# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )
 )
     Plaintiff, )    Civil Action No. 00-684
 )
     v. )
 )    Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP, )
 )
     Defendant. )

## THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF
## UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

Laura E. Ellsworth (PA #39555)
James M. Jones (PA #81295)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

## **TABLE OF CONTENTS**

Responsive Statement of Facts ...................................................................................1

I.    Background ...................................................................................................1

II.   Imputation ....................................................................................................3

III.  Audit Interference ......................................................................................15

IV.   Causation....................................................................................................42

V.    The Centennial Estate ................................................................................55

VI.   The Breach of Contract Claim ...................................................................62

Statement of Additional Material Facts .......................................................................66

I.    Imputation ..................................................................................................66

II.   Audit Interference ......................................................................................79

III.  Causation....................................................................................................95

IV.   The Centennial Estate ..............................................................................121

## THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF
## UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

Pursuant to Rule 56.1(C)(1) of the Local Rules of the United States District Court

for the Western District of Pennsylvania, plaintiff The Official Committee of Unsecured

Creditors of AHERF (the "Committee") responds as follows to PricewaterhouseCoopers LLP's

Statement of Undisputed and Material Facts. In addition, the Committee's Statement of

Additional Material Facts Under Local Rule 56.1(C)(1), set forth in paragraphs 226-411,

identifies other material facts that are at issue and/or necessary for this Court to determine PwC's

summary judgment motion. In accordance with Fed. R. Civ. P. 56 and Local Rule 56.1, the

admissions and denials set forth here apply only to whether the assertions at issue are undisputed

and/or material and are made only for purposes of summary judgment.[1]

## I.      BACKGROUND

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted, except the entity referred to as "Centennial" is Allegheny Hospitals,

Centennial ("AH-Centennial").

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

---

[1] PwC is the successor to Coopers and Lybrand, external auditors for AHERF and its affiliates. When discussing the auditing and other professional services the defendant provided to AHERF, the Committee will refer to the defendant as "Coopers." When referring to legal and factual positions the defendant has asserted throughout AHERF's bankruptcy and the instant matter, the Committee will refer to PwC.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Admitted.

17.    Admitted.  The Centennial hospitals were part of Graduate Health System, Inc. ("GHS") until October 31, 1996, at which time the three GHS Subsidiaries that owned them were merged into SDN, Inc.  *See infra* ¶ 194.  On May 1, 1997, SDN, Inc., changed its name to AH-Centennial.  *See infra* ¶ 194.

18.    The Committee admits that there was no express assumption of liability for the bonds, but Bankruptcy Judge McCullough held as a matter of law that the bankrupt AHERF affiliates are liable for one another's obligations.  *See infra* ¶¶ 409-11.

19.    Admitted.

20.    Admitted.

21.    Admitted, except that the Centennial Obligated Group was AH-Centennial, the successor to SDN, Inc., which did not become obligated on GHS bonds until October 31, 1996.  *See infra* ¶ 194.

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted.

26.    Admitted.

27.     Admitted.

28.     Admitted.  The Committee filed its First Amended Complaint on April 16, 2001.

## II.    IMPUTATION

29.     Admitted.

30.     Admitted, except Mr. Adamczak did not assume Mr. Spargo's position when Mr. Spargo left AHERF in June of 1997.  *See infra* ¶ 31.

31.     Admitted, except Mr. Adamczak did not assume all of Mr. Spargo's job responsibilities when Mr. Spargo left AHERF in June of 1997.  (Tab 1, Adamczak Dep. at 23-28).[2]

32.     Admitted.

33.     The Committee admits PwC accurately quoted Mr. Adamczak's deposition testimony but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee also denies the testimony is material.  Mr. Adamczak also testified he believed that Coopers was aware of the facts and circumstances underlying the concerns he had about the accuracy of AHERF's fiscal-year 1997 financial statements, such as the improper transfer of reserves between obligated groups.  *See infra* ¶ 136.

34.     The Committee admits PwC accurately quoted Mr. Spargo's deposition testimony in paragraph 34 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee also denies the testimony is material.  Coopers had access to the information necessary to determine whether the accounts receivable were fairly stated and there is no evidence Mr.

---

[2] Deposition transcript excerpts are attached behind Tab 1 in the Committee's Appendix in Support of Local Rule 56.1(C)(1) Fact Statement ("Com. Appdx."), arranged alphabetically by the deponents' surnames.  "Tab" cites refer to tabs in the Com. Appdx.

Spargo's concerns about accounts receivable interfered with Coopers' ability to conduct its audits in accordance with generally accepted auditing standards ("GAAS"), specifically its obligation to independently assess the reasonableness of AHERF's bad debt reserves. *See infra* ¶¶ 259-87.

Mr. Spargo also stressed that Coopers had been given the information it needed to determine whether AHERF's bad debt reserves were adequate:

> Q.    You knew that the auditors at Coopers & Lybrand were going to rely on those statements [in the management representation letter], right?
>
> A.    I knew they were going to be given everything they needed to make their own judgment.  That's what I really knew.
>
> * * *
>
> The bottom line is are they going to know what they need to determine what their audit opinion's going to be?  Absolutely. That's what that's [the management representation letter] all about.

(Spargo Dep. at 722; *see also infra* ¶¶ 259-87, 299-301).

Mr. Spargo further testified:

> Q.    . . . Is there any doubt in your mind that Coopers & Lybrand knew about the inaccuracies that you did happen to point out . . . in regard to the management representation letter for fiscal year 1996 --
>
> MR. RYAN:  Objection.
>
> * * *
>
> A.    Oh, yes, they knew, sure.
>
> Q.    They knew those facts from conversations with you and your staff?
>
> MR. RYAN:  Objection.
>
> A.    Yes, yes.
>
> Q.    And through documents provided to them?
>
> MR. RYAN:  Objection.

A.    Absolutely.

Q.    And from access to other information, electronic and otherwise?

MR. RYAN:  Objection.

A.    Yes.

Q.    Telling them what they already knew to you would seem
unnecessary; is that fair to say?

MR. RYAN:  Objection.

A.    Well, yeah.  They already knew it.

Q.    And you believed they did?

A.    I know they did.

(Spargo Dep. at 927-28).

35.    The Committee denies the facts in paragraph 35 are undisputed.  The Committee
admits that Messrs. Adamczak and Cancelmi testified that Mr. McConnell directed certain of the
"improper accounting entries."  (*E.g.*, Tab 2, Ex. 1597[3]; Adamczak Dep. at 773-74).  The
evidence cited by PwC addresses only "the Graduate reserve transfers," "AHERF's two sets of
financial results," and "classification of the Lockhart trusts."  (Ex. 1597).  The Committee has
alleged, and the Committee's experts have provided opinions to support, additional, material
improper accounting and auditing failures.  (Tab 3, Expert Report of Robert W. Berliner (dated
9/3/04) ("Berliner Rpt.")[4]; Expert Report of D. Paul Regan (dated 9/2/04) ("Regan Rpt."); Tab 4,
Pl. Resp. to Def. Second Set of Interrogs. (dated 5/7/04) at 10-30).[5]  These include improper
accounting, auditing and/or classification of:  tort settlements; long-term debt; intercompany

---

[3]  Deposition exhibits (and exhibit excerpts) are attached behind Tab 2 in the Com. Appdx., arranged in
ascending numerical order.

[4]  Reports of the parties' experts (and cited report exhibits) are attached behind Tab 3 in the Com. Appdx.,
arranged alphabetically by the experts' surnames.  The Committee's expert reports are accompanied by Declarations
from the experts.

[5]  Excerpts of discovery responses and pleadings served in this matter are attached behind Tab 4 of the
Com. Appdx., arranged chronologically by service date.

receivables and payables; the use of "cushions" or "excess reserves" to manage earnings;

depreciation recapture; sale and leaseback of an office building; deferred revenue; and

capitalization of interest.

        PwC has not provided evidence that Mr. Abdelhak knew of all the "improper

accounting entries" raised in its motion or that Mr. Abdelhak knew the accounting entries made

were improper.  The evidence cited by PwC relating to Mr. Abdelhak are schedules showing

various instances of AHERF using "cushions" to improve income, including certain "transfers

from Graduate."  (Exs. 1101, 1597, 1598; Adamczak Dep. at 773-75, 777-78, 784).  These

schedules do not establish Mr. Abdelhak was aware of "the improper accounting entries" raised

in PwC's motion, much less all of them.

      36.    Admitted.

      37.    PwC does not state material or undisputed facts in paragraph 37, but rather posits

inferences it would have this Court draw about Messrs. Abdelhak and McConnell's state of

mind, which inferences are properly left to the jury; therefore, no response should be required.

To the extent paragraph 37 could be read to state undisputed or material facts and to the extent it

relates to PwC's imputation defense, the Committee denies Messrs. Abdelhak and McConnell

acted in what they believed were the best interests of AHERF.  *See infra* ¶¶ 38, 226-40.  The

Committee further denies the deposition testimony cited by PwC in paragraph 37 is material as it

has no connection to the financial reporting misconduct PwC seeks to impute.  For example,

Debra Caplan's testimony that Mr. Abdelhak "did care very deeply about AHERF" is not

probative of the motivations underlying the financial misconduct at issue.  PwC has not

established the witnesses cited in paragraph 37 were aware of the relevant financial reporting

misconduct, and thus able to opine on what motivated that misconduct.  Other AHERF witnesses

have criticized Messrs. Abdelhak and McConnell and questioned their motivations,

trustworthiness, and honesty.  For example, Mr. Sanzo testified Mr. Abdelhak "was definitely

motivated by what his accomplishments may mean financially to him."  (Sanzo Dep. at 358; *see*

*also* McNair Dep. at 300, 307-08; Moyer Dep. at 202-04).

        38.     The Committee denies the facts in paragraph 38 are undisputed.  Senior

management at AHERF utilized assets for personal purposes.  For example, Carol Calvert,

President of Allegheny University Medical Practices ("AUMP"), confirmed at her sentencing

hearing that she had affairs with both Mr. Abdelhak and Mr. McConnell.  (Tab 5, Government's

Arraignment and Plea Memorandum (dated 6/9/03) at 4, Transcript of Sentencing of Carol

Calvert (dated 9/17/03) at 19[6]; *see also* Adamczak Dep. at 495-97; Harrington Dep. at 171-73;

Spargo Dep. at 480-81).  Later, utilizing AHERF funds, Mr. Abdelhak directed a payment of

$1.6 million to Ms. Calvert to settle a threatened tort claim for intentional infliction of emotional

distress.  (Ex. 2172; Antol Dep. at 21-22).  To negotiate this "settlement," Mr. McConnell's law

firm represented Ms. Calvert.  (Antol Dep. at 10).  Counsel for Ms. Calvert provided Mr.

Abdelhak with a draft demand letter seeking his comments before sending the final version.  (*Id.*

at 15-16; Ex. 2171).  At the same time, AHERF entered into a "consulting agreement" with Ms.

Calvert paying her $300,000 over ten months, even though she did not perform any work.  (Ex.

2174; Antol Dep. at 25-26; Tab 5, Transcript of Plea Hearing of Carol Calvert (dated 6/10/03) at

22-23).  Instead of expensing the settlement with Ms. Calvert, AHERF capitalized it as an

"asset."  (Ex. 193; Adamczak Dep. at 493).

        In addition, on the eve of bankruptcy, certain senior executives, including Messrs.

Abdelhak and McConnell, withdrew nearly $6 million in benefits held in a "KESOP" executive-

benefit program, even though some portion of those benefits had not yet vested and even though

---

[6]  Certain publicly filed documents and other documents produced by PwC and third parties throughout
AHERF's bankruptcy were obtained by the Committee during the course of this litigation and are included in the

funding the KESOP program would endanger AHERF's ability to meet payroll. (Exs. 2494, 2487; Kasperbauer Dep. at 159-62; Tab 6, DC2587-88[7]).

AHERF senior management, including Messrs. Abdelhak and McConnell, used AHERF funds to pay for lavish vacations, usually styled as "retreats" or "business travel," to the Cayman Islands, Reykjavik, Copenhagen, Scotland, Paris, Rome, London, and other "incredible venues," and private suites for sporting events and memberships at elite social clubs. (Kennedy Dep. at 231-238; Kasperbauer Dep. at 73-79; McNair Dep. at 301). For example, Mr. Abdelhak and others reportedly took a week and a half "business trip" to the northwestern coast of Scotland that was nothing more than a vacation on AHERF's dollar. (McNair Dep. at 131).

AHERF managers used the AHERF corporate jets for personal travel. (Kasperbauer Dep. at 171-72).

Moreover, in both fiscal-years 1996 and 1997, AHERF managers directed accounting entries that masked AHERF's deteriorating financial performance and condition. (Tab 4, Pl. Resp. to Def. Second Set of Interrogs. at 10-30). These actions allowed senior managers to collect substantial incentive compensation awards and to continue receiving exorbitant salaries and bonuses. *See infra* ¶¶ 226-36.

In August 2002, Mr. Abdelhak did not contest a criminal charge of misapplication of entrusted property, brought by the Attorney General of Pennsylvania, based on the allegation that Mr. Abdelhak sent a $50,000 check (signed by Mr. McConnell) from AHERF to his son's school to fund the expansion of the school's locker room. (Tab 8, Guilty Plea -- Explanation of

---

(continued…)

Com. Appdx. at separately numbered tabs. These documents are attested to in the sworn Declaration of John G. Unice (attached at Tab 7).

[7] Certain documents created by and/or produced from the files of AHERF or former AHERF employees were obtained by the Committee during the course of this litigation and are included in the Com. Appdx., at separately numbered tabs. These documents are attested to in the sworn Declaration of Charles P. Morrison (attached at Tab 12).

Defendant's Rights (dated 8/29/2002), Opinion of Robert E. Dauer, Sr. J. (dated 5/10/01) at 9-10), Grand Jury Indictment (dated 3/15/00) at 10-11, 18).

39.     PwC does not state material or undisputed facts in paragraph 39, but rather posits inferences it would have this Court draw about the states of mind of those individuals involved in the accounting misstatements at issue, which inferences are properly left to the jury; therefore, no response should be required.

        To the extent paragraph 39 could be read to state undisputed or material facts, the Committee denies PwC's statement in paragraph 39 that there "is no evidence that personal compensation motivated the accounting misstatements at issue." The evidence establishing that personal compensation motivated the accounting misstatements at issue is catalogued *infra* at ¶¶ 226-40. *See also supra* ¶ 38.

40.     Denied. Mr. Kasperbauer, AHERF's Chief Human Resources Officers, testified that certain bonuses were paid at Mr. Abdelhak's direction, including to Mr. McConnell, without notice to Mr. Kasperbauer and without proper approvals. (Kasperbauer Dep. at 139-42). Further responding, while the Compensation Committee approved salary increases and compensation payments, the approvals were based on AHERF's misstated financial statements.

41.     The Committee admits that the fact of the filing is undisputed but denies that it is material to PwC's defenses. *See infra* ¶ 42.

42.     The Committee admits that the fact of the entry of Judge Novak's order is undisputed but denies that it is material to PwC's defenses. Judge Novak's findings about whether Mr. Abdelhak acted with criminal intent when he ordered the liquidation of trust funds in the Spring of 1998 to pay the operational expenses of AHERF hospitals has no connection to the underlying financial reporting misconduct at issue in this case.

43.     The Committee admits the asserted facts in paragraph 43 are not now disputed but denies that they are material to PwC's defenses.  *See supra* ¶ 42.

44.     The Committee admits PwC accurately quoted from Mr. Daniel's deposition testimony but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee also denies the testimony in paragraph 44 is material because it has no connection to the financial reporting misconduct PwC seeks to impute.  If AHERF's Board or Audit Committee members had received accurate information regarding AHERF's financial condition and results of operations, or the financial misconduct PwC seeks to impute, they would have taken corrective action.  *See infra* ¶¶ 147, 150-52, 326-43.  As explained by Myles Turtz, a former Executive Vice President for System Development at AHERF and the former Chief Executive Officer of the United Hospitals (including the Bucks County ("Bucks"), Elkins Park ("Elkins") and St. Christopher's Hospital for Children ("St. Christopher's") hospitals), it is not uncommon for not-for-profit board members to defer to management until they become aware of serious financial problems.  (Turtz Dep. at 381-83, 449-51).  But "when you are in trouble," Mr. Turtz continued, "all the boards pay attention."  (*Id.* at 382).

Moreover, Coopers, which served as the outside auditors for AHERF and its predecessors for over a century before AHERF's bankruptcy filing, was obligated to plan its financial-statement audits taking into account the control environment at AHERF, including management's "operating style," integrity, and ethical values.  (Ex. 2024, 10/30/97 AHERF Board meeting minutes at GOV 71631; Ebert Dep. at 48-49; Tab 10, AU § 319.34).[8]

---

[8]  Certain professional standards promulgated by the American Institute of Certified Public Accountants ("AICPA"), denoted as "AU" sections, are located behind Tab 10 of the Com. Appdx. in ascending numerical order.

45.    The Committee admits PwC accurately quoted from Mr. Allyn's deposition testimony in paragraph 45 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee also denies the testimony in paragraph 45 is material.  *See supra ¶ 44; infra ¶¶ 147, 150-52, 326-43.*

46.    Denied.  AHERF Board members testified Mr. Abdelhak was receptive to others' suggestions.  (Davenport Dep. at 89 (Mr. Abdelhak "was solicitous of board members"); Fletcher Dep. at 123 (Mr. Abdelhak was open to other peoples' suggestions); Murasko Dep. at 167 (found Mr. Abdelhak "more willing to listen than many people at the top")).  Furthermore, the Committee denies any inferences or conclusions PwC would have this Court draw from the excerpted testimony in paragraph 46 and that the testimony is material.  *See supra ¶ 44; infra ¶¶ 147, 150-52, 326-43.*

47.    The Committee admits PwC accurately quoted from Dr. Victor's deposition testimony in paragraph 47 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee also denies the testimony in paragraph 47 is material.  *See supra ¶ 44; infra ¶¶ 147, 150-52, 326-43.*

48.    Denied.  The Committee denies PwC's characterization that "[m]any" trustees perceived that Mr. Abdelhak dominated the Board.  For example, Leslie Ann Miller testified

> Sherif and I enjoyed a healthy sparring relationship throughout my tenure.  I mean, he knew that I was going to be an ongoing bur in his saddle, a polite one, and I think that he ultimately respected me. . . . I think the fact that he not only kept me on the board but put me in positions of responsibility demonstrated that, but he knew that I was not a yes person.  But we battled regularly.

(Miller Dep. at 29).  The Committee also denies the testimony in paragraph 48 is material.  *See supra ¶ 44; infra ¶¶ 147, 150-52, 307, 326-43.*

49.     The Committee admits that available official Board minutes may not reflect trustee dissent from official actions taken but denies that the evidence cited by PwC supports the inference that there was no dissent expressed at Board meetings.  *See infra ¶* 59.  Further responding, the Committee denies that what the available Board minutes may reflect about the expression of dissent is material to how the Board would have reacted to a disclosure of financial misstatements or management fraud.  Rather, AHERF Board members would have acted to remedy a disclosure by Coopers of financial misstatements or management fraud.  *See supra* ¶ 44; *infra* ¶¶ 147, 150-52, 326-43.

50.     The Committee admits PwC accurately quoted from Dr. Spielvogel's deposition testimony in paragraph 50 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee also denies the testimony in paragraph 50 is material.  *See supra* ¶ 44; *infra* ¶¶ 147, 150-52, 326-43.

51.     The Committee admits PwC accurately quoted from Ms. Miller's testimony and Ms. Miller's 1995 trustee evaluation but denies PwC's characterization of that material and any inferences or conclusions PwC would have this Court draw from the excerpted material.  The Committee also denies the testimony and document cited in paragraph 51 are material.  *See supra* ¶ 44; *infra* ¶¶ 147, 150-52, 326-43.

52.     The Committee admits PwC accurately quoted from the document cited in paragraph 52 but denies PwC's characterization of that document and any inferences or conclusions PwC would have this Court draw from the excerpted material.  The Committee also denies the information in paragraph 52 is material.  *See supra* ¶ 44; *infra* ¶¶ 147, 150-52, 326-43.  Furthermore, Jules Blake was not a member of the AHERF Board and his purported comments do not relate to the AHERF Board.

53.     The Committee admits PwC accurately quoted from the Committee's allegations in the Director and Officer Action in paragraph 53 but denies PwC's characterization of the allegations and any inferences or conclusions PwC would have this Court draw from the excerpted allegations.  The Committee denies the facts in paragraph 53 are material.  The Committee has not alleged AHERF's Board members were aware of misstatements in AHERF's financial statements or that these Board members were unable or unwilling to seek correction of such misstatements had they become aware of them.  The Committee has alleged otherwise. (Tab 4, First Am. Comp. at ¶¶ 45-47, 53-56).  Had Coopers performed its audits in accordance with GAAS, AHERF's Board members could and would have taken the steps necessary to remedy misstatements in AHERF's financial reporting.  *See infra* ¶¶ 147, 150-52, 326-43.

54.     The Committee admits PwC accurately quoted from the Committee's interrogatory responses in paragraph 54 but denies PwC's characterization of the responses and any inferences or conclusions PwC would have this Court draw from the excerpted responses. The Committee denies the facts in paragraph 54 are material.  *See supra* ¶ 53.

55.     The Committee admits PwC accurately quoted from the Committee's interrogatory responses in paragraph 54 but denies PwC's characterization of the responses and any inferences or conclusions PwC would have this Court draw from the excerpted responses. The Committee denies the facts in paragraph 55 are material.  *See supra* ¶ 53.

56.     Denied.  The August 1996 public announcement of SDN's transaction with GHS preceded the effective date SDN's merger with these GHS subsidiaries (October 31, 1996) by over two months.  *See infra* ¶ 194.  In addition, PwC's citation to Claire Gargalli's testimony is misplaced, as she was not an AHERF Board member when the merger was announced or completed.  (Ex. 2056, 6/21/96 AHERF Board meeting minutes at GOV 53197; Ex. 832,

12/12/96 AHERF Board meeting minutes at PR-1-740; Gumberg Dep. at 314, 324-25). The

Board's Executive Committee authorized the SDN transaction with GHS. *See infra* ¶ 195.

57.     The Committee admits PwC accurately quoted from Dr. Brown's deposition

testimony in paragraph 57 but denies PwC's characterization of that testimony and any

inferences or conclusions PwC would have this Court draw from the excerpted testimony. The

Committee also denies the information in paragraph 57 is material. *See supra* ¶ 44. By way of

further response, Dr. Brown also testified that, after the potential transaction with GHS was

announced in August 1996, Mr. Abdelhak represented the acquisition of the former GHS

hospitals "would not jeopardize the AHERF financial stricture" and "regularly assured" the

Board that "while there was a lot of work to be done, it could be done." (Brown Dep. at 39, 176-

77).

58.     The Committee admits that the phrases quoted in paragraph 58 were used or

adopted by the referenced deponents in their testimony and denies that the "Graduate

transaction" was perceived as indicated or that the acquisition would have moved forward with

accurate and timely financial reporting. *See supra* ¶ 44; *infra* ¶¶ 147, 150-52, 326-43.

59.     Denied. Dr. Brown could not recall -- one way or the other -- whether any

trustees dissented on the final acquisition of the GHS hospitals. (Brown Dep. at 48). Dr.

Atkinson testified she "probably" *did* express her concerns about the acquisition and that other

trustees "might have" raised their concerns, too. (Atkinson Dep. at 65-66). Mr. Palmer recalled

expressing his concerns at a Board meeting and believed Dr. Brown expressed her concerns, as

well. (Palmer Dep. at 114-15). The excerpt from Dr. Kaye's deposition cited by PwC is

unrelated to the GHS hospitals acquisition. (Kaye Dep. at 101).

60.     The Committee admits PwC accurately quoted from Mr. Orlikoff's report, but

denies the accuracy, materiality, and admissibility of Mr. Orlikoff's opinion that Mr. Abdelhak

dominated the Board "so the board could not and did not act." Mr. Orlikoff's opinion is not a proper subject for expert testimony. (Tab 4, Committee's Motion to Exclude Certain Testimony From PricewaterhouseCoopers' Experts at 11-12).

61.     The Committee admits it retained Mr. Schwartz and that he read Mr. Orlikoff's report, but denies the facts in paragraph 61 are material. *See infra* ¶ 62.

62.     The Committee admits that Mr. Schwartz has not opined on the precise question "whether the AHERF Board was dominated by Mr. Abdelhak or senior management generally" but denies the facts in paragraph 62 are material. Mr. Schwartz was retained by the Committee "to provide expert testimony regarding the appropriate manner in which the [AHERF Board], and/or committees thereof, would have been expected and required to carry out their fiduciary obligations with respect to overseeing the financial affairs of AHERF during the 1996-1997 time period." (Tab 3, Expert Report of James R. Schwartz (dated 1/10/05) at 2-3).

## III.    AUDIT INTERFERENCE

63.     The Committee admits PwC has referenced certain of Coopers' AHERF engagement letters, the terms of which speak for themselves, and that those letters refer to audit scope and other matters. Responding further, Coopers was required to conduct its audits in accordance with GAAS and other professional standards.

64.     Admitted. In addition to its audit report on AHERF's consolidated fiscal-year 1997 financial statements, Coopers agreed to provide, and did provide, a "Report of Independent Accountants on Consolidating and Combining Financial Information." (Ex. 58 at TN CBC 43B00920; Cancelmi Dep. at 861). This report stated, among other things, that "[t]he supplementary consolidating financial information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in our opinion, is fairly stated,

in all material respects, in relation to the consolidated financial statements taken as a whole."
(*Id.*).

65.    The Committee admits PwC accurately quoted from the engagement letter referenced in paragraph 65 but denies PwC's characterization of the letter and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the letter.  The Committee denies the facts in paragraph 65 are material.  Coopers' audit failures were not caused by limitations inherent in the audit process or by "concealment through collusion and forgery." (Regan Dep. at 150).

66.    The Committee admits PwC accurately quoted from the engagement letters in paragraph 66 but denies PwC's characterization of the letters and any inferences or conclusions PwC would have this Court draw from the excerpted portions of the letters.  The Committee denies the facts in paragraph 66 are material.  The management representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  *See infra* ¶¶ 299-301.

67.    Admitted.  *See supra* ¶¶ 65-66.

68.    The Committee admits that the referenced AICPA standards applied to management members who were CPAs, including Messrs. Spargo, Adamczak, and Cancelmi. The Committee denies the facts in paragraph 68 are material.  Any failure by AHERF employees to follow AICPA professional standards did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  *See infra* ¶¶ 256-301.

69.    Admitted.

70.    Admitted.

71.    Admitted.

72.    Admitted.

73.    Admitted.

74.    Admitted.  In addition, the bad debt reserve methodologies used by Mr. Berliner include a methodology based upon the bad debt reserve methodology used by Allegheny General Hospital ("AGH").  Mr. Berliner modified the methodology to more conservatively reserve certain old accounts.  (Berliner Rpt. at 2-15–2.16).

