UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 00-684 |
| v. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) ) | Judge David Stewart Cercone |
| Defendant. | ) | |

**THE COMMITTEE'S BRIEF IN OPPOSITION TO PwC'S MOTION
TO PRECLUDE CERTAIN IRRELEVANT AND UNFOUNDED TESTIMONY
PROFFERED BY THE COMMITTEE'S CAUSATION EXPERTS**

**INTRODUCTION**

Defendant PricewaterhouseCoopers LLP, the successor to Coopers & Lybrand, moves this Court for an order precluding certain testimony from four expert witnesses identified by plaintiff The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation. The witnesses are James R. Schwartz, Thomas W. Singleton, R. Bruce Den Uyl, and Steven B. Kite. PwC labels these witnesses "causation experts." It then seeks to preclude them from testifying about what AHERF's Board of Trustees and its principal creditors (or "hypothetical idealized" trustees or creditors) could or would have done if presented with audited financial statements that were free of the misstatements that Coopers' negligently performed audits allowed. PwC argues that only a "properly qualified expert," who has performed what it calls an "analy[sis]" of "the historical behavior of the real-world AHERF Board and creditors" and who boldly claims that he can predict the precise behavior of the

PII-1121759v1

AHERF Board and its creditors in response to alternative hypothetical future scenarios, can testify on these topics. PwC Br. at 4-5.

As the Committee explains in the Brief in Support of the Committee's Motion to Exclude Certain Testimony from PwC's Experts, testimony from experts paid to "opine" that AHERF's trustees and creditors would not have responded to accurate financial statements and revised audit disclosures in the ways that these trustees and creditors themselves have testified is not admissible. PwC's experts lack the qualification to predict the behavior of others. The testimony lacks any reliable method and will not permissibly assist the jury.

The Committee's experts offer no such "opinions." They do not attempt to read the minds of AHERF's trustees or creditors. They do not claim the vision to see, with crystal ball clarity, the future acts of any given trustee or financial institution executive. Rather, they offer legitimate expert testimony regarding the options and alternatives available to trustees and creditors had Coopers discharged its professional duties, performed appropriate audit work, and made appropriate audit disclosures. Their testimony regarding reasonable and appropriate board and creditor decision-making and responsive action, is informed by substantial experience with the responses of other trustees and creditors in similar situations. AHERF's trustees and creditors themselves have testified to the options that they would have pursued. Courts in audit failure cases routinely authorize the kind of expert testimony proffered by the Committee. It should be so authorized here, and PwC's motion to preclude should be overruled.

## FACTUAL AND PROCEDURAL BACKGROUND

As it had for many years before, Coopers audited AHERF's financial statements for fiscal years 1996 and 1997. Accompanied by Coopers' unqualified audit opinions, the financial statements for those years overstated net income and unrestricted net assets by tens of

millions of dollars. These statements masked the financial drain occasioned by the recent acquisition of financially troubled hospitals in Philadelphia. They hid the system's inability to replenish the flush of cash that resulted from buying hundreds of money-losing physician practices and entering into unprofitable risk-sharing contracts with health insurers. They were not accompanied by required auditor reports to AHERF's Audit Committee disclosing suspect accounting and operational practices at AHERF -- practices that were known to the Coopers auditors.

Coopers' multiple audit failures ensured that AHERF's Board of Trustees and its major creditors were screened from AHERF's true and deteriorating financial performance and condition. These audit failures prohibited AHERF's trustees from timely addressing and remedying the system's financial maladies until it was too late for the system to recover.

Accurate reports of AHERF's poor financial performance, weakened financial condition, and the nature and extent of the violations of Generally Accepted Accounting Principles committed at AHERF and known to Coopers' auditors, if they had been made, would have demanded prompt investigation, intervention, and treatment. AHERF's trustees and representatives of its creditors have so testified.

