# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 00-684 |
| v. | ) ) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) | |

### EXHIBITS TO THE COMMITTEE'S
### BRIEF IN OPPOSITION TO PWC'S MOTION TO PRECLUDE CERTAIN
### IRRELEVANT AND UNFOUNDED TESTIMONY
### PROFFERED BY THE COMMITTEE'S CAUSATION EXPERTS

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA  15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114

Attorneys for Plaintiff The Official Committee of
Unsecured Creditors of AHERF

July 11, 2005

**TAB 1**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 00-684 |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) | |

## EXPERT REPORT OF JAMES R. SCHWARTZ

I, James R. Schwartz, am submitting this expert report in the above-captioned case.

### I.    QUALIFICATIONS

I am an attorney duly licensed to practice law before all of the courts of the State of California; the Ninth Circuit Court of Appeals; and the United States District Courts for the Central, Northern, and Eastern Districts of California. A current copy of my professional resume, including a list of my publications in the last ten (10) years, is attached to this report as Exhibit A.

I specialize in advising nonprofit organizations, and their officers, directors and senior management, in matters of corporate governance and with respect to compliance with nonprofit corporation and charitable trust law. A substantial emphasis in both my practice and my writing and speaking involves the health care industry. I am experienced and knowledgeable both in the legal requirements and constraints under which officers, directors and senior management function in carrying out their fiduciary obligations and in the manner in which officers, directors

1

and senior management of nonprofit organizations operating in the healthcare industry should and do react to consequential matters facing their organizations.

I have previously testified as an expert witness at trial or in deposition on the subjects of proper corporate governance and the fiduciary obligations of officers and directors of nonprofit corporations and trustees of charitable trusts in the following cases:

1) In the Matter of the Estate of Bernice P. Bishop, deceased – Circuit Court of the First Circuit, State of Hawaii, Equity No. 2048

2) Met-Rx Foundation for Health Enhancement et. al. v. Met-Rx, Inc et. al – Superior Court of the State of California, County of Orange, Case No. 771551

3) Pathology Medical Laboratories v. ScrippsHealth et. al. – Superior Court of the State of California, County of San Diego, case No. GIC 749962 and

4) Marjorie H. Bright et. al v. The Bright Family Foundation et. al, Superior Court of the State of California, County of Stanislaus, Case No. 274513.

In addition, I have submitted a report as an expert on the same subject in the case of Banner Health System v. Mark W. Burnett, in his official capacity as Attorney General of South Dakota, Civil Case No. 02-5017 (USDC, So. Dakota – Western Division).

## II.    **EXPERT RETENTION**

I have been retained by the attorneys for plaintiff the Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation to provide expert testimony regarding the appropriate manner in which the members of the Board of Trustees of AHERF, and/or committees thereof, would have been expected and required to carry out their fiduciary

obligations with respect to overseeing the financial affairs of AHERF during the 1996-1997 time period.

I am being compensated for my services at my standard hourly rate, which is currently $615 per hour. My compensation is not contingent upon the outcome of the case or upon the nature of my opinions. A list of the materials that I have considered in reaching my opinions is attached as Exhibit B hereto.

III.    **OPINIONS**

In my opinion, proper, effective corporate governance of nonprofit charitable corporations requires a "partnership" between senior management and the Board of Directors/Trustees ("board"). In this regard, management is normally responsible for developing and implementing strategic business plans and managing the day to day operations of the corporation. The board, acting as a whole and/or through the appropriate delegation of authority, exercises appropriate oversight and retains ultimate authority over the activities and affairs of the corporation.

In exercising such oversight and ultimate authority, board members are required to act in conformity with their fiduciary obligations – as set forth under applicable state and federal law. In the context of financial oversight – and with respect to matters not involving self-dealing and/or related party transactions – the board's focus is normally on the duty of care.

State law generally, and Pennsylvania law specifically (15 Pa. C.S.A. §5712), defines the duty of care and expressly authorizes Board members to rely, in carrying out their fiduciary obligations, upon financial reports, statements and opinions prepared or presented by officers or employees of the corporation, counsel, public accountants, and others whom the board members

3

believe to be reliable and competent in the matters presented.  Moreover, state law generally, and

Pennsylvania law specifically, expressly authorizes board members to rely on information,

opinions, statements or reports presented by committees of the board on which a board member

does not serve -- provided that the committee has been delegated authority in this regard by the

board.  In both instances, board members' ability to so rely is predicated upon the board

members acting in good faith and without knowledge that would cause such reliance to be

unwarranted.

The aforementioned statutory rules are designed to inform and permit the efficient and

proper management and operation of nonprofit corporations within the corporate management

structure, while simultaneously providing standards through which board members can exercise

appropriate oversight responsibility.  Critical to board members' ability to delegate authority, and

still exercise appropriate financial oversight with respect to the corporation's activities, is the

need to be able to reasonably rely on the information provided by management, outside

professionals and others in the board decision-making process.

I have reviewed the expert reports of Robert W. Berliner and Steven B. Kite.  Key among

the financial performance and condition issues raised in the expert reports of Mr. Berliner and

Mr. Kite in this regard are the following:

1)  Mr. Berliner's conclusions that the fiscal year 1996 consolidated financials, before

extraordinary item and change in accounting principles, should have shown a net loss of

approximately $90 million, instead of net income of approximately $6 million and that the fiscal

year 1997 consolidated financials should have shown a net loss of approximately $134 million,

instead of a net income of approximately $22 million,

4

2) Mr. Berliner's conclusion that "material misstatements...were attributable to a multitude of GAAP violations, many of which were committed for the express purpose of masking the deteriorating financial condition of AHERF and its subsidiaries and for meeting financial covenants of debt instruments" and

3) Mr. Kite's conclusion that certain financial covenants had been breached that would have enabled bond and master trustees to declare a default with respect to significant debt of AHERF.

Had the AHERF Board of Trustees and/or the appropriate committee(s) thereof (hereafter "Board"), been informed by AHERF's independent accountants that financial statements or reports prepared by AHERF management misstated the financial performance and/or condition of AHERF, and/or of key affiliates thereof (hereafter collectively "AHERF") during the relevant time period, to the extent and in the manner indicated in the expert reports of Robert W. Berliner and Steven B. Kite, the members of the Board, in complying with their fiduciary obligations, would, in my opinion, have been expected and required to take action in order to fully investigate such information and to take all appropriate action to ensure that the financial statements or reports prepared by AHERF management were, in fact, accurate and reliable and could properly be relied upon and serve as the basis for executive and Board decision-making. Such Board action should and would, in my opinion, have included, but not necessarily been limited to, the following:

1)    taking appropriate action to confirm the occurrence (or non-occurrence) of such misstatements and to determine the actual financial performance and/or condition of AHERF for the relevant time periods;

5

2)   if it were determined that the financial statements or reports of AHERF for the relevant time periods were misstated as indicated in the report of Mr. Berliner,

   a)   re-evaluating those executive and Board decisions that might be materially affected by the misstated financial statements or reports in order to determine whether those decisions were, and/or remained, appropriate in light of the actual financial condition and/or performance of AHERF;

   b)   determining the reasons for such misstatements, and the individual(s) responsible, in order to be able to assess whether the Board could reasonably rely on financial information provided by AHERF management on a going-forward basis and the need for any personnel actions, and

   c)   if such misstatements were the result of intentional violations of GAAP and/or the intentional falsification and/or manipulation of financial information by AHERF management, appropriate corrective action would, in my opinion, have required the termination of employment of those AHERF manager(s) and/or employee(s) responsible for such intentional wrongful acts.

   I have, in addition, read the report submitted by James E. Orlikoff. In his report, Mr. Orlikoff states that:

   "The AHERF board was composed of many accomplished, highly-educated, and distinguished individuals. These included many high –ranking, financially sophisticated corporate executives; entrepreneurs – some in healthcare-related businesses; accomplished physicians; experts in accounting and auditing; academic leaders; and others. Many trustees also

6

had knowledge of governance gained through their extensive service on many other boards, both not-for-profit and for-profit."[1]

My own review of the depositions given in this matter by Board members confirmed these same conclusions with respect to the background, experience and capabilities of the Board members.

In his expert report, Mr. Orlikoff also states his opinion that :

a) "There is no reason to believe that the additional information about AHERF's financial condition that plaintiff alleges Coopers should have placed before the (AHERF) Board would have caused the Board to initiate meaningful action."[2] and

b) "There is no reason to believe that Cooper's discovery of 'AHERF senior officials' financial manipulations' would have caused the (AHERF) Board to initiate any meaningful action."[3]

In my opinion, it is not possible for Mr. Orlikoff (or me, for that matter) to state with any reasonable certainty exactly what specific actions the Board would, in the end, have taken had it been advised by AHERF's independent accountants of the circumstances as set forth above and nothing in the materials that I have reviewed to date indicates that AHERF's independent accountants ever so advised the Board.

However, based upon my experience and expertise, I am able to opine on what courses of action an informed and sophisticated Board would have been expected and required to have

---

[1] See, Orlikoff report, page 6
[2] See, Orlikoff Report, page 54
[3] Ibid.

7

engaged in, if faced with the circumstances set forth above. Those courses of action are as described in my opinion as stated above.

Moreover, contrary to the conclusions reached by Mr. Orlikoff as to how the Board would have acted (or failed to act) had it been advised by AHERF's independent accountants of the misstatement of AHERF's financial condition and the potential effects thereof, a review of the deposition transcripts of a number of Board members (including those described by their fellow Board members as particularly active participants in Board oversight and/or particularly knowledgeable about financial affairs[4]) indicates that several such individual Board members expressed views of how they would have acted if provided with such information by AHERF's independent accountants and the actions described by them are, in my opinion, consistent with my above stated opinion as to how they would have been expected and required to act in complying with their fiduciary obligations.

