UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF          )
UNSECURED CREDITORS OF             )
ALLEGHENY HEALTH, EDUCATION        )
AND RESEARCH FOUNDATION,           )
                                   )
          Plaintiff,               )        Civil Action No. 00-684
                                   )
     v.                            )
                                   )        Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP,       )
                                   )
          Defendant.               )

## THE COMMITTEE'S BRIEF IN OPPOSITION TO PwC'S MOTION TO EXCLUDE TESTIMONY CONCERNING CERTAIN DAMAGES THEORIES PROFFERED BY R. BRUCE DEN UYL

### INTRODUCTION

PwC's motion to exclude opinion testimony from the Committee's damages expert, R. Bruce Den Uyl, is not a *Daubert* challenge. The motion does not cite *Daubert* or apply its standards. Rather, it presents a supplemental summary judgment challenge to the Committee's damages theories and certain of the expert testimony that supports them. Those theories are grounded in the relevant case law. The testimony, though it will doubtless be the subject of factual cross-examination and competing testimony from PwC's damages expert at trial, is in all events admissible.

Contrary to PwC's assertions, the Committee is not pursuing claims or seeking damages of AHERF's creditors. The Committee's "creditor shortfall" damages theory properly measures the harm caused by *Coopers & Lybrand* to the AHERF bankrupt estates.

There is no "law of the case" conflict between the creditor shortfall theory of damages and Judge Ziegler's conclusion that the Committee "may pursue only those claims of

AHERF" and not claims of its creditors. PwC's first summary judgment motion and Judge Ziegler's opinion did not address how to measure damages.

PwC does not dispute that Mr. Den Uyl's alternative method of measuring damages, *i.e.*, measuring AHERF's "avoidable costs," is a proper method to measure AHERF's damages. Instead, PwC challenges Mr. Den Uyl's application of the avoidable-costs method on the basis of disputed facts. Such factual arguments go to the weight, but not the admissibility, of Mr. Den Uyl's opinion.

PwC's motion should be overruled.

## ARGUMENT

### I. THE AMOUNT OF MONEY THAT AHERF OWES BUT IS UNABLE TO PAY ITS CREDITORS AS THE RESULT OF COOPERS' AUDIT CONDUCT IS A VALID MEASURE OF AHERF'S DAMAGES.

The Committee will prove that Coopers' audit failures caused AHERF to fail. With unreliable audited financial statements describing AHERF's financial performance and condition, AHERF's trustees and creditors allowed Sherif Abdelhak and David McConnell (the CEO and CFO) to continue their strategy of expansion. With accurate information, necessary corrections to AHERF's operations could and would have been made. Bankruptcy was not inevitable. AHERF could have continued to operate and could have paid its obligations to bank creditors, trade creditors, and others as those obligations came due. AHERF could have avoided certain creditor liabilities altogether through more efficient operation.

Because Coopers caused AHERF's bankruptcy, *i.e.*, AHERF's inability to meet obligations to creditors that AHERF otherwise would have met, a proper measure of damages is the amount of liability owed to creditors that AHERF is unable to pay. Mr. Den Uyl is measuring that amount through the creditor shortfall theory of damages. None of PwC's claimed flaws with the creditor shortfall measure of damages has merit.

A.    **The Creditor Shortfall Measures Damages To AHERF And Does Not Implicate The Law Of The Case.**

The creditor shortfall theory of recovery is not precluded by Judge Ziegler's January 28, 2002 opinion. Judge Ziegler wrote that "[The Committee] may pursue those claims of AHERF." January 28, 2002 Order at 6. That is precisely what the Committee has done -- pursued AHERF's claims against PwC, the successor to AHERF's former auditors, for professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty.

Judge Ziegler did not "previously reject" the creditor shortfall measure of damages. PwC Br. at 4. PwC's first summary judgment motion and Judge Ziegler's opinion had nothing to do with measuring damages. PwC argued (and Judge Ziegler agreed) that the Committee can only bring claims on behalf of and "stand in the shoes" of the bankrupt AHERF estates. *See* January 28, 2002 Order at 6. Neither PwC's motion nor Judge Ziegler's Order discussed how to measure the damages that AHERF suffered.

PwC is wrong when it asserts that Mr. Den Uyl's damages calculation based on the amount that AHERF owes to creditors, but cannot pay, "is not a measure of the loss experienced by AHERF." PwC Br. at 4. By improperly auditing AHERF, Coopers caused AHERF to be unable to pay its creditors the amounts that it owes. The "creditor shortfall" measures how much AHERF still owes but cannot pay. As Mr. Den Uyl explained, the creditor shortfall measures "the obligation of the bankruptcy estates" and, as such, "is an appropriate measure of the avoidable insolvency of the AHERF System." PwC Tab 1, Den Uyl Report at 24.[1]

---

[1] Pertinent excerpts of Mr. Den Uyl's expert report are set forth at Tab 1 in the Appendix to PwC's brief. Pertinent excerpts of his rebuttal report are set forth at Tab 20 of PwC's Appendix.

