# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )
                       )
        Plaintiff, )      Civil Action No. 00-684
                       )
        v. )
                       )      Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP, )
                       )
        Defendant. )

## EXHIBITS TO THE COMMITTEE'S BRIEF IN OPPOSITION TO PWC'S MOTION TO EXCLUDE TESTIMONY CONCERNING CERTAIN DAMAGES THEORIES PROFFERED BY R. BRUCE DEN UYL

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee of
Unsecured Creditors of AHERF

July 11, 2005

**TAB 1**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *DANIEL L. STICKLER*
*May 9, 2003*

---

## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

STICKLER, DANIEL L.



LEGALINK®

A WORDWAVE COMPANY

Page 2

1
2  A P P E A R A N C E S:
3  JONES DAY
       Attorneys for Plaintiff
4        51 Louisiana Avenue, N.W.
         Washington, D.C. 20001
5
6  BY:   JESSE A. WITTEN, ESQ.
7  JONES DAY
       Attorneys for Plaintiff
8        500 Grant Street - Suite 3100
         Pittsburgh, Pennsylvania 15219-2502
9
   BY:   ADAM W. WIERS, ESQ.
10
11
   CRAVATH, SWAINE & MOORE LLP
12     Attorneys for Defendant
         825 Eighth Avenue
13       New York, New York 10019-7475
14  BY:   KEVIN Y. TERUYA, ESQ.
           -and-
15       JOHN FRASER, ESQ.
16  ROBERT M. D'ANGEL, ESQ.
       Attorney for the Witness and
17     The Hunter Group
         333 Irving Avenue
18       Bridgeton, New Jersey 08302-2100
19
   ALSO PRESENT:
20
       HEATHER ZAMORA-HEGG, Videographer
21     Legalink Action Video
22
23
24
25

Page 4

1
2          MR. D'ANGEL:  I'm John D'Angel,
3  representing Dan Stickler and The Hunter Group.
4          THE VIDEOGRAPHER:  Today the court
5  report is Jack Finz.
6          Would the court reporter please swear
7  the witness.
8          D A N I E L    S T I C K L E R,
9  having been first duly sworn by the Notary Public
10  (Jack Finz), was examined and testified as
11  follows:
12          EXAMINATION BY MR. TERUYA:
13      Q.   Good morning, Mr. Stickler.
14      A.   Good morning.
15      Q.   Before we start out with substantive
16  questions, I just wanted to go over a few basic
17  preliminary questions, and let me start off by
18  asking you, are you represented by counsel this
19  morning?
20      A.   Yes, Bob D'Angel.
21      Q.   And that's Mr. D'Angel who is seated
22  at this table?
23      A.   Yes.
24      Q.   Are you familiar with how a
25  deposition works?

Page 3

1
2          THE VIDEOGRAPHER:  This is the video
3  operator speaking, Heather Zamora-Hegg, of Action
4  Legal Video, 420 Lexington Avenue, New York, New
5  York.  Today is May 9, 2003, and the time is 9:07
6  a.m.  We are at the offices of Cravath, Swaine &
7  Moore, LLP, Worldwide Plaza, 825 Eighth Avenue,
8  to take the videotaped deposition of Dan Stickler
9  in the matter of AHERF versus
10  Pricewaterhousecoopers, LLP, Civil Action No.
11  00-684, in the United States District Court for
12  the Western District of Pennsylvania.
13          Will counsel please introduce
14  themselves.
15          MR. TERUYA:  Kevin Teruya, from
16  Cravath, Swaine & Moore, LLP, for
17  Pricewaterhousecoopers, and with me as well is
18  John Fraser.
19          MR. WITTEN:  I'm Jesse Witten with
20  Jones Day, representing the Official Committee of
21  Unsecured Creditors of Allegheny Health,
22  Education and Research Foundation.
23          MR. WIERS:  I'm Adam Wiers, also with
24  Jones Day, representing Creditors Committee as
25  well.

Page 5

1          DANIEL STICKLER
2      A.   Yes.
3      Q.   Let me just say that, as usual, if at
4  any time you have any questions, feel free to
5  chime in and ask me.  If you need to take a
6  break, let me know that as well.  And if you
7  could please wait until I finished asking your
8  question before answering, that will help the
9  court reporter a lot, and the record.  And also
10  if you could answer audibly rather than with
11  gestures or otherwise, we would appreciate that.
12          Do you have any questions before we
13  start out?
14      A.   No.
15      Q.   Could you tell me what your full name
16  is for the record?
17      A.   Daniel Lee Stickler.
18      Q.   And could you please tell me your
19  residential address?
20      A.   5803 Fairwood Circle, Sarasota,
21  Florida 34243.
22      Q.   And would you also tell me your work
23  address?
24      A.   They recently moved the office of The
25  Hunter Group.  It's on the card that I

Page 6

DANIEL STICKLER

1
2    distributed.  I don't have it from memory.  If
3    you want me to read it for you, I can.
4        Q.    Sure.
5        A.    101 East Kennedy Boulevard, Suite
6    2200, Tampa, Florida 33602.
7        Q.    Thank you.
8            Could you please tell me your
9    educational background, starting with college?
10       A.    I have a bachelor's degree in civil
11   engineering from West Virginia University, a
12   master's degree in public health and health care
13   management from the University of Pittsburgh.
14       Q.    Could you tell me what year,
15   approximately, you got your bachelor's degree in?
16       A.    1960.
17       Q.    And could you tell me what year you
18   got your master's in?
19       A.    1970.
20       Q.    Just to clarify, you have no formal
21   accounting training of any kind, do you?
22       A.    None.
23       Q.    And you are not a CPA?
24       A.    No.
25       Q.    And you don't have any other formal

Page 7

DANIEL STICKLER

1
2    kinds of training, other than those you have
3    already mentioned?
4        A.    At one point I took some courses in
5    the administration of higher education at the
6    University of Pittsburgh, toward a doctorate
7    degree, but I did not complete it.
8        Q.    And you said that was in -- or your
9    studies were directed toward administration of
10   higher education?
11       A.    Yes.
12       Q.    Are you talking about running a
13   university or --
14       A.    Yes.
15           MR. TERUYA:  I would like to mark as
16   Exhibit 1550 a document bearing Bates numbers
17   HUNT 4821 through 4857, and on the front there is
18   a cover sheet that says "AHERF-Proposal."
19               (Deposition Exhibit 1550
20   for identification, document bearing Bates
21   numbers HUNT 4821 through HUNT 4857.)
22       Q.    I will give you a second to read it.
23   Just let me know when you have had a chance to
24   look through the document.
25           Do you recognize this document?

Page 8

DANIEL STICKLER

1
2        A.    No, I don't.
3        Q.    If you turn to the second page, do
4    you see that at the top it says The Hunter Group,
5    and there's a list of bullet points underneath
6    it?
7        A.    Yes.
8        Q.    Is this of the type of document that
9    The Hunter Group might prepare for a potential
10   engagement?
11       A.    It may be one that would be prepared
12   that would be of a generic nature, but generally
13   the engagement letter would be much more
14   specific.
15       Q.    Does this appear to be the kind of
16   marketing materials that The Hunter Group
17   prepares?
18       A.    I'm not sure I've ever seen something
19   exactly like this before.
20       Q.    Do you know who -- at The Hunter
21   Group, did you have responsibility over preparing
22   marketing literature?
23       A.    No.
24       Q.    Do you know who did, during the
25   period around the AHERF engagement?

