DANIEL L. STICKLER

1
2 passages that were not pointed out by Mr.
3 Teruya.
4        Are you at Exhibit G to Exhibit 1559?
5    A.   Yes.
6    Q.   And once again you understand this to
7 be part of a representation made to the
8 bankruptcy judge in Pennsylvania; is that right?
9    A.   That's my understanding.
10   Q.   It starts out -- are you on the page
11 that says Background, where it says Record of
12 Engagement with Allegheny Health, Education and
13 Research Financial, Background, and then it says
14 "Report of Mr. David Hunter, founder of The
15 Hunter Group."
16       This report begins by saying "The
17 Hunter Group is a consulting firm which for the
18 ten years of its history has specialized in the
19 health care industry. Our firm's mainstay
20 service is working with troubled hospitals,
21 usually in a turnaround mode."
22       Is that, to your understanding, an
23 accurate description of The Hunter Group's
24 mainstay service?
25   A.   I think so, yes.

DANIEL L. STICKLER

1
2    Q.   Continuing on the third sentence,
3 "We do this sometimes by supplying key
4 management executives to run our clients'
5 businesses for interim periods until operations
6 stabilized and other times by using consulting
7 teams over shorter periods to determine where our
8 clients' expenses could be reduced or where
9 revenues could be increased. On occasion, such
10 as with AHERF, both approaches of interim
11 managers and consulting teams are used."
12       Is that an accurate summary of --
13   A.   I think so.
14   Q.   The last sentence here on this page
15 says, "Our specific accomplishments are recapped
16 on the following pages." And the following pages
17 were discussed -- you testified about some of
18 them with Kevin, with Mr. Teruya.
19       Let's take a look at the next page,
20 Task 1, Cash Management and Conservation Plan.
21 Before listing ten specific accomplishments, it
22 reads "This task was structured so as to identify
23 broadly what actions might be taken to avoid
24 bankruptcy. The parameter of this task began to
25 change when it became apparent that bankruptcy

DANIEL L. STICKLER

1
2 protection was an unavoidable option."
3        Is this an accurate description of
4 the cash management and conservation plan?
5    A.   I think so, yes.
6    Q.   This page then says "Specific
7 accomplishments included," and it lists ten, on
8 that page, ten accomplishments. Do you see what
9 I'm referring to?
10   A.   Yes.
11   Q.   Take a look, please, at specific
12 accomplishment number 9. It says here,
13 "Identified 'management intervention' actions
14 which would have reduced expenses or otherwise
15 increased revenues or cash flow. Developed
16 preliminary timetables and calculated results for
17 as many as 80 distinct interventions, totaling
18 $80 million in cash flow improvement."
19       Is this consistent with your
20 recollection about the development of distinct
21 interventions that AHERF could have followed?
22   A.   I think this refers to the thing that
23 I had referred to earlier of a 30,000-foot level
24 plan that we felt could be implemented rapidly if
25 we had enough money to get us through that time

DANIEL L. STICKLER

1
2 period. My recollection was that the number was
3 less than this, but my memory is not very good on
4 that, so I would be more inclined to rely on the
5 number in the report.
6    Q.   When Hunter Group made reports for,
7 say, University of Pennsylvania, would the number
8 of management interventions have been about 80,
9 or was it higher or lower?
10   A.   The number -- there's a difference
11 between the 30,000-foot plan and the
12 comprehensive plan developed over a long period
13 of time with a team of 16 or 18 people. And, as
14 I indicated, the plan at the University of
15 Pennsylvania was a comprehensive plan, and the
16 total recommendations were probably three or four
17 or five hundred or something in that -- I don't
18 even know what the number is.
19   Q.   So the 80 distinct interventions
20 described here would have been as part of that
21 30,000-foot plan?
22   A.   Yes, sir, that's my understanding.
23   Q.   So are you testifying, then, that had
24 you had the opportunity to develop a full plan,
25 there likely would have been additional

Page 312

DANIEL L. STICKLER

1  interventions identified?
2  MR. TERUYA:  Objection.
3  A.   I would assume so, yes.
4  Q.   What does the expression "management
5  intervention" mean?
6  A.   Things that management can do that
7  would save money.
8  Q.   Let's look up the page to specific
9  accomplishment number 4, "Interviewed all
10 regional AHERF financial managers and key
11 analysts as to their duties and perspectives,"
12 and 5 similarly says, "Interviewed AHERF regional
13 operating managers as to their duties and
14 perspectives."
15      In any of these discussions with the
16 AHERF financial managers or regional operating
17 managers, did you discuss the audited financial
18 statements of AHERF?
19 A.   I would not have conducted the
20 review -- the interviews with the financial
21 managers.  That would have been the finance team
22 that would have done that.  So I can't answer
23 that question.
24      I would have been the person
25

Page 313

DANIEL L. STICKLER

1  conducting the operating manager review, with the
2  exception of those in the physician management
3  area.
4      I don't recall having discussed the
5  audited financial statements as part of any
6  review that I was part of.
7  Q.   Number 6 says, the sixth specific
8  accomplishment says, "Reviewed compensation and
9  benefit policies and rates.  Retained outside
10 research firm to develop comparative salary
11 structure for similar size and similar volume
12 organizations."
13      Do you recall who was this outside
14 research firm that Hunter --
15 A.   I don't recall that, no.
16 Q.   And do you recall what conclusions
17 might have been reached about compensation and
18 benefits?
19 A.   I think it was our general
20 conclusion, at least it was my general conclusion
21 that the AHERF organization was paying in the
22 higher end of the range of compensation for
23 executives, higher than most of the organizations
24 of a similar size.
25

Page 314

DANIEL L. STICKLER

1  Q.   Are you referring -- I'm sorry, I
2  interrupted you.
3  A.   No.  I said higher than most other
4  organizations of a similar size and type.
5  Q.   Are you referring to executives at
6  the hospital level or at the corporate AHERF
7  level?
8  A.   I don't recall having reviewed those
9  at the corporate AHERF level, so I would have
10 been reviewing in the Philadelphia area.
11 Q.   So the executives who were actually
12 line managers at the hospitals, or line
13 executives at the hospitals?
14 A.   And the medical schools.
15 Q.   Going back to number 9, which is the
16 80 distinct management interventions totaling $80
17 million in cash flow improvement, are there any
18 particular management interventions that stand
19 out in your mind now, five years later?
20 A.   That list that's later in this
21 document refreshed my memory on some of the
22 items, but I don't -- nothing else stands out in
23 my mind.
24 Q.   The tenth thing here says, the tenth
25

Page 315

DANIEL L. STICKLER

1  specific accomplishment says, "Began cash flow
2  modeling exercises.  Coordinated with and
3  transferred work products to another firm
4  (PriceWaterhouseCoopers) who were retained for
5  purpose of developing cash flow projections and
6  negotiating with interim lenders."
7      Did you have any role in this
8  specific accomplishment of cash flow modeling?
9  A.   I did not, no.
10 Q.   Who would have been -- who at Hunter
11 Group was involved in this task?  Tom Honan?
12 A.   I suspect it would have been Tom
13 Honan.  I think he was the only -- or Alan
14 Dzija.  Alan Dzija was a finance guy, too.  It
15 might have been him.
16 Q.   Did you yourself interact with anyone
17 from PriceWaterhouseCoopers about the cash flow
18 modeling?
19 A.   I don't recall having done so.
20 Q.   Did you interact with anyone from
21 PriceWaterhouseCoopers about anything dealing
22 with AHERF?
23 A.   I don't recall having done so.
24 Q.   Did anyone at Hunter Group ever tell
25

