**TAB 5**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *LORETTA A. LUNDBERG*
*June 21, 2004*

---

## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**LUNDBERG, LORETTA A.**



LEGALINK
A WORDWAVE COMPANY

Page 2

```
 1
 2   A P P E A R A N C E S:
 3   JONES DAY
     Attorneys for THE OFFICIAL COMMITTEE OF
 4   UNSECURED CREDITORS OF ALLEGHENY HEALTH,
     EDUCATION AND RESEARCH FOUNDATION
 5        500 Grant Street, Suite 3100
          Pittsburgh, PA 15219-2502
 6
     BY:   LAURA A. MEADEN, ESQ.
 7
 8   CRAVATH SWAINE & MOORE LLP
     Attorneys for PRICEWATERHOUSECOOPERS, LLP
 9        Worldwide Plaza
          825 Eighth Avenue
10        New York, New York 10019
11   BY:   KEDRIC L. PAYNE, ESQ.
12
     MINTZ LEVIN COHN FERRIS GLOVSKY and POPEO PC
13   Attorneys for the BANK OF NEW YORK
     and the Witness
14        One Financial Center
          Boston, Massachusetts 02111
15
     BY:   PETER A. BIAGETTI, ESQ.
16
17
18
19   ALSO PRESENT:
20   RICHARD BLY, LegaLink Action Video
21
22
23
24
25
```

Page 3

```
 1             LORETTA A. LUNDBERG
 2        VIDEOGRAPHER:  This is the video
 3   operator speaking, Richard Bly, of LegaLink
 4   Action Video, located at 420 Lexington Avenue,
 5   New York, New York.
 6        The court reporter is Tammey Pastor
 7   of LegaLink, Manhattan located at 420 Lexington
 8   Avenue, New York, New York.
 9        Today's date is June 21, 2004.  The
10   time on the record is 10:08 a.m. We are at the
11   offices of Cravath, Swaine & Moore, located at
12   825 Eighth Avenue, New York, New York to take
13   the videotaped deposition of Loretta A. Lundberg
14   in the matter of the Official Committee of
15   Unsecured Creditors of Allegheny Health,
16   Education and Research Foundation versus
17   PricewaterhouseCoopers LLP in the United States
18   District Court for the Western District of
19   Pennsylvania.  Civil action number 00-684.
20        Counsel may now introduce
21   themselves.
22        MR. PAYNE:  Kedric Payne, Cravath,
23   Swaine & Moore LLP representing
24   PricewaterhouseCoopers.
25        MS. MEADEN:  Laura Meaden from
```

Page 4

```
 1             LORETTA A. LUNDBERG
 2   Jones Day on behalf of the plaintiff, the
 3   Official Committee of Unsecured Creditors of
 4   AHERF.
 5        MR. BIAGETTI:  And Peter Biagetti
 6   from Mintz Levin for the Bank of New York and
 7   the witness.
 8        VIDEOGRAPHER:  Can we go off the
 9   record just a moment.  Going off the record at
10   10:09.
11        (Recess taken.)
12        VIDEOGRAPHER:  Returning to the
13   record at 10:11 from 10:09.
14             LORETTA A. LUNDBERG,
15   residing at 240 Warren Street, Brooklyn, New
16   York, having been first duly sworn by the Notary
17   Public (Tammey M. Pastor), was examined and
18   testified as follows:
19   EXAMINATION CONDUCTED BY MR. PAYNE:
20        Q.    Good morning.
21        A.    Good morning.
22        Q.    Can you state your full name for
23   the record.
24        A.    Loretta A. Lundberg.
25        Q.    And what is your home address?
```

Page 5

```
 1             LORETTA A. LUNDBERG
 2        A.    240 Warren Street, Brooklyn, New
 3   York.
 4        Q.    Where do you currently work?
 5        A.    The Bank of New York.
 6        Q.    How long have you been employed
 7   with the Bank of New York?
 8        A.    A little over eight years.
 9        Q.    What is your current title at the
10   Bank of New York?
11        A.    I am vice president and group
12   manager.
13        Q.    Is that in a particular group?
14        A.    I work in the default
15   administration group of the Corporate Trust
16   Division.
17        Q.    To whom do you report?
18        A.    Robert Griffin.
19        Q.    What is his title?
20        A.    Managing director.
21        Q.    How long have you been in your
22   current position?
23        A.    I have been group manager for three
24   years.
25        Q.    So, since 2001?
```

Page 6

LORETTA A. LUNDBERG

1
2    A.    Since June 2001.
3    Q.    And who reports to you?
4    A.    Several individuals.  Gary Bush,
5 Stuart Kratter, Martin Feig, Irene Siegel, Elna
6 Deguia, John Giuliano.
7    Q.    For Gary Bush, what is his title?
8    A.    He is vice president.
9    Q.    And the title for Stuart Kratter?
10   A.    Vice president.
11   Q.    For Martin Feig?
12   A.    F-E-I-G.
13   Q.    What is Mr. Fieg's title?
14   A.    Vice president.
15   Q.    Irene Siegel?
16   A.    Vice president.
17   Q.    Elna, what is her last name, sorry?
18   A.    Deguia, D-E-G-U-I-A.  She is an
19 assistant treasurer.
20   Q.    And John?
21   A.    Giuliano.
22   Q.    Giuliano.  Okay.
23   A.    Is vice president.  I also have a
24 part-time staff member, Mary Jane Schmazel
25 S-C-H-M-A-Z-E-L or L-Z-E-L.

Page 7

LORETTA A. LUNDBERG

1
2    Q.    What are your responsibilities as
3 vice president?
4    A.    I manage the default administration
5 group.  And I oversee the various people in my
6 group who consult on and manage trusteeships
7 that are in default.
8    Q.    What is the role of the default
9 administration group in general?
10   A.    The default administration group
11 serves in an advisory and consulting capacity to
12 the Corporate Trust Division on any trusteeship
13 that is in default and/or bankruptcy.
14   Q.    So your group becomes involved
15 after an event of default has been declared?
16   A.    Yes.  For the most part.
17   Q.    Are there situations where the
18 group is involved before an event of default is
19 declared?
20   A.    On a limited basis.
21   Q.    What type of basis would that be?
22   A.    If you have a client, let's say who
23 doesn't make a debt service payment, it may not
24 be an event of default for 30 days.  But we will
25 start looking at the file at that point in the

Page 8

LORETTA A. LUNDBERG

1
2 event that they don't cure that event of
3 default.
4    Q.    So in certain situations does the
5 default administration group make these
6 determination of whether an event of default
7 occurred?
8    A.    The documents make a determination.
9    Q.    Is the administration group
10 involved with determining whether, based on the
11 terms of the documents, that an event of default
12 has occurred?
13   A.    We look at it and we consult with
14 either the legal department or outside counsel.
15   Q.    Prior to 2001 when you became vice
16 president, what was your position at the Bank of
17 New York?
18   A.    I had been a vice president since I
19 joined the bank in 1996.  In 2001 I became the
20 group manager.
21   Q.    Prior to 2001 when you became the
22 group manager what were your responsibilities?
23   A.    I was a vice president within the
24 group and I managed various cases.
25   Q.    How did your responsibilities

Page 9

LORETTA A. LUNDBERG

1
2 change when you were made the --
3    A.    Well, instead of being an officer
4 who handled specific cases, I became the manager
5 of the group and responsible for one assigning
6 the cases to the various staff members, and two
7 reporting items that, you know, needed to be
8 reported up to senior management and I'm
9 basically in charge of the group.
10   Q.    Prior to 2001 who were your
11 supervisors?
12   A.    I reported to John Stevenson.
13   Q.    And his title?
14   A.    Vice president and group manager.
15   Q.    Mr. Stevenson was your predecessor?
16   A.    Yes.
17   Q.    Anyone else who you reported to?
18   A.    I reported directly to
19 Mr. Stevenson.
20   Q.    Who reported to you at this time?
21   A.    No one.
22   Q.    Where were you employed prior to
23 your employment with the Bank of New York?
24   A.    The Bank of Tokyo Trust Company.
25   Q.    What were the dates of employment

3 (Pages 6 to 9)

---

Page 34

```
1              LORETTA A. LUNDBERG
2        Q.    Would Mr. Volmar have been
3   responsible for calculating the amount of the
4   claim on this proof of claim?
5        MR. BIAGETTI:   Objection.
6        A.    This proof of claim was filed, it
7   was filed by IBJ Whitehall. I am not intimately
8   familiar with their procedures.
9        Q.    So you're saying you don't know?
10       A.    I couldn't say.
11       Q.    Do you know how the $156 million,
12  approximately $156 million claim amount in
13  section 4 of this document was calculated?
14       A.    Again, I can't speak to how the
15  predecessor Trustee would have done this. We
16  would have looked at the amount of principal,
17  amount of bonds outstanding as of the filing
18  date. And I have no reason to believe they
19  wouldn't have done the same thing.
20             They also would have added on the
21  accrued and unpaid interest as of the filing
22  date.
23       MR. PAYNE:   I am going to mark as
24  Exhibit 2717 the Second Amended Consolidated
25  Liquidating Plan of Reorganization Under
```

---

Page 35

```
1              LORETTA A. LUNDBERG
2   Chapter 11 of the Bankruptcy Code.
3             (Defendant's Exhibit 2717
4   for identification, Second Amended Consolidated
5   Liquidating Plan of Reorganization Under
6   Chapter 11 of the Bankruptcy Code.)
7        Q.    Have you seen this document before,
8   Ms. Lundberg?
9        A.    I am fairly certain I saw a copy of
10  this in our files.
11       Q.    Can I refer you to page 13 of the
12  document. Section 5.3, section A where it reads
13  "Allowance of Centennial Bondholder Claims." Can
14  you read that one section.
15       A.    Okay. I've read it.
16       Q.    You see that the secured claim is
17  $33 million?
18       A.    Yes.
19       Q.    You see that the unsecured claim is
20  $105.6 million?
21       A.    Yes.
22       Q.    And that do you agree with me that
23  total would be $138.6 million?
24       A.    Yes.
25       Q.    And do you know why the claim was
```

---

Page 36

```
1              LORETTA A. LUNDBERG
2   reduced from $156 million which is on the proof
3   of claim to the $138.6 million which is in this
4   Bank of New York plan?
5        A.    I don't know the answer.
6        MR. PAYNE:   I am going to mark as
7   Exhibit 2718 a notice sent from the Bank of New
8   York to the bondholders dated June 22, 2000.
9             (Defendant's Exhibit 2718
10  for identification,  Letter from the Bank of New
11  York to bondholders dated June 22, 2000,
12  production numbers BONY 057 through 60.)
13       Q.    Ms. Lundberg, do you recognize this
14  as a notice sent from the Bank of New York to
15  the Centennial bondholders on June 22, 2000?
16       A.    Yes.
17       Q.    I direct your attention to page 56
18  and the first bullet point --
19       A.    You mean Bates stamped 58?
20       Q.    Bates. Yes. Sorry.
21       A.    Okay. I see it.
22       Q.    Do you have any reason to doubt
23  this is correct that the $156 million amount of
24  the claim on the proof of claim was reduced to
25  138.6 million based on the mathematical equation
```

---

Page 37

```
1              LORETTA A. LUNDBERG
2   here?
3        MS. MEADEN:   Objection to the
4   form.
5        MR. PAYNE:   Yes, that was a bad
6   question. Let me rephrase.
7        Q.    Do you agree that according to the
8   statement that I had you read, that the $156.6
9   million claim was reduced by the debt service
10  reserve fund?
11       A.    Yes.
12       Q.    And the allowed claim then became
13  $138.6 million?
14       A.    Yes.
15       Q.    Do you know what the debt service
16  reserve fund is?
17       A.    It is a fund established pursuant
18  to the Indenture, usually at the time of the
19  offering that sets aside money to pay interest
20  or principal on the bonds should there be a
21  shortfall.
22       MR. PAYNE:   I am going to mark as
23  Exhibit 2719 an Order Granting Trustee's 26
24  Omnibus Objections Seeking to Disallow and
25  Expunge and Fix And/or Reclassify and Allow
```

