# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP<br><br>Defendant. | Civil Action No. 00-684<br><br>Judge David Stewart Cercone |

## PWC'S MEMORANDUM IN OPPOSITION TO THE COMMITTEE'S MOTION TO EXCLUDE CERTAIN TESTIMONY FROM PWC'S EXPERTS

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

Table of Contents

Pages

Preliminary Statement...........................................................................................1

Statement of Facts................................................................................................3

Argument ............................................................................................................5

I.    THE OPINIONS OF PWC'S FOUR CHALLENGED CAUSATION
      EXPERTS MEET ALL OF THE REQUIREMENTS OF RULE 702, AND
      ARE ADMISSIBLE...........................................................................................7

      A.    The Committee's Speculative Causation Testimony Is Inadmissible..........7

      B.    The Opinions of PwC's Experts Are Unlike the Committee's
            Speculative Testimony to Which They Respond...........................................8

      C.    PwC's Experts Are Well Qualified to Testify to the Opinions
            Expressed in Their Reports.....................................................................11

      D.    PwC's Experts Use Methods That Are Widely Accepted in Their
            Fields....................................................................................................14

      E.    Testimony From PwC's Experts Will Provide Valuable Assistance to
            the Jury..................................................................................................18

II.   DR. BURNS'S EXPERT ANALYSIS OF AHERF'S STRATEGY IS
      SOUNDLY BASED AND ADMISSIBLE.............................................................22

      A.    Dr. Burns Has Conducted Extensive Independent Research and
            Scholarly Analysis of AHERF..................................................................22

      B.    Dr. Burns Provides Expert Opinions, Not Argument or Mere
            Recitation of Facts.................................................................................23

      C.    Dr. Burns's Expert Analysis Is Sound, Despite the Committee's
            Attempts to Second-Guess the Scope of His Work....................................24

III.  MR. DICKINSON'S ANALYSIS OF THE DVOG SALE IS WELL
      WITHIN THE SCOPE OF HIS EXPERTISE........................................................26

      A.    Mr. Dickinson Is Well Qualified to Offer an Opinion on AHERF's
            Mismanagement of the DVOG Sale...........................................................27

      B.    Mr. Dickinson's Analysis of the DVOG Sale Is Based on Reliable
            Methods..................................................................................................29

Conclusion ........................................................................................................31

Table of Authorities

Pages

**Cases**

*Allapattah Svcs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335 (S.D. Fla. 1999) ................... 24

*Amco Ukreservice & Prompriladamco v. American Meter Co.*, Civ. A. No. 00-2638,
   2005 WL 1541029 (E.D. Pa. June 29, 2005) ............................................................... 14

*Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004) ............................................................ 24

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ............................... 23

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products,*
   MDL No. 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) .................................. 10, 11

*Eclipse Elec. v. Chubb Corp.*, 176 F. Supp. 2d 406 (E.D. Pa. 2001) ................................. 26

*ID Security Systems v. Checkpoint Systems, Inc.*, 198 F. Supp. 2d 598
   (E.D. Pa. 2002) ........................................................................................................... 19

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ......................................................... 15

*In re Northwest Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908
   (E.D. Mich. 2002) ...................................................................................................... 24

*Poust v. Huntleigh Healthcare*, 998 F. Supp. 478 (D.N.J. 1998) ..................................... 29

*Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) ............................................................ 6, 18

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997) .................................. 14

*U.S. Information Systems, Inc. v. International Bhd. of Elec. Workers,*
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) ........................................................................ 24

*United States v. Basroon*, 38 Fed. Appx. 772, 777 (3d Cir. 2002) ................................... 21

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) ................................................... 19

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) ................................................ 26

*United States v. McPhilomy*, 270 F.3d 1302 (10th Cir. 2001) ......................................... 14

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) .......................................................... 20

*Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998) ................................................................ 11

*Washington v. Dep't of Transp.*, 8 F.3d 296 (5th Cir. 1995) .............................................. 7

Pages

**Other Authorities**
Fed. R. Civ. P. 26................................................................................................ 2, 24

Fed. R. Evid. 701 ................................................................................................... 7

Fed. R. Evid. 702 ........................................................................................... passim

Defendant PricewaterhouseCoopers LLP ("PwC") submits this memorandum in opposition to the motion of the Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation (the "Committee") to exclude certain testimony from PwC's experts.

### Preliminary Statement

The Committee asserts that PwC's experts attempt impermissibly to predict how a variety of actors—the AHERF Board of Trustees (the "Board"), AHERF's bond insurer (MBIA) and AHERF's lenders—would have reacted in a hypothetical scenario. In fact, the Committee has it exactly backwards. The Committee's entire case rests on just such speculation, involving several layers of hypothetical events: first, that if AHERF's Board and creditors had known information even more negative than they already knew, they would have acted dramatically differently than they did; second, that if so informed the Board would have immediately and unerringly adopted a specific series of hypothetical measures and plans; and third, that upon adoption those measures and plans would have succeeded admirably, thereby completely changing the course of AHERF's history. As is evident, the Committee's entire case is based not on what did occur, but rather on a complicated chain of hypothetical events that never occurred.

It is no accident that the Committee's position is "backwards". With its entire case riding on a compound hypothetical, the Committee does not want experts in health-care management, hospital boards, bond insurance or commercial banking practices to disrupt its story with actual historical facts, research and analysis. The Committee clearly hopes to exclude PwC's experts' opinions, while leaving the field open for witnesses within the Committee's control to provide speculative opinion

testimony of their own in support of the Committee's causation case. As demonstrated in PwC's Memorandum in support of its Motion for Summary Judgment (at 29-45), the self-serving testimony on which the Committee bases its causation case is inadmissible, and insufficient to meet the Committee's burden of proving causation. But if the Court denies PwC's summary judgment motion and permits the Committee to take its speculative causation case to the jury, PwC must be permitted to defend itself through its causation experts.

In short, the Committee's motion has nothing to do with the requirements of Federal Rule of Evidence 702. The fact is that PwC's experts are all highly regarded figures in their fields, and have extensive specialized experience. Their areas of expertise, such as health system boards and governance and municipal bond insurance, are well outside the common understanding of jurors. They have employed reliable methods of analysis—the same methods they use in their regular work outside the litigation context—and, based on in-depth studies in their fields of expertise and of AHERF specifically, express opinions that various components of the Committee's hypothetical scenarios would not have occurred or would not have succeeded, or both.

