UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,  Plaintiff,  v.  PRICEWATERHOUSECOOPERS, LLP,  Defendant. | Civil Action No. 00-684  Judge David Stewart Cercone |

EXHIBITS TO THE COMMITTEE'S
BRIEF IN OPPOSITION TO PwC's MOTION TO PRECLUDE DUPLICATIVE AND
<u>UNRELIABLE EXPERT ACCOUNTING TESTIMONY</u>

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee of Unsecured Creditors of AHERF

July 11, 2005

**TAB 1**

# EXPERT REPORT OF JAMES WALLACE

## IN THE MATTER OF
## THE OFFICIAL COMMITTEE OF
## UNSECURED CREDITORS OF
## ALLEGHENY HEALTH, EDUCATION
## AND RESEARCH FOUNDATION,
## PLAINTIFFS

### V.

## PRICEWATERHOUSECOOPERS, LLP.
## DEFENDANT

### DATED JANUARY 11, 2005

## I. QUALIFICATIONS

### A. Education and certification

I am a Certified Public Accountant ("CPA") and have held licenses in 26 states plus the District of Columbia. I am currently a member of the AICPA. In 1960, I received a Bachelor of Arts degree in business and accounting from the University of Washington located in Seattle, Washington.

### B. Work experience

Upon graduation, I worked for a large insurance company, National Public Insurance Company, located in Seattle, Washington and became their Corporate Controller. That work experience included financial reporting, compliance with regulatory authorities, and computerization of all financial records.

In 1967, I joined the professional staff of Arthur Andersen, LLP ("AA"). At the time I retired from AA, AA was an international accounting and consulting firm with over 100,000 personnel. AA had a very large Health Care Division with a practice of over 4,000 healthcare clients nationwide. These healthcare clients ranged from small providers to large investor-owned corporations.

I spent my entire AA career in the firm's Health Care Division where I was a senior partner in the healthcare practice and one of its leaders. I was in charge of AA's healthcare practice in the Washington, DC area, Regional Director of the Southeast region, and a member of AA's Firm Wide Healthcare Steering Committee that oversaw the Health Care Division in the United States.

During my career with AA, I audited and gave over 1,000 professional opinions on the financial statements of healthcare organizations. In addition, I completed numerous special projects, including:

(1) reviewing and preparing Medicaid/Medicare cost reports,

(2) assisting in over 100 appeals for hospital providers to the Provider Reimbursement Review Board (a government agency designed to assist in Medicaid/Medicare cost report issues),

(3) completing over 200 feasibility studies related to public offerings for and changes in the physical plant to healthcare facilities and related financings,

(4) assisting many healthcare organizations in their strategic planning and allocation of resources,

(5) working on a wide variety of other special projects to assist in organizational matters and operations, and

(6) working as an expert witness for law firms in litigation matters regarding accounting/finance and claims issues.

Since retiring from AA in 1995, I have established a healthcare consulting firm, The Wallace Group. This practice has included special projects similar to the work I did with AA. Also, during the last nine years, I have served as an interim Chief Executive Officer for both the Hospital for Sick Children and AARP Services, Inc. and as interim Chief Financial Officer for Loudoun Healthcare, Inc., George Washington Health Care Plan, and the Country of Bermuda Healthcare System.

C. Professional affiliations and Boards

I have been an active member in the following organizations:

(1) American Institute of Certified Public Accountants,

(2) National Institute of Accountants,

(3) American College of Healthcare Executives,

(4) American Hospital Association,

(5) Healthcare Financial Management Association,

(6) Washington, DC Society of CPA's, and

(7) Federation of American Hospitals.

I served on the Board of Directors and Finance Committee of a large nationwide healthcare institution, the Holy Cross Health System. Also, I served on the Board of Directors of

AARP Services Inc., the for-profit division of AARP. Recently, I became a Board member of Care First, Inc., the local Blue Cross plan for the greater metropolitan Washington, DC area.

In summary, my 44-plus years of healthcare-related experience has included:

(1) giving professional opinions on financial statements, primarily relating to hospitals and other healthcare organizations,

(2) working on a variety of consulting projects to enhance operations and governance issues,

(3) working as an interim CEO and interim CFO on day-to-day management issues and as a Controller of a large insurance company, and

(4) serving as a member of the Board of Directors of three large corporations, among them for-profit and not-for-profit organizations and healthcare organizations.

## II. INTRODUCTION

I have been retained by the law firm of Jones Day to review the work and opinions of J.W. Tillett, Jr., contained in a report dated November 12, 2004. I reviewed Mr. Tillett's report and other materials and respond to his opinions to the extent that he seeks to justify the reasonableness of Coopers & Lybrand's audit work for the Allegheny, Health, Education and Research Foundation based on his experience or expertise in the performance of healthcare audits. Mr. Tillett applies an "experience" justification most frequently and directly in three significant audit areas:

(1) Methodology and use of materiality,

(2) Accounts receivable assessments, and

(3) The relationships between management, the auditor, and the Board and Audit Committee, including the reporting of audit findings to the AHERF Board and Audit Committee.

