(6) A written report regarding the weaknesses in the internal controls, as well as any suggestions for improvement in the operations of the organization.

Messrs. Berliner and Regan allege that C/L failed to meet the standards established within SAS No. 60 and 61 since C/L failed to communicate certain matters to the audit committee. Mr. Tillett states: "I disagree. I believe C&L's communications met the standards of GAAS. It has been my experience in attending hundreds of Audit Committee meetings during my career that the executives making up these committees are interested in only the most significant issues that have come to the attention of the auditor." I agree with the opinions of Messrs. Berliner and Regan.

I have read the financial statements of AHERF for fiscal 1996 and 1997, plus all the C/L reports that were issued to the Board and Audit Committee, as well as the Audit Committee minutes. From my perspective as a member of a board of directors and audit committee of healthcare organizations, the financial statements, as presented to the AHERF Board, reflect that AHERF was a financially viable entity with certain operational challenges due to recent mergers. From my experience advising and serving on not-for-profit Boards and committees, these Boards and committees focus on the "bottom line," operating and total margins, cash flow results, and the entity's level of cash or unrestricted investment reserves. In these areas, the financial statements of AHERF for fiscal 1996 and 1997 do not depict an entity that was on the verge of financial collapse. In fact, both financial statements show, on a consolidated level, a positive "bottom line." This would have provided comfort and assurance to Board and committee members. Also, since C/L did not give a "going concern" opinion for fiscal 1997, it appears that C/L, when it released its audit opinion, also considered AHERF to be economically viable. In fact, AHERF declared bankruptcy on July 21, 1998.

It has been my experience that healthcare entities do not experience sudden and drastic financial collapses. They do not "fall off a cliff." The demand for and supply of patient care services typically does not fluctuate significantly, and economic changes in the industry are moderate and implemented over time. A sudden financial collapse, as occurred with AHERF, suggests AHERF's financial situation had deteriorated over an extended period of time before AHERF's bankruptcy filing.

In my opinion, C/L failed miserably when reporting to the Board and Audit Committee not only with the items mentioned above, but also with respect to all of the requirements of SAS No. 60 and 61.

Executed in Washington, DC the 11th of January, 2005

James Wallace

James Wallace

# EXHIBIT A

# EXHIBIT A - INFORMATION CONSIDERED BY JAMES WALLACE

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| | AHERF and its affiliates' audited financial statements for FY 96 and 97 |
| | First Amended Complaint |
| | Plaintiff's Responses to Def's 2nd Set of Irrogs (5/7/04) |
| | Def's Responses and Objections to Plaintiff's 4th Set of Irrogs (6/15/04) |
| | Def's Responses and Objections to Plaintiff's 1st Set of Irrogs (6/12/04) |
| | Expert Report of J. W. Tillett, resume and summary of publications and prior testimony |
| | Expert Report of D. Paul Regan, CPA, CFE with exhibits |
| | Expert Report of Robert W. Berliner with exhibits |
| | Buettner Deposition Transcripts Vols. 1 - 3 |
| CG 02026 - 43 | Exhibit 2006 - 1997 Management Letter |
| CL 000326 - 37 | Exhibit 1351 - C&L SUD (1996) |
| CL 000876 | Patient Accounts Receivable - AGH |
| CL 000877 - 80 | Exhibit 1520 - Inpatient & Outpatient - Bad Debt Reserve Analysis |
| CL 000988 | Patient Accounts Receivable - Bucks |
| CL 000991 - 96 | Exhibit 4023 - Bucks Inpatient Bad Debt Analysis |
| CL 000992 - 96 | Exhibit 110 - Bucks County Hospital In-Patient Bad Debt Reserve Calculation |
| CL 000997 - 1006 | Exhibit 109 - Allegheny University Hospital's Bucks County Provision for Bad Debt |
| CL 001007 - 13 | Bucks Outpatient Bad Debt Analysis |
| CL 001008 - 13 | Exhibit 111 - Bucks County Campus Out-Patient Bad Debt Reserve Calculation |
| CL 001015 - 7 | BCC-O/P & I/P Bad Debt Reconciliation |
| CL 001086 - 92 | AHERF Subsequent Receipts Summary |
| CL 001096 - 101 | Exhibit 4387 - HUH (Center City) Inpatient Bad Debt Analysis - 6/30/96 |
| CL 001097 - 101 | Exhibit 117 - Hahnemann University Hospital In-Patient Bad Debt Reserve Calculation |
| CL 001102 | HUH (Center City) Outpatient Bad Debt Analysis 6/30/96 |
| CL 001103 - 07 | Exhibit 118 - Hahnemann University Hospital In-Patient Bad Debt Reserve Calculation |
| CL 001113 | Patient Accounts Receivable - Center City |
| CL 001178 | Exhibit 4274 Bad Debt Methodology |
| CL 001179 | Patient Accounts Receivable - East Falls |
| CL 001180 - 93 | Exhibit 1075 - MCPH (East Falls) Inpatient Bad Debt Analysis 6/30/96 Using HUH Methodology |
| CL 001194 - 6 | Exhibit 4388 - MCPH - Bad Debt Reserve (Client Methodology) |
| CL 001197 - 9 | Exhibit 4028 - EPPI - Bad Debt Reserve (Client Methodology) |
| CL 001200 - 3 | Exhibit 4389 - AHERF Reserve for Bad Debts Reconciliation - MCP & EPPI |
| CL 001269 | Patient Accounts Receivable - Elkins |
| CL 001270 - 3 | EPC - Inpatient Bad Debt Analysis |
| CL 001274 - 8 | EPC - Outpatient Bad Debt Reserve - 6/30/96 |
| CL 001280 - 2 | EPC - I/P &O/P Bad Debt Reconciliation |
| CL 001345 | Patient Accounts Receivable - SCHC |
| CL 001346 - 9 | SCHC - Analysis of Inpatient Bad Debt - 6/30/96 |
| CL 001350 - 4 | SCHC - Outpatient Bad Debt Reserve - 6/30/96 |
| CL 001356 - 8 | SCHC - I/P & O/P Bad Debt Reconciliation |
| CL 013608 - 11 | Exhibit 1521 - AHERF AGH Bad Debt Reserve |
| CL 036652 - 67 | Work Paper folder Titled "Long Term Incentive Plan Correspondence" (including related documents) |
| CL 042225 - 31 | Exhibit 2482 - Independent Accountant's Report on applying agreed-upon procedures |
| CL 042251 | C&L Agreed-upon procedures opinion (10/14/96) |

