and argument that Alberto's actions related to this dispute are a mere pretext to re-enter the Japanese market is rejected because the issue of whether Bank One's suspension of Sunstar's license rights was "based upon reasonable ground" is not an issue for trial. Sunstar is allowed, however, to introduce evidence of Alberto's desire to re-enter the Japanese market to show potential bias of Alberto's testifying executives.

The Court rejects Alberto's assertion that in granting summary judgment on Sunstar's tortious inducement of breach of fiduciary duty, Judge Lindberg rejected evidence regarding Alberto's purported wrongful intent for all purposes. Judge Lindberg ruled:

> Sunstar claims Alberto's claimed good faith is a fact issue, that a fact-finder can reasonably infer from the evidence that Alberto was not in fact acting to protect a contingent interest in the Trademarks but rather was raising a supposed concern about the Trademarks as a pretext [*42] for its real interest of engineering a return to the Japanese market that it gave up 22 years ago. However, this seems conjecture, and does not rise to the level of evidence on which a reasonable jury could find for [Sunstar].

11/7/02 Memo. and Order at 13. Judge Lindberg's ruling must be considered in the context of the issue before him at the time. He held that evidence that Alberto's actions related to this dispute are "a pretext for its real interest of engineering a return to the Japanese market that it gave up 22 years ago" did not rise to a level of evidence on which a reasonable jury could find for Sunstar on its inducement of breach of fiduciary duty claim. Nothing in Judge Lindberg's ruling prevents Sunstar from using evidence of Alberto's alleged desire to re-enter the Japanese market as a basis for impeachment of Alberto's executives at trial.

f. Alberto next seeks to bar argument, testimony, and trial exhibits to suggest that Sunstar's use of the 1999 Mark was permitted under Section 9.3 of the Basic Sales Agreement. Alberto argues that Sunstar's evidence is irrelevant under Judge Lindberg's ruling on Count V of Sunstar's Amended Complaint. Alberto also requests [*43] that the Court rule that Section 9.3 is inconsistent with Sunstar's *senyo-shiyoken* arguments. Sunstar responds that it will not argue that its use in Japan of the 1999 Mark was authorized by § 9.3 of the Basic Sale Agreement Rather, with regard to § 9.3 of the Basic Sale Agreement, Sunstar intends to argue that the wording of this provision "circumstantially corroborates" Sunstar's position as to the intended scope of the license grant. Alberto's request is denied.

In Count V of its Amended Complaint, Sunstar sought a declaration that under Section 9.3 of the Basic Sale Agreement, it can "freely use 'any variation' of the Japanese VO5 Trademarks in Japan." Section 9.3 of the Basic Sale Agreement states that: "[Sunstar] shall not, except for purpose of defending the Trademarks in Japan, register any new trademarks containing the names Alberto, Alberto VO5 or VO5 or any of the names or marks set forth in Appendices I or II, or any variation of any of the foregoing, in Japan and [Sunstar] shall not attempt to use or register any of the Trademarks anywhere else in the world, except with the written consent of Alberto." Sunstar points out that this language specifically prohibits [*44] both "use" and "regist[ration]" of VO5 trademarks by Sunstar outside of Japan, but within Japan this section only prohibits Sunstar from "register[ing] any new trademarks containing the names Alberto, Alberto VO5 or VO5 or any of the names or marks set forth in Appendices I or II, or any variations of any of the foregoing." According to Sunstar, the "drafting of § 9.3 in this way reflects the parties' understanding that under Sunstar's *senyo-shiyoken* license grant Sunstar would be able to use in Japan certain new VO5 marks or certain variations on existing VO5 marks, because it was necessary that § 9.3 not conflict with or seem to contradict Sunstar's contractual *senyo-shiyoken* license right to use such marks in Japan" Sunsiar's Memo. at 9.

Judge Lindberg granted summary judgment in favor of Alberto on Count V of Sunstar's Amended Complaint and ruled as follows:

> The scope of the grant allows Sunstar, the Licensee, to use only the specific VO5 Marks identified in the Appendices. The absence of an express 'negative covenant' in the License barring Sunstar from using other marks does not expand this grant to modified versions of the Licensed Trademarks. [*45] The license is a limited grant of authority to use the trademark in a defined way. Another use is not authorized by the grant and is a breach. . . . Sunstar's interpretation would render meaningless all references to the "Licensed Trademarks" and the specific identification of the 13 Licensed VO5 Marks in the License. The law will not construe contractual provisions as meaningless. . . . Therefore, the Court grants Alberto's motion for summary judgment on Sunstar's Count V.

  

11/7/02 Memo. and Order at 15. Judge Lindberg rejected Sunstar's claim regarding § 9.3 as pled in Count V of the Sunstar's Amended Complaint He did not address § 9.3 in regard to any other claim or issue raised by Sunstar. Judge Lindberg did not hold that § 9.3 had no relevance to the remaining issue of what the parties intended by inclusion of *senyo-shiyoken* in the License Agreement.

g. Alberto next argues that any argument or testimony suggesting that the 1999 Mark is a Licensed Trademark or that use of the 1999 Mark satisfies the use requirement of the Licensed Trademarks should be excluded as irrelevant and inconsistent with Judge Lindberg's findings. Alberto's argument is sustained. Sunstar [*46] has stated that it will not seek to argue at trial that the 1999 Mark is a Licensed Trademark. Judge Lindberg has ruled that Section 3 of the Trust Agreement requires Sunstar to keep the Licensed VO5 Trademarks in continuous use. See 11/7/02 Memo. and Order at 5. Judge Lindberg therefore rejected any argument that Section 3 of the Trust Agreement only contained a statutory compliance obligation. As Alberto correctly argues, it necessarily follows that use of the 1999 Mark cannot constitute use of the Licensed Trademarks under § 3 of the Trust Agreement. Any argument that use of the 1999 Mark satisfies Sunstar's "continuous use" obligation under § 3 of the Trust Agreement is barred.

h. Alberto also argues that Sunstar should be barred from arguing and offering evidence suggesting that its use of the 1999 Mark constitutes use of the Licensed Trademarks and therefore, inures to the benefit of the Trustee. Alberto's argument is sustained. Sunstar concedes that Judge Lindberg rejected Sunstar's argument that use of the 1999 Mark insures to the benefit of the Trustee because the 1999 Mark is not a Licensed Trademark and the License provides that "all use of Licensed Trademarks by [*47] Licensee shall inure to the benefit of Licensor."11/7/02 Memo. and Order at 15-16.

i. Alberto further seeks to exclude any argument or evidence that in connection with this dispute, the Trustee engaged in actions which constitute breach of contract, breach of fiduciary duty, or waste of assets. Alberto's request is granted because Judge Lindberg granted summary judgment in favor of Bank One on Sunstar's claims of breach of contract, breach of fiduciary duty, and waste of trust assets. 11/7/02 Memo. and Order at 17-18.

j. Lastly, Alberto argues that argument and evidence regarding use of VO5 Marks by Alberto outside of Japan should be barred from trial. Alberto's argument is overruled. Alberto contends that Sunstar intends to offer evidence regarding Alberto's worldwide trademark usage guidelines and specimens and to argue that use of the 1999 Mark does not damage Alberto outside of Japan. Sunstar makes clear in its opposition that it will not argue at trial that Alberto's use in Japan of the 1999 Mark does not damage Alberto outside of Japan. Alberto's assertion that its trademark practices and usage outside of Japan are irrelevant to the remaining issues in this case is not accurate. [*48] Judge Lindberg ruled that Sunstar's fifth affirmative defense raised genuine issues for trial, including the issue of whether "Alberto's claims of injury from the use of the 1999 Marks are inconsistent with the fact that Alberto knowingly acquiesces in the use of various VO5 trademarks around the world that deviate from Alberto's own worldwide trademark guidelines." 11/7/02 Memo. and Order at 11.

