# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )          Civil Action No. 00-684
                                  )
            Plaintiff, )
                                  )          Judge David Stewart Cercone
        v. )
                                  )
PRICEWATERHOUSECOOPERS, LLP, )
                                  )
            Defendant. )


## THE COMMITTEE'S BRIEF IN OPPOSITION
## TO PwC'S MOTION FOR SUMMARY JUDGMENT


James M. Jones (PA # 81295)
Laura E. Ellsworth (PA # 39555)
Laura A. Meaden (PA # 52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

Dated: July 11, 2005

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

PRELIMINARY FACTUAL STATEMENT ........................................................... 1

ARGUMENT ........................................................................................................ 10

I.   PwC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS *IN PARI DELICTO* DEFENSE .................................................................................. 10

    A.   Reasonable Jurors Readily Could Conclude That The Management Conduct About Which PwC Complains Should Not Be Imputed To AHERF ..................................................................................... 12

        1.   There Is Much More Than "A Scintilla" Of Evidence That Messrs. Abdelhak And McConnell Acted In Their Own Interests ...................... 13

        2.   AHERF Had No "Sole Actor." .............................................. 18

    B.   Equitable Factors Preclude Summary Judgment On PwC's *In Pari Delicto* Defense .................................................................................. 20

II.  PwC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS "AUDIT INTERFERENCE" DEFENSE .................................................................. 21

    A.   Reasonable Jurors Could Easily Conclude That The Actions Of AHERF Management Were Not A "Substantial Factor" In Coopers' Audit Failures ....... 23

    B.   The List Of Conflicting "Substantial Factor" Evidence Is Long .......................... 24

        1.   Adequacy Of Bad Debt Reserves ........................................... 24

        2.   The Graduate Reserve Transfers ............................................ 26

        3.   Classification Of The Lockhart Trusts ...................................... 29

III. THE RECORD IS REPLETE WITH COMPETENT EVIDENCE THAT COOPERS CAUSED AHERF'S INJURIES .............................................. 30

    A.   The Proof Burden Appropriately Stated ............................................ 30

    B.   The Committee Can Meet Its Burden Of Showing Causation Through The Testimony Of Trustees, Creditors, And Experts ................................... 32

        1.   The Committee's Evidence Is Typical Of Causation Evidence In Audit Failure Cases .................................................................. 32

        2.   AHERF's Board And Its Creditors Had Intervention Options ................ 35

        3.   The Trustees And Creditors Would Have Intervened ......................... 35

        4.   Action By AHERF's Trustees And Creditors Would Have Prevented Or Reduced The Losses At Issue ..................................... 37

**TABLE OF CONTENTS**
(continued)

**Page**

IV.     PwC IS LIABLE FOR THE "CENTENNIAL LOSSES." ............................................... 38

        A.      Coopers' Failed Audits Injured SDN, The Predecessor Of AH-Centennial ........ 38

        B.      PwC Is Liable To The AHERF Estate Because Its Audit Failures
                Foreseeably Caused AHERF To Become Liable For The AH-Centennial
                Losses.................................................................................................................... 43

V.      THE COMMITTEE HAS ASSERTED A VALID CLAIM FOR BREACH OF
        CONTRACT ...................................................................................................................... 45

VI.     THE COMMITTEE HAS ASSERTED A VALID CLAIM FOR AIDING AND
        ABETTING BREACH OF FIDUCIARY DUTY, AS WELL ......................................... 47

CONCLUSION.............................................................................................................................. 50

## INTRODUCTION

AHERF and certain of its affiliates filed for bankruptcy in July 1998. At the time, AHERF was a not-for-profit health system -- one of the largest in the country. The system included fourteen hospitals, two merged medical schools, and physician practices that employed hundreds of primary care physicians. For years before the bankruptcy, Coopers & Lybrand had audited the financial statements of AHERF and its affiliates or their predecessors. PwC is the successor to Coopers.

The Committee, on behalf of the AHERF estates, has sued PwC for professional negligence, breach of contract, and aiding and abetting breaches of fiduciary duty committed by certain members of AHERF's management. The Committee's claims focus on Coopers' audits of AHERF's financial statements for fiscal years 1996 and 1997.

After completing a discovery campaign, in which more than 200 witnesses were deposed (most of them noticed by PwC) and storerooms filled with documents were produced, PwC now moves this Court for summary judgment on each of the Committee's claims. PwC concedes that "there are many factual disputes between the parties," but contends that its "motion is based on facts as to which there is no genuine dispute." PwC Br. at 3. PwC got it half right. In a box full of summary judgment papers, PwC argues that not one genuine issue of material fact exists. But, PwC's papers, read by themselves, and against the Committee's responsive submission, catalogue factual dispute after factual dispute.

PwC's motion for summary judgment should be denied.

## PRELIMINARY FACTUAL STATEMENT

Coopers audited AHERF's financial statements for fiscal years 1996 and 1997. Accompanied by Coopers' unqualified audit opinions, the financial statements for those years overstated net income and unrestricted net assets by tens of millions of dollars. These statements

masked the financial drain occasioned by the recent acquisition of financially troubled hospitals in Philadelphia. They hid the system's inability to replenish the flush of cash that resulted from buying hundreds of money-losing physician practices and entering into unprofitable risk-sharing contracts with health insurers. They were not accompanied by required reports to AHERF's Audit Committee disclosing suspect accounting and operational practices at AHERF -- practices that were known to Coopers' auditors.

Coopers' multiple audit failures ensured that AHERF's Board of Trustees and its major creditors were screened from AHERF's true and deteriorating financial performance and condition. The audit failures prohibited AHERF's trustees from timely addressing and remedying AHERF's financial maladies. Treatment was delayed. Bankruptcy was the outcome.

Motivated in part by Coopers' interest in maintaining and expanding its long-standing and profitable relationship with AHERF, to include even-more-lucrative consulting services, Coopers' audit team excused flagrant violations of Generally Accepted Accounting Principles committed in preparing the system's financial statements. Coopers' work papers detail an "action plan" by the accounting firm to sell additional services to AHERF beyond those it provided as AHERF's auditor. "Step 1a," was "sizing the wallet" or measuring how much AHERF might be willing to spend on non-audit services. Next steps were to select and "pursue aggressively in 1996" additional "'food chains'" at AHERF. Coopers understood that to feed as the firm desired, it "[m]ust continue current relationships, particularly with [Sherif] Abdelhak and [David] McConnell," AHERF's Chief Executive Officer and Chief Financial Officer, respectively. SOF ¶ 242. The current client relationship with these gentlemen, of course, centered on Coopers' role as AHERF's long-time auditor.

- 2 -

And it is Coopers' auditing that is the center of this case. Coopers' audits in 1996 and 1997 were riddled with violations of Generally Accepted Auditing Standards and failures to report GAAP violations and other reportable conditions to AHERF's Audit Committee. The expert testimony to this effect is lengthy, detailed, and unequivocal. SOF ¶ 256. Coopers' failures resulted in audited financial statements that grossly misstated AHERF's financial performance and condition. SOF ¶ 257. PwC cannot and does not dispute that these audited financial statements were misstated. Its retained auditing expert supplies only excuses and rationalizations for Coopers' failure to detect the misstatements.

AHERF's fiscal-year 1996 and 1997 audited financial statements reported net income of $6.5 million and $21.9 million, respectively. SOF ¶ 316. One of the Committee's forensic accounting experts has opined that AHERF's audited statement of operations overstated net income by more than $90 million in 1996 and by more than $150 million in 1997. Correcting adjustments turn the black ink to red. Modest profits become huge losses. The adjustments reflect net losses on the order of $80 million in 1996 and $130 million the year after. They reveal affiliate loan covenant violations, as well. SOF ¶¶ 257, 347-48, 350. The audited balance sheet was no more accurate. The Committee's accounting expert gauges that the Coopers-blessed balance sheet overstated unrestricted net assets by more than $80 million in 1996 and by more than $240 million in 1997. SOF ¶ 257.

These are not small numbers. They did not result from little mistakes. Coopers audit failures were multiple, pervasive, and ultimately lethal. Just a few examples make the point. To be sure, PwC disputes that it committed these auditing failures or that it should be responsible for any failures it might have committed. But these examples and the disputes over them only serve to emphasize the unsuitability of resolving this case short of trial.

- 3 -

First, Coopers passed on and facilitated AHERF's significant overstatement of the dollar value of the system's accounts receivable. Accounts receivable and associated bad debt reserves receive so much attention in hospital audits because hospitals generate most of their revenue from fees for services provided to patients, and not all patients or insurers pay for those services, pay fully, or pay timely. The bad debt reserve is an amount subtracted from the dollar value of a hospital's accounts receivable to arrive at a reasonable estimate of the "net realizable value" of those accounts receivable, i.e., the amount of cash that is reasonably likely to be collected.

The audited balance sheets for AHERF's Delaware Valley Obligated Group hospitals in fiscal-year 1996 grossly understated this reserve and therefore grossly overstated accounts receivable. SOF ¶¶ 257, 267. Because increases in bad debt expense at these Philadelphia-area hospitals would have been required to raise the reserve to appropriate amounts, the audited statements of operations (or income statements) materially overstated net income, as well. Income was not charged, and the under-reservation was not remedied. Coopers auditors knew all of this and did nothing to report it. SOF ¶¶ 265-67, 269-87. Indeed, Coopers reported to the Audit Committee that "[a]s a result of our procedures, we have concluded that the controls over the establishment and monitoring of accounts receivable reserves are designed appropriately and are operating effectively so as to properly adjust accounts receivable balances to their estimated net realizable value." SOF ¶ 312.

The bad debt reserve shortfall at the DVOG hospitals, left untreated at year-end 1996, grew in fiscal-year 1997. To remedy the shortfall, $50 million worth of unsubstantiated and undesignated reserves were created in connection with newly acquired Philadelphia-area hospitals formerly owned by Graduate Health System, Inc., and these reserves were then inappropriately transferred to the bad debt reserve accounts at the DVOG hospitals. The

- 4 -

transaction was a direct, indisputable violation of Generally Accepted Accounting Principles, which violation allowed AHERF and the DVOG hospitals to avoid a charge to bad debt expense on their fiscal-year 1997 income statements, resulting in a material overstatement of earnings. SOF ¶¶ 85, 89, 289. These would not be the last of the non-GAAP reserve transfers from acquired hospitals to existing hospitals to boost bad debt reserves and other accounts. The siphoning of reserves from one set of hospitals to another would grow to nearly $100 million before it stopped. SOF ¶¶ 293, 295-96.

Coopers auditors concede that they knew about the first $50 million of these transfers, knew that they violated GAAP, and knew that bad debt expense was not charged. SOF ¶ 89. Still, just like in 1996, Coopers issued clean audit opinions in 1997, and no one at Coopers told AHERF's Audit Committee what its auditors knew.

Second, Coopers watched and approved as AHERF erroneously misclassified tens of millions of dollars of realized and unrealized gains on five irrevocable trusts, known as the Lockhart Trusts, upon which AHERF had become an income beneficiary only. The trust documents provided that gains from the sale of trust assets were to be added to the trusts' corpus and were not to be considered income. None of the trusts permitted use of trust corpus by AHERF. SOF ¶ 258. By the close of the fiscal-year 1996 books, the audited financial statements misclassified nearly $30 million of realized and unrealized gains related to these trusts as "unrestricted" net assets, and over $15 million of current-year and prior-year realized and unrealized gains were improperly included in AHERF's fiscal-year 1996 net income. SOF ¶ 258. In addition, as of June 30, 1996, the audited financial statements misclassified on the balance sheet more than $50 million more of trust assets as "temporarily restricted" net assets. *Id.* PwC now concedes, as it must, that the "unrestricted" and "temporarily restricted"

- 5 -

classifications could not be supported by the language of the trust. PwC Br. at 24. But back in 1996 Coopers passed on these classifications just the same.

