Not Reported in F.Supp.2d  
(Cite as: 2004 WL 771230, *5 (S.D.Ind.))

Page 5

million. Also in 1996, prior to accepting the engagement with BOH and APAG, Ernst & Young conducted an internal review of BOH and APAG that revealed O'Neal's insolvency and checkered business history. Nevertheless, Roach recommended the engagement, personally vouching for O'Neal's integrity. Ernst & Young accepted the engagement.

O'Neal withdrew over $3.7 million from BOP and APAG through the officer loans. Ernst & Young was paid over $600,000 in fees by BOP and APAG. In 1995, Roach was appointed to the APAG board of directors. He was also expected to be the CFO and a director of the new entity to be created following the expected Massey acquisition. The Massey acquisition, however, never was consummated. When Baker discovered the loan transactions in 1988, he removed O'Neal from his positions with BOH and APAG. Additional allegations are noted below.

B. *Counts VI to XI and XVII--Common Law Claims*

1. *Imputation of O'Neal's Wrongdoing and Knowledge*

**\*6** Defendants argue that knowledge of the O'Neal loan transfers should be imputed to BOH and APAG. Since the transfers form the basis of plaintiffs' common law claims, defendants argue that the doctrine of *in pari delicto*-- literally, "of equal fault"--bars these claims since the corporate plaintiffs were complicit in O'Neal's wrongdoing. While the court agrees that knowledge of and responsibility for the O'Neal transfers must be imputed to BOH and APAG, the court is unable to say based solely on a review of the pleadings that the defense of *in pari delicto* applies to bar the claims asserted in Counts VI to XI and XVII.

O'Neal's conduct is imputable to BOH and APAG in several different ways. First, based on a bankruptcy court judgment, BOH and APAG are estopped from denying that they were complicit in O'Neal's wrongdoing. Federal law applies to collateral estoppel issues when, as here, the judgment to be given preclusive effect was a federal judgment. *Havoco of America, Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307 n. 7 (7th Cir.1995). For issue preclusion to apply: (1) the issue must be the same as the one involved in the prior action; (2) the issue must actually have been litigated in the prior action; (3) the determination of the issue must have been essential to the prior final judgment; and (4) the party against whom issue preclusion is asserted must have been fully represented in the prior action. *Id.* at 307.

In the proceeding brought by BOH and APAG against O'Neal and his family to void the loan transfers as fraudulent conveyances, the bankruptcy court adopted the argument urged by BOH and APAG, holding as a matter of law that "O'Neal's fraudulent intent may be imputed to the Debtors [BOH and APAG]." Def. Ex. 12, Bankruptcy Court Findings of Fact and Conclusions of Law and Final Judgment ¶¶ 30, 33. This finding was essential to the court's judgment that the O'Neal transfers amounted to a fraudulent conveyance. BOH and APAG were seeking relief under Section 14(1) of the IUFTA, Ind.Code § 32-18-2-14(1), which required a finding that the debtors, BOH and APAG, had "actual intent to hinder, delay or defraud" their creditors.

Plaintiffs contend that the issue decided by the bankruptcy court is different from the issue to be decided here. In the prior proceeding, they argue, the bankruptcy court considered whether O'Neal's conduct with respect to the fraudulent transfers could be imputed to BOH and APAG, while in this proceeding the issue is whether O'Neal's entire wrongdoing may be imputed to plaintiffs. The allegations of the complaint, however, contain no mention of any wrongdoing on the part of O'Neal that could be considered separate and apart from the fraudulent transfers. When pressed at this court's hearing to identify additional wrongful conduct by O'Neal outside of the fraudulent loans, plaintiffs' counsel was able to cite only the improper capitalization of certain "expenses" alleged in paragraph 53 of the Third Amended Complaint (paragraph 63 in the Fourth Amended Complaint). But as plaintiffs' counsel conceded, these "expenses" were in fact the fraudulent loans obtained by O'Neal. The bankruptcy court--at the request of BOH and APAG--imputed O'Neal's fraudulent conduct to BOH and APAG. As a result, BOH and APAG are estopped from denying the same imputation in this proceeding.

**\*7** BOH and APAG also had constructive knowledge of the O'Neal loans. Paul Mohabir, the internal accountant for BOH and APAG, was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 771230, *7 (S.D.Ind.))
Page 6

completely familiar with the loans and their dubious accounting treatment--so much so that Mohabir repeatedly expressed concern to Roach on the issue. Mohabir Aff. ¶ 6. Nor were the loans in any sense "hidden." The loans were recorded in the plaintiffs' key financial records--financial statements, promissory notes, and tax returns--of which Baker, as sole shareholder and Chairman of the Board of Directors, is deemed to have knowledge. See *FDIC v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir.1980) ("A corporate director may not claim total ignorance of the corporation's affairs, particularly those matters fairly disclosed by the directors' meetings and those corporate records to which directors had access."). [FN2]

> FN2. In arguing that O'Neal's conduct should be imputed to BOH and APAG, defendants also rely on the "sole actor" doctrine. That doctrine teaches that even where an agent has acted to defraud the principal, the principal may still be charged with the agent's fraud where that agent is "the sole representative of the principal in the transaction in question." *First Nat'l Bank of Cicero v. Lewco Secs. Corp.,* 860 F.2d 1407, 1417-18 (7th Cir.1988) ("This 'sole actor' exception is founded on the notion that, where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability."). The Seventh Circuit has held, however, that the "sole actor" exception may not apply where the adverse party was aware of the agent's fraud and even participated in it. *Ash v. Georgia-Pacific Corp.,* 957 F.2d 432, 436 (7th Cir.1992) (affirming verdict in favor of corporation's successor against party who persuaded corporation's chief operating officer to act to defraud the corporation). Accordingly, the court does not rely on the "sole actor" exception to impute O'Neal's alleged wrongdoing to BOH and APAG.

2. *The In Pari Delicto Defense*

Even given the imputation of O'Neal's wrongdoing to BOH and APAG, whether plaintiffs' claims are barred by the *in pari delicto* doctrine is a different question. "The doctrine known by the latin phrase *in pari delicto* literally means 'of equal fault." ' *Theye v. Bates,* 166 Ind.App. 652, 337 N.E.2d 837, 844 (Ind.App.1975), quoting *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 135, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). "The expression 'in pari delicto' is a portion of the longer Latin sentence, 'In pari delicto potior est conditio defendentis,' which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Theye,* 337 N.E.2d at 844, quoting W.M. Moldoff, Annotation, *Purchaser's Right To Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by Doctrines of Estoppel or Pari Delicto,* 84 A.L.R.2d 479, 491. As legal entities, corporations are subject to the *in pari delicto* defense, although to some extent the doctrine "loses its sting when the person who is *in pari delicto* is eliminated." *Scholes v. Lehmann,* 56 F.3d 750, 754-55 (7th Cir.1995), citing *McCandless v. Furlaud,* 296 U.S. 140, 160, 56 S.Ct. 41, 80 L.Ed. 121 (1935).

