Not Reported in F.Supp. Page 12
(Cite as: 1997 WL 476455, *13 (E.D.Pa.))

F.3d 1486, 1492 (9th Cir.), *cert. denied,* 516 U.S. 964, 116 S.Ct. 418, 133 L.Ed.2d 335 (1995); *accord NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 295-97 (7th Cir.1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993); *Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 520 (S.D.N.Y.1997); *Brownell v. State Farm Mut. Ins. Co.,* 757 F.Supp. 526, 536 (E.D.Pa.1991). As the Southern District of New York recently stated, "such a federal law tends only to supplement state law by providing another vehicle by which to carry forth the substantive policies which both the federal and state laws will further." *Dornberger,* 961 F.Supp. at 520. Moreover, the fact that the remedies available under RICO and state laws differ does not violate the McCarran-Ferguson Act. *Merchants,* 50 F.3d at 1491-92; *American Family,* 978 F.2d at 296-97; *Dornberger,* 961 F.Supp. at 520.

It is significant that the Insurance Commissioner herself has instituted this action. She is seeking to use RICO to obtain redress for insolvent insurance companies under her supervision. Pennsylvania law specifically empowers her, in her capacity as Liquidator of SNLIC and EBL, to institute "any and all suits and other legal proceedings" in the name of the insurer. Pa.Stat.Ann. tit. 40, § 221.23(12) (West 1992). She has the authority under Pennsylvania law to "collect all debts and moneys due and claims belonging to the insurer." *Id.* § 221.23(6). Under the circumstances, we do not believe the top official with regulatory authority over the Commonwealth's insurance industry is acting to invalidate, impair, or supersede state law in violation of the McCarran-Ferguson Act. *See Corporacion Insular de Seguros v. Munoz,* 896 F.Supp. 233, 237 (D.P.R.1995). [FN17]

> FN17. To the extent that any Ohio laws governed the acquisition of SNLIC, the prosecution of this case would also not invalidate, impair, or supersede them. The Insurance Commissioner is not seeking to undo the acquisition.

*14 Defendants rely on a recently decided decision of the Court of Appeals for the Eighth Circuit. *See Doe v. Norwest Bank Minnesota,* 107 F.3d 1297 (8th Cir.1997). In *Doe,* the plaintiffs were a class of vehicle purchasers who entered into installment sales agreements with a dealership, which assigned the agreements to Norwest Bank. *Id.* at 1299. The agreements provided that in the event the purchaser did not obtain insurance for the vehicle, the bank could obtain insurance and charge the premium to the purchaser. *Id.* at 1300. The bank had purchased such insurance on behalf of plaintiffs in that case. Plaintiffs claimed that the insurer, Voyager, charged them for unauthorized coverage and paid illegal kickbacks to the bank which purchased the insurance. *Id.* at 1306. The Eight Circuit, applying a three prong test, held that the civil action was prohibited by the McCarran-Ferguson Act because the case would invalidate, impair or supersede the insurance laws of Minnesota. *Id.* at 1305. The court noted that because Minnesota law did not provide for a private cause of action, attorney's fees, or treble damages as RICO does, private plaintiffs would avoid the "administrative remedial system" set forth by Minnesota and opt to pursue a RICO lawsuit instead. *Id.* at 1306-07. Because RICO would undermine and "supplant" Minnesota's regulations, the case could not proceed. *Id.* at 1308.

Unlike our case, *Doe* involved activities which clearly constituted the business of insurance. It is also noteworthy that the *Doe* action was brought by private plaintiffs. In contrast, this action was initiated by the Insurance Commissioner herself in her capacity as the Liquidator of SNLIC and EBL.

For the reasons set forth above, the McCarran-Ferguson Act does not preclude the RICO claims made here. [FN18]

> FN18. For similar reasons, the three-part *Fabe* test also does not require dismissal of the Insurance Commissioner's amended complaint. Under *Fabe,* we must consider whether a state statute has been enacted for the purpose of regulating the business of insurance. *Fabe,* 113 S.Ct. at 2208. Pennsylvania has enacted a comprehensive scheme to regulate its insurance industry and the business of insurance. But the application of RICO would not impair, invalidate, or supersede this Pennsylvania regulatory scheme.

V

Even if the Insurance Commissioner's proposed amendment to the § 1962(b) RICO claim would not be futile, we still must decide under Rule 15 whether or not the amendment would cause undue delay or prejudice or is motivated by bad faith or a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.  
(Cite as: 1997 WL 476455, *14 (E.D.Pa.))

Page 13

dilatory motive. *In re Burlington Coat Factory,* 114 F.3d at 1434.  If so, we may disallow any further amendments.  In *Burlington,* the Third Circuit noted that where a plaintiff has already filed one amended pleading, had a substantial amount of time between the initial and revised pleadings, and the efforts of four different law firms were involved, a court may have sufficient basis to find undue delay or prejudice in the filing of yet another revised pleading. *Id.* at 1435.  The Third Circuit, quoting a district court, has also stated:

> "three attempts at a proper pleading is enough," and a "plaintiff has to carefully consider the allegations to be placed in a complaint before it is filed." [Plaintiff] is not seeking to add claims it inadvertently omitted from its prior complaints or which it did not know about earlier.  Rather, [[[plaintiff] is modifying its allegations in hopes of remedying factual deficiencies in its prior pleadings, even to the point of contradicting its prior pleadings.
> 
> *15 *Gasoline Sales, Inc. v. Aero Oil Co.,* 39 F.3d 70, 74 (3d Cir.1994).

