# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 00-684 |
| v. | ) ) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) | |

**APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)**

### VOLUME 1

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

# COMMITTEE APPENDIX

# Tab 1

**Adam Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS. L.L.P.*

---

## WILLIAM ADAM
### December 17, 2003

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

ADAM, WILLIAM



LEGALINK
A WORDWAVE COMPANY

WILLIAM ADAM

Page 134

1    THE WITNESS: I'll reread that again.
2    - - - -
3    (The witness reviewed the document.)
4    - - - -
5    THE WITNESS: Okay.
6    BY MS. MEADEN:
7    Q.    As I said earlier, this section, Roman numeral
8    III, financial projections, begins,
9    Mr. Dionisio reviewed AGH's major assumptions
10   for the projection period. The following items
11   were highlighted. There's a list.
12            The last bullet point, if you look at
13   the fourth -- third line from the bottom of the
14   page, it states, and AIHG.
15            See where I'm reading?
16   A.    Yes.
17   Q.    The primary care physician practice plan will
18   break even on an operating/cash basis by fiscal
19   year '99 requiring only capital support in
20   fiscal year '99 and thereafter.
21            My question is, does that refresh
22   your recollection as to projections that were
23   being made by management that the losses at
24   AIHG were projected to be relatively
25   short-term?

Page 135

1    MR. FRIESEN: Objection.
2    THE WITNESS: No. It does not jog my
3    recollection of that.
4    MS. MEADEN: Okay. You can put that
5    aside.
6    THE WITNESS: I wasn't at this
7    meeting, of course, and I'm not sure that I
8    even subsequently saw this piece of paper, but,
9    in any event, it does not jog my memory.
10   MS. MEADEN: I understand.
11   BY MS. MEADEN:
12   Q.    Now, if you would take a look at the document
13   that Mr. Friesen showed you earlier which is
14   marked as Exhibit 2101, those, for the record,
15   are the Allegheny Health, Education and
16   Research Foundation consolidated financial
17   statements, September 30, 1997.
18            Do you have that in front of you?
19   A.    I have it, yes.
20   Q.    And he directed your attention to the second
21   page of that document on the line item net
22   income, paren, loss, close paren?
23   A.    Uh-huh.
24   Q.    And I think he represented to you that the loss
25   at AHERF consolidated, that last column there,

Page 136

1    was approximately $42 million. It's difficult
2    to read.
3    A.    Right.
4    Q.    Do you recall having any feeling at that time,
5    and I'm talking about the first quarter fiscal
6    year 1998, which is when these financials
7    were -- the period these financials reflect,
8    having any belief that AHERF would not be able
9    to continue as a going concern?
10   A.    No.
11   Q.    Had you heard anything at that point from
12   AHERF's outside auditors that AHERF would not
13   be able to continue as a going concern?
14   A.    I have no recollection of that, no.
15   Q.    Earlier Mr. Friesen showed you two or three
16   documents that outlined certain critiques
17   regarding the way the AHERF board was run.
18            Did you ever feel, in light of those
19   criticisms that I think you said you agreed
20   with at the time, that you were ever hindered
21   in your exercise of your fiduciary duties as a
22   trustee of AHERF or Allegheny General Hospital?
23   MR. FRIESEN: Objection.
24   THE WITNESS: No.
25   BY MS. MEADEN:

Page 137

1    Q.    You felt that you were able to exercise your
2    fiduciary duty fully. Correct?
3    A.    Correct.
4    Q.    Now, did you understand at the time that you
5    were on the AHERF board that AHERF had outside
6    auditors reviewing its financial statements?
7    A.    Yes.
8    Q.    Did you know who the outside auditors were?
9    A.    Do I recollect --
10            Again, I think I knew that they were
11   Coopers. Do I recollect they were Coopers this
12   many years later? No.
13   Q.    Did you understand it was an outside accounting
14   firm?
15   A.    Yes.
16   Q.    And I think you testified in response to
17   Mr. Friesen's questions that you had no contact
18   with anyone from the audit team from the
19   auditors. Correct?
20   A.    Correct.
21   Q.    Now, as a volunteer trustee of a not-for-profit
22   organization like AHERF, that was not a
23   full-time position for you. Is that correct?
24   A.    That's correct.
25   Q.    And you couldn't give it the effort that you

35 (Pages 134 to 137)

WILLIAM ADAM

Page 138

1  were giving to your full-time job. Correct?
2  A.  Correct.
3  Q.  In light of that, did you rely then on outside
4      consultants such as the outside auditors for
5      AHERF to assist you in exercising your duties
6      as a trustee?
7  A.  Absolutely. Yes.
8          MR. FRIESEN: Objection to the term
9      "consultants."
10 BY MS. MEADEN:
11 Q.  Well, let me ask it this way. In light of what
12     we discussed, it not being a full-time job, did
13     you rely on the outside auditors to assist you
14     in exercising your fiduciary duties as a member
15     of the board of trustees of AHERF and its
16     entities?
17 A.  I did.
18 Q.  And did you rely on those outside auditors to
19     provide the board with accurate information?
20 A.  I did.
21 Q.  And did you rely on those outside auditors to
22     perform their audit of AHERF and its affiliates
23     and their financial statements to perform those
24     audits with integrity?
25 A.  I did.

Page 139

1  Q.  Did you rely on those auditors to inform the
2      audit committee or the board if they had
3      determined that the financial information that
4      AHERF presented for audit was not accurate?
5  A.  I don't know --
6          I did or I would, whatever the
7      appropriate answer is.
8  Q.  Do you recall at any time while you were a
9      member of the AHERF board of trustees ever
10     hearing from the outside auditors that the
11     information on AHERF's financial statements was
12     not accurate?
13 A.  Never heard any such mention.
14 Q.  Let me ask you this. What was your
15     understanding of the role that the outside
16     auditors played in reviewing AHERF's financial
17     statements?
18 A.  Well, I mean, I would assume that we were being
19     provided with accurate statements that were
20     prepared in accordance with whatever that's
21     called, the accounting principles, blah, blah,
22     blah, blah, blah, generally accepted accounting
23     principles, and that they were accurate, and
24     were an accurate portrayal of the operations.
25 Q.  You relied on the auditors to review those

Page 140

1  financial statements and to let you know if
2  there was something that wasn't in accordance
3  with the generally accepted accounting
4  principles?
5  A.  That is correct. That is correct.
6          MR. FRIESEN: Objection.
7  BY MS. MEADEN:
8  Q.  And are you familiar with the term "clean
9      opinion" that is used with respect to an
10     auditor's review of financial statements?
11 A.  If it means that we accepted -- that if there's
12     an auditor's statement that these were fine,
13     there was no exception, you know, except if
14     they wanted to say that, except one, we had a
15     problem, blah, blah, blah, blah, and there were
16     not any of those, I would assume that's a clean
17     opinion the way I understand it.
18 Q.  And during your tenure as a member of the AHERF
19     board of trustees, did you ever see anything
20     other than a clean opinion from the AHERF board
21     of auditors?
22 A.  I never did, so I assume I didn't.
23 Q.  Would you suspect --
24         If you did see a clean opinion, do
25     you assume that would be something you would

Page 141

1  have recalled?
2          MR. McCLENAHAN: If he would have
3      seen a clean opinion?
4          MS. MEADEN: If he had seen other
5      than a clean opinion.
6          THE WITNESS: I assume I would have
7      recalled that.
8          MR. FRIESEN: Objection.
9  BY MS. MEADEN:
10 Q.  Again, let me finish my question for the
11     record.
12         In your experience in business and as
13     a trustee of for-profit and not-for-profit
14     organizations, it is an unusual event if
15     something other than a clean opinion is given
16     on an entity's audited financial statements.
17     Is that correct?
18 A.  That would be my experience, yes.
19 Q.  In your view, and based on your experience,
20     what do you believe the significance of an
21     auditor's clean opinion is on audited financial
22     statements?
23 A.  That he's putting his professional reputation
24     on the line that these are, in fact, accurate
25     statements, and are so attesting to them.

