## PAGE 250
250

1 which, again, is what he had the primary
2 responsibility, was that there was some consideration
3 being given to moving reserves from the Graduate
4 hospitals to the Delaware Valley hospitals to cover
5 the bad debt shortfall.
6        And Mark asking how much Dan thought was
7 going to be involved in those transfers.
8        And Dan saying that he thought it was
9 somewhere in the neighborhood of at least $50 million.
10        And Mark didn't seem shocked or surprised
11 by the idea or the amount, and said that he would
12 discuss it with Bill Buettner, and they would get back
13 to Dan.
14    Q    'They' meaning he and Bill?
15    A    He and/or he or.  That somebody would get
16 back to Dan.
17    Q    Either Mr. Kirstein or Bill Buettner?
18    A    Right, correct.
19    Q    Do you recall anything you had to say about
20 the topic?
21    A    No, because, again, it wasn't -- it was
22 eastern driven.
23    Q    Do you recall anything more about the topic
24 being said at the time?
25    A    No, other than when Dan and I got out of

## PAGE 251
251

1 there, I was like, 'I'd be surprised if they let
2 you" -- "if they approve moving that."
3    Q    And then you, in your comment, to Dan --
4 you told Dan that after the lunch?
5    A    Yep.
6    Q    Yep?
7    A    Yes.
8    Q    And you mean -- the "they" in that sentence
9 was Coopers & Lybrand?
10    A    That I was surprised that they would --
11    Q    That they would have approved?
12    A    -- concur with the transfer of those
13 reserves, yes.
14    Q    What I'm saying is, when you say "they,"
15 you mean Coopers & Lybrand?
16    A    That's correct.
17        And then I did not hear -- hear about the
18 issue again until roughly -- and it's one of the memos
19 that you pulled out from Russ Laing, and the statement
20 in here, it's the Russ Laing memorandum of June 10th,
21 from Dan to Russ, Dan Cancelmi to Russ Laing.
22        It says, "A creative was recently developed
23 to record $50 million in reserves on various Graduate
24 entities which were subsequently transferred to the
25 Delaware Valley hospitals during March and April of

## PAGE 252
252

1 '97 to help reduce the bad debt reserve shortfall that
2 had increased to 62.3 million as March 31, 1997.
3 Coopers & Lybrand has accepted this proposal to
4 transfer the 50 million of reserves from Graduate."
5    Q    What exhibit are you reading from?
6    A    1531.
7    Q    Did you get a copy of that?
8    A    This memo?
9    A    Yes.
10    A    Yes.
11    Q    At or about the time it's dated?
12    A    Yes.
13        Because if you remember, we talked.  At the
14 top is a handwritten note from David McConnell --
15    Q    Right.
16    A    -- to me on June 16th.
17    Q    So was that the first time -- I think what
18 you're telling us is, that is the first time you
19 learned that -- the fact you were surprised -- I'm
20 sorry.
21        That is the first time you learned that
22 Coopers & Lybrand had approved of the transfer?
23    A    Yes.
24        Although I had surmised that because the
25 entries were made.

## PAGE 253
253

1        Now, when it said in the March 18 close --
2 if you remember, a month end is always closed
3 afterwards.
4        So those entries would not have been made
5 until sometime after March or April.
6        So that brings them potentially into the
7 May -- May arena, and this memo is dated early June,
8 that I assume, based on the fact that those entries
9 were made, that Coopers had -- had given the okay, or
10 that they were okay with that transfer.
11    Q    So to put it differently, you were betting
12 what was wrong on whether Coopers would approve?
13        MR. RYAN:  Objection.
14    A    Correct.
15    Q    I'm going to ask you to flip back to
16 another, Exhibit 1063, which are the compilation of
17 notes from -- we believe from Mr. Cepielik's files, at
18 least by Coopers & Lybrand in this case.
19        I'm sorry.  I'm going to refer you again,
20 Mr. Adamczak, to Bates range -- or, Bates page 147599,
21 and to a paragraph later in the page than the one we
22 you referred to earlier, where it says, "recalls a
23 50 million" -- "recalls," I think the translation is,
24 '50 million of reserves was originally introduced by
25 Dan Cancelmi to Mark Kirstein, who indicated he

**254**

```
1  thought it was okay, but wanted to run it up a
2  flagpole."
3        Do you see that?
4    A   Yes.
5    Q   And is -- does this note refer to you
6  telling Mr. Cepielik, or somebody at
7  PricewaterhouseCoopers, about the Tambellini's
8  conversation we just discussed?
9    A   It does.
10       Although, the only thing I would clarify
11 is, when I say was originally introduced by Dan, as I
12 mentioned in the conversation, Dan mentioned it to
13 Mark.
14       I don't know whether that was Dan
15 originally introducing it, meaning there may have been
16 discussions by McConnell, Spargo, or whoever, relative
17 to this concept.
18       So I don't want to -- I don't want it to be
19 construed as Dan was coming up with this idea at this
20 time and proposing it to Mark.
21       It may have been introduced or discussed by
22 others before this meeting, but it was introduced or
23 related to Mark at that meeting.
24   Q   And introduced to you at that meeting?
25   A   And to me at that meeting, right.
```

**255**

```
1        I mean, for all I know or don't know,
2  Bill Buettner may have already known about it when
3  Mark went back to him, because he may have discussed
4  it with McConnell.
5        I don't know that.
6    Q   So what you're -- I think what you're
7  trying to clear up is that you don't want the
8  impression left that you know Mr. Cancelmi was the
9  father of the idea?
10   A   Right, and at that moment.
11   Q   Right.
12       It may have been others, and it may have
13 been before, as far as you know?
14   A   Right.
15       And I would bet that's the case.
16       I doubt that he would have just come to
17 that conclusion, or thought -- thought that idea up
18 and presented it to Mark at that lunch.
19       I would bet there were some prior
20 discussions.
21   Q   Was the conversation in the car ride, or
22 was it at the lunch?
23   A   It was at the lunch.
24   Q   And as you left the lunch, that is, and
25 parted company with Mr. Kirstein, after you parted
```

**256**

```
1  company with Mr. Kirstein, is it then that you
2  expressed the sentiment that you would be surprised if
3  Coopers & Lybrand would approve --
4    A   Yes.
5    Q   -- to Mr. Cancelmi?
6    A   Uh-huh.
7    Q   Is that "yes"?
8    A   Yes.
9    Q   And what was his reaction to your
10 expression of surprise?
11   A   I think he had a similar -- a similar
12 thought.
13   Q   And I take it, then, from the testimony you
14 just gave us a few minutes ago, that he has never told
15 you, that is, that Mr. Cancelmi has never told you
16 that this idea of the 50 million -- initial
17 $50 million reserve transfer was his?
18   A   That is correct.
19   Q   The original idea?
20   A   Right, and I do not know where it came
21 from.
22   Q   Have you ever heard anybody else ascribe it
23 to anyone?
24   A   No.
25   Q   I'm going to refer you just quickly to a
```

**257**

```
1  paragraph immediately before in the notes of
2  10/14/98.
3        It says, I believe, "indicated '96
4  shortfall was thought to be 30," with a dollar sign, I
5  believe indicating 30 million, "in '96. It was not
6  until '97 that he heard of shortfall of $50 million,
7  70 million & 99 million."
8        Is that the way you read those notes?
9    A   Yes.
10   Q   And is that also accurate about your
11 conversation with this PricewaterhouseCoopers person
12 in 1998?
13   A   Yes.
14   Q   An accurate reflection of it?
15   A   Yes.
16   Q   And it's accurate and consistent with your
17 recollection today?
18   A   Yes.
19   Q   Do you remember anything else about the
20 $50 million sum, or the transfer of reserves that was
21 discussed at the Tambellini's meeting with
22 Mr. Kirstein, or by you and Mr. Cancelmi on that same
23 day?
24   A   No.
25   Q   Do you remember any other topic of
```

258

1 conversation during that lunch, or the ride to and
2 from it, as you sit here today?
3    A    Just that I thought -- I and Dan both
4 thought they needed to look at receivables and take a
5 good, hard look at it, which we had told him on
6 several occasions.
7    Q    That was you telling Mr. Kirstein that?
8    A    Yes.
9    Q    Both of you?
10    A    Uh-huh.
11    Q    Both Dan and you?
12    A    Correct.
13    Q    And what was his reaction to that, if any?
14    A    That they already had that on their radar
15 screen to look at.
16    Q    When you heard the comment at Tambellini's,
17 did you have a -- in your head, an idea about whether
18 the reserves had already been booked at the Graduate,
19 or whether they were going to be created for the
20 purpose of transfer?
21    A    I don't know that I had any indication
22 one way or the other based on that conversation.
23    Q    Did you have any indication one way or the
24 other based on anything else at the time?
25    A    No.

259

1    Q    Did you ever discuss this reserve transfer,
2 the 50 million discussed at Tambellini's, with anyone
3 from Coopers & Lybrand yourself?
4    A    I did not.
5    Q    Did you ever discuss any other reserve
6 transfer from Graduate hospitals' accounts to the
7 Delaware Valley Obligated Group accounts with anyone
8 at Coopers at any other time?
9    A    No.
10       The only other time that I it remember
11 being discussed, it was at one of the few weekly audit
12 update meetings that I went to.
13    Q    In what fiscal year?
14    A    It would have been the '97 fiscal year
15 audit, so it would have been after June 30, 1997,
16 where Bill Buettner made the comment that that's the
17 beauty of an acquisition, that it gives you the
18 opportunity to, in essence, take care of an issue like
19 bad debts over several years by capitalizing it as
20 goodwill.
21    Q    And this was made in your presence, this
22 comment?
23    A    That's correct.
24    Q    Who else was present at this update
25 meeting?

260

1    A    I believe Dan Cancelmi was there, and there
2 would have been most likely somebody else from
3 Coopers & Lybrand, Mark Kirstein or Amy Frazier, or
4 both.
5    Q    Anybody else from the AHERFs side?
6    A    It could have been Chuck Lisman, or any of
7 the accounting managers may have there.
8       Nick Vidovich.
9       Jack Nelson.
10       I just don't remember.
11    Q    Was the comment made in a discussion of the
12 $50 million transfer?
13    A    I don't remember it clear enough to
14 remember whether numbers were spoken about it, or just
15 in general.
16    Q    But the idea of the availability of the
17 Graduate reserves and the transfer of the Graduate
18 reserves was the context in which the comment was
19 made?
20       MR. RYAN:  Objection.
21    A    I believe so.
22    Q    And the transfer of those reserves to DVOG?
23    A    That was my understanding.
24    Q    That's what you took away from the comment?
25    A    That's correct.

261

1    Q    Did anybody else have a comment in response
2 to that?
3    A    No.
4    Q    Do you recall any other discussion of the
5 topic of the Graduate reserve transfer to DVOG in that
6 audit meeting?
7    A    No.
8    Q    And I think, from your testimony, then, you
9 don't recall any other conversations with anyone at
10 Coopers about the transfer after that?
11    A    That's correct.
12    Q    To the time of this deposition today?
13    A    Correct.
14    Q    Save and except --
15    A    Well, it may have been when we talked to
16 the guy who took the notes here from PWC.
17    Q    Mr. Cepielik, I apologize.
18    A    Right.
19    Q    Other than that?
20    A    There may have been some well after that
21 fact with Buettner, I don't remember, like late '98 or
22 '99.
23    Q    Do you remember the content of any such
24 communications?
25    A    No, no.

