359

1 David McConnell that this reporting is acceptable to
2 him since, as you know, from time-to-time on an
3 interim basis we have included advances among assets
4 limited or restricted as to use."
5        Is that right?
6    A   That's correct.
7    Q   So at least when you read this, you
8 perceived Mr. Dionisio to believe that including the
9 advances in assets limited or restricted as to use
10 would not have been in compliance with GAP; is that
11 right?
12   A   That's correct.
13   Q   He goes on, that is, Mr. Dionisio, to
14 comment, "Assuming we settle on this reporting, we
15 should anticipate inquiries and significant discussion
16 at the next AGH Board Meeting regarding the magnitude
17 of these advances."
18       Is that correct?
19   A   That is correct.
20   Q   The memo continues.
21       But in any event, did you share his
22 prediction, that if the advances to affiliates were
23 shown as other assets and not included in assets
24 limited or restricted as to use, that folks,
25 including AGH board members at their next meeting,

360

1 might question the magnitude of the intercompany
2 receivable?
3        MR. RYAN:  Objection to the lack of
4        foundation.
5    Q   Did I share that view?
6    Q   Yes.
7    A   Yes.
8    Q   That's because this was no small sum; is
9 that right?
10   A   That's correct.
11   Q   And it might have been a bit of a surprise
12 if people had been reading the internal financial
13 statements before year end; is that correct?
14       MR. RYAN:  Objection.
15   A   Unless they knew that that was the
16 treatment.
17   Q   And it would have been difficult for them
18 to know that, in your view?
19   A   Unless --
20       MR. RYAN:  Objection.
21   A   Unless it was discussed at the board
22 meetings, and I don't know the answer to that.
23   Q   Unless it was revealed orally at the board
24 meetings; is that right?
25   A   Correct.

361

1        Or, as it states, a written report
2 included.
3    Q   You don't know that any written report was
4 included; do you?
5    A   I don't know.
6    Q   Did you discuss this, or did Mr. Spargo or
7 Mr. Nelson discuss this issue with Mr. McConnell, to
8 your knowledge?
9    A   I believe Mr. Spargo did.
10   Q   And why is it you believe that?
11   A   Because, again, I was -- I was told that at
12 some point, this treatment would change, so that by
13 year end 1997, there was no longer that reclass to the
14 funded depreciation investments, that it would be
15 shown as a separate receivable from affiliates.
16       And I think there was actually -- if you
17 were to look at later financial statements -- less and
18 less transfers, if that's the right word, to funded
19 depreciation.
20       So there was a move to make that
21 distinction more on the terms of funded depreciation
22 being the investments, and assets -- or, receivables
23 from affiliates being receivables from affiliates.
24   Q   I'm handing you now, Mr. Adamczak, what has
25 been marked as Exhibit 549.

362

1        It's another in the series of memos from
2 Mr. Nelson to Mr. Dionisio, on which you were copied,
3 this one dated February 26, 1997; is that right?
4    A   That's correct.
5    Q   And it is again -- it does, again, include
6 a financial statement highlight for AGH, this one
7 dated December 31, 1996; is that right?
8    A   That's correct.
9    Q   That's mid fiscal year?
10   A   Correct.
11   Q   And I think we can read in this one in its
12 fourth bullet point, again at page 2 of the exhibit,
13 that the total amount of -- due from affiliates that
14 had been reclassified to funded depreciation now marks
15 $82.2 million; is that right?
16   A   That's correct.
17   Q   I'm going to ask you to flip to Bates
18 page 2720.
19       This looks to be an earlier draft of the
20 second page of the exhibit with some handwritten
21 notations that are yours?
22   A   That's correct.
23   Q   And, in fact, there's a note to Mr. Nelson
24 in your handwriting that says, "Jack, please make
25 these changes."

PAGE 82

363

1     Is that what that delta sign is there?
2     A    Yes.
3     Q    Then something.  Do you know what that last
4 word is?
5     A    "Reissue the memo."
6     Q    And then you write, "Thanks, Al"?
7     A    Correct.
8     Q    And then somebody writes, "Done 2-26-97."
9     Is that you, too?
10    A    No.  That appears to be Jack.
11    Q    And at whose direction were you asking Jack
12 to make the changes to the memo that he then made?
13    A    It would have been Joe Dionisio's request.
14        Again, I would assume, approved or
15 requested ultimately by David McConnell or
16 Sheriff Abdelhak.
17    Q    Do you, from your experience at AHERF, know
18 that board members more typically review the mid year
19 financial statements, internal financial statements,
20 than others?
21    A    I don't know that to be the case.
22    Q    You now have before you, Mr. Adamczak,
23 Exhibit 551, another in the same series.  This one
24 from Mr. Nelson to Mr. Dionisio again, dated May 5,
25 1997.

PAGE 83

364

1     This one has a subject line that says, "AGH
2 Draft March 31, '97 Financial Statement Highlights;"
3 is that right?
4     A    That's correct.
5     Q    And this one, in its fourth bullet point of
6 page 2, refers to a move to reduce the amount of
7 reclassifications that had been made to funded
8 depreciation to zero by year end.
9     Is that fair to say?
10    A    That is correct.
11    Q    So this would have been a -- something
12 supportive of your expectation that that was going to
13 be the case?
14    A    Correct.
15    Q    Handing you one of the last exhibits on
16 this topic, previously marked as Exhibit 199, another
17 financial statement highlights for Allegheny General
18 Hospital, dated June 30, 1997.
19        Do you recall receiving this one, as you
20 received the others?
21    A    Yes.
22    Q    I'm going to ask you, again, to look at the
23 fourth bullet point, its tag sentences reads, "The
24 50.2 million funded depreciation balance at June 30,
25 1997 does not include intercompany receivable balances

PAGE 84

365

1 as agreed upon."
2     Is that right?
3     A    That's correct.
4     Q    And that gave you some comfort; is that
5 right?
6     A    Right.
7     Q    That we were going to follow through and
8 get it to zero?
9     A    That's correct.
10    Q    And this was -- would have been the draft
11 that would have applied to year end fiscal year 1997;
12 is that right?
13    A    That is correct.
14    Q    I'm sorry, Mr. Adamczak, we need to mark
15 that one.
16        (Thereupon, Deposition Exhibit No. 1563 was
17        marked for identification.)
18 BY MR. JONES:
19    Q    We've just handed you 1563, or
20 Exhibit 1563, Mr. Adamczak, and I think you will be
21 able to tell me that it is, in fact, draft 7 dated
22 September 23, 1997 of the financial statements for
23 AHERF for the year ended June 30, 1997; is that
24 right?
25    A    Yes.  It's a draft of the audited financial

PAGE 85

366

1 statements.
2     Q    Thank you.
3        And I'm going to refer you to the balance
4 sheet page for Allegheny Health, Education and
5 Research Foundation, the consolidating balance sheet,
6 which is at 48464, and it has columns for various
7 obligated groups and hospitals; is that right?
8     A    That's correct.
9     Q    And there is a column, and it is, in fact,
10 the first of those columns that refers to Allegheny
11 General Hospital, is that right, and its balance sheet
12 for the year end?
13    A    That's correct.
14    Q    So as late as September 23rd, 1997, these
15 consolidating balance sheets were still reporting the
16 due from affiliates amount in the "Due for
17 affiliates" -- "Due from affiliates" row; is that
18 correct?
19    A    That's correct, a hundred and 44 million
20 dollars, roughly, of receivables.
21    Q    And the "Assets limited or restricted as to
22 use" row was how much?
23    A    58.6 million.
24    Q    What is meant by "Draft 7"?
25    A    There are various drafts prepared

SHEET 12  PAGE 86

367

1  throughout the process.
2       Subsequent drafts generally reflect
3  updates, and updates could be anything like typing
4  corrections, wording corrections, changes to numbers,
5  it could mean a host of items.
6       But this was the seventh draft of these
7  financials that were put together throughout our
8  typing process.
9    Q    Do you recall whether draft 7 was pretty
10 close to the end?
11   A    I would assume that it was, based on the
12 date of 9/23, and the fact that their sign-off date at
13 least in this draft was September 4th.
14   Q    I'm going to ask you to hold that page,
15 48464, in Draft 7 from a moment, and I'm going to
16 hand you Exhibit 58, which I think, upon review, you
17 will tell me are the final audited financial
18 statements for the year ended June 30, 1997 for AHERF
19 as issued?
20   A    I believe that's the case, and that there's
21 a signed opinion by Coopers & Lybrand on page 1.
22   Q    Would you please skip to the balance sheet,
23 the consolidating balance sheet in the auditeds, which
24 I think you'll find at TN CBC43B 00921?
25       MR. RYAN:  Objection to that

PAGE 87

368

1     characterization.
2  BY MR. JONES:
3    Q    Are you with me?
4    A    I am.
5    Q    And we're on the page that's labeled
6  "Allegheny General Health, Education and Research
7  Foundation Consolidating Balance Sheet as of June 30,
8  1997"; is that right?
9    A    That is correct.
10   Q    What is the amount of "Due from affiliates"
11 on this final balance sheet, consolidating balance
12 sheet for Allegheny General Hospital?
13   A    Although, it's very hard to read, I think
14 it's 28 -- 29,830,000.
15   Q    And what is the amount of "Assets limited
16 or restricted as to use"?
17   A    It appears to be a hundred and 72 million,
18 400 some thousand.
19   Q    So there's been a change made; is that
20 right?
21   A    Absolutely.
22   Q    Roughly how much of a change?
23   A    A hundred and 11 million that was moved
24 from "Due from affiliate" up to "Assets limited or
25 restricted as to use."

