Q Let me hand you, Mr. Adamczak, a document previously marked Exhibit 45.

I want to look at this, if we could, in conjunction with Exhibit 50.

Exhibit 45 is another set of schedules, AHERF analysis of reserves. Right?

A It is.

Q And this time there is a column headed "unadjusted 6-30-97" followed by a column and headed "taken". And then finally the column "Adjusted 6-30-97".

Right?

A Yes.

Q And is it your understanding that the column headed "taken" indicates reserves that were taken in to income?

A It appears that it refers to the same 31,550 on schedule 50. So I assume that is correct.

MR. JONES: Note my objection to foundation.

Q Did you review at the time the version of the analysis of reserves schedule indicating the reserves taken in to income that we marked Exhibit 45?

A Say that one last time?

Q Yes. Did you, at the time, review this

version of the analysis of reserves schedule indicating the reserves taken in to income that we have marked Exhibit 45?

MR. JONES: Object to form. Vague as to time.

A I don't believe so.

Q Is this the type of detailed work that you believe Mr. Cancelmi was performing?

A Yes.

I believe that this may have been put together to determine the numbers for this other analysis.

Q So that again the analysis of reserve schedule was used in order to identify the reserves available for the adjustments?

MR. JONES: Object to form and foundation.

A I believe the reserve schedule may have been used.

This schedule I believe was prepared at a much later date.

I don't know that for a fact.

I think it was prepared more when this analysis was done versus when the reserves were identified and taken.

But I believe this reserves schedule

probably was the source of determining the reserves.

Q When you say it was prepared at a later time, you are still talking about the summer -- midsummer 1997 time frame?

A Maybe even after. Yes. Summer fall of '97.

Q Let me mark, please, as Exhibit 1597 a document with Bates Nos. DC8295 pages 1 to 18.

(Thereupon, Exhibit No. 1597 was marked for identification.)

Q Do you see at least some of the schedules in Exhibit 1597 are the same schedules we looked at earlier in Exhibit 301?

A Yes.

Q And what I want to ask in particular about Exhibit 1597 has to do with the handwriting at the top.

Do you see that that reads "info prepared by Al and provided to DWMC, CPM and SSA"?

A I do.

Q Does that look to you like Mr. Cancelmi's handwriting?

A It does.

Q Did you provide a copy of these schedules in Exhibit 1597 to Mr. Abdelhak?

A I believe so.

Q Do you remember anything about how that came to be that you provided these schedules to Mr. Abdelhak?

A Yes. I was asked to prepare this analysis for some meeting with I believe a member or members of the board.

I thought David Barnes might have been one of the members that was mentioned.

So although this says info prepared, I think prepared means that I coordinated the typing of the schedules.

Dan had given me a lot of the input and reviewed the schedules.

And then I had sent it off.

I believe I had sent it to David McConnell and possibly Sherif. He may have sent it to Chuck Morrison as far as distribution.

But I believe that it went to those three parties.

My understanding it was for some kind of a board discussion, so that they could better understand what the results of '97 were, if you were to take out the unusual items.

Q I believe you said that you were directed

to prepare these schedules.
Who was it specifically who asked --
A I believe it was David McConnell.
Q And who told you that the schedules were going to be discussed with a member or members of the board of trustees?
A I believe it was him, also.
Q Did you ever speak directly to Sherif Abdelhak about these schedules?
A Directly, I don't believe I did.
Q But you sent them to him by fax or interoffice mail or something?
A Correct.
Q I believe you said that Dave McConnell mentioned the name of David Barnes?
A David -- I think Barnes is the wrong name.
It was the guy from Mellon Bank who was the previous chairman who may have headed the finance committee.
Q We discussed before how --
A If you would like, I could look. I saw his name on one of the lists that had board members on the previous exhibits.
Would that be helpful?
Q Sure.

As I recall, we had Exhibit 83, which was a board book.
A There was another. David Barnes might be it.
I think it is David Barnes. Did he come from Mellon Bank, previous chairman?
Q That is my understanding.
A That would be the fellow then.
Q Did you ever hear back anything about the meeting with David Barnes?
A I did not.
Q Do you know whether any other trustees were present at the meeting?
A I do not.
I don't even know whether a meeting occurred.
Q You were told that one would occur?
A When I was asked to prepare this analysis as part of that request, I was told we need to prepare this analysis for a meeting with David Barnes.
Q I think you mentioned earlier that because the schedule lists only 7 million of Graduate cushions transferred and taken in to income, when ultimately there were 28 million, that this was an interim schedule that didn't reflect the final set of

adjustments.
Right?
A I believe that is the case.
Q Do you believe, then, that you prepared this schedule and provided it to Mr. McConnell and Mr. Abdelhak in July of 1997?
A That sounds reasonable.
I guess we could go back and look at the Delaware Valley numbers and see where in this chronological order they fall. And if they were before that, then that probably is correct.
Q When you -- you are referring to looking at the income statement information schedules.
A Right. Page 3 of 18. Which starts with actual income statement information and trying to figure out particularly -- for the Delaware Valley the bottom line numbers that are in this analysis, where they fall in comparison to the other exhibits we just looked at that appear to show different periods of time.
Q That is very helpful. I won't take our time now to go through that.
Let me hand you, Mr. Adamczak, what has previously been marked Exhibit 1101.
Q Do you recognize Exhibit 1101?

A I do.
Q And what is it?
A It appears to be an analysis that I put together and that was given to Harry, who was kind of a transporter of information back and forth between buildings in the system that was to go to Sherif Abdelhak.
Q So Harry was a messenger, who you used?
A Yes.
Q Are you able to give an approximate time frame when you believe that you sent these analyses to Mr. Abdelhak?
A I would assume that the fact that there are two months of fiscal year information on it, July and August, and assuming this was based on August close, it could not have happened before September of 1998.
Q And you believe that it must have been in September or October, because if there had been at a later time, you would have provided Mr. Abdelhak with more up to date results?
A That's correct.
And I wouldn't think for August. I would think we had it closed some time early October at the very latest.
The other thing I don't know is with year

end we may have been a little bit behind, if they didn't sign off on it.
We generally can't close June final until the signoff. So if they didn't sign off until the end of August, we may have been running late with the closes.
Because generally we won't final close July or August until June is final closed.
So if the audit signoff was the end of August, we may have started in July or September, may have gone in to November. I doubt any later than end of October, early November.
Q You would date this some time from September through the early part of November 1997?
A Yes. It could be no earlier than September, because it has August information in it.
Q Is this your handwriting in the schedule?
A It is.
Q Do you recall how it came to be that you provided these schedules to Mr. Abdelhak?
A No.
I would assume it was a request of his. But I don't know that for sure.
Q Did you regularly provide this type of schedule to him?

A Not generally without a request.
Q Could you turn, please, about halfway through the document to the number with Bates No. 8766? Could you explain, please, what this schedule is?
A I would have to look at it.
I didn't put this analysis together. This came out of Dan Cancelmi's area.
But it looks like it tracks some inpatient net revenue and gross revenue per admission and per day historically, meaning month by month. And try to I guess calculate what an average inpatient revenue -- to show some kind of a trend.
Q This page we are looking at is for MCP hospital?
A That's correct.
Q Then the following pages relate to other DVOG hospitals?
A Correct.
Q Do you see that next to the inpatient net revenue per admission for June 1997, there is a footnote E?
A Yes.
Q And footnote E reads excludes 3 million dollar general reserve adjustment?

