Sara Antol

Page 6

1    Q.  I would just like to go over a
2 couple of deposition basics with you.
3 Presumably you are familiar with many of them,
4 but a couple key ones, if you don't understand
5 any question that I ask, please just ask me to
6 repeat it.  I ask that you please give
7 responses and yes and no and not shakes of the
8 head or nods or things like that for the sake
9 of the record, and if you at any point need to
10 take a break, just holler and we will take a
11 break.
12      Ms. Antol, where did you get your
13 undergraduate degree from?
14    A.  Indiana University of Pennsylvania.
15    Q.  And when was that?
16    A.  1983.
17    Q.  And where did you get your law
18 degree from?
19    A.  University of Pittsburgh.
20    Q.  And that was when?
21    A.  1990.
22    Q.  And then following your graduation
23 from the University of Pittsburgh Law School,
24 where did you first become employed?
25    A.  Babst Calland Clements and Zomnir.

Page 7

1    Q.  And when did you leave Babst
2 Calland?
3    A.  1997.
4    Q.  And where did you go from there?
5    A.  Tollgrade Communications.
6    Q.  And is that where you are today?
7    A.  Yes.
8    Q.  And what is your position there?
9    A.  I'm general counsel.
10    Q.  Okay.  When you were at Babst
11 Calland, what kind of work did you do there?
12    A.  General corporate, business law.
13    Q.  Okay.  And I understand at some
14 point while you were at Babst Calland, you
15 represented a woman named Carol Calvert; is
16 that correct?
17    A.  Yes.
18    Q.  When did you first hear of Ms.
19 Calvert?
20    A.  I don't remember the exact date.
21    Q.  Ballpark?
22    A.  I guess -- I think that was in
23 1994.
24    Q.  Was it before you represented her?
25    A.  No, not much.  Maybe a day or two

Page 8

1 before I represented her.
2    Q.  And how did you hear of her?
3    A.  It was a referral through another
4 attorney in the firm.
5    Q.  And his name?
6    A.  Jim Ummer.
7    Q.  And do you recall what Mr. Ummer
8 told you about the representation?
9      MR. DOUGLASS:  Well, again I'm
10 going to instruct the witness to be careful not
11 to disclose any privileged information.  This
12 whole deposition is a difficult deposition
13 given that Ms. Antol represented Carol Calvert,
14 and any discussions that you inquire into with
15 counsel from Babst Calland or with Ms. Calvert
16 it seems to me are privileged.
17      MR. WIERS:  I would also like to
18 add for the record that Ms. Calvert has
19 recently pled guilty to federal tax evasion for
20 not paying taxes on the $300,000 consulting
21 agreement negotiated by Ms. Antol, and we
22 believe that all conversations related to this
23 representation may fall under the crime fraud
24 exception privilege.  I just want to note that
25 for the record.  Do you still wish to invoke

Page 9

1 your privilege?
2      MR. DOUGLASS:  Yes.
3    Q.  What was the scope of your firm's
4 representation of Ms. Calvert as you understood
5 it?
6    A.  It was surrounding the settlement
7 matter relating to her termination of her
8 employment.
9    Q.  And termination of her employment
10 from where?
11    A.  It was one of the entities that was
12 part of the AHERF group.  I don't remember the
13 exact one.  I think she was CEO, president of
14 that entity.
15    Q.  And who was she claiming caused her
16 emotional distress?
17      THE WITNESS:  Can I answer that?
18      MR. DOUGLASS:  If you want to show
19 her documents that may -- to the extent you are
20 asking her for privileged information in terms
21 of communications with her client, she can't
22 disclose that.
23      MR. WIERS:  And I will certainly
24 get to that.  I'm just trying build up some
25 facts before we dive into it.

3 (Pages 6 to 9)

Sara Antol

---

**Page 10**

1    Q.   At any point did you become aware
2  of why Ms. Calvert chose Babst Calland for this
3  representation?
4    A.   I don't recall why. I knew that
5  Mr. Ummer knew her.
6    Q.   Have you ever heard of a gentleman
7  by the name ever David McConnell?
8    A.   I have heard of him, yes.
9    Q.   And who is Mr. McConnell?
10    A.   I think he was the CFO of AHERF or
11  in the financial department there.
12    Q.   Do you know if Babst Calland ever
13  represented Mr. McConnell?
14    A.   I do know that they did, yes.
15    Q.   And do you know if Mr. McConnell
16  referred Ms. Calvert to Babst Calland?
17    A.   I don't know that.
18    Q.   Did you ever have an opportunity to
19  discuss Ms. Calvert with Mr. McConnell?
20    A.   No. I have never met him.
21    Q.   Did anyone from Babst Calland work
22  with you on the Carol Calvert representation?
23    A.   Yes. Jim Ummer some, and Mark
24  Shepard.
25    Q.   And was Mark Shepard your senior or

---

**Page 11**

1  your junior?
2    A.   Senior.
3    Q.   Do you know who paid Ms. Calvert's
4  legal fees?
5    A.   In looking through the documents
6  that were produced, I see that it looks as if
7  AHERF paid them, but I really didn't remember
8  that until I saw it in the documents.
9       MR. WIERS: I would like to
10  introduce as Exhibit 2169 a document that is
11  Bates stamped CLC 00013 through 17.
12       - - - - -
13       (Thereupon, Deposition Exhibit 2169
14       was marked for purposes of
15       identification.)
16       - - - - -
17    Q.   Do you recognize this document, Ms.
18  Antol?
19    A.   Again I saw it in the documents
20  that were produced by Babst Calland.
21    Q.   And could you identify for me what
22  this document is?
23    A.   It is a bill for services.
24    Q.   And does it break down the services
25  at all?

---

**Page 12**

1    A.   Apparently, yes.
2    Q.   Did you keep time when you were at
3  Babst Calland?
4    A.   Yes.
5    Q.   And was it your practice to be as
6  accurate as possible?
7    A.   Yes.
8    Q.   Are you familiar with a man named
9  that Sherif Abdelhak?
10    A.   Yes.
11    Q.   And how do you know him?
12    A.   I knew him purely through this
13  issue. I believe that Carol Calvert reported
14  to him at the time before her employment was
15  terminated.
16    Q.   So he was Ms. Calvert's superior at
17  AHERF?
18    A.   Yes, I think so.
19    Q.   And did you have an opportunity to
20  speak with Mr. Abdelhak as part of your
21  representation of Ms. Calvert?
22    A.   I believe, yes, he may have been a
23  telephone conversation.
24    Q.   And do you recall when you first
25  spoke with him?

---

**Page 13**

1    A.   I don't. I don't recall.
2    Q.   I am going to introduce -- well,
3  firstly, let me go back to this document we
4  just marked.
5       The first line references a
6  telephone conference with Mr. Abdelhak and
7  Carol Calvert. Do you recall what that was
8  about?
9       This was with Mr. Ummer. Did he at
10  any point discuss with you that conversation?
11       MR. TERUYA: Objection.
12       MR. DOUGLASS: Yeah, I mean why
13  don't you break it down. If you are asking her
14  did she participate in the conversation,
15  obviously that conversation would not be
16  privileged. If you are asking her if she had
17  discussions with Mr. Ummer concerning that
18  conversation, that would be privileged.
19       MR. WIERS: Right.
20    Q.   Did you participate in that
21  conversation?
22    A.   I don't recall.
23       MR. WIERS: I'm going to
24  introduce -- I would like to introduce Exhibit
25  2170. It is a letter dated February 15, 1996

---

Sara Antol

Page 14

1    with Bates range CLC 0050 through 52.
2              - - - - -
3         (Thereupon, Deposition Exhibit 2170
4         was marked for purposes of
5         identification.)
6              - - - - -
7    Q.   Do you recognize this document?
8    A.   Yes.
9    Q.   And what is this?
10   A.   This was a letter we put together
11   to send to AHERF, Mr. Abdelhak, in connection
12   with potential claims that Carol Calvert had
13   against them.
14   Q.   And did you write it?
15   A.   You know, I can't recall if I wrote
16   it or if it was written by others, Mr. Ummer --
17   Q.   But someone at Babst calland wrote
18   it?
19   A.   Yes, someone at Babst Calland wrote
20   it.
21   Q.   And is that your signature there on
22   both the first page -- well, just on the first
23   page?
24   A.   Yes, it is.
25   Q.   If I can direct your attention to

Page 15

1    the first line, it says, "Please find enclosed
2    a draft of the letter we discussed." Does that
3    refresh your recollection that you may have had
4    a conversation with Mr. Abdelhak early on?
5    A.   It looks like if we did, but I really
6    don't recall the conversation.
7    Q.   This document looks to be a draft
8    demand letter. Is that what it looks like to
9    you?
10   A.   Yes, it does.
11   Q.   Was it your practice to send draft
12   demand letters?
13   MR. DOUGLASS: Objection. Was it
14   her practice in what context? I'm not sure I
15   understand the question.
16   Q.   How many demand letters would you
17   say you sent during your time at Babst Calland?
18   A.   Probably very few.
19   Q.   Very few. And do you recall of
20   those very few how often you would send a draft
21   before you would send a final?
22   A.   That probably -- I don't recall
23   ever doing it other than this time.
24   Q.   And do you recall why you did it
25   this time?

Page 16

1         MR. DOUGLASS: Again, you can
2    answer to the extent you are not violating the
3    attorney-client privilege.
4    A.   I believe we did that more as a
5    courtesy to alert Mr. Abdelhak to the fact this
6    letter would be coming.
7    Q.   Do you recall if Mr. Abdelhak asked
8    that you draft it?
9    A.   I don't recall that. I mean if he
10   did, I didn't know that.
11   Q.   And do you recall if he responded
12   to this letter at all with any comments?
13   A.   No.
14   Q.   Do you recall if you waited to
15   finalize the demand letter until you heard Mr.
16   Abdelhak's reaction to the draft letter?
17   A.   I don't.
18   MR. WIERS: I would like to
19   introduce Exhibit Number 2171, and this is a
20   letter dated February 15, 1996. It is Bates
21   stamped PR-PLD 062-02251 through 52.
22             - - - - -
23        (Thereupon, Deposition Exhibit 2171
24        was marked for purposes of
25        identification.)

