J. DAVID BARNES

Page 46

1    A.   I don't recollect the conversation with that
2         much particularity.
3    Q.   Why did you decide to accept service on the
4         audit committee?
5    A.   I don't recollect any specific logic that
6         caused me to accept the job.
7    Q.   Have you served on the audit committee of any
8         other organizations?
9    A.   Yes.
10   Q.   What other organizations did you serve on the
11        audit committee for?
12   A.   Well, I've been on the University of Pittsburgh
13        audit committee.  I suspect I've been on
14        others, I recollect, but I can't recollect
15        particularly which other ones I've been on.
16   Q.   What was the role of AHERF's audit committee?
17   A.   To recommend the certified public accountants
18        to the board, to review their audit plan, to
19        receive the audited financial statements, to
20        superintend the internal audit committee and
21        hear their work plans and hear the results
22        thereof.  I think that covers it all.
23   Q.   And do you recall that AHERF's internal audit
24        group was headed by Diane Schrecengost?
25   A.   Yes.

Page 47

1    Q.   And did you have an opinion as to her
2         qualifications or job performance?
3    A.   Well, I don't really have one now.  It's been
4         five, six, seven years ago.  Are you saying do
5         I recall?  Do I?  The answer is, no, I don't.
6    Q.   At the time, did you have an opinion as to
7         Ms. Schrecengost's job performance?
8    A.   Yes.
9    Q.   And what was that opinion?
10   A.   I thought she was a competent woman and did a
11        good job.
12   Q.   And as a member of the audit committee, you and
13        your colleagues on that committee reviewed the
14        reports that she made you?
15   A.   Yes.
16   Q.   And I believe you also stated that the audit
17        committee recommended an independent accounting
18        firm to the board, is that right?
19   A.   Yes.
20   Q.   In AHERF, was that the firm of Coopers &
21        Lybrand?
22   A.   Yes, it was.
23   Q.   And did you believe that that was a qualified
24        accounting firm?
25   A.   Yes.

Page 48

1    Q.   Do you recall who the Coopers & Lybrand
2         engagement partner was on the AHERF audit?
3    A.   I believe so.
4    Q.   Who was that?
5    A.   William Buettner.
6    Q.   Did you know Mr. Buettner in any way outside
7         the AHERF board?
8    A.   No.
9    Q.   Did you form an opinion as to Mr. Buettner's
10        qualifications while you were on the AHERF
11        audit committee?
12   A.   Yes.  I thought he was a quiet, hard-working,
13        competent man to have on the job.  He gave me
14        a -- I felt very good about having both the
15        firm and him as an individual in the saddle, so
16        to speak.
17   Q.   I believe you mentioned that as a member of the
18        audit committee, you also reviewed the
19        Coopers & Lybrand audit plan?
20   A.   Yes.
21   Q.   What steps did you undertake to review
22        Coopers & Lybrand audit plans?
23   A.   My recollection is that their plan for any
24        given year was presented to the audit
25        committee, oh, maybe in the summer, June,

Page 49

1         something like that, for any given year, and
2         that we would hear it and generally agree with
3         it.
4    Q.   Do you recall any instance in which you
5         disagreed with an aspect of one of the
6         Coopers & Lybrand audit plans?
7    A.   I don't recall either any instance of agreeing
8         or disagreeing.  It's just that we must have
9         agreed or it wouldn't have gotten done.
10   Q.   I believe you mentioned that also as a member
11        of the audit committee, you received the
12        financial statements as audited by
13        Coopers & Lybrand, is that right?
14   A.   That's correct.
15   Q.   What process did you undertake to review those
16        audited financial statements?
17   A.   I really don't understand the question.
18   Q.   Let me try to ask a, perhaps, simpler question.
19        Did you look through the various pages of the
20        audit to the financial statements as received
21        from Coopers & Lybrand?
22   A.   As an individual --
23   Q.   Yes.
24   A.   -- I did.  I can't speak for other people.
25   Q.   And what were you looking for?

13 (Pages 46 to 49)

Q. And was it also your understanding that management was engaged in other cost-saving measures, other efforts to reduce expenses besides the layoffs?
A. Yes.
Q. And was it also your understanding that the effort to sell eastern region hospitals was an effort to staunch AHERF's losses?
A. Yes.
Q. And at this time in the spring of 1998, was it your view that AHERF management was reacting appropriately to the serious financial problems AHERF faced?
MR. MCCLENAHAN: Do you mean was it his view at that time?
MR. RYAN: Yes.
MR. MCCLENAHAN: Or is it his view looking back on it in hindsight?
BY MR. RYAN:
Q. In the spring of 1998, was it your view that AHERF management was reacting appropriately to the serious financial problems the organization faced?
A. I guess it really -- the time they needed was very critical, because up to some point in

time, I was -- I want to answer that affirmatively. I was -- I felt that though I didn't think it would work, I felt that they were doing everything they could to sell the Philadelphia things, and I felt that -- I believed Sherif that they were doing a really good job in getting out costs. So up until point X, and I don't know when point X was, I thought the management was really doing a good job.
Then must have been in about the first of May or some time in maybe the May time frame, I became of the opinion that I wasn't sure Sherif was just pulling my leg, because I said to Sherif, I said, if we're getting all these costs out, why doesn't it show up in the financial statements? So I concluded, for better or worse, that he was -- had been pulling my leg all this time, and that, God damn it, they weren't getting the costs out they said they were getting out, and so there's that change of opinion of mine somewhere in that time frame.
Q. And you would place that in approximately May of 1998?

A. April, May, in that time frame.
Q. If you could take a look at page 2 of this document, Exhibit 1654.
A. Um-hum.
Q. Am I reading your notes right that the second bullet point reads: Also worked to put in place a comprehensive integrated delivery system?
A. Yes.
Q. And what did you mean by a comprehensive integrated delivery system?
A. Basically, a medical buzz word. The primary network care providers, that is the doctors, et cetera, community hospitals, the other dashes now -- and community hospitals.
Q. So did you understand the various acquisitions and affiliations that AHERF had been making over the years, both the hospital acquisitions and the physician practice acquisitions, to be toward this goal of a comprehensive integrated delivery system?
A. Yes.
Q. Did you think that was a good strategy for AHERF to be pursuing?
A. Yes, I don't -- that was consistent with their

long-term strategy of providing, as I've said a hundred times, good medical service. It also fed patients to their tertiary care hospitals. So, yes, I think this is consistent with their long-term strategy.
Q. Did the tough year that AHERF experienced financially we talked about earlier in fiscal year 1996 leave you at all to reconsider this strategy?
A. Well, '96 wasn't perceived as a tough year by us.
Q. Well, you stated in the meetings of committees that it was a very tough year.
A. Oh, Christ. Every minister in the world states certain things that they don't necessarily mean.
I said to people we have finished a tough year. Now, we've got to get cracking and get our -- and raise our income more. Maybe I should have phrased it differently, but that was the point. We thought '96 was an encouraging good year, because we had earned -- it had the signs of having turned the corner in the sense that '94, '95 were -- we had lost money. I was yapping about they ought to earn

J. DAVID BARNES

Page 182

1      five percent of their revenues.
2            In 1996, we earned six million bucks.
3      Now, is that a lot of money, no, but it's a big
4      deal when it's turning the corner.  So we were
5      all relatively happy with '96, although
6      admitting that it was not anything like a
7      satisfactory return on the size of business we
8      had, and then we were even more pleased with
9      '97 when we earned $22 million according to the
10     audited financial statements that we got.
11  Q.   I guess I'm confused about that, because you
12     didn't get the audited financial statements for
13     1997 that said the organization had earned
14     $20 million until months after the disastrous
15     results of the first quarter of '98, right?
16  A.   No.  We got the audited statements -- the audit
17     committee met, I think, on October 15, 1997,
18     and they received the financial statements
19     which showed earnings of $22 million.  Then 15
20     days later, on October 30, we received the
21     internal statement which showed the loss of
22     $42 million.  So for 15 --
23  Q.   You felt good, but only for 15 days?
24  A.   That's exactly right.  So for 15 days, we
25     really felt good.  The turn-around continued to

Page 183

1      appear to be there.
2  Q.   All right, but in the long-run, that didn't
3      really matter since you learned two weeks later
4      that you just had a disastrous quarter, right?
5  A.   That's probably correct, because it made us
6      feel good for two months -- two weeks.
7  Q.   Do you know one way or the other if
8      Coopers & Lybrand had come to the audit
9      committee in the fall of 1996 --
10         MR. MCCLENAHAN:  '96?
11         MR. RYAN:  Yes.
12  BY MR. RYAN:
13  Q.   -- and had said, you know, we don't think AHERF
14     earned $6 million the last fiscal year, we
15     think AHERF may have suffered a loss, do you
16     know one way or the other whether that would
17     have had any effect on the business strategy
18     that AHERF was pursuing?
19  A.   Assuming it had -- well, I think what it does
20     is it opens the door to a lot of questions.
21     Now, how they all get answered, I'm not sure,
22     but, you know, one family of questions is the
23     internal questions.  I mean, why did we not
24     earn the $6 million we thought we did?  I mean,
25     is it an annual problem or is it just a

Page 184

1      one-year thing?  Where did it happen?  Why did
2      it happen?  Are there one problem or are there
3      ten problems?  Does this suggest that the damn
4      financial statements system isn't any good or
5      is good?
6            You get that series of questions, and
7      then you got a secondary series of questions
8      is, okay, you know, what do you do about it?
9      You can say, well, give up Philadelphia and
10     sell everything in Philadelphia or kick it out
11     one way or another.  You can get a new
12     management team.  There are probably half a
13     dozen options on that side of the coin, one of
14     which would be to bring in a consultant.
15  Q.   The losses in 1994 and 1995 didn't lead anybody
16     to say we should get out of Philadelphia, did
17     they?
18  A.   No, but the trend -- you had, A, to worry about
19     the trend, and B -- I mean, it's one thing to
20     have a turn-around plan, but it's another, God
21     damn it, if you never turn, and that would be
22     one of the real issues there.  You know, we say
23     we have a turn-around -- the management says we
24     have this wonderful turn-around, we're going to
25     make these acquisitions and blah, blah, blah,

Page 185

1      and they don't turn in '94, they don't turn in
2      '95, and they don't turn by this hypothesis in
3      '96.  At some point in time, you know, you can
4      have -- keep your loyalists, but at some point
5      people begin to say, well, look this
6      turn-around thing is all talk.
7            So that the '96 earnings were
8      important, not so much from the quantity, but
9      because they demonstrated that the thing was
10     turning, and they gave the board and finance
11     committee and everybody else a very encouraged,
12     warm feeling that things were really turning,
13     and then when they didn't turn -- and then 22
14     made us -- as I say, we really felt quite warm
15     for two weeks, and -- so those numbers were
16     important.
17  Q.   Now, when the organization learned of the poor
18     performance in the first quarter of fiscal year
19     1998, the result was to undertake measures that
20     in hindsight turned out to be ineffective, is
21     that right?
22  A.   I would say poorly executed by management.
23  Q.   And what do you base that on?
24  A.   Well, on the cost-cutting thing, I don't think
25     that was a horrendously impossible objective.

