**Berliner Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

*ROBERT BERLINER*
*February 16, 2005*

---

*LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

BERLINER, ROBERT - Vol. 1



Robert Berliner

bad debt reserves at the DVOG hospitals at June 30, 1996 after the $17-1/2 million adjustment, is it not?

A. Slightly less. The adjustment would have brought the reserve to 68 million.

Q. Have you performed any analysis of whether some of the accounts that were written off as part of this so-called $80 million write-off were impact collectible?

A. Very little. If I recall 3 million is the total number that got collected.

Q. That's the amount that was in fact subsequently collected, right?

A. Yes.

Q. I was asking a slightly different question which is, did you perform an analysis as to the amount that was collectible at the time of the write-off if AHERF management had tried?

A. I did not do that, but it's my understanding that the outsourcer of that who was assigned the job of collecting the old accounts had pretty much given up and it was unlikely that further efforts would have been

Robert Berliner

successful or cost effective.

Q. What is the basis for that understanding that you just expressed?

A. Well, they have been at it for a while and there comes a point where any further efforts are unlikely to be successful and that the amount of future success that would be achieved would not be commensurate with the cost of paying the outsourcer to achieve them. So you would be losing money by collecting more accounts rather than gaining money.

Q. A question that I meant to ask you earlier today and I think I forgot to and I'm going to ask you now is do you consider yourself to be an expert sir in hospital billings or collections?

MR. JONES: Object to form.

A. No, I don't.

Q. Could you turn to page 3-1 of your report. You refer there right in the first sentence of part 3 of your report to a memorandum from Mr. Cancelmi to Mr. Spargo dated September 24, 1996, is that right?

A. Yes.

Robert Berliner

Q. Do you know whether Mr. Cancelmi or anyone else at AHERF provided a copy of that memo to Coopers & Lybrand?

A. I doubt that it was provided to Coopers & Lybrand, but I don't know for certain.

Q. Why is it that you doubt that?

A. Because it's not necessarily common that internal correspondence is provided to the auditors.

Q. We discussed before that September 11, 1996 was the last date of substantial field work for the 1996 audits, right?

A. Yes.

Q. Is it your understanding though that at this time, as of September 24, 1996, the audit report had not yet been released?

A. I believe that's correct.

Q. It is possible, is it not sir, that if Coopers & Lybrand had received a copy of this memo at that time or had otherwise learned that AHERF financial was about to embark on a write-off of about $80 million on accounts receivable that they might have taken some actions in response to that, right?

Robert Berliner

A. That's true, but I have to add that your question touches on the principal difference that I have with Mr. Tillett, because I think in his report Mr. Tillett misconstrues the responsibility of auditors in conducting a GAAS audit. Auditors just can't sit and wait for management to provide them with every bit of information, auditors have an affirmative responsibility to obtain sufficient competent evidential matter on which to form their opinion, and therefore the facts and circumstances pertaining to the receivables at DVOG were available to Coopers & Lybrand in my opinion had they sought out the appropriate people at AHERF and asked the appropriate questions of those people.

Q. The fact that AHERF management had formed the intent to do a write-off is not something that would be available to Coopers & Lybrand auditors other than being informed of such by AHERF management, isn't that right?

MR. JONES: Object to form.

A. No, I don't necessarily agree with that. I'm not by any means suggesting that

Page 142

Robert Berliner

AHERF management was totally above board and totally forthcoming with Coopers by no means, but I think it comes down to what is required of an auditor, what's an audit all about. I believe based upon my experience and my understanding of GAAS, that an auditor has an affirmative responsibility to seek out the facts and circumstances from those people in the client's organization in the best position to know those facts and circumstances.

I have to believe, given the aging of the DVOG accounts, that it would be incompetence on the part of Coopers not to perform the sufficient inquiry and other procedures to raise the question of isn't it appropriate to write-off some of these accounts, they are so old you're not going to collect them, and get out of the various people in management the story and possibly the very intent of doing the write-off.

Q. If I could ask you to jump ahead for a moment to page 18-2 of your report. Do you see that you set forth there in the middle of the page rule 102 of the ethics code to which

Page 143

Robert Berliner

members of the AICPA are required to adhere, is that right?

A. Yes, sir.

Q. That rule reads as follows "In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest and shall not knowingly misrepresent fact or subordinate his or her judgment to others", did I read that right?

A. Yes, you did.

Q. Will you agree with me that members of AHERF management did not comply with this rule of ethics in their dealings with Coopers & Lybrand?

MR. JONES: Object to form and foundation.

A. First of all this rule would only apply to those CPAs in AHERF's employ who were members of the AICPA. The question is whether they misrepresented facts to Coopers & Lybrand or were merely not forthcoming in divulging what a good financial management would divulge to its auditors. There is a dispute in the evidence in

Page 144

Robert Berliner

the case that I've read as to whether or not the additional Graduate transfers above the 50 million, the 49 million were conveyed to Coopers by AHERF people or not conveyed. Whether they were or not in my opinion is somewhat irrelevant because the real question is even if they weren't conveyed would the performance of a GAAS audit have detected the transfer of the additional reserves, in my opinion they would have.

The auditor has a responsibility under GAAS to plan his audit to detect errors and irregularities. The mere fact that an accounting error is intentional doesn't relieve the auditor of any responsibility for failing to detect it. If the auditor applies appropriate auditing procedures they are not guaranteed by any means to detect intentional errors but they should fetter out material errors, whether they be intentional or unintentional, if they are properly employed.

Q. I'm trying to ask you about something a little bit different though, let me try to ask it this way. Do you agree with me

Page 145

Robert Berliner

that members of AHERF management were not forthcoming in their dealings with Coopers & Lybrand in the course of the audits?

MR. JONES: Object to form.

A. I would say so.

Q. Do you agree with me that members of AHERF failed to provide Coopers & Lybrand with information that they should have provided Coopers & Lybrand with?

MR. JONES: Same objection.

A. What information are you referring to?

Q. I'm asking you for your view. My question is, is it your view that members of AHERF management failed to provide Coopers & Lybrand with information that they should have provided Coopers & Lybrand with?

MR. JONES: Same objection.

A. In my years of auditing I encountered all kinds of management, it ran the gamut from those who had presented to me on a silver platter to others who were not forthcoming and wouldn't tell me a thing, I had to find out everything on my own. Depending

Page 146

Robert Berliner

upon the differences in management the auditor modifies his auditing procedures to deal with those differences. I've read testimony that would contradict that fact that they were not forthcoming. Different AHERF people testified that they would have been available to provide information to Coopers had Coopers asked. In the area of the Lockhart Trusts I think a fellow by the name of Zwirn, if I got the name correctly, testified that he kept all of the agreements, trust agreements in a book and they were available had Coopers asked to see them. There's conflicting testimony along those lines.

