Page 174

Ralph W. Brenner, Esquire

1
2   Q.   And if Coopers & Lybrand had informed you
3   that the fiscal year 1996 or 1997 financial
4   statements that had been presented to them for audit
5   had been intentionally misstated by management,
6   would that have been something that would have
7   concerned you?
8         MR. FRIESEN:  Objection.  I think you
9   asked that one already.
10        MS. MEADEN:  If I did, I think I asked
11  materially misstated; now I'm asking intentionally
12  misstated.
13        MR. FRIESEN:  Okay.  Still object to it.
14   A.   I'm telling you maybe I'm an old fart, but
15  any indiscretion, no matter how minor it was, in any
16  of my fiduciary relationships, I don't have much to
17  offer in this world, but I do have my integrity and
18  I would not tolerate under any circumstances any
19  questions whatsoever if they came to our -- my
20  attention, and I was -- tried to do as scrupulously
21  as I could to look at whatever information was
22  provided to me so that I could make a judgment based
23  on that information and that was what I utilized to
24  do that, and if there was any minor thing brought to
25  my attention, I would ask that it be looked into

Page 175

Ralph W. Brenner, Esquire

1
2   fully and that the board and I have an opportunity
3   to evaluate that circumstance and make a decision,
4   whatever it may be.
5   Q.   And at no time during your tenure on the
6   board of AHERF did Coopers & Lybrand ever bring any
7   such indication to you?
8         MR. FRIESEN:  Objection.
9    A.   Not that I'm aware of.
10        MS. MEADEN:  Thank you.  That's all I
11  have.
12  BY MR. FRIESEN:
13   Q.   I just have --
14   A.   Two hours of questions?
15   Q.   -- very few questions.
16        You referred to -- this is going back to
17  Graduate and --
18   A.   Back to where, Graduate?
19   Q.   Graduate and the concerns you had about the
20  Graduate management people.  You referred to
21  practices that were being engaged in by the
22  management that you didn't agree with, meaning the
23  Graduate management from your time on the St.
24  Christopher's board.  Can you remember what -- were
25  there any particular practices that you had in mind

Page 176

Ralph W. Brenner, Esquire

1
2   when you said that?
3    A.   Well, I was referring as much to the personal
4   practices of the management, which were, in my
5   judgment, inappropriate or somewhat tortured
6   financial arrangements and I think the combination
7   of what I viewed as overly aggressive personalities
8   and interests in self-serving and some of what I
9   consider to be questionable arrangements they had
10  with other entities they were involved in and maybe
11  Graduate that I did not have the confidence in what
12  we might ultimately end up with if we acquired them.
13   Q.   And if you recall what these questionable
14  arrangements were?
15   A.   Not specifically.  They were, you know, I
16  think some large financial arrangements being made,
17  bonuses to the thing, and I remember going in to the
18  chairman's suite, my suite being about half the size
19  of this, this room, and here was this huge facility.
20  I mean it looked like President Bush's room and then
21  off to the side was this what's called the
22  amphitheater with all kinds of stereo equipment and
23  movie projectors.  Here was an entity which was
24  limping along and paying bonuses to themselves and,
25  you know, it just augered poorly because some of

Page 177

Ralph W. Brenner, Esquire

1
2   this came up -- and, by the way, it wasn't my
3   decision alone on the Graduate.  It was my -- the
4   other people who were working with me in that
5   negotiation, Miles Turtz and Tony Gigliotti, and
6   others, who reached the same conclusion, and, by the
7   way, they were more generous in their views as
8   business than I am.
9    Q.   Just to close out the record, who are the
10  actual management individuals at Graduate who you
11  are referring to?
12   A.   Mr. X and Mr. Y.  No, Howard -- Harold Cramer
13  was the chairman of the board, and I can't remember
14  the fellow's name, but he was the president of Medic
15  and a very well-known investor in Philadelphia.  I
16  can't remember his name.
17        MR. FRIESEN:  I don't have any further
18  questions.  Thanks again.
19        THE WITNESS:  Thank you again.
20        MS. MEADEN:  Let me ask you this first,
21  are you going to read or waive?
22        MS. LANGER:  I think he should have an
23  opportunity to read.
24        VIDEO TECHNICIAN:  This concludes the
25  videotape deposition of Ralph W. Brenner.  We are

45 (Pages 174 to 177)

Page 178

```
1              Ralph W. Brenner, Esquire
2     going off the record.  The time is 3:51.
3              (Witness excused.)
4              (The deposition concluded at 3:51 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 180

```
1              I have read the foregoing transcript
2     of my deposition given on September 30, 2003,
3     and it is true, correct and complete, to the
4     best of my knowledge, recollection and belief,
5     except for the corrections noted hereon and/or
6     list of corrections, if any, attached on a
7     separate sheet herewith.
8
9
10
11            _____
12            RALPH W. BRENNER, ESQUIRE
13
14
15
16
17    Subscribed and sworn to
18    before me this _____ day
19    of _____, 2003.
20
21
22            _____
23    Notary Public
24
25
```

Page 179

```
1
2              I N D E X
3
4     WITNESS:                    Page
5     RALPH W. BRENNER, ESQUIRE
6       By Mr. Friesen          4, 175
7       By Ms. Meaden             136
8
9
10             E X H I B I T S
11    No.       Description       Page
12
      2043    Trustees' Evaluation    127
13
      2044    Minutes of Resource Management
14            Committee of AGH, 7/9/96    145
15
16
17
18
19
20
21
22
23
24
25
```

Page 181

