William F. Buettner

Page 94

1  felt it was appropriate or not. The client
2  adopted a methodology that we had seen
3  elsewhere with other clients. As long as we
4  understood that methodology, then we could go
5  through our own assessment of the impact that    11:16:47
6  that would have.
7      Q.  So I think what you're telling me
8  is that you weren't saying grace over or
9  approving the methodology; you were only noting
10  that it was not, in your view, unheard of or    11:16:57
11  potentially uncommon?
12      A.  That's correct.
13      Q.  Did Coopers & Lybrand ask AHERF to
14  run two different versions of the aging for
15  these hospitals -- of the agings for these    11:17:13
16  hospitals that had employed this changed
17  methodology?
18      A.  We asked them for information to be
19  able to measure the difference, so I believe
20  that someone got that information because at    11:17:30
21  the end of the day I can remember being told
22  that the difference was not significant.
23      Q.  Who told you that?
24      A.  Someone on the staff. That's my
25  recollection. I can't tell you if it was Mark,    11:17:43

Page 95

1  if it was Brian, if it was Amy. I just can't
2  remember.
3      Q.  Correct me if I'm wrong, but the
4  change that we're talking about, to be a little
5  more specific, that's in your recollection    11:17:56
6  that the change at certain hospitals, at least,
7  inpatient billings were aged at final bill date
8  rather than discharged in this new methodology;
9  is that much right?
10      A.  That's correct.    11:18:11
11      Q.  At certain hospitals, outpatient
12  billings were now going to be in, in 1996, aged
13  over again or the aging would restart with the
14  receipt of a payment and that the former
15  beginning point for those agings were at    11:18:26
16  registration?
17      A.  The date of service, yes.
18      Q.  For date of patient service?
19      A.  Yes.
20      Q.  Did C&L propose any adjustment in    11:18:36
21  any amount for this aging change in 1996 in its
22  audit work, an adjustment to the reserve for
23  accounts receivable at any AHERF hospitals?
24      A.  I think your question has two
25  questions in it or I'm not sure I understand,    11:19:01

Page 96

1  so I'm going to ask you to repeat, please.
2      Q.  Certainly.
3          Do you recall that Coopers &
4  Lybrand proposed any adjustment to the accounts
5  receivable -- or the allowance for doubtful    11:19:11
6  accounts, the reserve for bad debt, at any
7  AHERF hospital that was related to this aging
8  change?
9          MR. RYAN:  Objection.
10      A.  No. I don't recall suggesting any    11:19:23
11  type of adjustment related to this aging
12  change.
13      Q.  Do you recall any discussions with
14  any member of the engagement team about placing
15  this aging change or any affect that may have    11:19:44
16  occurred because of it on the SUD, the
17  statement of unadjusted differences, from 1996?
18      A.  No. You're talking solely for the
19  aging change?
20      Q.  Yes.    11:20:03
21      A.  No.
22      Q.  Let me ask you this. If I continue
23  to use the shortened form or the abbreviated
24  form of statement for unadjusted differences
25  and the phrase, therefore, would be SUD, S U D,    11:20:15

Page 97

1  do we understand each other?
2      A.  Yes.
3      Q.  That would be a Coopers & Lybrand
4  internal work paper that puts together a
5  summary or a statement of unadjusted    11:20:26
6  differences as a part of its final field work
7  in an audit, is that fair?
8      A.  That's a fair summary.
9      Q.  Would you tell me what you
10  understand the SUD to be?    11:20:46
11      A.  Well, a SUD is a Coopers & Lybrand
12  tool that helps the staff meet the requirements
13  of the statement and auditing procedures
14  concerning aggregation of what we would call
15  audit misstatements. So the SUD is the vehicle    11:21:00
16  that we use to aggregate what we consider to be
17  misstatements to reach some sort of conclusion
18  on materiality of those misstatements and then
19  some sort of evaluation on whether the
20  financial statements are fairly presented.    11:21:13
21      Q.  So I can appear to at least know
22  what the parlance is or the language, it is
23  really the summary of unadjusted differences
24  and not the statement of unadjusted
25  differences?    11:21:27

25 (Pages 94 to 97)

William F. Buettner

Page 98

1    A.    Yes.
2    Q.    Thank you.
3        Do you recall that this issue, this
4   aging change for certain hospitals in I think
5   principally eastern hospitals was ever posted    11:21:43
6   to the SUD or proposed to be posted to the SUD
7   for the '97 audit or as a part of the '97
8   audit?
9        MR. RYAN:  Objection.
10   A.    Mr. Jones, I'm not sure what we    11:21:55
11  would post to the SUD.  The client is aging
12  their receivables.  They're using a methodology
13  that's, from our perspective, acceptable within
14  an industry practice.  The aging is not
15  disclosed in the financial statements.    11:22:15
16       Our audit is geared towards an
17  overall assessment of the accounts receivable
18  presented on the balance sheet and the
19  collectibility of that receivable.  And the
20  aging methodology is just one item that we    11:22:28
21  would look at.
22       So to indicate that the aging
23  methodology may be different from one year to
24  the next doesn't lead to some sort of item that
25  I believe would find its way on to -- on to the    11:22:41

Page 99

1   SUD.
2    Q.    Mr. Buettner, I'm handing you now
3   an exhibit marked 4250 in this case.  It is an
4   AHERF 6-30-97 work paper printed, to be fair to
5   you, from a version of the electronic database    11:23:05
6   CLASS.
7        You're familiar with the CLASS
8   database?
9    A.    Yes, I am.
10   Q.    I believe this to be a non final    11:23:15
11  version of the CLASS database that may have
12  been preserved by someone named Carrabba or
13  Carrabba or someone else, but that is my best
14  guess.
15       You see this, though, as, at least    11:23:28
16  the face page, for an audit work paper in the
17  CLASS system?
18   A.    Yes, it looks like some sort of
19  document that you would normally see in the
20  CLASS system.    11:23:38
21   Q.    It is marked as Exhibit 4250, just
22  to make sure I said that?
23   A.    Yes.
24   Q.    Thank you.
25       You see this has a comment section    11:23:48

Page 100

1   about midway down the page called Included On
2   Summary of Unadjusted Differences.  Do you see
3   that?
4    A.    Yes.
5    Q.    It has the client site, DVOG,    11:23:56
6   Delaware Valley Obligated Group?
7    A.    Okay.
8    Q.    Did I read that right?
9    A.    Yes.
10   Q.    When I say DVOG from time to time    11:24:05
11  today, tomorrow or the next day, we'll
12  understand each other that we're referring to
13  the Delaware Valley Obligated Group
14  hospitals --
15   A.    Yes.    11:24:12
16   Q.    -- that we referred to earlier in
17  full?
18       You see it refers to audit areas,
19  patients accounts receivable, reading up the
20  document?    11:24:20
21   A.    Yes.
22   Q.    And it has an issue type which
23  reads, Unadjusted Difference slash Error, is
24  that right?
25   A.    Yes.    11:24:27

Page 101

1    Q.    And then in the issue description,
2   I read, "To record additional bad debt reserve
3   to compensate for the Delaware entities using
4   final billed and last payment date for the A/R
5   agings?  Did I read that right?    11:24:46
6    A.    Yes.
7    Q.    Does it appear to you now, from
8   looking at this one-page work paper preserved
9   for us apparently by Mr. Carrabba, that at
10  least in 1997 audit work somebody on the    11:24:52
11  engagement team was talking about posting a SUD
12  entry or summary of unadjusted difference entry
13  for the aging methodology change we've been
14  discussing?
15   A.    It appears that staff accountants    11:25:05
16  at that time was going through an evaluation.
17   Q.    Let me hand you another exhibit.
18  It's Exhibit 4251.  You recognize this as
19  another CLASS database version of a work paper,
20  am I right, for the '97 audit?    11:25:30
21   A.    Yes.
22   Q.    It here reads, it apparently was
23  created by Miss Frazier, if the writing on the
24  document is accurate, is that right?
25   A.    That appears to be the case.    11:25:41

William F. Buettner

Volume 1

Page 102

1     Q.    It appears she created it
2  December -- in December of '97.  Is that right?
3     A.    Yes.
4     Q.    Fairly late in the audit process.
5  We'll talk about it.  But this was a fairly        11:25:51
6  late issuance, report issuance here for AHERF,
7  am I right?
8     A.    Yes.
9     Q.    And at the top of the page,
10  someone, and I can't tell you that I know it's     11:26:02
11  Miss Frazier because I don't recall her
12  testimony on this point off the top of my head,
13  has written, "Eliminate entry and evaluate
14  against other reserves," and the issue is the
15  same set of figures regarding the bad debt        11:26:15
16  reserve as in Exhibit 4250.  Is that right?
17     A.    It appears to be.  I'm not sure if
18  it is.  But if those two -- the two numbers are
19  the same, so --
20     Q.    Do you recall any conversations         11:26:27
21  with Miss Frazier or anybody else on the
22  engagement team in '97 about eliminating SUD
23  entries for this -- that otherwise had been
24  proposed for this aging methodology change?
25     A.    No.                                     11:26:41

Page 103

1     Q.    Does seeing either one of these two
2  documents refresh your recollections about
3  discussing potential SUD entries for this aging
4  change in connection with your '96 work at
5  AHERF?                                            11:26:59
6     A.    No.
7     Q.    We're going to flip back to 1996
8  again for a few more minutes.
9          I'm handing you, Mr. Buettner,
10  Exhibit 4201.  It is a document entitled AHERF    11:27:21
11  A/R Bullet Points with your handwriting on it,
12  is that right?
13     A.    That's correct.
14     Q.    You've dated your handwriting, or
15  at least your signature, anyway, with the date    11:27:37
16  5-17-96, is that right?
17     A.    Yes.
18     Q.    This would have been a part of
19  preliminary field work or at least dated during
20  the time period of preliminary field work        11:27:46
21  during the '96 audit; is that also right?
22     A.    Yes, we're probably out there doing
23  preliminary work during that period of time or
24  starting preliminary work.
25     Q.    Is there any handwriting on this        11:27:56

Page 104

1  document that is not yours?
2     A.    Other than the deposition exhibit
3  stamp, I would say no.
4     Q.    Thank you.
5          Let me ask you the last question,         11:28:13
6  preliminary question, is you don't doubt that
7  you wrote these notes either on May 17th, 1996
8  or right around there, is that fair to say?
9     A.    It's probably a summary of a
10  meeting on the 17th of May.                       11:28:27
11     Q.    Thank you.
12     A.    These notes are my observations
13  from that meeting.
14     Q.    So you would have written them
15  close in time to May 17th?                        11:28:35
16     A.    Yes.
17     Q.    Thank you.
18          About -- the better way to put this
19  would be to say, item .5 under the AHERF bullet
20  points reads, "There are missed, in quotes,       11:28:45
21  contractuals.  Patient accounting is aware of
22  that.  Are still in the system that have not
23  been removed."
24          Let me try that again because I
25  think I misaccented the phrase due to perhaps     11:28:59

Page 105

1  my own grammar problems.
2          I think it actually reads, "There
3  are missed contractuals patient accounting is
4  aware of that are still in the system that have
5  not been removed."                                11:29:11
6          Did I read the sentence right?
7     A.    Yes.
8     Q.    Did you prepare the document?
9     A.    No, I did not.
10     Q.    Then in the left-hand margin you        11:29:18
11  have written, '95 versus '96 question mark with
12  a little arch around bullet point number five.
13  Am I right?
14     A.    That's correct.
15     Q.    Do you recall what the issue is        11:29:28
16  that is referred to in this sentence and why it
17  is you wrote what you wrote in the margin next
18  to it?
19     A.    Well, contractual allowances or
20  contractuals, as it's described here, are        11:29:41
21  basically reserves or items that should be
22  reserved.  If those are still sitting in the
23  system and they have not been removed, then the
24  question is the client's processing as clean
25  as it should be.                                 11:29:57

