FRANK V. CAHOUET

Page 50

1 A.  No.
2 Q.  Dozens or --
3 A.  A dozen.
4 Q.  Seeing this document today, does this refresh
5     your recollection that you knew something about
6     the potential acquisition of Graduate back in
7     August of 1996?
8 A.  Not really.
9 Q.  While you were on the board of AGH but before
10    you were on the AHERF board, would you from
11    time to time speak with Mr. Abdelhak on the
12    phone or in person outside the context of
13    actual formal board meetings?
14 A.  I would have to say yes.  I can't recount
15    the --
16        You know, I can't remember specific
17    conversations, but I'd have to say yes.
18 Q.  Could you tell me basically what kinds of
19    things you would talk to him about?
20 A.  The hospital.
21 Q.  Do you recall the first time you met
22    Mr. Abdelhak?
23 A.  No.
24 Q.  Did you know him prior to your becoming a board
25    member on AGH's board?

Page 51

1 A.  Not really.  There may have been some time gap
2     there, but I didn't have a social relationship
3     with him.
4 Q.  You can put that aside.  Let me show you a
5     document that has previously been marked as
6     Exhibit 2101.
7             - - - -
8        (Deposition Exhibit No. 2101
9     previously marked for identification.)
10            - - - -
11        MR. FRIESEN:  This is a document with
12    the date October 28th, 1997, and it says AHERF
13    consolidated financial statements,
14    September 30th, 1997.
15        MR. RESTIVO:  And again, in fairness,
16    in completeness to the witness, would you tell
17    him the source of this document or what the
18    Bates stamp means.
19        MR. FRIESEN:  The source of this
20    document is not the files of Mr. Cahouet.
21    That's all I can tell you right now.
22        MR. RESTIVO:  And it does not appear
23    to be the files based on a prior document or
24    anything that Mellon Bank produced?
25        MR. FRIESEN:  That is correct.

Page 52

1        MR. RESTIVO:  Thank you.
2        MR. FRIESEN:  In fact, my first
3     question would be, once Mr. Cahouet has had a
4     chance to look at the document, whether he
5     recalls ever seeing it before.
6             - - - -
7        (The witness reviewed the document.)
8             - - - -
9        THE WITNESS:  No, I don't recall.
10 BY MR. FRIESEN:
11 Q.  If you could go to the second page of the
12    document, JB 00791 --
13 A.  Yes.
14 Q.  -- at the top it says AHERF consolidating
15    statement of operations for the three months
16    ended September 30th, 1997.
17 A.  Uh-huh.
18 Q.  And some of this is hard to read, but I'll tell
19    you what it says.
20        About halfway down it says, net
21    incomes/loss on the left.
22 A.  Uh-huh.
23 Q.  And then on the right that number, I will tell
24    you, is $42,571,000 for a net loss for that
25    three months.

Page 53

1 A.  Uh-huh.
2 Q.  Does that bring it --
3        MR. COGAN:  That's the number on the
4     far right?
5        MR. FRIESEN:  Right.
6        MR. COGAN:  What was it, 42,971?
7        MR. FRIESEN:  571.
8 BY MR. FRIESEN:
9 Q.  I'm not saying you knew this or got this
10    document or anything else, but I would just
11    like to know whether you recall knowing in
12    October of 1997 that there was such a net loss
13    for AHERF as a whole.
14 A.  No, I don't recall.  I'm at a little bit of a
15    disadvantage, because I can't read your
16    headings here.
17 Q.  Which headings?
18 A.  Well, western region --
19 Q.  Right.
20 A.  Eastern region?
21 Q.  Right.
22 A.  What's this next one?
23 Q.  Those are various SCHC --
24        Those are various subsidiaries or
25    entities within AHERF, and the one I was

14 (Pages 50 to 53)

FRANK V. CAHOUET

Page 142

1    The majority of your time that you
2  served as a trustee with an AHERF entity was at
3  AGH, the Allegheny General Hospital.  Is that
4  correct?
5  A.  Say that --
6       Repeat that question.
7       MR. FRIESEN:  Objection.
8       MR. RESTIVO:  I'm going to object,
9  also, to the form of the question.  I think
10 it's pretty clear that he was on the board of
11 AGH beginning in 1993, and that he didn't go on
12 the board of AHERF, wasn't named to the board
13 of AHERF, until January 5, 1998.  Those dates
14 are those dates.
15      MR. COGAN:  Okay.  And really I
16 wanted to try to establish that his role with
17 AHERF, the parent, was, in fact, quite limited.
18      MR. FRIESEN:  I would object.
19      MR. COGAN:  Well, do I understand,
20 Mr. Cahouet, that the first actual AHERF board
21 meeting that you attended was in April or March
22 of 1998?
23      THE WITNESS:  That's what the record
24 says.
25      MR. FRIESEN:  Objection.  I guess I'm

Page 143

1  not supposed to object to an answer.
2  BY MR. COGAN:
3  Q.  And during your tenure as a member of the AHERF
4      board, did you ever serve on the finance or
5      audit committee of that board?
6  A.  Not to my recollection.
7  Q.  Do you recall during any time between 1993 and
8      1998 meeting in executive session with AGH's or
9      AHERF's auditors?
10 A.  1993 and what?
11 Q.  And 1998.
12 A.  Anytime in 1998?
13 Q.  Yes, and say prior to the bankruptcy in July.
14     Do you recall any meetings in executive session
15     with the auditors?
16 A.  I can't remember.
17 Q.  Do you have any recollection of the outside
18     auditors ever requesting a meeting in executive
19     session with any committees of the board of
20     AGH?
21 A.  No.  I don't have any recollection.  I'm not
22     saying they didn't.  I just don't have any
23     recollection.
24     MR. COGAN:  Mr. Cahouet, I told you
25     I'd try to keep it short, and I'm done.  Thank

Page 144

1  you.
2       MR. FRIESEN:  I don't have anything
3  further, so we're all free to go.  Thanks very
4  much.
5       MR. RESTIVO:  We do not waive
6  signature.  We'd like to see the transcript,
7  review it for any possible errors, and sign it.
8       THE VIDEOGRAPHER:  Being there's no
9  further questions, this deposition is ended at
10 three o'clock.
11       - - - -
12 (The proceedings were concluded at 3:00 p.m..)
13       - - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 145

1  COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
2  COUNTY OF ALLEGHENY          )   SS:
3       I, G. Donavich, RPR, CRR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  FRANK V. CAHOUET, was by me first duly sworn to
7  testify to the truth, the whole truth, and nothing
8  but the truth; that the foregoing deposition was
9  taken at the time and place stated herein; and that
10 the said deposition was recorded stenographically by
11 me and then reduced to printing under my direction,
12 and constitutes a true record of the testimony given
13 by said witness.
14      I further certify that I am not a relative or
15 employee of any of the parties, or a relative or
16 employee of either counsel, and that I am in no way
17 interested directly or indirectly in this action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19 and affixed my seal of office this 6th day of March,
20 2004.
21
22      _____
22      Notary Public
23
24
25

37 (Pages 142 to 145)

FRANK V. CAHOUET

Page 146

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY          )   S H E E T
2

          I, FRANK V. CAHOUET, have read the foregoing
3  pages of my deposition given on Wednesday, March 5,
   2004, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read          Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21      _____
              FRANK V. CAHOUET
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2004.
24 _____
          Notary Public
25      AKF Reference No. 79731

38 (Page 146)

**Camp Dep.**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF PENNSYLVANIA
 2

                          - - - -
 3

    THE OFFICIAL COMMITTEE OF      )
 4  UNSECURED CREDITORS OF         )
    ALLEGHENY HEALTH, EDUCATION &  )
 5  RESEARCH FOUNDATION,           )
                                   )
 6                Plaintiff,       )
                                   )
 7              -vs-               )    Civil Action
                                   )    No. 00-684
 8  PRICEWATERHOUSECOOPERS, L.L.P. )
                                   )
 9              Defendant.         )
10

11                        - - - -
12       VIDEOTAPE DEPOSITION OF:  BRIAN W. CAMP
13                        - - - -
14

                  DATE:   June 28, 2004
15                        Monday, 10:00 a.m.
16

              LOCATION:   MANION McDONOUGH & LUCAS
17                        14th Floor
                          U.S. Steel Building
18                        Pittsburgh, PA  15219
                          412-232-0200
19

20             TAKEN BY:  Defendant

21

            REPORTED BY:  JoAnn M. Brown, RMR, CRR
22                        Notary Public
                          AKF Reference No. JB81435
23

