Daniel Cancelmi

Page 210

1    A.   This first page is a summary of the
2  items that went through the income statement.
3    Q.   Right.
4    A.   Second page is the items that did
5  not go through the income statement.
6    Q.   And then what's the third page that
7  says, "Graduate system restructuring," what's
8  this a list of?
9    A.   That's the list of the items on the
10  first page.
11    Q.   Okay.  The reserves, the
12  restructuring reserves that are referenced on
13  the first page, those reserves are the ones --
14  are listed on item three, right?  On page 3,
15  right?
16    A.   Yes.
17    Q.   Now, if we flip the page, it says,
18  "in addition to the reserves recorded on the
19  income statement outlined above."
20        Does that mean in addition to the
21  reserves that are listed on this third page,
22  behind this page?
23    A.   Yes.
24    Q.   "Certain reserves have been
25  recorded as part of the purchase price

Page 211

1  allocation, which are not reflected on the
2  income statement.  Rather, these reserves have
3  been capitalized on the balance sheet as an
4  intangible asset, which will be amortized over
5  35 years.  This accounting treatment has been
6  discussed with Coopers & Lybrand, who agrees
7  with this approach as these reserves are viewed
8  as unrecorded preacquisition contingencies."
9        Do you see that?
10    A.   Yes.
11    Q.   Were you the one who discussed
12  these reserves with Coopers & Lybrand?
13    A.   I was one of several people, my
14  understanding.
15    Q.   All right.  As of May 21, 1997, you
16  were one of several people who had discussed
17  with Coopers & Lybrand the creation of these --
18  or the recording of these reserves as described
19  in that paragraph?
20    A.   Yes.
21    Q.   Okay.  And you discussed with them
22  the amortization over 35 years?
23    A.   Yeah, that was -- that life -- it
24  was my understanding Bill Buettner came up with
25  that life.  And the only reason that stands out

Page 212

1  is the fact that it was an odd life, because
2  goodwill is generally amortized over 40 years.
3        And I can't remember if Spargo told
4  me or Adamczak told me that it was going to be
5  35 years.  And it was sort of like, well, where
6  did that come from, 35 years.  That was my
7  understanding.
8    Q.   The point is that there were a
9  series of reserves created, restructuring
10  reserves created while the Graduate entities
11  were in the SDN ownership.  Right so far?
12    A.   Yes.
13    Q.   Those reserves are the ones that
14  are listed on the next page.
15    A.   That's correct.
16    Q.   And that's this page that lists
17  these various items by month, by description,
18  and by Graduate entity in which they repose?
19    A.   Yes.
20    Q.   Some of these reserves are reserves
21  that were used to fund the $21 million and
22  $28 million transfers we talked about earlier,
23  right?
24    A.   Yes.
25    Q.   But the first 50 million doesn't

Page 213

1  come from these reserves, right?
2    A.   No.
3    Q.   It comes in the manner described on
4  the top of the second page of the memo.
5    A.   That's correct.
6    Q.   And this fact was discussed with
7  Coopers & Lybrand on or before May 21, 1997; is
8  that right?
9        MR. RYAN:  Objection.
10    A.   That's my understanding.
11        MR. WHITNEY:  What's the objection?
12        MR. RYAN:  I'm not sure which fact
13  you mean by this fact.
14    Q.   The fact that the 50 million is
15  coming from purchase price allocation
16  capitalized on the balance sheet as intangible
17  assets amortized over 35 years.
18    A.   Yes.
19    Q.   Okay.
20    A.   Which would be consistent with Mark
21  Kirstein's notes.
22    Q.   That's the question I was going to
23  ask you, because that's the question I asked
24  and I didn't think you were answering that
25  question.

54 (Pages 210 to 213)

Daniel Cancelmi

Page 214

```
 1        There was a point when -- before
 2   May 21, 1997, when consideration was given to
 3   creating these reserves that would form the
 4   first 50 in the same fashion as these reserves
 5   that are listed on the third page, right?
 6        A.   Yes.
 7        Q.   But your previous answer a couple
 8   of minutes ago was that idea was abandoned in
 9   favor of the approach discussed on page 2 of
10   the memo.
11        A.   Yes.
12        Q.   Okay.  But Coopers knew, clearly,
13   where the first 50 was coming from, right?
14        A.   I believe so.
15        MR. RYAN:  Objection.
16        Q.   Okay.  I note, and just to preview
17   a discussion we'll probably end up having
18   tomorrow, that among the restructuring reserves
19   that are listed on the third page are four
20   enumerated reserves for the Police and Fire
21   Medical Association.  Do you see that?
22        A.   Yes.
23        Q.   All right.  Does the fact that
24   these restructuring reserves are not part of
25   the original $50 million have significance to
```

Page 215

```
 1   you in terms of your own inquiry as to whether
 2   AHERF was -- or Coopers was aware of the
 3   subsequent transfers; that is, the transfers
 4   after the first 25 -- or the first 50 million?
 5        MR. RYAN:  Objection.
 6        Q.   The question stinks.  I'll try
 7   again.
 8        Are you aware of the notion that
 9   people within PriceWaterhouseCoopers contend
10   that, although they knew about certain
11   restructuring reserves attributable to the
12   PFMA, although they knew about those being
13   transferred to the DVOG, they thought that was
14   part of the first 50 million?
15        MR. RYAN:  Objection.
16        Q.   Have you ever heard that assertion
17   being made?
18        A.   Yes, I believe so.
19        Q.   As far as you are aware, though,
20   Coopers knew where the first 50 million was
21   coming from, right?
22        A.   Yes.
23        Q.   And they knew it wasn't coming from
24   existing restructuring reserves at the
25   Graduate, right?
```

Page 216

```
 1        A.   It's my understanding.
 2        Q.   And they knew that before the
 3   second group of $49 million of reserves
 4   transferred, were transferred, right?
 5        A.   To my understanding.
 6        Q.   Not only is it your understanding,
 7   you say that here, right?
 8        A.   Yes.
 9        Q.   Okay.  Now, it's as good a time as
10   any to ask this question.
11        Why are you writing this memo?
12        A.   Well, to summarize the reserves, I
13   think there was -- I'm not sure if this is the
14   one or not.  Someone asked -- maybe someone
15   from treasury asked Spargo or Adamczak, I guess
16   Steve was still there then, to summarize the
17   various Graduate reserves that had been
18   recorded.
19        Q.   Well, we looked at a document this
20   morning where you indicated that Adamczak had
21   asked you in 19 -- or Dionisio had asked you in
22   1998.
23        A.   Maybe that was later on.
24        Q.   But you think this might have been
25   a similar question?
```

Page 217

```
 1        A.   Well, yeah.  Dionisio didn't ask me
 2   to do this, this May 22nd, 1997 memo.
 3        Q.   Does looking at the distribution
 4   list help you as to the purpose of the memo?
 5        A.   No.  I mean it's, like I said, this
 6   was a summary of the reserves that had been
 7   recorded, whether they went through Graduate's
 8   income statement or had been recorded as part
 9   of goodwill.  And this is just distributing
10   information to all the various individuals.
11        Q.   Let me show you a document that was
12   written somewhat -- about a month earlier by
13   you to Steve Spargo that has previously been
14   marked as Deposition Exhibit 8.  Take a look at
15   this one.
16        A.   (Witness reviewing document.)
17        Q.   Again, you don't have to spend a
18   lot of time studying it, I know.  This is a
19   document that you have had a chance to review
20   on numerous occasions, right?
21        A.   Yes.
22        Q.   Now, and it's a document you wrote
23   on or about April 14, 1997?
24        A.   Yes.
25        Q.   To Steve Spargo.  Same question.
```

55 (Pages 214 to 217)

Daniel Cancelmi

**Page 278**

1  additional work there.
2       And I believe, based on, you know,
3  discussions that Coopers & Lybrand had with
4  Allegheny management, that the determination
5  was made at that point that there was
6  additional reserves that needed to be recorded,
7  which ultimately resulted into that 17 or
8  whatever the -- $17 and a half million number
9  that was recorded.
10      Q.   All right.  But ultimately, the
11 numbers are recorded and Coopers & Lybrand
12 issues a clean opinion on the 1996 financial
13 statement?
14      A.   For DVOG, yes.
15      Q.   Now, not to repeat myself, but then
16 by the time we reach, even before the end of
17 the audit year, of the next year,
18 three-quarters of the way through, we're
19 transferring $50 million of Graduate reserves
20 to the DVOG allowance for bad debt, and Coopers
21 knows about this, right?
22      A.   Yes.
23      Q.   And you're still up short
24 $25 million, right?
25      A.   Yes.

**Page 279**

1       Q.   And through that whole period of
2  time, you're at least expensing something to
3  bad debt, right?
4       A.   Yes.
5       Q.   That is, you're creating some bad
6  debt allowance in the more conventional way?
7       A.   Yes.
8       Q.   Maybe it's just me, but is that
9  describing a problem situation at AHERF?
10      A.   It was a problem situation, yeah.
11      Q.   Am I -- you know, $71 million may
12 be different things to different people, but
13 that's a pretty big problem, isn't it?
14      A.   There was a lot of concerns about
15 accounts receivable.
16      Q.   My question is:  While all of this
17 is happening and there's a discussion in bullet
18 points, in audit update meetings about the
19 Graduate reserves and their impact on the
20 Graduate reserves, is Coopers raising questions
21 about what's happening that is causing this?
22      MR. RYAN:  Objection.
23      A.   I mean I believe they were.  I
24 believe they knew what some of the problems
25 were, as did Allegheny management know what

**Page 280**

1  some of the problems were.  But, you know, it
2  takes time to fix some of those problems.  But,
3  yeah, I mean it was a widely known topic.
4       Q.   The transfer of the $21 million
5  from Graduate to DVOG, is this transaction, in
6  your experience, sufficiently similar to the
7  first $50 million that if the first $50 million
8  is acceptable under GAAP, the next 21 million
9  would be acceptable, too?
10      A.   Yes.
11      MR. RYAN:  Objection.
12      A.   It was the same logic.
13      Q.   Same principle.  If Coopers did not
14 know about the $21 million at or around the
15 time it was made, but did know about the
16 $50 million, would you have any reason to
17 believe that Coopers & Lybrand would have a
18 concern about the second 21 million?
19      MR. RYAN:  Objection.
20      A.   I'm not sure I understand that
21 question.
22      Q.   If, hypothetically, Coopers &
23 Lybrand did not know about that additional
24 transfer of $21 million of reserves in June and
25 July of 1997, but they did know about the first

**Page 281**

1  50 --
2       A.   Okay.
3       Q.   -- would there be any reason, in
4  your mind, to suspect that Coopers & Lybrand
5  might have a problem with the second 21?
6       MR. RYAN:  Objection.
7       A.   Not necessarily.
8       Q.   All right.
9       A.   But it was my understanding they
10 knew about at least the various components that
11 made up the 21.  Like I said, maybe not in this
12 deposition, but in other ones, the components,
13 the 50 was always a separate component.
14      The 21 and 28 weren't necessarily
15 referred to in that manner until probably when
16 they came back in and started doing the reaudit
17 in the summer of '98.  But certainly, you know,
18 some of the items that comprise the 21 and 28
19 had been discussed.
20      And, you know, I think the PFMA is
21 a perfect example.  The transfer of that
22 reserve, there were pieces of that that was in
23 the 28 and that were in the 21, so it was in
24 both pieces there and it was not in the 50.
25      Q.   Do you remember specifically -- do

