Daniel Cancelmi    Volume 2

---

Page 435

```
 1       MR. RYAN:  Objection.
 2     A.    There is a difference there.  And
 3  there's a percentage difference, yes, sizable
 4  percentage difference.
 5       What I'm struggling with is on this
 6  page 16, if that allowance percentage is the
 7  contractual allowance percentage or the bad
 8  debt reserve percentage.
 9     Q.    All right.  Let me see if I can
10  help you with that.  Why don't we go to
11  page 22.  This is a listing for the Patcom
12  receivables.
13     A.    What page?
14     Q.    Page 22.
15     A.    Okay.
16     Q.    This appears to me at least, and
17  correct me if I'm wrong, if appears to be a
18  listing of the outpatient receivables at Elkins
19  residing in the Patcom system.
20     A.    Right.
21     Q.    Right?  And then there's a little
22  handwritten note that --
23     A.    That's mine.
24     Q.    -- looks like your handwriting.
25  And I think it says, gives before contractuals.
```

Page 436

```
 1     A.    No.  Gross.
 2     Q.    Okay.  I'm sorry.  Gross before
 3  contractuals, refer to following schedule for,
 4  is that CA?
 5     A.    No.  For AR.
 6     Q.    For AR.
 7     A.    Net of after contractuals.
 8     Q.    Yes.  Now, why don't we go to
 9  following schedule, which I think you'll see on
10  page 25.  Actually, page 26.
11     A.    25.
12     Q.    This is titled Net Outpatient
13  Accounts Receivable, right?
14     A.    Yes.
15     Q.    And here, this is net of gross,
16  right?
17     A.    Net of contractuals.
18     Q.    So on this schedule you have
19  reduced it by any contractual amounts, right?
20     A.    That's my understanding, right.
21     Q.    And in there, in that schedule, you
22  have something titled Reimbursement Percentage?
23     A.    Yes.
24     Q.    Right?  Does that appear to be,
25  based your review of the gross schedule, the
```

Page 437

```
 1  next schedule, what you were referring to as
 2  contractual allowance for these accounts, at
 3  least the outpatient accounts?
 4       MR. RYAN:  Objection.
 5     A.    What that reimbursement percentage
 6  indicates, I believe, is that of the gross --
 7  of receivable balance, the gross receivable
 8  balance, I guess, is a million 022.  I'm
 9  looking in the 181 to 360 category.  The
10  reimbursement percentage was 49 percent, so the
11  bad debt reserve percentage, I guess, would be
12  51 percent, which would be a hundred less 49.
13     Q.    Well, the net -- what do you mean
14  by the bad debt reserve percentage?  This
15  51 percent?
16     A.    A hundred less the 49.
17     Q.    Isn't the net accounts receivable
18  the 51 percent, right, if you minus 49 percent?
19       MR. RYAN:  Objection.
20     A.    Give me a couple minutes to figure
21  out the schedules.
22       MR. TORBORG:  What's the nature of
23  the objection?
24       MR. RYAN:  Would you read the
25  question back, please?
```

Page 438

```
 1       (Record repeated.)
 2       MR. RYAN:  I think you stated it
 3  the opposite way from what it is.  I think what
 4  you referred to as the net accounts receivable
 5  is in fact the contractual allowance.  So
 6  that's why I objected.
 7       MR. TORBORG:  I think you're right.
 8     Q.    So the net amount collectible would
 9  be the 49 percent?
10     A.    Right.
11     Q.    That's what you're getting
12  reimbursed by?
13     A.    Right.
14     Q.    So that would be the net
15  receivable, right?
16     A.    Right.
17     Q.    So the contractual allowance would
18  actually be 51 percent?
19     A.    Right.
20     Q.    Right?
21     A.    I think so.
22     Q.    Okay.  Now, if you look at the
23  previous schedule, you see the same terminology
24  I was asking you about before with regard to
25  inpatient accounts, allowance percent.
```

Cleveland (216) 523-1313    Just Launched   www.rennillo.com   Schedule Online    Akron (330) 374-1313

Daniel Cancelmi                                                                                    Volume 2

---

**Page 439**

1    Does going through this exercise
2  allow you to infer that the allowance percent
3  listed both on page 22, for the gross
4  outpatient accounts, and page 16, on the
5  inpatient accounts, to be what the bad debt
6  reserve percentage was?
7    A.   No, I don't think that's the case.
8    Q.   Why not?
9    A.   Let me see if I can figure out
10  these schedules.
11    Q.   Let me help you out.  Why don't we
12  take the first page.  It's been a while
13  since -- okay.  First page of this schedule.  I
14  think I can make it real easy for you.
15    A.   Okay.
16    Q.   Page 1, see where it says, adjusted
17  inpatient required allowance for Elkins Park.
18    A.   Yes.
19    Q.   Patcom reserves, 983,000 and
20  change, right?
21    A.   Right.
22    Q.   Okay.  Now, let's go to page 18 of
23  27.  Do you see toward the bottom right corner
24  the figure 983,000 and change?
25    A.   Yes.

---

**Page 440**

1    Q.   Now, did that allow you to infer
2  that the bad debt reserve percentage,
3  percentages, let's just stay with the specific,
4  allow you to infer that the allowance percent
5  listed of 20 percent for the Blue Cross
6  accounts over 360 days in the Patcom system is
7  the bad debt reserve percentage?
8    A.   Looks like the Blue Cross -- what
9  age category?
10    Q.   360 days.
11    A.   Looks like it would be 20.
12    Q.   All right.  So that's the bad debt
13  reserve percentage.  So, in fact, we are
14  comparing the same thing, are we not, when we
15  compared the 20 percent and the 70 percent on
16  page 4?
17    A.   I think so.
18    Q.   Do you recall any discussions
19  within AHERF regarding the differences in the
20  reserve percentages that were applied from
21  Patcom receivables versus the Envision
22  receivables?
23    A.   Yeah, I mean I guess.  I think it
24  related to I guess back to what we talked about
25  a number of different times this morning, that

---

**Page 441**

1  the reserve methodology amongst the hospitals
2  were different.  So I guess, yeah, it would
3  have been part of that type of discussion.
4    Q.   Okay.  Do you recall having similar
5  conversations with anyone from Coopers during
6  the 1996 audit?
7    A.   I can't remember specifically.
8  There very well may have been.  Certainly they
9  were looking at this.  They were looking at the
10  Patcom receivables.  I remember, you know,
11  Patcom receivables were a topic of discussion.
12  So I mean it certainly could have come up
13  during the course of that audit, sure.
14    Q.   Why were the Patcom -- why do you
15  specifically remember the topic of the Patcom
16  receivables coming up?
17    A.   Because we had converted the
18  billing system.  We went from the Patcom system
19  to the Envision system.  So is there was
20  receivables still outstanding on the Patcom
21  system that were still out there at the time of
22  the audit that, you know, some of which were
23  relatively old, so there was an issue of how
24  much would we ultimately collect on those
25  receivables.

---

**Page 442**

1    Q.   Do you recall any general
2  conversations that were specific to the issue
3  of the adequacy of the reserve percentages on
4  the Patcom balances?
5    A.   There could have been.  I'm sure
6  there was.  I can't recall any specific
7  conversations today.
8    Q.   Let me back up and ask a little
9  broader question.  When you were at Coopers
10  auditing the area of bad debt reserves, the
11  adequacy of bad debt reserves, how would you go
12  about assessing the reasonableness of the
13  client's total balance?
14    A.   Well, there's a number of ways,
15  there's a number of different audit procedures
16  that the firm had established that you should
17  follow to try to get comfortable with the
18  adequacy.
19    But one of the things you look at
20  is how old the receivables are, what the
21  reserve percentages are.  And you could look at
22  subsequent receipts, cash that came in the
23  door.
24    After, you know, the end of the
25  client's fiscal year to see if, you know, based

---

                                                              33 (Pages 439 to 442)

Daniel Cancelmi

Page 443

1  on the cash that was coming in, whether the net
2  receivables that were out there at the time you
3  were auditing seemed to make sense or not.
4      Q.  I think you included in that list
5  looking at the reserve percentages.
6      A.  Yes.
7      Q.  Is a standard audit step, to the
8  best of your knowledge, at Coopers in assessing
9  the adequacy of the clients's bad debt reserves
10  specifically reviewing the reserve percentages?
11      MR. RYAN:  Objection.
12      A.  I don't think you can say there's a
13  standard audit step for every client.  But my
14  experience is with, you know, the hospital
15  clients, is, sure, you look at the reserve
16  percentages.  Whether it's a standard required
17  step of the firm, I can't say that.
18      Q.  Now, when you were at Coopers and
19  you wanted to assess the reasonableness of the
20  client's bad debt reserves, you didn't have
21  time to go through every single account
22  receivable on those hospitals' books, right?
23      A.  That's correct.
24      Q.  So you would have to take audit
25  steps short of that to make you comfortable

Page 444

1  with the adequacy of the reserves, right?
2      A.  Yes.
3      Q.  Is one of those steps looking to
4  reserve percentages?
5      MR. RYAN:  Objection.
6      A.  It can be.
7      Q.  Does it -- I already asked that
8  one.
9      You also said something about a
10  subsequent receipts test?
11      A.  Yes.
12      Q.  What can you tell me about that?
13      A.  Well, if your balance sheet shows
14  that you have a million dollars of receivables,
15  say as an example, in June of '96, and say
16  through October of '96 you've collected, you
17  know, 950,000 of the million dollars.  That's a
18  pretty good indicator that with the receivable
19  balance that you had out there in June is
20  probably reasonable.
21      If you collected zero, that would
22  probably be a pretty good indicator that might
23  not be good, that million dollar balance.  So
24  that's what a lot of times you'll try to do as
25  an auditor.

