Daniel Cancelmi                                                                 Volume 3

---

Page 833

1    Q.   And the schedule begins with AGH,
2  then eventually reached the DVOG hospitals and
3  the Graduate hospitals, correct?
4    A.   Yes.
5    Q.   Is it the case that this schedule
6  was prepared by or at the direction of Mr.
7  Adamczak?
8    A.   We put this together almost every
9  month.  And, you know, some of the information
10  -- well, May of '97, I either knew where some
11  of these things were or other people knew where
12  some of the things were.
13       It was usually prepared each month
14  to be provided to management.  As far as the
15  source of the numbers, some of the numbers came
16  from individuals outside of the accounting
17  department, just due to the nature of them.
18    Q.   Is that Mr. Adamczak's handwriting
19  at the top right-hand corner?
20    A.   Yes.
21    Q.   Is that a note that he wrote to
22  you?
23    A.   Yes.
24    Q.   Are you able to read that for us,
25  please?

---

Page 834

1    A.   Dan, I'm hesitant to take Forbes/AV
2  cushions because we have to, I'm not sure what
3  that word is.
4    Q.   Account?
5    A.   Account to Moyer.  The pencil
6  numbers are my suggestions which total
7  15.3 million needed.  25.1 or -- you gather
8  rather just for the bullets.
9    Q.   Bite the bullet, maybe?
10    A.   Bite.  That could be.  Bite the
11  bullet.  Take 10 million of Graduate reserves.
12    Q.   When Mr. Adamczak here referred to
13  the $25.1 million that was needed, that's a
14  reference to the $25,083,000 bad debt reserve
15  shortfall that you calculated in your June 20th
16  memo, correct?
17    A.   I don't know if -- it could be.  It
18  probably is.
19    Q.   Do you believe that what this
20  handwriting reflects is Mr. Adamczak going
21  through the X file schedules, seeing whether he
22  could identify $25.1 million of reserves that
23  would be available to cover the bad debt
24  reserve shortfall to DVOG hospitals?
25    A.   Yes.

---

Page 835

1    Q.   He had come up with $15.3 million
2  versus the needed 25.1 million, right?
3    A.   That's what it looks like.
4    Q.   Who was Mr. Moyer?
5    A.   He was the finance guy related to
6  Allegheny Valley and Forbes.
7    Q.   Do you know why Mr. Adamczak was
8  hesitant to take Forbes or Allegheny Valley
9  cushions?
10    A.   I think he didn't want to
11  necessarily utilize the Forbes and Allegheny
12  Valley reserves unless it was necessary.
13  Background on that is when AHERF was in a cash
14  crunch, the Forbes and Allegheny Valley systems
15  were -- it had a fair amount of cash
16  availability.
17       And there was a lot of times, at
18  least my understanding, there were discussions
19  about taking some cash from the Forbes or
20  Allegheny Valley organizations.  But, you know,
21  a lot of times Moyer, he just -- since he had
22  worked for those organizations, he just wanted
23  to keep Forbes and Allegheny Valley stuff to
24  just on their books.
25    Q.   So is it fair to say that Mr.

---

Page 836

1  Adamczak thought he couldn't use any Forbes or
2  Allegheny Valley reserves to transfer to DVOG
3  because Mr. Moyer would have noticed that?
4       MR. TORBORG:  Objection.
5    A.   He probably wouldn't have wanted
6  them transferred.
7    Q.   He would have objected?
8       MR. TORBORG:  Objection.
9    A.   He would have wanted them for
10  Forbes or Allegheny Valley.
11    Q.   Was there no one at the Graduate
12  hospitals who was in the position that Mr.
13  Moyer had at Forbes and Allegheny Valley who
14  could object to the use of Graduate reserves
15  for DVOG?
16       MR. TORBORG:  Objection.
17    A.   Was there?  Sure.  There was Chuck
18  Morrison.
19    Q.   But he was also responsible for
20  DVOG hospitals, right?
21    A.   That's correct.  Then there was
22  also -- there was CFOs of the Graduate
23  hospitals, and Matt Dowling, I think, was the
24  CFO of all the Graduate hospitals.
25    Q.   And Matt Dowling had been on Chuck

---

Daniel Cancelmi

Page 841

1 These have the Bates numbers 4553, page 1,
2 page 2 and page 3.
3    A.   Okay.
4    Q.   Is that your handwriting on each of
5 these three pages?
6    A.   Yes.
7    Q.   And the first page is a summary
8 page, right?
9    A.   Yes.
10    Q.   And the next two pages are the
11 detail pages?
12    A.   Yes.
13    Q.   Is this the same typewritten
14 schedule, X file schedule, as of June 30th,
15 1996 and May 31st, 1997, as we saw Mr. Adamczak
16 marking up on the next two pages, DC4554, pages
17 1 to 2?
18    A.   It looks like it.
19    Q.   Is it the cases that on the two
20 pages with Bates numbers DC4 553, page 2 and
21 page 3, that you were going through the X file
22 schedule and identifying the reserves that you
23 then used in your July 3rd, 1997 memo, which is
24 immediately before it in Exhibit 1094?
25    A.   Yes.

Page 842

1    Q.   Is it fair to say that you built on
2 the $15.3 million that Mr. Adamczak had already
3 identified in his review of the X file schedule
4 and found another $10 million or so to get up
5 to the $25 million total that you needed?
6    A.   Yes.
7    Q.   So was this process of identifying
8 the particular Graduate reserves to be
9 transferred to DVOG a collaborative one that
10 you and Mr. Adamczak were both involved in?
11    A.   Yes.  Yeah, I've testified to that
12 a long time.
13    Q.   If you now look at the first
14 several pages of Exhibit 1094 with Bates
15 numbers DC4551, pages 1 to 3.  Is this a copy
16 of the X file schedule as of June 30, 1996 and
17 May 31, 1997, revised to reflect the reserves
18 that you used for the transfer to DVOG
19 hospitals?
20    MR. TYCKO:  Can you give those
21 Bates numbers one more time?
22    (Record repeated.)
23    A.   Yes.
24    Q.   Was anybody directing you and
25 Mr. Adamczak in terms of which reserves to

Page 843

1 identify and utilize for the transfer?
2    A.   I think McConnell was involved in
3 this.  I guess based on my understanding, I
4 guess talking to Al and Chuck Morrison.  And
5 based on the issues, what some of the reserves
6 were for.  And then how some of them weren't
7 necessarily needed anymore.  We would go
8 through and identify which ones that would be
9 transferred.
10    Q.   We meaning you and Al Adamczak?
11    A.   Yes.
12    MR. RYAN:  We need to pause for
13 just a moment for another tape change.
14    VIDEO TECHNICIAN:  We are at the
15 end of tape two of the deposition of Daniel
16 Cancelmi on February 6, 2003.  We will resume
17 with tape three.  The time is 2:29.
18    (Brief recess.)
19    VIDEO TECHNICIAN:  The time is
20 2:42.  We are back on the record with tape
21 number three.
22    Q.   We were looking, Mr. Cancelmi,
23 before we broke at Exhibit 1094, which included
24 a number of X file schedules, right?
25    A.   Yes.

Page 844

1    Q.   And the reserves that are utilized
2 here totaled 28 or $9 million, of which
3 25 million was for the DVOG hospitals bad debt
4 reserve accounts, right?
5    A.   Yes.
6    Q.   And of that total, I think just
7 over 21 million came from Graduate, right?
8    A.   Correct.
9    Q.   And is that what you've referred to
10 previously in your testimony as the $21 million
11 reserve transfer?
12    A.   Yes.
13    Q.   Was that transfer actually made on
14 or about July 3rd, 1997, the date of the memo?
15    A.   I believe so.
16    Q.   One question I meant to ask you
17 earlier.  Relates to all the reserve transfers.
18 When we're talking about reserve transfers
19 here, we aren't talking about actually shipping
20 cash back and forth, are we?
21    A.   No.
22    Q.   These are simply bookkeeping
23 entries to establish reserves, right?
24    A.   That's correct.
25    Q.   Doesn't have anything to do with

Page 845

1  moving real money, cash, from one entity to
2  another, right?
3      A.   That's correct.
4      Q.   This packet we've marked as
5  Exhibit 1094 lays out the reserves used as part
6  of the $21 million transfer and shows which
7  reserves that AHERF believed were excess
8  remained on the books even after that transfer,
9  right?
10     A.   Correct.
11     Q.   And you never sat down with Coopers
12 & Lybrand with the schedules that we have here
13 in Exhibit 1094 and explained to them what you
14 were doing with these reserve transfers, did
15 you?
16     A.   This exact packet?
17     Q.   Yes.
18     A.   I don't know if I did or not.
19     Q.   You can't recall ever sitting down
20 with anyone from Coopers & Lybrand to go over X
21 file schedules, can you?
22     A.   The schedules themselves?
23     Q.   Yes.
24     A.   I don't know.  I don't know about
25 that.  I don't know if I ever did.  Whether

Page 846

1  someone else did, I don't know.  Could have.
2  Maybe not.
3          But most of the items on there, you
4  could pull any one of them.  Most of them are,
5  I think it's fair to say Coopers & Lybrand was
6  aware of what the issues were related to those
7  reserves.
8          But as far as exactly what packet
9  of information was discussed with them, I can't
10 say that like this exact packet was discussed
11 with them, no.
12     Q.   Okay.  And just to be sure that I'm
13 understanding you right, you don't recall
14 discussing any version of the X files with
15 Coopers & Lybrand, do you?
16     A.   Specifically, no.
17     Q.   And these X file schedules were
18 circulated monthly to certain members of AHERF
19 management?
20     A.   Yes.
21     Q.   They were viewed as a useful
22 high-level management tool; is that right?
23     A.   I believe so.  I guess you would
24 have to ask them.
25     Q.   Did you view them as a useful

Page 847

1  high-level management tool?
2      A.   I mean they were used a lot.  I
3  guess you could say they were useful.
4      Q.   Let me mark, please, as
5  Exhibit 1095 a document with Bates numbers CLIS
6  190 to 201.
7           -  -  -  -  -
8          (Thereupon, Deposition Exhibit 1095
9          was marked for purposes of
10         identification.)
11          -  -  -  -  -
12     Q.   Is Exhibit 1095, Mr. Cancelmi, a
13 summary of certain journal entries?
14     A.   Yes.
15     Q.   And the journal entries are
16 arranged by corporation number?
17     A.   Yes.
18     Q.   And these are the journal entries
19 that were recorded pursuant to your July 3rd,
20 1997 memo, right?  And please feel free to take
21 any time you need to confirm that.
22     A.   (Witness reviewing document.)
23         That's what it looks like, at least
24 on the first couple pages I looked at.
25     Q.   Is it the case that the part of the

