UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br><br>Defendant. | Civil Action No. 00-684<br><br>Judge David Stewart Cercone |

**APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)**

VOLUME 2

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

**Cepielik Dep.**

```
1           UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                 Case No.  00-684
3
4    THE OFFICIAL COMMITTEE OF     :
     UNSECURED CREDITORS OF                Deposition of:
5    ALLEGHENY HEALTH, EDUCATION   :
     and RESEARCH FOUNDATION,         ROBERT J. CEPIELIK
6                                  :
              Plaintiff,
7                                  :
     vs.
8
     PRICEWATERHOUSECOOPERS, LLP,  :
9
              Defendants.          :
10   ---------------------------
11
12       TRANSCRIPT of testimony as taken by and
13   before PATRICIA A. SANDS, a Shorthand Reporter
14   and Notary Public of the States of New York and New
15   Jersey, at the offices of CRAVATH, SWAINE & MOORE,
16   LLP, 825 Eighth Avenue, New York, New York on
17   Friday, January 9th, 2004, commencing at 9:08 in
18   the forenoon.
19
20
21
22
23
24
25
```

Page 62

1  the OMB 133 audit and questions that they might
2  have had from us about our work.
3      Q.   Do you recall anything more about
4  the conversations at that meeting?
5      A.   No, I'm sorry.
6      Q.   Regardless of who spoke?
7      A.   I'm sorry, it's just -- it's fuzzy.
8      Q.   Do you recall anything, whether
9  fuzzy or not?
10     A.   I'm sorry, no.
11     Q.   Mr. Cepielik, can you tell me
12 generally the scope of the work that you performed
13 with respect to the A-133 project, which was the
14 project on which I think you've told us now that
15 you were engaged?
16     A.   We were assigned to assist and complete the
17 OMB 133 audit procedures for 1997.
18     Q.   OMB means "Office --"
19     A.   "Office of Management and Budget."
20 Circular A-133.
21     Q.   And you understood this to be your
22 charge or your task from Mr. Hope?
23     A.   Yes.
24     Q.   And were you given any particular
25 written or oral assignment in this connection,

Page 63

1  other than to do work that you already knew how to
2  do from your prior audit experience?
3      A.   Yes, there were four issues that we had to
4  look at in connection with the 133 audit procedure.
5      Q.   And those were, what?
6      A.   Those four issues were:
7           One, accounting the for the movement
8  of certain reserves among entities within the AHERF
9  family of companies.
10          Two, classification of assets whose
11 use is limited.
12     Q.   Okay.
13     A.   Three, classification of transactions
14 surrounding the Lockhart Trust.
15     Q.   All right.
16     A.   And four, questions around something called
17 the Execu-flex benefit plan.
18     Q.   So these were the focuses or foci,
19 the things on which you were focusing as a part of
20 your OMB circular A-133 work?
21     A.   Yes, yeah.
22     Q.   What kind of work was performed by
23 you in this connection?
24     A.   I met with -- I was briefed on the issues.
25 And the team and I met with various representatives

Page 64

1  of AHERF to accumulate an audit, managements
2  conclusions regarding these issues.
3      Q.   Did you also meet with -- I think I
4  know the answer to this from your testimony earlier
5  today -- members of the C&L engagement team for
6  fiscal years '97 and '96?
7      A.   Yes.
8      Q.   And I think you've told me that
9  those included Mr. Buettner, Ms. Frazier -- or
10 Mrs. Frazier, Mr. Kirstein, at least over the
11 phone.
12          Was there anyone else that you met
13 or spoke with from the engagement team?
14     A.   The answer to your first question is yes, I
15 did meet with Mr. Buettner, Mrs. Frazier and
16 Mr. Kirstein.  There may have been other people
17 that I spoke with tangentially that were involved,
18 but it wasn't necessarily a detailed substantive
19 discussion.
20     Q.   Can you remember the names of anyone
21 else that you spoke with?
22     A.   No.
23     Q.   When you say you met with AHERF
24 representatives, I understand from your prior
25 testimony that you met with Mr. Cancelmi,

Page 65

1  Ms. Schaffer, Mr. Adamczak, Mr. Snow, and perhaps
2  others from his department, patient financial
3  services group?
4      A.   Yes.
5      Q.   Can you recall -- did you meet with
6  those folks that I just mentioned?
7      A.   Yes.
8      Q.   At least those I mentioned by name?
9      A.   Yes.
10     Q.   Did you meet with anyone else, the
11 name of whom you can recall today, from AHERF?
12     A.   Yes, read me the --
13     Q.   The list we have is:  Cancelmi?
14     A.   Uh huh.
15     Q.   Schaffer, Snow and some of his
16 colleagues?
17     A.   Yes.
18     Q.   And Adamczak?
19     A.   Yes.
20     Q.   Did you meet with anyone else from
21 AHERF other than Dan Cancelmi, Robin Schaffer, Greg
22 Snow, or Al Adamczak?
23     A.   Yes.
24     Q.   Who else?
25     A.   There was another representative of AHERF

