**Christian Dep.**

Page 266

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                Civil Action

    Plaintiff,                No. 00-684

     Vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

    Defendant.


   Continued videotape deposition of

BRIAN CHRISTIAN, called for examination under

the statute, taken before me, Jaci R. Traver,

RPR, CRR, and Notary Public in and for the

State of Ohio, at the offices of Jones Day, 500

Grant Street, Suite 3100, Pittsburgh,

Pennsylvania, on Tuesday, the 14th day of

October 2003 at 9:22 a.m.

    - - - - -

    VOLUME 2


    - - - - -

Brian Christian                    Volume II

Page 267

```
1   APPEARANCES:
2
3       On behalf of the Plaintiff:
4           Jones Day, by
5           J. KEVIN COGAN, ESQ.
6           41 South High Street
7           Suite 1900
8           Columbus, Ohio  43215
9           (614) 469-3939
10
11      On behalf of the Defendant
12      and the Witness:
13          Manion McDonough & Lucas, P.C., by
14          JOSEPH F. McDONOUGH, ESQ.
15          USX Tower, Suite 1414
16          600 Grant Street
17          Pittsburgh, Pennsylvania  15219
18          (412) 232-0206
19              &
20          Cravath, Swaine & Moore, by
21          MATTHEW Z. KRUSKO, ESQ.
22          Worldwide Plaza
23          825 Eighth Avenue
24          New York, New York  10019-7475
25          (212) 474-1296
```

Page 269

```
1           VIDEO TECHNICIAN:  Today's
2   date is October 14th, 2003.  We're on the
3   record at 9:22.
4           BRIAN CHRISTIAN, of lawful age, called
5   for examination, as provided by the
6   statute, being previously sworn, as
7   hereinafter certified, said as follows:
8           EXAMINATION OF BRIAN CHRISTIAN
9   BY MR. COGAN:
10      Q.   Good morning, Mr. Christian.
11  How are you today?
12      A.   I'm doing well.  How about you?
13      Q.   Good, thank you.  I would like to
14  begin by looking briefly at an exhibit we
15  looked at yesterday, and I've actually pulled
16  it out and it's on top of the pile, Exhibit
17  4025.
18           I think, as we discussed yesterday,
19  Exhibit 4025 were some work papers that were
20  completed by you; is that correct?
21           MR. McDONOUGH:  Did you say work
22  papers or paper?
23           MR. COGAN:  I actually made it a
24  plural, because I think there are actually two
25  there.  There's more than one.
```

Page 268

```
1   APPEARANCES, Continued:
2
3   ALSO PRESENT:
4           Phil Mennons, Kroll
5           Kurt Henschel, Video Technician.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 270

