**Cohen Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS LLP*

---

## *D. WALTER COHEN, D.D.S.*
*June 2, 2004*

---

*LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

COHEN, D.D.S., D. WALTER



D. Walter Cohen, D.D.S.

tracking of productivity of purchased practices?

A. Well, the people who I think had responsibility for those. Was it Carol Calvert, I think, was one. I know Harry Gottlieb was another. I can't give you any other details.

Q. Do you recall what Ms. Calvert's role was with the system?

A. I thought she played a role in trying to administer some of the practices that were acquired.

Q. Any other recollection as to what her role was with the system?

A. She was part of the administrative team.

Q. Do you have any memory as to the dates during which she was employed by AHERF?

A. It was during the time that the practices had been acquired, which I guess would have been between '96 and '98, I guess.

Q. During the course of your employment at AHERF, did you have any understanding of the source of funds that were used to pay the



D. Walter Cohen, D.D.S.

salaries of AHERF's acquired physicians?

A. No. I know that there was an announcement made by Sherif that $500 million had been set aside to acquire practices. I thought that was Board approved by AHERF. I don't know the source of the funds.

Q. And apart from the funds set aside to acquire practices, do you have any recollection of the source of funds used to pay the salaries of the practices once they were acquired?

A. I thought some of it came from the revenue that the practices generated.

Q. But you don't have any specific recall of those funds, sir?

A. No.

Q. That's a no?

A. I do not.

Q. Dr. Cohen, after the AHERF bankruptcy, were you aware of any efforts to reject contracts of any of the physicians that had been acquired by AHERF in the 1990s?

A. I heard that there might be some physicians who were leaving the system. I



D. Walter Cohen, D.D.S.

don't know who rejected whom.

Q. You had no involvement, sir, in the decisions regarding which practices, if any, to reject?

A. I had no part in that.

Q. Do you know who at AHERF had those responsibilities?

A. No, I don't.

Q. You mentioned earlier this morning that, I believe, University of Pennsylvania, like AHERF, had also engaged in physician practice acquisitions?

A. Yes.

Q. Was the, to your understanding, acquisition of physician practices a common strategy among AHERF's competitors to attempt to combat the rise in managed-care?

A. I think the -- I can't talk about all competitors.

I think University of Pennsylvania and AHERF were sort of in a race to acquire practices, recognizing that this may be one way of offsetting managed-care problems.

Q. Do you recall, sir, any other



D. Walter Cohen, D.D.S.

strategies shared by both AHERF and Penn, for example, to attempt to combat the rise in managed-care?

A. I wasn't that close to Penn. So, you know, I couldn't...

Q. Do you recall that one of the committees of the AHERF Board was the AHERF Audit Committee?

A. Yes.

Q. Do you have a recollection of what the role of that committee was?

A. To review financial statements and work with the auditors in overseeing the financial activities.

Q. Was it your understanding that the AHERF Audit Committee was the primary contact with the auditors during the course of an AHERF year-end audit?

MR. FRIESEN: Objection.

A. Yes.

Q. Do you recall any AHERF Board members who also sat on AHERF's Audit Committee?

A. I don't remember the committees. I

D. Walter Cohen, D.D.S.

could guess.

Q. I don't want you to guess.

A. Okay.

Q. Before joining us here today, Dr. Cohen, have you had any discussions about this deposition with any lawyers from Cravath, Swaine & Moore?

A. No.

Q. And have you had any discussions with lawyers from that firm about this litigation in general?

A. No.

MR. UNICE: I don't have any further questions for you, Doctor.

MR. FRIESEN: I just have a couple of short followups.

BY MR. FRIESEN:

Q. You mentioned Carol Calvert?

A. Yes.

Q. Do you know anything about the circumstances under which Ms. Calvert left AHERF?

A. I don't know anything about the circumstances. I know she was terminated

D. Walter Cohen, D.D.S.

abruptly. And I can't tell you more than that. I just -- she had been a patient of mine, but that's not related.

Q. Without divulging any doctor/patient privileges, did you believe that Ms. Calvert was qualified to have the position that she did at AHERF?

A. I really had -- other than seeing her as a patient, I had very little contact with her as far as her responsibilities in the AHERF system.

You know, I wasn't party to what she was doing or how she was doing it.

MR. FRIESEN: I don't have any further questions. Thank you.

MR. FRYMAN: Thank you. I have no questions.

MR. UNICE: We understand that you don't waive signature; is that right?

MR. FRYMAN: That's correct.

MR. UNICE: Just so it is on the record.

VIDEO SPECIALIST: That now concludes this videotaped deposition and

D. Walter Cohen, D.D.S.

Tape No. 2. The time, 12:08.

(Witness excused.)

(Deposition concluded at 12:08 p.m.)

- - -

INDEX

WITNESS

PAGE

D. Walter Cohen, D.D.S.

By Mr. Friesen 4, 106

By Mr. Unice 86

- - -

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2577 | Minutes of Allegheny Health Services Board of Directors Meeting, 11/6/89 | 35 |
| 2578 | Minutes of AHERF Board Meeting, 3/26/93 | 39 |
| 2579 | Minutes of AHERF Board Meeting, 6/30/93 | 39 |

- - -

I have read the foregoing transcript of my examination given on Wednesday, June 2, 2004, and it is true, correct and complete, to the best of my knowledge, recollection, and belief, except for the corrections noted hereon and/or list of corrections, if any, attached on a separate sheet herewith.

-------------------------
D. Walter Cohen, D.D.S.

Subscribed and sworn to before me this____day of____________________, _____

---------------------------------
Notary Public

I HEREBY CERTIFY that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on Wednesday, June 2, 2004, and that this is a correct transcript of same.

-------------------------
Debra Ann Whitehead

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

A. Cook Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

*ANTHONY M. COOK*
***September 4, 2003***

---

## *LEGALINK MANHATTAN*

***420 Lexington Avenue - Suite 2108***
***New York, NY 10170***
***PH: 212-557-7400 / FAX: 212-692-9171***

COOK, ANTHONY M.

LEGALINK
A WORDWAVE COMPANY

there.

I mean, if it's squeaky clean, and the only observations that are made in the management letter are ones that are correctable and perhaps even one time, then that's acceptable.

But if there are -- if the clean opinion comes with a list of qualifications such that the clean opinion is somewhat negated by those qualifications, then I'm not -- I don't think it is a clean opinion.

If that's answering your question.

Q. Well, maybe we are mixing up our terms here.

An opinion is given on the -- well, let me show you a document. Maybe we can talk about that from using some context here.

Would you take a look at a document that's been previously marked as Exhibit 1001.

A. Do I have that in Debbie's pile?

Q. I don't believe we have actually looked at that. So if you will give me --

MS. MEADEN: We can go off the record here briefly, I will get you a copy of it.

