C. DAVID COOK

1    accelerate, would that affect, would
2    acceleration affect the relationship between
3    the trustee and the bondholders?
4  A.  It could, yes.
5  Q.  So would acceleration, as you are defining it,
6    just to make sure we are on the same page,
7    include both the option of asking the trustee
8    to declare an event of default and accelerate
9    the bonds and also just PNC asking the -- its
10   client to make all or forcing all obligations
11   to become immediately due and payable of the
12   client?
13 A.  Yes, I could use the word either way.
14 Q.  Okay.  And is hiring a consultant another
15   option that you have considered from time to
16   time?
17 A.  Yes, it is.
18 Q.  And would offering more money in the form of a
19   bridge loan be another option?
20       MR. COGAN:  Objection.
21       THE WITNESS:  Sorry?
22       MR. COGAN:  I just objected.
23       MS. HACKETT:  You can answer.
24 A.  Yeah, yes, I mean that's certainly possible.
25   What I find myself thinking about is that there

1    are hundreds of thousands of things that
2    might, you know, that might happen, and, again,
3    it's going to depend on, you know, our judgment
4    on what's really occurring with the customer.
5  Q.  Was it your understanding that at the time that
6    PNC could under certain circumstances in
7    essence take control of management or
8    operations of a client if it wanted to?
9  A.  No.
10 Q.  So your understanding was that PNC could not do
11   that?
12 A.  That it is -- it never -- yes, that's my
13   understanding.
14 Q.  And was another option that PNC had available
15   to it in instances of noncompliance requesting
16   more information from the client and continuing
17   to work with management?
18 A.  That's probably the first -- you know, that's
19   probably the first step we take.  You know, in
20   many cases the customer's notifying us that
21   they are not in compliance.  You know, my hope
22   would be that the first question a relationship
23   manager asks is for more information.
24 Q.  And you've already mentioned that a waiver was
25   another option that often was available under

1    letter of credit agreements?
2        MS. HACKETT:  You are asking if he
3    already testified to that?
4        MR. TERUYA:  Yeah, I just said you
5    also mentioned that.
6        MS. HACKETT:  I guess you can answer
7    it again.
8  A.  Yeah, it's -- our ability to offer a waiver
9    could well have been written into the document.
10   Whether we chose to do it or not would depend
11   on the underlying condition -- situation at the
12   time.
13 Q.  And with respect to all the options we just
14   talked about, is it fair to say that, like with
15   the case of a waiver, what PNC chose to do in a
16   particular instance depended on the
17   circumstances?
18 A.  Right, and not -- not to belabor, but to me it
19   is a little bit like the rumble strip.  You
20   know you've hit it, you don't know until you
21   hit it what you are really going to do, but you
22   don't want to hit the wall, and so I mean,
23   frankly, the government's kind of given us
24   that.
25       What we do in the document is we give

1    ourselves a set of -- a set of points at which
2    when we -- when we make the loan or we agree to
3    extend the credit, we want some -- you know, we
4    want some warning points where we are going to
5    come back in a discussion with a customer,
6    whether we choose to do something about it or
7    not at the time, we look at it ahead of time
8    and say what if and if and if.  We want to talk
9    about it.
10 Q.  But until you actually get to a particular
11   instance --
12 A.  Till you get there --
13 Q.  -- you don't know what you would do?
14 A.  Right.
15 Q.  And are there any -- and I take it there's also
16   no just general principles, even if there's no
17   particular policies or practices, but that
18   there's no general principles that govern
19   evaluation and decisions relating to all the
20   options we just talked about?
21       MR. COGAN:  Objection.
22 A.  No, there aren't.
23 Q.  Who was --
24 A.  I mean other than good judgment at the time.
25 Q.  And you mentioned that the goal is to avoid

29 (Pages 110 to 113)

C. DAVID COOK

Page 114

1 hitting the wall. Do you mean by that the goal
2 is, of course, to choose the option that will
3 maximize PNC's interests?
4 A.   When we extend credit, the goal is to get it
5 back at some point. We don't make a lot of
6 money if we make loans that don't get repaid,
7 and so hitting the wall to me is getting
8 ourselves in a position where we get less than
9 100 cents on the dollar back.
10       So the rumble strips, and I guess I'm
11 stuck in that, but anyway, I mean the rumble
12 strip's there basically to cause us to have a
13 chance, as we probably do with hundreds of
14 customers a day, have a chance to talk about
15 the fact that something seems to be happening
16 in the company that neither of us thought would
17 happen, so let's understand it, and either
18 let's get comfortable with it or we are going
19 to be more uncomfortable, but let's still try
20 to do something so that -- so that the customer
21 survives and we get paid.
22       MS. HACKETT:  Can we go off the
23 record for a minute?
24       MR. TERUYA:  Sure.
25       THE VIDEOGRAPHER:  We are going off

Page 115

1 the record. The time is 11:23 a.m.
2                 - - - -
3 (There was a luncheon recess in the proceedings.)
4                 - - - -
5       THE VIDEOGRAPHER:  We are now back on
6 the record. The time as indicated on the
7 screen is 12:24.
8 BY MR. TERUYA:
9 Q.   When we left off, we were talking about the
10 goal of the various options that PNC might
11 consider --
12 A.   Right.
13 Q.   -- upon learning of a noncompliance under a
14 letter of credit, and I think you mentioned
15 that the goal was to maximize the chances of
16 PNC's repayment and to maximize the chance that
17 the customer survives, and why was it important
18 that the customer survives, from PNC's
19 perspective?
20 A.   I mean from PNC's perspective, you know,
21 probably if I was to give -- if I was to give
22 it in order of priority, obviously we would
23 prefer -- we would prefer to be repaid first,
24 and yet if you go back to the kind of four
25 precepts of the groups that we really feel

Page 116

1 responsible for as an organization, you know,
2 along the way, if we can be fully repaid, you
3 know, and the customer remains a viable
4 employer in our community, that's just viewed
5 as a good thing.
6 Q.   Is there any relationship to your understanding
7 between the survival of the customer and PNC's
8 chances of full recovery?
9 A.   Never thought about it. So I don't know.
10 Q.   Or put differently, in case of the way I worded
11 the question was confusing, does PNC to your
12 knowledge have less of a chance of full
13 recovery in bankruptcy rather than not in
14 bankruptcy of a customer?
15 A.   And, again, I've got -- I've got no statistics
16 that allow me to answer one way or the other.
17 Somebody may have those statistics. I don't.
18 Q.   Okay. And I think you mentioned that the
19 various --
20 A.   And -- but maybe it's very to say bankruptcy
21 doesn't necessarily -- I mean a customer can
22 survive and not file bankruptcy, a customer can
23 not survive and not file bankruptcy. So it
24 wasn't -- maybe I shouldn't go back, but it
25 wasn't logical to me that bankruptcy was the

Page 117

1 only way the customer didn't survive.
2 Q.   If I just separate out survival and bankruptcy,
3 would that change your answer to any of the
4 questions?
5 A.   No, I don't think it will change my answer. I
6 think, you know, the question is whether the
7 organization, you know, can remain a viable
8 organization as an employer. Sometimes --
9 sometimes, you know, perhaps that does mean
10 that they ultimately file, sometimes it
11 doesn't, but I just don't have any statistics
12 one way or the other on whether that leads to a
13 better repayment for PNC or not.
14 Q.   Okay. And I think you mentioned that which
15 option PNC would choose, and I know you
16 testified that it depends on the circumstances,
17 but I think you also mentioned in one of your
18 answers that it depended on the default type.
19 What did you mean by that?
20       MR. COGAN:  Objection.
21       THE WITNESS:  Sorry, what?
22       MS. HACKETT:  He's just saying
23 objection. You can answer.
24       THE WITNESS:  Okay. That's fine.
25       MR. COGAN:  Just protecting the

C. DAVID COOK

Page 326

1  that's all I can do.
2  Q.  So you don't have any personal knowledge as to
3      what financial statements PNC ultimately got?
4  A.  I don't.  I'm done.
5          MR. TERUYA:  I was going to say you
6  can set that document aside unless you want to
7  keep looking at it.
8          MS. HACKETT:  Are you at a good point
9  to stop for the day?
10         MR. TERUYA:  Yes.  Why don't we stop
11 for the day.
12         THE VIDEOGRAPHER:  Okay.  We are
13 going off the record now.  The time is 5:32.
14             - - - -
15     (The proceedings were adjourned at 5:33 p.m.)
16             - - - -
17
18
19
20
21
22
23
24
25

Page 328

1  COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
   COUNTY OF ALLEGHENY          )    S H E E T
2
       I, C. David Cook, have read the foregoing pages
3  of my deposition given on Monday, November 24, 2003,
   and wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21     _____
22             C. DAVID COOK
   Subscribed and sworn to before me this
23 _____ day of _____, 2003.
24     _____
          Notary Public
25 AKF Reference No. HW78347

Page 327

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY          )  SS:
3      I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness, C.
6  DAVID COOK, was by me first duly sworn to testify to
7  the truth; that the foregoing deposition was taken at
8  the time and place stated herein; and that the said
9  deposition was recorded stenographically by me and
10 then reduced to printing under my direction, and
11 constitutes a true record of the testimony given by
12 said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 1st day of
23 December, 2003.
24     _____
25             Notary Public

73 (Pages 326 to 328)

