Page 285

```
 1
    COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
 2  COUNTY OF ALLEGHENY           )    S H E E T
 3     I, DOUGLAS DANFORTH, have read the foregoing
    pages of my deposition given on Wednesday, October 8,
 4  2003, and wish to make the following, if any,
    amendments, additions, deletions or corrections:
 5
    Page/Line  Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21  _____
              DOUGLAS DANFORTH
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
              Notary Public
25  AKF Reference No. 77621
```

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## RONALD DAVENPORT
*April 20, 2004*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**DAVENPORT, RONALD - Vol.**



LEGALINK
A WORDWAVE COMPANY

Page 86

1    meetings?
2  A.   I did not.
3  Q.   And by one of these meetings, I meant the AHERF
4      board of trustees' meetings.
5  A.   Yes.
6  Q.   Let me just go back to Exhibit 1661, which are
7      the 1996 audited financials.
8  A.   Okay.
9  Q.   If you go to the page ending in 1606 --
10 A.   Okay.
11 Q.   -- it says, Report of independent accountants.
12 A.   Mm-hmm.
13 Q.   And there's a signature of Coopers & Lybrand at
14     the bottom.  If you could just read this page
15     to yourself, and then I'll ask you a couple
16     questions about it.
17                   - - - -
18         (The witness reviewed the Exhibit.)
19                   - - - -
20 A.   Okay.
21 Q.   Is your understanding of the role of Coopers &
22     Lybrand in auditing the financial statements of
23     AHERF any different from what is written here
24     in this report of independent accountants?
25         MR. UNICE:  Object to form.

Page 87

1  A.   My understanding -- I read this and
2      specifically the last sentence about
3      information as received.  I would assume that
4      an auditor would -- would be able to pick up
5      any shell games, if there were, in fact, shell
6      games, but that's what I would assume.  I
7      recognize the information is provided by the
8      principal.
9  Q.   Well, let me ask you this:  If you go to the
10     second paragraph --
11 A.   Right.
12 Q.   -- it says, We conducted our audit in
13     accordance with generally accepted auditing
14     standards.  Those standards require that we
15     plan and perform the audit to obtain reasonable
16     assurance about whether the financial
17     statements are free of material misstatement.
18 A.   Right.
19 Q.   Did you have any understanding of the role of
20     the outside auditor that differed from this
21     statement?
22 A.   No.
23 Q.   And generally do you think it's possible that
24     management could be doing shell games that an
25     auditor could not find?

Page 88

1         MR. UNICE:  Object to form.
2         MR. McCLENAHAN:  Do you think it's
3  possible is the question?
4         MR. FRIESEN:  Yes.
5  A.   Not for long.
6  Q.   Do you think in hindsight that Mr. Abdelhak had
7      too much power?
8         MR. UNICE:  Object to form.
9  A.   I don't think he had -- he had too much power.
10     I think the -- given the complicated nature of
11     the structure, it lent itself to independent
12     action.  In other words, it was almost like our
13     intelligence system, there's so many players so
14     that information's not always shared.
15         For example, you asked me the
16     question about do I ever have -- do I know of
17     any trustees raising questions.  Well, Vince
18     Sarni and I were very good friends.  He played
19     a major role in Philadelphia.  I never knew
20     that he resigned or why, because that would
21     have been very important to me.
22 Q.   And did that -- in your view, did the
23     supervision by the board, both the AHERF board
24     and the other connected and related boards, did
25     their supervision of management become more

Page 89

1      difficult as time progressed because of the
2      growing complexities of --
3  A.   Yes.
4  Q.   -- the organization?
5         MR. UNICE:  Object to form, lack of
6  foundation as to other boards he wasn't on.
7  Q.   Do you consider Mr. Abdelhak to be someone who
8      was open to other people's suggestions?
9  A.   Somewhat.  He was very opinionated, very strong
10     in his opinions.  He did not like dissent, but
11     he was solicitous of board members.
12 Q.   You can put that document aside.
13         Let's mark this exhibit as Exhibit
14     2553, and it's Bates numbered PR-PLD-020-02016
15     through 02021.
16                   - - - -
17     (Exhibit 2553 marked for identification.)
18                   - - - -
19 Q.   It says trustees' evaluation at the top.
20 A.   Okay.
21 Q.   And I'll represent to you that this came from a
22     stack of evaluations that were behind a tab
23     that said 1994 trustee evaluations, and this is
24     the only one I've seen that's actually typed
25     up, but is that your signature on the last

23 (Pages 86 to 89)

Page 90

1    page?
2    A.    That is my signature.
3    Q.    And do you recall typing or instructing someone
4    to type up a trustee evaluation?
5    A.    I do not recall, but that is my signature.
6    Q.    Do you remember receiving a trustee evaluation
7    at any time that was in this form?
8    A.    No.
9    Q.    But I take it that since you signed this, you
10   have no reason to dispute that you submitted
11   this at some point?
12   A.    I have no reason to dispute it.  That is my
13   signature, unless it was taken from some other
14   page.
15   Q.    Okay.  Let me show you another document then
16   which says -- well, this is Exhibit 2554.
17          - - - -
18   (Exhibit 2554 marked for identification.)
19          - - - -
20   A.    Okay.
21   Q.    This one says 1995, trustees' evaluation?
22   A.    Mm-hmm.
23   Q.    Now, your name is typed on this one at the end.
24   A.    Okay.
25   Q.    And do you recall --

Page 91

1    A.    No.
2    Q.    -- filling this one out?
3    A.    No, and I would -- I cannot imagine my having
4    my name typed.
5    Q.    Well, do you have any explanation for this
6    document then?
7    A.    None, but I can't imagine my name would be
8    typed.
9    Q.    Just for the record, why don't you read through
10   this document and let me know if there's
11   anything that you see --
12   A.    From 1995?
13   Q.    Yes.  If there's anything that you see that you
14   would not agree with, that stands out as
15   something you would not have put down here.
16          MR. UNICE:  That he could look over
17   that he wouldn't have agreed with in 1995?
18          MR. FRIESEN:  That he now thinks that
19   he wouldn't have agreed with in 1995.
20   A.    As an example, there's a question mark under
21   the meetings.
22   Q.    Yes.
23   A.    I don't know why I would do that.
24   Q.    Okay.
25   A.    Another line says I would want more meetings.

Page 92

1    I know I wouldn't say that.
2    Q.    Okay.  Anything else?
3    A.    I would not have said that I would want fewer
4    meetings that lasted longer, no.  Site visits,
5    not necessarily.  The line which has No. 2 on
6    education is the same as what I said in 1994.
7    I see under (c) I put an X in both.
8    Q.    I'm sorry, say that again?
9    A.    Under No. 3 under education, there's an X in
10   both system-wide and individual, I would never
11   have done that, or every three to five years.
12   I would not put question marks by my time
13   commitments or question marks about the time I
14   spent is appropriate.  Okay.  That's about it.
15          MR. FRIESEN:  Okay.  Let me take a
16   break, and I might be done fairly soon, okay?
17          THE VIDEOGRAPHER:  We are going off
18   the record at 12:10.
19          - - - -
20   (There was a recess in the proceedings.)
21          - - - -
22          THE VIDEOGRAPHER:  We are back on the
23   record at 12:25.
24   BY MR. FRIESEN:
25   Q.    Mr. Davenport, have you met with anyone from

Page 93

1    Jones Day about this deposition?
2    A.    No.
3          MR. FRIESEN:  Okay.  I don't have any
4    further questions at this time.  I may have
5    some more after he's done with you.  Thank you
6    very much for coming in.
7          - - - -
8          EXAMINATION
9          - - - -
10   BY MR. UNICE:
11   Q.    Good afternoon, Mr. Davenport.  Again, my name
12   is John Unice.  I'm here for the Plaintiff, the
13   Official Committee of Unsecured Creditors of
14   AHERF.
15          Earlier on this morning you listed I
16   think to the best of your recollection some of
17   the other nonprofit boards on which you served,
18   and correct me if I'm wrong, but they are the
19   National Urban League, the National Chamber of
20   Commerce and the Heinz Historical Foundation?
21   A.    The list was in the '80s he asked me.
22   Q.    Okay.
23   A.    The '80s, the National Urban League, the U.S.
24   Chamber of Commerce, but not Heinz.  Heinz
25   History came in the '90s.

