JEFFREY R. DICKSON

Page 94

1　that Paula Mammarella made the request you
2　mentioned to Mike Martin for certain kinds of
3　information that that was just a standard
4　ordinary-course type of request for more
5　information?
6　　　　MR. COGAN: Objection.
7　　　　MR. POHL: Objection.
8　A.　I believe it would have been, yes.
9　Q.　Do you recall any other kinds of requests that
10　were made of AHERF management, during the
11　limited time you were there, for more
12　information about the AHERF entities?
13　A.　No, I don't.
14　Q.　Do you recall ever, while you were at PNC, any
15　requests being made of AHERF management for PNC
16　representatives to be able to visit certain
17　facilities of AHERF?
18　A.　I'm not aware of any.
19　Q.　And do you recall any demands ever being made
20　of AHERF management in terms of actions that
21　they should take?
22　　　　MR. COGAN: Objection.
23　A.　Demands of AHERF management that they should
24　take?
25　Q.　Any demands of AHERF management in terms of

Page 95

1　actions that they should take?
2　　　　MR. POHL: You're saying demands by
3　PNC on AHERF.
4　　　　MR. TERUYA: Yes, by PNC on AHERF.
5　A.　What types of actions are you referring to?
6　Q.　Any type of business decisions in terms of
7　whether it be how to operate a hospital --
8　A.　That's lender's liability. Banks don't go
9　there. That's lender's liability. We do not
10　have the right to tell a company how to run its
11　business, unless it's under mutual agreement
12　and court protection.
13　Q.　Could you explain what you mean by that?
14　A.　Lender's liability?
15　Q.　Yes. What do you mean by the phrase lender's
16　liability?
17　A.　Lender's liability, I guess in your terms,
18　would be tortious interference with the actions
19　of management in the day-to-day running of the
20　business which is as close as I can come. I'm
21　not an attorney.
22　Q.　Sure.
23　A.　I mean, lender's liability is a legal concept.
24　I'm giving you a layman's interpretation of it.
25　Q.　I was just trying to understand what you meant

Page 96

1　by it in the context of your last answer?
2　　　　MR. POHL: He's explained that he
3　believes that a business entity like the bank
4　cannot tell a lender how to run their business.
5　　　　THE WITNESS: Tell a borrower.
6　　　　MR. POHL: Or, I'm sorry, a borrower
7　how to run their business.
8　BY MR. TERUYA:
9　Q.　Let me just ask you to make sure I got it on
10　the record.
11　　　　So your understanding was that PNC
12　had no right to tell AHERF management how to
13　run the business of AHERF?
14　　　　MR. COGAN: Objection.
15　Q.　Is that your understanding?
16　A.　I wouldn't limit it specifically to AHERF.
17　Banks simply cannot. I mean, there are legal
18　penalties for doing such.
19　Q.　Just with respect to the AHERF entities, was it
20　your understanding that PNC had no right to
21　tell AHERF management how to run the business
22　of AHERF?
23　　　　MR. POHL: Objection.
24　　　　MR. COGAN: Objection.
25　A.　I think you're asking me for a legal opinion.

Page 97

1　I don't think I'm in a position to respond to
2　that.
3　Q.　I'm just asking for your understanding based on
4　your experiences?
5　A.　I'm trying to respond to it in a way that I
6　think I can respond. I think I've probably
7　gone beyond what I should try to say. I'm
8　trying to be understanding here, but I don't
9　think I can respond to that question.
10　Q.　Let me divorce it from the concept of lender's
11　liability, and let me just ask you, generally,
12　did you think while you were at PNC, that PNC
13　had a right to make demands of AHERF management
14　in terms of how it was running AHERF's
15　business?
16　　　　MR. COGAN: Objection.
17　　　　MR. POHL: Objection. It's the same
18　question you just asked. He's given you his
19　answer. Whether you divorce it from lender's
20　liability, he's given you his answer, and he's
21　told you what he thinks he can respond to.
22　　　　MR. TERUYA: I'm just trying to make
23　sure I have his answer.
24　　　　MR. POHL: Well, you do.
25　A.　I've tried to be as clear as I can. I don't

25 (Pages 94 to 97)

JEFFREY R. DICKSON

Page 98

1  think I can say anything else about it.  I
2  don't think I -- there's nothing else I can add
3  to it.
4  Q.   So was it your understanding that PNC didn't
5  have that right?
6         MR. POHL:  Objection.
7         MR. COGAN:  Objection.
8  Q.   And I'll move on.  I mean, I'm just trying
9  to --
10         MR. POHL:  Yeah, you should.
11  Q.   -- understand your answer.
12  A.   I can't respond to it.  I think I've responded
13  as much as I can.
14  Q.   Okay.
15         MR. COGAN:  You know, just in all
16  fairness, I don't think it's a proper question.
17  After all, you've shown one credit agreement
18  that we know.  In all the depositions we've
19  done, there are other credit agreements.  Those
20  credit agreements do define the right and
21  obligations of the parties.
22         MR. TERUYA:  I was just asking for
23  his understanding based on what he knew.
24         MR. COGAN:  I don't think that's the
25  way you were asking the question.

Page 99

1         MR. POHL:  No, definitely not.  I
2  think he's given you -- made a good faith
3  effort to answer your question.
4  BY MR. TERUYA:
5  Q.   Do you know whether PNC ever wrote, at any
6  point in time while you were there, to the
7  AHERF board about any issues relating to the
8  AHERF entities?
9  A.   I have no knowledge about that.
10  Q.   And aside from the question of whether PNC had
11  any right to do so, do you know of any requests
12  that were made by PNC to AHERF management for
13  AHERF management to take certain actions?
14         MR. COGAN:  Objection.
15         MR. POHL:  Objection.
16  A.   I have no knowledge.
17  Q.   You have no knowledge of any such requests?
18  A.   Correct.
19  Q.   You mentioned that from time to time Paula
20  Mammarella prepared certain credit analyses?
21  A.   Correct.
22  Q.   And do you know what kinds of information she
23  considered in performing those analyses?
24  A.   The primary emphasis was placed upon audited
25  financial statements.  There would have been an

Page 100

1  update to the extent that we received quarterly
2  financial statements, but, again, the emphasis,
3  because of reliability questions --
4  generically, with quarterly financial
5  statements, the emphasis was placed upon those
6  annual financial statements which were audited
7  and certified by the accountants.
8  Q.   Do you know, other than financial statements,
9  whether she considered other types of or
10  sources of information about AHERF entities in
11  preparing these credit analyses?
12         MR. COGAN:  Objection, and the basis
13  of my objection is the credit analyses have
14  been marked as exhibits.  They pretty much
15  speak for themselves.
16         MR. TERUYA:  And I'm asking about
17  what sources of information were considered?
18         MR. COGAN:  And you deposed Paula
19  Mammarella, and she's the person who is best
20  situated to tell you the information she's
21  relying on, and then her document, the credit
22  analysis, is the best source as well.
23  A.   As a not-for-profit organization, it is
24  difficult to obtain information vis-a-vis a
25  publicly-held entity.  Within the context of

Page 101

1  not-for-profit institutions, there are ranges
2  of information which are provided by borrowers.
3         The available information in the case
4  of AHERF, which management provided, which we
5  had access to, was very small.  The amount of
6  public information about AHERF's operations,
7  its entities was, I would say, virtually nil.
8  I don't profess to know everything that was out
9  there, but I would say it was minimal at best,
10  and probably nothing in that information would
11  have in any way impacted the analysis from the
12  limited information that we had been provided
13  by the company.
14  Q.   What kinds of searches did you perform for
15  information that was publicly available about
16  the AHERF entity?
17  A.   You go on the Internet, but when you're going
18  on the Internet for something like that, you
19  just won't find it.  It's just not out there.
20  You might find a newspaper article.  You might
21  find a magazine article.  It probably would not
22  be entity-specific, you know, and I'm talking
23  about the window that I was there.  I don't
24  know what happened pre-'98.  I don't know what
25  happened, in essence, '99 on.  It would have

26 (Pages 98 to 101)

JEFFREY R. DICKSON

Page 166

1    Explaining Why the Ax Fell for 1,200, and let
2    me ask you, I know this article predates your
3    time at PNC, but did you ever come to learn,
4    during your time at PNC, about the fact that
5    AHERF had fired or laid off about 1,200
6    employees in late '97?
7  A.   I don't have any specific knowledge about that.
8    Mike Martin did say to me that they had made
9    some adjustments in head count.
10 Q.   Do you recall having any reaction to the
11   statement by Mike Martin that there had been
12   some adjustments in head count?
13 A.   It's not atypical in this industry.
14 Q.   Do you recall whether there was any discussion
15   of further cutbacks at AHERF at or around early
16   '98?
17 A.   I don't recall any.
18 Q.   Was -- did you ever have any discussions with
19   anyone at AHERF, other than the statement you
20   mentioned by Mike Martin, about potential for
21   further cutbacks at AHERF?
22 A.   I don't recall any.
23 Q.   Do you recall ever having any discussions about
24   the closure of Mt. Sinai Hospital by AHERF?
25 A.   I don't recall any.

