ROBERT L. FLETCHER

Page 174

1  A.    The fact that it's on the agenda or the fact of
2      this written notes?
3  Q.    How about both?
4  A.    Both?
5  Q.    These notes are on an agenda for that board
6      meeting.
7  A.    Right.  I don't have a specific recollection of
8      that.
9  Q.    How about a general one?
10  A.    Generally I would say -- have to say if I were
11      at the meeting and it's on the agenda, that I
12      must have some -- I must have been there.  I
13      don't have a recollection.
14  Q.    But you don't have any independent
15      recollection?  I'm sorry, go ahead, sir.
16  A.    I do not have a recollection of the
17      discussions.
18  Q.    Do you know whose handwriting is on this
19      document by any chance?
20  A.    I do not.  It is not mine.
21  Q.    You discussed a little bit today the
22      termination of some of AHERF's senior managers.
23      Do you remember that discussion?
24  A.    Yes.
25  Q.    And one of those was Mr. Abdelhak?

Page 175

1  A.    Yes.
2  Q.    Do you recall when that happened?
3  A.    Around the early part of June of 1998.
4  Q.    I'm going to hand you another document which
5      will be 1993.
6          - - - -
7      (Exhibit 1993 marked for identification.)
8          - - - -
9  Q.    It's Bates labeled RF 1041 through 1044, and
10      it's noted as being an agenda for the 6/5/98
11      meeting of the executive committee of the AHERF
12      board.
13          Do you recognize this document,
14      Mr. Fletcher, as one that has come from your
15      files?
16  A.    Yes.
17  Q.    You will note on the front, the first page
18      lists you as a member of the executive
19      committee?
20  A.    Yes.
21  Q.    Do you recall attending a meeting of the AHERF
22      board on 6/5 -- I'm sorry, the executive
23      committee of the AHERF board on 6/5/98?
24  A.    Yes.
25  Q.    Do you recall any discussions at that meeting

Page 176

1      about whether Mr. Abdelhak should be
2      terminated?
3  A.    Yes.
4  Q.    Take a look at the second page.  There are a
5      series of resolutions on there.  Do you see
6      that?
7  A.    Yes.
8  Q.    And the first one, you can peruse that, let me
9      know if I'm incorrect in paraphrasing it,
10      resolved to remove Mr. Abdelhak as the
11      executive of AHERF; is that right?
12  A.    Yes.
13  Q.    And what do you recall about discussions about
14      Mr. Abdelhak's termination?
15          MR. FRIESEN:  Objection.  You mean at
16      this meeting?
17          MR. UNICE:  Yes, sir.
18  A.    Specifically nothing.  Generally a lack of
19      performance.
20  Q.    Can you explain that to me, what you mean by a
21      lack of performance, if you do recall anything
22      other than that?
23  A.    Well, two things:  One, that things were not
24      working as anticipated by his -- by his own
25      reporting; two, that the financial situation of

Page 177

1      the enterprise was seriously in trouble.
2  Q.    Do you recall any discussions about
3      Mr. Abdelhak's termination occurring at the
4      executive committee level prior to the 6/5/98
5      meeting?
6  A.    No.
7  Q.    Do you recall those kinds of discussions any
8      other committee or board meeting at which you
9      were present before the 6/5/98 meeting?
10  A.    No.
11  Q.    Now, did the members of the executive committee
12      vote at that meeting whether or not they should
13      fire Mr. Abdelhak?  Was there a vote taken?
14  A.    I don't remember.
15  Q.    Do you recall how you felt in terms of whether
16      or not he should be let go?
17  A.    Yes.
18  Q.    What was your view?
19  A.    He should be let go.
20  Q.    The reasons you set forth?
21  A.    Yes.
22  Q.    Any other reasons besides the ones you've told
23      me today, and Mr. Friesen?
24  A.    No, not anything material.
25  Q.    What do you mean by material?

45 (Pages 174 to 177)

ROBERT L. FLETCHER

Page 178

1    MR. McCLENAHAN:  Go ahead, you can
2  answer the question.
3  A.    Well --
4    MR. McCLENAHAN:  Didn't we already
5  define material earlier in the -- your
6  questioning?
7    MR. UNICE:  I think the discussion
8  about materiality earlier was with respect to
9  financial statements.
10    THE WITNESS:  Yes, but that -- yes,
11  set that aside.
12    MR. UNICE:  So we really didn't, and
13  now he said it.
14  BY MR. UNICE:
15  Q.    So go ahead.
16  A.    The two things I mentioned were sufficiently
17  general and sufficiently fulfilled by
18  malperformance that there was really no other
19  need to introduce other things that might have
20  been material because they would have been
21  contained within the two things I mentioned.
22  Q.    Did you have any personal interaction with
23  Mr. Abdelhak --
24  A.    No.
25  Q.    -- after the decision to terminate him on --

Page 179

1  A.    No.
2  Q.    -- 6/5/98?
3  A.    No.
4          - - - -
5    (Exhibit 1994 marked for identification.)
6          - - - -
7  Q.    The court reporter just gave you what's been
8  marked Exhibit 1994, appear to be minutes for a
9  4/5/97 AHERF board meeting, and they span Bates
10  pages GOV 61996 to 62085, but I will represent
11  that those numbers aren't consecutive, if you
12  look at the document, they skip around.  I'll
13  also represent that this is the entire set of
14  unsigned minutes that we received.
15    MR. FRIESEN:  Let me just get this
16  clear.
17    MR. UNICE:  Yeah.
18    MR. FRIESEN:  Did you put this
19  together in page number order and it wasn't --
20  the Bates numbering was -- it wouldn't have
21  been in page number order if you had kept it in
22  Bates number order?
23    MR. UNICE:  This is how it was given
24  to me, so I don't know who actually put it in
25  the precise order, but if you look at the top

Page 180

1  left, to allay any heartburn we have here, of
2  each page, page 2 follows 3 to 10 and the
3  signature page.
4    MR. FRIESEN:  Okay.
5  BY MR. UNICE:
6  Q.    Just a few questions about this document.
7  A.    Mm-hmm.
8  Q.    First, do you recall attending an AHERF board
9  meeting on 4/5/97?
10  A.    Yes.
11  Q.    And do you see you are marked as a member being
12  present at this meeting?
13  A.    Yes.
14  Q.    I only have a question about one topic of
15  discussion.  If you'll turn to me -- turn with
16  me to page 6, top left-hand corner of this
17  document.
18  A.    All right.
19    MR. McCLENAHAN:  Page 6 of the Bates
20  number?
21    MR. UNICE:  No, I'm sorry, David,
22  page 6 of the top left-hand corner.  I want to
23  avoid the Bates numbers for confusion purposes.
24  Q.    Item V is a -- states report from the audit
25  committee that also references a Coopers &

Page 181

1  Lybrand proposed AHERF audit plan for fiscal
2  year '97.  Do you see that?
3  A.    Now, wait, you are on page 6?
4  Q.    Top left-hand corner.
5    MR. McCLENAHAN:  He means this page 6
6  (indicating).
7  A.    Okay.  All right.  I was on the right page to
8  begin with.  All right.
9  Q.    I'm sorry for the confusion there.  Are you
10  there with me?
11  A.    Yes.
12  Q.    And do you see item V I just referenced,
13  report?
14  A.    Yes.
15  Q.    Okay.  And there's a resolution below that to
16  approve the C & L proposed AHERF audit plan for
17  fiscal '97 as presented?  Did I read that
18  correctly?
19  A.    Yes.
20  Q.    Do you have any recollection of any discussions
21  at the 4/5/97 board meeting regarding Coopers'
22  proposed '97 audit plan?
23  A.    No.
24  Q.    Can you explain to me if you recall how that
25  plan was explained generally to the board?

