Amy Frazier

Page 46

1  period. And then at the bottom there appears
2  to be a listing of what is labeled major local
3  audit clients, open paren, healthcare and other
4  relevant organizations, close paren.
5      Do you see that?        10:12:13
6  A.   Yes.
7  Q.   Would you take a moment and read to
8  yourself those major local audit clients and
9  let me know if there are any, other than the
10 ones you've already mentioned to me, for whom    10:12:26
11 you provided audit services.
12 A.   As I guess a point of
13 clarification, the Graduate and Allegheny
14 Valley and Forbes would have all been at some
15 point a part of AHERF.        10:13:22
16 Q.   In subsequent years, later years,
17 correct? Is that right?
18 A.   Yes. Yes.
19 Q.   Are there any other healthcare
20 clients listed there for whom or for which you   10:13:32
21 provided services?
22 A.   On the University of Pennsylvania
23 Health System, the compliance A-133 audits I
24 was involved with as part of the overall
25 University of Pennsylvania audit.        10:13:47

Page 47

1  Q.   Thank you. You can put that one
2  aside.
3      We mentioned a few moments ago the
4  cost rate adjustment accounts that healthcare
5  organizations like AHERF had.        10:14:10
6      Do you recall that?
7  A.   Yes.
8  Q.   Can you explain for me your
9  understanding of what a cost rate account
10 reflects at a healthcare organization like    10:14:19
11 AHERF, at least in the time frame for which you
12 worked on AHERF audits?
13 A.   My understanding is a difference
14 between -- it's essentially a settlement
15 account between negotiated rates that an    10:14:37
16 organization or AHERF had with its payors and
17 what their ultimate reimbursement amounts would
18 be based on various attributes that the
19 organization may have, such as medical
20 education programs or capital or -- so it was a   10:14:58
21 settlement account with the government payors
22 and other payors to come to an agreement to
23 what their final reimbursement would be for a
24 given fiscal year.
25 Q.   So AHERF would have, in fiscal year    10:15:16

Page 48

1  1995 and later, cost report -- or cost rate
2  accounts for each fiscal year for each
3  third-party payor that was involved in cost
4  rate reimbursement, is that right?
5      MR. RYAN: Objection to form.        10:15:32
6      THE WITNESS: I'm sorry, can that
7  be repeated?
8      (Record read.)
9  A.   No.
10 Q.   How is it not right?        10:15:53
11 A.   There were certain payors that were
12 no longer under that type of an arrangement
13 because the perspective payment system had been
14 implemented.
15     There are other also other        10:16:08
16 third-party payors that they have agreements
17 with that they wouldn't necessarily be settling
18 at the end of the year a liability or a
19 receivable.
20 Q.   Then I think you misunderstood my    10:16:18
21 question. My question was simpler.
22     For each third-party payor that
23 AHERF settled with, as you put the term, with
24 respect to a cost rate or cost report and
25 had -- each of those had cost rate accounts for   10:16:35

Page 49

1  each fiscal year, is that right?
2  A.   No.
3  Q.   How was that wrong?
4  A.   Just given that there were changing
5  reimbursement requirements. They may have had    10:16:53
6  fiscal years that they had settlement items,
7  but there were certain other fiscal years that
8  they would not because of the changes in the
9  perspective payment system.
10 Q.   I understand that exception.        10:17:02
11     My question is, if you had a cost
12 report that had not been settled and you were a
13 third-party payor of AHERF's, AHERF would have
14 on its books a cost rate account for you for
15 that third-party payor, is that correct, for a    10:17:16
16 given fiscal year?
17 A.   No.
18 Q.   Why is that not the case?
19 A.   There may have been years where no
20 amounts were due or payable or -- I'm not sure   10:17:23
21 what you mean by account.
22 Q.   If you had an outstanding account
23 that had not been finally settled, would you
24 have a cost rate account at AHERF if you were a
25 third-party payor?        10:17:37

13 (Pages 46 to 49)

Amy Frazier

Page 202

1    A.    I don't recall being a part of
2  looking, you know, in an effort to look for
3  this document.
4          - - - - -
5          (Thereupon, Deposition Exhibit 4419
6          was marked for purposes of
7          identification.)
8          - - - - -
9    Q.    Miss Frazier, I'm handing you
10 what's been marked as 4419.  It is a document    15:50:15
11 with the title Bond Covenant Review, AGH, and
12 MCPH are headings along the left-hand margin.
13 Is that much right?
14   A.    Yes.
15   Q.    Why don't you take a moment and    15:50:33
16 look at this one-pager and tell me if you've
17 seen it before today.
18         I'm sorry.
19   A.    That's okay.
20   Q.    Sometimes when I'm looking down, I    15:51:37
21 can't tell that you're finished.  Please feel
22 free to shake me.
23   A.    Okay.
24   Q.    Do you believe that you prepared
25 this document, Exhibit 4419?                15:51:45

Page 203

1    A.    I don't recognize it.
2    Q.    Have you seen it before today?
3    A.    No.
4    Q.    Step ten beneath the AGH category
5  reads, "Due to covenants applicable to the 1995    15:52:05
6  A ampersand B debt assurance fall under the
7  Master Trust Indenture as amended, question
8  mark.  There is a reference to a loan agreement
9  95 A dash do we have this."  Then it reads,
10 "It's in the pink books given to us before" in    15:52:26
11 parentheses.
12         Do you have any idea what that item
13 ten means as you sit here today?
14   A.    No, I don't.
15   Q.    Do you recall anything about    15:52:45
16 missing bond documents in connection with debt
17 compliance auditing at AHERF in any fiscal
18 year?
19         MR. RYAN:  Objection.
20   A.    No, I don't.                      15:52:59
21   Q.    Handing you another exhibit, Miss
22 Frazier, this one 4005, 4005, which has a face
23 page with the exhibit sticker that reads AGH
24 debt covenant calculation, 6-30-97.  Is that
25 your handwriting?                          15:53:43

Page 204

1    A.    No.
2    Q.    Do you know whose it is?
3    A.    No.  Whoever's initials are in the
4  top it appears to be the same.
5    Q.    KDM.  Do you know whose initials on    15:54:03
6  the engagement team in '97 might have been KDM?
7    A.    Kim Metz.
8    Q.    Thank you.
9          Do you recall her to have been
10 involved in debt covenant auditing or debt    15:54:18
11 covenant compliance auditing?
12   A.    No, I don't recall.
13   Q.    I'm going to ask you to flip to
14 page 20813, the second page of the exhibit,
15 under the heading Allegheny General Hospital    15:54:43
16 Obligated Group.
17         Are you there?
18   A.    Yes.
19   Q.    In subsection (b) -- I'm sorry,
20 subsection (a) refers to something called a    15:54:57
21 Master Trust Indenture dated April 7, 1993.  Is
22 that right?
23   A.    Yes.
24   Q.    It says in handwriting next to it,
25 have, H A V E.  Is that right?              15:55:11

Page 205

1    A.    That's the word, yes.
2    Q.    If you skip down to Roman numeral
3  II, we have Delaware Valley Obligated Group, is
4  that right, as a heading?
5    A.    Yes.                            15:55:22
6    Q.    We have something under A listed,
7  "Master Trust Indenture and First Supplemental
8  MTI dated May 15, '96."  Is that right?
9    A.    Yes.
10   Q.    Next to it we have in somebody's    15:55:37
11 handwriting the words, the word, rather, have,
12 H A V E.  Is that right?
13   A.    Yes.
14   Q.    And then next to item one, Roman
15 numeral number I B, under the Allegheny General    15:55:50
16 Hospital Obligated Group, we have the listing
17 of the Morgan Guaranty Reimbursement and
18 Security Agreement dated April 1, 1995 that
19 we've just looked at as Exhibit 327; is that
20 right?                                     15:56:07
21   A.    Yes.
22   Q.    And we don't have the word "have"
23 next to this letter B or this Morgan Guaranty
24 reference.  Am I right?
25   A.    That word is not next to it,    15:56:17

52 (Pages 202 to 205)

Amy Frazier

Page 206

1  correct.
2      Q.   Do you know whose handwriting the
3  word "have" -- in whose handwriting the word
4  "have" has been written?
5      A.   It looks like Sue Gilbert's.    15:56:36
6      Q.   And Sue Gilbert was not a C&L
7  employee, is that right, or was she?
8      A.   She was not.
9      Q.   She was employed by whom?
10     A.   AHERF.                          15:56:49
11     Q.   Do you recall seeing this document,
12 this page of the work papers before today?
13     A.   No, I don't.
14     Q.   Does seeing the word have written
15 where they are and seeing the absence of the    15:57:26
16 words -- the word have next to the Morgan
17 Guaranty agreement here refresh your
18 recollection that someone was looking for a
19 copy of this document at any -- during any
20 audit year at AHERF?                    15:57:41
21         MR. RYAN:  Objection.
22     A.   No.  In fact, when I read the first
23 sentence of this page, it actually -- I recall
24 more of a discussion with Sue Gilbert on
25 evaluating which debt covenant letter she had    15:57:59

Page 207

1  from us and that this was being -- there was
2  something she was using as a tickler list to
3  keep track of the letters that she needed from
4  Coopers & Lybrand.
5      Q.   So you believe that the words have    15:58:11
6  may be Miss Gilbert's attempt to record debt
7  covenant or debt compliance letters that she
8  had received at some point and the ones she had
9  not yet received, is that right?
10     A.   Yes, and particularly because of    15:58:28
11 the in lieu of agreed upon procedures reference
12 that's being denoted under the section three.
13     Q.   Under section regarding AUMC?
14     A.   Yes.
15     Q.   So you recall some conversation    15:58:40
16 where Miss Gilbert was asking you about the
17 status or she was recording the status of
18 AHERF's receipt of debt compliance letters.
19 Were you with her when she wrote this or do you
20 just have a supposition that that may be if    15:58:54
21 this is indeed her handwriting that she may
22 have written this at the time she and you
23 talked?
24         MR. RYAN:  Objection to form.
25         MR. JONES:  That's a good    15:59:05

Page 208

1  objection.
2      Q.   Did you see her write these words
3  on this document?
4          MR. JONES:  Isn't that better?
5          MR. RYAN:  It is.  Thank you.    15:59:09
6      A.   I don't recall.
7      Q.   But you're recalling, however, a
8  conversation in which she asked you about the
9  status of what she expected by way of debt
10 compliance letters from C&L?              15:59:24
11     A.   Yes.
12     Q.   Do you recall there was some reason
13 that there was a delay in delivering a debt
14 compliance letter to AHERF regarding the Morgan
15 Guaranty security -- Reimbursement and Security    15:59:37
16 Agreement?
17     A.   No, I don't recall.  There were
18 some that were all sent at the same time.  I
19 just don't know which ones those were.
20     Q.   I'm going to ask you to skip with    16:00:03
21 me to page 20834.  Are you there?
22     A.   Yes.
23     Q.   Is any of the handwriting on this
24 page yours?
25     A.   Yes, all of it is.              16:00:30

Page 209

1      Q.   Do you know why you wrote the word
2  adjusted under category D regarding the Morgan
3  Guaranty Trust debt instrument and maintaining
4  a consolidated unrestricted fund balance of at
5  least $160,000?                         16:00:48
6      A.   I don't recall why I wrote that
7  specific word, but I recall the reference above
8  relative to adjusted to include ASRI.
9      Q.   Why don't you tell me what you do
10 recall about that, that reference.        16:01:17
11     A.   Just that there was -- that they
12 had pulled ASRI out of the debt agreement
13 during the year and there needed to be some
14 type of adjustment made to the actual letter
15 and the calculation related to it.  So I just    16:01:30
16 remember, generally speaking, us calling it to
17 simplify our discussion as the adjusted
18 calculation.
19     Q.   Do you recall that then there was
20 some debt covenant or debt agreement          16:01:46
21 modification that removed ASRI as an obligor,
22 is that what you're suggesting, or somebody who
23 was obligated for repayment on the debt
24 instrument?
25     A.   I don't recall exactly what    16:02:04

