Amy Frazier

Page 655

1    A.   Yes.
2    Q.   My next question is, just beneath
3  that word patient A/R or those two words
4  patient A/R, you have written, "Appear to be at
5  a low risk assessment.  Performing        12:01:04
6  walk-throughs of the system."
7       Is that right?
8    A.   Yes.
9    Q.   What did you mean by that?
10   A.   I don't recall these work papers.     12:01:12
11 The context, though, is taking things from
12 Deloitte work papers.
13   Q.   Is it fair that your best judgment
14 today would be that you were noting that
15 Deloitte & Touche had put patient A/R at the    12:01:27
16 Graduate hospitals or one of them at low risk?
17   A.   I don't know definitively that
18 that's what they did.  These are just notes
19 that I was gathering thoughts from, so I have
20 no idea.                              12:01:44
21   Q.   Well, do you recall yourself coming
22 to a conclusion in this time period when you
23 prepared these notes that the Graduate A/R
24 should be put at low risk as a matter of risk
25 assessment?                           12:01:56

Page 656

1       MR. RYAN:  You mean after she
2  joined AHERF when she was on it?
3       MR. JONES:  No, when she was
4  writing these notes.
5       MR. RYAN:  I'll object.  I don't    12:02:06
6  understand.
7    A.   I'm not sure, are you asking as it
8  relates to Deloitte?  I'm not sure what you're
9  asking.
10   Q.   I've tried to ask whether you think   12:02:10
11 it's your best judgment that you wrote low risk
12 adjustment because you read it in some of
13 Deloitte & Touche's work papers, and you told
14 me you didn't know; is that right?
15   A.   Well, since I used the word appear,   12:02:21
16 I'm not sure I would have been deriving
17 information.  I don't know what their audit
18 approach is and if they even used the word low
19 risk.  I'm just trying to infer a process.
20   Q.   So then that led me to my next      12:02:30
21 question, which was, is this your own
22 independent judgment, no matter how
23 preliminary, that their patient A/R at Graduate
24 hospitals or some group of them should be
25 assessed at low risk?                  12:02:44

Page 657

1       MR. RYAN:  Objection.
2    A.   No, it was an appearance of trying
3  to understand what Deloitte assessed them, not
4  translating that to what we should assess them.
5  We being C&L.                         12:03:00
6    Q.   I understand.
7       - - - - -
8       (Thereupon, Deposition Exhibit 4442
9       was marked for purposes of
10      identification.)
11      - - - - -
12   Q.   This is Exhibit 4442, Miss Frazier.
13 Are these your notes?
14   A.   Yes.
15   Q.   Do you believe these to have been    12:03:41
16 written in connection with the Graduate
17 hospitals' due diligence -- the Graduate
18 hospitals' acquisition due diligence?
19   A.   Yes.
20   Q.   Do you recall when roughly these     12:03:56
21 would have been written?
22   A.   The same time frame as discussed
23 before, and that's in November or December
24 1996, generally speaking.  I don't know if
25 there are other edits or other later notes,     12:04:09

Page 658

1  but --
2    Q.   Let me ask you to -- well, let me
3  ask you to do nothing more than with that
4  document, something with which you happily
5  comply, right?                        12:04:33
6       Can you look at the next exhibit
7  for us real briefly?
8       - - - - -
9       (Thereupon, Deposition Exhibit 4443
10      was marked for purposes of
11      identification.)
12      - - - - -
13   Q.   It's Exhibit 4443.  I think if you
14 flip toward the back of the page, you'll see
15 that you're listed in the computer screen      12:05:29
16 prints as the author of the document.
17      Do you see that?
18   A.   Yes.
19   Q.   Do you recall preparing this
20 document regarding the Park City Avenue trial    12:05:47
21 balance?
22   A.   I don't recall the document.
23   Q.   Do you have any doubt that you were
24 its author?
25   A.   Not based on the CLASS system, no,    12:05:58

31 (Pages 655 to 658)

Amy Frazier                                                                 Volume 3

Page 663

1  challenged here.
2      I think if you turn to page number
3  313, we have the same or similar set of
4  schedules for the Mt. Sinai Hospital.
5      Do you see that, Mt. Sinai Hospital      12:12:29
6  bad debt reserves is the heading, the working
7  paper name. Do you see that?
8      A.  Yes.
9      Q.  If you skip to page 315 A, you'll
10  see a similar schedule headed Mt. Sinai      12:12:50
11  Hospital A/R Reserve at June 30, '97 and a
12  similar note, do you see that?
13      A.  Yes.
14      Q.  This note, too, reads, "AHERF
15  decided to rely on the percentages developed by  12:13:01
16  D&T, Deloitte & Touche, because they are
17  conservative. C&L does not take exception."
18      Did I read that right?
19      A.  Yes.
20      Q.  Do you recall seeing this work      12:13:12
21  paper during your '97 audit work?
22      A.  I don't recall.
23      Q.  Do you recall seeing these work
24  papers at any time other than in deposition?
25      A.  No, I don't recall.            12:13:22

Page 664

1      Q.  Do you recall yourself learning
2  that C&L did not take exception to the view
3  that the bad debt reserve at Graduate hospitals
4  or any of them was conservative?
5      THE WITNESS: I'm sorry, can you      12:13:39
6  reread that?
7      MR. JONES: Why don't we have that
8  one read back.
9      (Record read.)
10      A.  Yes.                  12:13:56
11      Q.  When did you recall learning that?
12      A.  I guess, generally speaking, as
13  part of the year-end audit I recall discussions
14  with Mr. Buettner, broadly speaking, about
15  Graduate's reserving methodology, and I don't  12:14:16
16  recall if we used the word conservative, but
17  just that they seemed reasonable.
18      Q.  Do you recall roughly when those
19  conversations took place?
20      A.  Just during year-end field work.  12:14:35
21      Q.  Would you look back at 4263 for me,
22  if you can find it there. If you can't, we'll
23  try to help you.
24      A.  I can put this one aside?
25      Can I put this one aside?        12:15:19

Page 665

1      Q.  Yes, at least for the moment. You
2  might want to just put the rubber band on top
3  of it.
4      If you look back at tick mark B,
5  the text there that we discussed a little      12:15:46
6  earlier today. Are you with me?
7      A.  Yes. I guess there's no Bates
8  number, but --
9      Q.  Yes, it's -- let's just make sure
10  we're clear for the record. It's one, two,      12:16:02
11  three, four pages into the exhibit?
12      A.  Yes.
13      Q.  It's under the Graduate system
14  restructuring schedule?
15      A.  Yes.              12:16:11
16      Q.  It, again, says that, "Prior
17  experience with the Delaware Valley entities
18  led to the 15 million dollar reserve for bad
19  debts. AHERF management believed that when the
20  DV entities were brought into the AHERF system,  12:16:25
21  the entities did not have sufficient reserves
22  on their books for bad debts.
23      "Therefore, management wanted to
24  have sufficient reserves for the Graduate
25  hospitals when they were brought into AHERF.    12:16:38

Page 666

1  AHERF management discussed this decision with
2  C&L -- with the C&L partner who agreed that a
3  reserve should be established."
4      Did I read it right?
5      A.  Yes.              12:16:52
6      Q.  In light of the fact that you and
7  Mr. Buettner spoke as a part of the due
8  diligence process or thereafter and agreed that
9  the Graduate hospitals were reserved either
10  conservatively or reasonably for bad debt, why  12:17:07
11  would anyone write this footnote?
12      MR. RYAN: Objection.
13      A.  I don't know who wrote it, but the
14  last sentence looks like someone from AHERF
15  told them that.              12:17:23
16      Q.  It also says the C&L partner
17  agreed. Is that right?
18      MR. RYAN: Objection.
19      A.  It says it in the context, though,
20  of AHERF management discussed the decision with  12:17:34
21  the C&L partner. It sounds like it's being
22  reported to someone on the team, but I don't
23  know. I don't know who wrote it or recall the
24  document.
25      MR. JONES: Why don't we break here  12:17:51

33 (Pages 663 to 666)

Amy Frazier                                                                    Volume 3

Page 691

1    Q.    So you had a difference of opinion
2  with your client here?
3    A.    It was at least a different view.
4    Q.    Let me ask you to look at the
5  Medicare or what I think is a Medicare        13:35:45
6  recapture line item.  Am I right, that the 7.1
7  million dollars in brackets beneath the 61
8  million dollar total relates to a Medicare
9  recapture?
10   A.    Yes.                                  13:35:57
11   Q.    You've written next to the words
12 "reserve for Medicare recapture, or M/C
13 recapture, may be aggressive since payor has
14 not notified the client that such money is
15 likely to be received."  Is that right?       13:36:14
16   A.    Yes.
17   Q.    Then in parentheses you've written,
18 "i.e., FAS 5 contingent gain."  What did you
19 mean to say when you wrote that last bit about
20 "i.e., FAS 5 contingent gain"?                 13:36:28
21   A.    That recording this amount on the
22 balance sheet as part of the acquisition
23 adjustments would be essentially premature to
24 record that receivable until they had been
25 notified from the payor.                       13:36:47

