SUSAN GILBERT

Page 752

1　A.　Yes.
2　Q.　And if you look down at funded depreciation,
3　　　it's $180 million?
4　A.　Yes.
5　Q.　As of December 31, '96, Forbes hasn't entered
6　　　the AHERF system yet, has it?
7　A.　No.
8　Q.　Okay.  Are there any entities on here besides
9　　　AGH that has a funded depreciation account?
10　A.　It's possible that AUHS or AUH had a very small
11　　　allocation.  Very small.
12　Q.　But the vast majority?
13　A.　Oh, certainly, the vast majority, but there
14　　　were --
15　Q.　But the vast majority of the funded
16　　　depreciation account is the AGH account, right?
17　A.　Sure.
18　Q.　All right.  And if a board member on AHERF
19　　　knows that, then they would know that the
20　　　return that is indicated for funded
21　　　depreciation here was largely earned by AGH's
22　　　funded depreciation account, right?
23　　　　　MR. RYAN:  Objection.
24　A.　Yes.
25　Q.　And regardless of what percentage of the funded

Page 753

1　　　depreciation account is allocated to AGH, on
2　　　page -- if you turn to page -- on this one, on
3　　　page 40, there is a return of 9.9 percent for
4　　　the AGH funded depreciation account, correct?
5　A.　Um-hum.  That's correct.
6　Q.　All right.
7　A.　I just wanted to point out that if you turn to
8　　　page 39, the Delaware Valley Obligated Group
9　　　does have a funded depreciation component, but,
10　　　again, from this report, it's indeterminable as
11　　　to what that amount is.
12　Q.　Okay.  The 9.9 percent figure on page 40
13　　　indicates that whatever portion of the funded
14　　　depreciation account that's AGH was earning 9.9
15　　　percent, is that correct?
16　A.　That's right.
17　Q.　That's because the funded depreciation accounts
18　　　for all the entities were combined and invested
19　　　together, is that correct?  They all earned the
20　　　same amount?
21　　　　　MR. RYAN:  Objection.
22　Q.　Is that right?
23　A.　Post --
24　　　　　MR. RYAN:  Objection.
25　A.　-- entry into the Master Trust.  Following

Page 754

1　　　entry into the Master Trust.
2　Q.　That had happened by this point, right?
3　　　　　MR. RYAN:  Objection.
4　A.　Yes.
5　Q.　Well, strike that.  I may be misleading you
6　　　there.
7　A.　Well, it says here that Pittsburgh did not yet
8　　　join the structure or will join the structure
9　　　during FY '97, so --
10　Q.　That's right.  The 9.9 percent return indicated
11　　　for the AGH funded depreciation account, that
12　　　is deceptive, because there is a large portion
13　　　of the AGH funded depreciation account that
14　　　isn't earning 9.9 percent, correct?
15　　　　　MR. RYAN:  Objection.
16　A.　I don't know what it's earning.
17　Q.　Right.  It's the intercompany loan receivable,
18　　　right?
19　A.　It's the note receivable.  Right.
20　Q.　The only way to clarify or to correct that
21　　　mis-impression is to disclose that there is a
22　　　portion of the AGH funded depreciation
23　　　account -- or there is a portion of the funded
24　　　depreciation bar on page 38 that is not earning
25　　　9.9 percent, right?

Page 755

1　A.　That's right.
2　　　　　MR. RYAN:  Objection.
3　Q.　And to disclose that, you have to point out --
4　　　you would have to disclose that, instead of
5　　　being invested in the funded depreciation
6　　　account, it had been lent to affiliates, right?
7　A.　Right.
8　Q.　And that was not done in this report?
9　A.　That's correct.
10　Q.　Okay.  Do you have an understanding as to
11　　　whether or not the members of the AHERF board
12　　　were aware that a substantially large portion
13　　　of the AGH funded depreciation account had been
14　　　lent and spent to pay for operating expenses in
15　　　the East in the 1996 time period?
16　　　　　MR. RYAN:  Objection.
17　A.　It would just be speculation.
18　Q.　Well, what is your understanding in that
19　　　regard?
20　　　　　MR. RYAN:  Objection.
21　A.　Is that the board members were unaware, given
22　　　the fact that the question was asked quarterly,
23　　　shall I present it in the following manner
24　　　denoting that is a note receivable, and the
25　　　election was to not bring attention to it.

SUSAN GILBERT

Page 756

1  Q.  And your understanding is the reason that the
2     decision was made not to correct the
3     mis-impression about the return on the funded
4     depreciation account is because to do so would
5     require AHERF to disclose to the board members
6     that a substantial portion of the funded
7     depreciation account had been lent to the East?
8        MR. RYAN: Objection.
9  A.  Right.
10 Q.  Okay. You indicated, in response to the
11    questions of Mr. Antony, that you would have
12    expected Coopers to believe that you were a
13    professional and that you had carefully
14    reviewed the bond documents. Do you remember
15    those questions and answers?
16 A.  I do.
17 Q.  All right. Do you have an understanding as to
18    whether or not one of the reasons you bring in
19    an outside auditor is to find where you've made
20    inadvertent mistakes? Is that one of the jobs
21    of an outside auditor is to find the cases
22    where you guys made some inadvertent mistakes?
23       MR. RYAN: Objection.
24 A.  Well, I think it would be sort of a check and
25    balance just to make certain that the ground

Page 757

1     that we have covered was comprehensive, just
2     like a double check.
3  Q.  You wouldn't expect Coopers to come in and say,
4     well, you guys say you did a good job checking
5     this, so that's good enough for us? You
6     wouldn't expect that?
7  A.  No. I mean, that's not the role of an auditor.
8  Q.  What is the role of the auditor?
9  A.  My opinion on the role of an auditor is, once
10    they come on-site, to inspect the records and
11    the treatment of the financial assets and
12    liabilities of the organization for accurate
13    presentation and making certain that they're
14    adhering to accounting rules, adherence to bond
15    documents. I can go on.
16 Q.  Okay. Let me ask you finally, with respect to
17    the waivers Morgan Guaranty granted on the
18    violation on the unrestricted fund balance in
19    the spring of 1998, at that time, AHERF's board
20    had passed a resolution prohibiting any further
21    transfers from the AGH funded depreciation
22    account to the East, right?
23       MR. RYAN: Objection.
24 A.  When did that occur?
25 Q.  Well, do you know? At the time that AGH

Page 758

1     granted their waivers of the violation of the
2     unrestricted fund balance covenant, at that
3     time had AHERF adopted a policy of no more
4     transfers from the AGH funded depreciation
5     account to the East?
6  A.  I know that the resolution was approved, but I
7     cannot put a time/date on it. I don't know
8     when that resolution was approved.
9  Q.  All right. And if -- do you know when the
10    transfers from AGH to the East stopped?
11 A.  I do not.
12       MR. HAMILTON: I have no further
13    questions.
14       THE WITNESS: Come on, just one more.
15       THE VIDEOGRAPHER: With there being
16    no further questions, this deposition is
17    concluded at 5:20.
18       - - - -
19    (The proceedings were concluded at 5:20 p.m.)
20       - - - -
21
22
23
24
25

Page 759

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3     I, JoAnn M. Brown, RMR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  SUSAN GILBERT, was by me first duly sworn to testify
7  to the truth; that the foregoing deposition was taken
8  at the time and place stated herein; and that the
9  said deposition was recorded stenographically by me
10 and then reduced to printing under my direction, and
11 constitutes a true record of the testimony given by
12 said witness.
13    I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17    I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21    IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 18th day of
23 October, 2002.
24 _____
25           Notary Public

MANHATTAN REPORTING CORP., a LegaLink Company

SUSAN GILBERT

Page 760

1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T

2
        I, SUSAN GILBERT, have read the foregoing pages
3   of my deposition given on Tuesday, October 15, 2002,
    and wish to make the following, if any, amendments,
4   additions, deletions or corrections:
5   Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21         _____
                SUSAN GILBERT
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
           Notary Public
25         AKF Reference No. JB72402

49 (Page 760)

MANHATTAN REPORTING CORP., a LegaLink Company

Page 237

1              IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF PENNSYLVANIA

2
                              - - - -

3

THE OFFICIAL COMMITTEE OF        )

4  UNSECURED CREDITORS OF          )
   ALLEGHENY HEALTH, EDUCATION &   )

5  RESEARCH FOUNDATION,            )
                                   )

6                  Plaintiff,      )
                                   )

7              -vs-                )    Civil Action
                                   )    No. 00-684

8  PRICEWATERHOUSECOOPERS, L.L.P. )
                                   )

9                  Defendant.      )

10

11                         - - - -

12       VIDEOTAPE DEPOSITION OF:  IRA GUMBERG
                      VOLUME II

13

                              - - - -

14

15              DATE:    October 3, 2003
                         Friday, 8:58 a.m.

16

17              LOCATION:  KIRKPATRICK & LOCKHART
                           Oliver Building, 2nd Floor

18                         535 Smithfield Street
                           Pittsburgh, PA  15222

19

20              TAKEN BY:  Defendant

21

                REPORTED BY:  Heidi H. Willis, RPR, CRR

22                            Notary Public
                              AKF Reference No. HW77545

23

24

25

Page 238

```
 1      VIDEOTAPE DEPOSITION OF IRA GUMBERG, VOLUME II,
        a witness, called by the Defendant for examination,
 2   in accordance with the Federal Rules of Civil
        Procedure, taken by and before Heidi H. Willis, RPR,
 3   CRR, a Court Reporter and Notary Public in and for
        the Commonwealth of Pennsylvania, at the offices of
 4   Kirkpatrick & Lockhart, Oliver Building, 535
        Smithfield Street, Pittsburgh, PA 15222, on Friday,
 5   October 3, 2003, commencing at 8:58 a.m.
 6
                     - - - -
 7
 8   APPEARANCES:
 9      FOR THE PLAINTIFF:
        James M. Jones, Esq.
10   JONES DAY
        One Mellon Bank Center
11   31st Floor
        Pittsburgh, PA  15219
12   412-258-2300
13
14      FOR THE DEFENDANT:
        Roger G. Brooks, Esq.
15   CRAVATH, SWAINE & MOORE
        Worldwide Plaza
16   825 Eighth Avenue
        New York, NY  10019
17   212-474-1986
18
19      FOR THE WITNESS:
        David McClenahan, Esq.
20   KIRKPATRICK & LOCKHART
        Oliver Building, Second Floor
21   535 Smithfield Street
        Pittsburgh, PA 15222
22   412-344-6500
23
24      ALSO PRESENT:
        Ken Ingersoll, Videographer
25
```

