**Harrington Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE COOPERS*

---

**JUDY HARRINGTON**
*April 3, 2003*

---

## MANHATTAN REPORTING CORP.
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**HARRINGTON, JUDY**

Page 166

JUDY HARRINGTON

1
2   A. Yes, yes. Yes
3   Q. All right. We can set that aside.
4       You know, we've asked you or Miss Zach
5   asked you questions about risk contracts. There      02:41PM
6   really weren't a large number of risk contracts in
7   the eastern region; is that right?
8   A. Right.
9   Q. I think it's in the record here and there,
10  but I want to put it in one place. We have the U.S.  02:41PM
11  Healthcare contract which we've talked about?
12  A. Right.
13  Q. The Keystone Health Plan East contract?
14  A. Right.
15  Q. Which we talked about. Keystone Health Plan      02:41PM
16  East being somehow affiliated with Independence Blue
17  Cross?
18  A. Right.
19  Q. Besides those two, were there any other risk
20  arrangements in the eastern region that you would    02:41PM
21  consider substantial or large?
22  A. Well, the Qualmed, supposed Qualmed risk
23  agreement, but that was very small. No. I mean,
24  there was a primary care risk arrangement with
25  Labors District Counsel, but it was primary care     02:41PM

Page 167

JUDY HARRINGTON

1
2   focus, it wasn't a full risk agreement.
3   Q. So there's the Qualmed arrangement, later
4   Qualmed was called Foundation Health System?
5   A. Yes.                                              02:42PM
6   Q. But you depicted that as a small agreement?
7   A. Right.
8   Q. By that, there were not a large number of
9   covered lives?
10  A. There were very few lives and it was always      02:42PM
11  -- to me, it was unclear that whether or not we had
12  a risk arrangement since I had no information about
13  the number of lives, where they were or anything.
14  Utilization. Never got a utilization report.
15  Q. And you just mentioned another risk           02:42PM
16  arrangement, but that was for primary care services
17  only?
18  A. Labors District Counsel. We managed a
19  primary care network for them and then AHERF had a
20  Workers' Comp agreement which wasn't done out of my  02:42PM
21  office, but there was some -- it was some kind of
22  risk arrangement for Workers' Comp.
23  Q. There was also an Aetna arrangement?
24  A. Aetna arrangement.
25  Q. Was that distinct from the U.S. Healthcare.       02:42PM

Page 168

JUDY HARRINGTON

1
2   A. That was distinct from U.S. Healthcare and
3   when the two, U.S. Healthcare and Aetna merged, that
4   merged into the U.S. Healthcare. I don't think we
5   had hardly any -- I think we had very few Aetna      02:42PM
6   lives, distinctly Aetna lives, before they merged
7   with U.S. Healthcare.
8   Q. Then I think we saw a document earlier that
9   talked about some kind of risk arrangement between
10  Graduate and the Police and Fire Department of       02:43PM
11  Philadelphia?
12  A. Right. I don't know if that was separate
13  from the Qualmed risk arrangement or whether that
14  was -- it was separate. It was a separate kind of
15  arrangement for PMFA, but, again, that was also a    02:43PM
16  very small group.
17  Q. So aside from U.S. Healthcare and the
18  Keystone health plan, these were not arrangements?
19  A. Not significant.
20  Q. Right. And there may have been -- there was      02:43PM
21  also Medicaid risk arrangement?
22  A. With Health Partners, right.
23  Q. Was there anything else in the east by way
24  of risk contracts?
25  A. No. Other than the city Workers' Comp            02:43PM

Page 169

JUDY HARRINGTON

1
2   agreement, I don't remember any others.
3   Q. Did you have any firsthand involvement with
4   the risk arrangements in the west?
5   A. No.                                              02:44PM
6   Q. We mentioned Health America risk contract
7   earlier in the west.
8       Did you have any firsthand experience
9   in --
10  A. No, that was handled by Marianne Darrah.         02:44PM
11  Q. Earlier today you testified that two of the
12  advantages of creating a large network of primary
13  care physicians would be to facilitate negotiations
14  with managed care --
15  A. Right.                                            02:44PM
16  Q. -- companies?
17      And also to control, to some degree,
18  where referrals would be sent by those primary care
19  physicians; is that right?
20  A. Right.                                            02:44PM
21  Q. Of course, there are risk to have a primary
22  care physician network as well; isn't that right?
23  A. Right. Correct.
24  Q. So to evaluate the performance of a primary
25  care physician network, you'd have to look at other  02:44PM

43 (Pages 166 to 169)

Page 170

JUDY HARRINGTON

1
2 factors other than managed care contracts?
3     A. Absolutely, yes.
4     Q. I mean, obviously, you'd have to look at
5 whether those physician practices were profitable or   02:44PM
6 not?
7     A. Absolutely.
8     Q. And in addition to decide whether to create
9 or expand an existing primary physician network,
10 you'd have to consider not just the effect on   02:45PM
11 managed care contracting, but also profitability of
12 those practices?
13     A. Right.
14     Q. Did you -- am I right that earlier today you
15 testified that some hospitals affiliated with   02:45PM
16 primary care physicians to negotiate managed care
17 contracts in a way that was short of acquiring the
18 physician practices?
19     A. Yes. I don't remember which hospitals, but
20 -- well, I guess Crozer had a physician association   02:45PM
21 arrangement where physicians paid some kind of fee
22 and became part of a network associated with the
23 hospital. I know Penn had an affiliated practice
24 arrangement. I don't know what the terms of it
25 were. There were other ways of affiliating other   02:45PM

Page 171

JUDY HARRINGTON

1
2 than purchase.
3     Q. So, these non-acquisition affiliation
4 arrangements enabled hospitals and physicians to
5 align together to negotiate with managed care   02:46PM
6 organizations?
7     A. Yes, yes.
8     Q. Also, you testified earlier that when
9 hospitals join or merge with other hospitals to form
10 a larger health system such as AHERF, by joining   02:46PM
11 with those other hospitals they get better leverage
12 in negotiating with managed care organizations; is
13 that right?
14     A. Correct.
15     Q. To evaluate whether a hospital ought to   02:46PM
16 merge and join with other -- merge with hospitals
17 and form a larger system, one would have to look at
18 factors other than managed care contracting; isn't
19 that right?
20     A. Oh, yes.   02:46PM
21     Q. You knew Carol Calvert personally?
22     A. I worked for her. I never knew her before I
23 worked for her. I never saw her after I worked for
24 her.
25     Q. Do you know why she left AHERF?   02:46PM

Page 172

JUDY HARRINGTON

1
2     A. My understanding was she was let go.
3     Q. Do you know why she was let go?
4     A. No.
5     Q. Do you know any of the arrangements   02:46PM
6 surrounding her departure?
7     A. The rumor was that she was given some kind
8 of severance. I came into work one day and there
9 was a memo on my desk saying -- announcing she was
10 let go that day.   02:47PM
11     Q. Do you know how much her severance was?
12         MS. ZACH: Objection. Foundation.
13         MR. WITTEN: I'm asking her if she
14 knows how much the severance was.
15         THE WITNESS: I don't know.   02:47PM
16 BY MR. WITTEN:
17     Q. Did Carol ever discuss with you the nature
18 of her relationship with Sherif Abdelhek?
19     A. No.
20     Q. Did anyone else ever discuss with you the   02:47PM
21 nature of Sherif Abdelhek's relationship with Carol
22 Calvert?
23     A. There was rumors.
24     Q. What rumors did you hear?
25     A. This was a personal relationship between   02:47PM

Page 173

JUDY HARRINGTON

1
2 them, between Carol and Sherif.
3     Q. You mean rumors that they were having an
4 extramarital affair?
5     A. Yes.   02:47PM
6         MS. ZACH: Objection.
7 BY MR. WITTEN:
8     Q. Did you know Bob Perut?
9     A. Yes.
10     Q. He was the CEO of Hahnemann; is that right?   02:48PM
11     A. Yes.
12     Q. Do you know why he left AHERF?
13     A. He was doing consulting and my understanding
14 was that his leaving was inevitable. I mean, he
15 basically was replaced. He began his own consulting   02:48PM
16 services.
17     Q. Do you know whether he was paid a severance?
18     A. I don't know.
19     Q. Do you know whether as part of the
20 arrangement by which AHERF acquired Hahnemann he was   02:48PM
21 promised money personally?
22     A. I don't know.
23     Q. I should have asked you this: Did Carol
24 Calvert ever discuss with you the nature of her
25 relationship with David McConnell?   02:48PM

44 (Pages 170 to 173)

