Kristen Heinlein, CPA

Page 98

1  referring to.
2       MR. TORBORG:  Relative to the other
3  items for previous months that where the credit
4  balance entries of the month of July, 116,000,
5  month of August, 126,000.
6       MR. McDONOUGH:  Okay.
7       Q.   Then you go down to March and then
8  there's a credit entry of $3,112,436, right?
9       A.   Yes.
10      Q.   Do you recall noting the large,
11 unusual credit entry on the Elkins Park
12 inpatient schedule?
13      MR. STEINBERG:  Object to form.
14      A.   I don't know if I did or not.
15      Q.   Based on your -- based on your
16 practices at the time, your recollections of
17 the -- of your practice at the time, is this
18 something that you think you would have
19 noticed?
20      A.   I don't know.
21      MR. STEINBERG:  Objection, vague.
22      Q.   For the record, what I've shown the
23 witness has been marked previously as Exhibit
24 4255.  It is, again, a copy of a diskette, the
25 contents of which were produced to us in August

Page 99

1  of 2005.  The PWC --
2       MR. STEINBERG:  2000?
3       MR. McDONOUGH:  Three.
4       MR. TORBORG:  3.  I'm sorry.
5       Again, with a file directory
6  attached to it.
7       Q.   Miss Heinlein, my question is very
8  simple, that is do you recognize the
9  handwriting on the first page on the copy of
10 the diskette?
11      A.   Yes, it's mine.
12      Q.   For the record, what I've marked as
13 Exhibit 4291 is a schedule we printed off the
14 diskette, the contents of which pictured on the
15 previous exhibit that we looked at, 4255, file
16 name, bad debt.WK4 under the folder AHERF.
17      Again, that's what the Bates
18 numbering is intended to reflect.
19      And then in addition to the actual
20 schedule printed off, I've appended to the last
21 three pages of what I've marked as Exhibit 4291
22 screen prints of the -- how I pulled it off the
23 CD produced to us by Coopers & Lybrand.
24      So when I ask you about whether or
25 not you remember this diskette, I don't mean to

Page 100

1  include that information.
2       MR. McDONOUGH:  You mean the
3  schedule, when you ask if you remember the
4  schedule?
5       MR. TORBORG:  Yes.
6       Q.   So if you would look through the
7  schedule that is the first part of that
8  document.
9       A.   Okay.
10      Q.   Miss Heinlein, do you recall this
11 schedule?
12      A.   No.
13      Q.   Can you provide any insight as to
14 whether or not this schedule was something that
15 would have been produced by Coopers & Lybrand
16 or by AHERF?
17      A.   It would have been produced by
18 Coopers.
19      Q.   And what makes you say that?
20      A.   It's a summary of the roll-forward
21 schedules obtained by the client.
22      Q.   Based on your involvement with the
23 1997 audit, particularly the receivables, do
24 you believe that this is a schedule that you
25 would have created even though you can't recall

Page 101

1  it today?
2       A.   Probably, yes.
3       Q.   If I could ask you to flip -- I
4  apologize, I don't have Bates numbers on
5  these -- but to the schedule that has Bucks at
6  the top.  It's about five in.
7       A.   Okay.
8       Q.   Then if you would also, please, get
9  out the bad debt roll-forward schedule I marked
10 as Exhibit 4286.
11      Let me ask you, Miss Heinlein,
12 there is a -- in it there is a note T/B in the
13 row beginning allowance underneath the column
14 total?
15      A.   Yes.
16      Q.   Do you know what that means?
17      A.   Trial balance.
18      Q.   What does that note signify?
19      A.   That the beginning allowance agrees
20 to the trial balance.
21      Q.   Trial balance meaning the general
22 ledger?
23      A.   General ledger, yes.
24      Q.   So you would have tied it to the
25 general ledger; that's what the T/B annotation

26 (Pages 98 to 101)

Kristen Heinlein, CPA

Page 102

1    means?
2        A.    Yes.
3        Q.    How about the I/S annotation below
4    it?
5        A.    Income statement.
6        Q.    Can you tell me what that means?
7        A.    I would have tied the bad debt
8    expense numbers to the income statement.
9        Q.    On the general ledger?
10       A.    On the general ledger.
11       Q.    Now, if you would look back,
12   please, to the bad debt roll-forward schedule I
13   asked you to pull out, Exhibit 4286, underneath
14   the column ATB.
15       A.    Yes.
16       Q.    I can represent to you that if you
17   would add up the amounts in that column, minus
18   3 million dollars, you would get an amount that
19   ties within $12,000 to the bad debt expense
20   number in the inpatient column under the row
21   bad debt expense.  Okay?
22       A.    Okay.
23       Q.    Do you recall noting that when you
24   created this schedule whether you would have
25   noted that the large credit entry of 3 million

Page 103

1    dollars -- 3,000,109.925 cents did not go
2    through bad debt expense?
3        MR. McDONOUGH:  Well, first of all,
4    you got the number wrong, but -- it's
5    $3,109,925.
6        MR. TORBORG:  Thank you.
7        MR. McDONOUGH:  Second, there's no
8    foundation that connects these two documents.
9        MR. TORBORG:  I'm trying to see if
10   it refreshes her recollection about doing it.
11   If it doesn't, then we'll move on.
12       A.    I'm sorry, can you repeat the
13   question?
14       Q.    My question is, I think you
15   recalled reviewing the bad debt roll-forward
16   schedules during the preliminary phase of the
17   audit, right?
18       A.    Yes.
19       Q.    And although you don't recall
20   creating this schedule that I've marked as
21   Exhibit 4291, you think that you probably did
22   create it?
23       A.    Yes.
24       Q.    Right?
25       My question is, do you recall

Page 104

1    noting that the bad debt expense figure in the
2    Bucks County inpatient column of $1,067,747 was
3    a lot lower than the amounts in the ATB column?
4        MR. McDONOUGH:  Object to form.
5        A.    No.
6        Q.    Based on your practices at the
7    time, do you believe that's something you would
8    have recognized?
9        MR. McDONOUGH:  There's no
10   foundation that she even saw 4286, so you're
11   assuming in your question that she did and
12   didn't do something.
13       MR. TORBORG:  I think you mean she
14   doesn't recall Exhibit 4291, right?
15       MR. McDONOUGH:  No.  I think she
16   doesn't recall 4286.
17       MR. TORBORG:  I think she said that
18   she remembered these, actually.
19       A.    I remember the roll-forward one.
20       MR. McDONOUGH:  I'm sorry, I
21   thought she testified she remembered
22   roll-forwards but not these particular entries
23   that you were referring her to on these
24   particular exhibits.
25       MR. TORBORG:  Well, the record will

Page 105

1    reflect what she said, but I do think she
2    testified that she remembered these.
3        MR. McDONOUGH:  I don't want to
4    obstruct you.  I'm just objecting to form, lack
5    of foundation.
6        Q.    You've already testified that you
7    don't recall this particular schedule, right?
8        A.    Yes.
9        MR. McDONOUGH:  This one being?
10       MR. TORBORG:  4291.  I'm sorry.
11   Thank you.
12       Q.    Do you recall noting in reviewing
13   the roll-forward schedules in the preliminary
14   phase of the audit that for one or many of the
15   DVOG entities, the balances in the reserve
16   accounts had reduced significantly since the
17   beginning of the year?
18       A.    Not that I recall.
19       Q.    Based on your practices at the
20   time, do you believe that's something you would
21   have noticed?
22       MR. STEINBERG:  Objection.  Calls
23   for speculation, and vague.
24       A.    I don't know.  I don't know.  I
25   don't remember.

27 (Pages 102 to 105)

Kristen Heinlein, CPA

Page 106

1      Q.   Just so I'm clear, I'm not asking
2   whether you actually remember. I'm asking
3   based on your practices at the time, is it
4   something you believe you would have
5   recognized?
6      A.   I don't know. Again, I don't
7   remember what my practices were seven years
8   ago.
9          MR. TORBORG: Why don't we hand her
10  all of these.
11         These are all the next five
12  exhibits.
13         MR. McDONOUGH: Are we done, at
14  least temporarily, with 4286?
15         MR. TORBORG: We're done.
16         MR. McDONOUGH: So you can put
17  those in the pile.
18     Q.   We start off the first exhibit in
19  this stack as 4292, Miss Heinlein, right?
20     A.   Yes.
21     Q.   Thank you.
22         So that will be the next five
23  exhibits.
24         Miss Heinlein, I'm going to ask you
25  if you would flip through those schedules to

Page 107

1   the extent you feel necessary to tell me
2   whether you remember them. Then I'll have some
3   more specific questions for you later.
4          For the record, the exhibits that
5   I've marked here were printed off a prior
6   version of the CLASS database than the final
7   version. This one was printed off the Meyer
8   version of CLASS. That's what the Bates
9   numbers at the bottom of the page are
10  supposed -- or are intended to reflect.
11         MR. McDONOUGH: Just so this
12  witness understands, there were some versions
13  of the AHERF work papers in CLASS that had not
14  been replicated at various stages, and this is
15  one of those versions that had not been
16  replicated past a certain date, and I'm not
17  sure what that date is, but it's a version that
18  belonged to Meyer.
19         THE WITNESS: Okay.
20     A.   I recognize the roll-forwards.
21     Q.   In addition to containing
22  roll-forwards, these exhibits that I've marked
23  as Exhibits 4292 through 4296 also have what is
24  known as the bad debt reserve calculation
25  schedules, is that right?

Page 108

1      A.   Yes.
2      Q.   Do you recall those schedules?
3      A.   Yes.
4          MR. McDONOUGH: Can I just clarify
5   that the printouts at the end of the schedules,
6   again, are --
7          MR. TORBORG: Yes, I will do that.
8          MR. STEINBERG: Thank you.
9      Q.   Again, Miss Heinlein, at the end of
10  all these exhibits, I have printed off what I
11  like to call metadata information, which is
12  basically, if you go under a certain field, you
13  can figure out information that's not on the
14  actual document itself. I don't know if you
15  ever did that during the --
16     A.   I didn't even know you could.
17     Q.   Okay. So if I ask you if you
18  recall a document, I don't mean to incorporate
19  the metadata. I attached this on the back for
20  future reference to an attempt to avoid marking
21  documents more than once.
22     A.   Okay.
23     Q.   But while we're on that score, if I
24  can ask you to look at the -- go to the last
25  page of Exhibit 4292 with me in the metadata

Page 109

1   information itself, I have printed off -- and
2   if you go back four pages from that --
3   actually, five pages where the box that says
4   document has a summary that says revisions.
5   Then toward the right it says field name.
6      A.   Okay.
7      Q.   Okay?
8          Then I've printed off the next five
9   pages, there's some overlap between, but the
10  dates -- some different pages that came under
11  that metadata.
12         Let me ask you, do you know what
13  that field means, revisions?
14     A.   No.
15     Q.   If I could ask you to flip with me,
16  and I realize it will take you a while maybe to
17  find it, but where the roll-forwards of the
18  schedules start.
19         Actually, let's make this a little
20  easier. Actually, if I can find it. Did you
21  find it?
22     A.   Inpatient?
23     Q.   Yes, inpatient, under Bucks County.
24     A.   Yes.
25     Q.   Right?

