Page 234

```
 1     Q.   The reserve for the Graduate
 2  hospitals?
 3     A.   For the Graduate hospitals.
 4     Q.   Now, on the front page of this
 5  document, it has a completed by date of
 6  8-21-97.
 7     A.   Yes.
 8     Q.   Your name.
 9     Based on the documents that we've
10  seen today, the issue document in particular,
11  talking about the 50 million transferred from
12  Graduate to DVOG, right?
13     A.   Yes.
14     Q.   Wouldn't you have known when you
15  drafted this document that the 50 million
16  reserve was already transferred to the Delaware
17  Valley Obligated Group entities?
18     A.   Not necessarily.
19     Q.   Why not?
20     A.   I may not have been able to put two
21  and two together.  I don't know or remember at
22  that point in time.
23     Q.   But it's true that on June 9th you
24  drafted an issue document that discussed the
25  transfer of 50 million of reserves from
```

Page 235

```
 1  Graduate to DVOG, right?
 2        MR. STEINBERG:  Object to the form.
 3  I'm not sure that's what she testified to when
 4  she created the issue document.
 5     A.   I'm looking at the document.  I
 6  created it June 9th.  Again, it's still my
 7  recollection that I created it during our
 8  year-end procedures.
 9     Q.   But you have no argument with the
10  fact that you actually created it on June 9th?
11     A.   Correct.
12        MR. STEINBERG:  Object to the form.
13     Q.   Right?
14        Yet on this document -- do you know
15  when the note was drafted by you, note B?
16     A.   No.
17     Q.   Do you recall if it was in the
18  year-end procedures of the audit?
19     A.   I don't know.
20     Q.   What analysis did you do to
21  determine whether or not the Graduate entities
22  needed additional bad debt reserves?
23     A.   I did not do any analysis.
24     Q.   Do you know if anyone at Coopers
25  did any such analysis?
```

Page 236

```
 1     A.   I don't know.
 2     Q.   I've handed the witness what we've
 3  marked previously as Exhibit 4264.  This is
 4  another one-line summary document printed off
 5  the final CLASS disk, this one titled, This is
 6  Not Sufficient Documentation.
 7        This document was -- review comment
 8  was created by Amy Frazier on 8-7-97 and then
 9  answered by you on 8-21-97, right?
10     A.   Yes.
11     Q.   The review comment Ms. Frazier
12  wrote, "Where have we tried to assign a basis
13  for the need to account for this at Graduate,
14  paren, i.e., why Graduate needs to establish
15  such reserves," et cetera.
16        "How are we comfortable concluding
17  on the 35 years when a portion is going to be
18  classified to PP&E, we don't know if the useful
19  lives of the fixed assets support 35 years."
20        And then let me ask you on the
21  response table where it says, "I have included
22  this information with the Graduate good will
23  entry during opening B/S procedures."
24        Right, B backslash S, balance
25  sheet?
```

Page 237

```
 1     A.   Yes.
 2     Q.   And then, "It was concluded that we
 3  should keep these two issues separate."
 4        Did you draft any of the language
 5  in that response?
 6     A.   The first paragraph.
 7     Q.   Is it fair to -- looking at this
 8  document, does this refresh your recollection
 9  at all about when you would have drafted the
10  footnote B that we saw in the previous exhibit?
11     A.   No.
12     Q.   Do you believe it was something
13  that was drafted in response to Miss Frazier's
14  review comment?
15     A.   I don't know.
16     Q.   Just to make sure you understand my
17  question, I'll try to rephrase it a little
18  different way.
19        Do you believe that your drafting
20  of footnote B came in response to Miss
21  Frazier's asking where have we tried to assign
22  the basis for a need to account for this at
23  Graduate?
24        MR. STEINBERG:  Objection.  Asked
25  and answered.
```

60 (Pages 234 to 237)

Kristen Heinlein, CPA

Page 238

1    A.   Again, I don't know if footnote B
2  preceded or -- preceded this paragraph. I
3  don't know.
4    Q.   Do you know who wrote the second
5  paragraph?
6    A.   No.
7    Q.   Did you have an understanding back
8  in 1997 of what the second paragraph "it was
9  concluded that we should keep these two issues
10 separate" meant?
11   A.   Yes.
12   Q.   What's your recollection on that?
13   A.   Is the Graduate good will entry was
14 a separate entry and that the 50 million dollar
15 transfer was a completely separate entry,
16 separate issue.
17   Q.   But at the time you wrote the
18 Graduate good will entry footnote relating to
19 the 50 million, you knew that the 50 million
20 had already been transferred to DVOG, right?
21      MR. STEINBERG: Object to form.
22   A.   I don't know.
23   Q.   For the record, I've handed Miss
24 Heinlein what has been marked previously as
25 Exhibit 4123. It is a document with a working

Page 239

1  paper name, City Avenue Hospital, Opening
2  Balance Sheet Analysis with a working paper
3  reference number 0026-401.
4       It was completed by Anthony
5  Carrabba on August 21, 1997; last completed by
6  Christa Porter on September 10, 1997.
7       I note that Miss Heinlein is listed
8  in the modification history portion of the
9  document.
10      Miss Heinlein, if you could review
11 that document for me and then I'll have some
12 questions for you.
13   A.   Okay.
14      Okay.
15   Q.   First let me ask you, the fact that
16 your name is in the modification history
17 portion of the document, what does that mean,
18 to the best of your knowledge?
19   A.   It means I changed something on the
20 work paper.
21   Q.   Do you recall whether you drafted
22 any of the language in this document?
23      MR. STEINBERG: Can I just ask for
24 a clarification? The pages CL013041 through
25 43, is that part of the original document?

Page 240

1       MR. TORBORG: Let me clear that up.
2  We've had a lot of testimony on this, but let
3  me clear it up.
4    Q.   Do you recall that within the CLASS
5  system, you could do something called a pop-up
6  box?
7    A.   Yes.
8    Q.   Could you explain that for the
9  record for me?
10   A.   Sure. You would highlight
11 something in the document and you could press a
12 selection to use a pop-up box. Any time that
13 you would put your cursor or put the arrow on
14 that box, it would pop up with information
15 behind it.
16   Q.   So if we go to Bates page ending
17 401 -- or 41, there is a pop-up box, right?
18   A.   Yes.
19   Q.   Go to where it says AHERF
20 management analyzed. Are you able to determine
21 what particular line item on this schedule that
22 pop-up box relates to?
23   A.   It looks like it appears to be some
24 bad debt reserve for all payers line.
25   Q.   That's because it came up right

Page 241

1  below it?
2    A.   Right below it.
3    Q.   Do you have an understanding of
4  what this document is -- the purpose of this
5  document?
6       First, let me ask you, do you
7  recall this document?
8       Have I asked you that?
9    A.   No.
10      But, no, I don't recall this
11 document.
12   Q.   Do you recall any of the language
13 contained in this language -- in this document,
14 and specifically language on the pop-up box on
15 Bates page ending 42, does that refresh your
16 recollection at all?
17   A.   No, it's the same language as
18 footnote B on --
19   Q.   On the Graduate good will entry
20 document, right?
21   A.   The good will document, yes.
22      MR. McDONOUGH: 4263.
23      THE WITNESS: Yes.
24   Q.   Do you recall if you drafted this
25 language into this document?

Kristen Heinlein, CPA

<table>
<tr><td colspan="4" align="right">Page 258</td></tr>
<tr><td>1</td><td>object</td><td>173</td><td>20</td></tr>
<tr><td>2</td><td>object</td><td>184</td><td>9</td></tr>
<tr><td>3</td><td>object</td><td>190</td><td>15</td></tr>
<tr><td>4</td><td>object</td><td>191</td><td>11</td></tr>
<tr><td>5</td><td>object</td><td>196</td><td>12</td></tr>
<tr><td>6</td><td>object</td><td>196</td><td>23</td></tr>
<tr><td>7</td><td>object</td><td>198</td><td>4</td></tr>
<tr><td>8</td><td>object</td><td>198</td><td>5</td></tr>
<tr><td>9</td><td>object</td><td>198</td><td>24</td></tr>
<tr><td>10</td><td>object</td><td>199</td><td>22</td></tr>
<tr><td>11</td><td>object</td><td>200</td><td>7</td></tr>
<tr><td>12</td><td>object</td><td>201</td><td>19</td></tr>
<tr><td>13</td><td>object</td><td>206</td><td>11</td></tr>
<tr><td>14</td><td>object</td><td>207</td><td>4</td></tr>
<tr><td>15</td><td>object</td><td>208</td><td>22</td></tr>
<tr><td>16</td><td>object</td><td>213</td><td>23</td></tr>
<tr><td>17</td><td>object</td><td>214</td><td>4</td></tr>
<tr><td>18</td><td>object</td><td>222</td><td>1</td></tr>
<tr><td>19</td><td>object</td><td>222</td><td>7</td></tr>
<tr><td>20</td><td>object</td><td>225</td><td>13</td></tr>
<tr><td>21</td><td>object</td><td>235</td><td>2</td></tr>
<tr><td>22</td><td>object</td><td>235</td><td>12</td></tr>
<tr><td>23</td><td>objection</td><td>237</td><td>24</td></tr>
<tr><td>24</td><td>object</td><td>238</td><td>21</td></tr>
<tr><td>25</td><td>object</td><td>246</td><td>21</td></tr>
</table>

