ROBERT M. HERNANDEZ

Page 186

1    A.    Patient billings.
2    Q.    And patient billings are reflected in?
3    A.    In the receivables.
4    Q.    And, therefore, that's an important line item
5          to monitor and keep control of?
6    A.    Oh, it always is for any, you know, any
7          organization.
8    Q.    And that's consistent with your view about the
9          importance of moving toward an operating
10         break-even point?
11             MR. FRIESEN:  Objection.
12   Q.    That is, getting to a break-even financial
13         number on a yearly statement of operations
14         basis exclusive of investments and things like
15         that?
16             MR. RESTIVO:  I want that question,
17         assuming it's a question, read back.
18         - - - -
19         (The record was read back by the Reporter.)
20         - - - -
21   A.    I can answer it?  Not really.  There's -- it's
22         not inconsistent, but this is a -- a financial
23         thing.  This is talking about collecting on
24         your billings.  These -- when it hits accounts
25         receivable, it's already recorded as a revenue,

Page 188

1          competence and integrity of financial
2          management?
3    A.    Yes.
4    Q.    And when you have those kinds of concerns, do
5          you have options as a board member and how to
6          address them?
7    A.    Yes.
8    Q.    What kind of options?
9    A.    Well, you can terminate them, replace them,
10         change their positions.
11   Q.    Terminate them?
12   A.    Yeah, sure.
13   Q.    You can also instruct auditors to expand their
14         scope and their work?
15   A.    Yes.
16   Q.    Dig deeper?
17   A.    Yes.
18   Q.    You can also engage other consultants; is that
19         fair to say?
20   A.    Right, sure.
21   Q.    In fact, you reached out, I think you told us,
22         to Lehman Brothers in a sale transaction --
23   A.    Mm-hmm.
24   Q.    -- as an advisor; is that right?
25   A.    Right.

Page 187

1          and by doing -- by improving this, you are
2          going to improve your cash position, your
3          health and your balance sheet, you are not
4          going to improve your operating income.
5    Q.    I understand.  It's another facet --
6    A.    It's another facet to the -- to the management.
7    Q.    And another way to measure financial health?
8    A.    Yes, oh, absolutely.
9    Q.    Have you ever been -- strike that.
10             Let me ask you this, Mr. Hernandez:
11         If the auditors at Coopers & Lybrand had told
12         you that the fiscal year 1996 or fiscal year
13         1997 financial statements that were presented
14         to them for their audit were materially
15         misstated and that C & L was, therefore,
16         issuing an adverse opinion on those financial
17         statements in either year, would that have
18         caused you concern?
19   A.    Yes.
20             MR. FRIESEN:  Objection.
21   Q.    And why is that?
22   A.    Again, it means that -- I mean it's not a -- I
23         mean it's very unusual and it means that the
24         financial statements cannot be relied upon.
25   Q.    Would it have caused you to consider the

Page 189

1    Q.    And if you had learned what I just shared with
2          you about the adverse opinion, you would have
3          considered all those options and counseled with
4          fellow board members and taken the best course
5          of action that you thought most prudent I
6          presume?
7              MR. FRIESEN:  Objection.
8    A.    Yes.
9    Q.    If Coopers & Lybrand had told you that the net
10         income figure that we saw in the '96 financial
11         statements, I think it was 6, roughly $6.5
12         million?
13   A.    I don't remember.
14   Q.    It was a little over $6 million, if they had
15         told you that net income in fiscal year 1996,
16         either in audit committee meeting or full board
17         meeting, that that figure had overstated net
18         income in 1996, contrary to generally accepted
19         accounting principals, by $80 million or more,
20         would that have caused you concern?
21             MR. FRIESEN:  Objection.
22   A.    Well, let me answer the question this way:  I
23         think the reason for the overstatement would
24         have been important in whether I was concerned
25         or not.

48 (Pages 186 to 189)

ROBERT M. HERNANDEZ

Page 190

1  Q.   Right, and if --
2  A.   And to be honest, $80 million in the total
3       scheme of things, and if it was an $80 million
4       loss in a year, it may or may not have been a
5       concern, it just depends on why.
6  Q.   And you would have asked questions about what
7       the answer to that why question -- what the
8       answers to that why question were?
9  A.   I would think I would have.
10 Q.   And you had the same kinds of options available
11      to you that we just discussed?
12 A.   Yes.
13 Q.   If you didn't like the answers; is that fair to
14      say?
15 A.   That's fair to say.
16 Q.   But $80 million is a number that would have
17      caused inquiry on your part?
18         MR. FRIESEN:  Objection.
19 A.   I think so.
20 Q.   Similarly, if the 1997 financial statements had
21      been overstated, in the statement of operations
22      had been overstated in the net income row by
23      more than $100 million, you would have had the
24      same kinds of concern?
25 A.   Yes.

Page 191

1  Q.   And the same kinds of options?
2  A.   Yes.
3  Q.   If Coopers & Lybrand had told you that its
4       auditors questioned or had concerns about the
5       integrity and honesty of members of financial
6       management at AHERF, whether Mr. McConnell,
7       Mr. Abdelhak or others, would that have caused
8       you concern --
9  A.   Yes.
10 Q.   -- during your years of board service?
11 A.   Yes.
12 Q.   You would have made inquiry had you learned
13      that?
14 A.   Yes.
15 Q.   And you would have had the same kinds of
16      options we discussed?
17 A.   Yes.
18 Q.   You would have followed those options through
19      their prudent course?
20         MR. FRIESEN:  Objection.
21 A.   Yes.
22 Q.   Is that a yes, I'm sorry?
23 A.   Yes.
24 Q.   And if Coopers & Lybrand had told you that the
25      fiscal year 1996 and 1997 financial statements

Page 192

1       presented for audit to them were the product of
2       fraudulent conduct or suspected fraudulent
3       conduct on the part of financial management,
4       would that have concerned you?
5  A.   Yes.
6  Q.   Most definitely?
7  A.   Yes.
8  Q.   And you would have had the same kinds of
9       options and would have pursued them I presume?
10 A.   Yes.
11 Q.   If C & L had told you or somebody at Coopers &
12      Lybrand had told you that the 1996 or 1997
13      financial statements presented for audit had
14      been intentionally misstated by financial
15      management in their view, would that have
16      concerned you?
17 A.   Yes.
18 Q.   And the same options and course of conduct you
19      would have followed?
20 A.   Yes.
21 Q.   If you learned that the 80 million -- strike
22      that.
23         MR. JONES:  I don't think I have
24      anything further.
25         MR. FRIESEN:  I just have a couple of

Page 193

1  follow-up questions.
2         THE WITNESS:  Sure.
3      - - - -
4         RE-EXAMINATION
5      - - - -
6  BY MR. FRIESEN:
7  Q.   Using Mr. Jones' hypothetical, if you learned
8       at the time that the fiscal year 1996 financial
9       statements overstated net income by $80
10      million, can you say sitting here today with
11      certainty what precisely it would have been
12      that you would have done?
13 A.   No.
14         MR. JONES:  Object to form.
15 Q.   And the other hypothetical regarding the $100
16      million net income overstatement in fiscal year
17      1997, could you say sitting here with certainty
18      if you would have known that, hypothetically,
19      what precisely you would have done?
20         MR. JONES:  Object to form.
21 A.   No.
22         MR. JONES:  And foundation in both.
23 Q.   And the same question with regard to an adverse
24      opinion from the auditors on either of those
25      financial statements, if you had received that,

49 (Pages 190 to 193)

ROBERT M. HERNANDEZ

Page 194

1    do you know sitting here today with certainty
2    precisely what you would have done?
3            MR. JONES: Object to form and
4    foundation.
5    A.    Correct, I don't know what I would have done.
6    Q.    Mr. Jones mentioned that -- strike that.
7            The operating losses that you
8    testified were projected for AIHG for some
9    period of time, whether or not the actual
10   losses that happened turned out to be worse
11   than the projected losses numerically, was that
12   something that you assumed that AIHG and its
13   board kept track of?
14   A.    I'm not sure I understand your question.
15   Q.    Okay.
16   A.    You mean the actual recording or accounting for
17   the losses?
18   Q.    No. I mean the -- let me just rephrase the
19   question.
20           You knew generally that there were
21   operating losses that were projected for some
22   period of time for the AIHG practices; right?
23   A.    Yes.
24   Q.    Okay. And did you know that there were
25   specific budgeted projections of how much those

Page 195

1    losses would be from year to year?
2    A.    I believe I did at the time, yes.
3    Q.    And did somebody keep track of whether the
4    actual losses incurred were worse than those --
5    A.    Yes.
6    Q.    -- budgeted projected losses?
7    A.    Yes.
8    Q.    And was that AIHG that did that?
9    A.    For sure AIHG and maybe the AHERF management as
10   well.
11   Q.    But do you remember the AHERF board itself when
12   you were a trustee keeping track of that?
13   A.    I don't remember comparisons between projected
14   losses and the actuals, no.
15           MR. FRIESEN: I don't have any
16   further questions.
17           MR. JONES: I think I just have a
18   follow-up.
19           - - - -
20           RE-EXAMINATION
21           - - - -
22   BY MR. JONES:
23   Q.    Mr. Hernandez, I'm going to take you back to
24   the question I asked you about $80 million
25   operating loss in '96 and 100 million or more

Page 196

1    operating loss in '97. I want to make sure we
2    understand each other.
3            If you assume for a minute that you
4    were informed by the auditors that the
5    financial statements presented to them for
6    audit in each of those years were overstated by
7    those numbers approximately in each year, as a
8    consequence of financial management failing to
9    follow generally accepted accounting
10   principles, would that have caused you concern?
11   A.    Yes.
12   Q.    Without question?
13   A.    Without question.
14   Q.    Because you then have to explore competence and
15   integrity issues, am I fair -- am I right in
16   that?
17   A.    You are.
18   Q.    And you would have done so?
19   A.    I believe I would have.
20           MR. JONES: That's all I have.
21           MR. FRIESEN: Thanks a lot.
22           THE VIDEOGRAPHER: If there are no
23   further questions, this deposition is
24   concluded. We are now going off the record.
25   The time is 3:45 --

