Page 98

1   to go one by one or --
2       MR. TAMBURRI: Yeah.
3   Q. (BY MR. TAMBURRI) Do you mind going one by one?
4   A. No not at all. The first measure appears to be a
5       measure of the cost per adjusted discharge, a
6       measure of how much it costs for us to deliver
7       care. And it indicates that our decrease was 3 and
8       a half percent, while the medical component cost
9       index increased 4.7 percent. So our costs went --
10      our costs went down at a time when the Consumer
11      Price Index was going up.
12  Q. Can I ask you about this first -- I don't mean to
13      interrupt.
14  A. No.
15  Q. What was this designed -- what was the purpose of
16      this, of this Performance Measure, in layman's
17      terms?
18  A. To incend people to not be wasteful with expenses.
19  Q. Okay.
20  A. Operating results, as measured by the excess of
21      revenue over non-operating gains over expenses.
22      So that's, essentially, the margin, operating
23      margin of the company. And the comment is that the
24      excessive revenue, non operating gains over
25      expenses exceeded the target by $120,000.

Page 99

1       So we were successful in generating a higher
2       operating margin than was anticipated.
3   Q. This second performance measure was designed,
4       essentially, to measure net income of AHERF; is
5       that a fair statement?
6       MS. DeMASI: Objection, form.
7   A. Yeah, I guess -- yeah, operating profit.
8   Q. (BY MR. TAMBURRI) Okay. How about the third
9       performance measure?
10  A. This is a measure of increase in net equity of the
11      organization or of value of the organization. And
12      it increased at a rate greater than the Consumer
13      Price Index, so the equity, the value of the
14      organization went up.
15  Q. This is a measure -- Performance Measure Number 3
16      is designed to measure the net worth of AHERF?
17  A. Yeah, that would be accurate.
18  Q. What about the fourth performance measure?
19  A. The fourth one deals with maintaining a level of
20      uncompensated care for patient services, and
21      uncompensated care is a percentage of net patient
22      revenue decreased. And as I recall, managing
23      uncompensated care was a measure of trying to
24      control bad debt.
25  Q. Okay.

Page 100

1   A. And managing appropriately other forms of
2       uncompensated care, charity care.
3   Q. Okay. What about the fifth performance measure?
4   A. This is an incentive to recognize increased volume
5       or business activity, occupancy rate measured by
6       admission. So it's designed to reflect reward for
7       growing the organization.
8   Q. How about the sixth performance measure?
9   A. That's a measure of research funding. The idea is
10      to attract more research funding to support
11      research within the organization.
12  Q. These six performance measures were all measures of
13      AHERF's performance during fiscal year '95 rather
14      than the performance of any of its subsidiaries; is
15      that --
16  A. Correct.
17  Q. Okay.
18  A. That's correct.
19  Q. And is it your understanding that all six of these
20      performance measures had to be satisfied for AHERF
21      executives to be eligible for bonuses?
22  A. I don't know if they all had to be satisfied. I
23      think these were the factors that the Compensation
24      Committee looked at when they evaluated
25      performance, but I don't know -- going back to what

Page 101

1       you said earlier about must goals --
2   Q. Okay.
3   A. -- I don't know if these were expressed as must
4       goals or not, I don't recall.
5   Q. Okay. If you look at the top of the document, it
6       says, "The following quantitative performance
7       measures, which are compiled primarily from
8       information contained within the audited financial
9       statements, where appropriate, and which have been
10      reviewed and verified by Coopers & Lybrand, are
11      intended to assist in the annual evaluation of
12      AHERF's performance and that of its key managers
13      and employees."
14      What was Coopers & Lybrand's role in this
15      incentive?
16  A. It's my understanding that they perform what's
17      called in the business as an agreed-upon procedures
18      audit, which is essentially a review and
19      affirmation that the information that's provided is
20      provided consistent with procedures and business
21      practices.
22  Q. Okay. After reviewing that first sentence, is it
23      your recollection that Coopers & Lybrand -- Coopers
24      & Lybrand evaluated whether AHERF -- let me take a
25      step -- I'm going to ask you that question in a

Dwight Kasperbauer

Page 110

1  A. It would have been the top seven or eight people in
2     the organization in terms of the short and long
3     term, and then other vice president level people.
4  Q. Okay.
5  A. More than I can recall.
6  Q. Okay. Is it your understanding that the committee
7     approved the award of -- the Compensation Committee
8     approved the award of those incentive bonuses
9     because these six performance measures were indeed
10    satisfied for 1995?
11 A. Yes.
12 Q. Do you have an understanding as to why the
13    agreed-upon procedures that Coopers & Lybrand
14    implemented in connection with these performance
15    measures included a review of the audited financial
16    statements by Coopers?
17         MS. DeMASI: Object to the form.
18 Q. (BY MR. TAMBURRI) Do you know what I'm asking?
19    Do you understand?
20 A. Not exactly, no.
21 Q. Why is it that -- what's you're -- why is it that
22    Coopers was asked to prepare AHERF's calculations,
23    audited financial statements?
24         MS. DeMASI: Objection to form.
25 A. It's my understanding that those are the official

Page 111

1     results of the organization. They're attested to
2     by certified public accountants. And that's the
3     authority that you would go to for information.
4  Q. (BY MR. TAMBURRI) Okay. Did you ever -- did you
5     believe that for purposes of calculating net income
6     as a performance measure, the audited financial
7     statements would be the best source of information?
8  A. Yes.
9  Q. Why do you say that?
10 A. Because they're reviewed by, or analyzed by
11    professionals who are independent of the
12    organization. That's the role of the public
13    accountant, to review the work that's done by the
14    organization to attest to its accuracy.
15 Q. And you held that belief in fiscal year '95?
16 A. Yes, I did.
17 Q. Did you believe, for purposes of fiscal year '95,
18    that the audited financial statements of AHERF were
19    the best indicator of AHERF's net worth for
20    purposes of determining whether AHERF satisfied
21    performance measures regarding its net worth?
22 A. Yes.
23 Q. Why do you say that?
24 A. Again, it's an independent body that's reviewing
25    and attesting to the work that's prepared by the

Page 112

1     people in the organization. Outside the
2     organization reviewing the people that are inside
3     the organization.
4  Q. Do you know if the performance measures, the six
5     performance measures that we talked about earlier
6     changed in any way between fiscal year 1995 and
7     1996?
8  A. I think they did change from time to time.
9  Q. Okay. Do you remember what any of those changes
10    were?
11 A. Not off the top of my head, no.
12 Q. Okay.
13
14         (Document was marked Deposition
15         Exhibit Number 2480 for identification.)
16
17 Q. (BY MR. TAMBURRI) Mr. Kasperbauer, earlier you
18    expressed an interest in getting out of here, or
19    not getting out of here, but --
20 A. Getting out of here.
21 Q. -- finishing early.
22 A. Yes.
23 Q. I recognize that. If, however, you want to take a
24    break for lunch, just let me know. I'm happy to do
25    whatever you want to do, so it's up to you, really.

Page 113

1  A. I'm fine to continue.
2  Q. That's fine with me. Okay.
3     Let me show you what's been marked as
4     Exhibit 2480. Do you recognize this document?
5  A. This appears to be a report prepared by Al Adamczak
6     concerning the AHERF performance measures for
7     fiscal year 1996.
8  Q. And those performance measures were the performance
9     measures established for determining whether or not
10    AHERF executives would receive bonuses under the
11    incentive program?
12 A. That's correct.
13 Q. Did you receive this document at or about the time
14    it was generated?
15 A. Yes, I would have.
16 Q. You would have kept it in your file?
17 A. Yes, correct.
18 Q. You would have received it because you were the HR
19    VP; is that right?
20 A. That's correct.
21 Q. Does this document accurately depict the six
22    performance measures that have been established for
23    fiscal year '96 for purposes of determining whether
24    AHERF executives would receive bonuses during, for
25    fiscal year '96?

