## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 00-684 |
| v. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | Judge David Stewart Cercone |
| Defendant. | ) ) | |

### APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

#### VOLUME 3

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA  15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

Kaye Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.,*

---

## *DONALD  KAYE, M.D.*
### *June 17, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

KAYE, M.D., DONALD



A **WORDWAVE** COMPANY

DONALD KAYE, M.D.,

Page 98

1  the West was paying for any expenses in
2  the East; it was the first time you
3  heard them described as a loan or as
4  support?
5  A.  It was an aberrant, as a differing
6  type of payment than what the normal
7  payments would have been, which would
8  have been on an ongoing basis because
9  certainly the West was responsible for
10 part of the operations of the medical
11 school.
12 Q.  Okay.  And you indicated that the
13 board meeting where you heard these
14 payments or part of these payments
15 described as a loan occurred in December
16 of 1997?
17 A.  Thereabouts.  I recall that there
18 was a question from Mr. Gumberg about
19 what it was, what it was for, and there
20 was discussion of -- indicating that it
21 was a loan and would be repaid.
22 Q.  Now, Dr. Kaye, is there something
23 about your recollection of that meeting
24 that causes you to place it in December
25 as opposed to some different month in

Page 99

1  1997?
2  A.  No.  It just -- I recall it was
3  toward the end of '97.  I've been
4  through many of these questions many
5  times before, and so I basically have
6  come up with certain time frames for
7  certain things.  And I said December or
8  thereabouts.
9  Q.  Okay.
10 A.  I mean, it could have been in
11 November, but I think it was in
12 December.
13 Q.  Do you recall which organization
14 was having the meeting that you referred
15 to during which this concept of a loan
16 was raised by Mr. Gumberg?
17 A.  No, I don't, but it was one of the
18 Eastern boards.  It could have been the
19 medical school board; it could have been
20 the hospital board.  If I had to guess,
21 and I've been told not to guess, but
22 since I'm prefacing it by saying it's a
23 guess, I would say it was a medical
24 school board.
25 Q.  Do you have any recollection, Dr.

Page 100

1  Kaye, of the issue of transfers in the
2  range of a hundred million dollars from
3  the West to the East coming up in an
4  October meeting held in the West, in
5  Pittsburgh?
6  A.  I have no recollection of that,
7  but it could have happened.
8  Q.  Now, Dr. Kaye, I'm going to go
9  into the area of your review of the
10 financial statements for the various
11 components of the AHERF organization and
12 what they may or may not have revealed
13 to you.  And I start with the
14 acknowledgment that you've testified a
15 couple times here already that you don't
16 have a financial background.  But let's
17 start with the Eastern hospitals for
18 which you were acting as president or
19 CEO at various times during the 1990s.
20      Did you ever have occasion to
21 review monthly, quarterly, annual
22 financial statements with respect to
23 those entities?
24 A.  Yes.  I reviewed, or at least I
25 saw the financial statements on a

Page 101

1  monthly basis, and on an annual basis
2  always really with Chuck Morrison
3  explaining to me what was there and what
4  it meant.  And when we started having
5  problems was when he couldn't explain to
6  me what was there and why it was there
7  or why numbers would change when we had
8  no reason in terms of the numbers of
9  admissions and numbers of patient days
10 and things like that for it to be
11 changing.
12      I depended heavily on Chuck
13 because he was the finance person.  I
14 thought and I think very highly of him
15 in terms of competence, honesty, and so
16 on.  And so, yeah, he would explain to
17 me.
18      I spent my time really with
19 the revenue and the expense statements,
20 and really did not pay much attention
21 because I never really understood them
22 well, or maybe I should say even at all,
23 the cash flow statements.
24 Q.  You indicated in your answer that
25 you reviewed or at least you saw monthly

26 (Pages 98 to 101)

DONALD KAYE, M.D.,

Page 102

1  statements.
2  A.  I reviewed them.
3  Q.  Okay.  And what do you recall
4  would constitute your review?  What
5  would it entail on your part?
6  A.  I'd look at the revenue, I'd look
7  at the expenses, I'd look at the
8  components of the revenue and the
9  components of the expenses and then see
10  what the bottom line was, by hospital
11  and by system.
12  Q.  And after you reviewed that
13  information, were there occasions where
14  you did something about it or was this
15  informational, from your standpoint, in
16  terms of understanding what had been
17  reported?
18  A.  This was primarily informational,
19  and as long as the bottom lines were
20  positive, that is, that the -- taking
21  the bottom line plus depreciation into
22  account was positive, I would be
23  somewhat reassured.
24       And when those figures were
25  negative, I would be concerned and try

Page 103

1  to find out why they were negative,
2  whether it was lack of revenue or
3  whether our expenses had suddenly jumped
4  somewheres over what had been budgeted,
5  and try to take action to correct
6  whichever it was.
7  Q.  Dr. Kaye, is it fair to say that
8  throughout the entire 1990s there were
9  often occasions where at least some of
10  the hospitals within the East were
11  negative in terms of revenues not
12  exceeding the operating expenses and
13  depreciation?
14  A.  Yes.  There were times, and it was
15  primarily with the smaller hospitals and
16  the less important hospitals with the
17  bigger hospitals basically having bottom
18  lines that were able to carry or
19  compensate for the smaller hospitals.
20  Q.  And did there come a time when
21  even the bigger hospitals turned
22  negative?
23  A.  Yes, there was.
24  Q.  And when did that occur,
25  approximately?

