IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
   Plaintiff,
  vs.       Civil Action
PRICEWATERHOUSECOOPERS,  No. 00-684
LLP,
    Defendant.

    Continued Videotaped Deposition of

MARK D. KIRSTEIN, called for examination under

the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Jones Day, 222 East 41st Street,

Suite 400, New York, New York, on Thursday, the

13th day of May, 2004, at 8:30 a.m.

     - - - - -

    VOLUME III

     - - - - -

Mark Kirstein                                                                                  Volume 3

Page 584

1  substantive review role for all areas at the
2  managerial level or manager level for fiscal
3  year 1997?
4        MR. RYAN:  Objection to form.
5        A.   From a manager's perspective, she        08:55:32
6  would be the person that would do that, yes.
7        Q.   I think you've told us you don't
8  remember AHERF moving to a new bad debt
9  reserving methodology for fiscal year 1997, so
10 I think I can anticipate the answer to this        08:55:51
11 question, but forgive me.  Did you ever learn
12 that anyone at AHERF was involved in the
13 process of developing a new methodology for
14 fiscal year 1997, anyone internal or employed
15 by AHERF, internal to or employed by AHERF?        08:56:06
16       A.   I don't recall hearing that.
17       Q.   Do you recall learning that either
18 Mr. Cancelmi or those at the patient financial
19 services group were involved in such an
20 endeavor?                                          08:56:19
21       A.   No, sir.
22       Q.   Do you have a view as you sit here
23 today about who would have been better suited
24 to prepare a new or a methodology for fiscal
25 year 1997 between Mr. Cancelmi and those in        08:56:32

Page 585

1  his -- on his staff or those at the patient
2  financial services group?
3        MR. RYAN:  Objection.  Vague.  Lack
4  of foundation.
5        A.   What do you mean by better suited?      08:56:42
6        Q.   I would just ask you if you had a
7  view.
8        A.   I put everyone -- you talked about
9  AHERF people.  It's AHERF's financial
10 statements and AHERF's system of internal          08:56:51
11 controls.  I don't know who's better suited.  I
12 don't know what you mean by that.  But if they
13 were developing a new process, I would assume
14 they would do whatever reviews and dialogue and
15 discussions and consultation they felt            08:57:03
16 necessary amongst their own people.
17       Q.   Do you recall any discussions with
18 anyone at AHERF about, or at Coopers & Lybrand
19 about a proposed or implemented new bad debt
20 reserve methodology for fiscal year '97?          08:57:15
21       A.   No, I have no recollection.
22       Q.   You recall, however, that for
23 fiscal year -- let me withdraw that.
24       You recall, Mr. Kirstein, that for
25 fiscal year 1997, AHERF was moving to a           08:58:02

Page 586

1  consolidated audit?
2        A.   You mean in '97 AHERF would have
3  one audit for all of AHERF?  Yes.
4        Q.   In connection with that, do you
5  recall issues arising with respect to the          08:58:21
6  debt-holders for the various obligated groups?
7        A.   What sort of issues?
8        Q.   Issues about whether a consolidated
9  audit at AHERF complied with the terms of the
10 debt instruments at the various obligated          08:58:40
11 groups.
12       A.   What I recall is management
13 asked -- management engaged in dialogue with us
14 in the planning process in the -- for fiscal
15 '97 about doing a consolidated audit.              08:58:57
16       Coming off of '96 where we had just
17 done the DVOG audit, and I think there was an
18 AGH obligated group audit, what I recall is
19 that Coopers & Lybrand, we had said to
20 management, we can do whatever audit you want       08:59:10
21 us to do, you can engage us for the scope, but
22 you need -- you, AHERF, need to consult with
23 your debt-holders and your legal counsel
24 eventually to ensure that whatever audit report
25 we issue will be sufficient for your debt          08:59:26

Page 587

1  purposes.
2        Q.   Do you recall with whom at AHERF
3  you may have had any such discussions?
4        A.   It's the same general group I've
5  given you the last two days.  I mean, finance      08:59:40
6  folks.  I don't remember specific discussion.
7  But planning for '97 was pretty much with Dan
8  Cancelmi, Steve Spargo, Al Adamczak.
9        Q.   Do you recall that Mr. Spargo left
10 the organization sometime in 1997?                 09:00:05
11       A.   Yes, sometime early during the
12 planning stage.  I don't remember the exact
13 date.
14       Q.   Do you recall who assumed his
15 responsibilities?                                  09:00:14
16       A.   I believe Al Adamczak, but I don't
17 know if that was a one-for-one assumption of
18 responsibilities.  I don't know everything that
19 Steve did and everything that Mr. Al did.
20       Q.   The reason I raise it, when Mr.          09:00:28
21 Spargo left, you didn't start communicating
22 with somebody new; the group with whom you
23 primarily communicated just got one person
24 smaller; is that fair to say?
25       A.   Yes.                                    09:00:39

7 (Pages 584 to 587)

Page 588

1    Q.    There wasn't a replacement for Mr.
2   Spargo, whose name we haven't mentioned?
3    A.    No, not that I'm aware of.
4    Q.    Mr. Kirstein, I'm going to hand you
5   a rather large exhibit and ask you not to be      09:00:51
6   afraid.  It is an exhibit you've seen before in
7   the SEC proceeding and I think we're going to
8   leave it just like it was there because the
9   copy is superior to some of the
10  documents, and we will flip back and forth in    09:01:05
11  it from time to time, but we are going to have
12  to look at the whole thing.
13   A.    Okay.
14   Q.    It is -- I'm going to need to mark
15  that.  I apologize.                               09:01:12
16       It is Exhibit 377 in the SEC
17  proceeding, I believe, and we would like to
18  mark it in this case as exhibit next.
19       MR. TORBORG:  Spelled N E X T.
20   Q.    And that number is 4403.                   09:01:33
21       - - - - -
22       (Thereupon, Deposition Exhibit 4403
23       was marked for purposes of
24       identification.)
25       - - - - -                                    09:01:39

Page 589

1    Q.    I will direct your attention
2   obviously to a relative few pages in this
3   document from time to time this afternoon --
4   this morning.
5    A.    Okay.                                      09:01:53
6    Q.    The first one today -- as you may
7   recall, it is a combination of a number of
8   documents, and I know not whether they are
9   supposed to be related, but it was used in that
10  prior deposition and really did have superior    09:02:04
11  quality copies on a number of pages.
12       I'm going to ask you to look at
13  page 28 now, which I think is a distinct
14  document within it.  It's a single-page
15  document.                                         09:02:19
16   A.    Where is the page number, bottom in
17  the lower right?
18   Q.    They are in the lower right-hand
19  corner, yes.
20       They start with the prefix PwCK2 in         09:02:23
21  all instances, and, for our ease, I'm just
22  going to refer to the last two digits on the
23  far right side.
24   A.    Hang on.  Document dated August
25  15th at the top?                                  09:02:33

Page 590

1    Q.    Yes, it is an AHERF audit update,
2   August 15, 1997, is that right?
3    A.    Yes.
4    Q.    Does it contain your handwriting?
5    A.    Yes, it does.                              09:02:40
6    Q.    I'm going to refer you in
7   particular -- well, take a moment to read the
8   document and your notes.
9    A.    Great, thanks.
10       Okay.                                        09:04:01
11   Q.    The notes are all yours in your
12  hand?
13   A.    I believe so, yes.
14   Q.    I'm going to refer you to the point
15  with the black diamond next to it which appears  09:04:09
16  about a quarter of the way down the page headed
17  debt.
18   A.    Okay.
19   Q.    And beneath that, the first
20  subpoint reads, "Written representation from     09:04:19
21  bondholders regarding financial statements,"
22  and then beneath that, "Need for individual
23  compliance letters" with three question marks.
24       Do you see that?
25   A.    Yes.                                       09:04:32

Page 591

1    Q.    What is the handwritten note that
2   appears to have a line drawn to one or both of
3   those subpoints?  How does that read?
4    A.    It's only drawn to the -- looks --
5   appears to be only drawn to the second bullet,   09:04:43
6   title, Need for Individual Compliance Letters.
7   It says C&L to draft, and then, in parentheses,
8   Christa, Brian to research.
9    Q.    Having had a chance to read the
10  document, do you think, first of all, that you   09:04:55
11  prepared this audit update?
12   A.    The actual typed part?
13   Q.    Yes.
14   A.    I don't recall.
15   Q.    Do you recall reviewing it before        09:05:02
16  today?
17   A.    Sometime during preparation.
18   Q.    Do you recall, as you sit here
19  today, what the handwritten note means to you,
20  or do you know what the handwritten note means?  09:05:13
21       MR. RYAN:  You mean that note that
22  we've read?
23       MR. JONES:  Yes, the one he just
24  read into the record.
25   A.    I don't recall writing it, but it        09:05:23

8 (Pages 588 to 591)

Mark Kirstein                                                                 Volume 3

