JOHN LYNDON

Page 122

1  the record. The time on the screen is 1:27.
2      - - - -
3      EXAMINATION
4      - - - -
5  BY MR. RYAN:
6  Q.  Good afternoon, Mr. Lydon. Let me mark,
7      please, as Exhibit 199 a document with Bates
8      numbers DBR-AA 12651 through 55.
9      - - - -
10     (Deposition Exhibit 199 marked for
11     identification.)
12     - - - -
13 BY MR. RYAN:
14 Q.  Exhibit 199 is called Financial Statement
15     Highlights, Allegheny General Hospital,
16     June 30, 1997; right?
17 A.  Yes.
18 Q.  If you could take a look, please, at the last
19     page of the document, do you see a computer
20     file name there in the footer?
21 A.  Yes.
22 Q.  Do you see that that has a directory JTL?
23 A.  Yes.
24 Q.  Was that a computer directory that you used
25     for files you created?

Page 123

1  A.  Yes, although I don't remember creating these
2      highlights, but go ahead.
3  Q.  Well, do you recall that there were each
4      month for Allegheny General Hospital
5      documents called Financial Statement
6      Highlights?
7  A.  Yes.
8  Q.  Who created them?
9  A.  I do not recall. It may very well have been
10     me, but I -- we had to go through every month
11     obviously and look at the financial
12     statements, prepare highlights. I just don't
13     recall preparing them. It may very well be
14     me. I'm sure it was a group effort between
15     myself, Al and Jack Nelson.
16 Q.  Okay. Mr. Nelson was the manager for AGH?
17 A.  That's correct.
18 Q.  Do you know who received the monthly
19     financial statement highlights for AGH?
20 A.  IT would probably have gone to from Al to
21     Steve Spargo.
22 Q.  Do you know whether it went to Mr. Dionisio?
23 A.  That's quite possible that they went to Joe
24     Dionisio.
25 Q.  All right. You can put that aside. If you

Page 124

1  could go back, please, to Exhibit 198, which
2  again was a comparative cushion summary,
3  particularly the third page which was a
4  cushion roll forward.
5  A.  Okay.
6  Q.  We talked a little bit about how this
7      schedule showed certain reserves being
8      established and then certain reserves being
9      taken into income; right?
10 A.  Yes.
11 Q.  At the time did you consider the use of
12     cushions as set forth on this third page of
13     Exhibit 198 to be appropriate accounting?
14 A.  Yes.
15 Q.  Can you explain that a little for us, please?
16 A.  Just the fact, again, to control the
17     unexpected, I guess. Cushions happen. I
18     mean, reserves are established through charge
19     differentials and uncollectible allowances.
20         We didn't always take those to income
21     when we knew for that month if the reserve
22     exceeded the amount that should have been
23     recorded. I felt it was appropriate. Yes.
24 Q.  Can you think of any accounting entries that
25     you made while you were at AHERF that you

Page 125

1  believed at the time were inappropriate?
2  A.  No, no.
3  Q.  Did you ever hear of any accounting entries
4      being made by others at AHERF that you
5      believed at the time were inappropriate?
6  A.  Not that I recall.
7  Q.  As you sit here today are you aware of any
8      accounting entries where some people may be
9      saying that they were inappropriate?
10         MR. JONES: Object to form.
11 A.  I'm not sure who some people --
12 Q.  Anyone. I mean, have you heard about any
13     accounting entries at AHERF where anyone has
14     alleged that they may have been
15     inappropriate?
16 A.  Obviously, through all of this, the
17     bankruptcy and all this, the endowment
18     entries were questioned, but that's -- I mean
19     at the time we felt they were appropriate,
20     and we knew that Coopers was going to look at
21     them.
22         So, I mean, it was unusual, but we
23     felt it was appropriate at the time. We
24     thought what we were doing was suggested in
25     the FASB.

32 (Pages 122 to 125)

JOHN LYNDON

Page 126

1  Q.    When you were involved in the FASB 117
2        classification project in 1996, you knew that
3        there was a question as to whether AHERF
4        would ever be able to get access from the
5        trustee to the Lockhart trust funds; right?
6  A.    I don't know if I knew that at the time. I
7        think we were going ahead and booking the
8        entry based on what we had from an accounting
9        perspective. I don't know that it was
10       established that there was a question.
11            I don't recall if I knew that there
12       was going to be an issue getting the dollars.
13       I was charged with basically recording what
14       we thought what should happen from 117.
15 Q.    I didn't intend to ask you if you knew
16       about -- if AHERF was going to get access to
17       cash or not since I understand that was
18       something that the folks in treasury dealt
19       with; right?
20 A.    Yes, yes.
21 Q.    My question was intended to be whether you
22       were -- strike that. Did the thought cross
23       your mind at the time that you were involved
24       in the FASB 117 classification project that
25       AHERF might or might not be able ultimately

Page 127

1        to get access to the cash in these trust
2        funds from the trustee?
3  A.    I don't recall, but I don't think so. I
4        mean, again, I think we were looking at the
5        FASB and what we thought the interpretation
6        of it was and recording it correctly.
7            I don't know that I ever -- maybe I
8        did at the time. I just don't recall at this
9        point in time the question whether the cash
10       was to follow. I may have. I just don't
11       recall.
12 Q.    Now, FASB 116 and 117 were changes in the
13       rules for accounting for endowment funds;
14       right?
15 A.    Right.
16 Q.    So you thought at the time, didn't you, that
17       it was a bit unusual that AHERF was able to
18       move such significant amounts of money out of
19       restricted net assets?
20 A.    Sure, absolutely. Changes in the law and
21       pronouncement, tax law, these things created
22       all the time, it appears unusual, but it
23       happens. Yes, I did think it was unusual.
24 Q.    Did you think that the classification of the
25       endowment fund under FASB 116 and 117 was a

Page 128

1        bit of a gray area?
2            MR. JONES: Object to form.
3  A.    I don't know. I may -- again, it goes to the
4        unusual piece did I think it was gray or
5        unusual or both? I'm not sure there is a big
6        definition or there is a fine -- I'm not sure
7        there is a big divide between those two.
8            But I knew regarding it, it was going
9        to be looked at by others, so that if it was
10       not -- if it was unusual and we were doing it
11       wrong, we would have been told by Coopers
12       that it was wrong, it was incorrect.
13 Q.    Now, Coopers & Lybrand were the independent
14       auditors for AHERF; right?
15 A.    That's correct.
16 Q.    Who do you recall dealing with from Coopers
17       during their audit?
18 A.    Basically the people in charge were Amy
19       Frazier and Mark Kirstein. Probably mostly
20       dealt with Amy Frazier. There were several
21       senior accountants and whatever levels they
22       were. I don't recall all of them.
23            Mark Panucci was one, I think,
24       Brian -- I don't recall his last name -- and
25       then there is Kristen one year. You know how

Page 129

1        accounting firms work, every year there are
2        new faces. Amy and Mark Kirstein were there
3        a few years in a row.
4  Q.    Is Brian maybe Brian Christian?
5  A.    Brian Christian, yes.
6  Q.    And you mentioned one further person. Let me
7        throw out two different names to you and ask
8        you whether it was either of those people.
9        There is somebody called Christa Porter and
10       somebody called Kristen Heinlein?
11 A.    I do remember both now that you throw them
12       out.
13 Q.    You actually had interactions with them both?
14 A.    Yes.
15 Q.    Is there anyone else from Coopers you
16       remember?
17 A.    Other than the partner Bill Beuttner.
18 Q.    Did you ever deal directly with Mr. Beuttner?
19 A.    We had occasion to talk once in a while in
20       group meetings, but any kind of issues
21       probably wouldn't have gone through me. They
22       would have gone through Al, Dan or Steve.
23 Q.    That's Mr. Adamczak, Mr. Cancelmi or
24       Mr. Spargo?
25 A.    That's correct.

