**Martin Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P*

---

## *MICHAEL P.  MARTIN*
### *August 22, 2003*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**MARTIN,  MICHAEL P.**



A **WORDWAVE** COMPANY

MICHAEL P. MARTIN

Page 466

1    syndication of a PNC letter of credit for AGH
2    funds?
3  A.   No, I don't recall.
4  Q.   I believe you testified that this syndication
5    effort by PNC Bank occurred in the late 1995 or
6    early 1996 time frame?
7  A.   I believe so.
8  Q.   And am I correct that during the first half of
9    1996 you were discussing with PNC Bank becoming
10    a letter of credit provider for the DVOG bonds?
11  A.   Yes.
12        MR. TORBORG:  Counsel, I assume you
13    mean the calendar year 1996?
14        MR. KRUSKO:  Yes, thank you.
15  A.   Yes, that's probably the time frame.
16  Q.   Okay.  Do you recall any discussion in that
17    time frame, again, first half of calendar 1996,
18    with anyone at PNC Bank with respect to how
19    PNC's attempt to syndicate the AGH letter of
20    credit was going to impact, if at all, PNC's
21    willingness to enter into a letter of credit
22    with respect to the DVOG bonds?
23  A.   I recall that initially PNC made the statement
24    that given their exposure to the Allegheny
25    organization in total, that most likely they

Page 467

1    were not going to bid on the -- the upcoming
2    Delaware Valley Obligated Group bonds as a
3    letter of credit bank.
4        And I think ultimately they came
5    through with a bid for being a letter of credit
6    provider, but that it was priced well above
7    other providers for the same facility.
8        And I believe that we, meaning AHERF
9    treasury, had told PNC that they were priced
10    well above the market, and in terms of who we
11    were talking to, that seemed to be acceptable
12    and they understood where their bid had come in
13    regards to -- in regards to other competitors.
14        Shortly thereafter in sharing that
15    information with David McConnell, the CFO of
16    AHERF, PNC came back to us, and I think through
17    information that Mr. McConnell had shared with
18    other representatives of PNC, PNC came back and
19    said they wanted to rebid on the roles of
20    letter of credit provider.  They did so, and
21    they came in substantially lower, and, in fact,
22    they were the lowest bidder for that -- for
23    that position.
24  Q.   I take it in the first half of calendar 1996
25    there was a standard packet -- package of

Page 468

1    information that AHERF would send to
2    prospective letter of credit providers to
3    inform their decision as to whether to provide
4    a letter of credit?
5  A.   We had a bid package, yes.
6  Q.   In addition to this bid package, was there any
7    other package of information that AHERF made it
8    a practice to send to potential letter of
9    credit providers after the bid package had been
10    sent out?
11  A.   If a bidder came back with a unique request for
12    information, we tried to respond as best as
13    possible.
14  Q.   So after the bid package went out, AHERF
15    provided information on a case-by-case basis?
16  A.   Yes.
17  Q.   Do you recall whether a bid package was sent to
18    PNC Bank?
19  A.   Well, I'm assuming that because they had bid
20    that they did receive a bid package.
21  Q.   Do you recall with respect to the case-by-case
22    providing you information, any specific
23    requests for information by anyone at PNC Bank
24    after PNC Bank had received a bid package from
25    AHERF?

Page 469

1  A.   No, I don't.
2  Q.   Do you recall more generally any request for
3    information by PNC Bank after PNC Bank had made
4    its initial bid for the 1996 letter of credit?
5  A.   No.
6  Q.   Were you surprised at the time that PNC came
7    back with a second bid that was, in fact,
8    competitive?
9  A.   Yes.
10  Q.   And do you recall anything more other than just
11    general surprise that PNC's second bid was, in
12    fact, competitive?
13  A.   No.
14  Q.   And I take it you were surprised because PNC
15    had earlier tried to syndicate a letter of
16    credit it had provided for one of the AHERF
17    affiliates and had previously come in with a
18    bid that was not competitive?
19  A.   Yes.
20  Q.   And sitting here today, do you have any
21    knowledge as to why PNC put forth this second
22    competitive bid?
23  A.   No.
24  Q.   If I could show you three previously marked
25    exhibits, and I'm just doing this to refresh

8 (Pages 466 to 469)

MICHAEL P. MARTIN

Page 470

1  your recollection. I don't want to ask you or
2  I'm not going to ask you, rather, detailed
3  questions about each, and I'm putting before
4  you Exhibits 693, 694, and 695.
5          - - - -
6          (The witness reviewed the documents.)
7          - - - -
8  Q.  Mr. Martin, do you recognize Exhibits 693, 694,
9      and 695 as a series of faxes dated April 21st,
10     1998?
11 A.  Yes.
12 Q.  And is it your recollection that Exhibit 693
13     was prepared by Ms. Gilbert for Mr. McConnell?
14 A.  Yes.
15 Q.  And I believe you testified earlier you made
16     handwritten changes to this Exhibit 693 and the
17     handwritten changes are contained in Exhibit
18     694?
19 A.  Yes.
20 Q.  And I believe you also testified -- strike
21     that.
22         Is it the case that Exhibit 695
23     contains typewritten corrections which you had
24     previously made yourself?
25 A.  Yes.

Page 471

1  Q.  Did you retype Exhibit 694?
2  A.  Did I retype it personally?
3  Q.  Yes, or did anyone at your direction I should
4      ask you.
5          MR. TORBORG: Object to form.
6  A.  I don't recall typing it myself. I'm assuming
7      it would have been done by the administrative
8      assistant.
9  Q.  Do you recall any conversation with
10     Mr. McConnell in this time frame, April 21st,
11     1998, with respect to any of these three
12     exhibits, Exhibit 693, Exhibit 694, or Exhibit
13     695?
14 A.  Yes.
15 Q.  And what conversation are you recalling?
16 A.  Well, I recall that in general in regards to
17     the situation, which was to raise cash, the
18     purpose for raising cash was very confused.
19     This was a period in which there were demands
20     for cash on the organization, and there had
21     also been a number of conversations about the
22     overall equity investment position of the
23     organization from an investment policy
24     perspective as well.
25         So shortly after a conversation with

Page 472

1  some outside parties about the investment
2  policy for the organization, Mr. McConnell
3  directed that we raise the cash position for
4  the organization.
5          And I recall that in conversation
6  with Mr. McConnell I said so -- something to
7  the effect of so I guess we are also creating
8  cash and certainly I suppose that if, you know,
9  the right authority is gained, there is I guess
10 cash, if the Mellon situation gets out of hand,
11 if that comes to sort of a worst case
12 conclusion, and Mr. McConnell had I believe
13 made a general positive response to that sort
14 of comment.
15         So we had prepared some information,
16 and in my conversations with Susan Gilbert, I
17 believe that I discussed the fact that -- that
18 this liquidation and raising of cash I guess
19 served some purposes of reducing exposure, but
20 also it created I guess the potential if
21 everything fell in line that worst case there
22 would be some cash for a Mellon line as well.
23         So in a very straightforward manner,
24 that's what went out on the original copy of
25 the fax to Mr. McConnell. Mr. McConnell came

Page 473

1  back and said, look, we are only talking about
2  this in terms of reducing equity exposure. I
3  made the change, the memo was corrected and
4  retransmitted I believe back to Mr. McConnell.
5  Q.  Just so your testimony is clear, I believe you
6      are recollecting two conversations with
7      Mr. McConnell, one which occurred April 21st,
8      1998, and another which occurred sometime prior
9      to that day?
10 A.  Yes. I was trying to put the memo into
11     context.
12 Q.  Do you recall when that conversation prior to
13     April 21st, 1998, occurred?
14 A.  Just that it was prior.
15 Q.  Do you recall whether it occurred in April
16     1998?
17 A.  No.
18 Q.  Do you recall whether it occurred in March
19     1998?
20 A.  There were probably quite a few conversations
21     on these issues, and they would have been
22     occurring prior to April 21st at various points
23     in time.
24 Q.  It's your recollection though that you
25     mentioned to Mr. McConnell that the divesting

9 (Pages 470 to 473)

MICHAEL P. MARTIN

Page 474

1  effort with respect to AHERF's investments in
2  equity, that that effort would result in cash
3  which could be used to repay the Mellon line of
4  credit?
5  A.  I made some comments to that effect.
6  Q.  And what, if anything, do you recall of his
7  response?
8  A.  I think his response or responses were along
9  the lines of, yeah, I mean yes, that's
10  certainly the case, and we want to be ready,
11  and this certainly is a source of funds.
12  Q.  Do you recall the process by which an amount
13  was selected in terms of the equities that
14  AHERF was going to sell pursuant to this
15  divesting efforts?
16  A.  No, I don't.
17  Q.  Did you at the time have a personal view as to
18  the scope of the divesting effort that should
19  take place?
20  A.  I recall that from an investment policy
21  perspective, I wasn't favorably disposed
22  towards reducing equity exposure, particularly
23  in a wholesale nature, and I think that I
24  recall this transaction pretty much eliminated
25  the equity exposure for certain parts of the

