ROBERT M. MCNAIR, JR.

Page 66

1  which had been -- as I recall, this actually had gone  10:22:39
2  on in a negotiation between Mr. Abdelhak and      10:22:43
3  Mr. Korman personally. And I walked out of that      10:22:47
4  negotiation, handed her this and said, Type this,      10:22:51
5  which is why she put my initials on it.      10:22:53
6      Q.  So wherever we see the RMM footer, does that  10:23:00
7  mean that you likely had some kind of involvement with  10:23:03
8  the drafting of the document?      10:23:06
9      A.  Very probably. Again, it's obviously subject  10:23:07
10  to review of the particular document, but those are      10:23:10
11  obviously my initials, yes.      10:23:12
12      Q.  Do you recall that Allegheny had to pay money  10:23:13
13  in order to get out of the -- or to facilitate GHS      10:23:17
14  getting out of the management agreement it had with      10:23:21
15  HSI?      10:23:23
16      A.  I recall that vaguely. As I say, I remember  10:23:25
17  there were understandings between QualMed, which      10:23:27
18  basically was controlling HSI at this point, Graduate  10:23:31
19  and Allegheny. That's where the G4 conversations came  10:23:34
20  up. And as I recall, yes, there was some money that  10:23:38
21  changed hands. I couldn't tell you the precise amount  10:23:41
22  of them.      10:23:43
23      Q.  And that was money that was paid to HSI in  10:23:43
24  order to induce HSI to terminate the management      10:23:45
25  agreement?      10:23:48

Page 67

1      A.  Correct. And if I recall correctly,      10:23:49
2  Mr. Korman -- and I only overheard this, I never saw  10:23:50
3  it, but I believe Mr. Korman may have made some      10:23:54
4  payments to them too or liquidated a note or done      10:23:56
5  something that was some consideration on his part for  10:23:58
6  doing the deal as well.      10:24:02
7      Q.  Okay. Why don't we just set this document  10:24:03
8  aside. We might refer back to it later.      10:24:09
9      A.  Okay.      10:24:11
10      MR. COGAN:  Would this be a good time to      10:24:11
11  take a break. We've been going for an hour and a      10:24:12
12  half.      10:24:15
13      MR. TERUYA:  Sure. Why don't we take a      10:24:15
14  quick break.      10:24:18
15      THE WITNESS:  Not a problem.      10:24:18
16      VIDEO TECHNICIAN:  We are now going off      10:24:19
17  the videotape record. The time, 10:30.      10:24:20
18      (Short recess.)      10:39:50
19      VIDEO TECHNICIAN:  Back on. The time,      10:39:54
20  10:46.      10:39:55
21  BY MR. TERUYA:
22      Q.  Just reference back to Exhibit-988, but I  10:39:59
23  don't think -- you can look at it if you need to, but  10:40:01
24  I just was going to ask, do you recall any sort of hot  10:40:03
25  issues that came up in negotiating and drafting the  10:40:07

Page 68

1  various documents that are contained in Exhibit-988?  10:40:10
2      A.  Well, as I said, there was some back and      10:40:14
3  forth between QualMed and Allegheny and HSI about      10:40:18
4  getting out of the management agreement. There were  10:40:22
5  issues in the original negotiations about assuming      10:40:22
6  obligations with respect to some of the senior      10:40:28
7  managers from Graduate, most notably Mr. Cramer and  10:40:30
8  Mr. Mathews and Mr. Huber, who, interestingly enough,  10:40:35
9  chose not to work for Allegheny. Mr. Mathews did and  10:40:40
10  Mr. Cramer got his contract paid off, as best I      10:40:42
11  recall.      10:40:45
12      Probably the biggest issue in the original  10:40:47
13  negotiations was the amount of cash that was going to  10:40:50
14  be forthcoming from Graduate to Allegheny. There was  10:40:52
15  a lot of back and forth on that.      10:40:56
16      I did not participate directly in the      10:40:57
17  business discussions between the business people.      10:40:59
18  They were basically -- I was basically sitting there  10:41:01
19  scrivening and communicating with the lawyer on the  10:41:04
20  other side, Mr. Cornblatt. And then when we got down  10:41:06
21  to the revisions in the arrangements, there were some  10:41:12
22  discussions which I think were reflected in the      10:41:21
23  letters that went back and forth between Mr. Abdelhak  10:41:22
24  and Mr. Korman, which I think related to the change in  10:41:24
25  the format of the transaction and Mr. Korman's      10:41:27

Page 69

1  concerns about what kinds of liabilities and so forth  10:41:30
2  that might expose him to. Because there were real      10:41:32
3  issues that came up, particularly with respect to the  10:41:36
4  bond financings, with doing the transaction as a      10:41:47
5  merger rather than as an assumption of membership.      10:41:47
6      Q.  And do you recall if any of the liabilities  10:41:49
7  that you're mentioning with respect to bond financing  10:41:51
8  ever came to be?      10:41:54
9      A.  I don't know as a matter of personal      10:41:56
10  knowledge. Obviously the bonds went into default. I  10:41:58
11  know enough to know there was a special sort of class  10:42:03
12  of the Graduate bond holders in the general      10:42:06
13  transaction and that unlike the Allegheny bonds, which  10:42:08
14  were insured, the Graduate bonds were not insured, so  10:42:12
15  there was a tremendous amount of back and forth.      10:42:16
16      I do know, as I think I've mentioned      10:42:18
17  earlier, that there were some claims against      10:42:21
18  Mr. Korman lodged by -- I only know this from reading  10:42:23
19  the newspapers, by the way -- claiming that they had  10:42:26
20  been misled and that there had been various      10:42:30
21  guarantees, cross guarantees promised, and that monies  10:42:34
22  had been taken out, which were legitimately the bond  10:42:38
23  holders' monies.      10:42:41
24      And I know that those matters settled, and  10:42:42
25  as I recall, they settled for a payment of 4 or 5  10:42:46

18 (Pages 66 to 69)

ROBERT M. MCNAIR, JR.

Page 110

```
1   assistant secretary, and these were filed consistent   11:45:42
2   with Beth Cheng's original memorandum of April 22nd on  11:45:45
3   April 30.                                    11:45:49
4      Q. I don't know if I asked you this. This is   11:45:55
5   Item 3 on Beth Cheng's memo, right?          11:45:57
6      A. Yes. That's correct. On her May 9 memo,   11:45:59
7   this would be Article 3 -- Item 3.            11:46:01
8      Q. I'm going to mark as Exhibit-997 a document   11:46:03
9   with Bates number PR-BONDH-1195, and it appears to be   11:46:07
10  an Amended Certificate of Authority in New Jersey,   11:46:18
11  dated May 2nd, or filed May 2nd, 1997?        11:46:21
12     A. Correct.                               11:46:24
13     Q. Do you recognize this document?         11:46:24
14     A. I'm not sure I've ever seen this document   11:46:25
15  before, to be perfectly honest with you. It was   11:46:26
16  executed by Dr. Kaye, was filed by a fellow named Jim   11:46:29
17  Hetzel at Kalison & McBride, who had been helping us   11:46:33
18  with our CON issue in New Jersey.            11:46:39
19        But it obviously was intended to        11:46:40
20  accomplish what is identified in Item No. 4 of Beth   11:46:42
21  Cheng's May 9 memorandum, which is its Amended   11:46:46
22  Certificate of Authority filing.             11:46:49
23     Q. Does this somehow allow the now renamed   11:46:50
24  Horizon Medical Corporation to operate a hospital in   11:46:53
25  New Jersey? Is that the point of this document?   11:46:56
```

Page 111

```
1      A. I think the point of it is that it qualifies   11:46:58
2   it to do business in New Jersey, yes, and to operate   11:47:01
3   in New Jersey.                               11:47:04
4      Q. That's because --                      11:47:05
5      A. Well, they must have had a Certificate of   11:47:05
6   Authority before. This obviously amended it because   11:47:07
7   its name was amended.                       11:47:10
8      Q. And this is to operate the Zurbrugg and   11:47:12
9   Rancocas Hospitals?                         11:47:15
10     A. Yeah. Again, any time you have a foreign   11:47:16
11  corporation, it has to have a Certificate of Authority   11:47:18
12  to do business in a foreign jurisdiction. That's what   11:47:20
13  this is.                                    11:47:23
14     Q. Turning to a document I'll mark as          11:47:25
15  Exhibit-998, which bears Bates numbers PR-DLC-56-1359   11:47:26
16  through 1360.                               11:47:34
17     A. Yes.                                  11:47:36
18     Q. It appears to be Articles of Amendment of   11:47:36
19  SSMOB, Incorporated?                        11:47:38
20     A. Correct.                              11:47:41
21     Q. And appears to be filed April 30, 1997?   11:47:50
22     A. Yes, which I guess the -- what you have   11:47:50
23  identified as 999 is actually, I think, an attachment   11:47:52
24  to 998, if I'm not mistaken.                 11:47:56
25     Q. Why don't I mark as Exhibit-999 a document   11:48:03
```

Page 112

```
1   bearing Bates numbers PR-DLC-056-1446 through 1450.   11:48:06
2   This appears to be a number of attachments or an   11:48:16
3   attachment --                               11:48:21
4      A. This is the actual attachment to 998. This   11:48:23
5   is what would have actually been filed with the state.   11:48:25
6      Q. So do Exhibits 998 and 999 reflect Item No. 5   11:48:28
7   on Beth Cheng's memo?                        11:48:34
8      A. Yes, they appear to. Yes, they appear to.   11:48:38
9      Q. Do you recognize these two documents as   11:48:49
10  documents that you executed?                 11:48:52
11     A. Well, it's certainly my signature. I   11:48:53
12  executed them, and she arranged for the filing, I   11:48:55
13  believe.
14     Q. And you're at this point --
15     A. I executed the first one. The second one was   11:49:00
16  attached, which is the standard format you use.   11:49:02
17     Q. And is this just, this document, the purpose   11:49:06
18  of this document, to change the membership from GHS to   11:49:07
19  SDN of SSMOB, Incorporated?                  11:49:11
20        MR. COGAN: Objection.                  11:49:16
21        THE WITNESS: Let me put it this way: It   11:49:21
22  says that SDN is the member in this document, and   11:49:22
23  inasmuch as that was identified in another memorandum   11:49:25
24  as the purpose of this, I make the assumption that   11:49:28
25  that's what we were attempting to do here.   11:49:30
```

Page 113

```
1   BY MR. TERUYA:
2      Q. And at this point, were you assistant   11:49:33
3   secretary of SSMOB?                          11:49:35
4      A. Yes, I was. And by the way, just as an   11:49:37
5   aside, with respect to various of the entities that   11:49:39
6   had been under Graduate's control, we had a particular   11:49:44
7   form of articles and tax compliance language that we   11:49:47
8   liked to use, which is one reason we restated   11:49:51
9   articles, which was to get these things into the   11:49:53
10  format that we liked. Because in some cases, they   11:49:57
11  hadn't been -- I mean, it was just -- it was a   11:49:59
12  preference for having articles that were standard   11:50:02
13  throughout the organization.                 11:50:04
14        That was another purpose of this, as well   11:50:05
15  as getting the SDN in as the member.         11:50:06
16     Q. So whenever new entities came into the AHERF   11:50:10
17  system, it was customary to amend the Articles of   11:50:13
18  Incorporation to include the language?       11:50:15
19     A. Typically if there were another change in   11:50:17
20  corporate form required, we would at that time restate   11:50:19
21  their articles and redo the entire thing for the   11:50:22
22  non-profits. For the for-profits, not so frequently.   11:50:25
23     Q. I'd like to mark as Exhibit-1056 a document   11:50:30
24  bearing Bates numbers PR-DLC-056-1366 through 1372.   11:50:34
25  It appears to be a document that are the -- that is   11:50:43
```

29 (Pages 110 to 113)

ROBERT M. MCNAIR, JR.

Page 114

1  the Articles of Amendment for SSMOB filed April 30,    11:50:49
2  1997, and it has an attachment as well.    11:50:53
3      A.  Yes.  That's correct.  And it appears that    11:50:57
4  this is virtually identical to the prior document,    11:51:00
5  with the exception that U/G Holding has now been named    11:51:03
6  as the member of SDN, Inc. -- excuse me; that U/G    11:51:07
7  Holding has been named as the member of SSMOB, Inc.    11:51:11
8      Q.  Do you recall why this document has to -- let    11:51:15
9  me rephrase this.    11:51:20
10         Do you recall why the membership of SSMOB    11:51:20
11  was changed to SDN and then, within a matter of days    11:51:22
12  or within a day, then changed from SDN to U/G Holding,    11:51:27
13  Inc?    11:51:33
14      A.  I do not recall.  I can speculate.  And I    11:51:34
15  suspect it had to do with the month end.  And if I    11:51:37
16  recall correctly, certain of these enterprises had    11:51:41
17  April 30 year ends.  But I may have been wrong about    11:51:43
18  that.    11:51:46
19      Q.  You don't have any personal knowledge of the    11:51:46
20  reason why --    11:51:48
21      A.  No.  As I said, I think this -- the    11:51:49
22  instructions for these originated from the finance    11:51:52
23  department, as reflected on the original April 22nd    11:51:53
24  memo.  If you look at the people who were on the    11:51:55
25  distribution list for that memo, they were almost    11:51:57

Page 115

1  exclusively, with the exception of me and the two bond    11:52:00
2  lawyers, people who were in the finance group.    11:52:02
3      Q.  And this is Item No. 6 on Beth Cheng's memo,    11:52:05
4  Exhibit-993?    11:52:09
5      A.  That is correct.    11:52:12
6      Q.  I'm going to mark as Exhibit-1057 a document    11:52:14
7  bearing Bates numbers Foley, F-O-L-E-Y, 29561 through    11:52:19
8  29578.  It appears to be Articles of Division of SDN,    11:52:26
9  Incorporated?    11:52:39
10     A.  That's correct.    11:52:40
11     Q.  And it appeared to be filed April 30, 1997?    11:52:40
12     A.  That's correct.    11:52:45
13     Q.  Do you recognize this document?    11:52:46
14     A.  I executed it.  It is the Articles of    11:52:47
15  Division of SDN creating SDN Transition Corporation.    11:52:48
16  And I will have to look and see.    11:52:56
17         Yeah.  This was designed to effectuate the    11:53:14
18  transfer of the shares of SDN held in GHS Holding    11:53:18
19  Corporation, the membership interest of SDN in U/G    11:53:22
20  Holding and the membership interest of SDN in 17th &    11:53:25
21  South Street Parking Corporation, which would have    11:53:39
22  been transferred by operation of law by the division.    11:53:39
23     Q.  And do you recall that the SDN Transition    11:53:41
24  Corporation would have no members subsequent to the    11:53:44
25  division of SDN?    11:53:48