75.    Denied.  Messrs. Adamczak and Spargo testified that AHERF accountants and Coopers auditors agreed that DVOG bad debt reserves were understated at the end of Coopers' 1996 audit.  *See infra* ¶¶ 265-67.  Moreover, AHERF accountants have testified that they had extensive discussions with Coopers during the fiscal-year 1996 audit about the inadequacies in the bad debt reserve methodologies utilized by the DVOG entities, concerns over the collectibility of old receivables, and the need for Coopers to extensively audit the patient receivables area.  *See infra* ¶¶ 268-71.  Other witnesses have testified that, had Coopers inquired of their views about bad debts, they would have expressed their concerns.  *See infra* ¶¶ 76, 272.

76.    The Committee admits PwC accurately quoted from Mr. Snow's deposition testimony in paragraph 76 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. Coopers did not ask Mr. Snow or others in the billing department to share their views on the collectibility of receivables or associated accounting issues.  (Snow Dep. at 103-04, 116-20, 211-12, 274-75).  *See also infra* ¶ 273.

When Mr. Snow was asked why he did not inform Coopers of limitations on his ability to write-off old and uncollectible receivables, he testified:  "Number one, as I previously stated, if I had divulged that information directly, I would have been, in my opinion -- I would have been terminated.  And the second thing, they never asked."  (Snow Dep. at 407). According to Mr. Snow, it "should have been readily apparent by looking at the aging that there

was a substantial portion of the A/R over 90 days old and also in this particular case over 365 days old." (*Id.* at 428).

There is no evidence Mr. Snow or others in the billing department provided Coopers with inaccurate information or otherwise interfered with Coopers' ability to conduct its audits in accordance with GAAS. To the contrary, Mr. Snow stated the billing department provided Coopers "whatever we were asked for" and that he likely would have provided additional information if Coopers had asked for it. (*Id.* at 210, 218).

77.     The Committee admits PwC accurately quoted from Mr. Snow's deposition testimony in paragraph 77 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. The Committee denies the facts in paragraph 78 are material. *See supra* ¶ 76.

78.     The Committee admits the facts asserted in paragraph 78 are not now disputed but denies that they are material. The facts alleged in paragraph 78 did not interfere with Coopers' ability to conduct its audit in accordance with GAAS, specifically its obligation to independently assess the reasonableness of AHERF's bad debt reserves. *See supra* ¶¶ 34, 76; *infra* ¶¶ 259-87.

79.     The Committee admits the facts asserted in paragraph 79 are not now disputed but denies that they are material. *See supra* ¶¶ 34, 76, 78; *infra* ¶¶ 259-87.

80.     The Committee admits PwC accurately quoted from Mr. Spargo's deposition testimony in paragraph 80 and that the other facts asserted therein are not now disputed but denies PwC's characterization of testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. The Committee denies that the summary of Mr. Cancelmi's testimony is complete and accurate and further denies any inferences and conclusions PwC would have this Court draw from Mr. Cancelmi's or Mr. McConnell's testimony. Messrs. Spargo and Cancelmi testified only that they did not recall discussing the

-18-

proposed write-off of DVOG accounts receivable with, or providing Mr. Cancelmi's September 20, 1996 and September 24, 1996 memoranda to, Coopers, not that they did not tell Coopers of those facts.  (Cancelmi Dep. at 1384-86; Spargo Dep. at 219-20).  Mr. Cancelmi testified the plan to write-off old receivables "may have been brought to Bill[] [Buettner's] attention" before the October 1996 Audit Committee meeting and that, "I certainly don't remember it being some, you know, secret."  (Cancelmi Dep. at 1385-86).  The facts alleged in paragraph 80 did not interfere with Coopers' ability to conduct its audit in accordance with GAAS, specifically its obligation to independently assess the reasonableness of AHERF's bad debt reserves.  *See supra* ¶¶ 34, 76; *infra* ¶¶ 259-87.

81.    The Committee admits the 1996 management representation letter was signed and delivered as asserted and denies the facts in paragraph 81 are material.  The management representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  *See supra* ¶34; *infra* ¶¶ 299-301.

82.    The Committee admits PwC accurately quoted from the management representation letter in paragraph 82 but denies PwC's characterization of the letter and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the letter.  The Committee denies the facts in paragraph 82 are material.  The management representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS, specifically its obligation to independently assess the reasonableness of AHERF's bad debt reserves.  *See supra* ¶ 34; *infra* ¶¶ 259-87, 299-301.

83.    The Committee admits PwC accurately quoted Mr. Spargo's deposition testimony in paragraph 83 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee denies the facts in paragraph 83 are material.  The management representation letters did not

interfere with Coopers' ability to conduct its audits in accordance with GAAS, specifically its obligation to independently assess the reasonableness of AHERF's bad debt reserves. *See supra* ¶ 34; *infra* ¶¶ 259-87, 299-301. The Committee denies all relevant individuals within "AHERF management" knew that representations in the 1996 management representation letter were false at the time they were made or that Mr. Spargo knew that any representations were false beyond the one concerning receivables, which is the subject of his testimonial excerpt. *See supra* ¶ 35; *infra* ¶ 136.

84.    Admitted.

85.    The Committee admits the facts in paragraph 85 are material and, with one exception, that they are now undisputed. Mr. Cancelmi's April 14, 1997, memorandum indicated $50 million of bad debt reserves would be established on the books of the Graduate hospitals by recording restructuring expenses before AHERF became the sole member of SDN and those hospitals were included within AHERF's consolidated financial results. (Ex. 8 at CLIS 0168; Cancelmi Dep. at 732). A decision was later made to establish the $50 million of reserves through purchase accounting instead of through restructuring expenses. (Ex. 154 at DBR-RS-0287; Cancelmi Dep. at 781). The idea to change the accounting came from William Buettner, the Coopers Engagement Partner on the AHERF audits. (Adamczak Dep. at 259-60, 275-78, 304-05; Cancelmi Dep. at 208-12). Coopers audit Manager Mark Kirstein's handwritten notes of conference calls in April 1997 between Mr. Cancelmi and Coopers auditors indicate this change was discussed. (Ex. 4436 at PWCK2 44, PWCK2 45; Frazier Dep. at 598). Mr. Buettner and Amy Frazier, the other Coopers Manager on the AHERF audit, are listed in Mr. Kirstein's notes as attending at least one of the conference calls. (Ex. 4436 at PWCK2 45).

86.    Admitted.

87.    Admitted.

88.    Admitted.  *See infra* ¶¶ 243-55.

89.    Denied.  While Coopers auditors testified they did not approve the $50 million

transaction, but rather determined it was an immaterial violation of generally accepted

accounting principles ("GAAP"), the evidence is otherwise.  In any event, the violation of GAAP

was material.  (Berliner Rpt. at 4-16–4-22; Regan Rpt. at 80).

(a)    Coopers knew about, did not object to, and, indeed, encouraged the

$50 million transfer before AHERF recorded it.  *See infra* ¶¶ 243-55.  Coopers' working papers

make no mention of Coopers disapproving of the transfer, finding it to be a violation of GAAP,

conveying Coopers' disapproval to AHERF management, or requesting management to reverse

the transaction, as Mr. Buettner now claims.  (Buettner Dep. at 616-17).  Coopers did not inform

the AHERF Audit Committee or any AHERF Board member of its supposed disapproval of the

$50 million transaction.  (*Id.* at 619-20).  Even when asked about $99 million of Graduate

reserve transfers to DVOG in a June 1998 Audit Committee meeting, Mr. Buettner failed to

discuss the issue and Coopers' knowledge of the $50 million reserve transfer.  (*Id.* at 781-84).

(b)    Coopers' working papers do not reflect either a determination that the $50

million transfer did not result in a material misstatement or any detailed analysis to support such

a determination.  The only evidence of such an evaluation -- on a *$50 million* transaction -- are

two pages of handwritten notes by Mr. Buettner, contained within his copy of an October 1,

1997, audit update document.  These notes were prepared long after the transfer and reflect Mr.

Buettner's purported analysis that the $50 million was not needed to fix a bad debt reserve

shortfall.  (Ex. 4473 at CL 036438-39; Buettner Dep. at 604-07).  However, key elements of Mr.

Buettner's after-the-fact analysis are not supported by working papers or other material created

during the 1997 audit and, in some cases, are in conflict with the 1997 working papers.  For

example, Mr. Buettner's "analysis" uses supposed "excess contractual allowance" reserves at

DVOG in his finding that the $50 million of reserves transferred from the GHS hospitals were not needed. (Ex. 4473 at CL 036439; Buettner Dep. at 704-07). Coopers' 1997 working papers on DVOG's contractual allowances make no mention of "excess contractual allowances," and the Coopers staff auditor responsible for area, Kristen Heinlein, recalls no such discussion. (Heinlein Dep. at 332, 342). In fact, Coopers' working papers indicate the DVOG entities were *under-reserved* for contractual allowances, not over-reserved, and that Coopers was using supposed excess *bad debt* reserves to cover for shortfalls in *contractual allowance* accounts. (Ex. 4033 at CL 015498 (last paragraph); Ex. 4039 at CL 015527; Christian Dep. at 329-34, 424-25). Mr. Buettner's analysis is exactly the opposite, using supposed excess *contractual allowance* accounts for shortfalls in *bad debt* reserve accounts. (Ex. 4473 at CL 036439). The only materials supporting this figure are found in documents created in conjunction with a Coopers "A/R Review of 97 during FY 98," a "review" that occurred subsequent to Coopers' audit of the 1997 financial statements, after issues were raised about AHERF's financial statements. (Ex. 4446 at CL 138481, 138526-547; Frazier Dep. at 766-67).

(c)     Similarly, there are no documents created during the 1997 audit that support Mr. Buettner's $9 million reduction in AHERF's reserve needs because of "slow payments" from certain payors. (Ex. 4473 at CL 036439; Buettner Dep. at 726-29). Ms. Heinlein, the Coopers staff auditor in the accounts receivable area, recalls no such discussion of the "slow payments" issue or any quantification of it. (Heinlein Dep. at 217). Again, the only documentary evidence supporting the $9 million figure is found in the "A/R Review of 97 during FY98" file. (Ex. 4446 at CL 138458-65, 579-84).

(d)     In conjunction with its audits, Coopers prepared a "Summary of Unadjusted Differences," or "SUD." Mr. Buettner testified the SUD "is a Coopers & Lybrand tool that helps the staff meet the requirements of the statement and auditing procedures

concerning aggregation of what we would call audit misstatements. So the SUD is the vehicle that we use to aggregate what we consider to be misstatements to reach some sort of conclusion on materiality of those misstatements and then some sort of evaluation on whether the financial statements are fairly presented." (Buettner Dep. at 97). Coopers' 1997 SUD neither contains an evaluation of the $50 million transfer, nor any of the elements in Mr. Buettner's handwritten analysis. (Ex. 1079; Frazier Dep. at 435-36).

90.     Admitted.

91.     The Committee admits the facts asserted in paragraph 91 are not now disputed but denies the fact that Mr. Cancelmi's July 3, 1997, memorandum (Ex. 43) was not copied to Coopers is material. The existence of this memorandum did not interfere with Coopers' ability to conduct its audits in accordance with GAAS. Coopers either already knew about these transfers or should have learned of them through schedules provided by AHERF to Coopers and the application of appropriate auditing procedures. *See infra* ¶¶ 94, 95, 290-98.

92.     Admitted.

93.     The Committee admits AHERF witnesses have testified Mr. McConnell directed the $21 million and $28 million reserve transfers and that such direction is not now disputed.

(a)     The Committee admits the facts in this subparagraph are not now disputed but denies the fact that Mr. Cancelmi's June 20, 1997 memorandum (Ex. 41) was not copied to Coopers is material. The existence of this memorandum did not interfere with Coopers' ability to conduct its audits in accordance with GAAS. *See infra* ¶¶ 94, 95, 290-98.

(b)     The Committee admits PwC has accurately summarized Mr. Adamczak's testimony at pages 266-67 of his deposition but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the summarized testimony.

-23-

(c)     The Committee admits the transfer improved DVOG's reported net income for May 1997 over what it should have been, but denies PwC's characterization of Mr. Cancelmi's testimony and any inferences or conclusions PwC would have this Court draw from the referenced testimony.

(d)     The Committee admits PwC has accurately summarized Mr. Adamczak's testimony at pages 749-50 of his deposition but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the summarized testimony.

94.     Denied.  PwC misstates the testimony cited in paragraph 94 and fails to include testimony from AHERF witnesses that they did inform Coopers auditors of additional transfers beyond the initial $50 million of reserve transfers.  The Committee denies the testimony cited in paragraph 94 is material.  *See infra* ¶¶ 95, 290-98.

Mr. Cancelmi told Coopers the PFMA reserve had been transferred to DVOG:

Q.     And your statement is that you recall discussions with Coopers
       about the fact that the PFMA reserve, in fact, went to the DVOG?

A.     Yes.

       MR. RYAN:  Objection.

(Cancelmi Dep. at 301).  The PFMA reserves were used in both the $21 million and the $28 million reserve transfer.  (*Id.* at 281).

Mr. Cancelmi understood Coopers was aware of at least some of the reserve transfers making up the $28 million transfer, as they "had been discussed with Coopers or information made available to them that would suggest that those transfers had occurred."  (*Id.* at 318-19).  Mr. Cancelmi further testified:

My recollection is that certain of the reserves that were included in
the $28 million transfer, the questions had come up as to where
those reserves had gone.  And the ones that come to mind are like

-24-

maybe the PFMA reserve, I think the MA, there was an MR reserve or a Hill-Burton reserve.

I can't say specifically exactly which reserves may have been discussed. But there was certainly a number of reserves that were out there on the Graduate books. But then on June 30th they weren't there anymore because they had been transferred and were included as part of the 28.

(*Id.* at 321-22).

Mr. Cancelmi also testified that certain documents provided to Coopers would have signaled that AHERF had made transfers from specific Graduate reserve accounts. (*Id.* at 180-90, 290-301, 347-62).

Ms. Schaffer similarly recalled Coopers auditors asking questions on the whereabouts of certain Graduate reserves; she testified she would have told Coopers that the reserves had been transferred, had she been asked. (Schaffer Dep. at 282-83, 289-90, 322). Ms. Schaffer also stressed her belief that the additional transfers to bad debt reserves were evident in the bad debt roll-forward schedules and another document she provided to Coopers. (*Id.*; Ex. 125; Schaffer Dep. 246-47, 285-89). *See also infra* ¶¶ 103, 104. It was "her impression that they were very much aware of that just as they were of the 50 because no one ever asked me." (Schaffer Dep. at 720).

Mr. Adamczak understood Coopers was aware of and had approved all of the transfers between Graduate and DVOG. (Adamczak Dep. at 265-68, 790). He testified that Mr. McConnell told him Coopers was fine with transferring whatever reserves were necessary to address the shortfall in DVOG's bad debt reserves:

And at that point, I took it to David McConnell and said, "There's still a shortage of $20 million." And his comment was that, "We had discussed cleaning this up once and for all with" -- not "we," that he had discussed with Coopers once and for all cleaning this up.

> They were aware of it, they had approved the $50 million being moved, and that they would be fine with moving additional reserves to get the bad debt reserves where it needed to be.

(*Id.* at 264-65; *see also id.* at 317-25).

Mr. Lisman did not testify that AHERF employees did not inform Coopers of these transfers, only that he did not remember.  (Lisman Dep. at 165).

95.    Denied.  In addition to the evidence discussed in paragraph 94, *supra*, handwritten notes by Mr. Kirstein and Ms. Frazier of an August 22, 1997 Audit Update meeting indicate they were told the PFMA reserve had been transferred to the DVOG hospitals.  Ms. Frazier took the following note about the PFMA reserve:

> Reserves recorded in SDN.  Legal documentation indicates that GHS is obligated.  Transferred reserves of the books to DV

(Ex. 72; Frazier Dep. at 695).

In his notes of the August 22, 1997 Audit Update meeting Mr. Kirstein wrote:

> WHERE DID IT GO?

> Q.    NOT THROUGH INCOME/MOVED TO DV RESERVES FOR A/R

(Ex. 4403 at PWCK2 27; Kirstein Dep. at 589-91).

When asked if the notations indicate the reserve was to be transferred to the DVOG, Mr. Kirstein testified:  "I don't know what it means.  I mean, I don't remember the meaning. I don't know what I was thinking when I wrote the note, sitting here today, so I don't know what that interpretation would be."  (Kirstein Dep. at 724).

In addition to documents and testimony regarding the PFMA reserves, the circumstances surrounding the transfers beyond the initial $50 million transfer -- and the specific accounts impacted by those transfers -- indicate Coopers auditors were aware of many, if not all, of these additional reserve transfers.  *See infra ¶¶* 103-104, 290-98.

-26-

96.     The Committee admits that the assertions in paragraph 96 are not now disputed but denies PwC's characterization of the term "cheat sheets" and any inferences or conclusions PwC would have this Court draw from the testimony referenced in paragraph 96. The Committee also denies the facts in paragraph 96 are material. The fact that Mr. Cancelmi and Ms. Schaffer prepared schedules analyzing differences between gross and net patient service revenue is irrelevant to whether AHERF management interfered with Coopers' ability to conduct its audits in accordance with GAAS. The schedules were merely cited in Coopers' control testing, and there is no evidence Coopers used or otherwise relied upon them in its substantive audit testing. (Ex. 4284 at CL 016104; Ex. 4248 at PwC 010090, 095.A-.F; Heinlein Dep. at 78-79; Porter Dep. at 160-61). Coopers' own working papers identified these schedules as "cheat sheets." (Ex. 4248 at PwC 010090). Coopers' written audit requests did not include a request for copies of these documents. (Ex. 1312 at CANDEP 01347-48; Scharf Dep. at 86-87).

97.     The Committee admits the facts asserted in paragraph 97 are not now disputed but denies that they are material. *See supra* ¶ 96.

98.     The Committee admits the facts asserted in paragraph 98 are not now disputed but denies that they are material. *See supra* ¶ 96. The internal versions of the "cheat sheets" contained monthly figures. (*E.g.*, Ex. 303 at DLC NR 01 1858; Schaffer Dep. at 657-58). The explanatory footnotes that PwC complains were "stripped out" related to specific monthly figures. (*Id.*). The "cheat sheets" provided to Coopers did not purport to provide monthly figures under the headings "I/P Net Revenue per Admission," "I/P Gross Revenue per Admission," "I/P Net Revenue Per Day," and "I/P Gross Revenue Per Day." (*E.g.*, Ex. 313; Schaffer Dep. at 687-89). The Committee admits PwC accurately quoted from Mr. Cancelmi's deposition testimony in paragraph 98 but denies PwC's characterization of that testimony and

any inferences or conclusions PwC would have this Court draw from the excerpted testimony. *See infra* ¶ 99.

99.    The Committee admits PwC accurately quoted from Ms. Schaffer's deposition testimony in paragraph 99 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. Ms. Schaffer testified Coopers was provided "cheat sheets" that provided only full-year data because that was what Coopers had requested. (Schaffer Dep. at 685-87). The "stripped out" language used at the deposition was provided by counsel for PwC. Any implication that AHERF management removed information from internal schedules in order to deliberately mislead Coopers mischaracterizes the testimony of Ms. Schaffer and Mr. Cancelmi. The Committee denies the testimony quoted in paragraph 99 is material. *See also supra* ¶¶ 96, 98.

100.    The Committee admits PwC accurately quoted from Mr. Cancelmi's deposition testimony in paragraph 100 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. The Committee denies the testimony quoted in paragraph 100 is material. *See supra* ¶¶ 96, 98, 99.

101.    The Committee admits Mr. Cancelmi and Ms. Schaffer prepared schedules referred to as "bad debt roll-forward" schedules in connection with Coopers' audits of AHERF, but denies they "regularly" prepared these schedules.

102.    The Committee admits PwC accurately summarized Ms. Schaffer's testimony in paragraph 102 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this court draw from the summarized testimony. The Committee denies that Ms. Schaffer's edits to the bad debt roll-forward schedules were intended to mislead Coopers or that they are material and states further that the edits did not change the footnotes in any significant way.

103.    Denied.  Of the $21,265,000 of reserves transferred from Graduate to DVOG's bad debt reserve and related accounts, $1.2 million was transferred to DVOG to cover "Health Partners Deficits."  (Ex. 1548 at JD-DC0002522; Adamczak Dep. at 320).  That amount is therefore not reflected in the bad debt roll-forward schedules.  The $20,065,000 of reserves transferred to DVOG's bad debt reserve accounts were combined with the reclassification of $5,266,000 of reserves from within DVOG.  (*Id.* at JD-DC0002521).  AHERF used the combined reserves of $25,311,000 to cover a DVOG bad debt reserve shortfall that existed even after the initial $50 million transfer, and AHERF implemented these transfers and reclassifications at the same time.  (*Id.*; *see also* Adamczak Dep. at 264-65, 317-25).

Because $5,266,000 of the reserves did not come from Graduate, it would have been inaccurate to describe the June 1997 increases to DVOG's bad debt reserves as "transfer of reserves from Graduate."  Ms. Schaffer explained this at her deposition, and stated the "shortfall adjustment" language came from Mr. Cancelmi's July 3, 1997, memorandum, not any attempt to mislead Coopers.  (Schaffer Dep. at 602-03).

The "shortfall adjustments" language did not deceive the Coopers staff auditor charged with reviewing the roll-forward schedules, as the following exchange during Ms. Heinlein's deposition revealed:

Q.    Do you believe the phraseology bad debt shortfall adjustments was intended to hide the additional transfers from Coopers & Lybrand.

A.    I don't know.

Q.    Do you feel deceived as you sit here today?

A.    No.

Mr. McDonough:  Object to form.

(Heinlein Dep. at 173).

104.     Denied.  The testimony from Ms. Schaffer and Mr. Cancelmi cited by PwC does not support PwC's factual contention in paragraph 104.  The Coopers auditors who reviewed the roll-forwards would have known that the June increase to DVOG's bad debt reserves did not result from recording bad debt expense, the customary method of increasing bad debt reserves.  For example, the roll-forward for Hahnemann University Hospital ("Hahnemann") outpatient accounts shows an entry in the "Other" column for the month of June that increased reserves by $10,638,000, more than tripling the existing amount of reserves for those accounts.  (Ex. 291 at CL 013568.N; Schaffer Dep. at 610-11).  Footnote "d" indicates the increase was a "bad debt shortfall adjustment."  (*Id.*).  Coopers knew from this schedule and other working papers that the increase was not accompanied by a charge to bad debt expense.  Coopers' "Bad Debt Expense Analysis" working paper prepared by Ms. Heinlein, who reviewed the bad debt roll-forward schedules, indicated that Hahnemann charged only $4,469,295 of outpatient bad debt expense in fiscal-year 1997.  (Ex. 4248 at PwC 010162.A; Heinlein Dep. at 176-80; Porter Dep. at 160-61).

Similarly, the roll-forward for Elkins outpatient accounts shows an entry in the "Other" column for the month of June that increased reserves by $2,181,424, again more than tripling the existing amount of reserves for those accounts.  (Ex. 290 at CL 013556.M).  Footnote "j" indicates that some portion of the entry relates to a "($2,700,000) shortfall adjustment."  (*Id.*).  The "Bad Debt Provisions" column in the roll-forward shows only $120,277 in outpatient bad debt expense at Elkins for the month of June and only $1,540,931 for the entire year.  (*Id.*; *see also* Ex. 4248 at PwC 010162.A).

In addition, when Coopers auditors, including Ms. Heinlein, were reviewing the bad debt roll-forward schedules, they knew AHERF had already transferred $50 million of reserves from the Graduate hospitals to DVOG.  *See infra* ¶¶ 244-51.  These "transfers from Graduate" were also evident on the bad debt roll-forwards themselves.

105. Admitted.

106. The Committee admits the facts asserted in paragraph 106 are not now disputed but denies that they are material. The fact that Messrs. Adamczak and Cancelmi utilized the "X Files" to identify additional reserves from Graduate to increase DVOG's bad debt reserves is not material to whether AHERF management allegedly interfered with Coopers' ability to conduct its audits in accordance with GAAS.

107. Denied. The Committee denies the citations provided by PwC support the "facts" asserted in paragraph 107. Neither Mr. Cancelmi nor Mr. Lisman testified that they provided "X files" to Mr. Abdelhak. Mr. Cancelmi testified: "And I thought I had an understanding it went to Abdelhak, but I can't say for sure. I never gave it to him." (Cancelmi Dep. at 875). Mr. Lisman recalled that "X files" were copied to Mr. Abdelhak but he did not send the "X Files" to him. (Lisman Dep. at 206-11). The Committee denies the alleged facts in paragraph 107 are material. *See supra* ¶ 106.

108. Denied. Mr. Spargo testified that he recalled sharing and discussing the X Files with Coopers auditors, that there was no directive to hide the X Files from Coopers, and that Coopers and AHERF management discussed AHERF's use of "cushions" or "free reserves" at routine audit update meetings. (Spargo Dep. at 147-48, 150-52, 305-06). While Mr. Lisman testified he did not provide copies of the X Files to Coopers, he believed Coopers would have been aware of reserves listed on these files through its auditing. (Lisman Dep. at 205-07, 214). Mr. Cancelmi testified he did not recall whether he provided the X Files to Coopers, further adding: "I think it's fair to say Coopers & Lybrand was aware of what the issues were related to those reserves." (*Id.*). (Cancelmi Dep. at 845-46). The fact that AHERF kept track of excess reserves through the X Files did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.

109.    Admitted.

110.    The Committee admits PwC accurately quoted Mr. Cancelmi's deposition testimony in paragraph 110 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.

111.    The Committee admits the facts asserted in paragraph 111 are not now disputed but denies that they are material.  The absence of an adjustment to the "change in receivables" line on the statement of cash flows for additional Graduate reserve transfers did not interfere with Coopers' ability to conduct its audits in accordance with GAAS and is not evidence that AHERF management was attempting to deceive Coopers.  Mr. Cancelmi testified AHERF management never considered the issue of whether to adjust the statement of cash flows for the subsequent Graduate transfers to DVOG's bad debt accounts.  (Cancelmi Dep. at 916-20).

112.    The Committee admits PwC accurately quoted Mr. Adamczak's and Mr. Berliner's deposition testimony in paragraph 112 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee denies the facts in paragraph 112 are material.  *See supra* ¶ 111.

113.    The Committee admits the facts asserted in paragraph 113 are not now disputed but denies that they are material to Coopers' audit interference defense.  The fact that AHERF tracked the impact of using reserves and other accounting mechanisms to increase financial results is not material to whether AHERF management allegedly interfered with Coopers' ability to conduct its audits in accordance with GAAS.

114.    The Committee admits Mr. Adamczak testified that he directed the referenced documents to either Mr. Abdelhak and/or Mr. McConnell but denies the testimony is material to Coopers' audit interference defense.  *See supra* ¶ 113.