The Committee has provided examples of that trustee and creditor testimony in the previously mentioned brief in support of its motion to exclude certain testimony from PwC's experts. The testimony comes from the likes of the AHERF Audit Committee Chair and other trustees and officers and other executives of AHERF's largest creditors, MBIA Insurance Corporation and PNC Bank. It is direct and detailed. It describes the process for review and the likely course of conduct that would have followed audit revelations of the kind and on the order of those that the Committee's accounting experts say should have been made.

The Committee's trial evidence will also include testimony from qualified experts in the fields of not-for-profit board governance, distressed hospital turnarounds, damages incurred by the bankrupt estates, and bond and other debt instruments and the rights and remedies available to creditors that derive therefrom. In a case involving audit failure at a bankrupted not-for-profit hospital, none of this could come as a surprise.

PwC challenges certain of the testimony of four of the Committee's experts. James R. Schwartz is a licensed attorney who has long specialized in advising not-for-profit organizations and their officers, directors, and senior management regarding matters of corporate governance. Mr. Schwartz' work has had an emphasis in the healthcare industry, and he frequently reviews with client boards their fiduciary and other legal obligations when faced with various operational and governance challenges. In his report, Mr. Schwartz lays out what the AHERF Board would have been "expected and required" to do had Coopers made the Board aware of the deteriorating financial condition of AHERF. *See* Tab 1, Expert Report of James R. Schwartz ("Schwartz Rpt.") at 5. PwC contends Mr. Schwartz' opinions should be excluded because unlike PwC's expert, one James Orlikoff, Mr. Schwartz made "no study of this Board" and did not offer an opinion as to "what based on its history, *this* Board would have done." *See* PwC Br. at 5 (emphasis in the original).

The opinions of Mr. Schwartz and Mr. Orlikoff were informed by essentially the same deposition testimony and documents of record. (PwC contends that none of the Committee's four experts "studied" the AHERF Board as did Mr. Orlikoff, but all of the Committee's experts reviewed volumes of trustee and/or creditor deposition testimony and documents.) However, unlike Mr. Orlikoff, Mr. Schwartz does not purport to be able to predict with certainty what the AHERF Board would have done. Rather, Mr. Schwartz opines regarding

the "courses of action an informed and sophisticated Board would have been expected and required to have engaged in" if faced with the information alleged by the Committee. Tab 1, Schwartz Rpt. at 7-8. To the extent Mr. Orlikoff attempts to do more – diagnosing the AHERF Board as "dysfunctional" or endeavoring to predict with precision the behavior of individual or multiple trustees – he is neither qualified nor otherwise permitted, and his testimony should be excluded consistent with the arguments set forth in the Committee's motion to preclude that testimony and other testimony like it.

PwC also seeks to exclude certain opinions of Thomas W. Singleton. Mr. Singleton is the President and CEO of a healthcare turnaround firm. He has more than 25 years experience in the healthcare field. He has been involved in bringing hospitals out of bankruptcy, keeping hospitals out of bankruptcy, and improving the performance of financially stable hospitals concerned about deterioration in their financial performance. *See* Tab 2, Turnaround Evaluation As Of September 30, 1996 at 2. Mr. Singleton opines how AHERF, in the restated financial condition articulated by the Committee's forensic accountants for fiscal year-end 1996, with appropriate and timely intervention, the specifics of which he details, could have remained financially viable and avoided the financial loss occasioned when it filed for bankruptcy in 1998. *Id.* at 3. Mr. Singleton will offer an informed expert opinion that details the availability and feasibility of responsive actions and initiatives that, if implemented, would have righted the AHERF ship and avoided a bankruptcy and estate loss.

In his report, Mr. Singleton relates the swiftness with which boards in his experience typically respond when they are provided with accurate information regarding potential financial peril facing their company. *Id.* at 4. PwC asserts that Mr. Singleton's statements in this regard do not satisfy the "fit" requirement of *Daubert* and will likely confuse

the jury because Mr. Singleton does not purport to be able to predict with specificity the precise response of AHERF's Board members to all potential turnaround initiatives. The case law, however, is clear. Although experts may *not* tell the jury what specific individuals in specific circumstances would have done, as PwC's experts attempt to do, they may, as Mr. Singleton does in his report, offer opinions on what *reasonable* people in specific circumstances would have done. Because Mr. Singleton's opinions are informed by his significant experience with financially distressed healthcare organizations and their boards, he is more than qualified to offer such an opinion.