Specifically, these Board members testified that in the face of information of this type being provided by AHERF's independent accountants, they would have considered specific actions as follows[5]:

1) further investigation of the facts related to the misstatement of the financial reports, including potentially expanding the scope of the outside audit;

2) bringing in outside consultants to advise the Board;

---

[4] Board members Gumberg, Barnes, and Danforth, Brenner have been so described. (See deposition testimony of Barbara Atkinson (pages 112-113); William Snyder (pages 207-212); D. Walter Cohen (page 92) and Donna Murasko (pages 188-189).
[5] See the deposition testimony of Ira Gumberg (pages 349-357); Douglas Danforth (pages 260-264); David Barnes (pages 333-336); Ralph Brenner (pages 166-175); Robert Hernandez (pages 187-196);and Ronald Davenport (pages 102-107)

3) terminating the persons responsible for such misstatements of the financial reports; and/or

4) putting "the brakes" on, or reconsidering, any further hospital and physician practice acquisitions.

Based upon my experience and expertise and upon my review of the materials listed in the Exhibit B hereto, it is my opinion that the AHERF Board, if advised by its independent accountants of the facts as described above, would have been expected and required to take those actions that I have stated above and had I had represented AHERF during the relevant time period, I would have so advised the Board. Moreover, a failure by the AHERF Board to take such action under these circumstances would, in my opinion, have exposed the individual board members to substantial risk of personal liability and I would have so advised the Board of that fact as well.

In my experience, informed and sophisticated Board members when faced with such factual circumstances would, with substantial certainty, be expected to take those corrective actions described by the AHERF Board members in their depositions and as set forth in my opinion above. Moreover, in my opinion, it would be extremely unlikely that Board members in such a factual situation would simply fail to act and, therefore, expose themselves to such personal liability.

The opinions expressed in this report are my present opinions based upon the materials I have reviewed and upon my experience.  I reserve the right to revise or supplement this report based on additional information or facts which I may receive subsequent to this date.

Dated: 1/18/05

James R. Schwartz

**TAB 2**

# Allegheny Health Education and Research Foundation

## Delaware Valley Obligated Group

## Turnaround Evaluation
## As Of September 30, 1996

**Submitted:  August 2004**

**Thomas W. Singleton, President and CEO**
**Cambio Health Solutions, LLC**
**100 Westwood Place**
**Suite 350**
**Brentwood, TN  37027**

1

**Thomas W. Singleton – Experience and Qualifications**

My name is Thomas W. Singleton. I am President and CEO of Cambio Health Solutions, LLC (Cambio), a nationally-recognized hospital turnaround management and consulting company.

I have over twenty-five years of experience in the healthcare industry. Upon receiving an MBA from the University of Chicago, my healthcare career began as a systems and financial analyst. I then became a Chief Financial Officer of a hospital and was ultimately promoted to a corporate finance position with responsibility for the financial management of several hospitals. Subsequently I served as the Chief Financial Officer and Treasurer of a large hospital management company. In 1989, I founded Cambio's predecessor enterprise, The Intensive Resource Division of Hospital Management Professionals, Inc. In addition, I have also served as the president and CEO of a publicly-traded hospital company.

As President and CEO of Cambio, I have had ultimate responsibility for over 100 consultative and management engagements. These projects have included turning around various hospitals ranging from a 100 bed suburban hospital to a 700 bed teaching hospital.

I have been involved in bringing hospitals out of bankruptcy, keeping hospitals out of bankruptcy and improving the performance of financially stable hospitals concerned about deterioration in financial performance.

I have also negotiated a substantial number of hospital sales and debt restructurings. MBIA, a significant creditor of the Allegheny Health Education and Research Foundation (AHERF) engaged me in July of 1998 to serve as advisor/consultant for MBIA in the 1998 bankruptcy filing of AHERF. In connection with the 1998 filing, I began my assignment as an advisor to MBIA as to valuation and the identification of

2

potential purchasers of AHERF assets, and eventually I oversaw the development of a plan focused on the turnaround of certain Eastern AHERF enterprises.

In performing my analysis, I have utilized a team of persons employed by Cambio who worked under my direction and control.

For additional information on my qualifications and background, please refer to Exhibit I attached to this report for a copy of my Curriculum Vitae and Exhibit II for a list of national speaking engagements.

**SUMMARY**

I have been asked by the Official Committee of Unsecured Creditors of AHERF (the Committee) to evaluate whether AHERF, in the restated financial condition articulated by the Committee's forensic accountants for fiscal year-end 1996, and with appropriate intervention around September of 1996, could remain financially viable and therefore avoid the creditor loss occasioned when it resorted to Chapter 11 protection some two years later. Based upon both my review of the financial data and other information in connection with this engagement and on my previous work performed for MBIA, I believe that the answer to that question focuses upon whether those entities that formed the so-called Delaware Valley Obligated Group (DVOG), as influenced by operations at Allegheny Integrated Health Group (AIHG), could be restored to financial stability on a go-forward basis. It is my opinion that DVOG could have been restored to a position of financial viability upon a timely intervention by AHERF's Board or others around the end of September, 1996. For purposes of this analysis, and by "financial stability", I mean that the DVOG entities could, within three to four years, have been restored to a position of positive earnings before interest, taxes, depreciation and amortization (EBITDA), sufficient to allow AHERF's Board to sell the entities without creditor loss. In the late 1990's, hospitals of similar kind to the DVOG entities' sold at multiples of between five and eight times EBITDA. This does not suggest that a sale of any or all of the DVOG hospitals was or was not necessary. Rather, in analyzing for present purposes the ability to avoid a creditor loss through an intervention and

turnaround, a finite measure of success is the ability to sell the troubled entities free of loss to debt holders.

The Committee's accounting experts have developed various adjustments to the audited financial statements for fiscal 1996. The financial statements of DVOG, when properly stated, provide evidence of financial distress and accounting and financial practices sufficient to compel intervention in the financial management of DVOG. In my experience, when a board of trustees of a hospital organization is provided with accurate information regarding the operations and potential financial peril of the kind portrayed here, board action is swift. Board action is also inevitable when creditor pressure, precipitated by flagging financial performance or the organization's potential or actual inability to comply with debt covenants, is brought to bear. In my opinion, both of these results were probable, if not assured, had AHERF's independent public accounting firm reported upon statements with operating losses for the system consistent with those shown by the Committee's restated financial statements.

Often in such situations an independent firm such as Cambio is contracted to develop and implement an EBITDA improvement plan, commonly referred to as a "turnaround" plan, such as the one discussed herein. In reviewing the data, it became apparent that a major drain on AHERF's financial performance was the loss for the acquisition and subsidy of physician practices at AIHG, an AHERF entity not part of the DVOG obligated group. I therefore looked at potential EBITDA improvement at the DVOG entities as well as the AIHG physician practices.

As noted in the following table labeled "Summary of EBITDA Improvement," there were significant opportunities for both financial improvement and cost avoidance in the months and years following fiscal 1996. Principal among the latter would have been placing a hold on further development of AHERF's Integrated Delivery System model (IDS), specifically the further acquisition of hospitals and physician practices, and the assumption of additional capitated contract risk beyond that which existed at September of 1996. I have developed turn around initiatives that, when fully implemented in fiscal 1999, yield $123.7 million in EBITDA improvement for the DVOG

4

entities and limit further EBITDA deterioration at AIHG to $8.8 million. Consistent with my experience, I have conservatively assumed that 30% of the EBITDA improvements, reduced to account for nine months of improvement in year one, could have been achieved in fiscal 1997, 70% in 1998, with full realization in fiscal 1999. Cessation of further physician practice acquisition and risk contracting at or around September 30, 1996 would have produced an immediate impact on AIHG EBITDA deterioration.

| SUMMARY OF EBITDA IMPROVEMENT | | | | |
|---|---|---|---|---|
| | Delaware Valley Obligated Group and AIHG Total EBITDA for Fiscal Year Ending 6/30/1996 Calculated From Creditors Committee Accounting Expert's Adjustments | Fiscal Year Ending 6/30/1997 | Fiscal Year Ending 6/30/1998 | Fiscal Year Ending 6/30/1999 |
| **Delaware Valley Obligated Group** | | | | |
| Restated Base Year EBITDA | 38,129 | 38,129 | 38,129 | 38,129 |
| EBITDA Improvements (Cambio Findings) | | | | |
| Supply Chain Management | | 4,107 | 12,778 | 18,254 |
| Productivity | | 14,148 | 44.015 | 62,878 |
| Case Management | | 573 | 1,782 | 2,546 |
| Revenue Cycle | | 7,274 | 22,632 | 32,331 |
| Discretionary Spending | | 1,720 | 5,350 | 7,642 |
| Total EBITDA Improvements | | 27,882 | 86,556 | 123,651 |
| **Allegheny Integrated Health Group** | | | | |
| EBITDA as restated by the Creditors committee Accounting Experts adjusted for Improvements | (36,659) | (45,459) | (45,459) | (45,459) |
| **Combined DVOG and AIHG** | | | | |
| Combined Restated EBITDA Adjusted for Improvement | 1,470 | 20,492 | 79,226 | 116,321 |

Note: The Delaware Valley Obligated Group is comprised of the following entities:
    Allegheny Center City Hospital
    Allegheny East Falls Hospital
    Allegheny Bucks County Hospital
    Allegheny Elkins Park Hospital
    St. Christophers Hospital
    Allegheny University - (a medical school entity)
    Management Support Services - (an entity providing system resources such as Human Resources, Legal, etc.)

Note: The Allegheny Integrated Health Group is an entity charged with management and financial reporting of employed physicians and risk contracting for all of AHERF.