According to PwC, the name that Mr. Den Uyl used, "creditor shortfall," implies that he is not measuring damages suffered by AHERF, but by its creditors. *See* PwC Br. at 2, 4. This is just semantics.

The fact that a recovery of damages ultimately will benefit AHERF's creditors is of no consequence. "We think it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an inflow of money that will immediately flow out again to repay creditors." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 348-49 (3d Cir. 2001). The Third Circuit elaborated:

> The ... assertion that this action will benefit creditors is not an admission that this action is being brought on their behalf. In a liquidation case, it is commonplace for a trustee to pursue an action on behalf of the debtor in order to obtain a recovery thereon for the estate. If the trustee is successful in the action, the recovery which he obtains becomes property of the estate and is then distributed pursuant to [a bankruptcy plan]. Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors.

267 F.3d at 349 (quoting *In re Jack Greenberg, Inc.*, 240 B.R. 486, 506 (Bankr. E.D. Pa. 1999)).

## B. The Amount That AHERF Owes To Creditors But Cannot Pay Is A Proper Measurement Of AHERF's Damages.

PwC argues that the amount of money that AHERF owes its creditors, but cannot pay, is an improper measure of damages. PwC Br. at 4-8. But, PwC's argument contradicts the remedial purpose of Pennsylvania law on damages, to place the injured party in the place he or she would have occupied but for the defendant's wrongful conduct. As the Third Circuit explained:

> [A]n identifiable and compensable injury is essential to the existence of tort liability, *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985), but once an injury has occurred, 'tort law attempts to place the injured party in the same position he occupied before the injury,' *Hahn v. Atlantic Richfield Co.*, 625

> F.2d 1095, 1104 (3d Cir. 1980) (construing Pennsylvania tort
> policy). Similarly where a contractual 'breach occurs, contract law
> seeks to give to the nonbreaching party the benefit of his or her
> bargain, to put him or her in the position he or she would have
> been in had there been no breach.' 1 *Summary of Pennsylvania
> Jurisprudence* Torts § 1.1 (2d ed. 1999).

*Lafferty*, 267 F.3d at 351. Here, the creditor shortfall measure of damages places AHERF "in the same position [it] occupied" before Coopers' wrongful conduct, that is, capable of operating in a manner that enables it to meet its obligations to creditors. As noted, the Committee will prove at trial that AHERF could and would have been able to pay its creditors if it had slimmed down, cut costs, and ceased its expansion strategy, all as part of a turnaround plan.

Pennsylvania law allows for the measure of damages to suit the facts of the case. "While formulated rules relating to the appropriate measure of damage in varying circumstances have to some extent become fixed, they are by no means immutable but bend to the exigencies of the particular case in order that just compensation may be ascertained and awarded." *Neuman v. Corn Exch. Nat'l Bank & Trust Co.*, 51 A.2d 759, 766 (Pa. 1947). Here, if the jury concludes that Coopers was a proximate cause of AHERF's inability to meet its obligations, then the amount that AHERF owes but cannot pay will constitute "just compensation" that fits the "exigencies" of this case.

PwC does not explain what measure of damages constitutes just compensation for making another unable to pay obligations that otherwise would have been paid or not incurred. Rather, PwC just asserts that the creditor shortfall measure of damages is "inconsistent with the governing legal standard in this Circuit on the damages recoverable on behalf of debtors in cases such as this one." PwC Br. at 3. PwC further calls the creditor shortfall measure of damages a "novelty" and asserts that "no court has endorsed such a measure of damages to a bankrupt estate." PwC Br. at 4.

These assertions are wrong. At least one Third Circuit district court has endorsed the creditor shortfall theory in a similar case. *See Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 U.S. Dist. Lexis 27238 (D.N.J. Aug. 25, 2004) (Tab 7). *Crowley* involved claims against PwC by the receiver of a failed insurance company. In that case, PwC knew but failed to disclose that the insurance company was insolvent some two years before the insolvency became apparent. The receiver advanced two damages theories that the district court recognized as "valid efforts to calculate the damages at issue in this case." *Id.* at *71-72. These valid measures of damages were a creditor shortfall theory and an avoidable loss theory:

> The 'primary' theory seeks to measure the actual creditor shortfall of AIC's [the insurance company's] estate, measured by the terms of the Liquidation Order. The second or 'alternate theory' . . . takes a hypothetical intervention date . . . and measures the damage caused by virtue of the fact that PwC's actions caused AIC to wrongfully continue writing insurance policies.