Page 9

DANIEL STICKLER

1
2        A.    I don't recall, no.
3        Q.    Why don't we just turn for the moment
4    to the page with HUNT 4841 in the bottom right
5    corner.  Do you see that on that page there
6    appears to be a description of your resume,
7    essentially, in prose?  Do you see that?
8        A.    Yes.
9        Q.    Does this appear to be an accurate
10   description of your resume, at least at the time
11   before the AHERF engagement?
12       A.    It appears to be, with a brief review
13   of it, yes.
14       Q.    I just want to direct your attention
15   to the entry that says "Prior to joining The
16   Hunter Group, other major consulting assignments
17   included recommending a new management reporting
18   system and providing consultation services for
19   the patient-focused care initiative, Hahnemann
20   University Hospital, Pennsylvania."
21           Do you see that?
22       A.    Yes.
23       Q.    Could you please tell me what you did
24   for that consulting assignment?
25       A.    I was in practice in the name of DLS

3 (Pages 6 to 9)

Page 30

DANIEL STICKLER

1    
2    A.    Well, as of this January, when I
3    scaled back another step, I indicated, I hate to
4    say an unwillingness, but no longer a -- a desire
5    to no longer go into the field as an engagement
6    director for long-term engagements. And so I
7    have done a little bit of oversight work on some
8    engagements since then, but that's the major
9    change.
10    Q.    And that's since January of this
11    year, approximately?
12    A.    Yes.
13    Q.    And other than that, have any other
14    changes occurred in your responsibilities at The
15    Hunter Group since the AHERF engagement?
16    A.    Only as the clients changed.
17    Q.    Since the acquisition -- let me take
18    a step back. I saw from your business card that
19    it appears that The Hunter Group was acquired by
20    Navigant; is that correct?
21    A.    Yes.
22    Q.    Do you recall approximately when that
23    was, the acquisition?
24    A.    Sometime --
25    Q.    Last year?

Page 31

DANIEL STICKLER

1    
2    A.    A year ago or so, I think. I don't
3    have a good handle on that. I was not an owner,
4    and I was not one of the groups involved because
5    I was by then scaling back myself.
6    Q.    Are you saying you had no involvement
7    in the acquisition?
8    A.    No.
9    Q.    Do you know of the reasons for the
10    acquisition?
11    A.    No.
12    Q.    Has the acquisition in any way
13    changed, as far as you can tell, the way The
14    Hunter Group operates?
15    A.    No. I couldn't judge that. Somebody
16    else would have to judge that.
17    Q.    Did anyone who worked for The Hunter
18    Group come to work for AHERF at any time before
19    its bankruptcy, other than through an engagement
20    of The Hunter Group?
21    A.    I'm relatively certain not.
22    Q.    Were there any former AHERF employees
23    who were employed by The Hunter Group, other than
24    yourself -- I'm sorry, not even you.
25    A.    I was never an AHERF employee. I

Page 32

DANIEL STICKLER

1    
2    don't think so.
3    Q.    So there are no other -- just to
4    clarify my question, since I misspoke, there were
5    no former AHERF employees who worked for The
6    Hunter Group at the time that you --
7    A.    Not that I can recall, no.
8    Q.    Other than the work we have talked
9    about that you did at DLS Associates and at The
10    Hunter Group, did you do any other work for AHERF
11    at any time?
12    A.    No.
13    Q.    And you said you were CEO of
14    Presbyterian Hospital in Pittsburgh; is that
15    correct?
16    A.    Yes.
17    Q.    Do you know what years that was from?
18    A.    It was approximately 1976 to 1986. I
19    was with the hospital from '66 to '86, CEO from
20    '76 to '86.
21    Q.    During your time at Presbyterian
22    University Hospital, did you ever come to know
23    what an IDS strategy is, an integrated delivery
24    system strategy?
25    A.    Oh, yes. Yes.

Page 33

DANIEL STICKLER

1    
2    Q.    Could you tell me your understanding
3    of what it is?
4    A.    Bring together the components of
5    health care delivery, inpatient and outpatient,
6    and physician, and insurance, and all the
7    components together in one system.
8    Q.    Would that include acquiring other
9    hospitals that are in the same market as the
10    certain hospital?
11    MR. WITTEN: Objection.
12    A.    It would depend on how somebody would
13    implement the strategy.
14    THE WITNESS: I'm sorry. Am I
15    supposed to answer when somebody objects?
16    MR. D'ANGEL: Yes. He is just noting
17    it for the record. If they don't want you to
18    answer, one of them will make that clear.
19    Q.    Let me take a step back then. You
20    mentioned in your description of your
21    understanding of an integrated delivery system
22    strategy bringing together the components of a
23    health care system. Could you tell me what some
24    of the potential components are for a health care
25    system?

9 (Pages 30 to 33)

Page 34

DANIEL STICKLER

1
2     A.   I think I just did.  You know,
3  medical center hospitals, community hospitals,
4  physician practices, outpatient, activities, in
5  some cases insurance companies was brought into
6  it.  It was implemented to different degrees by
7  different systems during that era.
8     Q.   Would engaging in risk contracts be
9  one potential component of creating a health care
10 system, as you have described it?
11    A.   It might be, but it might not,
12 depending on how they chose to implement it.
13    Q.   Did you ever have occasion while you
14 were at Presbyterian University Hospital to
15 pursue an integrated delivery system strategy?
16    A.   I pursued a relationship with a
17 number of community hospitals, whereby we had
18 board representation from their board on our
19 board, but it was not one of ownership or
20 control.  And at the same time there were five
21 hospitals that were associated with the
22 University of Pittsburgh Medical School that were
23 all independent hospitals, but we did a number of
24 things together, like laboratory, radiology,
25 laundry, and things like that.

Page 35

DANIEL STICKLER

1
2     Q.   Were you CEO of any other hospitals
3  over time, other than Presbyterian University
4  Hospital?
5     A.   Cedars Medical Center, Miami,
6  Florida.
7     Q.   When you were at Cedars Medical
8  Center, did you have occasion there to pursue an
9  IDS strategy?
10    A.   No.  We were doing a turnaround and
11 survival mode.
12    Q.   Were you also at a point in time a
13 faculty member at the Graduate School of Public
14 Health --
15    A.   Yes.
16    Q.   -- for the University of Pittsburgh?
17    A.   Yes.  Not full-time faculty.
18    Q.   Do you recall approximately when?
19    A.   But I had course responsibility.
20         I would say probably the early 1970s
21 through to my departure from Pittsburgh in 1986.
22 I had responsibility for one course each year,
23 the Capstone course for the master's degree
24 students.
25    Q.   Which course was that?

Page 36

DANIEL STICKLER

1
2     A.   It was called a Capstone course.  It
3  was a case study course designed to bring
4  together the other elements of the education.
5     Q.   While you were at the University of
6  Pittsburgh, do you ever recall having any
7  discussions relating to Allegheny General
8  Hospital with any of the management of the
9  University of Pittsburgh?
10    A.   They were our primary competitor in
11 that area.  So I assumed there were discussions
12 on a somewhat regular basis as we worked on our
13 competitive strategies.
14    Q.   Were you part of those conversations
15 regarding the competitive strategy of the
16 University of Pittsburgh?
17    A.   At that point in time, the hospital
18 was independent of the university.  It's part of
19 the University of Pittsburgh Medical Center
20 today, but at that point in time it was a
21 separate corporation and independent.  But we had
22 our competitive strategy discussions, yes.
23    Q.   So the university had competitive
24 strategy discussions relating to AGH?
25    A.   Our hospital did.  They were our

Page 37

DANIEL STICKLER

1
2  primary competitor in that market.
3     Q.   So were you working at the University
4  of Pittsburgh Medical Center at that time?
5     A.   The University of Pittsburgh Medical
6  Center didn't exist in the form that it exists
7  today.  That's the point I was trying to make.
8  There were four or five -- four independent
9  hospitals that worked with the university medical
10 school but were not part of the university and
11 not part of the central corporate structure at
12 that point in time.
13    Q.   When you said that AGH was your
14 primary competitor, or your hospital's primary
15 competitor, which hospital are you referring to
16 there?
17    A.   Presbyterian University Hospital.
18    Q.   I was confused for a second there.
19         So while you were at Presbyterian you
20 had discussions relating to competitive strategy
21 with AHERF?
22         MR. WITTEN:  Objection.
23    A.   Anybody we competed with.
24    Q.   Do you recall the substance of any of
25 those conversations?