14 (Pages 312 to 315)

Page 316

DANIEL L. STICKLER

1  you that PriceWaterhouseCoopers reached any
2  different point of view about the desirability or
3  need to file for bankruptcy?
4      MR. TERUYA:  Objection.
5      A.   I don't recall having been told their
6  opinion on that subject.
7      Q.   Let's turn the page to Task -- the
8  next page refers to Task 1.a, "Initiating
9  Discussions with Partners."  And the text, the
10  descriptive text, says, "It quickly became
11  apparent that some form of merger alliance,
12  strategic partnership, or outright sale of some
13  or all operations might be necessary."
14      Was that true, that it quickly became
15  apparent?
16      A.   That's my opinion, yes.
17      Q.   And why was that?
18      A.   The debt problem and the access to
19  capital problems.  We could not ascertain a way
20  that we could see that organization getting out
21  of its financial difficulties without an
22  infusion, major infusion of capital or major
23  loans.
24      Q.   The next sentence here says, "The

Page 317

DANIEL L. STICKLER

1  cash management and conservation plan included
2  establishing initial contacts with possible
3  merger, affiliation, or acquisition partners."
4  And then there is a colon, and it has 11
5  activities listed below.
6      Can you, in your own words, describe
7  what The Hunter Group did to establish initial
8  contacts with possible merger, affiliation or
9  acquisition partners?
10      A.   My recollection was that we
11  brainstormed to develop a potential -- well, you
12  need to understand there was not an investment
13  banker on board at that point in time, so we did
14  what I think an investment banker would have
15  done, and that is we brainstormed as to who might
16  have a potential interest in becoming a strategic
17  partner or acquirer of the organization, or
18  pieces of it, and then tried to determine was
19  there a person that had a personal contact at
20  that organization that could make a confidential
21  inquiry, and then, to the extent that we were
22  able to identify that possibility, would initiate
23  those inquiries.
24      Q.   Number 10 here says "When

Page 318

DANIEL L. STICKLER

1  responsibilities for these areas were formally
2  transferred to investment banking firms (Merrill
3  Lynch and Lehman Brothers), briefed firm's
4  representatives on progress made and issues
5  identified."
6      Were you one of those who briefed
7  Merrill Lynch and Lehman Brothers?
8      A.   Yes.
9      Q.   And how did you brief them?
10      A.   They sat in on a large number of, if
11  not all of, our top hierarchy meetings in which
12  we talked about the actions that we were taking
13  and the difficulties that we were having, and it
14  was more through that process than through the
15  formal briefing process.
16      Q.   Who was it from Merrill Lynch who
17  would have attended those meetings?  Was her name
18  Lorrie Warner?
19      A.   Lorrie Warner, yes, sir.
20      Q.   How about from Lehman Brothers, who
21  attended the meetings?
22      A.   It was Anne Morse, if I remember
23  right, was her name, and there was a gentleman, a
24  tall thin gentleman, whose name I can't recall.

Page 319

DANIEL L. STICKLER

1      Q.   In point 11 here it says "Noted at
2  time of transfer of responsibilities that active
3  'suitors' were Jefferson System, Vanguard,
4  HealthSouth, Tenet, Temple, Children's Hospital,
5  Catholic Health East, Catholic Health
6  Initiatives, Memorial Hospital (NJ)," as in New
7  Jersey.
8      First of all, this reference to time
9  of transfer of responsibilities refers to the
10  transfer of responsibilities to the investment
11  bankers?
12      A.   Yes, sir.
13      Q.   And what is meant here by the
14  expression "suitors"?
15      A.   Well, that's -- I probably would not
16  have selected that word but would have indicated
17  organizations that expressed a potential interest
18  and asked to review documents or to learn more in
19  the process.
20      Q.   Let me turn your attention to the
21  next page, which references Task 2.1, "Interim
22  Executive: Chief Operating Officer."  I take it
23  this is a reference to you?
24      A.   I assume so, yes, sir.

15 (Pages 316 to 319)

Page 320

DANIEL L. STICKLER

1
2      Q.   And you see that there are 12, on
3  this page 12, and on the next page an additional
4  up to 23 different tasks that the chief operating
5  officer did?
6      A.   Yes.
7      Q.   Let's take a look at number 1.  It
8  says, "Generally, responsibilities consisted of
9  managing operations of nine hospitals
10 encompassing an average daily census of
11 approximately 1,200, a 3,000 student university
12 (including 1,000 medical students), a 350
13 physician medical practice, and a regional
14 administrative support unit."
15         Does that describe generally what
16 your responsibilities were in the function of
17 interim COO?
18     A.   Yes, sir.
19     Q.   The second point here says, "Reduced
20 operating expenses by approximately $34.7 million
21 and capital expenditures by $10 million."
22     A.   Yes, sir.
23     Q.   Does this, to your understanding,
24 refer to the last page of Exhibit G that Mr.
25 Teruya had pointed out to you previously?

Page 321

DANIEL L. STICKLER

1
2      A.   That would be my assumption, yes.
3      Q.   How does this 34.7 million in reduced
4  operating expenses and $10 million reduction in
5  capital expenditures relate to the $80 million
6  described two pages earlier that could result
7  from distinct management interventions?
8          MR. TERUYA: Objection.
9      A.   Well, the 80 million, as I understand
10 it, was this 30,000-foot level list of things
11 that could be done if we had enough time to do
12 them, to try to turn around the organization, and
13 the 34 million is a description of what we did do
14 during this phase-down and turnover of the
15 organization.
16     Q.   The 80 million that's referenced here
17 in point 9 under the cash management and
18 conservation plan, that describes $80 million in
19 cash flow improvement; right?
20     A.   Yes.  My understanding, yes.
21     Q.   And the 34.7 million is in reduced
22 operating expenses, with another 10 million
23 capital expenditures.  So is it your
24 understanding that 34.7 million is part of that
25 80 million or is in addition to that 80 million,

Page 322

DANIEL L. STICKLER

1
2  or do you not really recall?
3          MR. TERUYA: Objection.
4      A.   Pieces of it may have been part of
5  the 80 million, but, as I described earlier, our
6  focus changed completely from one of turnaround
7  to one of preparing for turnover of the
8  organization.
9      Q.   So the 80 million in identified
10 management interventions was part of the
11 30,000-foot turnaround plan?
12     A.   Turnaround plan, yes.
13     Q.   And the 34.7 million in improved
14 operating reflects actions that you took in the
15 period leading up to the sale of the hospitals?
16     A.   Yes.
17     Q.   Take a look under Task 2.1, COO, at
18 point number 8 here.  "Provided general
19 management oversights to FY99 budget process for
20 university.  Developed Medical School Model Plan
21 encompassing separate Medical Faculty Practice
22 Plan and School of Medicine downsizing."
23     A.   Yes.
24     Q.   What do these two sentences refer to?
25     A.   I don't know how to -- let me think

Page 323

DANIEL L. STICKLER

1
2  of how to describe it more specifically, more
3  elaborately.
4          We developed a budget for the coming
5  year for the medical school that was based on the
6  assumption that the medical school would continue
7  to exist, and what we thought could be the
8  minimal operating cost, and what we thought could
9  be done revenuewise to minimize the burden of
10 that medical school on whatever organization
11 ended up with that responsibility in the future.
12 And the development of the medical school
13 practice plan was a recommendation relative to
14 how the faculty, the medical practice of the
15 faculty, should be reorganized to place
16 incentives in place with faculties practice to
17 provide greater accountability for the
18 leadership, to shed activities that we felt
19 needed to be shed, et cetera.
20         The medical school downsizing -- both
21 of those were part of the budget process for the
22 university.  The medical school downsizing, that
23 proposed fiscal year '99 budget, was based on how
24 much could we cut if we cut to the bare bones in
25 that medical school and downsized it