Page 38

LORETTA A. LUNDBERG

1
2  Various Claims Filed Against the Debtors Estate
3  Dated January 13, 2004.
4          (Defendant's Exhibit 2719
5  for identification, Order Granting Trustee's 26
6  Omnibus Objections Seeking to Disallow and
7  Expunge and Fix And/or Reclassify and Allow
8  Various Claims Filed Against the Debtors' Estate
9  Dated January 13, 2004.)
10  Q.    Ms. Lundberg --
11  A.    Yes.
12  Q.    -- do you recognize this as an
13  order issued by the Bankruptcy Court in the
14  AHERF bankruptcy matter?
15  A.    It appears to be such, I haven't
16  seen this before, but, yes.
17  Q.    I want to direct your attention to
18  page 3 of the document and the first paragraph
19  that begins with "Ordered." Can you read that
20  to yourself, please.
21  A.    I have read it.
22  Q.    You see where it says that, "shall
23  reflect that Bank of New York has a secured
24  claim in the amount of $33 million, which has
25  previously been paid and, and a general

Page 39

LORETTA A. LUNDBERG

1
2  unsecured claim in the amount of $75,660,434?"
3  A.    Yes.
4  Q.    According to this order, the
5  allowed claim for the Bank of New York is
6  approximately $108 million; is that correct?
7          MS. MEADEN:   Objection as to the
8  form.
9  A.    The 33 million plus 75 million and
10  change is 108 million.
11  Q.    And would that be the allowed claim
12  for the Bank of New York according to the
13  Bankruptcy Court?
14  A.    According to the Bankruptcy Court.
15  Q.    Do you know why the claim has been
16  reduced to $108 million from the $138 million
17  that is quoted in the bankruptcy plan?
18          MS. MEADEN:   Objection.
19  A.    I don't know.
20  Q.    Let me refer you back to
21  Exhibit 2718 which is the June 22, 2000 notice
22  sent from the Bank of New York to the
23  bondholders.
24          If you will look at page Bates
25  stamped 058.

Page 40

LORETTA A. LUNDBERG

1
2  A.    Yes.
3  Q.    And read the second bullet point.
4  A.    I've read it.
5  Q.    According to this notice the
6  unsecured portion of the claim is $105.6
7  million; is that correct?
8  A.    Yes.
9  Q.    And then it states the amount of
10  the unsecured portion will be reduced by any
11  recoveries received by the bondholders from
12  sources described below under "Other AHC sources
13  of recovery and PHCT litigation." Is that
14  correct?
15  A.    Yes.
16  Q.    Can you turn to the next page to
17  the paragraph with the caption "Other AHC
18  Courses of Recoveries."
19  A.    Okay.
20  Q.    According to this paragraph is it
21  true that the unsecured portion will be reduced
22  by the accounts receivable and by any collection
23  of additional funds from Medicare?
24          MS. MEADEN:   Can I ask for
25  clarification, are you asking if that is the

Page 41

LORETTA A. LUNDBERG

1
2  what the paragraph says or if that is in fact
3  what happened?
4          MR. PAYNE:  I am asking if that is
5  what the paragraph says. So let me get the
6  question again.
7  Q.    According to this paragraph,
8  Ms. Lundberg, is the amount of unsecured claim
9  reduced by the accounts receivable and by any
10  collection for additional Medicare funds?
11          MS. MEADEN:   Objection.
12  A.    Can you repeat the question back,
13  please.
14          (The pending question was read.)
15  A.    Yes.
16  Q.    Can you also turn to Exhibit 2717
17  which is the Second Amended Bankruptcy Plan.
18  Page 13. Section 5.39(a), do you see where it
19  says "an allowed Centennial unsecured claim in
20  the amount of $105.6 million, subject to section
21  5.3(e) hereof?"
22  A.    Yes.
23  Q.    Can you turn to section 5.3(e). I
24  will direct your attention to a specific part of
25  5.3(e) which says in the end of the third line,

11 (Pages 38 to 41)

**TAB 6**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )
)
          Plaintiff, )    Civil Action No. 00-684
)
)    Judge David Stewart Cercone
          v. )
)
PRICEWATERHOUSECOOPERS, LLP, )
)
          Defendant. )

## DECLARATION OF N. TIMOTHY GUARNESCHELLI

1.    I am Vice President and General Counsel of HealthAmerica Pennsylvania, Inc. I have personal knowledge of the facts stated herein and could testify to them if necessary. I am over 18 years of age.

2.    I am familiar with the Risk Sharing Agreement ("Risk Contract") HealthAmerica Pennsylvania and its parent organization, Coventry Corporation, entered into with Allegheny Health, Education and Research Foundation ("AHERF") in 1997 and the parties' claims against one another arising under the Risk Contract. HealthAmerica Pennsylvania filed a proof of claim in AHERF's bankruptcy proceedings on behalf of itself and its parent corporation, Coventry Corporation as well as its affiliates, Coventry Health Care, Inc., Coventry Health and Life Insurance Company, Inc., and Coventry Health Plan of West Virginia, Inc. (collectively, "HealthAmerica") which sought, among other things, repayment of amounts expended by HealthAmerica that should have been paid by AHERF in accordance with the terms of the Risk Contract. I have been informed that a copy of the HealthAmerica proof of claim filed on July 30,

1998 has been marked as Exhibit 2586 in this case and that a copy of the revised proof of claim Health America filed on March 1, 1999 has been marked as Exhibit 2594 in this case.

3.    HealthAmerica offers various healthcare plans which provide a program of covered healthcare services to its members in exchange for the members' payment of premiums. As a licensed health maintenance organization in Pennsylvania, HealthAmerica is statutorily required to maintain a network of medical and healthcare providers such as hospitals and physicians that its members can access in order to obtain their covered healthcare services.

4.    On March 31, 1997 HealthAmerica entered into the Risk Contract with AHERF. I have been informed that a copy of the Risk Contract has been marked as Exhibit 2595 in this case.

5.    Under the terms of the Risk Contract, AHERF was obligated to provide or pay for the provision of all covered healthcare services delivered to persons enrolled in programs offered by HealthAmerica and covered by the Risk Contract ("Covered Members"). In exchange for AHERF's contractual assumption of this financial responsibility, HealthAmerica paid AHERF approximately 80% of the premiums it received from its Covered Members. HealthAmerica deposited AHERF's portion of the premiums into a controlled disbursement account ("CDA") each month.

6.    The Risk Contract provided that HealthAmerica would process and pay the claims for all covered healthcare services provided to the Covered Members by AHERF affiliates and non-AHERF providers from the premiums deposited into the CDA.

- 2 -

7.    If the cost of the covered healthcare services were less than its share of the premiums, AHERF was entitled to keep the balance in the CDA under the terms of the Risk Contract. If, however, the costs of service exceeded its share of the premiums, then AHERF was responsible for the shortfall. In the event of a shortfall, AHERF was required to pay the difference to the CDA.

8.    The parties reconciled the amounts paid and owed between them on a periodic basis as provided for in the Risk Contract.

9.    At the time AHERF filed for bankruptcy protection, the cost of providing healthcare services to the Covered Members exceeded AHERF's share of the premiums by approximately $57.8 million. This amount included a cash advance taken from the CDA by AHERF in the amount of approximately $22.6 million which AHERF was required to repay in the event of a shortfall, but did not. AHERF owed HealthAmerica the entire $57.8 million at the time of AHERF's bankruptcy.

10.    In addition, at the time AHERF filed for bankruptcy protection, HealthAmerica owed approximately $27.1 million for healthcare services rendered by AHERF-affiliated providers. Prior to the bankruptcy, AHERF had instructed HealthAmerica to withhold payments for healthcare services performed at AHERF-affiliated providers as a set-off against the amount AHERF owed under the Risk Contract, which HealthAmerica did.

11.    After netting the amounts due the parties from one another, AHERF still owed HealthAmerica approximately $30.7 million ($57.8 million minus $27.1 million). This amount was later reduced by $3 million to approximately $27.7 million as the result of certain

- 3 -

actuarially-determined accruals for anticipated claims being reduced by the amount of actual payments — and the actual payments being less than the accruals.

12.    The amount of $27.7 million represents the costs of providing healthcare services to the Covered Members that should have been, but were not, paid by AHERF under the terms of the Risk Contract.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct. Executed on this 8<u>th</u> day of July, 2005.

N. Timothy Guarneschelli

- 4 -

**TAB 7**

LEXSEE 2004 US DIST. LEXIS 27238

**JOHN CROWLEY, as Receiver of Ambassador Insurance Company, Plaintiff, — vs —
DORIS JUNE CHAIT, et al., Defendants.**

**CIV. NO. 85–2441 (HAA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2004 U.S. Dist. LEXIS 27238**

**August 25, 2004, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motions ruled upon by Crowley v. Chait, 2004 U.S. Dist. LEXIS 27237 (D.N.J., Dec. 17, 2004)

**PRIOR HISTORY:** Crowley v. Chait, 322 F. Supp. 2d 530, 2004 U.S. Dist. LEXIS 11201 (D.N.J., 2004)

**DISPOSITION:** Defendant PricewaterhouseCoopers LLP's motion for summary judgment and motion to strike Plaintiff's wrongful corporate life damages theory denied. Defendants Doris June Chait, the estate of Arnold Chait, Richard A. Tafro and Ambassador Group, Inc.'s motions to join PricewaterhouseCoopers LLP's motions granted. PricewaterhouseCoopers LLP's motion in limine granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JOHN M. BOYLE, Special Master: JOHN M. BOYLE, LINDABURY, MCCORMICK & ESTABROOK, PC, WESTFIELD, NJ.

For ELIZABETH R. COSTLE, AS RECEIVER OF AMBASSADOR INSURANCE COMPANY, Plaintiff: ROBERT J. STICKLES, CARPENTER, BENNETT & MORRISSEY, NEWARK, NJ.

For JOHN CROWLEY, AS RECEIVER OF AMBASSADOR INSURANCE COMPANY, Plaintiff: ROBERT J. STICKLES, KLETT, ROONEY, LIEBER & SCHORLING, PC, NEWARK, NJ; TRACY L. BOOKHARD, CHRISTOPHER J DALTON, MICHAEL T. STEWART, KLETT ROONEY LIEBER & SCHORLING PC, NEWARK, NJ.

For DORIS JUNE CHAIT, AMBASSADOR GROUP, INC., FRANCIS A.C. INDIVIDUALLY, AND AS CO-TRUSTEE OF THE ARNOLD CHAIT TRUST,

Defendants: ROBERT E. BARTKUS, DILLON, BITAR & LUTHER, L.L.C., MORRISTOWN, NJ.

For COOPERS & LYBRAND, Defendant: ARTHUR R. SCHMAUDER, DRINKER, BIDDLE & SHANLEY, LLP, FLORHAM PARK, NJ.

For PRICEWATERHOUSECOOPERS LLP, Defendant: STEPHEN R. LONG, MICHAEL CHARLES ZOGBY, DRINKER, BIDDLE, & REATH LLP, FLORHAM PARK, NJ.

**JUDGES:** Ackerman, Senior District Judge.

**OPINIONBY:** Harold A. Ackerman

**OPINION:**

**OPINION AND ORDER**

Ackerman, Senior District Judge:

This matter comes before the Court on four separate motions. Two of these [*2] motions are brought by Defendant PricewaterhouseCoopers LLP ("PwC"). First, PwC seeks summary judgment as to all of Plaintiff John Crowley's claims. In addition, PwC seeks to strike Plaintiff's "wrongful corporate life" damages theory as not timely disclosed. The remaining two motions are brought by Defendants Doris June Chait, the estate of Arnold Chait, Richard A. Tafro and Ambassador Group, Inc. (the "Ambassador Defendants"), seeking to join PwC in both of its motions. For the reasons outlined below, both of the Ambassador Defendants' motions to join are hereby GRANTED and both PwC's motion for summary judgment and motion to strike Plaintiff's wrongful corporate life damages theory are DENIED. In addition, this Court will consider PwC's argument that certain of Plaintiff's damage calculations are impermissible to be a motion in limine as to those calculations and that motion is GRANTED IN PART and DENIED IN PART.