The most effective rebuttal to the Committee's motion would be for the Court simply to read the reports of the challenged experts. (They are attached as tabs 1 to 5 to the Appendix to this Memorandum.) In accordance with Rule of Civil Procedure 26, each report sets forth the expert's credentials, each details the elaborate study and research undertaken, and each provides rigorous support for the opinions expressed. Given the length of the reports, however, and the Committee's effort to selectively criticize them, this Memorandum summarizes why each of the challenged opinions easily

2

meets the standards for admissibility of Rule 702. Accordingly, the Committee's Motion should be denied.

### Statement of Facts

The Committee's causation case is based entirely on the Committee's prediction of how AHERF's Board and creditors would have reacted to more negative financial statements than AHERF actually issued. First, the Committee claims that AHERF's Board would immediately have taken drastic action if the 1996 financial statements had been more negative, asserting that the Board would have immediately overridden or even fired AHERF's management in September 1996, and handed over management of the system to outside consultants, who in turn would have immediately abandoned the integrated delivery system ("IDS") strategy the Board had long supported. These consultants would then supposedly have improved operations at the hospitals in AHERF's Delaware Valley Obligated Group ("DVOG") to such an extent that AHERF would not have gone bankrupt, and increased the value of the hospitals so as to exceed DVOG's massive debt obligations and prevent any creditor loss.

Second, the Committee offers the prediction that AHERF's creditors would have taken equally decisive action. In particular, the Committee looks to the hypothetical actions of two of its own members, MBIA Insurance Corporation ("MBIA") and PNC Bank ("PNC"). MBIA insured bonds for AHERF, including bonds issued on behalf of the DVOG. MBIA is the largest claimant in the AHERF bankruptcy. PNC was one of AHERF's lenders; it is the second-largest claimant in AHERF's bankruptcy. The Committee claims that MBIA and PNC would have declared an event of default and

exercised a right to call in a consultant, and that this consultant would have changed AHERF's strategy and prevented the eventual bankruptcy from occurring.

There is no evidence to support the Committee's speculation of sudden intervention by AHERF's Board or AHERF's creditors. To the contrary, the record establishes that the Board was remarkably passive, scarcely even rising to the level of a "rubber stamp". AHERF's CEO, Sherif Abdelhak, was described by members of the Board as "a dominant CEO, to the extreme", whom the Board let "run the show". (Daniel Tr. (App. tab 6) at 143, Martinelli Tr. (App. tab 7) at 56, both quoted in Orlikoff Rpt. (App. tab 1) at 28-29.) The Board had a "culture of conformity", as demonstrated by the lack of "a single incident of dissent recorded in the minutes of any of the hundreds of meetings of the AHERF board or any of its committees". (Orlikoff Rpt. (App. tab 1) at 44.) The creditors were no more active. MBIA made "no serious effort" to influence AHERF, despite MBIA's own concerns about "the financial integrity . . . at the highest level at AHERF" and other "grave warning signs", and never met with Board members until three months before the bankruptcy. (Covintree Rpt. (App. tab 2) at 19-22.) PNC was even less critical and attentive than MBIA. (James Rpt. (App. tab 3) ¶ 76.) As late as early 1998, when PNC had an opportunity to modify the terms of an AHERF letter of credit to provide itself with additional protection, it took no action—except to increase its fee. (*Id.* ¶¶ 77-79.)

Disregarding all of that evidence, and a great deal more like it, the Committee asserts two types of support for its causation case. First, the Committee points to testimony of two (out of some thirty-six) members of the Board and a few employees of two members of the Committee itself (MBIA and PNC), who now more or

less claim (albeit with much hedging and long after the fact) that they might have undertaken some of the actions required by the Committee's causation case. Each of those witnesses, however, is beholden to the Committee in one way or another. Messrs. Gumberg and Barnes (*see* Brief in Support of the Committee's Motion to Exclude Certain Testimony From PwC's Experts ("Br.") at 4-6), former AHERF trustees, were sued by the Committee for breach of fiduciary duty contributing to the demise of AHERF, and settled the case on terms that require them to assist the Committee in this action. (Ex. 2760 (App. tab 8) at 61.) Mr. Weill, Mr. Michael and their colleagues (*see* Br. at 6-7) are current or former officers of MBIA or PNC.

Second, in the absence of any evidentiary support, the Committee simply asserts (Br. at 7) that the "duties" of AHERF trustees "required" them to act as the Committee speculates they would have, and that the Committee's hypothetical actions by AHERF's creditors are "what creditors do". Based on their research and analysis, however, PwC's experts have concluded that in fact AHERF's trustees and AHERF's creditors frequently did not do what the Committee claims they would have done. That makes it all the more unlikely that, in the Committee's hypothetical scenarios, AHERF's Board and creditors would all of a sudden have taken dramatically different action.

The Committee now moves to preclude PwC's experts from responding to its causation case.

### Argument

The proposed testimony of PwC's experts easily satisfies the requirements of Federal Rule of Evidence 702. "Rule 702 embodies a trilogy of restrictions on expert

testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

The Committee challenges the testimony of four PwC causation experts—James Orlikoff, Lawton Burns, David Covintree and Christopher James—on all three of these grounds. In Part I, we demonstrate that each of the challenged experts satisfies the three-part requirement of Rule 702 (*see infra* Parts I.C-.E), and respond to the real thrust of the Committee's motion—the effort to exclude any disinterested analysis of the Committee's causation case, itself founded on inadmissible speculation (*see infra* Parts I.A.-.B).

The Committee's motion also includes two subsidiary arguments. <u>First</u>, the Committee claims that Dr. Burns did not use a reliable methodology in rendering his opinion that "[b]y Fall 1996, the fate of AHERF was sealed by virtue of how it implemented and pursued the IDS strategy". (Burns Rpt. (App. tab 4) at 7.) In Part II, we demonstrate that Dr. Burns's careful analysis is based on generally accepted methods in business management and strategy. <u>Second</u>, the Committee claims that a fifth PwC expert, Robert Dickinson, is not qualified to render one of his opinions—that "the process for the sale of the AHERF assets was mismanaged by AHERF and its financial advisors" (Dickinson Rpt. (App. tab 5) at 2)—and that his opinion is unreliable. In Part III (supported by the Declaration of Robert A. Dickinson), we show that Mr. Dickinson is highly qualified to provide this opinion, and that he too uses reliable methods to arrive at his opinion.