Applying my own healthcare experience, I comment in this report on the extent to which Mr. Tillett's assertions that specialized applications of accounting principles to the healthcare industry, or other industry circumstances or realities, support or justify C/L's audit conduct or judgments.

## III. COMPENSATION AND DEPOSITION EXPERIENCE

My fee for this matter is based on my standard fee schedule of $350 per hour. The compensation that I receive for this matter is not dependent on the outcome of this case, nor is my opinion dependent on my compensation.

During the last four years, I have been deposed in one litigation, Cause No. 01-6514-C, pending In the District Court for Nueces County, Texas, 94th District Court.

IV.   **MATERIAL CONSIDERED**

Attached is Exhibit "A," which is a complete list of the documents I have considered in reaching my opinions. Also, I have considered my professional experiences and the appropriate American Institute of Certified Public Accountants ("AICPA") accounting literature when reaching my opinions. In summary, the key documents that I reviewed were as follows:

(1)   the audited financial statements of AHERF and its affiliates for fiscal 1996 and 1997,

(2)   various year-end reports issued by C/L to the AHERF Board and Audit Committee,

(3)   the expert report of Mr. J.W. Tillett, Jr., dated November 12, 2004,

(4)   the expert report of Mr. Robert W. Berliner, dated September 3, 2004,

(5)   the expert report of Mr. D. Paul Regan, dated September 2, 2004,

(6)   the deposition of Mr. William F. Buettner, C/L engagement partner, and

(7)   certain C/L workpapers and AHERF documents relating primarily to accounts receivable.

V.   **SUMMARY OPINION**

I disagree with Mr. Tillett's report and opinion to the extent that he asserts that healthcare auditing experience, expertise, and practices justify C/L's audit work and conclusions. His report is disturbing to me as it appears to favor C/L in each and every audit conclusion, even those involving large accounting transactions in clear violation of GAAP. I disagree with many of Mr. Tillett's assertions pertaining to the expert reports of Messrs. Berliner and Regan. My experience in auditing healthcare clients varies greatly from Mr. Tillett's, and, as I set forth below, my experience does not support the opinions given by Mr. Tillett.

Also, in my opinion, C/L failed to report many significant audit findings required by Statement on Accounting Standard ("SAS") No. 60 and 61 that could have had an impact on the future policy decisions of the governance bodies of AHERF.

VI.   **RESPONSIBILITIES OF AUDITORS**

The AICPA Professional Standard Section AU 110.01 states: "The objective of the ordinary audit of financial statements by the independent auditor is the expression of an

4

opinion on the fairness with which they present, **in all material respects, financial position, results of operations, financial statements, and cash flows of an entity in conformity with generally accepted accounting principles.**" (emphasis added).

There is a clear distinction between the responsibilities of the independent auditor and management. Section 110.02 describes the responsibilities of both parties. According to this AICPA Standard, "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of **material misstatements, whether caused by error or fraud.**" (emphasis added).

The Standard goes on to state: "The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." (AU 110.02). Although these are management's responsibilities, the objective of an audit remains the auditor's expression of an opinion on the fair presentation of these financial statements under generally accepted accounting principles.

AICPA Standard AU Section 333 requires that the independent auditor obtain written representation from management as part of the audit. The Standard goes on to state: "The auditor obtains written representations from management **to complement other auditing procedures** (emphasis added). In many cases, the auditor applies auditing procedures specifically designed to obtain evidential matter concerning matters that also are the subject of written representations." (AU 333.03) (emphasis added).

C/L, as a member of the AICPA, was required to follow these standards when expressing an opinion on the financial statements.

Thus, for the years 1996 and 1997, when C/L performed the AHERF audits, C/L, as the independent auditor of AHERF, was required to plan and perform the audits to enable C/L to express an opinion, providing reasonable assurance that the financial statements of AHERF were free of material misstatement, whether caused by error or fraud. This obligation was not in any way altered or diminished because the entity was a not-for-profit entity that operated hospitals.

## VII.   AUDIT RISK AND MATERIALITY

AU Section 312 "provides guidance on the auditor's consideration of audit risk and materiality when planning and performing an audit of financial statements in accordance with generally accepted auditing standards. Audit risk and materiality affect the application of generally accepted auditing standards, especially the standards of field work and reporting, and are reflected in the auditor's standard report. Audit risk and materiality, among other matters, need to be considered together in determining the nature, timing, and extent of auditing procedures and in evaluating the results of those procedures." (AU 312.01).

5

AU Section 312.02 states: "The existence of audit risk is recognized in the description of the responsibilities and functions of the independent auditor that states, 'Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected.' Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated."