# EXHIBIT A - INFORMATION CONSIDERED BY JAMES WALLACE

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| CL 043878 - 9 | C&L internal controls letter (1/8/98) |
| CL 057291 - 3 | Exhibit 1523 - Critical Matters: AHERF Summary of A/R Reserve Assuming AGH Reserve Philosophy |
| CL 150833 - 8 | Exhibit 2105 - Draft minutes of the AHERF Finance and Audit Committee Meeting (8/27/98) |
| CL 165116 - 25 | C&L Letter to AHERF Audit Committee (6/12/98) |
| CL 57316 - 22 | Exhibit 4379 - Critical Matters Noted in Planning |
| CL 57335 - 43 | Exhibit 1339 - C&L SUD (1995) |
| CL-DISK-0185/EPBD06.WK3 | Schedules relating to Elkins Bad Debt reserve calculation (6/1996) |
| CL-DISK-0185/SCHBD06.WK3 | Schedules relating to SCHC Bad Debt reserve calculation (6/1996) |
| D 016582 - 91 | Exhibit 2481 - Meeting of the Compensation Committee of AHERF |
| DB-CM-46-00982 - 87 | Exhibit 1448 - Letter re: status of accounts receivable (9/11/95) |
| DBR-AA 47289 - 91 | Letter re: adoption of new auditing standard dealing with communication with audit clients (10/16/95) |
| DBR-DK 001541 - 43 | Letter re: AHERF Long Term Incentive Plan (6/30/97) |
| DBR-DKS 020183 - 8 | AHERF Audit Committee Meeting minutes (4/8/96) |
| DBR-DKS 020379 - 85 | AHERF Audit Committee Meeting minutes (10/16/95) |
| DBR-DKS 020719 - 25 | AHERF Audit Committee Meeting minutes (4/3/95) |
| DBR-LI 0062868 - 70 | Exhibit 2135 - Letter re: adoption of new auditing standard dealing with communication with audit clients (9/22/97) |
| DBR-RS 00225 - 27 | Exhibit 29 - Memo regarding Delaware Valley Accounts Receivable Reserves |
| DBR-RS 00228 - 32 | Exhibit 30 - Memo regarding Delaware Valley Bad Debt Reserves |
| DBR-SG 6008 - 9 | Exhibit 1289 - Memo Re: Media Release w/attachment |
| DC4529 1 of 24 - 24 of 24 | Exhibit 115 - St. Christopher's Hospital for Children - Provision for Bad Debt for the month of June 1996 |
| DC4532 1 of 27 - 27 of 27 | Exhibit 113 - Allegheny University Hospital's Elkins Park - Provision for Bad Debt for the month of June 1996 |
| DC4534 1 of 8 - 8 of 8 | Exhibit 121 - Main Clinical Campus - Out-Patient Analysis of Reserves |
| DC8221 1 of 22 - 22 of 22 | Exhibit 7 - Letter with recommendations designed for AHERF's improvement and other matters for consideration attached |
| DC8230 1 of 16 - 16 of 16 | Exhibit 22 - Letter with internal control observations attached |
| GOR 0000194 - 202 | Exhibit 1648 - Transcription of Shorthand Notes of Carol Gordon - Audit Committee Meeting October 15, 1996 |
| GOR0000001 - 8 | Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee Meeting March 14, 1997 |
| GOR0000009 - 24 | Exhibit 2037 - Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee Meeting March 11, 1998 |
| GOR0000046 - 51 | Transcription of Shorthand Notes of Carol Gordon - Audit Committee Meeting April 8, 1996 |
| GOR0000082 - 90 | Exhibit 1898A - Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee Meeting August 27, 1998 |
| GOR0000091 - 111 | Exhibit 1900 - Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee September 1, 1998 |
| GOR0000112 - 131 | Exhibit 4162 - Transcription of shorthand notes of Carol Gordon - Finance and Audit Committee Meeting October 28, 1998 |
| GOR0000141 - 8 | Transcription of shorthand notes of Carol Gordon - Audit Committee Meeting October 10, 1994 |
| GOR0000149 - 55 | Transcription of shorthand notes of Carol Gordon - Audit Committee Meeting October 16, 1995 |
| GOR0000163 - 8 | Transcription of shorthand notes of Carol Gordon - Audit Committee Meeting April 3, 1995 |

## EXHIBIT A - INFORMATION CONSIDERED BY JAMES WALLACE

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| GOV 53261 - 81 | Exhibit 2057 - Letter with audit plan attached (4/8/96) |
| GOV 66179 - 83 | AHERF Audit Committee Meeting minutes (3/14/97) |
| JB 00485 - 95 | Exhibit 2038 - AHERF Finance and Audit Committee Meeting minutes (3/11/98) |
| JD-DC-0028748 - 67 | C&L Proposed Audit Plan (3/11/98) |
| JD-DC-0028931 - 3 | Exhibit 4281 - 1996 required communication letter (10/15/96) |
| JD-HL 0018165 - 71 | AHERF Audit Committee Meeting minutes (10/15/97) |
| K&L/CJQ/01374 - 81 | Exhibit 1647 - AHERF Audit Committee Meeting minutes (10/15/96) |
| PR-1-001809 - 16 | Exhibit 2122 - AHERF Audit Committee Meeting minutes (10/10/94) |
| PR-6-004708 - 32 | Exhibit 2058 - Coopers & Lybrand Proposed AHERF Audit Plan for FY 1997 |
| PR-RS-COMPUT 00082 - 94 | Exhibit 1635 - Transcripton of Shorthand Notes of Carol Gordon - Audit Committee October 15, 1997 |
| PwC 009741 - 45 | Exhibit 1079 - C&L SUD (1997) |
| RP 00048 - 53 | Exhibit 2107 - Draft Minutes of the Meeting of the AHERF Finance and Audit Committee (9/1/98) |
| TN CBC 43B 00893-936 | Exhibit 58 - AHERF Fiscal Year 1997 Audited Financial Statements |
| TN CBC 43B 01573 - 691 | Exhibit 1228 - AHERF Fiscal Year 1996 Audited Financial Statements |

**TAB 2**

LEXSEE 1992 US DIST LEXIS 3246

**ALEGRIA ENTERPRISES v. IMMEL'S MARINE, et. al.**

**CIVIL ACTION NO. 90-8127**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1992 U.S. Dist. LEXIS 3246*

**March 13, 1992, Decided**
**March 16, 1992, Filed; March 17, 1992, Entered**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] FOR ALEGRIA ENTERPRISES, PLAINTIFF, BLAISE H. COCO, JR., COCO, FEINER & CITRON, P.C., 1704 LOCUST STREET, PHILA, PA 19103, USA. LUIS P. DIAZ, INDEPENDENCE SQUARE WEST, THE CURTIS CENTER, STE. 1150, PHILA, PA 19102, USA.

FOR JOHN DYKSTRA, DEFENDANT, JOHN DYKSTRA, [PRO SE], C/O ST. JOHNS WATER SPORTS, ST. JOHN, VI 00830.

FOR IMMEL MARINE, JEROLD G. IMMEL AND JANE IMMEL, In Their Personal Capacity, DEFENDANTS, E. MICHAEL KEATING, III, CLARK, LADNER, FORTENBAUGH & YOUNG, 2005 MARKET STREET, ONE COMMERCE SQUARE, PHILA, PA 19103, USA.

FOR ALEGRIA ENTERPRISES, COUNTER-DEFENDANT, LUIS P. DIAZ, INDEPENDENCE SQUARE WEST, THE CURTIS CENTER, STE. 1150, PHILA, PA 19102, USA.

FOR IMMEL MARINE, JEROLD G. IMMEL AND JANE IMMEL, CROSS-CLAIMANTS, E. MICHAEL KEATING, III, CLARK, LADNER, FORTENBAUGH & YOUNG, 2005 MARKET STREET, ONE COMMERCE SQUARE, PHILA, PA 19103, USA.

FOR JOHN DYKSTRA, CROSS-DEFENDANT, JOHN DYKSTRA, [PRO SE], C/O ST. JOHNS WATER SPORTS, ST. JOHN, VI 00830.

**JUDGES:** VanArtsdalen

**OPINIONBY:** BY THE COURT; DONALD W. VANARTSDALEN

**OPINION:**

MEMORANDUM AND ORDER

VanARTSDALEN, S.J.

March 13, 1992

Though discovery has been completed and this case is scheduled for trial on April 6, 1992, discovery disputes [*2] continue unabated.

The current disputes center around plaintiff's expert (and non-expert) witnesses. Pursuant to the scheduling order, plaintiff turned over the expert reports of three expert witnesses (Stith, Hack and Woods) on February 14, 1992. Plaintiff did not disclose the report of its fourth expert (Kershaw), but instead sent a statement of his expected testimony, and forwarded his report on February 20, 1992. Additionally, plaintiff advised defendant that four witnesses (Brown, Gourley, Dill, and a representative of the Hinckley Company) would be called as fact witnesses whose testimony would include elements of opinion.

Defendants moved to preclude plaintiff from offering Kershaw's testimony at trial, because his report gas not disclosed according to the scheduling order. Because of the excessive amount of extensions granted in this case, and my warnings that the last scheduling order would indeed be the last, I granted defendants' motion.

Defendants now move to preclude the fact witnesses Brown, Gourley, Dill, and the Hinckley representative, from testifying as to their opinions as no expert reports were disclosed. Further, they move to preclude the testimony of either expert [*3] Stith or expert Woods, on the grounds that it is duplicative. Plaintiff, in turn, filed a motion for reconsideration of my order precluding Kershaw from testifying. For the reasons expressed below, defendants' motion will be granted in part and denied in part, and plaintiff's motion will be denied.