8. "Naked License Defense"

Alberto's eighth motion in limine seeks an order barring argument, evidence, or testimony that the license agreement constitutes a "naked license" or that the licensed marks are otherwise invalid. Alberto insists that the doctrine of "licensee estoppel" prevents Sunstar from raising a naked licensing defense at trial. Sunstar contends that Alberto's licensee estoppel argument was considered and rejected by Judge Lindberg in the summary judgment ruling. Sunstar alternatively argues that even if the licensee estoppel doctrine is applicable here, "that doctrine does not eliminate the 'naked license' defense as a matter of law so as to warrant exclusion of all 'naked license' evidence." Sunstar's Memo. in Opp. at 13. Alberto's motion is granted.

Sunstar maintains [*49] that the 1980 Agreements are a naked license, meaning that they licensed marks to Sunstar without control over the quality of products offered by Sunstar. A licensor who issues a naked license abandons the trademark. *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997). According to Sunstar, "the 1980 Agreements do not contain any provisions dictating or controlling the specific hair car products that Sunstar can sell in Japan under the VO5 brand pursuant to its trademark license, or the quality, ingredients or formulations of any such products, or the manufacturing processes to be used in manufacturing such products." Sunstar Memo. in Opp. at 4. Alberto responds that under the doctrine of licensee estoppel, Sunstar is estopped to deny the validity of Alberto's trademark rights by claiming lack of quality control during the terms of the license. The doctrine of licensee estoppel "stops a licensee from contesting 'the validity of the licensor's title during the course of the licensing arrangement.'" *Westco Group, Inc. v. K.B. & Associates. Inc.*, 128 F. Supp.2d 1082, 1088 (N.D. Ohio Jan. 24, 2001) (quoting *Professional Golfers Ass'n of*

  

*America v. Bankers Life & Casualty Co., 514 F.2d 665, 670 (5th Cir. 1975))*. [\*50]

Both sides briefed and argued the issue of whether licensee estoppel barred Sunstar's naked license defense to infringement during the summary judgment briefing. Sunstar moved for summary judgment on its declaratory claim that it could not have infringed under § IV of the License Agreement in part by relying on the naked license defense raised in its fourth affirmative defense. Sunstar SJ Memo. at 17-20. Alberto responded by arguing that Sunstar was estopped as a matter of law under the doctrine of licensee estoppel from attacking the License as a naked license. Alberto Memo. in Opp. at 17-18. In reply, Sunstar argued that only a licensor may assert a licensee estoppel defense to fend off a naked license challenge. Sunstar Reply at 11. Sunstar similarly opposed Alberto's summary judgment motion against Sunstar on Alberto's infringement claim by arguing that the agreements here amounted to a prohibited naked license. Sunstar Memo. in Opp. at 12, 13, 22. Alberto argued in its reply brief that Sunstar's naked license argument was barred as a matter of law by licensee estoppel.

In denying Alberto's summary judgment motion on its infringement claims. Judge Lindberg held that there was [\*51] not enough evidence to conclude as a matter of law that Sunstar's use of the 1999 Mark was likely to cause confusion. 11/7/02 Memo. and Order at 11-12. In reaching this conclusion, Judge Lindberg made no reference to Sunstar's naked licensing defense or the doctrine of licensee estoppel. In denying Sunstar's motion for summary judgment on Alberto's trademark infringement claims, Judge Lindberg rejected Sunstar's argument that it could not be found guilty of infringement as a matter of law because the agreements were naked license agreements. Judge Lindberg held that Alberto presented sufficient evidence to raise a genuine issue of material fact regarding whether Alberto "had the necessary quality control 11/7/02 Memo. and Order at 6-8.

Sunstar argues that in holding that issues of fact existed with respect to Sunstar's naked license defense, the Court necessarily considered and rejected Alberto's claim that such defense was precluded as a matter of law by the licensee estoppel doctrine. It is clear that Judge Lindberg bad found that the licensee estoppel doctrine precluded Sunstar's naked license defense as a matter of law, he would not have had to reach the issue of whether a genuine [\*52] issue of fact existed with respect to Sunstar's naked license defense. It may have been more efficient to address the legal issues before sending a case to trial. This does not mean, however, that by holding that genuine issues of material fact exist with respect to whether Alberto had the necessary quality control, Judge Lindberg necessarily rejected Alberto's licensee estoppel argument. In the absence of a single reference to the licensee estoppel doctrine in Judge Lindberg's opinion, this Court is unwilling to assume that Judge Lindberg rejected Alberto's licensee estoppel argument.

Moreover, Sunstar's naked license defense is barred as a matter of law. Illinois law recognizes that a trademark licensee is estopped from disputing the validity of the licensor's trademarks. *Lums Restaurant Corp. v. Bloomington Restaurant Investments, Inc., 92 Ill. App. 3d 1143, 416 N.E.2d 751, 753, 48 Ill. Dec. 478 (Ill. App. 1981)* (citing *Smith v. Dental Products Co., 140 F.2d 140 (7th Cir. 1944))*. "The basis for this rule is that a licensee who freely enters into a license and pays royalties or agrees to the limitations imposed by a licensor effectively recognizes [\*53] that the licensor possesses a valid trademark." *Chrysler Motors Corp. v. Alloy Automotive Co., Inc., 661 F. Supp. 191, 192-92 (N.D. Ill. 1987)* (citing *Smith, 140 F.2d at 148*). In addition, "the majority of courts . . . have found that the doctrine of licensee estoppel bars a licensee from asserting a naked licensing defense." *Westco Group, 128 F. Supp.2d at 1089* (citing *Creative Gifts, Inc. v. UFO, 235 F.3d 540, 547-48 (10th Cir. 2000))* (Hon. Milton I. Shadur, U.S.D.J., sitting by designation); see also *Big Boy Restaurants v. Cadillac Coffee Co., 238 F. Supp.2d 866, 873-74 (E.D. Mich. 2002)*; *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc., 88 F. Supp.2d 914, 927 (C.D. Ill. 2000)*; *STX, Inc. v. Bauer USA, Inc., 1997 U.S. Dist. LEXIS 16250, 1997 WL 337578, at \*11 (N.D. Cal. June 5, 1997)*. "The leading commentators have likewise found the doctrine of licensee estoppel applicable to naked licensing claims." Id. Accordingly, Sunstar is precluded from challenging the validity of the trademarks licensed to Sunstar, including raising its naked license contentions. n8

> n8 Sunstar's argument, mentioned only in passing and without citation to any supporting authority, that Alberto lacks standing to assert the licensee estoppel doctrine because it is not the licensee is also rejected. Alberto is entitled to assert licensee estoppel. Alberto is a party to the 1980 Agreements and has a contractually agreed right to enforce the license.

[\*54]

Finally, Sunstar argues that even if this Court concludes that the licensee estoppel doctrine is applicable here, "that doctrine does not eliminate the 'naked license' defense as a matter of law so as to warrant exclusion of all 'naked license' evidence." Sunstar Memo. in

  

Case 2:00-cv-00684-DSC    Document 123-4    Filed 07/11/2005    Page 4 of 14

Page 14
2004 U.S. Dist. LEXIS 16855, *54

Opp. at 13. Sunstar points out that "licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license." *Restatement (Third) of Unfair Competition § 33, cmt. d (1995)*. Sunstar contends that the Court has discretion to decline to apply licensee estoppel but has failed to offer any specific reason why the Court should exercise its discretion not to apply licensee estoppel to the circumstances of this case. Accordingly, Alberto's motion is granted.