Again lapses in 1996 carried over to the next year. During fiscal year 1997, the audited financial statements incorrectly recognized more than $50 million of revenue from assets released from restrictions and investment income due to improper accounting for the Lockhart Trusts. SOF ¶ 258. But not a dollar of this false "revenue" ever left the trust department at Mellon Bank. At the end of fiscal-year 1997, more than $80 million and $10 million of realized and unrealized gains relating to the Lockhart Trusts were misclassified on the balance sheet as "unrestricted" net assets and "temporarily restricted" net assets, respectively. SOF ¶ 258. These funds were never to be touched and should have been classified as "permanently restricted" net assets. These were not small misses.

Third, throughout its 1996 and 1997 audit work for AHERF, Coopers auditors were aware that AHERF's audited financial statements were, in significant part, the product of improper "earnings management." Earnings management -- "cookie jar accounting" -- is the deceptive practice of moving or shifting income and expenses between different financial-reporting periods to "cushion" against or "soften" downturns in real earnings. AHERF continually tallied the amount and nature of "general reserves" or "cushions" through "Analysis of Reserves" schedules, referred to by some within AHERF as "the X-files." SOF ¶ 229. Coopers knowingly acquiesced in and facilitated this earnings management, further masking a decline in operational performance during both fiscal years at AHERF's eastern hospitals and other affiliates. SOF ¶ 256.

Had Coopers performed its audits in compliance with Generally Accepted Auditing Standards and applied the expertise it claimed in health care auditing, AHERF's trustees and its

creditors could have intervened. Accurate reports of AHERF's poor financial performance and

weakened financial condition, if they had been made, would have demanded attention and action.

Accurate reports, coupled with an auditor's disclosure of the nature and extent of the violations

of GAAP committed at AHERF -- and known to Coopers' auditors -- would have demanded new

financial management. AHERF's trustees and representatives of its creditors have so testified.

For example, David Barnes, Chair of AHERF's Audit Committee, explained how he

would have reacted had Coopers informed the Audit Committee in 1996 that AHERF had

suffered a loss rather than the reported gain in that fiscal year:

> Assuming [Coopers] had -- well, I think what it does is it opens the door to a lot
> of questions. Now, how they all get answered, I'm not sure, but, you know, one
> family of questions is the internal questions. I mean, why did we not earn the $6
> million we thought we did? I mean, is it an annual problem or is it just a one-year
> thing? Where did it happen? Why did it happen? Are there one problem or are
> there ten problems? Does this suggest that the damn financial statements system
> isn't any good or is good?

SOF ¶ 329. Mr. Barnes went on to describe the various options available to the Audit

Committee and the Board if only they were presented with appropriate audit disclosures. "You

can . . . give up Philadelphia and sell everything in Philadelphia or kick it out one way or

another. You can get a new management team. There are probably half a dozen options on that

side of the coin, one of which would be to bring in a consultant." *Id.*

Ira Gumberg, a member of the AHERF and Allegheny General Hospital Boards and

AHERF's Executive, Finance, Audit, and its merged Finance and Audit Committees, testified

that had Coopers informed him that the 1996 or 1997 financial statements presented for Coopers'

audit were materially misstated and that Coopers would be required to issue an adverse opinion

on those statements, he "would have brought in consultants to help advise us." SOF ¶ 152. He

added that "had we been in that position, we may have put the brakes on everything that was

going on until we go our hands around it." *Id.* He explained that any application of the brakes

- 7 -

would have halted hospital and physician practice acquisitions. *Id.* And if inquiry revealed that there were questions about the competence and integrity of those in financial management, including Messrs. Abdelhak and McConnell, the board would have had no option "other than [to] terminate them." *Id.*; *see also* SOF ¶ 328.

The list of trustees who testified to the ship-righting work that they would have done with accurate financial statements and audit disclosures is long. SOF ¶¶ 147, 152, 326-327, 330-331; *see also* SOF ¶¶ 44, 150-51, 328-329, 332-343. Messrs. Barnes and Gumberg had plenty of company.

Others besides the trustees had options. AHERF's largest creditors testified to the steps that they would have taken in response to timely notice of AHERF's true financial performance and condition and the associated violation of debt covenants.

Richard Weill, President of MBIA Insurance Corporation, which insured $300 million of AHERF-affiliate bonds, laid out the general approach: "[I]f we had known the facts, we would have done what we did in other circumstances which is to talk to the directors -- the trustees directly and point out to them what the management was doing and what we thought was wrong." SOF ¶ 361; *see also* SOF ¶¶ 356-57, 362, 369, 370-71. MBIA's Karleen Strayer described how debt covenant violations at AHERF affiliates, if disclosed by Coopers' audit, would have given MBIA leverage to help AHERF avoid the financial dissipation it suffered. SOF ¶¶ 364-68. MBIA could have required AHERF to engage consultants to assist AHERF's management in operating the enterprise more effectively, and other stop-loss measures could have been effected to avoid ultimate credit defaults. SOF ¶¶ 161, 175, 360-68.

Ralph Michael, CEO of Corporate Banking for PNC Bank, the guarantor of more than $100 million of AHERF-affiliate long-term debt and the lender on more than $30 million worth

- 8 -

of line-of-credit draws, stated the obvious when he testified that lenders reading audited financial statements expect that those statements "project a true and correct . . . picture of the financial viability" of the borrower. SOF ¶ 351; *see also* SOF ¶¶ 359, 372-74. PNC's Paula Mammarella noted that had AHERF's audited financial statements disclosed debt covenant violations -- symptoms associated with threatened financial viability -- PNC would have had a number of remedial options at its disposal, including negotiating waiver or forbearance agreements if appropriate and declaring a default if necessary. SOF ¶ 377; *see also* SOF ¶¶ 376, 383-84. Mr. Michael explained that PNC "would have gone in and worked very closely . . . with the company to shore up their operating cash flow which could have included the introduction of a crisis manager for instance, as a mechanism to try and . . . preserve cash in and ultimately build the cash flow of . . . the AHERF entity." SOF ¶ 379; *see also* SOF ¶¶ 378, 380-82.

Testimony from trustees that they would have addressed the business and management practices that occasioned unprecedented financial losses is not surprising. Their duties require as much. SOF ¶ 319. Testimony from creditors that they would have explored available options to try to help their borrower avoid financial collapse is not remarkable. This is what creditors do.

Only in mid-1998, when AHERF's long-hidden financial problems became an immediate cash crisis, did AHERF's Board of Trustees come to learn some of the truth regarding AHERF's actual financial performance and the accounting machinations that had deprived the Board of earlier knowledge. When it learned, it acted. The Board retained counsel to investigate and a healthcare consulting firm, the Hunter Group, to manage its troubled Philadelphia-area hospitals. SOF ¶¶ 335, 340. The Board fired Abdelhak and McConnell. SOF ¶¶ 336, 338. The Board ended Coopers' decades-long role as AHERF's auditor. SOF ¶¶ 337, 339, 342. The Board

- 9 -

issued a press release announcing that no one should rely on AHERF's fiscal-year 1997 audited financial statements. SOF ¶ 343.

AHERF's creditors acted swiftly, too, in 1998. Creditor representatives met with officers and board members on numerous occasions to discuss the financial issues facing the DVOG hospitals. SOF ¶¶ 356-57, 369-70. They reached out directly to AHERF's Board with financing proposals. SOF ¶¶ 358, 369-71. Creditor activity shifted into "remedial overdrive." SOF ¶ 363.

But by mid-1998, it was too late to save AHERF. By late July of that year, real red ink, not the phony black stuff of which so much of AHERF's audited financial statements were made, and real cash shortages preceded the bankruptcy filing that shocked so many. But AHERF could have been saved if action had been taken earlier. AHERF could have been turned around had broad cost-cutting measures been implemented in the fall of 1996 (and even after), including the cessation of further hospital and physician practice acquisitions. Both the Hunter Group's Dan Stickler and the Committee's hospital turnaround expert, Thomas Singleton, have testified that there were sufficient opportunities to cut costs and improve operations at AHERF to have prevented bankruptcy. SOF ¶¶ 150, 153-54, 341. But Coopers' audit failures made sure that the Board learned too little too late, and one of the Commonwealth's largest employers became its largest bankruptcy. Estate losses in the hundreds of millions were racked up.

PwC doubtless will dispute many of these facts. But factual disputes are resolved by juries. PwC's summary judgment motion should be denied.

## ARGUMENT

## I.    PwC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS *IN PARI DELICTO* DEFENSE.

PwC opens its argument by confounding two separate legal doctrines. PwC argues that "[t]he Committee's claims are barred by imputation of AHERF management's wrongdoing."

PwC Br. at 3. But imputation alone bars nothing. It is a principle of agency law. It works to determine who may be responsible for the actions of others. It does not by itself bar claims.

*In pari delicto*, an equitable affirmative defense, derives from a Latin expression: "In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). *In pari delicto,* if established, could bar pursuit of certain of the Committee's theories of liability. But the factual disputes surrounding PwC's assertion of this defense are many, and only a trial will resolve them.

PwC would have this Court believe that if the conduct of certain of AHERF's former officers is "imputed" to AHERF itself, this Court's inquiry is at an end, and *in pari delicto* applies to bar the Committee's audit failure claims. PwC's Br. at 3-4. PwC cites *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358-59 (3d Cir. 2001), for this proposition. *Id.* Application of *in pari delicto* does not so turn. *Lafferty* does not so hold.

PwC pulls this sentence out of context from *Lafferty*: "'[I]f wrongdoing is imputed, then the *in pari delicto* doctrine comes into play and bars a suit.'" PwC Br. at 4 (quoting *Lafferty*, 267 F.3d at 355). But in *Lafferty*, the Third Circuit confirmed that *in pari delicto* was an equitable defense and held only that imputation led to the application of *in pari delicto* on the facts then before it, having just rejected as irrelevant the other equitable factors asserted by the bankrupt estate. *See Lafferty*, 267 F.3d at 354-55; *see also Baker O'Neal Holdings, Inc. v. Ernst & Young, LLP*, No. 1:03-CV-0132, 2004 WL 771230, at *7 (S.D. Ind. March 24, 2004) ("Even given the imputation of O'Neal's wrongdoing to [the plaintiff corporations], whether plaintiffs' claims are

- 11 -

barred by the *in pari delicto* doctrine is a different question.") (Unreported authority is attached at Tab 1.). Equitable factors bar application of *in pari delicto* here.

Initially, however, it warrants mention that the conduct that PwC argues should be imputed to AHERF has nothing to do with many of the audit failures and financial misstatements alleged by the Committee. SOF ¶ 35. The *in pari delicto* defense, through imputation or otherwise, does not reach these failures and misstatements. Trial of these matters must follow.

PwC's *in pari delicto* defense must fail and trial should follow, too, for the relative few audit failures and misstatements that involve what PwC argues is "bad" and imputable conduct on the part of AHERF's senior management. Imputation does not apply to these remaining failures and misstatements. The management members accused of bad acts did not act for the benefit of AHERF, and application of imputation is barred by the "adverse interest exception." And the adverse interest exception cannot be overcome by the what some courts label the "sole actor exception to the adverse interest exception." AHERF was no small, closely held enterprise to which this "exception to the exception" typically applies, and Sherif Abdelhak and the Board he served comprised no "sole actor." Additionally, other *in pari delicto* equitable considerations bar the application of the defense on the facts here even if some fact finder might impute the conduct of bad actors to AHERF.

### A. Reasonable Jurors Readily Could Conclude That The Management Conduct About Which PwC Complains Should Not Be Imputed To AHERF.