Two recent Seventh Circuit decisions have addressed in detail the scope of the *in pari delicto* defense. In *Scholes v. Lehmann,* the Seventh Circuit was faced with a Ponzi scheme in which the perpetrator of the fraud, a Michael Douglas, had carried out the scheme through the use of three wholly owned corporations that he had created specifically for that purpose. The corporations solicited funds from "investors." Those funds were used to pay dividends to previous investors and to maintain the Ponzi scheme. Douglas also caused the corporations to pay funds to himself, his ex-wife, and his favorite charities. Douglas's scheme was eventually exposed, and he pled guilty to federal fraud charges. In the wake of the criminal proceedings, the court appointed Scholes as a receiver for Douglas and the corporations.

Scholes filed a fraudulent conveyance action under Illinois law against the entities that had received pay-outs from the Ponzi corporations. The Seventh Circuit was asked to consider whether the *in pari delicto* defense barred Scholes from pursuing the Illinois fraudulent conveyance action. The court held that it did not. The court found that the rationale behind *in pari delicto*-- "that the wrongdoer must not be allowed to profit from his wrong"--did not apply to the receiver's action since "Douglas himself did not stand to benefit from the receiver's suit." *Scholes,* 56 F.3d at 754. The wrong invoked to support the defense of *in pari delicto* was chargeable to the Ponzi perpetrator. After the receivership entities were "freed from his spell[,] they became entitled to the return of the moneys ... that Douglas

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



had made the corporations divert to unauthorized purposes." *Id.*

**\*8** The Seventh Circuit revisited this issue in *Knauer v. Jonathon Roberts Financial Group, Inc.,* 348 F.3d 230, 234 (7th Cir.2003). Like *Scholes, Knauer* arose out of a classic Ponzi scheme. Kenneth Payne and several other individuals, operating under the auspices of Heartland Financial Services and JMS Investment Group, defrauded nearly a thousand investors of millions of dollars. *Knauer* differed from *Scholes,* however, in that the receiver in *Knauer* was not seeking to void a fraudulent conveyance but rather was pursuing tort damages against several securities broker-dealers for failing to adequately supervise Payne, who was a registered representative of the broker-dealers. *Id.* at 234. Judge Tinder had granted a motion to dismiss based on the *in pari delicto* defense, and the Seventh Circuit affirmed.

In *Knauer,* the Seventh Circuit held that *in pari delicto* barred the receiver's tort claims. However, as Judge Tinder expressed in his district court opinion, see 2002 WL 31431484, *10 (S.D.Ind.2002), and as the Seventh Circuit confirmed, the equitable context in which the *in pari delicto* defense is asserted is crucial. In the Seventh Circuit's view, the key distinction between *Scholes* and *Knauer* was that in *Scholes* the receiver had been seeking to recover "diverted funds from the beneficiaries of the diversions," while the broker-dealer defendants in *Knauer* "had derived no benefit from the embezzlements." *Knauer,* 348 F.3d at 236. *In pari delicto* was appropriate in *Knauer* because the equitable balancing favored the defendants. They had not seen a cent of the diverted funds, and their "involvement in the Ponzi scheme as a whole was quite minor." *Id.* at 237. On the other side of the equation, the Ponzi entities, as a result of the machinations of Payne, "were very much at the forefront of the Ponzi scheme." *Id* . It must also be noted that *Knauer* was decided on the pleadings.

For present purposes, however, the court must acknowledge the limits the Seventh Circuit placed on its reasoning. The Seventh Circuit emphasized that under the facts alleged in *Knauer* "there is no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them." *Id.* "Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case." *Id.* at 237 n. 6.

The case before the court is a different case from the one the Seventh Circuit decided in *Knauer* and, at least on the pleadings, could fit within the situation described in footnote 6. Here the plaintiffs have alleged that Roach (and thus Ernst & Young) were *directly* involved in O'Neal's wrongdoing. Applying the reasoning of *Scholes* and *Knauer,* the court cannot hold as a matter of law, based on the pleadings alone, that *in pari delicto* applies here. In weighing plaintiffs' culpability, O'Neal's misconduct is imputed to BOH and APAG. O'Neal's removal from BOH and APAG lessens the "sting" of *in pari delicto* to some degree, see *Scholes v. Lehmann,* 56 F.3d at 754, but does not totally exculpate the entity. See *Knauer,* 348 F.3d at 237 (applying *in pari delicto* even where the fraud perpetrator had been removed from the receivership entity).

**\*9** Accepting plaintiffs' allegations, as the court must at this point, defendants engaged in a course of conduct that went far beyond simply facilitating O'Neal's fraudulent loans. Plaintiffs allege that Roach and Ernst & Young committed several torts in the course of their relationship with BOH and APAG. Plaintiffs also allege that Roach and Ernst & Young acted negligently and fraudulently in not disclosing what they knew of O'Neal's financial and professional history and how these circumstances would affect the accounting treatment of the loans. [FN3] According to BOH and APAG, defendants also had a duty, as established by the Statement on Standards for Accounting and Review Services, to report the lack of "management integrity" within the company. Moreover, plaintiffs claim that Roach and Ernst & Young had a duty to blow the whistle on themselves. Plaintiffs' view is that defendants were so compromised by their prior dealings with O'Neal that they committed a tort just by agreeing to provide advisory services.

> FN3. While knowledge of the O'Neal loans is fairly imputed to BOH and APAG, the court cannot say on this record on a motion to dismiss that Baker himself should be charged with knowledge that the O'Neal loans would not be collectable.

Also, at least under the allegations of the complaint, Roach and Ernst & Young stood to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 771230, *9 (S.D.Ind.))

Page 8

benefit from their alleged wrongful conduct. Defendants disagree, citing *Knauer* for the proposition that the professional service fees an alleged tortfeasor receives during the course of his fraudulent conduct do not count as a "tangible benefit" for the purposes of the *in pari delicto* consideration. That is not a correct reading of *Knauer.* First, the broker-dealers in *Knauer* were alleged to have been the *employers* of Payne and the other Ponzi perpetrators. 348 F.3d at 232. The broker-dealers' alleged duty to supervise originated from their employment of the Ponzi perpetrators, not from any fees they received. Nowhere in the *Knauer* opinion are fees mentioned. Second, in this case the fees and benefits received by Roach and Ernst & Young are alleged to have been obtained directly *as a result* of fraudulent conduct. Ernst & Young secured its auditing engagement through O'Neal. Roach was appointed to the Board of Directors of APAG and was allegedly intended to serve on the Board of the new entity created to facilitate the Massey acquisition. Cplt. ¶¶ 29, 31. Plaintiffs have further alleged that O'Neal promised Roach future business opportunities with BOH and APAG. Cplt. ¶ 24. Plaintiffs are entitled to the inference that the benefits O'Neal distributed to Roach and Ernst & Young were the result of defendants' involvement in O'Neal's allegedly fraudulent scheme to enrich himself.