There is no evidence that the proposed amendment is prompted by bad faith or a dilatory motive. Moreover, it would not cause undue delay as the case is still in the pleading stage.  Finally, there would be no prejudice to any defendant in allowing this amendment.  This is not to say that amendments should be allowed endlessly.  This action was filed over ten months ago, on October 1, 1996.  While we will allow plaintiff to file her third complaint to prosecute the § 1962(b) RICO claim in the name of SNLIC and EBL against defendant Stewart, this will be the final amendment.  Three chances to formulate known claims are enough.  As the Third Circuit aptly noted:

> We are concerned about the alacrity with which plaintiffs appear to grasp at any theory of alignment of parties which might withstand dismissal.  A RICO complaint is not a mix and match game in which plaintiffs may artfully invoke magic words to avoid dismissal.  Instead, to plead a claim under section 1962(c) the complaint must be capable of being read to satisfy the statutory requirement that persons were conducting a pattern of racketeering through a separate and distinct enterprise.  That requirement does not do violence to the notion of notice pleading.  It simply reinforces the renewed emphasis on the obligation of responsible pleading.

*Glessner,* 952 F.2d at 714.

### VI

In addition to the RICO claims, the amended complaint set forth state law claims in Counts VI through XII. Additional defendants not named in the RICO counts were sued.  Since we had previously dismissed the RICO claims, we declined supplemental jurisdiction over these related state law claims and the additional parties under 28 U.S.C. § 1367. [FN19]

> FN19. Title 28 U.S.C. § 1367(a) states in relevant part:
> Except as provided in subsections (b) or (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Now that the Insurance Commissioner will have standing to assert a § 1962(b) RICO claim on behalf of SNLIC and EBL, we will determine whether her state law claims are ones upon which relief can be granted.  Where, as here, the same acts are alleged as the basis for the federal and state law counts, "federal courts routinely exercise supplemental jurisdiction over the state law claims." *Lyon v. Whisman,* 45 F.3d 758, 761 (3d Cir.1995).

#### A. Breach of Fiduciary Duty

Count VI alleges that defendants Stewart, Fletcher, Morris, Connors, Harbaugh and Mary Ann Stewart ("M.A.Stewart") breached fiduciary duties to SNLIC and EBL, in their capacity as owners, officers, and directors of these insurers. It also alleges that these defendants "functioned under conflicts of interest and engaged in self-dealing detrimental to SNLIC and EBL [ ] through the myriad of transactions between and among the Stewart entities" and other companies. ¶ 190.

M.A. Stewart asserts that Count VI is legally insufficient because it fails to allege that the Insurance Commissioner or either of the insurers placed their trust in M.A. Stewart or that she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(6) A written report regarding the weaknesses in the internal controls, as well as any suggestions for improvement in the operations of the organization.

Messrs. Berliner and Regan allege that C/L failed to meet the standards established within SAS No. 60 and 61 since C/L failed to communicate certain matters to the audit committee. Mr. Tillett states: "I disagree. I believe C&L's communications met the standards of GAAS. It has been my experience in attending hundreds of Audit Committee meetings during my career that the executives making up these committees are interested in only the most significant issues that have come to the attention of the auditor." I agree with the opinions of Messrs. Berliner and Regan.

I have read the financial statements of AHERF for fiscal 1996 and 1997, plus all the C/L reports that were issued to the Board and Audit Committee, as well as the Audit Committee minutes. From my perspective as a member of a board of directors and audit committee of healthcare organizations, the financial statements, as presented to the AHERF Board, reflect that AHERF was a financially viable entity with certain operational challenges due to recent mergers. From my experience advising and serving on not-for-profit Boards and committees, these Boards and committees focus on the "bottom line," operating and total margins, cash flow results, and the entity's level of cash or unrestricted investment reserves. In these areas, the financial statements of AHERF for fiscal 1996 and 1997 do not depict an entity that was on the verge of financial collapse. In fact, both financial statements show, on a consolidated level, a positive "bottom line." This would have provided comfort and assurance to Board and committee members. Also, since C/L did not give a "going concern" opinion for fiscal 1997, it appears that C/L, when it released its audit opinion, also considered AHERF to be economically viable. In fact, AHERF declared bankruptcy on July 21, 1998.

It has been my experience that healthcare entities do not experience sudden and drastic financial collapses. They do not "fall off a cliff." The demand for and supply of patient care services typically does not fluctuate significantly, and economic changes in the industry are moderate and implemented over time. A sudden financial collapse, as occurred with AHERF, suggests AHERF's financial situation had deteriorated over an extended period of time before AHERF's bankruptcy filing.

In my opinion, C/L failed miserably when reporting to the Board and Audit Committee not only with the items mentioned above, but also with respect to all of the requirements of SAS No. 60 and 61.