36 (Pages 138 to 141)

**Page 142**

1  Q.  Does that give you personally a heightened
2      confidence if there's a clean opinion from an
3      auditor on the accuracy of the audited
4      financial statements?
5          MR. FRIESEN: Objection.
6          THE WITNESS: As opposed to one
7      that's --
8  BY MS. MEADEN:
9  Q.  As opposed to something other than a clean
10     opinion.
11 A.  Yes.
12 Q.  As a member of the AHERF board of trustees, you
13     relied on Coopers & Lybrand to provide that
14     kind of check of AHERF and its affiliates
15     audited financial statements. Correct?
16         MR. FRIESEN: Objection.
17         THE WITNESS: Correct.
18 BY MS. MEADEN:
19 Q.  You testified earlier that it was your practice
20     to review the audited financial statements from
21     AHERF shortly around the time that you received
22     them. Correct?
23 A.  Correct.
24 Q.  Did you use those audited financial statements
25     in any way to gauge the performance of the

**Page 143**

1      entity?
2  A.  I think it goes without saying that whatever
3      they're showing on the income statement is a
4      gauge of how the organization's doing, so yes.
5  Q.  And did you use those financial statements then
6      as a gauge of how management was doing in
7      running the day-to-day operations of the
8      entity?
9  A.  Yes.
10 Q.  Did you have any understanding as to whether
11     AHERF's audited financial statements were used
12     by persons or entities outside the AHERF system
13     for any purpose?
14 A.  Did I have any knowledge of that?
15 Q.  Or understanding.
16 A.  No. I might have had a presumption that they
17     would be used by a lender, but I have no
18     knowledge of that, no.
19 Q.  You understood that AHERF did, in fact, issue
20     bonds, had bond debt. Correct?
21 A.  Correct.
22 Q.  And you understood that AHERF had borrowed
23     money from certain entities.
24 A.  Correct.
25 Q.  And you would presume that those entities would

**Page 144**

1      have relied on the audited financial
2      statements.
3  A.  Correct.
4  Q.  Are you familiar with the term "management
5      letter" as that term is used in accounting
6      parlance?
7  A.  No.
8  Q.  By the way, you did receive internal financial
9      statements on a periodic basis from AHERF that
10     were not audited. Correct?
11 A.  I believe so.
12 Q.  Did you ever see anything in the audited
13     financial statements that caused you to
14     question the accuracy of the internal
15     nonaudited financial statements that you were
16     receiving from management?
17 A.  Not to my recollection.
18 Q.  Again, I'm going to ask you to wait until I
19     finish. I know you are anticipating where
20     we're going, but it is difficult for our court
21     reporter, whom we haven't fed lunch to.
22         Now, is it your understanding that
23     the auditors presented the audited financial
24     statements as an initial matter to AHERF's
25     audit committee before it went to the full

**Page 145**

1      board?
2  A.  I don't know the modus operandi of the audit
3      committee.
4  Q.  Do you know how the audited financial
5      statements were presented to the AHERF board?
6          MR. FRIESEN: Objection.
7          MR. McCLENAHAN: Do you mean how --
8  BY MS. MEADEN:
9  Q.  Logistically.
10 A.  You mean were they mailed to me or
11     hand-delivered to me or what?
12 Q.  Let's back up, and I'll break this down a
13     little bit.
14         Do you recall at AHERF board meetings
15     you attended discussion of AHERF financial
16     statements on at least an annual basis?
17 A.  Yes.
18 Q.  And do you recall there being actually a
19     presentation of the audited financial
20     statements to the board at board meetings?
21 A.  Yes.
22 Q.  My question is do you recall who made that
23     presentation?
24 A.  No.
25 Q.  But you don't recall it being made by the

37 (Pages 142 to 145)

WILLIAM ADAM

Page 146

1  outside auditors themselves. Correct?
2  A.  That's correct.
3  Q.  And if I told you in certain years David Barnes
4  as chairman of the audit committee presented
5  the audited financial statements to the board,
6  would that be consistent with your
7  recollection?
8  A.  Yes.
9  Q.  And is it your recollection that after the
10  audited financial statements were presented to
11  the board --
12  A.  Let me retract.
13  Q.  Uh-huh.
14  A.  It's, once again, hard to do perfect pictures
15  of an event. Do I remember David Barnes
16  standing up handing out the audit reports? No.
17  Would I presume he would have as the
18  chairman of either the audit or finance
19  committee? Yes.
20  Q.  Do you recall the board being asked to vote on
21  a resolution approving the audited financial
22  statements?
23  A.  Yes.
24  Q.  Now, based on your experience both in business
25  and on various boards, did you have any

Page 147

1  expectation as to the types of things that
2  outside auditors should bring to the attention
3  of either the audit committee of an entity or
4  its board as a whole?
5  A.  Well, I suppose they might make commentary on,
6  say, one's receivables policy. What else? I
7  suppose the methods of depreciation utilized
8  perhaps. I can't --
9  There are probably others if I would
10  sit here and think about it for a while.
11  Q.  Would it be your expectation if the auditors
12  had found material misstatements in the
13  financial statements that were presented for
14  audit that they should bring that to the
15  attention of the audit committee or the board?
16  A.  Yes.
17  Q.  Would it be your expectation that if the
18  outside auditors found intentional
19  misstatements in the financial statements
20  presented for audit that they would bring that
21  to the board or the audit committee's
22  attention?
23  A.  Yes.
24  Q.  Would the same be true for issues they found
25  that reflected on the competency of an entity's

Page 148

1  financial management?
2  MR. FRIESEN: Objection.
3  THE WITNESS: Somewhere between
4  probably and possibly, depending on the
5  severity of what was uncovered.
6  MS. MEADEN: Would you expect that an
7  outside auditor would bring to the attention of
8  an outside audit committee or board issues
9  bearing upon the integrity of the outside
10  financial management that they discovered as
11  part of their audit?
12  MR. FRIESEN: Objection.
13  THE WITNESS: Yes.
14  MS. MEADEN: Would you expect outside
15  auditors to bring to the attention of the
16  outside audit committee or the board fraudulent
17  conduct they discovered as part of their audit?
18  THE WITNESS: Yes.
19  MR. FRIESEN: Objection.
20  BY MS. MEADEN:
21  Q.  Did you expect AHERF's outside auditors to
22  bring those types of matters to the audit
23  committee or to the board of directors as a
24  whole?
25  A.  Yes.

Page 149

1  Q.  At any time during your tenure on the board of
2  trustees of AHERF, were you ever informed that
3  Coopers & Lybrand had raised any matters of
4  these types with anyone on the audit committee
5  or the board of trustees?
6  A.  No.
7  MR. FRIESEN: Objection.
8  MS. MEADEN: If Coopers & Lybrand had
9  come to the board and informed the board that
10  the fiscal year 1996 or 1997 financial
11  statements that were presented to them for
12  audit were materially misstated, if you had
13  received that information, would that have
14  caused you concern?
15  MR. FRIESEN: Objection.
16  THE WITNESS: Obviously.
17  BY MS. MEADEN:
18  Q.  Why is that?
19  A.  It's kind of like ipso facto, isn't it?
20  Q.  It would have caused you to question the
21  financial performance of the entity. Correct?
22  A.  Yes. It would have caused me to question a
23  number of things, including that.
24  Q.  Would it have caused you to question --
25  A.  Rephrase your initial --

38 (Pages 146 to 149)

WILLIAM ADAM

Page 150

1    Did you say "material"?
2  Q.  Material misstatements.
3  A.  On the part of?
4  Q.  Contained within the financial statements that
5    were presented to Coopers & Lybrand for audit.
6    MR. FRIESEN:  Objection.
7    THE WITNESS:  I guess I would have to
8    know how they were -- what they were and how
9    they were uncovered exactly perhaps before I --
10  BY MS. MEADEN:
11  Q.  I'm not sure I understand your answer.
12  A.  Rephrase your question.
13  Q.  Let me ask it this way.  If Coopers & Lybrand
14    had come to the board or to the audit committee
15    and said we have fiscal year 1996 or fiscal
16    year 1997 audited or financial statements that
17    have been presented to us for audit; we've
18    determined that there are material
19    misstatements contained within these financial
20    statements, my question to you is would that
21    have caused you concern?
22  A.  This is not one they discovered in the prior
23    year, but the current ones they are currently
24    presenting they found a misstatement?
25  Q.  Yes, yes, that had been presented to them for

Page 151

1    audit, they found material misstatements
2    contained within those financial statements,
3    would that have caused you concern?
4  A.  Yes.
5    MR. FRIESEN:  Wait, wait, wait.
6    Objection.
7    MS. MEADEN:  And my question is, why
8    would that cause you concern?
9    MR. FRIESEN:  Objection.
10    You can answer.
11    THE WITNESS:  It would cause me
12    concern because I would want to know what the
13    nature of the misstatements were and who
14    perpetrated them and why.
15    MS. MEADEN:  So you would have wanted
16    some kind of investigation conducted as to the
17    nature of these material misstatements?
18    THE WITNESS:  Yes.
19    MR. FRIESEN:  Objection.
20    We're going to have to slow down a
21    little bit so I can get my objection in.
22    MS. MEADEN:  And you would have
23    had --
24    Depending on how that investigation
25    turned out, the board would have had a number

Page 152

1    of options available to it as to how to proceed
2    then.  Correct?
3    MR. FRIESEN:  Objection.
4    THE WITNESS:  Correct.
5    MS. MEADEN:  Can you think of any
6    options that the board might have had?
7    MR. FRIESEN:  Objection.
8    THE WITNESS:  I would presume that
9    depending on what the circumstances were,
10    either the financial staff of AHERF was up to
11    some shenanigans or Coopers were not doing
12    their job properly.
13    MS. MEADEN:  And you would have
14    followed whatever prudent course was dictated
15    by the results of that investigation.  Correct?
16    MR. FRIESEN:  Objection.
17    THE WITNESS:  I certainly hope so.
18    Sorry.  Was that too fast?
19    MS. MEADEN:  If Coopers had come to
20    you with that kind of information, that
21    certainly wouldn't have been something that
22    you, as a member of the board of trustees,
23    would have ignored.  Correct?
24    MR. FRIESEN:  Objection.
25    THE WITNESS:  Correct.