**262**

1   Q   Do you recall -- strike that.

2       Do you recall whether the flagpole language

3   was yours in your talk with the fellow from

4   PricewaterhouseCoopers in October '98?

5   A   I don't remember.

6   Q   Is that a phrase you used?

7   A   Periodically.

8   Q   But if you had used it, it would have

9   referred to what or whom?

10  A   In discussion with Bill Buettner.

11  Q   We've already shown you today,

12  Mr. Adamczak, Exhibit 1 -- No. 154, and I'm going to

13  ask you to turn back to it for a minute.

14  A   154?

15  Q   Yes.

16      It's a May 22nd, 1997 memo to -- from

17  Mr. Cancelmi to distribution. It had the restruct --

18  "Graduate System Restructure Reserves" as its final

19  page.

20  A   Okay.

21  Q   I'm going to ask you to skip to the

22  second page of the document, Mr. Adamczak.

23      At the top, it refers to the recording of

24  certain reserves at the Graduate hospitals as part of

25  purchase price allocation, and then underlines a

---

**264**

1   A   I do.

2   Q   So does it refresh your recollection now

3   that it was most likely in May of 1997 that you heard

4   about approval of the $50 million Graduate reserve

5   transfer by Coopers & Lybrand for the first time?

6   A   Yes, yes.

7       MR. RYAN:  Objection, misstates the

8       document.

9   BY MR. JONES:

10  Q   Did you ever discuss with Dan Cancelmi or

11  anybody else on what basis he included the statement

12  in this memo about the accounting treatment having

13  been discussed with Coopers & Lybrand who agreed with

14  the approach?

15  A   I did not.

16  Q   Did you ever talk with Dan or Steve or

17  Mr. McConnell at any time about any approval from

18  Coopers & Lybrand for the $50 million Graduate

19  transfer?

20  A   We talked about $99 million being the total

21  reserve.

22      After this 50 million was moved, subsequent

23  analysis that Dan Cancelmi prepared showed that there

24  was another shortage of some 20 million -- 20 plus

25  million dollars.

---

**263**

1   phrase which reads, "which are not reflected on the

2   income statement."

3       Do you see that?

4   A   I do.

5   Q   And then it says, "Rather," comma, "these

6   reserves have been capitalized on the balance sheet as

7   an intangible asset which will be amortized over

8   35 years."

9       Do you see that?

10  A   I do.

11  Q   "This accounting treatment," it continues,

12  "has been discussed with Coopers & Lybrand who agrees

13  with this approach as these reserves are viewed as

14  unrecorded preacquisition contingencies."

15      Did I read that right, as well?

16  A   You did.

17  Q   And you are noted at the distribution line

18  at the bottom of the page?

19  A   I am.

20  Q   I think, then, the table that follows the

21  text I just read has a row that lists "Delaware Valley

22  hospital bad debt reserves," and amounts of the

23  50 million -- that total 50 million that would be

24  accrued there.

25      Do you see that?

---

**265**

1       And at that point, I took it to

2   David McConnell and said, "There's still a shortage of

3   $20 million."

4       And his comment was that, "We had discussed

5   cleaning this up once and for all with" -- not "we,"

6   that he had discussed with Coopers once and for all

7   cleaning this up.

8       They were aware of it, they had approved

9   the $50 million being moved, and that they would be

10  fine with moving additional reserves to get the bad

11  debt reserves where it needed to be.

12      In other words, "There's an issue, we're

13  going to clean it up, and we're going to do what needs

14  to be done to get it cleaned up by the end of this

15  year."

16  Q   And the "this year" in that sentence was

17  fiscal year '97?

18  A   Correct.

19  Q   Did that -- do you recall approximately at

20  what point in time you had that conversation with

21  Mr. McConnell?

22  A   I don't remember specifically, but I know

23  it was after Steve left. So it would have been after

24  May 30th.

25  Q   Was it after year end?

---

PAGE 266

266

```
 1    A    I think it was when we were doing the May
 2  financial statements, because then again when June
 3  rolled around, we were another 20 short that no one
 4  suspected, because it -- because the direction had
 5  been given to the patient accounting people to clean
 6  up their patient records.
 7         So no one really knew what the magnitude of
 8  the final write off was going to be.
 9         They thought it was 50. Then in May, it
10  ended up 20 short. So they thought it was 70, and
11  more clean up occurred.
12         As you remember, I told you the patient
13  accounting records, there's a great volume.
14         So until they're cleaned up, no one knew
15  what the final outcome was going to be, and they
16  couldn't clean it up immediately. It took time.
17         So as of May, it was 21 additionally short,
18  and then in June, it became another 20 some million
19  additionally short, and that's when I went back to
20  David McConnell again, and he said, "Talk to Dan and
21  see whether there are any more reserves on the
22  Graduate hospitals or elsewhere to cover that 28,
23  because we are to clean it up by the end of the year."
24         Dan identified additional reserves for that
25  20 plus million and the reserves.
```

PAGE 267

267

```
 1         David approved it, and the write off
 2  occurred.
 3    Q    And that last slug was the 28 million that
 4  is referred to in the August 21, 1998 memo?
 5    A    Yes.
 6         It comes to 99 point --
 7    Q    The last piece --
 8    A    -- 565 million.
 9    Q    The last piece of the 99 million total?
10    A    That's correct.
11    Q    So you had two subsequent conversations
12  with Mr. McConnell?
13    A    That's correct.
14    Q    And in the second one, was
15  Coopers & Lybrand's review or approval of the ongoing
16  transfer subject brought up again?
17         MR. RYAN: Objection.
18    A    Yes.
19         Although, he -- I don't know that he went
20  to them specifically and said, "I'm going to write 21,
21  I'm going to write 28."
22         It was more like, "This issue was discussed
23  with Coopers. They know we're cleaning it up. They
24  know we're moving reserves to clean it up. They'll be
25  okay with it."
```

PAGE 268

268

```
 1    Q    And your direction from him was to take
 2  it -- get rid of it this year?
 3    A    Correct.
 4    Q    Mr. Adamczak, we are handing you now what
 5  has been marked as Exhibit 8 early on in the
 6  deposition proceedings in this case apparently, which
 7  is a memo dated April 14, 1997, apparently shortly
 8  after your Tambellini's lunch, to Mr. Spargo from
 9  Mr. Cancelmi, with a heading "Restructuring Charges
10  Earmarked for Bad Debt Reserves."
11         Have I described the memo accurately?
12         MR. RYAN: Objection.
13    A    You have.
14         MR. JONES: What's the basis for that
15  objection?
16         MR. RYAN: That there's any connection
17  between this memo and the Tambellini's lunch. It's
18  the inference that you were packing into
19  that.
20         MR. JONES: I think -- I was only
21  indicating a time relationship.
22  BY MR. JONES:
23    Q    But in any event, you are copied on the
24  memo; is that right, sir?
25    A    That's true.
```

PAGE 269

269

```
 1    Q    In the first sentence, it says, "In an
 2  effort to alleviate the Delaware Valley patient
 3  accounts receivable estimated bad debt reserve
 4  shortfall, a decision has recently been made to record
 5  approximately 50 million of restructuring reserves on
 6  the various Graduate Hospitals."
 7         Did I read the first sentence right?
 8    A    I believe so.
 9    Q    And so if -- if this memo was received by
10  you on or after April 14, 1997, you were aware that
11  the transfer was to go through, whether or not having
12  been approved by Coopers, at least by April 14, 1997;
13  is that right?
14    A    Correct.
15    Q    Does this refresh your recollection, this
16  first sentence, that the reserves were actually
17  recorded in the first instance for the purposes of
18  alleviating the bad debt reserve shortfall at DVOG?
19    A    It appears that's why they were recorded,
20  yes.
21         I think the -- the one memo we looked at,
22  No. 154, dated May 22nd, identifies on the second page
23  accruals for the existing AHERF Delaware Valley
24  hospital bad debt reserves of 50 million.
25    Q    Does the language also indicate to you, and
```

**270**

1 did you so read it at the time, that the reserves were
2 not yet booked at Graduate, if you go back to the
3 first sentence of the April 14 memo?
4    A   It appears that to be the case, that they
5 were not reserved -- were not recorded, or are being
6 recorded as a part of this initiative.
7    Q   Either they were not yet recorded, or were
8 recorded contemporaneous with the memo?
9    A   Correct.
10   Q   The second sentence of the memo says, "In
11 turn," comma, "these reserves will be transferred over
12 to AHERF Delaware Valley hospitals via intercompany
13 account transfers, which will serve to increase the
14 hospitals' bad debt reserve balances."
15       Is that right?
16   A   That's correct.
17   Q   And that was consistent with what you
18 understood was the proposal raised at the Tambellini's
19 lunch in your presence?
20   A   The only -- yes, but only thing that I was
21 not sure of at the Tambellini's lunch is whether
22 reserves would be created and moved, or whether they
23 would be existing reserves that would be moved.
24       But the concept of moving the reserves from
25 Graduate to Delaware Valley is consistent.

**272**

1 of this memo, Exhibit 8?
2    A   I do not.
3    Q   If they would have asked you for it, would
4 you have given it to them?
5    A   I assume so, but I don't know for sure.
6    Q   Would you have -- pardon my stuttering.
7        Did you ever receive any instruction not to
8 give this memo to anyone?
9    A   I did not.
10   Q   Did you ever give such an instruction?
11   A   I did not.
12   Q   I'm handing you or passing now,
13 Mr. Adamczak, what we've marked as Exhibit 203, and
14 it's a memo from you to Nick Vidovich dated April 17,
15 1997, three days later.
16       Is that right?
17   A   That's correct.
18   Q   And in it, you write under the subject
19 line, "Restructuring Reserves," "Fifty million of
20 reserves will be recorded on the Graduate Hospitals
21 and subsequently moved to DV hospitals via AHERF as
22 follows."
23       It, again, speaks of the recording process
24 to be in the future; is that right?
25   A   Correct.

**271**

1    Q   In here, it's made clear to you that it was
2 creation, as well?
3    A   Yes.
4    Q   Who would have actually ultimately recorded
5 the reserves; do you know?
6    A   The accounting staff for the Delaware
7 Valley.
8    Q   And who would have done the entries to
9 accomplish the transfer?
10   A   The accounting staffs for the Delaware
11 Valley hospitals.
12   Q   And you would not have been involved?
13   A   In the actual writing of journal entries
14 and putting them into the system?
15   Q   Or approving them.
16   A   No.
17   Q   You would not have?
18   A   I think this memo would have done it.
19       I may have -- I don't think I did in this
20 instance, but I may have authored a memo consistent
21 with this to the accounting staff that said, "Based on
22 this memo, record these entries."
23   Q   You just don't recall doing it?
24   A   Not on this issue, no.
25   Q   Do you know if Coopers ever received a copy

**273**

1    Q   And "DV" refers to Delaware Valley?
2    A   That's correct.
3    Q   And these, in fact, the entries that are
4 noted below that phrase, are, in fact, the way the
5 accounting treatment worked with AHERF as the
6 intermediary in the transaction; is that right?
7    A   Yes and no.
8        AHERF, the parent company, was not really
9 the intermediary, other than the fact that all banking
10 was settled through the parent company.
11       You only had a payable or receivable to the
12 parent, not to any other entity.
13   Q   You didn't have a direct payable or
14 receivable to sister enterprises?
15   A   Correct.
16       It was either a payable or a receivable
17 position with the parent company.
18       As a result of moving these reserves from
19 one hospital to another, there had to be a
20 corresponding entry on this parent relative to that
21 receivable or payable position.
22   Q   And this -- these entries accomplished the
23 task --
24   A   Correct.
25   Q   -- for the reserve transfers?