PAGE 88

369

1    Q    And funded depreciation is an asset item
2  that is typically recorded in "Assets limited or
3  restricted as to use"; is that right?
4    A    That is correct.
5    Q    Do you know why this change was made?
6    A    I have some insight.
7    Q    What is your insight?
8    A    The insight is that there was a -- I
9  believe it was an audit committee meeting or a board
10 meeting to discuss or review the -- a draft of the
11 audited financial statements.
12       The audited financial statements are never
13 final until either the board or the audit committee
14 approves them, I believe.
15       So there was a meeting to discuss them.
16       In preparation for that meeting, a draft of
17 the audited financial statements are sent to the board
18 members so that they could review them prior to that
19 meeting.
20       The mailing was to go out on a date that
21 was close to that board meeting, and I know there
22 was --
23   Q    In the fall of 1997?
24   A    That's correct.
25       I believe there was a meeting between

PAGE 89

370

1  Sheriff Abdelhak, William Buettner and I believe
2  Tony Sanzo to discuss those financial statements prior
3  to the mailing to the board members, kind of like a
4  preaudit review meeting.
5    Q    And why do you believe that such a meeting
6  took place?
7    A    Well, I'll tell you in a second.
8    Q    Okay.
9    A    I received a call from Bill Buettner that
10 mentioned that he was in a meeting, and that as a
11 result of that meeting, that a change should be made
12 to these financial statements before they were mailed
13 out to the board or audit committee, whoever the
14 mailing list was.
15       And that Diane Schrecengost, who was to
16 handle the mailing, needed to get these revised
17 financial statements very quickly, meaning in the next
18 hour or so, because the mailing had to go out in order
19 to get them to the board meeting -- the board members
20 in advance of the meeting.
21       And the change that Mr. Buettner requested
22 was that the hundred and 11 million be moved from "Due
23 from affiliates" up to "Assets limited or restricted
24 as to use."
25   Q    And this was voiced to you in the phone

PAGE 90

371

1  call?
2      A    That is correct.
3      Q    And the phone call occurred, given your
4  understanding of the need to move this fast, or the
5  timing of this package, in the fall 1997 time frame?
6      A    That's correct.
7      Q    And Mr. Buettner called you directly?
8      A    He did.
9      Q    Did he relate to you that others were in
10  the meeting with him?
11      A    He related that he had met with
12  Sheriff Abdelhak.
13          I believe I came later to understand that
14  possibly Tony Sanzo was there.
15      Q    Okay.
16          Were they in the room when the phone call
17  was made, or had they -- had a meeting just broken up?
18      A    I believe it had broken up, but I don't
19  know that for sure.
20      Q    Did you understand from the phone call
21  where Mr. McConnell was phoning from?
22      A    Mr. Buettner, you mean?
23      Q    I mean Mr. Buettner, yes.
24      A    No, I do not know where he was.
25      Q    Did he tell you why the decision had been

PAGE 92

373

1      Q    What do you remember about the call with
2  Mr. Dionisio, other than what you just said?
3      A    That we both -- we both were not very
4  comfortable with making the change.
5      Q    Did he tell you that he was uncomfortable,
6  Mr. Dionisio?
7      A    He did, and said he had expressed that back
8  to Mr. Sanzo at a minimum.
9      Q    And what did he Mr. Sanzo say to him, if
10  anything?
11      A    I don't remember.
12      Q    Do you remember anything more that
13  Mr. Buettner actually told you on the prior phone
14  call?
15      A    We had a very brief discussion where I
16  disagreed with making the change.
17      Q    What did you tell him?
18      A    That I was uncomfortable with that, that I
19  believed under GAP, there was a requirement to show
20  transactions with affiliates, such as this, as a
21  separate line, and that I didn't feel it appropriate
22  to show it under the line "Assets limited or
23  restricted as to use."
24      Q    So you thought -- you thought that that was
25  inappropriate?

PAGE 91

372

1  made?
2      A    No, he did not.
3      Q    Had you had -- and he basically instructed
4  you to make the change?
5      A    That's correct, at the request of
6  Mr. Abdelhak.
7      Q    Did you ask for -- was that a typical chain
8  of command instruction?
9      A    No, it was not.
10      Q    You didn't, in the past, have occasion to
11  have Mr. Buettner tell you what to do with respect to
12  an accounting treatment?
13      A    That's correct.
14      Q    Did you seek consent or input from anybody
15  else, given the rarity of this circumstance?
16      A    Yes.
17          I had called Joe Dionisio, who was the CFO
18  for Allegheny General Hospital, and mentioned to him
19  that I had been requested to make that change.
20          He was already aware that I was requested
21  to make it, and that's where I believe I understand
22  that Tony Sanzo was at the meeting.
23          I believe Tony Sanzo may have gone to
24  Joe Dionisio after the meeting to inform him that that
25  request was being made.

PAGE 93

374

1      A    Yes.
2      Q    What was his response to that?
3      A    His response to that was that the title of
4  the caption on the financial statements was "Assets
5  limited," not, "Investments limited," and that this
6  was considered an asset, and that it would be repaid.
7          It was not a normal intercompany
8  transaction, it was a loan, and that it was
9  appropriate to show it, and that it was eliminated in
10  consolidation.
11          So that from a consolidated perspective, it
12  had no effect, and that any reader that read the
13  details of consolidation in detail would see that
14  elimination and understand what was happening.
15      Q    He said all that to you on the phone call?
16      A    Yes.
17      Q    Did you believe -- did you take issue with
18  his justification?
19      A    Yes.
20          Although, I knew I was in no position to
21  not have the entry made.
22          MR. JONES:  We have to change tapes, so we
23  will stop here.
24          THE VIDEOGRAPHER:  This concludes tape five
25  of the deposition of Mr. Albert Adamczak.  We're

SHEET 13  PAGE 94

375

1  off the record. The time is 10:36 a.m.
2  (Recess taken.)
3  THE VIDEOGRAPHER: Standby, please.
4  This begins tape six of the deposition of
5  Mr. Albert Adamczak. We're back on the record.
6  The time is 10:50 a.m.
7  BY MR. JONES:
8  Q  Mr. Adamczak, when we had to break for a
9  change in the tape, you were telling us that you did
10  take issue with Mr. Buettner's voiced rationale for
11  the change between draft seven and the financial --
12  final audited financial statements for 1997.
13  Do you recall that?
14  A  I do.
15  Q  Did you take issue with him on the phone?
16  A  Well, I told him that I didn't agree with
17  the reclass initially, and then he gave me his reasons
18  why it was acceptable from his perspective.
19  Q  And did you tell him that you disagreed
20  with him again after you heard his rationale?
21  A  I don't know that I did or did not.
22  Q  But there's no question that you disagreed
23  with him; is that right?
24  A  That's correct.
25  Q  And what was the reason that you disagreed

PAGE 95

376

1  with him?
2  A  Again, I thought that under generally
3  accepted accounting principles, you were required to
4  show separately accounts or transactions with related
5  parties, which that clearly was, and that a receivable
6  from an affiliate ought to be shown as a separate
7  line item or footnoted in some way, versus combined
8  with other investments under the asset limited
9  category.
10  Q  Did it occur to you that if it was
11  Mr. Buettner's position that a close read of the
12  financial statements could reveal the transactions,
13  then why make the change at all, go through the
14  gyrations to make the change?
15  Did that kind of thought occur to you?
16  A  Yeah.
17  MR. RYAN: Objection.
18  A  Yeah. I understood that but, again, to me,
19  I didn't think it was that obvious unless you were a
20  very astute reader of the financial statements.
21  Q  Right.
22  Did Mr. Buettner tell you why he wanted
23  you to make the change that he was requesting you to
24  make?
25  A  I don't believe that he told me.

PAGE 96

377

1  I later came to learn that it related back
2  to the old -- the item that we had previously talked
3  about, the western hospitals giving money to the
4  eastern hospitals, and that by showing it as a
5  separate line would have highlighted the magnitude of
6  those transfers.
7  Q  For the readers of the financial
8  statements?
9  A  Correct.
10  Q  And who did you learn that from?
11  A  I think Mr. Abdelhak, himself, at some much
12  later date.
13  Q  Told you that?
14  A  Yeah, not specifically related to that
15  issue, but that there was a lot of pressure on him
16  relative to amounts that had been given from the west
17  to the east.
18  And I had come to learn that a group of
19  doctors from the west had actually requested, and I
20  believe were granted a meeting, with him where they
21  expressed their concerns personally to him.
22  Q  And when do you think that conversation
23  with Mr. Abdelhak happened?
24  A  That was much later.
25  Q  Was it before or after bankruptcy?

PAGE 97

378

1  A  I believe -- I believe he left somewhere
2  right around the bankruptcy, so I think it was
3  probably before.
4  Q  When was the meeting of the doctors that
5  you just referred to? If you can recall.
6  A  Sometime around then, also. Around
7  bankruptcy.
8  Q  You had a phone call with Mr. Dionisio
9  about your reservations in making this change in
10  treatment.
11  Did you have a phone call or communication
12  with anybody else on the topic at the time?
13  A  I would have asked somebody in accounting
14  to effect that change.
15  And I know that I had at least had talked
16  to Chuck Lisman, he was controlling the changes.
17  And I may have talked to Dan Cancelmi
18  either before that change was made, or right after it
19  was made, so he was aware that it was made, also.
20  Q  Did either Mr. Lisman or Mr. Cancelmi share
21  with you their reaction?
22  A  They both had the same reaction that I did.
23  Q  Which was?
24  A  That they did not think it appropriate.
25  Q  Sorry, Mr. Adamczak, I've made a mistake

PAGE 98

379

1 again. We need to mark that.
2        (Thereupon, Deposition Exhibit No. 1564 was
3 marked for identification.)
4 BY MR. JONES:
5    Q    Mr. Adamczak, I've handed you I think what
6 we've marked as Exhibit 1564, and it is something that
7 looks to be a reprint or a copy of publication which
8 is entitled "Principles in" -- I'm sorry, which is
9 entitled "Transactions among Affiliated Entities
10 Comprising an Integrated Delivery System," apparently
11 published by Healthcare Financial Management
12 Association; is that right?
13    A    That's correct.
14    Q    Who is the Healthcare Financial Management
15 Association?
16    A    I believe that it's a professional society
17 that is generally comprised of -- of health care
18 professionals and/or consultants and others that deal
19 in the health -- health care field.
20    Q    And are there accountants involved in this
21 organization?
22    A    Yes.
23    Q    And this is something headed "Statement
24 No. 19," as well; right?
25    A    Yes.

PAGE 99

380

1    Q    And these are the periodic statements from
2 this organization that you were kept apprised of in
3 your tenure at AHERF?
4    A    I was not kept apprised, but I believe
5 there were other statements.
6    Q    And how does this one come to be in your
7 file?
8    A    You know, I don't necessarily remember what
9 the issue was that gave rise to this being there,
10 quite honestly.
11    Q    Do you see the handwritten note at the
12 upper right-hand side of the document --
13    A    I do.
14    Q    -- of the first page that says "cc: Steve,
15 Al, Chuck, Carolyn and Jack E."?
16    A    I do.
17    Q    As in Ellsworth; is that right?
18    A    That is correct.
19    Q    And whose handwriting is that?
20    A    Dan Cancelmi.
21    Q    I'm going to ask you to flip to Bates
22 page 23085.
23        That's the "Conclusions" section of the
24 publication?
25    A    Yes.