A I do.
Q And then if you turn to Bates page 8771, this is a memo from you to Mr. McConnell dated September 23rd, 1997 on the subject of DVOG outpatient revenues. Is that right?
A Yes.
Q Do you see there the second column is headed fiscal year '97 outpatient cushions used in fourth quarter?
A Could you repeat that?
Q Do you see the second column?
A I see it.
Q And for MCP, the figure given there for outpatient cushions is 2 million dollars?
A Yes.
Q The 2 million dollars there for outpatient cushions plus the 3 million dollars in general reserve adjustment on the inpatient schedule on Bates 8766 total 5 million dollars, right?
A They do.
Q Did you happen to have a copy of Exhibit 50 handy still?
A I do.
Q And the use of reserves in the final June 1997 adjustment we have spoken of shown in Exhibit 50

at MCP hospital is 5 million dollars.
Right?
A Correct.
Q Similarly for Elkins Park, if we totaled up the inpatient figure on Bates 8767 and footnote E, and then the outpatient figure on Bates 8771, we would get the same 3 million dollar figure as shown on Exhibit 50.
Right?
A Correct.
Q Similarly for Bucks County, if we added the 1 million dollar inpatient figure on schedule 8768, footnote B with the 300,000 outpatient figure on Bates 8771, we get the 1.3 million dollar figure shown for use of reserves in Exhibit 50?
A Correct.
Q So these schedules in Exhibit 1101 that you sent to Mr. Abdelhak inform him, if he didn't already know about it, of the 31 million or so use of reserves made in the final June 1997 adjustment; is that right?
MR. JONES: Object to form and foundation.
A I believe so.
Q Did you ever speak directly to Mr. Abdelhak about those adjustments?
A I did not.

Q Was it your understanding at the time that he knew about them?
A I don't know that I had --
MR. JONES: Object to foundation.
A -- that I had an understanding other than I assume Mr. McConnell would have shared it with him.
Q Now, in the previous exhibit, Exhibit 1597, if these schedules were in fact provided to Mr. Barnes as Mr. McConnell told you they would be, then Mr. Barnes would have known at least about 75 million dollars in transfers from Graduate to DVOG, right?
MR. JONES: Object to foundation and form.
A I would believe so.
Q Do you have any other knowledge about whether Mr. Barnes was informed about the use of cushions or the transfers of reserves?
A I do not.
MR. JONES: Same objections.
Q Do you know whether any other members of the AHERF board of trustees were informed about the use of cushions or transfers of reserves?
MR. JONES: Same objections.
A I do not.
Q Let me mark, please, Exhibit 1598, a document with Bates Nos. SA1310, pages 1 to 5.

(Thereupon, Exhibit No. 1598 was marked for identification.)
Q Do you recognize the schedules in Exhibit 1598, Mr. Adamczak?
A Yes. Looks like an analysis I would have prepared.
Q Do you recall providing this analysis to Sherif Abdelhak?
A I believe I do.
Q And the analysis shows the use of inpatient and outpatient cushions both in the fourth quarter of fiscal year 1997 and in the first quarter of fiscal year 1998; is that right?
A Correct.
Q Do you believe, then, that you provided this schedule to Mr. Abdelhak some time in the second quarter of fiscal year 1998?
A Yes.
Q So that would be in the October to December 1997 time frame?
A Yes.
Q And this schedule shows the use of inpatient and outpatient cushions in the fourth quarter of fiscal year 1997, among other things the same adjustments we have been looking at at the DVOG

hospitals we have been referring to as the final June 1997 adjustments, right?
A I believe so.
MR. JONES: Object to form and foundation.
Q So this is another schedule that you provided to Mr. Abdelhak that informed him about those reserve transfers from Graduate to DVOG, right?
MR. JONES: Object to form and foundation.
A It informed him of use of cushions.
I don't know whether he knew that they came from Graduate or where. But if your question is should he have been aware that cushions were used? Yes.
Did he know the origination? I don't know that he did or didn't.
Q You are confident that he knew about the use of cushions to improve the reported DVOG hospitals results?
A I don't know that I can say that. I know the schedules were provided to him. Whether he read them and understood them, that is another question. Or whether he ever read them. They were provided to him.
Q Let me rephrase.
You know that you provided to Mr. Abdelhak

schedules that showed the use of cushions at the DVOG hospitals in June 1997 to improve the reported results?
MR. JONES: Object to form.
A I know that I sent them to him.
Q Would requests from Mr. Abdelhak for schedules of this type that you provided to him come directly from him to you?
A Generally, yes. Not always.
They may come through Mr. McConnell.
Q Can you recall Mr. Abdelhak calling you and making a request in words or substance from schedules that would break out the use of cushions?
A I don't remember that specific dialogue.
Q Can you remember anything about how Mr. Abdelhak would phrase the type of information that he was seeking from you?
A Generally it was more -- it was generally along the lines of I want to understand what really happened in the operation versus the unusual items it may have impacted in a given period.
Q And it was in response to a request of that type that you prepared and provided to Mr. Abdelhak schedules that showed the use of cushion?
A Correct.

Because to me they were unusual items.

Q Let me mark, please, Exhibit 1599 a document with Bates No. DM0627, pages 1 to 10.

(Thereupon, Exhibit No. 1599 was marked for identification.)

Q Pages 1 to 9 of this document are various schedules for AHERF entities called income statement trend.

Is that right?

A Correct.

Q Are these schedules that you prepared and provided to Mr. McConnell?

A I believe so.

Q Do you know whether the last page of this exhibit goes with these schedules? Or if it just is accidentally attached to them?

A It is not part of this analysis.

I don't know whether it was put there as part of a package for some discussion or not.

Q I would focus then just on the first nine pages of Exhibit 1599.

Were these schedules that you prepared on a regular basis? Or were they in response to particular request?

A I don't remember that.

Because we started to prepare more and more of these on a more routine basis.

So I don't remember whether it was a specific request or not.

It may have been a general request like I need to have information on a monthly basis, that I better understand the operations without unusual items or whatever were.

But I would not have just prepared this and sent it without some request for information, whether it was general or going forward let's try to do and provide me.

I don't think I would just sit there and say "Hey, I dreamed up this analysis". And I will just send it for the heck of it, knowing all of the other stuff that was going on.

And the fact that I had no spare time.

Q And so this was, you believe, a request either general or specific from David McConnell?

A Yes.

Q Is it your understanding that the months on these schedules are made through September 1997?

A Yes.

Q So that would be the last two months of fiscal year 1997, the first three months of fiscal

year 1998?

A Correct.

Q And the schedules show the use of cushions both for revenues and for expenses in May and June 1997, right?

A Yes.

Q And the use of cushions is the difference between the line reported revenue and the line actual revenue. Right?

A Correct.

Q Did you feel, then, that the reported revenue was not the actual revenue?

MR. JONES: Object to form.

A I believe that the reported revenue included unusual items or cushions. Yes.

Q Did you believe that the reported revenue was overstated?

A In which periods?

Q May and June of 1997.

A Yes.

Q And this was a belief that you held during the summer and fall of 1997?

A Yes.

Q Did you share that belief with Coopers & Lybrand?

A I did not.

Q Did you share that belief with David McConnell?

A I did not.

Q But it was your understanding from the fact that he had directed you to make those adjustments, that he would have been equally aware of the fact that revenues were overstated in those two months?

MR. JONES: Object to form and foundation.

A I don't know what he thought.

I believe that he knew the cushions were used, as I believe that Coopers knew about transfers of reserves and so forth. So from that perspective, I assumed they were okay, also.

Q You never actually spoke to them to see whether they did know about it?

A I did not. Nor did they ask me whether I was okay with the results.

Q Except when they asked you to sign a representation letter, right?

A That's correct.

Q That is an instance where they did ask you, and where you told them results were in accordance with GAAP?

MR. JONES: Object to form and foundation.

A Yes.

And again, every issue that you have brought up that I was uneasy with, it appears you had an explanation, not that I buy it, as to why it could have been appropriate.

Q We looked toward the end yesterday and so far this morning at a whole number of internal AHERF documents that reflected the use of cushions and/or the transfer of reserves in May or June of 1997.

Right?

A Correct.

Q And none of those documents are shown as having been copied or provided to Coopers & Lybrand, are they?