Page 17

1              - - - - -
2    Q.   Do you recognize this letter?
3    A.   Yes.
4    Q.   And what is this?
5    A.   It looks like the demand letter
6    that was actually sent.
7    Q.   Is that your signature at the end?
8    A.   Yes, it is.
9    Q.   Do you recall if Mr. Abdelhak
10   responded to this final draft or this final
11   version of the letter?
12   A.   I mean I'm sure he responded,
13   because we went on to negotiate a settlement
14   agreement, but what that response was, I don't
15   recall specifically.
16   Q.   So his response led to a
17   negotiation?
18   A.   Well, I mean a negotiation happened
19   and we did a settlement agreement, but I don't
20   remember what his response to this specific
21   letter was.
22   Q.   Was the settlement negotiation face
23   to face?
24   A.   No.
25   Q.   Or over the phone?

5 (Pages 14 to 17)

Sara Antol

Page 18

1     A.   It was over the phone.
2     Q.   And do you recall who was on that
3  phone call?
4     A.   I know Sherif Abdelhak was, but I
5  don't recall if anyone else was.
6     Q.   Do you recall if there was anything
7  said about Ms. Calvert's claims during the
8  telephone negotiation, the validity of her
9  claims?
10        MR. TERUYA:  Objection.
11     Q.   Go ahead and answer.
12     A.   You know, I really don't recall
13  specific discussions about that.  I mean as I
14  recall it, I think --
15        MR. DOUGLASS:  I'm just going to
16  object to the extent that I'm not sure we even
17  have a context for who was involved in this
18  conversation.  We know it was a telephone call.
19  Do we know who was on the call, what the
20  context of the call was?
21        MR. WIERS:  Well, I think we just
22  established that Ms. Antol and Mr. Abdelhak
23  were on the call, and I asked her if anyone
24  else was on the call and she said she didn't
25  recall.

Page 19

1        MR. DOUGLASS:  I'm missed that.
2  I'm sorry.
3     Q.   Do you recall if Ms. Calvert was on
4  the call?
5     A.   I don't recall whether she was or
6  not.
7     Q.   And the call was to -- the purpose
8  of it was to negotiate a settlement?
9     A.   Right.
10     Q.   What do you recall generally about
11  the call?
12     A.   Unfortunately, not much.  That was
13  a long time ago.  I mean I guess when I see
14  that we did a settlement agreement, it looks
15  like we probably discussed settling.
16        I mean I recall that -- I mean you
17  asked if there was much discussion of claims.
18  I don't recall that.  I think the discussions
19  probably started at the point where the parties
20  were willing to settle.  So how that came to
21  be, I don't know, but my recollection was that
22  it really went from a letter to settlement
23  discussions without much in between that I knew
24  of anyway.
25     Q.   Okay.  And you don't recall

Page 20

1  anything today, any discussions about the
2  validity of her claims?
3     A.   No, I don't.
4     Q.   And do you recall if at any point
5  anyone mentioned if Ms. Calvert had seen a
6  therapist or a doctor of any kind?
7        MR. DOUGLASS:  Any discussions with
8  Mr. Abdelhak about that?
9     Q.   Right, during this same telephone
10  call?
11     A.   No, I don't recall that.
12     Q.   During this same telephone call,
13  was anything said about the relationship
14  between Mr. Calvert and Mr. Abdelhak?
15        MR. DOUGLASS:  Mr. Calvert?
16     Q.   Ms. Calvert.  Excuse me.
17     A.   Again I really don't recall whether
18  that was discussed.
19     Q.   How about the relationship between
20  Ms. Calvert and Mr. McConnell?
21     A.   I don't recall that.
22        MR. WIERS:  I would like to
23  introduce Exhibit 7172, which --
24        MR. DOUGLASS:  You have had a lot
25  of exhibits in this case.

Page 21

1        MR. WIERS:  Yes, we have.  We were
2  just discussing we actually have had another
3  run up in the 4000s that were not included in
4  the 21.
5        Which is an agreement dated on the
6  15th of January between AHERF and Ms. Calvert.
7  It is Bates stamped AMS6 000153.
8        MR. DOUGLASS:  The 15th of January?
9        MR. WIERS:  15th of February.  I'm
10  sorry.  At the same time I would like to
11  introduce Exhibit 2173, which is Bates stamped
12  PR-PLD 062-02249.
13        - - - - -
14        (Thereupon, Deposition Exhibits
15        2172 and 2173 were marked for
16        purposes of identification.)
17        - - - - -
18     Q.   Turning first to Exhibit 2172, do
19  you recognize this document, Ms. Antol?
20     A.   Yes.
21     Q.   And what is this?
22     A.   It is the final settlement
23  agreement.
24     Q.   And were you present when it was
25  signed?

Sara Antol

Page 22

1    A.   I was present when Carol Calvert
2  signed it, but not when Sherif Abdelhak signed
3  it.
4    Q.   And do you recall that, that
5  specific event happening?
6    A.   I don't recall the specific event
7  happening, no.
8    Q.   But you recall that you were not
9  there when AHERF signed it?
10   A.   Right.
11   Q.   And is that your signature on the
12 last page there?
13   A.   Yes.  As a witness, yes.
14   Q.   And Exhibit 2173, do you recognize
15 this document?
16   A.   Yes.
17   Q.   And what is this?
18   A.   It was the release that went along
19 with the settlement agreement.
20   Q.   And were you present when this was
21 signed?
22   A.   Yes.
23   Q.   And is that your signature on the
24 bottom?
25   A.   Yes, it is.

Page 23

1    Q.   Okay.  Turning to Exhibit 2172,
2  what are the -- do you recall what the terms of
3  this agreement were?
4    A.   Only by reading it.
5    Q.   And by reading it, can you tell me
6  what the terms of it were?
7          MR. DOUGLASS: Well, again, I'll
8  object and say the document speaks for itself.
9          You are asking her to read the
10 document and summarize for you the terms of it?
11         MR. WIERS: I would just like to
12 get the terms of the document -- of the
13 settlement on the record.
14         MR. DOUGLASS: The document is on
15 the record.  The document is an exhibit.  If
16 you want to ask her specific questions about
17 specific terms, I think that would be fair.  If
18 you are going to ask her to summarize the terms
19 of the settlement --
20         MR. TERUYA: Fair enough.
21   Q.   Do you recall how the terms were
22 arrived at?
23   A.   I think through conversations with
24 Mr. Abdelhak, but I don't specifically remember
25 them.

Page 24

1    Q.   Right.
2    A.   And I do believe that AHERF
3  generated the document in draft.  So there may
4  have been some terms that were contained in
5  that document as well.
6    Q.   And do you recall that Ms. Calvert
7  was paid $1.6 million?
8    A.   I know that's what the agreement
9  provided for.  Whether she was actually paid, I
10 guess, is another question.
11   Q.   Do you recall if Mr. Abdelhak
12 seemed to be in a hurry to settle this matter?
13         MR. DOUGLASS: Object to form.  You
14 can answer.
15         MR. TERUYA: I'll object as well.
16   A.   I don't really know what that
17 means.
18   Q.   Did he appear eager to settle?
19         MR. TERUYA: Objection.
20         MR. DOUGLASS: Objection.
21   A.   I mean he was willing to settle.
22   Q.   Did you push him for more money --
23         MR. TERUYA: Objection.
24   Q.   -- do you recall?
25   A.   I don't recall.

Page 25

1    Q.   And I believe you said that AHERF
2  actually drafted these agreements?
3    A.   Yes, I believe they did.
4    Q.   Do you recall who initially came up
5  with the $1.6 million figure?
6    A.   I don't recall.
7    Q.   And you don't recall if that was
8  the figure that was the result of back and
9  forth?
10   A.   I really don't recall that, no.
11         MR. WIERS: I would like to
12 introduce Exhibit 2174.  This document is Bates
13 stamped PR-PLD 062-02247 through 48.
14         - - - - -
15         (Thereupon, Deposition Exhibit 2174
16         was marked for purposes of
17         identification.)
18         - - - - -
19   Q.   Have you had a chance to look over
20 the document, Ms. Antol?
21   A.   Yes.
22   Q.   And do you recognize this?
23   A.   Yes.
24   Q.   And what is this?
25   A.   This was a services consulting

7 (Pages 22 to 25)

Sara Antol

Page 26

1 agreement that went along with the settlement
2 arrangement.
3    Q.   And were you present when this
4 document was signed?
5    A.   I don't specifically recall it. I
6 did not witness this one.
7    Q.   You did not witness it by proof of
8 signature?
9    A.   Right.
10    Q.   But you recall generally this
11 agreement?
12    A.   Yes.
13    Q.   And do you recall that Ms. Calvert
14 was to be paid a total of $300,000 over the
15 course of ten months?
16    A.   Through reading this, yes.
17    Q.   And do you recall how much
18 consulting Ms. Calvert was expected to do --
19 let me rephrase.
20    Did Mr. Abdelhak or anyone else at
21 AHERF ever indicate to you how much consulting
22 Ms. Calvert was expected to do in return for
23 this $300,000?
24    A.   If I recall, it was -- not
25 specifically. I mean the idea, and this is not

Page 27

1 that unusual, is that given her position, that
2 she would be available during the transition
3 period, but specifically what she would do, I
4 don't recall there being discussion relating to
5 that.
6    Q.   Okay. These three contracts that I
7 have just handed to you, Exhibits 2172, 73 and
8 74, do these three documents represent the
9 agreement that you reached with Ms. Calvert to
10 the best of your knowledge?
11    A.   Yes.
12    Q.   Are you aware of any side
13 agreements that would modify or alter these
14 agreements?
15    A.   No.
16    Q.   Are you aware of any oral
17 agreements that would modify these?
18    A.   No.
19    Q.   Okay. We are moving right along
20 here.
21    MR. WIERS: I'm going to introduce
22 Exhibit 2175. This document is Bates stamped
23 CLC 00039 through 40.
24    - - - - -
25    (Thereupon, Deposition Exhibit 2175