J. DAVID BARNES

Page 186

1    Remember, the revenues were running about
2    $2 billion then.  Five percent of $2 billion is
3    a hundred million.  So you're talking about
4    getting out -- I mean, it's a lot of money, but
5    it's a percent of the revenues.  It wasn't such
6    a mind-bogglingly large percent.  So I think
7    that a right management could have taken those
8    costs out, or at least certainly done more to
9    the costs than were done.
10          The sale of the company thing, I
11   don't know, I never had any confidence in that
12   option and today don't.  I just -- maybe I'm
13   too much of a Scotsman or something, but I just
14   don't see how you're going to sell something
15   that loses $40 million a quarter to anybody
16   else for any meaningful amount of money.  Maybe
17   I'm wrong about that.
18   Q.  Did you raise with anyone at the time these
19       concerns you had about how AHERF was going to
20       sell hospitals that were losing so much money?
21   A.  Oh, yes.
22   Q.  Whom did you raise that with?
23   A.  I raised with Snyder.  I raised it -- probably
24       mentioned it to most of the finance committee
25       or the audit committee or something.  It was no

Page 187

1    secret where I stood on the subject, but on the
2    other hand, it would have been imprudent in my
3    judgment to try and torpedo or sink this
4    scheme.  I told you where I came from on the
5    subject, but I don't walk on water, so I could
6    have perfectly well have been a hundred percent
7    wrong, and he could have sold the thing for
8    billions of dollars, and I would have been
9    proven wrong.  So it would have been silly for
10   anybody, I think, to try to sabotage them or do
11   anything to Sherif's efforts to sell the thing.
12   So I let it be known I was skeptical, but still
13   going to be supportive.
14   Q.  Do you remember what Mr. Snyder's views were on
15       that subject?
16   A.  No, I can't speak for Bill or any -- I don't
17       know where Bill would have come from.
18   Q.  What response, if any, did Mr. Abdelhak provide
19       to your concerns about difficulties in selling
20       these hospitals?
21   A.  Well, he was pretty positive of the opinion he
22       could do it, and he rattled off some prospects
23       he had, Tenet -- somebody by the name of Tenet,
24       somebody by the name of Vanguard, I think, and
25       I think he had a third prospect, although maybe

Page 188

1    there were just two.
2    Q.  Do you recall that in early 1998 AHERF entered
3        into an exclusive arrangement with Vanguard to
4        the exclusion of other potential purchasers of
5        those assets?
6    A.  No, I do not.
7            MR. MCCLENAHAN:  Exclusive
8    arrangement to do what?
9            MR. RYAN:  To buy the assets.
10           MR. MCCLENAHAN:  To buy the
11   Philadelphia -- or some of the Philadelphia
12   hospitals?
13           MR. RYAN:  Right.
14   BY MR. RYAN:
15   Q.  That's not something that you recall?
16   A.  No, I do not.
17   Q.  Did you ever meet with the investment bankers
18       from Merrill Lynch & Company who were working
19       with AHERF on that transaction?
20   A.  I don't recollect meeting them.  I don't think
21       so.
22   Q.  Do you see on the top of page 3 of your notes
23       marked as Exhibit 1654 --
24   A.  Um-hum.
25   Q.  Well, could you perhaps read that first bullet

Page 189

1    point for us?
2    A.  Because of federal and state moves, 1997 and
3        1998 had massive revenue reduction.  Not
4        occupancy.  Not severity.  Almost all payment
5        rates.  Admittedly problem makes it
6        difficult -- admittedly problem make difficult
7        Philadelphia than Pittsburgh.
8    Q.  Was it your view back in fiscal year 1998 that
9        it was the reduction in payment rates from
10       federal and state governments that were driving
11       a massive revenue reduction for AHERF?
12   A.  Yes.
13   Q.  And what do you remember about that?
14   A.  Well, other than in principle, I remember the
15       federal government cut back its payment rates.
16       The State of Pennsylvania cut back its payment
17       rates.  The insurance companies either cut back
18       their payments rates or dragged their payments
19       terribly so that it hurt cash, but not
20       necessarily the other, but that's about all I
21       remember.  I don't remember any more details
22       than that.
23   Q.  Let me mark, please, as Exhibit 1655, a
24       document with Bates Nos. GOB 71626 through 36.
25           - - - -

48 (Pages 186 to 189)

J. DAVID BARNES

Page 198

```
 1    the clinical point of view, we have the
 2    responsibility to take care of Philadelphia.
 3    Philadelphia is a particularly tough problem,
 4    because they were in the main inner city
 5    hospitals, and you got to take care of the
 6    inner city population, and you can understand
 7    that line of logic.
 8         MR. RYAN:  All right.  Why don't we
 9    break now for the day, and we'll resume in the
10    morning.
11         THE WITNESS:  Same time, same
12    station?
13         MR. RYAN:  Yes.
14         THE VIDEOGRAPHER:  We're now going
15    off the record.  The time on the screen is
16    4:30.
17              - - - -
18         (The proceedings were temporarily
19    adjourned at 4:30 p.m.)
20              - - - -
21
22
23
24
25
```

Page 199

```
 1    COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
 2    COUNTY OF ALLEGHENY        )  SS:
 3         I, JoAnn M. Brown, RMR, CRR, a Court Reporter
 4    and Notary Public in and for the Commonwealth of
 5    Pennsylvania, do hereby certify that the witness, J. .
 6    DAVID BARNES, was by me first duly sworn to testify
 7    to the truth; that the foregoing deposition was taken
 8    at the time and place stated herein; and that the
 9    said deposition was recorded stenographically by me
10    and then reduced to printing under my direction, and
11    constitutes a true record of the testimony given by
12    said witness.
13         I further certify that the inspection, reading
14    and signing of said deposition were NOT waived by
15    counsel for the respective parties and by the
16    witness.
17         I further certify that I am not a relative or
18    employee of any of the parties, or a relative or
19    employee of either counsel, and that I am in no way
20    interested directly or indirectly in this action.
21         IN WITNESS WHEREOF, I have hereunto set my hand
22    and affixed my seal of office this 11th day of July,
23    2003.
24         _____
25              Notary Public
```

Page 200

```
 1    COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
      COUNTY OF ALLEGHENY          )   S H E E T
 2
          I, J. DAVID BARNES, have read the foregoing
 3    pages of my deposition given on Tuesday, July 8,
      2003, and wish to make the following, if any,
 4    amendments, additions, deletions or corrections:
 5    Page/Line  Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
      In all other respects, the transcript is true and
20    correct.
21         _____
               J. DAVID BARNES
22
      Subscribed and sworn to before me this
23    _____ day of _____, 2003.
24    _____
               Notary Public
25         AKF Reference No. JB76268
```

51 (Pages 198 to 200)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

### *J. DAVID BARNES*
*July 9, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**BARNES, J. DAVID - Vol. 2**



**LEGALINK**

A **WORDWAVE** COMPANY

J. DAVID BARNES

Page 222

1  statements for fiscal year 1997?
2  A.  No, I do not.
3  Q.  All right.  I'm done with that document.
4  A.  Okay.
5  Q.  Let me mark, please, as Exhibit 1660 a one-page
6  document with Bates No. DBR-AA 14574.
7          - - - -
8  (Exhibit 1660 marked for identification.)
9          - - - -
10         MR. MCCLENAHAN:  Let him take a
11  minute to read through it before you start
12  asking questions if you don't mind?
13         MR. RYAN:  No.  Sure.
14  A.  I've read it.
15  Q.  Do you recall Exhibit 1660 being handed out at
16  either the meeting of the full AHERF board or
17  the finance committee on October 30, 1997?
18  A.  No, I do not.
19  Q.  Do you recall receiving from AHERF management
20  schedules of this type that attempted to
21  quantify the impact of recent legislative
22  changes on AHERF's operations?
23  A.  Yes, from time to time.
24  Q.  And this schedule appears to show a total
25  impact of $99 million.  Do you see that on the

Page 223

1  bottom right?
2         MS. MEADEN:  Objection.
3  A.  It says $99 million, but I don't know that I
4  know what that means.
5  Q.  All right.  Do you recall being told by
6  management that the estimated negative impacts
7  so stated with these legislative changes were
8  in that order of magnitude?
9  A.  The number that I have in my mind as a
10  generality is $100 million.  Whether that's
11  this number or not, I don't know.
12  Q.  Okay.  Let me mark now as Exhibit 1661 a
13  document with Bates Nos. JB 01602 through 1714.
14         - - - -
15  (Exhibit 1661 marked for identification.)
16         - - - -
17  A.  I've got to get some coffee.
18  Q.  Please.  Please go ahead.
19         Do you recognize Exhibit 1661,
20  Mr. Barnes?
21  A.  I guess I'd have to answer no.  I mean, I don't
22  know of all these damn exhibits which one is
23  which.  So, no.
24  Q.  I'm sorry.  I'm talking about these exhibits
25  that I've just handed to you?

Page 224

1  A.  I know what it says on the face on it, but I
2  can't sit here and certify that, my God, that
3  is what it purports to be.
4  Q.  All right.  It purports to be a set of audited
5  financial statements for the AHERF organization
6  for fiscal year 1996, correct?
7  A.  Correct.
8  Q.  And I can represent to you that we got this out
9  of the documents that had been provided to us
10  as having come from your files.  If you could
11  turn to the AHERF consolidated balance sheet
12  which is on the page with the Bates number on
13  the bottom right JB 01607.
14  A.  Um-hum.
15  Q.  Does that look like your handwriting where you
16  have circled the cash and cash equivalents in
17  the first row of the consolidated balance
18  sheet?
19  A.  Probably.
20  Q.  Do you know why you circled that $1,539,000
21  figure?
22  A.  I guess because it's such a modest amount, it
23  drew my attention, and the circle is to draw my
24  attention to it again.
25  Q.  It seemed to you like a low amount of cash on

Page 225

1  hand for an organization of AHERF's size, did
2  it not?
3  A.  That's correct.
4  Q.  Do you recall asking anyone about the low
5  amount of cash on hand?
6  A.  No, I don't.  I don't recollect asking anyone
7  about the cash.
8  Q.  If you could turn, please, to the next page.
9  This is headed AHERF Consolidated Statement of
10  Operations for the Year Ended June 30, 1996?
11  A.  Yes, sir.
12  Q.  And I believe you testified yesterday a couple
13  times about a $6 million figure.  Is that the
14  $6,547,000 identified here as net income before
15  extraordinary item and change in accounting
16  principles?
17  A.  That's correct.  That is the number.
18  Q.  The fiscal year 1996 income statement for AHERF
19  did show, though, a net loss of $11,837,000,
20  did it not?
21  A.  No, I don't think so.  If you're talking about
22  what's implicitly operating net income, that's
23  six million five.  Then as this is entitled
24  here, it's extraordinary loss on early
25  extinguishment of debt which is not an annual

7 (Pages 222 to 225)

J. DAVID BARNES

Page 226

1    event, and income from change in accounting
2    principles which is also not an annual event.
3    So I think that their -- most properly read,
4    that their net income on sort of an operating
5    basis is six million five, and these two as
6    mentioned here are extraordinary and not usual,
7    not items that would occur periodically or
8    annually.
9    Q.    All right.  So I take it then that you felt
10    that the $6,547,000 in net income for
11    extraordinary item and change in accounting
12    principles was more relevant to you than the
13    $11,837,000 net loss?  How would you
14    characterize it?  I'm not trying to put words
15    in your mouth.
16        MR. MCCLENAHAN:  How would he
17    characterize what?  I mean, they're both there.
18    What do you mean how would he characterize it?
19    Q.    Let me step back.  The statement of operation
20    does state that the net loss for fiscal year
21    1996 for AHERF as a whole was a loss of
22    $11,837,000, right?
23    A.    That's what it says right here.
24    Q.    All right.  But have I understood you right
25    that you focused more on the positive