A clearly complicating factor is the fact that some of these people were former Coopers auditors. Cancelmi was a well respected audit manager at Coopers who had a relationship with Buettner and Kirstein and Laing I believe was also an audit manager at Coopers. Do I believe that these people should have been more forthcoming, Laing and Cancelmi in dealing with Coopers yes, I do, I think they should have been more forthcoming. Did they lie, I can't say that they lied, I got conflicting evidence.

Page 147

Robert Berliner

Whether they did or not, whether they should have been more forthcoming or not, I believe the documentation available to Coopers was such that had Coopers performed a GAAS audit they would have gotten to the right answer, and so I believe it was because of the failures to comply with GAAS that Coopers failed to detect all of the misstatements that were made of AHERF financial statements.

Q. Back when you were auditing you would have expected your clients to be more forthcoming with you than Dan Cancelmi and others were with Coopers & Lybrand, correct?

A. I had clients who were less forthcoming. I can recall vividly a situation where the CEO of a public company made a representation to me that didn't pass my personal smell test and I said to him I just need more. I hear what you're saying but that's not good enough for me, I need more. He said well what do you need, I said I have to go out to Los Angeles and I have to go to this company you acquired and I have to go and look at some information there. He says okay, if that's what

Page 148

Robert Berliner

you have to do, do it. So I went and I found information that totally contradicted what I was told by the CEO of that public company. The end result the board fired the CEO, the financial statements were restated and I gave a clean opinion on the restated financial statement. They were never issued, the corrected financial statements.

So I believe in that instance I did what GAAS required me to do, evaluate the -- ask the inquiries of the appropriate people, evaluate the responses, shoot them up the flag pole, see if they fly and if they don't, perform extended procedures and I think that's what should have been done in the Cooper's audit.

Q. Can you tell me what the name was of that company?

A. The name of that company?

Q. Yes.

A. It was called American Beverage, they made the Hoffman line of beverages which to New Yorkers was a famous brand and also Dr. Brown's which is still around, it's sold in all of the kosher delicatessens in the city and they

Page 149

Robert Berliner

had many other brands.

Q. Have you ever had in your career any other experience like the one that you described at American Beverage?

A. Yes, I did.

Q. What was that experience?

A. It was with a company called Nickelberry that had been a long-standing client of our Chicago office where there was a management change and the company relocated to New York. The company took a position that they had made a decision to dispose of a line of business during the year and therefore in the financial statements they wanted to release they categorized the operations of this line of business as a discontinued operation.

I'll never forget the situation, we were working lengthy hours and one night about 8:30 I asked my team, I was the partner and I asked my team look, I've got to leave now, is there anything I can read on the train and the answer was well, why don't you take the minutes of the board of directors. So I took the minutes of the board of directors meetings and

Robert Berliner

A. Yes.

Q. In this letter Ms. Robinson on behalf of Mellon Bank takes the view that the language for several of the Lockhart trust agreements is quite explicit for capital gains?

A. Four out of five.

Q. The point she's making is that they are explicit in her review that capital gains become part of the corpus and therefore are restricted, right?

A. Yes. The fifth one is really very immaterial to the five, this is by far the smallest in dollar amount.

Q. Is it your understanding that AHERF management did not provide this document to Coopers & Lybrand in connection with either the 1996 or 1997 audits?

A. That's my understanding.

Q. Is this another example of something where you would have expected in AHERF management to be above board and to have provided the document?

MR. JONES: Object to form.

A. Yes.

Robert Berliner

Q. Have you seen before this note here that Mr. Spargo has written on the memo which reads "Al and Dan, this little pickle may require a tad bit more creativity than even we are normally accustomed to, perhaps we can discuss at our next weekly meeting. Thanks, Steve"?

A. Yes.

Q. Do you have a reaction to that note?

MR. JONES: Object to form.

A. Yes, my reaction to that note is that Mr. Spargo is essentially saying that it would be tough to explain this thing.

Q. It indicates to you, doesn't it, that AHERF management knew that what they were doing was wrong?

MR. JONES: Object to form, foundation.

A. That would suggest that.

Q. And yet they didn't tell their auditors?

A. That's my understanding.

Q. Is it your understanding that AHERF

Robert Berliner

maintained copies of its endowment agreements in three-ring binders?

A. That's my understanding.

Q. Three-ring binders from which one could remove individual pages, potentially, right?

A. Yes.

Q. Do you know what pages of the Lockhart trust agreements were contained in those three-ring binders when they were provided to Coopers & Lybrand auditors?

A. I do not.

Q. Do you know whether the provision of the letter from Mellon Bank that has been marked as Exhibit 20 would have made any difference to the report that Coopers & Lybrand issued?

MR. JONES: Object to foundation.

A. All I can tell you is I read the deposition testimony of Ben Corbley and Mel Hope and Sepelia and Staldard and they were part of the '98 restatement team and it certainly made a difference to them, so I think the answer is yes. I think this is another one of the areas

Robert Berliner

that really illustrates my view and I didn't comment on it earlier and that is that I think even with whatever subterfuge was carried on here on the part of AHERF management, the accounting misstatements should have been detected by the auditors. I have two principal reasons for that, one is an understanding of what 116 and 117 did to change GAAP and it's pretty simple.

Generally speaking there were two categories heretofore, restricted and unrestricted, and what these statements did was to pretty much leave the unrestricted unchanged but to break out a restricted into temporarily restricted and primarily restricted. Now, we begin the year with the ending year '95 balances where there's a huge number in restricted and a relatively small number in unrestricted. What does that mean, well, again we said earlier that one of the things the auditors should do in conducting an audit is to have an understanding of the client, the business, so on and so forth.

So after many years of conducting these audits of the AHERF system it would seem

Robert Berliner

to me that it would only be reasonable to expect Coopers & Lybrand to have an understanding that these Lockhart trusts go back many, many years to the '20s and '30s and so forth and that the original grants grew over time because of unrealized gains to become big dollar amounts.

Now, if they are restricted at the end of '95 what is it that happened that would make them temporarily restricted in '96, it would have to be something. Why would they be temporarily restricted and remain temporarily restricted for all these many, many years. Temporarily restricted is a category that refers to restrictions that will lapse with the performance of certain acts or with the passage of time. Well clearly here they didn't lapse with the passage of time, they were restricted for 50 years.