```
1              `
2              CERTIFICATE
3       I HEREBY CERTIFY that the proceedings,
4     evidence and objections are contained fully and
5     accurately in the stenographic notes taken by me
6     on September 30, 2003, and that this is a true
7     and correct transcript of same.
8
9
10
11
12            _____
13            Cynthia A. Whyte, RPR
14
15
16       (The foregoing certification of this
17    transcript does not apply to any reproduction of
18    the same by any means, unless under the direct
19    control and/or supervision of the certifying
20    reporter.)
21
22
23
24
25
```

46 (Pages 178 to 181)

**Brown Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

## *DOROTHY MCKENNA BROWN, ED.D.*
### *May 4, 2004*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**BROWN, ED.D., DOROTHY MCKENNA**



LEGALINK
A WORDWAVE COMPANY

Dorothy McKenna Brown, Ed.D.

2  Q.  Can you remember any reaction that you had
3  when you read that?
4      MS. MEADEN:  Objection.
5  A.  Should I answer?
6      MS. MEADEN:  Go ahead.
7  Q.  Oh, yes.
8      MR. McCLENAHAN:  The question is do you
9  remember your reaction.
10  A.  Yes, I do remember my reaction.  As a
11  trustee, I didn't enjoy reading about a major change
12  in the newspaper, not knowing one thing about it,
13  and I called a variety of people -- I can't tell you
14  in what order, but the Philadelphia trustees, some
15  of them, Leslie Miller who was then chair of the
16  academic affairs committee, Claire Gargalli, Leon
17  Sunstein, Bob Palmer, Al Martinelli; and we had sort
18  of a back-and-forth conversation in different ways
19  about it.
20      I called Sherif and I asked him why he
21  had a board if he was going to have this kind of
22  activity without consulting with the full board, not
23  that I had a particular problem at that point with
24  the acquisition because it seemed to fit, as this
25  article goes on to relate, in with the vision, but

Dorothy McKenna Brown, Ed.D.

2  boards are for comment in that kind of a situation I
3  think.
4      He told me that he had the approval of
5  the executive committee and he got quite annoyed and
6  hung up.
7  Q.  He hung up on you?
8  A.  He hung up on me, called the next morning at
9  5 o'clock to apologize.
10      And then we had a subsequent meeting,
11  and I'm sure you have the minutes and whatever where
12  he outlined the deal and how it would be handled and
13  it would not jeopardize the AHERF financial
14  stricture.
15      And the one thing that this doesn't say
16  but I think was said somewhere in a meeting, that
17  also coming with it would have been the money from
18  the Graduate Foundation, which I think was close to
19  a hundred million dollars, and it never did.
20  Q.  It never did come?
21  A.  It never did come, and I don't know that it
22  was part of the official deal, but I just have a
23  recollection of that in a conversation.
24      MS. MEADEN:  I'm sorry.  I don't mean to
25  interrupt, but just to clarify, a recollection that

Dorothy McKenna Brown, Ed.D.

2  someone had told you that that money was going to
3  come --
4      THE WITNESS:  That that foundation would
5  also come with...
6  Q.  Okay.  Let me try and unpack a few of these.
7      The conversations with Miss Miller, Miss
8  Gargalli, Mr. Sunstein, Mr. Palmer and
9  Mr. Martinelli, these were all separate
10  conversations?
11  A.  Yes.
12  Q.  There were no conference calls with more than
13  one of them on the line?
14  A.  No.
15      And some of them wrote letters to
16  Sherif.  I didn't.  I called him.  Some of them
17  called and wrote letters.
18  Q.  And you called each of those people:  Miller,
19  Gargalli, Sunstein, Palmer and Martinelli, before
20  you called Sherif?
21      MR. McCLENAHAN:  If you know.
22  A.  I don't remember.  I probably called one or
23  two to say -- you know, because I thought was I
24  asleep at the switch or at some meeting and I didn't
25  hear this, and, you know, I can't tell you in what

Dorothy McKenna Brown, Ed.D.

2  order I called, but none of those people had any
3  knowledge of it.
4  Q.  Let me just plumb your memory for a moment on
5  each of these conversations.  Maybe you don't
6  remember anything about them, but maybe you do.
7      Let's start with Leslie Ann Miller.  Do
8  you remember any of the details of that
9  conversation?
10  A.  No.  As I remember it now -- I don't know how
11  many years we are going back -- they were pretty
12  much the same.  There was just a general concern
13  that things of major importance were being
14  undertaken without discussing it with the full
15  board.
16  Q.  And each of those people had that --
17  A.  They had that same feeling.
18  Q.  -- agreed with you?
19  A.  You know, we didn't say, oh, it is going to
20  lose this much money or we are going to have to
21  spend or anything like that; it was really with
22  where the board fit in all of this activity.
23  Q.  Can you remember anything specifically about
24  your conversation with Miss Gargalli other than what
25  you have already said?

11 (Pages 38 to 41)

Dorothy McKenna Brown, Ed.D.

1          Dorothy McKenna Brown, Ed.D.
2 money?
3        MS. MEADEN: Objection.
4    A. Yes. I'm sure they showed us important
5 financial information, but, again, it was -- you say
6 acquisition and in my mind that says that you're
7 bringing it right into the total, and we weren't
8 doing that. That I was aware of.
9    Q. So when you approved it, you did not consider
10 it to be a high-risk case as this article --
11    A. Not for AHERF.
12    Q. -- called it?
13        MS. MEADEN: If I could get my objection
14 to the question in, please.
15        I'm sorry.
16    Q. Do you know if anyone at AHERF spoke to any
17 of these local healthcare analysts who were quoted
18 in the newspaper as saying it was a high-risk case
19 for AHERF?
20        MS. MEADEN: Objection.
21        MR. McCLENAHAN: I'm sorry. What was
22 your question about that?
23        MR. FRIESEN: Whether she knows whether
24 anyone in AHERF spoke to any of these local
25 healthcare analysts who were quoted in the newspaper

1          Dorothy McKenna Brown, Ed.D.
2 article as saying that AHERF was taking on a
3 high-risk case.
4        MS. MEADEN: Objection.
5    A. No, I don't remember.
6    Q. And you never spoke to any of these people?
7    A. No.
8        MR. McCLENAHAN: I'm going to object to
9 the form of that question. I don't see in here any
10 consultant who characterizes it as a high risk.
11    Q. Well, the first paragraph says, "The
12 Allegheny Health, Education and Research Foundation
13 is about to take on a high-risk case in the Graduate
14 Health System according to the diagnosis of local
15 healthcare analysts." That's what I'm talking
16 about.
17        MR. McCLENAHAN: Yes, and that's what
18 the newspaper writer wrote.
19        MR. FRIESEN: Correct.
20        MR. McCLENAHAN: But they then go on to
21 quote several healthcare consultants, and I haven't
22 seen a single one who characterized it as high risk.
23        MS. MEADEN: Right, and your question
24 related to quotes from the healthcare consultants.
25        MR. McCLENAHAN: Right, not the

1          Dorothy McKenna Brown, Ed.D.
2 newspaper people.
3        MS. MEADEN: Right. That was the basis
4 for my objection as well.
5    Q. Are you aware of anyone who called the
6 newspaper and said, "Please let me know which local
7 healthcare analysts" --
8    A. No.
9    Q. -- "said that it was a high-risk case"?
10    A. No.
11        MS. MEADEN: Objection. Again, it
12 implies that someone said directly that other than
13 the author of the article.
14    Q. And no one spoke to the author of the article
15 that you know of?
16    A. No.
17    Q. By the time you voted -- well, let me strike
18 that.
19        Did, to your recollection, anyone
20 dissent, meaning vote no, on the issue of the final
21 acquisition of Graduate Hospital System?
22        MS. MEADEN: Objection as to form.
23    A. I have no idea.
24    Q. But you don't recall that happening?
25    A. No.

1          Dorothy McKenna Brown, Ed.D.
2        MS. MEADEN: Objection. Again, I think
3 it mischaracterizes what the board was asked to do
4 at the board meeting where that issue was discussed.
5    Q. Well, then let me bring out the board
6 minutes. I was hoping to avoid this, but here we
7 go.
8    A. There goes the fire alarm.
9        VIDEO TECHNICIAN: We are now going off
10 the video record. The time 10:31.
11        (Short recess.)
12        VIDEO TECHNICIAN: Back on. The time
13 10:46.
14 BY MR. FRIESEN:
15    Q. Dr. Brown, did you tell any of the other
16 trustees that Mr. Abdelhak had hung up on you?
17    A. Probably.
18    Q. Do you recall any reactions that any of them
19 had?
20    A. No.
21    Q. Did you think of resigning from the board
22 after he did that to you?
23    A. No.
24    Q. Did you think of firing him?
25    A. No.

Page 50

Dorothy McKenna Brown, Ed.D.

1
2  Q.  Let me show you a document that has
3  previously been marked as Exhibit 1988.  These are
4  board materials for a special meeting of the board
5  of trustees that was to be held September 16, 1996.
6  And let me just show you the minutes from that
7  meeting as well while we are at it, which is Exhibit
8  829.
9      MR. McCLENAHAN:  So the first document
10 is the board packet and the second is the minutes of
11 the same meeting?
12     MR. FRIESEN:  That is correct.
13 Q.  Now, let me direct you to the minutes first,
14 Exhibit 829.  You will see that these minutes for
15 the meeting held on September 16, 1996 show that you
16 are listed under "Members Absent"?
17 A.  Yes.
18 Q.  Would it be your practice, if you were not
19 going to go to a meeting, to read the board
20 materials in any event?
21 A.  Yes, I would try to.
22 Q.  And would it be your practice if you missed a
23 meeting to read the minutes of that meeting
24 afterwards --
25 A.  Yes.

Page 51

Dorothy McKenna Brown, Ed.D.

1
2  Q.  -- to see what you missed?
3      For the record, if you could just look
4  through these minutes and tell me if you think that
5  this listing of you as absent is inconsistent with
6  your memory.  In other words, do you think you were
7  really there even though you are listed as not
8  there?
9  A.  I think I would have pointed it out at a
10 subsequent meeting that the minutes were incorrect,
11 if I was not listed appropriately.
12 Q.  And you will see on Page -- the page ending
13 in 920 at the bottom, Roman Numeral VI, it says,
14 "Consolidation with Graduate Health Systems
15 Subsidiaries."  And that paragraph discusses an