27 (Pages 102 to 105)

William F. Buettner                                                                                    Volume 1

Page 114

1  your industry experience?
2      A.   Yes.
3      Q.   What was that view?
4      A.   60 percent is low.
5      Q.   What was --                              11:56:19
6      A.   Was low.
7      Q.   What would have been a common or
8  more average, in your view, in your experience
9  from that time period, the mid 90s, percentage
10 of first-run correctness?                         11:56:30
11     A.   I can't put an exact figure on it,
12 but the 60s should have been 90, let's say, or
13 perhaps even higher.
14     Q.   Let me ask you to flip to page
15 three of the report, which is a page that ends    11:56:46
16 in 429 in the Bates numbering system.
17         Are you with me?
18     A.   Yes.
19     Q.   The chart here attempts to depict
20 what, as you understand it?                        11:57:08
21     A.   As indicated above the chart, I
22 mean, there are certain parameters or he calls
23 indicators, certain measurement parameters that
24 would highlight bills being sent out the door,
25 if you will, submitted to the insurers or being   11:57:26

Page 115

1  paid or how long it takes to get paid.  He's
2  trying to compare that to some sort of best
3  practices level that he includes on the bottom
4  of the chart.
5      Q.   In the sections or the columns,          11:57:42
6  rather, where he includes -- has the -- the
7  columns that he heads with the phrases bill to
8  pay and discharge to pay, do you see those two?
9      A.   Yes.
10     Q.   Do you know as you sit here today        11:57:54
11 if the figures set forth in those columns that
12 are so headed include only the accounts that
13 had been paid at the time he was doing his
14 study as opposed to accounts that were still
15 outstanding?                                       11:58:08
16     A.   My understanding would only be
17 those that have actually been paid.
18     Q.   Do you recall as you sit here today
19 confirming that with him one way or the
20 another?                                           11:58:19
21     A.   I may have.  Reading that, that's
22 my assumption.  We may have talked about it
23 because I looked at an earlier draft, but I
24 don't recall a specific discussion with him
25 about it.                                          11:58:30

Page 116

1      Q.   If it included accounts that were
2  still outstanding at the time he took his
3  measurement, Mr. Kaliszewski, that is, would
4  you have been as confident in the accuracy or
5  the importance of the outcome of the study?       11:58:44
6          MR. RYAN:  Objection.
7      A.   I'm not sure if I understand your
8  question.
9      Q.   Do you think if he had included in
10 his study in these two columns accounts that      11:58:57
11 were not yet paid but still outstanding at the
12 time, that would have skewed the result in any
13 way?
14         MR. RYAN:  Objection.
15     A.   Well, I -- I don't know.  I mean, I       11:59:07
16 would have to look at the level of deviation,
17 if you will, if that were the case.
18     Q.   Would that -- well, strike that.
19         If it had been that Mr. Kaliszewski
20 included in these two columns accounts that had    11:59:39
21 not been paid but were still outstanding at the
22 time he took his measurements, it's fair to say
23 that some of those accounts may never have been
24 paid, is that -- because in eventuality
25 sometimes accounts aren't paid?                    11:59:54

Page 117

1          MR. RYAN:  Objection.
2      A.   That's possible.
3      Q.   It wouldn't then have been a delay
4  in payment issue for those accounts, but it may
5  have just been simply a nonpayment issue that     12:00:04
6  was causing the data to come out the way it
7  came out?
8          MR. RYAN:  Objection.
9      A.   Well, again, you would have to
10 determine why the payment was not made.  Was      12:00:16
11 the payment not made because it was a self-pay
12 and there was true credit risk?  Was a payment
13 not made because the registration process was
14 incorrect and as a result they were not able to
15 get the correct information?                       12:00:29
16         I mean, you have nominal credit
17 risk when dealing with third-party insurers,
18 Medicare or Medicaid.
19         So the fact that you're not being
20 paid is either an eligibility issue or you        12:00:44
21 simply can't get it right.  So we would have to
22 determine the reason for the nonpayment.
23            - - - - -
24         (Thereupon, Deposition.
25         Exhibit 4460 was marked for

30 (Pages 114 to 117)

William F. Buettner                                                    Volume 1

Page 118

1          purposes of identification.)
2          - - - - -
3      Q.    Mr. Buettner, we've handed you a
4  new exhibit which is marked -- could you give
5  me -- the number for me?              12:01:23
6      A.    4460.
7      Q.    Thank you.  4460.
8          Do you recall seeing this document
9  before today?
10     A.    I recall seeing a document similar    12:01:35
11 to this.  I don't know if it's the exact
12 document that I have in front of me, but I
13 remember seeing spreadsheets, if you will, that
14 look familiar to this -- or similar to this.
15     Q.    Do you know what this schedule      12:01:48
16 attempts to reflect?
17     A.    Well, I can only -- I can only
18 assume because it's really not dated.  I mean,
19 Norb prepared schedules similar to this when
20 doing his study in both '96 and '97.  I don't    12:02:15
21 know if this relates to '96 or '97.  I'm not
22 sure if he prepared it or if somebody from
23 AHERF copied the format and did their own
24 study.
25     Q.    But you believe this to be a part    12:02:30

Page 119

1  of Norb's work product --
2      A.    No.
3      Q.    -- in any event?
4      A.    No, I said I believe he prepared --
5  he prepared schedules similar to this, but I'm    12:02:38
6  not sure these are his schedules or if somebody
7  from AHERF, for instance, did their own study
8  and used his format.  I don't know.
9      Q.    Thank you.
10         You can put that one aside.       12:02:57
11         In performing your work in
12 connection with the '96 audit of accounts
13 receivable at AHERF, did you or those on your
14 engagement team review historical data,
15 historical collections data?            12:03:29
16     A.    Well, we, during our work in '95,
17 we would have looked at subsequent events.  In
18 '96, we would have looked at subsequent events.
19 Subsequent events being defined as cash coming
20 in after the fact that would support the value    12:03:44
21 of the receivable at an earlier date.
22     Q.    Subsequent events in '95 would have
23 been some period of weeks or months post close
24 of the fiscal year '95, is that right?
25     A.    That's correct.  Normally four to    12:04:04

Page 120

1  eight weeks, let's say.
2      Q.    That would be the same for '96?
3      A.    Yes.
4      Q.    So the historical collections data
5  that you would have referred to in connection    12:04:15
6  with your fiscal year '96 audit work, that is
7  historical from the perspective of the '96
8  fiscal year, would have been four to eight
9  weeks of subsequent events testing that took
10 place in connection with your '95 audit work,    12:04:28
11 is that fair?
12         MR. RYAN:  Objection.
13     A.    Yes, yes.
14     Q.    Do you recall referring to
15 historical collections data for any prior time    12:04:36
16 period or anybody on your engagement team
17 having done so in connection with the '96
18 audit, that is before the four to six or eight
19 weeks after the close of the '95 fiscal year
20 data from any prior time period?         12:04:49
21         MR. RYAN:  Objection.
22     A.    I'm totally confused here, sir.
23 I'm sorry.
24     Q.    That was long, so let me try it
25 again.                              12:04:58

Page 121

1          You told me that as a matter of
2  historical collections data, you believe in
3  connection with the '96 audit someone on your
4  engagement team would have looked at the '95
5  audit team's subsequent events testing.  Is    12:05:08
6  that much right?
7          MR. RYAN:  Objection.
8      A.    No, no, no.  I'm sorry.
9      Q.    Then correct me, please.
10     A.    Let me -- if I misled you, I        12:05:16
11 apologize.
12         We'll do it -- we'll look at '96
13 and I'll put some dates as an example that may
14 not necessarily correlate to dates in our work
15 papers.                             12:05:27
16         We're attempting to gain some sort
17 of comfort on the collectibility or what we
18 call the NRV, net realizable value, of patient
19 receivables as of June 30, '96.
20     Q.    This is as a part of your '96 audit    12:05:44
21 work?
22     A.    Yes, sir.
23         One thing that we would look at
24 then is we would look at collection activity in
25 July and August of '96.                 12:05:54

31 (Pages 118 to 121)

William F. Buettner                                                      Volume 1

Page 134

1    applied by the client at these hospitals, these
2    eastern area or Philadelphia area hospitals, in
3    your experience?
4        MR. RYAN:  Objection.
5        A.   No, I did not.  I mean, I wasn't    12:20:15
6    looking at the percentages, per se.  I'm
7    looking at the methodology.  There's a
8    difference between the methodology that AGH
9    followed and just applying percentages.
10       Q.   So you weren't looking at the    12:20:32
11   percentages?
12       A.   No.  We applied what I would call
13   the AGH methodology, which -- which, by the
14   way, in this particular case, was -- we used
15   the AGH percentages because we were trying to    12:20:42
16   create parameters.  But as I had indicated,
17   there are a wide variety of other items that
18   you would have to consider in making some sort
19   of assessment on the adequacy of the reserves
20   and so on.  You just wouldn't attach numbers    12:20:56
21   into a formula.
22       Q.   But this schedule, that formula is
23   merely calculated by applying the AGH
24   percentages, is that right?
25       A.   Yes.  The difference column that we    12:21:08

Page 135

1    talked about is simply the math.
2        Q.   Of taking percentages from AGH and
3    applying them to the aged bucket receivables at
4    these eastern area hospitals?
5        A.   That's correct.    12:21:20
6        Q.   Thank you.
7             Do you recall discussing this with
8    AHERF as a part of your '95 audit work, that
9    this calculation had been performed, this
10   application of percentage?    12:21:34
11       A.   Yes.
12       Q.   With whom did you discuss it?
13       A.   It was the basis for the meeting
14   that I mentioned I had with McConnell, Mark and
15   I had with McConnell for '95.    12:21:44
16       Q.   Did you share with him that you had
17   actually done this math or did you just share
18   with him your comments about the status of the
19   receivable in a more general way?
20       A.   No, I think we gave him everything    12:21:55
21   that Mark prepared.
22       Q.   What do you mean by that?
23       A.   Well, there was this schedule and I
24   believe there were a few other schedules, if
25   this is the same schedule.  I mean --    12:22:04

Page 136

1        Q.   In other words, you gave -- in any
2    event, though, you believe in that meeting you
3    gave Mr. McConnell a package of documents?
4        A.   Yes, documents or schedules, yes.
5        Q.   One of which may have been this    12:22:18
6    schedule?
7        A.   Yes.
8        Q.   But you can't tell me with
9    certainty that you gave him this document, is
10   that fair to say?    12:22:27
11       A.   We're talking again this document
12   with the numbers written on it?
13       Q.   At least that much.  I understand
14   there's also handwriting on it.
15       A.   I don't know if he ever saw this    12:22:39
16   document with the handwriting on it.
17       Q.   Separate and apart from the
18   handwriting?
19       A.   Yes, I'm sure -- I'm sure that we
20   discussed this with him and I believe he had a    12:22:49
21   copy of it.
22       Q.   Was there any reason you chose AGH
23   over any other hospital as the hospital whose
24   percentages would be applied?
25       MR. RYAN:  Objection.    12:23:05

Page 137

1        Q.   Allegheny General Hospital.
2        A.   Well, I had experience with the
3    Allegheny methodology.  They had been following
4    that methodology for at least three or four
5    years.  Management in the west was comfortable    12:23:20
6    with it.  They believed it was a very
7    conservative methodology.  So I felt that that
8    was one way of comparing the east versus west.
9        Q.   This AGH methodology, as you
10   understood it in this time frame, was a    12:23:37
11   methodology by which buckets of aged
12   receivables or groups of aged receivables for
13   various periods of time from a start date had a
14   percentage applied to them to generate an
15   allowance for doubtful accounts, is that fair    12:23:57
16   to say?
17       A.   Yes, that's probably one piece of
18   the way I would describe it.
19       Q.   Did the eastern hospitals generate
20   their own client allowance in the same way, at    12:24:06
21   least, at year-end?
22       A.   Not all of them.
23       Q.   Which ones did not?
24       A.   I can't remember exactly.  I
25   believe MCPH and St. Christopher's did not,    12:24:16