24

25
```

1   1785.
2   A.   Okay.
3   Q.   And, again, we're looking at Section 1 which
4   includes the most significant issues with
5   respect to the credit addressed in this credit
6   review, is that right?
7   A.   Yes.
8   Q.   And if we look at the third bullet point from
9   the end under that section, that paragraph
10  begins -- you've written, The individual
11  hospitals of the Delaware Valley group are
12  currently experiencing staff reductions to
13  offset an AHERF reported $6 million decrease in
14  reimbursement.  Overcapacity can also be
15  singled out for the current market situation.
16  Did I read that correctly?
17  A.   Yes.
18  Q.   If we flip to page 891 -- with the Bates ending
19  891, if you look at the second bullet point on
20  that page, which is, again, a continuation
21  under the heading Operating Performance --
22  A.   Okay.
23  Q.   -- it again says, The individual hospitals of
24  the Delaware Valley group are currently
25  experiencing staff reductions to offset an

1   AHERF reported $6 million decrease in
2   reimbursement.  And then it says, Also
3   contributing to this reduction was
4   overcapacity.
5   A.   Okay.
6   Q.   Is that correct?
7   A.   Yes.  That's what I see.
8   Q.   Do you recall in this time frame that AHERF's
9   Delaware Valley group affiliates were
10  experiencing layoffs?
11  A.   No, I don't.  Before I came here and read this,
12  I really didn't remember what the Delaware
13  Valley group was.  So, no, all I can really say
14  is what I'm reading.
15  Q.   I'm sorry.  I didn't mean to interrupt you.
16  A.   That's okay.
17       I was just saying all I can really
18  remember about the Delaware Valley group is
19  what I'm reading actually right here.
20  Q.   Do you recall that AHERF had affiliates in the
21  Delaware Valley?
22  A.   In reading this, I can see that.  Before, I
23  couldn't have told you what the Delaware Valley
24  was, but in reading this, clearly, the Delaware
25  Valley has affiliate hospitals, it appears.

1   Q.   Having looked at this, you know that AHERF had
2   affiliates in the Delaware Valley, is that
3   correct?
4   A.   Yes.  That's what this says.
5   Q.   Flip back to page 30891.
6   A.   Okay.
7   Q.   This is the portion of the document with
8   Ms. Mammarella's signature at the end, correct?
9   A.   30891?
10  Q.   I may have a pagination problem here.
11  A.   Okay.
12  Q.   Sorry.  I directed to you the wrong page.
13  30839 --
14  A.   839.
15  Q.   -- is the page that we need.
16       MR. UNICE:  839?
17       MR. SMITH:  Yes.
18  A.   Okay.
19  Q.   And this is the section of the document that I
20  believe was authored by Ms. Mammarella, is that
21  correct?
22  A.   Yeah, I'm not sure, but her name is at the end
23  of the section, so I believe it was.
24  Q.   In the paragraph at the top of that page, it
25  says, While cost savings of approximately $40

1   to $50 million through headcount cuts have been
2   achieved so far, (specifically a six percent
3   reduction in the work force, or 1,200 jobs,
4   primarily in Philadelphia), such expenses still
5   have negatively impacted the organization's
6   operating results as much more restructuring is
7   needed.  Did I read that correctly?
8   A.   Yes.
9   Q.   And the next sentence says, AHERF management
10  initially stated that the staffing cuts and a
11  20 percent pay cut imposed upon executives
12  throughout its system were due to the state's
13  mandatory shift of Philadelphia's Medicaid
14  patients into managed care and on the federal
15  government's attempts to rein in on Medicare
16  spending.  Did I read that one correctly?
17  A.   Yes.  That's what I see.
18  Q.   Do you recall any discussions with anyone in
19  the Health Care Lending Group with respect to
20  layoffs by AHERF of 1,200 employees amounting
21  to a six percent reduction in the work force?
22  A.   No.  I remember no layoff talks.
23  Q.   Do you know whether those layoffs referenced at
24  page 30839 are the same staff reductions that
25  you were referring to at pages 30886 and 30891,

1     the two paragraphs that we read from your
2     section immediately preceding?
3   A.   No, I don't recall.  I can read.  I don't
4     recall explicitly.  In reading it, it looks
5     like they may be referring to the same thing,
6     but I'm not sure, because I don't use the same
7     language that's used here.
8        What was the second page that you're
9     referring me to?
10   Q.   Of your section?
11   A.   Yeah, my document.
12   Q.   30891.
13   A.   891.
14   Q.   And the section we're looking at is the second
15     bullet point.
16   A.   Okay.  I don't remember, but it appears to be
17     talking about the same thing.
18   Q.   I'm going to hand you what's previously been
19     marked as Exhibit 1776, which is a reprint of
20     an article from The Philadelphia Inquirer dated
21     October 18, 1997 entitled Explaining Why The
22     Ax Fell For 1,200.
23        As part of your responsibilities in
24     monitoring health care credits, would you keep
25     apprised for press reports addressing the

1     entities for which you did credit analyses?
2   A.   In general, I wouldn't say I read all the
3     papers from the different cities, like, I don't
4     remember this article, but I would say I would
5     have attempted to stay as apprised as I could.
6   Q.   Did you say you would have attempted to stay as
7     apprised as you could?
8   A.   Yeah, I would have sought out whatever I could
9     have found, but I don't recall reading this.
10   Q.   This particular newspaper article?
11   A.   Yeah.
12   Q.   Do you see underneath the headline, Explaining
13     Why The Ax Fell For 1,200, the sub-heading
14     there says, Allegheny Hospital's chief
15     executive calls the layoffs unavoidable.  He
16     disputes a view that faults the company's
17     aggressive acquisitions and spending.  Did I
18     read that correctly?
19   A.   Yeah.  That's what I see.
20   Q.   I know you said you don't recall this article
21     specifically.
22   A.   Yeah.
23   Q.   Do you recall seeing any other press accounts
24     that faulted AHERF's aggressive acquisitions
25     and spending for the layoff of 1,200 employees

1     that's being reported here?
2   A.   No.  I know from the sentences in the
3     paragraphs you read me out of here, that the
4     Delaware Valley group is referring to a group
5     of hospitals in Philadelphia, which I didn't
6     quite remember before I came here, and this is
7     also referring to, it looks like, job cuts in
8     that group of hospitals in Philadelphia, but I
9     don't really recall.  That's pretty much what I
10     basically recall about it.  I really didn't
11     remember the Delaware Valley group until we
12     just read about it.
13   Q.   Do you remember the Allegheny General Hospital
14     Obligated Group?
15   A.   Yes, I remember Allegheny General Hospital.
16   Q.   Okay.  And what do you remember about that
17     obligated group?
18        MS. WYRICK:  About that what?
19        MR. SMITH:  Obligated group.  I'm
20   sorry.
21   A.   Oh, obligated group?
22   Q.   Yeah.
23   A.   No, I remember --
24        MR. UNICE:  Object to form.
25   A.   I remember doing -- I remember the hospital.  I

1     couldn't tell you what was in the obligated
2     group.
3   Q.   Okay.
4   A.   Okay?
5   Q.   And what do you remember about Allegheny
6     General Hospital?
7   A.   Just, in and of itself, that I believe I did a
8     credit report on Allegheny General Hospital.
9   Q.   Okay.  And just to make it clear, because I
10     think my first question we might have passed
11     each other a little bit, do you remember the
12     Allegheny General Hospital Obligated Group?
13   A.   No, I remember the hospital.
14   Q.   And why do you think you remember the hospital?
15   A.   Because I --
16        MS. WYRICK:  Object to that.
17   A.   I guess my general -- since it's been so long,
18     I tend to remember the bigger -- the actual
19     company underlying.  I don't remember, like,
20     how it was structured, an obligated group, and
21     Delaware Valley is just groupings of company.
22     I don't remember how they were grouped, but I
23     generally remember the hospital.
24   Q.   Do you remember Elkins Park Hospital?
25   A.   No, not at all.

Page 270

1  Q.  -- did you seek the help of others in
2      understanding the different components of the
3      financials that you thought were important to
4      your project?
5  A.  Oh, did I ask questions of others?
6  Q.  Yes, sir.
7  A.  I would have assumed I would have asked
8      questions of anybody that previously had the
9      account, and then as I don't really remember,
10     I'm telling you what I would assume I would
11     have done.
12 Q.  Well, I don't want you to do that.
13 A.  Okay.
14 Q.  I don't want you to assume.
15 A.  I don't remember who I would have asked
16     questions to.
17 Q.  Okay.  Fair enough.
18         I'm going to focus now on the audited
19     financial statements that PNC apparently did
20     have at its disposal in this time frame.
21 A.  Right.
22 Q.  Do you have an understanding of what the term
23     clean opinion means in the context of a
24     financial statement?
25         MR. SMITH:  Object to foundation.

Page 271

1  A.  No, I don't remember.
2  Q.  Do you recall the term unqualified opinion?
3         MR. SMITH:  Object to foundation.
4  A.  No, I don't.
5  Q.  Do you have an understanding of who AHERF's
6      auditors were in the 1997 time frame?
7  A.  No, I don't.
8  Q.  I want to show you a document to maybe refresh
9      your memory.
10 A.  Okay.
11 Q.  Turn to Bates 30915 in Exhibit 1785.
12 A.  Okay.
13 Q.  Tell me when you're there.
14 A.  I'm there.
15 Q.  This is a spread for AGH, correct?
16 A.  Correct.
17 Q.  At the top of the document, about four lines
18     from the top, there is listed auditors,
19     Coopers & Lybrand.  Do you see that?
20 A.  Yes, I do.
21 Q.  Does that refresh your memory as to the AHERF
22     system's external auditors were in that time
23     frame?
24 A.  Yes, it does.
25 Q.  Did you have any personal interaction with any