Daniel Cancelmi

Page 282

1 you remember telling Coopers & Lybrand at or
2 around June or July 1997 that the $21 million
3 of reserves had been transferred?
4    A.   I can't remember if I did at that
5 point or not.
6    Q.   Did anybody at AHERF ever tell you
7 they told Coopers that at or around June or
8 July of 1997?
9    A.   I don't know if specifically.
10 Certainly it was, those components were
11 ultimately, at least some of them had been
12 discussed, because reserves were gone at the
13 end of June.
14    Plus, as an example, that
15 21 million was on the key bad debt roll-forward
16 schedule that was provided to -- that would
17 have been provided to --
18    MR. WHITNEY:  Let's go off the
19 record a minute.
20    VIDEO TECHNICIAN:  Off the record.
21    (Brief recess.)
22    VIDEO TECHNICIAN:  We're on the
23 record at 5:21.
24    Q.   Your last answer, "I don't know if
25 specifically.  Certainly it was, those

Page 283

1 components were ultimately, at least some of
2 them had been discussed, because reserves was
3 gone at the June.  Plus, as an example, that
4 21 million was on key bad debt roll-forward
5 schedule that would have been provided to -- "
6    You don't finish the statement, but
7 the finish of that statement is Coopers, right?
8    A.   Correct.
9    Q.   The key bad debt roll-forward
10 schedule is going to show Coopers that there's
11 $21 million of additional reserves being
12 applied to DVOG bad debt, right?
13    MR. RYAN:  Objection.
14    MR. WHITNEY:  What's objectionable
15 about that?
16    MR. RYAN:  Leading and it also
17 misstates the schedule.
18    A.   Those bad debt --
19    MR. WHITNEY:  I don't know whether
20 it misstates the schedule or not, Mr. Ryan.
21 I'm going to ask him what the schedule means,
22 because I don't know what it means.  I'm just
23 following the witness.
24    A.   Those schedules include the
25 transfer of the $50 million reserves and they

Page 284

1 include the transfer of the $21 million
2 reserve.
3    Q.   289 through 293, Exhibits 289
4 through 293, which I have put in front of you,
5 are the key bad debt roll-forward schedules in
6 these documents?
7    A.   Yeah.  They're several pages back,
8 like on Exhibit 289 I think it's 013544.L
9 That's one of them.  Point M would be another
10 one.  This is just for Bucks County.
11    Q.   These are the key -- let me get --
12 the key bad debt roll-forward schedule for
13 Bucks County for June 1997?
14    A.   Yes.
15    Q.   The items 013544.L and M, right?
16    A.   Yes.
17    Q.   Now, what do they show us vis-a-vis
18 the $21 million?
19    A.   They show that there's the -- the
20 entire schedule shows the beginning balance as
21 of '96, June '96.  It shows the write-offs
22 during the year.  I believe that's the second
23 column.  The third column shows the recoveries.
24    And then the other column shows
25 other adjustments, some of the larger ones

Page 285

1 which would include the transfer, other
2 reserves that were part of the 50 million.  And
3 then, I believe, some of the reserves that were
4 transferred as part of the 71 million.
5    Q.   If we look, for example, at the
6 entry --
7    MR. TYCKO:  Do you mean 21 million?
8    A.   21 million.
9    Q.   If we look, for example, at the
10 entries for March of 1997, under other, there's
11 a number of 1,695,000 and change with a
12 footnote F, right?
13    A.   Yes.
14    Q.   And the footnote reads, includes
15 $4.7 million write-off of Patcom accounts
16 receivable balance, $3 million transfer from
17 Graduate.  And then another figure that I
18 confesses to you I can't read.  Non patient
19 cash.
20    The $3 million entry for transfer
21 from Graduate, to what transfer does that have
22 reference?
23    A.   I believe that references that that
24 was part of the $50 million transfer.
25    Q.   As was the $4 million transfer from

72 (Pages 282 to 285)

Daniel Cancelmi

Page 286

1 Graduate listed on the item with the footnote
2 G?
3     A.   I believe so.
4     Q.   All right.  Now, there is also a
5 line item under the last one, June, of an
6 adjustment of $2,900,000 and change with a
7 footnote L, and it says, includes $59 million
8 of shortfall adjustments.
9          MR. RYAN:  I think it's 59,000.
10    Q.   $59,000 of shortfall adjustments.
11 Thank you.
12         Is that $59,000 having reference to
13 any reserve transfers from Graduate?
14    A.   Yes.  I believe that's part of the
15 $21 million reserve transfers.
16    Q.   Well, it doesn't say that here,
17 though, does it?
18    A.   Well, it says, includes 59,000
19 shortfall adjustment.
20    Q.   All right.  Now, if we similarly go
21 to the exhibit marked 290, again, to items L
22 and M, we see on item L in footnote G a
23 reference to a transfer from Graduate.  And
24 under H, we see a reference to a $5 million
25 transfer from Graduate.  And then under item J

Page 287

1 we see another shortfall adjustment.
2     A.   Yes.
3     Q.   All right.  Again, this adjustment
4 does not have reference to any reserve transfer
5 from Graduate, right?
6     A.   That's correct.
7     Q.   We can go through 291, 292 and 293
8 as well, but what is the point you're making
9 about the $21 million that is revealed by these
10 key bad debt roll-forward schedules?
11    A.   That those transfers were also
12 presented on the schedule.  They don't
13 necessarily -- the June transfer, for example,
14 doesn't necessarily say Graduate, but it says
15 shortfall adjustment and why that language was
16 chosen.  I think the one memo that I wrote that
17 described all the transfers, I think the
18 caption of it was called bad debt reserve
19 shortfall, or something to that effect.
20         But like, you know, if you go to
21 the next page, point M, the same logic.  It
22 says pretty much the same thing.  Except this
23 number is $2.7 million shortfall adjustment.
24 And it's the same thing where that's where the
25 reserves were being transferred over.  It was

Page 288

1 part of the $21 million of reserve transfers.
2     Q.   We've done the calculations here on
3 all of these exhibits, 289 through 293, and
4 have come up with a total attributable to
5 Graduate where in these footnotes it references
6 including an amount transferred from Graduate,
7 and those totals are $50 million, right?
8     A.   Okay.
9     Q.   That's what we come up with.  Does
10 that number surprise you?
11    A.   No.
12    Q.   And the reason is?
13    A.   Because that was the amount of the
14 reserves that were transferred.
15    Q.   So that these transfers from
16 Graduate tie off to the $50 million number,
17 right?
18    A.   Yes.
19    Q.   We have also totaled up the various
20 numbers referenced as shortfall adjustments and
21 we come up with a number of about 7 million --
22 $27 million.
23         Does that number surprise you?
24         MR. RYAN:  I would like to object
25 to your faulty math.

Page 289

1         MR. WHITNEY:  My faulty math?  Did
2 you do it in your head sitting there with your
3 hands folded above you, or have you done some
4 calculation at some other time?
5         MR. RYAN:  I have done it some
6 other time.
7         MR. WHITNEY:  What do you come up
8 with?
9         MR. RYAN:  I don't have to tell
10 you.  I'm just objecting to the record you're
11 making, which I believe was wrong.
12        MR. WHITNEY:  Which part of it is
13 wrong?
14        MR. RYAN:  The number of
15 27 million.
16    Q.   Well, we'll go back and do that
17 overnight.  But we come up with a number that
18 is in excess of $20 million, in excess of
19 $25 million.  Does that number surprise you?
20    A.   No.  That would correlate to the --
21 there was a memorandum I wrote, I believe, in
22 July of '97 that had that 25 -- I think it was
23 roughly $25 million on it.
24    Q.   All right.  Now --
25    A.   Of which the 21 was part of the 25.

73 (Pages 286 to 289)

Daniel Cancelmi

Page 290

1    Q.   All right.  Now, how is the -- what
2  is it that the reviewer is to derive from these
3  documents that tells them that there has been
4  an additional $21 million of reserve transfers?
5        The launching point, as I
6  understand it, Mr. Cancelmi, for this
7  discussion of these of these bad debt
8  roll-forward schedules is that the fact of the
9  additional $21 million in transfers is revealed
10  on these bad debt roll-forward schedules,
11  right?
12    A.   That's my belief.
13    Q.   Explain to me like I'm five years
14  old why they are.
15    A.   Well, they're identified on the
16  schedule.  Some are more specifically labeled.
17  The $50 million of transfers is more
18  specifically labeled than the shortfall
19  adjustment.
20        But still the shortfall adjustment,
21  I think that description came from the
22  memorandum that I probably wrote.  I don't know
23  for certain about that.  But they probably used
24  that as the journal entry support for those
25  transactions.

Page 291

1        When you're looking at the other
2  column, there's some fairly substantial numbers
3  in that other column.  And, therefore, when you
4  would have numbers of that magnitude, what's
5  relevant is that there, especially like if I'm
6  looking at Exhibit 289, the point M page, the
7  shortfall adjustment column is June
8  indicates -- it's 1,500,000, I believe, and the
9  June number, which includes other adjustments.
10        But I mean the number is one of the
11  larger numbers on that schedule, certainly, at
12  least on this particular schedule, so it would
13  lead one to question, you know, what do those
14  adjustments relate to.
15    Q.   Whether it is identified as
16  reserves from Graduate or the product of a
17  reserve transfer from Graduate, these bad debt
18  shortfall analyses show that significant
19  shortfall adjustments are being made to the bad
20  debt reserves that are coming from somewhere
21  other than the $50 million of Graduate
22  reserves, right?
23    A.   Yes.
24    Q.   Is that what you're saying?
25    A.   The shortfall adjustments are

Page 292

1  different than the Graduate 50 million.
2    Q.   Okay.  So while Coopers does not,
3  from these documents, reveal -- does not reveal
4  to them that there is a 20 million plus reserve
5  transfer, you're saying it reveals to them, if
6  they review these documents, that there is
7  something that is driving these rather
8  considerable shortfall adjustments?
9    A.   That's right.
10    Q.   And is that the point that you're
11  making when you refer to these documents?
12    A.   Yes.
13    Q.   Okay.
14        MR. WHITNEY:  You're sure you're
15  not going to tell me what that number is?  If I
16  subpoena you, will you tell me?
17        MR. RYAN:  Not interested in
18  testifying.
19        (Discussion held off the record.)
20    Q.   If one assumes that Coopers &
21  Lybrand is not told about the $21 million
22  reserves when they occurred, and it is your
23  understanding they were; is that right?
24    A.   Some of the components that made up
25  the 21 million, I believe, were discussed with