Page 445

1      Again, the timing is always an
2  issue, how -- when you're issuing your audit
3  report and whether -- if you issue your audit
4  report, you know, a month after the client's
5  fiscal year end, probably most of the
6  receivables wouldn't be collected within that
7  month after year end.
8      So a lot of times, you know, an
9  accounting firm issues opinions relatively
10  quick after a client's fiscal year.  They do
11  other type of system testing throughout the
12  course of the year to get comfortable with the
13  system and the processes as opposed to trying
14  to vouch cash receipts that came in after the
15  year end.
16      Q.  Would the subsequent receipts test
17  be typically broken down by the various payors
18  and by the age of the accounts?
19      A.  It can be.  You know, it depends on
20  how extensive a test you want to do, what data
21  is available from the company.
22      Q.  Do you recall whether during the
23  1994 audit of AHERF, whether any members of the
24  Coopers audit team performed any sorts of
25  subsequent receipts test for the DVOG

Page 446

1  receivables?
2      A.  I can't say for certain.  We may
3  have done a little bit.  I mean that was a
4  step, depending on the hospital, or even
5  doesn't have to be a hospital, it could be any
6  client, again, it depends on the type of issues
7  that are out there.
8      If you think receivables are a
9  problem, you might do subsequent receipts
10  testing, because you're trying to get a little
11  bit more comfortable that the number is okay.
12      If you issue -- you know, there's a
13  lot of public companies, you know, that issue
14  their financial statements a couple weeks after
15  year end.  Like someone might be a December 31
16  year end, they issue their financial statements
17  January 10.  You're not going to get subsequent
18  receipts, so you go to other procedures to get
19  comfortable that the receivable balances would
20  be okay.
21      So as far as the '94 audit, we may
22  have done some.  You would have to look in the
23  work papers.
24      Q.  You referred to earlier your
25  perception that Coopers did extensive testing

34 (Pages 443 to 446)

Page 455

1        In the first page --
2        Q.   We don't need to go through the
3    first page.
4        As you might guess, I'm just going
5    to ask you about the last segment, the last
6    item, uncollectable Patcom accounts,
7    25 million.
8        A.   Yes.
9        Q.   I assume that's millions, right?
10       A.   Yes.
11       Q.   What is your -- first of all, given
12   the issues on here, do you have any idea what
13   fiscal year this relates to?
14       A.   I think it was '96.
15       Q.   Now, were there any Patcom accounts
16   left at the end of fiscal year '97?
17       A.   You mean '6?
18       Q.   '97.
19       A.   '97?
20       Q.   Yeah.  So that we can establish
21   that it's not '97.
22       A.   There could have been, but I
23   thought most of those had been written off at
24   that point.
25       Q.   So most likely this is dealing with

Page 456

1    fiscal '96?
2        A.   I think it was '96, and the reason
3    I say that is because the deferred financing
4    costs and the discount and extraordinary loss
5    items, that was related to the debt refinancing
6    in fiscal '96.
7        Q.   Okay.  Do you recall what was met,
8    to the best of your knowledge, by the language,
9    uncollectable Patcom accounts of 25 million?
10       A.   Yeah.  Whether there would be a
11   possibility that some of the Patcom accounts
12   wouldn't get collected.
13       Q.   Now, there would have been reserves
14   out there for Patcom accounts, right?  We went
15   through --
16       A.   Yes.
17       Q.   -- the schedules just now for at
18   least Elkins, right?
19       A.   Right.
20       Q.   Do you have an understanding that
21   the 25 million is what was potentially not
22   covered by reserves and that's why this would
23   be a potential expense item?
24       A.   Yeah.  I'll be honest, I don't
25   remember that 25 million, how it was arrived

Page 457

1    at.  Maybe it was half of the Patcom accounts,
2    maybe it was 25 percent.  I don't remember.
3        Q.   Do you recall discussing with
4    anyone from Coopers during the '96 audit any
5    sort of quantification of the level that the
6    Patcom receivables may be on the reserve?
7        A.   Specifically, I mean I can't
8    remember today sitting here today.  I mean my
9    general recollection is, you know, the Patcom
10   accounts was an issue during the audit.  So
11   there very well could have been some discussion
12   about the Patcom reserves for the '96 audit.
13       I mean I think when you look at --
14   when I was referring to the past couple days,
15   some of the additional work that was done, you
16   know, in the Patcom accounts, it probably would
17   be fair to say that was, you know, part of, you
18   know, an overall type of analysis.
19       Q.   Do you recall which of the DVOG
20   entities had Patcom accounts?  In other words,
21   which hospitals were on the Patcom system?
22       A.   I thought it was Elkins Park, Bucks
23   County, and St. Christopher's.
24       Q.   Okay.  That's consistent with what
25   the schedules seem to indicate.

Page 458

1        I'm going to hand you what's
2    previously been marked as Exhibit 105.  For the
3    record, this is a -- appears to be a July 15th,
4    1996 memo from Steven Spargo to Greg Snow which
5    has been copied to, among others, Mr. Cancelmi.
6        Do you remember seeing this
7    document?
8        A.   Yes.
9        Q.   I want to focus -- I just want to
10   read the language first into the record.
11   Mr. Spargo writes, "in reviewing the various
12   A/R and net revenue adjustments that have been
13   recorded in our June close, it occurred to me
14   that we may want to spend some extra time
15   analyzing our June 30th A/R balances in an
16   effort to identify all potential exposures
17   included therein.  Although, I would not
18   envision immediately sharing such an analysis
19   with our auditors, I do believe that it should
20   be assessed in conjunction with their
21   determination of the year end operating
22   results.  However, I foresee the most
23   significant advantage as having full knowledge
24   of your prior year A/R exposure before
25   embarking on fiscal year 1997."

37 (Pages 455 to 458)

Page 459

1    And then finally in this paragraph,
2  "we may want to go so far as to specifically
3  isolate these exposures within our accounting
4  records so as to avoid the prior year confusion
5  that has haunted us throughout 1996."
6    Do you recall any discussions that
7  happened after this memo?
8    A.  I don't remember specifically.  I'm
9  sure there were.  I'm sure we had conversations
10  regarding receivables.  I mean this is even
11  before the audit started.
12    Q.  Based on your working relationship
13  with Steve Spargo over the years, do you have a
14  personal opinion on what he means when he says,
15  although I would not envision immediately
16  sharing such analysis with their auditors?
17    MR. RYAN:  Objection.
18    A.  I mean I would take that to mean
19  that before Coopers comes in and, you know,
20  starts the audit and before we, management,
21  finalizes the numbers, they, management should
22  look at the numbers and make some conclusions
23  themselves before the auditors come in.
24    And then it doesn't say not to be
25  shared, it just says not immediately sharing.

Page 460

1  Because I mean it's quite common, you know, you
2  close your books before you provide the data to
3  the auditors.
4    So I think what he was trying to
5  say, you know, to Greg Snow was, you know,
6  let's go through receivables and see if there's
7  anything out there that we need to focus on or
8  adjust or whatever before the audit starts.
9    Q.  Based on your interactions with
10  Mr. Spargo up to this memo, do you believe he
11  was suggesting that AHERF should not share the
12  results of any analysis that AHERF did
13  regarding receivables?
14    MR. RYAN:  Objection.
15    A.  No.
16    Q.  Why do you say that?
17    A.  I mean, first of all, this issue,
18  it was out on the table.  I mean it was my
19  impression that the questions were being raised
20  on the Patcom accounts.
21    So even if you used the assumption
22  that you're inferring there, I mean you
23  couldn't.  I mean, you know, the numbers stood
24  out.  They were relatively sizable numbers.
25  There was a patient accounting system

Page 461

1  conversion.
2    Coopers & Lybrand obviously knew
3  about that, because when they audit the systems
4  of the computer, they need to know what
5  computer systems we have; not only their
6  auditors, but they bring in information systems
7  people to look at our computer systems.
8    So, you know, the Patcom system
9  conversion, I mean that was no secret or
10  anything like that.  I mean it was fully vetted
11  and it was out on the table.  So I don't take
12  that the way you may have interpreted.
13    Q.  I don't mean to infer what
14  Mr. Spargo was --
15    A.  I'm just --
16    Q.  -- I'm just trying to get an
17  understanding based --
18    A.  I don't believe -- he didn't mean
19  that.
20    Q.  Okay.  Do you recall whether, in
21  addition to the $17 and a half million of
22  various adjustments that were made to reserves
23  in the end of '96, weather there was any
24  discussion of utilizing in some way a
25  capitalized interest reserve on the books of

Page 462

1  Allegheny General Hospital?
2    A.  On Allegheny General?
3    Q.  Uh-huh.
4    A.  Yeah, that was discussed I think at
5  one point.  In fact, there's a memo out there,
6  I think, where that was one of the items being
7  considered.
8    Q.  Did you discuss it with Coopers?
9    A.  I can't remember if we did or not.
10  I know the capitalized interest adjustment was
11  something that Coopers always brought up during
12  the course of the audit.  Allegheny as a matter
13  of policy didn't capitalize interest on
14  construction projects.
15    And I think almost every year, the
16  audit, Coopers would come in and say, hey, have
17  you capitalized interest, and we would say no.
18  And so, you know, they bring it up and say, you
19  know, that's going to be an adjustment item,
20  you know, the interest should be capitalized.
21    And I think as we saw in the one
22  exhibit, it's 122, I believe, there was a
23  capitalized interest adjustments there that
24  were used to increase the bad debt reserves for
25  the Philadelphia hospitals.

38 (Pages 459 to 462)

Daniel Cancelmi

---

Page 463

1    And I think probably around the
2  same time, in addition to estimating
3  capitalized interest on the Philadelphia
4  hospitals, you also do the same thing on the
5  Pittsburgh hospital, Allegheny General. So I
6  believe that was potentially a topic of
7  conversation, sure.
8    Q.  Just to make sure I understand
9  this, what capitalized interest is, let me
10  explain what I think it is and correct me if
11  I'm wrong, so we can keep things moving along.
12    Is it a change in policy about
13  whether or not you're going to take income --
14  or take interest expense on your income
15  statement for certain construction projects,
16  and instead of taking that expense on the
17  income statement, which would be a debit,
18  correct?
19    A.  The interest expense is a reduction
20  of your income.
21    Q.  And turn that into an asset, if you
22  will, which -- capitalized interest, which is
23  an asset, which is also a debit, right?
24    A.  Yes.  I mean there's specific
25  accounting rules that allow that, the

---

Page 464

1  capitalized interest.
2    Q.  I'm not saying it's in any way
3  wrong.  But is there a policy that you know of
4  that requires entities like AGH and the DVOG
5  entities to capitalize interest, or is it just
6  a discretionary treatment?
7    A.  There's a specific accounting
8  standard that indicates, depending on the type
9  of projects you can capitalize interest.
10    Q.  Okay.  You can capitalize; it
11  doesn't mean you shall capitalize.
12    MR. RYAN:  Objection.
13    A.  Yeah, I would have to read the
14  standard or have an accounting person -- you
15  have to read the standard.  I don't remember
16  the standard exactly.  But it's relatively
17  common for companies to capitalize interest.
18    Q.  Why don't we go back to Exhibit
19  122, which is your handwritten memo on the 17
20  and a half million in adjustments.
21    Do you see on that schedule that
22  some of the items listed refer to prior year
23  capitalized interest?
24    A.  Yes.
25    Q.  $2 million?

---

Page 465

1    A.  Yes.
2    Q.  Now, in using the reserves created
3  via capitalized interest, some of the interest
4  expense that was being taken off the books
5  because of the change in the accounting policy
6  related to prior year interest expense, right?
7    A.  Yes.
8    Q.  Is that what that schedule is
9  telling you?
10    A.  Yes.
11    Q.  So did not relate to current year,
12  fiscal year '96, right?
13    A.  That's correct.
14    Q.  Do you remember any discussion
15  within AHERF regarding whether it was
16  appropriate to use prior year or reserves
17  relating to prior year activity --
18    A.  Yeah, I think --
19    Q.  -- for current year income issues?
20    A.  I think that came up, whether we
21  should go back and use capitalized interest for
22  the prior year or not.  And, you know, my
23  recollection is that based on the fact that the
24  amount was not material, that it would be okay
25  to do it.