Page 848

1  journal entries with the ID number CTYE1 was an
2  entry to bad debt expense?
3          MR. TYCKO:  Are you asking him
4  about all of the --
5      Q.   Let me start with a particular one.
6  We'll go from there.  Why don't we look at the
7  second page, Bates number 191.  This refers to
8  journal entries for MCP Hospital, right?
9      A.   Uh-huh.
10     Q.   And do you see there's a
11 debit to general ledger account number 8401100
12 in the third row?
13     A.   Yes.
14     Q.   And that is described in the right
15 column as bad debt Exp.?
16     A.   Yes.
17     Q.   That is a debit here in the amount
18 of $1,191,000 to the MCP Hospital bad debt
19 expense account, right?
20     A.   That's what it looks like, yes.
21     Q.   And on the next page we've got
22 similarly a debit to the bad debt expense
23 account at Elkins Park Hospital, right?
24     A.   Yes.
25     Q.   Also I'm now talking about journal

Daniel Cancelmi                                                    Volume 3

---

Page 857

1  Exhibit 1097 a document with Bates numbers
2  DC0896, pages 64 through 83.
3         - - - - -
4         (Thereupon, Deposition Exhibit 1097
5         was marked for purposes of
6         identification.)
7         - - - - -
8      Q.   Do you recognize Exhibit 1097, Mr.
9  Cancelmi?
10     A.   Yeah, I think so.
11     Q.   What is it?
12     A.   There's a number of documents in
13  here. One is a memo from Al to McConnell, just
14  summarizing some financial numbers for June.
15  The next page has some patient day and volume
16  admission information. Then some summary of
17  the explanation of some of the variances.
18  That's 67 to 92.
19     Q.   Whose handwriting is that on 67 to
20  92?
21     A.   Al Adamczak's. He's, I guess,
22  summarizing the data relating to DVOG. Then
23  69, 70, just financial statement information
24  related to the Delaware Valley or Eastern
25  Region stuff.

---

Page 858

1      Q.   All right. If I could focus,
2  please, on the first part of the fax, which is
3  the July 18th, 1997 memo from Mr. Adamczak to
4  Mr. McConnell.
5         There are figures there for actual
6  month of June patient service revenue at the
7  five DVOG hospitals, correct?
8      A.   Yes.
9      Q.   And those figures correspond to the
10  June 1997 patient revenue figures shown in
11  Exhibit 1096, the statements faxed to Mr.
12  McConnell on July 16th, don't they?
13     A.   I don't know. I'll verify that.
14     Q.   Well, we've got 12.4 million at MCP
15  Hospital, and Exhibit 1096 it's
16  $12,471,000 million?
17     A.   That's what it looks like, yeah.
18     Q.   Mr. Adamczak identifies in the
19  July 18th, 1997 memo that the actual results
20  for June in terms of DVOG inpatient service
21  revenue were significantly below budget, right?
22     A.   Correct.
23     Q.   Do you remember that the June 1997
24  results as initially recorded were very bad?
25     A.   Yeah, I mean from, you know, I

---

Page 859

1  think these were one of the first set of
2  June '97 statements. And I think it was a
3  consistent issue that there was write-offs that
4  occurred.
5      Q.   The variance here as shown in
6  Mr. Adamczak's memo is $15.7 million, right?
7      A.   Yes.
8      Q.   And then he identifies on the next
9  page volume variance of $8.2 million, right?
10     A.   Okay. Yes.
11     Q.   Top half of that page?
12     A.   Yes.
13     Q.   And then the remainder, the
14  variance of $7.5 million he assigns to rate
15  variance, right?
16     A.   Correct.
17     Q.   That $7.5 million figure, as you
18  understand it, is just the plug between the
19  overall $15.7 million variance and the
20  $8.2 million volume variance that you
21  calculated, right?
22     A.   Yeah, I mean and there was -- he
23  goes through and, you know, identifies -- when
24  you have a variance in revenue, it's either
25  rate or volume. So, you know, whatever one you

---

Page 860

1  start with, the difference, you know, you
2  assume is the other one.
3         So what he's saying is, here, this
4  is the other difference, you know, I guess
5  estimated to be the rate variance, and then
6  these are some of the unusual items that
7  happened during that month.
8      Q.   If you could turn, please, to the
9  page with Bates number 70.
10     A.   Yes.
11     Q.   Do you see it's headed AHERF
12  Eastern Region combined statement of revenue
13  and expenses for the year ended June 30th,
14  1997?
15     A.   Correct.
16     Q.   And this is a printout of the DVOG
17  income statement for fiscal year 1997 in the
18  format used for AHERF's monthly internal
19  financial statements for the results as they
20  were initially reported, right?
21     A.   I guess. I don't know the -- I
22  assume, since he's attaching it to this memo,
23  there's not a date on it, but, yeah, the next
24  page, 718. Okay, yes.
25     Q.   You're looking there at the print

---

57 (Pages 857 to 860)

Daniel Cancelmi

Volume 3

Page 861

1  date there, the bottom right corner of page 71,
2  right?
3      A.  Right.
4      Q.  Where it says July 18th, '97?
5      A.  Right.
6      Q.  Am I reading this right that the
7  way the results were initially reported, DVOG
8  had a $944,000 loss for fiscal year 1997?
9      A.  Yes.
10     Q.  And you're aware, aren't you, that
11 in the final financial information for DVOG,
12 there's a net income reported of approximately
13 $20 million, right?
14     A.  Is that what it is?  You would have
15 to show me a statement.
16     Q.  Why don't we dig that out.
17         Let me hand you, Mr. Cancelmi,
18 what's previously been marked as Exhibit 58.
19 Is this a copy of AHERF's 1997 audited
20 financial statements?
21     A.  Yes.
22     Q.  And attached to the audited
23 financial statements for consolidated AHERF are
24 certain consolidating schedules, right?
25     A.  Yes.

Page 862

1      Q.  And specifically on page 28 of the
2  original document, the Bates number ending in
3  922, there's consolidating income statement
4  information for AHERF's various affiliates for
5  the year ended June 30th, 1997, right?
6      A.  Correct.
7      Q.  And for DVOG, the net income is
8  shown there as $23,701,000, right?
9      A.  Correct.
10     Q.  And is the difference between the
11 income shown on the consolidating schedules
12 attached to the audited financial statements
13 and the net loss, as initially reported, that
14 we saw in Exhibit 1097, a series of adjustments
15 that were made to the June 1997 financial
16 statements?
17     A.  Yes.
18         MR. TORBORG:  Objection.
19     Q.  Were those adjustments made --
20 well, strike that.
21         At whose direction were those
22 adjustments made?
23     A.  That was, my understanding,
24 McConnell.
25     Q.  Did you speak directly to

Page 863

1  Mr. McConnell about that?
2      A.  I don't believe so.  I probably
3  would have been talking to Al about it.
4      Q.  Did Mr. Adamczak tell you that the
5  adjustments were being made at Mr. McConnell's
6  direction?
7      A.  I assume.  I mean that's how the
8  process normally worked.
9      Q.  Let me hand you, Mr. Cancelmi,
10 what's previously been marked as Exhibit 49.
11 Do you recognize the handwriting on the second
12 page of this exhibit?
13     A.  Yes.
14     Q.  Whose is it?
15     A.  Looks like mine.
16     Q.  And on this page, do you record the
17 original unadjusted --
18     A.  Some of them aren't mine, but most
19 of them are.
20     Q.  Okay.  Is there a way -- there
21 seems to be darker numbers and lighter numbers.
22 Can you identify --
23     A.  No, I can't do it based on that.
24 Looks like the Pittsburgh stuff.  Doesn't look
25 like that's my writing.

Page 864

1      Q.  You're referring to the first row
2  by AGH and then the row by Forbes and AOC?
3      A.  Right.  And then Delaware Valley
4  stuff looks like mine.  Most of the Graduate
5  stuff, that looks like mine.
6      Q.  So I'll just focus on the DVOG and
7  Graduate information.  That's your handwriting
8  mainly there; is that right?
9      A.  That's what it looks like, yes.
10     Q.  On this schedule are you writing
11 down the unadjusted net income or loss for
12 fiscal year 1997, and then adding certain
13 adjustments to increase income in arriving at
14 an adjusted fiscal year 1997 income?
15     A.  Yes.
16     Q.  Let me hand you what's previously
17 been marked as Exhibit 51.  Is this your
18 handwriting on Exhibit 51?
19     A.  Yes, except for I think the top to
20 the right.  Or going down, like that 6/97
21 column going down, that's Chuck Lisman's
22 writing.
23     Q.  But the hospitals, the indications
24 inpatient or outpatient, and the dollar amounts
25 are your handwriting?

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                      Akron (330) 374-1313

Daniel Cancelmi

Page 873

1    Q.   But the remainder is transferred to
2    DVOG and taken into income there, right?
3    A.   That's correct.
4    Q.   Who went through this X file
5    schedule marked as Exhibit 45 to identify the
6    reserves at the Graduate entities that could be
7    taken and transferred to DVOG?
8    A.   Who went through it?
9    Q.   Yeah.  Who sat down with a version
10   of this X file schedule that was unadjusted as
11   of June 30th, 1997 and determined which
12   reserves to take from the Graduate entities and
13   transfer to DVOG?
14   A.   I think we talked about this
15   before.  There was adjustments that management
16   wanted made to the DVOG financial statements.
17        And then based on whatever the
18   issue was, if there was a reserve that was
19   available, you know, Al or myself would go
20   through, based on information we knew about or
21   heard about, and, you know, like the PFMA, we
22   would receive correspondence from, you know, a
23   number of different areas, you know, that that
24   was available, et cetera.
25        And based on that, you know, the

Page 874

1    determination was made that those would be the
2    reserves that would be used.
3    Q.   All right.  So that's something
4    that you and Mr. Adamczak did?
5    A.   Yeah.  I mean it's similar to the
6    20, I think the 21, whatever that schedule was
7    you showed me a while back where he had
8    identified some of them.  He would ask me to
9    identify some of them.  You know, and maybe
10   other people identified some of them.
11        But, you know, this was the primary
12   schedule that had been distributed to
13   management.  And, you know, they were aware of
14   the issues and what these matters related to.
15   So this was the basis, so to speak, of where to
16   look for the reserves.
17   Q.   All right.  When you say
18   management, you're referring here, at least in
19   the context of DVOG and Graduate, you're
20   referring to Mr. McConnell and Mr. Morrison?
21   A.   Yes.  This was distributed to other
22   people, though, within Allegheny is my
23   understanding.
24   Q.   By this, you're referring now to
25   the X file schedule showing the reserves taken

Page 875

1    that we've marked as Exhibit 45?
2        MR. TORBORG:  Objection.
3    A.   I believe so.  I don't know exactly
4    every single schedule where it went.  It was my
5    understanding that after our department would
6    prepare it, it would go to -- Steve was there
7    at the time, and I thought he distributed it to
8    McConnell or Morrison or Dionisio.  Or when Al
9    was there at the time, you know, he sent it to
10   McConnell or Morrison or Dionisio.
11        And I thought I had an
12   understanding it went to Abdelhak, but I can't
13   say for sure.  I never gave it to him.
14   Q.   Now, we talked a little bit earlier
15   when we were looking at Exhibit 1095 about how
16   at the same time that the journal entries were
17   made for the $21 million transfer to DVOG bad
18   debt allowance accounts, an additional
19   $10 million in liabilities were established on
20   the books of Graduate hospitals in the accounts
21   payable liability account, right?
22   A.   Yes.
23   Q.   And does this exhibit now,
24   Exhibit 45, show substantial amounts being
25   transferred out of those general AP reserve

Page 876

1    accounts at Graduate, Mount Sinai and Rancocas
2    Hospitals?
3    A.   Yeah, I think so.  There's a line
4    for general AP reserves.
5    Q.   And so that's what you were
6    testifying about earlier when you said those
7    reserves were established basically for
8    transfer to DVOG, right?
9    A.   They were established for, you
10   know, AP type issues and then ultimately
11   transferred to DVOG for accounts receivable
12   issues, yes.
13   Q.   When you say ultimately, I mean
14   it's a matter of days or weeks after they were
15   established, right?
16   A.   Yeah.  Although, I think they were
17   being evaluated before that.  I can't say
18   exactly.  I think that was an issue that was
19   out on the table, at least for some length of
20   time.  But I don't remember exactly when.
21   Q.   Now, we've just looked at a whole
22   series of exhibits that reflect the adjustments
23   made to the June 1997 DVOG financial
24   statements, right?
25   A.   Correct.