Page 66

1  that was a financial officer of the company, the
2  name is eluding me right now. As soon as you say
3  it I'm going to zero in on it. Sorry, I just have
4  a memory slip on that one.
5      Q.   Do you recall whether this person
6  was male or female?
7  A.   Male.
8      Q.   And do you recall what his title was
9  or position?
10 A.   He was a finance officer. Again, I'm
11 sorry, it's just, it's slipping me. As soon as you
12 say the name, I'm going to say, yes that's it.
13     Q.   Well, it's obviously slipping me,
14 too. So we will go through your notes and it may
15 very well be there.
16          Do you recall having notes of this
17 conversation?
18 A.   Yes.
19     Q.   Okay. Now back --
20 A.   I'm sorry, in addition --
21     Q.   Yes.
22 A.   A woman by the name of Miriam Bailey.
23     Q.   Anyone else?
24 A.   Miriam Bailey's boss.
25     Q.   Dwight Kasperbauer?

Page 67

1  A.   Thank you. Dwight Kasperbauer.
2      Q.   Did you meet with Mr. Kirstein, or
3  only speak with him over the phone?
4  A.   I only talked with him over the phone.
5      Q.   The people you've mentioned
6  from AHERF, did you meet with all of them
7  face-to-face?
8  A.   Yes, as well as on the phone.
9      Q.   And we were discussing, then, your
10 scope of work and what it was that you did?
11 A.   Uh hum.
12     Q.   To help complete the tasks involved
13 in your scope of work. And we started by saying
14 you were briefed on the issues.
15          I presume that was by Mr. Hope or
16 was it by others?
17 A.   It was Mr. Hope and others.
18     Q.   And who were the others?
19 A.   Well, again, Amy, Bill Buettner, Ben may or
20 may not have been there. At the initial meeting
21 Jeff Close was there.
22     Q.   And was the initial meeting soon in
23 the time frame after you got to Pittsburgh?
24 A.   Yes.
25     Q.   In either late August or early

Page 68

1  September '98?
2  A.   Yes.
3      Q.   And where was the meeting held?
4  A.   It was in our offices.
5      Q.   Price Waterhouse offices?
6  A.   It was the collective, "our offices." They
7  were separate at the time. I, you know, it might
8  have been the legacy Cooper offices, they were on
9  different floors.
10     Q.   Were they all in the U.S. Steel
11 building?
12 A.   Yes.
13     Q.   As you understood it?
14 A.   Yes.
15     Q.   What do you recall about that
16 briefing?
17 A.   I was briefed on the four issues.
18     Q.   You were basically told, these were
19 the four issues to address?
20 A.   The scope of the work, OMB circular 133,
21 and in connection with OMB circular 133 we needed
22 to address these four issues because the OMB 133
23 engagement, albeit having different reports, is
24 part and parcel with the audit engagement and, in a
25 sense, sits on top of the GAAP audited, the audited

Page 69

1  GAAP financial statements.
2          So we needed to resolve and address
3  these issues in order to be able to finalize the
4  133 procedures.
5      Q.   Do you recall anything else about
6  the meeting that anybody said?
7  A.   No.
8      Q.   Do you recall any discussion at that
9  meeting, or at any other meeting, about a protocol
10 for how to conduct your interviews?
11 A.   No.
12     Q.   Do you recall anyone giving you any
13 instructions about whether to take notes or not to
14 take notes in your interviews?
15 A.   No.
16     Q.   Do you recall anyone telling you,
17 giving you any instructions at any time about
18 whether to keep or discard notes?
19 A.   No.
20     Q.   Did you follow your normal practice
21 as a part of your prior work with the company in
22 taking and maintaining notes as you went forward
23 with this work?
24 A.   Whose normal practice?
25     Q.   Yours.

Page 178

1  margin during the relevant two fiscal years?
2  A.  Yes, we were trying to get an understanding
3  of, where's the data.
4      Q.  Do you recall anything more today
5  about that meeting than what you've listed here?
6  A.  No.
7      Q.  I'm going to ask you to skip forward
8  a few pages in your notes.
9  A.  (Referring to document.)
10     Q.  To page, in Exhibit 4188, to page
11 X 25800, which in Exhibit 1063 is?
12 A.  X 25800?
13     Q.  Yes.
14 A.  Al Adamczak?
15     Q.  Yes.
16 A.  Okay.
17     Q.  Which in Exhibit 1063 is CL 147599.
18 A.  (Referring to document.)
19     Q.  And Mr. Adamczak you knew to be
20 employed at the time in the finance department at
21 AHERF; is that right?
22 A.  Yes.
23     Q.  And this, these two pages of notes,
24 X 25800 to X 25801, are notes of meeting you held
25 with him on October 14, 1998; is that right?