```
1           MR. McDONOUGH:  Yes.  I got you.
2       Q.   Is that correct, sir?
3       A.   From looking at the exhibit, my
4   name is in the "completed by" slot, so yes.
5       Q.   And would you turn to the Bates
6   001124, please.  That work paper
7   indicates that a step that was going to be done
8   was to test old account balances at 6/30/96,
9   doesn't it?
10      A.   That's in the step name, yes.
11      Q.   And would I understand that the
12  procedure to test the old account balances
13  would be to review the client summary of
14  accounts that were greater than 90 days old
15  with balances exceeding $100,000?
16      A.   That's what's indicated in the step
17  description, so I believe that would be the
18  procedure.
19           - - - - -
20           (Thereupon, Deposition Exhibit 4027
21           was marked for purposes of
22           identification.)
23           - - - - -
24      Q.   Now, let me hand you what I
25  have marked as Exhibit 4027 and ask you
```

Brian Christian                          Volume II

Page 271

1  to take a look at that, please.
2      A.  (Witness reviewing document.)
3      Q.  Have you had a chance to at least
4  briefly review what we've marked as
5  Exhibit 4027?
6      A.  Yes.
7      Q.  Looking at the first page of
8  Exhibit 4027, which bears the Bates number
9  CL009905, is that your handwriting?
10     A.  Looks like my handwriting.
11     Q.  And would this be the binder that
12  you would have prepared as part of the review
13  of the client summary of accounts that were
14  greater than 90 days old with a balance -- with
15  balances exceeding $100,000?
16     A.  I'm not sure.  I don't have any
17  memory of a binder of that type.
18     Q.  Do you know what this -- on the
19  first page here where it says, "HUH high dollar
20  AC and credit balance testing," do you see
21  that?
22     A.  Yes.
23     Q.  And what does the AC stand for?
24     A.  I would guess account.  I guess
25  that's an abbreviation for account.

Page 272

1      Q.  That, likewise, I take it is your
2  handwriting?
3      A.  Looks like my handwriting.
4      Q.  And I take it pursuant to the
5  review of old account balances that was to be
6  done, as reflected in the work paper we just
7  looked at, you or somebody on the audit team
8  would receive the client summary?
9      A.  I'm sorry, can you repeat that.
10     Q.  Well, you'll see on page -- of
11  Exhibit 4025 at Page 1124 --
12     A.  Okay.
13     Q.  -- under step description it says,
14  review client summary of accounts.  My question
15  was:  Was the client, AHERF, to provide to you
16  or another member of the C&L audit team a
17  summary of accounts that were greater than 90
18  days old with balances exceeding a hundred
19  thousand dollars?
20     A.  I don't have any memory of that.  I
21  mean if it was something that we asked for, if
22  it was included in the schedule request or
23  someone, you know, asked the client without it
24  being on the schedule request, the client would
25  have provided it to us.

Page 273

1      I don't remember, you know, I don't
2  remember receiving it, but I also don't
3  remember if it was on a schedule request or if
4  I asked for it or what have you.
5      Q.  But if we see in the work paper
6  that you completed a step description that
7  says, review client summary of accounts greater
8  than 90 days old with balances exceeding a
9  hundred thousand dollars, do you have any
10  reason to believe that such a review would not
11  have been done?
12     A.  The step is signed off.  I guess I
13  don't have reason to believe that the step
14  wasn't done.
15     Q.  Looking at the pages that follow in
16  Exhibit 4027, that is, pages Bates numbered
17  CL009906 through 9961, does that appear to be a
18  document that you would have created, that is,
19  the C&L audit team, or does that appear to be a
20  document prepared by AHERF?
21     MR. McDONOUGH:  Let me note for the
22  record that there appear to be a couple of gaps
23  in these pages.  There's no -- the pages
24  between 9910 and 9914 are missing.  And I think
25  the pages between 9916 and 9928 are also

Page 274

1  missing.
2      MR. COGAN:  Okay.  Let me change my
3  question then.
4      Q.  Mr. Christian, you've had a chance
5  to look at what has been marked as
6  Exhibit 4027.  Other than the very first page
7  of Exhibit 4027, do the remaining pages appear
8  to be schedules that would have been prepared
9  by AHERF or do they appear to be documents that
10  you would have prepared?
11     A.  Excluding the writing on the page,
12  which looks like it's mine, this would have
13  been a document, I believe, it would have been
14  generated by AHERF.
15     Q.  Then turning, if we could, to
16  Page 9907, which does contain some handwriting;
17  do you see that?
18     A.  Yes, I do.
19     Q.  Does that appear to be your
20  handwriting?
21     A.  The handwriting that I can make out
22  at the bottom that I believe starts with,
23  "note:  As of 8/28/96," it appears to be my
24  handwriting.  And below that -- there's some
25  writing just above that.  I'm not sure, it's

3 (Pages 271 to 274)

Brian Christian                                    Volume II

Page 275

1  hard to make out, but I'm not sure that that's
2  mine.
3      Q.   Just so that it's clear, the
4  language that says, "note: As of 8/28/96,
5  there were no receipts on this A/C," that's
6  your handwriting?
7      A.   It appears to be.
8      Q.   And then below that, where it looks
9  like there's a dash and begins, "overall manual
10  allowance percentage," and continuing on, does
11  that also appear to be your handwriting?
12      A.   I believe so.
13      Q.   And the handwriting you're not sure
14  of is that handwriting which appears above the
15  line beginning with the word "note"?
16      A.   There's a line that I believe says,
17  "estimated reimbursement." It's hard to make
18  out. I'm not sure that that's mine. There may
19  be, on the top right-hand side of the page
20  where there's some numbers written for reserve
21  or estimated, NRV, that may be my writing, too.
22      Q.   And if we turn to the next page,
23  which is 9908, is some of the handwriting that
24  appears on that page yours?
25      A.   It looks like my handwriting.

Page 276

1      Q.   Given that your handwriting appears
2  on at least a couple of pages of the document
3  that's been marked as Exhibit 4027, do you
4  believe that you would have reviewed these
5  materials that were received from AHERF?
6      A.   Based upon looking at the document
7  that's been put in front of me, I guess it
8  looks as though that I would have reviewed
9  these, if I would have made notes on the page.
10      Q.   Okay. If I could, then, let's turn
11  to what has been marked as -- or what has the
12  Bates number 9929. And you're at that page?
13      A.   Yes, I am.
14      Q.   What we see in the left-hand column
15  of this page is the identity of a patient; is
16  that correct?
17      A.   In the left-hand column?
18      Q.   Yes.
19      A.   There's a patient number and a
20  patient name, yes.
21      Q.   What I would like to do is direct
22  you, first, to the entry for Catherine A.
23  Townes; do you see that?
24      A.   Yes, I do.
25      Q.   And the information contained on

Page 277

1  this page would reflect that she was admitted
2  on 5/6/93 and discharged on October 8, '93,
3  doesn't it?
4      A.   From looking at this document,
5  that's what it says.
6      Q.   And the final bill date was
7  10/18/93?
8      A.   On this document there's a column
9  that says, final bill, and it has date of
10  10/18/93.
11      Q.   And if we go to very last entry
12  under "account balance," what does that show?
13      A.   For Catherine Townes?
14      Q.   For Catherine Townes, yes.
15      A.   Final column under account balance
16  for Catherine Townes reads, 124,581, I believe,
17  and 15 cents.
18      Q.   Now, going down a little further
19  with respect to the entry for Ann Weber; do you
20  see that?
21      A.   Yes, I do.
22      Q.   And her final bill date was what?
23      A.   Ann Weber's final bill date,
24  according to this document, was 12/1/1994.
25      Q.   What was the account balance?

Page 278

1      A.   Ann Weber's account balance per
2  this exhibit was $113,454.
3      Q.   And then let's look at the entry
4  for Benjamin Bashore; do you see that?
5      A.   Yes, I do see that.
6      Q.   What was the final bill date there?
7      A.   I believe his final bill date, from
8  this document, was 9/6/94.
9      Q.   What was the balance on the
10  account?
11      A.   The account balance is 109,830.
12      Q.   These account balances that we've
13  been discussing were as of June 30, 1996; is
14  that right?
15      A.   I would imagine, if this report was
16  from June 30th, '96. I don't know if that's
17  the case or not.
18      Q.   But would you understand this
19  report date to be June 30, 1996 at 8:22 p.m.?
20      A.   From looking at the report, that's
21  what's at the top of the page.
22      Q.   So I -- would you agree that as of
23  this report date, the accounts for Catherine
24  Townes, Ann Weber, and Benjamin Bashore were
25  more than 90 days old?

4 (Pages 275 to 278)

Brian Christian                        Volume II

---

Page 279

1      A.   Based on this report, based on the
2  final bill date on this report, it appears that
3  they're more than 90 days old, yes.  If this is
4  as of 6/30/96, that would be the case.
5      Q.   And the account balances were
6  greater than a hundred thousand dollars, right?
7      A.   From looking at this report, yeah.
8      Q.   Now, do you know, did you do any
9  analysis to determine the collectability of
10  these accounts, for example, the Catherine
11  Townes, Ann Weber, and Benjamin Bashore?
12      A.   I honestly do not remember if I did
13  or not.
14      Q.   Do you know if anybody on the
15  Coopers & Lybrand audit team would have done an
16  analysis with respect to the collectability of
17  these three accounts, which were greater than
18  90 days and more than a hundred thousand
19  dollars?
20      A.   I don't remember.
21      Q.   If such an analysis was done, would
22  you expect to find that in a work file such as
23  the one that's been marked as 4027?
24      A.   Included in the same work file?
25      Q.   That would be the first question,

---

Page 280

1  yes.
2      A.   Not necessarily.
3      Q.   Where else might one find such an
4  analysis, if it had been done?
5      A.   I would imagine it could be in
6  almost anywhere.  I mean if you're saying would
7  I expect to see it in this same work file that
8  I'm -- is the exhibit, not necessarily.  I
9  guess I would expect to see some explanation
10  somewhere within our working papers.
11      Q.   Go, if you would, to the -- back to
12  Exhibit 4025.  And the last page of that
13  exhibit with the Bates number 1125.
14      A.   Okay.
15      Q.   Do you see that on that work paper,
16  under "working paper type," there is a line
17  that says, "see the high-dollar and credit
18  balance audit supplement binder."
19      A.   Okay.
20      Q.   And I would ask you, what we have
21  marked as Exhibit 4027, is that the high-dollar
22  and credit balance audit supplement binder?