VIDEO SPECIALIST: Off video. The time, 3:58.

(Short recess.)

VIDEO SPECIALIST: Back on. 3:59.

MS. MEADEN: For the record, Exhibit 1001 is a document entitled Fiscal Year 1996 Audited Financial Statements.

BY MS. MEADEN:

Q. And if you would take a look at the fifth page of this document bears Bates No. TN-CBC43B 01577.

A. Uh-huh. Yes.

Q. And it is titled Report of Independent Accountants.

Please review this, and then I will ask you a couple of questions.

A. I have read the letter.

Q. You have seen this before today; correct?

A. Yes.

Q. All right. As I said, the document is titled at the top Report of Independent Accountants. And if you look at the third paragraph of this letter that's addressed to the Board of Trustees of Allegheny Health Education and Research Foundation, and signed by Coopers & Lybrand, LLP, it states, "In our opinion, the consolidated financial statements referred to above present fairly in all material respects the consolidated financial position of Allegheny Health Education Research

Foundation as of June 30, 1996, and the consolidated result of its operations, changes in net assets, and cash flows for the year then ended in conformity with Generally Accepted Accounting Principles."

And my question is, based on your experience on Audit Committees and in business, do you recognize this as an opinion given by an outside auditor, a clean opinion on financial statements?

A. Yes, I do.

Q. And it relates to the fairness and accuracy of financial statements?

A. Correct.

Q. Correct.

Now, when you are talking about qualifications, you are talking about items that are raised in management letters; correct?

A. Correct.

Q. And is it your belief or understanding that the items raised in management letters reflect on the accuracy or fairness of the presentation of an entity's financial statements?

A. No.

MR. LUFT: Objection.

BY MS. MEADEN:

Q. All right.

A. It is not.

Q. Then perhaps I misunderstood your earlier testimony.

You were talking about it being -- a clean opinion being qualified in the management letter, and I am trying to understand what you mean by qualified in a management letter.

A. Well, let me try to answer that question more clearly.

The clean financial statements are very, very important to any entity which has the obligation to use outside auditors or any auditor, inside or outside.

You want a clean opinion on the financials because that's -- that basically says the outside auditor accepts what you have stated to be your financial results over a period. Yes, I do, that is a clean opinion.

What I look for is, in the management letter, what recommended courses, recommended correction courses of actions, et cetera, are contained that in the future will make the clean opinion, the results reporting, even

better.
Q. Okay.
A. Even cleaner.
Q. All right. So you're not saying that any statements contained in a management letter call into question an opinion that may have been given on the financial statements?
A. I am not; I am not.
Q. Now, with respect to AHERF's audited financial statements, did you have any understanding that those financial statements were used or reviewed by any persons or entity outside the AHERF system?
MR. LUFT: Objection.
A. I did not.
Q. Did you have any understanding as to whether audited financial statements of AHERF were used by any lending institutions or bond agencies or creditors?
MR. LUFT: Objection.
A. Well, I did not.
But my assumption is that they were used by, you know, a bonding agency or financial institution as the foundation for, you know, floating the bonds or, you know, guaranteeing -- not guaranteeing, but making the loans, et cetera.

I mean, it is standard business practice.
Q. And certainly you knew that AHERF's bonds were rated by bonding agencies?
A. Oh, yes. Yes.
MR. LUFT: Objection.
BY MS. MEADEN:
Q. And you also knew that AHERF had significant debt; correct?
A. Yes.
Q. And, so, there were lending institutions involved in arriving at that significant debt?
A. Yes. My assumption was that they used the financials as the foundation for their decisions.
Q. You had testified earlier that you reviewed the financial statements as you received them during your tenure on the Audit Committee.
Did you have any particular purposes for which you used those financial statements? Did you use them as tools in any way to -- you personally?
A. Personal purposes?
Q. Right; right.
A. Outside of the realm of my Trustee responsibilities, no.
Q. No; I am talking about within the context of

your Trustee responsibilities.
How, if at all, did you use those financial statements, audited financial statements, in fulfilling or exercising your Trustee responsibilities?
A. If I understand the question correctly, the increase year by year in receivables.
I would do comparisons of my own in rates of increase, measuring the days, et cetera, over, say, a four or five-year period, which would give me trend lines. And if I -- I would discuss those, say, at an Audit Committee meeting.
We didn't really get into that at the hospital Trustee meetings. The financials we looked at there were the internal generated -- internally generated financials, which I spent probably more time on in terms of looking at trend lines and the ability to ask good questions at the Finance Committee about what's really happening in the institution.
Q. Well, in other words, were you using the financial -- audited financial statements as a way of gauging the financial performance of AHERF and its affiliated entities?
MR. LUFT: Objection.

A. On a consolidated basis, yes.
Q. Did you use the financial statements as a tool to make decisions about how to oversee management and, you know, its guidance of the business?
MR. LUFT: Objection.
A. Not really, no.
Q. Did you use those audited financial statements to measure the financial performance of specific initiatives that AHERF had engaged in; for example, the acquisition of hospitals or doctors' practices?
A. I would have to answer no. And my reason for saying no is that, it was very, very difficult to extract that sort of information from the consolidated financials.
I was not privy to the hospital financials. I was not privy to the AIGH financials, or HIG, whatever it is. I was only privy to the medical school's financials and the consolidated.
So I really -- I used the consolidated financials on a macro basis for analyzation and my hospital financials on a micro basis.
Q. Didn't the consolidated statements, though, also have consolidating schedules at the back that

did show specific information for various --
A. Entity by entity, yes.
Q. Yes.
MR. LUFT: Objection.
A. I just -- my interest was the medical school. My primary interest was the medical school.
I did look at the consolidated financials in terms of the overall health of AHERF.
Q. But because you weren't on the Board of AIHG, for example, you didn't focus in on the financial performance of that entity in particular; is that fair as an example?
A. Well, it is an example. But I don't think it would be accurate for me to say I didn't at times look at them individually.
I mean, I didn't throw my consolidateds away. I kept them year by year.
So if a question came up, I would go back and look at -- regarding the practices, I might go back and look at the base lines for the year before.
Q. Okay.
A. I was more concerned, frankly -- in using that entity as an example, I was more concerned in how they were being run. First how they were being

acquired, and secondly how they were being run.
Q. And how did information about how AIHG was being run or how the practices were being acquired reach you, through what channels?
A. Various channels.
Members of the AHERF management team, AHERF Delaware Valley management team; feedback from vendors to some of the operations that I just happened to know personally.
It was more -- you know, there were concerns about what was happening. It was coming from inside and outside of the organization.
Q. But you were not on a Board or committee that was specifically charged with overseeing the operations of the physician practices; is that correct?
A. That is correct.
Q. And in the context in which you were hearing information about concerns related to the acquisition of these physicians, was it more informational or was there some action that was to be undertaken by you?
MR. LUFT: Objection.
A. Well, it was more -- it was more informational. But when -- but since the practice,