C. DAVID COOK

Page 329

1              IN THE UNITED STATES DISTRICT COURT FOR THE
                   WESTERN DISTRICT OF PENNSYLVANIA
2
                            -  -  -  -
3
      THE OFFICIAL COMMITTEE OF        )
4     UNSECURED CREDITORS OF           )
      ALLEGHENY HEALTH, EDUCATION &    )
5     RESEARCH FOUNDATION,             )
                                       )
6                    Plaintiff,        )
                                       )
7                    -vs-              )    Civil Action
                                       )    No. 00-684
8     PRICEWATERHOUSECOOPERS, L.L.P.   )
                                       )
9                    Defendant.        )
10
                            -  -  -  -
11
            VIDEOTAPE DEPOSITION OF:  C. DAVID COOK
12                         VOLUME II
               CONFIDENTIAL EXCERPTS EXTRACTED
13
                            -  -  -  -
14
15              DATE:    November 25, 2003
                         Tuesday, 8:14 a.m.
16
17              LOCATION:   MANION McDONOUGH & LUCAS
                            U.S. Steel Tower
18                          14th Floor
                            Pittsburgh, PA  15219
19
20              TAKEN BY:   Defendant
21
                REPORTED BY:  Heidi H. Willis, RPR, CRR
22                            Notary Public
                              AKF Reference No. HW78347
23
24
25

C. DAVID COOK

Page 572

1   Q.   -- of AHERF were uninformed about the true
2        state of the financial condition of AHERF?
3   A.   No.
4   Q.   Do you know of what steps, if any, any trustees
5        of AHERF would, in fact, have taken if they had
6        had additional information about the financial
7        condition of AHERF at an earlier point in time?
8   A.   No.
9   Q.   Do you personally know of what, in fact, would
10       have been the effect, if any, of any steps that
11       any trustees of AHERF could have taken?
12  A.   No.
13  Q.   Do you personally know of any steps that any
14       trustees of AHERF could have taken that would,
15       in fact, have halted AHERF's financial demise?
16  A.   No.
17  Q.   Do you personally know what steps, if any, any
18       creditors of AHERF, including --
19  A.   Can we go back, can we go back to that one?
20  Q.   Oh, sure. Do you personally know of any steps
21       that any trustees of AHERF could have taken
22       that would, in fact, have halted AHERF's
23       financial demise?
24  A.   I suppose because we have just discussed the
25       letter and the proposal that PNC and MBI made,

Page 573

1        and when we discussed that I told you that I
2        thought there was a fair chance that that
3        financing might have stabilized it, but I
4        really have to change the answer on that one
5        and say that if the trustees had accepted the
6        proposals from PNC and MBIA, that I believe it
7        might have given them a chance to stabilize the
8        organization.
9   Q.   Other than that are you aware of any steps that
10       trustees of AHERF could have taken that would
11       have halted AHERF's financial demise?
12  A.   No.
13  Q.   Do you personally of know what steps, if any,
14       any creditors of AHERF, including PNC, would,
15       in fact, have taken if they had had additional
16       information about the financial condition of
17       AHERF at an earlier point in time?
18  A.   No.
19  Q.   Do you personally know --
20  A.   I mean I think we would have done something,
21       but it's just speculative. As we said before,
22       I mean lending is an art, not a science.
23  Q.   So the answer to your last question just to be
24       clear is no, no personal knowledge?
25       MR. COGAN: Objection.

Page 574

1        MS. HACKETT: No, he answered the
2        question. He didn't answer no.
3   A.   My answer would be no, comma, but if we had --
4        if we had received different financial
5        information than we received and it was -- I'm
6        drawing the conclusion it was more negative --
7        if we had received it and it was more negative,
8        we would have had a chance to do something. I
9        can't tell you what we would have done, but the
10       earlier we had a chance to start dealing with
11       something, the better off, generally speaking,
12       you know, we are and the client is.
13  Q.   Okay. And based on what you talked about
14       before about the considerations, the many
15       considerations that go into choosing among many
16       options, you have no personal knowledge of what
17       particular steps, if any, any creditors of
18       AHERF would have taken if they had had
19       additional information about the financial
20       condition of AHERF at an earlier point in time?
21  A.   Good answer, I agree.
22  Q.   And do you personally know what, in fact, would
23       have been the effect, if any, of any steps that
24       could have been taken by any creditors of
25       AHERF, including PNC?

Page 575

1        MR. COGAN: Objection.
2   A.   It's too general for me to say, but the answer
3        is generally no.
4   Q.   Do you personally know of any steps that any
5        creditors of AHERF, including PNC, could have
6        taken that would, in fact, have halted AHERF's
7        financial demise?
8   A.   Could have halted, no. Might have halted, I'll
9        go back to the proposals that we were making,
10       the financing that we and MBIA as creditors
11       were making might have halted it, and what we
12       could have done was, I suppose, been more
13       successful at getting the board to accept them,
14       but other than that, no.
15  Q.   Do you personally know of any conduct of
16       Coopers & Lybrand that contributed to delays in
17       discovering the true financial state of affairs
18       in the AHERF system?
19  A.   I guess I have to say no.
20  Q.   Do you personally know of any conduct of
21       Coopers & Lybrand that aided in preventing the
22       immediate implementation of effective measures
23       in time to reverse the decline in the system's
24       financial condition?
25  A.   No, other than suggesting that whatever their

60 (Pages 572 to 575)

C. DAVID COOK

Page 576

1    normal processes and procedures were, they may
2    not have been as effective here as they would
3    have liked.
4  Q.  Do you have any personal knowledge as to
5    whether that's, in fact, true?
6  A.  No.
7  Q.  Do you have any personal knowledge of any
8    inaccuracies revealed in the AHERF system's
9    financial statements that had a material and
10   negative effect on the sale price of certain
11   AHERF affiliates?
12 A.  No.
13 Q.  Do you personally know whether if any creditors
14   of AHERF, including PNC, had had additional
15   information about the financial condition of
16   AHERF at an earlier point in time, the system,
17   in fact, would have been precluded from
18   incurring the obligations to creditors that
19   eventually forced its bankruptcy?
20       MR. COGAN:  Objection.
21 A.  Yeah, I can surmise that that's true, but I
22   don't -- I don't really know specifically at
23   which point financial information may not have
24   been being accurately portrayed.  So I can't,
25   without that knowledge, I can't exactly guess

Page 577

1    what steps might have, you know, might have
2    been about to take place or didn't take place.
3  Q.  And I don't mean to ask you to guess and let me
4    just ask you --
5  A.  I know, that's why I'm not guessing.
6  Q.  Okay.  So just to be clear, you don't have any
7    personal knowledge of this issue, in fact?
8       MS. HACKETT:  Of this issue?  I don't
9    know what --
10 Q.  Okay.  Let me -- do you have any --
11 A.  I'm sorry, if you'll read it again, I'll try to
12   not equivocate.  I wasn't trying to equivocate.
13 Q.  Okay.  Do you have any personal knowledge of
14   whether if any creditors of AHERF, including
15   PNC, had had additional information about the
16   financial condition of AHERF at an earlier
17   point in time, the system would, in fact, have
18   precluded -- have been precluded from incurring
19   the obligations to creditors that eventually
20   forced its bankruptcy?
21       MR. COGAN:  Objection.
22 A.  Yeah, and I guess I'd answer partly like I
23   answered above, and that really is that I don't
24   know what we would have done, but given
25   different financial information at an earlier

Page 578

1    time, we would have done something, and I go
2    back to my rumble strip.  I don't know when I
3    hit the rumble strip what I'm going to do, but
4    if we had different financial information
5    sooner, we would have done something.
6  Q.  And do you know whether the effect of whatever
7    steps might have been taken would have been in
8    terms of precluding the system from incurring
9    the obligations that forced its bankruptcy?
10 A.  And that's why I was going back to timing.
11   Certainly some of the steps where they took on
12   additional debt might have taken place after,
13   we might have gotten different financial
14   information.  There's a couple of speculations
15   in there.  I don't like double "mights," but,
16   you know, if we -- if both of those had
17   occurred, yes, we might have precluded them
18   from making, you know, such acquisitions as the
19   Graduate acquisition.
20 Q.  But you don't know whether, you don't
21   personally know whether, in fact, that
22   acquisition or any others would have been
23   precluded; is that fair to say?
24       MS. HACKETT:  Objection, how can he
25   know about an event that didn't happen?  How

Page 579

1    could he -- you are asking if you --
2       MR. TERUYA:  That's my point.  If he
3    just says no, how can I know about an event
4    that didn't happen, that's fine.
5  A.  Great.  I can't know about an event that didn't
6    happen, so I can't -- I can't presume to guess
7    what might have happened afterwards.
8  Q.  Okay.  Do you personally know if any decrease
9    in AHERF's income or assets for fiscal '96 or
10   '97 would, in fact, have caused bondholders,
11   credit enhancers or other creditors to have
12   acted any differently?
13 A.  And my generic answer has to be if we had
14   gotten different information, I'm sure we would
15   have acted differently, but I don't know the
16   extent to which we would have acted
17   differently.
18 Q.  How do you know that you, in fact, you would
19   have acted differently?
20 A.  I'm comfortable based on having been a banker
21   for a lot of years that a change -- you know,
22   any change in a set of information that you get
23   causes you to think about it differently.  I
24   don't know exactly how I would have thought
25   about it; therefore, I don't know exactly what

61 (Pages 576 to 579)

C. DAVID COOK

Page 580

1  I would have done, but, you know, but any
2  changes, particularly those if they happen to
3  have been substantial would have caused us --
4  would have caused me and everyone else to react
5  differently in the bank.
6       I can't speak for the other
7  creditors. I can presume they would have done
8  the same thing.
9  Q.  Okay. And you mentioned that you would have at
10  least thought differently. Is it possible that
11  you might have nevertheless acted the same?
12       MR. COGAN: Objection.
13       MS. HACKETT: Come on, Kevin,
14  objection.
15  A.  Sure, in the third might, we might have gotten
16  different information at a different time, so
17  we might have -- we might have thought
18  differently but we might not have acted
19  differently, that's true. That's certainly a
20  possibility.
21  Q.  And would your answer be the same if I asked
22  you about any decrease in DVOG's income or
23  assets for fiscal '96 or '97?
24       MR. COGAN: Well, objection, I don't
25  know what you mean by the same.