24 (Pages 90 to 93)

Page 94

1  Q.   Okay.  Besides those three, any other
2       involvement on your end in nonprofit boards
3       that you haven't told us today?
4  A.   The Committee on Economic Development, CED.
5       That's all I can think of.
6  Q.   What is the Committee on Economic Development?
7       Where is that located?
8  A.   It's a group of businessmen, 200 businessmen,
9       made up of corporate leaders from all over the
10      country.  It's located in New York.
11 Q.   What is the length of your tenure on that
12      board?
13 A.   Oh, since about 1978.
14 Q.   And you are currently a member, sir?
15 A.   Yes.
16 Q.   So aside from AHERF-related entities, there are
17      four other --
18 A.   That's right.
19 Q.   -- entities on which you served as a nonprofit
20      trustee.
21         I believe you shared with Mr. Friesen
22      earlier on your view that the role of a
23      nonprofit board member are mainly twofold:
24      One, to select the organization's chief
25      executive officer; correct?

Page 95

1  A.   Correct.
2  Q.   And the second would be to supervise his or her
3       work with the system?
4  A.   That's correct.
5  Q.   Let's talk for a little bit about the second
6       component of that role.  As a nonprofit board
7       member, can you tell me generally in your
8       experience the types of information from
9       management that you found useful in the
10      execution of your duties?
11 A.   Financial, personnel, and vision.
12 Q.   Vision being strategic thinking and so forth?
13 A.   That's correct.
14 Q.   Now, in the course of your responsibilities as
15      a nonprofit board member, have you from time to
16      time been assisted by external professionals
17      retained by management --
18 A.   Yes.
19 Q.   -- to engage in those duties?
20 A.   Yes, we have.
21 Q.   What kinds of professionals have helped you in
22      the course of your duties?
23 A.   With the vision particularly, sometimes we'd
24      search for personnel and sometimes with
25      financial expertise.

Page 96

1  Q.   Now, let's stick for a minute now just with
2       your AHERF experience.
3  A.   Okay.
4  Q.   Let me rephrase that, AHERF-related experience.
5       This will go back to AGH before AHERF was in
6       anybody's mind.
7         Were you aware that AHERF, for
8       financial assistance, hired outside -- an
9       outside auditing firm to audit the financial
10      statements presented by management on a yearly
11      basis?
12 A.   Yes.
13         MR. FRIESEN:  Objection to the term
14      financial assistance.
15 Q.   Who are those auditors?
16 A.   They were Coopers & Lybrand.
17 Q.   Were you aware that Coopers & Lybrand had
18      served as AGH's auditor for the better half of
19      a century?
20 A.   Not really.
21 Q.   Did you have any sense at all?
22         MR. McCLENAHAN:  You were with them a
23      long time, but not that long.
24 Q.   Did you have any sense at all as to how long
25      they had been serving as --

Page 97

1  A.   No, I had ---
2  Q.   -- the organization's auditors?
3  A.   No.
4  Q.   Okay.  Now, let's focus on the role of external
5       auditor with respect to your service on the
6       AHERF board.
7  A.   Okay.
8  Q.   Can you tell me what your understanding was of
9       the role of the auditor for the AHERF
10      enterprise in connection with your duties as an
11      AHERF trustee?
12 A.   I think to review the financial performance of
13      the institution and to give us a report there
14      and to evaluate the information that the
15      internal financial committee was preparing and
16      to inform us if there were any questions or
17      problems.
18 Q.   Okay.  Couple things I want to break down in
19      that response.  Who is the "us" in the response
20      you just gave?
21 A.   The board of directors.
22 Q.   And then what do you mean, can you be more
23      descriptive when you say inform you of problems
24      with the financial information?
25 A.   If -- in typical terms if we are losing money,

25 (Pages 94 to 97)

Page 98

1    if our systems are set up in a way that it
2    would encourage fraud, if we are not properly
3    reporting to the appropriate governmental
4    agencies, or we are making improper charges or
5    submitting improper billing.
6  Q.  Now, did you place any reliance upon Coopers &
7    Lybrand as AHERF's external auditors to inform
8    the board of any of the examples that you just
9    gave me?
10  A.  Yes.
11  Q.  Explain to me what reliance you placed upon
12    them to discharge those duties.
13  A.  Total, and my view is always the only person
14    who can betray you is someone that you trust.
15    The others don't get the opportunity.
16  Q.  Did you also understand it that the external
17    auditors report on occasion to AHERF's audit
18    committee?
19  A.  Yes.
20  Q.  Explain to me your understanding of the
21    interaction between the AHERF audit committee
22    and the system's external auditors.
23  A.  I would assume that the audit committee would
24    go over in detail the financial information as
25    represented by management and would red flag

Page 99

1    or, pardon me, would be given a red flag on any
2    issues, any questions that might come from the
3    audit.
4  Q.  And the givers of the red flag in your last
5    answer would be the external auditors?
6  A.  That's correct, in the absence of management
7    giving it.
8  Q.  Did you also understand the role of the
9    external auditors to be to disclose to the
10    board or audit committee if it had concerns
11    with the integrity of the financial data that
12    management presented for audit?
13  A.  Oh, absolutely.
14      MR. FRIESEN:  Objection.
15  A.  Absolutely.
16  Q.  Why is that of concern to you as a board
17    member?
18  A.  Well, because you can only make decisions on
19    the basis of the information that you receive,
20    and if there is some question concerning the
21    integrity of the presenter or the developer of
22    the information, that's fundamental.
23  Q.  Is it part of your understanding of the
24    auditor's role or would part of that role also
25    include disclosure to the audit committee or

Page 100

1    board of any material misstatements the
2    auditors had found in the financial information
3    presented by management for audit?
4      MR. FRIESEN:  Objection.
5  Q.  Go ahead, sir.
6  A.  I would assume that that would be reported to
7    the audit committee, and the audit committee,
8    depending upon the gravity of the situation,
9    would report it to the board.
10  Q.  Did you also understand that another role of
11    the auditor for AHERF was to report any
12    intentional misstatements that it found --
13  A.  Well, absolutely.
14  Q.  -- in connection with the financial information
15    presented by management?
16      MR. FRIESEN:  Let me just get my
17    objection in.
18      THE WITNESS:  Okay.
19      MR. FRIESEN:  Objection.
20  A.  Okay.  Absolutely, of course.
21  Q.  Similarly, sir, if the external auditors during
22    the course of their audit work had concerns
23    with the integrity of the personnel in
24    financial management, would that be something
25    that you'd expect the auditors to bring to the

Page 101

1    board or audit committee's attention?
2      MR. FRIESEN:  Objection.
3  A.  Yes.
4  Q.  And why are those type of revelations that we
5    just talked about important to you as a
6    trustee?
7  A.  If there's an intentional misstatement of a
8    material fact, then it's of great importance.
9    If the integrity of the developer of the
10    material is in question, that is of great
11    importance because then you can't trust the
12    people.
13  Q.  Who is "the people" in that last response?
14  A.  The -- the financial people I'm talking about.
15  Q.  Financial management?
16  A.  That's right, the in-house financial
17    management.
18  Q.  Understood.  Would you also expect the
19    auditors, if they had disclosed what they
20    believed to be -- let me start over -- if they
21    had discovered what they believed to be fraud
22    in the presentation of the information
23    presented from financial management that it be
24    disclosed to the audit committee?
25      MR. FRIESEN:  Objection.