Page 167

1  Q.   Do you recall ever having any discussions with
2    anyone at AHERF about the closure of any or the
3    potential closure of any of AHERF's hospitals
4    in the Philadelphia region?
5  A.   There may have been discussion about the City
6    Line Hospital, I believe.
7  Q.   Is it City Avenue Hospital?
8  A.   There was a hospital on City Line, I believe.
9    That would have been the only thing.
10 Q.   What general recollection do you have about a
11   discussion about closing a hospital on City
12   Line?
13 A.   They only stated they were considering doing
14   that.
15 Q.   So, to the best of your recollection, in early
16   '98, AHERF was considering closing another --
17   or a hospital?
18 A.   Correct.
19 Q.   Do you recall having any reaction at the time
20   to that statement?
21 A.   It's management's decision.
22 Q.   Did you think it was a good idea for AHERF to
23   close a hospital at that point in time?
24 A.   Management has to make its assessment of the
25   best utilization of the assets. If they came

Page 168

1    to the conclusion it was appropriate, then it's
2    their decision, and I would have no basis to
3    disagree with that.
4  Q.   Did you have any view of your own or did you
5    come to form any view of your own as to whether
6    it was appropriate or a good idea for
7    management to close another hospital?
8  A.   No.
9  Q.   Let me show you what's been -- I'm sorry. You
10   can set aside that exhibit, and let me show you
11   what's been marked as Exhibit No. 1798 which is
12   a February 6, 1998 letter from Kelly Mertz to
13   Paula Mammarella which has Bates No. PNC 188.
14      Let me ask you, I know your name is
15   not on this document, did you have any
16   understanding of when the -- first off, when
17   AHERF's financial or fiscal years ended?
18 A.   I don't recall it as we sit here.
19 Q.   Do you see how in the entry number one, there's
20   a reference to -- on this document, there's a
21   reference to consolidated audited financial
22   statements of AHERF, including combining
23   financial statements of DVOG, as of and for the
24   fiscal year ended June 30, 1997?
25 A.   Yes, sir.

Page 169

1  Q.   Does looking at that at all refresh your
2    recollection as to when AHERF's fiscal years
3    ended?
4  A.   I'm assuming it's June 30, which is not
5    atypical. June 30, December 30 tend to be the
6    dates for hospitals like this to close.
7  Q.   Do you recall ever coming to learn of when
8    AHERF's fiscal year 1997 financial statements
9    were delivered to AHERF -- I'm sorry, to PNC?
10 A.   I don't know the date they were doing that, no.
11 Q.   Do you recall ever having any discussion about
12   any delay on the part of AHERF in delivering to
13   PNC the financial statements for fiscal year
14   1997?
15 A.   I have no knowledge, but that also precedes my
16   employment at the bank.
17 Q.   Okay. Set aside 1798.
18      Let me show you what's been
19   previously marked as Exhibit No. 1800 which
20   appears to be the consolidated financial
21   statements for the year ended June 30, 1997 for
22   AHERF, and let me ask you, as you look through
23   it, whether you recognize this document as one
24   that you might have seen before?
25 A.   I believe I saw this one, yes.

43 (Pages 166 to 169)

JEFFREY R. DICKSON

Page 170

1  Q.   Do you recall when, approximately, during your
2       tenure, you would have first seen this
3       document?
4  A.   Probably within the first 30 days of my
5       employment with the bank.
6  Q.   Did you review the entirety of this document,
7       the fiscal year '97 financial statements, for
8       AHERF?
9  A.   I would have read through it in its entirety,
10      yes.
11 Q.   What kind of review did you perform of this
12      financial statement?
13 A.   That's a very, very broad question.
14 Q.   I mean, in addition to reading through it, was
15      there any particular kind of task that you
16      performed with respect to your review of the
17      financial statements?
18 A.   May I back up for a second just to give you
19      bit of an overview?
20 Q.   Sure.
21 A.   Audited financial statements are the most
22      important document that banks rely upon in
23      trying to assess the financial condition of a
24      borrower.  Financial statements, by definition,
25      the way I read financial statements, are the

Page 171

1       summaries of the actions which management have
2       taken over the time frame for which the
3       statements are issued, and they summarize those
4       actions in accounting terms.
5            Understanding the notes to the
6       financial statements are every bit as critical
7       as understanding the numbers.  So when I read a
8       financial statement, I start by reading the
9       notes to the financial statements, and when I
10      start reading the notes, I want to know on what
11      basis these statements are prepared, what level
12      of work the accountant has done.  In an entity
13      like this, I would want to try to get and see
14      combining financial statements so I understand
15      what the component hospitals are doing.  I look
16      it in terms of debt structure.  I look at it in
17      terms of liquidity.  I look at it in terms of
18      cash flow, and this is really the only time
19      that we get financial statements, we get an
20      audited statement that you have an outside
21      third party who has reviewed in detail the
22      financial statements, making attestations as to
23      the financial condition of the borrower, and
24      that analysis -- the work that they have done
25      going into this is extremely important to me as

Page 172

1       a reader of this information.  So I focus on
2       liquidity, I focus on cash flow, I focus on
3       debt maturities, issues like that, when I read
4       financial statements, and then what I try to do
5       is I try to take the information I know about
6       the company and overlay that against the
7       financial statements that I've been presented
8       and see if it appears reasonable.
9  Q.   Do you recall whether, upon your review of the
10      fiscal year '97 financial statements for AHERF,
11      anything appeared unreasonable based on what
12      you knew at the time?
13 A.   No, there was nothing that appeared
14      unreasonable.
15 Q.   At that time, when you first were reviewing the
16      fiscal year '97 financial statements for AHERF,
17      how much information did you have at that point
18      in time about AHERF as a company and its
19      performance?
20 A.   We had the audited financial statements which
21      were, you know -- which you have in front of
22      you now.
23           I believe I used this as the starting
24      point, you know, the crux of trying to
25      understand what AHERF was in its most recent

Page 173

1       time frame, most recent accounting period.  So
2       my focus was on this, trying to understand
3       where they were as of the last accounting
4       period.  Now, you were, by the time I joined
5       the bank, nine months out of date.  So, to the
6       extent that we did have quarterly financial
7       statements, I would have looked at those in
8       terms of trying to identify trends, and trends
9       had changed, what the liquidity might have
10      been -- what might have been happening with
11      liquidity at the entity and what might have
12      been happening with cash flow, but this would
13      have been the foundation upon which my
14      assessment of AHERF was based.
15 Q.   Okay.  You mentioned that in reviewing
16      financial statements such as this, you would
17      overlay your understanding of what was
18      happening at a company to assess whether
19      financial statements were reasonable, and I was
20      wondering, with respect to this particular set
21      of financial statements, under the
22      circumstances you were in at PNC, what
23      information about AHERF did you overlay on
24      these financial statements, if any?
25 A.   It would have been whatever I could have read

JEFFREY R. DICKSON

Page 174

1   in the file about the nature of the operations
2   of the company, and by doing that, I would
3   arrive at some type -- when I say reasonable, I
4   mean some type of judgment as to whether what
5   the company says it's doing and what the
6   financial statements say are happening are
7   consistent. That's what I mean by reasonable.
8       If there's an inconsistency between
9   what I understand management's trying to do and
10  the financial statements, then I ask my
11  questions, and under that criteria, and based
12  upon my limited knowledge at the time when I
13  came on board with PNC, there seemed to be
14  consistency in terms of what they were saying
15  and what the financial statements said, albeit
16  nine months out of whack, and I wouldn't know
17  that again until I had audited statements which
18  would probably be towards the end of '98 for
19  the fiscal year end '98.
20  Q.  You mentioned that the fiscal year '97
21  financial statements, for the time you would
22  have been reviewing them, were nine months old
23  or out of whack?
24  A.  Correct.
25  Q.  Was that of any concern to you?