46 (Pages 178 to 181)

ROBERT L. FLETCHER

Page 194

1        internal loan committee?
2    A.   Ask the question again.
3    Q.   Sure.
4    A.   Because I'm not sure I heard.
5    Q.   What was it about moving funds from AGH, as you
6         just mentioned, that led to the formation of
7         the internal loan committee?
8    A.   Well, there were -- there were funds that were
9         transferred from AGH's, if you were to look at
10        their financial statement, there were funds
11        that were transferred from AGH to the east and
12        had no approval by any committee or board of
13        the -- of AHERF.
14   Q.   How did you learn about those transfers?
15   A.   I presume that I --
16            MR. McCLENAHAN: Don't presume. Do
17        you know? Do you recall?
18   Q.   Without speculating.
19   A.   Okay. Yeah, I don't recall really.
20   Q.   Okay. After the formation of the internal loan
21        committee, having discussed it now a little
22        bit, do you recall whether or not that
23        committee actually convened a meeting?
24   A.   I don't recall that there was ever a meeting.
25   Q.   And do you recall the magnitude or amount of

Page 195

1         funds that you are referencing that went from
2         AGH to the east?
3    A.   Specifically, no.
4    Q.   Or generally? Do you recall a range of an
5         amount?
6    A.   It was more than a million.
7    Q.   Any other parameters you can put on that for
8         me?
9    A.   (Shaking head side to side.)
10   Q.   Is that a no?
11   A.   That's a no.
12            MR. UNICE: I'm finished.
13            MR. FRIESEN: I don't have any
14        questions.
15            THE WITNESS: Okay.
16            THE VIDEOGRAPHER: If there are no
17        further questions. This deposition is
18        concluded. We are now going off the record.
19        The time is 3:10 p.m.
20            - - - -
21   (The proceedings were concluded at 3:10 p.m.)
22            - - - -
23
24
25

Page 196

1    COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2    COUNTY OF ALLEGHENY          )  SS:
3         I, Heidi H. Willis, RPR, CRR, a Court Reporter
4    and Notary Public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the witness,
6    ROBERT L. FLETCHER, was by me first duly sworn to
7    testify to the truth; that the foregoing deposition
8    was taken at the time and place stated herein; and
9    that the said deposition was recorded
10   stenographically by me and then reduced to printing
11   under my direction, and constitutes a true record of
12   the testimony given by said witness.
13        I further certify that the inspection, reading
14   and signing of said deposition were NOT waived by
15   counsel for the respective parties and by the
16   witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 18th day of
23   September, 2003.
24
25   _____
              Notary Public

Page 197

1    COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
     COUNTY OF ALLEGHENY           )   S H E E T
2
         I, Robert L. Fletcher, have read the foregoing
3    pages of my deposition given on Monday, September 15,
     2003, and wish to make the following, if any,
4    amendments, additions, deletions or corrections:
5    Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21   _____
              ROBERT L. FLETCHER
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2003.
24   _____
              Notary Public
25   AKF Reference No. HW77235

ROBERT L. FLETCHER

Page 198

1        AKF REPORTERS, INC.
              AKF Building
2       436 Boulevard of the Allies
         Pittsburgh, PA  15219
3        (412) 261-2323
4
   September 18, 2003
5
   TO:  David McClenahan, Esq.
6
7     RE:  DEPOSITION OF ROBERT L. FLETCHER
8     NOTICE OF NON-WAIVER OF SIGNATURE
9    Please have the deponent read his deposition
  transcript.  All corrections are to be noted on the
10 preceding Errata Sheet.
11    Upon completion of the above, the Deponent must
  affix his signature on the Errata Sheet, and it is to
12 then be notarized.
13    Please forward the signed original of the
  Errata Sheet to Jeffrey Friesen, Esq., for attachment
14 to the original transcript, which is in his
  possession.  Send a copy of same to all counsel, and
15 also a copy to me.
16    Please return the completed Errata Sheet within
  thirty (30) days of receipt hereof.
17
18
19 Heidi H. Willis, RPR, CRR
  Court Reporter
20
21
22
23
24
25

**Flori Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

*PAMELA FLORI*
*May 7, 2004*

---

## LEGALINK MANHATTAN

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

FLORI, PAMELA



LEGALINK
A WORDWAVE COMPANY

PAMELA FLORI

Page 81

1  Q.  Do you have Exhibit 2590 as well?
2  A.  Yes.
3  Q.  And from this exhibit, if you would turn with
4      me to page 36129.
5  A.  Okay.
6  Q.  Page 36129 is dated February 4th, 1997; is that
7      correct?
8  A.  Yes.
9  Q.  And page 06390 is dated January 29th, 1997?
10 A.  Yes.
11 Q.  In the second bullet on page 36129, you've
12     written, Given the increase in the hospital's
13     off-balance sheet financing, it may be
14     appropriate to consider a leverage covenant
15     which includes operating leases.  The
16     RM intends to negotiate this type of leverage
17     covenant if AGH violates the minimum
18     unrestricted fund balance covenant at fiscal
19     year-end 1997, close quotes.
20         Do you see that?
21 A.  Yes.
22 Q.  I take it that is your summary of the comments
23     that are contained on page 06390?
24         MS. WYRICK:  Objection.
25         MR. COGAN:  Objection.

Page 82

1  A.  I'm not sure what you mean.
2  Q.  In this second sentence, in the second bullet
3      underneath the subheading Transaction
4      Structure --
5  A.  Yes.
6  Q.  -- on page 36129, you are trying to convey to
7      the reader the relationship manager's strategy
8      with respect to this minimum unrestricted fund
9      balance covenant; correct?
10 A.  Yes.
11 Q.  Okay.  And I take it you have determined what
12     the relationship manager's strategy is through
13     communications with relationship manager?
14 A.  Correct.
15 Q.  And at this point in time the relationship
16     manager was Marcie Knittel for the AHERF
17     account?
18         MR. COGAN:  AGH.
19         MR. KRUSKO:  Yes, for AGH.
20 A.  I'm sorry, what was the question?
21 Q.  Okay.  At this point in time, January to
22     February 1997 time frame, Marcie Knittel was
23     the relationship manager for PNC's relationship
24     with AGH; is that your understanding?
25 A.  Yes.

Page 83

1  Q.  Once you completed this document, Exhibit 2590,
2      once it was finalized, would it then become
3      part of the overall offering that went to the
4      committee?
5  A.  Yes.
6  Q.  And from that point in time forward, what would
7      happen to the offering document, if you know?
8  A.  What do you mean what would happen?
9  Q.  After the committee considered the offering
10     document, did you have an understanding as to
11     what then would happen with the document?
12     Would it go into a file, or was it destroyed
13     or --
14         MS. WYRICK:  Objection.
15 A.  It went into the credit file.
16 Q.  And it went into the credit file for later
17     reference by PNC employees?
18 A.  Yes.
19 Q.  Do you recall who was -- withdrawn.
20         - - - -
21     (Exhibit 2592 marked for identification.)
22         - - - -
23 Q.  If I can show you what we just marked as
24     Exhibit 2592, which is Bates numbered PNC 25024
25     through PNC 25026, and, again, this is Exhibit

Page 84

1      2592.
2          Mrs. Flori, very briefly, do you
3      recognize Exhibit 2592 as a letter from PNC
4      Bank to AHERF informing AHERF that PNC has
5      extended a line of credit that's referenced on
6      the first page of the letter to March 15th,
7      2000?
8          MS. WYRICK:  Objection.
9  A.  I would -- I would have to -- do you want me to
10     read all through it?
11 Q.  I was just trying to save time by being
12     cumulative.  Let me ask you this:  Do you
13     recognize the form of this document?
14 A.  I do not.
15 Q.  Did you typically see letters that went to
16     clients confirming that PNC had decided to
17     provide financial assistance or render a credit
18     enhancement?
19 A.  Not typically, no.
20 Q.  Do you see the middle paragraph on page 25024
21     which states, We are pleased to advise you
22     that, subject to the terms hereof and your
23     execution of the acceptance hereto, we are
24     extending the stated termination date of the
25     letter of credit to March 15th, 2000, subject