53 (Pages 206 to 209)

Amy Frazier

Page 210

1  happened from a debt standpoint. I just
2  remember there being a change. I just -- I
3  don't know exactly what it was. I don't
4  remember what it was.
5     Q.   It was a change in the agreement        16:02:13
6  and it was a change that involved ASRI is what
7  you remember?
8     A.   It was a change in the organization
9  structure of AGH pulling ASRI out of the
10 consolidated -- Obligated Group. How that       16:02:28
11 related to the agreements and -- I just don't
12 remember.
13    Q.   Do you recall, as you sit here
14 today, that the Morgan Guaranty Reimbursement
15 and Security Agreement required backing out     16:02:41
16 certain items from the unrestricted fund
17 balance calculation?
18    A.   As I sit here today, I don't recall
19 how to get to that calculation, no.
20    Q.   Let me ask you to flip to page        16:03:12
21 20845. Is the handwriting on this page yours?
22    A.   No.
23    Q.   Do you know whose it is?
24    A.   No, I don't.
25    Q.   Do you see under AGH general fund      16:03:35

Page 211

1  balance before adjustments there's a phrase,
2  less colon Y, in parentheses, equity
3  investments in loans to persons which are not
4  subsidiaries. Do you see that?
5     A.   Yes.                                    16:03:51
6     Q.   Do you recall that that subtraction
7  was involved in the debt covenant calculation
8  regarding the unrestricted fund balance?
9     A.   I don't recall, no.
10    Q.   Let me ask you to flip back to        16:04:21
11 Exhibit 327, the actual loan document, the
12 Morgan Reimbursement and Security Agreement.
13         In particular, to the Bates page
14 that ends with the number 29.
15    A.   16929?                                  16:04:55
16    Q.   Yes.
17         Are you there?
18    A.   Yes.
19    Q.   It's page 35 of the original
20 document, apparently?                           16:05:00
21    A.   Yes.
22    Q.   Here we have in the heading B
23 little Roman numeral ii a definition of the
24 consolidated unrestricted fund balances and
25 then some descriptive language that goes        16:05:17

Page 212

1  beneath that. Do you see that?
2     A.   Yes.
3     Q.   Do you see a subparagraph little
4  (y) in parentheses much like the little (y) in
5  parentheses we just looked to at page 845?      16:05:29
6         You can put those side-by-side for
7  me. I think that would be helpful.
8         Do you see in the loan agreement,
9  itself, Exhibit 327, that the little (y)
10 language reads -- why don't you read that for   16:05:44
11 me, just the little (y) language.
12    A.   "All loans to and other investments
13 in affiliates which are not members of the
14 Obligated Group and all equity investments and
15 persons which are not subsidiaries and."        16:05:56
16    Q.   Do you see that that amount, among
17 other things, is to be backed out of the
18 calculation for the consolidated unrestricted
19 fund balance in the text above it?
20    A.   Yes, it says less the amount of and     16:06:23
21 refers to each of those items.
22    Q.   Now I'm asking you to flip back to
23 the 4005 set of debt covenant calculations in
24 Coopers & Lybrand's work papers, in particular
25 page 845, can you read for us the paraphrase,   16:06:42

Page 213

1  apparently of paragraph (y) that exists there?
2  It says less coion?
3     A.   "Parentheses Y, parentheses equity
4  investments in and loans to persons which are
5  not subsidiaries, colon."                       16:06:55
6     Q.   The language doesn't track exactly,
7  does it?
8     A.   No.
9     Q.   Do you have any idea why that is?
10    A.   No.                                     16:07:21
11    Q.   Do you recall ever learning that
12 that was the case, that the work papers at C&L
13 had language for subparagraph (y) here that was
14 different than the actual loan agreement?
15         MR. RYAN: Objection to form.           16:07:37
16    A.   I'm sorry, can you repeat that?
17    Q.   No, but I bet I can have it read
18 back.
19         (Record read.)
20    A.   No, I don't -- I don't recall.          16:08:02
21    Q.   Do you ever recall learning that
22 there were debt covenant calculations run with
23 respect to the Morgan Guaranty unrestricted
24 fund balance that did not back out amounts
25 loaned or invested in affiliates?               16:08:18

54 (Pages 210 to 213)

Amy Frazier

Page 234

```
1   intercompany balances did not represent loans
2   in the term of a, you know, repayment and an
3   agreement schedule.  They represented
4   day-to-day cash transactions that were
5   occurring throughout the AHERF organization and    16:50:12
6   that that would not be something that would be
7   backed out of the calculation.
8       Q.   Oh, so you don't think the due from
9   affiliate was a loan -- as you sit here today,
10  you don't think that due from affiliate amount     16:50:29
11  owed to AGH from Delaware Valley Obligated
12  Group hospitals was a loan for purposes of the
13  debt instrument, the Morgan Guaranty debt
14  instrument we looked at earlier this afternoon,
15  is that right, is that what you're telling me?     16:50:44
16      MR. RYAN:  Objection.
17      A.   What I'm stating is that we
18  considered the amount outstanding for AGH debt
19  covenants as a whole and how that related to
20  their covenants and whether or not those would     16:51:07
21  be collectible in the normal course of business
22  as part of how they settle their cash
23  transactions.
24      Q.   But separate and apart from that,
25  are you telling me now, which I thought I          16:51:20
```

Page 235

```
1   heard, that you folks at Coopers & Lybrand did
2   not think the due from affiliates amounts that
3   were growing at the AGH Hospital needed to be
4   backed out of the unrestricted fund balance in
5   the Morgan Guaranty agreement marked as Exhibit    16:51:40
6   327?
7       MR. RYAN:  Objection.
8   Mischaracterizes the testimony.
9       MR. JONES:  I just asked her if
10  that's what her testimony was.                     16:51:46
11      MR. RYAN:  You stated you thought
12  she said it, so I'm objecting to that
13  statement.
14      A.   I don't recall the actual work of
15  the Morgan Guaranty area, but what I recall is     16:51:58
16  discussions as it related, broadly speaking, to
17  AGH covenants and that the intercompany
18  balance, the due to and due from affiliates
19  needed to be evaluated for collectibility
20  versus it being a loan that would need to be       16:52:16
21  considered for backing out of debt covenant
22  requirements.
23      Not because I specifically remember
24  Morgan Guaranty, but in the healthcare
25  industry, I've certainly seen other loan          16:52:29
```

Page 236

```
1   agreements that you would back out affiliate
2   balances, so it wasn't that it was an
3   uncommon -- it wouldn't be unreasonable for me
4   to or us as a team to assess whether or not
5   that needed to be considered.  And I recall,       16:52:48
6   broadly speaking, regarding AGH covenants,
7   evaluating the collectibility of the receivable
8   and specifically including and discussing that
9   with management and including that in the rep
10  letter that they signed, that that would not       16:53:06
11  be -- that they would be settled in the normal
12  course of business and that it would not impact
13  the debt covenant.
14      So as I sit here today, my
15  understanding today is I would still believe in    16:53:19
16  that those conclusions that we reached at that
17  time based on even reading that document today.
18      Q.   Let me ask you this.  What testing
19  did you do in any audit year to determine
20  whether the amount owed from DVOG to AGH          16:53:34
21  through intercompany transactions or
22  intercompany accounting -- accounts was
23  collectible?
24      A.   I don't recall earlier years
25  knowing that the balances had not been as          16:53:53
```

Page 237

```
1   material but as, you know, high a number, big
2   number as it certainly was in 1997.  But I do
3   recall both inquiries of management, the
4   specific representation that we obtained from
5   management that they would be able to repay        16:54:16
6   those amounts, as well as evaluating the cash
7   flow availability at the entities that would
8   potentially need to fund that amount and their
9   ability to do so.
10      Q.   Hold on for one minute.             16:54:35
11      So you recall nothing that you did
12  or Coopers & Lybrand did in 1996 to determine
13  whether or not the intercompany owed to AGH --
14  intercompany due from affiliates owed to AGH
15  from DVOG hospitals was collectible, is that       16:54:51
16  right?
17      A.   I just don't recall what the
18  balances were.  Knowing that there were
19  stand-alone reports, there would have been -- I
20  do recall on -- that there was some level of       16:55:02
21  work done because there was a separate report
22  issued for the physician practice plans.
23      Q.   AIHG?
24      A.   Yes.
25      Q.   Did you do the work?                 16:55:21
```

Amy Frazier

Page 238

1    A.   I don't remember if I did the work.
2  I was a manager, so I don't recall if I did the
3  actual audit work, but I do recall the process
4  of needing to get some level of representation
5  regarding the collectibility of those accounts.    16:55:40
6  So I believe there was something done, just
7  knowing that there were individual stand-alone
8  reports and reconciling whether or not
9  intercompany's eliminated on a consolidated
10 basis, those are fairly standard procedures    16:55:57
11 that would be done in any year.
12    Q.   Maybe I can be more specific.
13       Do you recall yourself being
14 involved in any work to test the collectibility
15 of the amount owed by DVOG hospitals to AGH    16:56:08
16 through intercompany accounts at fiscal
17 year-end 1996?
18    A.   I don't recall whether I had --
19 well, I recall doing some level of work in the
20 review of the DVOG financial statements because    16:56:41
21 of the consolidated cash account and how cash
22 was recorded on the DVOG entities, which
23 included evaluating the classification of that
24 amount, and how it was reported, and would have
25 contemplated the discussing how those amounts    16:57:07

Page 239

1  would be settled, which I -- because we had
2  discussions about how they would be settled
3  plays -- I know that plays into the
4  collectibility.
5       So I have this general recollection    16:57:24
6  of focusing on DVOG intercompany balances and
7  how it relates to the cash and how it can be
8  repaid.
9       But how it relates specifically to
10 AGH is not clear because everything    16:57:36
11 consolidates up through the AHERF parent
12 account.  It is not a direct due to/due from
13 between AGH and DVOG.
14    Q.   What do you mean by amounts -- how
15 amounts were settled?    16:57:48
16    A.   AHERF, the parent, had a
17 consolidated cash treasury function, and this
18 how balances or amounts due to/due from were
19 repaid or collected went through this AHERF
20 parent account.  So I don't believe you could    16:58:14
21 identify direct association of amounts on AGH
22 that related to entities within DVOG or AIHG.
23 It just all flushed up through the parent
24 account balances.
25    Q.   Do you recall any balances coming    16:58:33

Page 240

1  from anywhere other than DVOG entities or AIHG
2  that were owed to AGH in 1996?
3    A.   ASRI.
4    Q.   Anybody else, any other enterprise
5  owed to AGH?    16:58:47
6    A.   ASRI actually I recall some direct
7  transactions between the two of them because
8  they were an affiliated Obligated Group.  But I
9  don't recall other than that any that are
10 directly between AGH and other entities.    16:58:59
11    Q.   My question remains, what do you
12 recall that you did, if anything, to directly
13 test the collectibility of the amounts that
14 DVOG entities owed AGH through intercompany
15 accounts for fiscal year 1996?    16:59:17
16       MR. RYAN:  Objection.  Asked and
17 answered.
18    A.   I recall the assessment of the cash
19 and how it was reported on the DVOG entities,
20 which I know some portion over time related to    16:59:33
21 AGH just by virtue of doing the math.
22    Q.   AGH as a source, you mean?
23    A.   Correct.
24       And I remember -- I recall looking
25 at that cash balance and understanding --    16:59:54

Page 241

1  trying to understand how that amount would be
2  repaid, if it would be repaid, and part of that
3  was playing into how to report it within the
4  financial statements, current, noncurrent,
5  cash.  So that gets to the heart of    17:00:16
6  collectibility.
7    Q.   How was it categorized in '96, the
8  amount owed to AGH by DVOG hospitals, current,
9  noncurrent, cash, how?
10    A.   Since it, as I said, it's not a    17:00:30
11 direct amount due to AGH, it is an amount that
12 is a source, it was actually due to/due from
13 affiliates, which I believe when you go through
14 the detail relates to AHERF, not AGH, but I
15 don't recall what the classification is.    17:00:44
16    Q.   Did you become comfortable at
17 fiscal year-end 1996 that DVOG had the income
18 cash flow and other resources to repay the
19 amounts owed to AGH through intercompany
20 accounts?    17:00:59
21    A.   I recall there not being concern
22 over their collectibility or being able to
23 repay their amounts due to AHERF which may
24 refund AGH, but it was payable to AHERF.
25    Q.   All right.    17:01:16

61 (Pages 238 to 241)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
                Plaintiff,
        vs.                          Civil Action
PRICEWATERHOUSECOOPERS,              No. 00-684
LLP,
            Defendant.