Page 692

1    Q.    Is FAS 5 an accounting
2  pronouncement that deals with when contingent
3  gains should be recognized?
4    A.    Not just contingent gains.
5    Q.    Among other things?                    13:37:00
6    A.    Yes.
7    Q.    That's a guidance you were
8  referring to then, a form of guidance?
9    A.    Yes.
10   Q.    Back to your note, tick mark M on     13:37:19
11 91, the page that ends with the Bates digits
12 91.  What did you mean when you wrote, "AHERF
13 has removed the cushion from Graduate and
14 transferred the cushion to other contingent
15 liabilities"?                                  13:37:36
16   A.    I don't recall specifically.  I
17 have a general understanding that I thought
18 they initially had reclassified it to
19 liabilities, but I don't recall specifically
20 the handwritten piece.                         13:37:54
21   Q.    Do you recall today what you meant
22 when you wrote "included in bad debt" in the
23 left-hand margin of tick mark M or next to tick
24 mark M on page 25991?
25   A.    Yes.                                   13:38:10

Page 693

1    Q.    What do you recall today?
2    A.    I included it in bad debt at
3  Graduate hospitals once I knew where it was
4  actually classified.
5    Q.    That does not reflect a note to you   13:38:23
6  that it was to be transferred to the Delaware
7  Valley Obligated hospitals for bad debt
8  reserves?
9    A.    No.
10   Q.    Why are you sure of that today?       13:38:31
11   A.    Because I remember going back in to
12 Dan Cancelmi and not knowing where it was in
13 contingent liabilities and asking him where it
14 was, and he said it was in bad debt for
15 Graduate hospitals.                            13:38:46
16   Q.    Did you have any reason to believe,
17 given your prior work in due diligence and
18 otherwise with respect for the Graduate
19 hospitals' bad debt reserves, that they needed
20 a sum as large as 14 million dollars for bad   13:38:57
21 debt?
22   A.    I didn't know.  I just didn't know
23 at the time when he told me how it actually was
24 incorporated in those last two months that
25 those entities were in the -- in the AHERF     13:39:13

Page 694

1  system.  So I just didn't know at the time I
2  wrote it down.
3    Q.    Forgive me, I missed part of that
4  answer.  You went and asked him and he told you
5  it was for Graduate bad debt?                  13:39:27
6    A.    That it was in Graduate bad debt.
7    Q.    If that reserve was there, why
8  would you need general reserves to cover the
9  exposure?
10        MR. RYAN:  Objection.                   13:39:53
11   A.    I wouldn't need general reserves.
12 AHERF.
13   Q.    That's what I mean, AHERF.
14   A.    Was -- my steps were to assess
15 whether or not they were general reserves       13:40:01
16 because I understood that the -- or came to the
17 understanding that the amount was essentially
18 included in the Graduate bad debt reserve
19 balance, which meant it was for the Graduate
20 bad debt, then there would be a need to         13:40:18
21 separately account for the PFMA piece as a
22 separate reserve since it was no longer
23 identified as PFMA by AHERF.
24   Q.    What do you mean by separately
25 account for?                                    13:40:33

40 (Pages 691 to 694)

Amy Frazier                                                                Volume 3

Page 695

1    A.    Just separately identify a reserve
2  for PFMA since AHERF was no longer identifying
3  a reserve for PFMA.
4    Q.    During your due diligence work or
5  at any time did you ever see an increase on any    13:41:11
6  roll-forward or other schedule on the accounts
7  receivable reserve at Graduate to reflect this
8  amount?
9    A.    I don't recall.
10   Q.    Let me show you Exhibit 72.  You've    13:41:27
11 seen this one before?
12   A.    Yes.
13   Q.    And it's got your handwriting on
14 it?
15   A.    Yes.                        13:41:36
16   Q.    It's a AHERF audit update August
17 22, 1997?
18   A.    Yes.
19   Q.    Dated that day?
20   A.    Yes.                        13:41:44
21   Q.    Do you see the line item Roman
22 numeral II, PFMA contract?
23   A.    Yes.
24   Q.    Can you read for us the words that
25 you have written in handwriting next to that    13:41:58

Page 696

1  entry?
2    A.    "Reserves recorded in SDN."  Then,
3  "Legal documentation indicates that GHS is
4  obligated."  Then below that, "Transferred
5  reserves of the books to DV."        13:42:18
6    Q.    GHS was the enterprise from whom --
7  through SDN AHERF acquired the Graduate
8  hospitals, right?
9    A.    That's correct.
10   Q.    Transferred reserves, you said it's    13:42:36
11 of the books?
12   A.    It says "of."
13   Q.    "Transferred reserves of the books
14 to DV," does that reflect that this amount of
15 reserve was being moved to the Delaware Valley    13:42:51
16 Obligated Group hospitals?
17        MR. RYAN:  You're asking her if she
18 recalled what she meant when she wrote this?
19        MR. JONES:  Yes.
20        MR. RYAN:  Or what she thinks it is    13:42:59
21 now?
22        MR. JONES:  I'm asking her if
23 that's what she meant when she wrote it.
24   A.    I don't recall what I wrote and I'm
25 not sure that's a complete -- those are each    13:43:05

Page 697

1  complete sentences or lines either, so I just
2  don't recall.
3    Q.    If you look at -- as you look at it
4  today, does that indicate to you that that's
5  what you meant, that the reserve recorded in    13:43:15
6  SDN indicated was to be transferred to the books of DV,
7  the Delaware Valley Obligated Group hospitals?
8    A.    No.
9    Q.    Why do you say that?
10   A.    Because I know I asked if there    13:43:34
11 were any other transfers and performed
12 procedures to understand if there were.  I
13 never became aware of that.
14   Q.    That's not true, is it?  I mean,
15 you became aware of other transfers?    13:43:43
16        MR. RYAN:  Objection.
17   A.    During the 1997 audit.
18   Q.    I understand that your claim has
19 been that you didn't know during the 1997 audit
20 work.  But you did become aware of other    13:43:53
21 transfers?
22        MR. RYAN:  You mean after the fact?
23        MR. JONES:  I mean at any time in
24 life after her audit work in 1997.
25        MR. RYAN:  Okay.                13:44:01

Page 698

1    A.    It's my understanding there may
2  have been, but I'm not -- I've never seen
3  anything or I'm sure of that.
4    Q.    No one's ever told you that there
5  were transfers that occurred after the first 50    13:44:13
6  million any time from the day you first walked
7  into AHERF hospitals until today?
8        MR. RYAN:  Objection.
9    A.    There's people that have told me
10 that there were, but I've never seen it myself    13:44:24
11 personally to know if that actually occurred.
12   Q.    So you've been informed of same?
13   A.    I've been informed that that might
14 be the case.  I just don't know.
15   Q.    Do you recall any discussions with    13:44:44
16 anyone at AHERF about the moving of this
17 reserve, the PFMA reserve, from the Graduate's
18 books to the books of the Delaware Valley
19 Obligated Group hospitals at any time?
20        MR. RYAN:  Objection.        13:45:00
21   A.    I'm sorry, can you repeat it or
22 reread?
23   Q.    I can repeat it.
24        Do you recall any discussions with
25 anyone at AHERF at any time about moving the    13:45:05

41 (Pages 695 to 698)

Page 763

1  payments. I remember that topic.
2       Q.    You believe that additional PATCOM
3  payments in the amount of 1 million 300 dollars
4  to have been excess in '97, you recall that?
5       A.    Yes, I do.                          15:36:14
6       Q.    Why did you think it was excess?
7       A.    I just recall that -- a description
8  somewhere that there was additional payments
9  that had been received before the end of the
10 year, and because the accounts had been written   15:36:29
11 off, they didn't take them in as directly to
12 income, essentially as a recovery of the bad
13 debt expense.
14      Q.    Did you discuss this with anyone at
15 AHERF to confirm this?                            15:36:43
16      A.    I don't recall.
17      Q.    Did you discuss it with anyone on
18 the C&L engagement team?
19      A.    Yes.
20      Q.    With whom?                            15:36:51
21      A.    I remember sharing it with
22 Mr. Buettner and I remember talking to Kristen
23 Heinlein about it.
24           MR. RYAN:  All done with that
25 exhibit just so Miss Frazier can reassemble it?   15:37:28

Page 764

1           MR. JONES:  I believe so.  Why
2  don't you hold on to it for a moment.
3       Q.    If you look back at 1070 just for a
4  moment.
5           Is the collection issue you just     15:37:43
6  referred to reflected on the two-page schedule
7  of Mr. Buettner we were discussing before the
8  break?  I'm going to direct you to 877 in the
9  hope that I'm right that that's where it shows
10 up.                                              15:37:57
11      A.    I mean, that appears to correlate
12 to the topic, yes.
13      Q.    That entry you're referring to is
14 the SCHC collection of 1 million dollars?
15      A.    Yes.                                 15:38:11
16      Q.    That correlates, but you don't know
17 with certainty that's what he's referring to,
18 is that fair?
19      A.    Obviously these are his notes that
20 he wrote, but I remember discussing the topic    15:38:17
21 with him.
22      Q.    Thank you.
23           Do you know what he meant when he
24 included a legal reserve G slash L of 1.7
25 million dollars on that same page?               15:38:33