Page 239

```
 1                * I N D E X *
 2   Examination by Mr. Brooks - - - - - - - -   240
     Examination by Mr. Jones - - - - - - - - -   304
 3   Re-Examination by Mr. Brooks - - - - - - -   378
     Re-Examination by Mr. Jones - - - - - - - -  391
 4
     Certificate of Court Reporter - - - - - - - -  394
 5   Errata Sheet - - - - - - - - - - - - - - - - -  395
 6
 7        * INDEX OF EXHIBITS *
 8                          REFERRED TO
 9   Deposition Exhibit 22  - - - -  328
     Deposition Exhibit 522 - - - -  357
10   Deposition Exhibit 832 - - - -  324
     Deposition Exhibit 1289 - - -  373, 375, 376
11   Deposition Exhibit 1659 - - -  247, 251
     Deposition Exhibit 1661 - - -  333, 335
12   Deposition Exhibit 1666 - - -  282
     Deposition Exhibit 1672 - - -  287
13   Deposition Exhibit 1939 - - -  325, 327, 380
     Deposition Exhibit 1994 - - -  321
14   Deposition Exhibit 2019 - - -  243
15
               MARKED    REF'D
16
     Deposition Exhibit 2051 - - - -  255
17   Deposition Exhibit 2052 - - - -  266
     Deposition Exhibit 2053 - - - -  273
18   Deposition Exhibit 2054 - - - -  285
     Deposition Exhibit 2055 - - - -  293     294
19   Deposition Exhibit 2056 - - - -  314
     Deposition Exhibit 2057 - - - -  316     317
20   Deposition Exhibit 2058 - - - -  321     322
     Deposition Exhibit 2059 - - - -  336     340
21   Deposition Exhibit 2060 - - - -  370
22
23
24
25
```

Page 240

```
 1               - - - -
 2          P-R-O-C-E-E-D-I-N-G-S
 3               - - - -
 4       THE VIDEOGRAPHER:  This is day two of
 5   the deposition of Ira Gumberg.  The witness is
 6   already sworn in.  We are now going back on the
 7   record.  The time is 8:58 a.m.
 8               - - - -
 9          EXAMINATION (CONT'D)
10               - - - -
11   BY MR. BROOKS:
12   Q.   Good morning, Mr. Gumberg.
13   A.   Good morning.
14   Q.   We spent some time yesterday looking at a
15   Coopers & Lybrand management or comment letter
16   I should say, and I want to ask a couple
17   follow-up questions about your experience with
18   Coopers & Lybrand.
19          Was Bill Buettner or any
20   representative of Coopers & Lybrand invited to
21   AHERF parent board meetings as a general
22   matter?
23          MR. JONES:  Object to foundation and
24   to form.
25   A.   I do not recall Bill at a parent board meeting.
```

Page 241

```
 1   Q.   Was he invited to AGH board meetings?
 2          MR. JONES:  Same objection.
 3   A.   I do not recall him at an AGH board meeting.
 4   Q.   Did he attend AGH resource management committee
 5   meetings?
 6          MR. JONES:  Same objection.
 7   A.   The answer to that as well would be no, to the
 8   best of my recollection, except for when I
 9   asked for a special Saturday morning session,
10   which I might add was my first time meeting
11   Bill Buettner.
12   Q.   Okay.  And --
13   A.   Excuse me, that would have been the second time
14   I met Bill Buettner, the first time being at
15   the -- first time I attended an audit meeting
16   on October the 15th was my first time meeting
17   Bill Buettner.
18   Q.   And the second time was shortly thereafter at
19   this special meeting?
20   A.   I don't remember.  I think it was in -- I think
21   in -- correct, it may have been a couple months
22   later.
23   Q.   Okay.  Other than that special meeting, did you
24   ever attend any meeting of any AHERF board at
25   which Mr. Buettner was present?
```

IRA GUMBERG                                          Volume #2

Page 242

1  A.   I don't believe so.
2  Q.   And let me correct my question.  Other than
3       that special meeting and the audit committee
4       meeting that you referred to, did you ever
5       attend any AHERF board or committee meeting at
6       which Mr. Buettner was present?
7  A.   I do not believe so.
8  Q.   At either of those two meetings you did attend
9       at which Mr. Buettner was present, did you ask
10      Mr. Buettner any questions?
11 A.   At the audit --
12 Q.   Sorry, why don't we hold until he gets that,
13      and we'll read back the question.
14          MR. McCLENAHAN:  Sorry.
15          MR. BROOKS:  Why don't you read back
16      the question, if you would.
17              - - - -
18      (The record was read back by the Reporter.)
19              - - - -
20 A.   I do not believe that I asked Mr. Buettner
21      questions at the October 15th audit meeting,
22      but I cannot say for sure.  I think -- I think
23      I may not have.
24          I did, because I chaired the meeting,
25      the Saturday morning session, so there would

Page 243

1       have been a number of questions I would have --
2       I would have asked of him.
3  Q.   Okay.  Let me hand you minutes of that October
4       15th, 1997 audit committee meeting which had
5       been be previously marked as Exhibit 2019 in
6       this litigation.
7           And, Mr. Gumberg, do these appear to
8       be the minutes of the meeting you were
9       referring -- of the audit committee meeting you
10      were referring to?
11 A.   It appears to be.
12 Q.   And this meeting was the first time you met
13      Mr. Buettner in any context?
14 A.   Yes.
15 Q.   If you would turn in this document into page 4,
16      Bates No. ending in 814, and three sentences in
17      at the top of that page you'll see a sentence
18      that reads, quote, Following discussion
19      regarding the outstanding balances in accounts
20      payable and expected adjustments which are
21      intended to be paid to AGH funded depreciation
22      account, and then it continues.
23          At that audit committee meeting on
24      October 15, 1997, was there a discussion of the
25      fact that large loans had been made from the

Page 244

1       AGH funded depreciation account to the Delaware
2       Valley entities?
3  A.   Yes, sir.
4  Q.   And --
5           MR. McCLENAHAN:  Mr. Gumberg, I think
6       it might be helpful if you at least skimmed the
7       section beginning with B over to page 4 where
8       Mr. Brooks is asking questions so you get --
9           THE WITNESS:  Okay.
10          MR. McCLENAHAN:  -- a sense of the
11      context of the question.
12              - - - -
13      (The witness reviewed the Exhibit.)
14              - - - -
15          THE WITNESS:  Okay.  I think you
16      asked a question if there had been discussion
17      about transfers.
18 BY MR. BROOKS:
19 Q.   And I think you answered that question.  I
20      think there's no question pending.
21          My question now is:  When did you
22      personally first become aware that substantial
23      loans may have been made from the funded
24      depreciation accounts of Allegheny General to
25      DVOG entities?

Page 245

1  A.   A few days -- a day before this meeting, which
2       would have been I believe on the 14th.
3  Q.   Okay.
4  A.   I came in for a pre-meeting, which would have
5       been a standard, a routine with me where any
6       type of a resource management committee meeting
7       that I would be participating in or chairing,
8       that there would be a pre-meeting, and that at
9       two o'clock this same day there was a resource
10      management meeting.  So that was the reason for
11      my being there the day earlier was for that
12      preparatory session.
13          The presenters that would be
14      presenting at that meeting were all in
15      attendance, and then they excused themselves or
16      Tony Sanzo I should say excused everybody
17      except himself and Joe Dionisio, and then Joe
18      Dionisio and Tony advised me that in their
19      opinion there were substantial transfers that
20      had been taking place and that they may not be
21      presented on the balance sheet as -- as
22      transfers due from the east back to the west,
23      but instead I believe were labeled as
24      investments.
25          I had a -- I then excused Joe

3 (Pages 242 to 245)

Page 246

1  Dionisio and only spoke one-on-one with Tony
2  Sanzo. I told Tony that I wanted to get to the
3  bottom of this immediately, and he said that
4  that was the reason why he came to me, that he
5  thought that I would be the personality, the
6  individual that would deal with this, and I
7  asked him if he would call Sherif and tell
8  Sherif that I'm aware and tell Sherif I'd like
9  to see him.
10         I received a call back at my office
11 sometime that afternoon asking if I could meet
12 Sherif at 11:30 this same day at Sherif's
13 office at the AGH enterprise.
14         MR. McCLENAHAN: The same day now
15 meaning the 15th?
16 A.  The next day, the 15th, the audit committee
17 meeting, the 15th, and then I met with Sherif
18 that morning, or at that 11:30 meeting.
19 Q.  And what was the substance of your conversation
20 with Mr. Abdelhak?
21 A.  Substance -- substance of that was that I
22 discussed with Sherif rather directly what I
23 had learned. At first told me he thought
24 that I was incorrect in terms of the way it was
25 presented in the balance sheet. The meeting

Page 247

1  became a little bit heated from his perspective
2  in the sense that he thought I didn't
3  understand and that I was completely off base
4  in terms of the accounting of this.
5         I told him that I might be, an
6  accountant I'm not, but that I do know as a
7  trustee to me investments to me meant General
8  Motors, 3M, IBM, it didn't mean invested in our
9  own shop, particularly on the other side,
10 meaning the east side of our enterprise, and I
11 thought that most board members would feel the
12 same way.
13         He then said that he understood, and
14 I recommended to him that I thought the -- that
15 he should come before his board at this twelve
16 o'clock meaning and discuss it.
17 Q.  And that is then what happened at that meeting?
18 A.  And that is then what happened at that meeting.
19 Q.  Let me also put in front of you what's been
20 previously marked, in fact, you probably have
21 it in your stack somewhere, this is the --
22 Ms. Gordon's shorthand, the transcription of
23 Ms. Gordon's shorthand notes of the October 15,
24 1997 meeting which is labeled as Exhibit 1659.
25 I'll save time by handing you --

Page 248

1  A.  Thank you.
2  Q.  -- another copy. I have one more here.
3         MR. McCLENAHAN: I got it.
4  Q.  And, again, you can decide how much context you
5  want to look at. I'm going to direct your
6  attention to some of the discussion that is
7  approximately recorded towards the top of page
8  7.
9  A.  I'm just going to ask for your help for page 7.
10         MR. McCLENAHAN: This is Western
11 Pennsylvania does a better job?
12         MR. BROOKS: That is the page and
13 then the discussion that follows underneath
14 that.
15         MR. McCLENAHAN: Well, help us out
16 here. Are you going to be talking about the
17 funded depreciation issue or the issue that
18 precedes it on --
19         MR. BROOKS: The funded depreciation
20 issue.
21         MR. McCLENAHAN: Okay. Ira, why
22 don't you start at the top of page 7 and
23 read down until Roman numeral III C.
24         - - - -
25         (The witness reviewed the Exhibit.)