Page 174

## JUDY HARRINGTON

1
2     A. No.
3     Q. Did you ever discuss with anybody else the
4  nature of Carol Calvert's relationship with David
5  McConnell?                                02:48PM
6     A. No.
7     Q. Did you ever --
8     A. I mean.  There were rumors.
9     Q. What rumors did you hear?
10    A. That there was a personal relationship    02:48PM
11  outside of the office.
12    Q. You mean an extramarital affair?
13    A. Well, Carol wasn't married.  So, I don't
14  think it would be extramarital for her, but that was
15  the rumor.                                02:49PM
16    Q. You never heard -- did you ever hear that
17  Bob Perut was paid over $3 million around the time
18  you left?
19    A. No.
20       MS. ZACH:  Was that no?  I'm sorry.     02:49PM
21       THE WITNESS:  The answer to the
22  question was no.
23  BY MR. WITTEN:
24    Q. Do you know who Bill Buitner or William
25  Buitner?                                  02:49PM

Page 175

## JUDY HARRINGTON

1
2     A. Bill Buitner.  Bill Buitner.  Didn't -- he
3  worked for Coopers?
4     Q. Right.
5     A. Yes, I think I met him one time at a      02:49PM
6  meeting.  Yeah, I don't remember the context, but I
7  do recall meeting him.
8     Q. Meeting him just once?
9     A. Yeah.  I think -- it was a meeting -- it
10  seems like it was in Pittsburgh.  It seems like --   02:50PM
11  there was some service they were going to do for us
12  and I remember meeting with them to talk about it,
13  but they never did it or we didn't agree to the
14  contract.  I don't remember the terms of it, but I
15  do remember meeting him.                  02:50PM
16    Q. But you don't remember ever actually working
17  on any project with him?
18    A. No.
19    Q. Or working on a project for him or him
20  working on a project for you?             02:50PM
21    A. No.
22       MS. ZACH:  Objection.
23  BY MR. WITTEN:
24    Q. How about Amy Frasier, do you know her?
25    A. Amy Frasier?  No.                    02:50PM

Page 176

## JUDY HARRINGTON

1
2     Q. Do you know -- have you ever met somebody
3  named Mark Kierstein?
4     A. No.
5     Q. To clarify something for me, were all the    02:50PM
6  insurance arrangements between U.S. Healthcare and
7  the eastern region tied up in that risk contract?
8  Not a well asked question, but what I mean to say
9  is, did U.S. Healthcare provide other insurance or
10  payments to the eastern regional hospitals outside   02:51PM
11  of the risk contract?
12    A. There were other contracts around specific
13  services like a PT agreement or a radiology
14  agreement, or something like that, but all the
15  services provided to U.S. Healthcare members who      02:51PM
16  were capitated to our providers were the -- the cost
17  came out of our risk contract.
18       Does that answer your question?
19    Q. Yes.
20    A. I don't know if it does or not.
21    Q. Can you take a look at Exhibit 1397?  It's
22  in your pile there.  1397.
23    A. Okay.
24    Q. Do you have it?
25    A. Mm-mm.                             02:52PM

Page 177

## JUDY HARRINGTON

1
2     Q. Who did you send this memo to?  I don't
3  recognize this --
4     A. SSA is Sherif.
5     Q. Where is SSA?  To SSA?              02:52PM
6     A. Sherif S. Abdelhek.
7     Q. Immediately from Judy Harrington it says TO
8  and then there's code for something.
9     A. Yeah, I'm trying to figure out what that is.
10  It looks like -- I mean, I think this is like -- I    02:52PM
11  wonder if this is e-mail at Allegheny General, AGH
12  being Allegheny General.
13       Yes, I suspect that first one is maybe
14  Sherif's e-mail or his secretary's e-mail.  Debbie
15  Hadtruck, the second one, AGH or AGHADMIN.  I think   02:53PM
16  she was in Sherif's administrative office.
17    Q. How about the cc at the bottom, is there
18  somebody named tcoffey then that you have cc'd?
19    A. I don't remember who that is.  I think NCB
20  was new college building.  Oh, yes, that's Tess       02:53PM
21  Coffey.  Tess Coffey was Donald Kaye's
22  administrative assistant.
23    Q. So presumably this was a means of getting it
24  to Donald Kaye?
25    A. Yes.                               02:53PM

45 (Pages 174 to 177)

Page 186

```
 1
 2                I N D E X
 3
 4    WITNESS:                     PAGE
 5    JUDY HARRINGTON
 6      By Ms. Zach               4, 182
 7      By Mr. Witten             161
 8
 9
10                  - - -
11
12            E X H I B I T S
13
14    NO.       DESCRIPTION        PAGE
15    1390    Memo dated 7/24/97    50
16    1391    Memo dated 2/7/94     55
17    1392    Hospital Association  59
18            Of Pennsylvania
19    1393    Memo dated 6/15/98    64
20    1394    Master agreement      84
21    1395    Keystone Health Plan  90
22            document
23    1396    Memo dated 8/11/98   102
24    1397    Memo dated 2/10/98   109
25    1398    Memo dated 2/10/98   118
```

Page 187

```
 1
 2    1399    Agenda dated 8/1/97   135
 3    1400    Memo dated 12/4/97    138
 4    1401    Memo dated 8/8/97     142
 5    1402    Letter dated 4/13/98  150
 6    1403    Letter dated 4/24/98  153
 7    1404    Letter dated 9/10/97  162
 8    1405    Document              165
 9
10
11
12
13
14
15
16
17                  - - -
18
19
20
21
22
23
24
25
```

Page 188

```
 1
 2            CERTIFICATE
 3
 4        I HEREBY CERTIFY that the
 5    proceedings, evidence and objections are contained
 6    fully and accurately in the stenographic notes taken
 7    by me upon the deposition of JUDY HARRINGTON, taken
 8    on April 3, 2003, and that this is a true and
 9    correct transcript of same.
10
11
12
13        _____
14        MICHELLE McCONNELL, CSR
          and Notary Public
15
16
17        (The foregoing certification of
18    this transcript does not apply to any reproduction
19    of same by any means, unless under the direct
20    control and/or supervision of the certifying
21    reporter.)
22
23
24
25
```

48 (Pages 186 to 188)

**Heberton Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *RICHARD HEBERTON*
*January 15, 2004*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**HEBERTON, RICHARD**



**LEGALINK**
A WORDWAVE COMPANY

RICHARD HEBERTON

1
2    sometimes additional resources would be pushed
3    down into the obligated group.  But it wasn't a
4    requirement of the parent.  They could just let
5    the obligated group perform on its own without
6    assistance and let it go under without assistance
7    and there's nothing you could do.  So it was
8    encouraging to hear that maybe resources of the
9    broader system would be applied to the obligated
10   group.
11        Q.    When you first learned of the cost of
12   AHERF's physician practice acquisition strategy
13   and how those costs impacted the DVOG, did you
14   discuss your concerns with Karleen Strayer?
15        A.    Yes.
16        Q.    And do you recall anything about the
17   substance of that conversation?
18        A.    No.
19        Q.    Aside from Ms. Strayer having the
20   same concerns as you.
21        A.    No.
22        Q.    Do you recall discussing, again, in
23   this time frame when you first learned about the
24   acquisitions the issue with Chip Reilly?
25        A.    Discussing the issue with Chip?  Is

1
2    that what you're asking?
3        Q.    Yes, when you first learned about the
4    acquisitions.
5        A.    I'm sure I did.  I don't remember
6    specific conversations though.
7        Q.    On a more general level, do you
8    recall discussing with Chip Reilly the physician
9    practice acquisitions made by AHERF at any point
10   in time?
11        A.    No, I don't remember.
12        Q.    Aside from Karleen Strayer and Chip
13   Reilly, do you recall having a conversation with
14   anyone at MBIA about the physician practice
15   acquisition strategy being pursued by AHERF in
16   this time frame?
17        A.    I would imagine that we discussed it
18   with Pat Mathis.  I don't remember a specific
19   conversation.
20        Q.    Why would you imagine that you
21   discussed it with Pat Mathis?
22        A.    As the leader of our surveillance
23   area, we would discuss a concern like that with
24   him.  Whether we discussed that very early on I
25   don't remember.  But I'm sure at some point it

1
2    was discussed.
3        Q.    If I can show you what we've
4    previously marked as Exhibit 1887.
5             Mr. Heberton, if you would take a few
6    moments to review this document, I'd like to ask
7    you some questions about it.
8        A.    Okay.
9        Q.    My first question is do you recall
10   writing this document?
11        A.    Yes.
12        Q.    And do you recall why you wrote this
13   document?
14        A.    Part of our annual review cycle.
15        Q.    This is the cycle by which MBIA's
16   surveillance department reviewed the audited
17   financial statements for an existing credit
18   within a year of the bond issuance?
19        A.    Yes.
20        Q.    You address this document to the file
21   and then there is a file name which appears.  Do
22   you see that?
23        A.    Um-hum.
24        Q.    Do you recall who would have seen or
25   had access to this document in this time frame?