28 (Pages 106 to 109)

Kristen Heinlein, CPA

Page 110

1    And we see there, again, the -- in
2  the March row under the ATB column, there's,
3  again, a credit entry of $3,109,925, right?
4    A.   Yes.
5    Q.   But this one has a D footnote next
6  to it?
7    A.   Yes.
8    Q.   Which on the next page states,
9  "Represents the monthly entry to bad debt
10  expense, paren, AHERF is booking to budget, end
11  paren, plus the entry of 3 million dollars from
12  the Graduate hospitals, paren, refer to the
13  issue, end paren, period.
14    "Monthly bad debt expense agrees to
15  the I/S without exception."
16    Miss Heinlein, did you write that
17  footnote?
18    A.   I think so, yes.
19    - - - - -
20    (Thereupon, Deposition Exhibit 4297
21    was marked for purposes of
22    identification.)
23    - - - - -
24    Q.   For the record, what I've marked as
25  Exhibit 4297 is a document bearing the Bates

Page 111

1  number CL232335336.  It's an issue topic titled
2  50 Million Dollar Reserve Entry that was
3  created by Kristen Heinlein on June 9th, 1997,
4  last modified by Kristen Heinlein on June 9th,
5  1996.
6    MR. McDONOUGH:  '97.
7    A.   '97.
8    Q.   I'm sorry, '97.
9    MR. McDONOUGH:  Viewed it and last
10  modified it on the same day.
11    MR. TORBORG:  Yes.
12    Q.   Miss Heinlein, if you would review
13  that document.
14    A.   Okay.
15    Q.   Miss Heinlein, do you recall this
16  document?
17    A.   Yes.
18    Q.   Is this -- earlier I had asked you
19  if there were any documents that you reviewed
20  in your preparatory session for your third day
21  of your SEC session?
22    A.   Yes.
23    Q.   I believe you referenced an issue
24  document?
25    A.   Yes.

Page 112

1    Q.   Is this that document?
2    A.   Yes.
3    Q.   Is this also the document that is
4  referenced in the bad debt roll-forward
5  schedule, Exhibit 4292, footnote D.  It says,
6  "Refer to the issue"?
7    A.   Yes.
8    Q.   What is that note in Exhibit 4297
9  that says, "Represents the monthly entry to bad
10  debt expense, AHERF is booking to budget, plus
11  the entry of 3 million dollars for the Graduate
12  hospitals" mean?
13    MR. McDONOUGH:  For the record,
14  it's 4292 that that footnote appears in.
15    MR. TORBORG:  What did I say?
16    MR. McDONOUGH:  4297 is the issue.
17    MR. TORBORG:  Yes.
18    A.   I don't remember what specifically
19  I meant when I wrote it.
20    Q.   Does it have reference to the
21  transfer of reserves from the Graduate entities
22  to the Delaware Valley Obligated Group
23  entities?
24    A.   It appears so.
25    Q.   Do you recall that issue as you sit

Page 113

1  here today, the transfer of reserves from
2  Graduate to DVOG?
3    MR. McDONOUGH:  You know, just to
4  be precise --
5    MR. TORBORG:  The 50 million.
6    MR. McDONOUGH:  -- the issue to
7  mean the exhibit or the issue to mean --
8    MR. TORBORG:  The broader issue.
9    MR. McDONOUGH:  -- the broader
10  issue?
11    MR. TORBORG:  Yes, the broader
12  issue.
13    MR. McDONOUGH:  I have contended
14  throughout this case that they should have
15  thought of a different name --
16    MR. TORBORG:  Good point.
17    MR. McDONOUGH:  -- for the
18  document.
19    You're talking about the broader
20  issue with the small i, basically?
21    MR. TORBORG:  Thank you, yes.
22    A.   Yes.
23    Q.   To the best of your recollection,
24  when did you first learn that AHERF was
25  planning to transfer or had transferred

29 (Pages 110 to 113)

Kristen Heinlein, CPA

Page 114

1 reserves from the Graduate entities to the
2 Delaware Valley Obligated Group entities' bad
3 debt reserve accounts?
4     A.   I thought I learned about it during
5 our year-end procedures.
6     Q.   When was that phase of the audit?
7     A.   August, September time frame?
8     Q.   That's what you thought initially?
9     A.   Yes.
10     Q.   And then did reviewing the issue
11 document marked as 4297 refresh your
12 recollection of when you first learned about
13 it?
14     A.   No.
15     Q.   But it does cause you to believe
16 that you learned about it in the preliminary
17 phase of the audit?
18     A.   Yes.
19     Q.   By at least June 9th, 1997?
20     A.   Yes.
21     Q.   How did you come to learn about the
22 concept of -- notice I didn't use the word
23 issue --
24         MR. McDONOUGH:  I appreciate it.
25     Q.   -- the concept of transferring

Page 115

1 reserves from the Graduate entities to the
2 Delaware Valley Obligated Group entities?
3     A.   I'm not sure who told me about the
4 50 million dollar transfer.
5     Q.   Do you believe it's something that
6 someone told you or something that you learned
7 about from reviewing schedules like
8 roll-forward schedules?
9     A.   I think someone told me.
10     Q.   Do you recall who it was that told
11 you?
12     A.   No.
13     Q.   Do you recall if it was someone
14 either at AHERF, the client, or within Coopers?
15     A.   I don't know.
16     Q.   Do you recall testifying during
17 your first SEC deposition, the first day, that
18 it was your best recollection that you learned
19 about the concept of transferring 50 million of
20 reserves from Graduate to DVOG from Amy
21 Frazier?
22         MR. STEINBERG:  Objection.  I think
23 if you're going to be referencing prior
24 testimony, you might want to put it --
25         MR. TORBORG:  That's what we're

Page 116

1 going to do.
2         MR. STEINBERG:  Put it in front of
3 her.
4         MR. TORBORG:  Since you invited
5 this.
6         MR. STEINBERG:  Didn't mean to
7 invite it, but I just think it's hard to deal
8 with the prior testimony and make
9 characterizations of it without the testimony
10 in front.
11         - - - - -
12         (Thereupon, Deposition Exhibit 4298
13         was marked for purposes of
14         identification.)
15         - - - - -
16     Q.   Miss Heinlein, if you could turn
17 to, and this is a miniscript version of your
18 testimony given on the first day of your SEC
19 deposition, March 1, 2000, to page 88 in the
20 little -- it has four pages on one page.
21         MR. McDONOUGH:  Just for
22 chronology, this is about four years ago?
23         MR. TORBORG:  Yes.  I don't know
24 that it was necessary to point that out on the
25 record, but, yes, 2000 was four years ago.

Page 117

1     Q.   Page 88 -- are you with me on page
2 88?
3     A.   Yes.
4     Q.   I'm going to read some testimony
5 into the record starting on line 17, okay?
6     A.   Yes.
7     Q.   Where there was a question, "And
8 with respect to that 50 million dollar
9 transfer, what did you do?
10         "We're talking from Graduate to
11 Delaware Valley, correct?"
12         Your answer, "Yes."
13         Question, "Okay."
14         Answer, "I received -- I learned
15 about the 50 million from Amy Frazier.  I
16 inquired of management for journal entries and
17 the allocation between which hospital entities
18 it was going to and then I documented my
19 results of my findings."
20         Question, "What was the issue?"
21         Answer, "I put my information in an
22 issue to flag to Christa Porter and to Amy what
23 I found out.  I didn't relate it.  I didn't
24 categorize it as a critical matter.  That was
25 my work in process issue."

Kristen Heinlein, CPA

Page 118

1    MR. STEINBERG: Just to clarify, I
2    don't think it says Christa Porter. It just
3    said Christa.
4    MR. TORBORG: Christa, thank you.
5    Why can't I read documents?
6    Q.   Do you recall giving this testimony
7    after having a chance to read through it with
8    me?
9    A.   I guess.
10    Q.   Do you believe that testimony was
11    truthful when you gave it in March of 2000?
12    A.   Yes.
13    Q.   If you would flip with me, please,
14    to page 219 of this transcript. I'm going to
15    do this same drill here, starting with line
16    five of page 219. Are you with me?
17    A.   Yes.
18    Q.   Question, "Did you ever have any
19    discussion with any members of the audit team
20    that indicated they were aware of the recording
21    of bad debt allowance at these magnitudes,
22    20 million at Graduate, 9 million at Rancocas,
23    5 million at Mt. Sinai; were they aware of
24    that? Was this news or information to Miss
25    Frazier?"

Page 119

1    Mr. Barron interjected. "At what
2    point in time," question. Then Mr. DeLacy
3    interjected, "At any point in time during the
4    audit after you were charged with the -- with
5    investigation of this 50 million dollar
6    transfer."
7    Your answer, "Amy Frazier knew
8    about it and Christa Porter knew about it. I
9    knew that."
10    Then a question by Mr. DeLacy, but
11    did -- "But did, though, know about the amounts
12    coming at the various hospitals, coming in
13    those amounts, were they familiar with that,
14    too?"
15    Mr. Barron interjected. "Prior to
16    that point in time when she did her research?"
17    Mr. DeLacy, "Correct." Mr. Barron, "Is that
18    what you're asking?" Mr. DeLacy, "Yes."
19    Your answer, "I think so. I think
20    Christa also knew."
21    Question, "Christa Porter and Amy
22    both knew?"
23    Answer, "I think so, yes."
24    Mr. Weiser interjected, "Just to clarify, they
25    knew about the amounts coming from Graduate or

Page 120

1    where they went on the DVOG entities, if you
2    remember, or if you don't remember."
3    Your answer, "I know they told me
4    about a transfer from Graduate to DVOG, 50
5    million dollars."
6    Mr. Weiser then asked, "Do you
7    remember whether they told you or not that they
8    went into specific months and the amounts that
9    they went into -- they went in specific
10    months?"
11    The witness, "They told me March
12    and April. I don't know if they told me
13    amounts."
14    Question by Miss Pappas, "In your
15    first conversation with Amy and Christa
16    sometime in August of 1997, why don't you tell
17    us, because we've gone a little bit further
18    here, tell us what they told you. We
19    understand from what you've told us already
20    that during that first conversation -- first of
21    all, both were present at the time?"
22    Answer, "I think so."
23    Question, "Okay, and you recalled
24    them both telling you about this issue, the 50
25    million dollars?"

Page 121

1    Answer, "Yes."
2    Question, "Issue meaning just
3    issue, not issue document?"
4    Answer, "Yes."
5    Question, "Now, in terms of what
6    they told you during that first meeting, they
7    informed you that there were transfers in March
8    and April, correct?"
9    Your answer, "Yes."
10    Question, "They further told you
11    that they came from Graduate, correct?"
12    Yes. Your answer, "Yes."
13    Question, "And they went to
14    Delaware Valley?"
15    Your answer, "Yes."
16    Miss Heinlein, do you recall giving
17    that testimony?
18    A.   Yes.
19    Q.   Was it truthful when you gave it?
20    A.   Yes.
21    Q.   And to the best of your
22    recollection at the time?
23    A.   Yes.
24    MR. TORBORG: I want to do one more
25    if I could at page 188.