Page 259

1  SIGNATURE OF WITNESS
2
3
4
5
6      The deposition of KRISTEN LEE
7  HEINLEIN, CPA, taken in the matter, on the
8  date, and at the time and place set out on the
9  title page hereof.
10      It was requested that the
11  deposition be taken by the reporter and that
12  same be reduced to typewritten form.
13      It was agreed by and between
14  counsel and the parties that the Deponent will
15  read and sign the transcript of said
16  deposition.
17
18
19
20
21
22
23
24
25

Page 260

1              AFFIDAVIT
2  The State of Ohio,  )
3                      ) SS:
4  County of Cuyahoga  )
5
6
7
8      Before me, a Notary Public in and for
9  said County and State, personally appeared
10  KRISTEN LEE HEINLEIN, CPA, who acknowledged
11  that he/she did read his/her transcript in the
12  above-captioned matter, listed any necessary
13  corrections on the accompanying errata sheet,
14  and did sign the foregoing sworn statement and
15  that the same is his/her free act and deed.
16      In the TESTIMONY WHEREOF, I have hereunto
17  affixed my name and official seal at this
18  day of          A.D 2004.
19
20
21
22      Notary Public
23
24
25      My Commission Expires:

Page 261

1  DEPOSITION ERRATA SHEET
2
3  RE:    OFFICIAL COMMITTEE OF UNSECURED
4         CREDITORS    VS.
5         PRICEWATERHOUSECOOPERS, LLP
6  RRS File No.:    7472
7  Deponent:    KRISTEN LEE HEINLEIN, CPA
8  Deposition Date:    FEBRUARY 24, 2004
9
10  To the Reporter:
11  I have read the entire transcript of my
12  Deposition taken in the captioned matter or the
13  same has been read to me.  I request that the
14  following changes be entered upon the record
15  for the reasons indicated.  I have signed my
16  name to the Errata Sheet and the appropriate
17  Certificate and authorize you to attach both to
18  the original transcript.
19
20
21
22
23
24
25

66 (Pages 258 to 261)

Kristen Heinlein, CPA

Volume 2

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
            Plaintiff,.
    vs.                          Civil Action
PRICEWATERHOUSECOOPERS,          No. 00-684
LLP,
            Defendant.


            Continued Videotaped Deposition of
KRISTEN LEE HEINLEIN, CPA, called for
examination under the Applicable Rules of
Federal Civil Procedure, taken before me,
Michele E. Eddy, a Registered Professional
Reporter and Notary Public in and for the State
of Ohio, pursuant to notice and stipulations of
counsel, at the offices of Jones Day, 500 Grant
Street, Suite 3100, Pittsburgh, Pennsylvania,
on Wednesday, the 25th day of February, 2004,
at 9:00 a.m.

                    - - - - -
            VOLUME II
                    - - - - -

Page 327

1    A.   No.
2    Q.   The M/A reserve at Mt. Sinai at
3  3-31, again, at Bates page ending 119 of
4  Exhibit 448, had a credit balance of
5  $1,915,000, right?
6    A.   Okay, m-hm.
7    Q.   And then if we look at the 6-30-97
8  version of this schedule, Bates page ending
9  156, the balance was a credit balance of just
10 $415,000, right?
11   A.   Yes.
12   Q.   Do you recall noting that during
13 your review of the 1997 work papers, the
14 reduction in that account?
15   A.   No.
16   Q.   So I take it you don't recall any
17 discussions coincident with that either?
18   A.   No.
19   Q.   And the 3-31 schedule had an entry
20 under Graduate Hospital for the Hill Burton
21 reserve that we just looked at?
22   A.   Yes.
23   Q.   A credit balance of 1,500,000,
24 right?
25   A.   Yes.

Page 328

1    Q.   And then that particular account is
2  not listed on the 6-30-97 lead schedule, right?
3    A.   Yes.
4    Q.   Do you recall noting the removal
5  of -- the apparent removal of that account
6  during your review during the 1997 audit?
7    A.   No.
8    Q.   I take it you don't recall any
9  discussions about that?
10   A.   No.
11   Q.   I had shown you earlier as Exhibit
12 72 that audit update agenda for August 22nd.
13   A.   Yes.
14   Q.   Under the PFMA contract, the
15 annotation, again, was, "Reserves recorded at
16 SDN. Legal documentation indicates that GHS is
17 obligated transferred reserves of the books to
18 DV."
19        Does looking at that refresh your
20 recollection at all about any discussions about
21 the PFMA contract?
22   A.   No.
23   Q.   For the record, I've handed Miss
24 Heinlein as Exhibit 4249 previously marked in
25 this case a series of schedules that bears the

Page 329

1  Bates number PWC 015958 through 79.
2        At the end there is a cover page
3  that says 470, which was a cover page for the
4  SEC exhibit. This was, again, an SEC
5  investigative discovery exhibit.
6        Miss Heinlein, if I could ask you
7  to review that document.
8    A.   Okay.
9    Q.   Do you recall these documents at
10 all?
11   A.   No.
12   Q.   Based on the format of these
13 schedules -- and if your answer needs to be
14 different for the various schedules, feel free
15 to do that -- does that provide you any insight
16 as to whether or not these schedules would have
17 been prepared by AHERF or Coopers & Lybrand?
18       MR. STEINBERG: Object to form.
19   A.   They look like AHERF schedules.
20   Q.   If I could ask you to go
21 specifically to Bates page ending 73, 973.
22       For the record, this is a schedule
23 titled Graduate Hospital Accounts Receivable
24 Trend Analysis. Just because I want to focus
25 on this schedule, does the format of this

Page 330

1  schedule look like it was a schedule that was
2  prepared by Coopers or AHERF?
3    A.   AHERF.
4    Q.   AHERF still.
5        And you don't recall this schedule
6  at all?
7    A.   No.
8        - - - - -
9        (Thereupon, Deposition Exhibit 4332
10       was marked for purposes of
11       identification.)
12       - - - - -
13   Q.   For the record, what I've marked as
14 Exhibit 4332 is a collection of account
15 receivable related work papers for the 1997
16 audit bearing the Bates numbers PWC 010341
17 through 612.
18       This was also marked as SEC
19 investigative deposition Exhibit 330 and has --
20 the front page indicates -- there's an
21 annotation that I believe says patient A/R,
22 file two of two. Whereas the exhibit we marked
23 in Exhibit 4248 had a cover page that said
24 patient A/R file one of two. Right?
25   A.   Yes.

Kristen Heinlein, CPA

Page 331

1    Q.   Miss Heinlein, if you would flip
2   through this just to the extent necessary to
3   tell me whether or not you recall these various
4   work papers and audit steps.
5        MR. STEINBERG:  Every work paper
6   and audit step, or -- I mean --
7        MR. TORBORG:  Let me retract that
8   question because I don't want to do that.  That
9   will take too long.
10   Q.   Why don't I just ask you to focus
11  on the first audit step work paper at Bates
12  page ending 342.
13   A.   Okay.
14   Q.   Again, this is an audit step work
15  paper in the section patient accounts
16  receivable, this one with a step name,
17  PPS-review balance sheet contractual allowance.
18        Miss Heinlein, if you could read
19  through this document.
20        I note it was completed by Miss
21  Heinlein on July 28th, 1997; last modified by
22  Christa Porter on August 6th of 1997.
23   A.   Okay.
24   Q.   Miss Heinlein, do you recall this
25  audit step work paper?

Page 332

1    A.   Yes.
2    Q.   Do you recall being involved in the
3   auditing of balance sheet contractual
4   allowances for the 1997 audit?
5    A.   Yes.
6    Q.   It was part of -- it was just
7   another element of your work in the account
8   receivables, right?
9    A.   Yes.
10   Q.   Do you recall that, at least at
11  AHERF, and at least my understanding at other
12  hospitals as well, there's something called a
13  balance sheet contractual allowance and then an
14  income statement contractual allowance?
15   A.   Yes.
16   Q.   Can you explain the difference?
17   A.   I don't remember.
18   Q.   Do you recall that for some
19  accounts, the contractual allowance would be
20  taken at the time the account was billed?
21   A.   I really don't remember.
22   Q.   Do you recall any -- do you recall
23  working with anyone in particular at AHERF with
24  respect to your auditing of contractual
25  allowances?

Page 333

1    A.   No.
2    Q.   Do you recall working with anyone
3   in particular at Coopers with respect to your
4   auditing of balance sheet contractual
5   allowances?
6    A.   I would have reported to Christa on
7   it.
8    Q.   Do you recall any discussions with
9   Christa about the auditing in this area?
10   A.   No.
11   Q.   If I could ask you to flip to Bates
12  page ending 344.  This is a work paper number
13  0053-5; work paper name, charge master testing.
14   A.   Yes.
15   Q.   Completed by you on July 24, 1997.
16  Last modified by Christa Porter, August 6,
17  1997.
18        This is a work paper that goes
19  through Bates page ending 349.
20        Take a chance to look at that.  I'm
21  going to ask you more than just whether you
22  remember it on this one.
23   A.   Okay.
24   Q.   Can you explain to me what charge
25  master testing is?