Page 197

1            MR. FRIESEN: Ken, Ken, wait, counsel
2    wants to say something.
3            MR. RESTIVO: We don't waive
4    signature. We want to review the transcript
5    and sign it. We don't waive signature.
6            THE VIDEOGRAPHER: With no further
7    questions this deposition is concluded. We are
8    now going off the record. The time is 3:46
9    p.m.
10           - - - -
11   (The proceedings were concluded at 3:46 p.m.)
12           - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

50 (Pages 194 to 197)

ROBERT M. HERNANDEZ

---

Page 198

1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF ALLEGHENY        )  SS:
3       I, Heidi H. Willis, RPR, CRR, a Court Reporter
4   and Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   ROBERT M. HERNANDEZ, was by me first duly sworn to
7   testify to the truth; that the foregoing deposition
8   was taken at the time and place stated herein; and
9   that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 8th day of
23  September, 2003.
24  _____
25              Notary Public

---

Page 200

1               AKF REPORTERS, INC.
                    AKF Building
2               436 Boulevard of the Allies
                Pittsburgh, PA  15219
3                   (412) 261-2323
4
5   September 8, 2003

    TO:  James J. Restivo, Jr., Esq.
6
7       RE:  DEPOSITION OF ROBERT M. HERNANDEZ
             NOTICE OF NON-WAIVER OF SIGNATURE
8
9       Please have the deponent read his deposition
    transcript.  All corrections are to be noted on the
10  preceding Errata Sheet.
11      Upon completion of the above, the Deponent must
    affix his signature on the Errata Sheet, and it is to
12  then be notarized.
13      Please forward the signed original of the
    Errata Sheet to Jeffrey Friesen, Esq., for attachment
14  to the original transcript, which is in his
    possession.  Send a copy of same to all counsel, and
15  also a copy to me.
16      Please return the completed Errata Sheet within
    thirty (30) days of receipt hereof.
17
18
19  Heidi H. Willis, RPR, CRR
        Court Reporter
20
21
22
23
24
25

---

Page 199

1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T
2
        I, Robert M. Hernandez, have read the foregoing
3   pages of my deposition given on Wednesday, September
    3, 2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21  _____
            ROBERT M. HERNANDEZ
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
            Notary Public
25      AKF Reference No. HW77081

---

Hilton Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *GRAEMER HILTON*
### *August 13, 2003*

---

## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### PH: 212-557-7400 / FAX: 212-692-9171

HILTON, GRAEMER



**LEGALINK***

A **WORDWAVE** COMPANY

Page 74

```
1          Because they were making --
2          Again, time frame is difficult, but
3     they were making changes in the management of
4     certain areas of the hospital.
5  Q.   Okay.  So by the end of fiscal '96, though, you
6     did have concerns about the financial and
7     operating position of AHERF?
8  A.   Yes.
9  Q.   And do you recall whether or not your concerns
10     were shared by other members of the boards of
11     committees on which you served?
12          MR. JONES:  Object to foundation.
13          THE WITNESS:  Yes.  I'm sure they
14     were.
15  BY MR. McDONOUGH:
16  Q.   Now, before we leave this page, or this
17     exhibit, Mr. Hilton, you indicated in one of
18     your answers that $42 million of increased debt
19     would be about two and a half percent of a
20     $1.6 billion organization.
21  A.   If my arithmetic is correct.
22  Q.   It sounds like it is to me.  And I just want to
23     focus in on that.  Were you attempting to say
24     that two and a half percent is a number that
25     should cause major concern or that two and a
```

Page 75

```
1     half percent is a more manageable or more -- or
2     less material number?
3          MR. JONES:  Object to form.
4          THE WITNESS:  I would --
5          You know, I would hope it would be
6     less material.
7          MR. McDONOUGH:  Let me show you
8     next -- I'm sorry.  You can put that aside --
9     what has been marked as Exhibit 1676.
10          - - - -
11          (Deposition Exhibit No. 1676
12     previously marked for identification.)
13          - - - -
14  BY MR. McDONOUGH:
15  Q.   Mr. Hilton, this is a previously marked exhibit
16     which is minutes of an audit committee meeting
17     held on October 15th of 1996.  Do you see that?
18  A.   Yes.
19  Q.   And to state the obvious, October 15th of 1996
20     would have been in fiscal year 1996.  Correct?
21  A.   Correct.
22  Q.   And you're shown as being present on the
23     document.  Correct?
24  A.   Correct.
25  Q.   Under the members of the committee present for
```

Page 76

```
1     the meeting.
2  A.   Right.
3  Q.   Did you receive as a matter of routine minutes
4     for the committee meetings and the board
5     meetings which you attended?
6  A.   Yes.
7  Q.   Did you ever notice a circumstance where you
8     were indicated as present when you weren't or
9     absent -- I'm sorry, you're absent when you
10     were --
11  A.   No.
12  Q.   So is it fair to say you found the minutes that
13     you received to be accurate in terms of
14     reflecting whether you were present for a
15     meeting or not?
16  A.   Correct.
17          MR. JONES:  I object to form.
18          MR. McDONOUGH:  And you know what?  I
19     misstated my prior question.
20  BY MR. McDONOUGH:
21  Q.   October of 1996 would have actually been in
22     fiscal '97.  Is that correct?
23          I get confused about this.  Let me
24     make the record clear.
25          The fiscal year for AHERF was July 1
```

Page 77

```
1     to June 30.  Correct?
2  A.   Correct.
3  Q.   So fiscal year 1996 would have ended on June 30
4     of 1996?
5  A.   Seven -- or '96.  Yes.
6  Q.   So, therefore, October of '96 then would be in
7     the next fiscal year which would end June 30th,
8     1997, and that would be fiscal '97.
9  A.   Right.
10  Q.   So just to put this in context then, this
11     meeting would have occurred after the
12     operations or after the results of financial
13     operations for AHERF in the '94, '95, and '96
14     time frame that we just looked at.
15  A.   Correct.
16          MR. McCLENAHAN:  Are you going to be
17     asking this witness questions about this
18     document?  If you are, I think he should take
19     the time to read it.
20          MR. McDONOUGH:  Take a moment to page
21     through it.  I'm just going to ask you about
22     one or two specific things.
23          - - - -
24          (The witness reviewed the document.)
25          - - - -
```

20 (Pages 74 to 77)

GRAEMER HILTON

Page 182

1                     - - - -
2              EXAMINATION
3                     - - - -
4    BY MR. JONES:
5    Q.    Mr. Hilton, my name, again, is Jim Jones. I'm
6        going to ask you, I think, a relative few
7        questions here this afternoon; and if we could
8        have the same agreement you had with
9        Mr. McDonough, and that is if I have asked you
10       something you don't understand or if my
11       question is unclear to you, if you'll tell me,
12       I'll do my best to clear it up.
13            Can we have that agreement?
14   A.    Yes.
15   Q.    Thank you. You were asked to talk briefly
16       about in your testimony earlier today your role
17       on the audit committee.
18            I'd like to ask you a few questions
19       about your perceptions of the role of the
20       independent auditors, Coopers & Lybrand, as it
21       related to their work for AHERF during the
22       fiscal years you were involved on the audit
23       committee.
24            Could you explain for me what you
25       perceived the role of Coopers & Lybrand to be

Page 183

1        in the process?
2    A.    Well, to certainly review the operations of the
3        hospitals, the financials, and make
4        recommendations, report back to the audit
5        committee.
6    Q.    As a part of that review, were they to give an
7        opinion on the accuracy of the financial
8        statements?
9    A.    Yes.
10   Q.    And why did you want that as a part of your
11       work as an audit committee or finance committee
12       member?
13   A.    What's the question again?
14   Q.    Why is it that you wanted the annual opinion
15       with respect to the financial statements?
16   A.    Well, to support, you know, what was being
17       reported by management.
18   Q.    And it was, in part, to receive an independent
19       opinion?
20   A.    Correct.
21   Q.    And it's a check or a monitor on management's
22       own recording. Is that fair to say?
23   A.    Yes.
24   Q.    And it's a check or a monitoring process that
25       has been a part of your work on the boards of

Page 184

1        other public companies?
2    A.    Correct.
3    Q.    And as a part of your work as a part of
4        management of other companies.
5    A.    Right.
6    Q.    Are there others who review audited financial
7        statements outside of the audit committee and
8        the board of trustees of AHERF, as you
9        understood it? Were there others, as you
10       understood it, during your time on the audit
11       committee?
12   A.    Not outside the committee or the board.
13   Q.    Were there third parties, however, that weren't
14       affiliated with AHERF that would review these
15       audited financial statements, to your
16       knowledge?
17   A.    Not to my knowledge.
18   Q.    Let me ask you this. Are you aware that the
19       creditors of the enterprise would ask for and
20       receive and review audited financial statements
21       from time to time from AHERF?
22   A.    Creditors of AHERF? I would expect, yes.
23   Q.    Are you aware of other parties besides
24       creditors?
25   A.    I can't recall any.

Page 185

1    Q.    What about lending enterprises, financial
2        institutions?
3            MR. McDONOUGH: Well, I object to
4        form. They would be creditors.
5            MR. JONES: They may.
6            THE WITNESS: I would expect, sure.
7            MR. McCLENAHAN: Depends on whether
8        they lend them money, I guess.
9            THE WITNESS: Right.
10           MR. JONES: In fact, those that may
11       make decisions about whether or not to lend
12       might ask for, and in your experience, asked
13       for and received audited financial statements
14       of AHERF enterprises?
15           THE WITNESS: Sure.
16           MR. McDONOUGH: Object to form.
17   BY MR. JONES:
18   Q.    During your time on the audit committee, did
19       you rely on Coopers & Lybrand to inform you of
20       whether or not the financial statements were
21       fairly stated?
22   A.    Yes.
23   Q.    And you relied so throughout your time on the
24       audit and finance committees?
25   A.    Yes.