29 (Pages 110 to 113)

www.rennillo.com

Cleveland (216) 523-1313                                                                Akron (330) 374-1313

Dwight Kasperbauer

Page 114

1  A. I believe it to be accurate, yes.
2  Q. Okay. If you look at Performance Measure Number 2,
3     it's listed as "Achieve favorable overall operating
4     results as measured by net income in excess of
5     established targets."
6        Net income, again, was a performance measure
7     for fiscal year '96?
8  A. Correct.
9  Q. Performance Measure Number 3. It says, "Achieve a
10    favorable trend in financial viability, as measured
11    by an increase in net equity, which is greater than
12    the change in the consumer price index."
13       Again, net worth was a performance measure for
14    fiscal year 1996?
15 A. That's correct.
16 Q. Is it your understanding that determination of
17    AHERF's net income for purposes of calculating --
18    let me take a step back.
19       Is it your understanding that AHERF's 1996
20    fiscal year audited financial statements were used
21    to determine whether AHERF satisfied the second
22    performance measure which dealt with net income?
23       MS. DeMASI: Objection to form.
24 A. I believe that to be the case, yes.
25 Q. (BY MR. TAMBURRI) And why do you say that?

Page 115

1  A. As we discussed earlier, as a part of the
2     agreed-upon procedures, I guess I would expect that
3     the financial performance results would be tied
4     back to the audited financial statements.
5  Q. Performance Measure Number 3 we discussed is a
6     measurement of AHERF's net worth?
7  A. That's correct.
8  Q. Is it your understanding that AHERF's net worth was
9     calculated for purposes of determining whether
10    AHERF satisfied Performance Measure Number 3 by
11    using the 1996 audited financial statements for
12    AHERF?
13 A. Yes.
14 Q. If you look back at the second performance measure
15    regarding net income. Was there anything other
16    than audited financial statements used to determine
17    whether AHERF satisfied that performance measure?
18 A. No, this document would indicate that they would
19    use the audited financial statements.
20 Q. And nothing else?
21 A. And nothing else, yes.
22 Q. Okay. Is it fair to say that the audited financial
23    statements were the only documents, or the only
24    information used to calculate or to determine
25    whether AHERF satisfied the performance measure

Page 116

1     regarding its net worth for fiscal year '96?
2        MS. DeMASI: Objection to form.
3  A. As represented by this document, yes.
4  Q. (BY MR. TAMBURRI) Okay. Do you have any reason to
5     think that any other information was used other
6     than the audited financial statements?
7  A. No.
8  Q. Did anyone at Coopers ever tell you that
9     information other than the audited financial
10    statements were used to determine whether AHERF
11    satisfied Performance Measures Numbers 2 and 3
12    during fiscal year '96?
13 A. No.
14 Q. How about for 1995?
15 A. No.
16
17           (Document was marked Deposition
18            Exhibit Number 2481 for identification.)
19
20 Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
21    what's been marked as Exhibit 2481. Do you
22    recognize this document?
23 A. Yes, I do. This is the -- these are the minutes
24    from the October 15th, 1996 AHERF Compensation
25    Committee meeting.

Page 117

1  Q. Okay. And you attended this meeting?
2  A. Yes, I did.
3  Q. And you would have received these minutes as the VP
4     of HR and an invitee of the committee?
5  A. Yes, I would have.
6  Q. And you would have kept a copy of these in your
7     file?
8  A. Yes, I would have.
9  Q. If you'd turn to Page 4 of the minutes.
10 A. (Witness complies).
11 Q. First "Whereas" clause that you can see on the
12    page. It says, "Whereas, the performance measures
13    adopted for Fiscal Year 1996 and the results for
14    each of those goals are:" And it lists six
15    performance measures. Do you see that?
16 A. I see them, yes.
17 Q. Do these minutes accurately reflect what the
18    performance measures were for determining whether
19    incentive bonuses would be distributed for fiscal
20    year '96?
21 A. Yes.
22 Q. And they are the same six performance measures that
23    were listed in Exhibit 2480?
24 A. Yes.
25 Q. And the Compensation Committee approved the

Dwight Kasperbauer

### Page 122

1. A. Yes.
2. Q. Do you see that the audited financial statements on
3. Page, or Page 3 of AHERF's audit and financial
4. statements reflect AHERF had a net loss of 11.8
5. million for fiscal year '96?
6. A. I see that.
7. Q. Do you remember any discussion as to whether or not
8. the calculation of AHERF's net income for purposes
9. of Performance Measure Number 2 was properly
10. performed in 1996?
11. A. No, I don't.
12. Q. Did you ever talk to anyone at Coopers & Lybrand
13. about the calculation of net income?
14. A. No.
15. Q. For fiscal year '96?
16. A. No.
17. Q. Okay.
18.
19.     (Document was marked Deposition
20.     Exhibit Number 2482 for identification.)
21.
22. Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
23. what's been marked as Exhibit 2482. Do you
24. recognize this document?
25. A. Yes, I do.

### Page 123

1. Q. What is this document?
2. A. It's a letter from Coopers & Lybrand to the Board
3. of Trustees of AHERF, essentially, in response to
4. my letter asking Coopers & Lybrand to do
5. agreed-upon procedures, audit, review of our
6. performance measures. So this is their official
7. letter back to the Board of Trustees.
8. Q. And you would have received a copy of this in the
9. ordinary course of your business?
10. A. Yes, I would have as HR Vice president. Yes, I
11. would have.
12. Q. And you would have kept a copy of this document in
13. your file as your practice?
14. A. Yes, I would have.
15. Q. If you'd turn to the second page of the exhibit.
16. It's entitled "Agreed-upon Procedures"; do you see
17. that?
18. A. Exhibit 1?
19. Q. Yeah. Starts on Page 42226.
20. A. Yes, I have it.
21. Q. Does Exhibit 1, which starts on 42226 and runs
22. through 42228 accurately reflect the agreed-upon
23. procedures for assessing performance measures of
24. fiscal year '96?
25. A. Yes, to the best of my recollection.

### Page 124

1. Q. And you were involved in determining what those
2. agreed-upon procedures were for fiscal year '96?
3.     MR. HENNING: Objection to form.
4. A. In the summary form I wouldn't say I got involved
5. in the details of what they would be, but as
6. accountants and auditors that they would apply
7. their judgment to those agreed-upon procedures.
8. Q. (BY MR. TAMBURRI) Okay. So short-term bonuses
9. under the Incentive Program were distributed to all
10. eligible executives for fiscal year 1995?
11. A. Yes, to the best of my recollection.
12. Q. Long-term bonuses, the Compensation Committee
13. approved the accrual of the long-term bonus to all
14. eligible executives based upon fiscal year, AHERF's
15. attainment of fiscal year '95 performance measures?
16. A. That's correct.
17. Q. All eligible AHERF executives received short-term
18. bonuses under the Incentive Plan because AHERF
19. attained this fiscal '96 -- fiscal year '96
20. performance measures?
21. A. Yes.
22. Q. And all eligible AHERF executives received the
23. accrual of the long-term bonus because AHERF
24. achieved its performance measures for fiscal year
25. '96?