Page 104

1  A.  It occurred in July of 1997 with
2  me seeing it probably -- obviously after
3  the end of July, but mid-August, end of
4  August.
5  Q.  Were these changes to negative
6  bottom lines attributable to the changed
7  environment that you testified to
8  earlier, or were there other reasons you
9  recall for that?
10      MR. WHITNEY:  Objection.
11  Foundation.
12      THE WITNESS:  I had great
13  difficulty in understanding precisely
14  why it had happened.  Some of it was
15  clearly change in environment because we
16  didn't know as of the beginning of July
17  just exactly what the Medicare changes
18  were going to be, because they weren't
19  going to occur until, I think, October,
20  so that there was a -- basically a
21  accounting for negative changes because
22  that's what we thought was going to
23  happen.  We didn't know.
24      And the revenue just went to
25  pot.  And that's when we really started

Page 105

1  to try to find out what was going on in
2  Pittsburgh, which was doing the billing.
3  When the July figures came in, the
4  middle or end of August, Mr. Abdelhak
5  had just had surgery done and I flew out
6  there to show him because I was very
7  concerned.  His answer was, "Well, July
8  is often a difficult month to
9  interpret," and so on. "So don't worry
10  about it.  Wait until you see the August
11  figures."
12      Well, when the August figures
13  came in, they were equally bad, and that
14  was about the middle of September.
15  BY MR. McDONOUGH:
16  Q.  Okay.  Now, you indicated in your
17  review of the financial statements that
18  you would have the statements or various
19  entries thereon explained to you by
20  Chuck Morrison.
21  A.  As best he could.
22  Q.  As best he could.  And you
23  indicated that when you had problems was
24  when he couldn't explain them.  When do
25  you recall the first time this began to

27 (Pages 102 to 105)

LEGALINK MANHATTAN  (212) 557-7400

DONALD KAYE, M.D.,

Page 278

1    that would be good.
2         MR. WHITNEY:  Or we may
3    decide, if he's -- if Joe is windy and
4    goes as he did today until 1:00.  And
5    all, we may decide we need to take that
6    break.  But I'd like to avoid that.
7         MR. ISTVAN:  Okay.
8         MR. McDONOUGH:  That's what I
9    get for letting you choose when to have
10   the lunch break.
11        THE VIDEOGRAPHER:  Off the
12   video --
13        MR. ISTVAN:  Well, I just was
14   hoping somebody other than me would be
15   the one who wussed out.  But, I mean, if
16   nobody else is going to wuss out, I'll
17   step up to the plate.  I mean, I'll
18   wuss.
19        MR. McDONOUGH:  Okay.  So we
20   start at 9:00 tomorrow?
21        MR. ISTVAN:  Fair enough.
22        MR. McDONOUGH:  Okay.  Thank
23   you.
24        THE VIDEOGRAPHER:  This is
25   the end of tape number four.  The time

Page 280

1         WITNESS CERTIFICATION
2
3         I hereby certify that I have
4    read the foregoing transcript of my
5    deposition testimony, and that my
6    answers to the questions propounded,
7    with the attached corrections or
8    changes, if any, are true and correct.
9
10
11   _____  _____
     DATE        DONALD KAYE, M.D.
12
13
14
15
16   _____
         PRINTED NAME
17
18
19
20
21
22
23
24
25

Page 279

1    is 7:20.
2         MR. McDONOUGH:  5:20.
3         (The deposition adjourned at
4    5:20 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Kennedy Dep.**

VIDEOTAPED DEPOSITION OF WILLIAM C. KENNEDY
CONDUCTED ON THURSDAY, AUGUST 15, 2002

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3     ———————————————————————————

4   THE OFFICIAL COMMITTEE OF UNSECURED )

5   CREDITORS OF ALLEGHENY HEALTH,      )

6   EDUCATION AND RESEARCH FOUNDATION,  )

7                       Plaintiff,) CIVIL ACTION

8   v.                              ) NO. 00-684

9   PRICEWATERHOUSECOOPERS, LLP,        )

10                      Defendant.)

11    ———————————————————————————

12        Videotaped Deposition of WILLIAM C. KENNEDY

13            Charlottesville, Virginia

14            Thursday, August 15, 2002

15                  9:00 a.m.