Page 592

1   looks like it's just a note that says Christa
2   Porter and Brian Christian were to research
3   something related to debt compliance letters.
4       Q.    Do you recall that there was an
5   effort on Cooper & Lybrand's part to assist its      09:05:34
6   client in evaluating whether the consolidated
7   financial statements that were proposed for the fiscal
8   year 1997 would comply with the various debt
9   agreements of the various obligated groups?          09:05:51
10      THE WITNESS:  Could you read that
11  again, please?
12      (Record read.)
13      A.    I don't recall that.
14      All I recall is what I said          09:06:19
15  earlier, that C&L had told AHERF management
16  that they need to consult with their legal
17  counsel and other appropriate parties for them
18  to ensure that what we would audit and provide
19  to them would be sufficient for their debt           09:06:31
20  purposes.
21      Q.    Did you ever learn that Mr. -- that
22  Brian or Christa, Mr. Christian or Miss Porter
23  ever did any research?
24      MR. RYAN:  Objection.  I think         09:06:41

Page 593

1   that's a misleading way of asking the question
2   because the topic that they are supposed to
3   research is a completely different topic the
4   witness has indicated from the topic of the
5   previous sentence.  So I'll object.          09:06:54
6       Q.    Do you recall whether they did the
7   research?
8       MR. RYAN:  Objection.  What
9   research?
10      MR. JONES:  Referred to in his          09:07:02
11  note.
12      A.    I said I don't recall what research
13  that would be, so I just don't know.
14      Q.    You recall seeing no results of
15  research that had anything to do with debt from      09:07:09
16  those two individuals, is that fair to say?
17      A.    I don't recall.
18      Q.    Did you ever do any research
19  yourself on the topic of debt at the various
20  obligated groups in connection with the              09:07:23
21  consolidated financial statements that were
22  proposed?
23      MR. RYAN:  Objection to form.
24      A.    In '97?
25      Q.    Yes, for fiscal year '97.          09:07:31

Page 594

1       A.    Not that I recall.
2       Q.    Do you recall --
3       A.    And I assume in your last question
4   you is Mark Kirstein?
5       Q.    Yes, I meant you personally.          09:07:41
6       A.    Not that I recall.
7       Q.    Do you recall becoming aware of an
8   effort on the part of AHERF to secure written
9   representation from the various bondholders to
10  the effect that the consolidated financial           09:08:05
11  statements that were proposed would comply with
12  the terms of their debt agreements?
13      MR. RYAN:  Would you read that
14  again, please?
15      (Record read.)          09:08:07
16      THE WITNESS:  One more time,
17  please?  I'm sorry.
18      (Record read.)
19      A.    I don't recall becoming aware of
20  that, but I also believe that Amy Frazier and        09:08:56
21  Bill Buettner addressed matters with management
22  related to debt covenants and required
23  communications that might be necessary with
24  AHERF and their legal counsel.  I think that
25  was Foley & Lardner.          09:09:12

Page 595

1       Q.    Regarding debt compliance matters
2   in connection with the audited financial
3   statements?
4       A.    Yes, it's my understanding, not
5   recollection, understanding some of that may be      09:09:20
6   from prep.  But I do recall Bill and Amy dealt
7   with the debt covenant pieces as the audit
8   wrapped up, I recall that.
9       Different times during preparation
10  I've seen, you know, Amy and Bill I believe          09:09:32
11  worked with AHERF management and their counsel
12  Foley & Lardner to determine what was required
13  from a debt compliance perspective.
14      Q.    And in preparation you mean either
15  in connection for this deposition or               09:09:48
16  depositions in the SEC proceeding?
17      A.    Correct.
18      Q.    Let me ask you to look at the last
19  diamond under debt on page 28 of Exhibit 4403.
20      A.    Okay.          09:10:05
21      Q.    It says, "Potential debt covenant
22  violations," and then it has three question
23  marks next to it.  Is that correct?
24      A.    Yes.
25      Q.    Do you recall becoming involved in      09:10:13

9 (Pages 592 to 595)

Mark Kirstein                                                                    Volume 3

Page 628

1   A.   Yes.
2   Q.   You have that before you again?
3   A.   Yes.
4   Q.   Do you recall reviewing the
5   provision I asked you to review, 440.6, on        10:08:35
6   page -- the second page of the exhibit before
7   today?
8   A.   No.
9   Q.   I'm going to ask you now to look at
10  page 26 of Exhibit 58, which itself is the        10:08:50
11  consolidated financial statements at AHERF for
12  the year-ending June 30, '97.
13  A.   Okay.
14  Q.   What did you understand in
15  connection with your audit work at AHERF the      10:09:05
16  purpose of this report at page 26 to be?
17  A.   It's a report that -- the language
18  pretty much does a nice job of explaining what
19  it is. It's a report that is on supplemental
20  information. So it's not a required part of       10:09:34
21  the AHERF consolidated financial statements
22  that is informing whoever would be reading this
23  that it is supplemental information and it's
24  telling them that it's not -- that the audit
25  was not designed to audit necessarily the        10:09:46

Page 629

1   detailed information in there. But, as it
2   says, this is presented for additional
3   analysis, this does not require -- a required
4   part of the consolidated financial statements.
5         Then it goes on and does give an          10:10:00
6   opinion or at least -- yeah, an opinion that
7   says, "The supplementary consolidated financial
8   information has been subjected to the auditing
9   procedures applied in audit of the consolidated
10  financials and in our opinion is fairly stated   10:10:12
11  in all material respects in relation to the
12  consolidated financial statements taken as a
13  whole.
14  Q.   Let me ask you to put that aside
15  for a moment. I'm going to ask you now about     10:10:40
16  another set of issues related to your work on
17  the fiscal year 1997 audit at AHERF. In
18  particular, the transfer of certain reserves to
19  the Delaware Valley Obligated Group hospitals.
20       When I ask you these next questions,       10:11:02
21  I'm going to refer to the Graduate hospitals
22  and the Delaware Valley Obligated Group
23  hospitals.
24       You understand those to be two sets
25  of hospitals within the AHERF family in fiscal   10:11:11

Page 630

1   year 1997?
2   A.   Yes.
3   Q.   The Graduate hospitals included
4   hospitals with names like the Graduate
5   Hospital, Mt. Sinai, Rancocas, City Avenue and   10:11:24
6   Parkview, is that consistent with your
7   recollection?
8   A.   Yes.
9   Q.   The Delaware Valley Obligated Group
10  hospitals to which we referred both today and    10:11:33
11  yesterday included hospitals named Hahnemann,
12  MCPH, EPPI?
13  A.   Right.
14  Q.   St. Chris, Elkins and Bucks?
15  A.   I think that's right.          10:11:45
16  Q.   For purposes of my questions that
17  follow, I'm going to use those definitions. Is
18  that fair to you?
19  A.   Sure.
20  Q.   When do you -- when do you first    10:11:56
21  recall, Mr. Kirstein, learning that AHERF had
22  set up 50 million dollars of reserves in
23  connection with purchase price accounting for
24  the acquisition of the Graduate hospitals and
25  then transferred those reserves to the DVOG      10:12:17

Page 631

1   hospitals?
2         MR. RYAN:  Can I get that read
3   back, please?
4   Q.   Bad debt reserve.
5         MR. RYAN:  Sorry, Jim, I didn't    10:12:25
6   mean -- I didn't realize you weren't done.
7         (Record read.)
8   Q.   Reserve accounts.
9   A.   Sometime early in the year-end
10  phase of the audit, so say August I recall       10:12:54
11  learning -- I believe I learned that from Amy
12  Frazier.
13  Q.   When do you first recall learning
14  that AHERF was planning to do what I just said,
15  or considering doing what I just said?           10:13:15
16        MR. RYAN:  Objection to form.
17  Q.   Let's start with planning.
18  A.   I don't recall ever learning that
19  they were planning to do that. The first time
20  I recall learning that they had transferred      10:13:27
21  reserves set up through purchase accounting was
22  in early August.
23  Q.   So the first time you learned of
24  it -- of the transfer of reserves or any
25  planning or consideration of it at all was in    10:13:39

18 (Pages 628 to 631)

Mark Kirstein                                                                                                    Volume 3

Page 632

1  this early August time frame, 1997?
2      A.  That's my recollection.
3      Q.   So you never learned of it in
4  advance of believing that it had already
5  occurred, is that fair to say?           10:13:56
6          THE WITNESS:  Could you read that
7  one again?
8          (Record read.)
9      A.  I don't understand that question.
10     Q.   I'm sorry.                       10:14:09
11         The first time you heard or had any
12  awareness of transfers of purchase accounting
13  reserves established in connection with the
14  Graduate hospitals' reserves by AHERF to the
15  Delaware Valley Obligated Group hospitals' bad  10:14:30
16  debt reserve was at a time when you believe the
17  transfers had already been effected or had
18  occurred?
19     A.   I believe that's what happened.  I
20  mean, in -- as I recall, I mean, I learned   10:14:48
21  early in the year-end phase of the audit that
22  C&L had received the purchase accounting
23  support, the support for the opening balance
24  sheet of Graduate hospitals.  At that point
25  that's when Amy Frazier learned that there was  10:15:02