33 (Pages 126 to 129)

JOHN LYNDON

Page 130

1  Q.  Do you recall dealing with Mr. Panucci on the
2      FASB 117 classification project?
3  A.  If I remember correctly -- again, it's been
4      quite a while -- I thought that Mr. Panucci
5      and Amy Frazier and I sat in my office and
6      discussed what we had done for 117,
7      particularly with regards to the Lockhart
8      funds.
9  Q.  What can you remember about that meeting?
10 A.  Just basically what our thought process was
11     going through, what I had done.  A lot of
12     details I'm sure I just can't remember.  It's
13     just too long ago.
14 Q.  Sure.  Do you recall providing Coopers with
15     certain schedules that you had prepared
16     relating to the endowment classification?
17 A.  If I didn't provide them, they were provided
18     to them.  They had access to all those
19     schedules.  Any of those roll forwards we had
20     they -- it should have been provided to them
21     and had access to all of them.
22 Q.  So you're talking about schedules like the
23     first page of Exhibit 19?
24 A.  Yes, yes.  And any of the journal entries
25     they had access to all of those, but they

Page 131

1      should have been provided the roll forwards
2      as part of their -- as part of the year-end
3      analysis.
4  Q.  All right.  Now, when you say that Coopers
5      had access to the journal entries, you don't
6      mean AHERF actually as a matter of course
7      provided Coopers with copies of all of
8      AHERF's journal entries?
9  A.  No, no.  They would have probably had to be
10     requested, but they definitely would have
11     gotten the roll forward schedules.  Some of
12     those roll forwards they may have attached
13     journal entries.
14     It depended on what the entries were.
15     I mean, I can't remember any criteria, but if
16     they thought it helped better explain.
17 Q.  Do you recall providing Ms. Frazier or
18     Mr. Panucci with excerpts from the Lockhart
19     agreements that you prepared to show them the
20     language about the uses of income that were
21     permissible?
22     MR. JONES:  Object to form.
23 A.  I don't recall.  I don't recall.  I don't
24     know if I specifically showed them that or I
25     directed them back to treasury.  I just don't

Page 132

1      recall.
2  Q.  Do you recall discussing with Ms. Frazier or
3      Mr. Panucci the language in the Lockhart
4      trust agreements that says things like income
5      can be used for charitable purposes and so
6      forth?
7  A.  I think that's what I was referring to when
8      we said we had a meeting.
9  Q.  Okay.  So --
10 A.  We talked about that.  That's my
11     recollection.
12 Q.  So this topic of what the Lockhart trust
13     agreement said about the uses of income came
14     up with Coopers?
15 A.  That's my recollection, yes.
16 Q.  And you believe that you explained to Coopers
17     your thinking about how AHERF could satisfy
18     those uses through the general charitable
19     services that it provided?
20 A.  Yes.
21 Q.  Do you recall discussing with Coopers
22     provisions in the Lockhart trust agreements
23     that talk about whether capital gains should
24     be classified as part of corpus or part of
25     income?

Page 133

1      MR. JONES:  Object to form.
2  A.  I don't recall specifically, no.
3  Q.  Do you recall anything about discussing that
4      subject with Coopers?
5  A.  No, I don't.
6  Q.  The only language from the Lockhart trust
7      agreement that you can remember discussing
8      with Coopers is the language about the use of
9      income; right?
10     MR. JONES:  Object,
11     mischaracterization.
12 A.  Yes.  I think we had a general discussion as
13     to what my logic was going forward with it as
14     to why we deemed it to be appropriate to move
15     it from permanently to temporary, permanently
16     restricted to temporarily restricted.
17 Q.  Okay.  And now in terms of the actual trust
18     agreements or other legal documents
19     establishing these trust funds, can you
20     remember discussing with Coopers any
21     provisions other than the provisions about
22     the use of the income that was allowed under
23     these documents?
24 A.  I don't recall.
25 Q.  You yourself did not provide any of the

MANHATTAN REPORTING CORP., a LegaLink Company

JOHN LYNDON

Page 182

1    would be reviewing the general ledger and
2    looking at the changes in these accounts to
3    me indirectly shows approval of what was
4    done.
5  Q.    That would show approval or assent. Do you
6    remember in advance of the process anyone
7    suggesting to you what the outcome ought to
8    be before the actual classification work had
9    been started by you?
10  A.    No, no, I don't.
11  Q.    Do you recall in fiscal year '96 when you
12    were about the business of performing FASB
13    116, 117 classification that AHERF was
14    experiencing a cash crunch, if you will?
15  A.    Yes. I'm sure, I'm sure at the time I was
16    aware of that.
17  Q.    And that was something that was discussed by
18    superiors to you in the accounting
19    organization at the time?
20        MR. RYAN: Objection.
21  A.    I mean, I don't know. Discussed with me as a
22    specific subject? I don't know that it was
23    brought up. I mean, the numbers are the
24    numbers. You're looking at the general
25    ledger you're looking at the cash accounts,

Page 183

1    you know what the cash flow is.
2  Q.    When you say the numbers are the numbers and
3    the gesture the way you did for the purpose
4    the paper record, you meant the financial
5    statements --
6  A.    They are there.
7  Q.    -- would have revealed the cash situation
8    was not what you would have hoped it to be?
9  A.    That's correct.
10  Q.    I ask you to turn back to Exhibit 184 for a
11    moment, Mr. Lydon. You testified, I believe,
12    in response to questions from Mr. Ryan that
13    you had seen Exhibit 184 before; am I right?
14  A.    Yes. I believe I recall seeing this.
15  Q.    My question to you now is merely one that
16    tries to put a finer point on the time at
17    which you would have seen it, and I guess
18    that is do you recall having this document
19    with you when you or having had a chance to
20    read it either at the time you were
21    performing your FASB classification project
22    or before?
23  A.    I would assume that I had it in my possession
24    when I did the reclass because the reclass
25    was not done until fiscal '96, which would

Page 184

1    have been June of '96.
2  Q.    That's the end of fiscal '96?
3  A.    Yes.
4  Q.    And you now told us that you assumed you had
5    it in front of you, and I think in part maybe
6    perhaps you're cc'd on this here in
7    handwriting?
8  A.    That's correct.
9  Q.    My question is do you recall as you sit here
10    today in the year 2002, referring back to
11    this memorandum or some other memorandum
12    perhaps or some other writing in helping you
13    do your classification work?
14  A.    Specifically referring back to it, no, I
15    don't.
16  Q.    Let me fix on the second part of what was a
17    multipart question. Do you recall referring
18    back to any written documentation during your
19    classification work other than the trust or
20    endowment documents themselves, the endowment
21    organic document themselves, and the FASBs?
22  A.    Other than the FASBs?
23  Q.    And the trust documents?
24  A.    I don't recall specifically, no.
25  Q.    You have no reason to doubt if this document

Page 185

1    was available, that is, Exhibit 184, you
2    might have looked back at it?
3  A.    That's correct.
4  Q.    When you conducted the FASB classification
5    review, Mr. Lydon, you had never done that
6    before?
7  A.    No. That's correct, because it was a --
8  Q.    Of the Lockhart funds in particular?
9  A.    Yes.
10  Q.    And the question, the answer to the question
11    was self-evident. It was a new rule, and
12    this was the first time for you in doing such
13    a classification review?
14  A.    That's correct.
15  Q.    And did you take comfort in the fact that
16    your work would be looked upon or looked at
17    rather by others?
18  A.    Absolutely. Going through it, I knew that I
19    was making these entries and the outcome was
20    going to be reviewed by superiors and also
21    that Coopers was going to take a look,
22    Coopers would look at it at year-end and let
23    us know if we booked something incorrectly or
24    inappropriately.
25  Q.    And you consider both of those kinds of

47 (Pages 182 to 185)

JOHN LYNDON

Page 186

1    things, a review by superiors and a review by
2    Coopers & Lybrand, as an independent check on
3    your work at what you considered at the time
4    to be a new classification arena?
5  A.   That's correct.
6  Q.   I think it was your testimony that Coopers
7    undertook such a review because you discussed
8    it with Ms. Frazier and Mr. Panucci; is that
9    right?
10        MR. RYAN:  Objection.
11  A.   That's my recollection.  That's correct.
12  Q.   You discussed the Lockhart funds and your
13    FASB review of them with those two Coopers &
14    Lybrand employees?
15  A.   That's my recollection as to what my logic
16    was going through.
17  Q.   And your recollection is that took place in
18    your office?
19  A.   Yes.  That's my recollection.
20  Q.   At the Clark Building?
21  A.   That's correct.
22  Q.   I could give you the floor or office
23    number --
24  A.   44 --
25  Q.   429 or 431?