Page 475

1  organization.
2  Heretofore, in terms of reducing any
3  kind of exposure, we did so on a pro rata
4  basis, taking slices at a time, and this
5  certainly changed the investment portfolio very
6  dramatically for the organization.
7  So from that perspective it didn't
8  make a whole lot of sense to me. In terms of
9  providing some sort of available liquidity, it
10  certainly did that very easily.
11  Q.  I believe you testified that at some point
12  prior to April 21st, 1998, you participated in
13  a conference call with Mr. McConnell,
14  Mr. Barnes, and other board members; is that
15  correct?
16  A.  Yes.
17  Q.  And during this conference call, AHERF's
18  exposure to equities was discussed; is that
19  correct?
20  A.  Yes.
21  Q.  Is it your recollection then that your
22  discussion with Mr. McConnell concerning what
23  could be done with the money that resulted from
24  this divesting effort, that that conversation
25  occurred after the discussion, or the

Page 476

1  conference call, rather, with Mr. McConnell,
2  Mr. Barnes, and other board members?
3  A.  I don't believe I follow the question.
4  Q.  I'm sorry, I'm just trying to place this in
5  time.
6  A.  Sure.
7  Q.  That conference call that you are recalling --
8  A.  Yes.
9  Q.  -- Mr. McConnell, Mr. Barnes, other board
10  members, do you recall roughly when that
11  occurred?
12  A.  It would have been somewhere in the April of
13  1998 time frame.
14  Q.  Is it your recollection that your conversation
15  with Mr. McConnell, at which point in time you
16  suggested or mentioned using the money that
17  resulted from the divesting effort as a source
18  of funds to repay the Mellon line of credit,
19  occurred after this conference call between
20  you, Mr. McConnell, and various board members?
21  A.  I think I can recall making a comment to the
22  effect that by reducing our equity exposure,
23  certainly one of the byproducts was that at
24  least we had liquidity in the organization so
25  that if there were ever some sort of payoff of

Page 477

1  Mellon, there was a -- a pool of capital which
2  might be available. I think that was my
3  comment.
4  Q.  Do you recall making that comment during the
5  conference call between you, Mr. McConnell,
6  Mr. Barnes, and other board members?
7  A.  It was after the conference call.
8  Q.  Okay. And, again, that comment was just
9  directed at Mr. McConnell during a telephone
10  call?
11  A.  Yes.
12  Q.  Did you discuss with any board members the
13  possibility of using money that resulted from
14  the divesting effort to repay the Mellon line
15  of credit?
16  A.  No. My assumption was that Mr. McConnell and
17  others were dealing with that issue.
18  Q.  And your assumption was based on the fact that
19  Mr. McConnell was the person to whom you
20  directly reported?
21  A.  That's correct, and I had had several
22  conversations over time with Mr. McConnell
23  about how information was flowing and what kind
24  of information was also flowing to certain
25  parties, either within the organization or

10 (Pages 474 to 477)

Page 478

1  associated with it, and Mr. McConnell made it
2  clear that this kind of information was being
3  shared with the board either by himself or
4  other members of the executive staff.
5       MR. KRUSKO:  Okay.  Would you please
6  mark this as Exhibit 1930.
7              - - - -
8  (Exhibit 1930 marked for identification.)
9              - - - -
10      MR. KRUSKO:  For the record I would
11  note that Exhibit 1930 is Bates numbered
12  DBR-RJN-00148.
13             - - - -
14  (The witness reviewed the Exhibit.)
15             - - - -
16  BY MR. KRUSKO:
17  Q.  Mr. Martin, do you recognize Exhibit 1930 as a
18       memorandum dated April 22nd, 1998, from Sherif
19       Abdelhak to David McConnell?
20  A.  Yes.
21  Q.  Do you recognize the handwriting that appears
22       at the bottom of this exhibit?
23  A.  Yes.
24  Q.  Whose handwriting is that?
25  A.  That's the handwriting of Carol Gordon who was

Page 479

1  the administrative assistant to Mr. McConnell.
2  Q.  And Ms. Gordon has indicated that you were to
3       receive a copy of this letter; is that correct?
4  A.  Yes.
5  Q.  Or, excuse me, memorandum.  Do you recall
6       receiving a copy of this memorandum?
7  A.  Yes.
8  Q.  Do you recall when you received it?
9  A.  I believe it was sometime after April 22nd.  I
10      don't recall receiving it on the 22nd.  It may
11      have been a day or so afterwards.
12  Q.  I believe you testified earlier that as of
13      April 21st, 1998, you believed that the funds
14      that were going to be liquidated in that time
15      frame, or excuse me, the investments that were
16      going to be liquidated in that time frame were
17      going to be liquidated pursuant to AHERF's
18      effort to divest itself of some of its equity
19      positions?
20  A.  Yes.
21  Q.  Is Exhibit 1930 then the first time that you
22      learned that funded depreciation from AUMC, in
23      addition to other funds, was going to be used
24      to pay off the Mellon line of credit?
25  A.  Yes.

Page 480

1  Q.  Did you speak with Mr. McConnell upon receiving
2       this letter?
3  A.  Yes.
4  Q.  Excuse me, memorandum?
5  A.  Yes.
6  Q.  What do you recall of that discussion?
7  A.  I recall asking him I think first off why this
8       was coming about and why so rapidly, and also
9       whether there was the appropriate authority use
10      these moneys for the repayment of Mellon Bank.
11  Q.  Did you ask Mr. McConnell during this
12      conversation or any time thereafter whether he
13      had discussed with the board, by that I mean
14      the board of AHERF the parent corporation,
15      using these funds to repay the Mellon line of
16      credit?
17      MR. TORBORG:  Object to form.
18  A.  I recall asking Mr. McConnell whether there was
19      the authority, and I think I had asked that in
20      general terms, and I think somewhere along the
21      lines the conversation asking what about board
22      approval.
23      And I believe that Mr. McConnell
24      responded by saying that authority was being
25      worked on, that the appropriate board members,

Page 481

1  if not the committees and boards would be dealt
2  with, and that in so many words I was not to
3  worry about the situation.
4  Q.  Do you recall anyone identified by
5      Mr. McConnell either in this conversation as
6      being an appropriate board member?
7  A.  No.
8  Q.  And do you recall more generally whether
9      Mr. McConnell mentioned discussing this with
10     the finance and audit committee?
11  A.  No.
12  Q.  In the last line of the first paragraph of
13     Exhibit 1930, Mr. Abdelhak states that the
14     funds are to be liquidated, open quote, As
15     necessary to provide sufficient liquidity to
16     pay the loan in full as of this Friday, April
17     24th, 1998, period, end quote; correct?
18  A.  Yes.
19  Q.  If I can show you what have been previously
20     marked as Exhibits 1423 and 1424, and if I
21     could direct your attention first to 1423.
22         Do you recognize this as a letter you
23     sent to Mr. William Simmons dated April 21st,
24     1998, concerning liquidation of securities,
25     Allegheny University Medical Center's funded

MICHAEL P. MARTIN

Page 526

1  Q.   Do you know what that means --
2  A.   Yeah.
3  Q.   -- no C & L opinion for OG?
4  A.   Yes.
5  Q.   Do you have an understanding what that means?
6  A.   Yes, I do.
7  Q.   And what --
8  A.   I recall some general discussions to the effect
9      that there was not going to be an opinion, a C
10      & L opinion for specific obligated groups.
11  Q.   And what all do you recall about those
12      conversations?
13  A.   Just very general comments about certainly the
14      issue that there was not going to be a C & L
15      opinion at the obligated group level, working
16      through understanding what that would mean, and
17      trying to determine whether that created issues
18      or concerns for outside parties who would be
19      receiving this audited information.
20  Q.   And at that time do you recall having concerns
21      about the fact that there would not be audit
22      opinion attached at the obligated group level?
23  A.   I recall within AHERF treasury the staff
24      discussed the situation, and I can recall
25      discussing I guess what we thought this meant

Page 527

1      in terms of what was showing up certainly in
2      footnotes, and also I can recall discussing
3      materiality, what would change in terms of what
4      was considered material if an opinion was being
5      delivered at one level as opposed to another
6      level.
7  Q.   I'm going to come back to your comment about
8      materiality, but let me ask you first, do you
9      recall expressing those concerns that you just
10      enunciated to Coopers & Lybrand?
11  A.   I don't recall.
12  Q.   Now, if you look at the item 2 on this document
13      we are looking at now, second page again, well,
14      first it says, item 1, AHERF consolidated, one
15      year only; and then 2, Supplemental schedules,
16      one year only.  Schedules for each OG, which I
17      assume means obligated group.  Combined and
18      combining OG schedules, and consolidating AHERF
19      schedules.  And at the bottom I think we looked
20      at number 5, No C & L opinion for obligated
21      group.
22          Do you recall whether there was
23      discussion back at this time, and I'm talking,
24      again, early September '97, about whether or
25      not there would be a Coopers & Lybrand audit