Page 116

1      A.  That's what Article 4 of the Articles of    11:54:03
2  Incorporation that created SDN Transition Co said at    11:54:05
3  the time they were filed.  So, yes.  I mean, that's    11:54:10
4  clearly an accurate reflection.    11:54:12
5      Q.  And do you recall that AHERF would become the    11:54:14
6  member of SDN?    11:54:18
7      A.  Well, I think the AHERF transaction was    11:54:23
8  happening more or less contemporaneously with these    11:54:24
9  transactions.  I haven't seen the -- I don't think    11:54:29
10  we've seen those.  If we have, it's many documents    11:54:33
11  ago.  I don't remember having seen the Articles of    11:54:35
12  Amendment of the SDN articles.    11:54:39
13         But, yeah.  That would have been -- and at    11:54:42
14  that time the name of SDN was changed to, I believe,    11:54:44
15  Allegheny Hospitals, Centennial.    11:54:47
16     Q.  I guess I'd refer you to FOLEY 29571, which    11:54:52
17  appears to be part of the amended and restated    11:54:56
18  Articles of Incorporation --    11:55:00
19     A.  Ah-ha.  So there it is.  Excellent.  So    11:55:02
20  that's exactly it, yes.  Thank you.  Yes.  This was    11:55:03
21  done simultaneously.  In other words, this was Step 2,    11:55:06
22  was accomplished effective as of April the 30th.  And    11:55:09
23  that was the second step of the overall transaction,    11:55:15
24  along with the transfer of Horizon to become a direct    11:55:18
25  subsidiary of AHERF.    11:55:21

Page 117

1      Q.  So this document makes AHERF the member of    11:55:23
2  SDN, Incorporated; is that right?    11:55:26
3      A.  Correct.  As well as dividing SDN into itself    11:55:30
4  and SDN Transition Corporation.    11:55:38
5      Q.  I'd like to mark as --    11:55:48
6      A.  By the way, that is the document reflected as    11:55:49
7  Item 7 on Ms. Cheng's May 9th memorandum.    11:55:53
8      Q.  Thank you.  And you executed that document --    11:55:56
9      A.  That's correct.    11:55:59
10     Q.  -- as assistant secretary of SDN?    11:56:00
11     A.  That's correct.    11:56:02
12     Q.  And the last exhibit in this series I'd like    11:56:05
13  to mark as Exhibit-1058.  It's PR-DLC-056-1391 through    11:56:07
14  1401.  It appears to be Articles of Merger between U/G    11:56:15
15  Holding, Incorporated and SDN Transition Corporation    11:56:21
16  and appears to be filed April 30, 1997.    11:56:25
17         Do you recognize this document?    11:56:30
18     A.  It's a document merging SDN Transition    11:56:34
19  Corporation and the assets that were transferred into    11:56:37
20  U/G Holding, which is another former Graduate    11:56:40
21  subsidiary.  And I executed this document, and it's    11:56:44
22  effective as of May 1, which was the day after the    11:56:48
23  other transactions were done.    11:56:51
24     Q.  And you executed this document in your dual    11:56:55
25  capacities as assistant secretary of SDN Transition    11:56:57

30 (Pages 114 to 117)

ROBERT M. MCNAIR, JR.

Page 126

1  McConnell and Abdelhak on our side.          12:06:35
2    Q.  How about HSI; anyone on their behalf?      12:06:39
3    A.  Again Korman, again Abdelhak.  I don't think  12:06:41
4  McConnell was as heavily involved in that one.      12:06:45
5  McConnell was involved in the -- at the early stages  12:06:47
6  of the Graduate transaction.  When we got down to some  12:06:50
7  of the iterations in September and October when the    12:06:53
8  transaction was being sort of modified, Abdelhak took  12:06:56
9  a much more active role.                      12:07:00
10        And see, I didn't, to be perfectly candid  12:07:03
11  with you, I didn't even know during the June, July    12:07:06
12  period how much Sherif was involved and how much David  12:07:08
13  was involved.  I was talking to David, but it may very  12:07:11
14  well have been that Sherif was right there on the      12:07:14
15  phone the same as everybody else.              12:07:16
16    Q.  Were there any HSI folks involved?        12:07:18
17    A.  Yeah.  Well, Malik Hasan, who was the --    12:07:20
18  well, no.  It was not -- it would not have been HSI.  12:07:25
19  HSI at this point was owned by QualMed.  The head of  12:07:28
20  QualMed at that time was a fellow named Malik Hasan,  12:07:31
21  who was a physician.  They were in Pueblo, Colorado.  12:07:34
22  And he was intimately involved in the discussions.  I  12:07:36
23  think there were a couple of other senior executives  12:07:38
24  involved.                              12:07:40
25        I dealt with a couple of their inside      12:07:41

Page 127

1  counsel, whoever their general counsel was and an    12:07:45
2  assistant GC, whose name was Mike something or other,  12:07:50
3  who was a skadnelon (ph), if I recall correctly.  I    12:07:54
4  couldn't -- I mean, if you had put their names in      12:07:57
5  front of me, I might remember them.              12:08:00
6        But there were some discussions there and  12:08:01
7  there was a little bit of posturing, as I said        12:08:03
8  earlier, and some back and forth, but that was --    12:08:05
9  those were the primary people.  And there was a      12:08:08
10  certain amount going on.  In fact, there was a lot    12:08:10
11  going on, I later think I determined, that was        12:08:12
12  completely beyond my purview, which was Korman's      12:08:16
13  discussions with Hasan and QualMed about the terms of  12:08:19
14  GHS's involvement in HSI and the HSI Management      12:08:24
15  contract going on.                          12:08:30
16    Q.  Were you involved in or were you privy to    12:08:31
17  these discussions?  Not just the HSI ones, but I mean  12:08:34
18  just the general discussions or negotiations relating  12:08:37
19  to the business terms.                        12:08:40
20    A.  Some.  I mean, I was there for a couple of  12:08:41
21  them when Mr. Korman and Mr. Abdelhak were talking    12:08:43
22  about very specific things.  Early on I was not there.  12:08:46
23  I mean, when we were doing the deal in June and July,  12:08:52
24  I was basically sitting at the end of a telephone,    12:08:55
25  getting drafts of stuff or being told what the deal    12:08:58

Page 128

1  was, drafting things, putting them in front of people,  12:09:10
2  they'd say, No, that's not the deal, or we've changed  12:09:10
3  this, or whatever it might be.  That sounds like a    12:09:10
4  peculiar way for lawyers to operate, I understand, but  12:09:10
5  the way that Allegheny did business was, they didn't  12:09:12
6  always involve the lawyers in lots of things that were  12:09:14
7  going on.  I think I understand why now, and perhaps I  12:09:17
8  should have suspected why then, but --            12:09:20
9    Q.  Was Foley & Lardner involved in negotiating  12:09:23
10  the business terms at all?                    12:09:26
11    A.  Not to the best of my knowledge.  I mean, you  12:09:26
12  know, there undoubtedly were some discussions with    12:09:31
13  Bob, only because they wanted to make sure that there  12:09:34
14  was no bond problem, but, I mean, I don't think he was  12:09:36
15  actively involved in negotiating.              12:09:38
16        I mean, their attitude about lawyers, just  12:09:40
17  as an aside, was, We'll make the deal and tell you    12:09:42
18  what the deal is.  You know, in fact, Abdelhak told me  12:09:46
19  early in my tenure there, I don't take business advice  12:09:50
20  from my lawyers.  All right.  Fine.              12:09:52
21    Q.  And that was even, like, from the day you sent  12:09:55
22  foot at Allegheny?                          12:09:58
23    A.  It was early on.  I can't say that it was the  12:09:59
24  day, but it was certainly within a short period of    12:10:01
25  time.                                  12:10:04

Page 129

1    Q.  So that would have been true with respect to,  12:10:06
2  what, the Hahnemann acquisition, for example, and the  12:10:08
3  United acquisition?                          12:10:10
4    A.  Yeah.  I mean, we did them pretty much --    12:10:11
5  well, I was outside at the time --              12:10:13
6    Q.  You were at DVR?                      12:10:15
7    A.  -- of the deal.                        12:10:15
8        And, in fact, there was a complication      12:10:17
9  with the United transaction because he wanted this to  12:10:19
10  be sort of ultra hush-hush.  So he actually conducted  12:10:21
11  the negotiations in the United transaction in our    12:10:26
12  offices, in Drinker's offices in Philadelphia, and he  12:10:29
13  and Myles Turtz met there.  And since they were there,  12:10:33
14  I was with them.  Not all the negotiations.  Like the  12:10:36
15  payoffs of the senior executives which went on.      12:10:39
16        But this was a pretty common format.  I    12:10:43
17  mean, they would go off, talk to the business guys on  12:10:46
18  the other side, come back and say, Here's the deal,    12:10:50
19  write it up.  And you'd say, Well, what about this,    12:10:52
20  what about that, what about the other thing, and      12:10:53
21  they'd -- you know, you'd kind of go back and forth.  12:10:55
22  It was not a very efficient way of doing things, but,  12:10:56
23  you know, you play on the field that the client sets  12:11:00
24  for you.                                12:11:04
25    Q.  During negotiating these acquisitions, did    12:11:04

MANHATTAN REPORTING CORP., A LegaLink Company

ROBERT M. MCNAIR, JR.

Page 130

1  Abdelhak consult with -- Mr. Abdelhak consult with the   12:11:07
2  Board of Directors of AHERF?              12:11:10
3      A.  I think he was consulting with individual     12:11:12
4  members of the Board.  I mean, he was relatively    12:11:14
5  punctilious about going and getting approval from at    12:11:17
6  least some group of the Board, whether it be the    12:11:19
7  executive committee or the full Board.  I mean, that's    12:11:22
8  certainly the case.                12:11:23
9         I know that, for example, in the Graduate    12:11:25
10  transaction, he represented to me -- now, whether he    12:11:26
11  did it or not, I wasn't on the phone -- that he had    12:11:28
12  talked to some of the key senior members of the Board,   12:11:31
13  like Mr. Snyder and Mr. Barnes, who was the chairman    12:11:34
14  of the finance committee, and people like that.  But,    12:11:37
15  I mean, whether he actually did or not, I can't tell    12:11:39
16  you.                    12:11:41
17      Q.  Do you know when that would have been that he    12:11:42
18  was talking with them?              12:11:44
19      A.  I think he was talking with them as the    12:11:45
20  transaction approached culmination, which would have    12:11:47
21  been late, late July, you know, within -- I'd say    12:11:51
22  within a week, ten days of when we were actually    12:11:56
23  concluding the thing.  Maybe even closer in it.    12:11:59
24         I know one reason why he -- first of all,    12:12:03
25  he would never have done anything without letting Mr.    12:12:08

Page 131

1  Snyder know about it anyway.            12:12:10
2         But, second, and I recall this very    12:12:11
3  distinctly, because Wynstra was actually in Scotland    12:12:13
4  the day that the deal got done.  They went off for a    12:12:16
5  junket.  He and Mr. Snyder and -- Nancy, Mr. Snyder    12:12:21
6  and Mr. Abdelhak went off to the northern --    12:12:26
7  northwestern coast of Scotland for a week and a half    12:12:31
8  and they stayed at some castle up there that Andrew    12:12:34
9  Carnegie used to own, the name of which escapes me.    12:12:37
10  And they were there purportedly in their role as the    12:12:41
11  risk retention committee of the malpractice captive.    12:12:47
12  Well, what they were doing was, they were having a    12:12:51
13  vacation, only they didn't charge themselves for it.    12:12:53
14         But the reason -- I come back to the    12:12:55
15  original question.  He wouldn't have dared to go to    12:12:56
16  Scotland with Mr. Snyder for ten days had he not    12:13:01
17  talked to him about this deal, which went down about    12:13:04
18  15 minutes before they all went over there together.    12:13:05
19         And he was very careful also, by the way,    12:13:07
20  about involving the general counsel.  I mean, she was    12:13:10
21  at the table a lot, particularly as things began to    12:13:15
22  unwind a little bit.              12:13:18
23      Q.  Other than Mr. Barnes and Mr. Snyder, are    12:13:20
24  there any other Board members that you can think of    12:13:23
25  that he may have talked with?            12:13:25

Page 132

1      A.  I think he mentioned Mr. Gumberg's name.  I'd    12:13:26
2  have to go back and look at the list.  There were    12:13:30
3  three or four key people out there who he sort of ran    12:13:33
4  things by.                  12:13:37
5         I'm trying to remember who was on the    12:13:37
6  executive committee.  I think Mr. Gumberg was.  I    12:13:48
7  think Mr. -- maybe Mr. Edelman, although possibly not   12:13:48
8  because he and Sherif were not big friends.  Maybe    12:13:50
9  Mr. Nimick.  Those were sort of the key people.    12:13:54
10         And I will say this:  I mean, all of the    12:14:01
11  key people he would have talked to would have been in    12:14:03
12  Pittsburgh, notwithstanding the fact this was a    12:14:05
13  Philadelphia transaction and notwithstanding the fact    12:14:10
14  that a Philadelphia trustee might have been more    12:14:12
15  conscious of some of those issues you raised earlier    12:14:14
16  about Graduate's standing in the community and    12:14:16
17  financial status.                12:14:18
18      Q.  We might return to that in a second.    12:14:22
19         And this is all taking place in July of    12:14:24
20  '96?                    12:14:27
21      A.  Yes; July and very early August.  If I looked    12:14:30
22  at a calendar, I can tell you precisely -- close to    12:14:34
23  the dates.                  12:14:38
24         The Graduate transaction was approved on    12:14:40
25  the first Monday in August of 1996.  I remember they    12:14:43