115.    Denied.  Mr. Cancelmi testified that he did not recall if he provided a copy of these internal AHERF schedules to Coopers auditors.  (Cancelmi Dep. at 889-90).  He testified others at AHERF may have provided the documents to Coopers.  The Committee denies the facts in paragraph 114 are material to Coopers' audit interference defense.  *See supra* ¶ 113.

116.    Admitted.

117.    Admitted.

118.    The Committee admits the facts asserted in paragraph 118 are not now disputed but denies that they are material to Coopers' audit interference defense and denies them as they might relate to the Lockhart Trusts.  There is no evidence that there was any difficulty locating full copies of pertinent endowment documents for the five Lockhart Trusts, the endowment funds at issue.  AHERF management provided Coopers with a binder or binders of trust documents for endowments in AHERF's Western Region.  (Panucci Dep. at 127-32).  Marc Panucci was the Coopers staff auditor assigned to the endowments area.  (*Id.* at 73, 79-80).  During the 1996 audit, Mr. Panucci was the only Coopers auditor to review the Lockhart Trust documents.  (Ex. 4109; Frazier Dep. at 384-86; Panucci Dep. at 191-93).

Mr. Panucci testified he did not recall "any discussion of a lack of documentation that was needed from the company" in order to audit whether AHERF had properly adopted Statements of Financial Accounting Standards ("FAS") Nos. 116 and 117 and that "[t]here was enough information contained within there to make that [classification] assessment."  (Panucci Dep. at 125-26; *see also id.* at 253-55).  While Mr. Panucci recalled there existed only old, incomplete documentation for some of the hundreds of investments held throughout the AHERF system, neither he nor Ms. Frazier recall if such issues related to the Lockhart Trusts.  (*Id.* at 254-55; Frazier Dep. at 384-385).

Mr. Panucci testified he received the binder(s) containing trust agreements for endowments in AHERF's Western Region, including at the parent level where the Lockhart Trusts were held, from Albert Zwirn, an AGH accountant. (Panucci Dep. at 130). Mr. Zwirn testified that he maintained a copy of the trust agreements for endowments in AHERF's Western Region. (Zwirn Dep. at 24-25). Mr. Zwirn identified Ex. 4111 as a copy of that binder. (*Id.* at 25-27). Ex. 4111 contains full copies of four of the five Lockhart trusts, the lone exception being a missing page from the "Lewis A. Park" trust, which trust represented approximately 7% of the collective value of the Lockhart Trusts. (*Id.* at 61; Ex. 4109).

Ex. 4111 contains the following language for the three "John Marshall Lockhart Trusts," account numbers 500-007, 500-017, and 500-022, relating to capital gains:

> In the case of the sale of any securities of the trust fund at a premium or profit, such premium or profit shall become a part of the corpus and not income.

(Ex. 4111). Coopers' "permanent file" for "Endowments" indicates that, for trusts held at the AHERF parent level, "copies of *full agreements* maintained by Al Zwirn, AGH accounting." (Ex. 4061 at CL 031944; Panucci Dep. at 210-12) (emphasis added).

119.    Admitted.

120.    Admitted.

121.    As understood by the Committee, paragraph 121 is denied. PwC's use of the language "classified the income" in the second sentence of paragraph 121 is vague. During fiscal-year 1996, AHERF recognized the realized and unrealized gains earned during that fiscal year on all five Lockhart Trusts. (Exs. 4109, 2295; Cancelmi Dep. at 1756-57). AHERF also recognized $4,478,000 of "assets released from restrictions" revenue during fiscal-year 1996 relating to three of the Lockhart Trusts, accounts 500-017, 500-022, and 505-208. (Ex. 2295). For fiscal-year 1996, AHERF classified the appreciation on two of the trusts as temporarily

-34-

restricted and on the other three trusts as unrestricted. (Exs. 4109, 19; Cancelmi Dep. at 1757-58).

122. Admitted.

123. Denied. Neither Mr. Panucci nor Ms. Frazier testified they were "unaware of the donor restriction on the capital gains in the Lockhart trust instruments." Mr. Panucci testified that he "d[id] not recall" whether he read or was otherwise aware of the donor restrictions on capital gains. (Panucci Dep. at 241-42, 263-64). When asked why some portion of the capital gains were classified as "temporarily restricted," Ms. Frazier testified: "I recall that the interpretation of the agreements were not clear as to whether or not the income was available for operations. It could be perceived that it would be and that, as a result, they felt that it was more conservative to classify items as temporarily restricted than to interpret the agreement as being fully unrestricted." (Frazier Dep. at 390-93). Ms. Frazier stated that, by "income," she was referring to "unrealized, realized gains and interest income, dividends and earnings. Essentially the cumulative earnings was how -- was the context of the discussion that it was everything in that pile." (*Id.*).

124. The Committee admits the facts asserted in paragraph 124 are not now disputed and that PwC accurately summarized Ms. Robinson's deposition testimony in paragraph 124 but denies the testimony in paragraph 124 is material to Coopers' audit interference defense. The meeting in late October 1996 was held after Coopers completed its audit of AHERF's 1996 financial statements and the meeting did not interfere with Coopers' ability to conduct its audits in accordance with GAAS. Coopers had access to all of the information it needed to audit whether AHERF accounted for the Lockhart Trusts in accordance with GAAP. Ms. Robinson testified that she would have answered any clarifying questions from Coopers or provided

Coopers with full copies of trust documents if requested; she routinely received such requests from auditors.  (Robinson Dep. at 174-82).  *See also supra* ¶¶ 118, 123.

125.   The Committee admits the facts asserted in paragraph 125 are not now disputed but denies that they are material to Coopers' audit interference defense.  Ms. Robinson's October 30, 1996 letter did not exist until after Coopers completed its audit of AHERF's fiscal-year 1996 financial statements and the existence of the letter did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  Coopers had access to all of the information it needed to audit whether AHERF accounted for the Lockhart Trusts in accordance with GAAP, including the language from the trust documentation that Ms. Robinson quoted in her October 30, 1996 letter.  *See supra* ¶¶ 118, 123.

126.   The Committee admits the facts asserted in paragraph 126 are not now disputed but denies that they are material to Coopers' audit interference defense.  The concerns of employees in management about the propriety of AHERF's classifications did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.

127.   The Committee admits PwC accurately quoted the note referred to in paragraph 127 but denies PwC's characterization of that note and any inferences or conclusions PwC would have this Court draw from the note.  The Committee denies the facts in paragraph 127 are material to Coopers' audit interference defense.  Mr. Spargo's note did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  Further responding, Mr. Spargo testified his handwritten comment was directed toward his frustration that Ms. Robinson's letter did not provide an answer to his overriding concern of whether AHERF could get access to the funds held in the Lockhart Trusts, as AHERF "desperately needed access to the funds," not a concern related to the accounting for the trusts.  (Spargo Dep. at 437-39).

128.    The Committee admits the facts asserted in paragraph 128 are not now disputed but denies the testimony referenced in paragraph 128 is material to Coopers' audit interference defense.  Mr. McConnell's alleged directives did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.

129.    Denied.  Messrs. Buettner and Panucci and Ms. Frazier testified only that they did not recall receiving a copy of Ms. Robinson's October 30, 1996, letter, not that AHERF did not raise questions or concerns about the classifications during the 1996 or 1997 audits.  *See supra* ¶¶ 123, 125.

130.    Denied.  The Committee admits Messrs. Spargo and Adamczak testified they did not provide a copy of Ms. Robinson's October 30, 1996 letter to Coopers, but denies that the remaining facts stated in paragraph 130 are undisputed and material.  Mr. Lydon testified to recalling a meeting with Mr. Panucci and Ms. Frazier about "what had been done for 117, particularly in regards to the Lockhart funds," and he recalled there was uncertainty about how to classify those funds.  (Lydon Dep. at 72-73, 127-30, 186-87).  Ms. Frazier also recalls uncertainly about the accounting for the Lockhart funds.  *See supra* ¶¶ 118, 123, 125.  Further responding, Mr. Spargo testified he was not aware of any effort within AHERF to "hide" the letter from Coopers.  (Spargo Dep. at 448).

131.    The Committee admits the facts asserted in paragraph 131 are not now disputed but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  The Committee denies the testimony referenced in paragraph 131 is material to Coopers' audit interference defense.  That testimony relates to calendar year 1998 and is not material to whether AHERF management interfered with Coopers' ability to conduct audits in accordance with GAAS.

132.     The Committee admits PwC accurately quoted Mr. Berliner's deposition testimony in paragraph 132 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. The testimony quoted in paragraph 132 is not material to whether AHERF management interfered with Coopers' ability to conduct its audits in accordance with GAAS. In his expert report, Mr. Berliner also opined, regarding Coopers' audit of the Lockhart Trusts:

> In summary, C&L violated SAS 22, 31, and 41 in that I have seen nothing in C&L's FY '96 and FY '97 audit workpapers to demonstrate that it performed any meaningful audit procedure to afford it a reasonable basis upon which to conclude, as it did, that the classifications of the trust assets were free from material misstatement. . . . C&L violated SAS 53 by failing to demonstrate the appropriate degree of professional skepticism in conducting this area of its FY'96 and FY'97 audits. C&L also violated SAS 19 in failing to corroborate Management's stated and implied assertions about the propriety of its treatment of the capital gains of the five irrevocable trusts in FY'96 and FY'97.

(Berliner Rpt. at 5-14; *see also* Berliner Dep. at 208-13).

133.     Denied. Mr. Zwirn, from whom Mr. Panucci received information relating to the Lockhart Trusts (Panucci Dep. at 130), testified that his binders were bound by a "metal fastener" at the left-side of the documents, not a loose-leaf three-ring binder. (Zwirn Dep. at 27, 73-74). As stated in paragraph 118, *supra*, there is no evidence Coopers did not receive complete and full copies at least of four of the five Lockhart Trusts, including the relevant donor restrictions on capital gains. No AHERF employee has testified that the Lockhart Trust documentation provided to Coopers was missing language related to donor restrictions.

134.     The Committee admits the facts asserted in paragraph 134 are not now disputed but denies that they are material to Coopers' audit interference defense. The management representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS. *See infra* ¶¶ 299-301.

135.    The Committee admits PwC accurately quoted from the management representation letters but denies the facts in paragraph 135 are material to Coopers' audit interference defense.  The management representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  *See infra* ¶¶ 299-301.

136.    The Committee admits the facts asserted in paragraph 136 are not now disputed but denies PwC's characterization of Mr. Adamczak's testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  While Mr. Adamczak had concerns that certain transactions may not have been properly accounted for, he relied upon Coopers' review, knowledge, and acceptance of the accounting treatments when he signed the management representation letter:

> Q.    Is part of any resolution of the apprehension you felt that occurred caused by comfort you took from Coopers & Lybrand's work in the audit process?
>
> MR. RYAN:  Objection
>
> A.    Absolutely.
>
> Q.    Could you explain that for me?
>
> A.    I knew they had reviewed the IBM transaction in detail.  Because I believe they were engaged directly to review that.
>
> I knew the question relative to the Graduate entities going in to SDN before they came in to AHERF was looked at vigorously by Coopers & Lybrand, because at one point they were pushing that it be consolidated, and then at some later date it ended up not to be consolidated.
>
> The 50 million dollar reserve transaction, it was my understanding that they knew about it.  Looked at it.  And had even requested that it be moved from restructuring costs to goodwill.  Representations in memos that I saw from Dan Cancelmi and others that led me to believe that Coopers was aware of all of the reserves being moved.

(Adamczak Dep. at 914-18; *see also id.* at 652-56).

Mr. Adamczak believed his opinions regarding the propriety of certain accounting treatments in AHERF's 1997 audited financial statements were not important to PwC:

Q.     So telling them that you thought things were inaccurate, or that you had apprehension about them --

A.     Were my opinion.

Q.     And wouldn't, in your view, have been news to them; is that right?

       MR. RYAN:  Objection.

A.     I don't know that I would say that.  But I know that in the past, when I have expressed contrary opinions, it didn't resolve in any differences.

       As a matter of fact, senior management generally took the position that Coopers & Lybrand were the experts, and when I had a contrary view, it was kind of thanks for your advice, but they are the experts we have hired.  And we will take their advice.

(*Id.* at 918-19; *see also supra* ¶ 33).

137.     The Committee admits PwC accurately quoted from the management representation letters but denies the facts in paragraph 137 are material to Coopers' audit interference defense.  The management representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  *See infra* ¶¶ 299-301.

138.     The Committee admits the facts asserted in paragraph 138 are not now disputed but denies PwC's characterization of Mr. Adamczak's testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  *See supra* ¶ 136.  The Committee also denies that testimony is material to Coopers' audit interference defense.  *See supra ¶* 136; *infra* ¶¶ 299-301.

139.     The Committee admits the facts asserted in paragraph 139 are not now disputed but denies that they are material to Coopers' audit interference defense.  The management

representation letters did not interfere with Coopers' ability to conduct its audits in accordance with GAAS.  *See supra ¶* 136; *infra* ¶¶ 299-301.

140.    The Committee admits the facts asserted in paragraph 140 are not now disputed but denies PwC's characterization of Mr. Adamczak's testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  *See supra* ¶ 136. The Committee denies the testimony quoted in paragraph 140 is material to PwC's audit interference defense.  *See supra* ¶ 136; *infra ¶* 299-301.

141.    Denied.  PwC has not fairly summarized Messrs. Spargo and Adamczak's testimony on the subject of management representation letters.  Both Mr. Spargo and Mr. Adamczak testified that it was their belief the management representation letters and their personal opinions were unimportant to PwC.  *See supra* ¶¶ 34, 136.  The Committee further denies Messrs. Spargo and Adamczak were positioned to know if and how "C&L was relying on the representations in the management representations letters."  The Committee denies the testimony referenced in paragraph 141 is material to PwC's audit interference defense.  *See supra* ¶ 136; *infra*  ¶¶ 299-301.

142.    The Committee admits the facts asserted in paragraph 142 are not now disputed but denies that they are material.  *See supra* ¶ 136; *infra*  ¶¶ 299-30.

143.    The Committee admits PwC accurately quoted Mr. Berliner's deposition testimony in paragraph 143 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  Mr. Berliner has provided two reports in this matter in which he criticizes Coopers' conduct relating to the AHERF audits.  (Berliner Rpt.; Second Supplementary Rebuttal Expert Report of Robert W. Berliner (dated 1/11/05) ("Berliner Supp. Rpt.")).

Mr. Berliner addresses the "audit interference" opinions of PwC's auditing expert, James W. Tillett, in his Second Supplementary Rebuttal Report, wherein he makes clear his opinion that AHERF management did not prevent Coopers from conducting its audits in accordance with GAAS. (Berliner Supp. Rpt. at 1-7). *See infra* ¶¶ 256, 259-60.

144. Admitted.

## IV. CAUSATION

145. Denied. PwC mischaracterizes the Committee's claim for damages. The Committee's claim for damages is premised upon the actions AHERF Board members and/or creditors would have taken had they received financial statements that accurately reported AHERF's financial condition and performance. Mr. Berliner's opinions and testimony regarding appropriate adjustments to the fiscal-year 1996 financial statements will be a part of the Committee's trial evidence.

146. PwC does not state undisputed or material facts in paragraph 146. Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 146 could be read to state undisputed or material facts, they are denied. Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the competence or integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed. *See supra* ¶ 44; *infra* ¶¶ 147, 150-52, 326-43.

147. PwC does not state undisputed or material facts in paragraph 147. Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 147 could be read to state undisputed or material facts, they are denied. Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the competence or integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed. Those actions would have included (1) expanding the scope of Coopers' audit work to determine the cause of the misstatements; (2) hiring outside consultants; (3) changing AHERF's business strategy, including ceasing all further hospital and physician-practice acquisition efforts; and/or (4) replacing senior financial management. (*See, e.g.,* Audit Committee members' testimony: Barnes Dep. at 183-85, 329-30, 333-36 (would consider selling AHERF's Philadelphia operations, replacing management, retaining a consultant, and whether AHERF should acquire additional physician practices or hospitals); Brenner Dep. at 170-72 (would have asked company to "embark[ ] on an intensive investigation immediately"); Danforth Dep. at 131-32, 260-65 (would consider changing AHERF's business strategy, terminating management, or retaining a hospital consultant), 263 (Board would "certainly . . . get a hospital consultant in, as [the Board] did . . . early in 1998."); Gumberg Dep. at 349-56 (would have considered expanding Coopers' work, hiring consultants, changing AHERF's acquisition strategy, or terminating management); Hernandez Dep. at 187-92 (would have selected the most prudent option between terminating management, expanding Coopers' audit work, or engaging other consultants); O'Brien Dep. at 93-101, 103 (would "demand" an investigation and consider expanding Coopers' audit work; would "clearly" replace senior financial management if the inquiry led him to question management's competence or integrity); Palmer Dep. at 234-38 (materially worse financial conditions in fiscal-year 1996 or 1997 "likely would have caused in-depth examination" of the

integrated delivery system ("IDS") strategy); Russell Dep. at 109-12 (would have made further inquiry to either Audit Committee or Board if Coopers raised concerns about material misstatements, management fraud, GAAP violations, or the competence or integrity of financial management); Thomas Dep. at 125-29 (would start an investigation and, depending on result of investigation, would consider expanding Coopers' work and discharging senior financial management; would have had "no choice" but to follow the options that made sense).  (*See also, e.g.,* Board members' testimony:  Adam Dep. at 149-55 (would have wanted an investigation of material or intentional misstatements or concerns with management's integrity, and would have followed whatever prudent course was dictated by the investigation's outcome); Davenport Dep. at 106-07 ("The option would be to -- I think to really only fire the person and replace him because that's fundamental…I think that's a one strike and you are out…"); J. B. Snyder Dep. at 140-42, 166-72 (would consider confronting or terminating management, hiring consultant, expanding the scope of the auditors' work; would follow the available options to their logical conclusion).  *See also supra* ¶ 44; *infra* ¶¶ 150-52, 326-43.

148.    PwC does not state undisputed or material facts in paragraph 148.  Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 148 could be read to state undisputed or material facts, they are denied.  Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed.  A turnaround plan would have been a part of those actions.  *See supra* ¶ 147.

149.    PwC does not state undisputed or material facts in paragraph 149.  Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 149 could be read to state undisputed or material facts, they are denied.  Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed.  Retaining an outside consultant would have been a part of those actions.  *See supra* ¶ 147.

150.    PwC does not state undisputed or material facts in paragraph 150.  Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 150 could be read to state undisputed or material facts, they are denied.  Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the competence or integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed.  A consultant retained by the Board or Audit Committee to address AHERF's financial distress would have recommended significant modifications to AHERF's business strategies and practices.  Thomas Singleton, the Committee's expert on hospital turnarounds, testified if he had been retained by AHERF at the end of fiscal-year 1996 following the issuance of financial statements reflecting adjustments of the type set forth in Mr. Berliner's expert report, he would have advocated very different strategic and operational decisions than those ultimately made by AHERF.  (Tab 3, DVOG Turnaround Evaluations as of 9/30/96 (dated August 2004) at 7

("Singleton Rpt."). Among other initiatives, Mr. Singleton would have curtailed physician practice and hospital acquisitions and ceased entering into risk contracting agreements. (*Id.* at 8-9).

151. PwC does not state undisputed or material facts in paragraph 151. Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 151 could be read to state undisputed or material facts, they are denied. Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the competence or integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed. Those actions would have included giving appropriate management authority to a retained turnaround consultant. (Singleton Dep. at 92-94; *see also supra* ¶ 147).

152. PwC does not state undisputed or material facts in paragraph 152. Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 152 could be read to state undisputed or material facts, they are denied. Had Coopers, as a part of its fiscal-year 1996 or 1997 audit work, accurately reported AHERF's financial condition and performance, disclosed that the financial statements presented for audit were materially or intentionally misstated, or shared concerns over the competence or integrity of AHERF's financial management, the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed. Those actions would have included putting a halt to the pursuit of AHERF's IDS strategy. *See supra* ¶ 147.

For example, Ira Gumberg, an Audit Committee and AHERF Board member, testified the AHERF Board may have "put the brakes on" AHERF's acquisition strategy, if Coopers had disclosed the financial statements presented for audit were materially misstated and Coopers was, therefore, issuing an adverse opinion on the financial statements:

> I believe we would have brought in consultants to help advise us. We may even asked Coopers under an engagement with the audit committee to delve deeper and to report back to us their additional findings.

> * * *

> And I think it's also possible that from my . . . business intuition, that had we been in that position, we may have put the brakes on everything that was going on until we get our hands around it.

> * * *

> I would think that it may have affected any other [hospital and physician-practice] acquisition strategy we had . . . I would think if we had found ourselves in that position, [we] would have had to have looked at everything that was happening.

(Gumberg Dep. at 349-51).

Other members of the Audit Committee and Board testified such audit revelations would have caused them to reconsider AHERF's IDS strategy.  (*See, e.g.,* Audit Committee members' testimony:  Barnes Dep. at 183-84 (materially misstated financial statements would have caused the Board to consider "giv[ing] up Philadelphia and sell[ing] everything in Philadelphia or kick it out one way or another"), 333-36 (materially misstated financial statements in 1996 would have raised questions about whether AHERF should acquire additional physician practices or hospitals, such as the GHS hospitals); Danforth Dep. at 131-32, 260-65 (would have considered changing AHERF's business strategy, terminating management, or retaining a hospital consultant); Palmer Dep. at 234-38 (materially worse financial conditions in fiscal-year 1996 or 1997 "likely would have caused in-depth examination" of the IDS strategy).

(*See also, e.g.,* Board members' testimony:  Adam Dep. at 154-55 (materially misstated financial statements would have caused the Board to question the "whole structure of the hospital, how it's being run, whether we have the right people, whether somebody has been up to something"); Davenport Dep. at 100-01, 106-07 (materially misstated financial statements would have caused the Board to question AHERF's "business direction"); Russell Dep. at 109 (concerns by Coopers regarding material misstatements, management fraud, GAAP violations, or the competence or integrity of financial management would have raised questions regarding the success or wisdom of AHERF's business strategy).

153.    PwC does not state undisputed or material facts in paragraph 153.  Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 153 could be read to state undisputed or material facts, they are denied.  If retained by the AHERF Board or Audit Committee "around the end of September 1996," Mr. Singleton opines DVOG could have been restored to "a position of financial viability."  (Singleton Rpt. at 3).  The turnaround plan designed by Mr. Singleton would have restored AHERF's DVOG entities, within three to four years, "to a position of positive earnings before interest, taxes, depreciation and amortization (EBITDA), sufficient to allow AHERF's Board to sell the entities without creditor loss."  *Id.*

154.    PwC does not state undisputed or material facts in paragraph 154.  Rather, PwC mischaracterizes the Committee's assertions; therefore no response should be required.

To the extent paragraph 154 could be read to state undisputed or material facts, they are denied.  Based on his experience in hospital and hospital-system turnarounds, Mr. Singleton opines that, were he retained in 1996, his efforts would have increased DVOG's EBIDTA by more than $100 million per year.  (Tab 3, Amended Singleton Report at 1 and Revised Exhibits XII, XII-A (dated 2/14/05)).

155.    Denied.  PwC mischaracterizes the Committee's responses to PwC's Second Set of Interrogatories.  The Committee's claim for damages is premised upon the actions AHERF Board members and/or creditors would have taken had they received financial statements that accurately reported AHERF's financial condition and performance.

156.    Admitted.

157.    Admitted.  As the Committee's expert Steven Kite explained in his report, "[a] covenant breach provides creditors with remedies they can use or threaten to use and thereby influence the course of a the debtor's operations.  Consultants can be hired and new actions can be implemented to improve operations."  (Tab 3, Expert Report of Steven B. Kite, Esq. (dated 9/1/04) ("Kite Rpt.") at 7-8, 12-13).

158.    The Committee admits "if AHERF's fiscal 1996 financial statements had shown covenant violations, AHERF's creditors would have considered AHERF to be in significantly greater distress" than was apparent.  For example, Ralph S. Michael, CEO of corporate banking at PNC Bank ("PNC"), testified during his deposition that prior to the bankruptcy, PNC "thought that AHERF was a very high quality borrower" and then, "[a]ll of a sudden . . . PNC became alarmed . . . that many of the things that [PNC] thought to be true weren't true."  Mr. Michael also testified that, in the 1996-1997 timeframe, PNC "had a misconception of what the hospital looked like from an operating perspective."  (Michael Dep. at 164).

159.    The Committee admits AHERF's creditors would have taken significant action if AHERF's fiscal 1996 financial statements had disclosed covenant violations.  Examples of what the creditors would have done (or did but would have done sooner) are identified *infra* ¶¶ 356-58, 360-65, 368-71, 375-76, 384.

160.    The Committee denies PwC's characterization of the Committee's Responses to PwC's Second Set of Interrogatories and denies the facts set forth in paragraph 160 are

undisputed. That said, the Committee admits that requiring DVOG to retain an outside consultant was one of the options available to AHERF's creditors to respond to a covenant violation and it would have pursued that course if necessary. Short of a covenant violation, creditors would have pressed for the appointment of an outside consultant. *See supra* ¶ 157; *infra* ¶¶ 161, 360-61, 379.

161.    The Committee denies the facts set forth in paragraph 161 are undisputed. While AHERF's creditors did not have the right to choose a consultant for AHERF, any consultant retained by AHERF had to satisfy certain qualifications. Moreover, AHERF's creditors could influence AHERF's choice of a consultant. Richard Weill, President of MBIA, testified that, upon learning of a covenant violation, MBIA could have influenced AHERF's management and trustees:

> Q.    So is it your understanding, then, that had the DVOG violated the debt service coverage ratio, the DVOG alone had the ability to bring in a consultant of its own choosing.
>
> A.    I believe that's what the document said.
>
> Q.    MBIA could have done nothing under the master trust indenture to stop the DVOG from doing so, correct?
>
> A.    Well, the answer to your question is -- let's divide the question into parts so that we answer it fairly.
>
> You have come up with the correct legal answer, you haven't come up with what happens in the real world. In the real world if you understand how bad a situation is, you have the capacity to talk with both management and, frankly, ultimately the trustees and point out to them the difficulty of the situation.
>
> I can point to other situations in David Stevens and Pat Mathis' regime in which they found, not in a hospital, but they found covenant violations that allowed for a call in and it was exclusively held by the issuer . . . and the issuer wanted to pick someone who we didn't think was a very good choice, we persuaded either the management, and in two cases we actually persuaded the board to pick who we thought should be picked, and in fact because of the

-50-

> situation, that management was actually not accepted going forward.
>
> Now, so I am telling you that although he is correct in what he says, if we had known of the violation we could have used other means available to us to persuade AHERF, trustees or management to choose a consultant that we thought was appropriate."

(Weill Dep. at 168-70; *see also* Kite Dep. at 118-19; *infra* ¶¶ 360-61).