PwC may attempt to cross-examine Mr. Singleton or Mr. Schwartz on or offer admissible rebuttal evidence regarding the extent to which the AHERF Board of Trustees may not have acted reasonably. (That admissible evidence, by the way, would not include Mr. Orlikoff's "dysfunctional board" diagnosis.) But *Daubert* "fit" is not at issue here.

PwC next takes issue with certain statements in the report of the Committee's damages expert, R. Bruce Den Uyl. Mr. Den Uyl has experience as a financial consultant on a broad array of financial issues, including valuations and financial analyses in the healthcare industry. He has acted as an expert and advisor to both troubled and financially viable healthcare entities. In this case, Mr. Den Uyl has calculated as one measure of damages the amount of liabilities assumed, cash expended and operational losses incurred by the AHERF estates on acquisitions and transactions that would have been avoided if Coopers had audited properly AHERF's financial statements. *See* Tab 3, Rule 26(a)(2)(B) Report of R. Bruce Den Uyl at 29-42.

In his report, Mr. Den Uyl outlines the deposition testimony of several AHERF Board members and AHERF creditors concerning the options that would have been available to

them had Coopers provided accurate financial statements for AHERF during fiscal years 1996 and 1997. *Id.* at 16-22. Contrary to PwC's assertions, Mr. Den Uyl's report does not purport to offer opinions as to what the AHERF Board or creditors specifically would have done in the face of accurate financial information. Rather, his purpose in outlining this testimony is to identify factual support for certain assumptions underlying his "avoidable costs" measure of damages, *e.g.*, that "responsible parties would not have undertaken certain acquisitions and would have proceeded to take counter actions" that would have avoided significant costs and steered AHERF from bankruptcy. *Id.* at 16.

Committee expert Steven B. Kite is a partner with a large Chicago law firm. In almost 30 years of practice, Mr. Kite has served as counsel on more than 410 tax exempt bond financings aggregating in excess of $13 billion of principal amount. *See* Tab 4, Expert Report of Steven B. Kite, Esq. at 1. He has also authored and co-authored several books and articles related to health care bonds.

Mr. Kite offers expert opinions with respect to the covenants contained in financing documentation of AHERF and certain of its affiliated entities. He identifies, among other things, the covenants whose violation would have been disclosed if Coopers had audited properly the fiscal year 1996 and 1997 financial statements, the effect of such breaches and the rights of creditors as a consequence of such breaches. *Id.* at 3.

As PwC correctly points out, Mr. Kite does not lapse into predicting the behavior of AHERF's creditors as PwC's experts, Messrs. James and Covintree do. Instead, consistent with the case law under *Daubert*, Mr. Kite identifies the "mitigating actions intervening creditors and financing trustees could have taken." *Id.* Given the complexity of the financial instruments at issue and Mr. Kite's extensive experience in dealing with agreements of this type, his

testimony unquestionably will be helpful to the jury in understanding the practical options that would have been available to AHERF's creditors.

## ARGUMENT

PwC fails to cite to even one audit malpractice case. But audit malpractice cases addressing these expert issues exist. Their holdings confirm the admissibility of the expert testimony proffered by the Committee.

For example, in *Salisbury v. Arthur Andersen & Co.*, 956 S.W.2d 601 (Tex. Ct. App. 1997), the trustee of a bankrupt corporation sued the corporation's former auditors for negligence in the preparation of the year-end audit. The trial court directed a verdict for the auditors, holding that the bankrupt corporation had not offered credible evidence that audit errors were a cause in fact of any damages. The trustee appealed. The appellate court reversed, holding that there was "probative evidence in the record that the negligence of Andersen was a substantial factor in bringing about harm." *Id.*