**Our analysis rendered a conclusion that improvements to EBITDA were sufficient to effect a turnaround. The improvements are sufficient to allow the AHERF Board of Trustees to sell the entities after turnaround without creditor loss.**

The anticipated EBITDA improvements are not immediately realized in full, necessitating access to working capital during the turnaround process. The following simplified cash flow illustrates the need for access to funds in excess of EBITDA for fiscal 1997 and 1998.

| SIMPLIFIED CASH FLOW | | | |
|---|---|---|---|
| | Fiscal 1997 | Fiscal 1998 | Fiscal 1999 |
| EBITDA estimate including AIHG | 20,492 | 79,226 | 116,321 |
| Less: | | | |
|    Debt Service | 25,412 | 36,488 | 35,457 |
|    Capital Requirements | 48,631 | 46,462 | 45,092 |
| Cash Required | 74,043 | 82,950 | 80,549 |
| | | | |
| Excess / (Deficit) Cash | (53,551) | (3,724) | 35,772 |
| Beginning Cash | 27,762 | (25,789) | (29,513) |
| Ending Cash | (25,789) | (29,513) | 6,259 |

AHERF, in fact, had sufficient working capital to undertake a feasible DVOG turnaround. AHERF and DVOG held investments in accounts titled "assets limited or restricted as to use." Amounts available for use are limited to the unrestricted portion of these asset accounts. We noted amounts in the unrestricted accounts (net of amounts designated for self-insurance reserves or encumbered as a debt service fund) of $48.8 million at DVOG alone as of June 30, 1996. In the context of a rational turnaround plan, AHERF had access to additional working capital through assets held by non-DVOG AHERF entities, current lenders or other sources.

The impact of a cessation of further IDS development, specifically acquisitions of hospitals, physician practices and entry into additional risk contracting agreements for AHERF as a whole is significant. Based on a review of data relating to capital acquisition and operating costs, if no additional physician practices had been purchased after September 30, 1996, AIHG would have conserved $38.7 million in cash. A total of $31.6 million in physician-acquisition costs were identified from the AHERF consolidating cash flow statement as of June 30, 1997. Additionally, AIHG incurred $7.1 million in derived EBITDA losses associated with practices that it acquired subsequent to September 30, 1996 during fiscal 1997.[1]

Based on a review of financial and statistical data, depositions of key individuals from the AHERF senior management team and others, various court filings and exhibits, and

6

## COMPENSATION

| | |
|---|---|
| Thomas W. Singleton | $600.00/hr. |
| Range for Cambio Team Members | $250.00 - $350.00/hr. |

## PRIOR TESTIMONY

I have not testified as an expert witness within the last four years.

Dated: _9/2/04_

_Thomas W Singleton_

Thomas W. Singleton

---

[1] EBITDA was derived from the May 31, 1997 AIHG Financial Statements (Bates JD DC 0057397-0057453.

[2] Penn Health System Charts Financial Future, Physician's News Digest, December 2000, C. Guadagnino

[3] As an exception to this rule relevant to operations at AHERF, in my turnaround plan I have generally examined activity and costs incurred at the AHERF Parent entity, as well. The functions performed at this enterprise and the expenses incurred indicate that they were for administrative management and related matters. Significant portions of these costs and expenses were allocated to DVOG and therefore are addressed in the specific EBITDA-improvement analyses provided in this report. To the extent that these costs and expenses were allocated to entities other than DVOG, my experience in the healthcare industry as well as my specific experience examining the DVOG entities, indicates that these costs and expenses could also have been reduced significantly to levels consistent with the continuing solvency of the AHERF Parent without sacrificing necessary services.

[4] The Center for Healthcare Industry Performance Studies, 1997-98 Almanac of Hospital Financial and Operating Indicators.

**TAB 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF            )
UNSECURED CREDITORS OF               )
ALLEGHENY HEALTH, EDUCATION          )
AND RESEARCH FOUNDATION,             )
                                     )    Civil Action No. 00-684
          Plaintiff,                 )    Judge David Stewart Cercone
                                     )
     v.                              )
                                     )
PRICEWATERHOUSECOOPERS, LLP,         )
                                     )
          Defendant.                 )

## Rule 26(a)(2)(B) Report of R. Bruce Den Uyl

### I.     Introduction

This report contains my opinions in the matter brought by The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation (the "Committee" or "Plaintiff") against the PricewaterhouseCoopers ("PwC", "Coopers" or the "Defendant").[1] I have been retained to provide expert opinions regarding the damages sustained as a result of misstatements contained in the audited financial statements of the Allegheny Health, Education and Research Foundation and its affiliates (the "AHERF System") for fiscal years ended June 30, 1996 and June 30, 1997.

### II.    Personal Background, Information and Qualifications

I am a Principal in the professional services firm AlixPartners LLC ("AlixPartners"). As part of performing my analysis, I utilized a team of AlixPartners personnel who worked under my direction and control.

---

[1] Coopers & Lybrand ("Coopers") and Price Waterhouse merged to create PricewaterhouseCoopers ("PwC") in July of 1998. The legacy Coopers auditors were the auditors of the Allegheny Health, Education and Research Foundation and its affiliates for the fiscal years 1996 and 1997.

All of the opinions presented in this report are based on my analysis of the available information and my experience, education and expertise as a financial consultant.

I have had extensive experience as a consultant on a broad array of financial issues. I have prepared financial and accounting analyses, valuations and efficiency studies in connection with mergers and acquisitions, bankruptcies, fairness opinions and litigation issues. I have acted as a consultant to companies and governmental bodies for the purpose of establishing values for acquisitions and divestitures. I have prepared analyses for cases involving failed acquisitions, fraudulent conveyance, bankruptcy, breach of contract, antitrust and securities issues. In addition, I have extensive experience preparing valuations and financial analyses in the healthcare industry including hospitals, HMOs, PPOs, physician practices, and clinics. I have acted as an expert and advisor to troubled and financially viable healthcare entities. I have also provided fairness reviews of transactions for Attorneys General throughout the United States and have provided expert testimony in several healthcare cases.

Exhibits 1, 2 and 3 contain copies of my curriculum vitae, a list of my presentations and publications in the last ten years, and a list of my deposition and trial testimony within the last four years, respectively.

## III.   Background

### A.   The History of Allegheny Health, Education and Research Foundation

AHERF was a Pennsylvania nonprofit corporation that was originally created in 1983 to function as the sole member of Allegheny General Hospital, which at that time had operated for nearly 100 years.[2] In the late 1980s, AHERF was a financially stable organization acting primarily as Allegheny General Hospital's parent foundation and coordinating the efforts of a relatively small

---

[2] First Amended Complaint at page 4.

had the misstatements contained in the audited financial statements been known.[82]  Those events are described in further detail later in this report.

### D.  The Reaction of Responsible Parties

Had they been provided with correct financial statements during fiscal years 1996 and 1997, responsible parties would not have undertaken certain acquisitions and would have proceeded to take counter actions.  Such behavior would have avoided significant costs that the creditors ultimately bore and would have steered the AHERF System from the course that ended in bankruptcy.

Accurate financial statements were imperative to the Board of Trustees.  Several members of the Board of Trustees, in particular those on the Audit Committee testified that they relied on Coopers to bring misstatements to their attention and that it was important for the Board of Trustees to be aware of material misstatements.[83]  For example, Ralph Brenner ("Mr. Brenner"), a member of the Audit Committee, testified that, in the eyes of the Board of Trustees, Coopers was the ultimate guardian of management and the financial affairs of AHERF and that he would expect Coopers to bring to the Board's attention any material misstatements.[84]  Mr. Brenner also testified that had Coopers come to the Audit Committee and indicated that the financial statements were intentionally misstated, he would have intensely investigated the situation.[85]  Similarly, Robert Palmer ("Mr. Palmer"), testified that a materially worse performance from a financial perspective during 1996 and 1997 would have caused an in-depth examination of the steps of the IDS [integrated delivery system], again suggesting the importance of the audited financial statements to the decision making processes of the Board of Trustees.[86]  Furthermore, Mr. Palmer testified that the Board expected losses during the first years after beginning to

---

[82] In certain aspects of my analyses, I have utilized the Marks Paneth restated financial statements, including that for fiscal year 1998.
[83] J. David Barnes deposition testimony, July 9, 2003 at pages 313 - 314. Ralph W. Brenner deposition testimony, September 30, 2003 at pages 160-161. Anthony M. Cook deposition testimony, September 4, 2003 at pages 258 - 259. Claire Gargalli deposition testimony, August 26, 2003 at pages 160 - 161. Robert Hernandez deposition testimony, September 3, 2003 at pages 158 - 169. Graemer Hilton deposition testimony, August 13, 2002 at pages 218 - 220.
[84] Ralph W. Brenner deposition testimony, September 30, 2003 at pages 160 - 161.
[85] Ibid at pages 170 - 175.
[86] Robert Palmer deposition testimony, August 8, 2003 at pages 236 - 239.

acquire physician practices, however, had the losses been 50% greater than expected as opposed to 5% greater, it would have caused him to examine the concept further.[87]

Likewise, in assessing whether or not to do business with AHERF, third party entities relied on the accuracy of the AHERF audited financial statements. For example, Mr. Stephen Dengler ("Mr. Dengler"), an employee of HealthAmerica, testified that he recalls that a great deal of reliance was placed on the Coopers audited financial statements in Fiscal Year 1996.[88] In fact, Mr. Dengler testified that the Fiscal Year 1996 audited financial statements were the basis for HealthAmerica's conclusion that AHERF was a viable entity and that HealthAmerica therefore was able to do business with AHERF.[89]

Evidence of options available to such responsible parties if faced with financial statements that significantly differed from those provided for fiscal years 1996 and 1997, rest in at least the following areas.