*Id.* at *72.

Indeed, the Committee's damages theories conform to *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 455 (D.C. Cir. 1990), cited by PwC in its summary judgment brief but not in support of this motion. In *Drabkin*, the court discussed two theories of harm to a bankrupt corporation. Under the "rescue obstructed theory," the harm results from the failure to disclose crucial financial information "at a time when corrective action [is] still possible." *Id.* Under the "liquidation deferred" theory, the harm is measured by liabilities needlessly and heedlessly acquired by a company that ended up in bankruptcy. Here, the creditor shortfall measure of damages to AHERF corresponds to and measures damages under the *Drabkin* "rescue obstructed" theory of harm. It matters not that different vocabulary was used.

Ignoring *Chait* and *Drabkin*, PwC misreads *Lafferty* by arguing that *Lafferty* delineated and limited damages available in accounting malpractice cases involving a bankrupt

plaintiff. First, *Lafferty* was not a damages-measurement case at all. The pertinent question in

*Lafferty* was whether an insolvent corporation had suffered an injury sufficient to confer standing

under Article III of the Constitution. *See Lafferty*, 267 F.3d at 346-47. The auditors had argued

that an insolvent corporation cannot, as a matter of law, suffer an injury-in-fact to confer

constitutional standing. *See id.* at 347. The Third Circuit disagreed. It held that an insolvent

corporation, whose insolvency is deepened by auditor malpractice, has constitutional standing.

*See id.* at 346-54. The Court did not analyze the details concerning how such damages should be

measured and awarded at trial.

Even if *Lafferty* could be read as endorsing a method to measure damages in the

deepening insolvency context, it does not purport to foreclose other valid methods. Discussing

the basic remedial purpose of Pennsylvania tort law, *Lafferty* recognized that an insolvent

corporation can suffer numerous different types of injuries that demand remedies. These

included, by way of illustration, injuries to a "corporation's relationships with its customers,

suppliers, and employees," impairing the "confidence of parties dealing with the corporation,"

imposing "legal and administrative costs" and "operational limitations," and causing the

"dissipation of corporate assets." *See id.* at 349-50. *Lafferty* did not suggest that these were the

only injuries that an insolvent corporation can suffer; nor did *Lafferty* suggest that there is only

one way to measure monetary damages for such an array of tangible and intangible injuries. *Id.*

at 348-351.[2]

---

[2] PwC's argument that AHERF took on no additional bond debt after fiscal year 1996 (PwC Br. at 5-8) is
factually wrong and irrelevant. It is wrong because SDN, Inc., the predecessor to Allegheny Hospitals,
Centennial, assumed approximately $160 million of Graduate bond debt through merger. Moreover,
banks and bondholders are not AHERF's only creditors. There are also trade creditors, service providers
and others. Indeed, AHERF's repayment of an $89 million bank loan made it more difficult to pay these
non-bank creditors. *See* PwC Br. in Support of Mot. for Sum. J. at 1.

In all events, the creditor shortfall measure of damages does no harm to the underlying premise of the deepening insolvency theory. As *Lafferty* explained, the deepening insolvency theory recognizes that a corporation suffers a remediable injury when a tortfeasor increases the corporation's liabilities that the corporation cannot pay. *See also Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983) ("the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability"). Likewise, in this case, the creditor shortfall method measures liabilities to third parties that AHERF cannot satisfy, due to Coopers' wrongful conduct.

## C.  Mr. Den Uyl's Damages Calculations Are Not Based On Speculation And Are Not Projections of Lost Profits.

PwC also attacks Mr. Den Uyl's damages analysis as based on the supposedly "speculative" opinion of the Committee's turnaround expert, Thomas Singleton. *See* PwC Br. at 8-11. Mr. Singleton has analyzed cost-saving and other turnaround opportunities available to AHERF, and concluded that AHERF could have avoided bankruptcy and could have met its obligations to creditors. Mr. Den Uyl is entitled to base his opinion on Mr. Singleton's opinion. *See, e.g., Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001); *United States v. 1,014.16 Acres of Land*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983), *aff'd*, 739 F.2d 1371 (8th Cir. 1984).