Page 54

DANIEL STICKLER

1
2  this report if --
3       A.   They would have been in the report,
4  whatever recommendations I had, yes.
5       Q.   Is there any particular section of
6  this report that contains your suggestions, or
7  are they just interspersed throughout?  Feel free
8  to, obviously, look through the report.
9       A.   The question was?
10      Q.   I was just wondering, is there a
11  particular section of this report that contains
12  your suggestions or are they just sort of
13  mentioned throughout, wherever you had them?
14      A.   They appear to be mentioned wherever
15  they occur here in the report.
16      Q.   Before leaving the report, let me
17  just confirm, you have no recollection at all
18  about the market conditions of the Delaware
19  Valley region in 1994?
20      A.   No, none at all.
21      Q.   Do you have any recollection, or did
22  you keep abreast of market conditions in the
23  Delaware Valley region over time prior to
24  arriving at AHERF in 1998?
25      A.   No.  Had no reason to.

Page 55

DANIEL STICKLER

1
2       Q.   Do you recall, moving away from 1994,
3  what the market conditions were like in the
4  Delaware Valley region in 1998?
5       A.   I don't recall, no.
6       Q.   Did you perform any studies of the
7  market conditions at the time?
8       A.   I did not personally, no.
9       Q.   Did you speak with any members of
10  AHERF management about market conditions at the
11  time?
12      A.   I really don't recall.
13      Q.   Do you recall how you received any
14  information that you can recall about market
15  conditions at the time?
16      A.   I don't recall, no.
17      Q.   Do you at least recall receiving some
18  information about the market conditions at the
19  time?
20      A.   I don't recall, no.
21      Q.   In your practice of doing work in
22  consulting engagements, like the one you
23  performed for AHERF, or The Hunter Group
24  performed for AHERF, is it your normal practice
25  to study the market conditions?

Page 56

DANIEL STICKLER

1
2       A.   This was a very untypical engagement
3  in that we came in to perform a performance
4  improvement program, develop a performance
5  improvement program, and that normally, in an
6  institution of that magnitude, would have taken
7  14 to 16 weeks.  Very soon after we got there it
8  became apparent that there was not enough cash to
9  sustain the organization through the development
10  of a turnaround plan and the implementation of a
11  turnaround plan, and so our focus changed
12  completely at that point in time.
13      Q.   Did you have a chance during that
14  time to, if you recall, speak with management
15  about what management was doing at the time to
16  deal with market conditions?
17      A.   I don't recall.  My memory of that
18  entire event is not very strong at this point,
19  this many years later, as you're seeing, I guess,
20  from my answers.
21      Q.   Do you recall that in 1997 -- let me
22  take a step back.  Do you recall where you were
23  in 1997, what engagement you might have been
24  working on in calendar year 1997 for The Hunter
25  Group?

Page 57

DANIEL STICKLER

1
2       A.   No.  What year did you say this
3  engagement started?
4       Q.   Put differently, do you recall what
5  engagement you might have been working on one
6  year before the AHERF bankruptcy, or before the
7  AHERF bankruptcy?
8       A.   I don't recall specifically, no.
9       Q.   Do you recall that at some point in
10  time the Balanced Budget Act of 1997 was enacted?
11      A.   I recall it was enacted, yes.
12      Q.   And do you recall which hospital
13  system you were working for, what you were
14  working on at the time it was enacted?
15      A.   Not the specific time it was enacted.
16      Q.   Do you recall having any discussions
17  at The Hunter Group about the Balanced Budget Act
18  of 1997?
19      A.   I assume we did, but I don't recall
20  them.
21      Q.   Do you recall any discussions at The
22  Hunter Group about -- or what was your view of
23  the Balanced Budget Act of 1997, from the
24  perspective of someone who manages hospitals?
25      A.   It was going to increase the

15 (Pages 54 to 57)

Page 62

DANIEL STICKLER

1    early on our emphasis was changed from a
2    turnaround to survival through this bankruptcy
3    process, which was much more short-term.
4        Q.    Did you perform any analysis of what
5    steps management had been taking over time in the
6    Delaware Valley region?
7        A.    No, I did not. We made a conscious
8    decision that our job at that point in time was
9    looking forward, to deal with whatever we had to
10   deal with in the time period we were in, that if
11   somebody wanted to investigate or review the
12   past, that was a different job, and whoever was
13   responsible for it could do it.
14       Q.    Would looking at any documents about
15   the conditions in the Philadelphia region help to
16   refresh your memory or would I essentially just
17   be putting documents in front of you that
18   would --
19       A.    You would be wasting your time, I
20   think.
21       Q.    Is there anything you could think of,
22   perhaps documents The Hunter Group generated,
23   that I could show you that would help to jog your
24   memory about market conditions in Philadelphia?

Page 63

DANIEL STICKLER

1        A.    Not that I can think of, no.
2        Q.    You don't recall ever preparing any
3    reports, or anything like that, that described
4    the market conditions?
5        A.    I didn't prepare any, and I don't
6    believe our firm did prepare one during that time
7    period.
8        Q.    When you arrived at AHERF in 1998, do
9    you recall which hospital CEOs you might have had
10   any interactions with?
11       A.    All of them that were in place at the
12   time. I was in a management role and all of them
13   that were in place at the time had direct
14   reporting relationships to me. That would have
15   been Meg McGoldrick, Gebar. Gee, I don't
16   remember the guy's name over at Graduate.
17       Q.    Is that Robert Matthews?
18       A.    Yes. And I don't remember the names
19   at the other smaller hospitals, either.
20       Q.    Do you recall that Galvin Bland was
21   working at St. Christopher's Hospital for
22   Children?
23       A.    I recall him having been there while
24   I was there, and I think he was there at the time

Page 64

DANIEL STICKLER

1    I came. I'm pretty certain he was.
2        Q.    Did you have any interactions with
3    the provost or dean of the university that AHERF
4    owned?
5        A.    Yes, both of them.
6        Q.    Do you recall the names of those
7    individuals?
8        A.    I don't recall the name of the
9    provost. I recall the name of the dean was
10   Barbara Atkinson.
11       Q.    Do you recall that the provost was
12   Leonard Ross?
13       A.    I think you're right. Well, wait a
14   minute. Wait a minute. I'm not certain whether
15   that's a name of the person that was there at the
16   time we came in or the name of the person that
17   was brought in after we left. So I'm not certain
18   which one of those it was, to be honest.
19       Q.    Do you recall the names of any of the
20   other members of AHERF management that you might
21   have dealt with at the time you arrived in 1998?
22       A.    I dealt with all the department
23   chairmen of the school. I don't recall the names
24   of the individuals. I'm sorry, I don't recall

Page 65

DANIEL STICKLER

1    their names now.
2        Q.    By the time you arrived at AHERF in
3    1998, was Sherif Abdelhak no longer employed
4    there?
5        A.    Yes, he was gone.
6        Q.    And was David McConnell already gone?
7        A.    David was still there.
8        Q.    And Nancy Wynstra was still there?
9        A.    Was still there.
10       Q.    Did you have chances to interact with
11   the two of them?
12       A.    Limited chances to, yes. Not too
13   long after I was there the legal services for the
14   eastern operation was separated from the
15   corporate legal services, and they began
16   reporting to me instead of to Nancy. Not too
17   long after we got there, Dave McConnell
18   departed. And I don't remember much discussion
19   with him at all.
20       Q.    You said the eastern region legal
21   department was reporting to you after you got
22   there, after some time?
23       A.    Not too long after I got there, yes.
24   Because we were in the process of paring it down.