Page 372

DANIEL L. STICKLER

1     DANIEL L. STICKLER
2 that was still being paid a significant salary
3 sometime after he ceased serving that role, that
4 I would have had some serious concerns about had
5 I been the CEO.
6   Q. What was that person's name?
7   A. I knew you were going to ask me
8 that. I can't think of it. That's one example
9 that comes to my mind.
10   Q. Was that person being paid while you
11 were there?
12   A. Until we found it and stopped it,
13 yes.
14   Q. Have you ever heard of the name Carol
15 Talbert?
16   A. I have, yes.
17   Q. And in what capacity have you heard
18 of the name Carol Talbert?
19   A. She was on the corporate staff at one
20 point in time. I don't think she was still there
21 when I got there. She had -- I don't even
22 remember exactly what -- I can't think exactly
23 what her responsibilities were, whether it was
24 physician practice acquisition or management of
25 physician practices. I can't remember what her

Page 373

DANIEL L. STICKLER

1     DANIEL L. STICKLER
2 responsibilities had been.
3   Q. Did you ever hear anything about the
4 circumstances of her separation from AHERF?
5   A. No, I don't recall having heard
6 that. I heard rumors surrounding her name, but
7 those were all very much hearsay and history, and
8 I don't think something that I could quote.
9   Q. Did you ever hear that she received a
10 $1.6 million settlement to depart AHERF?
11   A. I don't think I ever heard that, no.
12 I don't think so.
13   Q. Did you ever hear that she got a
14 consulting contract that paid her $300,000, but
15 that she didn't provide any services in exchange
16 for that contract?
17   MR. TERUYA: Objection.
18   A. I don't think so. I assume those
19 things all had happened prior to my arrival
20 there, and, to be honest with you, I wouldn't
21 have paid any attention to them if I had heard
22 them if they were history.
23   Q. What were the rumors surrounding the
24 name Carol Talbert that you referred to a few
25 minutes ago?

Page 374

DANIEL L. STICKLER

1     DANIEL L. STICKLER
2   A. Relative to potential personal
3 relationships.
4   Q. That she was having affairs? Did you
5 hear rumors that she was having an affair with
6 someone else within AHERF?
7   A. I heard rumors that she had a close
8 personal relationship with someone else within
9 AHERF.
10   Q. Okay, we will leave it at that. It's
11 already on the record.
12   Have you ever heard the name Iqbal
13 Paroo?
14   A. I have, yes.
15   Q. In what capacity?
16   A. He was the president of AUHS prior to
17 AHERF acquiring -- he was president of Hahnemann,
18 I guess, prior to AHERF acquiring AUHS, and I
19 think he remained in that role for some time
20 period after they acquired it. I'm not certain.
21   Q. Did you ever learn or hear anything
22 about the circumstances surrounding of Mr.
23 Paroo's departure from AHERF?
24   A. No, I did not.
25   Q. Did you ever hear that he was paid a

Page 375

DANIEL L. STICKLER

1     DANIEL L. STICKLER
2 settlement payment for $3 million to release a
3 claim for intentional infliction emotional
4 distress?
5   A. No, I did not.
6   Q. Did you ever have any conversations
7 with trustees of AHERF where they indicated that
8 they had known all along that AHERF's financial
9 condition was far worse than the audited
10 financial statements indicated?
11   MR. TERUYA: Objection.
12   A. I don't think I did, no.
13   Q. If you, meaning The Hunter Group, had
14 been on the scene 18 months earlier, say in
15 December of 1996, do you believe that you could
16 have implemented a turnaround plan and avoided
17 bankruptcy?
18   MR. TERUYA: Objection.
19   A. Yes, I believe we could have, yes.
20   Q. And what do you base that belief on?
21   A. I don't know that I could tie it to
22 specifics, other than my understanding of the
23 organization and the expense reductions that we
24 felt we could make when we put that 30,000-foot
25 plan together. It would have required some

29 (Pages 372 to 375)

Page 376

DANIEL L. STICKLER

1  
2 difficult decisions to be made, but I believe it
3 could have been done.
4      Q.   Is your belief also based in part on
5 your experience in the hospital field?
6      A.   Oh, obviously, yes.
7      Q.   And is your belief based in part on
8 other experience that you have had with other
9 turnarounds?
10     A.   Yes.
11     Q.   And is your belief based in part on
12 what experience that The Hunter Group, not just
13 you, has had in other hospital turnarounds?
14     A.   I guess to some extent.
15     MR. WITTEN:  Let's go off the record
16 for a minute and I will see if I have any more
17 questions.
18     THE VIDEOGRAPHER:  We will go off the
19 record.  It is 11:44.  And this is tape 5.
20     (A recess was taken.)
21     THE VIDEOGRAPHER:  Back on the
22 record.  It is 11:48, and this is tape 5.
23     BY MR. WITTEN:
24     Q.   Mr. Stickler, I don't have the Tenet
25 asset purchase agreement here, but I notice

Page 377

DANIEL L. STICKLER

1  
2 there's a provision in that asset purchase
3 agreement relating to the fact that some of the
4 monies, some of the purchase price, is going to
5 be used to purchase malpractice insurance tails
6 for the hospitals and the physicians.  I don't,
7 frankly, recall which.  Do you remember anything
8 about the discussion about the purchase of
9 medical malpractice insurance tails?
10     A.   I recall that the absence of any
11 malpractice coverage was considered by Tenet to
12 be an obstacle to their acquisition, because they
13 were concerned that liability from previous cases
14 may end up accruing to them in the absence of any
15 insurance, and there would not have been any
16 insurance or any way to buy insurance had that
17 not been done.
18     Q.   Was there an absence of insurance
19 covering the AHERF eastern region or some of its
20 assets?
21     A.   My recollection is that there was an
22 offshore insurance company, that there was a
23 question about there being enough assets to cover
24 potential liabilities, and that's one of the
25 reasons why this tail purchase was considered to

Page 378

DANIEL L. STICKLER

1  
2 be necessary.
3      Q.   This offshore is a subsidiary of
4 AHERF, the parent?
5      A.   That's my understanding, yes.
6      Q.   Did AHERF go out and purchase its own
7 insurance policies, or did that sub purchase
8 reinsurance?
9      A.   I couldn't answer that question for
10 you.
11     MR. WITTEN:  I don't have any other
12 questions.
13     MR. TERUYA:  I don't know what you
14 folks want to do in terms of scheduling.  I
15 probably have about maybe 45 minutes or so to an
16 hour of followup.  I don't know if you want to
17 take a quick lunch and come back.  It's up to
18 you.
19     THE WITNESS:  Let's do it and get it
20 over.
21     EXAMINATION BY MR. TERUYA:
22     Q.   Earlier this morning you were talking
23 about your experiences at Cedars Medical Center.
24 Do you recall that?
25     A.   Yes.