  

## Background

This case arises from the 1984 insolvency and liquidation of Ambassador Insurance Company ("AIC"), a Vermont-incorporated insurer with its principal place of business in New Jersey. AIC wrote insurance in the so-called "surplus lines" market, which [*3] offers insurance for high or novel risks for those unable to obtain insurance from the traditional, "admitted" marketplace. Coopers & Lybrand ("C&L"), now PwC, audited the consolidated financial statements covering the years 1979-1982 of AIC's parent company, Ambassador Group, Inc., a public company. Arnold Chait was AIC's President and CEO. Doris Chait was Arnold Chait's wife and Treasurer of AIC. Richard Tafro was, during the period of 1979-1983, the Vice President of Finance and CFO of AIC. Collectively with Ambassador Group, Inc., these individuals are known as the Ambassador Defendants.

As a Vermont-domiciled entity, AIC was under the primary regulatory jurisdiction of Plaintiff, the Commissioner of Banking and Insurance for the State of Vermont. n1 AIC was required to submit an annual approved form of financial statement — known in the industry as a "statutory annual statement" — to Plaintiff. On or about March 14, 1983, AIC filed its 1982 statutory annual statement, which showed a decline in the unrestricted surplus, from $29.6 million to $19.9 million. That decline in surplus prompted an immediate intervention by Plaintiff, ordering a one-week review by outside consultants [*4] and ordering AIC to take certain actions. Plaintiff retained certain experts to perform a special examination of AIC. Based upon a quick review, which lasted less than a week, and in reliance on C&L's audit, the experts determined that AIC was solvent, but in "hazardous financial condition." The experts suggested and Plaintiff ordered that AIC take certain actions to restore its health.

> n1 On account of the lengthy duration of this case, several different people have served as the Commissioner of Banking and Insurance for the State of Vermont, the Receiver of AIC, and the named Plaintiff. These three roles have been played by one person at a time, and have overlapped almost entirely for purposes of this case. There have been times, though, when these three roles have not overlapped, i.e., prior to the time the Commissioner acted to be appointed Receiver. The Court feels that whatever benefit in terms of precision might be obtained by continuous parsing of this distinction throughout its opinion would be substantially outweighed by the unnecessary confusion it would cause. For the sake of simplicity, then, the Court will refer to all of these individuals and entities as "Plaintiff".

[*5]

AIC's financial reports for the quarter ending September 30, 1983, showed that it had not taken those actions. In September 1983, Plaintiff ordered the experts to examine AIC again, and on November 9, 1983, they reported, again on the basis of a cursory exam, that AIC was then insolvent by about $3 million. Plaintiff filed suit that day in Vermont Superior Court seeking an injunction against the further transaction of business by AIC, and further seeking an order that he be appointed receiver. The next day, AIC's management stipulated to Plaintiff's appointment as receiver. This November 10, 1983 order also granted Plaintiff "the power to limit or suspend the issuance of new or renewal policies . . . or to pay or defer payment of claims and other obligations as he deems appropriate." Plaintiff in fact ordered the cessation of new and renewal policies immediately. A Liquidation Order was ultimately entered on March 10, 1987, and over the past 17 years Plaintiff has overseen more than 20,000 claims processed for reimbursement. More than 10,000 of these claims have been approved in a process that is regularly scrutinized by the same Vermont Superior Court judge who originally ordered [*6] AIC into receivership. Allowed claims are submitted to the Vermont court for objection and ultimate approval on a periodic basis.

Plaintiff's theory of the case is that Chait grossly mismanaged the company, ultimately bankrupted it, and continued writing policies well after AIC collapsed. The complaint charges the Ambassador Defendants with mismanagement, breach of fiduciary duty, and fraud. It charges PwC with negligence in connection with audits of AIC's parent company's financial statements for the years 1981 and 1982. The complaint also alleges that all defendants are responsible for the entire amount of the insolvency, estimated to be approximately $137 million.

Plaintiff alleges that C&L knew, or should have known, that AIC was at or near the point of insolvency two years before that insolvency was revealed, and that C&L failed in its obligation to disclose that fact. Further, Plaintiff contends that testimony in this case will establish that had C&L in fact determined the true financial condition of AIC as part of the audit of AIC's parent company, the Ambassador Defendants and C&L would have met with Plaintiff to report the essence of C&L's conclusions: i.e., that AIC was [*7] only marginally solvent (meaning surplus of $5 million or less) at year end 1981. As a result, Plaintiff claims that such a report would have caused Plaintiff to follow the same course of





action it did in November 1983, but instead sometime in April 1982. Plaintiff asserts that it would have immediately obtained a court order placing AIC in receivership and stopping AIC from writing new and renewal business.

Plaintiff sets forth two distinct theories of damages. First, Plaintiff claims that if AIC management had received a non-negligent audit from C&L at year end 1981, Plaintiff would have immediately placed AIC in receivership, stopped writing new business and began a "runoff" of claims. n2 Plaintiff's second theory is that C&L is responsible for the "deepening insolvency" created when AIC continued to operate as an insurance company instead of being placed in a runoff position by Plaintiff. Plaintiff presents a report from its damages expert setting forth both separate calculations.

> n2 Although neither party specifically defines the term "runoff," this Court understands that a runoff means that AIC would discontinue writing new and renewal premiums, would refund unearned premiums on in force policies and would pay claims as they were settled in the ordinary course. Thus, a runoff of claims allows the insurance company to conclude its business without the need of a more expensive and cumbersome court-ordered liquidation.

[*8]

Plaintiff has presented testimony that had C&L provided a non-negligent audit at year end 1981, Plaintiff, through experts, could have confirmed that AIC was insolvent. However, Plaintiff concedes that its experts would have advised Plaintiff in the spring of 1982 that, given the time value of money, AIC probably could pay all of its claims and adjustment costs in full, as they fell due. Based upon that advice, AIC would have been put in a runoff, whereby the company would never again resume operations and a claims and accounting staff would pay claims as they fell due.

Nonetheless, based on actual claims development through March 31, 2003, Plaintiff now knows that a runoff would not have been successful. Ultimately, Plaintiff's expert contends that even in a runoff situation there would have likely been a $16.9 million shortfall. PwC contends that because Plaintiff has conceded that the runoff of claims would not have been successful, it should be entitled to summary judgment. However, Plaintiff disputes this fact, claiming that even if a hypothetical runoff would create a shortfall, such amount would reduce the overall damages calculation and not amount to a complete failure of [*9] the damages.

Ultimately, PwC's summary judgment motion addresses whether C&L's audit actually caused any of AIC's damages based upon the damage calculations.

### Discussion

### I. Ambassador Defendants' Motions to Join

As a preliminary matter, the Court will first address both motions filed by the Ambassador Defendants seeking to join the motion for summary judgment and the motion to strike the wrongful corporate life damages theory filed by PwC. In both of these motions, the Ambassador Defendants filed notices that they intended to join in PwC's motions. With regards to the motion to strike the wrongful corporate life damages theory, neither Plaintiff nor PwC filed any opposition to the Ambassador Defendants' joinder motion; and thus, this Court will grant that motion without further discussion.

With regards to the motion for summary judgment, the Ambassador Defendants did not file any additional papers and rely solely on those papers submitted by PwC in connection with its motion. (Ambassador Defs.' Notice of Joinder in PwC's Mot. for Summ. J. at 2.) However, unlike the motion to strike, Plaintiff specifically opposes the Ambassador Defendants' notice of joinder in [*10] the summary judgment motion. Plaintiff asserts two discrete reasons. First, Plaintiff contends that the Ambassador Defendants' motion is untimely as all dispositive motions were to be served no later than March 15, 2004 and this joinder motion was filed one week later on March 22, 2004. Second, Plaintiff asserts that "PwC's arguments, to the extent they have any merit, do not relate to the claims against the [Ambassador Defendants]." (Pl.'s Br. In Opp'n to Ambassador Defs.' Notice to Join PwC's Mot. for Summ. J. at 2.) Thus, Plaintiff concludes that even if this Court were to grant summary judgment on some or all of the grounds raised by PwC, those arguments would have no application to the Ambassador Defendants.

There is precedent in this circuit, as well as others, simply to deny the Ambassador Defendants' motion to join the summary judgment as untimely filed. *Chiropractic Alliance of New Jersey v. Parisi*, 164 F.R.D. 618, 621 (D.N.J. 1996) (concluding that deadline for filing dispositive motions cannot be extended without approval of court); *see also Big Top USA, Inc. v. Wittern Group*, 183 F.R.D. 331, 343 (D. Mass 1998) (denying motion to join [*11] summary judgment motion filed one week after deadline for dispositive motion). n3 However, this Court prefers to address the substantive merits of a motion as opposed to entering a perfunctory procedural dismissal.

  

n3 *Cf. Edwards v. Cass County, Tex.,* 919 F.2d 273, 275 (5th Cir. 1990) (affirming a district court's discretion to disallow filing of dispositive motion that does not comply with scheduling order); *Gear v. Constantinescu,* 741 F. Supp. 525, 526 (D.N.J. 1990) (denying defendant's right to file motion to dismiss filed nearly two months after deadline in scheduling order).

It has long been established that, under certain circumstances, district courts are entitled to enter summary judgment sua sponte even absent a motion to join. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Generally, this type of summary judgment requires that the district court provide adequate notice. *Otis Elevator Co. v. George Washington Hotel Corp.,* 27 F.3d 903, 910 (3d Cir. 1994) [*12] ("[A] district court may not grant summary judgment sua sponte unless the court gives notice and an opportunity to oppose summary judgment."). Exceptions to this notice requirement include "the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue." *Gibson v. Mayor and Council of the City of Wilmington,* 355 F.3d 215, 224 (3d Cir. 2004). Thus, even if this Court finds that the Ambassador Defendants' notice of joinder is untimely, the Court can include the Ambassador Defendants as part of its summary judgment review.

Here, while the Court has not specifically provided notice that it will sua sponte include the Ambassador Defendants in its decision regarding PwC's motion for summary judgment, it is readily apparent that at least two of the three exceptions exist in this case for the lack of notice. First, PwC filed its motion for summary judgment and Plaintiff was "afforded an adequate opportunity to develop the record," and did in fact develop the record such that this Court can render a decision. *Id.* (quoting *Artistic Entertainment, Inc. v. City of Warner Robins,* 331 F.3d 1196, 1202 (11th Cir. 2003)). [*13] Additionally, there is no prejudice to Plaintiff in allowing the Ambassador Defendants to be considered along with PwC regarding the issues presented. Thus, the Court will grant the Ambassador Defendants' motion to join PwC's motion for summary judgment to the extent that those arguments apply to those defendants.

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted:

if the pleadings, depositions, answers to interrogatories, and admissions on file, to-gether with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir. 1987). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.,* 843 F.2d 139, 143 (3d Cir. 1988). [*14] All facts and inferences are construed in the light most favorable to the non-moving party. *See Peters v. Delaware River Port Auth. of Pa. and N.J.,* 16 F.3d 1346, 1349 (3d Cir. 1994).