I.    **THE OPINIONS OF PWC'S FOUR CHALLENGED CAUSATION EXPERTS MEET ALL OF THE REQUIREMENTS OF RULE 702, AND ARE ADMISSIBLE.**

A.    <u>The Committee's Speculative Causation Testimony Is Inadmissible.</u>

The Committee's causation case rests entirely on a series of speculative predictions as to the hypothetical behavior of AHERF's Board and creditors, and the chain of events they supposedly would have set in motion. The blueprints for this rickety contraption will apparently be presented through the speculation of a handful of "fact" witnesses, who in reality seek to give lay opinion testimony under Federal Rule of Evidence 701.[1]

The Committee's causation testimony (summarized in the Committee's brief at 4-7) is inadmissible. It is nothing more than self-serving speculation, with the benefit of hindsight, about what trustees and creditors "could" or "would have done". There is no foundation that the Committee's witnesses ever faced similar circumstances and acted as they now claim they would have done in the Committee's hypothetical scenarios. The proposed testimony is not "rationally based on the perception of the witness", and is inadmissible under Rule 701. *See Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993). (*See generally* Memorandum in Support of PwC's Motion

---

[1] The Committee also intends to proffer expert witnesses who claim that the Committee's hypothetical chain of events was "required" or "expected", without analyzing what AHERF's Board or creditors did or were likely to do in the real world. (*See, e.g.*, Schwartz Rpt. at 5.) This is the subject of PwC's Motion to Preclude Certain Irrelevant and Unfounded Testimony by the Committee's Causation Experts, in which we set forth why the Committee's expert witnesses should be precluded from testifying about what a hypothetical board of trustees, or a hypothetical creditor, or any other actor in the abstract, could or would have done in the Committee's "but for" world.

for Summary Judgment at 38-40.) PwC is therefore entitled to summary judgment, and

the Committee's motion is moot.

      B.    <u>The Opinions of PwC's Experts Are Unlike the Committee's Speculative Testimony to Which They Respond.</u>

      In contrast, PwC's experts have undertaken a far simpler task: they have

reviewed the deposition testimony and expert witness reports that lay out the

Committee's causation scenarios, evaluated them, and responded to them in light of their

own considerable expertise. Thus, Mr. Covintree responded to the Committee's attempt

to predict how MBIA would have reacted:

> "Such speculation is not justified by my experience in the bond insurance
> industry and MBIA's record in particular. . . . In light of the actual
> historical facts reviewed above, it is my opinion that <u>it is very unlikely that
> MBIA would have acted in the way assumed in the plaintiff's scenario.</u>
> MBIA would have been far more likely when receiving the negative 1996
> financials to have moved in its normal fashion slowly and deliberately
> [and to] have avoided any formal legal action for an extended period of
> time . . . ."

(Covintree Rpt. (App. tab 2) at 24, emphasis added.)

      Mr. Orlikoff reviewed the Committee's attempts to predict how the

AHERF Board would have acted:

> "In light of the board's inaction in the face of actual knowledge of
> AHERF's seriously deteriorating financial condition, <u>there is no reason to
> believe that additional information about that condition would have stirred
> them into initiating meaningful action.</u> That is especially true given the
> shared understanding among most of the AHERF trustees that the board's
> role was not to create strategy, and given AHERF's broken governance
> structure."

(Orlikoff Rpt. (App. tab 1) at 52, emphasis added.)

      Dr. James considered the Committee's claims about how PNC and other

lenders would have reacted:

> "The Kite and Den Uyl Reports do not specify what specific actions the banks would have taken in response to the hypothetical covenant violations. They merely speculate that the banks would have taken actions, but do not outline the specific steps the banks would have taken. Given the wide range of potential responses to covenant non-compliance, it is essential to analyze the response of the lenders to actual covenant violations to determine the likely response to a hypothetical covenant violation. <u>It is unlikely that the banks would have taken a course substantially different from what they actually followed when certain covenant violations were detected</u>."

(James Rpt. (App. tab 3) at 41, emphasis added.)

Notably, PwC's experts do not seek to opine (as the Committee's witnesses do) as to a <u>specific</u> course of action that AHERF's Board or creditors would have taken in hypothetical circumstances. The scope of PwC's experts' opinions is far more modest. No one—not the individual Board members and bond insurance and bank employees on whom the Committee relies, and not either party's experts—can know for certain what AHERF's Board or creditors would have done in circumstances that never occurred in real life, or what the result would have been of actions never taken. Accordingly, PwC's experts assess the Committee's speculative chain of events, and opine, based on what historically happened at AHERF and their expertise on health-care boards, bond insurers and banks, that the very specific actions postulated by the Committee's witnesses are highly <u>unlikely</u>, without speculating as to precisely what might have happened. That is, as opposed to the Committee's far-reaching and remarkably specific speculation, PwC's experts' opinions are cautiously framed in the negative—that it is <u>unlikely</u>, based upon their actual research, analysis, expertise and experience, that hypothetical events would have played out according to the Committee's script.

Moreover, PwC's experts base their analyses based on <u>actual</u> historical conduct, whereas the Committee speculates about entirely hypothetical conduct. As events actually unfolded, in the face of substantial and cumulative negative financial information, AHERF's Board and creditors took <u>no</u> action, and AHERF went bankrupt. The Committee now claims that, in its hypothetical circumstances, radically <u>different</u> actions would have been taken. The Committee obviously has the burden of proof here, and we do not believe the Committee can meet that burden. But, once again, PwC's experts' opinions are more modest. They do not speculate as to counter-factual conduct, but merely conclude that it is unlikely that AHERF's Board and creditors would suddenly have acted as they never had acted before in the real world (where they took no substantial action in response to a number of strong warnings of financial trouble).

It is surprising, therefore, that the Committee cites *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, MDL No. 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001). If anything, the holding in that case supports the exclusion of the Committee's proposed opinion testimony, not PwC's. The plaintiff class in the *Diet Drugs* case consisted of patients who asserted that two formerly popular medications known as "Fen-Phen" were riskier and less beneficial than was generally known at the time, and that the labels for those drugs should have disclosed those additional risks. The plaintiffs claimed that their physicians would have acted differently in their hypothetical world than they did in the real world—that they would not have prescribed Fen-Phen if additional risks had been disclosed by the labels for those drugs— and offered an expert witness to testify to that prediction. Judge Bechtle of the Eastern District of Pennsylvania ruled that the expert's testimony should be excluded, as it was

"purely speculative". 2001 WL 454586, at *18. The *Diet Drugs* ruling supports the
exclusion of precisely the speculative opinions on which the Committee relies here—the
opinion testimony of trustees and creditors. But it provides no support for the exclusion
of PwC's experts' fact- and research-based responses to that speculation.