AU 312.03 states: "The concept of materiality recognizes that some matters, either individually or in the aggregate, are important for fair presentation of financial statements to conformity with GAAP. The representation in the auditor's standard report regarding fair presentation, in all material respects, in conformity with GAAP indicated the auditor's belief that the financial statements taken as a whole are not materially misstated."

AU 312.04 states: "Financial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with GAAP. Misstatements can result from errors or fraud."

AU 312.11 states: "As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of a relatively small amount that come to the auditor's attention could have a material effect on the financial statements."

The auditor's consideration of materiality is a matter of professional judgment but is influenced and ultimately determined by his or her perception of the needs of a reasonable person who will rely on the financial statements. The perceived needs of a reasonable person are recognized in the discussion of materiality in Financial Accounting Standard Board Statement of Financial Accounting Concepts No. 2, "Qualitative Characteristics of Accounting Information," which defines materiality as "the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a **reasonable person relying on the information would have been changed or influenced by the omission or misstatement.**" (emphasis added). That discussion recognizes that materiality judgments are made in light of surrounding circumstances and necessarily involve both quantitative and qualitative considerations.

As mentioned above, the auditor must consider the readers of financial statements when considering materiality in their audit examinations. In my experience with for-profit and not-for-profit healthcare organizations alike, the readers and their needs are as follows:

(1)    Management

Because healthcare management is responsible for operations, management relies on the statement of operations and the categorization of accounts within this statement, such as the provision for bad debts, contractual discounts, and various categories of expenses. In my experience in healthcare organizations, categorization of accounts is important to management so that, for example, the entity can assess financial performance by payor and the effectiveness of accounts receivable management. Management is also interested in the balance sheet for items such as days cash on hand and revenue days in accounts receivable, among other things. Most

importantly, management knows that users of the financial statements are interested in whether operational performance is sufficient to maintain the financially viability of the entity. It is therefore not surprising that most of the audit issues, and asserted financial manipulations relating to AHERF, focus on the statement of operations.

    (2)  Boards of Directors and Finance/Audit Committees

    Due to their fiduciary responsibility for the financial well-being of the organization, the governance committees are keenly interested in the operating results or the "bottom line" of the organization. A healthcare organization must have sound operating results to sustain the mission of the organization, as well as to pay lenders and creditors. Also, these committees want to be made aware of any defaults in loan agreements with lenders or creditors. In my experience, the reporting given to the governance committees concentrates on the operating results of the organization.

    (3)  Debt Holders/Creditors

    This group of readers is keenly interested in the operating results, in particular the trends in operations. Also, they are also interested in whether or not the organization has the ability to sustain its operations and pay the debts to lenders. In my experience, these readers are very interested in the accounts in which management makes estimates, such as provisions for bad debts, contractual discounts, etc., because the trends in the collection of receivables is extremely important for the financial viability of an organization.

    As mentioned above in the Financial Accounting Concepts No. 2, the auditor needs to be aware of what is material to the various readers of the financial statements when issuing their opinions.

    With respect to materiality, Mr. Tillett opines: "C/L's consideration of materiality relative to unrestricted net assets, total net assets and the impact on debt covenants was appropriate. Furthermore, I believe the opinions expressed by Mr. Berliner and Mr. Regan on materiality judgments would be relevant for for-profit healthcare systems, but not appropriate for materiality judgments for non-for-profit healthcare systems." Mr. Tillett asserts that the consideration for materiality is different for not-for-profit versus investor-owned organizations. From my experience, this is just not true. The auditor should not determine materiality to be less stringent for not-for-profit organizations. The audit risk for the auditor is almost identical between the two types of organizations. Also, the Health Care Audit Guide does not distinguish between not-for-profit and investor-owned organizations. Moreover, the general notion that, in the context of AHERF and its interested parties (management, Board and creditors), the statement of operations is of secondary importance in assessing materiality is simply not credible.

    Mr. Tillett states that the AICPA Health Care Audit Guide ("Health Care Guide") does not specifically cover materiality measures. He also states that SAS No. 47, along with the materiality guidance from the AICPA Not-For-Profit Guide "relative to measures of materiality," is the relevant guidance for the auditor to consider when making materiality judgments in a not-for-profit healthcare environment.

The AICPA Not-For-Profit Guide applies to voluntary health and welfare organizations that are not involved in providing patient care services, as AHERF was. In fact, the Health Care Guide specifically states that the Not-For-Profit Guide is not applicable to healthcare organizations like AHERF.

Mr. Tillett believes the not-for-profit mission of an organization is crucial when an auditor sets the materiality thresholds. Thus, I interpret this comment by Mr. Tillett to state that C/L's materially threshold should be less stringent for AHERF as compared to investor-owned organizations.