Fact witnesses can be called upon to give their opinions. *Fed. R. Evid. 701*. When a witness performed an act which is relevant to the disputed facts, he can explain his reasons for performing it as he did. If those reasons are based on scientific knowledge not held by the average member of the public, the explanation is not thereby turned into an expert opinion. n1 For example, plaintiffs intend Mr. Dill, an accountant, to testify regarding the records and books which he kept relating to Alegria Enterprises. Surely he is not testifying as an expert in accounting practices, even though he may need to give opinions as to accounting in order to properly explain his testimony. To the extent, then, that defendants seek to preclude fact witnesses from explaining their actions by giving opinions based on specialized knowledge, it will be denied.

n1 Were this not the case, every witness in a patent litigation would be considered to be an expert witness. When an inventor explains why or how he created his invention, he is explaining his opinion which is the result of specialized knowledge. Yet he is not testifying as an expert in inventions, but merely as a factual witness regarding the particular invention which is the subject of the litigation.

[*4]

However, to the extent that any witnesses other than Stith, Hack, or Woods attempt to give pure opinion testimony, unrelated to an explanation of their own actions, the motion will be granted. Plaintiff states that it "will ask each and every witness who was on the scene what he thought of the salvage attempt of defendant." Plaintiff seems to be implying that simply because an expert actually perceived the facts on which he renders his opinion, rather than learning about them second-hand, he is a lay witness rather than an expert. However, if an expert testifies based on facts which happen to be within his personal knowledge, he is not any less an expert. For example, in a medical malpractice litigation, a physician may actually examine the plaintiff and base his opinion on the facts he observed during his investigation, without his being any less of an expert. n2 If plaintiff intends for any of his witnesses to give opinions regarding the propriety of others' actions, based completely on the witness' specialized knowledge, defendants could and should object at trial. n3

n2 This would be in contrast to the defendant physician himself, who would obviously testify that, in his opinion, he did nothing improper, but would not be considered as an expert witness.

[*5]

n3 The witness can, of course, testify to what she actions were (fact), but cannot give an opinion as to their propriety (expert opinion).

The distinction is clear. "Why did you do what you did?" calls for an explanation of a relevant fact. "Would you have done what he did?" calls for an opinion based on specialized knowledge. The first is permissible, the second is not.

Defendants' second objection, that the expert testimony will be duplicitous, is meritless. First, it appears that plaintiff's experts are sufficiently different so that their testimony will not overlap. Second, there is no rule against multiple expert opinions on the same point of contention. It is only unduly repetitious evidence which should be precluded. When the repetitions add to the weight of the opinions, rather than merely "beating a dead horse," duplicitous testimony is admissible.

Plaintiff requests reconsideration of my order precluding Kershaw from testifying. Plaintiff raises no new issues which require reversing my previous decision. Kershaw is not a necessary witness and plaintiff will not be unduly burdened by his [*6] not being allowed to testify. Plaintiff agrees that there are "other witnesses who can speak to these issues but who have already taken positions as fact witnesses and who may be perceived to have a bias in deciding damage questions." It is therefore not prejudicial to plaintiff's case to preclude "an independent witness on the issues of valuation and repair." There will be testimony to be weighed, and credibility decisions to be made, regarding these issues. It is not, therefore, against the interests of justice to preclude Kershaw from testifying.

An order follows.

ORDER - March 16, 1992, Filed; March 17, 1992, Entered

For the reasons explained in the accompanying memorandum, it is hereby ORDERED that:

1) Defendants' motion to preclude the expert testimony of Brown, Gourley, Dill, and the Hinckley representative is GRANTED IN PART and DENIED IN PART. Plaintiff cannot offer the expert opinions of any witnesses other than Stith, Woods or Hack. All fact witnesses can give explanations for their actions, even if these explanations involve opinions based on specialized knowledge; and

2) Plaintiff's motion for reconsideration of my or-

  

Page 3
1992 U.S. Dist. LEXIS 3246, *6

der precluding the expert testimony of Kershaw [*7] is DENIED.

BY THE COURT:

Donald W. VanArtsdalen, S.J.

March 13, 1992

  

**TAB 3**

LEXSEE 2004 U.S. DIST. LEXIS 16855

**SUNSTAR, INC., Plaintiff, v. ALBERTO-CULVER COMPANY, INC. and BANK ONE CORPORATION f/k/a FIRST NATIONAL BANK OF CHICAGO, Defendants. ALBERTO-CULVER COMPANY, a Delaware Corporation, Plaintiff, v. SUNSTAR, INC., a Japanese corporation, SUNSTAR GROUP COMPANY (f/k/a Alberto-Sunstar Co., Ltd.), a Japanese corporation, KANEDA, KASAN, KABUSHIKI KAISHA, a Japanese corporation, and BANK ONE, NATIONAL ASSOCIATION, as Trustee under Trust Agreement No. 22-81196, dated February 27, 1980, a national banking association, Defendants.**

**Case No. 01 C 0736**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

***2004 U.S. Dist. LEXIS 16855***

**August 20, 2004, Decided**
**August 23, 2004, Docketed**

**PRIOR HISTORY:** *Sunstar, Inc. v. Alberto-Culver Co., 2003 U.S. Dist. LEXIS 17431 (N.D. Ill., Sept. 29, 2003)*

**DISPOSITION:** The Court's opinion resolves the nineteen motions in limine.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For SUNSTAR INC, plaintiff: Paul Ethan Slater, Robert David Cheifetz, Sperling & Slater, Chicago, IL., Rory J. Radding, Barren W. Saunders, Ann L Gisolfi, Pennie & Edmonds, New York, NY., Timothy Todd Patula, Charles Thomas Riggs, Jr., Carolyn C Andrepont, Paige J Thomson, Patula & Associates, Chicago, IL., Robert A Schwinger, Marvin R Lange, Scott Sonny Balber, Janice A Payne, Melissa Jayne LaRocca, Chadbourne & Parke LLP, New York, NY., William S D'Amico, Chadbourne & Parke LLP, Washington, DC.

For ALBERTO-CULVER COMPANY, defendant: Craig S. Fochler, Charles Robert Mandly, Jr., John Sheldon Letchinger, Michael R. LaPorte, Lindsey Dinner Barnes, Melissa Suzanne Skilken, Wildman, Harrold, Alien & Dixon, Chicago, IL.

For BANK ONE CORP. fka First National Bank of Chicago, The defendant: Daniel A. Dupre, Bank One, N.A., Chicago, IL., Patricia Susan Smart, Chicago, IL., John Bostjancich, Smart & Bostjancich, Chicago, IL.

For ALBERTO-CULVER COMPANY, counter-claimant: Craig S. Fochler, Charles Robert Mandly, Jr., John Sheldon Letchinger, Michael R. LaPorte, Lindsey Dinner Barnes, Melissa Suzanne Skilken, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For SUNSTAR INC, counter-defendant: [*2] Paul Ethan Slater, Robert David Cheifetz, Sperling & Slater, Chicago, IL., Rory J. Radding, Darren W. Saunders, Ann L Gisolfi, Pennie & Edmonds, New York, NY., Timothy Todd Patula, Charles Thomas Riggs, Jr., Carolyn C Andrepont, Paige J Thomson, Patula & Associates, Chicago, IL., Robert A Schwinger, Marvin R Lange, Scott Sonny Balber, Janice A Payne, Melissa Jayne LaRocca, Chadbourne & Parke LLP, New York, NY., William S D'Amico, Chadbourne & Parke LLP, Washington, DC.

**JUDGES:** Magistrate Judge Nan R. Nolan, Judge Ronald A. Guzman.

**OPINIONBY:** NAN R. NOLAN

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Nan R. Nolan, United States Magistrate Judge

These two consolidated cases arises from a dispute between Sunstar, Alberto-Culver, and Bank One regarding Sunstar's use in Japan starting in 1999 of a certain "VO5" mark on women's hair care products that Sunstar

  

manufactures and sells in Japan. n1 The parties have filed their Final Pretrial Order and are proceeding to trial. District Judge Ronald A. Guzman referred the case for resolution of pretrial matters. This opinion resolves the nineteen motions in limine.

n1 The factual background of this case has been set forth in previous decisions in this matter including, *Sunstar, Inc. v. Alberto-Culver Co., Inc., 2003 U.S. Dist. LEXIS 17431, 2003 WL 22287380 (N.D. Ill. Sept. 30, 2003)*; *Sunstar, Inc. v. Alberto-Culver Co., Inc., 2003 U.S. Dist. LEXIS 13492, 2003 WL 21801428 (N.D. Ill. Aug. 1, 2003)*; and *Alberto-Culver, Co. v. Sunstar, Inc., 2001 U.S. Dist. LEXIS 17102, 2001 WL 124905 (N.D. Ill. Oct. 17, 2001)*. The Court assumes familiarity with those facts.