B. Bank One's Motions in Limine

1. The Trustee's Suspension

Bank One moves to bar evidence and argument on the issue of the correctness, reasonableness, alleged motivation and any other consideration of the propriety of Bank One's suspension of Sunstar's license to use the Licensed Trademarks. [*55] Because this Court has already held in ruling on Alberto's first motion in limine that Judge Lindberg's ruling granting summary judgment in favor of Bank One on Sunstar's breach of contract, breach of fiduciary duty, and waste of trust assets claims necessarily included a finding that Bank One acted reasonably in deciding whether to suspend the License Agreement, Bank One's first motion in limine is granted.

2. Indemnification Agreement; Choice of Counsel; and Bank One-Alberto Relationships

In its second motion in limine, Bank One seeks an order barring the introduction of evidence or argument by Sunstar regarding: (a) an indemnification given by Alberto to Bank One and any payments pursuant thereto; (b) any alleged failure by Bank One to use reasonable care, skill and caution in selection of a trademark law expert to advise it concerning suspension of Sunstar's license; and (c) business relationships (other than the Trust at issue in this case) between Bank One and Alberto or certain Alberto employees. The admission of this evidence is barred to the extent Sunstar intends to use it to challenge the correctness or propriety of Bank One's suspension of Sunstar's license, which [*56] is not an issue for trial. Bank One's motion is granted.

3. Joint Defense

Bank One seeks an order barring evidence and argument concerning an assertion of a "joint defense" privilege by Alberto with respect to a memorandum prepared by Alberto's counsel and revealed to Bank One's in-house counsel. Sunstar responds that evidence of a joint defense relationship is relevant to the jury's "determination of whether Bank One's purported suspension was based upon the contractually required 'reasonable ground.'" Sunstar Memo. in Opp. at 2. Bank One's motion is granted as the reasonableness of Bank One's actions with respect to the suspension is not an issue for trial.

4. Licensee Estoppel

Bank One's fourth motion in limine seeks an order barring evidence and argument on Sunstar's theory of naked licensing. Bank One's motion is granted. As discussed above, Sunstar is barred as a matter of law by the doctrine of licensee estoppel from asserting a defense of naked licensing.

5. Sunstar's Motivations for Adopting the 1999 Mark

Bank One moves to bar evidence and argument at trial relating to Sunstar's alleged motivation for adoption of the 1999 Mark as irrelevant to the [*57] remaining issue of whether Sunstar's use of the 1999 Mark constitutes a breach of the 1980 Agreements. Bank One's motion is granted. In granting Alberto's second motion in limine, this Court held that evidence of Sunstar's reason or justification for adopting the 1999 is irrelevant and even if minimally relevant as "background" information, the potential for unfair prejudice outweighs its slight probative value.

6. Japanese Law

Bank One seeks an order barring evidence and argument concerning certain matters of Japanese law, namely: (1) that Article 50(1) of the Japanese Trademark Law ("JTL"), as amended in 1996, supports the opinion that a *senyo-shiyoken* licensee of a registered trademark has the right to use a range of trademarks; and (2) that Japanese court decisions support the opinion that a *senyo-shiyoken* licensee of a registered trademark has the right to use a range of trademarks. Sunstar responds in part that Judge Guzman has already rejected Bank One's current arguments in denying Alberto and Bank One's Motion for Determination of Japanese Law. Bank One's motion is denied.

In their Motion for a Determination of Japanese Law, Alberto and Bank One sought a [*58] ruling as a matter of law that Japanese trademark law does not expand the scope of the license grant in the License Agreement and thus, an order holding that Sunstar's use of the 1999 Mark breaches the 1980 Agreements. Alberto and Bank One argued that: (1) under Article 30(2) of the JTA, the licensee acquires only a right to use a "registered trademark" limited by the contract granting the license; (2) Article 50(1) of the JTA has no applicability to con-

  

struing a license under Article 30(2); and (3) Article 70(1) of the JTA confirms that "registered trademark" is to be narrowly construed. Alberto/Bank One's Memo. in Support of Their Mo. for Determination of Japanese Law at 7-14. Bank One makes these same exact arguments in its sixth motion in limine. Bank 1 Memo. in Support of its Sixth Motion in Limine at 4-8.

Judge Guzman denied the Alberto/Bank One motion and declined to determine as a matter law what a *senyo-shiyoken* license is under Japanese trademark law and what rights, if any, registration of an exclusive license as a *senyo-shiyoken* with the JPO gives the licensee beyond those stated in the License Agreement. Judge Guzman ruled:

> In an attempt to affix meaning [*59] to the term *senyo-shiyoken,* the parties point the Court to the Japanese Trademark Act and thrust upon the Court numerous expert reports, declarations, and deposition transcripts purporting to clarify the term's meaning. Yet, even the experts disagree on the scope of the rights granted by a *senyo-shiyoken* license under Japanese law, *i.e.,* whether the term conveys to a licensee the full range of use rights inherent in the registered trademarks under Japanese law or whether a licensee's rights are limited to exclusive use of specific, registered marks only. Clearly, then, the term is ambiguous and reasonably susceptible to different constructions. Therefore, the parties' intent as to the meaning of the term *senyo-shiyoken* as used in the License Agreement is an issue to be determined by the jury at trial.

9/30/03 Memo. Opinion and Order at 7.

By requesting an order barring evidence and argument indicating that Article 50(1) supports Sunstar's position that a *senyo-shiyoken* licensee of a registered trademark has the right to use a range of trademarks, Bank One seeks the same relief it did in its prior motion—namely, that as a matter of law Sunstar's position [*60] regarding the scope of the license is contrary to Japanese law. Judge Guzman has declined to decide as a matter of law whether Sunstar's position regarding the substance of Japanese law is correct or incorrect. Any request for reconsideration of that decision should be directed to Judge Guzman.

Bank One also seeks to bar evidence and argument concerning three Japanese court decisions, one dated 1978 and two dated 1990, which Sunstar contends support its position that a *senyo-shiyoken* licensee of a registered trademark has the right to use a range of trademarks. Bank One's request is denied. Bank One first argues that Japan is a civil law county and that court decisions in Japan do not constitute binding precedent. For the reasons stated in Sunstar's memorandum, the Court is not persuaded that Japanese court decisions are irrelevant to analyzing issues of Japanese law even if they do not constitute binding precedent. Bank One next argues that the three Japanese court decisions should be excluded because none relate to the rights of a *senyo-shiyoken* licensee but rather deal with cancellation issues. Bank One concludes that for the same reasons that testimony and argument regarding [*61] the definition of "registered trademark" used in the context of cancellation proceedings is improper, testimony and argument about cases discussing cancellation issues likewise is improper. Again, Judge Guzman has refused to determine as a matter of law whether Sunstar's position regarding Japanese law and specifically, the applicability of Article 50(1) is incorrect. This Court declines to reconsider Judge Guzman's decision.