PwC ran its imputation argument before in this case. Judge Ziegler rejected it. The Court explained that "[PwC] has failed to adduce evidence that undermines [the Committee's] assertion that senior management acted for their own, rather than AHERF's, benefit. We, therefore, cannot decide, at this juncture, whether imputation is appropriate." January 28, 2002 Opinion at 10-11. The discovery record now is fuller, but PwC's failure remains just as

- 12 -

complete. PwC still does not and cannot tell this Court how what it calls "deliberate" book-cooking by management conceivably could have benefited AHERF. Whether Abdelhak, McConnell, or others "acted for their own, rather than AHERF's, benefit" continues to present a genuine factual issue for trial.

### 1. There Is Much More Than "A Scintilla" Of Evidence That Messrs. Abdelhak And McConnell Acted In Their Own Interests.

Pennsylvania "courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." *Lafferty*, 267 F.3d 340 at 358-59. Conduct is not imputed to the corporation if the officer did not act "for the benefit of the corporation." *Id.* Denying imputation on these grounds is called applying the "adverse-interest exception." *See id.* at 359.

Citing no Pennsylvania authority, PwC asserts that the adverse-interest exception applies only if Abdelhak and McConnell acted "entirely" in their own interest and "totally abandoned" the interests of AHERF. PwC Br. at 3, 5, 7, 9, 11. This is not the standard. In Pennsylvania, the inquiry is whether the officer "act[ed] in his own interest which is antagonistic to that of his principal, or commit[ed] fraud for his own benefit in a matter which is beyond the scope of his actual or apparent authority." *Todd v. Skelly*, 120 A.2d 906, 909 (Pa. 1956); *Solomon v. Gibson*, 615 A.2d 367, 371-72 (Pa. Super. Ct. 1992) (same). Under any standard, summary judgment should be denied.

PwC should be familiar with Pennsylvania imputation law and this Court's view of it from PwC's experience in *In re Phar-Mor, Inc. Securities Litigation*, 900 F. Supp. 784 (W.D. Pa. 1995). There, Judge Ziegler denied Coopers' motion for summary judgment. Observing that the case law "establish[es] that the inquiry into the application of the adverse interest exception is

- 13 -

fact-intensive," Judge Ziegler held that a reasonable jury could find that management's improper,

if not fraudulent, book-cooking fell within the adverse-interest exception:

> [W]e cannot conclude as a matter of law that the fraudulent acts of [the COO],
> [the CFO] and others were intended to benefit Phar-Mor. While we recognize
> that [these gentlemen and another] have all testified that the motivation behind the
> fraud and resultant cover up was to provide time for management to resolve Phar-
> Mor's underlying business problems, such a motivation does not, in our judgment,
> necessarily equate to a finding that the fraudulent actors intended to benefit Phar-
> Mor. *Indeed, a reasonable trier of fact could conclude that the true motive of the
> wrongdoers was the preservation of their employment, salaries, emoluments and
> reputations, as well as their liberty, at the expense of Phar-Mor's corporate well
> being.*

*Id.* at 786-787 (emphasis added). Here, Judge Ziegler already held that *Phar-Mor* is good law.

*See* January 28, 2002 Opinion at 9-10. PwC cites it nowhere.

But the good law will not go away. What Coopers tried in *Phar-Mor* should meet with

no more success here. As in *Phar-Mor*, this Court "cannot conclude as a matter of law that [any]

fraudulent acts" of AHERF's CEO or CFO "were intended to benefit" AHERF. A trier of fact

could reasonably conclude that Abdelhak and McConnell (and any others PwC might seek to

implicate) acted to preserve their own "employment, salaries, emoluments and reputations, as

well as their liberty."

Abdelhak and McConnell enjoyed a lavish lifestyle, thanks to AHERF. So did those that

reported to them. In 1996, Mr. Abdelhak's compensation exceeded $1.9 million, consisting of a

base salary of $775,000, plus bonuses and allowances totaling an additional $1.15 million. The

bonuses included a $150,000 "Graduate Merger Bonus," a $100,000 "Forbes Merger Bonus," a

$41,724 "Perquisite Allowance," a $21,600 "Automobile Allowance," a $123,150 "Key

Management Incentive (Long Term)" bonus, a $450,000 "Key Management Incentive (Short

Term)" bonus, and a $234,113 "Executive Retirement" allowance. In 1997, Mr. Abdelhak's

received over $1.8 million in total compensation. SOF ¶ 235. David McConnell, received over

- 14 -

$1.3 million and $1 million in total compensation in 1996 and 1997, respectively. SOF ¶ 236. It was publicly reported that Abdelhak's counterpart at the University of Pittsburgh Medical Center Health System received $393,914 in total compensation for the 1996-97 fiscal year. SOF ¶ 235. AHERF's top 26 executives averaged nearly that much. *Id.*

Significantly, much of Abdelhak's and McConnell's compensation was directly tied to AHERF's financial performance, in particular its net income, the account around which most of the financial and accounting manipulations revolve. SOF ¶¶ 226-33, 235-36. Bonuses tied to financial performance raise an inference of personal motivation.

Abdelhak, McConnell, and others in AHERF management also enjoyed extravagant perquisites, necessarily tied to continuing an illusion of financial success. They flew on corporate jets (often for personal purposes), "retreated" and went on other "business trips" to destinations like the Cayman Islands, Iceland, Copenhagen, Scotland, Paris, Rome, and London, entertained at private suites at sporting events, and enjoyed memberships at elite social clubs. SOF ¶ 38. Emoluments like these only strengthen the inference of personal interest.

The self-interest of Abdelhak and McConnell in other matters was truly personal. In a sentencing hearing for her tax evasion plea, the former President of AHERF's Allegheny University Medical Practices acknowledged that she had carried on affairs with each of these gentlemen and was paid a "tort settlement" of $1.9 million of AHERF money -- that later was erroneously capitalized to soften its income impact -- upon her departure from the company. *Id.* When bankruptcy was near, cash was at its shortest, and true motivations were revealed, Abdelhak directed that $6 million of AHERF's scarce funds be used to fund an executive benefits program, benefiting him personally, rather than to help AHERF meet payroll. *Id.* And though PwC tells this Court that "[t]here was no stealing, or embezzlement, or looting of

- 15 -

company assets for the personal benefit of anyone in AHERF management," PwC Br. at 8, PwC must have missed Abdelhak's no contest plea to a charge that he used AHERF's money to make a payment to his son's private school. SOF ¶ 38.

In *Phar-Mor* Judge Ziegler denied Coopers' request for summary judgment over direct testimony from Phar-Mor's CEO and CFO to the effect that they acted for the company's benefit, notwithstanding their big financial packages. Here, as PwC notes, Abdelhak and McConnell have invoked their Fifth Amendment rights (as, by the way, did each of Coopers' lead AHERF auditors in earlier AHERF proceedings). PwC Br. at 7; SOF ¶ 288. This evidentiary record therefore is void of any claims on the part of Abdelhak and McConnell that they "did it for the company." The void renders this record all the weaker a foundation for applying imputation.

Reasonable jurors easily could find that Abdelhak, McConnell, and others acted for their own interests. Revealing the true state of AHERF's financial affairs would mean an end to the "good life." And it in fact ended when AHERF's accurate financial condition started to be revealed in mid-1998. Abdelhak and McConnell were each dispatched to their after-AHERF lives. Anthony Sanzo, who replaced Abdelhak as AHERF's CEO and earlier served under him as Allegheny General Hospital's CEO, concluded what jurors surely could -- that Abdelhak "was definitely motivated by what his accomplishments might mean to him financially." SOF ¶ 37.

PwC argues that if continued employment and compensation supported an inference of adverse interest, then "*every* officer of *any* company could be said to have interests adverse to the company." PwC Br. at 8 (emphasis in original). Decoding the "could be said" phrase, PwC really is just observing that it can be difficult to discern an officer's motivation for acting. That is precisely why summary judgment routinely should be denied. *See In re Crazy Eddie Sec.*

*Litig.*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992) ("[A] jury will decide what motivated the Crazy Eddie management to commit the fraud and whether those actions should be imputed to the corporation.").

PwC's citation to *MCA Finance Corp. v. Grant Thornton, L.L.P.*, 687 N.W.2d 850 (Mich. Ct. App. 2004), does not diminish the point. In *MCA*, the only evidence that the officers acted in their own interest was the mere fact of their employment. *See id.* at 861. The Committee has adduced evidence that AHERF officers were compensated wildly beyond the competition, enjoyed rarely rivaled perks, and used AHERF money for personal benefit. *MCA* involved no such facts.

As if it mattered, PwC asserts last that Abdelhak and McConnell acted "to make AHERF look better to outsiders than it really was, as opposed to a misappropriation of company funds to enrich individuals at AHERF's expense." PwC Br. at 9-10. PwC presents a false choice. Those are not the only two possible motivations. Here, there is ample evidence that Abdelhak and McConnell have acted to forestall the Board's knowledge of AHERF's declining financial performance and thereby to forestall the Board's termination of their personal and sky-high financial remuneration. SOF ¶¶ 237-40.

Even if an officer or other executive manipulates his company's accounting only to make the company look better or in some other misguided effort to aid the company, in audit failure cases brought by the company as an audit client (as opposed to those brought by corporate outsiders), the better rule is that the adverse-interest exception still applies. Companies, after all, hire auditors to report on management misconduct detected during a non-negligent audit. *See Schact v. Brown*, 711 F.2d 1343, 1347-49 (7th Cir. 1983) (applying adverse-interest exception);

*In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 597-98 (D.N.J. 2001) (same); *Comeau v.*

*Rupp*, 810 F. Supp. 1127, 1141 (D. Kan. 1992) (*Comeau I*) (same).

Here, even if Mr. Abdelhak and his compatriots had acted only to aid AHERF, a GAAS-

compliant audit and appropriate and timely disclosures by Coopers to the Audit Committee

would have saved AHERF from the bankruptcy that befell it. AHERF did not benefit, at the

expense of outsiders, from any bad acts on the part of Abdelhak et al. The bad acts and bad

auditing led only to AHERF's own financial loss.

In any event, this Court need not predict how the Pennsylvania Supreme Court would

rule on the issue of applying the adverse interest exception where officers "'committed fraud for

the benefit of the corporation.'" PwC Br. at 9 (quoting *Cenco, Inc. v. Seidman & Seidman*, 686

F.2d 449, 456 (7th Cir.), *cert. denied*, 459 U.S. 880 (1982)). No fraud for the benefit of the

corporation was committed here. Rather, the evidence and all reasonable inferences drawn from

it compel the conclusion that Abdelhak, McConnell, and those they may have directed acted out

of self-interest and adverse to the interests of AHERF. The adverse interest exception applies.

PwC's imputation argument fails and, with it, PwC's *in pari delicto* defense.

### 2. AHERF Had No "Sole Actor."

As PwC notes, the adverse-interest exception is itself subject to the "sole-actor"

exception. PwC Br. at 5. The sole actor exception applies where a single person or small group

of persons hold all the shares in a corporation and therefore the power to appoint the company's

directors and management. If these persons turn out to be bad actors, their conduct can be

imputed to the company even if they acted out of personal interest rather than to benefit their

company.

PwC argues that the sole-actor exception should be expanded to bar the Committee's

claims here because AHERF Board members (all thirty or forty of them during the relevant

- 18 -

years), themselves CEOs, CFOs, and members of the Boards of the leading and largest

Pennsylvania-based corporations, were "dominated" by Abdelhak and therefore were "'impotent

to actually do anything.'" PwC Br. at 11 (quoting *In re Bennett Funding Group, Inc.*, 336 F.3d

94, 100 (2d Cir. 2003)). But this Board could and ultimately did take action to curtail

management's excesses and errors.