As the Seventh Circuit recognized in *Knauer,* "in pari delicto is an affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal." *Knauer,* 348 F.3d at 237 n. 6 (affirming dismissal, though, based on the facts "thoroughly alleged" in the complaint"). Within the confines of deciding the Rule 12(b)(6) motion, the court cannot find as a matter of law that BOH's and APAG's alleged fault in the O'Neal transactions exceeded that of defendants. Unlike the situation in *Knauer,* there are allegations in this case that defendants both were involved in the fraudulent conduct and benefitted from it.

*10 The risk of a liberal application of *in pari delicto* is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation. That seems to be improbable, as the Seventh Circuit has indicated in a similar situation. See *Ash v. Georgia-Pacific Corp.,* 957 F.2d 432, 436 (7th Cir.1992) ("Georgia-

Pacific's argument implies that anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim. We cannot believe that Illinois treats successful schemes as self-protecting."). Outside of a fraudulent conveyance scenario, the best case for *not* applying the *in pari delicto* defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators. That is a fair summary of plaintiffs' allegations here, though it remains to be seen whether they can be proved. The doctrine of *in pari delicto* does not require dismissal at this stage of the litigation.

3. *Accountancy Act Statute of Limitations*

The Indiana Accountancy Act, Ind.Code § 25-2.1-1-1, *et seq.,* imposes a one-year statute of limitations on all claims governed by the Act. The Accountancy Act applies to all actions
based on negligence or breach of contract brought against an accountant, a partnership of accountants, or an accounting corporation registered, licensed, or practicing in Indiana by an individual or a business entity claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting services.
Ind.Code § 25-2.1-15-1. By its terms, the Act does not apply to Counts VI to IX because these counts allege neither negligence nor breach of contract.

Defendants argue that *Crowe, Chizek, and Co. v. Oil Tech., Inc.,* 771 N.E.2d 1203, 1211 (Ind.App.2002), and *Shideler v. Dwyer,* 275 Ind. 270, 417 N.E.2d 281, 286 (Ind.1981), support a more expansive reading of the Accountancy Act's scope. In *Crowe, Chizek* the Indiana Court of Appeals applied the Accountancy Act's statute of limitations to a simple negligence action. In addressing the plaintiff's claim that constructive fraud operated to toll the statute of limitations, the court held that no evidence of constructive fraud had been presented. *Crowe, Chizek,* 771 N.E.2d at 1210. Contrary to defendants' argument, the bar to the constructive fraud claim in *Crowe, Chizek* was not the Accountancy Act but rather a lack of evidence.

In *Shideler,* the Indiana Supreme Court reaffirmed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the general rule that plaintiffs cannot avoid otherwise applicable statutes of limitations by artful pleading. The court held that despite the plaintiff's pleading of multiple counts, each asserting a different theory of recovery for the same injury, plaintiff's claim was essentially one of legal malpractice. As such, it was subject to the general two-year statute of limitations applicable to personal injuries and property damage. 417 N.E.2d at 286-87.

*11 The difference between *Shideler,* see Ind.Code § 34-1-2-2, and this case is that the Accountancy Act statute of limitations explicitly limits the causes of actions that it governs. The statute of limitations embedded in the Accountancy Act deliberately uses limited terms to give special treatment to certain types of claims that otherwise would have been governed by the general two-year limitations period or other more general statutes of limitation. Claims that are not specifically encompassed by the Act-- such as plaintiffs' claims of fraud, constructive fraud, breach of fiduciary duty and civil action by crime victim--are governed by the more general rule. They are not within the deliberately narrower scope of the Accountancy Act's statute of limitations. With the Accountancy Act, the Indiana legislature crafted a purposefully narrow statute of limitations. This court is obliged to respect the Act's limits. [FN4]

> FN4. The pending motion does not call on the court to decide which of the more general limitations periods should apply to these claims.

Additional analysis is necessary to decide whether the Accountancy Act applies to Counts X and XI, which allege negligence and breach of contract respectively. Defendants argue that the Act applies to these counts because Roach and Ernst & Young were engaged in the "practice of accountancy," as defined in the Act. See Ind.Code § 25-2.1-1-10. This phrase, however, is not employed in the one-year statute of limitations section of the Act. Under the statutory language, the relevant inquiry is significantly narrower: whether BOH and APAG are "claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting services." Ind.Code § 25-2.1-15-1. At least some of plaintiffs' allegations, such as defendants' alleged failure to disclose to Baker what they knew about O'Neal's background and his personal financial situation, do not, at least obviously, amount to claims of injury resulting from "financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting services."

The statute specifically distinguishes between activities within the "practice of accountancy" and the narrower range of activities that are covered under the section of the Act dealing with negligence and breach of contract actions. Drawing that line accurately presents a challenge, especially at the pleadings stage. At this point, plaintiffs are entitled to the benefit of a range of favorable inferences and hypotheses. It would not be prudent at this point to try to map the boundary between the broader "practice of accountancy" and the covered claims for negligence and breach of contract without significantly more factual development. At this stage in the litigation, the court does not hold as a matter of law that the Accountancy Act's statute of limitations applies to Counts X and XI.

4. *Objections to Individual Tort Counts*

*12 Count IX asserts that BOH and APAG are entitled to recover in tort for various crimes perpetrated upon them by Roach and Ernst & Young. While the court has its doubts about certain of the crimes that plaintiffs have alleged, the allegations of the complaint do present facts that generally conform to the elements of the crimes of fraud and conversion. Defendants' argument that there is no tort liability for aiding and abetting or conspiring to commit a crime is irrelevant because plaintiffs have also alleged that Roach and Ernst & Young actually committed the crimes as principals. Further, *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir.1982), does not stand for the proposition that there can be no aiding and abetting liability under tort law, only that no separate tort of "aiding and abetting" is required since an aider and abettor is necessarily liable as a participant in the criminal venture. See *Eastern Trading Co. v. Refco, Inc.* 229 F.3d 617, 623 (7th Cir.2000). Count IX asserts a viable theory of recovery.