Executed in Washington, DC the 11th of January, 2005

*James Wallace*

James Wallace

# EXHIBIT A

# EXHIBIT A - INFORMATION CONSIDERED BY JAMES WALLACE

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| | AHERF and its affiliates' audited financial statements for FY 96 and 97 |
| | First Amended Complaint |
| | Plaintiff's Responses to Def's 2nd Set of Irrogs (5/7/04) |
| | Def's Responses and Objections to Plaintiff's 4th Set of Irrogs (6/15/04) |
| | Def's Responses and Objections to Plaintiff's 1st Set of Irrogs (6/12/04) |
| | Expert Report of J. W. Tillett, resume and summary of publications and prior testimony |
| | Expert Report of D. Paul Regan, CPA, CFE with exhibits |
| | Expert Report of Robert W. Berliner with exhibits |
| | Buettner Deposition Transcripts Vols. 1 - 3 |
| CG 02026 - 43 | Exhibit 2006 - 1997 Management Letter |
| CL 000326 - 37 | Exhibit 1351 - C&L SUD (1996) |
| CL 000876 | Patient Accounts Receivable - AGH |
| CL 000877 - 80 | Exhibit 1520 - Inpatient & Outpatient - Bad Debt Reserve Analysis |
| CL 000988 | Patient Accounts Receivable - Bucks |
| CL 000991 - 96 | Exhibit 4023 - Bucks Inpatient Bad Debt Analysis |
| CL 000992 - 96 | Exhibit 110 - Bucks County Hospital In-Patient Bad Debt Reserve Calculation |
| CL 000997 - 1006 | Exhibit 109 - Allegheny University Hospital's Bucks County Provision for Bad Debt |
| CL 001007 - 13 | Bucks Outpatient Bad Debt Analysis |
| CL 001008 - 13 | Exhibit 111 - Bucks County Campus Out-Patient Bad Debt Reserve Calculation |
| CL 001015 - 7 | BCC-O/P & I/P Bad Debt Reconciliation |
| CL 001086 - 92 | AHERF Subsequent Receipts Summary |
| CL 001096 - 101 | Exhibit 4387 - HUH (Center City) Inpatient Bad Debt Analysis - 6/30/96 |
| CL 001097 - 101 | Exhibit 117 - Hahnemann University Hospital In-Patient Bad Debt Reserve Calculation |
| CL 001102 | HUH (Center City) Outpatient Bad Debt Analysis 6/30/96 |
| CL 001103 - 07 | Exhibit 118 - Hahnemann University Hospital In-Patient Bad Debt Reserve Calculation |
| CL 001113 | Patient Accounts Receivable - Center City |
| CL 001178 | Exhibit 4274 Bad Debt Methodology |
| CL 001179 | Patient Accounts Receivable - East Falls |
| CL 001180 - 93 | Exhibit 1075 - MCPH (East Falls) Inpatient Bad Debt Analysis 6/30/96 Using HUH Methodology |
| CL 001194 - 6 | Exhibit 4388 - MCPH - Bad Debt Reserve (Client Methodology) |
| CL 001197 - 9 | Exhibit 4028 - EPPI - Bad Debt Reserve (Client Methodology) |
| CL 001200 - 3 | Exhibit 4389 - AHERF Reserve for Bad Debts Reconciliation - MCP & EPPI |
| CL 001269 | Patient Accounts Receivable - Elkins |
| CL 001270 - 3 | EPC - Inpatient Bad Debt Analysis |
| CL 001274 - 8 | EPC - Outpatient Bad Debt Reserve - 6/30/96 |
| CL 001280 - 2 | EPC - I/P &O/P Bad Debt Reconciliation |
| CL 001345 | Patient Accounts Receivable - SCHC |
| CL 001346 - 9 | SCHC - Analysis of Inpatient Bad Debt - 6/30/96 |
| CL 001350 - 4 | SCHC - Outpatient Bad Debt Reserve - 6/30/96 |
| CL 001356 - 8 | SCHC - I/P & O/P Bad Debt Reconciliation |
| CL 013608 - 11 | Exhibit 1521 - AHERF AGH Bad Debt Reserve |
| CL 036652 - 67 | Work Paper folder Titled "Long Term Incentive Plan Correspondence" (including related documents) |
| CL 042225 - 31 | Exhibit 2482 - Independent Accountant's Report on applying agreed-upon procedures |
| CL 042251 | C&L Agreed-upon procedures opinion (10/14/96) |