Page 153

1    MS. MEADEN:  If Coopers had come to
2    you and said that the fiscal year '96 or '97
3    financial statements that had been presented to
4    them for audit contained intentional
5    misstatements, would that have been something
6    that would have caused you concern?
7    MR. FRIESEN:  Objection.
8    THE WITNESS:  Yes, although I'm kind
9    of mystified by your time sequence here when
10    you say the ones that were presented to them
11    and -- because you put two years --
12  BY MS. MEADEN:
13  Q.  I'm sorry.  I'm not trying to confuse you.  I'm
14    saying in either of those years --
15  A.  If in either of those years that --
16  Q.  I can break it down into two questions.
17  A.  According to Coopers contained misstatements,
18    would I --
19  Q.  Intentional misstatements.
20  A.  Would I be concerned?  Yes.
21  Q.  For the reasons you testified to earlier?
22  A.  Yes.
23  Q.  And again, you would have wanted some kind of
24    investigation done as to what was behind all of
25    that.  Correct?

39 (Pages 150 to 153)

WILLIAM ADAM

Page 154

1  A.   Yes.
2          MR. FRIESEN: Objection.
3          MS. MEADEN: And, likewise, you would
4   have followed whatever prudent course was
5   dictated by the outcome of that investigation.
6   Right?
7          MR. FRIESEN: Objection.
8          THE WITNESS: Correct.
9          MS. MEADEN: Now, if
10  Coopers & Lybrand had come to the board and
11  said they had questions about the integrity and
12  honesty of AHERF's senior financial management,
13  would that have caused you concern?
14         MR. FRIESEN: Objection.
15         THE WITNESS: Yes.
16 BY MS. MEADEN:
17 Q.   Why?
18 A.   You're raising major questions about the whole
19  structure of the hospital, how it's being run,
20  whether we have the right people, whether
21  somebody has been up to something, a myriad of
22  questions have been raised.
23 Q.   Again, would you have wanted to conduct an
24  investigation to get to the bottom of it all?
25 A.   Absolutely.

Page 155

1          MR. FRIESEN: Objection.
2          MS. MEADEN: And, likewise, you would
3   have pursued the inquiry and taken whatever
4   recourse was dictated by the outcome of that
5   inquiry. Correct?
6          MR. FRIESEN: Objection.
7          THE WITNESS: Correct.
8          MS. MEADEN: If revelations of this
9   type had been brought to your attention, would
10  that have caused --
11         Let me say it this way. Would that
12  have affected your view as to whether AHERF
13  should continue on a strategy of acquiring
14  physician practices?
15         MR. FRIESEN: Objection.
16         THE WITNESS: Perhaps. It would have
17  to depend on exactly what the circumstances
18  were.
19         MS. MEADEN: Again, that would not
20  have been something that you as a board of
21  trustees would have ignored if Coopers had come
22  to you with that type of information. Correct?
23         MR. FRIESEN: Objection.
24         THE WITNESS: Correct.
25 BY MS. MEADEN:

Page 156

1  Q.   Do you recall sometime during the summer and
2   fall of 1998 that there was a decision made to
3   publicly announce that the 1997 financial
4   statements of AHERF could not be relied upon?
5  A.   No.
6  Q.   So, therefore, you don't recall being involved
7   in that decision. Correct?
8  A.   I do not recall.
9  Q.   Do you recall that sometime during the fall of
10  1998 that Coopers & Lybrand was discharged as
11  AHERF's outside auditors?
12 A.   I don't recall.
13 Q.   Therefore, you don't recall being involved in
14  that decision?
15 A.   No.
16 Q.   I'm going to ask you to take a look at Exhibit
17  522 that was marked earlier today. For the
18  record, this is a copy of the slide
19  presentation that was presented to the AHERF
20  board at its April 5th, 1997 -- at its board
21  retreat at the Duquesne Club, and we talked
22  about it at length this morning.
23         I'm going to ask you to take a look
24  at the page that's marked with the Bates label
25  D-S 01849. See that?

Page 157

1  A.   Yes.
2  Q.   For the record, it's labeled eastern region
3   market trend AHERF market share, and it's a
4   graphic depiction of the percentage of AHERF
5   market share that, you know, AHERF was
6   projected to acquire over a period of time.
7   Correct?
8  A.   Correct.
9  Q.   All right. And does --
10         Looking at that graph, is that
11  consistent with your recollection that
12  Mr. Abdelhak was indicating during that board
13  retreat that he believed that AHERF could hold
14  its own in the face of declining admissions by
15  raising its market share?
16 A.   Correct.
17 Q.   And I think you testified earlier that during
18  that meeting you believe you raised issues
19  about whether or not AHERF was moving too
20  rapidly, and I think your testimony was that
21  Sherif had assured you that AHERF wasn't moving
22  too rapidly and had the financial strength to
23  complete the process. Correct?
24 A.   Correct.
25 Q.   All right. At that time or up until that time,

40 (Pages 154 to 157)

WILLIAM ADAM

<pre>
                                           Page 170
 1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T
 2
        I, WILLIAM ADAM, have read the foregoing pages
 3  of my deposition given on December 17, 2003, and wish
    to make the following, if any, amendments, additions,
 4  deletions or corrections:
 5  Page/Line  Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21     _____
            WILLIAM ADAM
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
         Notary Public
25       AKF Reference No. gd78684
</pre>

Adamczak Dep.

1

1          UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                    - - -

4  THE OFFICIAL COMMITTEE OF THE        )
   UNSECURED CREDITORS OF ALLEGHENY     )
5  HEALTH, EDUCATION AND RESEARCH       )
   FOUNDATION,                          )
6                                       )
             Plaintiff,                 )
7                                       )
        vs.                             ) Civil Action
8                                       ) No. 00-684
   PRICEWATERHOUSECOOPERS, LLP,         )
9                                       )
             Defendant.                 )

10                   - - -

11    Videotaped Deposition of ALBERT ADAMCZAK

12         Thursday, June 19, 2003

13               Volume I

14                   - - -

15        The videotaped deposition of ALBERT ADAMCZAK,
16  called as a witness by the Plaintiff, pursuant to
    notice and the Federal Rules of Civil Procedure
17  pertaining to the taking of depositions, taken before
    me, the undersigned, Teresa Constantini, a Notary
18  Public in and for the Commonwealth of Pennsylvania, at
    the law offices of Jones, Day, Reavis & Pogue, One
19  Mellon Bank Center, 500 Grant Street, 31st Floor,
    Pittsburgh, Pennsylvania 15219, commencing at
20  8:59 a.m. the day and date above set forth.

21                   - - -

22         COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.
23            PITTSBURGH, PENNSYLVANIA
                 412-281-0189

24                   - - -

25

PAGE 18

**18**

1 Allegheny General Hospital, or did you approach them?
2   A   I had approached them, although after
3 the -- what I had done was, I had spoken to what you
4 would call a head hunter, and he had approached them.
5   Q   As director of accounting, when you first
6 started with the predecessor enterprised AHERF, what
7 were your general duties?
8   A   To oversee the payroll function, the
9 accounts payable function, and the accounting
10 function.
11   Q   And how many finance department personnel
12 reported to you, or accounting personnel?
13   A   I'd say roughly about 30.
14   Q   And when you started with these
15 responsibilities at Allegheny General Hospital in your
16 reporting to Mr. Donnelly, who were the auditors for
17 the enterprise?
18   A   The firm that's now PricewaterhouseCoopers;
19 they were Coopers & Lybrand at the time.
20   Q   When you joined, did you have any
21 understanding, or did you come to learn how long C&L,
22 Cooper & Lybrand, had been the auditors for Allegheny
23 General Hospital?
24   A   Yeah.  I can't tell you exactly, but I know
25 it was a very long time.

PAGE 19

**19**

1   Q   Even before you arrived?
2   A   Oh, absolutely.
3   Q   More than ten years before you arrived?
4   A   Yes, absolutely more than that.
5   Q   How long did you hold the position of
6 director of accounting, the position you started with?
7   A   I would say for maybe two years or so.
8   Q   And your next position was what?
9   A   I believe it had the same title, other than
10 it -- the responsibilities changed.
11   Q   And what were the new responsibilities?
12   A   That I picked up responsibility for
13 budgeting for Allegheny General Hospital, and I think
14 business planning, or business development, or
15 something it was called.
16   Q   Other than -- during this what I'll call
17 two year plus time now -- let me ask this question:
18 How long did you hold this next position with the same
19 title but these additional responsibilities?
20   A   Probably for another, say, two to
21 three years.
22   Q   So during these initial three to -- four to
23 five years, was there an accounting manager or officer
24 senior to you other than Mr. Donnelly?
25   A   Yes.

PAGE 20

**20**

1   Q   Okay.
2   A   The first two -- two years, I reported to
3 Mr. Donnelly.
4       After that point, there was a
5 reorganization, and I reported to Steve Spargo.
6   Q   And so did your reporting to Mr. Spargo
7 coincide with this new position with a couple added
8 responsibilities?
9   A   Yes.
10   Q   And what was Mr. Spargo's title at the
11 time?
12   A   Initially, Steve Spargo was assistant vice
13 president of finance, and he later became vice
14 president of finance.
15       And I think he ultimately may have been
16 senior vice president of finance before he left.
17   Q   And at the time that you first took the new
18 position with the same title but the added
19 responsibilities, did Mr. Spargo, in turn, report to
20 Mr. Donnelly?
21   A   No.
22       Mr. Spargo reported to Mr. Dionisio.
23       As a part of that reorganization,
24 Mr. Dionisio became the CFO for Allegheny General
25 Hospital.