PAGE 274

274

1    A    That's correct.
2    Q    For the first 50 million anyway?
3    A    Yes.
4    Q    50 million, was that a significant sum in
5    magnitude?
6    A    I believe so.
7    Q    And was it significant enough that this --
8    you believe that this kind of transfer would have been
9    discussed with the auditors?
10    A    I would believe --
11    MR. RYAN:  Objection.
12    A    I would believe it was, and I would also
13    believe that they would have seen it in their auditing
14    work, and should have asked about it.
15    Q    Were you generally proactive in your
16    discussions with Coopers & Lybrand's about
17    transaction -- Coopers & Lybrand about transactions or
18    entries of this magnitude?
19    A    I don't know if we were or weren't, to be
20    honest.
21    Q    I believe you testified and used the word
22    "proactive" before when it came to recording something
23    like these kinds of transactions.
24    Do you have a reason to think otherwise
25    now?

PAGE 276

276

1    to create the $50 million worth of reserves through
2    purchase accounting and not the restructuring costs.
3    Is that consistent with your recollection?
4    A    Yes.
5    Q    And do you know why that decision was made?
6    A    To record it as a purchase price versus an
7    income item?
8    Q    A restructuring income item.
9    A    No.
10    Q    Do you know who was involved?
11    A    No.
12    Although, it says that it was discussed
13    with Coopers & Lybrand.
14    I was told at one point that they had
15    suggested it.
16    Q    Did Mr. Cancelmi and you ever discuss this?
17    A    Dan had mentioned to me that
18    Coopers & Lybrand -- that this is the issue where I
19    think I had mentioned that I thought originally this
20    might have been booked as an expense, and then moved
21    to the balance sheet as goodwill.
22    Q    I understand.
23    A    Or part of that issue, that certain items
24    were originally shown as restructuring and later
25    reclassified to goodwill.

PAGE 275

275

1    A    No, no.
2    And based on, you know, my recollection of
3    Dan bringing it up at the restaurant, and his memos,
4    where he says Coopers & Lybrand approved it, I have no
5    reason to believe that it wasn't discussed with them
6    proactively.
7    Q    And my question is:  With items of this
8    magnitude, 50 million -- in the $50 million range,
9    were you proactive in discussing generally these
10    matters with Coopers & Lybrand to avoid reversals
11    later?
12    A    Generally, yes.
13    MR. JONES:  Let's take a quick break here.
14    THE VIDEOGRAPHER:  We're off the record.
15    The time is 4:47 p.m.
16    (Recess taken.)
17    THE VIDEOGRAPHER:  Standby, please.
18    We're back on the record.  The time is
19    4:49 p.m.
20    BY MR. JONES:
21    Q    I'm going to ask you to flip back to
22    Exhibit 154.
23    It looks like, based on the language we
24    read on the second page of this exhibit together,
25    Mr. Adamczak, that at some point a decision was made

PAGE 277

277

1    Q    So when you say that -- was it Dan that
2    told you that Coopers was involved in changing the
3    initial treatment from restructuring cost charges to
4    the income statement, to a balance sheet item in
5    purchase price accounting?
6    A    Yes, that they were involved in that
7    suggestion or decision.
8    Q    Okay.
9    And do you recall roughly when he told you
10    that?
11    A    No.
12    Q    Do you recall the context of the meeting,
13    or the conversation?
14    A    Yeah.
15    I had asked him -- again, I had seen
16    financial statements for one month that had
17    restructuring expenses of a certain number, and then I
18    got the next month Delaware Valley statements, and
19    their restructuring number was much smaller on the
20    balance sheet increase.
21    So there was an adjustment to the prior
22    period, and I had asked Dan why that occurred.
23    And he told me that there was a discussion
24    with Coopers, and they suggested that certain of those
25    expenses should be shown as goodwill instead of as a

SHEET 36   PAGE 278
278

1 restructuring cost, and they made the adjustment
2 retroactive.
3    Q   When Mr. Buettner made the comment in the
4 meeting you referred to earlier about the beauty of
5 purchase accounting, was there any reaction from
6 anybody, or any other discussion of the topic?
7    A   I don't think so.
8    Q   Was a time frame put -- and forgive me if
9 you already testified to this -- to the amount of time
10 over which the items could be written off?
11   A   Well, it said in that memo that they would
12 be written off over 35 years, but I thought that that
13 was adjusted afterward downward to 15 to 20 years.
14   Q   And did Mr. Buettner say that in the
15 meeting you referred to earlier, or did you learn that
16 or recall that from some other set of events?
17   A   That the --
18   Q   That the time period would be 15 years.
19   A   I don't remember.
20   Q   Do you remember him putting a time period
21 to it in his comments about the beauty of purchase
22 accounting, purchase price accounting?
23   A   Yeah, but I don't remember whether he said
24 over 15 or 30, or just over future years.
25   Q   In the -- in Exhibit 8, just a few back,

PAGE 280
280

1       I can't say whether they did it in the
2 Delaware Valley or not.
3    Q   And do you believe such transfers to be
4 compliant with GAP?
5    A   No.
6       MR. JONES:  That's, I think, where we'll
7 stop for the day.
8       THE VIDEOGRAPHER:  This concludes tape four
9 of the deposition of Mr. Albert Adamczak.  We're
10 off the record.  The time is 4:55 p.m.
11       - - -
12     (Thereupon, at 4:55 p.m., the deposition
13 was continued, to resume on Friday, June 20,
14 2003 at 8:30 a.m.)
15       - - -
16
17
18
19
20
21
22
23
24
25

PAGE 279
279

1 or just on top of the pile, on the first page,
2 Mr. Cancelmi about halfway through the second
3 paragraph states, "Granted, the reallocation of the
4 reserves" -- "of these reserves from the Graduate
5 hospitals to other Delaware Valley hospitals is not
6 the most technically appropriate resting place."
7       Do you see that --
8    A   I do.
9    Q   -- sentence?
10      Did you agree with Mr. Cancelmi in this
11 statement?
12   A   Yes.
13   Q   And what -- what do you understand him to
14 be saying there?
15   A   Again, that they're created on
16 one hospital, or one obligated group, and moved to
17 another obligated group, that you've crossed
18 boundaries between legal entities.
19   Q   Had you ever seen that type of transfer
20 before in your work at AHERF?
21   A   Between obligated groups, I don't remember
22 ever seeing it.
23      I don't know whether they -- in Pittsburgh,
24 I don't remember it moving from one hospital to
25 another.

PAGE 281
281

CERTIFICATE
COMMONWEALTH OF PENNSYLVANIA, )
                              ) SS:
COUNTY OF ALLEGHENY           )

I, Teresa Constantini, do hereby certify that
before me, a Notary Public in and for the Commonwealth
aforesaid, personally appeared ALBERT ADAMCZAK, who
then was by me first duly cautioned and sworn to
testify the truth, the whole truth, and nothing but
the truth in the taking of his oral deposition in the
cause aforesaid; that the testimony then given by him
as above set forth was by me reduced to stenotypy in
the presence of said witness, and afterwards
transcribed by means of computer-aided transcription.

I do further certify that this deposition was
taken at the time and place in the foregoing caption
specified.

I do further certify that I am not a relative,
counsel or attorney of either party, or otherwise
interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my seal of office at Pittsburgh,
Pennsylvania, on this _____ day of _____,
2003.


_____
Teresa Constantini, Notary Public
In and for the Commonwealth of Pennsylvania
My commission expires October 3, 2004

       - - -

SHEET 36  PAGE 278

**278**

1 restructuring cost, and they made the adjustment
2 retroactive.
3     Q    When Mr. Buettner made the comment in the
4 meeting you referred to earlier about the beauty of
5 purchase accounting, was there any reaction from
6 anybody, or any other discussion of the topic?
7     A    I don't think so.
8     Q    Was a time frame put -- and forgive me if
9 you already testified to this -- to the amount of time
10 over which the items could be written off?
11    A    Well, it said in that memo that they would
12 be written off over 35 years, but I thought that that
13 was adjusted afterward downward to 15 to 20 years.
14    Q    And did Mr. Buettner say that in the
15 meeting you referred to earlier, or did you learn that
16 or recall that from some other set of events?
17    A    That the --
18    Q    That the time period would be 15 years.
19    A    I don't remember.
20    Q    Do you remember him putting a time period
21 to it in his comments about the beauty of purchase
22 accounting, purchase price accounting?
23    A    Yeah, but I don't remember whether he said
24 over 15 or 30, or just over future years.
25    Q    In the -- in Exhibit 8, just a few back,

PAGE 279

**279**

1 or just on top of the pile, on the first page,
2 Mr. Cancelmi about halfway through the second
3 paragraph states, "Granted, the reallocation of the
4 reserves" -- "of these reserves from the Graduate
5 hospitals to other Delaware Valley hospitals is not
6 the most technically appropriate resting place."
7         Do you see that --
8     A    I do.
9     Q    -- sentence?
10        Did you agree with Mr. Cancelmi in this
11 statement?
12    A    Yes.
13    Q    And what -- what do you understand him to
14 be saying there?
15    A    Again, that they're created on
16 one hospital, or one obligated group, and moved to
17 another obligated group, that you've crossed
18 boundaries between legal entities.
19    Q    Had you ever seen that type of transfer
20 before in your work at AHERF?
21    A    Between obligated groups, I don't remember
22 ever seeing it.
23        I don't know whether they -- in Pittsburgh,
24 I don't remember it moving from one hospital to
25 another.

PAGE 280

**280**

1         I can't say whether they did it in the
2 Delaware Valley or not.
3     Q    And do you believe such transfers to be
4 compliant with GAP?
5     A    No.
6         MR. JONES:  That's, I think, where we'll
7 stop for the day.
8         THE VIDEOGRAPHER:  This concludes tape four
9 of the deposition of Mr. Albert Adamczak.  We're
10 off the record.  The time is 4:55 p.m.
11        - - -
12        (Thereupon, at 4:55 p.m., the deposition
13 was continued, to resume on Friday, June 20,
14 2003 at 8:30 a.m.)
15        - - -
16
17
18
19
20
21
22
23
24
25

PAGE 281

**281**

                CERTIFICATE

COMMONWEALTH OF PENNSYLVANIA, )
                              )  SS:
COUNTY OF ALLEGHENY           )

    I, Teresa Constantini, do hereby certify that
before me, a Notary Public in and for the Commonwealth
aforesaid, personally appeared ALBERT ADAMCZAK, who
then was by me first duly cautioned and sworn to
testify the truth, the whole truth, and nothing but
the truth in the taking of his oral deposition in the
cause aforesaid; that the testimony then given by him
as above set forth was by me reduced to stenotypy in
the presence of said witness, and afterwards
transcribed by means of computer-aided transcription.

    I do further certify that this deposition was
taken at the time and place in the foregoing caption
specified.

    I do further certify that I am not a relative,
counsel or attorney of either party, or otherwise
interested in the event of this action.

    IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my seal of office at Pittsburgh,
Pennsylvania, on this _____ day of _____,
2003.