PAGE 100

381

1    Q    The conclusion 2.16 reads that, "If a loan
2 or advance from an affiliated entity is impaired in
3 accordance the measurement criteria of SFAS No. 114,
4 as stated above, or is otherwise deemed to be
5 uncollectible," and then there's a parenthetical, "the
6 impaired or uncollectible portion should be accounted
7 for as an equity transfer if the recipient of the loan
8 is a wholly-owned or a wholly-controlled affiliate, or
9 if both parties are wholly-owned or wholly-owned" --
10 or, "wholly-controlled by a common parent."
11        Do you see that?
12    A    I do.
13    Q    Does that refresh your recollection about
14 why this might have been in your files?
15    A    It may.
16        I know that at year end, and I believe it
17 was in '96, if not '95, there may have been some
18 concern, and it may not have necessarily even been
19 eastern/western, but that certain intercompany
20 balances that were reflected on entities' books may
21 not be collectible, or there may not ever -- or, there
22 may not have been an intention to repay them.
23    Q    Who is voicing that concern?
24    A    I think Coopers did.
25    Q    Were you concerned about the collectibility

PAGE 101

382

1 of the intercompany between the east and the west?
2    A    Oh, absolutely, because of magnitude.
3    Q    And --
4    A    The negative cash flow that they had.
5    Q    And were, therefore, you thinking at the
6 time, that is, at least in fiscal year '97, if not
7 before, that this should have been treated as -- these
8 amounts should be treated as an equity transfer as
9 opposed to a loan or an advance?
10    A    Yes, but I think my more immediate concern
11 was at least showing them as an intercompany advance.
12    Q    You were trying to take it in steps; is
13 that right?
14    A    Right.
15    Q    Do you know what more work would have
16 needed to be done to determine whether the booking of
17 these receivables should have been changed to an
18 equity transfer?
19    A    I think there are a couple criteria you
20 look at.
21        One is cash flow of the entity that owes
22 the money, and whether they have the ability to pay
23 it, and whether it looks like they'll have the ability
24 to pay.
25        Obviously, in this case, there was no

383

1 immediate ability to pay it but, again, and this
2 would be a management assertion, meaning a
3 David McConnell/Sherif Abdelhak, whether they had
4 intended to, in fact, do another bond offering to
5 gather cash to pay it.
6       And I do not know the -- I do not know the
7 answer to that.
8   Q   You mentioned that you thought Coopers was
9 considering this equity transfer versus loan or
10 advance issue.
11       Am I right?
12   A   Well, I think that it was more from a
13 collectibility standpoint.
14   Q   You don't know whether they were taking
15 that additional step or not?
16   A   To review it?
17   Q   Oh.
18   A   To move its equity?
19   Q   Yes.
20   A   I don't know that they were or weren't, but
21 I would assume that if they concluded that it wasn't
22 collectible, that the next logical step would be to
23 move it to an equity transfer.
24   Q   How were you apprised of the fact that they
25 were evaluating -- considering the collectibility of

384

1 the payable?
2   A   I believe it was an issue at the end of the
3 '96 audit.
4   Q   It was already an issue then?
5   A   It was discussed. It was discussed at the
6 end of '96.
7       And I think that's why Dan had pulled this
8 information together and distributed it to us.
9   Q   As you sit here today, do you know whether
10 the AHERF parent entity could have funded repayment if
11 the east could not?
12   A   I do not believe they could have.
13   Q   And why is that?
14   A   Just because of the magnitude, and I don't
15 believe they had unrestricted investments anywhere
16 near that amount.
17   Q   Did you, yourself, have any discussions
18 with Coopers about the collectibility about the
19 intercompany from -- owed from east to west in the '96
20 or '97 audits?
21   A   I don't remember having direct discussion.
22   Q   How did you -- how do you recall that it
23 was discussed at least at fiscal year '96?
24   A   I think it was at one of the preliminary
25 planning meetings where it was brought up as,

385

1 "Remember we had this issue at the end of '96. We'll
2 need to make sure" -- or, "it may become an issue
3 again at end of '97, depending on where the account
4 balances are."
5   Q   Did you ever discuss what you just told us
6 what is your perceived, anyway, inability of the
7 AHERF parent to pay the receivable with anybody at
8 Coopers?
9   A   No.
10   Q   This may be fundamental, but if the
11 accounting treatment had been changed to an equity
12 transfer for this receivable owed by the east to the
13 west, if it had been changed to an equity transfer,
14 there would be, then, no repayment on the books; is
15 that right?
16   A   That's correct.
17       MR. RYAN:  Objection.
18 BY MR. JONES:
19   Q   It would look more like a gift, if you
20 will, in laymen's terms?
21   A   Or an investment.
22   Q   Either or?
23   A   Yes.
24   Q   Do you have any idea of how that might have
25 affected AGH's debt compliance?

386

1   A   It probably would have reduced their net
2 tangible assets, because that was shown as an asset.
3       I don't remember whether the intercompanies
4 were backed out or not in that calculation, but it
5 could have reduced their net tangible assets, and I
6 believe there may have been a covenant.
7       (Thereupon, Deposition Exhibit No. 1565 was
8 marked for identification.)
9 BY MR. JONES:
10   Q   Mr. Adamczak, we've just handed you what
11 has been marked as 1565, or Exhibit 1565.
12       Before I visit with you about a little of
13 the detail on that document, do you recall that,
14 during the 1997 audit process, with respect to DVOG
15 entities, there was an issue regarding a failure to
16 contractualize a certain batch of accounts?
17   A   I don't necessarily remember that, other
18 than that we talked yesterday about certain accounts
19 that were at gross.
20   Q   Can you take a look at Exhibit 1565 for
21 me?
22       It look likes, to me, it's a memo from
23 Dan Cancelmi to you dated about November 24, 1997; is
24 that right.
25   A   That's correct.

PAGE 106

387

1 Q  Do you recall receiving it?
2 A  I'm sure I did.
3 Q  I'm going to direct your attention
4 primarily to the second page, if you have -- if you're
5 there, and right towards the end of the document,
6 Mr. Cancelmi writes, "In the event that the Patient
7 A/R reserves identified above are not fully needed,
8 any excess could potentially be utilized for other
9 items, e.g., Delaware Valley A/R valuation allowances
10 of 23,236 recorded in equity."
11     Do you see that?
12 A  Yes.
13 Q  And he -- although, he doesn't use all of
14 the zeros, he's referring to a sum of about
15 $23 million here; is that right?
16 A  That's correct.
17 Q  Does that refresh your recollection any?
18 A  I know what the $23 million issue is.
19 Q  And what is that?
20 A  What that is, is that in fiscal year 1998,
21 in the early months, and I assume by looking at this
22 it's before October or so, that, again, the net
23 patient revenue percents and/or levels of bad debt
24 looked awful high to the executives, Sheriff Abdelhak,
25 David McConnell and others, and the comment was made,

PAGE 107

388

1 "If we took care of this at the end of '97, why are
2 these levels so high?"
3 Q  Again?
4 A  Again.
5     And that there was a board meeting coming
6 up, and a request was made -- there was a telephone
7 conference between Joe -- I believe Joe Dionisio,
8 Chuck Morrison, I believe McConnell, myself, I don't
9 remember whether Dan was -- Dan Cancelmi was on the
10 phone or not, and I don't remember whether Coopers was
11 involved in the conversation or not.
12     But, basically, the decision was passed
13 down from either McConnell or Abdelhak to take this
14 unusual level of either write downs or allowances and
15 reflect them as a charge to funded depreciation
16 directly instead of having it go through the income
17 statement.
18 Q  To funded depreciation?
19 A  Or, to fund balance, excuse me. To equity.
20     Instead of going through this income
21 statement.
22 Q  And why was that, as you understood it?
23 A  The reason that was given on the phone
24 conversation was that, again, this was temporary, and
25 it was being done only for board presentation, so

PAGE 108

389

1 that the board understood what the real operations
2 were for that short period of time, versus these
3 unusual items that may not be reflective of
4 operations, so that they could really understand what
5 the operations were doing exclusive of these unusual
6 items.
7 Q  And so is it your understanding -- was it
8 your understanding, rather, from that explanation or
9 rationale that the perceived problem was really a 1997
10 not a 1998 fiscal year problem?
11     MR. RYAN:  Objection.
12 A  Either that, or that they were unusual
13 items to 1998 that should not be considered in part of
14 evaluating the ongoing operation.
15 Q  You didn't know any other exigency or
16 contingency that would separate them from 1998
17 operations, did you, at the time?
18 A  I did -- I had the feeling that it may be a
19 combination of both, quite honestly.
20 Q  But did you know of any other 1998 rarity
21 or strangeness that would require that?
22 A  No.
23     But, again, I did not believe that the full
24 amount was all related to '97.
25     And I was also told on that conversation

PAGE 109

390

1 that, and I do believe this is in track -- in fact,
2 true, that this adjustment that went directly to
3 equity would be shown on a separate line in equity,
4 and identified so that during the board meeting, it
5 could be pointed out and explained to the board what
6 it was.
7     So it wasn't hidden.
8 Q  I understand.
9     And you had a concern about that?
10 A  Oh, absolutely.
11     I would have preferred it to be shown in
12 the income statement, and identified and explained
13 that way.
14 Q  And did you know whether this other report
15 that was mentioned ever occurred, or was ever prepared
16 or shown?
17 A  I believe so, because I believe that's the
18 way the financials were prepared, with that shown as a
19 separate item down in the fund balance.
20     And I also believe -- and it's why I'm not
21 sure whether Bill Buettner was involved or not, or
22 whether it was another but similar issue -- that
23 Coopers came in after year end to look at some
24 adjustments that were made in the beginning of the
25 year to determine whether they were '97 or '98.

PAGE 210

491

1 Q   Do you recall becoming involved in the
2 accounting for that settlement, or the payout?
3 A   Yes.
4     Well, I knew of the accounting.
5 Q   And what did you know about it?
6 A   I believe it was set up as an asset and
7 amortized over time, through some period of time, and
8 then the remaining balance written off.
9 Q   Did that ever concern you?
10 A   Absolutely.
11 Q   What about it concerned you?
12 A   Generally, something like that is expensed,
13 when it happens, upon payment.
14 Q   And did you discuss that -- this issue with
15 anyone at Coopers?
16 A   No, because they -- I'm sure, they knew it
17 was there.
18 Q   And how do you come to that assurance?
19 A   That it was on the balance sheet, and that
20 was a rather large item that they should have looked
21 at.
22 Q   Do you recall the -- on the order of how
23 large an item it was?
24 A   I believe it was at least a million
25 dollars, if not more.

PAGE 211

492

1 Q   Did you take some comfort from the fact
2 that they would have reviewed that item?
3    MR. RYAN:  Objection.
4 A   Oh, yes.
5 Q   And you don't recall them ever talking to
6 you about the accounting treatment for it?
7 A   I don't remember them bringing it up as an
8 issue, no.
9    As a matter of fact, I do seem to remember
10 that Bill Buettner was -- I do believe they may have
11 been aware of it, and Bill Buettner was to take it
12 up with David McConnell to review the specifics.
13 Q   And what makes you now say that?
14 A   I just seem to remember it.
15    That the year that it happened, it may
16 have been one of the issues that we brought to
17 their attention, that these pay -- this payout
18 happened.
19    There was another one.  There was a
20 second payout.
21 Q   Involving an individual named Iqbal Paroo?
22 A   Correct.
23    THE COURT REPORTER:  What was the name?
24    MR. JONES:  That's a good question.
25    Iqbal, I-q-b-a-l, Paroo, P-a-r-o-o.