A That's correct.

Q And do you recall providing any of the exhibits that we have looked at that reflect the use of cushions or transfers -- transfer of reserves in May or June of 1997 to Coopers & Lybrand?

MR. JONES: Object to form.

A No. I don't believe I ever provided any documents to Coopers & Lybrand during their audit.

MR. RYAN: Let's take a quick break here.

THE VIDEOGRAPHER: This concludes tape 13 of the deposition of Mr. Albert Adamczak. We are

off the record. The time is 10:12 a.m.

(Recess taken.)

THE VIDEOGRAPHER: This begins tape 14 of the deposition of Mr. Albert Adamczak.

We are back on the record. The time is 10:23 a.m.

BY MR. RYAN:

Q Let me mark, please, as Exhibit 1615 a document with Bates No. DBRAA36488.

(Thereupon, Exhibit No. 1615 was marked for identification.)

Q Do you recognize Exhibit 1615, Mr. Adamczak?

A I do.

Q And what is it?

A Appears to be an agenda for a weekly meeting with David McConnell.

Q Meeting between you and David McConnell on July 21st, 1997?

A Yes.

Q Is that your handwriting on the agenda?

A It is.

Q Let me ask you first whether you can try to help give me a sense of what happened during these weekly meetings that you had.

A They were scheduled every week generally on a Monday morning.

I think they were scheduled for a very brief period of time, generally an hour or less.

Often times David McConnell would show up, they were generally in his office first thing in the morning.

Generally he showed up late for them. Continually was pulled away on telephone calls. And rarely did we discuss the entire agenda.

A lot of times we discussed very little.

A lot of times he would bring up or discuss issues not on this agenda, meaning "I need you to do this," or "I need you to do that."

They generally happened every week. Sometimes they were cancelled.

An agenda would be put together and we never had the meeting.

Q If you did not get in a particular meeting to discuss an item on the agenda that you thought continued to be important, would you carry it over to the agenda for the next meeting?

A Not always.

If I had any documents that I had brought relative to these items, I might leave them and say

"Hey, if you need the followup, just give me a call."

Q Are you able to tell from your handwritten notes whether this meeting took place? Or from the items on the agenda?

A I can't.

The only thing that might cause me to believe that it did was the note by No. 9, where I wrote something in.

The other items look like they were additions that I added to the agenda before the meeting.

Q But the notes by item 9 look like something that you may have written while you were sitting at the meeting?

A Yes.

Q Do you see item 1 reads "AUH slash SCHC bad debt reserves"?

A I do.

Q Do you recall what that item referred to?

A I do not.

Q Do you see item 2 reads "AHERF reserve cushion analysis"?

A I do.

Q Do you recall what that item refers to?

A I would assume it is that cushion analysis

Page 903

accepted accounting principles. Right?
A In my opinion, that's correct.
MR. JONES: Object to form.
Q And that was an opinion you held back at the same you signed the letter, right?
MR. JONES: Same objection.
A Yes. More so as time went on.
Q See at the top of page 2, paragraph 3 reads, "There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements."
A I see that.
Q And at the time that you signed this letter for Coopers & Lybrand, did you believe that that was a correct representation?
MR. JONES: Same objection.
A No.
Q Why not?
A Because of many of the issues we talked here.
And that you have given me reasons that Coopers believed they were on summary of audit differences. That to the bottom line, they did not affect the bottom line, even though they affected various lines.

Page 904

That they related to other years.
And I believe you proposed that under the iron curtain method, you needed to get the balance sheet right, so it didn't matter which year it related to.
Those types of things were the exact arguments that I knew would be proposed to the items that I had issues with.
Q At the time you signed the representation letter that included paragraph 3, you believed, didn't you, that the reserve transfers from Graduate to DVOG had not been properly recorded in the accounting records of AHERF?
A Correct.
Q And despite that belief, you signed the letter and provided it to Coopers & Lybrand, right?
A Correct.
Q Do you see paragraph 4A reads, "There have been no irregularities involving management or those employees who have significant roles in AHERF's internal control"?
A I do.
Q And at the time you signed the representation letter for Coopers & Lybrand, did you believe that that was a correct representation?

Page 905

A No.
Q If you could look down to paragraph 8. Do you see that reads, "The receivables recorded in the financial statements represent valid claims against debtors for services rendered or other charges arising on or before June 30th, 1997.
"And are not subject to discount except for normal cash discounts. These receivables have been approximately reduced to their estimated net realizable value.
"Additionally, adequate provisions have been made for estimated adjustments to revenue, such as for denied claims, changes to DRG assignments and cost report audits".
Did I read that right?
A Yes.
Q At the time you provided this letter to Coopers & Lybrand, did you believe that that was a correct representation?
A Generally, yes.
MR. JONES: Form.
A Because a cleanup had occurred by June 30th.
Q Turn, please, to paragraph 19 on page 4.
Do you see there there is a listing of

Page 906

intercompany receivables or payables between affiliates at June 30th, 1997?
A Yes.
Q And for Allegheny General Hospital, the amount listed there is 143 million dollars -- was 143,714,308 dollars?
A Yes.
Q And in your understanding, did that include the advance to the DVOG?
A Yes.
Q Do you see the next sentence reads, "We believe these balances will be settled through the normal course of business and will not be settled through net asset transfers", right?
A Right.
Q Was that a representation that meant that the receivables were going to be able to be repaid and would not have to be forgiven?
A Yes.
Q At the time you signed this letter for Coopers & Lybrand, did you believe that that was a correct representation?
A No.
But as you stated, there may have been another bond offering in the works.

Q Then on page 6, do you see paragraph 27 reads, "Other than those events described in note 16 and 17 to the financial statement, no events have occurred subsequent to June 30th, 1997, that would require adjustment to or disclosure in the financial statements."
Right?
A Yes.
Q At the time you signed this letter for Coopers & Lybrand, did you believe that that was a correct representation?
A The only item that I had apprehension was relative to the writeoffs early in '98, that I believe Coopers came in and rereviewed that and determined they were properly written off in '98. And that '97 statements did not need to be adjusted.
Q That is a reference to the 23 million dollars that was recorded as a valuation adjustment?
A Yes.
Q That was an item that Coopers & Lybrand told you that couldn't remain booked that way at year end 1998, right?
A The booking of that was not my concern.
My concern was did that writeoff belong in 1997.

They said '98 was proper. It is just the way it was reflected in the '98 statements.
Q Is it, though, the case that Coopers & Lybrand told you that they would not allow AHERF to carry that adjustment in the way that it had been booked at year end 1998?
A Yes.
But they did not insist that it be pushed back in to '97.
Q And is it the case that you did not tell anybody from Coopers & Lybrand that you believe any of the statements in the representation letter marked as Exhibit 1626 were inaccurate?
A That's true.
Q Let me mark, please, Exhibit 1627 a document with Bates Nos. SEC D414 through 421.
(Thereupon, Exhibit No. 1627 was marked for identification.)
Q If you turn to the second page of the exhibit, do you see this is a document entitled "offer of settlement of Albert Adamczak"?
A I do.
Q Could you explain what this document is?
A It is an agreement that I entered in to with the SEC, whereby I neither -- where certain

allegations were made by the SEC against me relative to the AHERF audited financial statements, whereby I neither admitted guilt nor was convicted of any of the allegations. But agreed basically in settlement not to represent clients before the SEC for a three year period that expired in beginning of May of 2003, which I hadn't done in many years before this and have not done in the three years that this was in effect.
Q And as a result of this offer of settlement with the Security and Exchange Commission, did you have your license as a certified public accountant suspended?
A I did.
My understanding is the rules that the certified public accounting profession follows is that if you enter in to a sanction agreement for any period of time with any other body that they follow suit and don't even investigate the allegations.
Q And is that your signature on the last page of the document?
A It is.
Q If I could call your attention on page 3, Bates No. 417, to paragraph 10, do you see that reads "AHERF's audited consolidated financial statements with consolidating schedules for the year ended June

30th, 1997 purportedly prepared in accordance with GAAP, were materially false and misleading and failed to comply with GAAP in that A, they materially overstated AHERF's 1997 consolidated net income, and B, they materially overstated Delaware Valley's 1997 net income"?
A I see that.
Q Do you believe that that is a true statement?
A I do.
Q And did you tell anybody at Coopers & Lybrand about that during the 1997 audit?
A I did not.
MR. RYAN: No further questions at this time. I thank you very much for your patience and your time, Mr. Adamczak.
EXAMINATION
BY MR. JONES:
Q Mr. Adamczak, Jim Jones again. I will ask you I hope a relatively few questions by way of followup.
Let's start where we left off with Exhibit 1627. Unless anybody needs a break.
A No.
Q I think you tried to tell Mr. Ryan moments

ago that the offer of settlement you provided the SEC contained a provision, or at least as you understood it, it contained a provision that you did not agree to all of the findings that the SEC may have proposed against you.