Page 28

1    was marked for purposes of
2    identification.)
3    - - - - -
4    Q.   Do you recognize this document, Ms.
5 Antol?
6    A.   It looks like a draft of the
7 services agreement, yes.
8    Q.   And is that your handwriting --
9    A.   Yes, it is.
10    Q.   -- on the document?
11    A.   Yes.
12    Q.   If you look with me at paragraph 4,
13 do you see where you have crossed out a line
14 that requires Ms. Calvert to list the hours
15 worked and any expenses claimed?
16    A.   Yes.
17    Q.   Did you remove that line requiring
18 Ms. Calvert to report her total hours?
19    A.   I don't recall.
20    Q.   Do you recall who may have asked
21 you to remove that requirement?
22    A.   No, I don't.
23    Q.   Do you recall any discussions
24 generally about the requirement of Ms. Calvert
25 keeping track of her total hours worked in any

Page 29

1 way?
2    A.   I can speculate as to why I might
3 have removed it, but I don't recall
4 specifically how that happened on this draft.
5    Q.   Is there any reason to believe that
6 you were not the one that crossed that out?
7    A.   I mean this was 1996. I haven't
8 been in control of these documents for all
9 these years. So, no, nothing that I know of,
10 but --
11    Q.   Do you know who William Kennedy is?
12    A.   No, I don't think so.
13    Q.   If I represent to you that he was
14 the attorney for AHERF who drafted the
15 settlement agreements, does that refresh your
16 recollection?
17    A.   Not really. I don't know if I had
18 any direct dealing with him. I don't recall
19 that.
20    Q.   Do you recall any conversations
21 with anybody, including Mr. Kennedy, about when
22 Ms. Calvert was supposed to do the consulting
23 work that was required by this agreement?
24    A.   No.
25    Q.   Did you have any discussions or do

Sara Antol

Page 58

1           AFFIDAVIT
2  The State of Ohio,  )
3             ) SS:
4  County of Cuyahoga  )
5
6
7
8     Before me, a Notary Public in and for
9  said County and State, personally appeared SARA
10  ANTOL, who acknowledged that he/she did read
11  his/her transcript in the above-captioned
12  matter, listed any necessary corrections on the
13  accompanying errata sheet, and did sign the
14  foregoing sworn statement and that the same is
15  his/her free act and deed.
16     In the TESTIMONY WHEREOF, I have hereunto
17  affixed my name and official seal at this
18  day of        A.D 2003.
19
20
21
22     Notary Public
23
24
25     My Commission Expires:

Page 59

1     DEPOSITION ERRATA SHEET
2
3  RE:    OFFICIAL COMMITTEE OF UNSECURED
4       CREDITORS, ETC.     VS.
5       PRICEWATERHOUSECOOPERS, LLP
6  RRS File No.:    7472
7  Deponent:     SARA ANTOL
8  Deposition Date:   NOVEMBER 5, 2003
9
10  To the Reporter:
11  I have read the entire transcript of my
12  Deposition taken in the captioned matter or the
13  same has been read to me.  I request that the
14  following changes be entered upon the record
15  for the reasons indicated.  I have signed my
16  name to the Errata Sheet and the appropriate
17  Certificate and authorize you to attach both to
18  the original transcript.
19
20
21
22
23
24
25

16 (Pages 58 to 59)

Atkinson Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

*BARBARA ATKINSON, M.D.*
*May 12, 2004*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**ATKINSON, M.D., BARBARA - Vol. 1**



LEGALINK
A WORDWAVE COMPANY

BARBARA ATKINSON, M.D.

Page 62

1    weren't doing as well as they were supposed to do
2    or any concerns over them?
3              MR. UNICE: Objection to form.
4    A.   I don't recall anything.
5    Q.   (BY MR. FRIESEN) Do you recall that a little later
6    in 1996, AHERF acquired the Forbes Hospitals in the
7    Pittsburgh area? Any recollection of that?
8    A.   Vague. I remember it in general but I don't really
9    remember any specifics, and I don't even know where
10   the hospitals are.
11   Q.   Do you recall anything about the reasons that
12   management gave for wanting to acquire the Forbes
13   hospitals?
14   A.   No, I believe it was by following the same
15   strategy that they'd considered was successful in
16   Philadelphia.
17   Q.   The Integrated Delivery System strategy?
18   A.   Yes.
19   Q.   And do you recall any trustees voicing opposition
20   to that acquisition?
21   A.   I don't recall.
22   Q.   Do you recall AHERF entering into what were called
23   risk contracts?
24   A.   Yes, but not -- I don't recall any details.
25   Q.   Do you recall any details about arrangements where

Page 63

1    AHERF would be financially responsible for a
2    defined set of people for their healthcare on a
3    contractual basis?
4    A.   Well I remember that they did it, but I don't
5    remember any details of how much or what or --
6    Q.   And was that also --
7    A.   -- when.
8    Q.   And was that something that was approved by the
9    board as well?
10             MR. UNICE: Object to form, lack of
11   foundation.
12   A.   I don't know, I assume that you have the board
13   books and you -- I don't remember.
14   Q.   (BY MR. FRIESEN) Okay. Do you recall at --
15   withdrawn.
16        Would management periodically provide financial
17   information to the Board of Trustees of AHERF?
18   A.   Yes.
19   Q.   And would they provide quarterly financial
20   statements for the various entities and the AHERF
21   entity as a whole?
22   A.   I believe every board meeting had some financial
23   statements.
24   Q.   And did you find it helpful to you in discharging
25   your duties to read through those statements?

Page 64

1    A.   Yes.
2    Q.   And why was that?
3    A.   Well, I, at least, I saw what it looked like
4    things -- what was happening. I mean, I could -- I
5    reviewed them each time and saw what was happening.
6    Q.   Do you remember that AHERF acquired something
7    called a Graduate Health System?
8    A.   Yes.
9    Q.   And how did you find out about that transaction?
10   A.   I think that was just an announcement, too. It
11   seemed to me it was about the same as Hahnemann,
12   but I may not have the timing of this. Was it a
13   year later? I can't remember.
14   Q.   So your recollection is that there was an
15   announcement where --
16   A.   I'm not sure, but it seemed to me it was not --
17   that I didn't first hear about it at a board
18   meeting, but I -- so I don't remember where I first
19   heard about it, but I heard an announcement that it
20   was either done or being considered.
21   Q.   Did you ultimately attend a board meeting where it
22   was considered?
23   A.   I don't remember.
24   Q.   So you don't remember one way or the other whether
25   you were at a board meeting where you approved it?

Page 65

1    A.   I didn't miss very many board meetings, so if I was
2    on the board then I'm sure I was there, but I don't
3    remember it.
4    Q.   What was your understanding of why AHERF wanted to
5    acquire Graduate?
6    A.   Again, to further develop the Integrated Health
7    System.
8    Q.   And did that make sense to you at the time?
9    A.   This one was beginning to be more of a stretch for
10   me because Graduate Hospital in and of itself was a
11   pretty strong competitor of Hahnemann, so you could
12   say on one hand that you were putting a competing
13   organization into -- competing hospital into the
14   organization.
15        All of the counter case was made to that, that
16   you could set it up so that it wouldn't compete and
17   that they could be doing different things; for
18   instance, orthopedics at Graduate and not competing
19   with orthopedics at Hahnemann and so on, that you
20   could set it up so that they would be complimentary
21   to each other and not competitive. But I found
22   this one beginning to be a bigger stretch in terms
23   of whether it was reasonable or not.
24   Q.   And did you express your views as it being a
25   stretch to management at the time?

BARBARA ATKINSON, M.D.

Page 66

1  A.  I probably did, but I don't remember any details.
2  Q.  And do you remember any details of expressing that
3      it was a stretch to any of the other trustees?
4  A.  I'm not sure.
5  Q.  Do you recall whether or not any of the other
6      trustees were opposed to the Graduate transaction?
7  A.  I really don't remember.
8  Q.  Do you remember anyone raising, even though they
9      might not have ultimately been opposed to it,
10     raising any concerns about it?
11 A.  I think there might have been.  I think that this
12     one may have actually been one that there were
13     concerns raised to, but I just don't remember any
14     details.
15 Q.  Do you remember any concerns that were raised by
16     anyone with respect to the process by which
17     Graduate was acquired, specifically with respect to
18     board approval?
19 A.  Now that you talk about it, I don't remember the
20     details that well, but I think this one was done
21     before the board approved.  I think the board did
22     the final approval, but I think that it really was
23     announced before the board.  And yes, I think there
24     were people who were very concerned about the
25     process.

Page 67

1  Q.  Any recollection of who they were?
2  A.  No.
3  Q.  And you don't recall that you were in that
4      category?
5  A.  Well I might have been in that category.  I'm not
6      sure if I expressed it at the board meeting or
7      privately, but I think I was probably in that
8      category as well.
9  Q.  Do you recall knowing, prior to any board approval
10     of the Graduate transaction, what the financial
11     condition of Graduate was, either from materials
12     that you received in the service of AHERF or just
13     generally from being in the medical community in
14     Philadelphia?
15 A.  No.
16 Q.  Let me show you a document that's previously been
17     marked 2385.  This is a letter dated August 8th,
18     1996 from Mr. Abdelhak to members of the Allegheny
19     Boards of Trustees.
20         If you could just read through this document,
21     please.
22 A.  Yes.  Do you want me to read the "Description of
23     the Proposed Reorganization"?
24 Q.  If you could, yes, please.
25 A.  Okay.