Page 227

1    $6,547,000 figure than on the $11,837,000 net
2    loss?
3    A.    They were both important numbers.  The one that
4    I think -- if you're trying to get a grip on
5    how is the organization doing from an operating
6    point of view, the six million five is the more
7    important number than the $11.8 million, and
8    the reason I think it's a more important number
9    is because it is their sort of annual running
10    rate, if you will.  These other two numbers,
11    the extinguishment of debt and the income from
12    accounting principles, were not numbers that
13    would be incorporated within the scope of what
14    you'd call the annual running rate.
15    Q.    All right.  Let me ask you about the fourth row
16    here on the income statement.  Do you see the
17    row that reads investment income $74,075,000?
18    A.    Yes.
19    Q.    Did you have an understanding as to what that
20    represented?
21    A.    No.  On these audited -- in terms of -- I
22    would -- these are audited statements.
23    Accepted audited statements, at least at that
24    time frame, is gospel.  The numbers are from
25    God.  No, I knew it was $74 million of

Page 228

1    investment income.  What the transactions were
2    that went into that, I do not know.
3    Q.    All right.  I mean, you did know that Coopers &
4    Lybrand wasn't God, right?
5    A.    I thought they were.
6    Q.    Do you see the next row reads:  Net assets
7    released from restrictions used for operations,
8    $18,916,000?
9    A.    Yes.
10    Q.    Did you have an understanding as to what that
11    row represented?
12    A.    No, I don't.  Today I couldn't tell you what it
13    meant.  I may have understood it at the time.
14    I couldn't -- I don't recollect what it was.
15    Q.    All right.  You mentioned that you thought it
16    was appropriate to get a view of how the
17    organization was doing from an operating point
18    of view.  Did you consider whether it would be
19    appropriate to look at operating income or loss
20    before any investment income?
21    A.    Well, I don't know that I understand the
22    question.  What would the $66 million have been
23    before -- after investment income was deducted
24    out or whatever?
25    Q.    Right.  That would be a $68 million loss,

Page 229

1    right, operating loss?
2    A.    Only if the investment income was a one-time
3    non-occurring thing.  Investment income
4    could -- if it's up there and carried as
5    income, could be a continuing revenue for ad
6    nauseam.
7    Q.    Do you know -- strike that.
8        Did you consider in 1996 whether
9    fiscal year 1996 had been a particularly good
10    year for the stock market?
11        MR. MCCLENAHAN:  You mean back at
12    that time?
13        MR. RYAN:  Yes.
14    BY MR. RYAN:
15    Q.    Did you, when you were reviewing these
16    financial statements in 1996, consider whether
17    AHERF's investment income for fiscal year 1996
18    was larger than it would be on a recurring
19    basis due to the unusually strong performance
20    of the stock market that year?
21    A.    I don't recollect the stock market action then,
22    but you'll see from time to time comments that
23    I make that the financial statements are -- I
24    think I made it somewhere in the minutes that
25    they are good from -- acceptable from a

8 (Pages 226 to 229)

J. DAVID BARNES

Page 230

1    quantitative point of view, but poor from a
2    qualitative point of view. I made them with
3    respect to the next year, and what I was
4    alluding to when I said that was too much
5    reliance on investment income.
6  Q.  That was something that you perceived back in
7    1996 as well?
8  A.  Oh, sure.
9  Q.  Do you know whether the $18,916,000 in revenue
10    identified as net assets released from
11    restrictions used for operations was a
12    one-time, non-recurring event?
13  A.  I do not.
14  Q.  If it was, then you would agree that it might
15    be appropriate to back that out to get a view
16    of recurring operating income or loss, right?
17  A.  Well, these are really audited statements, you
18    know, from a very fine firm. I, A, am not an
19    accountant, so I don't know what's right. I
20    think that the man on the street has a tendency
21    to accept these audited statements as fully
22    correct, and if it belongs there, that's where
23    it's been put.
24  Q.  Do you recall asking anyone what net assets
25    released from restrictions used for operations

Page 231

1    were?
2  A.  We may have discussed it, but I don't recollect
3    it.
4  Q.  This package includes, in addition to the
5    consolidated AHERF financial statements,
6    separate financial statements for various AHERF
7    affiliates or obligated groups, right?
8  A.  Um-hum.
9  Q.  At the time back in 1996, did you review those
10    financial statements separately?
11  A.  The committee didn't. I don't recollect
12    reviewing them separately. When I read the
13    material, I obviously looked at them.
14  Q.  Okay. So, I mean, you personally did review
15    all of these individual affiliate statements?
16  A.  Whatever is in the package, I read.
17  Q.  And was it your practice at all in reviewing
18    the financial statements to review liquidity at
19    AHERF or any of its affiliates?
20  A.  Not in -- there were comments made and
21    information given, as you've seen through
22    various things, that the money was maybe tight,
23    but I put more emphasis on liquidity by --
24    maybe it's a half-baked approach, but by
25    looking at calculating cash flow by adding the

Page 232

1    net income to the depreciation. That showed in
2    this year this enterprise had, roughly,
3    $101 million of cash flow, which was a pretty
4    good sum. So if the numbers had been good --
5    I'm not saying they weren't good, but if those
6    had been good numbers, that's a pretty generous
7    amount of cash flow, cash that they had to work
8    with to manage their problems.
9  Q.  All right. And that was a financial measure
10    that Coopers & Lybrand did not present, but
11    that you calculated independently based on
12    figures contained in the Coopers & Lybrand
13    audit to the financial statements?
14  A.  That's correct.
15  Q.  Let me mark, please, as Exhibit 1662 a document
16    with Bates Nos. PRBO 09600246.
17          - - - -
18    (Exhibit 1662 marked for identification.)
19          - - - -
20  BY MR. RYAN:
21  Q.  Let me just ask you first, for the record, do
22    you see these appear to be minutes of finance
23    committee of the board of trustees of AHERF for
24    a meeting held on Friday, June 20, 1997?
25  A.  That's correct.

Page 233

1  Q.  And what I'm going to ask you about,
2    Mr. Barnes, is Section 2, Additions to Agenda,
3    the paragraph on the bottom of the first page,
4    but, again, feel free to look at any other
5    portion of the minutes.
6  A.  Okay.
7  Q.  Do you recall this discussion, Mr. Barnes?
8  A.  No, I don't.
9  Q.  Do you see the first sentence in the paragraph
10    to which I called your attention reads:
11    Mr. Barnes announced a discussion of a possible
12    intercompany financing arrangement? Do you
13    know to what that refers?
14  A.  Other than what's contained here in this
15    paragraph, I don't recollect that discussion at
16    this meeting date.
17  Q.  All right. Do you recall generally the issue
18    of pursuing a sale/leaseback arrangement in the
19    Delaware Valley?
20  A.  I had some familiarity that a sale/leaseback --
21    that some leasebacks had been done, but I can
22    recollect any conversations relating
23    specifically to them vis-a-vis the Delaware
24    Valley nor anyplace else.
25  Q.  Why did AHERF engage in sale/leasebacks to your

9 (Pages 230 to 233)

J. DAVID BARNES

Page 238

1      time frame, you were concerned about issues of
2      how much reserves at Allegheny General Hospital
3      were left for intercompany borrowings?
4  A.   No, I do not at that point in time, or, no, I
5      do not recall any particular concerns.
6  Q.   Are you able to place in time when you first
7      started having such concerns?
8            MR. MCCLENAHAN: Objection. I'm not
9      sure he said he ever had such concerns.
10  Q.   All right. Did you at some point have concerns
11     about how much money was left at Allegheny
12     General Hospital to advance to the Delaware
13     Valley?
14  A.   No, because at a point in time where that might
15     have become critical, I was told that they were
16     repaying their loans. That is, they being the
17     east was repaying the loans to the west.
18         This credit committee issue is one
19     that bobbled along from this time frame until
20     the spring of '98 when it was sort of
21     terminated or put on the shelf, I guess, is a
22     better term.
23  Q.   Why was it put on the shelf?
24  A.   Because I was told that the Delaware companies
25     were repaying the loans to the west, and I told

Page 239

1      then whoever I was talking to that rather than
2      having the finance department spend a lot of
3      time researching and thinking through how you
4      make this loan committee work well, I would
5      rather they'd spend the time saving money on
6      cost control and saving funds rather than
7      thinking through the details of the finance
8      committee -- or loan facility if we're not
9      going to be making loans.
10  Q.   So you thought that there was no need for an
11     internal loan committee to meet, is that right?
12  A.   That's correct.
13  Q.   Do you know whether there ever was a meeting of
14     an internal loan committee?
15  A.   I do not. I don't think there was an internal
16     loan committee, so I don't think it ever met.
17     There may have been meetings at the resource
18     committees east and west, but I don't -- any
19     that I were involved with never met.
20  Q.   Exhibit 1662 and 63 suggest that you and others
21     on the finance committee --
22           MR. MCCLENAHAN: Which exhibits are
23     they?
24           MR. RYAN: The last two exhibits.
25           MR. MCCLENAHAN: Okay. This one? Go

Page 240

1      ahead.
2  BY MR. RYAN:
3  Q.   Exhibit 1662 and 1663 suggests that you and
4     other members of the finance committee knew of
5     the intercompany advances at least by June
6     1997, is that right?
7  A.   Oh, yes.
8  Q.   Do you know whether you had known about the
9     intercompany advances previously?
10  A.   They were implicit in the Delaware Valley
11     transactions from day one.
12  Q.   All right. It didn't come as a surprise to
13     you --
14  A.   No, no. It was implicit.
15  Q.   -- to learn --
16  A.   It was to totally implicit in the transaction,
17     when we bought the Delaware Valley properties,
18     we may have invest something in them to turn
19     them around and make them work.
20  Q.   Okay. Let me just ask again so we get the full
21     question and answer on the record.
22         It didn't then come as a surprise to
23     you to learn that the monies had been advanced
24     from the west to support operations in the
25     east?

Page 241

1  A.   Oh, no. Absolutely not.
2         MR. MCCLENAHAN: Is this a good time
3     to take a recess?
4         MR. RYAN: Sure. We can take a quick
5     break.
6         THE VIDEOGRAPHER: We're now going
7     off the record. The time on the screen is
8     10:17.
9          - - - -
10     (There was a recess in the proceedings.)
11          - - - -
12         THE VIDEOGRAPHER: We're now back on
13     the record. The time on the screen is 10:26.
14         MR. RYAN: Let me mark, please, as
15     Exhibit 1664 a one-page document with Bates No.
16     RS 00459.
17          - - - -
18     (Exhibit 1664 marked for identification.)
19          - - - -
20  BY MR. RYAN:
21  Q.   Do you see that Exhibit 1664 is a memo from
22     Sherif Abdelhak to you dated January 11, 1998?
23  A.   Um-hum.
24  Q.   And it begins: This will confirm your
25     agreement to chair an internal loan committee

J. DAVID BARNES

Page 242

1     for AHERF?
2  A.   That's what the letter says.
3  Q.   Do you recall Mr. Abdelhak asking you to chair
4       such a committee?
5  A.   No.
6  Q.   Do you recall anybody else asking you to chair
7       such a committee?
8  A.   No.
9  Q.   Do you know how it came about that you were to
10      be the chair of the committee?
11 A.   As I told you before the break, this is an
12      issue -- this loan committee issue has been one
13      that had been perking along since June of last
14      year, whether -- and only -- somebody gave
15      Sherif a hard time about the intercompany loans
16      or something like that, something.  He was
17      given a hard time about something, so he
18      decided in this time frame that he would
19      reconstitute the conversations, and my
20      suspicion is that this confirmation that he
21      uses here dates back some many matter of
22      months.  All those conversations are the
23      subject of whether it made sense to do it,
24      whether it didn't, and so forth.
25 Q.   Thank you.