So the odds on would be that the auditors would have an expectation that they would be permanently restricted and not temporarily restricted, which would lead I think to a higher level of skepticism when they see the client putting the bulk of the money into

Robert Berliner

the temporarily restricted, that's the first point.

The second point which is maybe even more powerful is the fact that how come if they were temporarily restricted the Mellon Bank as the trustee was not passing the money on to AHERF for AHERF to use in its operations. I think you have those two factors there that are very, very significant and certainly require the auditor to recognize that uh oh, I'm in a high risk area here, this thing doesn't smell so good, I have to do some extended procedures and that's where I come back to the first point of getting ahold of the trustee and asking the trustee for an interpretation.

Had they done that they would have gotten an interpretation which made this letter moot, because even though the client was trying to keep this from them they would have found it out on their own by performing what would only be considered to be appropriate auditing procedures under the circumstances.

Q. Are you aware of the fact that FAS 116 and 117 permits the recognition of the

Robert Berliner

expiration of restrictions prospectively?

MR. JONES: Object to form.

A. What does it mean prospectively, I don't quite understand.

Q. That is you don't have to go back and see whether the expirations expired between the time of contribution and the time of adoption of FAS 116 and 117. That you can start from the time of adoption in terms of whether the restrictions have expired or not?

A. Yes.

Q. So therefore with respect to the Lockhart trusts, that's why the expiration from restrictions were occurring in fiscal years 1996 and 1997 without regard to whether those same restrictions would have expired in the 1920s and '30s and '40s and '50s if FAS 116 and 117 had been effected so many years ago, right?

MR. JONES: Objection to form and foundation?

A. We're not talking about them expiring, we are talking about them still be temporarily restricted as of the beginning of '96. They took them from temporarily restricted

Robert Berliner

to unrestricted in '96 and 97. It's not that they classified them as unrestricted at the beginning of '96, so I don't quite understand how that facet of 116 and 117 are meaningful to the discussion we've been having.

Q. If I understand the point you are making, you don't understand how it could be that the capital gains are the funds that for many years have been classified as restricted, now all of a sudden after the adoption of FAS 116 and 117 were going to be classified as temporarily restricted, right?

A. Yes.

Q. Let me ask you a question about the iron curtain method of preparing the summary of un-adjusted differences, is that a term with which you are familiar?

A. Yes.

Q. Do you agree with me that the iron curtain method is an acceptable method under GAAS for aggregating audit differences and evaluating their impact on the financial statements year to year?

MR. JONES: Object to form.

Page 214

Robert Berliner

A. I ran into this situation when I was chairing the task force on risk and materiality, we tried mightily to resolve that by providing guidance and there was a divergence of views among the accounting firms and we couldn't resolve it, and we essentially copped out by putting a footnote that I drafted into the statement that said that that's essentially an accounting matter and it's a matter for the FASB to deal with, not the Auditing Standards Board, so we left it unresolved.

However, when you read the bulk of SAS 47 it leads you away from that method. Admittedly it's not the clearest thing in the world because we couldn't make it the clearest thing in the world. We have here a multitude of adjustments and I think you have to consider them in their entirety. So while I was aware of Coopers' preference for the iron curtain method, I found many more misstatements than Coopers detected. So my misstatements when taken in the aggregate were so material to the prior years that they demanded in my opinion prior period treatment.

Page 215

Robert Berliner

Q. I understand that that is your view and you've expressed that in your reports, I'm attempting to ask you much more basic questions first. Do you agree with me that both the iron curtain method and the rollover method of preparing the SUD are permissible methods under SAS 47?

A. Yes.

Q. Am I right that you personally apparently prefer the rollover method?

A. Yes.

Q. Is that perhaps because the Arthur Young firm at which you started out used the rollover method?

A. Yes.

Q. You've known for many years now that the Coopers & Lybrand firm had a preference for the iron curtain method, right?

A. Yes.

Q. Is it your understanding that the audit engagement team for the AHERF audits applied the iron curtain method consistently from year to year?

A. Yes.

Page 216

Robert Berliner

Q. Would you agree with me that that's the most important method that you apply consistently from year to year and not switch methods from year to year?

A. Yes.

Q. One of the accounting issues that you raise in your report has to do with an equity interest that AHERF had in an enterprise called Health Partners, right?

A. That's correct.

Q. There was an error in AHERF's accounting treatment for that that Coopers & Lybrand detected in the course of its fiscal year 1995 audit, right?

A. That's correct.

Q. Coopers & Lybrand posted that error to the fiscal year 1995 SUD and determined that it was immaterial, right?

A. Yes.

Q. AHERF corrected the error in the following year, fiscal year 1996, right?

A. Yes.

Q. Is it the case then that under the iron curtain approach to the SUD, Coopers &

Page 217

Robert Berliner

Lybrand properly did not need to make an SUD entry in fiscal year 1996?

A. Correct.

Q. So do you agree that the way Coopers & Lybrand handled the Health Partners equity investment was appropriate?

A. Under the iron curtain method, yes.

MR. JONES: Object to form.

Q. Let me ask now about capitalized interest. Is it your understanding that in fiscal year 1995 and prior years AHERF did not capitalize interest?

A. Right.

Q. Is it your understanding that GAAP states that interest on construction and process, if material, ought to be capitalized?

A. Yes.

Q. Coopers & Lybrand in the course of its 1995 audit detected the fact that AHERF had not capitalized interest, right?

A. Yes.

Q. Coopers & Lybrand posted an entry for instance to the AGH SUD, right?

A. Right.

ERRATA

I, Robert Berliner, wish to make the following changes, for the following reasons:

PAGE LINE

CHANGE:

REASON:

CHANGE:

REASON:

CHANGE:

REASON: See attached.

CHANGE:

REASON:

CHANGE:

REASON:

CHANGE:

REASON:

Robert W. Berliner

ROBERT BERLINER

Subscribed and sworn to before me this 16 day of March 2005.

Bette Heiman

Notary Public

BETTE HEIMAN
NOTARY PUBLIC, State of New York
No. 31-6833970
Qualified in New York County
Commission Expires March 30, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

vs

PRICEWATERHOUSECOOPERS, LLP

Civil Action Case No. 00-684 (W.D.Pa.)