16 informational update to the trustees that Mr.
17 Abdelhak gave.
18     And in that paragraph --
19     MR. McCLENAHAN:  Well, let her finish
20 the paragraph.
21     MR. FRIESEN:  Okay.
22 Q.  In the paragraph about halfway through, it
23 says, "Mr. Abdelhak stated that he expects to bring
24 a recommendation on the details of what components
25 of Graduate will ultimately move into AHERF to the

Page 52

Dorothy McKenna Brown, Ed.D.

1
2  board for approval in December."
3      Do you recall -- even though I know you
4  were not at this meeting, do you recall that it was
5  actually brought to the board's attention twice,
6  once here and again in December of that year?
7      MS. MEADEN:  Objection.
8      MR. McCLENAHAN:  I object as well.
9      You can answer the question if you --
10 A.  I don't remember specifically when it would
11 have been brought to the board's attention.
12 Q.  If you could just look at the other document
13 in front of you, which are the board materials for
14 the September meeting, the page ending in 788 at the
15 bottom, there is an agenda?
16 A.  Oh, the agenda; I'm sorry.
17 Q.  Right.
18     And Roman Numeral VI says,
19 "Consolidation with Graduate Health Systems
20 Subsidiaries, Action Required," and it says
21 "Information"?
22 A.  Right.
23 Q.  And let me just point you to that.  That
24 starts at the page ending in 906.  And you will see
25 there are some pages of financial information about

Page 53

Dorothy McKenna Brown, Ed.D.

1
2  the Graduate Health System.
3      My first question is, do you recall
4  seeing this information back in September of 1996?
5  A.  Not specifically, but if I received it, I
6  looked at it.
7  Q.  If you look at the page ending in 908, you
8  will see it shows a loss from operations, third
9  column -- sorry -- the third row from the bottom.
10 And if you go over to the far right, the combined
11 loss from operations for the Graduate system was a
12 little over $20 million?
13 A.  Uh-huh.
14     MS. MEADEN:  I'm going to object to the
15 form because the title says "Graduate Health System
16 Entities to Be Acquired by SDN."  I'm not sure if
17 that's all or part of the Graduate Healthcare
18 System.
19     MR. FRIESEN:  Okay.  That's fair enough.
20 Q.  The "Graduate Health System Entities to Be
21 Acquired by SDN," which is the name that you
22 referred to earlier.  Do you see there is a loss
23 from operations for the eleven months ended May 31,
24 1996 for $20,124,000?
25 A.  Yes.

14 (Pages 50 to 53)

Dorothy McKenna Brown, Ed.D.

1  correct?
2     A.  Yes, yes.
3     Q.  And was there an audit committee of Rosemont
4  College?
5     A.  No; it was all done within the finance
6  committee.
7     Q.  So it was the finance committee that had the
8  primary interaction --
9     A.  Right.
10    Q.  -- with the auditors, correct?
11    A.  No; we did not meet with them.  The finance
12  committee did not meet with them every year.
13       At Catholic Social Service they do.
14    Q.  And at Rosemont the auditors were commenting
15  on basically operations of Rosemont College?
16    A.  Well, they were commenting on a primary
17  source of income, that it was diminished that year
18  and if that trend kept up, we would have a problem
19  down the road and it was -- I mean, the board
20  already knew it.  We had talked about it and so
21  forth, but they just felt obliged to...
22    Q.  Did the board do anything in response or did
23  you as president of the board --
24    A.  Well, we were planning and doing new

Dorothy McKenna Brown, Ed.D.

1  initiatives and recruiting and so forth and it did
2  not continue to be a major problem.
3     Q.  And when you were at -- I'm sorry -- Catholic
4  Social Service, do you recall an instance where the
5  auditors ever asked to speak directly to the board?
6     A.  Well, we meet with them for at least two
7  hours as a finance committee.
8     Q.  Again, in that organization --
9     A.  We do the audit.
10    Q.  The finance committee did the audit?
11    A.  Does the audit, yes.
12    Q.  And was that something that was done in
13  executive session when the finance committee met
14  with the auditors?
15    A.  Well, they come in.  We review the year's
16  results.  The chief financial officer is there and
17  maybe one of his assistants, the head of Catholic
18  Social Services, the assistant, and so forth.  And so
19  we have this conversation and ask questions and so
20  forth.
21       Then we ask all management to leave and
22  we have a session with the auditors.
23       Then we ask the auditors to leave and we
24  have a session with management to make sure that

Dorothy McKenna Brown, Ed.D.

1  they are comfortable with the audit, that they are
2  confident that it is a fair representation of what
3  is going on.  We ask if there are any unusual
4  occurrences, that sort of thing.
5     Q.  During your tenure with Catholic Services,
6  did the auditors ever raise any issue concerning the
7  integrity of management --
8     A.  No.
9     Q.  -- or the integrity of the financial
10  statements --
11    A.  No.
12    Q.  -- that were presented to them for review?
13    A.  No.
14    Q.  And at Provident Mutual Life Insurance
15  Company I think you said that there was an issue
16  about the way something was being reflected on the
17  corporate books; is that correct?
18    A.  Uh-huh.
19    Q.  And the auditors came and spoke to the board
20  as a whole or to the audit committee?
21    A.  I think that the partner in charge came and
22  spoke to the whole board.  You know, it was not a
23  several-hour meeting.  It was like a ten-minute
24  meeting, and it was resolved.

Dorothy McKenna Brown, Ed.D.

1     Q.  And it was an informational issue as to why
2  something was being --
3     A.  Uh-huh.
4     Q.  Do you recall, was there a disagreement
5  between the auditors and management as to how this
6  particular --
7     A.  I think so, yes.
8     Q.  -- how this particular entry should be
9  reflected on the financial statements?
10    A.  Yes.
11    Q.  And were you, as a member of that board,
12  concerned about this disagreement between the two?
13    A.  No, no.  It seemed very professional, their
14  presentation and the conversation and the ultimate
15  solution.
16       Again, I say I'm not an accountant.  So
17  sometimes the vocabulary is difficult, but the
18  concepts I think I understand.
19    Q.  Now, as a member of the AHERF board, there
20  were a variety of committees --
21    A.  Right.
22    Q.  -- for that board as well.  You served on
23  some of those, as I understand it.
24       You've never served or you never served

Page 158

Dorothy McKenna Brown, Ed.D.

1
2   as a member of the audit committee of the AHERF
3   board --
4       A.  No.
5       Q.  -- correct?
6       A.  No.
7       Q.  And you were never on the finance committee
8   of the --
9       A.  No.
10      Q.  -- AHERF board, correct?
11      A.  No.
12      Q.  Did you ever serve on the executive committee
13  of the AHERF board?
14      A.  No.
15      Q.  Did you have any understanding as to what the
16  role of the AHERF audit committee was?
17      A.  I'm sure we were given their bylaws at some
18  point, but I can't recite them.
19      Q.  Well, let me try and break it down then.
20          Did you have any understanding as to
21  whether the audit committee was the primary
22  committee that was going to interact with the
23  outside auditors?
24      A.  I don't remember thinking about it.  I mean,
25  I just assumed that's what they would do.

Page 159

Dorothy McKenna Brown, Ed.D.

1
2       Q.  Do you recall that it was the audit committee
3   that would recommend to the board as a whole which
4   outside auditing firm should be retained as the
5   entity's independent auditors?
6       A.  I assume that's where it came from because I
7   do remember Coopers being recommended and the board
8   approving it, yes.
9       Q.  And do you recall the audit committee each
10  year presenting the audited financial statements to
11  the board as a whole for approval?
12      A.  Yes.
13      Q.  And do you recall the audit committee
14  presenting each year the audit plan that had been
15  put together by the outside auditors to the board as
16  a whole for approval?
17      A.  I don't have all of these boards in my head
18  and which one -- I can't swear to it.  I assume they
19  did.
20      Q.  And as a member of the AHERF board, did you,
21  in turn, rely on the audit committee then to
22  interact directly with the auditors --
23      A.  Oh, yes.
24      Q.  -- and be the first line of oversight?
25      A.  Oh, yeah.

Page 160

Dorothy McKenna Brown, Ed.D.

1
2       Q.  I think you answered this before, but just my
3   recollection is a bit hazy.
4           You don't recall being at any meeting at
5   which any of the auditors from Coopers & Lybrand
6   made --
7       A.  No.
8       Q.  -- any sort of presentation, correct?
9       A.  I do not.  The only time I ever remember
10  anyone from any outside agency being there was when
11  they reworked the bond issue, and I think it was
12  bond counsel that was present.  If there was an
13  auditor in the room, I didn't identify that person
14  as such.
15      Q.  Did you rely on the presentations made by
16  members of the audit committee to get an
17  understanding of how the audits of the enterprise
18  were progressing?
19      A.  I don't recall them making very detailed
20  presentations.  It was more -- and sometimes
21  management would present a report if the particular
22  person wasn't there that was the chair simply saying
23  "We have the recommendation of the committee.  You
24  have the report in your packet.  Are there any
25  questions?"  There would always be a few, and

Page 161

Dorothy McKenna Brown, Ed.D.

1
2   then...
3       Q.  Do you recall generally accepting the
4   recommendations --
5       A.  Yes.
6       Q.  -- that had been made by the audit committee
7   to the board as a whole?
8       A.  Yes.
9       Q.  Do you ever recall a situation where you
10  voted against a recommendation that had been made by
11  the audit committee to the board?
12      A.  No.
13      Q.  And was it your understanding that it would
14  be the audit committee in the first instance that
15  would address any issues or concerns that were
16  raised by the outside auditors about the financial
17  statements that had been presented to them for
18  review?
19          MR. FRIESEN:  Objection.
20      A.  I would assume so.
21      Q.  This is a pretty -- going to sound like an