35 (Pages 134 to 137)

William F. Buettner                                                                    Volume 1

Page 138

1  but -- I believe that's the case.
2      Q.   But you believe the rest did
3  generate the allowance by a percentage
4  application to aged buckets of receivables?
5      A.   I'm not sure of that exactly.        12:24:28
6      Q.   Do you recall how you think that
7  those two hospitals that you mentioned
8  generated their client reserve as you sit here
9  today?
10         MR. RYAN:  In 1995?              12:24:43
11         MR. JONES:  Yes.
12     A.   I want to say that it was my
13 understanding that both had used the
14 methodology in prior years based on self-pay
15 collection -- or self-pay receivable levels.   12:24:56
16 The reason that was done is that this reserve
17 was measuring credit risk and preponderance of
18 your credit risk is sitting in self-pay.
19     Q.   And be that as it may, whether the
20 total receivable in their buckets was one that  12:25:13
21 only listed self-pay, do you recall that those
22 hospitals also applied a percentage to it?
23     A.   I can't recall -- I just don't
24 recall.  I simply cannot remember.
25     Q.   Do you recall that it was proposed,  12:25:34

Page 139

1  at least, that your engagement team perform the
2  same kind of analysis, that is applying the AGH
3  percentages to the receivable balances at other
4  AHERF hospitals in connection with its '96
5  AHERF audit work?                    12:25:59
6         MR. RYAN:  Objection.
7      A.   Do I recall proposing that?
8      Q.   Yes.
9      A.   I never proposed that, no, sir.
10     Q.   The question was more general.  Do   12:26:11
11 you recall that it was proposed?
12     A.   I do not recall.
13        MR. JONES:  Let us break here for
14 lunch.  How about we try to come back about
15 1:30?
16        MR. RYAN:  Good.
17        THE VIDEOGRAPHER:  Going off the
18 record at 12:26.
19
20        (Lunch recess.)
21
22
23
24
25

Page 140

1      AFTERNOON SESSION commencing at 1:26 p.m.
2         THE VIDEOGRAPHER:  We're
3  back on the record at 1:35.
4      Q.   Mr. Buettner, I'm handing you now
5  what has been previously marked in this case as  12:44:22
6  Exhibit 1448, which I think you'll tell me upon
7  a review is a letter from Mr. Kirstein to Mr.
8  Morrison at AHERF dated September 11, 1995.
9         Does it appear to be that to you
10 and it has some attachments?              12:44:39
11     A.   Yes.
12     Q.   I am particularly interested with
13 respect to the references to the AGH
14 application issue we've been discussing, which
15 is discussed in the second paragraph of the     12:44:50
16 memo.  Would you read that -- read as much of
17 the letter as you like, but it's the second
18 paragraph that I'm going to be asking you a
19 question about it, and would you let me know
20 when you're finished.                  12:45:26
21     A.   Okay.
22     Q.   Do you recall reviewing this memo
23 before today or this letter before today?
24     A.   Yes.
25     Q.   Do you recall reviewing it in      12:45:33

Page 141

1  connection with its dispatch by Mr. Kirstein
2  and Mr. Morrison, that is around the time that
3  it left Mr. Kirstein's office?
4      A.   Yes, I believe I received a copy of
5  it either before or right after Mark mailed it   12:45:46
6  to Chuck Morrison.
7      Q.   Thank you.
8         In particular, like I mentioned, I
9  would like to ask you about the second
10 paragraph, and even in more particularity, the   12:46:00
11 last couple of sentences that read, I believe,
12 "In order to analyze the potential adjustment,
13 we applied the AGH reserve percentages to each
14 of the hospital's agings and identified what
15 the adjustment would entail under this         12:46:15
16 premise."
17        Do you see that?
18     A.   Yes, I do.
19     Q.   Then the concluding sentence for
20 the paragraph reads, "While this is           12:46:22
21 conservative and would be slightly offset by
22 unapplied PIP cash, we believe that it supports
23 the conclusion that the reserve should be
24 enhanced."
25        Did I read that one accurately as      12:46:35

36 (Pages 138 to 141)

William F. Buettner

Page 142

1  well?
2      A.   Yes.
3      Q.   My question is, you have -- Mr.
4  Kirstein has apparently written here that the
5  AGH -- the application of the AGH reserve        12:46:50
6  percentages to the other hospitals identified
7  or helped identify what adjustment would be
8  made to the bad debt reserve at these hospitals
9  in 1995.
10         Do you recall if it was that        12:47:05
11  application process and the math that resulted
12  from it that helped pick what the amount of
13  the enhancement or increase to the reserve would
14  be, the dollar amount?
15         MR. RYAN:  Objection.        12:47:20
16     A.   No, I would not agree with that.  I
17  believe I testified earlier that we applied the
18  methodology in an effort to establish some sort
19  of parameter.  But there were a variety of
20  other factors that we considered in concluding        12:47:37
21  exactly what the level of reserve enhancement
22  should be.
23     Q.   What were the other factors, if you
24  recall them today?
25         MR. RYAN:  In 1995?        12:47:45

Page 143

1      MR. JONES:  Yes.
2      Q.   The other factors that allowed --
3  or that helped you conclude that the amount of
4  the enhancement or increase would be for '95.
5      A.   Well, there were a number of items.        12:47:54
6  I think Mark indicated a few of them either
7  here or in the document that we looked at
8  before lunch.  One is the level of -- the
9  overall level of reserve to total receivables
10  just appeared low in '95 before the adjustment,        12:48:18
11  which led us to believe that some sort of
12  adjustment would be necessary.  So what would
13  we look at?  We're using the AGH methodology to
14  help, as I indicated, establish parameters.
15  But there are a number of other things we        12:48:35
16  looked at.
17         You made reference to unapplied PIP
18  cash.  PIP, I believe, stands for PIP, periodic
19  interim payment.  The organization had a large
20  balance in that account, which is an indication        12:48:54
21  that cash was collected by the organization but
22  not applied to the detailed accounts receivable
23  records.
24     Q.   So which way would that mitigate
25  with respect to the allowance; would that        12:49:13

Page 144

1  mitigate for raising it or holding it more
2  steady?
3         MR. RYAN:  Objection.
4      Q.   Let me see if I can fix my
5  apparently objectionable question.        12:49:22
6         Would it mitigate either way the
7  PIP application issue?
8      A.   It would reduce the reserve
9  requirements and that is because, in effect,
10  you've collected cash.  Since the client was        12:49:31
11  behind in the application of the cash payment
12  to the detailed accounts receivable records,
13  you would have receivables listed on the detail
14  in the aging that had already been collected.
15  And by applying any method, whether it's the        12:49:46
16  AGH methodology or any other methodology, if
17  you're applying a reserve against a portfolio
18  of receivables and some of those receivables
19  have been collected, you're going to overstate
20  the reserves if you don't pull those        12:50:03
21  receivables out.
22         Of course, AGH basically was not on
23  PIP or, if they were on PIP, the amounts were
24  very, very small.  So that's one of the items
25  that we had to consider.        12:50:20

Page 145

1         Another critical issue was the
2  environment in which the east was operating on
3  versus the west, if I can use those terms.
4      Q.   You mean the eastern --
5      A.   The east being the Hahnemanns,        12:50:31
6  MCP's where we're trying to access the reserve
7  adequacy versus the west, which is Allegheny.
8         The Allegheny processing of
9  receivables, while not perfect, was handled in
10  a much better format than the processing in the        12:50:54
11  east.
12         You did not have the people drain,
13  if you will, to staff reductions that occurred
14  in the east.  That did not replicate itself in
15  the west due to the centralization.        12:51:11
16         Because the processing was so
17  difficult in the east, you had receivables
18  going out the door incorrectly, claims being
19  rejected, coming back to the organization for a
20  resubmission of a correct amount.        12:51:26
21         Well, when you think about the
22  methodology that we've talked about this
23  morning where you're applying some sort of
24  percentages to aging buckets, in Allegheny's
25  situation, you have a bill go out the door that        12:51:43

37 (Pages 142 to 145)

William F. Buettner                                                                Volume 1

Page 146

1  would be classified in the zero to 30 category
2  and then presumably by the time it hit 90 days
3  it would be collected, perhaps 120 days if it's
4  a stay.
5        In the east, because as we had --    12:52:01
6  because of the processing problems that we've
7  talked about and the rejections that occur, a
8  clean claim may not go out until the 90-day
9  time period, in effect.
10       So where Allegheny is billing    12:52:18
11 Medicare or Blue Cross or Medical Assistance or
12 some commercial insurer, hoping to collect
13 their money within 30, 45, 60 days, and
14 attempting to provide some sort of loss
15 parameter of what may be uncollectible on that    12:52:35
16 processing schedule, in the east, you're adding
17 probably 60 days before you're getting some
18 sort of clean claim being processed.
19       You have to take that into
20 consideration in terms of coming out with an    12:52:48
21 overall evaluation.
22    Q.   Which way did that mitigate?
23    A.   That would reduce the reserve
24 requirement as well.
25    Q.   Why is that?    12:53:01

Page 147

1    A.   Well, as I indicated, a receivable
2  sitting in the 60-day or 90-day category for
3  AGH would have different attributes than a
4  receivable that's sitting in a similar category
5  out east because a clean claim out east may not    12:53:18
6  have been generated until the 90-day mark.
7        An easy way of thinking about it is
8  if you take the Allegheny method and you just
9  overlay an additional 60 days or 75 days of
10 aging before clean claim comes off the    12:53:33
11 system -- now, that doesn't happen all the
12 time, obviously.  But as a rule of thumb, there
13 were a higher level of rejects in the east
14 versus the west.
15    Q.   My question then is, isn't it also    12:53:45
16 the case, however, that this missed -- this
17 misphenomenon on first-runs or this ability to
18 get out clean claims first time and, therefore,
19 delay in getting out clean claims to the
20 payors, as you've described it, isn't it the    12:54:07
21 case that this delay might also itself lead to
22 ultimate uncollectibility?
23    A.   It may -- it may in terms of
24 self-pay, yes.  And that's why when you look at
25 the overall reserve requirement versus the    12:54:20

Page 148

1  overall portfolio receivable requirements, you
2  would want to do a comparison to see how the
3  east is versus -- compares to the west.
4    Q.   Might it also cause consternation
5  with third-party payors and ultimately    12:54:31
6  uncollectibility with respect to them as well,
7  this delay?
8        MR. RYAN:  Objection.
9    A.   If you end up getting a clean claim
10 in, you should be paid.  I mean, they may not    12:54:41
11 like the fact that they're rejecting the
12 claims, but if you ultimately get it right,
13 you're going to get collected within whatever
14 the timing requirements are for getting that
15 claim out.    12:55:03
16    Q.   Were there other factors besides
17 that and the AGH percentages?
18    A.   There was the PIP.
19    Q.   And the PIP, and the reserve total
20 to reserve -- or to receivable total.  Others?    12:55:11
21    A.   The environment was -- the
22 processing environment was very important.  The
23 PIP cash balances, if you will, were very
24 important in terms of whether you would use
25 this methodology -- you would have to adjust    12:55:24