Page 272

1      employees of Coopers relating to AHERF during
2      your tenure with PNC?
3  A.  No, I did not.
4  Q.  Do you understand that the -- let me ask you a
5      different way.
6         What did you understand the auditors'
7      role to be in connection with the issuance of
8      financial statements?
9         MR. SMITH:  Objection.
10 A.  I would have assumed that their role is to
11     audit the financial statements before they came
12     to me.  That's why I valued audited financial
13     statements above draft.
14 Q.  Okay.  I want to break that down a little bit.
15 A.  Okay.
16 Q.  You said you would have assumed.  Do you not
17     have a current understanding sitting here today
18     of what your --
19 A.  Yes, that's my current understanding.
20 Q.  Okay.  Why would it be important for you in
21     reviewing audited financial statements to have
22     an independent auditing firm review them?
23         MR. SMITH:  Objection.
24 A.  For a standard format, to make sure that the
25     information there meets some standard other

Page 273

1      than just somebody pulling something off a
2      spread sheet.
3  Q.  You mentioned earlier today a term called GAAP
4      or G-A-A-P?
5  A.  Um-hum.
6  Q.  Do you recall that?
7  A.  Yes.
8  Q.  Did you have any understanding as to what the
9      auditors' responsibilities were regarding
10     compliance with GAAP principles?
11         MR. SMITH:  Objection.
12 A.  No, I don't recall that.
13 Q.  Now, in the course of your review of audited
14     financial statements, if the auditors had
15     discovered what they considered to be GAAP
16     violations in the information that AHERF
17     management had provided to them, would you have
18     wanted to know that?
19         MR. SMITH:  Objection.
20 A.  Yes.
21 Q.  Why is that?
22 A.  Because, again, it goes back to my remembrance
23     of audited statements and prizing them above
24     draft.  The benefit of the audit statements is
25     that I get all the verbiage that comes in the

69 (Pages 270 to 273)

Page 274

1    audited statement to read above just generally
2    a spread sheet that comes when it's a draft.
3    Q.    And what comfort, if any, did that type of
4    verbiage give you?
5            MR. SMITH:  Objection.
6    A.    A comparison kind of a feel that somebody had
7    reviewed this and audited against some
8    standard, again, other than just somebody's
9    personal spread sheet that they were giving me.
10   Q.    And the standards you were referring to were
11   the GAAP principles we talked about?
12           MR. SMITH:  Objection.
13   A.    Yes, that's as I remember it.
14   Q.    If the auditors, during the course of their
15   audit work at AHERF, had discovered what they
16   believed to be material misstatements in the
17   financial data presented by management, would
18   you have wanted to know that?
19           MR. SMITH:  Objection.
20   A.    Yes.
21   Q.    For the same reasons as you responded to with
22   respect to GAAP violations, I presume?
23   A.    Yes, because at that point, then they'd be no
24   better than draft.
25   Q.    Would your answer be the same if the auditors

Page 275

1    had discovered what they determined to be
2    fraudulent misstatements in the financial data
3    presented by AHERF's management?
4            MR. SMITH:  Objection.
5    A.    Yes. Definitely.
6    Q.    Would the existence of material, fraudulent or
7    intentional misstatements affect in any way
8    your view of the success of the enterprise as
9    depicted in those financial statements?
10           MR. SMITH:  Objection.
11   A.    Yes. It would mean I couldn't trust the
12   financial statements.
13   Q.    And that would be important for you to know as
14   a reviewer of those statements, correct?
15   A.    Because my entire analysis is built off those
16   statements.
17   Q.    And those statements being the audit financial
18   statements?
19   A.    The audited --
20           MR. SMITH:  Objection.  I'm sorry.
21   Go ahead.
22   A.    Yes, the audit financial statements.
23           MR. SMITH:  Note my objection to the
24   prior question as well.
25   Q.    During your tenure at PNC, do you recall ever

Page 276

1    experiencing a situation where an auditor came
2    forward with the report that there were
3    intentional, material or fraudulent
4    misstatements in the client's financials?
5    A.    No, I don't recall.
6    Q.    And do you recall in that instance, if that
7    would occur, what would you have done?
8            MR. SMITH:  Objection.
9    A.    I would have to speculate what I would have
10   done at that time.
11   Q.    Would I be safe in assuming that you would have
12   at least raised it with the relationship
13   manager?
14           MR. SMITH:  Objection.
15   A.    Yes.
16   Q.    Would it be fair to say that material,
17   intentional or fraudulent misstatements in
18   audited financials would cause you to question
19   the accuracy and lack of reliability of the
20   information contain in the quarterly statements
21   that were not audited?
22   A.    Definitely.
23           MR. SMITH:  Objection.
24   Q.    And, again, that would be something that you'd
25   like to know as a credit analyst for PNC?

Page 277

1    A.    Yes.
2            MR. SMITH:  Objection.
3    Q.    If you could turn, please, to page 30890 in
4    Exhibit 1785.  Again, this is part of your
5    credit memo.
6    A.    Okay.
7    Q.    The final section on this page is titled DVOG.
8    Do you see that?
9    A.    Yes.
10   Q.    And I'm not going to read the entire paragraph,
11   but do you see it notes the revenues for DVOG
12   were $1.2 billion?
13   A.    Yes, I do.
14   Q.    Do you think you had that number in mind -- let
15   me start that over.
16           Would you have had that number in
17   mind if you did see the quarterly losses
18   reported in the other financial statements at
19   9-30-97 you looked at earlier today?
20   A.    Okay.
21           MR. SMITH:  Objection.
22   A.    I guess I need a little bit more clarity.  When
23   you say I would have had that number in mind --
24   Q.    I'm asking if you would have had that number in
25   mind, that revenue figure in mind when

Page 298

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )    SS:
3      I, JoAnn M. Brown, RMR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  BRIAN W. CAMP, was by me first duly sworn to testify
7  to the truth; that the foregoing deposition was taken
8  at the time and place stated herein; and that the
9  said deposition was recorded stenographically by me
10  and then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 2nd day of July,
23  2004.
24      _____
25          Notary Public

1  COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
   COUNTY OF ALLEGHENY       )    S H E E T
2
       I, BRIAN W. CAMP, have read the foregoing pages
3  of my deposition given on Monday, June 28, 2004, and
   wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21      _____
           BRIAN W. CAMP
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2004.
24  _____
         Notary Public
25  AKF Reference No. JB81435

76 (Pages 298 to 299)

**Cancelmi Dep.**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                Civil Action

       Plaintiff,                No. 00-684

   vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

      Defendant.


    Videotape deposition of DANIEL CANCELMI,
called for examination under the statute, taken
before me, Jaci R. Traver, RPR, CRR, and Notary
Public in and for the State of Ohio, at the
offices of Jones Day, 500 Grant Street,
Pittsburgh, Pennsylvania, on Thursday, the 23rd
day of January 2003 at 9:00 a.m.

- - - - -

VOLUME 1

- - - - -

Daniel Cancelmi

Page 110

1 has conducted various investigations into AHERF
2 and the issue of its financial statements,
3 financial reporting?
4    A.   Yes.
5    Q.   Have you been interviewed by anyone
6 at the Securities Exchange Commission?
7    A.   Yes.
8    Q.   How many times?
9    A.   I don't know.  Quite a few.
10    Q.   In terms of separate occasions of
11 one or more days, can you tell us how many
12 times?
13    A.   I couldn't.  I don't remember the
14 exact number of times.  I know I was -- there
15 was a two-day deposition, but then I met with
16 them a number of different times before that.
17    Q.   You gave a deposition to the SEC?
18    A.   Yes.
19    Q.   They swore you in and put you on
20 the record and asked you questions, right?
21    A.   Yes.
22    Q.   Was there any other party there?
23 Was somebody there from Coopers, for example?
24    A.   No.
25    Q.   Was somebody there from AHERF?

Page 111

1    A.   No.
2    Q.   All right.  In addition to being on
3 the record for two days, they also interviewed
4 you off the record; is that right?
5    A.   Yes.
6    Q.   Have they made any -- have they
7 filed any form of charges against you, the SEC?
8    A.   No.
9    Q.   Have they made any sort of deals
10 with you or arrangements with you about
11 prosecution or immunity from prosecution?
12       MR. RYAN:  Objection.
13    A.   No.
14       MR. WHITNEY:  What's the objection?
15       MR. RYAN:  I think it's vague.  Any
16 deals or arrangements.  I'm not sure --
17    Q.   Have they made any kind of
18 agreements or arrangements with you at all, the
19 SEC?
20    A.   No.
21    Q.   In addition to the two days that
22 you spent on the record with the SEC, there was
23 also a lawsuit between my client and the former
24 management of AHERF, or certain members of the
25 former management of AHERF.  Were you aware of

Page 112

1 that?
2    A.   Yes.
3    Q.   There were other and related
4 lawsuits arising out of the failure of AHERF,
5 other than this lawsuit.  You knew that, too?
6    A.   Yes.
7    Q.   Were you a participant in a
8 deposition in one or more of those proceedings?
9    A.   I was deposed in the creditor's
10 case that you mentioned for two days.
11       MR. TYCKO:  Just for the record,
12 that was part of the -- what were then the
13 consolidated cases, so there were a lot of
14 parties involved in that deposition.
15    Q.   Right.  And it was two-day