Page 293

1  Cooper.
2    Q.   But you're not -- you don't know
3  whether or not the whole 21 was?
4    A.   I can't say for certain.  I can't
5  say for certain someone said, hey, there's
6  $21 million and here's every single cent that
7  made up the 21 million, no.
8    Q.   Let me get this down before you
9  leave for Plano.  You don't know whether it was
10  stated that $21 million more of reserves was
11  transferred to Coopers and you don't know
12  whether it was not stated; is that right?
13    A.   That's correct.
14    Q.   Okay.  But if one assumes it
15  wasn't, that it was not discussed with Coopers
16  in a direct way, and one assumes they do not
17  look at the bad debt roll-forward schedules, is
18  there any other way that you can think of that
19  Coopers & Lybrand was aware of additional
20  reserve transfers to bad debt over and above
21  the first 50 in connection with the 1997
22  audits?
23    A.   I think, as I mentioned this
24  morning, I guess it was, there were reserves
25  that would have been on the Graduate hospitals'

74 (Pages 290 to 293)

Daniel Cancelmi

Page 294

1 books prior to June of '97. And then at the
2 end of June of '97 on our trial balance there
3 would have been zero balances left in those
4 accounts.
5        And there were for many of those
6 reserves that were transferred, separate
7 general ledger accounts, where the only item in
8 there was the reserve that was originally
9 established on Graduate's books. Just that as
10 an example, I think PFMA may have been in a
11 separate account. No other transaction was
12 recorded in that account.
13        And there was a number of those
14 type of reserve accounts that had a balance at
15 one point in time related specifically to that
16 reserve. And then in June of '97, there would
17 have been a zero reserve or a much, much
18 smaller reserve balance. So that would have
19 been one way.
20        Journal entries that Allegheny
21 maintained in the journal entry books would
22 have had those transactions in them, I believe.
23        And there was various, I think
24 there was some discussions and some notations
25 about some reserves that were transferred in

Page 295

1 particular, like the PFMA, that there's
2 notations about it being transferred for DVOG
3 AR. I'm sure there's other instances that
4 aren't coming to mind.
5        MR. WHITNEY: Everybody stay in
6 place.
7        (Discussion held off the record.)
8        - - - - -
9        (Thereupon, Deposition Exhibit 1072
10        was marked for purposes of
11        identification.)
12        - - - - -
13        Q.   Showing you a document that has
14 been marked as Exhibit 1072. And you can look
15 at how much of this you want or wish to. I'm
16 going to ask you some questions about the
17 second page of this document, which is an audit
18 update agenda, if you will, dated August 22,
19 1997.
20        A.   (Witness reviewing document.)
21        Q.   Have you ever seen this document
22 before?
23        A.   Yes, the SEC staff showed it to me.
24        Q.   You were talking earlier about the
25 fact that -- or in an answer a couple of

Page 296

1 answers ago about the fact that there were
2 discussions of specific reserves. There is an
3 item number two, PFMA contract. And there
4 is -- let me back up and ask a foundational
5 question. Do you recognize the handwriting on
6 the page?
7        A.   Yes.
8        Q.   Okay. Whose is it?
9        A.   Mark Kirstein's.
10        Q.   Were you at this meeting.
11        A.   I believe I was. I know I have
12 this in my file.
13        Q.   There is a statement, PFMA
14 contract, where did it go?
15        Does this refresh your recollection
16 that on or about August 22, 1997 Coopers is
17 specifically raising the question of what has
18 become of the PFMA reserve that was created on
19 the books of the Graduate?
20        A.   I can't say I remember the specific
21 conversation. Like I said before, I think
22 generally speaking, I do recall discussing the
23 PFMA reserve, for example, and that, you know,
24 it had been transferred. I can't say
25 specifically this is exactly what I said, you

Page 297

1 know, five years ago.
2        Q.   I'm not attributing it to you. I'm
3 just wondering whether or not it refreshes your
4 recollection that Coopers was raising the issue
5 of what became of this reserve?
6        MR. RYAN: Objection. Asked and
7 answered.
8        MR. TYCKO: You can go ahead.
9        A.   Again, I can't say specifically
10 what their exact question would be, but I mean
11 I generally recall we discussed certain of the
12 reserves that had been transferred for the
13 additional bad debt reserve.
14        Q.   Earlier in the deposition today, we
15 were discussing certain audit records that
16 might reveal these Graduate transfers to DVOG.
17 And one of those records would have been
18 records relating to Graduates' reserves, or the
19 reserves that were created on the books of the
20 Graduate prior to the transfer. Do you recall
21 that questioning and answer?
22        A.   Yes.
23        Q.   Do you recall that the question
24 about the notion that one of the things -- do
25 you recall a question being that one of the

75 (Pages 294 to 297)

Daniel Cancelmi

Page 298

1  things Coopers & Lybrand would have been
2  looking at in an audit, in your experience, was
3  what had -- what was the status of those
4  reserves at year end 1997?
5      A.  Yes.
6      Q.  That would be a specific item they
7  would be looking at?
8      A.  Yes.
9      Q.  This is one of those items, is it
10 not?
11     A.  I believe so.
12     Q.  A fairly substantial one, right?
13     A.  I believe so.
14     Q.  Do you remember how much?
15     A.  The PFMA was around 14 million.
16     Q.  Now, there's a notation, where did
17 it go.  And then there is -- am I reading this
18 right, is there an arrow pointing over to that
19 note to the right there?  Do you see that?
20     A.  Yes.
21     Q.  Do you see what that says?
22     A.  It's something through
23 intercompany.
24     Q.  How about not through income?
25     A.  That could be, not through income,

Page 299

1  move to DV reserves for AR.
2      Q.  All right.  Do you recall telling
3  Kirstein on or about August 22, 1997 that the
4  PFMA contract was, in fact, moved to DVOG
5  reserves for accounts receivable?
6      A.  I believe I told Coopers that that
7  happened.  Again, I can't remember the specific
8  conversation with Kirstein or whether it was
9  Amy, but I believe I probably more remember the
10 conversation with PFMA with Amy, but there's a
11 notation there.
12     Q.  All right.  Now, not
13 coincidentally, perhaps, that is where the PFMA
14 reserve ended up, right?
15     A.  Yes.
16     Q.  Exactly where this note says it
17 did?
18     A.  Yes.
19         MR. RYAN:  Objection.
20     Q.  And my question to you is, goes
21 back to the original premise.  Can you explain
22 why it is that Coopers' knowledge, if that's
23 what this means, that the PFMA reserve went to
24 DVOG accounts receivable, why that would inform
25 them that there are reserves going to the DVOG

Page 300

1  accounts receivable over and above the first
2  50?
3          MR. RYAN:  Objection.
4      A.  I don't understand the question.
5      Q.  Gee, I thought it was such a good
6  question that I wasn't even going to pay
7  attention to the objection, even at 10 minutes
8  to 6.
9          The point of the beginning of this
10 discussion was a question by me that if one
11 assumes that Coopers wasn't told directly that
12 there was $21 million more of reserves going
13 from the Graduate to the DVOG, and if one
14 assumes that they didn't look at the key bad
15 debt roll-forward schedules as we did a few
16 minutes ago, is there any other way that
17 Coopers & Lybrand, that you're aware of, that
18 Coopers & Lybrand knew that there were
19 additional reserves going from the Graduate to
20 the DVOG?
21         And your answer was a fairly
22 lengthy one, but it included an awareness by
23 them of certain Graduate reserves that were no
24 longer in the accounts of the Graduate.  Do you
25 remember that?

Page 301

1      A.  Yes.
2      Q.  We can go back and get the answer,
3  if you want.
4      A.  No, I remember that.
5      Q.  I showed you this document as a
6  vehicle for asking you whether or not you
7  recall a discussion with them specifically
8  about the Graduate reserve for PFMA, which was
9  a $14 million reserve, right?
10     A.  Yes.
11     Q.  And a discussion specifically about
12 PFMA that that reserve went to the DVOG.  And
13 your statement is that you recall discussions
14 with Coopers about the fact that the PFMA
15 reserve, in fact, went to the DVOG?
16     A.  Yes.
17         MR. RYAN:  Objection.
18         MR. WHITNEY:  What's the objection?
19         MR. RYAN:  I think it
20 mischaracterizes the prior testimony.
21     Q.  I'll take my chances.
22         The question I have for you is
23 essentially, we reached that point, so what?
24 If we assume that Coopers & Lybrand knew that
25 the PFMA reserve went to the DVOG, what does

76 (Pages 298 to 301)

Daniel Cancelmi

Page 302

1 that tell us about their knowledge of reserves
2 over and above the first 50 going to the DVOG?
3    A.   That they would --
4       MR. RYAN: Objection.
5    A.   -- know that there would be more
6 than the $50,000 transferred to the DVOG for
7 bad debt reserves.
8    Q.   Unless they think that the first
9 $50 million includes the PFMA contract, right?
10 Then it wouldn't tell them that, right?
11    A.   No, but the PFMA wasn't part of the
12 50 million, the first 50 million.
13    Q.   Are you aware of the fact that
14 certain representatives of Coopers say that
15 they thought it was?
16       MR. RYAN: Objection.
17    A.   Through the investigations I've
18 become aware of -- well, at certain points
19 that's what I've heard. Other times I've heard
20 they knew nothing about any of the reserves.
21    Q.   All right. But you have heard that
22 certain representatives of Coopers believe that
23 the PFMA reserves were part of the first 50?
24    A.   I guess I've heard that theory.
25    Q.   All right. Well, if that's the

Page 303

1 case, if they thought it was part of the first
2 50, then the fact that they knew that it was
3 going to the DVOG would not necessarily tell
4 them that there were more reserves above the 50
5 going to the DVOG, right?
6    A.   That would be right.
7    Q.   Okay. Do you dispute the notion
8 that they thought that that was part of the
9 first 50?
10    A.   Yeah, the PFMA was not part of the
11 first 50. They were recorded completely
12 different times. PFMA was recorded months,
13 six, seven months before the $50 million of
14 reserves were recorded. And they were
15 transferred at different times. The
16 $50 million was transferred in March and April.
17 The PFMA reserves were transferred, they were
18 included in the 21 and the 28 in May and June
19 of '97. Different reserves recorded at
20 different times initially and transferred later
21 on at different times.
22       MR. WHITNEY: All right. I'm done
23 for the evening.
24       (Deposition adjourned.)
25          - - - - -

Page 304

1            CERTIFICATE
2 The State of Ohio,   )
3                 SS:
4 County of Cuyahoga.  )
5
6       I, Jaci R. Traver, RPR, CRR and
7 Notary Public, duly commissioned and qualified,
8 do hereby certify that the within named
9 witness, DANIEL CANCELMI, was by me first duly
10 sworn to testify the truth, the whole truth and
11 nothing but the truth in the cause aforesaid;
12 that the testimony then given by the
13 above-referenced witness was by me reduced to
14 stenotyp in the presence of said witness;
15 afterwards transcribed, and that the foregoing
16 is a true and correct transcription of the
17 testimony so given by the above-referenced
18 witness.
19       I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 305

1       I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5       IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this       day of
8          , 2003.
9
10
11
12
13
14       Jaci R. Traver, Notary Public
15       within and for the State of Ohio
16
17 My commission expires July 15, 2003.
18
19
20
21
22
23
24
25

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                      Akron (330) 374-1313