---

Page 466

1    Q.  Who do you remember the discussions
2  with?
3    A.  I couldn't -- I mean maybe Steve.
4  Could have been Chuck Lisman.  It could have
5  been Coopers & Lybrand.  I don't know exactly
6  who -- I don't remember exactly who.
7    Q.  If it was at Coopers & Lybrand,
8  based on your interactions in the '96 audit
9  with Coopers, who would it likely have been
10  with?
11    A.  For '96?  I couldn't say for
12  certain.  I mean I think Kirstein was the
13  manager that year.  I don't know if Amy was a
14  manager.
15    But I mean we used to have
16  conversations with Coopers about the
17  capitalized interest, because it was always one
18  of their proposed adjustments.
19    Q.  So Coopers would, in essence, be
20  encouraging you to use this as an opportunity
21  to create reserve?
22    MR. RYAN:  Objection.
23    A.  Yeah, I can't say whether Coopers
24  was encouraging or not.  I know it was an
25  adjustment that Coopers would seem like they

---

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Daniel Cancelmi                                                    Volume 2

Page 467

1  proposed every year. And it was, just seemed
2  like -- my memory is, it seemed like it was,
3  you know, this would be one way to, you know,
4  hey, why don't you capitalize this interest,
5  you would be able to potentially booster the
6  bad debt reserves.
7      Q.  I want to ask you a hypothetical
8  question. If the prior year -- if the reserves
9  utilized, 17.5 collection of reserves utilized
10 to increase bad debt reserves, was all prior
11 year issues, do you believe that would have
12 been material?
13     MR. RYAN:  Objection.
14     A.  I couldn't make that conclusion.
15 You would have to look at -- you would have
16 to -- the independent accountant needs to make
17 those conclusions based on how big the company
18 is, what the issues are, what other adjustments
19 may or may not be out there.
20     Q.  If you wanted to change the policy
21 on capitalized interest and modify how interest
22 expense was taken in prior years, how would
23 that theoretically under GAAP typically be
24 handled?
25     MR. RYAN:  Objection.

Page 468

1      A.  Well, the actual accounting entry?
2      Q.  Uh-huh.
3      A.  You would debit property and
4  equipment, and you would credit interest
5  expense. That's how the entry is recorded.
6      Q.  If you wanted to do it during a
7  later year, how would you do it?
8      MR. RYAN:  Objection.
9      Q.  If it was a material item.
10     A.  If it was material, if someone
11 would conclude it was material, you can
12 assess -- well, there's a couple things you can
13 do. You can assess whether it requires
14 restatement of the prior year financial
15 statements. Or it could be a disclosure in the
16 financial statements, you know, that there had
17 been a change in accounting policy.
18     Q.  A change in accounting policy, is
19 that a separate line item on the financial
20 statements?
21     MR. RYAN:  Objection.
22     A.  No.
23     Q.  No. Are you familiar with the term
24 "prior period adjustment"?
25     A.  Yes.

Page 469

1      Q.  Is that a possibility of what could
2  have been done to deal with the scenario I just
3  discussed?
4      MR. RYAN:  Objection.
5      A.  Related to capitalized interest?
6      Q.  To capitalized interest and
7  changing how accounted for prior year's
8  interest expense.
9      MR. RYAN:  Objection.
10     A.  That could have been an option.
11     MR. TORBORG:  We've been going for
12 a while. Maybe we should probably take lunch.
13
14     (Lunch recess.)
15
16
17
18
19
20
21
22
23
24
25

Page 470

1      AFTERNOON SESSION
2      VIDEO TECHNICIAN:  On the record.
3      CONTINUED EXAMINATION OF DANIEL CANCELMI
4  BY MR. TORBORG:
5      Q.  Good afternoon, Dan.
6      A.  Good afternoon.
7      Q.  I'm going to hand you a document
8  that's already been marked in this case. It's
9  Exhibit 29. Ask you to take a look at that.
10     A.  (Witness reviewing document.)
11     Q.  Do you recall drafting this
12 document?
13     A.  Yes.
14     Q.  Do you know if you talked with
15 anybody before you drafted it and circulated
16 it?
17     A.  I think I discussed it with -- I
18 think actually Steve asked me to put the
19 memorandum together.
20     Q.  What was the purpose of this
21 memorandum? Tell me what you're doing here in
22 this document.
23     A.  Summarizing some of the older
24 outstanding categories of accounts for the DVOG
25 hospitals and assuming that the items or the

Just Launched   www.rennillo.com   Schedule Online

Cleveland (216) 523-1313                          Akron (330) 374-1313

Daniel Cancelmi                                                                    Volume 2

Page 471

1    accounts that were in the aging categories that
2    are listed on page 2, if they wouldn't be
3    collected, what some of those amounts may be.
4    And then what reserves existed out there to
5    potentially cover them.
6        Q.   Do you see in the second paragraph
7    it says -- for the record, by the way, this is
8    a September 24th memo from Dan Cancelmi to
9    Steve Spargo.
10        Do you see there in the second
11    paragraph it says, "I believe it is fair to
12    state that there is a pool of old receivables
13    that we will not be able to collect." Then it
14    goes on.
15        What did you mean by that?
16        A.   That there was some older accounts
17    out there that were either maybe greater than a
18    year old or close to a year old. And when
19    accounts usually get that old, there's usually
20    a pretty good likelihood that some amounts
21    would not be collected.
22        Q.   Let me ask you this. When did you
23    become aware that there were older accounts in
24    the magnitudes that are listed on the second
25    page of this document?

Page 472

1        A.   I don't know exactly when. I know
2    that, you know, we would do the bad debt
3    calculations each month. So, you know, as bad
4    debts continue to maybe to get higher, the bad
5    debt expense, there would be questions, why is
6    that? And you can go to these aging reports
7    and it would identify how old some of the
8    receivables were.
9        Q.   Was this a topic, the topic of
10    having a pool of old receivables out there, was
11    this a topic that was well-known throughout the
12    AHERF accounting department?
13        A.   Yeah, that's probably a fair
14    characterization. At least, I mean some people
15    who were involved in the process.
16        Q.   Okay. Who was involved in the
17    process again?
18        A.   There would have been a number of
19    people involved; my supervisor, Steve Spargo,
20    Chuck Morrison, who was the chief financial
21    officer for the Philadelphia hospitals, Joe
22    Dionisio, who was a chief financial officer in
23    the Pittsburgh hospitals, but he was also in
24    charge of the billing departments for all the
25    hospitals, both Pittsburgh and Philadelphia.

Page 473

1        It was my understanding McConnell
2    was aware of it. You know, obviously Robin
3    Schaffer, who worked for me. People who worked
4    for Joe Dionisio in the billing department,
5    like Greg Snow, you know, a number of
6    individuals within that department, other than
7    Greg, like Russ Laing.
8        There were people who worked for
9    Chuck Morrison out in Philadelphia, they were
10    called -- they were like -- they were, I forget
11    exactly what their title was. They were like
12    the finance liaisons with the hospitals, like
13    Cathy Stevens and Randy Jacobson, if there were
14    receivable issues.
15        A lot of the operating people at
16    the hospitals knew that the billing department
17    wasn't necessarily performing up to, I guess,
18    expectations or what they thought they could be
19    performing to.
20        And I mean I think that bears out
21    when you look at some of the work that
22    management had done and analyses and how they
23    asked Coopers to come in and do a review and
24    there was comments in the management letter to
25    that effect.

Page 474

1        And there was, you know, obviously
2    the transition of the billing department from
3    Philadelphia to Pittsburgh, which was
4    considered to be one of the reasons why there
5    was problems in that area.
6        I think when you -- in the -- I
7    think Allegheny did debt refinancing in fiscal
8    '96 at one point. I think there was a mention
9    in there about there was some problems with the
10    billing department due to the consolidation of
11    the departments in Pittsburgh, because
12    receivables increased or bad debt expense
13    increased or something to that effect. I mean
14    it was widely known.
15        Q.   Now, I want to refine my question a
16    little bit about not whether these individuals
17    knew that they were old accounts, but whether
18    it was widely known that there were old
19    accounts that were also uncollectable.
20        Do you see a difference between
21    those two questions?
22        A.   Yeah. I mean I guess, yeah, I mean
23    there's a difference. I think, though, when
24    people realize that if cash collections aren't
25    what they thought they would be, oftentimes

41 (Pages 471 to 474)

Daniel Cancelmi                                                                                            Volume 2

Page 503

1  me back up.
2       Do you recall that oftentimes when
3  the billing office patient financial services
4  group would write off accounts, that they would
5  write it off directly to the income statement
6  by charging contractual allowance expense?
7       A.  Yes.
8       Q.  Okay.  And then the accounting
9  department, you would take that and at times
10  put that against the bad debt reserves, right?
11      A.  Yeah, that could happen, or other
12  contractual reserves that were out there.
13      Q.  Okay.  Do you recall whether there
14  was an instance where AHERF took what was a
15  debit to contractual allowance expense needed
16  to write off some accounts and turned it into
17  or reclassified it as a debit to the PIP
18  account?
19      A.  Can you be more specific?
20      Q.  I don't think I can.  Do you
21  understand the accounting entries I'm
22  suggesting?
23      A.  No.  Repeat that again.
24      Q.  Okay.  I started off this by
25  stating that PFSG would often write off

Page 504

1  accounts by charging contractual allowance
2  expense, right?
3       A.  Right.
4       Q.  So instead of having a debit to bad
5  debt reserves, you would have debit to
6  contractual allowance expense.
7       A.  Okay.
8       Q.  Right?  And I'm asking you if you
9  recall whether or not that debit to bad -- that
10  debit to contractual allowance expense was
11  credited off, so to speak, meaning taking away
12  the debit.
13      A.  Okay.
14      Q.  And so crediting that contractual
15  allowance expense and then debiting a PIP
16  account.
17      A.  There could have been adjustments
18  like that.
19      Q.  Do you recall adjustments like
20  that?
21      A.  Specifically, no, but I know there
22  was -- we made adjustments in '96 to the PIP
23  account just because there was -- there was,
24  you know, they hadn't been reconciled for a
25  long time, so there was, very well could have

Page 505

1  been adjustments like that.
2       Q.  Okay.  Do you know if Coopers &
3  Lybrand would have been aware, to the best of
4  your knowledge, would have been aware that such
5  an adjustment was made?
6       MR. RYAN:  Objection.
7       A.  Actually, I believe Coopers, I
8  think Allegheny -- I think so.  I thought
9  Coopers was engaged or brought in to help
10  Allegheny reconcile the PIP accounts.  They
11  actually -- and I actually think Amy was
12  involved in it where they -- you know, the
13  accounts hadn't been reconciled for whatever
14  number of years, maybe.  And I don't know who
15  asked them to come in, whether it was McConnell
16  or Spargo, but I'm pretty sure there was one
17  point Coopers was brought in for at least a
18  couple weeks or a month to help reconcile the
19  PIP accounts.
20      MR. TORBORG:  I think we need to
21  change the tape.
22      VIDEO TECHNICIAN:  Going off the
23  record at 1:42.
24      (Mr. Whitney exits deposition
25  room.)