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                          Akron (330) 374-1313

Page 877

1    Q.   Adjustments that included the
2   greater part of the $28 million reserve
3   transfer from Graduate to the DVOG contractual
4   allowance accounts?
5    A.   Correct.
6    Q.   And you don't recall, do you,
7   providing any of these documents relating to
8   that $28 million reserve transfer to Coopers &
9   Lybrand?
10    A.   I don't know about any one of these
11   particular documents.  One of them may.  I
12   don't know exactly.  I mean we would have to go
13   through each one.  I couldn't say a hundred
14   percent for sure whether -- which ones were.
15   But like I said before, certain of the
16   components I thought had been discussed with
17   Coopers & Lybrand, as far as reserves, what
18   they related to and that they had been
19   transferred.
20    Q.   Let me just ask you a little bit
21   more about that.  I think you testified earlier
22   that, unlike the $50 million, the $21 million
23   reserve transfer and the $28 million reserve
24   transfer weren't being talked about inside
25   AHERF in those terms at the time, right?

Page 878

1    A.   That's correct.
2    Q.   They weren't being conceived as a
3   whole, right?
4    A.   Correct.
5    Q.   So you'd be pretty confident that
6   during the 1997 audit, you weren't really
7   talking to anybody, either at AHERF or at
8   Coopers & Lybrand, about the $21 million
9   reserve transfer?
10    A.   That's correct.
11     MR. TORBORG:  Objection.
12    A.   They just weren't referred to in
13   that manner at that point.
14    Q.   All right.  And you wouldn't have
15   been talking to anybody either at AHERF or
16   Coopers & Lybrand about the $28 million reserve
17   transfer?
18    A.   In that manner, no.
19     MR. TORBORG:  Objection.
20    A.   But there was adjustments that
21   obviously people knew about these adjustments
22   that had been made.  It's just they hadn't
23   necessarily been summarized in this 21 and 28
24   category, the way you're referring to them.
25    Q.   And the 21 and 28 is also how you

Page 879

1   have referred to them here in your testimony,
2   right?
3    A.   That's right.
4    Q.   Let me mark, please, as
5   Exhibit 1100 a document with Bates numbers
6   DC8295, pages 1 to 18.
7      - - - - -
8        (Thereupon, Deposition Exhibit 1100
9        was marked for purposes of
10        identification.)
11      - - - - -
12    Q.   Do you recognize Exhibit 1100, Mr.
13   Cancelmi?
14    A.   Yes.
15    Q.   What is it?
16    A.   It's a -- I've testified about this
17   a lot of times before.  It's a summary of
18   various financial results for fiscal '97.
19   Summarizes various reserves that were used in
20   fiscal '97.
21       I think it talks about fiscal '98
22   information in terms of forecasting for '98
23   data.  Talks about some fiscal '96 information.
24   Some of the various reserves that were used and
25   that type of stuff.

Page 880

1    Q.   Is that your handwriting on the top
2   of the first page, Exhibit 1100?
3    A.   Yes.
4    Q.   Could you read that for us, please?
5    A.   Info prepared by Al and provided to
6   DWMc, CPM and SSA.
7    Q.   Those three initials for David
8   McConnell, Chuck Morrison and Sherif Abdelhak?
9    A.   Yes.
10    Q.   How do you know that this
11   information was provided to those three
12   individuals?
13    A.   I thought, I remember Al telling me
14   that.  There would have been others, I think,
15   here, too.  Because at the time Al was putting
16   this together and I was helping Al put this
17   together, I believe my memory, if it's correct,
18   was this data, Chuck Morrison and Dr. Kaye were
19   involved in terms of analyzing the Philadelphia
20   numbers.
21       So these documents could have gone
22   to Dr. Kaye.  Couldn't say a hundred percent
23   for certain.  But I thought Al told me that
24   these documents at least had gone to McConnell,
25   Morrison and Abdelhak.  That's what I recall at

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Daniel Cancelmi                                                                                          Volume 3

---

**Page 885**

1 schedule which puts them all in one place, on
2 one sheet of paper, right?
3     A.    Yeah.
4     Q.    And a total surprise to you?
5     A.    I guess so, yeah. I'm not sure
6 exactly what I thought at the time.
7     Q.    You don't recall providing Coopers
8 & Lybrand with any of these schedules about the
9 use of cushions in fiscal year 1997, do you?
10     A.    Specifically, I can't say that I
11 did. I don't know if anyone else did. They
12 may have. I don't know. I don't remember
13 specifically. But, again, these, I know these
14 were filed in the front of my monthly financial
15 year-end binder, so, you know, it's not like
16 data was hidden or anything.
17     Q.    This is certainly information that
18 sheds light on the quality of AHERF's earnings
19 for fiscal 1997, doesn't it?
20     A.    Yeah.
21     Q.    And all this use of cushions is
22 summarized on just one page?
23     A.    It's summarized on a lot of
24 different pages in a lot of different manners,
25 but --

---

**Page 886**

1     Q.    And you didn't sit down with
2 Coopers & Lybrand, as best as you can recall,
3 and say, look, here's one sheet of paper that
4 shows $138 million in use of cushions in fiscal
5 year 1997, I just thought this is something you
6 should know?
7     A.    No. Well, I was -- it was my
8 understanding they were aware of, you know, the
9 issues that are wrong here. I don't think
10 there's anything in particular that -- maybe
11 not every single component, but the bad debt
12 expense, I mean if you just go across the
13 columns, the bad debt expense, I believe they
14 were aware of that.
15          CRA settlements, I guess that
16 wasn't my area. The Graduate cushions, I can't
17 say a hundred percent every single one of them,
18 but certainly a good bit of those of my
19 understanding Coopers was aware of.
20          Temporarily restricted funds, that
21 was at AHERF. The lion's share of that
22 adjustment I believe came from Mr. Buettner
23 related to U.S. Healthcare risk contract. So,
24 again, another issue that I would have just
25 assumed they were aware of.

---

**Page 887**

1          The deferred HSI revenue, that
2 issue had been discussed. Medicare recapture
3 had been discussed with them. And the other
4 column, the 6 and a half, I guess I would have
5 to see what was in those components.
6          MR. RYAN:  I'll move to strike that
7 answer as nonresponsive.
8          MR. TORBORG:  Objection.
9     Q.    The question I'm trying to ask more
10 specifically is:  If this schedule, when you
11 saw all this use of cushions on one sheet of
12 paper, if this was somewhat new and surprising
13 to you to see this all put together like this,
14 wouldn't it have been a good idea to sit down
15 with someone from Coopers & Lybrand and show
16 them this exact schedule, say, look here?
17     A.    Well, like I just went through and
18 explained, the issues that were outlined on
19 here, I believed the majority of them had
20 already been discussed with Coopers & Lybrand.
21          And I agree, these numbers add up
22 certain adjustments, but then there's a lot of
23 other transactions that take place in an
24 organization throughout the course of the year.
25 And you could pick out five or six of those and

---

**Page 888**

1 put them on a schedule. You could put down and
2 say, well, we picked up new business in, you
3 know, Montgomery County related to these six
4 new physician practices.
5          But, you know, whether you do that
6 with every single thing, we're focusing on six
7 items here, six or seven items, of which most
8 of these, based on my understanding, Coopers &
9 Lybrand was aware of them.
10          There's probably hundreds, if not
11 thousands, of other transactions that take
12 place during the course of a year that you
13 don't necessarily sit down and summarize and
14 sit down and say, hey, you know, what about
15 this?
16          So, yeah, I mean it's a number that
17 has, you know, some big numbers on it. But
18 like I said, a bad debt expense issue by and
19 large was discussed. The CRA settlements,
20 different reimbursement area. You could talk
21 to the folks in there. But Coopers & Lybrand
22 audited the cost report accounts.
23          Graduate cushions, majority of
24 those had been discussed. Temporarily
25 restricted funds, majority of that was a direct

---

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                                              Akron (330) 374-1313

Daniel Cancelmi                                                                   Volume 3

---

**Page 889**

1  entry, my understanding, from Bill Buettner
2  related to U.S. Healthcare risk contract.
3  Deferred HSI revenue, we discussed that that
4  had been discussed.  Medicare recapture was
5  analyzed also at Coopers & Lybrand.
6       Q.   I believe you just said that in
7  AHERF there were hundreds of thousands of
8  transactions that are occurring in the course
9  of a given fiscal year, right?
10      A.   That's correct.
11      Q.   AHERF was a large organization,
12  with lots of individual components, right?
13      A.   That's correct.
14      Q.   Lots of things going on in the
15  modern healthcare organization in terms of
16  reimbursement and different types of payors and
17  investments and so forth, right?
18      A.   Yes.
19      Q.   What we see on page 5 of
20  Exhibit 1100 is a road map, which is some of
21  the more significant transactions out of the
22  hundreds of thousands of transactions that
23  occurred at AHERF in the course of fiscal year
24  1997, right?
25      A.   That's correct.

---

**Page 890**

1          MR. TORBORG:  Objection.
2       Q.   But it's a road map you didn't
3  provide to Coopers & Lybrand, right?
4       A.   I don't remember specifically
5  providing.  Whether someone else did, very well
6  could be.
7       Q.   Let me mark, please, as
8  Exhibit 1101 a document with Bates numbers
9  DBR-AA 8757 to 72.
10         - - - - -
11         (Thereupon, Deposition Exhibit 1101
12          was marked for purposes of
13          identification.)
14         - - - - -
15      Q.   Now, Exhibit 1101 appears to be a
16  fax from Al Adamczak to Sherif Abdelhak.  Do
17  you see that?
18      A.   Yes.
19      Q.   Are you familiar with this fax or
20  with any of its contents, Mr. Cancelmi?
21      A.   I may have seen this before.  I
22  can't say for certain.  Although, schedules on
23  8766, there's schedules that we've prepared.
24      Q.   These are schedules that Robin
25  Schaffer prepared?