Page 179

1  A.  Yes.
2      Q.  Was anyone else in attendance
3  besides the two of you that day?
4  A.  Yes.
5      Q.  Who else?
6  A.  I believe D. Suarez was at that meeting.
7      Q.  Okay, do you know where D. Suarez is
8  today?
9  A.  I don't.
10     Q.  All right.  And I meant by way of
11 employment, not by way of personal residence.
12         Do you know either?
13 A.  I know either?
14     Q.  You don't?
15 A.  Or do I know neither?  I do not know.  I
16 don't know where she's at, where she works, where
17 she lives.
18     Q.  Perfect.  Let me ask you this:
19         You didn't write her name down; is
20 that right?
21 A.  I did not.
22     Q.  Can you read for me, after the words
23 "10/14/98" and "Al Adamczak," the first line?
24 A.  "Indicated he did not take responsibility
25 of east hospitals until 7/97."

Page 180

1      Q.  All right.  And that reflects his
2  sharing with you a change in job responsibilities,
3  as you recall it?
4  A.  Yes.
5      Q.  Do you recall more formally what
6  that change was, from that conversation?
7  A.  I do not.
8      Q.  Do you recall now that an individual
9  named Stephen Spargo formally had a role in the
10 finance department, but had left the enterprise?
11 A.  That name is familiar.
12     Q.  All right.  But the actual movement
13 of jobs or people filling jobs is not coming back
14 to you; is that right?
15 A.  No, but what does come back to me is we're
16 meeting with Al to talk about the reserves.  And I
17 think Al is alerting us that, for your information,
18 I took on this job on these hospitals in July
19 of '97.
20     Q.  All right.  And you did this day,
21 like you did in the meetings with Mr. Cancelmi and
22 Ms. Shaffer, your best to accurately reflect the
23 conversations that you had in your notes; is that
24 fair?
25     MR. BARRON:  Objection to the form.

Page 181

1  A.  Yes.
2      Q.  Thank you.  The next line, the next
3  sentence rather, or two, could you read for us?
4  A.  "Indicated a decision was made at a closing
5  meeting that 1996 AR reserve was $30 million under
6  reserved and to take it in over three years, done
7  at a closing meeting, all hands including C&L."
8      Q.  And that's, again, a comment that Al
9  Adamczak conveyed to you and Ms. Suarez, if she was
10 there?
11 A.  Yes.
12     Q.  Had you been aware of that before?
13 A.  I hadn't.
14     Q.  All right.  Did that concern you?
15 A.  It did.
16     Q.  And why is that?
17 A.  Because Al is indicating that their best
18 estimate at the time is about a $30 million
19 shortfall, which is something different than what
20 Dan Cancelmi is indicating is the shortfall.  It's
21 a substantially different dollar amount.
22     Q.  And the '96 you mentioned is fiscal
23 year '96; correct?
24 A.  Yes.
25     Q.  And the closing meeting you refer to

Page 182

1  you understood to be a year end audit closing
2  meeting; is that correct?
3      MR. BARRON: Objection to the form.
4  A.  He mentioned it was a closing meeting. I
5  don't know which closing meeting it was for.
6      Q.  All right. "AR," though, meant to
7  you "accounts receivable," as it has been used in
8  other sets of notes; correct?
9  A.  Yes.
10     Q.  What did you understand -- strike
11 that.
12     Did he tell you he, himself, was at
13 the meeting, the closing meeting, or do you recall?
14 A.  He indicated he was at the meeting.
15     Q.  Who did he indicate from C&L was at
16 the meeting?
17 A.  I don't -- I don't remember specifically,
18 but it would have included one or all of Buettner,
19 Kirstein and Frazier.
20     Q.  All right.
21 A.  What I would refer to as "the management
22 team," maybe one, maybe all three.
23     Q.  The management team for the
24 Coopers & Lybrand engagement?
25 A.  Yes.