23      A.   I have no idea.  It may only be a
24  piece of it.  It may only be one work paper.  I
25  have no idea.  No way of telling.

---

Page 281

1      Q.   Back to Exhibit 4027, and just
2  looking at the Bates Page 9932.  And do you see
3  about four patients down there's a Ruth Waters?
4      A.   I see that.
5      Q.   And a discharge or final bill date
6  of February 15, '94?
7      A.   Yes, I see that.
8      Q.   And assuming that this printout is
9  as of 6/30/96 at 8:22 p.m., the balance would
10  appear to be $108,058.16; do you see that?
11      A.   I do see that.
12      Q.   And, again, I would ask you, do you
13  know whether any analysis was done regarding
14  the collectability of this account, which was
15  more than 90 days old and greater than a
16  hundred thousand?
17      A.   I don't remember.
18      Q.   To the extent that Exhibit 4027
19  identifies other accounts that were more than
20  90 days old and greater than a hundred thousand
21  dollars as of June 30, 1996, do you know
22  whether any analysis was done to determine the
23  collectability of those accounts?
24      A.   I do not remember.
25      Q.   Do you know whether or not any

---

Page 282

1  analysis would have been done to determine if
2  adequate reserves had been established for
3  those accounts?
4      A.   I do not remember.
5      Q.   Going back to Exhibit 4025, and at
6  Page 1124, that first line under "step
7  description" that we talked about which
8  provides, "review client summary of accounts
9  greater than 90 days old with balances
10  exceeding $100,000."
11         Do you know what the purpose of
12  such a review would have been?
13      A.   Really not right offhand, no.
14      Q.   Has it been your experience that
15  one of the purposes in reviewing accounts such
16  as those which are more than 90 days old and
17  with a balance greater than a hundred thousand
18  dollars is, at least in part, to determine the
19  collectability of the account?
20      A.   I don't know that it's been my
21  experience that I can remember reviewing
22  individual accounts or a summary of individual
23  accounts that are that old.  So I don't know
24  that it's necessarily been my experience.
25      Q.   Have you -- change that.

---

5 (Pages 279 to 282)

Brian Christian                                  Volume II

Page 283

1        While you were at Coopers &
2   Lybrand, were you ever asked to determine the
3   collectability of accounts receivables for
4   healthcare providers?
5        A.   Was I specifically asked to do that
6   as a task or was I --
7        Q.   Yes.
8        A.   I don't remember that I was ever
9   specifically asked to just determine the
10  collectability of accounts receivable.  I know
11  I was asked to perform work on an audit area,
12  which was accounts receivable.
13       Q.   As part of the task of auditing
14  accounts receivables, do you attempt to
15  determine the collectability of accounts?
16       A.   I believe that is one of the tasks
17  that is included if you were auditing an
18  area -- if you were auditing A/R.
19       Q.   And if you could, how would you go
20  about doing that, that is, testing for the
21  collectability of accounts?
22       A.   Well, from what I can remember, you
23  might look at subsequent receipts.  You might
24  look at a history of payments of -- that have
25  come from vendors, or as it's related to

Page 284

1   patient A/R, it may have been coming from third
2   party providers over a period of time to
3   determine if they're actually getting paid on
4   accounts.
5        Q.   Would you consult with the client?
6        A.   That might be one of the steps I
7   would take.
8        Q.   Would you contact the payor?
9        A.   I don't remember having gotten in
10  direct contact with the payor, because I don't
11  know that it's necessarily never happened, but
12  I mean it's the client's A/R that is -- that
13  they're looking to collect.  It's not mine.  So
14  I don't know that I would necessarily contact
15  the payor.
16       Q.   So if, for example, looking at
17  Page 9932 of Exhibit 4027.
18       A.   9932.
19       Q.   Sure.  We'll use that as an
20  example.
21            And focusing specifically on the
22  Ruth Waters account; do you see that one?
23       A.   I do see that one.
24       Q.   That, we discussed earlier, had a
25  balance as of June 30th, 1996, at least based

Page 285

1   on this document, of $108,058.16; do you see
2   that?
3        A.   I do see that.
4        Q.   So one way that you might test the
5   collectability of that account would be to look
6   at whether there were any payments on the
7   account subsequent to June 30th, 1996; is that
8   right?
9        A.   Not specifically on one account,
10  necessarily.  Maybe as a whole, but I can't say
11  necessarily just on Ruth Waters' account would
12  I do that.
13       Q.   Now, I was just saying as an
14  example for testing the collectability of an
15  account, one thing that you could do would be
16  to determine, for example, in connection with
17  Ruth Waters, whether there were any subsequent
18  payments on that account?
19       A.   I don't know that I would
20  necessarily do that on a single account.
21  You're referring to an account.
22       Q.   Would another approach then be to
23  accumulate all of the accounts that were more
24  than 90 days old and with balances in excess of
25  a hundred thousand dollars and then determine

Page 286

1   whether there had been any subsequent payments
2   on the accounts?
3        A.   It might be.  It might also be to
4   inquire of the client, are they specifically
5   manually reserving for these accounts.  Do they
6   have adequate manual reserves for the
7   particular accounts that you're looking at,
8   because they are so old, that might be a step.
9        Q.   And do you recall having had any
10  such discussions with anybody at AHERF
11  regarding these accounts that we've talked
12  about, which are greater than 90 days old and
13  more than $100,000?
14       A.   No, I don't.
15       Q.   When you use the term "manually
16  reserving for the accounts," what do you mean
17  by that?
18       A.   Instead of having an accounting
19  system or, I guess, a patient accounting
20  system, perhaps record an automatic reserve on
21  a patient account, you're doing a procedure as
22  a client is doing a procedure where they're
23  looking at an account and noting, okay, it's
24  old, okay, there may be an issue with this, I'm
25  going to record a manual journal entry to

6 (Pages 283 to 286)

Cleveland (216) 523-1313                          Akron (330) 374-1313

Brian Christian                                    Volume II

Page 287

1  record additional reserves.
2     Q.   During the course of the audit of
3  accounts receivables in 1996 for AHERF, did you
4  determine whether AHERF was manually reserving
5  for any of its accounts that were more than 90
6  days old and with balances in excess of a
7  hundred thousand dollars?
8     A.   I don't remember.
9     Q.   When you are making inquiry of the
10 client as to whether they are manually
11 reserving for accounts, do you keep notes of
12 those conversations?
13    A.   I believe I would have -- if I
14 would have inquired of the client, if they are,
15 you know, performing a manual reserve, I would
16 have asked to see, you know, if they made an
17 entry, I probably would have taken notes on
18 what they told me.
19    Q.   I take it you would want to at
20 least make a note of who you talked to?
21    A.   I believe so.
22    Q.   And perhaps the date on which you
23 spoke with them?
24    A.   Not necessarily.
25    Q.   Would you want to at least make a

Page 288

1  note of what they told you?
2     A.   I believe that would be the case.
3     Q.   And to the extent that you asked to
4  see entries and those entries were shown to
5  you, would you make a note of that?
6     A.   I believe that's the case.
7     Q.   And those would be part of your
8  work papers?
9     A.   If that was the documentation
10 that -- the path that I chose to go, yeah, that
11 would -- I probably would have documented it
12 that way.
13    Q.   As we sit here today, you don't
14 have any recollection of having had such
15 discussions with anybody at AHERF regarding
16 whether they were doing manual reserving for
17 accounts that were greater than 90 days old
18 with balances in excess of a hundred thousand
19 dollars?
20    A.   As we sit here seven years later, I
21 do not have recollection of having a
22 conversation with anyone at AHERF regarding
23 that matter.
24    Q.   Let me hand you, Mr. Christian,
25 what was previously marked as Exhibit 914.

Page 289

1     A.   (Witness reviewing document.)
2     Q.   Have you had a chance to review
3  Exhibit 914?
4     A.   Yes, I have.
5     Q.   Exhibit 914 purports to be a memo
6  from Russell Laing to Greg Snow with a date of
7  June 10, 1996.
8         During the course of your work on
9  behalf of the AHERF audit in 1996, did you have
10 occasions to meet Greg Snow?
11    A.   I know I would have met with him, I
12 believe, at least once that I can remember.
13    Q.   If you go down to the -- below the
14 first paragraph there's an indentation, a
15 bullet entry there that says, "C&L has
16 increased their risk assessment (either 'Low',
17 'Below Maximum' or 'Maximum') from Low (in fye
18 1995 audit) to Below Maximum (in fye 1996
19 audit)."
20        Do you see that sentence?
21    A.   I see that sentence.
22    Q.   Does this refresh your recollection
23 at all that in connection with the 1996 audit,
24 that C&L had increased its risk assessment from
25 low to below maximum?

Page 290

1     A.   No, it doesn't.
2     Q.   And you'll notice that in this memo
3  there's a reference, and this is in the first
4  paragraph, "I conference-called both Norb
5  Shevelesky," S-h-e-v-e-l-e-s-k-y "and Mark
6  Kirstein today to discuss their FYE 1996 audit
7  approach to receivables."  Do you see that?
8     A.   I do see that.
9     Q.   Do you recall, did you participate
10 in any conference call with Mr. Laing and with
11 Mr. Shevelesky and Mark Kirstein where the
12 subject of the approach to auditing receivables
13 in fiscal year 1996 was discussed?
14    A.   No.
15    Q.   Do you have a recollection of
16 Mr. Kirstein or Mr. Shevelesky coming to you
17 sometime after June 10, 1996 to discuss the
18 approach to auditing accounts receivables?
19    A.   I do not remember Mr. Kirstein
20 coming to me.  I don't remember having a
21 meeting with Mr. Kirstein to discuss that.  I
22 don't know who Mr. Shevelesky is.
23    Q.   Okay.
24    A.   I would guess, there is a Norb
25 Kaliszewski who worked on -- did not work on

7 (Pages 287 to 290)

Brian Christian                         Volume II

**Page 327**

1  purports to be a memo from a Bill Gedman to
2  Greg Snow dated June 7, 1996, correct?
3      A.   I see that, yes.
4      Q.   Do you recall having, during the
5  course of your work with AHERF, worked with or
6  met a Bill Gedman?
7      A.   I may have, but I really don't
8  remember.
9      Q.   And if you look at the first page
10 of this exhibit, it reflects that a Bob Katchur
11 completed an update of the billed accounts
12 receivable analysis for measurement of maximum