the private practices', results were included in the medical school's results, I always wanted to see them separate and distinct from the actual operations of the medical school and the clinical practices in the medical school.
Q. I guess I am a little confused about that. Because I thought the practices were under the umbrella of a AIHG, which was a separate entity.
How is it that the financial performance of the practices was included within the University?
A. It was -- their financial results were included in the financial results, my understanding, of the medical school and separated for the consolidated financials of AHERF. I think I am correct on that.
Q. But you were never in a position to vote yeah or nay on the continuing or -- on the continuing acquisition of physician practices; is that correct?
A. It was a mystery. No one -- well, I shouldn't say, "no one." Very few people knew how that operated.
I mean, the eye-opener was when the Inquirer ran an article on it one Sunday, on this

dual between Penn and AHERF. And that's when we -- as a Trustee I learned.
Q. Do you recall time periods on that?
A. I am going to say that was in about '96, perhaps; late '96, early '97.
Q. Was it your understanding that the Board of AIHG, though, at least purportedly had the role of overseeing the acquisitions of the physician practices?
MR. LUFT: Objection.
A. I don't know that there was a board of AIHG.
Q. Okay.
A. I mean, if -- I just...
Q. You just are unclear at all as to how the practices were acquired or approved to be acquired?
A. Yes; yes.
Q. You talked earlier today about Audit Committee meetings that you were in attendance at where the financial statements were presented, the audited financial statements?
A. Right.
Q. Typically that was in the fall.
And you talked about Mr. Buettner's participation in those Audit Committee meetings.
Did Mr. Buettner attend -- I think

you said the Audit Committee met twice a year. Did he attend both meetings each year, in your recollection?
A. I think so. Yes, I believe so.
Q. And can you describe for me what his typical level of participation in those meetings was?
MR. LUFT: Objection.
A. On the -- as far as the annual Audit Committee meeting, where we reviewed and approved the -- or didn't approve the outside auditor's findings, he presented them. And it was a straight-forward examination of the financials. There were very few questions.
If the questions were asked, either he would answer them, or quite often Sherif -- not Sherif as much as David McConnell would answer them.
On the odd meetings, they were more devoted to the review and selection of the coming year's auditor, as I remember them. And Bill would present Coopers' case for continuing. And that would be, basically, it.
Q. I would like to back up for a moment.
My understanding is that in -- Fiscal Year 1997 was the first year that AHERF went

to a consolidated, true consolidated, audit.
Do you recall -- does your recollection comport with that?
A. I don't -- I do not recall that.
Q. Okay.
A. I thought, actually, it had been done earlier, but...
Q. Regardless of the time period, do you recall discussions about AHERF's intent or the suggestion that AHERF go to a consolidated audit format?
A. I do remember that it was the intent of AHERF to present the entire entity's operations on a consolidated financial basis.
Q. Was that an issue that was raised within the context of an Audit Committee meeting, as you recollect?
A. No. As I remember it, it was raised at one of our medical school meetings directly by Sherif.
Q. So you have no recollection, then, of any discussion of going to a consolidated audit at the Audit Committee meeting?
A. I do not.
Q. Do you recall any reasons that were given for going to a consolidated audit?
A. Primary reason was to present all of AHERF on

a -- you know, on the proverbial single page, if you will, to account for all activities, all entities within AHERF, endeavors within AHERF, and so we would have a -- whether you were at the Trustee level on a Board or a committee level with, say, the Audit Committee, you would have a snapshot of all of AHERF.
Q. You had testified earlier today about concerns that you had about the relationship between the auditors and the senior management at AHERF.
And I am a bit confused as to whether your concerns were related to the relationship between the entities Coopers & Lybrand and AHERF because it was a long-standing relationship, or whether it was concern about the individuals involved, in other words, Mr. Abdelhak, Mr. McConnell, and Mr. Buettner, and their relationship.
Can you clarify that for me?
A. I had no -- I had no reason to not believe that Coopers was doing a fine job as the outside auditor. I mean, they certainly carried the appropriate credentials. They appeared to be very thorough in their external audits.
But my one concern there, as I

stated before, was, they had been doing it for a long, long time. And I thought that perhaps we should consider -- not perhaps; that we should consider having a change in outside auditors.
Q. When you say, "they," though, are you talking about the entity or Mr. Buettner himself as the engagement partner for some period of time on that account?
A. How did I use "they"?
Q. That's my question. That is my question.
A. Oh, when I say, "they."
Q. They had been the outside auditors.
A. Oh, I am referring to Coopers' performance as an outside auditor.
Q. The entity itself?
A. The entity itself --
Q. Okay.
A. -- I thought did a fine job. I had no reason to believe that they didn't.
But I was concerned over the fact that they had been doing it for a lot of years. Okay?
Q. Right.
A. I was also concerned, and I mentioned this earlier, that Coopers was in the midst of a messy

situation with PharMor. And, you know, I just was -- had a concern.
Q. Do you know if any of the people who were involved on Coopers' behalf in the PharMor case were involved in the audit of AHERF?
A. I was told they were not.
Q. Did you ever know a Mr. Kirstein from Coopers & Lybrand? Did you have any --
A. No, name is not familiar.
Q. You don't know that name.
Did you have any concerns about Mr. Buettner himself and his relationship with Sherif Abdelhak and David McConnell, and how that may impact the way in which the audit of AHERF's financial statements was performed?
A. My concern -- yes, I did.
Q. Okay.
A. My concern was that I had a pretty good understanding, or I felt I had a pretty good understanding, of how Sherif operated.
Q. Okay.
A. And how McConnell operated.
And I was concerned that Bill was strong enough, when things started going south, strong enough to stand up to them and say, I really

think we should do this or do that.
That situation may not have existed. But my concern was that he was going to be strong enough to really take issue to the point where he would not be a whistle-blower, per se, but really go to whoever he had to go to to voice his concerns.
Q. Did you believe that --
A. Let me just finish.
Q. Yes.
A. I had no concern, really, about Bill's integrity --
Q. That's my --
A. -- as an accountant, as a CPA and as a partner in charge.
There was -- I'm sure there was a ton of pressure put on him often by Sherif and McConnell and the financial department.
Q. Well, did your concerns go to circumstances where Mr. Buettner would not disclose to the Audit Committee if his audit had found material misstatements in the financial statements that were presented to him for audit?
A. I didn't have a concern about that.
Q. You felt that he would do that at that time?