Page 581

1  Q.  Okay. Do you have any personal knowledge
2  whether -- or if any decrease in DVOG's income
3  and/or assets for fiscal '96 and/or '97 would,
4  in fact, have caused bondholders, credit
5  enhancers or other creditors to have acted any
6  differently?
7  A.  Yeah, and in similar vein, on the scale of
8  mights, and I understand that's perhaps not
9  where everybody would like me to be, but the
10  financial condition of DVOG was less strong
11  than the financial condition of AHERF. So if
12  there had been a negative change to some of the
13  numbers at DVOG, it is more likely we would
14  have not only thought differently, but acted
15  differently, but there wasn't as much cusion
16  there.
17  Q.  But you don't know in fact --
18  A.  But I do not know in fact, you are right.
19  Q.  -- whether you would have acted any
20  differently?
21  A.  Correct.
22  Q.  Do you know whether if any decrease in AHERF's
23  income or assets for fiscal years '96 or '97
24  would, in fact, have caused any covenant
25  violations?

Page 582

1  A.  Other than my previous comments, no.
2  Q.  What comments are those with respect to
3  covenant violations?
4  A.  Oh, I'm sorry, you just switched topics. No, I
5  do not.
6  Q.  Do you have any personal knowledge of any
7  decrease or do you personally know of any
8  decrease in DVOG's income or assets for fiscal
9  '96 or '97 in fact, have caused any
10  covenant violations?
11  A.  No, and I guess both of the questions depend on
12  the severity of the decrease.
13  Q.  Do you personally know what steps, if any, any
14  creditor of AHERF would, in fact, have taken in
15  response to learning of a covenant violation?
16  A.  No, but even more than what I said before, more
17  than just getting information and feeling
18  differently about it, a covenant violation says
19  we are definitely on the rumble strip, so we
20  would have something something different.
21  Q.  Do you personally know what particular steps,
22  if any, any creditor of AHERF, including PNC,
23  would, in fact, have taken in response to
24  learning of a covenant violation?
25       MS. HACKETT: Objection, other than

Page 583

1  what he's already testified to, that they --
2  extensively about what a bank might do in
3  response to a covenant violation?
4       MR. TERUYA: I'm asking whether he
5  personally knows what they would, in fact, do
6  in response to learning of a covenant
7  violation.
8  A.  I don't know what we would have done other than
9  we would have done something.
10  Q.  And do you personally know what steps, what
11  particular steps, if any, any creditor of
12  AHERF, including PNC would, in fact, have taken
13  in response to learning of a GAAP violation?
14  A.  Would it -- would it help, because this is got
15  to be just as tough for you to read these as it
16  is for me to answer these, would it help for me
17  to agree that almost anyone involved, I don't
18  know what anyone would, in fact, have done
19  based on almost any scenario, because we are
20  talking about someone -- we are talking about,
21  you know, other creditors or other
22  organizations that I have no way to control. I
23  can't even control PNC.
24  Q.  Okay. I was going to say I'm almost -- I'm
25  close to the end, it's probably worth just

62 (Pages 580 to 583)

C. DAVID COOK

Page 592

1      So I can say from my knowledge of
2   working in the industry, if an event of -- if
3   an event of default had been declared and to
4   the extent that there were cross-default
5   language, that, in fact, all of the letters of
6   credit get drawn. That's my belief. I've got
7   to tell you that.
8   BY MR. TERUYA:
9   Q.   And you would have -- would you defer to the
10      language of the master trust indentures that
11      govern the conduct of those trustees?
12  A.   I would do that.
13  Q.   And would me showing you the master trust
14      indentures right now in any way -- or would you
15      have knowledge of the requirements of the
16      master trustees beyond whatever would be in
17      those master trust indentures?
18  A.   Only generally, and the master trust indentures
19      really ought to cover it specifically. I'm --
20      I'm more than willing to say that the language
21      in the master indentures might not cause that
22      to happen. It's just my belief that it would
23      happen.
24  Q.   And if I showed you the master trust
25      indentures, other than reading what's in there,

Page 593

1      would you be able to testify on this point
2   right now as to whether the trustees would be
3   required in the case of an event of default to
4   call the bonds?
5   A.   I think it's probably more appropriate that
6      someone who really understood master trust
7      indentures would -- if you are looking for an
8      expert witness, I'm not going to presume that
9      I'm an expert witness on the -- on the subject.
10  Q.   Okay. So other than reading me what's in the
11      master trust indentures, you wouldn't be able
12      to testify more on this point if I put those
13      documents in front of you?
14  A.   Right.
15  Q.   Do you have any personal knowledge whether the
16      term unrestricted fund balance in any letter of
17      credit agreement between PNC and AHERF, in
18      fact, excludes intercompany loans?
19  A.   I don't.
20      MS. HACKETT: Are you almost done,
21      Kevin? Because you are on borrowed time. Are
22      you about there?
23      MR. TERUYA: I just didn't anticipate
24      this module to take longer than usual, so I'm
25      sorry about that.

Page 594

1   BY MR. TERUYA:
2   Q.   Do you personally know what the present extent
3      of the bankrupt AHERF estate's net insolvency
4      is?
5   A.   No.
6   Q.   Have you had any conversations with any lawyers
7      from Jones Day before this deposition?
8   A.   No. Well, that's not exactly true. I guess I
9      had a conversation with you on one earlier
10      occasion.
11      MR. COGAN: Right.
12  A.   I consider that part of, you know, part of the
13      deposition. They wanted to make sure I was
14      still alive, so they got to look at me last
15      week.
16  Q.   And how long was that conversation for without
17      going into the details of it?
18  A.   A few hours.
19      MR. COGAN: Whatever you recall.
20  Q.   Just for a few hours?
21  A.   Mm-hmm.
22  Q.   Was anyone else present at that or a
23      participant in that conversation?
24  A.   Just the three of us.
25  Q.   Mary Hackett was the other person?

Page 595

1   A.   Right.
2   Q.   Was that a face-to-face meeting?
3   A.   It was a face-to-face meeting.
4   Q.   And without going into the details of it, it
5      was in connection with this deposition?
6   A.   It was in connection with this deposition. I
7      have certainly known other Jones Day people
8      over the years. I haven't had any recent
9      conversations with them about any other
10      matters, and I haven't met with anybody else
11      from Jones Day on the AHERF matter.
12  Q.   Okay. Did you have any conversations with
13      anyone from PNC about the subject matter of
14      this deposition?
15  A.   No.
16  Q.   Do you have any present plan to testify at any
17      trial in this litigation?
18  A.   I haven't been invited.
19  Q.   Are you involved in this litigation in any way
20      other than testifying at this deposition?
21  A.   Not that I'm aware of.
22  Q.   Have you ever reviewed the Complaint or the
23      First Amended Complaint in this litigation?
24  A.   No.
25  Q.   And are you in any way involved in monitoring

65 (Pages 592 to 595)

C. DAVID COOK

Page 596

1    the present extent of the bankrupt AHERF
2    estate's net insolvency?
3    A.   No.
4    Q.   Do you know anyone at PNC who is?
5    A.   No.
6    Q.   And do you know anyone at PNC who is involved
7        in this litigation other than people who may
8        have testified already at depositions?
9    A.   No, I do not.
10              MR. TERUYA:  Okay.  Can we go off the
11   record.
12              THE VIDEOGRAPHER:  We are now going
13   off the record.  The time is 2:51 p.m.
14                   - - - -
15   (There was a discussion off the record.)
16                   - - - -
17              THE VIDEOGRAPHER:  We are now back on
18   the record.  The time is 2:53 p.m.
19   BY MR. TERUYA:
20   Q.   And to the best of your knowledge, PNC never
21       declared an event of default on any of the
22       letters of credit that it issued on behalf of
23       AHERF entities prior to the bankruptcy; is that
24       right?
25   A.   That's true.

Page 597

1              MR. TERUYA:  I have no further
2    questions on direct.
3                   - - - -
4              EXAMINATION
5                   - - - -
6    BY MR. COGAN:
7    Q.   Mr. Cook, just a couple of quick questions, and
8        this won't be long.
9              Would it be fair to say that in your
10       experience at PNC you have never ignored a
11       covenant violation when such violation has been
12       brought to your attention?
13   A.   Yes, that would be fair to say.
14   Q.   And would it be fair to say you are not aware
15       of any employees that have worked for you at
16       PNC that have ever simply ignored covenant
17       violations when made aware of those violations?
18   A.   Absolutely.
19   Q.   And as I understood your testimony over the
20       last day and a half, when you are apprised of a
21       covenant violation, one of the things you will
22       do is to look at the credit agreement to see
23       what rights and remedies PNC may have; is that
24       correct?
25   A.   That's correct.