26 (Pages 98 to 101)

Page 102

1  A.   Absolutely, or to the audit committee and then
2       to the audit committee to the board,
3       absolutely.
4  Q.   Okay.  Are you aware of, during any time in
5       which you served on the AHERF board, the
6       auditors coming to the board with concerns
7       about the integrity of financial information?
8  A.   Never.
9  Q.   Are you aware of whether or not the auditors
10      came to the board with concerns about any
11      perceived intentional or material misstatements
12      in the financial data presented by AHERF's
13      financial management?
14 A.   Never.
15 Q.   And are you aware of the auditors coming to the
16      board with any concerns that there had been
17      fraud in the presentation of financial
18      information presented to them for audit?
19 A.   Never.
20 Q.   Now, I take it that you understand that one of
21      the roles of the audit committee, if the
22      auditors had come to them with such concerns,
23      would be to investigate the revelations brought
24      to them?
25 A.   That's correct.

Page 103

1           MR. FRIESEN:  Objection.
2  Q.   Based on your experience with the AHERF board,
3       what is your understanding of what the audit
4       committee's role would be in that scenario?
5           MR. FRIESEN:  Objection, calls for
6       speculation.
7  Q.   Go ahead.
8  A.   My thought would be that the chairman of the
9       audit committee and the audit committee would
10      make an investigation, and if it were found to
11      be true, would report that to the board with a
12      recommendation.
13 Q.   And if its recommendation was brought forth to
14      the board, then the board in that meeting would
15      have either voted to accept or reject that
16      recommendation; is that correct?
17 A.   That's correct.
18          MR. FRIESEN:  Objection.
19 Q.   And, in fact, you relied upon the audit
20      committee to perform such an investigation if
21      they were charged with undertaking such a task?
22 A.   Yes.
23          MR. FRIESEN:  Objection.
24 Q.   Do you know, Mr. Davenport, who the chair of
25      AHERF's audit committee was during fiscal year

Page 104

1       1996?
2  A.   I believe it was J. David Barnes.
3  Q.   Do you know whether or not he also served in
4       that role in fiscal year 1997?
5  A.   I believe so.
6  Q.   Do you know Mr. Barnes personally?
7  A.   Yes.
8  Q.   You mentioned earlier today some trustees whom
9       you thought were more active than others.  Do
10      you recall discussing that?
11 A.   That's correct.
12 Q.   Would you throw Mr. Barnes into the category of
13      those trustees who were more active than others
14      in terms of questioning management and being
15      involved in meeting discussions?
16 A.   No, I would not.  I would say that he was
17      active in the sense of presenting the audit
18      committee reports, but in terms of questioning,
19      at least in terms of at trustee meetings, the
20      people I mentioned were the ones I felt were
21      the most aggressive.
22 Q.   So you viewed him as a primary point person
23      coming from the audit committee and
24      communicating his recommendations and findings
25      to the board; correct?

Page 105

1  A.   Correct.
2  Q.   In the course of your experience on other
3       nonprofit boards outside of AHERF, have you
4       ever been presented with a situation by an
5       outside auditor in which the auditors had
6       raised questions about the organization's
7       management or its integrity?
8  A.   No.  I hesitated because I have been presented
9       with information from a different source but
10      not from an audit, an auditor.
11 Q.   And does this relate to AHERF or some other
12      group?
13 A.   No, with regard to another group.
14 Q.   Okay.  And did that information call into
15      question the integrity of the management of
16      that organization?
17 A.   Yes.
18 Q.   And were any actions taken --
19 A.   Yes.
20 Q.   -- in response to that information?
21 A.   Yes.
22 Q.   Can you tell me what actions were taken, sir.
23 A.   Well, this is National Urban League.  There was
24      question about one of our, what we call,
25      affiliates, the New York affiliate was not

27 (Pages 102 to 105)

Page 106

1    paying taxes, was using grant moneys in an
2    improper fashion.  A special committee was
3    constituted on which I served, and we
4    investigated, found it to be true, and the guy
5    was fired.
6    Q.   And the individual responsible was terminated?
7    A.   That's correct.
8    Q.   Now, if the audit committee had come to the
9    AHERF board with a conclusion that there had
10    been shell games or financial misstatements in
11    the financial statements presented for audit,
12    can you tell me what options the board would
13    have had at its disposal to resolve that
14    situation?
15          MR. FRIESEN:  Objection, compound and
16    calls for speculation.
17    Q.   Go ahead, sir.
18    A.   The option would be to -- I think to really
19    only fire the person and replace him because
20    that's fundamental.
21    Q.   By saying fire the person, you mean the person
22    that would be responsible for the financial
23    misstatements?
24    A.   That's correct.  I mean I think that's a one
25    strike and you are out, before any material

Page 107

1    misrepresentations.
2    Q.   And, again, forgive me for being -- for this
3    question being so obvious, but why, to you as a
4    nonprofit board member, would financial
5    management's integrity be so important?
6    A.   That would determine your ability to stay in
7    business and the honesty of your
8    representations.  That's fundamental.
9    Q.   Would the integrity of financial management
10    also play a role in your views as to the
11    representations made by that management --
12    manager regarding the organization's business
13    direction?
14    A.   Yes.
15          MR. FRIESEN:  Objection.
16    Q.   And the -- is the integrity of an
17    organization's financial management important
18    to you as a board member in gauging whether or
19    not the projections they put forth are accurate
20    or based on accurate information?
21    A.   Yes.
22    Q.   Does the name Ira Gumberg ring any bells to
23    you?
24    A.   Yes.
25    Q.   Can you tell me who he is?

Page 108

1    A.   He's a businessman here in Pittsburgh and
2    serves on the board of AHERF.
3    Q.   Were you a concurrent member with Mr. Gumberg?
4    A.   Yes, I was.
5    Q.   Do you have any impressions as to whether or
6    not Mr. Gumberg was one of those more active
7    trustees that you discussed earlier who would
8    from time to time raise questions with
9    management?
10    A.   Sometimes, yes.
11    Q.   Can you recall any specific issues regarding
12    which Mr. Gumberg would raise questions?
13    A.   I recall a specific incident, but I don't
14    recall the issue.
15    Q.   What's the incident then?
16    A.   Well, the incident, I mean a time when there
17    was a question raised by Mr. Gumberg, but I
18    don't recall the context of it.
19    Q.   Do you recall even a general time frame in
20    which the issue was raised?
21    A.   Probably a year or two before the bankruptcy,
22    sometime around there, because Mr. Gumberg came
23    on the board substantially after I did, and so
24    probably -- I don't know exactly, but a year or
25    two before we really found out that we were

Page 109

1    really, really·in horrible shape, as I
2    recollect.
3    Q.   Do you recall any trustees outside the context
4    of an AHERF board meeting questioning the
5    integrity of either Mr. Abdelhak or David
6    McConnell?
7    A.   No.
8    Q.   Do you know who David McConnell is?
9    A.   Yes.
10    Q.   Who is he?
11    A.   The chief financial officer.
12    Q.   Outside of board meetings, do you recall any
13    trustees raising concerns with you about either
14    Mr. Abdelhak's or Mr. McConnell's competence to
15    lead AHERF?
16    A.   No.
17    Q.   Do you recall that one of the roles of the
18    audit committee was to recommend to the parent
19    board which independent auditing firm the
20    organizations would select for the next fiscal
21    year?
22    A.   Oh, yes.
23    Q.   Do you recall Mr. Barnes coming to the board
24    recommending that Coopers & Lybrand be so
25    retained?