Page 175

1   A.  Any time you get financial statements -- let me
2   back up.
3       Financial statements are a picture of
4   the condition of a borrower at a fixed point in
5   time. The further you get from that point in
6   time, the greater the possibility -- not
7   probably, but possibility that there could be
8   change from that financial condition, concept
9   of time and risk.
10  Q.  And did you mention that one way that you tried
11  to be able to understand how, if at all, the
12  company had changed since the time the fiscal
13  year '97 financial statements -- or since the
14  date of the fiscal '97 financial statements was
15  to look at quarterly financial statements?
16  A.  Correct. That was the only information, from a
17  financial standpoint, that was available to us.
18  That was the barometer that you had, the
19  interim barometer for whatever it was worth.
20  Q.  Okay. And would you have been relying on the
21  quarterly financial statements as the interim
22  barometer of how AHERF was doing since the last
23  financial statements that were audited?
24  A.  With the appropriate caveats that I stated this
25  morning in terms of reliance on quarterly

Page 176

1   financial statements, correct.
2   Q.  And you mentioned one of the things you'd look
3   to quarterly -- or one set of things that you'd
4   look to quarterly financial statements for was
5   to look if there were any trends that you
6   perceived and to look at the liquidity and cash
7   flow position, is that right?
8   A.  Correct.
9   Q.  In terms of this particular document, the
10  fiscal year '97 financial statements, are there
11  any particular sections of it that you would
12  look to to assess the liquidity position of the
13  company?
14  A.  You look at the cash. You look at marketable
15  investments -- I'm not looking at the balance
16  sheet, but this is typically what you'd look
17  at. Cash, marketable investments, fund
18  balances in terms of liquidity. Then you'd
19  look at cash flow, because that's either a
20  contributor to or detractor from cash flow, and
21  you look at capital structure, because that
22  could represent a potential call on liquidity
23  as far as debt maturities.
24  Q.  Okay. And how about with respect to cash flow,
25  is there any particular section you'd look to?

Page 177

1   A.  You want to make sure that your entities are,
2   you know, generating positive cash flow, and
3   hopefully it's not from just depreciation; it's
4   from operating profits. That's very important.
5   So you focus on where is the profitability
6   coming from? Where is the cash flow coming
7   from?
8   Q.  Is the analysis or the review to determine
9   where the cash flow is coming from centered on
10  any particular part of a set of financial
11  statements?
12  A.  You have the statement of cash flows contained
13  within audited financial statements which is
14  the starting point, and that balance sheet is
15  used -- the income statement and balance sheet
16  are used to derive that, so you refer back to
17  those two sections of the audited financial
18  statements. Then you have to go into the notes
19  for some of the information. Interest paid,
20  for example, is not the same as interest
21  expense. There's a difference between accrual
22  and payable. So you have to go through
23  financial notes to understand what is a cash
24  and what is a non-cash item.
25  Q.  You mentioned that you would have looked at

JEFFREY R. DICKSON

Page 274

1          - - - -
2          THE VIDEOGRAPHER:  Excuse me, sir.
3     At some point, there was a -- the camera didn't
4     record just for like, maybe, your first two
5     questions.  I know you've objected.  So if you
6     could go back to those at some point, there's a
7     risk that -- it may have gotten it, but just to
8     be completely sure.
9          MR. COGAN:  And I'll -- just to save
10    you reading that question, I'll just ask it
11    again.
12         THE VIDEOGRAPHER:  Not the ones you
13    just asked.
14         MR. COGAN:  No, I understand.  I
15    understand.
16    BY MR. COGAN:
17    Q.    You have in front of you page 26, do you not?
18    A.    Yes, I do.
19    Q.    And that's the report of the independent
20          accountants on the consolidating and combining
21          financial information, is that right?
22    A.    Yes, sir.
23    Q.    And is it your understanding, based upon that
24          report, that the consolidating financial
25          information has at least been subjected to the

Page 275

1     same auditing procedures that the auditors, in
2     this instance Coopers & Lybrand, applied with
3     respect to the audit of the consolidated
4     financial statements?
5     A.    Per this statement, that's correct.
6     Q.    Okay.  And have the auditors there opined that
7           the consolidating financial information is
8           fairly stated in all material respects in
9           relation to the consolidated financial
10          statements taken as a whole?
11    A.    You're back on the first opinion, first page,
12          or are you back on page 26?
13    Q.    No, I'm on page 26.  You see where it says --
14          well, let me ask you this -- let me strike that
15          question and ask you this:  Do you see where in
16          the report they say in the last two lines,
17          Coopers & Lybrand expresses, "And our opinion
18          is fairly stated in all material respects in
19          relation to the consolidated financial
20          statements taken as a whole?"
21    A.    Yes, sir.
22    Q.    And do you understand that to mean that the
23          consolidating financial information is fairly
24          stated in all material respects in relation to
25          the consolidated financial statements taken as

Page 276

1     a whole?
2     A.    Yes, sir.
3     Q.    And do you attach some significance to that
4           statement by the auditors with respect to your
5           review of the consolidating and combining
6           financial information?
7          MR. TERUYA:  Objection.
8     A.    It's very important.
9     Q.    Do you take some comfort from the fact that the
10          combining financial information has been
11          subjected to the same sort of auditing
12          procedures that were applied by the auditors
13          with respect to the consolidated financial
14          information?
15         MR. TERUYA:  Objection.
16    A.    Yes, because it tells us also what each entity
17          within the group is doing.  So we have a more
18          detailed view of the financial statements as
19          they roll up into the consolidated financial
20          statements.
21    Q.    Now, I understand from the videographer that we
22          may not have gotten a couple of my first
23          questions, so let's make sure.  We'll go back,
24          and I'll try to recapture them and ask you
25          again.

Page 277

1          Mr. Dickson, given your experience in
2     banking, I think I asked you, as a creditor,
3     with your experience and background, would you
4     want to know the financial statements that you
5     were relying upon for a credit risk contained
6     GAAP violations?
7          MR. TERUYA:  Objection.
8     A.    Absolutely.
9     Q.    And similarly, sir, with respect to a credit
10          risk that you were responsible for, would you
11          want to know that the financial statements that
12          you were being provided contained material
13          misstatements?
14         MR. TERUYA:  Objection.
15    A.    Definitely.
16    Q.    I take it it's important for you to have the
17          comfort that when you're reviewing audited
18          financial statements, that they be free of
19          material misstatements?
20    A.    Absolutely.  The financial statements are the
21          critical raw material that we use to start a
22          financial analysis.  That raw material, if it
23          can't be relied upon, in essence, cuts out the
24          foundation for the credit analysis, because
25          we're relying upon that party to perform its

JEFFREY R. DICKSON

Page 278

1  responsibilities in terms of the auditing and
2  making sure it's in compliance with GAAP, et
3  cetera, et cetera, so that we can make an
4  assessment of cash flow. So if the information
5  contained in that report is not correct, then,
6  by definition, the analysis which we are doing
7  on that particular credit is flawed. So we
8  have to have that confidence. We have to have
9  the correct information in order for our
10  analysis to be correct.
11  Q.   And so, consequently, if you're provided
12  audited financial statements and the auditor
13  has provided a qualified opinion or an adverse
14  opinion, that's a red flag to you to tell you
15  you can't, perhaps, rely on the financial
16  statements as you otherwise would with respect
17  to audited financial statements that are
18  accompanied by an unqualified opinion?
19        MR. TERUYA:  Objection.
20  A.   Very much so.
21  Q.   There was another exhibit that I wanted to ask
22  you about, Exhibit 1798, which I think you have
23  right in front of you there. It was the letter
24  from Kelly Mertz to Paula Mammarella dated
25  February 6, 1998.