19 (Pages 81 to 84)

Page 85

1    to the following, and then some conditions are
2    listed thereafter.
3        Do you see that?
4    A.   Yes.
5    Q.   And at the top of the first page, a letter of
6    credit is referenced; correct?  In the re
7    section?
8    A.   Yes, yes.
9    Q.   So does it appear to you then that the purpose
10   of this letter was to convey to AHERF that PNC
11   Bank had decided to extend the letter of
12   credit?
13       MS. WYRICK:  Objection.
14   A.   I assume that's what it is.  I've never seen it
15   before.
16   Q.   Okay.  Do you have any reason to believe that
17   the letter of credit that is at issue in
18   Exhibit 1745 was not renewed by PNC Bank?
19   A.   No, I have no reason to believe that.
20   Q.   Do you recall who at PNC was responsible for
21   monitoring this credit after this letter of
22   credit was renewed?  By credit, I mean AGH.
23   A.   The relationship manager.
24   Q.   Was it your understanding that the relationship
25   manager would, therefore, be responsible for

Page 86

1    determining whether any covenant in the letter
2    of credit had been violated?
3    A.   They -- the relationship manager was ultimately
4    responsible.  When financial statements came
5    in, it was sent to an analyst who checked them
6    and verified.  So it was kind of a joint step,
7    but the relationship manager was ultimately
8    responsible.
9    Q.   Would that analyst then in turn provide his or
10   her assessment of covenant compliance as well
11   as the financial statements?
12       MR. COGAN:  Objection.
13   Q.   To the relationship manager?
14       MR. COGAN:  Objection.
15   A.   Say that again?
16   Q.   I believe you said that the relationship
17   manager was responsible for determining
18   covenant compliance for existing credits?
19   A.   Correct.
20   Q.   And I believe you testified that analysts would
21   assist relationship managers in making those
22   determinations?
23   A.   Correct.
24   Q.   Did you have an understanding in this time
25   frame as to what the form of assistance those

Page 87

1    analysts provided to relationship managers?
2    A.   We did the calculations.  If it was a numerical
3    calculation, like say a leverage ratio or a
4    cash flow coverage ratio, we would do the
5    calculations and give those to the relationship
6    manager.
7    Q.   And this is work that you recall performing
8    separate and apart from the question whether
9    you performed it for AHERF?
10   A.   Yes.
11   Q.   When you performed this work, would you in turn
12   go back and look at credit memoranda to gain an
13   understanding as to what could potentially be
14   an issue?
15   A.   When we were -- when you say performed work,
16   you mean when we were checking covenants?
17   Q.   Correct, when you were checking compliance at a
18   later point in time.
19   A.   No.  We just went by the loan documents, what
20   was in the document.  We took that definition
21   and calculated it based on that definition.  By
22   "we" I mean the credit analyst.  I don't know
23   what the relationship managers did.
24   Q.   That at least was your practice?
25   A.   Exactly.

Page 88

1    Q.   Did you have access to offering memoranda
2    specific to the underlying transactions?
3    A.   Do you mean could we look at a credit offering?
4    Q.   Correct.
5    A.   Yes, yes.
6    Q.   In connection with this covenant compliance
7    work?
8    A.   We could, yes.  I don't know that we did, but
9    we could.
10   Q.   Can you turn with me to Exhibit 1745.
11   A.   Okay.
12   Q.   Can you turn with me to page 08315?
13   A.   Okay.
14   Q.   Do you see the subheading Credit Issues,
15   particularly the subparagraph No. 1 (b)?  Do
16   you see that subparagraph?
17   A.   Yes.
18   Q.   The second sentence in that subparagraph
19   states, AHERF's goal is to consolidate and
20   integrate these operations into a state-wide
21   and eventually a regional integrated health
22   system.
23       Do you see that?
24   A.   Yes.
25   Q.   Was that consistent with your understanding in

PAMELA FLORI

Page 117

1  and change the wording in the analysis for what
2  went into the final offering before it would go
3  on to -- into the file.
4       So I don't know. I can't remember
5  how I would have dated that, whether I would
6  have dated it after, like at the time I made
7  the correction or the time --
8  Q.  Sure.
9  A.  -- the time of the approval, the original, I'm
10     not sure.
11 Q.  I guess I'm talking about a different context
12     though.
13 A.  Oh, okay.
14 Q.  And that is the context of you exchanging
15     drafts of your memoranda with relationship
16     managers.
17 A.  Yes.
18 Q.  In that context did you make it your practice
19     to make sure that your drafts were properly
20     dated?
21 A.  Yes.
22          MR. COGAN: Objection.
23 Q.  And you did so to make sure that you and the
24     relationship manager would have an
25     understanding as to which draft was currently

Page 118

1  the operative draft?
2          MS. WYRICK: Objection.
3  A.  I dated it. I don't know if that was
4     specifically the reason, but there was a date
5     on there.
6          MR. KRUSKO: I don't have any further
7  questions.
8          MR. COGAN: Nor do I. Thank you.
9          THE VIDEOGRAPHER: That marks the end
10 of videotape No. 2 in the deposition of Pamela
11 Flori. The time indicated is 3:02 p.m. Thank
12 you very much.
13          - - - -
14 (The proceedings were concluded at 3:03 p.m.)
15          - - - -
16
17
18
19
20
21
22
23
24
25

Page 119

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY         )  SS:
3       I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  PAMELA FLORI, was by me first duly sworn to testify
7  to the truth; that the foregoing deposition was taken
8  at the time and place stated herein; and that the
9  said deposition was recorded stenographically by me
10 and then reduced to printing under my direction, and
11 constitutes a true record of the testimony given by
12 said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 11th day of May,
23 2004.
24 _____
25          Notary Public

Page 120

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY           )   S H E E T
2
      I, Pamela Flori, have read the foregoing pages
3  of my deposition given on Friday, May 7, 2004, and
   wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21 _____
            PAMELA FLORI
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2004.
24 _____
            Notary Public
25 AKF Reference No. HW80667

28 (Pages 117 to 120)

Franz Dep.

LORA FRANZ

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF PENNSYLVANIA

2

                          - - - -

3

THE OFFICIAL COMMITTEE OF        )

4  UNSECURED CREDITORS OF         )
   ALLEGHENY HEALTH, EDUCATION &  )

5  RESEARCH FOUNDATION,           )
                                  )

6                 Plaintiff,      )
                                  )

7              -vs-               )     Civil Action
                                  )     No. 00-684

8  PRICEWATERHOUSECOOPERS, L.L.P. )
                                  )

9               Defendant.        )

10

11                     - - - -

12                   VOLUME I
         VIDEOTAPE DEPOSITION OF:  LORA FRANZ

13

                        - - - -

14

15            DATE:   November 22, 2002
                      Friday, 9:00 a.m.

16

17            LOCATION:  MANION MCDONOUGH & LUCAS
                         14th Floor, USX Tower

18                       Pittsburgh, PA  15219
                         412-232-0200

19

20            TAKEN BY:   Defendant

21

              REPORTED BY:   JoAnn M. Brown, RMR

22                           Notary Public
                             AKF Reference No. JB72993

23

24

25

LORA FRANZ

Page 42

1   A.   So, under was me.  Over was a gentleman named
2        Dan Thiry.
3   Q.   Was he the first person to hold this position?
4   A.   Yeah, and then he -- I don't really know what
5        happened after I left, because then that's when
6        they split the business office in two and he
7        stayed with the Philly hospitals.  So I don't
8        know -- I'm foggy on that one.
9   Q.   Fair enough.
10  A.   What was the other one?  Director of pro fee.
11       Her name was Cynthia Malizia.  Don't even ask
12       me how to spell that.  Then I think she either
13       got fired or quit, and then I don't know who
14       she was replaced with, because I didn't have
15       much interaction with those people.
16           Then we had the director of
17       reporting, financial reporting, which there
18       were several analysts, and he was the person
19       who would prepare the monthly patient
20       accounting packet of reports, and he would be
21       the person who probably, actually, in reality,
22       spent the most time with Greg when you think
23       about it, and his name was Russ Laing.  I think
24       it's L-A-I-N-G.
25           Who else can I tell you?  Let's see.