                Continued Videotaped Deposition of

AMY FRAZIER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Wednesday, the 9th day of

June, 2004, at 9:00 a.m.

                    - - - - -

                VOLUME II


                    - - - - -

Page 382

```
 1        Q.   I didn't say that there was a
 2   restatement or that you opined that there
 3   should be one.
 4        I said were you ever involved in
 5   any work involving the potential for a        13:27:28
 6   restatement of the '97 financial statements
 7   that somehow involved these five trusts?
 8        A.   Yes.
 9        Q.   Thank you.
10        So you know what the Lockhart           13:27:38
11   trusts are as you sit here today?
12        A.   Them as an aggregate, yes.
13        Q.   When I speak of the Lockhart trusts
14   for the rest of our deposition, I'm going to
15   speak of these five.  Can we have that        13:27:49
16   understanding?
17        A.   Yes.
18        Q.   Thank you.
19        The first note that Mr. Panucci or
20   him or someone yet unnamed put into this      13:28:05
21   schedule reads, "C&L reviewed the endowment
22   agreements and noted the principal was
23   permanently restricted and the income was
24   unrestricted.  C&L noted part of the income was
25   kept as temporary restricted.  The client has  13:28:21
```

Page 383

```
 1   made the adjustment.  See below."
 2        Do you see that?
 3        A.   Yes.
 4        Q.   Do you know what adjustment he's
 5   referring to there?                           13:28:29
 6        MR. RYAN:  Are you asking her
 7   independently or as she interprets the work
 8   paper?
 9        MR. JONES:  If she knows it from
10   any source of information what adjustment he's  13:28:44
11   referring to.
12        A.   I don't recall.
13        Q.   So as you read this schedule today,
14   you can't tell me what he's referring to
15   either, is that right?                        13:28:58
16        A.   I'm not sure, but he does refer to
17   adjustments in other sections within this
18   paper.
19        Q.   On the second page he refers to an
20   adjustment, is that right, toward the middle of  13:29:40
21   the page?
22        A.   Yes.
23        Q.   Do you see any other place that he
24   refers to an adjustment?
25        A.   Not on this page -- these pages,    13:30:11
```

Page 384

```
 1   no.
 2        Q.   When he says C&L reviewed the
 3   endowment agreements, do you know who did that?
 4        A.   I don't recall if he personally
 5   looked at all of them or whether it was Patty,  13:30:31
 6   but, between the two of them, there were
 7   endowment agreements that at least were made
 8   available to them for their testing purposes.
 9        Q.   How do you know that, they told
10   you?                                          13:30:47
11        A.   I recall seeing the binders and in
12   some cases showing me some points relative to
13   those binders.
14        Q.   What do the binders look like?
15        A.   At least as it relates to the      13:31:02
16   western side of the state, there were black
17   binders.  On the east, I'm not sure if they
18   were in binders or there were files, but there
19   were also documents made available.
20        Q.   Do you recall seeing -- knowing how  13:31:18
21   many black binders there were on the western
22   side of the state -- for the western side of
23   the state?
24        A.   No, I don't recall.
25        Q.   Do you recall yourself seeing any   13:31:33
```

Page 385

```
 1   of the Lockhart trusts, as we've now defined
 2   the term, in connection with your '96 audit
 3   work?
 4        A.   I don't recall.
 5        Q.   Do you recall ever learning from    13:31:46
 6   Mr. Panucci or his colleague Patty that they
 7   had reviewed the language of the Lockhart Trust
 8   as we've now defined them themselves?
 9        A.   I recall a discussion with Mark
10   Panucci about AHERF endowments, not necessarily  13:32:09
11   using the term Lockhart trusts as we've now
12   defined them.
13        Q.   What do you recall about that
14   conversation?
15        A.   It was initially a conversation     13:32:22
16   where he shared a view of AHERF management on
17   how to record the AHERF endowments and which
18   then followed with the conversation with Jack
19   Lyden to actually discuss what they were
20   proposing.                                    13:32:46
21        Q.   We'll come back to that view
22   sharing.  But my question is, do you ever
23   recall learning from Mr. Panucci that he had
24   reviewed each of the five Lockhart trusts in
25   connection with his '96 audit work?           13:32:57
```

32 (Pages 382 to 385)

Amy Frazier                                                        Volume 2

Page 386

1    A.    I don't know if it was each of the
2  five trust documents, recognizing that he was
3  performing testing on their controls.  But he
4  had documents or certain information available
5  during that discussion that he and I have had.    13:33:16
6  I just don't know which ones or all or whether
7  it was a representative part of the population.
8    Q.    I'm sorry, I interrupted you.
9    A.    Whether it represented the
10 population that he was reviewing.    13:33:29
11   Q.    Do you believe that he should have
12 reviewed each of the five Lockhart trusts as
13 we've defined them, in connection with his '96
14 audit work?
15        MR. RYAN:  Objection.    13:33:39
16   A.    No, given that he was performing a
17 test of controls of a process that AHERF
18 management had implemented.
19   Q.    Do you know what he means in his
20 note about principal when he says reviewed    13:33:52
21 -- "C&L reviewed the endowment agreements and
22 noted the principal was permanently
23 restricted."
24        Do you know what principal is in
25 this schedule?  And if it's something I need to    13:34:06

Page 387

1  ask him, you can tell me that.
2        MR. RYAN:  You're asking what the
3  word means or where in the schedule the numbers
4  can be found?  I'm confused.
5        MR. JONES:  If that's a part of her    13:34:20
6  answer, that's fine.  I asked her what the word
7  principal means to her.
8        MR. RYAN:  Okay.
9    A.    You're referring to tick mark A?
10   Q.    Yes, I am.    13:34:28
11   A.    I don't know obviously precisely
12 what he meant when he wrote it, but I have a
13 general understanding of that term in the
14 context of endowments.
15   Q.    What do you think it means in your    13:34:43
16 read of it now since you don't recall the
17 document from '96?
18   A.    The original corpus or -- the
19 original balance that was contributed by the
20 donor.    13:34:56
21   Q.    So the amounts, perhaps, under the
22 column contribution on the far right-hand
23 margin of page one -- or page two of the
24 exhibit?
25   A.    Yes.    13:35:12

Page 388

1    Q.    The black binders that you referred
2  to for the western region, would you include
3  within the western region AHERF the parent
4  company in your understanding of western
5  region?    13:35:24
6    A.    Yes.
7    Q.    Do you recall ever learning from
8  whom or from what source Mr. Panucci or
9  Patty -- I've lost her last name --
10   A.    Francioni.    13:35:35
11   Q.    -- Franconi received the black
12 binders?
13   A.    I don't remember who they had
14 gotten them from in the past.  I just don't
15 recall.    13:35:53
16   Q.    Do you know what -- do you have any
17 recall from '96 about what Mr. Panucci meant
18 with the term income in tick mark A?  This is
19 recall from your work in '96.
20   A.    I don't have a recollection based    13:36:15
21 on this schedule and what he wrote here.
22   Q.    Reading the schedule today, do you
23 have an interpretation of what the word income
24 means?
25   A.    Without referring to the actual    13:36:46

Page 389

1  agreements or some other information at the
2  time, I'm not sure what -- it could mean
3  several components.
4    Q.    The next tick mark B reads, "C&L    13:37:13
5  reviewed the endowments."
6        It says again that C&L reviewed the
7  endowments, right?
8    A.    Yes.
9    Q.    And noted -- then it continues.    13:37:23
10 And noted there were general income
11 restrictions on the items.  "Management took
12 the current income as unrestricted since the
13 amount would have been expensed in the current
14 year and any income from the prior years was
15 kept as temporary restricted."    13:37:42
16        Have I read the first sentence or
17 so accurately?
18   A.    Yes.
19   Q.    Do you know what income means in    13:37:52
20 this tick mark?
21   A.    Today or --
22   Q.    Yes.  First, do you have any
23 recollection from '96?
24   A.    I do not have a recollection from    13:38:05
25 '96.

33 (Pages 386 to 389)

Amy Frazier

Page 390

1    Q.    Do you have an interpretation of it
2  today?
3    A.    Not without the facts and
4  circumstances that existed at that time.  I
5  would need that information.              13:38:17
6    Q.    The next sentence reads -- the next
7  sentence from tick mark B, "The reason
8  management was being conservative and could not
9  take the approach, the entire amount has been
10  expensed.  C&L agrees with this treatment."      13:38:32
11    Do you see that?
12    A.    Yes.
13    Q.    Do you recall C&L agreeing with the
14  treatment so described in 1996?
15    A.    Generally speaking, yes.              13:38:49
16    Q.    What do you recall about that?
17    A.    I recall that the interpretation of
18  the agreements were not clear as to whether or
19  not the income was available for operations.
20  It could be perceived that it would be and      13:39:16
21  that, as a result, they felt that it was more
22  conservative to classify items as temporarily
23  restricted than to interpret the agreement as
24  being fully unrestricted.
25    The word expensed, I'm not sure if      13:39:41

Page 391

1  that's necessarily the right -- the right term,
2  but the -- you know, just broadly speaking,
3  that they believed that these had some
4  potential to be used for operations, but
5  because it was not clear in the agreement that      13:40:01
6  they should be conservative in how they treated
7  them.
8    Q.    Again, you didn't review the
9  agreements yourself to determine whether you
10  thought it was clear or not, is that right?      13:40:10
11    A.    I don't recall if I had the actual
12  agreements in my hand.  I recall this
13  discussion with Jack Lyden and even a follow-up
14  discussion, actually, with Al Adamczak to talk
15  about the language that was in the AHERF      13:40:29
16  agreements as I knew them.
17    Q.    Do you recall any of the language
18  to which you refer now?
19    A.    Just that income was not clear and
20  that the general purposes of the organization      13:40:49
21  was part of that terminology.
22    Q.    When you say income was not clear,
23  or restrictions on income was not clear, or the
24  interpretations related to income was not
25  clear, what do you mean by income?      13:41:05