Page 765

1           MR. RYAN:  Does she know as she
2  sits here today?
3           MR. JONES:  Yes.  I'm sorry.
4       A.    I recall the topic of legal
5  reserve.  I don't know necessarily what he       15:38:53
6  wrote.
7       Q.    What do you recall, if at all,
8  about the topic of legal reserve?
9       A.    There was a schedule that AHERF had
10 that identified certain reserves as legal         15:39:07
11 reserves and they were for receivables that had
12 been -- that might go into litigation on
13 collections but that they were old receivables
14 or accounts that actually had been written off
15 and that it was really excess reserves.           15:39:31
16      Q.    That was an impression you had
17 anyway?
18      A.    My understanding of that legal
19 reserve, yes.
20      Q.    Do you know who you spoke -- did     15:39:38
21 you speak with anybody at AHERF about the legal
22 reserve?
23      A.    Well, I recall seeing it on some
24 document, but I just -- I don't remember who I
25 spoke to.                                         15:39:49

Page 766

1       Q.    Do you recall speaking about it
2  specifically with Mr. Buettner in these two or
3  three meetings that may have led to this
4  schedule you have before you?
5       A.    I don't recall.                      15:39:56
6       Q.    Humor here that only people working
7  on this case could find.
8           Miss Frazier, I'm handing you now a
9  binder clip, I believe is the way this was
10 probably maintained, it may not have been, I'm   15:40:30
11 sure you'll know better than me, but that at
12 least has a face page that is marked as A slash
13 R, W slash P's, A slash R, review of '97 during
14 FY '98.  We're going to mark it new in this
15 case.
16           - - - - -
17           (Thereupon, Deposition Exhibit 4446
18           was marked for purposes of
19           identification.)
20           - - - - -                            15:40:55
21      Q.    It's Exhibit 4446.  Have you seen
22 this document before or this set of documents
23 before if you -- after you take a chance to
24 look through it?
25      A.    I don't recall if I saw this first   15:41:18

58 (Pages 763 to 766)

Page 767

1  page, but something that represents the binder
2  cover.  I mean, I recall there was a binder
3  that had that title and had information in it,
4  but without seeing the originals, I just --
5      Q.  Look with me --                15:41:48
6      A.  -- don't know.
7      Q.  I'm sorry.
8          Look with me on page CL138440,
9  which is the second page of the exhibit.
10     A.  Yes.                           15:42:00
11     Q.  In the upper right-hand corner, my
12 copy may not be wonderful, but under the
13 heading contents, I think I read A slash R
14 review something during fiscal year '98 in your
15 handwriting.  Is that right?            15:42:11
16     A.  Yes.
17     Q.  You referred earlier in your
18 testimony today to a review binder or a review
19 that was undertaken of '97 A/R matters in '98.
20         Do you recall that?            15:42:34
21     A.  That's correct.
22     Q.  You did such a thing or were
23 involved in it, is that right?
24     A.  I was involved with some effort to
25 look at that, yes.                      15:42:35

Page 768

1      Q.  Who was involved in that effort
2  with you, if anyone, other than Mr. Buettner?
3      A.  When in '98?
4      Q.  Whenever you did it.
5      A.  When I physically was doing this   15:42:47
6  work?
7      Q.  Yes.
8      A.  I believe Ann Cuthbert assisted
9  with some information.  I recall Marne Betta
10 assisting with gathering some information.  I   15:43:04
11 don't know, there may have been others who were
12 helping, I just don't recall, as I sit here
13 today.
14     Q.  Was Mr. Buettner involved?
15     A.  Yes.                           15:43:17
16     Q.  Let me ask you to look in
17 particular here at pages 468 through 70.
18         Do you recognize these set of
19 pages?
20     A.  Yes.                           15:43:58
21     Q.  What do you recognize them to be?
22     A.  A summary that I had prepared in
23 preparation for a meeting.
24     Q.  For what kind of a meeting were you
25 preparing this summary?                 15:44:10

Page 769

1      A.  To meet with AHERF, to -- members
2  of AHERF to discuss an assertion that was made
3  at an audit committee meeting regarding
4  reserves.
5      Q.  What was the assertion that you     15:44:22
6  understood you were about to meet about?
7      A.  I'm not sure I really ever
8  understood what the assertion was, just that
9  there may have been some additional reserve
10 amounts.  I don't know if it was transferred or   15:44:39
11 what.  And that there was three different
12 numbers at some point that were being thrown
13 around.
14     Q.  When you say additional, you mean
15 beyond the 50 million set we've discussed     15:44:48
16 today?
17     A.  Presumably, but the facts were so
18 unclear at that point.
19     Q.  What were the three numbers that
20 you remember being discussed?           15:45:01
21     A.  I remember 114, a 99 and a 101.
22 That was from all different sources at AHERF.
23     Q.  Who do you recall hearing the
24 numbers from?
25     A.  I remember one number coming from   15:45:21

Page 770

1  the audit committee meeting that Mr. Buettner
2  went to.  I don't remember which number that
3  one was.  It was either the 114 or 101.
4          And then I remember -- I just don't
5  recall as I sit here today.  But -- and then I   15:45:41
6  remember some number from Mr. Adamczak and some
7  number from Mr. Cancelmi.
8      Q.  You don't recall which one either?
9      A.  Not as I sit here today.  I'm sure
10 I've testified before about it, but I don't    15:46:00
11 know today, as I sit here, who said which ones.
12     Q.  Did you understand these to be
13 total numbers of reserve transfers as opposed
14 to an additive of the 50 million?
15     A.  I had no idea what they were even    15:46:13
16 talking about.
17     Q.  Who asked you to do the work that
18 you did?
19     A.  Mr. Buettner after he returned from
20 the audit committee meeting.             15:46:23
21     Q.  He's the one that told you about an
22 audit committee meeting at which some number of
23 100 million or more was discussed?
24     A.  Yes.
25     Q.  And what work did he ask you to do?   15:46:33

# DEPOSITION ERRATA SHEET

RE:    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION AND RESEARCH FOUNDATION v. PRICEWATERHOUSE
COOPERS, LLP

I, Amy Susan Frazier, make the following corrections, additions, or deletions to the transcript of
my deposition, taken on June 8-10, 2004, for the following reasons. By my signature below, I
authorize you to attach this errata sheet to the transcript.

| Page: Line | Change | Reason |
|---|---|---|
| 3:11, 263:11-12, 540:12-13 | "Schulte, Roth & Zabel, LLP" should be "Schulte Roth & Zabel LLP" | Error |
| 17:16, 19:1 | "Janet" should be "~~Genatte~~  *Jeanetteau*" | Error |
| 35:19 | "one" should be "done" | Error |
| 40:23 | "I know" should be "no" | Error |
| 48:13, 49:9 | "perspecitve" should be "prospective" | Error |
| 59:6 | "provide" should be "provide," | Error |
| 59:7 | "a specialist in 1997 of Duane Girol to look at" should be "a specialist in 1997—Duane Girol—to look at" | Clarification |
| 90:16 | "are" should be "aren't" | Error |
| 97:25 | "are" should be "is" | Clarification |
| 114:16 | "bind" should be "binder" | Error |
| 114:17 | "class environment" should be "CLASS environment--" | Error |
| 234:5 | Insert "as I sit here today my understanding is" after "and" | Clarification |
| 235:20 | Insert "discussions of" after "versus" | Clarification |
| 238:9 | "intercompany's" should be "intercompanies" | Error |
| 290:4, 544:3, 549:4, 705:10, 803:7 | "Calosheski" should be "Kaliszewski" | Error |
| 290:23 | "CRA's" should be "CRAs" | Error |
| 294:13 | "Calosheski's" should be "Kaliszewski's" | Error |
| 316:6 | "contract" should be "contractual" | Error |
| 317:6, 385:19, 391:13, 393:23 412:20 | "Lyden should be "Lydon" | Error |
| 334:4 | "length" should be "link" | Error |
| 367:17 | "No" should be "No, I do not know of any such meeting" | Clarification |

2

| Page: Line | Change | Reason |
|---|---|---|
| 445:16 | Insert "about the accuracy of the accounting" after "unsure" | Clarification |
| 456:25 | "nor were" should be "nor were we" | Error |
| 462:8 | "reference" should be "a reference" | Error |
| 478:18 | "Supposedly," should be "Apparently," | Clarification |
| 489:7 | "affect" should be "effect" | Error |
| 552:7 | "review," should be "review" | Error |
| 547:21 | "reading" should be "rating" | Error |
| 569:21 | Remove "don't" | Error |
| 597:25 | "Absolutely not." should be "I absolutely did not learn of the transfers at that meeting." | Clarification |
| 678:5 | "I referred" should be "I must've referred" | Error |
| 723:2 | "of" should be "rev" | Error |
| 725:1 | "his" should be "Mr. Buettner's" | Clarification |
| 730:11 | "They're" should be "There are" | Error |
| 744:7 | "tentative, the" should be "'tentative'. The" | Error |
| 772:11 | "are" should be "our" | Error |
| 775:6, 776:10 | "Schafer" should be "Schaffer" | Error |
| 806:25 | "your" should be "our" | Error |
| 818:15 | "Eric" should be "Erica" | Error |

I have read the transcript of my deposition taken June 8-10, 2004 and swear that, with the above changes, the transcript is true and correct.