Page 249

1         - - - -
2  BY MR. BROOKS:
3  Q.  Okay. My first question is at this meeting was
4  it primarily Mr. Abdelhak or Mr. Buettner who
5  explained to the AHERF audit committee the
6  nature of these loans and how they were
7  accounted for?
8  A.  As I recall, I think Sherif set the -- set the
9  foundation for the discussion, the fact that
10 there had been these loans and transfers, and I
11 recall as well some specifics from Dave
12 McConnell that was also explained.
13         And the open question in my mind
14 after hearing all dialogue was when will they
15 be paid back, and I recall asking that
16 question, and I believe the answer that was
17 given to me was going to be within 12 to 18
18 months.
19 Q.  I take it from these notes that Mr. Buettner
20 either spoke or responded to questions in the
21 course of this discussion. Can you describe to
22 me what his role in this discussion was?
23 A.  I can't recall.
24 Q.  Okay. All right. In the course of this
25 meeting, do you believe that the AHERF audit

4 (Pages 246 to 249)

Page 250

1  committee was accurately advised as to the
2  amount of loans that had been made from AGH,
3  from the AGH funded depreciation accounts?
4       MR. JONES: Object to foundation and
5  form.
6  A.  I'm not sure, reading -- reading the page you
7  asked me to read, I'm not sure I even
8  understand when the -- the balances of AGH
9  funded depreciation June 30 was not used for
10  payments of payables less than 50 million,
11  Buettner responds 58 million left behind.
12       I don't know how that ties in.  I do
13  know that at a later date, I don't recall when,
14  the amount of transfers, as I remember, was
15  larger.
16  Q.  Larger than?
17  A.  Than what was I believe explained at that
18  meeting.  I think, as I recall, the number that
19  was transferred turned out to be something in
20  the 90 million-ish range.
21  Q.  Do you recall what the relationship between
22  that and the reference to an intercompany 112
23  million by Mr. Edelman in these notes was or
24  might be?
25  A.  I don't.  I do actually remember Harry asking

Page 251

1  the question where it showed up, and I do
2  remember an answer being given that it was in
3  the elimination column.
4  Q.  And --
5  A.  That's all I can recall.
6  Q.  -- at that meeting was it explained
7  sufficiently to your satisfaction?
8  A.  At the time I would have thought that I
9  understood, and I might add that following that
10  meeting thereafter, the balance sheets
11  reflected differently.  They reflected the fact
12  that there had been transfers to the east, and
13  I'm not sure, I think they were maybe footnoted
14  sizably on the balance sheet.
15  Q.  There is a note on this page in Exhibit 1659 by
16  Mr. McConnell's name that reads, quote, Bill
17  has agreed that he needs to indicate that some
18  of the money is in intercompany receivables.
19       Do you recall any comments from
20  Mr. Buettner to the effect that the accounting
21  for some of these transfers needed to be
22  changed?
23  A.  I do not.  I don't wish to editorialize, but
24  Bill Buettner came across to me as a rather
25  meek individual.  I don't recall much dialogue.

Page 252

1  Q.  There is in this half page we've looked at,
2  there are two comments noted by Mr. Buettner's
3  name.  Do you have any recollection that he
4  declined to answer any questions that anybody
5  asked him?
6  A.  No, I don't recall a decline.
7  Q.  Do you believe that he was not forthcoming in
8  answering questions that anybody asked him?
9       MR. JONES: Object to foundation.
10  A.  I also could not say that he was not
11  forthcoming.
12  Q.  About the time of the October 15 AHERF audit
13  committee meeting, did anybody bring this same
14  issue to the attention of the AGH board?
15  A.  Well, the --
16       MR. JONES: Object to foundation.
17  A.  -- yes, because at the two o'clock meeting
18  Sherif spoke again and addressed a huge
19  auditorium, because it was the consolidated --
20  yes, it was the -- it was a consolidation of
21  resource management committees across the whole
22  global system that had been invited in to the
23  auditorium, not because of the subject, but
24  whatever the agenda was that they were -- we
25  were discussing.

Page 253

1       And he took the first 10 or so
2  minutes of that meeting and spoke, and I might
3  add I recall him speaking rather articulately
4  about the subject, and board members were
5  there, physician members who were members of
6  committees were there, and it would have been
7  the first time that physician members would
8  have heard this, and there was a great deal of
9  surprise.
10  Q.  And at that large meeting Mr. Abdelhak laid out
11  the nature and size of these transfers clearly?
12  A.  He did.
13  Q.  Was it your judgment at the time that anything
14  about how these transfers had been done was
15  improper on the part of management?
16       MR. JONES: Object to form.
17       MR. McCLENAHAN: How they had been
18  done or -- is that your question?
19       MR. BROOKS: Let me reask it.
20  Q.  Was your judgment at the time that management
21  had acted improperly in making these loans from
22  the funded depreciation to the DVOG entities?
23       MR. JONES: Same objection.
24  A.  Is my attorney -- am I okay to answer?
25       MR. McCLENAHAN: Yes.

IRA GUMBERG

Volume #2

Page 254

1  A.   I don't believe that I would have viewed --
2       that I viewed them as improper.  I think the
3       only part that was of concern to me was the
4       labeling on the balance sheet and the fact that
5       I learned about it kind of last minute, and as
6       you know, I learned about it through a prep
7       session.
8  Q.   Did the fact that you only learned about it at
9       the last minute raise concerns in your mind
10      about whether you could trust top management?
11 A.   That's a -- that's a fair question.  My
12      judgment at the time was that I watched Sherif
13      come before his board, respond appropriately.
14      If he had not at the time, I would have had
15      great concern, but I thought he had cleared
16      himself appropriately, and I felt that maybe
17      all I was able to do in the process as being
18      one of his board members was just help him do
19      the right thing by his institution.
20 Q.   Did the fact of these transfers and the way
21      that you learned about them and the way they
22      had been recorded on the book cause you to
23      consider whether top management of AHERF should
24      be changed?
25 A.   It did not reach that level in my mind at that

Page 255

1       time.
2  Q.   What action, if any, did the AHERF audit
3       committee take in connection with this issue
4       once it was informed about it at the October 15
5       meeting?
6  A.   Roger, I don't recall exactly the action taken,
7       but there was more proactive action taken at a
8       meeting of the AHERF finance committee a few
9       weeks later.
10          MR. BROOKS:  Let me mark as Exhibit
11      2051 a one-page document bearing the Bates No.
12      HE 1373 titled Report From the Special Task
13      Force Reviewing Intercompany Loans.
14              - - - -
15      (Exhibit 2051 marked for identification.)
16              - - - -
17 BY MR. BROOKS:
18 Q.   And let me ask you first, Mr. Gumberg, if you
19      recognize this document.
20              - - - -
21      (The witness reviewed the Exhibit.)
22              - - - -
23 A.   I believe I -- I believe I did.
24 Q.   Did you write this report?
25 A.   I don't recall.

Page 256

1  Q.   This report appears to refer to a meeting of a
2       special task force of resource management
3       committee on April 18, 1998, of which you were
4       chair.
5          Can you describe for me what that
6       special committee -- special task force was and
7       how it came into existence?
8  A.   Yes, be happy to, but I need to take you back a
9       little bit.
10 Q.   Okay.
11 A.   Two weeks after the audit meeting, which I
12      believe was October 15th, there was a finance
13      meeting of the AHERF -- AHERF finance board.
14          MR. McCLENAHAN:  Committee.
15 A.   Committee, thank you.  And there at that
16      meeting I believe that was when a resolution
17      was being asked to be approved that would
18      have -- that would have approved an
19      intercompany transfer as high as $150 million.
20          And having heard this at the meeting,
21      I thought it was appropriate that I speak out,
22      and I did, and I -- I'm trying to go back in
23      life now, but I believe that I spoke about the
24      fact that in that two-week period that I had
25      felt a we/they issue had developed between our

Page 257

1       institution, that now we were a west and an
2       east, we were not one enterprise, that it was
3       the east that was burning the money, it was the
4       west that had been earning the money.  This is
5       in the mentality of the physicians I'm
6       referring to, and I felt a great schism
7       developing, whether correct or incorrect.
8          I also believe that I thought it was
9       inappropriate to have an internal line like
10      this set up without taking advantage of bankers
11      who sat on our boards who understood the
12      banking business, the lending business, and I
13      even said, and I certainly did not imply myself
14      because I'm not a banker, and that I felt that
15      a special committee should be set up to watch
16      over this.
17          They took my advice.  They set up a
18      special committee.  It was chaired by Dave
19      Barnes I believe.  I don't remember the name of
20      the committee, Roger, but it was -- it was the
21      committee that would watch to be sure that
22      whatever amounts were lent, that there was --
23      that the appropriate concentration in any one
24      entity was what it should be, that the payback
25      period should be what it should be, and that

Page 258

1     they would be watching over internal loans.
2  Q.  Were you on that committee?
3  A.  I was asked to be on that committee, and I
4     agreed to be on that committee.
5        Then what happened was we started to
6     track at the resource management level, western
7     level under my chairmanship, our dollars out
8     and our dollars back.  Then what happened was
9     we determined that we should set up a special
10    committee, that's this task force that I
11    chaired, and it was made up of key members of
12    my -- of my resource management committee,
13    and -- and it was to really bore into the
14    transfers.  It was also to bore into the
15    repatriation process, and then I think that
16    leads to this memo.
17  Q.  Okay.
18  A.  And then subsequently that led to questions we
19    started to receive.  As we were scorecarding
20    the reduction in our amounts outstanding, we
21    started to notice that some of the reductions
22    were coming in the form of noncash, and frankly
23    we didn't understand it, and that was my reason
24    for calling a special meeting that would --
25    that would include the Coopers engagement

Page 259

1     partner, as well as the management, the
2     financial people from management to help
3     explain what it was.
4  Q.  Did the task force or subcommittee chaired by
5     Mr. Barnes ever meet?
6  A.  The banking committee as it were?
7  Q.  As you described it.
8  A.  I don't think that it did.  It did have a
9     provision that allowed transfers to take place
10    if they were in the normal course of business
11    as previously approved by the budget and if
12    they were under $10 million.
13  Q.  Do you have any understanding as to why that
14    committee never met?
15  A.  I do not know, but I'm prepared to help you
16    further with another answer if you like.
17  Q.  Did you ever suggest that that committee should
18    meet?
19  A.  I don't recall if I -- I may have.  I may have.
20    I don't recall.
21  Q.  The -- was the April 18th meeting that we are
22    looking at a report about that second meeting
23    with Bill Buettner that you described earlier?
24  A.  My second meeting with Bill Buettner.
25  Q.  So between the October 15th AHERF audit

Page 260

1     committee meeting and the April 18, 1998 task
2     force meeting, you never were in a meeting with
3     Mr. Buettner?
4  A.  I don't believe I was.
5  Q.  And the focus of the April 18 meeting, why
6     don't you describe for me what the focus of
7     that meeting at which Mr. Buettner was present
8     was.
9  A.  I think that I -- I'll answer it again.  I
10    think the focus was as it related to the
11    payback of intercompany loans, that part that
12    was noncash, that we were unable to understand.
13  Q.  Well, let me ask then before you get to the
14    payback, did you also as part of this task
15    force try to understand in more detail the
16    nature of the loans that had been made out of
17    the funded depreciation?
18  A.  We were watching those on an ongoing basis and
19    I believe understood those.
20  Q.  Okay.  At this meeting, did Mr. Buettner give
21    any sort of presentation or explanation?
22  A.  Oh, sure.
23  Q.  What was it that he discussed to the task
24    force?
25  A.  Oh, I can't -- I can't remember.