1
2        A.    I would have certainly given it to
3    Karleen Strayer upon completion.
4        Q.    Let me ask a more general question if
5    I could.  Why did you address this document to
6    the file?
7        A.    That's the way we always did it for
8    all of our credit reviews.  It's not really to
9    anyone in particular; it's just part of our
10   normal process; therefore it goes to the file.
11        Q.    And I take it this is a printout of
12   something that was within an electronic file at
13   some point in time.
14        A.    Yes, a Word document.
15        Q.    And I take it anyone within the
16   surveillance department had access to the folder
17   or file that contained this document.
18        A.    Yes.
19        Q.    When you would write a hospital unit
20   rating and review form such as this, how would
21   you alert individuals in the surveillance
22   department that such a document had been created
23   and was added to the file?
24        A.    They would know from the monthly
25   report.  It would list all the deals that we had

RICHARD HEBERTON

1
2  rated during that month. And if they wanted to
3  find out more about it, they could go to the file
4  and pull it.
5      Q.   Would this document have appeared in
6  the monthly report or would a blurb about --
7      A.   A blurb.
8      Q.   -- the contents of this document have
9  put in it?
10         I take it you were the only analyst
11  in the healthcare department responsible for
12  monitoring the DVOG at this time.
13      A.   Yes.
14      Q.   This document, Exhibit 1887, reflects
15  a downgrade from 4-B to 6-B.
16      A.   Right.
17      Q.   Did you play a role in that
18  downgrade?
19      A.   In deciding that downgrade? Yes.
20      Q.   Did you recommend that it be
21  downgraded to 6-B or did you recommend that it be
22  downgraded to another numeric-alphabetical
23  rating?
24      A.   As I remember, I think I did discuss
25  with Karleen whether it should go to either a 6

1
2  or A-7. Looking at just the financial statements
3  and the ratios that came out of it, which are
4  probably attached here -- no, they're not, okay.
5  As I remember, the leverage ratio and the low
6  cash just on its own would have indicated that
7  maybe it was a 7. But other offsetting factors
8  such as the large size of the healthcare system
9  indicating a stronger competitive capability
10  than, say, a stand-alone entity led us I believe
11  to give it a slightly higher rating and we went
12  with a 6 instead of a 7.
13      Q.   Do you recall whether you in fact
14  recommended that the rating be 7?
15      A.   No, I don't remember specifically.
16  No, I don't remember specifically saying I think
17  it should be a 7. I think we probably discussed
18  it.
19      Q.   I take it a few moments back you were
20  looking for a spread or a printout of a 2020
21  spreadsheet that would have been attached to this
22  document.
23      A.   Yes.
24      Q.   Is that something that you would have
25  generated in this time frame to go along with

1
2  this memorandum?
3      A.   Yes.
4      Q.   Were you responsible for maintaining
5  the 2020 trend sheet with respect to the DVOG in
6  this time frame?
7      A.   Yes.
8      Q.   And do you recall entering audited
9  financial statement information into the 2020
10  trend program for DVOG?
11      A.   No, I don't remember.
12      Q.   Is that something you would have done
13  as a matter of course?
14      A.   Yes.
15      Q.   And is the same true with respect to
16  unaudited financial statement such as interim
17  quarterlies?
18      A.   Right.
19      Q.   Why would the large size of the AHERF
20  system be a factor weighing -- withdrawn.
21         Why would the larger size of the
22  AHERF system be a factor that would weigh in more
23  heavily for a 6 rating than a 7?
24      A.   It indicated a greater capability of
25  negotiating with managed care organizations to

1
2  win contracts at a reasonable price.
3      Q.   Why would the size of the system
4  itself matter in terms of the contracts that the
5  DVOG would be able to secure with managed care
6  providers in Philadelphia?
7      A.   Managed care providers often want to
8  make sure that their participants had a variety
9  of hospitals that they could go to, physicians
10  that they could go to, all the way from community
11  hospitals up to tertiary hospitals. And a larger
12  integrated organization like AHERF's DVOG could
13  provide that as opposed to, say, just a single
14  site community hospital.
15      Q.   How else, if at all, would the larger
16  size of the AHERF system be a factor weighing in
17  on the side of a 6 rating versus a 7?
18      A.   You also have greater possibility
19  that even if you have one underperforming unit,
20  there could be other units within the group that
21  could help shore up the overall financial
22  strength and maintain cash flow. So you want to
23  rely upon one place or even one or two places to
24  provide all the cash flow that had multiple
25  sources of income.

16 (Pages 58 to 61)

RICHARD HEBERTON

Page 66

1
2  stronger competitive capability in your view?
3      A.    It was helpful but I don't think it
4  was strong enough for them to really have a true
5  competitive advantage over some of the other
6  large systems in the area.
7      Q.    So perhaps I'm just confused then.
8  How is it that the DVOG was in a stronger
9  competitive -- withdrawn.
10          How is it that the DVOG -- I
11  apologize.  How is it that AHERF had a stronger
12  competitive capability that weighed in on the
13  side of a 6 and not a 7?
14      A.    Well, did you say AHERF?
15      Q.    Yes.  I apologize.  I thought we were
16  talking about AHERF.  Were you talking about the
17  DVOG?
18      A.    I've been talking about DVOG.
19      Q.    How is it then that DVOG had a
20  stronger competitive capability given that their
21  market share was only reasonably large?
22      A.    It was certainly stronger than
23  individual site hospitals in the Philadelphia
24  area which probably would have led me with the
25  same sort of financial ratios to call it a 7.

Page 67

1
2  But that's not to say that it was somehow in a
3  competitive situation where it was the strongest
4  or -- because there were other large systems,
5  like you had mentioned before the University of
6  Pennsylvania and Thomas Jefferson that were, I
7  can't remember, equally larger or larger that
8  would still put a lot of pressure on that DVOG
9  system.  But that still puts it way ahead of a
10  small one or two-hospital group.
11      Q.    But it's your recollection that there
12  were in fact many healthcare system in the
13  Philadelphia area.
14      A.    Yes.
15      Q.    And it's your recollection that the
16  DVOG was competing against those other systems
17  such as the University of Pennsylvania, Thomas
18  Jefferson, not against the small one-unit
19  hospital.
20      A.    They're competing against all of
21  them.  Ones they had to probably worry about the
22  most were the larger.
23      Q.    Is it your recollection, though, that
24  the market was splintered on the provider side?
25      A.    I don't know what that means.

Page 68

1
2      Q.    Is it your sense, or your
3  recollection rather, that healthcare providers in
4  the Philadelphia area -- withdrawn.
5          Based on your experience, was a 2
6  point numeric drop in a rating uncommon within
7  eight months of an initial bond offering in this
8  time frame and for a healthcare credit?
9      A.    Yes.
10      Q.    If you would turn with me to page
11  29894 of Exhibit 1887, and I'm going by the pages
12  that appear in the lower right-hand corner which
13  are called Bates numbers.  And if you would go to
14  the top of this document, I would direct your
15  attention to the second line which states,
16  "Previously, this credit number had consisted of
17  our exposure to Hahnemann University Hospital."
18      A.    Um-hum.
19      Q.    Was it your understanding that the
20  Hahnemann University Hospital was part of the
21  DVOG?
22      A.    Yes.
23      Q.    And was it your understanding that
24  Hahnemann University Hospital or the Hahnemann
25  healthcare system more broadly speaking had

Page 69

1
2  issued bonds in the late 1980s and early 1990s
3  for which MBIA provided bond insurance?
4      A.    Yes.
5      Q.    Is it your recollection that there
6  was a bond covenant default at Hahnemann in
7  1994?
8      A.    I don't remember that.
9      Q.    If you would turn with me to the
10  second paragraph from the bottom which states,
11  "The combined entity shows the scars of those
12  weak balance sheets which were further harmed by
13  43 million in restructuring write-offs in 1994
14  and 1995, a large 33 million extraordinary loss
15  due to the rate financing in 1996 and net
16  transfers to other affiliates of 74 million in
17  1996 and 17 million in the first quarter of
18  fiscal year 1997."  Do you see that?
19      A.    Yes.
20      Q.    I take it you obtained the amount of
21  the restructuring write-offs in 1994 and 1995
22  from a review of the audited financial statements
23  for the DVOG entities for those fiscal years.
24          MR. WITTEN:  Objection.
25      A.    Are you saying the financial audits

RICHARD HEBERTON

Page 70

1
2  of those entities prior to their joining the DVOG
3  group?
4      Q.   Correct.
5      A.   Yes, I think that's right.
6      Q.   And that would have been part of a
7  routine review that you would have conducted in
8  getting up to speed on the newly formed obligated
9  group?
10     A.   Yes.
11     Q.   I take it you got the net asset
12 transfer number of 74 million in fiscal year 1996
13 from a review of the fiscal year 1996 audited
14 financial statements for the DVOG.
15     A.   Yes.
16     Q.   And is that again part of the routine
17 review of those financial statements that you
18 would have conducted in, again, getting up to
19 speed on reviewing it?
20     A.   Yes.
21     Q.   If I can show you briefly what we've
22 marked as Exhibit 1884.  I don't want to spend
23 much time with this document, but first let me
24 ask you if you'd turn to the first page of
25 Exhibit 1884.