31 (Pages 118 to 121)

Kristen Heinlein, CPA

Page 122

1    MR. STEINBERG: I just want to add
2  that there were a couple minor discrepancies
3  when you read it, the transcript will control.
4    MR. TORBORG: Will control,
5  obviously.
6    It's quite clear that I'm unable to
7  read.
8    MR. STEINBERG: You're doing fine.
9    MR. TORBORG: Sometimes the
10  questions aren't very artfully given.
11    Q.   On page 188, line eight, Miss
12  Pappas asked you a question. "Why don't we go
13  to the chronology of the 50 million. Tell me
14  everything you know about it, when you first
15  heard about it. I'll probably let you go and
16  then come back and ask some questions. What do
17  you know?"
18    Your answer, "Amy told me about it
19  in the beginning of August, right around when
20  we first started year-end field work. That's
21  when I first remember -- first remember
22  learning about it.
23    "She instructed me to look at the
24  allocation of reserves, to which hospitals that
25  it went and then to agree the balance of the

Page 123

1  ending reserves to the general ledger and to
2  look at the journal entries to record the 50
3  million."
4    Were you able to follow?
5    A.   Yes.
6    Q.   Do you recall giving that
7  testimony?
8    A.   Yes.
9    Q.   Was it truthful and to the best of
10  your recollection at the time you gave the
11  testimony in March of 2000?
12    A.   Yes.
13    Q.   Do you recall what it was that
14  motivated you to put -- to create the issue
15  document that we've marked as Exhibit 4297?
16    A.   I was gathering information from
17  the client and I wanted to put all of my
18  information in one spot, so I put it in an
19  issue document.
20    Q.   Do you recall if -- do you recall
21  whether Miss Frazier or Miss Porter requested
22  that you put your findings in an issue
23  document?
24    A.   No.
25    MR. McDONOUGH: Was that question

Page 124

1  do you recall?
2    MR. TORBORG: Yes.
3    MR. McDONOUGH: Or did they?
4    MR. TORBORG: I think it was do you
5  recall. Yeah.
6    MR. McDONOUGH: I'll object to form
7  of the question.
8    - - - - -
9    (Thereupon, Deposition Exhibit 4299
10    was marked for purposes of
11    identification.)
12    - - - - -
13    Q.   For the record, what we've marked
14  as Exhibit 4299 is a miniscript copy of your
15  latest testimony from the SEC dated February
16  11th, 2003.
17    I would ask you, if you would, to
18  flip to the page -- it's actually at the
19  bottom. There's a little paren that says page
20  six. But I'm trying to get you to page 21 of
21  your actual transcript. They've got this in
22  sort of a scrunch format.
23    MR. McDONOUGH: I'm not following
24  you there.
25    MR. TORBORG: Page 21 of her

Page 125

1  testimony. If you look at the bottom, there's
2  a little six, if that helps.
3    MR. McDONOUGH: Okay.
4    Q.   Do you see page 21, Miss Heinlein?
5  Are you with me?
6    A.   Yes.
7    MR. TORBORG: Everyone with me that
8  has a transcript?
9    Q.   Let's go to line 13. I'm going to
10  read you some testimony. Question, "Do you
11  remember testifying on March 1 that you created
12  it -- that is in reference to the 50 million
13  dollar issue document -- after Miss Frazier
14  asked you to do some research on the issue of
15  the 50 million transfer?"
16    Your answer, "Yes."
17    Question, "Is that your
18  recollection today why you in -- in part why
19  you created it?"
20    Answer, "Yes."
21    Do you recall that testimony?
22    A.   Yes.
23    Q.   Was it truthful and to the best of
24  your recollection in February of 2003?
25    A.   Yes.

32 (Pages 122 to 125)

Kristen Heinlein, CPA

Page 126

1    Q.  What was your initial reaction,
2  Miss Heinlein, of the concept of transferring
3  reserves from Graduate to DVOG, the 50 million?
4        MR. McDONOUGH: Object to form.
5    A.  I don't know if I had any reaction.
6    Q.  Do you recall discussing the
7  concept with either Miss Porter or Miss
8  Frazier?
9    A.  Yes.
10    Q.  What is your best recollection of
11  when you had that discussion?
12    A.  In August during year-end.
13    Q.  Do you recall when or where that
14  discussion took place?
15    A.  Physical location?
16    Q.  Yes.
17    A.  It was in the Clark Building.
18    Q.  Do you recall anything specific
19  that was said?
20    A.  It was -- not really.  I mean, we
21  talked about the 50 million dollars and what I
22  did to substantiate the 50 million dollars.
23    Q.  Do you recall whether Miss Frazier
24  or Miss Porter expressed any surprise at the
25  fact -- about the transfers?

Page 127

1    A.  Not that I recall.
2    Q.  So to the best of your
3  recollection, both Miss Frazier and Miss Porter
4  were already aware of the transfers before that
5  meeting?
6        MR. McDONOUGH: Object to form.
7        MR. STEINBERG: Objection.
8        MR. McDONOUGH: The witness has
9  testified that they told her.
10        MR. TORBORG:  Okay, fair enough.
11  I'll withdraw the question.
12    Q.  Do you recall ever discussing an
13  issue document relating to the 50 million
14  dollar reserve entry with either Miss Porter or
15  Miss Frazier?
16    A.  No.
17    Q.  Do you recall that -- let me mark
18  an exhibit here.
19        If we go back to Exhibit 4297, the
20  50 million dollar reserve entry document, last
21  modified date of June 9th, 1997.  Do you recall
22  where you got the information to put in the
23  detail about where the reserve transfers were
24  allocated amongst the DVOG entities that is
25  reflected in that chart, the chart in the

Page 128

1  middle of the first page of the document?
2    A.  No, I'm not sure if I received it
3  from Amy or Christa or the client.
4    Q.  Do you recall if you had -- if you
5  obtained the information through a document or
6  through conversation?
7    A.  I'm not sure.
8    Q.  Do you recall ever receiving any
9  document from AHERF that referred to the
10  transfers?
11    A.  Yes.
12    Q.  Do you recall what that document
13  looked like?
14    A.  It was a chart.  It had Graduate
15  information on it.
16    Q.  When you say Graduate information,
17  can you be any more specific?
18    A.  I'll know when I see it.
19  Unfortunately I -- I think it had the Graduate
20  hospitals at the top of it.
21    Q.  Listed in a column format across
22  the top?
23    A.  Across the top, yes.
24    Q.  Do you recall when it was that you
25  received that document?

Page 129

1    A.  No.
2    Q.  Do you recall how it was that you
3  received the document?
4    A.  It was either from Amy or from
5  Christa.
6        - - - - -
7        (Thereupon, Deposition Exhibit 4300
8        was marked for purposes of
9        identification.)
10        - - - - -
11    Q.  Miss Heinlein, do you believe what
12  we've marked as Exhibit 4300 is the document
13  that you recalled and just tried to describe to
14  me?
15    A.  Yes.  Again, I'm not sure if the
16  writing was on it when I first saw it.
17    Q.  You're referring to the
18  annotations?
19    A.  Yes.
20    Q.  Do you recognize those annotations?
21    A.  Amy Frazier's.  It's Amy Frazier's
22  writing.
23    Q.  I'm not sure you're right on that
24  one, but that's okay.
25    A.  Okay.

Kristen Heinlein, CPA

Page 134

1  you should. I'm just noting that for the
2  record.
3      THE WITNESS: Can you read me back
4  what he asked me, the question, please?
5      THE NOTARY: Do you just want me to
6  read the question?
7      THE WITNESS: Yes.
8      (Record read.)
9   A.  I'm not going to argue with Robin
10  Schaffer's testimony. I don't know if she gave
11  it to me or not.
12   Q.  If you could go back, please, to
13  the second page of Exhibit 8, Mr. Cancelmi's
14  April 14th memo. Under the section, timing of
15  recognition, there's language there where
16  Mr. Cancelmi wrote, "A determination has been
17  made that 25 million of reserves will be
18  recorded in the Delaware Valley Hospital's
19  March 1997 financial statements. The remaining
20  25 million will be recorded in the fourth
21  quarter."
22      If you would go back to your issue
23  document, Exhibit 4297. Under the issue
24  description, the fourth line down, it says, "A
25  determination was made that 25 million of

Page 135

1  reserves was recorded in the DV Hospitals in
2  the March, comma, 1997 financials and the
3  remaining -- remaining 25 million dollars would
4  be recorded in April."
5      Do you note similarities between
6  that language?
7      MR. McDONOUGH: Object to form.
8   A.  There are similarities, yes.
9   Q.  Given that, do you believe you may
10  have received a copy of Mr. Cancelmi's
11  memorandum when you drafted the issue document?
12      MR. STEINBERG: Objection. Asked
13  and answered.
14   A.  Again, I don't remember receiving
15  this memo.
16      MR. McDONOUGH: This memo being the
17  April 14th memo?
18      THE WITNESS: Yes.
19      MR. TORBORG: Why don't we take a
20  break, go to lunch. Let's go off the record.
21      THE VIDEOGRAPHER: Going off the
22  record at 12:22.
23
24      (Luncheon recess taken.)
25      - - - - -

Page 136

1      AFTERNOON SESSION commencing at 1:31 p.m.
2      THE VIDEOGRAPHER: Going back on
3  the record at 1:31.
4      EXAMINATION OF KRISTEN LEE HEINLEIN, CPA
5  BY MR. TORBORG:
6   Q.  Welcome back, Miss Heinlein.
7   A.  Thank you.
8   Q.  If I could ask you to get out
9  Exhibit 8. I think it's still in front of you
10  here. I wanted to ask you some questions about
11  the language to see if it triggers -- actually
12  I just want to use this as sort of a platform
13  to ask some other questions.
14   A.  Okay.
15   Q.  The second paragraph, fourth
16  sentence starts, "The justification for
17  recording these reserves."
18      The memo stated, "The justification
19  for recording these reserves on the Graduate
20  hospitals' financials is that our experience
21  suggests that similar to other AHERF
22  acquisitions, it is inevitable that unknown
23  loss contingencies exist related to the
24  Graduate hospitals that were not identified
25  during the due diligence process. Granted, the

Page 137

1  reallocation of these reserves in the Graduate
2  hospitals to the other Delaware Valley
3  Hospitals is not the most technically
4  appropriate resting place, however, since only
5  one audited set of financial statements will be
6  prepared at a consolidated AHERF level, the
7  precise placement of the reserves on the
8  individual hospital's financial statements
9  becomes less critical."
10      My question for you, Miss Heinlein,
11  is do you recall any discussion at any time
12  during the 1997 audit about the fact that there
13  would be only one set of consolidated financial
14  statements in context with the reserve
15  transfers?
16   A.  Not in context with the reserve
17  transfers. I just knew there that there was
18  going to be one set of financials instead of
19  multiple perennity.
20   Q.  So you don't recall any connection
21  between the two?
22   A.  No.
23   Q.  At any time during the 1997 audit,
24  do you recall ever hearing about Coopers
25  requesting AHERF to reverse the transfers?

35 (Pages 134 to 137)

Kristen Heinlein, CPA

Page 138

1    A.  No.
2    Q.  Now, unlike some of the -- I want
3  to -- sorry, flip back to 4297.  That was your
4  issue document.
5    A.  Okay.
6    Q.  Now, unlike some of the other
7  documents we've seen today, this one is an
8  issue topic document and not a work paper, is
9  that right?
10    A.  Yes.
11    Q.  Is there a distinction between the
12  two types of documents?
13    A.  Yes.
14    Q.  To the best of your understanding,
15  what was the difference between an issue
16  document and a regular work paper?
17    A.  Work paper normally included
18  information that the client had given to the
19  auditors and then, you know, we, as the
20  auditors, put our tick marks on it or our
21  follow-up questions.  An issue was to bring
22  attention to something that we had found when
23  we were auditing our audit areas.
24    Q.  If I could ask you to flip out --
25  get out Exhibit 4001.  It was a document

Page 139

1  produced earlier today that has a cover page
2  that had the business assurance manual on it.
3  The first page will be a black document.
4        Again, Exhibit 4001 has a cover
5  page, which is the cover page for the business
6  assurance manual, assurance services, 1996
7  edition, as well as a particular section within
8  that manual, Section 620, Consideration of
9  Documentation of Issues.
10        Did you review this last time and
11  tell me if you recall whether or not you
12  remember this document?
13    A.  I remember the manual.  I'm not
14  specifically sure of Section 620.
15    Q.  Do you think you did look at it
16  during the -- at all during the AHERF audit?
17    A.  I don't know.
18    MR. STEINBERG:  Section 620?
19    MR. TORBORG:  Section 620, yes.
20    A.  I don't know.
21    Q.  Section .3 on Bates 256 states, "An
22  issue is a matter that we identify that is
23  relevant and requires a response in the audit
24  from either a technical project management or
25  client's service or any other point of view."