Page 334

1    A.   Again, I haven't looked at this in
2   four years, so I really don't remember.
3    Q.   As you sit here today, do you have
4   an understanding of what charge master testing
5   is even though maybe you don't recall the
6   specifics of this back in 1997?
7    A.   I understand the basic concept,
8   yes.
9    Q.   Can you explain what that is?
10   A.   Each hospital has a different
11  charge master.  Basically it's -- it's
12  basically what their gross charges are for a
13  procedure.  And to test it, I know that you
14  need to pull the charge masters and look at the
15  charges for the charge master.
16   Q.   Does the charge master attempt to
17  identify the contractual allowance that would
18  be applied to a gross charge?
19   A.   Not that I remember.
20   Q.   Can you explain to me how this
21  schedule at Bates page ending 345 and going
22  through 49 works?
23        MR. STEINBERG:  Object to form.
24   A.   I don't specifically remember.  I
25  know I went to each hospital and pulled a

Kristen Heinlein, CPA

Page 339

1  major changes from prior year."
2      The response written was, "These
3  major changes to the outpatient contractuals is
4  due to the following. During 1996, the finance
5  department had to manually contractualize more
6  payers.
7      "During 1997, three major payers
8  are now written down by the system. These
9  would include DC33, Health Partners and USHC.
10     Also, Blue Cross backslash Keystone
11  were at gross at the beginning of the year;
12  therefore, finance had to manually
13  contractualize. Then during the year the
14  system started to contractualize. However, at
15  year-end, the finance department started
16  contractualizing again because effective
17  3-01-97, Blue Cross and KHPE A/R was not
18  contractualized at time of billing.
19     "The Blue Cross reserve rate will
20  be 52 percent and the KHPE reserve rate will be
21  54 percent."
22     Miss Heinlein, can you explain to
23  me -- first of all, do you recall whether you
24  were the person who drafted this?
25     A.  No.

Page 340

1      Q.  The last sentence that I read there
2  in the response said, "The Blue Cross reserve
3  rate will be 52 percent and the KHPE reserve
4  rate will be 54 percent."
5      Do you know where it was that
6  Coopers would have obtained those reserve
7  rates?
8      A.  No.
9      Q.  If I could ask you to flip back to
10  Exhibit 4253. There's a document that I
11  introduced to you -- I handed to you yesterday
12  that was the old account balance testing.
13  4253.
14     MR. TORBORG:  Has everyone who
15  needs to find it found it?  Or do we need to
16  wait?
17     MR. STEINBERG:  I'll look off of
18  Karin's. Thanks.
19     Q.  Again, Miss Heinlein, this was a
20  document that I showed to you yesterday?
21     A.  Yes.
22     Q.  I think you indicated the
23  handwriting on the front page is yours?
24     A.  Yes.
25     Q.  Under the first note, the last

Page 341

1  sentence in that first note, it states, "C&L
2  notes that AHERF's contractual allowances are
3  quite conservative"?
4      A.  Okay.
5      Q.  Do you recall what you meant by
6  that note?
7      A.  No.
8      Q.  No?
9      A.  No.
10     Q.  As you sit here today, how would
11  you interpret what you wrote back then?
12     MR. STEINBERG:  Object to form.
13     A.  I don't know what I wrote back
14  then. Again, I haven't dealt with contractual
15  allowances for a long time, so I can't even
16  speculate.
17     Q.  So as you sit here today, you can't
18  interpret what you -- how you would interpret
19  what you meant to say as you sit here today?
20     MS. DeMASI:  Can I have that back?
21     MR. TORBORG:  Maybe I should just
22  restate it.
23     MS. DeMASI:  That would be great.
24     Q.  So as you sit here today, you can't
25  interpret what you meant with that note?

Page 342

1      A.  Correct.
2      Q.  Do you recall any discussions with
3  anyone that AHERF's contractual allowances
4  or -- let me strike that and start again.
5      Do you recall any discussions with
6  anyone else at Coopers that any of the AHERF
7  hospitals contractual allowance reserves were
8  overstated?
9      A.  No.
10     Q.  Or having excess contractual
11  allowances?
12     A.  No.
13     Q.  For the record, I've handed Miss
14  Heinlein what has been marked previously as
15  4033, which is a working paper called Interim
16  Balance Sheet Analytics, working paper
17  reference number 0103-1.
18     Miss Heinlein, if you would review
19  that document to the extent necessary to tell
20  me whether you recall the document.
21     A.  No, I do not recall it.
22     Q.  Let me ask you to flip with me to
23  Bates page ending 498. I'm going to read some
24  language into the record and see if it
25  refreshes your recollection about an issue, not

Kristen Heinlein, CPA

Page 343

1   necessarily specific language.
2       That is toward the bottom -- last
3   paragraph on the page, some language that
4   states, "The decrease of patient A/R relates to
5   approximately 23 million dollars of receivables
6   that were charged off as a valuation allowance
7   versus a reduction to the bad debt reserve.
8       "We do not agree with management's
9   presentation of the valuation allowance as a
10  component of net assets. However, this amount
11  is presented as such for internal reporting
12  purposes only and relates to continued aging of
13  the accounts and contractual allowances that
14  were misclassified as allowance for bad debts
15  at 6-30-97.
16      "Therefore, as analyzed in our
17  detailed A/R subsequent event work papers, we
18  have concluded that there would not be an
19  impact to the reported reserves at 6-30-97.
20      "However, a reclassification
21  between the allowance and the contractual
22  allowance may be warranted. C&L waives such
23  reclassification since the amount would only
24  affect disclosure provided on the face of the
25  balance sheet.

Page 344

1       "Note, the offset of the write-off
2   of receivables that took place during the first
3   quarter of 1998 is offset by the acquisition
4   which resulted in approximately 4 million
5   dollars of net receivables."
6       Miss Heinlein, do you recall an
7   issue about AHERF recording a valuation
8   allowance with respect to miscontractuals?
9       A.   No.
10      Q.   At all?
11      A.   No.
12      Q.   For the record, I've handed Miss
13  Heinlein what's been marked previously as
14  Exhibit 4039. It is a work paper titled
15  Out-of-period Adjustments, Inpatient, working
16  paper reference number 0103-01.
17      MS. DeMASI:  Dash 101.
18      MR. TORBORG:  Dash 101. Thank you.
19      Q.   Completed by Miss Heinlein on
20  December 7th, 1997. Last modified by Brian
21  Christian on December 9th, 1997.
22      Then there's a schedule on Bates
23  pages ending 26 through 27 that states, "AHERF
24  out-of-period adjustments, subsequent event
25  testing."

Page 345

1       Miss Heinlein, do you recall this
2   document at all?
3       A.   No.
4       Q.   Do you recall being involved at all
5   in attempting to identify and quantify the
6   amount of something called out-of-period
7   adjustments?
8       A.   No.
9       Q.   Do you have an understanding today
10  what out-of-period adjustments means?
11      A.   No.
12      Q.   Now, you are noted as the
13  individual who completed this document?
14      A.   Yes.
15      Q.   Do you believe that even though
16  you're noted as the one who completed it, that
17  you did not create the document?
18      A.   I don't remember creating this
19  document.
20      Q.   I'm just trying to draw a contrast
21  in that a lot of these other work papers that
22  you looked at with account receivables is you
23  recalled them and recall doing them.
24      A.   Right.
25      Q.   This one you don't recall?

Page 346

1       A.   No.
2       MR. TORBORG:  Why don't we take a
3   break, and when we come back I'm not going to
4   have very much.
5       MR. STEINBERG:  Great.
6       THE VIDEOGRAPHER:  Going off the
7   record at 11:06.
8       (Recess had.)
9       THE VIDEOGRAPHER:  Going back on
10  the record at 11:16. This is tape number two.
11      - - - - -
12      (Thereupon, Deposition Exhibit 4334
13      was marked for purposes of
14      identification.)
15      - - - - -
16      Q.   For the record, what I have handed
17  Miss Heinlein as Exhibit 4334 is a 1996 work
18  paper, number 0071-01, titled Accounts -- AP
19  Lead Schedule. Completed by Kristen Heinlein
20  and last modified by Craig Kocak.
21      Miss Heinlein, if you could take a
22  look at that document and let me know if you
23  recall this document.
24      A.   Yes, it's the lead schedule that I
25  created.