Page 186

1   Q.   And you expected them to bring to your
2        attention material misstatements in those
3        financial statements?
4            MR. McDONOUGH: Object to the form.
5            THE WITNESS: Yes.
6   BY MR. JONES:
7   Q.   And as a part of some of the challenging times
8        in the health care market that Mr. McDonough
9        and you discussed as a part of your earlier
10       testimony, you used the audited financial
11       statements to help you monitor AHERF's
12       performance in that challenging market. Is
13       that fair to say?
14  A.   Yes.
15  Q.   And you based decisions that you were called
16       upon to make in your board memberships in part
17       on those audited financial statements and the
18       financial performance they revealed.
19  A.   Correct.
20  Q.   If those statements were proven incorrect
21       materially so, those decisions you made might
22       have varied.
23           MR. McDONOUGH: I object to form
24       twice. Go ahead.
25           THE WITNESS: Well, that's difficult

Page 187

1        to say only from the standpoint how would you
2        know they were wrong.
3   BY MR. JONES:
4   Q.   Well, if it was revealed to you that they were.
5   A.   By whom?
6   Q.   By the auditors, for instance, that the
7        internal financial statements were wrong in one
8        aspect or another?
9   A.   The internal financial --
10  Q.   Yes.
11  A.   Of AHERF?
12  Q.   Let me start again. If it was revealed to you
13       as an audit committee member by the independent
14       auditors, Coopers & Lybrand, that the financial
15       statements presented to them for audit were, in
16       fact, materially incorrect --
17  A.   Uh-huh.
18  Q.   -- that might have an effect on the decisions
19       you make as a part of the committees that you
20       were a part of in your trustee service?
21  A.   Yes.
22           MR. McDONOUGH: Object to form.
23  BY MR. JONES:
24  Q.   Do you ever recall -- strike that.
25           As a part of your audit committee

Page 188

1        service, do you recall inviting the independent
2        auditors, Coopers & Lybrand, to visit with the
3        audit committee, meet with the audit committee,
4        in executive session?
5   A.   Yes.
6   Q.   And you offered that at every meeting?
7   A.   Every meeting.
8   Q.   And do you ever recall Mr. Buettner or anyone
9        else on behalf of Coopers & Lybrand taking you
10       up on that invitation?
11  A.   I don't recall, no.
12  Q.   And what is the reason for offering executive
13       session with the auditors?
14  A.   Well, to point out any deficiency or concerns
15       that they would suggest we take a look at,
16       either that they would run across during the
17       course of their audit --
18  Q.   The things they perceived that needed
19       improvement or were incorrect?
20  A.   Right.
21  Q.   And it allowed you to visit with the auditors
22       outside the presence of management?
23  A.   Correct.
24  Q.   And to forego any embarrassment or conflict
25       that might result from an all-hands meeting.

Page 189

1        Is that fair to say?
2   A.   Yes.
3   Q.   At the annual fall audit meetings, you were
4        presented sometimes I think we've established
5        shortly in advance of the meeting with the
6        audited financial statements for the fiscal
7        year that had ended that June. Is that
8        correct?
9   A.   Correct.
10  Q.   And in connection with those meetings, you
11       would review the statements typically before
12       the meeting and spend some time with them. Is
13       that right?
14  A.   Yes.
15  Q.   And then review them again with the committee
16       and the auditors?
17  A.   Correct.
18  Q.   At the meeting?
19  A.   Correct.
20  Q.   I'm going to hand you, Mr. Hilton, what has
21       been previously marked as Exhibit 1001, fiscal
22       year 1996 audited financial statements.
23           - - - -
24           (Deposition Exhibit No. 1001
25       previously marked for identification.)

48 (Pages 186 to 189)

GRAEMER HILTON

Page 190

1           - - - -
2           MR. McCLENAHAN:  Do you have a copy I
3    could --
4           MR. JONES:  Yeah.
5           - - - -
6    (The witness reviewed the document.)
7           - - - -
8    BY MR. JONES:
9    Q.    You've looked at a set of these financial
10        statements earlier today, perhaps under a
11        different exhibit number with Mr. McDonough,
12        but you recall receiving in advance of the '96
13        fall audit committee meeting a set of the
14        audited financial statements for AHERF.  Is
15        that fair to say?
16   A.    Yes.
17   Q.    And I'm going to ask you to take a look at a
18        number that I don't think he did ask you to
19        take a look at, and that is found at Page 3 of
20        the financial statements that ends with a Bates
21        number 579.
22   A.    Right.
23   Q.    Do you see there, Mr. Hilton, about halfway
24        down the page where there is an item for net
25        income before extraordinary items --

Page 191

1    extraordinary item and change in accounting
2    principles?
3    A.    Right.
4    Q.    There we see a figure of $6.5 million or a
5        little more than that.  Right?
6    A.    Correct.
7    Q.    So, in fact, does it meet with your
8        recollection that the fiscal year consolidated
9        performance of AHERF on an operating basis was
10       before an extraordinary item and change in
11       accounting principles, a positive number?
12   A.    Check.
13   Q.    Is that a yes?
14   A.    Yes.
15   Q.    Thank you.  And, therefore, that would have
16       been an improvement from the fiscal year before
17       1995.  Is that fair to say?
18   A.    Yes.
19   Q.    I'm going to ask you now to take a look at the
20       audit committee letter -- or, rather, the
21       management letter that accompanied --
22       I think there were a few of those
23       financial statements, and that is found at
24       Exhibit 168 that Mr. McDonough asked you to
25       look at, the board package of October 15, 1996,

Page 192

1    and you have that before you, sir?
2    A.    Yes.
3    Q.    I'm going to ask you to look at a couple
4        sentences in that management letter that you
5        received in connection with the fiscal year-end
6        '96 financial statements that you weren't asked
7        to look at earlier today.
8           MR. McCLENAHAN:  Will you tell us
9    what page?
10          MR. JONES:  I plan to.  It is
11   Page 201 or Page 17 up in the upper left-hand
12   corner under revenue and accounts receivable
13   overview.
14          Are you with me?
15          THE WITNESS:  Yes.
16          - - - -
17   (The witness reviewed the document.)
18          - - - -
19          MR. JONES:  Mr. McDonough asked you
20   if you had read certain portions of this
21   management letter, and I'd like to direct your
22   attention to a portion that you were not asked
23   to see or to review, and that is the
24   second-to-the-last paragraph.
25          Would you go ahead and read that to

Page 193

1    yourself.
2           THE WITNESS:  Yes.
3           - - - -
4    (The witness reviewed the document.)
5           - - - -
6    BY MR. JONES:
7    Q.    You see there that Coopers & Lybrand is
8        informing the board of trustees that, and I
9        quote, as a result of our procedures, we have
10       concluded that the controls over the
11       establishment and monitoring of accounts
12       receivable reserves are designed appropriately
13       and are operating effectively so as to properly
14       adjust accounts receivable balances to their
15       estimated net realizable value.
16          Do you see that language?
17   A.    Yes.
18   Q.    And that was language that you would have read
19       at the time?
20   A.    Yes.
21   Q.    And that is language in which you would have
22       taken some comfort at the time?
23   A.    Yes.
24   Q.    And, in fact, this language is different than
25       the language you were shown in the 1995

GRAEMER HILTON

Page 214

1  Q.  And $40 million numbers, regardless of where
2      they appeared on the financial statements,
3      would those be numbers significant enough for
4      you to want to pay attention to them?
5  A.  Correct.
6  Q.  You certainly wouldn't ignore them?
7  A.  That's right.
8  Q.  And a $40 million change in accounts
9      receivable, would that have been significant to
10     you, given its role in core earnings?
11 A.  Yes.
12 Q.  For a given year?
13 A.  Yes.
14 Q.  Did you ever meet anyone else from the
15     Coopers & Lybrand audit team other than
16     Mr. Buettner in connection with your work at
17     AHERF?
18 A.  Prior to Bill becoming the engagement partner,
19     when I first went on the board of Allegheny
20     General Hospital, there was another gentleman,
21     I don't recall his name, that was the
22     engagement partner; and then generally there
23     was at least one or two others that worked with
24     either one of those two gentlemen.
25 Q.  Do you recall the names of any of these

Page 215

1      individuals?
2  A.  No, I don't.
3  Q.  Did you ever meet Mr. Mark Kirstein or
4      Kirstein?
5  A.  It doesn't ring a bell.  Was he the engagement
6      partner before?
7  Q.  I do not frankly believe he was the engagement
8      partner before Mr. Buettner.  I do not know.
9  A.  I don't know.
10 Q.  Did you ever meet a woman named Amy Frazier
11     from Coopers & Lybrand?
12 A.  I don't remember the name, but there was a
13     young lady as a part of the team.
14 Q.  Do you recall her being involved in the early
15     '90s or the late '90s?
16 A.  I thought it was the latter.
17 Q.  You talked with Mr. McDonough a little bit
18     about some steps that AHERF apparently took in
19     the fall of calendar year 1997 and perhaps
20     later to reduce expenses, including some
21     layoffs.  Do you remember seeing the press
22     clippings?
23 A.  Yes, 1,200.
24 Q.  As you sit here today, do you have any reason
25     to doubt that AHERF would have taken similar

Page 216

1      expense reduction expenses earlier if the
2      financial operating results had revealed them
3      to be necessary?
4          MR. McDONOUGH:  Object to form.
5          THE WITNESS:  I couldn't answer that.
6  I don't know.
7          MR. JONES:  If the same financial
8  results obtained or -- same or similar -- would
9  you have expected similar reductions or efforts
10 in a prior year?
11         MR. McDONOUGH:  Same objection.
12 Asked and answered.
13         THE WITNESS:  There would certainly
14 be efforts, but beyond that, I
15 couldn't conjecture.
16         MR. JONES:  There would be efforts;
17 you just don't know all the detail?
18         MR. McDONOUGH:  No.  He said it would
19 be conjecture.  Don't answer his questions for
20 him.
21         MR. JONES:  I'm asking a new
22 question.
23         MR. McDONOUGH:  No.  You were
24 interrupting his answer.  Please proceed.
25         MR. JONES:  I will proceed.