### Page 125

1. A. Yes.
2. Q. Do you know if short-term bonuses were distributed
3. to eligible executives in 1997, for fiscal year
4. 1997?
5. A. Fiscal year '97 would have ended June of '97. No,
6. I don't believe so.
7. Q. Do you know why those bonuses were not distributed?
8. A. I think at that time we were -- if I have my years
9. correct, we were in the midst of downsizing in
10. Philadelphia, and the Compensation Committee didn't
11. approve bonuses at that time.
12.
13.     (Document was marked Deposition
14.     Exhibit Number 2483 for identification.)
15.
16. Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
17. what's been marked as Exhibit 2483.
18. A. Yes, I recognize this.
19. Q. Okay. Let me take one step back for a minute. Can
20. you take a look at 2478 again.
21. A. (Witness complies).
22. Q. Can you turn to Pages DBR-AA 22482 through 22484.
23. A. Okay.
24. Q. These are the agreed-upon procedures for fiscal
25. year 1995; is that right?

Dwight Kasperbauer

Page 126

1  A. Correct.
2  Q. Did these pages accurately reflect those
3     agreed-upon procedures?
4  A. Yes, to the best of my knowledge.
5  Q. Okay. Exhibit 2483, what is this document?
6  A. This is a spreadsheet maintained or created by Dave
7     Deasy in the Payroll Department to track, on the
8     first page, Sherif Abdelhak's long-term incentive
9     accrual and subsequent distributions.
10 Q. Okay. And did you receive a copy of this document
11    at the time that it was prepared?
12 A. Yes.
13 Q. Why did you receive it?
14 A. This would have been input information to the
15    Compensation Committee regarding incentive bonuses
16    to be awarded.
17 Q. And you would have received it because you were the
18    head of HR at the time that you did receive it?
19 A. Yes, I administered that plan.
20 Q. Okay. And would you have kept this in your file as
21    a business practice of yours?
22 A. Yes, I would have.
23 Q. Okay. Sherif Abdelhak received a long-term
24    incentive award for every year between 1988 and
25    1997; is that correct?

Page 127

1  A. That's correct.
2  Q. And the amount of his awards ranged, during those
3     years, between $65,000 and $185,000?
4  A. That's correct.
5  Q. And the total accrued balance of his awards as of
6     April 30th, 1998, was $651,357?
7  A. Yes, correct.
8  Q. Turn to the next page.
9  A. (Witness complies).
10 Q. You received a long-term incentive award for every
11    year from 1988 through 1997?
12 A. That's correct.
13 Q. And the amount of your awards during those years
14    ranged from $21,000 to $78,000?
15 A. That's correct.
16 Q. And the total accrued balance of your awards as of
17    April 30th, '98, was $280,848?
18 A. Yes.
19 Q. Turn to the next page.
20 A. (Witness complies).
21 Q. Doctor Kaye, he received a long-term incentive
22    award for every year between 1991 and 1997?
23 A. That's correct.
24 Q. And the total -- or the amount of his awards ranged
25    from $31,500 to $110,000?

Page 128

1  A. That's correct.
2  Q. And the total accrued balance of his awards as of
3     April 30th, '98, was $383,395?
4  A. That's correct.
5  Q. David McConnell received a long-term incentive
6     award for every year between 1998 (sic) through
7     1997?
8  A. That's correct.
9  Q. And the amount of his awards range from $36,000 to
10    $110,000?
11 A. That is also correct.
12 Q. The accrued balance of his awards totaled $391,207
13    as of April 30th, 1998?
14 A. That's correct.
15 Q. Mr. Sanzo received an award under the Long-term
16    Incentive Plan every year from 1998 (sic) through
17    1997 -- 1988 through 1997?
18 A. That's correct.
19 Q. And the range of his awards totaled $30,000 -- or
20    ranged from $30,000 to $100,000?
21 A. Correct.
22 Q. The total accrued balance of his awards was
23    $352,152?
24 A. That's correct.
25 Q. And that's as of April 30th, '98?

Page 129

1  A. That's correct.
2  Q. Now, there were other executives that received
3     long-term awards other than the individuals listed
4     on this exhibit; right?
5  A. Yes.
6  Q. Some of those individuals were Nancy Wynstra --
7  A. Possibly Doctor Ross.
8  Q. Okay. Joe Dionisio?
9  A. I believe so.
10 Q. Okay. Did you ever meet with representatives of
11    Coopers & Lybrand during the course of their annual
12    audit?
13        MS. DeMASI: Objection to form. The
14    audit of the financial statements?
15        MR. TAMBURRI: Yeah, I'm sorry, audit of
16    financial statements.
17 A. No, not that I recall.
18 Q. (BY MR. TAMBURRI) Were you ever asked to provide
19    information to anyone from Coopers & Lybrand in
20    connection with its audit of the AHERF financial
21    statements?
22 A. Only to the extent that I would have been asked for
23    retirement plan information.
24 Q. And to the extent that you were asked for
25    information, did you provide information?

Dwight Kasperbauer

### Page 134

1   the program?
2   A. Yes.
3   Q. Okay. Was it your understanding that short-term
4      and long-term incentive awards would only be
5      distributed if the performance measures were met?
6         MS. DeMASI: Objection in form.
7   A. Yes.
8   Q. (BY MR. TAMBURRI) Why did you have that
9      understanding?
10  A. That was the essence of what was expressed in the
11     administrative document that guided the incentive
12     plans.
13  Q. Okay. And if those perform -- six performance
14     measures had not been met in fiscal year '95, was
15     it your expectation that short-term and long-term
16     bonuses would not be distributed for that year?
17        MS. DeMASI: Objection.
18  A. I don't know if the committee would have overridden
19     that decision or not. I can't speculate, they had
20     their own mind but --
21  Q. (BY MR. TAMBURRI) Okay.
22  A. -- it wouldn't have been appropriate to recommend
23     distribution if we had not met the objectives.
24  Q. You would not have recommended distribution in
25     fiscal year '95 if those measures had not been met?

### Page 135

1   A. That's correct.
2   Q. Nor in '96 would you have recommended that?
3   A. That's correct.
4   Q. Okay.
5
6         (Document was marked Deposition
7         Exhibit Number 2484 for identification.)
8
9   Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
10     what's been marked as Exhibit 2484.
11  A. Yes, I recognize this.
12  Q. Okay. Can you identify it?
13  A. It's a memorandum from David McConnell to me
14     regarding Hahnemann affiliation completion bonuses
15     for completing the Hahnemann merger. And it -- do
16     you want me to go on to the particulars?
17  Q. Sure.
18  A. It indicates a check should be prepared for Sherif
19     Abdelhak for $156,000; Iqbal Paroo for $106,080;
20     David McConnell, 110,760; Nancy Wynstra, 84,240;
21     myself, Dwight Kasperbauer for 82,680; and Miles
22     Turtz, M.D. for 99,840.
23  Q. Did you receive this memo in your capacity as HR
24     Vice President from Mr. McConnell?
25  A. Yes, I did.

### Page 136

1   Q. And did you maintain it in your file in the
2      ordinary course of your business?
3   A. Yes, I would have.
4   Q. What were the criteria for the award of these
5      bonuses? I'm sorry, what was the criteria?
6   A. I'm not sure of the specific criteria, but it was
7      for effort and involvement and essentially extra
8      duty for completing the Hahnemann merger,
9      recognition for making the deal.
10  Q. Were these bonuses approved by the Compensation
11     Committee?
12  A. I believe so. I don't know so -- don't know so for
13     sure.
14  Q. Would it have been typical for the Compensation
15     Committee to have to approve these bonuses, or
16     these types of bonuses before they were
17     distributed?
18  A. I don't know, I would say this was out of the
19     ordinary.
20  Q. Okay. Would it have been unusual for the
21     Compensation Committee to not have approved these
22     bonuses?
23        MS. DeMASI: Objection, form.
24  A. I'm sorry, rephrase your question.
25  Q. (BY MR. TAMBURRI) I know.