16                Pages 1 - 274

17        Reported by:   Karen L. Hart, RMR-CRR

18

19

20

21

22

23

24

25

VIDEOTAPED DEPOSITION OF WILLIAM C. KENNEDY
CONDUCTED ON THURSDAY, AUGUST 15, 2002

Page 226

WILLIAM C. KENNEDY
1
2  Mike ever calling me asking me questions about what I  15:57:55
3  might have meant or not meant.  And I -- Mike and I  15:57:58
4  worked very well together, so I -- you know, I  15:58:03
5  just -- if I were involved in a call with Mike, I  15:58:06
6  would remember it, and I just -- I don't remember  15:58:13
7  one.  15:58:16
8    Q.  Okay.  Is your opinion that any realized  15:58:24
9  or unrealized gains that were had on the Lockhart  15:58:33
10  fund -- and I'm referring specifically to the three  15:58:37
11  accounts that are actually titled Lockhart and have  15:58:40
12  all the same language in the case of a security, that  15:58:43
13  language -- is it your belief that any gain on that  15:58:50
14  sale or any value appreciation on those funds other  15:58:55
15  than unspent income is part of principal?  15:59:01
16    MR. RYAN:  Objection.  15:59:08
17    THE WITNESS:  I think any monies that are  15:59:09
18  made on the sale of the securities would be  15:59:10
19  considered a premium or profit and that would be  15:59:14
20  corpus.  If you're getting a dividend -- you're  15:59:17
21  holding on to the stock and you're receiving  15:59:23
22  dividends, it would seem to me that in that instance  15:59:25
23  you're probably talking about income.  15:59:29
24  BY MR. TORBORG:  15:59:33
25    Q.  Okay.  Now, when you -- you said that you  15:59:33

Page 227

WILLIAM C. KENNEDY
1
2  weren't concentrating on Barbara Robinson's first two  15:59:38
3  paragraphs when you looked at this?  15:59:41
4    A.  Right.  15:59:43
5    Q.  You were simply looking at the language  15:59:43
6  itself?  15:59:44
7    A.  Yes.  15:59:45
8    Q.  Were you able to make the determination you  15:59:46
9  just made for me without looking at her first two  15:59:48
10  paragraphs?  15:59:53
11    MR. RYAN:  Objection.  15:59:56
12    THE WITNESS:  I hadn't thought of it that  15:59:56
13  way.  I was really responding specifically to the  15:59:58
14  questions that you've posed and trying to clarify my  16:00:02
15  answer.  16:00:07
16  BY MR. TORBORG:  16:00:12
17    Q.  My question is simply this.  16:00:12
18    A.  Reading the language, yeah.  16:00:15
19    Q.  Do you need this letter to determine  16:00:15
20  whether or not any gains on the sale that are not  16:00:17
21  attributable to interest income or dividend income  16:00:22
22  are permanently restricted and part of principal?  16:00:25
23    MR. RYAN:  Objection.  16:00:29
24    THE WITNESS:  That's an interesting  16:00:32
25  question.  16:00:33

Page 228

WILLIAM C. KENNEDY
1
2  This goes back to the question of there not  16:00:49
3  being a provision in the document for the use of  16:00:51
4  principal.  16:00:53
5    MR. TORBORG:  Well --  16:00:55
6    THE WITNESS:  And whether this -- we just  16:00:56
7  got done talking about premiums being income as  16:00:57
8  opposed to being principal.  So not having the  16:01:00
9  language in front of me, is it fair for me to  16:01:08
10  conclude that realized or unrealized gains could be  16:01:10
11  used is the question?  16:01:13
12  BY MR. TORBORG:  16:01:15
13    Q.  If the -- let me ask it a different way:  16:01:17
14  If there were language in the trust agreement that  16:01:19
15  said principal is permanently restricted or corpus is  16:01:22
16  permanently restricted --  16:01:25
17    A.  Uh-huh.  16:01:31
18    Q.  -- would you need the Barbara Robinson  16:01:31
19  letter to determine the availability of capital  16:01:32
20  appreciation on the trust?  16:01:37
21    MR. RYAN:  Objection.  16:01:37
22    THE WITNESS:  I think I would, but I  16:01:44
23  respect that someone that's much more knowledgeable  16:01:45
24  with regard to the way trusts function and work and  16:01:48
25  perhaps who are more familiar with the specific --  16:01:54

Page 229

WILLIAM C. KENNEDY
1
2  even these specific instruments might not have needed  16:01:58
3  it.  I think that my approach to this would be to go  16:02:03
4  back to the document, even if I had a gut feeling one  16:02:07
5  way or the other.  16:02:11
6  BY MR. TORBORG:  16:02:12
7    Q.  But you would rely on that underlying  16:02:12
8  document?  16:02:14
9    MR. RYAN:  Objection.  16:02:15
10    THE WITNESS:  I would rely on the  16:02:15
11  underlying document.  16:02:16
12    MR. TORBORG:  Okay.  I think we can put  16:02:23
13  this aside.  16:02:23
14    THE WITNESS:  Good.  16:02:25
15  BY MR. TORBORG:  16:02:25
16    Q.  You talked earlier about a severance  16:02:28
17  agreement that you prepared for Carol Calvert.  16:02:34
18    A.  Yes.  16:02:36
19    Q.  What do you remember about the  16:02:38
20  circumstances leading to that severance agreement?  16:02:40
21    A.  I was told that she was being let go by  16:02:51
22  David McConnell.  My conversations were all with  16:02:56
23  David, not with Mr. Abdelhak.  David came to me --  16:03:00
24  and again, this is at a time Nancy's not there -- we  16:03:07
25  need a severance agreement for Carol, basically what  16:03:11

58 (Pages 226 to 229)