Page 633

1  a transfer.
2      Q.   And is it -- should I take from
3  that answer that you learned of this transfer
4  of reserves -- was the amount 50 million that
5  you first heard of?                       10:15:18
6      A.   I don't specifically recall today
7  the amount, but that's consistent.
8      Q.   That's consistent with what?
9      A.   It's consistent generally with any
10  numbers that I've heard throughout, you know --  10:15:25
11  during the audit.  I mean, I can't sit here
12  today and say that day Amy told me it's 50
13  million dollars.
14     Q.   You later learned that this
15  purchase price accounting reserve amount that  10:15:35
16  was transferred to bad debt reserve was in the
17  amount of 50 million dollars; is that fair to
18  say?
19     A.   Yes.
20     Q.   Sometime after -- at or after early  10:15:44
21  August of 1997?
22     A.   Correct.
23     Q.   My question was, is it fair to say
24  from your answer, an answer or two ago, that
25  you learned of this development from Miss       10:15:55

Page 634

1  Frazier?
2      A.   Yes.
3      Q.   How is it that you learned of it,
4  through a letter, through a face-to-face
5  conversation, otherwise?               10:16:13
6      A.   No.  I believe, as I recall, I
7  believe Amy had received opening balance sheet
8  information related to Graduate or some sort of
9  information related to the Graduate
10  acquisition.  I was over at the Clark Building.  10:16:24
11  We talked earlier about my role being a
12  managerial role.  At some point, I don't
13  remember the date or time, Amy informed --
14  discussed with me at that point that she had
15  learned that they had transferred reserves to  10:16:34
16  Delaware Valley and that she was undertaking
17  audit procedures.
18     Q.   Was anybody else present?
19     A.   I don't recall.
20     Q.   What do you recall about the        10:16:43
21  conversation?
22     A.   I don't recall specifics about the
23  conversation.
24     Q.   Do you recall being concerned about
25  the fact that she had revealed to you?      10:16:51

Page 635

1          MR. RYAN:  Objection to form.
2      A.   No.
3      Q.   Do you recall her expressing
4  concern over the fact that she had revealed to
5  you?                                    10:17:07
6          MR. RYAN:  Objection.
7      Q.   The fact of the transfers.
8          MR. RYAN:  Objection to form.
9      A.   No.
10     Q.   Did either of you discuss whether   10:17:14
11  or not at this time the transfers would have
12  been in compliance with Generally Accepted
13  Accounting Principles?
14     A.   No.  All I generally recall is
15  learning that Amy learned of a transfer and  10:17:29
16  that she was going to undertake audit
17  procedures.  You don't typically make judgments
18  and assessments of whether it's GAAP or
19  allowable or unallowable until you complete
20  audit procedures.                      10:17:41
21     Q.   Did you at that time form an
22  opinion that you should take this to
23  Mr. Buettner promptly, this revelation?
24         MR. RYAN:  Objection to form.
25     A.   I don't know what you mean by     10:17:52

19 (Pages 632 to 635)

Mark Kirstein                                                    Volume 3

Page 648

```
 1      Q.   I would like to turn your attention
 2  to page 45 of the notes.  At the top of the
 3  page there's a header that is underlined that
 4  reads, Dan C period, 4-18, and I think
 5  continues with the names Buettner slash      10:32:47
 6  Frazier.  Am I right?
 7      A.   Yes.
 8      Q.   Does having a chance to see that
 9  and looking at the notes refresh your
10  recollection that these are notes of a        10:32:57
11  conversation among these three people and you?
12      MR. RYAN:  Objection.
13      A.   I believe they're notes of a
14  conversation amongst Bill Buettner, Amy
15  Frazier, Dan Cancelmi.  I don't recall the    10:33:13
16  specific conversation that these notes
17  reference, but --
18      Q.   You recall being involved yourself
19  as well?
20      A.   I don't recall this specific        10:33:20
21  meeting on April 18th, but the nature of my
22  note taking is to write the attendees at the
23  top.
24      Q.   Do you write your own name down is
25  what I'm getting at?                          10:33:30
```

Page 649

```
 1      A.   No.
 2      Q.   Or do you typically not do so?
 3      A.   I typically do not do that.
 4      Q.   So if you followed your protocol,
 5  this was a meeting or at least a phone call in  10:33:38
 6  which you were a participant at some level?
 7      A.   Correct.
 8      Q.   Do you recall whether it was a
 9  meeting or a phone call?
10      A.   I don't recall.                     10:33:45
11      Q.   You typically date your notes on
12  the day the communication took place?
13      A.   Yes.
14      Q.   Do you have any reason to doubt
15  that this communication took place on April 18,  10:34:00
16  1997 today?
17      MR. RYAN:  Objection.
18      A.   Doubt that it took place?
19      Q.   Yes.
20      A.   I suspect it did take place.        10:34:07
21      Q.   So you don't have a reason to doubt
22  it, I'm right?
23      A.   Correct.
24      Q.   What does the line across the
25  middle of the page mean to you, if anything, in  10:34:24
```

Page 650

```
 1  connection with your note taking practices?
 2      A.   It doesn't mean anything.
 3      Q.   Can you read the first two lines
 4  beneath that line across the middle of the page
 5  for us?                                        10:34:41
 6      A.   50 million dollar reserves at
 7  Graduate, will have 80 million dollars C slash
 8  O, charge-offs, in DV by 6-30-97, and then in
 9  parens, gross number on A/R outpatient.
10      Q.   The C/O means charge-offs?          10:35:03
11      A.   I believe so, yes.
12      Q.   Does the DV mean the Delaware
13  Valley Obligated Group?
14      A.   I don't know what the DV means in
15  this situation.                               10:35:12
16      Q.   I just asked you before if DV in
17  your answer meant Delaware Valley Obligated
18  Group.  So does having me refresh your
19  recollection there lead you to believe that DV
20  most likely means Delaware Valley Obligated    10:35:25
21  Group in these notes?
22      MR. RYAN:  Objection.  Misstates
23  prior question and answer.
24      A.   No, don't read anywhere DV meaning
25  any one thing at any one time.  You would have  10:35:36
```

Page 651

```
 1  to be at the place of a meeting to know the
 2  context of DV.  The reason I say that is
 3  Delaware Valley is a common term used by the
 4  audit team as well as by AHERF management to
 5  discuss the eastern region, the Philadelphia    10:35:52
 6  and eventually later New Jersey hospitals.  It
 7  also happens to be the Delaware Valley
 8  Obligated Group.  But in most cases in dialogue
 9  with management throughout the year as you're
10  planning for the audit, you're really talking   10:36:04
11  about hospitals.  You're not usually talking
12  about financial statements.
13      So I would say it's actually
14  probably more Delaware Valley references
15  entities than it does an obligated group, which  10:36:17
16  tends to happen later on when financial
17  statements are being prepared.
18      Q.   So as you sit here today, you know
19  that C/O, C slash O means charge-offs to the
20  best of your ability to read your note?         10:36:31
21      A.   Yes.
22      Q.   You don't know whether the DV means
23  Delaware Valley Obligated Group, is that right?
24      A.   That's right.
25      Q.   What does the gross number on A      10:36:35
```

23 (Pages 648 to 651)

Mark Kirstein                                                         Volume 3

Page 652

1  slash R outpatient mean?
2      A.   I don't recall.
3      Q.   Do you recall knowing at this time
4  frame, that is, in the spring or April -- in
5  the spring of or April of 1997 that AHERF        10:36:52
6  accounting had written off a large amount of
7  accounts on the books of the DVOG entities,
8  accounts receivable, that is?
9      A.   Yes.
10     Q.   Do you recall the quantum, roughly?    10:37:06
11     A.   I believe and I generally recall 80
12 million dollars being a number I heard at
13 different points in time during planning, that
14 AHERF had charged off some old accounts
15 receivable related to the system conversions we   10:37:19
16 talked about yesterday and the day before from
17 PATCOM to Envision.  There might have been
18 another -- another conversion in there as well.
19     Q.   I'm going to ask you to read the
20 next line of your notes.                          10:37:31
21     A.   Placing reserves on Graduate
22 entities to be used for DVAR at Y slash E,
23 year-end.
24     Q.   What does that mean to you today?
25 Or do you recall what you meant to write when     10:37:47

Page 653

1  you wrote that note?
2      A.   No, I --
3          MR. RYAN:  Objection.
4      A.   No, I don't recall this meeting and
5  I think, therefore, I don't know what the        10:37:54
6  context was, so I don't know what I was writing
7  there.
8      Q.   Do you recall today whether DV
9  meant the Delaware Valley Obligated Group or
10 some other group of hospitals?                    10:38:05
11     A.   I can't even tell you it meant a
12 group of hospitals.  It could have meant the
13 entity.  It could have meant the region
14 Delaware Valley.
15     Q.   What does the next line of your        10:38:17
16 notes say?
17     A.   "Does not believe there is any
18 general reserves other than 50 million
19 dollars."
20     Q.   Do you recall what that means        10:38:25
21 today?
22     A.   No, sir.
23     Q.   Can you read the next two lines?
24     A.   "Becomes part of PP&E slash
25 intangible as part of purchase adjustment from   10:38:37