Page 187

1  A.   One of those two.
2  Q.   My next question is do you recall when
3    approximately that conversation took place?
4    Was it apparently during the audit process?
5    My question is can you fix it in a month?
6  A.   I don't think I can.
7  Q.   Can you fix it in fiscal year 1996, the audit
8    work done in connection with fiscal year
9    1996?
10  A.   Yes, yes.
11  Q.   And that's when it took place?
12  A.   Yes.
13  Q.   Do you recall Ms. Frazier and Mr. Panucci or
14    anyone else from Coopers asking you for
15    specific documentation regarding the Lockhart
16    trusts and your FASB classification of the
17    funds therein?
18  A.   I don't recall specifically them asking me
19    for that.  Again, we prepared packages for
20    each work papers for each general ledger
21    account, and they were given the work papers.
22  Q.   Would it have been your practice if asked for
23    documentation or information regarding the
24    Lockhart funds or trusts and your FASB review
25    to have complied and provided the

Page 188

1    information?
2  A.   Absolutely.
3        MR. RYAN:  Objection.
4  Q.   Similarly any documentation that might have
5    been requested, would it have been your
6    practice to provide?
7  A.   Yes.
8        MR. RYAN:  Objection.
9  Q.   Sir, in your time at AHERF in the accounting
10    department, Mr. Lydon, do you recall ever
11    denying anyone from Coopers documentation or
12    information that they requested in the audit
13    process?
14  A.   No.  Coopers had access to everything that we
15    had, general ledger accounts, schedules,
16    journal entries.  It was all there.
17  Q.   I'm going to ask you to refer quickly back to
18    Exhibit 20, which was marked about the
19    time -- shortly before Exhibit 187, I
20    believe, in this deposition.  It is the
21    October 30 memo of 1996 to Mr. Martin from
22    Mellon Bank in the person of Barbara
23    Robinson.
24  A.   Okay.
25  Q.   At an earlier time today you and Mr. Ryan

Page 189

1    discussed the trust document language at the
2    top of page 2 of this letter referred to in
3    the text letter as article X, Roman numeral
4    X.  Are you with me?
5  A.   Yes.
6  Q.   The language that reads, In the case of the
7    sale of any securities of the trust fund at a
8    premium or profit, such premium or profit
9    shall become a part of the corpus and not
10    income.  Do you see that quote again?
11  A.   Yes.
12  Q.   Mr. Ryan asked you and I believe you
13    responded to his question.  The question was
14    having read that language or if you had read
15    that language in the trust document quoted
16    there, you would have classified the income
17    as restricted.  Do you recall that testimony?
18  A.   I think so, yes.
19        MR. RYAN:  Objection.
20  Q.   My question is do you mean to say permanently
21    restricted?
22  A.   I don't know that I know that.  I don't know
23    what my thought was at the time going through
24    it, if I even saw that.
25  Q.   If you read it now and knowing whatever you

MANHATTAN REPORTING CORP., a LegaLink Company

JOHN LYNDON

Page 222

1  for your time, Mr. Lydon. Mr. Lydon, perhaps
2  on the record is the best way to do it since
3  you didn't appear to be represented today.
4       You have the right, as we all, I
5  think, understand it -- if somebody disagrees
6  with me, shout -- to read this transcript,
7  make changes to it under the Federal Rules of
8  Civil Procedure.
9       The court reporter can make it
10  available for you, and you can also decline
11  to do that if you so choose, but we wanted to
12  make sure you knew you had the opportunity.
13       THE WITNESS: Okay. Thank you.
14       THE VIDEOGRAPHER: With there being
15  no further questions this deposition is
16  concluded at 4:10.
17       - - - -
18  (The proceedings were concluded at 4:10 p.m.)
19       - - - -
20
21
22
23
24
25

Page 224

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY        )   S H E E T
2
       I, John T. Lydon, have read the foregoing pages
3  of my deposition given on Tuesday, June 18, 2002, and
   wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21  _____
                John T. Lydon
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
                Notary Public
25  AKF Reference No. Cg70722

Page 223

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3       I, Claire Gross, RDR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  John T. Lydon, was by me first duly sworn to testify
7  to the truth; that the foregoing deposition was taken
8  at the time and place stated herein; and that the
9  said deposition was recorded stenographically by me
10  and then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13     I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17     I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 19th day of June,
23  2002.
24  _____
25         Notary Public

MANHATTAN REPORTING CORP., a LegaLink Company

**Maher Dep.**

# In The Matter Of:

*AHERF*
*PRICEWATERHOUSECOOPERS, LLP*

---

## ANGELA MAHER
*February 24, 2003*

---

## MANHATTAN REPORTING CORP.
### 420 Lexington Avenue – Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**MAHER, ANGELA (2/24/2003)**

**Word Index included with this condensed transcript**

ANGELA MAHER

Page 158

1    discussions?
2  A.    If there was a discussion, I would have been
3       a part of a larger group listening to this
4       because I didn't have one-on-one discussions
5       with David McConnell, so what you see here is
6       what there is, I guess.
7  Q.    When you were deposed last time Mr. Hamilton
8       asked you about Forbes" merger with AHERF,
9       and I believe you said that at that time, at
10      that time period there was a lot of
11      consolidation going on in the healthcare
12      market; is that true?
13 A.    Yes.
14 Q.    In what regions was that occurring?  Did that
15      include Pittsburgh?
16 A.    That included Pittsburgh.  It was a national
17      phenomenon, and in Pittsburgh UPMC, which
18      you're probably familiar with, was acquiring
19      various facilities in the city, and AHERF
20      wanted to reach out and acquire hospitals as
21      well; and since it had medical schools in the
22      east, it made sense for it to acquire
23      facilities in the east, eastern part of the
24      state, and they wanted to acquire facilities
25      here in Pittsburgh as well.  At the time

Page 159

1       AHERF and UPMC were considered to be strong
2       rivals.
3  Q.    What was the rationale behind consolidating
4       like that?
5          MR. HAMILTON: Object to form.
6  Q.    You can answer.
7  A.    My understanding was that it had to do with
8       the economics, that in a system you could
9       gain economies of scale, you can close some
10      facilities, you could use some facilities as
11      feeders into other facilities, you could take
12      departments that were only doing -- you could
13      get rid of the duplication of various
14      departments and reduce staff and so forth.
15      And also I had the sense that when one entity
16      started that strategy, it became necessary
17      for others to follow that strategy for fear
18      that they would be left behind.
19 Q.    And why is it that Forbes then wanted to
20      merge with AHERF?
21 A.    Well, I didn't make that decision, and I
22      wasn't part of those discussions.  I can only
23      surmise that Forbes felt that it couldn't
24      survive in the long term without aligning
25      with a stronger partner.