Page 528

1      schedule -- Coopers & Lybrand audit opinion on
2      the combining, the combined and combining
3      obligated group schedules?
4  A.   I recall that within AHERF treasury we did have
5      conversations about the fact that the opinion
6      would be at the AHERF level, and I also recall
7      conversations about, as we've discussed, how
8      much information would be available for the
9      obligated groups so that AHERF treasury could
10      at least meet the informational delivery
11      requirements for each obligated group.
12  Q.   And I presume the concerns that you had were
13      based upon the fact that the bond requirements
14      and various other forms of debt required an
15      audit opinion for each obligated group?
16  A.   The documents did require audited statements,
17      yes.
18  Q.   Just show you what we marked previously as
19      Exhibit 413.
20          Ron, I apologize, again, I have
21      highlighted a short portion of yours.
22          MR. CROUCH:  All right.
23          MR. TORBORG:  But it will help you
24      follow along.
25          For the record, Exhibit 413 is a

Page 529

1      September 12, 1997 memorandum from Becky
2      Serafini to Mike Martin and Sue Gilbert.
3          MR. KRUSKO:  Objection.  It's also
4      from Joel Dalinka.
5          MR. TORBORG:  Objection accepted.
6          It's a fax sheet and then a
7      memorandum, also from Mr. Dalinka, and if,
8      Mr. Martin, if you would take a quick glance
9      through that and I'll ask you about it.
10          - - - -
11      (The witness reviewed the Exhibit.)
12          - - - -
13  BY MR. TORBORG:
14  Q.   Mr. Martin, does this appear to be an update of
15      the previous memorandum dated September 3rd,
16      1997 that we looked at --
17  A.   Yes.
18  Q.   -- as Exhibit 943?
19  A.   Yes.
20  Q.   I'd like to draw your attention to specifically
21      page 4 of the memorandum which ends with Bates
22      61, and specifically there's an item (f) there,
23      and there is -- I'm going to read some language
24      in the record there.  Are you with me?
25  A.   Yes.

23 (Pages 526 to 529)

MICHAEL P. MARTIN

Page 530

1   Q.   It says, Coopers & Lybrand has conditioned the
2        release of its audit report upon AHERF's
3        securing such acceptance from the various
4        trustees, banks and lenders to which AHERF
5        affiliates are obligated to deliver audited
6        financial statements in a form different than
7        the consolidated audit.
8            Do you recall, Mr. Martin, that
9        Coopers & Lybrand or whether Coopers & Lybrand
10       was conditioning the use of its audit opinion
11       upon AHERF securing acceptance of the new
12       financial reporting format from the various
13       trustees, banks and lenders?
14           MR. KRUSKO:  What time frame?
15           MR. TORBORG:  In or around the early
16       September time frame, the date of this memo.
17  A.   Yes.
18  Q.   What do you recall about -- about that issue?
19       Was it based on personal conversations you had
20       with Coopers & Lybrand?
21  A.   I don't believe it was as a result of personal
22       conversations.  I think it was a result of
23       conversation between Coopers and the finance
24       department, financial accounting department
25       specifically, and it came back I believe to

Page 531

1        AHERF treasury that -- that this was one of the
2        conditions or a condition associated with the
3        new financial statements that resulted in AHERF
4        treasury issuing letters requesting acceptance
5        from various trustees, banks and lenders.
6   Q.   And I think Mr. Krusko asked you a few
7        questions about treasury's attempts to get
8        those kind of sign-offs from the various
9        lenders?
10  A.   Yes.
11  Q.   And I believe you -- you stated that the
12       initiative wasn't going particularly well
13       because there were some outside parties who
14       were unwilling to accept it?
15           MR. KRUSKO:  Objection.
16  Q.   Or had reservations about accepting it?
17           MR. KRUSKO:  Objection.
18  A.   There were outside parties that were not
19       willing to sign the -- or accept the
20       conditions.
21  Q.   Do you recall whether or not Coopers & Lybrand
22       was made aware of the difficulties AHERF was
23       having in getting across-the-board approval for
24       the new financial reporting format?
25  A.   I don't recall.

Page 532

1   Q.   Do you believe Coopers likely would have been
2        aware and been informed of the difficulties
3        AHERF treasury was having in getting
4        across-the-board approvals?
5            MR. KRUSKO:  Objection, calls for
6        speculation.
7   A.   Yes.
8   Q.   And what -- on what basis do you say that?
9   A.   That AHERF treasury was I believe keeping the
10       rest of AHERF finance informed of our progress
11       with this initiative, and it was my
12       understanding that AHERF finance was in regular
13       conversations or discussions with Coopers &
14       Lybrand.
15           MR. KRUSKO:  Heidi, would you note my
16       objection to that question.
17  Q.   Mr. Martin, do you recall any specifics about
18       which of the lenders, banks or other parties
19       were expressing reservations about putting
20       their agreement to accept the new financial
21       reporting format in writing?
22  A.   I believe I recall First Union.
23  Q.   If you would look back to exhibit -- what we
24       marked as Exhibit 1935, specifically it's the
25       longer one, legal sized paper, and specifically

Page 533

1        the last page of that exhibit and item 6, which
2        I believe states, PNC wants the right to
3        request additional information, given no
4        footnotes to OG schedules.
5            Do you recall whether AHERF treasury
6        was having some difficulties in getting PNC to
7        put its approval to the new financial reporting
8        format in writing?
9   A.   I don't recall PNC in specific.  I know that we
10       were having problems across a number of -- or
11       were having problems with a number of outside
12       parties.
13  Q.   I'll hand you what we marked previously as
14       Exhibit 645.
15           Ron, I lost mine.  Can I show it to
16       you briefly?
17           MR. CROUCH:  Sure.
18           MR. TORBORG:  Thank you.  For the
19       record, what we've marked as Exhibit -- or what
20       has been marked as Exhibit 645 appears to be an
21       e-mail from Susan Gilbert to Angela Maher, a
22       copy to Mr. Martin with a date of September 30,
23       1997.
24           - - - -
25       (The witness reviewed the Exhibit.)

24 (Pages 530 to 533)

Page 602

1    ask you to read this entire document, but do
2    you recognize what this is?
3  A.  Yes.
4  Q.  And what is it?
5  A.  It's a corporate policy manual for the AHERF
6    organization.
7  Q.  What was the purpose of this manual?
8  A.  To set a standard for various activities and
9    behavior within the organization. The policy
10    manual includes such concepts as code of ethics
11    or the operating principles for the entire
12    organization, how to deal with outside parties,
13    those kinds of things.
14  Q.  Do you know who developed this manual?
15  A.  I believe -- I believe it was put together by
16    the in-house legal department, but I don't know
17    how they assembled the document or how it was
18    developed.
19  Q.  If you go to the Bates ending 1516 through 19,
20    does this appear to be a table of contents?
21  A.  Yes.
22  Q.  And if you go to the Bates ending 17 and 18,
23    there appears to be some specific sections
24    relating to finance and treasury.
25    Let me ask you first, when you were

Page 603

1    at AHERF, did you have a copy of this manual?
2  A.  Yes.
3  Q.  Okay. Did you ever read it? Did you ever have
4    occasion to read it?
5  A.  I went through certain sections of it. I
6    didn't read it from cover to cover.
7  Q.  On page ending Bates 17, there's a section on
8    statement of investments, pension master trust,
9    funded depreciation assets, endowment assets,
10    section 2.12, and I'll ask if you would flip to
11    the Bates ending 1639. I think that will be
12    the section.
13  A.  Yes.
14  Q.  Then I'm going to ask you to flip to Bates
15    ending 642 which deals specifically with funded
16    depreciation assets?
17  A.  Yes.
18  Q.  And it says, amongst other things, The AHERF
19    board assumes the responsibility for
20    establishing the investment policy that is to
21    guide the investment of the funded depreciation
22    assets. The investment policy describes the
23    degree of investment risk that the board deems
24    appropriate.
25    And then on the next page, Bates

Page 604

1    ending 43, there's some allocation percentages
2    based on the types of investments?
3  A.  Yes.
4  Q.  Did you assist in coming up with these
5    allocations?
6  A.  Yes.
7  Q.  Who else assisted you in that effort?
8  A.  Other members of the AHERF treasury department
9    and other external consultant, investment
10    consultant to the organization.
11  Q.  What is the purpose of having these allocations
12    setting forth the types of investments for
13    which the fund depreciation assets would be
14    invested?
15  A.  Certainly as an ongoing guideline to direct the
16    actual day-to-day investing of those funds,
17    hopefully in a manner that was consistent with
18    not only the nature of the funds, but also the
19    risk tolerance of the organization.
20  Q.  That's all I have on that one right now.
21    I'd like to show you next what has
22    been previously marked as Exhibit 706.
23    - - - -
24    (The witness reviewed the Exhibit.)
25    - - - -

Page 605

1    MR. KRUSKO: Dave, I think you have
2  two exhibits in one here.
3    MR. TORBORG: I do?
4    MR. KRUSKO: Let's go off the record.
5    MR. TORBORG: Why don't we go off the
6  record a second. Might be time for a good
7  break here anyway.
8    THE VIDEOGRAPHER: We are going off
9  the record. The time is indicated on the
10  screen.
11    - - - -
12    (There was a discussion off the record.)
13    - - - -
14    THE VIDEOGRAPHER: We are now back on
15  the record. The time is indicated on the
16  screen.
17  BY MR. TORBORG:
18  Q.  Mr. Martin, I have shown you what we have
19    marked previously as Exhibit 706 which is
20    titled Management Report on Investments, March
21    31, 1996.
22    Did you have a chance to glance
23    through this document?
24  A.  Yes.
25  Q.  Do you recall this document?