Page 133

1  had a -- they had had a sort of informal Board meeting   12:14:47
2  the Sunday before.  And Monday afternoon of that week    12:14:52
3  we went over to the church, and their Board was    12:14:57
4  meeting there.  As I recall, it was me, Sherif, Don    12:15:03
5  Kaye and McConnell.  And we went in and they    12:15:07
6  introduced us, and they had a sort of -- they had    12:15:12
7  formally approved the transaction at this point.  And    12:15:14
8  Sherif made a little speech about what his hopes were    12:15:17
9  and introduced us and so forth.            12:15:20
10         And then we went back to Hahnemann, and    12:15:21
11  McConnell and Sherif and Wynstra had a conference    12:15:27
12  telephone call.  And that's the reason I remember why    12:15:31
13  Sherif was in Scotland, because in their capacity as    12:15:35
14  the Board of SDN to approve the other side of the    12:15:37
15  transaction.                  12:15:40
16      Q.  Do you remember, did any of the AHERF Board    12:15:40
17  approve the transaction at that point?          12:15:43
18      A.  I was told that the members of the executive    12:15:45
19  committee had approved the transaction, and he -- now,   12:15:48
20  whether he convened them in a group or not or whether   12:15:53
21  he just did it individually by polling them, I don't    12:15:55
22  know.                    12:15:58
23         I will tell you that there was later in    12:15:59
24  the fall a bit of a dust-up about that, because he had    12:16:02
25  a Board meeting, and which I happened to be present    12:16:06

MANHATTAN REPORTING CORP., A LegaLink Company

Page 134

1  at, which was not the normal style. He didn't like          12:16:09
2  the lawyers at the Board meetings, where there was          12:16:11
3  something of a controversy about the fact he had not     12:16:14
4  gone to the full Board. And he said -- and there was     12:16:16
5  truth to this. He said, Korman was leaving for Europe     12:16:20
6  for two weeks and there simply wasn't -- and he was.     12:16:23
7  I mean, that was what he told Sherif anyway. And          12:16:27
8  there simply wasn't time to convene the full Board, we   12:16:29
9  had to get this done quickly. And that was what I was   12:16:32
10  told. And I was told that the executive committee had   12:16:34
11  approved it, and I had the choice of either telling       12:16:36
12  him it was a lie and leaving or taking his word for     12:16:39
13  it.                                                        12:16:42
14     Q.  Had you, back in July and August of '96,          12:16:42
15  advised Sherif Abdelhak or anyone else that they          12:16:46
16  should be consulting with the Board of AHERF, the full  12:16:51
17  Board?                                                     12:16:54
18     A.  They knew perfectly well they should be           12:16:54
19  consulting with the Board. We told them that any          12:16:56
20  number of times.                                          12:16:59
21     Q.  Were you troubled by the fact that there was     12:17:00
22  this dust-up?                                             12:17:02
23     A.  I would have preferred him to convene the         12:17:03
24  Board and so forth. But, I mean, he had a lot of         12:17:05
25  authority, and the executive committee had a lot of     12:17:08

Page 135

1  authority, and he -- and he -- yeah. I mean, it would   12:17:09
2  have been far better if the full Board had approved      12:17:18
3  it. I mean, that just goes without saying.               12:17:21
4     Q.  Did you think it was improper that he was         12:17:22
5  going to the executive committee rather than the full   12:17:23
6  Board?                                                     12:17:26
7     A.  No, because there had been other                   12:17:27
8  circumstances, and I can't remember the details, but     12:17:29
9  where he had gone to the executive committee.             12:17:31
10        I mean, these were people who had been             12:17:33
11  empowered to do certain things on behalf of the Board   12:17:35
12  of Directors. And let's remember, by the way, that      12:17:37
13  nothing had actually happened when this was brought to  12:17:39
14  the Board's attention. Had they wanted to say, No,       12:17:45
15  we're not going to do this, it would have been           12:17:47
16  perfectly within their legal capability to do that.     12:17:51
17  We're talking about how much? Almost three months       12:17:53
18  later when the transaction finally happened.             12:17:57
19     Q.  Do you have any personal knowledge about          12:18:02
20  whether the executive committee could irrevocably        12:18:04
21  approve a transaction --                                 12:18:07
22     A.  I had been told --                                12:18:09
23     Q.  -- on its own?                                    12:18:09
24     A.  -- previously by the general counsel that the    12:18:11
25  executive committee had the plenary authority to act    12:18:12

Page 136

1  on behalf of the Board, because the question had come   12:18:15
2  up before. And I had not sat in those meetings. I       12:18:16
3  didn't know who had authorized whom to do what, but     12:18:20
4  she told me that and I pretty much was forced to take   12:18:22
5  her word for it.                                          12:18:24
6     Q.  Do you know if that happened with respect to     12:18:26
7  the GHS acquisition, that the executive committee        12:18:28
8  irrevocably approved the deal back in August '96?        12:18:33
9     A.  He told me that it had been approved by the       12:18:44
10  executive committee.                                      12:18:44
11     Q.  Do you know if it had been irrevocably           12:18:44
12  approved?                                                 12:18:44
13     A.  I can't tell you that that word was used.         12:18:44
14     Q.  Had there been a -- you've mentioned there       12:18:44
15  was sort of a past practice of the executive committee  12:18:44
16  acting on behalf of the full Board with respect to      12:18:47
17  acquisitions in the past?                                12:18:49
18     A.  No, no. Transactions. There had been other       12:18:50
19  circumstances that I was aware of, and as I say, I       12:18:53
20  can't cite them to you chapter and verse, but it had    12:18:55
21  been made clear to me by the general counsel that if    12:18:58
22  the executive committee approves something in a          12:19:01
23  circumstance where there was a legitimate reason for    12:19:03
24  having to do it quickly or because it, for whatever      12:19:06
25  reason, couldn't seek full Board approval, that that    12:19:08

Page 137

1  was acceptable, that was acceptable format.              12:19:11
2     Q.  Do you know any examples of acquisitions          12:19:12
3  where that had taken place?                               12:19:14
4     A.  No. In fact -- well, let me go back for a         12:19:15
5  minute.                                                   12:19:20
6        No. In point of fact -- well, I mean, the          12:19:21
7  question is at what point. I mean, in other words,       12:19:24
8  before he ever went to the Board of Directors, he        12:19:30
9  would have had the approval of the, quote, executive     12:19:34
10  committee or the members of the executive committee,    12:19:38
11  because he would want to -- he wasn't given to going     12:19:41
12  and getting himself beaten up.                           12:19:43
13        My recollection of the United deal, which         12:19:45
14  I only heard about, I was not a party to, was that it   12:19:48
15  was approved by the Board. I know that the Hahnemann    12:19:52
16  transaction was approved by the Board, because they     12:20:00
17  actually sent me to Pittsburgh because they wanted      12:20:02
18  somebody out there who knew about the transaction,      12:20:04
19  because everybody else was in Philadelphia meeting      12:20:06
20  with the Hahnemann Board. So I was out there.           12:20:08
21        So the answer is, no, I'm not sure it             12:20:10
22  happened previously in the context of an acquisition    12:20:14
23  transaction. But as I say, I don't remember the use     12:20:16
24  of the word "irrevocable," and I'm not aware that it    12:20:21
25  was -- I mean, let's put it this way: These were        12:20:23

35 (Pages 134 to 137)

Page 138

1  relatively prudent people. I mean, some of them had    12:20:27
2  been in fairly responsible positions. I mean, David    12:20:30
3  Barnes had been chairman of the Board of Mellon Bank,    12:20:34
4  which is not exactly small change, although he hadn't    12:20:36
5  done a very good job of it.    12:20:41
6      Cahouet may have been on that executive    12:20:43
7  committee too, Frank Cahouet, who was Barnes'    12:20:46
8  successor as chairman of Mellon Bank.    12:20:49
9      If he had proposed to them that they,    12:20:52
10 quote, irrevocably approved something, I would think    12:20:54
11 that would have triggered some questions.    12:20:58
12    Q.  But you don't know whether or not they did or    12:21:02
13 didn't irrevocably approve the transaction?    12:21:04
14    A.  No, I don't know that.    12:21:08
15    Q.  And did you think there were legitimate    12:21:09
16 reasons with respect to the GHS acquisition to go to    12:21:12
17 the executive committee rather than the full Board in    12:21:16
18 August of '96?    12:21:20
19    A.  Well, as I told you --    12:21:21
20    Q.  I know you mentioned one.    12:21:22
21    A.  -- what was true -- well, that was his    12:21:24
22 presumptive reason for doing it.  He said, We've got    12:21:26
23 to get this done, Korman is leaving, we can't do it    12:21:28
24 without Korman's approval.  Korman will not move    12:21:31
25 forward unless we have some kind of indication from    12:21:35

Page 139

1  our executive committee that they're willing to commit 12:21:38
2  to this transaction.  That was the story.  Now,    12:21:42
3  whether it was a true story or not a true story, for    12:21:44
4  all I know, he may have sent Korman to Europe.    12:21:47
5      But that was the approach, and it was the    12:21:50
6  approach that he raised in front of the Board when    12:21:53
7  this controversy occurred in, I think it was,    12:21:57
8  September.  And, I mean, there certainly was the    12:22:00
9  opportunity at that point for people to say, We're not 12:22:04
10 going to do this.    12:22:06
11     Now, this was, admittedly, a subsidiary    12:22:07
12 Board.  This was not the AHERF Board.  This was the    12:22:08
13 Allegheny Hospital's eastern region, or whatever they    12:22:11
14 were calling the thing at that point, Board.    12:22:17
15     But everybody stepped to the line and the    12:22:19
16 transaction got done.    12:22:22
17    Q.  But, I mean, the executive committee you're    12:22:28
18 referring to is a subcommittee of the main AHERF    12:22:29
19 Board; is that right?    12:22:32
20    A.  Yeah, exactly.  It was comprised -- which was    12:22:34
21 not an uncommon methodology, as you're aware of.  But,    12:22:36
22 I mean, generally the reason you have an executive    12:22:38
23 committee in place is precisely to deal with sensitive    12:22:40
24 issues or time-sensitive issues or things that you    12:22:42
25 don't want -- that you either can't or don't want to    12:22:45

Page 140

1  secure approval from the full group for.  And I've    12:22:50
2  seen that in a number of different settings.  AHERF    12:22:52
3  was certainly not unique in that regard.    12:22:55
4    Q.  And did you perceive there to be a legitimate    12:23:00
5  need at the time to go to the executive committee such 12:23:02
6  that it was appropriate to do so rather than going to    12:23:04
7  the full Board?    12:23:06
8    A.  He wanted to do the transaction quickly.  I    12:23:10
9  mean, that was his call.  I mean, once you accepted    12:23:12
10 that -- and this was not an uncommon methodology for    12:23:16
11 him, by the way.  I mean, we had done the United    12:23:20
12 transaction in 14 days or something back in 1990 and    12:23:22
13 '91.    12:23:31
14     If you accepted that premise, I mean, it    12:23:31
15 would not -- it literally would not have been possible 12:23:31
16 to convene that Board within less than a few weeks.  I 12:23:33
17 mean, they were pretty punctilious about their    12:23:37
18 scheduling and so forth and so on.    12:23:40
19    Q.  So at the time, you didn't see anything    12:23:42
20 inappropriate about it or --    12:23:43
21    A.  He told me the executive committee had    12:23:45
22 approved it.  I mean --    12:23:46
23    Q.  I guess I'm referring to, you didn't see    12:23:47
24 anything improper at the time about him going to the    12:23:49
25 executive committee rather than going to the full    12:23:52

Page 141

1  Board?    12:23:54
2    A.  I had been apprised that the executive    12:23:55
3  committee had the authority to act on behalf of the    12:23:57
4  Board.  The general counsel told me that.  And he was    12:23:59
5  the CEO.  If they didn't want him to go quickly, they    12:24:03
6  shouldn't have given him the approval.    12:24:08
7      But he told me he had the approval, and    12:24:10
8  I -- let's put it this way:  The general counsel was    12:24:11
9  in the middle of this transaction too.  In fact, she    12:24:14
10 was one of the three people who approved the    12:24:18
11 transaction on behalf of Allegheny, quote/unquote,    12:24:19
12 SDN.  And he made the representation to her on the    12:24:24
13 phone, I can remember pretty distinctly, that the    12:24:28
14 executive committee had approved the transaction, and    12:24:31
15 I didn't hear a whimper or protest at that point from    12:24:34
16 her.    12:24:39
17     Given that circumstance and given the fact    12:24:39
18 that she was the senior legal officer, I -- I mean,    12:24:42
19 had she said at that point, Well, we can't just do    12:24:44
20 this in front of the executive committee, that's a    12:24:46
21 perfectly legitimate point of view.  But it was her    12:24:50
22 call as to how the approval got done.    12:24:53
23    Q.  So at that point, you didn't really have any    12:24:55
24 concerns about --    12:24:57
25    A.  It's not a matter of not having concerns.

36 (Pages 138 to 141)

ROBERT M. MCNAIR, JR.