162.     The Committee admits threatening to accelerate AHERF's outstanding debt was one of the options available to AHERF's creditors.  However, the creditors had other options available to influence AHERF.  (Tab 4, Pl. Resp. to Def. Second Set of Interrogs. at 40-41; Weill Dep. at 243-45).

163.     The Committee admits that these trustee witnesses were deposed as indicated, except that Robert Hernandez was deposed on September 3, 2003, but denies the fact that they were deposed is material.

164.     The Committee admits that these trustee witnesses were not deposed but denies that this fact is material.

165.     The Committee admits that these trustee witnesses are deceased and were not deposed but denies that this fact is material.

166.     The Committee admits that these trustee witnesses executed affidavits but denies that this fact is material.

167.     Admitted; however, Mr. Den Uyl's report speaks for itself.

168.     Admitted.

169.     *See supra* ¶167.

170.     *See supra* ¶167.

171.     *See supra* ¶167.

172.     *See supra* ¶167.

173.    The Committee admits PwC accurately quoted Mr. Hernandez's deposition testimony in paragraph 173 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  It is not material that Mr. Hernandez stated he did not know "with certainty precisely" what he would have done had he learned that AHERF's financial statements had been overstated.  Mr. Hernandez earlier testified that the reasons for a net-income overstatement would have mattered to him and that he would have considered terminating management, expanding the scope of Coopers' audit work, or engaging outside consultants if Coopers had advised the Audit Committee or Board it was issuing an adverse opinion on AHERF's financial statements. (Hernandez Dep. at 187-92).

174.    The Committee admits PwC accurately quoted Mr. Weill's deposition testimony in paragraph 174 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  Throughout his deposition, Mr. Weill identified action MBIA could and would have taken.  *See infra ¶¶* 378-82; *see also* Tab 11, Weill Declaration ("Weill Dec.").

175.    The Committee admits PwC accurately quoted Mr. Weill's deposition testimony in paragraph 175 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony.  During his deposition Mr. Weill identified actions MBIA could and would have taken if it had learned AHERF's financial statements had been overstated.  For example, when asked whether MBIA would have threatened to accelerate the DVOG bonds in the event of a covenant violation in fiscal-year 1997, Mr. Weill testified that "had we had the information, we would have threatened to accelerate the bonds.  And the board, seeing that the covenant was breached and that power was in the hands of the creditors, would have gotten more involved, made more changes quicker

than they did." MBIA did not threaten to accelerate the bonds because, without a covenant violation, it did not have the right to do so. (Weill Dep. at 245-47).

176.    The Committee admits PwC accurately quoted Mr. Weill's deposition testimony in paragraph 176 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. It is not material that Mr. Weill stated that he did not know "in fact" what action fully informed Board members "would . . . have taken." Mr. Weill did understand that an informed Board member could have taken action and that MBIA could have influenced the action of Trustees. *See supra* ¶ 161.

177.    The Committee admits PwC accurately quoted Mr. Michael's deposition testimony in paragraph 177 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. It is not material that Mr. Michael stated that he did not know "in fact" what action a fully informed creditor "would . . . have taken." Mr. Michael did know that PNC could and would have taken action if it had known the truth about AHERF's and its affiliates' financial condition and performance. *See infra* ¶¶ 386-90.

178.    The Committee denies the facts contained in paragraph 178 are undisputed. Moreover, PwC's focus on Charles Reilly's and Richard Heberton's knowledge of what steps would have been taken ignores the actions AHERF's trustees and creditor could have taken if fully informed of AHERF's true financial condition. Numerous MBIA and PNC employees testified to actions those creditors could have taken (or did take but would have taken sooner) if they had received accurate and properly audited financial statements. *See infra* ¶¶ 356-58, 360-71, 375-84

179.    The Committee denies the facts contained in paragraph 179 are undisputed. The Committee admits PwC accurately quoted Thomas McCool's deposition testimony in paragraph

179 but denies PwC's characterization of that testimony and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. Moreover, Mr. McCool identified actions PNC could have taken (or did take but would have taken sooner). *See infra* ¶¶ 369-70, 383.

180.    The Committee admits PwC accurately quoted from Mr. Schwartz's report in paragraph 180 but denies PwC's characterization of that quotation and any inferences or conclusions PwC would have this Court draw from it.

181.    The Committee admits PwC accurately quoted from Mr. Schwartz's report in paragraph 181; however, that report speaks for itself.

182.    The Committee admits PwC accurately quoted from Mr. Kite's report in paragraph 182, with the exception that the word "AHERF" in brackets in the block quotation should instead be "AHERF, DVOG, and AGHOG." Further responding, the report speaks for itself.

183.    The Committee denies the facts contained in the first sentence of paragraph 183 are material. In Mr. Kite's report, he does not opine regarding the actions AHERF's creditors would have taken but rather explains the rights and remedies available to those creditors in the event of a covenant violation or other event of default. The Committee denies that PwC has accurately described the substance of the opinions contained in the Kite Report and testified to by Mr. Kite. (Kite Rpt. at 4-6).

184.    The Committee admits that the dollar figures and percentages referenced in paragraph 184 appear in Mr. Den Uyl's expert report.

185.    The Committee admits that the referenced settlement agreement was executed by the signatories thereon and denies the facts in paragraph 185 are material.

186.    The Committee admits the accuracy of the number of AHERF Board members as of the referenced date and denies the facts in paragraph 186 are material.  *See supra* ¶¶ 147, 150-52; *infra* ¶¶ 326-43.

187.    Admitted, except the AHERF Board bylaw provision cited by PwC is not from the final version of the bylaws.  A copy of the final version of the Corporate Bylaws of AHERF (including amendments through June 21, 1996) ("June 1996 Bylaws") is attached at Tab 9.

188.    The Committee admits Mr. Kite testified that DVOG could choose the consultant retained in response to a breach of the debt service coverage ratio, "subject to the caveat that the consultant has to have a favorable reputation for skill and experience in performing similar services,"" but the Committee denies that any facts implied by the testimony quoted by PwC are material.  Mr. Kite also testified that "it would be hard to say that AHERF meets that definition." (Kite Dep. at 118-19).  Furthermore, the creditors could exert substantial influence over DVOG's choice of a consultant.  *See supra* ¶¶ 161-62; *infra* ¶¶ 360-61.

189.    The Committee admits PwC accurately quoted Dr. Atkinson's deposition testimony in paragraph 189 but denies that it is material.  Dr. Atkinson also testified about her experience when management consultants are retained to assist an ailing organization.  She testified management "[v]ery often" ends up being removed when turnaround consultants, such as the Hunter Group, are engaged.  (Atkinson Dep. at 151).

## V.    THE CENTENNIAL ESTATE

190.    Admitted, except that Mt. Sinai Hospital was a d/b/a of the nonprofit corporation "The Fifth And Reed Hospital."  (Tab 16, 10/9/96 Articles of Merger (The Fifth And Reed Hospital into SDN).

191.    The Committee denies PwC's assertion that "[t]he Committee does not dispute the truth of any of the allegations made in the Centennial Trustee Complaint," and the

Committee is unaware of any evidence to support PwC's assertion. Paragraph 13 of the Centennial Trustee Complaint, which PwC cited, does not support PwC's assertion. Therefore, no response should be required. The Committee acknowledges the Chapter 11 trustee filed the Centennial Trustee Complaint and admits PwC quoted accurately the first sentence of Paragraph 4 of that Complaint. The Committee denies any inferences or conclusions PwC would have this Court draw from the excerpted language.

192.    Admitted.

193.    The Committee admits PwC accurately quoted portions of Paragraph 3 of the Centennial Trustee Complaint but denies PwC's characterization of the Complaint and any inferences or conclusions PwC would have this Court draw from them excerpted portions.

194.    The Committee denies that the "Graduate Hospitals" were merged into SDN. While the parties have commonly referred to certain hospitals formerly affiliated with GHS as the Graduate hospitals, there is no corporate entity the "Graduate Hospitals." On October 31, 1996, three nonprofit corporations that were subsidiaries of GHS (namely, GHS-Osteopathic, Inc, The Graduate Hospital, and The Fifth and Reed Hospital) merged into SDN. As a result of these mergers, SDN was the sole surviving corporation and became liable for the liabilities of GHS-Osteopathic, Inc, The Graduate Hospital, and The Fifth and Reed Hospital. (Tab 16, 10/9/96 Articles of Merger (Fifth and Reed Hospital into SDN); Tab 18, 10/9/96 Articles of Merger (GHS-Osteopathic, Inc. into SDN); Tab 19, 10/9/96 Articles of Merger (The Graduate Hospital into SDN); *see also In re AHERF,* 253 B.R. at 160, 165; 15 Pa. C.S.A. § 5929(b)).

The Committee denies the materiality of PwC's statement that "SDN was not a subsidiary of AHERF and AHERF was not a member of SDN." The Committee brings this action on behalf of the estate of AH-Centennial, as well as on behalf of other estates. SDN is the predecessor of AH-Centennial. (PwC SOF ¶¶ 196, 198; Ex. 1057, Articles of Division (SDN) &

-56-

attached Plan Of Division Of SDN, Inc. § 1.1; McNair Dep. at 115). Thus, regardless of whether SDN was a subsidiary of AHERF in October 1996, SDN was injured as a result of the October 1996 mergers. Furthermore, the relationship among AHERF, SDN and Coopers was such that Coopers owed a duty to SDN. *See infra* ¶¶ 385-401.

The Committee admits the boards of SDN and GHS adopted certain resolutions contemplating SDN's acquisition of assets of GHS and states further that the transaction was accomplished through the October 31, 1996, mergers described above.

The Committee denies PwC's assertion that "[n]either AHERF nor any other Debtor assumed any liabilities of the Graduate Hospitals in connection with the SDN merger." In fact, SDN assumed the liabilities of GHS-Osteopathic, Inc, The Graduate Hospital, and The Fifth and Reed Hospital as a result of the October 31, 1996 mergers (described above) from which SDN emerged as the sole surviving corporation. SDN changed its name to AH-Centennial on May 1, 1997, and is one of the Debtors. (Tab 16, 10/9/96 Articles of Merger (Fifth and Reed Hospital into SDN); Tab 18, 10/9/96 Articles of Merger (GHS-Osteopathic, Inc. into SDN); Tab 19, 10/9/96 Articles of Merger (The Graduate Hospital into SDN); *see In re AHERF,* 253 B.R. at 160, 165; 15 Pa. C.S.A. § 5929(b); Ex. 1057, Articles of Division (SDN) & attached Plan Of Division Of SDN, Inc. § 1.1; PwC SOF ¶¶ 196, 198).

Furthermore, the Committee denies the materiality of PwC's assertion that "[n]either AHERF nor any other Debtor assumed any liabilities of the Graduate Hospitals in connection with the SDN merger." As explained below, Bankruptcy Judge Bruce McCullough ruled that AHERF, Allegheny University Hospitals-East ("AUH-East"), AUMP and AUHS were all liable for the liabilities of SDN (by then known as AH-Centennial). *See infra* ¶ 409.

195.    Denied. The Board members of SDN were each senior AHERF officers, *i.e.,* the CEO, CFO and General Counsel of AHERF, and the CEO of AUMP. Acting with the authority

of the AHERF Board of Trustees, the Executive Committee of the AHERF Board approved SDN's taking on hospitals of GHS.  SDN's board members delayed taking action to adopt resolutions approving an SDN-Graduate transaction until the Executive Committee of the AHERF Board had first given its approval, indicating an understanding that AHERF Board approval was required.  (McNair Dep. at 65, 132-36, 139-41, 144-47, 152-53; Cahouet Dep. at 48-49; Ex. 2385 at FVC 01569; Tab 9, June 1996 Bylaws at PR-PLD-22-00207).

196.    Admitted, except that SDN was already a Pennsylvania nonprofit corporation. (Ex. 1057).

197.    The Committee denies that the Centennial Obligated Group became the "new name" for what had previously been the GHS Obligated Group (and SDN Obligated Group). The "GHS Obligated Group" consisted of The Graduate Hospital and The Fifth and Reed Hospital d/b/a Mt. Sinai Hospital.  The Graduate Hospital and The Fifth And Reed Hospital did not change their name.  As noted, they each separately merged into SDN on October 31, 1996, with SDN as the sole surviving corporation from those mergers.  (PwC SOF ¶ 190; Tab 19, 10/9/96 Articles of Merger (The Graduate Hospital into SDN); Tab 16, 10/9/96 Articles of Merger (Fifth and Reed Hospital into SDN).  *See supra* ¶ 194; *infra* ¶¶ 409-11.

198.    Admitted.  The Committee clarifies that the October 31, 1996 transaction was the merger of three GHS subsidiaries into SDN.  *See supra* ¶ 194; *see also In re AHERF*, 253 B.R. at 160.

199.    The Committee admits Deloitte & Touche audited the financial statements for the years ended June 30, 1996 and 1995 for The Graduate Hospital, Fifth and Reed Hospital d/b/a Mt. Sinai Hospital, the GHS Obligated Group, Parkview Hospital and City Avenue Hospital. While parties have commonly referred to these entities as part of the Graduate hospitals, there is no corporate entity the "Graduate Hospitals."

200.    The Committee denies the assertion that Centennial was not an "affiliate" of AHERF during the year ended June 30, 1996.  AHERF and AH-Centennial (then called SDN) held themselves out as "affiliates," SDN's corporate charter provided that its sole purpose was to support AHERF, all SDN income was to be given to AHERF and, in the event of SDN's dissolution, all of its property would go to AHERF.  SDN's four directors were AHERF senior executives.  (McNair Dep. at 65; Tab 13, SDN 1995 Form 990-EZ at Statement 1).  *See also infra* ¶¶ 385-93.  The Committee denies that it is material that the engagement letter for the fiscal-year 1996 audit did not include Centennial or any of the GHS entities.

201.    Denied.  Two months of Centennial's financial results were included within AHERF's consolidated financial statements and within "combining and consolidating information"; therefore, Centennial's financial results were subjected to Coopers' audit procedures.  *See supra* ¶ 64.  GAAS also required Coopers to perform certain procedures relating to Centennial's full-year, unaudited pro forma financial information.  (Tab 10, AU §§ 550, 558).

202.    Admitted; however, Mr. Den Uyl's report speaks for itself and the Committee denies any inferences PwC would have this Court draw from the citation to Mr. Den Uyl's report and PwC's characterization of that report.  Further responding, Mr. Den Uyl states in his report that had the true financial condition of AHERF at or before September 1996 been known by the Board and third parties, appropriate intervention to prevent unnecessary costs and liabilities could and likely would have occurred.  Mr. Den Uyl further stated that his opinion is "informed by the analysis of Mr. Singleton that such an intervention could and likely would have allowed a turnaround and therefore avoidance of any creditor loss."  (Tab 3, Rule 26(a)(2)(B) Report of R. Bruce Den Uyl (dated 9/3/04) ("Den Uyl Rpt.") at 24).

203.    Admitted; however, Mr. Den Uyl's report speaks for itself and the Committee denies any inferences PwC would have this Court draw from the citation to Mr. Den Uyl's report

and PwC's characterization of that report. By way of further response, in calculating the losses attributable to AHERF's acquisition of the Graduate Hospitals, Mr. Den Uyl offset against the liabilities associated with the acquisition benefits and recoveries obtained by AHERF related to the Centennial assets. (Den Uyl Rpt. at 32-33).

204.    Admitted.

205.    The Committee admits PwC accurately quoted Mr. Den Uyl's deposition testimony in paragraph 205 but denies its materiality, PwC's characterization of that testimony, and any inferences or conclusions PwC would have this Court draw from the excerpted testimony. Mr. Den Uyl also testified that he did not analyze whether the former GHS hospitals could have survived and avoided bankruptcy if they had not been acquired by AHERF because his analysis suggested that if AHERF's financial statements had been properly stated, the acquisition would not have been undertaken. He testified that the "issue of whether [the former GHS hospitals] would have gone bankrupt or not is not really relevant to that opinion." (Den Uyl Dep. at 67).

206.    Denied. Mr. Korman clarified that the "end of the line" testimony referred to the fact that AHERF was the "successful acquirer," and was the "end of the line" in that sense.

207.    The Committee admits PwC accurately quoted passages from Paragraph 7 of the Centennial Trustee Complaint but denies its materiality, any inferences or conclusions PwC would have this Court draw from the excerpted language.

208.    The Committee admits that a complaint was filed in *The Bank of New York, in its capacity as Trustee v. Philadelphia Health Care Trust (f/k/a Graduate Health System, Inc.)*, No. 1612 (Pa. Ct. Com. Pl. Philadelphia County). The complaint speaks for itself. The Committee denies it does not dispute any of the complaint's allegations and denies Ex. 2713 stands for the proposition that the Committee does not dispute such allegations.

209.    Admitted.

210.    Admitted.

211.    Admitted.  The Committee further states that the Chapter 11 trustee submitted the proposed Second Amended Consolidated Liquidating Plan of Reorganization and the Bankruptcy Court entered an Order adopting the Reorganization Plan on December 14, 2000.  (Ex. 2765 at 1; Morrison 30(b)(6) Dep. at 190; Tab 14, 12/14/00 Order Confirming Debtors' Second Amended Consolidated Liquidating Plan Of Reorganization Under Chapter 11 of The Bankruptcy Code).

212.    The Committee denies the facts asserted in paragraph 212 are material.  How the Reorganization Plan allocates recoveries among the various creditors is not relevant to AHERF liability for AH-Centennial's debts under the bankruptcy law doctrine of substantive consolidation or SDN's liability for the debts of the three former subsidiaries of GHS.

        Furthermore, under the Reorganization Plan, AH-Centennial creditors received certain benefits in exchange for having their unsecured claims paid at a lower rate than the unsecured claims against other Debtors.  For example, the Reorganization Plan allows AH-Centennial bondholders the right to seek certain recoveries against third parties outside of bankruptcy, and not share those recoveries with the creditors of other estates.  In addition, certain non-AH-Centennial creditors agreed to a compromise regarding their assertions that much of their claims were secured (and therefore come before unsecured claims).  Moreover, the substantive consolidation of the Reorganization Plan aided the AH-Centennial unsecured creditors because the secured claims against AH-Centennial might have exhausted its assets.  As of December 2003, the creditors of AH-Centennial have received a greater recovery on a percentage basis than other creditors, even though AH-Centennial unsecured claims are paid out at a lower rate than the unsecured creditors of other estates.  (Ex. 2765 at §§ 5.3(d), 5.4(a); Strayer 30(b)(6) Dep. at 20-27, 104-05; Tab 15, Amended Disclosure Statement Pursuant To

§ 1125 Of The Bankruptcy Code For the Amended Consolidated Liquidating Plan Of Reorganization Of The Debtors at 2, 41-44).

## VI.    THE BREACH OF CONTRACT CLAIM

213.    The Committee admits PwC accurately quoted language in the Committee's response to PwC's interrogatory number 17 but denies any inferences or conclusions PwC would have this court draw from the excerpted language.

214.    Admitted.

215.    The Committee admits PwC accurately quoted from the engagement letter in paragraph 215 but denies PwC's characterization of the letter and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the letter.  Responding further, Coopers was required to conduct its agreed-upon procedure engagements in accordance with GAAS and other professional standards.

216.    The Committee admits PwC accurately quoted from the report in paragraph 216 but denies PwC's characterization of the report and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the report.

217.    PwC does not state undisputed or material facts in paragraph 217, but rather a legal conclusion; therefore, no response should be required.  To the extent a response should be required, the Committee denies the facts asserted in paragraph 217 are undisputed.  Coopers failed to discharge professional and contractual obligations imposed by the referenced September 6, 1996, engagement letter when it failed to report exceptions in "agreeing" the financial components of performance measures regarding executive compensation, which components were inaccurate in light of overstated fiscal-year 1996 financial results.  *See infra* ¶¶ 256, 265-67.

218.     The Committee admits PwC accurately quoted from the engagement letter in paragraph 218 but denies PwC's characterization of the letter and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the letter.  Responding further, Coopers was required to conduct its agreed-upon procedure engagements in accordance with GAAS and other professional standards.

219.     The Committee admits PwC accurately quoted from the engagement letter in paragraph 219 but denies PwC's characterization of the letter and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the letter.  Responding further, Coopers was required to conduct its agreed-upon procedure engagements in accordance with GAAS and other professional standards.

220.     The Committee admits that PwC has referenced certain engagement letters which speak for themselves.  Responding further, Coopers was required to conduct its agreed-upon procedure engagements in accordance with GAAS and other professional standards.

221.     The Committee admits PwC accurately quoted from the management representation letter in paragraph 221 but denies PwC's characterization of the letter and any inferences or conclusions PwC would have this Court draw from the excerpted portion of the letter.  The Committee denies the facts in paragraph 221 are material because Messrs. Adamczak and Cancelmi did not interfere with Coopers' obligation to perform the agreed-upon procedure engagement in accordance with applicable professional standards.

222.     PwC does not state undisputed or material facts in paragraph 222, but rather a legal conclusion; therefore, no response should be required.  To the extent a response should be required, the Committee denies the facts asserted in paragraph 222 are undisputed.  Coopers failed to discharge professional and contractual obligations imposed by the referenced March 4, 1998, engagement letter when it failed to report exceptions in "agreeing" the financial

components of intercompany balances and the balances themselves to other source data, which components and balances did not accurately depict the level of repayment of intercompany balances.  Mr. Buettner was aware Messrs. Abdelhak and McConnell were using Coopers' report to support their false statement to the Finance and Audit Committee on March 11, 1998, that the "Eastern Region hospitals and University have paid a substantive portion of their loans back." (Tab 20, Gordon Declaration ("Gordon Dec.") at Ex. 16, transcription for 3/11/98 Audit Committee meeting at GOR000014); *see also infra* ¶ 311).  Mr. Buettner, who attended the meetings, knew that Mr. McConnell's claim that "the repayment mode is continuing" (*id.*) was false, and the reduction in intercompany balances had little to do with actual repayments of cash.

223.    Admitted.

224.    Admitted.  In addition, SAS 62 provides that "[s]uch assurance, however, should not be given unless the auditor has audited the financial statements to which the contractual agreements or regulatory requirements relate and should not extend to covenants that relate to matters that have not been subjected to the audit procedures applied in the audit of the financial statements."  (AU § 623.19).

The Committee denies that Coopers fulfilled its obligations to issue a debt compliance letter sufficient to satisfy the financial covenant reporting requirements contained in Section 7 of the Morgan Agreement, when, in a separate report, Coopers gave "negative assurance relevant to the applicable covenants based on the audit of the financial statements." Pursuant to the Morgan Agreement, AGHOG was required to obtain

> simultaneously with the delivery of each set of [year-end, audited] financial statements referred to in clauses (i) above, (A) a statement of each of the firms of independent public accountants which reported on such statements (x) whether anything has come to their attention to cause them to believe that any Default existed on the date of such statements and (y) confirming the calculations set forth in the officer's certificates delivered simultaneously therewith  . . . .

(Ex. 327 at D0016927; Mertz Dep. at 56-57).

      225.   Admitted.

## THE COMMITTEE'S STATEMENT OF
## ADDITIONAL MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

**I.     IMPUTATION**

226.     AHERF's "Executive Compensation Program" included Annual and Long-Term
Incentive Plans.  (Kasperbauer Dep. at 19-20).  Messrs. Abdelhak, McConnell, Spargo
Adamczak, and Cancelmi and Ms. Wynstra all were eligible to receive payments under the
Annual Incentive Plan during the fiscal-years 1996 and 1997.  (Kasperbauer Dep. at 90; Spargo
Dep. at 496-504; Cancelmi Dep. at 113).

227.     The Annual Incentive Plan provided bonuses of up to 35% of base salary if
certain "Must Goals" were met, what Coopers' working papers termed "very healthy bonuses."
(Ex. 2476 at JD-HL 0020916-17; Ex. 2500; Buettner Dep. at 657-61).  Mr. Kasperbauer recalled
the bonuses could go as high as 40%; for Messrs. Abdelhak and McConnell, the bonuses
exceeded 40% of base salary.  (Kasperbauer Dep. at 95; *infra* ¶¶ 235-36).  Bonus amounts were
calculated from a combination of Business Unit (*e.g.*, hospital) and individual performance
assessments.  (Ex. 2476 at JD-HL 0020917).

228.     The "Must Goals" included an "Operating Performance" target, requiring "overall
favorable operating results, as measured by net income, in excess of established targets," and a
"Financial Viability" target, requiring a "favorable trend in financial viability, as measured by an
increase in net equity, which is greater than the change in the consumer price index."  (Ex. 2476
at JD-HL 0020917; Ex. 2480 at DBR-AA 22680; Kasperbauer Dep. at 113-14; Ex. 1700 at DBR-
AA 22695; Spargo Dep. at 498).

229.     In both fiscal-years 1996 and 1997, the reported results for the individual
Business Units were nearly identical to the Operating Performance targets.  (Ex. 1700 at DBR-

AA 695; Ex. 1597 at DC 8295 page 3 of 18; Ex. 58 at TN CBC43B 00897, 922, 930; Cancelmi Dep. at 993).

(a)    AHERF management kept "Analysis of Reserves" files, referred to internally as "X Files," that tracked "free reserves" or "cushions" available throughout the AHERF system. (Ex. 1689; Spargo Dep. at 286-90, 525; Ex. 1094; Ex. 2294; Cancelmi Dep. at 831-32, 1395, 1748-49). "Cushions," or "free reserves," are not appropriate under GAAP. (Ex. 4042, FASB No. 5, *Accounting for Contingencies*, at ¶ 8)). AHERF management used these "cushions" to make adjustments necessary to "smooth earnings" to "mitigate any unforeseen negative consequences that may materialize over the course of a year." (Spargo Dep. at 288, 346-48).

(b)    In fiscal-years 1996 and 1997, AHERF management used the X Files to record adjustments that permitted the incentive targets to be met. For example, Exhibit 1122, a one-page schedule for AHERF's fiscal-year 1996 titled "Delaware Valley Year-End Adjustments," was produced from Mr. Cancelmi's files and contains his handwritten notations. (Ex. 1122; Cancelmi Dep. at 1143-44). One notation indicates the document was "discussed with Steve [Spargo] on July 24, 1996." According to the schedule, AHERF made over $20 million of "Adjustments" to boost DVOG "Preliminary net income/(loss)" of $8.8 million in the DVOG to an "Adjusted net income/(loss) of $29.6 million," just above the "Board Projections" of $28.7 million. Regarding these adjustments, Mr. Spargo testified:

> Q.    When these adjustments were being made in fiscal-year 1996, and in other fiscal years at which you were at AHERF, it's fair to say that the adjustments were made at least with the board projections in mind?
>
> A.    Oh, yes.

(Spargo Dep. at 338).