That probative evidence included testimony from officers and directors concerning what they would have done in response to revised audit disclosures and from an expert accountant who testified that "in his opinion the failure of Andersen to test the cost of goods sold and properly calculate the gross profit margin 'was the primary cause of the business failure and damages resulting from the business failure.'" *Id.* at 602. He also testified that "Andersen should have been able to foresee that the audit failures would result in damage to WCC," and that "the company would have run its business differently if it had realized that the gross profit margin was thirty-nine percent rather than forty-eight percent." Lastly, he stated that "he would have known what to do in that set of circumstances, though he did not know whether it would have been successful." *Id.*

Mr. Singleton's proffered expert testimony here concerning how AHERF's business would have been run differently had appropriate audit disclosures been made is of this same ilk (though his level of assurance concerning the likely success of the remedial strategies he proposes is higher). It is just as probative and should be admitted.

In *Comeau v. Rupp*, 810 F. Supp. 1127 (D. Kan. 1992), the FDIC, as receiver of failed savings and loan, brought an action against the financial institution's former accountants for malpractice. The accountants moved for summary judgment arguing that the FDIC could not prove causation.

The District Court denied the motion, holding that there are "[g]enuine issues of material fact as to whether the [savings and loans] board as [a] whole relied upon accountants' audits, thus causing loan losses that would not otherwise have been sustained." *Id*. at 1144. Those issues of fact were raised by testimony from board members that they "would have taken corrective action if they had been informed of the serious problems." *Id.* Messrs. Singleton, Den Uyl, and Schwartz were relying on the very same kind of testimony when they prepared the portions of their reports that PwC challenges today. The *Comeau* court also pointed favorably to testimony from a savings and loan expert who testified that "in his experience, an audit that advises an association of the need for a $500,000 loan loss reserve--which was not done in this case--can reasonably be expected to 'get management's attention very quickly.'"

The expert opined, as each of the Committee's experts do here, that red flag audit disclosures can reasonably be expected to draw action from company leaders. The expert did not opine, as certain of PwC's experts have, that he could predict with precision the specific actions that Board members would have taken.

The United States District Court for the Eastern District of Pennsylvania explained the bar to the kind of testimony PwC proffers and the admissibility of that tendered by the Committee. In *In re: Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001) ("*Diet Drugs (II)*") (*See* Tab 5), consumers alleged that American Home Products had manufactured defective diet drugs and failed to report adverse drug events.

The consumers proffered a physician, pharmacologist, and long-time FDA officer to opine that the FDA's Chief Medical Officer would have drawn different regulatory conclusions and that treating physicians would not have prescribed the drugs if the drug company had disclosed additional adverse-event information. *See id.*, at **5, 18. The *Diet Drugs (II)* court excluded the expert's opinions because they were not grounded in scientific method, but in subjective belief:

> Dr. Gueriguian is not qualified to opine on what decisions would have been made by the numerous physicians who prescribed diet drugs had they been provided with different labeling information. Unlike opining about what physicians in general expect to see on a label, *his surmising as to what physicians would do with different information is purely speculative and not based on scientific knowledge*.

*Id.*, at *18 (emphasis added). For the same reason, Dr. Gueriguian "[could] not testify as to what [the FDA's Chief Medical Officer] would have done." *Id.* at 19; *see also Rezulin Products Liability Litig.*, 309 F. Supp. 2d 531, 556-57 (S.D.N.Y. 2004) (barring expert from opining "as to whether physicians would have prescribed Rezulin if different information about Rezulin had been available"). To the extent that PwC's experts attempt to "surmise" what AHERF's trustees and creditors "would do with different information," their testimony should be barred, as well. The Committee has so argued in its single *Daubert* challenge.

But the *Diet Drugs (II)* court went on to hold that Dr. Gueriguian was "clearly qualified to testify as to what reasonable FDA officials, in the position occupied by [the Chief

Medical Officer], would do with adverse event information." The court clarified by stating that the expert "cannot testify as to what [the Chief Medical Officer] would have done. He can, however, testify as to what a reasonable official in the position of Dr. Lutwak would have done." *Id.* at *18-19. The testimony that the *Diet Drugs (II)* court found that the expert was "clearly qualified to testify" to is of the same kind offered by the Committee's experts here.