### Board Member Deposition Testimony

Several members of the AHERF Board of Trustees testified that they understood the Audit Committee of the AHERF Board had direct interaction with Coopers in regard to reviewing the audited financial statements of the AHERF System. The testimony of those Board members further indicated that, had any problems or issues been discovered with the audited financial statements, they would have expected those issues to be brought to the attention of the Audit Committee by Coopers, and ultimately to the AHERF Board.[90]

Mr. J. David Barnes ("Mr. Barnes"), Chairman of the Audit Committee in both fiscal years 1996 and 1997, was deposed in this matter. When asked whether he knew what the Audit Committee would have done if Coopers had informed the Committee that the Fiscal Year 1996 financial statements were overstated and that rather than having approximately $6 million in net income

---

[87] Ibid at pages 236 - 239.
[88] Stephen Dengler deposition testimony, June 10, 2004 at pages 70 - 79.
[89] Ibid at pages 70 - 79.
[90] Barbara Atkinson deposition testimony, May 12, 2004 at pages 115 - 135. Dorothy McKenna Brown deposition testimony, May 4, 2004 at pages 159 – 175. Donna Marie Murasko deposition testimony, April 8, 2004 at pages 178 - 187.

for the year, AHERF suffered a net loss, Mr. Barnes testified that a lot of questions would have been raised.[91]  Mr. Barnes testified that the Audit Committee would have looked into whether the financial statement misstatement was a recurring problem or whether it was a discrete one-year problem.  He would have asked where in the AHERF System, the problem happened and why it had occurred.  He testified that the Audit Committee would have questioned whether the financial statement problem related to one issue or several and would have caused the Committee to question whether the financial statement system was any good.[92]  Mr. Barnes indicated that the next set of questions would have involved determining what could be done about the financial statement problems.  He testified that the Trustees could have opted to give up on Philadelphia and have sold everything, could have installed a new management team, or could have brought in a consultant in response to the financial statement problems.[93]

When asked what he would have done if faced with financial statements that showed, by way of example, losses of $70 million in Fiscal Year 1996 as opposed to $6.5 million in income as per the Coopers audited financials (the Marks Paneth restated financial statements actually show a loss of nearly $90 million as opposed to the Coopers $6.5 million income figure), Mr. Barnes testified that such an event would have caused "more questions faster."[94]  In fact, Mr. Barnes agreed that such a change in financial statements would have raised questions as to whether or not there should be a change in management, whether there would be a need for a consultant to review the operation, whether the entity could continue to afford a physician acquisition program or any capital expenditure, including whether it would be prudent to acquire five more Eastern hospitals from Graduate Health System.[95]

Similarly, Mr. Ira Gumberg ("Mr. Gumberg"), another member of the Audit Committee, testified in his deposition that if the Trustees had known that the financial statements were materially misstated and that Coopers & Lybrand was therefore issuing an adverse opinion on those statements, he would have had several reactions.  First, Mr. Gumberg indicated that he would

---

[91] J. David Barnes deposition testimony, July 8, 2003 at page 183.
[92] Ibid at pages 183 - 184.
[93] Ibid at page 184.
[94] J. David Barnes deposition testimony, July 9, 2003 at pages 333 - 334.
[95] Ibid at pages 335 - 336.

18

have been "scared" to hear that the financial statements were materially misstated.[96]  Second, Mr. Gumberg testified that he believes consultants would have been brought in to advise the Board of Trustees on the situation.[97]  Mr. Gumberg believes that the Board of Trustees may have asked the auditors to delve deeper into the misstatement issues and to report back to the Audit Committee.[98]  Further, Mr. Gumberg testified, "we may have put the brakes on everything that was going on until we [got] our hands around it."[99]  In elaborating on what he meant by the "brakes on everything" Mr. Gumberg testified that "I would think if we had found ourselves in that position, [we] would have had to have looked at everything that was happening"[100] including hospital and physician practice acquisitions.[101]  When asked what options the Board of Trustees would have had if inquiries led by the auditors, the Board of Trustees, or consultants drew into question the competence and integrity of financial management leadership, Mr. Gumberg testified that he believes the Board would have had no option other than to terminate AHERF financial management.[102]

When provided with hypothetical situations of AHERF audited financial statements misstating net income by approximately $80 million in Fiscal Year 1996 and by approximately $100 million or more in Fiscal Year 1997, Mr. Gumberg testified that he would have had the same reaction with regard to putting the brakes on further acquisitions.[103]  Mr. Gumberg indicated that had it been brought to his attention that the Fiscal Year 1996 and 1997 financial statements were overstated by such significant amounts as $80 million and $100 million, for example, that those losses would have called into question his view of whether real efficiencies or synergies or other benefits had materialized from the integrated delivery system.[104]  Furthermore, Mr. Gumberg testified that any time an entity is under a crisis and has been advised that sizeable mistakes to financial statements have been made, such as an overstatement of $80 million in one year and

---

[96] Ira Gumberg deposition testimony, October 3, 2003 at page 350.
[97] Ibid at page 349 - 351.
[98] Ibid at page 349 - 351.
[99] Ibid at pages 349 - 351.
[100] Ibid at pages 349 - 351.
[101] Ibid at pages 349 - 351.
[102] Ibid at pages 350 - 351.
[103] Ibid at pages 352 - 353.
[104] Ibid at page 356.

$100 million in the next year, he believes that all of what the Board of Trustees is doing would be called into question, including the [executive] team.[105]

In regard to acquisitions that Mr. Gumberg testified would have been called into question had the Board of Trustees been advised that the AHERF financial statements were materially misstated, he testified that he did not recall ever having been advised by Coopers that the acquisition of the Graduate Hospitals could threaten the AHERF System's ongoing financial viability. Neither did he recall seeing anything in the audited financial statements that would have led him to believe that the financial viability of the AHERF System could be threatened by the acquisition.[106] Similarly, Mr. Gumberg did not recall either having been informed by Coopers or seeing anything in the audited financial statements for fiscal years 1996 or 1997 that led him to believe that ongoing physician practice acquisitions could threaten the financial viability of AHERF.[107]

In his deposition, Mr. William Snyder ("Mr. Snyder"), Chairman of the AHERF Board of Trustees, recalled that Messrs. Barnes and Gumberg did not think that risk contracts undertaken by AHERF were a good idea.[108]

Based on this testimony, as well as similar testimony by other Trustees, the acquisition strategy of AHERF, in particular the purchase of the former Graduate Hospitals and the continued acquisition of physician practices could and likely would have been avoided in the event that the Trustees were aware of material misstatements to the audited financial statements for fiscal years 1996 and 1997. In addition, given the fact that the HealthAmerica contract, effective April 1997, was expected to generate significant losses in the first two years of the contract's existence (see detail related to the risk contract later in this report) and the fact that Messrs. Barnes and Gumberg were not in favor of risk contracts, the HealthAmerica risk contract would have likely been avoided had the Trustees known that the audited financial statements were materially misstated.

---

[105] Ibid at page 356.
[106] Ibid at pages 356 – 357.
[107] Ibid at page 357.
[108] William Snyder deposition testimony, July 15, 2003 at pages 26 - 27.

***Third-Party Involvement***

Important to the issue of what may have been done differently had accurate audited financial statements been provided by Coopers, is the fact that certain third parties would have been involved in any such process based on debt covenant violations that would have occurred. Based on the restated financial statements prepared by Marks Paneth in fiscal years 1996 and 1997, AHERF and/or its obligated groups would have been in violation of certain debt covenants by the end of Fiscal Year 1996.[109] Mr. Gumberg also testified that he believed debt compliance was important because it stated that the AHERF fund balance and/or income and liquidity were acceptable to their lending institutions.[110]

Deposition testimony of the insurers and guarantors of the AHERF System bonds, as well as bond trustee representatives indicates that those parties would have communicated with and become involved in the decisions surrounding acquisition and investing activities of AHERF had the parties known of debt covenant violations. Specifically, representatives from PNC and MBIA have testified that had they known about AHERF's deteriorating financial situation sooner, steps would have been taken to address the situation. See Exhibit 7 for a summary chart of the Bond Trustees, Insurers, and Guarantors related to the various bonds outstanding.

Mr. Ralph Michael ("Mr. Michael"), CEO of Corporate Banking for PNC, testified that had PNC been made aware of AHERF's financial issues earlier, PNC would have had active discussions about either restructuring the debt in some form or fashion or accelerating repayment.[111] Furthermore, Mr. Michael testified that he is confident that had AHERF's financial statements been accurately presented, that the bond rating for AHERF would have been downgraded and that this would have caused creditors to pressure AHERF much more strongly to restructure and limit costs and in general "right the ship" from an operating perspective.[112] Mr. Michael also testified that a standard commercial banking practice is to introduce a crisis manager or turnaround specialist hired by the company [borrower] to assist in bringing about financial

---

[109] Expert Report of Steven B. Kite, Esq. dated September 1, 2004.
[110] Ira Gumberg deposition testimony, October 3, 2003 at pages 326 - 327.
[111] Ralph Michael deposition testimony, March 11, 2004 at pages 11 – 12 and 155 - 156.
[112] Ibid at pages 161 - 164.

resolution.[113] Had Coopers issued a qualified audit opinion [as opposed to a clean bill of health] after the PNC letter of credit was approved, it would have been a "severe red flag" and PNC would immediately have contacted Coopers to obtain more information.[114] Further, Mr. Michael testified that had Coopers issued a qualified opinion on any AHERF or DVOG financial statements, the [DVOG] credit never would have received investment grade status, a necessary condition for PNC to sign an approval of the credit.[115]

Mr. Richard Weill ("Mr. Weill"), President of MBIA and supervisor of the healthcare group beginning in 1994, testified in his deposition that he is absolutely sure that had MBIA known of AHERF's true financial condition sooner, it would have advocated steps including discontinuing physician practice acquisitions, cutting costs and hiring professionals to assist with AHERF's accounts receivable.[116] Furthermore, if Coopers' misstatements had been known sooner, MBIA would have had the leverage to hire a turnaround consultant such as the Hunter Group.[117]

## E.  Avoidable Acquisitions

Rather than curtailing hospital or physician practice acquisitions as they could have beginning at the end of Fiscal Year 1996 had accurate financial statements been provided, AHERF moved forward with both hospital and physician practice acquisitions.  In fact, as previously stated, AHERF acquired the Graduate Hospitals in May of 1997.  The Trustees knew that the Graduate Hospitals were poor performing hospitals.[118]  However, the Trustees did not know the true financial condition of the AHERF System, nor did they have accurate disclosure of the financial performance of the Philadelphia area facilities previously acquired by the AHERF System.  Accordingly, the Trustees actions regarding the acquisition of the Graduate Hospitals, were undertaken under the guise of misstated AHERF financial statements.