PwC has not asserted a *Daubert* challenge to Mr. Singleton's opinion that AHERF could have been turned around. To the contrary, PwC admits that whether an earlier intervention would have permitted AHERF to stave off bankruptcy is a question of fact: "Mr. Singleton's 'turn-around' testimony will be the subject of factual dispute, but PwC does not make a *Daubert* challenge to it." Memorandum in Support of PwC's Motion to Preclude Certain Irrelevant and Unfounded Testimony Proffered by the Committee's Causation Experts at 6 n.3.

The indirect attack on Mr. Singleton goes only to the weight and not the admissibility of Mr. Den Uyl's opinions. At trial, PwC can cross-examine Mr. Singleton as to his opinion. If PwC succeeds at revealing flaws in Mr. Singleton's opinion, then Mr. Den Uyl's opinion may be undermined, too. But, that is all for trial.

While Mr. Singleton's expert testimony is alone sufficient to create a disputed issue of fact, there is other evidence that supports his turnaround opinion. For example, Daniel Stickler of The Hunter Group testified that there were so many opportunities to cut waste at AHERF that bankruptcy could have been avoided. In June 1998, after the Board fired Abdelhak and one month before bankruptcy, AHERF retained The Hunter Group to operate AHERF's Philadelphia hospitals and its medical, nursing and public health schools. Mr. Stickler led that engagement. *See* Tab 1, Stickler Dep. at 65, 144-45, 265-66, 298-99, 396. Previously, from 1976 to 1986, he served as the CEO of Presbyterian Hospital in Pittsburgh, and from 1986 to 1991, he was the CEO of a large hospital in Miami (which he turned around). *See id.* at 32, 35-36, 290-93. Mr. Stickler testified that, if AHERF had retained The Hunter Group in December 1996, he and his team could have identified enough cost savings to enable a turnaround and avoid bankruptcy. *See id.* at 298-99, 375-76, 381-82, 386-88, 436-39, 441. Shortly after arriving at AHERF in 1998, Mr. Stickler and his team identified $80 million in annual savings possible at AHERF's Philadelphia hospitals, with additional one-time savings of up to $34.7 million. *See id.* at 310-14, 320-22. By the time of their engagement in June 1998, however, it was too late to implement a turnaround plan because AHERF had run out of cash. *See id.* at 56, 69-72.

Mr. Stickler subsequently led a successful turnaround engagement for The Hunter Group at the University of Pennsylvania Health System in Philadelphia. Mr. Stickler testified

that the potential to reduce costs, and therefore conduct a turnaround, was greater at AHERF than at the University of Pennsylvania Health System. *See id.* at 298, 381-82, 386-88, 399, 441.

In addition to relying on disputed factual issues concerning the potential for a turnaround, PwC tries to shoehorn this case into the mold of a "lost profits" case. But, as noted, the Committee is not seeking damages based on lost profits (or, to use the correct jargon, foregone positive net income since AHERF was a nonprofit corporation). What is relevant to the creditor shortfall theory is AHERF's ability to pay off its creditors and on this point there is ample evidence to support AHERF, as described above. Equally relevant for purposes of this challenge is Mr. Den Uyl's conclusion that there is ample evidence, in the form of Mr. Singleton's opinion, to support the conclusion that AHERF could have been turned around and could have avoided bankruptcy.

Finally, PwC argues that "the Committee's experts propose no turn-around plan for Centennial." As described elsewhere, three subsidiaries of Graduate Health System merged into SDN, Inc. ("SDN"), the predecessor to Allegheny Hospitals, Centennial ("AH-Centennial"), bringing with them $160 million in bond debt. *See* Com. Opp. to Mot. for Sum. J. at Part IV. No turnaround plan for these acquired Graduate hospitals is necessary.

If Coopers had made the disclosures it should have made, AHERF would not have acquired the Graduate Health System hospitals. *See id.*; *see also* PwC. Br. in Support of Mot. for Sum. J. at 50 ("the Committee's 'turn-around plan' assumes that AHERF would not have accepted ownership and control of [AH-Centennial] and does not provide for improvement of [its] financial condition."). The Committee need not prove the feasibility of a turnaround for hospitals that AHERF would never have acquired. Those hospitals could fail while part of

Graduate Health System, with no impact on AHERF. (In fact, the financial impact predictably would have been positive as there would be fewer hospital competitors in Philadelphia.)

Accordingly, because of disputed issues of fact concerning the potential for a turnaround of AHERF (and PwC's failure to challenge Mr. Singleton's turnaround opinion), PwC's challenge to Mr. Den Uyl's testimony should be denied.