17 (Pages 62 to 65)

Page 66

DANIEL STICKLER

1
2    Q.    Paring down the legal department?
3    A.    Yes, as we were with all the expenses
4  we could pare down.
5    Q.    Do you recall that outside law firms
6  were brought in to assist AHERF with its legal
7  services at the time?
8    A.    I recall that they were using some
9  external legal counsel in addition to the paid
10  staff, yes.
11    Q.    Do the names of either Kirkpatrick &
12  Lockhart or Hahn Losier ring any bells as the
13  names of those firms?
14    A.    My recollection is that Hahn Losier,
15  if I'm not mistaken, was the bankruptcy counsel
16  that was brought in by corporate AHERF, and
17  Kirkpatrick & Lockhart I think was legal counsel
18  to corporate in Pittsburgh.
19    Q.    Does the name of the law firm Foley &
20  Lardner ring any bells as well?
21    A.    Yes.
22    Q.    Do you recall what their role was?
23    A.    They were assisting the eastern
24  operations relative to the -- there was in
25  process at the time, if I recall correctly, an

Page 67

DANIEL STICKLER

1
2  attempt to sell part of the hospitals in the
3  eastern operation, and they were assisting with
4  that transaction that was being dealt with by
5  investment bankers.  And they had assisted with
6  some other work during that process, internal
7  corporate work, I would say, as opposed to
8  bankruptcy work.
9    Q.    Was the sale that you are referring
10  to the sale of the Philadelphia region hospitals
11  to Vanguard at the time that you arrived?
12    A.    There was a -- discussions were going
13  on about selling some portion of the Philadelphia
14  region hospitals to Vanguard at the time, yes.
15  It wasn't all the eastern hospitals, I don't
16  believe.
17    Q.    At the time you arrived, did you have
18  the sense that the hospital CEOs who you
19  interacted with were doing the best that they
20  could under the circumstances?
21    A.    I don't know that I was in a position
22  to make that call that quick.  You know, we
23  thought we could put together a turnaround plan
24  that would help to improve the financial
25  situation if we had enough time to do it.  There

Page 68

DANIEL STICKLER

1
2  wasn't enough time to do it.  We didn't get into
3  it very deeply.
4    Q.    So you didn't have enough time to put
5  together a turnaround plan?
6    A.    There wasn't enough money to operate
7  with to do it.
8    Q.    So you never, in fact, put together
9  even a plan?
10    A.    We put together a 30,000-foot level
11  estimate of what we thought we could do and how
12  long it would take to do it and how much money we
13  would need to operate in order to survive long
14  enough to do that.  We did put that together.
15    Q.    But you never got a chance to test
16  out the plan or actually implement it?
17        MR. WITTEN:  Objection.
18    A.    Never got any money from anybody to
19  carry through to do it.
20    Q.    So you can't say as you sit here
21  today whether the plan would have worked or not?
22    A.    We thought it would or we wouldn't
23  have proposed it, but we don't know unless it's
24  tested.
25    Q.    And you said your role was not to

Page 69

DANIEL STICKLER

1
2  evaluate what management had done in the past,
3  and the goal was just to look forward; is that
4  right?
5    A.    That's exactly right.  And we made
6  that as a conscious decision, because we had a
7  very heavy full-time effort to try to lead that
8  organization through the process it was going
9  through, and we felt -- I felt very strongly that
10  it was not our responsibility and it would be a
11  distraction of management to spend our time
12  looking back trying to figure out what somebody
13  did right or wrong.  It was immaterial to us at
14  that point.
15    Q.    Would part of putting together a
16  turnaround plan have entailed studying the market
17  conditions under which AHERF operated?
18    A.    It would have had we done the full
19  plan, yes.
20    Q.    And you said you didn't get a chance
21  to study the market conditions?
22    A.    No.
23        MR. WITTEN:  Objection.
24    A.    We did not.  In my recollection, we
25  did not.

18 (Pages 66 to 69)

Page 70

DANIEL STICKLER

1
2     Q.     And in your experience, does the
3  feasibility of a turnaround plan and what steps
4  you take in implementing a turnaround plan depend
5  upon the market conditions in which a hospital
6  operates, or a hospital system?
7     A.     As I indicated, we did a 30,000-foot
8  level look at what we thought we might be able to
9  do because we were working under a very short
10  time constraint, and we had to get money fast in
11  order to stay alive. And we did not have time to
12  do such an analysis. If we had done a full
13  14-week or 16-week performance improvement plan,
14  then we would have taken a look at the market
15  conditions and the strength of the organization
16  and projected what we thought they could do in
17  that market condition.
18     Q.     But you didn't have the chance to do
19  that under the circumstances?
20     A.     Right. We didn't even keep our
21  marketing person on the job.
22     Q.     Your person who conducted market
23  studies?
24     A.     Yes.
25     Q.     Do you know who that was at The

Page 71

DANIEL STICKLER

1
2  Hunter Group?
3     A.     I don't remember who was sent to the
4  project. As I said, we restructured the project
5  very rapidly very soon after we were there.
6     Q.     We will come to that, and I will show
7  you some documents with names of people.
8         Do you recall what were the
9  components of the 30,000-foot plan that you just
10  mentioned?
11     A.     I really don't.
12     Q.     Is that just an internal plan that
13  you had formulated that was thought about at The
14  Hunter Group?
15     A.     It was something that the members of
16  the team that we still had there at the time, and
17  the members of the management team that were
18  there in Philadelphia, i.e., the dean and the
19  provost and the hospital CEOs, put together based
20  on, as I said, a 30,000-foot level look on our
21  part, and then asking them what were the
22  opportunities for cost reductions.
23         And I don't want to overstate the
24  detail of that because, and I repeat, it was
25  looking at it on very rapidly the 30,000-foot

Page 72

DANIEL STICKLER

1
2  level.
3     Q.     And you said that this was a plan,
4  you know, at the 30,000-foot level, without
5  details, that you formulated in conjunction with
6  discussions with the hospital CEOs of AHERF?
7     A.     Yes.
8     Q.     Was Tony Sanzo involved in any of
9  those discussions?
10     A.     I'm certain that -- I don't know
11  whether he was involved in the process of putting
12  it together, but I'm rather certain that it was
13  reviewed and discussed with him once it was put
14  together.
15     Q.     And were any members of AHERF's board
16  involved in those discussions?
17     A.     No.
18     Q.     Either --
19     A.     No. Not with me, at least.
20     Q.     Backing up for a moment, in addition
21  to the various CEOs you have mentioned and Nancy
22  Wynstra and David McConnell, did you have a
23  chance to work with any AHERF board members
24  throughout your engagement with AHERF?
25     A.     There was one or two occasions in

Page 73

DANIEL STICKLER

1
2  which I appeared at an AHERF board meeting. I
3  don't even recall the reason why I was there.
4  Maybe it was when they were interviewing us to
5  hire us; I'm not certain. And then there was an
6  eastern board that met regularly during the time
7  that we were there, and we did interact with that
8  group.
9     Q.     Taking it in steps, you said you
10  thought you might have appeared at one or more of
11  the meetings of AHERF, the parent company's,
12  board, located in Pittsburgh; is that correct?
13     A.     Yes.
14     Q.     And, in addition to that, you also
15  thought you might have from time to time met with
16  or interacted with members of the eastern region
17  board?
18     A.     Yes. There was a separate board for
19  the eastern operation, and I did -- they met in
20  Philadelphia, and I met with them on a number of
21  occasions, discussed with them things that we
22  were proposing to do, et cetera.
23     Q.     And would that have been the meetings
24  with the Philadelphia region board members in the
25  context of a formal board meeting, or did you