Page 379

DANIEL L. STICKLER

1  
2      Q.   That's located down in Florida?
3      A.   Miami, Florida.
4      Q.   And did you previously mention that
5 one of the steps you take -- on day one of your
6 deposition did you mention that one of the steps
7 that you would take in trying to come up with a
8 turnaround plan and to judge its feasibility
9 would be to study the market conditions in which
10 a hospital operates, if you were going to try to
11 turn around a hospital?
12     A.   That would be one of the steps, yes.
13     Q.   And I take it you have never
14 performed any comparison of the market conditions
15 in Florida as they existed while you were in
16 charge of Cedars Medical Center and the market
17 conditions in Philadelphia at the time you were
18 there --
19     A.   We never did a comparison of that,
20 no.
21     Q.   And as you mentioned before, you
22 didn't perform any study of the market conditions
23 in Philadelphia because you didn't have time?
24     A.   That's right.  There were reports of
25 a market analysis that had been done by AHERF

30 (Pages 376 to 379)

Page 380

DANIEL L. STICKLER
1
2  that we did review.
3      Q.    But you didn't have a chance to judge
4  whether those were accurate in your view?
5      A.    No.
6      Q.    And you didn't have a chance to use
7  those in formulating a turnaround plan based on
8  them?
9      A.    No.  But in most instances, a
10  turnaround plan will -- about market analysis and
11  increased market share -- will in most instances
12  be less than 10 percent of the first three years'
13  turnaround expenses or where you are going to
14  have to do it.
15      Q.    In terms of revenue enhancement or
16  performance improvement in terms of revenue,
17  would that be something, a part of a turnaround
18  plan, that would depend upon an analysis of
19  market conditions, at least in part?
20      A.    Well, as I said, you know, you refer
21  to revenue enhancement.  Revenue enhancement
22  involves a much greater piece than just getting
23  more market share.  It involves your registration
24  process and your coding process and your billing
25  process, et cetera.  And those clearly would

Page 381

DANIEL L. STICKLER
1
2  be -- and those can produce more of a short-term
3  effect in a turnaround than the increased market
4  share can.
5      Q.    Would part of what you view as
6  creating a turnaround plan for a hospital include
7  coming up with a business strategy for that
8  hospital going forward?
9      A.    Yes.
10      Q.    And would that include such things as
11  whether to acquire or divest hospitals in the
12  area of a hospital?
13      A.    The long-term business strategy plan
14  would have to include those, yes.
15      Q.    And in formulating a long-term
16  business plan like that, would that involve a
17  study of the market in which a hospital operated,
18  among other things?
19      A.    Yes, as I said previously, it would,
20  yes.
21      Q.    And you never had the chance to
22  perform any kinds of studies like that in
23  Philadelphia because there was no time?
24      A.    We did not.  As I indicated, we
25  reviewed the work that had been done.  If you

Page 382

DANIEL L. STICKLER
1
2  look at the, what was it, list of 87 items, or
3  whatever it was, that was in one of those
4  exhibits, you will notice that there were
5  recommendations to close two hospitals that were
6  part of that, those recommendations.  Those were
7  based on current occupancy levels and on the
8  market analysis that had been done by AHERF.
9      Q.    Is your focus in formulating a
10  turnaround plan, at least for the short run, on
11  cost cutting rather than revenue enhancement?
12      A.    Usually about 90 percent of what you
13  can accomplish in a turnaround plan in the first
14  three years is on the cost side, and about 10
15  percent would be on the revenue side.
16      Q.    And, correspondingly, then, most of
17  the recommendations that you would come up with
18  in formulating a turnaround plan would relate to
19  cost cutting?
20      A.    Yes, sir.
21      Q.    Could you remind me what years you
22  were at Cedars Medical Center?
23      A.    '96 to '91 -- I mean '86 to '91.
24      Q.    Do you recall our discussion on the
25  first day of your deposition about the Balanced

Page 383

DANIEL L. STICKLER
1
2  Budget Act of 1997?
3      A.    Yes.
4      Q.    And you said you did recall that that
5  event was situated in time in 1997, the enactment
6  of the Balanced Budget Act?
7      A.    I recalled it after you mentioned it
8  was the Budget Act of '97, yes.
9      Q.    So you don't have any independent
10  recollection of the year of the enactment of the
11  Balanced Budget Act?
12      A.    No.  No, I do not.
13      Q.    Do you recall whether there were any
14  legislative enactments that affected revenues at
15  Cedars Medical Center at the time you were there?
16      A.    I don't recall, no.
17      Q.    Were there any particular market
18  conditions that you were focused upon during your
19  time at Cedars Medical Center?
20      A.    Well, the particular market
21  conditions, I guess, that was a very highly HMO
22  penetrated market, with two very powerful HMOs,
23  and developing a strategy for dealing with them
24  was very high on our list.  And attracting some
25  of the physicians into this, I indicated we

31 (Pages 380 to 383)

Page 384

DANIEL L. STICKLER

1 remodeled the old hospital into office buildings,
2 into an office building, and got some physicians
3 to move into that, and that was on the revenue
4 side.
5        I think those represent our major
6 strategies.  Plus the university affiliation.
7     Q.   Was developing an integrated delivery
8 system one of the steps you took to contend with
9 an HMO?
10    A.   No.
11    Q.   You said that, or you mentioned a
12 couple of steps you took to deal with a high
13 level of HMO penetration.  Were there any other
14 steps that you took at the time you were at
15 Cedars Medical Center to deal with that?
16    A.    Well, we did -- we invested a fair
17 amount of time and effort in analyzing our cost
18 structure as it related to our contracts with
19 them, and our performance under those contracts,
20 and in negotiations with them, yes.
21    Q.   Do you recall what years you
22 implemented your turnaround strategy during?
23    A.   Well, we started right after I got
24 there, and we were still working on it, I

Page 385

DANIEL L. STICKLER

1 guess -- well, not really still working on it
2 five years later, but probably the first three or
3 four years I was there.
4     Q.   And did you take any steps while you
5 were there to work on revenue enhancement of
6 Cedars Medical Center, as opposed to cost
7 cutting?
8     A.   We just discussed that, didn't we?
9 The HMOs, moving the physicians into the office
10 building, and the university affiliation.
11    Q.   Anything other than that?
12    A.   No, not that I recall.
13    Q.   And by the university affiliation,
14 you mean the fact of being affiliated with the
15 University of Pittsburgh?
16    A.   No, you're talking about in Miami,
17 correct?
18    Q.   I'm sorry.  Which university is that?
19    A.   University of Miami School of
20 Medicine.  And through that affiliation we moved
21 the department of orthopedics, the department of
22 urology and the department of dermatology out of
23 Jackson Memorial Hospital into our hospital and
24 enhanced the number of patients very

Page 386

DANIEL L. STICKLER

1 significantly, and the revenue very
2 significantly.
3     Q.   So did the affiliation with the
4 university increase the number of patients who
5 were referred to Presbyterian?
6     A.   Yes.  To Cedars Medical Center?
7     Q.   I'm sorry, Cedars Medical Center.  I
8 apologize.
9     A.   Yes, by almost 90 patients per day
10 occupancy level.
11    Q.   And were there any other benefits of
12 affiliation with the university to Cedars Medical
13 Center?
14    A.   Well, most of us believe that it
15 carries a banner of quality in the community to
16 be affiliated with a university teaching
17 hospital.
18    Q.   Switching topics, you talked this
19 morning about your engagement or your work on an
20 engagement for the University of Pennsylvania.
21    A.   Yes.
22    Q.   And you talked about the list of
23 proposals or recommendations that The Hunter
24 Group submitted to the University of