The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Therefore, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.* At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the finder of fact. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir. 1993). Therefore, to raise a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.; see also Anderson,* 477 U.S. at 252 ("The [*15] mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

## III. Choice of Law

While the parties have not specifically briefed or addressed the choice of law problem in this case, n4 it is apparent that when an action is brought pursuant to the diversity jurisdiction of the Court, 28 U.S.C. § 1332, the Court must engage in a choice of law analysis to determine the appropriate state law that governs the action. *Woessner v. Air Liquide Inc.,* 242 F.3d 469, 472 (3d Cir. 2001). A federal court exercising its diversity jurisdiction must apply the choice of law rules of the forum state in determining which state's laws should govern a given action. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941).

  

Because this action was filed in New Jersey, the Court must apply New Jersey choice of law rules. *Id.* New Jersey has adopted the "governmental-interest analysis in choice-of-law decision." *Veazey v. Doremus,* 103 N.J. 244, 247, 510 A.2d 1187, 1189 (1986). "Under [*16] that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue." *Id.* at 248, 510 A.2d at 1189.

n4 The parties do address the choice of law issue with regard to PwC's final claim for summary judgment — the alleged statute of limitations failure. (PwC's Br. In Supp. of Mot. for Summ. J. at 38; Pl.'s Br. In Opp'n to PwC's Mot. for Summ. J. at 36.) While the Court will specifically address the statute of limitations issue later in this opinion, a full discussion of choice of law in general is appropriate before addressing the substantive merits of the remainder of PwC's summary judgment motion.

"The first step in the analysis is to determine whether a conflict exists between the law of the interested states." *Id.* "If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Id.* [*17] New Jersey's choice of law test proceeds on an "issue-by-issue basis." *Id.* "Conflicts principles do not dictate that all legal issues presented by a single case should be decided under the laws of a single state. The evaluation of significant relationship and governmental interests takes place issue by issue and can lead to the application of different bodies of law." *Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 250 N.J. Super. 51, 65, 593 A.2d 367, 374 (App. Div. 1991). More importantly, where a defendant fails to raise a choice of law issue regarding any particular issue in a case, that argument will be deemed waived. *Neily v. Club Med Management Services, Inc.,* 63 F.3d 166, 180 (3d Cir. 1995).

In this case, Plaintiff contends that the substantive law of New Jersey controls this matter as New Jersey is the state with the most contacts to the instant action. PwC does not specifically argue for the substantive law of either New Jersey, New York or Vermont with regards to the main issue of potential auditor's liability. Instead, PwC confines its argument that the procedural law of New York must apply to bar part of the action on statute [*18] of limitations grounds. Implicit in its brief, however, PwC seems to concede that New Jersey law controls the major substantive issues in this case.

As will be discussed in further detail below, the main cause of action here is an auditor's liability for negligence or malfeasance. As there is no real conflict between the substantive law of both states, New York and New Jersey, and PwC has effectively waived its choice of law argument by not raising it as to the substantive issue, this Court ultimately concludes that the within cause of action arose in New Jersey. AIC's principal place of business was New Jersey and C&L's (PwC's predecessor) field work on the audits was conducted at AIC's offices in North Bergen, New Jersey. Further, New Jersey has a substantial interest in this case. AIC's inability to pay claims affected hundreds of New Jersey policyholders. Finally, PwC limits its choice of law argument to the fact that the audit was supervised and signed by a partner in the New York office and states that it was released in New York. To that end, PwC only seeks to avail itself of New York's favorable statute of limitations under a very limited circumstance without providing any [*19] genuine reason for this Court to otherwise use New York's substantive law.

Thus, in light of New Jersey's genuine interest in this matter and New York's tenuous contacts with the subject matter of the litigation, this Court concludes that New Jersey law will govern the substantive issues raised in this summary judgment motion.

## IV. Auditor's Liability

Plaintiff brings a diversity action against PwC based on accounting malpractice or negligence. Under New Jersey law, when a company prepares financial statements, an "independent auditor's role in the accountability process is to scrutinize management's accountability reports." *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 343, 461 A.2d 138, 148 (1983), *superceded by statute on other grounds in E. Dickerson & Son, Inc. v. Ernst & Young, LLP,* 361 N.J. Super. 362, 825 A.2d 585 (App. Div. 2003). n5 An independent auditor is "expected to detect illegal or improper acts that would be uncovered in the exercise of normal professional skill and care . . . [and] should exercise reasonable care in verifying the underlying data and examining the methodology employed in preparing the financial statements. [*20] " *Id.* 93 N.J. at 344, 461 A.2d 148-49. An independent auditor owes a duty of reasonable care to those to whom the company may foreseeably deliver the audit — as well as the company itself. Thus, as part of proving a case against the independent auditor, a company must prove the elements of duty, breach of duty, causation and damages. For purposes of this motion only, the Court will assume that PwC has breached its duty in the form of a deficient audit. This assumption is based solely on the fact that PwC has not raised any specific arguments on

  

summary judgment as to its breach of duty to AIC or Plaintiff.

n5 While this Court acknowledges that *H. Rosenblum, Inc.* has been abrogated by statute, N.J. Stat. Ann. § 2A:53A–25 (1995), that statute did not take effect until 1995 and is not retroactive. As this case was originally filed in 1985, the case of *H. Rosenblum, Inc.* is good law as to the instant matter.

## A. Causation

In its initial argument for summary judgment, PwC contends [*21] that Plaintiff cannot establish causation as a matter of law. PwC argues that: (i) Plaintiff cannot establish causation in fact; (ii) Plaintiff's damages theory violates proximate causation principles of remoteness, fairness, proportionality and foreseeability; and (iii) Plaintiff's calculation of the effects of a hypothetical runoff lacks foundation and reflects assumptions defying reason and logic. The Court will address each one of these arguments in turn.

### 1. Causation in Fact

To impose tort liability on a defendant under New Jersey law, a plaintiff bears the burden of proving by a preponderance of the evidence that the defendant's conduct is cause-in-fact of the plaintiff's injury. *Thorn v. Travel Care, Inc.,* 296 N.J. Super. 341, 346, 686 A.2d 1234, 1237 (App. Div. 1997). A plaintiff must introduce such evidence which provides a reasonable basis for the conclusion that it was more likely than not that negligent conduct of the defendant caused the injuries. *Fedorczyk v. Caribbean Cruise Lines, Ltd.,* 82 F.3d 69, 74 (3d Cir. 1996) (construing New Jersey law). While a jury may not find negligence or its causal relationship to damages by means [*22] of pure speculation, *Clarke v. Reiss,* 148 F. Supp. 135, 139 (D.N.J. 1957), proof of causation may rest upon legitimate inferences, so long as the proofs will justify reasonable and logical inferences as distinguished from mere speculation, *Kulas v. Public Service Electric & Gas Co.,* 41 N.J. 311, 319, 196 A.2d 769, 773 (1964).

Proof required to establish proximate cause does not need to be absolute, but only one of probability or likelihood. *Parks v. Pep Boys,* 282 N.J. Super. 1, 9, 659 A.2d 471, 474 (App. Div. 1995). A plaintiff is not required to prove causation by only direct, indisputable evidence. *Thorn,* 296 N.J. Super. at 346, 686 A.2d at 1237. Proof of proximate causation may rest upon legitimate inferences, so long as those inferences are reasonable and logical. *Id.* In general, the issue of proximate cause is

left to the jury for its factual determination. *Jakelsky v. Friehling,* 33 F. Supp. 2d 359, 365 (D.N.J. 1999); *Cruz-Mendez v. ISU/Insurance Services of San Francisco,* 156 N.J. 556, 576, 722 A.2d 515, 525 (1999). The issue can be addressed, as a matter of law, only where [*23] the outcome is clear or when highly extraordinary events or conduct takes place. *Jakelsky,* 33 F. Supp. 2d at 365. However, where there is a factual dispute as to events and circumstances which caused injuries, proximate cause is a jury question. *Melone v. Jersey Central Power & Light Co.,* 18 N.J. 163, 175-76, 113 A.2d 13, 20 (1955).

PwC argues that Plaintiff's theory of causation is impermissibly speculative and requires pure conjecture. In essence, PwC claims that in order for it to have caused Plaintiff's damages, C&L would have had to issue the audit report in mid-March 1982 that AIC was near insolvency (meaning a surplus of $5 million or less) and Plaintiff would have had to seize control of AIC and stop it from writing any new business after March 31, 1982, a mere 14 days later. PwC contends that, under Plaintiff's theory, "it is critical that [Plaintiff] would seize control within the 14 days between its mid-March receipt of the hypothetical [C&L] audit report stating that [AIC] 'may be near insolvency' and the end of March. Any additional delay would have postponed the April 1, 1982 date for [AIC's] going out of business and would, [*24] in turn, have jeopardized the asserted avoidance of a court-ordered liquidation." (PwC's Br. In Supp. of Mot. for Summ. J. at 12.)

PwC's argument regarding causation is based on the fact that in one of Plaintiff's damages calculations, Plaintiff's expert calculated the net loss to AIC as the difference between the losses incurred after a hypothetical runoff of claims and the more expensive court-ordered liquidation. Thus, PwC contends that unless Plaintiff can prove definitively that this exact script would have occurred, there is no causation.

To the contrary, Plaintiff asserts that its causation case only requires a jury to infer that one event would have happened: "Upon being advised by [AIC's] management or [C&L] in the first quarter of 1982 that [AIC] was at or near the point of insolvency, [Plaintiff] would have done exactly what it did when it received exactly the same information two years later: seize the company and 'stop the bleeding' by shutting down writings until a course of action could be determined." (Pl.'s Br. In Opp'n of PwC's Mot. for Summ. J. at 11.) Plaintiff argues that the other events addressed by PwC are not required to have happened in order to [*25] find causation and that there is ample evidence in the record to at least create a question of fact for the jury regarding this issue.

  

2004 U.S. Dist. LEXIS 27238, *25

Specifically, the record demonstrates that Plaintiff has two different experts who opine that if C&L had provided the appropriate audit, Plaintiff would have cut-off any writings to allow for a more orderly liquidation. (Affidavit of George K. Bernstein ("Bernstein Aff.") attached to Declaration of Richard B. Whitney ("Whitney Decl.") as Ex. 17, P 1; Deposition of Paul L. Sweeney ("Sweeney Dep.") attached to Whitney Decl. as Ex. 14 at 101-108.) Further, Plaintiff has offered testimony from two individuals employed by the Vermont Insurance Commissioner at the time who stated that "they would have immediately stopped the company from writing new or renewal business." (Deposition of George A. Chaffee ("Chaffee Dep.") attached to Whitney Decl. as Ex. 20 at 58-63; Deposition of Edward Meehan ("Meehan Dep.") attached to Whitney Decl. as Ex. 13 at 38-44.) George Chaffee testified to this point as follows:

A. Certainly a special examination would be called. And probably at that time I'd ask for a cessation in premium writings in the business. [*26] Where we would have a better look at the company.

Q. And what if management said, no, we don't want to stop writing?

A. Well, that's — then we would have to pursue other options because clearly management is not willing to dialogue with us about what we need to do as a regulator to find out the true — true condition of this company.

Q. The cessation and premium writings you described is new business plus renewals or new business only?

A. New business, perhaps non-renewed policies, yes, until further notice on that.

Q. But you might draw a distinction between totally new and renewal?

A. I suspect if confronted with a no, they weren't going to stop writing business. Just stop writing business, if you won't agree to it, we'll seek a court order immediately.

(Chaffee Dep. at 59:3-60:6.) Further, Edward Meehan testified, when asked whether he would have recommended that Plaintiff stop AIC from writing business:

I think so. With that — with that — a large decrease in surplus and the volume of business that they're doing at the time, I think that that might be one of the first things we would want to do . . . . Because you're telling me that [*27] — I don't know what the percentage is, but you're saying that we had an astronomical loss . . . . In a given year, and you got to do something to stop the bleeding. And to stop the bleeding is to stop the writing.

(Meehan Dep. at 39:8-39:21.)