    C.    <u>PwC's Experts Are Well Qualified to Testify to the Opinions Expressed in
Their Reports.</u>

        The experts who will testify on behalf of PwC in this action are all highly
distinguished figures in their fields. As a brief review of their qualifications makes clear,
each of the experts challenged by the Committee has an extensive background in his area
of expertise. They easily meet and surpass the requirements to be qualified as experts:
they "possess skill or knowledge greater than the average layman", based on "practical
experience as well as academic training and credentials". *Waldorf v. Shuta*, 142 F.3d
601, 625 (3d Cir. 1998) (citations omitted).

        1. James Orlikoff has been described as the nation's "foremost expert on
health-care boards and governance".[2] Mr. Orlikoff is the President of Orlikoff &
Associates, an independent consulting firm that specializes in health-care governance
issues. (Orlikoff Rpt. (App. tab 1) Ex. 1.) He is also the Executive Director of the
American Governance and Leadership Group, LLC, and National Advisor on
Governance and Leadership to the American Hospital Association and Health Forum.

---

    [2] College of Healthcare Information Management Executives, *CIO Connection*,
July 2003, at 3. Similarly, the Florida Hospital Association calls Mr. Orlikoff a
"nationally recognized leadership strategist and consultant", *In Action*, Dec. 2002, at 1,
and the Ontario Hospital Association calls Mr. Orlikoff "one of the most experienced and
highly regarded governance consultants in North America", *Executive Report 16/8*
(Feb. 26, 2004). These materials are all included in App. tab 9.

(*Id.*) Mr. Orlikoff has written or co-written sixteen books on leadership and governance in health-care organizations, and has published dozens of articles on the subject in academic and professional journals and magazines. (*Id.*) His book *Board Work: Governing Health Care Organizations* was named "book of the year" for 2000 by the American College of Healthcare Executives. (*Id.*) As a consultant, he provides hospital and health system boards with a variety of services, including assessing governance structure, and making and helping to implement recommendations for more effective governance. (*Id.* at 1.)

   2. Lawton Burns is Professor of Health Care Systems and Management at the Wharton School of the University of Pennsylvania, one of the country's leading business schools, where he directs the Wharton Center for Health Management and Economics. (Burns Rpt. (App. tab 4) Ex. 1.) He received a Ph.D. in organizational sociology in 1981, and an MBA with a specialization in hospital administration and marketing in 1984, both from the University of Chicago. (Burns Tr. (App. tab 10) at 8-14.) For the past twenty years, much of Dr. Burns's prolific work (encompassing dozens of research grants, books and peer-reviewed articles) has focused on health-care integrated delivery systems (or IDSs) and their financial performance, with emphasis on the Philadelphia market—the very market in which AHERF's dramatic expansion occurred. (Burns Rpt. (App. tab 4) at 3-4.) Dr. Burns has written and spoken extensively on healthcare strategy in general, and the IDS strategy in particular. (*Id.*) In particular, Dr. Burns has studied the development and demise of AHERF. In 2000, before being retained or even contacted by PwC, Dr. Burns published a scholarly analysis of the AHERF bankruptcy in *Health Affairs*, a leading peer-reviewed health policy journal, and

has given a number of academic talks on AHERF. (Burns Tr. (App. tab 10) at 57, 70, 96, 99.) The Committee's proposed expert, Roger Feldman, knows Dr. Burns and agrees that he "has expertise in the area of health care at hospitals and integrated delivery systems". (Feldman Tr. (App. tab 11) at 75.)

       3. David Covintree has extensive experience in healthcare finance and in the underwriting and insurance of municipal bonds. For more than thirteen years, he worked for Financial Guaranty Insurance Co. ("FGIC"), then one of the four major bond insurance firms in the country. (Covintree Rpt. (App. tab 2) at 1, Ex. 1; Covintree Tr. (App. tab 12) at 50-51.) At FGIC, Mr. Covintree worked in hospital credit rating and analysis, as Director of Health Care, as Vice President of Public Underwriting and as Acting Director of Public Finance Surveillance. (*Id.* at 1.) In these positions, reporting to the CEO of FGIC, Mr. Covintree was responsible for numerous aspects of FGIC's municipal finance department. (*Id.*) His responsibilities included credit approval, revising underwriting policies, pricing new bonds and monitoring existing credits. (*Id.*)

       4. Christopher James is the William H. Dial/SunBank Eminent Scholar in Finance and Economics at the University of Florida. (James Rpt. (App. tab 3) at 2.) He holds a Ph.D. and an MBA from the University of Michigan, and has spent more than twenty years in the field of corporate finance and financial institutions. (*Id.* at 2, Ex. 1.) Dr. James has published dozens of articles (including ones on debt covenants) in academic and scholarly journals, and has served many of those journals as editor or peer reviewer. (*Id.*; James Tr. (App. tab 13) at 96.) In addition to his academic work, he has advised numerous government agencies, serving as a consultant to the Federal Deposit Insurance Corporation and as Senior Economic Advisor to the Comptroller of the

Currency. (James Rpt. (App. tab 3) Ex. 1.) Dr. James is currently conducting a study on

debt covenants for the Federal Reserve Bank of New York. (James Tr. (App. tab 13) at

96-102.) Dr. James also serves on the Advisory Board of SunTrust Bank, one of the

nation's ten largest banking organizations, and advises senior SunTrust management on

policies and strategy. (*Id.* at 12-13.) For a number of years, he sat on the SunTrust "loan

and discount committee", which reviewed and approved all of the bank's credits over

$1 million, including any covenant waivers or loan restructurings. (*Id.* at 29-33.)

     D.    <u>PwC's Experts Use Methods That Are Widely Accepted in Their Fields.</u>

          The methods used by PwC's experts are widely accepted in their fields,

and are considered highly reliable. Notably, PwC's experts used the same concepts,

techniques and skills in their work in this action that they use in their day-to-day

consulting and academic work. This testimony is admissible under Rule 702 because

"the expert is being as careful as he would be in his regular professional work outside his

paid litigation consulting". *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th

Cir. 1997); *see also United States v. McPhilomy*, 270 F.3d 1302, 1313 (10th Cir. 2001)

(expert's opinion was reliable because of "his use of the same methodology that he uses"

in his regular job); *Amco Ukrservice & Prompriladamco v. American Meter Co.*, Civ. A.

No. 00-2638, 2005 WL 1541029, at *7 (E.D. Pa. June 29, 2005) (admitting opinion of

expert who applied his experience in commercial lending practices to the agreement at

issue in the case). As the Supreme Court has explained, the reliability requirement is met

if the witness "employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field". *Kumho Tire Co. v.

Carmichael*, 526 U.S. 137, 152 (1999). PwC's experts have done that here.