I disagree with Mr. Tillett's comment. In my opinion, the mission of the organization does not make a difference in setting materiality thresholds due to the following reasons:

(1) The Health Care Guide for GAAP and GAAS do not make any distinction due to the mission of the organization,

(2) Investor-owned enterprises generally have similar charity care policies and care for Medical Assistance and Medicare patients at "less than cost,"

(3) Financial failures occur equally in healthcare organizations when Boards, healthcare management and/or outside auditors fail in their respective duties and responsibilities,

(4) The not-for-profit providers have as a creed "no margin no mission," and thus give significant attention to the "bottom line," and

(5) Bond Rating Agencies make little or no distinction between not-for-profit versus investor-owned enterprises when making their evaluations for rating debt instruments.

I have given over 1000 audit opinions on healthcare organizations. These organizations were both not-for-profit and investor-owned enterprises, small and large healthcare providers, as well as large provider organizations like AHERF. The materiality guide that I used was based on SAS No. 47, which provides guidance to the auditor on materiality. This SAS makes the auditor aware that there will be many varied readers that rely on the auditor's opinion and the financial statements, and it states "the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omissions or misstatement."

The following are some of the qualitative factors that, in my experience, are important to the readers and that always need to be considered when applying professional judgments on materiality. In my experience, each of the qualitative factors listed below has equal or similar weight when applying materiality for the financial statements:

(1) The potential effect of the misstatement on trends, especially trends in profitability.

(2) The potential effect of the misstatement on the organization's strict compliance with loan covenants. In this area I use what is referred to as the "pregnancy test." This type of testing suggests that an organization needs to be in 100% compliance with all debt covenants.

(3) The significance of the misstatement relative to known user needs. Obtaining the views and expectations of the organization's Board, Audit Committee, and management is necessary to determine their needs.

(4) The definitive character of the misstatements -- for example, errors that are objectively determinable, such as recording the inventories to the actual physical inventory or the implementation of accounting treatments that are clearly contrary to GAAP.

(5) The motivation of management with respect to the misstatement -- for example, an intentional misstatement by management to "manage" earnings, especially when management has a bonus structure in place based, in part, on earnings (as was the case at AHERF).

(6) The existence of statutory or regulatory reporting requirements that affect materiality thresholds. Because many third-party payors for healthcare services calculate reimbursement based on allowable costs, special attention must be made by the auditor in this area. For example, depreciation and interest expenses are generally allowable costs. Thus, all changes to these accounts must be accurately reported. AHERF management was offsetting changes to these accounts by utilizing the allowance for doubtful accounts.

(7) The offsetting effects of different allowance accounts, such as contingency allowance or contractual discount vs. bad debts, etc. AHERF management erroneously offset reserve accounts against one another, which is against GAAP.

(8) The likelihood that a misstatement that is currently immaterial may have a material effect in future periods -- for example, management being "aggressive" in minimizing provisions for bad debts and contractual discounts, or management not properly evaluating the percentages used when accounts receivable are aged by date of discharge and type of payor.

In fiscal 1997, C/L used a materiality threshold for trial balance accounts of $1.5 million (Buettner deposition 651:22 to 652:21). Also, C/L used a materiality threshold of $500,000 for listing potential adjustments on its Summary of Unadjusted Differences ("SUD") (Buettner deposition 653:9-22). In evaluating the impact of audit adjustments, Mr. Buettner has testified that C/L used the policy of fund balance or net assets as the primary measure of materiality (Buettner deposition 313:7-24).

Mr. Tillett states in his opinion that "I firmly believe that measurements of materiality relative to unrestricted net assets, total net assets and the effect on debt covenants

9

were of the greatest significance. Therefore, I believe C/L's use of those measurements in its consideration of materiality was appropriate."

I disagree with Mr. Tillett's opinion. In my experience in both for-profit and not-for-profit organizations, the fund balance or net assets is not and should not be the primary measure. In fiscal years 1996 and 1997, AHERF and its obligated groups had significant balances in both the consolidated and combined net assets. If these amounts were utilized as the primary measure for materiality, then almost all proposed adjustments by C/L would be immaterial, as shown by the magnitude of fund balance amounts listed in the table below (000's eliminated):

| Year | Consolidated | DVOG |
|------|--------------|------|
| 1996 | $559,236 | $150,925 |
| 1997 | $569,796 | $191,270 |

In connection with its AHERF audits, C/L failed in its GAAS responsibilities when evaluating the impact of audit adjustments.

For fiscal 1997, C/L changed the scope of the examination of AHERF. In prior years, C/L issued separate opinions on the consolidated financial statements and opinions on various obligated groups. Thus, according to C/L and Mr. Tillett, the audit scope and procedures were appropriately designed by C/L with the sole intent to express an opinion on the AHERF consolidated financial statements.

With respect to the $50 million reserve transfer between obligated groups that occurred in 1997, I disagree with Mr. Buettner and Mr. Tillett's assertions relating to how that transfer should be evaluated from a materiality perspective. I disagree with their assertions that this transfer could properly be evaluated on a consolidated level.

In my experience, even though the scope of the opinions was changed in 1997, an auditor must be aware during the examination of AHERF that the financial information for individual hospitals in the various obligated groups needs to be fairly stated. C/L is required to give an opinion of negative assurance on the compliance of the debt coverage of the obligated groups. Thus, C/L needs to be assured that the obligated group financial information is fairly presented.