[*3]

**BACKGROUND**

On November 7, 2002, the Honorable George W. Lindberg denied Alberto's summary judgment motion on its breach of contract claim regarding the issue of whether Sunstar's use of the 1999 Mark exceeds the scope of the License Agreement. The district court concluded that several genuine issues of material fact exist, including "whether the 1999 Mark falls within the range of marks defined by Japanese trademark law as being encompassed within the use-rights under those registrations" and "what the parties intended in the License Agreement—whether the full range of use-rights inherent in the listed trademark registrations were licensed to Sunstar, or the specific marks only (as Alberto attests)." 11/7/02 Memo. & Order at 10.

On November 14, 2002, these cases were reassigned to the Honorable Ronald A. Guzman. In denying Alberto and Bank One's request that the court exclude experts on Japanese trademark law from testifying before the jury, Judge Guzman found that the term *senyo-shiyoken* renders the License Agreement ambiguous. n2 9/30/03 Memo. Opinion & Order at 8. Judge Guzman held that "the jury in this case may consider extrinsic evidence as to the scope of rights [*4] under Japanese law that a party may have intended to convey by inclusion of the term *senyo-shiyoken* in the License Agreement." Id. Judge Guzman further ruled that "testimony by experts in Japanese trademark law will constitute one piece of evidence as to what the parties may have intended by inclusion of the term *senyo-shiyoken* as a parenthetical to the phrase 'exclusive license' in the License Agreement." Id. at 9.

n2 "It is undisputed that *senyo-shiyoken* is the Japanese term for an exclusive license registered with the Japanese Patent Office ("JPO")." 9/30/03 Memo. Opinion & Order at 3.

**DISCUSSION**

A. Alberto-Culver's Motions in Limine

1. Conduct of the Trustee

Alberto Culver's first motion in limine seeks to exclude argument and evidence related to Bank One's conduct in suspending the License Agreement and any alleged bias that Bank One supposedly has because of its relationship with Alberto. Alberto's motion is granted.

Alberto argues that the evidence that [*5] Sunstar seeks to introduce (i.e. the existence of an indemnification agreement and the contacts and relationships between Alberto and Bank One representatives) only relates to Sunstar's breach of fiduciary duty and breach of contract claims against Bank One and a claim against Alberto for tortious interference which have been dismissed. Alberto states that this evidence should be excluded because Judge Lindberg ruled on summary judgment that Bank One acted reasonably in deciding whether to suspend the License Agreement.

Sunstar responds that § 5 of the License Agreement sets forth certain conditions precedent to the effectiveness of any suspension of Sunstar's license rights by Bank One. The License provides that Bank One may suspend the rights of Sunstar to use the licensed marks if "in the opinion of [Bank One] based upon reasonable ground," any act of Sunstar presents "a danger to the value or validity of [Bank One's] ownership and title" in the licensed marks. Sunstar wants to show that Bank One failed to act as an impartial, independent, detached neutral decisionmaker in suspending Sunstar's right to use the licensed marks under the License Agreement. Specifically, Sunstar [*6] seeks to present evidence at trial showing that prior to Bank One issuing the suspension, "Alberto undertook to ply Bank One decisionmakers with memoranda, private conferences, food, drink and a valuable indemnification, and indeed provided drafts of the very words that Alberto wanted Bank One to issue as its own." Sunstar's Memo. at 8. Sunstar contends that this evidence is relevant to a determination of whether the circumstances here truly evidence an "opinion" by Bank One that was "based upon reasonable ground" and its defense of Alberto's breach of contract claim based upon Sunstar's continued use of the marks after Bank One's suspension of the License Agreement.

  

The Court agrees with Alberto that the reasonableness of Bank One's actions with respect to the suspension are no longer an issue for trial. Sunstar's breach of contract claim against Bank One was based on Bank One's alleged failure to provide reasonable grounds for suspending the License Agreement. Sunstar Am. Cmplt. PP 20, 22, 24, 26, 31, 38, 40. Sunstar alleged that the suspension resulted from undisclosed private communications between Bank One and Alberto. Id. P 23. Judgment as a matter of law has been granted [*7] in favor of Bank One and against Sunstar on Sunstar's breach of contract claim. Judge Lindberg based his dismissal of Sunstar's breach of contract claim as well as its claims for breach of fiduciary duty and waste of trust assets against Bank One on § 4.09 of the Illinois Trust and Trustees Act, *760 ILCS §§ 5/1 et seq.* As Judge Lindberg noted, when a trustee like Bank One "uses reasonable care, skill, and caution in the selection of the agent, the trustee may rely upon the advice or recommendation of the agent without further investigation and . . . shall have no responsibility for action taken or omitted upon the advice or recommendation of the agent." 11/7/02 Memo. & Order at 17. In dismissing Sunstar's claims at summary judgment, Judge Lindberg specifically held that the fact that Bank One selected outside counsel based upon the recommendation by Alberto's outside counsel "does not warrant a conclusion that Bank One did not exercise the appropriate level of 'care, skill and caution' in selecting its counsel." 11/7/02 Memo. & Order at 17. Judge Lindberg thus held that Bank One used reasonable care, skill, and caution in the selection of outside counsel.

Sunstar seeks to argue [*8] at trial that the indemnification agreement "tempted and permitted Bank One to side with Alberto without fear of liability or litigation expense in a way that the 1980 Agreements did not contemplate as being appropriate." Sunstar Memo. at 9. Judge Lindberg ruled against Sunstar as to this issue. Judge Lindberg held that a reasonable jury could not find in favor of Sunstar on its argument that Bank One made its suspension decision by relying on the indemnification agreement from Alberto rather than the advice of counsel. Id. at 18. The district court has ruled that Bank One did not in fact rely upon the indemnification in deciding to suspend the License Agreement.

Sunstar emphasizes that the district court held on summary judgment that Bank One could not be held liable for alleged breaches of its obligations and that Alberto could not be held liable for inducing those alleged breaches based on the statutory protections from legal liability granted to trustees under the *Trustees Act* but that the district court did not rule that the suspension was reasonable or proper. The district court did discuss Bank One's conduct in connection with the suspension in its opinion. In granting [*9] summary judgment, the district court specifically held that no genuine dispute of material fact existed as to whether Bank One used "reasonable care, skill, and caution in the selection" of outside counsel and whether Bank One actually relied on the advice of outside counsel in deciding whether to suspend the License Agreement. 11/7/02 Memo. & Order at 17-18. Sunstar does not adequately explain how Bank One could have used reasonable care, skill, and caution in the selection of outside counsel, a specialist in trademark law at the firm of Michael Best and Fredreich, and actually relied on the advice of outside counsel in making the decision to suspend the License Agreement but failed to form an "opinion . . . based upon reasonable ground" that a danger to the value or validity of the licensed marks existed. To grant summary judgment against Sunstar on its breach of contract claim because Bank One used reasonable care, skill, and caution in the selection of outside counsel and actually relied on counsel's advice is the practical equivalent of holding that Bank One formed an "opinion . . . based upon reasonable ground," even if Judge Lindberg's opinion did not explicitly state that the [*10] suspension was "based upon reasonable ground." Because the reasonableness of Bank One's conduct in connection with the suspension is no longer an issue for trial, the evidence Sunstar wants to admit is irrelevant and is excluded.

2. Reason or Justification for Adopting the 1999 Mark

Alberto seeks to exclude at trial argument or evidence concerning any reason or justification for Sunstar's adoption and use of the 1999 Mark. Alberto's motion is granted.