Bank One further contends that two of three court decisions Sunstar seeks to introduce in evidence were decided after 1980. Judge Guzman has ruled that "the rights inherent in a trademark registered as *senyo-shiyoken* under Japanese trademark law at the time the parties entered into the License Agreement [in 1980] is relevant to, but not determinative of, the parties' intent." 9/29/03 Memo. Opinion and Order at 9. Judge Guzman further ruled that reference to or interpretation of the Japanese Trademark Act by the parties' experts is relevant to determining what the parties could reasonably have intended by inclusion of the term *senyo-shiyoken* in the License Agreement. *Id.* Pursuant to Judge Guzman's ruling, Sunstar's experts are allowed to rely on [*62] post-1980 case law to the extent it is helpful in determining the rights inherent in a trademark registered as *senyo-shiyoken* under Japanese trademark law in 1980. Finally, Bank One argues that the court decisions Sunstar relies on are factually distinguishable and introducing testimony as to marks in other cases and showing depictions of them will confuse the jury. The Court is not convinced that the threat of confusion envisioned by Bank One justifies exclusion of evidence Judge Guzman has previously deemed relevant.

C. Sunstar's Motions in Limine

1. 1989 Agreements

Sunstar's first motion in limine involves *Rule 408 of the Federal Rules of Evidence.* n9 Sunstar seeks to exclude all evidence relating to certain 1989 agreements



between Sunstar and Alberto as settlement material inadmissible under *Fed. R. Evid. 408* and for similar reasons also under *Fed. R. Evid. 401, 402, and 403*. Alberto responds that none of the subject evidence constitutes settlement materials under *Rule 408* and, even [*63] if it did, it would be admissible under exceptions to *Rule 408*. Bank One also opposes Sunstar's motion. Bank One contends that it intends to offer evidence relating to Sunstar's and Alberto's dispute over the 1989 Marks and the 1989 Letter Amendment to show that Sunstar expressed no belief in 1989 when the issue arose, that *senyo-shiyoken* would expand its right to use trademarks beyond the Licensed Trademarks. Sunstar's motion is granted in part and denied in part.

n9 *Federal Rule of Evidence 408* provides, in relevant part:

> Evidence of . . . accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to provide liability for invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Sunstar states that in or around 1988, it began using one or more new VO5 [*64] designs (the "1989 Marks") on some of its products in Japan. Alberto objected. According to Sunstar, the situation "rapidly escalated into an intense exchange of letters between counsel for the two companies" in July and August of 1988. Sunstar's Motion at 3. In early September 1988, "cooler heads began to prevail, and the parties moved from arguing the legal merits of the situation to working amicably toward a negotiated resolution of the dispute." Id. at 4. On September 7, 1988, Sunstar's counsel wrote to the trustee stating, "Whereas one alternative is to refer the disagreement as to the interpretation of the License Agreement to court for decision, the top executives of Sunstar would like to settle this matter amicably to maintain good relationship between Sunstar and Alberto-Culver Company." Id., Ex. 20. Sunstar's counsel proposed a "face-to-face meeting" to discuss their dispute and other subjects toward the end of September 1988. Id. on that same day, Sunstar's counsel also wrote to Alberto's general counsel and similarly stated: "While it is one alternative to refer the dispute to judgment by court, the top executives of Sunstar prefer solving the subject issue [*65] in a businesslike manner, if feasible, to maintain good relationship with your esteemed company." Id., Ex. 21. Sunstar's president then had several days of meetings with Alberto's chairman and then-president at Alberto's offices in Chicago at the end of September 1988. Id. at 5. "Thereafter, over a period of months, the parties had a series of meetings and communications to draft and negotiate the details of the formal agreement that would implement the agreed-upon framework for resolving the dispute." Id. The parties finalized two written agreements on February 8, 1989: (1) the 1989 License and Know-How Agreement and (2) the 1989 Side Letter Agreement.

Sunstar argues that all communications between the lawyers relating to the 1989 Marks, through the initial meetings of the company leaders in Chicago, through the execution of the 1989 Agreements are protected by *Rule 408*, as are the substantive terms of those Agreements. *Rule 408* excludes evidence of "conduct or statements made in compromise negotiations." Conduct or statements not a part of compromise discussions are not subject to *Rule 408*. Sunstar must show that the discussions in question were made in compromise negotiations. [*66] *New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474. 1482 (7th Cir. 1990)* (holding letter properly excluded under *Rule 408* where there was a substantial showing that the letter was part of a settlement attempt.").

The statements made in the pre-September 7, 1988 correspondence between Alberto and Sunstar were not part of settlement negotiations nor were they offers to compromise. On their face, these letters do not offer to compromise Alberto's claim that Sunstar's use of new VO5 designs violated the 1980 Agreements. These letters also fail to contain any suggestion of compromise. The letters from Alberto as well as Bank One's August 10, 1988 letter (Exh. 18 to Sunstar's Motion) consist of cease and desist demands and set forth Alberto's and Bank One's positions regarding whether the use of the 1989 Marks was prohibited or allowed by the 1980 Agreements. See *Winchester Packaging, Inc. v. Mobil Chemical Co., 14 F.3d 316, 319-20 (7th Cir. 1994)* (stating a demand for payment accompanied by a threat of legal action is not a settlement offer or a part of settlement negotiations excludable under *Rule 408*); *Hanson v. Waller, 888 F.2d 806, 813-14 (11th Cir. 1989)*. [*67] Sunstar's responses asked what provisions of the 1980 Agreements Sunstar's actions violated and set forth its position regarding the proper interpretation of the 1980 Agreements. There are no offers to settle nor any indication that any party is willing to settle in the pre-September 7, 1988 correspondence. The first indication of a willingness to settle came in Sunstar's counsel's





September 7, 1988 letters to the trustee and Alberto's general counsel.

The cases cited by Sunstar do not compel a different result. *Pierce v. F. R. Tripler & Co., 955 F.2d 820, 827 (2d Cir. 1972)*, indicates only that attorney threats of litigation accompanied by an offer to compromise is presumably inadmissible under *Rule 408*. The excluded attorney communication in Pierce included a job offer "conditioned on the release of Pierce's claims, which is another way of saying that the job offer was an attempt to compromise a claim." Id. The Pierce court held that the plain language of *Rule 408* barred evidence of the job offer. Here, the pre-negotiation correspondence as well as Bank One's August 10, 1988 letter do not contain any attempt to compromise Alberto's claim that Sunstar's [*68] use of new VO5 designs violated the 1980 Agreements.

In *Davis v. Rowe, 1993 U.S. Dist. LEXIS 1453, 1993 WL 34867 (N.D. Ill. Feb. 10, 1993)*, also cited by Sunstar, the Court granted defendants' motion in limine to exclude three items under *Rule 408*. The first two items were a letter from defendant to its insurer after a fire setting forth the value of the art collection, including projected sales, and a sworn statement from the defendant providing the projected sales figures. The district court found that the communications were part of a negotiation effort because "the relationship between a claimant and its insurer is inherently adversarial and can generally be assumed to be clothed in continual negotiation and conciliation efforts." *Id. 1993 U.S. Dist. LEXIS 1453 at *3*. The court also excluded a third item which was a letter from the defendant to the plaintiff which included a request for a release from liability in exchange for a payment of $250,000. The Davis court had no trouble concluding that this letter was written as part of a negotiation effort in an attempt to settle a dispute. *Id. 1993 U.S. Dist. LEXIS 1453 at *4*. In contrast, no assumption that compromise negotiations were occurring during the pre-September 7, 1988 correspondence [*69] between Alberto and Sunstar applies and no explicit offer to settle for an amount in exchange for a release of liability occurred during this correspondence. n10

> n10 Sunstar's remaining citations similarly fail to aid its attempt to bar admission of the pre-September 7, 1988 correspondence. In *Kritikos v. Palmer Johnson, 821 F.2d 418, 423 (7th Cir. 1987)*, the Seventh Circuit held that the trial judge improperly admitted two letters written by plaintiff's representative to the plaintiff because they were written "with the objective of advising the plaintiff of [a] possible compromise solution before legal action was commenced." One letter detailed a specific compromise solution for the plaintiff to consider in an attempt to reconcile the differences between the parties, and the second letter clarified what was said in the first letter. *Affiliated Mfrs., Inc. v. Aluminum Co. of Am. 56 F.3d 521, 526 (3d Cir. 1995)*, held that the district court properly: (1) construed *Rule 408*'s exclusion as applying to less formal stages of a dispute short of threatened or contemplated litigation; (2) found that a dispute existed between the parties as of May 1, 1990 and that the documents at issue evidenced attempts to compromise the dispute; and (3) found that internal memoranda prepared as a basis for settlement negotiations and not communicated to the opposing party were excluded under *Rule 408*. Again, in sharp contrast, no possible compromise solution or attempt to compromise appears in any of the pre-September 7, 1988 correspondence in the present case.