Coopers' own work papers make the point and defeat summary judgment all by

themselves:

> C&L's experience with the individual boards is that they are generally
> independent of management, extremely qualified and diligent in completing their
> responsibilities and are cognizant of their actions and the associated impact on the
> organizations' employees, patients, local communities and society at large. . . .
> The audit committee at AHERF is very active and has significant influence in the
> operations of the organization. They meet with C&L at least 2 times a year to
> discuss the audit plan and the audit results. . . . Any comments made as part of the
> audit are considered very important and addressed by the committee.

SOF ¶ 241.

Coopers got it right. No Board witness has testified that Board members would have

turned a blind eye to financial-reporting fraud, and there is an abundance of testimony supporting

their vigilance. SOF ¶¶ 147, 326-39, 342-43. No better evidence that the Board would have

focused acutely on and responded swiftly to competent audit disclosures from Coopers about the

acts of AHERF management is the Board's conduct, in 1998, as it came to learn more of the

truth about AHERF's financial condition. SOF ¶¶ 333-43. Unlike the Board in *Lafferty*, the

AHERF Board fired Abdelhak and McConnell before the bankruptcy filing.

PwC points out that, before it fired him, the Board went along with many of Abdelhak's

proposals. PwC Br. at 12. PwC fails to note the obvious -- that Board acquiescence and even

consensus can make sense when management and its auditors fail accurately to report a

company's dire financial circumstances.

Abdelhak, though a tough executive, did not dominate this Board, and the sole actor exception does not apply.

**B.    Equitable Factors Preclude Summary Judgment On PwC's *In Pari Delicto* Defense.**

Summary judgment also should be denied because at least two equitable factors preclude application of *in pari delicto*: (1) Coopers' own improper conduct; and (2) the presence of the AHERF Board members, who were innocent, independent actors who could have stopped the wrongdoing had Coopers conducted proper audits.

Here, Coopers knew about and was complicit in much of the management misconduct about which they now complain. SOF ¶¶ 33-34, 75, 89, 94-95, 136, 242-56, 265-67. When an auditor "has colluded with the corporation's agent," the *in pari delicto* defense is not available. *See In re Jack Greenberg, Inc.*, 240 B.R. 486, 507 n.29 (Bankr. E.D. Pa. 1999) ("*Greenberg II*"); *FDIC v. O'Melveny & Myers*, 969 F.2d 744 (9th Cir. 1992) (law firm cannot assert unclean hands defense unless it is also innocent).

In *Lafferty*, the court held that the auditors could assert *in pari delicto,* even though it was assumed that they had been complicit in the accounting fraud. In *Lafferty*, however, no one in the company actually relied on the false audited statements. The company's sole shareholders were the wrongdoers with whom the auditors were complicit, and these sole shareholders therefore knew that the company's financial reports were worthless. AHERF's Board did not know that AHERF's financial statements were deeply flawed and unreliable.

*In pari delicto,* an equitable defense, should not bar claims brought by companies against outside professionals where the company had "innocent decision makers," untainted by the fraud, who could have stepped in and stopped the wrongdoing. *See In re Sharp Int'l Corp.*, 278 B.R. 28, 36 (Bankr. E.D.N.Y. 2002); *Breeden v. Kirkpatrick & Lockhart*, 268 B.R. 704, 710

- 20 -

(S.D.N.Y. 2001); *Smith v. Arthur Andersen LLP*, 175 F. Supp. 2d 1180, 1200 (D.Ariz. 2001);

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 651 (S.D.N.Y. 1999), *aff'd*,

245 F.3d 174 (2d Cir. 2001), *Weschler v. Squadron, Ellenoff, Plesent & Sheinfeld*, 212 B.R. 34,

36 (Bankr. S.D.N.Y. 1997). Here, AHERF had such innocent decision-makers, the members of

its Board of Trustees. And they stopped the wrongdoing when they learned of it.

## II.    PwC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS "AUDIT INTERFERENCE" DEFENSE.

PwC next argues that the failure by some at AHERF to tell PwC everything they knew

about accounting at AHERF triggers application of "the audit interference rule." PwC Br.

at 14-29. To prevail, PwC must demonstrate that reasonable jurors could only conclude that the

conduct of AHERF management was a "substantial factor" in any losses resulting from Coopers'

"failure to perform its contract and report the truth." *Jewelcor Jewelers & Distribs., Inc. v. Corr*,

542 A.2d 72, 80 (Pa. Super. Ct. 1988), *appeal denied*, 569 A.2d 1367 (Pa. 1989).

Whether the conduct of AHERF's employees was a "substantial" factor, a "less-than-

substantial factor," or something else again is a jury question. The case PwC calls the "leading"

one (PwC Br. at 16) makes the point as well as any. "It was for the jury to say whether

[management's] practice of 'lapping' and 'kiting' of checks should have put the [auditors] upon

inquiry which would have led to discovery of [management's] defalcations." *See Nat'l Surety

Corp. v. Lybrand*, 9 N.Y.S.2d 554, 562 (1939).

The audit interference rule "involves numerous issues of fact, including whether any

contributory negligence was substantial enough to relieve the defendant of liability." *PNC Bank,

Kentucky v. Housing Mortgage Co.,* 899 F. Supp. 1399, 1409-10 (W.D. Pa. 1994). In audit

interference cases, "contributory negligence should not be declared as a matter of law unless the

record inescapably leads to that conclusion; otherwise, [the] question is reserved for the

- 21 -

determination by jury." *Greenberg II*, 240 B.R. at 520 (quoting *Solomon v. Baum*, 560 A.2d

878, 880 (Pa. Commw. Ct. 1989), *appeal denied*, 578 A.2d 930 (Pa. 1990)).

 Citing nothing, PwC states that "the defense is established if the client is not open and

forthcoming with respect to the audit" and that "[f]ailure to provide the auditor with pertinent

information in the client's possession . . . can itself constitute contributory negligence." PwC

Br. at 17. Though PwC would like this to be the rule -- offering an "escape hatch" in every case

where it can show even a collateral omission or misstatement by its client -- that is not the law.

 The court in *In re Cendant Corp.,* put it well:

> This Court does not agree that CUC's alleged failure to provide accurate
> information to E&Y relieved E&Y of its responsibilities under its contract. The
> very duty it undertook was to exercise due care and disclose any acts of fraud it
> uncovered. Such a promise necessarily requires that it anticipated the possibility
> it would receive inaccurate financial information from CUC. . . . In fact, one
> purpose of the independent audit is to protect a company and its investors from
> fraud.

139 F. Supp. 2d at 607. Actions against negligent auditors are not limited only to the client who

"obligingly documents his mis- or malfeasance for the convenient review of this auditor."

*Comeau v. Rupp*, 810 F. Supp. 1172, 1184 (D. Kan. 1992) ("*Comeau II*"). Audit interference is

not established merely because the client's failure to confess made the auditor's job "more

difficult." *Id.*

 PwC cites *Jewelcor* and *Board of Trustees of Community College District No. 508 v.

Coopers & Lybrand, L.L.P.,* 803 N.E.2d 460 (Ill. 2003), for the propositions that clients who are

guilty of "not telling the auditor of known deficiencies" or of "false representations" have

committed audit interference, barring their recovery, even if their auditors knew of or could have

detected the accounting problems at issue. PwC Br. at 17, 28. Neither case so holds.

 In *Jewelcor,* the appellate court held that the trial court did not err in giving an audit-

interference instruction to the jury setting forth the "substantial factor" standard where there was

evidence that management indeed provided the auditors with an inventory miscalculation. *See Jewelcor*, 569 A.2d at 552-53. The auditors did not prevail on summary judgment. Rather, it was the jury's job to decide whether management's inventory miscalculation rose to the level of a "substantial factor" or whether the auditor should have detected the miscalculation on its own.

In *Community College,* the court only observed, based on the evidence adduced at trial, that the client's misrepresentations "could have been" so misleading as to "interfere with the audit." 803 N.E.2d at 470. It, therefore, affirmed a jury verdict which found comparative negligence on the part of the company. The court emphasized that the "question of whether the false representations contributed to Coopers' failure to identify and disclose violations of the Board's investment policies is a factual question for the jury to decide." *Id.* at 469.

## A.    Reasonable Jurors Could Easily Conclude That The Actions Of AHERF Management Were Not A "Substantial Factor" In Coopers' Audit Failures.

Like its imputation argument, PwC's audit interference argument is premised upon management conduct in limited audit areas. For audit interference, those areas are only three: bad debt reserves, the Graduate reserve transfers, and the classification of the Lockhart Trusts. PwC Br. at 18. The remaining audit failures that are the subject of the Committee's claims are untouched by PwC's audit interference assertions. PwC's motion cannot affect the upcoming trial of the Committee's claims regarding those failures. And each of the three areas that PwC's audit interference charges do reach involve evidentiary conflicts that could never be resolved on summary judgment.

The summary judgment inquiry should end with this sentence: The Committee's accounting and auditing experts, after exhaustive review of the relevant accounting records, audit work papers, and testimony, have opined that nothing that AHERF management did or did not

- 23 -

do prevented Coopers from performing a GAAS audit and detecting the misstatements that PwC must now admit existed. SOF ¶¶ 256, 259.

While PwC's auditing expert disagrees, the fact issue is joined, and trial must follow. But the expert testimony proffered by each side is not the only evidence that conflicts.

**B.    The List Of Conflicting "Substantial Factor" Evidence Is Long.**

**1.    Adequacy Of Bad Debt Reserves.**

PwC argues that "[t]here is no evidence" that members of AHERF management "told C&L during the 1996 audit that they believed the DVOG bad debt reserves were understated" and that "AHERF's failure to provide C&L with its internal views on the collectibility of accounts receivable is undisputed." PwC Br. at 19. But Coopers' auditors were so informed, and no one needed to tell Coopers what it already knew.

AHERF accountants Stephen Spargo and Al Adamczak each independently recall a meeting at the end of Coopers' fiscal year 1996 audit work, attended by management and Coopers' auditors. At the meeting, all participants, including Coopers' auditors, acknowledged that the DVOG hospitals' bad debt reserves were understated in the range of $30 million. SOF ¶¶ 266-67. Messrs. Spargo and Adamczak each recall that Coopers agreed to allow AHERF to remedy the shortfall over a three-year period, rather than insisting upon the immediate correction or adjustment that GAAP required. *Id*. Mr. Adamczak recalled the three-year fix was to be discussed at a follow-up meeting and that Mr. Spargo later told him that the result of that meeting was "[t]hat no adjustment was to be made in '96." *Id*.

Mr. Adamczak reported these same facts to a PwC auditor dispatched to interview him in 1998 when the bankruptcy prompted PwC to debrief a number of AHERF accountants and Coopers' auditors about the audit conclusions rendered by Coopers in the previous two years. SOF ¶ 265. The PwC auditor recorded, in handwritten shorthand, that Mr. Adamczak

- 24 -

"[i]ndicated a decision was made at a closing meeting that 96 AR reserve was 30 million under reserved and to take it in over 3 years. Done at closing meeting, all hands including C&L." *Id.*

Multiple AHERF managers have testified about discussions with Coopers regarding inadequacies in how the DVOG hospitals reserved for bad debts, concerns over the collectibility of old accounts, and the need for extensive auditing in this area. SOF ¶¶ 269-71. Coopers knew about the 1996 bad debt reserve shortfall.

Coopers points out that Messrs. McConnell and Spargo signed a management representation letter in 1996 and Mr. Adamczak signed one in 1997 that indicated that "accounts receivable had been appropriately reduced to their collectible value." PwC Br. at 20, 26. This they did. But, as Messrs. Spargo and Adamczak have each testified, Coopers had been given access to all the material it required to make its own judgments in this regard and was itself acutely aware of the inadequacy of the reserve levels. SOF ¶¶ 33-34, 136, 271.