Count XVII alleges that defendants aided and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d  
(Cite as: 2004 WL 771230, *12 (S.D.Ind.))

Page 10

abetted O'Neal and conspired with him to breach his fiduciary duties. Defendants are correct that no *separate* tort for aiding and abetting the breach of a fiduciary duty has been established by Indiana law, but again this is not determinative. There are very few cases on point in Indiana, but it appears from the cases that do exist that a non-fiduciary can be liable for aiding and abetting another party's breach of its fiduciary duty.

The law is well established that, when a trustee of an express trust has taken advantage of his fiduciary relationship to cheat and defraud the cestui que trust out of the property held by him in trust, the cestui que trust is not limited to an action for the breach of the trust agreement; he may elect to prosecute an action against the trustee in his individual capacity, in tort, for the damages sustained. *Holderman v. Hood* (1904) 70 Kan. 267, 78 P. 838; *Brys v. Pratt* (1909) 55 Wash. 122, 104 P. 169; *Sherwood v.. Saxton* (1876) 63 Mo. 78; *Lathrop v. Bampton* (1866) 31 Cal. 17, 89 Am. Dec. 141. It is also the law that a third party, who has aided and abetted the trustee in carrying out the fraudulent scheme, may be joined as defendant in the same action. *Holderman v. Hood, supra.*

*Sharts v. Douglas,* 94 Ind.App. 201, 163 N.E. 109, 111 (Ind.App.1928) (*en banc*) (affirming verdict against trustee and non-fiduciary who participated in fraudulent scheme). Though the law in other jurisdictions is not uniform, the majority view is that a third-party non-beneficiary can be liable for aiding and abetting the breach of a fiduciary duty, especially where the third party is in privity with the fiduciary or has benefitted from the breach in some way. See Restatement (Second) of Torts § 874 cmt. c (1979) ("A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused."); 3 Am.Jur.2d Torts § 299 (1986) ("A person who intentionally causes or assists an agent to violate a duty to the principal is subject to liability in tort for the harm he has caused to the principal ..."). Accordingly, dismissal of Count XVII is unwarranted.

*13 The court is not persuaded by defendants' other objections to the common law counts. BOH and APAG have sufficiently pled a breach of fiduciary duty claim. Plaintiffs' negligence and breach of contract claims do not assert claims for negligent misrepresentation, but rather for professional malpractice. Finally, it is unnecessary to decide whether Indiana assigns liability for aiding and abetting negligent acts since plaintiffs have alleged that Roach and Ernst & Young were themselves negligent. Defendants' motion to dismiss Counts VI to XI and XVII is denied.

C. *Counts XII to XVI--Accessory Liability for Fraudulent Transfers Under the Bankruptcy Code and IUFTA*

Counts XII and XIII assert fraudulent transfer claims under sections 548 and 550 of the federal Bankruptcy Code. 11 U.S.C. §§ 548(a), 550. BOH and APAG concede that Roach and Ernst & Young are not "transferees" within the meaning of the statute. See 11 U.S.C. § 550(a); *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 893 (7th Cir.1988) ("we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes."). BOH and APAG contend, however, that with respect to the O'Neal loans, defendants are "entit[ies] for whose benefit such transfer was made," and that they are therefore subject to liability under the Bankruptcy Code. Plaintiffs' view is that Roach and Ernst & Young were beneficiaries of the fraudulent loan transfers because they allegedly received fees and promises of future engagements in return for aiding O'Neal.

Plaintiffs' interpretation of who constitutes a beneficiary is too broad. The purpose of the fraudulent transfer provisions of the Bankruptcy Act "is clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets." *Mack v. Newton,* 737 F.2d 1343, 1358 (5th Cir.1984), quoting *Elliott v. Glushon,* 390 F.2d 514, 516 (9th Cir.1967). Because these provisions are designed to facilitate the recovery of all of the fraudulently transferred property, the contemplated "benefit" of the transfer should be proportionate to the transfer itself. For instance, the Seventh Circuit's "paradigm 'entity for whose benefit such transfer was made' " is the guarantor of a debt that the transfer extinguished: "someone who receives the benefit but not the money." *Bonded Financial Services,* 838 F.2d at 895.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d  
(Cite as: 2004 WL 771230, *13 (S.D.Ind.))

Page 11

The fact that Roach and Ernst & Young might have received a remote benefit as a result of the transfer does not mean that the transfer was made for their benefit. "Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Id.* at 896. All of the loan transfers at issue here were received by O'Neal and his family. Whatever benefits Roach and Ernst & Young might have obtained after the transfers would have been "incidental, unquantifiable, and remote ... bearing no necessary correspondence to the value of the property transferred or received." *Mack,* 737 F.2d at 1359-60. [FN5]

> FN5. In rejecting the characterization of Roach and Ernst & Young as "entit[ies] for whose benefit such transfer was made" the court does not mean to suggest that monies paid as compensation for facilitating a fraudulent transfer--even if that compensation is provided under the guise of fees for legitimate services--will never amount to a "benefit" under section 550 of the Bankruptcy Code. Nevertheless, in this case, to the extent that BOH and APAG seek to recover the fees paid to Ernst & Young as a "benefit" of the fraudulent conveyances, these claims would only duplicate Counts I through V, which seek to achieve the same result by characterizing the fees themselves as avoidable preferences and fraudulent conveyances.

**\*14** BOH and APAG argue that even if the Bankruptcy Code does not impose liability for the fraudulent transfers on Roach and Ernst & Young as accessories, they are still liable under the Indiana Uniform Fraudulent Transfer Act (IUFTA), Ind.Code § 32-18-2-17, which is more expansive than the Bankruptcy Code. Essentially adopting the argument of the plaintiffs in *Freeman v. First Union Nat'l,* 329 F.3d 1231, 1233-34 (11th Cir.2003), BOH and APAG contend that the "catch-all" provision in IUFTA grants the court broad equitable powers to provide for a right of recovery against an aider and abettor of a fraudulent transfer. [FN6] The Eleventh Circuit certified this question to the Florida Supreme Court, which recently joined the multitude of other courts in holding that there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act. [FN7] - So.2d -, 865 So.2d 1272, 2004 WL 178598 (Fla. Jan 29, 2004); accord, *Wortley v. Camplin,* 2001 WL 1568368, \*9 (D.Me.2001); *FDIC v. White,* 1998 WL 120298, \*2 (N.D.Tex. March 5, 1998); *Litchfield AssetMgmt. Corp. v. Howell,* 70 Conn.App. 133, 799 A.2d 298, 309 (Conn.App.2002).

> FN6. Section 17(a)(3)(C) provides that in an action for relief from a fraudulent transfer, a creditor may obtain, subject to applicable principles of equity and rules of civil procedure, "any other relief the circumstances require."