1

# EXHIBIT A - INFORMATION CONSIDERED BY JAMES WALLACE

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| CL 043878 - 9 | C&L internal controls letter (1/8/98) |
| CL 057291 - 3 | Exhibit 1523 - Critical Matters: AHERF Summary of A/R Reserve Assuming AGH Reserve Philosophy |
| CL 150833 - 8 | Exhibit 2105 - Draft minutes of the AHERF Finance and Audit Committee Meeting (8/27/98) |
| CL 165116 - 25 | C&L Letter to AHERF Audit Committee (6/12/98) |
| CL 57316 - 22 | Exhibit 4379 - Critical Matters Noted in Planning |
| CL 57335 - 43 | Exhibit 1339 - C&L SUD (1995) |
| CL-DISK-0185/EPBD06.WK3 | Schedules relating to Elkins Bad Debt reserve calculation (6/1996) |
| CL-DISK-0185/SCHBD06.WK3 | Schedules relating to SCHC Bad Debt reserve calculation (6/1996) |
| D 016582 - 91 | Exhibit 2481 - Meeting of the Compensation Committee of AHERF |
| DB-CM-46-00982 - 87 | Exhibit 1448 - Letter re: status of accounts receivable (9/11/95) |
| DBR-AA 47289 - 91 | Letter re: adoption of new auditing standard dealing with communication with audit clients (10/16/95) |
| DBR-DK 001541 - 43 | Letter re: AHERF Long Term Incentive Plan (6/30/97) |
| DBR-DKS 020183 - 8 | AHERF Audit Committee Meeting minutes (4/8/96) |
| DBR-DKS 020379 - 85 | AHERF Audit Committee Meeting minutes (10/16/95) |
| DBR-DKS 020719 - 25 | AHERF Audit Committee Meeting minutes (4/3/95) |
| DBR-LI 0062868 - 70 | Exhibit 2135 - Letter re: adoption of new auditing standard dealing with communication with audit clients (9/22/97) |
| DBR-RS 00225 - 27 | Exhibit 29 - Memo regarding Delaware Valley Accounts Receivable Reserves |
| DBR-RS 00228 - 32 | Exhibit 30 - Memo regarding Delaware Valley Bad Debt Reserves |
| DBR-SG 6008 - 9 | Exhibit 1289 - Memo Re: Media Release w/attachment |
| DC4529 1 of 24 - 24 of 24 | Exhibit 115 - St. Christopher's Hospital for Children - Provision for Bad Debt for the month of June 1996 |
| DC4532 1 of 27 - 27 of 27 | Exhibit 113 - Allegheny University Hospital's Elkins Park - Provision for Bad Debt for the month of June 1996 |
| DC4534 1 of 8 - 8 of 8 | Exhibit 121 - Main Clinical Campus - Out-Patient Analysis of Reserves |
| DC8221 1 of 22 - 22 of 22 | Exhibit 7 - Letter with recommendations designed for AHERF's improvement and other matters for consideration attached |
| DC8230 1 of 16 - 16 of 16 | Exhibit 22 - Letter with internal control observations attached |
| GOR 0000194 - 202 | Exhibit 1648 - Transcription of Shorthand Notes of Carol Gordon - Audit Committee Meeting October 15, 1996 |
| GOR0000001 - 8 | Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee Meeting March 14, 1997 |
| GOR0000009 - 24 | Exhibit 2037 - Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee Meeting March 11, 1998 |
| GOR0000046 - 51 | Transcription of Shorthand Notes of Carol Gordon - Audit Committee Meeting April 8, 1996 |
| GOR0000082 - 90 | Exhibit 1898A - Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee Meeting August 27, 1998 |
| GOR0000091 - 111 | Exhibit 1900 - Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee September 1, 1998 |
| GOR0000112 - 131 | Exhibit 4162 - Transcription of shorthand notes of Carol Gordon - Finance and Audit Committee Meeting October 28, 1998 |
| GOR0000141 - 8 | Transcription of shorthand notes of Carol Gordon - Audit Committee Meeting October 10, 1994 |
| GOR0000149 - 55 | Transcription of shorthand notes of Carol Gordon - Audit Committee Meeting October 16, 1995 |
| GOR0000163 - 8 | Transcription of shorthand notes of Carol Gordon - Audit Committee Meeting April 3, 1995 |

# EXHIBIT A - INFORMATION CONSIDERED BY JAMES WALLACE

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| GOV 53261 - 81 | Exhibit 2057 - Letter with audit plan attached (4/8/96) |
| GOV 66179 - 83 | AHERF Audit Committee Meeting minutes (3/14/97) |
| JB 00485 - 95 | Exhibit 2038 - AHERF Finance and Audit Committee Meeting minutes (3/11/98) |
| JD-DC-0028748 - 67 | C&L Proposed Audit Plan (3/11/98) |
| JD-DC-0028931 - 3 | Exhibit 4281 - 1996 required communication letter (10/15/96) |
| JD-HL 0018165 - 71 | AHERF Audit Committee Meeting minutes (10/15/97) |
| K&L/CJQ/01374 - 81 | Exhibit 1647 - AHERF Audit Committee Meeting minutes (10/15/96) |
| PR-1-001809 - 16 | Exhibit 2122 - AHERF Audit Committee Meeting minutes (10/10/94) |
| PR-6-004708 - 32 | Exhibit 2058 - Coopers & Lybrand Proposed AHERF Audit Plan for FY 1997 |
| PR-RS-COMPUT 00082 - 94 | Exhibit 1635 - Transcripton of Shorthand Notes of Carol Gordon - Audit Committee October 15, 1997 |
| PwC 009741 - 45 | Exhibit 1079 - C&L SUD (1997) |
| RP 00048 - 53 | Exhibit 2107 - Draft Minutes of the Meeting of the AHERF Finance and Audit Committee (9/1/98) |
| TN CBC 43B 00893-936 | Exhibit 58 - AHERF Fiscal Year 1997 Audited Financial Statements |
| TN CBC 43B 01573 - 691 | Exhibit 1228 - AHERF Fiscal Year 1996 Audited Financial Statements |

3

**TAB 2**

LEXSEE 1992 US DIST LEXIS 3246

**ALEGRIA ENTERPRISES v. IMMEL'S MARINE, et. al.**

CIVIL ACTION NO. 90-8127

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1992 U.S. Dist. LEXIS 3246*

**March 13, 1992, Decided**
**March 16, 1992, Filed; March 17, 1992, Entered**

**LexisNexis(R) Headnotes**

COUNSEL: [*1] FOR ALEGRIA ENTERPRISES, PLAINTIFF, BLAISE H. COCO, JR., COCO, FEINER & CITRON, P.C., 1704 LOCUST STREET, PHILA, PA 19103, USA. LUIS P. DIAZ, INDEPENDENCE SQUARE WEST, THE CURTIS CENTER, STE. 1150, PHILA, PA 19102, USA.