PAGE 21

**21**

1   Q   And did Mr. Donnelly stay a part of the
2 organization?
3   A   Yes.  He was the CFO for the parent
4 company.
5       And I believe at that time payroll and
6 disbursement stayed under Mr. Donnelly, and I picked
7 up the budgeting and the financial forecasting, and so
8 forth, along with the accounting for Allegheny General
9 Hospital.
10       So, in essence, I kind of moved from the
11 parent company down to the hospital.  There was a
12 split in that.
13   Q   And the Mr. Dionisio we've been referring
14 to, his first name is Joseph; is that right?
15   A   That's correct.
16   Q   So your focus at the time of this new post
17 and the coincident reporting to Mr. Spargo was the
18 AG -- Allegheny General Hospital?
19   A   Correct.
20   Q   And how long did you stay in this post?
21       I think you told me two to three years.
22   A   I was -- I was there until Steve left, in
23 essence, which would have been May, the end of May,
24 1997.
25   Q   All right.

SHEET 4  PAGE 22

**22**

```
1        So it would have been --
2   A   Probably longer, yeah.
3   Q   -- longer than two or three years?
4   A   Yea.
5   Q   So it went from '89, it gave you two years
6  in your first post, that takes us into the --
7   A   '91. So probably more, like, six years.
8   Q   Okay.
9        So your primary responsibilities, then, as
10 you understood them, from about '91 to '96, were AGH
11 related?
12  A   Yes, although the corporate accounting for
13 the parent company came back under us at some point
14 along the way.
15  Q   Right.
16       And when approximately was that?
17  A   I want to say when Joe Donnelly left, which
18 I don't exactly remember when that was.
19  Q   Okay.
20       Did your title ever change?
21  A   Yes.
22       I went from director -- it was always
23 director of finance.
24       At some point, it became senior director of
25 finance.
```

PAGE 23

**23**

```
1   Q   Was that when you picked up the AHERF
2  parent level responsibilities?
3   A   I believe so.
4   Q   And that was some time before -- is that
5  when Mr. Spargo level, or before Mr. Spargo left?
6   A   Before he left. Probably a good year or
7  two before he left.
8   Q   Okay.
9        Did you take on added responsibilities when
10 he left?
11  A   Yes.
12       Initially, there was a period of about a
13 month where everything remained in limbo, and then at
14 some point Mr. McConnell, who was the executive vice
15 president of finance and oversaw all the finance,
16 asked me to, in essence, become the vice president of
17 finance, and oversee basically all the finance area
18 other than patient receivables, which was always
19 separate.
20  Q   And that was handled by a group at some
21 point called patient -- the patient financial services
22 group?
23  A   That's right, that reported to
24 Joe Dionisio.
25  Q   Okay.
```

PAGE 24

**24**

```
1        So at the time Mr. Spargo leaves in '96, do
2  you, then, essentially take over his title, his prior
3  title?
4   A   Yeah.
5        He -- he left in '97, if I believe; right?
6   Q   Then I misspoke, and I apologize.
7        But at the time he left, is that when you
8  took on his title?
9   A   I did not take on his title. There was
10 about a month lapse.
11  Q   I understand.
12  A   Then I took on -- he was senior vice
13 president. I took on the title vice president.
14  Q   Thank you.
15       And you report, though, at that -- you
16 reported, though, at that time, that is, the time you
17 became vice president, was to Mr. McConnell?
18  A   That's correct.
19  Q   Before, you had always reported either to
20 Mr. Donnelly or Mr. Spargo?
21  A   Correct.
22       And there was some overlap with
23 Mr. Dionisio, because he was the CFO for Allegheny
24 General Hospital.
25  Q   So you had some either dotted line or
```

PAGE 25

**25**

```
1  straight line --
2   A   Yes.
3   Q   -- responsibilities to Mr. Dionisio, as
4  well?
5   A   Correct.
6   Q   At or before the time Mr. Spargo left, had
7  you become involved in any aspect of accounting for
8  the operations in the eastern Pennsylvania hospitals?
9   A   When the acquisition occurred relative to
10 the hospitals that were purchased in and around '96, I
11 was asked to go out and help coordinate the plan to
12 bring back the accounting and the finance operations,
13 and consolidate them into our corporate department.
14       So I spent some time in Philadelphia
15 helping to do that.
16  Q   In about the fiscal year or calendar year
17 1996 time frame?
18  A   I'd say it started somewhere in '96 and
19 went through right before Steve left.
20       Maybe April of '97 or so I think we
21 finished up out there.
22  Q   But you're speaking in calendar year terms?
23  A   Yes.
24  Q   Before that time, did you have any
25 responsibility for oversight with respect to the
```

PAGE 26
26

1 accounting for operations in the Philadelphia or
2 eastern hospitals?
3    A   No, no.
4    Q   But as -- when you took on that
5 responsibility with respect to consolidating the
6 accounting function and thereafter, did you have some
7 responsibility for accounting for eastern operations?
8    A   I think technically I was to look at one or
9 two of the hospitals, I think Parkview, and it might
10 have been City Avenue, to make sure that they got
11 closed every month, but I don't know that I really
12 made any of the decisions relative to anything that a
13 decision needed to be made on.
14    Q   You were informed generally in your role,
15 but may not have been involved in the day-to-day
16 decisions; is that fair to say?
17    A   Right, right.
18      I kind of handled the process to make sure
19 the accounting -- the entries got made, the financial
20 statements got produced, and that they looked
21 reasonable, but if there was an issue, I generally
22 wasn't the decision maker.
23    Q   And who generally was?
24    A   I would say ultimately, depending on the
25 size of the decision, it was probably discussed with

PAGE 27
27

1 Mr. McConnell.
2    Q   And if it was decided at a level below
3 Mr. McConnell, who would it have been?
4    A   Probably Steve Spargo, and coming down the
5 ladder, it would have been Dan Cancelmi, and then I
6 possibly might have been asked for input after that.
7    Q   When you became vice president, however,
8 you had oversight function and responsibility for all
9 hospitals operations, east and west?
10    A   Technically, yes.
11    Q   And you qualify that why?
12    A   Because practically the state of the events
13 was that it was -- there was so much going on that
14 Mr. McConnell asked me to get deeply involved with
15 paying vendors, and cash flow, and understanding cash
16 flow items, and that because Dan Cancelmi was
17 considered a very strong accountant, that he would
18 basically handle the day-to-day accounting operations.
19    Q   For both eastern and western enterprises?
20    A   Yes.
21    Q   There was, if not a formal, an informal
22 separation of responsibility?
23    A   Yes, although I ultimately still had
24 responsibility for --
25    Q   There was at least a focus change?

PAGE 28
28

1    A   Correct.
2    Q   And your focus was dealing with vendor and
3 cash flow issues at Mr. McConnell's request?
4    A   Correct, and special projects that he had.
5    Q   And Dan Cancelmi's focus at Mr. McConnell's
6 request was general accounting operations, east and
7 west?
8    A   Correct, correct.
9    Q   And this focus shift, if you will, took
10 place approximately when?
11    A   June or July of 1997.
12    Q   And it was occasioned by what, as you
13 understood it? Why the shift?
14    A   Because of the tightness of the cash, cash
15 flow.
16    Q   Meaning?
17    A   And vendors -- vendor issues, them shutting
18 us off, the fear that the hospital might have a
19 catastrophic event because they couldn't get supplies
20 for not paying vendors.
21      So my job basically, along with Dave Deasy,
22 who was the director disbursements at that point, was
23 to juggle the cash that we had amongst the vendors, to
24 make sure that we got critical supplies into the
25 hospital so that there were no major medical events.

PAGE 29
29

1    Q   And that's what you meant by a
2 "catastrophic event"?
3    A   Right.
4    Q   Where a supply was not delivered due to
5 nonpayment, and there might be a health care
6 problem --
7    A   Right.
8    Q   -- as a result from --
9    A   A patient was in surgery, and they didn't
10 have a supply to perform the surgery because a vendor
11 hadn't been paid.
12    Q   Mr. Adamczak, we're doing essentially fine,
13 but I think the court reporter will be happier if you
14 hold your answer till I'm done with the question.
15    A   Okay.
16    Q   You often -- and it's every witness who
17 does this -- know the answer to my questions before I
18 ask them --
19    A   Sure.
20    Q   -- but if you do that, she'll be happier, I
21 think.
22    A   Okay.
23    Q   And in your experience, then, in the -- I
24 think you told me June 19 -- before the June of 1997
25 time frame, this focus shift took place?

SHEET 5   PAGE 30

**30**

1  A   No, it was somewhere around --

2  Q   June of 1997?

3  A   Yeah, really it was more like July.

4  Q   Okay.

5  A   The -- the cash flow issues had raised
6  their head much before then.  Probably in 1996.

7  Q   But your focus shifted --

8  A   But my focus shifted in June or July of
9  '97.

10  Q   And can you give me some examples of the
11  cash tightness and the kinds of events you were
12  experiencing with vendors that caused Mr. McConnell to
13  ask you to focus your attention --

14  A   Yeah.

15  Q   -- in this way?

16  A   Dave Deasy, who was the director of
17  disbursements, and the primary contact to the vendors,
18  would routinely have several hundred pink slips, which
19  are phone messages, on his desk that would come in per
20  day, with messages like, "If we do not get cash, you
21  will be shut off tomorrow," "We're not delivering
22  supplies until we get paid."

23      He would routinely have vendors show up in
24  his office and state that they would not leave until
25  they were paid, and sit out in the waiting room.