    _____
    Teresa Constantini, Notary Public
    In and for the Commonwealth of Pennsylvania
    My commission expires October 9, 2004
                - - -

282

1                    UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                           - - -

4   THE OFFICIAL COMMITTEE OF THE        )
    UNSECURED CREDITORS OF ALLEGHENY     )
5   HEALTH, EDUCATION AND RESEARCH       )
    FOUNDATION,                          )
6                                        )
               Plaintiff,                )
7                                        )
          vs.                            ) Civil Action
8                                        ) No. 00-684
    PRICEWATERHOUSECOOPERS, LLP,         )
9                                        )
               Defendant.                )
10                                       )

                            - - -

11

     Continued Videotaped Deposition of ALBERT ADAMCZAK
12
                    Friday, June 20, 2003
13
                        Volume II
14
                           - - -
15
          The continued videotaped deposition of
16  ALBERT ADAMCZAK, recalled as a witness by the
    Plaintiff, pursuant to notice and the Federal Rules
17  of Civil Procedure pertaining to the taking of
    depositions, taken before me, the undersigned,
18  Teresa Constantini, a Notary Public in and for the
    Commonwealth of Pennsylvania, at the law offices of
19  Jones, Day, Reavis & Pogue, One Mellon Bank Center,
    500 Grant Street, 31st Floor, Pittsburgh, Pennsylvania
20  15219, commencing at 8:26 a.m. the day and date above
    set forth.

21
                           - - -
22
               COMPUTER-AIDED TRANSCRIPTION BY
23             MORSE, GANTVERG & HODGE, INC.
                  PITTSBURGH, PENNSYLVANIA
24                    412-281-0189

25                         - - -

PAGE 10
291

1  documented so titled.
2      Do you recognize this document?
3  A  I do.
4  Q  And it is one of the update agendas?
5  A  Yes.
6      Although, based on the date, it looks like
7  it was probably a preaudit meeting, meaning that this
8  meeting looks like it took place before the year end.
9  Q  Before June 30?
10  A  Yes, before the year-end audits started.
11  Q  And, in fact, it follows the April 14, 1997
12  memo marked as Exhibit 8 by a couple months?
13  A  Correct.
14  Q  And it looks as if there are still ongoing
15  discussions about the appropriate entry date for the
16  Graduate hospitals as late as June 20?
17  A  I agree.
18      I see that halfway down where it says
19  closing date March May -- versus May.
20  Q  It says "March 1 versus May 1"; correct?
21  A  Correct.
22  Q  And do you remember any discussions at this
23  update meeting --
24  A  If I remember --
25  Q  -- on this topic?

PAGE 11
292

1  A  If I remember correctly, this agenda was
2  part of -- if you remember, we talked previously about
3  a -- generally having a planning meeting with
4  Coopers & Lybrand before they came and did their
5  interim work, or so forth, or before the audit anyhow,
6  it might have been even after they did their audit
7  work.
8      I think this was put together for a meeting
9  to discuss some outstanding issues before the audit.
10  Q  Do you recall at the meeting any discussion
11  of this Graduate closing date, or entry date with the
12  auditors?
13  A  I know that they were made aware of the
14  issue, and I think there was to be further follow-up
15  discussion after they were to do some research and
16  come back with some recommendations.
17      So I don't think there was an elaborate
18  discussion relative to this issue at the meeting.
19      I think it was introduced as an issue, that
20  there was some follow-up conversation relative to it
21  at a later date.
22  Q  Who introduced it?
23  A  I can't say for sure, but I believe
24  David McConnell was at this meeting.
25  Q  Did anyone from Coopers express a concern

PAGE 12
293

1  about the selection of the appropriate date?
2  A  I don't remember whether they did at the
3  meeting or not.
4  Q  Do you remember who was in attendance at
5  this meeting?
6  A  I believe Bill Buettner, and either
7  Mark Kirstein or Amy Frazier, myself,
8  David McConnell. Although I can't remember whether he
9  was or not, I would assume Dan Cancelmi probably was
10  here.
11  Q  Your -- are the handwritten notes on the
12  document yours?
13  A  They were.
14  Q  Can you read the ones up in the upper
15  left-hand corner for me?
16  A  Something relative a special purpose
17  opinion for some kind of a debt letter that we would
18  have needed.
19  Q  And in the upper right-hand corner, does it
20  say "Set up meeting"?
21  A  Set up meeting relative to Penn Medical and
22  Pyramid, which was an HMO arrangement, I believe.
23  Q  I think we mentioned them yesterday.
24  A  Yeah.
25      I think we had asked Coopers -- I don't

PAGE 13
294

1  know whether they were to engage -- whether it was
2  one of their actuaries, or somebody, to review -- with
3  an HMO, you generally review actuarial experience to
4  determine what liabilities may be out there that you
5  don't know about.
6      And they were to be involved in the process
7  of that actuarial review, to determine what
8  liabilities needed to be recorded for the Pyramid
9  contract at year end.
10  Q  Could you read for me the notes that are
11  closest now to the "Graduate closing Date" entry on
12  the agenda?
13  A  "Forbes opening balance sheet," and "Final
14  resolutions."
15  Q  And what does the "Final resolutions" refer
16  to? If you recall.
17  A  I would assume that had something to do
18  with the purchase agreements, and so forth.
19      I think there was something in the
20  resolutions that required the Graduate hospitals to
21  come into the AHERF system by a certain date.
22  Q  And at the base of the page, you've got a
23  note, a footnote, apparently next to the -- the
24  subheading under "Commitments" that has the word
25  "Others."

295

1        And could you read the footnote for me?
2    A    "DV," which is Delaware Valley, "provisions
3 that make cause capital treatment 90 percent of fair
4 market value."
5        So there must have been some kind of a
6 leasing agreement, that we were trying to determine
7 whether it should be treated as an operating lease or
8 a capital lease.
9    Q    On the second page, I think you'll see
10 additional handwritten notes.
11       Does the first one say "Audit Timing"?
12   A    Correct.
13   Q    "August 4 and August 31"?
14   A    No.
15       What it seems to say to me is, I believe,
16 that August 4th ending August 31st.
17   Q    Do you have any recollection of what those
18 notes mean?
19   A    That probably is when they were going to do
20 a bulk of their year-end work.
21   Q    Oh, I see.
22       And then the last entry in your handwriting
23 is "Policy Manual 2 year"?
24   A    Yeah.
25   Q    And what does that refer to?  If you

296

1 recall.
2    A    The thought was that we needed to develop a
3 policy manual related to something, I don't remember
4 what, and we thought the process might take about
5 two years to -- from the start to completion of a
6 thorough policy manual.
7    Q    I'm going to ask you to look back at
8 Exhibit 8 again.
9        If you look again at page 2 of the document
10 on the second page, the sentences we looked at moments
11 ago indicate that the 50 million initial reserve
12 transfers from the Graduate -- accounts at the
13 Graduate hospitals to accounts at the Delaware Valley
14 hospitals to occur in two increments.
15       Is that fair to say?
16   A    That's fair.
17   Q    Do you know who made that decision?
18   A    I don't.
19   Q    Do you recall discussions or ever learning
20 the reason that the -- about or ever learning the
21 reason underlying the two increment approach?
22   A    I did hear that it may have -- it may have
23 something to do with the smoothing out of that
24 transfer over two periods instead of doing it all in
25 one.

297

1    Q    And what does that mean?
2    A    To make the impact appear to be less.  In
3 other words, less noticeable than if you did it all at
4 one time.
5    Q    And who did you hear that from?
6    A    Steve Spargo.
7    Q    And less noticeable on the actual internal
8 end audit of the financial statements?
9    A    No.  It would only be on the internal,
10 because audited statements are only done at June.
11   Q    Okay.
12       So it was -- Mr. Spargo shared with you
13 that part of the reason -- that the reason, or at
14 least part of the reason, for the two increment
15 approach was to make it less obvious because it
16 appears in two sets of internal financial statements?
17   A    Correct.
18   Q    And less obvious to whom, did you
19 understand him to mean?
20   A    I don't know that he stated who, but I
21 would assume it's whoever read it.
22   Q    Okay.
23       And the readers of internal financial
24 statements at AHERF included whom generally?
25   A    Generally the operating CEOs.

298

1    Q    Did he express to you any -- did the board
2 members get internal financial statements?
3    A    I don't know if they routinely did, meaning
4 I don't know if they got monthly.
5        I know there were periodic board meetings
6 that financial statements went to.
7        I don't know whether March and April
8 statements would have gone to a board.
9        In other words, whether there was a board
10 meeting scheduled to review those statements.
11   Q    But in any event, board members at board
12 meetings, as understood it in this time period, got
13 more than the audited financial statements?
14   A    Oh, correct.  Yeah.
15       They would get an interim -- generally
16 whenever the meeting was, they got the most recent
17 available interim statements.
18   Q    Do you think, from your conversation with
19 Mr. Spargo or otherwise, that the decision to make the
20 moves in two $25 million amounts in two different
21 periods was made by Mr. Spargo or others?
22   A    I would believe it was made by others, but
23 I don't know that for sure.
24   Q    Why is it that you believe that?
25   A    I would believe that David McConnell was at

PAGE 18
299

1 least aware of that decision, because anything of this
2 magnitude he would be aware of.
3    Q    Did you learn that Coopers was involved in
4 the decision, or had input into it?
5    A    I did not.
6    Q    Did you ever discuss the decision with
7 anyone at Coopers, or have it discussed in your
8 presence?
9    A    No.
10    Q    I think you testified before that you were
11 never made aware of an adjustment that Coopers
12 requested or demanded on AHERPs financial statements
13 that was not made.
14        Is that a fair recollection of your
15 testimony from yesterday?
16        MR. RYAN:  Objection.
17    A    You need to give me some more history as
18 to --
19    Q    Well, let me ask it more simply.
20        Yesterday's testimony is yesterday's
21 testimony, so let's ask this one:  Do you recall
22 whether Coopers ever took exception to the $50 million
23 reserve transfers?
24    A    I learned sometime later, and it may have
25 been even in depositions well after the fact, that

PAGE 19
300

1 they may have taken exception, but I didn't know at
2 the time.
3    Q    Okay.
4        And in other words, in 1997 and at the time
5 of the transfers, you never heard of anybody -- and at
6 the close of the audit, you never heard of any
7 exceptions?
8    A    I did not.
9    Q    And no exceptions were ever expressed to
10 you; is that right?
11    A    No.
12    Q    Is that right?
13    A    That's correct.
14    Q    You never were made aware of any request to
15 reserve the transactions; is that right?
16    A    Again, I had heard much later in
17 depositions that there may have been that request made
18 to Dan Cancelmi.
19    Q    But at the time of the transactions, at the
20 time of the accounting and before the bankruptcy, you
21 never heard that; is that right?
22    A    Absolutely not.
23    Q    You never heard it?
24    A    I did not.
25    Q    And the depositions you're referring to are

PAGE 20
301

1 depositions in other AHERF-related litigation
2 regarding accounting?
3    A    Correct.
4    Q    And, in fact, the SEC proceedings --
5    A    Yes.
6    Q    -- that are -- that were initiated against
7 three of the auditors involved?
8    A    That's correct.
9    Q    You were never asked to reverse any of the
10 entries; is that right?
11    A    That is correct.
12    Q    By Coopers or anyone else?
13    A    Correct.
14        (Thereupon, Deposition Exhibit No. 1543 was
15        marked for identification.)
16 BY MR. JONES:
17    Q    Mr. Adamczak, I've handed you what we've
18 just marked as Exhibit 1543, which I think you will
19 identify for us as a May 1, 1998 memo from you to
20 Mr. Abdelhak; is that right?
21    A    That's correct.
22    Q    And its subject line is "Divested
23 Hospitals" -- "Divested Hospitals' Intercompany
24 Payable Balances at March 31, 1998"; is that right?
25    A    That's correct.