PAGE 212

493

1 BY MR. JONES:
2 Q   I'm going to hand you Exhibit 193,
3 Mr. Adamczak, or I think I am.
4    I am, and it is, I think you're going to
5 tell me, a handwritten memo from you to Jack somebody;
6 is that right?
7 A   Yes.
8 Q   Do you know to whom you were writing?
9 A   I believe it's Jack Lydon.
10 Q   Can you read the handwritten note?
11 A   Yes.
12    "Jack, Per discussion with Steve,
13 1.6 million of Carol Calvert payment is to be
14 capitalized as a tort settlement and amortized over
15 five years.  Remaining piece expensed to institutional
16 cost center," which is just a general cost center, "as
17 salary.  Please adjust in February close.  Al."
18 Q   And you remember writing this in fiscal
19 year 1996?
20 A   Yes.
21 Q   And this is sort of a direction to do
22 appropriate funds transfers and entries; is that
23 correct?
24 A   Not to do fund transfers.  That would be
25 handled through treasury.

PAGE 213

494

1 Q   Okay.
2 A   To account for the fund transfers.  It
3 already happened.
4 Q   Had you reviewed the settlement agreement?
5 A   No.
6 Q   Had you ever reviewed the settlement
7 agreement?
8 A   No.
9    As a matter of fact, we requested for
10 support for our journal entry and were told that that
11 would be maintained in either Nancy Wynstra or
12 David McConnell's office.
13    And I believe that's why -- you know, as I
14 mentioned, that's why I believe Bill Buettner or
15 somebody on Coopers & Lybrand was to go review it in
16 either Nancy Wynstra or David McConnell's office,
17 because we had no support for it.
18 Q   Because during the audit process you seem
19 to recall somebody at Coopers & Lybrand inquiring
20 after the document --
21 A   Yes.
22 Q   -- and it was unavailable?
23 A   Right.
24 Q   Do you recall who was making that inquiry?
25 A   I don't.

495

1    Q    But it was as a part -- to the best --
2    A    But that doesn't matter, because I know
3 that no one other than Bill Buettner, most likely, or
4 if he wasn't -- if he didn't, Mark Kirstein would be
5 the lowest level.
6         They would not let a staff person review a
7 document like that.
8         The fact that they wouldn't give it to
9 accounting, they would not let a staff --
10 Coopers & Lybrand staff person review it.
11   Q    And the "they" in that sentence is
12 Ms. Wynstra?
13   A    Or David McConnell.
14   Q    Do you recall ever coming to an
15 understanding about why this settlement agreement with
16 Ms. Calvert was entered into?
17   A    I had heard many stories.
18        I don't know which one is true.
19   Q    Well, I guess I don't want to take too much
20 time here, but what stories?
21        How many stories did you hear?
22   A    More than one.
23   Q    What was the primary story that you heard
24 and from whom?
25   A    I don't know who or where I heard it.

497

1    Q    Do you recall who you heard that from?
2    A    No.
3    Q    Did you hear these at the time you were
4 attempting to provide the accounting for the
5 transaction, or did you hear that at some subsequent
6 time, either one of these stories?
7    A    The fact that she may have been
8 romantically involved, I believe I may have heard
9 before.
10        I think that was gossip stories, gossip
11 news before.
12   Q    You mentioned Mr. Paroo.
13        Did you recall him to be an employee of
14 some AHERF organization?
15   A    I don't know whether he ever officially was
16 an employee or not.
17        He came to the organization via one of the
18 acquired hospitals.  I believe he was the CEO or one
19 of the top management people from -- I believe it was
20 the Allegheny University Hospitals.
21   Q    But do you recall, however, that he
22 departed -- in connection with his departed from
23 the -- departure from the organization, there was
24 another settlement agreement?
25   A    Correct.

496

1    Q    Okay.
2         What, essentially, were the stories that
3 you heard?
4    A    That she was somehow involved with AHERF
5 upper management personnel on an other than
6 professional basis.
7    Q    On a romantic basis?
8    A    Yes.
9    Q    Okay.
10        And who were other personnel purportedly
11 involved?
12   A    I had heard both Sheriff Abdelhak and
13 David McConnell.
14   Q    Okay.  And that this motivated her
15 departure and motivated the two gentlemen to approve a
16 settlement?
17   A    Correct.
18   Q    Did you hear any other story inconsistent
19 with those -- or, that story?
20   A    Not inconsistent, but the other piece of a
21 story I heard was that she was also possibly a drug
22 addict.
23   Q    And that there was a reason, therefore, to
24 want her departure from the organization?
25   A    Yes.

498

1    Q    Were you involved in the accounting for
2 that, as well?
3    A    Yes.
4    Q    And did that accounting similarly cause you
5 some concern?
6    A    Yes.
7    Q    In the same way?
8    A    Yes, that it was hung up instead of
9 expensed.
10   Q    When you say "hung up," you mean amortized
11 over time?
12   A    Correct.
13   Q    In that the expense amount was not all
14 taken in the fiscal year in which the transaction was
15 consummated; is that right?
16   A    That's correct.
17   Q    Did you talk about that with anyone at
18 Coopers?
19   A    No, but, again, I believe they were aware
20 of the item.
21   Q    What makes you say that?
22   A    I just seem to remember it.
23   Q    Who directed the accounting on both of
24 these settlements?
25   A    When you say "directed," meaning the

PAGE 218

499

1 capitalization and subsequent amortization?

2   Q   Yes. The part of the accounting that
3 concerned you, I take it, you didn't dream up --

4   A   That's true.

5   Q   -- and direct?

6   A   That's correct.

7   Q   So who directed it?

8   A   Steve Spargo would have explained to us the
9 accounting treatment.

10      Whether it was directed from
11 David McConnell, I don't know. I don't know who
12 directed him, if anybody.

13   Q   Did you ever learn any of the circumstances
14 as to why we were -- the organization was purportedly
15 paying Mr. Paroo any money upon his departure?

16   A   My understanding was, it was similar, that
17 there was a tort claim, and that he was paid basically
18 not to litigate.

19   Q   Let me try that again.

20      Do you ever -- did you ever learn that he
21 was being paid money to leave the organization that
22 really didn't have anything to do with a real claim?

23      MR. RYAN: Objection.

24   A   No.

25   Q   Okay.

PAGE 219

500

1      You had no knowledge about whether or not
2 he was departing and hadn't really incurred any tort
3 or not?

4   A   Correct.

5      As a matter of fact, that's similar to
6 Carol Calvert.

7      We were told all the documentation was
8 maintained in the legal office.

9   Q   And you never saw it?

10   A   That's correct.

11   Q   So you don't know whether he had a
12 legitimate claim or not?

13   A   I don't know whether he even ever filed or
14 not.

15   Q   And you don't whether Ms. Calvert ever had
16 a legitimate claim or not?

17   A   Correct.

18   Q   And that was part of what troubled you; is
19 that right?

20   A   Yes.

21   Q   Along with the amortization issue?

22   A   Yes.

23      And I would have thought that these would
24 have been approved by a board.

25      I don't know whether they were or weren't.

PAGE 220

501

1      The one purports to. It has at the bottom
2 of it, approved by some board.

3   Q   If you haven't seen them, how did you come
4 to know that?

5      Did you just come to see them at some later
6 time?

7   A   It was on a wire transfer.

8   Q   Oh, I'm sorry. Not on the settlement
9 agreement itself?

10   A   No. On a request for payment.

11      It must be Paroo, because I don't see it on
12 this Carol Calvert.

13   Q   Do you know if these putative tort
14 settlements were ever listed on your potential
15 adjustments in the analysis of reserves?

16   A   I don't.

17      But I seem to remember, when we restated
18 the financial statements in '98, that they were
19 written off, and that's the answer to my question,
20 that they were amortized for some period of time, and
21 then written off.

22   Q   I'm going to ask you to peek at
23 Exhibit 1524 back in the stack, Mr. Adamczak, real
24 quickly.

25      MR. JONES: While he's doing that, we're

PAGE 221

502

1 going to go off the record for a paper change.

2      THE VIDEOGRAPHER: We're off the record.

3 The time is 3:09 p.m.

4      (Recess taken.)

5      THE VIDEOGRAPHER: Standby, please.

6      This begins tape eight of the deposition of
7 Mr. Albert Adamczak. We are back on the record.

8 The time is 3:17 p.m.

9 BY MR. JONES:

10   Q   Mr. Adamczak, you now have located, and I
11 appreciate the effort, Exhibit 1524 that we marked
12 earlier in your deposition; is that right?

13   A   Yes.

14   Q   On the last page of the exhibit there is,
15 on list analysis of reserves, another table of
16 potential adjustments; is that right?

17   A   Yes.

18   Q   And in the first item under "Potential
19 Expense Items" is one at AHERF corporate, and the
20 two sub items are the "Iqbal Paroo tort settlement,"
21 and the "Carol Calvert tort settlement"; is that
22 right?

23   A   That's right.

24   Q   And the potential expense items listed in
25 association with those descriptions are $3.3 million

SHEET 31    PAGE 238

519

1                      CERTIFICATE

2    COMMONWEALTH OF PENNSYLVANIA, )
                                   )  SS:
3    COUNTY OF ALLEGHENY.          )

4         I, Teresa Constantini, do hereby certify that
     before me, a Notary Public in and for the Commonwealth
5    aforesaid, personally appeared ALBERT ADAMCZAK, who
     then was by me first duly cautioned and sworn to
6    testify the truth, the whole truth, and nothing but
     the truth in the taking of his oral deposition in the
7    cause aforesaid; that the testimony then given by him
     as above set forth was by me reduced to stenotypy in
8    the presence of said witness, and afterwards
     transcribed by means of computer-aided transcription.

9
          I do further certify that this deposition was
10   taken at the time and place in the foregoing caption
     specified.

11
          I do further certify that I am not a relative,
12   counsel or attorney of either party, or otherwise
     interested in the event of this action.

13
          IN WITNESS WHEREOF, I have hereunto set my hand
14   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this _____ day of _____,
15   2003.