Is that correct?

A I believe I didn't -- in this settlement, I didn't agree to any of them.

Q I will direct your attention to paragraph -- rather, page 2 of the settlement agreement.

Paragraph A.

Can you read that sentence for us?

A Under section A?

Q Yes.

A "Contents solely" --

Q The word is "Consents". You should read the clause that starts just before paragraph A.

A "On the basis of the foregoing, Adamczak hereby: Consents solely for the purpose of these proceedings and any other proceedings brought or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings contained in the order, except for those set forth in paragraph A1 below", which are factual in nature,

"Which are admitted to the entry of the order of the Commission making the following findings."

Q And paragraph A1 refers to your background and time of employment at AHERF in a general way; is that right?

A That's correct.

Q Mr. Adamczak, do you know whether the CPA licensing body, as licensing body for certified public accountants, did any investigation in connection with your suspension?

A I know they did not.

Q How is it you know that?

A Through discussion with them and the letter where my in essence CPA license was suspended, it says we basically follow -- under X rule we follow certain guidance. It says, "If your license is suspended, we automatically suspend it for the same time."

Q I will flip you back now to Exhibit 1626, which is the representation letter that Mr. Ryan gave to you just before he gave to you the settlement agreement offer. Do you have that in front of you?

A I do.

Q You just told us that you had I think the words were apprehensions, when you signed this January 12th, 1998 letter; is that right?

A That's correct.

MR. RYAN: Objection.

Q And the basis of your apprehensions were what in a general way?

A Many of the items that we discussed here.

The IBM -- recording the sale on gain of the IBM building.

The recording of income on the Lockhart funds.

The funded depreciation classification as -- excuse me, the intercompany receivable classification as funded depreciation.

The transfer of the reserves from Graduate to AHERF.

The initial allowance that the Graduate entities be put in to SDN, whose board members were I believe Nancy Wynstra, David McConnell and Sherif Abdelhak.

My belief was that because of that board representation, that it in essence was -- that company was part of AHERF and should have been consolidated from day one instead of several months where those entities were left in SDN.

Q For accounting purposes?

A For accounting purposes.

Q This is some of the things? Were there others that come to mind that caused you apprehension?

A The bad debt reserves shortfall from '96 that there was a subsequent meeting held on.

It appears there may have been some adjustment, 17 million of the 30. But the other 30 I never saw resolved.

Those types of items.

The fact that we continued to bring issues related to the receivables to Coopers & Lybrand's attention and never saw adequate resolution to those items.

Q As part of the comfort you took in resolving the apprehension -- let me rephrase. Is part of any resolution of the apprehension you felt that occurred caused by comfort you took from Coopers & Lybrand's work in the audit process?

MR. RYAN: Objection.

A Absolutely.

Q Could you explain that for me?

A I knew they had reviewed the IBM transaction in detail. Because I believe they were engaged directly to review that.

I knew the question relative to the Graduate entities going in to SDN before they came in

to AHERF was looked at vigorously by Coopers & Lybrand, because at one point they were pushing that it be consolidated, and then at some later date it ended up not to be consolidated.

The 50 million dollar reserve transaction, it was my understanding that they knew about it. Looked at it. And had even requested that it be moved from restructuring costs to goodwill. Representations in memos that I saw from Dan Cancelmi and others that led me to believe that Coopers was aware of all of the reserves being moved.

Even though agreed upon procedures were done on such things as the intercompany accounts, I relied on Coopers, that they didn't see anything.

I didn't put as much credence on that as an audit that they went and dug and looked at everything.

But that based on their limited procedures, that nothing came to sight, because I would expect even if you are ticking and tying balances, that you would at least read the schedule. And if it doesn't make sense or something looks out of whack, you bring that to attention of management.

The fact that in these followup meetings, the audit meetings, the ones I went to, issues did not come up that caused me any concern.

Relative to these big items.

I know that when I was in auditing, generally one of the procedures was when the auditors came in, they received a trial balance and asked for any subsequent entries to be given to them.

I know a lot of these items we talked about happened late in July or middle July.

I would have expected by then they were in with their trial balance and should have been reviewing any entries made from that time on.

Also, the magnitude of these adjustments were in my mind very big.

And as we looked at many sheets that had journal entries with millions of dollars on them, although I didn't review them, because it wasn't part of my process at the time to look at the detail, and I do acknowledge that I know these transfers happened.

I would have expected Coopers to see these numbers either through journal entry review, there is usually a large and unusual journal entry review or procedures they did.

And last but not least, I would have hoped that as part of the audit, they would have spent some time with me as an executive of that organization just to ask me some questions or my thoughts.

I don't know that there was more than two or three times they stopped by during the audit. And it was generally to express pleasantries, and that was it.

Q Did you ever tell them anything untrue?

A I did not.

Q At any time?

A No.

Q That is Coopers & Lybrand?

A That's correct.

Q Is it fair to say, sir, that -- strike that.

The question better put is what did you think about Coopers, what did you think and believe about Coopers' state of knowledge with respect to the items you just mentioned gave you apprehension or were perhaps inaccurate in the representation letter?

MR. RYAN: Objection.

A My thought is based on my history and my training were that the recording of these or the handling was incorrect.

Q What did you think about Coopers' knowledge about those facts?

MR. RYAN: Objection.

A My thought is that they had every fact that

I did other than my opinion.

Q So telling them that you thought things were inaccurate, or that you had apprehension about them --

A Were my opinion.

Q And wouldn't, in your view, have been news to them; is that right?

MR. RYAN: Objection.

A I don't know that I would say that.

But I know that in the past, when I have expressed contrary opinions, it didn't resolve in any differences.

As a matter of fact, senior management generally took the position that Coopers & Lybrand were the experts, and when I had a contrary view, it was kind of thanks for your advice, but they are the experts we have hired. And we will take their advice.

Q If you had spoken up at the time someone asked you to -- I assume someone asked you to sign the representation letter? Or it was put in front of you in some way?

A It was more or less sent to me.

Q By whom?

A There was no discussion.

Q Who sent it to you?