Page 68

1  Q.  Do you recall receiving this memo?
2  A.  I do.
3  Q.  Do you think this was the first time that you heard
4      about the Graduate transaction?
5  A.  Well I may have heard about it earlier than this
6      but not much.  I think this was -- I mean, I'm not
7      sure if it was in the news or I'd heard it directly
8      from somebody at MCP-Hahnemann or Allegheny, but
9      I'm sure this was the first time as board member I
10     heard it.
11 Q.  Do you recall reading about it in the newspaper at
12     all?
13 A.  I know it was in the newspaper but I don't recall
14     the timing of it.
15 Q.  Okay.  And when you say that you knew it was in the
16     newspaper, do you remember reading a newspaper
17     article, yourself, relating to the Graduate
18     acquisition?
19 A.  After it was done or before?
20 Q.  At any time?
21 A.  I'm sure, yes.
22 Q.  Okay.  Do you read the Philadelphia Inquirer, or
23     did you at the time, regularly?
24 A.  Yes, I did.
25 Q.  Okay.  It mentions in this Exhibit 2385, it

Page 69

1  mentions the Executive Committee of the AHERF
2  Board?
3  A.  Yes.
4  Q.  At the bottom.  "The AHERF Board will then review
5  and confirm the Executive Committee's actions."
6      At the time what was your understanding of the
7  role of the Executive Committee of the AHERF Board
8  as opposed to the board itself?
9  A.  Well, the Executive Committee met between board
10 meetings, and so if there was some urgent or
11 something, action that they could act on behalf of
12 the board, I guess that's the only, my only...
13 Q.  Did you ever have any concerns or qualms about the
14 Executive Committee's powers at the time?
15     MR. UNICE:  Object to form.
16 A.  No, I don't think I did.
17 Q.  (BY MR. FRIESEN)  Now having looked at this
18 memorandum, again, today, eight years later, do you
19 recall whether you spoke to anyone after you got
20 this memorandum about the memorandum?  Did you call
21 Mr. Abdelhak or talk to any of the other trustees
22 about it; do you recall?
23 A.  I don't believe so.  I mean, I may have talked to
24 Mr. Abdelhak, but I doubt that I talked to other
25 trustees about it.  And I just don't remember

18 (Pages 66 to 69)

BARBARA ATKINSON, M.D.

Page 110

1   Coopers & Lybrand?
2   A.  I don't remember.
3   Q.  Do you remember any discussions at all with anyone
4       from Coopers & Lybrand while you were on the board?
5   A.  No.  I think we must have -- I think the auditors
6       probably came but I don't remember.
7           MR. FRIESEN:  Let me mark the next
8       exhibit as 2572.
9
10          (Document was marked Deposition
11          Exhibit Number 2572 for identification.)
12
13  Q.  (BY MR. FRIESEN)  It's a document, Bates numbered
14      PR-PLD-066-00271 through 276.  And it says, "1995
15      Trustees' Evaluation" and it has Atkinson at the
16      top.  If you would just read, take a look through
17      this.
18  A.  Okay.  Okay.
19  Q.  And is that your signature on the last page?
20  A.  Yes.
21  Q.  And this is your handwriting in the document?
22  A.  Yes.
23  Q.  And do you recall filling it out, filling out this
24      Trustees' Evaluation?
25  A.  Not specifically, no, but I'm sure I did.

Page 111

1   Q.  Prior to the deposition today, did you have any
2       meetings or telephone conversations with either
3       Mr. Unice over there or any of his colleagues at
4       the law firm of Jones Day about this deposition?
5   A.  No.
6           MR. FRIESEN:  Okay, I don't have any
7       further questions at this time.  Mr. Unice will
8       have some questions, and I may have some after he's
9       done.  Thank you very much for coming here today.
10          THE WITNESS:  Thank you.
11
12          CROSS-EXAMINATION
13  BY MR. UNICE:
14  Q.  Doctor Atkinson, good afternoon.  My name is John
15      Unice, we met a few hours ago.
16  A.  Uh-huh.
17  Q.  I work for the law firm of Jones Day, and that firm
18      represents the Plaintiff in this case, the Official
19      Committee of Unsecured Creditors of AHERF.
20          I have several questions for you today, but I
21      promise to get you out of here as expeditiously as
22      possible.
23  A.  Okay.
24  Q.  Mr. Friesen asked you earlier today what you
25      thought your role was as a member of the AHERF

Page 112

1       Board.  And if I recall what you said, you said,
2       principally, it was to inform the Board of the
3       academic issues in the enterprise, and to represent
4       the interests of the faculty to the larger board
5       members; correct?
6   A.  Correct.
7   Q.  And you also said that there were other members of
8       the board who had more financial acumen than you
9       did not possess and do not possess; is that right?
10  A.  That's correct.
11  Q.  Can you remember for me any of the names of those
12      folks who had more financial experience than you,
13      after looking at some of the --
14  A.  If I could look back at one of the board things I
15      could tell you, one of these board lists that --
16      say I look at the October '97 AHERF Board.
17  Q.  Before you is Exhibit 1655, which are the minutes
18      the of 10/30/97 AHERF Board meeting?
19  A.  Yes.
20  Q.  Take a moment to skim the member list there and
21      tell me if that helps refresh your memory as to any
22      of the trustees that you referenced earlier?
23  A.  Right.  The ones that I would have particularly
24      paid attention to their financial opinions or their
25      opinions, I guess, in general, would be most of the

Page 113

1       Allegheny trustees.  David Barnes, particularly.
2       Doug Danforth, Harry Edelman both on financial and
3       other issues.  Ira Gumberg.
4           THE COURT REPORTER:  Excuse me?
5           THE WITNESS:  Ira Gumberg, G-u-m-b-e-r-g
6   A.  Bob Palmer from the eastern region, if you will.  I
7       guess those are the main ones.  Len Ebert.  Those
8       are the main ones.
9   Q.  (BY MR. UNICE)  If I recall from your testimony
10      earlier today, there's some overlap between the
11      names you listed as more active trustees with the
12      list you just gave me as to those who had more
13      financial experience than you?
14  A.  Right.  And I'm not really sure what the background
15      of those trustees were, but I heard them comment on
16      financial things so that's why I would say that.
17  Q.  As a board member at AHERF without a financial
18      background, would you rely, then, on the expertise
19      of those board members with financial matters?
20  A.  Yes.
21  Q.  Would you rely upon such trustees in terms of them
22      bringing issues to the Board that they saw fit
23      arising out of the financial information management
24      gave them?
25  A.  Yes.

LEGALINK MANHATTAN (212) 557-7400

BARBARA ATKINSON, M.D.

Page 114

1  Q.  You also spoke about, generally, the role of the
2      board itself. And I think you testified it was to
3      provide oversight of management and management's
4      operations of the enterprise; correct?
5  A.  That's right.
6  Q.  After having talked about your experience at AHERF,
7      do you recall any other general roles you saw as a
8      applying to the AHERF Board other than which you've
9      already told us?
10 A.  No.
11 Q.  Now in the providing of -- in the provision of
12     oversight to management, can you recall for me the
13     types of information that management would provide
14     to you that you would use to discharge those
15     duties?
16 A.  There would be the financial reports and they were
17     there at every meeting. There would be climate
18     reports, if you will, on healthcare and where that
19     was moving. There would be specific reports,
20     occasionally, on programs, education or research or
21     so on. I'd say that was the basic, the basic
22     composition of board meetings.
23 Q.  So it's fair to say you'd rely upon the financial
24     data and other information presented to you by
25     management in discharging your fiduciary duties?

Page 115

1  A.  That's correct.
2  Q.  And you expect that information to be accurate;
3      correct?
4  A.  Correct.
5  Q.  Now, I understand that AHERF also had outside
6      auditors that on a yearly basis present an opinion
7      on the financial information presented for audit by
8      management?
9          MR. FRIESEN: Objection.
10 A.  Yes.
11 Q.  (BY MR. UNICE) Who were those auditors?
12 A.  I think that was Coopers & Lybrand.
13 Q.  And do you recall, even generally, the process by
14     which Coopers & Lybrand would involve itself in
15     auditing AHERF's financial statements?
16 A.  No.
17         MR. FRIESEN: Objection.
18 A.  No.
19 Q.  (BY MR. UNICE) Was it your understanding as an
20     AHERF trustee, that those trustees on the audit
21     committee would have more direct interaction with
22     the auditors or the auditing process?
23 A.  Yes.
24 Q.  Can you explain to me your understanding in any
25     more detail of how the audit committee would

Page 116

1      interact with the auditors during the course of an
2      audit?
3  A.  No, I don't know.
4  Q.  And would the audit committee in some form or
5      fashion present to the board information during the
6      course of an AHERF audit?
7  A.  Yes.
8  Q.  What kinds of information did the audit committee
9      bring to the board's attention?
10 A.  I think they brought the audited reports. I think
11     they brought a resolution of who the auditor would
12     be for the next year.
13 Q.  Okay. Do you recall any other types of resolutions
14     or information the audit committee brought to the
15     board?
16 A.  I don't remember.
17 Q.  Can you recall for me what member or members of an
18     audit committee would typically bring that type of
19     information to the board's attention?
20 A.  I believe it was David Barnes but I'm not really
21     sure.
22 Q.  Do you recall what role he had on the audit
23     committee?
24 A.  I don't know. I thought he was maybe chair but I
25     don't know.

Page 117

1  Q.  So at least on a annual basis Mr. Barnes could come
2      to the AHERF Board and present the year-end
3      financial statements to the board for its approval?
4          MR. FRIESEN: Objection.
5  A.  Somebody came.
6  Q.  (BY MR. UNICE) Okay.
7  A.  But I don't remember who.
8  Q.  So let me rephrase it so we're both clear.
9          A representative of the audit committee would
10     come to the board on a annual basis and present for
11     the board's approval the audited financial
12     statements?
13 A.  Yes.
14 Q.  And someone from the audit committee would also
15     present for the board's approval its recommendation
16     for the external auditors to be retained for the
17     next year?
18 A.  Yes.
19 Q.  Do you ever recall the board not approving
20     financial statements presented for audit?
21 A.  I don't remember that.
22 Q.  Do you ever recall not approving the audit
23     committee's recommendation regarding the
24     appointment of external auditors?
25 A.  I don't.

BARBARA ATKINSON, M.D.