Page 243

1        Do you know who was giving
2       Mr. Abdelhak a hard time about the intercompany
3       advances?
4  A.   No, I don't.
5  Q.   Do you remember what views any of the other
6       individuals who are listed here as people who
7       have agreed to serve as members of an internal
8       loan committee may have expressed on the
9       subject of the intercompany loans?
10 A.   No, I -- no.
11 Q.   Do you recall any trustees who you would
12      consider to have been either strong proponents
13      or strong critics of the intercompany loans?
14 A.   As individuals, no, but basically the western
15      reserve, whatever that committee was --
16 Q.   Resource management?
17 A.   Yeah, resource management committee. -- I
18      think was concerned about it from the western
19      point of view, which, mainly, at that point in
20      time meant the AGH point of view, who was the
21      principal supplier of funds.  Their concern
22      legitimately is how much was a reasonable
23      amount to lend to the eastern hospitals.
24 Q.   Let me mark, please, as Exhibit 1665 a two-page
25      document with Bates Nos. AMS 402168 to 69.

Page 244

1              - - - -
2        (Exhibit 1665 marked for identification.)
3              - - - -
4  BY MR. RYAN:
5  Q.   If you could just take a moment to review this
6       letter, please.
7  A.   Um-hum.
8  Q.   Now, Exhibit 1665 is a letter addressed to you
9       co-signed by Anthony Sanzo and Joseph Dionisio,
10      is that right?
11 A.   That's correct.
12 Q.   Do you recall receiving this letter?
13 A.   Yes.
14 Q.   And what do you recall about that?
15 A.   Well, when you say what did I recall about
16      that, it ended up in the in-basket, and I
17      picked it up and there it was.  I don't know
18      what you mean what do I recall about receiving
19      it?
20 Q.   Did you discuss the substance of this letter
21      after you read it with either Mr. Sanzo or
22      Mr. Dionisio?
23 A.   Yes.
24 Q.   And what do you recall about that conversation
25      or conversations?

Page 245

1  A.   I told them that the loan committee and I
2       had, in discussions with Sherif, concluded it
3       was not the highest and best use of the finance
4       staff's time to set up a loan committee, and
5       that, therefore, we hadn't gone -- had not gone
6       ahead with it.  I told him that I had planned
7       to discuss this at the next meeting of the
8       audit committee or the finance committee, and
9       if they took issue with that, we would go ahead
10      and do it.
11         At this time frame, this was before
12      the finance committee or the audit committee
13      had agreed to my position on the matter, but it
14      was somewhere along in here that I was -- had
15      several negotiations, several conversations
16      with Sherif on that issue, and the reason I
17      felt it was unnecessary was they had told me
18      that they were repaying the loans -- that the
19      east was repaying the loans to the west.
20 Q.   And this was a conversation you had with
21      Mr. Sanzo?
22 A.   No, no.  Well, there are two conversations
23      floating around here.  The Abdelhak
24      conversations related to the -- bringing the
25      loan committee into being.  The other relates

12 (Pages 242 to 245)

J. DAVID BARNES

Page 262

1  recall expressing the view to representatives
2  of MBIA that you were aware of the accounts
3  payable squeeze?
4  A.  Yes.
5  Q.  Do you recall a discussion at all with MBIA
6  about the severity of the accounts payable
7  squeeze?
8  A.  I do not.
9  Q.  Do you remember anything that the
10  representatives from MBIA may have said about
11  AHERF's accounts payable squeeze?
12  A.  I do not.
13  Q.  Do you recall, with reference to the final
14  bullet point in this section of the memo, any
15  discussion with representatives of MBIA about
16  how you and Mr. Gumberg saw one system,
17  although the doctors saw two, east and west?
18  A.  I don't recollect that conversation.
19  Q.  Do you recall holding the view at the time that
20  you saw AHERF as one system, whereas members of
21  the medical staff tended to see the
22  organization in terms of east versus west?
23  A.  I think, generally, the -- I, and I think
24  generally the AHERF trustees saw the one-system
25  thing, but I don't -- I have no reason to

Page 263

1  concur in the view that the doctors see east
2  and west. I just don't know. I don't know
3  that that's true; I don't know that that's not
4  true. I have no knowledge of it at all.
5  Q.  Understood.
6      MR. RYAN: Okay. We need to pause
7  for change of the videotape, so why don't we
8  take a short break.
9      THE VIDEOGRAPHER: We're now going
10  off the record. The time on the screen is
11  11:08.
12          - - - -
13  (There was a recess in the proceedings.)
14          - - - -
15      THE VIDEOGRAPHER: We're now back on
16  the record. The time on the screen is 11:18.
17      MR. RYAN: Let me mark, please, as
18  Exhibit 1668 a document with Bates Nos.
19  JB 03755 to 56.
20          - - - -
21  (Exhibit 1668 marked for identification.)
22          - - - -
23  BY MR. RYAN:
24  Q.  And once you've had a chance to review that
25  letter, if you could just let me know, please,

Page 264

1      Mr. Barnes.
2  A.  Okay.
3  Q.  Do you recall receiving this letter from
4  Ms. Karleen Strayer of MBIA addressed to you
5  and Mr. Gumberg?
6  A.  Yes, I do.
7  Q.  And did you understand this to be a follow-up
8  of the April 29 meeting we discussed that you
9  and Mr. Gumberg had with MBIA?
10  A.  Yes.
11  Q.  And MBIA was providing you here with
12  information on quality hospitals that did not
13  own a medical school?
14  A.  Um-hum.
15  Q.  And was it your understanding that MBIA was
16  expressing the view that Allegheny General
17  Hospital didn't need to own a medical school to
18  be a quality hospital?
19      MS. MEADEN: Objection.
20  A.  I don't know how much further it goes than this
21  de facto. They say that this is a group that
22  doesn't own a medical school.
23  Q.  Had you heard that view expressed by anybody
24  before you heard it from MBIA in the spring of
25  1998?

Page 265

1  A.  Not that I recollect.
2  Q.  If you had heard that view expressed earlier,
3  do you know one way or the other how that would
4  have affected decisions taken by the AHERF
5  board of trustees?
6      MR. McCLENAHAN: Object to the form
7  of the question. It's hopelessly vague, but
8  you can answer it if you're able to.
9  A.  Well, this would, you know, sort of fly in the
10  face of the logic that had prevailed for a long
11  time. So whoever had this issue, they had the
12  burden of proof of getting people to accept it,
13  which, I guess, maybe you could.
14      Then the second question is, okay,
15  this is the ones that don't have a medical
16  school affiliation. What's the other side of
17  the coin? How many do? That's all I can see
18  that's in this at earlier times. I don't know
19  what -- I have no idea what you'd have saw if
20  you asked the other side of the coin, which
21  hospitals do have a medical school affiliation?
22  You might have a list that's three times this
23  long. I don't know.
24  Q.  After you received this June 9, 1998 letter
25  from MBIA, did you do anything to follow up to

17 (Pages 262 to 265)

J. DAVID BARNES

Page 266

1      learn any additional information on this topic?
2  A.   No.
3  Q.   Let me mark, please, as Exhibit 1669 a one-page
4      letter dated -- Bates stamped, rather, TACO
5      52826.
6          - - - -
7      (Exhibit 1669 marked for identification.)
8          - - - -
9  BY MR. RYAN:
10 Q.   If you could let me know, Mr. Barnes, when
11     you've had a chance to review the letter.
12 A.   I've read it.
13 Q.   This is a June 5, 1998 letter from W.P. Snyder,
14     III to Sherif Abdelhak?
15 A.   That's correct.
16 Q.   Have you seen this letter before?
17 A.   Yes.
18 Q.   This is the letter in which Mr. Snyder informed
19     Mr. Abdelhak that the executive committee was
20     removing him as president and chief executive
21     officer of AHERF?
22 A.   That's correct.
23 Q.   And there's reference here to a meeting of the
24     executive committee duly called and held on
25     June 5, 1998.  Do you recall that meeting?

Page 267

1  A.   Yes.
2  Q.   And what do you remember about that meeting?
3  A.   I recall the meeting.  The issue -- the issue
4      was the termination or non-termination of
5      Mr. Abdelhak.  The committee decided in the
6      affirmative to terminate him, and that, of
7      course, was what precipitated this letter.
8  Q.   How long in advance of that meeting did you
9      learn that there was consideration being given
10     to terminating Mr. Abdelhak?
11 A.   I can't recollect a date -- a particular date
12     where that would have been -- have occurred,
13     put it that way.
14 Q.   But you heard about that at some point before
15     the actual meeting that day?
16 A.   I didn't hear about it so much as, perhaps,
17     among others, but in any case, precipitated it.
18 Q.   But what role did you play in precipitating it?
19 A.   Well, I ultimately lost confidence in Sherif,
20     and so -- and I didn't really know how you go
21     about removing somebody in that sort of a
22     circumstance, so I went to a lawyer who has
23     been a good friend and had some relationship
24     with AHERF, a very senior lawyer, and asked him
25     how one went about this, and as a consequence

Page 268

1      of that, I went and talked to Mr. Snyder and
2      learned that other people had been talking with
3      Mr. Snyder.  So Mr. Snyder then terminated --
4      or then agreed to have this committee
5      meeting -- or this executive committee meeting
6      which resulted in his termination.
7  Q.   Who was the lawyer whom you consulted?
8  A.   Queenan.  Chuck Queenan.  C.J. Queenan.
9  Q.   He's a lawyer at the law firm of Kirkpatrick &
10     Lockhart?
11 A.   Um-hum.
12 Q.   And you knew Mr. Queenan, also, because he was
13     a member of the board of AHERF or one of its
14     affiliates?
15 A.   No.  He was not a member of the board of AHERF.
16     I don't think he was a member of anything else.
17 Q.   Had you interacted with Mr. Queenan on
18     AHERF-specific matters before?
19 A.   Very little.
20 Q.   Did those matters involve your asking him for
21     legal advice?
22 A.   No, I wasn't asking for legal advice, so the
23     answer is no, I guess.
24 Q.   What were those other matters where you spoke
25     with Mr. Queenan about AHERF?