ERRATA SHEET RE DEPOSITION OF ROBERT BERLINER
ON FEBRUARY 16, 2005

| Page:Lines | Comment | Reason |
|---|---|---|
| 8:18 | "confidence" should be "covenants" | Correction/Clarification |
| 18:16 | "Sherry" should be "Sherrie" | Correction/Clarification |
| 23:24 | "weren't" should be "were" | Correction/Clarification |
| 23:25 | "this" should be "these" | Correction/Clarification |
| 29:17 | delete "Young" | Correction/Clarification |
| 29:18 | "Adam Zack" should be "Adamczak" | Correction/Clarification |
| 33:4 | "affect" should be "effect" | Correction/Clarification |
| 42:15 | "offering" should be "operating" | Correction/Clarification |
| 43:8-9 | "in the proceeding" should be "and the preceding" | Correction/Clarification |
| 44:19 | "affect" should be "effect" | Correction/Clarification |
| 45:17 | "affect" should be "effect" | Correction/Clarification |
| 46:9 | "affect" should be "effect" | Correction/Clarification |
| 46:24 | "vesting" should be "investing" | Correction/Clarification |
| 48:7 | "affect" should be "effect" | Correction/Clarification |
| 49:4 | "affect" should be "effect" | Correction/Clarification |

| Page:Lines | Comment | Reason |
|---|---|---|
| 49:22 | "affect" should be "effect" | Correction/Clarification |
| 60:8 | "is" should be "it" | Correction/Clarification |
| 70:19 | "AICPA," should be "AICPA | Correction/Clarification |
| 70:22-23 | "an AICPA, SOP 00-01" should be "an AICPA SOP, 00-01," | Correction/Clarification |
| 71:14 | "00-1" should be "00-01" | Correction/Clarification |
| 72:5-6 | "in 00 in that 001" should be "that the 00 in 00-01" | Correction/Clarification |
| 80:2 | "order to submit a" should be "auditor submitted" | Correction/Clarification |
| 89:19 | "of" should be "from" | Correction/Clarification |
| 103:17 | "you used" should be "used" | Correction/Clarification |
| 104:21 | "you" should be "that" | Correction/Clarification |
| 106:2 | "the" should be "their" | Correction/Clarification |
| 106:21-22 | "the DVOG hospitals" should be "for the DVOG hospitals" | Correction/Clarification |
| 106:24 | "were" should be "were," | Correction/Clarification |
| 107:8 | "accounts" should be "accounts." | Correction/Clarification |
| 107:8 | "also" should be "Also," | Correction/Clarification |
| 109:2 | "where when" should be "where" | Correction/Clarification |
| 110:7 | "a" should be "the" | Correction/Clarification |
| 110:13 | "date, that" should be "date.  That" | Correction/Clarification |
| 121:8 | "I in" should be "I, in" | Correction/Clarification |
| 121:9 | "errors" should be "errors," | Correction/Clarification |

| Page:Lines | Comment | Reason |
|---|---|---|
| 121:10 | "FIN 14" should be "FIN 14," | Correction/Clarification |
| 132:22 | "Franz" should be "Laing" | Correction/Clarification |
| 134:17 | "if anything" should be ", if anything" | Correction/Clarification |
| 135:4 | "personal financial" should be "corporate support" | Correction/Clarification |
| 136:10 | "assets are limited" should be "assets limited" | Correction/Clarification |
| 138:10 | "impact" should be "in fact" | Correction/Clarification |
| 139:2 | "successful or cost effective" should be "successful." | Correction/Clarification |
| 139:7<br>139:7-12 | "successful" should be "successful."<br>delete "and that" on line 7 and all of lines 8-12 | Correction/Clarification |
| 144:10 | "reserves, in" should be "reserves. In" | Correction/Clarification |
| 144:20 | "fetter" should be "ferret" | Correction/Clarification |
| 149:9 | "Nickelberry" should be "Mickleberry" | Correction/Clarification |
| 149:15 | "release" should be "reclass" | Correction/Clarification |
| 151:5 | "responsibilities, otherwise" should be "responsibilities. Otherwise" | Correction/Clarification |
| 151:6 | "public, readers" should be "public? Readers" | Correction/Clarification |
| 151:21 | "Nickelberry" should be "Mickleberry" | Correction/Clarification |
| 152:23 | "management" should be "matter" | Correction/Clarification |
| 156:7 | "a client" should be "the client" | Correction/Clarification |
| 156:12 | "in a whole" should be "as a whole" | Correction/Clarification |
| 160:20 | "evaluate on" should be "evaluate" | Correction/Clarification |

| Page:Lines | Comment | Reason |
|---|---|---|
| 169:23 | "until which" should be "which" | Correction/Clarification |
| 170:7 | "to side" should be "top side" | Correction/Clarification |
| 174:23-178:9 | Add: "With the benefit of a review of Mr. Buettner's 'top-side analysis,' which was not provided to me during my deposition, and certain of his testimony, I agree that Mr. Buettner has testified that certain of the notes on the second page of that 'analysis' reflect the claimed impact of payment slowdowns and unapplied cash." | Correction/Clarification |
| 176:8 | "a reserve" should be "reserve" | Correction/Clarification |
| 179:3 | "grows" should be "gross" | Correction/Clarification |
| 181:20 | "finances" should be "financials" | Correction/Clarification |
| 182:22 | "assureds" should be "assurance" | Correction/Clarification |
| 183:18 | "property planned equipment" should be property, plant and equipment" | Correction/Clarification |
| 184:8 | "property planned equipment" should be property, plant and equipment" | Correction/Clarification |
| 187:18-19 | "further or for areas" should be "further errors" | Correction/Clarification |
| 190:18 | "statements" should be "misstatements" | Correction/Clarification |
| 191:8 | "going on development" should be "development going on" | Correction/Clarification |
| 193:20 | "liability, there" should be "liability?  There" | Correction/Clarification |
| 193:23 | "and the fact that not only" should be "not only" | Correction/Clarification |

| Page:Lines | Comment | Reason |
|---|---|---|
| 194:2 | "so far" should be "so far," | Correction/Clarification |
| 194:3 | "is to the" should be "and the" | Correction/Clarification |
| 204:18-19 | "trustee.  Particularly since the trustees" should be "trustee, particularly since the trustee" | Correction/Clarification |
| 208:21 | "Ben Corbley" should be "Ben Korbly" | Correction/Clarification |
| 208:22 | "Sepelia and Staldard" should be "Cepeilik and Stalder" | Correction/Clarification |
| 209:15 | "a restricted" should be "the restricted" | Correction/Clarification |
| 210:7 | "unrealized" should be "realized and unrealized" | Correction/Clarification |
| 212:23 | "still be" should be "still being" | Correction/Clarification |
| 213:5 | "are meaningful" should be "is meaningful" | Correction/Clarification |
| 217:16-17 | "construction and process" should be "construction in process" | Correction/Clarification |
| 217:24 | "instance" should be "interest" | Correction/Clarification |
| 218:21 | "amount and the 1996 amounts" should be "amounts and the 1996 amount" | Correction/Clarification |
| 218:23-24 | "required under the iron curtain method" should be "required, under the iron curtain method," | Correction/Clarification |
| 219:2 | "correction," should be "correction." | Correction/Clarification |
| 219:2 | "AHERF instead I believe" should be "AHERF instead, I believe," | Correction/Clarification |