22  pretty elementary or rudimentary question, but I do
23  want to make sure we have on the record your
24  understanding as to what service an outside auditor
25  provides.

41 (Pages 158 to 161)

Page 162

Dorothy McKenna Brown, Ed.D.

1  Dorothy McKenna Brown, Ed.D.
2       In particular in this case to the AHERF
3  board, what did you understand the role of Coopers &
4  Lybrand was as AHERF's outside auditors?
5    A.  They usually state it in the front letter
6  what they have done and what they are responsible
7  for, and I have seen probably at AHERF what they do
8  not do, which always seems a much longer list than
9  the one that they do do.
10      But they were responsible for certifying
11 that the statements were accurate in my view to the
12 extent that they tested according to generally
13 accepted accounting principles all the various
14 financial documents in the institution.
15   Q.  Was it your understanding that the outside
16 auditors presented an independent review of the
17 entity's financial statements?
18   A.  Yes.
19   Q.  And it was your understanding that they
20 either signed an opinion or they didn't --
21   A.  Right.
22   Q.  -- with respect to the --
23   A.  And if there was a problem, you would get an
24 ongoing concern statement, which I'm sure we never
25 got.

Page 163

Dorothy McKenna Brown, Ed.D.

1  Dorothy McKenna Brown, Ed.D.
2       MR. FRIESEN:  Let me lodge an objection
3  to at least your half question.
4       MS. MEADEN:  I don't think I got it all
5  out, but okay.
6    Q.  During your tenure as a board member, is it
7  your recollection that Coopers & Lybrand always
8  provided what was called a clean opinion --
9    A.  Yes.
10   Q.  -- on the AHERF financial statements?
11   A.  Yes.
12   Q.  And did you understand that clean opinion to
13 be an opinion that the financial statements that
14 were presented for audit fairly in all material
15 respects reflected the financial position of AHERF?
16   A.  Yes.
17   Q.  In conformity also with generally accepted
18 accounting principles, as you mentioned earlier,
19 correct?
20   A.  Yes.
21   Q.  Do you have any view as to what the
22 significance is of getting a clean opinion on an
23 enterprise's financial statement?
24       MR. FRIESEN:  Objection.
25   A.  Could you say it again?

Page 164

Dorothy McKenna Brown, Ed.D.

1  Dorothy McKenna Brown, Ed.D.
2    Q.  Sure.  Let me try and rephrase it.
3       In your view and based on your
4  experience as the head of various organizations and
5  as a member of both for-profit and not-for-profit
6  boards, what is your view as to the importance or
7  the significance of getting a clean opinion from an
8  outside auditing company on an entity's financial
9  statements?
10   A.  I think it's very important.
11   Q.  Could you explain for me why?
12   A.  Well, in the educational world you need it
13 for your accreditation.  You need it to be eligible
14 for various kinds of federal funding, for student
15 aid, for grants, for research, and whatever.
16 Various funders like foundations will ask for your
17 audit report.  They are obviously not going to put
18 money into a sinking ship.
19      Those are the things that immediately
20 come to my mind, and I think they provide a measure
21 of -- I don't want to say comfort, but a sense to
22 the trustees that, yes, things are as they are being
23 presented.
24   Q.  And when you receive those clean opinions
25 from Coopers & Lybrand each year, what significance,

Page 165

Dorothy McKenna Brown, Ed.D.

1  Dorothy McKenna Brown, Ed.D.
2  if any, did you place on those when they reviewed
3  AHERF's financial statements?
4    A.  That they were accurate, that it was an
5  accurate representation.
6    Q.  Did you use the financial statements in any
7  way to discharge your duties as a trustee of AHERF?
8    A.  No, no.
9    Q.  You didn't use them then as a measure to see
10 how well or how poorly the organization was doing in
11 integrating these entities that it was bringing in?
12   A.  No.
13   Q.  Did you have any understanding as to whether
14 those audited financial statements of AHERF's were
15 being used by any entities or persons outside the
16 AHERF system?
17   A.  Well, I would assume they were by all the
18 entities that I listed --
19   Q.  The lenders?
20   A.  -- the federal and state government, the
21 foundations.
22   Q.  Lenders?
23   A.  Private donors, lenders.
24   Q.  Ratings agencies, bond rating agencies?
25   A.  I guess.  I don't know that much about rating

42 (Pages 162 to 165)

Page 166

Dorothy McKenna Brown, Ed.D.

1       Dorothy McKenna Brown, Ed.D.
2    agencies.
3      Q.   Again, based on your experience, both your
4    employment experience and your experience as a
5    member of boards of for-profit and not-for-profit
6    entities, did you have any expectations as to the
7    types of things that Coopers & Lybrand as AHERF's
8    outside auditors should bring or should have brought
9    to the attention of the audit committee or the
10   board?
11     A.   Specifically, no.
12          MR. FRIESEN:  Let me just get you to
13   finish your question, and I will object if it's
14   objectionable, and then you can answer it, if you
15   don't mind.
16          MS. MEADEN:  I think I did finish it.
17          MR. FRIESEN:  Then I object.
18     Q.   If you need to have it read back, we can?
19          THE WITNESS:  Would you please read it,
20   please?
21          (The court reporter read the last
22   question.)
23          MR. FRIESEN:  Objection.
24     A.   Specifically, no.
25     Q.   Let me give you some examples then.

Page 167

1       Dorothy McKenna Brown, Ed.D.
2       Would you have expected Coopers &
3    Lybrand, if they had found material misstatements in
4    the financial statements that had been presented to
5    them for audit, to have brought that to the
6    attention --
7      A.   Oh, absolutely.
8      Q.   -- of the audit committee or the board as a
9    whole?
10          MR. FRIESEN:  Objection.
11     A.   Yes.
12     Q.   And if Coopers & Lybrand had found
13   intentional misstatements in the financial
14   statements that had been presented to them for
15   audit, would you have expected Coopers & Lybrand to
16   bring that to the attention of the audit committee?
17     A.   Yes.
18          MR. FRIESEN:  I have to raise my hand.
19          THE WITNESS:  I'm sorry.
20          MR. FRIESEN:  Objection.
21     Q.   And if Coopers & Lybrand had uncovered issues
22   reflecting upon the competency of financial
23   management during the course of their audit of
24   AHERF's financial statements, would you have
25   expected Coopers & Lybrand to bring that to the

Page 168

1       Dorothy McKenna Brown, Ed.D.
2    attention of the audit committee?
3          MR. FRIESEN:  Objection.
4      A.   Yes.
5      Q.   And I'll use a little bit of shorthand here.
6          Would you have expected Coopers to have
7    brought to the attention of the audit committee any
8    issues they uncovered reflecting upon the integrity
9    of AHERF's financial management to AHERF audit
10   committee?
11     A.   Yes.
12          MR. FRIESEN:  Objection.
13     Q.   And would the same be true if Coopers &
14   Lybrand had uncovered fraudulent conduct on the part
15   of AHERF's financial management; would you have
16   expected Coopers to bring that to the attention of
17   the audit committee?
18          MR. FRIESEN:  Objection.
19     A.   Yes.
20     Q.   Now, at any time during your tenure on the
21   AHERF board or as interim president of the
22   university, had you ever heard that Coopers &
23   Lybrand had raised any of those issues we just
24   discussed with anyone on the AHERF board?
25          MR. FRIESEN:  Objection.

Page 169

1       Dorothy McKenna Brown, Ed.D.
2      A.   No.
3      Q.   Now, if Coopers & Lybrand had brought such
4    matters to the attention of the audit committee,
5    would it -- would you have expected the audit
6    committee to conduct an investigation into those
7    issues raised by Coopers?
8          MR. FRIESEN:  Objection.
9      A.   Yes.
10     Q.   And is it your belief that the committee
11   would have conducted a thorough investigation of
12   such matters?
13          MR. FRIESEN:  Objection.
14     A.   Yes.
15     Q.   And based on some of your testimony earlier
16   today, I sensed that you were never hesitant, if
17   issues were presented to you that you were concerned
18   about, to inquire further and get answers to the
19   questions you had, correct?
20          MR. FRIESEN:  Objection.
21     A.   Yes.
22     Q.   That's a fair statement?
23     A.   Yes.  Why wouldn't I?
24     Q.   Right, right.
25          So if you had ever heard that these

43 (Pages 166 to 169)

Page 170

1          Dorothy McKenna Brown, Ed.D.
2   issues that I listed earlier had been raised by
3   AHERF's outside auditors and that came to your
4   attention, do you believe that you would have either
5   conducted an investigation on your own or gone to
6   people to insist that they conduct -- the
7   appropriate people to insist they conduct such an
8   investigation?
9          MR. FRIESEN: Objection. Calls for
10  speculation.
11     A.   Yes; not on my own, but I would have gone to
12  people that I thought were qualified to do such a
13  thing.
14     Q.   And that would have been members of the audit
15  committee?
16     A.   Right, or the resources.
17     Q.   Resource management committee, is that what
18  you meant?
19     A.   Committee. I keep calling it a finance
20  committee in my head, but it was resources.
21     Q.   But that's what you were talking about?
22     A.   Yeah.
23     Q.   And you certainly would have wanted to know
24  what the results of that investigation were had one
25  been conducted, correct?

Page 171

1          Dorothy McKenna Brown, Ed.D.
2          MR. FRIESEN: Objection.
3     A.   Yes.
4          Sorry.
5     Q.   Do you have any reason to believe that if
6   Coopers & Lybrand had ever raised any of these
7   issues with the audit committee at AHERF that the
8   audit committee would not have conducted any
9   investigation into those allegations?
10         MR. FRIESEN: Objection.
11    A.   No.
12    Q.   If the audit committee had heard such
13  allegations from Coopers & Lybrand and had conducted
14  such an investigation, it would have been your
15  expectation that they would then follow whatever
16  prudent course seemed dictated by the results of
17  that investigation, correct?
18         MR. FRIESEN: Objection.
19    A.   Yes.