Page 149

1  the methodology.  Those are the two primary
2  factors.
3        We would have looked at other items
4  such as subsequent collections, as I mentioned
5  before.  We would look at the level of    12:55:35
6  third-party payors and self-payors.  We would
7  look at the history of the reserve to receivable
8  for the east versus the west in previous years.
9    Q.   Mr. Kirstein in the letter that you
10 recall reviewing himself, however, notes that    12:55:50
11 our basis for this conclusion, that is that the
12 accounts receivable reserve should be enhanced,
13 is rooted in the amount of A/R over 180 days
14 old coupled with the reduction of the reserve
15 as a percentage of A/R at several of the    12:56:07
16 hospitals.
17       I at least read the sentence right,
18 didn't I?
19    A.   Yes, and I think I've indicated,
20 that's what I testified to earlier.    12:56:16
21    Q.   But -- go ahead.
22    A.   The percentage of reserves to the
23 total A/R portfolio.
24    Q.   I'm focusing in on a different part
25 of the same sentence, that is, Mr. Kirstein    12:56:26

38 (Pages 146 to 149)

William F. Buettner                                                                Volume 1

Page 150

1    appears to be noting a concern about A/R that
2    is over 180 days old and a concern there that
3    appears, to my eye, to be one about ultimate
4    collectibility.
5         Do you read it the same way, that        12:56:35
6    he has a concern that he's expressing about the
7    ultimate collectibility of A/R over 180 days
8    old?
9         MR. RYAN: Objection.
10        A.   Well, that he has a concern with      12:56:46
11   the collectibility of A/R over 180 days old.
12   That is one additional factor that we looked at
13   that led us to believe that the reserve --
14   reserve level should be enhanced.
15        Q.   Let me ask you to look at another     12:57:03
16   document for me. It's going to be Exhibit
17   4386.
18        Right before we broke for lunch, we
19   talked about whether you recalled proposing or
20   hearing about a proposal to apply the AGH       12:57:20
21   reserve percentages to aged buckets of
22   receivables at other AHERF hospitals in
23   connection with fiscal year '96 audit work. I
24   think you told me that you did not recall that
25   proposal.                                      12:57:31

Page 151

1         A.   I simply -- yeah, I don't recall
2    having the staff do that.
3         Q.   Let me ask you then to look at
4    Exhibit 4386 with me. It is an AHERF accounts
5    receivable procedures document, which is        12:57:46
6    apparently two pages in length, another one of
7    these accounts receivable typewritten
8    documents, not too dissimilar from the one we
9    saw before, am I right, in its format, anyway?
10        A.   It would be similar to what we        12:58:01
11   looked at before, yes.
12        Q.   About two-thirds of the way down
13   the first page of the document in one of the
14   bullet points on the left-hand margin I read
15   this phrase: "Prepare AGH model reserve for     12:58:13
16   all entities." Is that right?
17        A.   I see that, yes.
18        Q.   Do you recall being at a meeting or
19   reading a document like this at which this same
20   proposal is made or sentence was discussed?     12:58:30
21        A.   Well, I don't remember the meeting,
22   but, I mean, I believe I've seen this document
23   before. It was put together by the staff,
24   so --
25        Q.   When do you think you saw it?         12:58:37

Page 152

1         A.   Well, at some meeting. I mean, I
2    can see my handwriting over here in terms of
3    some comment on subsequent receipts testing and
4    so on.
5         Q.   So is it fair to say that your        12:58:48
6    recollection is refreshed that at some point
7    during the 1996 audit work there was a proposal
8    discussed to prepare AGH model reserve for all
9    entities?
10        A.   Well, that may have been other        12:59:03
11   people's suggestion, but it wasn't mine.
12        Q.   My question is, is your
13   recollection refreshed that the concept was
14   discussed, having seen the document?
15        A.   The concept may have been            12:59:15
16   discussed, yes, but I don't believe I was the
17   one that initiated the discussion of that
18   concept.
19        Q.   Just so we're clear, I understand
20   that you don't think you initiated it, and you
21   believe it may have been discussed, my question
22   is, is your recollection refreshed that it was
23   discussed?
24        A.   Yes, it probably was discussed at
25   the meeting. I don't have any specific reason   12:59:30

Page 153

1    to say that it wasn't.
2         Q.   Right.
3         Do you have a recollection that you
4    didn't want it to be done, that you didn't want
5    the AGH model reserve applied to all entities   12:59:37
6    in '96?
7         A.   Yes.
8         MR. RYAN: Objection.
9         A.   I reached a conclusion that it was
10   not necessary.                                  12:59:46
11        Q.   When did you reach that conclusion?
12        A.   Probably sometime during the
13   beginning of year-end work. I just didn't feel
14   that it would accomplish anything. I can't
15   tell you the exact date or time frame.          13:00:00
16        Q.   Do you recall what you based your
17   conclusion on?
18        A.   On the processing errors that
19   continued to exist at the eastern hospital
20   operations and the fact that the agings would   13:00:11
21   not be as valuable a tool in assessing reserve
22   requirements as they had been in the past
23   because of the inability of the organization to
24   get clean claims out the door.
25        Q.   I'm handing you now, Mr. Buettner,    13:00:41

39 (Pages 150 to 153)

William F. Buettner                                                    Volume 1

Page 154

1   what is marked as Exhibit 4387. I'm going to
2   ask you to take a look at that document with
3   me.
4           It is headed Working Paper for HUH
5   Center City, inpatient bad debt analysis,        13:01:01
6   6-30-96. Is that right?
7       A.   Yes.
8       Q.   HUH Center City was at that time a
9   DVOG hospital as you understood it?
10      A.   Yes.                                     13:01:11
11      Q.   This is a '96 work paper from the
12  CLASS system, or it appears so to you?
13      A.   Yes.
14      Q.   Apparently completed by
15  Mr. Christian and ultimately reviewed by         13:01:24
16  Mr. Kirstein in September of '96 or October of
17  '96, is that right?
18      A.   I don't know if it was completed by
19  Brian or not. I see the term. I haven't
20  looked at the rest of the document. I see the    13:01:31
21  term PBC there, which I believe stands for
22  prepared by client. It may, at least my
23  experience is that would tell you it's prepared
24  by client. So I'm not sure exactly what Brian
25  did to this schedule.                            13:01:45

Page 155

1       Q.   I understand.
2            He is at least listed as the
3   individual at C&L as completed by, his name
4   appears next to the words completed by?
5       A.   Yes.                                     13:01:54
6       Q.   Mr. Kirstein's appear next to the
7   words reviewed?
8       A.   Yes.
9       Q.   I think PBC, as you put it,
10  prepared by client, may be partially applicable  13:02:07
11  to this document, or it may not be. But in any
12  event, there are some footnotes that I think --
13  or tick mark notes that I think you will tell
14  me are Coopers & Lybrand's. If you look in
15  particular at page 1098.                          13:02:13
16      A.   M-hm.
17      Q.   Do you see the note there? The
18  note which reads note.
19      A.   Yes.
20      Q.   It goes on to read, "C&L does not     13:02:22
21  propose an entry for the difference between the
22  two reserve calculations because C&L has
23  prepared an additional analysis for the bad
24  debt reserve using AGH's reserve percentages
25  and the client has booked an additional          13:02:43

Page 156

1   reserve."
2            Do you see that?
3       A.   Yes.
4       Q.   Did I read that accurately?
5       A.   Yes.                                     13:02:48
6       Q.   Do you recall now that this
7   analysis was done and that an additional
8   reserve was booked?
9       A.   Yes, an additional reserve was
10  booked in '96.                                   13:03:03
11      Q.   Do you recall that the AGH reserve
12  percentage analysis was prepared?
13      A.   No, I don't recall that at all.
14      Q.   Would you have expected to have
15  been privy to that analysis had it been done as  13:03:13
16  a part of your audit responsibilities?
17      A.   Yes.
18           MR. RYAN: Objection.
19      A.   I spent a significant period of
20  time with Brian and Mark going through portions  13:03:24
21  of the receivable work papers in '96, and I
22  would have expected to see that.
23      Q.   Did you ever learn that it had been
24  done and then discarded, the application of the
25  AGH percentages to the aged receivables at       13:03:39

Page 157

1   other AHERF hospitals for fiscal year '96?
2            MR. RYAN: Objection.
3       A.   No. We spent, if my memory serves
4   me correctly, we spent a lot of time looking at
5   agings and other receivable documentation for   13:03:50
6   the east and the west in '96. And I recall
7   Brian printing out this information on rather
8   large spreadsheets because, quite frankly, the
9   computer printouts were small in terms of the
10  information and my ability to read them. We     13:04:15
11  spent a lot of time looking at those agings.
12           But I do not recall any type of
13  exercise of going through and having -- at
14  least exercise that I went through with them
15  where we would look at the AGH methodology,     13:04:30
16  let's say, compared to what was going on in the
17  east in '96.
18      Q.   Do you ever recall hearing from
19  either one of them or from anyone else on the
20  engagement team that it had indeed been done,   13:04:39
21  whether or not it was presented to you or gone
22  over by you?
23      A.   No, I don't remember that at all.
24      Q.   Do you recall reading this note
25  before today?                                   13:05:03

Page 214

1 review the financial statements and the
2 footnote disclosure, make some sort of
3 assessment on whether the disclosure was
4 reasonable and whether the financial
5 information included in the document made sense    15:40:52
6 vis-a-vis their understanding of the tests that
7 were performed and the conclusions that were
8 reached.
9     Q.   Is top side meant to be a term that
10 you use that is different from detailed review?    15:41:03
11     A.   Yes.  I mean, it's -- I'm not sure
12 if the auditing standard calls it a top side
13 analytic or global analytic, but there's some
14 sort of terminology that would indicate that
15 you would want some sort of review on the    15:41:21
16 document going down as opposed to looking at
17 detailed records and working your way up.
18     Q.   Let me ask you just a few questions
19 then about the document itself.
20         The first one is, to look at the, I    15:41:34
21 think the topic we were discussing just a few
22 moments ago, which I think is referred to under
23 the heading Patients Accounts Receivable on the
24 first page.  Do you see that heading anyway?
25     A.   Yes.                    15:41:46

Page 215

1     Q.   The subtopic there that I want to
2 highlight for us is the allowance as a
3 percentage of accounts receivable.  Do you see
4 that row?
5     A.   Yes.                    15:41:55
6     Q.   That row, I think, if I read the
7 table right, notes that the Delaware Valley
8 Obligated Group percentage -- allowance,
9 rather, as a percentage of accounts receivable
10 has increased between year-end '95 and year-end    15:42:10
11 '96; is that right?
12     A.   That's correct.
13     Q.   From 13 to 17 percent?
14     A.   Yes.
15     Q.   Did this figure mean anything to    15:42:22
16 you or this change in figures mean anything to
17 you in connection with your '96 audit work?
18     A.   Yes, that was an important measure
19 for us to evaluate in terms of the adequacy of
20 the reserve.                    15:42:35
21     Q.   Did the increase cause you to think
22 the reserve should be increased more than if
23 the percentage was not increasing?
24     MR. RYAN:  Objection.
25     Q.   Let me try that again because it    15:42:48

Page 216

1 had too many uses of the word percentage.
2         Did this move of the percentage of
3 allowance as a -- I'll try it one more time.
4         Did this move from 13 percent and
5 17 percent from year-end '95 to year-end '96    15:43:07
6 cause you to think, all things else aside, that
7 the AHERF allowance for doubtful accounts
8 should be increased, decreased or stay the
9 same?
10     MR. RYAN:  Objection.            15:43:18
11     A.   Based on this particular
12 evaluation -- we still concluded that the
13 reserve had to be increased, but it gave us
14 comfort because, in effect, management had
15 identified that the reserve level, if you will,    15:43:32
16 between '95 and '96 should increase.  And they
17 did increase it.
18     Q.   So this move in percentages
19 mitigated towards increasing the reserve, in
20 your opinion?                    15:43:46
21     MR. RYAN:  Objection to form.
22     A.   I'm not sure I understand your
23 question.
24     Q.   When you read this change --
25     A.   Yes.                    15:43:57