16 proceeding?
17    A.   Yes.
18    Q.   So you testified two days on the
19 record in that proceeding, two days on the
20 record with the SEC?
21    A.   And then there was one other
22 deposition I gave related to -- it was an
23 Allegheny related case, Philadelphia Healthcare
24 Trust.  That might not be the right entity, but .
25 there was a lawsuit between that organization

Page 113

1 and some of the Graduate entities.  I don't
2 know if Allegheny was a party to the suit or
3 not.
4    Q.   How many days did you testify in
5 that proceeding?
6    A.   One.
7    Q.   Other than the two days with the
8 SEC, the two days in these consolidated cases,
9 and the one day in this Philadelphia case, have
10 you given any other sworn testimony in
11 connection with the issues relating to AHERF
12 and its financial statements, including its
13 financial statements in 1996 and 1997?
14    A.   No.
15    Q.   While you were at AHERF, did you
16 receive bonuses?
17    A.   I was eligible for the bonus
18 program that Allegheny had for probably
19 literally hundreds of people.  It was a bonus
20 program that covered certain individuals in the
21 organization at certain levels that started,
22 generally speaking, I think at maybe the
23 director or senior director level on up, vice
24 president, senior vice president.
25       MR. TYCKO:  Can we go off the

29 (Pages 110 to 113)

Daniel Cancelmi

Page 114

1  record for one second.
2       VIDEO TECHNICIAN:  Off the record.
3       (Discussion held off the record.)
4       VIDEO TECHNICIAN:  On the record.
5    Q.   Talking about the bonus system
6  while you were at AHERF.  Were the bonuses tied
7  to any kind of achievement objectives or the
8  achievement of any kind of objectives?
9    A.   Yes.
10   Q.   Was profitability one of those
11 objectives?
12   A.   Yes, it was.
13   Q.   I have heard it said in some place,
14 it might have been in a deposition, that AHERF
15 had internal and external budgets.  Budgets
16 that were given to the trustees versus budgets
17 that were internal budgets.
18       Do you know anything about that?
19   A.   I don't remember that, but I didn't
20 go to board meetings.
21   Q.   I didn't ask you if you went to
22 board meetings.  I'm asking you whether or not
23 you were aware of the notion that there were
24 separate sets of budgets at AHERF; the internal
25 budgets that the employees and management

Page 115

1  worked off of, and the budgets they gave the
2  board?
3    A.   I don't remember that.
4    Q.   When you were at Coopers & Lybrand
5  auditing AHERF at year end 1994, was AHERF's
6  incentive compensation system or incentive
7  compensation program a subject of audit
8  inquiry?
9       MR. RYAN:  Objection.
10   Q.   If you recall.
11   A.   Yes.
12   Q.   All right.  Is this typically an
13 item that is covered by the audit of a company,
14 in your experience?
15       MR. RYAN:  Objection.
16   A.   It can be.  The reason it was
17 certainly an audit area with the Allegheny
18 audit was the fact that PWC was engaged to
19 issue its called an agreed upon procedures
20 letter, I believe, to review the various
21 calculations that go into determining whether
22 the various criteria are met to support the
23 payment of bonuses.
24       And there was criteria, there was
25 financial criteria, there was patient, I think,

Page 116

1  safety and the more qualitative criteria that
2  had to be met and not necessarily financial
3  related.
4    Q.   Well, when you say that Coopers &
5  Lybrand or PWC -- let me hold that point for a
6  second.  You fall victim to the same thing I
7  do.  When you talk about PWC, you mean its
8  legacy firm, Coopers & Lybrand, right?
9    A.   Sorry, yes.
10   Q.   But it's okay, as long as it's okay
11 with everybody else that when we talk about
12 PWC, we're referring to it by its present name.
13 But it was not merged at year end 1996 or at
14 year end 1997, as you recall, right?
15   A.   Yes, that's correct.
16   Q.   Now, when you say that PFC -- when
17 you say that PWC was engaged to do special
18 procedures, special procedures examination of
19 the AHERF compensation system, was that on an
20 annual basis?
21   A.   Yes.
22   Q.   All right.  And when you were at
23 AHERF in year end 1996 and year end 1997, was
24 Coopers & Lybrand presenting or performing such
25 an examination of the employee compensation

Page 117

1  system?
2    A.   Yes.
3    Q.   This would be something that they
4  would report to the board regarding
5  management's achievement of objectives relating
6  to the incentive compensation system?
7       MR. RYAN:  Objection.
8    A.   Yes.  It was -- I'm not sure it
9  went to the board.  It went to, I believe it
10 went to the compensation committee, which is,
11 you know, a subset I guess of the board of
12 Allegheny.  But there was a letter that Coopers
13 would issue saying they did certain procedures
14 related to this bonus program.
15   Q.   Was there any particular focus at
16 AHERF on achieving budgetary targets?
17   A.   Sure.  I mean there was, you know,
18 the organization, just like any organization,
19 established budgets.
20   Q.   Budgets.
21   A.   And would want to achieve them.
22   Q.   Do you recall if there was any
23 peculiar emphasis on achieving budgets at AHERF
24 as opposed to other companies that you're
25 familiar with, such as Tenent?

30 (Pages 114 to 117)

Daniel Cancelmi

Page 130

1  management, I believe, engaged Coopers &
2  Lybrand to come in and do sort of, I'm not sure
3  what the right term would be, but some type of
4  special review or audit of some of the
5  potential problems related to the accounts
6  receivable area. I don't exactly remember the
7  dates of that, but sometime in '96 or '97.
8     Q.   With respect to the year end 1996
9  audit, do you know whether or not Coopers &
10  Lybrand was attaching any special focus or
11  significance on the account area of accounts
12  receivable in connection with the AHERF audit?
13     A.   I believe so, because, again, the
14  special review that I mentioned, that may have
15  been happening or occurring right before the
16  end of '96 or right after.
17        And then it seemed like during the
18  '96 audit, they were performing it seemed like
19  additional work than they would have in a
20  normal audit due to some of the issues that had
21  been occurring.
22        And there would be, you know, if
23  you look at the management letter that would
24  have been issued by Coopers, there was, you
25  know, certainly a rather, you know, lengthy

Page 131

1  conversation or discussion in '96 in the
2  management letter about some of the issues that
3  were challenging the Allegheny organization in
4  the patient billing area.
5     Q.   You say if one looks in the
6  management letter of 1996, one will find
7  commentary about Coopers & Lybrand that
8  challenge the Allegheny organization?
9     A.   I'm not saying challenging, just
10  pointing out what some of their findings were
11  and some of the issues challenging or being
12  presented to the Allegheny organization.
13     Q.   All right. Now, I want to go back
14  to something you said in your last lengthy
15  answer, and that was it seemed like they were
16  doing additional work, more additional work
17  than they would have done in a normal audit.
18  This is in 1996?
19     A.   Yes, I believe so.
20     Q.   Okay. On what basis do you make
21  that statement?
22     A.   I thought that they were asking for
23  some more reports or data than they seemed to
24  have asked for in the past.
25     Q.   What sorts of reports and data, if

Page 132

1  you recall?
2     A.   Just -- I don't remember
3  specifically. Just accounts receivable type
4  information.
5     Q.   What about -- do you remember who
6  it was that was doing the asking?
7     A.   There was probably a number of
8  different people. It wasn't just one person.
9  I think they had -- Coopers would have, you
10  know, a number of different individuals looking
11  at accounts receivables, so you could have a
12  number of different people asking for data.
13        I think related to that special
14  review, they sent over like a request for
15  information from us of data that we would have
16  to pull together.
17        And then I think they had people
18  other than auditors, they had this healthcare
19  consulting group. They had some of those
20  people involved and went over and sat down and
21  reviewed data in the billing department area
22  and I guess spoke with people over there also.
23     Q.   Do you recall a conversation with
24  anybody from Coopers & Lybrand at or around the
25  time of the 1996 audit in which they told you

Page 133

1  specifically, we are really focused this year
2  on this accounts receivable?
3     A.   I can't remember a specific
4  conversation.
5     Q.   Was your impression that they were
6  doing additional work was simply that it seemed
7  like there was more activity from Coopers in
8  the area of accounts receivable?
9     A.   Yes.
10     Q.   More requests for information?
11     A.   Yes.
12     Q.   All right. But nobody from Coopers
13  was specifically telling you, we're troubled
14  about accounts receivable, or we're locked in
15  on accounts receivable, anything like that?
16     A.   I mean I think it was a given that
17  given that, you know, that there had been
18  problems in that area that Allegheny management
19  had identified and had brought to, you know,
20  Coopers' attention and had asked them to come
21  in and do some additional work or review
22  procedures, whatever you want to call them.
23        So I mean certainly, you know, took
24  on maybe more heightened sense of awareness
25  than it would have if there hadn't been

34 (Pages 130 to 133)

Page 134

1  problems or issues in that billing area.
2      Q.    But on the healthcare auditing
3  side, accounts receivable and the allowance for
4  doubtful accounts would always be a key
5  auditing area, right?
6          MR. RYAN:  Objection.
7      A.    I believe that would be a fair
8  characterization that a lot of people would
9  conclude.
10     Q.    Were you -- I asked you this