Daniel Cancelmi

Page 262

1  dialogue was at that point between AHERF senior
2  management and Coopers & Lybrand as to what the
3  ultimate issue is.
4        With those type of numbers, if
5  Coopers said that they absolutely don't agree
6  with it, you'd have to make some adjustment.
7    Q.  You would have to -- you would
8  basically either have to reverse those entries
9  or you would have to issue your financial
10 statements with a qualified or adverse opinion,
11 right?
12       MR. RYAN:  Objection.
13   A.  That's probably a good possibility.
14   Q.  My question to you, since I keep
15 catching these objections, based on your
16 experience on both the auditing side and the
17 client's side, if the auditor tells the client,
18 I'm not going to agree to transactions of that
19 magnitude, what are the company -- the company
20 basically has to go along with the auditor,
21 don't they?
22       MR. RYAN:  Objection.
23   A.  Yeah, if you want an unqualified
24 opinion.  I mean there's a number of different
25 things that have to happen, both from the

Page 263

1  client's side and from auditor's side.
2        I mean there's representation
3  letters, there's required communications with
4  audit committees, there's management comment
5  letters, there's communications indicating
6  whether there's any disagreements with the
7  management and the accountants.
8        Whether the auditors have
9  identified any material adjustments that they
10 had -- that they disagreed with and had to
11 bring to management's attention.  I mean
12 there's a -- I'm probably just -- that's tip of
13 the iceberg.
14   Q.  But in any event, at no time did
15 Coopers & Lybrand ever tell AHERF to reverse
16 any of these reserve transfers, right?
17   A.  Not that I'm aware of.
18       MR. RYAN:  Objection.
19   Q.  Not that you're aware of.  The
20 $50 million that was transferred from Graduate
21 to DVOG, the first 50, did DVOG need the money?
22   A.  Based on the calculations at that
23 point in time, that was the conclusion, that
24 they did need the reserves.
25   Q.  All right.  Would you have

Page 264

1  transferred these $50 million of reserves and
2  subsequently the other $21 million of reserves
3  to DVOG's allowance for bad debt if you did not
4  need the money?
5    A.  No, I don't believe so.
6    Q.  All right.  Were there other
7  reserves available to apply to DVOG's bad debt
8  in March and April and May and June of 1997,
9  other than these Graduate reserves?
10   A.  Generally speaking, I mean I think
11 Allegheny's position was the answer was no by
12 and large.  There may still have been
13 miscellaneous reserves out there, but I don't
14 think Allegheny management ever believed that
15 there was reserves of that magnitude that were
16 out there that would eliminate the need to make
17 those transfers.
18   Q.  You talked earlier about the
19 so-called X file, this circulated schedule of
20 reserves that was periodically circulated to
21 various representatives of AHERF, right?
22   A.  Yes.
23   Q.  Including you?
24   A.  Yes.
25   Q.  Okay.  By virtue of that X file,

Page 265

1  you would know, would you not, if there were
2  available reserves, other than the Graduate
3  reserves, to apply to the DVOG bad debt?
4        MR. RYAN:  Objection.
5    A.  Yeah, I mean that extra reserve
6  file or the X file, that was an attempt to
7  summarize at least some of the more noteworthy
8  reserves, excess or otherwise, on the financial
9  statements of the various Allegheny hospitals.
10   Q.  Do you remember whether or not
11 there was an excess contractual allowance
12 reserves of $9 million available as of year end
13 1997 to apply to these reserves -- or to the
14 DVOG bad debt?
15   A.  Not offhand.
16   Q.  Do you remember whether or not
17 there was a CRA reserve in the amount of
18 $10 million available to apply to the bad debt?
19   A.  I don't know.  I don't remember
20 that, although that wasn't our department's
21 area.  That was the cost reporting department,
22 government reimbursement department.
23   Q.  Let me show you a document here.
24        - - - - -
25        (Thereupon, Deposition Exhibit 1070

67 (Pages 262 to 265)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                    Civil Action

        Plaintiff,              No. 00-684

    Vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

        Defendant.


    Continued videotaped deposition of
DANIEL CANCELMI, called for examination under the
statute, taken before me, Jaci R. Traver, RPR,
CRR, and Notary Public in and for the State of
Ohio, at the offices of Jones Day, 500 Grant
Street, Pittsburgh, Pennsylvania, on Friday, the
24th day of January 2003 at 8:00 a.m.



- - - - -

VOLUME 2

- - - - -

Page 315

1  APPEARANCES:
2
3    On behalf of the Plaintiff:
4      Jones Day, by
5      RICHARD WHITNEY, ESQ.
6      North Point
7      901 Lakeside Avenue
8      Cleveland, Ohio  44114
9      (216) 586-7256
10
11     Jones Day, by
12     DAVID S. TORBORG, ESQ.
13     51 Louisiana Avenue, N.W.
14     Washington, D.C.  20001-2113
15     (202) 879-5562
16
17   On behalf of the Defendant:
18     Cravath, Swaine & Moore, by
19     ANTONY L. RYAN, ESQ.
20     AVRAM E. LUFT, ESQ.
21     Worldwide Plaza
22     825 Eighth Avenue
23     New York, New York  10019-7475
24     (212) 474-1296
25

Page 316

1  APPEARANCES, Continued
2
3    On behalf of the Defendant:
4      Manion McDonough & Lucas, P.C., by
5      JOSEPH F. McDONOUGH, ESQ.
6      USX Tower, Suite 1414
7      600 Grant Street
8      Pittsburgh, Pennsylvania  15219
9      (412) 232-0206
10
11   On behalf of the Witness:
12     Tycko Zavareei, LLP, by
13     JONATHAN K. TYCKO, ESQ.
14     1300 19th Street, N.W.
15     Suite 400
16     Washington, D.C.  20036
17     (202) 973-0902
18
19  ALSO PRESENT:
20     Jeffrey L. Close,
21     PriceWaterhouseCoopers
22     Kurt Henschel, Video Technician
23
24
25

Page 317

1       VIDEO TECHNICIAN:  Today's date is
2  January 24th, 2003.  We are on the record at
3  8:10.
4       This is the continued deposition of
5  Dan Cancelmi at Jones Days Pittsburgh, Official
6  Committee of Unsecured Creditors of AHERF
7  versus PriceWaterhouseCoopers in the United
8  States District Court, Western Division of
9  Pennsylvania, 00-684.
10      Counsel please state appearances
11  once again for the record.
12      MR. WHITNEY:  Richard Whitney,
13  Jones Day, Cleveland, Ohio, for the Plaintiff.
14      MR. TORBORG:  David Torborg, Jones
15  Day, for the Plaintiff.
16      MR. RYAN:  Antony Ryan from
17  Cravath, Swaine & Moor, for Defendant
18  PriceWaterhouseCoopers.  And with me is Avram
19  Luft from Cravath and Jeffrey Close from the
20  Office of General Counsel at
21  PriceWaterhouseCoopers.
22      MR. TYCKO:  Jonathan Tycko, with
23  Tycko Zavareei, LLP, in Washington, D.C., for
24  the witness.
25      (Discussion held off the record.)

Page 318

1       DANIEL CANCELMI, of lawful age, called
2  for examination, as provided by the statute,
3  having been previously sworn, as hereinafter
4  certified, said as follows:
5  CONTINUED EXAMINATION OF DANIEL CANCELMI
6  BY MR. WHITNEY:
7    Q.  Mr. Cancelmi, I want to start this
8  morning by talking briefly about the
9  $28 million reserve transfer.  The last segment
10 of the 99 million in reserve transfers that
11 occurred in 1999.
12      I asked you this question
13 yesterday.  You answered it, but I forgot
14 exactly what you said, although I'm 90 percent
15 sure.  If I try to characterize your testimony,
16 I'll catch an objection and I'll certainly be
17 wrong.
18      Can you tell me, therefore, again,
19 was it your understanding that Coopers &
20 Lybrand knew about the $28 million transfer at
21 or about the time it was made?
22    A.  Yes.  At least certain of the
23 components that comprise the 28 million.  Like
24 I said yesterday, the 28 million hadn't been
25 componentized and presented as the 50, the 21,

Just Launched   www.rennillo.com   Schedule Online

Cleveland (216) 523-1313                          Akron (330) 374-1313

Page 319

1   and 28 at that point in time that I remember.
2        That did not occur until probably
3   the summer of '98, when the restatement issues
4   were being discussed. Where all the numbers
5   were added up and they totaled the 99 some odd
6   million dollars.
7        But some of the components
8   certainly that were part of the 28 million
9   transfer, my understanding, had been discussed
10  with Coopers or information made available to
11  them that would suggest that those transfers
12  had occurred.
13       Q.  Let me pick up the last part of
14  that first. Some of the components certainly
15  that were part of the $28 million transfer, my
16  understanding had been with Coopers or
17  information -- my understanding had been
18  discussed with Coopers. Let me start over.
19       Some of the components certainly
20  that were part of the $28 million transfer, my
21  understanding, had been discussed with Coopers
22  or information made available to them that
23  would suggest that those transfers had
24  occurred.
25       I was actually going to explore

Page 320

1   this in two-part fashion. And my question
2   right now is whether or not it was discussed
3   with them at or about the time the $28 million
4   was -- $28 million transfers were made. It
5   wasn't just one big slug, was it, or was it?
6        A.  There was a few entries.
7        Q.  First, if you know, was the notion
8   that we are transferring reserves to address a
9   contract allowance shortfall deficiency, was
10  that discussed with Coopers?
11       MR. RYAN: Objection.
12       MR. WHITNEY: What's the objection?
13  I don't want this one to be wrong.
14       MR. RYAN: I don't understand what
15  you mean by a contract allowance shortfall.
16       MR. WHITNEY: You've got me on
17  that. Before going back, give it to me. Give
18  me the terminology.
19       Q.  Had the concept of transferring
20  reserves for the purpose of reducing
21  contractual allowances been discussed with
22  Coopers?
23       A.  At the time they were recorded, I
24  couldn't say if they were or not. I don't
25  remember.

Page 321

1        Q.  Was it your understanding that they
2   were?
3        A.  Around that time, I don't remember
4   if they were at the time they were recorded.
5        Q.  How about prior to Coopers &
6   Lybrand signing off on the 1997 audit? And by
7   signing off, I mean the issuing of their
8   opinion to 1997 audit.
9        A.  My recollection is that certain of
10  the reserves that were included in the
11  $28 million transfer, the questions had come up
12  as to where those reserves had gone. And the
13  ones that come to mind are like maybe the PFMA
14  reserve, I think the MA, there was an MR
15  reserve or a Hill-Burton reserve.
16       I can't say specifically exactly
17  which reserves may have been discussed. But
18  there was certainly a number of reserves that
19  were out there on the Graduate books. But then
20  on June 30th they weren't there anymore because
21  they had been transferred and were included as
22  part of the 28.
23       Q.  You're referencing now discussions
24  with Coopers about Graduate reserves and what
25  had become of them during the 1997 fiscal year.