Page 506

1       (Brief recess.)
2       VIDEO TECHNICIAN:  We're on the
3  record.
4       Q.  When we broke you were talking
5  about your belief that Coopers and Amy Frazier,
6  specifically, may have been involved in helping
7  AHERF reconcile some PIP accounts?
8       A.  Yes.
9       Q.  What makes you remember that?  Is
10  there anything specific that makes you
11  remember?
12      A.  Just when you showed me that
13  comment about the PIP account comment, that
14  came to my memory that I thought at one point
15  Coopers -- Allegheny asked Coopers to help out
16  and reconcile some of the PIP accounts of
17  Allegheny.
18      Q.  Was this in the form of a special
19  engagement or was this part of the audit?
20      A.  I don't know if there was like a
21  separate engagement letter or anything like
22  that.  I don't remember it being at the same
23  time as the audit.  I thought it was before
24  that.  I don't remember the exact date.
25      Q.  Who would Coopers have worked with

49 (Pages 503 to 506)

Page 507

1  on that kind of a project?
2     A.  I don't know if Robin was there yet
3  or not.  Maybe Robin.  Because they would have
4  worked, I guess, a little bit with me.  I don't
5  know exactly who they would have worked with.
6     Q.  Could it have been with members of
7  the reimbursement department?
8     A.  Could have been, sure, because I
9  think the reimbursement department helped out
10  at times reconciling the PIP accounts.
11     Q.  So individuals like Joe Scharf and
12  his group?
13     A.  Yes.
14     Q.  Do you remember anything else about
15  Coopers assisting AHERF in reconciling the PIP
16  accounts?
17     A.  No.  I just -- I remember that I
18  think they were brought in to help out.  I
19  don't remember exactly how long they were
20  there, but they helped out at some point.
21     Q.  I'm going to hand you what's
22  previously been marked as Exhibit 164.  I'm
23  going to be asking you about two things.  One
24  is the bullet on the second page, third bullet
25  down.  And then I'll ask you about that later.

Page 508

1  And then about the attachment D.
2        Have you had a chance to look at
3  attachment D?
4     A.  Okay.
5     Q.  Do you know who was the drafter of
6  the schedule that's attachment D?  Schedules.
7     A.  I think this was -- when I was
8  putting this memo together, I think I may have
9  given a draft copy to Al Adamczak and then Al
10  reviewed it, provided his comments, and I
11  thought this attachment D was a schedule that
12  Al wanted included in his write-up.
13     Q.  Do you have an understanding of
14  what Mr. Adamczak is attempting to do in the
15  top schedule?
16     A.  Yeah.  He was -- I'm sure I helped
17  and Robin probably would have done a lot of the
18  detail legwork.  What he was trying to do was
19  estimate or put a schedule or analysis together
20  that might suggest what the bad debt reserve
21  deficiency may have looked like in June '96,
22  looking back a year later with hindsight.
23     Q.  So it's your understanding that
24  this schedule was drafted approximately one
25  year after the close of fiscal year '96?

Page 509

1     A.  Yes.
2     Q.  What makes you think that?
3     A.  Because it's in his memo.
4     Q.  Why was he doing that, do you know?
5     A.  Again, just to try to potentially
6  identify what, you know, the deficiency may
7  have been in June of '96.  Again, looking back
8  at the activity that occurred during fiscal '97
9  to see how much was like a prior year impact.
10  Because there was -- I mean there was
11  conversations at times, you know, all these
12  receivable problems, what time period do they
13  relate to, you know.  Is it the current stuff,
14  is it the older stuff.
15        You know, I think Joe Dionisio's
16  department assumed control or responsibility of
17  the billing department in Philadelphia at a
18  certain point in time.  I don't remember
19  exactly when that was.  But I think it's fair
20  to say that there would be comments made at
21  times, they inherited a lot of problems from
22  the eastern hospitals' billing departments, and
23  you would hear comments.
24        I mean some of the people who ran
25  the billing departments, like Evan Fox and Rich

Page 510

1  Madison, were still around.  And I mean you'd
2  hear comments, you know, they may not
3  necessarily agree with the assessment of what
4  they -- the Pittsburgh and Dionisio's
5  department inherited wasn't necessarily bad.
6        So there was, you know, some
7  conversations going back and forth as to, you
8  know, really what time frame does this relate
9  to, who is responsible for it, that type of
10  stuff.
11     Q.  We talked yesterday and a little
12  bit today about the $75 million of various
13  reserves that were transferred to the DVOG bad
14  debts, right?  And this memo, or this analysis
15  that Adamczak is performing is after around the
16  time of those transfers, right?
17     A.  Yes.
18        MR. RYAN:  Objection.
19     Q.  Is he attempting, do you believe,
20  to assess whether the entirety of those
21  transfers related to problems in fiscal year
22  '97 as opposed to some prior year or years?
23     A.  I'm not -- I think he's trying to
24  assess how much of the, you know, the
25  adjustments that were made during fiscal '97

Daniel Cancelmi                                                                      Volume 2

Page 539

1   as part of the fiscal '96 audit?
2      A.   I think so.  I think so.
3      Q.   Who would those discussions have
4   been with?
5      A.   I can't say for certain whether I
6   had them or Robin had them or Steve had them.
7   It just -- just seemed like the issue was out
8   there.  That's my memory.
9      Q.   Who at Coopers would the discussion
10  have been had with?
11         MR. RYAN:  Objection.
12     Q.   If you know.
13     A.   It could have been -- I mean it
14  could have been anyone.  I mean from Buettner
15  on down to Amy or Mark or whoever the in-charge
16  was that year, Jeff Womer or Brian Christian.
17  It could have been a number of different
18  people.
19     Q.   Now, I want to just pin this down.
20  Do you remember any specific discussions with
21  anyone at Coopers about the accounts at gross
22  issue?
23     A.   I remember that the accounts at
24  gross were discussed.  I can't say specifically
25  that I had them or if someone else had them.

Page 540

1   But it was -- these accounts -- the issue of
2   accounts at gross, my understanding, was an
3   issue that Coopers & Lybrand was aware of.
4      Q.   Do you recall hearing either
5   firsthand or secondhand or thirdhand what
6   Coopers' response was that they were telling
7   AHERF when this issue was brought up?
8      A.   Not necessarily specifically.  I
9   know that was at one of their audit steps that
10  they performed.
11     Q.   What audit tests are you talking
12  about?
13     A.   Just to see how much the accounts
14  at gross may be and what, you know, what the
15  potential exposure is.  Now, whether it was in
16  their audit program or their work program, I
17  don't know specifically.  But it was my
18  recollection that, you know, it was an issue
19  that was out there.  You know, Allegheny people
20  had brought it up and Coopers would ask about
21  it every so often.
22     Q.   Do you know if Coopers had provided
23  any schedules or documents that would show what
24  the potential exposure was in this area?
25     A.   I believe they were.

Page 541

1      Q.   What kind of reports were they
2   shown?
3      A.   I think Robin would have provided
4   them some type of reports.  I don't know the
5   exact reports.
6      Q.   In your experience at Coopers,
7   would you have expected those kind of reports
8   to be in the work papers?
9          MR. RYAN:  Objection.
10     A.   They could be, sure.
11     Q.   Show you what's been previously
12  marked as Exhibit 149.  You're free to look at
13  the entirety of this document, but I am just
14  going to ask you about the second page on
15  accounts at gross.
16     A.   Okay.
17     Q.   If you could take a read of those
18  two indented paragraphs into that.
19     A.   (Witness reviewing document.)
20         Okay.
21     Q.   This, I take it, is your response
22  to his March 11th memo that we saw as
23  Exhibit 147?
24     A.   Yes.
25     Q.   And you see in the second paragraph

Page 542

1   under accounts at gross you say, or you have
2   written, "the level of accounts at gross that
3   needed contractualized as set forth in your
4   March 11, 1997 memo was considered for
5   potential adjustment.  However, due to
6   insufficient profitability levels and available
7   reserves, a determination was made to not
8   manually contractualize those accounts."
9          Do you recall who made the decision
10  not to record a reserve as Mr. Laing has
11  suggested for accounts at gross?
12     A.   I think it was either Morrison or
13  McConnell.  As you can see further on in that
14  paragraph, Chuck would ask every so often about
15  the account, Chuck Morrison, the CFO, would ask
16  every so often about accounts at gross.
17         And, you know, in the context of
18  some of the revenue numbers that would come out
19  on some of the monthly financial statements.
20     Q.   Is it fair to say that this
21  accounts at gross issue and the implications it
22  has on financial reporting is not a minor
23  issue?
24         MR. RYAN:  Objection.
25     A.   It can be a minor issue, but it can

58 (Pages 539 to 542)

Page 543

1  be, you know, a larger issue, depending on how
2  large they are.
3      Q.  Do you recall any discussions with
4  Coopers about the possibility of recording a
5  reserve to offset the accounts at gross?
6      A.  Specifically, I can't remember
7  specifically.  Like I said a couple minutes
8  ago, the accounts at gross were discussed with
9  Coopers & Lybrand.  And, you know, we didn't
10 necessarily have reserves for some accounts at
11 gross.
12     Q.  Do you recall whether they told
13 AHERF, you need to put a reserve there to cover
14 that exposure?
15     A.  I think it was a given that you
16 would need a reserve there.
17     Q.  I apologize for having to go
18 through some of these Graduate reserve things
19 again, but there are a couple of questions that
20 have been asked that I would like to follow up
21 on.
22     A.  Okay.
23          - - - - -
24          (Thereupon, Exhibit 1076 was marked
25          for purposes of identification.)