---

**Page 891**

1       A.   Yes.
2       Q.   766 to 770?
3       A.   Yes.  And the previous schedules, I
4  mean we may have helped out, provided data.  I
5  can't say for certain.  I mean I don't know
6  what that last two pages -- oh, I'm copied on,
7  I guess I did.
8       Q.   You're referring there to the
9  September 23rd, 1997 memo from Mr. Adamczak to
10  Mr. McConnell about DVOG outpatient revenue?
11      A.   Right.
12      Q.   Do you see on the fax cover sheet
13  Mr. Adamczak writes, attached are three
14  analysis given to Harry this morning, 10 a.m.?
15      A.   Yes.
16      Q.   Do you know who Harry is?
17      A.   No.
18      Q.   Do you know whether that's Harry
19  Edleman?
20      A.   I don't know.
21      Q.   Was --
22      A.   I heard the name Edleman.  I'm not
23  sure I remember what his first name was.
24      Q.   Was there anyone who worked in
25  finance at AHERF named Harry?

---

**Page 892**

1       A.   I'm sure there was someone.  Not
2  that I recall offhand, to be honest with you.
3          MR. TYCKO:  Can we take a short
4  break?
5          MR. RYAN:  Sure, that would be
6  great.
7          VIDEO TECHNICIAN:  The time is
8  3:46.  We are going off the record.
9          (Brief recess.)
10         VIDEO TECHNICIAN:  The time is
11  4:04.  We are back on the record.
12      Q.   Let me mark, please, as
13  Exhibit 1102 a document with Bates numbers
14  DC6130, pages 1 to 3.
15         - - - - -
16         (Thereupon, Deposition Exhibit 1102
17          was marked for purposes of
18          identification.)
19         - - - - -
20      Q.   Do you recognize Exhibit 1102, Mr.
21  Cancelmi?
22      A.   Yes.
23      Q.   Is this a Graduate System
24  restructuring schedule prepared by Mr. Lisman
25  and provided to you?

---

65 (Pages 889 to 892)

Daniel Cancelmi

Page 913

1  the April 14th, 1997 memo, which we had marked
2  as Exhibit 8.
3     A.  I'm sorry, Exhibit 8?
4     Q.  Yes.  This was one of the earlier
5  exhibits we used today.
6     A.  Got it.
7     Q.  If you turn, please, to page 2 of
8  Exhibit 8, on the bottom under the heading,
9  allocation of reserves, the schedule shows
10 there that $10 million of the initial
11 $50 million was allocated to Hahnemann
12 Hospital, right?
13    A.  Yes.
14    Q.  And that's consistent with
15 Hahnemann's portion of the $50 million reserve
16 transfer being adjusted on the increase or
17 decrease in cash flow changes in receivables
18 line on the combining statement of cash flows
19 for the year ended June 30th, 1997, right?
20    A.  I'll take your word about the math.
21    Q.  Why don't we just look at one more.
22 Why don't we take Bucks County Hospital.  Bucks
23 got allocated $7 million of the initial
24 $50 million, right?
25    A.  Yes.

Page 914

1     Q.  So if we start here on page 23 of
2  Exhibit 74, the combining balance sheet as of
3  June 30th, 1996, Bucks has $17,12,000 in net
4  patient accounts receivable, right?
5     A.  Uh-huh.  Yes.
6     Q.  An additional 43,000 in grants and
7  other receivables, right?
8     A.  Yes.
9     Q.  For a total of $17,055,000?
10    A.  Yes.
11    Q.  And if we turn to page 35 in
12 Exhibit 59, the 1997 audited financial
13 statements, we see that Bucks County Hospital
14 is shown as having $10,158,000 in patient net
15 accounts receivable at June 30th, 1997, right?
16    A.  Right.
17    Q.  And an additional 17,000 in grants
18 and other receivables, right?
19    A.  Right.
20    Q.  For a total of $10,175,000, right?
21    A.  Correct.
22    Q.  And so if we take the $17,055,000
23 from June 30th, 1996 and subtract the
24 $10,175,000 from June 30th, 1997, we would
25 expect to see a decrease of $6,880,000, right?

Page 915

1     A.  Roughly, yes.
2     Q.  And if we turn to page 38 in
3  Exhibit 58, the combining statement of cash
4  flow, we instead see a decrease of $120,000 on
5  the combining statement of cash flows for Bucks
6  County Hospital for the decrease in cash from
7  changes in receivables, right?
8     A.  Yes.
9     Q.  And the difference between the
10 amount that we would expect to see by comparing
11 the combining balance sheets as of the two
12 dates and the amount then we actually see in
13 the combining statement of cash flows is
14 exactly $7 million, right?
15    A.  I assume the math works, yes.
16 Pretty close.
17    Q.  And that's Bucks County's
18 $7 million portion of the $50 million initial
19 reserve transfer, right?
20    A.  That's probably the majority of it.
21 You could have other non cash items in there.
22    Q.  I will represent to you I've gone
23 through for each of the five DVOG hospitals and
24 done the comparison --
25    A.  Right.

Page 916

1     Q.  -- we've done.  And in each case,
2  the variance between what you would get by
3  comparing the balance sheet amounts as of the
4  two dates and the amount that, in fact, is
5  shown on the cash flow statement, corresponds
6  to the dollar to the -- to that hospital's
7  portion of the initial $50 million reserve
8  transfer.
9     A.  That makes sense.
10    Q.  And that's consistent with the
11 schedule you prepared in Exhibit 1103, which
12 was a monthly cash flow analysis through
13 May 31st, 1997, where you had similarly made
14 this adjustment for the $50 million non cash
15 reserve transfer, right?
16    A.  Yes.
17    Q.  Now, by the time the books were
18 finally closed on, or as of June 30th, 1997,
19 there had been an additional $21 million non
20 cash reserve transfer from the Graduate
21 hospitals to the DVOG hospitals, right?
22    A.  Correct.
23    Q.  And the same logic that led you to
24 deduct the $50 million non cash reserve
25 transfer from the change in accounts receivable

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                        Akron (330) 374-1313

Daniel Cancelmi                                                                 Volume 3

Page 917

1  should also have led you to deduct the
2  $21 million, correct?
3      A.  I don't think we did that.
4      Q.  I know you didn't do that.  I'm
5  asking whether the logic that led you to deduct
6  the $50 million should have also led you to
7  deduct the non cash $21 million reserve
8  transfer into the same DVOG bad debt allowance
9  account?
10     A.  I'm not sure if we focused on that
11 or not.  Although, now that I think about it,
12 the 50 was transferred to DVOG before Graduate
13 hospitals entered the AHERF system; whereas,
14 the other reserves were transferred after they
15 came into the AHERF system.
16         When you do a cash flow statement,
17 when you have an acquisition, when you're
18 fluxing balances, you exclude accounts that
19 were acquired as part of an acquisition.
20         So say you acquire a hospital that
21 has $10 million receivables and your
22 receivables go up 15 million.  10 of the 15
23 relates to acquisition, so you sort of strip it
24 out.
25         So maybe the logic was that since

Page 918

1  they were already in the AHERF system when
2  those reserves were transferred, you wouldn't
3  pull that effect out; whereas, the 50 was
4  transferred before the Graduate hospitals came
5  into the AHERF system.
6      Q.  To follow up on something you just
7  said, let me ask you to turn, if you would, in
8  Exhibit 58, the 1997 audited financial
9  statements, to the consolidated statement of
10 cash flows on page 5.
11     A.  Yes.
12     Q.  All right.  This is the statement
13 of cash flows for the consolidated AHERF
14 organization, right?
15     A.  Yes.
16     Q.  Do you see there, I think it's the
17 fifth item down, one of the adjustments to
18 reconcile the changes in net assets to net cash
19 provided by operating activities is net assets
20 balances related to business combinations.
21     A.  Yes.
22     Q.  In the amount of $42,669,000?
23     A.  Yes.
24     Q.  Now, that's an entry for what you
25 were talking about just now, that when you're

Page 919

1  preparing a cash flow statement for an
2  organization that's had acquisitions during the
3  fiscal year at issue, there's a row on the cash
4  flow statement for the changes related to
5  business combinations, right?
6      A.  That's part of it.  You have to
7  strip it out of each line, too.
8      Q.  You have to strip it out of each
9  line and put it into its own separate line,
10 right?
11     A.  Yes.
12     Q.  Now, by contrast, if we look back
13 at the DVOG combining statement of cash flows
14 we were on before, on page 38, same exhibit,
15 there weren't any significant acquisitions or
16 dispositions within DVOG during fiscal year
17 1997, were there?
18     A.  Within DVOG, no.
19     Q.  And that's why when we look here on
20 the statement of cash flows from operating
21 activities, there's activity in the net assets
22 balances related to business combinations only
23 at Allegheny University Health and Sciences,
24 right?
25     A.  Right.

Page 920

1      Q.  And that's a reflection of the
2  transfer of ASRI into AUHS during fiscal year
3  1997, right?
4      A.  ASRI Singer, yes.
5      Q.  At the DVOG hospitals that I'm
6  trying to focus on now, there's no entry,
7  there's just a dash, right?
8      A.  Right.
9      Q.  So in preparing the DVOG combining
10 statement of cash flows, at least as it relates
11 to the DVOG hospitals, because there's no
12 acquisition or disposition activity at those
13 hospitals during the fiscal year, the date of
14 entry of the Graduate hospitals into the AHERF
15 system isn't really relevant, is it?
16         I mean that would only be relevant
17 to a Centennial or Graduate statement of cash
18 flows.
19     A.  I can't remember if we analyzed
20 this or not.  The 50 were pulled out, I think,
21 because those reserves were transferred before
22 the Graduate hospitals came in the AHERF
23 system.
24         I'm not sure that the other
25 reserves that were transferred were evaluated,

Just Launched   www.rennillo.com   Schedule Online

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Daniel Cancelmi

Page 921

1  or if they were evaluated, it was because there
2  was no adjustment made for those, maybe because
3  those reserves were already in the AHERF's
4  consolidated financial statements as of
5  May 1st, and they were transferred subsequent
6  to that.
7       And, therefore, on a consolidated
8  basis, it didn't impact cash flow, so it all
9  netted out, because they were all being, I
10  guess, transferred between categories within
11  the cash flow from operations.
12       So cash flow from operations
13  wouldn't have been impacted by that, because it
14  was all transfers subsequent to the hospitals
15  being in AHERF. And all the transfers were
16  between accounts within the operating cash flow
17  section of the cash flow statement.
18       But the 50 million reduced
19  receivables on the consolidated financial
20  statements, because those reserves came into
21  the system before the Graduate hospitals did.
22  So that you would have to make a cash flow
23  statement adjustment for that. Non cash
24  adjustment for that.
25       Q.  Is it correct, though, that with