Page 183

1      Q.  Thank you. Did you share this
2  comment or this -- what you took away from these
3  comments, with anyone on the engagement team of
4  which you were a part in 1998?
5  A.  I don't, I don't remember.
6      Q.  All right.
7  A.  I don't remember.
8      Q.  So I take it, then, that you don't
9  remember anybody's reaction to what Mr. Adamczak
10 said?
11 A.  No, no, I just I don't recall.
12     Q.  All right. And the next, can you
13 read the next sentence for us?
14 A.  "Indicated '96 shortfall was thought to be
15 $30 million in '96, it was not until '97 that he
16 heard of shortfall of $50, $70 and $99 million."
17     Q.  And this, again, was Al speaking and
18 you doing your best to accurately reflect what he
19 said?
20 A.  Yes.
21     Q.  Did he tell you how he learned of
22 these different numbers in '97, if you can recall?
23 A.  I don't recall.
24     Q.  All right. Can you read the next
25 sentence?

Page 184

1  A.  "Reclass of $50 million of reserves was
2  originally introduced by Dan Cancelmi to Mark
3  Kirstein, who indicated he thought it was okay, but
4  wanted to run it up the flag poll."
5      Q.  This again is Al sharing his
6  recollections with you and perhaps Ms. Suarez?
7  A.  Yes.
8      Q.  Did you have any response to that
9  comment?
10 A.  The reaction again is I have another, yet
11 another inconsistency, between members of
12 management of AHERF of who knew about the
13 $50 million and when and who introduced the idea.
14     Dan's indicating that the whole 99
15 is Bill's idea. And here Al's recollection is the
16 only reclass he recalls hearing of is $50 million
17 and, in fact, it was Dan's idea.
18     So now I'm getting different
19 stories, different numbers, from different people.
20 Facts that seem to be different than what Bill and
21 Amy are explaining to Mel and I, the restatement
22 team, as to what was expressed to them during the
23 audit.
24     Q.  Did you say any of that to
25 Mr. Adamczak in the meeting on 10/14/98?

Page 185

1  A.  I don't recall.
2      Q.  All right. Do you recall anything
3  that you did say to him about this statement, about
4  Mr. Cancelmi talking with Mr. Kirstein who, in
5  turn, would run the $50 million idea up a flag
6  poll?
7  A.  I don't recall.
8      Q.  Did you talk with anybody on the
9  former C&L engagement team about Mr. Adamczak's
10 statement that a closing meeting, including C&L
11 representatives, in '96 reflected a $30 million --
12 people talked about a $30 million under reservation
13 and taking it in over three years?
14 A.  I don't remember.
15     MR. BARRON: Objection, objection to
16 the question.
17     Q.  You don't remember?
18 A.  I don't recall.
19     Q.  Do you recall talking or, I think I
20 asked you this, but forgive me, talking about this
21 fact or revelation with anybody on the
22 PricewaterhouseCoopers engagement team in '98?
23     MR. BARRON: Objection.
24 A.  I don't recall.
25     Q.  So you don't know, as you sit here

DEPOSITION ERRATA SHEET

RE: THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION VS. PRICEWATERHOUSECOOPERS, L.L.P.

I, Robert J. Cepielik, wish to make the following amendments, additions, deletions or corrections to my deposition given on January 9, 2004, for the following reasons. I have signed my name to the errata sheet and authorize you to attach it to the original transcript.

| Page/Line # | Amendment | Reason for Change |
|---|---|---|
| 25:6 | Insert "my" before "recollection" | Error |
| 89:15 | "sends" should read "send" | Error |
| 106:20 | "neatly" should read "neat" | Error |
| 107:15 | "A" should read "Q" | Error |
| 117:1 | "W/L" should read "W/O" | Error |
| 148:5 | "snow" should read "know" | Error |
| 166:23 | Insert "an" before "hour" | Clarification |
| 192:8 | "it was" should read "they were" | Clarification |
| 197:3 | "none" should read "non" | Error |
| 197:20 & 197:24 | "inconsolidation" should read "in consolidation" | Error |
| 238:8 | "was" should read "because" | Clarification |
| 243:25 | Delete "go" | Error |
| 245:11 | "conferred" should read "confer" | Error |
| 249:23-24 | Sentence should read, "So it is a component of the roll forward." | Clarification |
| 266:4 | Insert "I" before "got" | Error |
| 277:5 | "answer" should read "repeat" | Error |
| 296:24 | Insert "was" before "put" | Clarification |
| 307:17 | "role" should read "roll" | Error |

[[NYLIT:2259706v2:4044W:02/27/04--03:18 p]]

| | | |
|---|---|---|
| 344:10 | "tenant" should read "Tenent" | Error |

In all other respects, the transcript is true and correct.

*Robert A Cepielik*
Signature

Subscribed and sworn to before me this __1st__ day of __March__, 2004.

*Maryann E Shaw*
Notary Public

File/Reference Number: 7472

NOTARIAL SEAL
Maryann E. Shaw, Notary Public
City of Phila., Philadelphia County
My commission expires October 9, 2006