13 receivable exposure due to past statute
14 limitations, bad debt potential and silent PPO
15 potential; do you see that?
16     A.   I see that.
17     Q.   And it further indicates that
18 update was done using account receivable data
19 as of May 31, 1996.
20         It goes on to say that the total
21 increase in the exposure is 7.7 million, of
22 which 6.9 million is in the, quote, "past
23 statute," end quote, category; do you see that?
24     A.   I see that.
25     Q.   Do you or did you have an

**Page 328**

1  understanding as to what was meant by "past
2  statute"?
3      A.   Not that I recall.
4      Q.   Do you recall during the 1996 audit
5  learning that there had been approximately -- that
6  there had been an increase in exposure of
7  $7.7 million, of which 6.9 million was in the
8  past statute category?
9      A.   Do I remember learning that?
10     Q.   Yes.
11     A.   No, I do not.
12     Q.   In other words, did anybody provide
13 you, as you recall, with a copy of Mr. Laing --
14 excuse me, Mr. Gedman's memo to Greg Snow?
15     A.   Not that I can remember.
16     Q.   Did anybody at AHERF advise you
17 that some of the accounts receivables would be
18 uncollectible because they were in the past
19 statute category?
20     A.   I don't remember that.
21     Q.   Do you recall being in any audit
22 meetings with C&L personnel where the issue of
23 past statute accounts was discussed?
24     A.   I don't recall.
25     Q.   Let me hand you, Mr. Christian,

**Page 329**

1  what has already been marked as Exhibit 905 and
2  ask you to take a look at that.
3      A.   (Witness reviewing document.)
4      Q.   Have you had a chance to look at
5  Exhibit 905?
6      A.   Yes.
7      Q.   Exhibit 905 purports to be a
8  memorandum dated October 11, 1996 from Greg
9  Snow to a Joe Dionisio and Charles Morrison.
10 And the subject is "Past Statute (DVR)." Do
11 you see that?
12     A.   I see that.
13     Q.   By the way, during the course of
14 the time that you were involved with the audits
15 of AHERF, did you have occasion to meet a Joe
16 Dionisio?
17     A.   I don't know that I can remember.
18     Q.   Or Mr. Morrison?
19     A.   No, not that I can remember.
20     Q.   If we look into the memo itself,
21 you'll see there in the first paragraph it
22 says, "past statute accounts are receivables
23 whose balances have not been resolved within
24 predetermined time frames as set by the
25 payors." Do you see that?

**Page 330**

1      A.   I see that.
2      Q.   Does that refresh your recollection
3  as to what a past statute account would be?
4      A.   No, not really.
5      Q.   If we go to the next paragraph, it
6  says, "attached are three A/R past statute
7  schedules demonstrating the recent increase in
8  past statute receivables. Following is a
9  summary of these reports."
10        And then it says that as of 12/1/95
11 the past statute amount was $18 million; do you
12 see that?
13     A.   Yes, I see that.
14     Q.   And then as of 2/1/96, the past
15 statute amount had increased to 22,822,000; do
16 you see that?
17     A.   I see that.
18     Q.   And then as of July 1, 1996, the
19 past statute amount had increased to
20 $36.9 million; do you see that?
21     A.   I see that.
22     Q.   Do you recall during the course of
23 your work in the -- with respect to the fiscal
24 year 1996 audit of accounts receivables coming
25 across information indicating that accounts

17 (Pages 327 to 330)

Brian Christian               Volume II

Page 331

1  might be uncollectible because they were beyond
2  the time frame set by payors for payment of the
3  accounts?
4    A.  Do I recall coming across any
5  information -- no, I do not recall any
6  information.
7    Q.  If you would, turn over to the next
8  page. And do you see there's an entry
9  Number 4, towards the middle of the page?
10    A.  Entry Number 4.
11    Q.  And entry Number 4 recites that,
12  "effective September 27, 1995, PFSG was advised
13  to discontinue writing-off any balances,
14  regardless of the reason, for dates of service
15  prior to July 1, 1995 (that is contractual
16  write-offs were suspended)."
17    During the course your audit of the
18  accounts receivables for fiscal year 1996, did
19  you learn that the PFSG had been advised to
20  discontinue writing off account balances?
21    MR. McDONOUGH: Object to form.
22    A.  I don't recall learning that.
23    Q.  Based upon your work in connection
24  with the AHERF, did you understand PFSG to
25  stand for the Patient Financial Services Group?

Page 332

1    A.  I may have at one time, but I -- I
2  don't remember what that consisted of. I don't
3  remember, you know, who that might have been.
4    Q.  Again, if we look at the first page
5  of this memo, we see that it was from a Gregory
6  M. Snow, the vice president of financial
7  services.
8    As I recall your testimony, Greg
9  Snow was one of the people you worked with in
10  connection with doing your audit work for
11  fiscal year 1996?
12    A.  I remember meeting with him, I
13  believe, at least on one occasion.
14    Q.  And did you have occasion to work
15  with other members of the group for which he
16  was the vice president, that is, financial
17  services?
18    A.  I'm not sure. I don't know.
19    Q.  You may recall earlier today we
20  looked at some exhibits where we saw that there
21  were no write-offs for a period of time. Do
22  you recall that?
23    A.  I do recall those exhibits.
24    Q.  Based on this exhibit that we're
25  now looking at, Exhibit 905, does that refresh

Page 333

1  your recollection that a policy may have been
2  established regarding the write-offs of certain
3  balances?
4    A.  No, it does not refresh my
5  recollection.
6    Q.  Mr. Christian, let me hand you what
7  I'll mark as Exhibit 4033 and ask you to take a
8  look at that document, if you would.
9    - - - - -
10    (Thereupon, Deposition Exhibit 4033
11    was marked for purposes of
12    identification.)
13    - - - - -
14    A.  (Witness reviewing document.)
15    Q.  Have you had a chance to review
16  what has been marked as Exhibit 4033?
17    A.  Yes, I have.
18    Q.  And this is a -- well, this
19  document is titled, "Working Paper Name:
20  Interim Balance Sheet Antilytics." Do you see
21  that?
22    A.  I do see that.
23    Q.  And the working paper type is,
24  again, one of those O-L-E's or OLE's?
25    A.  I see that.

Page 334

1    Q.  If we look at the last page, it
2  indicates it was completed by Brian Christian?
3    A.  That's what it says.
4    Q.  And reviewed by Amy Frazier?
5    A.  Yes.
6    Q.  And last modified by Amy Frazier as
7  well, right?
8    A.  It has her name in the modification
9  history. I don't know if that means that
10  that's the last person who modified it.
11    MR. McDONOUGH: Is there anything
12  that you have that suggests that Page 15500
13  relates to what precedes it?
14    MR. COGAN: Other than that's what
15  I'm told.
16    MR. McDONOUGH: Okay. Well, it is
17  at least not in the same format we've been
18  dealing with throughout the prior part of this
19  deposition.
20    Q.  And you'll notice that this relates
21  to the 6/30/97 fiscal year, does it not?
22    A.  That's what I see at the -- on the
23  first page is 6/30/97.
24    Q.  And you continued, I take it, to
25  work on the AHERF account with respect to the

18 (Pages 331 to 334)

Brian Christian                    Volume II

Page 335

1  fiscal year 1997 audit?
2      A.   Yes, I did.
3      Q.   Turn, if you would, to the page
4  that is Bates stamped 15498.  And do you see
5  that there is a heading there, "C-Patient
6  Accounts Receivable"?
7      A.   Yes, I do see that.
8      Q.   Would you just take a minute to
9  review, please.
10     A.   To review --
11     Q.   Item C there.
12     A.   The whole item?
13     Q.   Yes, just as it appears on that
14  page.
15     A.   Okay.
16         (Witness reviewing document.)
17         MR. KRUSKO:  Brian, it  also
18  carries over to the next page.
19         MR. COGAN:  I know that.
20         MR. KRUSKO:  I understand that for
21  purposes of your question.  I'm just directing
22  Brian there's more that carries over to the
23  next page.  He should read that for context.
24     Q.    Have you had a chance to review
25  what is Section C, the patient accounts

Page 336

1  receivable?
2      A.   Yes.
3      Q.   Now, does that appear to be an
4  entry that was prepared by AHERF personnel or
5  does that appear to be an entry created by
6  Coopers & Lybrand?
7      A.   The entry C?
8      Q.   Yes.
9      A.   The dialogue that is in here?
10     Q.   Correct.
11     A.   I believe it would have been
12  something that was created by C&L personnel.
13     Q.   And directing your attention to the
14  sentence that appears underneath the chart in
15  Section C that begins, "the decrease."  Do you
16  see that?
17     A.   I see that.
18     Q.   It says, "the decrease of patient
19  A/R relates to approximately $23 million of
20  receivables that were charged off as a
21  valuation allowance versus a reduction to the
22  bad debt reserve.  We do not agree, however,
23  with management's presentation of the value
24  allowance as a component of net assets."  And
25  then it continues on.  Do you see that?

Page 337

1      A.   I do see that.
2      Q.   Do you recall having had any
3  discussion with anyone on the C&L audit team
4  regarding the charge-off of $23 million of
5  receivables as a valuation allowance as opposed
6  to a reduction in the bad debt reserve?
7      A.   No, I do not.
8      Q.   If, in fact -- well, let me ask you
9  this.  Would this charge-off of approximately
10  $23 million indicate that AHERF believed that
11  some $23 million in accounts receivables were
12  not going to be collected?
13     A.   I could assume that, but I can't
14  say for sure.
15     Q.   And if the write-off was
16  accomplished by a charge to the valuation as
17  opposed to the reduction in the bad debt
18  reserve, would that indicate that AHERF
19  believed that it needed to write-off the
20  $23 million because they had not been accounted
21  for as either contractual allowance or bad debt
22  reserve?
23         MR. McDONOUGH:  Object to form.
24     A.   I don't understand.  Could you
25  repeat that.

Page 338

1      Q.   Maybe it wasn't the best question.
2  See if I can improve upon it.
3         If you were going to write off
4  receivables of $23 million, would not the
5  typical GAAP approach be to make a charge to
6  the bad debt reserve?
7      A.   I'm not sure.
8      Q.   If management was writing off the
9  $23 million in receivables as a valuation
10  allowance, would that indicate to you that they
11  did -- that management believed it had not
12  sufficiently reserved for that write-off?
13     A.   I don't know.
14     Q.   Based upon your experience, was it
15  consistent with GAAP to write off accounts
16  receivables by making a charge to the valuation
17  allowance?
18     A.   I don't know.
19     Q.   Now, was any effort made to
20  determine whether these $23 million that were
21  charged off as a valuation allowance were
22  uncollectible as of 6/30/97?
23     A.   Was any effort made to determine
24  the $23 million that was charged off?  Could
25  you run through that again, I'm sorry.