A. I felt he would do that, yes.
Q. And did you feel that he would have gone to the Audit Committee if he had discovered in the course of Coopers & Lybrand's audit intentional misstatements on the financial statements?
A. I think -- yes, I think he would have done that.
Q. Okay.
A. He certainly had a responsibility to do that.
Q. And at the time did you believe that Mr. Buettner would have gone to the Audit Committee, if he had discovered fraud in the course of conducting his audit?
A. I think so.
Q. So notwithstanding those concerns, you said you didn't have any concerns at that time about Mr. Buettner's integrity; is that right?
A. That is correct.
Q. But you were concerned -- I'm trying to understand what it was you were concerned that he wouldn't do.
A. As --
Q. If anything.
A. As I understood it, at the time AHERF represented close to or better than a million

dollars worth of billings a year to Coopers.
Q. Where did you have -- where did you obtain that understanding?
A. Well, I knew what our annual engagement fee was, and I think at one meeting or another we talked about consulting fees in addition to that.
So my --
Q. Okay.
A. I may be dead wrong in that, but my thought was that it was 800,000 plus.
Q. Okay.
A. And that that meant to me there was going to be a ton of pressure on the partner in charge to not go crosswise with the client.
Q. How --
A. And this was a gut feeling on my part. There was -- there was nothing in specific evidence that I was exposed to to support that.
That concern was based on the size of the account and the fact we had no one else but Coopers that had been doing it for years.
Q. What I am trying to square is your concern that he wouldn't go crosswise with the client with your statement that you think he would have told the Audit Committee if he had discovered, during

the course of his audit, material misrepresentations, or material misstatements, or intentional misstatements, or fraud.

Is there some other type of situation where you were concerned that Mr. Buettner wouldn't go to the Audit Committee?

MR. LUFT: Objection.

BY MS. MEADEN:

Q. It is a convoluted question, and I apologize.

A. I would be reiterating what I said earlier about Bill personally as an -- I don't know him personally. I have never done anything with him socially. But as a professional accountant, I think that he fit that bill.

My concerns are the concerns that I previously stated. And I can only imagine, not having been there in the room with Sherif and Bill and McConnell, what sort of pressures, I'm sure, or I feel, were placed on Bill.

Now, is it to commit fraud or is it to commit something accounting -- akin to fraud? No. Is it over -- potentially overlooking this or overlooking that? Perhaps yes.

Q. Overlooking things that would rise to the level of material misstatements, though?

A. No; no.

Q. Smaller?

A. Yes.

Q. Okay.

A. I just -- and, you know, it is hindsight in 2003 to look back at those times.

Q. I understand.

A. But I didn't sense enough of an arm's length relationship between Coopers and AHERF.

Q. Was this something that you did raise within the context of the Audit Committee meetings?

A. When I requested a review of our outside auditor and the consideration of receiving quotes, I know I said that, you know, we have had the same accounting firm for a long time, we have an accounting firm that is currently embroiled in a situation here in Pittsburgh that is very messy, and it looks like they are not going to come out of it very clean, and I think we ought to look outside.

Q. Okay.

A. And I think it was Bruce that was heading the Audit Committee, and he agreed.

Q. Did you raise, though, this concern that Mr. Buettner might not be able to withstand certain

pressure from --

A. No, I did not; that was my feeling.

Q. And you never shared that with anyone else on the AHERF Board or Audit Committee?

A. Not with him personally. The concern was the relationship between the two entities.

Q. And I take it, then, that that was not a topic that was part of your discussion with Mr. Barnes back in the spring or summer of --

A. No.

Q. -- '97?

A. No, it was not.

Q. You were asked a question -- and I am going to go back to my notes here -- earlier today about what in your view was the cause of AHERF's bankruptcy. Bear with me.

Let me strike that question and go on to another topic while I look through my notes here.

We talked a little bit earlier today about the Graduate transaction. And I think you said at one point that you were on some Board or committee where the transaction had been presented for approval, but it had already been completed.

Did I misunderstand your testimony?

A. The first statement I believe I made was that the first time I learned about the Graduate acquisition was in the newspaper.

Q. Okay.

A. I believe that we were asked to approve the Graduate transaction after it had already -- it was a done deal, it was done.

Q. When you say, "we," who do you mean?

A. I say, "we." I -- frankly, I'm not sure whether it was the medical school Board or the Audit Committee.

I rather think it was the medical school Board. Now why would we be approving that transaction is a logical question.

And it may have been less a direct approval request or a -- than an information and, you know, Sherif saying, really would like to get the approval of MCP to go forward with this.

Q. Did you have any understanding that the transaction involving Graduate was actually a two-step transaction, where an entity known as SDN acquired the Graduate Hospitals in the first phase of the transaction?

Is that at all familiar to you?

A. (Witness shakes head.)

Q. No?
A. No.
What does "SDN" stand for?
Q. There is some debate about that.
But you have never heard of that entity?
A. I don't remember it.
Q. Do you recall?
A. I don't remember learning of that. I can't remember that in the article.
Q. Do you recall getting any information about the Graduate transaction from sources other than the newspaper article?
A. No.
Q. So, needless to say, you weren't involved at all in the negotiations leading up to that?
A. No.
As a matter of fact, a number of the Delaware Valley Trustees said publicly that had we been involved and had we been asked for an opinion, we would not have voted to do it.
Q. And why is that?
A. Because Graduate --
MR. LUFT: Objection.
A. (Continued.) Well, I --

Q. What is your view as to what --
A. I discussed that earlier.
I didn't see how -- I didn't see it as a win/win for AHERF.
Q. Did you ever get any explanation from anyone at AHERF as to why AHERF ultimately acquired the Graduate hospitals?
A. The explanation that was given was, we were going to set up an Orthopedic Center of Excellence at Graduate Hospital, and the three B's were coming over from -- I think they were Jeff at the time.
And that it was going to further optimize -- or it was going to optimize's AHERF's desire to have specialty centers, centers of excellence within the system.
Q. Was there any explanation given as to why such an orthopedic center couldn't have been established in any of the other tertiary-care hospitals in the AHERF system already?
A. No; no.
Q. Now, jumping around a bit, and I apologize, we also talked earlier today about executive session.
What is your understanding as to why an executive session is utilized?
MR. LUFT: Objection.