Page 598

1    Q.   And then as I understand your testimony, the
2        facts and circumstances as they exist at the
3        time will guide PNC in what remedies, rights,
4        actions it may pursue?
5    A.   That's correct.
6    Q.   We looked earlier at an exhibit, Exhibit 1815,
7        which was your effort to come up with a
8        valuation for AHERF.  Do you recall that?
9    A.   I do.
10   Q.   And as I would understand your testimony, it
11       was your belief at the time that an orderly
12       liquidation might result in the realization of
13       a value in excess of the debt; is that right?
14   A.   Yes, that's correct.
15   Q.   But, of course, as you sit here today, you
16       don't know whether that would, in fact, have
17       been the case or not; is that correct?
18   A.   That's correct, I do not.
19   Q.   And I think even as you indicate in that
20       Exhibit 1815, performing such a valuation as
21       you did was a difficult task; correct?
22   A.   Yes, it was.
23   Q.   And one of the reasons I think that you
24       identified for the difficulty in conducting
25       the -- or doing the valuation was, as you write

Page 599

1    here, a lack of confidence in the financial
2    information that had been furnished to PNC; is
3    that right?
4    A.   Yes, that's correct.
5    Q.   Did you later come to understand that AHERF and
6        PriceWaterhouseCoopers advised the public in
7        September of 1998 that people should not rely
8        upon the audited financial statements that had
9        been issued for the fiscal year 1997?
10   A.   I was informed of that, yes.
11              MR. COGAN:  That's all.  Thank you.
12              MR. TERUYA:  I just have a handful of
13   follow-up questions.
14              MS. HACKETT:  Just let me give you
15   one admonishment.
16              MR. TERUYA:  It's not going to go
17   past 3:30 so --
18              MS. HACKETT:  I'm not worried about
19   timing, but the first hour of this morning was
20   completely repetitive.  Don't repeat anything.
21   Please cover --
22              MR. TERUYA:  Yeah, they are follow-up
23   questions on his cross.
24              MS. HACKETT:  That's great.  I hope
25   they are.

66 (Pages 596 to 599)

C. DAVID COOK

Page 600

1    MR. TERUYA:  Okay.  They are, I
2    promise.
3    MS. HACKETT:  Go ahead.
4    - - - -
5    RE-EXAMINATION
6    - - - -
7    BY MR. TERUYA:
8    Q.   With respect to the September '98 press release
9        that you just testified about, am I correct
10       that you don't personally know why it is that
11       PWC and AHERF made that statement?
12   A.   No, I have no knowledge of the facts behind the
13       statement they issued.
14   Q.   And you have no personal knowledge of whether
15       or how, in fact, those financial statements
16       were in any way unreliable; is that right?
17   A.   No.  I mean I'll accept the fact that the two
18       organizations, you know, had a certain
19       reputation and if they are making this
20       statement, I'll accept the fact at its face
21       value that they believe the statement to be
22       true.
23   Q.   And you have no personal knowledge as to the
24       source of any lack of reliability that might
25       have been present in those financial

Page 601

1        statements; is that fair to say?
2    A.   That's fair to say, yes.
3    Q.   And any lack of reliability could have been
4        caused by a fraud on Coopers & Lybrand for all
5        you know; is that fair to say?
6            MR. COGAN:  Objection, calls for
7        speculation.
8    A.   On their part?
9    Q.   No, a fraud on Coopers & Lybrand, a key
10       prepposition.
11   A.   I can't -- I can't speculate.  Since I said
12       before I don't know the motives behind their
13       issuing the release, I've got -- I've got no
14       indication of what's going on, you know,
15       between the two.
16   Q.   Okay.  And in your memo, which is Exhibit 1815,
17       Mr. Cogan referred you to the section on a lack
18       of confidence in the financial information
19       which has been received and a paucity of
20       accurate financial information from the client.
21           Am I correct that the financial
22       information being discussed there is
23       information from AHERF and AHERF management?
24   A.   It is, yes, you are correct.
25   Q.   And do you know, do you personally know whether

Page 602

1        that information was in any way reviewed by
2        Coopers & Lybrand, the particular information
3        that's at issue in your memo?
4    A.   Other than -- other than the earlier audited
5        financials, no, I'm not aware of anything other
6        than the audited financials of them -- you
7        know, with a Coopers signature on an audited
8        financial, I'm comfortable they should have
9        reviewed it.  Whether they did or not is up to
10       them in their processes of applying the
11       signature, but the unaudited information that
12       came directly from the company, I have no
13       knowledge as to whether Coopers reviewed that
14       prior to it being given to us.
15   Q.   And in terms of your belief that there was a
16       paucity of accurate financial information from
17       the client and a lack of confidence in the
18       financial information which had been received,
19       did those statements apply to the audited
20       financial statements as well at that point in
21       time on July 8, on July 8 of 1998?
22   A.   To be honest I can't tell you whether I was
23       thinking about the audits or -- you know,
24       individually or collectively, or whether I was
25       just thinking about financial information in

Page 603

1        general.  I can't tell you what was in my mind
2        when I wrote that.
3    Q.   So you can't recall or you don't know as you
4        sit here today whether those statements refer
5        to merely the unaudited interim financial
6        statements that were being provided in calendar
7        year '98 by AHERF management?
8    A.   That's correct.
9    Q.   And lastly, you mentioned that the particular
10       remedies chosen by PNC in the case of covenant
11       noncompliance depends on the facts and
12       circumstances at the time that such
13       noncompliance occurred, is that --
14   A.   That's correct.
15   Q.   -- is that right?  That's what you testified
16       to?
17   A.   Yes, you guys both asked the same --
18           MR. COGAN:  We both got that.
19   A.   You got the same question, and I'll give you
20       the same answer.  Sorry.
21   Q.   And am I correct that if we hypothesize
22       different events to have occurred, such as the
23       provision of additional financial information
24       at an earlier point in time, then that would,
25       of course, change the facts and circumstances

67 (Pages 600 to 603)

C. DAVID COOK

Page 608

1   no further questions, the deposition is now
2   concluded at 3:04 p.m.  Thank you.
3                - - - -
4   (The proceedings were concluded at 3:04 p.m.)
5                - - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 610

1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY          )   S H E E T
2
3        I, C. David Cook, have read the foregoing pages
    of my deposition given on Tuesday, November 25, 2003,
3   and wish to make the following, if any, amendments,
    additions, deletions or corrections:
4
5   Page/Line  Should Read         Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21
                _____
22                     C. DAVID COOK
23  Subscribed and sworn to before me this
    _____ day of _____, 2003.
24  _____
            Notary Public
25  AKF Reference No. HW78373

Page 609

1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF ALLEGHENY          )  SS:
3        I, Heidi H. Willis, RPR, CRR, a Court Reporter
4   and Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness, C.
6   DAVID COOK, was by me first duly sworn to testify to
7   the truth; that the foregoing deposition was taken at
8   the time and place stated herein; and that the said
9   deposition was recorded stenographically by me and
10  then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 1st day of
23  December, 2003.
24  _____
25                Notary Public

69 (Pages 608 to 610)

Danforth Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *DOUGLAS D. DANFORTH*
*October 7, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**DANFORTH, DOUGLAS D. - Vol. I**



LEGALINK

A **WORDWAVE** COMPANY

DOUGLAS D. DANFORTH

Page 126

1  letter.
2  Q.  Okay.
3      MR. McCLENAHAN:  Unless you're close
4  to being finished --
5      MR. BROOKS:  I'm close to a break
6  point if that's your question.
7      MR. McCLENAHAN:  We probably ought to
8  get some lunch at some point.
9      MR. BROOKS:  Yes.  I'm at a good
10 break point.
11     THE VIDEOGRAPHER:  We are now going
12 off the record.  The time is 12:40 p.m.
13     - - - -
14 (There was a luncheon recess in the
15     proceedings at 12:40 p.m.)
16     - - - -
17     THE VIDEOGRAPHER:  We are now going
18 back on the record.  The time is 1:37 p.m.
19     - - - -
20     EXAMINATION CONTINUED
21     - - - -
22 BY MR. BROOKS:
23 Q.  Mr. Danforth, I have handed you what's been
24 previously marked as Exhibit 1656?
25 A.  In this big one.