28 (Pages 106 to 109)

Page 110

1  A.  I don't recall it, but I'm sure that occurred.
2  Q.  Do you also recall that another role of the
3    audit committee was to recommend to the board
4    for its approval the audit plan --
5  A.  Yes.
6  Q.  -- for the fiscal year-end?
7  A.  Yes.
8  Q.  Do you, in fact, recall those votes taking
9    place?
10  A.  No, I do not.
11  Q.  Do you ever recall any trustees raising
12    questions or concerns about the audit plan --
13  A.  No.
14  Q.  -- presented by Mr. Barnes at board meetings?
15  A.  No.
16  Q.  A while back you mentioned that quarterly
17    information was helpful to you as an AHERF
18    board member because it was helpful in giving
19    some indication of how the system was
20    performing?
21  A.  Correct.
22  Q.  Can you tell me how you used audited financial
23    statements, if at all, as a board member to
24    gauge the system's performance?
25  A.  Oh, clearly to see if we were making a profit

Page 111

1    or losing money or what have you, but, you
2    know, historically up until the end, we always
3    made money.
4  Q.  Did you also expect as a trustee that if there
5    was anything materially wrong with the internal
6    quarterly numbers that you were given, that
7    that would be disclosed in the year-end audit
8    report?
9  A.  Yes.
10  Q.  Why would that be important to you?
11  A.  Well, for the same reason, to see what
12    direction the institution was heading and make
13    certain that we were being responsive, we were
14    growing or moving in an appropriate fashion.
15  Q.  So is it fair to say that accurate audited
16    financial statements were also important to you
17    to gauge whether or not AHERF's business plan
18    was a wise one?
19  A.  Yes.
20  Q.  You also mentioned that in the beginning of the
21    trend towards managed care, that we initially
22    became more profitable under the system where
23    DRGs were used?
24  A.  That's correct.
25  Q.  Who was the "we" in your answer?

Page 112

1  A.  The Allegheny General Hospital.
2  Q.  Okay. Were you aware of whether any other
3    hospitals within AHERF similarly became more
4    profitable under the DRG system?
5  A.  There weren't any other hospitals.
6  Q.  At that time?
7  A.  At that time.
8  Q.  Understood. What do you base, if you can tell
9    me, that recollection on, that AGH had improved
10    its financial performance?
11  A.  Our financials, our financials, the
12    representations by Sherif Abdelhak and the
13    financials which showed I think we made like 30
14    million -- went -- made 8 million, make it $30
15    million, it's a lot of money in '80, whatever,
16    '88, '89.
17  Q.  So your recollection is based on both internal
18    information provided by management and the
19    audited information you received on a yearly
20    basis?
21  A.  Correct, that's right.
22  Q.  Take out for me Exhibit 724. It is the second
23    book --
24  A.  Okay.
25  Q.  -- for the 6/21/96 AHERF board meeting.

Page 113

1  A.  I have it.
2  Q.  Turn to page 3608.
3  A.  3608, okay.
4  Q.  This page is entitled Coopers & Lybrand
5    Proposed AHERF Audit Plan for FY 1996?
6  A.  Right.
7  Q.  I don't want you to review the entire thing,
8    sir, but just review the first couple of pages
9    following 3608, and let me know if this
10    refreshes your recollection at all with respect
11    to the audit plans presented for approval.
12  A.  I don't recall it. I see it, but I don't
13    recall. This is addressed to the audit
14    committee I guess? And so -- okay.
15  Q.  Turn back, if you will, to page 3568. It is
16    titled AHERF Executive Summary Fiscal Year
17    1997.
18  A.  Okay.
19  Q.  Tell me when you are there.
20  A.  I'm here.
21  Q.  This is a page that I think you and Mr. Friesen
22    discussed earlier?
23  A.  Right.
24  Q.  And this discusses some of the plans to address
25    the rise in managed care which included the

29 (Pages 110 to 113)

Page 138

1   A.   That's correct.
2   Q.   Now, I just want to clarify one thing that you
3        stated to Mr. Unice, which was you said that
4        historically AHERF -- you said historically we
5        had always been making money?
6   A.   Correct.
7   Q.   And I know that you were on the Allegheny board
8        beginning in 1969 --
9   A.   That's correct.
10  Q.   -- throughout after the bankruptcy, and that's
11       a very long time.
12  A.   Right.
13  Q.   And I just want to clarify, if you go to
14       Exhibit 2101 again, which is that short --
15       there it is -- for the first quarter of 1998.
16  A.   Mm-hmm.
17  Q.   For the meeting where you were not at the
18       meeting?
19  A.   Mm-hmm.
20  Q.   Clearly here AHERF's not making money; right?
21  A.   That -- clearly.
22            MR. FRIESEN:  Okay.  That's all I
23       have.
24            MR. UNICE:  Dave, would you like him
25       to read and sign.

Page 139

1            MR. McCLENAHAN:  We will not waive
2        signature.
3            THE VIDEOGRAPHER:  Being there are no
4        further questions, this deposition is ended at
5        1:18.
6                        - - - -
7        (The proceedings were concluded at 1:18 p.m.)
8                        - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1   COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
2   COUNTY OF ALLEGHENY          )  SS:
3        I, Heidi H. Willis, RPR, CRR, a Court Reporter
4   and Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   RONALD R. DAVENPORT, was by me first duly sworn to
7   testify to the truth; that the foregoing deposition
8   was taken at the time and place stated herein; and
9   that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 21st day of April,
23  2004.
24                        _____
25                              Notary Public

Page 141

1   COMMONWEALTH OF PENNSYLVANIA  )     E R R A T A
    COUNTY OF ALLEGHENY           )     S H E E T
2
3        I, Ronald R. Davenport, have read the foregoing
    pages of my deposition given on Tuesday, April 20,
4   2004, and wish to make the following, if any,
    amendments, additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
         In all other respects, the transcript is true and
20  correct.
21                        _____
                                RONALD R. DAVENPORT
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2004.
24                        _____
                                Notary Public
25                              AKF Reference No. HW80389

36 (Pages 138 to 141)

**Den Uyl Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

*ROBERT BRUCE  DEN UYL*
*March 8, 2005*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**DEN UYL, ROBERT BRUCE  - Vol. 1**



Page 14

Robert Bruce Den Uyl

1        Robert Bruce Den Uyl
2   list, we have two.
3        A.    The third would have been an
4   engagement involving Bon Secours Hospital.
5        Q.    Where is that?
6        A.    Well, Bon Secours, the hospital
7   entity that I was dealing with was in I think it
8   was Baltimore.
9        Q.    In what court was that case?
10       A.    It was a case in New Jersey.
11       Q.    Did you testify in the Bon Secours
12  case?
13       A.    No.
14       Q.    Did you submit an expert report in
15  the Bon Secours case?
16       A.    I believe so.
17       Q.    Did you submit expert reports in
18  the Poplar Bluff and Sutter Health cases?
19       A.    Yes, I did.
20       Q.    The fourth incident or retention
21  that you have in mind?
22       A.    I don't recall the name of the
23  matter.  It was a case when I was at
24  Pricewaterhouse actually involving a retailer, I
25  don't recall the name.

Page 15

Robert Bruce Den Uyl

1        Robert Bruce Den Uyl
2        Q.    In the Sutter health case did you
3   give live testimony at trial?
4        A.    Yes, I did.
5        Q.    When was that testimony given?
6        A.    I don't recall the date, it
7   probably have been '91, I'm sorry, 2001,
8   2000, somewhere in that time frame.
9        Q.    In your work for this case you have
10  not attempted to form any personal opinions or
11  conclusions as to the substantive merit of the
12  audits that were performed by Pricewater or by
13  Coopers & Lybrand in '96 and '97, have you?
14       MS. MEADEN:  Objection; vague.
15       A.    Yes, if you could elaborate what
16  you mean by substantive.
17       Q.    Do you expect to offer any opinions
18  in this case as to whether or to what extent
19  Coopers & Lybrand properly performed its duties
20  as auditor in connection with its audits in 1996
21  and in 1997 of AHERF and associated entities?
22       A.    No.
23       MR. BROOKS:  Let me ask the
24  reporter to mark as Exhibit 6106 and hand to the
25  witness a copy of his initial expert report in

Page 16

Robert Bruce Den Uyl

1        Robert Bruce Den Uyl
2   this case.
3        (Expert report of R. Bruce Den
4   Uyl, marked Exhibit 6106 for
5   identification.)
6        MR. BROOKS:  While we are at it I
7   will mark and give to the witness as Exhibit
8   6107 a copy of his rebuttal report.
9        (Rebuttal report of R. Bruce Den
10  Uyl, marked Exhibit 6107 for
11  identification.)
12       Q.    Mr. Den Uyl, at page 24 of your
13  initial report, Exhibit 6106, let me ask you to
14  turn to that page.  Do you say there "My opinion
15  is informed by the analysis of Mr. Thomas
16  Singleton that such an intervention could and
17  likely would have allowed a turnaround and
18  therefore the avoidance of any creditor loss",
19  do you see that language?
20       A.    Yes, I do.
21       Q.    Apart from studying the report of
22  Mr. Singleton, have you yourself made any
23  independent effort to design or evaluate the
24  feasibility of any turnaround plan for AHERF or
25  any AHERF entity?