Page 279

1  A.   Yes, sir.
2  Q.   Do you have that?
3  A.   Yes, I do.
4  Q.   Now, of course, February 6, 1998 predates your
5  arrival at PNC, doesn't it?
6  A.   Yes, sir.
7  Q.   In fact, I think your testimony was you didn't
8  join PNC until March 10, 1998, is that right?
9  A.   Correct.
10  Q.   And is it your understanding that one of the
11  documents that accompanied the letter to
12  Ms. Mammarella was, in fact, the June 30, 1997
13  consolidated audited financial statements for
14  AHERF which has been marked as Exhibit 1800?
15  A.   Yes, sir.
16  Q.   Would it be your understanding that Paula
17  Mammarella and others would have reviewed the
18  financial statements at or about the time they
19  were received?
20  A.   Either at or very shortly thereafter, yes.
21  Q.   And, of course, that would have been a review
22  of those financial statements prior to your
23  arrival, correct?
24  A.   It may have been.
25  Q.   And if they took any actions with respect to

Page 280

1  their review prior to your arrival, you may or
2  may not be aware of what they may have done, is
3  that right?
4  A.   That's correct.
5  Q.   And as I think I understood your testimony, you
6  didn't review -- change that. You reviewed
7  what's been marked as Exhibit 1800 some time
8  within the first 30 days of your arrival at
9  PNC, right?
10  A.   Correct.
11        MR. COGAN:  That's all the questions
12  I have, Mr. Dickson. Thank you.
13        - - - -
14        EXAMINATION
15        - - - -
16  BY MR. TERUYA:
17  Q.   I have a few questions on redirect.
18        Mr. Cogan asked you a number of
19  questions about whether, based on your
20  experience, you would have wanted to know about
21  GAAP violations, material misstatements,
22  non-compliance or unqualified or adverse
23  opinions. Do you recall that?
24  A.   Yes, sir.
25  Q.   And am I correct that consistent with what you

Page 281

1  said at the end of my questioning, you don't
2  know whether, in fact, there were any GAAP
3  violations, material misstatements,
4  non-compliance with covenants or unqualified or
5  adverse opinions expressed at any time, is that
6  right?
7        MR. POHL:  Objection.
8  A.   I don't know is how I responded then and I
9  would respond now.
10  Q.   And you don't know what steps, if any, would
11  have been taken by anyone in response to
12  learning of GAAP violations, material
13  misstatements, non-compliance or unqualified or
14  adverse opinions, is that right?
15        MR. POHL:  Objection.
16  A.   Yes.
17  Q.   And you don't know what effect, if any, any
18  steps that might have been taken in response to
19  learning of any of those items would have had,
20  in fact, is that right?
21        MR. POHL:  Objection.
22  A.   I don't know.
23  Q.   And you also, of course, don't know whether any
24  steps that might have been taken in reaction to
25  learning of any of those items would have been

JEFFREY R. DICKSON

Page 298

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY        )    S H E E T
2
      I, JEFFREY R. DICKSON, have read the foregoing
3  pages of my deposition given on Wednesday, August 13,
   2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
      In all other respects, the transcript is true and
20  correct.
21  _____
            JEFFREY R. DICKSON
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
      Notary Public
25  AKF Reference No. JB76783

Page 299

1     IN THE UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF PENNSYLVANIA
2
3          - - - -
   THE OFFICIAL COMMITTEE OF    )
4  UNSECURED CREDITORS OF       )
   ALLEGHENY HEALTH, EDUCATION & )
5  RESEARCH FOUNDATION,         )
                                )
6     Plaintiff,   )
                   )
7     -vs-         )  Civil Action
                   )  No. 00-684
8  PRICEWATERHOUSECOOPERS, L.L.P. )
                   )
9     Defendant.   )
10
11     * CONFIDENTIAL EXCERPT *
12
13          - - - -
   VIDEOTAPE DEPOSITION OF:  JEFFREY R. DICKSON
14
15          - - - -
16     DATE:  August 13, 2003
           Wednesday, 9:00 a.m.
17
18     LOCATION:  MANION McDONOUGH & LUCAS
           14th Floor, USX Tower
19         Pittsburgh, PA  15219
           412-232-0200
20
21     TAKEN BY:   Defendant
22
23  REPORTED BY:   JoAnn M. Brown, RMR, CRR
           Notary Public
           AKF Reference No. JB76783
24
25

Ebert Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

## *LEONARD T. EBERT*
### *September 17, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**EBERT, LEONARD T.**



**LEGALINK**

A WORDWAVE COMPANY

LEONARD T. EBERT

Page 46

```
 1           Leonard T. Ebert
 2  receivable were 192,907,000 and then in 1995 it
 3  escalated to 255,432,000?
 4     A.  Uh-huh.
 5     Q.  Do you recall being aware as of the end of
 6  fiscal year '95 about the growth of AHERF's accounts
 7  receivable over the past fiscal year?
 8           MR. UNICE:  Objection.  Lack of
 9  foundation.
10     A.  I don't recall.
11     Q.  If I could just ask you to turn to the income
12  statement on the next page, I'm going to ask you to
13  look at the line item of loss from operations?
14     A.  Yes.
15     Q.  And again I'm going to -- do you see that
16  AHERF had lost 12,513,000 in 1994 and then lost an
17  additional 7,845,000 in fiscal year 1995?
18     A.  Yeah, I see it.
19     Q.  Do you recall if at the end of fiscal year
20  1995 you were aware that AHERF had lost -- had
21  additional losses of operations of roughly $7.8
22  million in the past fiscal year?
23           MR. UNICE:  Objection.  Lack of
24  foundation.
25     A.  I don't recall.
```

Page 47

```
 1           Leonard T. Ebert
 2     Q.  Let's move on from this document then and I
 3  will show you what has previously been marked as
 4  Exhibit 1661.  Do you recognize this document,
 5  Mr. Ebert?
 6     A.  Yes.
 7     Q.  What is this document?
 8     A.  It is the audited financial statements for
 9  fiscal '96.
10     Q.  For AHERF?
11     A.  Oh, yeah, of course.
12     Q.  Do you recall if you reviewed this document
13  during your time as a member of the AHERF board of
14  trustees or a member of the AHERF finance committee?
15     A.  I don't recall, but I want to point out that
16  my daughter died on the 17th of September of 1996,
17  so I undoubtedly didn't have anything to do with
18  this.
19     Q.  Again, trying to avoid what is certainly a
20  painful topic, I will just ask you, do you recall if
21  at any point following the date of September 11,
22  1996 and prior to your leaving the AHERF board of
23  trustees you ever reviewed the 1996 AHERF audited
24  financial statements?
25     A.  I don't recall.
```

Page 48

```
 1           Leonard T. Ebert
 2     Q.  Do you recall if during the time period I
 3  just mentioned you were paying significant heed to
 4  what the finances of AHERF were, or were other
 5  factors in your life such that this was not a
 6  concern at that point?
 7     A.  I'm sorry.  I didn't read you on that one.
 8     Q.  Okay.  What I basically asked is from the
 9  period of the date of this, September 11, 1996,
10  through the end of your time on the AHERF board, my
11  question is basically, do you recall if you were
12  paying attention to AHERF's finances, or were other
13  factors in your life such that AHERF's finances were
14  no longer a priority?
15     A.  I don't recall, number one, and, number two,
16  the other factors in my life undoubtedly, rightly or
17  wrongly, took precedence.
18     Q.  Then let's move on from this document,
19  Mr. Ebert.
20           MR. LUFT:  I would like to mark as
21  Exhibit 2024 a document that has been Bates-stamped
22  GOV 71626 through 71636.
23           (Exhibit 2024 was marked for
24  identification.)
25     Q.  Mr. Ebert, the document that I've handed you,
```

Page 49

```
 1           Leonard T. Ebert
 2  Exhibit 2024, I believe you will tell me is a copy
 3  of the October 30, 1997 minutes of the AHERF board
 4  of trustees?
 5           MR. UNICE:  I don't doubt that that's
 6  what these are, but just for the record, they are
 7  unsigned.
 8           MR. LUFT:  That's fine.
 9     A.  Yes.
10     Q.  And I just want to -- do you see under
11  "Members Absent" you were listed as being absent
12  from this meeting?
13     A.  Yeah.  That's after I was no longer there.
14  By the way, that period is when Sherif in his
15  infinite wisdom reorganized, severely reorganized,
16  the whole committee structure and operations of
17  AHERF.  And that's when sitting at home I looked at
18  the material that was going to be sent to the board
19  and I found my name as retired.  And Sherif, to be
20  totally honest about it, two or three weeks later
21  called me and thanked me for my service.  But it was
22  belated.  I got kind of a shock when I sat at home
23  and read that he had retired me, which is what I
24  wanted in the first place, but...
25     Q.  If you could turn to what has been
```

13 (Pages 46 to 49)