Page 43

1        We had a director of customer service who at
2        one time was Linda Bond, and then it became
3        John DeZulovich, and then Linda Bond -- they
4        created another position called director of
5        administrative support, and Linda became that
6        person, and what she was responsible for was we
7        were going through a conversion -- all of the
8        Philly hospitals were on SMS but all different
9        versions, so they were going through a process
10       to get them all on the same version of SMS, and
11       so she was the person from a user perspective
12       representing patient financial services.  She
13       was the person who liaisoned with our
14       information services department as well as
15       the -- I think they had Ernst & Young was doing
16       the -- was the consulting firm that they had
17       doing the implementation for them.  So she was
18       the liaison between all those folks and us in
19       terms of when we need to make decisions about
20       tables and stuff like that.
21           And we had a director of like cash
22       application, and, again, his name was Ron
23       Becker at one point in time, and then he left,
24       and I don't remember what we did with that
25       position.

Page 44

1            Who did I leave out here?  Let me
2        think here.
3   Q.   Was there a director of revenue enhancement?
4   A.   Yeah.  Bob Michalski.
5   Q.   What was his responsibilities?
6   A.   He -- every hospital has what they call a
7        charge catalog, and if you could think about a
8        hospital and all the different services they
9        provide, usually it's, in a small hospital,
10       8,000 line items.  In a large hospital, I had
11       one client that's 28,000 line items in this
12       charge catalog.  And the responsibility -- and
13       if you think about how AHERF was, we didn't
14       have that times one, we had that times seven.
15       So his responsibility was making -- and
16       there's -- the government requires you to put
17       all different kinds of codes on each of those,
18       and the codes change, and his responsibility
19       was to make sure that we were using accurate
20       codes, and I believe he -- although I'm not
21       sure about this, he also had a responsibility
22       of making sure that the pricing structure
23       stayed in sync, you know, that we weren't
24       charging like $300 for a service at one
25       facility and $2.57 at another.

Page 45

1   Q.   Well, you said at the start that people were
2        constantly changing.  It certainly seems like
3        there was a fair amount of turnover.
4   A.   Oh, yeah.
5   Q.   What accounted for that?
6   A.   It was -- well, I think it was a couple things.
7        It was a high -- it was a very highly-pressured
8        environment.  I've worked in several hospitals,
9        and while I will always say I learned the most
10       at AHERF just from the standpoint of the tools
11       and the technology that we had available to us
12       to do work, it was a very pressured
13       environment.  It was, what did you do for me
14       today?  What are you doing for me tomorrow?  It
15       was cash, cash, cash, cash.  Where's our cash?
16       You know, we couldn't collect accounts fast
17       enough.
18  Q.   Where was this pressure coming from?
19  A.   Well, directly, it was coming from Greg.
20       Indirectly, it was coming from Joe Dionisio and
21       Sherif Abdelhak.  I forget he has a last name.
22       See, in Pittsburgh, he only has a first name.
23  Q.   Like Madonna.
24  A.   Yeah, exactly.
25  Q.   When you say directly from Greg, did anyone --

MANHATTAN REPORTING CORP., a LegaLink Company

LORA FRANZ

Page 46

1  did Joe Dionisio or Sherif Abdelhak ever come
2  down and sort of speak to you as the directors
3  about this or was everything funneled through
4  Greg?
5  A.  Everything was funneled through Greg. Joe did
6  come down and talk to us a couple times, but it
7  was not about specific cash, just sort of, you
8  know, his view from on top of the mount sort of
9  thing. You know, he was talking to the masses.
10     But it was very -- it was a very,
11  very pressure cooker environment, so I think it
12  really accounted for a lot of -- you know,
13  literally, one of the guys like had a heart
14  attack while I was there. I mean, it was
15  unbelievable to work in.
16     And then the other piece in terms of
17  turnover was we had very, very, high standards.
18  I mean, it was -- AHERF paid well but expected
19  a lot, and so people who just weren't willing
20  to give the 150 percent were going pretty
21  quickly. Sometimes their decision; sometimes
22  our decision. I mean, it was -- I can't always
23  say it was our decision.
24  Q.  Did Greg ever express -- when he was applying
25  the pressure, per se, did he ever express where

Page 47

1  that he was getting pressure from the top or
2  specific things that he was hearing from either
3  people in operations or from management?
4  A.  His -- and, again, you know, this is through
5  the filter of Greg, but he was never shy about
6  saying, you know, Joe says we have to get this
7  kind of number this month, you know. We can't
8  have the A/R, you know, grow. We've got to --
9  you know, you've got to go beat on these
10  accounts, blah, blah, blah, blah. He was never
11  shy about saying that it came from Joe, and
12  then occasionally, you know, I guess when he
13  felt like he needed to drop another name, it
14  would be Sherif's.
15     He also was under a fair amount of
16  pressure from the Philadelphia people, because
17  it was very -- our business office was very
18  contentious. The Philadelphia people did not
19  want their hospitals processed here in
20  Pittsburgh, so the Philadelphia management
21  people did not cooperate or get along well at
22  all with the Pittsburgh people. So anytime
23  that they felt they could jab Greg, they did.
24  Anytime he felt he could jab them, he did. So
25  some of the pressure also came from, you know,

Page 48

1  the Philadelphia contingency.
2  Q.  Did that have an effect on your ability to do
3  your job within PFSG, this sort of contention
4  with the east?
5  A.  Yeah. No, it did. I can give you one stupid
6  example, because it still sticks in my mind
7  after all these years.
8     We -- towards the end of the month,
9  the whole goal was to get all of the cash
10  collected, and at the end of the fiscal year,
11  that was really the goal. So, Dan Thiry and I
12  got on the corporate jet one Thursday. It was
13  right before June 30, so it was probably
14  June -- no, it probably was June 30, actually.
15  Get on the corporate jet in the morning. We go
16  out to Philadelphia. We stop at Independence
17  Blue Cross, a couple of the HMO plans. We had
18  probably $3 or $4 million of checks from these
19  payors in our briefcases. We could not get any
20  of the Philadelphia payors to deposit that
21  money in the bank accounts out there. They
22  refused. Dan and I take the checks in the jet,
23  hoping the jet doesn't go down, get back here
24  to Pittsburgh. We have deposit tickets --
25  these are for their hospitals. These are

Page 49

1  deposits for their hospitals. We had them, you
2  know, in our briefcases, but they were -- it
3  was PNC, and it was -- you couldn't use the
4  deposit tickets in eastern Philly, you could
5  only use them here -- or in Eastern
6  Pennsylvania. So we go to the airport, land,
7  go to one of these like a little PNC branch
8  somewhere, pull up to the drive-up window five
9  minutes before they close with $3 or $4 million
10  worth of checks. I'm sure they're probably
11  still talking about.
12     But there was an example -- this was
13  money for their accounts. I couldn't get any
14  of them -- I mean, I had to physically go out
15  there, take the corporate jet, run around to
16  all the different hospitals, pick up -- I
17  couldn't get any of those guys to help us.
18  Then I couldn't get them to deposit the money.
19  So there's sort of my own personal example of
20  how ridiculous it sort of got on days.
21  Q.  And this is an outgrowth of the consolidation
22  which the people in the east just didn't want
23  it to happen?
24  A.  Right. Yeah. They just didn't like their
25  accounts -- there was just a lot of contention