Page 392

1    A.    The availability of unrestricted --
2  I'm sorry, unrealized, realized gains and
3  interest income, dividends and earnings.
4  Essentially the cumulative earnings was how --
5  was the context of the discussion that it was      13:41:28
6  everything in that pile.
7    Q.    So you are defining income in your
8  term to include anything that wasn't the
9  original contribution?
10    A.    In this particular situation.      13:41:39
11  Obviously there are others that it could have
12  been defined differently where it specifically
13  excluded something, but in this circumstance my
14  understanding of what was in question was
15  the --      13:41:52
16    Q.    In this circumstance is the five
17  Lockhart trusts is what I'm referring to.
18    A.    Well, the trusts -- the majority of
19  the trusts on AHERF because I wasn't -- I was
20  not aware of them as the Lockhart trusts.      13:42:02
21    Q.    So there could have been others?
22    A.    It was those at AHERF, so to the
23  extent that this represented an entirety of
24  AHERF.
25    Q.    I see.  The point you're making is      13:42:14

Page 393

1  those that were held at the books of AHERF, the
2  parent?
3    A.    Correct.
4    Q.    Whether or not it was justified
5  Lockhart trusts?      13:42:24
6    A.    That's correct.
7    Q.    If there were others, your
8  understanding of the term income applied to
9  those others as well, others besides the five
10  Lockhart trusts held on the accounts at AHERF,      13:42:32
11  the parent?
12    I withdraw the question.  I think
13  we understand each other.
14    In any event, your definition of
15  income was everything but the original      13:42:50
16  contribution?
17    A.    In the context of our discussions
18  on this, yes.
19    Q.    You understood the point person at
20  AHERF who had been involved in the      13:43:15
21  classifications for the AHERF parent endowments
22  was Mr. Lyden?
23    A.    Mr. Lyden and Mr. Adamczak.
24    Q.    Was there any discussion about
25  whether the use of the classification      13:43:31

34 (Pages 390 to 393)

Page 394

1  temporarily restricted would create a cushion
2  to enhance earnings in future years?
3      MR. RYAN:  Objection to form.
4      A.  There was no discussion about that.
5      Q.  Did you think that might be the      13:43:48
6  case?
7      A.  Absolutely not.
8      Q.  Did that turn out to be the case,
9  to your knowledge?
10     A.  No.                              13:43:56
11     Q.  Do you recall ever making an
12  inquiry of any financial institution about
13  receiving copies of endowment agreements which
14  endowments were held on the accounts of AHERF,
15  the parent?                            13:44:23
16         THE WITNESS:  I'm sorry, can you
17  repeat that?
18         (Record read.)
19     A.  No, because I believe they were --
20  they, AHERF, had been undergoing that process  13:44:43
21  themselves.
22     Q.  Why did you believe that?
23     A.  They had a number of steps that
24  they had been implementing throughout the
25  entire process of adopting the new accounting  13:44:55

Page 395

1  pronouncement, which included gathering all of
2  the documents, reviewing them with their legal
3  counsel in-house, and evaluating the impact of
4  the new standards.  So it was a process that
5  they had undertaken.                   13:45:11
6      Q.  Well, my question is, did you
7  actually hear from anybody that AHERF had gone
8  to financial institutions and requested copies
9  of underlying endowment agreements for the
10  endowments held at AHERF, the parent?   13:45:21
11     A.  I believe your original question
12  was more directed to me, whether I personally
13  did.
14     Q.  It certainly was.  You referred me
15  to AHERF personnel.  That's why we're coming  13:45:29
16  back to that.
17         Do you ever recall hearing from
18  anybody that AHERF personnel were instructed or
19  had actually themselves gone out and asked for
20  copies of endowment agreements from financial  13:45:40
21  institutions in connection with this '96
22  endowment review?
23     A.  I don't know if I -- I don't recall
24  if I knew that.  I know they were gathering
25  documents.  I'm not sure of all the sources.  13:45:53

Page 396

1      Q.  My question is now, back to you,
2  did you ever yourself make an inquiry, call,
3  visit a financial institution and ask for
4  copies of endowment agreements you believed to
5  be held by AHERF, the parent, in your '96 work?  13:46:06
6      A.  I believe I said no because they
7  were doing it -- because they were taking their
8  own procedures to get the documents.
9      Q.  My question now is did you instruct
10  Mr. Panucci or anybody else to do that?   13:46:22
11     A.  No, I instructed him to review the
12  process of what management was undertaking.
13     Q.  Did you ever learn from Mr. Lyden
14  or anybody else that AHERF or C&L only had
15  partial copies or believed they had only   13:46:56
16  partial copies of any of the five endowments
17  that we've now defined as the Lockhart trusts?
18         MR. RYAN:  Could I get that read
19  back, please?
20         (Record read.)           13:47:31
21     A.  I don't recall.  I know there were
22  cases where they didn't have complete documents
23  or information wasn't available.  I just don't
24  recall specifically related to those documents
25  at AHERF.                          13:47:48

Page 397

1      Q.  Who did you learn what you just
2  learned about some documents, perhaps, being
3  missing from?
4      A.  I don't recall if it was Carolyn
5  Cafaro or someone, that there were documents   13:48:09
6  that were very old that they were trying to
7  track down.
8      Q.  Well, they were old documents that
9  might have some missing portions or they were
10  just old documents?                 13:48:24
11     A.  Old documents that they may just
12  not even have because they never existed or --
13  period, or -- and I don't know if that was
14  parts, pieces.  It was just that they didn't --
15  it was quite an effort to gather materials   13:48:41
16  throughout the system.
17     Q.  Miss Cafaro you understood to be
18  involved with endowment work related to the
19  eastern enterprises, is that right?
20     A.  Principally in 1996.  But she   13:48:58
21  clearly was identified as the person who had
22  really spent a significant amount of time in
23  understanding the pronouncements and was
24  helping the others in the western region with
25  evaluating what they needed to do.   13:49:10

35 (Pages 394 to 397)

Amy Frazier                                                                    Volume 2

Page 430

1    unrestricted categories in fiscal year 1996?
2            MR. RYAN:  Objection.
3        A.    I'm sorry, can you repeat that?
4        Q.    Do you recall whether AHERF made a
5    direct reclassification of certain of the gains    14:54:55
6    on the trusts, the Lockhart trusts from
7    restricted to unrestricted for fiscal year
8    1996?
9            MR. RYAN:  Same objection.
10       A.    I'm not sure I know what you mean    14:55:09
11   by direct reclassification.
12       Q.    Without income statement effect.
13       A.    I don't recall.
14       Q.    Is the amount reflected on the
15   Lockhart trust summary, which is now Exhibit    14:55:29
16   4427, the 13.4 million and change amount, was
17   that made as a reduction in the temporary fund
18   balance with no income statement impact?
19           MR. RYAN:  Objection.
20       Q.    Is that what's reflected there?    14:55:53
21       A.    I can't tell without all of the
22   detailed records.
23       Q.    I'm going to ask you to look back
24   at 4113.
25           Are you there?            14:56:33

Page 431

1        A.    Yes.
2        Q.    Let me make sure I get there.
3            I'm going to ask you to flip to
4    page 420, to the column headed prior period
5    effect, endowment prior period effect.    14:56:55
6            Are you there?
7        A.    Tell me which column, how many.
8        Q.    It's the third from the right.  I
9    realize they're hard to read in this font.
10           Endowment prior period effect    14:57:10
11   column, do you see it?
12       A.    Yes, I see the third column.  I
13   guess that's what that says.
14       Q.    The balance there is, I'll
15   represent to you, 13.4 million dollars.  Do you    14:57:22
16   see that?
17       A.    I see that number.  That's what it
18   looks like.
19       Q.    Do you know why it is in that
20   column as you sit here today?            14:57:32
21       A.    I don't recall.
22       Q.    I'm handing you what's been marked
23   as Exhibit 4114, Miss Frazier.  I'm going to
24   ask you to look at a set of documents from the
25   binder for a moment and I'll have a few    14:58:33

Page 432

1    questions for you about it.
2            This is called the trial balance
3    final binder for the year-ended 6-30-96.  Is
4    that right?
5        A.    Yes.                14:58:51
6        Q.    It's for AHERF at the parent level?
7        A.    Yes.
8        Q.    I'm going to ask you to look at
9    page number --
10       A.    I'm sorry, it's for AHERF.  I don't    14:59:01
11   know if what it contains is for the parent
12   level.
13       Q.    Let me know if you see anything
14   that suggests that it relates to anything other
15   than the parent level as we go through these    14:59:12
16   next questions or these next few pages.
17           I would like you to look at page
18   8511.
19       A.    Yes.
20       Q.    See the handwritten note, reclass,    14:59:43
21   in the right-hand margin?
22       A.    Yes.
23       Q.    Do you see the set of -- or the two
24   figures that are being subtracted beneath that
25   that appear to state a difference of 13.4    14:59:57

Page 433

1    million and change?
2        A.    Yes.
3        Q.    Do you know whose handwriting
4    that's in?
5        A.    No.                15:00:07
6        Q.    Does this refresh your recollection
7    about any direct reclassification of a sum of
8    approximately 13.4 million dollars?
9            MR. RYAN:  Objection.
10       A.    What period?            15:00:21
11       Q.    For fiscal year '96.
12       A.    No.
13       Q.    Did you learn about it later?
14           MR. RYAN:  Objection.
15       A.    I recall -- I recall a number here,    15:00:34
16   but not because of what we've just seen here
17   now.
18       Q.    What number are you telling me that
19   you recall?
20       A.    Just 13.456, knowing that I've seen    15:00:43
21   it on Exhibit 4427 today as we sit here.
22       Q.    That's fine.
23           You recall seeing it in a couple
24   places today?
25       A.    Yes.                15:00:53

44 (Pages 430 to 433)

Amy Frazier                                                                              Volume 2

Page 434

1      Q.   Do you ever recall that the 1996
2  AHERF parent level financial statements at any
3  time or in a prior draft had a larger amount,
4  the amount of 66.2 million dollars, roughly,
5  classified as temporarily restricted in          15:01:15
6  connection with these Lockhart trusts?
7          MR. RYAN:  Objection.
8      A.   I don't recall AHERF parent level
9  financial statements.  They didn't exist, at
10  least for our purposes.                           15:01:33
11     Q.   That the endowments -- where would
12  these endowments then have appeared on the 1996
13  financial statements, the sums in these
14  endowments?
15         MR. RYAN:  In which financial            15:01:47
16  statements?
17         MR. JONES:  The 1996 financial
18  statements.
19         MR. RYAN:  She's drawing a
20  distinction between AHERF, the parent, versus     15:01:53
21  the consolidated AHERF.
22         MR. JONES:  That's what I'm asking.
23  You're drawing a distinction for her, too, I
24  think, but I want her to tell me.
25     Q.   Tell me on what set of financial         15:01:59

Page 435

1  statements these endowments appeared in 1996.
2      A.   The consolidated AHERF financial
3  statements.
4      Q.   Thank you.  That's what I meant.
5          Handing you now, Miss Frazier,          15:02:36
6  Exhibit 1079, with the issue topic Summary of
7  Unadjusted Differences 6-30-97.
8          Do you see that?
9      A.   Yes.
10     Q.   Have you ever seen this document        15:02:46
11  before?
12     A.   Yes.
13     Q.   Let me direct your attention to
14  page 9743 to the entry, I know it's difficult
15  to read, about halfway down the page, in about   15:03:04
16  12 million dollars' amount, which reads, "To
17  recognize the remaining amount of temporarily
18  restricted net assets for the good of the
19  organization."
20         Do you see that?                         15:03:20
21     A.   Yes.
22     Q.   It has AHERF on the left-hand
23  margin next to the entry, right?
24     A.   Yes, it does.
25     Q.   Do you know what that refers to?        15:03:27