_Amy S. Frazier_
Amy S. Frazier

_7-16-04_
Date

Sworn to before me
This _11th_ day of July, 2004

_Notary signature_
Notary Public

Notarial Seal
Deborah M. Dundon, Notary Public
Phoenixville Boro, Chester County
My Commission Expires Mar. 24, 2007

Gilbert Dep.

SUSAN GILBERT

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA

2                        - - - -

3     THE OFFICIAL COMMITTEE OF        )
4     UNSECURED CREDITORS OF           )
      ALLEGHENY HEALTH, EDUCATION &    )
5     RESEARCH FOUNDATION,             )
                                       )
6            Plaintiff,                )
                                       )
7              -vs-                    )    Civil Action
                                       )    No. 00-684
8     PRICEWATERHOUSECOOPERS, L.L.P.   )
                                       )
9            Defendant.                )
10
                         - - - -
11
                      VIDEO TAPE
12          DEPOSITION OF:  SUSAN GILBERT
13                       - - - -
14
                 DATE:    September 24, 2002
15                        Tuesday, 8:58 a.m.
16
                 LOCATION: MANION McDONOUGH & LUCAS
17                         14th Floor, USX Tower
                           Pittsburgh, PA  15219
18                         412-232-0200
19
                 TAKEN BY:  Defendant
20
21               REPORTED BY:  Claire Gross, CRR, RDR
                              Notary Public
22                            AKF Reference No. Cg72085
23
24
25

SUSAN GILBERT

Page 150

```
1        financial information. Upon reconsideration,
2        our accountants are in agreement with us. Do
3        you see that?
4    A.   I do.
5    Q.   Do you know whether anyone from Foley &
6        Lardner spoke with anyone from Coopers &
7        Lybrand before sending AHERF this draft
8        letter to see whether upon reconsideration
9        Coopers & Lybrand was in agreement with that
10       interpretation of the bond documents?
11   A.   I don't know.
12   Q.   Did you ever speak to anyone from Coopers &
13       Lybrand to ask them whether they had a view
14       as to whether that financial statement
15       presentation complied with the provisions of
16       bond documents?
17   A.   I don't recall.
18   Q.   Do you know whether any of your colleagues in
19       the treasury department at AHERF ever spoke
20       to Coopers & Lybrand about that?
21   A.   I don't recall.
22   Q.   Let me show you what's been previously marked
23       as Exhibit 418. Exhibit 418 is multiple
24       copies of very similar letters followed by a
25       draft version of the financial statements.
```

Page 151

```
1        Do you see that the signed
2        October 22, '97 letters from Michael Martin
3        in Exhibit 418 are virtually identical to the
4        draft letter in the fax from Becky Serafini
5        of Foley & Lardner marked as 416?
6    A.   Uh-huh.
7    Q.   That was this one right here.
8    A.   Right.
9    Q.   Does it appear that the AHERF treasury
10       department followed Foley & Lardner's counsel
11       in terms of the form of the letter to send to
12       the various creditors?
13       MR. HAMILTON:  Object to form.
14   A.   Yes, it appears that way.
15   Q.   And this letter or these various letters in
16       Exhibit 418 were created in a computer file
17       on a directory under your name; is that
18       right?
19   A.   Yes.
20   Q.   Were you involved in the preparation of these
21       letters?
22   A.   Well, it was under my directory, but it
23       appears that Addie Saleik typed it for Mike.
24       It was just housed within my directory.
25   Q.   You're looking at the typist's initials, AMS?
```

Page 152

```
1    A.   Right.
2    Q.   Do you know whether before sending out this
3        October 22, 1997 letter to the various
4        creditors anyone from AHERF or from Foley &
5        Lardner consulted with Coopers & Lybrand to
6        see whether they were in agreement with
7        what's stated in the third paragraph of the
8        letter?
9    A.   I don't know.
10   Q.   Let me show you what's previously been marked
11       as Exhibit 419. Exhibit 419 is a December 1,
12       '97 letter from Mr. Zimmerman to David
13       McConnell; is that right?
14   A.   Yes.
15   Q.   And you and Mr. Martin are copied on the
16       third page; right?
17   A.   That's right.
18   Q.   Your understanding is this the opinion letter
19       from Foley & Lardner where Foley & Lardner
20       formally advised AHERF that the presentation
21       of financial statements based on the
22       consolidated audit only complied with the
23       bond documents?
24   A.   I did not read it yet.
25   Q.   Okay. Why don't you -- why don't do you
```

Page 153

```
1        that?
2    A.   (Witness reviews document.)
3        MR. RYAN:  Could you read back the
4        question, please, Claire?
5        - - - -
6    (The record was read back by the Reporter.)
7        - - - -
8    A.   As it related to the annual reporting only?
9    Q.   Yes.
10   A.   Yes. I believe this is related to that, yes.
11   Q.   So my question, I suppose, is this, in going
12       ahead and sending to external parties the
13       1997 audited financial statements which were
14       based on consolidated audits only rather than
15       separate audits of the individual obligated
16       groups, was AHERF relying upon this formal
17       opinion from Foley & Lardner marked as
18       Exhibit 419?
19   A.   Well, the letter that goes out to the other
20       parties predates this letter; right?
21   Q.   Well, that's a letter that attaches draft
22       financial statements; right?
23   A.   Yes. These are draft reports, right.
24   Q.   Let me ask the question this way, is it the
25       case that during this time frame in the fall
```

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 154

1    of '97 -- maybe even earlier in '97 -- there
2    were some discussions about whether the
3    format of the consolidated-only financial
4    statements would comply with various bond
5    document provisions; is that right?
6  A.    Yes.
7  Q.    Now, Foley & Lardner were AHERF's bond
8        counsel; right?
9  A.    They were actually hospital counsel.
10 Q.    They were bond counsel for the various
11       obligated groups?
12           MR. HAMILTON:  Object to form.
13 Q.    I'm perhaps confused by the term hospital.
14 A.    They represented -- they were the
15       university's counsel for debt issues, but I
16       believe that Ballard Spahr was bond counsel
17       for the transactions.
18 Q.    In any event, Foley & Lardner was the law
19       firm that AHERF was consulting on this issue?
20 A.    Yes.  That's right.
21 Q.    And Foley & Lardner had considerable
22       expertise in healthcare bond matters; right?
23 A.    Yes.
24 Q.    And was it your understanding that in
25       reaching the conclusion that this financial

Page 155

1    statement presentation complied with the bond
2    documents, that AHERF was relying on the
3    legal opinion of Foley & Lardner?
4  A.    Yes.
5  Q.    If Foley & Lardner had said, no, it's no good
6        like this, AHERF would have had to do
7        something different; correct?
8           MR. HAMILTON:  Object to form.
9  A.    Yes.
10 Q.    On this issue about compliance with these
11       bond documents as a legal matter, in your
12       understanding AHERF was not relying upon its
13       auditors from Coopers & Lybrand, were they?
14           MR. HAMILTON:  Object to form.
15 A.    No.
16 Q.    Foley was the one who was providing the legal
17       opinion?
18 A.    Yes.
19           MR. HAMILTON:  Object to form.
20           MR. RYAN:  Let me mark, please, as
21       Exhibit 646 a one-page document with Bates
22       number PR-DLC-16002805.
23           - - - -
24           (Deposition Exhibit 646 marked for
25       identification.)

Page 156

1           - - - -
2  BY MR. RYAN:
3  Q.    Is Exhibit 646 an E-mail that you sent to
4        Mike Martin, Angela Maher and Kelly Mertz on
5        December 19, '97?
6  A.    Yes.
7  Q.    And you are updating them on several items
8        that you had discussed with Becky Serafini of
9        Foley & Lardner; right?
10 A.    Yes.
11 Q.    In item 1 you state AHERF is required to
12       deliver the SMDR by December 31 even if the
13       attached financial statements are unaudited.
14       Is that something that Becky Serafini told
15       you?
16 A.    I do not recall.
17 Q.    Is that the type of thing that you would
18       conclude on your own, or is that something
19       that you would get advice from Becky
20       Serafini?
21 A.    I probably discussed it with Becky, yes.
22 Q.    And the SMDR is the secondary market
23       disclosure report?
24 A.    Yes.
25 Q.    The next sentence states, We must then

Page 157

1    resubmit to the dissemination agent when the
2    audit is complete.  Who was the dissemination
3    agent?
4  A.    I do not know.
5  Q.    Let me skip down to item 5.  You see there
6        you refer to Moody's verbal downgrade on DVOG
7        nonpublic rating to noninvestment grade per
8        MPM.  Do you see that?
9  A.    I do.
10 Q.    Is that a reference to the fact that Mike
11       Martin had told you that in a conversation
12       with Moody's they had told him that Moody's
13       had downgraded the shadow rating to a
14       noninvestment grade or junk bond rating?
15 A.    Yes.  That's what it appears to read.
16 Q.    And then skipping one sentence it then says,
17       Becky and Bob will review this topic further
18       and let us know of their position whether to
19       disclose or not.  Do you see that?
20 A.    Yes.
21 Q.    Is the issue there that you were discussing
22       with Ms. Serafini whether AHERF had to
23       disclose this downgrade on the nonpublic bond
24       rating in the secondary market disclosure
25       report?