Page 261

1  Q.  Did you find him -- the information that
2     Mr. Buettner gave at that meeting to be
3     accurate?
4  A.  I believe so, yes.
5  Q.  And have you ever learned anything to the
6     contrary?
7  A.  I have not.
8  Q.  Did you find him willing to answer whatever
9     questions the committee members had?
10  A.  Yes.
11  Q.  The last paragraph of this report begins,
12    quote, The task force was generally satisfied
13    with the explanations, but nonetheless agreed
14    to continue to monitor these transactions in
15    the future, and it continues.
16       Is that an accurate summary of your
17    own state of mind after this meeting on April
18    18th?
19  A.  Yes, and subsequently I reported this to both
20    my committee and I believe to the board.
21       MR. JONES:  I'm sorry, which board?
22       THE WITNESS:  That would have been
23    the west board, Jim.
24       MR. JONES:  Thank you.
25  Q.  And you described earlier the we/they mind-set

7 (Pages 258 to 261)

Page 262

1    that you observed on the part of some of the
2    doctors.  Was it your view that significant
3    intercompany loans were consistent with the
4    integrated system strategy that AHERF was
5    pursuing?
6         MR. JONES:  Object to form.
7    A.   I think the answer to that question is yes to a
8    certain point.
9    Q.   Did you ever come to a particular conclusion
10   about what that point was?
11   A.   I think that I did.
12   Q.   And what was your conclusion?
13   A.   That if we were going to exceed this $150
14   million range, that we needed to circumscribe
15   funds and stop allowing any future transfers,
16   and, in fact, I spoke up.  I had our resource
17   management committee authorize a resolution to
18   do just that, and then I took it to the board
19   of directors, and I asked the board of
20   directors to do the same, which it also was
21   moved by me and I believe seconded by Sherif.
22   Again, the board being the western board.
23   Q.   The AGH board?
24   A.   Yes.
25   Q.   So I'm clear on the chronology, at the October

Page 263

1    15th AHERF audit committee meeting,
2    Mr. Abdelhak and Mr. Buettner explained to the
3    committee intercompany --
4    A.   And the financial officer.
5    Q.   Mr. McConnell?
6    A.   Right.
7    Q.   -- explained to the committee the intercompany
8    transfers that had happened during fiscal 1987;
9    correct?
10        MR. JONES:  '97.
11   A.   I'd like to -- I'd like to just maybe cast that
12   a little differently.
13   Q.   Okay.
14   A.   I believe Sherif presented it.  I believe
15   McConnell added to the presentation, and I
16   believe, as I recall at least, that Buettner
17   answered questions.
18   Q.   The focus of that discussion and explanation
19   was on transfers that had happened during
20   fiscal 1997; correct?
21   A.   Transfers that had happened.
22   Q.   That had happened, and then following that, the
23   AHERF board approved up to an additional $150
24   million worth of --
25   A.   No, inclusive of.  150 I believe was -- the

Page 264

1    difference of whatever it was and 150, it was
2    not to go over 150.
3    Q.   So it was functionally something like a credit
4    line that was not to exceed --
5    A.   Correct, intercompany credit loan of 150.
6    Q.   Okay.
7         MR. JONES:  In total.
8         THE WITNESS:  In total.
9    Q.   Mr. Gumberg, how did you learn of the decision
10   that AHERF would acquire The Graduate
11   Hospitals?
12   A.   I attended a meeting in December of '96.  I
13   believe that was when I concede that I was on
14   the AHERF board.  They presented as part of an
15   agenda the fact that they had already an
16   agreement -- I can't remember if it was they
17   had acquired or if they had an agreement to
18   acquire The Graduate Hospital system, and I
19   remember some initials.  It wasn't called
20   Graduate, it was an entity called SD something.
21   Q.   SDN?
22   A.   Okay, SDN, and that was my first -- my first
23   knowledge.
24   Q.   Well, let me ask you this:  Back in August this
25   acquisition had been discussed in news articles

Page 265

1    in the newspaper in Pittsburgh and
2    Philadelphia, does that refresh your
3    recollection in any way as to whether you heard
4    about this before the December board meeting?
5    A.   It doesn't.
6    Q.   Okay.  Did you feel when you learned about this
7    in December of '96 that it was -- that you were
8    learning about it as a fait accompli?
9         MR. JONES:  Object to form.
10   A.   I would say so, yes.
11        MR. BROOKS:  Object to form or the
12   language?
13   Q.   Did you have any concerns that learning about
14   it at that stage made it possible for you to
15   carry out your fiduciary duties as a trustee of
16   AHERF?
17   A.   No.
18   Q.   Did you have any concern that you as a trustee
19   had not been consulted before a decision had
20   been made?
21   A.   No, I don't think I felt that way.
22   Q.   Did any other trustees express to you any
23   concerns on their part that the trustees should
24   have been consulted, that the board should have
25   had an opportunity to consider this at an

Page 306

1    Would you tell me what you see as the
2    role of the volunteer trustee for a
3    not-for-profit organization like AHERF?
4  A.   I think it's as an oversight capacity, and it
5    would be to rely heavily upon management
6    reporting, management's presentations, and to
7    also to rely on I believe, through the audit
8    committee of the board, rely on our external
9    auditors for financial reporting.
10  Q.   You relied on outside professionals like
11    auditors and lawyers to help you discharge your
12    duties to the organization?
13  A.   Yes, sir.
14  Q.   In fact, you also I think testified that you
15    engaged outside consultants of other varieties
16    during your time of board service?
17  A.   Yes.
18  Q.   The role of a volunteer trustee, is it a
19    full-time job or something less than that?
20  A.   It is -- it is not a full-time job.
21  Q.   What role did Coopers & Lybrand as outside
22    auditors, as you understood it, play in
23    connection with the review and presentation of
24    AHERF's financial statements?
25  A.   I understood them to be the primary auditor,

Page 307

1    perhaps the only auditor of the system.  Their
2    role was to develop a -- a scope and an
3    approach to the audit of our system, to
4    understand the operation of our business so
5    they could tailor their audit approach.
6  Q.   And ultimately that would lead to some, as you
7    understood it, opinion on the financial
8    statements that had been presented to them; is
9    that fair?
10  A.   Yes, an opinion that would be used by not only
11    our board, but other outsiders, such as banks
12    and debt institutions.
13  Q.   Trade creditors?
14  A.   Trade creditors, yes.
15  Q.   As a part of their work, you considered this a
16    check on management's internal financial
17    statement preparation?
18  A.   I understood it to be internal controls as
19    well.
20  Q.   An evaluation by the auditors of internal
21    controls?
22  A.   An evaluation, yes.
23  Q.   Of internal controls?
24  A.   And that if there were internal controls that
25    were weak or designs that were missing, that

Page 308

1    they would be reported.
2  Q.   And my question -- I understand your answer, my
3    question is a little different.  It is you
4    testified earlier that you received I think on
5    the order of quarterly internal unaudited
6    financial statements; is that right?
7  A.   Yes, sir.
8  Q.   And those you understood to be prepared by
9    whom?
10  A.   Management.
11  Q.   Internal financial management at AHERF?
12  A.   Yes.
13  Q.   The auditor's role, the outside auditor's role,
14    the role filled here by Coopers & Lybrand, was
15    an independent check of that financial
16    department's preparation of financial
17    statements in your view?
18  A.   Yes.  I'm just not sure if their review was a
19    quarterly review like I'm used to in a public
20    company where there's a negative assurance or
21    an annual.
22  Q.   I understand.  To the best of your
23    recollection, you got annual audited financial
24    statements while you were a member of AHERF
25    boards or committees?

Page 309

1  A.   Yes, sir.
2  Q.   And what is the importance to the enterprise
3    and to the board of a clean audit opinion for
4    the fiscal year while you were serving on AHERF
5    boards or committees?
6  A.   I'm not sure the stages of other than clean,
7    but less than clean opinion I believe would be
8    a serious blemish and could cause problems in
9    the financial markets.
10  Q.   Did the clean opinions -- let me strike this,
11    strike that.
12    You don't recall ever having AHERF
13    received anything less than a clean opinion
14    while you were affiliated; is that right?
15  A.   No, sir, I do recall.  I believe we received
16    when KPMG came into the company --
17    MR. McCLENAHAN:  He -- I'm sorry, I
18    interrupted.  Go ahead.
19  A.   -- when KPMG came into the company, the
20    auditor, at a later date, I believe it was
21    KPMG, I think there was something referred to
22    as a going concern.  I believe that's less than
23    a clean.  I'm not sure.  It's not my specialty.
24  Q.   I understand, and my question I think can be
25    better phrased.

IRA GUMBERG                                                    Volume #2

Page 310

1    Before bankruptcy in roughly July or
2  August of '98, it is your recollection that
3  AHERF had never received anything less than an
4  unclean opinion in its yearly audits conducted
5  by Coopers & Lybrand; is that right?
6  A.  That's correct.
7  Q.  And those clean opinions, did they help you in
8    any way gauge the validity or accuracy of the
9    internal financial statements you were getting?
10 A.  I believe so.  I believe that they did give an
11   indication that internal controls were
12   satisfactory.
13 Q.  You as a -- when you -- strike that.
14     Is it your recollection that you
15   typically, and I know we have an issue in 1997,
16   for fiscal year 1997, but do you recall
17   typically receiving the audited financial
18   statements from the auditors, Coopers &
19   Lybrand, in the fall of the calendar year?
20 A.  Yes.
21 Q.  On an annual basis throughout your board and
22   committee service?
23 A.  Yes.
24 Q.  And when you got those audited financial
25   statements typically in the fall of the year --

Page 311

1  A.  Yes.
2  Q.  -- you reviewed them and relied on their
3    content?
4  A.  Yes.
5  Q.  How did you use the statements, not in your
6    review, but in your oversight role as a
7    trustee?
8  A.  I think the best way to say I used them was
9    from a comfort perspective, the fact that they
10   were certified by a quality firm and gave
11   comfort to me as a board member that there
12   were -- that, in fact, the opinion was clean.
13 Q.  Did you use the audited financial statements to
14   help gauge the financial performance of the
15   enterprise generally?
16 A.  I think that it validated the results.  The
17   results themselves I think is where I would
18   have looked at performance.
19 Q.  And the audited financial statements gave you a
20   validation for the accuracy of the results I
21   think is what you are saying?
22 A.  Yes, sir.
23 Q.  Did you use these audited financial statements
24   to help you make decisions about how to oversee
25   the business, the actual results in them?