Page 71

1
2          Do you recognize on the page there
3  appears to be a stamp from MBIA's surveillance
4  department indicating that this document was
5  received on November 14th, 1996?
6      A.   Yes.
7      Q.   If you'd turn with me to the second
8  page of this document, here appears a letter from
9  Kelly Mercks with AHERF to Emmeline Rocha-Sinha.
10 Do you see that?
11     A.   Yes.
12     Q.   Do you see in the middle bottom of
13 the page a note to Karleen Strayer from Emmeline
14 Rocha-Sinha which states "FYR," which I take to
15 mean for your review.
16     A.   Yes.
17     Q.   Was it typically the case in this
18 time frame that financial statements were
19 directed to individuals on the new business side,
20 would then be forwarded to Karleen Strayer which
21 would be distributed to the individual
22 responsible for that credit?
23     A.   Yes.
24     Q.   Would you turn with me to page
25 015822.  Do you see here the combined statement

Page 72

1
2  of changes in net assets?
3      A.   Yes.
4      Q.   Do you see transfers to affiliates
5  net 73,676,000?
6      A.   Yes.
7      Q.   So I take it this is the number that
8  you rounded to 74 million in putting together
9  your memoranda?
10     A.   That looks right.
11     Q.   Do you recall receiving and reviewing
12 interim unaudited financial statements for the
13 DVOG for the first quarter of fiscal year 1997?
14     A.   I don't remember it specifically.
15     Q.   Just to be clear, is it your
16 recollection that the DVOG was on a June 30
17 fiscal year?
18     A.   I think I've just seen that, so yes.
19     Q.   If I can show you what we previously
20 marked as Exhibit 1891.  Mr. Heberton, if I could
21 at the outset ask you a general question.  In
22 your monitoring of healthcare credits as vice
23 president in the healthcare unit, I take it you
24 viewed it as important to obtain the most timely
25 financial information that you could get your

Page 73

1
2  hands on.
3      A.   Yes.
4      Q.   Why was that?
5      A.   You wanted to find out as soon as
6  possible if there were any problems.
7      Q.   And why would you want to find out as
8  soon as possible if there were any problems?
9      A.   Because we would want to initiate
10 remediation activities, meaning try and find ways
11 to fix the problem or head off the problem such
12 that it wouldn't affect their ability to repay
13 their bonds.
14     Q.   It's my understanding that the
15 primary way in which MBIA secured such
16 information was to put financial reporting
17 requirements in master trust indentures.
18     A.   Yes.
19     Q.   Do you recall whether in this general
20 time frame whether there was any standard
21 reporting requirements with respect to audited
22 financial statements?
23     A.   Oh, how soon you were supposed to
24 receive them --
25     Q.   Correct.

19 (Pages 70 to 73)

RICHARD HEBERTON

Page 74

1
2      A.   -- after close?  Yes, typically there
3  was a requirement.  What that was I can't quite
4  remember.  It might have -- it would have been
5  something like 180 days or 120 days.  I don't
6  remember specifically.
7      Q.   Do you have Exhibit 1891 in front of
8  you?
9      A.   Yes.
10     Q.   I apologize, I think I've given you
11 the wrong document.  If you would turn back with
12 me to Exhibit 1887.  Specifically to page
13 029895.
14     A.   Okay.
15     Q.   Do you see at the top the statements,
16 "Good profitability in the last two years
17 appears to partially mitigate this very weak
18 balance sheet, but it depends on how you
19 interpret the income statement.  The spreads show
20 bottom line profits of 1.6 million in 1994, 36
21 million in 1995, 27 million in 1996 and
22 9.4 million in the first quarter of 1997.  But
23 1994's result excludes a 39 million restructuring
24 charge, 1995 excludes a 4 million restructuring
25 charge and 1996 excludes a 74 million transfer of

Page 75

1
2  net assets to affiliates."  Do you see that?
3      A.   Yes.
4      Q.   I take it by spreads you're referring
5  to 2020 trend sheets.
6      A.   Correct.
7      Q.   The passage continues, "Of those
8  transfers 51 went to support the acquisition (10
9  percent) and operation (90 percent) of physician
10 practices by AHG.  Such support of physician
11 practices had previously been accounted for
12 mostly as an expense."  Do you see that?
13     A.   Yes.
14     Q.   It continues, "For example, in 1995
15 the group recorded an expense of 8 million and a
16 net asset transfer of 5 million to AHG.  If all
17 this 51 million had been treated as an expense in
18 1996, the group would have recorded a loss of
19 over 24 million instead of a 27 million profit."
20 Do you see that?
21     A.   Yes.
22     Q.   I take it you used an exclamation
23 point to emphasize the dramatic difference
24 between a 24 million loss and a 27 million
25 profit.

Page 76

1
2      A.   Correct.
3      Q.   And I take it you're including this
4  information in this document to alert the reader
5  to your interpretation of the financial
6  statements.
7      A.   Correct.
8      Q.   Do you know whether any bond
9  covenants would have been violated had the DVOG
10 reported a 24 million loss in fiscal year 1996?
11     A.   I don't recall if it definitely would
12 have caused a default, but I would assume that a
13 large loss like this could have done so.
14     Q.   And do you have any particular
15 covenant in mind?
16     A.   The rate covenant.
17     Q.   And why do you say rate covenant?
18     A.   It's the one that looks at income
19 results and compares it to the debt service to
20 see if it's covering it sufficiently.
21     Q.   And do you recall what the penalty
22 was if there was a rate covenant default at the
23 DVOG?
24     A.   No.
25     Q.   Do you have Exhibit 1884 handy?

Page 77

1
2  Those are the audited fiscal year 1996 statements
3  for the DVOG.
4      A.   Yes.
5      Q.   Would you please turn to page
6  015838.  Do you see the subheading "related party
7  transactions continued"?
8      A.   Yes.
9      Q.   This passage reflects the fact that
10 during fiscal year 1996 the DVOG through AHERF
11 transferred roughly 51 million to Allegheny
12 Integrated Health Group to help fund the
13 physician practice acquisition strategy that
14 AHERF was pursuing, is that correct?
15     A.   I see that.
16     Q.   I take it when you referred to 51
17 million being treated as an expense in 1996, this
18 is the amount to which you were referring.
19     A.   This says 58 million.  Am I in the
20 wrong place?
21     Q.   Oh, I'm sorry, I'm a little further
22 down, beginning with the sentence, "Also during
23 fiscal year 1996 the obligated group through
24 AHERF transferred 50,499,000."
25     A.   That looks more correct, yes.

20 (Pages 74 to 77)

RICHARD HEBERTON

Page 98

1
2  accounting treatment for these transfers could
3  impact its ability to comply with coverage
4  tests?
5      A.   No, I don't recall that.
6      Q.   Did you view this treatment issue as
7  a problem for MBIA?
8      A.   Yes.
9      Q.   Why was that?
10      A.   It was preventing -- well, two
11  things.  It was allowing them to transfer more
12  cash out of the system.  So since they went up to
13  76 million versus the 42 million limit they would
14  have had otherwise.  And we were concerned that
15  they didn't have a lot of cash to begin with, and
16  to see more go out was a significant credit
17  concern.
18      Q.   Was it your understanding at the time
19  that had the 74 million that was transferred out
20  of the DVOG in fiscal year 1996 been treated as
21  an expense, that one or more coverage tests would
22  have been breached?
23      A.   Yes.
24      Q.   Do you recall developing or
25  ascertaining the numeric threshold for a breach

Page 99

1
2  of one or more of the coverage tests?
3      A.   I think I remember creating a
4  spreadsheet to calculate sort of what-if
5  scenarios to tell what may have happened if it
6  was treated a different way.
7      Q.   Do you recall what you did with that
8  spreadsheet once you created it?
9      A.   I probably shared it with Karleen.  I
10  don't know if it went any further than that.  It
11  might have.  It might have been discussed with
12  Pat Mathis; I don't remember.
13      Q.   Is it correct that the spreadsheet
14  contained what-if scenarios with respect to not
15  only transfers in absolute terms but also how the
16  transfers were classified, meaning expenses or
17  net asset transfers?
18      A.   Yes, I mean, I think that's what I
19  was implying.  I was trying to show it under the
20  different scenarios.
21      Q.   Across these two issues.
22      A.   Which two issues?
23      Q.   Well, the issue of an 8 percent of
24  all assets test versus a 10 percent of all
25  PP&E --

Page 100

1
2      A.   Right.
3      Q.   -- test.  And then the other issue of
4  AHERF's treatment of these transfers and how
5  AHERF's treatment impacted various coverage
6  tests.
7      A.   Yes.  That's what I recall it doing.
8      Q.   Do you recall whether Ms. Sprayer or
9  Mr. Mathis followed up with you on this
10  spreadsheet?
11      A.   I can't remember.
12      Q.   Did the spreadsheet also contain
13  contingencies?  And by that I mean something
14  along the lines of if this covenant is breached,
15  I recommend that MBIA do X.
16      A.   I don't remember.
17      Q.   Mr. Heberton, if I can show you what
18  we've marked as Exhibit 1889.
19          Mr. Heberton, do you recognize this
20  as the legal analysis for the DVOG master trust
21  indenture generated by the new business -- excuse
22  me, the healthcare unit within the new business
23  group at MBIA?
24      A.   I don't recognize this.  It could
25  be.