Page 140

1        Issue matter -- "Issues may be
2  matters from the previous year that were
3  appropriate to be readdressed in the current
4  audit, risks identified during the client
5  acceptance or continuance review, risks
6  identified at the planning stage, exceptions
7  arising from our work or other matters
8  warranting further attention.
9        "Critical matters are those issues
10  deemed of such importance that they require
11  partner clearance.  This section outlines how
12  we should consider documenting issues,
13  including critical matters."
14        Does my reading that language in
15  the record refresh your recollection at all
16  about whether you read this language before?
17    A.  No.
18    Q.  Does this comport with your
19  recollection about what an issue was?
20    A.  Yes.
21    Q.  Under .4(a) under subsection under
22  identification of issues, it states, "Members
23  of the engagement team should identify issues
24  as early as possible."
25        Do you remember that being

Page 141

1  something that was stressed during the AHERF
2  audit, to identify issues as early as possible?
3    A.  Yes.
4    Q.  And then (c) stated, "Issues should
5  be analyzed by the member of the engagement
6  team with the appropriate experience, skills,
7  and judgment who should be satisfied that the
8  record of the issue is sufficient to identify
9  the audit engagements."
10        Do you recall that being something
11  that was stressed during the audit of AHERF,
12  1997 audit of AHERF?
13    A.  Yes.
14    Q.  Now, the issue document that we saw
15  in Exhibit 4297, the 50 million reserve entry,
16  the one created on June 9th -- June 9, 1997,
17  you have typed -- you have typed it issue type,
18  no further action required?
19    A.  Yes.
20    Q.  Do you recall that within the CLASS
21  system you could identify an issue type?
22    A.  Yes, I could.
23    Q.  And do you know why you typed this
24  one no further action required?
25    A.  Yes, because I only used this issue

Page 142

1  as a place where I kept my notes throughout the
2  audit.
3       MR. STEINBERG:  Are we done with
4  4001?
5       MR. TORBORG:  Yes.
6       - - - - -
7       (Thereupon, Deposition Exhibit 4302
8       was marked for purposes of
9       identification.)
10      - - - - -
11     Q.  For the record, what I've marked as
12  Exhibit 4302 is an issue topic titled 50
13  Million Reserve Entry.  Again, this one has a
14  created by date of June 9th, 1997; but this one
15  has a last modified by date of August 13, 1997.
16       Right?
17     A.  Yes.
18     Q.  Have you had a chance to look
19  through this document or do you need a second?
20     A.  I'm fine, go ahead.
21     Q.  Do you recall this document?
22     A.  Yes.
23     Q.  Now, this one has some changes from
24  the previous version, correct?
25     A.  Yes.

Page 143

1      Q.  One of the changes was that the
2  issue type was changed from no further action
3  required to audit implications?
4      A.  Yes.
5      Q.  Do you know why that was changed?
6       MR. STEINBERG:  You're comparing to
7  4297?
8       MR. TORBORG:  Yes.
9      A.  I don't know, I changed it.  I
10  don't know why.
11     Q.  What did the term audit
12  implications mean?
13     A.  Something that would impact the
14  audit and needed to be looked at by someone
15  higher than myself.
16     Q.  In addition, this version of the
17  work paper, the journal entries that are listed
18  on Exhibit 4297, the earlier version of the
19  issue document, the journal entries are not on
20  this version?
21     A.  Correct.
22     Q.  Do you know why not?
23     A.  I'm not sure why I deleted them.
24     Q.  And then in this version, the issue
25  description, you have, "Per conversation with

Page 144

1  Robin Schaffer, C&L notes that a total of 50
2  million was intercompanied from the Graduate
3  hospitals to the Delaware Valley Hospitals to
4  help, quote, support, unquote these entities
5  due to bad debt reserve shortfalls."
6       In the earlier version of this work
7  paper, you didn't have the language "to help
8  support," right?
9      A.  Yes.
10     Q.  Do you know why you added that
11  language?
12     A.  No.
13     Q.  Do you know what you meant when you
14  said "to support"?
15     A.  I don't know what I thought at that
16  time.
17     Q.  Do you know why you put it in
18  quotes?
19     A.  No.
20     Q.  Based on your practices at the
21  time, would that be, putting in quotes, would
22  that be something intended to suggest sarcasm?
23       MR. STEINBERG:  Objection.  Vague,
24  lack of foundation and calls for speculation.
25     A.  I have no idea why I put that in

Page 145

1  quotations.
2      Q.  I'm asking based on your practice
3  of when you drafted work papers or issue
4  topics, if you put something in quotes, like
5  you put in "to help support," would that be
6  something that based on your practice would
7  indicate hinting at sarcasm?
8      A.  No.
9       MR. STEINBERG:  Same objection.
10     Q.  For the record, I've shown the
11  witness or asked the witness to review Exhibit
12  4260, which is an April 7th, 1997 interoffice
13  correspondence from Christa Porter to the AHERF
14  engagement team that is a three-page document.
15  Miss Heinlein is shown on the distribution on
16  the third page of the document.
17       Miss Heinlein, if you would take a
18  look at that to the extent you think it's
19  necessary to tell me whether or not you recall
20  it, then I'll ask some specific questions.
21     A.  Yes, I recall it.
22     Q.  You do recall the document?
23     A.  Yes.
24     Q.  The fourth bullet on the second
25  page Bates ending 220 -- let me first read the

Kristen Heinlein, CPA

Page 146

1  first paragraph of that page. It says, "The
2  following is a list of CLASS tips for the AHERF
3  engagements. This list was generated from
4  prior experience in CLASS best practices.
5     "If you have any suggestions for
6  additional points or criticisms for those made,
7  please let me know."
8     Then the fourth bullet down reads,
9  "Prior to including an issue in the audit file,
10 the issue must be discussed with a senior
11 assigned to review the audit area for
12 concurrence."
13    Miss Heinlein, do you recall that
14 there was a guideline to discuss the creation
15 of an issue with a senior prior to including it
16 in the audit file?
17    MR. STEINBERG: Objection. Vague.
18 Sorry.
19    A.  I don't remember, no.
20    Q.  Do you recall whether it was your
21 practice to discuss issue documents with a
22 senior before putting it in the audit file?
23    A.  No.
24    Q.  Five bullets down from that is a
25 bullet that says, "A replication schedule will

Page 147

1  be developed for both prelim and year-end field
2  work. Please stick to the replication
3  schedule. This is important due to the size of
4  the engagement team."
5     Do you have an understanding of
6  what that means?
7     A.  Yes.
8     Q.  What is your understanding?
9     A.  There was a main database held on a
10 server, so everybody who had done work on this
11 database needed to transfer the information
12 from that day to the overall database on the
13 server, so we would replicate our databases.
14    Q.  Every member of the audit team
15 would replicate the databases?
16    A.  Yes.
17    Q.  To the best of your knowledge?
18    A.  Yes.
19    Q.  To the best of your knowledge, did
20 people stick with the replication schedule?
21    A.  I don't remember.
22    Q.  I asked you earlier if you recalled
23 whether or not you discussed -- when you first
24 created the issue document related to the 50
25 million, Exhibit 4297, whether you discussed it

Page 148

1  with anyone else. I think you said you don't
2  recall today if you did.
3     A.  Correct.
4     Q.  Based on your practices at the
5  time, would you have created an issue document
6  relating to the 50 million dollar transfers
7  without discussing it with someone above you?
8     MR. STEINBERG: Objection. Vague.
9  Lack of foundation. Calls for speculation.
10    A.  Quite possibly, yes.
11    Q.  Quite possibly you may have done
12 that?
13    A.  Yes.
14    Q.  Why do you say that?
15    A.  If I couldn't find my senior, if
16 the person wasn't there for the day, I would
17 create an issue and then eventually follow up
18 with the person.
19    4303 marked.
20    Q.  For the record, what we've marked
21 as Exhibit 4303 is a work paper for the 1996
22 audit, working paper name, 50 million dollar
23 reserve; 50 million dollar bad debt reserve
24 entry. The working paper reference number
25 0053-75. Completed by Kristen Heinlein on

Page 149

1  September 15th, 1997. Last modified by Christa
2  Porter on September 22nd of '97.
3     Miss Heinlein, if you could let me
4  know when you've had a chance to look at that.
5     A.  I'm fine, go ahead.
6     Q.  Do you recall this document?
7     A.  Yes.
8     Q.  Now, this one is unlike the -- let
9  me strike that.
10    This document has some of the
11 same -- or has the same language as some
12 portion of the intermediate version of the
13 issue -- of the second version of the issue
14 document on the 50 million, right?
15    MR. STEINBERG: You're talking
16 about 4302?
17    MR. TORBORG: Yes. Thank you.
18    A.  Yes.
19    Q.  Do you recall cutting and pasting
20 language from your issue document and putting
21 it into a work paper?
22    A.  Yes.
23    Q.  Do you recall why you did that?
24    A.  Christa Porter asked me to put my
25 information from the issue into a work paper.

38 (Pages 146 to 149)

Kristen Heinlein, CPA

Page 150

1    Q.   Did she -- do you recall when she
2  made that request?
3    A.   During our year-end field work.
4    Q.   Did she tell you why she wanted you
5  to do that?
6    A.   I don't remember if she did.
7    Q.   Do you recall if you hard deleted
8  your -- well, let me strike that and try to get
9  a little bit more background in.
10   A.   Okay.
11   Q.   Do you recall that on the CLASS
12 system you could mark items for deletion?
13   A.   Yes.
14   Q.   But that was different than taking
15 it off the database altogether, right?
16   A.   Yes.
17   Q.   The difference between a hard
18 delete, so to speak, which would be taking off
19 the system?
20   A.   Yes.
21   Q.   Is that the terminology you're
22 familiar with?
23   A.   Yes.
24   Q.   Versus just marking it for
25 deletion, right?

Page 151

1    A.   Yes.
2    Q.   Do you recall whether you hard
3  deleted the issue document on the 50 million
4  dollar reserve entry?
5    A.   I know now I hard deleted it. I
6  don't remember marking it for deletion or hard
7  deleting it at the time.
8    Q.   So I take it you don't recall why
9  you hard deleted it?
10   A.   No.
11   Q.   Do you have any recollection as you
12 sit here today on the amount of time that
13 elapsed between when you first created an issue
14 document related to the 50 million and when you
15 were told to put it into a work paper?
16   A.   Do I know now?  From looking at the
17 dates of creation, I know it was in a span of
18 three or -- three months.
19   Q.   I'm asking for your recollection.
20   A.   No.
21   Q.   No?  Okay.
22      I think you -- we talked earlier
23 about a meeting that you recalled with Miss
24 Frazier and Miss Porter with respect to the 50
25 million?