Kristen Heinlein, CPA

Volume 2

Page 367

```
1        I do further certify that I am not a
2    relative, counsel or attorney for either party,
3    or otherwise interested in the event of this
4    action.
5        IN WITNESS WHEREOF, I have hereunto
6    set my hand and affixed my seal of office at
7    Cleveland, Ohio, on this        day of
8            , 2004.
9
10
11
12
13
14        Michele Eddy, Notary Public
15        Within and for the State of Ohio
16
17   My commission expires May 22, 2005.
18
19
20
21
22
23
24
25
```

Page 369

| | | | |
|---|---|---|---|
| 1 | object | 284 | 14 |
| 2 | object | 290 | 9 |
| 3 | object | 290 | 15 |
| 4 | object | 292 | 1 |
| 5 | object | 295 | 14 |
| 6 | object | 302 | 6 |
| 7 | objection | 302 | 19 |
| 8 | objection | 302 | 20 |
| 9 | objection | 303 | 10 |
| 10 | object | 304 | 19 |
| 11 | object | 306 | 11 |
| 12 | object | 307 | 2 |
| 13 | object | 314 | 4 |
| 14 | object | 320 | 25 |
| 15 | object | 325 | 12 |
| 16 | object | 329 | 18 |
| 17 | object | 334 | 23 |
| 18 | objection | 335 | 19 |
| 19 | object | 337 | 19 |
| 20 | object | 341 | 12 |
| 21 | object | 349 | 5 |
| 22 | object | 352 | 25 |
| 23 | object | 353 | 11 |
| 24 | object | 353 | 14 |
| 25 | objection | 353 | 20 |

Page 368

```
1            I N D E X
2
3    CONTINUED EXAMINATION OF    265    4
4    KRISTEN LEE HEINLEIN
5    BY MR. TORBORG
6
```

| | | | |
|---|---|---|---|
| 7 | Exhibit 4320 was marked | 272 | 3 |
| 8 | Exhibit 4321 was marked | 279 | 16 |
| 9 | Exhibit 4322 was marked | 281 | 11 |
| 10 | Exhibit 4323 was marked | 283 | 6 |
| 11 | Exhibits 4324 through 4328 | 289 | 14 |
| 12 | were marked | | |
| 13 | Exhibit 4329 was marked | 314 | 7 |
| 14 | Exhibit 4330 was marked | 315 | 13 |
| 15 | Exhibit 4331 was marked | 316 | 25 |
| 16 | Exhibit 4332 was marked | 330 | 9 |
| 17 | Exhibit 4333 was marked | 337 | 22 |
| 18 | Exhibit 4334 was marked | 346 | 12 |
| 19 | Exhibit 4335 was marked | 350 | 13 |
| 20 | Exhibit 4336 was marked | 354 | 16 |
| 21 | Exhibit 4337 was marked | 356 | 24 |
| 22 | Exhibit 4338 was marked | 359 | 3 |
| 23 | | | |
| 24 | objection | 268 | 24 |
| 25 | objection | 269 | 3 |

Page 370

| | | | |
|---|---|---|---|
| 1 | object | 354 | 3 |
| 2 | object | 354 | 4 |
| 3 | objection | 358 | 23 |
| 4 | objection | 358 | 24 |
| 5 | objection | 361 | 22 |
| 6 | object | 364 | 17 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 371

1    SIGNATURE OF WITNESS
2
3
4
5
6        The deposition of KRISTEN LEE
7    HEINLEIN, CPA, taken in the matter, on the
8    date, and at the time and place set out on the
9    title page hereof.
10        It was requested that the
11    deposition be taken by the reporter and that
12    same be reduced to typewritten form.
13        It was agreed by and between
14    counsel and the parties that the Deponent will
15    read and sign the transcript of said
16    deposition.
17
18
19
20
21
22
23
24
25

Page 372

1        AFFIDAVIT
2    The State of Ohio,  )
3                         ) SS:
4    County of Cuyahoga  )
5
6
7
8    Before me, a Notary Public in and for
9    said County and State, personally appeared
10   KRISTEN LEE HEINLEIN, CPA, who acknowledged
11   that he/she did read his/her transcript in the
12   above-captioned matter, listed any necessary
13   corrections on the accompanying errata sheet,
14   and did sign the foregoing sworn statement and
15   that the same is his/her free act and deed.
16       In the TESTIMONY WHEREOF, I have hereunto
17   affixed my name and official seal at this
18   day of            A.D 2004.
19
20
21
22       Notary Public
23
24
25       My Commission Expires:

Page 373

1    DEPOSITION ERRATA SHEET
2
3    RE:    OFFICIAL COMMITTEE OF UNSECURED
4           CREDITORS    VS.
5           PRICEWATERHOUSECOOPERS, LLP
6    RRS File No.:    7472
7    Deponent:    KRISTEN LEE HEINLEIN, CPA
8    Deposition Date:    FEBRUARY 25, 2004
9
10   To the Reporter:
11   I have read the entire transcript of my
12   Deposition taken in the captioned matter or the
13   same has been read to me. I request that the
14   following changes be entered upon the record
15   for the reasons indicated. I have signed my
16   name to the Errata Sheet and the appropriate
17   Certificate and authorize you to attach both to
18   the original transcript.
19
20
21
22
23
24
25

# ERRATA SHEET

<u>Official Committee of Unsecured Creditors of Allegheny Health, Education
& Research Foundation v. PricewaterhouseCoopers LLP</u>, No. 00-684 (W.D. Pa.)

Deposition of Kristen Lee Heinlein
February 24-25, 2004

I, the undersigned, do hereby certify that I have read the above-referenced deposition transcript and to the best of my knowledge, recollection and belief, said deposition transcript is true and correct, subject to the following corrections:

| Page/Line | Correction | Explanation |
|---|---|---|
| 6:6, 6:7, 6:9, 6:10, 6:11, 10:11, 12:15, 12:17, 12:18, 13:11, 13:13 | Change "High Mark" to "Highmark" | Error |
| 8:18 | Change "1985" to "1995" | Error |
| 55:15 | Change "327" to "4327" | Error |
| 67:11 | Change "382" to "4382" | Error |
| 72:23 | Insert "," between "Scientific" and "PMAC" | Error |
| 79:25 | Change "Rick" to "Greg" | Error |
| 83:18 | Change "197" to "1997" | Error |
| 111:1 | Change "CL232335336" to "CL232335-336" | Error |
| 137:19 | Change "perennity" to "per entity" | Error |
| 148:21 | Change "1996" to "1997" | Error |
| 157:16 | Change "T/V" to "t/b" | Error |
| 159:25 | Add ", I did not." after "No" | Clarification |
| 170:23 | Add ", by the client." after "Yes" | Clarification |
| 191:20 | Change "4263" to "4253" | Error |
| 192:25 | Delete "Missed" | Error |
| 210:22 | Change "Kristen" to "Christa" | Error |
| 235:5 | Change "I'm" to "In" and "." to "," | Error/ clarification |
| 238:13 | Delete "Is" | Error |
| 280:11 | Change "4320" to "4321" | Error |
| 287:18, 288:12, 288:13, 288:25, 289:7 | Change "printer" or "printed" to "prudent" | Error |
| 299:11 | Change "fluct" to "flux" | Error |
| 322:21 | Change "551" to "151" | Error |

| 346:1 | Add ", I don't recall it." after "No" | Clarification |
| 360:6 | Change "C,NL" to "C&L" | Error |
| Throughout transcript | To the extent that passages from documents were inaccurately read and/or transcribed, the documents should control over the transcription | Error |
| | | |

Dated: March 29, 2004

Kristen Heinlein

1                                **AFFIDAVIT**

2     **The State of Ohio,**      )

3                                 ) SS:

4     **County of Cuyahoga**      )

5

6

7

8          Before me, a Notary Public in and for

9     said County and State, personally appeared

10    **KRISTEN LEE HEINLEIN, CPA**, who acknowledged

11    that he/she did read his/her transcript in the

12    above-captioned matter, listed any necessary

13    corrections on the accompanying errata sheet,

14    and did sign the foregoing sworn statement and

15    that the same is his/her free act and deed.

16         In the TESTIMONY WHEREOF, I have hereunto

17    affixed my name and official seal at this 29th

18    day of _March_____ A.D 2004.

19

20

21    _____

22    COMMONWEALTH OF PENNSYLVANIA
      Notarial Seal                    Notary Public
      Lawrence VanAllen, Notary Public
23    City Of Pittsburgh, Allegheny County
      My Commission Expires Nov. 3, 2007
      Member, Pennsylvania Association Of Notaries

24    _____11-3-07_____

25         My Commission Expires:

**Rennillo Reporting Services www.rennillo.com**
**(216) 523-1313   Cleveland      (330) 374-1313   Akron**

**Hernandez Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P*

---

## *ROBERT M.  HERNANDEZ*
### *September 3, 2003*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

HERNANDEZ, ROBERT M.



LEGALINK

A WORDWAVE COMPANY

ROBERT M. HERNANDEZ

Page 102

1  Q.  What sort of review, if any, would you
2      typically give of the Coopers & Lybrand
3      management letter and management responses?
4  A.  Well, you read it and try to ascertain at
5      the -- at the meeting that the points that they
6      raised were being addressed somehow or there
7      was a good reason for them not being addressed.
8  Q.  Again, you can read as much of this document as
9      you'd like to, but I'd like you to read the
10     sections at the bottom of page 2, now looking
11     at the bottom numbers, this is big page 20 --
12 A.  Got you.
13 Q.  -- onto page 3 regarding accounts receivable.
14 A.  Okay.
15                  - - - -
16     (The witness reviewed the Exhibit.)
17                  - - - -
18 A.  Okay.  I've read down through findings.  Is
19     that where you wanted me to go?
20 Q.  And the next section on deterioration of
21     accounts receivable aging.
22                  - - - -
23     (The witness reviewed the Exhibit.)
24                  - - - -
25 A.  Okay.

Page 103

1  Q.  Do you remember reading this at the time?
2  A.  I don't.
3  Q.  Do you remember in the fall of 1995 time frame
4      discussing issues about accounts receivable
5      with -- within the audit committee?
6  A.  I don't.  I remember discussing receivables
7      issues somewhere but, you know, foggy as to
8      when.
9  Q.  Do you remember discussing it with the board,
10     full board?
11 A.  Perhaps.  I don't recall where it was
12     discussed.
13 Q.  Can you remember what generally the substance
14     was?
15 A.  Just, you know, there was a problem with
16     growing receivables balances.
17 Q.  Was it something that management said?
18 A.  I didn't hear the question.
19 Q.  I'm sorry, was this something that management
20     told you?
21 A.  I believe so, yes.  I don't -- I just don't
22     remember the source of the information, type of
23     report.  May have been this.
24 Q.  Let me show you another document which has been
25     marked as Exhibit 168.