Page 217

1          THE WITNESS:  I'm saying I wouldn't
2  conjecture.
3          MR. JONES:  I'm not asking you to
4  conjecture for me at all.  I'm asking you to do
5  what you did, and I believe I heard you right.
6  You believe there would be efforts in a prior
7  year.
8          MR. McDONOUGH:  Objection.
9          THE WITNESS:  Right.
10         MR. JONES:  And what you can't tell
11 me are the specifics of them.  Right?
12         THE WITNESS:  Yes.
13         MR. JONES:  Thank you.
14 BY MR. JONES:
15 Q.  Do you know who proposed the severance
16     arrangements or the separation arrangements for
17     Mr. Abdelhak that you apparently were recording
18     in your notes shown to you earlier today?
19 A.  I thought about that afterwards, and I'm not
20     sure.  As I recall now, it's by what I said
21     before.  I think that those numbers were the
22     ones that Abdelhak was trying to get, that he
23     had proposed and sent to -- sent to the law
24     firm, maybe.  I'm not sure.  And --
25         But, as I recall, he didn't get

55 (Pages 214 to 217)

GRAEMER HILTON

Page 218

1  anything.
2  Q.   In the end, you don't recall that he received
3       any compensation?
4  A.   Correct.
5  Q.   Mr. Hilton, did anyone from Coopers & Lybrand,
6       Mr. Buettner or anyone else, ever raise with
7       you any question about the competence of anyone
8       in financial management or executive management
9       at AHERF?
10 A.   No.
11 Q.   Did Mr. Buettner or anyone else at
12      Coopers & Lybrand ever raise with you their
13      belief that there was questionable integrity on
14      the part of anyone in financial management or
15      executive management at any AHERF enterprise?
16 A.   No.
17 Q.   If they had such feelings or suspicions, would
18      you expect them to raise that with you?
19 A.   Yes.
20 Q.   During your time on board service or committee
21      service at AHERF, did you ever have reason or
22      remember yourself questioning the accuracy of
23      the 1996 or 1997 audited financial statements?
24 A.   No.
25 Q.   Do you recall ever questioning the accuracy of

Page 219

1  any of the internal financial statements that
2  you received during your board or committee
3  service at AHERF?
4  A.   No.
5  Q.   Were you ever informed that those internal
6       statements were in any way wrong?
7  A.   No.
8  Q.   Who were -- strike that.
9       Who was the committee chair for the
10      audit committee in the years 1995, '96, and
11      '97?
12 A.   Dave Barnes.
13 Q.   And do you recall who the finance committee
14      chair was during that same time period?
15 A.   I think he was for a period of time.
16 Q.   And did you, as a part of your board service or
17      committee service, look to him for leadership?
18 A.   Yes.
19 Q.   Were there others on the audit committee or
20      finance committee that you looked to for
21      leadership in these matters?
22 A.   I believe Fran Nimick who had been a board
23      member for years before I was on the board, and
24      I believe had been chairman of the finance
25      committee at one time, both in a leadership

Page 220

1  kind of role.
2  Q.   Anyone else come to mind?
3  A.   Well, yeah.  Initially Bruce Thomas was on the
4       audit committee, and he was vice chairman of
5       U.S. Steel and chief financial officer there,
6       and he was an active participant.
7  Q.   During your time on the audit and finance
8       committees and then your other board service,
9       did you expect Coopers & Lybrand to bring to
10      your attention any material misstatements in
11      any of the financial statements they reviewed?
12 A.   Yes.
13           MR. JONES:  Let's go off the record
14      here briefly, and I think I'll conclude fairly
15      shortly.
16           THE VIDEOGRAPHER:  We're now going
17      off the record.  The time is 4:10 P.M.
18           - - - -
19      (There was a recess in the proceedings.)
20           - - - -
21           THE VIDEOGRAPHER:  We are now going
22      back on the record.  The time is 4:16 P.M.
23 BY MR. JONES:
24 Q.   Mr. Hilton, were you involved at all -- let me
25      try that one again.

Page 221

1           Mr. Hilton, do you recall learning at
2       some time after the bankruptcy petition was
3       filed that AHERF separated ways with
4       Coopers & Lybrand as its auditors?
5  A.   I didn't recall that, no.
6  Q.   As we sit here today, did you ever know that to
7       be the case?
8  A.   Yes.  I learned about it.
9  Q.   When did you first learn about it?
10 A.   Gee, I don't remember.
11 Q.   Was your board and committee service over
12      before that decision had been made?
13 A.   I don't know when the decision was made.
14 Q.   Let me suggest to you that there are minutes
15      that reflect the board -- that the
16      recommendation at least was made to the board
17      in the August-September '98 time frame.  Was
18      your board service over by then?
19 A.   Probably I was still on the board, yes, but I
20      don't recall --
21 Q.   Still on the AGH board and the audit and
22      finance committees?
23 A.   Yes.
24 Q.   Do you recall having any input into that
25      decision?

56 (Pages 218 to 221)

Page 230

1       I looked down at the file, and it had
2   a couple little initials there that it was
3   apparently, as I recall, something that
4   Abdelhak's lawyers worked up and presented to
5   be looked at.
6   Q.   Okay.
7   A.   But it didn't come to me when you first asked
8   me about it, because --
9       As I recall, he didn't get anything.
10      MR. McCLENAHAN:  Thank you.  That's
11  all I have.
12      THE VIDEOGRAPHER:  If there are no
13  further questions, this deposition is
14  concluded.  We are now going off the record.
15  The time is 4:27 P.M.
16              - - - -
17  (There was a discussion off the record.)
18              - - - -
19      MR. McCLENAHAN:  We need something
20  for the witness to read, because we're not
21  going to waive signature.
22              - - - -
23  (The proceedings were recessed at 4:27 p.m.)
24              - - - -
25

Page 232

1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T
2
        I, GRAEMER HILTON, have read the foregoing
3   pages of my deposition given on Wednesday, August 13,
    2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
    In all other respects, the transcript is true and
19  correct.
20
                    _____
                        GRAEMER HILTON
21
    Subscribed and sworn to before me this
22  _____ day of _____, 2003.
23
                    _____
                        Notary Public
24  AKF Reference No. Gd76784
25

Page 231

1   COMMONWEALTH OF PENNSYLVANI   )   CERTIFICATE
2   COUNTY OF ALLEGHENY           )   SS:
3       I, G. Donavich, RPR, CRR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   GRAEMER HILTON, was by me first duly sworn to testify
7   to the truth, the whole truth, and nothing but the
8   truth; that the foregoing deposition was taken at the
9   time and place stated herein; and that the said
10  deposition was recorded stenographically by me and
11  then reduced to printing under my direction, and
12  constitutes a true record of the testimony given by
13  said witness.
14      I further certify that I am not a relative or
15  employee of any of the parties, or a relative or
16  employee of either counsel, and that I am in no way
17  interested directly or indirectly in this action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  and affixed my seal of office this 14th day of
20  August, 2003.
21                  _____
22              Notary Public
23
24
25

Dwight Kasperbauer

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF PENNSYLVANIA
 2

 3

 4    THE OFFICIAL COMMITTEE OF    )
      UNSECURED CREDITORS OF       )
 5    ALLEGHENY HEALTH,            )
      EDUCATION & RESEARCH         )
 6    FOUNDATION,                  )
                                   )
 7          Plaintiff,             )
                                   )   Civil Action
 8          vs.                    )   Case No.  No. 00-684
                                   )
 9    PRICEWATERHOUSECOOPERS,      )
      LLP,                         )
10                                 )
            Defendant.             )
11

12

13

14    VIDEOTAPED DEPOSITION OF:  DWIGHT KASPERBAUER

15

      DATE:  March 5, 2004
16
      LOCATION:   Courtyard Marriott - Kansas City Airport
17               7901 North Tiffany Springs,
                 Kansas City, Missouri  64153
18
      TAKEN BY:  Plaintiff
19
      REPORTED BY:  Sandra S. Sondag, CSR
20
      VIDEOGRAPHER:  Dave Perdaris, Legal Video
21