### Page 137

1   A. I think there was a double negative in there.
2   Q. Yeah. Was it part of the charge of the
3      Compensation Committee to approve bonuses such as
4      these?
5   A. That's correct, yes.
6
7         (Documents were marked Deposition
8         Exhibit Number 2485 and 2486 for
9         identification.)
10
11  Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
12     two exhibits, one's been marked as 2485 and the
13     other as 2486. Let me ask you about 2485. Do you
14     recognize this document?
15  A. Yes, I do.
16  Q. What is this document?
17  A. It's a handwritten note from Sherif Abdelhak to me
18     on March 26th, 1996 authorizing disbursement of
19     $50,000 in special bonus to Nancy Wynstra and to
20     David McConnell on April 1st of 1996.
21  Q. And you would have received this because you were
22     responsible for dispensing bonuses?
23  A. I would give authorization to the Payroll
24     Department to dispense the bonus, yes, sir.
25  Q. And that's why you would have received this memo?

Page 138

1  A.  That's correct.
2  Q.  And would you have maintained this memorandum in
3      your file as part of your ordinary practice?
4  A.  Yes, I would have.
5  Q.  There's a second note on this exhibit; is that from
6      Kathy Simon?
7  A.  That's my assistant, yes.
8  Q.  And why -- what's your understanding as to her
9      message to you?
10 A.  She's conveying to me that in order for these
11     bonuses to net $50,000 that they needed to be
12     grossed up to allow for taxes, and she's indicating
13     that because Nancy lived in the City of Pittsburgh,
14     there was a higher gross-up amount for her.
15 Q.  Was it your understanding that these two bonuses,
16     one for Mr. McConnell and one for Ms. Wynstra were
17     to be essentially tax-free bonuses?
18 A.  Yes, those were my instructions.
19 Q.  What was the purpose of these bonuses; do you know?
20 A.  I didn't know at the time, but as the subsequent
21     exhibit indicates, it may have been for political
22     contributions.
23 Q.  Okay.
24 A.  I learned about that after the fact.
25 Q.  And Exhibit 2486, could you identify that?

Page 139

1  A.  That's a memorandum from me to David Deasy as the
2      Payroll Director at that time, directing him to
3      distribute these net pay bonuses to Nancy Wynstra
4      and to David McConnell.
5  Q.  And you prepared this in your capacity as HR Vice
6      President?
7  A.  That's correct, pursuant to Mr. Abdelhak's
8      direction.
9  Q.  Okay. And you maintained this memo in your files?
10 A.  Yes.
11 Q.  Is that your signature on 2486?
12 A.  Yes, it is.
13 Q.  Do you know if anyone else ever received a bonus, a
14     special bonus like the one referenced in these past
15     three -- or in those prior two exhibits?
16 A.  Yes, I think there were two other people in a
17     similar situation. Joan Crestae (phonetic) and
18     Chris Copeland.
19 Q.  How much of a bonus did they receive?
20 A.  I don't recall specifically.
21 Q.  Okay.
22
23         (Document was marked Deposition
24         Exhibit Number 2487 for identification.)
25

Page 140

1  Q.  (BY MR. TAMBURRI) Let me show you what's been
2      marked as Exhibit 2487. Do you recognize this
3      document?
4  A.  No, I don't.
5  Q.  Did you ever come to learn that Mr. Martin, Mike
6      Martin received a 50,000 bonus, $50,000 bonus in
7      connection with the Delaware Valley Debt
8      Restructuring?
9  A.  I don't recall that, no.
10 Q.  Okay. Did you ever learn that Mr. McConnell
11     received a $100,000 bonus for that same
12     restructuring?
13 A.  No, I don't recall that.
14 Q.  If Mr. Martin and Mr. McConnell were to receive
15     these bonuses, was it not -- was it -- if Mr. Deasy
16     was to dispense with these bonuses to Mr. Martin
17     and Mr. McConnell, didn't protocol provide that you
18     be the executive at authorizing to do that?
19 A.  That's correct.
20 Q.  Do you have any explanation for why Mr. Abdelhak
21     sent this memorandum?
22 A.  No, I don't.
23         MS. DeMASI: Objection to form.
24 Q.  (BY MR. TAMBURRI) Okay.
25         MS. DeMASI: Mark, can I just ask a

Page 141

1      question? The exhibit that I have I don't think
2      references anything about Mike Martin. Do I have
3      the right document?
4          MR. TAMBURRI: I'm sorry. You know what,
5      I have -- my copy has two pages. I think I just
6      got confused when I gave it to you. Hang on.
7      Yeah, I think I have a copying error.
8  Q.  (BY MR. TAMBURRI) But just so the record is clear,
9      Mr. Kasperbauer, the memo you have is dated
10     June 10th, '96 from Sherif Abdelhak to David
11     McConnell?
12 A.  That's correct, referencing Delaware Valley Debt
13     Restructuring.
14 Q.  (BY MR. TAMBURRI) okay. Is it fair to say that
15     Mr. Abdelhak is authorizing Mr. Deasy to provide
16     Mr. McConnell with a, this bonus referenced in this
17     memo was not in compliance with Board-approved
18     policy?
19         MS. DeMASI: Objection to form.
20         MR. HENNING: Object to form.
21 A.  It's certainly out of the protocol that was
22     discussed or presented earlier to the Comp
23     Committee.
24 Q.  (BY MR. TAMBURRI) Okay. Did you ever learn -- did
25     you ever know if there were any other bonuses

Page 142

1  provided to executives for debt restructuring?
2  A. I don't know.
3  Q. Okay. Is the bonus referenced in Exhibit 2487 the
4     second instance you have not become aware of
5     bonuses that were paid without your, basically,
6     without your knowledge?
7  A. Yes.
8
9          (Document was marked Deposition
10         Exhibit Number 2488 for identification.)
11
12 Q. (BY MR. TAMBURRI) Do you have any reason to
13    believe that the Compensation Committee approved
14    the bonus that Mr. Abdelhak authorized Mr. Deasy to
15    provide for the Delaware Valley Debt Restructuring?
16 A. Sorry, let me read this.
17 Q. I'm sorry. I'm asking about the prior exhibit.
18 A. Oh, I'm sorry.
19 Q. That's my fault.
20 A. Okay.
21 Q. Let me ask you about this, this bonus here, it's
22    referenced on this. Do you know if the
23    Compensation Committee approved this bonus?
24 A. I don't know.
25 Q. Okay. I'm sorry, this is 24 --

Page 143

1  A. 88.
2  Q. Exhibit 2488 is two memos; is that correct?
3  A. That's correct.
4  Q. They're both dated September 5th, 1996. Can you
5     identify the first page of this exhibit?
6  A. The first is a memorandum from W.P. Snyder III to
7     Dave Deasy. And it is -- it's instructions to Dave
8     Deasy to prepare special checks recognizing
9     outstanding efforts for The Graduate Hospital
10    merger for Sherif Abdelhak, the amount was
11    $150,000; for David McConnell it was $112,500; and
12    for Myles Turtz, MD, $75,000.
13 Q. Did you receive this document?
14 A. Not that I recall.
15 Q. Do you remember learning that Mr. Abdelhak,
16    Mr. McConnell and Doctor Turtz received bonuses for
17    The Graduate Hospital acquisition?
18 A. I knew that there were completion bonuses granted
19    at that time.
20 Q. Do you know if the Compensation Committee approved
21    of these bonuses?
22 A. I don't know.
23 Q. Do you know if anyone else received a bonus in
24    connection with The Graduate Hospital acquisition?
25 A. Not that I'm aware of.