Page 654

1  SDN to AHERF."  Then there's an indent.  Defers
2  A/R problem to be deferred.
3      Q.   Did you understand SDN at the time
4  to be an enterprise that was somehow involved
5  in some intermediate ownership or -- let's       10:38:56
6  leave it at intermediate ownership of the
7  Graduate hospitals?
8      A.   I don't know the legal structure,
9  but SDN was an entity that I believe the
10 Graduate hospitals were going to sit in until     10:39:09
11 AHERF acquired them legally, whatever had to
12 happen legally.
13     Q.   Do you recall today what you meant
14 by saying "defers A slash R problem to be
15 deferred"?                                        10:39:24
16     A.   No, I don't, sir.
17     Q.   Do you recall any discussions with
18 Mr. Cancelmi or Mr. Buettner or Miss Frazier at
19 any time about deferring an A/R problem at the
20 Delaware Valley Obligated Group hospitals?        10:39:38
21     A.   No, I don't recall a discussion.  I
22 don't recall becoming aware of an A/R problem.
23     Q.   Do you recall any discussions with
24 anyone at Coopers & Lybrand during your fiscal
25 year 1997 audit work regarding deferring an A/R   10:39:51

Page 655

1  problem at any set of hospitals?
2      A.   No, I don't recall that being a
3  matter that I discussed that year.
4      Q.   Do you recall it being a matter
5  that you discussed in any year, deferring A/R     10:40:06
6  problems?
7      A.   No, I don't recall discussing
8  deferring problems.  We talked in '96 they had
9  increases in A/R and other things that could be
10 A/R problems, but I don't know what the defer     10:40:18
11 reference is here in these notes.
12     Q.   Do you ever --
13         I'm going to ask you to flip one
14 page back to page 44 of your notes.
15     A.   Okay.                                   10:40:48
16     Q.   At the top of the page you've
17 written the word or the -- I think the date
18 4-21 and the word conference call or an
19 abbreviation for it.
20         Is that right?                          10:41:01
21     A.   Yes.
22     Q.   Do you believe today that these are
23 notes of a 4-21-97 conference call --
24         MR. RYAN:  Objection.
25     Q.   -- written in your hand?               10:41:11

24 (Pages 652 to 655)

Mark Kirstein

Page 656

1    A.    Yes, at least the top part. I
2  don't know if the bottom part is written at
3  some other time or not. I don't know.
4    Q.    Let's look then at the top part.
5  Read the note for me that follows the heading.    10:41:21
6    A.    50 million dollar additional A D D
7  T, apostrophe L, additional reserves.
8    Q.    Can you read the note on the
9  left-hand margin that appears to either be
10  drawn to that first note or to a place above    10:41:36
11  it?
12    A.    Write down 50 million dollars
13  paren, parenthesis, put half against A/R.
14    Q.    Do you have any recollection today
15  what either one of those notes means?    10:41:49
16    A.    No, sir.
17    Q.    Can you read the rest of that note
18  regarding the 4-21-97 conference call for us
19  starting with the 40 million dollar reference?
20    A.    Sure. 40 million dollar --    10:42:14
21    Q.    Let me give you one caution on it.
22  I apologize for interrupting. If you'd read it
23  a little more slowly than some of the other
24  reading we've been doing, the court reporter
25  will be happier.    10:42:24

Page 657

1    A.    She'll be my friend?
2    Q.    Perhaps.
3    A.    40 million dollar debt at Mt. Sinai
4  to Graduate. Then there's a bullet. Mt. Sinai
5  to be sold for ten million dollars. Subbullet,    10:42:33
6  merge with AHERF, question mark. Prior or
7  subsequent, question mark. New bullet. D E P
8  R, depreciation. Recapture. Subbullet, view
9  as NOL under 109. Then the number one GW,
10  probably good will. The number two, other    10:42:58
11  intangibles. The number three, a down arrow.
12  Probably means decrease in expense.
13    Q.    Does NOL mean net operating loss?
14    A.    I believe so, yes.
15    Q.    What is under 109 mean to you?    10:43:10
16    A.    As it relates to AHERF or is it
17  just in this note or what?
18    Q.    As it relates to this note in
19  particular.
20    A.    I don't recall writing the note,    10:43:19
21  so, I mean, do you want me to speculate?
22    Q.    In your note-taking practices as an
23  auditor at Coopers & Lybrand, does that give
24  you any context to tell us what you think 109
25  meant at the time?    10:43:34

Page 658

1    A.    109 is a FASB related to taxes, an
2  SFAS statement related to taxes. Net operating
3  loss is a concept related to taxes.
4    Q.    Do you have any reason today to
5  doubt that the page -- the rest of the notes on    10:43:47
6  the page below the line that crosses it to
7  which you referred earlier were taken on the
8  same day?
9    MR. RYAN:  Objection.
10    A.    I don't know when they were    10:44:03
11  written.
12    Q.    Do you know one way or the other
13  whether they were written on the same day as we
14  sit here today?
15    A.    No, I don't.    10:44:10
16    Q.    Look at item one under summary of
17  conclusions. Can you read that for us?
18    A.    "Debits generated by purchase
19  accounting to PP&E over 30 years. Subbullet,
20  will occur at time to AHERF."    10:44:30
21    Q.    Do you know what that means today?
22  Do you have any recollection?
23    A.    I don't recall writing the note, so
24  I can't give you a specific recollection. It
25  seems to reference the concept of amortization    10:44:49

Page 659

1  of items recorded as part of purchase
2  accounting when they were recorded against
3  PP&E.
4    Q.    So the line "will occur at time to
5  AHERF" means at the time transferred to AHERF    10:45:03
6  ownership?
7    A.    I don't know what it means.
8    MR. RYAN:  Objection.
9    A.    I don't remember the meeting, so I
10  don't know exactly what it is, but you asked me    10:45:11
11  to generally try to speculate what number one
12  might reference. And I tried to help you with
13  that.
14    Q.    I didn't ask you to generally
15  speculate. I asked you to give me your best    10:45:18
16  effort to read the note in context.
17    Is it true that your best effort to
18  read the note in context would cause you to say
19  that the note will occur at time, to AHERF
20  means entrance into AHERF or ownership by    10:45:35
21  AHERF?
22    MR. RYAN:  Objection.
23    A.    I don't know. I don't know what
24  that means.
25    Q.    In the left-hand margin, the lower    10:45:40

25 (Pages 656 to 659)

Mark Kirstein                                                                    Volume 3

Page 660

1  left-hand corner, you have apparently written
2  the words in a box or a part of a box "view
3  consolidated basis as acquisition."
4          Did I read that right?
5      A.   Yes.                              10:45:53
6      Q.   Do you know what that means today?
7      A.   I do not.
8      Q.   Do you have any recollection of
9  what it meant when you wrote it down?
10     A.   No, I don't.                      10:45:58
11     Q.   I'm going to ask you to flip back a
12 couple pages to page 37 of the exhibit.  Page
13 37 through 41, I think, if you take a moment to
14 review them, are another set of your
15 handwritten notes.  If you could confirm that    10:46:33
16 for me and then that would be great and I will
17 have a few questions on them.
18         MR. JONES:  And this is a good spot
19 to change the tape.
20         THE VIDEOGRAPHER:  Off the record    10:46:49
21 at 10:47, end of the first videotape.
22         (Recess had.)
23         THE VIDEOGRAPHER:  On the record at
24 10:56.  Videotape number two, volume three.
25     Q.   Mr. Kirstein, I had a quick          10:56:22

Page 661

1  follow-up question to the set of notes we were
2  just looking at, in particular, on page 44.
3      A.   Okay.
4      Q.   Which those notes are headed with
5  the 4-21 conference call phrase.              10:56:35
6      A.   Okay.
7      Q.   Do you know who was on this
8  conference call as you sit here today?
9      A.   No, I do not.
10     Q.   Let's again refer you back again to    10:56:53
11 page 37 through 41.  These are notes in your
12 hand?
13     A.   Yes.
14     Q.   They're dated 6-10, is that right?
15     A.   Correct.                           10:57:19
16     Q.   Do you believe that to be 6-10-97?
17     A.   Yes.
18     Q.   You've numbered the pages one
19 through five through five of five?
20     A.   Correct.                           10:57:29
21     Q.   In the upper right-hand corner?
22     A.   Yes, sir.
23     Q.   The heading on the first page of
24 the note says "AHERF issue"?
25     A.   Might be plural issues, but yes.    10:57:36

Page 662

1      Q.   Then the word just beneath that, is
2  that the word review?
3      A.   You mean on the left-hand margin?
4      Q.   Yes.
5      A.   Revenues.                          10:57:47
6      Q.   I'm sorry, revenues.  Thank you.
7          Then you have a bullet point.  Can
8  you read what that bullet point says?
9      A.   "50 million dollar additional
10 reserve dash 25 million through March."  Next    10:57:58
11 line, "50 million through April."
12     Q.   Having had a chance to look at the
13 notes very briefly at our break and then see --
14 seeing now how they start off, do you recall
15 these to be notes of any meeting or call?    10:58:12
16     A.   I don't recall.
17     Q.   I believe that you have previously
18 testified that you had a belief that these
19 notes were of an internal update meeting with
20 Mr. Kirstein, Buettner and Frazier.  You don't    10:58:33
21 need to trust me on that, but now that I said
22 it, does that refresh your recollection, that
23 that may be what these notes are?
24     A.   Yes, I think my prior testimony was
25 I didn't recall what they came from, but    10:58:46