Page 160

1  Q.    I think you mentioned at your prior
2       deposition that there were financial
3       pressures on Forbes; is that correct?
4  A.    Yes.
5  Q.    What were those pressures?
6  A.    Well, reimbursement continued to decline for
7       Medicare, Medicaid.  There were the HMOs that
8       were continuing to reduce their per capita
9       fees.  PPOs were entering into the market.
10      By and large the overall reimbursement
11      situation continued to get worse and worse.
12         I believe that many in management
13      felt that they couldn't -- that Forbes would
14      not be viable over the long term if it didn't
15      find a suitable partner that could give it
16      the economics of scale that it needed.
17          - - - -
18      (Exhibit 1191 marked for identification.)
19          - - - -
20 Q.    You've been handed what's marked Exhibit 1191
21      which has the Bates numbers ABM 001565, and
22      then it skips to 67 for some reason.  I don't
23      know if there is a page 1566 or not.
24         I believe you looked at least at the
25      second page of this at your deposition with

Page 161

1       Mr. Hamilton.  Do you recall that?
2  A.    Yes.
3  Q.    I believe you said that these are suggestions
4       that you came up with in the spring of '98;
5       is that right?  Strike that.  Do you know
6       when you came up with these suggestions?
7  A.    I don't know when I came up with them, but I
8       remember having a discussion with Mike Martin
9       about them.  I was concerned that it was
10      probably in the fall of '97 when AHERF let go
11      1,200 employees in Philadelphia, and I became
12      alarmed because when you have that kind of a
13      downsizing it doesn't speak well for the
14      long-term viability of the organization, or
15      at least it gives you a hint there are things
16      that need to be fixed.
17         I sat down and I started writing out
18      ideas that I thought were worth pursuing, and
19      I gave them to him.  I don't know what he did
20      with them.
21 Q.    Besides Mr. Martin, did you give your list to
22      anybody else?
23 A.    No.
24 Q.    Did you have discussions about any of these
25      ideas with anyone else within AHERF?

41 (Pages 158 to 161)

ANGELA MAHER

Page 162

1  A.    Oh, I probably had discussions with my
2       coworkers.
3  Q.    Ms. Gilbert and Ms. Mertz?
4  A.    Probably.
5  Q.    Do you know if there were other people within
6       AHERF attempting to come up with ideas to
7       improve the situation at the time?
8  A.    There may have been others.  There should
9       have been others.  If this weren't, it was
10      clear that there needed to be having major
11      discussions about how to fix things.
12 Q.    Were you involved in any discussions about
13      how to fix things?
14 A.    No.  As I said, I became alarmed and just sat
15      down and wrote these because it disturbed me
16      the way things were going.  I only shared
17      this with Mike Martin as far as I can
18      remember.
19 Q.    And do you have any opinion as to whether
20      these undertakings would have prevented the
21      bankruptcy?
22 A.    You know, it's hard to separate what you know
23      afterwards from what you know at the time.
24      Sitting here I know a lot more today than I
25      knew then.  Particularly there is a very well

Page 163

1       written newspaper article that lasted through
2       seven, I think, series of what went wrong
3       with AHERF, and it's hard for me to separate
4       what I think now from what I thought then.
5            But I was just very concerned, and I
6       don't know if there was anything that could
7       have fixed it given the commitments that were
8       made to various entities.  I mean, you really
9       would have gone after it with a real sharp
10      knife and just cut out all sorts of things
11      that at the time were supposed to make sense
12      like buying these physician practices, which
13      I think was probably what really pushed them
14      over the edge.  But there were probably many
15      other things as well.
16 Q.    What commitments were you talking about?
17 A.    Well, for instance, I mean, like salaries
18      would have been a perfect one.  I suspect
19      that AHERF really had salaries that were just
20      really very, very high in comparison to other
21      facilities who had that kind of
22      responsibility, and I think that that's a
23      commitment, that maybe you should go back and
24      talk about people voluntarily reducing some
25      of these extraordinary salaries that they

Page 164

1       had.  The difference between the salaries at
2       AHERF and at Forbes were extraordinary.  It
3       was more than double.  So that's one thing.
4       I don't know.
5  Q.    I think Mr. Hamilton asked you this, but I'll
6       ask again.  Do you know what you meant by the
7       bullet points under sacred cows?
8  A.    Well, I don't know why I called it sacred
9       cows other than to say these are taboo things
10      you wouldn't want to talk about, like
11      lowering the management's salaries and maybe
12      everybody else's a little bit too.
13           Management capabilities, I'm not sure
14      that the management was -- the management
15      could have been better.  If they were, they
16      probably wouldn't be in that spot.  Board
17      issues, probably from that I might have
18      meant -- I'm only guessing now -- that if the
19      board were -- you know, I didn't have the
20      sense -- I didn't really understand whether
21      the board had the sense of the urgency that I
22      felt I had, and so I guess that would have
23      been an issue, are they really aware of all
24      of the things, are they really getting good
25      information?  Didn't have any way to know.

Page 165

1  Q.    Last one.
2            - - - -
3       (Exhibit 1192 marked for identification.)
4            - - - -
5  Q.    You've been handed what's been marked as
6       Exhibit 1192, which I believe you also
7       discussed at your prior deposition?
8  A.    Yes.
9  Q.    The Bates numbers of this document ABM
10      1001823 and 1825.  I don't know if there is a
11      1824 because I haven't seen it.  Do you
12      recognize this letter?
13 A.    Yes.
14 Q.    You wrote this letter?
15 A.    I did.
16 Q.    And the handwriting on the page that's 1825
17      is yours?
18 A.    It is.
19 Q.    Now, you never attended any board meetings;
20      is that right?
21 A.    No.
22 Q.    You never reviewed the material that was
23      provided to them --
24 A.    No, none.
25 Q.    -- apart from the investment reports which

42 (Pages 162 to 165)

ANGELA MAHER

Page 166

1    you had a role in preparing?
2  A.    Yes.
3  Q.    How much interaction did you have with the
4    trustees?
5  A.    I had no interaction with the trustees in a
6    professional nature.
7  Q.    The first sentence of this letter says, I'm
8    writing this letter to alert you to the near
9    collapse of the Allegheny system.  What was
10    your basis in March of '98 for believing that
11    Allegheny was near collapse?
12  A.    All right.  Let me just give you some
13    information about this letter.
14  Q.    Sure.
15  A.    I would go home at night and think -- you
16    know, I would see money coming out of our
17    funded depreciation, and I was not used to
18    that.  I came from an organization where we
19    only put money in, we didn't take it out, and
20    we only -- we were quite solvent at Forbes,
21    and so I had not seen this phenomenon where
22    large amounts of cash were being taken out of
23    the funds that were available to the system.
24        So I saw that and I also saw that we
25    were letting go 1,200 people.  We were having

Page 167

1    trouble meeting our bond covenants.  I was
2    hearing they did a salary study on UPMC and
3    Allegheny and the salaries for Allegheny were
4    just extraordinary.
5        You know, pulling all these pieces
6    together.  It's a kaleidoscope of
7    information, and I would think about this and
8    think, well, if I were a board member, would
9    I want -- would I want to react to some of
10    this.
11        I thought well, maybe they don't know
12    about it.  And I said, well, maybe they do
13    know about it.  I didn't know what to think.
14    One afternoon I just sat down and wrote this.
15    But then I never sent it to anyone.  No one
16    saw that before it became part of the
17    materials that I gave to the deposition the
18    first time.
19        I never sent it to anybody because I
20    didn't know what anybody knew and I didn't
21    feel as though I really knew everything.  So
22    to send a letter like this which could have
23    been a bomb, was that responsible?  So I
24    didn't do it.  I never sent it.  You know how
25    you write in a moment of passion?  That's

Page 168

1    what I wrote, so that's what this is.
2  Q.    Did you share this letter with anybody else
3    within treasury?
4  A.    No.  No one saw it.  No one saw the light of
5    day.  Nothing.  No one saw it.  No one in my
6    family, no one.
7  Q.    Did you ever discuss the types of concerns
8    that you had written down with anybody within
9    AHERF?
10  A.    Steady drain of cash flow, we talked about
11    that in the treasury department.  The
12    inaction for so many months.  As I said,
13    there is a steady drain, you're losing all
14    these employees, things are going bad.  It
15    occurs to me that we need to take charge.  We
16    need to do something, make some specific
17    moves.
18        Now, maybe the reduction of staff and
19    the -- in the East was considered to be the
20    move to make.  Maybe that was the response.
21    And whereas I saw it as one more symptom,
22    they may have said this is the answer, this
23    is going to make the difference.
24  Q.    So you don't know what moves the board had
25    considered or was taking?