42 (Pages 602 to 605)

MICHAEL P. MARTIN

Page 606

1   A.   I don't recall this document in particular,
2        although in general these were reports that
3        were issued on a periodic basis, typically
4        quarterly, to inform various parties about, in
5        some respects the financial markets, but more
6        specifically the performance of various
7        investment portfolios within the organization.
8   Q.   Who were the various parties?
9   A.   Certainly some members of management, primarily
10       though it was to the finance committee of the
11       board.
12  Q.   The AHERF finance committee?
13  A.   Yes.
14  Q.   So the system-wide finance committee?
15  A.   Yes.
16  Q.   Do you recall whether any of the subsidiaries'
17       boards or committees received these?
18  A.   I think that they received reports that were
19       similar on an as-requested basis.  So I think
20       that Allegheny General Hospital Obligated Group
21       received this kind of information, as did
22       Delaware Valley.
23  Q.   I'd like to show you what we've marked
24       previously as Exhibit 429.
25           For the record, Exhibit 429 starts

Page 607

1        out with a memo dated March 18, 1998, from
2        Michael Martin to Sherif Abdelhak, and it
3        contains some schedules?
4   A.   Yes.
5   Q.   Do you recall this document, Mr. Martin?
6   A.   Yes.
7   Q.   And does this appear to show activity, both
8        withdrawals and deposits, into and out of the
9        AGH funded depreciation account for fiscal
10       years 1996, 1997?
11  A.   Yes.
12  Q.   Do you recall why you put this document
13       together?
14  A.   I did so at the request of Mr. Abdelhak.
15  Q.   Did Mr. Abdelhak indicate why he wanted you to
16       put this together?
17  A.   No, he did not.
18  Q.   How did you -- did you draft these schedules
19       that we see depicting the withdrawals and the
20       deposits yourself?
21  A.   No.  I -- I believe that I requested Susan
22       Gilbert or maybe Kelly Mertz pulled this
23       information together for me.
24  Q.   Okay.  Do you know how they went about
25       obtaining the information necessary to put

Page 608

1        these charts together?
2   A.   I believe that they went back and took a look
3        at the historical information within the
4        treasury department that was either cash
5        management or investment related.
6   Q.   Do you recall whether there was at some point
7        or multiple points an issue as to whether or
8        not moneys that had been taken out of the AGH
9        funded depreciation account and lent to eastern
10       affiliates should be included in the balances
11       depicted for AGH on the management report of
12       investments?
13  A.   I recall in general recall the issue.  I don't
14       recall the timing when it occurred of -- of how
15       those balances were reflected.
16  Q.   And what issue do you remember?
17  A.   I recall something about whether -- whether
18       they were being classified as loans, and if so
19       how.  I think it was something along those
20       lines.
21  Q.   Do you recall how that issue was eventually
22       resolved?
23  A.   No, I don't.
24  Q.   Switching topics again, I'd like to move to
25       another subject Mr. Krusko asked you about last

Page 609

1        time, and that was the consolidated
2        unrestricted fund balance covenant that was
3        contained in the reimbursement security
4        agreement entered into between the AGHOG and
5        the Morgan Guaranty Trust Company of New York.
6   A.   Yes.
7   Q.   Do you recall that covenant specifically and
8        the subject matter?
9   A.   I recall the covenant.
10  Q.   Given the amount of time Mr. Krusko spent on
11       it, I have a relative few amount of questions
12       to follow up on.
13  A.   Okay.
14           MR. KRUSKO:  Heidi and I are curious
15       to know whether by ADHOG you mean DVOG.
16           MR. TORBORG:  No, I don't.
17           MR. KRUSKO:  I think I just misheard
18       you.  I'm not trying to put words in your
19       mouth.
20           MR. TORBORG:  The Morgan issue?
21           MR. KRUSKO:  Thank you.  I just
22       misheard you with respect to --
23           MR. TORBORG:  I think I meant to say
24       AGHOG, A-G HOG.
25           MR. KRUSKO:  Thank you.

MICHAEL P. MARTIN

Page 610

1  BY MR. TORBORG:
2  Q.  I'd like to show you first what we marked
3     previously as Exhibit 362.
4              - - - -
5     (The witness reviewed the Exhibit.)
6              - - - -
7  Q.  Mr. Martin, do you recognize this document?
8  A.  Yes.
9  Q.  And I note for the record Exhibit 362 appears
10    to be the agenda for a conference call with
11    Morgan Guaranty dated March 24th, 1998, and I
12    notice that you are listed as an attendee
13    towards the bottom half of the page there?
14 A.  Yes.
15 Q.  Do you recall attending a meeting with Morgan
16    Guaranty after you informed them of the
17    violation of the unrestricted fund balance
18    covenant?
19         MR. KRUSKO:  Objection.  This is
20    entitled conference call.
21         MR. TORBORG:  Conference call,
22    meeting.
23 A.  Yes, I recall sitting in on this call.
24 Q.  And what generally do you recall about Morgan's
25    reaction to either yourself or anyone else at

Page 611

1     AHERF that you heard about when told about the
2     noncompliance with the unrestricted fund
3     balance covenant?
4  A.  As I recall in general, I think Morgan seemed
5     to be fairly willing to work with the
6     organization on these issues, I think at least
7     at this point in time.
8  Q.  Do you see there's a handwritten note?  Let me
9     ask you first, do you recognize this
10    handwriting, the handwritten notations on the
11    document?
12 A.  Yes.  I believe those are Kelly Mertz' writing.
13 Q.  Do you see on the left side there are some
14    notations with numbers 1 through 4.  The first
15    one says, Policy of no transfers of any kind?
16 A.  Yes.
17 Q.  Do you see where I'm talking about there?
18 A.  Yes.
19 Q.  Do you recall whether or not at this meeting --
20    conference call, I'm sorry, with Morgan
21    Guaranty whether they made a statement that
22    there should be no more transfers of any kind?
23 A.  No, I don't recall.
24 Q.  Do you recall whether AHERF made a statement to
25    Morgan that there was an AHERF policy to have

Page 612

1     no more transfers of any kind?
2  A.  I don't recall that kind of statement within
3     the conference call.
4  Q.  Do you recall anything else about this
5     conference call?
6  A.  No, I don't.
7         MR. TORBORG:  I'd like to mark this
8     as our next Exhibit 1938.
9              - - - -
10    (Exhibit 1938 marked for identification.)
11             - - - -
12 BY MR. TORBORG:
13 Q.  For the record, we have marked as Exhibit 1938
14    is entitled AGH -- AGH Obligated Group (AGH &
15    ASRI) Series 1995-B Reimbursement & Security
16    Agreement, Analysis of Adjusted Consolidated
17    Unrestricted Fund Balances as of 6/30/96?
18 A.  Yes.
19 Q.  Do you recognize this document, Mr. Martin?
20 A.  I recognize seeing -- having seen pages like
21    this.
22 Q.  And is it your understanding that this is --
23    this was a schedule that attempted to calculate
24    the unrestricted fund balance as provided under
25    the particular language of the Morgan Guaranty

Page 613

1     agreement?
2  A.  Yes, it was a schedule that was provided to the
3     treasury area --
4  Q.  Okay.
5  A.  -- by financial accounting area.
6  Q.  Do you know who within the financial accounting
7     area supplied it to treasury?
8  A.  I don't recall.
9  Q.  Did you have occasion to review these, this
10    calculation on a regular basis?
11 A.  Well, I think we received these calculations or
12    this information on a quarterly basis.  I don't
13    think I made a habit of digging into the
14    numbers and accepted the numbers as they
15    were -- they were presented.
16 Q.  You didn't double-check the finance
17    department's calculation?
18 A.  Nothing beyond the simple addition and
19    subtraction on the page.  There wasn't any way
20    that either myself or anybody else in treasury
21    was able to -- to really validate, for example,
22    the equity investments in some of these
23    subsidiaries.  We just didn't have access to
24    that information or the ability to develop our
25    own calculations or evaluations of this

LEGALINK MANHATTAN  (212) 557-7400

MICHAEL P. MARTIN

Page 614

1     information.
2                  - - - -
3     (Exhibit 1939 marked for identification.)
4                  - - - -
5     BY MR. TORBORG:
6     Q.   For the record, what we have marked as Exhibit
7          1939, they are Bates Nos. CL 044347 and appears
8          to be a report of independent accountants on
9          Coopers & Lybrand letterhead dated September
10         11, 1996, addressed to the board of trustees of
11         Allegheny General Hospital.
12              And, Mr. Martin, have you had an
13         opportunity to review this document?
14    A.   Yes.
15    Q.   Can you tell me what this document is?
16    A.   It's a report, a letter from Coopers to the
17         board of trustees of AGH in terms of their
18         audit of the obligated group and their
19         requirements under the provisions of the
20         obligated group, that obligated group being
21         Allegheny General Hospital and Allegheny
22         Singer -- or excuse me, that obligated group
23         being Allegheny General Hospital Obligated
24         Group.
25    Q.   Do you see in the second paragraph, this