Page 142

1    Q.  -- what they were doing?    12:24:59
2    A.  It's a matter of what chair you're sitting    12:24:59
3  in.  I mean, were we operating under the    12:25:04
4  Sarbanes-Oxley rules now, I might have made a noisy    12:25:07
5  withdrawal.  There weren't any noisy withdrawals in    12:25:11
6  those days.  I mean, the GC knew what was going on,    12:25:13
7  knew who had approved the transaction, and not only    12:25:16
8  implicitly accepted it, but went ahead and formally    12:25:18
9  approved it as a director of the entity that was doing    12:25:21
10  the deal.    12:25:24
11    Q.  Did you raise any concerns with anyone other    12:25:25
12  than -- or anyone about going to the executive    12:25:26
13  committee?    12:25:30
14    A.  My recollection is that when he and I talked    12:25:30
15  about this on the phone, I said, Don't you think it    12:25:33
16  would be a good idea to go to the full Board?    12:25:35
17    He said, We don't have time to do that.    12:25:37
18  The executive committee has the authority.  Let's move    12:25:38
19  on, or words to that effect.    12:25:40
20    Q.  At that point, did you think -- did you have    12:25:43
21  concerns about what he -- after he told you that, did    12:25:46
22  you still have concerns about whether it was    12:25:49
23  appropriate to go to the executive committee rather    12:25:50
24  than the full Board?    12:25:52
25    A.  No, because the general counsel had told me    12:25:54

Page 143

1  that the executive committee had that authority.  I    12:25:56
2  mean, to the extent I would have had any, they would    12:25:58
3  certainly have vanished when she participated fully,    12:26:00
4  openly and knowingly in the approval of this    12:26:03
5  transaction.    12:26:05
6    I mean -- and considering the fact that    12:26:06
7  she spent a full ten days with the chairman of the    12:26:09
8  Board, approximately that amount of time, immediately    12:26:12
9  following this, I think had there been problems, they    12:26:14
10  would have come to light immediately.  And I'm not    12:26:16
11  aware that there were any.  In fact, the transaction    12:26:18
12  proceeded.    12:26:21
13    I mean, would I have preferred that they'd    12:26:22
14  gone to the full Board?  Sure.  Absolutely.    12:26:24
15    Q.  So after you talked with Mr. Abdelhak and    12:26:29
16  what you've just described occurred, at that point you    12:26:33
17  didn't raise any more concerns with any other    12:26:35
18  individuals?    12:26:38
19    A.  I'm not sure who I was supposed to raise it    12:26:38
20  with.  I mean, the general counsel knew about it.  The    12:26:40
21  CEO knew about it.  The Board had approved it.  The    12:26:42
22  chairman of the Board had been represented to me as    12:26:46
23  approving it.  He went off and spent time with that    12:26:50
24  following this.    12:26:53
25    I mean, there was never a whiff that this    12:26:54

Page 144

1  hadn't actually happened, that these people hadn't    12:26:57
2  actually approved it.  And to suggest otherwise would    12:27:00
3  have been -- never mind.  Would have resulted in my --    12:27:02
4  let's put it this way:  It wouldn't have been a    12:27:07
5  concern anymore because I wouldn't have been working    12:27:10
6  there anymore.    12:27:11
7    Q.  So at that point, you didn't say anything    12:27:11
8  more to anyone?    12:27:13
9    A.  I didn't know who I was supposed to say    12:27:14
10  anything to.  I mean, he told me that the executive    12:27:15
11  committee had approved it.    12:27:18
12    Q.  When did your involvement first start with    12:27:19
13  the GHS transaction?    12:27:20
14    A.  Late.  It was late in June.  Dr. Turtz called    12:27:22
15  me, I'd say, mid June.  As I think I said earlier,    12:27:24
16  Dr. Turtz called me and said, We've been talking to    12:27:28
17  Graduate, it looks like something may happen, you may    12:27:32
18  get a call from Bernie Korman's lawyer, Marc    12:27:39
19  Cornblatt, I want you to -- and he gave me a little    12:27:42
20  bit of background on the transaction.  And he said, I    12:27:45
21  want you to think about what needs to be done here and    12:27:48
22  the papers and so forth and so on.    12:27:50
23    And then within some period of time after    12:28:00
24  that, I think I got a call from Abdelhak telling me    12:28:00
25  what he thought the deal was and saying he wanted me    12:28:00

Page 145

1  to prepare a set of resolutions similar to what we had    12:28:03
2  done in the Hahnemann thing that memorialized the deal    12:28:04
3  in that format and to send it to him.    12:28:06
4    And I sent them to him, and I remember --    12:28:08
5  and this would have been late June, early July.  I    12:28:12
6  remember I was at my parents' house over in New    12:28:14
7  Jersey, because I was talking to him on the phone from    12:28:16
8  there on the weekend and we were going over the    12:28:17
9  documents, and that sort of initiated the process.    12:28:20
10  And then we went very quickly after that.  I would say    12:28:23
11  probably not more than three weeks more.  So this may    12:28:25
12  have been early to mid July when this conversation    12:28:31
13  occurred.    12:28:34
14    Q.  In your role as corporate secretary or    12:28:38
15  assistant secretary of SDN, did you sit in on Board    12:28:40
16  meetings of SDN?    12:28:44
17    A.  I sat in on the one that approved that    12:28:45
18  transaction.    12:28:47
19    Q.  But did you generally sit in on Board    12:28:48
20  meetings?    12:28:49
21    A.  No.  I don't think they had that many Board    12:28:50
22  meetings, to be perfectly honest with you.  I mean,    12:28:53
23  Wynstra was an officer as well.  She was, if I recall    12:28:55
24  correctly, the full secretary, so she didn't feel --    12:28:58
25    Q.  So you didn't have to sit there and take    12:29:00

MANHATTAN REPORTING CORP., A LegaLink Company

ROBERT M. MCNAIR, JR.

Page 146

1  notes of minutes of meetings or anything like that?    12:29:02
2      A.  No.  I happened to be in the pivotal one,    12:29:04
3  which was the one that was conducted by conference    12:29:07
4  telephone.    12:29:09
5          Interestingly enough, I think he probably    12:29:11
6  wanted me there intentionally, precisely because --    12:29:13
7  and as I look back, it may relate to this other issue,    12:29:18
8  which was that he wanted someone outside the group of    12:29:22
9  those three people to see that that transaction had    12:29:24
10  been approved and that the general counsel had been    12:29:26
11  involved to approve it.    12:29:28
12          As I look back on it, that -- but the    12:29:30
13  lawyers, as I said earlier, were rarely, rarely    12:29:32
14  brought into Board meetings other than the general    12:29:37
15  counsel.  I mean, you didn't get into a Board meeting    12:29:39
16  unless you had a specific issue to discuss that    12:29:42
17  related to a specific project or area of    12:29:45
18  responsibility for which you had responsibility.  And    12:29:50
19  when your piece was done, you got up and left.    12:29:50
20      Q.  So just to make sure I got it right, at that    12:29:52
21  conference call, that's when Abdelhak represented that    12:29:54
22  he had spoken -- or gotten -- secured the approval of    12:29:56
23  the Board and --    12:29:59
24      A.  Of the executive committee, yeah.    12:30:00
25      Q.  Of the executive committee.  And that's when    12:30:01

Page 147

1  Nancy Wynstra would have heard or been involved and    12:30:03
2  that wanted you to witness --    12:30:07
3      A.  Yeah.  She was in Scotland.  They were having    12:30:08
4  a conference call.  We were sitting up in the    12:30:10
5  president's conference room on the 19th floor.  He and    12:30:12
6  McConnell and I were sitting there.  She's on the    12:30:12
7  conference call.  They go through a little discourse    12:30:14
8  about the deal.  He says, It's been approved by the    12:30:17
9  executive committee, been approved by the Graduate    12:30:23
10  Board, blah, blah, blah, blah, blah.    12:30:25
11          I believe, if I recall correctly, we had    12:30:26
12  actually faxed her copies of the documents, so she had    12:30:28
13  them in front of her.  And they had a little formal    12:30:33
14  Board meeting and they said, you know, da, da, da, da,    12:30:37
15  and that was it.    12:30:38
16          By the way, there's another important    12:30:40
17  point to understand here.  Even if there were other    12:30:43
18  people sitting in Board meetings, lawyers, for    12:30:45
19  example, the only person who was allowed to write    12:30:48
20  Board minutes was Wynstra.  In fact, when the collapse    12:30:51
21  finally came, she was six months behind on her Board    12:30:56
22  minutes, because they had been having so many    12:30:59
23  emergency Board and committee meetings and so forth    12:31:01
24  and so on.    12:31:03
25      Q.  Are you talking about with respect to SDN or    12:31:04

Page 148

1  just --    12:31:06
2      A.  Everything.    12:31:07
3      Q.  So the whole AHERF system, Nancy Wynstra --    12:31:07
4      A.  I mean, have you had any problems finding    12:31:11
5  Board minutes from 1998 when all this was going on?    12:31:12
6      Q.  I found some of them.  Not all of them, but I    12:31:14
7  found some.    12:31:17
8      A.  Well, I would say that from -- she was    12:31:18
9  probably at least -- six may be an exaggeration.  She    12:31:21
10  was probably three or four months delinquent on her    12:31:25
11  Board minutes.    12:31:27
12          But it was made -- when I first got there,    12:31:28
13  they had other people drafting Board minutes.  They    12:31:30
14  also had lawyers going to Board meetings.  After    12:31:32
15  about, I'd say, in mid to late '93, that all changed.    12:31:35
16      Q.  Was this with respect to the AHERF parent    12:31:40
17  entity --    12:31:43
18      A.  Everything.    12:31:44
19      Q.  -- Board meetings or just within the AHERF    12:31:44
20  system, she was the one --    12:31:46
21      A.  Within the AHERF system.    12:31:47
22      Q.  -- who did the minutes?    12:31:49
23      A.  She went to the Board meetings.  She did the    12:31:49
24  minutes.    12:31:51
25      Q.  Got it.    12:31:51

Page 149

1      A.  You tell me what that means.    12:31:51
2      Q.  The minutes were presented to the Board in    12:31:54
3  subsequent meetings --    12:31:57
4      A.  Yes.    12:31:58
5      Q.  -- to be ratified; is that right?    12:31:58
6      A.  Yeah.  Correct.    12:32:00
7      Q.  So the Board members would obviously review    12:32:01
8  the minutes from the prior meeting just as a matter of    12:32:03
9  course, right?    12:32:07
10      A.  Right.    12:32:09
11          MR. COGAN:  Objection.    12:32:10
12  BY MR. TERUYA:
13      Q.  Presumptively?    12:32:10
14      A.  Occasionally when I saw them, yes.  I saw    12:32:12
15  Board packages that had minutes in them, let's put it    12:32:15
16  that way.  Whether they approved them or not is    12:32:17
17  unknown to me.    12:32:31
18          MR. COGAN:  What are we going to do about    12:32:31
19  lunch?  It's about 25 to 1:00.    12:32:31
20          MR. TERUYA:  Want to go off the record for    12:32:31
21  a moment?    12:32:31
22          THE WITNESS:  Sure.    12:32:31
23          VIDEO TECHNICIAN:  We are now going off    12:32:31
24  the videotape record.  The time, 12:38.    12:32:33
25          (Short luncheon recess.)

ROBERT M. MCNAIR, JR.

Page 150

1    VIDEO TECHNICIAN: Back on. The time,    13:13:41
2  1:20.    13:13:42
3  BY MR. TERUYA:
4    Q.  Good afternoon.    13:13:48
5    A.  Good afternoon.    13:13:49
6    Q.  I think when we left off, we were talking    13:13:51
7  about your role at SDN as corporate secretary.    13:13:53
8    A.  Yes. That's correct.    13:13:57
9    Q.  And did you play any role in terms of    13:14:00
10  advising the Board of SDN as to any of its decisions?    13:14:02
11    A.  No, not really. Not really.    13:14:06
12    Q.  Do you recall any dissent expressed at any    13:14:11
13  Board meetings you might have witnessed?    13:14:14
14    A.  No. As I said, I think the only one I ever    13:14:17
15  actually witnessed was the three-person one on August    13:14:20
16  the 5th or 6th, whatever the date was, approving the    13:14:23
17  Graduate transaction. I don't recall having gone to    13:14:26
18  others.    13:14:30
19    I may have gone -- I think I went to at    13:14:30
20  least one Board meeting subsequently after it became    13:14:32
21  Allegheny Hospitals, Centennial, when it had a, what    13:14:39
22  I'll call, real Board. But even at those Board    13:14:42
23  meetings, even at the real Board meetings, the few    13:14:46
24  that I attended, there was rarely any dissent. I    13:14:49
25  mean, the thing I told you about in September of '96    13:14:52

Page 151

1  was highly unusual where there was kind of a    13:14:55
2  controversy about what had happened. Because it just    13:14:58
3  wasn't encouraged; that's all.    13:15:05
4    Q.  Do you know how many Board members were upset    13:15:07
5  about not being notified in advance about the GHS    13:15:10
6  acquisition?    13:15:13
7    A.  There were not that many. I mean, there were    13:15:14
8  several. Several people were raising the issue.    13:15:16
9    The -- I thought a little bit more about this while we    13:15:19
10  were off, and the reason that he cited for moving    13:15:23
11  forward so quickly, in addition to Korman's departure,    13:15:28
12  was, he was very concerned that Korman was getting --    13:15:31
13  either was getting cold feet or that his Board was not    13:15:34
14  entirely in line with this.    13:15:40
15    And I think it's important that -- I    13:15:41
16  heard, I cannot confirm it by my own knowledge, that    13:15:44
17  Mr. Cramer, who had been sort of Korman's alter ego on    13:15:46
18  that Board, was opposed to do the Allegheny    13:15:51
19  transaction and was sort of -- didn't block it, but    13:15:53
20  was not enthusiastically in favor of it.    13:15:58
21    And I think one of the reasons that Sherif    13:16:02
22  cited was he was concerned that if they waited two or    13:16:04
23  three weeks, that the transaction might not get done,    13:16:06
24  because there would be more dissent on the Graduate    13:16:08
25  Board.    13:16:11

Page 152

1    As it was, they apparently had a difficult    13:16:11
2  Board meeting the day before they approved the    13:16:13
3  transaction, which involved some fairly heated    13:16:16
4  discussion, according to what I was told. I wasn't    13:16:20
5  there, obviously.    13:16:22
6    So, no. It was highly unusual, but the    13:16:23
7  reality of the situation is that the people who were    13:16:26
8  sitting in that Board meeting in Philadelphia wouldn't    13:16:30
9  have been the ones approving the transaction anyway.    13:16:33
10  I mean, that would have been the AHERF Board, which    13:16:36
11  were not the people that we were talking about. I    13:16:38
12  mean, they were kind of complaining because it was a    13:16:40
13  Philadelphia area transaction that they hadn't been    13:16:43
14  involved in. But they would not have had the say-so    13:16:45
15  anyway.    13:16:47
16    Some of them would have been on the AHERF    13:16:48
17  Board, but they wouldn't have been the ones making the    13:16:50
18  decision.    13:16:52
19    Q.  Is it your understanding that that's --    13:16:53
20  circumstances where there was a need to act quickly    13:16:55
21  were the reason for the existence of the executive    13:16:58
22  committee of the AHERF Board?    13:17:01
23    A.  Yeah. That's correct. And that was what he    13:17:02
24  cited, both to me and to others, in terms of why he    13:17:03
25  moved forward that way.    13:17:06

Page 153

1    Q.  And I take it that's like the whole, like,    13:17:09
2  point of existence of the executive committee, to be    13:17:11
3  able to act quickly?    13:17:14
4    A.  Correct. I mean, that's exactly right. Or,    13:17:17
5  I mean, occasionally it's not just desire to move    13:17:18
6  quickly, but where you think you've got something    13:17:20
7  that's sort of very sensitive information that you    13:17:22
8  don't want to share with a larger group.    13:17:24
9    But I would say that the primary reason    13:17:26
10  ordinarily that people make use of an executive    13:17:28
11  committee and empower one is to get things done more    13:17:31
12  quickly than you could with a full board, particularly    13:17:33
13  where you have large non-profit boards, which may be    13:17:35
14  much larger than the equivalent boards in a publicly    13:17:38
15  traded corporation, for example.    13:17:41
16    Q.  And if, for example, something happens    13:17:43
17  between quarterly Board meetings and there's a need to    13:17:45
18  act sooner than the next Board meeting --    13:17:48
19    A.  Exactly right. It's very hard with community    13:17:49
20  boards, which is what non-profits basically have, to    13:17:51
21  call special Board meetings. I mean, you've got to --    13:17:53
22  peoples' schedules of -- they used to publish the    13:17:56
23  Board schedules way, way, way in advance so people    13:17:58
24  would have full notice and so forth and so on.    13:18:01
25    Now, obviously there are things that    13:18:03

39 (Pages 150 to 153)

ROBERT M. MCNAIR, JR.