(c)    Similar documents exist for fiscal-year 1997. (Ex. 1597 at DC8295 page 4 of 18; Adamczak Dep. at 773-74; Ex. 49; Ex. 301 at DC0896 at page 87-92 of 92; Adamczak Dep. at 741-42, 760; Ex. 50; Lisman Dep. at 449-50). Exhibit 1597, for example, has a schedule (at page 4) with columns labeled "Actual without Use of Cushions," "FY 97 Use of Cushions" ($138 million worth) and "Final Adjusted Actual." Page 3 compares "Adjusted Actual" results and "FY 97 Projection per FY 98 Budget," listing the "Difference" in a separate column. The adjusted results for the various Business Units are almost identical to the targeted results.

(d)    Mr. Adamczak acknowledged that certain adjustments were made to June 1997 results to meet budgeted Operating Performance targets:

Q.    Through the use of these reserves, the income statement
       information depicted comes much closer to meeting the budgeted
       expectations; is that fair to say?

A.    That's correct.

Q.    And without it, it falls significantly short; is that fair to say?
       Without the use of the reserves referenced?

A.    Yes. As a matter of fact, I believe that with the use of the reserves,
       the adjusted number comes pretty close to the projected amount.

(Adamczak Dep. at 333-34; Ex. 49; *see also id.* at 749-50).

230.    Other AHERF documents and deposition testimony from AHERF witnesses indicate accounting decisions were driven by the bottom line, which, in turn, drove management bonuses. Examples include:

(a)    Mr. Cancelmi's April 14, 1997, memorandum discussing the $50 million Graduate to DVOG reserve transfer acknowledged the transaction's goal was to "enable us to establish reserves for the bad debt reserve shortfall without the attendant adverse income statement impact on the AHERF system." (Ex. 8; Lisman Dep. at 130).

(b)    In explaining why the DVOG hospitals' bad debt reserve grew worse in fiscal-year 1997, Mr. Cancelmi acknowledged in a July 3, 1997 memorandum that the required bad debt expense levels suggested by AHERF's new bad debt reserve methodology "were never recorded due to profitability concerns." (Ex. 164 at DBR-RS-0291; Cancelmi Dep. at 507-08).

(c)    In explaining why AHERF did not record a reserve for "accounts at gross," Mr. Cancelmi acknowledged in a June 10, 1997, memorandum that the proposal "was considered for a potential adjustment" but was not recorded "due to insufficient profitability levels and available reserves." (Ex. 149 at TN RC013 2476; Cancelmi Dep. at 541-43).

(d)    In a March 13, 1997, memorandum to Messrs. Abdelhak and McConnell, Mr. Spargo indicated "restructuring reserves" recorded at the Graduate hospitals "will be immediately available upon transfer to AHERF to smooth out earnings, to offset unexpected revenue declines or expenses overages, etc." (Ex. 1533 at DBR AA 41835; Spargo Dep. at 345).

(e)    Mr. Snow testified AHERF's budget for bad debt expense was woefully inadequate. (Snow Dep. at 248-51). When Mr. Snow inquired in the Spring of 1997 why the bad debt expense was not going to be increased in the budget for the upcoming year, he was told AHERF's financial statements could not "afford it." (*Id.*).

(f)    When Mr. Snow started at AHERF in 1995, he immediately attempted to clean up uncollectible accounts. (*Id.* at 252-54). Mr. McConnell quickly told Mr. Snow to cease writing off the old accounts. (*Id.* at 258-61; Ex. 822). In his deposition, Mr. Snow explained why the writeoffs stopped:

> [T]here were not sufficient reserves to cover that type of a write-off at the time, and this is the reason why we were told in September of 1995 that we could not perform these write-offs, and that it would have to be taken care of over a period of time because the -- because it would have a severe financial impact to the profitability of AHERF.

(Snow Dep. at 165).

(g)     When AHERF did finally write these accounts off, the writeoffs were done in four $20 million installments.  (*Id.* at 164; Ex. 138; Schaffer Dep. at 447-48).  AHERF knew in early fiscal-year 1997, if not earlier, the net amount of uncollectible receivables totaled at least $80 million.  (Ex. 29; Cancelmi Dep. at 470; Franz Dep. at 292-94).  Yet the final two $20 million installments were deferred until after AHERF increased DVOG's reserves through the $50 million reserve transfer.  (Ex. 138, Ex. 8; Snow Dep. at 189-90).

(h)     According to Mr. Spargo, the DVOG's bad debt reserves were not increased because to do so "would have yielded a reserve that would have been significantly larger than was on the books, the offset of which would have been a huge hit to the income statement."  (Spargo Dep. at 163-64).  He stated, "[t]hat's the only answer."  (*Id.*).

231.     All eligible employees received Annual Incentive Program bonuses for the fiscal-year 1996.  (Kasperbauer Dep. at 124).  However, had the audited fiscal-year 1996 financial statements been correctly reported, Operating Performance and Financial Viability targets would not have been met.  (Berliner Rpt. at Appendix I (Corrected Consolidated and Consolidating Statement of Operations)).

232.     Key executives received additional bonuses of 20% of their salary under AHERF's Long Term Incentive Plan.  (Kasperbauer Dep. at 89).  Long term bonuses were earned in one year (under the same "Must Goals" as the Annual Incentive Plan) and then deferred for five years for possible distribution, pending results.  (Ex. 2476 at JD-HL 0020927).

233.     AHERF's most senior management continued to receive payments under the Long Term Incentive Plan through March of 1998.  When the Committee approved payment of

long-term bonuses, it believed that "organizational performance . . . was excellent and met all

established goals." (Ex. 2492 at D 0000584-85; Kasperbauer Dep. at 153).

234.    AHERF management was paid significantly more than their counterparts at

similarly situated not-for-profit healthcare entities. Angela Maher, a Director in AHERF's

Treasury department who joined AHERF after it acquired the Forbes Health System, testified:

> I suspect that AHERF really had salaries that were just really very,
> very high in comparison to other facilities who had that kind of
> responsibility. . . . The difference between the salaries at AHERF
> and at Forbes were extraordinary. It was more than double.

> \* \* \*

> I was hearing they did a salary study on UPMC and Allegheny and
> the salaries for Allegheny were just extraordinary."

(Maher Dep. at 163-67; s*ee also* Franz Dep. at 46, 250-52).

235.    Mr. Abdelhak was richly compensated. In fiscal-year 1996, he received

$1,926,131 in total income, including large incentive and "merger" bonuses and various

"allowances," such as a $41,724 "Perquisite Allowance." (Ex. 2472 at DBR-DK 010243;

Kasperbauer Dep. at 77). He received $1,837,828 in total income the next year, including many

of the same type of bonuses and allowances. (*Id.* at DBR-DK 010244). Much of these bonuses

were directly tied to net income incentive targets. *See supra* ¶ 226-29. By contrast, it was

reported that Mr. Abdelhak's counterpart at the University of Pittsburgh Medical Center Health

System, which had revenues similar to AHERF, received $393,000 in total compensation for the

1996-97 fiscal year. (Tab 22, Steve Massey, *Anatomy of a Bankruptcy, Part 4:  Running on the

edge*, Pittsburgh Post-Gazette, January 21, 1999, at Page 7 of 8; Tab 22, Pamela Gaynor,

*Hospital executives here pull down healthy salaries*, Pittsburgh Post-Gazette, April 20, 1997)).

AHERF's top 26 executives *averaged* nearly that much. (*Id.*; *In re AHERF*, Case No. 98-25773

MBM, Statement of Financial Affairs, Rider 21 (excerpts)).

236.    Mr. McConnell was also richly rewarded.  In fiscal-year 1996, Mr. McConnell received total income of $1,326,886, including the same type of bonuses as Mr. Abdelhak. (Ex. 2475 at AMS6 000166; Kasperbauer Dep. at 84-85).  He received $1,050,000 in total income the next year.  (*Id.* at AMS6 000165).  Much of these bonuses were directly tied to net income incentive targets.  *See supra ¶* 226-29.

237.    Messrs. Abdelhak and McConnell did not accurately report AHERF's overall financial performance to AHERF's Board members.  Instead they presented a story of success. For example, in the presence of Mr. Buettner, on October 15, 1996, Mr. Abdelhak told the Audit Committee that the 1996 audited financial statements "are all very conservative" and that it "has been our policy to reflect our statements in conservative fashion so that there is a strong base for it."  (Ex. 1648 at GOR00000198; Tab 20, Gordon Dec.).  At the December 2, 1996 Finance Committee meeting, Mr. Abdelhak indicated that financial "results are very close to budget in many respects," that AHERF "experienced a better quarter and better first six months," that "the strength of the . . . hospitals in Philadelphia in the market place continues to pay off," and that he was "[o]ptimistic that we will have a great year."  (Ex. 1633 at GOR0000203; Tab 20, Gordon Dec.).

Three months later, at the March 14, 1997 Finance Committee meeting, Mr. McConnell noted that "[o]verall revenue for the six month period is $19.4 million ahead of budget" and that "[t]here is $90 million more of revenue than we had for the first six months last year."  (Tab 20, Gordon Dec. at Ex. 13, transcription of 3/14/97 Finance Committee meeting at GOR0000064).  Three months later, at the June 20, 1997 Finance Committee meeting, Mr. Abdelhak reported that the "hospitals continue to make progress in spite of incredible competition," that "AIHG has improved because of excellent rates that David [McConnell]

negotiated for risk contracts and because of the excellent results of the executives in AIHG," and

that there was "significant improvement" at AH-Centennial and in accounts receivable.  (Tab 20,

Gordon Dec. at Ex. 14, transcription of 6/20/97 Finance Committee meeting at GOR0000071,

73).

238.    Throughout fiscal-years 1996 and 1997, Messrs. Abdelhak and McConnell did not

reveal the liquidation of tens of millions of dollars of investments, primarily at AGH, to pay the

expenses of the Philadelphia-area hospitals.  (Ex. 429; Martin Dep. at 606-07; Ex. 4473 at CL

036431; Buettner Dep. at 604-05).  They left the Board in the dark by reclassifying what would

otherwise be "loans to affiliates" as funded depreciation.  (*E.g.*, Ex. 535 at DBR-AA 88163; Ex.

546 at PwC-SUB-DC-04105; Ex. 549 at JD-DC0002720; Adamczak Dep. at 346-85).  (Exs. 706,

707, 708; Gilbert Dep. at 525-45).  AHERF managers have stated these actions were taken to

"diminish the obviousness of the intercompany payable and receivable" and to prevent

"disclos[ure] to the board members that a substantial portion of the funded depreciation account

had been lent to the East."  (Adamczak Dep. at 355; Gilbert Dep. at 543-44, 755-56).

239.    When AHERF recorded the entries for the initial $50 million reserve transfers

from Graduate to DVOG, it recorded the entries in two different installments, $25 million in

March 1997 and $25 million in April 1997.  When asked why, Mr. Adamczak testified:  "I did

hear that it may have -- it may have something to do with the smoothing out of that transfer over

two periods instead of doing it all in one. . . .  To make the impact appear to be less."

(Adamczak Dep. at 296-97).

240.    On April 27, 1998, AHERF repaid a balance of approximately $90 million

outstanding on a line of credit with a consortium of banks that included Mellon Bank.

(Ex. 2452; Wicker Dep. at 223-24).  In order to raise funds to repay the Mellon line of credit,

Mr. Abdelhak directed Mr. McConnell to liquidate approximately $66 million of funds from the

funded depreciation accounts of the Forbes and Allegheny Valley hospitals. (Ex. 1930; Ex. 693;

Martin Dep. at 470-71, 478-79). Mr. Martin, who was directed to seek liquidation of the funded

depreciation assets from the asset managers, was informed: "NO ONE is to know about it except

you, David, Sherif, and Al [Adamczak]." (Tab 17, RMcK 022). This liquidation of funded

depreciation violated recently enacted Board resolutions requiring prior Board authorization of

intercompany transfers. (Ex. 2060; Gumberg Dep. at 262, 347, 370-71).

241. Coopers' working papers included an "Assessment of Control Environment,"

wherein Coopers observed the following about the "Role of the audit committee":

> C&L's experience with the individual boards is that they are
> generally independent of management, extremely qualified and
> diligent in completing their responsibilities and are cognizant of
> their actions and the associated impact on the organizations'
> employees, patients, local communities and society at large.
>
> * * *
>
> The audit committee at AHERF is very active and has significant
> influence in the operations of the organization. They meet with
> C&L at least 2 times a year to discuss the audit plan and the audit
> results. . . . Any comments made as part of the audit are considered
> very important and addressed by the committee.

(Ex. 2500 at CL 003253).

242. Included within Mr. Kirstein's AHERF files are documents that outline Coopers'

plan to go about selling more non-audit services to AHERF. (Ex. 4403 at PWCK2 67-85, 86-97;

Kirstein Dep. at 796-99). These documents were prepared for Client Service Approach ("CSA")

meetings headed by Mr. Buettner. (Kirstein Dep. at 799). "Step 1a" of the Coopers' "action

plan" was "sizing the wallet," wherein Coopers estimated AHERF had $11 million to spend on

audit and consulting services Coopers might provide. (Ex. 4403 at PWCK2 82; Kirstein Dep. at

807). $700,000 of the $11 million related to Coopers' audit relationship with AHERF. Other

steps in Coopers action plan were to "pursue aggressively" "2 new food chains" in 1996, which Mr. Kirstein testified meant "potential areas that we could provide non audit services where we've got resources."  (Ex. 4403 at PWCK2 75; Kirstein Dep. at 803).  The CSA document also detailed the "Threats to C&L/Allegheny Relationship" (including the current AHERF work being done by other auditing and consulting firms), noted that Coopers "[m]ust continue current relationships, particularly with Abdelhak and McConnell," and indicated if Mr. McConnell "left AHERF, [there] could be problems."  (Ex. 4403 at PWCK2 73-75, 84).

243.     Messrs. Kirstein and Buettner and Ms. Frazier all claim they did not become aware of AHERF's transfer of $50 million of reserves from the Graduate hospitals to the DVOG hospitals until at least late July or early August 1997 as part of their "year-end" audit procedures (after the entries had already been made), and that they had no role in the plan to make the entries.  (Buettner Dep. at 613 (claiming Coopers first became aware during "late July, early August of 1997"); Kirstein Dep. at 631 (claiming he became aware "[s]ometime early in the year-end phase of the audit"); Frazier Dep. at 523 (claiming she first became aware during the "late part of field work").  The evidence is otherwise.

244.     Mr. Spargo testified he was summoned to a meeting with Mr. McConnell and Mr. Buettner in Mr. McConnell's office in early April 1997.  (Spargo Dep. at 369-70).  He testified he was told at that meeting of an idea to create $50 million of reserves on the books of the Graduate hospitals that would then be transferred to the DVOG hospitals to fix the DVOG hospitals' bad debt reserve shortfall.  (*Id.* at 370-77).  Mr. Spargo testified he believed the proposal to create and then transfer reserves came from Mr. Buettner, who "express[ed] support for the idea."  (*Id.* at 371).

245.     Mr. Adamczak testified he first learned of the idea to create and then transfer $50 million in Graduate reserves during lunch at Tambellini's restaurant in early April 1997 with Mr. Kirstein and Mr. Cancelmi.  (Adamczak Dep. at 249-50).

246.     Mr. Cancelmi recalled several discussions with Coopers in the Spring of 1997 about AHERF transferring $50 million of reserves from Graduate to DVOG.  (Cancelmi Dep. at 202-07, 211-12, 788-99, 1731-33).  Mr. Cancelmi does not recall ever hearing that Coopers requested AHERF to reverse the $50 million reserve transaction.  (*Id.* at 263).

247.     Mr. Kirstein took handwritten notes of a conference call he attended on April 18, 1997 with Mr. Buettner, Ms. Frazier, and Mr. Cancelmi.  (Ex. 4436 at PWCK2 45).  During his deposition, Mr. Kirstein was asked to translate his notes appearing below the heading "$50 MM RESERVES @ GRADUATE," which he did:

> Will have 80 million dollars C slash O, charge-offs, in DV by 6-30-97, and then in parens, gross number on A/R outpatient.
>
> Placing reserves on Graduate entities to be used for DVAR at Y slash E, year-end.
>
> Does not believe there is any general reserves other than 50 million dollars.
>
> Becomes part of PP&E slash intangible as part of purchase adjustment from SDN to AHERF.
>
> Defers A/R problem to be deferred.

(Kirstein Dep. at 650-54).  Mr. Kirstein claimed not to recall the meaning of his notes.  (*Id.*).

248.     Mr. Kirstein also took notes of a June 10, 1997 meeting he believes he had with Mr. Buettner and Ms. Frazier.  (*Id.* at 662-63; Ex. 4403 at PWCK2 37).  At his deposition, Mr. Kirstein read his notes to say:

> 50 million dollar additional reserve dash 25 million through March.  Next line, 50 million through April. . . . 80 million dollar

> write-offs and offset by 50 million dollar reserve, and then there's
> a subbullet, need current versus prior year breakout.

(Kirstein Dep. at 661-64).  Mr. Kirstein professed not to know the meaning of his notes.  (*Id.* at

662-64).  Mr. Kirstein did acknowledge the "$80 million write-offs" related to the DVOG

hospitals, not Graduate.  (*Id.* at 668).

249.    Coopers' 1996 and 1997 audits of AHERF were completed using the Coopers and

Lybrand Audit Support System ("CLASS system"), a Lotus Notes-based software program that

provided, among other things, Coopers' audit program for the audits, the primary repository of

Coopers' working papers, and a mechanism for auditors to take notes or ask questions of other

team members.  On May 13, 1997, Ms. Frazier drafted notes on the CLASS system following her

preliminary review of Hahnemann's (a DVOG hospital) balance sheet.  (Ex. 4258; Frazier Dep.

at 613-15).  In that document, Ms. Frazier asked:

> how was the first 25 of the 50 million distributed to the entities or
> did this occur in April

(Ex. 4258).

250.    On June 9, 1997, Ms. Heinlein, the Coopers staff auditor in the patient receivables

area, authored an "Issue" document titled "$50 Million Reserve Entry."  (Ex. 4297).  The

CLASS system used "Issue" documents to identify matters observed during the audit that

required a response, and "to bring attention to something that we had found when we were

auditing our audit areas."  (Heinlein Dep. at 138-40).  On the CLASS system, "Issue" documents

are separate from other sections of the database, such as the sequentially organized "Working

Papers" section.  Within the "Issue Description" field of the document, Ms. Heinlein wrote:

> Per conversation with Robin Schafer [sic], C&L notes that a total
> of $50 million was intercompanied from the Graduate hospitals to
> the Delaware Valley hospitals due to the DV bad debt reserve
> shortfalls.

> A determination was made that $25 million of reserves would be
> recorded in the DV hospitals in the  March, 1997 financials and the
> remaining $25 million would be recorded in April.

(Ex. 4297 at CL 232235).

251.    Ms. Heinlein testified that she first learned about the idea to transfer $50 million

of reserves from Graduate to DVOG from Ms. Frazier.  (Heinlein Dep. at 113-125).

252.    Coopers auditors took efforts to eliminate or alter electronic working papers

indicating how early it was in the audit process that they actually became aware of the first $50

million of reserve transfers.  Ms. Heinlein's $50 Million Reserve Entry "Issue" document, with a

"Created By" date of June 9, 1997, was eventually made an ordinary working paper with a

"Completed By" date of September 15, 1997.  (Ex. 4303).  Ms. Heinlein testified that Ms. Porter,

the In-Charge senior associate on the audit, requested that she change the "Issue" document into

a "Working Paper" document.  (Heinlein Dep. at 149-50).  Ms. Porter does not recall why the

"Issue" document was changed into a "Working Paper."  (Porter Dep. at 331).

253.    When using the CLASS system, if an auditor wants to delete a particular

document out of the Issues or Working Papers sections of the database, the auditor can either

check a box titled "Mark for Deletion" or "hard delete" the document.  (Heinlein Dep. at 150).

Checking the "Mark for Deletion" box moves the document out of the "Issues" or "Working

Papers" sections of the database but does not delete it from the database.  (*Id.*).  On the other

hand, "hard deleting" deletes it from the database.  (*Id.* at 150-51).  When Ms. Heinlein changed

her $50 Million Reserve Entry "Issue" document (the one with a time-stamped "Created By"

date of June 9, 1997) to a Working Paper, she hard deleted the "Issue" document off of the

CLASS system.  (*Id.*).  She claimed not to recall why she hard deleted the document.  (*Id.*).

254.    On August 10, 1997, Coopers staff auditor Anthony Carrabba drafted documents

on the CLASS system relating to opening balance sheet work for the City Avenue and Parkview

hospitals, two of the five Graduate hospitals. (Exs. 4124, 4126). In the "Purchase Price Adjustments (Goodwill)" field of those documents, he placed the following explanation for $8 million of purchase adjustment entries on each hospital: "Additioinal [sic] bad debt reserve for DV A/R." (*Id.*). Of the $50 million of reserves created on the Graduate hospitals' books for transfer to DVOG, $8 million was placed on both City Avenue and Parkview's books. (Ex. 154 at DBR-RS-0287). In the final version of these working papers, "Last Modified By" Ms. Porter on September 10, 1997, the language "for DV A/R" was deleted from the explanations. (Ex. 4123 at CL 013040; Ex. 4125 at CL 013033).

255. On or around May 29, 1997, Ms. Heinlein drafted the following language in the "Step Comments" field in an audit step working paper titled "Examine adjustments made throughout the year": "$50 million - Graduate Bad Debt." (Ex. 4305; Heinlein Dep. at 156). A later version of this same audit step working paper had the following language in the "Step Comments" field: "C&L notes that no unusual or nonrecurring adjustments were made in reconciling A/R to the general ledger." Ms. Heinlein does not recall why the language was changed. (Heinlein Dep. at 154-57).

## II.    AUDIT INTERFERENCE

256. The Committee's two accounting and auditing experts independently reviewed AHERF's 1996 and 1997 financial statements and Coopers' audits upon them. Messrs. Berliner and Regan prepared lengthy and detailed reports that catalogue violations of GAAS impacting numerous substantive areas of the financial statements. (Berliner Rpt. at 5-18; Regan Rpt. at Page i). They independently concluded Coopers violated numerous core auditing standards, including its obligation to maintain independence from AHERF, and in some cases recklessly or "horrendously" disregarded auditing standards. (Berliner Rpt. at 18-1–18-5; Berliner Dep. at 32; Regan Rpt. at 72, 88, 113; Regan Dep. at 224-27). They independently concluded that Coopers

was aware that management deliberately misstated AHERF's financial statements in many substantive audit areas, including a pervasive practice of earnings management. (Berliner Rpt. at 17-9; 18-1–18-5; Regan Rpt. at 56-61, 69-74, 111).

257.    Through their separate work, Messrs. Berliner and Regan independently concluded that Coopers' audit failures caused AHERF's statements of operations and balance sheets for fiscal-years 1996 and 1997 to be materially misstated into the tens of millions of dollars. Mr. Berliner developed corrected statements of operations and balance sheets for the fiscal-years 1996 and 1997. He concluded AHERF's audited statement of operations overstated net income by more than $90 million in 1996 and by more than $150 million in 1997, turning positive net income into losses of approximately $80 million and $130 million, respectively. (Berliner Rpt., Appendices I, II). He also concluded AHERF's balance sheet overstated unrestricted net assets by more than $80 million in 1996 and more than $240 million in 1997. For not-for-profit entities, unrestricted net assets, or the "fund balance," is a measure of the financial health of an organization. (Turtz Dep. at 400-03).

258.    The Lockhart Trusts provided that gains from the sales of trust assets were to be added to the trusts' corpus and were not to be considered income. None of the trusts permitted use of trust corpus by AHERF. (Ex. 20; Robinson Dep. at 67-69). AHERF's 1996 audited financial statements misclassified nearly $30 million of realized and unrealized gains related to these trusts as "unrestricted" net assets, and over $15 million of current-year and prior-year realized and unrealized gains were improperly included in AHERF's fiscal-year 1996 net income. (Berliner Rpt. at 5-7–5-8; Regan Rpt. at 28-29). Those financial statements also misclassified on the balance sheet more than $50 million more of trust assets as "temporarily restricted" net assets. (*Id.*). AHERF's 1997 financial statements misclassified more than $80

million of realized and unrealized gains related to these trusts as "unrestricted" net assets and

more than $10 million as "temporarily restricted" net assets, and over $50 million of current-year

and prior-year realized and unrealized gains were improperly included in AHERF's fiscal-year

1997 net income.  (Berliner Rpt. at 5-7–5-8; Regan Rpt. at 95).

259.    In the areas of bad debt reserves, the Graduate reserve transfers, and the

classification of the Lockhart Trusts, Messrs. Berliner and Regan have opined that management

did not prevent Coopers from performing a GAAS audit and detecting these material

misstatements.  (Berliner Supp. Rpt. at 1-7; Berliner Dep. at 140-47; Rebuttal Report of D. Paul

Regan (dated 1/11/05), at 5, 9-10; Regan Dep. at 171-92).

260.    An auditor must follow three broad "standards of fieldwork" in issuing an opinion

on an entity's financial statements.  The third standard of fieldwork provides that "[s]ufficient

competent evidential matter is to be obtained through inspection, observation, inquiries, and

confirmations to afford a reasonable basis for an opinion regarding the financial statements under

audit."  (AU § 326.01).

261.    When the auditor selects the particular substantive tests used to achieve his or her

audit objectives, the auditor should consider, among other things, "the risk of material

misstatement of the financial statements."  (AU § 326.11).  "Because of the large monetary

amounts and the complexity of determining health care service revenue and receivables, there are

risks associated with health care service revenue recognition and the valuation of the related

receivables."  (Tab 23, AICPA Audit and Accounting Guide, *Healthcare Organizations* at § 2.09

(May 1, 1998 edition)).  Coopers' audit plan recognized that accounts receivable was an "area of

higher risk" and specifically noted that "AHERF patient accounts receivable has increased $65

million from June 30, 1995 to December 31, 1995."  (Ex. 4458 at CL 036236; *see also* Buettner

Dep. at 23-25, 49-50).

262.    The bad debt reserves carried by AHERF hospitals were accounting estimates.

Under GAAS, Coopers was responsible for "evaluating the reasonableness" of those bad debt

reserves.  (*Id.* at § 342.04).

263.    When the auditor evaluates an estimate, "the auditor should obtain an

understanding of how management developed the estimate.  Based on that understanding, the

auditor should use one or a combination of the following approaches:

> a.    Review and test the process used by management to
>        develop the estimate.
>
> b.    Develop an independent expectation of the estimate to
>        corroborate the reasonableness of management's estimate.
>
> c.    Review subsequent events or transactions occurring prior to
>        completion of fieldwork."

(*Id.* at § 342.10).

264.    In reviewing and testing management's process for developing the estimate,

GAAS recommends procedures the auditor might perform, including:

> •    "Identify the sources of data and factors that management
>      used in forming the assumptions, and consider whether
>      such data and factors are relevant, reliable, and sufficient
>      for the purpose based on information gathered in other
>      audit tests."  (*Id.* at § 342.11(b)).
>
> •    "Evaluate whether the assumptions are consistent with each
>      other, the supporting data, relevant historical data, and
>      industry data."  (*Id.* at § 342.11(d)).
>
> •    "Analyze historical data used in developing the
>      assumptions to assess whether the data is comparable and
>      consistent with data of the period under audit, and consider
>      whether such data is sufficiently reliable for the purpose."
>      (*Id.* at § 342.11(e)).