Messrs. Schwartz' and Singleton's opinions regarding the kinds of responses that are reasonably expected from or typical of boards upon learning that their company is financially distressed are helpful to a jury in the same way, and should be admitted for the same reasons. So too should be Mr. Kite's testimony concerning the options available to reasonable creditors when financial distress strikes their obligors.

In *Stelma v. Juguilon*, 597 N.E.2d 523 (Ohio App. 1992), a verdict was rendered in favor of personal injury plaintiffs in a medical malpractice action. The physicians appealed. The physicians argued on appeal that the trial court improperly allowed "plaintiffs' expert medical witness to testify that a reasonabl[y] prudent person would have decided against the procedure that produced the injury if there had been a fuller explanation of the risks and alternatives thus resulting in an invasion of the jury's province." *Id.* at 527. The appellate court affirmed the verdict and held that the "expert's specialized background and experience in evaluating [a] patient's response to the disclosed risks could have been helpful in assisting [the] jury to understand what [the] ordinary patient would do in that situation." *Id.* at 528.

The Committee's expert testimony here about the "response to disclosed [financial] risks" of a "reasonably prudent" board or creditor group is just as admissible.

PwC ends its brief arguing that the Committee's experts do nothing more than "refer to self-serving, after-the fact deposition testimony from a few trustees," which testimony

"cannot provide a foundation for a reliable opinion as to the actions the AHERF Board as a whole would have taken in particular hypothetical circumstances." PwC Br. at 14. But it was Coopers' conduct that thrust the AHERF Board and its creditors into the position of having to testify about what they could or would have done if the auditors had done their job. The defendant accountants in *Comeau* made this same argument, and the court dispensed with it in text upon which we cannot improve:

> By urging the court to refuse consideration of this deposition testimony, the Accountants fail to recognize that plaintiff's proof of causation in this case is rendered more difficult by the very nature of the claims: negligent omissions on the part of defendants that in turn cause inaction on the part of the RCSA Board. Because this necessarily poses the causation question of what "would have" happened if the Accountants had adequately fulfilled their duties, it is difficult to understand how the FDIC could prove its case without at least some of the testimony that the Accountants deride as "self-serving" and "speculative." To accept the Accountants' argument would allow them to profit from an uncertainty of their own creation, notwithstanding that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

*Comeau*, 810 F. Supp. at 1143-44 n.8 (quoting *Furr v. AT&T Technologies, Inc.*, 824 F.2d 1537, 1548 (10th Cir. 1987)).

PwC cannot now "profit from an uncertainty" that its "own wrong" has wrought. The challenged testimony from the Committee's experts is admissible. PwC's motion should be denied.

## CONCLUSION

For the foregoing reasons, this Court should overrule what PwC calls its Motion to Preclude Certain Irrelevant and Unfounded Testimony Proffered by the Committee's Causation Experts.

        Respectfully submitted,

/s/ James M. Jones
James M. Jones (PA # 81295)
Laura E. Ellsworth (PA # 39555)
Laura A. Meaden (PA # 52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee of Unsecured Creditors of AHERF

Dated: July 11, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of July, 2005, a true and correct copy of the Committee's Brief in Opposition to PwC's Motion to Preclude Certain Irrelevant and Unfounded Testimony Proffered by the Committee's Causation Experts was served upon all counsel registered with Electronic Case Filing to receive electronic service in this matter, as well as by Federal Express upon Antony J. Ryan, Esq. Cravath, Swaine & Moore, Worldwide Plaza, 825 8th Avenue, New York, New York 10019-7475, and Joseph F. McDonough, Esq., Manion, McDonough & Lucas, PC, 600 Grant Street, Suite 1414, Pittsburgh, Pennsylvania 15219, counsel for defendant.

/s/ John G. Unice
John G. Unice
One of the Attorneys for Plaintiff The Official
Committee of Unsecured Creditors of AHERF

PII-1123043v1