---

[113] Ibid at pages 165 - 167.
[114] Ibid at pages 171 - 172.
[115] Ibid at pages 171 - 173.
[116] Richard Weill deposition testimony, October 8, 2003 at page 286 - 288.
[117] Ibid at page 289.
[118] J. David Barnes deposition testimony, July 8, 2003 at pages 131 - 132. Ira Gumberg deposition testimony, October 3, 2003 at page 268. Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal year ended June 30, 1996.

22

Furthermore, during Fiscal Year 1997, AHERF acquired the practices of more than 200 physicians.[119]  The acquisition of the new practices during Fiscal Year 1997 alone required approximately $32 million in cash.[120]  The newly acquired physician practices combined with existing physician practices rendered significant net losses for the AHERF System.  The net losses totaled nearly $62 million in Fiscal Year 1997.[121]  The Trustees authorized the continued acquisition of physician practices based on a falsely stated AHERF financial condition.

In following the strategy of expanding its referral base and patient volume, AHERF also entered into a new risk contract during the Fiscal Year 1997.  The risk contract was with HealthAmerica and included the acquisition of the practices of more than 100 physicians including approximately 80 primary care physicians known as PGMA.  Documentation available in this matter shows that AHERF anticipated losses of $64 million related to the HealthAmerica risk contract over the initial two year time period of the contract.[122]  Again, this contract would not have likely been entered into had the Trustees known the true financial condition of AHERF.

---

[119] Allegheny Integrated Health Group Board Meeting Packages.
[120] "Acquisition of physician practice assets, net" and "Acquisition of physician practice intangible assets" per consolidating cash flow statement for Fiscal Year 1997.
[121] Net loss per Marks Paneth restated consolidating income statement.  The audited physician losses for Fiscal Year 1997 total $61 million.
[122] Coopers & Lybrand workpapers (CL 012628).

## IV. Summary of Opinions

A.      One measure of damages in this matter is the amount of the actual total creditor shortfall. Had the true financial condition of the AHERF System at or before September 1996 been known by the Board and third parties, appropriate intervention to prevent unnecessary costs and liabilities could and likely would have occurred. My opinion is informed by the analysis of Mr. Thomas Singleton ("Mr. Singleton") that such an intervention could and likely would have allowed a turnaround and therefore the avoidance of any creditor loss. The bankruptcy records as of June 30, 2004 reflect that the bankrupt entities have an existing shortfall to their creditors of approximately $557.0 million, and the obligation of the bankruptcy estates for this shortfall is an appropriate measure of the avoidable insolvency of the AHERF System.

B.      Alternatively, damages could be measured as the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions that were undertaken and that could have been avoided had the Board and third parties been apprised of the true AHERF System financial statements for fiscal years 1996 and 1997. The amount of damage under this analysis is approximately $267.5 million, and is a measure of the avoidable loss to the AHERF System incurred by virtue of the failure to disclose the true financial condition of the AHERF System at fiscal year end 1996. These avoidable costs were incurred over time as reflected in the exhibits hereto.

24

V.    One measure of damages in this matter is the amount of the actual total creditor
      shortfall.  Had the true financial condition of the AHERF System at or before
      September 1996 been known by the Board and third parties, appropriate
      intervention to prevent unnecessary costs and liabilities could and likely would have
      occurred.  My opinion is informed by the analysis of Mr. Thomas Singleton ("Mr.
      Singleton") that such an intervention could and likely would have allowed a
      turnaround and therefore the avoidance of any creditor loss.  The bankruptcy
      records as of June 30, 2004 reflect that the bankrupt entities have an existing
      shortfall to their creditors of approximately $557.0 million, and the obligation of the
      bankruptcy estates for this shortfall is an appropriate measure of the avoidable
      insolvency of the AHERF System.

Under the Liquidating Plan of Reorganization of the Debtors (the "Plan"), as of December 26,
2000 ("Plan Confirmation"), total allowed consolidated claims against the Debtors' estates were
approximately $677 million.[123]  The Plan provided, among other things, that the holders of the
MBIA/PNC Claims (the insurers of the DVOG bonds) and Centennial bondholders would have a
portion of their claims classified as Secured, with the remainder of claims classified as
Unsecured.   The Plan classified all claims against the Debtor Entities into ten separate classes
and subclasses.[124]  The following table summarizes the classification and treatment of claims
under the Plan.

| Class | Description | Class Treatment | Projected Distribution as of Effective Date |
|-------|-------------|-----------------|---------------------------------------------|
| N/A | Administrative Expense Claims | Paid in full. | Paid 100% in Cash. |
| N/A | Priority Tax Claims | Paid in full. | Paid 100% in Cash. |
| 1 | Priority Claims | Paid in full. | Paid 100% of Claim in Cash. |
| 2 | General Secured Claims | Paid in full or otherwise rendered unimpaired. | Paid 100% of Claim in Cash or otherwise rendered unimpaired. |

---

[123] Monthly Operating Report (June 30, 2004).
[124] Amended Disclosure Statement at page 3.

| Class | Description | Class Treatment | Projected Distribution as of Effective Date |
|---|---|---|---|
| 3 | Secured Claims of holders of Centennial Bondholder Claims | Granted an Allowed Secured Claim of $33 million and an Allowed Centennial Unsecured Claim of $105.6[125] million. | Paid $20.5 million of Allowed Secured Claim and granted an entitlement to recover remaining portion of Allowed Secured Claim upon first distribution by Liquidating AHERF. |
| 4 | Secured Claim of holders of MBIA/PNC Claims | Granted an Allowed Secured Claim of $50 million and an Allowed Unsecured Claim of $340.3 million.[126] | Paid $10 million of Allowed Secured Claim and granted an entitlement to recover remaining portions upon first, second and subsequent distributions by Liquidating AHERF in accordance with the Plan. |
| 5(A) | General Unsecured Claims | Distribution of Cash. | Paid 5% of Allowed Unsecured Claim in Cash and entitled to subsequent distributions by Liquidating AHERF in accordance with the Plan based on participation equal to amount of Allowed Claim. |
| 5(B) | Centennial Unsecured Claims | Distribution of Cash. | Paid 1.5% of Allowed Unsecured Claim in Cash and entitled to recover subsequent distributions by Liquidating AHERF in accordance with the Plan based on participation equal to 30% of Allowed Claim. |
| 6(A) | Allowed Convenience Claims | Distribution of Cash to holders of Allowed Unsecured claims less than $1,000. | Paid 10% of Allowed Unsecured Claim in Cash; not entitled to further distributions. |
| 6(B) | Allowed Centennial Convenience Claims | Distribution of Cash to holders of Allowed Centennial Unsecured Claims less than $5,000. | Paid 3% of Allowed Unsecured Claim in Cash; not entitled to further distributions. |
| 7 | Insurance Claims | Retain proceeds from any applicable Insurance Policy | No other distributions under Plan. |
| 8 | Allowed Membership Interests | Retain Membership Interests | Retain 100% of Membership Interests |

*Source: Amended Disclosure Statement dated August 15, 2000 at pages 3-5*

---

[125] Per the Amended Disclosure Statement, the Centennial Bondholders were allowed a Secured Claim of $105.6 million. These creditors received approximately $30 million in payments resulting from litigation settlements and accounts receivable collection rights. The Centennial bondholder allowed claim was therefore reduced to $75.6 million (JD-AHERF 1590 to 1597). See also the letter from Mr. Peter A. Biagetti on behalf of the Bank of New York as indenture trustee for the Centennial bondholders dated August 13, 2004.

[126] The MBIA/PNC Allowed Unsecured Claim was later changed to $342.6 million.

26

To date, all allowed claims of the Secured Creditors have been paid in full.  The table below summarizes the payouts to these creditors:

| Type | Class | Claim/Payment Amount ($ millions) |
|---|---|---|
| Administrative Expense Claims | N/A | $11.3 |
| Priority Claims | 1 | $4.1 |
| General Secured Claims | 2 | $2.1 |
| Secured Claims of Centennial Bondholders | 3 | $33.0 |
| Secured Claims of Holders of MBIA/PNC Claims | 4 | $50.0 |
| **Total Secured Claims** | | **$100.4** |

*Source: Schedules prepared by personnel of the Chapter 11 Trustee's office and Donlin Recano database (JD-AHERF 1585, JD-AHERF 0766-0768*

With regard to the Unsecured Claims, an initial and four incremental distributions have been made to the Unsecured Creditors.  These distributions are summarized in the table below.

| Distribution | Total Amount Distributed | General Unsecured Non-Centennial | General Unsecured Centennial |
|---|---|---|---|
| Initial Distribution – Per Plan  (December 2000 / March 2001) | $26.7 million | 5.000% | 1.500% |
| First Incremental Distribution – After Settlement of Mellon Preference Action (July 2001) | $16.9 million | 3.000% | 0.900% |
| Second Incremental Distribution – After D&O / GLS Settlement (July 2002) | $38.4 million | 6.500% | 1.950% |
| Third Incremental Distribution – After Resolution of Tenet Escrow Amount (February 2003) | $21.5 million | 3.500% | 1.050% |
| Fourth Incremental Distribution – After Re-evaluation of Reserves (December 2003) | $7.8 million | 1.250% | 0.375% |
| **Cumulative Distribution as of December 2003** | **$111.3 million** | **19.250%** | **5.775%** |

*Source:  Schedules prepared by personnel of the Chapter 11 Trustee's office (JD-AHERF 1548)*

27

Other distributions have been made under special circumstances, such as when the Bankruptcy Court has ordered that a specific creditor receive payment.[127]  Also, since the Petition Date, additional creditor claims that were initially disputed have been allowed.[128]

I have calculated the total creditor shortfall based on the information provided in the Plan, and through materials obtained from the Trustee's office and Donlin, Recano & Company ("Donlin Recano"), the claims administration agent to the Trustee.  The result of my calculations indicates a total creditor shortfall of $584.2 million.  From the total creditor shortfall figure, I have made two adjustments and expect to make a third adjustment at a later date, which had the impact of reducing the total creditor shortfall.  First, I deducted $4.9 million, which I understand the Trustee expects to obtain related to recoveries from the Allegheny Hospitals, New Jersey liquidation and Medicare recoveries that are not yet finalized.[129]  Second, I reduced the total creditor shortfall by the amount of total assets held by the Trustee, which in large part consist of cash and cash equivalents, totaling $23.1 million as of June 30, 2004.[130]  Making this reduction at this time is generous due to the fact that the existing amount of cash and cash equivalents will certainly decline over time and therefore not be available in total for distribution to creditors. The resulting adjusted creditor shortfall based on the two adjustments made to date is $556.2 million.[131]  See Exhibit 8.