## II.    MR. DEN UYL'S AVOIDABLE COSTS DAMAGES OPINION PROPERLY MEASURES DAMAGES CAUSED BY COOPERS' FAILED AUDITS.

Mr. Den Uyl's second damages theory, the "avoidable costs" theory, measures costs that AHERF could and would have avoided if Coopers had properly conducted its audits. PwC accepts that avoidable costs are a proper measure of damages. Indeed, there can be no dispute that "dissipation of corporate assets" damages are allowed. *Lafferty*, 267 F.3d at 349-50; *Drabkin*, 905 F.2d at 455 (needlessly acquired liabilities measured in that case by "liquidation deferred theory"); *In re Global Service Group, LLC*, 316 B.R. 451, 458 n.5 (Bankr. S.D.N.Y. 2004) (deepening insolvency measures of damages can also measure damages suffered by solvent corporations driven into insolvency).

Accepting the avoidable costs theory, PwC instead seeks to exclude Mr. Den Uyl's testimony because of disputes concerning underlying facts and disagreements between experts over the interpretation of those facts. This Court cannot resolve such disputes or decide which expert is right. Those are jury questions.

PwC's four attacks on Mr. Den Uyl's avoidable costs opinion should be saved for trial. They concern the weight and not the admissibility of Mr. Den Uyl's opinion.

A.    **The Court Should Deny PwC's Challenge Regarding Avoidable Costs Of Physician Practice Acquisitions Where AHERF Used Non-Debtor Money.**

AHERF and its bankrupt subsidiary that housed AHERF's acquired physician practices, Allegheny University Medical Practices ("AUMP"), squandered tens of millions of dollars on unprofitable physician practice acquisitions after the issuance of Coopers' 1996 audit reports. PwC agrees that these were avoidable costs, and Mr. Den Uyl determined that these avoidable costs approximate $52 million.

PwC argues that the $52 million should be reduced by however much money AHERF took from AGH and AUMC and gave to AUMP to purchase the practices. According to PwC, it was the non-Debtors AGH and AUMC that incurred that portion of the avoidable costs, not AHERF or AUMP. *See* PwC Br. at 14-17.

PwC's challenge should be denied for the simple reason that where AUMP got the money it squandered is irrelevant. The losses were incurred by AUMP, one of the debtor estates. What matters is that AHERF and AUMP threw the money away instead of using it appropriately. As Mr. Den Uyl stated in his rebuttal report, "[t]he appropriate amount of damage related to the acquisition of physician practices that would not have continued had accurate financial statements been available relates to <u>all</u> support and funding for the physician practice acquisitions by the AHERF System regardless of where the funding came from." PwC Tab 20, Den Uyl Rebuttal Report at 23 (emphasis original).

With accurate audited financial statements, a jury could conclude that AHERF or AUMP would not have squandered assets acquired through intercompany transfers. A jury could readily conclude that, armed with the necessary accurate information about AHERF's financial performance and condition, AHERF and AUMP would have used these assets as they were

needed, *i.e.*, to fund a turnaround at AHERF's Philadelphia hospitals and medical school or to unwind prior money-losing physician practice acquisitions at AUMP.

Finally, PwC's challenge poses an even more fundamental question of fact: whether the AGH and AUMC money was actually used to buy physician practices or to support other AHERF money-losing operations. Money is fungible and AHERF controlled the money of its subsidiaries since it was their sole member. A jury could view the intra-AHERF money flows differently even from how AHERF may have internally accounted for them.

Accordingly, this Court should reject PwC's argument that Mr. Den Uyl's avoidable-costs opinion must be modified to the extent that physician practices were acquired with money taken by AHERF from non-Debtor affiliates.

**B.     The Court Should Deny PwC's Challenge Concerning Mr. Den Uyl's Reliance On Total Liabilities Rather Than On Allowed Claims In Calculating AH-Centennial And AUMP Losses.**

With properly audited 1996 financial statements, AHERF would not have acquired hospitals from Graduate Health System, Inc. Those Graduate hospitals were housed in AHERF's subsidiary, AH-Centennial. Mr. Den Uyl included as "avoidable costs" the net liabilities of AH-Centennial, as the Graduate transaction would never have occurred. Mr. Den Uyl determined that the AH-Centennial avoidable costs total $167.5 million.

Mr. Den Uyl derived AH-Centennial's net liabilities from a number of sources, including certain AHERF financial records as of November 30, 1998. These records were filed with the Bankruptcy Court in March 1999 by the Court-appointed Chapter 11 Trustee. *See* Tab 2, Bankruptcy Trustee, Monthly Operating Report (Nov. 1998) at 38; Tab 3, Morrison Dep.

(6/29/04) at 42.[3]  From this filing, Mr. Den Uyl determined that AH-Centennial had total liabilities of $262 million.  Mr. Den Uyl then determined AH-Centennial assets, and made other calculations, to reach the $167.5 million of avoidable costs.