19 (Pages 70 to 73)

Page 142

DANIEL STICKLER

1    is that right, to the best of your memory?
2        A.    That's my recollection, and then I
3    thought I made a mistake when I read this, but
4    now I go back to my recollection.
5        Q.    And as to the package for the whole
6    set of Philadelphia region hospitals, to the best
7    of your recollection, that fell through sometime
8    around the bankruptcy, you recalled before, but
9    maybe it was after; is that right?
10       A.    No.  I'm thinking, now that I read
11   these minutes, that this proposal was part of the
12   package of filing for bankruptcy, and that the
13   bankruptcy counsel wanted and did receive what
14   they called a stalking horse bid, and I recollect
15   now, I think, it's very fuzzy, that that's what
16   this was.  But I'm not positive.
17       Q.    Could you explain what your
18   understanding is of a stalking horse bid, or is
19   that some term that's unique to AHERF, as far as
20   you are concerned?
21       A.    I think it's a term that's unique to
22   the bankruptcy process.  My understanding of it
23   was that it created a base for other proposals,
24   but that's about as much recollection as I have

Page 143

DANIEL STICKLER

1    on that.
2        Q.    When you say a base for other
3    proposals, did you mean that you had an
4    understanding that the Vanguard bid would sort of
5    be publicly known and other bidders in the
6    bankruptcy process would have to beat that bid,
7    essentially?
8        A.    Whether it was publicly known, I
9    don't know.  I don't recall.
10       Q.    But you recall that was the deal on
11   the table --
12       A.    I recall at some point in time there
13   was discussion about a stalking horse bid, and
14   Vanguard did put in a bid that was considered the
15   stalking horse bid.  That's about as much as I
16   recall about it.
17       Q.    And in terms of the general
18   recollection you have of a meeting where there
19   was video conferencing between Allegheny General
20   Hospital on the west and I assume Hahnemann
21   University on the east, do you have any
22   recollection of what that meeting was about?
23       A.    Only what I recall -- you know, what
24   these minutes tell me.

Page 144

DANIEL STICKLER

1        Q.    I mean, does looking at these minutes
2    refresh your memory at all, or are you able to
3    see what's on them?
4        A.    It makes me think that this must have
5    been it, but I don't know whether I would testify
6    that this was it based on that.
7        Q.    You don't have any recollection of
8    your own at this point?
9        A.    No.
10           MR. TERUYA:  I would like to mark as
11   Exhibit 1554 a document with Bates numbers HUNT
12   4502 through 4505, dated June 16, 1998.  It seems
13   to be an engagement letter between The Hunter
14   Group and AHERF dated June 16, 1998.
15           (Deposition Exhibit 1554
16   for identification, document Bates stamped HUNT
17   4502 through HUNT 4505.)
18       A.    Okay.
19       Q.    Do you recognize this document?
20       A.    I see it and read it.  I'm sure I saw
21   it before, but I don't recall.
22       Q.    Does this appear to you to be the
23   engagement letter between The Hunter Group and
24   AHERF?

Page 145

DANIEL STICKLER

1        A.    It appears to be the engagement
2    letter between The Hunter Group and AHERF
3    relative to the interim management services.  I
4    think I stated to you earlier that there was
5    performance improvement planning responsibility.
6    I had thought that was all in one engagement
7    letter.  There must have been separate engagement
8    letters, is all I can conclude, because I don't
9    see it mentioned here.
10       Q.    I will just mention, I have a series
11   of engagement letters, and I was just trying to
12   understand the differences between them.  So I am
13   taking out new ones, and if you are wondering
14   what I am doing.
15           So does this appear to be the initial
16   engagement letter between AHERF and The Hunter
17   Group?
18       A.    It appears to be, yes.
19       Q.    Do you see the signature on page 4 of
20   the document of Larry Scanlan?
21       A.    Yes.
22       Q.    Was he the president of The Hunter
23   Group at the time?
24       A.    Yes.

37 (Pages 142 to 145)

Page 146

DANIEL STICKLER

1
2    Q.    Is he still the president of The
3    Hunter Group, to the extent there is one, at
4    present?
5    A.    I don't know what his exact title is
6    now.
7        MR. D'ANGEL: He's a managing
8    director at Navigant. He's a Navigant employee
9    now.
10   Q.    Back at the time in 1998, did Larry
11   Scanlan have any kinds of involvement in the
12   AHERF engagement, other than signing off the
13   engagement letter, to your knowledge?
14   A.    Not to my knowledge. He may have had
15   in relationship to David Hunter, but I don't
16   recall in relationship with me.
17   Q.    And do you recognize this to be his
18   handwriting on page 4?
19   A.    No.
20   Q.    You don't know?
21   A.    No.
22   Q.    But you don't have any reason to
23   believe that this is not the engagement letter?
24   A.    No.
25   Q.    And at this point in time, is it

Page 147

DANIEL STICKLER

1
2    correct that this was an engagement letter just
3    for services by you and David Hunter in terms of
4    providing interim management services?
5    A.    That's what I see here, yes.
6    Q.    And at the time do you know why or
7    what was the objective in terms of obtaining
8    interim management services from The Hunter
9    Group, if you know?
10   A.    If I'm not mistaken, this was within
11   days after the departure of Sherif and Donald
12   Kaye, the eastern regional executive, and they
13   were trying to plug a hole, I think.
14   Q.    Do you remember who contacted whom?
15   Did AHERF contact The Hunter Group, or vice
16   versa?
17   A.    I don't know. I was riding down the
18   Coraner Turnpike in Ohio with my wife when I got
19   a call on my cell phone that said can you be in
20   Philadelphia Monday morning.
21   Q.    That was on a Friday, you said, they
22   gave you a call, and said be at work on Monday?
23   A.    Friday or Saturday.
24   Q.    And you were in Ohio, you said, at
25   the time?

Page 148

DANIEL STICKLER

1
2    A.    Yes.
3    Q.    Was that on a different engagement?
4    A.    No, I was visiting my in-laws.
5    Q.    At that time you were still residing
6    down in Florida?
7    A.    Yes.
8    Q.    Did you have to move up to
9    Pennsylvania for the AHERF engagements?
10   A.    No. I got a corporate apartment
11   there in town, and used that, and went home on
12   weekends when I could.
13   Q.    Were most of the members of the
14   engagement team from The Hunter Group who worked
15   at AHERF residents of Pennsylvania?
16   A.    I couldn't even --
17   Q.    Or put differently, were there a lot
18   of people who were in the same boat as you,
19   coming from Florida to Pennsylvania, or were
20   there lots of people who were from Pennsylvania?
21   A.    Our people are scattered to live all
22   over the country, and live wherever they want to,
23   and fly to work Monday morning. And one guy on
24   the engagement was from New Jersey, and he drove
25   in. I think he drove in every day most of the

Page 149

DANIEL STICKLER

1
2    time, and drove back. There was another guy that
3    I think his residence was in Philadelphia, in the
4    Philadelphia area, who drove in and back.
5        I'm trying to think who else was
6    there. I don't even remember. Honan's residence
7    was in Florida at the time, I think.
8    Q.    Were there any individuals other than
9    yourself who had had management experience in
10   Pennsylvania in terms of running hospitals, who
11   were on the engagement team?
12   A.    Well, David Hunter, of course. Alan
13   Dzija was on the engagement team and had had
14   experience in the Philadelphia area. I don't
15   remember whether he had -- he worked for one of
16   the consulting firms. I don't know whether he
17   had direct hospital experience or not. I don't
18   recall others.
19   Q.    Was David Hunter actually on the
20   engagement team, or did he just arrange for the
21   engagement to occur and then left it to you?
22   A.    He spent some time there. I couldn't
23   tell you exactly how much. But he spent some
24   time there, and he also spent some time on the
25   phone with me relative to it. But my