Page 387

DANIEL L. STICKLER

1 Pennsylvania?
2     A.   Yes.
3     Q.   And you said that you thought The
4 Hunter Group could have prepared such a list for
5 AHERF; is that right?
6     A.   Yes, I believe we could have.
7     Q.   And I take it what -- let me ask
8 you, what stopped you from preparing such a list?
9     A.   We had a team of 18 to 20 people on
10 the ground at the Hospital of the University of
11 Pennsylvania for three and a half, almost four
12 months.  We didn't have time to do that at AHERF.
13    Q.   I mean, you can't say for sure,
14 sitting here now, what you either would or
15 wouldn't have come up with with respect to AHERF;
16 right?
17    A.   Obviously not.  But I was asked the
18 question did we believe we could, and we said
19 yes -- I said yes.
20    Q.   So you believed you could but you
21 don't know because you never had the chance to
22 actually try to come up with a list for AHERF; is
23 that right?
24    A.   We came up with a 30,000-foot level

Page 388

DANIEL L. STICKLER

1   list that we believed could get us through the
2   time period of which we could create positive
3   cash flow. We did come up with that, yes.
4       Q.   But you don't know whether --
5       A.   But we didn't get the financing to be
6   able to carry it out.
7       Q.   And because you never had reason to
8   do so, you don't know if you, in fact, could have
9   come up with a list for AHERF that's the same as
10  for the University of Pennsylvania?
11      A.   I don't know if the sun will come up
12  tomorrow or not since I haven't seen it.
13      Q.   So you don't know. Good. I take it
14  that's a yes?
15      A.   I'm sorry. You have asked that
16  question about three times. It's beginning to
17  annoy me.
18      Q.   I just wanted to make sure I
19  understood correctly, you didn't have a chance --
20      A.   We don't know whether anything would
21  have worked that we haven't actually done, do
22  we?
23      Q.   Okay.
24      A.   Thank you.
25

Page 389

DANIEL L. STICKLER

1
2       Q.   Do you know when the University of
3   Pennsylvania engagement was, what year?
4       A.   I don't remember the specific dates.
5       Q.   Was it after AHERF?
6       A.   It was after AHERF, yes.
7       Q.   Do you recall approximately how long
8   after?
9       A.   Probably a year and a half or two
10  years would be my guess at this point.
11      Q.   Let me ask you, which hospitals did
12  you study at the University of Pennsylvania
13  during the course of your personal involvement in
14  that engagement, like which hospitals of the
15  University of Pennsylvania?
16      A.   The Hospital of the University of
17  Pennsylvania, Pennsylvania Hospital, Phoenixville
18  Hospital and Presbyterian Hospital.
19      Q.   And do you know whether both of those
20  hospitals are highly regarded in terms of how
21  they are ranked in health care publications?
22      A.   Both of those, you mean?
23      Q.   I'm sorry, the Pennsylvania Hospital
24  and the Hospital of the University of
25  Pennsylvania.

Page 390

DANIEL L. STICKLER

1
2       A.   Oh, I think the Hospital of the
3   University of Pennsylvania is very highly
4   regarded in the country. I don't know if
5   Pennsylvania Hospital still is.
6       Q.   Is Pennsylvania Hospital one of
7   the -- is that the first hospital in the United
8   States?
9       A.   That's my understanding, yes.
10      Q.   And do you know if the Hospital of
11  the University of Pennsylvania was more highly
12  regarded than any of AHERF's hospitals?
13      A.   I think it probably was, at least in
14  my mind it was.
15      Q.   Did you ever see, during the course
16  of your work at The Hunter Group, or did you ever
17  have the occasion to look at any rankings by U.S.
18  News and World Report of hospitals?
19      A.   I don't pay attention to those.
20      Q.   How about Modern Health Care?
21      A.   I don't pay attention to those.
22      Q.   Have you ever heard that the Hospital
23  at the University of Pennsylvania was
24  consistently ranked among the top hospitals in
25  the United States?

Page 391

DANIEL L. STICKLER

1
2       A.   Yes, I have, yes.
3       Q.   And is that also consistent with your
4   own views about that hospital?
5       A.   Yes.
6       Q.   Do you have any views as to the
7   reputation of the University of Pennsylvania
8   itself, the school?
9       A.   Oh, my understanding is it's an
10  extremely highly regarded university.
11      Q.   In your view, how would you compare
12  the reputation of the University of Pennsylvania
13  to Allegheny University of the Health and
14  Sciences?
15      A.   I'm not sure you could compare them.
16  It would be the opposite ends of an extreme.
17          MR. D'ANGEL: It sounds like a
18  comparison.
19      Q.   Just to state what I think is the
20  obvious, but just for clarity in the record,
21  University of Pennsylvania is at the high regard
22  end of the spectrum and Allegheny University is
23  at the low end of the spectrum?
24      A.   Yes, sir.
25      Q.   In terms of how they are regarded?

33 (Pages 388 to 391)

Page 392

DANIEL L. STICKLER

1
2     A.    That's my impression, yes.
3     Q.    And is your impression based upon
4   your work at both of those universities, in part?
5     A.    I'm not sure what-all it's based on.
6   On my life's information, I guess.
7     Q.    And your work in the health care
8   field?
9     A.    Yes.  Well, in both instances they
10  were more than -- or at least the University of
11  Pennsylvania is far more than a health sciences
12  university.  It's extremely highly regarded than
13  a lot of professional schools.
14    Q.    While you were working at the
15  engagement at the University of Pennsylvania, did
16  you have any occasion to learn about the amount
17  of funding that the University of Pennsylvania
18  had available to it?
19    A.    Well, at one point I saw the
20  endowment number of the university, if that's
21  what you are referring to.  I don't remember what
22  it was.  And the Health Sciences Division of the
23  university was the financial statements that we
24  focused on.  We didn't focus on the School of
25  Business or the Engineering School or any of the

Page 393

DANIEL L. STICKLER

1
2   others.
3     Q.    In terms of funding that was
4   available for, you said, the health sciences
5   area --
6     A.    Yes.
7     Q.    Do you recall whether that was a
8   large amount, in your view, or a significant
9   amount?
10    A.    When you say available, I guess
11  that's a question that is not really clear.  What
12  do you mean by that?
13    Q.    I mean available in terms of when you
14  were trying to get a sense of where the
15  University Hospital stood and what funding was
16  available to them to fund --
17    A.    Do you mean the revenue generated by
18  them, or the revenue -- I'm not sure I understand
19  the question.
20    Q.    I guess what I'm trying to get at,
21  and maybe I'm not using the right terminology, is
22  just to try to understand, in terms of the
23  hospitals at the University of Pennsylvania that
24  you studied, did you have any occasion to learn
25  about the amount of funds that were available to

Page 394

DANIEL L. STICKLER

1
2   support any programs that you at The Hunter Group
3   wanted to implement that were available, say, for
4   example, from endowments or parts of endowments?
5     A.    We had access to the total financial
6   information of the health sciences arena.
7     Q.    And did you have any view as to the
8   amount of funding that was available to the
9   health sciences arena?  Was there a lot of money
10  available or not?
11    A.    Well, it was a very large financial
12  revenue and expense in both instances.  When you
13  say available, they were losing money, so
14  technically they weren't generating anything to
15  make available for anything at that point in
16  time.  They were losing money.
17    Q.    So the hospitals themselves were
18  losing money?
19    A.    Yes.
20    Q.    What sources of money were available
21  to support the hospitals is what I'm trying to
22  understand, if any.
23    A.    Well, my assumption is that since
24  they were all part of the university, that when
25  the hospitals lost money they came out of some