Pursuant to New Jersey law, this Court must only find that a reasonable inference exists as to causation in the present case because any factual dispute should be sent to the jury rather than decided on a motion for summary judgment. *Cruz-Mendez,* 156 N.J. at 576, 722 A.2d at 525; *Kulas,* 41 N.J. at 319, 196 A.2d at 773. It is readily clear from the briefs and the statement of undisputed facts that the parties are at odds as to the script of causation required to find PwC liable for Plaintiff's losses. However, it also readily apparent from the record that Plaintiff can provide more than a mere scintilla of proof that "but for" PwC's negligence, Plaintiff would have immediately caused AIC to stop writing any additional policies, thereby reducing any ultimate losses to the company. Further, PwC's argument that the record does not support the inference because the witnesses can only testify as to what Plaintiff [*28] *could* do and not as to what Plaintiff *would* do, flies in the face of the hundreds of pages of testimony already submitted in the voluminous record of this case. The witnesses, who were actual employees of the Vermont Insurance Commissioner at the time in question, can actually testify as to what they *would* have done if circumstances had been different. PwC's attempt to disparage these witnesses by linking together several "sound bites" from the record to show that the testimony is speculative is more argumentative than real argument.

In addition, PwC relies heavily on the case of *Drabkin v. Alexander Grant & Co.,* 284 U.S. App. D.C. 348, 905 F.2d 453 (D.C. Cir. 1990) to demonstrate that courts are willing to dispose of similar auditor liability cases when the evidence of causation is too speculative. However, this case has no real application to the matter before the Court. In *Drabkin,* the trustee of a railroad corporation sought to recoup damages incurred due to an accounting firm's deficiencies in its audit of the plaintiff. 905 F.2d at 454-55. By special verdict, the jury awarded the trustee $11 million, finding the defendant accountant liable for deficient [*29] audits in two separate years. *Id.* at 455. The accountant filed a motion for

  

judgment notwithstanding the verdict, which was denied. Thereafter, on appeal, the D.C. Circuit reversed, finding that there was no evidence of a causal relationship between the accountant's failures and the plaintiff's damages. *Id.* at 454.

However, the evidence presented to the D.C. Circuit in *Drabkin* is not of the same type or quantity as the evidence existing in the present matter. First, in *Drabkin,* the accountant did actually warn the plaintiff of the problems and the potential for the ultimately caused damages. *Id.* at 455. The audit at issue in *Drabkin,* although deficient, did raise concerns over the business and the accountant issued qualifications in the audit that effectively warned of potential problems. *Id.* Here, however, both audits issued by PwC never gave notice of any existing or potential problems with AIC. Thus, in this case there was no opportunity for AIC's management to ignore the warnings from PwC, as none ever came. Moreover, in *Drabkin,* the only causation testimony came from a single member of the company's board [*30] and there was no evidence that he could have (or would have) convinced enough of the board to take action following a non-deficient audit opinion. *Id.* at 456. In the present matter, there is competent testimony from the actual Vermont Insurance Commissioner that he would have stopped AIC from writing new business and that he had the authority to do so single-handedly. Ultimately, there is ample evidence in the record to support the inference that Plaintiff's actions would have been different if PwC had provided a non-deficient audit to AIC and its management. Further, it is also readily apparent that any disputes as to the evidence regarding causation are issues that must be decided by a jury and are not proper for summary judgment. *See Shapiro v. Glekel,* 380 F. Supp. 1053, 1058–59 (S.D.N.Y. 1974) (indicating that whether auditor's alleged negligence was proximate cause of losses sustained by client–plaintiff is question for jury).

## 2. Proximate Causation Principles

A tortfeasor is generally held answerable for the injuries that result in the ordinary course of events from his or her negligence, and "it is generally sufficient if [the] negligent [*31] conduct was a substantial factor in bringing about the injuries." *Lynch v. Scheininger,* 162 N.J. 209, 228, 744 A.2d 113, 125 (2000). "The fact that there were also intervening causes which were foreseeable or were normal incidents of the risk created would not relieve the tortfeasor of liability." *Id.* "Ordinarily, these questions of proximate and intervening cause are left to the jury for its factual determination." *Id.* Intervening events constitute superseding causes as a matter of law only where such events were

"sufficiently extraordinary or so clearly unrelated to the antecedent negligence that imposition of liability would be unreasonable." *Id.; see also Port Authority of New York and New Jersey v. Arcadian Corp.,* 189 F.3d 305, 318 (3d Cir. 1999); *Jakelsky,* 33 F. Supp. 2d at 366.

Without a single citation to the record, PwC claims that "the current insolvency of [AIC] is the result of a confluence of events, all beyond the control of [C&L], remote from [C&L's] audit work, and, in every practical sense, unforeseeable by [C&L] in 1982." (PwC's Br. In Supp. of Mot. for Summ. J. at 17.) PwC argues that the insolvency [*32] is the result of several intervening events "including decisions by management as to what to insure; decisions by management as to how to operate the company; decisions by [Plaintiff] on how to handle claims, and/or how to spend money during the receivership." (*Id.* at 18.) PwC contends that to connect the end result of the alleged intervening events back to the audits of AIC's financial statements "stretches any sensible causal chain beyond the breaking point." (*Id.* at 19.)

However, while arguing that the claimed intervening events require this Court to grant summary judgment on its behalf, PwC has failed to provide any evidence or even argument as to why those intervening events are "sufficiently extraordinary or so clearly unrelated to the antecedent negligence that imposition of liability would be unreasonable." *Lynch,* 162 N.J. at 228, 744 A.2d at 125. More importantly, Plaintiff disputes the facts regarding any claimed intervening events, thereby creating an issue of fact. Thus, the existing dispute as to whether any alleged intervening events effectively cut-off PwC's liability to Plaintiff must go to the jury and summary judgment is inappropriate. [*33]

### 3. Plaintiff's Calculation of Damages

Finally, PwC argues that Plaintiff's damage calculation requires that Plaintiff "would have begun a runoff of [AIC's] claims on April 1, 1982 and not sought a court-ordered liquidation." (PwC's Br. In Supp. of Mot. for Summ. J. at 19.) Further, PwC contends that this calculation requires "guesswork" due to the fact that the runoff spans a 19-year period and thus "renders the 'calculation' impermissibly speculative." (*Id.*) In its original summary judgment brief as well as a supplemental brief, PwC suggests that Plaintiff's records and damage calculations are so replete with errors and discrepancies as to be untrustworthy and that the entire damage calculation should be thrown out. The Court notes that these claims are supported with very few actual citations to the record and without any mention whatsoever in PwC's 56.1 Statement of Undisputed Facts.

  

To the contrary, Plaintiff asserts that the alleged errors and discrepancies have been identified, explained and resolved in Plaintiff's expert's final damage calculation served in March 2004. Specifically, Plaintiff argues that the damage report is an ongoing calculation and is being [*34] refined to be as accurate as possible. Moreover, Plaintiff notes that the receivership financial systems and databases were not originally designed or intended to be litigation support tools and Plaintiff's expert has continually updated the damage report to take advantage of improved data compilations received from the receivership. (Pl.'s Br. In Opp'n to PwC's Mot. for Summ. J. at 21.) Plaintiff contends that the damage report "has been refined and clarified and the jury will get the most accurate evidence available on which to base their decisions." (*Id.* at 23.)

In essence, PwC seeks to re–argue points that it could have made in its *Daubert* motions regarding the admissibility and methodology of Plaintiff's damage report, but chose not to. In those several motions, PwC sought to exclude testimony of several Plaintiff experts, including Loren Kramer, Plaintiff's damages expert. *See Crowley v. Chait,* 322 F. Supp. 2d 530 (D.N.J. 2004). However, for reasons unknown to this Court, PwC did not specifically challenge the damage report in those motions. Now, PwC includes a disguised *Daubert* argument in its motion for summary judgment. While this action is not [*35] completely impermissible, the Court notes that the very issue of "error corrections," although in the context of other expert reports, was dealt with in this Court's *Daubert* opinion. Specifically, this Court noted that:

> *Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes or retracted his false statements. In fact, one of the very purposes of a *Daubert* hearing, . . . is to give experts a chance to explain and even correct errors that they made in their reports. . . . There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report.

*Id.* at 540.

The Court has reviewed Kramer's original damage report completed in February 2000 as well as Kramer's updated damage report completed in March 2003 with additional corrections in March 2004. This Court is persuaded that the corrections and updated figures used in the new report do not represent any substantial changes in methodology, but rather represent the most updated and accurate damages calculation that Plaintiff can present to the jury. For example, in Kramer's [*36] corrected March 2003 damages report, Kramer changed the interest rate from 1.2% to 1.4% to accurately reflect AIC's average investment earnings rate. (Kramer's Corrected March 2003 Damage Report attached to Supplemental Declaration of Richard B. Whitney as Ex. 1 at 1.) Another example is an adjustment made on PwC's expert testimony for certain liquidated claims that were inadvertently double counted in the original calculation. (*Id.* at 2; Deposition of Dale Ogden attached to Declaration of Jay Kelly Wright ("Wright Decl.") as Ex. J at 280–83.) PwC's arguments regarding the changes made to the original report address issues or questions that go to the weight and credibility of the testimony and not to its admissibility. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1999) ("Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Voilas v. General Motors Corp.,* 73 F. Supp. 2d 452, 461 (D.N.J. 1999) ("Indeed, federal courts have generally found that the perceived flaws in an expert's testimony [*37] often should be treated as matters properly to be tested in the crucible of the adversarial system, not as the basis for truncating that process."). Thus, this Court must deny PwC's motion for summary judgment as to the issue of causation because there does exist disputed issues of fact as to whether PwC in fact caused Plaintiff's damages and these issues must be presented to the trier of fact.

**B. Damages**

Next, PwC claims that it is entitled to summary judgment because the damage calculation of Plaintiff's expert is based on unreliable data and includes "impermissible factors" which "invalidate the entire calculation because plaintiff's calculation commingles everything into an 'all or nothing' number." n6 (PwC's Br. In Supp. of Mot. for Summ. J. at 22.) Specifically, PwC claims that Plaintiff impermissibly includes calculations for: (i) prejudgment interest; (ii) a claim against AIC made by a Horizon liquidator; and (iii) Plaintiff's attorneys' fees and other litigation expenses. In response, Plaintiff argues that all of the damage components are appropriate and therefore summary judgment should be denied. Additionally, Plaintiff contends that even if this Court should determine [*38] that part of the damage calculation is impermissible, the appropriate response is to deduct that impermissible calculation and not to "throw out" the damage calculation in its entirety.





n6 The Court notes that under this separate point heading, as it did under causation and its supplemental brief, PwC once again argues that the entire damage calculation is flawed because it is "riddled with significant, unexplainable errors and discrepancies." (PwC's Br. In Supp. of Mot. for Summ. J. at 22.) However, as explained previously, this Court notes that such a theory does not warrant summary judgment. PwC should save any further argument regarding the alleged deficiencies of the damages expert report for cross-examination as that evidence goes to the weight and sufficiency of the overall report.

While this Court has not found any New Jersey cases directly discussing the appropriate measure of damages under factually similar circumstances, it is clear that New Jersey's tort policy has a remedial theme. *See, e.g.,* [*39] *Giantonnio v. Taccard,* 291 N.J. Super. 31, 40, 676 A.2d 1110, 1114 (App. Div. 1996) ("We begin with the thesis that wronged persons ordinarily should be compensated for their injuries and that generally those responsible should bear the cost of their tortious conduct."). Under New Jersey law, compensatory damages in a professional malpractice case are those damages that flow as a natural and continuous consequence from the defendant's negligence. *E.g., Carey v. Lovett,* 132 N.J. 44, 72, 622 A.2d 1279, 1293 (1993); *Grunwald v. Bronkesh,* 131 N.J. 483, 495, 621 A.2d 459, 465 (1993); *see also H. Rosenblum, Inc.,* 93 N.J. at 351, 461 A.2d at 152 ("In the final analysis the injured party should recover damages due to an independent auditor's negligence from that auditor. This would shift the loss from the innocent creditor or investor to the one responsible for the loss.")