1. Mr. Orlikoff reviewed the Committee's assertion that members of the AHERF Board of Trustees would have taken prompt and drastic remedial action if, hypothetically, the Board had received financial statements for fiscal year 1996 that were more negative than they actually were. (Orlikoff Rpt. (App. tab 1) at 2.) As an expert on the structure, organization and behavior of health system boards, Mr. Orlikoff frequently reviews the efficacy of governance systems, and applied that same form of review here. He reviewed the testimony of Board members, the minutes of several years of AHERF Board and committee meetings, other relevant documents gathered in the case, and scholarly publications in the field. (*Id.* Ex. 2.) Mr. Orlikoff evaluated this evidence using the same methods that he regularly uses in advising his hospital board clients on their governance structure. He concluded that, in light of the Board's numerous failures to take action in response to financial problems and the dysfunctional system of governance at AHERF, it is his opinion that there is no reason to accept the Committee's assertion that the Board would have taken radically different action if the 1996 financial statements had been more negative than they were. (*Id.* at 52-61.)

Mr. Orlikoff studies the organizational behavior of health system boards, has observed the group decision-making dynamics of countless boards, has experience with how boards do and do not react to distressed situations, and has studied in detail the historical record of the AHERF Board. This methodology, together with his experience, enables Mr. Orlikoff to provide an expert opinion on what the AHERF Board likely would have done in an unprecedented situation of financial distress.

2. Dr. Burns reviewed the Committee's claim that AHERF would have changed its IDS strategy if the 1996 financial statements had been more negative. As a

15

leading scholar in the field of health-care management and strategy, he has devoted a substantial part of his academic work to the study of integrated delivery systems and their financial performance, focusing on Pennsylvania and Philadelphia, and he applied that expertise and methodology here. He reviewed the academic literature on IDSs, read substantial case documents and testimony, interviewed government and industry representatives, and performed extensive empirical analyses of AHERF and other health-care institutions, including statistical trend analysis, Herfindahl-Hirschman Index measurements, and regression analysis. (Burns Rpt. (App. tab 4) at 54, 58, Ex. 3.) Dr. Burns concluded, using those widely accepted techniques, that there is no reason to believe that the Committee's hypothetical chain of events would have taken place, or that it would have succeeded in preventing the bankruptcy.

3. Mr. Covintree evaluated the actions of MBIA in connection with its insurance of the DVOG bonds, and the Committee's claims concerning how MBIA would have reacted to worse financial results. During his career in the bond insurance industry, Mr. Covintree was responsible for underwriting and surveillance of health-care bonds, and review and revision of the insurer's policies on those subjects. In preparing his report, he applied his experience and expertise in such analyses to the evidence in this case, and concluded that MBIA ignored its own standards and policies in underwriting the DVOG bonds (Covintree Rpt. (App. tab 2) at 7), had only weak and limited protection against credit risks at DVOG (*id.* at 13), performed only perfunctory surveillance of DVOG (*id.* at 18) and repeatedly failed to take any meaningful action in response to its awareness of AHERF's and DVOG's mounting troubles (*id.* at 20-23). As

a result of those analyses, he concluded that "it is very unlikely that MBIA would have acted in the way assumed" by the Committee. (*Id.* at 24.)

      4. Dr. James "evaluate[d] the assertions made by Plaintiff's experts Steven Kite and Bruce Den Uyl relating to the actions that they allege would have been taken by the banks" in the event of alleged debt covenant breaches that the Committee says should have been reported. (James Rpt. (App. tab 3) at 2.) In his career as a scholar, an advisor to banking regulators (the FDIC and the Office of the Comptroller of the Currency), and an advisor to a large commercial bank (SunTrust) on its credit policies and decisions, Dr. James has often analyzed the actions of financial institutions. He performed precisely such an analysis in this action. He reviewed the opinions of Messrs. Kite and Den Uyl, reviewed the evidence in the case and the allegations made by the Committee, and evaluated the claims of the Committee's proposed experts. Dr. James noted, among other things, that PNC had a lengthy and highly profitable relationship with AHERF (*id.* at 10, 35), knew or should have known of the risks posed by the 1996 letter of credit it extended to DVOG (*id.* at 17-24), failed to monitor its 1996 DVOG letter of credit (*id.* at 30-31), and failed to take timely, effective action in response to a covenant violation at DVOG (*id.* at 42-48).

*  *  *

      The analyses conducted by PwC's experts, using the same methodologies that have established them among the leading figures in their fields, are plainly not resorts to "intuition", nor are they attempts "to predict the conduct of AHERF's former trustees and creditors" without a proper basis. (Br. at 14, 15.) The Committee's only response to the analyses described above is to pretend that they were never performed.

17

E.    <u>Testimony From PwC's Experts Will Provide Valuable Assistance to the Jury.</u>

The testimony of PwC's experts also satisfies the third requirement of Rule 702—their testimony is "relevant for purposes of the case and . . . assist[s] the trier of fact". *Schneider*, 320 F.3d at 404. The Committee asserts that the testimony would not be helpful since jurors "can reach their own conclusions" about the subjects of the experts' testimony (Br. at 16), and that PwC's experts have usurped the jury's function by making judgments on witnesses' credibility (Br. at 8, 11-12, 16). Both assertions are meritless.

1.    <u>The Testimony of PwC's Experts Falls Outside the "Common Understanding" of Jurors.</u>

The Committee asserts that the actions of bond insurers, major commercial banks and the AHERF Board are not proper subjects of expert opinion and testimony at all, because "jurors can reach their own conclusions about whether AHERF's trustees and creditors would have endeavored to address the enterprise's financial woes". (Br. at 16.) That is, of course, not the question. The actual issue in this case is whether PwC's work was negligently inadequate in the first place and, even if it was, whether AHERF's Board, MBIA or PNC (1) upon receipt of different financial information would have acted differently than they did <u>and</u> (2) would have carried out a specific series of steps ordained *ex post facto* by the Committee's experts <u>and</u> (3) by doing so would have succeeded in turning an unfolding financial disaster into a model of financial success. The Committee claims they would have; PwC's experts have analyzed the actual conduct of AHERF's Board and creditors, and opine, based on this history as well as their expertise on health-care management and strategy, health system boards,

bond insurers and commercial banks, that they likely would not have reacted, or would not have reacted as the Committee now claims with hindsight.