C/L did recognize in the 1997 audit working papers that a separate evaluation is necessary for the DVOG hospitals. PWC 009741 states:

> "For purposes of evaluation, the summary of unadjusted differences has been prepared by obligated group financial results. This was done since C&L issues a debt compliance letter for the AH and DVOG obligated group. We have also prepared a SUD on a consolidated basis. It has been determined that though consolidated financial statements are presented, given the various debt covenant **requirements, separate evaluation of the obligated groups level is necessary.**" (emphasis added).

10

Mr. Tillett evaluates what he concedes was a non-GAAP $50 million reserve transfer to the DVOG for the test of annual debt service coverage (see table 17 on page 93). The debt service coverage was required to be at least 1.10. According to the table in Mr. Tillett's report, the debt service coverage, as reported in the financial statements, was 2.83 (or almost three times the necessary coverage).

Mr. Tillett then calculated the debt service ratio assuming the $50 million was charged to income. The debt service coverage was reduced to 1.46 versus the 2.83 mentioned above. The minimum debt service coverage was not violated in a mathematical sense, but the reduction could have led to different conclusions about the financial wherewithal of the organization by outside readers of the financial statements.

Mr. Tillett states that "Based on the calculation above, DVOG would not have been in violation of its debt service coverage ratio even if the entire $50 million were expensed at the DVOG." I disagree with Mr. Tillett's apparent suggestion that merely because the debt service ratio would not have been violated, that a change from 2.83 to 1.46 would not be material. In my experience, a reduction of the debt service ratio from one year to the next would have been very material for all readers, especially for the lenders. A sharp reduction of the debt service ratio from prior years would have been very material to lenders and other financial statement users.

Mr. Tillett concludes that the $50 million reserve transfer was an inter-company transaction that eliminated in consolidation. He further states that C/L reasonably concluded that it had no effect on the consolidated statements of AHERF and did not violate any debt covenants. In my opinion, the $50 million reserve transfer to the DVOG (1) was not in accordance with GAAP and C/L was required to insist upon an appropriate reversing adjustment, (2) the impact of the trend of the debt service coverage was material, and (3) the impact on the combining financial statements of the DVOG hospitals was material.

Apart from the obvious quantitative materiality of the transfers, the $50 million transfer was unquestionably material from a qualitative perspective. In my experience advising and serving upon Board and Audit Committees, any suggestion that management has engaged in accounting manipulations or improprieties to improve earnings, particularly when there is a bonus system in place based on earnings, is of great importance. Any suggestion that a non-GAAP transaction involving a sum of $50 million could somehow be "immaterial" to AHERF's financial statements or financial statement users is simply not a credible statement.

## VIII. ACCOUNTS RECEIVABLE FROM PATIENTS

In general, gross service revenue at healthcare organizations is recorded in the accounting records on an accrual basis at the provider's established rates, regardless of whether the healthcare organization expects to collect that amount. Provisions for contractual adjustment are recorded on the accrual basis and deducted from gross revenues and patient accounts receivable. Also, provisions for bad debts are recorded on the accrual basis and included in the statement of operations as an expense. Finally, the allowance for uncollectible accounts is recorded in the balance sheet and reduces the accounts receivable to the net realizable value.

11

For AHERF, the estimated allowance for uncollectible accounts and the provision for bad debts were very material to the operating results of the various hospitals, as shown below by the magnitude of these accounts. The consolidated balance sheet of AHERF for fiscal years 1996 and 1997 included the following ($000's eliminated):

| Year | A/R | Allowance | Allowance/AR |
| --- | --- | --- | --- |
| 1996 | $383,889 | $63,830 | 17% |
| 1997 | $494,485 | $127,424 | 26% |

The consolidated statement of operations for AHERF for fiscal years 1996 and 1997 included the following (000's eliminated):

| Year | Material/supply Expense | Provision for Bad Debts | % Provision/ Expense |
| --- | --- | --- | --- |
| 1996 | $498,941 | $67,534 | 14% |
| 1997 | $700,154 | $66,416 | 10% |

Also, the consolidated net income, as reported, was (000's eliminated) $6.547 million and $21.926 million, respectively, for 1996 and 1997.

Clearly, as previously mentioned, the allowance for uncollectible accounts and provision for bad debts were "important for the fair presentation (of AHERF's) financial statements in conformity with GAAP." (AU 312.03). As previously mentioned in my report, the various readers of the financial statements of healthcare organizations, such as the AHERF's Board and Audit Committee, lenders, creditors and financial analysts, would have been extremely interested in these amounts. Thus, AHERF management's estimates should have a significant impact on the nature, timing and extent of C/L's audit procedures applied during performance of the AHERF audit examinations.