Sunstar wants to tell that jury that it adopted the 1999 Mark "to help revitalize the declining VO5 brand in Japan in direct response to consumer market research results and recommendations regarding the VO5 logo received from outside consultants, and not as an attempt to palm off its VO5 products as the products of someone else." Sunstar Memo. at 2. Alberto contends that evidence concerning any reason or justification for Sunstar's adoption and use of the 1999 Mark is irrelevant. Alternatively, Alberto argues that such evidence should be barred under *Federal Rule of Evidence 403* because it could confuse the jury by creating the false impression that Sunstar's business reasons for adopting [*11] the 1999 Mark constitute a valid defense to Alberto's breach of contract claim and cause the jury to prejudicially perceive Alberto as an unreasonable business partner that ignored Sunstar's marketing studies and efforts.

Sunstar responds that evidence of how and why it

  

adopted the 1999 Mark for use in Japan is critical to the jury's evaluation of the infringement issues raised by both sides in this case. Sunstar states that one of the most important factors in evaluating infringement is the intent of the party alleged to have infringed. Sunstar additionally argues that evidence of the reasons why Sunstar adopted the 1999 Mark is admissible as background evidence to give the jury a complete story.

The parties appear to agree that the contractual prohibition in § IV of the License Agreement against acts by Sunstar that "infringe" the licensed marks contractualizes what would otherwise be statutory claims for trademark infringement. Sunstar states, and Alberto does not dispute, that both sides in this case have looked to U.S. federal trademark law to define the nature, elements, and relevant proof for trademark infringement. The Seventh Circuit has noted that "the linchpin of both [*12] common law and federal statutory trademark infringement claims is whether consumers in the relevant market confuse the alleged infringer's mark with the complainant's mark." *AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 614 (7th Cir. 1993)*. The Seventh Circuit has found seven factors, including "defendant's intent to palm off its goods as those of the plaintiffs," relevant to the "likelihood of confusion" analysis. *Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 897 (7th Cir. 2001)*. Bad faith or wrongful intent to "palm off" or lack of intent to confuse customers is not required to establish likelihood of confusion, but when present, it is an important factor in the likelihood-of-confusion analysis. *Eli Lilly & Co. v. Natural Ans., Inc., 233 F.3d 456, 465 (7th Cir. 2000)*; *Henri's Food Products Co., Inc. v. Kraft, Inc., 717 F.2d 352, 359 (7th Cir. 1983)*. The issue here is whether Sunstar's adoption of the 1999 Mark breached the 1980 Agreements by infringing, i.e. causing a likelihood of confusion.

"The only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse." [*13] 3 McCarthy on Trademarks and Unfair Competition § 23:110 (4th ed. 2004); *Eli Lilly & Co. 233 F.3d at 465* (stating "the fact that one actively pursues an objective greatly increases the chances that the objective will be achieved."). Presence of good faith or good intent is not a valid defense to a claim of trademark infringement. 3 McCarthy on Trademarks and Unfair Competition § 23:106 (4th ed. 2004) (stating "good faith intentions of an infringer are no defense to a finding of liability"); see also *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 287 (6th Cir. 1997)* (stating "the *presence* of intent can constitute strong evidence of confusion . . . . The converse of this proposition, however, is not true; *lack* of intent by a defendant is 'largely irrelevant in determining if consumers likely will be confused as to source.'"); *Polaroid Corp. v. Polaraid Inc., 319 F.2d 830, 836 (7th Cir. 1963)*; *Playboy Enterprises v. Frena, 839 F. Supp. 1552, 1561 (M.D. Fla. 1993)* (stating "even though a guilty state of mind is relevant evidence of trademark infringement, an innocent state of [*14] mind is irrelevant on the issue of likelihood of confusion since the lack of intent to deceive does nothing to alleviate the confusion precipitate by similarity of trademarks.").

Whether Sunstar had a good business reason for adopting the 1999 Mark is not relevant to the likelihood of confusion issue. n3 It does not matter whether Sunstar acted prudently or sensibly by introducing the 1999 Mark. The fact that Sunstar may have adopted the 1999 Mark for legitimate business reasons does not make it more or less probable that Sunstar intended to confuse consumers or negate any wrongful intent to confuse. *Daddy's Junky Music, 109 F.3d at 287* (stating "lack of intent neither reduces nor increases the probability of consumer confusion."); 3 McCarthy on Trademarks and Unfair Competition § 23:106 (4th ed. 2004) (stating "while evidence of intent is probative of likelihood of confusion of customers, the absence of such evidence does not prove that confusion is unlikely."). Sunstar's alleged good faith or business reasons for adopting the 1999 Mark is not probative as to the likelihood of confusion issue and not information the jury needs to determine whether there was a breach [*15] of the 1980 Agreements by infringement.

> n3 "Relevant evidence" is "evidence having any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid. 401*.

Finally, even if the reasons why Sunstar adopted the 1999 Mark could be considered useful or permissible "background" information, the potential for unfair prejudice outweighs its slight probative value. See *Fed. R. Evid. 403*. n4 Evidence of Sunstar's business reasons for adopting the 1999 Mark-allegedly "to help revitalize the declining VO5 brand in Japan in direct response to the information and recommendation received from the DGA consulting firm"-may cause jury confusion regarding the relevant infringement standard or suggest a decision on an improper bias and unfairly prejudice Alberto by suggesting that business reasons or lack of improper intent constitute a [*16] valid defense to infringement. The jury may improperly infer that Sunstar was entitled to use the 1999 Mark if it was justified by business conditions. The jury may also infer from such evidence that Alberto was an unreasonable busi-

  

ness partner that improperly ignored Sunstar's marketing studies and efforts. The problem with that inference is that Alberto's reasonableness is irrelevant to the issue of likelihood of confusion.

> n4 Under *Rule 403*, even relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." The phrase "unfair prejudice" used in *Rule 403* "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee of the Proposed Rules.

For these reasons, Alberto's motion is granted with the understanding that Alberto will not be allowed to argue at trial that the absence of evidence regarding why Sunstar adopted the 1999 Mark indicates Sunstar intended to confuse [*17] consumers.

3. Unexpressed Intent for Including the Phrase *Senyo-Shiyoken* in the Agreements

Alberto's third motion in limine seeks to bar argument, evidence or testimony concerning any unexpressed or uncommunicated intent for including the phrase *Senyo-Shiyoken* in the agreements. Alberto's motion is denied without prejudice.

The License Agreement granted Sunstar an "exclusive license to manufacture, use, sell and offer for sale within the territorial limits of Japan, Licensed Products bearing Licensed Trademarks . . . . [Sunstar] agrees to cause said exclusive license (Senyo-Shiyoken) to be registered at the Japanese Patent Office . . . ." Judge Lindberg has ruled that a genuine dispute of fact exists regarding "what the parties intended [by including the phrase *Senyo-Shiyoken*] in the License Agreement-whether the full range of use-rights inherent in the listed trademark registrations were licensed to Sunstar, or the specific marks only (as Alberto attests)." 11/7/02 Memo. and Order at 10.

Sunstar seems to concede that it will not offer any evidence of unexpressed intent at trial. Sunstar claims that Alberto's motion is based on an "utterly false premise. [*18] " Sunstar Memo at 10. Sunstar states that Alberto's motion "assumes that nothing was ever communicated during negotiations about the purpose behind *'senyo-shiyoken'* when in fact the opposite is true." Id. at 10-11. According to Sunstar, the term *"senyo-shiyoken"* was put into the 1980 Agreements to make clear that Sunstar had the right to use a certain range of variations on the originally-filed trademark designs that is defined by principles of Japanese law. Sunstar asserts that "this understanding was clearly communicated and agreed upon in the course of substantive business negotiations for the 1980 Agreements." Id. at 2. Since Sunstar does not appear to intend to offer evidence relating to unexpressed intent behind the inclusion of the phrase *senyo-shiyoken* into the agreements, Alberto's motion is denied without prejudice.

4. Agreements and Negotiations that Preceded the 1980 Agreements

Alberto seeks to exclude argument, evidence, or testimony concerning alleged agreements, understandings or conversations that pre-date the execution of the 1980 Agreements to which Bank One was not a party. Alberto's motion is granted in part and denied in part.