[*70]

With respect to the admissibility of post-September 6, 1988 statements and conduct under *Rule 408*, Professors Wright and Graham have considered this precise situation in their Federal Practice and Procedure treatise. They identified the issue as "whether *Rule 408* bars evidence that there were no offers of compromise, or more realistically, that certain statements were not made during compromise negotiations." Wright & Graham, Federal Practice and Procedure: Evidence § 5308, at 239 (1980). Professors Wright and Graham then give the following illustration: "Suppose that in a dispute over the meaning of a contract, one of the parties offers evidence that during attempts to settle the disagreement his adversary never advanced the construction of the contract that he is now urging on the jury." Id. Wright and Graham noted that such evidence would be circumstantial evidence of offers to compromise but concluded that *Rule 408* does not prohibit admission of evidence that certain statements were not made during compromise negotiations. "Read literally, *Rule 408* would not seem to prohibit evidence that an offer of compromise was not made or that certain statements were not made during [*71] negotiations. Nor does there seem any strong policy reason for departing from the literal interpretation." Id. The parties have not cited, and this Court has not found, any case addressing whether *Rule 408* bars evidence that certain statements were not made during compromise negotiations to show that the current meaning assigned to a contractual phrase by the opposing party was an afterthought. In the absence of any case authority addressing this precise issue, this Court

  

follows the approach suggested by Professors Wright and Graham and finds that statements and conduct post-September 6, 1988 are admissible to show that during the parties' dispute regarding the 1989 Marks, Sunstar did not take the position that the *senyo-shiyoken* provision allowed it to use a mark other than the Licensed Trademarks.

Alternatively, Sunstar argues that all evidence relating to the 1989 Agreements is barred by *Rules 401-403*. Sunstar's failure to assert in pre-September 7, 1988 correspondence with Alberto that it was allowed to use the 1989 Mark pursuant to the *senyo-shiyoken* provision is highly probative in that it undercuts Sunstar's current position that *senyo-shiyoken* was intended [*72] in 1980 to allow Sunstar to use trademarks in addition to the Licensed Trademarks specified in the License grant. If there is any prejudicial impact to Sunstar from the pre-September 7, 1988 correspondence it is negligible and clearly does not outweigh the probative value, as required by *Rule 403*. Evidence of post-September 6, 1988 statements to show that Sunstar did not take a certain position during compromise negotiations is needlessly cumulative and thus, has little probative value. Moreover, evidence of settlement negotiations and the 1989 Agreements poses a threat of unfair prejudice. There exists a danger that such evidence could lead the jury to improperly conclude that the 1989 settlement implies a concession of contractual liability for using any VO5 trademark variation in Japan. n11

> n11 Sunstar's attempt to justify exclusion of the pre-September 7, 1988 correspondence on the basis that the jury will be confused and misled "by the introduction of partial evidence concerning that dispute without sufficient context or explanation, and might infer liability in the present dispute based on an incomplete understanding of the facts concerning the earlier dispute" is unpersuasive. Sunstar's Reply at 15. The Court is confident the jury will be able to give appropriate consideration to this correspondence as it bears on the intent of the parties in 1980 only and will not infer liability in the present dispute based on the mere existence of a prior dispute. Sunstar's request to offer a limiting instruction is granted.

[*73]

2. Single Expert Witness on Matters of Japanese Law

Sunstar next moves for an order limiting Alberto and Bank One collectively to a single expert witness at trial on matters of Japanese law. Alberto proferred expert reports on matters of Japanese law by Professors Hidetaka Aizawa and Akihiko Hara. Bank One proferred an expert report on matters of Japanese law by David S. Guttman, Esq. Alberto listed both of its Japanese law experts as witnesses in the Final Pretrial Order. Bank One listed Mr. Guttman as a trial witness for Bank One. Sunstar's motion is granted in part and denied in part.

Alberto and Bank One first assert that the Court has already determined that Alberto's experts and Bank One's expert may testify at trial. None of the cited materials indicate that Judge Lindberg or Judge Guzman has definitely ruled that Alberto's experts and Bank One's expert may testify at trial. Alberto also argues, without citation to any authority, that Sunstar's objection to multiple experts on Japanese law testifying at trial comes too late because multiple experts on Japanese law have appeared during discovery and motion practice in this case. The prohibition against multiple experts [*74] on the same subject matter is not a rule pertaining to the discovery or motion practice stages of the case. Rather, it is a rule governing the trial stage of the case. *Commonwealth Ins. Co. v. Stone Container Corp.*, 2002 U.S. Dist. LEXIS 4033, 2002 WL 385559, at *6 (N.D. Ill. March 12, 2002) (stating "While it is generally the practice in this district to prohibit a party from offering multiple experts to express the same opinions on a subject, there is no general practice or rule that prohibits a party from identifying under *Fed.R.Civ.P. 26(a)(2)* more than one testifying expert on a subject and reserving for later the decision as to which one to use at trial."). Sunstar timely objected to Alberto's naming of two experts on Japanese law in the final pretrial order.

As noted above, this district generally prohibits a party from offering multiple experts to express the same opinions on a subject. This Court's standard form of Final Pretrial Order, Form LR 16.1.1, footnote 7 to Item 2(e) states, in relevant part: "Only one expert witness on each subject for each party will be permitted to testify absent good cause shown." Alberto has not demonstrated good [*75] cause for deviating from this general rule. Only one of Alberto's experts will be permitted to testify at trial on each subject of Japanese law. This does not mean that Alberto is limited to one testifying expert regarding Japanese law; it is limited to one testifying expert on each subject of Japanese law.

Sunstar also moves under *Rule 403* to limit Alberto and Bank One collectively to using a single Japanese law expert at trial because "allowing testimony from more than one of them would simply be repetitive and cumulative and thus a waste of time for both the Court and the jury." Sunstar Motion at 4. Under *Rule 403*, the trial court may exclude relevant evidence on grounds of

  

"undue delay, waste of time, or needless presentation of cumulative evidence." Multiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative. It also raises the unfair possibility that jurors will resolve competing expert testimony by "counting heads" rather than evaluating the quality and credibility of the testimony.

The Court therefore rules that Mr. Guttman's testimony will be permitted to the extent it is not duplicative of the testimony of Alberto's expert(s) [*76] on Japanese law. Bank One contends that the reports of Alberto's and Bank One's experts are not merely cumulative. Bank One gives two examples of points made by its expert Mr. Guttman not covered by Alberto's experts. See Bank One's Memo. at 12. Testimony regarding these two points is not cumulative and will be permitted to the extent it is otherwise admissible. n12

> n12 Sunstar contends that these points by Mr. Guttman are "extraneous." Sunstar's Reply at 14 n.6.