The signatures of these gentlemen on form representation letters, drafted in the first instance by Coopers, did not impede Coopers in performing its audit. In this case -- where the written evidence shows that the very misstatement at issue was the subject of discussion with and approval by Coopers -- reliance on the so-called "rep letter" is remarkable. If signatures on management representation letters barred audit failure claims, no claim could ever be brought. Auditors require the signatures as a part of their audit protocols. For this reason, too, "'representations from management are part of the evidential matter the independent auditor obtains,'" but "'they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for opinion on the financial statements under audit.'" *In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 481 (S.D.N.Y. 2005) (quoting AU § 333.02). Management representations are intended only to "complement other auditing procedures." AU

- 25 -

§ 332.03. SOF ¶ 299. The auditor must employ "professional skepticism" and "'should not be satisfied with less than persuasive evidence because of a belief that management is honest.'" *Worldcom*, 352 F. Supp. 2d at 480 (quoting AU § 230.09).

PwC nowhere explains how management actually interfered with its ability to assess the reasonableness of DVOG's bad debt reserves. Coopers' audit testing in this area was riddled with faulty and unperformed procedures and results that went unevaluated or unappreciated. SOF ¶¶ 261-64, 273-87. Indeed, some bad debt reserve testing results appear to have gone "undocumented" so that Coopers' audit file would look as rosy as its audit conclusions. SOF ¶¶ 280-83. No one at AHERF could be blamed for Coopers' audit conduct here.

But Coopers casts blame. AHERF's Greg Snow indeed testified that he feared being fired if he raised collectibility issues with Coopers' auditors. But it was not Mr. Snow's duty to raise those issues; it was Coopers' duty to inquire. And, as Mr. Snow confirmed, "they never asked." SOF ¶ 76.

### 2.    The Graduate Reserve Transfers.

PwC admits that "[t]here is . . . no dispute that AHERF informed C&L about [the] initial $50 million transfer" of reserves from the books of the former Graduate Health System hospitals to the books of the DVOG hospitals. PwC Br. at 20-21. PwC concedes, too, that the transfer was a "departure from GAAP," an auditor's (or lawyer's) euphemism for a violation of GAAP. *Id.* at 21. What PwC does not put in its brief but deserves mention is that William Buettner, Coopers' AHERF engagement partner, was aware of this "departure" and its magnitude, says he was concerned enough about the matter to instruct his subordinate Amy Frazier to tell management to reverse the entries, but passed on the financial statements anyway and never told anyone on AHERF's Audit Committee, even when he was asked. SOF ¶ 89.

- 26 -

PwC now argues that "no witness has stated that he or she expressly informed C&L" that $49 million worth of additional non-GAAP transfers of reserves from the former Graduate Health System hospitals to the DVOG hospitals occurred. PwC Br. at 22. This is just not accurate, and Coopers' own auditors' notes confirm it.

Dan Cancelmi, AHERF's Senior Director, Financial Reporting, testified that he "recall[ed] discussions with Coopers about the fact that the PFMA reserve," a reserve that made up $14 million of the second $49 million of transfers, "in fact, went to DVOG." SOF ¶ 94. Mr. Cancelmi's recall is supported by contemporaneous handwritten notes penned by both of Coopers' own managers on the 1997 audit, Mark Kirstein and Amy Frazier. SOF ¶ 95. Both auditors wrote essentially the same note on the same agenda for an update meeting between Coopers' auditors and AHERF accountants. Next to the item "PFMA reserve" on the agenda, Ms. Frazier wrote: "Reserves recorded in SDN legal documentation indicates that GHS is obligated. transferred reserves of the books to DV." *Id.* Mr. Kirstein wrote in all capital letters: "WHERE DID IT GO? NOT THRU INCOME/MOVED TO DV RESERVES FOR A/R." *Id.*

PwC tells the Court that "C&L witnesses have uniformly denied that they were told about, or had any knowledge of, the additional reserve transfers." PwC Br. at 22. But denials of the truth of Mr. Cancelmi's testimony and denials of the import of their own handwritten notes are, at least, the stuff of which factual disputes are made. Coopers knew about the second $49 million of Graduate reserve transfers. And even if PwC continues to deny it all the way through trial, the factual dispute could not be plainer.

Nor did AHERF do anything that could have prevented Coopers from detecting these transfers. Auditors conduct testing and analytical procedures to "identify such things as the existence of unusual transactions and events, and amounts, ratios and trends that might indicate

matters that have financial statement and audit planning ramifications." SOF ¶ 291. These

transfers were all recorded in AHERF's general ledger. SOF ¶ 296. The numbers were big.

They could not have been missed. Either Coopers didn't do the tests or didn't record the results.

But in neither case did AHERF management impede the process.

PwC lists in bullet points a series of charges to the effect that AHERF misled or withheld

information from Coopers concerning the second $49 million of transfers. PwC Br. at 22-23.

Each bullet point serves best as a place marker for a factual dispute that the jury will resolve.

- PwC says that AHERF provided it with DVOG revenue schedules that were "stripped" of "tell-tale" footnotes. PwC Br. at 22. Not true. The internal schedules to which PwC refers contained monthly revenue figures. The schedules Coopers got for its year-end audits did not contain monthly figures. They contained full-year revenue figures. These schedules were different documents; not two different versions of the same document. The footnotes contained in the monthly schedule did not apply to the full-year data. Nothing was "stripped." SOF ¶¶ 96-100.

- PwC says that AHERF "camouflaged" the reserve transfers in bad debt reserve roll forwards that it gave Coopers with references like "bad debt shortfall adjustment." PwC Br. at 22. But, to an auditor, notes like "bad debt reserve shortfall adjustment," with large dollar amounts like those attached to these notes, are red bullseyes, not camouflage. And the phrase "bad debt reserve shortfall adjustment" was used instead of ''transfers from Graduate'' because some of the sums referenced with the former phrase, indeed, were not transferred from Graduate but were re-classified within the books of the DVOG hospitals. SOF ¶¶ 103-04.

- PwC says that AHERF concealed the additional reserve transfers by treating them differently on cash flow statements than it treated the first $50 million of transfers. PwC Br. at 23. But AHERF's accountants have testified that they never thought about the issue, and if Coopers failed (or refused) to see the red-flagged "bad debt reserve shortfall adjustments," does PwC really expect a jury to believe that cash flow statement entries, without the attention-grabbing references, would have been even more revealing? SOF ¶ 111.

- PwC says that other internal schedules and "sets of financial results" that contain words like "cushions," "X Files," and "reserves adjustments" were in AHERF's files and not given to its auditors. PwC Br. at 23. This is no surprise. Clients do not give all of their files to their auditors. Nor did these unseen documents impede Coopers' audits. Documents that Coopers' auditors never saw could not have misled or misinformed them. While it may be argued that some of these documents indicate underlying financial statement errors, they are not evidence of audit obstruction. SOF ¶¶ 106-08.

- 28 -

Putting the lie to charges of concealment, Coopers' own work papers contain schedules that expressly label the additional reserve transfers to the DVOG hospitals from the former Graduate hospitals, which were renamed the "Centennial" hospitals upon joining AHERF. These schedules, prepared by AHERF's Robin Schaffer, are replete with references to "Transfer from Centennial," "Transfer Resv. from Centennial," and "Transfer reserve from Centennial." SOF ¶ 297. If Ms. Schaffer was out to hide from Coopers the second $49 million of reserve transfers to DVOG from Graduate/Centennial, she blew it.

### 3.    Classification Of The Lockhart Trusts.

PwC argues here that AHERF's failure timely to provide it with an October 30, 1996, letter from Mellon Bank's trust department constitutes audit interference. PwC Br. at 24-26. But the letter is dated more than a month after Coopers' audit report on AHERF's 1996 financial statements. The letter could not have affected Coopers' 1996 audit work.

The text of the letter merely recites short quotes from the language of the underlying trust documents, which documents were provided to Coopers in large black binders. SOF ¶¶ 118, 133. Only one Coopers auditor, Marc Panucci, reviewed the Lockhart Trust documents, and he did not recall "any discussion of a lack of documentation that was needed from the company on the adoption of the new [classification] standards." SOF ¶ 118. Coopers' working papers indicate that, for trusts held at the AHERF parent level, "copies of *full agreements* were maintained by Al Zwirn, AGH accounting." *Id.* (emphasis added). Mr. Panucci received trust documents for the Lockhart Trusts from Mr. Zwirn. *Id.* Coopers had the Lockhart Trust documents. The letter from the Mellon Trust Department adds nothing.

Any failure to read the trust documents is Coopers' failure. So, too, is the failure to simply call the Mellon Bank trust department with any questions that might have arisen from a

- 29 -

read-through. Barbara Robinson, the author of the letter from the Mellon Bank trust department,
fielded a number of calls and questions in 1996 from other auditors at other auditing firms, who
were doing their jobs reading trust documents on which their clients were named as
beneficiaries. Coopers never called. SOF ¶ 124.

PwC is not entitled to summary judgment on its audit interference defense.

## III.    THE RECORD IS REPLETE WITH COMPETENT EVIDENCE THAT COOPERS CAUSED AHERF'S INJURIES.

PwC argues that the Committee can come forward with "no competent evidence that it is
more likely than not that at least one of . . . two hypothetical sequences of events would have
happened if AHERF had issued less favorable financial statements in 1996." PwC Br. at 32.
PwC spends the better part of three pages detailing these "hypothetical sequences" and then
labels them "Rube Goldberg-like chains of events." *Id.* at 29-32. Having created its straw man
and troubling itself to name him, PwC then exhausts ten more pages trying to knock him down.
The straw man is PwC's, and the tilting is wasted effort.

The Committee need only present evidence from which reasonable jurors could conclude
that AHERF's Board or its creditors, if accurately informed, would have intervened to staunch
AHERF's losses and that the intervention would not have been entirely in vain. The record is
filled with that evidence, and PwC's causation argument must fail.

### A.    The Proof Burden Appropriately Stated.

The Committee is not required to establish causation to a certainty. *See Bogacki v. Am.
Machine & Foundry Co.*, 417 F.2d 400, 404 (3d Cir. 1969); *Lewis v. U.S. Rubber Co.*, 202 A.2d
20, 23 (Pa. 1964). Proof by a preponderance of the evidence is sufficient. *See Hamil v.
Bashline*, 392 A.2d 1280, 1285 (Pa. 1978); *Smith v. Bell Tel. Co. of Pa.*, 153 A.2d 477, 480 (Pa.
1959). The Committee does not need to prove that Coopers' conduct was the sole cause of

- 30 -

AHERF's harm.  It is enough to show that it was "a substantial factor in bringing about the harm." *Hamil*, 392 A.2d at 1285*; Walsh v. Snyder*, 441 A.2d 365, 366 (Pa. 1981) (citing *Hamil*); *Robert Wooter Co. v. Fidelity Bank*, 479 A.2d 1027, 1033 (Pa. Super. 1984).

The Committee may prove causation through circumstantial evidence.  *See Lewis*, 202 A.2d at 23; *Hamil*, 392 A.2d at 1285; *Hayes Creek Country Club, Inc. v. Central Penn Quarry Stripping & Constr. Co.*, 181 A.2d 301, 305 (Pa. 1962).  And it is entitled to the benefit of all reasonable inferences from that circumstantial evidence.  *See Hamil*, 392 A.2d at 1285; *Lewis*, 202 A.2d at 23; *Hayes Creek*, 181 A.2d at 305; *Smith*, 153 A.2d at 480.  The Committee does not need to show that the only reasonable inference from the facts is that Coopers caused the losses at issue.  *Hayes Creek*, 181 A.2d at 305.  If the Committee produces enough evidence to support a reasonable inference of causation, the question of causation is for the jury to decide.  *Lear v. Shirk's Motor Express Corp.*, 152 A.2d 883, 887 (Pa. 1959).  *See also Lewis*, 202 A.2d at 23 (quoting *Lear*); *Hayes Creek*, 181 A.2d at 305.