> FN7. Florida, like Indiana, has adopted the Uniform Fraudulent Transfer Act. The statute examined in *Freeman* is identical to the IUFTA in all relevant respects.

The court agrees with the results these other courts have reached. At most, IUFTA's "catch-all" provision gives a court flexibility to fashion remedies not explicitly provided for in the statute. The provision does not permit the court to assign liability where the Act did not, or to create out of whole cloth "substantive rights of action with accompanying damages which are not otherwise implied or stated in the statute." *FDIC v. White,* 1998 WL 120298 at \*2. Accessory liability for fraudulent transfers cannot be supported by either the Bankruptcy Code or the IUFTA. Accordingly, Counts XII through XVI are dismissed.

*Conclusion*

Plaintiffs' motion for leave to amend the complaint is granted and the tendered Fourth Amended Complaint shall be deemed filed today. Defendants' motion to dismiss, as applied to the Fourth Amended Complaint, is denied with respect to Counts VI to XI and XVII, and granted with respect to Counts XII through XVI. Defendants shall respond to the remaining counts of the Fourth Amended Complaint no later than April 30, 2004.

So ordered.

2004 WL 771230 (S.D.Ind.)

**Motions, Pleadings and Filings (Back to top)**

. **2004 WL 2772980** (Trial Pleading) Answer and Affirmative, Non-Party and Additional Defenses of Ernst & Young Llp (Apr. 30, 2004)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d   Page 12
(Cite as: 2004 WL 771230, *14 (S.D.Ind.))

. 2004 WL 2772970 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Motion for Reconsideration of Denial of Motion to Dismiss Counts VI - XI and XVII (Apr. 28, 2004)

. 2004 WL 2772972 (Trial Motion, Memorandum and Affidavit) Response of Defendants to Plaintiffs' First Motion to Extend Certain Deadlines in Case Management Plan (Apr. 28, 2004)

. 2004 WL 2772982 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Reconsideration of Denial of Motion to Dismiss Counts VI-XI and XVII (Apr. 28, 2004)

. 2004 WL 2772966 (Trial Pleading) Fourth Amended Complaint (Mar. 24, 2004)

. 2003 WL 23917636 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Amended Brief in Opposition to Defendants' Motion to Dismiss (Nov. 21, 2003)

. 2003 WL 23917635 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss (Sep. 17, 2003)

. 2003 WL 23917632 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Motion to Dismiss (Jul. 01, 2003)

. 2003 WL 23917630 (Trial Pleading) Third Amended Complaint (May. 29, 2003)

. 2003 WL 23917628 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion for Leave to File Third Amended Complaint (Apr. 30, 2003)

. 2003 WL 23917627 (Trial Motion, Memorandum and Affidavit) Defendants Ernst & Young LLP and Charles J. Roach's Memorandum in Opposition to Plaintiffs' Motion for Leave to File Third Amended Complaint (Apr. 18, 2003)

. 1:03cv00132 (Docket) (Jan. 29, 2003)

. 2003 WL 23917640 (Trial Pleading) Defendant Charles J. Roach's Answer to the Fourth Amended Complaint and Affirmative, Non-Party and Additional Defenses (2003)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  Page 1
2005 WL 525401 (E.D.Pa.), 95 A.F.T.R.2d 2005-1372, RICO Bus.Disp.Guide 10,838
(Cite as: 2005 WL 525401 (E.D.Pa.))
▷

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
Todd HELLER, Susan Heller, THI Smith Lane Investments, Inc. THI Partners, Todd Heller, Inc. Abraham Bernstein, Dianne G. Bernstein, AB Rittenhouse Investments LLC, Rittenhouse Square Partners, ABD Rittenhouse Investments, Inc., James F. Nasuti, Celeste Nasuti, JFN Williamson Investments LLC, Williamson Partners, and JFN Williamson Investors, Inc.
v.
DEUTSCHE BANK AG, Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities, Inc., David Parse, BDO Seidman, L.L.P. Robert Dudzinsky, Elliott P. Footer, Beard Miller Company, LLP Steven D. Orndorf, Wilkinson and Tandy LLC, Ralph E. Lovejoy and KPMG, LLP
No. Civ.A. 04-CV-3571.

March 3, 2005.
David Stewart Clancy, Jeven R. Sloan, W. Ralph Canada, Jr., Shore Deary LLP, David R. Deary, Deary, Montgomery, Defeo & Canada, LLP, Dallas, TX, Kenneth I. Trujillo, Kathryn C. Harr, Trujillo, Rodriquez & Richards, Philadelphia, PA, for Plaintiffs.

Aleksander Jerzy Goranin, Cheryl A. Krause, Hangley, Aronchick, Segal & Pudlin, Joseph Kernen, Daniel J. Layden, Piper Rudnick L.L.P., Jeffrey B. McCarron, Kathleen M. Carson, Swartz, Campbell & Detweiler, Patrick R. Kingsley, Stradley, Ronon, Stevens & Young LLP, Abraham C. Reich, Ronald J. Shaffer, Fox, Rothschild, O'Brien & Frankel LLP, John E. Caruso, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, Benjamin Sokoly, Christine Chi, Christine E. Harding, L. Judson Welle, Lawrence M. Hill, Richard A. Nessler, Seth C. Farber, Dewey Ballantine LLP, New York, NY, Michael S. Poulos, Ernst & Young, Cleveland, OH, Alec W. Farr, Bryan Cave, LLP, A. Benjamin Gordon, James T. Phalen, King & Spalding LLP, Washington, DC, for Defendants.

*MEMORANDUM AND ORDER*

JOYNER, J.

*1 This civil action has been brought before the Court again on motion of Defendants, Beard Miller Company, LLP and Steven D. Orndorf to dismiss Plaintiffs' Complaint. For the reasons set forth below, the motion shall be granted in part and denied in part.

*History of the Case*

This case has its origins in an income tax avoidance strategy which the defendants, allegedly acting in concert, marketed and sold to the plaintiffs. Despite having knowledge of two IRS notices in 1999 and 2000 which informed tax attorneys and accountants across the country of the illegality of strategies such as the one at issue here involving the purchase of digital options on foreign currency, Defendants allegedly nevertheless continued to aggressively market and sell the strategy as a legitimate tax shelter, charging Plaintiffs fees of between 5 1/2 % and 9 1/2 % of the client's desired tax savings. Unbeknownst to Plaintiffs, Defendants also failed to register the strategy as a tax shelter with the IRS and failed to inform them that the legal opinion letters upon which Plaintiffs were relying were not independent opinions but were instead drafted by the same law firm that helped develop the strategy in the first place. Defendants also did not advise Plaintiffs of the IRS Tax Amnesty Program under which taxpayers who voluntarily disclosed their participation in such an illegal strategy could avoid any penalties for underpayment of taxes.