FOR JOHN DYKSTRA, DEFENDANT, JOHN DYKSTRA, [PRO SE], C/O ST. JOHNS WATER SPORTS, ST. JOHN, VI 00830.

FOR IMMEL MARINE, JEROLD G. IMMEL AND JANE IMMEL, In Their Personal Capacity, DEFENDANTS, E. MICHAEL KEATING, III, CLARK, LADNER, FORTENBAUGH & YOUNG, 2005 MARKET STREET, ONE COMMERCE SQUARE, PHILA, PA 19103, USA.

FOR ALEGRIA ENTERPRISES, COUNTER-DEFENDANT, LUIS P. DIAZ, INDEPENDENCE SQUARE WEST, THE CURTIS CENTER, STE. 1150, PHILA, PA 19102, USA.

FOR IMMEL MARINE, JEROLD G. IMMEL AND JANE IMMEL, CROSS-CLAIMANTS, E. MICHAEL KEATING, III, CLARK, LADNER, FORTENBAUGH & YOUNG, 2005 MARKET STREET, ONE COMMERCE SQUARE, PHILA, PA 19103, USA.

FOR JOHN DYKSTRA, CROSS-DEFENDANT, JOHN DYKSTRA, [PRO SE], C/O ST. JOHNS WATER SPORTS, ST. JOHN, VI 00830.

JUDGES: VanArtsdalen

OPINIONBY: BY THE COURT; DONALD W. VANARTSDALEN

OPINION:

MEMORANDUM AND ORDER

VanARTSDALEN, S.J.

March 13, 1992

Though discovery has been completed and this case is scheduled for trial on April 6, 1992, discovery disputes [*2] continue unabated.

The current disputes center around plaintiff's expert (and non-expert) witnesses. Pursuant to the scheduling order, plaintiff turned over the expert reports of three expert witnesses (Stith, Hack and Woods) on February 14, 1992. Plaintiff did not disclose the report of its fourth expert (Kershaw), but instead sent a statement of his expected testimony, and forwarded his report on February 20, 1992. Additionally, plaintiff advised defendant that four witnesses (Brown, Gourley, Dill, and a representative of the Hinckley Company) would be called as fact witnesses whose testimony would include elements of opinion.

Defendants moved to preclude plaintiff from offering Kershaw's testimony at trial, because his report gas not disclosed according to the scheduling order. Because of the excessive amount of extensions granted in this case, and my warnings that the last scheduling order would indeed be the last, I granted defendants' motion.

Defendants now move to preclude the fact witnesses Brown, Gourley, Dill, and the Hinckley representative, from testifying as to their opinions as no expert reports were disclosed. Further, they move to preclude the testimony of either expert [*3] Stith or expert Woods, on the grounds that it is duplicative. Plaintiff, in turn, filed a motion for reconsideration of my order precluding Kershaw from testifying. For the reasons expressed below, defendants' motion will be granted in part and denied in part, and plaintiff's motion will be denied.

  

Fact witnesses can be called upon to give their opinions. *Fed. R. Evid. 701*. When a witness performed an act which is relevant to the disputed facts, he can explain his reasons for performing it as he did. If those reasons are based on scientific knowledge not held by the average member of the public, the explanation is not thereby turned into an expert opinion. n1 For example, plaintiffs intend Mr. Dill, an accountant, to testify regarding the records and books which he kept relating to Alegria Enterprises. Surely he is not testifying as an expert in accounting practices, even though he may need to give opinions as to accounting in order to properly explain his testimony. To the extent, then, that defendants seek to preclude fact witnesses from explaining their actions by giving opinions based on specialized knowledge, it will be denied.

> n1 Were this not the case, every witness in a patent litigation would be considered to be an expert witness. When an inventor explains why or how he created his invention, he is explaining his opinion which is the result of specialized knowledge. Yet he is not testifying as an expert in inventions, but merely as a factual witness regarding the particular invention which is the subject of the litigation.

[*4]

However, to the extent that any witnesses other than Stith, Hack, or Woods attempt to give pure opinion testimony, unrelated to an explanation of their own actions, the motion will be granted. Plaintiff states that it "will ask each and every witness who was on the scene what he thought of the salvage attempt of defendant." Plaintiff seems to be implying that simply because an expert actually perceived the facts on which he renders his opinion, rather than learning about them second-hand, he is a lay witness rather than an expert. However, if an expert testifies based on facts which happen to be within his personal knowledge, he is not any less an expert. For example, in a medical malpractice litigation, a physician may actually examine the plaintiff and base his opinion on the facts he observed during his investigation, without his being any less of an expert. n2 If plaintiff intends for any of his witnesses to give opinions regarding the propriety of others' actions, based completely on the witness' specialized knowledge, defendants could and should object at trial. n3

> n2 This would be in contrast to the defendant physician himself, who would obviously testify that, in his opinion, he did nothing improper, but would not be considered as an expert witness.