---

PAGE 31

**31**

1      We continually talked to vendors who told
2  us they would have to close their business if we
3  didn't pay them because they couldn't pay their
4  salaries.

5      Certain vendors had set us up on payment
6  schedules, where Dave and I had to, in essence, cut a
7  check, get in the car and take it to a bank and have
8  it deposited, and the vendor would receive notice from
9  the bank that the check was deposited before they
10  would release the supplies or the material.

11  Q   And these kinds of events started in
12  calendar year '96?

13      MR. RYAN:  Objection.

14  BY MR. JONES:

15  Q   You can go ahead and answer.

16  A   They started in '96, but were more
17  prevalent in '97.

18  Q   And for which hospitals were these vendors
19  filling Mr. Deasy's desk with pink slips?

20  A   It was for all the hospitals.

21  Q   East and west?

22  A   Yeah, but primarily the eastern hospitals.

23  Q   Did you -- you obviously discussed, then,
24  this problem with Mr. McConnell?

25  A   He was quite aware of it.

---

PAGE 32

**32**

1  Q   And you did discuss it with him?

2  A   Yes.

3  Q   Did you --

4  A   He -- excuse me.

5      He would often get calls from vendors,
6  himself, as would board members.

7  Q   And how did you ever learn that a board
8  member got a call?

9  A   Mr. McConnell would call and say, "A board
10  member got a call, and we need to get with this vendor
11  and resolve the issue."

12  Q   Do you recall the name of any board member?

13  A   No.

14  Q   So you learned it through a discussion with
15  Mr. McConnell?

16  A   Yes.

17  Q   Did you discuss this cash flow issue and
18  the issues relating to the pink slips that arrived on
19  Mr. Deasy's desk with any of the auditors at
20  Coopers & Lybrand at any time?

21  A   I did not, but I believe at some point,
22  and I don't remember the date, one of the
23  Coopers & Lybrand auditors may have actually been
24  hired as an independent person to help in the accounts
25  payable area.

---

PAGE 33

**33**

1  Q   Do you recall who that was?

2  A   I think it was a Dawn Zink.

3  Q   And what did you understand his role was to
4  be?

5  A   It was a woman.

6  Q   I'm sorry.  D-a-w-n?

7  A   Yes.

8  Q   And what did you understand Ms. Zink's role
9  to be?

10  A   To help us with the cash flow issues
11  relative to accounts payable.

12  Q   And do you know roughly when that might
13  have occurred?

14  A   I don't.  I can't remember.

15  Q   Was that her post here in Pittsburgh?

16  A   Could you clarify that?

17  Q   I mean, did she perform her work here in
18  Pittsburgh?

19  A   Yes.

20  Q   At the Clark Building?

21  A   Yes.

22  Q   Did you ever learn that others at AHERF
23  accounting shared the cash tightness issues we've just
24  discussed with the auditors at Coopers & Lybrand?

25  A   At one point, I was asked to do a project

SHEET 9  PAGE 62

**62**

1  Q    And the underlying data would have been
2  retrieved from some other, I assume, system?
3  A    Yes.
4  Q    And what system would that have been?
5  A    The McCormick and Dodge system.
6  Q    And the McCormick and Dodge system was the
7  system on which AHERF kept its general ledger?
8  A    That's correct.
9  Q    And was in place at the time you arrived at
10 AHERF and throughout the time you were there?
11 A    Yes.
12 Q    And that's an electronic general ledger
13 system?
14 A    Correct.
15 Q    Is it a common general ledger system, or
16 was it a common general ledger system in place in
17 health care enterprises during those years?
18 A    I don't know whether it's a common system
19 in health care enterprises.
20      I was told that it is a pretty common
21 system for big companies.
22 Q    Who told you that?
23 A    I just either read it or heard it through
24 conversation.
25 Q    What is the general purpose of a general

---

PAGE 63

**63**

1  ledger, whether maintained electronic or otherwise?
2  A    To track transactions and allow information
3  to be summarized and reported, basically to show that
4  the financial data for any -- any company or
5  enterprise.
6  Q    And ultimately is it a source document for
7  the balance sheet and the statement of operations and
8  other financial statements?
9  A    Yes.
10 Q    Do all transactions go through the general
11 ledger at AHERF, or did they, rather, in the
12 relative -- the time period you were there?
13 A    I need you to clarify generally what --
14 generally -- generally anything that was in the
15 financial statements went through the general ledger
16 at some point.
17 Q    Do all journal entries made by department
18 personnel or department accounting personnel get --
19 find their way to the general ledger?
20 A    They are supposed to, and if they're in the
21 financial statements, yes.
22      In other words, somebody -- the exception
23 might be somebody may write up a journal entry and
24 write it up incorrectly, and upon looking at it, know
25 that it's wrong. That may not make its way.

---

PAGE 64

**64**

1       But anything that is in the general ledger
2  generally either gets there through a journal entry,
3  or through a system that's set up, like a cash receipt
4  or disbursement system, where information is keyed in,
5  and the system then posts to the general ledger.
6  Q    I see.
7       So it short circuits the request for a
8  journal entry in that case?
9  A    Correct, because generally it's a high
10 volume of similar transactions.
11 Q    And the typical journal entry process while
12 you were at AHERF was a written request for a journal
13 entry that was then keyed after approval?
14 A    That's correct.
15 Q    And who gave the approvals?
16 A    Generally, it was the accounting director
17 or senior director, whatever you would call that role
18 on routine items, and as they became more major, they
19 were approved at higher levels in the organization.
20      Now, the approval did not always include a
21 sign off on a journal entry.
22      So by that I mean, if there was a large
23 item, David McConnell, who would most -- most
24 assuredly know about the entry, may not have signed
25 off on the physical journal entry.

---

PAGE 65

**65**

1  Q    He may have signed off in some other way?
2  A    Or verbally.
3  Q    When you said that finance directors or
4  senior finance directors, did you mean those with
5  responsibility for a given hospital or enterprise
6  within the system?
7  A    Yes.
8  Q    Through your contacts with
9  Coopers & Lybrand during the audit process or
10 otherwise, did you understand that they had come to
11 understand what the general ledger system was?
12 A    Oh, I believe so, and I believe it's pretty
13 standard amongst all companies.
14 Q    Did you ever have a discussion with them
15 about the way the general ledger system worked and
16 operated?
17 A    No, no.
18 Q    Did they ever ask you for access to the
19 general ledger?
20 A    When you say "access," what do you mean?
21 To view the general ledger?
22 Q    Yes, either on screen, on line, or
23 otherwise.
24 A    Well, we often produce for them trial
25 balances and reports that came out of the system. So

---

66

1 from that perspective, they viewed it.

2 Q    And let me understand that if I can.

3        When you're saying you produce trial

4 balances and schedules, were those directly from the

5 general ledger, or was that data then put into one of

6 the spreadsheets you talked about and given to

7 Coopers & Lybrand in that format?

8 A    Both.

9 Q    Okay.

10       So sometimes there's a -- sort of a print

11 button you can hit on the general ledger that would

12 produce a trial balance that was given to

13 Coopers & Lybrand?

14 A    Correct.

15 Q    Do you know whether Coopers & Lybrand ever

16 asked for or got access to work in the general ledger

17 on line with a keyboard, or a mouse, if that was

18 available?

19 A    I believe they viewed certain things in the

20 general ledger, like account activity.

21       I most assuredly believe that they had no

22 access to make entries or entries into the general

23 ledger.

24       They could only view what was already in

25 the general ledger.

67

1 Q    All right.

2        But you saw them, or witnessed them, or

3 understood otherwise that they had that kind of

4 access?

5 A    Yes.

6 Q    Which was it? Did you actually see it

7 happen?

8 A    I believe I've seen them look at account

9 detail.

10 Q    And you heard it from others?

11 A    Yes.

12 Q    Mr. Adamczak, you're familiar with the term

13 "bad debt reserve" or "allowance for uncollectible

14 accounts" in your work at AHERF?

15 A    I am.

16 Q    And are those synonymous terms?

17 A    Yes.

18 Q    And what are those terms -- what do they

19 reflect on the books and records at AHERF?

20 A    What a bad debt reserve or an allowance

21 for doubtful accounts relates to is a reserve, in

22 essence, that is set up to reduce receivables to what

23 you think the net collectible value is without

24 specifically writing off the individual underlying

25 account.

68

1        It's more or less a pool, or a pool of

2 write offs that bring the receivables down to what you

3 think you ultimately will collect.

4        Because oftentimes you want to maintain the

5 detail of the receivables and pursue collection versus

6 writing them off.

7        Even though you don't think they're

8 collectible, you provide this reserve to bring them

9 down to the net realizable value.

10 Q    And the net realizable or net collectible

11 value is re -- sought after and to be reflected on the

12 financial statements to show the accounts receivable

13 at a reasonably collectible estimated value?

14 A    That's correct.

15 Q    So that they're not overstated, that is,

16 the accounts receivable?

17 A    Correct.

18 Q    On the balance sheet?

19 A    Correct.

20 Q    And how does -- how did AHERF typically

21 establish bad debt reserves?

22 A    The typical methodology was to review the

23 accounts receivable in buckets that were set up to

24 reflect the different insurance providers or the

25 payors, and then within each bucket or payor

69

1 classification, to look at the aging, in other words,

2 how long the receivable had been outstanding or, i.e.,

3 from the date of the invoice until the current period,

4 how long it had been uncollectible.