PAGE 21
302

1    Q    And in it, you discuss the total of 199 --
2 or, $99.6 million reserve establishment and transfer
3 in fiscal year 1997 from Graduate to DVOG; is that
4 right?
5    A    Correct.
6    Q    What prompted this memo?
7    A    Sheriff Abdelhak had contacted me somewhere
8 around this date and asked me to put together such an
9 analysis.
10        He wanted to understand the -- the value of
11 the reserves that were created and moved, and from
12 which hospital to which hospital.
13        So I asked Dan Cancelmi to put together an
14 analysis that I could basically understand and write a
15 narrative to, and he, in essence, constructed the --
16 the very last page, page 3, which is the detail of the
17 reserve transfers.
18        From that, I was able to put a summary
19 together in the memo.
20        I, then, talked to both Dan and to
21 Chuck Morrison relative to page 2 of the memo, which
22 gave reasons for the need to move the reserves, in
23 essence, why the bad debt deserve was inadequate,
24        Being that Dan, again, handled the Delaware
25 Valley, and Chuck Morrison was the CFO of that entity,

SHEET 4   PAGE 22

**303**

1  and had been involved in discussions relative to the
2  bad debt reserves, they were able to give me the
3  three points that are included in that memo.
4      Q    On the second page of the memo to
5  Mr. Abdelhak, you considered -- you have some
6  additional narrative that we will get to.
7          But is it fair to say that you considered
8  this a fairly important topic, and did your best to be
9  as accurate as you could in reporting to the CEO of
10  the operation?
11     A    Yes.
12     Q    And in the second -- on the second page,
13  you list individual reserve amounts that were
14  transferred, and show the total as 99.6 million; is
15  that right?
16     A    That's correct.
17     Q    And then just below that total, the very
18  next sentence read, "It should be noted, that the
19  above transfers were discussed on more than
20  one occasion and concurred with by Coopers & Lybrand
21  prior to such recording."
22          is that right?
23     A    That is correct.
24     Q    And that was accurate then, and remains
25  accurate today?

PAGE 23

**304**

1          MR. RYAN:  Objection.
2      A    Yes.
3          The basis are the memos that we previously
4  discussed, where Dan had, in fact, mentioned that it
5  was approved by Coopers & Lybrand.
6      Q    And you had at least a couple conversations
7  with and/or in the presence of the auditors about the
8  transfers yourself; is that right.
9          MR. RYAN:  Objection.
10     A    That is not correct.
11     Q    You had a couple -- you had a conversation
12  with Mr. Kirstein at which the $50 million transfer
13  was discussed; is that right?
14     A    It was introduced, yes.
15     Q    So the topic was discussed?
16     A    Yes.
17     Q    And then you had an audit closing
18  meeting -- or, I'm sorry, you had at least another
19  audit update meeting at which Mr. Buettner discussed
20  the beauty of purchase accounting; is that right?
21     A    That's correct, and I believe that he was
22  discussing this.
23     Q    These Graduate reserve transfers?
24     A    Correct.
25          MR. RYAN:  Objection.

PAGE 24

**305**

1  BY MR. JONES:
2      Q    Any other conversations?
3      A    With Coopers & Lybrand?
4      Q    Yes, about the topic.
5      A    No.
6      Q    So the basis for the sentence is some
7  personal conversations on your part?
8      A    Yes.
9      Q    And the reporting of Mr. Cancelmi?
10     A    Correct.
11     Q    And anything else?
12     A    No.
13     Q    On the first page of the document, you
14  state in the second paragraph that, "During the latter
15  part" -- or, "the later part of fiscal year 1997
16  approximately 99.6 million of reserves established as
17  part of the Graduate acquisition, and subsequently
18  determined to be cushion from a Graduate perspective,
19  were transferred from the Graduate entities to
20  either" -- "to other DV entities."
21          Do you see that sentence?
22     A    I do.
23     Q    What did you mean by "subsequently
24  determined to be cushion"?
25     A    Subsequently either determined not to be

PAGE 25

**306**

1  needed, or that the reserves were in excess of what
2  was needed.
3          (Thereupon, Deposition Exhibits Nos. 1544
4      and 1545 were marked for identification.)
5  BY MR. JONES:
6      Q    Mr. Adamczak, we've handed to you now
7  Exhibits 1544 and 1545.
8          The first one, 1544, bears -- bears Bates
9  No. JD-SA-0001729.
10          And the second one bears Bates No. -- and
11  that is Exhibit 1545 -- bears Bates No. DBR-AA 38808.
12          These are two memos from you to
13  Mr. Abdelhak again; am I right?
14     A    Yes.
15     Q    The first one is dated May 6, that is,
16  Exhibit 1544; is that right?
17     A    May 6th, correct.
18     Q    And Exhibit 1545 is dated the very next
19  day; is that right?
20     A    That's correct.
21     Q    And they appear to be very similar and
22  almost identical in content.  They're one-page
23  documents; is that right?
24     A    Correct.
25     Q    In both of them, you note that the

PAGE 34                                                  315

1 reserve transfers, the Delaware Valley shortfall in
2 bad debt reserve was at a figure that Mr. Cancelmi
3 approximates at $25 million.
4       Is that right?
5    A   That's correct.
6    Q   So now even after all 50 have been moved,
7 the problem continues?
8    A   Correct.
9    Q   I'm handing you now a one-page exhibit
10 previously marked 1093, and it is headed,
11 Mr. Adamczak, "David McConnell Bi-weekly Meeting
12 Agenda May 30, 1997."
13       Is this an agenda you would have prepared?
14    A   I believe that Dan Cancelmi and I both
15 prepared it.
16       In other words, some of the items were his
17 and some we are mine.
18    Q   And these were meetings that you two
19 typically had with Mr. McConnell together in this time
20 period?
21    A   There may have only been this one that we
22 both attended.
23       I think it was -- this meeting occurred,
24 and then there were no meetings for a period of time,
25 and then Dave had appointed me to the position that

PAGE 35                                                  316

1 Steve held, and Dan reported to me.
2       And I think one of his reasons for doing
3 that is, he didn't -- didn't like to have two or
4 three people from accounting report to him.
5       He liked to have as few reports to him as
6 possible.
7    Q   Did he tell you why?
8    A   No.
9    Q   The handwritten notes are yours or
10 Mr. Cancelmi's, or somebody else's?
11    A   They're mine.
12    Q   And they just reflect that you and Dan were
13 in attendance; is that right?
14    A   Correct.
15    Q   The last bullet on the agenda is
16 "Graduate" -- reads "Graduate Reserves Earmarked for
17 DV Bad Debt Reserve."
18       Do you see that?
19    A   I do.
20    Q   Do you recall the conversations at the
21 meeting about that topic?
22    A   I do not.
23    Q   You're fairly certain from the fact that it
24 was on the agenda that the topic was, however,
25 discussed?

PAGE 36                                                  317

1    A   At least brought up.
2       (Thereupon, Deposition Exhibit No. 1546 was
3    marked for identification.)
4 BY MR. JONES:
5    Q   Mr. Adamczak, we just handed you what was
6 marked Exhibit 1546. It's another Al Adamczak weekly
7 meeting agenda?
8    A   Yes.
9    Q   Dated June 30, 1997?
10    A   Yes.
11    Q   Does this reflect another meeting with
12 Mr. McConnell?
13    A   Yes.
14       This would have been one of the weekly
15 meetings that we had.
16    Q   And, again, given what you just said, this
17 is likely to have been a meeting between just the
18 two of you?
19    A   Correct.
20    Q   And No. 1 on the agenda here is "Delaware
21 Valley Bad Debt Reserve Shortfall"; is that right?
22    A   Yes.
23    Q   Do you recall in specific anything
24 discussed at that time meeting?
25    A   Yes.

PAGE 37                                                  318

1    Q   What do you recall?
2    A   I believe that it -- if you refer back
3 to the exhibit that you had just given me,
4 Exhibit 41.
5    Q   Yes.
6    A   Do you remember that was distributed in or
7 around June 20th, and spoke about an additional
8 shortfall of 25 million above the 50?
9       My recollection is that I talked to David
10 about that additional 25, and asked him what he
11 wanted -- how that should be handled.
12    Q   And is this the -- is this the conversation
13 that you testified to yesterday, in which
14 Mr. McConnell's reaction was generally that we were to
15 fix the problem by year end?
16    A   Yes.
17       And that Coopers was aware of the issue,
18 and they were on board with having it disposed of by
19 year end.
20    Q   And you took that to me that additional
21 reserves transfers, if and where available, were to be
22 made to resolve the problem by year end?
23    A   Yes.
24       (Thereupon, Deposition Exhibit No. 1547 was
25    marked for identification.)

SHEET 6  PAGE 38

**319**

1  BY MR. JONES:
2     Q    We've handed you just now, Mr. Adamczak,
3  what was marked as Exhibit 1547, which is a memo from
4  Mr. Cancelmi to you dated July 3rd, 1997.
5          Do you recall receiving this brief memo?
6     A    I do.
7     Q    And in the first sentence, Mr. Cancelmi
8  states, "In order to address two of the more
9  pronounced exposure areas prior to our year end audit,
10  various reserves have been utilized to eliminate bad
11  debt reserve shortfalls and Health Partners deficits."
12          Do you see that opening sentence?
13     A    I do.
14     Q    What did you understand him to mean by
15  "more pronounced exposure areas"?
16     A    The bad debt reserve shortfall appeared to
17  have been an item of concern back at the end of the
18  '96 audit, and it continued to be troublesome
19  throughout '97.
20          As you have seen through the various memos,
21  there were shortfalls, and I think this was, you know,
22  Dan just formalizing that in writing, that this --
23  this hopefully would bring the bad debt reserve back
24  into line with where -- where it needed to be.
25     Q    On the second page of the memo, does

PAGE 39

**320**

1  Mr. Cancelmi provide you an attachment which shows
2  the shortfall and the reserves that had been
3  transferred?
4     A    Yes.
5          (Thereupon, Deposition Exhibit No. 1548 was
6          marked for identification.)
7  BY MR. JONES:
8     Q    Exhibit 1548, which you now have before
9  you, Mr. Adamczak, is another Al Adamczak weekly
10  meeting agenda, dated this time July 28, 1997.
11          Is that right?
12     A    That's correct.
13     Q    This would have reflected another meeting
14  between you and Mr. McConnell only?
15     A    That's correct.
16     Q    Again, topic No. 1 is "Delaware Valley Bad
17  Debt Reserve Shortfall"?
18     A    Correct.
19     Q    Do you recall the discussions in this
20  meeting?
21     A    Yes.
22     Q    What do you recall about them?
23     A    As we just talked about, 25 million were
24  moved sometime around the end of June, beginning of
25  July, to cover $25 million shortfall that was

PAGE 40

**321**

1  identified through the end of May.
2          Upon preliminary -- preliminarily closing
3  June's general ledger, there was an additional
4  shortfall of some $20 plus million that was
5  unanticipated, and this was the discussion with David
6  as to make him aware that he was short another
7  28 million.
8     Q    So I'm going to ask you to flip back
9  one exhibit.
10          Exhibit 1547 shows 25 million of the
11  transfers and other adjustments on top of the original
12  50; is that right?
13     A    That's correct.
14     Q    And the weekly agenda -- weekly meeting
15  agenda for July 28, 1997 indicates to you and causes
16  you to recall, or you recall otherwise, that you
17  visited with Mr. McConnell again about a continuing
18  shortfall even after the additional 25?
19     A    Correct.
20     Q    And at this meeting, you recall discussing
21  a figure of about 28?
22     A    Yes.
23     Q    28 million?
24     A    Yeah.
25     Q    What was Mr. McConnell's reaction to this

PAGE 41

**322**

1  topic?
2     A    He then -- he reaffirmed that, you know,
3  the issue was to be dealt with by year end, that all
4  parties were involved, on board, including Coopers,
5  and that he asked me to go back to Dan Cancelmi to see
6  whether there were adequate reserves or additional
7  reserves on Graduate or elsewhere to cover this
8  shortfall.
9          So I went back and asked Dan --
10     Q    Before you get there, can I stop you for a
11  moment?
12     A    Sure.
13     Q    Do you remember anything more about the
14  conversation with Mr. McConnell on this topic?
15     A    No.
16     Q    Did you ever have another with
17  Mr. McConnell on this topic, the Graduate reserve
18  transfers or reserve transfers of any kind to the
19  Delaware Valley?
20          MR. RYAN:  Other than what he's already
21          testified to?
22          MR. JONES:  Yes.
23  BY MR. JONES:
24     Q    I'm talking about additional to the ones
25  you've testified today.