16

17

18   _____
     Teresa Constantini, Notary Public
19   In and for the Commonwealth of Pennsylvania
     My commission expires October 9, 2004
20                     - - -

21

22

23

24

25

520

```
1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3                          -  -  -
4    THE OFFICIAL COMMITTEE OF UNSECURED )
     CREDITORS OF ALLEGHENY HEALTH,      )
5    EDUCATION and RESEARCH FOUNDATION,  )
                                         )
6              Plaintiff,                )
                                         )
7         vs.                            ) No. 00-684
                                         )
8    PRICEWATERHOUSECOOPERS, LLP,        )
                                         )
9              Defendant.                )
10                         -  -  -
11     Continued videotape deposition of ALBERT ADAMCZAK
12                 Thursday, June 26, 2003
13                     Volume III
14                         -  -  -
15         The continued videotape deposition of ALBERT
     ADAMCZAK, called as a witness by the plaintiff,
16   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
17   taken before me, the undersigned, Lance E. Hannaford,
     a Notary Public in and for the Commonwealth of
18   Pennsylvania, at the offices of Jones, Day, Reavis &
     Pogue, 31st Floor, One Mellon Bank Center, Pittsburgh,
19   Pennsylvania  15219, commencing at 9:00 o'clock a.m.,
     the day and date above set forth.
20
                           -  -  -
21           COMPUTER-AIDED TRANSCRIPTION BY
             MORSE, GANTVERG & HODGE, INC.
22             PITTSBURGH, PENNSYLVANIA
                     412-281-0189
23                         -  -  -
24
25
```

1  on sale of the IBM building and provided to Coopers &
2  Lybrand for that audit?
3      MR. JONES: Object to foundation.
4      A    Looks like a schedule prepared by
5  Mr. Nelson. I don't know whether it was given to
6  Coopers & Lybrand for further audit or not.
7      Q    You can see a tick mark A here next to the
8  net sale proceeds figure that says C & L vouched the
9  payment of the net proceeds and noted no exceptions.
10     Right?
11     A    I do.
12     Q    And a tick mark at the bottom to indicate
13 the schedule foots, right?
14     A    Yes.
15     Q    Now, this calculation here in Exhibit 232
16 is identical to the one in Exhibit 195 except that the
17 1.5 million dollar item for improvement has been
18 omitted. Right?
19     A    Yes.
20     Q    The result was to increase the calculated
21 gain on sale from what would have been 5.2 million
22 dollars to 6.7 million dollars; is that right?
23     A    Correct.
24     Q    Do you know whether anybody from AHERF
25 discussed with Coopers & Lybrand the issue of

1  including the 1.5 million dollars of improvements in
2  calculating the gain on sale of the IBM building?
3      A    I don't.
4      But it was my understanding that Coopers &
5  Lybrand did review the sales documents.
6      Q    If you could turn back to the 1996 SUD
7  which we looked at earlier marked Exhibit 1588.
8      A    Yes.
9      Q    And if you could turn, please, to the AGH
10 Allegheny General Hospital SUD, which begins on Bates
11 page 333.
12     A    Yes.
13     Q    Do you see there the fourth entry on the
14 schedule is a proposed adjustment from Coopers &
15 Lybrand to defer the gain on the sale leaseback?
16     A    Yes.
17     Q    In other words, Coopers & Lybrand agreed
18 with the analysis that you had conducted the sale
19 leaseback in your memo marked Exhibit 194, right?
20     MR. JONES: Object to foundation.
21     A    It is not my memo in the memo.
22     I was copied on it. It is not my memo.
23     Q    I apologize. I am referring to Exhibit
24 194, which is your February 28th, 1996 memo, where you
25 talked about the accounting treatment for sale of the

1  IBM building?
2      A    Yes. They agreed it would be deferred
3  similar to my analysis, if the sale occurred under the
4  terms that I outlined in my memo.
5      Correct.
6      Q    You would agree, then, with how Coopers &
7  Lybrand handled that issue?
8      MR. JONES: Object to foundation. And
9  form.
10     A    I don't know that I agree with that.
11     Q    Why not?
12     A    I would -- in my mind, the adjustment
13 should have been booked.
14     They would need to -- Coopers & Lybrand
15 would need to review that in terms of other
16 adjustments and determine whether it was material.
17     But looking at it on a stand alone basis,
18 it should have been -- it should have been deferred
19 and it was not.
20     Q    That is what the entry on the Allegheny
21 General Hospital SUD says.
22     And then as you say, there was a further
23 analysis to determine whether that was a material item
24 or not. Right?
25     MR. JONES: Object to foundation.

1      A    There was a further analysis prepared.
2      Whether it was inclusive of all items that
3  it should, I can't conclude on that.
4      Q    You don't have any reason to believe that
5  it was not inclusive of all items that it should have,
6  do you?
7      MR. JONES: Object to foundation and form.
8      A    No.
9      But again, as on the one set that we looked
10 at, I did have a difference of opinion as to which
11 year it applied to, the capitalized interest.
12     I don't know whether there are other items
13 like that included.
14     Q    Let me mark, please, as Exhibit 1590 a
15 document with Bates Nos. DC8227, pages 1 to 5.
16     (Thereupon, Exhibit No. 1590 was marked for
17 identification.)
18     Q    Do you recognize Exhibit 1590, Mr. Adamczak?
19     A    I do.
20     Q    What is it?
21     A    It is a representation letter to Coopers &
22 Lybrand.
23     Q    From AHERF management?
24     A    That's correct.
25     Q    Do you recognize the signatures on the last

Page 653

1  page?
2      A    I do.
3      Q    And they are the signatures of
4  Mr. Abdelhak, Mr. McConnell, Mr. Spargo and
5  Ms. Wynstra?
6      A    Yes.  They are.
7      Q    Did you review the 1996 management
8  representation letter?
9      A    I don't know whether I did or didn't.
10     Q    Do you have an understanding at the time of
11  what the purpose of the management representation
12  letter is?
13     A    I did.
14     Q    And what was that understanding?
15     A    That it was management's belief that the
16  financial statements were fairly stated.
17     Q    In this letter, Exhibit 1590, that is
18  stated in paragraph 1 on the top of the second page,
19  right?
20     A    Yes.
21     Q    Then there are further specific statements
22  that are made by management in the letter that relate
23  to particular items that arose during the year at
24  AHERF.
25         Right?

Page 654

1      A    That's correct.
2      Q    So for example, paragraph 22 on the top of
3  page 5 of the letter reads, "We have adopted financial
4  accounting standard board statements, FAS, No. 116,
5  accounting for contributions received and
6  contributions made.  No. 117, financial statements of
7  not for profit organizations.  And No. 124, accounting
8  for certain investments held by not for profit
9  organizations.  And have complied with requirements of
10  these statements in the preparation of our financial
11  statements."
12         Do you see that?
13     A    I do.
14     Q    So that was a representation by the
15  management of AHERF to Coopers & Lybrand that AHERF
16  had correctly applied FAS 116, 117 and 124, correct?
17         MR. JONES:  Object to form and foundation.
18     A    It is.  And part of that representation may
19  be based on Cooper -- understanding from Coopers'
20  review.
21     Q    It was your understanding at the time that
22  one of the purposes of a representation letter from
23  management was so that the auditors could rely upon
24  those statements in issuing their report on the
25  financial statements?

Page 655

1      A    Yes.
2          MR. JONES:  Object to form.
3      Q    If I could call your attention to one other
4  provision here.  Paragraph 17.  In the middle of page
5  4.
6          Do you see that reads, "Settlement due to
7  or due from third party payers recorded on the balance
8  sheet are stated on amounts which reflect assessments
9  resulting from settlement already made or from those
10  contemplated by third party payers."
11     A    I do.
12     Q    And is that a representation that among
13  other things told Coopers & Lybrand and AHERF
14  management had recorded reserves for CRA's using
15  assessments of settlements made or contemplated?
16         MR. JONES:  Object to form and foundation.
17     A    I believe so.
18     Q    This is a representation letter, I can't
19  remember if I asked you this already or not, for the
20  fiscal year 1996 audit, right?
21     A    Yes.
22     Q    Dated September 20th, 1996.
23     A    Correct.
24     Q    And so this time you weren't asked to sign
25  this letter because Steve Spargo occupied the job that

Page 656

1  you then later moved in to?
2      A    That's correct.
3      Q    If you had been asked to sign this letter
4  marked Exhibit 1590 in September 1996, would you have
5  done so?
6          MR. JONES:  Object to form.  And
7  foundation.
8      A    Back then I believe I would have.  Because
9  again I relied on staff people from AHERF along with
10  Coopers & Lybrand knowing the things that they
11  reviewed.
12         And based on the fact that they did not
13  bring anything to my attention that required me to
14  believe that they weren't.
15     Q    Back in fiscal year 1996, Mr. Cancelmi had
16  responsibility for the accounting issues for entities
17  in the Delaware Valley region?
18     A    He did.
19     Q    Did you have an opinion at the time about
20  Mr. Cancelmi's technical abilities as an accountant?
21     A    Yes.  An opinion.
22     Q    And what was that opinion?
23     A    That he was qualified and had very good
24  credentials and appeared to me to be very -- a very
25  good accountant.

```
 1    Q    Did you and others at AHERF rely upon him
 2  on occasion for guidance on technical accounting
 3  questions?
 4    A    We did.
 5        He was probably the newest member of our
 6  staff from a public accounting environment.
 7        So was the closest to technical things from
 8  that nature.
 9    Q    Let me hand you, Mr. Adamczak, what has
10  previously been marked Exhibit 4.
11        If you could just take a moment to review
12  this document.
13        Do you recognize Exhibit 4?
14    A    I do.
15    Q    What is it?
16    A    It is an engagement letter which appears to
17  me to be for the fiscal year '96 audit.
18    Q    It is an engagement letter between AHERF
19  and Coopers & Lybrand, right?
20    A    That's correct.
21    Q    Looking down at the paragraph headed
22  summary of services in the bottom of the first page,
23  it is the engagement letter for the audits, not only
24  of AHERF on a consolidated basis, but also for the
25  stand alone audits of various affiliates of AHERF.
```

```
 1        Right?
 2    A    That's correct.
 3    Q    Including the audit for the Allegheny
 4  General Hospital obligated group and the audit for the
 5  Allegheny Delaware Valley Obligated Group, right?
 6    A    Correct.
 7    Q    Do you recognize the signatures on page 8
 8  of the document?
 9    A    I do.
10    Q    Whose are they?
11    A    David McConnell and William Buettner.
12    Q    Did you review this engagement letter
13  either before or after it was signed by Mr. McConnell?
14    A    I don't know whether I did or not.  I don't
15  believe so.  I may have a copy of it.
16    Q    If you could turn please to page 4.
17        Do you see there there is a paragraph
18  entitled "Limitations of the auditing process"?
19    A    Yes.
20    Q    If you could just read to yourself that
21  first paragraph, please.
22        Were you aware at the time back in 1996,
23  that there were inherent limitations in the auditing
24  process as stated in this paragraph?
25    A    I believe so.
```

```
 1    Q    Turn to the next page, please.
 2        Do you see the heading "Responsibilities as
 3  to internal controls"?
 4    A    I do.
 5    Q    Do you see the second sentence there reads,
 6  "You recognize that the financial statements and the
 7  establishment and maintenance of an internal control
 8  structure are the responsibility of management"?
 9    A    I do.
10    Q    And was that something that you were aware
11  of in 1996 as well?
12    A    Yes.
13    Q    And finally, turn to page 6.
14        Do you see the heading "Representation from
15  management"?
16    A    I do.
17    Q    Do you see there it reads "At the
18  conclusion of the audits, AHERF management will
19  provide to us a representation letter for each
20  respective report, that among other things will
21  confirm management's responsibility for the
22  preparation of the financial statements in conformity
23  with generally accepted accounting principles, the
24  availability of financial records and related data,
25  the completeness and availability of all minutes of
```

```
 1  the board and committee meetings, management's
 2  responsibilities for the entities compliance with laws
 3  and regulations, the identification of disclosure to
 4  the auditor of all laws and regulations to have a
 5  direct and material effect upon the determination of
 6  financial statement amounts and to the best of their
 7  knowledge and belief the absence of irregularities
 8  involving management or those employees who have
 9  significant roles in the control structure"?
10    A    I do.
11    Q    Is that a reference to representation
12  letter which ended up being dated September 20th,
13  1996, that we marked as Exhibit 1590?
14        MR. JONES:  Object to foundation.
15    A    It is.
16    Q    And were you aware, generally, during the
17  course of the fiscal year 1996 audit that there was
18  going to be a representation from the management of
19  AHERF to Coopers & Lybrand along the lines set forth
20  here in Exhibit 4 at the conclusion of the audit?
21        MR. JONES:  Object to form.
22    A    I was.
23    Q    If you look at the very last paragraph on
24  this page 6, do you see it states "AHERF hereby
25  indemnifies Coopers & Lybrand, LLP and its partners,
```