A I believe Coopers & Lybrand sent it or someone internally.
Q If either -- strike that.
If at the time this representation letter marked as Exhibit 1626 hit your desk, you had spoken up and said "I don't think I will sign it" for the reasons you just expressd on the record here today among others, what do you think the reaction from the auditors would have been based on your experience over the years with them, especially in the '96 audit work?
MR. RYAN: Objection.
A Similar to the funded depreciation reclass. I think there would have been an explanation given to me as it was right or okay.
And internally, I think I would have been outcast by management.
Q Do you think any expression of your apprehensions or belief in the inaccuracies of any particular paragraph in the representation letter would have been ultimately futile?
A Yes.
MR. RYAN: Objection.
A Absolutely.
Q I will ask you to look at a couple other things Mr. Ryan showed you. In particular Exhibit

320. Just because it is closer to the top. Let's look at the second page.
We looked at these notes. We looked at them last week. We looked at them again today. I don't want to belabor the point.
But Mr. Ryan asked you a series of questions. I think he got you to say that yes, footnote F is the only footnote on that page, the second page of Exhibit 16 -- Exhibit 320 that has the word "Graduate" on it, isn't that right?
A That's correct.
Q However, the very next footnote, right below F, and alphabetically consecutive, footnote G has an entry called with the footnote language rather year end shortfall adjustment in an amount of 5.6 million dollars nearly.
Right?
A That's correct. Then it says something at the end about an EPPI bad debt transfer 5.28 million.
Q Those are big numbers?
A I would assume so.
Q If you would have seen a footnote F -- and you were an auditor for a long time at Ernst & Whinney; is that correct?
A That's correct.

Q If in your experience as an auditor you would have seen a footnote F that said Graduate transfer with a big number like 15 million in one footnote, and the footnote right below it said 5.6 million dollar year end shortfall adjustment, would you have asked more questions?
MR. RYAN: Objection.
A Most definitely including the fact that at the end it says EPPI bad debt transfer 5.28. I might have concluded that was a 10 or 11 million dollar issue.
Q And you would have wanted to talk to people inside the accounting information about what not only the Graduate reserve entry was about, but about these other entries as well?
MR. RYAN: Objection.
A Most definitely.
Q That goes for every other footnote essentially that Mr. Ryan just showed you in that even when there was a Graduate entry, there may also have been a shortfall adjustment in a similarly big number; is that right?
MR. RYAN: Objection.
A That's right.
Q We could look through these pages and do it

again. But each time he omitted to note the other shortfall adjustments in the same string of footnotes. Am I right?
A That's correct.
Q And you would have asked questions about all of those footnotes, wouldn't you?
A I believe so.
Q And you think a reasonably prudent auditor doing his job would have done the same thing, am I right?
MR. RYAN: Objection.
A Yes.
Q Look at 1549. This is the 28 million dollar schedule. Am I right?
A It is.
Q It includes a cover page and some roll forwards; is that right?
MR. RYAN: Objection.
A Cover page --
Q And excerpts from roll forwards?
A From trial balances that give trial balances in two points of time.
Q I apologize. Trial balances. And some other memos in there, is that right?
A That's correct.

Q Let's talk about the trial balances.
Let's look at the second page of the document.
Skip about two-thirds of the way down. See something called MA reserve.
Do you see that?
A Yes.
Q It is under account 1201905. And the description is what again?
A MA reserve.
Q And you see that the variance between the current month and the prior month is a neat even 2 million dollars.
Am I right?
A You are right.
Q Let's look back at the cover page.
See the top of the page under Graduate it says MA reserve?
A I do.
Q Same GL account number?
A Yes.
Q And the neat even difference there is 2 million; is that right?
A Yes.
Q We can tie that one, can't we?

A Yes. Generally even adjustments -- even changes like that, particularly if you see a lot of them, are reason to at least ask questions, also.
Q And the question about where this came from might have been asked; is that right?
MR. RYAN: Objection.
A Yes.
Q Let's look at another one. Let's look at the one on page 38849. About two-thirds of the way down, account No. 1201902, it is called other reserves, PFMA, see that?
A Yes.
Q The current month has what balance in that -- in the current month column?
A Zero.
Q What does it have in the prior month?
A A reserve for that issue of 7,050,000 dollars.
Q So 7,050,000?
A Correct.
Q So the variance is --
A 7,050,000 dollars.
Q Magically a reserve that didn't exist current month does in the next?
MR. RYAN: Objection.

A It existed in May, it is gone in June.
Q Thank you for correcting me. But it is just all gone, right?
A Correct.
Q Not hard to see a big jump there?
A Same with the item below.
Q And it is a big number, right?
A Another million 5.
Q Both together are big numbers?
A Yes.
Q Taken separately they are big numbers?
A Yes.
Q Would you have asked questions, if you had seen changes like this?
MR. RYAN: Objection.
Q As an auditor?
MR. RYAN: Objection.
A I would have.
Q Do you think a reasonably prudent auditor would have asked questions as well?
MR. RYAN: Objection.
A Yes.
Q Reviewing these, forgive me, trial balance excerpts?
A Yes.

Q Did anybody at C & L ever come to you and tell you what their position was with respect to whether or not the 50 million dollar Graduate reserve transfers in fiscal year 1997 caused 1997 audited financial statements to be materially misstated?
A No.
Q Would there be more info available on transfer of the 28 million dollars, if you would have looked elsewhere in the general ledger?
MR. RYAN: Objection.
A My thought relative to the entire hundred million was to the extent it all came from the Graduate entities, the Graduate acquisition was a relatively new thing. It only happened for the most part at the end of '97. As an auditor I would have paid particular attention to that transaction.
And if I looked at the one schedule we looked at that showed -- I don't remember the number, 100 million dollars of reserves plus being booked on Graduate and the other column, where they were reduced by some significant number, I think I would have wanted to understand that very detail as to exactly why the hundred were established in the first place and why they were reduced significantly.
Q And I take it from your answer that you

might have done that by looking more at general ledger entries; is that right?

MR. RYAN: Objection.

A That and analysis that were given to me. I think I would have focused a little more on them than it appears was done.

Q And you think -- do you know as you understood the general ledger at AHERF in fiscal year '96 and '97 that additional information could have been gleaned from looking at other general ledger information about the reserve transfers?

MR. RYAN: Objection.

A Particularly the journal entries, yes.

MR. JONES: Let's take a break here and we will come back and finish up.

THE VIDEOGRAPHER: We are off the record. The time is 3:05 p.m.

(Recess taken.)

THE VIDEOGRAPHER: This begins tape 16 of the deposition of Mr. Albert Adamczak. We are back on the record. The time is 3:15 p.m.

BY MR. JONES:

Q Mr. Adamczak, did anyone at Coopers & Lybrand ever share with you how they got comfortable that the 50 million dollar transfer of reserves from

the Graduate Hospitals to the Delaware Valley Obligated Group to boost those hospitals' bad debt allowances fiscal year 1997 did not result in the material misstatement of the fiscal year 1997 audited financial statements?

A No. As a matter of fact, in '98, when this became an issue in and around bankruptcy, I originally became aware that they denied that they knew about it. And that they later maybe admitted that they maybe knew about certain parts of it.

Q Would you like to have had that conversation with somebody at Coopers & Lybrand back at the time of the fiscal year close or audit work with respect to fiscal year '97?

MR. RYAN: Objection.

A It might have given me more comfort in that was one of the items I had apprehension.

Or it might have given me a chance to refute the reasons that they thought that it was appropriate.

Q It might have given you some guidance with respect to their view about any future reserve transfers after the first 50 million, is that fair to say?

MR. RYAN: Objection.

A Yes.

Q You didn't get that guidance, did you?

MR. RYAN: Objection.

A No. As a matter of fact, part of the reason I entered in to the settlement agreement with the SEC were some of these issues. I didn't want to be bothered trying to fight them.

And I didn't know that information. It might have been critical or helpful.

Q I will ask you to look back at Exhibit 43 and 320.

320 should be right there in front of you.

43 shouldn't be far.

43 is the July 3, 1997 memo from Dan Cancelmi to you.

A I found 43. What is 320?

Q 320 is in front of you.

I am sorry for that exercise. Look at 43 briefly, first.

It is indeed the July 3rd memo to you from Mr. Cancelmi regarding reserves utilized to cover bad debt shortfalls and health partners' deficits?

A That's correct.

Q It shows the 28 million dollar shortfall; is that right?

A It does.

MR. RYAN: Objection.

Q We talked about it over the part of a couple days?

A Correct.

Q Look at 320 now. First of all, look at the second page of Exhibit 43.