Page 118

1  Q.  I'm going to point you just to one page on
2      Exhibit 1655.  It ends on Bates 71630, and see if
3      this refreshes your recollection as to who the
4      individual from the audit committee would be that
5      would present the information we talked about.
6  A.  It looks like it was Mr. Barnes.
7  Q.  And you understood that his role in the audit
8      committee was to function as its chair?
9  A.  I believe so, yes.
10 Q.  Do you have a general understanding of what the
11     term "clean opinion" means in the context of an
12     audited financial statement?
13 A.  Yes.
14 Q.  What is that understanding?
15 A.  The paragraph in the middle says that it's okay.
16     That it has standard paragraphs at the beginning
17     and the end, but the middle one says they don't
18     find any material, something wrong.
19 Q.  Let's take a look at 1661, I think I know where
20     you're going.  Again, 1661 of the consolidated
21     financial statements for AHERF and its affiliates
22     in fiscal year 1996, and turn to page ending in
23     Bates 1606.
24 A.  Yes.
25 Q.  This is a report of independent accountants

Page 119

1      addressed to the Board of Trustees of AHERF signed
2      by Coopers & Lybrand; correct?
3  A.  Yes.
4  Q.  And does this report represent what you believe to
5      be, in your understanding, the clean opinion you
6      referenced for me earlier?
7  A.  It looks like that.  It's the third paragraph
8      actually says the, presents it fairly.  The fourth
9      actually has some issues, and I'd have to go back
10     and look at those to see whether those were
11     substantial or not, but I assume...
12 Q.  Can you read --
13         MR. FRIESEN:  I'm not sure if the
14     Doctor's finished her answer.
15 A.  But I would look at those that, to be sure that
16     that was -- that those were -- whether they were
17     substantial or not and what they actually meant,
18     because it does point to a couple things.
19 Q.  (BY MR. UNICE)  Can you read out loud for me the
20     third paragraph.
21 A.  "In our opinion the consolidated financial
22     statements referred to above present fairly in all
23     material respects the consolidated financial
24     position of Allegheny Health, Education and
25     Research Foundation as of June 30th, 1996, and the

Page 120

1      consolidated results of its operations, changes in
2      net assets and cash flows for the year then ended
3      in conformity with generally accepted accounting
4      procedures."
5  Q.  "Accounting principles"?
6  A.  "Accounting principles."
7  Q.  Okay.
8  A.  Sorry.
9  Q.  Okay.  I'm going to pin you back somewhat on one of
10     Mr. -- well let me just start that over.
11         As an AHERF trustee, what were your
12     expectations of the external auditors for their
13     work arising from the year-end audits of AHERF's
14     financial statements?
15         MR. FRIESEN:  Objection.
16 A.  You would assume that they did exactly what they
17     said in this letter, that they audited them, that
18     they conducted the audit fairly, and that they gave
19     an opinion on them.
20 Q.  (BY MR. UNICE)  Okay.  And if the auditors during
21     the course of their audit work had discovered what
22     they considered to be fraud in the presentation of
23     the financial information given by management,
24     would you expect the auditors to raise those
25     concerns with the audit committee?

Page 121

1          MR. FRIESEN:  Objection.
2  A.  Yes.
3  Q.  (BY MR. UNICE)  If the auditors had uncovered what
4      they believed to be intentional misstatements in
5      the financial statements presented by management
6      for audit during the course of an audit, would you
7      expect those concerns to be raised in the audit
8      committee?
9          MR. FRIESEN:  Objection.
10 A.  Yes.
11 Q.  (BY MR. UNICE)  If the auditors had discovered what
12     they considered to be material misstatements in the
13     financial statements presented for audit, would you
14     expect them to disclose those concerns to the audit
15     committee?
16         MR. FRIESEN:  Objection.
17 A.  Yes.
18 Q.  (BY MR. UNICE)  And matters such as those would be
19     important to you to know as a trustee?
20 A.  Yes.
21 Q.  Why is that?
22 A.  Well because you need to -- we need, as trustees,
23     to understand our fiduciary responsibility, which
24     includes having appropriate financial data to base
25     that on.

31 (Pages 118 to 121)

BARBARA ATKINSON, M.D.

Page 122

1  Q.  In your experience as an AHERF trustee, how would
2      the lack of appropriate financial information
3      prevent you from fulfilling your fiduciary duties?
4  A.  I mean, I can't, I can't answer that.  I don't
5      understand exactly -- I don't --
6  Q.  Okay, I'll rephrase it, I'll ask you a different
7      question.
8          But you expected the auditors, if they did
9      discover either material intentional or fraudulent
10     misstatements, to bring those issues to the concern
11     of the audit committee; correct?
12         MR. FRIESEN:  Objection.
13 Q.  (BY MR. UNICE)  Go ahead.
14 A.  Correct.
15 Q.  And as an AHERF trustee, you relied upon the
16     auditors to look for those types of issues during
17     the course of an audit?
18         MR. FRIESEN:  Objection.
19 A.  Yes.  Although that they always have a statement
20     that basically says it's -- that it's -- well, that
21     they audit within their purview --
22 Q.  (BY MR. UNICE)  Sure.
23 A.  You still do expect that they give you a fair
24     statement of what they find.
25 Q.  Now if such concerns had been raised with the audit

Page 123

1      committee, what is your understanding in that
2      scenario what the audit committee's
3      responsibilities be?
4          MR. FRIESEN:  Objection.
5  A.  I would assume the audit committee should bring it
6      to the entire board if they're concerned.
7  Q.  (BY MR. UNICE)  Would you expect the audit
8      committee in that situation to investigate the
9      concerns of the auditors to get to the bottom of
10     the issue?
11         MR. FRIESEN:  Objection, calls for
12     speculation.
13 Q.  (BY MR. UNICE)  Go ahead.
14 A.  Yes.
15 Q.  Would you rely upon the audit committee to conduct
16     a prudent investigation to discover the root cause
17     of the issues brought forth by the auditors?
18         MR. FRIESEN:  Objection.
19 A.  Yes.
20 Q.  (BY MR. UNICE)  If during the course of an audit --
21     let me just change that question.
22         If during the course of the year the auditors
23     had discovered what they believed to be concerns
24     with the integrity of AHERF's financial management,
25     would you expect the auditors to bring those

Page 124

1      concerns to the audit committee's attention?
2          MR. FRIESEN:  Objection.
3  A.  Yes.  Although I don't know that they do it during
4      the course of a year.
5  Q.  (BY MR. UNICE)  Okay.
6  A.  They do it at a, in a time frame, but, yes, I would
7      expect that they would bring it to them.
8  Q.  Your understanding, during what time frame would
9      they be responsible for looking for such issues?
10 A.  I thought they came in and did an audit at year
11     end.
12 Q.  Okay.  So Let me rephrase this so we're on the same
13     page.
14         During the course of its audit work, if the
15     auditing firm had discovered what they believed to
16     be concerns with the integrity of AHERF's financial
17     management, you would at that time expect them to
18     bring those concerns to the audit committee's
19     attention; correct?
20         MR. FRIESEN:  Objection.
21 A.  Yes.
22 Q.  (BY MR. UNICE)  And similar to my prior line of
23     questions, you would expect the audit committee in
24     that instance to conduct an investigation to get to
25     the bottom of whatever concerns the auditors had

Page 125

1      brought to their attention; correct?
2          MR. FRIESEN:  Objection.
3  A.  Yes.
4  Q.  (BY MR. UNICE)  And then in your understanding of
5      the audit committee, a representative --
6          THE COURT REPORTER:  What committee?
7          MR. FRIESEN:  What's that?
8          THE COURT REPORTER:  What committee?
9          MR. UNICE:  The audit committee,
10     a-u-d-i-t.
11         THE COURT REPORTER:  Okay.
12 Q.  (BY MR. UNICE)  A representative of the audit
13     committee, would that bring its conclusions to the
14     full board; correct?
15         MR. FRIESEN:  Objection, calls for
16     speculation.
17 A.  Yes.
18 Q.  (BY MR. UNICE)  If the audit committee had come to
19     the AHERF parent board after such an investigation
20     with the conclusion that there had been fraud in
21     the presentation of the financial statements, would
22     that have been a matter of concern to you as a
23     board member?
24         MR. FRIESEN:  Objection.
25 A.  Yes.

32 (Pages 122 to 125)

BARBARA ATKINSON, M.D.

Page 126

1    Q.  (BY MR. UNICE)  You would have not have ignored the
2         conclusions of the audit committee in that
3         instance; correct?
4                 MR. FRIESEN:  Objection.
5    A.  Yes.
6    Q.  (BY MR. UNICE)  Would it have been your practice as
7         an AHERF board member to ask questions about the
8         steps the audit committee took to investigate the
9         concerns brought to them by the auditors?
10                MR. FRIESEN:  Objection, calls for
11        speculation.
12   A.  I don't know.
13   Q.  (BY MR. UNICE)  Do you believe that it would have
14        been the practice of those board members with more
15        financial experience to raise questions with
16        respect to the investigation of the audit committee
17        in that instance?
18                MR. FRIESEN:  Calls for even more
19        speculation, objection.
20                MR. UNICE:  As did half of your
21        questions.
22   Q.  (BY MR. UNICE)  Go ahead.
23   A.  Yes.
24   Q.  I understand that you were never a member of the
25        AHERF audit committee, but did you ever attend a

Page 127

1         meeting as an invitee or otherwise?
2    A.  I don't believe so.
3    Q.  In the course of your tenure as an AHERF trustee,
4         did the audit committee ever inform the board that
5         it was conducting an investigation into any
6         concerns raised by the auditors regarding
7         management's presentation of the financial
8         statements?
9    A.  I don't remember anything like that.
10   Q.  Doctor Atkinson, can you explain to me how, if at
11        all, you as an AHERF trustee used the year-end
12        audited financial statements to assist you in
13        performing your role?
14   A.  Well, I guess I just reviewed them, looked for
15        data, looked for whether, what trends were, what
16        was happening, whether it looked like things were
17        going well, and then I listened to what
18        explanations were for management about where we
19        were and compared that to what I saw on the
20        reports.
21   Q.  Did you use the audited financial statements to
22        generally gauge the performance of AHERF?
23   A.  Yes.
24   Q.  Did you use the audited financial statements in any
25        way as a check on the internal financial