Page 269

1  A.   Sherif had mentioned some time in, I guess, the
2      May period of -- this is very foggy in my
3      mind -- of perhaps a substantial write-off in
4      the east or perhaps the accounting people in
5      the east had not done things appropriately, and
6      so I had talked about let's investigate and get
7      the facts, and I think Sherif and I had talked
8      with Queenan in the May time frame on that
9      issue, but I'm not really clear on the details
10     of that affair.
11 Q.   Was it your understanding that Mr. Queenan was
12     to investigate this accounting issue?
13 A.   I guess he was really -- our real consultation
14     was to ask him what we would do about it, and
15     if he volunteered to help us, then so be it.
16 Q.   Did you ever hear back from Mr. Queenan about
17     what the results may have been of any
18     investigation?
19 A.   I don't think he had time to do any work -- any
20     significant work until the termination of
21     Sherif.
22 Q.   Did you ever hear back from him at all about
23     any work he may have done?
24 A.   No.  He had done nothing that can I recollect.
25 Q.   So after you spoke with Mr. Queenan, you went

J. DAVID BARNES

Page 270

1 to speak with the chairman of the board,
2 Mr. Snyder, is that right?
3 A.  That's correct.  As I recollect, that's
4 correct.
5 Q.  And what did you tell Mr. Snyder in that
6 meeting?
7 A.  I told him that I had lost my confidence in
8 Abdelhak, and that I strongly urged that we
9 ought to terminate him and replace him with
10 someone else.
11 Q.  Did Mr. Snyder say anything to you about who
12 else had approached him about terminating
13 Mr. Abdelhak?
14 A.  No, I can't -- he perhaps did, but I can't
15 recollect any comments of Snyder.
16 Q.  Did you speak to anybody else other than
17 Mr. Queenan and Mr. Snyder about whether
18 Mr. Abdelhak should be terminated before this
19 executive committee meeting?
20 A.  I can't recollect any.
21 Q.  Do you remember hearing something about a
22 petition among doctors at Allegheny General
23 Hospital to remove Mr. Abdelhak?
24 A.  No.
25 Q.  Did you give any consideration as to whether

Page 271

1 the executive committee should remove
2 Mr. Abdelhak or whether that was an issue for
3 the full board of trustees?
4 A.  I did not, no.
5 Q.  Do you know whether any other members of the
6 board of trustees other than those on the
7 executive committee were consulted before this
8 meeting?
9 A.  I do not know that.
10 Q.  What can you recall about the views that may
11 have been expressed by those who attended the
12 June 5, 1998 executive committee meeting?
13 A.  I can't recollect the views of the
14 individual -- of the people that were there.
15 Q.  Do you remember whether you spoke out at that
16 meeting in favor of removing Mr. Abdelhak from
17 his position?
18 A.  I do not recollect whether I did or did not.
19 Q.  Do you remember anybody expressing a contrary
20 view and urging that Mr. Abdelhak be retained?
21 A.  No, I do not remember that either.
22 Q.  I believe you mentioned that when you spoke to
23 Mr. Snyder prior to the June 5 meeting, he told
24 you that others had approached him about
25 terminating Mr. Abdelhak.  Did he himself

Page 272

1 express any views to you at that meeting about
2 what he thought about whether Mr. Abdelhak
3 should be terminated or not?
4 A.  I don't recollect whether he did or didn't.
5 Q.  Who succeeded Mr. Abdelhak as chief executive
6 officer of AHERF?
7 A.  Mr. Sanzo.
8 Q.  And how was Mr. Sanzo selected for that
9 position?
10 A.  He was -- his name was put forth before a
11 committee, I presume the same committee, and it
12 was agreed that he would be, among the horses
13 we had, a good candidate.
14 Q.  Do you recall who nominated Mr. Sanzo for the
15 position?
16 A.  I cannot recall that.
17 Q.  Do you recall whether there were any other
18 candidates considered to replace Mr. Abdelhak
19 as CEO?
20 A.  I do not recall any other candidates.
21 Q.  Did you give any consideration to bringing
22 anybody in from outside the organization to
23 provide fresh outside leadership?
24 A.  Not in that time frame, no.
25 Q.  Was there any time frame in which you

Page 273

1 considered that?
2 A.  No.
3 Q.  Do you remember any other member of the board
4 of trustees suggesting that somebody be brought
5 in from the outside to be CEO?
6 A.  I do not remember anybody doing that.
7 Q.  Do you recall that by this time, Dr. Kaye had
8 resigned from his position?
9 A.  No, I don't recall that.
10 Q.  Did you ever learn why Dr. Kaye resigned?
11 A.  I don't remember -- I don't recollect knowing
12 why Kaye resigned other than the general broad
13 range of problems that we're all familiar with.
14 Q.  I take it then that you never spoke to Dr. Kaye
15 about that matter?
16 A.  No, I don't recollect talking with Dr. Kaye
17 about that.
18 Q.  What led you to -- well, strike that.
19 Did you believe in June 1998 that
20 Mr. Sanzo would be a good CEO for AHERF?
21 A.  Well, things were moving very rapidly then.
22 You had to have a horse.  I mean, we couldn't
23 necessarily worry about whether this is the
24 best horse.  You had to have a horse.  I
25 thought he was a good candidate for the job at

19 (Pages 270 to 273)

J. DAVID BARNES

Page 294

1    last two days to mention an entity known as
2    AHSPIC, the Allegheny Health Services Provider
3    Insurance Company?
4    A.    To my knowledge, we have not.
5    Q.    Is that an entity with which you had
6    familiarity while you were on the AHERF board?
7    A.    Yes.
8    Q.    That was an insurance company?
9    A.    Yes.
10   Q.    Did you attend meetings related to AHSPIC?
11   A.    I attended their annual meeting.
12   Q.    And where was their annual meeting held?
13   A.    Grand Cayman.
14   Q.    That's in the Cayman Islands?
15   A.    Um-hum.
16   Q.    And was it typical for a number of members of
17   the board often accompanied by spouses to be on
18   this trip?
19           MR. MCCLENAHAN:  Objection to the
20   form.
21   A.    I really can't answer.  I can't answer that.  I
22   don't know about the spouse part of the issue.
23   Obviously, there were a number of people that
24   attended the meeting, yes.  The spouses, I
25   don't know.

Page 295

1    Q.    Okay.  Were there a number of other members of
2    the board of trustees of AHERF apart from you
3    present at these meetings in the Cayman
4    Islands?
5    A.    I can't answer that.  I don't know.  I think it
6    was -- my impression is it was AHERF -- I mean,
7    AHSPIC, whatever it is.  My impression is it
8    was trustees of the insurance company who were
9    there and not other people.
10   Q.    I see.  Did you think that there was anything
11   inappropriate about these meetings in the
12   Cayman Islands?
13   A.    No.  No.  As you probably know, they were very
14   common in the industry.  You would get off the
15   plane, and there would be the Pittsburgh people
16   and the University of Pennyslvania people or
17   somebody getting on the plane.
18   Q.    And in your understanding, this had to do with
19   rules governing offshore insurance companies
20   that the meetings had to be held out of the
21   country?
22   A.    That's correct.
23   Q.    Did you ever have occasion to discuss with
24   anyone at AHERF a concept known as the bad
25   bank?

Page 296

1    A.    No.
2    Q.    Is that a concept with which you are familiar?
3    A.    Yes.
4    Q.    From your time at Mellon Bank?
5    A.    My banking business, yeah.
6    Q.    Do you recall ever talking about that with Dave
7    McConnell?
8    A.    No.
9    Q.    Or any concept that was based on the bad bank
10   idea?
11   A.    No.
12           MR. RYAN:  That's all I have.  Thank
13   you very much for your patience and your time
14   over the last day-and-a-half, Mr. Barnes.
15           THE WITNESS:  Thank you.
16           - - - -
17           EXAMINATION
18           - - - -
19   BY MR. WHITNEY:
20   Q.    Mr. Barnes, my name is Richard Whitney.  I'm
21   representing the Creditors Committee in the
22   litigation against PriceWaterhouseCoopers.  I
23   have just a few questions to ask you.
24           During the course of your deposition,
25   there has been reference to a concern that you

Page 297

1    expressed at least once, and perhaps more than
2    once, at the AHERF board level which was about
3    the quantity and quality of earnings.  What is
4    meant or what do you mean by quality of
5    earnings?
6    A.    That term was used in connection with the
7    quantity, it was the $22 million or the six,
8    whatever the number was, but what I was
9    concerned about in both years, but particularly
10   in the year that they were $22 million, was the
11   organization was too reliant on investment
12   income and needed to get things changed around
13   so their core earnings were more -- were really
14   doing the job rather than being reliant on
15   investment income.
16   Q.    Given the fact that AHERF was in the hospital
17   business, what would its core earnings be?
18   A.    Well --
19           MR. MCCLENAHAN:  Do you mean what
20   would the source of the earnings be?
21           MR. WHITNEY:  Yes.
22   A.    The source of the earnings -- the way AHERF was
23   constructed, the source of the earnings would
24   have been the top -- the revenue lines at the
25   top minus expenses.

J. DAVID BARNES

Page 298

1  Q.  In that AHERF was in the hospital business, a
2      source of earnings would be patient revenue, is
3      that right?
4  A.  Yes.
5  Q.  Would patient revenue be a core earning that
6      you were concerned about in 1995, 1996 and
7      1997?
8  A.  Yes.
9  Q.  You've testified that in reviewing financial
10     statements -- I believe you testified to this,
11     and if I'm wrong, you can correct me, but I
12     believe you said that your focus was on the
13     income statement or the statement of operations
14     more than the balance sheet, is that right?
15 A.  That's correct.
16 Q.  Why would that be?
17 A.  Because I think that demonstrates what you're
18     earning from your efforts, and in the final
19     analysis, those earnings are what make it
20     possible for you to achieve your mission.
21 Q.  From the standpoint of AHERF, and I want to --
22     I'm going to be focusing my questions on that
23     10-15-96 audit committee meeting which was the
24     meeting which you testified yesterday was when
25     you were presented with the audited financial

Page 299

1      statement of AHERF for fiscal year 1996.
2      Focusing on 1996, was there anything about
3      AHERF that would cause you to be especially
4      interested in the statement of operations as
5      opposed to the balance sheet?
6          MR. RYAN:  Objection.
7  A.  Yes. It was important to the organization to
8      develop a good, healthy cash flow.
9  Q.  You had testified yesterday, I believe, that
10     AHERF was pursuing strategies in the mid 1990's
11     that related to growth and incorporation of
12     hospitals and medical schools, physician
13     practices. Do you recall that testimony?
14 A.  Yeah.
15 Q.  In light of those strategies, I believe --
16     strike that. I believe you also said that
17     those strategies had caused some short-term
18     cost to the organization, is that right?
19 A.  That's correct.
20 Q.  In light of those strategies and those costs
21     and in assessing AHERF's performance on a
22     year-to-year basis, would the income statement
23     or the statement of operations be especially
24     meaningful to you in gauging those operations
25     and the success of the strategy?