| Page:Lines | Comment | Reason |
|---|---|---|
| 219:3 | "and on the DVOG piece" should be "and, on the DVOG piece," | Correction/Clarification |
| 219:4 | "2 million credited to the bad debt reserve," should be "2 million, credited it to the bad debt reserve." | Correction/Clarification |
| 219:5 | "that's just wrong and required to me" should be "That's just wrong and required, to me," | Correction/Clarification |
| 219:12 | "capitalize" should be "capitalized" | Correction/Clarification |
| 220:4 | "whatsoever, what" should be "whatsoever. What" | Correction/Clarification |
| 220:6 | "CRA reserves, what" should be "CRA reserves? What" | Correction/Clarification |
| 220:7 | "bad debt reserve, absolutely nothing" should be "bad debt reserve? Absolutely nothing." | Correction/Clarification |
| 220:9 | "what does it tell you, to me the years get wide" should be "what does it tell you? To me, the ears get wide," | Correction/Clarification |
| 220:13 | "things, it looks" should be "things. It looks" | Correction/Clarification |
| 220:16 | "thing, it requires extended procedures, it even" should be "thing. It requires extended procedures. It even" | Correction/Clarification |
| 220:17 | "requires I think" should be "requires, I think," | Correction/Clarification |
| 220:20 | "okay," should be ",okay," | Correction/Clarification |
| 220:24 | "that that's okay, it's" should be "and that's okay." It's" | Correction/Clarification |
| 224:11 | "condition" should be "within" | Correction/Clarification |

| Page:Lines | Comment | Reason |
|---|---|---|
| 224:24 | "fortune" should be "portion" | Correction/Clarification |
| 224:25 | "be captured" should be "recapture" | Correction/Clarification |
| 232:7 | "were now false?" should be "were not false?" | Correction/Clarification |
| 234:22-23 | "material in the state that they exist?" should be "material misstatements that exist?" | Correction/Clarification |
| 234:25 | "too" should be "to" | Correction/Clarification |
| 253:20 | "unreportable conditions" should be "reportable conditions" | Correction/Clarification |
| 254:20 | "equipment" should be "equivalent" | Correction/Clarification |
| 255:5 | "was" should be "was," | Correction/Clarification |
| 285:19 | "was" should be "with" | Correction/Clarification |

Robert W. Berliner

**Brenner Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *RALPH W. BRENNER*
***September 30, 2003***

---

## *LEGALINK MANHATTAN*
***420 Lexington Avenue - Suite 2108***
***New York, NY 10170***
***PH: 212-557-7400 / FAX: 212-692-9171***

BRENNER, RALPH W.

LEGALINK
A WORDWAVE COMPANY

Ralph W. Brenner, Esquire

didn't see you at the meeting or after the meeting I never did get a chance to talk to you, but here are my thoughts. But the real purpose of the discussion was to make the pitch. I never wrote him back or talked to him again I don't think.

Q. So did you tell him earlier that we didn't receive timely and accurate financial information on an ongoing basis and then he kind of put it back to you?

MS. MEADEN: Objection.

A. I don't recall that.

Q. You don't recall?

A. I don't recall having said that. I can't remember the man and I am troubled by what his position was even on the audit committee. I don't know whether he was there in some advisory sense or whether he -- because I never attended the meetings, I didn't get to meet all of these people, so I think if I was there it was sort of after it, hi, I'm Cook and there must have been some presentation and he said I have some concerns and I probably said -- listened to him and said, yeah, there are some concerns, but I didn't get into -- he was now, as I see it, laying out his specific concerns, which I

Ralph W. Brenner, Esquire

don't know whether I shared or didn't share at that point in time.

I did, as I said before, express some concern myself as to the overall situation.

Q. Right. Okay.

Up until the time of Mr. Abdelhak's termination, did you have confidence at all times in his integrity?

A. Define for me the word "integrity."

Q. His honesty.

A. I had no reason to question his integrity. I questioned his judgment. I questioned whether he was -- I questioned his ego. I questioned whether he was a man who had set a course and was unwilling to deviate from it regardless of some of the consequences, but I certainly don't think I had a sense of distrust. Maybe I should have, but I didn't. I don't think I did.

Q. When did you first have the feeling that you questioned his ego, as you described it?

A. It is hard to put these things together. I think it was before the Graduate situation.

Q. Do you know whether any other trustees had the same kinds of concerns?

Ralph W. Brenner, Esquire

A. Are you talking about integrity now, or are you talking about judgment or -- your question was integrity.

Q. My question was integrity.

A. And I said I don't have any reason to believe that.

Q. Right. And then you --

A. I said I had questions about other aspects.

Q. Right. Those other aspects, ego, et cetera --

A. I have no way of specifically knowing, but I certainly had the sense that others questioned certainly some of those traits. In other words, was he too headstrong on some of these positions he was taking and whether he was somehow as flexible as we would have liked him to be.

Q. Do you recall any other trustees questioning his integrity?

A. Certainly not before he was terminated. I mean there may have been other people that knew things that I didn't know. All I'm saying is I don't recall anybody specifically saying that to me.

Q. Okay. I'm just here to get your understanding.

Ralph W. Brenner, Esquire

A. Yeah.

Q. What about Mr. McConnell; did you ever have concerns about his integrity up until the time that he was terminated?

A. Once again, I don't believe I had any questions about his integrity; however, I had some serious questions as to the accuracy of all of the financial dealings that were being suggested in connection with some of the transactions. I say that recognizing that I am not an accountant. I have already admitted to not being the guru in the area of the financial world, but I do listen and I do try and pay attention and I was somewhat mystified by some of the suggestions of how some of these transactions, particularly the latter ones, maybe Graduate as much as any, were to come into being.

Q. Can you remember anything specifically that mystified you about that?

A. No, no, I just knew I sat there and said, you know, I'm trying, but it's too complicated to work in the way that they are suggesting.

Q. Just to finish the topic, do you know of anyone else who had those same concerns on the

Ralph W. Brenner, Esquire

board?