20    Q.   And if at the end of such an investigation
21  the audit committee had come to the board and made a
22  recommendation to the board about a course of action
23  to follow and had sufficiently satisfied any
24  questions that you may have had, would you believe
25  that you would have followed the recommendation of

Page 172

1          Dorothy McKenna Brown, Ed.D.
2   the audit committee in that regard?
3          MR. FRIESEN: Objection.
4     A.   Yes.
5     Q.   Yes, you would have?
6     A.   I would, yeah.
7     Q.   Prior to the fall of 1998, did you ever have
8   any question as to the accuracy of AHERF's financial
9   statements?
10    A.   No.
11    Q.   Did you have any --
12         MR. FRIESEN: I'm sorry. Did you say
13  fall of 1998?
14         MS. MEADEN: Yes.
15         MR. FRIESEN: Objection.
16  Mischaracterizes the prior testimony.
17         MS. MEADEN: I didn't characterize her
18  testimony. I asked her a question if she had any.
19         MR. FRIESEN: Okay. Contradicts prior
20  testimony.
21         MS. MEADEN: I don't think it does, but
22  all right.
23         THE WITNESS: I don't think it does.
24         MR. McCLENAHAN: Let's just go to the
25  next question. We can have this debate later on.

Page 173

1          Dorothy McKenna Brown, Ed.D.
2     Q.   Did you make any observations as to -- strike
3   that.
4          Did you come to understand at some point
5   that Mr. McConnell had been terminated, his
6   employment had been terminated at AHERF?
7     A.   Yes.
8     Q.   Did you have any understanding as to why his
9   employment was terminated?
10    A.   No.
11    Q.   Were you involved in the decision to
12  terminate his employment?
13    A.   No.
14    Q.   Do you recall during the summer and fall of
15  1998, late summer, early fall of 1998, there was
16  some question as to whether AHERF's 1997 audited
17  financial statements could continue to be relied
18  upon?
19    A.   Yes.
20    Q.   Tell me how you first learned of that.
21    A.   I'm not sure. I may have read it in the
22  newspaper.
23    Q.   Do you recall why it was that there was some
24  concern as to whether those financial statements
25  could continue to be relied upon?

44 (Pages 170 to 173)

Page 174

Dorothy McKenna Brown, Ed.D.

1
2    A.   No.
3    Q.   Do you recall that there was a public
4    announcement made, I think in September of 1998,
5    that those statements should no longer be relied
6    upon, the audited financial statements of AHERF for
7    fiscal year 1997?
8    A.   It's a bit of a blur, but I'm sure that I
9    knew it when it was announced.
10   Q.   Were you involved at all in the decision to
11   make that public announcement?
12   A.   No.
13   Q.   At some point in time did you come to
14   question the thoroughness or the competency of
15   Coopers & Lybrand's audit of AHERF's financial
16   statements?
17        MR. FRIESEN:  Objection.
18   A.   Only after that announcement that they had to
19   recast them or --
20   Q.   Do you recall specifically --
21   A.   That would be in that September time frame.
22   Q.   Do you recall having any discussions with
23   anyone on the AHERF board or within AHERF management
24   about that issue?
25   A.   No.

Page 175

Dorothy McKenna Brown, Ed.D.

1
2    Q.   During that same time period a decision was
3    made not to continue to retain
4    Pricewaterhousecoopers, which was the successor to
5    Coopers & Lybrand?
6    A.   Right.
7    Q.   Are you familiar with that decision?
8    A.   Yes.
9    Q.   Were you involved in that decision?
10   A.   No.
11   Q.   Did you have any understanding as to why that
12   decision was made?
13   A.   I guess because there was a lack of
14   satisfaction with the previous audit.
15   Q.   Did you have any conversations with anyone
16   about that --
17   A.   No.
18   Q.   -- topic?
19        At one point earlier today we were
20   looking at Book 3 for a board meeting of 12/16/1994,
21   and we don't need to refer to that, but I'm just
22   trying to put in context your testimony.  And I
23   think Mr. Friesen was asking you questions about the
24   physician practice acquisition, and I think your
25   testimony was that you raised a question at that

Page 176

Dorothy McKenna Brown, Ed.D.

1
2    point, do we have enough money to do all of these
3    things?
4    A.   Or sometime prior.  In that time frame.  I
5    don't know if it was at that heating or not.
6    Q.   And I think you said that someone answered
7    with a definitive yes?
8    A.   I think it was Sherif.
9    Q.   That was my question.  Do you recall who?
10   A.   Yes, I think it was Sherif, and I think he
11   said we have plenty of money.
12   Q.   And do you recall until the fall of 1997 Mr.
13   Abdelhak giving recurrent assurances to the board
14   that the system was financially strong enough to
15   absorb acquisitions of hospitals and acquisitions of
16   physician practices?
17   A.   I can't quote him the way I did in that
18   particular instance, but, yes, I have a sense that
19   we were regularly assured that while there was a lot
20   of work to be done, it could be done.
21   Q.   And, to be clear, you never heard from the
22   outside auditors --
23   A.   No.
24   Q.   -- that Mr. Abdelhak's assurances in that
25   regard were incorrect or inaccurate, correct?

Page 177

Dorothy McKenna Brown, Ed.D.

1
2    A.   No.
3        MR. FRIESEN:  Objection.
4    Q.   Earlier this afternoon Mr. Friesen also
5    showed you the 1996 audited financial statements,
6    and, again, there is no need to go back and look at
7    them.  I'm just trying to put in context your
8    testimony.  And he asked you if you reviewed the
9    financial statements as a practice when you got
10   them.  And I believe your testimony was you
11   typically looked at the letter from the auditors and
12   the balance sheet and then perhaps looked at
13   footnotes if something caught your interest,
14   correct?
15   A.   Yes.
16   Q.   And I think you said you expected highly
17   unusual items to be pointed out by the finance
18   committee?
19   A.   Or the audit committee.
20   Q.   Or the audit committee?
21   A.   Or the audit committee.
22   Q.   And did you in that same vein expect highly
23   unusual items to be pointed out by the outside
24   auditors?
25   A.   I would assume they would have been

45 (Pages 174 to 177)

Page 178

Dorothy McKenna Brown, Ed.D.
1
2      pointed -- would have been pointed out to the audit
3      committee.
4      Q.  By the outside auditors?
5      A.  By the outside auditors.
6      Q.  And, again, you are not aware of Coopers &
7      Lybrand ever pointing --
8      A.  No.
9      Q.  -- out such highly unusual items to the audit
10     committee, correct?
11     A.  No.
12          MR. FRIESEN:  Objection.
13          MS. MEADEN:  Thank you for your
14     patience, Dr. Brown.  I don't have any further
15     questions at this point.  Mr. Friesen may.
16     BY MR. FRIESEN:
17     Q.  I just have a few.
18          I would like to clarify one thing, Dr.
19     Brown.  In response to Miss Meaden's question, you
20     testified that prior to the fall of 1998 you
21     didn't -- I think you said you didn't believe that
22     any of AHERF's financial statements were inaccurate?
23     A.  No, I think she asked if Coopers' financial
24     statements were inaccurate.
25          MS. MEADEN:  The audited.

Page 179

Dorothy McKenna Brown, Ed.D.
1
2      A.  The audited.
3      Q.  Well, what she said was financial statements,
4      and I want to be clear what we are talking about
5      here.
6      A.  Okay.
7      Q.  Did you mean in your answer to talk about
8      audited financial statements?
9      A.  I meant audited financial statements.  As I
10     indicated earlier, I had great concern when Sherif
11     said, quote, I don't have good numbers.
12     Q.  That's what I was getting at, and that was
13     the source of my confusion.
14          The second question I have is with
15     respect to the timing of the Graduate acquisition.
16     The testimony that you gave about believing that
17     there was a period of time within which the Graduate
18     entities could be given back to prior management, I
19     think you testified in response to Miss Meaden's
20     questions that that was during the due diligence or
21     trial period?
22     A.  Yes.
23     Q.  Now, did you approve of the acquisition
24     beyond the trial period, or did you think that
25     beyond the trial period you would have to approve it

Page 180

Dorothy McKenna Brown, Ed.D.
1
2      again?
3      A.  Well --
4          MS. MEADEN:  Objection.  Vague.
5      Compound.
6          Go ahead.
7      A.  I think there is a -- something you showed me
8      here --
9      Q.  Right.
10     A.  -- minutes that talk about the final
11     presentation by Sherif, if I'm not mistaken.
12     Q.  Exhibit 832, which are the minutes of the
13     December 12, 1996.
14     A.  Yes.
15     Q.  Beginning on Page 743.  That's right.  Thank
16     you.
17          The paragraph on 743, the introduction
18     there says, "The president," meaning Mr. Abdelhak,
19     "reviewed the overall plans underway and steps taken
20     to date to accomplish the integration and
21     transaction of appropriate GHS activities to AHERF,
22     noting that final form of the reorganization will be
23     determined as current due diligence reviews and
24     other financial legal and operational analyses are
25     completed."

Page 181

Dorothy McKenna Brown, Ed.D.
1
2      A.  Yes.
3      Q.  And then the resolution goes on.
4      A.  For pages.
5      Q.  Yes.
6          And my question -- and I can point you
7      to specific paragraphs of the resolution if you
8      like, but before I do that, my question is:  Did you
9      understand that this resolution gave Mr. Abdelhak
10     the authority to finally fold the Graduate entities
11     into the AHERF system once due diligence was
12     complete?  And if you like, I can point to specific
13     paragraphs.
14          MR. McCLENAHAN:  If you have a current
15     recollection what this all meant in December of
16     1996 --
17          THE WITNESS:  I don't have a current
18     recollection.
19          MR. FRIESEN:  Well, it may help to look
20     at --
21          MR. McCLENAHAN:  Let me finish.
22          -- then you can answer that question.
23     But unless you have such a current recollection or
24     unless counsel can specifically refresh your memory,
25     you shouldn't speculate on what these pages of

46 (Pages 178 to 181)

Page 189