Page 217

1     Q.   -- the allowance as a percentage of
2 accounts receivable at DVOG hospitals is going
3 up between the two fiscal years, right?
4     A.   Yes.
5     Q.   That going up, did that lead you to    15:44:05
6 think, all things else the same or aside, that
7 there ought to be a modification of the reserve
8 that is positive, increasing the reserve, or
9 did it not have any affect at all?
10     MR. RYAN:  Objection.            15:44:24
11     A.   We reached the conclusion -- well,
12 I'm going to try to answer your question in two
13 parts.  If I'm not answering it, just interrupt
14 me.
15         This measure, this comparison of    15:44:44
16 the allowance to receivables at 17 percent and
17 the fact that it increased from 13 to 17
18 provided us with some comfort that management
19 was attempting to address their issue --
20 besides trying to fix the processing issue,    15:44:59
21 they were trying to go through some sort of
22 rational assessment of what the reserve level
23 should be.
24     Q.   That rational assessment led then
25 to actually increase the allowance as a percent    15:45:11

55 (Pages 214 to 217)

William F. Buettner                                                                              Volume 1

1  of the outstanding receivable?
2      A.   Yes.  Now --
3      Q.   Please go ahead and finish.
4      A.   I'm not done yet.
5          As I recall, we wanted that          15:45:22
6  percentage to increase to a greater level.  It
7  was based on some other analytics that we
8  performed.
9      Q.   That was --
10     A.   When I say we, I'm talking Brian,      15:45:38
11 Mark and myself.
12     Q.   The percentage you refer to is the
13 '96 percentage?
14     A.   Yes, yes, yes, the 17 percent here,
15 we wanted it to be higher.  So, as a result, I    15:45:51
16 believe we suggested some sort of adjustment,
17 if you will, to increase the percentage.
18     Q.   Do you recall that you suggested an
19 adjustment in a particular amount to AHERF
20 management or that they suggested an adjustment    15:46:01
21 in a particular amount?
22     A.   No, we went to them and suggested
23 an increase of somewhere between 15 and 20
24 million dollars.
25     Q.   Who made that suggestion, the          15:46:13

1  person?
2      A.   I made that suggestion.  The
3  suggestion wasn't made simply on the receivable
4  level.  It was made near the end of the audit.
5  And we had perhaps seven or ten items that we    15:46:28
6  were talking to management about that either
7  would have found their way on to our SUD or
8  items that we thought they should consider.
9  The item that we had we felt was the most
10 important was the increase in their receivable    15:46:45
11 reserve.
12     Q.   Who did you make the suggestion to?
13     A.   Spargo.  I believe that both
14 Cancelmi and Adamczak were in the meeting.
15 Mark and Amy were there.  I want to say Brian    15:46:59
16 was there, but I'm not certain.  And I'm not
17 sure if people stayed -- if all of those folks
18 were there for the entire meeting or session or
19 whatever you want to call it.  It wasn't a
20 formal meeting.  It was, quite frankly, a        15:47:12
21 discussion in an open area in the finance
22 department.  As I recall, the first meeting was
23 probably after 5:00.
24     Q.   Do you recall, it wasn't in a
25 conference room, it was just in a hallway?        15:47:26

1      A.   No, not in a hallway.  They have --
2  they had back then what I would -- a cubicle
3  area and a couple conference rooms and bullpen
4  area, if you will, that were all
5  interconnected.  And it was somewhere in that    15:47:46
6  area there.
7      Q.   Do you recall roughly when this
8  meeting took place, or this conversation took
9  place?  Was it in August or September of '96?
10     A.   It was -- well, it was either late    15:47:54
11 August or September.  It was close to what I
12 would call the audit finalization or wrap-up
13 date.
14     Q.   Was Mr. McConnell a participant?
15     A.   No, I don't recall him being there    15:48:06
16 at all.
17     Q.   Do you recall any reaction that
18 anyone at AHERF had to the suggestion that you
19 made of upping the reserve for the allowance --
20 the allowance for doubtful accounts by 15 to 20    15:48:17
21 million dollars at AHERF hospitals?
22     A.   We didn't get an argument from
23 them, let's put it that way.  I mean, they
24 listened to us and understood where we were
25 coming from and indicated they would have to      15:48:29

1  sit down and talk about it.
2      Q.   Do you recall any follow-up meeting
3  where, or conversation at which they told you
4  the results of that follow-up or conversation?
5      A.   Yes.  I can't tell you if it was      15:48:45
6  the next day or within two or three days, but
7  some short period of time thereafter they got
8  back to us with what I would call a proposal to
9  adjust for three or four of the items or five
10 of the items that we had on our list.  That      15:49:01
11 would include the receivables.
12     Q.   Did they give you an amount for the
13 allowance boost, the allowance for doubtful
14 accounts?
15     A.   They gave -- yes, they gave us a      15:49:14
16 summary of what they would be willing to post,
17 and I believe it was 17 million dollars.
18     Q.   I've seen a number 17.5 million
19 dollars in other depositions and other
20 documents.  Does that sound about right to you?   15:49:27
21     A.   That's probably right.
22     Q.   So the 15 to 20 range was yours and
23 the 17.5 was AHERF's as the way the
24 conversations played out?
25     A.   Yes.

William F. Buettner                                                Volume 1

Page 222

1    Q.   Thank you.
2         Who conveyed that and to whom was
3    it conveyed on the engagement team, the 17.5?
4    A.   Well, I recall being at the client
5    location when the decision was made.  I don't     15:49:50
6    know if Mark and Amy learned about it before I
7    did or not.
8    Q.   How did you learn of it then?
9    A.   That's what I'm saying, I can't
10   remember if they told me or Spargo told me.  I    15:50:01
11   don't know if Steve told me.  But they already
12   knew.  I just don't remember.
13   Q.   For the record, Steve is Mr.
14   Spargo's first name?
15   A.   Yes.                                15:50:10
16   Q.   You were comfortable and believed
17   that 17.5 was a figure that Coopers & Lybrand
18   would not take exception to, is that right?
19   A.   Yes, that's right.
20   Q.   Do you recall the other adjustments   15:50:30
21   as you sit here today that were being
22   discussed, the seven to ten other items, or
23   what might be six to nine other items?
24   A.   Well, there were items that we had
25   on our SUD or would be posting to our SUD.       15:50:52

Page 223

1    Capitalized interest on construction projects.
2    Self insurance reserve liabilities.  I would
3    have to go down the list.
4    Q.   That's fine.
5    A.   But it would be -- it was those     15:51:08
6    types of items.
7    Q.   But to you the most important one
8    was the boost that would be required to the
9    allowance for doubtful accounts?
10   A.   At that point in time, yes, in '96,   15:51:16
11   yes.
12   Q.   Your handwritten notes on Exhibit
13   4394, at the bottom of the page, you note
14   "Excess CRA, 10 to 20 million dollars."  Do you
15   know what that refers to today?               15:51:38
16   A.   Those are notes that I -- someone's
17   conveying information to me.  I can't tell you
18   if it's from the C&L team or if it's from
19   somebody at AHERF.
20   Q.   CRA is a cost rate adjustment        15:52:05
21   account?
22   A.   Yes.
23   Q.   I'm handing you now, Mr. Buettner,
24   Exhibit 4390.  Do you recall reviewing this
25   document at any point before today?  It's     15:52:54

Page 224

1    headed Delaware Valley inpatient days in A/R
2    analysis, 6-30-96, and it's a Coopers & Lybrand
3    work paper, I believe.
4    A.   No, I can't say that I've seen this
5    before.                                      15:53:12
6    Q.   Let me hand you one more and ask
7    you the same question.  It's Exhibit 4391
8    headed Delaware Valley outpatient days in A/R
9    6-30-96.  Have you seen this work paper before
10   today?                                       15:53:25
11   A.   No, I don't remember seeing it.
12   Q.   Do you recall asking anyone on your
13   engagement team or being aware that anyone on
14   your engagement team had calculated something
15   called days in accounts receivable?          15:53:42
16   A.   Well, yes.  I mean, I would expect
17   the -- well, I would expect the client to be
18   calculating this on an ongoing basis, and I
19   would expect my engagement team to either look
20   at their computation or go through their own   15:53:58
21   computation.
22   Q.   Do you recall the results of any
23   such analysis separate and apart from looking
24   at the documents?  And look at them if you
25   like.                                        15:54:08

Page 225

1         MR. RYAN:  In 1996?
2         MR. JONES:  Yes.
3    Q.   That is the results of days in
4    accounts receivable analysis.
5    A.   No.  I mean, I remember it being a   15:54:21
6    discussion point of something that we would go
7    through and would be another item that we would
8    factor into in terms of our overall assessment
9    of the revenue function, the billing function
10   at the -- in the west and in the east and      15:54:36
11   reserve needs and things of that nature.
12   Q.   This may be a question you can't
13   answer, but would you look at Exhibit 4390 for
14   me and tell me if you, in your auditing
15   experience with respect to healthcare          15:54:48
16   enterprises, think that inpatient days in
17   A/R -- the inpatient days in A/R calculated on
18   Exhibit 4390 look high to you for the DVOG
19   hospitals?
20   A.   Yes, they do look high.              15:55:04
21   Q.   They look high compared to AGH as
22   well, is that right?
23   A.   That's correct.
24   Q.   What about outpatient on the next
25   exhibit?                                      15:55:12

William F. Buettner                                                                      Volume 1

Page 226

1       A.   Your question?
2       Q.   Do these DVOG hospitals appear to
3   have, in your view, as you sit here today, high
4   calculations as well for -- in this exhibit it
5   appears to be bad debt as a percent of net          15:55:39
6   patient service revenue?
7       A.   I'm sorry --
8            MR. RYAN:  Objection.
9       A.   -- you've lost me there.  A bad
10  debt or --                                           15:55:53
11      Q.   I'm sorry.  You know what, I
12  skipped it and I apologize.  4391.  It's the same
13  question, days in A/R.
14           Do the DVOG hospitals days in A/R
15  look high to you in this exhibit as you sit          15:56:05
16  here?
17      A.   Yes, they do.
18      Q.   Did this concern you in connection
19  with your '96 audit work?
20           MR. RYAN:  Objection.                       15:56:18
21      A.   This particular measurement was an
22  item that we considered.  First of all, we
23  expected that they -- this number to be high if
24  you can't get bills out correctly the first
25  time.  So it was an item that we considered,         15:56:30

Page 227

1   yes.
2       Q.   You considered it, and I think what
3   you're telling me is that you understood, at
4   least in your view, that part of the
5   explanation for it was the less than stellar        15:56:51
6   first-run success rate --
7       A.   Yes.
8       Q.   -- at billing?
9       A.   Correct.  Sorry for interrupting
10  your question.                                       15:57:04
11      Q.   That's okay.
12           Do you recall comparing these days
13  in A/R figures calculated for the Delaware
14  Valley Obligated Group hospitals to any other
15  set of hospitals, non AHERF hospitals in            15:57:17
16  connection with your '96 audit work
17  specifically?
18      A.   I would have done a general review,
19  yes, just to compare -- to try to gain some
20  sort of understanding or appreciation of what       15:57:36
21  the overall basis would be.  I walked away from
22  that assessment or analysis with an
23  understanding that the parameter, if you will,
24  the days in A/R were high for the organizations
25  in the east.                                         15:57:56