11  before, but I'm not sure that I remember what
12  the answer was.
13         When you were at Coopers at year
14  end 1994, you had overall responsibility as
15  manager for items such as accounts receivable,
16  I think that was your testimony; is that right?
17     A.    Yes.  When you're the overall
18  engagement manager in practice, you have
19  responsibility for making sure the entire
20  engagement is pulled together.  You might have
21  other managers underneath you reviewing certain
22  areas and then you rely on, you know, the work
23  and the review procedures that they perform and
24  that the people underneath them perform.
25     Q.    Do you remember whether or not your

Page 135

1  work as manager at the year end 1994 audit
2  would specifically include inquiry into the
3  issue of bad debt, accounts receivable and bad
4  debt?
5      A.    I can't remember.
6      Q.    All right.  The reason I ask the
7  question is because you said that many would
8  consider this to be a focal point of a
9  healthcare audit, right?
10     A.    Yes.
11     Q.    An important part of a healthcare
12  audit?
13     A.    Yes.
14     Q.    As opposed to tying off bonds or
15  something like that?
16     A.    Right.
17     Q.    It involves in the bad debt area
18  that thorny issue of the auditing of estimates,
19  right?
20     A.    Yes.
21     Q.    And I'm wondering, in light of that
22  and in light of the fact that you were the lead
23  manager, if you will, on the AHERF audit, would
24  this not presuppose that you would be involved
25  in some direct way in the work and conclusions

Page 136

1  being drawn by Coopers on accounts receivable
2  and bad debt?
3      A.    I would --
4          MR. RYAN:  Objection.
5      A.    I would be involved.  Whether I
6  performed the detailed nitty gritty review of
7  every single work paper and schedule that
8  supported those, I can't say that.  I would
9  have to go look at the work papers and see
10  which ones I reviewed and maybe had another
11  manager review them.
12         But they would have presumably kept
13  me apprised of what the issues were.  And if
14  there was any problems, it would have been, you
15  know, brought to my attention and they would
16  have been, you know, obviously escalated to the
17  partner, if necessary.
18     Q.    You talked about the fact that
19  Robin Schaffer would put together estimates
20  using matrixes of the kind and percentages that
21  we talked about earlier.  Do you recall that
22  testimony?
23     A.    Yes.
24     Q.    And that this is an evaluation that
25  would go up the line at AHERF.  People would

Page 137

1  look at the accounts receivable and the
2  estimates and they would look at the data and
3  sort of second guess, if you will, or add their
4  thoughts or concepts or judgments as it goes up
5  the line, right?
6      A.    Yes.
7      Q.    Now, when you were over at Coopers
8  & Lybrand, is there somebody over at Coopers &
9  Lybrand in connection with the auditing of that
10  column or that item that's doing essentially
11  the same thing, i.e., looking at the data that
12  is being relied on, looking at the numbers, and
13  making independent estimates?
14         MR. RYAN:  Objection.
15     Q.    Since I'm catching an objection, my
16  question is a broad one.
17         Based on your experience at Coopers
18  & Lybrand, how did you guys go about auditing
19  bad debt reserves at AHERF?
20     A.    I mean the firm has predefined
21  audit steps that are established at the start
22  of the auditing engagement that they set forth
23  and say, these are the steps or audit tests or
24  reviews that we will conduct to get comfortable
25  that the numbers are correct.

Daniel Cancelmi

Page 170

1  earmarked accounts at the Graduate, created at
2  the Graduate before they were sold to AHERF,
3  right?
4      A.   Yes.
5      Q.   Okay.  When was the $25,265,000 of
6  additional bad debt reserves transferred from
7  the Graduate to the DVOG hospitals?
8      A.   I think in May and June.
9      Q.   Of 1997?
10     A.   Of '97.
11     Q.   Whose idea was it to transfer those
12  reserves?
13     A.   How those reserves were transferred
14  is after our department would have prepared the
15  financial statements for those months, those
16  financial statements would have been
17  distributed to management for their review.
18  And that would have been like Chuck Morrison
19  and David McConnell, et cetera.
20         And after they had reviewed those
21  financial statements, they made the
22  determination that, indeed, we needed to
23  transfer additional reserves for the DVOG bad
24  debt reserves, and that the contractual
25  allowances on the DVOG hospitals for those

Page 171

1  particular months needed to be adjusted.
2      Q.   Okay.  1997, in March and April, in
3  each of those two months $25,000 -- $25 million
4  of Graduate reserves are transferred to the
5  DVOG hospitals and used to augment bad debt.
6  And then at some point a determination is made
7  that you need more; is that right?
8      A.   Yes.
9      Q.   And the decision is made to
10  transfer in May and June, in increments in both
11  May and June of 1997, $21 million more of
12  Graduate reserves, in this case created
13  through -- or created as contingent liability
14  reserves.  The decision is made to transfer
15  them over, much like you would transfer the
16  first 50, right?
17         MR. RYAN:  Objection.
18     A.   Yes.
19     Q.   Now, you say that the decision was
20  made by people like Morrison and McConnell; is
21  that right?
22     A.   Yes.
23     Q.   Do you know whether or not Coopers
24  & Lybrand was involved in the decision?
25     A.   I don't know if they were involved

Page 172

1  in the decision at that specific point in time.
2  I couldn't say for sure.
3      Q.   Do you know whether or not they
4  came to know about this transfer?
5      A.   Yes, I believe they did know about
6  it.
7      Q.   How do you know that?
8      A.   Well, there was -- we provided
9  various documentation to Coopers & Lybrand that
10  would have these transfers listed, these items
11  listed on there.  And then there would have
12  been either through conversations directly with
13  them, documentation provided to them, or
14  documentation made available to them, that, you
15  know, these transactions had been recorded.
16     Q.   What documentation did you provide
17  to Coopers & Lybrand that would have had these
18  transfers listed?
19     A.   And I may not have provided the
20  documentation to them directly, but maybe it
21  was Robin or people in her department, as far
22  as the accounts receivable area.  There is a
23  number of different audit schedules that they
24  request throughout the course of an audit, such
25  as the activity in the hospitals, bad debt

Page 173

1  reserve accounts.
2         And, you know, there's some rolls,
3  bad debt roll-forward schedules that I think
4  they were referred to that had many, at least
5  70 some million of these transfers identified
6  on there.  There was, I believe there was other
7  schedules that identified some of the
8  components of accounts receivable.  And there
9  would have been a listing.
10        And I believe Coopers got, I think
11  it was their practice to ask Robin for it and
12  to -- and for her to provide it to Coopers.  It
13  listed all the various components.  I think
14  there may have been a line item or two that
15  said something, Graduate reserves, or reserves
16  for bad debt Graduate, or something to that
17  effect that had like the 50 listed and then the
18  20 some million listed.
19        So either between, you know,
20  conversations with them or documentation
21  provided to them or information made available
22  to them, my understanding is that they were
23  aware of it.  All the transactions were
24  recorded in the general ledger.  And, you know,
25  with the journal entries, you know, filed, I

44 (Pages 170 to 173)

Daniel Cancelmi

Page 174

1  believe, appropriately in journal entry books
2  with, you know, documentation backing up
3  whatever the nature of the journal entry was.
4      Q.   The $28.3 million that's used to
5  reduce contractual allowances, whose idea was
6  it to do that?
7      A.   I don't know if there was like one
8  person's particular idea.  My recollection was
9  the additional bad debt reserves at 21 million
10  or 21 million and then the 28, I believe they
11  were recorded sort of around the same time.
12      And the bad debt reserves, there
13  was -- we were producing schedules, if not
14  monthly, pretty much monthly that identified
15  the bad debt reserves shortfalls each month,
16  which were, I believe, provided to like Chuck
17  Morrison and David McConnell, which listed how
18  much the estimated shortfall was each month.
19      So based on them looking at that
20  type of information, in addition to the
21  financial statements that were prepared each
22  month, that, you know, there needed to be
23  adjustments made to the bad debt reserves
24  because there didn't seem to be enough in the
25  reserves, unless there was additional reserves

Page 175

1  recorded.
2      Q.   How normally would one augment the
3  bad debt reserve, if one needed to raise the
4  bad debt reserve?  What is the normal vehicle
5  by which a healthcare entity does that, if you
6  know?
7      A.   I mean there can be a number of
8  different ways.  Two of the more common ways is
9  to record bad debt expense or if you get,
10  receive collections on accounts you had
11  previously written off, when that cash comes
12  in, you could put that money aside into the bad
13  debt reserve account.
14      Q.   Let's focus for a second on the
15  more usual way that you described.
16      You can, you say, record a bad debt
17  expense.  That means, for example, since we're
18  talking about 1997, if you need to raise your
19  bad debt reserve by $50 million, you've got to
20  take an expense item of $50 million, right?
21  You've got to show that as a 1997 expense?
22      A.   If that's -- yeah, if you're
23  talking about the conventional method.