Page 322

1   Right so far?
2        A.  Yes.
3        Q.  And in the context of those
4   discussions, are you saying at least -- they
5   were told that at least some of these reserves
6   were being used to reduce the contract
7   allowances?
8        A.  I don't know exactly what
9   terminology would have been used. Could have
10  been they were used for patient revenue or
11  patient accounts receivable issues. I just --
12  I can't remember specifically what the language
13  would have been used.
14       Q.  But in any event, they were -- were
15  they told, in essence, that apart from the
16  50 million, the first 50, which they knew
17  about, you say?
18       A.  Yes.
19       Q.  Apart from the 21 million, which
20  you believe they knew about; is that right?
21       A.  Yes.
22       Q.  And if I understand yesterday, from
23  the exhibits we looked at, the key bad debt
24  rollover -- or roll-forwards, they could have
25  derived in the fashion you testified yesterday,

Page 323

1  right?
2      A.  Yes.
3      Q.  Okay.  In addition to that, they
4  were told that reserves -- that some of these
5  Graduate reserves had been used to address
6  other issues?
7      A.  I believe so.  I mean derive that
8  in the same fashion as the 21.  Because some of
9  the reserves that were part of the 21 were part
10 of the 28.  So if you're looking at
11 transactions related to the 21, you'd see the
12 same issues because the reserves, there were
13 some reserves that were in both the 21 and 28,
14 I believe.
15     Q.  PFMA, the PFMA reserves which
16 totaled somewhat more than $14 million, those
17 reserves were used as a piece of both the 21
18 and the 28, right?
19     A.  I believe so, yes.
20     Q.  So is what you're saying that if
21 they back up from, say, the key bad debt
22 roll-forwards to the PFMA reserves, they will
23 see that, in addition to the fact that those
24 reserves had been transferred for the
25 21 million, in part, they were also transferred

Page 324

1  for another purpose, right?
2      MR. RYAN:  Objection.
3      A.  Yes.
4      Q.  Now, when you say, it's my
5  understanding that they knew about this, to use
6  your terminology -- "not understanding, believe
7  so.  In addition to that, they were told that
8  the reserves, that some of these Graduate
9  reserves had been used to address other issues,
10 I believe so."
11     Are you saying somebody told you
12 that or are you saying you know that?
13     A.  Like I said, I can't say
14 specifically what the exact conversation was.
15 There were reserves that were on Graduate's
16 books at a certain point in time early in the
17 audit.  And then at the end of the audit,
18 June 30th, they were not there.
19     And it's my understanding, based on
20 I think conversations I had or maybe someone
21 else would have had, that those reserves were
22 gone.  And to explain where they went, they
23 either went to bad debt reserves or they went
24 somewhere else.
25     And the journal entries, if someone

Page 325

1  would go in and look at the time journal
2  entries, it's clear they either would have
3  went, at least some of the reserves would have
4  went to bad debt or went to contractual
5  allowance.
6      Q.  Do you believe that Coopers &
7  Lybrand as part of their 1997 audit was looking
8  at these reserves, these Graduate reserves?
9      A.  Yes.
10     MR. RYAN:  Objection.
11     Q.  From your perspective, as both a
12 former auditor of Coopers who audited AHERF and
13 a former AHERF employee who worked with Coopers
14 on the audit, would it be likely that Coopers &
15 Lybrand, or could Coopers & Lybrand have
16 audited AHERF's financial statements without
17 looking at the status of the Graduate reserves
18 at the end of 1997?
19     MR. RYAN:  Objection.
20     A.  I mean you could always do that.
21 I'm not -- you know, I don't believe that was
22 the case, but I mean how they conducted their
23 audit, that was their decision.
24     Q.  These reserves were set up as part
25 of acquisition -- what's called acquisition

Page 326

1  accounting; is that right?
2      A.  They were set up -- the reserves
3  that were part of the 28 and the 21 were set up
4  as part of the due diligence related to the
5  acquisition on the Graduate hospitals.
6      Q.  All right.  These reserves --
7  strike that.
8      Does Generally Accepted Accounting
9  Principles, to your knowledge, address the
10 issue of the establishment of reserves in these
11 kinds of transactions?
12     A.  Yeah, I think so.
13     Q.  Does it contain mandates or
14 provisions as to how these reserves are to be
15 addressed over time after they are created, do
16 you know?
17     A.  I don't know if -- yeah, I guess
18 you would say that.  I mean they're supposed to
19 be reserves for, you know, certain items that
20 are out there.  And, you know, Generally
21 Accepted Auditing Standard would be, you know,
22 that's something you would look at, presumably,
23 periodically to make sure that it's still
24 appropriate, or if they're not, why not.
25     Q.  All right.  Is someone allowed to

Page 343

1  Right?
2      A.  Yes.
3      Q.  Okay.  Were they also indicating
4  they didn't understand where the rest of it
5  came from, that is, the other 71 million?
6      A.  I think at certain times that was
7  our sense.  Like, you know, what's the 50?
8  There was just -- there just seemed like there
9  was confusion as to these reserve transfers.
10     Q.  I'm trying to explore what you're
11 characterizing here as confusion.
12         First of all, it was, you say it
13 was our sense at times that they were saying
14 they did not know about all or some of the
15 elements of these reserve transfers; is that
16 right?
17     A.  Yes.
18     Q.  Who is "our"?
19     A.  Myself, Robin.
20     Q.  Robin Schaffer?
21     A.  Robin Schaffer.  I know there was
22 conversations with Al, because Al actually, I
23 think, looked through some of his files and was
24 able to find some documents to suggest that
25 there was some, you know, at least some

Page 344

1  correspondence he was able to find on that, on
2  some of the transfers of reserves.
3      Q.  You knew by the time these
4  meetings -- strike that.
5          Did you know by the time these
6  meetings were occurring that you're describing
7  here, these discussions were occurring, that
8  questions had been raised about the propriety
9  of the $99 million in reserve transfers?
10     A.  Yes.
11     Q.  In that context you are having
12 discussions with representatives of Coopers &
13 Lybrand, right?
14     A.  Yes.
15     Q.  Included in those discussions are
16 representatives of PriceWaterhouse?
17     A.  Yes.
18     Q.  And you're saying that in the
19 course of those discussions and in front of
20 others, Amy Frazier is suggesting that she did
21 not know about these reserve transfers?
22         MR. RYAN:  Objection.
23     A.  Yes.
24     Q.  Was Buettner in the room, too, or
25 was he part of these discussions?

Page 345

1      A.  I remember Buettner was at least in
2  the first one.  And, you know, there was
3  questions, what's the 99, what's the 21, what's
4  the 28, okay, what's the 50?
5          And I think at one point there was
6  a -- I asked a question, you know, to Bill
7  saying, you know, is the firm changing their
8  opinion on, you know, how these were accounted
9  for?  I believe I asked that question.
10 And there really wasn't much of an answer to
11 it.
12     Q.  Well --
13     A.  Or response.
14     Q.  Was Buettner suggesting that he
15 didn't know about these reserve transfers
16 either?
17     A.  Bill didn't really say much.
18     Q.  All right.  Was Kirstein in on
19 these discussions?
20     A.  No, I don't think so.
21     Q.  Okay.  Were these reserve transfers
22 or components of them discussed with Amy
23 Frazier prior to the end of the 1997 audit?
24         MR. RYAN:  Objection.
25     A.  Yes.

Page 346

1      Q.  Then when Amy Frazier was
2  suggesting at this meeting that she either did
3  not know or may not have known about these
4  transfers, did that surprise you?
5      A.  Yes.
6          MR. RYAN:  Objection.
7      Q.  All right.
8      A.  Just to set the picture.  There was
9  questions about, first of all, in general, the
10 99 million.  Then the pieces, you know, what's
11 the 50, what's the 21, what's the 28.
12         It was our sense that at times it
13 seemed like they didn't remember the 50, but
14 then it seemed like, okay, okay, I remember
15 that, I remember the 50, I remember the 21, I
16 believe, or at least it was on the bad debt
17 roll-forward schedule.
18         And then at the end, it seemed like
19 it focused on the 28, questions about knowing
20 about the 28 or having the documentation on the
21 28.  And that's why we put this together at the
22 end.
23         After early on, it was pretty -- I
24 mean the information that my understanding was
25 provided, the 50 and the 21 sort of went off

Daniel Cancelmi

Volume 2

Page 347

1  the table after early on.  That was seemed to
2  be, you know, there was no question at that
3  point, but then it sort of boiled down to this
4  28.
5      Q.   All right.  In that context, you
6  prepared Exhibit 321?
7      A.   Yes.
8      Q.   And the summary of the $28 million
9  of reserves are contained on the first page of
10  321; is that right?
11      A.   Yes.
12      Q.   This is where it comes from, right?
13      A.   Yes.
14      Q.   These are the various Graduate
15  entity reserves that were utilized to create
16  the $28.3 million of amounts to be transferred?
17      A.   Yes.
18      Q.   All right.  Then what, for my
19  benefit, are we looking at that is attached to
20  this first page, for example?  What is this
21  document?
22      MR. TYCKO:  You're referring to
23  0073?
24      MR. WHITNEY:  Yes.  Thank you.
25      A.   It's a general ledger of Graduate

Page 348

1  hospital.
2      Q.   For the jury's benefit when,
3  somebody is talking about in this case about
4  the general ledger, this is what it looks like?
5      A.   Yes.
6      Q.   Or this is what one of them looks
7  like?
8      A.   Yes.
9      Q.   And this is the general ledger for
10  the Graduate hospital for the month ending
11  5/31/97?
12      A.   Correct.
13      Q.   All right.  Now, at the top of the
14  summary list on the first page of 321, the
15  first reserve discussed is MA reserve and it
16  says,GL number 1201905, do you see that?
17      A.   Yes.
18      Q.   What is 1201905, what does that
19  number mean?
20      A.   That's the general ledger account
21  number.
22      Q.   Okay.  So if one goes to a general
23  ledger account number bearing the number
24  1201905, one will see some reference to this
25  reserve being transferred?

Page 349

1      MR. RYAN:  Objection.
2      A.   Yes.  No.  It doesn't reference a
3  reserve being transferred.
4      Q.   Thank you.
5      A.   It references a separate reserve
6  account of which this was recorded in.  And you
7  see between the months, the reserve balance
8  went down $2 million.
9      Q.   Which means it went somewhere.
10      MR. RYAN:  Objection.
11      A.   Yes.
12      Q.   All right.  Or it was --
13      A.   Or it was used.
14      Q.   Or it was used or it was written
15  off or something?
16      A.   Something.
17      Q.   All right.  And I notice toward the
18  bottom of the page under patient accounts
19  receivable there is an entry bearing that
20  number that says, MA reserve.  Do you see that?
21      A.   It's not an entry, it's an account.
22      Q.   It's an account, sorry.  Bear with
23  me.
24      Can you walk us through that and
25  show us what it shows?

Page 350

1      A.   It just shows that that reserve
2  balance decreased $2 million.
3      Q.   I'm asking a more simplistic
4  question.  I prefer probably broader brush
5  reading when I'm relaxing, so I'm not familiar
6  with this kind of reading.
7      The first column, current month,
8  shows a negative balance, 360,604.  What's that
9  mean?
10      A.   That's the reserve balance.
11      Q.   It's --
12      A.   At the end of the month.
13      Q.   It is a liability totaling 360,604?
14      A.   Right.
15      Q.   Prior month, in that column, there
16  is a negative balance, 2,360,604.
17      A.   Yes.
18      Q.   And that is?
19      A.   Prior month balance.
20      Q.   Of the same item?
21      A.   Same item.
22      Q.   Same account?
23      A.   Same account.
24      Q.   The variance is $2 million; is that
25  right?