Page 544

1          - - - - -
2      Q.  I've handed you what has been
3  marked as Exhibit 1076, which is a schedule
4  titled Schedule of Patient Accounts Receivable
5  as of June 30, 1997.
6      A.  Okay.
7      Q.  Do you recall -- first of all, have
8  you had a chance to look at that?  Do you need
9  some more time?
10     A.  No, I'm okay.
11     Q.  Do you recall this schedule?
12     A.  Yes.
13     Q.  What is this schedule?
14     A.  This is a schedule I think I
15 referenced yesterday.  It's a schedule that
16 just identified all the various components of
17 the various patient accounts receivable
18 balances on the books of the hospitals.
19     Q.  Is this sometimes referred to as a
20 lead schedule?
21     A.  No.
22     Q.  Okay.  Does it have any sort of
23 nickname?
24     A.  Not that I remember.
25     Q.  Is this the type of schedule that

Page 545

1  Coopers could have received?
2          MR. RYAN:  Objection.  Entirely
3  speculative.
4      Q.  Based on your experience with what
5  you --
6          MR. TORBORG:  He did work with
7  Coopers & Lybrand.  He may know.  Not totally
8  speculative, I don't think.
9          MR. RYAN:  I maintain the
10 objection.
11         MR. TYCKO:  Wait a minute.  What's
12 the question that's pending?  Because you
13 started to rephrase it.
14     Q.  Let me rephrase.
15         Do you recall whether you gave this
16 schedule to Coopers & Lybrand during the fiscal
17 '97 audit?
18     A.  I don't remember giving this, but I
19 wouldn't have.  It would have been someone like
20 Robin.
21     Q.  Because she worked in accounts
22 receivable?
23     A.  Right.
24     Q.  When you were auditing AHERF from
25 the Coopers side, did you receive this kind of

Page 546

1  document as part of your audit?
2      A.  No.  The reason for that is this
3  type of document, this was a schedule that
4  Robin developed herself when questions, people
5  would have questions about some of the
6  components in accounts receivable.
7          So Robin and me worked together to
8  sort of develop this.  And I do know that she
9  indicated to me that, you know, at times she
10 would give to this Coopers & Lybrand, this type
11 of schedule.
12         - - - - -
13         (Thereupon, Exhibit 1077 was marked
14         for purposes of identification.)
15         - - - - -
16     Q.  If you could turn to Bates PWC
17 009492.
18     A.  (Witness reviewing document.)
19     Q.  I take it you've never seen this
20 document before?
21     A.  I may have.
22         MR. RYAN:  You mean just this page?
23 There are a lot of very disparate documents.
24     Q.  I want to talk specifically about
25 the document that starts at this particular

Daniel Cancelmi                                                                                    Volume 2

Page 635

1        DEPOSITION ERRATA SHEET
2
3   RE:  THE OFFICIAL COMMITTEE OF
4      UNSECURED CREDITORS OF ALLEGHENY HEALTH,
5      EDUCATION & RESEARCH FOUNDATION vs.
6      PRICEWATERHOUSECOOPERS, L.L.P.
7
8   RRS File No.:      7472
9   Deponent:        DANIEL CANCELMI
10  Deposition Date:    January 24, 2003
11
12  To the Reporter:
13  I have read the entire transcript of my
14  Deposition taken in the captioned matter or the
15  same has been read to me.  I request that the
16  following changes be entered upon the record
17  for the reasons indicated.  I have signed my
18  name to the Errata Sheet and the appropriate
19  Certificate and authorize you to attach both to
20  the original transcript.
21
22
23
24
25

Page 636

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                          Civil Action

          Plaintiff,                          No. 00-684

    vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

        Defendant.



Continued videotape deposition of

DANIEL CANCELMI, called for examination under the

statute, taken before me, Jaci R. Traver, RPR,

CRR, and Notary Public in and for the State of

Ohio, at the offices of Jones Day, 500 Grant

Street, Pittsburgh, Pennsylvania, on Thursday,

the 6th day of February 2003 at 9:00 a.m.

- - - - -

VOLUME 3

- - - - -

Daniel Cancelmi

Page 729

1    But I don't know in terms -- I had,
2  you know, I believe I conducted myself with the
3  upmost integrity.  And objectivity, I mean I
4  believe I was objective.  I mean, but, you
5  know, when you work for a company, I don't know
6  if that legally changes this objectivity
7  definition or not.  I don't know.
8    Q.   All right.  In 1997, you weren't an
9  external auditor, right?
10   A.   No.
11   Q.   But you worked as an accountant at
12 AHERF, right?
13   A.   That's correct.
14   Q.   And from May 1997 on, as the senior
15 director of accounting and financial reporting,
16 correct?
17   A.   That's correct.
18   Q.   And at that time, you were a member
19 of the AICPA, the American Institute of
20 Certified Public Accountants, right?
21   A.   Yes.
22   Q.   Do you see a little bit lower down
23 that page, Rule 102-1, which reads, "a member
24 who knowingly makes, or permits or directs
25 another to make, false and misleading entries

Page 730

1  in an entity's financial statements or records
2  shall be considered to have knowingly
3  misrepresented facts in violation of rule 102."
4    A.   Yes, I see that.
5    Q.   Did you in 1997 make and direct
6  others to make certain entries into AHERF's
7  financial records?
8    A.   Repeat that question.
9    Q.   Did you in 1997 make or direct
10 others to make certain entries in AHERF's
11 financial records?
12   A.   Yes.
13   Q.   And were you aware at that time of
14 your obligation as a Certified Public
15 Accountant not to make or direct others to make
16 false or misleading entries?
17     MR. TORBORG:  Objection.
18   A.   I didn't make directions to anybody
19 to make false or misleading entries.
20   Q.   Thank you.  Were you, though, in
21 1997 aware of that duty that you had as a
22 Certified Public Accountant?
23   A.   Well --
24     MR. TORBORG:  Objection.
25   A.   Whether I knew the specific rule or

Page 731

1  not, I can't say that I did or didn't.  But I
2  didn't direct people to make false and
3  misleading entries.
4    Q.   And you were aware of the fact that
5  as a CPA, that was something that you shouldn't
6  do, right?
7      MR. TORBORG:  Objection.
8    A.   Yeah.  I mean whether you're CPA or
9  not, you shouldn't do that.
10   Q.   Could you turn, please, to the next
11 page of Exhibit 1091.  Do you see there Rule
12 102-3, which is entitled, "obligations of a
13 member to his or her employer's external
14 accountant"?
15   A.   Yes.
16   Q.   Do you agree that in 1997, as a
17 CPA, you had certain obligations to AHERF's
18 external accountants?
19   A.   Yes.
20   Q.   And those were Coopers & Lybrand,
21 right?
22   A.   Yes.
23   Q.   And did the duties that you owed to
24 Coopers & Lybrand include being candid with
25 them?

Page 732

1    A.   Yes.
2    Q.   Did those duties also include not
3  knowingly misrepresenting facts?
4    A.   Yes.
5    Q.   And finally, did those duties
6  include not knowingly failing to disclose
7  material facts?
8    A.   Yes.
9    Q.   Let me hand you, Mr. Cancelmi, what
10 was previously marked as Exhibit 8.
11     I believe we've looked at this
12 previously.  This is an April 14th, 1997 memo
13 that you wrote to Mr. Spargo; is that right?
14   A.   Yes.
15   Q.   It's entitled, "restructuring
16 charges earmarked for bad debt reserves."
17   A.   Yes.
18   Q.   If I could call your attention,
19 please, to the second paragraph in the middle.
20 I believe it's the fourth sentence.  Do you see
21 it reads, "the justification for recording
22 these reserves on the Graduate hospitals'
23 financials is that our experience suggests that
24 similar to other AHERF acquisitions, it is
25 inevitable that unknown loss contingencies

Daniel Cancelmi                                                                                      Volume 3

Page 733

1  exist related to the Graduate hospitals that
2  were not identified during the due diligence
3  process."
4        Do you see that?
5    A.  Yes.
6    Q.  Could you explain, please, what you
7  meant by unknown loss contingencies existing
8  relating to the Graduate hospitals?
9    A.  Just what it says, that oftentimes
10 related to an acquisition there's contingencies
11 out there that aren't necessarily specifically
12 identified at the time of the acquisition.
13   Q.  Can you just explain to us, for
14 those of us who aren't accountants, what a loss
15 contingency refers to?
16   A.  It's potentially an item that you
17 may have to pay money for, or an item that
18 you -- an asset you might not collect. I mean
19 there's all kind of different examples.
20   Q.  All right. So the idea was that
21 there might be these unknown loss contingencies
22 at the newly acquired Graduate hospitals?
23   A.  Yes.
24   Q.  And you state here in your memo
25 that that was the justification for recording

Page 734

1  the reserves on the Graduate hospitals' books,
2  right?
3    A.  Yes.
4    Q.  And that was a true statement,
5  right?
6    A.  Yes.
7    Q.  Do you recall discussing with
8  Coopers & Lybrand in this time frame the
9  concept that there might be unknown loss
10 contingencies at the Graduate hospitals?
11   A.  The background on this, and I think
12 I've testified a number of different times on
13 it, is that the rationale for establishing
14 these reserves was for, you know, related to
15 acquisitions there would be unknown loss
16 contingencies, and that they would be
17 transferred over to DVOG for their bad debt
18 reserve shortfalls.
19   Q.  I'm not asking you, though, about
20 the transfer step. I'm asking about the
21 justification for recording the reserves in the
22 first place.
23   A.  That was part of my, I think the
24 first part of my answer. As part of the, you
25 know, the acquisition, that there's oftentimes

Page 735

1  unknown loss contingencies. And that would be
2  the justification for recording them on the
3  Graduate hospitals.
4        And then there was no question that
5  they would be transferred, those reserves would
6  be transferred to DVOG for their bad debt
7  reserves.
8    Q.  There's no question in your mind
9  about that, right, that those reserves would be
10 transferred?
11   A.  I don't think there's questions in
12 any people's mind.
13   Q.  All right. But you don't know what
14 was in other people's minds, other than yours,
15 right?
16   A.  No. I know that I had
17 conversations with a number of different
18 people, and that was always my understanding.
19   Q.  All right. So let me ask you
20 again. Do you recall discussing with Coopers &
21 Lybrand that the justification for recording
22 reserves on the books of the Graduate hospitals
23 was unknown loss contingencies at the Graduate
24 hospitals?
25        MR. TORBORG:  Objection.

Page 736

1    A.  I believe so.
2        MR. TORBORG:  Asked and answered.
3    Q.  Now, you refer here to your
4  experience with other AHERF acquisitions; is
5  that right?
6    A.  I'm saying our experience.
7    Q.  AHERF's?
8    A.  AHERF's experience.
9    Q.  Did that experience include the
10 Hahnemann acquisition?
11   A.  Yes.
12   Q.  Were there at Hahnemann unknown
13 loss contingencies that you didn't know about
14 at the time Hahnemann was acquired that came to
15 light later?
16        MR. TORBORG:  Objection.
17   A.  I think so.
18   Q.  Did those loss contingencies
19 include accounts receivable issues?
20   A.  They could have. I don't remember.
21   Q.  Certainly by April of 1997, you
22 knew that there were a number of aged patient
23 accounts receivables on the books at Hahnemann
24 University Hospital, correct?
25   A.  Yes.