Page 922

1  respect to the DVOG combining statement of cash
2  flows, the $50 million reserve transfer from
3  Graduate and the $21 million reserve transfer
4  from Graduate had identical effects on the
5  change in accounts receivable at the DVOG
6  hospitals?
7       A.  I don't know. I'm trying to think.
8  You had adjustments, your P and L was reduced.
9  No, because your P and L would have had a
10  credit in it or an expense for the write-offs
11  of the account. And then the reserve gets
12  transferred over, which results in a reduction
13  of receivables, which is a source of cash,
14  which offsets the use of cash, because the
15  write-off of the accounts is in the P and L, so
16  it nets out to zero, which is a zero cash
17  impact on cash flow from operations, which it
18  was, because these were non cash write-offs.
19       So, no, I have to think about it a
20  little bit more, and maybe you guys should
21  think about that a little more, but I don't
22  think so. Because when the accounts were
23  written off, they went to the P and L.
24       So if you had no other transactions
25  during the course of the year, you would

Page 923

1  have -- let's say you wrote off a hundred
2  dollars of accounts. The top of the statement
3  would have had a big bracket, negative a
4  hundred. Reserves get transferred over, say a
5  hundred dollars of reserves. Your receivables
6  go down. It's a source of cash. Negative
7  hundred, positive hundred, nets to zero.
8       Which would be the case, because
9  you didn't receive any cash for those
10  transactions. So I don't believe that method
11  of that logic you're proposing would be right.
12  But I have to think about it some more and make
13  sure that's right.
14       That's my knee jerk reaction to it.
15  Because when those receivables went down, cash
16  didn't come in the door. So I guess now the
17  more I think about it even more, if we had a
18  non cash adjustment there, it would have made
19  the statement of cash flows incorrect. That's
20  my knee jerk reaction.
21       Q.  In any event, you agree that in the
22  combining statement of cash flows for DVOG for
23  the year ending June 30th, 1997, there was a
24  non cash adjustment for the $50 million reserve
25  transfer and there was not one for $21 million

Page 924

1  of reserve transfer, right?
2       A.  That's correct, but I think, like I
3  said, my knee jerk reaction, I think that's
4  right because what I said. The accounts that
5  were part of the 21 to 28 went through P and L.
6       And go back to my example. If you
7  write off a hundred dollars of accounts, you
8  start off at the top with negative a hundred.
9  And if your receivables went down, you would
10  have had a positive hundred to offset the
11  negative hundred to get to zero cash flow from
12  operations, which is what the case would be.
13       If you had a non cash adjustment in
14  there, you would have shown a source of cash
15  from receivables. Or you would not have shown
16  a source from source receivables, which would
17  have resulted in a hundred dollars of cash from
18  outflow operations, and that wouldn't have been
19  the case.
20       Again, that's my knee jerk
21  reaction. I think if you walk through the
22  logic, I don't think your heading on that would
23  be right, the more I think about it. If you
24  actually had an adjustment for that, that
25  actually could be the wrong way, doing that

Just Launched    www.rennillo.com    Schedule Online

Daniel Cancelmi                                                                                    Volume 3

Page 985

```
 1          AFFIDAVIT
 2   The State of Ohio,   )
 3                   ) SS:
 4   County of Cuyahoga   )
 5
 6
 7
 8      Before me, a Notary Public in and for
 9   said County and State, personally appeared
10   DANIEL CANCELMI, who acknowledged that he/she
11   did read his/her transcript in the
12   above-captioned matter, listed any necessary
13   corrections on the accompanying errata sheet,
14   and did sign the foregoing sworn statement and
15   that the same is his/her free act and deed.
16      In the TESTIMONY WHEREOF, I have hereunto
17   affixed my name and official seal at this
18   day of          A.D 2003.
19
20
21
22         Notary Public
23
24
25         My Commission Expires:
```

Page 986

```
 1      DEPOSITION ERRATA SHEET
 2
 3   RE:      OFFICIAL COMMITTEE OF UNSECURED
 4           CREDITORS, ETC.   VS.
 5           PRICEWATERHOUSECOOPERS, LLP
 6   RRS File No.:   7472
 7   Deponent:      DANIEL CANCELMI
 8   Deposition Date:   FEBRUARY 6, 2003
 9
10   To the Reporter:
11   I have read the entire transcript of my
12   Deposition taken in the captioned matter or the
13   same has been read to me.  I request that the
14   following changes be entered upon the record
15   for the reasons indicated.  I have signed my
16   name to the Errata Sheet and the appropriate
17   Certificate and authorize you to attach both to
18   the original transcript.
19
20          .
21
22
23
24
25
```

89 (Pages 985 to 986)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                    Civil Action

            Plaintiff,                  No. 00-684

        vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

            Defendant.


        Continued videotaped deposition of

DANIEL CANCELMI, called for examination under the

statute, taken before me, Jaci R. Traver, RPR,

CRR, and Notary Public in and for the State of

Ohio, at the offices of Jones Day, 500 Grant

Street, Pittsburgh, Pennsylvania, on Friday, the

7th day of February 2003 at 9:00 a.m.

                - - - - -

                VOLUME 4

                - - - - -

Daniel Cancelmi                                                    Volume 4

---

Page 988

1  APPEARANCES:
2
3     On behalf of the Plaintiff:
4        Jones Day, by
5        RICHARD WHITNEY, ESQ.
6        North Point
7        901 Lakeside Avenue
8        Cleveland, Ohio  44114
9        (216) 586-7256
10
11       Jones Day, by
12       DAVID S. TORBORG, ESQ.
13       51 Louisiana Avenue, N.W.
14       Washington, D.C.  20001-2113
15       (202) 879-5562
16
17    On behalf of the Defendant:
18       Cravath, Swaine & Moore, by
19       ANTONY L. RYAN, ESQ.
20       AVRAM E. LUFT, ESQ.
21       Worldwide Plaza
22       825 Eighth Avenue
23       New York, New York  10019-7475
24       (212) 474-1296
25

---

Page 989

1  APPEARANCES, Continued:
2
3     On behalf of the Defendant:
4        Manion McDonough & Lucas, P.C., by
5        JOSEPH F. McDONOUGH, ESQ.
6        USX Tower, Suite 1414
7        600 Grant Street
8        Pittsburgh, Pennsylvania  15219
9        (412) 232-0206
10
11    On behalf of the Witness:
12       Tycko Zavareei, LLP, by
13       JONATHAN K. TYCKO, ESQ.
14       1300 19th Street, N.W.
15       Suite 400
16       Washington, D.C.  20036
17       (202) 973-0902
18
19 ALSO PRESENT:
20    Jeffrey L. Close,
21       PriceWaterhouseCoopers
22    Justin Wiener, Video Technician
23
24
25

---

Page 990

1        VIDEO TECHNICIAN:  We are resuming
2  with the deposition of Daniel Cancelmi on
3  February 7th, 2003.  The time is 9:06.  You may
4  proceed.
5     CONTINUED EXAMINATION OF DANIEL CANCELMI
6  BY MR. RYAN:
7     Q.   Good morning, Mr. Cancelmi.
8     A.   Good morning.
9     Q.   When we broke yesterday, I think we
10 were looking at your May 22nd, 1997 memo marked
11 as Exhibit 154.  Do you have a copy of that?
12    A.   Yes.
13    Q.   And this is a memo in which you
14 summarize Graduate system restructuring
15 reserves, right?
16    A.   Yes.
17    Q.   And the total amount of reserves is
18 about $47 and a half million?
19    A.   No.  Actually, it's 47 and a half,
20 plus another 60 on the next page.
21    Q.   And the 60 million on the next page
22 were recorded as part of the purchase price
23 allocation; is that right?
24    A.   They were recorded as intangible
25 assets.  And I try to distinguish between the

---

Page 991

1  two in this memo.
2     Q.   Since you mentioned that, why don't
3  I just show you what's previously been marked
4  as Exhibit 35.
5        Do you recognize Exhibit 35, Mr.
6  Cancelmi?
7     A.   Yes.
8     Q.   This is a memo that you wrote to
9  Mr. Morrison dated June 20th, 1997?
10    A.   Yes.
11    Q.   And does this memo summarize all
12 the intangible assets on the Graduate entities?
13    A.   Yeah.  This was an attempt to
14 summarize the intangible assets that existed at
15 that point in time.
16    Q.   All right. So the three reserves
17 capitalized as an intangible asset shown on
18 page 2 of your May 22nd memo are a subset of
19 the larger list in the June 20th memo, right?
20    A.   Yes. I believe.  Yes.
21    Q.   All right.  And the third row on
22 the June 20th memo is called net unrestricted
23 deficit as of AHERF system entry date 5/1/97,
24 right?
25    A.   Yes.

---

2 (Pages 988 to 991)

Daniel Cancelmi                                                                                    Volume 4

Page 992

1    Q.   That totals $49,585,000?
2    A.   Yes.
3    Q.   Does that reflect the amount of
4  operating losses that the Graduate entities
5  incurred between the date of their entry into
6  SDN and the date of their entry into AHERF,
7  plus the restructuring reserves that were
8  recorded on the entities during that period?
9    A.   That was their -- it was their
10  negative equity at the time they came into the
11  AHERF system, which would have included their
12  losses through time, plus those restructuring
13  costs.
14    Q.   So ultimately, all the
15  restructuring reserves set forth on the
16  attachment to your May 22nd, 1997 memo were
17  capitalized as an intangible asset, the same as
18  the purchase price allocations were, right?
19    A.   Yes.
20    Q.   So focusing for the time being on
21  the May 22nd memo, there's a total there of
22  $47,466,000 recorded as restructuring reserves
23  while the Graduate entities were in SDN, or
24  even before they entered SDN, right?
25    A.   Yes.