19 (Pages 335 to 338)

Brian Christian                    Volume II

---

**Page 419**

1      Mr. Christian, look at the next
2  exhibit marked yesterday, 4022. This work
3  paper is shown as being, quote, "completed by,"
4  close quote, you, correct?
5      A.   From looking at the document, I can
6  see my name is by the "completed by."
7      Q.   Just paging through this work
8  paper, Mr. Christian, is all this material in
9  the work paper created by you?
10     A.   No.
11     Q.   Does this work paper indicate that
12 it was seen and, in fact, modified by other
13 members of the audit team who were your
14 superiors?
15         MR. COGAN:  Objection.
16     A.   Yes, because I can see Mark
17 Kirstein's name on there.
18     Q.   Does it indicate that it was
19 reviewed by Mr. Kirstein?
20     A.   Yes.
21     Q.   Let's go to the next exhibit, 4023.
22 Is this a work paper that is shown as, quote,
23 "completed by," close quote, you?
24     A.   Yes.
25     Q.   Perusing through it, does this

---

**Page 420**

1  appear to be a work paper containing
2  information created solely by you?
3      A.   No.
4      Q.   Does the work paper indicate that
5  it was modified by other members of the
6  engagement team?
7          MR. COGAN:  Objection.
8      A.   Yes.
9      Q.   Does it show that it was reviewed
10 by other members of the engagement team?
11     A.   Yes.
12     Q.   Let's do one more.  We won't beat a
13 dead horse, Mr. Christian, but Exhibit 4024,
14 another work paper, correct?
15     A.   Yes.
16     Q.   Shows, quote, "completed by," close
17 quote, you, correct?
18     A.   Yes.
19     Q.   Perusing through what's attached to
20 that work paper, is that all created by you?
21     A.   I don't believe so.
22     Q.   Does the work paper indicate that
23 it was actually modified by other members of
24 the C&L engagement team?
25     A.   Yes.

---

**Page 421**

1      Q.   Does it indicate it was reviewed by
2  Mr. Kirstein, your supervisor?
3      A.   Yes.
4      Q.   Without going through every exhibit
5  here, Mr. Christian, is that typical of the
6  exhibits you saw that you were asked questions
7  about, as if you completed the work paper and
8  you did all the work with respect to them?
9          MR. COGAN:  Objection.  Foundation.
10 Leading, which every question has been.
11     Q.   Well, let's do it the hard way, Mr.
12 Christian.  Let's look at the next exhibit,
13 Exhibit 4025.  It's a work paper, right?
14         MR. COGAN:  Objection.  Leading.
15     Q.   Well, Mr. Christian, let me solve
16 that problem the hard way.  What is this a copy
17 of?
18     A.   It's a work paper.
19     Q.   Who is it completed by?
20     A.   My name is in the "completed by"
21 box on this document.
22     Q.   Does it show that it was modified
23 by other members of the C&L engagement team?
24     A.   Yes.
25     Q.   Does it show it was reviewed by

---

**Page 422**

1  Mr. Kirstein?
2      A.   Yes.
3      Q.   Look at the -- let's see.  Just to
4  make this clear, this was a previously marked
5  Exhibit 1587.  What is it, Mr. Christian?
6      A.   I believe it's a work paper.
7      Q.   Does it show that other people from
8  the C&L engagement team either modified it or
9  reviewed it or both?
10     A.   Yes, it does.
11     Q.   4028, what is it, Mr. Christian?
12     A.   It's a work paper.
13     Q.   Does it show it was completed by
14 you?
15     A.   Yes, it does have my name in the
16 "completed by."
17     Q.   Does it appear that others on the
18 C&L engagement team are shown as having
19 modified it and reviewed it?
20     A.   Yes.
21     Q.   You're not the only one who worked
22 on this work paper, Mr. Christian?
23     A.   No.
24     Q.   Let's go to Exhibit 4030.  What is
25 it?

---

40 (Pages 419 to 422)

Brian Christian                                  Volume II

---

Page 423

1      A.  It's a work paper.
2      Q.  Shown as, quote, "completed by,"
3  close quote, you, correct?
4      A.  Yes.
5      Q.  Does it indicate on its face that
6  it was modified and reviewed by another member
7  of the C&L engagement team?
8          MR. COGAN:  Objection.
9      A.  Yes.
10     Q.  Who was your superior during the
11  1996 audit, correct?
12     A.  Yes.
13         MR. COGAN:  Objection.
14     Q.  To whom you reported during the
15  1996 audit, correct?
16         MR. COGAN:  Objection.
17     A.  Yes.
18     Q.  Mr. Christian, were you asked any
19  of these questions during your direct
20  examination here about what appears on the face
21  of these documents in terms of other people who
22  reviewed these and other people who modified
23  them?
24         MR. COGAN:  Objection.  The record
25  will speak for itself.

---

Page 424

1          MR. McDONOUGH:  It will.  I'll
2  withdraw that.
3          MR. COGAN:  And it will, because
4  the very first document I had specific
5  discussions with him on the issue of
6  modifications, and the record will show that.
7          MR. McDONOUGH:  Well, quit while
8  you're ahead.  I withdrew the question.
9      Q.  Mr. Christian, look at
10  Exhibit 4031.  What is it?
11     A.  It's a work paper.
12     Q.  Does it show that you were the sole
13  person who looked at the work paper?
14     A.  No, it does not.
15     Q.  Does it indicate it was modified by
16  Mr. Kirstein?
17     A.  Yes.
18     Q.  Does it indicate it was reviewed by
19  Mr. Kirstein?
20     A.  Yes, it does.
21     Q.  Was he your supervisor during the
22  1996 audit, or one of them?
23     A.  Yes.
24     Q.  Look at Exhibit 4033, if you will.
25  What is it?

---

Page 425

1      A.  It's a work paper.
2      Q.  Is this with respect to the
3  '97 audit?
4      A.  Yes.
5      Q.  Looking at the last page, does it
6  show that it was, quote, "completed by," close
7  quote, you?
8      A.  Yes, it does.
9      Q.  Does this appear, Mr. Christian,
10  this work paper, does it appear to contain only
11  your work?
12     A.  I don't think it's just only my
13  work in here.
14     Q.  Does the work paper itself indicate
15  that it was modified and reviewed by other
16  members of the engagement team to whom you
17  reported?
18     A.  Yes, it does.
19     Q.  Let's look at Exhibit 4034.  This
20  work paper shows -- I'm sorry.  What is this?
21     A.  It's a work paper.
22     Q.  Turning to the third page, which
23  appears to be the middle of this exhibit.  Does
24  it indicate this work paper was, quote,
25  "completed by," close quote, you?

---

Page 426

1      A.  The third page?  What's the Bates
2  stamp?
3      Q.  I'm sorry, it's the fourth page in.
4  It would be Page 15504.
5      A.  Okay.
6      Q.  Does it show this work paper was,
7  quote, "completed by," close quote, you?
8      A.  Yes.
9      Q.  Looking at this work paper, Mr.
10  Christian, does it appear to contain only your
11  work?
12     A.  I don't know that I can say it's
13  only my work on this work paper.
14     Q.  Okay.  Looking at Exhibit 4035,
15  what is it?
16     A.  It's a work paper.
17     Q.  Does it show that it was, quote,
18  "completed by," close quote, you?
19     A.  Yes, it does.
20     Q.  Does it show that it was modified
21  by other members of the C&L engagement team?
22     A.  Yes.
23     Q.  Looking at 4038, what is this, Mr.
24  Christian?
25     A.  It's a work paper.

---

41 (Pages 423 to 426)

Brian Christian                              Volume II

Page 427

1      Q.    Does it show that it was, quote,
2   "completed by," close quote, you?
3      A.    Yes.
4      Q.    Does it indicate that it was
5   modified and reviewed by other members of the
6   C&L engagement team?
7      A.    Yes.
8      Q.    Exhibit 4039. What is this, Mr.
9   Christian?
10     A.    It's a work paper.
11     Q.    Does this show that this was even
12  completed by you?
13     A.    No.
14     Q.    Does it show that you last modified
15  it?
16     A.    Yes.
17     Q.    Does it indicate that the work
18  paper was completed by someone else on the C&L
19  engagement team?
20     A.    Yes, it does.
21     Q.    Do you recognize that individual?
22     A.    I recognize the name.
23     Q.    Is that someone who worked as part
24  of the engagement team on the 1997 AHERF audit?
25     A.    I believe, yes, Kristen Heinlein

Page 428

1   did work on the audit in 1997.
2      Q.    Now, Mr. Christian, I would like
3   you to turn back in this group of exhibits to
4   4027, which is not a computerized work paper.
5   It's one of the thicker ones.
6          Mr. Christian, do you recall being
7   shown this exhibit earlier today?
8      A.    I believe it was earlier today.
9      Q.    And do you recall that you
10  identified the handwriting on the cover page on
11  this pouch as being yours?
12     A.    I believe that it is my
13  handwriting.
14     Q.    Now, Mr. Christian, do you also
15  recall being taken through -- turn to Page 9929
16  as an example. Do you recall being taken
17  through a number of patients by name entered on
18  this page with respect to the date of the final
19  bill and the amount of the receivable?
20     A.    Yes.
21     Q.    Now, at the top of this page, does
22  this page contain an indication as to whether
23  this relates to an outpatient or inpatient
24  accounts receivable?
25     A.    From reading the top of the page,

Page 429

1   it indicates, it says, "final bill date,
2   inpatient accounts receivable."
3      Q.    Okay. I believe another page you
4   were referenced to is 9932. What does that
5   indicate at the top of the page?
6      A.    "HUH Fiscal Year '96 Report,
7   balances greater than 100,000, 90 days from
8   final bill date, inpatient accounts
9   receivable."
10     Q.    Does the top of the page indicate
11  in the typed area that this -- that this deals
12  with inpatient accounts receivable?
13     A.    That's what it says on the report.
14     Q.    Now, let's go back to the note that
15  you wrote on the cover of this page, which you
16  were asked to read.
17         Does your note on this page relate
18  to inpatient accounts receivable or outpatient
19  accounts receivable?
20     A.    I believe that it relates to
21  outpatient, because I have an abbreviation, OP,
22  which I believe is outpatient accounts.
23     Q.    Is outpatient accounts, in your
24  experience in auditing hospitals, a different
25  category than inpatient accounts?

Page 430

1      A.    Yes.
2      Q.    Now, Mr. Christian, every once in a
3   while you get asked a really easy question. As
4   we sit here today, is this October of 2003?
5      A.    Yes, it is.
6      Q.    Now, you were asked a long series
7   of questions about work you did on the 1996
8   audit activities for AHERF. How long ago was
9   that from today?
10     A.    That work would have been performed
11  more than seven years ago. Seven years, plus.
12     Q.    You were asked a smaller number,
13  but still a number of questions regarding the
14  1997 audit work that you did. How long ago
15  would that have been that you did that work
16  from today?
17     A.    Six plus years.
18     Q.    How long has it been since you did
19  any work on any aspect of any AHERF activity?
20     A.    It's got to be approximately --
21  more than four years, almost five years.
22     Q.    Mr. Christian, turn, if you would,
23  to Exhibit 4035.