A. At the --
Q. At the Audit Committee.
A. At the Audit Committee.
Q. Yes.
A. My understanding is, it is used either to -- for the external auditor to request an executive session so he can talk directly to just the Audit Committee, without management present; or that it is used for the Audit Committee to request executive session and eliminate both the auditor and management for just an executive committee session, session of the Audit Committee.
Q. And in the case of where an executive session is offered to an outside auditor, is that so that the auditor may feel he can speak more freely with management outside the room about the work that he is conducting? Is that your understanding?
MR. LUFT: Objection.
A. That is my understanding.
Q. And is it your recollection that executive session was always offered to Coopers & Lybrand during the Audit Committee meetings that you attended?
A. Yes.
Q. And do you recall Coopers & Lybrand ever

accepting the offer and going into executive session with the Audit Committee?
A. No.
Q. And you have no recollection of them doing that?
A. I have no recollection.
Q. And is it your understanding that it is really up to the auditor to, once the offer is made, to accept or decline the offer?
A. Yes.
MR. LUFT: Objection.
BY MS. MEADEN:
Q. And not for the committee to force executive session on him?
A. No. I remember the committee offering executive session to Bill on a regular basis. But I -- I don't remember him ever taking the committee up on that offer.
Q. And based on your experience on Audit Committees and in business, what is your, or what was your expectation as to the types of things that AHERF's outside auditors should bring to the -- or should have brought to the attention of AHERF's Audit Committee?
MR. LUFT: Objection.

A. To the executive session?
Q. To the Audit Committee either in executive session or otherwise.
A. Or otherwise.
I think the Audit Committee was -- should expect the outside auditor to, in addition to just the numbers, bring to the committee any observations and/or concerns that have arisen during the audit process that the auditor feels should receive a hearing.
Q. Things like material misstatements in the financial statements?
A. Material misstatements in the -- you know, the internal audit controls.
You know, they are not all major, certainly. But when the internal audit standards are reviewed during the normal control, and they believe there are improvements that could be made, that they be brought to the committee's attention. And they were typically done by way of the management letter.
Q. What about things like concerns regarding the competency of the financial management, the entity; would you have expected AHERF's outside auditors to bring that to the Audit Committee, if they had felt

that there were real competency issues with AHERF's financial management?
A. I would have expected it.
Q. And would you have expected Coopers to have brought any fraudulent conduct that they may have uncovered during the course of their audit to the attention of the Audit Committee?
MR. LUFT: Objection.
A. Yes, I certainly would.
Q. And if, again, there were intentional misstates in the statements, financial statements that were presented for audit, you would have expected Coopers to bring that to the attention of --
A. I wouldn't have expected to receive the consolidated results.
Q. Or clean opinion letter?
A. If they know, if they knew or suspected that there were material misstatements.
Q. And during your tenure on the Audit Committee, I take it Coopers & Lybrand never presented any sort of issues of that type or concerns of that type to the Audit Committee; is that correct?
MR. LUFT: Objection.
A. We never had executive session with Coopers,

to the best of my knowledge, and their management letters never presented something like that.
I would have -- I am not an accountant.
Q. Right.
A. But I certainly would not have expected an outside auditor to present, basically, a clean letter, and then in the management letter say, hey, we got some real, real problems here.
Q. But in any communication other than the management letter, any form of communication other than a management letter, Coopers & Lybrand, during your tenure on the Audit Committee, never presented any issues of this type to the Audit Committee; correct?
A. No, not that I --
MR. LUFT: Objection.
A. (Continued.) Not that I can remember.
Q. Did you ever question the integrity or competence of Bill Buettner at any time?
A. No.
Q. At any time did you ever question the integrity or competence of Sherif Abdelhak?
A. Yes.
Q. And when did that first...

A. I can't -- when things started to go awry.
When -- an example would be the Mid States accreditation is underway. We are upstairs, a group of us, inside Trustees, a few inside Trustees, but, you know, and a couple of outside Trustees, and there has been no mention whatsoever of these layoffs, and the word gets out and the place is surrounded by pickets.
And, you know, that bothered me.
Q. That was in the fall of '97; is that correct?
A. I don't remember the time frame. That sounds about right.
Q. Did that reflect on Mr. Abdelhak's integrity or competence in your mind?
A. It reflected on both; it reflected on both.
There were statements being made that were counter to that, and then suddenly this action is being taken.
And it was -- you know, it was part of other things. I mean, that was just an incident.
Q. And shortly -- just to try and put things in context, is it your recollection that shortly after that incident involving the pickets and the Mid State Atlantic -- is that it?

A. Mid States Accreditation.
Q. Mid States Accreditation Committee, that it was shortly after that that you were no longer a full voting member of the Board's?
A. Some time after that, yes.
MR. LUFT: Objection.
BY MS. MEADEN:
Q. Do you have any recollection of the time period?
A. I know I was made a Life Trustee in, what, January of '88 -- or '98. And this, I believe, occurred in '97.
Q. '97?
A. The Mid States?
Q. Yes.
A. Yes.
Q. I would like to ask you a few questions about a document that you already looked at today, which is Exhibit 1953, which is the letter that you wrote to Mr. Brenner.
A. Yes.
Q. And I think when Mr. Luft first showed this to you, you called it the infamous letter.
Can you just tell me what you meant by that?

A. I received a call about a year, year and a half after the bankruptcy from the U.S. Attorney's office in Philadelphia with a request to come in for a visit.
And I agreed to the visit after chatting with the Assistant U.S. Attorney, U.S. Attorney. And it was during the course of my hour or so with him that this letter -- he brought up this letter.
And I had even forgotten I had written it to Ralph, but he had a copy of the letter I'm sure in the documents that were under discovery.
And we talked about it.
Q. And Mr. --
A. That's what I mean about the infamous letter.
Q. Because of your involvement with the U.S. Attorney?
A. Yes.
Q. Yes.
A. My first and last exposure, I hope, to a U.S. Attorney.
Q. And Mr. Luft earlier today read into the record that first paragraph, but I do want to ask you some specific questions.

First, what precipitated this letter to Mr. Brenner? Why did you write it, in other words?
A. Well, Ralph was also on the Audit Committee. He was -- he was probably the other Delaware Valley -- there probably were just two of us. In looking at some of the minutes, I don't see anyone else from the Delaware Valley as a member.
And occasionally we went back and forth to the meetings together. I met Ralph through a mutual friend out -- totally outside of AHERF some time in the past. He had expressed interest in my consulting practice. And so we got to know each other a bit.
And I think this letter was the result, probably, of that October 15 Audit Committee meeting, where I was just frustrated over the availability and the timeliness of information.
Q. Was there anything that -- in particular that transpired at that October '97 Audit Committee that raised your frustration level?
A. Nothing that I can think of right at that meeting.
But it was, rather, more involved with the Delaware Valley proceedings, where we

were, you know, regularly fighting to get information.
Q. Do you --
A. And Ralph was the Board Chair at St. Chris. And I think he was probably on the parent AHERF Board, although I'm not sure.
Q. Well, the first sentence says, "As always, it was a pleasure to spend time with you last week following the AHERF Audit Committee meeting."
Did you and he have some discussion about AHERF, then, following that meeting? Is that what that sentence means?
A. We may have. I think we could have possibly flown back together that day, and we talked in general terms. But -- or, we could have gone out together, one or the other.
I expressed to him concerns over the availability and timeliness of information. And I thought, well, I am just going to put it in a letter to him.
Q. Was that -- do you recall if that -- well, based on your earlier testimony, you had that frustration before the October 15, '97, meeting?
A. Oh, yes. Sure. Sure.
Q. All right. Are you familiar with a woman by

I HEREBY CERTIFY that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on Thursday, September 4, 2003, and that this is a correct transcript of same.