Page 127

1  Q.  Related to an October 30, 1997 meeting of the
2  board of trustees of AHERF.
3  A.  All right.
4  Q.  And do you believe this to be a set of
5  materials that you received before the
6  October 30, '97 board meeting?
7  A.  Yes.
8  Q.  If you turn in this document to page
9  beginning with Bates number ending in 827,
10 large number at the top 17.
11 A.  Okay.
12 Q.  You will find the consolidated financial
13 statements for the year ended June 30, 1997,
14 in draft form.  Do you see that?
15 A.  Right.
16 Q.  I want to take you in that document to page
17 ending 831 which is the consolidated
18 statement of operations --
19 A.  Okay.
20 Q.  -- and direct your attention in the statement
21 of operations first to the line item for
22 Investment Income, which I believe you will
23 see is about 85.9 million?
24 A.  Yes.
25 Q.  And below that Net assets Released From

Page 128

1  Restrictions Used for Operations of about 47
2  million; correct?
3  A.  Right here?
4  Q.  Immediately below that.
5  A.  Right.
6  Q.  And did you have an understanding as to what
7  net assets released from restrictions used
8  for operations referred to?
9  A.  Do I now or did I then?
10 Q.  Are you able to answer either of those
11 questions?  Did you then?
12 A.  Probably not, unless they were unrestricted
13 gifts of some sort that were in the kitty.
14 Q.  Did you generally understand that to refer to
15 one type or another of endowment assets?
16 A.  Of course now I know to be a fact.  Then I'm
17 not sure whether I knew specifically that was
18 where it came from.
19 Q.  Okay.  Let me call your attention to the net
20 income shown for fiscal year 1997 of about 22
21 million.
22 A.  Yes.
23 Q.  You would agree with me, would you not, that
24 to derive net operating income you would
25 subtract at least investment income from that

Page 129

1  net income?
2  A.  That's probably the case, yes.
3  Q.  And that would give you a number of about at
4  a loss of about $64 million?
5  A.  Yes, right.
6  Q.  And based on your current understanding at
7  least you would also subtract out the $47
8  million of net assets released from
9  restrictions; correct?
10     MR. McCLENAHAN:  If you wanted to get
11 pure net operating income.
12     MR. BROOKS:  Net operating income,
13 yes.
14 BY MR. BROOKS:
15 Q.  Is that consistent with your understanding?
16 A.  Yes.
17 Q.  And that would leave you with something in
18 the order of something in excess of a hundred
19 million dollar net operating loss?
20 A.  Yes, except that you can't tell without
21 looking at the prior year whether that $47
22 million is an upside number or downside
23 number or whether it's an annual kind of a
24 thing.
25 Q.  That is -- and I haven't asked you whether

33 (Pages 126 to 129)

DOUGLAS D. DANFORTH

Page 130

1   that's sustainable, but just in terms of this
2   year's net operating loss if you would
3   subtract out those two numbers and find
4   something in excess of a hundred million
5   dollar net operating loss for fiscal '97;
6   correct?
7   A.   Correct.
8   Q.   Do you recall that being a subject of, that
9   is, a net operating loss of that scale being
10  a subject of severe concern among AHERF board
11  members?
12  A.   Again, I can't recall the specifics, but I
13  would be sure that all of these numbers would
14  have been discussed in some detail at one of
15  the board meetings after this draft was
16  presented because these are the kinds of
17  things that were discussed at the board
18  level.  Macro numbers as opposed to all the
19  details, yes.
20  Q.   Do you recall any member of the AHERF board
21  after receiving these fiscal year '97 figures
22  raising the suggestion that top management
23  should be changed?
24  A.   I can't recall that.  I don't recall that
25  being the case, no.

Page 131

1   Q.   Do you recall yourself considering opposing
2   that?
3   A.   No, not at this time.
4   Q.   Let me ask you a hypothetical question.  The
5   hypothetical is that the consolidated
6   statement of operations for AHERF for fiscal
7   '97 had shown a net operating loss of $200
8   million instead of $100 million.  If that had
9   been the case, as you sit here today, do you
10  know whether AHERF management would have then
11  replaced -- pardon me -- whether AHERF -- the
12  AHERF board would then have replaced top
13  management?
14  A.   Well, again, you posed it as a hypothetical
15  question, that if that were the case;
16  however, management was convincing in saying
17  this is a transitional thing, twelve months
18  from now everything will be quite different,
19  you got another set of circumstances.  So it
20  is a hypothetical question and not very easy
21  to answer.
22  Q.   Okay.  On that same hypothetical do you know
23  whether AHERF management -- on that same
24  hypothetical do you know whether the AHERF
25  board would then, that is upon receipt of the

Page 132

1   fiscal '97 numbers, have insisted that AHERF
2   abandon the procurement of physician
3   practices?
4   A.   Or changed their strategy and that together
5   with other things, perhaps yes.
6   Q.   Do you know as you sit here today what
7   particular business adjustments the
8   management or the board would have insisted
9   on in that circumstance?
10  A.   Well, again, we looked mostly at the whole,
11  but it was known at that time that the
12  eastern establishment was struggling, and I
13  think it would beg the question of what do we
14  do with the eastern entities other than MCP,
15  which is an integral part of the strategy.
16  Q.   Explain to me, if you would, why MCP in the
17  East was an integral part of strategy even
18  for the western AHERF entities.
19  A.   Well, I explain it's two pieces.  There is
20  two parts of the strategy, and I dealt with
21  one of them before.  MCP was acquired because
22  it was felt there is a need to have a
23  coupling with a medical college for two
24  reasons, one, to enhance our ability to
25  attract research dollars and, secondarily, to

Page 133

1   serve as a source of residents to feed the
2   western hospitals.
3   Q.   Did it, in fact, successfully serve both
4   those functions?
5   A.   I believe so, yes.
6   Q.   Let me hand you a document previously marked
7   as Exhibit 1655 in this litigation which is a
8   set of minutes relating to an October 30,
9   1997 AHERF board meeting.  Mr. Danforth, am I
10  correct that you were present at this
11  particular meeting?
12  A.   I was.  It says I was.  I'm sure I was.
13  Q.   And the title of the document says Via Video
14  Conference.
15  A.   Right.
16  Q.   Can you describe for me, if you recall,
17  physically how this meeting was held?
18  A.   There was a conference room at Allegheny with
19  a big screen and speakers on the table and a
20  similar setup they had at Hahnemann, and so
21  it was to save travel time.  The meeting was
22  conducted with both the video and audio
23  systems in both places.
24  Q.   So a portion of the board was in Pittsburgh
25  and a portion was physically located in

34 (Pages 130 to 133)

DOUGLAS D. DANFORTH

Page 134

1  Philadelphia?
2  A.  Exactly.
3  Q.  Were other AHERF board meetings conducted in
4  that same way?
5  A.  Some, but not all, but some.
6  Q.  Did you find that meeting by video conference
7  to work adequately for the purpose of
8  enabling the board to discuss the issues that
9  were before it?
10  A.  Yes.  It's not quite as good as everyone
11  being there, but I still use them today.  I'm
12  still on three corporate boards, and we use
13  them fairly frequently.
14  Q.  Which boards are you still on today?
15  A.  I'm still on Sola International and a company
16  called Envirasource in Philadelphia, and I'm
17  a partner in Greenwich Partners in New York.
18  Q.  Well, let me ask you to turn to page ending
19  in 631.  I'm going to call your attention to
20  the section headed Report on the Finance
21  Committee.
22       MR. McCLENAHAN:  This is October 30,
23  1997.
24  A.  Okay.
25  Q.  The subheading here is Results of AHERF

Page 135

1  Operations for the Period Ending
2  September 30, 1997.  That would be the first
3  quarter of fiscal '98 is; correct?
4  A.  Correct.
5  Q.  Tell me when you've read that section to
6  yourself.
7  A.  (Witness reviews document.)
8  Q.  Now, did Mr. Abdelhak, in fact, record at
9  this meeting that the system was $34 million
10  short of its revenue estimates --
11  A.  Right.
12  Q.  -- for the first quarter of '98?
13  A.  Correct.
14  Q.  Do you recall this meeting with any clarity?
15  A.  I vaguely recall it with clarity.  Probably
16  not.
17  Q.  Do you recall your reaction to learning that
18  the system was $34 million below budget for
19  one quarter alone?
20  A.  Well, obviously it's a big number.  Yes, I
21  can't recall the specifics of this particular
22  discussion.  I do recall that there was great
23  discussion about the cutbacks in federal and
24  state support.  That was discussed at several
25  meetings.

Page 136

1  Q.  In your judgment did the report that the
2  system was $34 million behind budget amount
3  to an announcement that AHERF faced a serious
4  crisis?
5  A.  I think it goes on to say that the
6  organization is strong financially.
7  Q.  I'm asking you for your recollection of your
8  judgment when you heard this --
9  A.  The 34 million is revenue, not income, so --
10  thank you.  My fall allergies.  What was the
11  question again?
12  Q.  The question is did you -- was it your belief
13  when you heard this news that this meant that
14  AHERF was in a crisis situation?
15  A.  Trouble yes, crisis no.
16  Q.  How urgent did you judge it to be that
17  changes be made to improve revenues?
18  A.  Well, at that time I'm sure the board felt
19  that still management had a solution to it
20  and they were taking appropriate actions, so
21  the board obviously accepted that at that
22  time.
23  Q.  By the first quarter of '98 it was the case,
24  was it not, that AHERF had gone through
25  several years in which results had been

Page 137

1  disappointing?
2  A.  Well, disappointing in the total arena of the
3  industry probably not because we were still
4  showing an after tax profit, modest as it
5  was, that it appeared as though the
6  organization was afloat and probably not any
7  worse off than others in our industry because
8  you may remember at that time hardly a week
9  went by that there wasn't something in the
10  press about hospital A, B, C, D, you know,
11  that the health industry was struggling.
12  Were we struggling more than others?  I don't
13  know, but probably not at that time.
14  Q.  After the disclosure of the first quarter '98
15  results did, to your recollection -- I asked
16  you this question as of the end of fiscal
17  year '97.  Now I want to ask after the first
18  quarter '98 -- did you or any member of the
19  AHERF board suggest that top management,
20  including Mr. Abdelhak, be replaced?
21       MR. McCLENAHAN:  And this is at what
22  time?
23       MR. BROOKS:  After receiving the
24  first quarter '98 financial results.
25  A.  You're talking about calendar '98 or --