Page 17

Robert Bruce Den Uyl

1        Robert Bruce Den Uyl
2        MS. MEADEN:  Objection as to form.
3        A.    No, I have not.
4        Q.    Have you performed any modeling
5   yourself or had any staff perform any modeling
6   to arrive at any personal conclusion as to
7   whether any hypothetical turnaround for AHERF or
8   any AHERF entity would have worked?
9        A.    No, I have not.
10       Q.    In fact, in this litigation do you
11  expect to offer any opinions as to the
12  feasibility of any turnaround plan for AHERF or
13  any AHERF entity?
14       MS. MEADEN:  Objection as to form.
15       A.    No, I don't think so.  I'm relying
16  on Mr. Singleton to render his opinion with
17  respect to the turnaround.
18       Q.    Do you have any academic training
19  in the management of healthcare organizations?
20       A.    No, not specifically, no.
21       Q.    Do you have any prior experience
22  holding any executive position in a healthcare
23  organization?
24       A.    No, I've just been a consultant to
25  healthcare organizations.

5 (Pages 14 to 17)

Page 18

Robert Bruce Den Uyl

1
2    Q.    Have you ever been on the board of
3    any healthcare organization?
4    A.    No.
5    Q.    Have you ever been retained as a
6    consultant to develop a turnaround plan for a
7    healthcare organization?
8    A.    No, I have not.
9    Q.    Describe for me if you would the
10   nature of the engagements that you have had with
11   healthcare organizations, apart from serving as
12   an expert in legal proceedings?
13   A.    Sure.  Well, there's been a number
14   of them over the years, many of them are related
15   to valuations of healthcare entities for a
16   number of different purposes.  Typically it will
17   be with an acquisition or a divestiture or a
18   merger of a healthcare entity that they want to
19   have a valuation performed and in connection
20   with that I also get involved in working with
21   either the management or the board in analyzing
22   the transaction, analyzing the financial impact
23   of the transaction, things like that.  I have
24   also done a number of what I would refer to as
25   fairness reviews for attorney generals

Page 19

Robert Bruce Den Uyl

1
2    throughout The United States regarding
3    healthcare transactions where a not-for-profit
4    healthcare entity is being purchased by a for
5    profit entity.
6    Q.    The fairness review again is
7    relating to fairness of the valuation?
8    A.    The fairness of the consideration
9    received, yes.
10   Q.    Is it fair to say that your primary
11   expertise in this area relates to the valuation
12   of healthcare organizations?
13         MS. MEADEN:  Objection.
14   A.    Certainly valuation is one area and
15   then all the financial advice that may be a part
16   of that, or even financial advice separate and
17   apart from a valuation.  I've advised healthcare
18   companies or institutions regarding financial
19   issues that they may face.
20   Q.    What type of financial issues?
21   A.    Well, for example, if a healthcare
22   institution is having financial difficulties I
23   have talked to them about what some of the
24   options might be that they could undertake.  It
25   could be a divestiture of a hospital that they

Page 20

Robert Bruce Den Uyl

1
2    own, it could be the acquisition of another
3    hospital, it could be just advising them that
4    certain other internal actions might be wise or
5    they need to slow down in some other activities
6    that they are undertaking, say capital programs
7    or something like that.
8    Q.    Do you consider yourself an expert
9    on the governance of healthcare organizations?
10   A.    I'm not sure how exactly you mean
11   governance, maybe I can ask you to define that.
12   Q.    Do you consider yourself an expert
13   on how boards do or should perform their
14   supervisory responsibilities in the context of
15   healthcare organizations?
16         MS. MEADEN:  Objection; vague.
17   A.    What I would, in answer to your
18   question and in some areas I may not get
19   involved.  When it comes to helping boards or
20   advising boards take action with respect to
21   their financial matters, that's something I have
22   been involved with and do consider myself
23   somewhat of an expert on.
24   Q.    Do you consider yourself an expert
25   on the processes and procedures that boards

Page 21

Robert Bruce Den Uyl

1
2    should follow in the course of fulfilling of
3    their fiduciary duties to the entities they
4    supervise?
5         MS. MEADEN:  Objection; vague.
6    A.    It sounds like what you're asking
7    is more of legal processes than fiduciary
8    responsibilities, that's certainly not what I
9    would be involved in.  If it relates to a
10   financial issue then I may provide advice as to
11   how the board might want to proceed or whatever
12   issues they may choose to consider.
13         MS. MEADEN:  Can we go off the
14   record.
15         THE VIDEOGRAPHER:  We are going off
16   the record, the time is 9:33.
17         (Off the record.)
18         THE VIDEOGRAPHER:  We are now back
19   on the record, the time is 9:34, the tape is
20   rolling.
21   Q.    Mr. Den Uyl, do you consider
22   yourself an expert on the structuring of
23   covenants in debt instruments?
24         MS. MEADEN:  Objection.
25   A.    Well, your question is specific on

6 (Pages 18 to 21)

Page 62

Robert Bruce Den Uyl

2  your due diligence and I don't know if that had
3  been accomplished in December or at some later
4  date.
5      Q.    Without flipping you in your
6  report, do you recall that at the time that it
7  was, well, do you recall that in June of 1996
8  the Graduate hospitals which were ultimately
9  acquired by AHERF had approximately $170 million
10  of preexisting long-term debt?
11      A.    Yes, that's correct.
12      Q.    Do you know when that debt was
13  incurred?
14      A.    Not specifically, no.
15      Q.    But some years earlier, correct?
16      A.    Sometime earlier, yes.
17      Q.    Do you know whether that debt was
18  ever refinanced after Graduate was -- was that
19  debt ever refinanced after Graduate was merged
20  into SDN?
21      A.    As I recall they assumed the debt,
22  but then I think there were some Centennial
23  bonds that were issued that may have refinanced
24  that, but I would have to check to make sure.
25      Q.    Do you have any recollection as to

Page 63

Robert Bruce Den Uyl

2  whether Graduate was headed towards financial
3  failure and bankruptcy at the time that it was
4  acquired by AHERF?
5      MS. MEADEN:  Objection; vague as to
6  when it was acquired by AHERF.
7      Q.    Let me ask a clearer question.  Do
8  you have any knowledge as to whether Graduate
9  was in such financial distress that bankruptcy
10  was likely prior to the time that it merged into
11  SDN?
12      A.    No, I don't think so.  The parent
13  entity had quite a bit of cash and furthermore
14  the distress was not such that it necessarily
15  couldn't have been turned around at that time.
16      Q.    Let me turn you to page 4 in your
17  report.  Toward the bottom you state that the
18  Graduate hospitals were in financial distress,
19  you cite certain news articles and a financial
20  statement, and then you mentioned that the
21  Graduate bonds were down graded to junk bond
22  status in August of 1996, do you see that?
23      A.    Yes.
24      Q.    In that sentence you say they were
25  downgraded "Citing the change in control and the

Page 64

Robert Bruce Den Uyl

2  uncertainty regarding the timely surrounding and
3  improvement in the Graduate Hospital's financial
4  condition."  What was the significance of the
5  reference to the change in control in your
6  understanding?
7      A.    That's what Moody's discussed in
8  one of the rationales for providing the
9  downgrade, that there was the possibility that
10  there would be a change in control from the
11  entity that had the cash to an AHERF entity.
12      Q.    Let me give you what has been
13  previously marked as Exhibit 245 which is a
14  Moody's investor service rating news relating I
15  believe to the downgrade in question.  Take a
16  look at that and tell me if you have seen that
17  before?
18      A.    Yes, I think I've seen this.
19      Q.    On the second page of the document
20  the first page headed "Rating News", I'm
21  correct, am I not, in this document Moody's
22  states that it "views the entrance of new
23  leadership (AHERF executives) as a stabilizing
24  factor at this lower rating level."
25      A.    Where are you?