LEONARD T. EBERT

Page 50

Leonard T. Ebert

1    Bates-stamped on Exhibit 2024 stamped --
2
3    A. Turn to what?
4    Q. GOV 71630.
5    A. I've got it.
6    Q. Do you see at the top it says "Report From
7    the Audit Committee" and it states "Report on Fiscal
8    Year 1997 Audited Financial Statements and Related
9    Reports for AHERF"?
10   A. Yeah.
11   Q. I know you were absent from this meeting,
12   Mr. Ebert, so I'm not going to ask you about what
13   happened there, but what I am curious about is did
14   you ever have the opportunity when you were a member
15   of the AHERF board of trustees to review the fiscal
16   year 1997 audited financial statements for AHERF?
17   A. No, I did not.
18   Q. Did you ever seek a copy of those financial
19   statements while you were a member of the board of
20   trustees?
21   A. Keep a copy?
22   Q. Seek a copy, ask for a copy so that you could
23   review them while you were a member of the board of
24   trustees.
25   A. No. I think we have a date conflict here. I

Page 51

Leonard T. Ebert

1
2    was not in a position to ask for any copy at that
3    stage in my career.
4    Q. Okay. If you recall --
5    A. I would have to add to this, David Barnes,
6    who was, I guess, chairman of the audit committee or
7    chairman of the finance committee and so on was a
8    previous CEO of Mellon Bank and he, in my
9    impressions when I was in his presence, got the
10   opinion that he was impatient with anyone who would
11   question what he had been doing or anything related
12   to it. In other words, it was an environment that
13   they apparently played pretty close to the vest. I
14   was not there. But after the fact it suddenly
15   dawned on me that this is what's been going on.
16        I have nothing -- I had nothing to do
17   with the audit committee. I don't recall seeing any
18   reports from the auditors. They were all handled in
19   Pittsburgh, I guess principally by McConnell and
20   Sherif and so on. So that is the environment in
21   which materials were being given to other board
22   members. I didn't happen to be there, but that
23   suddenly dawned on me that...
24   Q. Well, you can put this document aside,
25   Mr. Ebert. I think we have pretty fairly

Page 52

Leonard T. Ebert

1
2    established that during this relevant period you
3    were just, as you said you were, either absent or
4    not -- this was not a priority.
5        I would like to move on to another
6    factor which I believe began during a period that
7    you were prior to your tragedy in which you were
8    active for both MCP and AHERF and which you alluded
9    to earlier. Do you recall earlier today you said
10   that -- we talked about MCP and how it couldn't
11   survive in the current environment prior -- and that
12   is one of the reasons they went looking for an
13   affiliation or a partner.
14        MR. UNICE: Object to form. Go ahead.
15   A. That wasn't my wisdom, but that was the
16   conventional wisdom of thinking individuals
17   including the healthcare field.
18   Q. And when you say it was the conventional
19   wisdom of people in the healthcare field, the wisdom
20   was that you had to, I believe you said, get to a
21   thousand beds or something?
22   A. Well, yeah, you picked that number. I
23   probably said that, but certainly more than 300, 350
24   or anything in that bracket. I'll even include 400,
25   maybe 500. It was a given that an institution was

Page 53

Leonard T. Ebert

1
2    going to fall on hard times if they couldn't expand
3    their bed base.
4    Q. Do you recall, Mr. Ebert, that one of the
5    reasons that it was believed -- strike that.
6        Mr. Ebert, was it your understanding at
7    the time when MCP was making its decision that one
8    of the reasons that it would not be able to survive
9    without expanding its bed base was because managed
10   care was rising?
11        MR. UNICE: Object to form.
12   Q. Let me be a little bit clearer about that.
13   When I say "managed care was rising," the percentage
14   of the payor mix which was attributable to managed
15   care is what I was referring to.
16   A. I'll have to say I don't have any way to
17   answer that question. If you want to restate it,
18   maybe I'll --
19   Q. Let me break it down. Maybe my question was
20   inarticulate.
21   A. Managed care to me means HMOs and so on.
22   Q. That is your understanding of managed care?
23   A. But, frankly, not being privy to these
24   specific figures, but I don't think managed care had
25   a big impact on this bed question, but that's

14 (Pages 50 to 53)

LEONARD T. EBERT

Page 74

```
1
2        I have read the foregoing transcript
3    of my deposition given on Wednesday, September
4    17, 2003, and it is true, correct and complete,
5    to the best of my knowledge, recollection and
6    belief, except for the corrections noted hereon
7    and/or list of corrections, if any, attached on
8    a separate sheet herewith.
9
10
11       _____
12       LEONARD T. EBERT
13
14
15
16
17   Subscribed and sworn to
18   before me this _____ day
19   of _____, 2003.
20
21
22   _____
23   Notary Public
24
25
```

Page 75

```
1
2        CERTIFICATE
3        I HEREBY CERTIFY that the proceedings,
4    evidence and objections are contained fully and
5    accurately in the stenographic notes taken by me
6    on Wednesday, September 17, 2003, and that this
7    is a true and correct transcript of same.
8
9
10
11
12       _____
13       Cynthia A. Whyte, RPR
14
15
16       (The foregoing certification of this
17   transcript does not apply to any reproduction of
18   the same by any means, unless under the direct
19   control and/or supervision of the certifying
20   reporter.)
21
22
23
24
25
```

20 (Pages 74 to 75)

Fast Dep.

Kimberly Fast

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                    Civil Action No.

                    Plaintiff,          00-684

                    Vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

                    Defendant.


          Videotape deposition of KIMBERLY

FAST, called for examination under the statute,

taken before me, Jaci R. Traver, RPR, CRR, and

Notary Public in and for the State of Ohio, at

the offices of Manion McDonough & Lucas, 600

Grant Street, Suite 1414, Pittsburgh,

Pennsylvania, on Wednesday, the 8th day of


October 2003 at 9:10 a.m.


                    - - - - -

Kimberly Fast

**Page 90**

1 know myself if they did.
2    Q.  Did you obtain a -- did you keep a
3 copy of the debt agreement for yourself, for
4 your own audit work, or did you make copies of
5 the section and bring it back, or did you sit
6 there in the file room and look at the
7 agreement? I'm trying to figure out how you
8 went about this.
9    A.  It would have been at the client's
10 site, because we take -- when we go to the
11 audit, we take the trunk there. I didn't make
12 copies of the agreement, nor did I make a copy,
13 to my recollection, of that section. I would
14 have had it sitting in front of me while I was
15 doing the work.
16    Q.  When you say, "doing the work," do
17 you mean to refer to checking compliance with
18 the covenants contained in the agreement?
19    A.  Yes.
20    Q.  Reperforming the calculations?
21    A.  Yes. And agreeing balances. Yes.
22    Q.  During the audit, during the 1997
23 audit -- strike that.
24     During the time in which you worked
25 on checking debt compliance, did you come to

**Page 91**

1 learn of any concerns of Coopers not having
2 copies of any of the agreements that you were
3 attempting to check compliance with?
4    A.  I did not personally, no, come into
5 that, a concern.
6    Q.  Do you believe that for any
7 covenants that you were involved in checking
8 that you would have had a copy of the debt
9 agreement or, otherwise, you would have
10 remembered that you didn't have a copy of it?
11    A.  My own practice, I would think that
12 I would have had a copy of the ones that I
13 worked on, but I can't recall if I didn't.
14    Q.  If we could turn back to the
15 internal manual section, 220, and flipping one
16 more page, section point 6. I says in part,
17 "for objectively determinable covenants or
18 provisions, such as working capital and
19 debt-to-equity requirements or restrictions on
20 annual capital expenditures, we should
21 determine compliance by reperforming the
22 relevant calculations."
23     Let me ask first, do you have an
24 understanding of what "objectively determinable
25 covenants" means?

**Page 92**

1    A.  I could guess. I don't --
2    Q.  Would it include financial
3 covenants like liquidity ratios, debt service
4 coverage ratios, capitalization ratios,
5 unrestricted fund balance requirements?
6    MR. McDONOUGH: That question is
7 asking you what you know. It's not asking you
8 to guess.
9    A.  Right. So I guess the answer would
10 be no.
11    Q.  Okay. Do you recall whether in
12 your work in checking compliance with debt
13 covenants whether or not you actually
14 reperformed the relevant calculations for any
15 of the covenants?
16    A.  I don't recall reperforming
17 calculations.
18    Q.  Let me ask you what your
19 understanding of the word "reperform" means so
20 that I can make sure we're on the same page
21 when you say you don't recall reperforming,
22 because it may be different than what this
23 document says.
24    A.  Right now as I sit here?
25    Q.  Yes.