13 (Pages 46 to 49)

Page 230

```
1        unknown to us.
2   Q.   Now, would Russ have the information that he
3        would need if he were to be the one that would
4        help substantiate those reserve percentages?
5   A.   He could, yeah.
6             MR. LUFT: Objection.
7   A.   He could by running simple queries out of the
8        accounts receivable system.
9   Q.   Okay. But he would be the person that would do
10       this?
11  A.   Yeah. He would not even probably even talk to
12       me about it, unless he saw some sort of problem
13       or he had a question or something he couldn't
14       resolve, but I don't remember ever, other than
15       the commercial -- maybe, the payment tracking
16       stuff that he had asked me, but I don't really
17       remember him asking me lots of questions about,
18       you know, any kind of reserving calculations he
19       was doing.
20            MR. TORBORG: Well, I guess it's
21       quarter till. Do you guys want to stop? We'll
22       go off the record.
23            THE VIDEOGRAPHER: We're now going
24       off the record. The time is 3:41.
25            - - - -
```

Page 231

```
1             (The proceedings were temporarily
2        adjourned at 3:41 p.m.)
3             - - - -
```

Page 232

```
1   COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2   COUNTY OF ALLEGHENY        )  SS:
3        I, JoAnn M. Brown, RMR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   LORA FRANZ, was by me first duly sworn to testify to
7   the truth; that the foregoing deposition was taken at
8   the time and place stated herein; and that the said
9   deposition was recorded stenographically by me and
10  then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 26th day of
23  November, 2002.
24       _____
25            Notary Public
```

Page 233

```
1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY       )   S H E E T
2
        I, LORA FRANZ, have read the foregoing pages of
3   my deposition given on Friday, September 22, 2002,
    and wish to make the following, if any, amendments,
4   additions, deletions or corrections:
5   Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21       _____
              LORA FRANZ
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
         Notary Public
25  AKF Reference No. JB72993
```