Page 436

1      A.   Yes.
2      Q.   What does it refer to, the entry?
3      A.   The temporarily restricted net
4  assets that were on AHERF that should be
5  recognized, that AHERF should have considered    15:03:43
6  recognizing into income because of the
7  operating losses at AHERF.
8      Q.   Why was it not similarly necessary
9  to propose the same kind of adjustment for the
10  five Lockhart trusts as a part of your '96       15:04:10
11  audit work?
12     A.   Because AHERF did not have
13  operating -- net operating losses that needed
14  to be considered in evaluating whether or not
15  that amount could be released from restriction.  15:04:21
16     Q.   In 1996?
17     A.   In 1996.
18         MR. JONES:  Let's go ahead and
19  pause there for a change of tapes.
20         THE VIDEOGRAPHER:  Off the record,       15:04:33
21  3:05.
22         (Recess had.)
23         THE VIDEOGRAPHER:  Back on the
24  record at 3:24.
25     Q.   Miss Frazier, do you recall any         15:24:12

Page 437

1  discussions with Mr. Buettner during your
2  fiscal year 1996 audit work concerning AHERF's
3  classifications of the Lockhart trusts as we've
4  defined them?
5      A.   Yes, as it relates to AHERF trusts.    15:24:37
6  So, again, I wasn't using Lockhart at the time
7  in 1996.
8      Q.   When do you recall those
9  conversations taking place?
10     A.   During year-end field work.            15:24:52
11     Q.   Do you recall these conversations
12  to have related to irrevocable trusts held by
13  the AHERF parent or irrevocable trusts held by
14  the AHERF parent?
15     A.   I don't recall if I used that term      15:25:09
16  or not.
17     Q.   I don't mean to suggest that I want
18  you to restrict your effort to recall things
19  about what term you used.
20         My question is more do you recall        15:25:19
21  thinking that the trusts you were discussing
22  with Mr. Buettner were irrevocable?
23     A.   I don't recall.  I just recall the
24  discussion of trusts at AHERF.
25     Q.   What do you recall about that          15:25:37

45 (Pages 434 to 437)

Page 438

1    conversation or those conversations?  Was it
2    more than one?  That's about six questions.
3            Let me ask you one question.  Did
4    you have more than one conversation on this
5    topic with Mr. Buettner?              15:25:47
6        A.   We're still in 1996?
7        Q.   Yes.
8        A.   I don't recall if it was more than
9    one.
10       Q.   Was it more than one or two if it    15:25:58
11   was more than one?
12       A.   I don't recall if it was more than
13   one or not.  I just recall that I could have
14   said the same thing twice.  I don't know.  I
15   just --                                15:26:18
16       Q.   I think I understand that.  My
17   question is really getting at do you recall a
18   steady stream of conversations with
19   Mr. Buettner about AHERF held trusts or do you
20   recall a conversation or two?          15:26:29
21       A.   I recall several discussions that
22   he and I had about AHERF trusts as a whole, so
23   there were -- which included all the eastern
24   and western regions.  But I recall as it
25   relates to the AHERF parent only trusts at    15:26:45

Page 439

1    least one conversation.
2        Q.   So it was more on the order of a
3    conversation or two with respect to AHERF
4    held -- AHERF parent held trusts than it would
5    have been a steady stream of conversations, am    15:26:59
6    I right?
7        A.   Yes.
8        Q.   What do you recall about that
9    conversation or two?
10       A.   The similar conclusions that I    15:27:11
11   shared with you earlier that AHERF had made --
12   AHERF management had made relative to these
13   trusts at AHERF, that they were drawing the
14   best conclusion that they could on the
15   information that they had and how to classify    15:27:25
16   those trusts in the financial statements.
17   Essentially sharing with him the conclusions
18   that AHERF management had reached relative to
19   the classification of the trusts.
20       Q.   Did you express to him any concern    15:27:39
21   over the propriety of the classifications?
22           MR. RYAN:  Objection to form.
23       A.   I wasn't concerned.  I expressed to
24   him their conclusions and that I did not have
25   any information that would suggest that their    15:27:57

Page 440

1    conclusions would be inappropriate.
2        Q.   Do you recall any reaction he had
3    to what you shared with him, anything he said?
4        A.   I recall him feeling that the
5    process that they had undertaken seemed    15:28:13
6    reasonable and that to classify -- in
7    particular I recall classifying the temporarily
8    restricted and having a view that that was
9    conservative seemed appropriate.
10       Q.   Do you recall anything more about    15:28:32
11   the conversation or two?
12       A.   Not as I sit here today, no.
13       Q.   Have you ever come to the belief
14   that AHERF's accounting for sums maintained in
15   the Lockhart trust accounts, as we've defined    15:28:53
16   them today, was wrong in either fiscal year
17   1996 or fiscal year '97?
18           MR. RYAN:  You mean accounting in
19   those years, not her belief in those years?
20           MR. JONES:  Yes.            15:29:04
21           MR. RYAN:  It was sort of an
22   ambiguous question.
23           MR. JONES:  I meant the accounting
24   in those years because I used the phrase has
25   she ever come to the belief.  But let me try it    15:29:09

Page 441

1    again.
2        Q.   Have you ever come to the belief
3    that the AHERF's accounting for the sums held
4    in the Lockhart trusts, as we've defined them
5    today, in 1996 or 1997 was wrong?          15:29:23
6        A.   No.
7        Q.   Did you ever become concerned that
8    that was the case or might be the case?
9        A.   I'm not sure I felt concerned, but
10   I certainly during 1998 felt that we needed to    15:29:39
11   at least understand based on potentially new
12   information that it needed to be considered.
13       Q.   What was the potentially new
14   information?
15       A.   Well, certainly the actual letter    15:29:55
16   from Mellon Bank was new information but still
17   at that point did not know if it was
18   conclusive, that it needed -- or that it
19   required a change.
20       Q.   Did you ever learn that anybody    15:30:10
21   else at C&L came to the belief that the
22   accounting for the Lockhart trusts and the sums
23   held in those trusts by AHERF in 1996 or 1997
24   was wrong?
25       A.   No.                        15:30:25

46 (Pages 438 to 441)

Amy Frazier

Page 518

1  Q.  Do you recall any discussion about
2  any change in the obligation that Coopers &
3  Lybrand might -- change in the obligations that
4  Coopers might have to disclose a misstatement
5  contained in the consolidating or supplementary   17:12:46
6  information regarding the individual Obligated
7  Groups in 1997 that would have been different
8  from their obligations to disclose such a
9  misstatement in 1996?
10  A.  I'm not sure I understand from --   17:13:05
11  what you're referring to as far as a change in
12  obligation. I'm not aware of any changes in
13  what supplementary schedules mean and what that
14  report states, if that's what you're referring
15  to.   17:13:25
16  Q.  Well, let me ask it maybe this way.
17  In 1997, did you ever have any conversations
18  about whether -- with anyone on the engagement
19  team about whether if a material -- if a
20  misstatement had been detected by AHERF in the   17:13:42
21  consolidating information or supplementary
22  information relating to an individual Obligated
23  Group, whether -- that was material to that
24  individual Obligated Group's financial
25  information itself, whether that misstatement   17:14:00

Page 519

1  would have to be disclosed in the 1997 report?
2  MR. RYAN:  Objection.
3  A.  I recall discussions that we were
4  considering adjustments on the consolidated
5  financial statements taken as a whole and that   17:14:27
6  the mathematical accuracy of the information
7  reported in those consolidating schedules was
8  exactly what that represented.
9  I recall discussions of adjustments
10  that may have affected different entities   17:14:48
11  between those statements, but not that as it
12  related to our obligations.
13  Q.  I'm handing you now what we marked
14  as Exhibit 4404 in an earlier deposition, which
15  is, I believe, after your review, something   17:15:09
16  you'll tell me is section 440 from the Business
17  Assurance Manual regarding reports on
18  consolidating information.
19  Is that what it appears to be to
20  you?   17:15:26
21  A.  It's been a long time since I've
22  looked at it. It appears to be something that
23  may have represented the Business Assurance
24  Manual.
25  Q.  Let me direct you to the second   17:15:43

Page 520

1  page. The paragraph that appears beneath
2  supplementary data qualified because of a
3  departure from GAAP. Do you see that?
4  Do you see that heading?
5  A.  Yes.   17:16:01
6  Q.  Go ahead and read that paragraph to
7  yourself, and then I'll hopefully have very few
8  questions on it and we'll conclude for the day.
9  A.  Okay.
10  Q.  The first sentence reads, "When we   17:16:37
11  report on consolidating financial statements as
12  supplementary data and we are aware that one or
13  more of the individual statements contain a
14  departure from Generally Accepted Accounting
15  Principles, GAAP, that is material to the   17:16:52
16  individual company but not to the consolidated
17  group, our responsibilities are not different
18  than from when we are aware of a material
19  departure from GAAP in any other financial
20  statements with which we are associated."   17:17:09
21  Did I read that right?
22  A.  Yes. I think you had a "then" in
23  there, but -- right after different, but --
24  Q.  Otherwise I read it right?
25  A.  Yes.   17:17:19

Page 521

1  Q.  Whenever -- it continues.
2  "Whenever a financial statement's" -- I'm
3  sorry, "Whenever financial statements depart
4  materially from GAAP and are not appropriately
5  revised by the client, we are required to issue   17:17:29
6  a qualified or an adverse opinion."
7  Did I read that right?
8  A.  Yes.
9  Q.  Do you recall any conversation of
10  this -- about this topic in connection with   17:17:44
11  your 1997 audit work?
12  A.  Yes.
13  Q.  What do you recall?
14  A.  I recall consideration of the 50
15  million dollar transfer of reserves and that   17:17:59
16  since in effect it had been -- it was on the
17  balance sheet of the respective entities --
18  well, maybe not in the -- in a different
19  category within those financial statements, it
20  was in at least the respective financial   17:18:19
21  statements, and that such classification did
22  not have an affect or need to be disclosed in
23  the report that was included within the
24  supplementary schedules.
25  Q.  What is the such classification?   17:18:34

Amy Frazier                                                                                                    Volume 2

Page 522

1    A.   That -- I would have to look back
2  to the supplementary schedules to refresh my
3  memory as to where it actually was, but that
4  there was a credit balance on Graduate and
5  that -- there was an -- again, I don't want to    17:18:56
6  even speculate there. I have to look at the
7  detailed schedules, but I recall the conclusion
8  that when you walk through the accounting and
9  where those amounts were, that it was -- that
10  we were -- that it was -- we were comfortable    17:19:14
11  with drawing a conclusion that it did not
12  misstate those statements.
13    Q.   Which statements?
14    A.   The consolidating statements, or
15  the consolidated financial statements taken as    17:19:25
16  a whole.
17    Q.   Both sets?
18    A.   Correct.
19    Q.   And the 50 million dollar transfer
20  that you referred to is the 50 million dollars    17:19:31
21  of reserves established in connection with the
22  acquisition of the Graduate hospitals that
23  later ended up enhancing the bad debt reserve
24  at the DVOG, Delaware Valley Obligated Group
25  hospitals, correct?                               17:19:48

Page 523

1    A.   I wouldn't use the word enhancing.
2    Q.   Increasing?
3    A.   Included as part of the total.
4    Q.   Making the reserve larger?
5    A.   Mathematically, through              17:20:03
6  bookkeeping, yes.
7    Q.   That's what I meant.
8         Who did you have a conversation
9  with?
10    A.   Mr. Buettner.                        17:20:12
11    Q.   Anybody else?
12    A.   I don't recall.
13    Q.   Do you recall when?
14    A.   During the late part of field work
15  for 1997 audit, year-end.                   17:20:27
16    Q.   Let me ask you this. We're going
17  to come back to this conversation and the 50
18  million dollar issue tomorrow, I promise.
19         Let me ask you this. If Coopers &
20  Lybrand had become aware in 1997 that DVOG's,   17:20:51
21  the Delaware Valley Obligated Group's statement
22  of operations column in the consolidating
23  information presented a net income figure that
24  was overstated by an amount material to the
25  Delaware Valley Obligated Group, but not        17:21:12