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 178

1 Graduate Health System before the affiliation
2 with AHERF?
3 A.   Well, that's what I was questioning when you
4 say before the affiliation. I have no
5 recollection of a timeline here.
6 Q.   Okay. At any rate, we can agree that the
7 covenant noncompliance is for fiscal year '95
8 for Zurbrugg, which had a December 31 year --
9 would be as of December 31, '95; is that
10 right?
11 A.   Yes.
12 Q.   And Ernst & Young was then retained to
13 prepare this consultant's report; is that
14 right?
15 A.   Apparently, yes.
16 Q.   Do you recall whether the master trustee for
17 the Zurbrugg bonds accepted the Ernst & Young
18 consultant's report to cure the covenant
19 violation?
20 A.   I don't know who the master trustee was. I
21 don't know.
22 Q.   I think earlier we saw a reference to Maria
23 Eisen from the Bank of New York?
24 A.   Bank of New York. Okay. You're right. It
25 was Bank of New York. Whether or not they

Page 179

1 accepted this?
2 Q.   Yes.
3 A.   I don't know.
4 Q.   Do you recall that the Graduate acquisition
5 was done in two stages with a company called
6 SDN, Inc. being used at an intermediate
7 stage?
8       MR. HAMILTON: I will object to
9 form.
10 A.   What are the two stages?
11       MR. HAMILTON: I'm going to object.
12 Q.   Do you recall --
13 A.   I remember the SDN definitely.
14 Q.   I'll ask you what you can remember about the
15 role of SDN, Inc. in the Graduate
16 acquisition?
17 A.   I remember the SDN name. I don't know.
18 That's what I was alluding to. I'm not
19 certain what the first and second step was.
20       MR. RYAN: Okay. Since it's now
21 4:00, why don't we break here for the day,
22 and we'll pick up here tomorrow morning.
23       THE VIDEOGRAPHER: We are now going
24 off the record. The time on the screen is
25 3:59.

Page 180

1       - - - -
2 (The proceedings were adjourned at 3:59 p.m.)
3       - - - -

Page 181

1 COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2 COUNTY OF ALLEGHENY      )  SS:
3    I, Claire Gross, RDR, a Court Reporter and
4 Notary Public in and for the Commonwealth of
5 Pennsylvania, do hereby certify that the witness,
6 SUSAN GILBERT, was by me first duly sworn to testify
7 to the truth; that the forgoing deposition was taken
8 at the time and place stated herein; and that the
9 said deposition was recorded stenographically by me
10 and then reduced to printing under my direction, and
11 constitutes a true record of the testimony given by
12 said witness.
13    I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17    I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21    IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 25th day of
23 September, 2002.
24 _____
25         Notary Public

46 (Pages 178 to 181)

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 182

```
1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY          )   S H E E T
2
        I, SUSAN GILBERT, have read the foregoing pages
3   of my deposition given on Tuesday, September 25,
    2002, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21  _____
            SUSAN GILBERT
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
        Notary Public
25      AKF Reference No. Cg72085
```

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 354

1            IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF PENNSYLVANIA

2                          - - - -

3
     THE OFFICIAL COMMITTEE OF        )
4    UNSECURED CREDITORS OF           )
     ALLEGHENY HEALTH, EDUCATION &    )
5    RESEARCH FOUNDATION,             )
                                      )
6            Plaintiff,               )
                                      )
7              -vs-                   )    Civil Action
                                      )    No. 00-684
8    PRICEWATERHOUSECOOPERS, L.L.P.   )
                                      )
9            Defendant.               )
10

11                         - - - -

                           VIDEO TAPE
12        DEPOSITION OF:  SUSAN GILBERT
13                     VOLUME III
14                         - - - -
15

                DATE:     September 26, 2002
16                        Thursday, 8:02 a.m.
17
                LOCATION:  MANION McDONOUGH & LUCAS
18                         14th Floor, USX Tower
                           Pittsburgh, PA  15219
19                         412-232-0200
20
                TAKEN BY:  Defendant
21
22              REPORTED BY:  Claire Gross, CRR, RDR
                              Notary Public
23                            AKF Reference No. Cg72148
24
25

SUSAN GILBERT

Page 519

1   performing the short-term indebtedness
2   cleanup calculation required by the DVOG
3   Master Trust Indenture would only include the
4   letter of credit borrowings and reduce those
5   to the levels required by that provision but
6   not reduce the payables to affiliates as part
7   of that calculation?
8       MR. RYAN:  Objection.
9   A.   That appears to be how my message reads, but
10      from these notes here I can't provide any
11      substantive information as to why that was
12      the decision, if it was, in fact, the
13      decision.
14  Q.   And just so we close the record on this, do
15      you have any recollection at all of that
16      conversation with Mr. Kirstein?
17      MR. RYAN:  Is it Kirstein?
18      MR. HAMILTON:  I believe it's
19      Kirstein.
20      MR. RYAN:  Excuse me, Mr. Kirstein.
21  A.   No, I do not recall.
22  BY MR. HAMILTON:
23  Q.   Do you have any recollection of how you
24      came -- how you acquired this information
25      that you transmitted to Mr. Kirstein?

Page 521

1   covenant?
2       MR. RYAN:  Objection.
3   A.   I don't know.
4   Q.   Did you have an understanding as to whether
5       or not Coopers & Lybrand would be reviewing
6       for accuracy AHERF's calculations of its
7       compliance with its debt covenants under the
8       DVOG master trust indenture?
9   A.   Yes.  They typically did that on year-end
10      audits, so from a compliance standpoint, as I
11      mentioned earlier, that would have been why
12      they would have been concerned.
13  Q.   On the 6-25 note I'm confused a little bit.
14      Maybe you can help me, maybe not.  The note
15      said, I believe you said, services provided
16      by all or certain Delaware Valley affiliates.
17      Are those supposed to be services that are
18      provided to the Delaware Valley affiliates or
19      by the Delaware Valley affiliates?  Strike
20      that.  That's a bad question.
21      Let me ask it this way.  If AHERF
22      were to pay for a Delaware Valley affiliate's
23      fringe benefits or malpractice insurance or
24      administrative support expense, would that
25      payment be recorded as on the Delaware Valley

Page 520

1   A.   Not from this information presented here.
2   Q.   You don't have any independent recollection?
3   A.   No.
4   Q.   Do you have any understanding as to why you
5       were transmitting this information to
6       Mr. Kirstein?
7   A.   Possibly as a follow-up to his earlier
8       letter.
9   Q.   And you're referring to Exhibit 698, the
10      June 18, '96 letter?
11  A.   Yes.
12  Q.   Do you have any understanding as to why
13      Coopers & Lybrand would want to know this
14      information that you're giving them?
15  A.   Probably because the number had grown to a
16      size that was somewhat substantial, and I
17      guess just generally from a compliance
18      standpoint.
19  Q.   By the number, you mean the intercompany
20      payable that was on DVOG's -- the DVOG
21      entities' books to the West?
22  A.   That's right.
23  Q.   Why do you believe Coopers & Lybrand would be
24      concerned about how that would affect your
25      compliance with the short-term indebtedness

Page 522

1   entities' books as a payable to an affiliate?
2   A.   I don't know if these two notes here are
3       directly related.  Is that your point?
4   Q.   Well, that's where I'm going with it, yes.
5   A.   I was trying to figure out the connection
6       between these two.  They might be just two
7       separate questions.
8   Q.   Before I tie it back to the notes, let me
9       just ask the question again.  If AHERF pays a
10      fringe benefit expense on behalf of
11      Hahnemann, and it's paid out of AHERF funds,
12      is it your understanding that the amount of
13      that payment would be recorded on Hahnemann's
14      accounting records as a payable to
15      affiliates, a payable to AHERF?
16  A.   Are you saying that it would reduce the
17      intercompany?
18  Q.   At this point I'm just asking you if the
19      payment made by AHERF on behalf of Hahnemann
20      would be recorded on Hahnemann's books as a
21      payable to AHERF or a payable to an
22      affiliate?
23  A.   Possibly, but this is not my area of
24      expertise, and I don't know for certain how
25      it would be handled.

SUSAN GILBERT

Page 523

1  Q.    Are the fringe benefits and malpractice
2       insurance and administrative support and
3       teaching notations you have there examples of
4       normal routine operating expenses that you
5       made a note of just above?
6  A.    I do not know. I don't know if the two notes
7       are related.
8  Q.    I want to ask you one more question about
9       Exhibit 701 which before we had looked at
10      solely because of the Bates stamp range, and
11      that's the fax cover page from Amy Frazier at
12      Coopers to you.
13           Again, we don't have, at least in
14      this Bates stamp range, the attachment to
15      this cover page. You see a number of pages
16      it indicates two pages.
17 A.    Yes.
18 Q.    Do you have any idea what was attached to
19      this cover page?
20 A.    There is no date on it either?
21 Q.    Well, up here the fax header has been cut off
22      on the copy. I've been unable to put a date
23      on it.
24 A.    I mean, it might be the Mark Kirstein letter
25      which she would have sent it under her name.