Page 312

1  A.  I'd have to say yes.
2  Q.  Was accurate financial information about the
3    performance of AHERF important to you,
4    especially given the challenging market
5    conditions that you and Mr. Brooks discussed
6    earlier in this deposition?
7  A.  I think any -- I think any presentation, any
8    report coming out of an institution is
9    important to me.
10 Q.  And these financial statements would be such a
11   report?
12 A.  Absolutely.
13 Q.  Did you use the financial statements we have
14   been discussing to help measure the financial
15   performance of specific initiatives, like the
16   AIHG physician practice acquisition or other
17   hospital acquisitions?
18 A.  Yes.  Again, the answer is yes, but the
19   presentation given to me as a board member by
20   management quarterly and then at the end of the
21   year would have been the same type of -- board
22   would use the same information.
23 Q.  Was there anything you ever got from reading
24   the audited financial statements at year-end or
25   post year-end that led you to question the

Page 313

1    accuracy of the internal financial statements
2    at AHERF?
3  A.  No, sir.
4  Q.  When you were attempting to measure the
5    performance of financial management at AHERF,
6    did you use financial results as a part of that
7    monitoring and gauging --
8  A.  Yes, sir.
9  Q.  -- mechanism?
10 A.  Yes.
11 Q.  And those financial results were portrayed in
12   both the internal financial statements and the
13   annual audited financial statements?
14 A.  And portrayed in the form of performance given
15   to us so we could track against where we were
16   against budget for that period of time.
17 Q.  Okay.  So there's three sources of tracking I
18   think you are telling me:  there's internal
19   financial statements, the annual audited
20   financial statements, and then performance
21   against plan or budget?
22 A.  Plan or budget presented by management.
23 Q.  So -- but I'm right that there's all three of
24   those?
25 A.  Yes, sir.

20 (Pages 310 to 313)

Page 314

1   Q.   You spoke briefly about the reliance on the
2        auditors to prepare an appropriate plan and
3        scope for their work each year.  Do you recall
4        that just moments ago?
5   A.   Yes.
6            MR. JONES:  I'm going to ask our
7        court reporter to mark for us an exhibit that I
8        don't think has been marked in this litigation.
9                    - - - -
10       (Exhibit 2056 marked for identification.)
11                   - - - -
12  BY MR. JONES:
13  Q.   Mr. Gumberg, I've handed you what the court
14       reporter has kindly marked as Exhibit 2056
15       which I believe you'll find to be minutes of a
16       board meeting of the Allegheny Health,
17       Education and Research Foundation held on
18       Friday, June 21, 1996, which indicate that you
19       were a member and present.
20           Is that at least what this document
21       purports to be?
22  A.   Yes, it does.
23  Q.   I'm going to ask you to flip briefly for me to
24       the page that has -- that ends -- I'm sorry,
25       the page that has a Bates No. at the bottom

Page 315

1        right-hand corner which ends 200?
2   A.   Okay.
3   Q.   And under the Report from the Audit Committee,
4        I think you'll find text that indicates that
5        Mr. Barnes, who I believe was then perhaps
6        chair of the audit committee, presented the
7        Coopers & Lybrand proposed AHERF audit plan for
8        fiscal year 1996; is that right?
9   A.   IV (A) right -- or VI (A)?
10  Q.   Yes.
11  A.   Yes.
12  Q.   And is that your recollection that the full
13       board was presented with the Coopers & Lybrand
14       audit plan for the fiscal year in the spring or
15       early summer months of each calendar year?
16  A.   Yes.
17  Q.   In fact, the next bold text phrase anyway
18       reads, Resolved that the board of trustees of
19       Allegheny Health, Education and Research
20       Foundation approves the C & L proposed AHERF
21       audit plan for fiscal year 1996 as presented;
22       is that right?
23  A.   Yes.
24  Q.   And you recall that being a part of the process
25       at full board meetings?

Page 316

1   A.   Again, for the period of time that I was on the
2        bigger board, yes.
3   Q.   I understand, and I know there's a difference
4        of recollection and documentation as to when
5        you actually sat on the big board, and I think
6        it's at least in my mind from your testimony
7        that your recollection is that you joined the
8        full board in December of '96, or perhaps the
9        turn of the year '97, but we apparently have
10       records at least that indicate --
11  A.   Right.
12  Q.   -- otherwise; is that right?
13  A.   That's correct.
14  Q.   So even if you didn't -- and you don't have a
15       current recollection whether or not you
16       received these minutes or attended this
17       meeting; is that fair to say?
18  A.   I do not have a recollection.
19           MR. JONES:  I'm going to ask the
20       court reporter to mark for us one more exhibit.
21                   - - - -
22       (Exhibit 2057 marked for identification.)
23                   - - - -
24  BY MR. JONES:
25  Q.   Mr. Gumberg, I think the court reporter has

Page 317

1        just handed you Exhibit 2057; is that right?
2   A.   Yes.
3   Q.   And it purports to be I think you'll tell me an
4        April 8, 1996 letter from Coopers & Lybrand to
5        the audit committee of the board of trustees of
6        the Allegheny Health, Education and Research
7        Foundation; is that right?
8   A.   Yes.
9   Q.   And it, in fact, appears to be the audit plan
10       for that fiscal year; is that a fair way to
11       characterize the document?
12  A.   It does, yes.
13  Q.   And it is consistent with your recollection of
14       your board service that audit plans like these
15       were indeed presented to the audit committee
16       and then in turn to the big board in this time
17       period; is that correct?
18  A.   Well, I think the answer is I'm sure yes, but I
19       was not on the audit committee.
20  Q.   I understand.
21  A.   So I would --
22           MR. McCLENAHAN:  Do you mean in April
23       of '86 -- of '96.
24  A.   I was not until October 15th of '97, but it
25       does look that way, and this does look like

IRA GUMBERG                                                    Volume #2

1      THE WITNESS:  I don't mean to
2  interrupt your rhythm, but you can see that I
3  was also now asked to be on the AHERF, that
4  would have been 1997, audit committee.
5  BY MR. JONES:
6  Q.   Indeed on the same page we just referred to,
7      your appointment is mentioned expressly, and
8      that may help confirm for you the timing that
9      you've given to us earlier.
10  A.   Thank you.
11  Q.   I think you've just been handed Exhibit 2058,
12      Mr. Gumberg, which I think you'll also tell me
13      upon your review of it is the AHERF audit plan
14      provided by Coopers & Lybrand for fiscal year
15      1997 to which the board minutes we just
16      examined refer; is that accurate?
17  A.   Yes.
18  Q.   And do you recall receiving -- both attending
19      this meeting in April of '97 and receiving this
20      audit plan?
21  A.   No.  I do not recall attending the meeting.  I
22      recall my first meeting being October.
23  Q.   Do you know whether you, as you sit here today,
24      since I asked that in two parts and I shouldn't
25      have, whether you received this audit plan at

1      any time during your board service at AHERF?
2  A.   I do not recall.
3  Q.   Mr. Gumberg, as you understood the protocol in
4      the annual audit process, the audited financial
5      statements for AHERF and its affiliated
6      enterprises were first presented by the
7      auditors to the audit committee; is that right?
8  A.   That's how I understand it.
9  Q.   And then the audit committee in turn shared
10      them with the full board thereafter, the
11      audited financial statements?
12  A.   I'm not sure it was the -- I'm sure the audit
13      committee reviewed it, but I believe then
14      management presented them to different
15      committees.
16  Q.   Thank you for the clarification.  Ultimately
17      they were presented by someone to the full
18      board after the audit committee meeting is my
19      point?
20  A.   That would be -- yes.
21  Q.   And I think -- is it your recollection that
22      your first board meeting was in December of
23      1996 now, your first full board meeting, that
24      is at the AHERF level?
25  A.   That was my recollection.

1  Q.   Okay.
2  A.   It does seem that I may have attended prior,
3      but that was my recollection.
4  Q.   We may have marked this, but for ease I'm going
5      to pull out other copies now.  The December 12,
6      1996 board minutes have been previously marked
7      in this case as Exhibit 832, if I can read the
8      numerals on that exhibit sticker.
9          MR. McCLENAHAN:  You don't need to
10      remark them; right?
11          MR. JONES:  No.
12  Q.   And you are indeed noted on the minutes that I
13      just handed you as Exhibit 832 as attending;
14      correct?
15  A.   Yes.
16  Q.   And while other matters were discussed at this
17      meeting that had been reviewed with you earlier
18      today, the fiscal year 1996 audited financial
19      statements were also presented and discussed --
20          MR. BROOKS:  Objection.
21  Q.   -- I think you'll tell me having reviewed
22      page -- the page that ends with the Bates No.
23      762?
24  A.   Yes.
25  Q.   And that meets with your recollection of the

1  meeting as well?
2  A.   Yes.
3  Q.   And that the minutes -- the statements were
4      ultimately approved; is that accurate?
5  A.   Yes.
6  Q.   Mr. Barnes, it is indicated, presented the
7      audited financial statements for fiscal year
8      1996, and he also apparently, according to the
9      minutes, presented a report that included
10      related debt compliance letters for AHERF; is
11      that accurate?
12  A.   I see report on internal controls.
13  Q.   I'm sorry, let me refer you back to 762.
14  A.   I see, yes, included the debt compliance
15      letters, yes.
16  Q.   And that's a presentation that you are familiar
17      with that was annual in that the auditors would
18      perform certain activity with respect to debt
19      compliance and present a report?
20  A.   Yes.
21  Q.   I want to hand you what has been marked earlier
22      in another deposition as Exhibit 1939, which I
23      think upon review you will tell me is a report
24      of independent accountants signed by Coopers &
25      Lybrand and dated September 11, 1996, on debt

23 (Pages 322 to 325)