Page 101

1
2      Q.   Do you recognize the handwriting that
3  appears on these pages?
4      A.   No.
5      Q.   If I could ask you to turn with me to
6  page 017811.  I apologize if this is a little
7  redundant, but do you recognize the handwriting
8  that appears on this page?
9      A.   No.
10      Q.   Do you recall discussing the
11  8 percent of all assets versus 10 percent of PP&E
12  issue with Emmeline Rocha-Sinha at any point in
13  time?
14      A.   No, I don't recall.
15      Q.   If I can show you what we've
16  previously marked as Exhibit 2193.  Mr. Heberton,
17  do you recognize this document, Exhibit 2193?
18      A.   Yes.
19      Q.   Why did you write this document?
20      A.   Whenever we downgrade at MBIA a
21  credit to the caution list or credit watch list,
22  in other words, either go 6, 7 or 8, we do so
23  by -- we alert everyone in the company,
24  especially senior management, that this is being
25  done through an alert report.

26 (Pages 98 to 101)

Page 102

1
2       Q.   I take it the downgrade was motivated
3   by the DVOG's weakening balance sheet, its large
4   ongoing cash transfers to affiliated physician
5   groups in the midst of fierce competition in the
6   Philadelphia market, as is reflected in the first
7   passage here.
8       A.   Right.
9       Q.   Do you recall any factors beyond
10   those that prompted the downgrade and the ones we
11   discussed earlier?
12      A.   You mean the one we discussed
13   earlier, the stiff competition, the tough
14   Philadelphia market?  Yes, that was included as
15   well.
16      Q.   In the first paragraph you've written
17   "While MADS coverage appears strong at 2.98 X,
18   if the 74 million in cash transfer is made in
19   1996 are included, coverage falls to .87 X."  Do
20   you see that?
21      A.   Um-hum.
22      Q.   I take it that reflects the fact that
23   had the asset transfers out of the DVOG been
24   included as an expense, the DVOG would have
25   failed to comply with the debt service coverage

Page 103

1   rate.
2       A.   Yes.
3       Q.   Do you recall what the remedy was for
4   MBIA if the DVOG failed to comply with the rate
5   covenant?
6
7           MR. WITTEN:  Objection.  I didn't
8   hear your answer.
9       A.   No.
10      Q.   You continue in this paragraph,
11   "Partially mitigating these concerns are 123
12   million in restricted cash and an additional 250
13   million in unrestricted cash in the AHERF
14   division but outside the obligated group."
15      A.   Right.
16      Q.   How much weight did you put on the
17   existence of this additional cash within the
18   AHERF system?
19      A.   It was important.  It's always nice
20   to know that there's a possibility of additional
21   resources being brought into the obligated
22   group.
23      Q.   And did that possibility play a role
24   in the decision to downgrade it to numeric rating
25   6 as opposed to 7?

Page 104

1
2       A.   As I recall, yes.
3       Q.   In the second paragraph you state,
4   "In 1996 ADVOG transferred 74 million to its
5   affiliated physician group and other affiliates
6   to pay for salaries and other expenses.  In
7   previous years this type of transfer was partly
8   treated as an expense.  However, in 1996 ADVOG
9   recorded it only as an adjustment to the fund
10   balance.  This allowed ADVOG to post an apparent
11   27 million profit.  If all the transfer had been
12   treated as an expense, ADVOG would have lost
13   47 million."  Do you see that?
14      A.   Yes.
15      Q.   Would you turn back with me to
16   Exhibit 1887.  And this is your February 28th,
17   1997 memorandum.
18      A.   Right.
19      Q.   If you would turn with me to the
20   third page, 029895, here you say at the top that
21   if these transfers had been treated as an
22   expense, there would have been a 24 million
23   loss.
24      A.   Right.
25      Q.   But in Exhibit 2193, the March 11,

Page 105

1
2   1997 memo, you're referencing a $47 million
3   loss.
4       A.   Right.
5       Q.   I'm just trying to gain an
6   understanding of the discrepancy.
7       A.   The discrepancy I believe had to do
8   with our uncertainty as to why all of the
9   transfer, even historically, wasn't treated as an
10   expense.  It had been true that part of the
11   transfer may have been treated as an expense in
12   the past, but to our way of -- at least my way of
13   thinking, I didn't see why all of it shouldn't be
14   transferred -- be considered as an expense.
15          And I think there's a confusion, just
16   to be more conservative in writing this up, I
17   included the entire transfer as an expert in the
18   report while I just followed what was in the
19   audit note when I was writing up this part.
20      Q.   And why is it that you thought that
21   all of the transfers should be considered as an
22   expense?
23      A.   It gets back to sort of the approach
24   to doing a credit analysis to a hospital or
25   really for any sort of competitive entity.  And

27 (Pages 102 to 105)

RICHARD HEBERTON

1
2  additional financial advisors to be brought in.
3      Q.   Is it more likely that a remediation
4  would be successful if one gets an earlier start
5  rather than a later start?
6          MR. KRUSKO:  Objection to form.
7      A.   I believe so.
8      Q.   Do you understand that you're the
9  MBIA analyst who first reviewed the DVOG 1996
10 audited financial statement?
11     A.   Yes.
12     Q.   And did the DVOG 1996 audited
13 financial statement disclose a covenant
14 violation?
15     A.   No.
16     Q.   If the DVOG 1996 audited financial
17 statement had disclosed a covenant violation,
18 what do you expect that you would have done?
19         MR. KRUSKO:  Objection; calls for
20 speculation.
21     Q.   You can answer.
22     A.   I would be speculating, but I would
23 imagine that it would have speeded up our
24 remediation process, I probably would have hired
25 assistance from consultants and attorneys at an

1
2  earlier stage.
3      Q.   Would MBIA have reviewed all the
4  options available to it?
5      A.   Yes.
6      Q.   And if one of those options was a
7  right for a consultant call in, would MBIA have
8  pursued it?
9          MR. KRUSKO:  Objection to form.
10     A.   It's likely.
11     Q.   If MBIA after a covenant default had
12 been dissatisfied with management's response,
13 would MBIA have gone to the board of trustees?
14         MR. KRUSKO:  Object to form.  He's
15 not a 30(b)(6) witness.
16     Q.   You can answer that, even if you're
17 not a 30(b)(6) witness.
18     A.   Whatever that means.  It's possible
19 it would go to the board.  It would have depended
20 on the situation.
21     Q.   I'm talking about if you were
22 unsatisfied with the steps that management were
23 taking.
24     A.   Ultimately it would go to the board
25 if we were not getting cooperation at the

1
2  management level.
3      Q.   Earlier today do you remember that
4  Mr. Krusko asked you whether MBIA had sought some
5  sort of commitment from AHERF that it would stop
6  transferring money from DVOG to the physician
7  practices?
8      A.   Yes, I remember that question.
9      Q.   If the 1996 DVOG audited financial
10 statement had disclosed a covenant violation,
11 would that violation have given MBIA leverage to
12 try to negotiate exactly such a commitment?
13         MR. KRUSKO:  Objection; calls for
14 speculation.
15     A.   It would have given them leverage.
16     Q.   Do you recall earlier that you were
17 asked if MBIA -- you were asked by Mr. Krusko if
18 MBIA had sought some sort of binding commitment
19 from AHERF, that it would use resources at either
20 the parent level or in the west to support the
21 DVOG?
22     A.   Yes, I remember the question.
23     Q.   So if the 1996 DVOG audited financial
24 statement had disclosed a bond covenant
25 violation, would that violation have given MBIA