Page 152

1    A.   Yes.
2    Q.   Right?
3       And your recollection of that
4  meeting today was that it occurred in --
5  sometime in August?
6    A.   Yes.
7    Q.   I don't recall if you told me this
8  yet, but did Miss Frazier ask you to do
9  anything in that meeting with respect to the 50
10 million?
11   A.   I'm not sure if she gave me a
12 specific direction or not.
13   Q.   Do you recall her asking you to do
14 some research with respect to the 50 million?
15   A.   Through the course of the audit,
16 yes.  I'm not sure specifically that day.
17   Q.   At the time that Miss Porter told
18 you to put the content of your issue document
19 into the work -- into a work paper, do you
20 recall if that was before or after the meeting
21 you had with Amy Frazier and Christa Porter
22 that you remember?
23      MR. STEINBERG:  I'm sorry, I missed
24 the question.  Would you mind reading that back
25 for me, please?

Page 153

1       (Record read.)
2       MR. STEINBERG:  Thank you.
3    A.   It was after my meeting with
4  Christa, yes.
5      - - - - -
6       (Thereupon, Deposition Exhibit 4304
7       was marked for purposes of
8       identification.)
9      - - - - -
10   Q.   For the record, what I've shown
11 Miss Heinlein, or what I've handed Miss
12 Heinlein as Exhibit 4304 is an audit step work
13 paper for the 1997 audit for the file section
14 name patient accounts receivable; step name,
15 examine adjustments made throughout the year,
16 completed by Kristen Heinlein on August 26th,
17 1997, and last modified by Christa Porter on
18 September 10, 1997.
19      Miss Heinlein -- and also I've
20 attached, again, what I call metadata
21 information, the remaining portion of this
22 document.
23      My first question -- after you've
24 had a chance to read just the first page -- is
25 whether or not you recall the first page.

39 (Pages 150 to 153)

Kristen Heinlein, CPA

Page 154

1    A.   During the audit, no. I've seen it
2   obviously since during testimony.
3    Q.   You've seen it in testimony with
4   the SEC?
5    A.   Yes.
6    Q.   Under this -- this debt description
7   says, "Examine support for significant, unusual
8   or nonrecurring adjustments made throughout the
9   year by the client in reconciling detailed
10  patient -- patients receivable records with
11  control accounts in the general ledger."
12       Under the step comments, it was
13  written, "C&L notes that no unusual or
14  nonrecurring adjustments were made in
15  reconciling A/R to the general ledger."
16       Do you recall if you drafted this
17  language in the step comments?
18   A.   I don't remember.
19   Q.   Do you recall whether you ever
20  considered whether or not the 50 million of the
21  reserve transfer should be listed in this step
22  comment that -- under the step description
23  asking to examine support for significant or
24  nonrecurring adjustments made throughout the
25  year by the client?

Page 155

1    A.   Not that I remember.
2        - - - - -
3        (Thereupon, Deposition Exhibit 4305
4        was marked for purposes of
5        identification.)
6        - - - - -
7    Q.   For the record, what I've handed
8   the witness as 4305 is a similar audit step
9   work paper, this one from an earlier version of
10  the CLASS database, again, as Mr. McDonough
11  explained earlier on the record, there were
12  some prior versions of the CLASS system that
13  weren't replicated, so they were still out
14  there and never produced to us, as well as what
15  I call metadata information beyond the first
16  page.
17   A.   Okay.
18   Q.   Do you recall -- have you had a
19  chance to look at this document?
20   A.   Yes.
21   Q.   Do you recall this version of the
22  document?
23   A.   No.
24   Q.   Now, this one was -- does not have
25  a completed by date but has a last modified by

Page 156

1   date of May 29, 1997, right?
2    A.   Yes.
3    Q.   Now, this -- now, did you notice
4   any difference between this document and the
5   last one?
6        MR. STEINBERG:  4304.
7        MR. TORBORG:  Yes.
8        MR. STEINBERG:  4305.
9    A.   The information in the step
10  comments is different.
11   Q.   This one, the step comments says 50
12  million dollar hyphen Graduate bad debt, right?
13   A.   Yes.
14   Q.   You don't recall whether you
15  drafted that?
16   A.   I think I drafted that.
17   Q.   Why do you think you drafted that?
18   A.   I don't know, just my recollection.
19   Q.   Do you know why there was a change
20  from an earlier version of this same audit step
21  that provided 50 million Graduate bad debt
22  under this step description to the final one
23  that we looked at in Exhibit 4304?
24   A.   No, I don't.
25   Q.   Do you recall who made the change?

Page 157

1    A.   No.
2    Q.   Would it be fair to say -- let me
3   ask you this. Do you know what the 50 million
4   dash Graduate bad debt refers to?
5    A.   Yes.
6    Q.   What does it refer to?
7    A.   There was 50 million dollars on
8   Graduate's opening balance sheet, I guess to --
9   fortunately I need to use my words in the
10  document -- to help support the Delaware Valley
11  entities.
12   Q.   For the record, I've handed the
13  witness what we've marked previously as Exhibit
14  4258. It is a document printed off of the
15  Meyer version of the CLASS disk again, this one
16  with a working paper name Hahnemann T/V review,
17  as well as what I call metadata information
18  from the fourth page of the exhibit to the
19  remainder of the exhibit.
20       Miss Heinlein, I'm going to ask
21  you, if you would, to please just review the
22  first three pages of the document.
23   A.   Okay.
24   Q.   Do you recall this specific
25  document at all?

40 (Pages 154 to 157)

Kristen Heinlein, CPA

1    A.   No.
2    Q.   Do you recall -- whether or not you
3  recall this document at all -- reviews that
4  someone may have done of preliminary trial
5  balances?
6    A.   Yes.
7    Q.   What do you recall about this?
8    A.   I know Christa Porter and Tony
9  Carrabba were doing reviews of the opening
10 balances for Graduate.
11   Q.   Now, this particular document, all
12 of the language is in lower case letters,
13 right?
14   A.   Yes.
15   Q.   And there's no punctuation at the
16 end of any of these questions typically, right?
17   A.   Yes.
18   Q.   Given that style, do you recall
19 anyone on the AHERF audit team that wrote in
20 that style?
21   A.   No.
22   Q.   If I could ask you to flip back to
23 Exhibit 4296. I believe it's the first of the
24 3-31 bad debt reserve calculation with the
25 roll-forward schedules. I may have my number

1  wrong, and I apologize if I do.
2        4292. I'm sorry. Am I off.
3        Again, if you would flip with me
4  about nine pages back into the document and
5  attempt to find the inpatient and outpatient
6  roll-forward schedules that we talked about
7  earlier.
8    A.   No.
9    Q.   All right?
10       If you go to the outpatient
11 schedule, the one that has some notes on it.
12   A.   Okay.
13   Q.   Let me ask you first, the footnotes
14 under B, C, D and E on that page.
15   A.   Yes.
16   Q.   Are those footnotes that you
17 drafted?
18   A.   Yes.
19   Q.   And the notes that are on the top
20 of that in a different font, it says -- the
21 first one says, "Notes, A/R balance as of
22 9-30-96 does not include FY '97 revenue
23 adjustment, 200,000." You didn't write those
24 notes, right?
25   A.   No.

1    Q.   Those were provided by the client?
2    A.   Yes.
3    Q.   Right?
4        Do you recall the language "FY
5  revenue adjustment" at all?
6    A.   No.
7    Q.   Sitting here today, do you have an
8  understanding of what that is?
9    A.   No.
10   Q.   If I ask you about similar FY '97
11 revenue adjustments on other entities'
12 roll-forward schedules, would your answer be
13 the same?
14   A.   Yes.
15   Q.   Based on your practices at the
16 time, is that something that you would have
17 attempted to investigate?
18       MR. STEINBERG: Objection. Vague,
19 lack of foundation. Calls for speculation.
20   A.   I don't know.
21       MR. TORBORG: Mr. Steinberg, I
22 think -- I don't really mind too much the
23 objection, but the calls for speculation,
24 that's an objection that's preserved by the
25 case management order. So if you want, you can

1  just say object to form, it's covered. You
2  don't have to say calls for speculation and all
3  that. You can just say object to form. That's
4  fine. The speculation objection is preserved.
5        MR. STEINBERG: I just want to make
6  the basis of the objection to the form of the
7  question clear.
8        MR. TORBORG: I'll let you know if
9  I want to know the basis, okay?
10       MR. STEINBERG: I want the record
11 to be clear for the basis for my objection to
12 form as well.
13       MR. TORBORG: All you need to say
14 is object. There's a case management in
15 this -- order in this case that generally says
16 just to keep your objection to object to form.
17       MR. McDONOUGH: Okay, let's move
18 on, please. You know, we always have our
19 longest discussions when we try to minimize
20 comments.
21       MR. TORBORG: Okay. Well, I'll
22 move on, but --
23       MR. McDONOUGH: I take your point.
24 Just let's move on. Thanks.
25       BY MR. TORBORG:

Kristen Heinlein, CPA

Page 162

1    Q.   On footnote D, I asked you already
2  about the first sentence in that one.
3        The second sentence you wrote,
4  "Monthly bad debt expense agrees to the I/S
5  without exception."
6        And what does that note mean?
7    A.   The monthly bad debt expense agrees
8  with the income statement without exception.
9    Q.   Do you recall whether that was
10 something that you attempted to do, to tie the
11 bad debt expense -- or the figures in I guess
12 the row -- the column that has the E at the
13 bottom of it with the general ledger?
14   A.   It appears so.
15   Q.   Do you know why you were doing
16 that?
17   A.   Not as I sit here today.
18   Q.   Do you recall if that was a
19 standard audit step in reviewing the
20 roll-forwards?
21   A.   Probably was, yes.
22        - - - -
23        (Thereupon, Deposition Exhibits
24        4306 through 4310 were marked for
25        purposes of identification.)

Page 163

1        - - - -
2    Q.   For the record, what I've marked as
3  4306 through 4310 are documents I printed off a
4  different version of a prior version of the
5  CLASS system, this one from a gentleman named
6  HIPKISS.  And the Bates numbering at the bottom
7  of each of these documents is intended to
8  reflect that.
9        Miss Heinlein, take as much time as
10 you need to answer my question, but I think you
11 probably already know the answer to my
12 question.  Other than the metadata information
13 I've attached to the back of each of these
14 schedules, do you recall these schedules?
15   A.   Yes.
16   Q.   Do you recall when you received
17 those schedules?
18   A.   During our year-end audit
19 procedures.
20   Q.   Do you recall from whom you
21 received them?
22   A.   It was either Robin or one of
23 Robin's staff.
24   Q.   Do you recall if you received them
25 on a disk or if you received hard copies?