Page 104

1      For the record, this is the board
2      book for the audit committee of AHERF for
3      October 15th, 1996, which is one year later
4      than the previous document, and if you -- well,
5      let me ask you, again, do you recall receiving
6      this document?
7  A.  No, I don't specifically recall.
8  Q.  You were still on the committee at this point,
9      right, on the audit committee?
10 A.  I believe so.
11 Q.  If you look on the second page of it --
12 A.  Yeah, I'm listed.
13 Q.  Do you have any reason to doubt that you
14     received the document?
15 A.  I have no reason to doubt.
16 Q.  If you go to page 13, the big numbers at the
17     top, that's where the Coopers & Lybrand
18     management letter --
19 A.  Yes.
20 Q.  -- and AHERF management response for this year,
21     fiscal year '96 begins, and if you could turn
22     to page 28, it says, Status of prior year
23     observations, and then on the next page, page
24     29, it says, Accounts receivable observations?
25 A.  Mm-hmm.

Page 105

1  Q.  Quote, As previously discussed, management
2      recognizes the unique issues surrounding
3      AHERF's accounts receivable management.  Though
4      the following observations have not been
5      addressed during 1996, appropriate follow-up
6      procedures are currently in the development
7      stage, and then there are four bullet points.
8          Do you see that?
9  A.  Yes.
10 Q.  Do you recall any discussion in the October
11     1996 time frame at the audit committee about
12     the fact that there were certain observations
13     in the Coopers & Lybrand management letter
14     about accounts receivable that weren't
15     addressed from the prior year?
16 A.  No.
17 Q.  Do you recall having any concern at the time
18     that there were specific issues that hadn't
19     been addressed from the prior year's letter?
20 A.  I recall discussions about the deteriorating
21     accounts receivable and hearing reports by
22     management what they were doing to enhance
23     collections and that sort of thing, but I can't
24     put a time frame on it for you.
25 Q.  Were you confident that management had things

27 (Pages 102 to 105)

ROBERT M. HERNANDEZ

Page 106

1    under control?
2  A.   I believe that, yes.
3  Q.   You can put that document aside.  I'm going to
4    show you another document that's been marked as
5    Exhibit 1661.
6         This is the Allegheny Health,
7    Education and Research Foundation audited
8    financial statements for fiscal year 1996.
9    Again, it's a very long document.  I'm going to
10    ask you some questions about specific parts of
11    it, but if there is any more of it that you
12    want to read, feel free.
13         My first question is whether you
14    remember seeing this document, the audited
15    financials for fiscal year 1996?
16  A.   I don't remember the document.  I'm sure I saw
17    it at some point, but I don't remember it.
18  Q.   Assuming that this is -- that these are the
19    actual audited financial statements for fiscal
20    year 1996, were these presented to the audit
21    committee?
22  A.   In the normal course of business they would
23    have been, or a draft, probably a draft.
24  Q.   And would you review the audited financial
25    statements or the draft that you received?

Page 107

1  A.   At the -- oh, would I personally, yes.
2  Q.   Right.  Any idea how long you'd typically spend
3    looking at it?
4  A.   No, and it might be interrupted.  It would be
5    hard to tell you.
6  Q.   If you go to page 3, using the big numbers at
7    the top --
8  A.   Mm-hmm.
9  Q.   -- there are a number of charts here beginning
10    on page 3, which is the consolidated balance
11    sheet.  Actually if you go to the next page,
12    which is page 4, you see there was a net loss
13    there of 11,837,000?
14  A.   Yes.
15  Q.   And you see up near the top under investment
16    income there is $74,075,000?
17  A.   Yes.
18  Q.   And then below that it said, Net assets
19    released from restrictions used for operations
20    $18,916,000?
21  A.   Yes.
22  Q.   Do you have any idea what that refers to, net
23    assets released from restrictions used for
24    operations?
25  A.   Not precisely, no, no more than what the words

Page 108

1    describe.
2  Q.   Does that have anything to do with endowment
3    funds?
4  A.   Could be.  Could be some kind of contribution.
5  Q.   Now, if you wanted to determine the operating
6    loss for fiscal year 1996, how would you do
7    that?
8  A.   Well, first --
9  Q.   If you can do it from this page.
10  A.   First you start with the net -- you pointed out
11    the net loss, but three lines above is the net
12    income before extraordinary items that changes
13    the accounting principle of 6,547,000.  You
14    start with that, and probably the easiest way
15    to get at that is then subtract off the
16    investment income.
17         That's the way I would do it.  That
18    would -- that would give me a pretty quick feel
19    for what the operating income was, because
20    everything else on here -- well, oh, I subtract
21    off the 74 million from investment income,
22    subtract that from 6 1/2 million and I'd add
23    back the 40 million 957 of interest expense.
24    Are you with me?
25  Q.   I think so.  So what kind of number would that

Page 109

1    leave us with?
2  A.   Well, it would be -- roughly 34 minus --
3    roughly $28 million operating loss, a loss from
4    operations I should say.  That's not pure.
5    There's probably some other things here, but
6    that will get you close.
7  Q.   Do you recall receiving these statements and
8    determining that there was such an operating
9    loss?
10  A.   I can't say I recall it specifically for this,
11    but I usually made that calculation, so I, you
12    know, I probably did.
13  Q.   Do you recall being concerned about it?
14  A.   Well, as I stated in my testimony earlier, I
15    was and raised it with AHERF top management.
16  Q.   And they told you that the strategy was going
17    to take care of the -- of your concern?
18  A.   I don't think that's what I said.  I mean they
19    just acknowledged that it was an issue and it
20    would be desirable, even though, you know, as
21    of this year we showed a profit, it would be
22    desirable to show a profit or at least break
23    even at the operating income level.
24  Q.   If you look at the next page, which is page 5,
25    actually page 6, consolidated statement of cash

28 (Pages 106 to 109)

Page 154

1    previously marked as Exhibit 1676 in this case,
2    and I believe, Mr. Hernandez, that after you
3    take a look at Exhibit 1676, you will tell me
4    that you recognize it at least in form and
5    format as a copy of the minutes of the
6    Allegheny Health, Education and Research
7    Foundation audit committee and a meeting held
8    on October 15, 1996.
9    A.    Yeah, that's what it says here.
10   Q.    And, in fact, it also indicates that you were a
11   member and were present at the meeting; is that
12   right?
13   A.    That's what it indicates.
14   Q.    And is that consistent with your recollection
15   then, that you served on the audit committee at
16   least through October 15 of 1996?
17   A.    My recollection is that I wasn't at a meeting
18   in 1996, but my recollection could be wrong.
19   Q.    Okay.  And have you ever known the meeting
20   minutes to be incorrect for the audit committee
21   at AHERF with respect to your attendance?
22   A.    I think they are.  I think we had some from
23   1997 that indicated I was on the committee, and
24   I don't think I was.
25   Q.    And, I'm sorry, that was a board package

Page 155

1    announcing a meeting, and I'm asking if you
2    remember that your attendance was inaccurately
3    marked to your knowledge at a meeting in the
4    minutes themselves, the official minutes?
5    A.    I don't remember that.  I wouldn't -- I don't
6    think I was seeing the minutes to tell you the
7    truth because I don't think I was on the
8    committee.  I'm just telling you what my
9    recollection and beliefs are.
10   Q.    That's fine.  In your role as an audit
11   committee member, you did, however, receive the
12   draft or final financial -- audited financial
13   statements in an annual -- on an annual basis?
14        MR. FRIESEN:  You mean when he was on
15   the board.
16        MR. JONES:  When he was on the board
17   and when he was a member of the audit
18   committee.
19   A.    Yes.
20   Q.    And I think you've testified you reviewed them
21   when you received them?
22   A.    Yes.
23   Q.    And that was typically in the fall of the year?
24   A.    The drafts -- well, I don't recall.
25   Q.    The drafts anyway typically appeared in the

Page 156

1    fall of the year?
2    A.    I just don't remember.
3    Q.    Well, it was sometime after the close of the
4    fiscal year which was in June; correct?
5    A.    So it makes sense.
6    Q.    That it would be the fall of the year?
7    A.    Yes.
8    Q.    And you knew that the audited financial
9    statements, whether in draft or final form,
10   presented to you as a board member or a
11   committee member in 1996 or 1997 for those two
12   fiscal years were the product of management and
13   had been audited by the independent auditors?
14   A.    Correct.
15   Q.    And those financial statements came with
16   typically an opinion?
17   A.    Correct.
18   Q.    And that opinion came from whom?
19   A.    The external auditors.
20   Q.    And in your time on the board, that opinion was
21   a clean opinion in the parlance of accounting;
22   is that fair to say?
23   A.    Yes.
24   Q.    And what did that mean to you?
25   A.    It meant that the auditors certified the

Page 157

1    financial statements with no major exceptions.
2    There are always, you know, minor details that
3    they find during the course of the audit or
4    after the books are closed that are minor in
5    nature, but no major exceptions taken.
6    Q.    And why was it important to an enterprise like
7    AHERF when you were on its audit committee and
8    a member of its board important to have a clean
9    opinion on the financial -- audited financial
10   statements each year?
11   A.    Wow, it's important I guess for a lot of
12   reasons.  I mean it -- no one can look at the
13   financial statements and trust them without
14   that.  Creditors rely on them, not just
15   bondholders, but people who study, you know,
16   day-to-day credit, banks, employees so --
17   Q.    Those that might provide financing?
18   A.    Right, others that want to do business with
19   you.
20   Q.    Trade creditors for instance?
21   A.    Trade creditors, right.
22   Q.    Hospital supply organizations?
23   A.    Right.
24   Q.    Sorry?
25   A.    Yes, correct.