22

23

24

25
```

Dwight Kasperbauer

---

**Page 14**

1   policies, programs, and practices assuring
2   consistency with organizational strategies and
3   imperatives. Managed employment, labor and
4   employee relations, compensation & benefits,
5   training and development, organizational
6   development, human resource information systems,
7   and regulatory compliance."
8       Is that a fair statement of the activities or
9   some of the activities you were responsible for?
10  A.  Yes, it is.
11  Q.  Okay. In July of 1999 you left AHERF. What
12      precipitated your departure from AHERF?
13  A.  Essentially, the bankruptcy Judge McCulla
14      (phonetic), Judge McCulla determined that neither
15      my services nor the services of Joe Dionisio, the
16      Chief Financial Officer, or Anthony Sanzo, the
17      Chief Executive Officer, were necessary.
18  Q.  Okay.
19  A.  And our employment wasn't continued with the
20      successor organization.
21  Q.  After you left AHERF, what was your next employment
22      position?
23  A.  For a period of time I did some consulting work
24      that doesn't appear on the resume, some small
25      consulting assignments. I subsequently joined a

---

**Page 15**

1       company called Mid Atlantic Medical Services in
2       Roanoake, Virginia as an account executive.
3       Essentially, a marketing role for managed care
4       plans, group insurance, group health insurance
5       programs.
6   Q.  After you left Mid Atlantic, what was your next
7       employment position?
8   A.  I became VP of Human Resources for the University
9       of Kansas Hospital in Kansas City, Kansas. That
10      was in June of 2000.
11  Q.  Okay.
12  A.  Or 2002. I'm sorry.
13  Q.  Okay. And just so I'm clear, you worked for Mid
14      Atlantic Medical Services, Incorporated from 2000
15      to 2002?
16  A.  Approximately two years, yes.
17  Q.  Okay. And you're currently employed by the
18      University of Kansas?
19  A.  University of Kansas Hospital.
20  Q.  Hospital, okay.
21      If I could ask you to take one final look at
22      your resume, and my question to you is: Is there
23      anything, as you sit here today, that you believe
24      is inaccurately stated on your resume?
25  A.  No. The only thing that I pointed out is a gap of

---

**Page 16**

1       time where I did consulting services, and it was of
2       insignificant nature to put on a resume.
3   Q.  Okay.
4   A.  But otherwise it's a chronology of my employment.
5   Q.  Okay. If you could walk me through your AHERF
6       employment. When you started at AGH in 1984, who
7       did you directly report to?
8   A.  Reported to a gentleman by the name of David
9       Campbell.
10  Q.  And what was --
11  A.  He was the president of the hospital.
12  Q.  Okay. Did you report to him continuously through
13      1989?
14  A.  No. I don't recall specifically when David
15      Campbell left, but at about that time I started
16      reporting to Sherif Abdelhak. Must have been in
17      '86, early '87 when that change occurred.
18  Q.  Other than Sherif Abdelhak, did you report to
19      anyone else, directly report to anyone else between
20      1986 and 1987 and the end of your tenure at AHERF?
21  A.  Well I reported to him until the time that he was
22      fired.
23  Q.  Okay. In mid 1998?
24  A.  In May of '98.
25  Q.  Okay.

---

**Page 17**

1   A.  June of '98.
2   Q.  Okay. During, between '86 and '98, did you report
3       directly to any other executive at AHERF?
4   A.  No, I only reported to Sherif.
5   Q.  Okay. How many people directly reported to you
6       between 1984 and 1989 would you say?
7   A.  At the peak of the size of the organization, there
8       were approximately a hundred and 50 people that
9       were in the Human Resources organization that
10      reported up to me.
11  Q.  Okay.
12  A.  Direct reports were somewhere between five and six.
13  Q.  Okay. Can you identify who your direct reports
14      were at the peak of AHERF's size?
15  A.  Sure. Maria Randall was responsible for corporate
16      compensation and benefits. It's terrible, I don't
17      remember the gentleman's name, but there was a
18      gentleman responsible for Human Resource
19      Information Systems. I'll think of it later. He
20      worked for me for a short period of time.
21  Q.  Okay.
22  A.  Keith Allen was the vice president of Human
23      Resources for Allegheny General Hospital. Frank
24      Ross, Rossy was the VP of Human Resources for
25      Forbes Health System. Bill Crider (phonetic) was

---

Dwight Kasperbauer

Page 18

1   the VP for Philadelphia Hospitals. And Angelia
2   Francheska was the VP for Academic Human Resources.
3   Q.  I've seen the name David Deasy. Was he one of your
4       direct reports?
5   A.  No, he was not. David was responsible for payroll,
6       and he reported through the finance part of the
7       organization.
8   Q.  Okay. So he never reported in any direct or
9       indirect way to you?
10  A.  No, not at all.
11  Q.  Okay. Other than the five individuals that you
12      just identified as your direct reports, can you
13      think of anyone else who was a direct report of
14      yours between --
15  A.  Kathy Simon was my administrative assistant.
16  Q.  Okay. Anyone else you can think of?
17  A.  No, not that I recall.
18  Q.  Okay.
19
20          (Document was marked Deposition
21          Exhibit Number 2460 for identification.)
22
23  Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
24      what has been marked as Exhibit 2460. I'll give
25      you a chance to take a look at this. My first

Page 19

1   question to you is going to be if you recognize
2   this document. I'll let you take a look at it
3   first.
4   A.  Yes, I recognize it.
5   Q.  Can you identify it for it for me?
6   A.  It is the minutes of the Compensation Committee of
7       AHERF for a meeting held on October 4th, 1993.
8   Q.  Okay. What was the Compensation Committee of
9       AHERF?
10  A.  It was a, I believe a subcommittee of the Board
11      made up of Board members. Their names are listed
12      on the document. David Barns, Doug Danforth,
13      Graemer Hilton, Francis Nimick and William B.
14      Snyder the third.
15  Q.  What was the function of the Compensation Committee
16      of the AHERF Board of Trustees?
17  A.  They oversaw the Executive Compensation Program and
18      they oversaw general compensation policy in the
19      organization.
20  Q.  What was the Executive Compensation Program?
21  A.  It was composed of a Base Salary Program, an Annual
22      Incentive Program, Long-Term Incentive Program, and
23      an Executive Benefit Program.
24  Q.  What employees or executives at AHERF were governed
25      or were members or participants in the Executive

Page 20

1   Compensation Program? I'm not asking for specific
2   names but...
3   A.  Oh, I'm sorry.
4   Q.  I'm thinking more of job titles or levels.
5   A.  Essentially, vice president and above. Also, at
6       the time we were involved with the academics part
7       of the university, the department chairs. Their
8       compensation was overseen by the committee as well.
9   Q.  What was the most number of participants in the
10      Executive Compensation Program at any given time?
11  A.  I would say probably a hundred plus.
12  Q.  What was your connection to the Compensation
13      Committee?
14  A.  I provided staff support to the committee.
15  Q.  And what was the purpose of providing a committee
16      with staff support? Why was that necessary?
17  A.  Assembling information and reports for them in
18      order to make decisions. Providing them with the
19      record of compensation, what people earned in terms
20      of base salary. Putting together for them for
21      consideration the award of incentive compensation.
22  Q.  Was there any other executive at AHERF that was
23      providing that kind of support to the Compensation
24      Committee during your tenure at AHERF, let's say
25      between '89 and '99?

Page 21

1   A.  Not that I'm aware of.
2   Q.  Okay. Why is it that -- well let me take a step
3       back.
4       This, the meeting that's referenced here in
5       Exhibit 2460, it lists you as a guest of the
6       meeting. Do you remember attending this or any
7       other Compensation Committee meeting?
8   A.  I attended some of them, yes.
9   Q.  What was the purpose of you attending Compensation
10      Committee meetings?
11  A.  To share information or to answer questions for the
12      CompensationCommittee. In some situations making
13      presentations to them regarding various programs.
14  Q.  Between 1989 and 1999, were you the most
15      knowledgeable executive at AHERF about Executive
16      Compensation Programs?
17          MS. DeMASI: Objection to form.
18  A.  I'm sorry, between?
19  Q.  (BY MR. TAMBURRI) I'm sorry. Between 1989 and
20      1999, were you the most knowledgeable executive at
21      AHERF about Executive Compensation Programs?
22  A.  I would guess so, yes.
23  Q.  Why do you say that?
24  A.  Because I don't know of anybody else who would have
25      been more connected with the Compensation Program

6 (Pages 18 to 21)

Dwight Kasperbauer

Page 22

1    other than possibly Sherif or David.
2    Q.   When you say Sherif and David, you're referring to
3    Sherif Abdelhak --
4    A.   Sherif Abdelhak, David McConnell.  And Nancy
5    Wynstra as well.  She was frequently an invited
6    guest to the Compensation Committee meetings.
7    Q.   If you turn to -- I'm sorry, let me ask you first,
8    do you know who prepared the minutes, these minutes
9    that have been marked as Exhibit 2460?
10   A.   Nancy Wynstra had the responsibility for
11   maintaining the minutes.
12   Q.   Were the minutes of the Compensation Committee
13   meetings prepared in the ordinary course of AHERF's
14   business, and is this an ordinary practice to
15   record the minutes at Compensation Committee
16   meetings?
17   A.   Yeah, that was, to my understanding, a consistent
18   practice with all Board meetings, that we worked
19   from an agenda and then the meeting was
20   subsequently documented with minutes.
21   Q.   Were the minutes of the Compensation Committee
22   meetings maintained in a file as a regular practice
23   at AHERF?
24   A.   I assume the Legal Department did, yes.
25   Q.   Okay.  Did you maintain copies of these minutes?

Page 23

1    A.   Yes, I did, in the department, HR Department.
2    Q.   HR Department, Okay.
3        If you could turn to what's referenced as Page
4    3 of the minutes in the upper left-hand corner.
5    A.   (Witness complies).
6    Q.   At the bottom it's Bates labeled JD-HL 20815.  If