Page 144

1  Q. Turning to the second page of the exhibit, can you
2     identify this memo for me?
3  A. This is also a memorandum written on September 5th,
4     1996 from William P. Snyder III to David Deasy, and
5     it's instructions to award special bonuses for
6     extraordinary effort on contributions made in the
7     acquisition of the Forbes Health System. First is
8     in the amount of $100,000 to Sherif Abdelhak, and
9     the second is $75,000 to David McConnell.
10 Q. Did you receive this document?
11 A. Not that I'm aware of.
12 Q. Would you have expected to have received copies of
13    these documents at the time they were transmitted?
14 A. Well, pursuant to our protocol, I normally would
15    have expected the instructions to come through me
16    to go to the Payroll Department.
17 Q. Okay. Do you know why you were circumvented?
18         MS. DeMASI: Object to the form.
19 A. I do not.
20 Q. (BY MR. TAMBURRI) Do you know if anyone else
21    received a Forbes Health System acquisition bonus
22    other than Mr. Abdelhak and Mr. McConnell?
23 A. I don't know.
24
25         (Document was marked Deposition

Page 145

1          Exhibit Number 2489 for identification.)
2
3  Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
4     what's been marked as Exhibit 2489. Do you
5     recognize this document?
6  A. No, I do not.
7  Q. Okay. Did you learn at some point that
8     Mr. McConnell received a $100,000 bonus in
9     connection with the acquisition of the Pain Group
10    Medical Associates?
11 A. No, I don't know or recall.
12 Q. Do you know if anyone else received a bonus in
13    connection with the acquisition of that physician
14    practice group?
15 A. This document would suggest that Sherif Abdelhak
16    received $150,000 for that.
17 Q. And again, would you have expected to received a
18    copy of this document in connection with your
19    responsibilities for authorizing Mr. Deasy to
20    distribute compensation?
21 A. Yes, if we follow the normal course of business I
22    would have done that.
23 Q. Did anyone ever tell you why you were not copied on
24    this memo?
25 A. No.

Dwight Kasperbauer

Page 150

1  McConnell, Nancy Wynstra, Donald Kaye, Anthony
2  Sanzo, Leonard Ross, and myself.
3
4         (Document was marked Deposition
5         Exhibit Number 2491 for identification.)
6
7  Q.  (BY MR. TAMBURRI) Let me show you what's been
8      marked as Exhibit 2491.
9  A.  Yes.
10 Q.  Do you recognize this document?
11 A.  Yes. This is a memorandum from Susan Kirsch,
12     Senior Director of Taxation, to me regarding the
13     KEYSOP program.
14 Q.  And you asked Ms. Kirsch to prepare this memo?
15 A.  I'm not sure if I asked her to prepare it. She was
16     involved in the discussion and presented it,
17     brought it forward.
18 Q.  You received this in the ordinary course of your
19     business?
20 A.  Yes.
21 Q.  And you kept it in your file?
22 A.  Yes.
23 Q.  If you'd turn to the last page of the memo under
24     the section "Form 990 Matters."
25 A.  Yes.

Page 151

1  Q.  Do you see that?
2  A.  Uh-huh.
3  Q.  The last sentence says, "Perhaps just as important
4      as the IRS's opinion of the Plan will be the
5      public's opinion of the compensation package and
6      AHERF's ability to manage their perceptions in a
7      tumultuous healthcare environment."
8          What was your reaction, what was your
9      understanding of Ms. Kirsch's sentence?
10         MS. DeMASI: Objection to form.
11 A.  I think she was expressing concern that if
12     executive compensation were released to the public,
13     that it would be, create an unfavorable public
14     opinion about the organization and its executives.
15 Q.  (BY MR. TAMBURRI) Why do you say that? I'm sorry.
16 A.  I'm drawing a conclusion about what her thoughts
17     were.
18 Q.  Did you ever talk to her about that sentence?
19 A.  I may have.
20 Q.  Okay.
21         MR. HENNING: Mark, I think we have to
22     change tapes.
23         MR. TAMBURRI: Oh, I'm sorry.
24
25         (Off the record.)

Page 152

1
2  Q.  (BY MR. TAMBURRI) Do you remember the content of
3      any communications you had with Ms. Kirsch about
4      that sentence?
5  A.  I think she may -- and she was expressing concern
6      about public opinion on the compensation package,
7      and I don't recall a specific conversation with
8      her, but if I had one it would have been around the
9      sense that in health care, almost any level of
10     compensation above a hundred thousand dollars for
11     an executive is a cause for a concern. So we live
12     with that issue daily regardless of whether it's a
13     KEYSOP program or another type of program.
14 Q.  Why would compensation above a hundred thousand
15     dollars be concern? I mean, as you used the term?
16 A.  Well, and this is my opinion now, my impression,
17     that in a health care environment, viewed as a
18     charity or not-for-profit organization, that high
19     levels of compensation, although may be merited
20     toward the content of the work that people do
21     compared to other industries, is still viewed as
22     health care, and there's a potential for public
23     concern for that.
24 Q.  Did the Compensation Committee ultimately approve
25     the KEYSOP program?

Page 153

1  A.  Yes.
2
3         (Document was marked Deposition
4         Exhibit Number 2492 for identification.)
5
6  Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
7      what's been marked as Exhibit 2492. I'll let you
8      look at it. Again, my question is going to be if
9      you recognize this document?
10 A.  Yes, this is the -- these are the minutes from the
11     March 11th, 1998 AHERF Compensation Committee
12     meeting.
13 Q.  And you attended that meeting?
14 A.  Yes, I did.
15 Q.  And you would have received a copy of these minutes
16     in connection with your role as Vice President of
17     HR?
18 A.  That's correct.
19 Q.  Do you know if these minutes were prepared around
20     the time that the meeting took place?
21 A.  I believe so, yes.
22 Q.  And would you have kept a copy of these minutes in
23     your HR file?
24 A.  Yes, I would have.
25 Q.  If you look at Page 2 of the minutes, under heading

www.rennillo.com
Cleveland (216) 523-1313                                    Akron (330) 374-1313

**Page 154**

1  "C. Compensation Items/Executive Benefit Plan
2  Amendments."
3  A.  Uh-huh.
4  Q.  It says, "Mr. Abdelhak and Mr. Kasperbauer
5  presented a recommendation to The AHERF
6  Compensation Committee to modify the existing
7  benefit program for the senior executives of the
8  organization in a manner which would make the
9  benefit structure a better vehicle for building
10  capital. They stated that while the proposed
11  changes would make the benefit program more
12  valuable to the executives, these changes will cost
13  the organization no more than the benefit program
14  in its present configuration."
15     First of all, did you state to the Compensation
16  Committee that the changes would make the KEYSOP
17  program more valuable to the executives?
18  A.  The main element of this was that, through the use
19  of mutual funds as a repository or holding folder
20  for the benefits, the participant could get benefit
21  from the growth in mutual funds over time.
22  Q.  Okay.
23  A.  As opposed to an interest-bearing account or an
24  interest-crediting arrangement like we had under
25  the Long-Term Incentive Plan.

**Page 155**

1  Q.  Okay. Was another difference between the KEYSOP
2  program and the Long-Term Incentive Plan that
3  participants of KEYSOP could cash in, essentially,
4  the KEYSOP benefits at any time, or they had to
5  wait five years to access the long-term bonus?
6  A.  Yeah. There were timing thresholds with the KEYSOP
7  program, I don't recall specifically what they
8  were, but there were exercise periods under the
9  KEYSOP plan, yes.
10  Q.  And they were less restrictive than the time
11  privileges under the long-term bonus?
12  A.  Yes, they could have been, yes.
13  Q.  Why did you -- first of all, did you tell the
14  Committee that KEYSOP, the KEYSOP program would
15  cost the organization no more than the benefit
16  program in its present configuration?
17  A.  The set-up of the KEYSOP program was to roll the
18  current Long-Term Incentive Plan balances into it.
19  So those were accounts or amounts that were already
20  on the books, and then future accruals would go
21  into the KEYSOP based upon the accrual of the
22  incentive plans.
23  Q.  Okay. Was there a rollover, also, of the executive
24  retirement account?
25  A.  Yes, that's correct.