Page 663

1  looking at the nature of the content of the
2  five pages, it appears to be from some sort of
3  update meeting related to the audit.
4          I don't sitting here today recall
5  if Bill Buettner and Amy Frazier was there, but    10:59:00
6  I had to get the information from somebody to
7  write it down.
8      Q.   Do you believe it was a set -- a
9  meeting, though, with Coopers & Lybrand
10 personnel as you sit here today?          10:59:09
11     A.   I believe so, yes.
12     Q.   Do you recall -- can you recall
13 whether any AHERF personnel were in attendance?
14     A.   No, I don't have a specific
15 recollection of June 10th, of the meeting.  I    10:59:17
16 just tried to help in prior testimony and
17 again, for you, given the general nature what
18 it might be from.
19     Q.   When you read the first few lines
20 as you just did, or having so read them, do you    10:59:32
21 have any recollection today of what you meant
22 by using the word thru in short form, T H R U?
23     A.   No, I don't.
24     Q.   When you wrote that term in your
25 auditing work, did it have any specific meaning    10:59:52

                                              26 (Pages 660 to 663)

Mark Kirstein                                                                        Volume 3

Page 664

1  to you?
2       MR. RYAN:  Objection.
3       A.    No, I don't think -- no.  Thru is
4  not a generally accepted auditing term that I
5  know of and I don't recall having a meaning to     11:00:04
6  that.
7       Q.    The next line reads how?
8       A.    I'm sorry?
9       Q.    How do you read the next line of
10 text?                                              11:00:13
11      A.    You would like me to read it or --
12      Q.    I would.
13      A.    "80 million dollar write-offs and
14 offset by 50 million dollar reserve," and then
15 there's a subbullet, "need current versus prior    11:00:24
16 year breakout."
17      Q.    Do you recall today what you meant
18 when you wrote that?
19      A.    No.
20      Q.    In any of your work in reviewing        11:00:33
21 documentation over the years, either in
22 preparation for depositions or otherwise, have
23 you come to an understanding of what you meant?
24      MR. RYAN:  Objection.
25      A.    No, I have not.               11:00:47

Page 665

1       Q.    Do you recall any discussion of the
2  topic of using the 50 million dollar of
3  reserves established in purchase accounting in
4  connection with the Graduate acquisition to
5  offset the 80 million dollar charge-offs to       11:01:14
6  which we referred earlier at the Delaware
7  Valley Obligated Group?
8       MR. RYAN:  I'm sorry, can I get
9  that read back, please?
10      (Record read.)                    11:01:22
11      MR. RYAN:  I'll object to the lack
12 of a time frame.
13      Q.    There is no time frame.  At any
14 time.
15      A.    Other than what we talked about a       11:01:50
16 little earlier, learning of a potential, of the
17 transfer in early August, that's the only time
18 I recall hearing of something, something to
19 that effect.
20      Q.    So you -- all right.            11:02:01
21      Nothing before that on this topic?
22      A.    No.  In fact, as I said earlier,
23 we, C&L, had been waiting, had told management
24 we needed to see what the opening balance sheet
25 and purchase accounting would be, and I don't      11:02:18

Page 666

1  believe we got that until the year-end audit
2  phase.  So even in June, while I don't recall
3  the meeting, there was no purchase accounting
4  detail that we had at this point in time.
5       Q.    Had you discussed any of the             11:02:28
6  purchase accounting approaches that AHERF was
7  taking or was planning to take with AHERF
8  personnel before August?
9       MR. RYAN:  Objection.
10      A.    Are you referencing like purchase        11:02:44
11 versus pooling?
12      Q.    I'm sorry?
13      A.    Are you referencing like how they
14 would account for it, like purchase accounting
15 versus pooling?                          11:02:52
16      Q.    Yes.
17      A.    I believe sometime early in
18 planning, maybe January, February, March time
19 frame, there was discussions that I was part of
20 at certain points with management about how        11:03:01
21 would the acquisition for Graduate and
22 potentially others, I think Forbes and AGH, be
23 accounted for by AHERF.
24      Q.    Do you recall any discussion of
25 offsetting reserves established in connection       11:03:16

Page 667

1  with the purchase of the Graduate enterprises
2  against any write-offs in those discussions?
3       MR. RYAN:  Objection.
4       A.    No.  As I said, I don't recall
5  hearing that until August.               11:03:34
6       Q.    As you sit here today, do you
7  believe that offsetting 80 million dollars of
8  write-offs at the Delaware Valley Obligated
9  Group hospitals or charge-offs with 50 million
10 dollars of reserves established in connection      11:03:54
11 with the Graduate acquisition would have been
12 wrong under GAAP?
13      MR. RYAN:  Objection.
14      A.    I think GAAP, at least when I think
15 back, GAAP was assessed at the financial           11:04:10
16 statement level.  So in the case of AHERF, it
17 would have been at the AHERF consolidated
18 financial statement level.
19      So I guess it's possible that the
20 transaction that you just talked about, if it      11:04:24
21 even occurred, could theoretically be GAAP.
22 You would have to know the facts and
23 circumstances to make that determination.
24      Q.    It certainly could also be non GAAP
25 as well?                              11:04:38

27 (Pages 664 to 667)

Mark Kirstein                                                                                    Volume 3

Page 720

1   the Delaware Valley Obligated Group hospitals,
2   does that refresh your recollection about why
3   you wrote where did it go?
4        A.   No, sir.
5        Q.   Did you ever come to learn that      13:12:46
6   what I just described occurred?
7        A.   I believe subsequent in litigation
8   preparing for depositions I've heard something
9   similar to what you just described, yes.
10       Q.   When you heard it then, did it       13:13:00
11  refresh your recollection about why you wrote
12  where did it go?
13       A.   No, sir.
14       Q.   As you sit here today, you don't
15  know why you wrote the words where did it go?   13:13:11
16       A.   No, sir.
17       Q.   What's in the circle just above the
18  words PFMA contract?
19       A.   Need docs, D O C S.
20       Q.   Need, N E E D?                        13:13:22
21       A.   Correct.
22       Q.   What is in the box just to the left
23  of PFMA contract?
24       A.   WFB write-up.
25       Q.   What does WFB mean?                   13:13:32

Page 721

1        A.   Bill Buettner.
2        Q.   What does write-up mean to you
3   today?
4        A.   I don't know.  I don't remember
5   writing this.                                   13:13:41
6        Q.   When you wrote write-up in your --
7   the words write-up with -- next to somebody's
8   initials -- when you wrote the words write-up
9   next to somebody's initials in your audit work
10  in connection with fiscal year 1997 or other    13:13:54
11  years, what did that typically mean to you?
12       MR. RYAN:  Objection.
13       A.   I don't think it has a typical
14  meaning.  I don't know.
15       Q.   Does write-up -- I'm only asking, I   13:14:03
16  don't know the answer -- mean put together a
17  memo, put together a written piece of some kind
18  to you?
19       A.   Not necessarily.  I don't know what
20  this meant.  It could be put together.  It      13:14:17
21  could be someone has a memo to read.  I don't
22  know.
23       Q.   Have you ever used it in your
24  business practices to mean that, write up a
25  memo for me or write up something on a piece of  13:14:23

Page 722

1   paper for me?
2        MR. RYAN:  Objection.
3        A.   It's likely that I have.  I don't
4   recall specific instances, but that seems like
5   a reasonable interpretation.                    13:14:35
6        Q.   Do you ever recall receiving a
7   write-up or a memorandum or words on paper from
8   Mr. Buettner or anyone on the PFMA contract or
9   any reserve regarding the PFMA contract?
10       A.   Me receiving something?               13:14:54
11       Q.   Yes, sir.
12       A.   No.
13       Q.   Do you see --
14       Do you recall any discussions with
15  anybody on the AHERF engagement at Coopers &    13:15:13
16  Lybrand about the PFMA contract other than what
17  you've already shared with us, if anything?
18       MR. RYAN:  Objection.
19       A.   No, sir.
20       Q.   Do you recall any conversations       13:15:23
21  with anybody at AHERF about the PFMA contract?
22       A.   No, sir.
23       Q.   Look down towards the bottom of the
24  page under item two, Greater Atlantic.  Do you
25  see that?                                       13:15:53

Page 723

1        A.   Yes.
2        Q.   Can you read the next few words for
3   me in that line?
4        A.   Greater Atlantic enters, the letter
5   K, contract is my -- would that mean, with      13:16:01
6   Philadelphia Fire.
7        Q.   Looking down, the last subpoint
8   with an arrow beneath that, you write, McNair,
9   Beth Chang say something, I can't read the rest
10  of it.  Can you read that line for me?          13:16:19
11       A.   McNair slash Beth Chang say
12  liability is with GHS.  That's underlined.
13       Q.   GHS was the health system that
14  formerly owned the Graduate hospitals?
15       A.   I don't recall.                       13:16:35
16       Q.   You don't recall.
17       Do you know who Mr. McNair or Miss
18  Chang were?
19       A.   No idea who Beth Chang is.  I think
20  McNair was an attorney, an in-house attorney    13:16:46
21  with AHERF, I believe.
22       Q.   Do you ever recall that they had
23  advised that they believed that any liabilities
24  for PFMA losses resided with parties other than
25  AHERF or the Graduate hospitals?                13:16:59