Page 169

1  A.    No.  I had no idea.
2  Q.    You had no idea what financial information
3    they actually had available to them?
4  A.    No.
5  Q.    For how long a period did you believe that
6    there were problems at AHERF?
7  A.    Problems meaning financial problems?
8  Q.    Yes, financial problems.
9  A.    Well, I always questioned whether I knew what
10    I knew and whether what I knew was really
11    relevant to what was there.  Probably in late
12    '97 I started to think, you know, that this
13    has got to be a problem, we are taking money
14    out, we are using it.  I don't see money
15    coming in.
16        How this was going to turn around I
17    didn't know, but I didn't -- I didn't know if
18    the board had put in place things that would
19    have changed the situation, so I always
20    questioned -- I always worried, but I always
21    questioned, well, maybe somebody knows, maybe
22    somebody is doing something about this, maybe
23    I'm not -- I don't have all the information,
24    and I'm not privy to decisions that other
25    people would make -- would change the

43 (Pages 166 to 169)

ANGELA MAHER

Page 222

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
   COUNTY OF ALLEGHENY          )  S H E E T
2
      I, ANGELA MAHER, have read the forgoing pages
3  of my deposition given on Monday, February 24, 2003,
   and wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21  _____
              ANGELA MAHER
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2003.
24 _____
         Notary Public
25      AKF Reference No. Cg74257

**Mammarella Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## PAULA MAMMARELLA
### July 28, 2003

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

MAMMARELLA, PAULA



PAULA MAMMARELLA

Page 178

1  Q.  Do you see how there's that exception in the
2     first clause that I read you?
3  A.  I see that it says except for, yes.
4  Q.  Do you recall learning at the time or in
5     December of 1997 that Charles Morrison had
6     drawn an exception to his statement that the
7     financial statements, quarterly financial
8     statements for Delaware Valley Obligated Group
9     were prepared in compliance with GAAP?
10 A.  I don't recall specifically the circumstances
11    under which we got this or reading it, but I
12    see that it evidences this per the certificate.
13 Q.  Did you learn at any time in calendar year 1997
14    that certain parts of unaudited financial
15    statements being presented to PNC were not
16    prepared in compliance with GAAP?
17 A.  I don't recall specifically when or how that
18    happened.
19 Q.  Do you recall learning at any point while you
20    were senior financial analyst that certain
21    members of AHERF management had alerted you or
22    any other member representative of PNC that
23    some part of a financial statement, a set of
24    financial statements that had been prepared by
25    AHERF, had been prepared not in compliance with

Page 179

1     GAAP?
2  A.  I recall that there were certificates that we
3     received that had language in it that indicated
4     that there were issues with their compliance
5     meaning that something that -- a calculation
6     for compliance with certain covenants that we
7     had were not being met according to the
8     calculation as it was originally to be set up.
9  Q.  Do you recall ever learning about any instances
10    where AHERF management was informing PNC about
11    any parts of the financial statements not being
12    prepared in accordance with GAAP as opposed to
13    simply that there was some instance of a
14    covenant noncompliance?
15 A.  I don't remember the specifics of those kind of
16    nuances and what was being communicated back
17    and forth.
18 Q.  Okay.
19 A.  Because I just don't remember.
20 Q.  Sure.  Do you recall any discussions you might
21    have had at PNC about any reported violations
22    of GAAP or any violations of GAAP reported by
23    AHERF management to PNC?
24 A.  I don't recall.
25 Q.  And, accordingly, you don't recall ever

Page 180

1     speaking with any members or inquiring with any
2     members of AHERF management about any
3     violations of GAAP that they had informed you
4     of or any members of PNC of?
5  A.  I don't recall having those specific
6     conversations with any members of AHERF
7     management, although I was at a meeting with
8     David McConnell; I can't remember the
9     specifics, however, of what was discussed at
10    that meeting.
11 Q.  Do you recall ever having any conversations
12    with the outside auditors of any AHERF
13    entities?
14 A.  I do not recall having any of those.
15 Q.  And, in particular, you have no recollection of
16    any conversation about any GAAP violations
17    with --
18       Let me rephrase that.
19       Accordingly, you have no recollection
20    of any conversations with any external auditors
21    of AHERF entities about any GAAP violations
22    that had been reported to you by AHERF
23    management?
24       MR. POHL:  Objection.
25       THE WITNESS:  I have no recollection.

Page 181

1       MR. TERUYA:  Okay.
2  BY MR. TERUYA:
3  Q.  At the time in December of '97, did you have
4     any practice with respect to following up with
5     questions about any officers' certificates you
6     might have received at the time from AHERF
7     management?
8  A.  We had a practice of following up on any
9     compliance certificates from any institution or
10    any health care or any type of company we dealt
11    with where we had questions with regard to
12    anything that we didn't understand.
13       We were supposed to make sure we
14    understood them and would follow up on anything
15    we had questions on, not just AHERF.
16 Q.  Do you know if under that practice -- or under
17    that practice can you tell, looking at this
18    certificate, whether you, in fact, followed up
19    with members of AHERF management about the
20    clause with respect to the $23 million
21    approximately?
22 A.  I can't remember the beginning of your
23    question.  What was the beginning of your
24    question?
25       MR. TERUYA:  Could you read that

PAULA MAMMARELLA

Page 182

1   back, please.
2          - - - -
3   (The record was read back by the Reporter.)
4          - - - -
5          THE WITNESS:  I don't recall.
6          MR. TERUYA:  Okay.  We can set this
7   document aside.
8          I'm going to mark as Exhibit 1785 a
9   document bearing Bates Nos. 30 -- sorry, PNC
10  30833 through 930 and it appears to be a credit
11  information sheet dated December 19, 1997,
12  signed by, among other people, Paula
13  Mammarella.
14         - - - -
15         (Deposition Exhibit No. 1785 marked
16  for identification.)
17         - - - -
18  BY MR. TERUYA:
19  Q.  Let me ask you as you flip through it whether
20      you recognize this particular document.
21  A.  I recognize it as a credit information sheet
22      which is part of -- and then followed by a
23      credit underwriting memorandum as part of a
24      total credit underwriting memorandum.
25  Q.  So this whole package of materials is what you

Page 183

1       were referring to earlier as a credit
2       underwriting memorandum?
3   A.  There's a lot of stuff in here.  Without
4       looking through the whole thing, I can see what
5       the beginning of it is, a credit underwriting
6       memorandum package.
7   Q.  Can you tell as you flip through it what the
8       other parts of this document are?
9   A.  It looks to be part of an entire package, a
10      credit underwriting package.  There's different
11      dates on things in here.  Some of it's dated
12      January 30th.  Some of this is dated December,
13      so I don't know if this was all together or --
14          It looks like a couple things were
15      combined.  There's a risk rating grade that's
16      dated January -- I'm sorry --
17          No.  There's another date on here.
18      I'm sorry.  It's hard to say without looking
19      through it very carefully.  It appears to be
20      all one package from December.
21  Q.  Do you see handwritten at the bottom there's,
22      at least on many of the pages, handwritten
23      numbers that run for the most part sequentially
24      through this document?
25          - - - -

Page 184

1          (The witness reviewed the document.)
2          - - - -
3          THE WITNESS:  Yes.  I see them.
4   BY MR. TERUYA:
5   Q.  Do those numbers appear to be written in your
6       handwriting?
7   A.  Yes.  I haven't gone through the whole thing
8       yet but --
9   Q.  Oh, okay.  You're saying as you look through
10      those, that this appears to be all part of one
11      package of materials?
12  A.  We sure can kill trees, can't we?
13          There are just a couple that don't
14      have numbers on them that aren't attached.
15      There was like one or two in the middle that
16      look like they should belong to the same
17      package.  I don't know about the spreads at the
18      end.
19  Q.  So with the exception of the last couple of
20      pages at the back which you can't be sure
21      about, it appears this is all one package from
22      one document?
23  A.  It appears, yes.
24  Q.  Is this the kind of package you put together
25      from time to time while you were senior