Page 615

1     particular letter refers to section 7 of the
2     reimbursement and security agreement dated
3     April 1, 1995, with Morgan Guaranty Trust
4     Company of New York?
5     A.   Yes.
6     Q.   PNC Bank as master trustee?
7     A.   Yes.
8     Q.   And you spoke of, a second ago, requirements by
9          the obligated group. For this letter would
10         those requirements be the financial covenants
11         contained in the reimbursement security
12         agreement with Morgan Guaranty Trust company?
13    A.   Yes.
14              MR. KRUSKO: Please note my objection
15         to foundation on that question.
16    Q.   Do you recall why these documents were prepared
17         by Coopers & Lybrand?
18              MR. KRUSKO: I object. This is one
19         page. You don't -- you didn't attach the
20         report to Exhibit 1939. I don't think it's
21         fair to ask him about documents when there's
22         only one page before the witness.
23    Q.   Okay. You can answer.
24    A.   I don't recall.
25    Q.   Do you -- do you know if debt agreements

Page 616

1     required an affirmation from Coopers & Lybrand
2     that they had reviewed the various financial
3     covenants?
4     A.   Yes.
5     Q.   Was it your understanding that Coopers &
6          Lybrand would be reviewing the calculation that
7          we looked at in Exhibit 1938?
8              MR. KRUSKO: Object to form.
9     A.   Yes.
10    Q.   And what is the basis of that understanding?
11    A.   The basis is my recollection of -- of
12         representatives from Coopers being in the
13         treasury department and asking for information
14         related to certain calculations associated with
15         various debt documents.
16    Q.   Do you know whether or not Coopers & Lybrand
17         had a copy of the reimbursement and security
18         agreement between AGHOG and Morgan Guaranty
19         Trust Company?
20    A.   No, I don't.
21    Q.   Did you expect that they would have a copy of
22         that?
23    A.   I would certainly have expected them to have at
24         least reviewed the document. They had access
25         to that document in the treasury department.

Page 617

1     Q.   Mr. Martin, I'd like to show you what we
2          previously marked as Exhibit 350.
3              For the record, what we've marked as
4          Exhibit 350 is a November 26th, 1997 memorandum
5          from Susan Gilbert to Joseph Dionisio, that is
6          copied to, among others, Mr. Martin?
7     A.   Yes.
8     Q.   Do you recall this document, Mr. Martin?
9     A.   No.
10    Q.   Drawing your attention to the second full
11         paragraph on the document which states,
12         Pursuant to our phone conversation earlier this
13         week, Dave McConnell directed treasury to
14         incorporate the AGH note receivable into the
15         liquidity ratio calculation (reflected in
16         board-designated assets component).
17    A.   Yes.
18    Q.   Do you recall Mr. McConnell directing treasury
19         to, in this time period, November 1997, to
20         incorporate the AGH note receivable into the
21         liquidity calculation?
22    A.   Yes.
23    Q.   Did you have an understanding of what the AGH
24         note receivable is at this time?
25    A.   I believe that it referred to moneys which were

45 (Pages 614 to 617)

MICHAEL P. MARTIN

Page 618

1  due to AGH that had been borrowed by the
2  Delaware Valley operations.
3  Q.   Did you have concerns at the time about
4  including that AGH note receivable into the
5  liquidity ratio calculation?
6  A.   I believe that there had been discussions, and
7  I think I had expressed some concerns about the
8  ability of the Delaware Valley Obligated Group
9  to repay those -- those funds, and if it wasn't
10  an ability to repay, certainly the timing of
11  that repayment.
12        And it was Mr. McConnell's argument
13  that historically the Delaware Valley had been
14  able to make those repayments and there was no
15  reason not to think that on a going-forward
16  basis at some point they wouldn't be able to do
17  the same.
18  Q.   Did you ever discuss this issue with Coopers &
19  Lybrand, the inclusion of the AGH note
20  receivable in the liquidity ratio calculations
21  for various AGH debt?
22  A.   I don't recall.
23              - - - -
24  (Exhibit 1940 marked for identification.)
25              - - - -

Page 619

1        (The witness reviewed the Exhibit.)
2              - - - -
3  BY MR. TORBORG:
4  Q.   For the record, Exhibit 1940, two-page document
5  contained -- containing e-mail threads dated
6  7/8/97 between Susan Gilbert and Kelly Mertz,
7  Angela Maher, and then copying Mr. Martin.
8  A.   Yes.
9  Q.   Have you had a chance to look at this document,
10  Mr. Martin?
11  A.   Yes.
12  Q.   Do you recall receiving this e-mail, this
13  e-mail thread, some or all of this e-mail
14  thread?
15  A.   Yes.
16  Q.   And I want to focus on the second page under
17  the second e-mail thread which I believe starts
18  with Susan Gilbert's 7/8/97, 10:34 a.m.?
19  A.   Yes.
20  Q.   And in the second sentence, Ms. Gilbert wrote,
21  It appears as though the PNC covenant will not
22  be met for FY '97, and the Morgan covenant is
23  questionable.
24        Do you recall, Mr. Martin, that as
25  originally calculated for the end -- for the

Page 620

1  period ending 6/30/97 the AGHOG did not meet
2  the PNC unrestricted fund balance covenant
3  which at the time I believe was $200 million?
4        MR. KRUSKO:  Object to form.
5  A.   I recall that AGH, the obligated group had
6  problems meeting that requirement.
7  Q.   Do you recall what steps, if any, were taken to
8  move that, move the AGHOG into compliance with
9  that covenant, and I'm speaking of the PNC
10  unrestricted fund balance covenant as of
11  6/30/97?
12  A.   If -- no, I don't.
13        MR. TORBORG:  I'm sorry, we got to
14  mark that one.  1941.
15              - - - -
16  (Exhibit 1941 marked for identification.)
17              - - - -
18        (The witness reviewed the Exhibit.)
19              - - - -
20  BY MR. TORBORG:
21  Q.   For the record, what we've marked as Exhibit
22  1941 is a February 27th, 1998 memorandum from
23  Joseph Dionisio to Anthony Sanzo bearing the
24  Bates No. JDD-2 01323 through 24.
25        And feel free -- you can feel free to

Page 621

1  look through the entire document, but I'm going
2  to be focusing for purposes of my question on
3  the last bullet at the bottom of the page
4  starting with At June 30.
5  A.   Yes.
6  Q.   Have you had a chance to read that paragraph?
7  A.   Yes, I have.
8  Q.   Okay.  Does that refresh your recollection at
9  all about any steps that might have been taken
10  by the organization to improve the fund balance
11  at AGH as of 6/30/97?
12        MR. KRUSKO:  Object to form.
13  A.   Yes.
14  Q.   And your recollection as refreshed is what?
15  A.   That on seeing that there were going to be some
16  compliance issues with the ratio as calculated,
17  we returned that to the AHERF finance --
18  financial accounting department, along with AGH
19  Obligated Group, Mr. Dionisio, and said that
20  certainly as the ratio stood now that indicated
21  there would be an event of noncompliance.
22        And it was my understanding, although
23  I didn't see any work product to that effect,
24  that Mr. Dionisio and I believe AHERF finance
25  worked on -- on the issue and returned the

46 (Pages 618 to 621)

Page 666

1  A.  I -- I honestly don't recall beyond what I've
2  already said.
3        MR. TORBORG:  Okay.  That's all the
4  questions I have.  Thank you very much for your
5  time.
6        THE WITNESS:  Sure, thank you.
7        MR. KRUSKO:  Mr. Martin, thank you
8  very much for your time and your generosity in
9  being here today and the prior two days.
10       THE VIDEOGRAPHER:  With nothing
11  further, that concludes the deposition.
12        - - - -
13  (The proceedings were concluded at 5:52 p.m.)
14        - - - -
15
16
17
18
19
20
21
22
23
24
25

Page 668

1  COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
    COUNTY OF ALLEGHENY          )    S H E E T
2
    I, Michael P. Martin, have read the foregoing
3  pages of my deposition given on Friday, August 22,
    2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19  In all other respects, the transcript is true and
20  correct.
21     _____
        MICHAEL P. MARTIN
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
        Notary Public
25      AKF Reference No. HW76926

Page 667

1  COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3    I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  MICHAEL P. MARTIN, was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13    I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17    I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21    IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 27th day of
23  August, 2003.
24
25     _____
        Notary Public