Page 154

1  permit you to do things like conference telephone and  13:18:04
2  all the rest of it, but for all intents and purposes,  13:18:07
3  you've got to get the same amount of participation  13:18:09
4  you'd have in person. So that's not necessarily an  13:18:12
5  answer.  13:18:21
6      Q.  I'm going to turn back for one moment to the  13:18:21
7  smaller document with tabs that we marked, which I  13:18:23
8  believe was Exhibit No. 988. If you turn for a second  13:18:26
9  to Tab 7, which precedes the document with Bates  13:18:38
10  number PH7402 through 7403.  13:18:43
11      A.  Yes.  13:18:49
12      Q.  Do you recognize this document? It says  13:18:51
13  Certificate at the top.  13:18:53
14      A.  Yes.  13:18:57
15      Q.  Do you see on the second page the first  13:19:00
16  paragraph says, "Further resolved that the annual  13:19:02
17  extension of the" meeting agreement -- I'm sorry;  13:19:05
18  "management agreement between SDN, Inc. and AHERF  13:19:08
19  dated July 1, 1992 (the management agreement) is  13:19:11
20  hereby approved"?  13:19:14
21      A.  Mm-hmm.  13:19:16
22      Q.  Do you know what that refers to?  13:19:17
23      A.  Yeah. I believe when SDN -- when the United  13:19:20
24  deal happened, my recollection is that there was  13:19:25
25  created a management agreement under which AHERF was  13:19:28

Page 155

1  actually rendering services to SDN, because SDN, for a  13:19:32
2  period of time after the United deal, actually had a  13:19:37
3  couple of subsidiaries which were in, what I'll call,  13:19:40
4  runoff, and a couple -- one was sold, as I recall. A  13:19:43
5  couple were kind of wound down and so forth. So they  13:19:46
6  actually had a need of services. I mean, they were  13:19:49
7  actually doing some functioning things, or their  13:19:53
8  subsidiaries were.  13:19:55
9      And that's the document that's -- I think  13:19:56
10  it was a simple form agreement. I mean, it just said  13:20:00
11  basically that they'd rendered the services and SDN  13:20:02
12  would reimburse them the cost. I don't know whether  13:20:05
13  there was actually any reimbursement ever paid.  13:20:08
14      And so what it was designed to do was to  13:20:11
15  ratify and approve that document and then allow SDN to  13:20:14
16  use those services for the benefit of the GHS  13:20:21
17  enterprise. So, yes.  13:20:26
18      Q.  So certain key members under this contract of  13:20:27
19  AHERF's management would provide management services  13:20:29
20  to SDN?  13:20:32
21      A.  Maybe not even key people. It might be  13:20:33
22  people in accounting. It might be people in finance  13:20:35
23  or legal, or whatever it might be. The notion was  13:20:37
24  that they would do whatever is needed to kind of  13:20:40
25  operate this enterprise.  13:20:42

Page 156

1      And, of course, for the period of whatever  13:20:43
2  it ended up being, eight months, between the beginning  13:20:48
3  of August and the end of May, you really needed a  13:20:52
4  mechanism like this, because SDN was kind of sitting  13:20:54
5  on its own outside the system.  13:20:57
6      Q.  And do you recall when -- I mean, is this  13:20:58
7  July 1, 1992 date the execution date for the  13:21:02
8  management agreement?  13:21:05
9      A.  That's my best recollection. It may have  13:21:05
10  been executed -- it may have been signed subsequently,  13:21:07
11  effective as -- with a pre-dated effective date. I  13:21:11
12  just don't remember.  13:21:14
13      Q.  And it seems from this paragraph that the  13:21:15
14  agreement is extended every year, basically ratified  13:21:18
15  or reapproved every year?  13:21:21
16      A.  Yeah. I think, as I recall, it had either a  13:21:23
17  one-year or multi-year term, with automatic renewals,  13:21:27
18  unless either party terminated, and no one had ever  13:21:30
19  terminated it. It had been in effect for, what, four  13:21:34
20  years at this point.  13:21:37
21      Q.  Are you aware of whether at any point the  13:21:38
22  agreement was terminated?  13:21:39
23      A.  I don't know. I mean, I would -- I would --  13:21:41
24  well, that's an interesting question. I mean, it  13:21:44
25  certainly wouldn't have been necessary to have it in  13:21:46

Page 157

1  effect once SDN came into the system, but nobody may  13:21:49
2  have bothered to terminate it. I mean, it may just  13:21:53
3  have been an oversight.  13:21:55
4      Q.  So at least as of the date of this document,  13:21:56
5  is it consistent with your recollection that the  13:21:57
6  agreement still existed? And the date of this  13:22:00
7  document being August 5, 1996.  13:22:03
8      A.  Yes. Yes.  13:22:05
9      Q.  Do you recall why the decision was made to  13:22:10
10  use SDN in the acquisition of the former GHS entities?  13:22:14
11      A.  Sure. Because it had a tax exemption and it  13:22:20
12  was not within the Allegheny system. And because of  13:22:22
13  his timing considerations, Mr. Abdelhak did not want  13:22:26
14  the Graduate transaction to occur through an entity  13:22:31
15  that was within the AHERF system, because he would  13:22:33
16  have had to go through a Hart-Scott-Rodino review  13:22:35
17  process, which would have taken two, three, four  13:22:38
18  months, whatever it would have taken.  13:22:40
19      So I seem to recall that there was a  13:22:42
20  conversation between several of us, including  13:22:45
21  McConnell, and somebody made the suggestion, and I do  13:22:48
22  not remember who that was, they said, Well, you know,  13:22:54
23  SDN is still around, we basically got control of that  13:22:55
24  entity, I mean, let's use that. It's tax exempt, it  13:22:58
25  won't cause any problems with the bonds, et cetera, et  13:23:00

40 (Pages 154 to 157)

ROBERT M. MCNAIR, JR.

Page 154

1  permit you to do things like conference telephone and  13:18:04
2  all the rest of it, but for all intents and purposes,  13:18:07
3  you've got to get the same amount of participation  13:18:09
4  you'd have in person. So that's not necessarily an  13:18:12
5  answer.  13:18:21
6     Q.  I'm going to turn back for one moment to the  13:18:21
7  smaller document with tabs that we marked, which I  13:18:23
8  believe was Exhibit No. 988. If you turn for a second  13:18:26
9  to Tab 7, which precedes the document with Bates  13:18:43
10 number PH7402 through 7403.  13:18:43
11    A.  Yes.  13:18:49
12    Q.  Do you recognize this document? It says  13:18:51
13 Certificate at the top.  13:18:53
14    A.  Yes.  13:18:57
15    Q.  Do you see on the second page the first  13:19:00
16 paragraph says, "Further resolved that the annual  13:19:02
17 extension of the" meeting agreement -- I'm sorry;  13:19:05
18 "management agreement between SDN, Inc. and AHERF  13:19:08
19 dated July 1, 1992 (the management agreement) is  13:19:11
20 hereby approved"?  13:19:14
21    A.  Mm-hmm.  13:19:16
22    Q.  Do you know what that refers to?  13:19:17
23    A.  Yeah. I believe when SDN -- when the United  13:19:20
24 deal happened, my recollection is that there was  13:19:25
25 created a management agreement under which AHERF was  13:19:28

Page 155

1  actually rendering services to SDN, because SDN, for a  13:19:32
2  period of time after the United deal, actually had a  13:19:37
3  couple of subsidiaries which were in, what I'll call,  13:19:40
4  runoff, and a couple -- one was sold, as I recall. A  13:19:43
5  couple were kind of wound down and so forth. So they  13:19:46
6  actually had a need of services. I mean, they were  13:19:49
7  actually doing some functioning things, or their  13:19:53
8  subsidiaries were.  13:19:55
9        And that's the document that's -- I think  13:19:56
10 it was a simple form agreement. I mean, it just said  13:20:00
11 basically that they'd rendered the services and SDN  13:20:02
12 would reimburse them the cost. I don't know whether  13:20:05
13 there was actually any reimbursement ever paid.  13:20:08
14        And so what it was designed to do was to  13:20:09
15 ratify and approve that document and then allow SDN to  13:20:14
16 use those services for the benefit of the GHS  13:20:21
17 enterprise. So, yes.  13:20:26
18    Q.  So certain key members under this contract of  13:20:27
19 AHERF's management would provide management services  13:20:29
20 to SDN?  13:20:32
21    A.  Maybe not even key people. It might be  13:20:33
22 people in accounting. It might be people in finance  13:20:35
23 or legal, or whatever it might be. The notion was  13:20:37
24 that they would do whatever is needed to kind of  13:20:40
25 operate this enterprise.  13:20:42

Page 156

1        And, of course, for the period of whatever  13:20:43
2  it ended up being, eight months, between the beginning  13:20:48
3  of August and the end of May, you really needed a  13:20:52
4  mechanism like this, because SDN was kind of sitting  13:20:54
5  on its own outside the system.  13:20:57
6     Q.  And do you recall when -- I mean, is this  13:20:58
7  July 1, 1992 date the execution date for the  13:21:02
8  management agreement?  13:21:05
9     A.  That's my best recollection. It may have  13:21:05
10 been executed -- it may have been signed subsequently,  13:21:07
11 effective as -- with a pre-dated effective date. I  13:21:11
12 just don't remember.  13:21:14
13    Q.  And it seems from this paragraph that the  13:21:15
14 agreement is extended every year, basically ratified  13:21:18
15 or reapproved every year?  13:21:21
16    A.  Yeah. I think, as I recall, it had either a  13:21:23
17 one-year or multi-year term, with automatic renewals,  13:21:27
18 unless either party terminated, and no one had ever  13:21:30
19 terminated it. It had been in effect for, what, four  13:21:34
20 years at this point.  13:21:37
21    Q.  Are you aware of whether at any point the  13:21:38
22 agreement was terminated?  13:21:39
23    A.  I don't know. I mean, I would -- I would --  13:21:41
24 well, that's an interesting question. I mean, it  13:21:44
25 certainly wouldn't have been necessary to have it in  13:21:46

Page 157

1  effect once SDN came into the system, but nobody may  13:21:49
2  have bothered to terminate it. I mean, it may just  13:21:53
3  have been an oversight.  13:21:55
4     Q.  But at least as of the date of this document,  13:21:56
5  is it consistent with your recollection that the  13:21:57
6  agreement still existed? And the date of this  13:22:00
7  document being August 5, 1996.  13:22:03
8     A.  Yes. Yes.  13:22:05
9     Q.  Do you recall why the decision was made to  13:22:10
10 use SDN in the acquisition of the former GHS entities?  13:22:14
11    A.  Sure. Because it had a tax exemption and it  13:22:20
12 was not within the Allegheny system. And because of  13:22:22
13 his timing considerations, Mr. Abdelhak did not want  13:22:26
14 the Graduate transaction to occur through an entity  13:22:31
15 that was within the AHERF system, because he would  13:22:33
16 have had to go through a Hart-Scott-Rodino review  13:22:35
17 process, which would have taken two, three, four  13:22:38
18 months, whatever it would have taken.  13:22:40
19        So I seem to recall that there was a  13:22:42
20 conversation between several of us, including  13:22:45
21 McConnell, and somebody made the suggestion, and I do  13:22:48
22 not remember who that was, they said, Well, you know,  13:22:54
23 SDN is still around, we basically got control of that  13:22:55
24 entity, I mean, let's use that. It's tax exempt, it  13:22:58
25 won't cause any problems with the bonds, et cetera, et  13:23:00

40 (Pages 154 to 157)

ROBERT M. MCNAIR, JR.