- "Consider whether changes in the business or industry may cause other factors to become significant to the assumptions." (*Id.* at § 342.11(f)).

- "Review available documentation of the assumptions used in developing the accounting estimates and inquire about any other plans, goals, and objectives of the entity, as well as consider their relationship to the assumptions." (*Id.* at § 342.11(g)).

265.     On or around October 14, 1998, Mr. Adamczak was interviewed by Robert Cepielik, a Price Waterhouse legacy partner involved in reviewing Coopers' AHERF audit work. (Ex. 1063 at CL 147599-600; Cepielik Dep. at 64-65, 180-83; Adamczak Dep. at 166-68).  Mr. Cepielik took notes of his meeting with Mr. Adamczak.  (Cepielik Dep. at 180-83).  Among other things, Mr. Cepielik's notes indicate Mr. Adamczak told him:

> Indicated a decision was made at a closing meeting that 96 AR reserve was 30 million under reserved and to take it in over 3 years.  Done at a closing meeting, all hands including C&L.

(Ex. 1063 at CL 147599; Cepielik Dep. at 180-83).

266.     In his deposition, Mr. Adamczak's recollection was consistent with Mr. Cepielik's notes.  He recalled both AHERF management and Coopers agreed there was a shortfall in the range of $30 million, a proposal had been mentioned to fix it over three years, and it was his understanding no adjustment would be made to fix the shortfall.  (Adamczak Dep. at 170-76).

267.     Mr. Spargo also recalled AHERF management and Coopers recognized a shortfall at the end of the 1996 audit in the $30 million range and agreed on a plan to correct it over time. (Spargo Dep. at 216-17).  Mr. Berliner has concluded DVOG's bad debt reserves were understated by a range of $26.9 million to $48.2 million.  (Berliner Rpt. at 2-6).  Mr. Regan independently estimated an understatement of $26.2 million to $53.0 million.  (Regan Rpt. at 51-52).

268.    Ms. Schaffer and her staff prepared the calculations used to estimate DVOG's estimate for bad debt reserves for the year-end June 30, 1996.  (Schaffer Dep. at 40-45). Ms. Schaffer coordinated AHERF's response to Coopers' audit requests and discussed accounts receivable issues with Ms. Frazier and Brian Christian, a Coopers staff auditor assigned to the patient receivables area.  (Schaffer Dep. at 61-62, 88-90).

269.    Ms. Schaffer testified extensively about discussions she had with Coopers auditors about inadequacies in the methodologies used by the DVOG entities to estimate bad debts reserves:

Q.    Can you tell us what you can recall about what they told you about what their concerns were?

A.    What I recall is just when they -- one, we had different methodologies and, two, the percentages we were using, depending on how old the receivables were, were different among the hospitals and not always probably as high as they should have been.

What I recall specifically is them looking at our bad debt the way we recorded bad debt, not being very comfortable with the percentages themselves because of the aging of the receivables.

* * *

Q.    Do you recall any discussions that you may have had about the MCP, EPPI bad debt methodology with Coopers & Lybrand during the 1996 audit?

A.    I know specifically -- when I say that they generally had concerns about our methodology, the MCP, EPPI one was probably the biggest concern because that one -- because of how it was done, probably there was the most exposure was on that particular group.

(*Id.* at 31, 59; *see also id.* at 63-64, 68).

Ms. Schaffer recalled providing Coopers with schedules showing large amounts of old receivables carried on the DVOG hospitals' books, which would have indicated to Coopers there was a large amount of uncollectible receivables that had not yet been written off

and should have been reserved at 100%. (*Id.* at 157). Ms. Schaffer also recalled candid and "very open" discussions with Ms. Frazier about problems in AHERF's centralized billing office and the need for Coopers to discuss those problems with billing personnel. (*Id.* at 830-32).

270.    Mr. Cancelmi also recalled discussions with Coopers about concerns over the collectibility of old accounts:

> Q.    Based on your interactions with Mr. Spargo up to this memo, do you believe he was suggesting that AHERF should not share the results of any analysis that AHERF did regarding receivables?
>
> MR. RYAN:  Objection.
>
> A.    No.
>
> Q.    Why do you say that?
>
> A.    I mean, first of all, this issue, it was out on the table. I mean it was my impression that the questions were being raised on the Patcom accounts. So even if you used the assumption that you're inferring there, I mean you couldn't. I mean, you know, the numbers stood out. They were relatively sizable numbers.

(Cancelmi Dep. at 460-61; *see also id.* at 440-42, 1619). Mr. Cancelmi too recalled "very candid" discussions with Coopers about problems in the AHERF billing office and the need for extensive auditing in the accounts receivable area. (Cancelmi Dep. at 1418-19). He testified Coopers was "fully aware" there was "disconnect between what the numbers were and . . . some of the conclusions or summaries of what some of the issues were between the accounting area versus the billing area." (*Id.*; *see also id.* at 133-34).

271.    Mr. Spargo also recalled discussions with Coopers about "potential exposure" relating to the PATCOM accounts and the general under-accrual of the DVOG hospitals for bad debts. (Spargo Dep. at 127-28, 135-36, 142, 148-50). Mr. Spargo recalled that he repeatedly "begged" for Coopers to assist the AHERF accounting department's efforts to adopt a more realistic approach to valuing receivables. (*Id.* at 179-80). The response to his pleas, he testified,

was that Coopers "found a way to get comfortable with the current A/R balances" and merely stated, "this is the comments that we're going to put in the management letter." (*Id.*).

272.    Russell Laing, Director of Financial Reporting in AHERF's centralized billing office, performed financial analyses of patient revenue and receivables for financial reporting purposes. (Laing Dep. at 57-58). Mr. Laing was an alumnus of Coopers' Pittsburgh office, had worked with Mr. Buettner on at least one hospital audit, and was known to possess extensive experience in auditing and estimating healthcare receivables. (*Id.* at 18, 26-27, 92-93). Mr. Laing expressed surprise that Coopers did not meet with him to discuss the valuation of AHERF's accounts receivable: "It struck me as extremely odd that they didn't want to sit down and engage in a conversation or -- or review with me issues relating to the valuation of accounts receivable and net revenue. I was very surprised at that." (*Id.* at 92-94). When asked if he felt Coopers was reckless in not consulting him on the adequacy of AHERF's reserve percentages, Mr. Laing stated: "I absolutely do and I did." (*Id.* at 344).

Mr. Laing also testified he would have shared his views regarding the valuation of accounts had Coopers asked him: "Yes, I would in every respect that was material and important to the process of financial reporting." (*Id.* at 95; *see also id.* at 149). He testified that Coopers could and should have determined that there were problems with the PATCOM accounts. (*Id.* at 106).

273.    In connection with its fiscal-year 1995 audit, Coopers observed the methodologies used by the DVOG hospitals for reserving bad debts were flawed. Mr. Kirstein's September 11, 1995 letter to Charles Morrison, Chief Financial Officer of AHERF's eastern operations, outlined Coopers' concerns:

> Based on our review, we believe that the reserve for accounts
> receivable should be enhanced and the methodology used to

> establish the reserves reviewed for future reference. Our basis for
> this conclusion is rooted in the amount of A/R over 180 days old
> coupled with the reduction in the reserve as a percentage of A/R at
> several of the hospitals.

(Ex. 1448 at DB-CM-46-00982; Kirstein Dep. at 100).

274.    During the 1995 audit, a Coopers auditor observed in a draft management letter comment that the "inconsistencies in the [bad debt reserve] methodologies were especially prevalent in the Delaware Valley where the reserve percentages were significantly lower than those at AGH." (Ex. 4090; Kirstein Dep. at 113-14). The auditor noted the "variations between entities appear to cause difficulties in analyzing the bad debt allowance which could possibly result in an inadequate reserve in future years." (*Id.*). This comment did not appear in the final management comment letter provided to the AHERF Board. (Ex. 7 at DC8221 page 7 of 22).

275.    In fiscal-year 1996, DVOG continued to use bad debt reserve methodologies at its hospitals that had "reserve percentages [that] were significantly lower than those at AGH." For example, AGH reserved outpatient receivables over 240 days outstanding from Medicare and Blue Cross at 80%, meaning the hospital assumed it would collect only 20 cents on the dollar for such receivables. (Ex. 1520 at CL 000879; Kirstein Dep. at 323). In contrast, the methodology used by three of the five DVOG hospitals, Bucks, Elkins, and St. Christopher's, reserved *less than 2%* of the gross balance of Medicare and Blue Cross receivables over 180 days outstanding on the "PATCOM" system (for fiscal-year 1996, most of these hospitals' older receivables were held on the PATCOM system). (Ex. 109 at CL 001004-05; Schaffer Dep. at 185; Ex. 113 at DC4532, pages 22-23 of 27; Schaffer Dep. at 202-03; Ex. 115 at DC4529, pages 19-20 of 24; Schaffer Dep. at 205). Hahnemann reserved Medicare and Blue Cross receivables over 180 days at just 5 or 10%. (Ex. 118 at CL 001107; Schaffer Dep. at 213). MCP did not apply a bad debt reserve to receivables owed by third-party payors. (Ex. 4274; Frazier Dep. at 336-37).

276.    Coopers was provided accurate copies of schedules designating how the bad debt reserve estimate for all of the DVOG hospitals were calculated.  (Exs. 109-111, 113, 115, 117, 118; Schaffer Dep. at 185-88, 195, 202-06, 214, 220).  These schedules showed old receivables being reserved using very low percentages.  (*Id.*).

277.    Coopers disapproved of MCPH and EPPI's methodology of reserving only self-pay accounts, indicating the "analysis should be revised to include the insurance as well as the patient account balance for all financial classes."  (Ex. 4274).  Mr. Buettner wrote a notation on a Coopers "A/R Bullet Points" document that indicated:  "MCPH - Aging must be revised.  Not included for third party billings."  (Ex. 4201; Buettner Dep. at 103).

278.    Coopers' working papers evaluated MCPH and EPPI's bad debt reserve requirements using the poor but marginally better methodology used by Hahnemann.  (Ex. 1075; Cancelmi Dep. at 417-19; Kirstein Dep. at 350-52).  The analysis indicates a required reserve at MCPH and EPPI of $21,707,002 million dollars.  (Ex. 1075 at CL 001181, 85, 91).  MCPH and EPPI had only $6,495,456 in its bad debt reserve accounts, suggesting a shortfall of over $15 million.  (Ex 4389 at CL 001201-03; Kirstein Dep. at 359-60).

279.    Although the other DVOG hospitals reserved old third-party receivables at very low rates (*see supra* ¶ 275), Coopers' working papers contain no analysis to evaluate how much those hospitals were under-reserved for bad debts.

280.    Coopers' "Accounts Receivable Procedures" for the 1996 audit indicate the audit staff was to "Prepare an AGH model reserve for all entities."  (Ex. 4386; Buettner Dep. at 151).  Coopers had evaluated the DVOG hospitals' reserve requirements in fiscal-year 1995 using the AGH bad debt reserve methodology because it disapproved of the methodologies used at the DVOG hospitals.  (Ex. 1523; Kirstein Dep. at 83).  Coopers preferred AGH's methodology,

which had significantly higher reserve percentages on older accounts, and had confirmed the reasonableness of the methodology through a special engagement. (Ex. 7 at DC8221 page 7 of 22; Kirstein Dep. at 126; Ex. 1522; Frazier Dep. at 42-44).

281.    Coopers' 1996 working papers for certain of the hospitals indicate that "C&L has prepared an additional analysis for the bad debt reserve using AGH's reserve percentages and the client has booked an additional reserve." (Ex. 4387 at CL 001098; Buettner Dep. at 154; Ex. 4023 at CL 000993; Kirstein Dep. at 320). The results of the 1996 AGH comparative analysis, which are not contained in the 1996 working papers, would have called for a higher adjustment. (Regan Rpt. at 47). *See also infra* ¶ 282.

282.    Mr. Buettner testified he concluded as a result of his 1996 audit work that the DVOG hospitals' bad debt reserves needed to be adjusted upward by $15 to 20 million. (Buettner Dep. at 218-20). AHERF adjusted the reserve upward by $17.5 million. (*Id.* at 220). As conceded by PwC's auditing expert, Coopers' working papers contain no evidence to support Mr. Buettner's claim that he performed an analysis coming to an "independent expectation" that the reserve needed to be increased by a range of $15 to $20 million. (Tillett Dep. at 187-188, 192-93) ("I don't see that number or range in the work papers."). Moreover, although its analysis of MPCH and EPPI's reserve suggested a shortfall of $15 million (*see supra* ¶ 278), only $3.9 million of AHERF's $17.5 million adjustment was applied to MCPH and EPPI. (Ex. 122; Cancelmi Dep. at 400-01).

283.    Coopers' "Accounts Receivable Procedures" for the 1996 audit indicated it would perform "subsequent receipts testing" and would "seek high coverage" from that testing. (Ex. 4386). Coopers performed only one month of subsequent receipts testing. (Ex. 4024; Christian Dep. at 205). That testing showed that, on average, the DVOG hospitals collected less than half

as much of its outstanding receivables as AGH, collecting only 13-20% of outstanding receivable balances. (Ex. 4024). The audit testing did not confirm the DVOG hospitals' bad debt reserves were reasonable; in fact, it suggested otherwise.

284. Coopers' "AHERF - Major Payor A/R > 180 Days" working paper for the 1996 audit purported to summarize the amount of receivables over 180 days and 360 days and the "Reserve" associated with those accounts. (Ex. 4022 at CL 004241-44; Christian Dep. at 153-54). The working paper showed over $92 million and over $41 million of "Net A/R" (not reserved by the "Reserve") over 180 and 360 days outstanding, respectively. (*Id.* at CL 004244). Mr. Buettner appears to have modified this chart to include the impact of contractual allowances. (Ex. 4463 at CL 035633; Buettner Dep. at 236-37). Still, the amount of unreserved balances over 180 and 360 days outstanding was over $72 million and $29 million, respectively. (*Id.*). Mr. Buettner acknowledged that such information would call for an increase in the reserve. (Buettner Dep. at 244-45).

285. Coopers' audit program for AHERF included a step called "Test old account balances at 6/30/96," which required the auditor to:

> Review client summary of accounts greater than 90 days old with balances exceeding $100,000. Investigate Medicare/Medicaid balances greater than 120 days through client inquiry to determine collectibility. Consider reclassifying old Medicare/Medicaid balances to self-pay and including in the bad debt reasonableness test. Consider uncollectible balances in determining reasonableness of overall accounts receivable allowances.

(Ex. 4025; Christian Dep. at 216-17).

Coopers' audit testing revealed many receivables with balances greater than $100,000 that had been outstanding for more than 90 days, particularly at Hahnemann. (Ex. 4027 at CL 009928-40; Christian Dep. at 271). Many of the accounts had bill dates predating 1995, meaning the accounts were well over a year old. (*Id.*). Other than identifying such

accounts, however, there is no evidence Coopers determined whether such receivables were collectible, either through inquiry with appropriate AHERF personnel or otherwise, or considered the results of its findings in assessing Hahnemann's bad debt reserves. Mr. Christian, the Coopers staff auditor in the receivables area for the 1996 audit, did not recall anything about his work in testing old accounts. (Christian Dep. at 225-27, 271-88).

286.    A common industry benchmark in the patient receivables area is known as "Days in A/R," which is the amount of days revenue a hospital has sitting in the value of its patient receivables. (Kirstein Dep. at 391). As part of its analytic work, Coopers calculated "Days in A/R" figures for the DVOG hospitals, and those figures were considerably higher than industry averages. (Exs. 4390, 4391; Kirstein Dep. at 389-95; Buettner Dep. at 225-28).

287.    Coopers was aware the DVOG hospitals in some instances were not reducing gross receivables to the agreed-upon reimbursement value provided in the contracts with third-party payors, commonly known as "contractualizing" the accounts. (Ex. 4201; Buettner Dep. at 103).

288.    Like Messrs. Abdelhak and McConnell, Messrs. Buettner and Kirstein and Ms. Frazier all, at one time or another, invoked their Fifth Amendment rights when testifying in AHERF-related proceedings. (Buettner Dep. at 16; Kirstein Dep. at 839; Frazier Dep. at 840).

289.    The appropriate method to increase bad debt reserves under GAAP is to charge bad debt expense. Had AHERF increased DVOG's bad debt reserves by $50 million through a charge to bad debt expense, DVOG's net income would have been reduced from $23.7 million to a net loss of $26.3 million. (Ex. 58 at TN CBC43B 00922). AHERF would not have reported net income of $21.9 million but rather a loss of $28.1 million. (*Id.* at TN CBC43B 00897). The

transaction increased the DVOG hospitals' bad debt reserves from just $6.9 million to $56.9 million, an eight-fold increase.  (Ex. 41; Cancelmi Dep. at 824; Morrison Dep. at 358).

290.     AHERF accountants recorded approximately $47 million of "restructuring reserves" on the books of the Graduate hospitals both before and during the time the hospitals were merged with SDN.  (Ex. 154; Cancelmi Dep. at 208-09).  The newly created reserves were placed into specific trial balance accounts on the books of the Graduate hospitals.  Many of the reserves, such as PFMA, Hill Burton, and Medical Assistance were carried in separate trial balance accounts.  (Ex. 4248 at PwC 010114, 18-19; Porter Dep. at 160-61).

291.     Auditors conduct analytical procedures, including fluctuation analyses, to "identify such things as the existence of unusual transactions and events, and amounts, ratios and trends that might indicate matters that have financial statement and audit planning ramifications."  (AU §329.06).  The "auditor should evaluate significant unexpected differences," because "unexplained differences may indicate an increased risk of material misstatement."  (*Id*. at § 329.21).  As Ms. Porter, the In-Charge Senior Associate on the 1997 audit explained, significant changes "would require more questions to the client to understand why [the account balance] changed, what caused the change, etc."  (Porter Dep. at 165).

292.     Coopers' audit program included an audit step in the accrued expenses and other payables area titled "Test accrued liabilities and other payables balances for reasonableness, fluctuations and omissions."  (Ex. 4132; Porter Dep. at 389-90).  This audit step required the auditor to:  "[r]eview the balances for reasonableness, expected or unexpected fluctuations between years and obvious omissions" and "[o]btain explanations for any changes greater than or equal to $500,000 and 5%."  (*Id.*).

293.    Over $11 million of the Graduate reserves transferred to DVOG as part of the $21.3 million and $28.3 million transfers came from accrued expenses and other payable accounts.  The source for these transfers were "Accrued miscellaneous" accounts at Graduate Hospital, Mt. Sinai, and Rancocas.  Initially, the balances in these accrued miscellaneous accounts had increased significantly, as a result of purchase price adjustments which Coopers' working papers had indicated increased the "cushion" in these accounts.  (Ex. 4127 at CL 013236 (note F)).

294.    Coopers' working papers noted that by June 30, 1997 the balances in these accounts had decreased significantly since May 1, 1997.  (Ex. 4130 at CL 015199) (note B in the Mt. Sinai and Rancocas schedules).  The working papers do not evidence any attempt to "obtain explanations" for the changes, as called for in its audit program and by GAAS.  (Porter Dep. at 396-97; Ex. 4132; AU § 329.21).

295.    Over $25 million of the Graduate reserves transferred to DVOG as part of the $21.3 million and $28.3 million transfers came from patient receivable accounts.  Coopers' audit program included an audit step in the patient receivable area titled "Obtain or prepare a comparative summary at 6/30/97."  (Ex. 4248 at PwC 010151; Porter Dep. at 396-97).  This audit step called for the auditor to "Perform fluctuation analysis from 3/31/97 balances."  (Ex. 4248 at PwC 010151).  Coopers did not perform a fluctuation analysis from the 3/31/97 balances to the year-end June 30, 1997 balances, but instead performed a fluctuation analysis comparing the 6/30/96 and 6/30/97 balances.  (*Id.* at PwC 010152-58).  As a result, Coopers did not document, show, or explain the significant decrease in these accounts from the opening balance sheet (May 1, 1997) to June 30, 1997 caused by the additional Graduate reserve transfers.

296.    All of the reserve transfers included within the $21.3 million and $28.3 million transfers were recorded in AHERF's general ledger.  (Cancelmi Dep. at 173-74, 183).  With available search technology, Coopers could have tracked down the reserve transfers through simple searches on specific trial balance accounts.  (*Id.* at 353-54; Lisman Dep. at 266-67; Adamczak Dep. at 339-40, 926-27).  Coopers had access to the general ledger and Mr. Adamczak recalls that Coopers actually reviewed account detail on AHERF's general ledger from time to time.  (Spargo Dep. at 61; Adamczak Dep. at 65-67).  Moreover, management maintained "journal entry books" that included back-up support for all journal entries, including the reserve transfers.  (Cancelmi Dep. at 173-74, 183-84 1074; Adamczak Dep. at 340).  These journal entry binders were made available to Coopers during its audits.  (*Id.*).

297.    During the 1997 audit, Ms. Schaffer provided to Coopers a schedule titled "Allegheny University Hospitals, Summary of Inpatient/Outpatient Adjustments."  (Ex. 4450).  The schedule has a Coopers' auditor notation indicating it was "Prepared by Robin Schaffer." (*Id.*).  This schedule describes $7 million of entries as "Transfer from Centennial," "Transfer Resv. from Centennial," or "Transfer reserve from Centennial."  (*Id.* at CL 94016, 18-19).  A file source index PwC provided to the Committee indicates the document was produced from the "1997 Workpapers."

298.    AHERF employees have denied they tried to hide the transfer ("[n]othing was snuck") and testified that they would have told Coopers about the transfers if asked.  (Cancelmi Dep. at 353; Schaffer Dep. at 322).

299.    GAAS provides that "representations from management are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial

-94-

statements."  (AU § 333.02).  Written representations from management "complement other auditing procedures."  (AU § 333.03).  "If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made."  (AU § 333.04).

300.    Under GAAS, "written representations from management should be obtained for all financial statements and periods covered by the auditor's report."  (AU § 333.05).

301.    The management representation letters signed by AHERF management for the fiscal-years 1996 and 1997 audits of AHERF were drafted by Coopers.  (Adamczak Dep. at 918-19; Spargo Dep. at 728, 832).

## III.    CAUSATION

302.    The Audit Committee of the AHERF Board was comprised of external trustees. (Tab 9, June 1996 Bylaws at PR-PLD-022-211; Tab 21, Corporate Bylaws of AHERF (including amendments through December 12, 1996) ("December 1996 Bylaws") at DBR-LI-183362). During fiscal-years 1996 and 1997, J. David Barnes, the former Chairman of Mellon Bank, chaired the Audit Committee.  (Barnes Dep. at 6-7, 45; Ex. 2015 at DBR-CG-387; Ex. 2016 at GOV 56058; Ex. 1676 at SEC-1-0001756; Ex. 2209 at GOV 55880.

303.    The Audit Committee was charged to, among other things, (a) oversee all matters related to the annual audits of AHERF's financial statements, (b) provide opportunities for AHERF's external auditors to meet with the Committee, outside the presence of management, as necessary to discuss confidential and/or sensitive matters, and (c) recommend various actions to the AHERF Board, including the appointment of external auditors, the approval of each year's audit plan, and the approval of each year's audited financial statements.  (Tab 9, June 1996 Bylaws at PR-PLD-022-211-12; Tab 21, December 1996 Bylaws at DBR-LI-183362-63).

304.    The Audit Committee also assisted the AHERF Board to meet and exercise its "fiduciary responsibilities" and to "safeguard the organization's assets, monitor the financial performance of the organization and ensure the integrity of the financial information upon which the Board relie[d]."  (Tab 9, June 1996 Bylaws at PR-PLD-022-211; Tab 21, December 1996 Bylaws at DBR-LI-183362).

305.    AHERF Board members relied on the Audit Committee to interact with Coopers, review Coopers' findings, and to make appropriate recommendations to the Board with respect to financial and audit matters.  (*See, e.g.*, Atkinson Dep. at 115-17; Brown Dep. at 158-61 (relied on Audit Committee to interact directly with auditors and act as first line of oversight); Cohen Dep. at 105; Martinelli Dep. at 184-85; Miller Dep. at 67-68; Murasko Dep. at 183 (Audit Committee was "interface" between auditors and management and brought recommendations on audit-related issues to the Board); Spielvogel Dep. at 132-33 (Audit Committee served as a primary contact with the auditors); Sunstein Dep. at 118-19 (relied on Audit Committee to work with the auditors and address their concerns regarding the financial statements); Williamson Dep. at 179-80.

306.    As of March 11, 1998, the Audit Committee was merged with AHERF's Finance Committee, forming the Finance & Audit Committee, which assumed the responsibilities of the Audit Committee.  Mr. Barnes was the Chairman of the Finance & Audit Committee.  (Ex. 2038 at JB 485.  (For ease of reference, the Audit Committee and Finance & Audit Committee will be referred to hereafter collectively as the "Audit Committee.")

307.    Many of AHERF's Audit Committee and Board members were business executives and board members of large Pittsburgh-and Philadelphia-based corporations.  (*See, e.g.*, Barnes Dep. at 6-7; Brenner Dep. at 5-6; A. Cook Dep. at 8-12; Danforth Dep. at 6-9;

Gumberg Dep. at 21-28; Hernandez Dep. at 7-9; O'Brien Dep. at 6-9; Palmer Dep. at 5-8; Sculley Dep. at 6-8).

308.    AHERF and its affiliates operated on a fiscal year beginning on July 1 and ending on June 30.  (Tab 9, June 1996 Bylaws at PR-PLD-022-185; Tab 21, December 1996 Bylaws at DBR-LI-183338).

309.    At least one Coopers representative attended each Audit Committee meeting held during fiscal-years 1996-1999.  (Ex. 2015 at DBR-CG-387; Ex. 2016 at GOV 56058; Ex. 1676 at SEC-1-0001756; Ex. 2209 at GOV 55880; Ex. 2019 at GOV 55811; Ex. 2038 at JB 485; Ex. 2105 at CL 150833; Ex. 2063 at CL 150841; Hilton Dep. at 75-76; Korbly Dep. at 226-29, 279).

310.    Mr. Buettner served on the AHERF account for 18 years -- nine years as the Engagement Partner -- and attended every Audit Committee meeting held during fiscal-years 1996, 1997 and 1998.  (Ex. 2015 at DBR-CG-387; Ex. 2016 at GOV 56058; Ex. 1676 at SEC-1-0001756; Ex. 2209 at GOV 55880; Ex. 2019 at GOV 55811; Ex. 2038 at JB 485; Ex. 4458 at CL 36237).

311.    Carol Gordon, the Office Supervisor to David McConnell, AHERF's CFO, took shorthand notes of what was said about the business of AHERF at each Audit Committee meeting from 1996 to 1998.  (Tab 20, Gordon Dec. at 13).