Per the Monthly Operating Report for the month ended June 30, 2004, the total remaining obligations related to the Allowed Claims of the Unsecured Creditors was $585.0 million.[132] After making the same adjustments to this figure as made in my calculation above, the amount of adjusted creditor shortfall is $557.0 million.  See Exhibit 9.

---

[127] Interview with Diane Schrecengost, April 16, 2004.
[128] Approximately $129 million in claims that were initially disputed have since been allowed.
[129] Charles Morrison deposition testimony, June 29, 2004 at pages 141 - 150.
[130] Monthly Operating Report, Balance Sheets as of June 30, 2004.
[131] I have been advised by counsel that it may be appropriate to deduct fees paid to professionals in the prosecution of this litigation.  Accordingly, I plan to deduct the professional fees after such fees have been fully incurred and/or finalized.
[132] The Trustee submits a monthly report to the Bankruptcy Court that contains, among other things, information related to the claims that have been filed, claims that have been allowed and claims that have been liquidated.  This report is known as the Monthly Operating Report.

The Trustee's office has provided me the necessary information to reconcile the slight discrepancy between my calculation of the total creditor shortfall and the corresponding information presented in the June 30, 2004 Monthly Operating Report. I understand that the discrepancy primarily relates to certain distributions held back by the Trustee due to pending adversary proceedings. A reconciliation of my calculations to the Monthly Operating Report is presented in Exhibit 10. The bankruptcy records indicate and my analysis confirms that the bankrupt estates have been damaged by the amount of approximately $557.0 million as of June 30, 2004.

**VI.  Alternatively, damages could be measured as the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions that were undertaken and that could have been avoided had the Board and third parties been apprised of the true AHERF System financial statements for fiscal years 1996 and 1997. The amount of damage under this analysis is approximately $267.5 million, and is a measure of the avoidable loss to the AHERF System incurred by virtue of the failure to disclose the true financial condition of the AHERF System at fiscal year end 1996. These avoidable costs were incurred over time as reflected in the exhibits hereto.**

I have also taken an alternative approach to quantifying damages due to the misstated financial statements as audited by Coopers. In particular, during the period between the end of the first quarter of Fiscal Year 1997 (shortly after Coopers issued its audit report related to the misstated financial statements for Fiscal Year 1996) through the end of Fiscal Year 1997 (the second year of the Coopers misstated financial statements) there were a number of acquisitions and/or transactions that were undertaken by the AHERF System. As outlined above, evidence in the record indicates that the acquisitions and/or transactions would not have occurred had accurate financial statements been presented in fiscal years 1996 and 1997 (the "Avoidable Costs").

## A. *Acquisition of the Graduate Hospitals in Philadelphia*

Among the transactions that would not have occurred but for Coopers' misstatements was AHERF's acquisition of five financially distressed hospitals from the Graduate Health System during Fiscal Year 1997.

On August 5, 1996, Mr. Abdelhak and Mr. Snyder sent a letter to the AHERF Board of Trustees to inform Board members that the Graduate Health System had approached AHERF management about certain of its hospitals and other organizations becoming part of AHERF.[133] The letter also indicates that rather than consummating an immediate transaction between AHERF and the Graduate Health System, that the transaction would initially occur between the Graduate Health System and SDN, an entity managed by AHERF, but independent of AHERF. Because SDN was not part of the AHERF System, the letter stated that no prior approval of the Board of Trustees was necessary to approve the transaction. However, if the Graduate Health System entities were to be merged into AHERF in the future, the AHERF Board would have the opportunity to review and confirm the actions taken by the Executive Committee.[134]

Effective November 1, 1996, the Graduate Hospitals in Philadelphia were merged into SDN.[135]

At the Annual Meeting of the AHERF Board of Trustees held on December 12, 1996, the Board authorized Mr. Abdelhak to take any and all reasonable action necessary to effectuate the reorganization of the Graduate Hospitals into the AHERF System.[136] Four of the purchased hospitals were located in the Philadelphia area: Graduate, Parkview, City Avenue and Mt. Sinai. These hospitals would ultimately be merged into the Allegheny Hospitals, Centennial ("Centennial") division of AHERF, a Debtor entity. One of the purchased hospitals, Rancocas Hospital, was located in New Jersey. Rancocas Hospital was ultimately merged into a division of AHERF, Allegheny Hospitals, New Jersey, which was not part of the bankruptcy.

---

[133] Letter from Mr. Abdelhak and Mr. Snyder to the AHERF Board of Trustees, August 5, 1996 (D 0004319).
[134] Ibid.
[135] Minutes from the Meeting of the Board of Trustees of AHERF (December 12, 1996).
[136] Ibid.

As stated earlier, considered collectively, the Graduate Hospitals were in financial distress at the time that AHERF acquired them. The Graduate Hospitals demonstrated declining margins between fiscal year 1995 to fiscal year 1996, the last completed fiscal year prior to AHERF's acquiring the hospitals. At fiscal year end 1995, the Graduate Hospitals had an operating loss of $7.3 million or an operating margin of -2.3%, which declined further by the end of fiscal year 1996 to $19.4 million in operating losses or an operating margin of -6.4%.[137]

In addition, the Graduate Hospitals carried a bond debt balance of $171 million by the end of fiscal year 1996. The heavy debt load required the Graduate Hospitals to repay approximately $5 million per year in principal and $14 million per year in interest expense.[138] Without knowing the true financial condition of the AHERF System, the AHERF Trustees approved the transaction. Had I been consulted at the time, and based on accurately stated financial statements for the AHERF System, I would have advised against the purchase.

Ultimately, the Centennial division of AHERF, which held the Graduate Hospitals, experienced negative financial consequences that, but for the acquisition of the financially distressed hospitals would not have been incurred. First, Centennial incurred cash flow losses of $26.7 million from May 1, 1997 through June 30, 1998. I have also included cash flow losses of $14.2 million for the period of July 21, 1998 through November 9, 1998, the end of operations under AHERF.

The starting point for the calculation of the cash flow losses that I have calculated is net income before extraordinary items. I have adjusted this figure for depreciation and amortization expense and unusual items to derive the measure of Earnings Before Taxes, Depreciation and Amortization ("EBTDA"). From EBTDA, I subtract capital expenditures as they represent cash spent on property, plant and equipment. Finally, I adjust for any increases or decreases in working capital requirements in order to derive the cash flow losses of the Graduate Hospitals

---

[137] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal years ended June 30, 1995 and June 30, 1996. If non-operating gains are included in the operating margin calculation, the Fiscal Year 1995 margin is –1.4% and the Fiscal Year 1996 margin is –3.8%.

[138] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal years ended June 30, 1995 and June 30, 1996.

for both fiscal years 1997 and 1998, while owned by AHERF. These cash flow losses would not have occurred had the transaction not taken place.

In addition to the cash flow losses generated by the Graduate Hospitals, AHERF became liable for $174 million in bond debt held by the hospitals. Of the total amount of bond debt assumed, $7.0 million was extinguished prior to June 30, 1998, the amount of which I have also included as a component of damages. In addition, I have included the repayment of a line of credit in the amount of $6.2 million, which was assumed in the transaction, as a damage component. I have offset the cash flow losses and the bond debt for the cash received by AHERF in its acquisition of the Graduate Hospitals totaling $4.7 million. This amount of cash would have been a benefit provided to the AHERF System in the acquisition. In addition to the bond debt assumed in the acquisition of the Graduate Hospitals, other liabilities were also assumed. The balance of these liabilities ultimately became the responsibility of Centennial. Accordingly, I have included the balance of liabilities just after the sale of the hospitals to Tenet as an amount of damage. In order to appropriately state damages, I have offset the liabilities with the corresponding recoveries achieved through the sale of the assets to Tenet and in the runoff of the Centennial estate, as discussed below.

As discussed in detail in Section III above, on September 29, 1998, Tenet made an offer for nearly the entirety of the Eastern Entities. The offer was in the amount of $345 million and was contingent on Tenet being able to find a partner to operate the Allegheny University of the Health Sciences. Drexel University agreed to manage the Allegheny University of the Health Sciences and $110 million of the $345 million in sale proceeds were directed towards the Allegheny University of the Health Sciences. Therefore, $235 million of the $345 million sale proceeds related to the eight Philadelphia hospitals. As a further mitigating factor to the damages related to the Centennial transaction, I have considered the portion of the $235 million in sale proceeds attributable to Centennial.