It was objectively reasonable for Mr. Den Uyl to rely on the information prepared by the Court-appointed Chapter 11 Trustee and filed with the Bankruptcy Court, with the expectation that the Court and the public would rely upon that information.  According to PwC, however, Mr. Den Uyl should not have used $262 million as the amount of AH-Centennial's total liabilities because, in the bankruptcy proceedings, there are only $169 million in allowed creditor claims against AH-Centennial.

Citing nothing, PwC asserts that Bankruptcy Judge McCullough "conclusively ruled" that $93 million of creditor claims against AH-Centennial were bogus.  (The $93 million figure is the difference between $262 million of total liabilities and $169 million in allowed claims.)  PwC declares that:

- Judge McCullough ruled that $93 million of claims were "not enforceable obligations of the Debtors."  PwC Br. at 17.

- "[I]t has been litigated and decided that $93 million of the supposed Centennial liabilities are not enforceable debts, and this may be neither relitigated nor ignored."  *Id.* at 19.

---

[3] The total liabilities on the Trustee's Monthly Operating Report for November 30, 1998 indicates total liabilities of $315 million.  Mr. Den Uyl reduced the total liabilities by approximately $53 million of intercompany payables to arrive at the $262 million total liability component.  The $262 million of liabilities comprised bond debt ($157 million), other pre-petition long-term debt ($7 million), pre-petition accounts payable and accrued expenses ($54 million), other pre-petition liabilities ($23 million), and post-petition liabilities ($21 million).  *See* Tab 2 at 38.

● "Mr. Den Uyl has included *disallowed* claims as avoidable 'costs', even though the Bankruptcy Court has conclusively ruled that they are *not* obligations of the estates." *Id*. at 13 (emphasis original).

These assertions, put mildly, are too strong. PwC's brief includes just two orders of Judge McCullough (Tabs 21 and 22 to PwC's Appendix). These two orders do not reflect a ruling by Judge McCullough that claims asserted against AH-Centennial were not enforceable obligations of AH-Centennial. Most of the claims disallowed in those orders do not appear to concern AH-Centennial. The only substantial item dealing with AH-Centennial was set forth in Schedule 26E to Tab 21. This Schedule reflects a reduction in the amount of the allowed claim filed by the trustee of the AH-Centennial bondholders, not because the claim was improper but because part of the claim had been paid.

As Mr. Den Uyl testified, "I don't know why the bankruptcy court -- I would be interested in seeing anything [the court] said that any of these claims weren't legally enforceable. Obviously the bankruptcy court determined the allowed claims, that doesn't mean necessarily that the other claims aren't legally enforceable." Tab 4, Den Uyl Dep. at 94.

Contrary to PwC's assertions about Judge McCullough's rulings, $39 million of the $93 million difference is easily explained. Approximately $21 million represents liabilities to creditors that arose in the normal course of business after the July 21, 1998 bankruptcy filing. *See* Tab 2, Bankruptcy Trustee, Monthly Operating Report (Nov. 1998) at 38. Such post-petition liabilities paid in the ordinary course do not require the filing of a proof of claim. *See, e.g., In re Vernon Sand & Gravel, Inc.*, 109 B.R. 255, 257 (Bankr. N.D. Ohio 1989). In addition, the claim asserted by the trustee of the AH-Centennial bondholders (IBJ Whitehall), on behalf of the bondholders, was reduced by $18 million because a dedicated fund within AH-Centennial was

used to pay this amount. Accordingly, the Bankruptcy Court reduced the IBJ Whitehall allowed claim by $18 million -- not because it was a flawed claim but because part of the liability had already been satisfied. *See* Tab 5, Lundberg Dep. at 37.[4]

And there are very logical explanations as to the remaining difference. In this case, creditors would have preferred to file their proofs of claim corresponding to AH-Centennial liabilities against AHERF rather than against AH-Centennial if they had any legal basis for doing so. That is because AH-Centennial's condition was even more dismal than AHERF's, and had fewer assets to pay claims.

In addition, in any bankruptcy, creditors reasonably settle their claims for less than the debtor's full liability to achieve finality or because it is not worth contesting the matter because there is no expectation of a full recovery anyway. Indeed, in the bankruptcy context, many creditors do not even file claims, because they lack the wherewithal to do so or because of the cost of filing a proof of claim, or because of an expectation that they will not recover much because of the depth of the debtor's insolvency.