38 (Pages 146 to 149)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

### DANIEL L. STICKLER
*May 28, 2003*

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**STICKLER, DANIEL L.**



**LEGALINK**

A WORDWAVE COMPANY

Page 264

1
2  A P P E A R A N C E S:
3  JONES DAY
   Attorneys for Plaintiff
4     51 Louisiana Avenue, N.W.
      Washington, D.C. 20001
5
   BY:   JESSE A. WITTEN, ESQ.
6
7  JONES DAY
   Attorneys for Plaintiff
8     500 Grant Street - Suite 3100
      Pittsburgh, Pennsylvania 15219-2502
9
   BY:   ADAM W. WIERS, ESQ.
10
11
   CRAVATH, SWAINE & MOORE LLP
12  Attorneys for Defendant
      825 Eighth Avenue
13     New York, New York 10019-7475
14  BY:   KEVIN Y. TERUYA, ESQ.
15
   ROBERT M. D'ANGEL, ESQ.
16  Attorney for the Witness and
   The Hunter Group
17     333 Irving Avenue
      Bridgeton, New Jersey 08302-2100
18
19  ALSO PRESENT:
20    DAVID PELOZA, Videographer
      Legalink Action Video
21
22
23
24
25

Page 265

1            DANIEL L. STICKLER
2        THE VIDEOGRAPHER:  Today's date is
3  May 28, 2003.  The time is 9:05.  This is the
4  continuation of the deposition of Mr. Stickler.
5  It's Tape No. 4.  We are on the record.
6        CONTINUED EXAMINATION
7        BY MR. TERUYA:
8     Q.   Good morning.
9     A.   Good morning.
10    Q.   I just wanted to follow up with a few
11  items left over from last time.  And let me start
12  out by taking a step back and just asking you
13  what your precise role was with respect to the
14  engagement of The Hunter Group by AHERF.
15    A.   I was the interim chief operating
16  officer for the eastern operations, reporting to
17  the interim CEO of AHERF overall, which meant I
18  had operational responsibilities for the medical
19  school and the nine hospitals in the east, and
20  the other two schools.
21        (Off the record.)
22        THE VIDEOGRAPHER:  We are back on the
23  record.  And it's 9:08, Tape 4.
24    Q.   Sorry about the interruption.  And
25  were you complete or finished with your answer as

Page 266

1            DANIEL L. STICKLER
2  to what your role was?
3     A.   That was the role with AHERF, and
4  with The Hunter Group my role was engagement
5  director for the team that was there.
6     Q.   And so did all members of the team
7  report to you?
8     A.   Yes.
9     Q.   And would you regularly meet with all
10  the members of the team to get a status update?
11    A.   Yes.
12    Q.   And would the members of the team
13  submit written reports to you as well?
14    A.   Not usually.
15    Q.   They would just orally convey to you
16  what was going on?
17    A.   Or comment on the written reports of
18  the organization.
19    Q.   That the organization provided?
20    A.   Yes.
21    Q.   And did you have responsibility to
22  approve any proposed actions that The Hunter
23  Group was going to take with respect to the
24  engagement for AHERF?
25    A.   You need to be a little more

Page 267

1            DANIEL L. STICKLER
2  specific.  I'm not sure I understand you.
3     Q.   For example, if The Hunter Group was
4  going to recommend to AHERF that a certain
5  contract be submitted to the bankruptcy counsel
6  for rejection in the bankruptcy process, would
7  that have been something you were responsible for
8  approving before it was actually told to AHERF?
9     A.   Not necessarily on individual
10  contracts, because I might receive a list of, for
11  example, physician contracts, and the people
12  would be telling me that this was the criteria by
13  which we developed this list, and I would approve
14  it, yes.
15    Q.   So in terms of any actions that The
16  Hunter Group was recommending that AHERF take
17  after the bankruptcy, would those recommendations
18  have to be approved by you before they were
19  conveyed to the client, AHERF?
20    A.   I suspect probably so.  I don't
21  remember specifically.  But David Hunter was the
22  oversight person on that engagement and was
23  involved there somewhat.  Some things went up to
24  him for approval, some did not.
25    Q.   In terms of day-to-day

Page 288

DANIEL L. STICKLER

1
2  transplantation.
3      Q.    But as you sit here today, you can't
4  recall what the dollar amount of annual savings
5  achieved were?
6      A.    I don't recall the specific dollar
7  amount.  I know that it was very significant.
8      Q.    Do you recall -- when you say very
9  significant, are you talking along -- do you have
10 any sense of what range of dollar amounts you are
11 talking about?
12     A.    The subsidy of that research, my
13 recollection, was approaching a million dollars a
14 year, and so I assume the savings eventually was
15 of that magnitude.  There was a transition, of
16 course.
17     Q.    But you said that you thought that
18 that project had some value, you said?
19     A.    I felt it had value to society as a
20 research project, and I felt that if an
21 organization could afford it, it may have been
22 something that I could have recommended keeping.
23 But given the financial condition of the
24 organization, I felt that priorities had to be
25 established, and we couldn't afford to continue

Page 289

DANIEL L. STICKLER

1
2  to support it.
3      Q.    Was there a contract that was between
4  AHERF and this particular researcher that you are
5  mentioning?
6      A.    If I recall correctly, there was.
7      Q.    And was that a contract that was
8  submitted to bankruptcy counsel for --
9      A.    No, because we dealt with it
10 outside.  As I indicated, she was rather angry at
11 first, but I think began to understand that it
12 was a move designed to protect her research
13 project and give her a chance to find a new home
14 for it, and she did.
15     Q.    Was her contract a contract that
16 AHERF could not have just walked away from, to
17 your understanding, prior to bankruptcy?
18     A.    I'm not a lawyer, and I couldn't
19 express an opinion on that.
20     Q.    When you said there was a contract
21 with this person, was it some kind of a research
22 contract?
23     A.    I've gone as far as my memory is
24 going to carry me.
25     MR. TERUYA:  Well, I don't have any

Page 290

DANIEL L. STICKLER

1
2  further questions on direct.
3      If you want to start.
4      MR. WITTEN:  Thank you.
5      EXAMINATION BY MR. WITTEN:
6      Q.    Good morning, Mr. Stickler.
7      A.    Good morning.
8      Q.    Let me reintroduce myself.  I am
9  Jesse Witten, and I represent the Official
10 Committee of Unsecured Creditors of AHERF.
11     You testified last time that you were
12 the chief executive officer of Presbyterian
13 University Hospital in Pittsburgh.
14     A.    Yes.
15     Q.    Do you remember the years that you
16 were the CEO of that hospital?
17     A.    The years, but not the months, 1976
18 through 1986.
19     Q.    How large is that hospital, as
20 measured by the average daily number of
21 inpatients?
22     MR. D'ANGEL:  Then or now?
23     Q.    While you were the CEO of the
24 hospital.
25     A.    If I recall correctly, it was about

Page 291

DANIEL L. STICKLER

1
2  580 patients, average daily census at that -- at
3  the point at the end of that time period.
4      Q.    And that hospital while you were the
5  CEO was affiliated with the University of
6  Pittsburgh?
7      A.    Yes.
8      Q.    That hospital was used to train the
9  residents and interns of the University of
10 Pittsburgh?
11     A.    One of the hospitals.  The primary
12 adult medical-surgical hospital used to train
13 interns and residents there.
14     Q.    Measured by the number of inpatients,
15 when you were the CEO of that hospital, was there
16 a larger hospital in Pittsburgh than Presbyterian
17 University?
18     A.    I don't think so.  The other large
19 hospitals at the time were Allegheny General,
20 West Penn, Mercy, but I don't think any of them
21 were quite as large.
22     Q.    When you left Presbyterian, you went
23 to a hospital in Florida; is that right?
24     A.    Yes, sir.
25     Q.    And what was the name of that