Page 395

DANIEL L. STICKLER

1
2   other -- out of the main body of the university.
3   Now, whether it came out of profits generated by
4   the schools or endowment, in common endowment
5   principle, I'm not a lawyer.
6     Q.    Would The Hunter Group, even if not
7   yourself on that engagement, have studied where
8   the support funding, if any, to the hospitals
9   came from?
10    A.    That wasn't part of the issue.  The
11  issue was can we get these organizations back on
12  a self-sustaining basis.  Nobody wanted to
13  subsidize them from anyplace, and the challenge
14  was to get them back to where they were
15  self-sustaining.
16    Q.    So The Hunter Group wouldn't have had
17  reason to study any amount of subsidies?
18    A.    We had no interest in that at all.
19    Q.    Did you study the market conditions
20  in Philadelphia at the time that you were engaged
21  by the University of Pennsylvania?
22    A.    Our team did, yes, sir.
23    Q.    Were you personally involved in that
24  study?
25    A.    Not in the study of the market

Page 396

```
 1              DANIEL L. STICKLER
 2   conditions, no.
 3        Q.    What was your role on that
 4   engagement?
 5        A.    I was engagement director for it.
 6        Q.    So just to compare the two
 7   engagements, who held the engagement director
 8   role in the AHERF engagement?  Was that David
 9   Hunter?
10        A.    Well, I noticed one of the pieces of
11   paper said he did.  I thought I did.  So I'm not
12   sure.  I think I was on-the-ground engagement
13   director on a daily basis, yes, with AHERF.  And
14   I was definitely at the University of
15   Pennsylvania engagement.
16        Q.    At the ground level?
17        A.    Yes.  I was there full-time on both
18   jobs.  I was interim management at AHERF.  I was
19   not interim management at the Hospital of the
20   University of Pennsylvania.  It was strictly a
21   consulting team, putting together that turnaround
22   team that management implemented.
23        Q.    Did you have any occasion while you
24   were working on the University of Pennsylvania
25   engagement to speak with any outside entities
```

Page 397

```
 1              DANIEL L. STICKLER
 2   about any parts of the engagement?  So, for
 3   example, the community, to gauge what kind of
 4   support there was for the University of
 5   Pennsylvania?  Or were you just strictly dealing
 6   with the management of the University of
 7   Pennsylvania hospitals?
 8        A.    We were not dealing with the
 9   university beyond the health sciences piece.  We
10   were only dealing with the hospital piece.
11   Members of the team interviewed health insurance
12   companies, Blue Cross, the HMOs in town, some
13   people like that, as part of the market review.
14        Q.    Did you have, or did you hear what
15   kind of relationship the University of
16   Pennsylvania had with the HMOs that were in town,
17   or the University of Pennsylvania hospitals had?
18        A.    My perception is that at least some
19   members of the management staff at the Hospital
20   of the University of Pennsylvania believed that
21   the insurance companies, third-party payers, were
22   not paying them as much as they should, and the
23   third-party payers thought they were paying them
24   as much as they should, which is not a surprise.
25   We find that in most places.
```

Page 398

```
 1              DANIEL L. STICKLER
 2        Q.    Do you recall how that was resolved
 3   ultimately?
 4        A.    It was resolved with an increased
 5   internal understanding that there may be some
 6   opportunity for improvement, but the real source
 7   of their problem was not being underpaid.  At
 8   least that was our resolution of it.
 9        Q.    What did you determine was the source
10   of their problem, the hospital's problem?
11        A.    The management and cost control
12   structure.
13        Q.    We talked about the Hospital at the
14   University of Pennsylvania.  Did you form any
15   view as to the other hospitals that were owned by
16   the University of Pennsylvania in comparison to
17   the AHERF hospitals in terms --
18        A.    We had no reason -- I mean, by then
19   AHERF was history.  We had no reason to be
20   interested in that.
21        Q.    Had you at The Hunter Group taken
22   away from the AHERF engagement any insights or
23   experiences that were of use to you in dealing
24   with the University of Pennsylvania engagement?
25        A.    Oh, I guess you learned a little bit
```

Page 399

```
 1              DANIEL L. STICKLER
 2   of something every place you go, when you move
 3   from academic medical center to academic medical
 4   center.  I don't recall any specific things.
 5   They were very different in a lot of ways, in
 6   most ways.
 7        Q.    Could you tell me what some of the
 8   more significant differences were that you
 9   perceived at the time?
10        A.    Well, one of them was going bankrupt
11   and the other one wasn't.  That was the biggest
12   difference.  One was behind in their payables,
13   and the vendors weren't paying them; the other
14   one wasn't.
15             There was some -- we felt, or at
16   least I feel there was a greater opportunity for
17   cost reduction in AHERF than there was at HUP,
18   although there was opportunity for cost reduction
19   at both places.
20             That's all I can think of right now.
21        Q.    So you said that you thought there
22   was more cost reduction opportunities at which
23   hospital?
24        A.    AHERF.
25        Q.    At AHERF?
```

Page 436

DANIEL L. STICKLER

1
2  contract that I thought he would be embarrassed
3  or had difficulty enforcing, then I would put the
4  monkey on his back and let him decide to try to
5  cause us to continue paying him.
6      Q.   Did you at that point in time go back
7  and look at records of who this person was and
8  why he had been paid previously?
9      A.   Well, I asked enough questions to
10 find out that he had been the chairman of the
11 department of cardiovascular surgery, and that he
12 had left, and that Sherif had made a deal with
13 him to get him to go, and that was all I needed
14 to know.
15     Q.   So all you knew is that he wasn't
16 there anymore but he was still being paid and so
17 you thought that that was something that the
18 institution had to correct at the time?
19     A.   Very much so.
20     Q.   And I know you were asked a number of
21 questions about what you thought you could have
22 done in 1996 or at some earlier point in time
23 than when you were there in 1998, and let me just
24 ask a couple of followup questions on that.  I
25 take it you had no occasion to perform any study

Page 437

DANIEL L. STICKLER

1
2  of the market in 1996, '97 or '98 in the
3  Philadelphia region.
4      A.   You trouble me by continuing to come
5  back to that question, because the implication
6  seems to be, therefore, we didn't have confidence
7  in our ability to turn the place around, and
8  that's not the conclusion.  As I indicated
9  previously, that less than 10 percent of any
10 turnaround plan is going to be on the revenue
11 side within the first three years.  And so that
12 was not an impediment to our ability to turn the
13 organization around had we had enough time and
14 money to do it.
15     Q.   I guess what I'm trying to get at
16 is -- I mean, it's a hypothetical question, and
17 you just don't know because you didn't actually
18 do it, what you would or wouldn't have done in
19 1996 or '97, but that's all I'm asking.
20     A.   And my answer was we believed, if we
21 had had enough time and money to implement a
22 turnaround plan, that we could have done it and
23 saved it from going into bankruptcy.
24     Q.   But, like you said, you don't know
25 because you never, of course, got the chance

Page 438

DANIEL L. STICKLER

1
2  to --
3      A.   You are trying to manipulate my words
4  and I'm not going to let you do it.  I'm going to
5  answer the question just the way I answered it.
6      Q.   Let me ask, the only plan you got to
7  implement and test out and see how it worked was
8  in 1998; isn't that right?
9          MR. WITTEN:  Objection.
10     A.   The plan we implemented was to shut
11 down and a turn-over plan, which was not the
12 turnaround plan that we had proposed.
13     Q.   And that's the only plan that you
14 implemented and know how it turned out, and
15 that's reflected in Exhibit --
16     A.   I feel like you're badgering me
17 again, and I'm getting annoyed with it again.
18         MR. D'ANGEL:  I keep hearing the same
19 question and the same answer.
20     A.   It's self-evident that if I haven't
21 picked up those glasses I don't know whether I
22 can pick them up or not.  I don't need to tell
23 you that five times.
24     Q.   I apologize.  I just need to get it
25 on the record.  I mean, I know it's self-evident,