In general, a plaintiff in an accounting malpractice case may recover only those sums that will compensate him or her for the loss suffered as a result of the defendant's wrong conduct. *See McCulloch v. Price Waterhouse LLP,* 157 Ore. App. 237, 971 P.2d 414, 417 (Or. Ct. App. 1998); [*40] *World Radio Lab., Inc. v. Coopers & Lybrand,* 251 Neb. 261, 557 N.W.2d 1, 13 (Neb. 1996). Included in such a compensatory damage claim may be sums for losses due to injury to an ongoing business, *Wagenheim v. Alexander Grant & Co.,* 19 Ohio App. 3d 7, 19 Ohio B. 71, 482 N.E.2d 955, 968 (Ohio Ct. App. 1983), losses due to lost profits, *World Radio Lab., Inc.,* 251 Neb. 261, 557 N.W.2d at 13, and losses due to lost investments, *Anoka Orthopaedic Assoc., P.A. v. Mutschler,* 773 F. Supp. 158, 171 (D. Minn. 1991). In addition, losses incurred from an auditor's malpractice may include those damages suffered when a plaintiff-company is forced to file for bankruptcy. *See*

*Greenstein, Logan & Co. v. Burgess Mktg., Inc.,* 744 S.W.2d 170, 186 (Tex. Ct. App. 1987) (indicating that jury reasonably could have concluded that auditor's negligent performance of audit, which failed to discover substantial underpayment of federal excise tax, was a substantial factor in bringing about the client-plaintiff's bankruptcy).

Ultimately, this Court recognizes that New Jersey law allows Plaintiff's damage calculation to include any and all losses that would reasonably flow from PwC's alleged [*41] tortious conduct. *Carey,* 132 N.J. at 72, 622 A.2d 1279 (1993); *Grunwald,* 131 N.J. at 495, 621 A.2d at 465). Thus, summary judgment is only appropriate if Plaintiff's *entire* damage calculation is impermissible. As PwC has not argued anywhere in its several briefs that Plaintiff's entire damage calculation is impermissible, summary judgment is not warranted. As discussed earlier, this argument is more properly considered as a motion in limine and the Court will review each element to determine if a reduction is appropriate.

### 1. Accrued Interest

PwC takes particular issue with Mr. Kramer's inclusion of some $70 million of alleged accrued prejudgment interest. Specifically, PwC contends that the interest number comes from a calculation made by one of Plaintiff's other experts and is based on a provision in the Liquidation Order signed by the Vermont state court. n7 Without citation to any controlling case law, PwC asserts that inclusion of the calculated prejudgment interest as addressed in the Vermont Liquidation Order is inappropriate because "the law does not necessarily confer an automatic award for the time value of money." (PwC's [*42] Br. In Supp. of Mot. for Summ. J. at 26.)

n7 The Liquidation Order provides in pertinent part:

> To the extent funds are available, the liquidator shall pay interest on the unpaid portion of any allowed claim, with such interest to accrue as of the date of the first partial payment made on that claim. No interest shall be payable unless and until the principal amount of all allowed claims of the same priority have been paid in full, but such interest shall be payable in full before any distributions are made to claimants of a lower priority.

(March 10, 1987 Liquidation Order, attached to Whitney Decl. as Ex. 6 at 18; Bernstein Aff., P



7.)

To the contrary, Plaintiff argues that the damage calculation does not include "prejudgment interest," but rather includes the "mandatory interest payments" reflected in the Vermont Liquidation Order. (Pl.'s Br. In Opp'n of PwC's Mot. for Summ. J. at 24.) Plaintiff claims that the interest in the damage calculation is not "prejudgment interest" because the interest [*43] is a component of actual damages. That is, Plaintiff claims that PwC must pay this interest because each priority claimant cannot receive any money until all higher priority claimants receive all money in full, plus interest.

In support of his position, Plaintiff cites *Pac. Gas & Elec. Co. v. Howard P. Foley Co.*, No. 85-2922, 1993 WL 299219 (N.D. Cal. July 27, 1993), *Minpeco, S.A. v. Hunt*, 686 F. Supp. 420 (S.D.N.Y. 1988), *United Telecomm., Inc. v. American Television & Comm. Corp.*, 536 F.2d 1310 (10th Cir. 1976) and *American Anodco, Inc. v. Reynolds Metal Co.*, 743 F.2d 417 (6th Cir. 1984) for the proposition that interest as part of the substantive damage claim is a permissible damage calculation and does not amount to prejudgment interest. While each of these cases addresses the inclusion of some form of "interest" in a substantive damage calculation, this Court finds the decision in *United Telecomm.* most instructive.

In *United Telecomm.*, the Tenth Circuit allowed the plaintiff to include "the cost of continued borrowing" in the form of interest as part of its overall damage calculation. 536 F.2d at 1313. [*44] The defendant argued that any interest paid on monies borrowed to cover the plaintiff's losses amounted to impermissible prejudgment interest under state statute. *Id.* The court reasoned that the interest was an item of damage related to the substantive claim and was different from an award of interest as measured by a percentage of the judgment. *Id.* 536 F.2d at 1313-14. Ultimately, the Tenth Circuit was concerned with making the plaintiff whole and found no error in the trial court's inclusion of this element of damage. *Id.* 536 F.2d at 1314. PwC contends that the cases cited by Plaintiff are inapposite because, unlike the plaintiffs in those cases, Plaintiff here did not have to borrow any money as a result of its alleged actions. (PwC's Reply Br. at 7-8.) The Court is unpersuaded by this argument. In essence, PwC is claiming that *if* Plaintiff had borrowed funds to pay off all of its remaining claimants (most of whom have sat unpaid for a long while due to the two decades this case has been in litigation), *then and only then* would Plaintiff have the right to collect that element of damage. It seems readily apparent that the cases cited by Plaintiff support [*45] a finding that interest may constitute a permissible part of the damages calculation.

More importantly, a quick review of New Jersey state law allows this Court to draw the same conclusion.

Under New Jersey law, prejudgment interest is generally permitted in cases sounding in tort pursuant to a formula set forth in N.J. Court Rule 4:42-11(b). n8 In malpractice cases, the award of prejudgment interest is "guided by equitable principles with the concept of making the victim whole of paramount significance." *Bailey v. Pocaro & Pocaro*, 305 N.J. Super. 1, 8, 701 A.2d 916, 920 (App. Div. 1997). However, New Jersey law has also specifically recognized that interest may be part of the actual substantive damages required to make a plaintiff whole. *See Osborne v. O'Reilly*, 267 N.J. Super. 329, 332, 631 A.2d 577, 579 (App. Div. 1993) (finding that plaintiff may recover interest lost on underlying case as component of actual damages in attorney malpractice claim). Thus, this Court is convinced that New Jersey law would allow a plaintiff to include interest amounts in his overall damage calculation where, as here, interest is a component of actual damage. Accordingly, [*46] Plaintiff's inclusion of interest on the unpaid pending claims is an appropriate element and any issue regarding its calculation is an issue of fact for the jury.

n8 N.J. Court Rule 4:42-11(b) provides, in pertinent part:

> Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest.

**2. Horizon liquidator's Claim against AIC**

Next, PwC claims, again without single citation to the record, that the damage report has included a component of approximately $33 million, "which is said to represent a claim against [AIC] by the liquidator of Horizon." n9 (PwC's Br. In Supp. [*47] of Mot. for Summ. J. at 27.) PwC contends that the Horizon claim has never been investigated or allowed by Plaintiff, yet is included as part of the damages. Alternatively, PwC claims that this element of damages is precluded because

  

the Horizon liquidator has previously brought this claim against PwC and lost in *Muhl v. Ambassador Group, Inc.,* No. 28414/85 (N.Y. Sup. Ct. Sept. 3, 1996).

n9 The history between AIC and Horizon and its liquidator is long and complicated. Suffice to say that most of those facts are irrelevant to the present motion before the Court. This Court's knowledge of those facts and the history of the New York state litigation are gleaned from the unpublished written opinion filed on September 9, 1996 in conjunction with *Muhl v. Ambassador Group, Inc.,* No. 28414/85 (N.Y. Sup. Ct. Sept. 9, 1996). This Court notes that AIC was a 100% stock owner of Horizon, a New York chartered casualty insurance company. *(Muhl,* No. 28414/85 at 2, attached to Wright Decl. as Ex. B.) Due to circumstances related to the instant litigation, the New York Superintendent of Insurance, as liquidator, filed an action against AIC and the same defendants in this case for similar claims. The disposition of the New York action, however, has no bearing on the instant matter, as Plaintiff was not involved in that action. *See Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 505 (3d Cir. 1992) (finding critical element of issue preclusion is presence of party in *both* actions).

[*48]

Plaintiff argues, however, that the damage component is an "amount owed to Horizon on account of the 50% quota share reinsurance treaty between [AIC] and Horizon." (Pl.'s Br. In Opp'n to PwC's Mot. for Summ. J. at 25.) As such, Plaintiff contends that it is a permissible portion of Plaintiff's overall damages. This Court is persuaded that the portion of Plaintiff's damages resulting from the money owed to the Horizon liquidator is a permissible component of the overall substantive damages. As discussed above, New Jersey law allows recovery of those amounts that reasonably and logically flow from a defendant's tortious conduct. *Osborne,* 267 N.J. Super. 329 at 332, 631 A.2d at 579. Even assuming that the New York state court decided that the Horizon liquidator could not maintain a separate cause of action against PwC for its losses sustained during AIC's receivership, that fact alone does not relieve AIC from its obligation to pay Horizon in accordance with the agreement. n10 Moreover, it does not preclude Plaintiff from including that sum in his damage calculation to the extent that AIC's damages resulted from defective C&L audits. Thus, any argument by PwC as to the appropriateness [*49] of this damage component goes to the

sufficiency and weight of the evidence and does not preclude this Court from allowing that component as part of the overall damage calculation.

n10 On September 7, 1982, Horizon and AIC entered into a 50% Quota Share Reinsurance Agreement retroactive to January 1, 1982. Under this agreement, Horizon agreed to forward AIC reinsurance premiums equal to 50% of its written premiums after deducting reinsurance premiums due to other reinsurers. In return, AIC agreed to pay 50% of all claims paid by Horizon to its policyholders and 50% of the cost of handling those claims, after deducting reinsurance from Horizon's other reinsurers. *(Muhl,* No. 28414/85 at 4–5.)

### 3. Attorneys Fees and Other Litigation Costs

Finally, PwC argues that Plaintiff's damage calculation includes the fees and costs of his attorneys and fees and expenses of Plaintiff's consultants and experts. PwC contends that the more than $15 million in fees and expenses included in the damage calculation has automatically [*50] shifted the burden of litigation from Plaintiff to PwC and "violates the general American rule on litigation attorneys' fees and expenses." (PwC's Br. In Supp. of Mot. for Summ. J. at 28–29.) Plaintiff counters, however, that the inclusion of attorneys fees and expert costs is appropriate under New Jersey law. In urging the Court to allow these fees as part of his consequential damages, Plaintiff analogizes his loss in the present accounting malpractice claim to the type of loss suffered in a legal malpractice claim. Specifically, Plaintiff claims that "but for [C&L's] malpractice, [Plaintiff] would not have incurred the substantial costs of litigating this case. That causal chain makes recovery of attorney's fees appropriate in this context." (Pl.'s Br. In Opp'n to PwC's Mot. for Summ. J. at 27.)