PwC's experts' fields of expertise, and the topics of the testimony they will deliver, are well outside the common experience of jurors. The proposed topics of testimony of the experts whom the Committee challenges are:

- non-profit health system and hospital boards and governance (Mr. Orlikoff);

- health care management and business strategy, focusing on "integrated delivery systems" (IDSs) (Dr. Burns);

- municipal bond insurance, in particular for health-care bonds (Mr. Covintree); and

- commercial banking practices, including credit decisions and responses to loan covenant violations (Dr. James).

These are all highly specialized areas. No juror could be expected to be conversant with any one of these areas, let alone all four.

The cases cited by the Committee (Br. at 15) provide no grounds for excluding expert testimony in such specialized fields. The opinion evidence excluded in *United States v. Castillo*, 924 F.2d 1227, 1233 (2d Cir. 1991), included such common-place assertions as "drugs are kept in plastic bags" and "scales are used to weigh drugs". The testimony excluded in *ID Security Systems v. Checkpoint Systems, Inc.*, 198 F. Supp. 2d 598, 611 (E.D. Pa. 2002), was equally obvious: an expert proposed to testify that "a businessman in making rational business decisions will extend a contract with a party if doing so will yield him a higher profit than the alternatives available to him at the time", a concept the court found to be so obvious as not even to require citation, much less expertise.

There can be no legitimate argument that the expert testimony in this case bears the slightest resemblance to that which was excluded in *Castillo* or *ID Systems*. The jury will find valuable assistance in the testimony of PwC's experts concerning intricate matters of finance, corporate governance and the business of health care.

2.     PwC's Experts Do Not Evaluate the Credibility of Any Witness.

The Committee accuses PwC's experts of offering opinions as to "the motivations, intentions, and state of mind" of fact witnesses, and of "[w]eighing the credibility of witnesses". (Br. at 16.) PwC's experts do no such thing. PwC's experts intend to offer opinions that contradict the speculative testimony of the Committee's witnesses. But that is entirely different from opining on their credibility.

None of PwC's experts opines on whether witnesses are truthful or not. None of PwC's experts gives greater or lesser weight to the testimony of fact witnesses based on an assessment of their credibility.[3] That is what the rule against expert opinion on witness credibility prohibits, as demonstrated by the case on which the Committee relies, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988), which rejected an expert's opinion that was "based on his positive assessment of the trustworthiness and accuracy of the testimony of [one party's] witnesses".

Expert witnesses are permitted to provide opinions contradicting fact witnesses' testimony. For example, in *United States v. Basroon*, 38 Fed. Appx. 772, 777

---

[3] As set forth in the Memorandum in Support of PwC's Motion to Preclude Duplicative and Unreliable Expert Accounting Testimony (at 11-12), the testimony of one of the Committee's experts, D. Paul Regan, should be excluded because Mr. Regan admitted at deposition that his opinions are based in part on the credibility of one of PwC's fact witnesses. Nothing of the sort is the case with any of PwC's experts.

(3d Cir. 2002) (non-precedential opinion), the prosecution presented an accounting expert who testified that the explanations the defendant provided in civil deposition testimony for variances between his company's financial statements and income tax returns were "totally inadequate". The Third Circuit ruled that this "testimony was not a direct attack on [the defendant's] credibility, and the testimony was properly admitted". *Id.* at 777.

Indeed, the opinions of PwC's experts are not even directed at the Committee's witnesses. Rather, PwC's experts evaluate the Committee's causation claims (as set forth in the Committee's interrogatory responses and expert reports) and opine as to the likelihood of events unfolding as the Committee asserts they would have. For example, Mr. Covintree states, "In light of the actual historical facts reviewed above, it is my opinion that it is very unlikely that MBIA would have acted in the way <u>assumed in plaintiff's scenario</u>." (Covintree Rpt. (App. tab 2) at 24 (emphasis added), *quoted in part in* Br. at 13.) The opinions of PwC's other causation experts (quoted in Br. at 11-13) are of a piece. Nowhere does any PwC expert state that he considers any fact witness to be untruthful or less than fully credible. All PwC's experts do is apply their research, analysis and experience to challenge the entirely hypothetical causation scenarios in the Committee's case. In other words, they disagree with premises of the other side's case. That happens in every trial. It is the adversary process.

The Committee's argument amounts to the contention that PwC's experts should be barred from disagreeing with the opinions offered by the Committee's fact witnesses. There can be no justification for allowing opinions on one side, but not the other—let alone permitting self-serving speculation by fact witnesses with a clear interest

21

in the question, while excluding the careful analysis of PwC's disinterested experts.

Accordingly, the Committee's motion should be rejected.

## II.    DR. BURNS'S EXPERT ANALYSIS OF AHERF'S STRATEGY IS SOUNDLY BASED AND ADMISSIBLE.

The Committee urges the Court to exclude Dr. Burns's testimony on the asserted grounds that it is "an early closing argument for counsel" (Br. at 19), and that Dr. Burns's opinion is not the "product of [a] reliable methodology" because he did not consider a variety of questions of apparent interest to the Committee (Br. at 18). The Committee's assertions are untenable and should be rejected.

A.    Dr. Burns Has Conducted Extensive Independent Research and Scholarly Analysis of AHERF.

Dr. Burns began his study of AHERF and the causes of its bankruptcy before this action was even filed, and long before he was ever approached on behalf of PwC to serve as an expert in litigation. Dr. Burns published "The Fall of the House of AHERF: The Allegheny Bankruptcy" in the January/February 2000 issue of *Health Affairs*, a leading peer-reviewed academic journal. (App. tab 14.) Dr. Burns's article has been widely influential in the field, is used as a case study in business school courses around the country, and has been cited in more than twenty other scholarly articles since its publication. (*See* materials included in App. tab 15.) Its topic—the cause of AHERF's failure and bankruptcy—is <u>exactly</u> the question at the heart of the Committee's causation case.

The independent nature of Dr. Burns's research and publication on AHERF is strong evidence of the reliability of his opinions. As Judge Kozinski stated for the Ninth Circuit on remand from the Supreme Court in *Daubert*:

> "That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science. . . . For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support. . . . That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method'."

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Just so,

Dr. Burns's opinions in this case carry their own "indicia of reliability" from his prior

research and publication in *Health Affairs*.

> B.    Dr. Burns Provides Expert Opinions, Not Argument or Mere Recitation of Facts.

The Committee claims that Dr. Burns's "'sealed fate' tag line . . .

betray[s]" his report as "the argument of counsel that it is" (Br. at 18-19), but provides no

support for that assertion. Tellingly, the Committee neglects to mention that its counsel

asked Dr. Burns at deposition whether or not PwC's counsel had given him "any

suggestion about what the content [of his Report] ought to be", and Dr. Burns answered

"No." (Burns Tr. (App. tab 10) at 229.) The Committee's "argument of counsel"

assertion, not any portion of Dr. Burns's report, should be rejected as *ipse dixit*.