On the subject of the allowance for uncollectible accounts, Mr. Tillett opines: "C/L's audit procedures with respect to the allowance for uncollectible accounts were in accordance with GAAS, and together with other audit procedures provided a reasonable basis for their conclusion that net patient accounts receivable at June 30, 1996 were presented, in all material respects, in accordance with GAAP, in relation to the financial statements taken as a whole." Mr. Tillett asserts that his and Mr. Buettner's conclusions regarding the allowance for uncollectible accounts were and are supported by their experience with healthcare enterprises.

From my review of important workpapers relating to the audit of AHERF entities' allowances for uncollectible accounts, my experience with healthcare organizations would not support the conclusions reached by Messrs. Tillett and Buettner.

For example, C/L noted that, consistent with prior years, management applied different methodologies at various hospitals when estimating the allowance for uncollectible

accounts. Two related entities, MCPH and EPPI, utilized self-pay as the basis for their estimation of the allowance for uncollectible accounts. Messrs. Berliner and Regan have opined that the methodology was unacceptable and that C/L failed to adequately address allowance deficiencies caused by this methodology. Mr. Tillett states that, in his experience, this methodology is used by other hospitals to estimate the allowance for uncollectible accounts and that he believes it is one of many valid approaches that is acceptable.

       In my experience, the self-pay method (or any other method that assigns no or very low reserve rates to older third-party accounts) is not an acceptable method unless the organization has the internal controls and processes in place to identify accounts that have been rejected by third-party payors (particularly after a significant period of time) and to classify those accounts appropriately as self-pay accounts. Even in the unlikely event that the hospital has these controls in place (in my experience, most do not), there will still be a significant amount of third-party receivables that will be denied by the third-party payors that the hospital does not yet know will be denied. Thus, it is almost impossible to have the self-pay method as an acceptable method.

       I disagree with any assertion that a hospital needs only to reserve for "credit risk." As any experienced healthcare auditor would know, there are many reasons why a third-party payor might not pay on an account, and most of these reasons have no relation to credit risk.

       During fiscal 1996, certain DVOG hospitals changed their procedures for aging inpatient and outpatient receivables. The aging for inpatient receivables was changed from being based on discharge date to final bill date. The aging for outpatient receivables was changed from being based on registration date to last payment date. AHERF management made this change due to the significant delays in the billing process as well as the high error rate. Mr. Tillett states that the change in methodologies is consistent with his experience in auditing not-for-profit healthcare systems. In my experience, it would be almost impossible to change the methodology for inpatients to final bill date without a significant amount of research to justify the percentages that will be used in the calculations of the allowance account.

       Also, in my experience, the change in methodology for outpatient services to the date of last payment is unacceptable. This method would have significant biases, such as a large patient receivable balance that has received only periodic or sporadic minimal payments being classified as current. This method would be unacceptable.

       One of the primary metrics to assess the allowance for uncollectible accounts that Mr. Tillett says C/L utilized was the ratio of reported allowance for uncollectible accounts to that of patient accounts receivable (the "Allowance Percentage"). Mr. Tillett concludes that "In my experience, calculating and reviewing the Allowance Percentage as compared to prior years is a reasonable and appropriate procedure to asses the reasonableness of net patient accounts receivable." In my experience, comparing the Allowance Percentage is not the primary metric used to assess the reasonableness of net patient accounts receivable. I agree that it could be a "reasonable" test but (1) it should come only after a thorough testing and analysis of the individual payors is completed, and (2) if the prior year's allowance account is not accurate, the test is worthless.

On the subject of C/L's audit testing of accounts receivable in the subsequent events period, Mr. Tillett's report states: "Based on the results of these procedures, C&L reasonably concluded no events occurred subsequent to the balance sheet date that required adjustment to, or disclosure in, the financial statements."

C/L's opinion is dated September 11, 1996. Other documents indicate that C/L auditors were still reviewing allowance for uncollectible accounts as late as October 3, 1996 (see CL 001180). The auditor's opinion is supposed to be dated when the "majority" of field work is completed (see Section 530.01). Also, the management representation letter was dated and signed on September 20, 1996. The management representation letter and the date of the opinion should almost always be the same. This latter date indicates that C/L was still performing significant audit work.

Thus, the sign-off date should have been sometime in October and C/L could then have completed subsequent cash receipts tests through September. I see no evidence that this was done. Given the large amount of old receivables carried on the DVOG hospitals' books and the relatively low amount of reserves on these old receivables, the processing issues C/L was aware of in AHERF's billing and collections department, and the wide disparity between the collections on accounts receivable shown in C/L's subsequent receipts testing and the reported net realizable value of the accounts, I would have expected C/L to conduct more extensive audit testing subsequent to year end, including cash receipts. In the not-for-profit healthcare environment, there are fewer strict reporting deadlines, such as those required by the SEC for for-profit entities.