Sunstar [*19] "plans to offer evidence concerning the history of the negotiation of the deal which led to the 1980 Agreements, including predecessor documents, to show that the parties' intent was for Sunstar as *senyo-shiyoken* licensee to enjoy the full range of use-rights inherent in the licensed trademark registrations under Japanese law for *senyo-shiyoken* licensees." Sunstar Memo. at 4. Alberto argues that this evidence should be excluded for three reasons: (1) it is irrelevant and being offered for an improper purpose; (2) its introduction is barred by the integration clause of the 1980 Agreements; and (3) such evidence is not probative of the parties' intent in including *senyo-shiyoken* into the 1980 Agreements because Bank One did not participate in the pre-1980 agreements, negotiations and understandings. The Court addresses each argument in turn.

Alberto contends that neither the Memorandum of Discussion" ("MOD") nor the Agreement in Principle ("AIP"), both pre-1980 agreements between Alberto and Sunstar, is relevant to determining the meaning of *senyo-shiyoken* in the 1980 Agreements. The MOD set forth Alberto's and Sunstar's intentions with respect to a proposed transaction [*20] involving Sunstar's purchase and ownership of all of the rights in the licensed marks. Alberto argues that because Sunstar did not become the owner of the licensed marks and the MOD deals only with a possible assignment it "has no relevance to the meaning of the term *Senyo-Shiyoken* used in a provision dealing exclusively with the registration of a license agreement . . . ." Alberto Reply, at 5. With respect to the AIP, Alberto argues that its single use of *senyo-shiyoken* is "substantively and virtually literally the same as the use made of *Senyo-Shiyoken* in the License Agreement, which Judge Lindberg found to be ambiguous." Alberto's Reply at 5. Therefore, Alberto contends that the sole reference to *Senyo-Shiyoken* in



the AIP sheds no light on the meaning of that term as it is used in the License Agreement. Finally, Alberto argues that Sunstar's attempt to tie the "philosophy of the assignment of the Trademarks" provisions of the AIP to the meaning of *senyo-shiyoken* fails because: (1) the references to a *senyo-shiyoken* registration and "philosophy of assignment" are in two separate provisions of the AIP that are separated by almost four pages of numerous other, [*21] diverse provisions and make no reference to one another; (2) by its literal terms, the "philosophy of assignment" provision deals with Sunstar's desire to get the benefits of an assignment "to the extent practicably possible" and it is not "practicably possible" to give the benefits of an assignment through the grant of a license; and (3) the "philosophy of assignment" provision expressly anticipated other "detailed agreements" and the simultaneous assignment that was accomplished when all of the 1980 Agreements were executed sufficiently placated Sunstar's unfulfilled desire to become the owner of the Licensed Marks.

Alberto's arguments regarding the relevancy of the pre-1980 Agreements go to their weight, not their admissibility. In denying Alberto summary judgment on its breach of contract claim, Judge Lindberg ruled that:

> "Senyo-shiyoken" is in the License Agreement for a reason. However, a question of fact still exists as to whether the 1999 mark falls within the range of marks defined by Japanese trademark law as being encompassed within the use-rights under those registrations. A question of fact also exists as to what the parties intended in the License Agreement—whether [*22] the full range of use-rights inherent in the listed trademark registrations were licensed to Sunstar, or the specific marks only (as Alberto attests).

11/7/02 Memo. & Order at 10. Judge Guzman expressly ruled that "the jury in this case may consider extrinsic evidence as to the scope of rights under Japanese law that a party may have intended to convey by inclusion of the term *senyo-shiyoken* in the License Agreement. 9/29/03 Memo. Opinion & Order at 8.

The pre-1980 extrinsic evidence Sunstar seeks to admit is not clearly inadmissible. *Marlow v. Winston & Strawn,, 1994 U.S. Dist. LEXIS 11246, 1994 WL 424124, *1 (N.D. Ill. Aug. 11, 1994)* (stating evidence should be excluded on a motion in limine only if it "clearly is not admissible for any purpose."). Evidence of the negotiations and agreements that preceded the execution of the 1980 Agreements may be relevant to resolving the ambiguity in the parties' use of the term *senyo-shiyoken* in the License Agreement. As one Illinois court has explained:

> "'. . . In the construction of an ambiguous or uncertain writing which is intended to state the entire agreement, preliminary negotiations between the parties may be considered in [*23] order to determine their meaning and intention and to ascertain in what sense the parties themselves used the ambiguous terms in the writing which sets forth their contract. * * * In the determination of the meaning of an ambiguous or uncertain contact and as an aid to its construction, the court must have recourse, not only to the working and context of the agreement, but also to the circumstances and correspondence between the parties pending the negotiation of the final agreement.'"

*Rybicki v. Anesthesia & Analgesia Assocs., Ltd., 246 Ill. App. 3d 290, 615 N.E.2d 1236, 1243, 186 Ill. Dec. 179 (Ill. App. 1993)* (quoting *17A Am.Jur.2d Contracts § 403*, at 429-30 (1991)). Alberto takes too narrow a view of relevance with respect to admissibility of the pre-1980 evidence at trial. The prior proposed agreements need not define *senyo-shiyoken* or expressly state why it was used in the 1980 Agreements to be relevant to the question of the parties' intent in including the term *senyo-shiyoken* in the License Agreement.

In making its relevancy argument, Alberto assumes that no part of the prior proposed agreements sheds light [*24] on the meaning of *senyo-shiyoken* in the 1980 Agreements. In contrast, Sunstar contends that evidence concerning the history of the negotiations, including portions of the prior proposed agreements, will show that the intent behind the grant of the *senyo-shiyoken* license was to give Sunstar use-rights that were as close as possible to the use-rights that Sunstar would have enjoyed as the owner under the original sale version of the transaction. The reasonableness of Sunstar's version is an issue for the jury to determine at trial. Alberto's objections, including its arguments about why Sunstar's attempts to tie the "philosophy of the assignment" provision of the AIP to the meaning of *senyo-shiyoken* fail, implicate the weight that should be afforded this evidence rather than its admissibility. The Court declines to find, as Alberto urges, that the "philosophy of assignment" provision, the *senyo-shiyoken* registration provision of the AIP, or the assignment provisions of the MOD are irrelevant as a matter of law in determining the par-



ties' intent in using the term *senyo-shiyoken*. How much weight to be accorded this evidence is an issue for the jury to resolve.

Alberto [*25] next argues that Article II of the License Agreement and the integration clause in Article XII of the License Agreement prevent Sunstar from introducing pre-1980 agreements. Article II provides in relevant part: Sunstar "shall not represent in any way that legal title in or legal right to the ownership of Licensed Trademarks rests in [Sunstar] . . . ." Alberto claims that by offering pre-1980 agreements to explain the parties" intent in inserting *senyo-shiyoken* in the 1980 License Agreement, Sunstar is "in effect, taking the position that it should be treated as an owner of the Licensed Trademarks . . . ." Alberto's argument amounts to an untimely request for summary judgment. Under the guise of a motion in limine, Alberto seeks to eliminate Sunstar's position regarding the scope of rights granted by the License Agreement. Judge Lindberg set a September 11, 2002 deadline for summary judgment motions. Alberto filed a motion for summary judgment which included numerous arguments but there was no argument that as a matter of law Article II precluded Sunstar's position regarding the breath of the license. The Court rejects Alberto's current request.