Finally, Alberto and Bank One complain that it is unfair that Sunstar's testifying expert plans to incorporate in his expert testimony the expert opinions of Sunstar's other expert. There is nothing improper about one expert adopting and incorporating the opinions of another expert so long as it is made clear in the expert report. Alberto and Bank One could have done the same thing. Alberto and Bank One knew long before they submitted their expert reports in October 2003 that Sunstar's expert, Professor Port, had adopted and incorporated the opinions [*77] of Professor Doi. See May 29, 2002 Expert Declaration of Professor Port at P 14 and Expert Report of Professor Port at P 1.

3. Bank One's Japanese-Law Expert, David S. Guttman

Sunstar's next motion in limine also involves expert testimony. Sunstar moves for an order excluding any expert testimony by David S. Guttman, the expert witness on matters of Japanese law preferred by Bank One under *Fed. R. Evid. 702*. Sunstar argues that Mr. Guttman's testimony is improper because: (1) he makes and relies upon legal interpretations of the parties' agreements that directly contradict prior holdings of this Court and (2) he makes or assumes (and then relies upon) factual findings as to matters outside the subject-matter area of his claimed expertise and which this Court previously held were required to be determined by the jury at trial. Sunstar states that this is not a Daubert motion but rather, it seeks "to reaffirm certain fundamental principles about the proper role of expert testimony, which Bank One's proffer of Mr. Guttman's report flouts at every turn." Sunstar Motion at 2.

In light of the Court's above rulings that the reasonableness [*78] of Bank One's conduct in connection with the suspension is no longer an issue for trial and that Mr. Guttman's testimony will only be permitted to the extent it is not duplicative of the testimony of Alberto's expert(s) on Japanese law, the extent of any remaining expert testimony by Mr. Guttman is unclear. Therefore, Sunstar's motion is denied without prejudice to reassertion if necessary after the precise content of Mr. Guttman's testimony, if any, is determined.

4. Alberto Deposition Exhibit 162 and Any Similar Testimony/Documents

Sunstar moves for an order excluding from evidence Alberto's Deposition Exhibit 162 and any other potential testimony or documents that are of similar effect or whose offering into evidence is intended for a similar purpose, pursuant to *Fed. R. Evid. 402, 403, 404(a), 608(a) and 802*. Neither Alberto nor Bank One indicate that it seeks to offer any similar testimony or documents. Sunstar's motion is granted.

Exhibit 162 was used as an exhibit during the deposition taken [*79] by Alberto of Junji Masuda, Esq. and was listed on Alberto's proposed trial exhibit list in the Final Pretrial Order. Mr. Masuda is an attorney and member of the bar in both Japan and New York. Mr. Masuda is a partner in the law firm of Masuda & Ejiri, which he founded in 1977. Mr. Masuda represented Sunstar in connection with the negotiation of the 1980 Agreements that are at issue here and has continued to represent Sunstar on various matters since that time. Alberto states that Mr. Masuda requested the insertion of the term *senyo-shiyoken* into the 1980 Agreements.

Exhibit 162 (the "Web Page") is part of a 46-page document entitled "Lawyer's Guide to Japan," dated 1997. The Web Page was printed from the Masuda & Ejiri website. The Web Page states:

Japanese Attitudes Toward Contracts

> The Japanese often prefer to include vague contract provisions such as "(certain things) shall be determined by mutual negotiation" rather than explicit provisions which clearly state the rights of each party on every presumable occasion. In fact, the Japanese sometimes ask for things that are completely different from the contract signed. Such attitudes reflect their prefer-





ence for [*80] the flexible implementation of a contract according to the subsequent situations upon the mutual understanding which they believe is implied in the contract. n13

> n13 The current version of the Web Page provides:
>
>> The Japanese traditionally prefer to include vague contract provisions such as "(certain things") shall be determined by mutual negotiation" rather than explicit provisions which clearly state the rights of each party on every presumable occasion. Such attitudes reflect a preference for the flexible implementation of a contract according to the subsequent situations upon the mutual understanding which they believe is implied in the contract. However, more and more Japanese, particularly major corporations, are becoming legalistic in the approach towards contracts.

The Web Page is not admissible because it is not relevant. Generalizations about a country's business practices without an adequate connection to the particular transaction at issue are not relevant:

> The problem with Pelham's [*81] testimony is that it was simply not relevant to any issue in this case. As the majority correctly observes, none of Pelham's testimony was directly connected to Jinro itself, and none was based on personal knowledge of Jinro or this particular transaction. It is a factual question whether a majority of Korean businessmen act in a certain way, but whether that fact is proven or not, it has no relevancy to show that this particular Korean businessman (or company) is that type of businessman or acted that way in this specific contractual arrangement. No serious effort was made at trial, or in any brief on appeal, to link Pelham's generalized testimony about Korean businessmen and the Korean financial and regulatory landscape to Jinro or the particular transaction at issue here. Thus, under *Rule 401* Pelham's testimony was irrelevant and inadmissible because it sheds no light on Jinro's activities in this case.

*Jinro Am. Inc. v. Secure Investments, Inc., 266 F.3d 993, 1010-11 (9th Cir. 2001)* (Wallace, J., concurring in the result). Similarly, the Web Page is not relevant because it says nothing about the particular transaction at issue in this case. Alberto has [*82] not adequately linked the Web Page to Masuda, Sunstar, or this particular transaction. Even if it is true that Japanese companies prefer to include vague contract provisions rather than explicit provisions, Japanese businessmen often ask for things that are completely different from the signed contract, and Japanese businessmen prefer a flexible implementation of a contract, these generalizations do not make it more probable that Masuda and Sunstar acted that way in this particular transaction in 1980.

Alberto asserts that the Web Page is relevant to Sunstar's state of mind and intent in negotiating the 1980 Agreements. Alberto contends that the Web Page reflects the state of mind of a Japanese lawyer representing Japanese clients, about how he and his clients view contract negotiations. Alberto seeks to offer the Web Page to show that "Masuda believed that Japanese businesses negotiate contracts this way and that he negotiated the Agreements and inserted the phrase *senyo shiyoken* on Sunstar's behalf consistent with this intent." Alberto Resp. at 6 n.7.

Nothing in the record shows that the statements in the Web Page represent the approach of Mr. Masuda in 1980 or that he negotiated [*83] the 1980 Agreements in this manner. The statements in the Web Page were written by persons other than Mr. Masuda more than 17 years after the 1980 transaction. Mr. Masuda testified at his deposition that he did not write the material in the Web Page, had no involvement with its preparation, did not know who was involved in its preparation, did not know who had edited it, and had never read it before it was shown to him at his deposition. Masuda Dep. at 186-87. Mr. Masuda further testified that he believed "relatively young lawyers" or "very young lawyers" in his firm wrote the statements contained in the Web Page. Id. Mr.





Masuda explained that he believed the general statements made in the Web Page pertain to domestic contracts only and not lawyer-assisted international business transactions. Id. at 189. In sum, Alberto has not cited any evidence showing that the statements in the Web Page reflect the opinions of Mr. Masuda in the 1980 time frame or that be acted in a manner consistent with these generalizations in his work on this specific transaction. There is also no evidence indicating that Sunstar generally acts in this way or that Sunstar did so in the specific transaction [*84] which is the subject of this litigation. n14

> n14 Alberto argues that the Web Page is also probative of which party should bear the responsibility for the existence of an ambiguity in the Agreements. *Contra proferentum* is a rule of contract construction which requires that an ambiguous contract provision be construed more strongly against the person who selected the language. Black's Law Dictionary 327 (6th ed. 1990). Sunstar responds that the rule of *contra proferentum* is inapplicable when dealing with contracts freely negotiated by sophisticated parties. The Court expresses no opinion on whether the doctrine of *contra proferentum* is applicable to the instant case. Even if the doctrine applied to this case, the Web Page is not probative of whether Sunstar inserted the phrase *senyo-shiyoken* to create an ambiguity because there is no adequate link between the generalized statements in the Web Page regarding a Japanese preference for vague contract provisions and Masuda, Sunstar, or this specific transaction.