"Pennsylvania courts have generally held that the question of negligence and causation is a jury question." *Clack v. Commonwealth*, 710 A.2d 148, 158 (Pa. Commw. Ct. 1998); *see also Whitehill v. Gilbert Carriers*, 149 F. Supp. 843, 847 (W.D. Pa. 1957), *aff'd*, 251 F.2d 226 (3d Cir. 1958) ("Ordinarily, the question of proximate cause is for the fact finding tribunal").  The question of causation "should only be removed from the jury's consideration where it is clear, as a matter of law, that reasonable minds could not differ on the issue." *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1371 (3d Cir. 1993).

Reasonable jurors could conclude that Coopers' negligence was a substantial factor in causing AHERF's loss.

- 31 -

**B.    The Committee Can Meet Its Burden Of Showing Causation Through The Testimony Of Trustees, Creditors, And Experts.**

**1.    The Committee's Evidence Is Typical Of Causation Evidence In Audit Failure Cases.**

PwC's no-causation argument boils down to the claim that proof of causation cannot be based on evidence of the options that would have been available to and steps that would have been taken by trustees or creditors if they had been properly informed about financial problems.

This argument was specifically rejected in *Community College,* 775 N.E.2d at 55. There, City Colleges sued Coopers for professional negligence and breach of contract in connection with an audit. City Colleges claimed that the audit should have disclosed that its funds were being invested in a manner that violated City Colleges' investment policy and that the improper investments resulted in financial loss.

City Colleges' causation evidence included testimony by one board member that if he had been informed of the investment policy violation "he would have made whatever changes Coopers recommended." *Id.* Another board member testified that if it had been made aware of the violations, "the Board would not have tolerated it and that it would have 'cleared up' the situation." A third member of the Board testified that "he would have pursued any information that indicated improper investment" practices. *Id.* at 62. Two former board members testified "to the action they would have taken if Coopers had indicated any deviation from the investment policy." *Id.*

On appeal from a jury verdict in favor of City Colleges, Coopers argued that "the limited testimony regarding causation was far too speculative to prove proximate causation." *Id.* The appellate court disagreed:

> City Colleges put forth the testimony of the three [current] board members in addition to [the testimony of the former board members]. The Board produced circumstantial evidence that it had previously taken action based upon suggestions

- 32 -

> given to City Colleges by Coopers in the course of its audit. City Colleges also
> offered testimony and evidence that as soon as the investment policy violation
> was discovered, immediate action was taken.

*Id.* at 63. The appellate court then affirmed the verdict. PwC's no-causation argument is no

different here. It should meet with the same fate.

In *Comeau I*, the FDIC, as receiver for a failed savings and loan association, sued the

association's accountants claiming that they failed to recognize the high risk nature of certain

loans, and that if the board had been made aware of the nature of the loans, the losses resulting

from them would have been avoided. The accountants moved for summary judgment, alleging

that the FDIC could not show causation.

Denying the accountants' motion, the district court relied on three types of evidence:

testimony of two of the board's outside directors that "they would have taken corrective action if

they had been informed of the serious problems with [the association's] lending practices," 810

F. Supp. at 1143-44; the opinion of plaintiff's expert that "in his experience, an audit that advises

an association of the need for a $500,000 loan loss reserve -- which was not done in this case --

can reasonably be expected to get management's attention very quickly"; and the corrective

measures actually taken by the board when it learned (too late) of the problems with the loans.

810 F. Supp. at 1144. This evidentiary submission led the court to conclude that there were

"genuine issues of fact as to whether the [board] as a whole relied upon the audits, thus causing

loan losses that would not otherwise have been sustained." 810 F. Supp. at 1144.

The *Comeau I* court took dead aim at the accountants' efforts to bar consideration of the

kind of causation evidence relied upon by the FDIC in that case and by the Committee here:

> [T]he Accountants fail to recognize that plaintiff's proof of causation in this case
> is rendered more difficult by the very nature of the claims: negligent omissions on
> the part of defendants that in turn caused inaction on the part of the RCSA Board.
> Because this necessarily poses the causation question of what "would have"
> happened if the Accountants had adequately fulfilled their duties, it is difficult to

- 33 -

> understand how the FDIC could prove its case without at least some of the
> testimony that the Accountants deride as "self-serving" and "speculative." To
> accept the Accountants' argument would allow them to profit from an uncertainty
> of their own creation, notwithstanding that "[t]he most elementary conceptions of
> justice and public policy require that the wrongdoer shall bear the risk of the
> uncertainty which his own wrong has created."

810 F. Supp. at 1143-44 n.8 (quoting *Furr v. AT&T Technologies, Inc.,* 824 F.2d 1537, 1548

(10th Cir. 1987) (internal quotations omitted)).  PwC cannot now "profit from an uncertainty"

that its "own wrong" has wrought.  Its attack on the Committee's causation evidence should fail.

    *Community College*, and *Comeau I*, do not stand alone.  Audit failure cases from around

the country stand for the proposition that the Committee's causation evidence is both admissible

and sufficient.  *See, e.g., Seafirst Corp. v. Jenkins*, 644 F. Supp. 1152, 1156 (W. D. Wash. 1986)

(denying auditor's motion for summary judgment for lack of proof of causation on the basis of

declarations by two board members about what they would have done); *Salisbury v. Arthur

Andersen & Co.*, 956 S.W.2d 601, 602-603 (Tex. Ct. App. 1997) (reversing directed verdict for

accounting firm and holding that question of proximate cause should have been submitted to

jury); *Greenstein, Logan & Co. v. Burgess Marketing, Inc.*, 744 S.W.2d 170, 186-188 (Tex. Ct.

App. 1987) (causation evidence "legally and factually sufficient" to support jury verdict); *Phar-

Mor*, 900 F. Supp. at 787 (denying Coopers' summary judgment motion, in part, on the strength

of CFO's testimony that "had the Board of Directors known of the condition of Phar-Mor, it

would not have authorized the ill-fated expansion program"); *Crowley v. Chait*, Civ. No. 85-

2441 (HAA), 2004 U.S. Dist. Lexis 27238, at *25 (D.N.J. Aug. 25, 2004) (denying summary

judgment and rejecting PwC's challenge to causation evidence).

    The Committee's causation evidence is similar and superior to that catalogued in these

cases.

- 34 -

### 2.    AHERF's Board And Its Creditors Had Intervention Options.

AHERF's Board and its creditors had a variety of options that they could have exercised if Coopers had warned them in time of AHERF's precarious financial condition. The Board could have fired management, called in a hospital consultant, replaced Coopers, stopped the disastrous program of acquiring hospitals and physician practices -- all of which it ultimately did. SOF ¶¶ 147, 152, 335-36, 338, 340, 342. But, Coopers' silence kept the Board from availing itself of any of its options in time to do any good.

AHERF's creditors had options, too. They arose from their significant credit relationships with AHERF and the covenants in their AHERF financing agreements. As the Committee's bond finance expert, Steven Kite, explains, breaches of covenants, early warning devices, trigger a range of remedies that the creditors can employ to stabilize the debtor and protect their own investments: "A covenant breach provides creditors remedies which they can use or threaten to use and thereby influence the course of the debtor's operations. Consultants can be hired and new actions can be implemented to improve operations." SOF ¶ 157. In addition to the consultant-call-in option in the DVOG Master Indenture, Mr. Kite identifies the range of remedies that would have been available to AHERF's creditors in the event of a debt covenant default. SOF ¶¶ 157, 183, 348-50. The omnipresent remedy is the right to accelerate the outstanding balance of the loans. The creditors themselves have corroborated the range of available options. SOF ¶¶ 161, 175, 356-71, 374-84.

### 3.    The Trustees And Creditors Would Have Intervened.

Transcripts are filled with testimony from AHERF's trustees and creditors to the effect that they could and would have exercised the options available to them if Coopers had promptly and properly disclosed the financial problems of which it became aware in the course of its audit work. SOF ¶¶ 147, 152. Board and Audit Committee leaders uniformly detailed the remedial

- 35 -

steps they would have taken, and fellow Board members have confirmed they would have followed their lead. SOF ¶¶ 152, 323, 326-330. AHERF's largest creditors testified to the steps that they would have taken in response to timely notice of AHERF's true financial performance and condition and the associated violation of debt covenants. SOF ¶¶ 175, 360-65, 368, 375-76, 378-79, 381-82, 384.

PwC contends that the Committee's causation theory, to the extent it is based on the likelihood of creditor intervention, fails as a matter of law because the debt agreements between AHERF and its creditors provided that AHERF, not the creditors, had the right to choose who would be called in as a consultant in the event AHERF violated debt covenants. PwC says "[t]here is no reason to believe that Mr. Abdelhak could have retained a consultant who . . . would have contradicted everything management had done for years." PwC Br. at 42.

But, this assumption ignores three things. First, with accurate audit disclosures, Abdelhak may have been looking for a job instead of a consultant. Second, the creditors had leverage to influence the choice of a consultant. MBIA's Richard Weill, addressed this well: "If we had known of the [debt covenant] violation we could have used other means available to us to persuade AHERF, trustees or management to choose a consultant that we thought was appropriate." SOF ¶ 161; *see also* SOF ¶¶ 368-69. Third, the purpose of the provision was to remedy events that were causing AHERF to be in violation of its debt covenants. Any competent consultant acting in good faith and faced with accurate information about AHERF's precarious financial condition would have had to recommend changes in AHERF's operations. The jury may surely so infer.

4.    **Action By AHERF's Trustees And Creditors Would Have Prevented Or Reduced The Losses At Issue.**

The Committee's expert Thomas Singleton looked closely at whether timely disclosure of AHERF's true financial condition and prompt intervention would have been effective in preventing AHERF's ultimate losses and eventual demise. In 35 pages of detailed and documented analysis, Mr. Singleton concluded that the answer is yes. Mr. Singleton concluded that "AHERF, in fact, had sufficient working capital to undertake a feasible DVOG turnaround" and that it "could have been restored to a position of financial viability upon a timely intervention by AHERF's Board or others around the end of September, 1996." SOF ¶ 153. To be sure, PwC has retained an expert witness who disagrees with Mr. Singleton's turnaround opinion. But factual disagreements are resolved by juries.

The only audit failure case that PwC can muster to support its "incompetent evidence of causation" claim is the D.C. Circuit's decision in *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453 (D.C. Cir. 1990). *Drabkin*, however, did not hold that testimony by trustees or board members about what they would have done is incompetent. To the contrary, the court assumed that the jury reasonably could have "credited" such testimony. 905 F.2d at 456. The problem in the court's view was that the board had not responded when the auditors raised red flags by issuing "going concern" opinions for two of the audit years. 905 F.2d at 455-56. The board also "stood by silently and passively," 905 F.2d at 456, and did nothing when the unpaid tax liabilities at issue in that case were made known. 905 F.2d at 457, and even renewed the auditors' contract after the audit failures were disclosed. *Id.* None of these facts are a part of this record.

*Drabkin* did not, as PwC suggests, establish some mathematical rule that testimony by some, but not all, board members is inadequate proof of causation. PwC Br. at 40. *Drabkin* held

- 37 -

only that an evidentiary record that included the testimony of a single director regarding actions he would have taken, in light of the other record facts noted above, was not sufficient to support the verdict. 905 F.2d at 457-58.