As a result of their participation in the defendants' illegal tax strategy, Plaintiffs incurred significant penalties and interest to the IRS along with having to pay back taxes, and additional legal and accounting advisory fees. They commenced this suit on July 28, 2004 under the theories of Civil RICO, 18 U.S.C. §§ 1962(c) and (d), breach of contract, unjust enrichment, breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud, negligent misrepresentation, malpractice, civil conspiracy and for declaratory judgment. Defendants Beard Miller Company, LLP ("Beard Miller") and Steven Orndorf ("Orndorf"), now move to dismiss the complaint against them in its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                           Page 2
(Cite as: 2005 WL 525401, *1 (E.D.Pa.))

entirety pursuant to Fed.R.Civ.P. 12(b)(6).

*Standards Governing Motions to Dismiss*
In considering motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), district courts must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Allah v. Seiverling,* 229 F.3d 220, 223 (3d Cir.2000) (internal quotations omitted). *See Also: Ford v. Schering-Plough Corp.,* 145 F.3d 601, 604 (3d Cir.1998). A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. *See, Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997). The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims. *In re Rockefeller Center Properties, Inc.,* 311 F.3d 198, 215 (3d Cir.2002). Dismissal is warranted only "if it is certain that no relief can be granted under any set of facts which could be proved." *Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 342 (3d Cir.1999) (internal quotations omitted). It should be noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. *In re Rockefeller,* 311 F.3d at 216. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those documents. *GSC Partners, CDO Fund v. Washington,* 368 F.3d 228, 236 (3d Cir.2004); *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426. *See Also, Angstadt v. Midd-West School District,* 377 F.3d 338, 342 (3d Cir.2004).

*Discussion*
A. Plaintiffs' RICO Claims

*2 Defendants first move to dismiss the plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d) on the grounds that the complaint fails to sufficiently allege such claims and that the claims are barred by Section 107 of the Private Securities Litigation Reform Act, ("PSLRA"), which amended 18 U.S.C. § 1964(c). [FN1]

   FN1. Plaintiffs' have also endeavored to state a third RICO claim for "violations of 18 U.S.C. § 2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(c)." (Complaint, p. 67) However, as we noted in our Memorandum and Order in this case issued on February 3, 2005, the U.S. Court of Appeals for the Third Circuit has held that a private cause of action for aiding and abetting a RICO violation does not lie under 18 U.S.C. § 2 or § 1964. *See, Pennsylvania Association of Edwards Heirs v. Rightenour,* 235 F.3d 839, 843-844 (3d Cir.2000); *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 657 (3d Cir.1998). We therefore grant the moving defendants' motion to dismiss that claim at the outset.

Specifically, Section 1962(c) states:
It shall be unlawful for any person [FN2] employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

   FN2. Under the "Definitions" given in 18 U.S.C. § 1961,
   As used in this chapter-
   ...
   (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
   (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
   (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;
   ....

Section 1962(d) provides:
It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section.

Finally, under Section 1964(c), (as amended by Section 107 of the Private Securities Litigation Reform Act, Pub.L. No. 104-67, 109 Stat. 737 (1995)) which provides for civil remedies for RICO violations,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  Page 3
(Cite as: 2005 WL 525401, *2 (E.D.Pa.))

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.* (emphasis added).

Thus, § 107 operated to eliminate, as a predicate act for a private cause of action under RICO any conduct actionable as fraud in the purchase or sale of securities. *Mathews v. Kidder, Peabody & Co., Inc.,* 161 F.3d 156, 157 (3d Cir.1998). In determining whether the alleged predicate acts are barred by this section of the PSLRA, Courts should properly focus their analysis on whether the conduct pled as the predicate offenses is "actionable" as securities fraud--not on whether the conduct is "intrinsically connected to, and dependent upon" conduct actionable as securities fraud. *Bald Eagle Area School District v. Keystone Financial, Inc.,* 189 F.3d 321, 330 (3d Cir.1999). As noted by the Committee Conference Report accompanying § 107, the amendment was not intended merely "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "pleading other specified offenses, such as mail or wire fraud, as predicate acts under Civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Burton v. Ken-Crest Services, Inc.,* 127 F.Supp.2d 673, 676 (E.D.Pa.2001), quoting H.R. Conf. Rep. No. 104-369, at 47.

*3 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
....
(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange not so registered or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
....

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 similarly provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Thus, securities fraud is a scheme to defraud, a misleading statement, or an omission of a material fact in connection with the purchase or sale of securities. *Flood v. Makowski,* Civ. A. No. 3:CV:03-1803, 2004 U.S. Dist. LEXIS 16957 (M.D.Pa. Aug.24, 2004), citing 15 U.S.C. § 78j(b) and *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 173 (3d Cir.2001). To state a valid claim for a violation of securities fraud under § 10b and Rule 10b-5, [FN3] a plaintiff must show that the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury. *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002); *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.,* 315 F.Supp.2d 666, 673-674 (E.D.Pa.2004). It should be noted that the PSLRA's exclusion of securities fraud as a RICO predicate act applies regardless of whether a particular plaintiff has standing to bring a civil

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
(Cite as: 2005 WL 525401, *3 (E.D.Pa.))

Page 4

action under § 10b and Rule 10b-5. *Gatz v. Ponsoldt,* 297 F.Supp.2d 719, 731 (D.Del.2003); *In re Ikon Office Solutions, Inc. Securities Litigation,* 86 F.Supp.2d 481, 486 (E.D.Pa.2000).

> FN3. The scope of Rule 10b is coextensive with the coverage of § 10b. *Securities and Exchange Commission v. Zandford,* 535 U.S. 813, 816, 122 S.Ct. 1899, 1900, 153 L.Ed.2d 1 (2002), n. 1, citing *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) and *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

It is generally recognized that among Congress' objectives in passing the Securities and Exchange Act was "to insure honest securities markets and thereby promote investor confidence" after the stock market crash of 1929. *Zandford,* 535 U.S. at 819, 122 S.Ct. at 1903, quoting *U.S. v. O'Hagan,* 521 U.S. at 658. In so doing, Congress sought "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Id.,* quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). To that end, Congress enacted a broad definition of "security," sufficient "to encompass virtually any instrument that might be sold as an investment." *Securities and Exchange Commission v. Edwards,* 540 U.S. 389, 393, 124 S.Ct. 892, 896, 157 L.Ed.2d 813, 819 (2004), quoting *Reves v. Ernst & Young,* 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Consequently, the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes. *Zandford,* 535 U.S. at 819. It is enough that the scheme to defraud and the sale of securities [FN4] coincide. *Zandford,* 535 U.S. at 822, 122 S.Ct. 1904.