[*5]

> n3 The witness can, of course, testify to what she actions were (fact), but cannot give an opinion as to their propriety (expert opinion).

The distinction is clear. "Why did you do what you did?" calls for an explanation of a relevant fact. "Would you have done what he did?" calls for an opinion based on specialized knowledge. The first is permissible, the second is not.

Defendants' second objection, that the expert testimony will be duplicitous, is meritless. First, it appears that plaintiff's experts are sufficiently different so that their testimony will not overlap. Second, there is no rule against multiple expert opinions on the same point of contention. It is only unduly repetitious evidence which should be precluded. When the repetitions add to the weight of the opinions, rather than merely "beating a dead horse," duplicitous testimony is admissible.

Plaintiff requests reconsideration of my order precluding Kershaw from testifying. Plaintiff raises no new issues which require reversing my previous decision. Kershaw is not a necessary witness and plaintiff will not be unduly burdened by his [*6] not being allowed to testify. Plaintiff agrees that there are "other witnesses who can speak to these issues but who have already taken positions as fact witnesses and who may be perceived to have a bias in deciding damage questions." It is therefore not prejudicial to plaintiff's case to preclude "an independent witness on the issues of valuation and repair." There will be testimony to be weighed, and credibility decisions to be made, regarding these issues. It is not, therefore, against the interests of justice to preclude Kershaw from testifying.

An order follows.

ORDER - March 16, 1992, Filed; March 17, 1992, Entered

For the reasons explained in the accompanying memorandum, it is hereby ORDERED that:

1) Defendants' motion to preclude the expert testimony of Brown, Gourley, Dill, and the Hinckley representative is GRANTED IN PART and DENIED IN PART. Plaintiff cannot offer the expert opinions of any witnesses other than Stith, Woods or Hack. All fact witnesses can give explanations for their actions, even if these explanations involve opinions based on specialized knowledge; and

2) Plaintiff's motion for reconsideration of my or-

  

der precluding the expert testimony of Kershaw [*7] is DENIED.

BY THE COURT:

Donald W. VanArtsdalen, S.J.

March 13, 1992





**TAB 3**

Case 2:00-cv-00684-DSC   Document 124-5   Filed 07/11/2005   Page 12 of 15


LEXSEE 2004 U.S. DIST. LEXIS 16855

SUNSTAR, INC., Plaintiff, v. ALBERTO-CULVER COMPANY, INC. and BANK ONE CORPORATION f/k/a FIRST NATIONAL BANK OF CHICAGO, Defendants. ALBERTO-CULVER COMPANY, a Delaware Corporation, Plaintiff, v. SUNSTAR, INC., a Japanese corporation, SUNSTAR GROUP COMPANY (f/k/a Alberto-Sunstar Co., Ltd.), a Japanese corporation, KANEDA, KASAN, KABUSHIKI KAISHA, a Japanese corporation, and BANK ONE, NATIONAL ASSOCIATION, as Trustee under Trust Agreement No. 22-81196, dated February 27, 1980, a national banking association, Defendants.

Case No. 01 C 0736

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2004 U.S. Dist. LEXIS 16855*

August 20, 2004, Decided
August 23, 2004, Docketed

**PRIOR HISTORY:** *Sunstar, Inc. v. Alberto-Culver Co., 2003 U.S. Dist. LEXIS 17431 (N.D. Ill., Sept. 29, 2003)*

**DISPOSITION:** The Court's opinion resolves the nineteen motions in limine.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For SUNSTAR INC, plaintiff: Paul Ethan Slater, Robert David Cheifetz, Sperling & Slater, Chicago, IL., Rory J. Radding, Barren W. Saunders, Ann L Gisolfi, Pennie & Edmonds, New York, NY., Timothy Todd Patula, Charles Thomas Riggs, Jr., Carolyn C Andrepont, Paige J Thomson, Patula & Associates, Chicago, IL., Robert A Schwinger, Marvin R Lange, Scott Sonny Balber, Janice A Payne, Melissa Jayne LaRocca, Chadbourne & Parke LLP, New York, NY., William S D'Amico, Chadbourne & Parke LLP, Washington, DC.

For ALBERTO-CULVER COMPANY, defendant: Craig S. Fochler, Charles Robert Mandly, Jr., John Sheldon Letchinger, Michael R. LaPorte, Lindsey Dinner Barnes, Melissa Suzanne Skilken, Wildman, Harrold, Alien & Dixon, Chicago, IL.

For BANK ONE CORP. fka First National Bank of Chicago, The defendant: Daniel A. Dupre, Bank One, N.A., Chicago, IL., Patricia Susan Smart, Chicago, IL., John Bostjancich, Smart & Bostjancich, Chicago, IL.