5        And the theory, then, was to particularly

6 take a harder look at the older receivables that

7 hadn't been collected, and they were higher

8 candidates, or more likely not to be collected.

9        So in that instance, you provided either a

10 higher reserve or fully reserve those accounts.

11 Q    Your reserve percentages that apply to

12 these aging buckets typically would be higher for the

13 older accounts?

14 A    Exactly.

15 Q    And that's a summary of the methodologies

16 applied; is that right?

17 A    That's correct.

18 Q    To arrive at a reserve amount?

19 A    That's correct.

20       Now, as we talked about, there were a

21 number of acquisitions in the '96 time frame, '97 time

22 frame.

23       Each hospital that we acquired may or may

24 not have subscribed to that methodology, and one of

25 the processes that we were going through was to

PAGE 162

162

1    MR. JONES: Let's take a quick break here.
2    THE VIDEOGRAPHER: This concludes tape two
3 of the deposition of Mr. Adamczak. We're off
4 the record. The time is 1:42 p.m.
5    (Recess taken.)
6    THE VIDEOGRAPHER: Standby, please.
7    This begins tape three of the deposition of
8 Mr. Albert Adamczak. We are back on the record.
9 The time is 1:48 p.m.
10 BY MR. JONES:
11    Q    Mr. Adamczak, at the outset of your
12 deposition then, or recently just before our break, we
13 talked about the wrap-up or closing meeting for the
14 '96 audit work done by Coopers & Lybrand.
15    You believe that to have taken place in
16 roughly the August 1996 time frame?
17    A    Yes.
18    Q    And you were in attendance.
19    Do you recall who else was in attendance?
20    A    I believe David McConnell, Joe Dionisio,
21 Steve Spargo, myself, Dan Cancelmi, Bill Buettner,
22 Mark Kirstein, and I don't know whether Amy Frazier
23 was there or not, but she very well may have been.
24    Q    Okay.
25    Where do you think -- believe that that

PAGE 163

163

1 meeting was held?
2    A    David McConnell's office.
3    Q    Does he have a big conference table?
4    A    Yes.
5    Q    What are closing meetings generally about?
6    A    It's generally a chance for
7 Pricewaterhouse -- or, PricewaterhouseCoopers to
8 highlight any significant items from their audit, how
9 the audit went, did it go smoothly, were there
10 problems that they encountered, to review the
11 management letter comments, at least the significant
12 ones, with David McConnell, to review the significant
13 adjustments that they might have found, or even the
14 insignificant ones that they thought needed to be
15 discussed, to comment on how, we as a finance group,
16 performed during the audit, i.e., did our records seem
17 to be in shape, did it seem like we generally had an
18 organized approach to our bookkeeping, that kinds of
19 thing.
20    To kind of give the top finance guy from
21 AHERF an overview of their process, their findings,
22 and the state of what they thought the finance shop
23 was in.
24    Q    You mentioned that one topic of
25 conversation in the fiscal year '96 wrap-up or closing

PAGE 164

164

1 meeting was what I think you termed as a Delaware
2 Valley bad debt reserve shortfall that was large, and
3 that there was a -- you think a separate meeting after
4 the wrap-up meeting held between Mr. McConnell and at
5 least Mr. Buettner; is that right?
6    A    What I remember was that there was some
7 issue brought up by Coopers & Lybrand relative to the
8 adequacy of the bad debt reserve on the Delaware
9 Valley, and that their feeling was that it might not
10 be adequate.
11    I don't remember the numbers as to how
12 significant it was or wasn't.
13    But based on the fact that it came up for
14 discussion tells me it was at least of some
15 significance, that they thought it important enough to
16 bring it up as a topic of discussion.
17    And David McConnell asked them and
18 Dan Cancelmi and Steve if they had any supporting
19 documentation that he could look at and see what kind
20 of numbers they were talking about it, and where these
21 conclusions and -- may have come from.
22    And no one had any supportive stuff with
23 them at the meeting.
24    So he asked if -- if basically he and Bill
25 and Steve, if needed, could get together outside of

PAGE 165

165

1 that meeting in another meeting in the next day or two
2 to continue the discussion on that one issue.
3    Q    And that was a meeting that you did not
4 attend?
5    A    That's correct.
6    Q    Did you provide any information for that
7 meeting?
8    A    No.
9    The Delaware Valley accounting group
10 would.
11    The only feedback that I ever received or
12 heard relative to that meeting was that there was a
13 decision made to write some number off, which I assume
14 was the inadequacy of that reserve over some ensuing
15 years, over the next couple -- two or three years, to
16 get it back into line.
17    Q    Do you recall other topics of discussion or
18 concern that Coopers & Lybrand raised in that '96
19 closing meeting?
20    A    I don't.
21    Q    I'm going hand to you now, Mr. Adamczak,
22 what has been marked in a prior deposition as
23 Exhibit 1063.
24    It's, I believe, produced from the files of
25 Coopers & Lybrand, and bears the Bates label on the

SHEET 22    PAGE 166

166

1 first page of CL14754, and concludes with page 147613.
2       It also has on the first page the initials
3 "RJC" and the word "Notes"; is that right?
4   A   Yes.
5   Q   I'm going to ask you to flip to Bates
6 page CL147599, and the heading on that page is
7 "10/14/98 Al Adamczak"; is that right?
8   A   It is.
9   Q   And it's a handwritten set of notes; is
10 that right?
11   A   Yes.
12   Q   Do you recall, in the October '98 time
13 period, being interviewed from anyone at either
14 Coopers & Lybrand, or what may have been then
15 PricewaterhouseCoopers, about the fiscal year '96
16 audit?
17   A   I remember being interviewed by a guy for a
18 very short period of time.
19   Q   Do you recall his name to have been
20 Robert Cepielik?
21   A   I don't -- that could have very well have
22 been.
23       I know he was not involved in the audit,
24 and I didn't get the impression he was from their
25 legal office.

PAGE 167

167

1   Q   But you had the impression that he was from
2 either Coopers & Lybrand or PricewaterhouseCoopers?
3   A   I had that knowledge, yeah.
4   Q   As he identified himself --
5   A   Correct.
6   Q   -- in that way?
7       Is that "yes"?
8   A   Yes.
9   Q   I'm going to ask you roughly, how long do
10 you think you spoke with the gentleman?
11   A   I'd say no more than two hours, but I think
12 it was less than that.
13   Q   And do you remember him taking notes of the
14 conversation?
15   A   Yes.
16   Q   And do you recall where the interview took
17 place?
18   A   In my office.
19   Q   Did he ask -- did he tell you why he was
20 interviewing you?
21   A   I don't remember specifically.
22       He may have said at the request of the
23 board or of PW -- something with the board.
24   Q   And you told him everything you could
25 about -- in answer to his questions to the best of

PAGE 168

168

1 your ability at the time?
2   A   At that time.
3   Q   And to the best of your recollection at
4 that time?
5   A   Uh-huh, yes.
6   Q   You didn't hold anything back from the
7 interview?
8   A   No.
9   Q   I'm going to ask you to take a look at the
10 notes, and in particular, given our most recent set of
11 questions, what I look -- what looks to be the
12 second paragraph, in which it says, I think,
13 "Indicated a decision was made at the closing meeting
14 that '96 A/R reserve was 30 million under reserved,
15 and to take it in over three years," period. "Done at
16 closing meeting," comma, "all hands including C&L."
17       Do you see that?
18   A   Yes.
19   Q   Does that, as you sit here today, refresh
20 your recollection about the closing meeting and the
21 discussion of the '96 A/R reserve at -- in the
22 Delaware Valley?
23   A   I think that's consistent with what we've
24 talked about.
25       It fills in that it may have been as much

PAGE 169

169

1 as 30 million, and that I think it was talked about
2 taking it in over three years, and that McConnell
3 again asked for the detail to better understand where
4 this number came from.
5   Q   And does that -- does the note, at least
6 the part we've just read, fairly characterize your
7 statement to Mr. Cepielik or the
8 PricewaterhouseCoopers representative at the time?
9   A   Yeah.
10       Although, I clarify that where it says the
11 reserve was 30 million under reserve, that I don't
12 know that a definitive -- that everybody necessarily
13 said, "Hey, it's 30 million."
14       I think it was, "It could be as much as
15 30 million."
16   Q   That was a range that was used?
17   A   Yeah, I think that --
18       MR. RYAN:  Objection.
19   A   I think that's why the subsequent meeting
20 was to be held, to better look at the details, and
21 determine what they thought the real amount was.
22   Q   Is it -- did you have any reason to suspect
23 at the time or since that Mr. Cepielik mistranscribed
24 your comments during his interview?
25   A   I had no reason to believe that, no.