PAGE 42

323

1    A    I don't remember.
2    Q    So this would have been your last
3 conversation on reserve transfers with Mr. McConnell?
4    A    I believe so.
5    Q    All right.
6        Go ahead.  What you did next was to speak
7 with Mr. Cancelmi, I think you were telling us?
8    A    Yeah, and ask him whether there were
9 sufficient reserves in the Delaware Valley either on
10 Graduate or any of the Delaware Valley hospitals that,
11 in essence, could be used to cover the shortfall that
12 he, in essence, had identified, that additional 28 was
13 identified by him in the preliminary closing process.
14    Q    And the "him" in that sentence is Dan?
15    A    Dan, was Dan.
16        Dan then came back and relayed that there
17 were, and he may have even put a list together as to
18 where the reserves were.
19        And I talked -- when you said did I ever
20 talk to David McConnell again after that, I would
21 have, because I went back to him with this list of
22 reserves, or at least Dan's representation that there
23 were adequate reserves to cover that 28.
24        And he said, "Fine, make the entries."
25    Q    And was this -- can you put a time frame on

PAGE 43

324

1 that additionally recalled conversation with
2 Mr. McConnell?
3    A    No, but it -- it probably was not long
4 after this July 28th.
5    Q    This was something you were trying to do
6 promptly?
7    A    Right.  I would think it was in the next
8 week.  Probably no longer than two weeks.
9    Q    Okay.
10        And his -- you received his approval again?
11    A    That's correct.
12    Q    Anymore to that conversation other than the
13 essentially, "I approve"?
14    A    No.
15        I then went back to Dan and told him that
16 it was approved, to book the adjustments.
17    Q    Did he mention Coopers again,
18 Mr. McConnell, in the approval conversation?
19    A    I don't remember.
20    Q    Did you have any concerns at the time about
21 the propriety of these additional moves?
22    A    Absolutely.
23    Q    What were those concerns?
24    A    Again, the magnitude of them moving from
25 one entity to the other, that kind of a thing.

PAGE 44

325

1        The way that I was able to get past that,
2 in my mind, was that Coopers was on board with it and
3 understood it.
4    Q    You took some comfort from that?
5    A    I did.
6    Q    And why?
7    A    Because they were supposedly an independent
8 expert in the field, where I had been away from it for
9 several years.
10    Q    In part, that's what you hired them to do?
11    A    Correct.
12        MR. RYAN:  Objection.
13 BY MR. JONES:
14    Q    And that is, be an independent expert in
15 the field?
16        MR. RYAN:  Objection.
17    A    That is correct.
18    Q    I'm handing you now, Mr. Adamczak,
19 Exhibit 320.  I'm going to ask you take a look at this
20 document for a while, and tell me you've ever seen it
21 before.
22        I will tell you that the Bates label
23 indicates to me that it was produced perhaps from the
24 files of Robin Schaffer.
25    A    I have seen this.  I did not see it during

PAGE 45

326

1 this time frame.
2    Q    During which time frame?
3    A    The '97 audit time frame.
4    Q    When did you first see it?
5    A    Sometime months afterward.  Probably
6 sometime around bankruptcy, or after bankruptcy, when
7 some of these issues arose.
8        When I asked Dan Cancelmi, again, whether
9 he was sure that Coopers was aware of all the reserve
10 transfers, and his comment was --
11    Q    When say "all," you mean the 99.6 --
12    A    The 99, yeah.
13    Q    -- .6 total?
14    A    Correct.
15        And his comment to me was, "I'm sure they
16 have, it's even in work papers that we had given to
17 them."
18    Q    And this --
19    A    And he showed me at least one or two of
20 these analyses that include footnotes that spoke to
21 reserve transfers.
22    Q    And this analysis was then provided to you
23 by Mr. Cancelmi?
24    A    I don't -- he did not provide it to me.  He
25 showed it to me in his office.

SHEET 7   PAGE 46

**327**

1    I don't know that I ever took a copy of it,
2 or had a copy, possessed a copy.
3    Q    I see.
4         It was shown to you, in any event?
5    A    Correct.
6    Q    And did it give you more comfort?
7    A    Absolutely.
8    Q    And I'm going to ask you then, the topic --
9 or, the topic line or the first line of the document,
10 on the first page, I'm sorry, reads "Amounts Per
11 Attached Analyses Provided to Auditors" in thousands;
12 is that right?
13   A    Yes, that's what it says.
14   Q    Thousands of dollars; is that right?
15   A    Correct.
16   Q    And on the -- I'm going to ask you to flip
17 to the next page, the second page of the document, and
18 can you identify what this page is?
19   A    It looks to me to be a roll forward by
20 month of reserves for bad debt.
21   Q    At MCP inpatient?
22   A    Correct.
23        That starts with a beginning balance for
24 any given month, and the -- a detailed activity in the
25 categories as to what took place resulting in the

PAGE 47

**328**

1 ending balance at the end of the month.
2    Q    And MCP was the Medical College of
3 Pennsylvania Hospital?
4    A    That's correct.
5    Q    And that is a DVOG hospital?
6    A    Yes, it is.
7    Q    I'm going to direct your attention to a
8 couple footnotes that appear, and before I do that, it
9 was your understanding that Mr. Cancelmi -- strike
10 that.
11        Mr. Cancelmi told you that these documents
12 were shared with the auditors?
13   A    That's correct.
14   Q    At the time of the audit?
15   A    Yes.
16   Q    For fiscal year '97?
17   A    Yes.
18   Q    The footnotes I was going to refer you to
19 before, and will now, are F and G.
20        F reads, "Includes Past Statute write-off
21 of $139,000," roughly, "and reserves from Graduate of
22 $15 million."
23        Is that right?
24   A    That's correct.
25   Q    And the "15 million" is circled?

PAGE 48

**329**

1    A    Correct.
2    Q    And then the second footnote, footnote G,
3 that I was referring to, reads, "Includes
4 $5.591 million year end," or "YE shortfall adjust".
5         Is that right?
6    A    That's correct.
7    Q    Are those the kinds of --
8         MR. RYAN:  The footnote does go on to
9 say --
10        MR. JONES:  I'm sorry.
11 BY MR. JONES:
12   Q    The footnote goes on and says other things,
13 including "$34,000," roughly, "accounts receivable
14 reconciliation adjustment, EPPI bad debt transfer of
15 $5,281,000," roughly; is that right?
16   A    It does.
17   Q    Are these the kinds of footnotes that gave
18 you comfort, that the auditors knew about the
19 transfers to which you just referred?
20   A    Yes.
21        MR. RYAN:  Objection.
22 BY MR. JONES:
23   Q    What about them gave you comfort?
24        MR. RYAN:  Objection.
25   A    The fact that it states that the transfers

PAGE 49

**330**

1 were made.
2    Q    Do the words "year end shortfall
3 adjustment," are those important words to you, as
4 well?
5    A    They are, but not as much as the fact that
6 it says transfer reserves from Graduate.
7    Q    As an auditor, when you see things like
8 "year-end shortfall adjustment" in an amount of
9 five and a half million dollars, what does that tell
10 you to do?
11        MR. RYAN:  Objection.
12   A    Well, what that tells me is that before
13 this adjustment was made, there was a shortfall or a
14 deficiency, and that there was a transfer made to make
15 up for that shortfall.
16        As an auditor, I would ask where the
17 transfer came from, and how it was recorded.
18   Q    You'd ask other questions?
19   A    Correct.
20   Q    You'd do follow up?
21   A    I would.
22   Q    Because year-end adjustments of this
23 magnitude are things that need to be tracked?
24        MR. RYAN:  Objection.
25   A    Unless I -- unless I knew what had

PAGE 50

331

1 happened.
2    Q    Unless you already knew the facts?
3    A    Right.
4        MR. JONES:  Let's take a break here.
5        THE VIDEOGRAPHER:  We are off the record.
6    The time is 9:21 a.m.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  Standby, please.
9        We're back on the record.  The time is
10    9:33 a.m.
11  BY MR. JONES:
12    Q    Mr. Adamczak, I'm going to ask you now
13  about the $28.3 million set of reserves or other
14  adjustments that were made as the last part of the
15  99.6.
16        Do you recall that from our prior
17  discussions?
18    A    I do.
19    Q    Whose idea was it to make those transfers?
20    A    When you say "idea," what --
21    Q    Do you recall ever knowing who first
22  proposed that last set of moves?
23    A    Well, there was a shortfall in the
24  preliminary close that I talked to David McConnell
25  about.

PAGE 51

332

1        And as I mentioned, he asked me to go back
2  to Dan Cancelmi and ask him whether there were
3  adequate reserves of any type anywhere in the Delaware
4  Valley that could cover those shortfalls.
5    Q    Or the Graduate?
6    A    Correct.
7    Q    And that -- that's what led ultimately to
8  the 28.3?
9    A    Correct.
10    Q    Handing you now what has been marked as
11  Exhibit 49 in a prior deposition.
12        Do you recognize this document?
13    A    Yes.
14    Q    What is it?
15    A    It looks like an analysis that takes the
16  unadjusted, meaning preliminary, June results, bottom
17  line income or expense, and shows some analysis coming
18  over to an adjusted June year to date income, and
19  compares it to the -- the 1997 budget, the 1997
20  projection that was prepared with the 1998 budget, and
21  the 1996 actual results.
22    Q    And the heading of the document is "AHERF
23  Income Statement Information FY 97"?
24    A    Correct.
25    Q    There is a column -- actually, the

PAGE 52

333

1  information is also broken down for total DVOG; is
2  that right?
3    A    That is correct.
4    Q    And there is a column called "Use of
5  Reserves."
6        Am I right?
7    A    That's correct.
8    Q    And the total there for apparently used at
9  DVOG is what sum?
10    A    22,800,000, although they're Centennial,
11  which was also in the Delaware Valley, which is
12  another four million, and New Jersey, which is
13  two million five.
14        So if I read all -- all the uses in the
15  Delaware Valley, it's 31 million 550 minus 2 million
16  250.
17    Q    And how is it that you first came to
18  possess or see this document?
19    A    I believe either I or Dan put this
20  together.
21    Q    Through the use of these reserves, the
22  income statement information depicted comes much
23  closer to meeting the budgeted expectations; is that
24  fair to say?
25    A    That's correct.