## Page 729

1  A    Correct.
2  Q    Let me hand you, Mr. Adamczak, what has
3  previously been marked Exhibit 164.
4      This is another July 3rd, 1997 memo from
5  Mr. Cancelmi to you that we looked at last week.
6      This one is entitled Delaware Valley bad
7  debt reserves.
8      Right?
9  A    Right.
10  Q    I know we looked briefly last week at
11  attachment D, on the last page of the document.
12      I just want to be sure and clear on this.
13      I think you testified that you don't recall
14  having any involvement in the bad debt allowance
15  analysis set forth on this page; is that right?
16  A    I believe that is correct.
17  Q    So is it fair to say, then, that you don't
18  have a view one way or the other as to whether or not
19  there was a 41 million dollar bad debt allowance
20  shortfall at June 30th, 1996?
21  A    That's correct.
22  Q    Have you ever attempted to do any analysis
23  to estimate whether there was a bad debt allowance
24  shortfall June 30th, 1996, and if so, in what amount?
25  A    I did not.

## Page 730

1      MR. RYAN:  Since it is just about 5:00
2  o'clock, why don't we go off the record for today
3  and we will see each other tomorrow morning at
4  8:00 o'clock.
5      MR. JONES:  Before we go off, let's make it
6  8:15.  I know the way they lock the doors around
7  here.  And if we say 8:00 it will make huge
8  headaches.  Is that all right?
9      THE VIDEOGRAPHER:  This concludes tape 12
10  of the deposition of Mr. Adamczak.  We are off
11  the record.  The time is 4:59 p.m.
12
13      (Thereupon, at 4:59 o'clock p.m. the
14  deposition was adjourned to be continued the
15  following day.)
16

## Page 731

1      CERTIFICATE
2  COMMONWEALTH OF PENNSYLVANIA, )
                                ) SS:
3  COUNTY OF ALLEGHENY.        )
4      I, Lance E. Hannaford, do hereby certify that
   before me, a Notary Public in and for the Commonwealth
5  aforesaid, personally appeared ALBERT ADAMCZAK, who
   then was by me first duly cautioned and sworn to
6  testify the truth, the whole truth, and nothing but
   the truth in the taking of his oral deposition in the
7  cause aforesaid; that the testimony then given by him
   as above set forth was by me reduced to stenotypy in
8  the presence of said witness, and afterwards
   transcribed by means of computer-aided transcription.
9
      I do further certify that this deposition was
10  taken at the time and place in the foregoing caption
   specified, and was completed without adjournment.
11
      I do further certify that I am not a relative,
12  counsel or attorney of either party, or otherwise
   interested in the event of this action.
13
      IN WITNESS WHEREOF, I have hereunto set my hand
14  and affixed my seal of office at Pittsburgh,
   Pennsylvania, on this ____ day of _____,
15  2003.
16
17  _____
18  Lance E. Hannaford
   Notary Public
   In and for the Commonwealth of Pennsylvania
19  My commission expires October 19, 2006

## Page 732

1      I-N-D-E-X
2  EXHIBIT:              MARKED:
3  1585 -               545
4  1586 -               585
5  1587 -               627
6  1588 -               631
7  1589 -               648
8  1590 -               652
9  1591 -               661
10  1592 -               678
11  1593 -               684
12  1594 -               690
13  EXHIBITS IDENTIFIED FROM PREVIOUS DEPOSITIONS:
14  4 - 4-12-96 letter to Mr. McConnell
15  7 - 10-16-95 letter to Board of Trustees
16  8 - 4-14-97 memo to Mr. Spargo
17  14 - AHERF Summary of AR Testing
18  15 - 2-9-96 memo to Mr. McConnell
19  29 - 9-24-96 memo to Mr. Spargo
20  30 - 9-30-96 memo to Mr. Spargo
21  37 - 5-1-97 memo to Mr. Morrison
22  39 - May financial statement adjustments
23  40 - May F/S adjustments
24  41 - 6-20-97 memo to Mr. Morrison
25  43 -7-3-97 memo to Mr. Adamczak

1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3                      - - -
4    THE OFFICIAL COMMITTEE OF UNSECURED )
     CREDITORS OF ALLEGHENY HEALTH,       )
5    EDUCATION and RESEARCH FOUNDATION,   )
                                          )
6                 Plaintiff,              )
                                          )
7             vs.                         ) No. 00-684
                                          )
8    PRICEWATERHOUSECOOPERS, LLP,         )
                                          )
9                 Defendant.              )
10                     - - -
11    Continued videotape deposition of ALBERT ADAMCZAK
12              Friday, June 27, 2003
13                  Volume IV
14                     - - -
15        The continued videotape deposition of ALBERT
     ADAMCZAK, previously called as a witness by the
16   plaintiff, pursuant to notice and the Federal Rules of
     Civil Procedure pertaining to the taking of
17   depositions, taken before me, the undersigned,
     Lance E. Hannaford, a Notary Public in and for the
18   Commonwealth of Pennsylvania, at the offices of Jones,
     Day, Reavis & Pogue, 31st Floor, One Mellon Bank
19   Center, Pittsburgh, Pennsylvania  15219, commencing at
         o'clock a.m., the day and date above set forth.
20
                          - - -
21        COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.
22            PITTSBURGH, PENNSYLVANIA
                  412-281-0189
23                     - - -
24
25

Page 735

1  APPEARANCES:
2    On behalf of the Plaintiff:
3      Jones, Day:
       James M. Jones, Esquire
4      500 Grant Street, 31st Floor
       Pittsburgh, Pennsylvania  15219
5
     Jones Day:
6      David S. Torborg, Esquire
       51 Louisiana Avenue, N.W.
7      Washington, D.C.  20001-2113
8    On behalf of the Defendant:
9      Cravath Swaine & Moore, LLP:
       Antony L. Ryan, Esquire
10     Avram E. Luft, Esquire
       Worldwide Plaza, 825 Eighth Avenue
11     New York, New York  10019-7475
12            - - -
13  ALSO PRESENT:
14     David Scherm, Videographer
       Ryan Billings
15
            - - -
16
17            I-N-D-E-X
18  EXAMINATION BY:              PAGE:
19  Mr. Ryan              736, 956
    Mr. Jones                 910
20
            - - -
21
22
23
24
25

Page 736

1        THE VIDEOGRAPHER:  This begins tape 13 of
2   the deposition of Mr. Albert Adamczak.  We are
3   back on the record.  The time is 8:09 a.m.
4           ALBERT ADAMCZAK
5   Previously called as a witness by the plaintiff,
6   having been previously duly sworn, as hereinafter
7   certified, was continually deposed and said as
8   follows:
9            EXAMINATION
10  BY MR. RYAN:
11      Q    Good morning, Mr. Adamczak.
12      A    Good morning.
13      Q    Let me hand you what has previously been
14  marked Exhibit 48.
15           Do you see this is a three page schedule?
16  It is a standing accrual analysis?
17      A    Yes.
18      Q    Are you familiar with this type of
19  schedule?
20      A    I am not.
21      Q    This isn't a type of schedule that you
22  prepared or reviewed during your time at AHERF?
23      A    It is not.
24           I understand what it says.  But I have
25  never seen it before.

Page 737

1       Q    Then I don't have any questions.
2            Let me hand you what has previously been
3   marked Exhibit 1095.
4            Exhibit 1095 appears to be a summary of
5   certain journal entries.
6       A    That is what it looks like, yes.
7       Q    And if you take out Exhibit 43, which we
8   looked at right toward the end yesterday.
9            This was a July 3rd, 1997 memo from
10  Mr. Cancelmi addressed to you.
11      A    Yes.
12      Q    Do you see that the journal entries in
13  Exhibit 1095 appear to correspond to the schedule of
14  reserves used that are attached to the memo we have
15  marked Exhibit 43?
16      A    A quick look they appear to be.
17      Q    If you could take a look, please, at the
18  top of the second page of Exhibit 1095.  Do you see
19  there journal entries in the amount of 1,191,000
20  dollars that were entered at corporation 210?
21      A    I do.
22      Q    That was MCP hospital?
23      A    I believe so.
24      Q    And do you see that those journal entries
25  involve a debit to bad debt expense at MCP hospital?

Page 738

1       A    Yes.
2       Q    And if you look at the third page, Bates
3   No. 192 in Exhibit 1095, one of the journal entries on
4   that page for corporation 211 also involves a debit to
5   bad debt expense.
6            Is that right?
7       A    What page are you?
8       Q    I was on Bates No. 192.
9       A    For 24,000?
10      Q    Yes.
11      A    Yes.
12      Q    Whereas, the other journal entries on that
13  page, for example 2 million dollars, which is
14  described as PFMA reserve, don't appear to involve an
15  entry to bad debt expense.
16           Is that right?
17      A    That's correct.
18      Q    Is it your understanding, then, that of the
19  reserves used to cover the bad debt shortfall as set
20  forth in attachment A to Exhibit 43, some of the
21  reserves that were used involve debit to bad debt
22  expense, whereas others did not?
23           MR. JONES:  Object to form and foundation.
24      A    Until I looked at it now, I had no
25  understanding one way or the other.

Page 739

1    I had never seen the journal entries.
2    Q    If I could ask you to turn to Bates page
3 197 in Exhibit 1095.
4    MR. JONES:  My copy's Bates page ranges are
5 obliterated at the bottom of many of the pages.
6    MR. RYAN:  I apologize.
7    Q    This is the page with the journal entries
8 for corporation 250.  Looking at the left hand column.
9    Do you see that the journal entries toward
10 the top of that page with the journal entry ID CTYE3
11 involve a variety of entries with a credit to an
12 intercompany account?
13    A    I don't know.  Because I don't remember the
14 attached structure.  It appears to me to be a balance
15 sheet account.  But I can't tell which specific
16 account.
17    Q    Do you see that the various reserve amounts
18 there for journal entry ID CTYE3 correspond to the
19 reserves that are described as Graduate reserves on
20 attachments A and B to Exhibit 43?
21    A    The 2 million and the 3 million, I do.
22    Q    Right.
23    2 million in excess bad debt, 3 million in
24 prudent buyer, correct?
25    A    Yes.