It has the list of reserves used to cover bad debt shortfall, which it sums here to be about 25 million; is that right?

A Yes.

Q And in coming to that sum, there are a series of Graduate reserves identified.

A Yes.

Q But on top of those right at the top of the chart are a series of other reserves. Is that right?

A That's correct.

Q They aren't Graduate related are they?

A They are not.

Q They are intraDVOG reserves, am I right?

A I believe so.

Q So let's look at Exhibit 320. Look at the second page again. Footnote G where we see the year end shortfall adjustments.

A Yes.

Q And the reference there in the last sentence is to a representation letter of the type that you provided to Coopers & Lybrand in connection with the fiscal year 1997 audit. Right?

MR. JONES: Object to foundation and form.

A Correct.

Q And you were aware of material facts regarding the financial statements of AHERF that you did not disclose to Coopers & Lybrand, right?

A Yes.

Q That is all I have on this document.

Do you recall on June 12th, 1998, attending a meeting with certain AHERF trustees at which Harry Edelman asked about the transfer of reserves?

A No.

As a matter of fact, I think I may have been scheduled to attend that meeting. And at the last minute told it was not necessary for me to attend.

MR. RYAN: Nothing further.

MR. JONES: Nothing further as well.

THE VIDEOGRAPHER: There being no further questions, this deposition is concluded. We are off the record. The time is 4:03 p.m.

THE WITNESS: I will waive signature. I do

not want to read and sign.

---

(Thereupon, at 4:03 o'clock p.m. the deposition was concluded and signature was waived.)

---

CERTIFICATE

COMMONWEALTH OF PENNSYLVANIA, )
) SS:
COUNTY OF ALLEGHENY. )

I, Lance E. Hannaford, do hereby certify that before me, a Notary Public in and for the Commonwealth aforesaid, personally appeared ALBERT ADAMCZAK, who then was by me first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth in the taking of his oral deposition in the cause aforesaid; that the testimony then given by him as above set forth was by me reduced to stenotypy in the presence of said witness, and afterwards transcribed by means of computer-aided transcription.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania, on this ____ day of ________________, 2003.

______________________________
Lance E. Hannaford
Notary Public
In and for the Commonwealth of Pennsylvania
My commission expires October 19, 2006

- - -

I-N-D-E-X

| EXHIBIT: | MARKED: |
|---|---|
| 1595 - | 756 |
| 1596 - | 764 |
| 1597 - | 773 |
| 1598 - | 784 |
| 1599 - | 787 |
| 1615 - | 792 |
| 1616 - | 795 |
| 1617 - | 822 |
| 1618 - | 823 |
| 1619 - | 825 |
| 1620 - | 853 |
| 1621 - | 855 |
| 1622 - | 861 |
| 1623 - | 862 |
| 1624 - | 863 |
| 1625 - | 879 |
| 1626 - | 900 |
| 1627 - | 908 |

EXHIBITS IDENTIFIED FROM PREVIOUS DEPOSITIONS:

8 - 4-14-97 memo to Mr. Spargo
17 - 3-16-98 letter to Mr. Dionisio
20 - 10-30-96 letter to Mr. Martin
39 - May financial statement adjustments

**Allyn Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *HENRY ALLYN*

*December 11, 2003*

---

*LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

ALLYN, HENRY

LEGALINK
A WORDWAVE COMPANY

Q. Good afternoon, Mr. Allyn.
A. Good afternoon.
Q. We met a while back. Again, I'm John Unice. I am here for the plaintiff in this case, the Creditors Committee of AHERF. I have some follow-up questions to which you and Mr. McDonough already talked about today. I'll keep my questioning as brief as I can. If you need to take a break before I'm done, just let me know, and I'll let you do that, of course, and if you have any questions about my questions and don't understand one of them or can't hear one of them, I would ask that you let me know that so we can communicate better. Okay?
A. I'll be glad to.
Q. All right. Early on in your testimony, you explained your understanding of your role as a trustee, and I think you said a couple things. One being to approve or turn down proposals provided by management and to approve or deny promotions also brought forth by management. Do you generally recall that testimony?
A. Yeah.
Q. Now, at AHERF -- let's talk about your function

at AHERF first for a while now.
Do you recall as a board member being called upon at the end of each fiscal year to approve the financial statements of the enterprise as presented by management and audited by Coopers & Lybrand?
A. Yeah, that was -- I mean, sure. Annual responsibility, if you will.
Q. Can you recall when for AHERF that responsibility was discharged? What time of year?
A. No, I don't know when. Whenever AHERF started, I guess.
Q. Okay. We can get to that in a minute.
Explain to me, if you can, your general recall of how the process of approving the financial statements occurred at AHERF?
A. The financial statements, as I recall it, were presented by the chief financial officer to the finance committee who reviewed them at a committee meeting, and eventually if they were approved, they came to the board, and in those cases, usually Sherif had David McConnell present them.
Q. Let's talk about the 1996 time frame for a

moment and the fiscal year 1996 financial statements.
Can you recall anything specific, more than what you just relayed to me, about your involvement in the approval of the 1996 financial statements?
A. I don't recall anything peculiar about it.
Q. And the same question with respect to the fiscal year 1997 financials. Beyond your general description of how you understood the process to work, can you recall any other involvement that you had in approving those financial statements?
MR. MCDONOUGH: Well, I object to form. There's no foundation that he was a member of the board when the '97 financial statements were presented.
THE WITNESS: Well, '97 -- I mean, I wasn't present, you say? I was a board member, was I not? No. The year '97, yeah, that terminated in June, didn't it?
MR. MCDONOUGH: Well, yes.
THE WITNESS: Fiscal year.
MR. MCDONOUGH: Yes, Mr. Allyn, but my objection is based on the fact that the

audited opinion for those financial statements was not rendered until the end of January or early February of 1998.
THE WITNESS: I see. I got you.
BY MR. UNICE:
Q. Let's do this: Let me hand you an exhibit, and I'm going to change my question once I do that, because I think this will clear up a little bit of confusion.
You may already have it, but just to save time, Exhibit 1655 are the minutes of the 10-30-97 AHERF board meeting. I do note that you were listed as a member absent at that meeting?
A. That's right.
Q. Turn to the page ending in the number 71630.
A. Yeah.
Q. At the top of that page, there's a section titled Report from the Audit Committee, and then a subsection titled Report on Fiscal Year 1997 Audited Financial Statements and Related Reports for AHERF. Do you see that?
A. I do.
Q. Okay. I don't want to belabor the point since you weren't physically present at this meeting.

Okay?
A. I understand.
Q. My question is do you recall any discussions with board of trustee members in the fall '97 time frame regarding the process that was used to approve the 1997 financial statements presented for audit?
A. No.
Q. Okay. You mentioned towards the end of your discussion with Mr. McDonough about the receipt of a clean opinion at AHERF on the financial statements?
A. I didn't hear the question properly. I'm sorry.
Q. Do you recall mentioning to Mr. McDonough towards the end of your discussion with him that you didn't recall receiving anything other than a clean opinion on the financial statements?
A. That's right.
Q. What's a clean opinion in your understanding?
A. Well, in my layman's terms --
Q. That's all I'm asking for.
A. -- there is normally a sentence in the outside auditor's opinion of the figures that have been

presented by management that states that they, the outside auditors, feel that the information was properly presented, and that in their opinion, it meets the standards of the -- what do you call that outside auditing -- the Big Eight group. Now it's Big Four, perhaps. I ought to be able to quote the darn thing by memory, but I can't, but it states, in effect, that we feel that the figures that are here which management gave us and which we reviewed substantially and correctly present the condition of the corporation, hospital, whatever it is.
Q. As an external trustee to an organization like AHERF, can you tell me what significance you placed upon receiving such a clean opinion as you described it?
A. I'm not quite sure what you're driving at, but if we didn't want an opinion, be it clean or otherwise, we wouldn't hire outside auditors.
Q. Let me ask it a different way.
What was your reaction, if you can recall, at AHERF when you received clean opinions from the auditors?
A. I felt satisfied.