Page 128

1         information that you were given throughout the
2         course of the year?
3    A.  I think it was always consistent with the internal
4         information.  I don't think it was ever
5         inconsistent.
6    Q.  What do you mean by inconsistent?
7    A.  I mean, I think that it rolled up the same as you
8         would see on the quarterly reports earlier.
9    Q.  If the information contained in the audited
10        financial statements were inconsistent with the
11        quarterly information you were given, would that be
12        a matter of concern to you as an AHERF board
13        member?
14                MR. FRIESEN:  Objection.
15   A.  Yes.
16   Q.  (BY MR. UNICE)  And why is that, Doctor Atkinson?
17   A.  Well, something would be wrong.  I mean, one or the
18        other would have -- would be wrong.
19   Q.  And in that instance would you expect the board to
20        inquire into why there was such a discrepany?
21                MR. FRIESEN:  Objection.
22   A.  Yes.
23   Q.  (BY MR. UNICE)  And do you believe in the course of
24        your role as an AHERF trustee, you would have
25        ensured that the board followed the prudent course

Page 129

1         necessary to resolve the inconsistencies between
2         the two statements?
3                 MR. FRIESEN:  Objection.
4    A.  It's hard to say, that's so speculation.
5    Q.  (BY MR. UNICE)  But you certainly would have wanted
6         to know of that information, as an AHERF board
7         member?
8                 MR. FRIESEN:  Objection.
9    A.  Wanted to know which information?
10   Q.  (BY MR. UNICE)  You surely would have wanted to
11        know if the auditors doing the year-end audit work
12        had come to the conclusion that the information
13        management had given you was not accurate?
14                MR. FRIESEN:  Objection.
15   A.  Yes, I would have wanted to know that.
16   Q.  (BY MR. UNICE)  Do you recall ever seeing any data
17        in AHERF's audited financial statements that lead
18        you to believe that the acquisition of the Graduate
19        Health System could have threatened AHERF's ongoing
20        financial viability?
21   A.  I don't recall that.
22   Q.  Do you recall ever seeing anything in the audited
23        financial statements that lead you to believe that
24        the continuing acquisition of physician practices
25        would threaten AHERF's ongoing financial viability?

33 (Pages 126 to 129)

BARBARA ATKINSON, M.D.

Page 130

1  A.  I don't believe so.
2  Q.  Do you remember after the bankruptcy filing AHERF
3      issuing a press release stating that its 1997
4      audited financial statements should no longer be
5      relied upon?
6  A.  I don't remember that, but it might have happened.
7      It probably did.
8  Q.  Buy you have no independent recollection of that?
9  A.  I don't.
10 Q.  Doctor Atkinson, do you recall in the fall of 1998,
11     AHERF decided to replace what was then
12     PricewaterhouseCoopers as its external auditors?
13 A.  After, no.  I think I was not part of that then.
14 Q.  Let me show you a document that may refresh your
15     memory.  I've handed you Exhibit 1992.  It's a
16     four-page document Bates labeled TAC056657-CM to
17     661-CM.
18     Doctor, this exhibit is an agenda, a partial
19     agenda for the 8/27 1998 --
20 A.  I guess I was still on the board then.
21 Q.  -- AHERF meeting.
22 A.  Uh-huh.
23 Q.  And there are some notes here that I want to point
24     you to, but before I do that, as you've noted on
25     the first page of the exhibit under "Members

Page 131

1      Present" you're listed?
2  A.  Uh-huh.
3  Q.  Does this help refresh your memory at all as to any
4      discussions you had in the fall of 1998 regarding
5      the replacement of PricewaterhouseCoopers?
6  A.  Well, I'll read the minutes, but I don't actually
7      remember the meeting, but it says I was there so
8      I'm sure I was there.
9  Q.  Okay.  Turn to the last page of this exhibit.
10     Again, these are not minutes, but rather an agenda
11     with some notes.
12 A.  Okay.
13 Q.  I'd like to point you to the handwritten notes
14     under the line item titled "Executive Session."
15     Just read that text to yourself.
16 A.  Whose notes are these?
17 Q.  I do not know.  But read the text to yourself and
18     let me know when you're finished.  And you can stop
19     with a note where it says that "Brenner abstained."
20 A.  Okay.
21 Q.  Are you done reading it?
22 A.  Yes.
23 Q.  Does the review of these notes refresh your memory
24     at all as to the decision to replace
25     PricewaterhouseCoopers as AHERF's external auditor?

Page 132

1  A.  It looks like it was discussed but I don't remember
2      it.
3  Q.  Put that aside then, ma'am.
4  A.  (Witness Complies).
5          MR. UNICE:  What number are we on?
6          THE COURT REPORTER:  We're on 2573.
7          MR. UNICE:  Okay.
8
9          (Document was marked Deposition
10         Exhibit Number 2573 for identification.)
11
12 Q.  (BY MR. UNICE)  Doctor Atkinson, you've been
13     handed Exhibit 2573.  It's a one-page document,
14     Bates labeled DBRLI-LI-102899.  It purports to be
15     an 11/4/98 letter from you to William Penn Snyder.
16     Review this document and let me know if you
17     recall it.
18 A.  I do recall it, yes.
19 Q.  What is this exhibit?
20 A.  This exhibit is my letter of resignation from the
21     AHERF boards and the Allegheny General Board.
22 Q.  And that's your signature?
23 A.  Yes.
24 Q.  So as of 11/4/98, you resigned from all AHERF
25     affiliated boards?

Page 133

1  A.  Right.
2  Q.  Can you recall why you made that decision?
3  A.  This must have been close to when we were coming
4      out of bankruptcy.  I don't remember exactly, but I
5      think we came out November 11th or something, but
6      at that point I had decided that I wanted to resign
7      from the boards.
8  Q.  So based on some of the documents you reviewed
9      earlier, the entire tenure of you and the AHERF
10     board was from around June 1993 to November 1998?
11 A.  Right.
12 Q.  In discussing AHERF's decision to engage in
13     physician practice acquisitions, I think you
14     testified that it had always been planned that
15     there would be a deficit in the practice component
16     of the AHERF enterprise; correct?
17 A.  They, that primary care practice component, yes.
18 Q.  Can you recall for me the basis for your
19     recollection of that expected deficit?
20 A.  I don't.  I don't remember any specifics of it, but
21     I know that most people project that it's the
22     hospital admissions that make money from those
23     patients, that you have to see a certain number of
24     patients, and it's the admissions that actually
25     make money.

BARBARA ATKINSON, M.D.

Page 146

1 Q. I also think you mentioned that, you thought at the
2    time that the layoffs were necessary to help Mr.
3    Abdelhak right the ship?
4 A. Yes.
5 Q. Do you recall any trustees expressing the opposite
6    view about those layoffs?
7 A. I don't remember, no.
8 Q. You mentioned earlier today AHERF's engagement of
9    the Hunter Group; do you recall that?
10 A. Yes.
11 Q. What's the Hunter Group?
12 A. The Hunter Group is a consulting group that does
13    turnarounds on hospitals and medical schools and
14    universities that are in trouble financially.
15 Q. Do you remember when relative to the bankruptcy
16    AHERF engaged the Hunter Group?
17 A. I remember that they were engaged almost right
18    after Sharif Abdelhak was removed and Tony Sanzo
19    was made the overall person. I think Tony engaged
20    the Hunter Group rather quickly, and I believe that
21    the bankruptcy was then within a few weeks of the
22    engagement of the Hunter Group.
23 Q. Having those events as a context, can you recall
24    now with any more detail when Mr. Abdelhak was let
25    go, relative to the bankruptcy?

Page 147

1 A. Oh, I think it was April, I'm not really positive.
2    And I think it was probably about a month before
3    the bankruptcy, maybe, something like that.
4 Q. Okay. Did you have any discussions with any
5    representatives of the Hunter Group for the course
6    of their work at AHERF?
7 A. Oh, yes. I reported to Dan Stickler of the Hunter
8    Group.
9 Q. Okay. Can you recall for me today the types of
10    steps that you were involved in with the Hunter
11    Group to help AHERF's financial condition?
12        MR. FRIESEN: Objection.
13 A. We were involved in review of the whole financial
14    piece. Personally, I was for the university, and
15    specifically, for the school of medicine. So
16    review of everything with them, then looking to
17    plan the new budget, and then doing due diligence
18    with all the buyers.
19 Q. (BY MR. UNICE) Mr. Stickler, you mentioned, was
20    your primary contact at Hunter?
21 A. Yes.
22 Q. Do you recall any other individuals from that
23    company with whom you worked?
24 A. There was a CFO whose name I don't remember, and
25    there were others but those two are the ones that

Page 148

1    were the most memorable, but Mr. Stickler was the
2    main one.
3 Q. Did you take part in the decision by AHERF to
4    actually retain the Hunter Group, specifically?
5 A. I don't believe so.
6 Q. Do you know who was involved in that decision?
7 A. I think my understanding was it was Tony Sanzo, but
8    I'm not really sure.
9 Q. And for the record, Mr. Sanzo was at that point the
10    CEO and then succeeded Mr. Abdelhak?
11 A. Yes.
12        MR. UNICE: I'm almost through but I have
13    about a minute and a half tape left, so let's
14    change it. I'm sure Jeff will have some follow-up
15    and we'll go from there.
16        THE VIDEOGRAPHER: Going off record,
17    1:28 p.m.
18
19        (Brief Recess)
20
21        THE VIDEOGRAPHER: We're back on record,
22    1:29 p.m.
23 Q. (BY MR. UNICE) Doctor Atkinson, can you recall the
24    length of the Hunter Group's engagement with AHERF?
25 A. It would have been from that time when they were,

Page 149

1    just before the bankruptcy through to the end of
2    the bankruptcy.
3 Q. And do you have any more of a specific recollection
4    as to what they were engaged to do for the system?
5 A. Well, it was to run the system in the eastern
6    region, basically, the whole system, not just the
7    university.
8 Q. Okay. Do you know whether or not any of the Hunter
9    Group's efforts was focused in AHERF's western
10    region?
11 A. I don't believe it was but I'm not positive of
12    that.
13 Q. Do you recall ever forming the belief during,
14    again, your --
15 A. I should actually say, I just remember David
16    Hunter. I did interact with him a little bit.
17 Q. And who is Mr. Hunter?
18 A. He's the Hunter of the Hunter Group, the head
19    person that was engaged.
20 Q. What was his role with respect to the AHERF
21    engagement?
22 A. I not sure. Dan Stickler was the one in charge of
23    the eastern region. He's the oversight of the
24    whole Hunter Group --
25 Q. Yes.