Page 300

1          MR. RYAN:  Objection.
2  A.  We were, as you know, basically trying to build
3      a viable medical system in the Philadelphia
4      market, the purpose of which was to really fund
5      a top quality medical school in Philadelphia,
6      and probably as good a measure of what kind of
7      progress we were making was the P&L.
8  Q.  All right. When AHERF acquired these eastern
9      hospitals, was it your recollection that they
10     were profitable entities before AHERF acquired
11     them?
12 A.  No, it was not.
13 Q.  All right. Is it your recollection that at
14     least Mr. Abdelhak's suggestion was that
15     although not profitable, they could become
16     profitable under the AHERF umbrella because of
17     efficiencies to be acquired in the
18     consolidation of operations?
19 A.  That's correct.
20 Q.  Would a tracking of the statement of operations
21     from year to year to year provide you and other
22     members of the board, in your opinion, with
23     guidance as to whether or not that statement
24     was proven out?
25          MR. RYAN:  Objection. Lack of

Page 301

1      foundation as to other people and asks a
2      speculative question.
3  Q.  All right. Let's leave the other members of
4      the board out of it. Good point.
5          From the standpoint of your own
6      assessment of whether or not what Mr. Abdelhak
7      was stating had validity, would an analysis of
8      the statement of operations of AHERF from year
9      to year to year be probative evidence?
10         MR. RYAN:  Objection. Asks for
11     opinion testimony from a fact witness.
12         MR. WHITNEY:  Um-hum.
13 A.  It certainly was to me.
14 Q.  All right. I want to show you or -- well,
15     before I do, the document that's there on the
16     top right there on that pile, could you pull
17     that out again for me, and you indicated, I
18     believe, that this Exhibit 1597 that Mr. Ryan
19     showed you last in his questioning is a
20     document that you don't recall seeing before,
21     is that right?
22 A.  That's correct.
23 Q.  You see that it's titled Delaware Valley
24     Hospitals FY '97 Use of Cushions.
25         In October of 1996, Mr. Barnes, do

26 (Pages 298 to 301)

J. DAVID BARNES

Page 302

1  you recall whether you knew -- you had ever
2  heard the term cushions before?
3           MR. MCCLENAHAN: Do you mean in the
4  context of --
5           MR. WHITNEY: Accounting.
6  A.  No, I didn't. I had no knowledge of it as an
7  accounting term.
8  Q.  All right. There is testimony in this case
9  that AHERF's financial people used general
10  reserves or cushions, set asides from previous
11  years to smooth out or improve earnings in a
12  subsequent year. Were you aware of that?
13          MR. RYAN: Objection.
14  A.  No.
15  Q.  If that were true, would that be a matter of
16  concern to you?
17          MR. RYAN: Objection.
18          MR. WHITNEY: What's the objection
19  there?
20          MR. RYAN: It's a hypothetical
21  question. You haven't given him nearly enough
22  information for him to be able to answer the
23  question and answer.
24          MR. WHITNEY: Okay.
25  BY MR. WHITNEY:

Page 303

1  Q.  Let me give you some information to put into
2  your hodgepodge here.
3          Assume that the evidence in this case
4  will show that AHERF's financial people would
5  set aside money in a year in sort of a slush
6  fund denominated a cushion, and then in
7  subsequent years, release that money on an
8  as-needed basis to improve the appearance of
9  operations. Assume that. Okay? Would that be
10  a matter of concern to you as a member of the
11  board of trustees of AHERF?
12          MR. RYAN: Objection.
13  A.  Well, what we were looking for or looking at
14  were consolidated audited statements in the era
15  when accountants were thought to walk on water
16  and be just God-like in their work, and so we
17  relied on the audited financial statements.
18  Now, if somebody had -- if there was a
19  profit-moving system, whatever you want to call
20  it, in the system and the accountants said
21  that's okay, then we would, I guess, assume it
22  was okay.
23  Q.  All right. Do you remember Coopers & Lybrand
24  ever telling you that an accounting treatment
25  such as I've just described was okay?

Page 304

1  A.  No.
2  Q.  All right. Let me show you or ask you to pull
3  out again a couple of documents we looked at
4  yesterday which would be the minutes from the
5  October 15, 1996 audit committee meeting, it's
6  Exhibit 1648, as well as Carol Gordon's
7  transcribed notes from that meeting.
8  A.  1648?
9  Q.  1647 and 1648 are the numbers I'm looking for.
10  Here, you can have my copies.
11  A.  I got them here.
12  Q.  Okay. And we'll put those aside and show you
13  first or ask you first to take a look at the
14  1996 audited financial statement for AHERF.
15  You never saw this. I'm sorry.
16          MR. RYAN: You don't want to use the
17  one that I marked?
18          MR. WHITNEY: I thought you did mark
19  one. It doesn't matter.
20  BY MR. WHITNEY:
21  Q.  I'll show you one that's been previously marked
22  in this case as Exhibit 1001 and ask you if you
23  would, please, to turn to the third numbered
24  page, the last four digits of the Bates No.
25  1579.

Page 305

1  A.  Okay.
2  Q.  And it showed -- this is the consolidated
3  statement of operations of AHERF for the year
4  ended 1996 which shows a net income before
5  extraordinary item change in accounting
6  principles of $6,547,000?
7  A.  That's correct.
8  Q.  I believe you've had reference to that before,
9  and I believe you testified that you thought
10  that there was some significance in that number
11  or in that -- in this financial statement?
12          MR. RYAN: Objection to form.
13  Q.  Do you recall that testimony?
14  A.  Yes.
15  Q.  All right.
16  A.  What do you want me to say here? I mean, one
17  guy says yes, and one guy says no.
18  Q.  If he's objecting, and I'm not rephrasing,
19  don't worry about it. Just answer my question.
20          MR. MCCLENAHAN: If he objects, he's
21  permitted to do so on the record, but unless
22  you're instructed not to answer, you should go
23  ahead and answer the question.
24          THE WITNESS: All right. Repeat your
25  question now.

27 (Pages 302 to 305)

J. DAVID BARNES

Page 306

1 BY MR. WHITNEY:
2 Q.  Oh, golly.  Do you recall testifying -- I
3     believe you testified yesterday that you
4     thought there was some significance to you in
5     this $6.5 million number?
6 A.  That's correct.
7 Q.  At the time?
8 A.  That's correct.
9 Q.  And this, by the way, is the financial
10    statement that was presented to the audit
11    committee on October 15, 1996, right?
12 A.  Yes.
13 Q.  Okay.  And I believe you testified yesterday,
14    but I wanted to inquire further into that, that
15    one of the reasons why this number was
16    significant is its comparison to previous
17    years, is that right?
18 A.  That's correct.
19 Q.  And specifically why was that so?
20 A.  Well, as you know, from much conversation, that
21    we had basically a turn-around game on our
22    hands, and that is the organization as a whole,
23    and the Philadelphia hospitals in particular,
24    had not made any money, and the strategy in
25    buying them was to put in new systems, do this,

Page 307

1     that and the next thing, and so we were looking
2     to see whether this number was important,
3     because, in small measure, it validated that
4     the strategy made sense and it was working.
5 Q.  How does it validate that?
6 A.  Well, we were no longer losing money on an
7     annual basis, but we had made a turn into
8     profitability.
9 Q.  All right.  Now, in the board meeting, I
10    believe you testified yesterday -- I want to
11    have reference with you if I could to -- and
12    I'm already getting choked up by my own
13    paper -- to Exhibit 1648 which is titled
14    Transcription of Shorthand Notes of Carol
15    Gordon, Audit Committee.
16 A.  Um-hum.
17        MR. MCCLENAHAN:  What date?
18        MR. WHITNEY:  It's October 15, 1996.
19    That very meeting we've been talking about.
20 BY MR. WHITNEY:
21 Q.  And I want to direct your attention to the top
22    of page 5 of these notes.
23 A.  Um-hum.
24 Q.  And I believe you testified yesterday that you
25    remember Carol Gordon would sit in these

Page 308

1     meetings and take notes of them, right?
2 A.  That's correct.
3 Q.  Did you know that she was making transcriptions
4     of those notes?
5        MR. RYAN:  Objection as to time
6     frame.
7 Q.  Or do you know whether or not she ever made
8     transcriptions of those notes before you saw
9     these?
10 A.  I do not.
11 Q.  All right.  At the top, there's a statement
12    attributable -- attributed to you that we
13    talked about yesterday, To wrap it up,
14    institution identified the strategy several
15    years ago and has been working vigorously to
16    implement it.  Cost a lot of money, but it
17    seems to be working.  Keeping hospitals full.
18    Think it is important that we all understand
19    too.  Do you see that?
20 A.  Yes.
21 Q.  You were asked yesterday about a number of the
22    words in that statement, but the one that you
23    were not asked about yesterday was the phrase,
24    but it seems to be working.
25 A.  Um-hum.

Page 309

1 Q.  Do you remember -- I believe this statement is
2     also in the minutes.  We can check.  Do you
3     remember making that observation at the October
4     1996 audit committee meeting?
5        MR. RYAN:  Objection.
6 A.  No, I do not.
7 Q.  All right.  Do you doubt that you made such a
8     statement?
9 A.  No, I do not.
10 Q.  All right.  Given that you were at that meeting
11    looking at and evaluating the 1996 financial
12    statement, Mr. Barnes, would it be fair to say
13    that it was on the basis of that financial
14    statement that you concluded that the strategy
15    "seems to be working?"
16        MR. RYAN:  Objection.  You mean only
17    on the basis of that statement?
18 Q.  I'll let that comment just go and ask you if
19    you can answer my question?
20 A.  Well, obviously -- not obviously.  The
21    financial statement was an important
22    consideration in whether the -- in this
23    sentence, but it was not the only
24    consideration.  There were other -- there was
25    other data that showed that hospital attendance

28 (Pages 306 to 309)

J. DAVID BARNES

Page 310

1    was up. I don't know where that is, but it's
2    somewhere floating in all this paper. We knew,
3    for instance, that we were making some progress
4    in integrating the hospitals -- I mean, the
5    medical school, and that it was an improving
6    institution. The research grants to the
7    organization were moving up. So there were a
8    lot of flags, if you will, that gave us
9    confidence that we were making progress with
10   the organization. This particular sentence was
11   in the context of the financial statements and
12   so forth, but there are other items, too, that
13   suggested that the thing was coming our way.
14   Q.   All right. But in the context of the audit
15        meeting, the statement was made with reference
16        to the financial statement?
17             MR. RYAN: Objection. He doesn't
18        remember making the statement.
19   A.   Well, no, I don't think only.
20   Q.   All right.
21   A.   I think it was more from a broader --
22        obviously, the financials were important, but
23        there were a number of other phenomenon that
24        were encouraging too.
25   Q.   Do you believe that AHERF's net income number

Page 311

1    that we just referenced, when compared to
2    similar results in previous years, was indeed
3    indicative of the notion that it seemed to be
4    working, that is, the strategy?
5    A.   Yes, it was an encouraging sign.
6    Q.   All right. The 1996 financial statement that
7         you were looking at in that meeting of
8         October 15, 1996, at the time did you have any
9         reason to believe that this financial statement
10        was incorrect?
11   A.   No.
12   Q.   At any time while you were on the board of
13        trustees of AHERF up to and including the end
14        of fiscal year 1996, did you ever have any
15        reason to believe that any audited financial
16        statement presented to you was not correct?
17   A.   No.
18   Q.   All right. Earlier this morning, you were
19        asked a question in which your response was, I
20        thought Coopers was God.
21             What role, in your mind, did Coopers
22        play in connection with the measurement and
23        presentation of AHERF's financial statements?
24   A.   Would you ask the question again? I'm not sure
25        I understand it.