A. No.

Q. And do you know of anyone else who voiced a concern about Mr. McConnell's integrity?

A. No.

Q. You mentioned that you don't recall --

A. I should say I can't remember specifics about it, but I think there were some people who shared my view not about the integrity, but about the complicated mechanisms which were being suggested for completing some of these transactions.

Q. Did you have any of those questions about the Forbes acquisition?

A. You know, I don't remember much about the Forbes transaction. My only recollection was that one meeting that I had and I don't remember anything else about that. I don't remember seeing any papers on that Forbes transaction to be honest with you.

Q. Did you have those kinds of concerns about the Hahnemann transaction?

A. Have any concerns about it?

Q. The kinds that you mentioned about the --

A. I don't think so.

Q. You mentioned earlier that you don't recall

Ralph W. Brenner, Esquire

ever speaking with Mr. Buettner at Coopers & Lybrand. Do you recall speaking or hearing -- speaking to or listening to anyone else from Coopers & Lybrand during the course of your time at AHERF?

A. No.

Q. What was your view, if any, while you were on the audit committee of the role of an outside auditor?

A. I viewed them as perhaps the most important facet of supporting staff that a board member, trustee, could have. It is in my judgment the ultimate guardian of the financial management of the enterprise and, while many of the board members probably are sophisticated in handling financial matters, many are not and therefore they look to the auditors to bring to their attention any concerns, any new procedures, any new materials which they may have learned about so that the board can consider it and react and make intelligent decisions as to how to proceed. And I relied -- I always have relied heavily on them, the auditors, in every position I have ever been in.

Q. Did you understand that auditors in turn relied on company management or, in this case,

Ralph W. Brenner, Esquire

not-for-profit organization management?

MS. MEADEN: Objection as to foundation.

A. I certainly understand that the auditors must rely on receiving the information necessary and to learn and gain the information necessary from the business people so that they can appropriately conclude their audits, but I also think it is up to them to press hard and, if they perceive any irregularities or questionable practices, that they should be called to the attention not only of the management, but of the board.

Q. Are you aware at all of Mr. Abdelhak ever having used any AHERF funds with respect to his divorce?

A. No.

Q. While you were on the AHERF board of trustees, did you ever have any concerns about the number of people on the board, too many or too few?

A. No, I thought it was an appropriate number. I don't remember what it was. I would be guessing. 25? Just guessing.

Q. Did you ever believe that sometimes the AHERF board meetings didn't last long enough to get through all the materials?

Ralph W. Brenner, Esquire

MS. MEADEN: Objection as to form.

A. You have to remember that I was new on the board in eighty -- '93 or 4. I can't remember. It was an old established board and going to Pittsburgh with the board consisting of 90 percent of long-established board members, one did not question the operations which presumably had been in effect for some period of time. That did not mean they didn't question the items that came before us, but in terms of the length of the board meetings, the agenda for the board meetings and things like that, certainly for the first couple of years it took a while -- and, as I say, you could ask me now the names of all those board members and I bet I couldn't give you half of them, a quarter of them, simply because I would -- you would attend a meeting, fly out, spend an hour and a half maybe at the meeting. If you wanted to get back to the office, you didn't stay for lunch, so you went back to the office. And so the meetings generally covered the items that were on the agenda. They certainly got longer as the problems got more difficult.

Q. Let me show you a document that even though

Page 122

Ralph W. Brenner, Esquire

it is not written on here I believe it has been previously marked as Exhibit 1990, and, for the record, this is the minutes from meeting of the committee of trustees of AHERF dated October 10, 1997.

Mr. Brenner, you are listed here as attending via telephone conference. I don't think I asked about this committee before. Do you remember being on the committee of trustees?

A. No. What did we do?

Q. Well, let's see.

A. Ah, yes. This is where he created what I was trying to recall as the -- what is it? The eastern region -- the Allegheny University Hospital's eastern region, AUH. Remember you asked me if --

Q. Uh-huh.

A. It was at this point that he felt that there were too many meetings I guess, too many duplication of time and effort and so he was establishing some new boards which I guess by the date of this, once again, had very little, if any, activity. They met -- I can recall just really one special meeting. There were other meetings when they were talking about the bankruptcy.

Page 123

Ralph W. Brenner, Esquire

Q. "They" meaning AUH Eastern Region?

A. Right.

Q. And the "he" you are referring to is Mr. Abdelhak?

A. I'm sorry?

Q. The "he" you are referring to, the "he" did this, was Mr. Abdelhak?

A. Yes, he's the one who suggested this. Well, it may have been with others. He may have consulted others, I don't know, but he was the one who I believe was given credit for the suggestion and I can't believe this would have occurred without his blessing.

Q. If you look on the second page of this document under "Proposed Corporate Restructuring" --

A. Where is this?

MS. LANGER: Paragraph B.

A. Middle paragraph?

Q. Right. It says, "Mr. Abdelhak presented for discussion a proposed governance restructuring. He noted that as the AHERF system has grown, the size and complexity of the governance structure has increased expedientially. He further noted that many trustees have complained about the amount of

Page 124

Ralph W. Brenner, Esquire

time required to attend the various governance meetings as well as the duplication of presentations and actions."

Were you one of those trustees who complained that he is referring to, do you know?

A. I don't think --

MS. MEADEN: Objection as to foundation and form.

THE WITNESS: I'm sorry.

A. I don't think I complained to anybody, but I was aware of that. I had suffered from that myself; otherwise, I would have gone to some of the audit meetings or I would have gone out to the Pittsburgh board meetings, which I didn't attend. It was just too much to do. And, once again, once you get into this late '97 period, things are starting to stir up a little bit and I think one of his reasons for trying to distill this down was to try to reduce the number of some of those meetings for a variety -- not only the trustees but his own management.

Q. And why do you think that he would want to do that?

A. I would hope he would want to do it to try to help the trustees and management or maybe he felt by

Page 125

Ralph W. Brenner, Esquire

the multitude of meetings he was not getting the benefit of the help of the trustees who could not participate in all of those events.

Q. Did the changes in -- first of all, did these changes actually take effect?

A. Some of them he tried to take effect. As I say, in my mind it is one of those sort of futile let's try and do something. One of the -- you will note here a question was raised as to whether the women's hospital like St. Christopher's should have a separate board and at the same time he wanted to change the name of St. Christopher's to Allegheny St. Christopher's. Every other hospital here was Allegheny Graduate, Allegheny Hahnemann, Allegheny -- everybody Allegheny, and I threatened to resign from the board. I said it has to be St. Christopher's. St. Christopher's is the name it is known by. St. Christopher's has the reputation, and if you are going to change that name, you are in effect changing what I believe to be one of the assets of this, and he backed off. But it was during this period that he was making a variety of changes like this.