```
 1
 2        I have read the foregoing transcript
 3   of my deposition given on May 4, 2004, and it
 4   is true, correct and complete, to the best of
 5   my knowledge, recollection and belief, except
 6   for the corrections noted hereon and/or list of
 7   corrections, if any, attached on a separate
 8   sheet herewith.
 9
10
11
12        DOROTHY McKENNA BROWN, ED.D.
13
14
15
16
17   Subscribed and sworn to
18   before me this 3rd day
19   of ____JUNE____, 2004.
20
21
22   _____
23   Notary Public
24
25
```

> Notarial Seal
> Andrew P. Rolii, Jr., Notary Public
> Lower Merion Twp., Montgomery County
> My Commission Expires Oct. 22, 2006
> Member, Pennsylvania Association Of Notaries

Page 190

```
 1
 2              CERTIFICATE
 3        I HEREBY CERTIFY that the proceedings,
 4   evidence and objections are contained fully and
 5   accurately in the stenographic notes taken by me
 6   on May 4, 2004, and that this is a true and
 7   correct transcript of same.
 8
 9
10
11
12        _____
13        Cynthia A. Whyte, RPR
14
15
16        (The foregoing certification of this
17   transcript does not apply to any reproduction of
18   the same by any means, unless under the direct
19   control and/or supervision of the certifying
20   reporter.)
21
22
23
24
25
```

DEPOSITION ERRATA SHEET

RE:    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY
       HEALTH, EDUCATION AND RESEARCH FOUNDATION VS.
       PRICEWATERHOUSECOOPERS, L.L.P.

The following corrections are in accordance with changes made by Dorothy McKenna Brown on
the transcript, in lieu of an errata sheet. The transcript is signed by Ms. Brown to reflect approval
of these changes. - G.M.V. 6/15/04

| Page/Line # | Amendment | Reason for Change |
|---|---|---|
| 9:6 | "college" should read "art collection" | Error |
| 54:19 | "know" should read "want"` | Error |
| 120:11 | Sentence should read, "Yes, as a member of AUHS, not the resource management committee." | Clarification |
| 176:5 | "heating" should read "meeting" | Error |

**Buettner Dep.**

William F. Buettner                                                    Volume 1

Page 1

IN THE UNITED STATES DISTRICT COURT

OF PENNSYLVANIA

WESTERN DIVISION

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

           Plaintiff,

              Vs.    Civil Action No. 00-684

PRICEWATERHOUSECOOPERS, LLP,

           Defendant.


    Videotaped deposition of WILLIAM F.
BUETTNER, called for examination under the
Applicable Rules of Federal Civil Procedure,
taken before me, Michele E. Eddy, a Registered
Professional Reporter and Notary Public in and
for the State of Ohio, pursuant to notice and
stipulations of counsel, at the offices of
Jones Day, 500 Grant Street, Suite 3100,
Pittsburgh, Pennsylvania, on Tuesday, the 22nd
day of June, 2004, at 9:00 a.m.


                - - - - -

William F. Buettner                                                          Volume 1

Page 2

APPEARANCES:

    On behalf of the Plaintiff:
        Jones Day, by
        JAMES M. JONES, ESQ.
        500 Grant Street, 31st Floor
        Pittsburgh, PA  15219
        (412) 391-3939

        Jones Day, by
        DAVIS S. TORBORG, ESQ.
        51 Louisiana Avenue, NW
        Washington, D.C.  20001-2113
        (202) 879-3939


                    ----

Page 3

APPEARANCES, Continued:

    On behalf of the Defendant:
        Cravath, Swaine & Moore, LLP, by
        ANTONY RYAN, ESQ.
        LOUIS LaROCCA, ESQ.
        Worldwide Plaza
        825 Eighth Avenue
        New York, New York 10019-7475
        (212) 474-1296

    On behalf of the Witness:
        Miller, Alfano & Raspanti, PC, by
        GREGORY P. MILLER, ESQ.
        STEPHEN G. STROUP, ESQ.
        1818 Market Street, Suite 3402
        Philadelphia, Pennsylvania  19103
        (215) 972-6400
                - - - - -
ALSO PRESENT:
    Jeffrey Close
    DJ Trozzo, Videographer
                ----

Page 4

1     THE VIDEOGRAPHER:  Good morning.
2  The time is 9:11.  Today's date is June 22nd.
3  We're here to take the deposition of William
4  Buettner being held at Jones Day, One Mellon
5  Center, Pittsburgh, PA in the matter of the    09:12:14
6  Official Committee of Unsecured Creditors of
7  the Allegheny Health, Education & Research
8  Foundation versus PricewaterhouseCoopers, LLP
9  in the district -- U.S. District Court of
10  Pennsylvania.  Case Number 00-684.            09:12:26
11     I'm the videographer.  My
12  name is DJ Trozzo.  If counsel could
13  please introduce themselves.
14     MR. JONES:  My name is Jim Jones.
15  I'm here on behalf of the Committee, and I'm    09:12:36
16  joined by David Torborg.
17     MR. RYAN:  Antony Ryan from
18  Cravath, Swaine & Moore on behalf of the
19  defendant PricewaterhouseCoopers, LLP and the
20  witness.  And with me are Jeff Close from PwC   09:12:49
21  and Lou -- Louis LaRocca from Cravath.
22     MR. STROUP:  Stephen Stroup.  I'm
23  counsel for Mr. Buettner along with Gregory
24  Miller.
25     THE VIDEOGRAPHER:  If the court    09:13:05

Page 5

1  reporter would swear in the witness, we may
2  proceed.
3     WILLIAM F. BUETTNER, of lawful age,
4  called for examination, as provided by the
5  statute, being duly sworn, as hereinafter
6  certified, said as follows:
7     EXAMINATION OF WILLIAM F. BUETTNER
8  BY MR. JONES:
9     Q.   Mr. Buettner, could you state your
10  full name for the record, please?            09:13:18
11     A.   My name is William F. Buettner.
12     Q.   Good morning, Mr. Buettner.  We met
13  just a few moments ago.  My name is James Jones
14  or Jim Jones.  I'm here on behalf of the
15  Committee in the case you just heard          09:13:29
16  referenced.
17     I'm going to ask you a few
18  questions today and for the better part of
19  tomorrow, at least.
20     You've had your deposition taken    09:13:37
21  before?
22     A.   Yes, I have.
23     Q.   Here are just a few ground rules
24  that I'm sure you understand but you can tell
25  me whether you do or not.  They are that if at   09:13:44

2 (Pages 2 to 5)

Page 6

1  any time you don't understand my question,
2  please stop me, tell me that. I'll do my best
3  to rephrase it so that we do understand one
4  another.
5          Can we have that agreement?        09:13:56
6      A.  Yes.
7      Q.  Is there any reason this morning,
8  Mr. Buettner, that you would have difficulty
9  giving accurate testimony, and only by way of
10 example I mention perhaps medication or an        09:14:07
11 illness that you might be suffering from?
12     A.  No.
13     Q.  Mr. Buettner, what's your current
14 home address?
15     A.  I live in Cannonsburg, Pennsylvania    09:14:16
16 at 131 Jonathan Drive.
17     Q.  Do you have any intention of
18 leaving that address as your residential
19 address within the year?
20     A.  No plans at the current, no.        09:14:28
21     Q.  Do you have a current work address?
22     A.  No.
23     Q.  Are you currently employed?
24     A.  No, I am retired.
25     Q.  Are you employed anywhere in your    09:14:43

Page 7

1  retirement? I assume when you said retired,
2  you meant from PricewaterhouseCoopers, is that
3  right?
4      A.  I am retired from
5  PricewaterhouseCoopers.            09:14:51
6      Q.  Are you, therefore, employed in any
7  other capacity?
8      A.  No, I am retired.
9      Q.  Do you have plans to seek
10 employment?                    09:14:57
11     A.  Not at the present.
12     Q.  When did you retire, sir, from
13 PricewaterhouseCoopers?
14     A.  December 31, 2000, I believe is the
15 exact date.                    09:15:16
16     Q.  You received some form of
17 retirement benefits from -- connected with your
18 work at PricewaterhouseCoopers over the years?
19     A.  Yes.
20     Q.  Generally, without telling me        09:15:27
21 particular amounts, what kinds of benefits will
22 you receive?
23     A.  A monthly pension payment based on
24 a pension plan that existed for Coopers &
25 Lybrand and subsequently a plan that was        09:15:42

Page 8

1  developed by PwC after the merger.
2      Q.  Were you full-time employed at
3  PricewaterhouseCoopers or its predecessor,
4  Coopers & Lybrand, up until December 31, 2000?
5      A.  I was a partner, an active partner    09:16:02
6  up until December 31, 2000.
7      Q.  I appreciate that clarification.
8          Effective essentially what date or
9  what year were you elevated to the status of
10 partnership at Coopers & Lybrand?        09:16:17
11     A.  October of 1984, I believe.
12     Q.  What I meant I guess by my question
13 or two before was, was there a time when you
14 were on a reduced time commitment to the
15 enterprise before retirement?            09:16:34
16     A.  I'm not sure I understand your
17 question, Mr. Jones. I was a full-time active
18 partner up until the time that I retired in
19 2000.
20     Q.  Since that time, have you received    09:17:01
21 compensation from PricewaterhouseCoopers in any
22 form other than the retirement benefits you
23 just mentioned since the time of your
24 retirement?
25     A.  Well, as part of my retirement        09:17:15

Page 9

1  package, I received over a two-year period an
2  amount equal to one year of my last
3  compensation year, if you will.
4          That payout, if you will, my
5  understanding was similar to the payout given    09:17:33
6  to all the individuals who retired at the same
7  time I did, or all the partners who retired at
8  that time. There was a group of roughly 85
9  partners, I believe, who were involved in an
10 early retirement package. And my understanding    09:17:55
11 is the terms I received in terms of that payout
12 was similar to what the other folks received.
13     Q.  Have you received any compensation
14 since December 31, 2000 related to work with
15 the firm PricewaterhouseCoopers or lawyers    09:18:09
16 representing the firm in connection with
17 litigation?
18     A.  None.
19     Q.  Including AHERF related litigation.
20     A.  None.                    09:18:22
21     Q.  Therefore, you're not receiving any
22 compensation for your time here today?
23     A.  No.
24     Q.  You received no compensation in
25 connection with your time for preparing to be    09:18:35

3 (Pages 6 to 9)

William F. Buettner                                                                    Volume 1

Page 18

1 in the trial of the Pharmor matter?
2     A.   No.
3     Q.   That matter you understood to be
4 pending here in a courthouse of Greater
5 Pittsburgh?                              09:28:40
6     A.   Yes.
7     Q.   What was your role in the Pharmor
8 audits, as you recall it today, your formal
9 role by way of title, whether engagement
10 partner or the like?                     09:29:04
11    A.   I was the concurring partner.
12    Q.   Was any other member of the
13 engagement team with whom you worked on AHERF
14 audits in '95, '96, '97 or '98, to the best of