Page 228

1       Q.   Do you recall any specific
2   hospitals you compared them to?
3       A.   No.  I compared -- there was a
4   database that the firm provided to the staff
5   that was available on Lotus notes.  I believe       15:58:13
6   it was the CHIPS database.  I would go in there
7   periodically and just, you know, run
8   comparisons, if you will, of days in A/R or
9   other measures.  I would do that as part of
10  this analytic review or top side review when I      15:58:31
11  was going through the financial statements.
12      Q.   Was the CHIPS database available on
13  line to auditors at C&L at this period of time?
14      A.   Yes, yes.  It would have been a
15  year or so old, obviously, in terms of the data     15:58:45
16  that you were comparing it to, but, yes.
17      Q.   Now I want to turn to the bad debt
18  expense metric I tried to steer you to
19  prematurely a few moments ago.
20           - - - - -
21           (Thereupon, Deposition.
22           Exhibit 4461 was marked for
23           purposes of identification.)
24           - - - - -
25      Q.   This is Exhibit 4461, Mr. Buettner.  15:59:17

Page 229

1   It is entitled AHERF Bad Debt Expense Analysis.
2   It's another Coopers & Lybrand work paper from
3   the '96 audit.
4           Do you recall reviewing this work
5   paper in connection with your '96 audit work at     15:59:33
6   AHERF?
7       A.   I don't remember looking at the
8   document itself, but I'm sure I talked to
9   the -- I talked to the engagement team about
10  the items included here.                             15:59:49
11      Q.   I'm sorry, the items included here
12  are essentially a calculation that is headed
13  with the row marker here, "Bad debt as
14  percentage of net patient service revenue," is
15  that right?                                          16:00:04
16      A.   Well, you've got an entire page of
17  numbers here.  I mean, there's much more to it
18  than just that particular parameter.  There's
19  bad debt as a percentage of net patient
20  revenue, contractual allowance as a percentage      16:00:19
21  of gross revenue.  There are comparisons
22  between June of '95 and June of '96, as well as
23  comparisons between March 31, '96 and June of
24  '96.
25      Q.   But the two percentages that are     16:00:31

58 (Pages 226 to 229)

William F. Buettner                                                    Volume 1

Page 234

1   we looked at.
2           - - - - -
3       (Thereupon, Deposition
4       Exhibit 4462 was marked for
5       purposes of identification.)
6           - - - - -
7       Q.   Mr. Buettner, we're now handing you
8   what was newly marked as 4462 with a little
9   difficulty.  I'm going to ask you to take a
10  look at this one-page document and tell me if      16:06:45
11  you recognized it -- if you recognize it.
12      A.   I do not believe this is an audit
13  schedule prepared by C&L.  I may have seen
14  this.  It looks similar to some information
15  that AHERF management may have provided us, but    16:07:11
16  I just don't remember.
17      Q.   It is headed AHERF, Patient
18  Accounts Receivable Balances, Fiscal Year 1996.
19  Is that right?
20      A.   Yes.                         16:07:23
21      Q.   It lists a series of hospitals
22  along the left-hand margin.
23      A.   Yes.
24      Q.   Down in the lower right-hand margin
25  you've written a handwritten note, or is that      16:07:30

Page 235

1   your handwriting?
2       A.   That is not my handwriting.
3       Q.   That is not your handwriting.
4       A.   No, it is not, sir.
5       Q.   This document, I am told by my         16:07:37
6   esteemed colleague to my left, was produced
7   from what has been identified to us by your
8   counsel or PwC's counsel as Mr. Buettner's
9   files.  Does me saying that mean anything to
10  you about whether or not it's likely that you      16:07:56
11  reviewed it?
12          Did you keep personal files on
13  audit matters?
14      A.   Yes, I did.
15          MR. RYAN:  Objection.              16:08:02
16      Q.   Was it your habit to review those,
17  the material in those files in connection with
18  your audit work?
19      A.   Yes.  It was also my habit to, as I
20  was reviewing or going through an audit review,    16:08:14
21  the staff would give me documents, I would look
22  at, we would talk about, I would put them in
23  the file.
24      Q.   Do you recognize the handwriting?
25      A.   No, I don't.  But that's not my        16:08:26

Page 236

1   handwriting.  I probably don't dispute the fact
2   that there's been a significant increase in
3   receivables over the two-year period, but
4   that's just not my handwriting.  That's all.
5       Q.   That's fine.  That's fine.          16:08:38
6           Let me hand you one more exhibit.
7           - - - - -
8       (Thereupon, Deposition.
9       Exhibit 4463 was marked for
10      purposes of identification.)
11          - - - - -
12      Q.   It is Exhibit 4463.  And my
13  questions are two, have you seen this document
14  before, and is the handwriting on it yours?
15      A.   Yes.                          16:09:10
16      Q.   Yes to both?
17      A.   Yes to both.
18      Q.   It is headed AHERF Consolidated
19  Aging by Major P.  Does that stand for payor?
20      A.   I can't tell you that's what       16:09:23
21  that -- it's probably by major payor, but I
22  don't know.
23          MR. RYAN:  You can see it better in
24  some of the other pages.
25          THE WITNESS:  It's just not --      16:09:35

Page 237

1       Q.   The typing apparently, or the font
2   apparently gets clear on later pages.  But
3   there are payors listed on the left-hand
4   margin, is that fair to say, of the document?
5       A.   Yes.                          16:09:48
6       Q.   When do you recall seeing this
7   document before today?
8       A.   As I had indicated earlier, when
9   you provided me with some schedules that I
10  simply couldn't read, that I told Brian that he    16:10:01
11  was going to have to increase the font so that
12  I could sit down and perform some sort of
13  reasonable review with him.
14          He had put together some aging
15  schedules, and this is just a summary, I think,    16:10:15
16  of probably about 40 pages of printouts that he
17  generated of very long sheets that were, quite
18  frankly, in larger print than this.  They were
19  eight and a half by 11.
20      Q.   Yes.                          16:10:31
21      A.   And we sat down and over, as I
22  indicated, over a couple day period, day and a
23  half, whatever, when I sat down and talked to
24  Mark and Brian, we were going through
25  receivables, we were trying to dissect exactly    16:10:43

60 (Pages 234 to 237)

William F. Buettner

Page 238

1  what was going on here, how it tied into other
2  items that we thought were occurring from a
3  processing perspective, what Norb was coming
4  down with, what was the client doing in terms
5  of increasing reserves, what the client's            16:10:58
6  assessment was in terms of collectibility, if
7  they had any specific reasons on why certain
8  items should be ignored, written off.
9          So it was basically my -- these
10 pages, plus a few other pages, were basically        16:11:18
11 my work pad, if you will, during that period of
12 time when we were going through the review.
13     Q.   This is the period of time during
14 which you came to the ultimate conclusion that
15 the reserve or the allowance -- the reserve or        16:11:31
16 the allowance for doubtful accounts needed to
17 be increased by 15 to 20 million dollars?
18     A.   Yes, one.
19     Q.   These meetings were held primarily
20 with you and Mr. Kirstein and Mr. Christian           16:11:42
21 from time to time?
22     A.   Yes.  I mean, it was within a two,
23 three-day period, rather intense.  I spent a
24 lot of time over at the client location.  I had
25 other client responsibilities.  But I think for       16:11:57

Page 239

1  one day I was there probably all day.  I felt
2  kind of bad for Brian because I had him running
3  around quite a bit getting information.
4      Q.   This would have been then, again,
5  in the late August, early September time frame        16:12:12
6  and shortly before the meeting with Mr. Spargo
7  and others about your suggestion to up the
8  reserve?
9      A.   Yes, yes.  That all could have
10 occurred within a one-week period, let's say.         16:12:21
11 When I say one week, I don't mean Monday
12 through Friday, but within a five, six-day
13 period, yes.
14     Q.   On the first page of the schedule
15 which we've newly marked -- would you do me the       16:12:34
16 favor of repeating back for me the exhibit
17 number?
18     A.   4463.
19     Q.   On the first page of Exhibit 4463,
20 the lower right-hand corner of the document,          16:12:49
21 the figure appears at the very bottom under the
22 heading Total All Entries, Over 180 Days, and
23 the entry there is in a row for net A slash R;
24 is that right?
25     A.   Yes.                                         16:13:05

Page 240

1      Q.   The entry used to read something
2  like 72 million dollars.  It has a line through
3  it, and then your handwriting, 50 million
4  dollars beneath it.  Is that right?
5      A.   50,000, but yes.                             16:13:16
6      Q.   50,000.  But this schedule would
7  refer to -- is it 50,000 or 50 million?
8      A.   I can't remember.  I mean, as I
9  told you, we were going through a number of
10 assessments in terms of overall reserve               16:13:30
11 requirements and so on.
12     Q.   So let me make sure -- I think I
13 understand your testimony.  I want to make sure
14 that the record is clear.
15         The figure that is typewritten on            16:13:38
16 this schedule for all entities under net A/R
17 over 180 days is 72 million dollars and change?
18     A.   Yes.
19     Q.   That much is right?
20     A.   Yes.                                         16:13:49
21     Q.   What you've written in in
22 handwriting is the figure 50, five zero,
23 comma -- let me try that again.  Five zero
24 comma, zero, zero, zero or 50,000, is that
25 right?                                                16:14:00

Page 241

1      A.   Yes.
2      Q.   You don't know whether that meant
3  to relate to 50,000 or 50 million as you sit
4  here today?
5      A.   Yes.  In all probability it relates         16:14:06
6  to 50 million, but I honestly can't testify
7  today because I'm not sure how that number was
8  derived.
9      Q.   Do you recall considering whether
10 net A/R -- the net A/R figure calculated by           16:14:19
11 either the client or by C&L for all entities
12 which reflected A/R over 180 days should be
13 adjusted downward by any measure, by any sum in
14 these Christian/Kirstein/Buettner meetings?
15     A.   Well, yeah, I think we had reached          16:14:38
16 a conclusion that the reserve had to be
17 increased by 15 to 20 million dollars, yes,
18 sir.
19     Q.   So if having -- having given us the
20 benefit of that, net A/R in your view is A/R          16:14:50
21 after the allowance?
22     A.   Yes.
23     Q.   And, therefore, this roughly 22
24 million dollar difference, if we assume for a
25 minute that the 50,000 you wrote there meant 50       16:15:01

William F. Buettner                                                                    Volume 1

Page 242

1  million, would be in the ballpark of the
2  suggestion you were proposing, is that fair to
3  say?
4          MR. RYAN: Objection.
5      A.   You could say that, but I'm not      16:15:11
6  sure that's what it meant. I just don't know.
7      Q.   You just don't know?
8      A.   I cannot remember.
9      Q.   That's fine. I'm going to ask you
10  skip to the next page.                        16:15:21
11         Do you know what you're doing with
12  the handwritten figures that appear in the
13  first four columns with actual numbers in them
14  at the base of the page on page 35634 as you
15  sit here today?                               16:15:35
16     A.   No, I can't remember.
17     Q.   Do you know why this second page
18  appears to -- strike that.
19         Do you know why -- what this second
20  schedule is doing as compared to the first    16:16:01
21  schedule as you sit here today?
22     A.   What page are you on?
23     Q.   I'm sorry, the second page of the
24  exhibit, 4463. At your quick review here, can
25  you tell me why this schedule is different than 16:16:12

Page 243

1  the first one?
2          MR. RYAN: Objection to form.
3      A.   I'm not sure -- I don't see the
4  difference.
5      Q.   Okay. I think if you look to the     16:16:25
6  third page, maybe you'll see.
7          The third page gives a total
8  reserve figure of -- a total -- I'm sorry, net
9  A/R figure, total net A/R figure for all
10  entities at over 180 days at 92 million        16:16:38
11  dollars.
12     A.   M-hm.
13     Q.   Do you know why there would be two
14  different figures in these schedules?
15     A.   I don't know.                         16:16:45
16         MR. RYAN: Objection.
17     A.   I don't know.
18         MR. JONES: Let's take our last
19  break of the day here. If we take a quick one,
20  we may finish shortly after 5:00.             16:17:06
21         THE VIDEOGRAPHER: Going off the
22  record at 4:17.
23         (Recess had.)
24         THE VIDEOGRAPHER: We're back on
25  the record at 4:34.                           16:34:01