24      Q.   And it would be an expense on the
25  DVOG financial statements, right?

Page 176

1      A.   Yes.
2      MR. RYAN:  Objection.
3      MR. WHITNEY:  The reason?
4      MR. RYAN:  In 1997 there were no
5  audited DVOG financial statements.
6      Q.   It would be -- it would be on the
7  AHERF, it would be charged as a $50 million
8  expense in my hypothetical on the AHERF
9  financial statements, right?
10      A.   Yes.
11      Q.   But in the consolidating schedules
12  that were attached to the 1997 financial
13  statements, it would show as an expense to
14  DVOG, right?
15      A.   Yes.
16      Q.   Thank you.  What we're talking
17  about here then is a methodology that was
18  employed to increase bad debt without having to
19  take an expense on DVOG's financial statement,
20  right?
21      MR. RYAN:  Objection.
22      A.   Yes.
23      MR. WHITNEY:  What's the objection
24  there?
25      MR. RYAN:  The same, DVOG financial

Page 177

1  statement objection.
2      Q.   All right.  You're talking about a
3  vehicle for transfer or augmenting bad debt,
4  the bad debt reserve attributable to DVOG
5  accounts without having to take a charge on the
6  AHERF financial statement, right?
7      A.   Yes.
8      Q.   Which would be a charge to DVOG in
9  the consolidating schedules, right?
10      A.   Yes.
11      Q.   Incidentally, do you know if there
12  was anybody out there in 1997 who was looking
13  at those consolidated schedules?
14      MR. RYAN:  Consolidated or
15  consolidating?
16      Q.   Thank you.  Consolidating
17  schedules.
18      A.   Yes, there was consolidating
19  schedules in the AHERF consolidated audit
20  report, of which there was, I believe, there
21  was like a supplemental opinion on those
22  consolidating schedules.
23      Q.   By Coopers & Lybrand?
24      A.   Yes.
25      Q.   All right.  My question is:  Do you

45 (Pages 174 to 177)

Daniel Cancelmi

Page 178

1 know whether or not there was any population of
2 readers of the financial statements that had
3 particular interest in DVOG financial
4 statements or financial performance as opposed
5 to AHERF generally?
6      MR. RYAN:  Objection.
7      A.  There was -- before 1997, there was
8 separate DVOG financial statements issued,
9 audited financial statements issued.  However,
10 in '97, Allegheny management, it was my
11 understanding, had obtained approval to just
12 provide one set of consolidated AHERF financial
13 statements with consolidating schedules in the
14 back of those financial statements that showed
15 the various hospitals or obligated groups
16 within the AHERF organization.
17     Q.  Approval from whom?
18     A.  My understanding, they had got
19 approval from the debtholders or bondholders or
20 whatever legal course needed to be taken.
21     Q.  We're talking about, at least in
22 certain cases, debtholders or bondholders of
23 obligations pertinent to DVOG, right, the
24 Delaware Valley Obligated Group?
25     A.  Among others, because AHERF had

Page 179

1 more than just debt obligation related to DVOG.
2 There was other, I don't know if there was
3 other Philadelphia -- yeah, there was other
4 Philadelphia debt instruments and then there
5 was obviously Pittsburgh.
6      Q.  We got lost here, though, because
7 we were talking about the $28 million that was
8 used to, I always confuse this, reduce the
9 contractual allowance, which you said was
10 something that was done around, again, the time
11 frame June, July, when the 21.3 was done,
12 right?
13     A.  Yes.
14     Q.  My question to you was:  Who made
15 the decision to do that?  And that being
16 transfer $28.3 million of Graduate reserves to
17 the DVOG entities to reduce contractual
18 allowances?
19     A.  I mean I believe it was, you know,
20 Dave McConnell and Chuck Morrison.  I mean they
21 approved the financial statements.  I know the
22 May and June financial statements that year had
23 been prepared and had been sent off to various
24 individuals, including, you know, Chuck
25 Morrison and David McConnell for their review

Page 180

1 before these adjustments were recorded.
2      And then after they reviewed them,
3 they would have came back and told my
4 supervisor, at the time it would have been Al
5 Adamczak, that we should make adjustments to
6 the financial statement.
7      Q.  Do you know whether or not Coopers
8 & Lybrand knew about this $28.3 million
9 transfer of reserves at or around the time the
10 transfers were made?
11     A.  I believe they knew.  Maybe not
12 exactly at the time they were recorded, but at
13 some point during the audit it was my
14 understanding that they were aware of the
15 transfer.
16     Q.  Where does that understanding come
17 from?
18     A.  Well, there would have been
19 information either provided to them or
20 conversations or information made available to
21 them that would indicate that the reserves had
22 been transferred.
23     Q.  Like what?
24     A.  There could have been whether it's
25 journal entries made available, whether it's

Page 181

1 schedules, whether it's trial balances.  There
2 was a lot of these reserves were in separate
3 trial balance accounts on the general ledger.
4      And they would have had balances at
5 a certain point in time and then at the end of
6 June there wouldn't have been balances anymore,
7 there would have been zero balances, which
8 would indicate after you would go in and review
9 the activity for that account that the reserves
10 had been transferred and you could trace to
11 where the reserves would have been transferred
12 to.
13     Q.  All right.  You're saying that
14 there are a variety of different accounting
15 documents that would have reflected these
16 reserve transfers, right?
17     A.  That would have reflected the
18 reserve transfers or indicated that the
19 reserves that were there previously were no
20 longer there.  And then once you start getting
21 further and further into the detail, you would
22 see that the reserves had been transferred and
23 where they went to.
24     Q.  You say that these various
25 documents were made available to Coopers,

46 (Pages 178 to 181)

Daniel Cancelmi

Page 182

1 right?
2          MR. RYAN: Objection.
3     A.   Every --
4          MR. WHITNEY: I'm sorry, what's the
5 objection?
6          MR. RYAN: The witness said they
7 could have been provided to Coopers, not that
8 he knows that they, in fact, were.
9          MR. WHITNEY: Let me check that,
10 because I didn't mean to soft pedal that one.
11 That's kind of important. I agree with you.
12 I'm always trying to be fair.
13     Q.   You said there would have been
14 information either provided to them or
15 conversations or information made available to
16 them that indicate that the reserves had been
17 transferred.
18          Son of a gun, I'm right and
19 Mr. Ryan is wrong this time. That's not going
20 to happen a lot. That's what you said and
21 that's the segue to my next question.
22          Are you saying that it's in these
23 records when Coopers was auditing the company,
24 and if they didn't see it, that's tough; or are
25 you saying they were in records you know they

Page 183

1 saw, or what?
2          MR. RYAN: Objection. Compound and
3 leading.
4     A.   What I'm saying is that --
5          MR. WHITNEY: Can't be leading. I
6 gave him two alternatives.
7     A.   What I'm saying is there would --
8 my recollection that there would have been
9 schedules provided that would show various
10 components of these reserves that had been
11 transferred, whether it's bad debt reserves or
12 roll-forward schedule. Whether it's a general
13 ledger that had a reserve balance at a certain
14 point in time and then there was no balance
15 left at the end of June, that would indicate
16 the reserve was gone.
17          And then if they would have gone to
18 a journal entry book, whether -- I can't say
19 for certain whether every single reserve was
20 discussed in detail. I can't personally say
21 that, but all the reserves that were
22 transferred were in journal entries, in journal
23 entry books that were certainly available to be
24 reviewed.
25          It was my understanding that some

Page 184

1 of the reserves would have been discussed. I
2 can't say every single one, but the reserves,
3 the bad debt reserves were certainly, like
4 we've talked about earlier today, I mean it was
5 certainly an area of concern of the
6 organization and had been for a number of
7 years.
8          And based on the various dialogues
9 or dialog or conversations that occurred over
10 numerous period of time, you know, there's
11 certainly the accounts receivable area was one
12 that got a lot of attention.
13     Q.   All right. You have a somewhat
14 unique perspective in this case because you
15 both audited AHERF for Coopers and you were
16 with AHERF dealing with and providing
17 information to Coopers in their audits.
18          From those perspectives, what
19 happens in 1997 is apart from the $28 million
20 that's going to reduce contractual allowances,
21 is during the course of a three-month period of
22 time or four-month period of time, a total of
23 approximately $71 million that was Graduate
24 reserves is going through intercompany
25 transfers to AHERF bad debt, right? I'm

Page 185

1 leaving out all of the accounting transactions,
2 but that is the essence of what's happening,
3 right?
4     A.   It's going to DVOG bad debt
5 reserves.
6     Q.   And the bad debt reserve at DVOG is
7 being enhanced by the amount of $71 million
8 without any charge to the income statement,
9 right?
10     A.   Yes.
11     Q.   Now, were all of these transactions
12 recorded in the general ledger?
13     A.   Yes. As far as I know.
14     Q.   Well, if they weren't, would you
15 know that?
16     A.   I would think so.
17     Q.   Are you saying that they were
18 there?
19     A.   That's my understanding they are.
20     Q.   Now, based upon your perspective as
21 both a former Coopers auditor and a person
22 providing information to Coopers from AHERF, in
23 your view is there any way they could have
24 missed it?
25          MR. RYAN: Objection.

47 (Pages 182 to 185)

Daniel Cancelmi

Page 186