10 (Pages 347 to 350)

Daniel Cancelmi

Page 351

```
 1      A.   Yes.
 2      Q.   What's the variance mean?
 3      A.   The change in the account balance.
 4      Q.   Okay.  So what is does this mean,
 5  this $2 million variance?
 6          MR. RYAN:  Objection.
 7      Q.   If you know.
 8      A.   The $2 million -- what that
 9  variance represents is that's how much the
10  account balance changed between months.
11      Q.   Okay.  What does this tell the
12  reader of 321?
13          MR. RYAN:  Objection.
14      Q.   Why are you putting this in 321?
15      A.   We put this in the document to
16  indicate that the MA reserve had been recorded
17  in a separate account; that that was the
18  balance in the account at a certain point in
19  time.  And then the balance was lower and the
20  reduction was the exact amount that's presented
21  on the summary schedule, which we said here,
22  hey, $2 million was used or transferred.  And
23  this was the account it was in.
24      Q.   I'm trying to get back to the most
25  basic level.  Tell me like I'm five years old,
```

Page 352

```
 1  so what does this tell me as it relates to
 2  $28 million of reserve transfers?
 3      A.   It tells you --
 4          MR. RYAN:  Objection.
 5      A.   -- that there was a reserve out
 6  there that had been reduced.  And that, you
 7  know, that's something an auditor may want to
 8  look at.
 9      Q.   If an auditor wanted to look at it,
10  you're showing by this document he could have
11  found it?
12          MR. RYAN:  Objection.
13      Q.   Is that right?
14          MR. RYAN:  Objection.
15          MR. WHITNEY:  I'm only asking
16  him -- I'm not asking him to speculate, and it
17  may sound like I am.  And if it does, the
18  question is inartfully framed.
19      Q.   I'm asking this question from the
20  standpoint of the fact that foundationally you
21  put this document together as some sort of
22  support for some position you were taking about
23  the $28 million of reserve transfers, right?
24      A.   Yes.
25      Q.   Okay.  It was thought appropriate
```

Page 353

```
 1  by you to put this particular page behind the
 2  summary sheet; is that right?
 3      A.   Yes.
 4      Q.   Did you do that because you
 5  believed it evidenced something?
 6      A.   Yes.  We put it in there because we
 7  thought this would demonstrate, hey, it was
 8  recorded in a separate account, a reserve that
 9  we believe they knew about, and that it had a
10  higher balance at one point and now it had a
11  lower balance.  Therefore, this would be a form
12  of documentation to suggest that that reserve
13  had been utilized to a large extent.
14      Q.   You had not sneaked this
15  $28 million of reserve, or in this case this
16  $2 million of reserve, over to DVOG without
17  entering it into the company's books; is that
18  right?
19      A.   Nothing was snuck.
20      Q.   And that's what you're trying to
21  show Coopers & Lybrand?
22      A.   Yes.
23          MR. RYAN:  Objection.
24      Q.   It was there to see in the general
25  ledger when you looked at the general ledger?
```

Page 354

```
 1      A.   Yes.
 2          MR. RYAN:  Objection.
 3      Q.   If you looked at the general
 4  ledger?
 5          MR. RYAN:  Objection.
 6      A.   Yes.
 7      Q.   Would a review of the general
 8  ledger be something that you would expect
 9  Coopers & Lybrand to do as part of its audit of
10  AHERF?
11          MR. RYAN:  Objection.
12      A.   Yes.
13      Q.   And I am, again, asking you that
14  question from your perspective of being both a
15  former auditor for Coopers & Lybrand of the
16  AHERF account and an employee of AHERF working
17  with Coopers & Lybrand in their audit of the
18  AHERF account.
19      A.   Yes.
20      Q.   Okay.
21          MR. RYAN:  I'm sorry.  I don't know
22  if that was a question.
23          MR. WHITNEY:  There was no
24  question.  He just answered the prefatory
25  before I asked the question.
```

11 (Pages 351 to 354)

Daniel Cancelmi                                                    Volume 2

Page 355

1    A.    I think there was a question.
2    Q.    But now that the official has blown
3 the whistle and the parties are brought back
4 together, let me ask you the question that
5 stems from it.
6         Based upon that perspective, this
7 page here, this general ledger is something
8 that Coopers & Lybrand would ordinarily be
9 expected to reserve as part of their audit?
10   A.    Yes.
11        MR. RYAN:  Objection.
12   A.    Whether this particular exact
13 single page, I can't say, but they were
14 provided general ledgers.
15   Q.    All right.  And once again, what we
16 are talking about here is changes in the
17 balance of the Graduate reserves during the
18 year; is that right?
19   A.    Yes.
20   Q.    Okay.  Now, similarly, the PFMA,
21 there is a reference to -- I'm not going to go
22 through all of them for everybody's benefit,
23 but the PFMA there is a reference to general
24 ledger number 1201902.
25        Would that be found -- I don't --

Page 356

1 you're right, I was looking at a second page
2 and it looks like the same page twice, but it's
3 not that either.
4         Is 120192 attached?
5    A.    I'm sorry?
6    Q.    I'm sorry.  You're right.
7         MR. TYCKO:  Look over at 075.  I
8 think you're looking for the page that shows
9 the variance that PFMA.
10        MR. WHITNEY:  Yes.
11        MR. TYCKO:  It's 0075.
12        MR. TORBORG:  I don't think so.
13        MR. WHITNEY:  I don't either.
14 That's what I'm having the confusion about and
15 I apologize to everybody.
16   A.    Yes, it is.
17   Q.    Excuse me?
18   A.    Yes, it is.
19   Q.    It is?
20   A.    Yes.
21   Q.    0075?
22   A.    Yes.
23   Q.    Has, in fact, reference to this
24 1201902 general ledger number.
25   A.    Yes.  Says, other reserves-PFMA.

Page 357

1    Q.    You're right.  You're right.  Thank
2 you, Mr. Cancelmi.
3         And so forth, down the column,
4 either attached or if Coopers wanted to look at
5 them, are general ledger references to similar
6 reductions in these reserves; is that right?
7         MR. RYAN:  Objection.
8    A.    For some of them, yes, that's
9 the -- that was for some of these reserves,
10 that are summarized here we put copies of the
11 general ledger, which would indicate where the
12 reserves, the account reserves were in and that
13 they had been reduced.
14   Q.    How about this 0074, the audit
15 update of 8/22/97.  That's the second support
16 page behind 321.
17        Why is that included as part of
18 this package?
19   A.    Because we thought from looking at
20 this audit update agenda there was a reference
21 to the PFMA contract.
22   Q.    So?
23   A.    Which sort of was our recollections
24 that it had been discussed with them.  And then
25 when we saw it on this agenda, we said, well,

Page 358

1 that seems to be an indication that it could
2 have been -- would have been discussed.
3    Q.    In fact, you have seen a copy of
4 this very agenda with Kirstein's handwriting on
5 it, right, I believe it was marked yesterday --
6    A.    I believe so.
7    Q.    -- as Exhibit 1072.  1072, was that
8 the number you just showed me?
9         MR. TYCKO:  Doesn't appear to be in
10 the witness's stack.
11   Q.    That's an interesting revelation
12 that I'm going to have to try to figure out the
13 answer to during the next break.
14        But let me show you what was marked
15 yesterday as Exhibit 1072 and the second page
16 of 1072 shows what appears to be a copy of this
17 very document.  Do you see that?
18   A.    Yes.
19   Q.    We talked about this yesterday.
20 You indicate that's Kirstein's handwriting?
21   A.    Yes.
22   Q.    Had you seen this document before,
23 this document being 1072, had you seen that
24 document before you put this audit update --
25   A.    No.

12 (Pages 355 to 358)

Daniel Cancelmi

Page 359

1    Q.  -- memo here?
2    A.  You mean with Kirstein's notes?
3    Q.  Right.
4    A.  No.
5    Q.  The purpose for which you attached
6  this to your Exhibit 321, this agenda, is to
7  show that the PFMA contract was discussed --
8    A.  Yeah, we thought --
9    Q.  -- during an audit update meeting?
10       MR. RYAN:  Objection.  Misstates
11  the prior testimony.
12    Q.  Well, if it misstate it or not, let
13  me give it another shot.
14       Was one of the reasons why the
15  August 22, 1997 audit update memo attached to
16  this is -- it's attached to it because of the
17  reference in Roman 2, right?
18    A.  Yes.
19    Q.  What is that telling Coopers?
20       MR. RYAN:  Objection.
21    Q.  If anything.
22    A.  What we were trying to demonstrate
23  is we had thought it was discussed with Coopers
24  and, in fact, we found this audit update
25  agenda, which indicated that this PFMA contract

Page 360

1  had been listed as one of the agenda items.
2       So what we were trying to tell PWC
3  was here, this is, we believe another
4  indication that the PFMA reserve had been
5  discussed.
6    Q.  All right.  And Kirstein's note to
7  that item is, where did it go, right?
8       MR. RYAN:  Objection.
9    A.  That's what the note says.
10    Q.  Thank you.  The item that's got
11  Bates number 0076 attached to it, which is also
12  not a general ledger entry.  Doesn't appear to
13  be.
14       You put this as part of this
15  package together for Coopers & Lybrand in 1998
16  as well, right?
17    A.  Yes.
18    Q.  Now, what's that telling -- what is
19  that intended to tell Coopers & Lybrand, if
20  anything?
21       MR. RYAN:  Objection.
22       MR. WHITNEY:  What's wrong with
23  that question, just out of curiosity?
24       MR. RYAN:  It's unclear whether
25  you're talking about what it told Coopers &

Page 361

1  Lybrand during the 1997 audit or what it was
2  intended to tell PWC in '98.
3       And it's also speculative about how
4  somebody from Coopers & Lybrand would read such
5  a schedule.  Two separate problems.
6    Q.  The second problem was obviated by
7  the question because the question asked what
8  was it intended to tell them.  And thank you.
9  I've got to ask you more often, because you're
10  very helpful to me.
11       I'm referencing, when I'm talking
12  about what it was intended to tell Coopers &
13  Lybrand, to the period of time in which the
14  memo was being -- or this document was being
15  submitted and discussed.  We've already talked
16  about what Coopers & Lybrand was told or not
17  told, saw or did not see in 1997, during the
18  audit.
19       In 1998 you put this together and
20  you were intending to show something with this
21  document, right?
22    A.  Uh-huh.  Yes.
23    Q.  What were you intending to show?
24    A.  Well, this was a document that I
25  believe had been prepared by Robin and her

Page 362

1  group.  And I believe these schedules were
2  commonly provided to Coopers & Lybrand as part
3  of the audit.  And its a summary of various
4  contractual allowance balances or reserve
5  balances.
6       And this schedule showed that as of
7  March, there was this excess bad debt reserve
8  of this million 20.  And there was a balance
9  early on.  And then at the end of June, the
10  balance had essentially gone down to almost
11  zero.  There was couple hundred dollars left in
12  the account.
13       But it was the same logic.  We were
14  trying to indicate that this may be another
15  document to suggest that they had information
16  available to them that would indicate that the
17  reserve had been reduced.
18    Q.  And this would relate to the third
19  item on the Graduate system reserve's list,
20  excess bad debt?
21    A.  Yes.
22    Q.  Okay.  Now, when you gave this --
23  did you give this 321 to Coopers?
24    A.  Yes.
25    Q.  Who at Coopers?