26 (Pages 733 to 736)

Page 781

1    A.   I don't know one way or the other.
2    Q.   And you didn't show Coopers &
3  Lybrand on this memo that we've marked as
4  Exhibit 37 as a recipient or a copyee, did you?
5    A.   No.
6    Q.   Let me hand you, Mr. Cancelmi, what
7  has previously been marked as Exhibit 154.
8         Is Exhibit 154 a memorandum that
9  you sent to a distribution list dated May 22nd,
10  1997 regarding Graduate system restructuring
11  reserves?
12    A.   Yes.
13    Q.   And the distribution list as shown
14  on the second page consisted of 10 AHERF
15  employees, right?
16    A.   Ten, yes.
17    Q.   There's no one from Coopers &
18  Lybrand shown on the distribution list, right?
19    A.   No.
20    Q.   Now, in this memorandum, you
21  discussed the fact that the $50 million in
22  reserves that you had discussed previously in
23  your April 14th memo, by this point in time had
24  been established on the books of the Graduate
25  hospitals through purchase price adjustments,

Page 782

1  right?
2    A.   Yes.
3    Q.   So is it fair to say that that
4  change in accounting treatment occurred
5  sometime between April 14th and May 22nd, 1997?
6    A.   Yes.
7    Q.   Now, I think you testified a couple
8  of weeks ago a little bit about either
9  participating in or learning about, I wasn't
10  sure which, conversations with Bill Buettner
11  about accounting for a loss contract with
12  Health America?
13    A.   I don't think I participated in it.
14  I heard about it.
15    Q.   All right. Who told you about
16  conversations with Bill Buettner about possible
17  accounting treatments for the Health America
18  loss contract?
19    A.   It would have been probably Spargo
20  or Adamczak.
21    Q.   And this was a risk contract that
22  AHERF assumed as part of a transaction with
23  Coventry Corporation that related to Health
24  America and the Penn Group Medical Associates,
25  right?

Page 783

1    A.   Yeah, what that reserve -- my
2  understanding of that reserve was -- I thought
3  it was an estimate of anticipated losses on
4  those physicians' operations that were
5  anticipated over, I don't know if it was a year
6  or next year or two.
7    Q.   All right. And what you learned
8  from Mr. Spargo or Mr. Adamczak was that
9  Mr. Buettner had advised that it would be
10  appropriate to capitalize the anticipated
11  losses on the Health America contract, and then
12  amortize them over time, right?
13    A.   Yes.
14    Q.   And so that would involve
15  establishing an asset known as goodwill on the
16  balance sheet of AHERF, right?
17    A.   Yes.
18    Q.   And is it the case that when you
19  heard about Mr. Buettner's suggestion relating
20  to the Health America loss contract, that you
21  said to yourself, well, perhaps the same
22  accounting treatment could be applied to the
23  $50 million of reserves that we set up last
24  month as restructuring cost?
25    A.   No, I don't remember it like that.

Page 784

1  The intangible asset related to the 50 million
2  for the bad debt reserve, my memory is that
3  preceded the Health America issue.
4    Q.   It's not the case that when you
5  learned about Mr. Buettner's proposed
6  accounting for the Health America risk
7  contract, that you realized how purchase price
8  accounting could work for preacquisition
9  contingencies?
10    A.   No. My memory was that I thought
11  it was the -- when the intangible, the purchase
12  price adjustment or the intangible asset
13  related to the 50 was discussed, I remember
14  thinking, well, you know, boy, there's been
15  other adjustments on Graduate that could have
16  been potentially recorded in that manner. But,
17  you know, they had already been recorded.
18         I thought, my memory, I thought
19  that the Health America came later on. I
20  thought that was towards the end of '97. In
21  fact, Steve might not even have been around at
22  that point. That's why I say Steve or Al.
23         I just seem to remember probably
24  more Al than Steve on this Health America that,
25  you know, said that there was some meeting with

38 (Pages 781 to 784)

Daniel Cancelmi                                                                    Volume 3

Page 785

1  Buettner and that, you know, there was going to
2  be this reserve established for estimated
3  losses related to these physician practices of
4  Health America. It was going to be recorded.
5      Q.   Do you see here the third sentence
6  on the second page of Exhibit 154 reads, "this
7  accounting treatment has been discussed with
8  Coopers & Lybrand who agrees with this approach
9  as these reserves are viewed as unrecorded
10 preacquisition contingencies."
11     A.   Yes.
12     Q.   Would you explain to us, please,
13 what is meant by unreported preacquisition
14 contingencies?
15     A.   Similar to what I had in that
16 April 14th memo. Just there's contingencies
17 out there that you haven't necessarily
18 specifically identified, but they're
19 contingencies and recorded as part of purchase
20 price accounting.
21     Q.   All right. So is this the same
22 thing as what in your previous memo you
23 referred to as a loss contingency?
24     A.   Yes.
25     Q.   And is it the case that you learned

Page 786

1  that Coopers & Lybrand had advised AHERF that
2  certain preacquisition contingencies should
3  properly be accounted for through purchase
4  price adjustments?
5      A.   Yes.
6      Q.   And that's what you state here in
7  this sentence, right?
8      A.   Yes.
9      Q.   You don't recall when you wrote
10 that sentence having any specific knowledge
11 that Coopers & Lybrand had given that advice as
12 it related to the $50 million transferred to
13 DVOG; isn't that right?
14         MR. TORBORG:  Objection.
15     A.   No. No. That -- if I understand
16 your question, it's my understanding Coopers &
17 Lybrand was comfortable with it at that point,
18 for the intangible asset for the $50 million of
19 the bad debt reserves.
20     Q.   My question is directed, though, to
21 the specific sentence, where it states that,
22 "Coopers & Lybrand who agrees with this
23 approach as these reserves are viewed as
24 unrecorded preacquisition contingencies."
25         You can't testify as you sit here

Page 787

1  today, can you, that this sentence had specific
2  reference to something Coopers & Lybrand said
3  about the 50 million, as opposed to the general
4  accounting treatment for unreported
5  preacquisition contingencies?
6          MR. TORBORG:  Objection.
7      A.   No. I said it was related to the
8  50. That's why it's in there.
9      Q.   If it was related specifically to
10 the $50 million, why didn't you write that?
11         MR. TORBORG:  Objection.
12     A.   I think I did. I mean it seems
13 pretty clear.
14     Q.   You didn't yourself --
15     A.   There's 50 million. This is a
16 summary of the reserves capitalized in
17 intangible asset, and right below it says,
18 accruals for existing Delaware Valley
19 hospitals' bad debt reserves, and there's the
20 50 million.
21         That sentence precedes -- it's an
22 introduction into the summary of these
23 reserves, of which 50 out of the 60 million
24 relates to the 50 million that relates to
25 April 14th memo.

Page 788

1      Q.   You can't recall any conversation
2  in which you personally discussed the
3  establishment of this $50 million of reserves
4  with Coopers & Lybrand before May 22nd, 1997,
5  can you?
6          MR. TORBORG:  Objection.
7      A.   No. What I've testified is my
8  understanding that I had been involved in
9  conversations, and I've -- there's been --
10 there's these notes of certain meetings of
11 notes, which seem to be consistent with my
12 recollection, where they talk about that the
13 50 million would be recorded as an intangible
14 asset for the DVOG bad debt reserves.
15     Q.   Do you recall an actual
16 conversation that you personally were involved
17 in with anyone from Coopers & Lybrand before
18 May 22nd, 1997, about recording the $50 million
19 in the books at Graduate hospital?
20     A.   Generally, yes.
21     Q.   Do you recall an actual
22 conversation, as opposed to a general
23 understanding, do you actually recall a
24 conversation?
25     A.   It was my understanding at the time

39 (Pages 785 to 788)

Page 789

1  that I had participated in a conversation with
2  Coopers & Lybrand about this.
3      Q.   Who was there?
4      A.   At that point, I thought Bill
5  Buettner was aware of this issue.
6      Q.   He talked with you; is that right?
7      A.   That was my impression when I wrote
8  this, based on my either sitting in on the
9  conference call or sitting in a meeting. And I
10 think there's notes that would sort of confirm
11 that conversations had taken place.
12         This -- I'll go back to the
13 beginning. I said that all along. I thought
14 Allegheny had had conversations with Coopers &
15 Lybrand about this. But I pointed out
16 countless times, I can't tell you an exact day.
17 I don't remember exactly what was discussed,
18 specifically. But I'm just telling you, that
19 was my recollection.
20         And there's been documents that
21 have been, I think, unsurfaced since then that
22 would support that recollection.
23         But, you know, to say -- am I going
24 to sit here and say, I remember on April 13th
25 exactly, you know, we discussed this? No. I

Page 790

1  mean that's not realistic, and I've said that
2  all along. It's, you know, six years ago. I
3  said that all along, it was my general
4  recollection. And you know, I stand by that.
5         And I think there's been
6  documentation, there would be documentation to
7  support that.
8      Q.   Do you have any notes of any such
9  conversation with Coopers & Lybrand?
10     A.   Not that I'm aware of.
11         MR. TYCKO:  You mean his own?
12         MR. RYAN:  That's right.
13     Q.   You don't have any notes you took
14 of any such conversations, do you?
15     A.   You would have to look through my
16 files at Allegheny, but --
17     Q.   In all the days that you've met
18 with representatives of the SEC and
19 representatives of Jones Day, no one has ever
20 shown you any such notes, have they?
21     A.   No, they have not.
22     Q.   Is it possible that others from
23 AHERF told you about conversations they had
24 from Coopers -- had with Coopers and that you
25 weren't part of those conversations?

Page 791

1         MR. TORBORG:  Objection.
2      A.   Yes, there certainly would have
3  been conversations I probably wasn't a part of.
4      Q.   So your understanding that you had
5  in the May 1997 time frame that Coopers was
6  aware of the $50 million reserve transfer might
7  be hearsay from what other people told you, as
8  opposed to anything from your own personal
9  knowledge?
10     A.   No.
11         MR. TORBORG:  Objection. Misstates
12 prior testimony.
13     A.   No. I wouldn't say that. You know
14 what, it was -- my recollection was -- I'm not
15 going to sit here and say I was involved in all
16 the conversations, because I can't say that.
17 But it was my recollection I had at least a
18 conversation, if not maybe more, regarding this
19 issue with Coopers & Lybrand.
20     Q.   Who at Coopers & Lybrand did you
21 have the conversations with?
22     A.   Like I said a number of different
23 times, it could have been Bill, Amy.
24     Q.   I'm not asking who it could have
25 been. I'm asking who did you have the

Page 792

1  conversations with?
2      A.   Bill, Amy or Mark, individually or
3  collectively. I can't say a hundred percent
4  for certain. I didn't take notes and tape
5  record every single conversation I had with
6  Coopers & Lybrand.
7         I'm just telling you what my
8  recollection at that time was. And that's my
9  recollection today.
10     Q.   Were these in-person meetings or
11 over the phone?
12     A.   They could have been both.
13     Q.   You don't know whether they were
14 either, though, do you?
15     A.   Could I say a hundred percent for
16 certain? No.
17     Q.   You don't know whether you ever
18 discussed this issue with Bill Buettner before
19 you wrote this May 22nd memo, do you?
20         MR. TORBORG:  Objection.
21     A.   I -- we talked about this issue.
22 What I'm testifying to is I can't remember
23 specifically dates, times, where it was at,
24 whether it was in-person, over phone, over the
25 phone, and who was present.