Page 993

1    Q.   And you've broken it down into
2  reserves acquired before the SDN acquisition
3  date and reserves recorded thereafter, right?
4    A.   Yes.
5    Q.   Let me ask you first, who recorded
6  the restructuring reserves before the SDN
7  acquisition?
8    A.   Who recorded them?
9    Q.   Was it AHERF or was it the Graduate
10  Health System?
11    A.   Physically who recorded them?  They
12  were recorded on the books of the Graduate
13  hospitals.
14    Q.   Who directed them to be recorded?
15    A.   Well, the Graduate people were
16  working with the AHERF people who were, I
17  guess, acting on behalf of SDN, and I guess
18  evaluating these issues.
19    Q.   And were you a part of that
20  evaluation?
21    A.   Yes.
22    Q.   Let me mark, please, as Exhibit
23  1114 a one-page document with Bates number
24  DBR-AA 42522.
25       - - - - -

Page 994

1       (Thereupon, Exhibit 1114 was marked
2       for purposes of identification.)
3       - - - - -
4    Q.   Do you see your handwriting on
5  parts of Exhibit 1114, Mr. Cancelmi?
6    A.   Yes.
7    Q.   Which portions are in your
8  handwriting?
9    A.   It says, Graduate, and then there's
10  bullet points going down.  And then
11  osteopathic, and then where it says Workers'
12  Comp.  And then the dollar amounts.
13    Q.   And the remaining handwriting in
14  the document is Mr. Adamczak's?
15       MR. TORBORG:  Objection.
16    A.   No.
17    Q.   Do you know whose it is?
18    A.   It's Steve Spargo's.  Except for
19  that that one number at the top where it says
20  246-2335, I don't know whose that is.
21    Q.   If you compared this list here in
22  your handwriting at the top for the Graduate
23  hospital on Exhibit 1114 with the attachment to
24  your May 22nd memo, the list of Graduate system
25  restructuring reserves, there's some items that

Page 995

1  appear to correspond between the two lists; is
2  that right?
3       I'm looking, for instance, at the
4  first item, patient accounts greater than 180
5  days, $3 million.
6    A.   Right.
7    Q.   And there's an NIH potential
8  payback of $400,000, plus another $470,000.  Do
9  you see that?
10    A.   I don't see the 470.  I see the
11  400.
12    Q.   Right.  And then in your
13  handwritten version on 1114 it says, 471,000
14  already booked, and then the 470,000 is listed
15  on the other sheet.
16    A.   They're different issues.
17    Q.   I see, the ones --
18    A.   471 is different than the 470.
19    Q.   Is the schedule on Exhibit 1114 a
20  rough draft that you sketched out of potential
21  restructuring reserves to record on the books
22  of the Graduate hospital before it turned into
23  SDN?
24    A.   That's what it looks like.  I don't
25  remember the time when this was put together.

3 (Pages 992 to 995)

Daniel Cancelmi

Volume 4

Page 1072

1    Q.    But there are five Graduate
2  hospitals, right?
3    A.    I guess.
4    Q.    There's AGH, right?
5    A.    Yes.
6    Q.    AHERF the parent corporation?
7    A.    Yes.
8    Q.    Other Pittsburgh-based entities?
9    A.    Yes.
10   Q.    The Forbes Hospitals had several
11 different general ledgers, didn't they?
12   A.    Yes, they did.
13   Q.    And there's Allegheny Valley in
14 addition?
15   A.    Yes.
16   Q.    A couple there, probably?
17   A.    Yes.
18   Q.    So overall, we're talking about
19 maybe 20 different general ledger systems by
20 the end of fiscal year 1997, right?
21   A.    It could have been -- there's -- I
22 think there was more than that.
23   Q.    All right.  More than 20 general
24 ledgers and there are a couple hundred accounts
25 in each, right?

Page 1073

1    A.    Uh-huh.
2    Q.    So overall we're talking about
3  thousands of different accounts in the AHERF
4  general ledger system?
5    A.    Yeah, if you add them up
6  collectively.
7    Q.    And many of these accounts would
8  have numerous transactions during the course of
9  a given year, right?
10   A.    Yes.
11   Q.    Let's take, as an example, a
12 contractual allowance account.  An account like
13 that would have many hundreds of transactions
14 in a year, right?
15   A.    Yes, it could.
16   Q.    And there would be many hundreds of
17 entries to that account right?
18   A.    It could.  I mean generally
19 speaking, I think you had, you know, you had a
20 standardized computer system interface that
21 went in each month, where the billing system
22 interfaced into the general ledger system.  And
23 then you had manual adjustments that were made.
24   Q.    So there would be certain entries
25 into the general ledger system that would be

Page 1074

1  made through a computer interface system, and
2  then there would be others that would be made
3  manually, right.
4    A.    Yes.
5    Q.    And overall, in any year for the
6  AHERF system, we're talking about at least
7  hundreds of thousands of entries against the
8  general ledger system, right?
9    A.    It's a lot.  I have no idea how
10 much it is.
11   Q.    Millions, maybe?
12   A.    I have no idea.
13   Q.    And certainly when you were an
14 auditor, you never reviewed millions of entries
15 in your client's general ledger system, did
16 you?
17   A.    No.  You didn't have to review
18 millions of journal entries.  There was
19 sometimes you looked for large entries, flip
20 through journal entry books.  I think there was
21 audit program steps, you would do that for
22 manual journal entries.
23   Q.    And you --
24   A.    But every single journal entry
25 wouldn't have been examined.

Page 1075

1    Q.    And you would expect your client to
2  direct you to unusual journal entries, right?
3    A.    Yes and no.  It depends, you know,
4  if the issue came up.
5    Q.    It would be part of an open, candid
6  and honest working relationship for the client
7  to direct the auditors to unusual journal
8  entries, wouldn't it?
9    A.    Yeah, and as far as, you know,
10 certain issues, depending on what the issue
11 relates to.  You know, whether everyone
12 remembers every single journal entry, I think
13 as you mentioned, there's hundreds of thousands
14 of journal entries, so to even begin to think
15 that the client sits down with the auditor and
16 goes through every single hundreds of thousands
17 of journal entries, I mean that doesn't happen.
18   Q.    Looking at this page, we're still
19 on the second page of Exhibit 321, I believe
20 you testified that the reason you included this
21 page in the packet was that the balance in
22 general ledger account 1201905 for the Medicaid
23 reserve declined between April 1997 and
24 May 1997; is that right?
25   A.    I put this in there to demonstrate,

Daniel Cancelmi                                                                          Volume 4

Page 1076

1  you know, that, hey, this reserve had been
2  recorded in a separate account. And at that
3  time I thought we had discussed it, but what I
4  wanted to do was provide an example of
5  documentation that this item had been, you
6  know -- certainly hadn't been hidden.
7       It was in a separate general ledger
8  account. The activity had changed balance.
9  And that was the purpose of, you know, pulling
10 the data together.
11      Keep in mind, at this point I think
12 that Coopers & Lybrand, I think, Al Adamczak
13 told me had gone to the board and suggested
14 that they weren't aware of these transactions,
15 and that the entries had been sliced and diced.
16      And so what we were trying to do at
17 this point, I believe, is say, you know, that's
18 not the case. I mean look, I mean there's some
19 pretty, you know, open, you know,
20 documentation, separate accounts and stuff, you
21 know, it wasn't been hidden.
22      MR. RYAN: I move to strike that as
23 nonresponsive.
24      MR. TORBORG: Objection to the
25 motion.

Page 1077

1       Q.  The balance in the Medicaid reserve
2  account as shown on this excerpt from the
3  Graduate Hospital trial balance for May 31st,
4  1997, declined by $2 million from the prior
5  month, right?
6       A.  Yes.
7       Q.  And there could be many reasons why
8  that Medicaid reserve balance had declined over
9  the course of the month; is that also right?
10      MR. TORBORG: Objection.
11      A.  There could be -- no, they declined
12 for one reason.
13      Q.  You know it declined because you
14 transferred the $2 million of reserves to
15 Graduate, but somebody looking at this page
16 from the Graduate hospital trial balance cannot
17 determine that, right?
18      A.  No.
19      Q.  When you say no, you mean you agree
20 that the person can't determine that from this
21 page, right?
22      A.  That's correct.
23      Q.  Somebody might reasonably infer
24 that AHERF had satisfied the obligation for
25 which the Medicaid reserve was established,

Page 1078

1  right?
2       A.  That could be one reason.
3       Q.  That the money had been paid out,
4  right?
5       A.  That could be one reason.
6       Q.  Somebody might also reasonably
7  infer that there had been a change in the
8  estimate of what Medicaid reserve was needed on
9  the books of the Graduate hospital during the
10 month of May, 1997, right?
11      A.  That could be one. There could be
12 hundreds of different reasons.
13      Q.  Did you use this schedule in the
14 cover page of Exhibit 321 to explain the $28
15 million reserve transfer to Mr. Hope and
16 Mr. Cepielik?
17      A.  Yeah, we provided this to them as,
18 you know, here's some documentation that
19 suggests that, you know, these issues were
20 certainly out on the table. And here's, you
21 know, some of the correspondence, you know,
22 that you may want to take a look at to see for
23 yourself.
24      I'll be honest with you, and I
25 think I testified to this before, that, you

Page 1079

1  know, that we provided it to them. I don't
2  even really remember them spending too much
3  time or caring to receive it. It seemed like
4  they were pretty much at the point where they
5  had wrapped up their review.
6       Because I remember saying to them
7  that, well, have you had a chance to speak with
8  Chuck Morrison yet? And I think the response
9  was, who is Chuck Morrison? And just seemed
10 odd to me, since he was the chief financial
11 officer that, maybe they hadn't talked to Chuck
12 Morrison yet. But that's why I say, I thought
13 it was at the end.
14      MR. RYAN: I move to strike that as
15 nonresponsive.
16      Q.  My question, Mr. Cancelmi, was very
17 simple. Did you provide this schedule to
18 Mr. Hope and Mr. Cepielik in 1998 to explain to
19 them the $28 million reserve transfer?
20      A.  Yes, and I'll go back to the answer
21 I just gave.
22      Q.  And you didn't provide this summary
23 schedule or any other schedule like this to the
24 Coopers & Lybrand audit team during the fiscal
25 year 1997 audit, did you?

24 (Pages 1076 to 1079)

Daniel Cancelmi

Page 1140

1  to and including the CFO, Chuck Morrison, or
2  Spargo. And even Dionisio, who was responsible
3  for the billing department.
4         So we would prepare the financial
5  statements oftentimes with the data that came
6  out of the billing system. The people would
7  start asking questions. A lot of times we
8  don't -- I don't know, we don't know. I mean
9  that's not our department. You need to talk
10  to, you know, someone in the billing
11  department.
12        Then those guys would go and talk
13  to people in the billing department. And, you
14  know, then it would start going back and forth.
15        Then there was an effort to try get
16  people to -- like the people in the billing
17  department to share data on a more timely basis
18  with, you know, Morrison or Spargo or whomever,
19  and get that, so that information could get to
20  us.
21        And, you know, at first it was
22  pretty rocky. And then, you know, over time,
23  the sharing of information improved and there
24  was more of a better dialogue or sharing of
25  data between the departments.