24         Do you recall, Mr. Christian, being
25  asked some questions about the hours that you

42 (Pages 427 to 430)

DEPOSITION ERRATA SHEET

RE:    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
       ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION v.
       PRICEWATERHOUSE COOPERS, L.L.P.


I, Brian Christian, wish to make the following amendments, additions, deletions or
corrections to my deposition given on October 13-14, 2003, for the following reasons. I
have signed my name to the errata sheet and authorize you to attach it to the original
transcript.

| Page:Line(s) | Change |
|---|---|
| 49:8 | Change "laid out of sort of" to "laid out as sort of" to correct typo. |
| 49:19 | Change "patient comes through door" to "patient comes through the door" to correct typo. |
| 123:17-18 | Change "I don't understand what I would do with it" to "I don't understand the question" for clarity of record. |
| 129:25 | Change "I don't remember visiting" to "I don't remember visiting any of those entities, other than HUH" for clarity of record. |
| 190:16 | Change "I believe" to "I believe so" for clarity of record. |
| 221:15 | Change "I would gather I would look at" to "I would gather and look at" for clarity of record. |
| 411:2-3 | Change "There would have been a partner on , I believe there were two managers" to "There would have been a partner on this engagement and I believe there were two managers" for clarity of record. |

413:9-10          Change "the managers on the and the partner on the job" to "the
                  managers on the job and the partner on the job" for clarity of
                  record.

In all other respects, the transcript is true and correct.

_Brian Christie_
Signature

_12/2/03_
Date

Brian Christian

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                Civil Action

                Plaintiff,    No. 00-684

                Vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

                Defendant.


        Videotape deposition of BRIAN

CHRISTIAN, called for examination under the

statute, taken before me, Jaci R. Traver, RPR,

CRR, and Notary Public in and for the State of

Ohio, at the offices of Jones Day, 500 Grant

Street, Suite 3100, Pittsburgh, Pennsylvania,

on Monday, the 13th day of October 2003 at 9:04

a.m.


                - - - -

Brian Christian

Page 150

1  its bad debt reserves?
2     A.   I believe at some point in time, if
3  I was auditing patient accounts receivable, I
4  would have done that. I would have determined,
5  you know, what was their methodology of
6  reserving for bad debt.
7     Q.   I think at the outset of the
8  deposition I understood your testimony to be
9  that one of the purposes in auditing of
10  accounts receivables is to determine whether
11  the accounts receivable are being reported at
12  their net realizable value on the balance
13  sheet. Do you recall that?
14     A.   I believe so.
15     Q.   And in order to determine whether
16  the accounts receivables are being reported at
17  their net realizable value, you would have to
18  know what the bad debt reserve is, would you
19  not?
20     A.   I believe that's the case.
21     Q.   And in order to know whether
22  management's estimates of the bad debt reserves
23  was reasonable, would you not have to know the
24  method by which they calculated the bad debt
25  reserve?

Page 151

1     A.   I believe so.
2     Q.   Now, in connection with the audit
3  of AHERF in fiscal year 1996, would you have
4  been the person determining the methodologies
5  that were being utilized to calculate the bad
6  debt reserves at the various AHERF entities, or
7  was that somebody else's responsibility?
8     A.   Would I have been the person
9  that -- could you restate that, I'm sorry.
10     Q.   I'm wondering, did you do the --
11  did you determine the methodologies that were
12  being used by management to calculate the bad
13  debt reserves at the various AHERF entities, or
14  did somebody else do that?
15     A.   I didn't make a determination of
16  the methodologies they were using. That was
17  management's decision to determine what
18  methodology they used.
19         I would have simply -- I would have
20  looked at what management determined and said
21  if it was -- said it was reasonable or not
22  reasonable and passed that on to my superiors
23  to see what their opinion of it is.
24     Q.   So you would have wanted to
25  understand the methodology that was being

Page 152

1  utilized, would you not?
2     A.   That would be my guess, because I
3  don't think there would be any other way that I
4  would be able to understand what they were
5  doing.
6     Q.   So as part of the audit then, is it
7  fair to say that you did come to an
8  understanding as to how management was
9  calculating the bad debt reserves?
10     MR. McDONOUGH: Object to form.
11  Asked and answered.
12     A.   In auditing patients accounts
13  receivable, I believe I may have come to the
14  determination -- I may have come to some sort
15  of understanding of how the methodology -- how
16  they developed their methodology. I don't
17  specifically remember working on AHERF.
18     Q.   With respect to AHERF, do you ever
19  recall having any concerns as to the
20  reasonableness of the bad debt reserves?
21     A.   I don't remember.
22     Q.   Do you recall ever raising any
23  questions in connection with how the bad debt
24  reserves were being calculated at any of the
25  AHERF entities?

Page 153

1     A.   I don't remember.
2     Q.   Let me hand you, Mr. Christian,
3  what we'll mark as Exhibit 4022, and ask you to
4  take a look at this, if you would.
5         - - - - -
6         (Thereupon, Deposition Exhibit 4022
7         was marked for purposes of
8         identification.)
9         - - - - -
10     A.   (Witness reviewing document.)
11     Q.   While the witness is looking at it,
12  for the record, what has been marked as
13  Exhibit 4022 is a document bearing Bates stamp
14  CL004240 through 4284.
15         Have you had an opportunity to at
16  least briefly review Exhibit 4022?
17     A.   Yes.
18     Q.   Is Exhibit 4022 a work paper that
19  you prepared?
20     A.   In looking at the document in front
21  of me, I believe that I prepared it, because it
22  has my name in "completed by."
23     Q.   In this instance, the entry, unlike
24  the two earlier work papers we looked at that
25  said, "created by," this one says, "completed

39 (Pages 150 to 153)

Brian Christian

Page 154

1  by"; is that correct?
2      A.  Yes.
3      Q.  Is there a difference in your
4  understanding to whether a document is
5  designated "created by" or "completed by"?
6      A.  Not really.
7      Q.  You'll notice down at the very
8  bottom of the first page it says, "modification
9  history," and then your name appears there.
10     A.  Okay.
11     Q.  What does that signify?
12     A.  I'm really not sure.
13     Q.  This work paper indicates that it
14  relates to major payor A/R greater than 180
15  days; is that right?
16     A.  Repeat that, I'm sorry.
17     Q.  Well, why don't you, if you could,
18  do you see the line, "working paper name:"?
19     A.  Okay.
20     Q.  What is the working paper name?
21     A.  AHERF major payor A/R greater than
22  180 days.  Okay.
23     Q.  With respect to putting together a
24  working paper of major payor accounts
25  receivables greater than 180 days, is there any

Page 155

1  significance to the time frame of greater than
2  180 days?
3      A.  None that I can really think of.
4      Q.  Did you decide to do the analysis
5  of accounts receivables greater than 180 days
6  or did somebody task you to do that?
7      A.  I'm not sure.  I don't remember.
8      Q.  What was the purpose of compiling
9  this information on major payor accounts
10  receivables that were greater than 180 days?
11     A.  I don't know.
12     Q.  Let's go to the next page which
13  bears the Bates stamp CL004241.  Do you see
14  that?
15     A.  Yes.
16     Q.  Am I correct in understanding that
17  the hospitals whose accounts you are reviewing
18  appear at the top of the page?
19     A.  Meaning under the AHERF
20  consolidated, that line, the next line below
21  it?
22     Q.  Yes.
23     A.  I believe that that's the case.
24     Q.  Then on the left-hand margin you
25  have listed the payors, the various payor

Page 156

1  categories?
2      A.  I believe that's the case, from
3  looking at this document, yes.
4      Q.  In addition to listing the amount
5  of the payors greater than 180 days, you also
6  set forth the reserve amount; is that right?
7      A.  I don't set forth the reserve
8  amount.  If this was a document that was
9  prepared, I have a feeling it was prepared by
10  the client and they would have included what
11  the category was, what the reserve was.  But I
12  don't remember putting together this work
13  paper, so I would have to assume that it was
14  the client that did this.
15     Q.  Okay.  And assuming that the client
16  put this document together, I take it you would
17  review the document, though; is that correct?
18     A.  I don't remember reviewing this
19  document.
20     Q.  I'm sorry?
21     A.  I don't remember reviewing this
22  document.
23     Q.  Do you have any reason to doubt
24  that you would have reviewed this document as
25  part of the audit of the accounts receivables

Page 157

1  in 1996?
2          MR. McDONOUGH:  Object to the form.
3      A.  I really have no idea.
4      Q.  Well, let's turn to the -- let me
5  stay on that second page, that CL004241.
6          The first line with actual revenue
7  figures is St. Chris inpatient greater than 180
8  days to, and then it says, dash 36.  Do you see
9  that?
10     A.  I see that.
11     Q.  And do you understand that to mean
12  St. Chris inpatient greater than 180 days, up
13  to 360 days?
14     A.  From looking at the work paper, I
15  would guess that that's what it is, given it
16  says, greater than 180 days to dash 36, I would
17  guess that's what it would be.
18     Q.  You'll see the next column says,
19  St. Chris inpatient greater than 360 days.
20     A.  I see that.
21     Q.  And then there is the same sort of
22  information tabulated for outpatient, 180 days
23  to 360, and then greater than 360, right?
24     A.  Okay.
25     Q.  Now, would you at some time have

40 (Pages 154 to 157)

Brian Christian

Page 202

1    A.   No, I don't.
2    Q.   Do you recall whether there was
3  generally a concern as to the way in which the
4  hospitals in the east were calculating the bad
5  debt reserve?
6    A.   No, I do not.
7    Q.   After you had done your work in
8  connection with the audit of accounts
9  receivables for 1996, did you believe that the
10 accounts receivables were being reported at
11 their net realizable value?
12   A.   I don't remember.
13   Q.   In connection with the work that
14 you did in 1996, did you have -- did you
15 express any concern that the accounts
16 receivables were not being reported at their
17 net realizable value?
18   A.   I don't remember expressing that
19 concern.
20   Q.   Again, sir, if -- what would you
21 turn to to refresh your recollection as to
22 whether or not you had any concerns with
23 respect to the manner in which the way the bad
24 debt reserves were being calculated?