--------------------------

Debra Ann Whitehead

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

C. D. Cook Dep.

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION & )
RESEARCH FOUNDATION, )
)
Plaintiff, )
)
-vs- ) Civil Action
) No. 00-684
PRICEWATERHOUSECOOPERS, L.L.P. )
)
Defendant. )

- - - -

VIDEOTAPE DEPOSITION OF: C. DAVID COOK
CONFIDENTIAL EXCERPTS EXTRACTED

- - - -

DATE: November 24, 2003
Monday, 8:58 a.m.

LOCATION: MANION McDONOUGH & LUCAS
U.S. Steel Tower
14th Floor
Pittsburgh, PA 15219

TAKEN BY: Defendant

REPORTED BY: Heidi H. Willis, RPR, CRR
Notary Public
AKF Reference No. HW78347

do you mean by that?
A. Where we are particularly concerned about the current measurement of profitability of a company, and so that those were more growth industries, communications, higher education, public finance, financial institutions and healthcare.
Q. And do you recall what year that was that you were in charge of that industry?
A. Sure. I would have switched -- I would have switched in '89, 1989 or 1990.
Q. Do you know if that group that you were managing was called the select industries group?
A. It was.
Q. And what caused your move into being manager of the select industries group?
A. The bank essentially decided to significantly reposition itself away from international.
Q. And were you manager of the select industries group with respect to a particular geographic region within the United States?
A. Not specifically, although as in the early -- more as related to specific industries than geography.

Q. So you focused in on those particular industries, but within those particular industries you had no geographic focus?
A. Right.
Q. And --
A. My only hesitation is in the early -- in the early times of being part of select industries, we had a communications team in Philadelphia. We still had communications relationships in Pittsburgh, and there were separate healthcare -- there was a separate healthcare team in Philadelphia, and ultimately we decided to combine from an industry focus. So all of the communications credits went to that Philadelphia team, and responsibility for all of healthcare and public finance came to the Pittsburgh team.
Q. Do you know when all the responsibility for healthcare moved over to the Pittsburgh team?
A. I can't give you a specific date, but it would have been early '90s.
Q. Do you know who was on the Philadelphia team with respect to healthcare?
A. Do I know who was on the Philadelphia team with respect to healthcare.

MS. HACKETT: We are talking about back at that point in time.
Q. Back at that point when there was a Philadelphia team responsible for healthcare.
A. A couple of names come to mind, but I can't be sure whether -- whether they were there at the time when we swapped responsibilities or not.
Q. And what are those couple of names?
MS. HACKETT: I don't want you to guess or speculate, so if you are guessing or speculating, you don't want to do that.
A. Yeah, that's all I'm doing. If you are looking for specific times and specific people on the team, then I would be speculating, so it's probably better not to answer.
Q. And aside from specific times, do you know anyone who at any point worked on that Philadelphia team with respect to healthcare?
A. Sure.
Q. Can you tell me those people?
A. Yeah, the Philadelphia team when we -- at the end basically was led by a lady named Rhonda Chatzkel, R-h-o-n-d-a, I'm sorry, you were trying to --
Q. Oh, no, I was trying to think of it for the

court reporter as well. What's her -- how does her last name?
A. C-h-a-t-z-k-e-l, Tim Fitzgerald, that's probably easier, Jack Squires, Squires, probably not with a Q, and then it starts to get fuzzy.
Q. And when you were manager of the select -- well, let me back up.
When there was still a Philadelphia group as well as a Pittsburgh group handling healthcare issues, what was the divide in responsibilities between those two groups?
A. It was more geographical. At that point the industry focus would have been more dealing with names of -- names and clients that were in the geography close to the city we are talking about.
Q. Okay. And was the AHERF relationship, once it came to exist between PNC and AHERF, the responsibility of the group in Pittsburgh?
A. It was.
Q. And did the group in Philadelphia have any responsibility at all with respect to AHERF?
A. No.
Q. When you were -- when you started to be manager

of the select industries group in Pittsburgh in '89, who did you manage with respect to AHERF?
A. Fellow named Emery Holloway, and a -- Emery Holloway.
Q. And how long did you remain manager of the select industries group?
A. Until we changed its name to the healthcare and public finance group.
Q. And do you recall when that was?
A. No, I don't.
Q. And did you continue as manager of the healthcare and public finance group?
A. I did.
Q. And how long did you hold that position for?
A. Until we basically put -- until we basically disbanded healthcare and public finance.
Q. Do you recall when that was?
A. Would have been about four years ago.
Q. So approximately '99?
A. Yeah.
Q. And when you say that you were manager of first the select industries group and then the healthcare and public finance group, did your title change over time?
A. I went from being a vice president to being a

senior vice president.
Q. And at some point in time, did it come to be the case that there were layers of management between you and the relationship managers who helped work on the AHERF deal?
A. Yes.
Q. Do you recall when that occurred?
A. No.
Q. At the point in time when that change occurred, can you tell me who was -- became the management level or who occupied the management level between you and the relationship managers?
A. Well, as far as the Pittsburgh team was concerned, Frank Taucher became the manager.
Q. And do you recall when you first started working on AHERF-related matters?
A. No.
Q. During your time working on AHERF-related matters, do you recall who the people were that you had responsibility for managing?
A. Well, over -- over a course of years, there were a number of people involved. Would you like -- would you like a few of them?
Q. Sure.