35 (Pages 134 to 137)

DOUGLAS D. DANFORTH

Page 210

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3      I, Claire Gross, RDR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  DOUGLAS D. DANFORTH, was by me first duly sworn to
7  testify to the truth; that the forgoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 8th day of
23  October, 2003.
24  _____
25            Notary Public

Page 211

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY       )   S H E E T
2
       I, DOUGLAS D. DANFORTH, have read the forgoing
3  pages of my deposition given on Tuesday, October 7,
   2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21  _____
           DOUGLAS D. DANFORTH
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
           Notary Public
25  AKF Reference No. Cg77584

54 (Pages 210 to 211)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *DOUGLAS DANFORTH*
### *October 8, 2003*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**DANFORTH, DOUGLAS - Vol. II**



**LEGALINK**
A WORDWAVE COMPANY

DOUGLAS D. DANFORTH

Page 221

1  as requested by the auditors?
2        MR. McCLENAHAN: Objection to the
3  form. Do you mean whether the AHERF managers
4  would have reversed this?
5        MR. BROOKS: I'm sorry. What did I
6  say?
7        THE WITNESS: You said the audit
8  committee.
9        MR. McCLENAHAN: No, no. You didn't
10  say audit committee.
11        MR. BROOKS: What I said on the
12  transcript was AHERF management.
13        Why don't you read back the question,
14  if you would.
15        MR. McCLENAHAN: Did you mean to say
16  AHERF management? I think that's what you
17  said.
18        MR. WHITNEY: Wait a minute. Let
19  me --
20        MR. BROOKS: Let's just hear the
21  question back. I think that's what I meant to
22  say. If I --
23        MR. McCLENAHAN: Let me spell out my
24  objection. If you want to re-ask it --
25        I object on the grounds of vagueness.

Page 222

1  I wasn't sure you meant to use the word
2  "managers." If you did, that's fine.
3        I'm not sure how this man could know
4  that. It's vague. There's nothing in the
5  question that would educate the witness about
6  what the transfers were, what the magnitude of
7  them were, that would give him a basis upon
8  which to respond to the question.
9  BY MR. BROOKS:
10  Q.    Let me ask a foundational question.
11        At some point, Mr. Danforth, in your
12  capacity as a member of the board of trustees
13  of AHERF or otherwise, did you come to learn
14  the amount of reserves that had been
15  transferred from Graduate entities to Delaware
16  Valley Obligated Group entities?
17  A.    We eventually, obviously, learned of it. I
18  can't pinpoint the time, but we certainly
19  learned of the magnitude of the dollars that
20  were transferred, yes.
21  Q.    And my question for you is this. It's a
22  hypothetical question. I'll say that up front.
23        If, during the '97 audit, the
24  Coopers & Lybrand audit team had taken the
25  position that those transfers had to be

Page 223

1  reversed, do you have any knowledge, as you sit
2  here today, as to whether AHERF management
3  would have reversed the transfers?
4  A.    I really don't. As we discussed yesterday, I
5  was not on the audit committee, so I have no
6  way of responding really to that.
7  Q.    If the fiscal '97 financials proved to the
8  board of trustees the level of bad debt expense
9  at the Delaware Valley Obligated Group
10  hospitals had been reported at a substantially
11  higher level than it was, in fact, reported, do
12  you know as you sit here today whether based
13  upon those poorer results the board of trustees
14  would have replaced top management at AHERF?
15        MR. McCLENAHAN: Objection. Vague.
16  Without foundation.
17        MR. WHITNEY: Join.
18        THE WITNESS: I pass.
19        MR. BROOKS: You can do many things,
20  but passing isn't one of them.
21        MR. McCLENAHAN: The question is, do
22  you know as you sit here today whether the
23  board would have replaced AHERF management; do
24  you know that?
25        THE WITNESS: I don't know that, no.

Page 224

1        MR. BROOKS: I have no further
2  questions.
3        - - - -
4        EXAMINATION
5        - - - -
6  BY MR. WHITNEY:
7  Q.    Mr. Danforth, we've met before. My name is
8  Richard Whitney. I'm from Jones Day. I
9  represent the creditors' committee in this
10  case.
11        The creditors' committee in this case
12  is suing PriceWaterhouseCoopers for audit
13  failures in connection with the 1996 and 1997
14  audits. Were you aware of that?
15  A.    Yes.
16  Q.    You have, if I may say, a rather remarkable
17  resume, and we didn't even get to the issue of
18  how many civic and nonprofit boards you sit on,
19  but one of the civic and nonprofit activities
20  you engaged in was being a member of first
21  Allegheny General Hospital and then AHERF's
22  board of trustees. Is that right?
23  A.    That's correct.
24  Q.    Now, this is something for which you were not
25  paid.

4 (Pages 221 to 224)

DOUGLAS D. DANFORTH

Page 225

1  A.  That's correct.
2  Q.  And the other trustees were not paid either.
3  A.  That's correct.
4  Q.  In your judgment, were the other trustees of
5  AHERF, focusing on 1996 and 1997, men and women
6  of intelligence?
7  A.  Yes.
8  Q.  Men and women of demonstrated success?
9  A.  Yes.
10 Q.  All right. Mr. Danforth, if you knew in 1996
11 or believed in 1996 -- let me start over.
12        If you believed in 1996 that AHERF
13 was failing, and that left to pursue its
14 current tragedy it would end up in bankruptcy,
15 would you have demanded action be taken to curb
16 that problem?
17        MR. BROOKS: Objection.
18        THE WITNESS: Well, again, it would
19 depend on how it was framed. If we knew then
20 what we know now and that management felt the
21 deficiencies were correctable and that actions
22 were under way or could be taken to strengthen
23 the fiscal position of the overall enterprise,
24 probably we would not have taken action.
25 BY MR. WHITNEY:

Page 226

1  Q.  All right. As a member of this board, you
2  testified you saw a great deal of financial
3  information, both audited and unaudited. Is
4  that right?
5  A.  True.
6  Q.  Did you attach any special significance to the
7  audited financial information that you
8  received?
9  A.  The answer is yes, because those were the
10 official documents that reported the results of
11 the enterprise.
12 Q.  And they were audited by Coopers & Lybrand, a
13 so-called big four or big six or big eight
14 accounting firm. Right?
15 A.  Yes.
16 Q.  Did you place --
17        As a trustee of a nonprofit board,
18 which you're engaged in without fee and for
19 civic good, did you place any special reliance
20 on Coopers & Lybrand's presence in evaluating
21 financial information?
22        MR. BROOKS: Objection.
23        MR. McCLENAHAN: You can answer the
24 question.
25        THE WITNESS: I can answer the

Page 227

1  question?
2        We placed, obviously, dependence on
3  both our internal auditing group and financial
4  people, as well as, obviously, external
5  auditors as you do in a for-profit or nonprofit
6  organization.
7  BY MR. WHITNEY:
8  Q.  Coopers & Lybrand were independent of internal
9  management. Right?
10 A.  That's correct.
11 Q.  So Coopers & Lybrand would have been to you an
12 independent set of eyes?
13 A.  Yes.
14 Q.  Did that fact give you special comfort in
15 looking at the financial statements that they
16 audited and opined on?
17        MR. BROOKS: Objection.
18        THE WITNESS: Again, from my
19 experience in other enterprises as well as this
20 one, the answer is yes; you depend upon the
21 external auditors to verify what your internal
22 people are reporting.
23 BY MR. WHITNEY:
24 Q.  Yesterday you were asked by Mr. Brooks, I
25 believe, what metric the board used to gauge

Page 228

1  management's success in this integrated
2  delivery strategy. Do you recall that?
3  A.  Yes.
4  Q.  Would one of those metrics be the financial
5  statements produced by the company as time went
6  on?
7  A.  There were many criteria, obviously, comparing
8  our reporting benchmark against other
9  organizations, both for-profit and nonprofit
10 organizations; obviously numerical results,
11 occupancy rates, and many, many other factors
12 we used to measure the performance of senior
13 management.
14 Q.  You'll recall when the United Hospitals were
15 acquired in the 1990s, they were not performing
16 very well. Do you recall that?
17 A.  I recall that.
18 Q.  And you recall that Mr. Abdelhak indicated that
19 he believed that through synergies that could
20 be achieved through consolidation, the
21 historically poor performance of those
22 hospitals could be turned around, and they
23 could become profitable. Is that right?
24 A.  That's correct.
25 Q.  In measuring whether or not Mr. Abdelhak was

5 (Pages 225 to 228)

DOUGLAS D. DANFORTH

Page 229

1     true to his word in turning around the
2     performance of those hospitals, would the
3     financial performance of those hospitals, as
4     set forth in the audited financial statements,
5     be relevant?
6  A.  They would be relevant and looked at on a
7     quarterly basis, yes.
8  Q.  All right.  The audited financial statements
9     were available on an annual basis.  Right?
10 A.  Yes.  Internal people reported quarterly, of
11    course.
12 Q.  Did there come a time in 1998 where you came to
13    be aware that there was an issue about whether
14    or not the 1997 audited financial statements
15    had to be restated?
16 A.  We became aware of that, as I recall, after
17    many other events led us to ask for the
18    resignation of senior management.
19       We had no way of knowing before we
20    delved into the reasons for the predicament we
21    found ourselves in in the first half of '98.
22 Q.  Is it your recollection that you had already
23    fired management before you were aware that the
24    financial statements had to be restated?
25 A.  I believe the answer is yes.