Page 65

Robert Bruce Den Uyl

2      Q.    In the last paragraph on the page
3  ending in 123.  The language I wanted to call
4  your attention to is three lines from the end it
5  states "Moody's does view the entrance of new
6  leadership (AHERF executives) as a stabilizing
7  factor", do you see that?
8      A.    Yes, I do.
9      Q.    So in this context Moody's viewed
10  the change of management as stabilizing and a
11  positive factor, correct?
12      A.    Potentially they did, yes.
13      Q.    That's what they said they viewed
14  it as, right?
15      A.    They say at this lower rating
16  level.
17      Q.    Are you aware that in this time
18  period one of Graduate's major payers, the Blue
19  Cross organization, IBC, had sent notice that it
20  was terminating its relationship with Graduate?
21      A.    Yes.
22      Q.    Would you agree with me that that
23  termination had it been put in place and
24  continued would have been financially disastrous
25  for Graduate?

17 (Pages 62 to 65)

Page 66

Robert Bruce Den Uyl

1          Robert Bruce Den Uyl
2          MS. MEADEN:  Objection, foundation.
3     A.   I don't know that that would be
4  true.
5     Q.   You don't know one way or the
6  other?
7     A.   Well, people may move out of a
8  relationship with a managed care organization
9  and pick up a new managed care organization.
10     Q.   If responsible Graduate executives
11  have testified in this case that the termination
12  of the IBC contract would have been disastrous
13  for Graduate, would you have any reason to
14  disagree with their views?
15          MS. MEADEN:  Objection to form and
16  foundation.
17     A.   Yes, well I would have to
18  understand the context of it.  So for example,
19  if whatever they mean by disastrous it isn't
20  necessarily the case that someone couldn't come
21  in and form a new relationship with another
22  managed care organization.
23     Q.   As you sit here today do you have
24  any knowledge of whether there were other
25  managed care organizations in the relevant

Page 67

1          Robert Bruce Den Uyl
2  market as large as IBC?
3     A.   I don't know, it was one of the
4  large organizations certainly.
5     Q.   What financial analysis, if any,
6  have you attempted to evaluate the question of
7  whether Graduate could have survived and avoided
8  bankruptcy had it not been acquired by AHERF?
9     A.   I haven't done any specific
10  analysis because my analysis suggests that they
11  would have had the properly stated financial
12  statements that they wouldn't have undertaken
13  the Graduate acquisition.  The issue of whether
14  they would have gone bankrupt or not is not
15  really relevant to that opinion.
16     Q.   That is you have confined yourself
17  to the question of whether AHERF would have
18  acquired Graduate and have not studied the
19  question of what would have happened to Graduate
20  and its bondholders if it had not been acquired,
21  correct?
22     A.   Certainly the first part of your
23  question is true, that's what I have focused on.
24  I don't think anybody can know what would have
25  happened to Graduate had they not been acquired

Page 68

1          Robert Bruce Den Uyl
2  by AHERF.
3     Q.   Let me turn you to page 31 in your
4  report.  There in the third paragraph you
5  summarize Centennial's cash flow losses from May
6  of 1997 through June of 1998 and then through
7  November of 1998, correct?
8     A.   Yes, that's right.
9     Q.   What is your understanding of the
10  source from which those cash flow losses were
11  paid?
12     A.   It would have been the funds that
13  AHERF had, whether it be the west or other
14  entities in the east I don't know.
15     Q.   Are you aware of any evidence that
16  AHERF ever transferred cash from other entities
17  to Centennial or any of the Graduate hospitals
18  for purposes of covering cash flow losses?
19     A.   I think there were transfers, yes.
20     Q.   What transfers do you have in mind?
21     A.   I've just seen inter-company
22  payables on the books of Graduate.
23     Q.   Do you know whether you have seen
24  any evidence of cash transfers from any AHERF
25  entity to Centennial?

Page 69

1          Robert Bruce Den Uyl
2     A.   I don't know that I've seen
3  specific cash transfers, no.
4     Q.   Have you formed any opinion as to
5  whether the cash flow losses of the Graduate
6  hospitals would have been lower if those
7  hospitals had not been acquired by AHERF?
8     A.   No, I think that's unknowable.  You
9  don't know what would have happened to those
10  hospitals but for the acquisition, we know what
11  actually did happen.
12     Q.   Do you have any knowledge as to
13  whether Graduate management searched for or
14  negotiated with other potential purchasers
15  before the AHERF transaction was entered into?
16     A.   I recall reading that they were
17  looking for other suitors as well.
18     Q.   Do you have any understanding as to
19  whether they succeeded in finding any other
20  potential acquirers?
21     A.   Not that I am aware of.
22     Q.   That is they didn't find others?
23     A.   I'm not aware that they did find
24  others.
25     Q.   Let me ask you to find your

Official Committee of Unsecured Creditors of AHERF v. PwC
Errata Sheet: Robert Bruce Den Uyl Deposition dated March 8, 2005

| Page | Line | Change | Reason |
|---|---|---|---|
| 5 | 5 | "Alix Partner's" to "AlixPartners'" | Transcription error |
| 5 | 14 | "Alix Partners" to "AlixPartners" | Transcription error |
| 5 | 18 | "Alix Partner's" to "AlixPartners'" | Transcription error |
| 8 | 10 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 8 | 15 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 8 | 22 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 8 | 24 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 9 | 10 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 9 | 16 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 9 | 17 | "Stahlder" to "Stalder" | Name misspelling |
| 9 | 20 | "Stahlder" to "Stalder" | Name misspelling |
| 9 | 25 | "Stahlder" to "Stalder" | Name misspelling |
| 10 | 3 | "Stahlder" to "Stalder" | Name misspelling |
| 10 | 20 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 10 | 25 | "Alix Partners" to "AlixPartners" | Transcription error |
| 11 | 9 | "Alix Partners" to "AlixPartners" | Transcription error |
| 12 | 5 | "Alix Partners" to "AlixPartners" | Transcription error |
| 12 | 10 | "Alix Partner's" to "AlixPartners" | Transcription error |
| 12 | 11 | "Alix Partners" to "AlixPartners" | Transcription error |
| 14 | 24 | "Pricewaterhouse" to "Price Waterhouse" | Transcription error |
| 15 | 12 | "Pricewater" to "PricewaterhouseCoopers" | Transcription error |
| 26 | 10 | "290" to "90" | Transcription error |
| 26 | 18 | " n serious" to "in serious" | Transcription error |
| 27 | 5 | "40" to "$40" | Add dollar sign |
| 32 | 15 | "140" to "$140" | Add dollar sign |
| 36 | 12 | "$1 0" to "$150" | Include a missing number |
| 38 | 16 | "C and O" to "D and O" | Transcription error |
| 39 | 4 | "days" to "dates" | Transcription error |
| 42 | 12 | "McConnel" to "McConnell" | Name misspelling |
| 50 | 13 | "aggressive" to "above" | Transcription error |
| 70 | 23 | "bankers" to "bankruptcies" | Transcription error |
| 71 | 23 | "likely" to "unlikely" | Transcription error |
| 84 | 15 | "subsequent" to "substantively" | Transcription error |
| 95 | 22 | "subsequently" to "substantively" | Transcription error |
| 100 | 8 | "unless it was" to "it was" | Removal of extra word |
| 101 | 22 | "21" to "$21" | Add dollar sign |
| 107 | 18 | "40" to "$40" | Add dollar sign |
| 107 | 20 | "60" to "$60" | Add dollar sign |
| 111 | 16 | "17" to "$17" | Add dollar sign |
| 111 | 25 | "require" to "acquire" | Transcription error |
| 114 | 14 | "position" to "physician" | Transcription error |
| 114 | 25 | "AIGH" to "AIHG" | Transcription error |
| 122 | 19 | "productivity" to "profitability" | Transcription error |
| 124 | 24 | "one else's" to "analysis" | Transcription error |