**Page 93**

1    A.  I would`say taking the financials
2 and putting together a calculation myself.
3    Q.  Would it also include consultation
4 with the debt agreement and whatever it
5 provided specific to what, for example, the
6 numerator of liquidity ratio might be?
7    A.  Yes. Uh-huh.
8    Q.  And you don't recall doing that in
9 conjunction with your work on the AHERF audit;
10 is that right?
11    MR. McDONOUGH: Is that question,
12 asking her whether she recalls doing it?
13    MR. TORBORG: Yes.
14    MR. McDONOUGH: Or whether or not
15 she recalls doing it?
16    MR. TORBORG: I guess I don't
17 understand the distinction. Whether she
18 recalls --
19    MR. McDONOUGH: The distinction is
20 this. One question would ask her whether she
21 recalls that she didn't do it and the other
22 question would be whether she can recall
23 whether or not she did it.
24    Q.  Okay. Do you recall whether you
25 ever reperformed calculations?

24 (Pages 90 to 93)

www.rennillo.com

Cleveland (216) 523-1313          Akron (330) 374-1313

Kimberly Fast

Page 94

1    A.    I do not recall.
2    Q.    Do you recall if the nature of your
3    work was more in the nature of tying off
4    balances from the calculations prepared by
5    AHERF treasury, or whether it was actually
6    taking a copy of the debt agreement, a copy of
7    the relevant financial statements and the
8    information, and reperforming the calculation
9    without even looking at AHERF's calculation?
10    A.    I recall it being the first option
11    that you had mentioned.
12    Q.    The last sentence of section point
13    5 you read earlier states, "if provisions or
14    covenants of debt agreements are unclear, the
15    client should be asked to request its counsel
16    or the lenders to provide a written
17    interpretation of the item or items in
18    question."
19        Do you recall there ever being an
20    issue during your work on the AHERF audits with
21    debt covenants provisions being unclear?
22    A.    I do not recall that, no.
23    MR. TORBORG:  Let me mark this as
24    4004.
25        - - - - -

Page 95

1        (Thereupon, Deposition Exhibit 4004
2        was marked for purposes of
3        identification.)
4        - - - - -
5    Q.    For the record, what we have marked
6    as Exhibit 4004 is a letter dated January 8th,
7    1998 from Coopers & Lybrand to the board of
8    trustees of AHERF. It's titled, "Report of
9    Independent Accountants." If you would just
10    take a look at that one.
11    A.    (Witnesses reviewing document.)
12    Q.    Have you had a chance to look at
13    this?
14    A.    Yes.
15    Q.    Do you have an understanding of
16    what this letter is?
17    A.    I believe it's the opinion on the
18    consolidated financial statements.
19    Q.    You think it's the opinion on the
20    AHERF 1997 consolidated financial statements?
21    A.    Yes.
22    Q.    If you look down at the second
23    paragraph there, it says, "in connection with
24    our audit of the consolidated financial
25    statements of AHERF, nothing came to our

Page 96

1    attention that caused us to believe that the
2    Obligated Group was not in compliance with the
3    covenants (insofar as they relate to accounting
4    matters or auditing matters) contained in
5    Section 7 of the Reimbursement and Security
6    Agreement dated April 1, 1995 between the
7    Obligated Group and Morgan Guaranty Trust
8    Company of New York. It should be noted,
9    however, that our audit was not directed
10    primarily toward obtaining knowledge of such
11    noncompliance.
12        Then the next paragraph reads, "the
13    Obligated Group's financial covenants for
14    'Capitalization,' 'Liquidity' and 'Debt Service
15    Coverage Ratio' for the year ended June 30,
16    1997 was 55.8 percent, 3.77 to 1 and 2.227 to
17    1, respectively." And then it continues on.
18        Does this appear to be a letter
19    that specifically focused on a specific debt
20    agreement?
21    A.    Specific -- I'm sorry?
22    Q.    Debt agreement, specifically the
23    Reimbursement and Security Agreement between
24    the Obligated Group and Morgan Guaranty Trust
25    Company.

Page 97

1    A.    Appears that they're referencing a
2    specific agreement.
3    Q.    Do you recall being involved in the
4    preparation of opinions like this related to
5    specific debt agreements?
6    A.    No, I do not.
7    Q.    Do you have any understanding of
8    what the purpose of this letter was?
9    A.    No.
10        - - - - -
11        (Thereupon, Deposition Exhibit 4005
12        was marked for purposes of
13        identification.)
14        - - - - -
15    Q.    For the record, what we've marked
16    as Exhibit 4005 is a series of documents
17    bearing the Bates numbers CL 020812 through
18    875. And the cover page is titled, "AGH Debt
19    Covenant Calculations 6/30/97," and has some
20    initials, KDM 9/4/97 and 9/12/97 from KLH, I
21    believe, in the upper left-hand corner.
22        Obviously, Ms. Fast, I'm not going
23    to ask you to look through every document.
24    I'll pinpoint the questions I have. But if you
25    could just take a glance through it and let me

25 (Pages 94 to 97)

DEPOSITION ERRATA SHEET

RE:    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
VS. PRICEWATERHOUSECOOPERS, LLP

I, Kimberly Fast, wish to make the following amendments, additions, deletions or corrections to my deposition given on October 8, 2003, for the following reasons.  I have signed my name to the errata sheet and authorize you to attach it to the original transcript.

| Page/Line # | Amendment | Reason for Change |
|---|---|---|
| 5:11 | Insert "of" between "SEC" and "the". | Transcription error |
| 91:16 | Should read "It" instead of "I". | Transcription error |
| 128:21 | Should read "knowledge" instead of "acknowledged" | Transcription error |
| 131:7 | Should read "first" instead of "frist" | Transcription error |
| 8:7 | Should read "Kris" instead of "Chris" | Transcription error |

In all other respects, the transcript is true and correct.

_Kimberly D. Fast_
Signature

Subscribed and sworn to before me this ___11___ day of _DECEMBER_, 2003.

_Jane M. Young_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Jane M. Young, Notary Public
Upper St. Clair Twp., Allegheny County
My Commission Expires June 20, 2005
Member, Pennsylvania Association of Notaries

File/Reference Number: 7472

**Fletcher Dep.**

## In The Matter Of:

*UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION v.*
*PRICEWATERHOUSECOOPERS*

---

### ROBERT L. FLETCHER
*September 15, 2003*

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**FLETCHER, ROBERT L. - Vol.**



LEGALINK
A WORDWAVE COMPANY

ROBERT L. FLETCHER

Page 118

1    Do you recall seeing the draft consolidated
2    financial statements for fiscal '97 at or
3    around October of 1997?
4    A.   Generally I would recall it.
5    Q.   Just to be clear, do you recall actually seeing
6    these particular financial statements?
7    A.   I was at the meeting.  If -- if you say that
8    these were passed out at the meeting, if they
9    were passed out at the meeting, I was at the
10   meeting, I must have seen them.
11        MR. McCLENAHAN:  If I can help.  His
12   question is do you remember as you sit here
13   today in 2003, do you remember seeing these
14   financial statements at that meeting in October
15   of '97.
16        THE WITNESS:  No.
17   Q.   Okay.  These are actually part of the board
18   book that would be sent out prior to the
19   meeting; is that right?
20        MR. UNICE:  Objection.
21   A.   Presumably.
22   Q.   And you recall being at the meeting; is that
23   right?
24   A.   Yeah.
25   Q.   I'm sorry?

Page 119

1    A.   I recall being at the meeting, yes.
2    Q.   How far in advance of the AHERF board meetings
3    would you usually get the board materials for
4    that meeting?
5    A.   I -- I really don't recall.
6    Q.   Now, if you go to page 21, again, referring to
7    the large numbers at the top, and this is part
8    of the financial statements that we were
9    talking about earlier, the draft financial
10   statements for fiscal year '97, do you see that
11   it says net income, 21,926,000?
12   A.   Yes.
13   Q.   Do you know from looking at this how you would
14   arrive at the operating income or operating
15   loss, which doesn't appear to be on here?
16        MR. UNICE:  Objection, form and
17   foundation.
18   A.   No, I don't.
19   Q.   Well, if you took out the investment income,
20   you see investment income near the top?
21   A.   Yes.
22   Q.   And net assets released from restrictions used
23   for operations, do you see that?
24   A.   Yes.
25   Q.   If you take those two numbers and you add them