MANHATTAN REPORTING CORP., a LegaLink Company

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF PENNSYLVANIA
 2
                            - - - -
 3
      THE OFFICIAL COMMITTEE OF        )
 4    UNSECURED CREDITORS OF           )
      ALLEGHENY HEALTH, EDUCATION &    )
 5    RESEARCH FOUNDATION,             )
                                       )
 6            Plaintiff,               )
                                       )
 7            -vs-                     )    Civil Action
                                       )    No. 00-684
 8    PRICEWATERHOUSECOOPERS, L.L.P.   )
                                       )
 9            Defendant.               )
10
                            - - - -
11
                         VIDEO TAPE
12          DEPOSITION OF:  LORA FRANZ
                         VOLUME II
13
                            - - - -
14
15            DATE:    December 4, 2002
                       Wednesday, 9:20 a.m.
16
17            LOCATION:   MANION McDONOUGH & LUCAS
                          14th Floor, USX Tower
18                        Pittsburgh, PA  15219
                          412-232-0200
19
20            TAKEN BY:   Defendant
21
           REPORTED BY:   Claire Gross, CRR, RDR
22                        Notary Public
                          AKF Reference No. Cg73107
23
24
25
```

LORA FRANZ

Page 247

1    Q.    Do you know if any analysis was done
2          regarding those type of accounts as related
3          to the reserve percentages?
4                MR. LUFT:  Objection.
5    A.    I remember talking about them with Russ at
6          one point in time, but I don't know if he did
7          any analysis.  I don't know -- I remember
8          talking about him as this was -- we were
9          going to have to deal with it in terms of
10         moving accounts in the amount of A/R to
11         another financial class so we could isolate
12         them realizing we weren't going to get paid
13         from Medical Assistance on them.  I remember
14         having that discussion with him.  But what he
15         did with that information I don't know.
16   Q.    I think you just answered my next question.
17         I was going to ask you where does Medical
18         Assistance -- I've seen that term.  Is this
19         the type of accounts we were talking about
20         when we were talking about general assistance
21         or general relief?  Is it the same thing?
22   A.    Medical Assistance is really Medicaid here in
23         the State of Pennsylvania.  At one point in
24         time if you were to look at the -- any of the
25         age trial balances for AHERF, you would see

Page 248

1          them grouped together.  You would see the
2          state Medical Assistance program along with
3          general relief grouped into like a Medicaid
4          or Medical Assistance rollup, sort of a payor
5          rollup.
6                The managed Medicaid, when they moved
7          folks into the managed care programs, they
8          would always be a different classification.
9                After the general relief program
10         ceased to exist, though, patients were then
11         classified as self-pay, patient pay.  They
12         were moved out of that particular financial
13         category, and Medicaid or Medical Assistance
14         would simply be those patients who were not
15         in a managed Medical Assistance program.
16   Q.    Can you give me some idea of when these
17         changes in the payor environment we've talked
18         about, the general relief and then the
19         movement of the Medicaid program into sort of
20         a managed care Medicaid, when those took
21         place?
22   A.    The elimination of the county general
23         assistance programs, I'm thinking that was
24         around '97, sometime in '97 I'm thinking.
25         The migration to managed care from the true

Page 249

1          Medicaid program happened over a course of
2          time because what happened is each county
3          would have different -- depending on how many
4          managed care payors they had signed up that
5          were going to do Medical Assistance, they
6          would have different schedules about doing
7          them.
8                I do recall Philadelphia was one of
9          the pilot -- that area was one of the pilot
10         sites, so I believe they started migrating
11         those patients sooner than they did here in
12         Pittsburgh.
13               So I would guess that that probably
14         started in '96, '97 as well.  More full-blown
15         in '98, but again not all patients would go
16         into these managed care organizations.
17   Q.    About 60 percent of them would?
18   A.    I would say about 60 percent of them.
19   Q.    Would you agree with me that if AHERF did not
20         alter its reserve percentages to take into
21         account these changes in the payor
22         environment, that there is a likelihood that
23         the accounts receivable, the net accounts
24         receivable, may be overstated?
25               MR. LUFT:  Objection.

Page 250

1    A.    Yes, that's possible.
2    Q.    I want to follow up on a few things we talked
3          about last time.  You talked a little bit
4          about the fact that you noticed a change from
5          when you started and when you left AHERF
6          about AHERF's management responsiveness to
7          your need for additional resources.
8    A.    Yes.
9    Q.    I think you said originally it was kind of a
10         belief that there was plenty of money to go
11         around?
12   A.    Uh-huh, absolutely.
13   Q.    I wanted to sort of follow up on that, if I
14         could.  Just what was the general feeling
15         when you started at AHERF in July of '96
16         about sort of the capitalization of AHERF as
17         a whole and its perceivability to kind of
18         experiment with these technologies?
19               MR. LUFT:  Objection.
20   A.    When I was recruited basically Greg said to
21         me that he viewed this business office as he
22         was going to make it the premier organization
23         in the country and, really money was no
24         object from the standpoint of if we needed to
25         invest in certain technologies, if we needed

5 (Pages 247 to 250)

LORA FRANZ

Page 251

1  to invest in more people, that that really
2  wasn't an issue.
3      Even I would fly out to Philadelphia,
4  and people -- like all the other directors
5  would fly out to Philadelphia probably a
6  couple times a month on the corporate jets.
7  I would make it a point to always come home,
8  make one-day trips, but people who stayed
9  over were staying at the Rittenhous, which is
10  like a four or five-star hotel in
11  Philadelphia.
12      So even as someone who did business
13  on behalf of AHERF, you had very much the
14  impression that this was a well-capitalized
15  organization; and when there was a problem we
16  just threw money at it until we could solve
17  it.
18      In terms of hiring staff and
19  recruiting management talent, if you look at
20  the directors that were in the patient
21  financial area, Greg paid a lot of money for
22  us, and that was sort of the way it was.
23  Anybody said they were going to leave, he
24  threw more money at you.  An interesting
25  environment.

Page 252

1  Q.    Is it fair to say there wasn't a big focus on
2  cutting costs?
3  A.    No.  In fact, my initial job was to look at
4  reengineering and redesigning, and when I
5  would start to look at some of the
6  productivity measures and the staffing levels
7  and to say, for instance -- for instance,
8  when I first got there the number of billers
9  looked abnormally high.
10      One of the reasons was because they
11  hadn't fully implemented the technology that
12  would allow them to process more bills by
13  having the system do some of the editing
14  versus human beings.
15      But when I brought that up it was
16  very much Greg was like no, no, we can't do
17  that, we can't do that.  So that was just the
18  big source of my frustration, and that's
19  really what led to me taking over the
20  collection function was to say you're just
21  not ready to look at these things, you're not
22  ready to look at it from an efficiency
23  standpoint, you are focused on effectiveness
24  right now.
25      And so he just agreed with me, that

Page 253

1  he wasn't ready to look at it, could he make
2  it more efficient from a cost perspective.
3  Q.    As a general matter do you think that costs
4  in the business office could have been cut
5  without significantly affecting your
6  effectiveness?
7  A.    I believe there were some decisions that were
8  made that were not necessarily as cost
9  effective as they could be.  The one that
10  I'll mention is some of the extensive use of
11  outsourcers.
12      I believe the outsourcers
13  arrangement -- I'm guessing because I never
14  saw the contracts -- but ten percent of what
15  they were to recover.  I mean, that would
16  be -- eight to ten percent would be a normal
17  range.  I would have expected that we were
18  paying outsourcers.
19      I believe there were situations where
20  certain groups of accounts, had we been able
21  to hire people towards the end, we could have
22  done that cheaper than paying someone a
23  contingency to collect those accounts.
24  Q.    You also talked last time about the fact that
25  the end of your tenure at AHERF AHERF was

Page 254

1  sort of running out of money?
2  A.    Yes.
3  Q.    And that I think you specifically mentioned
4  you didn't have the money to pay a credit
5  bureau vendor?
6  A.    Uh-huh.
7  Q.    Can you think of anything else that the
8  running out of money did to hinder your
9  collection efforts?
10  A.    Well, I can distinctly remember one day when
11  because we hadn't paid the vendor who
12  provided us with the bill forms -- which, not
13  to make you all hospital billing experts, but
14  hospitals bill on a U-B 92 bill form.  It's a
15  very special-looking red and white form.
16      Whenever we would have to submit a
17  paper claim, a nonelectronic claim, we would
18  have to produce claims on this form.
19      With the commercial payors many of
20  our commercial payors didn't accept
21  electronic transmission, so we would have to
22  print claims.
23      Well, because we hadn't paid the
24  vendor who supplied us with these forms, they
25  actually went, I believe it was, like two,

6 (Pages 251 to 254)

LORA FRANZ

Page 287

1    accounts that are really 180 days old that
2    look like they are 30 days old, and it would
3    affect -- if your reserves were based on an
4    aging it would definitely have impact on it.
5  Q.    That was going to be my follow-up question.
6    Do you recall whether there was any system of
7    automatic reaging in the Philadelphia area
8    hospitals?
9  A.    They were all on SMS, and I can't remember --
10    again, it would have depended on how you did
11    the rebill about whether -- because there is
12    like sort of two functions, a reprint and a
13    rebill.