Page 524

1  material to AHERF taken as a whole, is that
2  something Coopers should have disclosed in its
3  audit opinion?
4         MR. RYAN:  Objection.  You're
5  asking a hypothetical question?             17:21:27
6         MR. JONES:  Yes.
7    A.   So you're saying if we had some
8  reason to believe that?
9    Q.   Yes.
10    A.   When?                               17:21:34
11    Q.   In your 1997 audit work.
12    A.   It's too hard to answer that
13  without knowing what the facts and
14  circumstances are what it related to, when it
15  really --                                   17:21:50
16         Certainly if there was something
17  that we needed to consider as part of those
18  supplemental schedules that were included or
19  someone lied to us and didn't tell us
20  information, obviously we would have needed to    17:22:03
21  evaluate that, but --
22    Q.   I ask you to assume for me that you
23  had concluded from all the facts and
24  circumstances presented for audit that the
25  Delaware Valley Obligated Group's statement of    17:22:20

Page 525

1  operations column in the consolidating
2  statements in 1997 was materially misstated,
3  materially overstated in an amount to be
4  redundant, material to the Delaware Valley
5  Obligated Group but not material to AHERF as a    17:22:38
6  whole, I want you to assume that, after all of
7  your review of the facts and circumstances, was
8  it Cooper's obligations, therefore, in 1997 if
9  that were the case to disclose that
10  overstatement in its audit opinion or to         17:22:54
11  qualify its opinion or render an adverse
12  opinion?
13         MR. RYAN:  Objection.  Sounds like
14  you're asking her for an expert opinion.
15         MR. JONES:  I'm asking her for her    17:23:08
16  opinion as a C&L auditor.  We just read the
17  Business Assurance Manual.
18    A.   Recognizing that I've not been in a
19  situation of an engagement partner ever in my
20  career, I'm not sure that I am qualified to      17:23:21
21  make that type of a conclusion.  But --
22  furthermore, it's based on, I need more facts
23  and circumstances to understand qualitatively
24  what that relates to.
25    Q.   What do you think you need to        17:23:40

67 (Pages 522 to 525)

Amy Frazier                                                    Volume 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
        Plaintiff,
        vs.                          Civil Action
PRICEWATERHOUSECOOPERS,              No. 00-684
LLP,
        Defendant.


        Continued Videotaped Deposition of

AMY FRAZIER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Thursday, the 10th day of

June, 2004, at 9:00 a.m.

                - - - - -

                VOLUME III


                - - - - -

Amy Frazier                                                                                                    Volume 3

Page 595

1   System Restructuring on that page in the upper
2   left-hand corner in very small print?
3        A.   Yes.
4        Q.   Beneath it the Graduate header for
5   the Graduate hospitals, perhaps, or the          10:28:43
6   Graduate Hospital, do you see that?
7        A.   Yes.
8        Q.   Do you see the row about halfway
9   down the first half of the first column that
10  reads, "Record bad debt allowance"?              10:28:56
11       A.   Yes.
12       Q.   Do you see the parenthetical entry
13  of 20 million dollars under a certain account
14  number there, one, two, three, four account
15  numbers over as a column?                        10:29:11
16       A.   Yes.
17       Q.   Do you know what that account
18  number was for?
19       A.   I don't recall, but I do just want
20  to make sure -- I'm not sure if these were --    10:29:19
21  they may be consecutive.  I just don't know
22  that they correlate with the meeting.  I just
23  wanted to make sure we were clear on that.
24       Q.   If I told you that account number
25  related to due to slash from AHERF, does it      10:29:33

Page 596

1   refresh your recollection at all about what
2   this entry meant?
3            MR. RYAN:  You mean what she
4   thought it meant --
5            MR. JONES:  Yes.                        10:29:44
6            MR. RYAN:  -- or what she saw on
7   the schedule or what she thinks now?
8            MR. JONES:  What she thought it
9   meant when she saw it.
10       A.   I don't recall seeing this            10:29:50
11  schedule.
12       Q.   I'm going to ask you the same
13  question for the record bad debt allowance and
14  the parenthetical entry of 5 million under the
15  same account number on the next page, do you     10:30:04
16  see that, at Mt. Sinai Hospital?
17       A.   Yes.
18       Q.   Do you recall what that meant when
19  you got the schedule?
20       A.   I don't recall the schedule or when   10:30:11
21  I got the schedule.
22       Q.   If you got the schedule in July of
23  '97 when you made the notes for Mr. Cancelmi or
24  otherwise -- let me ask it this way.
25            Do you recall reviewing a schedule    10:30:30

Page 597

1   like this with Mr. Cancelmi during your July 16
2   or thereabouts 1997 meeting?
3        A.   No, I actually recall another
4   schedule that I have from him.
5        Q.   You don't recall going over this      10:30:41
6   one with him during that meeting?
7        A.   No, I don't.
8        Q.   Upper right-hand corner of the
9   schedule which ends in the Bates digits 699,
10  does that say Dan, if you turn the page          10:30:52
11  sideways and look at it so that the information
12  is presented left to right?  Does the upper
13  right-hand corner down by the Bates digits say
14  Dan?
15       A.   It looks like it could.               10:31:04
16       Q.   Is that your handwriting?
17       A.   No.
18       Q.   So just, I guess, to summarize, and
19  Mr. Ryan will tell me if I've summarized it
20  inaccurately, is it your testimony, Miss         10:31:27
21  Frazier that you did not learn of the 50
22  million dollar Graduate reserve transfers
23  during a conversation with Mr. Cancelmi in July
24  of 1997 or about July 16 of 1997?
25       A.   Absolutely not.  In fact, there was   10:31:39

Page 598

1   50 million dollar reserves for Graduate that I
2   was still waiting for support on.  That was
3   part of my conversation with him.
4        Q.   Let me ask you to look at another
5   document with me.                                10:31:51
6            - - - - -
7            (Thereupon, Deposition Exhibit 4436
8            was marked for purposes of
9            identification.)
10           - - - - -                              10:32:36
11       Q.   We're handing you now, Miss
12  Frazier, what we've marked as Exhibit 4436,
13  which is a set of handwritten notes, I believe,
14  that were authored by Mr. Kirstein.  I only
15  believe that from recollection of discussing    10:32:47
16  some of these notes with him a couple weeks
17  ago.
18            Do you recognize the handwriting as
19  his?
20       A.   Yes.                                   10:32:54
21       Q.   I'm going to ask you to take a look
22  at the page of Exhibit 4436 that starts with
23  the Bates digits, the ending Bates digits 44.
24            No, I'm not.  Actually the next
25  page, 45.                                        10:33:28

16 (Pages 595 to 598)

Amy Frazier                                                                 Volume 3

Page 599

1    Do you see at the top of the page,
2 he has apparently written the words Dan C
3 period, 4-18, and then across the row where
4 that text appears are the names Buettner slash
5 Frazier?                              10:33:46
6    A.   Yes.
7    Q.   Do you recall participating in a
8 meeting or a conference call with Mr. Cancelmi,
9 Mr. Kirstein and Mr. Buettner on or about April
10 18, 1997?                            10:34:01
11   A.   I recall several conference call
12 type meetings in April.  I just don't know the
13 precise dates.
14   Q.   Would you take a moment to look at
15 these two pages of handwritten notes, 45 and    10:34:18
16 46, and then I'll just have a couple questions
17 for you.
18   A.   Yes.
19   Q.   Have you ever seen these notes
20 before?                              10:34:56
21   A.   Yes.
22   Q.   When?
23   A.   In connection with the deposition
24 preparation.
25   Q.   Did you see them in connection with  10:35:03

Page 600

1 preparing for this deposition?
2    A.   Not -- last week.  With that said,
3 I've obviously been doing them for years now,
4 so --
5    Q.   Not in this case, though, right?    10:35:26
6    A.   No.
7    Q.   It may seem like years, but we've
8 only been together for two days and a part of
9 the third day, is that right?
10   A.   That's correct.              10:35:28
11   Q.   The other testimony was in the SEC
12 proceeding?
13   A.   Yes.
14   Q.   The second portion of the page
15 toward the bottom, if you look there, you will   10:35:35
16 see the phrase 50 million reserves -- 50
17 million dollars reserves at Graduate, comma,
18 will have 80 million C slash O in DV by
19 6-30-97.  Do you see that?
20   A.   Yes.                          10:35:55
21   Q.   Do you recall discussing this topic
22 with Mr. Cancelmi, Mr. Kirstein and
23 Mr. Buettner on or about April 18, 1997?
24       MR. RYAN:  Objection.
25   A.   I recall the topic of 50 million    10:36:12

Page 601

1 dollars of reserves for Graduate.  I don't
2 recall exactly when we, as I said before, the
3 discussion on the 80 million dollars of
4 charge-offs.
5    Q.   You do, however, from your prior    10:36:26
6 testimony today, recall that there had been 80
7 million dollars of charge-offs at -- A/R
8 charge-offs at the Delaware Valley Obligated
9 Group hospitals recently?
10       MR. RYAN:  Objection.         10:36:39
11   A.   That there would be 80 million
12 dollars charge-offs.  I don't -- I guess my
13 expectation was those would have been in the
14 DVOG hospitals, but --
15   Q.   Okay.                         10:36:48
16   A.   -- I didn't know the detail of
17 where.
18   Q.   Do you recall discussing with
19 Mr. Buettner, Mr. Cancelmi and Mr. Kirstein in
20 April of 1997 any topic that included           10:36:58
21 connecting the 50 million dollars of reserves
22 at the Graduate with 80 million dollars of
23 charge-offs at the Delaware Valley Obligated
24 Group hospitals?
25       MR. RYAN:  Objection.         10:37:11

Page 602

1    A.   Absolutely not.
2    Q.   Look to the next note on the page,
3 it reads, "Placing reserves on Graduate
4 entities to be used for DV" -- "to be used for
5 DV A slash R at year-end."            10:37:51
6        Do you see that?
7    A.   Yes.
8    Q.   Do you recall having any
9 conversation with any of the folks I just
10 mentioned about placing the reserves on the     10:38:01
11 Graduate entities to be used for the Delaware
12 Valley Obligated Group A/R at year-end?
13       MR. RYAN:  Objection.
14   A.   I was never involved in such a
15 conversation.                        10:38:10
16   Q.   At the bottom of the page, "Mr.
17 Kirstein's apparently written, defers A slash R
18 problem to be deferred."  He may have been
19 redundant and used deferred or some form of the
20 word twice.                          10:38:30
21       Do you recall ever having a
22 discussion with Mr. Cancelmi and Mr. Buettner
23 or Mr. Kirstein in April of 1997 about
24 deferring an A/R problem at the Delaware Valley
25 Obligated Group hospitals or any of them?        10:38:41

17 (Pages 599 to 602)

Page 603

1      A.    No.
2      Q.    So let me ask you to flip back to
3  page 44, the page I misguided you to at the
4  beginning of this little conversation.
5           On that page, Mr. Kirstein has      10:39:16
6  apparently written at the top of the page "4-21
7  conference call." Do you see that?
8      A.    Yes.
9      Q.    Beneath it he's written the words,
10 "50 million additional reserves." Do you see      10:39:30
11 that? "50 million additional reserves" or the
12 abbreviation for additional.
13     A.    Yes.
14     Q.    Off to the left-hand margin he's
15 also written, I think, "Write-down, 50 million      10:39:38
16 dollars, put one-half against A/R."
17          Do you see that?
18     A.    Yes.
19     Q.    Do you recall discussing using 50
20 million dollars of Graduate reserves or      10:39:51
21 reserves created in connection with the
22 acquisition of the Graduate hospitals for the
23 Delaware Valley Obligated Group bad debt
24 reserve in a conference call with Mr. Kirstein
25 in late April or about April 21, 1997?      10:40:05