Page 524

1  Q.    Yes. Okay. All right. Okay. If you look
2       at Exhibit 698, which is the Kirstein letter,
3       you see up at the top right in the fax header
4       Exhibit 701, the cover page says page 1;
5       right?
6  A.    Yes.
7  Q.    And on 698, which is the Kirstein letter,
8       which is also sort of cut off in the left on
9       the far right it appears to be page 2. That
10      would be consistent with your thought that
11      this might have been the attachment?
12 A.    Sure.
13 Q.    Got you. Were you involved in the
14      preparation of management investment reports?
15 A.    The investment reports, yes.
16 Q.    Yes.
17 A.    I was.
18 Q.    When did you first become involved in
19      preparing the investment reports?
20 A.    After I had been on board for a short time,
21      maybe like a year or so.
22 Q.    Did there come a time -- when you first
23      became involved, were you involved or were
24      you the one that actually created the report?
25 A.    What do you mean created it? We basically

Page 525

1       used the prior quarter and then just updated
2       it.
3  Q.    Who was responsible for doing that?
4  A.    I would say I was.
5  Q.    Did there come a time when you delegated that
6       responsibility to Ms. Mertz?
7  A.    Yes.
8  Q.    Do you remember approximately when that was?
9  A.    No.
10 Q.    If I can show you what we are going to mark
11      as Exhibit 706.
12           - - - -
13           (Deposition Exhibit 706 marked for
14      identification.)
15           - - - -
16 BY MR. HAMILTON:
17 Q.    Exhibit 706 is a document which bears the
18      Bates stamp JD-MM-003495 consecutively -- not
19      consecutively -- 3495, 3497, 3499 and 501.
20      It appears we are missing every other page
21      because it probably was a two-sided original
22      that was photographed missing every other
23      page. Do you recognize this document,
24      Ms. Gilbert?
25 A.    Yes.

Page 526

1  Q.    What is this document?
2  A.    This document is a quarterly report that was
3       presented at or was made a part of the
4       package presented to the investment committee
5       board of trustee members.
6  Q.    Is this an example of the investment reports
7       that we were talking about?
8  A.    Yes.
9  Q.    As of this report, March 31, '96, is this a
10      report that you had delegated the initial
11      responsibility for preparing to Ms. Mertz?
12 A.    I'm not certain of the exact time frame.
13 Q.    Now, if you look at the tables that are on --
14      you have on the page in big print 77 at the
15      top right-hand corner, the first tables
16      represent the allocation of AHERF investment
17      funds by entity. Do you see that?
18 A.    Yes.
19 Q.    And under AGH there is the total written
20      above the bar graph of 162,706 which I think
21      is a reference to 162 million; is that
22      correct?
23 A.    Yes.
24 Q.    Does that figure -- what does that figure
25      represent?

MANHATTAN REPORTING CORP., a LegaLink Company

A. Let's see here. It appears that pension is included in this allocation, so that would include AGH's pension plan and nonpension investable assets which would be endowment funded depreciation and special purpose.
Q. And then if we look at the third one, Allocation by Portfolio, you see the second bar graph is labeled Funded Depreciation. Do you see that, the bottom?
A. Yes.
Q. And there is a number of 157,657,000. Do you see that?
A. Yes.
Q. What does that represent?
A. That would represent total funded depreciation market value systemwide.
Q. For all the AHERF entities?
A. Yes.
Q. If we turn -- can't do it on this one. All right. Let's mark this one as the next one 707.
----
(Deposition Exhibit 707 marked for identification.)
----

BY MR. HAMILTON:
Q. The court reporter has handed you, Ms. Gilbert, Exhibit 707, which has the same problem of being every other page, I believe. It has the Bates stamp JD-MM 0003536, 3538, and 3540. Is this a copy of the investment report for the next quarter, September 30, '96?
MR. RYAN: Objection.
A. The June quarter would have fallen between the two.
Q. My fault. That's right.
A. I mean, when you had said earlier that I had delegated this effort to Kelly Mertz, I mean, I also played a part in the development of this.
Q. Okay. And if you look to the second page of this exhibit, under the bar graph or allocation of entity by AGH, it shows 160,479,000 for funds invested for AGH; is that correct?
A. That's correct.
Q. Again that includes the funded depreciation at AGH and pension and some other funds?
A. Right.

Q. And then down at the bottom on allocation by portfolio there is a total figure of 147,623 for funded depreciation accounts systemwide?
A. Yes.
MR. HAMILTON: We'll mark this one as the next exhibit.
----
(Deposition Exhibit 708 marked for identification.)
----
BY MR. HAMILTON:
Q. The court reporter has handed you what's been marked as Exhibit 708. This time we fixed the problem, Ms. Gilbert. It appears to be the entire document that bears the Bates stamp GOV 58499 consecutively to 58506. Is this the investment report ending December 31, '96?
A. Yes.
Q. And on this one you turn the page to 38, the allocation tables.
A. Uh-huh.
Q. The first table is allocation by entity and it indicates for AGH total investments of 193,742. Do you see that?

A. I do.
Q. Down at the bottom, although the photocopy is cut off at this point, the amount for funded depreciation systemwide is 180,480,000; right?
A. Yes.
Q. Now, if you turn to page 40 -- let's start with 39. On page 39 there is a heading Roman V Performance Results. Do you see that?
A. I do.
Q. If you flip the page you get the box for Funded Depreciation Pittsburgh Only?
A. Yes.
Q. And you understand that to mean the funded depreciation accounts in this box of AGH?
A. Yes.
Q. And it indicates under the column of One Year Ending 12-31-96 a percentage of 9.9 percent. Do you see that?
A. Yes.
Q. What does that figure represent?
A. That represents the net performance return on the AGH entire portfolio across the three accounts for the one-year period ending

SUSAN GILBERT

Page 531

1    12-31-96.
2  Q.   And when you say a performance return, what
3    does that mean?
4  A.   The performance return would be a combination
5    of interest income, dividend income, realized
6    gains and losses and the unrealized component
7    as well, unrealized gain or loss.
8  Q.   How did you derive that figure, 9.9 percent?
9  A.   That was actually computed by outside
10    consultants.
11  Q.   How did they compute it?
12  A.   What they did was they based their return
13    information on the trust accounts that were
14    supplied to them by Mellon, and they would
15    have computed quarterly return for the
16    portfolio and basically strung the four
17    quarter returns together to arrive at the
18    9.9.
19  Q.   And so this 9.9 percent return on the AGH
20    funded depreciation, does that relate then in
21    some way to the bar graph on page 38 for the
22    AGH invested funds?
23  A.   Yes.
24    MR. RYAN:  Objection.
25  Q.   How does it relate?

Page 532

1  A.   Well, first of all, in the AGH funded
2    depreciation, that's where there was a note
3    receivable, I believe, embedded in the funded
4    depreciation total, and the performance
5    return information that is presented on this
6    page 40 would be the components that I had
7    just recited based upon the actual dollars
8    held in those respective trust accounts as
9    opposed to inflating it by that note
10    receivable.
11  Q.   So on page 38, under AGH, the bar graph under
12    allocation of entity by 193 million, that
13    number includes not only the amount of money
14    that was actually still in the funded
15    depreciation account as of 12-31-96 at AGH
16    but also the money that had been taken out of
17    the funded depreciation account and spent in
18    the East and was recorded as a note
19    receivable on AGH books; is that right?
20    MR. RYAN:  Objection.
21  A.   The 180 at the bottom, which is actually
22    the -- well, that would be funded
23    depreciation systemwide.  But, yes, if you
24    look at the AGH number here, I believe that
25    the note receivable was in there.  I don't

Page 533

1    know what the size of it would have been at
2    that time, but that's where the location of
3    it was, and David McConnell had wanted that
4    included in those balances presented.
5  Q.   Now, the 9.9 percent return figure for the
6    AGH funded depreciation doesn't apply to the
7    funds that had been transferred and spent in
8    the east; is that right?
9  A.   That's right.
10  Q.   Is that fact indicated anywhere on this
11    investment report?
12  A.   I'm not certain if it's included in this one,
13    but at one particular date that particular
14    message began to be included in this report,
15    but I don't have a firm idea on timeline, and
16    I believe it was at Joe Dionisio's request to
17    make that statement.  Not so much in the
18    AHERF report, but possibly in the AGH report.
19    MR. HAMILTON:  Mark this one.
20    - - - -
21    (Deposition Exhibit 709 marked for
22    identification.)
23    - - - -
24  A.   Do you want this back?
25  Q.   Yes.  I need to see it.  Okay.  Exhibit 709,

Page 534

1    Ms. Gilbert, has the Bates stamp GOV 58034
2    consecutively through 43 -- it's not
3    consecutively.  All right.  34, 35, 36, 37,
4    and there is three pages missing, and then
5    40, 41, 42, and 43.  Can you tell me what
6    this document is?
7  A.   This is another quarterly management report
8    on investments for the quarter ended
9    March 31, '97, to the AHERF investment
10    committee.
11    MR. HAMILTON:  Mark that as 710.
12    - - - -
13    (Deposition Exhibit 710 marked for
14    identification.)
15    - - - -
16  BY MR. HAMILTON:
17  Q.   Ms. Gilbert, the court reporter has handed
18    you what's been marked as Exhibit 710 --
19  A.   Yes.
20  Q.   -- which has the Bates stamped JD-DMC-0011289
21    consecutively through 0011300.  What is this
22    document?
23  A.   This is a memo from Angela Maher to Tony
24    Sanzo and Joe Dionisio for the Western Region
25    Resource Management Committee meeting.