Page 326

1    compliance for fiscal year 1996; is that right?
2  A.  Yes.
3  Q.  In the second paragraph, Coopers & Lybrand
4    tells the board of trustees of Allegheny
5    General Hospital -- a member of which you were;
6    correct?
7  A.  Yes.
8  Q.  -- that in connection with their audit, nothing
9    came to their attention that caused them to
10   believe that the obligated group was not in
11   compliance with the covenants insofar as they
12   relate to accounting or auditing matters
13   contained in section 7 of the reimbursement and
14   security agreement dated April 1, 1995, with
15   Morgan Guaranty Trust Company of New York and
16   PNC Bank; is that a fair statement or fair
17   recitation of the sentence?
18 A.  Yes, and it looks like it helps, perhaps helps
19   me date back to an earlier discussion, I
20   couldn't tell what year on -- that I introduced
21   the bank, the institution.  This might have
22   been Morgan Guaranty.  I just don't remember,
23   it was either Morgan or JP Morgan.
24        MR. BROOKS:  Okay.
25 Q.  What importance did you attach to these reports

Page 327

1    of independent accountants, including Exhibit
2    1939, with respect to debt compliance issues?
3  A.  Important that our -- our fund balance and/or
4    our income and liquidity was, in fact,
5    acceptable to our lending institutions.
6  Q.  If, in fact Allegheny General Hospital or any
7    member of the obligated group or the obligated
8    group itself was not in compliance, what kind
9    of circumstances might befall the enterprise in
10   that event?
11 A.  It could have -- I would think it could have
12   caused a default.
13 Q.  And what can a default lead to?
14 A.  I'm not sure.  Some defaults could have
15   cross-defaults that would lead to other sources
16   of collateral, could have led to our inability
17   to refinance or raise funds through the --
18   through the public market, the bond market.  It
19   may have caused some reputational damage.
20 Q.  And defaults can lead to long-term debt being
21   declared current and due; is that accurate?
22 A.  I believe that's the case.
23 Q.  If Coopers & Lybrand instead of providing the
24   report marked as Exhibit 1939 had told the
25   board of trustees of Allegheny General

Page 328

1    Hospital, or AHERF for that matter, that
2    through that work they had uncovered a
3    violation of a debt covenant or specifically an
4    unrestricted fund balance covenant that was
5    included in the security agreement with Morgan
6    Guaranty and PNC, would that have caused you
7    concern?
8        MR. BROOKS:  Objection.
9  A.  Yes.
10 Q.  And for the reasons we just mentioned?
11 A.  Yes.
12 Q.  You were not so told, were you?
13 A.  I was not.
14 Q.  Mr. Gumberg, we are handing you now what has
15   been marked early in these proceedings as
16   Exhibit 22.
17        MR. McCLENAHAN:  22.
18 Q.  Which I think I was there, I can testify.
19        MR. McCLENAHAN:  I don't think I've
20   seen anything with less than four digits.
21 Q.  I will ask you to look at it and tell me if you
22   recognize it as a September 23rd, 1996
23   management comment letter signed by Coopers &
24   Lybrand to the board of trustees of the
25   Allegheny Health, Education and Research

Page 329

1  Foundation?
2        MR. BROOKS:  Objection, lack of
3  foundation.
4        MR. McCLENAHAN:  Are you asking
5  whether he recognizes this letter as such or --
6        MR. JONES:  We can break it down.  I
7  understand the --
8        MR. McCLENAHAN:  -- has he ever seen
9  it before?
10        MR. JONES:  Well, I asked him what I
11  asked him, but I'll break it down.
12 BY MR. JONES:
13 Q.  Does the letter purport to be a letter from
14   Coopers & Lybrand dated September 23rd, 1996,
15   in the form and format of a management comment
16   letter?
17 A.  It does.
18 Q.  Do you recall today, Mr. Gumberg, whether you
19   received this management comment letter?
20 A.  I don't recall.  I -- I just don't recall.
21 Q.  I'm going to ask you -- and you've testified
22   earlier about what you knew and didn't know
23   about how broadly these were circulated.  We
24   will not rehash that.  My question deals with
25   the management comment letter's subsection on

24 (Pages 326 to 329)

Page 342

1     Coopers & Lybrand had reviewed the internal
2     controls within AHERF and its obligated group
3     entities and stated that there were no matters
4     noted during the audits that would be
5     considered to be material weaknesses in the
6     internal control structure.
7         Do you recall that being the case,
8     that he so reported?
9 A.  I don't recall.
10 Q.  What does that sentence mean to you as you read
11     it?
12         MR. BROOKS: Objection.
13 A.  That's a healthy statement about the
14     institution's controls.
15 Q.  And the controls in your mind were what? What
16     kinds of things made up the controls?
17 A.  I think the critical -- the critical accounting
18     controls.
19 Q.  You don't recall coming away from the audit
20     meeting in October of '97 with any view that
21     Mr. Buettner had opined negatively on the
22     controls, do you?
23 A.  May I ask a question?
24 Q.  Sure.
25 A.  So that I understand? Was this the meeting

Page 343

1     where the management letter was presented, a
2     management letter was presented that indicated
3     a number of issues to be suggestions I would
4     say?
5 Q.  I can't tell you that the minutes reflect the
6     presentation of a management letter at this
7     meeting.
8 A.  Okay. I just want to get my time right, in the
9     right order so I give an honest, appropriate
10     answer.
11 Q.  I understand. There indeed was a 1997
12     management letter. I can't tell you from the
13     minutes or my read of them here that it's
14     discussed here.
15 A.  I believe that the 1997 -- if I'm right, based
16     on dating, I know I tend to be accurate,
17     certainly with my integrity -- that the 1997
18     management letter that was presented I believe
19     to this audit committee clearly identified
20     issues to be watchful of and that suggestions
21     made.
22         The statement about the fact there
23     are no material weaknesses of our internal
24     controls is a -- is a strong statement to the
25     board and to the committee that what was

Page 344

1     submitted were areas to improve, but that the
2     structure of the controls were well in place.
3     That's the way I think I have to answer that,
4     if my timing is accurate.
5 Q.  Do you recall learning at any point,
6     Mr. Gumberg, that the actual numbers in the
7     financial statements that were presented post
8     audit but presignature by Coopers & Lybrand in
9     October of 1997 were in any way changed, that
10     the numbers were in any way changed after they
11     ultimately signed the report and the report was
12     distributed after the turn of the year 1998?
13 A.  I recall it being identical.
14 Q.  You recall it being?
15 A.  Identical.
16 Q.  Do you recall -- strike that.
17         MR. BROOKS: Jim, I'm going to need
18     to ask for a short break for a moment.
19         MR. JONES: Sure. This is a good
20     time.
21         THE VIDEOGRAPHER: We are now going
22     off the record. The time is 12:01 p.m.
23         - - - -
24     (There was a recess in the proceedings.)
25         - - - -

Page 345

1         THE VIDEOGRAPHER: We are now going
2     back on the record. The time is 12:06 p.m.
3 BY MR. JONES:
4 Q.  Mr. Gumberg, in connection with Coopers &
5     Lybrand's work as the independent auditors for
6     the AHERF organizations while -- throughout the
7     time you were a trustee of any AHERF enterprise
8     or board committee, did you expect the auditors
9     to bring to the audit committee or to the
10     board's attention material misstatements in the
11     financial statements presented for their audit?
12 A.  Yes.
13 Q.  Did you expect the auditors to bring to the
14     board and the audit committee's attention
15     intentional misstatements in the financial
16     statements?
17 A.  Yes.
18 Q.  Did you expect them, that is Coopers & Lybrand,
19     to bring to the audit committee and the board's
20     attention any concerns they had regarding the
21     integrity of financial management or its
22     competence?
23         MR. BROOKS: Objection.
24 A.  Yes.
25 Q.  Did you expect them, that is the auditors,

28 (Pages 342 to 345)

Page 346

1     Coopers & Lybrand, to bring to the audit
2  committee and the board's attention fraud on
3  the part of financial management or suspected
4  fraud on the part of financial management that
5  they uncovered?
6     MR. BROOKS:  Objection.
7  A.   Absolutely, if they knew.
8  Q.   Did Coopers & Lybrand ever raise these matters
9  with you or the committee to your knowledge or
10  with the board to your knowledge?
11  A.   Certainly not to me.  I don't believe to other
12  board members.
13  Q.   Before --
14  A.   But I don't know everybody.
15  Q.   Before the spring of 1998, did you yourself
16  question the integrity or competence of
17  Mr. Abdelhak?
18  A.   No.
19  Q.   Before the spring of 1998, did you question the
20  competence or integrity of Mr. McConnell?
21  A.   I would say no.
22  Q.   Ultimately both gentlemen were discharged; is
23  that accurate?
24  A.   Yes.
25  Q.   Explain for me, if you would, what you

Page 347

1  understand precipitated Mr. Sherif's departure
2  from the -- Mr. Sherif Abdelhak's departure
3  from the organization?
4  A.   I think it was for a couple of reasons:  One,
5  when -- when I and other members of the board
6  found out of the contravention against our
7  resolution of not touching funds on the west
8  that had taken place; secondly, I think the
9  integrity had come undone from the standpoint
10  of the physicians, and Sherif in our opinion
11  lost the ability to lead the medical group;
12  thirdly, I believe it was due to the fact that
13  we were not able to turn around the financials
14  of the institution as promised and that we had
15  lost the faith in the fact that he could lead
16  the institution from that perspective; and I
17  also believe that the fact that the disposition
18  deal with Vanguard which had been talk and
19  never really turned into appropriate price or
20  action had taken place.
21  Q.   When you came to these conclusions, did you
22  yourself act as promptly as practical?
23  A.   I believe that I did.
24  Q.   In asking Mr. Abdelhak to depart?
25  A.   Well, what I did was I went to what I referred

Page 348

1  to as senior leaders of the board.  I discussed
2  it with one or two senior leaders, and I knew
3  that they picked up the phone and discussed it
4  with others, and then the momentum just
5  started.
6  Q.   Why is it as you recall it today that
7  Mr. McConnell was discharged in the spring or
8  summer of 1998?
9  A.   I believe it was a recommendation by Tony
10  Sanzo, who then became the CEO of the
11  institution, that he felt that he had to go.
12  Q.   Do you recall it involving to your knowledge
13  anything related to the transfer of certain
14  reserves from the former Graduate Hospitals to
15  the Delaware Valley Obligated Group hospitals?
16  A.   Yes, there was an issue regarding that, and I
17  heard about it the day before, there was a
18  meeting with MBIA, and I made a recommendation,
19  I believe it was myself that made a
20  recommendation we bring in Chuck Queenan as a
21  special investigator to report to the audit
22  committee and to report to Dave Barnes.  Dave
23  Barnes agreed with that.
24          I also wanted to be sure when I heard
25  it that Sherif was going to present that