1
2  leverage to try to negotiate exactly that sort of
3  commitment?
4          MR. KRUSKO:  Objection.
5      A.   It would have given them leverage.  I
6  don't know of the outcome.
7      Q.   In general, if the 1996 DVOG audited
8  financial statement had disclosed a bond covenant
9  violation, would that have given MBIA leverage to
10 try to negotiate various controls over actions
11 that AHERF management might otherwise have wanted
12 to take?
13         MR. KRUSKO:  Objection.
14     A.   I feel it would have given them some
15 leverage.
16     Q.   Could you take a look at Exhibit
17 1887.  This is your February 28, 1997 memo.
18     A.   Okay.
19     Q.   And could you take a look at the
20 third page of this document, the numbers in the
21 bottom right are MBIA 029895.
22     A.   Okay.
23     Q.   Are you on that page?
24     A.   Yes.
25     Q.   I want to draw your attention to the

45 (Pages 174 to 177)

RICHARD HEBERTON

Page 178

1
2  third paragraph, the first sentence here.  It
3  reads, "The tertiary hospitals in
4  St. Christopher's are the money makers in the
5  group.  As the medical school generates losses
6  ($5 million in 1996) and the community hospitals
7  have historically posted poor results."  Do you
8  see that sentence?
9      A.  Yes.
10     Q.  Do you happen to recall which are the
11 tertiary hospitals that you described as money
12 makers?
13     A.  Well, I remember one of the tertiary
14 hospitals was Hahnemann.  I don't recall the
15 names of the others.
16     Q.  Could you look at the previous page
17 in case this helps jog your memory.  Take a look,
18 please, at the third paragraph that begins
19 "Allegheny University hospitals," underlined.
20     A.  Right.
21     Q.  It says Allegheny University
22 hospitals consists of two Philadelphia tertiary
23 hospitals.
24     A.  Yes.
25     Q.  And do you see the first one is the

Page 179

1
2  Hahnemann that you're mentioning?
3      A.  Right.
4      Q.  Do you see the second one there?
5      A.  Right.  The Medical College of
6  Pennsylvania.
7      Q.  You write that the second one is
8  Allegheny East Falls Hospital and you described
9  it as formerly the Medical College of
10 Pennsylvania Hospital.
11     A.  Yes.
12     Q.  Are these two hospitals -- let's turn
13 now back to the page you were previously looking
14 at.  When you refer to the tertiary hospitals in
15 this sentence, are you referring then to
16 Hahnemann and the Hospital Medical College of
17 Pennsylvania?
18     A.  Correct.
19     Q.  When you wrote this memo, did you
20 believe that Hahnemann was a money maker?
21     A.  That's what it says here.  I don't
22 specifically remember the financial results.
23     Q.  Would you have gotten those financial
24 results from the 1996 audited financial
25 statements of DVOG?

Page 180

1
2      A.  I don't know.  Often financial audits
3  don't break out the individual hospitals and
4  sometimes they do.  So I don't recall if that was
5  done in this case or if I received that
6  information from management.
7      Q.  Am I right that you prepared this
8  memorandum?  You testified that you prepared this
9  memorandum following your review of the 1996 DVOG
10 financial statements?
11     A.  Yes.
12     Q.  And the tertiary hospitals that are
13 described as money makers are Hahnemann and the
14 hospital at the Medical College of Pennsylvania?
15         MR. KRUSKO:  Objection; asked and
16 answered.
17     A.  Yes.
18     Q.  And St. Christopher's Hospital for
19 Children is also described as a money maker?
20     A.  Yes.
21     Q.  We can set this document aside.
22     A.  Okay.
23     Q.  When you were analyzing DVOG, were
24 you trying to find a covenant violation?
25     A.  You're always checking to see if a

Page 181

1
2  covenant has been violated.
3      Q.  Would you say that you were trying to
4  find a covenant violation?
5          MR. KRUSKO:  Objection to form.
6      A.  Can you phrase it a different way?
7      Q.  Was it your view that a covenant --
8  had there been a covenant violation that would
9  have enhanced the rights that MBIA enjoyed?
10     A.  Yes.
11     Q.  So in terms of protecting MBIA's
12 interests, would it have been helpful for there
13 to have been revealed a covenant violation?
14     A.  Yes.
15     Q.  Can you take a look, please, at
16 Exhibit 1888.  This is the March 10th, 1997
17 higher risk credit checklist.
18     A.  Okay.
19     Q.  Was the point of your preparing this
20 document in part at least to check to see if
21 there had been a covenant violation?
22     A.  Yes.
23     Q.  Was covenant compliance, or rather
24 compliance with covenant terms measured based on
25 the audited financial statement of DVOG?

46 (Pages 178 to 181)

RICHARD HEBERTON

Page 182

1
2    A.    Yes.
3    Q.    I don't have any further questions.
4    A.    Okay.
5         MR. KRUSKO:  Could we go off the
6    record?
7         THE VIDEOGRAPHER:  Going off the
8    record.  The time is 2:59 p.m.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  Returning to the
11   record.  The time is 3:00 p.m.
12        EXAMINATION CONTINUED BY MR. KRUSKO:
13   Q.    Welcome back, Mr. Heberton.  Do you
14   understand that you're here today to testify
15   based on your personal experiences in your
16   personal capacity?
17   A.    Yes.
18   Q.    I take it then you are not testifying
19   in any way on behalf of MBIA.
20   A.    That's correct.
21   Q.    Sir, would you turn with me to page
22   11, going by the Bates numbers, of Exhibit 330.
23   And again --
24   A.    Page 11 you said?
25   Q.    Yes, going by the Bates numbers.

Page 183

1
2    It's page 4 using the bottom center pages.  Sorry
3    for the confusion.
4    A.    Okay.
5    Q.    Do you recognize Exhibit 330 as the
6    master trust indenture for the DVOG bond
7    offering?
8    A.    Yes.
9    Q.    Going back to page 4 of the document,
10   do you see there a definition of the term
11   "consultant"?
12   A.    Yes.
13   Q.    Here it states, "Consultant shall
14   mean a person who, which is appointed by any
15   member of the obligated group for the purpose of
16   passing on questions relating to the financial
17   affairs, management or operations of one or more
18   members of the obligated group, or the entire
19   obligated group, and has a favorable reputation
20   for skill and experience in performing similar
21   services in respect of entities engaged in
22   reasonably comparable endeavors."
23        Do you see that statement?
24   A.    Yes.
25   Q.    I take it then according to the

Page 184

1
2    master trust indenture, the obligated group had
3    the power to select the consultant that would be
4    brought in pursuant to any sort of consultant
5    call-in provision, is that correct?
6    A.    That seems to be right, assuming this
7    is the term that's used in that other
8    definition.
9    Q.    Correct.  In your experience, is it
10   more beneficial for a credit enhancer such as a
11   bond insurance company to have the ability to
12   select the consultant that is required to be
13   brought in pursuant to a consultant call-in
14   provision as opposed to the obligated group
15   having the power to select that consultant?
16   A.    Yes, that's better.  Though it's not
17   unusual to see this.
18   Q.    Under this provision, was MBIA given
19   any legal right to block the selection of a
20   consultant by the DVOG provided this definition
21   was met?
22   A.    It does not appear so.
23        MR. KRUSKO:  I don't have any further
24   questions.
25        MS. SPRINGER:  Neither do I.  We're

Page 185

1
2    done.
3         THE VIDEOGRAPHER:  This concludes for
4    today, January 15th, 2004, the videotaped
5    deposition of Richard Heberton.  Going off the
6    record, the time is 3:03 p.m.
7         (TIME NOTED:  3:03 p.m.)
8
9    _____
10            RICHARD HEBERTON
11
12   Subscribed and sworn to before me
13   this _____ day of _____, 2004.
14
15   _____
16
17
18
19
20
21
22
23
24
25

47 (Pages 182 to 185)

**Heinlein Dep.**

Kristen Heinlein, CPA

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

          Plaintiff,.

    vs.                    Civil Action

PRICEWATERHOUSECOOPERS,     No. 00-684

LLP,

          Defendant.

          Videotaped Deposition of KRISTEN LEE HEINLEIN, CPA, called for examination under the Applicable Rules of Federal Civil Procedure, taken before me, Michele E. Eddy, a Registered Professional Reporter and Notary Public in and for the State of Ohio, pursuant to notice and stipulations of counsel, at the offices of Jones Day, 500 Grant Street, Suite 3100, Pittsburgh, Pennsylvania, on Tuesday, the 24th day of February, 2004, at 9:00 a.m.