Page 164

1    A.   I think I received them on disk.
2    Q.   Do you recall any discussions
3  coincident with you receiving these schedules?
4    A.   Not that I remember.
5    Q.   Do you recall any discussions with
6  anyone at AHERF with respect to these schedules
7  at all?
8    A.   I think I followed up with some
9  questions with Robin.
10   Q.   Do you recall generally what those
11 questions were?
12   A.   Not at this time.
13   Q.   I have some questions for you on
14 these schedules, but I think to make it a
15 little bit easier, I'm going to use this -- can
16 you guys share that one?
17        MR. STEINBERG:  Sure.
18   Q.   This one has Bates numbering on it.
19 It makes it a little bit easier to use it.
20        All right.  Miss Heinlein, it's my
21 understanding what I've handed you, Exhibit
22 4248, is a collection of some of the accounts
23 receivable related work papers for the 1997
24 audit.
25        If I could ask you to turn, please,

Page 165

1  to the Bates page ending 10279.
2    A.   102.79?
3    Q.   10279, PWC 10279.
4    A.   I'm sorry.
5        Okay.
6    Q.   Does this document appear to be a
7  bad debt reserve calculation and roll-forward
8  schedule for the Hahnemann University Hospital
9  for 6-30-97?
10   A.   Yes.
11   Q.   If I could ask you to turn to the
12 second and last -- second to last and last page
13 of this exhibit.  It has the Bates number
14 PWC010290.L and .M.  These were blown-up
15 schedules so we can read them a little easier.
16        Do you recall this schedule --
17   A.   Yes.
18   Q.   -- these two schedules?
19   A.   Yes.
20   Q.   Now, on the 3-31 version of the
21 roll-forwards, if you remember them, do you
22 recall that the -- well, let me strike that.
23 Sorry.
24        If we go to the bottom of page
25 290.0, there is a footnote E.  It says transfer

42 (Pages 162 to 165)

Kristen Heinlein, CPA

Page 166

1  of reserves from Graduate that relates to 5
2  million dollar credit entries in March and
3  April, right?
4      A.  Yes.
5      Q.  In the "other" column?
6      A.  Yes.
7      Q.  Now, in the -- on the 3-31-97
8  versions of these schedules, we saw that the
9  amount transferred from Graduate was in the
10  column that had the monthly bad debt expense,
11  right?
12      A.  Yes.
13      Q.  Do you know why for the 6-30-97
14  version of the schedule these amounts have been
15  broken out into an "other" column?
16      A.  No.
17      MR. STEINBERG:  Which document were
18  you referring to in your question?
19      MR. TORBORG:  3-31-97 roll-forward
20  schedules.
21      MR. McDONOUGH:  Wasn't that
22  something --
23      MR. TORBORG:  4292.
24      MR. McDONOUGH:  -- that was headed
25  under the trial balance column?

Page 167

1      MR. STEINBERG:  That was my
2  recollection, too.
3      A.  It was under ATB.
4      Q.  Your understanding of what was
5  under the ATB column was meant to be under the
6  bad debt provision column?
7      MR. McDONOUGH:  Is that a question?
8      MR. TORBORG:  Yes.
9      A.  I don't know.
10      Q.  Let me go to -- if we can get out
11  Exhibit 4292. Actually, let me do it a
12  different way if you don't mind.
13      Go to -- if you can keep one finger
14  on Exhibit 010255.
15      MR. McDONOUGH:  Keep one finger on
16  what?
17      Q.  Why don't we go to Exhibit 4292.
18  That's the 3-31-97 roll-forward schedule for
19  Bucks.
20      As we noted earlier, there's some
21  amounts underneath the ATB column, right?
22      A.  Yes.
23      Q.  Now, if you would flip with me,
24  please, to the larger exhibit, 4248, to the
25  Bates page ending 266K.

Page 168

1      MR. STEINBERG:  Is that Exhibit
2  4248?
3      MR. TORBORG:  Yes.
4      A.  Okay.
5      Q.  If you go to the roll-forward
6  schedule for Bucks County inpatient accounts,
7  there's a column for bad debt provision. Do
8  you see that?
9      A.  Yes, on 4292?
10      Q.  I'm asking you to look at --
11      A.  I'm sorry.
12      Q.  -- the Bates ending 266K.
13      A.  Okay. Yes.
14      Q.  Do you see the bad debt provision?
15      A.  Yes.
16      Q.  For the month of July, in the
17  amount of 122,478?
18      A.  Yes.
19      Q.  Month of August, 175,794.
20      Do you see that that matches the
21  amounts that are, for those two months, at
22  least, in the column ATB on the -- on Exhibit
23  4292?
24      A.  Yes.
25      Q.  Are you comfortable now assuming

Page 169

1  that what's in the ATB column really was the
2  bad debt provision column?
3      MR. STEINBERG:  Object to form.
4      MR. McDONOUGH:  Object to form.
5      A.  I don't know.
6      Q.  If we go back to 290.L on the large
7  Exhibit 4248. Have that in one hand. And then
8  I'm going to ask you to pull out Exhibit 4294.
9      And then if you would kindly find
10  for me the bad debt roll-forward portion on
11  that schedule, probably about ten pages back.
12      Did you do it? Do you have it?
13      A.  M-hm.
14      Q.  You saw it coming, huh?
15      A.  I did.
16      Q.  Look at note C on Exhibit 4294.
17      A.  Okay.
18      Q.  There's a note C next to the March
19  amount of a credit amount of $5,521,000 --
20  $521,015, do you see that?
21      A.  Yes.
22      Q.  The note C states -- represents the
23  monthly entry to bad debt expense, paren, AHERF
24  was booking to budget, end paren, plus the
25  entry of 5 million dollars from the Graduate

43 (Pages 166 to 169)

Kristen Heinlein, CPA

Page 170

1  hospitals, paren, refer to issue, and then
2  monthly bad debt agrees to the I/S without
3  exception, right?
4      A.  Yes.
5      Q.  Now, if we go back to, in Exhibit
6  4248, Bates page ending 290.L, there is no
7  similar tick mark or footnote indicating that
8  the amount of bad debt expense has been tied to
9  the general ledger.  Right?
10     A.  Yes.
11     Q.  Do you know why that is?
12     A.  No.
13     Q.  Staying with that page, 290, in the
14  other column for the month of June, on the
15  inpatient schedule, there is a credit amount of
16  $691,047, right?
17     A.  Yes.
18     Q.  The footnote F that states bad debt
19  shortfall adjustments, right?
20     A.  Yes.
21     Q.  That was a footnote that was
22  drafted with a client?
23     A.  Yes.
24     Q.  Do you recall that footnote?
25     A.  No.

Page 171

1      Q.  Do you recall if you knew what a
2  bad debt shortfall adjustment was?
3      A.  No.
4      Q.  Based on your practices at the
5  time, would you have attempted to determine
6  what it was?
7          MR. STEINBERG:  Objection to form.
8      A.  I don't know.
9      Q.  If we go to the second -- the page
10  after that, .M.  There is a -- in the June row
11  "other" column, a $10,638,000 entry, credit
12  entry, right?
13     A.  Yes.
14     Q.  Footnote D.
15         Does it appear as you look at this
16  schedule that that credit entry served to
17  increase the amount of bad debt reserves in the
18  outpatient reserve account, bad debt reserve
19  account at Hahnemann?
20         MR. STEINBERG:  Based on looking at
21  the document now?
22         MR. TORBORG:  Yes.
23         MR. STEINBERG:  Object to form.
24     A.  It looks like it does, yes.
25     Q.  Do you believe that's something

Page 172

1  that you would have understood back in 1997
2  when you were doing the audit?
3          MR. McDONOUGH:  What, that the
4  credit increases the net reserve?
5          MR. TORBORG:  Yes.
6          MR. McDONOUGH:  Okay.
7          MR. STEINBERG:  Object to form.
8      A.  I would think so.
9      Q.  And, again, this has a footnote
10  that says bad debt shortfall adjustments,
11  right?
12     A.  Yes.
13     Q.  Do you recall anything about that
14  footnote?
15     A.  No.
16     Q.  Based on your practices at the
17  time, given the magnitude of that credit entry,
18  do you believe that's something that you would
19  have investigated?
20         MR. STEINBERG:  Object to form.
21     A.  I don't know.
22     Q.  Do you know why I'm asking about
23  these as you sit here today?
24     A.  As I sit here today, yes.
25     Q.  Why do you think I'm asking you

Page 173

1  about them?
2      A.  There were additional reserves on
3  AHERF's books.
4      Q.  Would those be additional reserves
5  transferred from the Graduate entities to the
6  Delaware Valley entities over and above the 50
7  million?
8      A.  Yes, that's my understanding.
9          MR. McDONOUGH:  As you sit here --
10         MR. TORBORG:  Yes.
11     A.  As I sit here today.
12     Q.  Do you believe the phraseology bad
13  debt shortfall adjustments was intended to hide
14  the additional transfers from Coopers &
15  Lybrand?
16     A.  I don't know.
17     Q.  Do you feel deceived as you sit
18  here today?
19     A.  No.
20         MR. McDONOUGH:  Object to form.
21     Q.  Now, I could go through and ask you
22  about similar different amounts about different
23  credit entries on the other four -- other four
24  DVOG hospitals.  Would your answer be the same
25  with respect to those --

44 (Pages 170 to 173)

Kristen Heinlein, CPA

Page 174

```
 1      A.  Yes.
 2      Q.  -- your recollection?
 3          MR. McDONOUGH:  Assuming the
 4   entries are the same?
 5          MR. TORBORG:  Yes.
 6          MR. McDONOUGH:  Yes.
 7          MR. TORBORG:  Assuming the entries
 8   are the same, that's a good point, because
 9   they're not exactly the same.
10          MR. STEINBERG:  I'm sorry, just for
11   clarification, are there categories of credit
12   entries you're talking about or -- I mean, I
13   don't want to make you go through everything,
14   but I'm not sure I know which credits you're
15   talking about.  If the witness knows what
16   you're talking about, that's fine, but I'm not
17   sure I do.
18      Q.  Do you know what I'm talking about?
19      A.  Yes.
20      Q.  Do we need to go through the
21   process?
22      A.  No.
23      Q.  If I could ask you to flip in
24   Exhibit 4248 to Bates page ending 151.
25      A.  Which document is that?
```

Page 175

```
 1      Q.  It's the large one, the one that
 2   you have in your hand, PWC Bates number.
 3          MR. McDONOUGH:  The thick one
 4   there.
 5      A.  I'm sorry, can I have the Bates
 6   number again?
 7      Q.  To make your life a little easier,
 8   you can take all of those other documents but
 9   that one off your plate for awhile.  We'll stay
10   with that one for awhile.
11      A.  Okay.
12          Can I have the Bates number again,
13   please?
14          MR. STEINBERG:  10 --
15      Q.  161.
16          MR. STEINBERG:  Sorry.
17      Q.  261.  You're right.
18          For the record, I've directed Miss
19   Heinlein's attention to a work paper titled bad
20   debt expense analysis for the 1997 audit,
21   working paper reference number 0053-64.
22          And then, Miss Heinlein, I would
23   invite you to save your eyes and look at the
24   Bates page ending .A and skip over the second
25   page.  .A is an enlargement of the second page.
```

Page 176

```
 1          MR. McDONOUGH:  So we're at 261?
 2          MR. TORBORG:  And 62.A.
 3          MR. McDONOUGH:  And 62.
 4          MR. TORBORG:  I'm sorry, 161 and
 5   162.A.  Sorry.
 6          MR. McDONOUGH:  That's all right.
 7          MR. TORBORG:  I'll let you --
 8          I really apologize.  I actually had
 9   more copies of this document that I can give
10   you guys.  I'm sorry, I did request extra
11   copies of this exhibit.
12      Q.  Miss Heinlein --
13          MR. TORBORG:  Is everyone caught
14   up?
15      Q.  Miss Heinlein, have you had an
16   opportunity to review the schedule on 162.A?
17      A.  Yes.
18      Q.  Now, this is titled bad debt
19   expense analysis, 6-30-96.
20          Do you think that's a typo?  It
21   probably should be 6-30-97?
22      A.  Yes.
23      Q.  Do you recall this schedule at all?
24      A.  Yes.
25      Q.  Did you create this schedule?
```