ROBERT M. HERNANDEZ

1  Q.  And you used audited financial statements
2      yourself in your oversight, in discharging your
3      oversight obligations; is that fair to say?
4  A.  Yes.
5  Q.  And how did you do that?
6  A.  By reviewing them.
7  Q.  Did they help you gauge the financial
8      performance of the enterprise?
9          MR. RESTIVO:  I'm sorry, did you
10     finish your last answer?
11         THE WITNESS:  Yes.
12         MR. RESTIVO:  I'm sorry.
13 Q.  We are all sorry.  Did they help you gauge the
14     financial performance of the enterprise?
15 A.  Yes.
16         MR. FRIESEN:  Objection.  I'm not
17     sure which one you are talking about.
18 Q.  The audited financial statements presented to
19     you yearly as either a member of either the
20     audit committee or the board full?
21 A.  Yes.
22 Q.  And you understood that when you answered my
23     question?
24 A.  Yes.
25 Q.  Is it fair to say that they helped monitor the

1      job management was doing with the enterprise,
2      those audited financial statements?
3  A.  Yes.
4  Q.  Helped you monitor?
5  A.  Yes.
6  Q.  And as a volunteer board member in a not -- for
7      a not-for-profit organization, you weren't a
8      full-time employee; is that fair to say?
9  A.  Correct.
10 Q.  You did not have the time and could not give
11     the same time to this that I gave to your board
12     service that you gave to your full-time job;
13     correct?
14 A.  Correct.
15 Q.  And because that's the case, you had to rely on
16     others to help provide you accurate
17     information?
18 A.  Let me just say though that even though -- I
19     mean I gave the same time to this that I gave
20     to other, even my for-profit board issues.
21 Q.  I'm sorry.
22 A.  Those were just -- that was not a full-time
23     job, not meant to be a full-time job.
24 Q.  I understand.
25 A.  So I did give less time than I gave to, you

1      know, my full-time work of course.
2  Q.  And because you could only give it what you
3      gave as appropriate time to all your board
4      service but not -- it was not a full-time
5      occupation, you had to rely on others for
6      assistance in discharging your duties of
7      oversight; is that fair?
8          MR. FRIESEN:  Objection.
9  A.  Absolutely.
10 Q.  And you relied on the auditors as a part of
11     that?
12 A.  And management.
13 Q.  And other outside professionals?
14 A.  Occasionally, yes.
15 Q.  Retained consultants from time to time?
16 A.  I guess.  I don't remember specifically.
17 A.  I assume that AHERF had lawyers?
18 A.  Yeah, oh, sure.
19 Q.  That were engaged from time to time?
20 A.  Sure.
21 Q.  Did you use the financial statements in your
22     review -- and you testified earlier about how
23     you did some calculations in your head or on
24     scratch paper when you would receive the
25     audited financial statements -- did you use

1      these financial statements to help you gauge
2      the financial performance anyway of certain of
3      the initiatives that management had undertaken,
4      hospital acquisitions, physician practice
5      acquisitions, things of that nature?
6  A.  Yeah, I can't say that I tried to look at
7      specific initiatives.  I usually kind of
8      gauged, you know, sort of the overall state of
9      affairs, and I recognized, still recognize
10     wherever I am, that some things are going to
11     work and some things aren't, and in general I
12     was more interested in how well the whole --
13     the overall enterprise was going.  So I don't
14     know that I spent a lot of time trying to look
15     at, you know, each individual initiative.
16 Q.  But is it true -- well, strike that.
17         I'm going to ask you to look back at
18     the last exhibit you were shown, which is
19     Exhibit before the one I --
20 A.  1676?
21 Q.  I'm sorry, before the one I just showed you,
22     Exhibit 1655, which is a set of --
23 A.  Got it.
24 Q.  -- minutes of the October 30, 1997 --
25 A.  Right.

LEGALINK MANHATTAN  (212) 557-7400

ROBERT M. HERNANDEZ

Page 162

1  Q.  -- AHERF board meeting. I'm going to ask you
2       to flip to big page 6.
3            MR. RESTIVO: Hold on one second.
4            MR. JONES: I'm sorry, big No. 6,
5       Exhibit 1655.
6  A.  This is the -- these are the October 30, 1997
7       AHERF board of trustees' meeting.
8            MR. RESTIVO: Okay. I'm with you.
9  Q.  And in those minutes you'll see, if you flip to
10      the page which has a big 6 in the upper
11      right-hand corner --
12 A.  Got it.
13 Q.  -- an opening paragraph that is headed with the
14      Roman numeral V?
15 A.  Right.
16 Q.  And reads, Report from the audit committee?
17 A.  Right.
18 Q.  And there you see, I think, that what I think
19      you'll tell me is your recollection of prior
20      year AHERF board meetings in the fall, and that
21      is that the audited financial statements were
22      presented to the full board as they had been
23      presented to the audit committee immediately
24      prior. Does that --
25            MR. FRIESEN: Objection.

Page 163

1  Q.  -- does that meet with your recollection?
2            MR. RESTIVO: Yeah, I think I'm going
3       to object to the form of that question and ask
4       you to break it, I think it's a compound
5       question --
6            MR. JONES: Let me break it down.
7            MR. RESTIVO: -- and break down your
8       question into several questions.
9            MR. JONES: Let me break it down.
10 Q.  I'm going to ask you to just read the paragraph
11      5 (a), Mr. Hernandez.
12 A.  Okay.
13            - - - -
14      (The witness reviewed the Exhibit.)
15            - - - -
16 A.  Okay.
17 Q.  Does that refresh your recollection that indeed
18      at least in the fall of 1997 the board was
19      presented with the draft fiscal year 1997
20      audited financial statements?
21 A.  Yeah, that's what it -- that's what it says.
22 Q.  And you have no reason to doubt that?
23 A.  I have no reason to doubt that.
24 Q.  And does that also refresh your recollection
25      that the full board -- I think you've already

Page 164

1       testified to this -- would receive the audited
2       financial statements --
3  A.  Yes.
4  Q.  -- on an annual basis?
5  A.  Correct.
6  Q.  And I think you already testified that the
7       audit committee obviously received the draft or
8       final audited financial statements on an annual
9       basis as well in the fall?
10 A.  Right.
11 Q.  And my question is directed -- my questions now
12      are directed to those audit committee meetings
13      in the first instance.
14           The audited financial statements were
15      presented I think you said typically by
16      Mr. McConnell, the CFO of the enterprise?
17 A.  I thought I said that he would be my guess, but
18      I really don't remember who presented them.
19 Q.  And do you recall that the auditors were in
20      attendance at the audit committee meetings --
21 A.  I do recall that.
22 Q.  -- when the financials were presented?
23 A.  Yes.
24 Q.  And in the person of whom, if you recall?
25 A.  Certainly the engagement partner, Mr. Buettner,

Page 165

1       and my recollection is he had one or more
2       associates with him.
3  Q.  And would he then comment on the audit process,
4       Mr. Buettner, or his colleagues in that
5       meeting?
6  A.  I'm sure he did. I just don't remember.
7  Q.  And you were asked about executive session
8       earlier today?
9  A.  Yes.
10 Q.  Do you recall that the audit committee invited
11      the auditors on its own initiative to meet with
12      it, the audit committee in executive session in
13      these meetings?
14 A.  I don't recall.
15 Q.  Do you recall whether any executive sessions,
16      that is meetings that included only audit
17      committee members and auditors, but not -- and
18      not management, ever took place while you were
19      on the audit committee?
20 A.  I seem to have a recollection that they did,
21      but I just -- I can't -- I don't know time or
22      place.
23 Q.  And whether or not such meetings took place
24      during your AHERF audit committee board
25      service, what do you understand in your board

ROBERT M. HERNANDEZ

Page 166

1    service over the years and in your role as a
2    CFO as the purpose for executive session
3    meetings with auditors or would be the purpose?
4  A.   Well, the purpose is that when you have
5    management present, it's awkward sometimes for
6    the -- either the internal auditor or the
7    external auditor to raise the, you know, an
8    issue that they might be uncomfortable about,
9    that might reflect on the management, and that
10   they might not be all that certain about.
11        So this was just makes it easier to
12   do and provide some confidentiality so that it
13   doesn't -- you don't want to taint the -- or
14   cause the relationship between the external
15   auditor and management to deteriorate
16   necessarily -- unnecessarily.
17  Q.   Whether in executive session or not, during
18   your board service at AHERF, would you have
19   expected the auditors to share with the audit
20   committee or the board material misstatements
21   they found in the financial statements
22   presented for their audit?
23  A.   Yes.
24  Q.   Would you have expected the auditors Coopers &
25   Lybrand to share with the committee or the

Page 167

1    board whether it had -- if it had uncovered
2    intentional misstatements in the financial
3    statements?
4  A.   Yes.
5  Q.   Would you have expected Coopers & Lybrand to
6    share with you as a committee member of the
7    audit committee or on the board any concerns
8    they had, the auditors had, with respect to the
9    competence of financial management?
10  A.   Yes.
11  Q.   Similarly, would you have expected C & L to
12   share with you concerns, any concerns C & L had
13   with the integrity of financial management?
14  A.   Yes.
15  Q.   And lastly, would you as an audit committee
16   member and a board member at AHERF have
17   expected C & L to have shared with you any
18   concerns they had that fraud might have been
19   perpetrated by financial management or a member
20   of the finance department at AHERF?
21  A.   Yes.
22  Q.   Did C & L or anybody at Coopers & Lybrand,
23   Mr. Buettner or others, ever raise these
24   matters with you as an audit committee member
25   or full board committee member?