7    you'd look at Paragraph 3 at the bottom of the
8    page, there is a section there entitled "Executive
9    Salary Controls"?
10   A.   Uh-huh.
11   Q.   And I'll give you a chance to read that, but I'm
12   going to ask you a question about the first
13   sentence, which reads, "Mr. Kasperbauer presented
14   to the Committee a management proposal, recommended
15   to assure appropriate counting controls and
16   segregation of duties, that only Dwight
17   Kasperbauer, the Executive Vice President and Chief
18   Human Resources Officer, may direct the AHERF
19   Payroll Manager to make adjustments in
20   compensation."
21       Do you remember presenting to the Compensation
22   Committee this proposal?
23   A.   Generally, yes.
24   Q.   Okay.  What was the purpose of this proposal?
25   A.   As an accounting practice, to maintain separation

Page 24

1    of control from those who essentially cut the
2    paychecks and those who could direct people to cut
3    paycheck.  There was an intermediate step.
4    Q.   Okay.  Who was the AHERF payroll manager?
5    A.   Dave Deasy.
6    Q.   Was this proposal, in fact, approved by the
7    Compensation Committee?
8    A.   Yes, it was.
9    Q.   So after this was approved in 1993, were you the
10   only executive that could direct Mr. Deasy or
11   anyone else holding that position of payroll
12   manager to make adjustments in compensation?
13   A.   I thought I was, until subsequent to the
14   bankruptcy, and I learned this was not the case in
15   all situations.
16   Q.   What do you mean by that?
17   A.   I came to find out after Sherif left that a bonus
18   was paid to Sherif in the fall of 1998 that I
19   wasn't aware of.
20   Q.   How did you find that out?
21   A.   I think in the course of putting together
22   information for the, I think the Executive
23   Committee of AHERF after Sherif separated.  I don't
24   recall specifically when that happened, but I think
25   there was a request for, give us a report on his

Page 25

1    compensation, and it came to light at that point.
2    Q.   Do you know why the bonus was paid, why he received
3    the bonus?
4    A.   Not exactly, no.
5    Q.   Okay.  The proposal that's referenced here that
6    only you would have the authority to direct the
7    payroll manager to make adjustments in
8    compensation, what was your understanding as to
9    what compensation this was referring to?
10   A.   It was my understanding that it would apply to base
11   salary and incentive compensation.
12   Q.   Okay.  Would it refer to, or did it refer to the
13   four elements of the Executive Compensation Program
14   that you referenced earlier; that is, base salary,
15   Annual Incentive Program, Long-Term Incentive
16   Program and executive benefits?
17   A.   All but executive benefits.
18   Q.   Okay.
19   A.   Those would have been, generally, non cash --
20   Q.   Okay.
21   A.   -- kinds of benefits.
22   Q.   Okay.  I want to ask you some questions about the
23   different elements of the Executive Compensation
24   Program.  I'll ask you first about base salary.
25   But let me take one step back.

7 (Pages 22 to 25)

Dwight Kasperbauer

Page 70

1    what's been marked as Exhibit 2469.  Do you
2    recognize this document?
3  A.  Yes, I do.
4  Q.  Can you identify it for me?
5  A.  It's a document to an insurance person verifying
6    Mr. Abdelhak's income level.
7  Q.  Why were you verifying his income level for an
8    insurance company?
9  A.  I believe he was attempting to acquire additional
10   life insurance, and the insurance company wanted to
11   see if there was an appropriate basis.  Either that
12   or possibly a disability policy.  They wanted to
13   verify a level of income.  I think it was
14   disability.  They're going to verify his income and
15   then pay replacement for the policy based upon
16   that.
17 Q.  Did you prepare this letter in the ordinary course
18   of your practice as --
19 A.  Yes.
20 Q.  -- the HR vice president?
21 A.  Yes, I did.
22 Q.  And you maintained a copy of this in your file as
23   was your practice?
24 A.  Yes, I did.
25 Q.  The information you provided to the insurance

Page 71

1    company regarding Mr. Abdelhak's income was
2    accurate?  You don't have any reason to believe it
3    was inaccurate?
4  A.  No.  What I don't recall is whether it was -- it
5    must have been with all bonuses.  Yeah, it was
6    accurate.
7  Q.  So what this lists is Mr. Abdelhak's income for
8    1993, '94 and '95?
9  A.  Correct.
10 Q.  What was his income for 1993?
11 A.  $1,103,278.52.
12 Q.  If you look at Exhibit 2467.  I'm sorry, I'll get
13   to that in a second.
14   What was his income for 1994?
15 A.  $1,228,476.69.
16 Q.  Now if you could look at Exhibit 2467.
17 A.  (Witness complies).  Uh-huh.
18 Q.  2467 indicates that Mr. Abdelhak's base salary for
19   '94 was $563,000; right?  Do you see that?
20     MS. DeMASI:  Objection to form.
21 A.  Yeah, I do.
22 Q.  (BY MR. TAMBURRI)  Okay.  When you look at 2469, is
23   it fair to say that Mr. Abdelhak received more than
24   his base salary in benefits in 1994?
25     MS. DeMASI:  Objection to form.

Page 72

1  A.  I'm sorry, can you restate your question?
2  Q.  (BY MR. TAMBURRI)  I'm sorry, yeah.
3      1994 it lists -- you indicated that his income,
4    I'm sorry, was over 1.2 million?
5  A.  Right.
6  Q.  And his base salary for that same year was
7    $563,000?
8  A.  Uh-huh.
9  Q.  Is it fair to say that he received more -- he
10   received benefits in excess of his base salary for
11   1994?
12 A.  Correct, yes.
13 Q.  Okay.  What was Mr. Abdelhak's income for 1995?
14 A.  $1,532,492.05.
15
16     (Documents were marked Deposition
17     Exhibits Numbers 2470 and 2471 for
18     identification.)
19
20 Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
21   two exhibits.  One, first, has been marked
22   Exhibit 2470, and the second has been marked 2471.
23   I'll give you a chance to look at these.
24     MS. DeMASI:  Can you just confirm for us
25   which is which?

Page 73

1      MR. TAMBURRI:  Oh, I'm sorry, yeah.  2470
2    is titled "Sherif Abdelhak - Computation of Income
3    Taxes.
4      MS. DeMASI:  Got it, thanks.
5  A.  Okay.
6  Q.  (BY MR. TAMBURRI)  Let me ask you about 2470 first.
7    Do you recognize this document?
8  A.  Vaguely, yes.
9  Q.  What is this document?
10 A.  It appears to be a schedule prepared to, I guess,
11   look at estate taxes and death benefits.  Looks
12   like schedules for some form of estate planning.
13 Q.  For Mr. Abdelhak?
14 A.  For Mr. Abdelhak, yes.
15 Q.  Did you receive this document in the ordinary
16   course of your business at AHERF?
17 A.  Yes, I would have.
18 Q.  Did you keep this in your file?
19 A.  Yes.
20 Q.  Okay.  Do you know who prepared Exhibit 2470?
21 A.  I believe it was prepared by financial planners.
22   The name appears at the top of the sheet, a fax
23   reference to Lurie Besikof Lapidus.
24     MS. DeMASI:  Mark, can I ask a question?
25     MR. TAMBURRI:  Yes.

19 (Pages 70 to 73)

Dwight Kasperbauer

Page 74

1    MS. DeMASI:  Is this a complete document,
2  because it starts on Page 3 at the bottom, and the
3  fax is already at Page 6.
4    MR. TAMBURRI:  This is all I have.
5  Q. (BY MR. TAMBURRI)  Mr. Kasperbauer, I'm not going
6  to represent to you that this is the whole
7  document.  This is, I think, what I had available,
8  but let me just ask you with that preface, let me
9  just ask you, generically.  In December of '96, was
10  estate planning done for Mr. Abdelhak?
11    MS. DeMASI:  Objection to form.  You can
12  answer.
13  A. Yes, I believe there was some estate planning done
14  at that time, yes.
15  Q. (BY MR. TAMBURRI)  Who paid for the estate planning
16  that was done for Mr. Abdelhak?
17  A. I believe the organization paid for that.
18  Q. When you say that, you mean AHERF?
19  A. AHERF, uh-huh.
20  Q. How much did the estate planning cost?
21  A. I don't recall.
22  Q. Who directed -- were you involved in any way in
23  facilitating the estate planning for Mr. Abdelhak?
24  A. Yes, I was.
25  Q. What was your connection to that?

Page 75

1  A. I asked for some advice from MCG, if they knew of
2  someone who could assist the senior executive in
3  putting together a financial plan.
4  Q. Who directed you, if anyone, to be involved with
5  this estate planning?
6  A. Mr. Abdelhak requested it.
7  Q. Okay.  Did he instruct you to charge the
8  organization for the planning?
9  A. No, he did not.
10  Q. Okay.  How did you know that the organization
11  should be charged for it?
12  A. I didn't know that, but I believe that's what
13  happened.
14  Q. Okay.  Were any other executives at AHERF provided
15  with estate planning other than Mr. Abdelhak?
16  A. Not at that time.
17  Q. How about at any other time?
18  A. There was some consideration of it in late '96 and
19  '97, and I don't believe we brought that to
20  closure.  We had some additional discussions with
21  another estate planning representative.
22  Q. Okay.  Were there any other financial services like
23  this that were provided to Mr. Abdelhak in any way,
24  financial planning?
25    MR. HENNING:  Objection to form.

Page 76

1    MS. DeMASI:  Can I have the question read
2  back?  I wasn't sure you were done.
3
4    (The material requested was read
5    back by the Reporter.)
6
7    MS. DeMASI:  Objection to form.
8  A. I think he may have had his income tax preparation
9  reimbursed in '96.
10  Q. (BY MR. TAMBURRI)  Okay.
11  A. Yeah, I believe we did that for a group of
12  executives at that time.
13  Q. Okay.  And that was billed to AHERF?
14  A. I believe it was, yes.
15  Q. Okay.  Who else received that service?
16  A. It would have been David McConnell, myself, I
17  believe Doctor Kaye, the senior executive people.
18  Q. Okay.  If you look at 2471, Exhibit 2471.
19  A. Uh-huh.
20  Q. What is this document?
21  A. It appears to be a memorandum from a lady by the
22  name of Diane Malone, who I believe was with MCG to
23  Kirk Sherman, myself and Jeff Starbird.
24  Q. Who were -- who was Kirk Sherman?
25  A. Kirk Sherman was an attorney that provided advice

Page 77

1  regarding the Executive Benefit Program, and, yeah,
2  I think that's what it --
3  Q. He was an AHERF attorney?
4  A. No, he was not.  He was counsel located in
5  Minneapolis.
6  Q. Okay.  And Mr. Starbird, who was he?
7  A. I believe he was the CPA with Lurie Besikof and
8  Lapidus.
9
10    (Document was marked Deposition
11    Exhibit Number 2472 for identification.)
12
13  Q. (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
14  what's been marked as Exhibit 2472.  I'll ask you
15  to turn to the second page, which is Bates labeled
16  DBR-Dk 10244.  Can you identify that page of the
17  exhibit for me?