**Page 156**

1  Q.  And how about the Non-Qualified Restoration
2  Benefit?
3  A.  I don't recall if that was.
4  Q.  Let me just show you what I'm referring to.
5  A.  Yes.
6  Q.  It's on Page 3, and it's the last sentence.
7  A.  Okay.
8  Q.  The third full paragraph.
9  A.  Okay.
10  Q.  So the KEYSOP was to replace a Non-Qualified
11  Restoration Benefit, the Executive Retirement
12  Account, the Deferred Bonus Program?
13  A.  Yes. Essentially, the capital accounts that were
14  held by the executives, and allocated to the
15  executives.
16  Q.  And was the idea that those accounts would either
17  be liquidated or rolled into the KEYSOP in that
18  those accounts would provide the funding for the
19  KEYSOP?
20  A.  Correct, yes.
21  Q.  And if that -- given that, that's why you told the
22  Committee that the KEYSOP would cost no more, would
23  be that AHERF would incur no additional costs?
24  A.  Right.
25  Q.  By the switch to the KEYSOP?

**Page 157**

1  A.  Right. Dollars that were already on the books, so
2  to speak, in each of these programs would be
3  consolidated in the KEYSOP program.
4  Q.  Okay. And this March 11th, '98 meeting of the
5  Compensation Committee was the meeting in which the
6  Committee approved the KEYSOP program?
7  A.  Yes.
8  Q.  Okay. What did you do after the KEYSOP program was
9  approved in order to implement it?
10  A.  Put together the -- I put together the analysis of
11  the funds that were in the various accounts, and
12  then prepared summary documents for the executives
13  to show what had been rolled over and what they
14  needed to do to enroll in the KEYSOP program.
15  Q.  Okay. Who were the executives that were eligible
16  in the first wave of the KEYSOP program? Who was
17  eligible to participate?
18  A.  Sherif, David, Sherif Abdelhak, David McConnell,
19  Nancy Wynstra, Anthony Sanzo and myself. I think
20  that was it.
21
22     (Document was marked Deposition
23     Exhibit Number 2493 for identification.)
24
25  Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you

Dwight Kasperbauer

Page 158

1    what's been marked as Exhibit 2493.  Can you
2    identify this document?
3  A.  This is a summary or a spreadsheet of the funds
4    that would be allocated into the KEYSOP.
5  Q.  Did you prepare this document?
6  A.  Yes, or one of my staff members would have, yes.
7  Q.  At your direction?
8  A.  Yes.
9  Q.  There's, in the third column of the spreadsheet,
10   there's a column entitled "Assets"?
11 A.  Uh-huh.
12 Q.  What's your understanding as to the purpose of that
13   column, or what does that column signify?
14 A.  Those would have been assets that were held in
15   those various accounts.  I guess that's the best
16   way I can describe it.
17 Q.  Okay.  There's a number on the far right column
18   under "Sub-Total"?
19 A.  Uh-huh.
20 Q.  What's that number there?
21 A.  On the far right?
22 Q.  Yeah.
23 A.  Two million 005?
24 Q.  Yep.
25 A.  I think that's the shortage of funding for the

Page 159

1    various accounts that were going to be rolled over.
2  Q.  So the accounts that were to be used to fund the
3    KEYSOP program had insufficient funds to properly
4    fund the KEYSOP program?
5  A.  Yeah.  These items shown as assets would have been
6    assets.  The -- I think the $2 million that is
7    indicated here would have been an expense entry or
8    an entry on the books of the organization as a
9    liability.
10      So in the sense that the assets were actually
11   tangible or not tangible but were assets,
12   investments, the $2 million was a recorded
13   liability of the organization for the Long-Term
14   Incentive Plan, but not funded per se.
15 Q.  Okay.
16
17       (Document was marked Deposition
18       Exhibit Number 2494 for identification.)
19
20 Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
21   what's been marked as Exhibit 2494.
22 A.  This is the e-mail from Miriam Bailey to me
23   concerning KEYSOP funding.
24 Q.  Let me ask you one question about the last exhibit
25   before we get to this one.

Page 160

1  A.  Uh-huh.
2  Q.  Does the number in the far right column here, it's
3    $2,005,269.70; that signifies the extent to which
4    the KEYSOP program was underfunded as of May 1st,
5    1998?
6  A.  Yes.
7  Q.  Okay.  And turning to Exhibit 2494, who was Miriam
8    Bailey?
9  A.  Miriam Bailey was a benefit specialist that worked
10   in the Human Resources Department, worked
11   indirectly for me.
12 Q.  Okay.  And what is -- what's your understanding as
13   to why she sent you this message?
14 A.  I think she's indicating that there was some
15   difficulty in funding the KEYSOP amount, to move
16   the cash into the mutual funds.  And she's saying
17   that Mike Martin, there's a T-Note that could be
18   liquidated for the funding, but that the future
19   compensation would have to wait till later in the
20   year, the future compensation, future accruals
21   would have to wait till later in the year.
22 Q.  So her suggestion that the KEYSOP is underfunded is
23   consistent with Exhibit 2493, which indicates that
24   it was underfunded by over $2 million as of May 1,
25   '98?

Page 161

1  A.  In terms of cash for the funding, yes.
2  Q.  Okay.  In the last sentence of the first full
3    paragraph, her e-mail, she writes, "He is concerned
4    that the $2 million will have a negative impact on
5    payroll at the end of the month."
6       What did you understand her to be saying in
7    that sentence?
8  A.  That was a large amount of money to take out of the
9    organization at that time.
10 Q.  What do you mean --
11 A.  The cash flow may not have been available for the
12   payroll.
13 Q.  For the payroll of AHERF employees
14 A.  Yes.
15 Q.  Okay.  Was there any discussion among senior
16   management as to whether the KEYSOP should be
17   funded at this time?
18 A.  I believe I had some conversation with Mr. Abdelhak
19   about it, yes.
20 Q.  Okay.  What were the nature of your communications?
21 A.  That it was difficult to fund it.
22 Q.  Did you tell him the extent of the underfunding?
23 A.  I probably did, I don't recall.
24 Q.  Okay.  What was his response?
25 A.  That I should move forward and do the best that I

Page 162

1 could with it.
2 Q. Did you communicate to him that funding KEYSOP --
3    properly funding the KEYSOP might have an adverse
4    effect on the ability of the organization to meet
5    its payroll?
6 A. I probably did, but I don't recall for sure.
7 Q. Okay. Do you have any recollection of him
8    responding, if you had made that comment, do you
9    recollect?
10 A. He didn't say.
11       MS. DeMASI: Objection to form.
12 Q. (BY MR. TAMBURRI) Okay. Did you understand after
13    having your conversation with him that you should
14    fund the KEYSOP payroll -- or to ensure that it
15    should be properly funded?
16 A. That I should move forward with it, yes.
17 Q. Okay. Is that what you did?
18 A. Yes.
19 Q. Okay. How did you go about doing that?
20 A. Well as we indicated here, I think we did the
21    liquidation of the T-note. I don't recall, given
22    the time of this whether that actually -- whether
23    the final funding actually took place.
24
25       (Document was marked Deposition

Page 163

1       Exhibit Number 2495 for identification.)
2
3 Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
4    what's been marked as Exhibit Number 2495. Do you
5    recognize this document?
6 A. Yes, it's a letter from me to a Gloria Pederson or
7    Pederson at National City Bank in Minneapolis
8    regarding the asset allocation and distribution of
9    funds for the start-up of the KEYSOP.
10 Q. And did you prepare this document as the executive
11    at AHERF responsible for the KEYSOP plan?
12 A. Yes, I did.
13 Q. Did you keep a copy of this document in your files?
14 A. Yes, I would have.
15 Q. That's your signature?
16 A. Yes.
17 Q. In this letter did you authorize Ms. Pederson at
18    National City Bank to roll over the assets that are
19    listed on the second page of the letter? Excuse
20    me, roll them over into the KEYSOP plan?
21 A. Yes, I did.
22 Q. And these assets totaled or were valued at
23    approximately $5.7 million?
24 A. Yes.
25 Q. Was it your understanding -- well let me ask you