41 (Pages 720 to 723)

Mark Kirstein                                                    Volume 3

---

Page 724

1    A.    No.
2    Q.    At the top of the same page, you've
3  got a note in the upper right-hand corner or
4  toward the upper right-hand corner that's
5  circled. Can you read that for us?        13:17:32
6    A.    Up here?
7    Q.    Yes.
8    A.    "Not through income slash move to
9  DV reserves for A/R."
10   Q.    Do you know what that means today?    13:17:41
11   A.    No, sir.
12   Q.    It says, "Move to DV reserves for
13 A/R." Is that right?
14   A.    Yes.
15   Q.    Does that mean the Delaware        13:17:55
16 Valley -- does that mean the Delaware Valley
17 Obligated Group hospitals and their reserves to
18 you today?
19   A.    I don't know what it means.  I
20 mean, I don't remember the meaning.  I don't    13:18:05
21 know what I was thinking when I wrote the note,
22 sitting here today, so I don't know what that
23 interpretation would be.
24   Q.    Did you ever see a legal memorandum
25 from Miss Chang on the topic of the PFMA    13:18:16

---

Page 725

1  contract or any losses or reserves in
2  connection with it?
3    A.    I don't recall seeing one.
4    Q.    Did you ever ask for one, a legal
5  opinion, or a legal memorandum?        13:18:31
6    A.    I don't believe I did, no.
7    Q.    Do you recall any discussions about
8  a legal memorandum on this topic in your work
9  at AHERF?
10   A.    Personally, no.  I mean, this    13:18:43
11 wasn't an area that I was working on.
12   Q.    Do you recall anyone coming to a
13 conclusion about whether any liabilities, as a
14 member of the Coopers & Lybrand engagement
15 team, coming to a conclusion about who would be    13:19:07
16 liable for the PFMA losses?
17       MR. RYAN:  Could you read that
18 again, please?
19       (Record read.)
20   A.    I don't -- are you talking at the    13:19:35
21 time of the audit?
22   Q.    Yes, during your audit work for
23 AHERF.
24   A.    I don't recall.
25   Q.    Did you learn about who became    13:19:42

---

Page 726

1  liable subsequently for those losses?
2    A.    I don't know if I learned who
3  became liable.  That sounds like a legal
4  determination.  I think in preparing for
5  depositions I've seen some work papers that Amy    13:19:54
6  Frazier had done where I believe she made a
7  determination as to whether or not there should
8  be a reserve for PFMA, and I think she
9  considered it in one of her analyses.
10   Q.    I'm going to ask you to look a    13:20:11
11 little bit further down in the document, page
12 27 of Exhibit 4403, to the heading CRA Review,
13 A, Cushion slash Open Items.
14   Q.    Do you recall any discussions of
15 cushions at this audit meeting?        13:20:28
16       MR. RYAN:  Objection to form.
17       MR. JONES:  What is that objection
18 based on?
19       MR. RYAN:  I think we previously
20 established that is a term that has multiple    13:20:35
21 meanings, so I'm not sure what meaning you were
22 using the word cushion.
23       MR. JONES:  I don't know that I
24 attached a particular meaning.
25   Q.    Do you recall discussions that    13:20:44

---

Page 727

1  included the word cushions?
2    A.    No, sir.
3    Q.    Do you see that there are amounts
4  written in your handwriting that have a line
5  drawn back to the word cushions?        13:21:00
6    A.    Yes.
7    Q.    Those amounts say AGH 2 million
8  dollars, is that right?
9    A.    Yes.
10   Q.    And Forbes 7 million dollars?    13:21:05
11   A.    Correct.
12   Q.    Do you know what those amounts were
13 for?
14   A.    No, I do not.
15   Q.    Do you recall that those were    13:21:10
16 amounts that someone determined were cushions
17 on the books of those hospitals?
18   A.    I don't recall what they are in
19 this meeting.
20   Q.    Do you recall today from any other    13:21:19
21 source?
22   A.    No, sir.  I wouldn't -- you have to
23 understand, these are notes from an update
24 meeting.  So what typically happens after these
25 meetings is whatever information we gather,    13:21:32

---

42 (Pages 724 to 727)

FROM CRAVATH SWAINE & MOORE LLP

# DEPOSITION ERRATA SHEET

RE:    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY
       HEALTH, EDUCATION AND RESEARCH FOUNDATION v. PRICEWATERHOUSE
       COOPERS, LLP

I, Mark Douglas Kirstein, make the following corrections, additions, or deletions to the
transcript of my deposition, taken on May 11-13, 2004, for the following reasons. By my
signature below, I authorize you to attach this errata sheet to the transcript.

| Page: Line | Change | Reason |
|---|---|---|
| 11:9 | "ACP" should be "HCP" | Error |
| 33:8 | Answer should end at "Kocak", A new question begins with "thank you" and ends at "bad debt" | Error |
| 36:15 | "grade" should be "rate" | Error |
| 80:5 | "I do not, no" should be "I do not know" | Error |
| 95:15 | "when" should be "went" | Error |
| 101:15 | "what it says" should be "Is that what it says?" | Clarification |
| 103:17 | "reserve that" should be "reserve. That" | Error |
| 145:5 | "fluct" should be "flux" | Error |
| 149:4 | "There's" should be "That's" | Error |
| 152:24 | "that" should be "a" | Clarification |
| 155:5 | "it's an audit" should be "I saw it" | Error |
| 163:23 | "of an" should be "of" | Error |
| 196:10 | "Cancelmi" should be "McConnell or" | Error |
| 205:11 | "Marie" should be "Murray" | Error |
| 212:7 | "WL" should be "WO" | Error |
| 217:25, 219:12, 224:9, 302:20, 303:3, 303:14 | "Calosheski" should be "Kaliszewski" | Error |
| 224:16 | "Collections. He" should be "collections, and even" | Error |
| 224:17 | "referred them" should be "further" | Error |
| 239:5 | "inpatients instead" should be "inpatients. Instead" | Error |
| 239:6 | "aging. Day" should be "aging day" | Error |
| 239:8 | "billed. Where" should be "billed -- Where" | Error |
| 250:23 | "Christa" should be "Kristen" | Error |
| 291:7 | "17. I" should be "17 I" | Error |

| Page: Line | Change | Reason |
|---|---|---|
| 332:17 | "about, what FAS or FAS" should be "about -- in what FAS or SAS" | Error |
| 335:6 | "Envision" should be "Invision" | Error |
| 357:6 | "same" s/b "self" | Error |
| 380:13 | "D&FB" should be "DNFB" | Error |
| 385:20 | "to control" should be "of controls" | Error |
| 395:7 | "Elkins box St. Chris" should be "Elkins, Bucks, St. Chris" | Error |
| 397:18 | "that" should be "that--" | Error |
| 401:13 | "contractual is a bad debt, yes" should be "contractuals, a bad debt--yes" | Error |
| 403:5 | "number" should be "level" | Error |
| 437:19 | "entries" should be "interest" | Error |
| 452:10 | "Elsworth" should be "Ellsworth" | Error |
| 460:10 | "BP&E" should be "PP&E" | Error |
| 461:10 | "CR" should be "CRA" | Error |
| 465:21 | "I do not, no." should be "I do not know" | Error |
| 472:2 | "I do not, no." should be "I do not know" | Error |
| 481:7 | "can" should be "can't" | Error |
| 507:9 | "us" should be "this" | Error |
| 523:1 | "Lyden" should be "Lydon" | Error |
| 527:11 | "throw" should be "flow through" | Error |
| 533:7 | "Might" should be "Might've" | Error |
| 543:12 | "line" should be "of" | Error |
| 543:13 | "adjusted" should be "unadjusted" | Error |
| 544:8 | "No" should be "No. I don't recall that" | Clarification |
| 572:7 | "Jenker Bittel" should be "Drinker Biddle" | Error |
| 583:10 | "Chris" should be "Kristen" | Error |
| 587:19 | Remove "that Mr." | Error |
| 623:4 | "A." should be "Q." | Error |
| 625:12 | "and assets" should be "of net assets" | Error |
| 626:19 | "answer you" should be "give you" | Error |
| 629:3 | "does not" should be "is not" | Error |

FROM CRAVATH SWAINE & MOORE LLP

3

| Page: Line | Change | Reason |
|---|---|---|
| 645:3 | "plan" should be "part" | Error |
| 662:11 | "50" should be "25" | Error |
| 664:13 | Insert quotation mark after "offs" | Error |
| 664:14 | Insert quotation mark before "offset" | Error |
| 666:22 | "AGH" should be "AVH" | Error |
| 688:4 | "you" should be "you've" | Error |
| 692:4 | "document" should be "audit" | Error |
| 716:10 | Remove "time of the" | Error |
| 731:9, 738:17 | "Mary Bess" should be "Maribess" | Error |
| 741:13 | "imbedding" should be "embedding" | Error |
| 789:25 | "PricewaterhouseCoopers" should be "Pricewaterhouse" | Error |
| 795:6 | "from Carl Wease" should be "phone call once" | Error |
| 806:3 | "Casperbauer" should be "Kasperbauer" | Error |
| 822:3 | "Wackly and Marty Bennett" should be "Wockley and Marne Betta" | Error |

I have read the transcript of my deposition taken May 11-13, 2004 and swear that, with the above changes, the transcript is true and correct.