Page 185

1       financial analyst?
2   A.  Yes.
3   Q.  And did you prepare packages like this in the
4       ordinary course of your work as senior
5       financial analyst?
6   A.  I prepared packages with cover sheets, the
7       credit information sheet, and, you know, the
8       attachments, the risk rating grids, the what's
9       called RAROC, R-A-R-O-C, report.  The nature of
10      what's contained in it was obviously specific
11      to Allegheny General, AHERF, all those
12      entities, but this is the makeup of the type of
13      report I would have prepared, yes.
14  Q.  Are there any parts of this report that you
15      would not have prepared in the ordinary course?
16  A.  When I'm speaking about in the ordinary course
17      of preparing a review, there's a lot of
18      discussion in here if you look through here
19      about concern is growing over this because of
20      the nature of what's going on here, S&P
21      downgraded its rating, there's specifying in
22      here that address was going on with the
23      analysis of their financials and the
24      downgrades, et cetera.
25          That is not ordinary.  That is

47 (Pages 182 to 185)

PAULA MAMMARELLA

Page 186

1      specific to what is going on with maybe the
2      entity we were looking at.
3    Q.   I just meant this type of document, is this --
4    A.   The format of it, yes.
5    Q.   This type of document is the type of document
6      you prepared in the ordinary course?
7    A.   The format, yes.
8    Q.   And you would store documents like this in
9      PNC's files in the ordinary course, as well?
10   A.   I would --
11   Q.   Store documents like this in PNC's files?
12   A.   Yes.
13   Q.   Would this go into the credit file that you
14     referred to?
15   A.   Yes.
16   Q.   Can you tell what this particular credit
17     information sheet was prepared for?
18   A.   The reason for submission on the front page of
19     the credit information sheet, or CIS, is annual
20     review. There's a block that's checked called
21     annual review on the first one.
22          On the second one, there are other
23     blocks checked, including annual review.
24     There's modification of commitment and
25     commitment renewal. That one's for AGH

Page 187

1      specifically. Allegheny University Medical
2      Centers' commitment renewal and annual review.
3      That looks like the only ones we have.
4    Q.   The signatures on the first three pages next to
5      the typewritten name, Paula Mammarella, are
6      those your signatures?
7    A.   My signature appears by my name.
8    Q.   Do you see how for each of the first three
9      pages there are a number of other signatures
10     for Frank Taucher, W. Alex Eliason, C. David
11     Cook, and Frank R. Krepp?
12   A.   Yes.
13   Q.   Are those the people you referred to earlier
14     who would have to sign credit information
15     sheets like these in order to approve actions
16     mentioned in them?
17   A.   Those are the signatories, yes.
18   Q.   See how there's a stamp at the bottom that says
19     recorded in the minutes of the market credit
20     committee dated January 28, '98, and it says
21     recording secretary and there's some initials
22     above it?
23   A.   Yes.
24   Q.   Do you have any idea what that stamp and
25     handwriting refers to?

Page 188

1    A.   It's my recollection and it's based on PNC's
2      way of doing the signature method of approval,
3      getting away from the committee as we talked
4      about before, it's my understanding and my
5      recollection that this would actually record
6      things in minutes that you would naturally have
7      in a committee being taken as you're sitting
8      there during the committee, but it's my
9      understanding that this is how it's documented
10     in the --
11   Q.   Let me see if I understand this properly. At
12     this point in time when the five of you who are
13     listed on this document had signed off on the
14     credit information sheet, for practical
15     purposes the actions requested were approved.
16     Is that correct?
17   A.   They were approved as of that date, yes, of the
18     signatories.
19   Q.   Was there any further approval that was
20     required by any other person at PNC in order
21     for the actions requested to be approved?
22   A.   I'm sorry. You were saying?
23   Q.   Let me rephrase that. Did anyone else have to
24     sign off on the credit information sheet other
25     than the five people listed here?

Page 189

1    A.   Is there's a signature. There's a line below
2      the signatures that says highest credit
3      signatory affirmation that signatures are
4      complete, and there's initials there, and
5      that's the affirmation that you've gotten to
6      the level that you need to. Someone's
7      attesting to that.
8    Q.   Does that look like the initials FRK?
9    A.   Yes.
10   Q.   For Frank R. Krepp?
11   A.   Correct.
12   Q.   To your understanding, was that after he signs
13     off on that that the actions requested in this
14     credit information sheet were approved?
15   A.   Yes.
16   Q.   And the stamp reflects the creation of minutes
17     after that?
18   A.   Yes.
19   Q.   And would those minutes reflect the discussions
20     that had occurred between the five signatories?
21   A.   No.
22   Q.   What would those minutes reflect?
23   A.   I'm not sure everything that they would
24     reflect, but a person that's stamping this
25     wasn't in the discussions and meetings with the

48 (Pages 186 to 189)

PAULA MAMMARELLA

Page 226

1    that it's an executed form that indicates an
2    acceptance of the terms for renewal of the
3    letter of credit.
4        MR. TERUYA: Is it pretty standard
5    practice while you were senior financial
6    analyst for PNC to send to various health care
7    credits proposed terms and conditions in
8    advance of reaching any formalized agreement?
9        MR. POHL: Objection.
10       THE WITNESS: It's my understanding
11   that in banking, if you -- to have something
12   set up where you submit terms to a customer for
13   them to accept it, just the terms and
14   conditions, that's pretty typical.
15       MR. TERUYA: Okay. We can set this
16   document aside.
17       I'm going to mark as Exhibit 1791 a
18   one-page document with Bates No. PNC 191, and
19   it appears to be a letter from Paula Mammarella
20   to Michael Martin dated January 6th, 1998.
21       - - - -
22       (Deposition Exhibit No. 1791 marked
23   for identification.)
24       - - - -
25       - - - -

Page 227

1        (The witness reviewed the document.)
2        - - - -
3    BY MR. TERUYA:
4    Q.   I'll ask you as you look at it if you recognize
5         this document.
6    A.   I recognize it as a memo that I sent over to
7         Mike Martin in January.
8    Q.   Do you recognize your signature down at the
9         bottom?
10   A.   Yes.
11   Q.   Could you tell me why you sent this memo to
12        Mike Martin.
13   A.   As I'm reading it, it indicates that I'm asking
14        him to send me financial projection information
15        outlining plans to meet the liquidity covenant
16        by June 30th of 1998.
17   Q.   Does looking at this refresh your memory in any
18        way that PNC had asked AHERF for plans as to
19        how it could meet the liquidity covenant by
20        6-30-98?
21       MR. POHL: Objection.
22       THE WITNESS: Only as I read it here
23   it refreshes --
24       MR. TERUYA: I think you mentioned
25   this, but let me ask you, was one of the steps

Page 228

1    you mentioned that might have occurred either
2    at the meeting with David McConnell in April
3    of -- in April -- on April 1st, would one of
4    the steps at that meeting have been to discuss
5    AHERF's plans for dealing with noncompliance
6    with one of the covenants in one of the letters
7    of credit between AHERF and PNC?
8        MR. COGAN: Objection.
9        THE WITNESS: I can't recall
10   specifically what all was discussed then.
11   BY MR. TERUYA:
12   Q.   Do you ever recall having any discussions while
13        you were a senior financial analyst at PNC
14        about what AHERF's plans were to respond to any
15        noncompliance by any AHERF entities?
16   A.   I can't recall.
17   Q.   Sort of on the flip side, I take it you don't
18        recall any discussions with any members of
19        AHERF management about their plans for dealing
20        with any noncompliance by any AHERF entities.
21   A.   I don't recall specifics of the conversation
22        that was held on April 1st, but there was a
23        discussion on April 1st in a meeting that I was
24        attending. I don't remember the agenda.
25   Q.   And other than that meeting, do you recall any

Page 229

1    other discussions you might have had with AHERF
2    management on that issue?
3    A.   I can't recall.
4    Q.   Okay. We can set 1791 aside.
5        I'm going to mark as Exhibit 1792 a
6    one-page letter from Paula Mammarella to
7    Michael Martin dated January 8, 1998, with
8    Bates No. PNC 43090.
9        - - - -
10       (Deposition Exhibit No. 1792 marked
11   for identification.)
12       - - - -
13       (The witness reviewed the document.)
14       - - - -
15   BY MR. TERUYA:
16   Q.   Let me ask you as you look at it whether you
17        recognize this document.
18   A.   Again, just as I'm reading it.
19   Q.   Oh, okay. Do you recognize it as you're
20        reading it as a letter from you to Mike Martin
21        notifying Mike Martin that the letter of credit
22        that PNC had issued to Allegheny General
23        Hospital Obligated Group was being renewed for
24        a one-year term set to expire on January 29,
25        1999?