Page 669

1       AKF REPORTERS, INC.
         AKF Building
2      436 Boulevard of the Allies
        Pittsburgh, PA  15219
3       (412) 261-2323
4
5  August 27, 2003
6
    TO:  Ronald Crouch, Esq.
7    RE:  DEPOSITION OF MICHAEL P. MARTIN
8    NOTICE OF NON-WAIVER OF SIGNATURE
9    Please have the deponent read his deposition
    transcript.  All corrections are to be noted on the
10  preceding Errata Sheet.
11    Upon completion of the above, the Deponent must
    affix his signature on the Errata Sheet, and it is to
12  then be notarized.
13    Please forward the signed original of the
    Errata Sheet to Matthew Krusko, Esq., for attachment
14  to the original transcript, which is in his
    possession.  Send a copy of same to all counsel, and
15  also a copy to me.
16    Please return the completed Errata Sheet within
    thirty (30) days of receipt hereof.
17
18
19  Heidi H. Willis, RPR, CRR
    Court Reporter
20
21
22
23
24
25

**Martinelli Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *ALFRED W. MARTINELLI*
### *May 5, 2004*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### PH: 212-557-7400 / FAX: 212-692-9171

**MARTINELLI, ALFRED W.**



LEGALINK
A WORDWAVE COMPANY

Page 182

Alfred W. Martinelli

1
2    Q    And did you understand while you
3    were a member of the AHERF board that there
4    were outside professionals such as the
5    auditors --
6    A    Oh, yes.
7    Q    -- that were there to assist you in
8    discharging your responsibilities as a member
9    of the Board of Trustees?
10    A    Absolutely.
11    Q    Did you also know that at the time
12    that you were on the AHERF board that Coopers
13    & Lybrand was the outside auditors for AHERF?
14    A    Yes.
15    Q    Had you ever met with any of the
16    auditors from Coopers & Lybrand during your
17    tenure with AHERF either within the context of
18    a formal board meeting or outside?
19    A    They may have been there to make a
20    presentation.  I don't recall specifically,
21    but I never had kind of a one on one
22    relationship with them.  And if they did
23    appear, it would have been early on and they
24    would have maybe talked to the full board.
25    Q    You don't specifically recall

Page 183

Alfred W. Martinelli

1
2    Mr. Buettner being the partner in charge?
3    A    No.
4    Q    As a member of AHERF's board, did
5    you then rely on Coopers & Lybrand to provide
6    the board or audit committee with accurate
7    information about the work it was doing in
8    connection with its audits?
9    A    Yes.
10    Q    And I assume you relied on them to
11    perform their duties as the outside auditors
12    competently and with integrity; correct?
13    A    There's a set of principles, there's
14    an accounting principle board, there's an
15    engagement letter and all that's spelled out.
16    I hadn't seen the engagement letter, but I
17    understood the accounting principles board.
18    And so we just assumed we were assured they
19    would be operating in that context.
20    Q    And was it your expectation that if
21    Coopers & Lybrand had determined that there
22    was some information in the financial
23    statements that had been presented to them for
24    audit that was in some way inaccurate or
25    incorrect that Coopers would notify the audit

Page 184

Alfred W. Martinelli

1
2    committee or the board as a whole?
3    MR. FRIESEN:  Objection.
4    BY MS. MEADEN:
5    Q    You may answer.
6    A    In my past experience with public
7    accounting firms, I found them to be quite
8    ethical and quite moral and I would
9    absolutely -- if something came to their
10    knowledge that was being held from the board,
11    I would expect them to let us know.
12    Q    During your time that you were on
13    the AHERF board, what was your understanding
14    of the function that the AHERF audit committee
15    of the board performed?
16    A    Again, to see that the auditors
17    implemented the engagement letter, to review
18    the engagement letter with them, the scope of
19    the audit, to deal with it, to receive the
20    results of the audit and to go over it in
21    great detail because as a director I'm
22    entitled to rely not only on the outside
23    auditors, I'm entitled to rely on the people,
24    board members or committees who form the
25    committee of the board to deal with the audit

Page 185

Alfred W. Martinelli

1
2    and finance committee.  So my sense is that
3    the audit committee would look at all of those
4    things, kind of review the 10Ks, review the
5    quarterly reports that came out, and all of
6    the other regulatory information that was put
7    forward.  Even though we weren't public, we
8    had public debt, so they had to go through it
9    and put some of this data out.
10    Q    So when you mentioned a 10K, of
11    course, AHERF didn't file a 10K?
12    A    No.
13    Q    Do you know, during the time period
14    in the mid-1990s, '96, '97, who the members of
15    the audit committee were at AHERF?
16    A    I do not.
17    Q    Do you recall that Mr. Barnes was
18    the chairman of the audit committee at that
19    time?
20    A    I don't know that specifically.
21    Q    Okay.
22    A    I think that most of those board
23    members were -- I think when the merger took
24    place, not all of the Hahnemann board members
25    became members of the AHERF board.  A lot of

47 (Pages 182 to 185)

Alfred W. Martinelli

1   Alfred W. Martinelli
2   them were kind of let go because I think there
3   must have been 30 or 40 people on that board.
4   And one or two of the people might have gone
5   on the audit committee. My recollection is
6   that maybe Bob Palmer did and maybe Dorothy
7   brown. I'm not sure.
8       Q   Do you recall during your tenure on
9   the audit board having confidence in those
10  members of the board who made up the audit
11  committee?
12      A   Yes.
13          MR. FRIESEN: Objection. You
14      said audit board I think by mistake.
15          MS. MEADEN: I'm sorry. I
16      meant the AHERF board. Thank you. Let
17      me rephrase the question so we have a
18      nice clear question.
19  BY MS. MEADEN:
20      Q   During your tenure as a member of
21  the AHERF board, do you recall having
22  confidence in those trustees who comprised the
23  audit committee of the board?
24      A   Yes.
25      Q   Was it your recollection that each

Alfred W. Martinelli

1   Alfred W. Martinelli
2   year the audit committee would present to the
3   board as a whole the audited financials and
4   recommend or not recommend that the board
5   accept the audited financials as presented?
6       A   That's the normal procedure. And I
7   don't know if I was present, but that's the
8   normal procedure at any board meeting.
9       Q   Are you talking about the normal
10  procedure within the AHERF system or --
11      A   Within the AHERF system.
12      Q   And do you ever recall an instance
13  where the audit committee did not recommend
14  that the board accept the audited financial
15  statements as presented?
16      A   No, I do not.
17      Q   And during your tenure on the AHERF
18  board, do you ever recall that the AHERF
19  financial statements received something other
20  than a clean opinion from Coopers & Lybrand?
21      A   I do not ever recall them saying
22  they did not receive a clean opinion.
23      Q   I may have gotten ahead of myself.
24  I'd like to step back a minute and ask you
25  what your understanding is of the role that an

Alfred W. Martinelli

1   entity's outside auditors play in reviewing
2   financial statements.
3           MR. FRIESEN: Objection.
4       A   Well, there's a set of principles
5   that are put forth by the accounting principle
6   board that the auditors in order to certify a
7   statement have to concern themselves with the
8   facts that are presented, that they're
9   accurate, that -- management prepares the
10  statements. The auditors don't prepare the
11  statement. And the auditors go back and
12  essentially check statements that were
13  prepared by management. They also have an
14  obligation to look at any projections and to
15  indicate whether or not those projections are
16  in line or not in line. And they generally
17  are also asked to look at various obligations
18  that the enterprise entered into such as debt
19  covenants and those kind of things to see
20  companies are in line with that. They don't
21  do it on a complete basis. They do it on a
22  test basis with the theory they test enough of
23  the transactions and look at enough of the
24  situations to render an opinion.

Alfred W. Martinelli

1   Alfred W. Martinelli
2       Q   In the simplest terms, the outside
3   auditors present an independent review of the
4   entity's financial statements; correct?
5           MR. FRIESEN: Objection.
6       A   You got it.
7       Q   He's probably going to object to my
8   questions, so you may want to wait a half a
9   beat before you start to answer.
10      A   Okay.
11      Q   We've been through this before.
12  Based on your business experience, based on
13  your experience as a member of various boards,
14  what is the significance to you of receiving a
15  clean opinion from an outside auditor on an
16  entity's financial statements?
17      A   Well, if you drive some of the new
18  cars and you turn the thing on, it says no
19  malfunction, you feel very good about it.
20  Essentially, a clean opinion is an assurance
21  that management is preparing numbers in
22  accordance with accounting principles, that
23  the projections you received are okay, and
24  that all of the other things that go on with
25  the company, all the internal control problems

Page 190

Alfred W. Martinelli

1
2  if you're worried a little about that in
3  various companies, various control mechanisms
4  for dealing with cash and accounts receivable,
5  and so when you get a clean opinion the
6  auditors have done sufficient checking to
7  ensure themselves that everything is okay.
8    Q    And did you feel that assurance when
9  you learned that Coopers & Lybrand had given
10  clean opinions on AHERF's financial
11  statements?
12    A    Yes.
13    Q    Again, was it your understanding
14  that the auditors' first line of communication
15  with the AHERF board was through the audit
16  committee?
17        MR. FRIESEN:  Objection.
18    A    The communications -- I mean, I
19  think you need to -- they have a reporting
20  responsibility to the audit committee and then
21  to the board.  Communications, a lot of it
22  takes place with management.  If they see
23  something that they think is amiss or some
24  area of control that they think is weak, they
25  will talk to management about that and get

Page 191

Alfred W. Martinelli

1
2  management's view as to how to correct that
3  before they go back to the board so that the
4  board sees there's a problem and management's
5  view as to the issues, how to correct that.
6    Q    My question was poorly worded.  What
7  I was just trying to get at was, was it your
8  understanding that it was the audit
9  committee's role to interact with the auditors
10  on behalf of the board as a whole?
11    A    Yes.
12    Q    Thank you.  Now, again, based on
13  your business experience and your experience
14  with other boards, did you have an expectation
15  as to the types of things that auditors should
16  bring to the attention of the audit committee?
17        MR. FRIESEN:  Objection.
18    A    As I said before, there are issues
19  of internal control that are weaking, if there
20  was a question of any defalcations or anything
21  like that that would likely occur, if some of
22  the assumptions and projections going forward
23  are totally out of line with their judgment,
24  they have an obligation to say something about
25  that.