Page 298

1　rules for university physicians. Don't be ridiculous. 16:07:48
2　　I mean, he just persuaded that this thing 16:07:51
3　was there. So... 16:08:00
4　　Q. Do you know what the final resolution was 16:08:03
5　with respect to the incentive program you're talking 16:08:03
6　about? 16:08:03
7　　A. He didn't do it. I mean, this was weeks 16:08:03
8　before he left. 16:08:03
9　　Q. And you're talking about a program where 16:08:06
10　physicians would be paid to refer patients? 16:08:06
11　　A. Well, it wasn't really paid -- it was much 16:08:08
12　more subtle than that. It was an incentive program 16:08:11
13　based on profitability of their practice, which 16:08:14
14　combines both revenue and expense control and so forth 16:08:19
15　and so on. I mean, it was not an uncreative idea. 16:08:22
16　It's just the rules don't work -- 16:08:25
17　　Q. Some kind of profit-sharing arrangement? 16:08:25
18　　A. Sort of, yeah. Incremental profitability 16:08:27
19　arrangement, yeah. Loss reduction, whatever you want 16:08:30
20　to call it. I mean, you can call it a variety of 16:08:32
21　names, but it was not -- but it just wasn't doable. I 16:08:36
22　mean, it was not -- but I cite it not for the 16:08:38
23　particular thing, but for the fact that he just 16:08:40
24　persuaded himself there was this thing in the law that 16:08:42
25　wasn't there. And I knew it wasn't there and 16:08:45

Page 299

1　everybody else he talked to knew it wasn't there, but 16:08:47
2　he didn't want to hear it, wouldn't have it. 16:08:49
3　　Q. Do you know if the hubris that you're 16:08:51
4　mentioning was also shared by any of the Board members 16:08:52
5　in Pittsburgh? 16:08:52
6　　A. I do not know.
7　　　MR. COGAN: Objection. 16:08:56
8　　　THE WITNESS: I don't know. 16:08:57
9　BY MR. TERUYA:
10　　Q. Did you ever get the sense that the Board was 16:08:59
11　doing things that, in your mind, reflected hubris on 16:09:02
12　their part? 16:09:04
13　　A. I knew so little about what the Board was 16:09:05
14　doing, that -- I was so far removed from the Board and 16:09:07
15　I saw so little of their activities and what they were 16:09:09
16　doing, that I wouldn't even begin to know how to 16:09:14
17　answer that. 16:09:16
18　　Q. Do you know who Mr. Abdelhak's top advisors 16:09:21
19　were for business planning and strategy matters? 16:09:24
20　　A. Well, I mean, the people he kept around were 16:09:29
21　Wynstra and McConnell and Kasberbauer. I mean, those 16:09:31
22　were the three people who were there, period, as far 16:09:34
23　as I know. 16:09:36
24　　Q. That's Dwight Kasperbauer?
25　　A. Yeah. Well, he was the HR guy. I mean, 16:09:39

Page 300

1　McConnell and Wynstra were really the two he kind of 16:09:42
2　kept close, who despised each other. And I'm 16:09:44
3　convinced he purposely kept two people who despised 16:09:47
4　each other. 16:09:49
5　　Q. You said Wynstra and McConnell despised each 16:09:49
6　other? 16:09:51
7　　A. Oh, they couldn't stand the sight of each 16:09:52
8　other. And I think that was intentional on his part. 16:09:53
9　He kind of kept them on their toes by having them 16:09:57
10　fighting with each other instead of fighting with him. 16:10:00
11　　But those, as far as I know, were the only 16:10:03
12　people he was listening to. I don't know whether he 16:10:05
13　talked to Board members or not. I never saw any 16:10:08
14　evidence of it. 16:10:10
15　　Q. Did you have any opinion of David McConnell? 16:10:11
16　　A. Yeah. Smart, dishonest. Smart and 16:10:14
17　dishonest. I mean, he's a smart guy, but I wouldn't 16:10:22
18　trust him as far as I could throw him up a flight of 16:10:26
19　stairs. 16:10:27
20　　Q. Why did you think he was dishonest? 16:10:27
21　　A. Because I just thought he was. I don't think 16:10:28
22　he was trustworthy. I mean, just based on his general 16:10:30
23　demeanor. He also was mean. I mean, he was a guy who 16:10:33
24　would take a lot of pleasure in sort of doing things 16:10:37
25　to people. 16:10:39

Page 301

1　　You know, just a personal impression. I 16:10:42
2　mean, there's nothing specific I can point to. He's 16:10:44
3　the kind of guy you use the Wild Bill Hickock rule 16:10:48
4　with. Don't play cards unless your back is to the 16:10:51
5　corner or you got a mirror in front of you. 16:10:54
6　　Q. How about Nancy Wynstra; did you have any 16:10:57
7　opinion of her? 16:10:59
8　　A. Nancy was, in many ways, a very pleasant 16:11:00
9　person. I think she was hopelessly in over her head 16:11:02
10　as general counsel in an organization. I don't think 16:11:05
11　she had the legal qualifications to do it. And her 16:11:08
12　lack of legal qualifications was compounded by the 16:11:10
13　fact that she spent most of her time traveling at the 16:11:13
14　company's expense. She was rarely around. 16:11:15
15　　She refused to delegate decision-making 16:11:19
16　authority. I mean, she was a control freak of the 16:11:22
17　worst kind, but -- on the one hand, she refused to 16:11:26
18　delegate the decision-making authority, but on the 16:11:28
19　other hand, she either wasn't there to make decisions 16:11:30
20　or when she was there, wouldn't make them. 16:11:32
21　　So, I mean, the only good thing was that 16:11:35
22　she was pretty laissez faire about our work. She 16:11:40
23　didn't interfere too much with the work. And that 16:11:44
24　was, I think, the only reason a lot of the legal work 16:11:47
25　got done, was we just went about doing our jobs. 16:11:49

MANHATTAN REPORTING CORP., A LegaLink Company

ROBERT M. MCNAIR, JR.

Page 302

1    Q.  So you could still get things done because of  16:11:53
2    her hands-off policy?                              16:11:56
3    A.  Yeah.  Right.  I mean, she -- there were       16:11:57
4    times when you couldn't.  I mean, it really depended  16:11:58
5    on the nature of the matter, but sometimes you'd just  16:12:00
6    take things into your own hands and just go ahead and  16:12:03
7    do them, because you had to.  I mean, they would go on  16:12:05
8    for weeks and months and so forth.  And, I mean, she  16:12:08
9    was traveling all the time.                        16:12:10
10    Q.  Did you raise any concerns about her travel  16:12:11
11    and failure to make certain decisions with anyone?  16:12:14
12    A.  That's an interesting story.  I was told, by  16:12:20
13    the way, that McConnell at one point performed an  16:12:22
14    audit of her traveling and found out how many days she  16:12:24
15    was out of the office.  And I never saw it.        16:12:26
16        Abdelhak was very precise about the fact    16:12:29
17    he didn't want people circumventing the command    16:12:31
18    structure.  In other words, if I had a problem, I had  16:12:45
19    to go to her.                                      16:12:45
20        The guy who had been the Hahnemann           16:12:45
21    counsel, Bill Kennedy, egged on by Dave McConnell and  16:12:45
22    by Tony Sanzo, at the time was the CEO of Allegheny  16:12:48
23    General Hospital, actually at one point in the summer  16:12:52
24    of '97 -- summer of '97 I'm pretty sure, maybe it was  16:12:55
25    early in '97 -- actually confronted Abdelhak and said,  16:13:02

Page 303

1    Wynstra is not doing her job.  She's not paying    16:13:07
2    attention.  She's never here, da-da, da-da, da-da,  16:13:10
3    da-da, da-da.  And Abdelhak just tore him apart and  16:13:14
4    said, How dare you come in here and do this and so  16:13:18
5    forth and so on.  And of course, the end result was,  16:13:20
6    the guy left.  But he left with a termination payment  16:13:23
7    before the preference period, so there's something to  16:13:26
8    be said for it.  Anyway...                          16:13:29
9        No.  So, I mean, I think he was conscious    16:13:31
10    of her deficiencies.  I think he probably kept her in  16:13:34
11    the job because of her deficiencies.  You know,    16:13:36
12    looking back, I don't think he wanted anybody who was  16:13:38
13    paying a lot of attention to what was going on.    16:13:41
14    Q.  Did you ever think to raise any concerns with  16:13:43
15    anyone outside of the chain of command?            16:13:46
16    A.  Who was I supposed to do it with?              16:13:49
17    Q.  Write a letter to a Board member or anything  16:13:51
18    like that?                                          16:13:53
19    A.  That would have been fruitless.  I mean, you  16:13:54
20    have to understand the way the organization worked.  I  16:13:57
21    mean, they reposed complete confidence in Sherif    16:14:00
22    Abdelhak.  And if you had done that, not only would it  16:14:04
23    have resulted in my instant dismissal, which would  16:14:06
24    have been what it was -- and, I mean, there were times  16:14:11
25    when I did things that I thought might get me fired,  16:14:13

Page 304

1    like with this business with Chuck Morrison and the  16:14:15
2    restricted funds and drafting this resolution.  But it  16:14:17
3    would have gone ignored, and who knows, they might  16:14:21
4    have sued me for slander, for all I know.  I mean,  16:14:24
5    they just were not having any of it.               16:14:26
6        It was a single-person-controlled            16:14:29
7    organization, and that extended to the Board as well  16:14:35
8    as to the staff.  I mean, it may sound cowardly to say  16:14:37
9    it, but that's just the reality of what it was.    16:14:44
10        In a situation like that, you say to         16:14:47
11    yourself, Well, do I want to do what Kennedy did and  16:14:49
12    get tossed out of here, or do I want to keep trying to  16:14:53
13    do the job here, keep things on track, try and make  16:14:57
14    sure that things are done properly?  Because I knew if  16:15:01
15    Nancy was in charge other than day to day, there      16:15:05
16    wouldn't be, and so forth.                          16:15:07
17        I mean, you have conversations with          16:15:07
18    yourself about things like that a lot.  It's not the  16:15:09
19    easiest thing in the world.                        16:15:11
20    Q.  Do you know if anyone ever tried to write a  16:15:14
21    letter to the Board or have you ever heard that anyone  16:15:15
22    did?                                                16:15:19
23    A.  No.  I'm not aware of it.  I'm not aware of  16:15:19
24    it.  And I'm sure everybody else's perception was the  16:15:22
25    same as mine.                                      16:15:25

Page 305

1        I mean, the simple reality of the matter    16:15:26
2    was that the chairman of the Board had, up until he  16:15:28
3    fired him, he had the complete unequivocal,        16:15:31
4    unconditional support of the chairman of the Board and  16:15:35
5    of that cluster of people in that senior group, that  16:15:39
6    executive committee group.  And I think he devoted a  16:15:42
7    lot of time to making sure that that was the case.  16:15:45
8    Q.  How about any of the Board members outside of  16:15:49
9    that cluster?                                      16:15:52
10    A.  What's that?                                   16:15:53
11    Q.  In other words, any of the other AHERF parent  16:15:54
12    Board members.  Did anyone --                      16:15:56
13    A.  I have no idea.                                16:15:59
14    Q.  Did you ever think --                          16:16:00
15    A.  I mean, I -- no.  Nobody -- you just have to    16:16:01
16    understand, I mean, nothing was going to happen.  They  16:16:05
17    had plenty of opportunity to raise issues.  By the  16:16:12
18    middle of -- early to middle of '98, there were plenty  16:16:16
19    of warning signs out there that things were not going  16:16:19
20    well.  And my personal view is that they just said,  16:16:21
21    We're not going to do anything here, because if we do  16:16:27
22    anything, it will show that we knew what was going on,  16:16:29
23    and we could blame the auditors, just between you and  16:16:31
24    me.  Now, I realize that's your client, but I'm      16:16:35
25    telling you what my view is.  We'll hide behind the  16:16:38

77 (Pages 302 to 305)

ROBERT M. MCNAIR, JR.

Page 306

1  financials and say everything was fine and so forth.  16:16:40
2      Q.  So in your view, the Board basically wanted  16:16:43
3  to make like an ostrich and just stick their head in  16:16:45
4  the sand?  16:16:48
5      A.  That seems to me like what they were doing.  16:16:48
6      MR. COGAN:  Objection.  16:16:50
7      THE WITNESS:  Never mind.  Sorry.  16:16:51
8  BY MR. TERUYA:
9      Q.  I just got a few wrap-up questions.  16:16:56
10     A.  I mean, I don't know that to a moral  16:16:59
11 certainty.  I'm just saying that it seems to me that  16:17:00
12 there were sufficient storm flags out there.  And I  16:17:02
13 don't know what conversations were going on, because I  16:17:06
14 wasn't in meetings for a year or more before the final  16:17:08
15 thing.  16:17:12
16     I'm not sure I saw a Board member in  16:17:13
17 that -- actually, I did.  I went to a meeting in the  16:17:15
18 summer of '98 because Wynstra was in San Diego.  They  16:17:17
19 related to what they were going to do about the  16:17:22
20 faculty and how they were going to cut back on  16:17:25
21 faculty, and there were some complicated issues there  16:17:28
22 about the American Association of University  16:17:41
23 Professors and tenure rules and so forth and so on.  16:17:41
24 That was a mechanical meeting more or less.  And these  16:17:41
25 people were attempting to deal in good faith with what  16:17:41

Page 307

1  was going on there.  16:17:41
2      So there may have been efforts going on,  16:17:41
3  but you certainly didn't see it reflected in the  16:17:44
4  broader world.  And it took them a long time to file,  16:17:48
5  which kind of surprised me.  I mean, I wasn't entirely  16:17:52
6  sure why that happened, but...  16:17:55
7      Q.  During your time at AHERF, do you personally  16:17:58
8  know of any AHERF employees who embezzled funds from  16:18:00
9  AHERF?  16:18:05
10     A.  Oh, I remember we had a -- you mean AHERF  16:18:07
11 literally or any of the entities?  16:18:10
12     Q.  Any of the AHERF entities.  16:18:11
13     A.  We had an embezzlement case at St.  16:18:13
14 Christopher's back in the early '90s, as I recall,
15 right about the time I got there, somebody in the  16:18:17
16 payroll or accounting department or something.  And  16:18:19
17 that got taken care of and the -- I've forgotten --  16:18:24
18 DNO policy or something paid off on it.  I mean, it  16:18:29
19 was an isolated event.  16:18:31
20     Q.  Other than that?  16:18:32
21     A.  I'm not aware of it.  16:18:33
22     Q.  Do you personally know of any AHERF employee  16:18:35
23 who ever acted solely in his or her own personal  16:18:38
24 interest while acting in his capacity as an AHERF  16:18:41
25 employee?  16:18:45

Page 308

1      MR. COGAN:  Objection.  16:18:46
2      THE WITNESS:  I'm not sure I'm qualified  16:18:48
3  to saying that.  People's motivations are pretty hard  16:18:49
4  to ferret out sometimes.  I mean, you know, I've seen  16:18:52
5  people do a lot of selfish things in their life.  I  16:18:55
6  don't know anybody who acted out -- who did that, but  16:18:57
7  I can't say for sure that there wasn't somebody.  16:18:59
8  BY MR. TERUYA:  16:19:06
9      Q.  Okay.
10     A.  I can say I didn't.
11     Q.  Did you have any substantive discussions with  16:19:07
12 C&L employees, Coopers & Lybrand employees, during  16:19:12
13 your time at AHERF?  16:19:14
14     A.  On a couple of occasions, relatively rare  16:19:16
15 occasions.  I remember we had a discussion back in the  16:19:19
16 fall of '92 or sometime in '93 about a 337-B problem,  16:19:23
17 which was that McConnell wanted to do away with the  16:19:33
18 DHG, which owned the airplane, which had been  16:19:37
19 depreciated, and if he had done away with DHG, 337-B  16:19:41
20 would have required that Allegheny recognize a large  16:19:45
21 gain on disposition, because they would have had an  16:19:48
22 imputed fair market value relative to the depreciated  16:19:51
23 value.  16:19:54
24     We had run across this issue when I was at  16:19:56
25 Drinker before I came in there.  It came up and  16:19:58

Page 309

1  surfaced again.  16:20:01
2      The Coopers people didn't seem to know too  16:20:06
3  much about it.  I remember having a discussion with  16:20:07
4  somebody by telephone.  I undoubtedly had some others.  16:20:11
5  I'm trying to think of one other I had.  16:20:15
6      Very rarely.  I mean, you know, yeah,  16:20:21
7  occasionally I had had -- actually, it's interesting,  16:20:24
8  I had more interaction with the Coopers people back in  16:20:27
9  the '91, '92 time period when we were doing the United  16:20:30
10 transaction and so forth, and I was involved in a  16:20:35
11 number of discussions at that point with Bill Buettner  16:20:37
12 and various other people.  We'd have some interaction  16:20:41
13 with them when they did the Levy practice  16:20:43
14 acquisitions, because Coopers had done the feasibility  16:20:45
15 on that.  16:20:47
16     There were Coopers people, Buettner was  16:20:48
17 one of them, at the due diligence meetings in the '96  16:20:51
18 transaction.  I don't remember having any particular  16:20:54
19 substantive discussions with them as opposed to just  16:20:58
20 the rest of the group.  16:21:00
21     No.  You know, I anticipated you were  16:21:01
22 going to ask me this.  And I had very little  16:21:04
23 interaction with Coopers.  I mean, that was -- it was  16:21:06
24 my impression that relationship was pretty much  16:21:09
25 controlled by McConnell.  He did all the talking, and  16:21:11

78 (Pages 306 to 309)

ROBERT M. MCNAIR, JR.