312.    During the October 15, 1996, Audit Committee meeting, when the audited fiscal-year 1996 financial statements were approved, Mr. Buettner reassured the Committee that AHERF had taken a "very realistic and conservative approach" to establishing reserves and that Coopers performed "additional work in the receivables area from a control perspective and from an individual billing review perspective," and that it was "comfortable with the process

management is following to establish reserves."  (Ex. 1648 at GOR0000198; Tab 20, Gordon

Dec.).

On September 23, 1996, Coopers had provided its fiscal 1996 management

comment letter to the AHERF Board.  That letter was designed to provide "suggestions or ideas

where the organization could improve its system of internal controls or its processing . . . ."

(Buettner Dep. at 48).  In that letter, Coopers told the AHERF Board the methods used by the

AHERF hospitals for reserving accounts receivable were "designed appropriately."

> As a result of our procedures, we have concluded that the controls
> over the establishment and monitoring of accounts receivable
> reserves are designed appropriately and are operating effectively so
> as to properly adjust accounts receivable balances to their
> estimated net realizable value.

(Ex. 22 at DC8230 page 4 of 16; Buettner Dep. at 329-31).  In fact, Coopers was not comfortable

with the process AHERF used to establish the bad debt reserve estimates for the DVOG

hospitals.  (Buettner Dep. at 216-20; Ex. 4274).

313.    At the March 14, 1997, Audit Committee meeting, at which Coopers' fiscal-year

1997 audit plan was approved, Mr. Barnes, the Audit Committee Chair, "urge[d]" Coopers to

keep a "heavy eye" on AHERF's accounts receivable.  (Tab 20, Gordon Dec. at Ex. 6,

transcription for 3/14/97 Audit Committee meeting at GOR0000040).  Mr. Buettner assured the

Committee:  "in terms of our overall time commitment, that is our overall largest time user.

Have listed areas of audit focus, and patient receivables is at the top."  (*Id.* at GOR0000040.)

314.    At each Audit Committee meeting during fiscal-years 1996, 1997, and 1998, the

Committee offered to meet with Coopers in Executive Session in order to provide Coopers with

an opportunity to discuss, outside of management's presence, confidential and/or sensitive

matters regarding the information provided by senior financial management.  (Tab 9, June 1996

Bylaws at PR-PLD-022-212; Tab 21, December 1996 Bylaws at DBR-LI-183363; Ex. 2015 at

DBR-CG-391; Ex. 2016 at GOV 56062; Ex. 1676 at SEC-1-0001761; Ex. 2209 at GOV 55884; Ex. 2019 at GOV 55816; Ex. 2038 at JB 493); Hilton Dep. at 187-89 (executive session offered to Coopers so auditors could "point out any deficiency or concerns that they would suggest [the Audit Committee] take a look at . . . that they would run across during the course of their audit" or things that needed improving or were incorrect).

315.    Coopers declined every offer of Executive Session extended by the Audit Committee during fiscal-years 1996, 1997, and 1998.  (Ex. 2015 at DBR-CG-391; Ex. 2016 at GOV 56062; Ex. 1676 at SEC-1-0001761; Ex. 2209 at GOV 55884; Ex. 2019 at GOV 55816; Ex. 2038 at JB 493).

316.    Coopers presented "clean opinions" of AHERF's audited financial statements for fiscal-years 1996 and 1997, stating the financial statements "present[ed] fairly, in all material respects, the consolidated financial position" of AHERF at June 30, 1996, and June 30, 1997, respectively.  (Ex. 1661 at JB 01606; Ex. 58 at TN CBC 43B 00895; Hernandez Dep. at 106).

317.    Coopers never informed the Audit Committee or the AHERF Board that the fiscal-year 1996 or 1997 financial statements contained intentional or material misstatements, evidenced fraud by financial management, or contained information that raised questions about the competence or integrity of AHERF's financial management.  (*See, e.g.*, Audit Committee members' testimony:  Barnes Dep. at 311; Brenner Dep. at 162-63, 174-75; Gumberg Dep. at 345-46; A. Cook Dep. at 258-260; Hernandez Dep. at 167-68; Hilton Dep. at 218-19; Thomas Dep. at 118, 125-29).  (*See also, e.g.*, Board member's testimony:  Adam Dep. at 139, Atkinson Dep. at 127; Brown Dep. at 172; Davenport Dep. at 110-11 ("historically up until the end, we always made money."); Marks Dep. at 86-87; Murasko Dep. at 183-85; Ray Dep. at 110-12; J.B.

Snyder Dep. at 164-65; Williamson Dep. at 182-85); *see also* Ex. 1661 at JB 01606; Ex. 58 at

TN CBC 43B 00895).

318.    Audit Committee and AHERF Board members testified that information in the

audited financial statements did not suggest that additional expansion activities could threaten

AHERF's financial viability or that AHERF was in financial distress.  (*See, e.g.,* Audit

Committee members' testimony:  Gumberg Dep. at 356-57; Hernandez Dep. at 178-82; O'Brien

Dep. at 88-89, 92 (audited financial statements gave him "comfort" that AHERF was "still cash

flowing in a meaningful way" and was "clearly still operationally solid," even though specific

initiatives such as physician practices may have been losing money).  (*See also, e.g.,* Board

members' testimony:  Atkinson Dep. at 128-30; Miller Dep. at 71-72; Murasko Dep. at 183-85;

Sunstein Dep. at 112-13; J.B. Snyder Dep. at 161-62, 172-73).

319.    In discharging their fiduciary duties, AHERF Board members were entitled under

Pennsylvania law to rely, and did rely, upon information, reports and statements from Coopers,

as AHERF's external auditors, as well as information, reports and statements from Board

committees on which they did not serve, including the Audit Committee.  (15 Pa. C.S.A.

§ 5712(a); Martinelli Dep. at 184-85 (". . . I'm entitled to rely not only on the outside auditors,

I'm entitled to rely on the people, board members or committees who form the committee of the

board to deal with the audit and finance committee.").

320.    Audit Committee and AHERF Board member Ralph Brenner described Coopers

as the "ultimate guardian" of AHERF's financial management.  (Brenner Dep. at 119-20).  He

testified the Board relied on Coopers to "bring to their attention any concerns, any new

procedures, any new materials which they may have learned about so that the board can consider

it and react and make intelligent decisions as to how to proceed."  (*Id.*).

321.    Other members of the Audit Committee and the AHERF Board relied on Coopers to advise them of any improprieties in AHERF's financial statements.  (Barnes Dep. at 227-228 (audited financial statements were "numbers from God."); Danforth Dep. at 227 ("you depend upon the external auditors to verify what your internal people are reporting."); Russell Dep. at 103-05 (Coopers functioned as "watchdog" for "fraud or any other unusual practice that would lead them to have any concern").

322.    Members of the AHERF Board and the Audit Committee relied on the audited financial statements for fiscal-years 1996 and 1997 for many purposes, including their efforts to: (1) monitor the success of management's business strategy; (2) verify the internal quarterly financial information submitted by management was accurate; (3) confirm AHERF's internal financial controls were satisfactory; and (4) gauge the success of specific strategic initiatives, such as physician-practice or hospital acquisitions.  (*See, e.g.,* Audit Committee members' testimony:  Barnes Dep. at 227-28, 230 (relied on audited financial statements to assess AHERF's performance from a "qualitative" and "quantitative" standpoint); *see also id.* at 299-300 (focused on "P&L," or profit and loss statement, in audited financial statements to measure success of AHERF's strategy of purchasing hospitals, physician practices, and medical schools); A. Cook Dep. at 235-37 (used audited statements to gauge AHERF's performance on a consolidated basis); Danforth Dep. at 226-29 (used audited statements to measure whether AHERF's CEO was following through on his promise to turnaround acquired hospitals and to gauge the success of management's IDS strategy); Gumberg Dep. at 310-13 (used audited statements to validate the accuracy of information from management, make decisions affecting AHERF, measure the performance of physician-practice and hospital acquisitions, and determine whether AHERF's internal controls were satisfactory); Hernandez Dep. at 156-59 (used audited

statements to discharge his oversight obligations as a Trustee and monitor management's performance); Hilton Dep. at 186 (based decisions he made as a Trustee in part on the audited financial statements); O'Brien Dep. at 94-95 (based "judgments on performance and risk" on audited financial statements); Sculley Dep. at 144-45 (used audited statements to verify that management's numbers were "sound"); Thomas Dep. at 111 (used audited statements "to see how the organization . . . was doing financially."). (*See also, e.g.,* Board members' testimony: Allyn Dep. at 143-45 (used audited statements to verify information from management and to assess success of management's business plan); Atkinson Dep. at 127-28 (used audited statements to gauge AHERF's performance and compared them with financial information provided by management); Davenport Dep. at 110-11 (used audited statements to gauge whether AHERF's business plan was wise); J.B. Snyder Dep. at 143-46 (used audited statements as a check on information provided by management, oversee management's performance, and gauge the performance of physician-practice and hospital acquisitions)).

323.    Mr. Barnes explained that AHERF's Board members used the audited financial statements to make decisions affecting AHERF:

> [W]e received [the audited] statements on the basis of which we had to make decisions, and it was important to us to know that a legitimate, qualified, highly-reputable outsider [Coopers] had said, in essence, we have reviewed the statements, and the numbers are accurate.

(Barnes Dep. at 313; *see also* J.B. Snyder Dep. at 143 (Board used the audited financial statements to review "the health of the organization….They were audited statements, and therefore you felt you could rely upon them to be the gospel.").

324.    Robert Palmer, a member of the Audit Committee and the AHERF Board, explained why accurate financial information was critical as a management tool:

> Because you must understand what it is you are dealing with. . . .
> If you can't measure it, you can't manage it, to put it simply.

(Palmer Dep. at 231).

325.    Audit Committee and AHERF Board members expected Coopers to inform the Audit Committee or the Board if Coopers discovered:  (1) intentional or material misstatements in the financial statements presented by management for audit; (2) fraud in the preparation of the financial statements presented by management for audit; or (3) misstatements reflecting negatively on the competence or integrity of AHERF's senior financial management.  (*See, e.g.,* Audit Committee members' testimony:  Barnes Dep. at 312; Brenner Dep. at 119-20, 166-69; A. Cook Dep. at 247-28, 257-59; Gumberg Dep. at 345-46; Hernandez Dep. at 166-67; Hilton Dep. at 185-86; O'Brien Dep. at 93-94; Russell Dep. at 107-08).  (*See also, e.g.,* Board members' testimony:  Adam Dep. at 147-48; Allyn Dep. at 159-60; Atkinson Dep. at 120-22; Brown Dep. at 159-75; Davenport Dep. at 110-11; Murasko Dep. at 178-87; Ray Dep. at 107-09, 111; J.B. Snyder Dep. at 143-44, 164-65; Williamson Dep. at 183-84).

326.    Audit Committee and Board member Mr. Brenner explained:

> I'm telling you maybe I'm an old fart, but any indiscretion, no matter how minor it was, in any of my fiduciary relationships, . . . I would not tolerate under any circumstances any questions whatsoever if they came to our -- my attention, and I . . . tried to . . . look at whatever information was provided to me so that I could make a judgment based on that information . . . and if there was any minor thing brought to my attention, I would ask that it be looked into fully and that the board and I have an opportunity to evaluate that circumstance and make a decision, whatever it may be.

(Brenner Dep. at 174-75).

327.    Audit Committee and AHERF Board member Thomas O'Brien testified how he would have responded had Coopers questioned AHERF's financial statements:

> I know precisely what I would do, yes.  I would demand to have a
> special committee look into the allegations.  That special
> committee would probably have been from the board, not just from
> the audit committee, because of the seriousness of the allegations.

(O'Brien Dep. at 103).

328.    AHERF Board members who were not on the Audit Committee relied on that

Committee to investigate any concerns raised by Coopers during the course of its audit work

regarding the discovery of intentional or material misstatements, management fraud, or

misstatements reflecting negatively on the competence or integrity of AHERF's senior financial

management.  (*See, e.g.*, Atkinson Dep. at 120-26; Davenport Dep. at 99-103 (same); Fletcher

Dep. at 164-67; Marks Dep. at 87-88; Ray Dep. at 108-12; Williamson Dep. at 194-95; *see also*

15 Pa. C.S.A. § 5712(a).  Ira Gumberg, an Audit Committee and Board member, testified that, if

an inquiry revealed that there were questions about the competence and integrity of those in

financial management, including Messrs. Abdelhak and McConnell, the board would have had

no option "other than [to] terminate them." (Gumberg Dep. at 351).

329.    Mr. Barnes explained how he would have reacted if Coopers had informed the

Audit Committee in 1996 that AHERF had suffered a loss rather than the reported gain in that

fiscal year:

> Assuming [Coopers] had - well, I think what it does is it opens the
> door to a lot of questions.  Now, how they all get answered, I'm
> not sure, but, you know, one family of questions is the internal
> questions.  I mean, why did we not earn the $6 million we thought
> we did?  I mean, is it an annual problem or is it just a one-year
> thing?  Where did it happen?  Why did it happen?  Are there one
> problem or are there ten problems?  Does this suggest that the
> damn financial statements system isn't any good or is good?
>
> You get that series of questions, and then you got a secondary
> series of questions is, okay, you know, what do you do about it?
> You can say, well, give up Philadelphia and sell everything in
> Philadelphia or kick it out one way or another.  You can get a new

> management team.  There are probably half a dozen options on that
> side of the coin, one of which would be to bring in a consultant.

(Barnes Dep. at 183-84).

330.    AHERF Board members would have followed the Audit Committee's

recommendations arising from that Committee's investigation of any disclosures by Coopers of

intentional or material misstatements, management fraud, or misstatements reflecting negatively

on the competence or integrity of senior financial management.  (*See, e.g.,* Adam Dep. at 151-52

would have followed whatever prudent course was dictated by the results of Audit Committee's

investigation); Atkinson Dep. at 123-26 (would not have ignored conclusions of Audit

Committee regarding investigation of fraud); Brown Dep. at 166-72 (would have followed Audit

Committee's recommendation about what course of action to follow); Fletcher Dep. at 166

(would base decisions on Audit Committee's investigation of material misstatements); Martinelli

Dep. at 186-96 (Board would take "appropriate actions," including dismissal of senior financial

management, based on Audit Committee's recommendations; Murasko Dep. at 183-94 (Murasko

was "absolutely dependent" on "external [sic] audit committee" to inform the Board if something

was wrong with the financial statements); *see also supra* ¶¶ 147, 150-52.

331.    During fiscal-years 1996, 1997, and 1998, the AHERF Board approved every

resolution recommended by the Audit Committee regarding matters related to the external audits

of AHERF's financial statements.  (Exs. 2050, 2056, 829, 832, 530, 1994, 2709, 2024, 2178,

2508, 2562.

332.    When Mr. Gumberg learned from members of management that Mr. Abdelhak

had directed certain transfers of money from AGH to AHERF's eastern-region affiliates be

classified as "investments" rather than loans "due from affiliates" on AGH's 1997 fiscal year-

end financial statements, he required Mr. Abdelhak to disclose the transfers to the AHERF Audit

Committee and the AUH (Western Region) Resource Management Committee ("AUH-W RMC"). (Gumberg Dep. at 243-47, 249-55; Tab 20, Gordon Dec. at Ex. 7, transcription for 10/15/97 Audit Committee meeting at PR-RS COMPUT 82-83).

333.     In response to Mr. Abdelhak's disclosure of the transfers, the Finance Committee of the Board (of which Mr. Gumberg was also a member) formed the Internal Loan Committee which consisted of external trustees to "authorize any and all inter-company loans in excess of $10 million to, or from, any Allegheny entity to another, including the interest to be charged and the repayment schedule." (Ex. 1664, 1/11/98 memo from Abdelhak to Barnes; Gumberg Dep. at 256-58; Barnes Dep. at 241-42; Tab 20, Gordon Dec. at Ex. 14, transcription for 6/20/97 Finance Committee meeting at GOR0000071).

334.     The AUH-W RMC formed a special task force of external trustees to investigate the "origin and nature of the intercompany transactions and advances." (Ex. 2051, AUH-West Report from Task Force Reviewing Intercompany Loans at HE 1373; Gumberg Dep. at 255-56). During the course of its investigation, the task force met with Mr. Buettner. (*Id.*).

335.     When Messrs. Barnes and Gumberg learned from Mr. Abdelhak in April 1998, that Mr. McConnell had "really messed up the books" by overstating reserves at the former GHS hospitals and transferring the reserves to other AHERF entities in violation of GAAP, Messrs. Barnes and Gumberg recommended independent legal counsel be retained to investigate the matter, and counsel was retained the next day. (Ex. 2060 at IG 337; Gumberg Dep. at 370-71).

336.     On June 5, 1998, the AHERF Executive Committee of the AHERF Board removed Sherif Abdelhak from all AHERF offices and from all AHERF-related Boards and Committees because trustees had lost confidence in his ability to lead AHERF, questioned his integrity, and disapproved of the repayment of the Mellon Bank line of credit in late April 1998.

(Ex. 1993, 6/5/98 AHERF Executive Committee meeting draft minutes; Fletcher Dep. at 175-76; Barnes Dep. at 267-68; Gumberg Dep. at 346-48; Palmer Dep. at 244-46; W. Snyder Dep. at 145-46, 149-51).

337.    In mid-June 1998, Mr. Buettner was removed from Coopers' Engagement Team for AHERF at the Audit Committee's request.  (Buettner Dep. at 792).  At its June 20, 1998, meeting, the AHERF Executive Committee discussed the need for a "fresh look at audit approach and totally new team."  (Ex. 1983, notes of 6/20/98 Executive Committee meeting, at TAC055214).

338.    In late June 1998, the AHERF Executive Committee removed David McConnell from all AHERF offices and all AHERF-related boards and committees.  (Tab 24, 6/26/98 AHERF Executive Committee meeting agenda at TAC055629CM, Tab 25, 7/9/98 AHERF Executive Committee meeting materials at TAC055706CM-707CM).

339.    In August 1998, the Audit Committee expanded the scope of audit work to be performed using Price Waterhouse legacy personnel, to examine issues regarding the fiscal-year 1997 audit, including (a) the accounting for the Lockhart trust funds, (b) the Graduate reserve transfer, (c) accounting for intercompany loans, and (d) Rabbi Trust accounting.  (Hope Dep. at 43-45; Cepielik Dep. at 59, 63).

340.    After Sherif Abdelhak was terminated, the AHERF Board approved the retention of the Hunter Group to "provide assistance to management in determining operational strengths and weaknesses as well as in forming a plan to stem losses and correct operational deficiencies." (Tab 26, 6/13/98 AHERF Executive Committee meeting draft minutes at TAC055155CM; Ex. 1447, 6/20/98 AHERF Executive Committee meeting agenda at TAC055222CM; Ex. 1554, Hunter Group Management Services Agreement; Stickler Dep. at 144-45).

341.    Daniel Stickler, the interim chief operating officer for AHERF's eastern region from the Hunter Group, testified that had the Hunter Group been retained 18 months earlier, he could have implemented a turnaround plan and avoided bankruptcy.  (Stickler Dep. at 375-76).

342.    When the Audit Committee learned certain accounting and reporting issues may require a restatement of AHERF's audited fiscal year 1997 financial statements, the Committee decided to replace Coopers as external auditors for AHERF and its subsidiaries.  (Ex. 2105, 8/27/98 Audit Committee meeting draft minutes at CL 150834-38; Stalder Dep. at 349-52; Russell Dep. at 114).

343.    On September 2, 1998, AHERF issued a press release stating that "no further reliance" should be placed on AHERF's audited fiscal-year 1997 financial statements.  (Ex. 1289, 9/2/98 Press Release at DBR-SG-6009; Korbly Dep. at 260-61).

344.    When AHERF's fiscal-year 1996 audited financial statements were released in the Fall of 1996, a number of banks and other credit institutions had substantial credit relationships with AHERF and its affiliates.  By June of 1996, MBIA had insured DVOG's repayment of approximately $306 million in long-term bonds.  (Ex. 2618; Weill Dep. at 76-77).  Similarly, PNC had entered into two agreements with DVOG members guaranteeing the payment by DVOG of approximately $50 million in revenue bonds and approximately $54.2 million in commercial paper notes.  (Kite Rpt. at 16-17; Exs. 332, 333; Mertz Dep. at 69).

345.    By September of 1996, various members of DVOG owed an aggregate of approximately $57 million under short-term loans to three banks.  PNC had two lines of credit with approximately $33 million in principal outstanding to DVOG entities.  (Kite Rpt. at 19-20; Ex. 1701; Knittel Dep. at 61-62; Tab 27, F&L-01-014168-83, F&L-01-014164-66).  CoreStates Bank had loaned approximately $16.5 million to DVOG entities, and First Fidelity (by then part

of First Union Corporation) had loaned $7.5 million to a DVOG entity. (Kite Rpt. at 18-21; Exs. 2693, 2730, 2731; Woodward Dep. at 151; Seybold Dep at 10-13).

346.    By September of 1996, the Allegheny General Hospital Obligated Group ("AGHOG") also had significant long-term debt obligations. Morgan Guaranty Corporation had issued a letter of credit guaranteeing $50 million in 1995 Series B long-terms bonds. (Ex. 327; Mertz Dep. at 56-57). PNC had entered into an agreement guaranteeing the payment by AGHOG of $90 million in long-term bonds, of which approximately $75 million was outstanding. (Exs. 325, 326; Mertz Dep. at 54-56; Kite Rpt. at 23). MBIA had insured the repayment by AGHOG of approximately $72 million in long-term bonds. (Exs. 1865, 899; Rocha-Sinnha Dep. at 118-19).

347.    The creditors were misled by AHERF's management and by Coopers about AHERF's true financial condition, largely through the inaccurate presentation of AHERF's financial condition and results of operations in its fiscal-year 1996 and 1997 audited financial statements. Among other things, the financial statements concealed from the creditors that AHERF had violated covenants or other obligations in its credit agreements. (Berliner Rpt. at 2-3).

348.    The DVOG Master Trust Indenture ("MTI"), under which the obligations securing DVOG's long term debt were issued, required DVOG's financial statements to be prepared in accordance with GAAP. (Kite Rpt. at 11; Ex. 330; Mertz Dep. at 62-63). DVOG's audited financial statements for fiscal-years 1996 and 1997, however, contained numerous GAAP violations. (Berliner Rpt., Bases for Opinions 2-4, 7-12, 15-16). In addition, DVOG was required to maintain a debt service coverage ratio of at least 1.10:1.00. (Ex. 330 at § 6.3.) Properly audited financial statements would have disclosed that the ratio was only 0.88:1.00 for

fiscal-year 1996, and that, for fiscal-year 1997, it had fallen to 0.63:1.00, resulting in a non-curable breach. (Kite Rpt. at 12; Ex. 330). The breach of the debt service coverage ratio also constituted an Event of Default under the DVOG First Supplemental Master Trust Indenture (a provision intended for the benefit of MBIA), and a violation of DVOG's loan agreements with the Pennsylvania Higher Education Facilities Authority and the Bond Indentures for the outstanding bonds. (Kite Rpt. at 12-13, 15-16).

349.    If they had known that DVOG had violated the debt service coverage ratio covenant, MBIA and PNC could have caused the DVOG Master Trustee to direct all DVOG's gross revenues to be deposited with it and the Master Trustee would have had the discretion, working with a consultant, to determine how those revenues would be spent. (Kite Rpt. at 14-15; Ex. 330; Tab 11, Weill Dec. at ¶ 13). Likewise, third-party payors would have been required to make payments to a lockbox controlled by the Master Trustee. (Kite Rpt. at 16; Ex. 332 at PNC 18763; Ex. 333 at PNC 18710-11; Mertz Dep. at 68-70). In addition, MBIA and PNC could have caused the Master Trustee to accelerate all outstanding obligations under the DVOG long-term debt. (Kite Rpt. at 14; Ex. 330; Tab 11, Weill Dec. at ¶ 14). Finally, DVOG would have been required to inform the public about the default, which would have increased the pressure on DVOG and AHERF to institute reforms. (Kite Rpt. at 17; Ex. 2677 at FOLEY 22554-55; Taylor Dep. at 85-87).

350.    DVOG's violations of the debt service coverage ratio also would have constituted an event of default under the loan with First Union. If DVOG's violations had been disclosed, First Union had the right not to extend its $7.5 million line of credit with Hahnemann University Hospital (HUH), which was otherwise scheduled to come due on October 31, 1996. First Union's decision not to extend the line of credit would likely have heightened the concerns of

other lenders.  Furthermore, if HUH did not repay the line of credit, this would have led to cross-defaults under other debt instruments.  (Kite Rpt. at 18-19; Exs. 2669, 2693; Woodward Dep. at 79-80, 150-51).  A breach of the DVOG MTI also would have led to defaults under PNC's $33 million lines of credit to DVOG and would have allowed PNC to exercise a wide variety of remedies, including acceleration.  These defaults would have given PNC considerable leverage in negotiations regarding DVOG's debt service coverage ratio violation.  (Kite Rpt. at 19-20; Ex. 1701; Knittel Dep. at 61-62; Tab 27 at F&L-01-014168-83).  If CoreStates had known DVOG's true financial condition, it could have demanded payment.  Core States' loans were payable on demand.  (Kite Rpt. at 20-21; Exs. 2730, 2731; Seybold Dep. at 10-13).

351.    According to PNC's Jeffrey R. Dickson, a vice-president with responsibility for PNC's relationship with AHERF, "[a]udited financial statements are the most important document that banks rely upon in trying to assess the financial condition of a borrower"; they provided the "foundation upon which [his] assessment of AHERF was based."  (Dickson Dep. at 99, 170, 173, 277).  PNC's relationship manager for AHERF, Marcella Knittel, testified that PNC placed a "great deal of reliance on the audited financial statements."  (Knittel Dep. at 496; *see also* Michael Dep. at 41-42).  Mr. Dickson explained why audited financial statements were so important:

> [m]anagement has the ability to present--to create a financial
> presentation of accounts within certain limits as they choose to do
> so.  The auditors are the ones who make sure that the accounting
> structure and the financial reporting, the accuracy, the integrity, the
> reliability, et cetera, et cetera, conforms to generally accepted
> accounting principles.  Without that attestation from the auditing
> firm, you don't have that complete confidence that the quarterly
> statements are, in fact--I'm not saying that there is something
> wrong, but you don't know until you actually get the audited
> financial statements that these have been reviewed by an outside
> third-party and they conform to Generally Accepted Accounting
> Principles.

(Dickinson Dep. at 82-83). Mr. Michael testified that audited financial statements should "project a true and correct . . . picture of the financial viability of the firm." (Michael Dep. at 187-89).

352.    MBIA received DVOG's 1996 audited financial statements by letter dated October 31, 1996. Karleen Carlson Strayer, the manager of the healthcare group in MBIA's surveillance department, received them shortly thereafter and forwarded them to Mr. Heberton. (Ex. 1884; Strayer Dep. at 27-28, 150-51, 154-55; Heberton Dep. at 70-72).