Zolfo Cooper LLC ("Zolfo Cooper"), a financial advisor to the Committee, prepared an allocation analysis of the Tenet sale proceeds.[139] The analysis indicates that the net sale proceeds

---

[139] HLAH 0003641 - 3647.

related to Centennial was approximately 22% of the total net sale proceeds.[140]  I have applied the 22% allocation to the $235 million in sale proceeds to determine the amount of the Tenet consideration due Centennial.  This approach is conservative based on the fact that Vanguard specifically identified only approximately 17% of its $460 million offer as relating to the Centennial hospitals.[141]

In addition to the Tenet sale proceeds attributable to Centennial, other amounts have been recovered related to the Centennial assets, including, for example, $36.8 million in accounts receivable collections, $17.9 million related to the Centennial debt service reserve funds, $10 million related to a settlement with Medicare and $14 million related to a settlement involving the PHCT litigation.[142]  I have deducted the sum of known recoveries from the total liabilities assumed in my calculation of damages.  Total damages related to the Graduate Health System acquisition are $167.5 million.  See Exhibit 11.

## B. Continued Acquisition of Physician Practices

Another loss-producing activity of AHERF's strategic plan, which would have likely been curtailed had AHERF's financial situation been accurately reported by Coopers, was the continued acquisition of physician practices.  As stated earlier, AHERF acquired hundreds of physician practices between fiscal years 1995 and 1998.  The bulk of this acquisition activity occurred in fiscal years 1996 and 1997.[143]  See Exhibit 12 for a list of the physician practices that AHERF acquired subsequent to September 30, 1996.

Between fiscal years 1996 and 1998, Allegheny Integrated Health Group reported severe operating losses.  Despite these losses, significant capital continued to be spent to acquire more physician practices.  The table below shows specifically what the audited financial statements

---

[140] HLAH0003646.
[141] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.
[142] PWC-SUB-A+M 04140 to 04151.  Deposition Exhibit 2752.  Joint Motion to Approve Settlement Agreement and Stipulation and Order Approving Settlement Agreement and Stipulation between the Trustee and Tenet.  Application For An Order Approving a Certain Settlement Agreement and Order Approving A Certain Settlement Agreement between the Trustee and Philadelphia Health Care Trust.  Letter from Mr. Peter A. Biagetti on behalf of the Bank of New York as indenture trustee for the Centennial bondholders dated August 13, 2004.
[143] Deposition Exhibits 1227, 1302, 1303.

demonstrated the net losses of Allegheny Integrated Health Group to be in fiscal years 1996 and 1997 as well as the losses in the internal fiscal year end 1998 financial statements.

| | Fiscal Years Ended June 30 ($ millions) | | |
|---|---|---|---|
| | 1996 | 1997 | 1998[144] |
| Net income (loss) before extraordinary items | ($40.9) | ($61.4) | ($56.1) |
| *% Margin* | *-53.7%* | *-48.8%* | *-29.6%* |

*Source: AHERF Audited Financial Statements; AHERF Internal Financial Statements*

While Allegheny Integrated Health Group generated these losses, approximately $21 million and $32 million was spent to acquire additional physician practices in fiscal years 1996 and 1997, respectively.

AHERF's commitments to its physicians were the primary contributing factor to Allegheny Integrated Health Group's operating losses. First, AHERF guaranteed high salaries relative to national benchmarks.[145] Second, AHERF offered five-year contracts with guaranteed salaries, and did not include in these contracts any post-acquisition productivity requirements.[146] AHERF experienced declining physician productivity post-acquisition.[147] As a result, Salaries, Wages and Benefits expense at Allegheny Integrated Health Group exceeded its total revenue in fiscal years 1996 through 1997.

As stated previously, AHERF made its largest single physician practice acquisition in April of 1997 when it acquired the practices of more than 100 physicians of PGMA in the Pittsburgh region. Donald Kline ("Mr. Kline"), CFO of the Allegheny Integrated Health Group, testified that PGMA had historical demonstrable operating losses[148] and continued projected losses of $17

---

[144] The Allegheny University Medical Practices revenues in Fiscal Year 1998 contain $560.5 million in risk contract revenue. The same amount of expenses are contained on the Allegheny University Medical Practices income statement for Fiscal Year 1998 related to the risk contract revenue. Accordingly, there is no impact on the net income amount; however, the Allegheny University Medical Practices total revenue needs to be adjusted for the risk contract revenue in order for the calculated margin to be comparable to the prior years. The adjusted revenue for purposes of the margin calculation is $189.9 million.
[145] Deposition Exhibit 792.
[146] Deposition Exhibit 790.
[147] Deposition testimony of Donald Kline (April 9, 2003) at pages 437 - 438.
[148] Ibid at pages 342 - 343.

million, $11 million and $4 million over the ensuing three years.[149]  AHERF paid $20 million in cash to acquire these practices.[150]

Had I been consulted by the Trustees around September 30, 1996, following disclosure of accurately stated financial statements, I would have advised against the continued purchase of the physician practices.

To quantify damages related to the continued acquisition of loss-generating physician practices, I have focused only on those physicians purchased after September 30, 1996 and therefore after the issuance of Coopers' Fiscal Year 1996 audit report.  I have relied upon schedules produced in this matter, which provide detail at the practice level of the revenue, expenses and net income of AHERF physician practices.[151]  The schedules also provide detail related to miscellaneous overhead expenses, which I have allocated to each physician practice based on its contributed percentage of revenue to Allegheny Integrated Health Group.  I have also added back estimated depreciation expense and unusual items, by allocating total Allegheny Integrated Health Group depreciation expense[152] and unusual items based on the revenue of those physician practices acquired after September 30, 1996, as a percentage of total Allegheny Integrated Health Group revenue, which results in the estimated EBTDA of these practices.  The EBTDA between September 30, 1996 and June 30, 1998 of those practices purchased after September 30, 1996 is negative $19.0 million.

A second component of the calculation of cash flow losses related to the continued acquisition of physician practices is the cash spent on the practices between September 30, 1996 and June 30, 1998 of $31.6 million.[153]  In addition, I have allocated the other capital expenditures for PP&E and changes in working capital of Allegheny Integrated Health Group to the physician practices

---

[149] Deposition Exhibit 727.

[150] Asset Purchase Agreement between AHERF and HealthAmerica, February 26, 1997 at page 5.

[151] Allegheny Integrated Health Group Financial Statements, May 31, 1997 (JD-DC-0057397 to 57467).  Allegheny Integrated Health Group Financial Statements, June 30, 1997 (JD-DC-0057397 to 57394).  Allegheny University Medical Practices Financial Statements, May 31, 1998 (JD-DC 0055458 to 55527).

[152] In June 1997, property plant and equipment and intangibles were transferred from Allegheny Integrated Health Group to Allegheny General Hospital and DVOG.  For purposes of my depreciation calculation, and in order to be conservative, I have treated these assets as restored at Allegheny Integrated Health Group for fiscal years 1997 and 1998.

[153] Fiscal years 1997 and 1998 cash flow statements.

35

purchased after September 30, 1996 based on the revenue of these practices as a percentage of total revenue of Allegheny Integrated Health Group.

The resulting cash flow losses related to physician practices acquired after September 30, 1996, between September 30, 1996 and June 30, 1998, is $50.0 million. I have also included cash losses of $1.5 million for the period of July 21, 1998 through November 9, 1998, the end of operations under AHERF.

I also included, as a component of damages, a proportion of the AUMP liabilities following the sale of certain entities to Tenet. I offset the physician practice related liabilities assumed with a proportion of any known recoveries achieved by the AUMP estate.[154]

The total damages caused by the continued physician practice acquisition activity, calculated as the cash losses incurred and the cash spent on the AHERF physician practices acquired after September 30, 1996, as well as the ultimate balance of liabilities offset for any known recoveries of the Allegheny University Medical Practices $64.3 million. See Exhibit 13.

Although I understand the goal of the AHERF System with regard physician practice acquisitions was to bolster patient volume at the AHERF System hospitals, based on the restated financial statements there were not discernible profitability improvements at the Debtor entity hospitals subsequent to the September 30, 1996 time period. Therefore, I have not adjusted my analysis for any potential growth in inpatient admissions.

### C. HealthAmerica Risk Contract

In connection with AHERF's acquisition of the PGMA physician practices, AHERF entered into a Risk-Sharing agreement (the "Risk Contract") with HealthAmerica on March 31, 1997.[155]

---

[154] HLAH 0003640 - 3644. Monthly Operating Report (November 30, 1998). Charles Morrison deposition testimony dated June 29, 2004 at pages 50 - 54.
[155] Risk Sharing Agreement by and between HealthAmerica Pennsylvania, Inc., Coventry Corporation and AHERF, March 31, 1997.

HealthAmerica, as a health insurer, received premium payments from enrollees in its health insurance plans (the "Covered Lives") to cover the potential health care needs of those individuals in a given year.[156] HealthAmerica offered various insurance programs, including Commercial Health Maintenance Organizations ("HMO"), Preferred Provider Organizations ("PPO") and Medicare HMOs to which those Covered Lives could subscribe.[157] Pursuant to the Risk Contract, AHERF would receive a fixed percentage of the premiums paid to HealthAmerica (the "AHERF Premium").[158] In return for this percentage of compensation, AHERF would be responsible for the total costs of health care for the Covered Lives. AHERF therefore assumed the risk of financial losses associated with the provision of care for the Covered Lives.[159] The table below summarizes the percentage of premiums paid to AHERF from HealthAmerica.

| Program | Duration | Percentage of Total Premium |
|---|---|---|
| Commercial HMO Program | First Five Years of Contract | 78.0% |
| Commercial HMO Program | Year 6 Through End of Agreement | 78.5% |
| PPO Program | Not Specified | 78.0% |
| Point of Service Program | Not Specified | 78.0% |
| Medicare HMO Risk Program | Not Specified | 81.0% |

*Source: Risk Sharing Agreement by and Between HealthAmerica and AHERF*

When health providers performed services for the Covered Lives, HealthAmerica reimbursed the providers, including AHERF and non-AHERF providers for the services rendered (the "Provider Payments").[160]

Per Section 5.4 of the Risk Contract, in order to facilitate prompt reconciliation of the differences between the amounts paid and amounts owed between AHERF and HealthAmerica, quarterly reconciliations were performed for the first three quarters of each year of the Risk Contract.[161] Such reconciliations included the calculation of the "Interim Premium Reconciliation Amount",

---

[156] Ibid at page 4.
[157] Ibid at pages 3 - 4.
[158] Ibid at page 2.
[159] Ibid at page 18.
[160] Ibid at page 5.
[161] Ibid at page 19.

which equals the difference between (1) the AHERF Premium Amount for a given period plus any payments made by AHERF pursuant to Section 5.10.6 and (2) the total amount of Provider Payments incurred by HealthAmerica for services provided plus an amount for claims incurred by not reported ("IBNR"), calculated consistently with HealthAmerica's other IBNR claims calculations, less any amounts recovered by AHERF from an applicable reinsurer.[162]  If the Interim Premium Reconciliation Amount was a positive number, *HealthAmerica would pay that amount to AHERF.*  If the Interim Premium Reconciliation Amount was a negative number, *AHERF would pay that amount to HealthAmerica.*[163]  For example, if the AHERF Premium was $100 in a given period and the Provider Payments equaled $120, assuming other components of the Interim Premium Reconciliation Amount were equal to zero, the Interim Premium Reconciliation Amount would be equal to ($20) and AHERF would owe HealthAmerica $20.