Accordingly, Mr. Den Uyl explained at his deposition why, based on his experience advising bankruptcy debtors, it is more appropriate to use total liabilities rather than allowed claims. "My experience has been that generally the allowed claims are probably less than what someone might recover outside of the bankruptcy context." Tab 4, Den Uyl Dep. at 89, 91. "[A]gain, my experience is that many liabilities are not allowed that may be outside of the context of a bankruptcy proceeding might be valid liabilities." *Id.* at 91. Thus, in Mr. Den Uyl's expert opinion, the superior measure is AH-Centennial's total liabilities:

---

[4] Mr. Den Uyl properly included the $18 million used to satisfy that portion of the claim as among AH-Centennial's assets.

> I intentionally and appropriately measured the Centennial
> liabilities as the total liabilities remaining after the Tenet sale and
> not by the Centennial claims that were allowed in the bankruptcy.
> This is because the measure of damage in this analysis [avoidable
> costs] values the specific losses to AHERF associated with the
> transactions that would not have occurred. It is a proper measure
> of damages irrespective of whether a bankruptcy would have
> occurred. For this reason, the amount of damages associated with
> the Centennial transaction should not be reduced for the difference
> in total liabilities and claims allowed in the bankruptcy.

PwC Tab 20, Den Uyl Rebuttal Report at 21. Mr. Den Uyl's credibility regarding the

appropriateness of using total liabilities instead of allowed claims is a question for the jury.

Finally, PwC misleads when it declares that "Mr. Den Uyl practically concedes

. . . error." PwC Br. at 18 n.6. Mr. Den Uyl merely observed that, if the $169 million in allowed

claims were used instead of the $262 million in total liabilities, then additional adjustments

would also be required to the allocation to AH-Centennial for recoveries during the bankruptcy.

The result would be to reduce the avoidable costs relating to the Graduate hospitals acquisition to

approximately $149 million, from $167.5 million, an $18.5 million reduction. *See* PwC Tab 20,

Den Uyl Rebuttal Report at 21 n.61.[5] He conceded nothing.

In sum, this Court should reject PwC's challenge because it is based on a myth

that Judge McCullough "conclusively ruled" that $93 million of claims against AH-Centennial as

"unenforceable obligations." This Court should not require that Mr. Den Uyl use the

bankruptcy-allowed claims figure (of $169 million) rather than the total-liabilities figure (of

$262 million) as an input for his avoidable costs opinion.

---

[5] As PwC mentions vaguely (*see* PwC Br. at 17 & 18 n. 6), the factual issue of whether it is more reliable
to compute avoidable costs using total liabilities or allowed claims also arises in connection with
computing the avoidable costs of AUMP's physician practice acquisitions. Using allowed claims against
AUMP, instead of AUMP's total liabilities, would have an approximately $11 million impact on
damages. *See* PwC Tab 20, Den Uyl Rebuttal Report at 23 n.71.

**C.    The Court Should Deny PwC's Challenge Regarding Avoidable Costs Arising From The Acquisition Of Graduate Health System Hospitals**

As noted, one of the avoidable costs measured by Mr. Den Uyl was the net liabilities incurred as a result of AHERF's acquisition of hospitals of Graduate Health System.

PwC argues that Mr. Den Uyl is precluded from testifying as to these avoidable costs for reasons asserted in PwC's summary judgment brief. *See* PwC Br. at 19-20. As the Committee has explained in response, both AH-Centennial and AHERF incurred avoidable costs as a result of the acquisition of the Graduate Health System hospitals. *See* Committee's Opp. to Mot. for Sum. J. at Part IV. The pertinent facts are briefly restated.

On October 31, 1996, three subsidiaries of Graduate Health System merged into SDN. As a result of those three mergers, SDN was the sole surviving corporation, and SDN became liable for the liabilities of the merged Graduate subsidiaries. Thereafter, on May 1, 1997, SDN changed its name to AH-Centennial, and AHERF became the sole member of SDN/AH-Centennial.

If the Graduate subsidiaries had not merged into SDN, then AH-Centennial would not have incurred the net liabilities of the Graduate hospitals it acquired. Rather, the Graduate hospitals would have failed, if at all, while part of Graduate Health System, and not as part of SDN/AH-Centennial.

In addition, on December 14, 2000, Bankruptcy Judge McCullough ruled, under the bankruptcy doctrine of substantive consolidation (a bankruptcy law analog to piercing the corporate veil), that AHERF (parent) was liable for the obligations of AH-Centennial. Thus, not only was AH-Centennial saddled with the avoidable costs resulting from the Graduate hospitals acquisition, but so, too, was AHERF. In fact, under Judge McCullough's December 14, 2000

Order, the other Debtors (AUH-East, AUHS and AUMP) also became saddled with these avoidable costs.