Page 292

DANIEL L. STICKLER

1  hospital?
2  A.   Cedars Medical Center.
3  Q.   Located in?
4  A.   Miami, Florida.
5  Q.   And what was the size of that
6  hospital?
7  A.   I don't remember the exact size.  It
8  was -- I think the average census was someplace
9  around -- I think it was someplace in the four
10 hundreds at the time that I left.
11 Q.   And did you have the position of
12 chief executive officer of that hospital?
13 A.   Yes, sir.
14 Q.   And can you remember the years that
15 you were the CEO of Cedars Medical Center?
16 A.   1986 through 1991.
17 Q.   So you said the average daily census
18 was in the four hundreds when you left.
19 A.   Yes.
20 Q.   How about at the time that you
21 arrived?
22 A.   It was probably a hundred less than
23 that.
24 Q.   Can you describe Cedars' performance

Page 293

DANIEL L. STICKLER

1  while you were there in terms of its financial
2  performance?
3  A.   We were losing a significant amount
4  of money when I came.  We were making a small
5  amount of money when I left.  It was named by
6  somebody -- or I was named by somebody
7  turnaround administrator of the year one year
8  during that time period.  I'm not sure who the
9  national organization was.  But we achieved a
10 financial turnaround during that time period.
11 Q.   That's a nice honor, turnaround
12 executive of the year.
13      How did you accomplish --
14 A.   That and a quarter will get you a cup
15 of coffee.
16 Q.   Where can you get a cup of coffee for
17 a quarter.
18 A.   It shows you how old I am.
19 Q.   How did you cause Cedars' performance
20 to improve while you were its chief executive
21 officer?
22 A.   You don't turn an organization around
23 with one or two or three things in any instance.
24 There's always a large number of things that have

Page 294

DANIEL L. STICKLER

1  to be done.  And we did a great deal of work on
2  improving the productivity and management of the
3  organization.  We converted the old hospital
4  building into a physicians office building and
5  attracted some additional physicians to practice
6  there.
7       I negotiated the first affiliation
8  agreement with the University of Miami School of
9  Medicine, and we got a block of about 90 census
10 in one chunk from them, through that affiliation
11 agreement, that helped greatly.
12 Q.   How did you improve productivity and
13 management at Cedars?
14 A.   We got the attention of some managers
15 that may not have been paying quite as much
16 attention as they had previously, put
17 productivity monitoring systems in place,
18 reviewed all the contracts, renegotiated some of
19 them, started developing annual performance
20 expectations for every manager and evaluating
21 them against those, getting rid of people that
22 weren't contributing, and all of the things you
23 have to do.
24 Q.   So no real magic?

Page 295

DANIEL L. STICKLER

1  A.   No.
2  Q.   After you left Cedars, you testified
3  before that you went to DLS Associates -- you
4  formed DLS Associates?
5  A.   Yes.
6  Q.   Did you take part in any substantial
7  turnaround engagements with DLS?
8  A.   No.
9  Q.   After DLS, you testified that you
10 moved on to --
11 A.   The Hunter Group.
12 Q.   The Hunter Group.  Were you and are
13 you now an employee of The Hunter Group?
14 A.   I was, and I was an independent
15 contractor for some period of time.  I don't
16 remember how long, whether it was three months or
17 six months, or something like that.  And then I
18 became an employee and was an employee up until
19 January of this year.  And I'm not exactly sure
20 what my status is right now.  I have an
21 arrangement with them whereby I do work for them
22 on a per diem basis, a very limited amount of
23 work on a per diem basis, and get my health
24 insurance covered.  So, I guess, I think I'm a

9 (Pages 292 to 295)

LEGALINK MANHATTAN  (212) 557-7400

Page 292

DANIEL L. STICKLER

1  hospital?
2  A.  Cedars Medical Center.
3  Q.  Located in?
4  A.  Miami, Florida.
5  Q.  And what was the size of that
6  hospital?
7  A.  I don't remember the exact size.  It
8  was -- I think the average census was someplace
9  around -- I think it was someplace in the four
10  hundreds at the time that I left.
11  Q.  And did you have the position of
12  chief executive officer of that hospital?
13  A.  Yes, sir.
14  Q.  And can you remember the years that
15  you were the CEO of Cedars Medical Center?
16  A.  1986 through 1991.
17  Q.  So you said the average daily census
18  was in the four hundreds when you left.
19  A.  Yes.
20  Q.  How about at the time that you
21  arrived?
22  A.  It was probably a hundred less than
23  that.
24  Q.  Can you describe Cedars' performance

Page 293

DANIEL L. STICKLER

1  while you were there in terms of its financial
2  performance?
3  A.  We were losing a significant amount
4  of money when I came.  We were making a small
5  amount of money when I left.  It was named by
6  somebody -- or I was named by somebody
7  turnaround administrator of the year one year
8  during that time period.  I'm not sure who the
9  national organization was.  But we achieved a
10  financial turnaround during that time period.
11  Q.  That's a nice honor, turnaround
12  executive of the year.
13       How did you accomplish --
14  A.  That and a quarter will get you a cup
15  of coffee.
16  Q.  Where can you get a cup of coffee for
17  a quarter.
18  A.  It shows you how old I am.
19  Q.  How did you cause Cedars' performance
20  to improve while you were its chief executive
21  officer?
22  A.  You don't turn an organization around
23  with one or two or three things in any instance.
24  There's always a large number of things that have

Page 294

DANIEL L. STICKLER

1  to be done.  And we did a great deal of work on
2  improving the productivity and management of the
3  organization.  We converted the old hospital
4  building into a physicians office building and
5  attracted some additional physicians to practice
6  there.
7       I negotiated the first affiliation
8  agreement with the University of Miami School of
9  Medicine, and we got a block of about 90 census
10  in one chunk from them, through that affiliation
11  agreement, that helped greatly.
12  Q.  How did you improve productivity and
13  management at Cedars?
14  A.  We got the attention of some managers
15  that may not have been paying quite as much
16  attention as they had previously, put
17  productivity monitoring systems in place,
18  reviewed all the contracts, renegotiated some of
19  them, started developing annual performance
20  expectations for every manager and evaluating
21  them against those, getting rid of people that
22  weren't contributing, and all of the things you
23  have to do.
24  Q.  So no real magic?