Page 439

DANIEL L. STICKLER

1
2  but I just need to have it as testimony rather
3  than me just saying that it's self-evident.  So I
4  apologize if it seems like I'm asking an obvious
5  question.
6      A.   And you are asking an obvious
7  question the 14th and 15th time.
8      Q.   I just want to make sure that as to
9  the particular questions you were just asked on
10 cross, that I ask you the right followup.  I know
11 I asked questions on my first day of deposition,
12 on the first day of your deposition, so I will
13 just ask you one last time, you didn't actually
14 have the chance to perform any plan or to
15 implement any plan other than the one you
16 actually did, so, of course, as you say, it's
17 self-evident that you don't know how things would
18 have actually turned out?
19         MR. WITTEN:  Objection.
20     A.   I don't know if I can pick up those
21 glasses unless I get a chance to reach down and
22 pick them up.  That's my answer.
23         MR. TERUYA:  Let me just take a quick
24 break, off the record.  I'm just going to look
25 over my notes.

45 (Pages 436 to 439)

Page 440

DANIEL L. STICKLER
1
2         THE VIDEOGRAPHER:  We are going off
3  the record.  It's 1:03.  This is tape 5.
4         (Discussion off the record.)
5         THE VIDEOGRAPHER:  Back on the
6  record.  It's 1:04, tape 5.
7         MR. TERUYA:  I have no further
8  questions on redirect.
9         MR. WITTEN:  Thank you.  I just have
10  a handful of questions.  It shouldn't take very
11  long.
12         EXAMINATION BY MR. WITTEN:
13     Q.    Mr. Teruya elicited testimony from
14  you comparing and contrasting the AHERF system
15  from the University of Pennsylvania system.
16     A.    Yes.
17     Q.    You recall that?
18     A.    Yes.
19     Q.    And you testified that the Allegheny
20  University of the Health Sciences is not as
21  prestigious a university as the University of
22  Pennsylvania Medical School; is that right?
23     A.    That's correct.
24     Q.    And was it also your testimony that
25  the hospitals that make up AHERF were not as

Page 441

DANIEL L. STICKLER
1
2  prestigious as the Hospital of the University of
3  Pennsylvania and Pennsylvania Hospital?
4     A.    That's correct.
5     Q.    Even taking into account the
6  reputation -- excuse me, let me start that over.
7         Taking into account your
8  understanding of the reputation of AHERF, lower
9  generally than the University of Pennsylvania
10  system, does that alter your view about whether a
11  turnaround was achievable for AHERF?
12         MR. TERUYA:  Objection.
13     A.    No.
14     Q.    Turning to the 30,000-foot plan that
15  we have referenced this day and the last day, I
16  believe I know the answer but I want to make sure
17  the record is clear on this, of all the exhibits
18  that you looked at, that I have shown you and Mr.
19  Teruya has shown you, is it right that you did
20  not recognize any of the documents or any part of
21  the documents that you looked at, that we drew
22  your attention to, as memorializing that
23  30,000-foot plan?
24     A.    I did not recognize them as a
25  specific document that I had seen before.  As to

Page 442

DANIEL L. STICKLER
1
2  whether the contents of that document is exactly
3  what we put together back then, I couldn't
4  testify.
5     Q.    And is that in part because of the
6  passage of time?
7     A.    Yes, mainly because of the passage of
8  time.
9         MR. WITTEN:  I don't have any other
10  questions.
11         MR. TERUYA:  I don't have any other
12  questions.  Thank you for your time.
13         THE VIDEOGRAPHER:  We will go off the
14  record.  The time is 1:06.  And this is the end
15  of Tape No. 5.
16         (Time noted:  1:06 p.m.)
17
18
19         _____
              DANIEL L. STICKLER
20
21  Subscribed and sworn to before me
22  this _____ day of _____, 2003.
23
24  _____
25

Page 443

1         DANIEL L. STICKLER
2  STATE OF NEW YORK     )
                        ss:
3  COUNTY OF NEW YORK    )
4     I wish to make the following changes, for
  the following reasons:
5
  PAGE LINE ____ ____
6      CHANGE FROM: _____
          CHANGE TO: _____
7  REASON: _____
8      CHANGE FROM: _____
          CHANGE TO: _____
9  REASON: _____
10      CHANGE FROM: _____
          CHANGE TO: _____
11  REASON: _____
12      CHANGE FROM: _____
          CHANGE TO: _____
13  REASON: _____
14      CHANGE FROM: _____
          CHANGE TO: _____
15  REASON: _____
16      CHANGE FROM: _____
          CHANGE TO: _____
17  REASON: _____
18      CHANGE FROM: _____
          CHANGE TO: _____
19  REASON: _____
20      CHANGE FROM: _____
          CHANGE TO: _____
21  REASON: _____
22
23         DANIEL L. STICKLER
24  Subscribed and sworn to before me
  this _____ day of _____, 2003.
25

46 (Pages 440 to 443)

**TAB 2**

DEBTOR:    A.H.E.R.
CASE #:    98-25773 through 98-25777                    MONTHLY OPERATING REPORT

ACCRUAL BASIS

### OFFICE OF THE UNITED STATES TRUSTEE - REGION 3 OFFICE OF THE UNITED STATES TRUSTEE - REGION 3
### MONTHLY OPERATING REPORT
for the month ending:  November 30, 1998

| Required Attachments: | Document Attached | Previously Submitted | Explanation Attached |
|---|---|---|---|
| 1. Tax Receipts | ( ) | (X) | ( ) |
| 2. Bank Statements | (X) | ( ) | ( ) |
| 3. Most recently filed Income Tax Return | ( ) | (X) | ( ) |
| 4. Most recent Annual Financial Statements prepared by Accountant | O | (X) | ( ) |

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following Monthly Operating Report (Cash Basis – 1 through Cash Basis – 9) and the accompanying attachments and, that to the best of my knowledge, these documents are true, correct and complete.  Declaration of the preparer (other than responsible party) is based on all information of which preparer has any knowledge. *SEE ATTACHED MEMO ON PREPARATION OF ATTACHED SCHEDULES.*

**RESPONSIBLE PARTY:**

_Charles P Morrison_
Signature of Responsible Party

_SVP Chief Administrative Officer, AHERF_
Title

_CHARLES P MORRISON_
Printed Name of Responsible Party

_3-24-99_
Date

**PREPARER:**

Signature of Preparer Party

Title

Printed Name of Preparer Party

Date

**EXHIBIT**
2746
ID 6/29/04

# MEMO

**To:**       Mr. Greg King US Trustees Office
**From:**    Charles P. Morrison *CPM*
**Subject:**  Preparation of the Attached Schedules
**Date:**     March 23, 1999

The attached financial statements and operating report were prepared using available source
documentation. In certain instances data was not available due to transitions in information
systems and or changes in processes. Where the usual source data was not available we have
incorporated estimates into the financial statements. As additional information becomes
available the financial statements will be adjusted. Adjustments are also likely as a result of
refinements in the allocation of the purchase price of the operations sold to Tenet. Additonally,
analysis of intercompany allocations is in process. These analyses may result in adjustments to
the balances reported in these financial statements.