As a general rule in New Jersey, each party must bear its own litigation expenses, including attorneys' fees. *Right to Choose v. Byrne,* 91 N.J. 287, 316, 450 A.2d 925, 940 (1982). However, a prevailing party can recover those fees and costs if they are expressly provided for by statute, court rule, or contract. *State, Dep't of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 504, 468 A.2d 150, 166 (1983). [*51] Under New Jersey law, many statutes expressly authorize these awards, n11 and N.J. Court Rule 4:42–9 also provides for an award of attorneys' fees in certain situations, none of which apply to the present matter.

n11 *See, e.g., The Conscientious Employee*



Protection Act, N.J. Stat. Ann. § 34:19-5(e); 34:19-6; The Consumer Fraud Act, N.J. Stat. Ann. § 56:8-19; The Law Against Discrimination, N.J. Stat. Ann. § 10:5-27.1.

In addition, in *Saffer v. Willoughby,* 143 N.J. 256, 272, 670 A.2d 527, 534 (1996), the New Jersey Supreme Court held that "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred . . . in prosecuting [a] legal malpractice action." *Saffer* involved a fee dispute between an attorney and a former client. *Id.* 143 N.J. at 260, 670 A.2d at 529. The client filed a request for fee arbitration, but before a decision was reached, the client discovered evidence that led him to file [*52] a legal malpractice claim against his former attorney. *Id.* In evaluating whether the client was entitled to an award of fees in the case of legal malpractice, the court emphasized that a client is entitled to recover for losses that are proximately caused by an attorney's negligence. The court noted that the purpose of a legal malpractice claim is to put the client in as good a position as he or she would have been if the attorney had performed competently. *Id.* 143 N.J. at 269-71, 670 A.2d at 533-34. The court further reasoned that attorneys' fees "are consequential damages that are proximately related to the malpractice[,]" and that "unless the negligent attorney's fee is determined to be part of the damages recoverable by a plaintiff, the plaintiff would incur the legal fees and expenses associated with prosecuting the legal malpractice suit." *Id.; see also Bailey,* 305 N.J. Super. at 6, 701 A.2d at 919 ("[A] plaintiff who is economically injured by an attorney's legal deficiency should be made whole ... The concept of 'wholeness' includes the attorney's fees and costs to pursue the malpractice claim."); *Davin, L.L.C. v. Daham,* 329 N.J. Super. 54, 71, 746 A.2d 1034, 1042 (App. Div. 2000) [*53] ("In appropriate circumstances, a client may be entitled to recover the costs of litigation in a professional malpractice action.").

In *Packard-Bamberger & Co., Inc. v. Collier,* 167 N.J. 427, 771 A.2d 1194 (2001), the New Jersey Supreme Court addressed the issue of attorney's fees in a malpractice case where the claim for malpractice was dismissed. In *Packard-Bamberger & Co.,* the trial court found that an attorney's actions amounted to an intentional violation of a fiduciary duty, but did not amount to legal malpractice. *Id.* 167 N.J. at 439, 771 A.2d at 1201. Due to the dismissal of the malpractice claim, the Appellate Division found that an award of attorneys' fees was not warranted because the plaintiffs were "unsuccessful legal malpractice litigants" and that an award of fees was not otherwise allowed by a statute, contract or specific court rule. *Id.* 167 N.J. at 442, 771 A.2d at 1203.

In reversing the Appellate Division, the New Jersey Supreme Court found that the Appellate Division's conclusion "requires a circumscribed reading of *Saffer,* one that is inconsistent with the sound policies undergirding that decision." *Id.* The court explained [*54] that "such an approach would lead to the incongruous result that a plaintiff could recover counsel fees if successful in proving an attorney's negligence, but not when proving an intentional violation of a fiduciary duty arising as a result of the attorney-client relationship." *Id.* Thus, the court held "that a successful claimant in an attorney-misconduct case may recover reasonable counsel fees incurred in prosecuting that action." *Id.* 167 N.J. at 443, 771 A.2d at 1203.

Despite the wealth of law in New Jersey regarding the payment of attorneys' fees in the context of a legal malpractice claim, there exists no case law with regards to the payment of attorneys' fees and costs in the context of other professional malpractice claims. There exists virtually no case law in any other state addressing this issue either. Accordingly, this Court is compelled to agree with PwC regarding this specific component of damages set forth in Plaintiff's expert damages report. It is true that New Jersey courts have found a compelling reason to stray from the general rule regarding the payment of litigation expenses in legal malpractice cases, but there is no indication that New Jersey courts [*55] would follow that same analysis in other professional malpractice cases. More importantly, there are absolutely no facts presented in the context of this summary judgment motion that would allow this Court to find that PwC's actions were somehow willful, wanton or intentional. As a matter of fact, most of the record seems to indicate that the bulk of Plaintiff's claims are that PwC acted negligently.

Thus, as Plaintiff has not indicated that there exists any contract, statute or court rule that might otherwise allow an award of attorneys fees and costs, the Court will require Plaintiff to amend his expert damages report to remove the approximately $12.7 million in attorneys' fees and expert costs from the total expected damage award. However, this decision is without prejudice and Plaintiff may, if circumstances warrant, make application to the Court for an award of attorneys' fees and costs at another more appropriate time.

## C. Duty of Auditor to Receiver

PwC's next argues that Plaintiff's demand that C&L "pay enough to cover all of the losses of those who have claims against [AIC] but cannot be fully paid from [AIC's] own assets. . . . is an attempt to circumvent [the] [*56] governing law." (PwC's Br. In Supp. of Mot. for Summ. J. at 31.) In essence, PwC argues that C&L owed



no duty to Plaintiff such that an award for all of AIC's losses would be warranted. PwC states two reasons for this conclusion: (i) that there is no privity between PwC and Plaintiff; and (ii) that Plaintiff lacks standing to sue for the losses of the third party creditors in this case. In response, Plaintiff asserts that his entire argument is frivolous and inappropriate because his claims against PwC comply with current New Jersey and Third Circuit case law. Moreover, Plaintiff notes that this Court has already addressed these very arguments on two separate occasions in the course of this litigation.

This Court will dispose of PwC's argument and claim that there is no duty to Plaintiff and that Plaintiff's claims do not comply with governing law based on the law of the case doctrine. This very issue has been decided by this Court, twice, in the course of the litigation: first, in 1986, in the context of a motion for summary judgment and again, in 1988, in the context of a motion to dismiss. PwC, making the very same arguments that it makes today, was rejected two times and this [*57] Court finds no compelling reason, new intervening case law or factual circumstance to disturb its earlier findings.

The "law-of-the-case" doctrine stands for the proposition that an unreversed decision of law or fact made during the course of litigation settles that question for all subsequent stages of the suit. *Arizona v. California,* 460 U.S. 605, 619, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983); *see also State v. Reldan,* 100 N.J. 187, 203, 495 A.2d 76, 85 (1985). The policy supporting this doctrine is that once an issue is litigated and decided, courts should avoid relitigating that issue. *Sisler v. Gannett Co.,* 222 N.J. Super. 153, 159, 536 A.2d 299, 302 (App. Div. 1987), *certif. denied,* 110 N.J. 304, 540 A.2d 1283 (1988). This doctrine applies both to issues actually discussed and issues decided by necessary implications. *Schultz v. Onan Corp.,* 737 F.2d 339, 345 (3d Cir. 1984). The purpose of the doctrine is to "promote the judicial system's interest in finality and in efficient administration." *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 165 (3d Cir. 1982) (citations omitted).

While there are certain exceptions [*58] to the law of the case doctrine, none of those exceptions are warranted under the circumstances here. Additionally, this Court has noted that "this discretionary doctrine 'does not preclude a trial judge from clarifying or correcting an earlier ambiguous ruling . . . whenever it appears that a previous ruling, even if unambiguous, might lead to an unjust result.'" *Babcock v. Chait,* No. 85-2441, slip op. at 48 (D.N.J. March 16, 1988) (quoting *Swietlowich v. County of Bucks,* 610 F.2d 1157, 1164 (3d Cir. 1979)). Once again, this Court finds that the prior decision in this case was correct and "that under New Jersey law, the

accountant may be liable for damages that resulted from any alleged negligence and that [Plaintiff], on behalf of [AIC], had standing to bring such a suit." *Id.*

Not only did this Court unambiguously find that Plaintiff had standing to bring the present lawsuit on behalf of AIC, but the Court relied on the decision in *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 78 L. Ed. 2d 698, 104 S. Ct. 508 (1983), which stands for the proposition that a receiver can maintain an action on behalf of creditors and policyholders. [*59] *Babcock,* No. 85-2441, at 49. In *Schacht,* a liquidator of an insurance company brought suit against the accountants claiming that the defendants knew that the insurance company was insolvent but prepared opinion letters regarding the company's financial status which contributed to its deepened insolvency. *Id.* (citing *Schacht,* 711 F.2d at 1345). The defendants "asserted that the liquidator lacked standing to sue them for damages caused by the 'fraudulent prolongation of the company's life.'" *Id.* (citing *Schacht,* 711 F.2d at 1350). The Seventh Circuit found that the damages "were recoverable from the perpetrators of the fraud to hold otherwise 'rests upon a seriously flawed assumption, i.e., that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests.'" *Id.* at 49–50 (quoting *Schacht,* 711 F.2d at 1350).

In applying the facts of the present matter to the law as established in *Schacht,* this Court concluded that "[Plaintiff] clearly has standing to assert claims against [PwC] for damages that have resulted from its alleged [*60] negligent accounting practices." *Id.* at 50. The Court also found "that [Plaintiff] could maintain an action on behalf of the creditors and policyholders." *Id.* This Court reasoned that "the Liquidation Order . . . specifically empowers [Plaintiff] to prosecute any action which may exist on behalf of the creditors, policyholders and shareholders of [AIC]." *Id.* at 51. In addition, this Court noted "that a receiver who, either by statute or court appointment, is charged with protecting, among other things, the rights of the creditors of the insolvent corporation 'may protect corporate creditors through an independent action although the corporation could not have done so.'" *Id.* (citation omitted).

This Court finds the case law discussion and reasoning set forth in the 1988 opinion regarding PwC's motion to dismiss to be equally applicable today as it was sixteen years ago. Moreover, with the passage of time, the Third Circuit has now embraced, although under factually different circumstances, the holding in *Schacht* that a representative of a failed corporation has standing to sue third party professionals on behalf of creditors for the "deep-

  

ening insolvency" those [*61] professionals caused to the underlying corporations. In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 343 (3d Cir. 2001), the Third Circuit held that the plaintiff n12 had standing to sue because the plaintiff was not merely asserting claims belonging to the creditors, but rather was bringing a separate claim for a cognizable injury–the corporation's deepening insolvency–that was not illusory. In so holding, the Third Circuit noted:

> It follows from this discussion that a corporation can suffer an injury unto itself, and any claim it asserts to recover for that injury is independent and separate from the claims of shareholders, creditors, and others. We think it is irrelevant that . . . a successfully prosecuted cause of action leads to an inflow of money to the estate that will immediately flow out again to repay creditors.

*Id.* at 348–49; *see also Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir. 1995) ("That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets."); *Waslow v. Grant Thornton LLP (In re Jack Greenberg, Inc.),* 240 B.R. 486, 506 (Bankr. E.D. Pa. 1999) [*62] ("Simply because the creditors of a [sic] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors."). After reaching this conclusion, the Third Circuit concluded that, under Pennsylvania law, a "deepening insolvency" theory is a cognizable injury warranting standing for the plaintiff to sue. *Lafferty,* 267 F.3d at 352.

> n12 In this bankruptcy proceeding, the bankruptcy court had approved a stipulation between the plaintiff and the bankrupt corporation authorizing the plaintiff "to commence and prosecute . . . litigation on behalf of the [corporation's] estate." *Lafferty,* 267 F.3d at 344. Thus, the plaintiff in *Lafferty* had acquired the same status as a bankruptcy trustee, which is similar to that of a receiver or liquidator.