The Committee's second assertion—that Dr. Burns's testimony is no more

than a recitation of evidence (Br. at 19)—is equally unsupported. The Committee fails to

point to a single instance where Dr. Burns merely "summarize[s] the facts and the

depositions of others". *Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004). In his

seventy-seven page expert report, Dr. Burns sets out the factual bases for his opinions, as required by Rule 26(a)(2). He also sets out clear and emphatic opinions based on those facts—opinions fatal to the Committee's case.

Dr. Burns conducted an extensive empirical analysis of AHERF's bankruptcy, assessing both qualitative and quantitative data drawn from a broad range of sources. He utilized the same well-established and widely accepted methodologies that underlie his acclaimed scholarly work. The methods he used, including statistical trend analysis, Herfindahl-Hirschman Index measurements, and regression analysis, are regularly accepted by courts. *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004) (statistical analysis); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1347 (S.D. Fla. 1999) ("[R]egression analyses are [generally] considered [a] reliable discipline[]."); *In re Northwest Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 919 n.11 (E.D. Mich. 2002) (Herfindahl-Hirschman Index).

    C.    <u>Dr. Burns's Expert Analysis Is Sound, Despite the Committee's Attempts to Second-Guess the Scope of His Work.</u>

PwC retained Dr. Burns to identify and analyze the principal factors leading to AHERF's bankruptcy. (Burns Rpt. (App. tab 4) at 4.) As an expert on integrated delivery systems, Dr. Burns evaluated the decline of AHERF from a systems-level perspective. He assessed the business strategy adopted by AHERF, and the particular manner and environment in which the strategy was pursued.

The Committee asserts that Dr. Burns bases his testimony upon his "personal view[s]" rather than a reliable method because he analyzed AHERF's rise and fall from the perspective of business strategy, in the context of broader market history

24

and trends, rather than conducting a detail-level "turn-around" analysis. (Br. at 17-18.) To that end, the Committee sets forth a list of nine hypothetical cost-cutting measures and operational improvements it believes Dr. Burns should have analyzed, such as whether "concessions from AHERF's largest creditors could have assisted in a turnaround plan", or "whether AHERF could have voided employment contracts with clinical researchers". (Br. at 18.)

But the additional subjects that the Committee asserts Dr. Burns should have analyzed are irrelevant to his opinion, for two reasons. First, Dr. Burns was not asked to analyze a "turn-around plan"; PwC retained Robert Dickinson for that purpose. These are separate areas of expertise. Similarly, the Committee has proffered two separate experts: a management consultant who puts forward a "turn-around plan" (Thomas Singleton) and a health-care economist (Roger Feldman), who responds to Dr. Burns's systems-level analysis without himself analyzing a "turn-around plan". There is no reason why Dr. Burns should have performed a separate kind of analysis, farther from the area of his core expertise, for which each party has retained distinct experts. Second, the analysis that Dr. Burns did perform led him to conclude that "a combination (or interaction) of internal factors" ("well established and in place by 1996") and "external factors precipitated the AHERF bankruptcy". (Burns Rpt. (App. tab 4) at 77.) Since Dr. Burns concluded, as an expert on health-care strategy, that by the fall of 1996 AHERF could not have avoided bankruptcy, the assortment of cost-cutting measures that the Committee claims Dr. Burns should have reviewed simply do not come into the question.

In short, the Committee has no genuine criticism to offer of Dr. Burns's methods; it is simply unhappy with his intellectually rigorous conclusions. The Committee's list of additional topics that Dr. Burns could have studied are, at most, subjects to be raised on cross-examination at trial. They do not go to the reliability of Dr. Burns's methods. *See Eclipse Elec. v. Chubb Corp.*, 176 F. Supp. 2d 406, 412 (E.D. Pa. 2001) (admitting testimony of expert who used a reliable method over objection that "a better and more reliable method existed"). The court's gatekeeping role with regard to expert testimony is not intended to "serve as a replacement for the adversary system" or "substitute for testing the assumptions underlying the expert witness's testimony on cross-examination". *United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004). The Committee's quibbling with Dr. Burns's analysis may or may not persuade the jury on cross; it has no place in a *Daubert* motion.

## III.   MR. DICKINSON'S ANALYSIS OF THE DVOG SALE IS WELL WITHIN THE SCOPE OF HIS EXPERTISE.

PwC intends to offer Robert Dickinson as an expert witness to provide two opinions: first, that "a turnaround plan for DVOG executed beginning at the end of 1996 would have been unlikely to succeed"; and second, that "the process for the sale of the AHERF assets was mismanaged by AHERF and its financial advisors". (Dickinson Rpt. (App. tab 5) at 2.) The Committee acknowledges the admissibility of Mr. Dickinson's first opinion, but moves against his second opinion. The Committee has two complaints about that opinion: it claims that Mr. Dickinson is not qualified to offer an expert opinion on the sale of hospital assets, and it asserts that his report is "void of analytical

work", and presents "nothing more and nothing less than a summary of PwC's factual position on the point". (Br. at 20.) The Committee's complaints are both meritless.

### A.  Mr. Dickinson Is Well Qualified to Offer an Opinion on AHERF's Mismanagement of the DVOG Sale.

The Committee asserts that Mr. Dickinson "concede[d] that he has no professional experience with the sale of hospitals" (Br. at 20), and argues on that basis that he should not be permitted to testify about the mismanagement of the DVOG sale. The premise for the Committee's argument is false.

Robert Dickinson is Managing Director of BDC Advisors, LLC, one of the nation's foremost healthcare consulting firms. (Dickinson Rpt. (App. tab 5) Ex. 1.) For more than fifteen years, Mr. Dickinson has provided consulting services to troubled hospitals and hospital groups across the country. (*Id.* at 2.) He has repeatedly directed turn-around efforts for large and small organizations that had been failing. (*Id.*) For example, he was responsible for the reorganization of a large chain of more than forty hospitals spread across three states. (Dickinson Decl. (App. tab 16) ¶ 4.)

In addition, Mr. Dickinson frequently provides advice to his clients in connection with hospital sales. (*Id.* ¶ 5.) He has been involved in 14 client engagements in which he performed or supervised valuations of hospitals or hospital assets, often in the context of preparing, or deciding whether, to sell a hospital. (*Id.* ¶ 6.) He is often consulted by his clients about whether or not to sell particular hospitals or other assets, and how to time sales in order to ensure the best result. (*Id.* ¶ 7.) He has been asked by clients to identify, contact and evaluate potential buyers of hospital assets, and has performed extensive due diligence activities on behalf of his clients. (*Id.* ¶ 8.)