Also, if there is a "significant" delay between the sign-off date and the release date, then accounting firms have a policy that certain subsequent review procedures should be made to ensure no significant events have occurred since the sign-off date. According to Mr. Regan, page 34, on September 27th C/L released its unqualified opinions on DVOG's June 30, 1996, combined financial statements. The release date was sixteen days after the date of C/L's opinion date. In my experience, it takes a little more than a week to process the reports at the audit firm. Given these considerations and those mentioned above, I believe that C/L had a responsibility to do subsequent testing through September 1996.

Relating to the $17.5 million audit adjustment that increased the amount in the DVOG hospitals' allowance for uncollectible accounts, Mr. Tillett states in his report: "C/L had a reasonable basis for their conclusion that the manner in which AHERF management recorded an increase to the allowance for uncollectible accounts by $17.5 million and recorded certain other audit differences did not cause the fiscal year 1996 financial statements to be materially misstated."

After discussions between C/L and AHERF management for the fiscal 1996 audit, a proposed increase was agreed upon to increase the allowance for uncollectible accounts for the DVOG hospitals by $17.5 million. However, as required under GAAP, AHERF management did not charge the total increase to the provision for bad debts in the statement of operations. Management instead increased bad debt reserves by utilizing the following accounts:

| Account | Total (in millions) | Impact on Operations |
|---|---|---|
| Provision for doubtful accounts | $2.5 | $2.5 |
| Accumulated depreciation | 6.0 | 0 |
| Property, plant and equipment | 2.0 | 0 |
| Cost rate adjustment | 7.0 | 0 |
| Total | $17.5 | $2.5 |

These entries are wrong for a number of reasons, including reasons directly relating to the auditing of healthcare organizations:

(1) The provision for bad debts in the statement of operations was materially understated by $15.0 million. The provision for bad debts figure is of significant interest to users of healthcare organizations' financial statements in evaluating the effectiveness of collections activity.

(2) The adjustment for accumulated depreciation of $6.0 million needs to be made to the depreciation expense account. For cost reimbursement purposes, such as Medicare and Medicaid, this entry violates many rules and regulations regarding third-party reimbursement and could possibly subject AHERF to various fines or other enforcement actions.

(3) The property, plant and equipment adjustment of $2.0 million needs to be offset against interest expense, again for cost reimbursement purposes.

(4) The cost rate adjustments of $7.0 million should be made to the contractual accounts, not the bad debt allowances.

(5) C/L gave an opinion on the financial condition and results of operations. Even though the net realizable value of receivables might be correct, the provision for bad debts in the statement of operation is understated by $15 million, which would be material to all readers of these financial statements.

Messrs. Berliner and Regan have asserted that AHERF violated GAAP by failing to record the entire increase in the allowance for uncollectible accounts as a charge to income. Mr. Tillett states in his report that he disagrees with this assertion. In my opinion, for the reasons mentioned above, the assertion by Messrs. Berliner and Regan are correct.

In addition, from my review of the expert reports filled by Messrs. Tillett, Berliner, and Regan, it appears that the audit workpapers provide no explanation or support for the $17.5 million audit adjustment. In my experience auditing healthcare entities, the area of doubtful accounts deserves and receives significant audit attention, and auditors will often propose adjustments in this area. It is also my experience that Board members are interested in understanding the nature and rationale behind such adjustments. I would expect the workpapers to provide an explanation behind significant audit adjustments in the area of doubtful accounts.

## VIII. MANAGEMENT, BOARD AND AUDITOR INTERACTIONS/REPORTABLE CONDITIONS

In his report Mr. Tillett states: "In my opinion, AHERF management failed to meet its obligations to C/L as set forth in the AICPA professional standards and in the letters of arrangement in connection with C/L's fiscal year 1996 and 1997 audits of the financial statements. As a result, C/L was precluded in its ability to detect material misstatements in connection with its audits."

According to Mr. Tillett, AHERF management had an obligation to disclose to C/L sufficient and relevant information and that, in certain respects, AHERF management failed in this obligation. Relating specifically to the area of accounts receivable, an audit area that I was asked to review, I believe that AHERF management did disclose sufficient and relevant information regarding the estimates for the allowance for bad debts. AHERF management gave C/L the relevant information on how the accounts were aged as well as the specific detail of how AHERF calculated the bad debt reserves for the various payor accounts. This information provided to C/L the detail necessary for C/L to perform audit tests to obtain assurance over the net realizable value of the receivables.

In the audit examination, C/L was required to exercise due care and have a degree of professional skepticism. An auditor should increase the professional skepticism when the auditor is made aware of certain "red flags" during the course of their examination. In my experience, the following "red flags" should have alerted C/L to be "extra skeptical" in their audit procedures for determining AHERF management's estimates on the net realizable values of patient receivables:

(1) In subsequent years, AHERF management should have made sure that the prior years' allowances for doubtful accounts were reasonable. There are many ways to accomplish this goal. In my experience, the best way is to have the client do a "run out" of the prior net realizable value. It is my understanding that AHERF did not perform, and C/L did not require, such tests.