Alberto also argues that the [*26] integration clause in Article XII of the License Agreement prevents Sunstar from introducing pre-1980 agreements. Article XII provides in relevant part: "This Agreement (and the Basic Sale Agreement and the Trust as described herein) represents the entire understanding of the parties respecting its subject matter and all previous trademark agreements executed by the parties are hereby superseded." The integration clause contained in the 1980 Agreements does not prevent Sunstar from presenting pre-1980 conversations, negotiations, and agreements for the purpose of determining the parties' intent as to the meaning of the term *senyo-shiyoken* as used in the License Agreement. See *Rybicki, 615 N.E.2d at 1243* (indicating that preliminary negotiations between the parties may be considered when construing an ambiguous term in an integrated agreement); *Fox v. The Montell Corp., 2001 U.S. Dist. LEXIS 3403, 2001 WL 293632 at *2 (N.D. Ill. March 19, 2001)* (holding that "extrinsic evidence may be used to clarify the meaning of ambiguous contract terms" even though the "contract contains an integration clause."). Sunstar will not offer any pre-1980 evidence to vary or contradict the unambiguously [*27] expressed terms of the 1980 Agreements. Instead, pre-1980 conversations, negotiations, and agreements will be presented solely to assist the jury in understanding the parties' intent in inserting *senyo-shiyoken* into the 1980 Agreements.

Without citation to any authority, Alberto next contends that the AIP and the other pre-1980 Agreements should not be admitted because Bank One was not involved in the negotiations leading up to the AIP signed between Alberto and Sunstar. According to Alberto, that negotiation history has "no bearing on the meeting of the minds of all parties with the respect to the subsequently executed 1980 Agreements." Alberto Memo. at 9.

The Court rejects Alberto's argument as a basis for excluding Alberto and Sunstar's pre-1980 negotiation history. The 1980 Agreements cannot be viewed in isolation from the history that led to the 1980 Agreements. Rather, the 1980 Agreements are more properly analyzed in the context of Alberto and Sunstar's relationship as a whole. As shown in the November 6, 1979 MOD signed by Alberto and Sunstar, they originally intended that Alberto would sell to Sunstar the Japanese VO5 trademarks as well as Alberto's 49% interest in their [*28] joint venture company. Then, in January 1980, Alberto and Sunstar agreed in the AIP after "renegotiation" regarding "the basic structure of the transactions contemplated" to "change the form of the transaction from assignment of the Trademarks to [a] trust arrangement with the trustee holding for the benefit of Sunstar." The AIP contemplated "detail agreements to be prepared in connection with the" AIP. Finally, in February 1980, Sunstar, Alberto, and Bank One entered into a group of agreements, referred to collectively as the 1980 Agreements regarding the sale of Japanese VO5 trademarks. The preliminary negotiations between Alberto and Sunstar are not irrelevant to resolving the ambiguity as to what Alberto and Sunstar may have intended by using *senyo-shiyoken* simply because Bank One was not involved in the negotiations.

Finally, Alberto argues that Sunstar should not be allowed to introduce to the jury any pre-1980 negotiations, conversations, or agreements for the purpose of showing whether or not the Trustee's suspension of the License Agreement was justified. Because this Court has already determined in ruling on Alberto's first motion in limine that the reasonableness [*29] of Bank One's actions with respect to the suspension are no longer an issue for trial, Alberto's motion is granted in this regard.

5. Actions Taken By Alberto or Its Subsidiary Licensee

Alberto next seeks to bar argument or evidence that conduct of Alberto or by related entities relating to marks other than the 1999 Mark constitutes acquiescence by Alberto to use of the 1999 Mark by Sunstar or is otherwise a defense to Alberto's claims for breach of contract. Alberto's motion in limine raises the following arguments: (1) Sunstar's acquiescence defense is equitable



and inapplicable to Alberto's legal claim for breach of contract; (2) even if the defense were to apply, the evidence that Sunstar relies on is irrelevant to that defense because it only matters whether Alberto consented to Sunstar's use and not what Alberto knew or should have know; and (3) conduct outside of Japan is irrelevant as a matter of law to a defense of acquiescence because that defense is only applicable within the geographic scope of the consent. Alberto's motion is denied because it is really an untimely motion for summary judgment on Sunstar's fifth affirmative defense. n5

n5 Sunstar's fifth affirmative defense states:

> To the extent that any of Alberto's claims rest upon an allegation that Sunstar's use of the Modernized VO5 logo would impair, lessen the value of or infringe rights with respect to VO5 marks, or prevent the protection of the rights in VO5 marks intended by the 1980 Agreements, Alberto is estopped from asserting such claims by virtue, inter alia, of its July 20, 1993 and July 28, 1993 letters to Sunstar authorizing Sunstar to depart (at Sunstar's sole option) from using the same major worldwide logotypes as being employed by Alberto's various Units worldwide, and, on information and belief, by Alberto's own deviations from its guidelines for VO5 trademarks on products marketed in Hong Kong and England and its knowing acquiescence to deviating VO5 trademark uses.

[*30]

Alberto's summary judgment motion argued, in relevant part, that Sunstar's use of the 1999 Mark impairs and lessens the value of the licensed VO5 marks. Alberto's Memo. in Support of its Motion for SJ at 12-13. In response to Alberto's request for summary judgment on the impairment and lessening of value claim, Sunstar relied on its expert's opinion that in light of numerous factors, including (a) lack of consistency between the Licensed VO5 Trademarks and VO5 trademarks used by Alberto outside Japan and (b) Alberto's past willingness to have Sunstar use in Japan new unregistered VO5 marks that were created long after the 1980 Agreements were signed, "it is impossible reasonably to conclude that Sunstar's use of the 1999 Mark has lessened, impaired or created a danger to the value of the Japanese VO5 Trademarks or the Trustee's interest therein." Sunstar's Memo. in Opposition to Alberto's SJ at 15-16. Sunstar additionally argued in opposition to Alberto's summary judgment motion that Alberto's conduct as alleged in Sunstar's fifth affirmative defense raised issues of fact as to whether Alberto is subject to an estoppel or waiver barring its claim that Sunstar's use of the 1999 Mark [*31] lessens the value of the Trademarks. Id. at 22.

Judge Lindberg denied summary judgment on Alberto's claim that the 1999 Mark infringes, impairs and lessens the value of the licensed trademarks in breach of § IV of the License Agreement. Judge Lindberg ruled as follows:

> After reviewing the evidence, the Court concludes that whether the 1999 mark infringes the License Agreement and whether Sunstar has diminished the value of the "Licensed Trademarks" depends on genuine issues of material fact that should be determined by the trier of fact. Sunstar's fifth affirmative defense raises genuine issues of material fact: in this defense Sunstar states that Alberto's basic position in this action against Sunstar's use of the 1999 Mark is inconsistent with Alberto's willingness to have Sunstar switch in Japan from using the Licensed Trademarks to using the "global logo" developed in 1993 that has never been registered as a trademark in Japan and that Alberto's claims of injury from the use of the 1999 Marks are inconsistent with the fact that Alberto knowingly acquiesces in the use of various VO5 trademarks around the world that deviate from Alberto's own worldwide trademark guidelines. [*32]

11/7/02 Memo. and Order at 11.

Alberto's motion in limine amounts to request for the entry of summary judgment on Sunstar's fifth affirmative defense because a ruling favorable to Alberto would be dispositive of Sunstar's fifth affirmative defense. Alberto raised numerous arguments in its summary judgment motion but did not move for summary judgment on Sunstar's fifth affirmative defense. In response to Sunstar's argument that its fifth affirmative defense raised genuine issues of fact precluding summary judgment on Alberto's claim that use of the 1999 Mark lessens the value of the Trademarks, Alberto's reply brief in support of summary judgment did not raise the main arguments raised in its current motion. Rather, Alberto characterized the fifth affirmative de-



fense as one of waiver and argued only that the 1980 Basic Sale Agreement forbids an unwritten waiver. See Alberto's SJ Reply Memo. at 14. Alberto could have moved for summary judgment on Sunstar's fifth affirmative defense arguing that it failed as a matter of law for all of the reasons it now asserts. Alberto has offered no justification, such as an intervening change in the law or the availability of new evidence, [*33] for this Court to consider the merits of an untimely dispositive motion.

The Court also rejects Alberto's argument that if in denying Alberto's summary judgment motion on its breach of contract claims under section IV of the License Agreement, Judge Lindberg ruled that Sunstar's acquiescence defense was valid and presented triable issues of fact, the ruling is either clearly erroneous or will work a manifest injustice. This Court cannot find that Judge Lindberg's ruling on summary judgment was clearly erroneous where Alberto did not raise its current arguments in its summary judgment pleadings. Alberto's fifth motion in limine is denied. n6

n6 The Court expresses no opinion at this time on whether the trial court or the jury should ultimately resolve Sunstar's acquiescence defense.