[*85]

Even if the Web Page was marginally relevant, the Court finds it inadmissible under *Rule 403*. Testimony that "either directly or indirectly seeks to link a defendant's conduct to that which is said to be typical of a particular racial, ethnic group or nationality" is excludable under *Rule 403*'s balancing test:

> Allowing an expert witness in a civil action to generalize that most Korean businesses are corrupt, are not to be trusted and will engage in complicated business transaction to evade Korean currency laws is tantamount to ethnic or cultural stereotyping, inviting the jury to assume the Korean litigant fits the stereotype, in stark terms, [the expert's] syllogism reduced to this: (a) Korean businesses generally are corrupt; (b) Jinro is a Korean business; (c) therefore, Jinro is corrupt. Our caselaw, and that of other circuits, establishes that this is an impermissible syllogism.

*Jinro, 266 F.3d at 1007*. The Web Page Alberto seeks to admit would only serve to introduce the same kind of "impermissible syllogism" here. Alberto clearly wants the jury to infer from the Web Page that Japanese businesses generally disregard the terms of written contracts [*86] and therefore in this particular instance, Sunstar, as a Japanese company, did not honor the terms of the 1980 Agreements. The problem with that inference is that a stereotype or generalization about Japanese companies is not probative of how Sunstar acted in this specific transaction. Likewise, there exists a real danger that the proposed evidence could suggest a decision to the jury on an improper basis. The Web Page could lead the jury to decide the issue of what the parties intended by including the phrase *senyo-shiyoken* into the 1980 Agreements by improper reference to ethnic stereotypes. The cultural generalizations in the Web Page may also improperly divert the jury's attention away from the real issue of whether Sunstar disregarded the terms of the 1980 Agreements.

5. Damages Calculations

Sunstar's final motion in limine seeks pursuant to *Rule 408* (and also *Rules 401, 402, and 403*) to bar admission of all evidence pertaining to any purported reasonable royalty or other damages calculations that are based (in whole or in part, directly or indirectly) on either or both of two agreements between Sunstar and Alberto dated February 8, 1989: a License and Know-How Agreement [*87] and an accompanying side letter agreement. Sunstar's motion is denied.

Aron Levko, Alberto's damages expert, prepared a report regarding the damages that Alberto allegedly sustained due to Sunstar's use of the 1999 Mark. Levko's Report states that it

> sets forth [his] opinions about (a) the damages that may be recoverable by Alberto due to Sunstar's use of the 1999 Mark; and (b) the proper methodology for calculating such damages.

Levko reached his conclusion regarding the amount of damages allegedly due Alberto from Sunstar's use of the 1999 Mark by "using the 1989 License as a benchmark regarding the economic terms that would have been incorporated into an agreement in 1999, prior to Sunstar's

  

Case 2:00-cv-00684-DSC    Document 123-4    Filed 07/11/2005    Page 12 of 14

Page 22
2004 U.S. Dist. LEXIS 16855, *87

use of the 1999 Mark." Levko Report at 4. Specifically, the Levko Report states that he determined the "reasonable royalty" by "tak[ing] the annual minimum sum per the 1989 Agreement and increased it by the percentage increase in the United States Consumer Price Index for Personal Care Products ("CPI") for the time period February 1989 to February 1999." Id. at 4-5.

Sunstar contends that *Rule 408* precludes Alberto audits expert from making any evidentiary use of amounts [*88] taken from the 1989 Agreements as support for a calculation of claimed damages in this litigation. Alberto argues, among other things, that the 1989 Agreements and its expert's damage calculation made in reliance thereon should be admitted at trial because *Rule 408* is inapplicable where Alberto's claims at issue in this action are not the claims which are the subject of the 1989 compromise.

*Rule 408* forbids admission of evidence from compromises or compromise negotiations "to prove liability for or invalidity of *the claim* or its amount." *Fed. R. Evid. 408* (emphasis added). The Tenth Circuit has noted that "read literally, the rule does not appear to cover compromises and compromise offers that do not involve the dispute that is the subject of the suit, even if one of the parties to the suit was also a party to the compromise." *Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1363 (10th Cir. 1987)*. Substantial authority supports Alberto's contention that *Rule 408* only bars evidence of settlement negotiations to prove the validity or amount of the claim under negotiation. "*Rule 408* does not require the exclusion of evidence regarding [*89] the settlement of a claim different from the one litigated." *Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 770 (10th Cir. 1997)*; see also *Boardcort Capital Corp. v. Summa Med. Corp., 972 F.2d 1183, 1194 (10th Cir. 1992)*. The Sixth Circuit Court of Appeals has explained that the "general principle" is that "*Rule 408* only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim." *Uforma/Shelby Business Forms, Inc. v. NLRB, 111 F.3d 1284, 1293-94 (6th Cir. 1997)* (quoting 23 Wright & Graham, Federal Practice & Procedure: Evidence § 5314 n.25). Notwithstanding *Rule 408*, settlement evidence regarding a claim or dispute different from the one being litigated has been held admissible in numerous other cases. See *Wyatt v. Security Inn Food & Beverage, 819 F.2d 69, 71 (4th Cir. 1987)*; *Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 277 (8th Cir. 1983)*; *Herman v. City of Allentown, 985 F. Supp. 569, 577 (E.D. Pa. 1997)*; *United States v. McCorkle, 1994 U.S. Dist. LEXIS 9263, 1994 WL 329679, at *2 [*90] (N.D. Ill. July 7, 1994)* ("[]*Rule 408* does not bar settlement information in one case from admissibility in another case."). n15

n15 But see *Williams v. Fermenta Animal Health Co., 984 F.2d 261, 264 (8th Cir. 1993)*; *Playboy Enterprises, Inc. v. Chuckleberry Publ. Inc., 687 F.2d 563, 568-69 (2d Cir. 1982)*; *Citibank, N.A. v. Citytrust, 1988 U.S. Dist. LEXIS 9273, 1988 WL 88437 (E.D. N.Y. Aug. 23, 1988)*; *Lo Bosco v. Kure Engineering Limited, 891 F. Supp. 1035, 1038 (D.N.J. 1995)* (holding that the better view is that *Rule 408* may exclude settlement proposals in one case from admission in another case where the cases are related); *Scaramuzzo v. Glenmore Distilleries, Co., 501 F. Supp. 727, 733 (N.D. Ill. 1980)*.

Most importantly, the Seventh Circuit has held: "*[Rule] 408* provides that statements made in settlement negotiations are not admissible to establish a party's liability, or damages, in the dispute that was the subject of the negotiation." *Cates v. Morgan Portable Building Corp., 780 F.2d 683, 691 (7th Cir. 1985)*. [*91] The Cates court held that the district court did not violate *Rule 408* by using a 1973 settlement agreement to fix damages incurred thereafter. Judge Posner, writing for the court, explained: "Nothing [the defendant] said or agreed to in the negotiations that culminated in the execution of the stipulation in September 1973 could have been used to establish its liability for the breach of contract that occurred in September 1970 or to fix its damages for that breach." Id. *Gates* is controlling precedent. Alberto is therefore precluded under *Rule 408* from introducing the 1989 Agreements to establish Sunstar's liability for breaching the 1980 Agreements through its use of the 1989 Marks as well as to fix damage for that alleged breach. Since the dispute under negotiation in the 1989 Agreements is different than the dispute at issue in this litigation, *Rule 408* does not bar this evidence from being considered here.