## IV.    PwC IS LIABLE FOR THE "CENTENNIAL LOSSES."

PwC seeks to absolve itself of responsibility for the losses its failed audits caused to the AH-Centennial and the other AHERF estates. PwC Br. at 45-55. Absolution should be denied.

As a result of Coopers' 1996 failed audit, AH-Centennial's predecessor, SDN, Inc., assumed massive liabilities of three subsidiaries of Graduate Health System, Inc. AH-Centennial would have avoided these liabilities, which would have remained Graduate's problem, had Coopers properly performed its 1996 audit. PwC is liable to AH-Centennial directly. PwC is also liable to each of the other AHERF estates for the AH-Centennial losses because Coopers' audit failures caused AHERF to become AH-Centennial's sole member and all of these estates to become jointly liable in bankruptcy for the debts of AH-Centennial. The Committee may recover for AH-Centennial losses under either theory.

### A.    Coopers' Failed Audits Injured SDN, The Predecessor Of AH-Centennial.

Coopers is liable to the AH-Centennial estate because its audit failures in 1996 proximately caused SDN to merge with three Graduate Health System subsidiaries and take on their liabilities. PwC argues that Coopers "did not audit the 1996 financial statements of Centennial's predecessors, the Graduate Hospitals . . . and since the Graduate Hospitals were not affiliated with AHERF in fiscal 1996, they were not parties to AHERF's contract with [Coopers] for audits of AHERF affiliates in 1996." PwC Br. at 49. This may be true. But SDN was AH-Centennial's predecessor. And Coopers had a written contract with SDN and owed professional duties to SDN.

- 38 -

On October 31, 1996, three subsidiaries of Graduate Health System, Inc. merged into SDN. SOF ¶¶ 194, 404. SDN was the sole surviving corporation. By operation of law, SDN became liable for the obligations of the merged, former Graduate corporations. SOF ¶¶ 194, 409-411; Pa. C.S.A. § 5929(b). On May 1, 1997, SDN changed its name to AH-Centennial. SOF ¶ 407.

PwC asserts that duty arises only where the plaintiff and the professional were in "contractual or professional privity." PwC Br. at 48. While this may be the case, Coopers was in "contractual or professional privity" with SDN in 1996.

A formal accountant-client relationship is not required to create privity. Rather, privity arises when there is either "an attorney-client or analogous professional relationship or a specific undertaking" by the professional. *Guy v. Liederbach*, 459 A.2d 744, 746 (Pa. 1983); *Pittsburgh Coal & Coke, Inc. v. Cuteri*, 590 A.2d 790, 794 (Pa. Super. Ct. 1991), *rev'd on other grounds*, 622 A.2d 284 (Pa. 1993). Here, the SDN-AHERF relationship, coupled with Coopers' simultaneous and related engagements both for SDN and for AHERF, support a finding that SDN and Coopers were in privity.

Before the October 1996 mergers, SDN was a shell corporation. SOF ¶ 387. SDN's Articles of Incorporation required that it be organized and operated "exclusively to support, benefit, perform the functions of, or to carry out the purposes of" certain AHERF subsidiaries. SDN's Articles and bylaws required that all SDN profits be distributed to those AHERF subsidiaries, and that all SDN's assets be distributed to those AHERF subsidiaries if SDN dissolved. SOF ¶¶ 200, 388-390.

In their tax returns filed with the IRS, AHERF and SDN each described the other as an "organization related . . . through common membership, governing bodies, trustees, officers,

etc." SOF ¶ 392. SDN's tax return gave the AHERF tax department in Pittsburgh as its address and SDN informed the Pennsylvania Secretary of State that its registered office was an AHERF corporate office in Cheltenham. SOF ¶ 393.

SDN's four directors were AHERF officers: Abdelhak, McConnell, the General Counsel of AHERF, and the CEO of AUMP. SOF ¶ 391. SDN's directors owed fiduciary duties to AHERF, and were employed by AHERF at the pleasure of AHERF's trustees. SDN's directors waited until the AHERF Board Executive Committee gave them authority before they adopted a resolution allowing SDN to enter into a merger agreement with Graduate. SOF ¶ 394-95.

Coopers understood the AHERF-SDN relationship and that AHERF was using SDN as a vehicle to acquire the Graduate hospitals. In August 1996, after the AHERF Board Executive Committee authorized Abdelhak to look into a transaction with Graduate Health System, SDN itself retained Coopers to conduct due diligence for the transaction. SOF ¶¶ 394-400. The lead partner on the AHERF audit engagement, William Buettner, was the concurring partner on the SDN-Graduate due diligence engagement. SOF ¶ 400.

Finally, while Coopers was performing due diligence for SDN, it anticipated that SDN would become a formal audit client after the Graduate acquisition was fully consummated. In fact, Coopers subsequently used its SDN due diligence work product in its 1997 audit of AHERF. SOF ¶¶ 399-401.

Through the AHERF audit and the SDN due diligence engagement, Coopers undertook to provide to SDN's and AHERF's decision-makers information to help them decide whether SDN should merge with the three Graduate subsidiaries. This information consisted of information regarding AHERF's financial ability to acquire more hospitals (the AHERF audit engagement) and information concerning the assets and liabilities to be obtained (the SDN due diligence

engagement). Both pieces of information were provided, in whole or in part, to enable AHERF and SDN to decide whether to pursue a transaction with Graduate. Coopers and SDN were in "contractual and professional" privity.

In *Phar-Mor*, GE Delaware, a Phar-Mor investor, sued Coopers for negligently auditing Phar-Mor, not GE Delaware. *In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. at 676 (W.D. Pa. 1995). In addition to auditing Phar-Mor, Coopers also happened to be GE Delaware's auditor. But GE Delaware's claim was for the negligent Phar-Mor audit. Coopers moved for summary judgment, asserting a lack of privity. Judge Ziegler denied the motion and held that Coopers' separate relationship with GE Delaware raised issues of fact as to whether there was privity sufficient to allow GE Delaware to sue for negligent professional services rendered to Phar-Mor. *See* 892 F. Supp. at 694.

Other courts have likewise denied motions for summary judgment where there are facts indicating that a professional agreed to a specific undertaking for someone other than its formal client. *See, e.g., Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*, No. 99-0528, 2001 WL 10788, at \*4-5 (E.D. Pa. Dec. 27, 2000) (denying summary judgment due to issues of fact concerning whether auditors had specifically undertaken to provide services to non-clients); *In re Asousa Partnership*, No. 01-12295, 2005 WL 775429 (Bankr. E.D. Pa. Feb. 2, 2005) (denying summary judgment due to issues of fact concerning whether an insurance agent had specifically undertaken to provide services to a non-client); *I&S Associates Trust v. LaSalle National Bank*, No. 99-4956, 2001 U.S. Dist. LEXIS 15225, at \*14-16 (E.D. Pa. Sept. 27, 2001) (denying summary judgment due to issues of fact concerning whether attorneys had specifically undertaken to provide services to a non-client).

- 41 -

Coopers and SDN were in privity. PwC is not entitled to partial summary judgment on losses suffered by the AH-Centennial estate.

And losses indeed were suffered. SDN would not have been saddled with the liabilities of the three Graduate subsidiaries if Coopers had properly audited AHERF in 1996. The AHERF trustees would have reversed AHERF's expansion strategies had they known the truth about AHERF's financial condition and performance, and AHERF's creditors would have pressed the trustees for a such a change in strategy. SOF ¶¶ 147, 150-52, 302-384.

The Board had the opportunity to prevent the Graduate transaction had it been provided with properly audited financial statements. Coopers dated its flawed opinion on AHERF's fiscal year 1996 financial statements as of September 11, 1996. Coopers presented the (unreliable) results of its 1996 audit work to the Audit Committee of AHERF's Board of Directors on October 15, 1996. The SDN-Graduate mergers occurred October 31, 1996, and thus, could have been prevented. SOF ¶¶ 403-404. For quite awhile thereafter, the Board had the opportunity to prevent the second part of the Graduate transaction (AHERF becoming SDN's member on May 1, 1997). SOF ¶¶ 406-407. The Chairman of the Graduate Board himself understood that the SDN-Graduate transaction could be unwound and the hospitals returned to Graduate Heath System if AHERF ultimately decided not to proceed. SOF ¶ 408.

In addition, the Graduate Health System trustees relied on AHERF's financial strength in agreeing to convey those hospitals to AHERF. SOF ¶ 405. A jury could conclude that the Graduate Health System would not have agreed to the SDN-Graduate mergers if Coopers' audit had showed AHERF's true weaknesses.

Because Coopers' failed audit stopped the AHERF trustees or the Graduate trustees from acting, SDN, a previously empty shell corporation, was filled with the liabilities of the three

- 42 -

Graduate corporations that merged into it. PwC argues that the merger of the "Graduate Hospitals" into SDN "changed nothing about liability for the costs of those hospitals." PwC Br. at 51. PwC is wrong; the merger changed everything for SDN.

PwC also argues that the "Graduate Hospitals" would have gone bankrupt even if they had not merged into SDN. PwC Br. at 49-53. That is utterly beside the point. If the SDN-Graduate merger had not occurred, the Graduate hospitals would have failed, if they failed at all, as part of the Graduate Health System, not as part of SDN. And SDN, now the AH-Centennial estate, would have suffered no injury.

## B. PwC Is Liable To The AHERF Estate Because Its Audit Failures Foreseeably Caused AHERF To Become Liable For The AH-Centennial Losses.

PwC trumpets, "[n]either AHERF nor any of the other Debtors ever assumed liability for any of the obligations of SDN/Centennial." PwC Br. at 53. But the failure to expressly assume the AH-Centennial liabilities did not immunize AHERF from those liabilities.

Here, under substantive consolidation, Bankruptcy Judge McCullough concluded that AHERF was liable for the obligations of AH-Centennial and its other subsidiaries. SOF ¶¶ 409-411. Judge McCullough held that each bankrupt AHERF entity was liable for one another's obligations and confirmed a bankruptcy reorganization plan that included substantive consolidation of the assets and liabilities of the AHERF debtors. *Id.*

Substantive consolidation is a bankruptcy law analog to veil-piercing. *See White v. Creditors Service Corp.*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996). Substantive consolidation is triggered where, pre-bankruptcy, the bankrupt entities operated as a single economic unit such that it would be unduly expensive to unscramble the various entities' assets and liabilities. *See In re Cooper*, 147 B.R. 678, 683-684 (Bankr. D.N.J. 1992); *In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 412-16 (Bankr. E.D. Pa. 1991). Here, Judge McCullough found that the assets

- 43 -

and business functions of AHERF and its subsidiaries were so commingled, and inter-company

obligations so substantial and complicated, that it would be difficult and costly to segregate and

ascertain individual assets and liabilities of the five bankrupt AHERF corporations. SOF ¶ 409.

A jury could conclude that AHERF's liability for the obligations of AH-Centennial was

the foreseeable result of Coopers' audit failures. It was foreseeable that AHERF's trustees

would rely upon AHERF's audited financial statements and that reliance on inaccurate

information could lead to bad business decisions, like the acquisition of the Graduate hospitals.

Here, Coopers knew that AHERF was looking into acquiring the Graduate hospitals. Coopers

also knew of the conditions creating risk for substantive consolidation. From its audit work,

Coopers knew that AHERF's audited financial statements were prepared on a consolidated basis

and knew how AHERF internally transferred assets and liabilities.

PwC asserts that application of the substantive consolidation doctrine had no "alchemical

power to create claims against third parties that did not previously exist." PwC Br. at 54. But

Judge McCullough "created" no claims. AHERF has a claim against PwC because of Coopers'

conduct. That AHERF became responsible for the obligations of AH-Centennial, by operation

of bankruptcy law, alters only the damages suffered by certain AHERF estates as a result of

Coopers' conduct. Like veil-piercing, substantive consolidation does not "create" claims, but

provides that one corporation may be liable for the obligations of a its affiliate due to the manner

in which the corporate family operated. Judge McCullough is no alchemist.