> FN4. Under the Securities and Exchange Act of 1933, 15 U.S.C. § 77b(a), the term "security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Similarly, under the Securities and Exchange Act of 1934, 15 U.S.C. § 78c(a)(10),

> The term "security" means any note, stock, treasury stock, security future, bond debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof) or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument, commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

**\*4** In this case, Moving Defendants do not assert that the Plaintiffs' foreign currency option trades constitute the purchase or sale of securities or that the COBRA transaction [FN5] constituted a securities transaction in and of itself. [FN6] Rather, they contend that it was the fact that plaintiffs were required to form and purchase shares in S Corporations in order to participate in the COBRA strategy which gives rise to the PSLRA bar. In making this argument, Movants rely upon the Supreme Court's holding in *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) that the sale of stock in a privately-held corporation was sufficient to garner

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                         Page 5
(Cite as: 2005 WL 525401, *4 (E.D.Pa.))

the protection of the securities laws given that the definition of "security" under the Securities and Exchange Acts is "quite broad."

> FN5. Here, the steps of the COBRA strategy were as follows:
> First, the Individual Plaintiffs would sell a short option and purchase a long option in almost identical amounts on a foreign currency with different (but narrow) strike prices, each to expire in thirty (30) days. The cost of the long option, though large, would be largely (although not entirely) offset by the premium earned on the sale of the short option. The Individual Plaintiffs would form a single-member limited liability company ("LLC") for the purpose of purchasing the options; Second, the Individual Plaintiffs (through the LLCs) would contribute their options to a general partnership formed for the purpose of conducting the COBRA transactions. After 30 days, the long and short options would expire either "in or out of the money," resulting in a gain or loss, depending upon the exchange rate between the U.S. dollar and the relevant foreign currency at the time; Third, the Individual Plaintiffs would make a capital contribution consisting of cash or other capital assets to the partnership; if cash was contributed it was sometimes used to purchase capital or ordinary assets (depending on whether a capital or ordinary loss was being "created"); Fourth, the Individual Plaintiffs would contribute their interests in the partnership to an S Corporation, causing the termination of the partnership as a matter of law; and Fifth, the S Corporation would sell the capital or ordinary assets contributed by the Individual Plaintiffs. These assets would have an artificially inflated basis and their sale would lead to a substantial unrealized short-term capital loss and/or ordinary loss. (Complaint, ¶ 82).

> FN6. We note that the allegations in the complaint in this case with respect to the foreign currency transactions are very similar to those in *Lehman Brothers Commercial Corp. v. Minmetals International Non-Ferrous Metals Trading Company,* 179 F.Supp.2d 118 (S.D.N.Y.2000) and 179 F.Supp.2d 159 (2001) in that it appears that "no physical exchange of the underlying foreign currencies took place in connection with the trading activity. The foreign currency trades were placed and, at expiration-when the currency would otherwise change hands-new positions were entered into that either rolled the trades further into the future or offset them with trades taking the opposite position." *See, Lehman,* 170 F.Supp.2d at 163. As observed by Judge Keenan in that case, "[a]s such, these transactions resemble a contractual wager based on movements in specified foreign currency prices, without the real possibility of foreign-currency positions changing hands. Unlike with an option, neither party here, for all intents and purposes had a right to take possession of foreign currency." *Id.* Thus, the *Lehman* court found that the foreign exchange or FX transactions at issue did not fall within the meaning of securities set forth in the 1933 and 1934 Securities and Exchange Acts.

While it is true that the Court held in *Landreth* that a single individual who purchased 100% of the stock in a privately-held corporation could state a claim under the securities laws for fraud in the sale of the business, its holding was premised upon the finding that the stock in question possessed all of the characteristics traditionally associated with common stock. Those characteristics are: (1) the right to receive dividends contingent upon an apportionment to profit; (2) negotiability; (3) the ability to be pledged or hypothecated; (4) conferring of voting rights in proportion to the number of shares owned; and (5) the capacity to appreciate in value. *Landreth,* 471 U.S. at 686, 105 S.Ct. 2302, citing *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Given that all we know at this juncture in this case is that the plaintiffs are alleged to have been the 100% shareholders of certain S Corporations which were capitalized by Plaintiffs' contributions of their interests in general partnerships, we cannot find that the S Corporation "stocks" at issue here constitute "securities" within the meaning of the 1933 and 1934 Acts. Accordingly, we deny the defendants' motion to dismiss on the basis of this argument at this time. Upon further development of the record, of course, Moving Defendants are free to re-argue this point via motion for summary judgment.

Moving Defendants alternatively assert that Plaintiffs' RICO claims against them should be dismissed because they do not sufficiently allege that they participated in the operation and management of the purported enterprise, they do not plead the alleged predicate acts with the required degree of specificity, and because they have not alleged the existence of a RICO conspiracy under § 1962(d).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
(Cite as: 2005 WL 525401, *4 (E.D.Pa.))

Page 6

To state a cause of action under Section 1962(c), a plaintiff must at a minimum allege (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity or the collection of an unlawful debt. *Salinas v. U.S.*, 522 U.S. 52, 62, 118 S.Ct. 469, 476, 139 L.Ed.2d 352 (1997); *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). To plead a claim under § 1962(d), the complaint must contain allegations that (1) there was an agreement to commit the predicate acts of fraud and, (2) that defendants had knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate § 1962(a), (b) or (c). *Stewart v. Associates Consumer Discount Co.*, 1 F.Supp.2d 469, 475 (E.D.Pa.1998); *Martin v. Brown*, 758 F.Supp. 313, 319 (W.D.Pa.1990).

*5 In order to allege a RICO enterprise, the Third Circuit has identified three elements: (1) that there be an ongoing organization; (2) that the associates function as a continuing unit; and (3) that the enterprise is separate and apart from the pattern of activity in which it engages. *Bonavitacola Electric Contractor, Inc. v. Boro Developers, Inc.*, Civ. A. No. 01-5508, 2003 U.S. Dist. LEXIS 2190, at *10-11 (E.D.Pa. Feb. 12, 2003). *See Also, Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 2090, 150 L.Ed.2d 198 (2001) and *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 269 (3d Cir.1995).