For ALBERTO-CULVER COMPANY, counter-claimant: Craig S. Fochler, Charles Robert Mandly, Jr., John Sheldon Letchinger, Michael R. LaPorte, Lindsey Dinner Barnes, Melissa Suzanne Skilken, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For SUNSTAR INC, counter-defendant: [*2] Paul Ethan Slater, Robert David Cheifetz, Sperling & Slater, Chicago, IL., Rory J. Radding, Darren W. Saunders, Ann L Gisolfi, Pennie & Edmonds, New York, NY., Timothy Todd Patula, Charles Thomas Riggs, Jr., Carolyn C Andrepont, Paige J Thomson, Patula & Associates, Chicago, IL., Robert A Schwinger, Marvin R Lange, Scott Sonny Balber, Janice A Payne, Melissa Jayne LaRocca, Chadbourne & Parke LLP, New York, NY., William S D'Amico, Chadbourne & Parke LLP, Washington, DC.

**JUDGES:** Magistrate Judge Nan R. Nolan, Judge Ronald A. Guzman.

**OPINIONBY:** NAN R. NOLAN

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Nan R. Nolan, United States Magistrate Judge

These two consolidated cases arises from a dispute between Sunstar, Alberto-Culver, and Bank One regarding Sunstar's use in Japan starting in 1999 of a certain "VO5" mark on women's hair care products that Sunstar

  

manufactures and sells in Japan. n1 The parties have filed their Final Pretrial Order and are proceeding to trial. District Judge Ronald A. Guzman referred the case for resolution of pretrial matters. This opinion resolves the nineteen motions in limine.

> n1 The factual background of this case has been set forth in previous decisions in this matter including, *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2003 U.S. Dist. LEXIS 17431, 2003 WL 22287380 (N.D. Ill. Sept. 30, 2003); *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2003 U.S. Dist. LEXIS 13492, 2003 WL 21801428 (N.D. Ill. Aug. 1, 2003); and *Alberto-Culver, Co. v. Sunstar, Inc.*, 2001 U.S. Dist. LEXIS 17102, 2001 WL 124905 (N.D. Ill. Oct. 17, 2001). The Court assumes familiarity with those facts.

[*3]

## BACKGROUND

On November 7, 2002, the Honorable George W. Lindberg denied Alberto's summary judgment motion on its breach of contract claim regarding the issue of whether Sunstar's use of the 1999 Mark exceeds the scope of the License Agreement. The district court concluded that several genuine issues of material fact exist, including "whether the 1999 Mark falls within the range of marks defined by Japanese trademark law as being encompassed within the use-rights under those registrations" and "what the parties intended in the License Agreement—whether the full range of use-rights inherent in the listed trademark registrations were licensed to Sunstar, or the specific marks only (as Alberto attests)." 11/7/02 Memo. & Order at 10.

On November 14, 2002, these cases were reassigned to the Honorable Ronald A. Guzman. In denying Alberto and Bank One's request that the court exclude experts on Japanese trademark law from testifying before the jury, Judge Guzman found that the term *senyo-shiyoken* renders the License Agreement ambiguous. n2 9/30/03 Memo. Opinion & Order at 8. Judge Guzman held that "the jury in this case may consider extrinsic evidence as to the scope of rights [*4] under Japanese law that a party may have intended to convey by inclusion of the term *senyo-shiyoken* in the License Agreement." Id. Judge Guzman further ruled that "testimony by experts in Japanese trademark law will constitute one piece of evidence as to what the parties may have intended by inclusion of the term *senyo-shiyoken* as a parenthetical to the phrase 'exclusive license' in the License Agreement." Id. at 9.

> n2 "It is undisputed that *senyo-shiyoken* is the Japanese term for an exclusive license registered with the Japanese Patent Office ("JPO")." 9/30/03 Memo. Opinion & Order at 3.

## DISCUSSION

A. Alberto-Culver's Motions in Limine

1. Conduct of the Trustee

Alberto Culver's first motion in limine seeks to exclude argument and evidence related to Bank One's conduct in suspending the License Agreement and any alleged bias that Bank One supposedly has because of its relationship with Alberto. Alberto's motion is granted.

Alberto argues that the evidence that [*5] Sunstar seeks to introduce (i.e. the existence of an indemnification agreement and the contacts and relationships between Alberto and Bank One representatives) only relates to Sunstar's breach of fiduciary duty and breach of contract claims against Bank One and a claim against Alberto for tortious interference which have been dismissed. Alberto states that this evidence should be excluded because Judge Lindberg ruled on summary judgment that Bank One acted reasonably in deciding whether to suspend the License Agreement.

Sunstar responds that § 5 of the License Agreement sets forth certain conditions precedent to the effectiveness of any suspension of Sunstar's license rights by Bank One. The License provides that Bank One may suspend the rights of Sunstar to use the licensed marks if "in the opinion of [Bank One] based upon reasonable ground," any act of Sunstar presents "a danger to the value or validity of [Bank One's] ownership and title" in the licensed marks. Sunstar wants to show that Bank One failed to act as an impartial, independent, detached neutral decisionmaker in suspending Sunstar's right to use the licensed marks under the License Agreement. Specifically, Sunstar [*6] seeks to present evidence at trial showing that prior to Bank One issuing the suspension, "Alberto undertook to ply Bank One decisionmakers with memoranda, private conferences, food, drink and a valuable indemnification, and indeed provided drafts of the very words that Alberto wanted Bank One to issue as its own." Sunstar's Memo. at 8. Sunstar contends that this evidence is relevant to a determination of whether the circumstances here truly evidence an "opinion" by Bank One that was "based upon reasonable ground" and its defense of Alberto's breach of contract claim based upon Sunstar's continued use of the marks after Bank One's suspension of the License Agreement.