1    MR. RYAN:  Objection.
2  BY MR. JONES:
3    Q    And does this comport, this sentence,
4  comport with your recollection today, to the best that
5  you have it?
6    MR. RYAN:  Objection.
7    A    Yeah.  I have no reason to believe
8  otherwise.
9    Q    And, in fact, is it your best estimation
10  that your recall about the facts regarding the fiscal
11  year '96 closing meeting would have been better in
12  October of '98 than they may be today?
13    A    Yes, I do.
14    Q    You think that's right?
15    A    I think that's right, yeah.
16    Q    Who -- who do you think or do you recall
17  now would have been the individual in the meeting to
18  make the proposal that's evidenced in the sentence we
19  just read to you from Mr. Cepielik's notes?
20    A    To write it off over three years?
21    Q    And the 30 million range of the proposed
22  write off.  Both.
23    A    I believe Coopers & Lybrand may have thrown
24  out the number, being as much as.
25        The three year, I don't remember what --

1  who proposed that, whether it was PWC, or Allegheny
2  that --
3    Q    But it was discussed by all hands?
4    A    Absolutely.
5    Q    That is, both the $30 million number range
6  and the three year take in?
7    A    Yeah.
8    MR. RYAN:  Objection.
9        The witness keeps on saying "up to
10    30 million," not a $30 million range.  So I
11    think you're misstating that in each of your
12    questions.
13    MR. JONES:  Well, I don't think that's a
14    legitimate objection.
15        The witness can tell me whether I've
16    misstated his testimony or not.
17  BY MR. JONES:
18    Q    But the figure 30 million and the take in
19  over three years were both discussed with all hands?
20    A    That's correct.
21        But I don't know that this decision to
22  handle it over three years was definitively agreed to
23  at this meeting.
24    Q    Right.  I understand that you there were at
25  a subsequent meeting, and it may have been discussed

1  later, and finally decided in that meeting as well, is
2  what you're saying?
3    A    Yes.
4    Q    Okay.
5    A    I think this proposal was put forward at
6  that meeting.
7    Q    What else do you recall about any reaction
8  to that proposal as put forward by anyone at the
9  meeting?
10    A    I think there was a little surprise on the
11  part of the accounting -- the accounting folks,
12  meaning Steve Spargo, Dan and I, that Coopers would
13  allow this to be written off over three years.
14    Q    And why were there expressions -- was there
15  expressions of a surprise?
16    A    I don't think at the meeting.
17    Q    Okay.
18        Later there were?
19    A    Yeah.
20    Q    To you?
21    A    I think we talked about it, and were all
22  under that same -- we all had that same reaction.
23    Q    And why were you all of the same reaction,
24  and that reaction being surprise?
25    A    Because of the magnitude of the number.

1  Although, I also point out that we weren't
2  aware of possibly other things that went the other way
3  that could offset the magnitude of this number.
4    Q    Were you also surprised about
5  Coopers & Lybrand's apparent willingness to permit the
6  taking in of the $30 million figure or thereabouts
7  over time?
8    A    Yes.
9    MR. RYAN:  Objection.
10  BY MR. JONES:
11    Q    And why was that surprising?
12    A    Again, because of the magnitude of the
13  dollar value.
14    Q    But was there something about the over time
15  that also caused you surprise?
16    A    Yes.
17    Q    And what about that?
18    A    Again, as we spoke generally, an adjustment
19  belongs in the year that it's discovered or
20  determined.
21    Q    And that is the purpose of what, permitting
22  operations to be reflective of --
23    A    -- what they really are.
24    Q    For a given time period?
25    A    Yes.

SHEET 23    PAGE 174

**174**

1  Q   What did you interpret take it in over the
2  three years to mean, or as you recall today, what do
3  you recall being the substance of that over time
4  reference?
5  A   Just what it says that, that we would build
6  reserves or write off receivables to the magnitude of
7  about $30 million, or whatever that number was
8  determined to be over the next three fiscal years.
9  Q   Do you recall any more conversations about
10 the topic in that '96 closing meeting?
11 A   No.
12 Q   Do you recall anything more about that '96
13 closing meeting, as you sit here today, by way of the
14 topics of conversation?
15 A   Just that the audit went smoothly, that we
16 were given very complimentary remarks as a finance
17 department relative to our recordkeeping, and being on
18 top of things, you know, that kind of thing.
19        That they thought the accounting shop was
20 in very good order, that we provided things very
21 timely during the audit, that there were no problems
22 in getting through the audit, that kind of -- those
23 kinds of comments.
24 Q   There were no complaints about your --
25 AHERFs conduct in the audit?

PAGE 176

**176**

1  A   Steve Spargo had told us.
2  Q   And how did he tell you that he learned it,
3  if he did?
4  A   From David McConnell.
5        And I know that the statements that were
6  prepared and, in theory, one step away from
7  finalization at that meeting were not changed.
8        So no adjustment was recorded.
9  Q   Did you trouble you, when you learned that
10 no adjustment was recorded?
11 A   I think it did but, again, it wasn't my
12 issue.
13       It was a Delaware Valley issue.
14 Q   And in what way did it trouble you even if
15 it wasn't significant?
16 A   Well, the reason that it troubled me was
17 from what we -- we had previously talked about, that
18 magnitude.
19       Part of the reason that it didn't trouble
20 me to the nth degree was that, again, I didn't know
21 what other items were there that might be going the
22 other way.
23       So I didn't know the magnitude of this
24 compared to other things that weren't a Delaware
25 Valley.

PAGE 175

**175**

1  A   Absolutely not.
2        As a matter of fact, it was the opposite.
3  Q   And there was, in fact, praise?
4  A   Yes.
5  Q   And who did that -- who voiced that praise?
6  A   Billing Buettner primarily, supported by
7  Mark Kirstein.
8  Q   Do you recall any discussion of why the
9  period to take in the 30 million, or roughly
10 $30 million figure, was three -- was three years?
11 A   Absolutely not. I have no idea.
12 Q   And what do you recall learning, if ever
13 you did learn anything, about the subsequent meeting
14 with Mr. Cancelmi and others that was proposed during
15 the closing meeting?
16 A   Again, I don't know if Dan was -- went to
17 that meeting.
18       I know supposedly Bill Buettner and
19 David McConnell were the only ones I feel certain were
20 there.
21 Q   I'm sorry.
22       What do you recall learning, if anything,
23 about the results of that meeting?
24 A   That no adjustment was to be made in '96.
25 Q   And how did you come to that understanding?

PAGE 177

**177**

1  This, on a stand-alone basis, seemed rather
2  material.
3        (Thereupon, Deposition Exhibit No. 1527 was
4        marked for identification.)
5  BY MR. JONES:
6  Q   Mr. Adamczak, I'm handing now what we've
7  marked as Exhibit 1527.
8        Again, it happens to have been produced at
9  some point from your files, and it is entitled,
10 "Summary of Fiscal Year 1996 Non-Recurring 'Hits'",
11 and the word 'Hits' is in quotes; is that right?
12 A   Yes.
13 Q   Have you ever seen this document before,
14 that you can recall?
15 A   If it came out of my file, I must have, but
16 I don't remember it.
17 Q   Do you have any recollection of what the
18 first line item might mean, whether or not it's
19 derived from actually seeing the document or not?
20       And it states, "Increase in bad debt
21 reserve and write-off of accounts resulting from
22 system conversion," and it has an entry next to it of
23 39 million.
24 A   What that would -- from reading that now,
25 what I would believe that is, is that, as you spoke,

PAGE 178

178

1 there was a conversion from the PATCOM system to the
2 Invision system, that in 1996 there was an increase
3 into the bad debt reserve that was purely attributable
4 to moving from one system to other.
5         As I mentioned to you, at some point you
6 don't -- you kind of shut the old system off, and
7 whatever's in it is garbage, and you don't follow up
8 on it.
9         And I think, for the purpose of this
10 analysis, that was looked at as an unusual item that
11 happened because we went from one system to the other.
12     Q    Do you recall whether or not this bad debt
13 reserve increase and write off occurred in fiscal year
14 1996?
15     A    By looking at the schedule, it appears that
16 it did. It appears that it is in the bad debt --
17     Q    And this --
18     A    -- write offs for that year.
19     Q    Do you recall putting together or seeing
20 non-recurring hits documents in prior or subsequent
21 years?
22     A    Yeah.
23         I mean, that's something that happens. You
24 have unusual items every year.
25     Q    I understand that.

PAGE 179

179

1         And this is a kind of a document that
2 allowed you to keep score of what those unusual items
3 were from year to year; is that right?
4     A    Yes.
5     Q    Is that right?
6     A    Yes.
7         (Thereupon, Deposition Exhibit No. 1528 was
8     marked for identification.)
9 BY MR. JONES:
10    Q    Mr. Adamczak, I've just handed you what
11 we've had marked 1528, another document I believe to
12 have been produced from your files, which is a July 3,
13 1997 memo from Mr. Cancelmi to Mr. -- to you with a
14 subject of "Delaware Valley Bad Debt Reserves"; is
15 that right?
16    A    That's correct.
17    Q    Does that look like Dan's initials or
18 signature next to his name?
19    A    Yes, it does.
20    Q    I'm going to let you familiarize yourself
21 with the document, and ask you just a few questions
22 about it.
23    A    Okay.
24    Q    Mr. Adamczak, do you recall what occasioned
25 Mr. Cancelmi preparing and sending you this memorandum