PAGE 53

334

1    Q    And without it, it falls significantly
2  short; is that fair to say?  Without the use of the
3  reserves referenced?
4    A    Yes.
5        As a matter of fact, I believe that with
6  the use of the reserves, the adjusted number comes
7  pretty close to the projected amount.
8    Q    And is the -- are the reserves listed in
9  this schedule part of the 28.3 third installment of
10  reserve moves?
11    A    I believe that they are.
12    Q    Is there -- do you recall whether there was
13  a May move that may have caused the numbers not to tie
14  directly together, that involved a portion of the
15  28.3, as you sit here today?
16    A    I need -- I need you to ask that again.
17    Q    Do you recall that there was a roughly
18  $7 million move in May of the year that would have
19  been reflected on this schedule, but was still a part
20  of the 28.3?
21    A    I don't remember that.
22        (Thereupon, Deposition Exhibit No. 1549 was
23        marked for identification.)
24  BY MR. JONES:
25    Q    Mr. Adamczak, I've just handed you what

SHEET 8  PAGE 54

**335**

1 we've now marked as Exhibit 1549, which appears to
2 have been produced from your files, and I believe has
3 a handwritten note from Mr. Cancelmi to you on the
4 first page.
5       Do you remember receiving this document?
6   A   I do.
7   Q   About when do you think you got it?
8   A   Again, I know this was not in the time
9 frame of the '97 audit. It was some -- some
10 subsequent period.
11  Q   So after August of '97, at least?
12  A   At least.
13  Q   Do you recall getting it before or after
14 bankruptcy? If you can.
15  A   I don't remember, but I believe it probably
16 was after.
17  Q   And do you recall the circumstances under
18 which you came to possess it? Did you ask for some
19 back up?
20  A   Yeah.
21      Again, it was through subsequent
22 inquiries. I don't know whether it was when the PWC
23 representative came on behalf of the board, or there
24 was some inquiry, or some initiative to better
25 understand something that happened back in the -- the

PAGE 55

**336**

1 June '97 time frame.
2       And, again, I asked Dan, you know, "You're
3 sure that Coopers was on board or knew about these
4 transfers?"
5       And he produced this document, or sent this
6 document to me.
7   Q   Could you read the handwritten note?
8   A   Sure.
9       It says, "To Al," "Al, attached is the
10 info I found to confirm that C&L knew about the
11 28.3 million."
12  Q   And that is in Mr. Cancelmi's hand?
13  A   Signed "Dan," yes.
14  Q   And you were familiar with his handwriting?
15  A   It looks -- sure looks like it.
16  Q   And you are familiar with his handwriting?
17  A   I am.
18  Q   And the heading of the document is -- of
19 the first page of the first document, in any event, is
20 "Graduate System Reserves Fiscal Year Ended June 30,
21 1997"; is that correct?
22  A   That is correct.
23  Q   And the grand total at the bottom of the
24 schedule is what?
25  A   28,300,000.

PAGE 56

**337**

1   Q   And what does the schedule generally depict
2 for you?
3   A   To me, it looks like the source of
4 $28.3 million worth of reserves identified by hospital
5 and by category of where the reserve was.
6   Q   And these 28.3 million of reserves that
7 were transferred from the Graduate hospitals to the
8 Delaware Valley hospitals went to a different account
9 than the first 50 and the second 21; am I right on
10 that?
11  A   I believe that's true.
12  Q   What is it that you recall about the
13 account that these latter 28.3 were received in at the
14 Delaware Valley hospitals?
15  A   I don't remember.
16  Q   Was it to reduce contractual allowance?
17  A   That's what it says in the one memo that we
18 previously had looked at, but I didn't remember that.
19  Q   Do you recall any discussions, at the time
20 of these moves or after, that the 28.3 million was
21 moved in the hope of meeting budgeting income?
22  A   I heard about it much later.
23  Q   And how is it that you heard about it?
24  A   I had asked Dan Cancelmi, and he
25 mentioned it.

PAGE 57

**338**

1   Q   What did he say to you about that?
2   A   That the actual results for June were less
3 than anticipated, and it was not all due to the
4 shortfall in the bad debt reserve.
5   Q   And that -- and what about needing to make
6 the moves to meet budget?
7   A   That these moves accomplished that.
8   Q   This was a post June move, or near about
9 June move?
10  A   It was a post June on a calendar date, but
11 it was in the June close.
12  Q   And when was this conversation had with
13 Mr. Cancelmi about the motive?
14  A   Sometime in or around bankruptcy, if not
15 after.
16  Q   Was anybody else present?
17  A   Not that I'm aware of.
18  Q   Do you recall whose decision it was to move
19 these 28.3 to contractual allowance expense, if that's
20 where they were moved to?
21  A   I don't.
22  Q   Did you review the content of the schedules
23 that are attached to the face page of Exhibit 1549
24 when you received the memo?
25  A   Not in detail.

PAGE 58

339

1    I took a quick look through them.
2    Q    Did you understand these pages to have been
3  information either provided to or available to Coopers
4  during the audit process?
5    A    I did.
6    MR. RYAN:  Objection.
7  BY MR. JONES:
8    Q    Did you understand them to have been
9  provided to them?
10    A    Yes.
11    Q    If Coopers or anyone at Coopers & Lybrand
12  had any questions about any entry on these pages, what
13  additional information could have been available --
14  made available to them, kinds of additional
15  information?
16    A    Oh, I think at a minimum, they could have
17  sat down with somebody and had it explained to them in
18  very -- very detail.
19    Q    Could they have also asked for additional
20  documentation or pull forwards?
21    A    Absolutely. Absolutely.
22    Q    Could they have asked to view general
23  ledger entries on the screens?
24    A    Yes, or specific copies of the journal
25  entries themselves.

PAGE 59

340

1    Q    In hard copy?
2    A    Correct.
3    Q    They could have made queries, could have
4  asked for queries to have been made of the general
5  ledger system?
6    A    Yeah.
7    As a matter of fact, generally one of the
8  process -- or, procedures that an auditor does is to
9  review all big journal entries during the year for
10  unusual items.
11    Q    Were there paper copies of journal entries
12  maintained at AHERF that would have been available to
13  C&L?
14    A    Yes.
15    Q    How were they maintained?
16    A    I believe each hospital had its own set of
17  files of journal entries, and they were maintained in
18  a file by month.
19    Q    Were they in binders, or file gussets, or
20  some other maintenance procedure?
21    A    I don't necessarily remember.
22    Q    When Mr. Cancelmi told you that the
23  28.3 slug of reserve transfers was at least in part
24  motivated by a desire to have income performance look
25  closer to budget at year end 1997, did he tell you

PAGE 60

341

1  where he heard that from himself, if it was from
2  somebody else?
3    A    No.
4    Q    Do you have any knowledge about whether it
5  was Mr. Cancelmi's or somebody else's idea to make the
6  $28.3 million move?
7    A    I don't believe it would have been his idea
8  to move.
9    Q    And why is that?
10    A    Again, he nor I have any authority to do
11  anything like that.
12    Q    Mr. Adamczak, I'm handing you now what
13  we've marked as Exhibit 301.
14    Have you seen this document before?
15    A    I have.
16    Q    What is it?
17    A    This was some attempt to determine the
18  amount of cushions or unusual items that were in
19  income in 1987 that was prepared after June 30th.
20    Q    The memo itself was?
21    A    The analysis was.
22    Q    And handwriting on the first page is yours?
23    A    It is.
24    Q    And it's addressed to "David," as in
25  David McConnell?

PAGE 61

342

1    A    That's correct.
2    Q    I'm going to ask you to flip to the
3  second page for a moment, and in it is a table that's
4  headed "Delaware Valley Hospitals Fiscal Year 97 Use
5  of Cushions" in millions of dollars.
6    Is that right?
7    A    That's correct.
8    Q    Did you prepare this table?
9    A    With the input of Dan Cancelmi, yes.
10    Q    And it notes that, in total, net income in
11  the Delaware Valley hospitals was improved and
12  increased by what figure through the use of cushions?
13    A    Could you repeat that one more time?
14    Q    The schedule or table tells the reader that
15  Delaware Valley hospitals' net income would have been
16  improved through the use of cushions by what total
17  figure in fiscal year 1997?
18    A    75 million.
19    Q    And where do you pull the number from?
20    A    The middle column, "Transfers from Graduate
21  to Cover Shortfall and Bring Bad Debt Allowance to
22  Required Levels."
23    Q    I think I'm looking at page 2 of the
24  document, and you may be looking at a different one.
25    A    Oh, you're right.

343

1  Q    Does this give you a different figure?
2        Page 2, that is.
3  A    Yeah, let me -- 59.1 million.
4  Q    And that's the total?
5  A    Correct.
6  Q    It notes "Graduate Cushions" in a column --
7        MR. RYAN: I apologize.
8  BY MR. JONES:
9  Q    -- "Transferred and taken into Income" of
10 only $7 million.
11       Does -- is that because the table may have
12 been prepared before the last 21.3 --
13 A    No, the table would have been --
14 Q    -- of the -- let me finish the question.
15       -- of the 28 had been moved?
16 A    I believe this analysis was prepared after
17 the 28 was moved.
18 Q    Was there -- can you explain, then, why you
19 would only have seven in that column as a total?
20 A    No, I don't remember why.
21 Q    Okay.
22       59.1, or something even greater, as you
23 referred to a moment ago, would have been a material,
24 to you, number in terms of the Delaware Valley income
25 statement; is that fair to say?

344

1        MR. RYAN: Objection.
2  A    That's fair.
3  Q    It's a big number?
4  A    Yes, it is.
5  Q    And if the statement of operations or
6  income statement at the Delaware Valley had been
7  improved inappropriately by that number, a reader of
8  the financial statements would have been mislead as to
9  operations in fiscal year 1997 at the Delaware -- at
10 the Delaware Valley, is that right, the success of
11 those operations?
12 A    I believe so.
13 Q    Mr. Adamczak, I'm going to shift gears for
14 a minute or more and ask you now to talk with us a
15 little bit about the accounting for intercompany
16 transfers.
17 A    Okay.
18       (Thereupon, Deposition Exhibit No. 1562 was
19       marked for identification.)
20 BY MR. JONES:
21 Q    We've handed you now what we've marked as
22 Exhibit 1562, which is a memo from you to Mr. Spargo,
23 dated August 27, 1996; is that right?
24 A    That's correct.
25 Q    And that's your name and signature, at

345

1  least your first name, in the "From" line?
2  A    Correct.
3  Q    And it deals with a problem you mentioned
4  yesterday, that is, the memo deals with a problem you
5  mentioned yesterday, which was cash receipts, or the
6  lack thereof; is that right?
7  A    Yes.
8  Q    And, in fact, the last line -- lines of
9  the first paragraph state, "Overall, I believe that
10 cash collection shortfalls were probably in the
11 neighborhood of some 70 to 80 million for fiscal
12 year 1996, and this excludes making any progress on
13 the $62 million increase in A/R during fiscal year
14 1995"; is that right?
15 A    Yes.
16 Q    So does this refresh your recollection that
17 the cash difficulties you recalled being in play at
18 AHERF were in play in fiscal year 1996, as well?
19 A    Yes.
20       I believe they were heightened in '97 or
21 got worse.
22 Q    They were not easy problems in 1996; is
23 that fair to say?
24 A    I think that's fair to say.
25 Q    They were significant challenges?