Page 740

1    Q    And 2 million in a PFMA reserve?
2    A    Yes.
3    Q    1,100,000 in a pension reserve?
4    A    Yes.
5    Q    And then 400,000 and 900,000 in a workers'
6 comp reserve?
7    A    Yes.
8    Q    In your understanding, then, are these the
9 journal entries for the intercompany transfer of
10 reserves from the Graduate hospitals to DVOG entities?
11    MR. JONES:  Object to foundation again.
12    A    I could only guess yes.  Like I said, I
13 have never seen a journal of these before.
14    Q    What I would like to ask you about in
15 particular is the last journal entry shown on this
16 page.
17    Do you see that it has a date as of which
18 it was recorded, which is April 30th, 1997?
19    MR. JONES:  Object to form.
20    A    Yes.
21    MR. JONES:  And foundation.
22    Q    And does this appear to be a journal entry
23 to establish 5 million dollars more in reserves at the
24 Graduate Hospital going back to April 30th, 1997?
25    A    I don't know what it does.

Page 741

1    Q    Do you recall that at the time that AHERF
2 made reserve transfers from Graduate beyond the 50
3 million dollar initial transfer, that AHERF went back
4 and created additional purchase accounting reserves to
5 be used in those transfers?
6    A    I do not.
7    Q    Let me hand you what has previously been
8 marked Exhibit 301.  Off the record for one moment.
9    THE VIDEOGRAPHER:  We are off the record.
10 The time is 8:21 a.m.
11    (Discussion off the record.)
12    THE VIDEOGRAPHER:  We are back on the
13 record.  The time is 8:23 a.m.
14 BY MR. RYAN:
15    Q    All right.
16    Do you now have in front of you,
17 Mr. Adamczak, a copy of Exhibit 301 that appears to
18 have all of the pages?
19    A    Yes.
20    Q    Now, this is a set of schedules that you
21 sent with a handwritten note from you to David
22 McConnell; is that correct?
23    A    That's correct.
24    Q    The schedule in the second page of the
25 exhibit is headed Delaware Valley hospitals, FY97 use

Page 742

1 of cushions.
2    Right?
3    A    Correct.
4    Q    Is this a schedule that you created?
5    A    I put it together.  Dan Cancelmi was the
6 input to it.
7    Q    When you used the word "cushions" in this
8 schedule, would you explain what you meant by that,
9 please?
10    A    Items similar to what we saw on the reserve
11 schedule we talked about.
12    The items that were no longer needed in
13 prior years and that were available more or less on a
14 discretionary basis to take in to income.  Or to
15 offset an exposure item that came to be.
16    Q    The first column is headed cushions used to
17 reduce bad debt expense in fiscal year '97.
18    Right?
19    A    Correct.
20    Q    That totals 33.1 million dollars?
21    A    It does.
22    Q    Is it the case with reference to the
23 schedule on the following page, the third page of the
24 exhibit, that the 33.1 million dollars was a portion
25 of the total of 75 million dollars in transfers from

Page 743

1  Graduate?
2      A    I don't remember whether it was part of the
3  75 or in addition to the 75.
4      Q    Well, does it look from the schedule on the
5  third page of the exhibit, Bates page 86, as though a
6  total of 75 million is being divided in to two
7  portions?  41.9 million, which is shown as the bad
8  debt allowance shortfall of June 30th, 1996, and then
9  33.1 million that would be the fiscal year '97
10 portion?
11     A    Looks like that could be the case.
12     Q    And we saw earlier a document we were
13 looking at just before we ended yesterday, Exhibit
14 164, which had attachment D, the final page showed a
15 calculation of a bad debt allowance deficiency at June
16 30th, 1996.
17         Didn't it?
18     A    Page D?
19     Q    Right.  Attachment D at the end.
20     A    That's correct.
21     Q    Is it your understanding that the total of
22 75 million represented the initial 50 million dollar
23 reserve transfer from Graduate plus the 25 million
24 dollars in reserves utilized to cover bad debt
25 shortfalls set forth in Mr. Cancelmi's memo we marked

Page 744

1  Exhibit 43?
2          MR. JONES:  Object to form and foundation.
3      A    That was my understanding.
4      Q    You provided these schedules that set forth
5  both the initial 50 million dollar reserve transfer
6  plus the additional 25 million to Mr. McConnell.
7          Right?
8      A    This schedule was provided to
9  Mr. McConnell, correct.
10     Q    Going back again to the schedule on the
11 second page of the exhibit, do you see the second
12 column is headed prior year CRA settlement taken in to
13 income in fiscal year 1997?
14     A    I do.
15     Q    And does that refer to settlements of cost
16 reports relating to prior year?
17     A    I believe so.
18     Q    Do you recall whether those settlements
19 were made during fiscal year 1997, or whether they had
20 been made in prior years?
21     A    I do not remember.
22     Q    If those settlements were made during
23 fiscal year 1997, resulting in a change in estimate
24 during that year, then it would have been appropriate
25 to recognize additional revenue during fiscal year

Page 745

1  1997, right?
2          MR. JONES:  Object to form and foundation.
3      A    Assuming that all cost reports that were
4  settled in that year were recorded.  In other words,
5  that you didn't just pick the good ones and leave the
6  bad ones behind, it would be appropriate.
7      Q    And as you sit here today, do you recall
8  anything inappropriate about how AHERF accounted for
9  settlements or cost reports during fiscal year 1997?
10     A    No.  But again, I remember there being
11 cushions or reserves on that reserve analysis that
12 related to cost reports from prior year settlements.
13         Whether this relates to those items or to
14 settlements in '97, I do not remember.
15     Q    Do you see the next column is headed
16 "Graduate cushions transferred and taken in to
17 income"?
18     A    I do.
19     Q    That totals 7 million dollars?
20     A    I think we looked at that yesterday.  It
21 appears it was additional items.
22     Q    Is it your understanding with the benefit
23 of the documents we looked at yesterday that this is
24 the 7 million dollars in reserves from Graduate set
25 forth in Exhibits 39 and 40?

Page 746

1          MR. JONES:  Object to foundation.
2      A    I believe that is so.
3      Q    Then the last two columns on this page
4  refer to various other reserves and the aggregate
5  total of 6.1 million dollars?
6      A    Correct.
7      Q    Do you remember anything about any of those
8  other reserves?
9      A    No.
10         Although the one column says use of
11 cushions established in prior years.
12         So I would bet that they were from a prior
13 year.
14     Q    Do you remember anything about what those
15 cushions were?
16     A    I do not.
17     Q    If you could turn, please, to Bates page 87
18 in Exhibit 301.  This is a schedule headed Delaware
19 Valley obligated group hospitals, statement of revenue
20 and expenses for the year ended June 30th, 1997?
21     A    Correct.
22     Q    Is this a schedule that you prepared?
23     A    I prepared it again with input from Dan
24 Cancelmi.
25     Q    Could you explain to us how this schedule

Page 747

1  works, please?
2      A    I believe that the left hand column where
3  it says "actual" is the actual reported numbers.
4          The use of cushions would be any items that
5  I considered unusual and probably included the
6  cushions from the previous analysis to come to the
7  actual excluding the cushions and compares it to the
8  fiscal year '97 budget, calculates a variance.
9      Q    And in the use of cushions, 59,100,000
10  dollars ties to the use of cushions on the schedule we
11  were just looking at, Bates page 85.
12          Does it not?
13      A    It does.
14      Q    Is it your understanding that those are the
15  same cushions?
16      A    I believe so.
17      Q    And the following five pages of this
18  exhibit are schedules similar to Bates page 87, but
19  they are pages for the individual DVOG hospitals; is
20  that right?
21      A    That's correct.
22      Q    And there is no page here for the
23  university?
24      A    Meaning the college?
25      Q    Yes.

Page 748

1      A    That's correct.
2      Q    Let me hand you, Mr. Adamczak, what has
3  previously been marked Exhibit 58.  You can just keep
4  that one out, the previous one, Exhibit 301.
5          If you could turn, please, in Exhibit 58 to
6  page 36.
7          This is a Delaware Valley obligated group
8  combining statement of operations for the year ended
9  June 30th, 1997.
10          Right?
11      A    It is.
12      Q    And this is a schedule attached to the
13  consolidated audited financial statements for the year
14  ended June 30th, 1997 for AHERF, right?
15      A    It is.
16      Q    Do you see that net income for the combined
17  Delaware Valley obligated group that is shown as
18  23,701,000 dollars?
19      A    I do.
20      Q    And one of the components flowing up in to
21  that number is a 15,273,000 dollar loss at Allegheny
22  University of the Health Sciences?
23      A    That's correct.
24      Q    So that five DVOG hospitals combined
25  excluding the university then had net income of

Page 749

1  38,973,000 dollars or so?
2      A    Sounds reasonable.
3      Q    That is about 21 million dollars and change
4  more than the figure shown in the "actual" column on
5  page 87 of Exhibit 301.
6          Right?
7      A    Yes.
8      Q    Do you recall that when you initially
9  closed the books in June 1997 and reported the results
10  to David McConnell, that he was dissatisfied with
11  those results and directed additional adjustments to
12  be made?
13      A    I do.
14          MR. JONES:  Object to form.
15      Q    Could you explain what you did about that
16  process?
17          MR. JONES:  Object to form.
18      A    I don't remember much about it other than
19  he asked if there were cushions available to be taken
20  in to income.  I went to Dan Cancelmi and asked him
21  whether there were.
22          He confirmed that there were.
23          And David asked that they be recorded.
24      Q    Did he tell you why he wanted to take
25  additional reserves in to income?

Page 750

1      A    He did not.
2      Q    Did you understand the reason why he wanted
3  to do that was to improve the reported results for
4  AHERF entities?
5          MR. JONES:  Object to foundation.
6      A    I suspect it had something to do with a
7  forecast that he had put forward.
8      Q    That he wanted reported results to match or
9  come close to a forecast that he had done at some
10  earlier time?
11      A    I suspected.
12      Q    Did you know at the time that that was not
13  proper accounting?
14      A    It depended on when the cushions were built
15  and all that kind of thing.  I didn't go back and
16  analyze it.  But as you see, there were cushions taken
17  in quite often and used for issues.
18          So it is no different than any of the other
19  issues that cushions were used on.
20      Q    Do you recall that the cushions that were
21  taken in to income as part of this final adjustment in
22  1997 were ones that had been established in purchase
23  accounting at Graduate?
24          MR. JONES:  Object to form.
25      A    I remember some of them were.