Q. Why is that?
A. That the books were in good shape.
Q. And was that important to you as a trustee?
A. You're darn right.
Q. Why?
A. Because it's one of our responsibilities to be satisfied that we're doing business legally, et cetera.
Q. And if you received an unclean opinion, would that concern you as a trustee to a non-profit organization?
A. Yes, indeed.
Q. Why is that?
A. I guess the answer I gave to the previous question you didn't listen to.
Q. So it's the same response?
A. No, not the same response.
If I got an unclean answer from the outside auditors, you wouldn't even have an annual report, because somebody would make sure that they looked into this and found out what was wrong.
Q. In your board service on other entities -- forget AHERF for a minute.
A. Okay.

Q. -- did you ever come across an auditor's report that issued an unclean opinion?
A. I don't believe so.
Q. Skipping back now to your service on AHERF, can you recall for me how you as an external trustee used the audited financial statements, if at all, to discharge your duties for the organization?
A. Well, we used it as a basis -- speaking for myself.
Q. That's all I'm asking for.
A. -- of feeling assured that the figures that had been presented by management and audited by the outside auditors were confidence inspiring that the organization was in good shape.
Q. Would you use the year-end financial statements to help you as a trustee guide and assess how management was doing in implementing its business plans?
A. In relation to the business plan you're saying?
Q. Yes. Yes.
A. Yeah, sure.
Q. Can you recall any other ways in which you as a trustee would use the audited financial statements to discharge your duties?

A. I don't think so.
Q. Now, during your service on the AHERF board, am I right in assuming that you also received, on a quarterly or thereabout basis, internal financial statements that were not audited by the auditors; is that right?
A. Yes.
Q. At any time during your board service for AHERF, do you recall seeing any significant difference in the year-end financial statements when compared to one of the earlier interim reports you received from management that were not audited?
A. When you say significant difference, what do you mean by that? The figures, of course, change every year.
Q. Well, did you see anything in -- can you recall seeing anything in the audited financial statements that gave you cause to doubt the accuracy of the information that you were receiving on a quarterly basis from management?
A. No, I did not.
Q. At any time during your service on the AHERF board, do you recall ever doubting the accuracy of the audited financial statements that you

received at fiscal year end?
A. No.
Q. Do you recall any other trustees expressing to you any doubts they may have had with the accuracy of those statements?
A. No.
Q. Now, you mentioned a moment ago that in your understanding, the external auditors would review the financial statements prepared by management, and then issue a report on those statements and issue that to ultimately the full board, is that right?
A. Yes. They'd issue an opinion.
Q. An opinion?
A. Yeah.
Q. What other expectations did you have of the external auditors -- and let's just focus now on those that were employed by AHERF -- with respect to presentation of financial statements?
A. Well, I may be wrong, but I don't think we hired Coopers & Lybrand to do anything but auditing.
Q. And aside from assessing those statements, did you have any other expectations of them in

terms of their performance of those duties beyond what you've already talked to me about?
A. Well, I guess I'd have to say that my expectation of them was that they were an honest firm and they'd tell us the facts as they saw them.
Q. You were asked many times today whether or not you could recall AHERF engaging outside consultants to assess at the outset of an endeavor whether or not management should proceed with that endeavor as well as whether or not, after that endeavor, AHERF acquired consultants to assess the success of those efforts. Do you remember generally those questions about consultants?
A. Oh, I remember very clearly.
Q. Okay.
A. I may not remember anything else about Mr. McDonough, but I'll remember that.
Q. Okay. Do you remember, specifically yourself now, ever thinking personally that management should, in fact, engage consultants when it did not do so?
A. No.
Q. Did any other trustee express to you a belief

that management should engage consultants when, to your recall, management did not do so?
A. No, I don't recall.
Q. I think you were also asked whether or not AHERF engaged consultants to assess how the various hospitals it acquired were doing post acquisition. Do you recall those lines of questions?
A. You mean the individual affiliates that we acquired?
Q. Yeah, I do.
A. I think I answer that question.
Q. Correct me if I'm wrong, but I thought, for example, you were asked whether or not management, after the acquisition of United, retained outside consultants to assess how the United Hospitals were doing? You don't recall that testimony?
A. I recall the question. I think I said I did not remember that we ever thought of doing so.
Q. That's right.
Do you know whether anyone employed by AHERF was charged with assessing how the hospitals it acquired were doing post acquisition?

the column titled Consolidated AHERF, do you see that?
A. Right.
Q. The last column?
A. Yes.
Q. And there's a reported gain of $6.5 million before Extraordinary Item and Change in Accounting Principles, do you see that?
A. Yes.
Q. Does that refresh your memory at all as to how it was reported the AHERF organization was doing overall at fiscal year end '96?
A. Well, that gave us enough income as of the end of June 30 of '96, yes.
Q. Do you recall any discussions at board meetings about AHERF's reported positive net income before extraordinary item in that time frame?
A. I don't recall any specific discussion of that figure.
Q. That's all for that one.
A. Okay.
Q. The next one, sir, I give you is Exhibit 58.
A. Um-hum.
Q. And these are the audited financial statements for AHERF as of 6-30-97.

A. Um-hum.
Q. Again, do you recall in your board service at AHERF receiving the year-end report -- year-end audited financial statements for 1997?
A. I don't specifically remember receiving it, but I'm sure I did.
Q. Well, let me put you -- I want to make sure we're on the same page here.
The audit report, as Mr. McDonough referenced earlier, was not issued until February 1998, early February.
A. I doubt that it was sent to me.
Q. Okay. I don't want to ask you questions about something that you've never seen before, so let's just put that aside.
You mentioned early on today your service on other for-profit boards of trustees. I don't think you were asked what other non-profit boards you served on, if any, besides AHERF. Could you tell me what that answer is?
A. I served for a number of years on the board of trustees of Allegheny Trails Council Boy Scouts. I served on the board of trustees and then later the session of the Presbyterian

church to which I belong in Sewickley, Pennsylvania. There may have been others, but they don't come to mind, just at the moment they don't.
Q. And on any of those non-profit organizations, did you ever serve on what would be similar to AHERF's audit committee?
A. No. Well, I'm trying to think whether we have an internal audit committee at the church. I don't think we do, but I served on the board of trustees which at that point in time -- in fact, I was chairman of it -- acted as the financial organization of the laymen in the church responsible for its financial condition and insurance of its properties and all that sort of stuff.
Q. In that role, did you work with any external auditors, if the church had any?
A. Yes, to the extent that I think in the church we got an annual report from external auditors, and I'm sure we got an audited report, although I wasn't on an audit committee as such, of the Boy Scouts.
Q. In any of your non-profit board service outside of AHERF, did you ever run across a situation

where an external auditor came to that organization's board with concerns about the integrity of that organization's management?
A. No.
Q. The same question with respect to your service on for-profit organizations' boards. In that context, do you recall any auditors coming to your attention -- calling to your attention any concerns with that organization's upper management?
A. No.
Q. You spoke earlier today about the changes in government funding from Medicare and Medicaid, and I think you were shown a document outlining potential impact on AHERF.
A. Um-hum.
Q. Do you remember doing that?
In your board service at AHERF, do you recall discussing with other trustees what impact those changes would have on AHERF's competitors here in Pittsburgh?
A. No.
Q. During your board service, do you recall any discussions with trustees of AHERF about what impact government cutbacks would have on

AHERF's eastern region competitors?
A. For AHERF's what?
Q. Eastern region competitors in Philadelphia.
A. No.
MR. UNICE: Could you mark this the next exhibit? Thanks. That's 2135.
- - - -
(Exhibit 2135 marked for identification.)
- - - -
BY MR. UNICE:
Q. You've been handed Exhibit 2135. It's a three-page letter from Coopers & Lybrand addressed to the board of trustees of AHERF dated September 22, 1997. It bears Bates Nos. DBR-LI 62868 through 70.
Mr. Allyn, take a moment to look at this document, and let me know if you've ever seen it before today.
A. Okay.
Q. Do you recall receiving this document during your board service at AHERF?
A. No.
Q. Do you recall ever seeing this before today?
A. I don't know whether I did or not to tell you the honest truth.