38 (Pages 146 to 149)

BARBARA ATKINSON, M.D.

Page 150

1  A.  -- so in that regard he was around on occasion.
2  Q.  Okay.  Now, during the time that you were employed
3      by AHERF, did you ever form the belief -- do you
4      recall ever forming the belief that had the Hunter
5      Group been brought in earlier it could have done
6      more to right AHERF's ship?
7          MR. FRIESEN:  Objection.
8  A.  I don't know.  I guess in retrospect I'm sorry
9      they weren't called in earlier; but certainly, it
10     would not have -- I mean, they certainly could not
11     have worked with Sherif Abdelhak, so it was one or
12     the other.
13 Q.  (BY MR. UNICE)  Did you have any discussions with
14     either Mr. Hunter or Mr. Stickler about whether or
15     not they could have done more had they been brought
16     in at an earlier time?
17 A.  I don't believe so.
18 Q.  And can you explain to me your last comment
19     regarding your belief that it would either had to
20     have been the Hunter Group or Mr. Abdelhak running
21     the system?
22 A.  Sherif Abdelhak didn't listen to other people.  He
23     needed -- I mean, he could not have a consultant
24     group working with him or for him, he ran the
25     system.  Although I should say he hired consultants

Page 151

1      for specific projects, but not at the scope that
2      the Hunter Group did, which was essentially to do
3      his job in the eastern region.
4  Q.  Sure.  Was it your understanding that the Hunter
5      Group typically is engaged to run the system once
6      it's prior management had already been removed?
7  A.  Not always.  It happens sometimes, but sometimes
8      they're hired under somebody who's already there.
9      Very often that person ends up being removed
10     afterwards, but not always first.
11         MR. UNICE:  At this time I don't have any
12     other questions, but Mr. Friesen may have a few.
13         MR. FRIESEN:  I have just a couple
14     follow-up questions.
15
16            REDIRECT EXAMINATION
17 BY MR. FRIESEN:
18 Q.  You testified that you would use the audited
19     financial statements to help you gauge the
20     performance of AHERF; do you remember that
21     testimony?
22 A.  Yes.
23 Q.  And would you also use, when they came out, the
24     quarterly unaudited financial, internal financial
25     statements to gauge the performance of AHERF?

Page 152

1          MR. UNICE:  Objection, asked and
2      answered.
3  A.  Yes.
4  Q.  (BY MR. FRIESEN)  Okay.  And would it be the case
5      that since you would get the quarterly ones each
6      quarter and then at the end an audited financial
7      statement, that you could look at the trend to see
8      how things were going from looking at the previous
9      years' audited financial statement, and then the
10     next quarter and then the next quarter and then the
11     next quarter?
12         MR. UNICE:  Object to form.
13 A.  Yes.
14 Q.  (BY MR. FRIESEN)  Okay.  Now, I'd like to show you
15     a document that has been marked as Exhibit 1656.
16     These are the board materials for that meeting that
17     you didn't attend, October 30th, 1997.
18         Now would it be your practice to receive the
19     materials, even if you turned out not to go to the
20     meeting?
21 A.  Yes.
22 Q.  And you would read them as best as you could?
23 A.  Yes.
24 Q.  If you go to the page beginning at 827 on the
25     bottom.

Page 153

1  A.  Okay.
2  Q.  And you see there's a "Draft" it says "Draft" at
3      the top?
4  A.  Yes.
5  Q.  And then it says, "Consolidated Financial
6      Statements for the year ended June 30th, 1997"?
7  A.  Yes.
8  Q.  So the fiscal year was from July 1st till June 30th
9      of the following year?
10 A.  Yes.
11 Q.  And if you go to the page ending in 831.
12 A.  Yes.
13 Q.  You'll see that there's a net income there of
14     $21,927,000, about halfway down?
15 A.  Oh, yes, okay.
16 Q.  Okay.  First of all, do you have any recollection
17     of seeing this?
18 A.  I don't remember any specifics of seeing this, no.
19 Q.  Okay.  So you have a net income of $21,926,000.
20     Now I would like you to get out, again, Exhibit
21     2101, which is the unaudited financial statements
22     for the three months ended September 30th, 1997.
23 A.  These?
24         MR. UNICE:  Huh-uh.
25 Q.  (BY MR. FRIESEN)  It's a four- or five-page

39 (Pages 150 to 153)

BARBARA ATKINSON, M.D.

Page 154

1    document.
2  A.  These are the unaudited ones?
3  Q.  Correct.
4  A.  Okay.
5  Q.  Now, you'll see that the unaudited ones, the ones
6      in your hand, Exhibit 2101, those are for the
7      three months following the fiscal year 1997, which
8      are in the other document you have --
9  A.  Right.
10 Q.  -- Exhibit 1656. And you'll recall that there was
11     a net loss of some $42 million for that
12     three months?
13 A.  Yes.
14 Q.  And in the previous fiscal year we just saw there
15     was a net income of $21 million. Now, again, I
16     know that you weren't at the meeting and you didn't
17     recall seeing that $42 million number, but that
18     trend, from a $21 million net income for a whole
19     fiscal year followed by a $42 million net loss for
20     the next three months, is that a trend that if you
21     had seen it at the time would have caused you
22     alarm?
23         MR. UNICE: Object to form.
24 A.  Well, I would have certainly wanted to know an
25     explanation for it.

Page 155

1  Q.  (BY MR. FRIESEN) And you would have asked the
2      kinds of questions that you mentioned earlier about
3      what it's projected to do in the future and what's
4      the cause of it?
5  A.  I would assume so, yes.
6  Q.  It's not a trend in the right direction, is it?
7  A.  No.
8          MR. UNICE: Object to form.
9          MR. FRIESEN: Those are all the questions
10     that I have right now.
11         MR. UNICE: I don't have any more
12     questions for you either.
13         MR. FRIESEN: Wonderful.
14         THE WITNESS: Thank you.
15         MR. FRIESEN: Thank you.
16         THE VIDEOGRAPHER: We're going off record
17     at 1: --
18         MR. UNICE: Before we do that.
19         THE VIDEOGRAPHER: Sorry.
20         MR. UNICE: Yeah. Want to advise her
21     about her right to read and sign or should I?
22         MR. FRIESEN: Yes. You have the right to
23     receive a copy of the transcript and to read it,
24     and to let the court reporter know if there are any
25     transcript mistakes, meaning that the court

Page 156

1  reporter wrote something down that wasn't actually
2  in the record. Or, you can waive that right. It's
3  totally up to you. So you should let us know
4  whether you'd like to receive and read a copy of
5  the transcript and make any corrections.
6          THE WITNESS: I would like to do that.
7          MR. FRIESEN: Okay.
8          THE VIDEOGRAPHER: Going off record, 1:40
9  p.m.
10
11         (Deposition concluded at 1:44 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 157

1
2
3
4
5
6
7  _____
8  BARBARA ATKINSON, M.D.
9
10
11
12 Subscribed and sworn to before me this _____ day of
13 _____, 2004.
14
15
16 My Commission Expires:
17
18 _____
19 NOTARY PUBLIC
20
21
22
23
24
25

**Barnes Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS L.L.P.*

---

## J. DAVID BARNES
*July 8, 2003*

---

# LEGALINK MANHATTAN

## 420 Lexington Avenue - Suite 2108
## New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

BARNES, J. DAVID - Vol. 1



**LEGALINK**

A **WORDWAVE** COMPANY

J. DAVID BARNES

**Page 2**

```
1           VOLUME I
            VIDEOTAPE DEPOSITION OF J. DAVID BARNES,
2   a witness, called by the Defendant for examination,
    in accordance with the Federal Rules of Civil
3   Procedure, taken by and before JoAnn M. Brown, RMR,
    CRR, a Court Reporter and Notary Public in and for
4   the Commonwealth of Pennsylvania, at the offices of
    MANION McDONOUGH & LUCAS, 14th Floor, USX Tower,
5   Pittsburgh, PA 15219, on Tuesday, July 8, 2003,
    commencing at 9:00 a.m.
6
7           - - - -
8   APPEARANCES:
        FOR THE PLAINTIFF:
    Richard B. Whitney, Esq.
9   JONES DAY REAVIS & POGUE
    901 Lakeside Avenue
10  Cleveland, OH 44114
    216-586-7256
11      -and-
    Laura A. Meaden, Esq.
12  JONES DAY REAVIS & POGUE
    One Mellon Bank Center
13  31st Floor
    Pittsburgh, PA 15219
14  412-258-2300
        FOR THE DEFENDANT:
15  Antony L. Ryan, Esq.
    CRAVATH, SWAINE & MOORE, LLP
16  Worldwide Plaza
    825 Eighth Avenue
17  New York, NY 10019
    212-474-1986
18      FOR THE WITNESS:
    David L. McClenahan, Esq.
19  KIRKPATRICK & LOCKHART
    2nd Floor, Oliver Building
20  Pittsburgh, PA 15222
    412-355-6500
21
22      ALSO PRESENT:
23  Jake Mercatoris, Videographer
    Duane Cranston
24
25
```

**Page 3**

```
1           * I N D E X *
2   Examination by Mr. Ryan - - - - - - - - - -  5
3   Certificate of Court Reporter - - - - - - - - 199
    Errata Sheet - - - - - - - - - - - - - - - - 200
4
5
6           * INDEX OF EXHIBITS *
7   Deposition Exhibit 1645 - - - - - - - - - - - 59
    Deposition Exhibit 1646 - - - - - - - - - - - 64
8   Deposition Exhibit 1647 - - - - - - - - - - - 107
    Deposition Exhibit 1648 - - - - - - - - - - - 111
9   Deposition Exhibit 1649 - - - - - - - - - - - 114
    Deposition Exhibit 1650 - - - - - - - - - - - 114
10  Deposition Exhibit 1651 - - - - - - - - - - - 145
    Deposition Exhibit 1652 - - - - - - - - - - - 149
11  Deposition Exhibit 1653 - - - - - - - - - - - 156
    Deposition Exhibit 1654 - - - - - - - - - - - 174
12  Deposition Exhibit 1655 - - - - - - - - - - - 190
    Deposition Exhibit 1656 - - - - - - - - - - - 193
13
```