Page 312

1    Q.   As chairman of the audit committee, what role
2         in your mind, at least, did Coopers & Lybrand
3         play in connection with the preparation and
4         presentation of the financial statements?
5    A.   All right. They were the firm's certified
6         public accountants. They met with us in April
7         or so to review their audit plan. They
8         presented us with audited financial statements
9         in the fall. Their job was to review the work
10        our people had done. As I understand it, this
11        is a certified -- the CPA's job is to review
12        the work that had been done, see if they
13        thought the circumstances were accurate, and
14        then give us an audited financial statement.
15        So annually we received from C&L a statement
16        which was termed as an audited financial
17        statement, and that was my understanding of
18        their responsibility.
19   Q.   What did that mean to you, the fact that they
20        were signing off with a clean opinion on the
21        financial statement?
22             MR. RYAN: Objection.
23   A.   We thought it was important to have a -- we
24        felt it was important to have a financial
25        statement, and it was important to have a good,

Page 313

1    clean one.
2    Q.   Why was it important to have a clean one?
3    A.   I guess at least two reasons: A, creditors and
4         outside constituencies were interested in that,
5         and secondly, as I said many times yesterday,
6         we tried to run a real quality operation, and
7         that meant, among other things, getting clean
8         financial statements. It also meant clean
9         things in the medical area and so forth.
10   Q.   Well, from the standpoint --
11   A.   That's what we were looking for.
12   Q.   Apart from creditors and third parties, did you
13        as a member of the board of trustees rely on
14        Coopers & Lybrand's opinion in satisfying
15        yourself that the financial information you
16        were receiving was correct?
17             MR. RYAN: Objection.
18   A.   Yes.
19   Q.   All right. In what way?
20   A.   Well, we received these statements on the basis
21        of which we had to make decisions, and it was
22        important to us to know that a legitimate,
23        qualified, highly-reputable outsider had said,
24        in essence, we have reviewed the statements,
25        and the numbers are accurate.

29 (Pages 310 to 313)

J. DAVID BARNES

Page 314

1  Q.  If Coopers & Lybrand believed that that
2      financial statement was materially wrong, that
3      one being the one at year end 1996, would you
4      expect them to tell you that?
5          MR. RYAN:  Objection.
6  A.  If it was materially wrong, yes, I would.
7  Q.  All right.  There is reference in the minutes
8      of the October 1996 audit committee meeting, as
9      well as in Ms. Gordon's notes, to the notion
10     that you invited or asked Mr. Buettner if he
11     wished to meet in executive session.  Do you
12     recall that?
13 A.  Yes.
14 Q.  Do you recall asking Mr. Buettner if he wished
15     to -- either at the 1996 meeting or more
16     generally if he wished to meet in executive
17     session?
18         MR. RYAN:  Objection.  Compound.
19 A.  Yes, it was our practice, and without looking
20     at the minutes, I assume we followed our
21     standard ordinary practice and extended him
22     that opportunity at the whatever it is, October
23     1996 meeting.
24 Q.  As the chairman of the audit committee, why
25     would you do that?  What were you looking for,

Page 315

1      if anything, in executive session with the
2      auditor?
3  A.  Well, we had several constituencies, the
4      external auditor, the internal auditing types,
5      and I guess other people, and so we --
6      sometimes, conceivably, something somebody
7      would say would be embarrassing to others.
8  Q.  All right.
9  A.  So, in that environment, we thought it
10     appropriate to give each one a chance to meet
11     privately with the committee to see if they had
12     any information that they thought was
13     worthwhile for us to receive.
14 Q.  Well, specifically with regard to Coopers, what
15     constituency might be embarrassed by something
16     they had to say?
17 A.  Perhaps the internal staff and the internal
18     auditing staff.
19 Q.  All right.  Why?
20 A.  It might contradict what had been done.  They
21     may have feelings that it wasn't hunky-dory or
22     wasn't perfect in every respect.
23 Q.  If Coopers & Lybrand then thought that things
24     were not hunky-dory, and they did not want to
25     say it in front of the auditing staff, you

Page 316

1      would at least expect them to say it in
2      executive session with you?
3          MR. RYAN:  Objection.
4  A.  Well, now you're getting on thinner ice than I
5      can really help on.
6  Q.  Then you don't understand my question.  Let me
7      withdraw it and ask it again.
8  A.  No.  No.  There are issues of materiality and
9      issues of non-materiality, and if the CPA
10     people had something that they had a
11     disagreement, a material disagreement over ten
12     cents, then I wouldn't expect them to attend
13     the meeting and say we've got a ten cent --
14     we're in dispute over a ten cent item.
15 Q.  Well, what about if they had a material
16     disagreement with the way in which AHERF was
17     accounting for something, but, just for
18     hypothetical purposes, assume it's not a
19     material amount in and of itself but it
20     suggests or may suggest an issue of integrity
21     of the people that are preparing the financial
22     statement, would you expect them to raise that
23     with you either in front of the other people or
24     in executive session?
25         MR. RYAN:  Objection.

Page 317

1  A.  Yes.  I think if it were a material -- an item
2      that was meaningfully to the issue of
3      integrity, then I think that they should have
4      taken advantage of the opportunity that was
5      extended to them and discussed it with us.
6  Q.  As of October 15, 1996, did you consider
7      Mr. McConnell to be a person of integrity?
8  A.  Yes.
9  Q.  As of October 15, 1996, did you consider
10     Mr. Abdelhak to be a person of integrity?
11 A.  Yes.
12 Q.  As of October 15, 1996, did you consider
13     Mr. Buettner to be a person of integrity?
14 A.  Yes.
15 Q.  All right.  If Mr. Buettner did not -- strike
16     that.  Withdraw that.
17         Do you recall any concerns whatsoever
18     as of October 15, 1996 about the integrity of
19     the financial information that you were being
20     presented with?
21 A.  No.
22 Q.  All right.  Whatever else people may suggest
23     that you did or did not do while you were a
24     member of the board at AHERF, would it be
25     accurate to say that at all times up through

30 (Pages 314 to 317)

J. DAVID BARNES

Page 326

1  There are probably half a dozen options on that
2  side of the coin, one of which would be to
3  bring in a consultant.
4      Question: The losses in 1994 and
5  1995 didn't lead anybody to say we should get
6  it out of Philadelphia, did they?
7      Answer: No, but the trend -- you
8  had, A, to worry about the trend and, B -- I
9  mean, it's one thing to have a turn-around
10 plan, but it's another, God damn it, if you
11 never turned, and that would be one of the real
12 issues. The management is saying, we have a
13 wonderful turn-around, we're going to make
14 these acquisitions and blah, blah, and they
15 don't turn in '94, they don't turn in '95, and
16 they don't turn by this hypothetical in '96.
17 At some point, this time you could have -- keep
18 your loyalists, but at some point people begin
19 to say this turn-around is all talk.
20      So the '96 earnings are important,
21 not to much for quantity, because they
22 demonstrated the thing was turning, and they
23 gave the board and finance committee and
24 everybody else a very encouraged, warm feeling
25 that things were really turn, and then when

Page 327

1  they didn't turn -- and then 22 made us -- as I
2  say, we felt quite warm for two weeks, and so
3  these numbers were important. All right?
4      I wonder if I can embellish a bit on
5  Mr. Ryan's hypothetical now that we have it in
6  our minds. He asked you, do you know one way
7  or the other if Coopers & Lybrand had come to
8  the audit committee in the fall of 1996 and
9  said, you know, we don't think we earned
10 $6 million the last fiscal year; we think AHERF
11 may have suffered a loss?
12      Let me ask you by way of embellishing
13 somewhat that hypothetical, let me draw your
14 attention again to page 3 of that financial
15 statement, the consolidated statement of
16 operations where it says $6,547,000. Let me
17 ask you first, Mr. Barnes, to assume that
18 Coopers had come to you in October of 1996 in
19 connection with this financial statement and
20 told you that this $6.5 million operational
21 profit before extraordinary item is not a
22 legitimate number, and that, in fact, it fails
23 to reflect what they regard as a necessary
24 charge to AHERF's accounts receivable for
25 uncollectable accounts of $30 million. So that

Page 328

1      the net income before extraordinary item and
2      change in accounting principles should be
3      negative $24 million -- roughly $24,500,000
4      before extraordinary. Do you have that
5      hypothetical in mind?
6  A.  Um-hum.
7  Q.  First of all, would that cause you to question
8      whether or not management's presentation of the
9      financial statement was, in fact, conservative?
10         MR. RYAN: Objection. Hypothetical.
11 A.  Well, as I said in the last testimony, it would
12     raise a lot of questions. It would raise that
13     one.
14 Q.  Would it also raise a question whether or
15     not --
16         MR. MCCLENAHAN: Excuse me. Were you
17     finished with your answer?
18         THE WITNESS: Yes.
19 BY MR. WHITNEY:
20 Q.  Would it also raise a question in your mind,
21     Mr. Barnes, as to whether or not Coopers'
22     statement in the management letter that
23     accounts receivable or the controls over
24     accounts receivable were operating effectively?
25         MR. RYAN: Same objection.

Page 329

1  A.  I don't know how I can say that, and then
2      simultaneously say it's $30 million.
3  Q.  That's my question. Would it cause you to
4      question the accuracy of such a statement if it
5      were made?
6         MR. RYAN: Same objection.
7  A.  Maybe accuracy isn't the word, but it would
8      certainly question. To sit here and speculate
9      about one question is not to -- I mean, if you
10     got that kind of a problem, you got 10 or 20
11     relevant questions.
12 Q.  All right.
13 A.  Both the internal sort of questions and
14     external questions. That doesn't mean that
15     from those questions, you can draw any horribly
16     bad or horribly good conclusion, but it sure as
17     hell will cause you to stop and think.
18 Q.  All right. Would a performance by AHERF at
19     year end 1996 of negative $24 million or
20     negative $24,500,000 instead of $6,500,000
21     plus, would that cause you to question in any
22     way whether or not the turn-around plan was
23     working?
24         MR. RYAN: Objection.
25 A.  Well, it would be one of the questions you'd

33 (Pages 326 to 329)

J. DAVID BARNES

Page 330

1    ask.
2  Q.  It would be true, though, would it not -- in
3    that hypothetical scenario, it would be true
4    that the poor results or the loss results that
5    were shown in 1994 and 1995 would not be
6    turning around in 1996, right?
7        MR. RYAN: Objection.
8  A.  Well, again, it's the ten-question thing. I
9    mean, you got to find out why. Why is this
10    thing -- why is this minus 24? I mean, is
11    it --
12  Q.  I just gave you that hypothetical. The reason
13    is because they failed to charge $30 million in
14    bad debt expense in 1996. Accounts receivable
15    are overstated by $30 million. That's the
16    hypothetical we're working on. Okay? Would
17    that cause you to change your answer?
18        MR. RYAN: Objection. I'm unclear
19    what the question is.
20  A.  Well, as I say, it just surfaces a whole slew
21    of questions.
22  Q.  One of them would be whether or not AHERF was
23    acquiring -- was getting a handle on the
24    collection of accounts receivable, wouldn't it?
25  A.  That would indeed be one of the ten questions

Page 331

1    or 20 questions or whatever.
2  Q.  Let me ask you to further assume that
3    Coopers & Lybrand told you, in addition to that
4    $30 million bad debt charge-off that they think
5    belongs in this financial statement and is not
6    there, what if they also told you that
7    $30 million in revenue was, in fact, not
8    related to 1996 operations at all but was put
9    in here as a result of a release of cushions or
10    general reserves created in prior years, would
11    that be a matter of concern to you?
12        MR. RYAN: Objection. Hypothetical.
13  A.  Yes.
14  Q.  Okay. So that in that hypothetical, now
15    AHERF's negative position at year end 1996 is
16    not negative $24 million, but they're coming to
17    you -- Coopers is telling you at the audit
18    committee meeting at October 1996 that AHERF
19    consolidated posted a loss before extraordinary
20    item of about $54 million. Would that be a
21    matter of concern to you?
22        MR. RYAN: Objection. Hypothetical.
23  A.  Yes, it would be.
24  Q.  All right. Now, what if they also told you
25    that in addition to that, AHERF wrongly booked

Page 332

1    about $15 million in investment income on
2    restricted funds that were not allowed to be
3    booked as investment income, so that now what
4    they're telling you is that AHERF's
5    consolidated operational statement is, what,
6    54, 60, negative $70 million for year end 1996,
7    so that we are proceeding from a loss year in
8    1994 to a loss year in 1995 to a 1996
9    performance that is not net $6.5 million
10    positive, but close to $70 million negative,
11    would that be a matter of concern to you?
12  A.  Clearly, yes.
13        MR. RYAN: Objection.
14  Q.  All right. Now, if in that hypothetical
15    scenario, if that had been presented to you,
16    Mr. Barnes, would that have caused you to
17    question the integrity of Mr. Abdelhak?
18        MR. RYAN: Objection. Hopelessly
19    speculative.
20  A.  Yes.
21  Q.  Yeah. Let me withdraw that. That's not bad.
22    That's not bad, Mr. Ryan. Thank you.
23        Would revelations like that relate in
24    some way in your mind to integrity of
25    management?