Q. In your view did these changes, the ones that

Ralph W. Brenner, Esquire

of the board?

A. Well, they certainly had the titles.

Q. What do you mean by that?

A. Well, you know, president of U.S. Steel, president of a bank, president of Westinghouse. There were a whole bunch of very significant titles of people and many of them were, you know, highly respected, certainly one would think -- I considered it an honor to be able to be with that board and I certainly believed that it was -- they were being generous in letting me join a very well thought of organization.

I mean when I joined, it was -- there were plaudits around Philadelphia that I would have been asked to join the board and it was a very nice thing to have happen and, as I say, it gave me an opportunity to do something for St. Chris in an area where it would be difficult to penetrate a huge organization.

Q. Did you have a view when you joined that board as to the sort of collective business acumen that the members of the board had?

A. Very hard to judge that because so much of it is -- you know, I had a limited expertise in areas

Ralph W. Brenner, Esquire

and if you were to ask any of those board members, they would probably say the same thing about me. He probably knows something in the legal area but clearly what does he know about a new fiduciary arrangement of some sort?

Q. At the time that you joined the board, were you aware that Coopers & Lybrand were the outside auditors for AHERF?

A. I certainly did.

Q. And how is it that you became aware of that?

A. They were a factor in my joining the board.

Q. Could you explain to me how?

A. In the days before Allegheny came up, St. Christopher's decided that it needed new auditors, and I, along with other members of my board and management, interviewed virtually every substantial accounting firm certainly in the city and that was all the big ones and decided conclusively that the most talented and the most experienced in hospital management area was Coopers & Lybrand and so we hired them and I interviewed Ernst & Ernst, you name them, Touche Ross, did them all.

Q. And you hired the Philadelphia office of Coopers & Lybrand for St. Christopher's?

Ralph W. Brenner, Esquire

A. Yeah, I think so.

Q. And how is it that that played a factor in your decision to join the AHERF board?

A. Well, I certainly looked at some of the annuals. I was provided I think with some early background materials which I asked for, and amongst those were the statements of recognition that Coopers & Lybrand were doing it and obviously that was a comforting thought because I thought I know how they operate.

Q. Earlier Mr. Friesen asked you about what your view of the role outside auditors play in an entity and you said something to the effect that they are the ultimate guardian of the financial management?

MR. FRIESEN: Objection.

A. They are the ultimate guardian -- I thought I said they were the ultimate guardian in the eyes of the board of the management of the financial affairs of the corporation simply because they are an independent force who are looking at the numbers. True, we had responsibility for those, but heavy reliance would be upon the accountants, who we are much more experienced and sophisticated and knowledgeable, particularly when they are

Ralph W. Brenner, Esquire

experienced in the hospital field. And so -- on the account side. So I think obviously we all tried to do as much as we could, but if one of our business people would say something and we questioned it, we would always try and ask, you know, "Was this run by the accountants?" I always asked that question.

Q. At AHERF you are saying?

A. Yeah.

Q. And what was the response to that question when you asked it?

A. Sometimes yes; sometimes no.

Q. And if it was sometimes no, did you request that they then run it by the accountants?

A. Well, maybe I would say -- I'm not sure. Maybe I would say maybe "You ought to have them look at it," and whether they did or didn't, I don't know.

Q. And why do you place reliance on the fact that they were an independent force, "they" being the outside auditors?

MR. FRIESEN: Objection.

Q. What comfort did that give you?

MR. FRIESEN: Objection.

A. Well, management obviously is always charged

Ralph W. Brenner, Esquire

with trying to achieve the highest results and in so doing sometimes are prone to be a little less careful than they should be. Board members likewise are sometimes a little less knowledgeable and a little less careful in the review of the materials that are provided to them. And thus, if they are busy and they don't really get a chance to look at them, if something comes in and says it has been approved by the accountants, that gets you off the hook, and so both in terms of how -- whether management was on stream or whether the numbers were on stream, so I think you look very carefully to that. It has to be some backdrop of reliance which you can have which takes you outside the people who are actually participating in the benefit and who may not have the knowledge and that I view as the board and management and we both make mistakes.

Q. At any time during your tenure on the AHERF board, did the outside auditors ever indicate that there was any question about the accuracy or the fairness of the representations of the numbers that were contained within AHERF's financial statements?

MR. FRIESEN: Objection.

A. I don't recall, but they may have already

Ralph W. Brenner, Esquire

given that information to the management and changes may have been made before those documents were ultimately seen by the board.

Q. But you as a board member --

A. No.

Q. -- have no recollection --

A. No.

Q. -- of ever hearing that from the outside auditors, correct?

A. No.

Q. No, I'm not correct?

A. No, I never heard from them.

Q. Just to make sure we're clear.

Did you have an understanding that Coopers & Lybrand had some expertise in auditing healthcare entities?

A. They certainly did when I interviewed them. And they were clearly the superior accounting firm in this area.

Q. In this area --

A. And they were not a client of mine or this firm. We independently looked at all of them. In fact, we have represented a number of the big accounting firms, but we were looking for a

Ralph W. Brenner, Esquire

particular expertise in some people who were most experienced in this area and it was clear not only to myself but to Miles Turtz, Tony Gigliotti and others who were on the board at that time that Coopers were the best.

Q. Do you recall generally speaking when it was that you interviewed Coopers & Lybrand in connection with St. Christopher's outside auditing needs?

A. Probably in the early '80s.

Q. Early '80s.

You also responded to Mr. Friesen's question about the role that outside auditors played in your mind by stating that you believed it was up to the outside auditors to press hard and to bring questions regarding practices not only to management but to the board?

A. Correct.

Q. That's correct?

A. Yeah.

Q. And what types of things in that regard did you expect the outside auditors to bring to the board of AHERF?

A. Well, I think -- and, as I say, the one example that I have is that -- and I am so getting

Ralph W. Brenner, Esquire

stupid that I can't remember the name of that. There is a procedure that goes through when the accountants, before they issue their final audit, and the management get together. It is not the management letter, but they discuss suggested changes to either the auditing procedures or some of the -- whether there are -- certain things are be accurately reflected back and forth and there are discussions and those matters are usually resolved between the two parties and ultimately the audited statements come out, and what I was alluding to when I made that comment was that to the extent that the accountants see anything which they view as potentially a problem, might be considered a problem if read later on, anything like -- even if it's a nit, and some of them were nits, you ought to be selling -- you ought to put the name of three officers at the end of this thing instead of one, that ought to be raised and they are obviously skilled in knowing what is appropriate and what changes should be made and my recollection was that they were made. And this discussion that I had on the phone during that board meeting related to those kinds of things. It had nothing to do with anything

Ralph W. Brenner, Esquire

like, okay, there is something hanky-panky going on anywhere. It was solely related to the kinds of cosmetic things which should be achieved and agreed upon by the client and the accounting firm.