15 your recollection, also involved in the Pharmor   09:29:24
16 audits at issue in the Pharmor case?
17    A.   I believe Mr. Kirstein worked on
18 the account during some period of time.  I
19 don't know if the years he worked on the
20 Pharmor account coincided with the two years    09:29:42
21 that I worked as the concurring partner on the
22 account.
23    Q.   What were those two years, if you
24 recall today?
25    A.   I can't remember specifically, but    09:29:49

Page 19

1 it was either the late '80s or early '90s.
2     Q.   Any other member of the AHERF
3 engagement's team during the '85 to '98 time
4 period that you knew to be involved in the
5 Pharmor account or the Pharmor audits?    09:30:02
6     A.   I can't recall anyone else
7 specifically.
8     Q.   Mr. Buettner, we have asked for a
9 resume or a CV, curriculum vitae, for you.  I
10 don't believe we've received one to date.  We    09:30:25
11 haven't found one in the many boxes of
12 documents that have been produced.
13         Do you have a CV current as of any
14 date in the '90s?
15    A.   Well, yes, we had one in the '90s.    09:30:37
16 I'm not sure if it survived my retirement or
17 the move when we moved our offices.
18    Q.   Have you a copy with you anywhere
19 in your files at home or elsewhere?
20    A.   No, I do not.                  09:30:48
21    Q.   Let me ask you just a few questions
22 and bear with me then since I don't have the
23 benefit of that document.
24    A.   Sure.
25    Q.   You attended Duquesne University?    09:30:54

Page 20

1     A.   Correct.
2     Q.   Here in Pittsburgh?
3     A.   Yes.
4     Q.   What year did you graduate and with
5 what degree?                             09:31:00
6     A.   I graduated in 1972 with a
7 Bachelor's in Accounting and in, I believe it's
8 December of '73, with an MBA.
9     Q.   Did your MBA have a particular
10 concentration?                           09:31:24
11    A.   Finance.
12    Q.   Have you received further degrees
13 from an institution of higher learning?
14    A.   No.
15    Q.   At some point you took and passed    09:31:38
16 the CPA exam in Pennsylvania?
17    A.   That's correct.
18    Q.   Do you recall what year that was?
19    A.   Let's just say it's somewhere
20 around 1975, '76.  I can't give you a specific    09:31:50
21 date.
22    Q.   Have you taken postgraduate course
23 work at any other institution of higher
24 learning other than your MBA?
25    A.   No.                           09:32:16

Page 21

1     Q.   As I understand it, your employment
2 as a professional accountant has -- was
3 throughout its entirety with either Coopers &
4 Lybrand or later PricewaterhouseCoopers, am I
5 right?                                   09:32:21
6     A.   Well, no, not exactly.  While I was
7 going to Duquesne both in undergraduate and
8 graduate school, I worked for a regional CPA
9 firm called J.K. Lazier.  That company
10 subsequently merged with what's now Deloitte &    09:32:39
11 Touche.  So I worked there for perhaps three
12 and a half years, I would guess.
13    Q.   At which point then in your
14 educational experience, was it post
15 undergraduate or MBA, that you joined Coopers &    09:32:57
16 Lybrand?
17    A.   Post MBA.
18    Q.   How soon after you received your
19 MBA did you then join Coopers & Lybrand?
20    A.   Within weeks.                   09:33:10
21    Q.   Then you were with them the
22 remainder of your professional career as an
23 accountant?
24    A.   Yes.
25    Q.   Them and then                   09:33:22

6 (Pages 18 to 21)

William F. Buettner                                                                    Volume 1

---

Page 22

1  PricewaterhouseCoopers?
2      A.   Yes.
3      Q.   PricewaterhouseCoopers and Coopers
4  & Lybrand did the business combination that
5  they did, I'll try not to describe it, at some        09:33:31
6  point in July of '98, to the best of your
7  recollection?
8      A.   That sounds about right.  I'm not
9  sure on the exact date, but that approximates
10  my understanding.                                     09:33:45
11      Q.   You were always a member of the
12  audit services or business assurance practice
13  at Coopers & Lybrand and
14  PricewaterhouseCoopers?
15      A.   For the most part, yes.              09:34:01
16      Q.   When you say for the most part, how
17  do you mean to qualify your answer?
18      A.   Well, the first two years with the
19  firm I spent some time in the tax department of
20  Coopers & Lybrand.                              09:34:12
21      Q.   After that point, you were strictly
22  in the audit practice?
23      A.   Correct.
24      Q.   If I use business assurance only --
25  I only use it because I've picked it up from       09:34:27

---

Page 23

1  Coopers & Lybrand auditors or manuals -- you
2  understood that term to be synonymous or mean
3  essentially the same thing as audit, is that
4  fair to say?
5          MR. RYAN:   Objection.              09:34:39
6      A.   I was a member of the Coopers &
7  Lybrand audit staff.  Once the merger occurred,
8  terminologies may have changed.  But I was
9  primarily an audit partner for the period of
10  time at Coopers & Lybrand and at PwC.          09:34:55
11      Q.   Do you mean to tell me then by that
12  answer that I've picked up the business
13  assurance term, perhaps, from
14  Pricewaterhouse -- former Pricewaterhouse
15  auditors?                                      09:35:05
16      A.   No, I'm not.  I'm not sure exactly
17  where that term was created.
18          - - - - -
19          (Thereupon, Deposition
20          Exhibit 4458 was marked for
21          purposes of identification.)
22          - - - - -
23      Q.   Mr. Buettner, I'm handing you now
24  what's been marked as Exhibit 4458 in this
25  action.  I believe if I give you a moment to    09:35:54

---

Page 24

1  look at it you'll recognize it as an April 8,
2  1996 memo or letter from the Coopers & Lybrand
3  firm to the audit committee of the Board of
4  Trustees the Allegheny Health, Education and
5  Research Foundation signed by you for the firm     09:36:11
6  with an attachment which appears to be an audit
7  plan.
8          I don't have very many questions on
9  this.  If you do me the favor and let me know
10  if I'm right as far as I've gone, that would be    09:36:25
11  helpful.
12      A.   Okay, I've looked at the document.
13      Q.   Is it indeed a letter to the audit
14  committee at AHERF dated April 8, 1996 that has
15  the Coopers & Lybrand signature in your         09:37:18
16  handwriting with an attachment?
17      A.   If you want to call it a letter.
18  It's basically the outline of our audit plan
19  that has the Coopers & Lybrand signature, and
20  I'm the one who signed the letter.              09:37:35
21      Q.   Thank you.
22          And there are some handwritten
23  notes, at least on the first couple pages of
24  the letter or memo or plan, that are yours as
25  well?                                           09:37:48

---

Page 25

1      A.   Yes.
2      Q.   I'm going to refer you, sir, to the
3  second page of the document, which ends with
4  the Bates digits 237.  In particular, to the
5  paragraph that comes fifth on the page.  It      09:38:05
6  reads, "The engagement team is led by Bill
7  Buettner."  It goes on to describe your
8  experience with the AHERF engagement.
9          Do you see that?
10      A.   Yes, I do.                    09:38:19
11      Q.   It tells us there that you have
12  been the partner on the AHERF engagement for
13  eight years as of this writing and a member of
14  the AHERF engagement team for 17 years.
15          Is that right?                  09:38:30
16      A.   Yes, that's what it says.
17      Q.   Is that consistent with your
18  recollection for the time period you were
19  involved with the AHERF audit or the audit of
20  AHERF or any of its predecessors?               09:38:40
21      A.   Yes, either AHERF or some
22  organizations within the AHERF system, yes.
23      Q.   When we speak of AHERF today, so
24  that we don't have to spell it out in longer
25  terms, I will refer to the Allegheny Health,    09:38:59

7 (Pages 22 to 25)

William F. Buettner                                                                                    Volume 1

Page 26

1  Education and Research Foundation or I will
2  mean by AHERF that foundation and its
3  predecessors. If I speak that way, will we
4  understand each other?
5      A.  Yes.                              09:39:10
6      Q.  Thank you.
7          I will try to talk about individual
8  hospitals either by their names or their
9  initials like AGH for the Allegheny General
10 Hospital. Is that a conversational way that   09:39:21
11 you'll understand?
12     A.  Yes.
13     Q.  We'll also talk about obligated
14 groups from time to time. When we do, I'll
15 bring that up.                             09:39:31
16         When I speak of AHERF and only use
17 the word AHERF, I will mean to the best of my
18 ability to do it the broader organization and
19 not just the parent company unless I say
20 differently.                              09:39:48
21         Can we have that understanding?
22     A.  Yes.
23     Q.  Thank you.
24         If the context is clearly
25 different, please stop me and tell me you don't   09:39:48

Page 27

1  understand the question and I'll do my best to
2  clear it up for you.
3      A.  That's fine.
4      Q.  Thank you.
5          When it says the engagement team    09:39:58
6  was led by Bill Buettner who has been the
7  partner on the AHERF engagement for eight
8  years, I have one quick question on that.
9          Does that mean you were the
10 engagement partner for eight years prior to    09:40:09
11 April 8, 1996 and is that consistent with your
12 recollection?
13     A.  Yes.
14     Q.  You were involved in other
15 capacities in the years prior?              09:40:22
16     A.  Yes.
17     Q.  In what other capacities had you
18 been involved on AHERF audits before you became
19 the engagement partner in a general way?
20     A.  I worked as the in-charge          09:40:36
21 accountant back in the '70s on, I'll use some
22 terms here that hopefully we'll understand what
23 organizations we're talking about, but I was
24 the in-charge accountant on AGH and the parent
25 company at the time, which was not AHERF, but I   09:40:54

Page 28

1  believe it was Allegheny Health and Research
2  Corporation at the time.
3          I was the manager for a few years
4  on Allegheny General, as well as the parent
5  company of Allegheny General. I'm not sure if   09:41:10
6  that was the corporation, the foundation or
7  Allegheny Health Services. They had changed
8  the name of the parent several times.
9          I worked as the concurring partner
10 for a couple of years on AGH and AHERF, I      09:41:25