Page 244

1      Q.   Mr. Buettner, could you look back
2  at Exhibit 4463 for me, the last series of
3  schedules we were reviewing at the time we
4  broke. 4463, the net A/R schedule. Are you
5  with me?                                       16:34:19
6      A.   Yes.
7      Q.   Regardless of which figure we
8  choose, the roughly 72 million dollar figure
9  for net A/R, all entities over 180 days, or the
10  roughly 92 million dollar figure for net A/R   16:34:34
11  all entities over 180 days, the schedule
12  reflects that this amount is an amount
13  outstanding and presumably owed to AHERF
14  hospitals or other enterprises against which
15  there is no reserve.                          16:35:00
16         Is that fair to say?
17         MR. RYAN: Objection to form.
18     A.   Yes. Yes.
19     Q.   Did that fact or knowing that fact
20  in connection with your '96 audit work cause  16:35:05
21  you concern about the reserve or the allowance
22  for doubtful accounts?
23         MR. RYAN: Objection.
24     A.   As I stated previously, it would be
25  an item that we would consider in evaluating  16:35:21

Page 245

1  the overall adequacy of the client's
2  established reserve.
3      Q.   Did you evaluate this item as one
4  that would suggest that an enhancement to the
5  reserve should be made or an increase in the  16:35:34
6  reserve should be made?
7      A.   I would conclude that it would tell
8  us that we would want to take a look at an
9  increase in the reserve, not a decrease in the
10  reserve.                                       16:35:48
11     Q.   Thank you. That's where I was
12  going with the question.
13         You have testified for us a little
14  while ago about the year-end adjustment to the
15  allowance suggested by you in the range of 15  16:36:02
16  to 20 million dollars. I think I understand
17  from your testimony that that range of increase
18  came at the conclusion of a series of meetings
19  or a day or more of meetings with Mr. Christian
20  and Mr. Kirstein, is that right, that that's   16:36:22
21  when the suggestion crystallized in your mind?
22     A.   Yes, that's when we made -- we had
23  reached our conclusion that the reserves should
24  be enhanced.
25     Q.   And enhanced, in fact, in that       16:36:36

William F. Buettner                                                                    Volume 1

Page 246

1  amount, or is that an amount or a range,
2  rather, that you came up with separate and
3  apart from any conversations you had with these
4  two gentlemen?
5      A.  That I cannot remember.  There were    16:36:52
6  a whole -- there were a variety of factors, a
7  lot of conversation, a lot of data that was
8  shared.  The ultimate decision that was made
9  was my decision.
10         That decision was based on the        16:37:12
11  information I had seen, plus the information
12  that the staff had given me and what I also had
13  heard from the client.
14     Q.  Did you -- do you recall sharing
15  your 15 to 20 million dollar recommendation    16:37:22
16  with Mr. Christian or Mr. Kirstein before the
17  meeting with AHERF at which you shared this
18  suggestion?
19     A.  I think I did, but I can't remember
20  specifically.                                  16:37:35
21     Q.  Do you recall as you sit here today
22  any difference of opinion between the three of
23  you about the number or the range?
24     A.  No, I don't remember any comments,
25  adverse comments from their perspective in     16:37:49

Page 247

1  terms of the adequacy of that adjustment.
2      Q.  Do you recall either one of them or
3  anyone else on the engagement team indicating
4  to you that they thought the adjustment should
5  be more, higher, more than 17.5 -- or more than   16:37:59
6  15 to 20 million dollars?
7      A.  No, I don't remember any
8  conversations at all along those lines.
9          - - - - -
10         (Thereupon, Deposition
11         Exhibit 4464 was marked for
12         Purposes of identification.)
13         - - - - -
14     Q.  Mr. Buettner, do you recall
15  documenting anywhere in the work papers or      16:38:47
16  elsewhere, for that matter, the suggestion of
17  increasing the allowance for doubtful accounts
18  at AHERF hospitals by 15 to 20 million for
19  fiscal year '96?
20         MR. RYAN:  Could I get that read       16:39:02
21  back, please?
22         (Record read.)
23     A.  No, I don't, because I
24  believe the client ended up going
25  through that documentation process for         16:39:26

Page 248

1  us by booking the journal entry or by
2  increasing the reserves, let's say.
3      Q.  Do you recall posting the amount
4  of -- any amount to the SUD?
5      A.  After the client accepted the -- it    16:39:40
6  agreed to book the adjustment?  No.
7      Q.  Do you recall posting any amount
8  for an increase to the allowance for doubtful
9  accounts to the SUD at any time?
10     A.  In 1996?                    16:39:54
11     Q.  Yes.
12     A.  No.
13     Q.  Is it your best recollection that
14  the suggestion of a 15 to 20 million dollar
15  increase in the allowance was not documented;   16:40:06
16  it was not written down in the work papers or
17  anywhere else?
18         MR. RYAN:  Objection.
19     A.  I believe it was written down to
20  the extent that the client had to book some    16:40:17
21  sort of adjustment to their financial
22  statements and on their general ledger, and the
23  staff reviewed that adjustment that was made,
24  and they documented the adjustment in the work
25  papers.                            16:40:34

Page 249

1      Q.  Let me see if I can break that down
2  because I think we're speaking past each other,
3  perhaps.
4          And I understand that ultimately a
5  17.5 million dollar adjustment was made by      16:40:43
6  AHERF and that that may be reflected in some
7  internal AHERF schedules or on the general
8  ledger, or it may not.
9          My question is really, do you
10  recall yourself or any member of your          16:40:57
11  engagement team committing the 15 to 20 million
12  dollar range suggestion that you made to Mr.
13  Spargo and others at the meeting towards the
14  end of the audit work in fiscal 1996 to paper?
15     A.  No, not the range.  I don't think      16:41:15
16  we would do that because the client accepted
17  the proposal that we had made in terms of an
18  adjustment that should be booked.  So we
19  reflected the adjustment, not the proposed
20  adjustment.                        16:41:33
21     Q.  They accepted -- the client
22  ultimately, apparently, accepted, in your
23  testimony, anyway, a number within the range.
24     A.  M-hm.
25     Q.  They didn't accept 20, right?        16:41:41

63 (Pages 246 to 249)

William F. Buettner

IN THE UNITED STATES DISTRICT COURT

OF PENNSYLVANIA

WESTERN DIVISION


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,

         vs.   Civil Action No. 00-684

PRICEWATERHOUSECOOPERS, LLP,

        Defendant.


        Continued videotaped deposition of
WILLIAM F. BUETTNER, called for examination
under the Applicable Rules of Federal Civil
Procedure, taken before me, Michele E. Eddy, a
Registered Professional Reporter and Notary
Public in and for the State of Ohio, pursuant
to notice and stipulations of counsel, at the
offices of Jones Day, 500 Grant Street, Suite
3100, Pittsburgh, Pennsylvania, on Wednesday,
the 23rd day of June, 2004, at 9:00 a.m.


        VOLUME II

William F. Buettner                                                    Volume 2

Page 326

1  Coopers & Lybrand, the recommendations or the
2  reactions that were Coopers & Lybrand's?
3      A.   Well, we would circulate the letter
4  for two reasons.  One is it was agreed that a
5  management response would be provided to our      09:53:05
6  comments.  So to get that management response,
7  clearly we would have to review the comment
8  with management.
9          And then, secondly, it was a
10  vehicle to make sure that we had our facts       09:53:17
11  right, we're making observations, we're making
12  recommendations.  We would want to make sure
13  that our facts were correct.
14          It's one thing to make a
15  recommendation and management may disagree with  09:53:28
16  it or there may be some tension in terms of
17  comment, but if the facts are just wrong, and
18  the observation is not -- is without merit,
19  then it shouldn't be included in the letter.
20      Q.   Do you recall ever receiving          09:53:45
21  comment from AHERF personnel on the factual
22  portions or the recommendations of C&L separate
23  and apart from the management response portion
24  of the letter?
25      A.   In some cases, yes.            09:54:01

Page 327

1      Q.   Do you recall receiving any in
2  particular in connection with the '96 or '97
3  audit?
4      A.   I can't remember specifically, but
5  I wouldn't be surprised if we received comments  09:54:07
6  in each year that we performed this service.
7      Q.   Do you recall ever rejecting any
8  comments?
9          MR. RYAN:  Objection.
10      A.   I don't understand what you mean by   09:54:19
11  rejecting.
12      Q.   That is receiving them, reviewing
13  them but deciding not to include them in the
14  final text of the document?
15      A.   Receiving them from who?            09:54:28
16      Q.   AHERF management.
17      A.   I don't understand your question.
18  We're the one who's generating the comment.
19      Q.   Let me try it again.  Let me try it
20  again.                              09:54:41
21      A.   Okay.
22      Q.   I think you told me that you
23  recalled receiving some input or comments on
24  the text of the management comment letter from
25  time to time from AHERF personnel?        09:54:48

Page 328

1      A.   Yes, yes.
2      Q.   Including comments or notes on the
3  text of the factual portions and C&L's
4  recommendations separate and apart from the
5  management response portion of the letter; is    09:55:00
6  that also right?
7      A.   Yes, yes.
8      Q.   My question now is, in any fiscal
9  year or for any fiscal year, do you recall
10  receiving comments from AHERF management on the  09:55:08
11  C&L portions of the document, not just the
12  management response, but the C&L portions of
13  the documents that you or your engagement team
14  rejected, did not accept, did not put in the
15  final text?                         09:55:24
16          MR. RYAN:  Objection.
17      A.   In other words, feedback that they
18  provided to us and we said, no, we're not going
19  to include that?  Probably, yes.  We receive
20  comments both ways either for factual or --     09:55:35
21  factual information or just other information.
22  Some of it we may have included, some -- I
23  can't remember.  But it was -- we would sit
24  down and assess our comments that we received
25  from them, plus their responses, and we would   09:55:50

Page 329

1  also assess observations from within the group
2  as we were passing this document around as
3  well.  We would make a final change to the
4  document before issuing it to the board and the
5  audit committee.                     09:56:06
6      Q.   Do you recall any specific comments
7  received from AHERF to the C&L portions of the
8  document that you rejected in either fiscal
9  years '95, '96 or '97?
10      A.   No, I don't remember anything       09:56:18
11  specific.
12      Q.   I'm going to ask you now to look at
13  a specific page of the management comment
14  letter from Coopers & Lybrand to the Board of
15  Trustees marked as Exhibit 22.  That is Exhibit  09:56:27
16  22 before you, sir?  Would you look at the face
17  page for me?
18      A.   Yes.
19      Q.   Do you see under the page marked
20  three of 16 in the lower right-hand corner?     09:56:39
21      A.   Yes.
22      Q.   There's a heading called Accounts
23  Receivable Observations?
24      A.   Yes.
25      Q.   And if you turn the page, we have a  09:56:47

13 (Pages 326 to 329)

William F. Buettner                                                                Volume 2

Page 330

1  general overview and then a revenue and
2  accounts receivable overview section?
3      A.   Yes.
4      Q.   Do you see about three-quarters of
5  the way down the page, the second to last    09:56:58
6  paragraph, there is a sentence in the revenue
7  and accounts receivable overview that reads,
8  "As a result of our procedures, we have
9  concluded that the controls over the
10 establishment and monitoring of accounts     09:57:12
11 receivable reserves are designed appropriately
12 and are operating effectively so as to properly
13 adjust accounts receivable balances to their
14 estimated net realizable value."
15     Did I read that right?                    09:57:25
16     A.   Yes.
17     Q.   Do you know who wrote that text as
18 you sit here today?
19     A.   No, I don't.
20     Q.   Did you believe it at the time the   09:57:32
21 letter was dispatched?
22     A.   Yes.
23     Q.   Do you believe it today?
24     MR. RYAN:  Objection.
25     A.   With regards to 1996 are we          09:57:41