1    Q.   The $71 million.
2         MR. RYAN:  Objection.
3    A.   No, I don't believe so.
4    Q.   And the reason is because it is
5  reflected in records that they would certainly
6  be looking at as part of the audit?
7         MR. RYAN:  Objection.
8    A.   Yes.
9    Q.   And do I get it, one of them is --
10  withdraw that.
11        Tell me again, what are the records
12  that they would certainly have been looking at
13  as part of the audit that would have revealed
14  this?
15        MR. RYAN:  Objection.
16   A.   There would be, and I couldn't list
17  every single one of them, but whether it's an
18  analysis of the bad debt reserve accounts,
19  whether -- it could be an analysis of bad debt
20  reserve accounts.  It could be an analysis of
21  the bad debt expense on the income statement.
22  It could be an analysis of trying
23  to roll-forward bad debt reserve balances on
24  the balance sheet from the prior year to the
25  current year.  And factoring into that

Page 187

1  roll-forward the expense that was on the income
2  statement.
3         It could be looking at journal
4  entries, bad debt journal entries, either bad
5  debt expense journal entries or bad debt
6  reserve journal entries.  It could be other
7  documents provided.  There could be a whole
8  host of documents you could look at, or would
9  have looked at.
10   Q.   One set that you might have left
11  off, in connection with the 1997 audit, would
12  Coopers be looking specifically at Graduate
13  reserves?
14   A.   Yes.
15   Q.   Why?
16   A.   Because 1997 would have been the
17  first year that the Graduate hospitals would
18  have been in AHERF's financial statement,
19  consolidated financial statements.
20   Q.   Are there accounting implications
21  specific to the creation of reserves?
22   A.   Yeah.  I mean, well, just the mere
23  fact that you have an acquisition of an entity
24  or a group of hospitals or entities, the first
25  year they go into your financial statements, as

Page 188

1  an auditor you would look at those financial
2  statement numbers.
3    Q.   But is it important to know, in the
4  context of the audit, is it important to know
5  what reserves were taken and where are they
6  now?
7    A.   Yeah, I think that would be a fair
8  characterization.
9    Q.   So that if one was looking at when
10  reserves were created in the Graduate before it
11  was acquired by AHERF and where are they now,
12  the books and records of the company would
13  clearly show that $71 million of them is gone
14  at the end of 1997, right?
15        MR. RYAN:  Objection.
16   A.   The books and records would clearly
17  show that the 99, whatever the numbers, was
18  gone.
19   Q.   The 71 million and the 28 million,
20  right?
21   A.   Yes.
22   Q.   To your recollection, would AHERF's
23  general ledgers and other accounting
24  information show that the reserves that were
25  used to transfer -- to be transferred over to

Page 189

1  DVOG for the purposes stated were no longer on
2  Graduate's side of the balance sheet at year
3  end 1997?
4    A.   Yes.
5    Q.   Back to the first 50 million.  You
6  indicated that the decision was not made by
7  you.  And before I forget to ask you the
8  question, whoever decided to transfer the
9  $21 million in Graduate reserves over to DVOG
10  in June -- or May and June of 1997, whoever
11  that was, it was not you?
12   A.   No.  No.  The decision would have
13  been made by Morrison and McConnell.
14   Q.   What about the $28 million?
15   A.   The same.
16   Q.   Whether the decision was made by
17  you, were any of these four transactions, I say
18  four, the 25 in March, the 25 in April, and the
19  21 and 28 in May and June, were any of these
20  your idea?
21   A.   I wouldn't characterize it as that,
22  my idea.  I mean these were -- these were
23  transactions.  You got to keep in mind we're
24  talking about the accounts receivable area that
25  had been getting a lot of attention up and down

48 (Pages 186 to 189)

Daniel Cancelmi

Page 190

1  the organization, inside the organization,
2  externally from our auditors.
3        And we were providing, as I'm sure
4  we'll go through, numerous documents that I was
5  generating, advising people of what some of the
6  accounts receivable reserve issues were on a
7  monthly basis, and sending that information to
8  my supervisors for them to determine what they
9  want to do and what needs to be done and I mean
10 to evaluate the numbers.
11    Q.  Was the concept of using reserves
12 as a vehicle to address accounting items in the
13 financial statement without the need to record
14 expense, was that a new concept to AHERF in
15 1997, in your experience?
16    A.  Yeah, that's fair.
17    Q.  Do you know what the term cushion
18 accounting means?
19    A.  Yeah, a lot of people refer to
20 cushions.  I think I would know what you're
21 referring to.
22    Q.  It's the use of reserves -- I
23 understand it, I'm using it to mean the use of
24 reserves as essentially slush funds to be used
25 on an as-needed basis in order to improve

Page 191

1  financial results without having to take
2  expense on the income statement.  Is that the
3  way you use cushion accounting?
4     A.  Cushion accounting, I mean
5  cushion -- first of all, there's nothing in the
6  literature that talks about cushion accounting.
7     Q.  Actually, to the extent there's
8  anything in the literature, it is you don't do
9  that, right?
10    A.  That would be right.
11    Q.  That's a no-no.
12    A.  Cushions are oftentimes viewed as
13 excess reserves.
14    Q.  But you're not supposed to use
15 cushions.
16    A.  Well --
17    Q.  At least in -- cushions aren't
18 GAAP, right?
19    A.  If you have a reserve, you don't
20 need any more, in practice you're supposed to
21 get rid of it and it's a matter of how you
22 dispose of it.
23    Q.  By getting rid of it, it means,
24 when you create a reserve for a specific
25 purpose and the purpose does not come to pass,

Page 192

1  you're supposed to get rid of that reserve in
2  some fashion consistent with the fact that you
3  don't need it anymore, right?
4     A.  Yes.
5     Q.  But that does not typically include
6  transforming it into a cushion to use on an
7  as-needed basis in the organization to address
8  unrelated accounting issues without having to
9  go to the income statement, right?
10    A.  Yes.
11    Q.  Now, that -- the concept of cushion
12 accounting, as I'm using it, was not a new one
13 at AHERF, right?
14    A.  As far as cushion accounting, when
15 I'm saying this was a new concept, as far as
16 transferring reserves from entities outside of
17 the AHERF system into the AHERF system, that's
18 really what was new.
19       Allegheny, you know, would have had
20 reserves in prior years, they wouldn't
21 necessarily have been needed before, they may
22 have been used.  Whether you call that cushion
23 accounting or not, I'll leave that for someone
24 else to decide that.
25       But organizations will establish

Page 193

1  reserves.  And at certain points if they don't
2  need them anymore, they'll use them and reverse
3  them.
4     Q.  I'm not trying to put you on the
5  spot here, Mr. Cancelmi, but actually, the use
6  of acquisition accounting to create cushions
7  was not new to AHERF with the Graduate
8  acquisition, was it?  They had created cushions
9  when they acquired, for example, Hahnemann,
10 that -- they had created reserves when they
11 acquired Hahnemann that were used as cushions,
12 didn't they?
13       MR. RYAN:  Objection.
14       MR. WHITNEY:  What's the objection?
15       MR. RYAN:  You're leading the
16 witness.
17    Q.  Okay.  I'll take that.
18    A.  I couldn't --
19    Q.  I agree.
20    A.  I'm not sure.  I mean I would have
21 to look at all the reserves that were
22 established as part of the Hahnemann
23 acquisition.
24       I know there was reserves
25 established as part of the Hahnemann

49 (Pages 190 to 193)

Daniel Cancelmi

Page 198

1   record at 2:56.
2       Q.   I need to mark, I guess, 1063, if
3   it's not been marked before.
4           -   -   -   -   -
5           (Thereupon, Deposition Exhibit 1063
6       was marked for purposes of
7       identification.)
8           -   -   -   -   -
9       Q.   I am showing you a document that
10  I've marked as Exhibit 1063, which I want to be
11  willing to predict with some certainty you have
12  not seen -- or you did not author.  Whether
13  you've seen it before or not we'll soon
14  establish, but for your benefit you can look at
15  whatever portions of this series of materials
16  you wish, but the questions I'm going to ask
17  you focus on that document that bears the Bates
18  stamp CL147599.
19      A.   (Witness reviewing document.)
20           599?
21      Q.   Right.  And specifically the fourth
22  paragraph.
23      A.   Okay.
24      Q.   These are, in fact, I believe,
25  Mr. Cancelmi, the notes of someone associated

Page 199

1   with Coopers & Lybrand named Cepielik,
2   C-e-p-i-e-l-i-k.
3           And these apparently are notes from
4   an interview with Al Adamczak.  I derive that
5   from the top of this page bearing the date
6   10/14/98.
7           Whether they are or they aren't,
8   four lines down, I don't know whether you can
9   read that or not.  I have scuffled with it and
10  I believe what I come up with is, and you look
11  along with me, reclass of the $50 million of
12  reserves was originally introduced by Dan
13  Cancelmi to Mark Kerstein, who indicated that
14  it was okay, but wanted to run it up the flag
15  pole.
16          Do you see that?
17      A.   Uh-huh.
18      Q.   First question is:  Do you remember
19  introducing the reclassification of $50 million
20  of reserves?
21      A.   No.  I mean I really don't view it
22  as that.  I assume --
23      MR. TYCKO:  In fairness, that isn't
24  what this says.  It just says, introduces by
25  him to Mark Kirstein.

Page 200

1       MR. WHITNEY:  Whatever it says, I'm
2   asking him, do you remember introducing the
3   idea of the $50 million of reserves, period.
4       MR. TYCKO:  To whom?
5       MR. WHITNEY:  To anyone.
6       A.   Not that I remember.