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                      Akron (330) 374-1313

Daniel Cancelmi

Page 363

1    A.    There was a meeting in my office.
2    Robin was in there, I think Rob Cepielik was in
3    there, and I think Mel.  There was one other
4    person in there.  I think it was Mel, but I
5    can't say for certain.
6        Q.    Who did you give the document to?
7    All of them?
8        A.    I believe so.
9        Q.    What was the response, if any, of
10   Coopers & Lybrand to this document?
11       A.    I'll be honest, I remember after
12   the meeting, me and Robin were talking.  It
13   didn't seem like they even paid much attention
14   to the document.  We -- they -- for whatever
15   reason we were getting together to go through
16   some things, I guess a status of where they
17   stood.
18           And we provided this document to
19   them.  Said, hey, we know it seems like there's
20   been questions about this 28.3 million and
21   we've put this document together to try to
22   suggest that here's some documentation that's
23   out there that they may have looked at to
24   indicate that these reserves had been reduced
25   and, therefore, transferred over either to --

Page 364

1    for this 28.3 million.
2           And I don't remember much of a
3    dialogue on this.  It seemed like they were
4    pretty much done with their review at that one
5    point in time.
6           In fact, I believe that was the
7    meeting where they said they were pretty much
8    wrapped up.  And I think I asked them, well,
9    have you talked to Al Adamczak or have you
10   talked to Chuck Morrison?  And I think it's
11   this meeting where it seemed like, I'm not --
12   they seemed surprised or, well, who was Chuck
13   Morrison?
14          And I asked them, have you talked
15   to Chuck Morrison, he's the chief financial
16   officer.  He certainly can provide some
17   background on, you know, these transactions
18   that you're examining.
19          And that was pretty much it.  The
20   meeting pretty much wrapped up.
21       Q.    Was it Amy Frazier who asked who
22   Chuck Morrison was?
23       A.    No.  I don't think Amy was in
24   there.
25       Q.    The context of these discussions

Page 365

1    was at least in part that concerns had arisen
2    about the $99 million of reserve transfers; is
3    that right?
4        A.    Yes.
5        Q.    And the question is whether or not
6    the 1997 year end financials had to be
7    restated; is that right?
8        A.    Yes.
9        Q.    Now, in that context, Coopers &
10   Lybrand is raising questions about whether or
11   not they knew about these reserve transfers; is
12   that right?
13           MR. RYAN:  Objection.
14       A.    It seemed like they were asking
15   questions as to what these reserves related to.
16       Q.    And one of the people asking such
17   questions was Amy Frazier?
18       A.    Yes.
19       Q.    All right.  You indicated that you
20   were surprised that Amy Frazier was asking
21   those questions; is that right?
22       A.    Yes.
23       Q.    Was surprise the only emotion you
24   had at that point?
25       A.    I don't know all my emotions.  I

Page 366

1    was -- we were surprised, that it seemed like
2    they were indicating that they weren't aware of
3    at least some of these reserves.
4           At times others, they seemed to
5    indicate they remembered others that they had
6    not.  And we were, you know, we were definitely
7    surprised.  And that's when we, you know,
8    decided to try to identify documentation that
9    we could provide them, you know, to indicate
10   that, hey, I mean this was out in the open.
11   And something that wasn't, you know, hidden
12   from them or anything like that.
13           And Al had had conversations with
14   me during this time that, you know, it seems
15   like there's questions as to what they knew and
16   what had been discussed with them.  And I
17   believe even Allegheny's external legal
18   counsel, Hahn Loser, had indicated the same
19   thing to me.
20       Q.    Don't care about Hahn Loser.  I'm
21   asking about Coopers & Lybrand.
22       A.    I'm putting it into context.  I am
23   answering your question.  This is all -- I'm
24   hearing this from a number of different
25   sources, including, I think Al at one point

14 (Pages 363 to 366)

Daniel Cancelmi

Page 395

1      MR. RYAN: Objection.
2      A.   I can't remember. I know I
3   provided -- I would have provided my comments.
4      Q.   Do you recall proposing language
5   for inclusion in the 1996 audit letter that
6   went beyond what is in here and contained more
7   specific discussion of problems in the area of
8   accounts receivable?
9      MR. RYAN: Objection.
10     A.   Language I would have suggested
11  that didn't make it into the letter?
12     Q.   Yes, that deals with problems in
13  accounts receivable.
14     A.   Boy, I can't remember. I know I
15  would have provided comments. Whether
16  everything got in there, I don't know. I don't
17  remember.
18     Q.   Well, I'm talking about problems
19  that if they're not in there, you might
20  remember. And if you don't remember, then you
21  don't remember.
22     A.   I really --
23     Q.   I'm trying to find out whether or
24  not you were involved in proposing language for
25  Coopers' management letter that discussed

Page 396

1   problems in the area of accounts receivable at
2   year end 1996 that did not make it into the
3   management letter.
4      MR. RYAN: Asked and answered.
5      A.   I don't remember. My recollection
6   was that the first draft we saw seemed to be a
7   little light and I thought, from thinking about
8   the right year, we provided language to beef it
9   up. Whether every single suggestion that I
10  made or Steve might have made or Al or Chuck
11  Morrison or whoever else, whether every single
12  suggestion in there, I don't remember.
13     Q.   You remember one occasion in which
14  you thought the language discussing accounts
15  receivable was a little light and you and
16  perhaps Spargo proposed language to beef it up?
17     A.   It could --
18     MR. RYAN: Objection.
19     A.   It could have been me. It could
20  have been Steve's language.
21     Q.   But somebody proposed language?
22     MR. RYAN: Objection.
23     A.   That wasn't necessarily -- when you
24  get a first draft of a letter, you know,
25  oftentimes they're drafted by the less

Page 397

1   experienced individuals, so you, you know,
2   there's a lot of times, and I think if there's
3   any copies of the drafts I would have reviewed,
4   you would have seen that I probably would have
5   had a number of different comments and
6   suggested language changes, but I don't
7   remember every single one, certainly.
8      Q.   But you do recall occasions in
9   which you proposed language to Coopers &
10  Lybrand addressing the issue of accounts
11  receivable, right?
12     A.   Yeah, I think so, sure.
13     Q.   Addressing the issue of problems
14  related to accounts receivable?
15     A.   Or issues. Whatever the case may
16  be.
17     Q.   With that foundation, do you
18  remember whether or not you proposed such
19  language in 1996?
20     A.   I think I did.
21     Q.   Do you remember whether or not your
22  proposals all made it into the management
23  letter?
24     A.   I've answered that I think three or
25  four times.

Page 398

1      Q.   Try a fifth.
2      A.   I don't remember if every single
3   thing made it.
4      Q.   Very good. I believe we talked
5   about this yesterday, but do you recall whether
6   or not at some point during the 1996 -- the
7   preparation of the 1996 financial statements a
8   determination was made that DVOG's allowances
9   for bad debt were insufficient?
10     A.   Repeat the question again, I'm
11  sorry.
12     Q.   Let me headline it. We're talking
13  about -- we're going to talk about now
14  $17.5 million of reserves being applied to
15  AHERF bad debt in 1996.
16     A.   Okay.
17     Q.   In that general subject area.
18     A.   Okay.
19     Q.   Do you recall that at some point
20  during the 1996 preparation, finalization of
21  the 1996 AHERF financial statements a
22  determination was made that DVOG's bad debt
23  allowance was insufficient?
24     A.   Yes, I do remember that. There
25  was, like I said yesterday, there was a lot of

22 (Pages 395 to 398)

Daniel Cancelmi

Page 399

1  analysis, it seemed like, that was taking place
2  over and above what at least seemed to have had
3  occurred in the prior audit.  Maybe some more
4  information requests or data requests.
5        And I think that was a
6  by-product -- or the 17 and a half million
7  dollars of adjustments, I think, may have been
8  a by-product of some of the additional
9  procedures that had been performed.
10      Q.   Let me show you a document that has
11  previously been, I'll bet, shown to you by
12  other parties interested in the affairs of
13  AHERF, but ask you whether or not you can
14  recognize it.
15        I'm going to need to mark this one
16  with a new exhibit number.
17            - - - - -
18        (Thereupon, Exhibit 1073 was marked
19        for purposes of identification.)
20            - - - - -
21      Q.   Showing you what has now been
22  marked as Deposition Exhibit 1073, I wonder if
23  you can identify this document, if you're able
24  to identify this document?
25      MR. RYAN:  Objection.

Page 400

1        MR. WHITNEY: They're always good,
2  so let me ask.
3        MR. RYAN:  You've changed from if
4  he recognizes it to whether he can identify it.
5  The only thing I want to be clear on is whether
6  this witness can lay any foundation for this
7  document, since I doubt it.
8        MR. WHITNEY:  I like your question
9  better and I can't stand it when I read the
10  transcripts and I see that I have done that,
11  because I'm thinking about something else when
12  I'm doing it.
13      Q.   First of all, do you recognize this
14  document?
15      A.   I can't say that I do.  I may have
16  seen it.
17      Q.   May have seen it is the best you
18  can do?
19      A.   Yes.
20      Q.   Then never mind my previous
21  comments and let me show you a document that
22  has been marked as Defendant's Exhibit 122
23  instead, because maybe I'll do better with this
24  one.
25        Do you recognize this document?

Page 401

1      A.   Yes.
2      Q.   Whose handwriting is this?
3      A.   Mine.
4      Q.   Man.  Can you tell us what this is?
5      A.   It's a summary of adjustments that
6  were made to the DVOG hospitals bad debt
7  reserves.
8      Q.   Okay.  Does it show, to move this
9  along, that $17 and a half million was -- or
10  the accounts receivable balances were adjusted
11  upward by $17 and a half million?
12        MR. RYAN:  Objection.
13      A.   It shows that the adjustments of
14  $17 and a half million were made to the AR
15  reserve account, yes.
16      Q.   And then under item A, there's a
17  note A under that $17 and a half million there,
18  the total of the adjustments.  And the footnote
19  references, I gather, to these specific items
20  that are below it, right?
21      A.   Yes.
22      Q.   What are these items?
23      A.   These are the reserves that were
24  out there that management determined could be
25  used to increase the reserves by the 17 and a

Page 402

1  half million and these listed where some of the
2  reserves were.
3      Q.   Now, for jury's benefit, since
4  we've been talking for the last day and a half
5  about reserve transfers, this had nothing to do
6  with the Graduate reserves and those
7  $99 million, right?
8      A.   No.
9      Q.   And actually we're talking about a
10  period of time earlier than that discussion,
11  right?
12      A.   Yes.
13      Q.   Management decided to apply these
14  reserves to the bad debt allowance account; is
15  that right?
16      A.   Yes.
17      Q.   Do you remember where the
18  suggestion came from to apply these reserves to
19  the account?
20        MR. RYAN:  Objection.
21      Q.   Maybe too broad.  Who made the
22  determination to apply reserves to DVOG's
23  allowance for bad debt in 1996?
24        MR. RYAN:  You mean these
25  particular reserves or just increase the