40 (Pages 789 to 792)

Daniel Cancelmi                                                                                                Volume 3

Page 793

1      Q.    And my question is -- my question
2  is -- I'm not asking you about specific date,
3  specific time.  I'm not asking you any of that.
4          What I'm asking you is:  Do you
5  recall personally discussing the $50 million
6  reserve transfer with Bill Buettner?
7      A.    I thought I did, yes.
8      Q.    And how do you recall that?
9      A.    Just my memory.  That was my
10 recollection at the time.
11     Q.    Do you remember anything else about
12 this conversation that you say occurred?
13     A.    No.  Just in general that it was my
14 memory that I had had a conversation.
15     Q.    You don't know whether the
16 conversation was in-person or over the phone?
17     A.    No.
18     Q.    You don't know whether anybody else
19 was there for AHERF?
20     A.    There probably was, but I can't say
21 a hundred percent who was there and who wasn't
22 there.
23     Q.    You don't know whether anybody else
24 was there from Coopers & Lybrand?
25     A.    No, I couldn't say a hundred

Page 794

1  percent for certain who was there from Coopers
2  & Lybrand.
3      Q.    You don't know what you told Bill
4  Buettner, do you?
5      A.    This issue was discussed.  It was
6  my understanding that Coopers & Lybrand had a
7  full understanding of it.  But, no, I can't
8  tell you exactly what I said.
9      Q.    You can't tell me even in general
10 terms what you said, can you?
11         MR. TORBORG:  Objection.
12     A.    In general terms, this issue was
13 discussed.
14     Q.    Are you saying that you actually
15 recall discussing this issue with Bill
16 Buettner?
17         MR. TORBORG:  Asked and answered.
18     Q.    Are you saying that or not?
19     A.    I believe that I had been involved
20 in a conversation with Bill Buettner.  I've
21 said a number of different times that it was --
22 my memory of this is that Buettner, Kirstein or
23 Frazier would have been involved.
24         I don't know exactly every single
25 one who may have been involved, but that's just

Page 795

1  my memory.  And I don't have notes to say
2  either way where it was, the time, the place,
3  exactly what was said.
4          And, you know, just -- I spoke with
5  those individuals frequently.  Some more than
6  others.  But we dealt with Coopers & Lybrand a
7  lot of times on a daily basis.  And I didn't
8  commit everything to memory, nor did I tape
9  record or make notes of everything.
10         So to expect me to sit here and say
11 exactly where it was, everyone who was there,
12 it's just not realistic.
13     Q.    You say that each of those three
14 individuals may have been involved.
15     A.    That's --
16     Q.    You can't say that any one of them,
17 in fact, was involved, can you?
18         MR. TORBORG:  Objection.
19     A.    I would say that one was involved.
20     Q.    You have no idea which one, right?
21         MR. TORBORG:  Objection.
22         MR. WHITNEY:  Could you let him
23 finish his answers, please?
24     A.    These were the senior engagement
25 people in the account.  And my understanding

Page 796

1  and my recollection is that they were involved.
2  I don't know exactly who was there every time
3  the issue was discussed.  And I don't know what
4  else to say about it.
5      Q.    You have no idea which one of these
6  three individuals that you've mentioned may
7  have been involved, in fact, was involved, do
8  you?
9          MR. TYCKO:  All right.  Enough is
10 enough.
11         MR. TORBORG:  Objection.
12         MR. TYCKO:  Antony, you've now
13 asked the same question about 20 times.  You've
14 spent probably 10 or 15 minutes on it.  Plus, I
15 can, if I had time, refer to you back to
16 another hundred pages of his testimony in his
17 prior nine or ten days of depositions where
18 he's answered these same questions.  All right.
19         Why don't you just move on to
20 another topic.  I really don't think that last
21 question you asked him is a question that has
22 not been asked at least two or three or four or
23 five or six times of him before right now.
24         MR. RYAN:  Since I don't know the
25 answer to the question, could you read it back,

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                                    Akron (330) 374-1313

Daniel Cancelmi                                                                                    Volume 3

Page 797

1  please, Jaci.
2       MR. WHITNEY:  "You have no idea
3  which one of these three individuals that
4  you've mentioned may have been involved, in
5  fact, was involved, do you?"
6       MR. TORBORG:  Objection.
7    A.  I believe that certain of those
8  individuals were involved.  I can't say with a
9  hundred percent certainty exactly when, where,
10  time, and exactly what was discussed, six years
11  ago.
12    Q.  I understand you don't remember
13  when, you don't remember where, you don't
14  remember what was said.  But I don't think you
15  answered my question, which is:  Is it the case
16  that you also don't remember to whom at Coopers
17  you believe you said this?
18    A.  I have said a number of different
19  times, I thought that I've had conversations
20  with the three of them, but I can't say for a
21  hundred percent certainty, because I don't have
22  a tape recording of the conversation.  I've
23  said that countless times.  It's my general
24  recollection.  And I've been saying that for
25  over five years.

Page 798

1    Q.  When you wrote the sentence that
2  we're looking at where it says, "this
3  accounting treatment has been discussed with
4  Coopers & Lybrand," who did you have in mind
5  when you wrote that sentence as having
6  discussed it with Coopers?
7    A.  Specifically at Coopers?  I'm not
8  sure if I had anyone in mind.  I said with
9  Coopers & Lybrand.
10    Q.  I'm sorry, it was an unclear
11  question.
12       I was trying to ask who at AHERF
13  did you have in mind who you believed had
14  discussed this with Coopers & Lybrand?
15    A.  It would have been myself.  It was
16  my recollection Steve had conversations.  Al.
17  And I don't think I was involved in any
18  conversation with McConnell, but I believe
19  Steve had told me that McConnell had had a
20  conversation about it.
21    Q.  How come you didn't write in the
22  memo who at AHERF had discussed this issue with
23  Coopers & Lybrand?
24       MR. TORBORG:  Objection.
25    A.  I don't know.  I didn't think it

Page 799

1  was probably necessary.
2       MR. TYCKO:  Can we go off the
3  record?
4       VIDEO TECHNICIAN:  The time is
5  12:45.  We are going off the record.
6
7       (Luncheon recess taken.)
8       - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 800

1       AFTERNOON SESSION
2       VIDEO TECHNICIAN:  The time is
3  1:35.  We are going back on the record.
4       CONTINUED EXAMINATION OF DANIEL CANCELMI
5  BY MR. RYAN:
6    Q.  Good afternoon, Mr. Cancelmi.
7    A.  Good afternoon.
8    Q.  Do you remember that for a brief
9  period of time after Mr. Spargo had announced
10  that he was going to leave the AHERF
11  organization, all of the people who reported to
12  Mr. Spargo reported directly to Mr. McConnell?
13    A.  Yes.
14    Q.  And that was before Mr. Adamczak
15  was appointed to fill Mr. Spargo's role; is
16  that right?
17    A.  Yes.
18    Q.  It is your understanding that prior
19  to that time, Mr. Spargo had periodic meetings
20  with his superior, Mr. McConnell?
21    A.  Yes.
22    Q.  And that after Mr. Adamczak assumed
23  that rule, he, in turn, met with David
24  McConnell regularly?
25    A.  Yes.

42 (Pages 797 to 800)

Daniel Cancelmi                                                                                          Volume 3

Page 801

1    Q.   Did you attend any of the periodic
2  meetings with Mr. McConnell?
3    A.   When? What point in time?
4    Q.   At any point in time did you attend
5  the weekly or biweekly meetings with David
6  McConnell?
7    A.   I was probably at some of them.
8  The short period of time that I guess I
9  reported directly to him, I think there was
10 only one meeting that I attended. Al was
11 there, too, I think. I don't know if anyone
12 else was there.
13         But at that -- you know, it was
14 maybe a week or two period, there was just I
15 remember one meeting that I was in there with
16 Al and David.
17         But other than that, I didn't meet
18 with McConnell alone, that I remember, during
19 that brief period that I reported to him.
20 During the time when Steve was there, Al was
21 there, you know, I was in meetings with
22 McConnell every so often. Not that frequently.
23    Q.   Let me mark, please, as
24 Exhibit 1093 a one-page document with Bates
25 number DBR-AA 36504.

Page 802

1          - - - - -
2          (Thereupon, Deposition Exhibit 1093
3          was marked for purposes of
4          identification.)
5          - - - - -
6    Q.   Is Exhibit 1093, Mr. Cancelmi, a
7  copy of the agenda for the meeting that you and
8  Mr. Adamczak had with Mr. McConnell shortly
9  after Mr. Spargo announced he was leaving
10 AHERF?
11    A.   I believe so.
12    Q.   And you saw a copy of this agenda
13 at the time?
14    A.   I believe so, yes.
15    Q.   Did you help to prepare it?
16    A.   Yeah, I may have.
17    Q.   Do you see the last bullet point
18 item on the agenda, the Graduate reserves
19 earmarked for DV bad debt reserve?
20    A.   Yes.
21    Q.   Is that a reference, to your
22 understanding, to the $50 million that was
23 transferred from the Graduate entities to the
24 DVOG hospitals?
25    A.   I think so.

Page 803

1    Q.   Do you recall that point being
2  raised with Mr. McConnell at this meeting?
3    A.   Specifically, no. I mean I don't
4  remember the exact conversation.
5    Q.   Is it your understanding that
6  Mr. McConnell was aware of the $50 million
7  transfer?
8    A.   Yes.
9    Q.   Is it your understanding that he
10 approved of it?
11    A.   Yes.
12    Q.   Let me hand you, Mr. Cancelmi, what
13 has previously been marked as Exhibit 39, I
14 believe. It's a little bit hard to read. It's
15 definitely from Mr. Lisman's deposition and it
16 has Bates numbers DC8297, pages 1 to 2.
17         Focusing on the first page of
18 Exhibit 39, Mr. Cancelmi, is this a list of May
19 financial statement adjustments?
20    A.   Yes.
21    Q.   And did you prepare this schedule?
22    A.   I believe so.
23    Q.   And is that your handwriting at the
24 top of the page?
25    A.   Yes.

Page 804

1    Q.   Could you read that for us, please?
2    A.   Summary of adjustments provided to
3  Al and CPM.
4    Q.   Is Al Al Adamczak?
5    A.   Yes.
6    Q.   Is CPM Charles P. Morrison?
7    A.   Yes.
8    Q.   When did you write that?
9    A.   I don't know exactly.
10    Q.   Did you write that after the AHERF
11 bankruptcy?
12    A.   My notation?
13    Q.   Yes, the one that you just read
14 into the record for us.
15    A.   I may have. I can't say for
16 certain.
17    Q.   Did you go back through various
18 documents you had in your files at some point
19 and try to identify which ones you recalled
20 providing to people?
21    A.   Yes.
22    Q.   And that's an example here, you at
23 the time in 1998 recall that back in 1997 you
24 had provided this particular schedule to
25 Mr. Adamczak and Mr. Morrison?