Page 1141

1         But you'd still have times where
2  something would happen. We didn't know the
3  answer to it. And they'd look to the patient
4  accounting department for the answer.
5         And to be quite frank, from their
6  side, they thought a lot of times that, you
7  know, hey, you guys, meaning general
8  accounting, are making me look bad. And that
9  wasn't the case at all. It's like, these are
10  your numbers. I mean we just -- we don't know
11  the answers to these questions, so they need to
12  talk to you.
13        So I mean it was that type of
14  information, or that type of interactions back
15  and forth. And it got frustrating at times.
16        Q.   Were there occasions when you or
17  your colleagues in the general accounting
18  department went to the Patient Financial
19  Services Group and asked them for information,
20  but didn't get the information that you
21  requested?
22        A.   There could have been. I don't
23  know. Or there could have been a delay in
24  getting the information. Keep in mind, you
25  know, you have -- depends who is asking for the

Page 1142

1  information.
2         And, you know, Greg Snow, he's
3  above me. You know, he reports to Dionisio.
4  You know, Spargo and Dionisio, you know, had
5  two different departments. You know, but they
6  both reported to, you know, McConnell. And,
7  you know, a lot of times, I mean that was my
8  sense that, you know, there was tension between
9  the two groups.
10        And, you know, a lot of it was just
11  because of what was going on. There was, you
12  know, some of the problems that were within the
13  billing department. And I think a lot of times
14  they thought that, you know, we were pointing
15  things out in a bad light and, you know, they
16  were scrambling.
17        But the bottom line was, there was
18  many times they had processed a lot of
19  adjustments and hadn't necessarily advised, at
20  least, Spargo or Morrison or McConnell.
21  Whether or what was shared between the
22  department from Dionisio on down, I don't know.
23  I didn't work there.
24        I mean you could talk to a number
25  of people up and down the patient accounting

Page 1143

1  department, a lot of people would say the same
2  thing.
3         Q.   They would say that it was often
4  difficult to get the information they needed
5  out of PFSG?
6         A.   Well, if they worked in PFSG, I
7  don't know if they would say that. What they
8  would be saying is there was lot of people who
9  felt that the billing department wasn't
10  functioning up to par.
11        Q.   And the question I guess I meant to
12  ask was: You and your colleagues in the
13  general accounting group often had difficulty
14  getting the information you needed from the
15  PFSG, right?
16        A.   Sometimes. Depends what the issue
17  was.
18        Q.   Let me mark, please, as the next
19  exhibit a one-page document with Bates numbers
20  DC2942, page 35. This will be Exhibit 1122.
21             - - - - -
22        (Thereupon, Exhibit 1122 was marked
23         for purposes of identification.)
24             - - - - -
25        Q.   Do you recognize this schedule,

Just Launched   www.rennillo.com   Schedule Online

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Daniel Cancelmi                                                                                    Volume 4

Page 1144

1  Mr. Cancelmi?
2      A.   Yes.
3      Q.   What is it?
4      A.   It's a summary of adjustments made
5  in Delaware Valley for the '96.
6      Q.   These are adjustments that were
7  recorded -- strike that.
8          These are adjustments that were
9  recorded at year-end fiscal year 1996?
10     A.   Yes.
11     Q.   Is this your handwriting on this
12 schedule?
13     A.   Yes.
14     Q.   And the adjustments that were made
15 increased net income for the DVOG, right?
16     A.   Yes.
17     Q.   Is that your handwriting also at
18 the top of the document, in the circle?
19     A.   Yes.
20     Q.   Does that say, discussed with Steve
21 on July 24th, 1996?
22     A.   Yes.
23     Q.   Steve is Steve Spargo?
24     A.   Yes.
25     Q.   And is it the case that you and

Page 1145

1  Mr. Spargo discussed these year-end adjustments
2  at the DVOG?
3      A.   Yes.
4      Q.   Mr. Spargo approved of the
5  adjustments?
6      A.   Yes.
7      Q.   Now, do you see the first
8  adjustment is listed as Health Partners
9  unrecorded equity?
10     A.   Yes.
11     Q.   Do you recall what the issue was
12 there?
13     A.   Yeah.  Allegheny had an investment
14 in this -- it was Medical Assistants HMO plan
15 out in the Philadelphia area.  It had been out
16 there for a number of years.
17         And sometimes the operations of
18 that organization were profitable; other times
19 they were not.  And I guess at the time the
20 Philadelphia operations were transferred, the
21 accounting operations were transferred to
22 Pittsburgh, I guess there may have been some
23 balance or maybe it was small balance related
24 to that investment.
25         But at some point, after the

Page 1146

1  operations came back to Pittsburgh, the
2  financial position of that organization, you
3  know, was looked at.  And based on their
4  operating results, it was determined that there
5  could be an adjustment made.
6          And I can't remember if this
7  happened in -- could have been the end of --
8  maybe it was part of during '96 that Coopers &
9  Lybrand raised this issue that we had this
10 Health Partners investment that wasn't recorded
11 on the financial statements.  I believe Mark
12 Kirstein was involved in that.
13     Q.   And is what happened that at the
14 end of the fiscal year 1995 audit, Coopers &
15 Lybrand raised the issue with AHERF that there
16 was this investment in Health Partners that was
17 not recorded on AHERF's books?
18     A.   I can't remember if it was '95 or
19 '96.
20     Q.   But at some point in time, you do
21 recall that Coopers & Lybrand caught this issue
22 and brought it to the attention of AHERF,
23 right?
24     A.   I don't know if caught is the right
25 word.  You know, Allegheny knew about this

Page 1147

1  investment.  You know, Chuck Morrison provided
2  more background on it in terms of in its
3  beginning stages, what was recorded on the
4  financial statements and what was not.
5          But at some point, you know, the
6  issue was discussed with Coopers & Lybrand
7  about this investment; hey, look at the most
8  recent financial statements.  You know, it
9  would suggest that you could record investment
10 balance there.
11     Q.   AHERF accounted for its investment
12 in Health Partners using what's known as the
13 equity method, right?
14     A.   Yeah, I guess you could look at it
15 like that.  I think that somebody, up until the
16 time it was recorded, I don't think anything
17 was being recorded on a monthly basis.
18         And then that number there, I
19 think, was an estimate of what their
20 proportionate share of Health Partners' equity
21 was at that time.
22     Q.   So you took the Health Partners'
23 equity and divided it by the proportion of
24 Health Partners corresponding to AHERF's
25 investment?

Just Launched    www.rennillo.com    Schedule Online

Cleveland (216) 523-1313                                                Akron (330) 374-1313

Daniel Cancelmi

Page 1248

1  examination at this time.  I'm hopeful that we
2  can continue an off-the-record discussion and
3  hopefully resolve it that way.
4          VIDEO TECHNICIAN:  Being there are
5  no further questions at this time, we are going
6  off the record.  The time is 5:27.
7
8          (Deposition adjourned.)
9          - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1250

1          I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5          IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this          day of
8          , 2003.
9
10
11
12
13
14          Jaci R. Traver, Notary Public
15          within and for the State of Ohio
16
17  My commission expires July 15, 2003.
18
19
20
21
22
23
24
25

Page 1249

1          CERTIFICATE
2  The State of Ohio,   )
3                       SS:
4  County of Cuyahoga.  )
5
6          I, Jaci R. Traver, RPR, CRR and
7  Notary Public, duly commissioned and qualified,
8  do hereby certify that the within named
9  witness, DANIEL CANCELMI, was by me first duly
10  sworn to testify the truth, the whole truth and
11  nothing but the truth in the cause aforesaid;
12  that the testimony then given by the
13  above-referenced witness was by me reduced to
14  stenotypy in the presence of said witness;
15  afterwards transcribed, and that the foregoing
16  is a true and correct transcription of the
17  testimony so given by the above-referenced
18  witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

Page 1251

1          I N D E X
2  CONTINUED EXAMINATION OF DANIEL CANCELMI
3  BY MR. RYAN............................ 990:5
4
5  Exhibit 1114 was marked................ 994:1
6  Exhibit 1115 was marked................ 1000:1
7  Exhibit 1116 was marked................ 1003:21
8  Exhibit 1117 was marked................ 1095:24
9  Exhibit 1118 was marked................ 1097:3
10  Exhibit 1119 was marked................ 1101:15
11  Exhibit 1120 was marked................ 1107:9
12  Exhibit 1121 was marked................ 1109:1
13  Exhibit 1122 was marked................ 1143:22
14  Exhibit 1123 was marked................ 1168:10
15  Exhibit 1124 was marked................ 1179:1
16  Exhibit 1125 was marked................ 1211:12
17  Exhibit 1126 was marked................ 1218:19
18  Exhibit 1127 was marked................ 1219:23
19  Exhibit 1128 was marked................ 1222:8
20  Exhibit 1129 was marked................ 1240:15
21  Exhibit 1130 was marked................ 1241:19
22
23  AFTERNOON SESSION..................... 1111:1
24
25  objection............................. 994:15

Daniel Cancelmi                                                    Volume 5

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF PENNSYLVANIA

3

4    THE OFFICIAL COMMITTEE OF

5    UNSECURED CREDITORS OF

6    ALLEGHENY HEALTH, EDUCATION &

7    RESEARCH FOUNDATION,              Civil Action

8              Plaintiff,              No. 00-684

9    vs.

10   PRICEWATERHOUSECOOPERS, L.L.P.,

11             Defendant.

12

13             Continued videotaped deposition of

14   DANIEL CANCELMI, called for examination under the

15   statute, taken before me, Michael E. Miller, CSR,

16   RPR, CRR in and for the State of Texas, at the

17   offices of Gibson, Dunn & Crutcher, 2100 McKinney

18   Avenue, Suite 1100, Dallas, Texas, on Monday, the

19   24th day of November, 2003 at 9:08 a.m.

20

21                    - - - - -

22                    VOLUME 5

23                    - - - - -

24

25

Daniel Cancelmi                                                    Volume 5

Page 1349

1  accounting rules were out there for investments.
2      Q.   (BY MR. RYAN) Fiscal year 1996 is
3  when AHERF adopted FAS 116 and 117 and 124?
4      A.   Yes.
5      Q.   I take it, though, that you don't have    11:35AM
6  any specific knowledge of anyone from AHERF
7  telling Coopers & Lybrand about this issue that
8  apparently went back and forth with Chuck
9  Morrison about whether or not to record these
10 realized gains?                         11:36AM
11     MR. TORBORG: Object to form.
12     A.   We very well may have.
13     Q.   (BY MR. RYAN) Do you actually recall
14 that happening?
15     A.   I don't remember specifically, no.    11:36AM
16     Q.   Do you have any recollection of
17 talking to Coopers & Lybrand about this issue,
18 this disagreement that went back and forth with
19 Mr. Morrison?
20     MR. TORBORG: Object to form.       11:36AM
21     A.   Again, I wouldn't -- I don't know if
22 I'd call it a disagreement; but no, I don't
23 remember a specific conversation.
24     MR. RYAN: Let me mark, please, as
25 Exhibit 2278 a document with Bates numbers    11:36AM

Page 1350

1  DC1241, pages 1 to 14.
2      (Exhibit 2278 marked.)
3      Q.   (BY MR. RYAN) Do you recognize
4  Exhibit 2278, Mr. Cancelmi?
5      A.   Looks like the financial statements    11:37AM
6  for the Delaware Valley for November '96.
7      Q.   So these are financial statements for
8  a period two months later than those that we
9  looked at in Exhibit 2275?
10     A.   Yes.                          11:37AM
11     Q.   If you could turn, please, to the
12 balance sheet, which is on Bates page 4. And if
13 you wouldn't mind comparing that to the balance
14 sheet on Bates page 4 of Exhibit 2275, the
15 September 30th, 1996 financial statements.    11:37AM
16     A.   2275?
17     Q.   Yes, sir.
18     A.   Okay.
19     Q.   And do you see that there's a change
20 in the method of presentation of patient accounts    11:38AM
21 receivable from Exhibit 2275 to Exhibit 2278?
22     A.   Between November and September?
23     Q.   Yes. Specifically, I'm referring to
24 the fact that there's no longer a disclosure in
25 the margin of the balance sheet --           11:39AM