25       MR. McDONOUGH:  Object to form.

Page 203

1  Sorry.  Go ahead.
2    A.   What would I turn to now or --
3    Q.   Yeah, I guess I'm just trying to
4  figure out if there's anything out there that
5  would refresh your recollection, and if so, if
6  you could tell me what it would be.
7        MR. McDONOUGH:  Same objection.
8    A.   I have no idea.
9    Q.   I understand that you didn't
10 analyze the individual buckets and the
11 percentages used with respect to each
12 individual bucket, but how would you go about
13 or how did you go about just generally
14 analyzing the reasonableness of the bad debt
15 reserve methodologies that were being used?
16       MR. McDONOUGH:  Object to form.
17   A.   I don't know.  I don't remember.
18   Q.   Was it your responsibility in
19 connection with the 1996 audit to at least do
20 the preliminary work with respect to the
21 analysis of the bad debt reserve?
22       MR. McDONOUGH:  Object to form.
23   A.   It may have been.  It may have
24 been, if there was some sort of an analysis to
25 be performed, it may have been, but I really

Page 204

1  don't remember.
2    Q.   Would it be the case in the audit
3  of an institution such as AHERF that you would
4  not have engaged in some analysis of the
5  methodologies used to calculate the bad debt
6  reserves?
7        MR. McDONOUGH:  Objection.  Just
8  asked and answered.
9    A.   Could you repeat that.  I'm sorry.
10       MR. COGAN:  Could you read the
11 question back.
12       (Record repeated.)
13   A.   I would guess that we would
14 have -- that we would have reviewed what
15 the client's methodology was.
16   Q.   Why would you do that?
17       MR. McDONOUGH:  Object to form.
18   A.   To gain an understanding of how
19 they come about with their reserve, how the
20 client would come about the reserve.  I mean,
21 you would have to have some understanding of
22 it.
23   Q.   And how did you do that analysis?
24       MR. McDONOUGH:  Object to form.
25   A.   I honestly do not remember.  It was

Page 205

1  seven years ago.
2        - - - - -
3        (Thereupon, Deposition Exhibit 4024
4        was marked for purposes of
5        identification.)
6        - - - - -
7    Q.   Mr. Christian, I'll hand you
8  what's been marked as Exhibit 4024.  Ask
9  you to take a look at that, if you would,
10 please.
11   A.   (Witness reviewing document.)
12   Q.   Have you had a chance to look at
13 Exhibit 4024?
14   A.   Yes.
15   Q.   Is that, again, a working paper
16 that you completed?
17   A.   From looking at the document, it
18 has my name in the "completed by" section.
19   Q.   And the working paper name is
20 "AHERF Subsequent Receipts Summary."  Do you
21 see that?
22   A.   Yes, I do see that.
23   Q.   And, again, this indicates the
24 working paper is an OLE, so that would have
25 been a link to a client-prepared document?

52 (Pages 202 to 205)

Brian Christian

Page 206

1    A.  I believe that's the case.
2    Q.  And is the document to which you
3  had the electronic link what appears as Bates
4    CL000861 to 866?
5    A.  Is what's being linked from -- yes.
6    Q.  Did you do a subsequent receipts
7  testing?
8    A.  I believe I did.  I don't
9  remember -- I don't remember performing that
10  task.
11    Q.  What exactly is a subsequent
12  receipts testing?
13    A.  My understanding of it is if you
14  look at the cash received subsequent to your
15  balance sheet date, the date that you're
16  looking at the receivables, if you look at the
17  cash received on the existing receivables as of
18  that date, you should see collection of them,
19  give you an idea of the collectability of the
20  amount that's on the financial statements as of
21  your balance sheet date.
22    So if you were able to collect a
23  hundred percent of a balance, let's say, over a
24  period of time close to year end, you would say
25  that balance at that date is a hundred percent

Page 207

1  collectible.
2    Q.  So, for example, if we look at 861,
3  and that document is an AGH cash summary; is
4  that right?
5    A.  That's what it says.
6    Q.  Again, the first line across after
7  AGH cash summary, those would be the various
8  payor classes?
9    A.  I believe that's the case.
10    Q.  And then the next line entry shows
11  what the accounts receivable balance was for
12  each of those payors as of June 30, 1996.
13    A.  Okay.  That's what it says.
14    Q.  Is that right?  If we go down, we
15  can just watch what the collections were then
16  between July 1 and July 31st?
17    A.  I believe that's the case.
18    Q.  We have a total line, which would
19  be the total collections during that one-month
20  period, and then we have a remaining balance;
21  is that right?
22    A.  That's what I see.
23    Q.  Now, what use do you make of this
24  information as part of your audit of the
25  accounts receivables?

Page 208

1    A.  What use do I make of this
2  information?
3    Q.  Yeah.  Or let me put it to you, why
4  do you do the subsequent receipts testing?
5    A.  I believe because it gives you a
6  better picture as to the collectability of a
7  balance as of a certain date.  Because if
8  you're receiving cash on your A/R, that means
9  it's a valid A/R.  It's not just something
10  that's sitting out there that will never be
11  collected.
12    Q.  So what would you interpret or
13  construe from that first Blue Cross line that
14  we just reviewed?
15    A.  I don't know that I would interpret
16  anything.  I interpret that based on this
17  schedule, they received $8,257,229 worth of A/R
18  over that first month period.
19    Q.  Would you have had any discussions
20  with anybody at AGH regarding why they hadn't
21  collected more on A/Rs from Blue Cross during
22  that 30-day period?
23    A.  I don't know that I would have.
24    Q.  Let's go to the next page, which is
25  a Center City cash summary.  And it covers the

Page 209

1  same time period, does it not?
2    A.  I believe so.
3    Q.  In other words, we're looking at
4  the account receivable balance at June 30, 1996
5  and then cumulating payments from July 1
6  through July 31st?
7    A.  Okay.
8    Q.  Is that right?
9    A.  Yes.
10    Q.  Now, in this instance I see that
11  the Center City cash balance was $19,454,638;
12  do you see that?
13    A.  Yes.
14    Q.  And total collections during that
15  period on the Blue Cross account was
16  $2,873,327; is that right?
17    A.  I see that.
18    Q.  Which left a balance of $16.5 plus
19  million, right?
20    A.  I see that.
21    Q.  When you saw that, did that cause
22  you some concern as to whether Center City was
23  collecting its accounts receivables in a timely
24  manner?
25    A.  I don't remember if it did or not.

53 (Pages 206 to 209)

Brian Christian

Page 214

1    Q.   Yes.
2    A.   I don't remember.
3    Q.   Let me go back, and I apologize,
4    but I have some confusion.
5         Do you have an understanding as to
6    what the purpose is of subsequent receipts
7    testing?
8    A.   I believe -- what I described
9    earlier was it gives you a picture of a
10   potential collectability of an amount as of a
11   specific date by looking at the receipts, cash
12   that would have come in the door in a period
13   subsequent to that date. So it gives you an
14   idea of how much of that amount is actually
15   collectible.
16   Q.   And looking at Page 862, where we
17   see Blue Cross collections of approximately
18   2.8 million, would that have raised concerns
19   about the potential collectability of the Blue
20   Cross account receivable balance?
21        MR. McDONOUGH: Objection. Asked
22   and answered twice.
23   A.   It may or may not have.
24   Q.   What other test, in addition to the
25   subsequent receipts testing, would you perform

Page 215

1    to better understand whether the accounts will
2    be collectible?
3    A.   I would guess a number of tests. I
4    would guess you might also look at collections
5    over another period of time, not just
6    subsequent to the end of the year. You might
7    take a look at their agings and see if,
8    perhaps, there was -- the buckets were becoming
9    more towards the -- the accounts were getting
10   older and older. I would guess I would look at
11   a number of issues.
12   Q.   With respect to those tests that
13   you have identified, did you look at
14   collections over other periods of time in order
15   to determine the potential of the
16   collectability of the accounts receivables?
17   A.   I don't remember.
18   Q.   And do you remember, as an
19   additional test, looking at the aging buckets,
20   as you described it?
21   A.   I don't remember.
22   Q.   Based upon the information that you
23   had pulled together and provided to your
24   supervisors, did any of your supervisors
25   express any concern about the collectability of

Page 216

1    the accounts receivables?
2    A.   I don't remember that as being -- I
3    don't remember.
4    Q.   Do you recall having any
5    discussions with your supervisors on the
6    subject of whether the accounts receivables
7    were stated at their net realizable value?
8    A.   No, I don't remember.
9         - - - - -
10        (Thereupon, Deposition Exhibit 4025
11        was marked for purposes of
12        identification.)
13        - - - - -
14   Q.   Mr. Christian, let me hand
15   you what I'll mark as Exhibit 4025.
16   A.   (Witness reviewing document.)
17   Q.   Have you had a chance to look at
18   Exhibit 4025?
19   A.   Yes.
20   Q.   And, again, this is a work paper
21   that you completed?
22   A.   I believe so, because it has my
23   name by the "completed by" box on the work
24   paper.
25   Q.   And as I would understand it, this

Page 217

1    work paper, which has been marked as
2    Exhibit 4025, relates to patient accounts
3    receivable for Center City, correct?
4    A.   That's what it says.
5    Q.   Of course, that was one of the
6    subsequent receipts testing that we were just
7    reviewing was for Center City, was it not?
8    A.   I believe that's the case.
9    Q.   The work paper indicates, "perform
10   the following to ascertain that the hospital is
11   properly accounting for high-dollar accounts."
12   Do you see that?
13   A.   Yes.
14   Q.   And then it lists a number of
15   different tasks that need to be completed, four
16   of them, right?
17   A.   I see that.
18   Q.   And would you have performed those
19   tasks?
20   A.   I don't remember if I did or not.
21   Q.   Would there have been somebody who
22   would have been working for you that would have
23   done these tasks?
24   A.   I'm not sure.
25   Q.   Do you recall during the time that

55 (Pages 214 to 217)

Brian Christian

Page 218

1  you were working on the 1996 audit whether you
2  had anybody supporting you in your work?
3      A.   There may have been somebody on odd
4  occasions that they would be footing things,
5  you know, maybe agreeing certain items at
6  certain times, but I can't remember what tests
7  they would have performed.  It might have been
8  some of the associates that we had on the job,
9  but I don't remember a specific event where
10  they -- you know, we assigned a duty to them.
11  It's a possibility.
12      Q.   But with respect to the '96 audit,
13  was anybody reporting to you?