A. I mean it would have included Marcie Knittel, it's actually probably Marcella Knittel, and obviously Frank stayed involved, fellow named Bob Courie, C-o-u-r-y, and there may be other people involved whose names don't come to me at this point.
Q. Was Jeffrey Dickson a person who was involved?
A. Jeff certainly was involved for a period of time, yes.
Q. And do you recall if the progression of relationship managers over AHERF went from Emery Holloway to Robert Courie to Marcella Knittel and then to Jeffrey Dickson?
A. I don't specifically recall that, no.
Q. And do you recall if -- were all four of those individuals relationship managers?
A. They were.
Q. And do you recall a person by the name of Dorothy Hunter?
A. I do.
Q. Could you tell me what roles she held?
A. Dorothy was more -- more what I would call a junior relationship manager moving into a relationship manager position.
Q. And I take it she never became a relationship

manager with respect to AHERF matters?
A. I -- in thinking about that, I can't confirm that one way or the other.
Q. And were there any -- well, do you know the name Paula Mammarella?
A. I do.
Q. Was she another junior relationship manager?
A. She was, yes.
Q. Were there any other individuals who you worked with who you can recall having responsibility over AHERF-related matters?
A. No.
Q. And you said Frank Taucher at some point became the manager of those individuals and he then reported on to you?
A. Yes.
Q. Did you work with any people on the credit side at PNC or in a credit group at PNC who also had involvement with AHERF-related matters?
A. Certainly.
Q. Would it be fair to call the group of people including yourself, Frank Taucher and the relationship and junior relationship managers you mentioned as being on the relationship side at PNC with respect to AHERF matters?

Page 94

there's a provision No. 1 that talks about notifying the trustee of an event of default and directing the trustee to declare an event of default as defined in the indenture to accelerate the bonds and draw on the letter of credit and/or to exercise remedies under the bonds documents?
A. Right.
Q. Not with respect to this particular letter of credit necessarily, but just on your understanding of PNC letters of credit, do you have any understanding of what the distinction is between those two provisions?
MR. COGAN: Objection.
A. I'd actually -- I'd suggest that paragraph 1 relates to the relationship between the bank and -- I'm sorry, not paragraph 1 but point 1 is between the bank and the trustee and point 3 is the bank and the corporation.
Q. And do you have any understanding of what distinction there is between asking the trustee to accelerate the bond and draw on a letter of credit versus the PNC declaring a client's obligations immediately due and payable?
A. Yes, I do.

Page 95

Q. And could you tell me what your understanding is?
A. My understanding would generally be that if we act under section 3, or point 3, I never remember what these are called, it's not a section I guess, it's a point, that we would actually be asking our client, the corporation, to basically fulfill all of their obligations under the agreement, and that could be separate from our notifying the trustee and asking them to basically declare that there's been an event of default and accelerate the bonds.
They are two -- again, it's kind of like apples and oranges. There are two different facets of the relationship.
Q. If a trust -- based on your understanding, if the trustee declares an event of default and accelerates the bonds, does that -- what happens under that circumstance?
A. If the bonds are accelerated, the bondholders are basically asked to tender their bonds, and the trustee would then draw under the full value of the letter of credit, which effectively makes the bank the owner of the bonds.

Page 96

Q. And in that instance would bondholders be repaid by the trustee?
A. Bondholders would have been repaid because the bonds that they owned would have been purchased by the trustee.
Q. And you are saying effectively PNC would own the bonds because PNC is the one who provided the funds?
A. PNC provides the cash so we -- I'm not sure I know whether we legally become the owner of the bonds -- I don't know whether we would legally become the owner of the bones or we have an hypothecated interest but --
Q. And in instances where PNC instead just called the corporation's obligations immediately due and payable, what would happen under those circumstances?
A. You wouldn't necessarily have changed the relationship of the bondholder to the bonds, they would still own them, but the bank would have gathered collateral that would have -- perhaps would have gathered collateral to fully secure its position.
Q. In that instance would the corporation in essence have to pay the trustee the amount of

Page 97

money that's --
A. That's not what it says. What it says here is the corporation's obligations would become due and payable. The corporation's obligations are the bank. So we -- we can issue stand-by letters of credit on a variety of bases. We can issue unsecured, we can issue secured, and that secured can include cash collateral.
So we could perhaps, having not read this document, we could perhaps simply be moving to get cash to secure our obligation with the trustee which leaves the bonds in place.
Q. Got it. Let me refer you to 7.03 which talks about waivers.
A. Okay.
Q. Do you know if that is a standard provision in PNC letters of credit, that PNC with waive noncompliance with covenants or other defaults if PNC so desires?
A. It's certainly a concept I've seen.
Q. And do you know if PNC has any policies or practices with respect to decisions to waive noncompliance?
A. I'm not familiar with what's in place today,

no.
Q. How about back during the '90s? Do you know?
A. We would have -- well, discussion of a waiver would have been -- would have probably had some approvals associated with it.
Q. I'm sorry, would have had some?
A. Would probably have had some approvals, internal approvals associated with it.
Q. So depending on the dollar amount, either you could approve it or people above you would be required to approve it as well, is that what you are saying?
A. That's possible. I mean I don't remember specific policies and waivers.
Q. Do you know if there are any documents that sets forth any considerations that had to be taken into account in dealing with waivers?
A. No.
Q. And you said you don't recall any policies with respect to waivers. Do you know if there were any standard practices, even if they weren't embodied in a policy document or anything like that?
A. I tried to cover that in the earlier -- the earlier answer. You know, covenants --

covenants are part of a transaction, in the same way that a rumble strip is built in a highway, and when you are driving on the highway, you don't know that you are going to need it, but it's nice if it's there, and if you hit it, you don't know what you are going to do, but it's telling you you got to think about what's going on, and maybe you pull back on the highway, maybe you let it rumble for a while, you know, or not, and a waiver -- a waiver depends on that as well.

But much like when you are driving on the turnpike, if you've had the pleasure of our Pennsylvania Turnpike, you know, you want a rumble strip to be there just in case something's going on in the external environment that you didn't see.
Q. So is it fair to say that PNC's decisions during the '90s as to whether to waive covenant noncompliance depended on the circumstances of each noncompliance?
A. Yes, it is.
Q. And there is, therefore, no principles that one could state that would govern whether under certain circumstances PNC necessarily would

have granted a waiver or not?
A. That's correct.
Q. Do you know if PNC ever asked to examine the books of AHERF's, bookkeeping entries that AHERF accountants generated?
A. No, I'm not aware of that.
Q. And did you ever visit any of AHERF's properties in connection with any credits that were outstanding?
A. Yes.
Q. Do you recall how often you did that?
A. No, but I would say regularly.
Q. What would be the reason for your visits?
A. Basically to share information, and relationship managers might have done it, managers working for me might have done it, I certainly did it.

I mean a relationship with a client is, you know, is ongoing and continuous, and so you want to not only be getting the financial statements as they are prepared, but you really want to have an ongoing dialogue of competition and what's going on in the markets and just how are they really managing the business, what are their challenges.

THE VIDEOGRAPHER: I'm sorry, we've got about five minutes left on this tape.
Q. Okay. Were the visits for purposes of meeting with officers or other individuals at AHERF?
A. Yes, they would have been.
Q. Did you ever perform any visits where to essentially -- or did you ever have any visits to perform due diligence and to look at various facilities of AHERF's?