Page 230

1  Q.  All right.  Do you recall why it is that the
2     board determined to discharge David McConnell,
3     the chief financial officer?
4  A.  As I recall, he was discharged after Sherif was
5     discharged; and Tony Sanzo, who succeeded
6     Sherif, asked that he stay on for a time until
7     he began to, you know, take over his
8     responsibilities.
9        It was about, I think, one or two
10    months that he decided, obviously, that he had
11    to make a change in the CFO and others in that
12    particular department, but it was after that
13    Sherif was released.
14 Q.  Do you remember why, though, the decision was
15    made to terminate Mr. McConnell?
16 A.  I can't remember exactly, no, but just Tony
17    felt he had to make a change.  That was a key
18    position; and he made a change in human
19    resource director, as well, I guess, feeling
20    part --
21       They were not guessing.  They were
22    part of the problem.
23 Q.  Did you at any time have any reason to doubt
24    the honesty or integrity of Mr. McConnell?
25 A.  I did not.

Page 231

1  Q.  All the way up to the time he was discharged?
2  A.  All the way up to the time.
3  Q.  All right.  As you look back on it today, are
4     there questions in your mind about his
5     integrity?
6  A.  Well, you used two words, dishonesty and
7     integrity.
8  Q.  All right.
9  A.  I don't think it was ever proven he was
10    dishonest.  His zeal, I guess you would call
11    it, to support his CEO, was such that he
12    probably bent and compromised himself in the
13    reporting of the numbers.
14 Q.  If Coopers & Lybrand, during the performance of
15    their audits, had come to conclude themselves
16    that Mr. McConnell was dishonest, would you
17    expect them to tell the board of that
18    revelation?
19 A.  Yes.
20 Q.  Would that be something that would matter to
21    you as a board member?
22 A.  Of course.
23 Q.  Because the notion that the chief financial
24    officer of an entity may be dishonest is
25    something that is of some great concern?

Page 232

1  A.  Of course.
2  Q.  All right.
3  A.  Let me just qualify that by saying I don't
4     think we would have just taken the word of the
5     external auditors.  We obviously would have had
6     our own investigation to make sure that what
7     was presented to us was, indeed, fact.
8  Q.  All right.  You mentioned a situation in Texas
9     where on -- on a board where you were involved
10    where Ernst & Young basically said in a
11    management letter you're going to need to fire
12    management, or we quit.  Do you remember that?
13 A.  I do.
14 Q.  What if Coopers & Lybrand had told you that
15    they had severe question about Mr. McConnell's
16    honesty or integrity, and if you don't fire
17    him, we quit?  Is that something you would have
18    taken seriously?
19       MR. BROOKS:  Objection.
20       THE WITNESS:  That's, again, a
21    situation that you don't know how you'd react.
22    We would certainly have taken it upon ourselves
23    as a board to do our own investigating to see
24    how much depth there was to this.  We would
25    engage, I'm sure, outside counsel and say let's

6 (Pages 229 to 232)

DOUGLAS D. DANFORTH

Page 257

1  Q.   If Coopers & Lybrand told you that management
2      was wrongfully trying to take money from those
3      Lockhart trusts and take them into general
4      income, would that be a matter of concern to
5      you?
6  A.   Are you talking about taking the principal or
7      the earnings on --
8         MR. BROOKS:  Objection.
9  BY MR. WHITNEY:
10  Q.   The principal.
11  A.   The earnings generally do flow right into the
12      general income --
13  Q.   I'm talking about capital gains that are
14      staying in the trust through the sale of
15      securities and that is restricted under the
16      terms of the trust documents.  Would that be a
17      matter of concern to you?
18         MR. BROOKS:  Objection.  Lack of
19      foundation.
20         THE WITNESS:  Yes.
21         MR. WHITNEY:  All right.  That would
22      be a matter of concern to you again because in
23      the first place, AHERF is taking money out of
24      restricted endowments and trying to take it
25      into income.  Right?

Page 258

1         MR. BROOKS:  Objection.
2         THE WITNESS:  I would have to see the
3      document and see how it was worded; but, again,
4      income can be taken into operations, whereas
5      the principal, if it's restricted, as the name
6      implies, it can't be touched.
7  BY MR. WHITNEY:
8  Q.   In my hypothetical, Coopers & Lybrand is
9      telling you they looked at the instrument, and
10      it can't be touched.  The money that AHERF is
11      using can't be touched.  Okay?
12  A.   What's the question then?
13  Q.   The question is, is that a matter of concern to
14      you?
15  A.   Yes.
16  Q.   Would it cause you to question why management
17      was trying to take restricted funds into
18      earnings?
19  A.   Again, you're talking about principal.
20  Q.   Right.
21  A.   Yes.  That would be a concern.
22  Q.   Would it also be a matter of concern to you
23      that Coopers & Lybrand is saying what they are
24      doing is contrary to GAAP?
25  A.   Describe GAAP again to me.

Page 259

1  Q.   Generally accepted accounting principles.
2  A.   Of course.  Of course.  I would say yes.  Yeah.
3      Gap is a clothing manufacturer, also.
4         MR. BROOKS:  Let's see if we can work
5      them in here.
6  BY MR. WHITNEY:
7  Q.   The total of these adjustments I've
8      hypothesized would be instead of making
9      $6 million in 1996, AHERF was making negative
10      30, 60, 75 -- approximately negative
11      $70 million in 1996 for the reasons I've given
12      you in that hypothetical.
13  A.   Well, as I said earlier, in that case you'd
14      have to look at it vis-a-vis what the budget
15      said they were going to do, what their
16      pro forma expectations were and, again, you'd
17      have to hear from management what are they
18      going to do to correct their losses and the
19      deterioration of the balance sheet.
20  Q.   But in the context that I've given you for
21      these adjustments, the first is that Coopers is
22      telling you that management is overstating
23      accounts receivable in the east, and,
24      therefore, revenue in the east is being
25      overstated.

Page 260

1      Secondly, management is wrongfully
2      releasing into 1996 income reserves created in
3      prior years, and is inappropriately enhancing
4      revenue with nonoperational, noninvestment
5      income; and, thirdly, they are using restricted
6      funds to essentially pad the income statement.
7      In that context, would this be a
8      matter of concern to you?
9         MR. BROOKS:  Objection.
10        THE WITNESS:  I think we just went
11      over that.  Again, I said before, what you
12      would do is --
13      You would obviously get your
14      management in the same room with the external
15      auditors and say let's hash this out and find
16      out who's right and whose opinion would
17      prevail.
18      You wouldn't just act singularly on
19      one opinion or the other independent of which
20      side it came from.
21  BY MR. WHITNEY:
22  Q.   What if you concluded as a result of that
23      investigation if what Coopers told you was
24      right and that the chief financial officer was
25      preparing financial statements contrary to

13 (Pages 257 to 260)

DOUGLAS D. DANFORTH

Page 261

1      GAAP, would that be a matter of concern to you?
2   A.    Yes.
3   Q.    What if they told you at the end of 1996 that
4       they had questions about Mr. McConnell's
5       integrity?  Would that have been a matter of
6       concern to you?
7           MR. BROOKS:  Objection.
8           THE WITNESS:  It would have been
9       investigated, yes.
10  BY MR. WHITNEY:
11  Q.    Okay.  If the investigation on your part
12      determined that there was validity to that
13      conclusion, what would you do?
14  A.    You would ask for McConnell's resignation,
15      obviously.
16  Q.    You would fire McConnell?
17  A.    Yes.
18  Q.    If Abdelhak was in on it, you would fire
19      Abdelhak, too.  Right?
20  A.    Yes.
21  Q.    If you decided that the net effect of the
22      adjustments I just talked about were that the
23      board was being given severely overstated
24      financial results, would you consider actions
25      to try to stave off the losses that Coopers was

Page 262

1       telling you about?
2           MR. BROOKS:  Objection.
3           THE WITNESS:  Well, again, these are
4       a lot of hypothetical questions --
5           MR. WHITNEY:  I'm bound to ask
6       them --
7           THE WITNESS:  You'd have to know the
8       full context that this was presented and all
9       the information on the table before you would
10      take any action, because, obviously, if one is
11      discharged improperly, then you've got other
12      liabilities to be concerned about; so you'd
13      have to make absolutely sure that the charges
14      were valid and that there was justification for
15      an action and, of course, a change in
16      management.
17          MR. WHITNEY:  But if you concluded
18      that the charges were valid, in addition to
19      terminating management, what other actions
20      might be available to the board?
21          MR. BROOKS:  Objection.  Requires
22      speculation.
23          THE WITNESS:  Again, that's very hard
24      to consider.  Obviously you'd look at the
25      competency of our audit committee, you'd look

Page 263

1       at the effectiveness of the board.  There's a
2       lot of things you would look at.
3           MR. WHITNEY:  Would you consider,
4       perhaps, hiring a consultant to see whether or
5       not there were actions that could be taken to
6       improve results?
7           MR. BROOKS:  Objection.
8           THE WITNESS:  You would -- obviously
9       at that point we would have had an outside
10      counsel in to review with us the validity of
11      the charges, and certainly at some point in
12      time you'd get a hospital consultant in, as we
13      did, as you know, early in 1998.
14  BY MR. WHITNEY:
15  Q.    Uh-huh.
16  A.    From Detroit, I believe.  I can't remember
17      their name.
18  Q.    That was the next question I was going to ask
19      you.
20          When all of this, in fact, came to
21      pass, that is, you came to understand that
22      financial results were materially different
23      than what you had understood them to be, the
24      board took decisive action.  Right?
25  A.    Correct.