**Official Committee of Unsecured Creditors of AHERF v. PwC**
**Errata Sheet: Robert Bruce Den Uyl Deposition dated March 8, 2005**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 130 | 23 | "practice" to "practices" | Transcription error |
| 137 | 19 | "100" to "$100" | Add dollar sign |
| 139 | 8 | "100" to "$100" | Add dollar sign |
| 139 | 23 | "September 30, 1997" to "September 30, 1996" | Change to appropriate year |
| 144 | 14 | "9" to "$9" | Add dollar sign |
| 144 | 22 | "9" to "$9" | Add dollar sign |
| 146 | 11 | "September 1997" to "September 1996" | Change to appropriate year |
| 147 | 4 | "2.2" to "$2.2" | Add dollar sign |
| 148 | 3 | "12.7" to "$12.7" | Add dollar sign |
| 148 | 6 | "18.8" to "$18.8" | Add dollar sign |
| 148 | 7 | "30" to "$30" | Add dollar sign |
| 148 | 24 | "31.573" to "$31.573" | Add dollar sign |
| 150 | 18 | "September 30, 1997" to "September 30, 1996" | Change to appropriate year |
| 150 | 24 | "20" to "$20" | Add dollar sign |
| 150 | 24 | "100" to "$100" | Add dollar sign |
| 151 | 2 | "10/1/97" to "10/1/96" | Change to appropriate year |
| 151 | 2 | "20" to "$20" | Add dollar sign |
| 151 | 3 | "20" to "$20" | Add dollar sign |
| 151 | 3 | "100" to "$100" | Add dollar sign |
| 151 | 14 | "a good enough benefit" to "a benefit" | Removal of extra words |
| 151 | 25 | "9/30/97" to "9/30/96" | Change to appropriate year |
| 155 | 4 | "22" to "$22" | Add dollar sign |
| 158 | 2-3 | "America Health" to "Health America" | Change order of words |
| 162 | 6 | "22.63" to "$22.63" | Add dollar sign |
| 162 | 18 | "22.63" to "$22.63" | Add dollar sign |
| 162 | 19 | "cashed" to "cash" | Transcription error |
| 163 | 14 | "22.63" to "$22.63" | Add dollar sign |
| 165 | 11 | "22" to "$22" | Add dollar sign |
| 165 | 23 | "22" to "$22" | Add dollar sign |
| 165 | 24 | "22" to "$22" | Add dollar sign |
| 166 | 9 | "22" to "$22" | Add dollar sign |
| 166 | 14 | "22" to "$22" | Add dollar sign |
| 167 | 13 | "27.1" to "$27.1" | Add dollar sign |
| 167 | 19 | "27.1" to "$27.1" | Add dollar sign |
| 167 | 21 | "30.7" to "$30.7" | Add dollar sign |
| 167 | 24 | "30.7" to "$30.7" | Add dollar sign |
| 168 | 4 | "30.7" to "$30.7" | Add dollar sign |
| 168 | 17 | "27.1" to "$27.1" | Add dollar sign |
| 168 | 21 | "27.1" to "$27.1" | Add dollar sign |
| 168 | 25 | "30.7" to "$30.7" | Add dollar sign |
| 169 | 4 | "30.7" to "$30.7" | Add dollar sign |
| 169 | 14 | "22.6" to "$22.6" | Add dollar sign |
| 169 | 21 | "27.1" to "$27.1" | Add dollar sign |
| 169 | 22 | "30.7" to "$30.7" | Add dollar sign |

**Official Committee of Unsecured Creditors of AHERF v. PwC**
**Errata Sheet: Robert Bruce Den Uyl Deposition dated March 8, 2005**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 169 | 22 | "27.8" to "$27.8" | Add dollar sign |
| 169 | 25 | "27.1" to "$27.1" | Add dollar sign |
| 169 | 25 | "30.7" to "$30.7" | Add dollar sign |
| 170 | 3 | "57.8" to "$57.8" | Add dollar sign |
| 170 | 10 | "57.8" to "$57.8" | Add dollar sign |
| 170 | 16 | "22.6" to "$22.6" | Add dollar sign |
| 171 | 4 | "22.6" to "$22.6" | Add dollar sign |
| 172 | 9 | "22" to "$22" | Add dollar sign |
| 172 | 15 | "22" to "$22" | Add dollar sign |
| 172 | 20 | "27" to "$27" | Add dollar sign |
| 178 | 8 | "35.1" to "$35.1" | Add dollar sign |
| 178 | 9 | "27" to "$27" | Add dollar sign |
| 178 | 14 | "57.8" to "$57.8" | Add dollar sign |
| 178 | 16 | "22" to "$22" | Add dollar sign |
| 178 | 22 | "57.8 to "$57.8" | Add dollar sign |
| 178 | 23 | "27.12" to "$27.12" | Add dollar sign |
| 178 | 25 | "27.12" to "$27.12" | Add dollar sign |
| 179 | 4 | "35.19" to "$35.19" | Add dollar sign |
| 179 | 8 | "60" to "$60" | Add dollar sign |
| 179 | 10 | "22" to "$22" | Add dollar sign |
| 179 | 14 | "57.8" to "$57.8" | Add dollar sign |
| 179 | 17 | "27" to "$27" | Add dollar sign |
| 179 | 24 | "27.12" to "$27.12" | Add dollar sign |
| 180 | 3 | "35.19" to "$35.19" | Add dollar sign |
| 180 | 4 | "27.12" to "$27.12" | Add dollar sign |
| 180 | 11 | "57.8" to "$57.8" | Add dollar sign |
| 180 | 12 | "57.8" to "$57.8" | Add dollar sign |
| 189 | 7 | "Pricewaterhouse" to "PricewaterhouseCoopers" | Transcription error |
| 191 | 9 | "certainly" to "certainty" | Transcription error |
| 195 | 21 | "stopped motion forward his IBS" to "stopped forward motion of the IDS" | Transcription error |
| 197 | 9 | "improved" to "imprudent" | Transcription error |
| 197 | 15 | "improved" to "imprudent" | Transcription error |
| 203 | 4 | "30" to "$30" | Add dollar sign |
| 203 | 17 | "128" to "$128" | Add dollar sign |
| 203 | 18 | "228" to "$228" | Add dollar sign |
| 204 | 25 | "100" to "$100" | Add dollar sign |
| 205 | 21 | "200" to "$200" | Add dollar sign |
| 205 | 25 | "1" to "$100" | Add dollar sign and correct number |
| 205 | 25 | "'97" to "'96" | Transcription error |
| 206 | 2 | "200" to "$200" | Add dollar sign |
| 206 | 8 | "200" to "$200" | Add dollar sign |
| 206 | 13 | "200" to "$200" | Add dollar sign |
| 207 | 6 | "tied" to "tide" | Transcription error |

**Official Committee of Unsecured Creditors of AHERF v. PwC**
**Errata Sheet: Robert Bruce Den Uyl Deposition dated March 8, 2005**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 212 | 17 | "26.6" to "$26.6" | Add dollar sign |
| 212 | 21 | "32.6" to "$32.6" | Add dollar sign |
| 212 | 25 | "32.6" to "$32.6" | Add dollar sign |
| 236 | 16 | "2.1" to "$2.1" | Add dollar sign |
| 242 | 11 | "part your" to "part of your" | Add missing word |