Page 120

1    together and then you subtract them from the
2    net income, would that be an approximation of
3    the operating loss?
4        MR. UNICE:  Objection, form and
5    foundation.
6    A.   I would assume that that's correct.
7    Q.   Do you -- let me ask you, do you recall seeing
8    this particular page?
9    A.   No.
10   Q.   Now, you said that you recall being at the
11   board meeting where these financial, draft
12   financial statements were presented.  What do
13   you remember about that meeting, if anything?
14        MR. UNICE:  Objection.
15   A.   Nothing specifically.
16        MR. McCLENAHAN:  I think you already
17   went through an exhibit that reflected part of
18   what went on in this meeting, may have been
19   minutes of the meeting.  I don't know.
20   Q.   Do you recall any discussion at the October 30,
21   1997 board meeting about the results for fiscal
22   year 1997?
23        MR. UNICE:  Object to form.
24   A.   Specifically, no.
25   Q.   You can put this aside, and I'll show you

Page 121

1    another document that's previously been marked
2    Exhibit 1653.
3        Now, this is a board book or
4    committee book for the meeting of the audit
5    committee of AHERF for a meeting on October
6    15th, 1997.  Now, we know that you were not on
7    the audit committee --
8    A.   Correct.
9    Q.   -- is that correct?  I'd like to have you look
10   at page 70 -- actually page 68, again, the
11   large numbers at the top.
12   A.   Mm-hmm.
13   Q.   And if you'd actually flip to the previous
14   page, page 67, you'll see this is the beginning
15   of the Coopers & Lybrand management letter and
16   AHERF management response.
17        Even though you weren't on the audit
18   committee, did you ever see in -- well, did you
19   ever see at any time this Coopers & Lybrand
20   management letter and AHERF management
21   response?
22   A.   No.
23        MR. McCLENAHAN:  You haven't even
24   shown him the letter yet.
25   Q.   Well, this is the beginning of the letter, and

31 (Pages 118 to 121)

ROBERT L. FLETCHER

Page 122

1     please feel free to -- to go through it.
2  A.   Well, I didn't see the letter so --
3  Q.   Just to be doubly sure, if you look at page 70
4        where the letter continues, it says General
5        Overview.
6  A.   All right.
7  Q.   This is all part of the letter, and I just
8        wanted to make sure if you look at this that
9        you can confirm that you haven't seen it or
10       maybe you have seen it?
11 A.   I have not seen it.
12 Q.   Okay. Good. You can put that aside.
13 A.   Just occurred to me if I stack this up in front
14       of me that reasonably soon I would no longer be
15       videotaped.
16 Q.   You can build an igloo.
17          While you were affiliated with AHERF,
18       what was your view of the integrity of
19       Mr. Abdelhak? And if it changed over time,
20       then let me know that.
21 A.   From my initial meeting with him until the time
22       he was no longer affiliated?
23 Q.   Correct.
24 A.   I would say I was impressed with his
25       credentials and his performance up until the

Page 123

1        time it appeared that things were not going
2        according to a plan that I had not seen in
3        detail.
4  Q.   And when roughly was that?
5  A.   I would say as a general point of demarcation
6        mid-'97.
7  Q.   Now, had you heard at any time prior to his
8        termination anyone else voice any concerns
9        about Mr. Abdelhak's integrity?
10 A.   No.
11 Q.   Did you consider Mr. Abdelhak to be someone who
12       was open to other people's suggestions?
13 A.   Yes, that's as opposed to no.
14 Q.   Do you need to explain that a little bit or --
15 A.   I -- I can't honestly answer yes without saying
16       that because I have no idea of how many
17       suggestions people have made to him that I saw
18       manifested eventually.
19 Q.   Okay. Well, speaking about your own personal
20       experience, did you feel comfortable making
21       suggestions to him?
22 A.   Yes.
23 Q.   Did you ever make a suggestion to him that you
24       thought was contrary to his own way of
25       thinking?

Page 124

1          MR. UNICE:  Object to form.
2  A.   No.
3  Q.   What was your view of the integrity of
4        Mr. McConnell during the same time period,
5        while you were on the AHERF board until his
6        termination? And if it changed, then let me
7        know.
8  A.   Probably comparable.
9  Q.   Meaning that it changed for the worse at around
10       the same time that it did for Mr. Abdelhak?
11 A.   Yes.
12 Q.   Were you on the executive committee when
13       Mr. Abdelhak was terminated?
14 A.   Yes.
15 Q.   And why was he terminated?
16 A.   I would have to say in as few words as possible
17       a gross dissatisfaction with his -- his
18       performance.
19 Q.   Were you involved with the decision as to who
20       his replacement would be?
21 A.   Yes.
22 Q.   And he was replaced by Mr. Sanzo?
23 A.   Yes.
24 Q.   How was Mr. Sanzo chosen to -- to be the one
25       who would replace Mr. Abdelhak?

Page 125

1  A.   How was he chosen?
2  Q.   Right. Let me clarify that. Why Mr. Sanzo
3        instead of anyone else?
4  A.   Basically because of the need for someone to
5        step into that position very quickly and is
6        experienced with the components of the system.
7  Q.   At the time he was replacing Mr. Abdelhak, did
8        you have a view as to any -- any differences in
9        the way they thought the organization should be
10       run going forward between Mr. Abdelhak and
11       Mr. Sanzo?
12          MR. UNICE:  Object to form.
13 A.   At the time that the decision was made to
14       select him as the replacement?
15 Q.   Right.
16 A.   No.
17 Q.   While you were on the AHERF board, did you have
18       any concerns about the number of members on the
19       board, meaning that there were too many or too
20       little?
21          MR. UNICE:  Object to form.
22 A.   Yes.
23 Q.   And what were your concerns?
24 A.   Well, they -- they came from my experience with
25       a much more small board, much smaller board and

LEGALINK MANHATTAN  (212) 557-7400

ROBERT L. FLETCHER

Page 162

1   A.   No.
2   Q.   No reason to believe you weren't presented with
3        those --
4   A.   No.
5   Q.   -- you just can't recall it; correct?
6   A.   Correct.
7   Q.   Do you recall whether or not any
8        representatives from Coopers & Lybrand ever
9        attended an AHERF board meeting?
10  A.   No.
11           MR. FRIESEN:  Objection.  You mean
12       while he was on the board obviously?
13  Q.   While you were an AHERF board member?
14  A.   Correct.
15  Q.   Same answer?
16  A.   Same answer.
17  Q.   Now, you were a board member of Forbes Health
18       System for several years before becoming an
19       AHERF board member; is that right?
20  A.   Yes.
21  Q.   And I'd assume you had external auditors for
22       that enterprise as well?
23  A.   Yes.
24  Q.   And they would audit the financial statements
25       on a yearly basis of that enterprise?

Page 163

1   A.   Yes.
2   Q.   Based on your board experience at Forbes as
3        well as AHERF, what is your understanding of
4        the -- or the relevance of an outside auditor's
5        opinion to an enterprise's financial
6        statements?
7            MR. FRIESEN:  Objection.
8   A.   In a word, verification.
9   Q.   Would you agree that -- do you have an
10       understanding of what the term a clean opinion
11       or unqualified opinion is?
12  A.   Yes.
13  Q.   Tell me what you think that means.
14  A.   I knew you were going to ask.  Unqualified
15       essentially in the context as I understand it
16       and have used it is that there was nothing
17       there that the auditors felt worthy of bringing
18       to the attention as produced in the audited
19       financial statements.
20  Q.   Did you as an AHERF board member rely on
21       Coopers & Lybrand to provide this verification
22       of AHERF's financial statements?
23  A.   Yes.
24  Q.   Now, as an outside trustee of a nonprofit
25       entity, what reliance, if any, then did you

Page 164

1        place on the outside auditors when they issued
2        their audited year-end report?
3   A.   That the numbers in the audited financial
4        report were verifiable by them, without
5        exception, unless so noted.
6   Q.   Do you also have a general understanding of
7        what the term materiality means in the context
8        of a financial statement?
9   A.   Yes.
10  Q.   Generally what's your understanding of that
11       term?
12  A.   That it makes a difference.
13  Q.   And if something's material in an auditor's
14       view, what is your understanding of their
15       obligations if that occurs?
16  A.   To report it.
17  Q.   To whom or to who, to whom?
18  A.   To the audit committee.
19  Q.   Now, if Coopers & Lybrand had told you in
20       fiscal year '96 or '97 that the financial
21       statements that have been presented to them for
22       audit were materially misstated and that they
23       were therefore issuing an adverse opinion, an
24       unclean opinion, would that have caused you any
25       concern?