14        A rebill would go in -- a reprint
15    would only regenerate the claim basically.
16    Think of it as copying the claim.
17        A rebill goes in and recalculates the
18    contractual allowance, sort of starts all
19    over again. Depending on how they were
20    running the aging reports -- when I ran aging
21    reports I always aged from discharge day, so
22    it didn't make any difference how many times
23    we would rebuild or what we had done to it.
24    So the reports I ran to see how old accounts
25    were were always by discharge date. When I

Page 288

1    started I did see some agings being run by
2    bill date.
3  Q.    Which would be if you're attempting to
4    establish your reserves based on aging, that
5    would be a big problem?
6  A.    Yes, because --
7        MR. LUFT: Objection.
8  A.    -- Bill date can have little relevance to
9    discharge date. And the payor statute use
10    the run on discharge date, not our bill date.
11  Q.    You spoke of sort of a mass rebilling. I
12    think there may have been more than one.
13  A.    There were a series of them.
14  Q.    Do you remember when?
15  A.    Well, there was one like when I started in
16    July of '96. I seem to remember they were in
17    the throes of one right either shortly after
18    that or right around that same time because
19    people were just consumed with the work that
20    it was creating.
21        And then, as I said, we probably did
22    another one. Greg always liked to do them
23    sort of when he felt it could impact his
24    end-of-the-year results, so I'm guessing we
25    probably did another one in January or

Page 289

1    February of '97 because he would want to get
2    that in before June, so that would be a good
3    time to do one.
4        His pattern was if it worked once
5    I'll do it again, so he probably did it
6    again. January, February time frame would be
7    a good time to do those rebillings to get
8    money in before the end of the fiscal year,
9    so I'm guessing that we always did them
10    around that time period.
11  Q.    When you started at AHERF, walked in the door
12    and then when you assumed the collection
13    function, do you recall -- I think you
14    testified last time there was a lot of old
15    accounts on the books?
16  A.    Yes.
17  Q.    When I say on the books, I should say in the
18    patient accountings system because that's
19    really what you're more familiar; right?
20  A.    Uh-huh.
21  Q.    Not what's on the general ledger?
22  A.    Right.
23  Q.    Do you remember anyone saying that there was
24    a certain amount of water in the receivables?
25    Do you remember a discussion?

Page 290

1  A.    I never heard that term water.
2  Q.    Okay.
3  A.    I would remember that one because that
4    doesn't make any sense to me.
5  Q.    Do you remember any conversations about the
6    fact that there were a lost of old accounts
7    still on the books or still on the inpatient
8    accounting system?
9  A.    Yes, because at that time we were running
10    multiple systems. The old Buck, Elkins and
11    St. Chris Hospitals were on Keane, so there
12    were -- that was like a really old system.
13        Then they had switched to SMS, and
14    they were running a different version than
15    Hahnemann or Medical College, and so when you
16    went to look for receivables you had to look
17    in a lot of different places.
18        I do remember having a conversation
19    with Greg, and it really was around when we
20    started to take some of those big waves of
21    getting rid of the old moldy accounts about
22    his saying that, you know, these need to go.
23        I mean we all knew it. There was no
24    documentation. It just needed to go. That
25    was the old issue of writing them off in

15 (Pages 287 to 290)

LORA FRANZ

Page 291

1  waves.
2  Q.  Was there discussion that in addition to the
3  fact these were old accounts, they were also
4  likely uncollectible?
5  A.  I don't remember specifically somebody saying
6  they are uncollectible, but when you say they
7  are old, I guess the industry, old equals
8  uncollectible in a sort of sick way.
9        The way the industry works is the
10  older it is the less collectible it is, so by
11  saying they are old in your mind, you say
12  they are less collectible.
13  Q.  Do you remember if there was ever an effort
14  to sort of quantify the amount of old and
15  uncollectible accounts that were still on the
16  various patient accounting systems?
17  A.  Yes, there was. I think Bill Gedman was
18  working on that, G-E-D-M-A-N. There must
19  have been. The reason I say that, because
20  when we decided to write them off, we were
21  given targets, like at this time we can only
22  write off 15 million -- I can't remember. We
23  were given targets. To give us targets they
24  must have done some analysis to show the
25  total size of it.

Page 292

1        My job in addition to getting them
2  written off was just to keep track of how we
3  were against that target and not to exceed
4  it.
5  Q.  Why were you given, if you know, targets
6  rather than just writing it off all at once?
7  A.  The explanation was given by Greg was that
8  this was the approval he had received from
9  Joe that they didn't want to take it all at
10  once, that he wanted to take it in smaller
11  bite-sized chunks. So that was the
12  explanation I was given.
13  Q.  So at the time they were written off -- let's
14  focus on the first time a chunk was written
15  off. There was a lot more uncollectible than
16  just what was written off at that time?
17  A.  Right. That was the ones -- yes.
18        MR. LUFT: Objection.
19  A.  The known uncollectible was much bigger.
20  Q.  Do you remember any specific numbers that
21  Gedman might have come up with in trying to
22  quantify the amount of the old and/or
23  uncollectible accounts?
24        MR. LUFT: Objection.
25  A.  I don't remember specifically. That one

Page 293

1  exhibit that I had seen the other day, that
2  looked to be pretty factual as I remember it.
3  That looked like to be Gedman's numbers that
4  he had come up with before.
5  Q.  Do you remember there was somewhere in the
6  neighborhood of 80 to 100 million dollars?
7  A.  80 was always a number I remembered, yes.
8  Q.  Do you remember a specific figure of $84
9  million?
10  A.  I know it was over 80, yes. It was like --
11  80 was like the number that we had as a
12  target in our mind.
13  Q.  Now, besides just sort of oral conversations
14  regarding the 80 million, do you remember --
15  other than sort of the documents we showed
16  you last time, do you remember any sort of
17  analysis that was done prior to the writeoffs
18  that quantified this 80 million figure?
19  A.  Not unless it was something that Bill Gedman
20  had done or Russ had done. There were only
21  like about three people, I think, that even
22  had access into some of the old -- the Keane
23  system -- K-E-A-N-E -- that was used by the
24  other facilities, so I couldn't even get
25  reports on some of those accounts. So I have

Page 294

1  to assume that it was Bill or Russ that had
2  done some of the analysis.
3  Q.  Do you recall any discussion of the fact that
4  some of these accounts that comprise the $80
5  million were past statute accounts?
6  A.  Yes. Well, I guess I could say it this way,
7  the issue was there was very little
8  documentation on them. We were beyond the
9  billing statute, so if I can't document that
10  I ever billed the payor, it's a statute -- I
11  have nothing to defend myself.
12        The payor can reject it, and I have
13  no documentation to go back and say, yes, no,
14  we billed it on this date and here's the
15  receipt or here's your acknowledgement or
16  anything like that. So definitely there had
17  to be statute losses in that pile.
18        MR. TORBORG: Let me mark this as
19  Exhibit 905.
20        - - - -
21        (Deposition Exhibit 905 marked for
22  identification.)
23        - - - -
24  BY MR. TORBORG:
25  Q.  For the record, Exhibit 905 is a document

16 (Pages 291 to 294)

LORA FRANZ

Page 295

1  Bates numbered GOV 43674 through 81, and it's
2  an October 11, '96 memo from Greg Snow to Joe
3  Dionisio and Charles Morrison.  If you could
4  take a look at that.
5  A.  (Witness reviews document.)
6  Q.  First question is have you ever seen this
7  document before?
8  A.  No.
9  Q.  If you look at the first sentence of the
10  document, Mr. Snow writes, Past statute
11  accounts are receivables whose balance is,
12  have not been resolved within predetermined
13  time frames as set by the payors.  And then
14  he lists the time frames below.
15      I think last time you said that there
16  were two ways in which an account can become
17  past statute, the first of which it's not
18  billed with any predetermined time frame.
19  The second would be that it's not paid or
20  resolved.
21  A.  Well, the second one would be if it is not
22  billed within the time frame.  That is the
23  first one.  The second one would be if it had
24  been denied and it wasn't appealed within the
25  appeal time frames.

Page 296

1  Q.  So there could be accounts of -- let's take
2  an example.  If you look at Medical
3  Assistance there in that column it says
4  twelve months.  There could be a Medical
5  Assistance account that was greater than twelve months that was still
6  greater than twelve months that was still
7  potentially collectible; is that correct?
8  A.  If we filed the appeal within the time
9  frames.  If we hadn't filed the appeal, then
10  we lose our right to appeal basically, and it
11  becomes uncollectible.  Perhaps not as a
12  statute loss, but uncollectible, right.
13  Q.  So if you've got, for example, Medical
14  Assistance receivable on the accounting
15  system or on patient accounting system for
16  which there has been no appeal filed, and
17  it's over twelve months old, that account is
18  not collectible?
19  A.  If it's over twelve months old -- well, some
20  of them could still be collectible, and
21  here's why I say that.  Remember Medical
22  Assistance -- take the bad one, Medical
23  Assistance.  Some of those patients could be
24  qualified -- could have taken us three months
25  to get them qualified for Medical Assistance.

Page 297

1  Q.  Okay.
2  A.  So if they had a discharge date of January 1,
3  and it took us until March 15 to get them
4  qualified, we have twelve months from the
5  time they get qualified, not -- for that
6  particular group of patients.  So there are
7  some patients in the Medicaid financial
8  classes that would still be collectible after
9  the twelve months because it took us three
10  months for the state to determine that they
11  were eligible.
12  Q.  How about for the other four classes listed
13  there, same question?  Do I need to repeat
14  the question?
15  A.  Yes, repeat the question.  I'm sorry.
16  Q.  Let's take managed care.
17  A.  That's a good one.
18  Q.  If you had a managed care account on the
19  patient accounting system that was over
20  twelve months old from the date that it was
21  either billed or discharged and has not been
22  an appeal filed on it, would that account be