Page 604

1          MR. RYAN:  Objection.
2      A.    There was never a call that I was
3  involved in that discussed that.
4      Q.    Do you recall discussing on a
5  conference call with anyone, Mr. Kirstein or      10:40:33
6  anybody else on the engagement team, about
7  whether because the -- let's try that again.
8          Look to the lower left-hand corner
9  of the page where Mr. Kirstein has apparently
10 written the words "view consolidated basis as      10:40:52
11 acquisition." Do you see that?
12     A.    Yes.
13     Q.    Do you recall being involved in a
14 conference call or a meeting or a discussion
15 with Mr. Kirstein at which you discussed the      10:41:03
16 fact that if AHERF as the enterprise was viewed
17 on a consolidated basis after the Graduate
18 acquisition, transfer of the 50 million dollar
19 reserves would not need to be disclosed on the
20 financial statements?      10:41:21
21          MR. RYAN:  Objection.
22     A.    Absolutely not.
23     Q.    And I mean a meeting or a
24 conference that occurred in April of '97.
25     A.    Never.      10:41:28

Page 605

1      Q.    Have you seen these notes before or
2  any of them that we've just reviewed other than
3  in preparation sessions for deposition?
4      A.    No.
5           - - - - -
6           (Thereupon, Deposition Exhibit 4437
7           was marked for purposes of
8           identification.)
9           - - - - -
10     Q.    Miss Frazier, I'm going to hand you      10:42:11
11 now Exhibit 4437. It's been marked apparently
12 in another proceeding, and I've got to believe
13 it was the SEC proceeding as Plaintiff's
14 Exhibit 11. It's a set of color notes that I
15 believe you'll tell me, two pages' worth, that      10:42:30
16 I believe you'll tell me are written in your
17 hand. Is that right?
18     A.    Yes.
19     Q.    They're dated April 22nd, 1997. Is
20 that right?      10:42:41
21     A.    That's the date at the top.
22     Q.    Do you believe that you took these
23 notes on April 22nd, 1997 or within a few days
24 of April 22nd, 1997?
25          MR. RYAN:  You mean the red part or      10:42:51

Page 606

1  the whole thing?
2          MR. JONES:  Let's start with the
3  red part.
4      Q.    There are certain notes in red,
5  correct?      10:42:59
6      A.    Yes.
7      Q.    And certain notes in black,
8  correct?
9      A.    Yes.
10     Q.    Do you believe that you took any      10:43:09
11 portion of these notes on April 22nd, 1997 or
12 within a few days thereof?
13     A.    I believe the red notes would have
14 been in April of 1997, yes.
15     Q.    Do you believe it would have been      10:43:15
16 within a few days of April 22nd that you took
17 these notes?
18     A.    Likely, yes.
19     Q.    You, I think, want to tell me that
20 the notes in black or Mr. Ryan wants me to      10:43:22
21 understand that the notes in black were taken
22 at some other time in your view. Is that
23 right?
24     A.    Yes.
25     Q.    When do you believe that those      10:43:30

18 (Pages 603 to 606)

Amy Frazier                                                                    Volume 3

Page 607

1  notes in black were penned by you?
2      A.    Sometime during year-end field
3  work.
4      Q.    For the 1997 audit?
5      A.    Yes.                        10:43:41
6      Q.    Do you know when?
7      A.    No.  It could have included even
8  the subsequent event period.  I'm just not
9  sure.
10     Q.    Let me ask you to skip to the     10:44:08
11 middle of the page in red ink with an arrow
12 next to it.  You have written the phrase 50
13 million reserve location, is that right?
14     A.    Yes.
15     Q.    50 million reserve location, is    10:44:24
16 that right?
17     A.    Yes.
18     Q.    Do you know what these -- why you
19 wrote that?
20     A.    Yes.                        10:44:32
21     Q.    Why?
22     A.    Because I was on a conference call
23 where Dan Cancelmi communicated that they
24 wanted to record 50 million dollars of reserves
25 at Graduate for Graduate but they weren't sure   10:44:45

Page 608

1  where on the balance sheet they wanted to
2  record them.
3      Q.    He used the words at Graduate for
4  Graduate?
5      A.    Yes.                        10:44:54
6      Q.    You're certain he used those very
7  words?
8      A.    Yes, because he also provided
9  examples of what they would use it for at
10 Graduate.                           10:45:03
11     Q.    You've written next to 50 million
12 dollar reserve location the word intercompany
13 in black pen.  Is that right?
14     A.    Yes, with a slash.
15     Q.    Why did you write that, if you     10:45:14
16 recall today?
17         Do you recall today?
18     A.    Yes.
19     Q.    Why did you write that?
20     A.    I recall at year-end, sometime     10:45:19
21 during year-end field work going back through
22 my notes to understand where the Graduate --
23 anything that needed follow-up, actually going
24 back and evaluating how it had been accounted
25 for, where, and then in that case I knew that   10:45:34

Page 609

1  it was part of intercompany at year-end.
2      Q.    What do you mean by intercompany?
3      A.    That the amount was in an
4  intercompany balance.  It was just a
5  short-term -- shortened word for me to refer   10:45:49
6  back to.
7      Q.    The amount was going somewhere
8  else, though, if it was in an intercompany
9  account, is that correct?
10     A.    Yes.  I mean, we came to know that   10:45:58
11 as part of year-end, yes.
12     Q.    Where did it end up again?
13     A.    At the DVOG hospitals.
14     Q.    To boost or enhance or increase the
15 bad debt reserve?                    10:46:08
16     A.    It was a bookkeeping entry that was
17 included in their bad debt reserve numbers at
18 DVOG.
19     Q.    Well, what I mean to say is, and I
20 think what you perhaps understood is that the   10:46:21
21 bad debt reserve got larger by dollar volume --
22 dollar amount, is that right?
23     A.    Literally, yes, it was a larger
24 dollar number with it in there.
25     Q.    Does seeing this document now, Miss   10:46:47

Page 610

1  Frazier, give you any reason to believe that
2  you knew about the 50 million dollar reserve
3  transfers of which we've been speaking in April
4  of '97?
5      A.    Absolutely not.  I knew about it in   10:46:58
6  August or year-end field work of 1997.
7      Q.    Let's skip to the next page.  It
8  says materiality, 15 million dollars, $500,000
9  SUD.  Did I read that right?
10         MR. RYAN:  I'm not sure it was 15.    10:47:16
11         MR. JONES:  I said 15.
12         MR. RYAN:  I'm not sure that's
13 15.
14     A.    I believe that's 1.5.  There's a
15 faint dot there that maybe on the original is   10:47:23
16 more clear.
17     Q.    I apologize if I've misread it, but
18 I really can see no dot.  So if that's your
19 best recollection -- you've seen the document a
20 number of times before, is that right?          10:47:34
21     A.    Yes.  It's 1.5.
22     Q.    So the note reads, and it's in red,
23 materiality, 1.5 million dollars, $500,000 SUD,
24 is that right?
25     A.    Everything is in red.  There wasn't   10:47:50

19 (Pages 607 to 610)

Amy Frazier                                                              Volume 3

Page 611

1  anything unique about it being red.
2      Q.   I was just trying to time it so
3  that we knew when you took it.
4      A.   Yes.
5      Q.   Do you know what that means today?   10:47:57
6      A.   I was referring to some materiality
7  guidelines that we were contemplating as part
8  of planning for the audit.
9      Q.   What did the 1.5 million dollars
10 refer to?                                10:48:12
11     A.   I would have to look back to our
12 actual planning information.  I just don't
13 recall as I sit here today.
14     Q.   Do you know what the 500,000 K SUD
15 referred to?                             10:48:27
16     A.   Based on that, it's an -- I don't
17 recall writing it, but, based on that, it
18 appears at least as an initial recommendation
19 of what we would include as possible
20 adjustments on the SUD.                  10:48:37
21     Q.   But the -- you can't recall what
22 the 1.5 million dollars reserves to?
23          Is that overall materiality?
24          MR. RYAN:  Objection.
25     A.   I can't recall.  I need to go back   10:48:46

Page 612

1  into the planning work papers.
2      Q.   You can't recall?
3      A.   I can't, without looking at that.
4      Q.   It's been a number of years.
5      A.   Yes.                           10:48:53
6      Q.   But you recall with clarity that
7  the 50 million dollar reserve location note of
8  a number of years ago did not refer to the
9  transfer of the reserves from the Graduate
10 hospitals to the Delaware Valley Obligated   10:49:19
11 Group hospitals, am I right?
12     A.   Absolutely, because that was a part
13 of a conference call.  This, we wouldn't have
14 been talking about materiality with that call.
15     Q.   You think this note is unrelated,   10:49:22
16 the materiality note?
17     A.   It could have been or it's just a
18 follow-up discussion even after we got off the
19 phone, but I remember the call.
20     Q.   You can recall Mr. Cancelmi's words   10:49:33
21 precisely so that you can quote them, am I
22 right, today?
23          MR. RYAN:  Objection.
24     Q.   That the reserves were for Graduate
25 at Graduate in those words?              10:49:43

Page 613

1          MR. RYAN:  Objection.
2      A.   In those words.  I don't know if he
3  had ands and the's in between, but he said
4  they're for Graduate at Graduate for the types
5  of things that they need at Graduate.   10:49:52
6      Q.   I just want to make sure you recall
7  that today.
8      A.   Absolutely.
9      Q.   Miss Frazier, I'm handing you what
10 we've marked as 4258.  It's a working paper   10:50:34
11 named Hahnemann Trial Balance Review.  Do you
12 see that?
13     A.   Yes.
14     Q.   This is a working paper, I believe,
15 that has been printed out in hard copy from a   10:50:46
16 version of the CLASS database that was not the
17 final version of the CLASS database for fiscal
18 year '97.
19          If you look about one, two, three,
20 four pages into the document, you'll see a   10:51:09
21 print of the screen that shows you as the
22 author.  Is that right?
23     A.   That's what it states, yes.
24     Q.   Do you recall authoring this
25 document?                                10:51:27

Page 614

1      A.   I don't recall the document
2  specifically, no.
3      Q.   Do you have any doubt that you did?
4      A.   No, not based on this.  I'm not
5  sure -- I mean, I'm not sure about all of the   10:51:37
6  individual line items within it, but --
7      Q.   If you skip to the next page, the
8  print of that page indicates that you created
9  the document.  Is that right?
10     A.   Yes.                           10:51:51
11     Q.   Do you have any doubt that you did?
12     A.   No.
13     Q.   If you skip to the next page, that
14 screen print indicates that you created the
15 document on May 13, 1997 about 2:00 in the   10:52:02
16 afternoon.  Is that right?
17     A.   I'm sorry, I don't see my name.
18     Q.   Well, that the document itself was
19 created.  I was carrying over the presumption
20 that you created it from the page prior.   10:52:28
21     A.   Oh, I'm sorry.  That's what it
22 states, yes.
23     Q.   Can you look at the rest of the
24 screen prints and find for me -- I believe the
25 document indicates that it was last modified on   10:52:37

20 (Pages 611 to 614)

Amy Frazier                                                                                          Volume 3