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 535

1  Q.    What is attached to the memo?
2  A.    What is attached is the investment report on
3        AUH West as of September 30, '97.
4  Q.    And the date that this was transmitted by
5        Ms. Maher to Mr. Sanzo and Dionisio is
6        January 27, '98?
7  A.    That's correct.
8  Q.    And so this is an example of the investment
9        reports for not AHERF but the Western Region?
10 A.    That's right.
11 Q.    And if you look at the page that has the
12       tables on it, the pie charts which has the
13       Bates stamp 11294, and if you look at here
14       the allocation by entity, under AGH there is
15       a reference to 185,736,000. Do you see that?
16 A.    I do.
17 Q.    What does that represent?
18 A.    That represents AGH investable assets
19       including pension and nonpension, and it also
20       incorporates the AGH intercompany note
21       receivable that's embedded in its funded
22       depreciation balance.
23 Q.    And that fact is reflected here by the
24       asterisk; is that right?
25 A.    That's right.

Page 536

1  Q.    Because the asterisk is right next to the
2        185?
3  A.    Yes.
4  Q.    The asterisk says Includes AGH intercompany
5        note receivable in the amount of 119,431,000;
6        is that right?
7  A.    That's right.
8  Q.    Is this the document that you were referring
9        to where eventually it was noted that the
10       intercompany note receivable was noted with
11       respect to the amounts that were invested on
12       behalf of AGH?
13       MR. RYAN: Objection.
14 A.    Yes.
15 Q.    Prior to the investment report that was
16       prepared for AUH West for the period ending
17       September 30, '97, did the treasury
18       department prepare an investment report that
19       noted expressly that the -- strike that. Let
20       me start over.
21       Prior to the investment report that
22       was prepared for AUH West for the period
23       ending September 30, '97, that is Exhibit
24       710, did the treasury department ever prepare
25       a management investment report that expressly

Page 537

1        noted that the investments allocated to the
2        AGH entity in the report included in the
3        total figure the AGH intercompany note
4        receivable?
5  A.    It's possible. Either David McConnell or Joe
6        Dionisio made the decision on how they wanted
7        that note receivable reflected. So we
8        were -- the treasury department was directed
9        by either one of those individuals as it
10       referred to their respective reports.
11 Q.    With respect to Exhibit 709, which is the
12       management report on investments for the
13       period ending March '97, if you look at
14       the -- at this time it's bar graphs as
15       opposed to pie charts.
16 A.    Sure.
17 Q.    There is no asterisk next to the AGH figure
18       of 160,265,000; right?
19 A.    That's right.
20 Q.    So on this document it does not appear that
21       the existence of the intercompany note be
22       included in that amount has been disclosed in
23       this report?
24       MR. RYAN: Objection.
25 A.    It has not been disclosed as redirected by

Page 538

1        David McConnell. That's correct.
2  Q.    That fact was also not disclosed on the
3        management report for the period ending
4        December 31, '96, that is Exhibit 708; is
5        that correct?
6        MR. RYAN: Objection.
7  A.    I do not see it, no.
8  Q.    And if you look at Exhibit 707 where the
9        management report ending September 30, '96,
10       and the allocation tables on page 24, the
11       fact that the intercompany note receivable is
12       included in the 160,479 figure for AGH is
13       also not disclosed?
14 A.    That's correct.
15       MR. RYAN: Objection.
16 A.    It's not disclosed in this chart.
17 Q.    Did you have discussions with Ms. Mertz and
18       Mr. Martin as to whether or not the inclusion
19       of the intercompany note receivable in those
20       bar graphs was appropriate in these reports?
21 A.    I believe those conversations took place.
22 Q.    What do you recall about those conversations?
23 A.    Just the idea, again, presenting this
24       information to a trustee member and not
25       bringing attention to the fact that a

SUSAN GILBERT

Page 539

1  significant portion of the AGH funded
2  depreciation portfolio was in the form of a
3  note. That fact was transparent to a trustee
4  member because there was no explicit comment
5  within the body of the report --
6  Q.  And so --
7  A.  -- nor the financial statements for that
8  matter.
9  Q.  And so when you say transparent to the board
10  member, what do you mean by the term
11  transparent?
12  A.  A trustee member taking a look at a quarterly
13  report would see that AGH has X amount of
14  dollars invested in their funded depreciation
15  portfolio assuming that it would be spread
16  across the various asset classes as denoted
17  not knowing that there was a note to the
18  Delaware Valley embedded as an investment,
19  embedded in the funded depreciation portfolio
20  as an investment.
21  Q.  Why would that matter to the trustee?
22      MR. RYAN: Objection.
23  A.  I think it should matter to the trustee
24  because basically what was happening was that
25  AGH was financing the operations of the

Page 540

1  Delaware Valley without their knowledge and
2  approval.
3  Q.  Based upon your understanding of -- let's
4  just pick the Exhibit -- strike that --
5  Exhibit 709, which is the investment report
6  from March 30, '97, and if I can direct your
7  attention on that Exhibit 709 to page 47 in
8  the box that has the Return for Funded
9  Depreciation Pittsburgh Only.
10  A.  Yes.
11  Q.  And it says for -- let's just say the one
12  year ending 3-31-97 there is a percentage of
13  7.1 percent. Do you see that?
14  A.  Yes.
15  Q.  Would it be reasonable for a trustee who
16  receives this report to infer from the report
17  that the portion of AGH's 160,265,000 that
18  was invested as indicated on the last page,
19  the portion of that 160 million that was in
20  the funded depreciation account had earned
21  7.1 percent in interest for the past twelve
22  months?
23      MR. RYAN: Objection.
24  A.  Not interest. It also includes the
25  unrealized component.

Page 541

1  Q.  All right. Would it be reasonable for the
2  trustee to make that inference from this
3  report the way it's presented?
4      MR. RYAN: Objection.
5  A.  To make the inference that the one-year
6  performance return net of fees is 7.1 for the
7  funded depreciation portfolio only?
8  Q.  Yes?
9  A.  Yes?
10  Q.  And if he made that -- if he or she, the
11  trustee made that reasonable inference, would
12  they be in error?
13      MR. RYAN: Objection.
14  A.  No.
15  Q.  Did AHERF earn a 7.1 percent return on the
16  portion -- strike that. Did AGH earn a 7.1
17  percent return on the portion of the funded
18  depreciation account that was actually
19  liquidated and transferred to the East and
20  recorded as a note receivable?
21      MR. RYAN: Objection.
22  A.  There may have been some calculation done
23  behind the scenes by the accounting group
24  with respect to charging them interest. I
25  don't know if that was the case or not.

Page 542

1  Q.  All right. That's why I was asking you
2  earlier -- let's go back to this.
3  A.  Okay.
4  Q.  Let's go to page 3 and the funded
5  depreciation Pittsburgh only, AGH return 7.1
6  percent. How is that figure calculated for
7  this report?
8  A.  The figure is based upon the underlying
9  Mellon trust statements that do not include
10  the note receivable, the actual assets that
11  are physically in those three trust accounts.
12  Q.  So there is no -- in preparing that 7.1
13  percent figure putting in this report, there
14  is no effort to calculate the rate of return
15  that AGH is earning or realizing on the money
16  that has been, quote, lent, closed quote, to
17  the other entities?
18      MR. RYAN: Objection to form.
19  A.  It is outside of these dollars, however
20  that's being handled.
21  Q.  And the trustee who receives this report
22  would not be aware of that fact; is that
23  right?
24      MR. RYAN: Objection.
25  A.  In its present form, correct.

48 (Pages 539 to 542)

SUSAN GILBERT

Page 543

1  Q.    Did you believe that was a problem with this
2        form of the report?
3              MR. RYAN:  Objection.
4  A.    I did not think that it was a valid or
5        appropriate presentation of the AGH funded
6        depreciation portfolio.
7  Q.    Did Ms. Mertz agree with you on that point?
8  A.    I think she may.
9  Q.    And did you discuss that with Mr. Martin?
10 A.    I'm sure Mike heard my comments on that
11       topic.
12 Q.    Did he agree with you?
13 A.    He may have.
14 Q.    Did you express that view to Mr. McConnell?
15 A.    I did have a conversation with David on that
16       topic regarding how do we present the note
17       receivable.
18 Q.    Did you have just one conversation or more
19       than one conversation with Mr. McConnell in
20       that regard?
21 A.    I believe I sent friendly quarterly
22       reminders -- not reminders -- memos inquiring
23       how -- I would ask him quarterly how he would
24       like that presented.
25 Q.    Were those written memos?