Page 349

1  situation, that fact that there could be a
2  problem to MBIA.
3  Q.   Do you know whether he ever did?
4  A.   Yes, I actually think that he did.
5  Q.   With respect to Mr. McConnell, did you move as
6  quickly as you thought practical to investigate
7  and make a determination about whether he
8  should stay with the organization?
9     MR. BROOKS:  Objection.
10  A.   Again, I believe so, it being more in the hands
11  of the CEO of the organization that had to
12  guide that, but without question I think that
13  I -- I passed my comments on.
14  Q.   Before the bankruptcy in July or August of
15  1998, did you ever question the integrity or
16  competence of Mr. Buettner or his fellow
17  Coopers & Lybrand auditors?
18  A.   I never did.
19  Q.   Before that same time period, summer of 1998,
20  at the time of the bankruptcy, did you ever
21  question the accuracy -- accuracy of the
22  audited financial statements you had received?
23  A.   I never did.
24  Q.   If Coopers & Lybrand had told you, Mr. Gumberg,
25  that the fiscal year 1996 or 1997 financial

29 (Pages 346 to 349)

Page 350

1   statements presented for audit were materially
2   misstated and that C & L was therefore issuing
3   an adverse opinion on those statements, what
4   would your reaction have been?
5        MR. BROOKS:  Objection, calls for
6   speculation.
7   A.  Well, I think I would have been at first scared
8   to hear something like that.  Secondly, I
9   believe we would have brought in consultants to
10  help advise us.  We may have even asked Coopers
11  under an engagement with the audit committee to
12  delve deeper and to report back to us their
13  additional findings.
14  Q.  And so you were -- go ahead.
15  A.  And I think it's also possible that from my
16  own -- my business bellybutton, my business
17  intuition, that had we been in that position,
18  we may have put the brakes on everything that
19  was going on until we get our hands around it.
20  Q.  What do you mean by the brakes on everything?
21  A.  I would think that it may have affected any
22  other acquisition strategy we had.  I'm sitting
23  here today looking backwards, but I would think
24  if we had found ourselves in that position,
25  would have had to have looked at everything

Page 351

1   that was happening.
2   Q.  Including hospital acquisitions and physician
3   practice acquisitions?
4        MR. BROOKS:  Objection.
5   A.  That's what I meant by, yes, by acquisitions.
6   Q.  That's what you meant?
7   A.  That's what I meant.
8   Q.  If the inquiries either led by Coopers &
9   Lybrand, the board, or other consultants had
10  drawn into question the competence and
11  integrity of Mr. Abdelhak or Mr. McConnell or
12  others in financial management leadership, what
13  options did you have?
14       MR. BROOKS:  Objection.
15  A.  I think none other than terminate them.
16  Q.  And do you believe you would have acted
17  prudently to select the appropriate option of
18  those -- option from those that you just gave
19  us?
20       MR. BROOKS:  Objection.
21  A.  Absolutely.
22  Q.  If Coopers & Lybrand had told you that the
23  fiscal year 1996 or 1997 financial statements
24  presented for their audit had been
25  intentionally misstated by management, would

Page 352

1   that have concerned you?
2        MR. BROOKS:  Calls for speculation.
3   A.  Frightening.
4   Q.  And you would have had the same kinds of
5   options and could have selected from them as
6   you just described?
7   A.  Absolutely.
8        MR. BROOKS:  Same objection.
9   Q.  If C & L or Coopers & Lybrand had told you that
10  net income, the lines to which we just referred
11  on the audited financial statements, on the
12  fiscal year 1996 statement of operations
13  presented for their audit had been overstated
14  in violation of generally accepted accounting
15  principles by approximately $80 million, what
16  would your reaction have been?
17       MR. BROOKS:  Objection.
18  A.  I believe it would have been to replace for
19  sure the financial side of our house and maybe
20  as well possibly our CEO.
21  Q.  And you had the same kind of options with
22  respect to putting a brake on further
23  acquisitions as well?
24  A.  Absolutely.
25  Q.  Do you believe you would have pursued that

Page 353

1   course?
2        MR. BROOKS:  Objection.
3   A.  I believe we -- I believe that would have been
4   a course to pursue.
5   Q.  Would you have required that the inappropriate
6   entries be reversed or restated?
7   A.  I think we would have had an obligation to do
8   that as a -- as a public entity.
9   Q.  If C & L or Coopers & Lybrand had told you that
10  net income on the fiscal year 1997 statement of
11  operations presented for audit had been
12  overstated contrary to generally accepted
13  accounting principles by approximately $100
14  million or more, would your reaction have been
15  the same?
16  A.  Yes.
17       MR. BROOKS:  Objection.
18  Q.  And your options and your course have been the
19  same?
20       MR. BROOKS:  Objection.
21  A.  Yes, sir.
22  Q.  If Coopers & Lybrand had told you that its
23  auditors had come to question the integrity and
24  honesty of senior financial management, would
25  that have concerned you?

IRA GUMBERG                                                    Volume #2

Page 354

1           MR. BROOKS:  Objection.
2   A.   Terribly so.
3   Q.   And you would have had the same options and
4        could have pursued the same courses?
5           MR. BROOKS:  Objection.
6   A.   Yes, sir.
7   Q.   If Coopers & Lybrand had informed you that the
8        fiscal year 1996 or 1997 financial statements
9        presented for audit were the product of
10       fraudulent conduct or suspected fraudulent
11       conduct on the part of financial management,
12       what would your reaction have been?
13          MR. BROOKS:  Same objection.
14  A.   I think the same feeling of great fear.
15  Q.   Would you have had the same kinds of options?
16  A.   I believe so.
17  Q.   And do you believe you would have followed the
18       same kinds of courses?
19          MR. BROOKS:  Objection.
20  A.   Yes, sir.
21  Q.   Would audit revelations like these have
22       affected your view about the financial success
23       of the strategy to acquire eastern hospitals
24       and physician practices?
25          MR. BROOKS:  Objection, calls for

Page 355

1        speculation.
2   A.   I would suspect it would have had an impact.  I
3        just want to be careful to say that I believe
4        that part of the AIHG acquisitions was also the
5        defensive mode that we were -- that our better
6        physician groups or better physicians were
7        being targeted by competitors.  I think I -- in
8        the bigger picture of what you are -- what you
9        are asking me, the answer though is would have
10       called into question the strategy clearly.
11  Q.   Would audit revelations like these for fiscal
12       year 1996 as we just discussed them have caused
13       you to exercise more caution -- strike that.
14  A.   Is it okay if I get a bottle of water?
15  Q.   Sure.
16          You mentioned that audit revelations
17       from Coopers & Lybrand like some of those we
18       have just discussed would have caused you to
19       put the brakes on acquisitions.  Do you recall
20       that testimony?
21          MR. BROOKS:  Objection.
22  A.   Right.
23  Q.   What about those -- these kinds of revelations
24       would have caused you to think that would have
25       been the prudent course?

Page 356

1           MR. BROOKS:  Objection, calls for
2        speculation.
3   A.   I think any time that you are under a crisis, a
4        fraudulent crisis, a misrepresentation crisis,
5        an accident with the financials, I don't know
6        how it would be labeled, that would, in fact,
7        advise you that you are off by maybe 80 million
8        one year, 100 million the next year, those are
9        sizable mistakes and I think calls into
10       question everything that we are doing,
11       including the execution team.
12  Q.   Does it also or would it also have called into
13       question your view of whether real efficiencies
14       or synergies or other benefits had materialized
15       from the integrated delivery system strategy?
16  A.   Correct, I think that's -- that goes without
17       saying, yes.
18  Q.   You were never told anything -- strike that.
19          Were you ever told anything by
20       Coopers & Lybrand that led you to believe that
21       the acquisition of The Graduate Hospitals could
22       threaten AHERF's ongoing financial viability?
23  A.   I don't -- I don't recall hearing that from
24       Coopers.
25  Q.   Do you recall seeing anything in the audited

Page 357

1        financial statements that you reviewed that led
2        you to think that the acquisition of The
3        Graduate Hospitals could threaten AHERF's
4        ongoing financial viability?
5   A.   I don't recall that either.
6   Q.   Were you ever told anything by the auditors or
7        did you ever see anything in the audited
8        financial statements for fiscal years 1996 or
9        1997 that led you to believe that ongoing
10       physician practice acquisitions could threaten
11       the financial viability of AHERF?
12  A.   I don't recall that either.  If I could maybe
13       elaborate on that question, I would say that
14       based on the financials that were presented to
15       us at a finance level, in terms of budgets,
16       that AIHG drag on earnings, so to speak, was
17       absorbable on a consolidated basis.
18  Q.   It was your view throughout your board service
19       that AIHG losses, both capital and income,
20       could be funded by the reserves of the greater
21       institution?
22  A.   Either earnings and/or reserves, yes.
23  Q.   In that connection, Mr. Gumberg, I'm going to
24       ask you to refer back to an exhibit that
25       Mr. Brooks showed you, Exhibit 522, which is an

31 (Pages 354 to 357)

Page 358

1    April 10, 1997 letter from Mr. McConnell to the
2    board of trustees.
3        MR. McCLENAHAN:  What date?
4        MR. JONES:  April 10, 1997, enclosing
5    slides from a then recent board retreat.
6  A.  Okay.  I have it.
7  Q.  I'm going to ask you to skip to page that ends
8    896, which is towards the very back of the
9    document, and is headed Allegheny Integrated
10   Health Group Projected Statement of Revenue and
11   Expenses for Fiscal Years --
12       MR. BROOKS:  896?
13       MR. JONES:  Yes.
14  Q.  -- Fiscal Years 1997 through 2000.  Are you
15    with me?
16  A.  Yes, sir.
17  Q.  I think I'm going to highlight for you a line
18    or a row rather that received no highlighting
19    during your prior examination on this document,
20    and that is the total net income/loss row.
21  A.  Yes, I see it.
22  Q.  It does indeed show a I think at the time
23    projected loss for the entire Allegheny
24    Integrated Health Group enterprise of 53
25    million in 1997; is that right?