- - - - -

Kristen Heinlein, CPA

Page 74

1  best of your understanding?
2        MR. McDONOUGH:  In the accounts
3  receivable?
4     Q.   In respect to the accounts
5  receivable for the '97 audit.
6     A.   She was supposed to review my work
7  and do more of the high level A/R accounting
8  work.
9     Q.   When you say high level A/R
10  accounting work, what do you mean by that?
11    A.   More analysis.
12    Q.   Do you recall any discussions with
13  Miss Porter about more the high level analysis
14  type of work in the A/R area in the 1997 audit?
15    A.   She would ask me questions
16  regarding my schedules, but nothing more than
17  that.
18    Q.   So was it your understanding that
19  her responsibility went beyond simply seeing if
20  you completed the audit steps?
21    A.   Yes.
22    Q.   What was miss -- your understanding
23  of what Miss Frazier's role was with respect to
24  accounts receivable in the 1997 audit?
25    A.   She was supposed to oversee Christa

Page 75

1  and myself.
2     Q.   Again, doing more of the high level
3  analysis work?
4     A.   Exactly.
5     Q.   Do you know why it was that you
6  were selected as the associate to perform audit
7  tests in the A/R area for the 1997 audit?
8     A.   I think I was the only second year
9  staff on the engagement.
10    Q.   Is that something that's typically
11  given to a second year staff person?
12    A.   Yes.
13    Q.   The accounts receivable area?
14    A.   Yes.
15    Q.   As opposed to a first year
16  associate?
17    A.   Yes.
18    Q.   Why is that?
19    A.   A/R's a little bit more risky.
20    Q.   Would you say it's a high risk area
21  of a healthcare audit?
22        MR. McDONOUGH:  Object to form.
23    A.   It's one of the risky areas, yes.
24    Q.   Why is that?
25    A.   Collection always is risky.

Page 76

1     Q.   When you say the collection is
2  always risky, you mean the collection of
3  accounts receivable?
4     A.   Collection of accounts receivable,
5  yes, collection of payments.
6     Q.   Prior to your -- beginning your
7  audit work for the engagement, do you recall
8  having any discussions with anyone else on the
9  audit team about the state of the AHERF
10  affiliates' accounts receivable?
11    A.   I'm not sure I understand what you
12  mean by state of their entities.
13    Q.   Let me refine the question.
14        Do you recall any discussions with
15  anyone else on the AHERF audit team that some
16  of the AHERF affiliates, particularly in the
17  Philadelphia area, had a lot of old accounts on
18  their books?
19    A.   Yes.
20    Q.   With whom do you recall those
21  conversations?
22    A.   Brian Christian, he was the
23  senior -- he was the staff member that
24  performed the A/R audit the previous year
25  before I did.

Page 77

1     Q.   Do you recall anything
2  Mr. Christian said in meetings --
3     A.   No.
4     Q.   -- with him?
5     A.   He basically went through his work
6  papers and pointed me to some things and
7  schedules that I was going to need to obtain
8  for the current year.
9     Q.   About how long would you say you
10  worked with Mr. Christian reviewing the A/R
11  area?
12    A.   I don't know.
13    Q.   Do you recall discussing with
14  Mr. Christian or anyone else on the AHERF audit
15  team the fact that AHERF was writing off a lot
16  of the old accounts?
17    A.   Not that I remember.
18    Q.   If you could flip back, please, to
19  what I marked -- or what I showed you earlier,
20  Exhibit 4035, which was the budget to actual
21  hours work paper that had your time on it, that
22  chart number at Bates ending 823 that had your
23  hours on it.
24    A.   Yes.
25    Q.   The fourth line under

20 (Pages 74 to 77)

Kristen Heinlein, CPA

Page 78

1  preliminary -- I take it preliminary is the
2  preliminary audit phase of the audit, right?
3      A.  Yes.
4      Q.  And then before that there was
5  planning, right, and then year-end?
6      A.  Yes.
7      Q.  I note that you have 153 hours
8  under the heading RMC revenue, paren, including
9  early substantive, end paren.
10     A.  Yes.
11     Q.  What does RMC stand for?
12     A.  I don't remember.
13          - - - - -
14          (Thereupon, Deposition Exhibit 4284
15          was marked for purposes of
16          identification.)
17          - - - - -
18     Q.  For the record, what I've marked as
19  Exhibit 4284 is a document that is titled
20  Record of Monitoring Controls, Health Controls,
21  AHERF, 6-30-97.
22          Miss Porter (sic), if you would
23  take a look at that document, you'll note that
24  this is sort of an oddly produced document, I
25  guess, where the language on Bates page ending

Page 79

1  604 and 606 is the same.  So to the extent
2  you're reviewing the document, you can skip
3  104.
4          If you would just review it to the
5  extent necessary to tell me whether you
6  remember it.
7      A.  Yes.
8      Q.  Do you recall this document?
9      A.  Yes.
10     Q.  Did you draft language in this
11  document?
12     A.  Yes.
13     Q.  Do you recall if you borrowed, so
14  to speak, some language from a prior year
15  similar work paper?
16     A.  Yes.
17     Q.  And then rolled it over into the
18  '97 audit?
19     A.  Yes.
20     Q.  And then added some things?
21     A.  Yes.
22     Q.  Do you recall meeting with any
23  individuals from AHERF in doing the control
24  work for the A/R area for 1997?
25     A.  I met with Robin Schaffer, Rick

Page 80

1  Snow, Bill Gedman, some of Robin's staff, some
2  of Bill's staff.
3      Q.  Do you recall meeting with a guy
4  named Russell Laing at all?
5      A.  Russell Laing?
6      Q.  Yes, Laing, L A I N G.
7      A.  No.
8      Q.  Do you recall what it was you
9  discussed with Mr. Snow?
10     A.  My meeting with Greg was more of a
11  high level as an introduction, and then he
12  introduced me to his staff.
13     Q.  When you say high level, what do
14  you mean?
15     A.  Just to make sure he was reviewing
16  his staff's work, that type of information.  It
17  wasn't -- I wasn't asking direct questions to
18  him.
19     Q.  If you would go to the Bates page
20  ending 107.  The second item, there's a dash by
21  A/R agings.  Are you with me there?
22     A.  Yes.
23     Q.  It stated, A/R agings, paren,
24  monthly reports that detail A/R by payer
25  hospital, agings focusing on accounts older

Page 81

1  than 90 days old, paren, refer to A/R agings,
2  ROT, end paren.
3          Do you know why it was that AHERF
4  was preparing schedules that had detail on
5  accounts over 90 days old?
6      A.  I'm sorry, I don't understand your
7  question.
8      Q.  Do you know why it was that AHERF
9  was focusing on accounts that were over 90 days
10  old in the reports?
11         MR. STEINBERG:  Object to form.
12     A.  Accounts that are over 90 days old
13  are sometimes less likely to be collected.
14     Q.  And then skipping the item
15  underneath that and going to the one that says
16  rejected billing reports, it says, rejected
17  billing reports, paren, i.e. quarterly AHERF
18  rejected claim analysis report, paren, refer to
19  rejected claim analysis report ROT.
20         Do you recall reviewing any
21  rejected billings report -- rejected billing
22  reports?
23     A.  I don't remember what the rejected
24  billings reports are.
25     Q.  The item underneath that states,

21 (Pages 78 to 81)

Kristen Heinlein, CPA

Page 82

1   financial reporting executive summary report,
2   paren, reports on days in system A/R, credit
3   balances, historical data, cash summaries, et
4   cetera, referred to executive summary ROT.
5       Q.   Do you recall ever reviewing any of
6   the cash data from AHERF with respect to
7   receivables collection?
8       A.   I looked at some daily cash reports
9   prepared by Bill Gedman.
10      Q.   What was the purpose of looking at
11  those?
12      A.   Subsequent receipts testing.
13      Q.   So for purposes of your subsequent
14  receipts testing, you were using the daily cash
15  reports?
16      A.   Yes.
17      Q.   Did you review any daily cash
18  reports for periods prior to the period in
19  which you were doing the subsequent receipts
20  testing work?
21      A.   Not that I remember.
22      Q.   Toward the bottom of the page,
23  Bates 107, I guess it's the second dash from
24  the top, there's a section, account charges
25  greater than.  Are you with me there?