Page 177

```
 1      A.  Yes.
 2      Q.  What occasioned you to create this
 3   schedule?
 4      A.  During the year-end field work I
 5   created this schedule.
 6      Q.  Do you recall whether this was a
 7   schedule that Miss Frazier and/or Miss Porter
 8   specifically asked you to create?
 9      A.  I don't know.  I would assume so
10   because this is a summary of the bad debt
11   roll-forwards.
12      Q.  Now, you said this was a summary of
13   the bad debt roll-forwards.  What did you mean
14   by that?
15      A.  It just pulls out certain
16   information from the roll-forwards, if I'm not
17   mistaken, and contractual allowance schedules.
18   I think this was an accumulation of a number of
19   schedules to be put in one place.
20      Q.  Does it appear, among other things,
21   that this schedule is attempting to quantify
22   the amount of bad debt expense as a percentage
23   of net patient service revenue for the fiscal
24   years 1996 and 1997?
25      A.  Yes.  For 1997 for sure.  For 1996
```

45 (Pages 174 to 177)

Kristen Heinlein, CPA

Page 178

1    I think I just used that as a comparison.
2         Q.   Now, you said I used it as a
3    comparison. Were you looking at these figures
4    and attempting to draw any conclusions?
5         A.   No.
6         Q.   Do you know if anyone was?
7         A.   That would be an assumption, so I'm
8    not sure.
9         Q.   Do you recall having any
10   discussions with anyone else at Coopers about
11   this schedule?
12        A.   No.
13        Q.   I have shown the witness what we've
14   marked previously as Exhibit 4254, which is a
15   document that I printed off a floppy disk
16   produced to us in CD ROM format, and the disk
17   numbered by PricewaterhouseCoopers and the file
18   number are reflected in the Bates stamped
19   number.
20        Miss Heinlein, does this document
21   that I've shown you, Exhibit 4254, appear to be
22   a different version of the bad debt expense
23   analysis schedule that we see in Exhibit 4248
24   at Bates ending 162A?
25        A.   Yes.

Page 179

1         Q.   Now, if you would look with me
2    under the Hahnemann column, the first column
3    there, the 6-30-97 column, under O/P bad debt
4    expense, first of all, do you recall where it
5    was that you got these figures?
6         A.   No.
7         Q.   Would you have -- do you believe
8    you would have gotten them from the general
9    ledger?
10        A.   I don't know.
11        Q.   In any event, there's a credit
12   entry there of $4,469,295, right?
13        A.   I'm sorry, I don't see where you
14   are.
15        Q.   I'm sorry, I'm with the row O/P bad
16   debt expense. Sorry, I don't think I directed
17   you to that first. I apologize.
18        MR. McDONOUGH: You're actually on
19   the --
20        A.   Okay.
21        MR. McDONOUGH: I think you're on a
22   prior exhibit, too, aren't you?
23        THE WITNESS: Yes, he is.
24        MR. McDONOUGH: You're on 162.A.
25   Not 4254.

Page 180

1         Q.   I'm going to ask you to compare the
2    two, so it doesn't really matter what you do
3    first.
4         Under Exhibit 4254, the credit
5    amount is $3,469,295. Whereas on Exhibit 4248
6    at Bates ending 162.A, the amount is exactly
7    one million dollars difference, right?
8         A.   Yes.
9         Q.   Do you know why there's a one
10   million dollar difference between the two?
11        A.   No.
12        Q.   If there were other differences on
13   Exhibit 4254 and Bates page ending 162A of
14   4248, would you know why there were any
15   differences in other amounts?
16        A.   No.
17        Q.   Do you know if you were the person
18   who created Exhibit 4254?
19        A.   I think I did.
20        Q.   Do you recall whether or not anyone
21   else from the audit team asked you to compare
22   or compare data, benchmarking data from which
23   you could compare the bad debt expense
24   percentage of total net patient service revenue
25   from industry data and what would be reflected

Page 181

1    on the schedule, 4248?
2         A.   Not that I remember.
3         Q.   Do you recall being asked to
4    collect any industry data at all with respect
5    to accounts receivable for the '97 audit?
6         A.   No.
7             - - - - -
8         (Thereupon, Deposition Exhibit 4311
9         was marked for purposes of
10        identification.)
11            - - - - -
12        Q.   For the record, what I've marked as
13   Exhibit 4311 is a document printed off another
14   one of the floppy disks produced to us by
15   PricewaterhouseCoopers in August of 2003. This
16   one has a title, St. Christopher's Hospital for
17   Children Analysis of Allowance for Bad Debt,
18   June 30, 1997.
19        And then it contains just some
20   schedules behind it that show from what
21   particular file I got it off the CD ROM.
22        Miss Heinlein, if you would take a
23   look at that document.
24        A.   Okay.
25        Q.   Miss Heinlein, do you -- also I

Kristen Heinlein, CPA

Page 182

1  should note that the date in the upper
2  right-hand corner is the date I printed it off
3  the document. I couldn't get it to print
4  without it.
5       Do you recall this schedule at all?
6   A.  No.
7   Q.  Under the bolded section,
8  preliminary G/L balance as of June 30, 1997 --
9  June 30, 1997, the fourth item down there is an
10  item that has year-end administrative
11  adjustments, on the inpatient side a credit
12  entry of 328,000, and then on the outpatient
13  side a credit entry of 3.3 million.
14       Do you recall the terminology
15  year-end administrative adjustments at all?
16   A.  No.
17   Q.  You don't recall this schedule at
18  all, right?
19   A.  No.
20       MR. TORBORG: Why don't we take a
21  break.
22       THE VIDEOGRAPHER: Going off the
23  record at 2:34.
24       (Recess had.)
25       THE VIDEOGRAPHER: Going back on

Page 183

1  the record. This is tape number three.
2   Q.  Welcome back.
3       If I could ask you to please turn
4  to, in Exhibit 4248, Bates page ending 254,
5  going back in the document a bit.
6       For the record, I've directed Miss
7  Heinlein to part of the '97 accounts receivable
8  work papers that has an audit step titled
9  Assess Reasonableness of the Allowance at
10  6-30-97.
11       The step description provides,
12  "Assess the overall reasonableness of the
13  allowance using an analytical review and/or by
14  considering changes in the economy, any changes
15  in the client's payer mix or collection
16  patterns in any changes in the industry."
17       It's noted to be completed by you,
18  but without a date, and last modified by
19  Christa Porter, September 10th, 1997. Right?
20   A.  Yes.
21   Q.  Okay. What part, if any, did you
22  take in assessing the overall reasonableness of
23  the bad debt allowance on the various AHERF
24  hospitals' books?
25   A.  I didn't assess the reasonableness

Page 184

1  of the allowance.
2   Q.  So even though you're noted as an
3  individual who completed the audit step, you're
4  not the one who did a high level review?
5   A.  Correct.
6   Q.  How would you characterize your
7  role in assessing the overall reasonableness of
8  the bad debt reserves?
9       MR. McDONOUGH: Object to form.
10   A.  I received information from the
11  client, roll-forwards, did my work on them and
12  presented them to my senior. That was pretty
13  much my role in auditing the accounts
14  receivable.
15   Q.  Whether or not you were involved
16  with them yourself, are you aware of what types
17  of analytical reviews were utilized by Coopers
18  & Lybrand to assess the bad debt reserves at
19  the AHERF hospitals for the '97 audit?
20   A.  No.
21   Q.  Were you involved in considering
22  any changes in the economy --
23   A.  No.
24   Q.  -- with respect to the allowance?
25   A.  No.

Page 185

1   Q.  How about assessing changes in
2  collection patterns?
3   A.  No.
4   Q.  You don't recall collecting any
5  information about any of those items?
6   A.  Not that I remember.
7   Q.  Do you recall if you ever saw any
8  collection of receivables history for the 1997
9  audit?
10   A.  I remember looking at like a daily
11  cash spreadsheet, is that what you're referring
12  to?
13   Q.  Yes.
14       And you were looking at that for
15  purposes, as you stated earlier, of doing a
16  subsequent receipts testing, right?
17   A.  Yes.
18   Q.  Other than that, you don't recall
19  looking at any collection history?
20   A.  No.
21   Q.  If we can go back again to Bates
22  page ending 279 of this exhibit. That is the
23  Hahnemann bad debt reserve calculation and
24  roll-forward.
25       I'm going to be asking to you stay

47 (Pages 182 to 185)

Kristen Heinlein, CPA

Page 186

1    with me on the first page of the schedule.
2        A.   Okay.
3        Q.   Does it appear on the front page of
4    this schedule that right underneath the line
5    below working paper type, there's something,
6    that's a link to a document, right, the
7    document that follows in the rest of this
8    collection -- or, I'm sorry, the Bates ranges
9    that follow 279?  Do you recall that you -- let
10   me rephrase.
11       A.   I'm not sure I understand your
12   question.
13       Q.   Do you remember that you could link
14   in schedules of the CLASS systems that were
15   created by the client?
16       A.   Yes.
17       Q.   Is that what we see here?
18       A.   Yes.
19       Q.   Now, this refers to bad debt
20   calculations dash new methodology, right?
21       A.   Yes.
22       Q.   Do you recall that AHERF
23   implemented a new bad debt reserving
24   methodology for fiscal year 1997?
25       A.   Yes.

Page 187

1        Q.   What do you recall about that?
2        A.   What I remember is the Delaware
3    Valley hospitals did not have as stringent of a
4    reserve methodology as AGH, as the Pittsburgh
5    hospitals, and the accounting department tried
6    to mimic AGH's methodology on the Delaware
7    Valley hospitals.
8        Q.   How did you learn about the fact
9    that the Delaware Valley hospitals didn't have
10   as strongly reserved percentages as AGH?
11       A.   I don't know.
12       Q.   Just something you remember --
13       A.   Yes.
14       Q.   -- right?
15           Do you know why AHERF attempted to
16   follow the Allegheny General Hospital
17   methodology?
18       A.   No.
19       Q.   Do you recall if the Allegheny
20   General Hospital methodology was a methodology
21   that Coopers was more comfortable with?
22       A.   I don't remember.
23           - - - - -
24           (Thereupon, Deposition Exhibit 4312
25           was marked for purposes of

Page 188

1            identification.)
2            - - - - -
3        Q.   For the record, what I've handed
4    Miss Heinlein as Exhibit 4312 is a document
5    that I printed off the Meyer version of the
6    CLASS disk that is titled One-line Summary,
7    then talk to Dan, and then has a chart.
8            Miss Heinlein, if you would take a
9    look through that document.  It's only one
10   page, I think.
11       A.   Okay.
12       Q.   Have you had a chance to look
13   through it?
14       A.   Yes.
15       Q.   Do you recall this document?
16       A.   No.
17       Q.   Do you recall that within a CLASS
18   system you could write review comments to one
19   another with respect to audit issues?
20       A.   Yes.
21       Q.   Is that what this -- instead of
22   actually being a work paper number or an issue
23   document?
24       A.   Yes.
25       Q.   That's what this document is?