Page 168

1  A.   No.  There was a meeting close to the time of
2    the bankruptcy where it seems to me -- I don't
3    think it was not an audit committee meeting, it
4    was -- must have been a board meeting or an
5    executive committee meeting, and I just don't
6    recall, where they gave us the going-concern
7    concern.
8  Q.   The auditors shared with you their views of
9    whether AHERF was a going concern at some
10   point?
11  A.   Right, yeah.
12  Q.   Close to bankruptcy?
13  A.   Yeah.
14  Q.   Was it at this point the auditing firm now
15   known as PriceWaterhouseCoopers?
16  A.   It might have been.  I don't remember when they
17   merged.
18  Q.   Do you know who made that -- who shared that
19   with you?
20  A.   Well, Mr. Buettner was there, and Lou Testoni
21   who managed the Coopers office, now manages the
22   PriceWaterhouse office was there.
23  Q.   Was that a full board meeting or an executive
24   committee meeting?
25  A.   I don't recall.

Page 169

1  Q.   Do you recall how shortly before bankruptcy
2    that meeting took place?
3  A.   It was within months.
4  Q.   Do you recall who was in attendance besides
5    yourself --
6  A.   No.
7  Q.   -- and those two gentlemen?
8  A.   No.
9  Q.   Was there ever a time during your AHERF
10   committee or board service that you came to
11   question the accuracy of the audit financial --
12   audited financial statements for any fiscal
13   year for AHERF?
14  A.   No -- I'm sorry, there was -- after the
15   bankruptcy there was a restatement.
16  Q.   I'm sorry?
17  A.   There was a restatement after the bankruptcy.
18  Q.   You recall that at least being discussed?
19  A.   Yes.
20  Q.   And do you recall whether it was for fiscal
21   year 1997 or some other?
22  A.   I don't recall.
23  Q.   Who was involved in those discussions?
24  A.   Joe Dionisio seems to me led that discussion.
25  Q.   And do you recall whether those discussions you

43 (Pages 166 to 169)

ROBERT M. HERNANDEZ

Page 170

1    were held in audit committee or full board
2    meetings or executive committee meetings?
3  A.  I wasn't on the audit committee, so it had to
4    have been either the executive committee or the
5    full board.
6  Q.  And do you recall whether representatives of
7    PriceWaterhouseCoopers were involved in those
8    discussions?
9  A.  I don't recall.
10  Q.  Do you recall whether restatement was actually
11    done or whether something else was done?
12  A.  I recall it being done.
13  Q.  And do you recall the issues about which the
14    restatements centered?
15  A.  No.
16  Q.  Or on which the restatements centered --
17  A.  No.
18  Q.  -- efforts centered?
19  A.  No.
20  Q.  If I shared with you that I think there was a
21    public announcement made in the fall of 1998 or
22    the late summer that was a joint announcement
23    by the AHERF board, its management and
24    PriceWaterhouseCoopers that no further reliance
25    should be had on the fiscal year 1997 financial

Page 171

1    statements, would that refresh your
2    recollection that that was the way the
3    restatement issue was resolved rather than a
4    full restatement?
5    MR. FRIESEN:  Objection.
6  A.  Yeah, that refreshes my recollection.
7  Q.  You do now recall a no further reliance
8    statement?
9  A.  I don't recall that, I just remember the
10    announcement.
11  Q.  I'm going to hand you now, Mr. Hernandez, what
12    has been marked as Exhibit 1289, ask you to
13    review it briefly for me.
14        - - - -
15    (The witness reviewed the Exhibit.)
16        - - - -
17    MR. FRIESEN:  I object to this as
18    being beyond the scope of my direct
19    examination.
20  Q.  Have you had a chance to take a look at it?
21  A.  Yes.
22  Q.  And does showing you Exhibit -- well, strike
23    that.
24        Can you identify Exhibit 1289 for us?
25  A.  It's -- you mean --

Page 172

1  Q.  Describe for the jury what it is briefly.
2  A.  Sure.  It's a cover letter from Tony Sanzo to
3    the AHERF executive staff and various --
4    various other staff describing attached media
5    release, and then there's a media release under
6    the AHERF letterhead saying that AHERF was
7    reviewing its financial statements for the year
8    ended June 30, 1997, and was considered a
9    restatement.
10  Q.  And, in fact, it also goes on to say that no
11    further reliance should be placed on those
12    1997 --
13  A.  Pending completion of their review, no further
14    reliance should be placed on the financial
15    statements.
16  Q.  And does that refresh your recollection,
17    Mr. Hernandez, that a statement of this kind
18    was, in fact, made?
19  A.  It does.
20  Q.  When that effort to determine whether a
21    restatement of the 1997 financial statements
22    would be made was undertaken, did you begin to
23    question the quality of the work of the
24    auditors for AHERF --
25    MR. FRIESEN:  Objection.

Page 173

1  Q.  -- for any fiscal year?
2    MR. FRIESEN:  Objection.
3    MR. RESTIVO:  When you say -- object
4    to the form of the question, unless you define
5    what you mean when you say question.  To
6    himself?  To other people?  I'd ask you to
7    refine your question.
8  Q.  Did you internally start to question
9    the quality of the work of the auditors at this
10    time?
11  A.  I can't say that I had a refined enough
12    knowledge to question, you know, anybody in
13    particular.  I questioned the financial
14    statements and all -- you know, everybody
15    involved in their preparation I guess goes with
16    that, but I can't say, you know, I homed in on
17    the auditors per se.
18  Q.  When you say everybody involved in the
19    preparation, did you mean to include the
20    auditors with management there?
21  A.  Sure, sure.
22  Q.  Did you share those concerns with anyone at the
23    time?
24  A.  No, no.  At that point everybody was pretty
25    concerned about everything.

44 (Pages 170 to 173)

ROBERT M. HERNANDEZ

Page 174

1  Q.  Were you involved in the discussions that led
2      to PriceWaterhouseCoopers' disengagement from
3      audit work for AHERF?
4  A.  No.
5  Q.  Did you ever learn about the reasons for that
6      decision from any source?
7  A.  I believe I heard reports on that or was
8      involved in meetings where that was discussed.
9      I honestly don't remember what the reasons
10     were.
11 Q.  When you first learned of the strategy to
12     acquire physician practices as a means or a
13     part of the means of putting together this
14     integrated delivery system, I think you told us
15     that you had some understanding that there
16     would be limited -- a limited period of
17     operating losses that would be incurred?
18 A.  I would have expected that.
19 Q.  Okay.  Do you recall having formulating a
20     conclusion about the limitation in terms of
21     time --
22 A.  No.
23 Q.  -- how long operating losses would be incurred?
24 A.  I recall not having an understanding of that or
25     reached any conclusions.

Page 175

1  Q.  You did understand it to be finite, at some
2      point there would be operating loss turnaround?
3  A.  An operating loss turnaround, but not
4      necessarily an end to the losses because, you
5      know, when you are -- when you have an
6      integrated system, a bunch of divisions or
7      subsidiaries all basically in the same
8      business, it's pretty hard to tell where the
9      profits are actually coming from.
10 Q.  And you knew there would be capital
11     expenditures if you were going to continue to
12     acquire practices?
13 A.  Yeah, but that's not my point.
14 Q.  I understand.
15 A.  My point is that, you know, the physician
16     practices themselves might be costing the
17     system money in terms of losses, but the load
18     on the hospitals might more than make up for
19     that, so, you know, you can't really focus too
20     much on a particular --
21 Q.  I understand.
22 A.  -- piece of the pie.
23     MR. JONES:  I'm going to ask that our
24     court reporter mark for us exhibit next in
25     order.

Page 176

1            - - - -
2      (Exhibit 1951 marked for identification.)
3            - - - -
4  BY MR. JONES:
5  Q.  Mr. Hernandez, we've just handed you what we've
6      marked as Exhibit 1951, which I believe you
7      will find to be some minutes of a July 9, 1996
8      special meeting of the resource management
9      committee of Allegheny General Hospital that at
10     least the minutes reflect was attended by you.
11         Is that what the document at least
12     purports to be?
13 A.  Yes.
14 Q.  Do you recall attending resource management
15     committee meetings for the Allegheny General
16     Hospital from time to time?
17 A.  Oh, yes.  I have no specific recollection of
18     this meeting, but I have no reason to think I
19     didn't attend it.
20 Q.  I'm going to ask you real quickly to turn to
21     the second page of Exhibit 1951, and towards
22     the bottom of the page, I'm going to ask you to
23     read the last, I don't know whether that's a
24     bullet point or a caret, but the last full
25     paragraph of the -- of the page.