18  A. Yes.  It's a letter from David McConnell to Sherif
19  Abdelhak, and it's a summary of his 1997 income for
20  income tax reporting purposes.
21  Q. And you received a copy of this document?
22  A. Yes, I did.
23  Q. You kept it in your file as it was your practice?
24  A. Yes, I did.
25  Q. What was Mr. Abdelhak's total income for 1997?

20 (Pages 74 to 77)

Dwight Kasperbauer

Page 78

1  A.  Total income or total taxable income?
2  A.  Total income.
3  A.  $1,837,828.03.
4  Q.  What was his base salary for 1997?
5  A.  $904,500.
6  Q.  Beneath his base pay is a line item, "Merger
7     Bonus"?
8  A.  Yes.
9  Q.  What was the merger bonus that he received?  How
10    much was it?
11 A.  $150,000.
12 Q.  What was that bonus for?
13 A.  I don't know.  Can't identify from here.
14 Q.  Then there is a line item right below it -- right
15    above "Total Income", it says, "Imputed Income
16    (House)"?
17 A.  Yes.
18 Q.  What is that a reference for?
19 A.  It's my recollection that the house that
20    Mr. Abdelhak lived in Sewickley was owned by
21    AHERF, and I'm not sure of the details of the
22    financial transaction, but he had imputed income
23    associated with the benefit of living in that
24    house.
25 Q.  And that imputed income for 1997 was in excess of

Page 79

1     $200,000?
2  A.  Yes.
3  Q.  Mr. Abdelhak received in excess of $900,000 in
4     bonuses in 1997; is that correct?  Or I'm sorry, I
5     need to rephrase.
6        He received in excess of $900,000 in benefits
7     in 1997?
8        MS. DeMASI:  Objection to form.
9  A.  Yes.  I clarify that, benefits and incentive
10    compensation.
11 Q.  (BY MR. TAMBURRI)  Okay.  He received in excess of
12    $900,000 -- strike that.
13       He received more benefits -- his benefits --
14    the value of his benefits exceeded the value of his
15    base pay in 1997?
16       MS. DeMASI:  Objection, form.
17 A.  His benefits and bonuses exceeded his base pay.
18 Q.  (BY MR. TAMBURRI)  Okay.  Okay.  Sorry about that.
19
20       (Document was marked Deposition
21        Exhibit Number 2473 for identification.)
22
23 Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
24    what's been marked as Exhibit 2473.  Can you
25    identify this document for me?

Page 80

1  A.  It's a memorandum from Sherif Abdelhak to me
2     indicating that I'm eligible or will become
3     eligible for the Executive Loan Program at a
4     $2 million level.
5  Q.  That he, Mr. Abdelhak, was eligible?
6  A.  I'm sorry, Mr. Abdelhak was eligible.
7  Q.  Okay.
8  A.  Sorry.
9  Q.  Okay.  And this memo is dated March 12th, '98?
10 A.  Right.
11 Q.  Do you remember receiving it around that time?
12 A.  Yes, I do.
13 Q.  Do you maintain this in your file after you receive
14    it?
15 A.  I would have, yes.
16 Q.  And you received it because you were the HR Vice
17    President?
18 A.  Correct.
19 Q.  Okay.  What was the Executive Loan Program?
20 A.  I don't recall the details of it, but it was,
21    essentially, a benefit program that the Board
22    authorized certain key executives to obtain a bank
23    loan, I think, in the equivalent of one time their
24    total compensation, and that -- and that's about
25    all I recall about that.

Page 81

1  Q.  Okay.  And Mr. Abdelhak was eligible to
2     participate -- or he was eligible to receive a
3     $2 million loan in March of '98?
4  A.  Yes.
5  Q.  What was the -- first of all, who was eligible to
6     receive an executive loan, and specifically, which
7     individuals were eligible?
8  A.  Initially it was Mr. Abdelhak, David McConnell,
9     Nancy Wynstra.  And then eligibility was later
10    expanded to include myself and Doctor Kaye and
11    Anthony Sanzo.
12 Q.  What was the benefit of this program?  Why was it
13    considered a benefit that was limited to those
14    individuals?
15       MS. DeMASI:  Objection to form.
16 A.  I guess it was access to funds to invest as the
17    executive chose to invest it.  Property or real
18    estate or whatever.
19 Q.  (BY MR. TAMBURRI)  Who paid the interest on these
20    executive loans?
21 A.  I'm not quite sure how the original arrangement was
22    established.  The subsequent arrangement, when I
23    was offered the program and we did the program, it
24    was to be deducted from the executive Exec-U-Flex
25    allowance.

21 (Pages 78 to 81)

Dwight Kasperbauer

Page 82

1  Q.  Okay.  Did all of the six individuals that you
2      identified participate in the Executive Loan
3      Program?
4  A.  I don't believe Doctor Kaye did, but I think the
5      others, all the others did.
6  Q.  So they received loans?
7  A.  Right.
8  Q.  Okay.
9
10         (Document was marked Deposition
11          Exhibit Number 2474 for identification.)
12
13  Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
14      what's been marked as Exhibit 2474.  Do you
15      recognize this document?
16  A.  Yes, I do.
17  Q.  What is this document?
18  A.  It's a summary of a benefit program called the
19      KEYSOP or Key Executive Stock Option Plan.  And
20      this would be for Sherif Abdelhak's summary of
21      compensation.
22  Q.  Did you prepare this document?
23  A.  Yes, I believe I did.
24  Q.  And you prepared it because you were the HR Vice
25      President?

Page 83

1  A.  That's correct.
2  Q.  And you would have kept this in your file?
3  A.  Yes.
4  Q.  Part your practice?  Mr. Abdelhak's base salary as
5      of June 5th, 1998 was how much?
6  A.  $1,020,460.
7  Q.  What is the reference -- there's a reference to
8      "KEYSOP Plan Future Benefit Accrual Rate."  What
9      does that mean, or what is that referring to?
10  A.  I'm not sure I recall precisely.
11  Q.  Okay.
12  A.  And I hate to speculate, you know, as far as
13      recollection.
14  Q.  That's fine.
15  A.  Actually, I think I do recall.
16  Q.  Okay.
17  A.  This was the compensation summary prepared, I
18      believe, in connection with Mr. Abdelhak's
19      separation.
20  Q.  Okay.
21  A.  And his employment contract provided that if he was
22      separated from the organization, pay and benefits
23      would continue for a period of time.
24  Q.  Okay.
25  A.  And so this was a projection of what he might have

Page 84

1      accrued under that plan to the termination of,
2      with the payout period under the contract.
3  Q.  Okay.  So as of June 5th, 1998, Mr. Abdelhak was
4      entitled to accrue future KEYSOP benefits at the
5      rate of $702,000 per year?
6  A.  Right.
7         MR. TAMBURRI:  We're missing a copy of
8      this or -- I'll make a copy over the break, but we
9      need to...
10
11         (Document was marked Deposition
12          Exhibit Number 2475 for identification.)
13
14  Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
15      what's been marked as Exhibit 2475.  I'll let you
16      look at that, but I'm going to refer you to the
17      page that's been Bates labeled AMS6 165.
18         Actually, let me refer you to the last page of
19      the Exhibit first, and that's Page 169.  Could you
20      identify this document?
21  A.  It appears to be a letter from David Deasy,
22      payroll -- corporate payroll manager to David
23      McConnell, summarizing his 1993 income for income
24      tax reporting purposes.
25  Q.  Would you have received a copy of this at the time

Page 85

1      it was generated?
2  A.  Possibly.
3  Q.  Why do you say that?
4  A.  I don't think I started receiving the summaries of
5      these letters until later on, maybe '95, '96.
6  Q.  Okay.  This document lists Mr. McConnell's total
7      income for 1993 as $682,726.81.  Is that consistent
8      with your recollection about his income for 1993?
9  A.  I would say in general terms, yes.
10  Q.  If you turn to the preceding page.  Can you
11      identify this document for me?
12  A.  A letter from Dave Deasy, payroll manager, payroll
13      director to David McConnell summarizing his 1994
14      W-2 income.
15  Q.  Do you think you would have received a copy of this
16      letter?
17  A.  Again, possibly.
18  Q.  Okay.  This letter lists Mr. McConnell's total
19      income for 1994 at $821,571.84.  Is that consistent
20      with your recollection about his total income for
21      1994?
22  A.  I would say generally speaking, yes.
23  Q.  If you could turn to the preceding -- or the next
24      page, which is 167.
25  A.  Yes.

22 (Pages 82 to 85)

Dwight Kasperbauer

Page 86

1 Q.  Do you think you would have received a copy of this
2     document?
3 A.  Again, I think it's entirely possible.  I can't say
4     with specific recollection.
5 Q.  Fair enough.  This lists Mr. McConnell's income,
6     total income for 1995 as approximately $829,000.
7     Is that consistent with your recollection of his
8     total income for 1995?
9 A.  Yes.
10 Q.  And you would have known Mr. McConnell's total
11     income during these years in your capacity as HR
12     Vice President?
13 A.  Yeah, in one fashion or another through the reports
14     of the compensation and so forth.
15 Q.  The last page that I want to ask you about in this
16     exhibit is Bates labeled AMS 166.
17 A.  Yes.
18 Q.  Do you see that?
19 A.  Yes, I do.
20 Q.  Can you identify this page?
21 A.  Again, it's also a letter from David Deasy, senior
22     director, corporate payroll to David McConnell
23     summarizing his 1996 W-2 income.
24 Q.  And what was his total income for 1996?
25 A.  $1,326,866.09

Page 87

1 Q.  You see -- what was Mr. McConnell's base pay for
2     1996?
3 A.  $487,534.
4 Q.  It appears he also received a Graduate merger
5     bonus; how much did he receive?
6 A.  $112,500.
7 Q.  He also received a Forbes merger bonus; is that
8     correct?
9 A.  That's correct.
10 Q.  How much was that?
11 A.  $75,000.
12 Q.  The next line says "Miscellaneous Bonuses."  How
13     much -- how many miscellaneous bonuses did he
14     receive?  Or how much in dollars did he receive?
15 A.  $252,023.09.
16 Q.  What were those miscellaneous bonuses provided to
17     Mr. McConnell for?
18 A.  I don't know.
19 Q.  Okay.  Are you aware of any other miscellaneous
20     bonuses that were provided to AHERF executives
21     during your tenure?
22 A.  Only the one I mentioned earlier that Abdelhak
23     received in the fall of '97.
24 Q.  Okay.
25 A.  I mean of this magnitude.  There may be small spot

Page 88

1     bonuses of other rank and file people.  Not of this
2     magnitude.
3 Q.  Is it fair to say that Mr. McConnell in 1996
4     received around $800,000 in benefits and bonuses?
5 A.  Yes.
6        MR. TAMBURRI:  Take a break if you want.
7     It's up to you.  Let me know if you want to take a
8     break.
9        THE WITNESS:  No, it's fine.  I just as
10     soon get through this.
11        MR. TAMBURRI:  Okay.