Page 164

1    this first: And you authorized her to roll those
2    assets over into the KEYSOP on May 6th, 1998?
3 A. Yes.
4 Q. It was your understanding at the time that you
5    wrote this that by rolling over these assets the
6    KEYSOP accounts would still be underfunded by
7    approximately $2 million?
8 A. I'd have to go back and take a look at the numbers.
9    This would suggest that they were funded to the
10    extent that the benefits had been earned.
11 Q. Okay. But to the extent that there were deferred
12    bonuses that had accrued but were not yet payable,
13    the plan was still underfunded?
14 A. Underfunded, right.
15 Q. Okay.
16
17       (Document was marked Deposition
18       Exhibit Number 2496 for identification.)
19
20 Q. (BY MR. TAMBURRI) Mr. Kasperbauer let me show you
21    what's been marked as Exhibit 2496. Do you
22    recognize this document?
23 A. Yes, it's a request for electronics fund transfer
24    for Mellon Bank AHERF Concentration account to
25    National City Bank, authorized by me.

Page 165

1 Q. Is that your signature under the approval section
2    on the first page?
3 A. Yes, it is.
4 Q. And did you keep a copy of this document in your
5    file?
6 A. Yes, I would have.
7 Q. What is -- what was the AHERF Concentration
8    account?
9 A. I believe that was the account that was used for
10    disbursements, distribution, sort of a single
11    checking account for the corporation.
12 Q. Was that the account through which payroll payments
13    were made; do you know?
14 A. I don't know.
15 Q. And what was the purpose of this document?
16 A. This appears to be the authorization for the final
17    funding of the KEYSOP program. The difference
18    between the benefits allocated and the sources of
19    fund in the trust funds.
20 Q. And this was -- this document authorizing Mellon
21    Bank to electronically transfer approximately $1.8
22    million to the KEYSOP accounts maintained by
23    National City Bank?
24 A. That's the authorization to do that, yes.
25 Q. That's what this document is?

Dwight Kasperbauer

Page 166

1  A.  Yes.
2  Q.  Okay. And Mellon Bank, to the best of your
3      knowledge, transferred that money to the KEYSOP
4      accounts?
5  A.  Yes.
6  Q.  And that was on May 6th, 1998?
7  A.  Yes.
8  Q.  Turn to the second page.
9  A.  (Witness complies).
10 Q.  Did you prepare this spreadsheet on the second
11     page?
12 A.  Yes, or someone on my staff would have.
13 Q.  Okay. In the 1.878 -- 1.8 million that's listed at
14     the bottom of the spreadsheet, that's been labeled
15     as additional funding needed; is that right?
16 A.  Correct.
17 Q.  And that's the additional funding that was needed
18     to fund the KEYSOP accounts?
19 A.  Correct.
20 Q.  Okay. Will you turn to the last page.
21 A.  (Witness complies).
22 Q.  This last page is actually a duplicate of the
23     exhibit I just showed you, 2495; is that right?
24 A.  Yes.
25 Q.  Okay. And I may have mistaken you or mislead you

Page 167

1      inadvertently. I think I asked you on Exhibit 2495
2      if that spreadsheet was a list of the accounts that
3      had been rolled over or liquidated into the KEYSOP?
4  A.  Well that's not the case.
5  Q.  That's not the case?
6  A.  This is the end point.
7  Q.  These are the assets that were purchased?
8  A.  Correct.
9  Q.  These were the funds that were owned by the
10     executives in the KEYSOP plan?
11 A.  Right.
12 Q.  Okay. And those funds total approximately
13     $5.7 million?
14 A.  Correct.
15 Q.  Okay. Did you ever talk to anyone other than
16     Mr. Abdelhak and/or Ms. Bailey about underfunding
17     of the KEYSOP in May of 1998?
18 A.  Not other than my staff. Maria Randall was on my
19     staff and Miriam Bailey reported to her. But no, I
20     don't recall talking to anyone else.
21 Q.  Okay. Turn back to that last exhibit, the last
22     page of the last exhibit.
23 A.  (Witness complies).
24 Q.  Was the value of Mr. Abdelhak's KEYSOP account on
25     May 1st, 1998, is that identified here on this

Page 168

1      spreadsheet?
2  A.  It would be the far right number, the 2,191,000.
3  Q.  Okay, that was the value of his KEYSOP account?
4  A.  KEYSOP.
5  Q.  What was the value of your KEYSOP account on May
6      1st, 1998?
7  A.  $621,889.
8  Q.  And can you tell me the value of the accounts for
9      the remaining executives on that date?
10 A.  Donald Kaye, MD's account balance was $763,896;
11     David McConnell, 700 -- I'm sorry, did I misread
12     that? Donald Kaye, 763,896; David McConnell,
13     $786,010; Anthony Sanzo, $590,164; and Nancy
14     Wynstra, 900 -- excuse me, $797,360.
15 Q.  Did you or any of the other executives redeem the
16     value of your KEYSOP accounts at any time in the
17     future?
18 A.  Yes. Those accounts were liquidated in, I think,
19     June of 1998.
20 Q.  What prompted the liquidation of those accounts?
21 A.  They were liquidated primarily to free up assets to
22     pay off Mr. Abdelhak's Executive Loan Program and
23     David McConnell's Executive Loan Program and Nancy
24     Wynstra's, too, I believe.
25     Mr. Abdelhak and Mr. McConnell were separated

Page 169

1      from the organization, and they had loans that were
2      due, and those assets were liquidated to settle
3      those loans.
4          MR. TAMBURRI: I'm short one copy of
5      this. Share.
6
7          (Document was marked Deposition
8          Exhibit Number 2497 for identification.)
9
10 Q.  (BY MR. TAMBURRI) Let me show you what's been
11     marked as Exhibit 2497. Do you recognize this
12     document?
13 A.  Yes. These appear to be copies of cancelled checks
14     for the distribution out of the -- make sure -- out
15     of the KEYSOP program, yes.
16 Q.  Did you prepare these checks?
17 A.  The Payroll Department prepared these checks.
18 Q.  Did they prepare them at --
19 A.  At my request, yes.
20 Q.  At your request?
21 A.  Yes.
22 Q.  What were the -- let me take a step back.
23     Did these checks included in these -- or copies
24     of these checks that are included in these
25     exhibits, represent -- were they tendered for the

**Page 170**

1  full amount of the KEYSOP accounts for these
2  executives as of the date of the checks?
3  A. Yes. That's my understanding.
4  Q. Okay. And these checks, they were all issued on
5  July 10th, 1998?
6  A. Yes.
7  Q. Can you tell me how much Mr. Abdelhak received on
8  that date?
9  A. The net amount of -- the amount after taxes was
10  $1,516, looks like 170.97.
11  Q. How much did you receive on that date?
12  A. I received $430,431.49.
13  Q. How about Doctor Kaye?
14  A. Doctor Kaye received $499,727.84.
15  Q. How about David McDonnell?
16  A. David McConnell received $449,437.75.
17  Q. And Mr. Sanzo?
18  A. $408,009.80.
19  Q. Did Ms. Wynstra receive a check, too, to the best
20  of your recollection?
21  A. I believe so, yes.
22  Q. Do you remember how much she received?
23  A. No, I don't.
24  Q. If I told you it was $528,691.12, does that seem to
25  be fairly accurate?