_Mark D. Kirstein_
Mark D. Kirstein

_7/13/04_
Date

Sworn to before me
This _13th_ day of July, 2004

_M. Dolores Moyado_
Notary Public

OFFICIAL SEAL
M DOLORES MOYADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 09-25-07

**Kite Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS LLP,*

---

*STEVEN B. KITE*
*February 25, 2005*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**KITE, STEVEN B. - Vol. 1**



Page 114

1 he's required to?
2     A.   I really hadn't thought about that. I
3 mean, we have to think to the point simply if there is
4 a breach, there are remedies for creditors to take.
5     Q.   Okay. And I'm just trying to -- I'm just
6 trying to --
7     A.   Yeah, and what they might do I think is
8 something I -- you know, we can't speculate on it. I
9 mean, typically it involves getting a consultant and
10 implementing the recommendations of a consultant to
11 enhance revenues, cut expenses or sell off
12 non-productive assets.
13     Q.   Now, you've referred to a provision
14 requiring call-in of a consultant. And that would,
15 for example, be in Section 6.3 of this Master Trust
16 Indenture?
17     A.   Correct.
18     Q.   Let's talk a little bit about Section 6.3.
19 It's on pages 37 to 38; is that right?
20     A.   Right.
21     Q.   And this is a section entitled "Rates and
22 Charges;" is that right?
23     A.   Mm-hmm.
24     Q.   Have you heard this referred to sometimes

Page 115

1 as a rate covenant?
2     A.   Correct.
3     Q.   And do you agree that Section 6.3 then
4 contains a covenant that the obligated group will
5 operate all of its facilities on a revenue-producing
6 basis and will charge such fees and rates for its
7 facilities and services and will exercise such skill
8 and diligence as to provide income from its property
9 together with other available funds sufficient to pay
10 promptly all payments of principal and interest on its
11 indebtedness, all expenses of operation, maintenance
12 and repair of its facility and all other payments
13 required to be made by it hereunder to the extent
14 permitted by law"?
15     A.   Yes, Section 6.3 contains several
16 covenants, and that is one of them.
17     Q.   All right. So, this is in effect a
18 covenant to manage your business and to charge rates
19 in such a way that you'll be able to make the payments
20 you have to make?
21     A.   Correct.
22     Q.   All right. So, the second sentence
23 contains a related covenant which says if the
24 obligated group has to change its rates in order to be

Page 116

1 able to make all those payments, that they will change
2 their rates, right?
3     A.   Correct.
4     Q.   And that's why this is called a rate
5 covenant, right?
6     A.   Probably. That's part of it.
7     Q.   All right. Then the third sentence of
8 Section 6.3 states, "The Members of the Obligated
9 Group covenant and agree that they will cause the
10 officer certifying the report referred to in Section
11 6.6(b) hereof to calculate the Historical Debt Service
12 Coverage Ratio for the Fiscal Year covered by such
13 report and to deliver a copy of such calculation to
14 the Master Trustee," right?
15     A.   Right.
16     Q.   So, that's saying every year the obligated
17 group will calculate this ratio and an officer of the
18 company will deliver that to the Master Trustee?
19     A.   Right.
20     Q.   And in fact DVOG did that for 1996 and
21 1997, right?
22     A.   I don't think I ever saw a certificate.
23     Q.   Okay. You didn't ever review the
24 certificates that were provided by officers of DVOG?

Page 117

1     A.   I don't believe I ever saw that.
2     Q.   Okay. But at a minimum you don't have any
3 basis to say that DVOG didn't do what's stated there
4 in the third sentence of Section 6.3, right?
5     A.   Just don't know one way or the other.
6     Q.   Okay. Do you agree that DVOG in fact
7 operated its business and charged rates in such a way
8 that it was able to make the payments it needed to in
9 1996 and 1997?
10     A.   I don't have any basis to know that one way
11 or the other.
12     Q.   All right. Now, all three of the sentences
13 that we've reviewed so far contain the words
14 "covenant" and "agree," right?
15     A.   Okay. Yes.
16     Q.   Now, the next sentence, which now talks
17 about historical debt service coverage ratio of 1.10,
18 that sentence does not contain the words "covenant" or
19 "agree," does it?
20     A.   That's correct.
21     Q.   All right. Now, this is the sentence which
22 provides that if the historical debt service coverage
23 ratio is less than 1.1 to 1, then the obligated group
24 has to retain a consultant, right?

30 (Pages 114 to 117)

STEVEN B. KITE

Page 118

1  A.  Yes.
2  Q.  Now, "consultant" is another one of our
3 defined terms; is that right?
4  A.  Right.
5  Q.  In fact, it's defined on page 4 of the
6 agreement.
7  A.  Okay.  I'm with you.
8  Q.  Now, do you agree with me that under the
9 DVOG Master Trust Indenture the obligated group can
10 choose who the consultant will be if a consultant has
11 to be called in through Section 6.3?
12  A.  Yes.
13  Q.  That is, the bond insurer or the letter of
14 credit bank doesn't have an ability to veto the
15 selection of consultant, right?
16  A.  Correct.
17  Q.  Do you agree with me that there is no
18 requirement that the consultant must be independent of
19 the obligated group?
20  A.  Correct.
21  Q.  Have you seen bond documents where the
22 definition of consultant in fact did include such a
23 requirement?
24  A.  Yes.

Page 119

1  Q.  And that was not included in the DVOG
2 Master Trust Indenture, right?
3  A.  Correct.
4  Q.  So that, to provide an example, the DVOG
5 could have retained AHERF as a consultant in the
6 manner that in 1977 the Centennial Obligated Group
7 retained AHERF as a consultant under the analogous
8 provision of its Master Trust Indenture, right?
9  A.  Subject to the caveat that the consultant
10 has to have a favorable reputation for skill and
11 experience in performing similar services.
12      And I noticed that in how they were dealing
13 with Centennial it struck me that it would be hard to
14 say that AHERF meets that definition.  But if AHERF
15 did meet that definition, yes, they could have been
16 appointed.
17  Q.  All right.  And you are aware, are you not,
18 that in 1997 AHERF and Centennial took a position that
19 AHERF in fact did meet the definition of a consultant?
20  A.  I believe -- I believe so, they took that
21 position.
22  Q.  And are you aware of the fact that the
23 trustee for the Centennial bonds never disagreed with
24 that position?

Page 120

1  A.  I -- somebody disagreed with it I remember
2 from reading something.  I don't recall whether it was
3 a trustee or one of the banks in the credit group, but
4 I remember reading something about somebody saying
5 AHERF shouldn't have been the consultant.  But I don't
6 remember who it was and I don't remember what the
7 trustee's position was.
8  Q.  Do you agree that the trustee for the
9 Centennial bonds never declared an event of default as
10 a result of Centennial's retention of AHERF as a
11 consultant?
12  A.  I'm not aware of an event of default.
13  Q.  All right.  Now, if you could return,
14 please, to Section 6.3, --
15  A.  Okay.
16  Q.  -- the next sentence, we're now on the
17 fourth paragraph of this section, the next sentence
18 provides that a copy of the consultant's report and
19 recommendations has to be filed with various people,
20 right?
21  A.  Right.
22  Q.  Then the next sentence states, "The
23 obligated group shall follow the recommendation of the
24 consultant to the extent feasible," right?

Page 121

1  A.  Right.
2  Q.  Then the next sentence is the one that I
3 believe you focus on in your report, right, that
4 contains a proviso relating to a hundred percent,
5 right?
6  A.  Correct.
7  MR. COGAN:  Objection.
8 BY MR. RYAN:
9  Q.  Now, this sentence states in part, "No
10 event of default shall be deemed to have occurred
11 hereunder," right?
12  A.  Right.
13  Q.  And you agree with me that "hereunder"
14 means under this Master Trust Indenture?
15  A.  Yes.
16  Q.  It does not mean under this section?
17  A.  Correct.
18  Q.  Now, you see, then, in the next sentence
19 that reads, "The foregoing provisions notwithstanding,
20 if in any fiscal year the historical debt service
21 coverage ratio is less than 1.10, the Master Trustee
22 shall not be obligated to require the members of the
23 obligated group to retain a consultant to make such
24 recommendations" if two certain instances obtain,

31 (Pages 118 to 121)