58 (Pages 226 to 229)

PAULA MAMMARELLA

Page 230

1  A.   Yes, except it's to Allegheny General Hospital,
2       not the group.
3  Q.   Okay.  Do you recall any discussion you had at
4       the time?  Does looking at this help you recall
5       any discussions about this?
6  A.   No.  I don't recall.
7  Q.   Do you recognize your signature at the bottom
8       of this exhibit?
9  A.   Yes.
10 Q.   And you said that in the ordinary course you
11      would write letters like this to AHERF
12      management.  Is that correct?
13           MR. COGAN:  Objection.
14           THE WITNESS:  There's no ordinary
15      course for any --
16           MR. TERUYA:  Sorry.  I should have --
17           Let me rephrase it more generally.
18      Do you recall writing letters --
19           You said you recalled writing letters
20      from time to time to members of AHERF
21      management, even if they weren't letters
22      dealing with renewals.  Is that right?
23           MR. POHL:  Objection.
24           THE WITNESS:  I recalled
25      correspondence with folks for any client that I

Page 231

1       would work on requesting financial information
2       that might be by phone or FAX or the E-mail or
3       whatever.
4            I don't recall specifics of what I
5       sent back and forth between AHERF.
6  BY MR. TERUYA:
7  Q.   Okay.  Any letters that you did send to AHERF
8       management or received from them, you would
9       have in the ordinary course kept in the
10      correspondence section of the credit file.  Is
11      that right?
12 A.   In the ordinary course, yes.
13 Q.   Do you recall receiving from time to time
14      certain letters from AHERF management?
15 A.   I don't recall.
16 Q.   Okay.  We can set 1792 aside.
17      I'm going to mark as Exhibit 1793 a
18      document with Bates Nos. PNC 38971 through 74,
19      and it's captioned Amendment to Letter of
20      Credit Reimbursement and Security Agreement,
21      and it appears to be signed by Paula Mammarella
22      and appears to be dated as of January 29, 1998.
23           - - - -
24           (Deposition Exhibit No. 1793 marked
25      for identification.)

Page 232

1            - - - -
2       (The witness reviewed the document.)
3            - - - -
4  BY MR. TERUYA:
5  Q.   And let me ask you as you look at it whether
6       you recognize this document.
7  A.   I recognize it as an amendment.  I recognize my
8       handwriting at the top.  It looks like it says
9       legal file and my signature on the back.
10 Q.   Does this appear to be an amendment to a 1993
11      letter of credit issued by PNC to Allegheny
12      General Hospital?
13 A.   Yes.
14 Q.   And does it appear to be an amendment which
15      extends the expiration date of the letter of
16      credit to 5 P.M. on January 29th, 1999?
17 A.   Where do you see --
18 A.   I'm sorry; in the Section D on the first page.
19 A.   Okay.  Your question is?
20 Q.   I'm sorry.  Does this appear to be an amendment
21      to a 1993 letter of credit issued by PNC to AGH
22      to extend the expiration date of the letter of
23      credit until 5 P.M. on January 29th, 1999?
24 A.   Yes, and to amend certain provisions of the
25      original agreement as provided in this

Page 233

1       agreement.
2  Q.   And is one of the other provisions that's being
3       amended the fee that's being provided to PNC
4       from Allegheny General Hospital?  And I'm
5       referring to the second page of the document
6       now.  Sorry about that.
7  A.   Okay.  A renewal fee of 55/100 percent, yes.
8  Q.   So does this indicate that a renewal fee is now
9       55 basis points?
10           MR. COGAN:  Objection.
11 BY MR. TERUYA:
12 Q.   Why don't I word my question in a more open
13      way.  What's your understanding of what the
14      amendment listed on Page 2 next to No. 1 means?
15 A.   Page 2 next to No. 1?
16 Q.   Yes.  What does the first amendment listed on
17      Page 2 mean?
18 A.   There is to be added this paragraph that
19      includes the verbiage that indicates that
20      beginning in January 29th of 1998, and
21      continuing as long as any credit remains
22      available to the paying agent and a letter of
23      credit on the date of termination of the letter
24      of credit, the letter of credit commitment fee
25      payable by the corporation to the bank shall be

59 (Pages 230 to 233)

PAULA MAMMARELLA

Page 294

1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
    COUNTY OF ALLEGHENY            )   S H E E T
2
        I, PAULA MAMMARELLA, have read the foregoing
3   pages of my deposition given on Monday, July 28,
    2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
        In all other respects, the transcript is true and
20  correct.
21  _____
            PAULA MAMMARELLA
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
            Notary Public
25      AKF Reference No. Gd76557

Marks Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

*STANLEY MARKS, M.D.*
*June 22, 2004*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**MARKS, M.D., STANLEY - Vol.**



LEGALINK
A WORDWAVE COMPANY

1    threatening them that if they went with
2    Allegheny, you know, that they'd put them out
3    of business, they'd build a competing hospital.
4    I mean that was UPMC's tactics at the time,
5    even though I now work for them, that they
6    threatened them that if they went with
7    Allegheny, that there would be --
8  Q.    Repercussions?
9  A.    -- repercussions, negative, yeah, for them
10    whereas in their dealings with Allegheny they
11    just felt more comfortable and felt they'd make
12    a better partner.
13  Q.    And Barry Roth was CEO of Forbes at the time;
14    is that right?
15  A.    Yes.
16  Q.    If you would take a look at Exhibit 1988, which
17    is one of the exhibits that Mr. Walker showed
18    you earlier today, and for the record, that is
19    the special meeting of the board of trustees of
20    Allegheny Health, Education and Research
21    Foundation, September 16th, 1996.
22        You had flipped through this document
23    and said you were obviously there. My question
24    to you is that -- did you make that statement
25    because you actually recall being present at

1    that meeting or because you saw your name
2    listed as a member on the third page of the
3    document?
4  A.    Well, I saw my name listed, but also I remember
5    being at a board meeting at Fifth Avenue Place,
6    so unless that wasn't the same one, but I'm
7    pretty sure I was there.
8  Q.    And the reason I mentioned that and I wanted to
9    make sure you were aware that these were not
10    minutes of that meeting, this would be a board
11    packet that would have been submitted in
12    advance of the meeting. So your name as a
13    member doesn't necessarily indicate the fact
14    that you were, in fact, there, but if you
15    recall that, I just wanted to make sure.
16  A.    Yes.
17  Q.    Thank you. That's all I have on that document.
18    There -- well, strike that.
19        Were you aware that there were
20    various committees of the AHERF board of
21    directors?
22  A.    Yes.
23  Q.    Do you recall having served on any of those
24    committees of the AHERF board?
25  A.    I don't recall. I don't think I did.