Page 192

Alfred W. Martinelli

1
2    Q    So certainly if the auditors had
3  uncovered material misstatements within the
4  financial statements presented to them for
5  review, would you have expected Coopers &
6  Lybrand to bring that to the attention of the
7  AHERF audit committee?
8        MR. FRIESEN:  Objection.
9    A    Absolutely.
10    Q    And, similarly, if Coopers & Lybrand
11  had found intentional misstatements in those
12  financial statements, would you have expected
13  Coopers to bring that to the attention of the
14  AHERF audit committee?
15        MR. FRIESEN:  Objection.
16    A    Absolutely.
17    Q    What about issues that Coopers
18  discovered that reflected on the competency of
19  financial management; would you have expected
20  them to bring that to the attention of AHERF,
21  the AHERF audit committee?
22        MR. FRIESEN:  Objection.
23    A    You need to deal with the question
24  competency.  If it's a subjective situation,
25  you know, I'm not sure that you want them to

Page 193

Alfred W. Martinelli

1
2  get into that.  If it's competency with
3  respect to gross negligence and not doing the
4  job, then you would expect to hear about that.
5    Q    If it was an issue with respect to
6  their competency with following GAP, generally
7  accepted accounting principles, would you have
8  expected that to have been brought to the
9  attention of the audit committee?
10        MR. FRIESEN:  Wait.  Objection.
11    A    I would think that the auditors
12  would have an obligation to kind of dig into
13  that a little bit because following generally
14  accepted accounting principles is not quite as
15  easy as it sounds and there's a lot of give
16  and take in that.  And so if there's an
17  issue -- if they took an issue with the way
18  some revenue was recorded or some expenses
19  were being written off or some receivables were
20  being written off or not collected, then they
21  would have an obligation to tell the audit
22  committee on that.
23    Q    What if Coopers & Lybrand had found
24  issues reflecting on the integrity of AHERF's
25  financial management; would you have expected

49 (Pages 190 to 193)

Page 194

Alfred W. Martinelli

1
2 them to bring that to the attention of the
3 audit committee?
4        MR. FRIESEN:  Objection.
5     A   Integrity in what sense?
6     Q   Integrity in the sense of honesty or
7 lack thereof.
8        MR. FRIESEN:  Objection.
9     A   Again, honesty meaning if they are
10 deliberately falsifying any information, that
11 would be -- and they knew it, they would
12 absolutely have an obligation to tell the
13 audit committee.
14     Q   During your tenure on the AHERF
15 board, did you ever come to learn that Coopers
16 & Lybrand had raised any issues of the type
17 we've just talked about with anyone on the
18 audit committee or on the board as a whole?
19     A   I don't know that personally.
20     Q   Now, if Coopers & Lybrand had raised
21 issues of the type we just discussed with the
22 audit committee, would you have expected the
23 audit committee to conduct an investigation
24 into those issues?
25        MR. FRIESEN:  Objection.

Page 195

Alfred W. Martinelli

1
2     A   I think that the audit committee's
3 obligation is to bring that to the attention
4 of the full board.  And then the question is
5 that the full board would generally -- if that
6 did happen, they would generally appoint some
7 outsider, attorney or another accountant, to
8 come in and look at that to see whether that
9 was true or not.
10     Q   And if -- I'm sorry.  I didn't mean
11 to interrupt you.
12     A   And, you know, if it was, take what
13 the appropriate actions are.
14     Q   And the appropriate actions would
15 be?
16     A   Dismissal or let them go and see
17 what happened.
18     Q   You're talking about perhaps
19 dismissal of management?
20     A   The management and the board and the
21 auditors if the auditors have misled or
22 deliberately misled, you know, and put forth
23 statements that were incorrect.
24     Q   Another option would be to bring in
25 a consultant to help straighten out the

Page 196

Alfred W. Martinelli

1
2 situation?
3        MR. FRIESEN:  Objection.
4     A   Well, if it's deliberate, it's not a
5 question of straightening it out.  It's a
6 question of getting rid of the people who did
7 that.  I mean, deliberate, that is a whole
8 different thing.  If someone makes a mistake,
9 if there's a receivable that's not working
10 correctly or accounts receivable department,
11 they might need help, auditors might say we
12 think you need some help, bring some
13 outsiders.  If someone says they recorded a
14 million when it should have been 10 million
15 and we let that go, then you have to ask
16 yourself -- that's a question of basic
17 integrity of the job that's being performed
18 and that's a whole different question.
19     Q   At any time, did you ever come to
20 question the accuracy of the AHERF audited
21 financial statements?
22     A   No.
23     Q   I think you had testified earlier,
24 Mr. Martinelli, that at a certain period in
25 time you believed that there was sufficient

Page 197

Alfred W. Martinelli

1
2 capital within the AHERF system to support the
3 operations in the east that were having
4 difficulty?
5     A   Yes.
6     Q   If Coopers & Lybrand had determined
7 during the course of its audit work that
8 there, in fact, wasn't sufficient capital
9 within the system to keep the eastern
10 enterprises operating, would that be something
11 that you would have expected they would report
12 to the audit committee or to the board?
13        MR. FRIESEN:  Objection.
14     A   Well, I think it's something that
15 had to be brought up, but what would be more
16 important is not the fact that it was brought
17 up but what management's answer was.  At a
18 given point in time, if you say this is low
19 tide but not to worry because, you know, in
20 three hours high tide's going to come in and
21 we'll be okay.  So the fact that that happened
22 is important, but also listening to what
23 management had to say was equally important.
24     Q   Earlier today you looked at the
25 first quarter financials for fiscal year 1998

50 (Pages 194 to 197)

Page 198

1       Alfred W. Martinelli
2  that reflected a net loss of approximately $42
3  million and you and Mr. Friesen had a
4  conversation about that.  My question really
5  goes to, at that time, was there any
6  information that came to your attention that
7  AHERF's survival as a going enterprise was in
8  question?
9       MR. FRIESEN:  Objection.
10   A  No.
11   Q  I'm sorry?
12   A  No.
13   Q  And I take it from the letters that
14  you wrote over the course of your tenure with
15  the AHERF board that if something came to your
16  attention that you were concerned about or
17  that raised questions in your mind, you didn't
18  hesitate to probe and to seek answers to those
19  questions; is that correct?
20   A  That's correct.
21   Q  And do you believe that if Coopers &
22  Lybrand had brought to the attention of the
23  audit committee or the board and to your
24  attention issues of the type that we discussed
25  earlier -- intentional misstatements,

Page 199

1       Alfred W. Martinelli
2  fraudulent misstatements -- do you believe
3  that you would have continued to probe to get
4  to the bottom of the issues that they would
5  have raised with you?
6       MR. FRIESEN:  Objection.
7   A  Yeah, absolutely.
8   Q  That is not something that you would
9  have ever ignored as a board member of AHERF;
10  correct?  I'm sorry?
11       MR. FRIESEN:  Objection.
12   A  Absolutely.
13   Q  Absolutely correct, you would have
14  probed?
15   A  Yes.
16       MS. MEADEN:  Thank you.  I
17  don't have any further questions for you.
18       MR. FRIESEN:  I actually don't
19  either so we can all go.  Thanks very
20  much.
21       THE VIDEOGRAPHER:  We are now
22  going off the video record.  This
23  concludes Tape 3.  The time is 3:03 p.m.
24      (Whereupon the deposition
25  adjourned at 3:03 p.m.)

Page 200

1
2        I N D E X
3  WITNESS:          Page
4  ALFRED W. MARTINELLI
5   By Mr. Friesen      4
6   By Ms. Meaden     174
7
8
9
10     E X H I B I T S
11  No.    Description     Page
12  2557    Documents Bates Nos.  94
      JD-DMC-0003378-3379
13
    2558    Document Bates No.   95
14      JD-DMC-0003377
15  2559    Documents Bates Nos.  120
      AM00319-320
16
    2560    Article entitled   147
17      "Explaining why the
      ax fell for 1,200
18
19
20
21
22
23
24
25

Page 201

1
2      I have read the foregoing
3  transcript of my deposition given on May
4  5, 2004, and it is true, correct, and
5  complete, to the best of my knowledge,
6  recollection, and belief, except for the
7  corrections noted hereon and/or list of
8  corrections, if any, attached on a
9  separate sheet herewith.
10
11
12      _____
13      ALFRED W. MARTINELLI
14
15
16
17  Subscribed and sworn to
18  before me this _____ day
19  of _____, 2004.
20
21
22     _____
23  Notary Public
24
25

Mathews Dep.