Page 310

1  all of the communications to and from Coopers pretty    16:21:14
2  much came through his office.              16:21:17
3      Q.  When you mentioned 337-B, that's a corporate    16:21:19
4  tax code?                    16:21:22
5      A.  Yes.  That's the Internal Revenue code.  It's  16:21:23
6  a provision that --              16:21:25
7      Q.  Of basis?                16:21:26
8      A.  -- mandates recognition of distributions for  16:21:26
9  non-profits or to non-profits if taxables are wound up  16:21:29
10 or merged or whatever.  It's to prevent non-profits    16:21:36
11 from setting up taxable subsidiaries, running taxable    16:21:38
12 businesses, depreciating assets.  Then when they're    16:21:42
13 done with the business, giving the assets to the    16:21:46
14 non-profit and not having to recognize any gain,    16:21:48
15 because they've taken advantage of the loss on the    16:21:50
16 depreciation.  That's the purpose of that provision.    16:21:54
17     Q.  Do you recall any of the substance of your    16:21:56
18 discussions with Coopers & Lybrand about any of the    16:21:58
19 points you've mentioned?            16:22:01
20     A.  No.  I mean, there were -- there just weren't  16:22:02
21 that many.  I mean, I'm sort of scouring my memory    16:22:06
22 banks.                    16:22:10
23         No.  I mean, I don't think I talked to    16:22:14
24 Bill for the last couple of years I was there.  If I  16:22:16
25 did, he may have been on a conference call where there  16:22:21

Page 311

1  were multiple parties on it.  It would not have been a  16:22:23
2  one-on-one conversation.            16:22:24
3         I would not have been -- I mean, I don't    16:22:28
4  think I ever talked to their auditors in the context    16:22:30
5  of an audit.  I don't remember having -- I mean,    16:22:33
6  occasionally -- the one thing I remember looking at    16:22:49
7  their work product for was that every year, we would    16:22:49
8  do bond disclosure stuff, which included their    16:22:49
9  financials.  I mean, we would get to see those kind of  16:22:49
10 before they were kind of put out to the general    16:22:52
11 public, and we would look at the disclosure and just    16:22:54
12 say whether we thought it was adequate or not.    16:22:55
13         And so -- but, no.  I didn't see a lot    16:22:57
14 of -- five minutes -- I didn't see a lot of them, and  16:23:01
15 I don't recall having had a lot of discussions with    16:23:06
16 them.  If somebody recalls having had a discussion    16:23:08
17 with me and can recite it, I'd be happy to recall it,  16:23:10
18 but I don't remember.            16:23:13
19     Q.  Did you recall -- I mean, you said the    16:23:14
20 financial statements, the audited financial    16:23:16
21 statements, of Coopers & Lybrand were -- or of AHERF    16:23:17
22 that Coopers had audited were put into the bond    16:23:21
23 disclosures; is that right?            16:23:23
24     A.  That's my recollection, yeah.  I think that's  16:23:24
25 correct.                    16:23:28

Page 312

1      Q.  Were you in charge of reviewing those    16:23:28
2  statements?                16:23:30
3      A.  No, I was not in charge.  They distributed    16:23:31
4  them to a large number of people.  I just happened to  16:23:33
5  be one of the people who got it.            16:23:35
6      Q.  Did you ever see anything that you thought    16:23:36
7  was inappropriate or misstated?            16:23:37
8      A.  No.  I might have made minor amendments to    16:23:40
9  them, but there was nothing materially wrong with    16:23:44
10 them.  I mean, by and large, it revolved around the    16:23:46
11 financials.  I mean, the financials said what the    16:23:47
12 financials said.  I mean, I didn't consider myself    16:23:50
13 competent to flyspeck the financials.        16:23:52
14     Q.  Are you a creditor of AHERF?            16:23:56
15     A.  Yes.                16:23:57
16     Q.  Could you explain the nature of your credit    16:23:58
17 claim?                    16:24:01
18     A.  I think I know what the nature of it is.    16:24:02
19 They really didn't tell me.            16:24:04
20         I was a participant in the so-called    16:24:06
21 Execuflex Plan, which was a flexible benefits plan,    16:24:13
22 non-qualified, for senior executives.  And what they    16:24:14
23 would do is, they would give you a specified sum of    16:24:16
24 money, which was a percentage of your salary or your    16:24:21
25 comp, and that would be used to pay your Social    16:24:25

Page 313

1  Security taxes and your FICA and a bunch of other    16:24:24
2  things.  And then you would have optional things you    16:24:30
3  could buy, like insurance, extra vacation, expanded    16:24:33
4  disability coverage and some other things.        16:24:35
5         And any amounts that weren't funded in    16:24:37
6  that plan were supposed to be put aside into basically  16:24:41
7  a pour-over account, which you could get within two    16:24:48
8  years after it was put in there, provided you were    16:24:51
9  still working there and so forth and so on.        16:24:53
10         My impression is -- and I don't know this  16:24:56
11 to a certainty -- my impression is that portions of    16:24:59
12 those amounts were not funded and that portions of    16:25:00
13 certain other benefits may not have been funded.    16:25:03
14         All I know is that I had a claim, but I    16:25:06
15 had no idea how much it was, because I didn't know    16:25:10
16 what they'd funded and what they hadn't, in the amount  16:25:13
17 of about $105,000.  And I have to date collected    16:25:14
18 17,000 maybe, give or take.            16:25:19
19     Q.  Is Drinker Biddle & Reath a creditor of    16:25:22
20 AHERF?                    16:25:24
21     A.  Yes, they are.            16:25:25
22     Q.  Is their credit claim just based on legal    16:25:27
23 services that were rendered?            16:25:30
24     A.  Yes.  And they've received some    16:25:32
25 distributions, just as I have.  I think the total    16:25:33

MANHATTAN REPORTING CORP., A LegaLink Company

ROBERT M. MCNAIR, JR.

Page 318

```
1              CERTIFICATE
2        I HEREBY CERTIFY that the proceedings,
3   evidence and objections are contained fully and
4   accurately in the stenographic notes taken by me upon
5   the foregoing matter on January 17, 2003, and that
6   this is a true and correct transcript of same.
7
8
9
10
11        _____
12        MICHELE L. MURPHY
13        RPR-Notary Public
14
15
16        (The foregoing certification of this
17   transcript does not apply to any reproduction of the
18   same by any means, unless under the direct
19   control and/or supervision of the certifying
20   reporter.)
21
22
23
24
25
```

MANHATTAN REPORTING CORP., A LegaLink Company

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## ROBERT McNAIR
*January 30, 2003*

---

## MANHATTAN REPORTING CORP.
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

McNAIR, ROBERT (1/30/2003)

**Word Index included with this condensed transcript**

ROBERT McNAIR

Page 344

1  third-party payers were really sort of trimming    09:32:37
2  payment rates, which was -- or holding the line on    09:32:41
3  payments rates at the very least.    09:32:43
4      So I think on the revenue side, the    09:32:46
5  payment rates coming in from outside were not as high.    09:32:49
6  I suspect, and I heard kind of as a general matter,    09:32:53
7  that some of the physicians weren't as productive as    09:32:58
8  they had been when they were in private practice. Eat    09:33:00
9  what you kill is a great motivator.    09:33:02
10     And I think in many cases their expenses    09:33:04
11 went up, because I think they were -- they now were    09:33:07
12 Allegheny employees, which meant under the ERISA rules    09:33:12
13 they had to have a full-blown benefits structure and    09:33:16
14 they had to have a lot of other things, and there were    09:33:18
15 various sort of electronic media requirements that    09:33:21
16 were imposed on them. In some cases they had to come    09:33:23
17 into compliance with the Rehabilitation Act because    09:33:26
18 their offices weren't wheelchair accessible or    09:33:29
19 whatever it may be.    09:33:32
20     So, I mean, there were a variety of    09:33:32
21 different reasons, some of which were in AHERF's    09:33:36
22 control and some of which weren't.    09:33:37
23     Q.  During this time period of '94, say, up until    09:33:38
24 1997, was there an effort on the part of AHERF to try    09:33:41
25 to achieve some economies of scales with respect to    09:33:45

Page 345

1  AIHG? As for example, centralized billing,    09:33:49
2  centralized purchasing.    09:33:55
3      A.  You know, I wasn't aware of it, to be    09:33:57
4  perfectly honest with you. Now, that was on the    09:34:00
5  operations side of the business. And, again, the    09:34:00
6  lawyers were sort of not in that silo, for want of a    09:34:02
7  better term.    09:34:06
8      I know that one of the common complaints    09:34:08
9  we had, not only with AIHG but with acquisition of    09:34:09
10 other enterprises, was that there seemed to be very    09:34:14
11 little sort of economizing as a result of the size of    09:34:16
12 the enterprise.    09:34:22
13     Our IS department, for example, was kind    09:34:24
14 of a continuing joke, which is one of the areas where    09:34:27
15 you would expect things to happen.    09:34:30
16     I was not aware that there was a central    09:34:32
17 billing operation, by way of example, for AIHG. I    09:34:34
18 think it was primarily being done through the    09:34:37
19 physicians' offices. Now, all those bills may have    09:34:40
20 been accumulated in one place for submission, but I    09:34:42
21 doubt it.    09:34:47
22     Q.  As I understand it -- is it Dr. Levy or    09:34:52
23 just --    09:34:58
24     A.  No; Mr. Levy.    09:34:58
25     Q.  Okay. -- (continued) Mr. Levy was    09:35:00

Page 346

1  responsible for managing AIHG?    09:35:01
2      A.  Yeah.  He along with whoever the physician    09:35:04
3  who was assigned to sort of oversee the physician    09:35:06
4  activities -- and the identity of that person changed    09:35:10
5  several times -- was responsible for sort of    09:35:13
6  day-to-day operations and management.    09:35:17
7      I think Ms. Calvert had technically been    09:35:20
8  the CEO at one point. Dr. Kaye, I think, became the    09:35:22
9  technical CEO in February of '96. I may be wrong on    09:35:25
10 that date, but it was approximately that. But Harvey    09:35:29
11 was the one who was kind of overseeing the day-to-day    09:35:33
12 operations. And he knew something about operating    09:35:35
13 physician practices. He made a substantial amount of    09:35:37
14 money back in the '80s and the early '90s doing    09:35:40
15 precisely that.    09:35:43
16     Q.  Harvey Levy then would have reported to Carol    09:35:45
17 Calvert, and then when she left, he reported to    09:35:47
18 Dr. Kaye?    09:35:49
19     A.  Yes, in theory, although he really reported    09:35:51
20 directly to Mr. Abdelhak. They had a very close    09:35:54
21 personal relationship. They owned race horses    09:35:57
22 together. There was something going on there that    09:35:59
23 wasn't entirely clear to all of us. So he could    09:36:01
24 pretty much do what he wanted to in terms of talking    09:36:05
25 to Sherif and getting what he wanted out of Sherif.    09:36:06

Page 347

1      So, I mean, it was -- while his formal    09:36:08
2  relationship may have been with Ms. Calvert, Dr. Kaye,    09:36:20
3  any time he wanted to, he would just go around them.    09:36:20
4      This was a source of great frustration to    09:36:20
5  both of them, I think, over time, but it was what it    09:36:23
6  was.    09:36:23
7      Q.  How involved, from your perspective, did    09:36:24
8  Sherif Abdelhak remain in the physicians acquisition    09:36:27
9  strategy?    09:36:31
10     A.  It's hard to know. I mean, I wasn't -- I    09:36:31
11 know there were lots and lots and lots of late night    09:36:33
12 telephone calls between Harvey and Sherif. I mean, he    09:36:36
13 would just reference them in passing.    09:36:39
14     I don't know whether they were talking    09:36:41
15 about specific physicians. I don't know whether they    09:36:42
16 were talking about how things were going. But I know    09:36:44
17 that they were in continuous, pretty continuous,    09:36:47
18 contact for fairly a long period of time.    09:36:50
19     How long that went on, I can't say with    09:36:53
20 any certainty. And one of the reasons is because in    09:36:57
21 the spring of '97, the lawyers were relocated. We had    09:36:59
22 previously been in a converted convent, interestingly    09:37:04
23 enough, or actually a nuns retirement facility up at    09:37:09
24 Cheltenham on called Laurel Avenue. That's where the    09:37:14
25 legal offices were. That's where some of the other    09:37:17

8 (Pages 344 to 347)

ROBERT McNAIR

Page 348

1  support offices were. And that's where AIHG offices    09:37:18
2  were. That's where Levy's office was. And his office
3  was right down the hall from me, so I used to see a    09:37:22
4  lot of him, I would hear what was going on and so    09:37:23
5  forth and so on.    09:37:26
6        When we moved in the spring of '97 and we    09:37:27
7  moved into kind of a remote space where there was    09:37:29
8  nobody else from Allegheny located there, that flow of    09:37:32
9  information more or less stopped. The only time I    09:37:34
10  talked to him was on the telephone, and that was much    09:37:37
11  less frequent than it had been, obviously when you'd    09:37:41
12  see somebody in the hallway or were having regular    09:37:44
13  meetings or whatever it may be.    09:37:47
14    Q.  Did Harvey Levy's responsibilities with    09:37:49
15  respect to physician acquisitions extend to the west    09:37:51
16  as well?    09:37:54
17    A.  That's an interesting question. I don't    09:37:56
18  know. I think he very well may have been overseeing    09:37:57
19  the western acquisitions. I really didn't have any    09:38:00
20  part in those acquisitions.    09:38:02
21        I suspect, only because Mr. Abdelhak had a    09:38:04
22  good deal of confidence in his business judgment and    09:38:07
23  he was a smart businessman, there's no question about    09:38:10
24  that, that he very well may have looked at those    09:38:12
25  acquisitions and undertaken to review them and so    09:38:14