353.    When Mr. Heberton prepared the February, 1997 rating and review form for DVOG, he had been misled by DVOG's 1996 audited financial statements into believing that "[t]he tertiary hospitals and St. Christopher's [were] the money makers in the Group." (Ex. 1887 at MBIA 029895.) Mr. Heberton explained at his deposition that he was referring to three hospitals: St. Christopher's, MCPH (a/k/a "East Falls Hospital"), and Hahnemann (a/k/a "Center City"). (Heberton Dep. at 56-57, 177-80; Ex. 1887 at MBIA 29894).

354.    Although the audited financial statements presented these three hospitals as "money makers," in actuality they were not. DVOG's 1996 audited financial statements misstated the financial results for St. Christopher's, Hahnemann, and MCPH. According to the audited financial statements, St. Christopher's had positive net income before extraordinary item and change in accounting principle of $14.7 million, when in reality it was a negative ($11.7) million. MCPH reported a positive $5.1 million in net income, when it really was a negative ($6.7) million. Similarly, Hahnemann reported a positive net income of $4.9 million when it was really a negative ($20.2) million. (Ex. 1884 at MBIA 015842; Berliner Rpt. at Appx. I).

355.    Because of the incorrect audited financial statements, MBIA was also misled about the extent to which AHERF had unrestricted funds available to assist DVOG. In preparing

his February, 1997, rating and review for DVOG, Mr. Heberton reported that the AHERF system had about $200 million in "unrestricted cash." (Ex. 1887 at MBIA 029894). In March of 1997, MBIA issued an internal "Alert Report" for DVOG, which stated that the AHERF system had $200 million in unrestricted cash, "[p]artially mitigating" MBIA's concerns. (Ex. 2193 at MBIA 029899; Heberton Dep. at 101-02).

356.    MBIA had frequent discussions with Mr. McConnell, Mr. Martin and others at AHERF. (Heberton Dep. at 101; Strayer Dep. at 257-58; Reilly Dep. at 31-37).

357.    In April of 1998, MBIA personnel met in Pittsburgh with Mr. Abdelhak and other AHERF representatives, including AHERF trustees J. David Barnes and Ira Gumberg. (Strayer Dep. at 262; Ex. 1667). Regarding the meeting, Ms. Strayer testified:

> . . . I think what the board and MBIA did not have a full appreciation for, that could have made a difference, is how serious the extent of financial difficulties were, and I don't know that any of us understood even at this late date how bad things really were.

(Strayer Dep. at 457-59, 465-66).

358.    To help AHERF avoid bankruptcy, MBIA and PNC offered, on July 7, 1998, to make up to $160 million in emergency financing available to AHERF. (Ex. 1898; Weill Dep. at 209-11; Stevens Dep. at 252-53). Thereafter, in a letter dated July 11, 1998, and addressed to AHERF's Board, MBIA outlined a proposal for interim financing that was designed to allow the AHERF system to be sold and thereby avoid bankruptcy. (Ex. 1642; Weill Dep. at 220; Sanzo Dep. at 398-99). MBIA's July 11 proposal was followed by PNC's liquidity proposal delivered to AHERF on July 13, 1998. PNC, in conjunction with MBIA, expressed a willingness to provide DVOG with $33 million so that AHERF's Eastern Region could survive through August 7, 1998. (Ex. 1243; Weill Dep. at 222-23; Sanzo Dep. at 402-03).

359.     According to Mr. Weill, MBIA's efforts to remedy AHERF were undermined by the unreliable 1996 audited financial statements:  "Implicit in all of the discussions that we had at MBIA was a belief that the information that we were receiving was accurate and correct, that there weren't any misstatements in it."  (Weill Dep. at 223-24).

360.     The misstatements in the financial statements concealed the existence of covenant violations which MBIA could have used to force AHERF to retain a consultant, like the Hunter Group:  "If we had known that [covenant violations existed] we would have had the leverage or would have applied the leverage to have gotten the Hunter Group in there, or would have attempted to apply the leverage."  That "leverage" included the "threat of acceleration."  (Weill Dep. at 288).

361.     Mr. Weill also testified that: "If the debt coverage test had been broken one, we knew about it in '97, [sic] we would have had more power, more ability to cause the board to look at costs, to cause Hunter to be inserted, to do all kinds of things, obviously always with the threat of causing there to be an acceleration."  As Mr. Weill explained: "You work with people, but you have to have the right to assert things, and we didn't know we had the right, because the financial statements that were given to us turned out to be, at least according to Coopers & Lybrand, incorrect because they restated them."  (Weill Dep. at 294-95).  Mr. Weill testified: "[I]f we had known the facts, we would have done what we did in other circumstances which is to talk to the directors -- the trustees directly and point out to them what the management was doing and what we thought was wrong."  (*Id.*. at 170; *see also* Tab 11, Weill Dec. at ¶ 19).

362.     Mr. Reilly also testified about the impact that notice of a DVOG covenant violation would have had on MBIA:

Q.     Let me ask you this.  If there had been a covenant violation at the DVOG and a quarterly liquidity ratio imposed by MBIA, how

-114-

would that have impacted MBIA's losses as a result -- how would
that have impacted MBIA's position?

A.     That would have been a very big deal.  First of all, it wouldn't be
just a liquidity covenant.  There would be other performance
measures and transfer limitations.  But bottom line, profitability
issues, perhaps accounts receivable agings, things of that nature.
What it would do, it would give you more frequent reporting to
hold management to.  And as they say they're going to do A, B and
C, the next month you get to see whether they've done it or not.
To the extent they don't, you certainly alert them to it.

And if you don't get anywhere, again, you go to Sherif [Abdelhak],
you go to the board.  And if we could have seen Ira [Gumberg] and
David [Barnes] a year earlier, that could have had a really big
impact.  The Hunter Group said boy, just 60 or 90 days would have
made a big difference.  Can you imagine what a year would have
made?

(Reilly Dep. at 164-65).  As Mr. Reilly succinctly put it: "Timing's everything."  (*Id.*).  Mr.

Reilly described measures MBIA would have taken if a covenant had been breached, including

imposing a liquidity ratio, requiring a consultant call-in, more frequent financial reporting and

better cash and transfer controls, and designing a plan to shore up DVOG's balance sheet.  (*Id.* at

146)

363.     Patrick Mathis, the managing director of MBIA's surveillance department

responsible for healthcare clients, testified that disclosure of covenant violations (such as

DVOG's violation of the debt service coverage ratio) would have prompted MBIA to go into

"remedial overdrive."  (Mathis Dep. at 30-33, 309-10).

364.     Ms. Strayer testified that events would have been dramatically different if MBIA

had received accurate audited financial statements for 1996:

A.     . . . I mean, certainly if we had had financial statements in 19 -- for
fiscal 1996 that showed a rate covenant failure, we would have
been able to effect change better and potentially had a successful
remediation with AHERF.

Q.     And what's your basis for that statement?

A.    Because my basis for that statement is that my understanding is
that the, the net income position of the 1996 financial statements
was presented incorrectly in the audit and, if it had been correctly
presented, there would have been a rate covenant failure but also
potentially a very substantial negative number on the net income
line.

And the fact that the bonds had just been issued in June of 1996
and a few months later would have shown not only a rate covenant
failure but also a negative bottom line and 70-plus million dollar
asset transfer would have been a real wake-up call, would have led
to, I'm sure, a stronger board reaction than what actually occurred;
would have probably led to, you know, newspaper reports on this
occurrence.

In my almost 17 years of experience in healthcare, I've never seen
a situation where public bond issue is done and a few months later
you have massive losses and a covenant default; I've never seen
that.

So it would have been news in the industry; it would have been
news in Philadelphia, certainly; the doctors would have gotten
involved; so I believe there would have been a lot of things that
could have happened in late 1996, if those statements had shown
the loss that it should have.

(Strayer Dep. at 555-57).

365.    If MBIA had been presented with accurate financial information from the

beginning, then, according to Ms. Strayer, the April, 1998 meeting with Mr. Abdelhak, Mr.

Barnes, Mr. Gumberg and others could have occurred much sooner:

I think the reason it occurred, when it did, is that none of us, and I
can't speak for the board members but I can speak for myself, I
think none of us in May of 1998, while we understood that this
situation was very, very serious, I don't know that we understood
that the hospital system was two months away from, from
bankruptcy.

And to my earlier point: Had the financial statements indicated the
losses that subsequently we realized should have been presented,
we would have had a dramatically different response in 1996, as I
believe the board would have also.

-116-

>So was this late? Yes. Was it because we weren't paying attention?
>No. It was because we did not have the full information that we
>needed.

(*Id.* at 470-71).

366.    Ms. Strayer testified that, if there had been a covenant breach, MBIA could have

negotiated changes to the underlying bond documents including restrictions on assets transfer,

which would have limited DVOG's ability to transfer money to affiliates, most notably AIHG.

(*Id.* at 318).

367.    With a covenant breach, Ms. Strayer testified that MBIA also would have had the

option of seeking political support for changes at AHERF, given AHERF's non-profit status and

the number of jobs at stake. Mr. Weill also testified that MBIA "could have gone to the

governor" and "could have gone to the newspapers." (*Id.* at 371; Weill Dep. at 289).

368.    With properly audited financial statements, revealing accurate information about

AHERF's true financial performance and condition, MBIA would have been more aggressive in

pressing for change in AHERF's operations than it had been. (Tab 11, Weill Dec. at ¶¶ 18-28).

369.    Mr. McCool, PNC's workout specialist, became involved with AHERF in May of

1998 after a meeting in Philadelphia where AHERF's management made a presentation to the

creditors, including PNC and MBIA, about how AHERF intended to correct its financial

problems. He testified that, given the liquidity position of DVOG, PNC devised a term sheet that

they offered to AHERF that would have provided more liquidity so AHERF could meet its

obligations. In return, according to Mr. McCool, PNC asked AHERF to pledge the western

assets but AHERF refused to do so. (McCool Dep. at 62, 67-68).

370.    According to Mr. McCool, in the weeks leading up to the bankruptcy filing, PNC

had a number of meetings with AHERF's management and select trustees. (*Id.* at 182-83). In

May of 1998, PNC was engaged in negotiations with AHERF. As part of these efforts, PNC

attempted to obtain information from AHERF on various matters. (Ex. 2078; McCool Dep. at 201).

371.    Mr. Michael also testified about efforts PNC made, along with MBIA, to avoid AHERF's bankruptcy by approaching AHERF's Board of Trustees in July of 1998 with a financing proposal. (*Id.* at 132; Ex. 1819).

372.    Mr. McCool testified that having accurate and timely financial statements is important to PNC because it allows PNC to better assess its options and to make more-informed decisions. (McCool Dep. at 277-78).

373.    Mr. Camp, a PNC credit analyst, testified that he would have wanted to know if AHERF's auditors had discovered GAAP violations because that "would mean [he] couldn't trust the financial statements" which would have been important because his "entire analysis [was] built off of those [audited financial] statements." (Camp Dep. at 273-75).

374.    C. David Cook, the manager of PNC's healthcare and public finance group, compared financial covenants to "rumble strips" on a highway and testified that covenants are intended to alert PNC to potential problems. When confronted with a covenant violation, PNC's objective is to evaluate its significance and, if appropriate, give its borrowers the opportunity to improve their financial condition. Consequently, creditors must receive properly audited and correct financial statements so that financial covenant violations are timely disclosed. (C.D. Cook Dep. at 18, 99, 104, 114).

375.    Mr. Kite stated in his report that, "[a]s a result of AHERF's prominence in the Pittsburgh and Philadelphia healthcare markets, it is my opinion, . . . that the disclosure of a covenant breach . . . would have generated significant publicity, thereby adding to the pressure on AHERF's management and fiduciaries to implement remedial measures." Mr. Camp's

testimony confirms this opinion.  Mr. Camp testified that he attempted to "stay as apprised as [he] could" of press reports regarding entities for which he had credit responsibilities.  Had media reports disclosed that shortly after the closing of the 1996 bond refinancing DVOG had violated its covenants, Mr. Camp would have taken note of that fact and ". . . sought out whatever [he] could have found."  (Kite Rpt. at 8; Camp Dep. at 131).

376.    In the event of a covenant violation, PNC would have reviewed its agreements to see what rights and remedies PNC had available to it.  (C.D. Cook Dep. at 597).  PNC's decisions regarding its exercise of these rights and remedies would have been guided by the facts and circumstances as they existed at the time.  (*Id.* at 598; Michael Dep. at 196).  PNC would not have ignored a covenant violation.  (C.D. Cook Dep. at 597).

377.    Paula Mammarella, a Senior Financial Analyst with responsibility for AHERF, testified that, had AHERF's audited financial statements disclosed debt covenant violations, PNC would have had a number of remedial options available, including granting a waiver or forbearance or declaring a default.  (Mammarella Dep. at 477-78).

378.    Mr. Michael testified that, if PNC had received earlier, more accurate information about AHERF's financial condition, there would have been "very active discussion around either restructuring the debt in some form or fashion or accelerating repayment."  He added that "the timeliness of information here is of real import to a creditor."  Mr. Michael also testified that it is "very likely" that PNC would have done something along the lines of threatening to declare a default or accelerating the debt, which would have prevented $90 million from being repaid to Mellon Bank.  According to Mr. Michael, if both PNC and Mellon had threatened a default, everyone would have come to the table to structure a workout.  (Michael Dep. at 155-56, 158).

379.    Mr. Michael testified that if a covenant violation had been disclosed in 1996 or 1997, PNC "would have gone in and worked very closely . . . with the company to shore up their operating cash flow which could have included the introduction of a crisis manager, for instance, as a mechanism to try and . . . preserve cash in and ultimately build the cash flow of . . . the AHERF entity." (*Id.* at 166).  According to Mr. Michael, the introduction of a crisis manager, hired by the company, was a fairly standard method for addressing and resolving financial difficulties.  (*Id.* at 166-67).  Based on having seen "countless situations of similar nature," Mr. Michael testified that he has a "very, very high degree of confidence" that hiring a crisis manager would have caused the creditors to obtain a higher realization on their claims.  (*Id.* at 174-75).

380.    In addition to AHERF hiring a crisis manager, Mr. Michael identified a "whole host of steps" that might be utilized by PNC or other creditors.  Historically, Mr. Michael explained, these steps have been successful at preserving cash, enhancing liquidity, and, in many cases, averting bankruptcy.  (*Id.* at 167-68).

381.    According to Mr. Michael, if the decline in AHERF's financial performance and condition in 1996 and 1997 had been accurately reported, the debt ratings would have been reduced and that would have caused bondholders, credit enhancers and other creditors to act differently.  There would have been greater pressure on AHERF to "right the ship from an operating perspective."  (*Id.* at 164).

382.    Mr. Michael testified that if Coopers had issued a qualified opinion it would have been a "severe red flag"  and AHERF would not have received an investment grade rating from Moody's and Standard & Poor's.  This would have been critical, because two of the conditions necessary for Mr. Michael's credit approval were an unqualified opinion and investment grade rating.  Without those two criteria being met "it's a non-starter."  (*Id.* at 171-72).

383.    While Mr. McCool acknowledged PNC could not replace AHERF's management, PNC could have used an event of default, or even a new extension of credit, as leverage to achieve that result.  He testified that: "We have done it in the past where we requested or required that for, say, new money advances that the company would alter management, change management, hire a crisis manager, take steps like that; and sometimes we get what we want, and sometimes we don't."  (McCool Dep. at 239-40).

384.    Mr. Cook testified that, if PNC had received accurate financial information disclosing AHERF's declining financial performance, PNC would have taken action.  He testified, for example, that PNC might have prevented AHERF from making additional acquisitions, such as the Graduate acquisition.  (C.D. Cook Dep. at 574, 577-79).

## IV.    THE CENTENNIAL ESTATE

### (A)    SDN-AHERF Relationship

385.    SDN, a nonprofit Pennsylvania corporation, was called United Hospitals, Inc. before July 3, 1991.  (Tab 28, 7/3/91 Articles of Amendment).

386.    The name "SDN" comes from the initials of AHERF's CEO, CFO and General Counsel, *i.e.*, Sherif Abdelhak, David McConnell, and Nancy Wynstra.  (McNair Dep. at 65).

387.    For some time prior to October 31, 1996, SDN was an inactive shell corporation. (Tab 13, 1995 SDN Form 990-EZ; PwC Br. at 46).

388.    SDN's Articles of Incorporation required that it be organized and operated "exclusively to support, benefit, perform the functions of, or to carry out the purposes of St. Christopher's Hospital for Children and Allegheny United Hospitals, Inc. . . ("AUHI")," two AHERF subsidiaries that later merged into AUH-East.  (Tab 29, 6/28/91 Amended and Restated Articles of Incorporation of United Hospitals, Inc. at Art. III; PwC SOF ¶ 7).

389.    SDN's Articles of Incorporation required that in the event of its dissolution, the assets of SDN be distributed to St. Christopher's and AUHI, two AHERF subsidiaries that were eventually merged into AUH-East.  (Tab 29, 6/28/91 Amended and Restated Articles of Incorporation of United Hospitals, Inc., at Art. IX; PwC SOF ¶ 7).

390.    SDN's bylaws required that any profits earned by SDN be distributed to St. Christopher's and AUHI, two AHERF subsidiaries that were eventually merged into AUH-East. (Tab 30, Amended And Restated Bylaws Of SDN, Inc., Art. 6.1 at DC3121-34); PwC SOF ¶ 7).

391.    SDN's four directors were senior AHERF executives:  the CEO, CFO and General Counsel of AHERF, and the CEO of AUMP, Sherif Abdelhak, David McConnell, Nancy Wynstra, and David Kaye, respectively.  (McNair Dep. at 65).

392.    In their respective tax returns filed with the IRS, AHERF and SDN each described the other as an "organization related . . . through common membership, governing bodies, trustees, officers, etc."  AHERF's and SDN's Form 990 tax returns were publicly available. SDN's and AHERF's 1994 tax returns, filed in February 1996, were the most recently filed tax returns as of the Fall of 1996, when Coopers was conducting the 1996 audit.  (Tab 13, 1994 SDN Form 990 at line 80b and statement 1; 26 C.F.R. § 301.6104(b)-1(a)).

393.    SDN's tax return listed the AHERF tax department as its address.  SDN reported to the Pennsylvania Secretary of State that its address was the same address as an AHERF office in Cheltenham which housed the headquarters of AUMP and other AHERF corporate offices. (Tab 13, 1994 SDN Form 990; Tab 29, 6/28/91 Amended and Restated Articles of Incorporation of United Hospitals, Inc. at Art. II; Levy Dep. at 164; McNair Dep. at 347-48; Ex. 1305 at PR-Dr.K-09-1450).

(B)     AHERF-SDN-Graduate Transactions/Coopers' Due Diligence

394.     On or about August 2, 1996, acting with the authority of the AHERF Board of Trustees, the Executive Committee of the AHERF Board approved SDN's taking on hospitals of GHS.  The Board members of SDN purposefully delayed taking action to adopt resolutions approving an SDN-Graduate transaction until the Executive Committee of the AHERF Board had given its approval.  (McNair Dep. at 65, 132-36, 139-41, 145-47, 152-53; Ex. 2385 at FVC 01569; Tab 9, June 1996 Bylaws at PR-PLD-22-00207).

395.     Before William Snyder, the Chairman of the AHERF Board of Trustees and a member of the Executive Committee, agreed to permit the use of SDN in AHERF's transaction, he sought and obtained assurance from Nancy Wynstra, the AHERF General Counsel that AHERF's use of SDN was legal.  He sought the advice because he did not understand why "we [are] doing things off to the side."  He was "leery of off-balance sheet things. . . ."  (W.P. Snyder Dep. at 92).

396.     In August 1996, SDN engaged Coopers to conduct due diligence of GHS in connection with the proposed transaction approved by the AHERF Executive Committee.  (Ex. 4407, 12/13/96 Coopers' Due Diligence Report at CL 039132; Schrecengost Dep. at 219, 223; Ex. 807 (SDN-GHS Due diligence checklist (8/23/96); Tab 31, 8/26/96 SDN-Coopers engagement letter).

397.     Coopers addressed the SDN due diligence letter to David McConnell, sending the letter to Mr. McConnell's office at AHERF.  The letter identified Mr. McConnell as the "Executive Vice President and CFO" of SDN, but that was his AHERF title.  His SDN title was Treasurer.  (Tab 13, 1995 SDN Form 990-EZ at Statement 1; Tab 31, 8/26/96 SDN-Coopers engagement letter at CL 046537).

398.    The SDN-Coopers engagement letter directed Mr. McConnell to call Mr. Buettner -- the AHERF audit engagement partner -- if he had any questions about the due diligence engagement.  (Tab 31, 8/26/96 SDN-Coopers engagement letter at CL 046540).

399.    The SDN-Coopers engagement letter provided in part that "[o]ther services such as an audit or attestation relating to a closing date balance sheet will be the subject of another arrangement."  (Tab 31, 8/26/96 SDN-Coopers engagement letter at CL 046539).

400.    While serving as engagement partner for the AHERF audit, Mr. Buettner also served as the "concurring partner" in the SDN-Graduate due diligence engagement.  (Buettner Dep. at 672; Schrecengost Dep. at 219, 223; Ex. 807, SDN-GHS Due diligence checklist (8/23/96)).

401.    Coopers used the results of its due diligence work, performed pursuant to the SDN-Coopers engagement letter, in Coopers' 1997 audit of AHERF.  (Tab 32, Coopers' Working Papers at CL 012634-49).

402.    The AHERF Board of Trustees discussed the possibility of AHERF acquiring hospitals from GHS during a special meeting on September 16, 1996.  (Ex. 829 at PR-1-000920).

403.    The Audit Committee of the AHERF Board of Trustees met on October 15, 1996. During that meeting, Coopers reported on the results of its 1996 audit work.  (Ex. 761 at GOV55940-48).

404.    On October 31, 1996, three nonprofit corporations that were subsidiaries of GHS (namely, GHS-Osteopathic, Inc, The Graduate Hospital, and The Fifth and Reed Hospital) merged into SDN.  As a result of these mergers, SDN was the sole surviving corporation and thereby became liable for the liabilities of these three GHS subsidiaries.  (Tab 16, Articles of Merger (Fifth and Reed Hospital into SDN); Tab 18, Articles of Merger (GHS-Osteopathic, Inc.

into SDN); Tab 19, Articles of Merger (The Graduate Hospital into SDN); s*ee also In re*

*AHERF,* 253 B.R. at 160, 165; 15 Pa. C.S.A. § 5929(b)).

405.    Management and the Board of Directors of GHS, relied on the perceived financial

strength of AHERF in agreeing to the transaction with AHERF.  They specifically relied upon

the 1996 audited financial statements of AHERF, and knew that SDN had no assets.  (Korman

Dep. at 119-20; Mathews Dep. at 33-34, 103-05, 137-38).

406.    At a meeting on December 12, 1996, the AHERF Board of Trustees adopted a

resolution authorizing AHERF management to take additional steps to complete the AHERF

acquisition of the former GHS hospitals.  (Ex. 832 at PR-1-920; Gumberg Dep. at 324-25).

407.    On May 1, 1997, SDN changed its name to AH-Centennial, and AHERF became

its member.  (Ex. 1057, Articles of Division (SDN) & attached Plan Of Division Of SDN, Inc.

§ 1.1; PwC SOF ¶¶ 196, 198).

408.    The Chairman of the Board of GHS believed that AHERF could unwind the

October 31, 1996 mergers if it wished, up until May 1, 1997.  (Korman Dep. at 9-10, 20-23,

213).

        (C)    Judge McCullough Found AHERF Liable For Obligations Of SDN/AH-
               Centennial.

409.    On December 14, 2000, under the doctrine of substantive consolidation,

Bankruptcy Judge McCullough entered an Order holding AHERF, AUH-East, AUMP and

AUHS each liable for the liabilities of AH-Centennial.  The Order stated in part that the assets

and business functions of AHERF and its subsidiaries were so commingled, and inter-company

obligations so substantial and complicated, that it would be extremely difficult and very costly to

segregate and ascertain individual assets and liabilities of the five AHERF corporations in

bankruptcy.  Judge McCullough ordered in part:

> . . . all assets (and all proceeds thereof) and liabilities of the
> Debtors shall be deemed merged or treated as though they were
> merged into and with the assets and liabilities of AHERF . . . [;]
>
> . . . any claim against any Debtor and any guarantee thereof
> executed by any other Debtor and any joint or several liability of
> any of the Debtors shall be deemed to be one obligation of the
> consolidated Debtors . . . [; and]
>
> . . . each and every Claim filed or to be filed in any of the Chapter
> 11 Cases shall be deemed filed against the consolidated Debtors,
> and shall be deemed one Claim against and obligation of the
> consolidated Debtors . . .

(Tab 14, 12/14/00 Order Confirming Debtors' Second Amended Consolidated Liquidating Plan

Of Reorganization Under Chapter 11 of The Bankruptcy Code at 11-12, 16).

410.    Judge McCullough's December 14, 2000 Order also confirmed, pursuant to 11

U.S.C. § 1129, the Debtors' Second Amended Consolidated Liquidating Plan of Reorganization

("Reorganization Plan").  (Tab 14, 12/14/00 Order Confirming Debtors' Second Amended

Consolidated Liquidating Plan Of Reorganization Under Chapter 11 of The Bankruptcy Code at

1, 14).

411.     The Reorganization Plan confirmed by Judge McCullough provided for substantive consolidation using the same language that appeared in his December 14, 2000 Order.  (Ex. 2765 at § 2.1).  *See supra* ¶ 410.

Date:  July 11, 2005                                       Respectfully submitted,

                                                          /s/ James M. Jones
                                                          James M. Jones (PA #81295)
                                                          Laura E. Ellsworth (PA #39555)
                                                          Laura A. Meaden (PA #52002)
                                                          JONES DAY
                                                          500 Grant Street, 31st Floor
                                                          Pittsburgh, PA  15219

                                                          Richard B. Whitney
                                                          JONES DAY
                                                          North Point
                                                          901 Lakeside Avenue
                                                          Cleveland, OH  44114

                                                          Attorneys for Plaintiff The Official Committee of Unsecured Creditors of AHERF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of July, 2005, a true and correct copy of the

Committee's Response to PwC's Statement of Undisputed and Material Facts Under Local Rule

56.1(C)(1) and accompanying Appendix were served upon all counsel registered with Electronic

Case Filing to receive electronic service in this matter, as well as by Federal Express upon

Antony L. Ryan, Esq., Cravath, Swaine & Moore, Worldwide Plaza, 825 8th Avenue, New

York, New York 10019-7475, and Joseph F. McDonough, Esq., Manion, McDonough & Lucas,

PC, 600 Grant Street, Suite 1414, Pittsburgh, Pennsylvania 15219, counsel for the defendant.


/s/ John G. Unice
One of the Attorneys for Plaintiff The Official
Committee of Unsecured Creditors of AHERF