The financial impact of the Risk Contract was recorded on the financial statements of the AHERF parent company ("AHERF Parent"), a Debtor entity.[164]  AHERF anticipated that it would incur $64 million in losses during the first two years of the Risk Contract, or $8 million per quarter.[165]  To reflect these anticipated losses, $64 million in goodwill and a corresponding $64 million liability in accounts payable and accrued expenses and in other non-current liabilities was recorded on the AHERF Parent's balance sheet.[166]  The $64 million of goodwill was to be amortized over 35 years, with the amortization expense also recorded on the books of the AHERF Parent.[167]

The Risk Contract also included a $20 million note payable, to be paid over 10 years, which was recorded on the balance sheet of Allegheny Integrated Health Group in other assets ($20 million), accounts payable and accrued expenses ($2 million), and other non-current liabilities

---

[162] Ibid at page 19.
[163] Ibid at page 19.
[164] Coopers & Lybrand workpapers (CL 012628).
[165] Ibid.
[166] Coopers & Lybrand workpapers (CL 017051, CL 017089).
[167] Allegheny Health, Education and Research Foundation 1997 Audit Update dated October 1, 1997 (PwC 0036868 - 0036880).

($18 million).[168]  It appears that $4 million in payments were made on the note to HealthAmerica.[169]

Although as indicated above the Risk Contract required AHERF to pay HealthAmerica for any negative Interim Premium Reconciliation Amount, AHERF did not do so and HealthAmerica was left with a shortfall in the amount due it from AHERF.  Accordingly, to quantify damages associated with the Risk Contract, I have relied upon the information contained in claim filed by HealthAmerica in the bankruptcy proceedings and corresponding attachments.  HealthAmerica initially filed a proof of claim (the "HealthAmerica Claim") on March 1, 1999.[170]  The Claim was subsequently revised on December 20, 2000.[171]  The following table summarizes the Claim as initially filed and as revised.

| Component of Claim | Original Claim ($ millions) | Revised Claim ($ millions) |
| --- | --- | --- |
| Risk Sharing Agreement – Note Payable | $16.0 | $12.5 |
| Risk Sharing Agreement – Losses | $30.7 | $27.8 |
| Lease Guarantees | $9.3 | $1.0 |
| Data Services | $0.3 | $0.3 |
| Insurance Premiums | $0.1 | $0.1 |
| **Total Claim Amount**[172] | **$56.4** | **$41.7** |

*Source:  HealthAmerica Claim, Attachment F*

Based on information contained in the HealthAmerica Claim, it appears that the cost incurred to provide healthcare services for the Covered Lives exceeded the AHERF Premium by $57.8

---

[168] Allegheny Integrated Health Group Footnotes to Financial Statements (May 31, 1997) (JD-DC 0057396).
[169] The Proof of Claim filed by HealthAmerica included a claim for $16 million related to the note payable, which indicates that of the $20 million note, $4 million had been paid by AHERF.
[170] Proof of Claim filed by HealthAmerica (March 1, 1999).  Stephen Dengler deposition testimony, June 10, 2004 at pages 30 - 35.
[171] Stipulation and Agreed Order resolving the Claim of HealthAmerica Pennsylvania, Inc. and certain related entities filed against the Debtors' Estates (December 20, 2000).  Stephen Dengler deposition testimony, June 10, 2004 at pages 57 - 58.
[172] The source of this data is an analysis prepared on November 2, 2000, which is attached to the Claim as Attachment F.  There are minor discrepancies between the total claim amounts shown here and the original and revised claim amounts as filed.  The amounts per the original and revised claims as filed are $56,400,000 and $41,556,648.

million, and thus HealthAmerica was owed this amount by AHERF.[173]  However, HealthAmerica owed AHERF $27.1 million for AHERF Premiums that had not yet been provided to AHERF by HealthAmerica.[174]  Accordingly, the net amount that AHERF owed to HealthAmerica per the HealthAmerica claim was $30.7 million, derived by subtracting the $27.1 million in AHERF Premiums due AHERF from the $57.8 million in net costs of providing healthcare services to the Covered Lives.  This amount is shown on the table above as the "Risk Sharing Agreement-Losses" component of the original Claim.  The amount was later reduced from $30.7 million to $27.8 million due to an update on the IBNR run out of claims paid after the Bankruptcy Claim was filed.[175]

AHERF's participation in the Risk Contract resulted in losses of approximately $27.8 million.  In addition to these losses, and as stated earlier, AHERF also paid $4 million to HealthAmerica per Section 5.11 of the Risk Contract on the $20 million note.  The sum of these amounts results in damages of $31.8 million.  See Exhibit 14.

Alternatively, if the entire amount of the note payable and other HealthAmerica claimed items are included in the quantification of damages related to the Risk Contract, then the calculation would include the full $41.6 million amount that the Court has determined that AHERF owed HealthAmerica, plus $4 million paid on the note for a total of approximately $45.6 million.

Had I been consulted about the HealthAmerica risk contract, provided that accurately stated financial statements were available, I would have advised against entering into the contract.

### D. Executive and Management Incentive Compensation

I have also included, as a component of damages, the executive incentive compensation that would not have been paid by the AHERF System had the accurate financial statements been available.  In particular, I have summed the amounts of annual incentive compensation paid to

---

[173] This amount is per Attachment A to the Claim and reflects Dates of Service from April 1, 1997 through July 20, 1998, with claims paid through December 31, 1998.

[174] AHERF Contract Close (Attachment A to HealthAmerica Claim).

[175] HealthAmerica Claim Summary Revised (Attachment F to HealthAmerica Claim).

executive and management employees in Fiscal Year 1997.[176]  The annual incentive amounts paid are based in part on the AHERF System performance of Fiscal Year 1996 as represented by the misstated audited financial statements.[177]  I have also summed the long-term incentive compensation paid to executive and management employees in Fiscal Year 1998.[178]  The Compensation Committee of AHERF approved the long-term incentive payments during fiscal year 1997, which related to accrued incentive compensation from fiscal year 1993.[179]  The long-term incentive awards were approved based in part on AHERF System financial performance of Fiscal Year 1996, again per the misstated audited financial statements.[180]  Finally, I have summed the transaction related and extraordinary bonus payments made to certain AHERF System executives that either represented payments for transactions that likely would not have been undertaken had accurate financial statements been available or that occurred subsequent to the misstated audited financial statements of Fiscal Year 1996.[181]

The executive and management incentive compensation as identified above and for which I was able to locate supporting documentation, totals approximately $4 million.  Because the Compensation Committee provided approval to pay incentive compensation to several employees for which records are not readily available, the incentive compensation amount that I have determined is conservative and would increase if such information were located.  See Exhibit 15.

---

[176] Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 to JD-HL 0021010).  Deposition Exhibit 2472.
[177] Deposition Exhibits 2480 and 2482.
[178] Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 to JD-HL 0021010).  Deposition Exhibit 2472.  Series of July 1, 1997 letters providing notice to employees of the long-term incentive award (DBR-DK 006006 to DBR-DK 006023).
[179] Memo from David M. Deasy dated June 20, 1997 (DBR-DK 006040).
[180] Coopers & Lybrand report dated June 30, 1997 (DBR-DK 001541 to DBR-DK 001543).
[181] Memo from Dave Deasy dated July 8, 1998 (DBR-DD-0042 to DBR-DD-0073).

### E. Avoidable Costs Conclusion

Damages measured by the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions discussed above, that were undertaken and that would likely not have occurred but for the misstated financial statements as audited by Coopers & Lybrand total approximately $267.5 million.  See Exhibit 16.

\*    \*    \*

My analysis of Avoidable Costs relates primarily to three transactions that were undertaken by the Debtor Entities subsequent to September 30, 1996, the approximate date of the Coopers Fiscal Year 1996 audit opinion, which accompanied the materially misstated AHERF financial statements.  The three transactions *do not* represent all of the losses that were incurred by the Debtor Entities during the period at issue.  For example, the DVOG hospitals incurred losses during the time period from September 30, 1996 through the sale of the entities to Tenet but those losses are not included in the Avoidable Costs analysis.  Another example of losses that are not included in the Avoidable Costs analysis are the losses related to the physician practices that were acquired by the AHERF System prior to September 30, 1996.  These types of excluded losses provide the primary basis for the difference between the damages determined via the Avoidable Costs methodology and the total creditor shortfall methodology.

In regard to the DVOG entities, in particular, I understand that Mr. Singleton has quantified the amount of cost savings that could have been achieved had a turnaround been undertaken following the receipt of accurately stated financial statements for Fiscal Year 1996. Accordingly, accurately stated financial statements would have provided the necessary information for responsible parties to take actions to improve the AHERF financial situation.  I have not considered these types of losses in my analysis.

42