Accordingly, and for the reasons set forth at Part IV of the Committee's summary judgment opposition, issues of fact preclude granting PwC's challenge to Mr. Den Uyl's testifying concerning the avoidable costs incurred as a result of the transaction with Graduate Health System.

**D.     The Court Should Deny PwC's Challenge To Avoidable Costs Arising From AHERF's Risk Contract With HealthAmerica.**

In 1997, AHERF entered into a risk contract with HealthAmerica, an HMO.  If Coopers had properly audited AHERF's financial statements in 1996, AHERF would have turned its attention to the need to implement a turnaround and would not have entered into such a risky arrangement, particularly in view of AHERF's prior unprofitable experiences with other similar risk contracts.

Because of the avoidable HealthAmerica risk contract, AHERF ended up losing approximately $27.7 million.  As HealthAmerica's Timothy Guarneschelli explained in his declaration, AHERF owed HealthAmerica $57.8 million, HealthAmerica owed AHERF $27.1 million, and a subsequent truing-up reduced AHERF's liability by about $3 million.  The net result was that AHERF had $27.7 million in liability to HealthAmerica.  *See* Tab 6, Declaration of N. Timothy Guarneschelli ¶¶ 9-12.  PwC agrees that the "bottom line" was that AHERF owes, but has not paid, HealthAmerica $27.7 million.  PwC Br. at 22.

In his opinion, Mr. Den Uyl properly included the $27.7 million as avoidable costs to AHERF.

PwC objects to calling the $27.7 million "avoidable costs" because that amount is the loss to HealthAmerica, and supposedly not the avoidable cost to AHERF.  *See* PwC Br. at

20-21, 23. PwC is wrong. Equating AHERF's liability to HealthAmerica with avoidable costs is entirely reasonable; it measures the loss that AHERF incurred due to a risk contract it would not have entered into. Indeed, it is a conservative measure of AHERF's avoidable costs. This measure of damages reflects that, had AHERF not entered into the HealthAmerica risk contract, AHERF would have had no alternative gain.

PwC may cross-examine Mr. Den Uyl on this implied, but reasonable, assumption. But, there is no reason for barring his testimony.

Finally, PwC distorts the facts concerning implementation of the risk contract. As noted, AHERF ended up owing HealthAmerica $57.8 million, and HealthAmerica ended up owing AHERF $27.1 million (with a later $3 million revision in AHERF's favor). As PwC pointed out, the $57.8 million that AHERF owed HealthAmerica included a $22.6 million "unmerited cash advance." PwC Br. at 22; *see also* Tab 6, Guarneschelli Dec. ¶ 9. PwC casually calls this "an interest free loan," asserting that AHERF's "obligation to repay what was in essence an interest-free loan cannot by any ingenuity be transformed into an injury or loss to AHERF." PwC Br. at 22. In fact, no ingenuity is required. As the Guarneschelli Declaration explains, the $22.6 million was a portion of what AHERF owed HealthAmerica on account of healthcare services provided to patients covered by the risk contract. *See* Tab 6, Guarneschelli Dec. ¶12.

Issues of fact concerning AHERF's losses as a result of the HealthAmerica risk contract preclude this Court from granting PwC's challenge to Mr. Den Uyl's testimony in this regard.

## **CONCLUSION**

For the foregoing reasons, the Court should deny PwC's Motion To Exclude

Testimony Concerning Certain Damages Theories Proffered By R. Bruce Den Uyl That Do Not

Comport With Applicable Legal Standards.

Respectfully submitted,

/s/ James M. Jones
James M. Jones (PA # 81295)
Laura E. Ellsworth (PA # 39555)
Laura A. Meaden (PA # 52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA  15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114

Attorneys for Plaintiff The Official
Committee of Unsecured Creditors of
AHERF

Dated:  July 11, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2005, a true and correct copy of the

Committee's Brief in Opposition to PwC's Motion to Exclude Testimony Concerning Certain

Damages Theories Proferred by R. Bruce Den Uyl was served upon all counsel registered with

Electronic Case Filing to receive electronic service in this matter, as well as by Federal Express

upon Antony J. Ryan, Esq. Cravath, Swaine & Moore, Worldwide Plaza, 825 8th Avenue, New

York, New York 10019-7475, and Joseph F. McDonough, Esq., Manion, McDonough & Lucas,

PC, 600 Grant Street, Suite 1414, Pittsburgh, Pennsylvania 15219, counsel for defendant.


/s/ John G. Unice
John G. Unice
One of the Attorneys for Plaintiff The Official
Committee of Unsecured Creditors of AHERF