Page 295

DANIEL L. STICKLER

1  A.  No.
2  Q.  After you left Cedars, you testified
3  before that you went to DLS Associates -- you
4  formed DLS Associates?
5  A.  Yes.
6  Q.  Did you take part in any substantial
7  turnaround engagements with DLS?
8  A.  No.
9  Q.  After DLS, you testified that you
10  moved on to --
11  A.  The Hunter Group.
12  Q.  The Hunter Group.  Were you and are
13  you now an employee of The Hunter Group?
14  A.  I was, and I was an independent
15  contractor for some period of time.  I don't
16  remember how long, whether it was three months or
17  six months, or something like that.  And then I
18  became an employee and was an employee up until
19  January of this year.  And I'm not exactly sure
20  what my status is right now.  I have an
21  arrangement with them whereby I do work for them
22  on a per diem basis, a very limited amount of
23  work on a per diem basis, and get my health
24  insurance covered.  So, I guess, I think I'm a

LEGALINK MANHATTAN  (212) 557-7400

Page 296

```
1              DANIEL L. STICKLER
2    contract person now.
3         Q.   Have you ever had an ownership
4    interest in The Hunter Group?
5         A.   No.
6         Q.   Aside from AHERF, were you involved
7    in any other turnaround projects for The Hunter
8    Group?
9         A.   Not as the interim executive, but as
10   the engagement director for an engagement to put
11   together what we call a performance improvement
12   plan which is, in essence, a turnaround plan.
13   And, yes, that's what I did most of the
14   engagements that I was involved with with them.
15        Q.   Is there a difference in the
16   expression turnaround plan and performance
17   improvement plan?
18        A.   One sounds a lot better than the
19   other.
20        Q.   What were some of the major
21   turnaround plans that you worked on for The
22   Hunter Group, aside from AHERF?
23        A.   I guess I can name clients, can't I?
24             MR. D'ANGEL:  It's public
25   information.
```

Page 297

```
1              DANIEL L. STICKLER
2         A.   George Washington University Medical
3    Center, University of Illinois-Chicago; Beth
4    Israel Deaconess Medical Center, Boston;
5    University of Pennsylvania, Philadelphia;
6    Downstate Medical Center in Brooklyn. There's
7    probably some other ones that I'm not thinking of
8    right now.
9         Q.   Were these five that you mentioned,
10   George Washington, University of
11   Illinois-Chicago, Beth Israel Deaconess,
12   University of Pennsylvania, and Downstate Medical
13   in Brooklyn, were they ultimately successful
14   turnaround engagements?
15             MR. TERUYA:  Objection.
16        A.   They were turnaround -- they were
17   successful turnarounds, but in every one of those
18   instances we developed a turnaround plan for the
19   organization, but we didn't manage the
20   organization during the turnaround. So we
21   contributed to the successful turnaround. I
22   don't think it would be fair to say that we did
23   the turnaround.
24        Q.   So do you mean to say that you
25   analyzed the situation for the client and
```

Page 298

```
1              DANIEL L. STICKLER
2    recommended a course of action?
3         A.   Yes.
4         Q.   And then the client --
5         A.   With a team, a team from The Hunter
6    Group did.
7         Q.   So when I say "you," you are
8    correcting me because it wasn't just you, it was
9    you and a team of others?
10        A.   That's correct.
11        Q.   And then the client was to implement
12   The Hunter Group turnaround recommendations?
13        A.   Yes.
14        Q.   What was the nature of the
15   recommendations that were given at the University
16   of Pennsylvania by The Hunter Group?
17        A.   Well, there were two notebooks about
18   that thick, which reinforces the point that you
19   can't turn around an organization by a few
20   individual actions. That's probably at best I
21   can say. But there were a great number, a great,
22   great number of recommendations. We don't put
23   together a turnaround plan that makes you think
24   there is a magic wand that's going to do it for
25   you. There's a lot of things you have to do.
```

Page 299

```
1              DANIEL L. STICKLER
2         Q.   So at least for your recommendations
3    at the University of Pennsylvania, and it sounds
4    elsewhere, your recommendations are an aggregate
5    of many, many distinct interventions?
6         A.   Yes. Yes.
7         Q.   The list of five that you gave us
8    before, GW, Illinois, Beth Israel Deaconess,
9    Pennsylvania and Downstate Medical, was it the
10   same in each case that The Hunter Group generated
11   a thick set of recommendations?
12        A.   Yes.
13        Q.   If you had had the time at AHERF,
14   would you have anticipated being able to make
15   those same set of recommendations?
16             MR. TERUYA:  Objection.
17        A.   From the 30,000-foot level, and the
18   amount of time we had, as I testified earlier, we
19   believed that if we had a certain amount of time,
20   we could have accomplished a turnaround, yes.
21   And money to carry us through that time.
22        Q.   Tell me about The Hunter Group. Is
23   it a well-known company in the hospital field?
24        A.   Yes.
25        Q.   And how did it become well-known?
```

10 (Pages 296 to 299)

Page 300

DANIEL L. STICKLER
1
2      A.    Well, I think because it probably has
3  done more successful work in helping
4  organizations turn around their performance than
5  any other firm, I believe.  At least I believe
6  that.
7      Q.    Is that one of the reasons you were
8  wanting to join The Hunter Group?
9      A.    I joined The Hunter Group because I
10  knew David Hunter from graduate school, and he
11  suggested it, and it sounded like a good idea.
12  As I indicated previously, I didn't like the
13  marketing piece, and et cetera.
14      Q.    Is David Hunter personally prominent
15  in the hospital field?
16      A.    Very much so.
17      Q.    And how did he become prominent?
18      A.    I think he's built a career of
19  success from a hospital CEO of a hospital in New
20  Jersey to one time served as president of the
21  Voluntary Hospitals of America, if I'm not
22  mistaken.  And then through this firm, and
23  speaking, I think he was named as one of the 100
24  most -- or maybe a smaller number than that, most
25  influential people in health care by some

Page 301

DANIEL L. STICKLER
1
2  magazine in the last year.
3      Q.    What are the handful of the most
4  significant turnarounds that The Hunter Group
5  accomplished, not necessarily projects that you
6  worked on, but Hunter Group turnarounds that are
7  known?
8      MR. TERUYA:  Objection.
9      A.    The University of California San
10  Diego comes to my mind.  The Hunter Group was
11  involved in the dissolution of the Stanford
12  University of California San Francisco merger.
13  We weren't involved in putting it together.  We
14  were involved in taking it apart.
15      There are probably some other ones, a
16  number of other ones.  And a lot of smaller
17  hospital -- you know, I worked mostly in the
18  academic medical center area and didn't pay a lot
19  of attention to the community hospital
20  engagements, but there were a lot of smaller
21  hospital engagements across the country that The
22  Hunter Group developed a plan for the turnaround.
23      Q.    Who in 1998 would you say was the
24  chief competition to The Hunter Group in terms of
25  turnaround consultants?

Page 302

DANIEL L. STICKLER
1
2      A.    We didn't think there was any.
3      No, the big accounting firms would
4  pop up once in a while as competition.  I think
5  Cambio was in existence, or one of its
6  predecessor lives, and they popped up once in a
7  while as competition.  There were probably some
8  others.
9      Q.    Is Cambio around today?
10      A.    I think so.  I'm not positive.
11      Q.    And is Cambio a consulting firm that
12  does turnarounds?
13      A.    Amongst other things, they profess to
14  do them, yes.
15      Q.    They are competition for The Hunter
16  Group?
17      A.    I don't think they've taken very many
18  jobs from The Hunter Group, to be honest with
19  you.  So competition would be people that are
20  winning the thing.
21      Q.    On occasion does The Hunter Group
22  tell clients that a turnaround is not feasible?
23      A.    There had been occasions when we've
24  done that, yes.
25      Q.    And why is that?

Page 303

DANIEL L. STICKLER
1
2      A.    Because we don't think it's feasible.
3      Q.    That's because The Hunter Group
4  doesn't want to promise more than it can
5  deliver?
6      MR. TERUYA:  Objection.
7      A.    No, I think because we don't think
8  it's feasible.  You know, we, as I said earlier,
9  hold a position in every one of these plans that
10  we put together, and we emphasize to each other
11  the fact that you don't recommend a plan that you
12  don't think you could implement yourself.  And
13  there have been some instances in which we would
14  put together the plan, and the gap between where
15  the organization was that day and the financial
16  viability was greater than what we thought we
17  could close.
18      Q.    Earlier today Mr. Teruya referred to
19  recommendations that The Hunter Group would make
20  to AHERF.  You were actually, however, the
21  interim COO of the eastern region?
22      A.    Yes.
23      Q.    In that capacity, you didn't have to
24  make recommendations for things that were within
25  the authority of a COO to do; is that right?  Do

11 (Pages 300 to 303)