The attached Schedules were prepared and compiled by various individuals on behalf of the
debtors. Accordingly, no single individual can be identified as the "preparer".

/data/wp/novtrust.wpd

2

DEBTOR:     A.H.E.R.

CASE #:     98-25773 through 98-25777                    ,ONTHLY OPERATING REPORT

All Chapter 11 debtors must file this report with the Court and serve a copy on the United States Trustee no later than the 15th day of the month following the end of the month covered by the report.

ACCRUAL BASIS – 2

| | | | | |
|---|---|---|---|---|
| 1. | Cash – Beginning of Month | | | |
| **RECEIPTS** | | | | |
| 2. | Cash Sales | | | |
| 3. | Accounts Receivable Collection | | | |
| 4. | Loans & Advances | | | |
| 5. | Sales of Assets | | | |
| 6. | Lease & Rental Income | | | |
| 7. | Wages | | | |
| 8. | Other (Attach List) | | | |
| 9. | Total Receipts (Total Lines 2 through 8) | | | |
| **DISBURSEMENTS** | | | | |
| 10. | Net Payroll | | | |
| 11. | Payroll Taxes | | | |
| 12. | Sales, Use & Other Taxes Paid | | | |
| 13. | Inventory Purchases | | | |
| 14. | Mortgage Payments | | | |
| 15. | Other Secured Note Payments | | | |
| 16. | Rental & Lease Payments | | | |
| 17. | Utilities | | | |
| 18. | Insurance | | | |
| 19. | Vehicle Expenses | | | |
| 20. | Travel | | | |
| 21. | Entertainment | | | |
| 22. | Repairs & Maintenance | | | |
| 23. | Supplies | | | |
| 24. | Advertising | | | |
| 25. | Household Expenses | | | |
| 26. | Charitable Contributions | | | |
| 27. | Gifts | | | |
| 28. | Other (Attach List) | | | |
| 29. | Total (Lines 10 through 28) | | | |
| **REORGANIZATION EXPENSES** | | | | |
| 30. | Professional Fees | | | |
| 31. | U.S. Trustee Fees | | | |
| 32. | Other (Attach List) | | | |
| 33. | Total (Lines 30 through 32) | | | |
| 34. | Total Disbursements (Line 29 + Line 33) | | | |
| 35. | Net Cash Flow (Line 9 – Line 34) | | | |
| 36. | Cash – End of Month (Line 1 + Line 35) | | | |

***PLEASE REFER TO ATTACHED FINANCIAL STATEMENTS. Due to the departure of a significant number of the financial accounting staff, a number of analyses and reconciliations normally completed in support of the financial statements have not been finalized. The attached draft financial statements are subject to adjustment upon the completion of these analyses.*

DEBTOR:      A.H.E.R.J
CASE #:      98-25773 through 98-25777                     .ONTHLY OPERATING REPORT

ACCRUAL BASIS – 3

Cash Disbursements Detail
(Attach Additional Sheets If Necessary)

| | Date | Payee | Purpose | Amount |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| Total Cash Disbursements | | | | |

***PLEASE REFER TO ATTACHED FINANCIAL STATEMENTS.

Bank Account Details
(Attach Additional Sheets if Necessary)

| Check Number | Date | Payee | Purpose | Amount |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| Total Bank Account Disbursements | | | | |

***PLEASE SEE ATTACHED BANK STATEMENTS.

| TOTAL DISBURSEMENT FOR THE MONTH | |
|---|---|

***PLEASE REFER TO ATTACHED FINANCIAL STATEMENTS.

4

DEBTOR:      A.H.E.R.F
CASE #:      98-25773 through 98-25777                    ...JNTHLY OPERATING REPORT

ACCRUAL BASIS – 4

Month: November 1998

| Accounts Receivable – Trade | |
|---|---|
| Total Accounts Receivable at the Beginning of the Period | |
| + Amounts Billed During the Period | |
| - Amounts Collected During the Period | |
| Total Accounts Receivable at the End of the Period | |

***PLEASE REFER TO ATTACHED FINANCIAL STATEMENTS.*

| Accounts Receivable Aging | |
|---|---|
| 0—30 days old | |
| 31-- 60 days old | |
| 61-- 90 days old | |
| 91 + days old | |
| TOTAL ACCOUNTS RECEIVABLE | |
| AMOUNT CONSIDERED UNCOLLECTIBLE | |
| ACCOUNTS RECEIVABLE (NET) | |

***PLEASE REFER TO ATTACHED FINANCIAL STATEMENTS AND REPORTS SUMMARIZING
GROSS AND NET A/R BY ENTITY AS OF 11/10/98 and 2/28/99. Due to the cut-off of certain systems
after the sale to Tenet on 11/10, aging reports are incomplete.*

| Amounts Due from Affiliates & Insiders (Itemize) | |
|---|---|
| S. Abdelhak | $1,516,170.97 |
| D. McConnell | 449,437.75 |
| N. Wynstra | 528,691.12 |
| Total | $2,494,299.84 |

***Demand has been made for the recovery of amounts paid under a KESOP plan to certain AHERF
executives. Recovery of taxes and payments to the above individuals is in progress. Litigation may be
required to recover amounts owed and in dispute.*

| Inventory | |
|---|---|
| Beginning Inventory | |
| Plus Purchases | |
| Minus Ending Inventory | |
| Cost of Goods Sold | |

***PLEASE REFER TO ATTACHED FINANCIAL STATEMENTS.*

5

DEBTOR:      A.H.E.R.F
CASE #:      98-25773 through 98-25777                    ⊃NTHLY OPERATING REPORT

ACCRUAL BASIS – 5

| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | A▓▓▓▓▓ |
|---|---|
| Post-petition Loans | •• |
| Reorganization Expenses | |
| Professional Fees | |
| U.S. Trustees' Quarterly Fees  PD IN DECEMBER | 30,000 |
| Court Fees | |
| Trade Debt | ••• |
| Other (attach list) (Report tax obligations in next section only) | |

| ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓ |
|---|---|---|---|---|---|
| Payables | | | | | |

**\*\*DIP financing was paid-off with proceeds of the November 10, 1998 sales transaction with Tenet. Please refer to attached loan ledger report from Foothill Capital Corporation.**
**\*\*\*PLEASE SEE ATTACHED AGING REPORT.**

| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | Beginning Tax Liability | Amount Withheld or Accrued | Amount Paid | Ending Tax Liability | Delinquent Taxes |
|---|---|---|---|---|---|
| ▓▓▓▓▓▓▓ | | | | | |
| Withholding\*\*\* | | | | | |
| FICA-Employee\*\*\* | | | | | |
| FICA-Employer\*\*\* | | | | | |
| Unemployment | | | | | |
| Income | | | | | |
| Other (Attach List) | | | | | |
| Total Federal Taxes | | | | | |
| ▓▓▓▓▓▓▓▓ | | | | | |
| Withholding | | | | | |
| Sales | | | | | |
| Excise | | | | | |
| Unemployment | | | | | |
| Real Property | | | | | |
| Personal Property | | | | | |
| Other (Attach List) | | | | | |
| Total State and Local | | | | | |
| Total Taxes | | | | | |

**\*\*\*The beginning tax liability should represent the liability from the prior month, or if this is the first operating report, the amount should be zero.**
**\*\*\*Attach photocopies of IRS Form 6123 or your FTD coupon and payment receipt to verify payment or deposit.**

**\*\*\*TAX DOCUMENTATION ON FILE.  PLEASE SEE NOTICE ATTACHED TO AUGUST MONTH-END FILING.**

6