Applying the analysis in *Lafferty* to the present matter, this Court concludes that Plaintiff has standing to bring the present matter and that the Third Circuit, after [*63] applying New Jersey law, would find that AIC suffered a cognizable injury from PwC's actions in the form of "deepening insolvency." As previously addressed in this opinion, New Jersey's tort policy is remedial in na-

ture and New Jersey courts seek to provide just and full compensation to a plaintiff who suffers injury. *Carey,* 132 N.J. at 72, 622 A.2d at 1293; *H Rosenblum,* 93 N.J. at 351, 461 A.2d at 152 ("In the final analysis the injured party should recover damages due to an independent auditor's negligence from that auditor."). Further, the New Jersey Appellate Division, while citing this Court's 1986 opinion in this very case, has held that a liquidator suing a company's auditor for concealing the company's true economic condition "may prosecute a claim 'on behalf of its creditors and policyholders, provided that the objective of such a suit is to increase the assets of the estate of the insolvent insurance company to which the creditors and policyholders, as well as the public, may look for satisfaction of their debt." *In re Integrity Insurance Co.,* 240 N.J. Super. 480, 493–94, 573 A.2d 928, 935 (App. Div. 1989) (citations omitted). [*64]

Thus, in light of the law of the case doctrine and the current governing case law in both New Jersey and the Third Circuit, this Court finds PwC's motion for summary judgment based on Plaintiff's lack of standing or lack of duty is completely without merit.

### D. Honest Estimation of Loss Reserves Defense

PwC also contends that any mistakes made during the C&L 1981 audit in testing AIC's loss reserve estimates are not actionable because "the entire process of projecting and estimating [loss reserves] is art, not science." (PwC's Br. In Supp. of Mot. for Summ. J. at 29.) In essence, by making comparisons to reserve estimates calculated by Plaintiff's experts, PwC asserts that any mistakes made by C&L were minor and that the estimates were the result of an "honest effort." (*Id.* at 30.) Again, PwC makes this argument without benefit of any citation to the record or any claim of undisputed facts. Additionally, PwC does not set forth any legal argument demonstrating that an honest estimation of loss reserves is a valid defense to a claim of auditor's negligence. PwC points only to a few factually inapplicable cases to suggest that, absent fraud, it cannot be held responsible [*65] for its estimations of loss reserves because such estimations are difficult and require the exercise of judgment.

The cases cited by PwC are inapposite to the facts at hand. In *Delta Holdings v. Nat'l Distillers & Chem. Corp.,* 945 F.2d 1226, 1247 (2d Cir. 1991), a complex securities fraud case dealing with the sale of a reinsurance corporation, the Second Circuit held, as a matter of law, that a company's failure to disclose an accountant's improper estimation of loss reserves was not a material misrepresentation warranting liability. In so holding, the court, in dicta, discussed how "loss reserves



are not like a debt with fixed payments of principal and interest. Informed guesswork is an accepted basis for determining such reserves." *Id.* at 1250. However, it is important to note that while the Second Circuit, in *Delta Holdings*, observed that estimating loss reserves may be "conjectural" reflecting "judgment calls," the court did not address potential auditor liability for either fraud or negligence and the case is inapplicable to the matter at hand.

Similarly, PwC cites *In re Kindred Healthcare, Inc. Secs. Litig.*, 299 F. Supp. 2d 724, 733-34 (W.D. Ky. 2004) [*66] for the proposition that "reserve levels are projections of future events and results." However, PwC cites this case without any discussion of the facts and circumstances to which it relates. The case of *In re Kindred Healthcare* pertains to a large securities fraud class action brought by investors of a large health care company. *Id.* at 728-29. There, the plaintiffs alleged that the company had a duty to disclose information regarding the status of the company's reserves to cover professional liability claims. *Id.* at 733. In concluding that the company had not committed securities fraud, the district court found that a company only has an affirmative duty to disclose "hard" facts and that because information regarding reserve level projections were not "hard" facts, the company had no duty to disclose. *Id.* Again, as with *Delta Holdings*, *In re Kindred Healthcare* is factually dissimilar to the present matter and does not specifically address the issue of an *auditor's* liability with regards to loss reserve estimations. Thus, this Court finds that PwC has not presented any evidence of undisputed facts to conclude that an honest estimation [*67] of loss reserves is a valid defense under these circumstances.

**V. Statute of Limitations**

Finally, PwC contends that the New York statute of limitations should apply to this cause of action, thereby precluding Plaintiff's claims regarding the 1981 audit. n13 PwC argues that the audit of AIC's 1981 financial statements was signed and dated on March 15, 1982. Thus, PwC concludes that Plaintiff's cause of action regarding the 1981 audit was filed out of time because Plaintiff instituted this case in May 1985, more than three years after March 15, 1982. On the other hand, Plaintiff asserts that New Jersey substantive law applies in this matter and thus the appropriate statute of limitations is six years.

n13 PwC only argues the statute of limitations argument with regards to the 1981 audit and does not raise it regarding the 1982 audit.

As already addressed, "[a] federal court sitting in a diversity action applies the forum state's choice of law rules." *Pittston Co. v. Sedgwick James of New York, Inc.*, 971 F. Supp. 915, 922 (D.N.J. 1997); [*68] *see also Woessner*, 242 F.3d at 472. Under New Jersey's choice of law rules, New Jersey's statute of limitations governs unless an exception to that rule applies. *Pittston Co.*, 971 F. Supp. at 922. Although New Jersey usually reviews choice of law on an "issue-by-issue basis," *Veazey*, 103 N.J. at 247, 510 A.2d at 1189, it also follows the traditional conflict of laws rule "whereby the statute of limitations of the forum governs unless the limitation period is a condition of the cause of action." *Pittston Co.*, 971 F. Supp. at 922.

In *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 140, 305 A.2d 412, 417 (1973), the New Jersey Supreme Court held that a foreign state's statute of limitations may be applied when: (1) the cause of action arises in another state; (2) the parties are all present in and amenable to the jurisdiction of that state; (3) New Jersey has no substantial interest in the matter; (4) the substantive law of the foreign state is to be applied; and (5) the foreign state's limitation period had expired at the time suit is commenced in New Jersey. *Id.* 63 N.J. at 141, 305 A.2d at 418. [*69]

Applying the *Heavner* analysis to the case at bar requires this Court to apply the statute of limitations for New Jersey. First, the Court begins with the presumption that the New Jersey statute of limitations applies. Then, the Court must determine whether the facts and circumstances of the present matter warrant application of New York's statute of limitations. As previously discussed, this cause of action arose in New Jersey; not in New York. AIC's principal place of business was New Jersey and the majority of C&L's audit work took place in New Jersey. Further, New Jersey has a substantial interest in this matter as AIC's inability to pay claims affected hundreds of New Jersey policyholders. Additionally, this Court will apply the substantive law of New Jersey regarding an auditor's liability for negligence. Finally, while it is apparent that New York's statute of limitations has expired with regards to the 1981 audit, such a fact alone, when weighed against the overwhelming bases for utilizing New Jersey's statute of limitations, leads this Court to find no exception to use the statute of limitations for New York. Accordingly, the Court, after applying the six year statute [*70] of limitations relevant in New Jersey to this matter, concludes that PwC's request for summary judgment based on the statute of limitations is inappropriate.

**VI. Wrongful Prolongation of Corporate Life Damages Theory**

  

PwC's second motion seeks to strike Plaintiff's "wrongful corporate life" damages theory. Curiously, PwC submitted a document containing the caption "Brief of PriceWaterhouseCoopers LLP In Support of Its Motion to Strike Plaintiff's 'Wrongful Corporate Life' Damages Claim as not Timely Disclosed." The Court notes this curiosity because the purported "brief" bears little, if any, resemblance to a proper legal argument required pursuant to local rules, as it: (i) lacked the proper requirements of all briefs pursuant to L. Civ. R. 7.1(d) & 7.2; (ii) consisted entirely of one self-serving statement of facts broken up into five separate sections; and (iii) contained *absolutely no* citation to a single legal authority. Nevertheless, PwC attempts to "split hairs" in this motion and argue that the "wrongful corporate life" damages theory set forth in Plaintiff's portion of the pre-trial order is untimely. PwC contends that "Plaintiff served its portions of the final [*71] pretrial order, therein unveiling a newly-minted claim for 'wrongful prolongation of corporate life,' together with a calculation that was not timely disclosed." (PwC's Br. In Supp. of Mot. to Strike at 1.) However, upon closer examination, it is quite apparent that the damage calculation labeled in the pre-trial order as "wrongful corporate life" damages is in actuality the same alternative damages theory that PwC has known about, at the very least, for four years of this lengthy litigation.

This Court has already addressed, in the context of the summary judgment motion, that an injury for "deepening insolvency," otherwise known as "wrongful corporate life," is a cognizable injury pursuant to New Jersey law. Thus, the Court will not remark again as to the propriety of such an injury in the context of an auditor's negligence or malpractice claim. However, a quick review of those facts related to this motion to strike is necessary.

Sometime in February 2000, Plaintiff provided PwC with an expert damages report with two measures of damage. The measures were continually referred to by both sides as the "primary" and "alternate" theories of damage. Both are valid efforts to calculate [*72] the damages at issue in this case. The "primary" theory seeks to measure the actual creditor shortfall of AIC's estate, measured by the terms of the Liquidation Order. The second or "alternate" theory, which corresponds with the aforementioned case law, takes a hypothetical intervention date, March 31, 1982, and measures the damage caused by virtue of the fact that PwC's actions caused AIC to wrongfully continue writing insurance policies. While both theories actually seek to measure damages caused by "deepening insolvency," Plaintiff, in the final pre-trial order, referred to the second method as "wrongful prolongation of corporate life." n14

n14 In the 2000 version of the expert damages report, the alternative calculation was described as "estimating the additional loss incurred as a result of the prolongation of [AIC's] existence." (PwC's Br. In Supp. of Mot. to Strike at 6.) Surprisingly enough, PwC included this exact phrase in its brief to support the motion to strike the claim as untimely. Clearly, PwC cannot expect this Court to strike an entire damages theory merely because Plaintiff changed the name from "prolongation of existence" to "wrongful prolongation of corporate life."

[*73]

Ultimately, this Court concludes that PwC's motion to strike is inappropriate and unfounded with respect to the record. As an aside, this Court notes that PwC took the opportunity to argue for a third time in this brief that the expert's damage report is replete with errors and discrepancies as to be untrustworthy and that the entire damage calculation should be thrown out. While it is still unclear to the Court exactly why PwC never sought to raise these arguments in the context of the many *Daubert* motions filed in this matter, it is clear that any perceived problems or deficiencies with the damages calculation are better reserved for cross-examination at trial. Accordingly, this Court finds no basis to strike Plaintiff's "wrongful prolongation of corporate life" damages theory as this theory is the same calculation previously used by Plaintiff, merely existing with a new moniker.

### Conclusion

For the aforementioned reasons, it is on this 25th day of August, 2004 hereby ORDERED that:

1. The Ambassador Defendants' motion to join Defendant PwC's summary judgment motion is hereby GRANTED;

2. The Ambassador Defendants' motion to join Defendant PwC's motion to strike Plaintiff's [*74] "wrongful corporate life" damages theory is hereby GRANTED;

3. Defendant PwC's motion for summary judgment is hereby DENIED;

4. Defendant PwC's motion in limine to exclude attorneys fees and expert costs totaling $12.7 million as a component of Plaintiff's damages is hereby GRANTED and Plaintiff is further ORDERED to make the appropriate correction to the Kramer Damages Report. Nothing in this Order precludes Plaintiff from making an application to the Court for an award of attorneys fees' or

  

2004 U.S. Dist. LEXIS 27238, *74

costs at a later date. Defendant PwC's motion in limine to exclude accrued interest and the Horizon liquidator's claim as components of Plaintiff's damages is hereby DENIED;

  5.  Defendant PwC's motion to strike Plaintiff's

"wrongful corporate life" damages theory is hereby DENIED.

Newark, New Jersey

    s/ Harold A. Ackerman, U.S.D.J.