In one such engagement, Mr. Dickinson was asked to evaluate potential purchasers of a children's hospital in Boston. (*Id.* ¶ 9.) Mr. Dickinson identified two potential buyers, contacted them, conducted due diligence of them, and sent them formal requests for proposals. (*Id.*) As another example, Mr. Dickinson was asked by Stanford University Hospital and Clinics to locate potential buyers for that organization. (*Id.* ¶ 10.) He identified and investigated four potential buyers and pursued a variety of alternatives with each of them. (*Id.*) In these and other engagements, Mr. Dickinson has provided much the same sort of advice and assistance to his clients as the AHERF advisors whose performance he evaluates in his report. (*Id.* ¶ 11.)

Mr. Dickinson testified to some of his qualifications in this area at deposition (testimony that is not mentioned in the Committee's brief). (*See* Dickinson Tr. (App. tab 17) at 265 ("I've done many valuations of hospitals. It's part of what I do.").) He was ready and willing to testify further on that subject, but the Committee chose not to ask him about the rest of his qualifications. Instead, the Committee asked a series of narrow questions designed to evade Mr. Dickinson's experience rather than to illustrate it. (*See* Br. at 20-21.) Thus, the questions underlying six of the Committee's nine bullet-point items were restricted to things that Mr. Dickinson has not done in connection with hospitals <u>in bankruptcy</u>. What the Committee does not acknowledge is that prior to AHERF there were only a very limited number of hospitals sold in bankruptcy (Dickinson Decl. (App. tab 16) ¶ 12), making it unsurprising that any expert has not been involved in such a sale. Moreover, the bankruptcy proceedings were not

28

material to most of the failures that Mr. Dickinson identifies in the AHERF sale process.[4]

Bankruptcy can impose additional challenges to a sale, but will not convert a

mismanaged sale into an efficient one. (*Id.* ¶ 13.)

   Similarly, the Committee notes that Mr. Dickinson has not "given a

fairness opinion regarding the sale of hospital assets". (Br. at 21, emphasis added.)  In

fact, Mr. Dickinson has frequently led teams at BDC that prepared fairness opinions. (*Id.*

¶ 15.)  The only reason that he did not "give" those opinions himself is that it is BDC's

policy that only the firm's Managing Director can sign a fairness opinion. (*Id.* ¶ 16.)

Mr. Dickinson became Managing Director in 2003; fairness opinions provided by the

firm prior to that date were signed by his predecessor. (*Id.*)

   Mr. Dickinson amply satisfies the test to serve as an expert witness with

regard to the DVOG sale.  As the Committee admits, an expert need possess only

"minimal qualifications, either through experience or education, in a field relevant to a

subject which will assist a trier of fact". (Br. at 20, *citing Pousi v. Huntleigh Healthcare*,

998 F. Supp. 478, 490-91 (D.N.J. 1998).)  In light of the accompanying Declaration,

Mr. Dickinson more than satisfies this requirement.

   B.   Mr. Dickinson's Analysis of the DVOG Sale Is Based on Reliable
        Methods.

   According to the Committee, the only work Mr. Dickinson performed in

the course of analyzing the sale process was to "review[] depositions taken in this case

---

[4] Mr. Dickinson's opinion that "the filing of bankruptcy itself has a negative
impact on value" is based on a review of the scholarly literature, and discussion of two
academic studies published in peer-reviewed journals (the *Journal of Finance* and the
*Journal of Financial Economics*). (Dickinson Rpt. (App. tab 5) at 32 & nn.71-72.)

and affidavits submitted in the bankruptcy proceedings". (Br. at 19.) The Committee's representations are a gross distortion of the record.

Mr. Dickinson's analysis did begin with a review of the evidence in the case, as it ought to. But the Committee's assertion that his report on the subject of the sale process is "merely a summary of the deposition testimony and the affidavits that he reviewed" (Br. at 19) is wrong. Mr. Dickinson's opinion on the AHERF sale process was formed using the same analytical skills and methods that he regularly employs on behalf of his clients in dealing with sale processes.

For example, Mr. Dickinson expresses the opinion that "[t]he single most critical mistake made by AHERF and its financial advisors in the management of the sale process was to pursue 'sole source' negotiations with Vanguard [Health Systems, Inc.]". (Dickinson Rpt. (App. tab 5) at 29.) Mr. Dickinson identified that decision as a mistake in light of his own experience in seeking bidders for hospitals and hospital assets, where he always prefers to involve multiple potential buyers rather than conduct "sole source" negotiations. (Dickinson Decl. (App. tab 16) ¶ 17.) Thus, in the children's hospital engagement discussed above (at 28), Mr. Dickinson worked with two potential suitors. (*Id.* ¶ 9.) Similarly, in the Stanford engagement (*see* above at 28), Mr. Dickinson contacted and pursued discussions with four potential bidders. (*Id.* ¶ 10.)

As another example, Mr. Dickinson expresses the opinion that "AHERF was poorly prepared and highly disorganized during the sale process". (Dickinson Rpt. (App. tab 5) at 34-35.) Here again, Mr. Dickinson formed that opinion in light of his experience and expertise. Mr. Dickinson has supervised hospital sale processes in his

consulting work, and in this litigation assignment he evaluated AHERF's sale process using the same standards he applies with his clients. (*Id.* ¶ 18.)

The remaining portions of Mr. Dickinson's report on the sale process reflect his analysis and evaluation in similar detail, and are equally grounded in the same analytical methods that Mr. Dickinson regularly uses on behalf of his clients. The Committee's complaints about Mr. Dickinson's methods are therefore groundless and should be rejected.

### Conclusion

For the foregoing reasons, the Committee's Motion to Exclude Certain Testimony From PwC's Experts should be denied.

Dated: July 11, 2005

Respectfully submitted,

MANION McDONOUGH & LUCAS, P.C.

By

Joseph F. McDonough
(Pa. I.D. #19853)

USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

CRAVATH, SWAINE & MOORE LLP

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2005, a true and correct copy of the foregoing Memorandum in Opposition to the Committee's Motion to Exclude Certain Testimony from PwC's Experts was served upon counsel of record by either hand delivery and/or overnight delivery, addressed as follows:

### *Via Hand Delivery:*

James Jones, Esquire
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 3100
Pittsburgh, PA  15219

### *Via Federal Express - Overnight*

Richard B. Whitney, Esquire
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114