(2) C/L noted in their 1995 management letter to the Board and Audit Committee that there was severe deterioration in the aging of receivables, especially at the DVOG hospitals. Thus, C/L should have paid "extra special" attention to the AHERF management's estimates of net realizable values in subsequent years, as "under reserving" would have a material impact on the statement of operations.

(3) For fiscal 1996, C/L recommended an increase of the allowance accounts by $17.5 million. The provision for bad debts in the statement of operations was only increased by $2.5 million, not the appropriate amount of $17.5 million. This increase was not recorded in accordance with GAAP and C/L should have mandated AHERF management to correct the provision account. This should have alerted C/L to the competency and integrity of AHERF financial management.

(4) Further relating to the $17.5 million adjustment in fiscal 1996, AHERF management made a "top side entry" to offset the $17.5 million increase by reducing the gross receivable and the allowance account by the same amount. This offset is not in accordance with GAAP. Had the allowance been reported properly, the readers may have detected a problem emerging in the collection of the accounts receivable and then made appropriate decisions.

(5) The allowance for bad debt accounts were never actually reconciled to their provision for bad debts.

(6) In fiscal 1997, AHERF management wrote off $80 million of old patient accounts receivable. AHERF management wrote off these accounts equally over four installments, which should have concerned C/L. In my experience, this write-off process should alert the auditor to possible impropriety by management in that write-offs are typically uniform on a monthly basis and are routinely processed by the billing and collections office. The "staging" of these write-offs suggests management is attempting to "hide" something from financial statement users.

Messrs. Berliner and Regan opine that C/L's audit procedures were deficient and failed to detect several material misstatements during the course of their audits in 1996 and 1997. Mr. Tillett states that "I disagree, since I believe the misstatements were caused by irregularities. This was not a fraud audit, but an audit performed in accordance with GAAS to provide reasonable assurance that the financial statements were fairly presented in all material respects."

I agree with the above-mentioned opinions of Messrs. Berliner and Regan regarding C/L's audit procedures. In my experience, auditors in the healthcare industry must probe more for the appropriate information and potential misclassifications of accounts because:

(1) Most Billing/Collecting Departments are focused more on the prompt care of the patients and the revenue cycle, which includes gathering the necessary data in order to bill and collect from the patients or third-party payors.

(2) Also, in a very large organization that is geographically spread out (such as AHERF) there is generally no one person really who knows the "whole story." Thus, the auditor needs to discuss accounting, credit and collection issues with a wide variety of the client's personnel.

Relating to many accounts, including specifically accounts receivable and the allowance for doubtful accounts, Mr. Tillett's report states that C/L relied on AHERF management's representations. In the area of accounts receivable, I believe Mr. Tillett has placed too much importance on the significance of the management representation letter to the conduct of the audit. The general representation letter signed by AHERF management needs additional verification by C/L in each and every audit examination. At the time that AHERF management signed the letter, C/L should have performed the necessary audit work to support

17

management's representation, as required in AU Section 333. AU Section 333 states: "The auditor obtains written representations from management to complement other auditing procedures."

In his report Mr. Tillett states that "C/L's communication with the Audit Committee and/or Board of Trustees was appropriate and in accordance with GAAS." On this subject, I have been requested to comment as to differences in my audit experiences from Mr. Tillett's.

Messrs. Berliner and Regan opine that C/L failed to meet the standards established within SAS No. 60 and 61 since C/L failed to communicate certain matters to the audit committee. Mr. Tillett disagrees with the allegation and states: "It has been my experience in attending hundreds of Audit Committee meetings during my career that the executives making up these committees are interested in only the most significant issues that have come to the attention of the auditor."

In the first place, in all of my experience with healthcare audits, I cannot recall ever seeing a set of entries that rise to the degree of qualitative significance of AHERF's reserve transfers, which were clear violations of GAAP apparently made to avoid taking appropriate bad debt expense. More generally, however, my experience with Audit Committees is completely different than Mr. Tillett's. No two Audit Committees are the same because of the varied background of the individual members. My standard operating procedure would be to give to each Audit Committee "as much information as possible" and then let the committee members assess the significant matters. As an example of this, I would always have the following, as a minimum, presented to the Audit Committee at the year end:

(1) A roll forward of the net income before and after we completed the audit. This would alert the Committee to the various entries made during the audit.

(2) Where management made certain estimates, such as allowance for bad debts, I would cover our work and conclusion. In addition, I would give the Committee the low and high range of our estimate and where management's estimates were located within the range from year to year.

(3) All entries that were not made by the client would be reviewed in some manner. This would alert the Committee to the impact of the passed adjustments as well as a discussion as to why the entries were not made.

(4) A discussion would be held, generally in a closed session with the Committee, regarding the integrity and competency of senior management, especially the Finance and Accounting Departments.

(5) A thorough discussion would be held about any prior year's impact on the current statement of operations. Thus the Committee would know the "quality" of the current year's operations, whether material or not.