6. Expert Testimony on Foreign Law, Japanese Courts Decisions, and Credibility of Witnesses

In its sixth motion in limine, Alberto seeks to bar Japanese law experts from testifying at trial because such testimony relates [*34] to the determination of foreign law which is a question for the Court, not the jury; such testimony will rely in part on Japanese case law which has no precedential effect; and such testimony cannot be used to bolster the credibility of witnesses. In response, Sunstar argues that Alberto is foreclosed from relitigating the issue of whether Japanese law experts should be allowed to testify before the jury. Alberto's reply argues that its present motion is directed to issues "arising for the first time out of [Judge Guzman's] decision to allow Japanese law experts to testify to the jury." Alberto's Reply at 3. According to Alberto, the "new issues" raised by Judge Guzman's prior decision to allow law expert testimony before the jury are: (1) whether the expert legal testimony should be permitted to determine if a party is "believable" (i.e. credible); (2) whether the jury can make such an evaluation without reaching a decision as to what the correct construction of the relevant Japanese law in 1980; and (3) whether the jury should be charged with making evaluations as to the intent of an individual party, rather than the parties' joint intent. Alberto's motion is denied without prejudice. [*35]

In their Motion for Determination of Responsive Expert Report Dates and Exclusion of Law Expert Testimony from Trial, Alberto and Bank One requested the district court to "exclude experts on Japanese trademark law from testifying before the jury." 9/29/03 Memo. and Order at 7. They argued, as Alberto argues in its current motion, that foreign law experts may not properly testify before the jury under *Fed. R. Civ. P. 44.1* and *Pittway Corp. v. U.S., 88 F.3d 501, 504 (7th Cir. 1996)*. See Alberto and Bank 1 Memo. for Exclusion of Law Expt. Testim. from Trial, p. 7; Alberto's 6th Motion in Limine at 4. Judge Guzman denied Alberto/Bank One's Motion for Exclusion of Law Expert Testimony from Trial. Judge Guzman held that "the jury in this case may consider extrinsic evidence as to the scope of rights under Japanese law that a party may have intended to convey by inclusion of the term *senyo-shiyoken* in the License Agreement" and that "testimony by experts in Japanese trademark law will constitute but one piece of evidence as to what the parties may have intended by inclusion of the term *senyo-shiyoken* . . . ." 9/23/03 Memo. [*36] and Order at 8, 9. Judge Guzman explained that "expert testimony as to the different available constructions of the foreign legal terminology [will be] used solely to aid the trier of fact in determining the reasonableness of the positions of the parties as to their true intent." Id. at 10.

By requesting an order barring expert testimony on foreign law, Alberto now seeks the exact same relief in its sixth motion in limine as it did in its prior motion. Alberto acknowledges that Judge Guzman has ruled that the Japanese law experts may testify on the law of *senyo-shiyoken* trademark licenses as it was in 1980. Alberto contends, however, that Judge Guzman's prior ruling in that regard was "clearly erroneous." The only way this Court could grant Alberto's requested relief would be to overrule Judge Guzman's ruling that Japanese trademark law experts will be allowed to testify before the jury. This Court declines to reconsider Judge Guzman's ruling and expresses no opinion on the merits of Alberto's current arguments. n7 Any request for an order barring testimony by experts in Japanese trademark law should be made to Judge Guzman in the form of a motion for reconsideration.

n7 The Court also declines to address Alberto's argument that Sunstar should be precluded from presenting testimony regarding Section 50.1 on the Japanese Trademark Act on relevancy grounds because this argument was raised for the first time in its reply brief and Sunstar has not had an op-

  

portunity to respond. *Wagner v. Magellan Health Services, Inc., 121 F. Supp. 2d 673, 680 (N.D. Ill. 2000).*

[*37]

7. Interlocutory Orders

Alberto's seventh motion in limine seeks an order barring argument, evidence or testimony which would be inconsistent with various prior rulings by Judge Lindberg in this case. Alberto's motion is granted in part and denied in part.

a. Alberto first argues that argument or evidence indicating that Sunstar's adoption of the 1999 Mark was necessary due to the Japanese market conditions and the economic pressures it was facing would be inconsistent with Judge Lindberg's ruling that "the fundamental purpose of the Trust is to secure the performance and observance of undertakings and covenants made by the parties to the Trust Agreement, and not to allow Sunstar to maximize the full inherent value of the Japanese VO5 Trademarks." 1/15/02 Memo. and Order at 10. In granting Alberto's second motion in limine, this Court ruled that the circumstances and reasons behind Sunstar's adoption of the 1999 Mark is excluded. Accordingly, Alberto's request that such evidence be excluded as inconsistent with an interlocutory order is denied as moot.

b. Alberto next seeks to exclude any evidence or argument regarding Alberto's purported wrongful acts and intent in influencing [*38] the Trustee as inconsistent with Judge Lindberg's ruling that Alberto has a beneficial interest in the Trust and such interest is not negligible. See 1/15/02 Memo. and Order. Alberto's motion is granted because any evidence regarding Alberto's purported wrongful efforts to influence the Trustee to suspend the License, including alleged improper secret dealings between Alberto and Bank One, is irrelevant given Judge Lindberg's grant of summary judgment in favor of Alberto on Sunstar's tortious interference with contract claim and inducement of breach of fiduciary duty claim. Any evidence of purported wrongful conduct by Alberto to influence the Trustee is also irrelevant given this Court's ruling in connection with Alberto's first motion in limine that the reasonableness of the Trustee's conduct in suspending the License is no longer an issue for trial.

c. Alberto also argues that any testimony or argument suggesting that Sunstar has complied with the requirements of the 1980 Agreements for it to use the Licensed Trademarks because it complied with the statutory requirements for use under Japanese law should be excluded as inconsistent with Judge Lindberg's ruling that Sunstar [*39] is contractually obligated to make continuous use of each of the Licensed Trademarks. Alberto's argument is sustained. Sunstar argues that Judge Lindberg did not hold that Sunstar is contractually obligated to use each of the Licensed Trademarks continuously. In ruling on Sunstar's claim that Alberto is not entitled to have the License Agreement and the Trust structure terminated and the trademarks transferred to itself, Judge Lindberg stated that "it is a factual dispute as to whether Sunstar has complied with the obligation to keep the Licensed VO5 Mark in continuous use." 11/7/02 Memo. and Order at 5. This Court interprets Judge Lindberg's opinion as necessarily holding that the Trust Agreement creates a continuous use obligation, not just an obligation to satisfy Japanese statutory use requirements.

d. Alberto further seeks to exclude evidence of Alberto's contacts with Bank One, including correspondence between Alberto and Bank One, business dealings between them, a meeting they had regarding this dispute, Alberto's indemnification agreement with Bank One, and the joint defense of this matter because such evidence is inconsistent with Judge Lindberg's ruling that Alberto's actions [*40] related to this dispute did not constitute tortious interference with the contract between Sunstar and Bank One. Sunstar responds that such evidence is relevant to the jury's determination of whether the "based upon reasonable ground" condition of § V of the License Agreement was satisfied. Because this Court has ruled in connection with Alberto's first motion in limine that the reasonableness of Bank One's actions with respect to the suspension are not an issue for trial, Alberto's motion is granted in this regard.

e. Alberto next argues that evidence suggesting that Alberto's actions related to this dispute are a mere pretext for it to re-enter the Japanese market should be barred as inconsistent with Judge Lindberg's grant of summary judgment in favor of Alberto on Sunstar's claim for inducement of breach of fiduciary duty. Sunstar asserts that evidence of Alberto allegedly "seeking to re-enter the Japanese market and regain control of the Japanese VO5 trademarks back from Sunstar" is relevant for two reasons. First, such evidence is pertinent to the jury's determination of whether the "based upon reasonable ground" condition precedent was satisfied. Second, such evidence is relevant [*41] and admissible for the purpose of impeaching Alberto's executives by establishing that they are not disinterested. Alberto's argument is sustained in part and overruled in part.

Sunstar's first argument for admissibility of evidence