Sunstar also argues that for similar reasons the 1989 Agreements should be excluded under the general relevance *Rules of 401* and *402* and because of their excessive prejudice in comparison to any probative value under *Rule 403*. Sunstar argues that the 1989 Agreements [*92] are not relevant to what a willing licensee would pay a willing licensor in arms length negotiation because they were settlement agreements, made in the face of explicit threats of litigation and for the purpose of avoiding the burden of complex and expensive litigation. The Court concludes that any prejudice from admitting the 1989 Agreements for the purpose of establishing a reasonable royalty rate does not substantially outweigh their probative value, as required by *Rule 403*.

  

Sunstar does not dispute that license agreements are generally relevant for the purpose of showing a reasonable royalty. *Medtronic, Inc. v. Catalyst Research Corp., 547 F. Supp. 401, 415 (D. Minn. 1982)* (stating that the "most persuasive evidence" of what a willing buyer and willing seller would agree to consisted of two existing agreements between the patent owner and non-parties, and the terms that the patent owner actually offered the proposed infringer."). Rather, Sunstar contends that royalties paid under threat of litigation have no probative value. It is true that the Supreme Court stated more than a century ago that: "a payment of any sum in settlement of a claim for an alleged infringement [*93] cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement." *Rude v. Westcott, 130 U.S. 152, 164, 32 L. Ed. 888, 9 S. Ct. 463, 1889 Dec. Comm'r Pat. 543 (1889)*. The Supreme Court explained: "Many considerations other than the value of the improvements patented may induce the payment in such cases. The avoidance of the risk and expense of litigation will always be a potential motive for a settlement." Id.

The Court does not interpret Rude as prohibiting the introduction of licenses or offers to license made after litigation or threat of litigation on the issue of a reasonable royalty. The Court concludes that the rule stated in *Rude* governs the weight, not the admissibility of such license evidence in a reasonable royalty analysis. Courts have recognized that the trier of fact may properly consider the context in which the license was reached in weighing the probative value of such evidence. See *Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1557 (Fed. Cir. 1983)* (holding that district court could properly "discount the probative value" of a license [*94] negotiated "against a backdrop of continuing litigation."); *Devex Corp. v. General Motors Corp., 667 F.2d 347, 362 (3d Cir. 1981)* (noting that an industry-wide licensing offer made by plaintiffs in 1964 "doubtlessly included an element of a desire to end this already extensive litigation" but "that factor, although to be taken into account, does not automatically rule out use of the [licensing offer to establish a reasonable royalty.]"); *Tights, Inc. v. Kayser-Roth Corp., 442 F. Supp. 159, 162 (M.D. N.C. 1977)* (holding that in awarding a reasonably royalty to a patent holder it is improper to give "substantial evidentiary weight" to existing license agreements having a royalty rate which was arrived at under conditions of open, industry-wide infringement.). n16

n16 See also *Deere, 710 F.2d at 1560* (Davis, J. dissenting in part) (noting that numerous Court of Claims cases have held that licenses, even in settlement, furnish a relevant component for determining a royalty).

[*95]

The Seventh Circuit has recognized that licenses agreed to under threat of litigation or to settle litigation are relevant to fix damages for infringement. In *Columbia Broadcasting System, Inc. v. Zenith Radio Corp., 537 F.2d 896 (7th Cir. 1976)*, the Seventh Circuit upheld a judgment for royalties based upon the plaintiff's license grants, settlements of litigation, and an offer to settle with other American tube manufacturers. Moreover, in a case cited by Sunstar, this court confirmed that the context in which the licenses were negotiated effects the weight rather than the admissibility of the license evidence. *Activated Sludge, Inc. v. Sanitary Dist. of Chicago, 64 F. Supp. 25, 33-35 (N.D. Ill. 1946)*, aff'd per curiam, *157 F.2d 517 (7th Cir. 1946)* (considering but failing to give determinative weight to licenses which included settlements for past infringement). Finally, in *B & H Manufacturing, Inc. v. Foster-Forbes Glass Co.,1993 U.S. Dist. LEXIS 21432, 1993 WL 141120 (N.D. Ind. Jan. 6, 1993)*, a magistrate judge rejected defendant's attempt to prevent plaintiff from introducing at trial evidence concerning the licenses between plaintiff and [*96] third parties. The plaintiff argued that the license agreements were relevant because they showed "the result obtained from a negotiation between a willing licensor and a willing licensee: an agreed upon royalty rate of 18[cent] per gross." *Id.1993 U.S. Dist. LEXIS 21432 at *6*. The magistrate judge refused to exclude the license agreements at trial, stating:

> The court agrees with B & H that the agreements will be useful to the jury for the purpose of establishing a damages floor. Although Owens-Illinois and Anchor Glass had both been threatened with litigation (and Owens-Illinois had fought a lawsuit for three years), due to the size and strength of these two companies the court finds that the licenses are evidence of a reasonable royalty rate obtained after negotiation between a willing licensor and a willing licensee.

*Id.1993 U.S. Dist. LEXIS 21432 at *7*.

Sunstar's arguments about royalties paid under threat of litigation implicate the weight, not the admissibility, of the 1989 Agreements. The trier of fact may consider the context in which the 1989 Agreements were reached

  

and determine whether the probative value of the 1989 license should be discounted because it was negotiated under threat of litigation. [*97] Alberto is entitled to show that the 1989 Agreements have relevance to the reasonable royalty determination despite their negotiation under the threat of litigation. Sunstar is free to cross-examine Levko about the basis for his opinion. Through cross-examination and testimony from its own witnesses, Sunstar is also free to reveal any weaknesses in Levko's opinion and establish that the 1989 license included a premium for litigation avoidance.

## CONCLUSION

For the reasons stated above, the parties' motions in limine are granted in part and denied in part. In Case No. 01 C 0736, Sunstar's motion in limine [150-1] is granted; Sunstar's motion in limine [151-1] is granted in part and denied in part; Sunstar's motion in limine [152-1] is denied; Sunstar's motion in limine [153-1] is denied without prejudice; Sunstar's motion in limine [154-1] is granted in part and denied in part; Bank One's motion in limine [156-1] is granted; Bank One's motion in limine [157-1] is granted; Bank One's motion in limine [158-1] is granted; Bank One's motion in limine [159-1] is granted; Bank One's motion in limine [160-1] is granted; Bank One's motion in limine [161-1] is [*98] denied; Alberto's motion in limine [163-1] is granted; Alberto's motion in limine [164-1] is granted; Alberto's motion in limine [165-1] is denied without prejudice; Alberto's motion in limine [166-1] is granted in part and denied in part; Alberto's motion in limine [167-1] is denied; Alberto's motion in limine [168-1] is denied without prejudice; Alberto's motion in limine [169-1] is granted in part and denied inpart; and Alberto's motion in limine [170-1] is granted.

Under *Rule 72(a)*, objections to this memorandum opinion and order must be filed with the district court within ten days after being served with a copy of this opinion. Failure to object to a magistrate judge's ruling on nondispositive pretrial matters waives the right to attack such rulings on appeal. *United States v. Brown, 79 F.3d 1499, 1504 (7th Cir. 1996)*.

**ENTER:**

**Nan R. Nolan**

**United States Magistrate Judge**

**Dated:** 8/20/04