Even if Judge McCullough could be considered an intervening actor, his order holding

AHERF liable for the obligations of AH-Centennial is no different from a personal injury

plaintiff having his maladies altered, indeed worsened, by a well-intentioned but negligent

physician. *See Shaffer v. Commonwealth*, 842 A.2d 989, 993-94 (Pa. Commw. Ct. 2004).

AHERF and the personal injury plaintiff have not developed new claims; but, the claims they already had now legally demand a potentially larger remedy.

Alternatively, Coopers' liability for the AH-Centennial debt is an application of the rule that a tortfeasor who injures a plaintiff with an eggshell skull is liable for all the injuries caused to that super-sensitive plaintiff. *See Geyer v. Steinbronn*, 506 A.2d 901, 912 (Pa. Super. Ct. 1986). Here, when Coopers' audit failures proximately caused AHERF's bankruptcy, Coopers became liable for the resultant injuries. The AHERF estates' vulnerability to substantive consolidation is similar to the vulnerability to injury of a person with a thin skull.

Finally, PwC lifts a sentence from *Lafferty* out of context to argue that the substantive consolidation is not relevant to determining AHERF's damages. PwC Br. at 54-55. *Lafferty*, however, did not hold that post-bankruptcy events have no relevance and cannot be considered. Rather, in *Lafferty*, the court held that an auditing firm could assert an *in pari delicto* defense even though the corporation's bad actors had been replaced by a trustee and would not receive any recovery from the litigation.

PwC is not entitled to partial summary judgment on the AH-Centennial losses.

## V.    THE COMMITTEE HAS ASSERTED A VALID CLAIM FOR BREACH OF CONTRACT.

PwC argues that the Committee cannot assert a breach of contract claim against an auditor based on a breach of the professional standard of care. PwC is wrong.

The Pennsylvania Supreme Court has not considered whether a breach of contract claim may be brought against an accountant for failure to comply with the professional standard of care. The court has, however, held that a breach of contract action may be maintained against an attorney for failure to comply with an attorney's professional standards. *See Bailey v. Tucker*, 621 A.2d 108 (Pa. 1993). *Bailey* involved claims against an attorney for negligence and breach

of contract. The supreme court, addressing the breach of contract claim, stated "[o]f course an attorney who agrees for a fee to represent a client is by implication agreeing to provide that client with professional services consistent with those expected of the profession at large." *Id*. at 115. The court then held, "if an attorney agrees to provide his or her best efforts and fails to do so, an action [for breach of contract] will accrue." *Id*.

In *Gorski v. Smith*, 812 A.2d 683 (Pa. Super. Ct. 2002), *appeal denied*, 856 A.2d 834 (Pa. 2004), the defendant attorney argued, as PwC does here, that a malpractice claim for breach of contract is "limited solely to those instances in which the plaintiff can show that the attorney failed to follow a specific instruction of the client." *Id*. at 693. The Superior Court rejected that defense. The defense "no longer has continuing vitality in light of the Supreme Court's more recent ruling in the case of *Bailey*." *Id*. at 694.

In *Koken v. Steinberg*, 825 A.2d 723 (Pa. Commw. Ct. 2003), the Commonwealth Court held that *Bailey,* applies in the accountant malpractice context as well as the legal malpractice context. The court rejected the argument that a breach of contract claim should be dismissed for failing to allege breach of a specific contract term and because it duplicated a negligence claim. 825 A.2d at 727-30. The court explained that "accountants are subject to the same standard that [the Pennsylvania] Supreme Court applied to attorneys in *Bailey*," stating "[n]othing in [Pennsylvania] law insulates accountants or other professionals from being sued in contract for a failure to properly perform professional services." 825 A.2d at 730.

Similarly, in *Heller v. Deutsche Bank AG*, No. 04-CV-3571, 2005 WL 525401 (E.D. Pa. March 3, 2005), the defendant accountants argued, "the breach of contract claim should be dismissed as a 'mislabeled negligence claim' because it is not based on a breach by movant of any specific provision of the contract." *Id*. at *8. The district court disagreed. Relying on

*Bailey*, *Gorski,* and *Koken*, the court found that contracts for professional, legal and accounting services contain an implied promise to render services in accordance with the profession at large. *Id.* The court denied the motion to dismiss.

When Judge Ziegler ruled on PwC's motion for partial summary judgment in January 2002, the Pennsylvania courts had not yet decided whether *Bailey* applies to accountants. They now have, and an audit client can bring a breach of contract action against an auditor for falling below professional standards of care.

The Committee has alleged a valid breach of contract claim.

## VI.   THE COMMITTEE HAS ASSERTED A VALID CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, AS WELL.

PwC argues that claims for aiding and abetting a breach of fiduciary duty arise under the Restatement (Second) of Torts § 876(b), and since subpart (b) of that section has not yet been expressly adopted by the Pennsylvania Supreme Court, the Committee's claim must be dismissed. PwC Br. at 58-60. PwC does not argue that the Committee has failed to advance facts sufficient to show that Coopers aided and abetted wrongful conduct on the part of AHERF management. SOF ¶¶ 33-34, 75, 89, 94-95, 136, 242-56, 265-67. The Committee's claim and Pennsylvania aiding and abetting law, however, are not as limited as PwC would like. The First Amended Complaint alleges facts sufficient to plead a claim for relief under all three subparts of § 876. The Pennsylvania Supreme Court has already adopted § 876(a) and, if presented with the opportunity, would most certainly adopt § 876 in its entirety. The Committee's aiding and abetting claim should proceed to trial.

In *Skipworth v. Lead Industries Ass'n*, 690 A.2d 169, 174-75 (Pa. 1997), not cited by PwC, the Pennsylvania Supreme Court adopted at least § 876(a). The conduct alleged by the Committee falls squarely within § 876(a) (as well as subparts (b) and (c)). The Committee

alleges, among other things: "Coopers not only acquiesced in, but in fact helped devise accounting manipulations in violation of generally accepted accounting principles (GAAP) which were done for the specific purpose of masking the over-recognition of income in various entities of the AHERF System." Complaint at ¶ 60(a); SOF ¶¶ 33-34, 75, 94-95, 136, 242-56, 265-67. This conduct falls squarely within § 876(a), which provides redress for "a tortious act in concert with the other or pursuant to a common design with him."

While the Supreme Court in *Skipworth* adopted § 876(a), the court also signaled that it would adopt all three subparts of § 876 when given the opportunity. The court cited, with approval, *Burnside v. Abbott Laboratories*, 505 A.2d 973 (Pa. Super. Ct. 1985), and *Kline v. Ball*, 452 A.2d 727 (Pa. Super. Ct. 1982). Both *Burnside* and *Kline* involved concert of action claims under § 876. Neither was limited to a § 876(a) claim.

In *Daniel Boone Area School District v. Kutak Rock*, No. 1999-4899, slip op. at 8-9 (Pa. Ct. Com. Pl., Blair County Aug. 16, 2000), upon which PwC relies, the Common Pleas Court drew a distinction between liability under § 876(a), which it found the Pennsylvania Supreme Court *did* endorse, and § 876(b), which it found had not yet been adopted by Pennsylvania courts. *Id*. at 8-9. Section 876(a), it reasoned, requires a finding of "*a duty* on the part of the defendant who is alleged to have acted in concert against the victim of the tort," while "Section 876(b) only requires for the imposition of liability that a party assist or offer substantial assistance or encouragement to tortuous conduct of another directed at the victim. There is no requirement the party acting to assist or encourage have *a duty* to the victim whatsoever." *Id.* (emphasis added). In another case relied upon by PwC, *Clayton v. McCullough*, 670 A.2d 710, 713 (Pa. Super Ct. 1996), the court found that the defendant had "breached no duty or obligation recognized by the law in Pennsylvania."

- 48 -

In both these cases, the courts were reluctant to impose liability upon defendants who owed no pre-existing duty to the plaintiffs. Those considerations have no application here. There is no dispute that Coopers owed professional duties to AHERF, including the duty to report management malfeasance to the Board.

A number of Pennsylvania courts have recognized a cause of action for aiding and abetting breach of fiduciary duty under § 876(b). In *Infosage, Inc. v. Mellon Ventures LP, et al.*, No. GD01-16476 at 9-10 (Pa. Ct. Com. Pl., Allegheny County Nov. 18, 2002), Judge Wettick noted that "[m]ost other jurisdictions that have considered this issue have recognized the tort of aiding and abetting a breach of a fiduciary duty" and held that "Pennsylvania law recognizes a claim of aiding and abetting a breach of fiduciary duty . . . ." *Infosage* at 6, 9.

The Pennsylvania Commonwealth Court recognized the validity of an aiding an abetting claim in *Koken*, 825 A.2d at 731-32. There, the Pennsylvania Insurance Commissioner brought suit against Deloitte & Touche, the auditor of a failed insurance company asserting a cause of action for, among others, "aiding and abetting breach of fiduciary duty" by the insurance company's executives -- the same count brought by the Committee here. The court held "[o]ur Supreme Court addressed Section 876 in *Skipworth* . . . and this Court is convinced . . . that Section 876 is a viable cause of action in Pennsylvania." 825 A.2d at 731. The Court did not hold that an "aiding and abetting breach of fiduciary duty" claim against an auditor was limited to a claim under § 876(b).

The majority of federal district courts considering this issue have found that the Pennsylvania Supreme Court would recognize a cause of action for aiding and abetting a breach of fiduciary duty. *See Adena, Inc. v. Cohn*, 162 F. Supp. 2d 351, 357-58 (E.D. Pa. 2001); *Stone Street Servs., Inc. v. Daniels*, No. 00-1904, 2000 WL 1909373, at *3 (E.D. Pa. Dec. 29, 2000);

- 49 -

*Kaiser v. Stewart*, No. 96-6643, 1997 WL 476455 (E.D. Pa. Aug. 20, 1997); *Schuylkill Skyport*

*Inn, Inc. v. Rich*, No. 95-3128, 1996 WL 502280 (E.D. Pa. Aug. 21, 1996); *SDK Investments,*

*Inc. v. Ott*, No. 94-1111, 1996 WL 69402 (E.D. Pa. Feb. 15, 1996); *Pierce v. Rosetta Corp.*, No.

88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992).

The Committee's aiding and abetting breach of fiduciary duty claim states a claim for

relief under all three subparts of § 876. Pennsylvania law recognizes the claim, and PwC makes

no challenge to the evidence the Committee has assembled to prove it. Trial should go forward.

## CONCLUSION

For these reasons, PwC's motion for summary judgment should be denied.

Respectfully submitted,

/s/ James M. Jones
James M. Jones (PA # 81295)
Laura E. Ellsworth (PA # 39555)
Laura A. Meaden (PA # 52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

Dated: July 11, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2005, a true and correct copy of the

Committee's Brief in Opposition to PwC's Motion for Summary Judgment was served upon all

counsel registered with Electronic Case Filing to receive electronic service in this matter, as well

as by Federal Express upon Antony J. Ryan, Esq. Cravath, Swaine & Moore, Worldwide Plaza,

825 8th Avenue, New York, New York 10019-7475, and Joseph F. McDonough, Esq., Manion,

McDonough & Lucas, PC, 600 Grant Street, Suite 1414, Pittsburgh, Pennsylvania 15219,

counsel for defendant.

/s/John G. Unice
John G. Unice
One of the Attorneys for Plaintiff The Official
Committee of Unsecured Creditors of AHERF