Racketeering activity means "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1344 (relating to wire fraud) ..." 18 U.S.C. § 1961(1)(b). To plead a pattern of racketeering activity, a plaintiff must allege that a defendant committed at least two acts of racketeering activity, as part of a related and continuous pattern. *Teti v. Towamencin Township*, Civ. A. No. 96-CV-5602, 2001 U.S. Dist. LEXIS 15600, at *18 (E. D.Pa. Aug. 17, 2001), citing *H.J., Inc.*, 492 U.S. at 237, 109 S.Ct. at 2899. A pattern is not formed by sporadic activity and a person cannot be subjected to the sanctions of RICO simply for committing two widely separated and isolated criminal offenses. *Teti*, 2001 U.S. Dist. LEXIS at *25, citing *H.J, Inc.*, 492 U.S. at 239, 109 S.Ct. At 2900. Stated otherwise, a "pattern" of racketeering activity exists when predicate criminal acts are related and amount to or otherwise constitute a threat of continued criminal activity. *Werther v. Rosen*, Civ. A. No. 02-CV-3589, 2002 U.S. Dist. LEXIS 22262, at * 5 (E.D.Pa. Oct.30, 2002).

Racketeering acts are said to be related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. *H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. At 2901; *Schroeder v. Acceleration Life Insurance Co.*, 972 F.2d 41, 46 (3d Cir.1992). Continuity has been said to be both a closed and open-ended concept referring either to a closed period of repeated conduct or to past conduct which by its nature projects into the future with a threat of repetition. *H.J., Inc.*, 492 U.S. at 241-242, 109 S.Ct. at 2902. Thus, a party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time or by demonstrating that a threat of continuing criminal activity exists. *Id.; Hindes v. Castle*, 937 F.2d 868, 872 (3d Cir.1991).

Whether the predicate acts constitute a threat of continued racketeering activity depends on the specific facts of each case. *Tabas v. Tabas*, 47 F.3d 1280, 1295 (3rd Cir.1995). Indeed, with respect to a "closed-ended scheme," the Third Circuit has developed a durational requirement of at least twelve months, which time period is measured between the first and last predicate acts alleged. *Bonavitacola*, 2003 U.S. Dist. LEXIS at *27, citing *Tabas*, 47 F.3d at 1293 and *Plater-Zyberk v. Abraham*, Civ. A. No. 97-3322, 1998 U.S. Dist. LEXIS 1736, at *23-24 (E.D.Pa. Feb.18, 1998). While predicate acts extending over a few weeks or months and threatening no future criminal conduct thus do not satisfy the continuity requirement, open-ended continuity may be satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business or of conducting or participating in an ongoing and legitimate RICO enterprise. *H.J., Inc.*, 492 U.S. at 243, 109 S.Ct. at 2902; *Tabas*, at 1295. Finally, in determining whether a pattern of racketeering activity has been established in a given case, it is appropriate to consider: (1) the number of unlawful acts; (2) the length of time over which the acts were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                           Page   7
(Cite as: 2005 WL 525401, *5 (E.D.Pa.))

committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. *Tabas,* at 1292; *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36, 39 (3rd Cir.1987). *See Also: Bonavitacola,* 2003 U.S. Dist. LEXIS at *22.

**\*6** Finally, "to conduct or participate directly or indirectly in the conduct of an enterprise's affairs," a defendant must have had some part in directing those affairs and "one is not liable unless one has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 1170, 1172, 122 L.Ed.2d 525 (1993).

In reviewing the complaint in this case in light of the preceding standards, we find that it is adequate to state claims under Sections 1962(c) and (d) against the Beard Miller defendants. Indeed, according to the complaint, there were in essence two "enterprises" at work: (1) the "solicitation" enterprise, which consisted of the Deutsche defendants, Jenkens & Gilchrist, the BDO Seidman defendants, the KPMG defendants and "all other marketing participants (including without limitation, the Beard Miller defendants, Wilkinson defendants and Wachovia defendants) and other persons and entities which solicited persons to participate in the FX contracts offered by the Deutsche Defendants for the alleged purpose of tax liability reduction as set forth in the opinion letters offered by Jenkens;" and (2) the "FX" enterprise, which consisted of "all defendants and all other persons or entities that participated in any way in the implementation, sale and or development of FX contracts sold for the alleged purpose of decreasing the tax liability of any individual." (Complaint, ¶ 153). Beard Miller and Steven Orndorf are alleged to have participated in the solicitation and FX enterprises specifically by using their knowledge of the Heller plaintiffs' finances and their positions as the Heller plaintiffs' longtime accountants to introduce them to the COBRA strategy, by setting up meetings and telephone conference calls with Attorneys Daugerdas and Guerin of Jenkens & Gilchrist and David Parse of Deutsche Bank and by helping to sell the Hellers on the legality of the strategy. (Complaint, ¶ s 63, 69, 70). In addition to their purported roles in marketing COBRA to the plaintiffs, the Beard Miller defendants are also alleged to have further participated in the FX enterprise by preparing the 1999 and 2000 corporate and personal tax returns for the Heller plaintiffs. We find these averments clearly suffice to allege direct participation in the RICO enterprises in this case.

As to the predicate acts, the complaint avers that "[f]or the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises the Defendants, in violation of 18 U.S.C. § 1341[and] 18 U.S.C. § 1343 ... placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service and received matter and things therefrom ..." [and] "transmitted and received by wire matter and things therefrom including but not limited to contracts, instructions, correspondence, opinion letters, funds ... tax returns, wire transfer and other instructions ... and others." (Complaint, ¶ s 166-167, 170-171). Plaintiffs allege that these mail and wire transmitted documents were false and/or fraudulent in that, *inter alia,* they misrepresented and suppressed material facts which would have alerted Plaintiffs to the true likelihood (1) that the IRS would not accept the tax treatment of the COBRA transactions as indicated in the opinion letters, (2) that the FX contracts would not pay out, (3) that the Defendants retained virtually unlimited discretion to determine whether the FX contracts would pay out, and (4) that the Jenkens' opinion letters were truly not independent. (Complaint, ¶ 172).

**\*7** Finally, in paragraph 174, the plaintiffs specify various letters, agreements, invoices and e-mails which Defendants transmitted via the mail and wire, including the persons to whom they were directed and the dates on which they were sent and/or transmitted. Thus, as these excerpts make clear, the plaintiffs have alleged RICO predicate acts with sufficient particularity to survive a Rule 12(b)(6) motion. We therefore deny Moving Defendants' motions to dismiss Plaintiffs' claim under Section 1962(c).

We reach the same conclusion as to the § 1962(d) claim. Indeed, reading the complaint as a whole and looking at paragraphs 131-139 and 199-200 in particular, we find that the plaintiffs have alleged an outline of the defendants' agreement to commit the predicate acts of fraud and their awareness that those acts were part of an overall pattern of racketeering

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