Case 2:00-cv-00684-DSC    Document 124-5    Filed 07/11/2005    Page 15 of 15

Page 3
2004 U.S. Dist. LEXIS 16855, *6

The Court agrees with Alberto that the reasonableness of Bank One's actions with respect to the suspension are no longer an issue for trial. Sunstar's breach of contract claim against Bank One was based on Bank One's alleged failure to provide reasonable grounds for suspending the License Agreement. Sunstar Am. Cmplt. PP 20, 22, 24, 26, 31, 38, 40. Sunstar alleged that the suspension resulted from undisclosed private communications between Bank One and Alberto. Id. P 23. Judgment as a matter of law has been granted [*7] in favor of Bank One and against Sunstar on Sunstar's breach of contract claim. Judge Lindberg based his dismissal of Sunstar's breach of contract claim as well as its claims for breach of fiduciary duty and waste of trust assets against Bank One on § 4.09 of the Illinois Trust and Trustees Act, *760 ILCS §§ 5/1 et seq.* As Judge Lindberg noted, when a trustee like Bank One "uses reasonable care, skill, and caution in the selection of the agent, the trustee may rely upon the advice or recommendation of the agent without further investigation and . . . shall have no responsibility for action taken or omitted upon the advice or recommendation of the agent." 11/7/02 Memo. & Order at 17. In dismissing Sunstar's claims at summary judgment, Judge Lindberg specifically held that the fact that Bank One selected outside counsel based upon the recommendation by Alberto's outside counsel "does not warrant a conclusion that Bank One did not exercise the appropriate level of 'care, skill and caution' in selecting its counsel." 11/7/02 Memo. & Order at 17. Judge Lindberg thus held that Bank One used reasonable care, skill, and caution in the selection of outside counsel.

Sunstar seeks to argue [*8] at trial that the indemnification agreement "tempted and permitted Bank One to side with Alberto without fear of liability or litigation expense in a way that the 1980 Agreements did not contemplate as being appropriate." Sunstar Memo. at 9. Judge Lindberg ruled against Sunstar as to this issue. Judge Lindberg held that a reasonable jury could not find in favor of Sunstar on its argument that Bank One made its suspension decision by relying on the indemnification agreement from Alberto rather than the advice of counsel. Id. at 18. The district court has ruled that Bank One did not in fact rely upon the indemnification in deciding to suspend the License Agreement.

Sunstar emphasizes that the district court held on summary judgment that Bank One could not be held liable for alleged breaches of its obligations and that Alberto could not be held liable for inducing those alleged breaches based on the statutory protections from legal liability granted to trustees under the *Trustees Act* but that the district court did not rule that the suspension was reasonable or proper. The district court did discuss Bank One's conduct in connection with the suspension in its opinion. In granting [*9] summary judgment, the district court specifically held that no genuine dispute of material fact existed as to whether Bank One used "reasonable care, skill, and caution in the selection" of outside counsel and whether Bank One actually relied on the advice of outside counsel in deciding whether to suspend the License Agreement. 11/7/02 Memo. & Order at 17-18. Sunstar does not adequately explain how Bank One could have used reasonable care, skill, and caution in the selection of outside counsel, a specialist in trademark law at the firm of Michael Best and Fredreich, and actually relied on the advice of outside counsel in making the decision to suspend the License Agreement but failed to form an "opinion . . . based upon reasonable ground" that a danger to the value or validity of the licensed marks existed. To grant summary judgment against Sunstar on its breach of contract claim because Bank One used reasonable care, skill, and caution in the selection of outside counsel and actually relied on counsel's advice is the practical equivalent of holding that Bank One formed an "opinion . . . based upon reasonable ground," even if Judge Lindberg's opinion did not explicitly state that the [*10] suspension was "based upon reasonable ground." Because the reasonableness of Bank One's conduct in connection with the suspension is no longer an issue for trial, the evidence Sunstar wants to admit is irrelevant and is excluded.

2. Reason or Justification for Adopting the 1999 Mark

Alberto seeks to exclude at trial argument or evidence concerning any reason or justification for Sunstar's adoption and use of the 1999 Mark. Alberto's motion is granted.

Sunstar wants to tell that jury that it adopted the 1999 Mark "to help revitalize the declining VO5 brand in Japan in direct response to consumer market research results and recommendations regarding the VO5 logo received from outside consultants, and not as an attempt to palm off its VO5 products as the products of someone else." Sunstar Memo. at 2. Alberto contends that evidence concerning any reason or justification for Sunstar's adoption and use of the 1999 Mark is irrelevant. Alternatively, Alberto argues that such evidence should be barred under *Federal Rule of Evidence 403* because it could confuse the jury by creating the false impression that Sunstar's business reasons for adopting [*11] the 1999 Mark constitute a valid defense to Alberto's breach of contract claim and cause the jury to prejudicially perceive Alberto as an unreasonable business partner that ignored Sunstar's marketing studies and efforts.

Sunstar responds that evidence of how and why it