PAGE 180

180

1 in July 3 -- or, on or around July 3rd, 1997?
2     A    What I -- what I seem to remember and
3 believe is that, as you remember, Steve Spargo left at
4 the end of May, and then there was a period, as I
5 previously mentioned, from May to June where there was
6 really no change in reporting.
7         Both Dan and I kind of dealt with David on
8 issues, me for the west and him for the east.
9     Q    David McConnell?
10    A    David McConnell.
11        And then sometime around here
12 David McConnell asked me to, in essence, move into the
13 slot that Steve occupied, and to become responsible
14 for the whole system.
15        And I think this is an attempt by Dan to
16 bring me up to speed on all the prior history of this
17 thing, and all the shortfalls, where before I hadn't
18 been involved in them other than in passing
19 conversations, or where we might be at a meeting, and
20 Dan and Steve might be talking about a Delaware Valley
21 issue, and I might be there just more or less
22 overhearing it.
23        But I really wasn't involved in the
24 Delaware Valley.
25        And this was to give me kind of a catch-up

PAGE 181

181

1 understanding of all that had gone on during the year
2 so that I had some feeling for where it stood, and
3 that there still appeared to be a problem of, at this
4 time, $25 million.
5     Q    And that is in bad debt reserve shortfall?
6     A    Correct.
7     Q    And you do recall receiving the memorandum
8 in the July 1997 time period?
9     A    Yes.
10    Q    On the second page of the memorandum,
11 Mr. Cancelmi writes to you that -- he says this
12 sentence, "The required expense level suggested by the
13 reserve calculations which approximated the expense
14 levels if calculated levels under the old reserve
15 methods were never recorded due to profitability
16 concerns."
17        What did you understand him to mean by the
18 failure to record due to profitability concerns?
19    A    My understanding was that -- if you
20 remember how we discussed the bad debt reserve
21 methodology, you put the accounts into buckets,
22 applied percents and came to a required reserve.
23        From an Allegheny General Hospital
24 perspective, that, then, was how we adjusted the
25 reserve to what this calculation showed.

PAGE 242

242

1 for all of the hospitals; is that right?
2    A    For all the Delaware Valley hospitals,
3 correct.
4    Q    And that total amounts to how much?
5    A    49 million 076.
6    Q    And, in fact, as of this writing, or as of
7 apparently the November 30, 1996 time period reflected
8 in this writing, there were some hospitals who had a
9 debit balance for bad debt reserve; is that right?
10   A    That's what it -- let me see.
11       I don't know that I conclude that.
12   Q    Okay. Well, let me ask you maybe a simpler
13 question.
14       If you look back at page -- the second page
15 of the document for a moment.
16   A    What's --
17   Q    I'm sorry. The Bates number are 38838.
18   A    Okay.
19   Q    The second to the -- I'm sorry, the column
20 one in from the right reads at its heading, "Bad Debt
21 Reserve/(Debit) Balances After Old Accounts Are
22 Written Off."
23       For four of the five hospitals, the balance
24 is a parenthetical debit balance; am I right?
25   A    That's correct.

PAGE 244

244

1 reserve for those hospitals?
2    A    I knew there was some concern. I wasn't
3 involved in it, no.
4    Q    And how is it that you knew there was some
5 concern?
6    A    It was -- as you remember, we talked at the
7 end of '96, there was a concern there.
8    Q    There already had been a concern then.
9    A    And I assumed it continued, right.
10   Q    Do you know, as you sit here today, whether
11 this concern and this -- and perhaps this memorandum
12 was shared with Coopers at the time or after?
13   A    I do not know one way or the other.
14   Q    Mr. Adamczak, I'm handing you now a
15 document that I believe you will tell me you have seen
16 before. You're copied on it.
17       And it's an August 21, 1998 memo to
18 Mr. Dionisio from Mr. Cancelmi, and the subject line
19 of the document reads, "Fiscal 1997 Transfer of
20 Reserves for Patient Receivables."
21       Am I right?
22   A    You're correct.
23   Q    And I'm also right that you saw the
24 document in the August 1998 time period?
25   A    That's correct.

PAGE 243

243

1    Q    So at least he is telling Mr. Morrison,
2 that is, Mr. Cancelmi is telling Mr. Morrison, and
3 you, when you caught the memo at some time later, that
4 that was the position of the bad debt reserve balance
5 at those hospitals for the time period referred to in
6 the memo?
7       MR. RYAN: Objection.
8    A    After the accounts were written off.
9    A    I understand that.
10   A    Right.
11   Q    That's the legend of the column.
12   A    Right.
13   Q    But after those old accounts were written
14 off, that is the reflected position?
15   A    Correct.
16   Q    And what does it mean to have a debit
17 balance in a bad debt reserve?
18   A    That something's wrong.
19   Q    And that means there's insufficient reserve
20 to cover to relevant write offs; is that fair to say?
21   A    As a matter of fact, you're saying you're
22 going to collect more than the receivables.
23   Q    Were you involved at the time period that
24 this memo was written, in January '97, in any
25 discussions about the need to increase the bad debt

PAGE 245

245

1    Q    The memo breaks down a series of reserve
2 transfers in chart format into three categories.
3       Am I right?
4    A    That's correct.
5    Q    And the categories are the initial -- what
6 are titled the initial $50 million transfer for bad
7 debts; is that right?
8    A    Correct.
9    Q    Then an additional bad debt reserve
10 category, which sums about $21 million; is that right?
11   A    Correct.
12   Q    And a final category on the second page of
13 the exhibit headed "Reserves Used to Reduce
14 Contractual Allowances," which totals a little more
15 than $28 million?
16   A    That's correct.
17   Q    And the table reflects that the amounts in
18 these reserves were transferred from accounts at the
19 Graduate hospitals to two kinds of accounts at the
20 DVOG hospitals; is that right?
21   A    Yes.
22   Q    The bad debt reserve and the contractual
23 allowance account; is that right?
24   A    Yes.
25   Q    And the total amount of the transfers is

246

1 summed in the row labeled "Grand Total" on page 2 of
2 the document at about what figure?
3      A   It's close to a hundred million dollars.
4      Q   99.565, is it; right?
5      A   That's correct.
6      Q   You first learned of discussions, in any
7 event, relating to the potential transfer of some of
8 these reserves at an earlier time; is that fair to
9 say?
10     A   That's correct.
11     Q   And I believe that you have testified in other
12 proceedings that you placed the first -- your first
13 knowledge of a potential reserve transfer from the
14 Graduate hospitals to the bad debt reserve at the
15 Delaware Valley hospitals in the April 1997 time
16 frame.
17         Does that sound right to you?
18     A   That's correct.
19         (Thereupon, Deposition Exhibit No. 1541 was
20     marked for identification.)
21 BY MR. JONES:
22     Q   Mr. Adamczak, I've handed you now what I
23 will tell you looks like the cover page from your
24 "Week At A Glance" calendar for 1997 produced in this
25 litigation, and it's really only got one page from it.

247

1         The whole calendar, as you probably recall,
2 was a larger document.
3      A   Correct.
4      Q   But we've pulled a page from April of 1997,
5 and the day is April 7, 1997, and it notes a -- a
6 lunch that may have either been had or started at
7 11:30 a.m. or moved to 1:00 p.m., I can't tell from
8 the notation, but it purports to include, I guess
9 you'll tell me, you, Mark Kirstein and Dan.
10         Is that at least the participants in the
11 lunch?
12     A   That's correct.
13     Q   And can you tell from your regular method
14 of annotating your calendar whether the lunch started
15 around 11:30 or 1:00 o'clock?
16     A   I cannot.
17         I would say it's more toward 11:30.
18         What this is, is a scheduling calendar that
19 meetings were scheduled on.
20         So I had my secretary block out, and
21 this is her writing, from 11:30 to 1:00 o'clock for a
22 lunch meeting.
23     Q   I see.
24         And that's the -- you circled -- somebody
25 circled "11:30," and then drawn a line down to "1:00"?

248

1      A   Right.
2         So she knew not to schedule anything in
3 between that time, that we would get together and meet
4 presumably sometime within that blocked out period of
5 time.
6      Q   And I believe that you have testified that
7 it was at a lunch meeting with the two people noted on
8 Exhibit 1541, your at a glance calendar, Dan Cancelmi
9 and Mr. Kirstein, from Coopers & Lybrand, that you
10 first heard of the potential transfer of Graduate
11 reserves to the Delaware Valley hospitals; is that
12 right?
13     A   That's correct.
14     Q   And that's consistent with your
15 recollection today?
16     A   Yeah.
17     Q   And it was at -- now, having looked at your
18 calendar, is it your best recollection or estimate
19 that that lunch, in fact, happened on April 7?
20     A   Yes.
21     Q   Of 1997?
22     A   Yes.
23     Q   Could you tell us what you remember -- how
24 you remember the topic coming up, and what was
25 discussed?

249

1      A   What I remember, this meeting was a
2 preliminary discussion to a preplanning meeting.
3         In other words, Mark, I and Dan went to
4 lunch, I believe, at Tambellini's on Route 51.
5      Q   So it wasn't downtown?
6      A   That's correct.
7      Q   Though I think there are, I think, a number
8 of Tambellini's restaurants in the metropolitan area.
9         Am I right on that?
10     A   I believe so.
11     Q   And there were in 1997?
12     A   I believe that's true.
13     Q   Okay.  So this one was not downtown, but on
14 Route 51?
15     A   It was on Route 51.
16         And Mark would have picked Dan and I up,
17 and we drove together to Tambellini's to give him some
18 insight onto some things relative to their
19 preplanning, so they could put this planning document
20 together to tell us when they were going to come in
21 for interim, and things like that.
22     Q   For the fiscal year '97 audit?
23     A   That's correct.
24     Q   And I remember one of the items that Dan
25 brought up relative to the eastern side of the state,