346

1  A    Yes.
2  Q    And this shortfall that is referred to here
3  was an eastern part of the enterprise, or was this an
4  overall shortfall?
5  A    I believe it's overall.
6  Q    But it was primarily, if you look at the
7  second page, driven by eastern hospitals' shortfalls;
8  is that fair to say?
9  A    Yes.
10       MR. RYAN: Objection.
11 BY MR. JONES:
12 Q    And the AIHG enterprise, which was a
13 physician practices acquisition enterprise; is that
14 right?
15 A    That's correct.
16 Q    In fact, the shortfall at AGH was the
17 smallest shortfall on the table on page 2?
18 A    That's correct.
19 Q    You recall, Mr. Adamczak, that from time to
20 time, western hospitals were called upon to advance or
21 loan money to AHERF, which would then be loaned to
22 eastern region affiliates to make up for this cash
23 shortfall?
24 A    That's correct.
25 Q    What funds in western hospitals do you

PAGE 66
347

1 recall being affected by these loans or advances?
2    A    Generally, it was the funds that we
3 referred to as funded depreciation funds.
4    Q    And funded depreciation generally is what?
5    A    Well, first at what hospitals?
6    A    Generally, it was Allegheny General
7 Hospital.
8    Q    And then what is generally funded
9 depreciation?
10    A    Generally funded depreciation are
11 investments or cash that are put aside under the
12 theory that, over time, your assets, your major assets
13 wear out, and this is a way of saving cash to fund the
14 replacement of those assets in the future.
15        From a very theoretical perspective, your
16 depreciation expense is noncash, meaning it's an
17 expense that hit your income statement, but it's
18 noncash.
19        Hospitals traditionally or used to set that
20 amount of cash aside, with the understanding that
21 although it was noncash, if they could put that cash
22 aside, that as the asset was used, which depreciation
23 is reflective of, they'd have enough cash to replace
24 that asset when it was fully used up.
25    Q    Whose idea was it to make the loans or

PAGE 67
348

1 advances, and use funded depreciation as the source?
2    A    Well, I think ultimately it was
3 David McConnell's choice and Sheriff Abdelhak would
4 have to be aware that funded depreciation was used,
5 and that he would see his investments going down as he
6 looked at the financial statements.
7        As far as a choice, I think it was a choice
8 that had to be made because there were bills to be
9 paid.
10    Q    Who approved the loans as they were called
11 for?
12    A    I believe that David McConnell authorized
13 withdrawals from funded depreciation.
14    Q    And why do you say you believe that?
15    A    I seem to remember -- and that was handled
16 through the treasury department.
17        I seem to remember there being a letter
18 issued or something every time that happened from
19 David McConnell approving the draw down, or the
20 liquidation of funded depreciation funds.
21    Q    Mr. Adamczak, I've just handed you what
22 we've marked as Exhibit 534.
23        Do you recognize this, recognize this
24 document?
25    A    I do.

PAGE 68
349

1    Q    What do you recognize it to be?
2    A    A set of monthly financial statements for
3 Allegheny General Hospital for the period ending
4 March 31st, 1996.
5    Q    And that's still in the fiscal year 1996?
6    A    That's correct.
7        I'm going to ask you to flip to the balance
8 sheet, and you'll find that at page 87661.
9        Are you with me?
10    A    I'm there.
11    Q    And on the "Assets" side of the balance
12 sheet, there's a column entitled, "Current Assets";
13 right?
14    A    Correct.
15    Q    And there is an -- a row, I'm sorry, a row
16 entitled "From affiliates"; is that right?
17    A    That's correct.
18    Q    And it is a receivable row?
19    A    That's correct.
20    Q    And the amount is $25,771,000 as of
21 March 31?
22    A    That is correct.
23    Q    And as of June 30, 1995, the prior year
24 end, the amount was zero; is that right?
25    A    That is correct.

PAGE 69
350

1    Q    Under an additional "Asset" heading, there
2 is an amount for "Investments limited or restricted as
3 to use by the board of trustees" of $145,608,000; is
4 that right.
5    A    That is correct.
6    Q    What does restricted by board of trustees
7 mean, "restricted as to use"?
8    A    Those are the funded depreciation assets
9 for the most part that you spoke about.
10        Generally, they are unrestricted, meaning
11 they are -- they can be used by the organization as
12 the organization sees fit.
13        In other words, they are not external
14 restrictions by donors or unrelated parties.
15    Q    They are more liquid than these externally
16 restricted assets?
17    A    Well, not only liquid, but available for
18 use, so the operations of the hospital at their
19 discretion.
20        Generally, the board of directors -- or,
21 not generally.
22        The board of directors at most hospitals
23 may be required to approve the use of those funds, but
24 they may not be.
25        It's a hospital by hospital designation.

SHEET 10  PAGE 70

**351**

1  Q    I hand you now what we've marked as
2  Exhibit 535. It is entitled "Financial Statement
3  Highlights," "Allegheny General Hospital," "Month
4  ended March 31, 1996."
5        And the page deals with the balance sheet;
6  is that right?
7  A    It does.
8  Q    In the second bullet point, there appears a
9  sentence, "As noted last month, 40 million of such
10 inter-company receivables has been reclassified to
11 funded depreciation assets as such represents a
12 receivable to be repaid upon completion of the DVR
13 bond refinancing."
14       Who made the decision -- am I right about
15 that, the way it reads?
16 A    Yes.
17 Q    Who made the decision to reclassify
18 40 million of intercompany receivables to funded
19 depreciation?
20 A    I don't know who ultimately made that
21 decision.
22       I know that David McConnell, through
23 Steve Spargo, had communicated that change be made.
24 Q    To you?
25 A    Either to me, or to probably Jack Nelson or

**352**

1  Joe Dionisio, but ultimately through me.
2  Q    Do you recall why the change was -- the
3  classification change was being made?
4  A    I assumed it was because there was some
5  sensitivity, as we spoke about previously, relative to
6  money from the west in Allegheny General Hospital
7  going to the east.
8  Q    Sensitivity on the part of those reading
9  the financial statements?
10 A    Yes, and doctors who may not read the
11 financial statements, but may not particularly care
12 for money from, as they saw it, their hospital going
13 to support the eastern hospitals.
14 Q    They might learn of it from others who read
15 the financial statements; is that what you mean?
16 A    Yes.
17 Q    I'm handing you now what we've marked as
18 Exhibit 536, which is -- again, it's titled "Financial
19 Statements Highlights," "Allegheny General Hospital,"
20 "Month Ended June 30, 1996."
21       Is this a document you recall receiving?
22 A    Yes.
23 Q    It notes that, "Additionally, during June,
24 49.8 million previously transferred to AHERF for
25 DVR cash requirements was repaid from the proceeds of

PAGE 72

**353**

1  the Delaware Valley Obligated Group series of 1996
2  bonds and 9.9 million of additional funded
3  depreciation investments were liquidated."
4  Q    Do you see that?
5  A    I do.
6  Q    Who made the decision to use a portion of
7  the DVOG refinancing to repay AGH? If that's what
8  this notes reflects.
9  A    That's what it appears to reflect to me
10 and, again, the decision would have been made at the
11 David McConnell/Sherif Abdelhak level.
12 Q    You weren't involved?
13 A    No.
14 Q    And you didn't learn who made the decision?
15 A    No.
16 Q    Do you know whether any of the creditors or
17 insurers for the bond issuance had notice of this?
18 A    I do not know.
19 Q    You now have before you Exhibit 546,
20 Mr. Adamczak. It's a note from -- a memo, rather,
21 from Jack Nelson to Joe Dionisio, dated November 13,
22 1996.
23       And the subject line is "AGH October 31,
24 1996 Financial Statements."
25       Is that right?

**354**

1  A    That's correct.
2  Q    You got a copy of this at the time,
3  roughly?
4  A    Yes, yes.
5  Q    On the second page, it attaches another
6  "Financial Statement Highlights" for AGH, this one for
7  the month ended October 31, 1996; is that right?
8  A    That's correct.
9  Q    And in it, in the notes on this balance
10 sheet portion of the highlight document, the following
11 appears, "Funded depreciation investments increased
12 by 19.1 million from September 30, 1996 to
13 133.2 million," comma, "such increase is primarily
14 related to a $30 million of intercompany receivables
15 reclassified to funded depreciation investments which
16 represents an amount related to anticipated
17 collections on DVR patient accounts during the
18 remainder of fiscal year '97 and 705,000 of investment
19 income."
20       Do you see that?
21 A    I do.
22 Q    Was this another reclassification?
23 A    Yes, it was.
24 Q    Do you know who made this decision?
25 A    I don't.

PAGE 74

355

1      Again, I would again assume it's
2  David McConnell or Sheriff Abdelhak.
3      Q    And when you saw this document, did you
4  understand or believe that the reason for the
5  classification was -- the reclassification was the
6  same as the reason for the prior reclassification?
7      A    Yes.
8      Q    And that was to diminish the obviousness of
9  the intercompany payable and receivable?
10     A    Yes.
11     Q    And the obviousness of that growing
12  intercompany receivable was, thereby, lessened by any
13  reader of the financial statements, including board
14  members?
15     A    Yes.
16     Q    Did this trouble you?
17     A    Yes, it did.
18          As a matter of fact, I think at some later
19  date, Joe Dionisio expressed our frustration with that
20  reclass to Mr. McConnell.
21     Q    Did you express yours to Mr. Dionisio
22  first?
23     A    I don't know that I needed to.
24          I think he had the same frustration right
25  off the bat.

PAGE 75

356

1      Q    How did you learn that Mr. Dionisio
2  expressed his frustration to Mr. McConnell?
3      A    I had seen a copy of the memo.
4      Q    Do you recall what Mr. McConnell's reaction
5  was, if you ever learned of it?
6      A    I thought it said something to the effect
7  that this would be -- and these are my words versus
8  his -- corrected by the end of the year so that it was
9  no longer -- that any intercompany would no longer be
10  reclassed to funded depreciation.
11     Q    Do you remember seeing some memo to that
12  effect from Mr. McConnell?
13     A    I do.
14     Q    So for whatever reasons, the
15  reclassifications were going on, you, at least at the
16  time you received that memo, had some hope that they
17  would be corrected by year end?
18     A    I had an understanding that they would be,
19  not a hope.
20     Q    Mr. Adamczak, I'm now handing you what
21  we've marked as another memo from Mr. Nelson to
22  Mr. Dionisio that you received, of which you received
23  a copy, this one dated December 30, 1996, and it again
24  attaches the financial statement highlights for AGH
25  this time as of November 30, 1996; is that right?

PAGE 76

357

1      A    That is correct.
2      Q    And this memo notes that there was, in
3  fact, a reversal of certain reclassifications, is that
4  right, in its fourth bullet point under the "Balance
5  Sheet" heading of page 2?
6          Or that such a reversal should take place?
7      A    What I read this to say is that, and as
8  with the process, a draft of the financials were
9  sent to Joe Dionisio for approval, that in the draft,
10  the 30 million was shown as an intercompany
11  receivable, and that Jack is asking in this memo, or
12  informing Joe that that's the case, and telling him
13  to please inform -- telling Joe to please inform Jack
14  if he would like an intercompany receivable reclass
15  made.
16     Q    To funded depreciation?
17     A    To funded depreciation in the final
18  statements.
19     Q    It's a query?
20     A    Correct.
21     Q    Exhibit 548 is a memo from Mr. Dionisio
22  himself dated June 6 -- I'm sorry, January 6, 1997, on
23  intercompany transfers to a team of finance department
24  folks, including yourself; is that right?
25     A    That's correct.

PAGE 77

358

1      Q    Mr. Spargo is directed -- the memo is
2  directed to him and Mr. Nelson, as well?
3      A    That's correct.
4      Q    I want to give you a second to read the
5  memo.
6          Have you had a chance?
7      A    I have.
8      Q    The final paragraph of the memo reads, in
9  part, "you previously advised me that Advances to
10  Affiliates" -- that's the intercompany receivable
11  we've been talking about; right?
12     A    That's correct.
13     Q    -- "should be recorded as other assets,"
14  and then parenthetically Mr. Dionisio writes, "as
15  opposed to included in Assets Limited or Restricted As
16  To Use."
17          Is that right?
18     A    That's correct.
19     Q    And he then puts the tag on that which
20  follows, and I quote, "in accordance with generally
21  accepted accounting principles and year end reporting
22  requirements."
23          Is that right?
24     A    That's correct.
25     Q    And then he asked, "Please confirm with