Page 751

1        I don't remember where they all came from.
2    Q    We have seen some other schedules that
3    involved reserves that had been established at
4    existing DVOG hospitals and then were considered no
5    longer necessary and would then reserve to income?
6    A    We have.
7    Q    Those reserves would presumably have been
8    expensed either in the period they were taken in to
9    income -- in the year they were taken in to income or
10   in some prior year, right?
11        MR. JONES: Object to foundation.
12   A    Not necessarily.
13   Q    That would be the case for most of them,
14   though, right?
15        MR. JONES: Same objection.
16   A    I don't remember where the reserves came
17   from.
18        But not all of them were expense items.
19        Some were revenue that weren't recorded in
20   prior years.
21   Q    That type of cushion would similarly then
22   have had a net income effect at some time at AHERF
23   affiliates.
24        Right?
25        MR. JONES: Object to form. And

Page 752

1    foundation.
2    A    When the reserve was finally recognized?
3    Taken in to income? Yes.
4    Q    I am not asking a clear question.
5        You have talked about two kinds of
6    cushions.
7        One was a liability established at a
8    previous time through an expense.
9        Right?
10   A    That is one type.
11   Q    And then the other type was the failure to
12   take a particular item in to income at a prior time,
13   right?
14   A    Right.
15        You receive revenue or a positive. And you
16   do not recognize it.
17   Q    In either case by either leaving the
18   existing reserve on the books at the prior time or by
19   not taking it in to revenue at the prior time, there
20   was an effect upon AHERF's net income.
21        Right?
22        MR. JONES: Object to form and foundation.
23   A    Yes. It was generally understated.
24   Q    So that the only issue from a perspective
25   of the income statement when that reserve was later

Page 753

1    utilized was the timing of the recognition of income
2    from one year to another? Right?
3        MR. JONES: Same objection. Form and
4    foundation.
5    A    I believe so. But that is a significant
6    difference.
7    Q    Yes. It is.
8        I am trying to ask you this question,
9    though. Do you recall that the reserves established
10   at Graduate, or at least many of them were established
11   in purchase accounting?
12   A    Yes.
13   Q    And for those reserves, AHERF had not yet
14   taken any in through income, correct?
15        MR. JONES: Object to form.
16   A    Correct. But even if they were established
17   through income, AHERF may not have taken the hit.
18   Because if you remember, we talked about those
19   entities going in to SDN, which was not part of
20   AHERF. So whether they were created through purchase
21   accounting or through a hit to the income statement
22   may not have had any impact on AHERF one way or the
23   other.
24   Q    Did you consider at the time that using
25   reserves from Graduate was more problematic than using

Page 754

1    other cushions?
2    A    I personally did not.
3    Q    Let me hand you, Mr. Adamczak, what has
4    previously been marked Exhibit 1096.
5        It will be helpful, I see you are already
6    doing it, if you could open to page 36, the DVOG
7    combining statement of operations in Exhibit 58.
8        Let me first ask you about Exhibit 1096.
9        This is a series of schedules for various
10   eastern region hospitals entitled "Statement of
11   revenue expenses" for the year ended June 30th, 1997.
12   Right?
13   A    That's correct.
14   Q    And do you recognize Dan Cancelmi's
15   handwriting on the bottom of the page?
16   A    I do.
17   Q    It reads "Statements faxed to McConnell on
18   7-16-97 and seen by Dr. Kaye"?
19   A    It does.
20   Q    What process did you and Dan Cancelmi
21   follow in terms of closing the books at this time
22   after you had taken over Mr. Spargo's job and
23   distributing results to senior management?
24   A    Generally, the books were preliminarily
25   closed, financial statements generated, then

Page 755

1  circulated to the CFO's of each of the entities along
2  with Mr. McConnell.
3       They would then provide their comments
4  back, and any adjustments that were required by them
5  were made. And then the final statements were issued.
6       Q    And the CFO for the DVOG Graduate entities
7  was Chuck Morrison?
8       A    That's correct.
9       Q    Was it typical to distribute the
10  preliminary results to Dr. Donald Kaye?
11      A    I don't know whether the -- I don't
12  remember in the Delaware Valley whether that was
13  typical or not.
14           In the Pittsburgh region, that was not
15  typical for it to go to the CEO.
16      Q    Who was Tony Sanzo?
17      A    Correct. Generally the CFO, once he was
18  happy and we had made all their final adjustments,
19  they would generally take it to the CEO.
20      Q    And would you have reviewed preliminary
21  results before Dan Cancelmi sent them on to David
22  McConnell?
23      A    Sometimes yes. Sometimes no. Depending
24  whether I was busy with other activities or not.
25           And as we mentioned particularly in this

Page 756

1  time frame, and I speak more from the Pittsburgh side,
2  prior to this period I would always review the AGH
3  statements or the Pittsburgh statements before they
4  went to the Pittsburgh CFO's.
5       During this period of time, as you
6  remember, I was off doing other things.
7       So there is a reasonable possibility that
8  they could have been circulated without my review.
9       Q    Now, do you see that the net income for the
10  fiscal year 1997 reported for the various DVOG
11  hospitals here in Exhibit 1096 is lower than the
12  corresponding figures in the combining statement of
13  operations attached to the audited financial
14  statements in Exhibit 58?
15      A    That appears to be the case.
16      Q    And does that suggest to you that these are
17  preliminary results before adjustments directed by
18  Mr. McConnell?
19           MR. JONES: Object to foundation.
20      A    That appears to be the case.
21      Q    Let me mark as the next exhibit, please, a
22  document with Bates No. DC0896, pages 64 through 80.
23           (Thereupon, Exhibit No. 1595 was marked for
24  identification.)
25      Q    Do you recognize Exhibit 1595,

Page 757

1  Mr. Adamczak?
2       A    Yes.
3       Q    What is that?
4       A    Appears to be a document that was faxed to
5  David McConnell at my request.
6            It shows differences between actual and
7  budget and explanations.
8       Q    And these are schedules that you had faxed
9  to him on July 19th, 1997?
10      A    That appears to be correct.
11      Q    The first attachment on Bates pages 65 and
12  66 is a memo from you to Mr. McConnell dated July
13  18th, 1997 on the subject of DVOG June patient service
14  revenue?
15      A    Correct.
16      Q    And you report there that inpatient patient
17  service revenue was 15.7 million dollars below budget?
18      A    Correct.
19      Q    Could you explain, please, what the
20  calculations are that you are performing on the second
21  page of that memo?
22           MR. JONES: Object to form.
23      A    It looks to me like it is a rate in volume
24  variance analysis.
25      Q    Could you explain what rate in volume

Page 758

1  variances are, please?
2       A    Volume would be differences in actual and
3  budget resulting from less activity than you
4  originally budgeted, either days or admissions.
5       Q    And so you calculated that of the 15.7
6  million dollar inpatient patient service revenue
7  variance from budget for the month of June 1997, 8.2
8  million of that was the result of volume variances?
9       A    That's correct.
10      Q    And the remainder, then, you attributed to
11  rate variances?
12      A    Yes.
13      Q    Did you discuss with anybody how poor the
14  preliminary results were for the DVOG hospitals for
15  the month of June 1997?
16      A    I think this was sent to David McConnell.
17  So by this, this would have been a communication or
18  discussion.
19      Q    Do you recall talking in person with him
20  about that?
21      A    No.
22      Q    Do you recall talking with anybody else
23  about that?
24      A    No.
25      Q    Do you recall that 29 percent or so

Page 759

1  variance from budget as shown here in your memo was an
2  unusually poor result?
3      A    It seemed unreasonably poor.
4      Q    Did you have a view at the time as to what
5  had caused that poor result?
6      A    I did not.
7      Q    And it was these poor results in the month
8  of June 1997 that McConnell was obscuring by directing
9  adjustments to be made.
10     Right?
11         MR. JONES:  Object to form and foundation.
12     A    For the month, yes.
13         I don't know whether it obscured them for
14  the year or not.
15     Q    Did you ever tell anyone from Coopers &
16  Lybrand about how poorly the DVOG hospitals were
17  actually doing at the end of fiscal year 1997?
18     A    Again, I only looked at June.
19         So I don't know how poorly they did or
20  whether there were adjustments from other months that
21  were made as a catch-up in June.
22     Q    Did you tell anyone from Coopers & Lybrand
23  how poorly the DVOG hospitals were doing in the month
24  of June 1997?
25     A    I did not.

Page 760

1      Q    Let me hand you, Mr. Adamczak, what has
2  previously been marked Exhibit 49.
3         This is a series of schedules entitled
4  "AHERF income statement information," fiscal year '97?
5      A    It is.
6      Q    It shows the use of reserves to make
7  adjustments to the results through June 1997.
8         Correct?
9      A    It does.
10     Q    And this column "use of reserves" shows the
11  reserves that you were directed by David McConnell to
12  take in to income in the final June 1997 close.
13     Right?
14         MR. JONES:  Object to foundation.
15     A    I believe so.
16     Q    Do you recognize the handwriting on the
17  second page of the exhibit?
18     A    I believe so.
19     Q    Whose is it?
20     A    Appears to me to be Dan Cancelmi.
21     Q    Is any of this your handwriting?
22     A    It is not.
23     Q    Did Dan Cancelmi then identify the specific
24  reserves to be used to fulfill the directive from
25  David McConnell?

Page 761

1      A    I believe he did.
2      Q    Did you and Dan get guidance as to what the
3  amount was of reserves that McConnell wanted to be
4  taking in to income?
5      A    That was generally the case.  He would ask,
6  "Are there reserves of roughly X amount that are
7  available that could be taken in to income, or that
8  could be used to offset this negative implication?"
9         I would ask Dan, again because I was not
10  that familiar particularly with the Delaware Valley,
11  "Are there this level of reserves?"
12         And he would come back and say yes or no.
13         I would never know the detail.  Nor would
14  David McConnell, as to the specific reserves that he
15  was speaking of.
16         Then David would approve it.
17         I would go back to Dan and say "David has
18  approved using the 20 million you proposed.  Go ahead
19  and book the journal entries."
20     Q    Do you recall in this instance for the
21  final June 1997 adjustments, how specific he was in
22  terms of the amount of reserves he wanted to utilize?
23     A    David?
24         MR. JONES:  Object to form.
25     Q    Yes.

Page 762

1      A    I believe he was pretty specific, meaning I
2  think he wanted somewhere around -- I don't know that
3  he said 31 million 550, but he would say somewhere
4  around 31 and a half million or 30 plus million,
5  something to that effect.
6      Q    Let me hand you, Mr. Adamczak, what has
7  previously been marked Exhibit 50.
8         There are some pages in this exhibit that I
9  think are the same as in the previous exhibit.
10         But there is some new ones I want to direct
11  your attention to.
12         Particularly the second page of Exhibit
13  50.  Which is headed "AHERF income statement
14  information," fiscal year '97?
15     A    Yes.
16     Q    Is this a schedule with which you are
17  familiar?
18     A    I can't say that I saw this.  But I can't
19  say -- I just don't remember.
20     Q    There is a middle column headed
21  "adjustments June year to date".
22         Do you see that?
23     A    Yes.
24     Q    And then in the right margin there are
25  descriptions of those adjustments.