Q. Okay. I'm going to ask you one question about the second page of this document.
A. All right.
Q. There's a section -- well, first of all, am I right in characterizing this letter as a letter that's required to be sent to the board by the AICPA of Coopers & Lybrand?
A. That's my understanding.
Q. Now, on the second page there's a section titled Errors, Fraud or Legal Acts. Do you see that?
A. Um-hum.
Q. And it states, Our audit includes procedures designed to provide reasonable assurance of detecting errors, irregularities and illegal acts which are material to the financial statements. During our audit, no such matters came to our attention. Do you see that?
A. Right.
Q. Did I read that right?
A. Yes.
Q. Is that consistent with what you expected as a board member of the external auditor in terms of the things the auditors report to the board if necessary?

A. Well, yes. As a matter of fact, this is a somewhat fuller than normal clean opinion in my book.
Q. Would you expect the auditors to report to the board if during the course of their audit work they discovered what they thought to be material misstatements in the financial statements prepared by management?
A. Certainly.
Q. Would you expect the auditors to report to the board if they discovered in the course of their audit work intentional mistatements in the financial statements?
A. Sure.
Q. Would you expect the auditors in the course of their audit work to report to the board if they discovered what they believed to be fraud in the preparation of financial statements?
A. Certainly.
Q. During your service on the AHERF board, were any such concerns as I listed to you reported to the board to your recollection?
A. Would you say the question again?
Q. Yeah. That was poorly phrased.
During your board service, do you

recall Coopers & Lybrand ever coming to the board with concerns about intentional misstatements in the financial statements?
A. No, I do not.
Q. Do you recall them bringing concerns with respect to material misstatements in the financial statements?
A. No.
Q. Or with respect to suspected fraud in the financial statements?
A. No, I do not.
MR. UNICE: That's all I have.
MR. MCDONOUGH: Mr. Allyn, I have a few follow-up points, but do you mind if we change seats again?
MR. UNICE: Not at all.
MR. MCDONOUGH: Because I can talk to his good ear.
THE WITNESS: I have my wife's approval to stay anyhow.
MR. MCDONOUGH: Well, I'm sure your wife is anxious to get you home.
THE WITNESS: Only because we have a dinner date. No problem.
- - - -

EXAMINATION

- - - -

BY MR. MCDONOUGH:

Q. Just a couple areas, Mr. Allyn, based upon your answers to Mr. Unice.

He asked you if you would use the year-end audited financial statements to assess where management was in the operations of AHERF, and you indicated, I believe, that you would look at the year-end statements?

A. Yes.

Q. Okay. Is it true, Mr. Allyn, that you actually got financial statements -- internal interim financial statements showing where management was all the way throughout the year?

MR. UNICE: Objection. Asked and answered.

A. Well, we got the management reports at each of our quarterly board meetings.

Q. Yeah. That's what I'm --

A. And that was sort of a status report, if you want, about the statistics and so on.

Q. Yeah, that's what I'm referring to, that ever quarter, am I correct, management would provide financial statements indicating the performance

of the organization and its subsidiaries?

A. That's correct.

Q. Okay. And management would also provide, am I correct, annual statements at the end of the year?

A. Yeah.

Q. Okay. And so the audited statements that you received were just one aspect of the financial information that a board member received on an ongoing quarterly basis in connection with the trustee's service as a member of the AHERF board?

A. I think that's a fair statement.

Q. Now, with respect to the auditor's opinion that was on the audited statements --

A. Um-hum.

Q. -- I think you covered this in your answer, but I want to come back to it just to nail it down. Whose financial statements are being opined on by the outside auditors?

A. The statements which are furnished by management to the outside auditors.

Q. Okay. So am I correct, Mr. Allyn, that the outside auditors don't prepare the financial statements?

A. No. They shouldn't.

Q. And they don't prepare every ledger entry or every internal audit -- I'm sorry, every internal accounting entry made by any organization, do they?

A. I don't think they should, and I'm sure they didn't in our case.

Q. Now, Mr. Allyn, did the Pittsburgh & Lake Erie Railroad have outside auditors?

A. Yes.

Q. Just out of curiosity, who were they?

A. I wish you hadn't asked me. We changed them. I think for years we had Coopers & Lybrand. They also audited Penn Central, our parent company, but we had outside stockholders, so the minute the bankruptcy occurred, we changed auditors, and I think they went on -- I may be wrong, it may not have been Coopers, and I think we at that time went to PriceWaterhouse.

Q. Okay. Now, in your years in management of the Pittsburgh & Lake Erie Railroad, did you ever yourself observe any dissatisfaction with the level of service provided by Coopers & Lybrand?

A. No.

Q. How about PriceWaterhouse?

A. No.

Q. Now, when you were in senior management of the Pittsburgh & Lake Erie Railroad, was it management's, that is to say, your financial statements that were delivered for audit?

MR. UNICE: Object to form.

A. Yeah, delivered by our management. Yeah.

Q. Did you as part of management understand that it was your responsibility to provide honest and complete financial statements for review by the auditors?

A. Oh, yes, absolutely.

Q. Did you recall, Mr. Allyn, that you were even required to sign what are called representation letters indicating that you believed the statements -- the financial statements submitted for audit to be true and correct in all material respects?

A. I think I had to sign off on them every year, yeah.

Q. Now, in all of your experience in profit companies and in not-for-profit companies -- strike that, Mr. Allyn.

Let me ask it this way: You were asked about your expectations of the Coopers &

Lybrand firm in connection with their audits of AHERF, and you said you expect -- your expectation was that they would be an honest firm that would tell us the facts as they saw them?

A. Yes.

Q. Okay. Did you ever have any reason to believe your expectation was not met by Coopers & Lybrand?

A. Not while I served on the board.

MR. MCDONOUGH: Thank you. That's all I have.

THE VIDEOGRAPHER: With there being no further questions, that concludes today's deposition. Thank you.

\- - - -

(The proceedings were concluded at 3:28 p.m.)

\- - - -

COMMONWEALTH OF PENNSYLVANIA ) CERTIFICATE
COUNTY OF ALLEGHENY ) SS:

I, JoAnn M. Brown, RMR, CRR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, HENRY ALLYN, was by me first duly sworn to testify to the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to printing under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that the inspection, reading and signing of said deposition were NOT waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 16th day of December, 2003.

____________________________
Notary Public

COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
COUNTY OF ALLEGHENY ) S H E E T

I, HENRY ALLYN, have read the foregoing pages of my deposition given on Thursday, December 11, 2003, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line Should Read Reason for Change

In all other respects, the transcript is true and correct.

____________________________
HENRY ALLYN

Subscribed and sworn to before me this ________ day of ______________, 2003.

____________________________
Notary Public
AKF Reference No. JB78599

**Antol Dep.**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION & RESEARCH FOUNDATION

Plaintiff,

vs.

PRICEWATERHOUSECOOPERS, LLP,

Defendant.

Case No. 00-684

- - - - -

Videotape deposition of SARA ANTOL, called for examination under the Applicable Rules of Federal Civil Procedure, taken before me, Wendy L. Klauss, a Notary Public in and for the State of Ohio, at the offices of Jones Day, 500 Grant Street, Suite 3100, Pittsburgh, Pennsylvania, on Wednesday, November 5, 2003, at 9:33 o'clock a.m.

- - - - -