**Page 4**

```
1           - - - -
2           P-R-O-C-E-E-D-I-N-G-S
3           - - - -
4           THE VIDEOGRAPHER:  Good morning.
5   This is the video operator speaking, Jake
6   Mercatoris, for Manhattan Reporters of New
7   York, New York.
8           Today is Tuesday, July 8, 2003, and
9   the time is 8:59 a.m.  We are at the offices of
10  Manion, McDonough & Lucas in Pittsburgh,
11  Pennsylvania to take the video deposition of
12  J. David Barnes in the matter of the Official
13  Committee of Unsecured Creditors of the
14  Allegheny Health, Education & Research
15  Foundation versus PriceWaterhouseCoopers in the
16  United States District Court District for
17  Western District of Pennsylvania.
18          Will counsel please introduce
19  themselves?
20          MS. MEADEN:  Laura Meaden from Jones
21  Day on behalf of the plaintiff.  With me will
22  be Richard Whitney, also of Jones Day.
23          MR. RYAN:  Antony Ryan from Cravath
24  Swaine & Moore, LLP representing the defendant,
25  PriceWaterhouseCoopers, LLP, and with me is
```

**Page 5**

```
1   Duane Cranston.
2           MR. MCCLENAHAN:  I'm David
3   McClenahan.  I represent the witness,
4   Mr. Barnes.
5           THE VIDEOGRAPHER:  Thank you.  Will
6   the Court Reporter please swear in the witness?
7           - - - -
8           J. DAVID BARNES,
9           being first duly sworn,
10  was examined and testified as follows:
11          - - - -
12          EXAMINATION
13          - - - -
14  BY MR. RYAN:
15  Q.   Good morning, Mr. Barnes.
16  A.   Good morning.
17  Q.   Could you please state your full name for the
18  record?
19  A.   John David Barnes.
20  Q.   And you go by David?
21  A.   Yes.
22  Q.   And could you provide us, please, with your
23  address?
24  A.   What address do you want?
25  Q.   Home address will be fine.
```

2 (Pages 2 to 5)

J. DAVID BARNES

Page 6

1   A.   Why don't I give you my office address.  I
2        think that would be better.
3   Q.   All right.  Go ahead.
4   A.   What is it?  4101 One Mellon Bank Center,
5        Pittsburgh, Pennsylvania 15258, I believe.
6   Q.   What education have you had since high school?
7   A.   I went to college.  I went to law school.
8   Q.   Did you study accounting at all?
9   A.   A course here and there, but I'm not an expert
10       by a long shot.
11  Q.   And would you mind quickly running through for
12       us what employment you've had?
13  A.   I assume you mean significant employment, just
14       not any old thing?
15  Q.   Yes.  Yes, sir.
16  A.   Okay.  I was in the army for two or three years
17       during, I guess, the Korean War, and then I was
18       discharged, and I went to work for Mellon
19       Bank, and I worked there till I retired.
20  Q.   All right.  And when did you retire from Mellon
21       Bank?
22  A.   1987.
23  Q.   And when you retired, what was your job title?
24  A.   Chairman.
25  Q.   And how long were you chairman of Mellon Bank?

Page 7

1   A.   I don't know exactly.
2   Q.   Was it a number of years?
3   A.   It was probably five years.  Something like
4        that.
5   Q.   And when you say chairman, was that chairman of
6        the board?
7   A.   Yes.
8   Q.   Did you also hold a management title such as
9        president or CEO or such?
10  A.   At that point, as CEO.
11  Q.   So you were both chairman of the board and CEO?
12  A.   Well, I don't regard those as two separate
13       functions, but, yes.
14  Q.   And so in all, you worked at Mellon Bank for a
15       period of 30 years or more?
16  A.   Yes.
17  Q.   What boards of directors or boards of trustees
18       have you served on?
19       MR. MCCLENAHAN:  Do you mean ever?
20       MR. RYAN:  Yes.
21  A.   I can't recollect ever.
22  Q.   All right.  Well, are there ones that you can
23       recall?
24  A.   I can give you some.
25  Q.   Sure.

Page 8

1   A.   But that's not the same as ever.
2        Let's see.  I've been on the board of
3        the University of Pittsburgh.  I was on the
4        board of the Pittsburgh Child Guidance Center.
5        I was on the board of Maxus Energy Company in
6        Texas.  I was on the board of Diamond Shamrock
7        Corporation.  I was on the board of the Ellis
8        School, and there's some more, but I can't
9        think of them just right off.
10  Q.   All right.  And you were on the board of Mellon
11       Bank too?
12  A.   Of course.
13  Q.   Did you stay on the board of Mellon Bank after
14       1987?
15  A.   No.
16  Q.   And were you on the board of the Allegheny
17       Health, Education & Research Foundation?
18  A.   Yes.
19  Q.   And is it okay if I use the term AHERF to refer
20       to that?
21  A.   Yes.
22  Q.   When did you join the board of AHERF?
23  A.   I don't recollect.
24  Q.   Do you remember whether it was before or after
25       you retired in 1987?

Page 9

1   A.   I do not.
2   Q.   Were you on the board of affiliates of AHERF?
3   A.   Generally not.  In other words, I was on the --
4        one exception -- I think the AIHG board for a
5        very short period of time, I believe.
6   Q.   AIHG was the Allegheny Integrated Health Group?
7   A.   I think so.
8   Q.   That was a group that purchased practices of
9        physicians?
10  A.   I think in the western end of the state, yes.
11  Q.   How did it come about that you joined the AHERF
12       board?
13  A.   Mr. Snyder, who was the chairman of the AHERF
14       board, asked me if I'd join the board.
15  Q.   How did you know Mr. Snyder?
16  A.   Well, I've lived in Pittsburgh for 40 years,
17       and I know people.  I don't know how I knew
18       him.
19  Q.   Have you had business dealings with him?
20  A.   I don't think so.
21  Q.   Do you know him on a social basis?
22  A.   Yes.
23  Q.   Do you recall who was the chief executive
24       officer of AHERF when you were asked to join
25       the AHERF board?

3 (Pages 6 to 9)

J. DAVID BARNES

Page 42

1  goes to the board is if you make a major
2  business strategic change. I suppose generally
3  major real estate transactions go to the board.
4  If you're going to buy -- when U.S. Steel built
5  this building, I presume that went to the U.S.
6  Steel board, although I don't know in fact that
7  it did, nor do I know that it's necessary that
8  it goes.
9      I suppose, really, to come up with a
10  good answer here, one has to talk about what
11  goes to the board of necessity, which I don't
12  know that I can outline for you, and then what
13  just goes in any given enterprise as a matter
14  of habit. That probably, I would guess, varies
15  enormously from business A to business B. Not
16  much of an answer.
17  Q.  I'm not trying to ask you anything about
18      statutes or regulations or legal rules or
19      anything of that type.
20      Let me try to approach my question
21      this way: You have extensive experience in
22      business, don't you?
23  A.  Um-hum.
24  Q.  And you have extensive experience serving on a
25      number of boards, do you not?

Page 43

1  A.  Um-hum.
2  Q.  And my question to you is what role does a
3      board play in what you just described as a
4      major strategic decision for the organization?
5      MR. MCCLENAHAN: Again, you're still
6  talking about hypothetically in American
7  business?
8      MR. RYAN: I'm talking about in the
9  witness' experience in American business, yes.
10  Not hypothetically, in the witness's
11  experience.
12  A.  What was the question?
13  Q.  What role does the board play in major
14      strategic decisions?
15      MR. MCCLENAHAN: Object to the form
16  of the question. You can answer it if you can.
17  A.  Well, I think generally the board approves
18      major strategic decisions. Where the rubber
19      hits the road is the definition of what's a
20      major strategic decision.
21  Q.  And when you say that the board approves a
22      decision of that type, what do they have to do
23      before they approve it? They're not just
24      supposed to rubber stamp what management
25      proposes, are they? They're supposed to go

Page 44

1  through some kind of deliberative process,
2  aren't they?
3      MR. MCCLENAHAN: Object to the form
4  of the question. There are at least three of
5  them there. You can answer if you can.
6      THE WITNESS: I'm confused between
7  you guys' conversations.
8      MR. MCCLENAHAN: Can you ask a single
9  question? You asked about three.
10      MR. WHITNEY: Let me just interpose
11  the observation that now that I've finally
12  figured out where this is going, I object to
13  the question as being overly hypothetical and
14  overly general.
15      MR. MCCLENAHAN: Do you have a
16  question?
17      MR. RYAN: Yes, I do.
18  BY MR. RYAN:
19  Q.  In your experience in business serving on
20      boards, what process of review does a board go
21      through in reviewing a major strategic decision
22      proposed by management?
23  A.  Well, in my experience, presentations of some
24      kind or other are made at which the management
25      spells out to the board what it wants to do.

Page 45

1      Normally, the financial data is critically
2      important, and the board says yea or nay.
3  Q.  And while you were serving on the AHERF board,
4      was it your understanding that for a major
5      strategic decision, the board of trustees was
6      supposed to critically review management
7      presentations?
8  A.  Yes.
9      MR. WHITNEY: Objection. Vague.
10  Q.  And did that, in fact, occur while you were on
11      the AHERF board?
12  A.  As best I recollect, it did.
13  Q.  In your time of service on the AHERF board,
14      were you are also a member of committees of the
15      board?
16  A.  Yes, I was.
17  Q.  Were you on the audit committee?
18  A.  Yes, I was.
19  Q.  Were you the chairman of the audit committee?
20  A.  For a time, I was.
21  Q.  How did it come to be that you served on the
22      AHERF audit committee?
23  A.  Mr. Snyder, I guess, asked me to.
24  Q.  Did he tell you why he wanted you to serve on
25      the AHERF audit committee?

12 (Pages 42 to 45)