Page 333

1        MR. RYAN: Objection.
2  A.  Yes.
3  Q.  All right. Would revelations like that relate
4    or cause you to question whether or not the
5    financial statements were really conservative?
6        MR. RYAN: Same objection.
7  A.  Well, presumably we never would have seen this.
8  Q.  No, and I'm hypothesizing that --
9  A.  Under your hypothetical, we kind of got people
10    on both sides of the street. I mean, you see
11    this, and then you say it's supposedly 60 or 70
12    or 90 or whatever.
13  Q.  All right. Let me clarify it for you.
14    Yesterday, Mr. Ryan asked you a hypothetical
15    question. You liked his evidently better than
16    you like mine. He asked you a hypothetical
17    question of what if it wasn't six-and-a-half
18    million dollars, what if it was a loss, and you
19    said, well, it depends on a lot of items. Now,
20    today I'm telling you what if it's not
21    six-and-a-half million dollars, but it's
22    negative $70 million because, one, accounts
23    receivable was overstated by $30 million, two,
24    supposed revenues of $30 million are, in fact,
25    being put into the balance sheet through a

34 (Pages 330 to 333)

J. DAVID BARNES

Page 334

```
1    release of cushions from prior years and,
2    three, $15 million of investment gain is not
3    legitimate on this financial statement. That's
4    my hypothetical.
5         MR. MCCLENAHAN: Can I ask you to
6    clarify your hypothetical? Are you saying that
7    Coopers would come in in October and say
8    management's financial statements are wrong
9    because of these reasons?
10        MR. WHITNEY: Yes.
11        MR. MCCLENAHAN: So that's the
12   revelation you're talking about?
13        MR. WHITNEY: Yes.
14        MR. MCCLENAHAN: All right.
15 A.   Well --
16        MR. RYAN: I object to the question.
17        MR. WHITNEY: Okay.
18 A.   -- clearly, I mean, it's just common sense that
19   if we had seen a $70 million negative
20   performance or whatever, some big number, it
21   would cause more questions faster.
22 Q.   Would it raise questions about management's
23   integrity?
24        MR. RYAN: Objection.
25 A.   That would be one of the questions.
```

Page 335

```
1 Q.   Would it raise questions in your mind as to
2    whether or not there ought to be a change in
3    management?
4         MR. RYAN: Same objection.
5 A.   That would be one of the questions.
6 Q.   Okay.
7         MR. WHITNEY: Are all of your
8    objections to hypotheticals -- to the
9    hypothetical nature of the questions?
10        MR. RYAN: At least to that. There
11   are some where I thought the form of the
12   question was hopelessly convoluted, but as to
13   all of them --
14        MR. WHITNEY: How about the last one?
15        MR. RYAN: On the last one, I was
16   objecting to the hypothetical.
17        MR. WHITNEY: Okay. Thank you.
18 BY MR. WHITNEY:
19 Q.   Would it raise questions in your mind as to the
20   possible need for a consultant to come in and
21   look at the operation?
22        MR. RYAN: Objection.
23 A.   That's one of the alternatives.
24 Q.   All right. Would it lead to questions in your
25   mind as to whether or not the entity, which
```

Page 336

```
1    this year lost in my hypothetical $70 million,
2    can continue to afford a physician acquisition
3    program that had lost the kind of money it did
4    in 1996?
5         MR. RYAN: Objection.
6 A.   Yes. Any capital expenditure. That would
7    include the physicians.
8 Q.   Would any capital expenditure also include at
9    least a question as to whether or not it would
10   be advisable or prudent to acquire five more
11   eastern hospitals under the aegis of the
12   Graduate Health System?
13        MR. RYAN: Objection.
14 A.   Yeah.
15        MR. WHITNEY: All right. I have
16   nothing further. We're done.
17        MR. RYAN: I just have two minutes of
18   follow-up questions, and then we'll be out of
19   here, Mr. Barnes.
20        THE WITNESS: Okay.
21        MR. MCCLENAHAN: What happened to the
22   15 to 30 minutes and we're out of here about an
23   hour ago?
24        MR. WHITNEY: Did I take that long?
25   God, there's nothing more appealing than the
```

Page 337

```
1    sound of my voice, Mr. McClenahan.
2         MR. RYAN: You can put all of the
3    documents aside. I'm not going to ask you any
4    questions about the documents.
5         THE WITNESS: Okay. No, I'm just
6    sorting out these papers here.
7         - - - -
8         EXAMINATION
9         - - - -
10 BY MR. RYAN:
11 Q.   Have you met with Mr. Whitney before the
12   deposition began yesterday?
13 A.   The deposition from him, yes.
14 Q.   I'm sorry. I didn't catch that.
15 A.   Yes. We had depositions from him and his
16   partner. The answer is yes. I'm telling you
17   that we did.
18 Q.   Okay. When you say that you had depositions
19   from him and his partner, you mean you've been
20   questioned under oath by them before?
21 A.   No, not under oath.
22 Q.   Oh, you met with them and answered questions
23   from them before?
24 A.   That's correct.
25 Q.   And was Ms. Meaden also at that meeting?
```

35 (Pages 334 to 337)

J. DAVID BARNES

Page 338

1    A.   Who?
2    Q.   Was Laura Meaden who is present here day also
3         at that meeting?
4    A.   Yes.  Yes.  Yes.
5    Q.   Were there any other lawyers from Jones Day
6         present?
7    A.   Yes.
8    Q.   Who were they?
9    A.   One man.  Jim Jones, is that his name?
10        Mr. Jones.
11   Q.   Anybody else?
12   A.   No.
13   Q.   How many such meetings were there?
14   A.   One, I believe.
15   Q.   About how long did the meeting last?
16   A.   Oh, two hours is my recollection.
17   Q.   How recently was the meeting?
18   A.   A week or maybe two weeks ago.
19   Q.   What were the subjects of discussion at the
20        meeting?
21   A.   Around the same things we've been talking about
22        here for two days.
23   Q.   Did Mr. Whitney ask you some of the same
24        questions he asked you today at the meeting
25        last week?

Page 339

1    A.   I don't recollect the same questions being
2         asked.
3    Q.   Did he ask you questions about your reaction to
4         the 1996 AHERF financial statements?
5    A.   Yes.
6    Q.   Did he ask you for your views about what
7         hypothetical effect changes to those financial
8         statements might have had?
9    A.   Yes.
10   Q.   So at least in general outline, he was asking
11        about the same type of topics last week that he
12        just asked you just now?
13   A.   That's correct.
14   Q.   Why did you agree to meet with Mr. Whitney last
15        week?
16   A.   Why did I agree to meet with Mr. Whitney?
17   Q.   Yes.
18   A.   I was counseled to by my counsel.
19   Q.   You've never met with me before we began the
20        deposition yesterday, did you?
21   A.   Did you ask?
22   Q.   Have you ever met with me before the deposition
23        began yesterday?
24   A.   No.
25   Q.   Have you ever met with any lawyer representing

Page 340

1         PriceWaterhouseCoopers before this deposition
2         began?
3    A.   No.
4    Q.   Were you aware back in 1996 that the financial
5         statements of AHERF were prepared by AHERF
6         management?
7    A.   You mean -- well, I'm not sure I understand
8         your question.  Prepared by the finance
9         department, you mean?
10   Q.   Well, I was about to get to that, but my more
11        general question first was did you understand
12        in 1996 that somebody at AHERF prepared AHERF's
13        financial statements?
14        THE VIDEOGRAPHER:  Hold on.  Sorry.
15        Okay.  Go ahead.
16   A.   What I understood was that they had been
17        developed, as they had been developed in the
18        prior decade, by the management department, the
19        accounting department, and Coopers had reviewed
20        them, and here they are.
21   Q.   Who -- in your understanding in 1996, what
22        individual was in charge of the preparation of
23        AHERF's financial statements?
24   A.   I recollect it was Dionisio, but I may be
25        wrong.

Page 341

1    Q.   Did you have an understanding as to whether
2         David McConnell was involved in the preparation
3         of AHERF's financial statements?
4    A.   My understanding is he would have superintended
5         the process.
6    Q.   And he had been elected, in your understanding,
7         by the board of trustees to serve as chief
8         financial officer of AHERF, is that right?
9    A.   That's correct.
10   Q.   And if you and your fellow trustees had wanted
11        somebody else to prepare financial statements
12        of AHERF, you could have replaced him with
13        somebody else, is that right?
14   A.   That would be correct.
15   Q.   And was it your understanding that the role of
16        Coopers & Lybrand as independent accountants
17        for AHERF were to review the work that had been
18        done by people reporting to Mr. McConnell?
19   A.   That would be correct.
20   Q.   Now, I believe at one point you agreed with a
21        question from Mr. Whitney that
22        Coopers & Lybrand was certifying whether the
23        numbers were accurate, but at another point you
24        yourself brought up the topic of materiality.
25        So with that backdrop, my question to

36 (Pages 338 to 341)

Page 346

```
 1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
 2   COUNTY OF ALLEGHENY          )  SS:
 3        I, JoAnn M. Brown, RMR, CRR, a Court Reporter
 4   and Notary Public in and for the Commonwealth of
 5   Pennsylvania, do hereby certify that the witness, J.
 6   DAVID BARNES, was by me first duly sworn to testify
 7   to the truth; that the foregoing deposition was taken
 8   at the time and place stated herein; and that the
 9   said deposition was recorded stenographically by me
10   and then reduced to printing under my direction, and
11   constitutes a true record of the testimony given by
12   said witness.
13        I further certify that the inspection, reading
14   and signing of said deposition were NOT waived by
15   counsel for the respective parties and by the
16   witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 14th day of July,
23   2003.
24        _____
25             Notary Public
```

Page 347

```
 1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
     COUNTY OF ALLEGHENY           )   S H E E T
 2
          I, J. DAVID BARNES, have read the foregoing
 3   pages of my deposition given on Wednesday, July 9,
     2003, and wish to make the following, if any,
 4   amendments, additions, deletions or corrections:
 5   Page/Line  Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21   _____
22             J. DAVID BARNES
     Subscribed and sworn to before me this
23   _____ day of _____, 2003.
24   _____
             Notary Public
25   AKF Reference No. JB76292
```

38 (Pages 346 to 347)