Q. Well, if Coopers & Lybrand had found material misstatements in the financial statements that were presented to them by AHERF management for audit, would you have expected Coopers & Lybrand to bring that to the attention of the AHERF board?

MR. FRIESEN: Objection. Calls for speculation.

A. Any semblance of concern in that area I would ask for an intensive further investigation and documentation before any further discussion was held of that.

Q. But my question really is more preliminary than that, which is would you have expected them to bring it to the attention of the board in the first place?

MR. FRIESEN: Objection.

A. Yes, I would.

Q. And if Coopers & Lybrand had found intentional misstatements in the financial statements that were presented to them for audit,

Ralph W. Brenner, Esquire

would you have expected them, "them" being Coopers & Lybrand --

A. Recognizing this is a hypothetical, yes, I would.

Q. -- to the committee?

MR. FRIESEN: I have to get an objection in there somewhere.

Q. I have to get a question in there somewhere, so if you could wait until I finish my question completely and then we will give Jeff the opportunity to object and then you can answer it.

But my question is, would you have expected Coopers & Lybrand to bring their suspicions of intentional misstatements, if they had found some during their audit, to the attention of the board?

MR. FRIESEN: Objection.

A. Yes.

Q. And if you -- would you have expected that Coopers & Lybrand, if it had concerns about the competency of financial management as uncovered during their audit of the financial statements, would you have expected them to bring that to the attention of the board?

MR. FRIESEN: Objection.

Ralph W. Brenner, Esquire

A. Well, I would expect them at least to bring it to the attention of the chief executive officer first before -- and ultimately, if there was a problem, then it probably should go to the board.

Q. Mr. Brenner, could you bring your --

VIDEO TECHNICIAN: Your hands are blocking the microphone, Mr. Brenner.

Q. And if Coopers & Lybrand had found during the course of their audit of AHERF's financial statements something that caused them to question the integrity of AHERF's financial management, would you have expected Coopers & Lybrand to bring that to the attention of the board?

MR. FRIESEN: Objection.

A. Once again, I would expect them to -- there is the audit committee and I would expect them to bring it to the audit committee and probably to the chief executive officer.

Q. The audit committee is made up of board members though, correct?

A. Yes, and I don't know if there were any financial people on there from AHERF. I don't know.

Q. You mean inside directors?

A. Yeah.

Ralph W. Brenner, Esquire

Q. And if Coopers & Lybrand had uncovered something that indicated fraudulent conduct on the part of AHERF's financial management during the course of their audits, would you have expected Coopers & Lybrand to bring that to the attention of the audit committee or the board?

MR. FRIESEN: Objection.

A. I would.

Q. Do you have an understanding of what the term "clean opinion" means with respect to financial statements?

A. I've heard of it and I'm not certain precisely what that may mean today in terms of a clean opinion. If somebody gives it, I guess it's the auditors.

Q. Well, let me ask it this way: Was it your understanding that a clean opinion was an opinion from the outside auditors stating that their audit revealed that the financial statements were fairly and accurately presented?

MR. FRIESEN: Objection.

A. Now what's the question?

Q. My question is, was that your understanding of what a clean opinion from an auditor is?

Ralph W. Brenner, Esquire

MR. FRIESEN: Objection.

A. Well, I didn't have an understanding.

Q. Okay.

A. I had heard of the term and I am assuming that it meant a clean opinion from somebody, presumably the auditors, as to the financial records of the company.

Q. Did you have any understanding as to what the term "adverse opinion" means with respect to audited financial statements?

A. No.

Q. Now, if Coopers & Lybrand had come to the audit committee or the board of which you were a member and indicated that the fiscal year 1996 or 1997 financial statements that had been presented to them for audit had been intentionally misstated by management, would that have concerned you?

MR. FRIESEN: Objection.

A. Obviously it's a hypothetical as far as I'm concerned because I had no knowledge of that. Obviously I -- it goes back to any irregularity. My expectation would be that we would hear about it.

Q. And if you had in fact heard about it, you would have been concerned about that, right?

Ralph W. Brenner, Esquire

A. If I had heard about it, I would have embarked on an intensive investigation immediately asking the company to do that.

Q. It wouldn't have been something that you would have ignored, correct?

A. Absolutely not.

Q. And you would have asked -- I'm sorry -- you said management to embark on an investigation?

A. Yeah, I would have asked them to investigate immediately, get from the auditors precisely all the information that they had so that we had an opportunity to view that and make a judgment ourselves as to whether or not there was indeed the kind of irregularity they were alluding to.

Q. And once that investigation was completed and the results were presented to you, you would have had various options --

A. To act in some way.

Q. Right.

MR. FRIESEN: Did you finish?

Q. You would have had various -- let me back up and we will start again to just make sure I get a clean record here.

Once the investigation was completed and

Ralph W. Brenner, Esquire

the results of the investigation were presented to you, you would have had various options as to what course of action to take, correct?

MR. FRIESEN: Objection.

A. Or one being no action.

Q. That's right.

A. Obviously you can do an investigation and you make a determination as to the authenticity or credibility of the alleged activity.

Q. And if you found that the auditors were mistaken, you may decide that you would want to get a new audit team in there, correct?

A. That's one option.

Q. And another option would be if the investigation found that the auditors were correct, you might have asked them to expand the scope of their audit, correct?

A. Correct.

Q. Or you might have decided to fire management, correct?

MR. FRIESEN: Objection.

A. You can do a variety and many other things.

Q. And you would have -- you personally as a board member would have followed whatever prudent

Ralph W. Brenner, Esquire

course you thought the investigation led you to, correct?

A. Absolutely.

Q. Do you have any understanding as to what generally accepted accounting principles are or GAAP?

A. Yeah, about, yeah. I mean I'm aware of them and I -- they keep changing.

Q. Right. And tell me what your understanding of GAAP is.

A. I cannot articulate what they are, but I am aware generally of those principles.

Q. Right, and I'm not asking you for specifics of what the GAAP principles are.

A. Well, I already told you I didn't know, so feel free to ask.

Q. I would just like to know what your general understanding is as to what those principles are.

A. Yes, I understand that there is through the accounting industry a very carefully crafted set of regulations and rules with respect to appropriate accounting procedures, and those are, I think, publicized and are available to all financial interested persons.