11 believe.
12         Then when I became the partner on
13 AGH, I assumed the responsibility for AHERF,
14 the parent company with AGH, and we had fellow
15 partners in Philadelphia performing the audit   09:41:43
16 of the organizations out east, principally the
17 Medical College of Pennsylvania.
18     Q.  Is the progression of your
19 involvement such that you were the concurring
20 partner for AGH and AHERF immediately before   09:41:59
21 you became the engagement partner?
22     A.  I believe that's correct.
23     Q.  Do you -- strike that.
24         During the '90s, were you also
25 involved in the audit of other healthcare      09:42:32

Page 29

1  organizations or organizations that owned
2  hospitals?
3      A.  Outside of AHERF?
4      Q.  Yes.
5      A.  Yes.                              09:42:46
6      Q.  I have a list that we've compiled
7  that may be drawn from either documents or
8  other testimony. I just want to see if this
9  refreshes your recollection about what those
10 might be as opposed to giving you a memory test   09:43:00
11 that might be unfair.
12         I understand that you may have been
13 the engagement partner for the Meadville
14 Medical Center at some time during the '90s.
15 Is that true?                              09:43:11
16     A.  That's correct.
17     Q.  The Norwest Medical Center?
18     A.  Northwest.
19     Q.  Thank you.
20         Northwest Medical Center?           09:43:17
21     A.  Yes.
22     Q.  Where is that located or was it
23 located?
24     A.  Oil City/Franklin area of
25 Pennsylvania. About two hours north of         09:43:26

8 (Pages 26 to 29)

Page 46

1  yet. Folks in Phili were leaving. They
2  brought in a firm to try to outsource, if you
3  will, that process, billing process.
4  Apparently that did not work very well.
5       During that period of time, they        10:02:58
6  were also going into the various hospitals
7  within the eastern region and planning on some
8  sort of systems conversion from various systems
9  to SMS or an upgrade to the SMS system.
10      So you had multiple factors that         10:03:14
11  were influencing the organization's ability to
12  get a bill out the door. That was my
13  understanding of the issues.
14      Q.   So this is your understanding going
15  into the '96 audit?                           10:03:28
16      A.   Yes, yes.
17      Q.   Now, you said that it may have --
18  you may have had a different understanding
19  after the '96 audit was essentially completed.
20      What was that understanding of the       10:03:37
21  problems, if it's different?
22      A.   Well, after we completed our audit
23  in '96, it became clear to, at least from our
24  work, that while the system upgrades could
25  cause some consternation and obviously the lack   10:03:53

Page 47

1  of billers caused some problems, that there was
2  also some significant training issue needs that
3  had to be met in the east and that the
4  registration process within the east needed
5  some significant work, patient registration.    10:04:07
6      Q.   Mr. Buettner, could you turn with
7  me to the attachment which starts at the page
8  that has the ending Bates digits 239? Is this
9  attachment essentially what C&L folks referred
10  to? When I say C&L, I mean Coopers & Lybrand.   10:04:42
11  Do we understand each other there?
12      A.   Yes.
13      Q.   Referred to as an audit plan?
14      A.   Well, it's an audit plan to be
15  reviewed with the audit committee, yes.         10:04:55
16      Q.   I'm going to ask you to just tell
17  me what was meant by -- is this a document you
18  would have drafted or someone on your staff
19  would have drafted?
20      A.   The managers would have drafted      10:05:08
21  this document. I would have reviewed it, and
22  we would have reached some sort of conclusion
23  on the content after that review.
24      Q.   Is it the same drafting protocol
25  that would have been followed for the cover     10:05:20

Page 48

1  memo?
2      A.   Yes.
3      Q.   Do you have any idea today what is
4  meant by the second arrow on the second page
5  there which reads, "Provide management with     10:05:30
6  value-added services"? What were value-added
7  services in Coopers & Lybrand speak or at least
8  Coopers & Lybrand speak as it was intended to
9  be read by an audit committee?
10      A.   Well, the first item would be the    10:05:43
11  issuance of some sort of what we would call
12  management comment letter. In other words, it
13  would be suggestions or ideas where the
14  organization could improve its system of
15  internal controls or its processing of whatever  10:05:58
16  they were processing in a particular area.
17  That would be what we would view as a byproduct
18  of our audit procedures.
19      Q.   Anything else that that term means
20  to you, value-added services?                   10:06:21
21      A.   Well, that could vary upon the
22  needs of a particular organization and the
23  resources that the firms would have. We would
24  be on the look-out to see if there were other
25  things that we could provide that would be      10:06:26

Page 49

1  meaningful to the organization.
2      Q.   It doesn't involve consulting
3  services?
4      A.   No, not from an auditing
5  perspective.                                    10:06:36
6      Q.   Let me ask you to flip to the page
7  that ends in the digits 241. Do you see the
8  patient receivables slash third-party is listed
9  under the category higher risk assessment?
10      A.   Yes.                                  10:06:58
11      Q.   Why would that be the case?
12      A.   Well, within a healthcare
13  organization, we viewed, as a matter of course,
14  billing systems as well as dealing with the
15  third parties to be an area of higher risk.     10:07:15
16      I think as you mentioned earlier in
17  your questioning of me, receivables were an
18  important area of a healthcare provider, and
19  certainly we reviewed it as being a very
20  important area.                                 10:07:32
21      Q.   I'm sorry, go ahead.
22      A.   And there are inherent issues in
23  that process. I'm not talking control issues
24  or things of that nature. Just that they --
25  the complexity of the area makes it just a      10:07:45

13 (Pages 46 to 49)

William F. Buettner                                                          Volume 1

---

Page 50

1  difficult area for management to manage.  So we
2  provided a higher risk assessment to that area.
3       Q.    When you say risk, what do you mean
4  by risk of what?  What do you mean by that,
5  risk of what?                          10:08:02
6       A.    In other words, there's a greater
7  risk of what we considered to be an error or a
8  material misstatement in that error because of
9  the complexity, because of the environment.
10      Q.    You've noted in handwriting -- I    10:08:19
11  believe the handwriting here is yours as well
12  on this page?
13      A.    Yes, I believe so.
14      Q.    Towards the bottom of the page on
15  the right-hand side, I think I read your    10:08:31
16  writing to say, "Increase A slash R, review
17  slash testing."
18          Have I done a capable job there?
19      A.    Yes.
20      Q.    What did you mean, if you can    10:08:43
21  recall, to convey by writing that note on the
22  document?
23      A.    I'm not sure I understand your
24  question, sir.
25      Q.    What did that mean -- what does    10:08:56

---

Page 51

1  that mean to you?
2       A.    We're going to increase the
3  accounts receivable review and testing.  We're
4  going to do things in 1996 that we may not have
5  done in 1995 or we may not do normally.    10:09:10
6       Q.    When do you believe, if you have
7  any recall today, you put these notes on this
8  document, that is the notes on the memo and the
9  notes on the plan?
10      A.    I can't answer that specifically,    10:09:23
11  but I know some of the notes would have been
12  there to help me in my presentation or
13  discussion with the audit committee.  I can't
14  tell you if all of them would have been there
15  at that point in time.  I just can't remember.    10:09:39
16      Q.    I know there are several notes,
17  you'll note lots of figures in the latter few
18  pages of the document.
19          Are those figures in your
20  handwriting as well, which start at least on    10:09:49
21  page 255?
22      A.    Yes.
23      Q.    Do you have any doubt, though, that
24  these notes were written within a few days or a
25  week or two of April 8, 1996 on the memo and on    10:10:02

---

Page 52

1  the plan?
2       A.    They would have been written within
3  that time period.  I can't tell you if it's a
4  week or a few days from April 8th, but within
5  that time period, yes.                  10:10:21
6       Q.    Thank you.
7          Do you recall different things that
8  Coopers & Lybrand did or your engagement team
9  did in the area of testing accounts receivables
10  in '96 that had not been done in prior years?    10:10:30
11      A.    Yes.
12      Q.    What do you recall differently?
13  What do you recall that was different that had
14  been -- that was done in '96?
15      A.    Well, we brought in -- let me --    10:10:43
16  let me preface it by indicating I met with
17  management and indicated we wanted to do some
18  additional testing in certain areas.  They
19  agreed.
20      Q.    Who at management?              10:11:00
21      A.    David McConnell.
22      Q.    What did you indicate to him that
23  you would do differently --
24      A.    Well, I --
25      Q.    -- if you told him?              10:11:15

---

Page 53

1       A.    Pardon me, if I --
2       Q.    If you told him specifically what
3  you were planning to do differently.
4       A.    Yes, I told him what I wanted to
5  do.  It was basically that I felt that a large    10:11:28
6  sample of review of a sample of bills was
7  necessary so that we could gain a better
8  understanding of why bills were not getting out
9  the door.
10      Q.    When you review a sample of bills,    10:11:39
11  what do you mean?
12      A.    Well, review bills from the time
13  that the patient registered in the facility to
14  the time that the bill went out and eventually
15  the money was collected by the organization.    10:11:50
16      Q.    Do you mean actually looking at
17  paper or electronic copies of bills or looking
18  at the billing process?
19      A.    The billing process.
20      Q.    Did you tell Mr. McConnell any    10:12:01
21  other new testing that you planned to do in the
22  accounts receivable area for '96?
23      A.    We indicated we were going to bring
24  in specialists to perform that billing process
25  review.                              10:12:18

---

14 (Pages 50 to 53)