Page 331

1  speaking to?
2      Q.   Yes, the time period for which the
3  letter was written.
4      A.   Yes.
5      MR. JONES:  Why don't we take our         09:57:48
6  morning break here.
7      THE VIDEOGRAPHER:  Going off the
8  record at 9:57.
9      (Recess had.)
10     THE VIDEOGRAPHER:  We are back on         10:32:21
11 the record at 10:32.
12     MR. RYAN:  If he could just -- I
13 think there's one point the witness wants to
14 clarify what happened before.
15     Q.   Do you have a clarification to a     10:32:30
16 prior answer, sir?
17     A.   Yes, I do, or maybe a series of
18 answers.
19     Q.   Let me ask you, have you had an
20 opportunity to discuss this clarification with  10:32:39
21 counsel at the break?
22     A.   Yes.
23     Q.   How long did that discussion take?
24     A.   90 seconds.
25     Q.   We've been off the record for about  10:32:49

Page 332

1  30 to 35 minutes.  It was a 90-second
2  conversation?
3      A.   Yes, it was 90 seconds.
4      Q.   With whom did you discuss it?
5      A.   Well, everybody was in the room,     10:32:57
6  but principally Mr. Ryan.
7      Q.   The everybody is Mr. Close --
8      A.   Yes.
9      Q.   -- in-house consultant at
10 PricewaterhouseCoopers?                        10:33:06
11     A.   Yes.
12     Q.   And Mr. LaRocca, a lawyer at
13 Cravath, Swaine, and Moore?
14     A.   Yes.
15     Q.   And Mr. Stroup, a lawyer for you?    10:33:11
16     A.   Yes.
17     Q.   What's your clarification, sir?
18     A.   Simply that the 7.1 million dollar
19 adjustment that we had talked about, I'm
20 uncertain in terms of if individuals understand  10:33:28
21 the item that we have on our SUD here and the
22 purpose for that.  So if I could just take one
23 minute and outline my understanding of the
24 facts.
25     The client booked a 7.1 million           10:33:49

Page 333

1  dollar adjustment reflecting capitalization of
2  interest for both the 1996 period and prior
3  years.  They did that to correct what we
4  considered to be misstatements that had
5  accumulated over a period of time.            10:34:04
6      Q.   Misstatements in what account, sir?
7      A.   It would have been -- well,
8  capitalized interest would have gone to fixed
9  assets or property, plant and equipment.
10     Q.   The misstatement was the failure to  10:34:14
11 capitalize the interest --
12     A.   Yes.
13     Q.   -- over a period of years?
14     A.   Yes.
15     We concluded that their correction        10:34:22
16 of that misstatement in 1996 was appropriate,
17 so they fixed the property, plant and
18 equipment.  But when he did that, they created
19 a second misstatement, and that misstatement
20 was creating this unsupported general reserve  10:34:33
21 or general cushion, as you called it,
22 Mr. Jones, in an unsupported CRA account.
23     Q.   In the amount of 7.1 million
24 dollars?
25     A.   Yes.                                  10:34:46

14 (Pages 330 to 333)

IN THE UNITED STATES DISTRICT

COURT OF PENNSYLVANIA

WESTERN DIVISION


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,

        Vs.    Civil Action No. 00-684.

PRICEWATERHOUSECOOPERS, LLP,

        Defendant.


        Continued videotaped deposition of

WILLIAM F. BUETTNER, called for examination

under the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Jones Day, 500 Grant Street, Suite

3100, Pittsburgh, Pennsylvania, on Thursday,

the 24th day of June, 2004, at 9:00 a.m.

        VOLUME III

        - - - - -

William F. Buettner                                                                      Volume 3

Page 559

1      A.    From the C&L perspective?
2      Q.    Yes.
3      A.    Yes, sir.
4      Q.    Do you recall being involved in
5  discussions about the decision to move to        09:03:16
6  this -- or to implement this change?
7      A.    Yes.
8      Q.    With whom did you have such
9  discussions?
10     A.    I had a number of discussions with      09:03:28
11 Mr. McConnell, perhaps Mr. Spargo, probably
12 over an 18-month period about reporting
13 requirements and options that were available to
14 the AHERF management group.
15     Q.    Who first initiated these              09:03:50
16 conversations about changing the audit format
17 between the two years?
18     A.    I need a little help in your
19 question. Are you talking about in 1997, sir?
20     Q.    I'm talking about the change we've     09:04:08
21 just been discussing in the '97 audited
22 financial statements, at least the
23 presentation. Who first raised the topic, was
24 it you, somebody at AHERF?
25          When did you first hear about it?       09:04:18

Page 560

1      A.    AHERF management told us during the
2  planning session, if you will, very early
3  planning session for the 1997 audit that they
4  had made a decision or were strongly leaning
5  towards the presentation of only a consolidated  09:04:39
6  report for the AHERF system as their, what I
7  would call their general purpose report, and
8  that as a result our audit scope should be
9  adjusted to reflect a consolidated audit, if
10 you will.                                         09:04:55
11     Q.    Who was it in AHERF management that
12 first told you that?
13     A.    I can't remember if that was
14 McConnell or if that was Spargo.
15     Q.    What do you recall, and I             09:05:06
16 understand you told me there were conversations
17 over a number of months.
18     A.    Yes.
19     Q.    What is it that you recall about
20 the reason that AHERF management in the person   09:05:11
21 of Mr. McConnell or Mr. Spargo had for making
22 this change?
23          MR. RYAN: Objection.
24     A.    I am uncertain if the initial
25 discussion centered around specific reasons.     09:05:31

Page 561

1  As we had further discussions during the
2  development of the '97 audit, a number of
3  reasons developed. But our original
4  discussions were more or less we're considering
5  this. This is what we would like to do. You      09:05:48
6  can give us your thoughts. We had had previous
7  discussions about it. But give us your
8  thoughts in terms of how that would impact your
9  work in '97 and if you see any other items that
10 we should consider.                               09:06:03
11     Q.    What were the reasons, if you ever
12 learned any, from AHERF management about why
13 they were considering or thought it might be
14 appropriate to change the presentation?
15     A.    Well, audit fees would have been        09:06:17
16 one. I don't think that was the primary one,
17 but it would have been one item because
18 obviously our audit scope would have been
19 reduced.
20          They were operating more as a            09:06:28
21 system, if you will, in 1997 than in prior
22 years. That had implications in terms of our
23 audit scope and how we would report at the
24 Obligated Group level. And I believe they
25 understood that. I know they understood that.     09:06:45

Page 562

1          And there were just other factors,
2  as I understood, in terms of presentation to
3  the public of looking at AHERF as a corporate
4  identity, if you will, as opposed to the
5  eastern region or the west. Other business       09:07:04
6  reasons as well.
7      Q.    When you say a corporate identity,
8  you mean as a singular or single corporate
9  identity?
10     A.    Yes, yes. In fact, Mr. McConnell,      09:07:13
11 I think at one point in time had indicated that
12 there were just some very, very high level
13 general thought of trying to develop a reason
14 for only one, I'll probably not use the correct
15 term, one medical license or one state license   09:07:34
16 to run a hospital across the state as opposed
17 to having seven or ten licenses, if you will,
18 or licensees across the state.
19     Q.    What thoughts or comments, rather,
20 did you share with AHERF management over the     09:07:48
21 course of this period of when the consolidated
22 presentation was being discussed about your or
23 C&L's reaction to the proposed change?
24     A.    Well, the first point that we
25 mentioned was that clearly it's their decision.  09:08:03

3 (Pages 559 to 562)

William F. Buettner

Page 563

1  We have a lot of clients within the PwC or C&L
2  list of clients who would only present
3  consolidated financial statements. So it
4  wasn't unusual.
5      They did have reporting          09:08:20
6  requirements, though, at what I would call
7  subsidiary level or Obligated Group level to
8  certain outsiders. We had indicated that there
9  would probably be some sort of need to contact
10 those folks to determine whether they were     09:08:35
11 going to be meeting their external reporting
12 requirements.
13     Q.   Were these primarily folks involved
14 with having lent -- loaned money to AHERF,
15 these outsiders?                   09:08:47
16     A.   Yes, that would be the principal --
17 principal group.
18         And so I felt that there was some
19 need for discussion with those folks, a need to
20 get the attorneys involved in terms of some     09:08:59
21 sort of assessment on whether the reporting
22 requirements would be sufficient.
23         And they had a clear understanding,
24 of course, that our audit scope would be based
25 on a consolidated financial statement and not   09:09:14

Page 564

1  necessarily on the financial -- individual
2  financial statements of the Obligated Group.
3      Q.   What did you tell either Mr.
4  McConnell or Mr. Spargo or anyone else at AHERF
5  management in this time period about the change  09:09:31
6  in scope that you just mentioned?
7      A.   Well, I had indicated that we would
8  factor that into our plan and give them an idea
9  in terms of what the change in scope would
10 entail. Of course that would translate into     09:09:46
11 time and effort and audit fee and things of
12 that nature.
13         So it was both an audit scope
14 change, if you will, in terms of the level of
15 items we would look at, as well as the impact    09:10:00
16 it would have on the overall time we would
17 spend on the engagement, which would translate
18 into fees.
19     Q.   Let me see if I've got it right.
20         I'm sorry to take a quick note        09:10:13
21 there.
22         Did you indicate to them that the
23 time would involved in the audit for '97 would
24 be less under the changed presentation and,
25 therefore, the fees would be less?              09:10:24

Page 565

1      A.   Yes.
2      Q.   Did you indicate to them that the
3  things you would look at would change?
4      A.   Yes.
5      Q.   What did you indicate?           09:10:33
6      A.   Not necessarily the things, but the
7  level of detail in certain areas would change.
8      Q.   What did you tell anyone at AHERF
9  management about the change and the level of
10 detail, if you can recall today?              09:10:48
11     A.   I can't recall specifically. It
12 was outlined more or less in the engagement
13 plan that we finally developed.
14         In these early-on meetings and
15 these discussions, I didn't sit down and say,    09:11:00
16 well, hours would go down because we would be
17 doing less work in this area, that area because
18 we had to put together an engagement plan.
19         The other thing, of course, that
20 complicated that was you had some acquisitions   09:11:14
21 going on that would increase hours and increase
22 efforts in those particular areas as well. So
23 putting together the engagement plan was a
24 challenge in '97 in terms of the changes that
25 were occurring.                      09:11:26

Page 566

1      Q.   The acquisitions you refer to are
2  the acquisitions of certain hospitals formerly
3  owned by the Graduate Health System?
4          MR. RYAN:   Objection.
5      A.   That would be one part of the        09:11:34
6  acquisitions, yes, sir.
7      Q.   I was going to list some more, but
8  that was one of them?
9      A.   Yes.
10     Q.   And those hospitals were primarily   09:11:39
11 located in the Philadelphia area, I think maybe
12 perhaps one in New Jersey?
13     A.   Yes.
14     Q.   And then, if I refer to those
15 hospitals today, the ones acquired altogether    09:11:50
16 as the Graduate hospitals, will we understand
17 one another?
18     A.   Yes.
19     Q.   Thank you.
20         If there's ever a time where that     09:12:00
21 context isn't clear to you, just tell me.
22         And then the other acquisitions
23 during fiscal year '97 were in the western part
24 of the state, the hospital acquisitions,
25 anyway?                          09:12:10

4 (Pages 563 to 566)