7       Q.   Okay.  Do you remember discussing
8   with Mark Kirstein the subject of the
9   $50 million reserves under circumstances where
10  he said he would take it back to people at
11  Coopers?
12      A.   I really don't remember that.
13      Q.   All right.  You don't remember any
14  conversation in which Kirstein would have said,
15  I will take it up -- I'll run it up the flag
16  pole?
17      A.   No, I really don't remember.  I
18  think they're referring to that luncheon at
19  Tambellini's.  And my recollection, I mean this
20  is my recollection, whether it's right or not,
21  I don't remember us going to that lunch
22  thinking, hey, we got this brainstorm of an
23  idea, we'll run it by Mark and then see if he
24  thinks it's okay and then he'll run it to
25  Buettner.  I just -- that wasn't my

Page 201

1   recollection of it.
2       Q.   If Adamczak's recollection is
3   different, and I don't know if it is or it
4   isn't, but if Adamczak's recollection is
5   essentially as stated in these notes, would you
6   dispute that?
7       A.   Yeah.  I mean that just -- I don't
8   remember it being like that.  I just don't
9   remember me and Al going to a lunch meeting
10  like that thinking, hey, we'll try this out on
11  Kirstein, and if he buys off on it, hopefully
12  he'll take it up to Buettner.  I mean that's
13  not what I remember.
14      Q.   Do you remember conversations with
15  Kirstein in other context in the spring of 1997
16  relating to the $50 million of reserves?
17      A.   Generally speaking, yes.  I can't
18  say specifically when or what the exact
19  communication was.  I know I've seen notes of
20  supposedly a conference call or something like
21  that where it was discussed.
22      Q.   You asked, Mr. Cancelmi, and I
23  provide.
24      A.   But I'll be honest, when I saw
25  that, and I can't remember if the SEC showed

51 (Pages 198 to 201)

Daniel Cancelmi

Page 202

1    that to me first or maybe even the creditors.
2        Q.   Doesn't matter. I'm going to show
3    it to you now and you can tell us what you
4    think of it now.
5            - - - - -
6            (Thereupon, Deposition Exhibit 1064
7            was marked for purposes of
8            identification.)
9            - - - - -
10           (Discussion held off the record.)
11       Q.   Let me show you a document that's
12   been marked as Defendant's Exhibit 1064. You
13   were starting to talk to me about notes that
14   you were shown, perhaps, by the SEC. Would
15   these be those notes?
16       A.   Yes.
17       Q.   For the benefit of the assembled
18   masses, these notes appear to say at the top,
19   Dan C, 4/18, Buettner/Frazier.
20           Do you recognize the handwriting
21   here?
22       A.   Yes.
23       Q.   Whose handwriting is this?
24       A.   Mark Kirstein's.
25       Q.   You know his handwriting on sight?

Page 203

1        A.   Yes.
2        Q.   How come?
3        A.   I worked with him for a number of
4    years.
5        Q.   Do you remember specifically a
6    telephone conversation with Buettner and
7    Frazier and Kirstein on April 18th, perhaps
8    1977?
9            MR. TYCKO:  '77?
10       Q.   1997.
11       A.   Not -- vaguely. I don't remember
12   specifically, although obviously I don't
13   dispute it. I know there was some
14   conversations that took place and, in fact, I
15   think Steve might have been involved in one or
16   two of them.
17           But this one, I don't remember
18   exactly this exact meeting, but I take it that
19   it occurred, because I think, in fact, it may
20   have been on one of the calenders of mine.
21       Q.   Well, it says down in the second --
22   beneath the line there, $50 million reserves at
23   Graduate. Will have $50 million CO. Perhaps
24   charge-off? I'm sorry, $80 million charge-off
25   in DV by 6/30/97, gross number on accounts

Page 204

1    receivable outpatient. Do you see that?
2        A.   Yes.
3        Q.   Do you know what that reference is
4    to?
5        A.   I think he's referring to the past
6    statute accounts there.
7        Q.   And there are $80 million in past
8    statute accounts on the books as of April 18th,
9    1997 that are going to be written off?
10       A.   Those accounts had started to have
11   already been written off.
12       Q.   But you're familiar, you're
13   familiar with that discussion point?
14       A.   Yes.
15       Q.   And then it next says, placing
16   reserves on Graduate entities to be used for DV
17   A/R at year end. Do you see that?
18       A.   Yes.
19       Q.   That would -- do you remember
20   discussing on or about April 18 with
21   Cancelmi -- or Kirstein, Buettner and Frazier
22   the subject of placing reserves on Graduate
23   entities to be used for Delaware Valley
24   accounts receivable at year end?
25       A.   That's consistent with my

Page 205

1    recollection at the time frame that there had
2    been discussions with Coopers & Lybrand
3    regarding establishing reserves on Graduate and
4    transferring them to DVOG.
5        Q.   Are you saying you recall
6    specifically discussing this on April 18 in
7    this conference call or this discussion that is
8    referenced in these notes?
9        A.   I can't say I specifically
10   remember.
11       Q.   All right. But what are you then
12   saying? You don't remember this discussion,
13   but you remember conversations to this effect?
14       A.   Right.
15       Q.   All right.
16       A.   I mean it's six years ago. I can't
17   say that, you know, I remember exactly what was
18   discussed at a certain date back then, but my
19   general recollection was, you know, this issue
20   was discussed several times around that time
21   frame, so that would be consistent with what's
22   noted here.
23       Q.   Down at the bottom there, there's a
24   bullet point, becomes part of. Can you read
25   that?

52 (Pages 202 to 205)

Daniel Cancelmi

Page 206

1    A.   Becomes part of PP&E/intangible as
2  part of purchase adjustment from SDN to AHERF.
3  Defers AR problem to be deferred, I guess.  AR
4  problem to be deferred.
5    Q.   Do you know what he's talking about
6  when he's talking about becomes part of
7  PP&E/intangible?
8    A.   Yeah.  Meaning when the reserves
9  were established on Graduate, it became part
10  of -- it was recorded by -- it was recorded in
11  intangible assets or included in goodwill and,
12  therefore, the goodwill would be amortized over
13  a length of time.  And the ultimate life that
14  was chosen, I believe, was 35 years.
15    Q.   Do you remember telling Coopers
16  about where these $50 million of reserves came
17  from?
18    A.   Yeah.  I mean they -- it was my
19  understanding that they were aware that the
20  reserves were established on Graduate.
21    Q.   But more specifically, that they
22  were -- they were created by debiting goodwill?
23    A.   Actually, the goodwill piece of the
24  reserves came, you know, a little bit later on,
25  because I think there's a memo that's written

Page 207

1  where there was initial -- I thought it would
2  be recorded as restructuring costs.
3         But then I believe it was Spargo
4  told me, well, it would be recorded as part of
5  a purchase price.
6    Q.   Adjustment.
7    A.   Purchase price adjustment.  And the
8  reason that stands out is I had known that we
9  had recorded other reserves as part of the
10  Graduate acquisition, and they hadn't been
11  recorded like that.
12         I just remember thinking, geez, you
13  know, those reserves potentially could have
14  been recorded in the same manner.  And the
15  other reason is, a little bit later on, I don't
16  know exactly when, but certainly by the end of
17  June, the '97 audit, I was, again, I don't know
18  if it was Spargo or Adamczak told me that I
19  guess McConnell and Buettner had been
20  discussing recording about 60 some million
21  dollars of reserves related to various
22  physician, the Health America physician
23  practice acquisitions in Pittsburgh, on the
24  Pittsburgh side.  And that there was estimated
25  losses related to those physician practices

Page 208

1  that were going to be recorded as part of the
2  purchase price adjustment, in the same manner
3  recorded as goodwill.
4    Q.   Let me show you another document,
5  if I may, and then perhaps come back to this
6  document.  And the document that I want to show
7  you is a document that has been previously
8  marked in this case, I believe.  Let me just
9  check it out here.  Yeah, as Deposition
10  Exhibit 154.
11    A.   (Witness reviewing document.)
12    Q.   Do you recall this document?
13    A.   Yes.
14    Q.   You don't even probably need to
15  read it by now.
16    A.   No.
17    Q.   The first paragraph says, "as a
18  result of various items identified during the
19  due diligence process, certain restructuring
20  reserves have been recorded on the Graduate
21  hospitals' financial statements prior and
22  subsequent to the hospitals being acquired by
23  SDN.  These reserves have been classified as
24  'below-the-line' expenses on the income
25  statement.  With the recent integration of the

Page 209

1  Graduate hospitals into the AHERF system on
2  May 1, 1997, all of the reserves were recorded
3  prior to May 1, 1997.  Accordingly, since the
4  SDN financial statements are not consolidated
5  into AHERF's financials, AHERF's fiscal 1997
6  operating results will not be adversely
7  impacted by these reserves."
8         Do you see that?
9    A.   Yes.
10    Q.   Are the reserves that you're
11  referencing in that paragraph those that are
12  listed on the third page of this memo?
13    A.   No.
14    Q.   They are not?
15    A.   No.
16    Q.   "Since the reserves have been
17  recorded at various times (i.e., before and
18  after being acquired by SDN) the attachment to
19  this memorandum summarizes all the reserves
20  that have been recorded on the income
21  statement, which may have to be explained to an
22  outside party at some point."
23         So is this attachment then all the
24  reserves that have been recorded on the income
25  statement?

53 (Pages 206 to 209)