Daniel Cancelmi

Page 403

```
1   allowance?
2       Q.   That will do.
3       A.   These particular -- it was my
4   understanding Allegheny management.
5       Q.   Now, see, Mr. Ryan is tricky and
6   smart and he has led me, a weaker mind, down a
7   road I don't want to go.  So let me back up
8   one.
9       Who made the decision to apply
10  reserves to the DVOG allowance for doubtful
11  accounts --
12      MR. RYAN:  Objection.
13      Q.   -- in connection with the 1996
14  audit?  That's a question one step removed
15  backward from the question I just asked you.
16      A.   I don't know specifically.  It was
17  my understanding that Spargo was involved and I
18  assume McConnell and Chuck Morrison, but I
19  can't say for certain.
20      Q.   How about people at Coopers, do you
21  know whether or not Coopers were involved in
22  the discussions about conceptually using
23  reserves to augment DVOG's allowance for bad
24  debt?
25      A.   I believe they were.
```

Page 405

```
1       A.   Yes.
2       Q.   Okay.  And did that decision
3   include Coopers?
4       A.   I thought it did, but I really -- I
5   believe Spargo and McConnell and Morrison would
6   have been more involved.
7       Q.   Okay.  This is an important point
8   that we need to make.  Are you saying, if it
9   did involve Coopers, you weren't in on that?
10      A.   No, not necessarily saying that.  I
11  just don't -- just seemed like Coopers was
12  doing more work, working, you know, doing
13  additional work over and above, like I said,
14  what they normally would have done.
15      It seemed like there were having
16  conversations, whether it was with Spargo or
17  McConnell or whoever else.  They were obviously
18  asking us for data, you know, in our
19  department.
20      And it seemed like at some point, I
21  guess it would have been Steve saying I think
22  there needs to be more -- based on what, you
23  know, what's being concluded, there needs to be
24  more reserves recorded.  And therefore, you
25  know, there are reserves out there and then
```

Page 404

```
1       Q.   All right.  I want to ask you some
2   questions to try to focus on this process.
3       Did there come a point in time
4   before that decision -- a decision was made to
5   apply reserves, did there come a point in time
6   when it was determined that the reserve or the
7   allowance for doubtful accounts at DVOG was
8   understated?
9       A.   Yeah.  I mean the background on
10  this, my memory of the background is that the
11  books for June of '96 were closed by Allegheny
12  management.  They did not include the $17 and a
13  half million of adjustments.  So the initial
14  closing I believe did not include these
15  adjustments.
16      And then during the course of --
17  after the initial close, as management was
18  further reviewing the bad debt reserves and
19  Coopers & Lybrand was reviewing those reserves
20  as part of their audit, ultimately it was my
21  understanding there was a decision made that
22  there needed to be more reserves recorded.
23      Q.   All right.  Stop you right there.
24  A decision was made, we need to record more
25  reserves, right?
```

Page 406

```
1   there was a discussion on where the reserves
2   could be -- the source of the reserves to
3   support recording the additional 17 and a half.
4       Q.   Let me put this in context.  You
5   say, "and it seemed like at some point, I guess
6   it would have been Steve saying I think there
7   needs to be more -- based on what, you know,
8   what's being concluded, there needs to be more
9   reserves recorded.  And therefore, you know,
10  the reserves out there, and there was a
11  discussion of where the reserves could be, the
12  source of the reserves to support recording the
13  additional 17 and a half."
14      There are a couple of concepts in
15  there, but right now I'm focusing and we're
16  going to get to other one, but right now I'm
17  focusing on that language that says, based on
18  what's being concluded, there needs to be more
19  reserves recorded.
20      It's the part about the concluded
21  that I'm trying to find out now.  Coopers is
22  out doing an audit that includes an audit of
23  the allowance for doubtful accounts, right?
24      A.   Yes.
25      Q.   Management is doing that which
```

24 (Pages 403 to 406)

Daniel Cancelmi

Page 415

1     MR. TYCKO:  Just to be clear, are
2  you asking him whether or not he would expect
3  to see a schedule like that or whether the
4  schedule would rightly exist?
5     MR. TORBORG:  I think I asked
6  whether he would expect to see such a schedule.
7     A.  You know, it wouldn't surprise me.
8     Q.  I want to go back and ask you some
9  different questions on East Falls methodology
10  that we talked about earlier?
11     A.  Yes.
12     Q.  And I want to mark a new exhibit.
13          - - - - -
14     (Thereupon, Exhibit 1074 was marked
15          for purposes of identification.)
16          - - - - -
17     Q.  We'll mark this as Exhibit 1074.
18  For the record, this is a document bearing
19  Bates DC45 25, page 22.
20          I would like to represent to you,
21  Mr. Cancelmi, that the Bates label DC indicates
22  it came from your files.
23     A.  Okay.
24     Q.  And my first question is:  Do you
25  recall seeing this document?

Page 416

1     A.  I believe so.
2     Q.  Now, do you see in the -- you can
3  look through the rest of the document, if you
4  want, but I'm just going to ask you about the
5  footnote three about a third of the way down
6  the page underneath MCP.  Do you see where it
7  says, "reserve calculated on all the self-pay
8  balances and only the patient liability
9  balances for all other payor classes," right?
10     A.  Yes.
11     Q.  Now, I think Mr. Whitney earlier
12  referred to only reserving self-pay balances.
13  And I believe I heard an objection from
14  Mr. Ryan.
15          Would it be fair to say that you
16  believe the MCP methodology was only reserving
17  self-pay balances and the patient liability
18  balances on other payor classes?
19     MR. RYAN:  You mean as part of the
20  bad debt allowance?
21     MR. TORBORG:  Yes.
22     A.  I mean I believe that statement is
23  accurate.  If they were balances sitting in the
24  self-pay category or I think the billing
25  system, if amounts were owed from insurance

Page 417

1  companies and it was separated between maybe a
2  thousand dollars would come from Blue Cross and
3  then maybe a hundred from the patient, that
4  1100 total may be classified as a Blue Cross
5  receivable, but the hundred dollars patient
6  balance would have been the balance that would
7  have maybe had a bad debt reserve --
8     Q.  Okay.
9     A.  -- estimated on.
10     Q.  Okay.  So it's the patient
11  liability for all other payor classes is, can
12  we also say that's sort of the co-pay?
13     A.  It could be a co-pay or deductible
14  or whatever the lingo would be for that
15  insurance company maybe.
16     Q.  Fair enough.  I'm going to mark as
17  our next Exhibit 1075.
18          - - - - -
19     (Thereupon, Exhibit 1075 was marked
20          for purposes of identification.)
21          - - - - -
22     Q.  For the record, this is a document
23  Bates labeled CL001180 to 93.
24          Now, I take it given this is a
25  Coopers work paper, you've never seen this

Page 418

1  document before?
2     A.  I may have during some of these
3  investigations.  I can't say for certain.
4     Q.  But you wouldn't have seen it
5  during the time of the '97 audit, or '96 audit?
6     A.  I don't know.  I mean some of these
7  schedules that are behind here are schedules
8  from Allegheny, so I probably would have seen
9  some of these schedules.
10     Q.  Okay.
11     A.  Based on -- this is based on using
12  the Hahnemann methodology.
13     Q.  Do you have an understanding after
14  saying that what this document is attempting to
15  do?
16     A.  On the first page it says the bad
17  debt analysis at June of '96 using the
18  Hahnemann Hospital, that's that HUh, that's
19  what that meant, methodology.  So I mean I may
20  have seen some of these schedules.  I couldn't
21  say for certain.
22     Q.  Do you recall any discussion with
23  anyone from the Coopers audit team that they
24  were looking at the adequacy of the MCP and
25  EPPI reserve balances by using the Hahnemann

27 (Pages 415 to 418)

Daniel Cancelmi                                                                    Volume 2

Page 419

1  University Hospital methodology?
2        MR. RYAN: Objection.
3        MR. TORBORG: What's the objection?
4        MR. RYAN: These are estimates. So
5  what's being assessed reasonableness, not
6  accuracy.
7        A.  Generally speaking, I knew, like I
8  said earlier, that there was some questions
9  regarding East Falls methodology and, you know,
10  compared to how the methodologies being used at
11  the other Allegheny hospitals.
12        And, you know, I guess I would
13  remember that either they did the calculation
14  or they asked, they would have asked Robin, I
15  guess, to try to run the numbers through -- run
16  East Falls, some of their numbers through a
17  methodology that was similar to Hahnemann.
18        And there's an indicator on the
19  first page that says, PBC, which I believe
20  meant that the schedule would have been
21  prepared by the client. I mean I guess Robin
22  or someone on her staff may have run the
23  numbers or input the numbers in here.
24        Q.  So you think based on the PBC
25  notation that Coopers requested that AHERF run

Page 420

1  these calculations?
2        A.  Yes.
3        Q.  Do you recall discussing the
4  results of those calculations with anyone from
5  Coopers?
6        A.  Specifically, not -- I couldn't say
7  for certain. I mean I remember it being an
8  issue, so I assume there was some type of
9  conversation about it.
10        Q.  Do you remember talking about that
11  issue with anyone internal to AHERF?
12        A.  Oh, yeah. I mean I guess with
13  Robin, because, you know, her or someone on her
14  staff would have had to do it. I assume Steve,
15  because he would have been there at that time.
16  And I don't know if there was any conversations
17  with Chuck Morrison or not.
18        When Chuck Morrison had
19  responsibility for preparing a financial
20  statements, or his staff did, before Spargo
21  took over that responsibility, they would have
22  been using the same methodology that would have
23  been used by our department with a carryover.
24  We were using the same methodology that Chuck
25  Morrison's staff was using, if I remember.

Page 421

1        Q.  I wanted to ask you not to assume
2  conversations you may have had given this
3  document, but whether you have any specific
4  recollection of any conversations --
5        A.  I can't remember.
6        Q.  -- about this.
7        A.  I can't remember any specific
8  conversations.
9        Q.  I also want to follow up on
10  something you just said. You said that Chuck
11  Morrison's staff had originally prepared
12  these --
13        A.  Not this --
14        Q.  -- calculations?
15        A.  Not this schedule.
16        Q.  Not this schedule, but were they
17  originally charged with assessing the adequacy
18  of the bad debt reserves at one point in time?
19        A.  They were -- before some of the
20  accounting processes were transferred from
21  Philadelphia to Pittsburgh, when they were out
22  in Philadelphia, Chuck was responsible for --
23  his staff was responsible for preparing the
24  financial statements, similar to our
25  department.

Page 422

1        And Chuck had the same role. He
2  was the chief financial officer, so he would
3  ultimately approve the financial statements.
4  The only difference was that instead of having
5  staff accountants prepare the financial
6  statements, like our department did, that those
7  staff accountants, our department, now was
8  under Steve Spargo as opposed to reporting up
9  to Chuck Morrison.
10        Q.  Do you recall the fiscal year that
11  people under you and the AHERF centralized
12  accounting office took over the assessment of
13  the adequacy of the bad debt reserves at DVOG?
14        A.  We took over the preparation and
15  the calculations and the consolidation of the
16  accounting departments, I believe it was in
17  fiscal '95.
18        Q.  So prior to that, this was being
19  done by some -- this assessment was being done
20  by someone at Chuck Morrison's staff?
21        A.  Yes.
22        Q.  Do you remember who or --
23        A.  Probably would have been a number
24  of different people.
25        Q.  Do you recall who would have been?

28 (Pages 419 to 422)