43 (Pages 801 to 804)

Daniel Cancelmi                                                                                   Volume 3

Page 821

1  of $2 and a half million from a Graduate
2  reserve account to DVOG hospital?
3     A.   Yes.
4     Q.   And that's part of this $7 million
5  that was recorded as of May 1997, right?
6     A.   I believe so.  Yes.
7     Q.   You don't recall providing Coopers
8  & Lybrand with these standing accrual analysis
9  schedules, do you?
10    A.   Offhand, no.  I don't know if we
11 did or not.
12    Q.   Let me hand you what's previously
13 been marked as Exhibit 299.
14        Do you recognize Exhibit 299, Mr.
15 Cancelmi, as a June 23rd, 1997 memo from Ms.
16 Schaffer to you?
17    A.   Yes.
18    Q.   Did she, at least at certain points
19 in time, prepare monthly memos like this about
20 Delaware Valley's patient revenue?
21    A.   Yes.
22    Q.   On this memo it appears that she
23 copies Mr. Morrison, Mr. Adamczak?
24    A.   Yes.
25    Q.   There are no other copyees listed,

Page 823

1     Q.   Then on the next page for St.
2  Christopher's Hospital there's an additional
3  $1 million recognition of reserves from
4  Graduate, right?
5     A.   Yes.
6     Q.   And if we go back to the page with
7  Bates number 189 for Elkins Park, there's
8  another $1 million recognition of reserves from
9  Graduate, right?
10    A.   Yes.
11    Q.   And that's the $7 million that was
12 transferred in the May 1997 closing, right?
13    A.   That's correct.
14    Q.   So that anybody who received a copy
15 of this memo marked as Exhibit 299 could have
16 learned from looking at the footnotes about the
17 $7 million reserve transfer, right?
18    A.   Yes.  It would be one way, yes.
19    Q.   But you don't recall providing this
20 memo to Coopers & Lybrand, do you?
21    A.   This particular memo, I don't know
22 if we did or not.  I would say the same thing.
23 These, just like that summary of adjustments,
24 these monthly schedules I used to file in my
25 monthly financial statement binder.

Page 822

1  right?
2     A.   No.
3     Q.   If you could turn, please, to the
4  page with the Bates number DBR-RS-0191.
5     A.   Yes.
6     Q.   Is this page an example of what you
7  and Robin referred to as a cheat sheet?
8     A.   Yes.
9     Q.   It was a way to try to reconcile on
10 an analytical basis between gross and net
11 patient revenue?
12    A.   Yes.  And we provided this monthly
13 when management was reviewing the financial
14 statements.  And then when we'd go out to
15 Philadelphia and discuss financial statements
16 with some of the people out there, this was
17 nice summary of, you know, some of the results
18 for the month.
19    Q.   All right.  Do you see here, we're
20 on a sheet for Hahnemann Hospital, right?
21    A.   Yes.
22    Q.   Do you see there footnote C reads,
23 "includes $5 million recognition of reserves
24 from Graduate"?
25    A.   Yes.

Page 824

1         And I know we gave some schedules
2  to Coopers for this information, but it was
3  distributed to a lot of different individuals
4  within the company.
5     Q.   Do you know whether this went to
6  Dr. Kaye?
7     A.   It might have.  It certainly went
8  to Chuck Morrison.  I don't know if Chuck would
9  have given it to him or not.
10    Q.   Let me hand you what's previously
11 been marked as Exhibit 41.  Do you recognize
12 Exhibit 41, Mr. Cancelmi?
13    A.   Yes.
14    Q.   What is it?
15    A.   It's a summary of Delaware Valley's
16 DVOG bad debt reserve shortfall.  I guess this
17 is as of May '97.
18    Q.   There's a reference here to the
19 $50 million transfer of reserves from Graduate,
20 right?
21    A.   Right.
22    Q.   And even after that transfer, there
23 was still a shortfall in the bad debt allowance
24 accounts at the DVOG hospitals of about
25 $25 million; is that right?

Page 825

1     A.    Correct.
2     Q.    And you sent this memo to
3  Mr. Morrison?
4     A.    Yes.
5     Q.    And you copied, I think, seven
6  other AHERF officers or employees?
7     A.    Yes.
8     Q.    And Coopers & Lybrand isn't shown
9  as a recipient or a copyee, are they?
10     A.    That's correct.
11     Q.    Let me hand you what's previously
12  been marked as Exhibit 43. Do you recognize
13  this exhibit, Mr. Cancelmi?
14     A.    Yes.
15     Q.    What is it?
16     A.    It's a summary of reserves that
17  were utilized to address bad debt shortfalls in
18  the Health Partners issue related for the DVOG
19  hospitals.
20     Q.    Does this memo summarize the
21  transfer of reserves that was undertaken to
22  cover the $25 million bad debt reserve
23  shortfall referred to in the memo we were just
24  looking at marked as Exhibit 41?
25     A.    Yes.

Page 826

1     Q.    If we turn to the second page of
2  Exhibit 43. I don't know if your copy is a
3  little bit cut off on the right.
4     A.    A little bit.
5     Q.    There's a reference there on the
6  first row to the same $25,083,000 shortfall
7  that you had in your June 20th memo, right?
8     A.    I think so. Yes.
9     Q.    And what's listed here is a list of
10  reserves used to cover the shortfall, right?
11     A.    Correct.
12     Q.    Some were existing DVOG reserves,
13  right?
14     A.    Correct.
15     Q.    Others were purchase accounting
16  reserves that you transferred from Graduate,
17  right?
18     A.    Correct.
19         MR. TORBORG: Objection.
20     Q.    The existing DVOG reserves had
21  previously been expensed in AHERF's financial
22  statements, right, when those reserves were
23  established?
24         MR. TORBORG: Objection.
25     A.    Capitalized interest. Those were

Page 827

1  all the capitalized interest reserve. The
2  depreciation reserve, I guess was --
3  capitalized interest, I think that was set up,
4  I don't remember the exact entry, but it was
5  capitalized interest you credit interest
6  expense. And then I think a reserve was
7  recorded to offset the interest credit that was
8  recorded.
9     Q.    Okay. That's helpful. I asked a
10  bad question.
11         The capitalized interest reserves
12  at the DVOG corporations were established
13  appropriately, according to GAAP, right?
14     A.    Yeah, the capitalized interest, I
15  think I've testified a lot of times on this,
16  AHERF as an organization didn't record
17  capitalized interest on a monthly basis. And
18  then usually as part of the annual audit,
19  Coopers & Lybrand would come in and, you know,
20  ask whether it was recorded, and then suggest
21  that we record it.
22         And I think up until '96, it hadn't
23  been recorded. And then in '96, it was
24  recorded. I think when it was recorded, like I
25  said, I think interest was credited. And then

Page 828

1  there was a corresponding reserve established.
2  So it sort of washed out on the income
3  statement.
4     Q.    All right. And that's an
5  appropriate accounting treatment under GAAP,
6  right?
7         MR. TORBORG: Objection.
8     A.    Based on that, yeah, that was my
9  understanding, yes.
10     Q.    And the depreciation reserve at
11  Hahnemann University Hospital had been
12  established in a prior period by taking expense
13  on AHERF's income statement, right?
14     A.    Yeah, the depreciation reserve, the
15  accounting records, we were trying to get our
16  property and equipment activity onto an
17  automated computer system. So, you know, we
18  had looked at that over a year or so, and it
19  looked like that depreciation had been
20  overstated in prior years. So we tried to
21  estimate what that may be. And to try to firm
22  that up and make sure that, you know, what some
23  of our assumptions, whether they made sense or
24  not.
25         Allegheny started to have physical

49 (Pages 825 to 828)

Daniel Cancelmi                                                                     Volume 3

Page 829

1    inventories of our property and equipment
2    conducted.  And I think at one point, Coopers &
3    Lybrand was engaged to start doing physical
4    inventories of our fixed assets.
5         These reserves, we had recorded the
6    depreciation reserves in a separate account.
7    And, you know, based on what we thought, it
8    looked like we had, you know, additional
9    depreciation reserves there.
10        We never, I don't think at least
11   when I was there, we never got everyone up on
12   the system.  I don't think Coopers had done all
13   the physical inventories yet and we hadn't
14   transferred all the records in, but that's sort
15   of the background on that reserve.
16        Q.   Is it fair to say that as
17   additional information became available to you,
18   for example, physical inventories, you
19   concluded that Hahnemann Hospital had more
20   depreciation reserve than it needed?
21        A.   Yeah, well, I don't know if
22   Hahnemann had a physical at that point, but you
23   could get a sense.  You do estimates what you
24   think depreciation expense should be versus
25   what's been recorded.

Page 830

1         But I think it was the conclusion
2    at that point we thought there was additional
3    depreciation reserves.
4         Q.   So you believed around the time you
5    wrote this memo dated July 3rd, 1997, that that
6    excess depreciation reserve at Hahnemann could
7    be released into income, right?
8         A.   Yes.
9         Q.   Instead what you did was to
10   reclassify it as a bad debt reserve, right?
11        A.   That's correct.
12        Q.   And that has the same net effect on
13   the income statement as though you had first
14   released the excess depreciation reserve to
15   income and then taken an expense to establish a
16   bad debt reserve in the same amount, right?
17        MR. TORBORG:  Objection.
18        A.   Yeah, I guess.  I mean we didn't
19   reverse it into income.  I don't think we
20   reversed it into income.  I just thought the
21   reserve was transferred from the depreciation
22   accounts to bad debt reserve accounts.
23        Q.   All right.  Not transferred in the
24   same way we've been talking about transfer of
25   reserves between obligated groups, though,

Page 831

1    right?
2         A.   No.  This was within the same
3    obligated group.
4         Q.   This was more reclassifying the
5    reserve at the same entity, right?
6         A.   That's correct.
7         Q.   Let me mark, please, as
8    Exhibit 1094 documents with Bates numbers
9    DC4551, page 1, through DC4554, page 2.
10              - - - - -
11        (Thereupon, Deposition Exhibit 1094
12        was marked for purposes of
13        identification.)
14              - - - - -
15        Q.   Now, Mr. Cancelmi, does
16   Exhibit 1094 contain, among other things, a
17   series of documents entitled AHERF Reserve
18   Summary?
19        A.   Yes.
20        Q.   Also contains a perhaps more
21   legible copy of the memo we just looked at that
22   was Exhibit 43, right?
23        A.   Yes.
24        Q.   Now, let me focus on the AHERF
25   reserve summaries.  These are the schedules of

Page 832

1    excess reserves that were sometimes referred to
2    within AHERF as the X file, right?
3         A.   Correct.
4         Q.   That's like the show on TV, the X
5    Files, right?
6         A.   No.  No.  Extra reserve.  Extra
7    reserves.  I don't know about the show on the
8    TV.
9         Q.   But these schedules had the same
10   name as that TV show, right, the X Files?
11        A.   I guess.
12        Q.   Who first started to prepare X file
13   schedules like these?
14        A.   Reserve schedules, I guess our
15   department did.  I mean they go back a number
16   of years, I guess.
17        Q.   Let me start with the last part of
18   this document.  So it's the next to last page,
19   DC4554, page 1.
20        A.   Yes.
21        Q.   Focusing for a moment just on the
22   typed schedule.  This is a version of the X
23   files that shows the reserve balances as of
24   June 30th, 1996 and May 31st, 1997, right?
25        A.   Yes.