Page 1351

1      A.   Oh.
2      Q.   -- for the allowance for doubtful
3  accounts.
4      A.   Yes, I see that.
5      Q.   Do you know why that is?          11:39AM
6      A.   I don't remember offhand.
7      MR. RYAN: Let me show you a
8  document which may assist with that. Let me
9  mark as Exhibit 2279 a document with Bates
10 numbers DC2777, pages 1 to 13.          11:39AM
11     (Exhibit 2279 marked.)
12     Q.   (BY MR. RYAN) All right. Do you see
13 Exhibit 2279 is another version of the
14 November 30th, 1996 financial statements for the
15 DVOG, but this time with a print date of      11:40AM
16 December 24th, 1996, compared to the print date
17 in Exhibit 2278 of January 19th, 1997?
18     A.   Yes.
19     Q.   Somebody was working on Christmas Eve,
20 it seems.                            11:40AM
21     And is that your handwriting in the
22 upper right-hand corner of Exhibit 2279?
23     A.   Yes.
24     Q.   It's a note from you to Keith?
25     A.   Yes.                          11:40AM

Page 1352

1      Q.   Who was Keith?
2      A.   Keith Reabe.
3      Q.   And what role did Keith Reabe play in
4  generating AHERF's internal monthly financial
5  statements?                          11:40AM
6      A.   He prepared the computer stuff,
7  whether it was Lotus or Excel -- I guess it was
8  Lotus at that point.
9      Q.   So if you had changes to how you
10 wanted to set up a presentation of the internal    11:40AM
11 monthly financial statements, I take it you'd
12 talk to Keith Reabe about it?
13     A.   Yes.
14     Q.   All right. Could you turn, please, to
15 the balance sheet in Exhibit 2279, which is on    11:41AM
16 Bates page 3. And is that -- does that look like
17 your handwriting where you have crossed out a
18 disclosure in the margin of the allowance for
19 doubtful accounts?
20     A.   Yes.                          11:41AM
21     Q.   And did you write in the margin "Hide
22 this"?
23     A.   Yes.
24     Q.   Why did you want to hide the
25 disclosure of the allowance for doubtful         11:41AM

24 (Pages 1349 to 1352)

Daniel Cancelmi                                                                          Volume 5

Page 1353

1    accounts?
2        A.   Well, the term "hide" within the
3    computer system, that just means not to display
4    it.
5        Q.   Why did you not want to display it?    11:41AM
6        A.   Offhand, I don't remember.  I'm sure
7    someone probably didn't want to have the
8    disclosure for the allowance for those time
9    periods.
10       Q.   Do you know who it was who didn't want    11:42AM
11   to have that disclosure?
12       A.   Offhand, no.
13       Q.   Who was it that you wanted to hide the
14   disclosure from?
15       A.   Well, this was around the time I --    11:42AM
16       MR. TORBORG:  Object to form,
17   foundation.
18       A.   -- I didn't want to hide it.  This was
19   around the time that the various reserves were
20   being utilized to write off accounts in the    11:42AM
21   Delaware Valley, and when they were going through
22   and writing those accounts off, they would get
23   applied against the bad debt reserve.
24       So what you had, when you look at
25   that, is the fact that you have accounts that    11:42AM

Page 1354

1    are -- you have the gross account sitting in
2    receivables, you have the accounts -- before they
3    get written off, you have the reserve and the bad
4    debt reserve, and then when you write them off,
5    you take the gross account off and you apply it    11:42AM
6    against the bad debt reserve; and just due to the
7    timing of when accounts are being written off,
8    you can have a distortion of the bad debt
9    reserve, which was happening there because there
10   was accounts being taken off and applied against    11:43AM
11   the bad debt reserve.
12       Q.   So here in the portion that's being
13   crossed out, I think I can make it out.  It looks
14   like it was a bad debt allowance of 20,647,000 at
15   November 30th compared to $50,625,000 at    11:43AM
16   June 30th, right?
17       A.   Yes.
18       Q.   And that decrease was due to the
19   write-off of aged accounts that was taking place
20   in the Delaware Valley during fiscal year 1997?    11:43AM
21       A.   Yes.
22       Q.   And by this point in time, as of
23   November 30th, 1996, there hadn't been an
24   additional bad debt expense taken at the DVOG
25   hospitals in order to build the bad debt    11:43AM

Page 1355

1    allowance back up, right?
2        A.   Well, there was bad debt expense being
3    recorded.
4        Q.   Right.  But it was being recorded to
5    budget, right?    11:43AM
6        A.   At that time, it -- it probably was at
7    that point.
8        Q.   It wasn't -- apparently, as we can see
9    here in Exhibit 2279, the bad debt expense wasn't
10   being taken in an amount large enough to build    11:44AM
11   the allowance back up to anything like the
12   previous levels, right?
13       A.   That's right.  And the previous levels
14   were probably -- those bad debt reserves were
15   probably higher than maybe someone would argue    11:44AM
16   than normal because there was accounts out there
17   that hadn't been written off yet.
18       Because if you look at the November
19   receivables compared to the June receivables,
20   they're up, but it's not significant.  So even    11:44AM
21   though there was -- you look at the allowance,
22   the allowance went down by 30 million, you don't
23   see the same corresponding change in the
24   receivables.  And that -- and the reason for that
25   big switch in the allowance account was because    11:44AM

Page 1356

1    they were -- started writing off older accounts
2    against the bad debt reserve.
3        Q.   And this decrease in the bad debt
4    allowance of the DVOG hospitals due to the
5    write-offs of older accounts, combined with the    11:45AM
6    fact that bad debt expense was being recorded at
7    budgeted levels, is what resulted in the bad debt
8    reserve shortfall that was growing during fiscal
9    year 1997, right?
10       A.   Yes.    11:45AM
11       Q.   And, in effect, what we see here in a
12   disclosure of the allowance for doubtful accounts
13   going down from 50 million plus at June 30th to
14   20 million plus at November 30th is a reflection
15   of that same bad debt reserve shortfall, isn't    11:45AM
16   it?
17       A.   It's a reflection that there was
18   accounts getting written off against the bad debt
19   allowance.
20       Q.   And do you recall that AHERF wanted --    11:45AM
21   that AHERF management wanted to hide that
22   information?
23       MR. TORBORG:  Object to form and
24   foundation.
25       A.   No, I -- I don't know if I'd    11:45AM

25 (Pages 1353 to 1356)

Daniel Cancelmi                                                                                    Volume 5

Page 1381

1    MR. TORBORG: Object to
2  foundation --
3    A.  Not that I remember.
4    MR. TORBORG: -- and to form.
5    Q.  (BY MR. RYAN) And is it the case that  12:18PM
6  in -- that as of September 24th, 1996, even after
7  you'd written this memo which in effect
8  calculated what the implications for the bad debt
9  allowance would be if management decided to write
10 off $80 million in accounts receivable, that that  12:19PM
11 didn't lead you to believe that there should be a
12 prior period adjustment to the 1996 financial
13 statements?
14   MR. TORBORG: Object to form and
15 foundation.                        12:19PM
16   A.  Yeah, I don't remember the issue
17 arising regarding because these accounts are
18 being written off that there should be a prior
19 period adjustment.  It may have, but I'll be
20 honest, I don't remember that.           12:19PM
21   Q.  (BY MR. RYAN) That's not something
22 that you considered at the time?
23   A.  I don't remember that.
24   Q.  And that would be because you had an
25 understanding at the time that the bad debt       12:19PM

Page 1382

1  allowance is an estimate and a change in facts or
2  circumstances after the balance sheet date
3  doesn't mean you have to go back and correct an
4  error and make a prior period adjustment, right?
5    MR. TORBORG: Object to form.      12:20PM
6    A.  Yeah, depending on the fact pattern,
7  that can be true.  Depending on a different fact
8  pattern, that cannot be true.  So it really
9  depends.
10   Q.  (BY MR. RYAN) Now, you didn't      12:20PM
11 attend --
12   MR. TYCKO: Hold on.
13   MR. RYAN: Sorry.
14   (Conference out of the hearing of
15 the reporter.)                      05:07PM
16   MR. TYCKO: Are you coming to a
17 breaking point?
18   MR. RYAN: I am.  I'll stop in just
19 one minute.
20   MR. TYCKO: Okay.  Fine.       12:20PM
21   Q.  (BY MR. RYAN) You, I believe, didn't
22 ever attend meetings of the board of trustees of
23 AHERF, right?
24   A.  Not when I was at AHERF.  I think I
25 went to one meeting when I was at Coopers.   12:20PM

Page 1383

1    Q.  One meeting of the audit committee?
2    A.  Audit committee.
3    Q.  While you were at AHERF, though, you
4  did not attend meetings of the audit committee?
5    A.  No.                     12:20PM
6    Q.  But you were aware, I take it, that
7  the audit committee would meet every year,
8  usually in October, to review and approve the
9  annual audited financial statements for AHERF,
10 right?                             12:21PM
11   A.  Yes, some -- generally around that
12 time frame.
13   Q.  Do you remember any discussion with
14 anyone in late September or early October 1996
15 about a fact that there was this concept that had  12:21PM
16 been proposed of writing off $80 million in older
17 patient accounts receivable and the 1996
18 statements hadn't yet gone to the audit committee
19 of the board for its approval?
20   A.  Offhand, I don't.              12:21PM
21   Q.  Did you ever consider taking any
22 action to bring to the attention of the audit
23 committee of the board of trustees the fact that
24 AHERF was considering writing off $80 million in
25 accounts?                         12:22PM

Page 1384

1    A.  Me?
2    Q.  Yes.
3    A.  They wouldn't know me if I hit them in
4  the head with a 2x4, so not necessarily.  I just
5  didn't have interaction with them.      12:22PM
6    Q.  Did you ever suggest to any of your
7  colleagues at AHERF who did attend these meetings
8  that they might want to bring that to the
9  attention of the audit committee?
10   A.  I don't remember that being an issue.   12:22PM
11 I -- like I said, I don't remember there being an
12 issue that, oh, you know, it's a subsequent event
13 concern.  It may have come up, but I'll be
14 honest, it doesn't stand out.  You know, I think
15 my recollection was that, you know, there were    12:22PM
16 audit adjustments made at June '96 for the -- you
17 know, for the financial statements as of that
18 point in time, you know, the 17-1/2 and whatever
19 other adjustments were out there, and that was
20 the needed adjustments at that point in time.     12:22PM
21   Q.  You knew, I take it, that Bill
22 Buettner from Coopers & Lybrand attended meetings
23 of the audit committee?
24   A.  Yes.
25   Q.  Did you consider at all between the    12:23PM

32 (Pages 1381 to 1384)