14      A.   No.
15      Q.   Do you recall that there were
16  occasions that you would have gone to
17  Mr. Kirstein or Ms. Frazier and asked for
18  assistance in completing a task?
19      A.   Asked for assistance, asked for
20  their assistance?
21      Q.   No.  Asked that they provide you
22  with an additional associate help in order to
23  complete an audit task.
24      A.   Not necessarily.  It could be -- it
25  could have been as informal as asking the

Page 219

1  in-charge on the job is somebody, you know,
2  working on something can they spare five
3  minutes.  It could be as informal as at the end
4  of the day asking an associate, hey, do you
5  have a couple minutes to help me out with
6  footing something or agreeing something.  It
7  could be that informal.
8      Q.   Okay.  With respect to the four
9  tasks that are identified in Exhibit 4025,
10  would you approach asking somebody to do one of
11  those tasks in this informal type manner that
12  you've just described?
13      A.   There's a possibility I would do
14  that.
15      Q.   Let's talk about the various tasks
16  that are identified there.  The first one says,
17  "agree client prepared listing for account
18  balances exceeding $200,000 on a test basis to
19  the in-house, DNFB and Final Billed accounts
20  receivable detail at year-end."  Do you see
21  that?
22      A.   I see that.
23      Q.   Now, I take it as you sit here
24  today, you don't recall doing that work?
25      A.   No, I don't.

Page 220

1      Q.   Do you recall the results of that
2  work?
3      A.   No, I don't.
4      Q.   Is that the sort of task that could
5  be completed in five or ten minutes?
6      A.   I don't know.  It depends on how
7  long the listing is.
8      Q.   And with -- and you had no
9  recollection?
10      A.   No.
11      Q.   How about the, "review client
12  summarized information which provides a status
13  update on the accounts through August 23, '96."
14  Do you recall doing that?
15      A.   No, I do not.
16      Q.   Who would have requested the
17  information from the client?
18      A.   Who would have requested what
19  information?
20      Q.   It says, "review client summarized
21  information which provides a status update on
22  the accounts through August 23, 1996."
23          Would somebody have to request that
24  information?
25      A.   I would guess -- it would depend.

Page 221

1  I guess it could have come in a form of a
2  schedule request, it could come in the form of
3  somebody asking for it.
4      Q.   Again, I take it you don't know
5  whether you did that work or not?
6      A.   No, I don't remember.
7      Q.   Item C says, "determine that the
8  appropriate contractual allowances have been
9  taken against these high-dollar accounts."  Do
10  you see that?
11      A.   I see that.
12      Q.   How would you go about determining
13  whether the appropriate contractual allowance
14  had been taken?
15      A.   I would gather I would look at the
16  client's prepared information and determine
17  what allowance had been taken.  And we'd sit
18  down and take a look at what allowance would
19  have been taken at that time.
20      Q.   But once you have determined the
21  allowance that has been taken, how do you
22  determine that it is the appropriate
23  contractual allowance?
24      A.   I guess it would be comparison
25  to -- comparison to, you know, as a percentage

56 (Pages 218 to 221)

Brian Christian

Page 222

1  compared to what else they've been taking in
2  the system.
3      Q.  Is that something that you would
4  have done as part of your audit of accounts
5  receivables?
6      A.  I don't know.  I may have.  It's
7  described here and I signed off the step, but I
8  don't know if I did do that or not.  I don't
9  remember.
10     Q.  Is it your understanding, though,
11 that as part of auditing accounts receivables,
12 one of the tasks is to determine whether the
13 client has taken the appropriate contractual
14 allowances?
15     A.  Would you ask that again, I'm
16 sorry.
17     Q.  Yes.  In auditing accounts
18 receivables, is it necessary for you to
19 determine whether the client has taken the
20 appropriate contractual allowance?
21     A.  I believe so.
22     Q.  And as part of your audit
23 responsibilities in 1996, did you ever make any
24 determination as to whether AHERF was taking
25 the appropriate contractual allowances?

Page 223

1      A.  I didn't make any determination,
2  but I don't know it was ultimately my
3  responsibility to make a determination.
4      Q.  I take it you would have as part of
5  your audit responsibilities compiled
6  information regarding the contractual
7  allowances that had been taken?
8      A.  I'm sorry, say that again.
9      Q.  Would you compile information
10 regarding the contractual allowances that had
11 been taken?
12     A.  I would have -- I would have taken
13 information that the client would have prepared
14 for me and I believe it would have been
15 presented as part of the whole body of my work
16 to my supervisors, who would take a look at it
17 and see if it was reasonable.
18     Q.  Okay.  And then with respect to the
19 decision or the determination as to whether the
20 appropriate contractual allowance had been
21 taken, was that determination up to your
22 supervisors?
23     A.  I think, to determine if it was
24 reasonable, I believe that would be the case.
25     Q.  So you wouldn't have been making

Page 224

1  the decision on reasonableness?
2      A.  I would not have been the final
3  person doing that, no.
4      Q.  If you encountered something that
5  you believed was unreasonable, would you bring
6  that to the attention of your supervisors?
7      A.  If I saw something that was
8  unreasonable, I probably would.
9      Q.  Do you recall ever bringing any
10 information to the attention of your
11 supervisors regarding whether AHERF had taken
12 the appropriate contractual allowances?
13         MR. McDONOUGH:  Object to form.
14     A.  I don't remember.
15     Q.  The last entry that appears on the
16 first page of this work paper under the tasks
17 that need to be done is, "consider the risk
18 that significant unrecorded outliers exist."
19 Do you see that?
20     A.  I see that.
21     Q.  What are unrecorded outliers?
22     A.  At this point, I am not sure.
23     Q.  Do you have any understanding of
24 what work would have been performed in order to
25 determine whether there was a risk of

Page 225

1  significant unrecorded outliers?
2      A.  No, I don't.
3      Q.  Turn, if you would then, to
4  Page 1124.  This is a work paper bearing the
5  Bates number CL001124; do you see that?
6      A.  Yes, I do.
7      Q.  And, again, this is a document that
8  was -- work paper that was completed by you,
9  correct?
10     A.  It is marked completed by me on the
11 page.
12     Q.  And it relates to patient accounts
13 receivable at Center City, right?
14     A.  That's the file section name, yes.
15     Q.  Do I understand that what was to be
16 done was to test old account balances at
17 6/30/96?
18     A.  From looking at this page, it
19 describes reviewing client summary of accounts
20 greater than 90 days with balances exceeding a
21 hundred thousand dollars, and investigating
22 Medicare and Medicaid balances greater than 120
23 days to determine collectability.  So that's
24 what it describes.
25     Q.  What I was looking at, and I wasn't

57 (Pages 222 to 225)

Brian Christian

Page 226

1  very clear, the work paper has items, "Step
2  Name:" Do you see that?
3      A.  I do see that.
4      Q.  The entry there is, "test old
5  account balances at 6/30/96," right?
6      A.  Okay.
7      Q.  And then the balances that -- the
8  old account balances that you were testing are
9  described in the step description, correct?
10     A.  Yes.
11     Q.  And those accounts were accounts
12 that were greater than 90 days old with a
13 balance exceeding a hundred thousand dollars,
14 and then Medicare and Medicaid balances greater
15 than 120 days, right?
16     A.  That's what it says.
17     Q.  Now, would you have been the person
18 to engage in that review?
19     A.  I don't remember.
20     Q.  It also indicates, as part of this
21 step description, to consider reclassifying old
22 Medicare and Medicaid balances to self-pay and
23 including in the bad debt reasonableness test.
24         Do you recall whether you had any
25 involvement in that issue?

Page 227

1      A.  No, I don't recall.
2      Q.  Then the last step description is,
3  "consider uncollectible balances in determining
4  reasonableness of overall accounts receivable
5  allowances." Do you see that?
6      A.  I see that.
7      Q.  And did you have any involvement in
8  considering the uncollectible balances?
9      A.  I do not remember.
10     Q.  Do you recall having any
11 involvement in determining the reasonableness
12 of overall accounts receivable allowances?
13     A.  I do not remember.
14     Q.  Mr. Christian, in terms of
15 preparing for your deposition today, did you
16 meet with anybody and talk about the
17 deposition?
18     A.  Outside of my counsel, or PWC's
19 counsel, no, I have not.
20     Q.  And I take it you did meet with
21 PWC's counsel?
22     A.  Yes.
23     Q.  When did you meet?
24     A.  Last Friday.
25     Q.  For how long did you meet?

Page 228

1      A.  I don't know, five hours, maybe.
2      Q.  And who specifically did you meet
3  with?
4      Mr. McDonough, Mr. Krusko.
5      Q.  During the course of that meeting,
6  did you review any documents?
7      A.  Yes, I believe we looked at some
8  documents.
9      Q.  Did those documents refresh your
10 recollection in any way?
11     A.  No, not really.
12     Q.  Did you see any documents that
13 refreshed your recollection?
14     A.  No.
15     Q.  While you were at Coopers &
16 Lybrand, did you maintain any personal files
17 with respect to the audit work you did on
18 behalf of AHERF?
19     A.  I maintained files for a period of
20 time that I was on the engagement.  And any of
21 the files that I would have maintained were
22 submitted as part of a document submission
23 whenever the -- well, when I left the
24 engagement, but then anything else I searched
25 through my files whenever the bankruptcy

Page 229

1  occurred and all documents were -- that were
2  asked for, I provided.
3      Q.  So if I understood your answer,
4  even after an audit was completed, you may have
5  still had some information relating to AHERF?
6      A.  There is a possibility.
7      Q.  And that was the sort of
8  information that you provided following the
9  bankruptcy?
10     A.  I provided everything that I
11 thought I had, because I was removed from the
12 engagement prior to the bankruptcy.  Whenever
13 the bankruptcy occurred, there was a meeting in
14 the office.  I went back through any of my
15 files to see if there was anything remaining of
16 AHERF.  And I don't remember if I found
17 anything or not, but it all would have been
18 provided and I wouldn't have had anything else
19 after that point in time for sure.
20     Q.  After the bankruptcy -- well, let
21 me back up.
22         You indicated that you were, I
23 think you said, removed from the engagement?
24     A.  Yes.
25     Q.  And when did that occur?

58 (Pages 226 to 229)