MR. COGAN: Objection.
A. And my answer really is due diligence is the natural ongoing process of the relationship with the customer. I mean everything that you are doing is part of the due diligence process because you are -- because you are continuously trying to affirm how you feel or don't feel about the customer.
Q. So when you say everything that you are doing is due diligence, you mean that the whole of your --
A. I mean every phone call, every phone call, every visit, every piece of paper they send you is part of the ongoing due diligence process. There isn't -- I never view that February 1 to February 10th we are doing due diligence. You

know, I think it's January 1 to December 31, so you can't separate it.
Q. So across your or PNC's relationship with AHERF, there was a continual process of due diligence on the part of --
A. Right.
Q. -- of yourself and others under your responsibility?
A. Mm-hmm.
Q. I'm sorry?
A. Yes.
Q. Okay. And before we change the tape, let me ask you, did you ever visit the properties of AHERF entities to inspect the properties themselves and to meet with people who were operating or managing those properties?
MS. HACKETT: Objection, I thought he just answered that, but answer it again.
A. Yeah, I can't recall any visit where I went to inspect. I feel comfortable with that. I can't recall any visit where I went to inspect, but I also can't recall any time when I visited any customer anywhere where I haven't paid attention to my surroundings. That's kind of the best answer I've got.

MR. TERUYA: Okay. Why don't we take a quick break just to change the tape.
THE VIDEOGRAPHER: We are now going off the record. The time is 11:06 a.m.
- - - -
(There was a discussion off the record.)
- - - -
THE VIDEOGRAPHER: We are now back on the record. This is the beginning of tape No. 2 in the deposition of C. David Cook. The time is 11:09 a.m. You may proceed.
BY MR. TERUYA:
Q. If you turn and look at page PNC 18977, section 7.01 (b) --
A. Okay.
Q. -- do you see there there is a discussion of a 30-day cure period?
A. Yes.
Q. And do you see there that essentially in this case the corporation has 30 days to try to cure any noncompliance after receiving written notice from PNC?
A. Right.
Q. Is that a standard type of provision in letter of credit agreements?

A. Yeah, the concept's standard.
Q. Okay. Do you have any understanding of what's the reason for affording to PNC clients a 30-day cure period?
MR. COGAN: Objection.
A. Yes, basically to be sure -- go back to my rumble strip analogy, you may get this a bunch, but anyway, if you are just on the rumble strip but you can come back and nothing's happened, you know, there are probably a number of requirements in here, you know, that might cover lawsuits, et cetera, where the -- where the entity might be out of compliance but, in fact, could cure; and since we are really not -- we are not really trying to catch them on a speed bump, trying to be aware of it and discuss it, but if it's something they can actually cure and reposition themselves from a financial strength standpoint, you know, then as part of negotiations on the agreement, we give them the chance to do that.
Q. And is it your understanding that under provisions like this, that the other party to the letter of credit agreement is entitled to 30 days to try to fix covenant noncompliance in

the event it occurs after receiving written notice from PNC?
A. That seems to be what this paragraph says, yes.
Q. And is that your understanding of how provisions like this actually worked in terms of the practice --
A. Yes.
Q. -- at PNC?
A. Mm-hmm.
Q. Okay. You can set aside this document.
I'm going to briefly show you and ask you if you recognize a document that has been previously marked as Exhibit 326, which is a letter of credit reimbursement and security agreement between AGH and Pittsburgh National Bank dated January 29, 1993.
A. No.
Q. So you don't recognize this document?
A. No, but -- not -- it would have been very unusual for me to have been involved in the preparation or in a review of an actual document. I mean it's really prepared externally. The relationship manager, you know, on the team worked with it, and I mean they are really empowered in our process to go

out and get the deal done.
Q. Let me ask you just generally then, did you have an understanding of what remedies were available to you and to PNC in the event that AHERF or any AHERF entities failed to comply with a covenant contained within a letter of credit agreement that PNC had with AHERF at the time?
MR. COGAN: Kevin, isn't that the question you just asked him in connection with the last exhibit we looked at? Since he didn't recognize the agreement, you asked him what generally his understanding was and you specifically went through --
Q. I'm just saying in the real world, like what are the options you believe were available to you?
A. In the real world, because each document's -- you know, each document's different, each agreement's different, potentially the covenants are actually different because they may have been negotiated at different times, you know, if a deal's fully functioning and a relationship manager affirms compliance, I'm not particularly worried about it.

If we are out of compliance at any one time, it's really more likely that the relationship manager's going to create a summary showing the, you know, the out-of-compliance situation and could well relate to or refer to specific covenants in whichever document's out of compliance, but it still would be very, very unusual for me to see the original document.
Q. I don't necessarily mean, you know, what's specified in a particular document, but just in terms of your -- based on your experience as a manager of --
A. Generally speaking --
MS. HACKETT: Wait a minute. Stop.
THE WITNESS: Let him answer.
MS. HACKETT: Yeah, let him finish so you are sure you answer what he's asking.
THE WITNESS: Okay. You are right. Sorry. Go ahead.
Q. I was just going to say just based on your experience as a manager of the -- or being in charge of the group you were in charge of, what were the types of remedies that were available to you in the event of a covenant

noncompliance?
A. In a particular case that we were out of -- that we were not in compliance, I would have been given a summary of the document and whatever was -- you know, whatever was possible to us under the document we would have discussed with them.
Q. And can you tell me what are some of the types of remedies that you discussed during the '90s with respect to instances of noncompliance you came across?
A. Yes, and depending on the type of noncompliance, I mean we could have discussed anywhere from -- from taking additional collateral to arranging a sale of assets to other -- you know, taking additional guarantees, other things that might have strengthened our financial condition.
Q. And is acceleration also another type of remedy that you might have considered from time to time?
A. Yes, certainly possible, yep.
Q. And is making all obligations immediately due and payable another type of option?
A. Yeah, I probably would have defined that as

acceleration.
MR. COGAN: Acceleration.
Q. Okay. I just meant to distinguish between the acceleration we saw where you asked the trustee to accelerate and making all the obligations immediately due and payable?
A. Yeah, we more asked the -- we more asked the trustee, if I remember that paragraph, to declare an event of default and then accelerate, but if we had approached the customer, it would have been, you know, deemed to be acceleration.
Q. Let me ask you this then: When you refer to acceleration, what do you mean by that, just to make sure we are on the same wavelength?
A. It could be -- it could be the more, you know, generic causing all obligations to become due and payable, and I probably wouldn't have differentiated in the opening -- in the opening approach to, you know, would we like to accelerate, I don't know that I would have differentiated between having the client pay everything to us versus how we are going to handle the bondholders.
Q. I'm sorry, so under your terminology,