Page 264

1   Q.    You hired a consultant?
2   A.    Correct.
3   Q.    You considered whether or not you could address
4       the problem by moving certain entities out of
5       the system?
6   A.    We looked at a lot of things, yes.
7   Q.    But you didn't just sit there and do nothing.
8   A.    That's correct.
9   Q.    And in 1996, if you were confronted with the
10      same situation, that is, that the true
11      financial picture was considerably worse than
12      what it had been portrayed as being, you
13      wouldn't have sat there and done nothing.
14      Right?
15          MR. BROOKS:  Objection.
16          THE WITNESS:  Again, as I stated
17      yesterday, we would examine it in the whole.
18      And if management were persuasive and convinced
19      us, yes, these were the numbers and next
20      quarter there would be this improvement and
21      next year there will be this improvement, and
22      we were persuaded of that, we probably would
23      have continued with the same management for a
24      period of time.
25  BY MR. WHITNEY:

14 (Pages 261 to 264)

DOUGLAS D. DANFORTH

Page 265

1  Q.  All right.
2  A.  So you have to look at all of the data before
3      you could make just an arbitrary decision as to
4      what you would do.
5  Q.  But the bottom line is if the financial results
6      were materially wrong and management knew they
7      were materially wrong and Coopers was telling
8      you they were materially wrong, that would be a
9      serious matter facing the board.  Right?
10 A.  Correct.
11 Q.  Let's assume instead of coming to you and
12     giving you a restated financial statement on
13     9-11-96, you came to realize that
14     Coopers & Lybrand was certifying a financial
15     statement in 1996 that they themselves knew to
16     be wrong, would that be a matter of concern to
17     you?
18         MR. BROOKS:  Objection.
19         THE WITNESS:  Well, the answer is
20     obviously it would be a concern, yeah.
21 BY MR. WHITNEY:
22 Q.  All right.  Did there come a point in time
23     where the board decided to terminate
24     Coopers & Lybrand?
25 A.  No.

Page 266

1  Q.  You don't recall that?
2  A.  I don't recall that, no.  I --
3  Q.  All right.
4  A.  You're talking about in 1998?
5  Q.  Yes.
6  A.  I don't recall a discussion of their removal.
7      It could have taken place, but I don't recall.
8          MR. WHITNEY:  All right.  Why don't
9      we take a short break, let me put some
10     documents together, and then we'll close up.
11         THE VIDEOGRAPHER:  We're now going
12     off the record.  The time is 10:09 A.M.
13             - - - -
14     (There was a discussion off the record.)
15             - - - -
16         THE VIDEOGRAPHER:  We're now going
17     back on the record.  The time is 10:26 A.M.
18         MR. WHITNEY:  Back off the record
19     again.
20         THE VIDEOGRAPHER:  Back off the
21     record.  10:26 A.M.
22         MR. WHITNEY:  Okay.  Back on.  I'm
23     sorry.
24         MR. McCLENAHAN:  Is there something
25     that you --

Page 267

1          Are we back?
2          THE VIDEOGRAPHER:  We are now going
3      back on the record.  The time is 10:26 A.M.
4              - - - -
5  (Exhibit 1653 previously marked for identification.)
6              - - - -
7          MR. WHITNEY:  Mr. Danforth, yesterday
8      Mr. Brooks showed you an exhibit marked 1653
9      which was a document entitled Meeting of the
10     Audit Committee of the AHERF -- of AHERF for
11     10-15-97.  If you refer to the large numbered
12     Page 70 and 71 of that document --
13         MR. McCLENAHAN:  I have a different
14     version.  Can you tell me what Bates number?
15         THE WITNESS:  70 and 71.
16         MR. WHITNEY:  Is it one that's got a
17     CG Bates number?
18         MR. McCLENAHAN:  It's a GD and a GOV.
19     I'll take either of those.  Tell me what
20     you're --
21         MR. WHITNEY:  I'm looking at the
22     management letter, general overview, 1987 --
23         MR. McCLENAHAN:  I can find that.
24 BY MR. WHITNEY:
25 Q.  All right.  You recall that Mr. Brooks examined

Page 268

1      you yesterday about this management letter?
2  A.  Right.
3  Q.  All right.  And you remember he asked you
4      whether or not you regarded this as a strong
5      management letter.  Do you recall that?
6  A.  I do.
7  Q.  My only question to you is, Mr. Brooks did not
8      show you, I believe, if you turn back to
9      Page --
10         I'm sorry.  We need to go off the
11     record one more time.  Hold on one second.
12             - - - -
13     (There was a brief pause in the proceedings.)
14             - - - -
15         MR. WHITNEY:  Back on.
16 BY MR. WHITNEY:
17 Q.  Mr. Danforth, as part of that same package, if
18     you turn back to Page 14 --
19         Actually, if you turn back to Page
20     10 --
21 A.  Okay.
22 Q.  -- you will see that included in the same
23     package along with the management letter is a
24     consolidated financial statement for year ended
25     6-30-97 denominated as draft.  Do you see that?

15 (Pages 265 to 268)

DOUGLAS D. DANFORTH

Page 281

```
1              - - - -
2        (The witness reviewed the document.)
3              - - - -
4        THE WITNESS:  Right.
5        MR. WHITNEY:  All right.  My
6    questions are fairly brief here.
7        Do you recall that at this point in
8    time there was a discussion of the possibility
9    of not retaining PriceWaterhouseCoopers to do
10   the audits for 1998?
11       MR. BROOKS:  Objection.
12       THE WITNESS:  As I said earlier, I
13   actually don't recall any discussion.
14   BY MR. WHITNEY:
15   Q.  All right.
16   A.  I'm not sure.  Was I at this --
17   Q.  Yes.  You were at that meeting.  We already
18   quoted you as doing some arithmetic.
19   A.  Yes.  I was there.  I can't recall that
20   discussion.
21   Q.  Here's the only reason I showed you this
22   document is I'm intrigued by the statement of
23   Palmer, we, the board, got fed a tremendous con
24   by Dave and Sherif when we voted on a single
25   consolidated audit.
```

Page 282

```
1        Do you see that?
2    A.  Yes.
3    Q.  Do you have any recollection, as you sit here
4    today, of what it was Palmer was talking about
5    there?
6    A.  No, I don't, actually.
7    Q.  Or what it was that was so apparently agitating
8    Palmer in that statement?
9    A.  By that time, of course, the whole thing was
10   collapsing, so Palmer was very annoyed, as were
11   many board members, that it was happening.  We
12   were obviously --
13       It says Dave and Sherif fed us a real
14   con job, which in that respect they did, but,
15   you know --
16   Q.  But my question is, the con supposedly by Dave
17   and Sherif that he's talking about appears to
18   relate to voting on a single consolidated
19   audit.
20   A.  Right.
21   Q.  My question is, do you remember what the issue
22   was, if any, as to what was a con as it related
23   to the single consolidated audit?
24       MR. BROOKS:  Objection.
25       THE WITNESS:  I don't really remember
```

Page 283

```
1    that discussionwise, no.
2        MR. WHITNEY:  Okay.  I have no
3    further questions.  Thanks so much,
4    Mr. Danforth.
5        THE WITNESS:  You're welcome.
6        MR. BROOKS:  And I have no questions.
7        MR. McCLENAHAN:  No questions.
8        MR. BROOKS:  You're done.
9    John, anything?
10       MR. UNICE:  Maybe.  One second.
11       THE WITNESS:  I have a question.  How
12   do I look?
13             - - - -
14       (There was a discussion off the record.)
15             - - - -
16       THE WITNESS:  I would have powdered
17   my head.  You can put that in.
18       THE VIDEOGRAPHER:  If there are no
19   further questions, the deposition is now
20   concluded.  We are now going off the record.
21   The time is 10:50 A.M.
22             - - - -
23       (The proceedings were concluded at 10:50 a.m.)
24             - - - -
25
```

Page 284

```
1   COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2   COUNTY OF ALLEGHENY          )  SS:
3       I, G. Donavich, RPR, CRR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   DOUGLAS DANFORTH, was by me first duly sworn to
7   testify to the truth, the whole truth, and nothing
8   but the truth; that the foregoing deposition was
9   taken at the time and place stated herein; and that
10  the said deposition was recorded stenographically by
11  me and then reduced to printing under my direction,
12  and constitutes a true record of the testimony given
13  by said witness.
14      I further certify that I am not a relative or
15  employee of any of the parties, or a relative or
16  employee of either counsel, and that I am in no way
17  interested directly or indirectly in this action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  and affixed my seal of office this 9th day of
20  October, 2003.
21
22
23   _____
24              Notary Public
25
```

19 (Pages 281 to 284)