**Dickson Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *JEFFREY R. DICKSON*
### *August 13, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**DICKSON, JEFFREY R.**



**LEGALINK**

A **WORDWAVE** COMPANY

JEFFREY R. DICKSON

Page 78

1    topics. I know that there really wasn't -- I
2    don't recall anything on the acute care
3    hospital industry in general, for example. It
4    was mostly what you read out of Modern Health
5    Care and what you picked up on the Internet
6    from company websites.
7  Q.  From time to time, did you look at look at
8    certain Internet websites about any AHERF
9    entities, if you recall?
10 A.  I don't recall even if AHERF had a website at
11    that point in time. This was '98. I don't
12    recall if they had one, and if they had, they
13    would not have put financial information out
14    there anyway, because they were not-for-profit.
15    Most not-for-profits put very little, if any,
16    information on the Web regarding financial
17    condition.
18 Q.  What kinds of information sources did you
19    consult from time to time to learn about the
20    AHERF entities while you were responsible for
21    them?
22 A.  Without sounding facetious, it's sort of like
23    jumping on a train that's going 60 miles an
24    hour. It's a very small window of time that I
25    had. You get here and, you know, like four

Page 79

1    months later they filed for bankruptcy.
2  Q.  Sure.
3  A.  That's not a long window, and things -- you
4    know, the process went very quickly.
5  Q.  Sure.
6  A.  At one point, I know I was picking up the files
7    of the entities here in the Pittsburgh area and
8    going through the credit files just trying to
9    understand what we had in the way of exposure
10    and reading previous write-ups, not every
11    write-up, but the most recent write-up. I'd
12    look at the financial statements, and then most
13    of what you learned was learned by contact with
14    companies, especially in a situation like this
15    where it was not a publicly-traded entity. So
16    you were very heavily reliant upon
17    management's -- upon discussions with
18    management, the amount of information which
19    management provided you. The audited financial
20    statements were critical in this process. You
21    know, it's a very, very small universe to pull
22    information from.
23 Q.  What were in the credit files you mentioned
24    that you reviewed?
25 A.  They would have had the write-ups, such as, you

Page 80

1    know, what Paula Mammarella would have done.
2    They would have had copies of the financial
3    statements. They would have had the -- well,
4    copies. Usually they're the originals of
5    financial statements. They would have had -- I
6    can't remember at PNC. They might have had the
7    officer's compliance certificates. There was a
8    compliance memo which I think they had to do
9    quarterly. They would have had the spreads of
10    the financial statements, and if there was a
11    legal documentation file, I don't recall
12    whether it was part of the credit files or
13    whether it was over the loan operations area.
14    I don't recall how PNC did that, but my focus
15    was on financial statements.
16 Q.  And did this file include, it sounds like
17    you're saying, this historical information in
18    the sense of not just necessarily the most
19    recent financial statements, but all the types
20    of documents you just mentioned that had been
21    received with respect to the AHERF entities
22    across time?
23        MR. COGAN:  Objection.
24 Q.  If you know?
25 A.  Generically, the response would be -- you know,

Page 81

1    not AHERF specifically, but, yes, and it also
2    could be a stack of files if it was a long
3    relationship. If you asked for the files, the
4    credit files on AHERF, you could have had a
5    stack like this maybe. I don't remember, but,
6    in theory, you could have a stack like, you
7    know, three feet high.
8  Q.  Did you say you don't recall how big the AHERF
9    credit file was?
10 A.  No, I don't. I don't recall.
11 Q.  Okay. You mentioned that there were both -- or
12    I think you mentioned that there were both
13    quarterly and annual financial statements from
14    the AHERF entities, is that correct?
15 A.  Yes, sir.
16 Q.  And did you review the quarterly financial
17    statements when you -- that were in the credit
18    files at the time you looked at those files?
19 A.  I focused primarily on the annual financial
20    statements, because only those were audited.
21 Q.  What's the reason that you focused only on the
22    annual audited financial statements?
23 A.  Well, by definition, the quarterly statements
24    were unaudited, and you cannot rely completely
25    upon unaudited financial statements as

21 (Pages 78 to 81)

JEFFREY R. DICKSON

Page 82

1    representing accurately the financial condition
2    of an entity, and, therefore, the audited
3    financial statements are of critical importance
4    in terms of doing your analysis.
5  Q.   Why is it that, in your view, you can't rely
6    completely on the unaudited financial
7    statements?
8  A.   By definition, they're unaudited.  They can
9    be -- management has some ability to
10   classify -- management has the ability to
11   present -- to create a financial presentation
12   of accounts within certain limits as they
13   choose to do so.  The auditors are the ones who
14   make sure that the accounting structure and the
15   financial reporting, the accuracy, the
16   integrity, the reliability, et cetera, et
17   cetera, conforms to generally accepted
18   accounting principles.  Without that
19   attestation from the auditing firm, you don't
20   have that complete confidence that the
21   quarterly statements are, in fact -- I'm not
22   saying that there's something wrong, but you
23   don't know until you actually get the audited
24   financial statements that these have been
25   reviewed by an outside third party and they

Page 83

1    conform to Generally Accepted Accounting
2    Principles.
3  Q.   Did PNC rely on the quarterly financial
4    statements from AHERF entities?
5  A.   Quarterly financial statements with any entity
6    give you an indication of trends.  They don't
7    represent an absolute.  So, yes, we looked at
8    them, yes, we paid attention to them, but the
9    critical analysis in the sense that you had
10   that third-party look only came once a year.
11  Q.  So other than this look on a once-a-year basis,
12   was there any way for PNC to get a look at
13   entities such as the AHERF entities between
14   those periods?
15  A.  We looked at the quarterly statements, but we
16   would be very hesitant, Paula and myself, to
17   make representations as to the absolute
18   reliability of financial statements on a
19   quarterly basis for any borrower, because
20   they're unaudited.
21  Q.  I understand you mentioned that you wouldn't
22   make any representations as to the absolute
23   reliability of the quarterly financial
24   statements, because they were unaudited.  Would
25   you make any reliance on the quarterly

Page 84

1    financial statements between the audited
2    financial statements?
3        MR. COGAN:  Objection.
4        MR. POHL:  Objection.
5        MR. COGAN:  He just answered that
6    question.
7  A.   We -- as I said, we look at trends, we
8    obviously pay attention to quarterly
9    statements, but we don't have the third-party
10   validation of the financial statements and the
11   reliability on that quarterly statement.
12  Q.  Do you know whether PNC required quarterly
13   financial statements to be provided to it by
14   the AHERF entities?
15  A.  I believe they did.  I can't testify for a fact
16   they did.  My recollection is that they did.
17  Q.  Was it standard practice at PNC, to your
18   knowledge, for quarterly financial statements
19   to be provided to PNC from various credits?
20  A.  Yes, sir, it was.
21  Q.  And was it also standard practice that where
22   compliance certificates were required, that
23   those certificates would be based on quarterly
24   financial statements, you know, during -- at
25   the end of each quarter, and then based on the

Page 85

1    annual financial statements at the end of the
2    year?
3  A.   Yes, sir.
4  Q.   And you mentioned that in the credit file,
5    there were certain documents called spreads, is
6    that right?
7  A.   Yes, sir.
8  Q.   And you said those were documents that were
9    created using the financial statements provided
10   by various entities, is that right?
11  A.  Yes, sir.  Banks take the financial statements
12   provided by borrowers, and they have a certain
13   format in which they put the financial
14   information.  It's reasonably consistent
15   amongst banks, but it's not necessarily equal.
16   That document -- those sheets are just numbers,
17   basically, and it's called a spread sheet.
18   Spreads, that's how everybody refers to them.
19  Q.  And did you mention that the spreads for the
20   AHERF entities were contained within the AHERF
21   credit files?
22  A.  They should have been.  I don't recall, but
23   they should have been as a matter of practice.
24  Q.  I think you mentioned that the spreads were
25   created by using some type of proprietary

22 (Pages 82 to 85)