Page 165

1            MR. FRIESEN:  Objection, calls for
2        speculation.
3   A.   Yes.
4   Q.   Why is that?
5   A.   Well, because in the normal circumstance,
6        that's something that you'd like to know more
7        about.
8   Q.   Would you expect as an external trustee of
9        AHERF that material misstatements, if found,
10       would be presented to the audit committee?
11           MR. FRIESEN:  Objection.
12  A.   Yes.
13  Q.   What options would you have had as an AHERF
14       trustee if you had those concerns in a
15       situation we are talking about?
16           MR. FRIESEN:  Objection, calls for
17       speculation.
18  A.   Well, the best way I can answer that is to say
19       that would very much depend on the report of
20       the audit committee and their reflections and
21       recommendations to the board as -- as a
22       reconciliation of what had been noted.
23  Q.   So if the audit committee agreed with Coopers'
24       decision or Coopers' view that there were
25       material misstatements, you'd be faced with

42 (Pages 162 to 165)

ROBERT L. FLETCHER

Page 166

1    several options as a trustee; right?
2         MR. FRIESEN: Objection.
3  A.  Let me answer in this way: For instance, if
4    there was a material difference and the audit
5    committee upon examination decided that they
6    didn't feel that that was substantial and
7    reported that to the board, the board
8    presumably would not pursue that any further.
9  Q.  So in your view you would have relied on the
10    audit committee's response to Coopers bringing
11    this to their attention?
12        MR. FRIESEN: Objection.
13  A.  Yes.
14  Q.  I'm sorry, I couldn't hear you there.
15  A.  Yes, I'm sorry.
16  Q.  Would your response be the same if C & L had
17    told the audit committee that fiscal '96 or
18    '97, that the financial statements presented by
19    management had been intentionally misstated --
20        MR. FRIESEN: Objection.
21  Q.  -- in a material fashion?
22        MR. FRIESEN: Same objection.
23  A.  If it were reported by them?
24  Q.  Yes, sir.
25  A.  I think that would depend on what they reported

Page 167

1    and then the reaction of the internal audit and
2    financial people as to the severity of that
3    difference.
4  Q.  Again, you'd rely on the audit committee's
5    response to that report in forming your
6    decisions?
7        MR. FRIESEN: Objection.
8  A.  Yeah, yes.
9  Q.  Now, do you have a general understanding of
10    what generally accepted accounting principles
11    are or GAAP?
12  A.  Yes, generally without being --
13  Q.  You and I both. What's your understanding of
14    the term GAAP?
15  A.  Those are the guidelines laid down by the
16    accounting industry to clarify those things
17    that nobody else would understand.
18  Q.  Now, if the auditors had come to the audit
19    committee in 1996 or '97 and reported that in
20    their view the financial statements presented
21    to them were overstated by between 80 and $100
22    million due to GAAP violations, would that have
23    caused you concern?
24        MR. FRIESEN: Objection, calls for
25    speculation and lack of foundation.

Page 168

1        MR. McCLENAHAN: This is '96 or --
2        MR. UNICE: '96 and '97, yes, sir.
3  A.  Yes.
4  Q.  And what kind of response would you have had as
5    a trustee?
6        MR. FRIESEN: Objection.
7  Q.  Let me ask it a different way. Would you have
8    made some inquiries to see why that had
9    happened?
10  A.  Yes.
11        MR. FRIESEN: Objection.
12  Q.  Would another option have been --
13  A.  Unless it was explained through the actions of
14    the audit committee.
15  Q.  And if the questions weren't answered, would
16    another option be to engage perhaps outside
17    consultants to look at the issue?
18        MR. FRIESEN: Objection.
19  A.  Could be remedial.
20  Q.  Would you also perhaps, is it possible to
21    instruct the auditors to revise their audit
22    scope and their procedures if that were the
23    case?
24        MR. FRIESEN: Objection.
25  A.  I don't think I could rule that out.

Page 169

1  Q.  If the auditors came to you with that concern,
2    would you also perhaps have considered
3    evaluating whether financial management at
4    AHERF should be retained?
5        MR. FRIESEN: Objection.
6  A.  Again, it would depend on the circumstance, the
7    severity, the depth of research and the audit
8    committee and their report to the board.
9  Q.  Now, if the auditors had come to you in '96 or
10    '97 and said that based on information they
11    reviewed, they did have, in fact, concerns with
12    the integrity and honesty of members of AHERF's
13    financial management, would that have caused
14    you concern?
15        MR. FRIESEN: Objection, calls for
16    speculation.
17  A.  You are saying if they would have come to you.
18  Q.  Yes, sir.
19  A.  As opposed to coming to the board or
20    communicating in some fashion to the board or
21    the audit committee or someone.
22  Q.  We'll start with you personally.
23  A.  If they would have come to me personally?
24  Q.  Yes, sir.
25  A.  I consider that to be extraordinary.

43 (Pages 166 to 169)

ROBERT L. FLETCHER

Page 170

1  Q.  Would that have caused you concern, that
2      information they relayed to you?
3  A.  Depended upon what the information was, the
4      materiality, dimension of it.
5  Q.  If the information was in their view material,
6      in the auditor's view material, would you have
7      evaluated or at least researched what had
8      happened?
9          MR. FRIESEN:  Objection, calls for
10     speculation.
11 A.  I personally?
12 Q.  As an AHERF board member.
13 A.  As an AHERF board member, I personally probably
14     would not have.  I would have -- I would have
15     suggested there were reasons to have that done.
16 Q.  To whom would you have made that suggestion?
17         MR. FRIESEN:  Objection.
18 A.  Well, either the CEO or the CFO or both.
19 Q.  Would your response be the same if C & L had
20     come to the AHERF board with that same
21     information?
22         MR. FRIESEN:  Objection.
23 A.  The same circumstances?
24 Q.  Yes, sir.
25 A.  I'm not sure, and my hesitancy is because if I

Page 171

1      seem to be the outlier in that group, I may
2      have been just being more contrition about it
3      than others, so if everybody else on the board
4      was satisfied, I'd have to look more
5      introspectively at why I felt the need for
6      that.
7  Q.  Do you recall while you were an AHERF board
8      member at some point in 1998 the organization
9      decided to not retain Coopers & Lybrand to do
10     an additional audit?
11 A.  I don't.
12 Q.  Let me show you a document that might help
13     refresh your memory.
14         - - - -
15     (Exhibit 1992 marked for identification.)
16         - - - -
17 Q.  Did you have a chance to review Exhibit 1992?
18 A.  In its entirety, no.
19 Q.  Go ahead and take a look.  I think it's five
20     pages.
21         MR. FRIESEN:  That's between 1 and
22     400 for the record.
23         MR. UNICE:  But not between 100 and
24     400.
25         - - - -

Page 172

1      (The witness reviewed the Exhibit.)
2          - - - -
3          MR. McCLENAHAN:  Are we on the
4      record?
5          MR. UNICE:  Yes.
6          MR. McCLENAHAN:  Is there a question?
7          MR. UNICE:  Yes.  I was giving the
8      witness a chance to review the document.
9          THE WITNESS:  Yes.
10 BY MR. UNICE:
11 Q.  Have you had a chance to do so?
12 A.  Yes.
13 Q.  Exhibit 1992 is Bates labeled TACO 56657 CM
14     through 56661 CM.  The first page states,
15     Meeting of the board of trustees for Allegheny
16     Health, Education and Research Foundation for
17     August 27th, 1998.
18         Do you see your name on the first
19     page as a member being present at that meeting,
20     Mr. Fletcher?
21 A.  Yes.
22 Q.  Do you recall sitting here today attending a
23     meeting of the board on 8/27/1998?
24 A.  I do not.
25 Q.  Take a look for me at the last page of the

Page 173

1      document ending in Bates 56661.
2  A.  Mm-hmm.
3  Q.  I'm going to take a look at some handwriting
4      here and kind of decipher it.  Underneath Roman
5      numeral VI, which is labeled Executive Session?
6  A.  Yes.
7  Q.  Do you see there's a notation that says, Also
8      discussed auditors?
9  A.  Yes.
10 Q.  And then a few lines down it says, Think will
11     have serious conflicts with C & L?
12 A.  Yes.
13 Q.  And then, Rec changing, underneath that?
14 A.  Yes.
15 Q.  It also follows that it says, KPMG or Deloitte
16     both good firms.  Decided on KPMG for the W,
17     that's what it appears to be, Deloitte to do
18     procedures for E, or east I'm assuming, if
19     court approves.
20         Do you see that?
21 A.  Yes.
22 Q.  Does this help refresh your memory at all as to
23     any discussions at the AHERF board about
24     deciding to not retain Coopers & Lybrand or to
25     replace them with other firms?

44 (Pages 170 to 173)