23  uncollectible?
24  A.  No appeal filed on it and no payments made on
25  it?

Page 298

1  Q.  Yes.
2  A.  It would be suspicious, yes.  I would put
3  that in the suspicious category of being a
4  potential loss, yes.
5  Q.  Okay.  How about same question, do I need to
6  repeat the question about applying it to the
7  commercial class?  I'm going to ask you about
8  all the classes.
9  A.  The commercial class is kind of interesting
10  that he would have a time frame on here
11  because truly a piece of the commercial -- we
12  talked about this before, those silent POs
13  and repricer agreements.
14      So there is a time frame associated
15  with those because we had contracts with
16  them.  It's this whole issue about some of
17  the commercial financial classes were
18  actually -- needed to be collateralized
19  because of these silent PPO and repricer
20  arrangements.
21      But to make a categorical statement
22  that all of commercial had a statute to it,
23  I'm not sure I understand why one would say
24  that because if it's truly a commercial that
25  we have no contract with, there is no

MANHATTAN REPORTING CORP., A LegaLink Company

Page 435

1  COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
2  COUNTY OF ALLEGHENY         )  SS:
3      I, Claire Gross, RDR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  LORA FRANZ, was by me first duly sworn to testify to
7  the truth; that the forgoing deposition was taken at
8  the time and place stated herein; and that the said
9  deposition was recorded stenographically by me and
10  then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 6th day of
23  December, 2002.
24      _____
25          Notary Public

Page 436

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY          )   S H E E T
2
       I, LORA FRANZ, have read the forgoing pages of
3  my deposition given on Wednesday, December 4, 2002,
   and wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21  _____
           LORA FRANZ
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
           Notary Public
25  AKF Reference No. Cg73107

MANHATTAN REPORTING CORP., A LegaLink Company

**Frazier Dep.**

Amy Frazier

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,

    vs.                     Civil Action

PRICEWATERHOUSECOOPERS,    No. 00-684

LLP,

        Defendant.



      Videotaped Deposition of AMY

FRAZIER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Tuesday, the 8th day of

June, 2004, at 9:00 a.m.

            - - - - -

Amy Frazier

Page 38

1  was a model at AGH that could be used.
2      Q.   You recall that from discussions
3  with the C&L engagement team?
4      A.   At least discussions or overhearing
5  their discussions, something to that effect.    09:49:06
6      Q.   Do you recall anything more about
7  that topic at all?
8      A.   No.
9      MR. RYAN:  In 1996 still?
10     Q.   In connection with the 1996 audit?    09:49:15
11     A.   No.
12     Q.   You don't recall anything about it
13  in connection with the 1995 audit?
14     A.   No.
15     Q.   Is that right, what I just said was    09:49:21
16  right?
17     A.   Taking into consideration the
18  points that I made that --
19     Q.   We're going too far.
20         In connection with 1995, you don't    09:49:32
21  recall anything about applying AGH's reserve
22  percentages to any other hospitals, is that
23  right?
24     A.   That's correct.
25     Q.   Referring you back to the note that    09:50:12

Page 39

1  we just read a sentence from, it continues with
2  the words, "This reserve calculated by C&L was
3  compared to the reserve booked by the client,
4  the difference between the reserves," and there
5  is an S on that word, "was then reduced by 15    09:50:35
6  percent of unapplied PIP cash at 6-30-95 to
7  obtain the adjusted difference.
8         "C&L then used the adjusted
9  difference to the amount to be posted to the
10  summary of unadjusted differences."    09:50:52
11         How did I do reading that one?
12     A.   I agree with what you've read.
13     Q.   Do you recall this event, that is
14  applying -- or reducing, rather, the difference
15  between the reserve calculations by 15 percent    09:51:13
16  of unapplied PIP cash at 6-30-95 in connection
17  with your 1995 audit work?
18     A.   No, I do not recall.
19     Q.   Tell me what the summary of
20  unadjusted differences is.    09:51:37
21     A.   It is a schedule in which
22  adjustments that the engagement team has
23  concluded are different from the reported
24  numbers of the client, that there is a schedule
25  that summarizes that information for those    09:51:49

Page 40

1  unadjusted differences in evaluating the
2  reasonableness of the financial statements
3  taken as a whole.  And it's summarized at the
4  completion of the audit.
5      Q.   It's a document that C&L creates --    09:52:04
6  or created in these years that you were working
7  on the AHERF audit?
8      A.   It is a document that members of
9  the engagement team would complete as part of
10  that, yes.    09:52:16
11     Q.   And if I use the word SUD, S U D,
12  today, you and I will understand each other
13  that I'm referring to the summary of unadjusted
14  differences?
15     A.   Yes.    09:52:33
16     Q.   And if you use it, I'll understand
17  the same thing?
18     A.   Yes.
19     Q.   Thanks.
20         Do you recall being involved in    09:52:43
21  posting to the SUD the difference or the
22  adjusted difference mentioned in the note?
23     A.   I know because I was out on
24  maternity leave during the completion
25  procedures of the audit, so I really have no    09:53:01

Page 41

1  recollection of posting anything to the SUD.
2      Q.   That may be helpful to me and
3  perhaps, at least with respect to your time
4  with us, helpful to you.
5         Tell me, if you would, when you    09:53:12
6  recall going out on maternity leave in the
7  calendar year of 1995, if it was in the
8  calendar year that you did so?
9      A.   It was within the first -- early
10  part of September.  My son was born on    09:53:27
11  September 24th.  I took at least two weeks off.
12  I basically completed my work on a Sunday and
13  I -- I think it was shortly after this --
14  towards the end of some of the field work, but
15  I can't -- without a calendar -- I can tell you    09:53:53
16  it was a Sunday, a couple of weeks before my
17  son was born.
18     Q.   You're describing a Sunday which
19  would have been the last day of work before the
20  birth of your son?    09:54:05
21     A.   Yes.
22     Q.   You did not come back to work that
23  calendar year, is that fair to say?
24     A.   No, I did.
25     Q.   When did you come back?    09:54:10

11 (Pages 38 to 41)

Amy Frazier

Page 42

1       A.    Sometime in November.
2       Q.    But the final audit work had been
3   completed with respect to fiscal year '95 at
4   AHERF at that time?
5       A.    It was certainly after any audit        09:54:23
6   committee meetings.  I don't know, there may
7   have been other ancillary reports that were
8   still ongoing that were not completed by then.
9       Q.    You don't recall any as you sit
10  here today, though, do you?                        09:54:40
11      A.    I know the A-133 compliance reports
12  weren't done.  But, beyond that, I'm not sure.
13      Q.    Do you know why the AGH reserve
14  percentages -- strike that.
15           Given your testimony this morning,        09:55:16
16  you have no idea why the AGH percentages may
17  have been applied to the aged receivable
18  buckets of other hospitals in 1995, am I right?
19      A.    I don't recall, no.
20      Q.    Do you know why it was AGH's            09:55:37
21  reserve percentages that were considered for
22  application or discussed in connection with the
23  1996 audit work for application to other
24  hospitals' aged receivable buckets?
25      A.    Yes.                                     09:55:56

Page 43

1       Q.    Why is that?
2       A.    It was known as a well organized
3   receivable area that had been fairly successful
4   in their collections historically.  We had
5   looked at those reserve percentages when they    09:56:12
6   first implemented them and the methodology of
7   how they had aggregated the -- to actually use
8   them.  So I know that there was at least a
9   level of familiarity with how they had been
10  accumulated over the time.                         09:56:34
11      Q.    From -- I'm sorry.
12      A.    So that was a measure of why we
13  would at least consider the information that
14  they had used to develop those percentages.
15      Q.    And the familiarity is borne of the     09:56:47
16  fact that the Allegheny General Hospital, or
17  AGH, had been a part of AHERF and, before it,
18  AHSI, for quite some time and Coopers & Lybrand
19  had more familiarity with AGH than perhaps
20  certain other of the AHERF hospitals, is that     09:57:06
21  what you're saying?
22      A.    I'm just -- I'm saying it from the
23  standpoint of there was a specific project at
24  one point that we had been involved when they
25  first implemented the methodology at AGH, and I   09:57:18

Page 44

1   was familiar that we had done such project.  I
2   don't know whether or not that also relates to
3   the length of time that we had been the
4   auditor, but I am just aware of this other
5   project.                                          09:57:34
6       Q.    Was that an agreed upon procedures
7   project of some kind?
8       A.    I don't know.
9       Q.    Do you know who did it, the project
10  that you referred to?                              09:57:47
11      A.    I don't know.
12      Q.    That is who at Coopers & Lybrand
13  was involved?
14      A.    I don't recall.
15      Q.    Do you know when it was done?           09:57:51
16      A.    I don't recall.
17      MR. JONES:  Why don't we take our
18  morning break here.
19      MR. RYAN:  Sure.
20      THE VIDEOGRAPHER:  Off the record             09:58:01
21  at 10:00.
22      (Recess had.)
23      THE VIDEOGRAPHER:  Back on the
24  record, 10:11.
25           - - - - -

Page 45

1           (Thereupon, Deposition Exhibit 4416
2   was marked for purposes of
3   identification.)
4           - - - - -
5       Q.    Miss Frazier, we're going to mark a    10:10:48
6   new exhibit and ask you to review it briefly
7   with me.  The exhibit number is 4416.
8           It is a document that is headed
9   with the phrase Allegheny Health, Education and
10  Research Foundation discussion document,           10:11:16
11  capabilities and expertise dash survey of
12  external document slash consulting firms.
13           It is, I think, four pages in
14  length.
15           Have you ever seen this document         10:11:40
16  before?
17      A.    No.
18      Q.    On the page that ends with the
19  Bates number 215523, there is a firm name that
20  reads Coopers & Lybrand at the top of the page.   10:11:45
21  Do you see that?
22      A.    Yes.
23      Q.    It gives the sites or the cities in
24  which Coopers & Lybrand has offices for at least some time
25  State of Pennsylvania, at least for some time     10:12:00

12 (Pages 42 to 45)