Page 615

1  May 22nd, 1997. Do you see that?
2      A.   I see date modified, 5-22-97. I'm
3  not sure if that's last modified.
4      Q.   Does that list all of the dates of
5  the modification there?               10:53:06
6      A.   I don't know. I'm not just that
7  familiar with that level of detail of CLASS to
8  know that.
9      Q.   Let me direct you back now to the
10  first page of the document. You see about a    10:53:20
11  third of the way down on the face page of the
12  document that there is a line that reads, "How
13  is the first 25 of the 50 million distributed
14  to the entities, or did this occur in April."
15      Do you see that?                 10:53:39
16      A.   Yes.
17      Q.   Do you believe that you typed that
18  line or two lines?
19      A.   I don't have any reason to doubt
20  that I didn't.                       10:53:47
21      Q.   As you sit here today, do you know
22  what that means?
23      A.   Generally speaking, yes.
24      Q.   What do you believe that it means?
25      Let me ask this. Do you have any    10:54:00

Page 616

1  recall from 6-30-97's audit work about what
2  this means?
3      A.   Yes.
4      Q.   What is your recall of what this
5  means?                               10:54:10
6      A.   That the DVOG hospitals were going
7  to be implementing their new bad debt
8  methodology and, once they did that, they
9  expected that they would need to record
10  additional bad debt reserves and they were    10:54:26
11  going to take it over two months of about 25
12  and 25 million each.
13      Q.   Where were they going to get those
14  reserve amounts, do you have any recollection
15  of that or knowing that at the time you typed    10:54:37
16  this document?
17      MR. RYAN: Objection.
18      A.   I don't recall as far as typing the
19  document, but I recall generally in April
20  knowing that they were going to record it as    10:54:48
21  just normal bad debt reserves that you would do
22  on any type of bad debt reserve transaction.
23      Q.   Who did you learn that from?
24      A.   Dan Cancelmi.
25      Q.   When you had those conversations --    10:55:02

Page 617

1  was this in a conversation?
2      A.   Yes.
3      Q.   When you had those conversations,
4  did Mr. Cancelmi tell you anything about how he
5  anticipated that reserve increase was to be    10:55:19
6  recorded in specific?
7      MR. RYAN: Objection.
8      A.   I just recall it being we're going
9  to record our bad debt reserve like we do, we
10  adopted the methodology, it's just normal    10:55:30
11  course of business that they've done in the
12  past.
13      Q.   When you say normal course of
14  business, how was it recorded at AHERF
15  hospitals?                          10:55:39
16      A.   In the past?
17      MR. RYAN: You mean generally?
18      Q.   Yes, in your experience as of the
19  audit of 1997.
20      A.   As bad debt expense.          10:55:46
21      Q.   So you increase bad debt expense on
22  the statement of operations and boost the
23  reserve by the same amount?
24      A.   That would be the offsetting entry,
25  yes.

Page 618

1      Q.   You had no knowledge, as of the
2  date you authored Exhibit 4258, of a plan to or
3  the implementation of a plan to move 50 million
4  dollars of reserves established in connection
5  with the Graduate Hospital acquisition to the    10:56:15
6  Delaware Valley Obligated Group bad debt
7  reserves, is that right?
8      A.   Absolutely not.
9      Q.   Am I right?
10      A.   I had no knowledge of that.       10:56:33
11      Q.   Why use the word distributed then
12  if you -- if they were going to do this in the
13  normal course, what does the word distributed
14  mean?
15      A.   I just didn't know how, on which    10:56:36
16  books it related to. So I knew it broadly as
17  there was going to be 50 million on all the
18  DVOG entities. I just didn't know which ones.
19      Q.   I'm handing you now, Miss Frazier,
20  Exhibit 4297. I'll just have a few questions    10:57:14
21  for you. It's a C&L work paper dated June 9,
22  1997 and apparently created and last modified
23  by Miss Heinlein. Is that right?
24      A.   Yes, according to what it says.
25      Q.   It's an issue topic document, is    10:57:37

21 (Pages 615 to 618)

Amy Frazier                                                                 Volume 3

Page 647

1  weren't disclosed.
2      Q.  I want you to assume they were not
3  until at least 1998.
4          MR. RYAN:  You're asking her to
5  testify as to what she remembers actually      11:50:03
6  feeling something about a fact you're asking
7  her to assume?
8          MR. JONES:  No, that's not what I'm
9  asking her at all.
10         MR. RYAN:  I'm confused.              11:50:09
11         MR. JONES:  I'm sorry you're
12 confused.  My question was, does she recall
13 having a conversation with anyone, a personal
14 friend, anyone, about discomfort over, personal
15 discomfort over not disclosing the Graduate     11:50:19
16 reserve transfers to the AHERF board.
17         MR. RYAN:  Objection.
18     A.  I guess two points.  I don't know
19 that they weren't disclosed.
20     Q.  I've asked you to assume that they    11:50:30
21 were not.
22     A.  And, secondly, I don't talk about
23 client matters to friends.
24     Q.  So you don't recall such a
25 conversation?                                11:50:41

Page 648

1      A.  I never had a conversation with
2  friends or spouse or other family members.
3      Q.  That's fine.
4          Do you recall discussing with
5  anyone discomfort over the fact that the      11:50:49
6  Graduate reserve transfers were not placed on
7  C&L's SUD for fiscal year '97?
8      A.  I'm not sure I know what you mean
9  by discomfort.  I never had discomfort because
10 I think I've testified that Mr. Buettner and I   11:51:02
11 talked about whether or not it was necessary to
12 include them.
13     Q.  I mean other than Mr. Buettner.
14         MR. RYAN:  Objection.
15     A.  I also said I don't recall if I had   11:51:22
16 other discussions regarding the SUD on that
17 particular item.
18     Q.  Do you recall ever seeing a draft
19 version of the SUD in which the 50 million
20 dollar reserve transfers were mentioned -- on   11:52:00
21 which the 50 million dollar reserve transfers
22 were mentioned?
23     A.  I don't recall there being one.
24         - - - - -
25         (Thereupon, Deposition Exhibit 4439

Page 649

1          was marked for purposes of
2          identification.)
3          - - - - -
4      Q.  We've just marked, Miss Frazier,
5  Exhibit 4439.  I'm going to ask you to take a    11:52:42
6  few moments to take a look at the exhibit and
7  ask -- then I'll ask you if you've ever seen it
8  before.
9      A.  I don't recall in this sequential
10 order.  I recall some of them in a subsequent    11:53:23
11 event binder.
12     Q.  Which pages do you recall appearing
13 in a subsequent event binder?
14     A.  Just generally the format and
15 putting the subsequent event binder together    11:53:31
16 and that there was an index in the front of the
17 sections.
18     Q.  So some of these documents may have
19 appeared there, it is your view?
20     A.  Yes.                    11:53:45
21     Q.  I'm going to ask you to look now at
22 the -- the subsequent events binder to which
23 you refer was for the '97 audit?
24     A.  Yes.
25     Q.  I'm going to ask you to look now at   11:53:57

Page 650

1  the first page.  Do you see the language there
2  underneath the heading Supplemental Schedules,
3  Critical Matter?
4      A.  Yes.
5      Q.  It reads, "Included in the opinion    11:54:07
6  is the addition of two supplemental paragraphs
7  discussing the lack of information provided in
8  the supplemental schedules of the report."
9          Do you know what that refers to
10 today?                             11:54:22
11     A.  No, I don't.
12         - - - - -
13         (Thereupon, Deposition Exhibit 4440
14         was marked for purposes of
15         identification.)
16         - - - - -
17     Q.  I'm handing you now, Miss Frazier,
18 what we've marked as Exhibit 4440, which is a
19 memo written on Coopers & Lybrand's letterhead
20 dated November 12, 1996 from you to Steve Elek,   11:55:20
21 E L E K.  It appears that the subject of this
22 memo is the highlights of Deloitte & Touche's
23 Graduate work paper review.
24         Have I read the top portion of the
25 document accurately?                    11:55:36

29 (Pages 647 to 650)

Amy Frazier                                                                    Volume 3

Page 651

1    A.   Yes.
2    Q.   Who is Steve Elek?
3    A.   He was a partner in our, I don't
4  know what group it was called at the time, but
5  he would work on due diligence engagements for    11:55:43
6  clients who had been acquiring other companies.
7    Q.   Do you know whether he or anyone
8  else at Coopers & Lybrand was involved in due
9  diligence with respect to the acquisition of
10  the Graduate hospitals?                           11:55:57
11       MR. RYAN:  Objection.
12    Q.   AHERF's acquisition?
13    A.   Well, I guess at that stage it was
14  an SDN acquisition, so I'm not sure.
15    Q.   Yes.  If that is indeed what you    11:56:15
16  recall about it, fine.
17       Do you recall whether anyone at
18  Coopers & Lybrand was involved in the
19  acquisition process in any of its phases,
20  including SDN?                                     11:56:28
21    A.   I know Steve Elek was.  I had some
22  involvement for reviewing the Deloitte & Touche
23  work papers.  I believe Bill Buettner
24  participated in some meetings.
25       Mark Kirstein got involved as it    11:56:41

Page 652

1  related to the lease transaction for Omega, as
2  we talked yesterday.  And I think Steve had
3  people working for him.  I just don't recall
4  who they were.
5    Q.   Do you recall preparing this memo    11:56:55
6  in or about November of 1996?
7    A.   I recall preparing a memo for Steve
8  Elek based on the work that I performed.  I
9  don't recall this one specifically, but I
10  recall preparing a memo.                           11:57:10
11    Q.   Do you have any doubt that this is
12  your memo?
13    A.   No.
14             - - - - -
15       (Thereupon, Deposition Exhibit 4441
16       was marked for purposes of
17       identification.)
18             - - - - -
19    Q.   I'm going to hand you now, Miss
20  Frazier, a set of handwritten notes that I    11:57:55
21  believe you will tell me are yours.  We've
22  marked them as Exhibit 4441.
23       Would you take a moment or two to
24  look at the notes and tell me whether they are
25  indeed yours?                                      11:58:10

Page 653

1    A.   Yes, they appear to be.
2    Q.   Do you recall when you took these
3  notes?
4    A.   Not all of them individually.  I
5  recall sometime in November or late calendar    11:58:45
6  year 1996 reviewing Deloitte work papers and
7  taking notes.  But I also recall at some later
8  point going back through them, which may be a
9  different time for some of the check marks and
10  things like that.                                  11:58:59
11    Q.   Was this all done in connection
12  with the Graduate hospitals' acquisition by
13  AHERF or SDN?
14    A.   Certainly the original note taking
15  was.  I just don't know as far as kind of the    11:59:17
16  follow-up.  I remember referring to them during
17  the '97 audit occasionally.
18    Q.   Do you recall writing anything on
19  them during the '97 audit?
20    A.   I don't know.                               11:59:29
21    Q.   Let me ask you to turn to page
22  038078.  038078.
23       Are you with me?
24    A.   Yes.
25    Q.   At the top of the page you've    11:59:45

Page 654

1  written the word "patient A/R," is that right?
2    A.   Yes.
3    Q.   That would refer in these notes to
4  patient accounts receivable at Graduate
5  hospitals, is that correct, as we've discussed    12:00:01
6  them this morning?
7       MR. RYAN:  Objection.
8    A.   I don't know if it's in the
9  aggregate or just Graduate Hospital.  I can't
10  tell.                                              12:00:14
11    Q.   I'm sorry, I put the word -- or the
12  letter S on hospitals to mean it was either the
13  Graduate Hospital or any of the Graduate
14  hospitals.  Is that fair to say?
15    A.   I don't know if it's referring to    12:00:27
16  any of them.  It may just be Graduate.  I just
17  am not sure.
18    Q.   I think we're communicating, but
19  I'm not certain.
20       These are a part of your work    12:00:37
21  product in connection with Graduate, the
22  Graduate acquisition and so, therefore, patient
23  A/R here refers to patient A/R at either one of
24  or several of the Graduate hospitals.  Is that
25  fair?                                              12:00:56

30 (Pages 651 to 654)