Page 544

1  A.    I believe there was one that was written.
2  Q.    Were there occasions where you did it orally?
3  A.    Possibly.
4  Q.    What do you recall his responses to those
5        were?
6  A.    This was his response, the way it's presented
7        here, not to bring attention to the note.
8  Q.    What do you recall him specifically telling
9        you?
10 A.    I can't remember if it was on this topic or
11       another topic, but I had asked -- he was
12       unavailable, and I had his secretary -- it
13       may have been on this topic.  It could have
14       been on another topic, but I do recall asking
15       his secretary to relay the question how he
16       would like this handled, and I believe she
17       had gotten back to me to present it in the
18       format that you see it presently with no
19       explicit notation and do so until further
20       direction.  Basically quit asking me this
21       every quarter was how I had interpreted the
22       feedback.
23 Q.    Do you recall telling Ms. Mertz at some point
24       that Mr. McConnell had told you to include
25       the note receivable and don't ask me again?

Page 545

1  A.    I could have passed that along to Kelly.
2  Q.    If you had, would that be a reference to this
3        communication you had had with
4        Mr. McConnell's secretary?
5  A.    Possibly if it related to this topic.  I
6        remember the conversation.  I don't remember
7        if it referred to this or some other issue,
8        but I do recall that conversation.
9  Q.    And the conversation you recall is the
10       conversation with Mr. McConnell's secretary?
11 A.    Right.  I believe that's how it was handled.
12 Q.    Do you know who the name of the secretary
13       was?
14 A.    Carol Gordon.
15 Q.    Now I'd like to show you what's been marked
16       as -- previously marked as Exhibit 328.
17       Exhibit 328 is a one-page document that bears
18       the Bates stamp FNL-01-011562.  It's dated
19       March 17, '95.  Ms. Gilbert, have you ever
20       seen this document before?
21 A.    I don't believe I have.
22 Q.    Did you have any involvement at all in the
23       negotiations of the reimbursement and
24       security agreement with Morgan Guaranty Trust
25       in connection with the AGH bonds?

Page 546

1  A.    From the correspondence that was shared
2        yesterday, apparently I was.
3  Q.    Do you have any recollection of Ms. Flanagan
4        raising during those negotiations a concern
5        regarding the intercompany flows that have
6        occurred -- this had occurred and may occur
7        in the future in the AHERF system?
8  A.    Yes.  I believe that was the message or the
9        common theme in yesterday's documents that
10       that was the reduction to the consolidated
11       fund balance.  That was one of the ratios
12       that was not met because of that very reason.
13 Q.    All right.  If we look at Exhibit 328, the
14       first paragraph indicates that item No. 2
15       (relating to AHERF) remains a major problem
16       for the Group.  Do you see that?
17 A.    I do.
18 Q.    And the next paragraph says, quote, Morgan's
19       proposed solution was not intended to tie
20       into AHERF's assets (You will note we have
21       not requested or received financial
22       information relating to AHERF).  We can
23       remove references to AHERF in the agreement,
24       however, given a substantial volume of
25       intercompany flows that have occurred and

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 547

1  that may occur in the future, we seek
2  protection customary for this type of
3  transaction, that our limited obligation will
4  not be weakened by net outflows to the
5  advantage to other parts of the system,
6  period, closed quote. Do you see that?
7  A.  I do.
8  Q.  Is that what you believe is a reference to
9  what became the calculation of the
10  unrestricted fund balance covenant?
11 A.  Yes.
12 Q.  And if we look at the next paragraph, it
13  says, quote, We are willing to take another
14  approach to achieve the same objective by
15  requiring minimum consolidated unrestricted
16  fund balances defined to exclude, quote,
17  loans, to and investments in affiliates
18  outside the AHG Obligated Group and expressed
19  as a percentage of total assets, period,
20  closed quotes. Do you see that?
21 A.  Yes.
22 Q.  Do you recall this issue being raised during
23  the negotiations?
24 A.  I do not recall this one-pager because when I
25  see the six unresolved issues, I'm wondering

Page 548

1  what six she's referring to and item No. 2.
2  So although I was somewhat included in the
3  renewal and change in terms of this
4  agreement, I don't recall this letter.
5  Q.  Let me show you what's been marked as
6  Exhibit 329 previously. Would you take a
7  moment to review this document, Ms. Gilbert.
8  It is a one-page document that bears the
9  Bates stamp FNL-01-021561.
10 A.  (Witness reviews document.)
11    Okay.
12 Q.  If you look up at the top to document is
13  dated March 21, 1995. Did you see that?
14 A.  Yes.
15 Q.  The first paragraph of text indicates --
16  strike that. If you look at Exhibit 328 it
17  indicates it's a memo from Susan Flanagan
18  from Mr. Martin, Tom Barry and Bob Zimmerman.
19 A.  Yes.
20 Q.  You understand Ms. Flanagan to be a
21  representative from Morgan.
22 A.  Yes.
23 Q.  If you look down at the bottom there is a
24  handwritten -- looks to me like an S. Do you
25  understand that to be her signature?

Page 549

1  A.  I believe so.
2  Q.  And then if we look at Exhibit 329, it's
3  again to Mike Martin, Tom Barry and Bob
4  Zimmerman, but it doesn't say who it's from,
5  but you have the same S down at the bottom;
6  is that right?
7  A.  Yes.
8  Q.  So you understand 329 to be also a memorandum
9  from Ms. Flanagan?
10 A.  Yes.
11 Q.  The first text of this in Ms. Flanagan's memo
12  she says, Pursuant to your request I'm
13  revising certain sections of my memo to you
14  dated 3-15-95 relating to the proposed letter
15  of credit reimbursement agreement to reflect
16  what was mutually agreed during the telephone
17  conversation of yesterday, closed quote. Do
18  you see that?
19 A.  Yes.
20 Q.  Do you have reason to believe that you were a
21  participant in that telephone conversation
22  she refers to there?
23 A.  I could have been.
24 Q.  If you see here there are listed six topics
25  on Exhibit 329.

Page 550

1  A.  I do.
2  Q.  Do you believe that that corresponds to the
3  six unresolved issues that you were unsure
4  about with respect to Exhibit 328?
5  A.  Yes.
6  Q.  If we look at unresolved issue No. 2, it says
7  Reference to AHERF in the reimbursement
8  agreements. Do you see that?
9  A.  Yes.
10 Q.  And the resolution that has been agreed on
11  is, quote, All references to AHERF will be
12  removed from the reimbursement agreement?
13 A.  Yes.
14 Q.  And that is consistent with what Ms. Flanagan
15  had talked about in the text of her memo of
16  Exhibit 328?
17 A.  Right.
18 Q.  And then if we go to issue No. 3 of
19  Exhibit 329, Sale/Transer of Assets, it says,
20  quote, The reimbursement agreement will not
21  contain the customary ten percent per annum
22  limitation on sales transfers of assets as we
23  believe the $200 million unrestricted fund
24  balance requirement will effectively protect
25  the asset base during the original three-year

SUSAN GILBERT

Page 352

```
1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF ALLEGHENY        )  SS:
3        I, Claire Gross, RDR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   SUSAN GILBERT, was by me first duly sworn to testify
7   to the truth; that the forgoing deposition was taken
8   at the time and place stated herein; and that the
9   said deposition was recorded stenographically by me
10  and then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 27th day of
23  September, 2002.
24  _____
25            Notary Public
```

Page 353

```
1   COMMONWEALTH OF PENNSYLVANIA )   E R R A T A
    COUNTY OF ALLEGHENY        )   S H E E T
2
         I, SUSAN GILBERT, have read the forgoing pages
3   of my deposition given on Wednesday, September 25,
    2002, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read     Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21  _____
              SUSAN GILBERT
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
              Notary Public
25  AKF Reference No. Cg72118
```

44 (Pages 352 to 353)

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 571

```
 1           IN THE UNITED STATES DISTRICT COURT FOR THE
                   WESTERN DISTRICT OF PENNSYLVANIA
 2

                           - - - -
 3

    THE OFFICIAL COMMITTEE OF          )
 4  UNSECURED CREDITORS OF             )
    ALLEGHENY HEALTH, EDUCATION &      )
 5  RESEARCH FOUNDATION,               )
                                       )
 6                Plaintiff,           )
                                       )
 7             -vs-                    )     Civil Action
                                       )     No. 00-684
 8  PRICEWATERHOUSECOOPERS, L.L.P.     )
                                       )
 9                Defendant.           )
10
11                         - - - -
12                       VOLUME IV
          VIDEOTAPE DEPOSITION OF:  SUSAN GILBERT
13
                           - - - -
14
15            DATE:    October 15, 2002
                       Tuesday, 11:30 a.m.
16
17            LOCATION:  MANION McDONOUGH & LUCAS
                         14th Floor, USX Tower
18                       Pittsburgh, PA  15219
                         412-232-0200
19
20            TAKEN BY:   Defendant
21
22            REPORTED BY:  JoAnn M. Brown, RMR
                            Notary Public
                            AKF Reference No. JB72402
23
24
25
```