Page 359

1  A.  Yes.
2  Q.  But then those losses as a matter of the
3    projections set forth gets smaller and, in
4    fact, turn to gains by the year 2000; is that
5    right?
6  A.  Yes.
7  Q.  And that is the total net income apparently --
8  A.  I would think that's -- fiscal 2000?
9  Q.  Yes.
10  A.  So that would be in 1999.
11  Q.  Thank you.  In any event, these losses turning
12    to gains as a trend are total in that they
13    include both physician practice operations and
14    risk contracting endeavors, at least as
15    depicted here.
16  A.  Yes.  I -- I should point out, if it's okay.
17  Q.  Go ahead.
18  A.  I should point out that the physician practice
19    bottom line continues to be negative through
20    fiscal 1999 -- through fiscal 2000, which is
21    year 1999, and it's the risk contracting that
22    is profitable from day one and grows
23    significantly to offset that.  I believe I'm
24    reading that correctly.
25  Q.  I understand, and, in fact, the physician

Page 360

1    practice acquisition bottom line, although it
2    hits a bump in 1998, as depicted here indicates
3    smaller losses in '99, 2000; is that fair?
4  A.  Clearly.
5  Q.  And is that consistent then with your general
6    recollection of the way AIHG and its efforts
7    were depicted for you that the losses would
8    diminish over time?
9  A.  Yes.
10  Q.  And, in fact, as you understood the program,
11    operating losses were reflected in
12    presentations to you by management as a
13    short-term phenomenon; is that accurate?
14  A.  Excuse me.  I'm making too much noise so let me
15    put it away.  I'm sorry, could you ask that
16    again?
17       MR. JONES:  Maybe we could have that
18    read.
19          - - - -
20    (The record was read back by the Reporter.)
21          - - - -
22  A.  That's correct.  As a matter of fact, I think
23    that it was actually viewed as seed money for
24    it ultimately would become either profitable or
25    profitable through the generation of referrals.

Page 361

1  Q.  I think I'm going to ask you to turn your
2    attention now, Mr. Gumberg, to events in 1998
3    and -- or at least primarily in 1998.
4  A.  Okay.
5  Q.  And you discussed today and I think at some
6    point yesterday your concern about the
7    potential misclassification of loans from AGH,
8    AGH's, with an apostrophe S, funded
9    depreciation accounts to fund eastern
10    operations.  Do you recall that testimony?
11  A.  I do.
12  Q.  Part of what you thought was the problem when
13    you discovered these loans and their size -- I
14    think for the first time in October of 1997; is
15    that right?
16  A.  That is correct.
17  Q.  -- was the misclassification on the financial
18    statements; is that right?
19  A.  Yes, a mislabeling I thought, right, maybe a
20    misclassification.
21  Q.  And I think we are saying synonymous terms.
22    Descriptions in the financial statements of the
23    loans that you didn't think were fair?
24  A.  Correct.
25  Q.  And then I think I understood that you had

Page 366

1  Q.   And did you understand that that vetting was to
2       take place while these hospitals that were
3       former members of the Graduate Health System
4       were corporately housed in an enterprise known
5       as SDN?
6  A.   Yes, and I believe that -- at least I believe I
7       understood it to be taking place that way
8       because there were certain assets that may not
9       be merged in, certain assets that may be
10      eliminated.
11 Q.   Or excluded?
12 A.   Right, correct.
13 Q.   And that further review would determine which
14      would be which?
15 A.   That's why I believe the SDN vehicle was set
16      up.
17 Q.   Did you ever come to learn that at what time
18      period any of the former Graduate Hospital or
19      Graduate Health System enterprises were
20      actually made a part of AHERF?
21 A.   I don't remember.
22 Q.   Do you recall it being in the spring or early
23      summer months of 1997?
24 A.   Could have.  Could have been.  I -- I don't --
25      was it summer when -- did Centennial become the

Page 367

1       board, was it known as the Centennial board?
2  Q.   There was a Centennial board.
3  A.   Is there any interrelation?  I'm just trying
4       to --
5  Q.   We just want your best recollection.
6  A.   Then I can't answer.  I don't know.
7  Q.   That's fine.
8  A.   I'm trying to answer you.
9  Q.   And we understand that you are trying to be as
10      forthright as you can be.
11 A.   That's right.
12 Q.   I think in testimony regarding the October 15,
13      1997 audit committee meeting you described
14      Mr. Abdelhak's comments an explanation of the
15      foundation of these intercompany loans that had
16      occurred.  Do you recall that testimony?
17 A.   Yes.
18 Q.   Mr. Buettner was also involved in that
19      conversation by the minutes or transcribed
20      notes that we saw.  Do you recall that being
21      the case as well?
22 A.   I recall him I believe answering questions.
23 Q.   And do you recall his role to be answering
24      questions about the accounting rather than the
25      reasons for the loans?

Page 368

1  A.   Yes, that was my recollection.
2  Q.   Was part of your concern about the intercompany
3       loans revealed in October of 1997 to you the
4       lack of prior board or board committee
5       approval?
6  A.   I think more knowledge than approval.
7  Q.   And why do you say that?
8  A.   I just think that it was -- it came across as a
9       surprise to me the way I heard it and when I
10      heard it and seemed to be a substantial number.
11 Q.   When we discussed or rather you discussed this
12      topic on the record earlier, I want to make
13      sure I understood the conversation.  Did you
14      understand these loans that were revealed in
15      a -- strike that entirely.  New topic.
16           A different loan type transaction
17      occurs and is ultimately shared with you in the
18      spring of '98, and that is the taking of
19      amounts previously held in funded depreciation
20      at Allegheny Valley and Forbes Hospital.  Do
21      you remember that testimony earlier today?
22 A.   I do.
23           MR. McCLENAHAN:  Object to form.  I
24      don't believe that's ever been described as a
25      loan.

Page 369

1  Q.   The taking of funds.
2  A.   I was going to say the same thing, it was a
3       taking.  I don't know that it was a taking to
4       be replaced.
5  Q.   And I take your edit and Mr. McClenahan's edit
6       to my question, and with that edit it is your
7       recollection of the circumstances there
8       involved that amounts previously held in
9       Allegheny Valley Hospital's and the Forbes
10      Hospital's funded depreciation accounts were
11      used by Mr. Abdelhak to repay a line of credit
12      to the Mellon Financial institution.  Is that
13      the way you recall the transaction?
14 A.   That's the way I recall it, plus some other
15      AHERF funds.
16 Q.   I understand.  And that endowment funds and
17      their use to pay whomever they might have been
18      used to pay was a separate issue; is that fair?
19 A.   Yes.
20 Q.   All of which you learned about, if at all, not
21      until 1998; is that correct?
22           MR. BROOKS:  Objection.
23 A.   I learned about it -- I think I learned about
24      it when I had the second call from Sherif.
25 Q.   Which was in, as you recall it, 1998?

Page 370

1  A.   Yes, correct.
2                        - - - -
3       (Exhibit 2060 marked for identification.)
4                        - - - -
5  Q.   Mr. Gumberg, I have just handed you what has
6       been marked as Exhibit 2060, and I'm going to
7       ask you if you know what it is and if you would
8       tell me?
9  A.   This is a recitation of what happened from the
10      first time I received the call from Sherif
11      where I decided a couple days later to begin
12      memorializing these dialogues.
13 Q.   So this document would have been started within
14      a few days of October 20 -- or April 23rd or
15      24, 1998?
16 A.   Well, certainly within a week I would have felt
17      that I would have started this.
18 Q.   And did you create it in handwriting and have
19      it typed, or did you type it yourself?
20 A.   I don't type, so I would have written the daily
21      comments and then have it typed by my
22      secretary.
23 Q.   And why is it again -- strike that.
24           Is this the chronology that you
25      referred to earlier in your testimony today?

Page 371

1  A.   Yes.
2  Q.   And why is it that you created the chronology
3       again?
4  A.   When I received the phone call that he had paid
5       off Mellon --
6  Q.   The "he" in that sentence is Mr. Abdelhak?
7  A.   "He" being Sherif Abdelhak, and the use of
8       AHERF funds, I just began, just sort of didn't
9       feel right in my stomach.
10 Q.   And it was for your purpose of documenting
11      events so that you could recall them at a later
12      time?
13 A.   Yes.
14 Q.   And it would have been your best recollection
15      of events at the time, this document?
16 A.   Oh, absolutely.
17 Q.   At some point in the summer and fall of 1998 or
18      summer or fall of 1998, there were questions
19      raised at the board level and audit committee
20      level about the accuracy of certain of the
21      audited financial statements of AHERF in prior
22      years.  Is that accurate?
23 A.   I believe so, yes.
24 Q.   And you were a part of some of the meetings at
25      which that topic was discussed?

Page 372

1  A.   I would think I was.
2  Q.   And ultimately is it your recollection,
3       Mr. Gumberg, that there was a public
4       announcement issued jointly by the AHERF board
5       and the then-merged auditing firm of
6       PriceWaterhouseCoopers that no further reliance
7       should be taken on the 1997 financial
8       statements that had been audited by Coopers &
9       Lybrand?
10 A.   Yes, that's correct.
11 Q.   Did you find -- strike that.
12           Do you recall being involved in the
13      determination to issue that statement, that
14      public statement?
15           MR. McCLENAHAN:  I'm sorry, what was
16      your question?
17           MR. JONES:  Does he recall being
18      involved in the issue to the public no further
19      reliance statement.
20 A.   I'm not sure if I was involved in the -- in the
21      decision, but I -- because I think it was
22      professionally guided by our professionals, but
23      I certainly didn't -- I certainly went along
24      with it.
25           MR. McCLENAHAN:  Do you want this

Page 373

1  marked as an exhibit?
2       MR. JONES:  It's already been marked.
3  Q.   Mr. McClenahan is doing me the great favor of
4       handing you Exhibit 1289, Mr. Gumberg, and I'm
5       going to ask you to review it and tell me if
6       you can identify it as the statement that no
7       further reliance should be had.
8                        - - - -
9       (The witness reviewed the Exhibit.)
10                       - - - -
11 A.   I think this is the document that was released.
12 Q.   And is it your recollection that at least the
13      two items which appear next to black diamonds
14      in the release were accounting treatments
15      discussed with board or audit committee members
16      before the release of this statement?
17 A.   Well, the Graduate situation I know for sure.
18 Q.   And that's the first black diamond; correct?
19 A.   Yes, and correctly reversing reserves and the
20      income I think is what that was.  I don't --
21 Q.   And the second one is earnings and tradings
22      from certain restricted funds may have been
23      incorrectly reported as net assets released
24      from restrictions and investment income.  Do
25      you see that?

35 (Pages 370 to 373)

IRA GUMBERG                                    Volume #2

Page 394

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3       I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness, IRA
6  GUMBERG, was by me first duly sworn to testify to the
7  truth; that the foregoing deposition was taken at the
8  time and place stated herein; and that the said
9  deposition was recorded stenographically by me and
10  then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 7th day of
23  October, 2003.
24                    _____
25                    Notary Public

Page 395

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
   COUNTY OF ALLEGHENY        )  S H E E T
2
       I, Ira Gumberg, have read the foregoing pages
3  of my deposition given on Friday, October 3, 2003,
   and wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21                    _____
                         IRA GUMBERG
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24                    _____
                      Notary Public
25  AKF Reference No. HW77545