Page 83

1       A.   Yes.
2       Q.   It's stated, account charges
3   greater than 250 -- actually, let me skip that
4   one.
5           No, wait, I do want to do that one.
6   Sorry.
7           Account charges greater than $2,500
8   with a balance within 90 percent of total
9   charges final billed, paren, examine all
10  patient accounts that remain at gross charges
11  except commercial self-payer -- self-payers and
12  M/A aps in paren.
13          Do you recall reviewing reports
14  like that?
15      A.   I don't remember the reports.
16      Q.   For the record, I've handed the
17  witness what we've marked previously as Exhibit
18  150.  It is a July 17, 197 memo from William
19  Gedman to Gregory Snow.  Subject, DVR accounts
20  at gross summary, June 30, 1997.
21          Miss Heinlein, if you would review
22  that three-page document, let me know when
23  you've had a chance to look at it.
24      A.   Okay.
25      Q.   Let me ask you first, do you recall

Page 84

1   this document?
2       A.   The memo, or the chart?
3       Q.   Either.
4       A.   No, neither.
5       Q.   So the second page of this exhibit,
6   the chart, doesn't refresh your recollection at
7   all about reviewing any charts attempting to
8   identify account balances within 90 percent of
9   total charges?
10      A.   No.
11      Q.   Do you have an understanding of why
12  AHERF was developing charts that then attempted
13  to identify account balances within 90 percent
14  of charges?
15      A.   No, sir.
16      Q.   Do you think you would have had an
17  understanding at the time you wrote the
18  language in the record of monitoring controls
19  document?
20          MR. STEINBERG:  Objection.  Calls
21  for speculation.
22      A.   I don't know what I knew at that
23  point.
24      Q.   As you sit here today, do you know
25  why AHERF was attempting to identify accounts

Page 85

1   within 90 percent of gross charges?
2       A.   No.
3       Q.   Do you recall any discussion at all
4   that for one reason or another there were
5   accounts on various hospitals' books where the
6   contractual allowance had not been taken
7   properly?
8       A.   No.
9       Q.   Do you know what I mean when I say
10  contractual allowance?
11      A.   Yes.
12      Q.   What is your understanding of that
13  term?
14      A.   Total charges, most physicians,
15  hospitals have a charge master which are a
16  hundred percent of charges.  Most of the time
17  their contracts don't give them a hundred
18  percent of charges, so they write a contractual
19  allowance against what the total charges versus
20  what the amount is that they would be
21  collecting.
22      Q.   If you go back to Bates page ending
23  107 of the record monitor controls document.
24          The item below the one I just read
25  regarding the 90 percent of total charges,

22 (Pages 82 to 85)

Kristen Heinlein, CPA

Page 86

1  there is a section that says, at month-end and
2  out-of-period report it is developed that -- I
3  believe that's supposed to be a that -- details
4  the contractuals taken in the recent month that
5  were billed in the prior month. This report is
6  also given to Robin Schaffer in finance.
7      Miss Heinlein, do you recall that
8  AHERF prepared reports that were -- that
9  attempted to identify contractuals taken
10 out-of-period?
11     A.  No.
12     Q.  If you would look at that document.
13     For the record, I've shown the
14 witness 2298, which is a October 15th, 1997
15 memo from Robin Schaffer to Dan Cancelmi that
16 attached has some schedules.
17     Q.  Miss Heinlein, if you could review
18 that schedule to the extent you feel necessary
19 to tell me whether or not you recall it.
20     MR. McDONOUGH:  Do you recall --
21     MR. TORBORG:  It.
22     MR. McDONOUGH:  It.  Thank you.
23     MR. TORBORG:  Or any of the
24 documents contained within there.
25     A.  I don't remember seeing this

Page 87

1  document.
2      Q.  If I ask you just briefly to turn
3  to the third page of the document, Bates ending
4  501.
5      A.  Okay.
6      Q.  Does that schedule look at all
7  familiar to you?
8      MR. STEINBERG:  Objection.  Asked
9  and answered.
10     A.  No.
11     Q.  Now, the schedule we looked at
12 earlier that was tracking your time for the
13 1997 audit under the RMC revenue area had in
14 paren some language that said including early
15 substantive.  Right?
16     A.  Yes.
17     Q.  Do you know what that means?
18     A.  I also looked at the roll-forwards
19 for March 1997, which is not normally part of
20 controls testing.
21     Q.  Do you recall whether you reviewed
22 any other -- or you performed any other
23 substantive testing during the preliminary
24 phase of the audit?
25     A.  I don't remember anything else.

Page 88

1      Q.  But you do remember reviewing
2  roll-forward schedules dated 3-31-97?
3      A.  Yes.
4      Q.  Do you recall for what entities you
5  reviewed those schedules?  All of them?
6      A.  I think all of them.
7      Q.  Including the Graduate entities
8  that were brought into the AHERF system in
9  1997?
10     A.  I don't think Graduate.
11     - - - - -
12     (Thereupon, Deposition Exhibit 4285
13     was marked for purposes of
14     identification.)
15     - - - - -
16     Q.  For the record, what I've marked as
17 Exhibit 4284 -- 85 is a copy of a production
18 produced to us by PricewaterhouseCoopers in
19 approximately August of this year -- I'm sorry,
20 in August of last year.  That is a copy of a
21 diskette and then a file directory that was on
22 that diskette.
23     Miss Heinlein, my question for you
24 is, do you recognize the handwriting on the
25 diskette itself?

Page 89

1      A.  No.
2      Q.  You don't recognize that as your
3  handwriting?
4      A.  No.
5      Q.  Can you read what it says on there?
6      A.  FY97, fiscal year '97 auditor
7  files.  I can't read what -- I think that says
8  revenue and A/R, prelim, 3-97, and AUDWK4.
9      Q.  Miss Heinlein, do you recall
10 whether you had copies of floppy diskettes that
11 had schedules and other items related to the
12 AHERF audit?
13     A.  Yes.
14     Q.  Do you know if these diskettes you
15 shared them, amongst others, in the AHERF audit
16 team or if you had sort of your own diskettes?
17     A.  Both.
18     MR. TORBORG:  I'm going to mark
19 five exhibits all at once.
20     - - - - -
21     (Thereupon, Deposition Exhibits
22     4286  through 4290 were marked for
23     purposes of identification.)
24     - - - - -
25     MR. TORBORG:  That's your first

23 (Pages 86 to 89)

Kristen Heinlein, CPA

Page 90

1  one.
2          I'll explain the Bates numbers in a
3  second.
4          That's your second one, 4287.
5          Sit back and relax. You've got a
6  second while we go through this minutia.
7          So I've marked 4286, 4287, 4288,
8  4289, and 4290, or we're in the process of
9  doing this.
10          Let me explain for the record the
11  Bates numbering on this document. I've put a
12  JDCL disk 0198 Bates range on all of these
13  documents which indicates the Bates number that
14  was put on by Jones Day, and that is a file
15  that we pulled from the diskette pictured on
16  the previous exhibit. Okay?
17          They were actually eventually
18  produced to us on a CD. And then the
19  particular file names for the schedules are
20  actually on the Bates numbers as well. Okay?
21          And then I also note for the record
22  that the date in the upper right-hand corner on
23  the schedule, December 2003, that's the date
24  that just pops up when I print it. That's it.
25  I couldn't get it not to print that. So that's

Page 91

1  what that is, so the record is clear on that.
2      Q.  And, also, behind each of these
3  documents I have provided printouts of the
4  production diskette that shows where they came
5  from, as well. But I don't have any questions
6  for you on that.
7          If you would, though, flip back
8  with me to the cover of the diskette and the
9  file directory.
10          MR. STEINBERG:  Exhibit 4285?
11          MR. TORBORG:  Thank you. 4285.
12      Q.  The first -- the exhibit I've
13  marked as Exhibit 4286 is file name
14  BCCBDAUD.WK4.
15          I think you'll see that particular
16  number. The second one over that has a --
17  something in the directory column, do you see
18  that there?
19      A.  Yes.
20      Q.  And then there's a date on that
21  particular file of April 28th. April 28th,
22  1997. Do you see that?
23      A.  Yes.
24      Q.  First of all, let me ask you, do
25  you recognize the schedules that I have marked

Page 92

1  as Exhibits 4286 through 4290 as copies of bad
2  debt roll-forward schedules?
3      A.  Yes.
4      Q.  Do you recall these schedules?
5      A.  Yes.
6          MR. STEINBERG:  Just to clarify,
7  the schedule is -- does not include the
8  printouts of the directories --
9          MR. TORBORG:  Yes.
10          MR. STEINBERG:  -- behind them?
11          MR. TORBORG:  You're right. Thank
12  you.
13      Q.  Do you know what the date on the
14  file of April 28th, 1997 means?
15      A.  No.
16          MR. McDONOUGH:  On Exhibit 4285?
17          MR. TORBORG:  Yes.
18      A.  No.
19      Q.  Would that be the date at which it
20  was last modified?
21          MR. McDONOUGH:  Object to form.
22      A.  I don't know.
23      Q.  Do you recall from whom you
24  received these schedules?
25      A.  Either Robin Schaffer or Robin

Page 93

1  Schaffer's staff.
2      Q.  Do you recall in what form you got
3  this schedule, whether it was on a disk or
4  whether you got actual paper copies of them?
5      A.  I think they were on a disk.
6      Q.  Do you recall when it was after you
7  received the diskette that you started to
8  review the schedules?
9      A.  No.
10      Q.  Was it shortly thereafter, a couple
11  weeks after, a month after, any notion at all?
12      A.  No.
13      Q.  If I could ask you to go to Exhibit
14  4286, which is the first of the roll-forward
15  schedules I showed you for Bucks County.
16      A.  Yes.
17      Q.  Inpatient side.
18          First of all, can you explain on
19  the record how this schedule works?
20      A.  It shows the beginning balance,
21  which is fiscal year 6-30-96, $2,945,570, which
22  also has a beginning balance in July, and it
23  rolls forward write-offs, recoveries, the age
24  trial balance, and it gives you a total for the
25  month. And that's either added or subtracted