Page 189

1        A.   Yes.
2        Q.   This is a document you created on
3    June 4th, 1997 and last modified on June 9th,
4    1997.
5            I want to direct your attention to
6    the last item on the cell to the left where it
7    says, methodology for allowance percentages,
8    then DV entities.
9            Then at the top it said talked to
10   Dan.
11           Do you recall having any
12   discussions with Mr. Cancelmi about the bad
13   debt reserve percentages?
14       A.   Not that I remember.
15       Q.   Do you recall any discussions
16   within Coopers about the new bad debt reserving
17   methodology?
18       A.   No, just knowing that I knew they
19   had a new methodology.  I don't remember any
20   specific conversations.
21       Q.   Just to see if it refreshes your
22   recollection, though, do you recall any
23   discussion within Coopers noting that the
24   reserved percentages were too conservative, not
25   conservative enough, about right, anything

48 (Pages 186 to 189)

Kristen Heinlein, CPA

Page 190

1  along those lines?
2      A.   No.
3      Q.   This document also refers to DV
4  entities, right?
5      A.   Yes.
6      Q.   Do you have an understanding of
7  what DV entities means?
8      A.   Delaware Valley entities.
9      Q.   Would that be the hospitals within
10  the Delaware Valley Obligated Group entities?
11      A.   Yes, not Graduate.
12      Q.   Did you have an understanding
13  during the 1997 audit of who was evaluating the
14  propriety of the new reserve percentages?
15          MR. McDONOUGH:  Object to form.
16          MR. TORBORG:  Why don't you -- I'm
17  going to ask you to clarify that one.
18          MR. McDONOUGH:  Propriety is a word
19  that I don't understand in a sense that it
20  isn't moral.
21          MR. TORBORG:  It isn't what?
22          MR. McDONOUGH:  Moral.
23          MR. TORBORG:  Moral, okay.
24      Q.   Do you recall any discussions or
25  did you have an understanding at the time of

Page 191

1  the 1997 audit about who, if anyone, within
2  Coopers was evaluating the reasonableness of
3  the new bad debt reserve percentages?
4      A.   Amy and Christa.
5      Q.   Did you have an understanding of
6  how they were evaluating the reasonableness of
7  those percentages?
8      A.   No.
9      Q.   Do you recall who within AHERF
10  developed the new methodology?
11          MR. McDONOUGH:  Object to form.
12      A.   I think it was Robin Schaffer in
13  conjunction with Dan Cancelmi.
14      Q.   I'm going to show you two exhibits
15  at the same time here.
16          For the record, I have shown the
17  witness Exhibit 4252 and Exhibit 4253.
18          4252 is an audit step name, test
19  old account balances at 6-30-97.
20          Then Exhibit 4263 is a, at least a
21  front page, appears to be a pouch sheet titled
22  AHERF high dollar accounts, old account
23  balances.
24          Miss Heinlein, have you had a
25  chance to look through both of these documents

Page 192

1  just to see if you recall them?  I'll have some
2  specific questions for you in a moment.
3      A.   Yes.
4      Q.   Do you recall these documents?
5      A.   No.
6      Q.   You said that 4252 out of the step
7  description provides review client summary of
8  accounts greater than 90 days old with balances
9  exceeding $100,000.
10          Investigate Medicare/Medicaid
11  balances greater than 120 days through client
12  inquiry to determine collectibility.
13          Consider reclassifying old
14  Medicare/Medicaid balances to self-pay,
15  including in the bad debt reasonableness test.
16  Consider uncollectible balances in determining
17  reasonableness of overall accounts receivable
18  allowances.
19          Whether you recall these documents,
20  do you recall testing old account balances?
21      A.   No.
22      Q.   Do you know why the audit step
23  required a review of account balances over 90
24  days old with balances exceeding $100,000?
25      A.   Missed accounts receivable that's

Page 193

1  over 120 days old has a chance of not being
2  collectible.  Exceeding $100,000, I'm not sure
3  why that dollar limit was used.
4      Q.   And do you know why there was a
5  second set -- second sentence stated to
6  investigate Medicare and Medicaid balances
7  greater than 120 days to determine
8  collectibility, right, through client inquiry
9  to determine collectibility?
10          MR. McDONOUGH:  Right, that's what
11  the sentence says, the question is do you know
12  why it says that?
13          MR. TORBORG:  Yes.  Thank you.
14      A.   Medicare and Medicaid are slower
15  payers.
16      Q.   So the time frame to get concerned
17  is a little longer?
18      A.   Yes.
19      Q.   On Exhibit 4253, the front page of
20  this exhibit has some handwriting on it.  And
21  do you recognize that handwriting?
22      A.   It's mine.
23      Q.   Under the second note below there,
24  it says, "Per inquiry with Bill Gedman and
25  through the review of the account status for

49 (Pages 190 to 193)

Kristen Heinlein, CPA

Page 214

1   what Miss Frazier meant when she wrote
2   "eliminate entry and evaluate against other
3   reserves"?
4        MR. STEINBERG:  Object to form.
5        A.  I don't remember what I knew at
6   that time.
7        Q.  As you sit here today, do you have
8   any understanding of what that means?
9        A.  Eliminate the entry, delete the
10  entry and evaluate against other reserves,
11  probably the reserves that they already had on
12  their books.
13       Q.  Bad debt reserves?
14       A.  Bad debt reserves.
15       Q.  Does the phraseology "other
16  reserves" mean anything to you?
17       A.  No.
18       Q.  If I could ask you again to flip to
19  4248, the large collection of accounts
20  receivable documents.  This time at Bates page
21  ending 178.
22       For the record, I've directed Miss
23  Heinlein's attention to the step name titled
24  Test Accuracy of Supporting Documentation,
25  paren, Below Maximum, end paren, dash HCRG.

Page 215

1   Completed by Kristen Heinlein on September 8th,
2   1997; last modified by Christa Porter on
3   9-10-97.
4        Then the schedule behind it is a
5   work paper number 0053-75, working paper name,
6   HCRG testing.
7        And then I think you'll see that
8   there's a better copy of what's on Bates page
9   180 and 181 at -- that's Bates page 181A and B,
10  and C.
11       If you would take a look through
12  both the audit step and the schedule behind it.
13       A.  Okay.
14       Q.  Have you had a chance to take a
15  look at that to the extent necessary to tell me
16  if you remember the document?
17       A.  Yes.  I don't remember the document
18  and I did not complete it.  Norb Kaliszewski
19  did.
20       Q.  Under the audit step work paper at
21  Bates ending 178, the step comments.
22       A.  Yes.
23       Q.  That starts out with summary from
24  Norb Kaliszewski --
25       A.  Yes.

Page 216

1        Q.   -- audit procedures; did you write
2   that language?
3        A.  Yes.
4        Q.  And then you also wrote below that,
5   "C&L examined 100 patient accounts with
6   Delaware Valley and noted the following."  Then
7   it lists some statistics, right?
8        A.  Yes.
9        Q.  That was based on Norb's audit
10  procedures, right?
11       A.  Yes.
12       Q.  Do you know why Mr. Kaliszewski was
13  only examining accounts for the Delaware
14  Valley?
15       A.  No.
16       Q.  Do you know -- let me ask you this.
17  Do you recall discussing the results of Mr.
18  Kaliszewski's audit procedures with anyone else
19  at Coopers?
20       A.  No.
21       Q.  Do you know the -- the step
22  description states, "Test propriety of detailed
23  listing based on supporting documentation, EG,
24  medical records and propriety of DRG
25  assignment," right?

Page 217

1        A.  Yes.
2        Q.  That's the step description.
3        And then the step comments lists
4   statistics about the average number of days to
5   bill, average number of days from discharge to
6   payment, that kind of thing.
7        How does that relate to testing the
8   propriety of the detailed listing, the step
9   description?
10       A.  I don't know.  I didn't do --
11  perform the testing.
12       Q.  Do you know what the purpose of
13  Norb's testing was and the results of his
14  testing?
15       A.  No.
16       Q.  Do you recall any discussions with
17  anyone else at Coopers about a payment -- a
18  slowdown of payments received by payers in the
19  Delaware Valley?
20       A.  No.
21       Q.  If I can ask you, please, to flip
22  back a couple of pages to the Bates page ending
23  172.H of Exhibit 4248.
24       Miss Heinlein, this is a particular
25  page in the schedule we looked at earlier, the

55 (Pages 214 to 217)

Kristen Heinlein, CPA

Page 218

1  aging schedule, that compared the Greg Snow
2  method to the C&L method, right?
3      A.  Is it 173, perhaps?
4      Q.  I'm sorry, 172.  You know, I guess
5  you could probably look at 172, but you can
6  also look at 172.H in the same document.  I
7  think you can read 172.
8          MR. McDONOUGH:  Well, the question
9  is whether it's 173 because we don't seem to
10  have a 172.
11      Q.  I'm sorry, let's just go to that
12  one since you're closer to that one, 173.H.
13          This, again, is part of the
14  schedule we looked at earlier, right, the
15  schedule of agings?
16      A.  Yes.
17      Q.  At the top of that page is a
18  paragraph that states, "It should be noted that
19  AHERF implemented a past statute project during
20  FY '97.
21          "This project entailed identifying
22  all past statute accounts in Delaware Valley
23  and then writing off those accounts.
24          "In total, 80 million dollars was
25  written off during the course of FY '97.

Page 219

1          "The agings compared 1997 versus
2  1996 looked to be improving, however, this
3  improvement is as a result of the write-offs.
4          "PATCOM, paren, the prior A/R
5  system at Elkins, Bucks and HCH -- I'm sorry,
6  SCHC, end paren, write-offs total approximately
7  34 million dollars.
8          "The FY '97 agings for these three
9  entities definitely show improvement over FY
10  '96 due to the write-offs.
11          "It is difficult to analyze the
12  agings and determine if the aging buckets,
13  especially those greater than 180 days, have
14  shown improvement over the prior year due to
15  the large amount of write-offs."
16          Miss Heinlein, do you recall AHERF
17  implementing a past statute project?
18      A.  I don't remember what past statute
19  means, but I do remember them writing off old
20  accounts receivable.
21          - - - - -
22          (Thereupon, Deposition Exhibit 4314
23          was marked for purposes of
24          identification.)
25          - - - - -

Page 220

1      Q.  For the record, what I've marked as
2  Exhibit 4314 is another one-line summary
3  document titled Based on What I'm Seeing,
4  comma, created by Amy Frazier on December 11th,
5  1997; last modified and answered by Kristen
6  Heinlein on the same day, December 11th, '97.
7          If you could take a look at that
8  document.
9      A.  Okay.
10      Q.  In her review comment, Miss Frazier
11  wrote, "The accounts are continuing to
12  deteriorate by virtue that patient accounting
13  is writing off old accounts and the other
14  accounts are continuing to deteriorate.  Again,
15  I get back to the fact that the reserve
16  methodology is reasonable, it's that they're
17  not working the accounts to the point that they
18  are setting up a separate department to muddle
19  through them; otherwise, to date, they just
20  write them off because they do not want to deal
21  with them.  Am I on track?"
22          Let me ask you first before we get
23  into your response, do you recall Miss Frazier
24  ever commenting that she felt the Delaware
25  Valley or the new AHERF methodology was

Page 221

1  reasonable?
2      A.  No.
3      Q.  In your response to Miss Frazier's
4  comment, you wrote, "I'm not sure that they do
5  not want to deal with them.  I think it's the
6  fact that there are not people to work the
7  accounts or bills are going out without -- with
8  errors and they are not being corrected before
9  they are sent out again.
10          "Yes, they are continuing to write
11  off old accounts because they are past statute
12  or they feel they will never get paid."
13          Do you recall the term past
14  statute?
15      A.  No.
16      Q.  As you sit here today, do you have
17  an understanding of what it is referring to?
18      A.  I think so.
19      Q.  What is your understanding?
20      A.  That they're over and above the day
21  that they don't -- or over and above a time
22  frame in which they will never be collected.
23      Q.  What did you mean when you said
24  "I'm not sure that they do not want to deal
25  with them"?

56 (Pages 218 to 221)