Page 177

1            - - - -
2      (The witness reviewed the Exhibit.)
3            - - - -
4  Q.  Have you completed that, sir?
5  A.  Yes.
6  Q.  And I'm just going to read for purposes of the
7      record the last phrase of the paragraph reads,
8      AIHG (the primary care physician practice plan)
9      will break even on an operating/cash bays by
10     fiscal year 1999 requiring only capital support
11     in fiscal year 1999 and thereafter.
12         Did I read that correctly?
13 A.  You did.
14 Q.  Does that refresh your recollection that from
15     an operating cash basis there were at least
16     projections that you were hearing from
17     management at AGH that the AIHG program of
18     acquiring physician practices would be at an
19     operating or cash basis break-even point in
20     that limited period of time?
21 A.  I don't -- it doesn't refresh my recollection.
22     I don't recall it, but I don't deny that that's
23     what it says.
24 Q.  Okay.  You don't deny that you were being
25     informed as a board member that the AIHG

LEGALINK MANHATTAN  (212) 557-7400

ROBERT M. HERNANDEZ

Page 178

1  operating losses would be short-term and on the
2  order of three or four years like this?
3  A.  Yeah, that was the projection.
4  Q.  You mentioned at one point the trustees
5      discussed -- the board of trustees at AHERF
6      discussed the large losses being incurred at
7      AIHG.  Do you recall that testimony earlier
8      today?
9  A.  Yes.
10 Q.  And that ultimately the practice acquisitions
11     were curtailed?
12 A.  That's my recollection.
13 Q.  If you had been informed by the management or
14     the auditors at some point before bankruptcy
15     that operating losses at AIHG and capital
16     expenditures for AIHG could no longer be funded
17     by the resources of AHERF, would that have
18     affected how soon you might have thought about
19     curtailing such acquisitions?
20         MR. FRIESEN:  Objection, calls for
21     speculation.
22 Q.  You can answer.
23 A.  I'm not even sure I understand what you are
24     saying, could no longer be funded by.
25 Q.  If there was sufficient capital within AHERF as

Page 179

1  the larger enterprise existed to fund further
2  acquisitions or to otherwise support further
3  operating losses at AIHG, you would have taken
4  that into consideration in evaluating whether
5  further acquisitions made sense?
6      MR. FRIESEN:  Same objection.
7  A.  Well, what you are saying is that AHERF had no
8      more -- in your hypothetical situation, AHERF
9      had no liquidity, yeah, I mean --
10 Q.  That would have to be?
11 A.  I mean that would be -- you know, there would
12     be more than AIHG that I would be concerned
13     about in that case.
14 Q.  That's right.  And what more would you have
15     been concerned about at that point?
16         MR. FRIESEN:  Calls for speculation.
17 A.  Solvency.
18 Q.  Solvency generally?
19 A.  Well, if you are saying that there's no
20     liquidity --
21 Q.  Yes.
22 A.  -- that's, you know, a pretty serious matter.
23 Q.  Do you recall that the Graduate -- let me try
24     that again.
25         Do you recall that the ultimate

Page 180

1  acquisition of certain hospitals that were
2  formally affiliated with the Graduate Health
3  System in Philadelphia took place in a number
4  of phases?
5  A.  I don't.
6  Q.  Do you recall that there was an enterprise
7      known as SDN, three initials, that initially
8      was involved in acquiring those former Graduate
9      hospitals before AHERF took them into its
10     membership?
11 A.  I've heard of that, and I don't know when I
12     learned of it.  I may have learned of it after
13     the bankruptcy.
14 Q.  Do you recall that there was a time period for
15     a due diligence review of the financial
16     operation of the Graduate hospitals during
17     which AHERF could make a decision about whether
18     or not to fully integrate those hospitals into
19     AHERF as a member?
20 A.  I remember that there was some due diligence
21     time period.  You know, I'm not trying to evade
22     your question but --
23 Q.  That's all I'm really asking.
24 A.  -- the specifics I don't recall.
25 Q.  But you do remember there was a due diligence

Page 181

1  period or opportunity --
2  A.  Yes.
3  Q.  -- to undo the transaction, if you will?
4  A.  Yeah, or not proceed.
5  Q.  Do you remember hearing about objectors to the
6      actual acquisition of the hospitals?  You were
7      asked earlier about whether there were
8      objectors to the process by which the board
9      learned or was informed of the acquisition.
10     I'm asking a slightly different question I
11     think, which is, do you recall any board of
12     trustee member voicing objection to the
13     fundamental decision to acquire these
14     additional hospitals?
15 A.  No.
16 Q.  You mentioned liquidity problems and solvency
17     issues a moment ago.  If AHERF had experienced
18     liquidity problems and solvency issues or
19     either and you were informed of same before The
20     Graduate Hospital acquisition, would that have,
21     in your estimation, altered your view of that
22     acquisition?
23         MR. FRIESEN:  Objection, vague,
24     compound, and calls for speculation.
25         MR. RESTIVO:  I object to the form of

46 (Pages 178 to 181)

ROBERT M. HERNANDEZ

Page 182

1    the question also.
2  Q.   You can answer.
3        THE WITNESS:  I can answer?
4        MR. RESTIVO:  If you can.
5  A.   If I thought that AHERF was insolvent and,
6    slash, or illiquid, I would raise questions,
7    you know, about any expenditure of funds,
8    including board retreats.
9  Q.   I'm sorry, including?
10  A.   Including board retreats.
11  Q.   I'm going to ask you to look back at Exhibit
12    168, Mr. Hernandez, which I think at least
13    included -- well, strike that, I've got it
14    wrong.
15        THE WITNESS:  While you are looking,
16    can I take a two-minute break?
17        MR. JONES:  Sure, let's do that.
18        THE VIDEOGRAPHER:  We are now going
19    off the record.  The time is 2:26 p.m.
20        - - - -
21    (There was a recess in the proceedings.)
22        - - - -
23        THE VIDEOGRAPHER:  We are now going
24    back on the record.  The time is 3:29 p.m.
25

Page 183

1  BY MR. JONES:
2  Q.   I think I was correct, Mr. Hernandez, in
3    directing you to Exhibit 168, which I think, if
4    you have it before you --
5  A.   I do.
6  Q.   -- you can confirm for me is a set of materials
7    for the audit committee and a meeting of that
8    committee on October 15, 1996?
9  A.   Mm-hmm.
10  Q.   Is that right?
11  A.   Yes.
12  Q.   I'm going to ask you to flip to the management
13    letter that you discussed earlier today, and in
14    particular page 17.
15  A.   Big No. 17?
16  Q.   Big No. 17 in the upper left-hand corner.  It's
17    a portion, again, of the management letter for
18    fiscal year 1996; am I right?
19  A.   You are.
20  Q.   And I'm going to direct your attention to a
21    portion of that letter that you were not asked
22    to review in specific earlier, and that is the
23    second to last paragraph on the page, and it
24    reads, As a result of our procedures, we have
25    concluded that the controls over the

Page 184

1    establishment and monitoring of accounts
2    receivable reserves are designed appropriately
3    and are operating effectively so as to properly
4    adjust accounts receivable balances to their
5    estimated net realizable value.
6        Have I read that right?
7  A.   You have.
8  Q.   What did that mean to you when you read it at
9    or about the time that you received this
10    document?
11        MR. FRIESEN:  Objection, foundation.
12  Q.   As an experienced reader of management letters?
13        MR. FRIESEN:  Objection, foundation.
14        THE WITNESS:  I can answer?
15        MR. RESTIVO:  You may answer.
16  A.   That -- I mean this is pretty typical wording
17    and means that the central controls, central
18    control structure is operating, you know, it
19    doesn't mean that every individual thing is 100
20    percent perfect, but to the extent that they
21    have observed it and elsewhere in here they'll
22    indicate, you know, the extent of their --
23    level of their -- their testing that things
24    were okay.
25  Q.   Things were okay?

Page 185

1  A.   (Nodding head up and down.)
2  Q.   And that was part of your -- the foundation for
3    your belief that you expressed earlier today
4    that management had accounts receivable under
5    control during this time period; is that right?
6  A.   Well, I don't know that -- I don't remember if
7    I testified to that, but I didn't have a
8    feeling that it was out of control.
9  Q.   You did not have a feeling that it was not
10    under control?
11  A.   Correct.
12  Q.   And, in fact, if this management letter had
13    read differently and had said, in so many
14    words, that management did not have in place
15    sufficient controls over accounts receivable to
16    accurately adjust them to net realizable value,
17    would that have caused you concern?
18  A.   Yes.
19  Q.   And why is that?
20  A.   Actually I've rarely ever seen that, and as a
21    matter of fact, I don't know that I've ever
22    seen that, so it says that, you know, something
23    is out of control.
24  Q.   And what is the revenue stream for hospitals,
25    the operating revenue stream?

47 (Pages 182 to 185)