12 Q.  (BY MR. TAMBURRI)  Can you tell me about the
13     incentive, the Management Incentive Program that
14     was in place at AHERF; what was it?
15 A.  Generally speaking, at the senior level it had two
16     components.  It had a Short-term Incentive Plan
17     component which was based upon year-by-year
18     performance against goals and objectives, and then
19     a long-term component that was basically earned in
20     one year and then deferred for five years for
21     distribution.  And the percentage target that you
22     were eligible for in both of short and long-term
23     programs was a function of your level in the
24     organization, and it varied from, I think in Sherif
25     Abdelhak's case, a target of -- an annual target of

Page 89

1     like 33 or 35 percent to 25 to 20.  I don't recall
2     the precise details, it's been awhile.
3 Q.  When you refer to percentage, you're referring to
4     percentage of base salary?
5 A.  Base salary, correct.
6 Q.  So, the short-term incentive bonus to the extent
7     was provided to an executive was calculated as a
8     percentage of that executive's base salary?
9 A.  Right.  For example, in Abdelhak's case, if his
10     salary was a million dollars, base salary was a
11     million dollars, then his annual bonus target would
12     be either 33 or 35 percent.  The long-term
13     component, I believe, was capped at 20 percent of
14     base salary.
15 Q.  Okay.  Were the short-term bonuses always
16     calculated as a percentage of an executive's salary
17     during your tenure at AHERF?
18 A.  I believe so.  That was the intent.
19 Q.  Okay.  And as to the long-term bonuses, were they
20     also always calculated as a percentage of base
21     salary during your tenure at AHERF?
22 A.  Yes, that's my recollection.
23 Q.  Okay.  When did the incentive program that included
24     the short-term and long-term bonuses go into
25     effect?

23 (Pages 86 to 89)

Dwight Kasperbauer

1    A.   Approximately 1989, 1990.
2    Q.   Who was eligible to receive either a short-term or
3         long-term bonus under this program?
4    A.   The short-term bonus program went down to the vice
5         president level in the organization. The Long-term
6         Plan was for a smaller group of people, the top six
7         or top eight people in the organization.
8    Q.   Who were those people?
9    A.   Would have been Sherif Abdelhak. David McConnell,
10        Nancy Wynstra, Anthony Sanzo, myself, Doctor Ross.
11        There may have been others but I don't recall.
12   Q.   Doctor Kaye?
13   A.   Doctor Kaye, yeah.
14   Q.   How many people would have been eligible to receive
15        a short-term bonus if everyone at the VP level or
16        comparable level was included?
17   A.   In 1995, '6, '7, and probably, well, the academic
18        chairmen were included at that time, so it could
19        have been in the neighborhood of a hundred plus
20        people.
21   Q.   What was the purpose of the Incentive Program?
22   A.   It was to incend or motivate and reward for
23        attainment of goals and objectives.
24
25            (Document was marked Deposition

1            Exhibit Number 2476 for identification.)
2
3    Q.   (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
4         what's been marked as Exhibit 2476. Again, I'll
5         give you a chance to look at this. My question is
6         going to be if you recognize this document?
7    A.   Yes, I recognize this document.
8    Q.   Okay. What is this document?
9    A.   It is the -- it's the minutes of the AHERF
10        Compensation Committee held on March 7th, 1995.
11   Q.   Okay. And were these minutes prepared in the
12        ordinary course of AHERF's business in its regular
13        practice?
14   A.   Yes. Nancy Wynstra would have prepared the minutes
15        to the meeting.
16   Q.   And would you have reviewed these minutes as part
17        of your responsibilities as HR Vice President?
18   A.   Yes, I would usually do that.
19   Q.   And would you have kept a copy of these in your
20        file?
21   A.   Yes, probably.
22   Q.   Okay. If you turn to the page, it's Page 3 of the
23        minutes, the top is a Paragraph C. It says,
24        "Mr. Abdelhak's --" let me take us one step back.
25        You attended this meeting; right.

1    A.   Yes, I did.
2    Q.   Okay. Do you remember attending it?
3    A.   Not specifically.
4    Q.   Okay.
5    A.   No.
6    Q.   Page 3, it begins, "Mr. Abdelhak presented an
7         overview of the proposed revisions to the Annual
8         and Long-term Incentive Plans.
9             First of all, that is a reference to the
10        incentive plans you and I have just been
11        discussing; is that correct?
12   A.   Yes, correct.
13   Q.   The Annual Plan governed short-term bonuses; is
14        that right?
15   A.   Yes.
16   Q.   And the Long-term Incentive Plan obviously governed
17        long-term bonuses?
18   A.   Correct.
19   Q.   The sentence continues with text, "Noting that
20        these proposed revisions have been developed as a
21        result of concerns expressed by the Committee that
22        the prior plans did not reflect an appropriate
23        balance last between the various mission elements
24        of the organization and the need for the
25        organization to retain financial strength."

1             Do you remember that these incentive plans were
2         revised around March of 1995?
3    A.   I don't recall.
4    Q.   Let me -- I'm not trying to play hide the ball
5         here. Let me refer you to the page that's labeled
6         2914 in the bottom right-hand corner.
7    A.   Okay.
8    Q.   Okay. What is this document that begins on that
9         page?
10   A.   It's a plan summary for the Management Annual
11        Incentive Plan for AHERF for Administrative Guide.
12   Q.   So this is a plan governing the short-term bonuses?
13   A.   That's correct.
14   Q.   If you look at the last page of this summary, which
15        is Page 7, and is also Bates labeled 2920, under
16        Paragraph 20, "Effective Date", it says, "The Plan
17        is effective as of July 1, 1994 and shall remain in
18        effect until terminated by the Compensation
19        Committee."
20            Does this refresh your memory that this plan --
21        or this is the summary of the plan that was in
22        effect as of July 1, '94?
23   A.   That's correct, yes.
24   Q.   Are you aware of any provisions that governed the
25        plan other than these pages that we've just

Dwight Kasperbauer

Page 94

1  referred to here, 2914 through 2920?
2  A.  Not that I'm aware of, no.
3  Q.  So this is, more or less, the Plan?
4  A.  Yes.
5  Q.  Okay.  If you turn to Page 2 of the Plan.  It's on
6  2915.
7  A.  (Witness complies).
8  Q.  At the top it says, "Must Goals"?
9  A.  Uh-huh, I see that.
10  Q.  What's your understanding as to what the "Must
11  Goals" were of the plan?
12          MS. DeMASI:  Objection to form.
13  A.  I don't think I recall what they were.
14  Q.  (BY MR. TAMBURRI)  Who prepared this Plan?  Who
15  would have prepared it?
16  A.  I don't recognize the formatting as something that
17  would have come out of my office, so this might
18  have been prepared by MCG.
19  Q.  If you look at Page 4 of the Plan, there's a table
20  in the middle of the page.  Do you see this?
21  A.  Uh-huh.
22  Q.  What's your understanding as to what that table
23  depicts?
24  A.  That would help determine the individual's bonus
25  award based upon the individual's performance and

Page 95

1  the organizational performance.
2  Q.  So the calculation of an executive's bonus was
3  dependent on the success or lack thereof of his or
4  her business unit; right?
5  A.  Right.
6  Q.  But --
7  A.  If it's business unit achieved expectations and the
8  individual achieved expectations, the target -- the
9  bonus would be 20 percent.  It could be, I guess,
10  as low as 15 and as high as 25, according to this.
11  Q.  Okay.  Is it fair to say, looking at this table,
12  that if an executive was eligible for a bonus
13  ranging between 5 percent and 35 percent of his or
14  her salary, depending on how he or she performed
15  and how his or her business unit performed?
16  A.  Yeah.  And I would probably go on to say that
17  judgement could be applied, but it could go from
18  zero to 40 percent.
19  Q.  Okay.  And this just refers to the short-term
20  bonuses?
21  A.  That's correct.
22  Q.  Did you understand that some of the criteria for
23  determining whether any executive was eligible for
24  a short-term bonus was the financial performance of
25  AHERF?

Page 96

1          MS. DeMASI:  Objection.
2  A.  There were financial measures in the plans, yes.
3  Q.  (BY MR. TAMBURRI)  Okay.
4
5          (Document was marked Deposition
6          Exhibit Number 2477 for identification.)
7
8  Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
9  what's been marked as Exhibit 2477.  Do you
10  recognize this document?
11  A.  Yes, I do.  It appears to be a report that would
12  have been put together in preparation for
13  determining incentive compensation.  Doesn't say
14  that but I think that was the purpose of it.
15  Q.  Okay.  Do you know who prepared this document?
16  A.  Not for sure, no.
17  Q.  Would you have received a copy of this document at
18  or around the time that it was prepared?
19  A.  Most likely, yes.
20  Q.  Would you have kept this in your files in the HR
21  Department?
22  A.  Yes.
23  Q.  Why would you have done that?
24  A.  Well, this is, I guess, a part of the incentive
25  compensation, so I keep that as a file for

Page 97

1  documentation purposes.
2  Q.  If you turn to the second page.
3  A.  Uh-huh.
4  Q.  And if you look at the footer, it says, "AA:kw"?
5  A.  Uh-huh.
6  Q.  Does that lead you to think that Al Adamczak
7  prepared this?
8  A.  I would conclude that, yes.
9  Q.  This document lists six performance measures.  Do
10  you see them listed there?
11  A.  Yes, I do.
12  Q.  Is it your understanding that these are the six
13  performance measures that AHERF had to satisfy for
14  any executive to be eligible for either a
15  short-term or a long-term bonus under this
16  Incentive Plan?
17  A.  I think so, without going back and seeing what
18  might have been set in the minutes at the beginning
19  of the fiscal year.
20  Q.  Okay.
21  A.  But I -- I would conclude that, yes.
22  Q.  Okay.  If we can look at these, could you tell me
23  what these performance measures, first of all, what
24  they were and what they were designed to measure?
25          MS. DeMASI:  I'm sorry, do you want him

25 (Pages 94 to 97)

www.rennillo.com
Cleveland (216) 523-1313          Akron (330) 374-1313