**Page 171**

1  A. That would be accurate, given the relationship to
2  the other executives' disbursements.
3  Q. Okay. Do you need a break?
4  A. No, I don't. Thank you.
5  Q. Did AHERF own corporate jets during the time that
6  you worked there?
7  A. Yes.
8  Q. How many corporate jets did it own?
9  A. Two.
10  Q. Do you know when AHERF owned those corporate jets?
11  A. I couldn't give you precise dates, no.
12  Q. Was there a point at which spouses of certain
13  executives were authorized to use the corporate
14  jets?
15  A. I believe so, yes.
16  Q. Do you know whose spouses were authorized to use
17  the corporate jets?
18  A. You mean to fly on the jet with their husbands or
19  spouses?
20  Q. Yeah, exactly.
21  A. I'm not sure I could tell you all of them. I'm
22  certain Sherif and David. My wife and I flew on it
23  from time to time. I'm not sure I could give you a
24  list of who.
25  Q. Okay. Was there a point at which those executives'

**Page 172**

1  spouses were -- where AHERF was billed for the cost
2  of the spouses travelling with -- forgive me, it's
3  been a long day.
4  A. I know.
5  Q. Was there a point at which AHERF paid for the
6  spouses of executives to fly on corporate jet?
7  A. I don't know.
8  Q. Okay.
9
10      (Document was marked Deposition
11      Exhibit Number 2498 for identification.)
12
13  Q. (BY MR. TAMBURRI) Let me show you what's been
14  marked as Exhibit 2498.
15  A. Uh-huh.
16  Q. Have you seen this document before?
17  A. No, I have not.
18  Q. Okay. There's a reference in this document to
19  AHSPIC?
20  A. Yes.
21  Q. What was AHSPIC?
22  A. That was the Captive Insurance Company that
23  provided medical liability insurance for physicians
24  in the hospitals within the system.
25  Q. This document suggests that per director,

**Page 173**

1  Mr. Abdelhak, the spouses of the following
2  executives would be provided travel through AHSPIC?
3  And that was Sherif Abdelhak, David McConnell, you,
4  Anthony Sanzo, Donald Kaye, Nancy Wynstra.
5      The document also says, "Please take the
6  necessary steps to make sure that AHSPIC is billed
7  accordingly."
8      Did you ever learn that AHSPIC was billed for
9  the travel of the following -- of those
10  executives -- spouses of those executives at any
11  particular time?
12      MS. DeMASI: Object to the form of the
13  question.
14  A. I don't know.
15  Q. (BY MR. TAMBURRI) Okay. Did you ever know or
16  learn that Mr. Abdelhak's wife, that AHERF paid her
17  travel expenses when she travelled with him?
18  A. I had no knowledge of that.
19  Q. Did you ever travel to the Grand Cayman Islands as
20  part of, or in connections with AHSPIC Board
21  meetings?
22  A. Yes, on one occasion.
23  Q. Okay. When was that?
24  A. I believe that was in January or February of '96.
25  Q. How many people attended that meeting?

Page 174

1  A.  My guess would be 15 to 20 executives, Board
2      members, physicians, and then spouses as well.
3      Some spouses.
4  Q.  Okay. Why were Board meetings for AHSPIC held in
5      the Grand Cayman Islands?
6  A.  I believe because of the insurance company being an
7      offshore insurance company. And as such, there's
8      an advantage to avoid on-shore premium taxes and
9      other restrictions and complications to provide
10     liability insurance.
11
12          (Document was marked Deposition
13           Exhibit Number 2499 for identification.)
14
15 Q.  (BY MR. TAMBURRI) Let me show you what's been
16     marked as Exhibit 2499. I'll give you a chance to
17     look at this document.
18 A.  Okay.
19 Q.  Did you receive a copy of this document?
20 A.  I believe I would have, yes.
21 Q.  Okay. What is this document?
22 A.  It essentially lays out the itinerary and travel
23     arrangements and accommodation assignments for
24     those people attending the Captive Insurance
25     meeting in the Cayman's.

Page 175

1  Q.  And that was for 1997?
2  A.  Yeah, January of '97.
3  Q.  Okay. So, to the extent you attended one of these
4      meetings, it was probably '97?
5  A.  '97. I said '96. Yeah.
6  Q.  Okay. If you look down on the first page,
7      Paragraph 4 says, "Travel Expense Reimbursement
8      Form. Maximum reimbursements, including prepaid
9      airline tickets and hotel is $2,650."
10         Do you remember if AHERF paid for, or
11     reimbursed travel expenses for everyone that
12     travelled to the extent of $200 and -- $2600?
13         MS. DeMASI: Objection to form.
14 A.  I believe so.
15 Q.  (BY MR. TAMBURRI) Okay. And would that have
16     included guests who were not employees of the
17     organization?
18 A.  Yes.
19 Q.  Okay. When an executive and his spouse were
20     travelling, were their expenses reimbursed each by
21     $2600; do you know?
22 A.  I don't recall the mechanics of it.
23 Q.  Okay. Did you ever hear of AHERF executives taking
24     trips to Portugal using AHERF money?
25 A.  No.

Page 176

1  Q.  How about Reykjavik, Iceland?
2  A.  I thought I heard about an offshore AHSPIC meeting
3      in Reykjavik.
4  Q.  Okay. Do you know when that was?
5  A.  No.
6  Q.  Okay. You didn't attend that meeting?
7  A.  No.
8  Q.  Okay. Did you ever hear that there were meetings
9      held in Stockholm, Copenhagen, or Scotland by AHERF
10     executives that were billed to the organization?
11 A.  No.
12 Q.  Did you ever meet with an individual named Rob
13     Cepielik from Coopers & Lybrand --
14     PricewaterhouseCoopers?
15 A.  What was the name?
16 Q.  Rob Cepielik, in October of 1998?
17 A.  Not that I recall.
18         THE COURT REPORTER: Can you spell that
19     last name, by any chance? Is it Cepielik?
20         MS. DeMASI: C-e-p-i-e-l-i-k.
21         THE COURT REPORTER: Thank you.
22 A.  What time period?
23 Q.  (BY MR. TAMBURRI) October 1998.
24 A.  Would have been after the bankruptcy.
25 Q.  (Nods head up and down).

Page 177

1  A.  No, I'm sorry, doesn't ring a bell.
2  Q.  Did you ever hear that AHERF paid any money on
3      behalf of Sherif Abdelhak in connection with his
4      divorce?
5  A.  No.
6
7          (Document was marked Deposition
8           Exhibit Number 2500 for identification.)
9
10         MR. TAMBURRI: I apologize, I'm short one
11     copy.
12 Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
13     what's been marked as Exhibit 2500. Have you ever
14     seen this document before?
15 A.  No, I don't recognize it.
16 Q.  Okay. Let me refer to you to Page 3249. I'll just
17     represent to you that this is a document that was
18     produced by PricewaterhouseCoopers in this
19     litigation.
20 A.  Uh-huh.
21 Q.  If you'll look at the top, it says, Section E,
22     "Risk of intentional misstatement of the financial
23     statements."
24         Under "Area For Assessment" in the left it
25     says, "The auditor should be alert for any known

## DEPOSITION ERRATA SHEET

| PAGE | LINE | |
|------|------|---|
| 142 | 4 | change "not" to "now" |
| 208 | 13 | change "some idea" to "IDS" |
| 211 | 17 | change "idea of" to "IDS" |

SIGNATURE: *[signature]*  DATE: 5-25-04

Dwight Kasperbauer

Page 228
1
2
3
4
5
6      *[signature: Dwight Kasperbauer]*
7      DWIGHT KASPERBAUER
8
9
10
11  Subscribed and sworn to before me this _____ day of
12  _____, 2004.
13
14
15          My Commission Expires:
16
17          _____
18          NOTARY PUBLIC
19
20
21
22
23
24
25