## ERRATA SHEET
## FOR STEVEN B. KITE

| Page/Line | Should Read | Reason for Change |
|---|---|---|
| 6/14 | Change "Yeah" to "Yes" | Grammar |
| 8/5 | Change "enjoyed work" to "enjoyed working" | Grammar |
| 8/15 | delete "in" | Grammar |
| 9/10 | Change "their" to "its" | Grammar |
| 9/11 | Change "their" to "its" | Grammar |
| 9/12-17 | Change to read "and bond counsel's client is typically viewed for legal conflict of interest purposes as the borrower or the issuer." | Clarity |
| 11/18 | Change "party" to "entity" | Clarity |
| 12/11 | Change "yeah" to "yes" | Grammar |
| 12/19 | Change "represent" to "represents" | Grammar |
| 12/23 | Change "a couple of" to "two" | Grammar |
| 16/24 - 17/1 | Delete "I said" insert "company" at end of sentence" | Clarity |
| 17/14-16 | Revise sentence to read "I've represented them in the past, but not recently or currently." | Clarity |
| 18/24 | Change "Non-profit" to "Health Care" | Accuracy |
| 29/12 | Change "Yeah" to "Yes" | Grammar |
| 29/16 | Insert "for" before "selling" | Clarity |
| 30/18 | Change "you know" to "I would" | Clarity |
| 37/1 | Change "were" to "was" | Grammar |
| 46/24 | Change "relate d" to "related" | Typo |
| 47/4 | Change "graduate" to "Graduate" | Typo |
| 51/23 | Change "exemptions" to "exceptions" | Clarity |
| 55/13 | Change "ben" to "been" | Typo |
| 57/20 | Insert "up" after "picked" | Clarity |
| 59/2 | Change "yeah" to "Yes" | Grammar |
| 63/7 | Change "Yeah" to "Yes" | Grammar |
| 64/17 | Change "contain" to "contains" | Grammar |
| 65/1-2 | Change "has typically been" to "is typically" | Grammar |
| 65/12 | Insert "a" before "separate" | Grammar |
| 70/4 | Change "then kind of" to "that" | Clarity/Grammar |
| 74/9 | Change "Yeah" to "Yes" | Grammar |
| 81/21 | Change "we" to "they" and "our" to "their" | Grammar |
| 84/18 | Change "but" to "by" | Typo |
| 86/3 | Change "cuz" to "because" | Grammar |
| 101/6 | Change "as" to "is" | Typo |
| 103/23 | Change "restate d" to "restated" | Typo |
| 110/10 | Change "required" to "allowed" | Clarity |
| 114/3 | Change "think" to "get" | Clarity |
| 114/7 | Change "Yeah" to "Yes" | Grammar |
| 124/14 | Change "weeding" to "reading" | Typo |
| 125/6 | Change "Yeah" to "Yes" | Grammar |
| 136/15 | Insert "paper" after "commercial" | Clarity |
| 136/20 | Delete apostrophe in "agreement's" | Grammar |

| Page/Line | Should Read | Reason for Change |
|---|---|---|
| 151/18 | Change "Yeah" to "Yes" | Grammar |
| 152/1 | Change "Yeah" to "Yes" | Grammar |
| 157/5 | Change "the" to "by" | Clarity |
| 160/17 | Change "what" to "was" | Clarity |
| 162/22 | Change "Yeah" to "Yes" | Grammar |
| 166/10 | Change "Yeah" to "Yes" | Grammar |
| 167/3 | Change "cuz" to "because" | Grammar |
| 169/2 | Change "Yeah" to "Yes" | Grammar |
| 169/7 | Change "Yeah" to "Yes" | Grammar |
| 170/3 | Change "Yeah" to "Yes" | Grammar |
| 171/6 | Insert "disclosure part" after "market" Change "till" to "until" | Clarity |
| 174/17 | Change "'em" to "them" | Grammar |
| 180/2 | Change "gonna" to "going to" | Grammar |
| 189/21 | Change "Yeah" to "Yes" | Grammar |
| 192/2 | Change "Yeah" to "Yes" in both places | Grammar |
| 216/21 | Change "in in" to "into" | Clarity |
| 217/4 | Change "out" to "over" | Clarity |
| 219/2 | Change "gonna" to "going to" | Grammar |
| 219/4 | Change "familiar" to "I remember" | Clarity |
| 220/13 | Change "gonna" to "going to" | Grammar |
| 221/7 | Change "Yeah" to "Yes" | Grammar |
| 227/4-5 | Change "cuz" to "because" | Grammar |
| 228/15 | Change "their" to "the" | Clarity |
| 232/12 | Change "in" to "an" | Typo |
| 234/2 | Change "kind of " to "tied to" | Clarity |
| 234/17 | Change "gonna" to "going to" | Grammar |
| 238/15 | Change "creditor's" to "creditors'" | Typo |
| 238/17 | Change "the" to "a" | Clarity |
| 244/12 | Change "covenant" to "consultant" | Clarity |
| 245/1 | Change "change" to "charge" | Typo |
| 254/10 | Change "gonna" to "going to" | Grammar |
| 254/23 | Change "waiving" to "waiting" | Typo |
| 255/5 | Change "gonna" to "going to" | Grammar |
| 260/9 | Change "change" to "charge" | Typo |
| 267/4 | Change "cuz" to "because" | Grammar |
| 267/9 | Change "Yeah" to "Yes" | Grammar |
| 267/18 | Change "490" to "495" | Checked Our Records |
| 268/15 | Change "either 400 or 420" to "410" | Checked Our Records |
|  | Change "490" to "495" | Checked Our Records |
| 221/10 | Change "least" to "last" | Typo |
| 269/20 | Change "nineties" to "eighties" | Checked Our Records |
| 270/2 | Change "95" to "85" | Checked Our Records |

**Knittel Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## MARCELLA KNITTEL
### *July 23, 2003*

---

# LEGALINK MANHATTAN

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

KNITTEL, MARCELLA



**LEGALINK**

A **WORDWAVE** COMPANY

MARCELLA KNITTEL

Page 58

1    words or something, I might make some
2    suggestions or give the credit analyst more
3    information, but ultimately the credit analyst
4    was responsible for what they put into the
5    write-up.
6  Q.  Okay. But you would have had an understanding
7    of what it was based on your discussions with
8    them --
9  A.  Yes.
10 Q.  -- of what they were writing up?
11 A.  Yes.
12 Q.  Would you have approved of -- would you have to
13   approve what they wrote up?
14 A.  Yes.
15 Q.  Do you recall any instances where they wrote
16   something into their write-up that you didn't
17   agree with and then in turn submitted it to the
18   senior credit committee?
19 A.  Yes.
20 Q.  I mean --
21 A.  I mean that was common to have differing views
22   on how a certain piece of information might be
23   evaluated. Typically, typically we came to a
24   common understanding before the -- before it
25   went to senior credit committee, but there --

Page 59

1    there were places where we tended to disagree.
2  Q.  Would you have indicated that disagreement in
3    any way in the packages of information that
4    were submitted to the senior credit committee?
5  A.  More -- more in dialogue, in a question and
6    answer dialogue. If points were brought up
7    that I didn't agree with, I might say so in the
8    dialogue.
9  Q.  Were the disagreements that you recall about
10   how information was presented to the senior
11   credit committee limited to how information was
12   presented? Or let me rephrase that.
13      You mentioned you had some
14   disagreements from time to time with the credit
15   analysts as to information that went to the
16   senior credit committee, and was that limited
17   to how information was presented or do you
18   actually recall some instances where you
19   actually thought information that was presented
20   to the committee was incorrect?
21 A.  It's -- I would say -- the best way to
22   characterize this in terms -- it's not always
23   just information that's going to the senior
24   credit committee that we would either disagree
25   or agree on, and it's not really so much

Page 60

1    whether it's correct or incorrect, it's how you
2    would potentially interpret information or how
3    you would view, for instance, a change in the
4    financial statements, is this -- how good or
5    how bad is this. It's a matter of degree
6    typically, not a no, this is right or this is
7    wrong. It typically wasn't that black or
8    white.
9  Q.  So as to some of the attachments that were
10   attached to your report, you might have
11   disagreed with from time to time how
12   information was interpreted or presented?
13 A.  That's fair.
14 Q.  Do you recall any times where you actually
15   thought that the data that was submitted was
16   incorrect?
17 A.  No.
18 Q.  Before we take a break, the actual report that
19   had these attachments on it, was that authored
20   by you in most instances?
21 A.  The credit -- the credit -- the front part of
22   the credit offering memorandum was authored by
23   me.
24      MR. TERUYA: Okay. Why don't we take
25   a break.

Page 61

1      MS. HACKETT: Okay. Thank you.
2      THE VIDEOGRAPHER: We are now going
3  off the record. The time is 10:04 a.m.
4      - - - -
5  (There was a recess in the proceedings.)
6      - - - -
7      THE VIDEOGRAPHER: We are now going
8  back on the record. The time is now 10:17 a.m.
9      MR. TERUYA: I'm going to mark as
10  Exhibit 1701 a document that appears to be a
11  credit agreement by and among Allegheny United
12  Hospitals, St. Christopher's Hospital For
13  Children, Horizon Medical Corporation, and PNC
14  Bank, National Association, dated January 6th,
15  1994, that has Bates Nos. PNC 38124 through
16  169.
17      - - - -
18  (Exhibit 1701 marked for identification.)
19      - - - -
20 BY MR. TERUYA:
21 Q.  I'll just ask you to take a look at the
22   document, and I was going to ask you if you
23   recognize it?
24      - - - -
25      (The witness reviewed the Exhibit.)

16 (Pages 58 to 61)