1  Q.    For example, you were not a member of the AHERF
2    finance committee; is that correct?
3  A.    No.
4  Q.    And at any time were you a member of the
5    executive committee of the AHERF board?
6  A.    No.
7  Q.    And earlier today when you talked about being a
8    member of the executive committee, your
9    references were to the executive committee of
10    the medical staff --
11  A.    Yes.
12  Q.    -- is that correct?
13  A.    Yes.
14  Q.    Were you aware that there was actually an audit
15    committee of the AHERF board?
16  A.    Yes.
17  Q.    Did you at any time serve as a member of the
18    audit committee?
19  A.    Never.
20  Q.    Did you have any understanding of what the role
21    of the audit committee was?
22  A.    No, just in, you know, simple terms they
23    audited what went on at the board, at oversight
24    committee.
25  Q.    Did you understand that they were an oversight

1    committee for the operations of the hospital or
2    the entity --
3  A.    I thought it was more financial but --
4  Q.    Financial, okay. Did you have an understanding
5    during your tenure as a member of the AHERF
6    board that AHERF had independent outside
7    auditors that reviewed the financial statements
8    prepared by management?
9  A.    Yes.
10  Q.    Did you know who those outside auditors were?
11  A.    I -- you know, I wouldn't know until I saw
12    today. I mean I wouldn't remember.
13  Q.    Do you recall now that it was Coopers & Lybrand
14    that was the outside --
15  A.    Yeah, now, but if you had asked me without
16    seeing the documents, I wouldn't.
17  Q.    Okay. Do you recall ever being at any board
18    meeting where there were representatives of
19    Coopers & Lybrand present?
20  A.    I don't recall.
21  Q.    Do you recall ever having any interaction in
22    any arena with any member or employee of
23    Coopers & Lybrand that was involved in the
24    audit of the AHERF financial statements?
25  A.    No, I don't think so. I don't recall anything.

Page 86

1  Q.   Okay.  All right.  Did you have any
2       understanding as to the service that was
3       provided by Coopers & Lybrand as the outside
4       independent auditors of AHERF?
5  A.   No, again, just in general terms they did an
6       independent audit of the financials.
7  Q.   What was your understanding as to what it meant
8       to have an outside independent audit of AHERF's
9       financials?
10 A.   Just in general to make sure that no one's
11      cooking the books, that the financials are
12      accurate.
13 Q.   Do you recall ever seeing a report from Coopers
14      & Lybrand with respect to what they had found
15      in reviewing AHERF's audited financial
16      statements?
17 A.   Offhand I don't recall.
18 Q.   Do you recall ever hearing that the auditors of
19      Coopers & Lybrand had found anything irregular
20      in AHERF's financial statements in any respect?
21 A.   No.
22           MR. WALKER:  Objection, foundation.
23 Q.   Are you familiar with the term clean opinion as
24      it relates to the audit of financial
25      statements?

Page 87

1  A.   No, I mean only what it sounds like it means,
2       but I've never heard the term before.
3  Q.   Okay.  Did you have an understanding that after
4       reviewing the financial statements that were
5       presented by AHERF management, Coopers &
6       Lybrand issued an opinion with respect to those
7       financial statements?
8  A.   That's -- you are asking me if that's what the
9       audited statement is?  That's what I assumed it
10      meant.
11 Q.   Okay.  All right.  And was it your
12      understanding that at all times Coopers &
13      Lybrand reported that it had found that AHERF's
14      financial statements fairly represented the
15      financial condition of AHERF and its
16      affiliates?
17 A.   I wasn't aware of anything other than that.
18 Q.   Other than that?
19 A.   Yeah.
20 Q.   Okay.  Did you have any view at the time you
21      sat on the AHERF board as to the significance
22      of receiving such an opinion from Coopers &
23      Lybrand?
24 A.   I mean I just thought it was routine.
25 Q.   Okay.

Page 88

1  A.   Routine business.
2  Q.   Would it have been routine business if Coopers
3       & Lybrand had notified the board that they
4       found that the financial statements did not
5       fairly and accurately represent the true
6       financial condition of AHERF?
7            MR. WALKER:  Objection, speculative.
8  Q.   You can answer.
9  A.   Would have raised flags.
10 Q.   And would you have looked to the other members
11      of the finance and audit committee to address
12      those issues if they had been raised or those
13      flags if they had been raised by Coopers &
14      Lybrand?
15 A.   Yes.
16           MR. WALKER:  Same objection.
17 Q.   And that's something that you would have
18      expected the audit committee to address if such
19      a circumstance had occurred; correct?
20 A.   Yes.
21 Q.   That was not something you felt was your
22      role --
23 A.   No.
24 Q.   -- as a member of the board; correct?
25 A.   Yes.

Page 89

1  Q.   And you had mentioned Mr. Gumberg and
2       Mr. Barnes and several others to be what you
3       considered to be active members of the AHERF
4       board.  Do you recall knowing who the members
5       of the audit committee of the AHERF board were
6       during your tenure?
7  A.   No.
8  Q.   Do you recall the audit committee of the AHERF
9       board presenting the audited financial
10      statements to the board as a whole during
11      meetings that you attended on an annual basis?
12 A.   I don't recall.
13 Q.   Do you ever recall hearing that at some point
14      in time PriceWaterhouseCoopers, which became
15      the successor to Coopers & Lybrand, their
16      services with AHERF were terminated?
17 A.   No.
18 Q.   Do you recall there being a time when AHERF and
19      PriceWaterhouseCoopers issued a press release
20      stating that the audited financial statements
21      for fiscal year 1997 of AHERF and its
22      affiliates could no longer be relied upon?
23 A.   No.
24 Q.   Earlier today Mr. Walker asked you about
25      Exhibit 1661 which contained the audited

23 (Pages 86 to 89)

Page 90

1  financial statements of AHERF and its
2  affiliates for fiscal year-end or fiscal year
3  1996, and he asked you about investment
4  income --
5  A.  Mm-hmm.
6  Q.  -- and AHERF's reliance on investment income.
7     Based on your experience in working at various
8     hospitals, was it your understanding that
9     hospitals, and particularly nonprofit
10     hospitals, typically have to rely on investment
11     income --
12        MR. WALKER:  Objection.
13  Q.  -- as a portion of their revenue?
14  A.  Yes.
15  Q.  Okay.  Was that something that struck you as
16     unusual, that AHERF relied on investment income
17     as a portion of its revenue?
18  A.  No, I mean certainly nowadays it's much worse
19     than it used to be, but I can't recall back
20     then if it was a big deal or not.
21  Q.  Okay.  When you say it's much worse than it
22     used to be --
23  A.  Well, because all hospitals have no profits on
24     the operating side anymore for the most part.
25  Q.  So they have to rely on their investment

Page 91

1  income?
2  A.  Mm-hmm.
3  Q.  Was that a yes?
4  A.  Yes.
5        MS. MEADEN:  You have to keep your
6     responses verbal.  Just a quick minute here.
7        I don't believe I have any further
8     questions for you.  Thank you.
9        MR. WALKER:  Nothing further, Doctor.
10     Thanks.
11        THE VIDEOGRAPHER:  There being no
12     further questions.  This deposition is
13     concluded.  Thanks.
14        - - - -
15  (The proceedings were concluded at 12:23 p.m.)
16        - - - -
17
18
19
20
21
22
23
24
25

Page 92

1  COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3     I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  STANLEY MARKS, M.D., was by me first duly sworn to
7  testify to the truth, the whole truth, and nothing
8  but the truth; that the foregoing deposition was
9  taken at the time and place stated herein; and that
10  the said deposition was recorded stenographically by
11  me and then reduced to printing under my direction,
12  and constitutes a true record of the testimony given
13  by said witness.
14     I further certify that I am not a relative or
15  employee of any of the parties, or a relative or
16  employee of either counsel, and that I am in no way
17  interested directly or indirectly in this action.
18     IN WITNESS WHEREOF, I have hereunto set my hand
19  and affixed my seal of office this 23rd day of June,
20  2004.
21
22
23  _____
24        Notary Public
25

Page 93

1  COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
   COUNTY OF ALLEGHENY        )   S H E E T
2
3     I, Stanley Marks, M.D., have read the foregoing
   pages of my deposition given on Tuesday, June 22,
4  2004, and wish to make the following, if any,
   amendments, additions, deletions or corrections:
5  Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21  _____
        STANLEY MARKS
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2004.
24  _____
        Notary Public
25  AKF Reference No. HW81344