# In The Matter Of:

***THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION, etc. v.***
***PRICEWATERHOUSECOOPERS, LLP***

---

### *ROBERT MATHEWS*
*June 24, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**MATHEWS, ROBERT - Vol.**



LEGALINK

A WORDWAVE COMPANY

Page 30

1  statistics for the Graduate Hospital in 1994 and 1995
2  had been negative, as stated by this document?
3       MS. MEADEN:  Objection.
4     A.  If I just thought about it, I would say no, I
5  didn't think they were negative, but I don't recall the
6  numbers.
7  BY MS. ZACH:
8     Q.  And when you say you don't recall the numbers,
9  you don't recall the specific numbers for admissions or
10  length of stay?
11    A.  I was thinking about the trends of these
12  things in '94 and '95.  I probably wouldn't have thought
13  at this point they were negative trends, but I don't
14  recall for sure.
15    Q.  And you were aware at the beginning of
16  calendar year 1996 that the economic performance of the
17  Graduate Hospital had been negative?
18    A.  Yes.
19    Q.  Correct?
20    A.  Yes.
21    Q.  And you don't have recollection for 1994 and
22  1995?
23    A.  No.
24    Q.  The next paragraph states, "Intensive efforts
25  to improve the hospital's performance through a focus on

Page 31

1  physician recruitment serve as quality and expense
2  management as described in a separate section of this
3  report."
4       Do you see that?
5     A.  Yes.
6     Q.  Was it your understanding at the time of this
7  document in the end of 1996 that efforts were in fact
8  being taken to improve the hospital's performance?
9     A.  You could say that about the -- all the
10  hospitals in the system, sure.
11    Q.  Did you believe that these efforts were in
12  fact intensive?
13    A.  Yes.
14    Q.  If you could turn to the page ending in 265,
15  this section is titled "Relationships with
16  Nongovernmental Payors."  The first paragraph reads,
17  "The nongovernmental payors with the largest penetration
18  in the Philadelphia region are Independence BlueCross
19  and US Healthcare.  Their combined market share is
20  approximately 90 percent."
21       Do you see that?
22    A.  Yes.
23    Q.  Does this refresh your recollection at all
24  regarding the HMO market within the Philadelphia region?
25    A.  Yes.

Page 32

1     Q.  Do you have any additional recollection
2  regarding the effects of these two dominant HMOs in the
3  Philadelphia market?
4     A.  90 percent just doesn't refer to HMOs.  It
5  refers to all of the BlueCross insured.  So the HMOs
6  have grown significantly.  It usually had a negative
7  effect on the bottom line of the hospitals, unless the
8  volumes were great enough to offset the lower rates and
9  in some cases the volume increases were.
10    Q.  In your understanding, was that one of the
11  reasons why hospitals focused on increasing admissions?
12    A.  To increase their bottom line, yes.  To offset
13  the lower rates that were being paid to them.
14    Q.  And in your experience, had the acquisition of
15  physician practices been one method that hospitals had
16  taken to increase admissions?
17    A.  Yes.
18    Q.  Mr. Mathews, had you been involved at all in
19  Graduate Health System's efforts to sell one or any of
20  its hospitals?
21    A.  Yes.
22    Q.  Can you describe for me your involvement in
23  Graduate Health System's efforts to sell any of its
24  hospitals?
25    A.  I was involved in the Community General

Page 33

1  Hospital in Reading, its sale to Franciscan Health
2  System.
3     Q.  Were you involved in any other sale or
4  acquisition?
5     A.  Peripherally.  You mean as relates to AHERF
6  or --
7     Q.  Well, let's talk about AHERF first.  Were you
8  involved at all in the decision to attempt to sell the
9  hospitals to AHERF Health System?
10    A.  I was involved in discussion.
11    Q.  And by discussion, you are referring to
12  internal discussions within Graduate Health System?
13    A.  I was kind of kept out of that because AHERF
14  was going to employ me, so they felt it was
15  inappropriate for me to get involved in the actual sale
16  or transfer because of that.  So that was handled mainly
17  by the members of the board.
18    Q.  Let me focus first prior to any contact that
19  may have been made between Graduate Health System and
20  AHERF.  Were there internal discussions prior to any
21  contact between the two health systems?
22    A.  Yes.
23    Q.  Were you involved in those internal
24  discussions?
25    A.  Yes.

9 (Pages 30 to 33)

Page 34

1    Q.   Were those discussions concerning whether
2  Graduate Health Systems should sell any of its
3  hospitals?
4    A.   To AHERF?
5    Q.   Just generally.
6    A.   We had looked at merging with other systems,
7  acquiring other hospitals, merging with insurance
8  companies; everything was looked at.
9    Q.   Do you know why Graduate Health System was
10 considering these options for its hospitals?
11   A.   To improve its bottom line.  We thought that
12 we could guarantee the survivability of the hospitals if
13 we were involved with a much larger organization.  It
14 would make us more competitive in the marketplace.
15   Q.   Why is it that Graduate Health System believed
16 that merging with a larger health system would make it
17 more competitive in the marketplace?
18   A.   Talking about AHERF?  If you look at AHERF, it
19 was the amount of capital or dollars they said they had
20 available to make improvements in the hospital, do
21 physician acquisitions, just overall improve the
22 financial viability of the hospitals.
23   Q.   Was there also an understanding that greater
24 leverage could be obtained with HMO negotiations through
25 a larger health system?

Page 35

1    A.   That's the whole purpose of having a larger
2  health system, to negotiate with third-party payors to
3  get better rates.
4    Q.   And the belief was that the larger the health
5  system, the more leverage could be obtained with the
6  HMOs?
7    A.   Yes, yes.  Not just the HMOs.  All the
8  third-party payors.  Not Medicare but BlueCross.
9    Q.   Were you aware of any specific health systems
10 that Graduate Health System had considered merging or
11 selling its hospitals to?
12   A.   Yes.
13   Q.   And I'm speaking other than AHERF.
14   A.   We talked to Penn, talked to the Crozer or
15 Keystone Crozer System.  I can't recall who else we
16 talked to, but those were the two major ones.
17   Q.   Do you recall when those discussions had taken
18 place?
19   A.   I would think in '95, '96 time frame.
20   Q.   Were you personally involved in discussions
21 with Penn and Crozer Keystone?
22   A.   Yes.
23   Q.   And there ultimately was not a transaction
24 with those two health systems.  Do you recall why?
25   A.   I think with Penn the concern was they wanted

Page 36

1  all of the dollars of the health system and indeed it
2  was set up during the acquisition of the HMO.  They
3  wanted to get control of all those dollars, which was in
4  excess of a hundred million dollars.  It was in that
5  part of the system.  I just think Penn -- they just
6  weren't that interested.
7        Crozer Keystone, they didn't want to give up
8  their control, so they didn't go ahead with it.
9    Q.   Were you responsible at all for providing
10 financial information to either Penn or Crozer Keystone
11 regarding the hospitals?
12   A.   CFO of the system did that.
13   Q.   Were you aware of any concerns that either of
14 these hospital systems had regarding the financial
15 condition of the Graduate Health System hospitals?
16   A.   Not specifically, no.
17   Q.   You stated earlier, I think, that you had less
18 involvement in the acquisition of the hospitals by AHERF
19 because you were going to be employed by AHERF, correct?
20   A.   Correct.
21   Q.   Do you recall when the decision was made that
22 you would be employed by AHERF?
23   A.   Sometime in '96.  I don't recall when.
24   Q.   Can you recall --
25   A.   I think the April, May time frame.  Something

Page 37

1  like that.
2    Q.   Were you involved at all in the provision of
3  information to AHERF regarding the Graduate hospitals?
4    A.   Not that I recall.
5    Q.   Do you recall who was responsible for
6  providing information to AHERF within the Graduate
7  Health System?
8    A.   I think the chief financial officer was.  I
9  would also assume -- I guess there was some information
10 provided directly by the hospital's chief financial
11 officers, but I don't recall what information that was.
12   Q.   Did you have any contact directly with AHERF
13 prior to the transition of your employment to AHERF?
14   A.   Various meetings with their officers.  So I
15 had contact.
16   Q.   Do you recall any discussions that you may
17 have had with anyone from AHERF prior to your employment
18 by AHERF?
19   A.   No.
20   Q.   Was it your understanding that any information
21 requested by AHERF had been provided?
22   A.   I thought so.
23   Q.   You didn't have any knowledge regarding
24 withholding information on the part of Graduate Health
25 System?

10 (Pages 34 to 37)