Page 349

1  forth and so on. But I wasn't involved in that.    09:38:19
2    Q.  I would understand from your testimony that    09:38:21
3  you had no involvement with respect to the west and    09:38:22
4  the acquisition of physician practices in the west; is    09:38:26
5  that right?    09:38:28
6    A.  No. I was aware of it, but I certainly    09:38:29
7  wasn't involved in any kind of detailed way.    09:38:30
8    Q.  Did you have a counterpart in the west who    09:38:33
9  would have been performing the role that you were    09:38:34
10  performing here in the east?    09:38:36
11    A.  Well, not to the same extent. We had a    09:38:38
12  senior lawyer in the west up until the summer of '97,    09:38:41
13  whose name was Bill Kennedy, who had been counsel at    09:38:45
14  Hahnemann University. And when we took over Hahnemann    09:38:48
15  in '93 and '94, he kind of came along with it, and the    09:38:50
16  general counsel offered him the opportunity to stay,    09:38:54
17  but did it with the specification he had to move to    09:38:56
18  Pittsburgh in order to do it.    09:38:59
19        I do not believe that Bill would have been    09:39:00
20  involved day to day in overseeing those things.    09:39:03
21  Certainly not to the same extent I was, because when I    09:39:06
22  first got involved, I was the only lawyer doing it, so    09:39:10
23  I sort of put the papers together and did a variety of    09:39:12
24  things.
25        There was a woman named Eileen Weiner who    09:39:14

Page 350

1  had a lot of involvement in the western acquisitions,    09:39:16
2  but I didn't have much occasion to talk to her about    09:39:21
3  those. We may have kind of mentioned it in passing,    09:39:23
4  but we were both working on it, but she certainly    09:39:25
5  didn't call me regularly for advice.    09:39:28
6    Q.  Did you have occasion to work with Carol    09:39:30
7  Calvert with respect to the acquisition of practices?    09:39:33
8    A.  Sure. Sure. Certainly during '94 and '95    09:39:34
9  when she was involved. To the extent she showed up,    09:39:38
10  yes, I would have.    09:39:41
11    Q.  Was her involvement in physician practices    09:39:42
12  active?    09:39:45
13    A.  She attended all the meetings. She certainly    09:39:47
14  had the title of CEO, but she was absent a lot, and I    09:39:50
15  would say that she was not active day to day to the    09:39:57
16  same extent that Harvey was. I didn't see nearly the    09:40:01
17  same amount of her that I saw of Harvey. Now, part of    09:40:03
18  that was because he was right down the hall from me.    09:40:06
19  And there was a certain amount of tension between the    09:40:08
20  two of them. That was evident.    09:40:10
21        She certainly did not have the same kind    09:40:16
22  of operational experience that he had running    09:40:18
23  practices.    09:40:22
24    Q.  Do you know what her background was?    09:40:22
25    A.  She was a French major at Penn State, I can    09:40:25

Page 351

1  tell you that. I know that she had been an auditor.    09:40:27
2  I think she was with Touche, Ross originally and maybe    09:40:29
3  Deloitte. I've forgotten which one. She had been    09:40:41
4  hired to work in the internal audit department at    09:40:41
5  United hospitals, which was the entity -- enterprise    09:40:41
6  that Allegheny had taken over in 1991, which included    09:40:44
7  St. Christopher's and three community hospitals. And    09:40:48
8  she came on board as part of that and was kind of put    09:40:49
9  in charge of AIHG along the road.    09:40:54
10    Q.  Were her offices here in the east or was --    09:41:02
11    A.  She had an office in Cheltenham on the third    09:41:03
12  floor of the building. We didn't see much of her.    09:41:05
13  She -- as I say, there were lots of times she wasn't    09:41:08
14  there. She had an infuriating habit of never showing    09:41:13
15  up on time, which very nearly derailed our    09:41:16
16  negotiations with the U.S. Healthcare risk-based    09:41:19
17  contract. Looking back, it's a shame it didn't.    09:41:22
18        But she was doing whatever she was doing.    09:41:27
19  I mean, I didn't see a lot -- she used to show up    09:41:30
20  regularly for our weekly meetings to evaluate    09:41:32
21  potential practices, and I would see her at AIHG Board    09:41:36
22  meetings when I went to those. I did not see her a    09:41:41
23  lot on a day-to-day basis.    09:41:43
24    Q.  Structurally when AIHG would acquire a    09:41:46
25  physician practice --    09:41:50

9 (Pages 348 to 351)

ROBERT McNAIR

Page 492

```
 1              CERTIFICATE
 2         I HEREBY CERTIFY that the proceedings,
 3    evidence and objections are contained fully and
 4    accurately in the stenographic notes taken by me upon
 5    the foregoing matter on January 30, 2003, and that
 6    this is a true and correct transcript of same.
 7
 8
 9
10
11         _____
12         MICHELE L. MURPHY
13         RPR-Notary Public
14
15
16         (The foregoing certification of this
17    transcript does not apply to any reproduction of the
18    same by any means, unless under the direct
19    control and/or supervision of the certifying
20    reporter.)
21
22
23
24
25
```

MANHATTAN REPORTING CORP., A LegaLink Company

**Mertz Dep.**

KELLY MERTZ

Page 1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF PENNSYLVANIA

2

                        -  -  -  -

3

    THE OFFICIAL COMMITTEE OF        )
4   UNSECURED CREDITORS OF           )
    ALLEGHENY HEALTH, EDUCATION &    )
5   RESEARCH FOUNDATION,             )
                                     )
6            Plaintiff,              )
                                     )
7             -vs-                   )    Civil Action
                                     )    No. 00-684
8   PRICEWATERHOUSECOOPERS, L.L.P.   )
                                     )
9            Defendant.             )
10

                        -  -  -  -

11

                    VIDEO TAPE
12       DEPOSITION OF:  KELLY MERTZ
                    VOLUME I
13

                        -  -  -  -

14
15            DATE:    July 31, 2002
                       Wednesday, 9:11 a.m.

16
17         LOCATION:   MANION McDONOUGH & LUCAS
                       14th Floor, USX Tower
18                     Pittsburgh, PA  15219
                       412-232-0200

19
20         TAKEN BY:   Defendant
21
           REPORTED BY:  Claire Gross, CRR, RDR
22                       Notary Public
                         AKF Reference No. Cg71290

23
24
25

KELLY MERTZ

Page 38

1   A.    I generally would try to get Mike to respond,
2        and then there was a point in time when Dan
3        Cancelmi wanted to handle those inquiries.
4   Q.    Do you know when that occurred?
5   A.    I don't remember.
6   Q.    Do you know why Dan Cancelmi wanted to handle
7        that?
8   A.    I think he wanted all of the replies to be
9        handled by one individual so that they could
10       be -- they would be consistent and people
11       weren't --
12  Q.    Did Dan Cancelmi normally interact with any
13       of the banks we were talking about?
14  A.    No.  But because the questions were about the
15       financial statements which he had
16       responsibility for, it made sense for him to
17       answer those questions.
18  Q.    He again was responsible for the DVOG --
19  A.    I think there was a period of time where he
20       was AGH as well.
21  Q.    Do you remember?
22  A.    No.
23  Q.    Who in the treasury department worked on the
24       covenant calculations?
25  A.    I prepared the calculations for the long-term

Page 39

1        debt, and I shared them with Sue and Mike for
2        their review.
3   Q.    Who prepared the calculations for the
4        short-term debt?
5   A.    Actually Rich McKeown had responsibility for
6        that, but the actual calculations on the
7        short-term debt were prepared by the
8        accounting department.
9   Q.    By short-term debt what are we referring to?
10  A.    The AHERF line of credit is what I was
11       referring to.
12  Q.    Did you have any involvement in preparing
13       covenant calculations for that line of
14       credit?
15  A.    No.
16  Q.    Did you have any involvement in reviewing the
17       calculations that were prepared for that line
18       of credit?
19  A.    I remember -- I mean, I didn't have
20       responsibility for that.  I do remember at
21       one point seeing the calculations.  Rich
22       passed along a copy to me.
23  Q.    But you weren't responsible for reviewing
24       them?
25  A.    No.

Page 40

1   Q.    How often would you calculate compliance with
2        debt covenants, long-term debt covenants?
3           MR. HAMILTON:  Object to form.
4   A.    On a quarterly basis.
5   Q.    What is your understanding of what a master
6        trust indenture is?
7   A.    That's a document executed between the
8        institution that's issuing debt and the bank
9        that's acting as bond trustee on that debt,
10       and that would spell out the requirements of
11       both the trustee and the institution in terms
12       of debt service payments and default
13       provisions and things of that nature.
14  Q.    What is your understanding of what the master
15       trustee is supposed to do?
16  A.    Master trustee actually handles the payments
17       to the bondholders.  The debt service
18       payments are made between the institution --
19       by the institution to the trustee.
20  Q.    What is the master trustee's relationship to
21       the bondholders?
22  A.    I don't know.
23  Q.    Do you know how AHERF's bonds were issued?
24  A.    AHERF's bonds?
25  Q.    Or I guess -- when I refer to AHERF, I guess

Page 41

1        I'm talking about all of the different
2        obligated groups that AHERF had, so I guess
3        we can -- do you know how the bonds were
4        issued?
5   A.    I guess I'm not understanding your question.
6        You mean the debt --
7   Q.    Let me take it a different way.  What is your
8        understanding of what an obligated group is?
9   A.    The obligated group is the entity that's --
10       or the combined group of entities that are
11       issuing long-term debt.
12  Q.    What is the benefit of having bond insurance
13       or a letter of credit supporting a bond
14       issuance?
15  A.    The benefit to the bondholder or the benefit
16       to the institution issuing debt?
17  Q.    I guess the benefit to the institution, to
18       the obligator.
19  A.    As I mentioned, the bond trustee is the
20       person that's making payments to the actual
21       bondholders, and it's security for in the
22       event we would not be able to make debt
23       service payments or we default on those debt
24       service payments.
25  Q.    AHERF was -- well, the treasury department

11 (Pages 38 to 41)

KELLY MERTZ

1    was paying the banks for letters of credit.
2    What benefit do you think you were receiving
3    in return for those payments?
4    A.    I already mentioned the benefits I thought we
5    derived from that relationship.
6    Q.    Which was?
7    A.    Making payments to the bondholders, is
8    that --
9    Q.    I guess I'm just trying to figure out what it
10    is or why it is that AHERF would want to pay
11    to receive a letter of credit or bond
12    insurance.
13    A.    Well, a bondholder would be more likely to
14    buy a bond that was insured or a letter of
15    credit supported.
16    Q.    So having a letter of credit or bond
17    insurance allows you to issue more bonds?
18    A.    Yes.
19    Q.    For a larger amount of money?
20    A.    Yes.
21        MR. KAO:  I'm going to mark as
22    Exhibit 324 a document with the Bates numbers
23    PR Binder 0100001 through 86.  This is what
24    is titled as Restated and Amended Master
25    Indenture Between Allegheny General Hospital

1    and Other Members of the Obligated Group and
2    PNC Bank.
3        - - - -
4        (Deposition Exhibit 324 marked for
5    identification.)
6        - - - -
7        MR. HAMILTON:  Counsel, do you know
8    was this marked at her June 2001 depo?
9        MR. KAO:  I do not know.
10        MR. HAMILTON:  Okay.
11        MR. KAO:  I think it may have been,
12    but I just don't know.
13    BY MR. KAO:
14    Q.    Do you recognize this document, Ms. Mertz?
15    A.    Yes.
16    Q.    Do you know who negotiated this document or
17    drafted this document?
18        MR. HAMILTON:  Well, object to form.
19    Q.    Do you know who negotiated this document?
20    A.    You're talking about individuals that
21    negotiated this document?
22    Q.    Yes.
23    A.    This was prior to me joining AHERF.
24    Q.    Did you have any involvement in --
25    A.    No.

1    Q.    -- drafting this?
2    A.    No.
3    Q.    For which bonds was this, the operative
4    master trust indenture form?
5    A.    The AGH Obligated Group issued bonds.
6    Q.    As I understand, AGH had a number of series
7    of bonds.  Do you know which in particular
8    this master trust indenture pertained to?
9    A.    I think they were the Series '93.
10    Q.    What about the Series '95 bonds?
11    A.    I can't remember.
12    Q.    Can you turn to page 48 of this -- let me
13    see.  42. I'm sorry.  And if you would
14    review Section 5.11(a).
15    A.    (Witness reviews document.)
16        Okay.
17    Q.    Under this agreement what was the AGH
18    Obligated Group's responsibility for
19    providing financial statements to the master
20    trustee?
21    A.    Specific to 5.11(a)?
22    Q.    Or if there is any other provisions in this
23    agreement that you think have bearing on
24    that.
25        MR. HAMILTON:  Well, I object to

1    form.
2    A.    All of these documents have their own little
3    nuances, so for me to attempt to remember
4    specifically the reporting requirements of
5    this entire document and articulate them
6    right now, it's -- I'm not going to attempt
7    to do that.
8        I mean, if you want me to specific to
9    5.11(a), I'd be happy to do them, send them
10    financial statements within five months after
11    the fiscal year with an auditor's opinion.
12    Q.    Did AGH have to report quarterly under this
13    master trust indenture?
14    A.    I don't remember.
15    Q.    Do you know if AGH reported quarterly?
16    A.    I can't remember.  I doubt -- generally
17    speaking, it did do quarterly reporting, but
18    I don't know if that was a specific
19    requirement of this indenture.  If you have a
20    copy of the AGH debt compliance checklist, it
21    could save probably all of us a lot of time.
22    Q.    If you could turn to page 39 and look at
23    Section 5.08.
24    A.    (Witness reviews document.)
25        MR. HAMILTON:  All three parts?

MANHATTAN REPORTING CORP., a LegaLink Company