KELLY MERTZ

Page 50

```
1      percent of the -- upon written request of the
2      bondholders holding not less than 20 percent
3      of the outstanding principal could declare
4      those debts due and payable.
5   Q.   Does the master trustee have any other -- is
6      there anything else that the master trustee
7      can do in the event of default?
8         MR. HAMILTON: Object to form.
9   A.   Yes, but I'm not -- I mean, this document is
10      how many pages, 69 pages, and for me to
11      properly respond to what I think is going to
12      be your next question, which is what else can
13      they do, I am not going to attempt to do this
14      at this point.
15         MR. HAMILTON: We've been going about
16      an hour and a half. Can we take a break?
17         MR. KAO: Sure. That's fine.
18         THE VIDEOGRAPHER: We are now going
19      off the screen. The time on the screen is
20      10:30.
21            - - - -
22      (There was a recess in the proceedings.)
23            - - - -
24         THE VIDEOGRAPHER: We are now back on
25      the record. The time on the screen is 10:44.
```

Page 51

```
1   BY MR. KAO:
2   Q.   I would just ask you to look at one last
3      provision in here. It's on page 54, Section
4      7.2(f).
5   A.   (Witness reviews document.)
6   Q.   Is it your understanding, Ms. Mertz, that the
7      master trustee had the right to come in and
8      examine the obligated groups' financial
9      records?
10  A.   Yes.
11  Q.   Do you recall whether PNC ever made such a
12      request under this master trust indenture?
13  A.   I don't believe so, no.
14  Q.   Generally did the banks that we've been
15      speaking about have the right to request
16      records and inspect records at any time?
17  A.   Yes.
18  Q.   Did any of them ever make such a request to
19      you?
20         MR. HAMILTON: Object to form.
21  A.   Not that I recall specifically.
22  Q.   I'm going to try to -- we have a lot of other
23      agreements here. I'm going to try to go
24      through a little bit quicker. Generally what
25      is your understanding of the difference
```

Page 52

```
1      between noncompliance with a covenant and an
2      event of default?
3   A.   When there is noncompliance with the
4      financial covenant or any other covenant,
5      generally the bond trustee or letter of
6      credit provider has the opportunity or I
7      guess -- let me just think about how I want
8      to say this.
9         Once the institution notifies the
10      bond trustee of a noncompliance issue,
11      generally the bond trustee gives the
12      institution the opportunity to remedy that
13      instance of noncompliance before declaring
14      technical event of default.
15  Q.   And does the bond trustee or provider of a
16      letter of credit have to give the obligated
17      group written notice before it declares an
18      event of default?
19  A.   I believe so.
20         MR. HAMILTON: Object to form.
21  Q.   And after -- how long a period generally or
22      how long is the obligated group given to
23      remedy or cure an event of noncompliance
24      before a bank might declare an event of
25      default?
```

Page 53

```
1         MR. HAMILTON: Object to form.
2   A.   It varies.
3   Q.   By agreement?
4   A.   Yes.
5   Q.   In order to determine that, you would review
6      the actual agreement to figure out what that
7      period would be?
8   A.   Yes.
9   Q.   After an event of default is then declared --
10      strike that. Does the fact that an event of
11      default -- strike that. If there is an event
12      of default that has been declared, does that
13      mean that the bonds are immediately due and
14      payable?
15         MR. HAMILTON: Object to form.
16  A.   Not necessarily.
17  Q.   The master trustee or the other banks have
18      the right to make that decision, to determine
19      whether or not to call the bonds immediately
20      due and payable, but it's not automatic?
21  A.   That's my understanding, yes.
22  Q.   And again it varies by --
23  A.   Yes.
24  Q.   -- agreement?
25  A.   Yes.
```

MANHATTAN REPORTING CORP., a LegaLink Company

KELLY MERTZ

Page 54

1  Q.    And at all times, both with respect to an
2        event of noncompliance with a covenant and an
3        event of default, the bank could waive that?
4            MR. HAMILTON:  Object to form.
5  A.    Yes.
6  Q.    Let me try and go through these very quickly
7        but just to have you look at them.  I'd like
8        to mark as Exhibit 325 a document bearing the
9        Bates numbers PNC 18946 through 19017, and it
10       is titled Letter of Credit Reimbursement and
11       Security Agreement between Allegheny Health
12       Education and Research Corporation and
13       Pittsburgh National Bank.
14            - - - -
15          (Deposition Exhibit 325 marked for
16       identification.)
17            - - - -
18  BY MR. KAO:
19  Q.    After you've had a chance to review it, my
20       question will be do you recognize this
21       document?
22  A.    (Witness reviews document.)
23        Yes.
24  Q.    When you were responsible for debt compliance
25       at the treasury department, was this one of

Page 55

1        the letters of credit that was still in
2        place?
3  A.    Yes.
4  Q.    Which series of bonds was this letter of
5        credit applicable to?
6  A.    The AGH Series '88.
7            MR. KAO:  Moving on, I'd like to mark
8        as Exhibit 326 a documents with Bates numbers
9        D 00016838 through 16891 which is titled
10       Letter of Credit Reimbursement and Security
11       Agreement Between Allegheny General Hospital
12       and Pittsburgh National Bank.
13            - - - -
14          (Deposition Exhibit 326 marked for
15       identification.)
16            - - - -
17  BY MR. KAO:
18  Q.    Do you recognize this document?
19  A.    Yes.
20  Q.    While you were at the treasury department is
21       this one of the letters of credit that was in
22       place?
23  A.    Yes.
24  Q.    Which series of bonds did this letter of
25       credit pertain to?

Page 56

1  A.    The Series '93.
2  Q.    Both Exhibit 325 and 326 say Pittsburgh
3        National Bank on it?
4  A.    Yes.
5  Q.    Is it your understanding that is now called
6        PNC Bank?
7  A.    Yes.
8  Q.    That's the same entity?
9  A.    Yes.
10           MR. KAO:  Let's mark as Exhibit 327 a
11       document bearing the Bates numbers DZ 0016892
12       through D 0016990.  It's the Reimbursement
13       and Security Agreement Among Allegheny
14       General Hospital and Allegheny-Singer
15       Research Institute and the Morgan Guaranty
16       Trust Company of New York.
17            - - - -
18          (Deposition Exhibit 327 marked for
19       identification.)
20            - - - -
21  BY MR. KAO:
22  Q.    Do you recognize this document?
23  A.    Yes.
24  Q.    Was this reimbursement and security agreement
25       in place while you were responsible for debt

Page 57

1        compliance in the treasury department?
2  A.    Yes.
3  Q.    Which series of bonds did this agreement
4        pertain to?
5  A.    The Series '95-B.
6  Q.    With Exhibits 325, 326 and 327 did you have
7        copies of these at the treasury department?
8  A.    Yes.
9  Q.    Did anyone else within AHERF have copies of
10       these?
11  A.    Yes.
12  Q.    Who did?
13  A.    The accounting department.
14  Q.    Did you provide them to the accounting
15       department?
16  A.    Yes.  Actually, I should -- both of the '93
17       and the '88 were before I joined AHERF, but
18       again, as a matter of practice the treasury
19       department would have provided the accounting
20       department with those.
21           But the '95 reimbursement security
22       agreement, either I personally or Sue would
23       have delivered a copy of this to the
24       accounting department.
25  Q.    Who in the accounting department did you give

MANHATTAN REPORTING CORP., a LegaLink Company

KELLY MERTZ

Page 58

1     the letters of credit to?
2  A.   In '95 it would have been whoever was
3     responsible for AGH financial reporting. I
4     don't remember who it was in April of '95.
5  Q.   Why did you give the agreement to that
6     person?
7  A.   Because of the -- to make them aware of the
8     covenant provisions and the financial
9     reporting requirements.
10 Q.   Did you have any involvement in the drafting
11    of this agreement, the Morgan Guaranty Trust
12    agreement?
13 A.   Not in the drafting of it, no.
14 Q.   Did you participate in the negotiation of
15    this?
16 A.   I would have probably been a party to some of
17    the discussion about this agreement,
18    certainly not a major player given my role in
19    the treasury department. But, I mean, I
20    definitely would have been given draft
21    versions of this document.
22 Q.   Do you know who was involved with the
23    negotiation of this document?
24 A.   In the treasury department Mike Martin and
25    Sue Gilbert would have been involved, and

Page 59

1     then Foley & Lardner, who was our bond
2     counsel, would have participated in those
3     discussions. And then whatever the other
4     entity was, like in the case of Morgan
5     Guaranty, it would have been Susan Flanagan.
6  Q.   Were there any other AHERF employees outside
7     the treasury department who would have
8     participated in negotiating this agreement?
9  A.   The legal department probably would have been
10    involved as well, so it would have been like
11    Bill Kennedy maybe -- I don't remember if
12    Bill was involved in the AGH borrowing or
13    not, but someone from the legal department.
14 Q.   Was anybody from AGH or the AGH CFO's office
15    involved?
16 A.   There was a working group established when we
17    did a bond issue that I remember there being
18    a working group list that if you were on the
19    working group list you would have been given
20    provided copies of these documents for
21    review. I don't remember if Joe Dionisio was
22    part of that working group or not. I know he
23    was at the closing dinner.
24       MR. KAO: I'd like to mark as Exhibit
25    328 a document with Bates numbers

Page 60

1     F & L-01-021562.
2        - - - -
3        (Deposition Exhibit 328 marked for
4     identification.)
5        - - - -
6  BY MR. KAO:
7  Q.   After you've had a chance to review it, my
8     question is have you ever seen this document
9     before?
10 A.   Your question is what?
11 Q.   Have you ever seen this document before?
12 A.   I honestly do not recall ever seeing this
13    document before.
14 Q.   Do you recall the substance of any of the
15    discussions you had regarding the negotiation
16    of the Morgan Guaranty Trust agreement?
17 A.   No.
18       MR. KAO: I'd like to mark as Exhibit
19    329 a document -- let me see -- with Bates
20    numbers F & L-01-021651.
21       - - - -
22       (Deposition Exhibit 329 marked for
23    identification.)
24       - - - -
25 BY MR. KAO:

Page 61

1  Q.   After you've had a chance to review it, my
2     question is have you seen this document
3     before?
4  A.   I honestly don't recall ever seeing this
5     before.
6  Q.   Do you recall there being any discussion in
7     the March 1995 time frame about the
8     composition of the unrestricted fund balance
9     for the purposes of the Morgan Guaranty Trust
10    agreement?
11 A.   I don't remember.
12 Q.   Do you know who would have been involved in
13    any such discussions?
14 A.   The same folks that I mentioned before. And
15    I forgot about Tom Barry's participation in
16    this.
17 Q.   Who is Tom Barry?
18 A.   He actually acted as -- I don't know. It was
19    sort of an unusual relationship. He was like
20    our external counsel on this particular bond
21    issue. I don't ever remember us having -- on
22    any other bond issue us having an individual
23    that acted in Tom's capacity in this
24    borrowing.
25       Again, who he was employed by changed

16 (Pages 58 to 61)

KELLY MERTZ

Page 62

1    several times during the course of this bond
2    issue, and I don't remember the names of any
3    of the entities that he worked for during the
4    time.
5  Q.   Do you know if he worked on any other bond
6    issuances for --
7  A.   I think he worked on the AGH '88 and '93
8    borrowing, but I could be wrong.  I just
9    remember that the other folks in the treasury
10    department were familiar with Tom.
11  Q.   Do you have any understanding as to what his
12    responsibilities were with respect to the
13    bond issuances?
14  A.   No.
15    MR. KAO:  I'd like to mark as Exhibit
16    330 a document with the Bates numbers
17    K & L\DAK 0003 through 00070.
18      - - - -
19    (Deposition Exhibit 330 marked for
20    identification.)
21      - - - -
22  BY MR. KAO:
23  Q.   Do you recognize this document?
24  A.   Yes.
25  Q.   What is it?

Page 63

1  A.   The Delaware Valley Obligated Group Series
2    1996 Master Trust Indenture.
3  Q.   Was this one of the agreements that was in
4    place when you were at the treasury
5    department reporting on compliance?
6  A.   Yes.
7  Q.   Did you have any involvement in the
8    negotiation of this document?
9  A.   I was a member of the working group, so I
10    would have been provided with copies of this
11    document for review.  In terms of actually
12    negotiating provisions, that would not have
13    been my role.
14  Q.   Who are the individuals involved in
15    negotiating?
16  A.   It would have been Mike and Sue and --
17    actually, not even so much Sue.  It would
18    have been more Mike from the AHERF treasury
19    department and Becky and Bob from Foley &
20    Lardner and then the folks from Norwest Bank,
21    Debbie Taylor.
22  Q.   Were Becky Serafini and Bob Zimmerman also
23    involved in the negotiation of the Morgan
24    Guaranty agreement?
25  A.   Yes.

Page 64

1  Q.   Was Tom Barry involved in the negotiation of
2    the DVOG master trust indenture?
3  A.   No.
4  Q.   Did he have any involvement at all with the
5    DVOG bond issuance?
6  A.   I don't think so.
7  Q.   What was -- did you have -- did AHERF have
8    any other financial advisors in connection
9    with the DVOG bond offering?
10  A.   I don't think so.
11  Q.   Did Merrill Lynch have any involvement in the
12    DVOG bond offering?
13  A.   Merrill Lynch, I believe, was the underwriter
14    on the DVOG borrowing.
15  Q.   What did Merrill Lynch's -- what did Merrill
16    Lynch do with respect to the DVOG bond
17    offering?
18  A.   Merrill Lynch in their role as underwriter
19    helped us to find the structure of how all of
20    the preexisting debt and debt service
21    payments associated with Hahnemann, MCP and
22    AUH and St. Chris, how it made most sense to
23    fold into this Delaware Valley Obligated
24    Group.  I remember working with them to again
25    to define the structure of it and -- there

Page 65

1    were six series.
2    I think there was the A, B, C, D and
3    E. And Merrill Lynch also -- there was the
4    Series E was a commercial paper program, and
5    Merrill Lynch was involved -- they were the
6    agent on the commercial paper program.
7  Q.   Do you understand why the bond offering was
8    structured the way it was with all these
9    different series?
10  A.   Well, the financial reporting and all of the
11    covenant calculations and so forth that were
12    required by all the individual Delaware
13    Valley entities, it became a very cumbersome
14    task to keep track of all that from a
15    reporting perspective.  So one of the reasons
16    that we -- and the debt service payments and
17    everything.
18    So that was one of the reasons that
19    we wanted to sort of streamline the debt
20    structure and have just two obligated groups
21    rather than individual obligated groups for
22    the Delaware Valley entities.
23    MR. KAO:  I'm going to mark as
24    Exhibit 331 a document with Bates numbers PNC
25    08053 through 8160, and it's entitled The

17 (Pages 62 to 65)

KELLY MERTZ

Page 66

1    First Supplemental Master Trust Indenture.
2    - - - -
3         (Deposition Exhibit 331 marked for
4    identification.)
5    - - - -
6    BY MR. KAO:
7    Q.   Do you recognize this document?
8    A.   Yes.
9    Q.   What is this?
10   A.   It's a supplement to the original master
11   trust indenture for the DVOG borrowing.
12   Q.   What did this supplement -- how did this
13   supplement the master trust indenture --
14   A.   I honestly don't remember.
15   Q.   If you look on (i), article 3 says Covenants
16   for the benefit of the bond insurer?
17   A.   Okay.
18   Q.   Do you know if this document or this
19   agreement was requested by MBIA?
20   A.   I don't know.
21   Q.   Do you know if MBIA had -- was there a
22   supplemental master trust indenture for the
23   1995 AGH bonds that MBIA insured?
24   A.   I don't remember.
25   Q.   Did you refer to this supplemental master

Page 67

1    trust indenture for the DVOG bonds to
2    determine compliance with MBIA's covenants?
3    A.   Yes.
4    Q.   Do you recall how MBIA's covenants were
5    different from the master trust indenture?
6    A.   No.
7    Q.   Do you know if MBIA required any additional
8    covenants or reporting?
9    A.   I don't recall offhand.
10   Q.   Did you have a copy of both this master --
11   both the supplemental master trust indenture
12   and the original Master Trust Indenture?
13   A.   Definitely.
14        MR. KAO:  I'm going to mark as
15   Exhibit 332 a document bearing the Bates
16   numbers PNC 18740 through 18800.  It's a
17   letter of credit reimbursement and security
18   agreement with PNC Bank.
19        I would also mark as Exhibit 333 a
20   document bearing the Bates numbers PNC 18687
21   through 18739, which is also a letter of
22   credit reimbursement and security agreement
23   with PNC Bank.
24        - - - -
25        (Deposition Exhibits 332 and 333

Page 68

1    marked for identification.)
2    - - - -
3         MR. HAMILTON:  Counsel, my copy seems
4    to be missing the last page of 332.
5         MR. KAO:  What page?
6         MR. HAMILTON:  Exhibit 332, last page
7    seems to be missing.  You have the complete
8    one?
9         MR. KAO:  I have a different version
10   because mine only goes --
11        MR. RYAN:  Why don't we just go off
12   the record for a moment.
13        THE VIDEOGRAPHER:  We are now going
14   off the record.  The time on the screen is
15   11:18.
16   - - - -
17   (There was a recess in the proceedings.)
18   - - - -
19        THE VIDEOGRAPHER:  We are now back on
20   the record.  The time indicated on the screen
21   is 11:22.
22        MR. KAO:  For the record, Exhibit 332
23   is missing the last page, page 25.  Page 25
24   is not attached to this exhibit.  We will
25   attempt to get that page sent to us, and

Page 69

1    we'll fix it.
2         MR. HAMILTON:  Presumably it's just
3    the signature page.  I have no objection to
4    you using the exhibit.
5         MR. KAO:  Great.
6    BY MR. KAO:
7    Q.   After you've had a chance to look at these,
8    if you can let me know if you have seen these
9    before.
10   A.   (Witness reviews documents.)
11        Yes.
12   Q.   What is Exhibit 332?
13   A.   This is the letter of credit agreement
14   between DVOG and PNC supporting the -- Series
15   '96 D bonds, and this is the letter of credit
16   between DVOG and PNC for the commercial paper
17   program.
18   Q.   Exhibit 333, the --
19   A.   I'm sorry.  Yes.
20   Q.   Were you involved in negotiating either
21   Exhibit 332 or Exhibit 333?
22   A.   Not in the negotiating, no.
23   Q.   Did you have any discussions with anyone
24   about the negotiations of 332 and 333?
25   A.   I was part of the working group, so I

MANHATTAN REPORTING CORP., a LegaLink Company

KELLY MERTZ

Page 70

1    probably would have been a party to some of
2    this discussion.
3    Q.    Who was in the working group for these
4    letters, letters of credit?
5    A.    It would have included Mike and Sue from the
6    treasury department, and then Merrill Lynch
7    would have been involved. Foley & Lardner
8    would have been involved.
9    Q.    Did you have copies of both of these in the
10    treasury department?
11    A.    Yes.
12    Q.    Did you provide these to accounting as well?
13    A.    Yes.
14    Q.    Do you remember who in accounting?
15    A.    Dan Cancelmi.
16         MR. KAO: Last one. This will be
17    Exhibit 334. Bates numbers of this document
18    are BND 02858 through 2947, and it's a master
19    trust indenture between the Graduate Hospital
20    and the Fifth and Reed Hospital and Meridian
21    Trust Company.
22         - - - -
23         (Deposition Exhibit 334 marked for
24    identification.)
25         - - - -

Page 71

1    BY MR. KAO:
2    Q.    Have you seen this document before?
3    A.    Yes.
4    Q.    What is Exhibit 334?
5    A.    It's the master trust indenture between the
6    Graduate Hospital and Meridian Trust for the
7    Graduate Series 1991 bond issue.
8    Q.    How many bond issues were there for Graduate?
9    A.    I don't know. I can't remember. I don't
10    think they -- I think they had a '91 and '93,
11    I believe.
12    Q.    Would this master trust indenture also have
13    governed the '93 bond issue?
14    A.    I believe so.
15    Q.    Do you know if there was an amendment or
16    supplement to this master trust indenture?
17    A.    I don't know offhand.
18    Q.    Did you have a copy of this in the treasury
19    department?
20    A.    Yes.
21    Q.    Was this master trust indenture provided to
22    accounting?
23    A.    I believe so. But this wasn't a bond issue
24    that was done out of our treasury department.
25    Q.    When did you first receive a copy of this

Page 72

1    master trust indenture?
2    A.    Probably somewhere in the late '96, early '97
3    calendar year. Actually, I remember going
4    to -- I remember spending a couple of days at
5    Graduate prior to the affiliation to do some
6    due diligence, so I would have seen a copy of
7    it then. And that would again have been
8    around that same time frame, late '96.
9    Q.    When you went to Graduate, what else do you
10    recall doing?
11    A.    Actually, that's -- there was just a big
12    document room they had set up that had copies
13    of all of their bond documents and a bunch of
14    other like legal documents and things. But
15    Sue Gilbert and I spent most of the time
16    reviewing the bond documents.
17         I remember actually sitting there
18    with the laptop trying to do a debt
19    compliance checklist on this master trust
20    indenture. That's what I spent most of my
21    time doing.
22    Q.    Did you look at anything else there?
23    A.    Not that I recall.
24    Q.    Who else was with you on this trip?
25    A.    Sue Gilbert was the only -- and then Bob

Page 73

1    Zimmerman came for part of the day.
2    Q.    What did Bob Zimmerman do?
3    A.    He actually -- he spent some time in the
4    document room with us. I remember Anne Kelly
5    being there and sort of just giving us a tour
6    of the Graduate -- the church building they
7    called it. That's all I remember.
8    Q.    Were there any other people from other AHERF
9    departments that went with you?
10    A.    Not on this trip, no. There was another
11    gentleman from Foley & Lardner there, but I
12    don't remember his name, and it wasn't
13    something that we normally -- it wasn't
14    someone we normally dealt with.
15    Q.    Do you know what he was doing there?
16    A.    Reviewing documents, but I don't know what
17    exactly his role was.
18         MR. KAO: I'd like to mark as Exhibit
19    335 a document with Bates numbers SS 3172,
20    and it's a fourteen-page document. It's a
21    memo from Kelly Landy to David McConnell,
22    among others, dated March 1, 1994.
23         - - - -
24         (Deposition Exhibit 335 marked for
25    identification.)

KELLY MERTZ

Page 182

1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF ALLEGHENY        )   SS:
3      I, Claire Gross, RDR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   KELLY MERTZ, was by me first duly sworn to testify to
7   the truth; that the foregoing deposition was taken at
8   the time and place stated herein; and that the said
9   deposition was recorded stenographically by me and
10  then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13     I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17     I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 5th day of August,
23  2002.
24     _____
25          Notary Public

Page 183

1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY       )   S H E E T
2
       I, KELLY MERTZ, have read the foregoing pages
3   of my deposition given on Wednesday, July 31, 2002,
    and wish to make the following, if any, amendments,
4   additions, deletions or corrections:
5   Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21  _____
            KELLY MERTZ
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24  _____
         Notary Public
25  AKF Reference No. Cg71290

MANHATTAN REPORTING CORP., a LegaLink Company

**Michael Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## RALPH S.  MICHAEL
*March 11, 2004*

---

# LEGALINK MANHATTAN
## 420 Lexington Avenue - Suite 2108
## New York, NY 10170
### PH: 212-557-7400 / FAX: 212-692-9171

MICHAEL, RALPH S.



LEGALINK
A WORLDWIDE COMPANY

RALPH S. MICHAEL

Page 38

1    Q.  I guess I'll run through some documents --
2    A.  Fine.
3    Q.  -- in a moment, but what kinds of limited
4  recollections do you have right now?
5    A.  I recall -- I recall nothing prior to '96.
6  The -- in 1996 I was involved with the approval of
7  the loan to the Delaware Valley Operating Group, and
8  thereafter save one breakfast with Dave Mc Connell.
9    Q.  The CFO?
10    A.  Yeah.  And I think Joe Dionisio or whatever
11  his name was was there as well, and that was more a
12  -- an introductory type of thing.
13      Save that, you know, my involvement was,
14  you know, was nonexistent to my recollection until
15  the -- until probably would have been early '98.
16  Whenever things got into serious trouble.  And then
17  for a brief period of time I had some involvement,
18  and then, you know, postbankruptcy, none.
19    Q.  What kinds of involvement did you have in
20  the approval process to the loan to the Delaware
21  Valley Group?
22    A.  I was simply a -- the final approving
23  signature because of my level of credit authority.
24    Q.  Do you recall whether a committee process,
25  a senior loan committee process, was still in place

Page 39

1  at the time the loan to DVOG was made?
2    A.  I don't, no.
3    Q.  So you recall just at some point putting in
4  a final signature to approve the loan?
5    A.  Yes.
6    Q.  Do you recall whether any presentation was
7  made to you prior to your signing the loan or
8  approving the loan via signature?
9    A.  What I recall was that I was presented with
10  an offering memorandum as we call them, you know, and
11  a very brief, very high-level explanation was given
12  to me by Dave Cook.
13      I had the offering in my hand, reviewed the
14  -- as I always do, reviewed the financial statements
15  for an unqualified opinion, listened to the quality
16  of his story, you know, and based on the caliber of
17  the borrower as we knew it, signed the approval and
18  off we went.
19    Q.  Did you have any responsibility for
20  monitoring the performance of any, you know, credits
21  that PNC had dealings with?
22    A.  Not specifically, no.
23    Q.  You mentioned that you would always review
24  financial statements for unqualified opinions?
25    A.  Uh-huh.

Page 40

1    Q.  Is that at the time of any potential
2  offerings?
3    A.  Yes.
4    Q.  And do you recall when the last or the most
5  recent audited financial statements -- or let me
6  rephrase that.
7      Do you recall what was the date of the most
8  recent financial statements for AHERF at the time of
9  the approval?
10    A.  I do not.  That would be in the approval
11  document itself, but I don't recall.
12    Q.  And would you have reviewed, in connection
13  with reviewing the approval document, just the most
14  recent audited financial statements as opposed to the
15  most recent financial statements, period?
16    A.  Customarily, our packages would include,
17  you know, several years of audits, you know,
18  including the most recent period for which audited
19  statements had been received, and, you know, at least
20  two, you know -- and typically two, you know, interim
21  periods.
22    Q.  And the interim periods would typically be
23  more recent than the audited statements?
24    A.  Yes.  Thank you.  They would be the most
25  recent interim periods, you know, and would typically

Page 41

1  be company-prepared.
2    Q.  And would you review those most recent
3  internal or company-prepared statements as well as
4  the audited statements?
5    A.  Yes.
6    Q.  Why would you review the internal most
7  recent financial statements?
8    A.  Customarily, you would look at that for
9  trends, you know, because, you know, for instance,
10  you know, if we were examining a company in November,
11  and it was a 12-31 year-end, we would have several
12  quarters of activity, interim quarters, you know,
13  between the time the most recent audited statements
14  were given and the time of our decisioning, and if
15  the company had fallen off the table, we want to know
16  that.
17    Q.  And would you rely on those internal most
18  recent financial statements as well as the audited
19  financial statements in making a decision?
20    A.  You would save that the internal
21  statements, you know, will give you trends as to the
22  business performance.  The audited statements give
23  you a much more complete picture of such things as
24  internal controls, for instance --
25    Q.  Uh-huh.

11 (Pages 38 to 41)

RALPH S. MICHAEL

Page 42

1    A.  -- and balance sheet reconciliations, you
2  know, that tell you of the quality of what you're
3  examining.  You don't have that same measure of
4  protection with the company's internally-prepared
5  statements.
6    Q.  In addition to the approval of the loan to
7  DVOG or in addition to the loan to DVOG, do you know
8  of any other services that at that point in time PNC
9  was providing to AHERF or its affiliates?
10    A.  I believe that our PNC securities affiliate
11  was providing some bond underwriting, I think.  I'm
12  not clear on that.  I'm doing this from memory.  And
13  I believe we were providing some treasury management
14  business.  Operating accounts.
15    Q.  Do you recall whether or what you and David
16  Cook discussed at a very high level in connection
17  with your review of the materials to approve the loan
18  to DVOG?
19    A.  I remember that we discussed the nature of
20  the transaction that was giving rise to the credit
21  request.  I'll also tell you that today I couldn't
22  tell you what that was, but from my recollection.
23  But I know that we did discuss that.
24        We discussed the financial capacity of the
25  borrower, you know, and its parent organization, as I

Page 43

1  recall, and that would be about it.  It would be more
2  -- about it in terms of what I can recall.  There
3  would be more extensive conversation than that, but
4  those are the two that I specifically recall.
5    Q.  And you mentioned at some point in time you
6  had a breakfast meeting with David Mc Connell and
7  perhaps Joe Dionisio?
8    A.  Yes.
9    Q.  And was that pretty early on in the
10  relationship or early on in the approval of the loan
11  to DVOG?
12    A.  It wasn't nearly contemporaneous.
13  Oftentimes you would meet a client at or shortly
14  after closing.  This would, my recollection is, it
15  would be a year or a year and a half later.
16    Q.  And do you recall what was discussed other
17  than, you know, just getting to know the folks at
18  AHERF?
19    A.  No, I don't.
20    Q.  Was there anything that motivated the
21  meeting other than a desire to get to know the people
22  inside better?
23    A.  That was essentially it on both sides.
24    Q.  Was anyone else at PNC present at that
25  breakfast meeting?

Page 44

1    A.  Yes, and I couldn't even begin to tell you
2  who.  I have a visual recollection of a breakfast
3  meeting at the Rivers Club in Pittsburgh at a larger
4  table than just the three of us, but that's -- having
5  eaten hundreds and thousands of breakfasts,
6  seemingly, over my life, I can't recall.
7    Q.  What was your impression of the management
8  of AHERF that you did have occasion to meet with?
9    A.  I felt that -- I felt that they were
10  bullying us a bit, that Dave was, you know, in terms
11  of the position he was taking towards the bank, and
12  that was all I recall of that.
13    Q.  What was the position he was taking towards
14  the bank at the time?
15    A.  I don't even recall that.  The only reason
16  that I recollect that is that this was a relatively
17  social breakfast.  We had a substantial relationship
18  with them, and I thought he was antagonistic which
19  is -- so it was -- it just seemed out of character
20  for the nature of the meeting that we were engaged
21  in.
22    Q.  At the time did AHERF have any kind of
23  leverage with which to bully PNC?
24    MR. COGAN:  Objection.
25    MS. HACKETT:  You may answer.

Page 45

1  BY MR. TERUYA:
2    Q.  You can answer if you understand.
3    A.  Simply the leverage that any customer has,
4  you know.  The normal commercial promise of
5  additional business or removing that business that
6  already existed.
7    Q.  Was AHERF one of the larger accounts that
8  you were involved with at the time?
9    A.  I would need clarification of "larger" and
10  how you would quantify that.
11    Q.  I guess in terms of fees or other types of
12  revenue given to PNC, was AHERF one of the larger
13  accounts?
14    A.  It was clearly not the largest by any
15  extent, and, to wit, I got around and met the larger
16  accounts pretty quickly.  I was meeting them
17  substantially later in my tenure.
18    MS. HACKETT:  Did -- when you say, "meeting
19  them," you meant AHERF substantially later?
20    THE WITNESS:  I'm sorry.  Yes.
21    MS. HACKETT:  Okay.
22    THE WITNESS:  Thank you.  But it was not
23  the smallest account, either.  So it was a -- an
24  attractive size for a commercial bank.
25  BY MR. TERUYA:

12 (Pages 42 to 45)

RALPH S. MICHAEL

Page 114

1  was -- well, he's currently President of PNC's
2  Pittsburgh market.  He had a reporting relationship
3  with Dave Cook at one point.
4       You asked me earlier if there was someone
5  that was between Dave and me, and for a brief period
6  Sy was there, but it was a very brief period.  I
7  think I indicated back to you that I thought there
8  might be somebody, and I think he was probably the
9  person, but it was a very brief period, and I
10  couldn't tell you when it was.  I don't think it was
11  at the time of approval.  Given this May 28th date,
12  he is either there because he was in that slot or
13  because he at that point in time was President of the
14  Pittsburgh market, and this was a Pittsburgh credit,
15  and I can't tell you the answer to which.  But it
16  was, I would imagine, one of the two.
17       Q.  Do you know if Sy Holzer was on the
18  original team that was pitching the DVOG letter of
19  credit issuance?
20       A.  I'm pretty sure not.  Sy is not a -- Sy is
21  more a marketer than a credit type.
22       Q.  Did he have any responsibility for
23  marketing the DVOG letters of credit?
24       A.  I would doubt it.  It's too complex a
25  transaction for him.

Page 115

1       Q.  What title did he hold back in that time
2  frame from '96 to '98?
3       A.  In all likelihood a senior vice president.
4       Q.  And he sort of resided in the -- you said
5  in the position between Dave Cook and you?
6       A.  On a -- for a very brief period.  He was
7  more on the government side of that business than the
8  healthcare.
9       Q.  When you say "the government side," what do
10  you mean by that?
11       A.  Well, the segment at a point in time had
12  both government and education and healthcare.  Dave
13  was really the onpoint healthcare expert, and Sy had
14  more of the government activity.
15       Q.  Are you talking about municipal bond
16  offerings?
17       A.  No, not municipal bond offerings, because
18  he was not a registered rep, but our relationship
19  with the state of Pennsylvania, city of Pittsburgh,
20  county of Allegheny from a relationship management
21  perspective.
22       Q.  So was Sy Holzer not involved substantially
23  with lending-type activities?
24       A.  No.  And that's why I say when I -- I don't
25  mean to imply that this is a dramatically-complex

Page 116

1  financing, but Sy doesn't have a background in
2  lending, per se, so if you talk to him about, you
3  know, about letters of credit or irrevocable letters
4  of credit and draws on letters of credits, that's
5  beyond his technical expertise.
6       Q.  And do you know what role Alex Eliason
7  played?
8       A.  He was an assistant to Frank Krepp.  A
9  credit officer but not the senior credit officer.
10  Divisional credit -- what we call a DCO.  It's not
11  here.  There it is.  DCO.
12       Q.  Do you recall if he had any involvement or
13  started to have increased involvement around the time
14  that certain of the AHERF credits started to run into
15  trouble?
16       A.  I don't know.
17       Q.  Okay.  Does looking at -- well, do you
18  recognize this document?
19       A.  No.
20       Q.  Okay.  You can set aside this document.
21       A.  Okay.
22       MR. TERUYA:  Let me mark as exhibit
23  number --
24       THE COURT REPORTER:  2323.
25       MR. TERUYA:  -- 2323, a one-page document

Page 117

1  with Bates no. PNC 29811.
2       (Whereupon Exhibit-2323, a one-page
3  document with Bates no. 29811, was marked for
4  identification.)
5       MS. HACKETT:  May I hand it to him?
6       MR. TERUYA:  Yeah, please.  Thank you.
7       Q.  Let me ask you if you recognize the bottom
8  e-mail on this document which is dated 6-5-98 from
9  Dave Cook to a number of people?
10       A.  I do.
11       Q.  Could you tell me what you recognize it as?
12       A.  Just simply an e-mail that was sent
13  internally, you know, informing us of the management
14  change.
15       Q.  Do you recall any discussions at or around
16  this time about the management change?  I.e., the
17  replacement of Sherif Abdelhak by Tony Sanzo?
18       A.  No, I don't.  I recall being personally
19  surprised, but that's all.  And that was just a
20  personal opinion.
21       Q.  Why in your personal view were you
22  surprised at the time about the replacement of Sherif
23  Abdelhak by Tony Sanzo?
24       A.  I guess I didn't see it coming.  That's --
25  just intellectual curiosity.

30 (Pages 114 to 117)

RALPH S. MICHAEL

Page 118

1    Q.  Did you ever have any interactions with
2 either Sherif Abdelhak or Tony Sanzo?
3    A.  I've never met Sherif.  Sure heard a lot
4 about him.  And Tony I knew slightly, you know.  And
5 I met him two, three, four times.  Something like
6 that.  Mostly socially.
7    Q.  Had you met him in the context of AHERF or
8 in the context of his prior positions at prior
9 Pittsburgh areas offices?
10    A.  No.  I probably would have met him in the
11 AHERF context, you know, and may have even had one
12 meeting with him -- although I don't recall the
13 substance -- but you see people at various events
14 around the city, so --
15    Q.  Do you recall ever having any interactions
16 with any of the trustees of AHERF?
17    A.  I recall, you know, a meeting we held prior
18 to the bankruptcy, you know, over at Allegheny
19 General when we were talking about extending
20 additional credit.  I think it was on a Sunday, and
21 we were talking -- the attendees that I recall, you
22 know, were Jim Rohr, Tom Mc Cool, I think, and me and
23 possibly Dave Cook from PNC, Bill Snyder, who is
24 listed here as W.P. and Bob Hernandez from the Board,
25 and it's possible that Tony was there, Joe Dionisio,

Page 119

1 I think, was there.
2    And the discussion was we were attempting
3 to -- as I recall, we were willing, along with MBIA,
4 to provide financing to the Allegheny General entity
5 to keep it out of bankruptcy.  And the gist of our
6 discussion was bankruptcy is very expensive,
7 Allegheny General we think is very stable and sound,
8 and we made our position -- we made our case and
9 left, and that was about the last we heard.  So that
10 was not long before bankruptcy -- the AHERF
11 bankruptcy was ultimately declared.
12    Q.  Do you recall anything about what the
13 trustees and management that you met with of AHERF
14 said in response to your proposal?
15    A.  No, I really don't.  It -- obviously they
16 didn't accept it, you know.  They clearly -- I
17 remember Bob Hernandez in particular listened
18 attentively, but I don't recall any of the
19 discussion thereafter.
20    Q.  What reaction did the folks at PNC have to
21 the fact that AHERF did not accept the proposal?
22    A.  The -- the -- we were clearly disappointed.
23 We were trying to figure out a way, you know, to keep
24 this from going into bankruptcy, and when it went
25 into bankruptcy we were disappointed with that, you

Page 120

1 know, at the time vis-a-vis what we thought was our
2 solution, albeit by the same token bankruptcy was a
3 far better outcome in my estimation than letting it
4 just grind on, you know, without a plan.
5    Q.  And what was the competing solution that
6 PNC had to bankruptcy?
7    A.  My recollection was that we were offering
8 additional financing for Allegheny General.
9    Q.  So there were three options:  Either the
10 entity continues as is, the entity goes bankrupt or
11 PNC provides additional financing which could lead to
12 a different result for that entity?
13    A.  Could, yeah.  Could lead to the -- I don't
14 recall this, but we might have been willing to -- we
15 might have by that time foreclosed the salvageability
16 of DVOG itself but were rather trying -- and I think
17 this was the case -- to make sure that the Allegheny
18 General enterprise didn't get drawn into bankruptcy,
19 you know, if avoidable.  Might not even have been
20 avoidable.  To -- let me go back to your earlier
21 question to make sure that I answered it accurately,
22 because I don't want there to be an implications that
23 PNC thought -- was disappointed, you know that, gee,
24 there was an answer, and it wasn't taken.  I don't
25 recall that specifically.

Page 121

1    What I do recall is that we were
2 disappointed by the outcome, and the outcome being
3 that the enterprise went bankrupt, went upside down
4 and we lost a lot of money.  Now, we'd have been
5 disappointed even -- I think even if our suggestions
6 had been taken so this was not a good situation is
7 the point I want to make.
8    Q.  All right.  Were there any views at the
9 time as to negative consequences of bankruptcy on
10 AGH?
11    A.  Yes.  Our view of bankruptcy on AGH as we
12 expressed to those trustees, was that bankruptcy was
13 an extraordinarily expensive, you know, due to --
14 strictly to the administrative fees attendant to that
15 and an extraordinarily expensive process, and we were
16 attempting to ensure that the trustees really
17 understood that, you know, and -- you know, because
18 we thought that community assets could be dissipated
19 unnecessarily, so --
20    Q.  How about with respect to DVOG?
21    A.  There was no discussion of DVOG at that
22 meeting, and I was not involved in any DVOG
23 discussions.  At least there were no DVOG discussions
24 that I can recall.  This was an Allegheny General
25 meeting to my recollection.

31 (Pages 118 to 121)

RALPH S. MICHAEL

Page 130

1    Q.  Do you recall having any views of your own
2  as to any options that AHERF could take?
3    A.  Don't recall that, either.
4    Q.  Okay.
5    A.  Can we go back, if I could, and clarify one
6  thing I said earlier.
7    Q.  Sure.
8    A.  The observation I made about the
9  growth-at-any-cost strategy, you know, while I was
10  concerned about it at the time that they were
11  undertaking it, the financial position of the
12  enterprise appeared sufficient to go ahead and do
13  that, so this wasn't a case where we thought we saw
14  the ship going over and upside down.
15    Q.  Did you raise your concerns about the
16  strategy with anyone?
17    A.  No.  It wasn't -- again, because it wasn't
18  that dire.  That's I think the issue that I wanted to
19  bring forward.  I mean, this appeared to be a very
20  well capitalized, very powerful engine, that --
21  AHERF, that I felt was attempting to overreach, and I
22  guess I'm drawing the distinction, where -- why
23  I wanted to come back to this is while that could be
24  financed and while that could be a viable strategy, I
25  didn't think it was in the best interest of the

Page 131

1  community.  I thought the best interest of the
2  community didn't need to have a sole provider of
3  healthcare for a region.  It needed to have several
4  providers of healthcare because the power struggle to
5  get from several to one would have, you know,
6  dissipated the assets -- a lot of assets that a lot
7  of people contributed a lot of money to create.  So
8  that's the distinction I'd like to make.
9    Q.  Okay.  And in this time frame of '97 or so;
10  is that right?
11    A.  Uh-huh.
12    Q.  Were there other institutions, healthcare
13  institutions, that PNC had dealings with that were
14  pursuing aggressive acquisition strategies?
15    A.  UPMC, clearly.
16    Q.  Do you know if these -- did you have any
17  understanding of what was motivating the acquisition
18  strategies of AHERF and -- or UPMC?
19    A.  I had a speculative belief but no
20  understanding.
21    Q.  I think earlier you said those two in
22  institutions were competing with each other; is
23  that --
24    A.  That was a speculative belief, yes, and I
25  think there was some grounding for that.

Page 132

1  Speculatively I believe that there was a clash of
2  egos between the two leaders, but that's personal
3  opinion.
4    Q.  And in terms of the strategy being pursued
5  by AHERF in the Philadelphia area, did you have any
6  understanding of whether there was an acquisition
7  strategy going on there as well?
8    A.  I did not.
9    Q.  Let me show you what's been previously
10  marked as Exhibit 1819 which is a July 7th, 1998,
11  letter from Tom Mc Cool and David Stevens to members
12  of the Board of Trustees of AHERF.
13       Do you recognize this document?
14    A.  Vaguely.
15    Q.  What do you recognize it as to some extent?
16    A.  It was an effort on our part to reach out,
17  I think, through the management of AHERF directly --
18  to communicate directly to the Board.
19    Q.  Is this a communication, if you can tell,
20  relating to the issue you referred to earlier whereby
21  PNC and perhaps MBIA extended additional credit or
22  offered additional credit to AHERF?
23    A.  I think so.  And I'm so fuzzy on the
24  recollection that I don't recall.  I think this --
25  well, no, I can't say.  I'm sorry.  I just don't want

Page 133

1  to guess at it.
2    Q.  You see the last paragraph on the first
3  page?
4    A.  Uh-huh.
5    Q.  Says, "Moreover, at a time when the AHERF
6  system had already manifested serious financial
7  problems, the Board nevertheless allowed the
8  withdrawal from the AHERF system in April 1998 of
9  almost 90 million to repay, and thereby prefer as to
10  all other creditors, Mellon Bank" --
11    A.  Yes.
12    Q.  -- "an action which drained the AHERF
13  system of desperately needed liquidity at a critical
14  juncture"?
15    A.  Uh-huh.
16    Q.  Does looking at that refresh your
17  recollection as to any issues that related to the
18  repayment by AHERF of a line of credit to Mellon
19  Bank?
20    A.  I recall only the allegation of a
21  preferential payment and the dealing, you know, by
22  certain directors of AHERF who were insiders at
23  Mellon with preferential repayment, that's -- and
24  I -- the -- the details surrounding that are so fuzzy
25  in my mind anymore, I remember the issue but not much

34 (Pages 130 to 133)

RALPH S. MICHAEL

Page 134

1  more than that.
2      Q.  Okay.  Do you know when that issue came to
3  your attention just in terms of the bankruptcy?
4  Before or after the bankruptcy?
5      A.  It became very definitely before, and you
6  can see so stated in this letter.
7      Q.  Do you recall who raised those allegations
8  to your attention?
9      A.  The -- who raised the allegation or the
10  fact that repayment was made?
11      Q.  The allegation or who was making the
12  allegation?
13      A.  I don't recall.
14      Q.  Do you know if any people inside of PNC
15  were focussing on the question of whether Mellon Bank
16  was the recipient of a preferential payment?
17      A.  Yes, we were.
18      Q.  Do you know for what purpose folks were
19  evaluating that question?
20      A.  Well, we felt -- I think it's stated here
21  that that payment drained the liquidity from the
22  system and in fact necessitated the -- had that loan
23  remained outstanding and that amount of liquidity in
24  the system it might not have been necessary to put
25  this sort of credit in place.  At least for a period

Page 135

1  of time.
2      Q.  Did you formulate any view at the time of
3  your own as to whether the repayment was injurious to
4  recovery by other creditors?
5      A.  Well, it looked to me -- and not being a
6  lawyer or, as has been previously pointed out, a
7  C.P.A., you know, but it looked to me as though this
8  was a preferential payment and that in the event that
9  the inevitable happened here -- I take that back.
10  Inevitable is a poor word choice.  In the event that
11  what actually happened happened is what I meant to
12  say that in fact there would be a claim of
13  preferential treatment against Mellon.
14      Q.  At this point in time did you have any view
15  just from a business or economic standpoint as to
16  whether the repayment of $90 million was detrimental
17  to the recovery of other creditors?
18      A.  There was no question that in our belief
19  that it was.
20      Q.  And who -- do you know who looked into that
21  question of just the economics of the repayment?
22      A.  Well, that was -- that would have been part
23  of -- that wasn't a hard one to look at because there
24  was an obvious need for additional liquidity here,
25  and money had just gone out the door to someone so it

Page 136

1  made the question simple.
2      Q.  You said that -- I know you earlier just a
3  moment ago corrected your statement about the
4  bankruptcy being inevitable.
5      Did you have any view at or around this
6  point in time in July 1998 as to whether the
7  bankruptcy was inevitable?
8      A.  Didn't think that it was inevitable because
9  had we thought it was inevitable, we wouldn't have
10  put this offer in place.  You know, we thought that
11  there was -- it was the potential to work through
12  this, but yet we felt, too, it would be very
13  challenging.
14      Q.  Okay.
15      In terms of the repayment to Mellon Bank,
16  did you believe at the time that that was a
17  contributor to the bankruptcy of AHERF?
18      A.  Only in that it drained liquidity, you
19  know, from the system.
20      Q.  Okay.  You can set aside that document.
21      A.  Okay.  Looks like a trip down memory lane
22  here, and I'm realizing I don't have much.
23      Q.  Let me show you what's been previously
24  marked as Exhibit No. 1820 which was a July 11, 1998,
25  letter from Richard Weill of MBIA to the members of

Page 137

1  the Board of Trustees of AHERF.
2      A.  That -- he was the one that we dealt with,
3  because as I mentioned previously, it was I thought
4  the president of MBIA, so --
5      Q.  And let me ask you if you recognize this
6  letter.
7      A.  No, I don't.  I'm not sure I ever saw this.
8  I'm not sure I didn't, either, but I --
9      Q.  Do you see just the last paragraph, it
10  says, "We strongly urge you to consider the sale of
11  the entire AHERF system" --
12      A.  Uh-huh.
13      Q.  -- "and to contact us regarding the
14  provision of interim financing during the process of
15  sale"?  And then it says, "as we have indicated
16  previously, we stand ready to meet with the entire
17  Board or designated group thereof at any time?"
18      Do you recall that issue or the issue of
19  the sale or possible sale of the entire AHERF system
20  ever coming up?
21      A.  No.  No, but it may have been that I just
22  wasn't involved in that aspect of the conversations.
23  I don't think it would have been possible, but --
24      Q.  What do you base that statement on?
25      A.  Just my own opinion.

35 (Pages 134 to 137)

RALPH S. MICHAEL

Page 150

1     Q.   Were there any types of written practice or
2  procedure or policy documents that you referred to
3  from time to time in your work as CEO of the
4  corporate banking area?
5     A.   Not typically, no.
6     Q.   Were there on specific occasions any types
7  of documentation you relied on or referred to?
8     MS. HACKETT:  Can I stop you for a minute?
9  I don't understand.
10    Is there a particular subject matter for
11 which he would have referred to the written
12 documentation?  Am I missing something in this?
13    MR. TERUYA:  With respect to healthcare
14 matters.
15    THE WITNESS:  There were healthcare credit
16 policies, but I typ-- -- of which I had a general
17 understanding but not a specific understanding.
18 BY MR. TERUYA:
19    Q.   Other than the healthcare policies, perhaps
20 examples of which we've seen today, were there any
21 other types of documents you would have referred to
22 from time to time in making credit-type decisions
23 with respect to healthcare?
24    A.   No, other than borrower-specific
25 information.

Page 151

1     Q.   Okay.  When you say borrower-specific
2  information, do you mean offerings or other types of
3  documents --
4     A.   Financial or -- financial statements, et
5  cetera.
6     Q.   Okay.
7     Do you know if there was any established
8  practice or procedure at PNC in how to respond to
9  noncompliance or defaults with debt agreement
10 obligations?
11    A.   Every situation is different, you know, so
12 there are no established, "if this, then that," no.
13    Q.   Do you personally know as you sit here
14 today of any GAP violations in any AHERF or DVOG
15 financial statements?  And when I say "personally
16 know," I mean not from news articles or people
17 telling you things, but just from your own personal
18 knowledge.
19    A.   It's been so long that I believe I do, but
20 I can't cite what they are, so -- I believe I had
21 knowledge of them at one point, but I honestly can't
22 remember what they are.
23    Q.   Do you know what your knowledge was based
24 on at some point even if you can't recall particular
25 examples?

Page 152

1     A.   Yeah.  My understanding of the financial
2  statements and of GAP.
3     Q.   As a non-C.P.A.?
4     A.   As a non-C.P.A., correct.
5     Q.   And was that belief or knowledge formed
6  just on your own personal review without assistance
7  from others of the financial statements?
8     A.   I don't recall.
9     Q.   And even if you don't recall the particular
10 items, do you recall anything about even what areas
11 those violations might have related to?
12    A.   No.
13    Q.   Do you recall who you might have had any
14 discussions with about such violations?
15    A.   No.  Most of -- most of the -- as I stated
16 earlier, most of the energy that I put toward this at
17 the time was really prospective.  How do we keep this
18 thing from -- on the rail, so to speak.  There isn't
19 a lot -- when you're in a crisis mode like this,
20 there isn't a lot of, gee, how did we get here?
21 There is, you know, typically forensic accounting
22 work done, you know.  But the first thrust of that is
23 to find out what's real in the balance sheet and
24 among the cash flows, not so much of who shot John.
25    Q.   Do you personally know of any audit failure

Page 153

1  by Coopers & Lybrand?
2     A.   Not personally, no.
3     Q.   Do you personally know of any failure by
4  Coopers & Lybrand to comply with generally-accepted
5  auditing standards?
6     A.   I don't.
7     Q.   Do you personally know of any failure of
8  Coopers & Lybrand to comply with the contract with
9  AHERF and/or its affiliates?
10    A.   Wouldn't know what that contract is, so I
11 would have no way of knowing.
12    Q.   Okay.
13    Do you personally know of any failure by
14 Coopers & Lybrand to expose AHERF's deteriorating
15 financial condition, violations of areas that
16 covenants, deficient financial controls and/or AHERF
17 senior officials' financial manipulations?
18    A.   I don't know specifically.
19    Q.   Do you have any general knowledge of that
20 topic?
21    A.   No.  None that bears mention.  Speculation.
22    Q.   Okay.
23    Do you personally know which trustees, if
24 any, of AHERF or its affiliates were uniformed about
25 the true state of AHERF's financial condition?

39 (Pages 150 to 153)

RALPH S. MICHAEL

Page 154

1    A.  No.
2    Q.  Do you personally know of what steps, if
3  any, any trustees of AHERF or its affiliates would in
4  fact have taken if they had had additional
5  information about AHERF's financial condition at an
6  earlier point in time?
7    A.  No.
8    Q.  Do you personally know of what in fact
9  would have been the effect, if any, of any steps that
10  trustees of AHERF might have taken?
11    A.  No.  Because I don't know what those steps
12  were, it's hard to know what the effect would have
13  been.
14    Q.  Do you personally know of any steps that
15  any trustees of AHERF or its affiliates could have
16  taken that would have in fact halted AHERF's
17  financial demise?
18    A.  No.
19    Q.  Do you personally know of any steps that
20  anyone could have taken that would in fact have
21  halted AHERF's financial demise?
22    A.  No.
23    Q.  Do you personally know what steps, if any,
24  any creditors of AHERF or its affiliates, including
25  PNC, would in fact have taken if they had had

Page 155

1  additional financial information about AHERF's
2  financial condition or its affiliate's financial
3  condition at an earlier point in time?
4    A.  I think safe to say that had we known this
5  earlier, you know, the -- there would have been, you
6  know, very active discussion around either
7  restructuring the debt in some form or fashion or
8  accelerating repayment.  The timeliness of
9  information here is of real import to a creditor.
10    Q.  Do you know what would have been the
11  outcome of those discussions in fact?
12    A.  I don't know because we didn't have the
13  information at that time.
14    Q.  So sitting here today it's impossible to
15  speculate or it would be just speculation --
16    MR. COGAN:  Objection.
17  BY MR. TERUYA:
18    Q.  -- as to what would have happened?
19    MS. HACKETT:  It would be speculation as to
20  what would happen?  I don't understand the question.
21    THE WITNESS:  Yeah.
22    MS. HACKETT:  What are you asking him?
23  BY MR. TERUYA:
24    Q.  You said you couldn't say today what would
25  have been the outcome of the discussions, and what

Page 156

1  I'm trying to ask is, you know, why is it that you
2  can't say sitting here today what would the outcome
3  have been?
4    A.  Well, if the outcome is in terms of would
5  AHERF ultimately file bankruptcy -- this is the way I
6  interpreted it -- would they ultimately file
7  bankruptcy or not, you know, I don't know that.
8    You know, Would it be likely that we would
9  have done something -- we, PNC, I can't speak for
10  other creditors -- but that we PNC would have done
11  something along the lines of accelerating the debt,
12  you know, I think it's very likely.
13    Q.  So you think --
14    A.  Declaring a default and/or when I say
15  accelerating the debt, that's kind of the end
16  statement.  But, you know, threatening to declare a
17  default, you know, and, for instance, causing the $90
18  million not to be paid to Mellon Bank.
19    Q.  Let me ask you in steps.
20    Do you think that declaring a default and
21  actually accelerating rather than threatening to
22  accelerate the debt would have been the outcome?
23    A.  I think that threatening a default, you
24  know, probably would have, you know, caused a
25  different outcome.  Declaring a default and

Page 157

1  accelerating the debt definitely would have brought
2  about a different outcome for the secured creditors.
3    Q.  Okay.  Let me back this up.
4    Do you know what PNC in fact would have
5  done as between restructuring the debt, accelerating
6  the debt, or something else?
7    A.  No because we didn't have the information
8  at that time, and I can't put myself back to the
9  point in time where I would have the information,
10  so --
11    Q.  Okay.
12    And in terms of declaring a default, do you
13  know in fact what would have been the effect if PNC
14  had declared a default in terms of how things would
15  have unfolded at AHERF?
16    A.  No.  And I think that was the question I
17  tried to answer earlier.
18    MS. HACKETT:  Uh-huh.
19    THE WITNESS:  No.  I can't say that we know
20  that specifically.
21  BY MR. TERUYA:
22    Q.  And likewise, do you know in fact what
23  would have been the effect if PNC had declared a
24  default and then accelerated the debt?
25    A.  Ask that again.  For some reason I got

40 (Pages 154 to 157)

Page 158

1    distracted.
2        Q.   I said, likewise, do you know what would
3    have been the effect in fact if PNC had declared a
4    default and then accelerated the debt in terms of how
5    things would have unfolded?
6        A.   No.  I don't know, you know.
7        Q.   And earlier you mentioned the possibility
8    of stopping the repayment to Mellon Bank.
9        A.   Just as one potential outcome.
10       Q.   How would that have been effectuated?
11       A.   Well, the -- by -- you know, by -- and
12   again, this is a -- just simply an example, you know,
13   but by notifying the management and potentially the
14   Board that an event of default existed and would not
15   be waived, the management of the Board would have
16   been crazy to pay $90 million to yet another creditor
17   when the gun is held to your head by one creditor.
18       So I suspect what would have happened there
19   is that Mellon and PNC would have threatened default,
20   and everyone would have come to the table together as
21   a workout.
22       Q.   Do you know when is the earliest date that
23   PNC could have declared an effect of default with
24   respect to the DVOG letters of credit?
25       A.   I don't.

Page 159

1        MR. COGAN:  Objection.  That's okay.  I
2    protected the record.
3        MR. TERUYA:  What was the objection about
4    that question, just out of curiosity, to make sure I
5    didn't misstate something?
6        MR. COGAN:  I'm objecting to the form of it
7    and the foundation of it.
8        MR. TERUYA:  Okay.
9        MR. COGAN:  And more particularly, he's
10   never read the credit instruments.  You're asking him
11   for a legal conclusion as to when they could have
12   first declared a default.  He doesn't know the
13   underlying documentation, so I don't know how he can
14   make that determination, and do when you can first
15   declare a default in my view does -- at least the way
16   you asked it -- calls for a legal conclusion.  I hope
17   that helps.
18       MR. TERUYA:  Okay.
19       MR. COGAN:  Since you asked.
20       MR. TERUYA:  I did ask.
21       Q.   Did anyone -- did you have any
22   understanding of your own as to when PNC could
23   declare an event of default?
24       A.   No.  Does that tell you -- from the vantage
25   point that -- I had never read the legal agreement.

Page 160

1        Q.   Okay.  Do you know -- I think we covered
2    this with respect to particular examples, but do you
3    know what in fact would have been the effect, if any,
4    of any steps that any creditors of AHERF's affiliates
5    could have taken?
6        MS. HACKETT:  Other than what he's already
7    testified to?
8        MR. TERUYA:  Yeah.
9        Q.   Other than what you've already talked
10   about?
11       A.   No, I don't.
12       Q.   Do you personally know of any steps that
13   any creditors of AHERF or its affiliates, including
14   PNC, could have taken that would in fact have halted
15   AHERF's financial demise?
16       A.   It's been so long, I can't recall the --
17   what the remedies might have been.  The proposed
18   remedies might have been at that point.
19       Q.   So given the passage of time --
20       A.   Yeah.
21       Q.   -- you don't have knowledge today as you
22   sit here?
23       A.   I don't.  I don't.
24       Q.   Do you personally know of any conduct by
25   Coopers & Lybrand that contributed to delays in

Page 161

1    discovering the true financial statement of affairs
2    in the AHERF system?
3        A.   I don't.
4        Q.   Do you have any personal knowledge of any
5    conduct of Coopers & Lybrand that aided in preventing
6    the immediate implementation of effective measures in
7    time to reverse the decline in AHERF's financial
8    condition?
9        A.   I don't.
10       Q.   Do you know personally of any inaccuracies
11   revealed in AHERF's financial statements that had a
12   material and negative effect on the sale price of
13   certain AHERF affiliates?
14       A.   I don't, but I'm not sure I would have been
15   close enough to it to know.  But I don't know.
16       Q.   Okay.
17       Do you know whether -- personally know
18   whether if any creditors of AHERF or its affiliates,
19   including PNC, had had additional information about
20   AHERF's financial condition -- I'm sorry.  Let me
21   start over, then.
22       Do you personally know whether any
23   creditors of AHERF or its affiliates, including PNC,
24   had had additional information about AHERF's or its
25   affiliates' financial condition at an earlier point

41 (Pages 158 to 161)

RALPH S. MICHAEL

Page 162

1  in time, the AHERF system would in fact have been
2  precluded from incurring the obligations that
3  eventually forced its bankruptcy?
4      MR. COGAN:  Objection.
5      MS. HACKETT:  Did AHERF -- you're asking
6  him that AHERF would have been prevented from
7  incurring the obligations?
8      THE WITNESS:  I --
9      MR. TERUYA:  Yes.
10     MS. HACKETT:  Object.  Lack of foundation.
11 But you may answer if you understand it.
12     THE WITNESS:  I would say simply that I
13 don't -- it's not clear to me what financial
14 obligations that specifically caused the bankruptcy,
15 so I guess I can't answer the question.
16     MR. TERUYA:  Okay.
17     THE WITNESS:  It's a lack of understanding
18 on my part.
19     MR. TERUYA:  Okay.
20     Q.  Do you personally know if any decrease in
21 AHERF's income or assets for fiscal years '96 or '97
22 would in fact have caused bond holders, credit
23 enhancers or other creditors to have acted any
24 differently?
25     A.  I have a strong belief that had the, you

Page 163

1  know, financial results been reported at that point
2  in time that the debt ratings would not have remained
3  at the level that they were, and I think that would
4  have had an impact on all of the above.
5      Q.  Do you know whether in fact the debt rating
6  would have been affected?
7      A.  I don't know it for a hard fact because I'm
8  not Moody's or Standard and Poors, but I'm very
9  confident that it would have been.
10     Q.  And what would in fact have been the effect
11 in any change of the debt rating?
12     A.  Depending on the time, I know certainly had
13 it been -- had it occurred prior to our approval, had
14 the debt been noninvestment grade, you know, it's
15 possible that we wouldn't have approved, you know,
16 that credit.  It is likely that we wouldn't have
17 approved it in that size, you know.
18     Q.  Do you have any recollection as you sit
19 here today of the chronology of the approval of the
20 DVOG letters of credit versus the issuance of the
21 fiscal year '96 financial statement?
22     A.  I don't recall.
23     Q.  Okay.
24     In addition or other than or setting aside
25 the possible ramifications with respect to the

Page 164

1  approval decision, what other effects, if any, would
2  be -- any change in the financial statements in fact
3  have caused among creditors?
4      A.  Including PNC or --
5      Q.  Including PNC.
6      A.  Yeah.  The -- the -- it's entirely likely
7  that that would have made the, you know -- any
8  covenant violation, any waiver discussions, you know,
9  much more difficult for the company.  You know, that
10 there would have been, you know, far stronger
11 pressure to restructure, you know; far stronger
12 pressure to limit expenses and to really right the
13 ship from an operating perspective.
14     We had a misconception of what the hospital
15 looked like from an operating perspective.
16     Q.  And do you know what particular steps PNC
17 would have taken?
18     A.  I don't really know because we weren't
19 confronted with that issue.
20     Q.  Okay.
21     Do you know what effect in fact a
22 restructuring would have had if it had occurred at an
23 earlier point in time?
24     A.  Well, I don't know in fact, but I would
25 observe that it -- it probably would have improved

Page 165

1  the operating cash flow of the organization.
2      Q.  Did you ever perform any retrospective
3  study of any of these issues of what, you know, could
4  have been different in terms of the operations at
5  AHERF --
6      A.  I did not.
7      Q.  -- if different steps had been taken?
8      A.  I did not, no.
9      Q.  Do you personally know of or would your
10 answer be the same to the question do you personally
11 know if any decrease in DVOG's income or assets for
12 for fiscal years '96 or '97 would in fact have caused
13 bond holders, credit enhancers, or other creditors to
14 have acted any differently?
15     A.  Same answer.
16     Q.  Do you personally know if any decreases in
17 AHERF's or DVOG's income or assets for fiscal years
18 '96 or '97 would in fact have caused any covenant
19 violations?
20     A.  I don't know.
21     Q.  Do you personally know what steps, if any,
22 any creditor of AHERF or its affiliates would in fact
23 have taken in response to learning of a covenant
24 violation?
25     A.  I don't know.  If you're talking about

42 (Pages 162 to 165)

RALPH S. MICHAEL

Page 166

1  creditors including PNC, I, again, go back to my
2  earlier comment of much more difficult and attentive,
3  you know, discussion around waivers.
4      Q.   Would your answer still be that you can't
5  say what specific actions PNC would in fact have
6  taken?
7      A.   Only by virtue of the fact that it -- since
8  it didn't happen, I can't tell you exactly what we
9  would have done.  I can tell you that in a general
10 sense we would have gone in and worked very closely,
11 you know, with the company to shore up their
12 operating cash flow which could have included the
13 introduction of a crisis manager, for instance, as a
14 mechanism to try and preserve and ultimately build --
15 preserve cash in and ultimately build the cash flow
16 of, you know, the AHERF entity.
17     Q.   What's a crisis manager?
18     A.   Crisis manager would be a consultant
19 experienced in turnarounds.
20     Q.   Was any recommendation ever made with
21 respect to AHERF as things actually unfolded in terms
22 of appointing a turnaround expert or consultant of
23 some sort?
24     A.   That's really a question for Tom Mc Cool.
25     Q.   Have you ever had any role or involvement

Page 167

1  or did you ever have any role or involvement as CEO
2  of the corporate banking area in appointing a
3  turnaround expert or consultant?
4      A.   Yes.  We -- that's -- and actually Tom Mc
5  Cool does that, but that's a fairly standard
6  practice, you know, within the commercial banking
7  industry and introducing crisis managers hired by the
8  company, you know, for -- to -- to work -- to bring
9  about financial resolution.
10     Q.   Once as you mentioned some of the problems
11 at AHERF became apparent to people at PNC, do you
12 know if in fact someone was hired as a turnaround
13 consultant?
14     MS. HACKETT:  I believe you asked him that.
15     MR. TERUYA:  I asked if there was any
16 consideration of it, and he said Tom Mc --
17     MS. HACKETT:  Yeah.  Okay.
18     THE WITNESS:  And same answer.  I just
19 don't know whether it happened or not.
20     MR. TERUYA:  Okay.
21     Q.   In addition to the possibility of hiring a
22 crisis manager, are there any other specific steps
23 that you know PNC would in fact have taken or might
24 have taken?
25     A.   Well, there are a whole host of steps that

Page 168

1  are really driven by the particular circumstances at
2  the time.
3      Q.   Can you say what the effects in fact would
4  have been of any of those particular steps?
5      A.   Historically, you know, those are very
6  successful at preserving cash in the estate,
7  enhancing the liquidity of the enterprise and, in
8  many cases, averting bankruptcy.
9      For instance, to -- and we talked earlier
10 about, you know, money that in hindsight looks silly,
11 corporate boxes at stadiums, et cetera.  A crisis
12 manager would come in, identify that and eliminate
13 it, and that cash, therefore, never gets spent.  So
14 that's the sort of thing that can occur.
15     Q.   And do you know what in fact would have
16 been the outcome of any such steps in this instance
17 with respect to AHERF?
18     A.   I don't know because again we didn't have
19 the opportunity to do that.
20     Q.   Who are the crisis managers, if you know,
21 that PNC deals with?
22     A.   Again, I'd refer you to Tom Mc Cool because
23 he's the actual party in charge there.
24     Q.   Do you personally know what steps, if any,
25 any creditor of AHERF or its affiliates, including

Page 169

1  PNC, would in fact have taken in the event that a
2  default would have been declared?
3      A.   Again, I don't know with absolute
4  certainty, but it would run the range, you know,
5  from -- if an event of default had been declared, my
6  guess is it would be acceleration.
7      Now, if an event had been -- had been
8  threatened but not declared, it might be different.
9      Q.   Are you equating the event of default being
10 declared or an event of default being declared an
11 indecision to accelerate?
12     A.   Well, the -- if you think through the chain
13 of events, a situation occurs, a default occurs which
14 can go, you know, one of three ways:  It can be
15 cured; it can be waived, or it can be declared.  I
16 took your question from the very narrowest sense
17 because once declared, it means, typically, that you
18 and the borrower have acknowledged that you're going
19 to disagree, and, you know, that you're not willing
20 to work together and in a high percentage of declared
21 defaults, you know, there is an acceleration.  So it
22 may simply be the form of the question that you
23 asked.  If the -- and again, I go back to that event
24 of default which can be dealt with in one of three
25 ways.

43 (Pages 166 to 169)

RALPH S. MICHAEL

Page 170

1    Q.   Okay.  So like a lower case e, lower case
2  d, event of default, it could be dealt with in three
3  possible ways?
4    A.   Yes.
5    Q.   One of which is to declare a formal capital
6  E, capital D event of default?
7    A.   Correct.
8    Q.   And then likely to accelerate?
9    A.   Right.
10    Q.   Do you know if there are possible remedies
11  or steps that PNC could take, competing steps PNC
12  could take once a formal event of default is
13  declared?
14    A.   There are, but they're relatively limited,
15  you know.  That's -- the declaration of a formal
16  event of default is a very serious issue.
17    Q.   Do you know whether during calendar '98
18  before the bankruptcy any other creditors of AHERF or
19  its affiliates declared a formal event of default?
20    A.   I don't know.
21    Q.   Do you know what steps, if any, PNC would
22  in fact have taken if another entity creditor had
23  declared a formal event of default?
24    A.   I don't know because I don't know the
25  answer to the first question, so that's --

Page 171

1    Q.   Okay.
2        Do you personally know what steps, if any,
3  any creditor of AHERF or its affiliates would in fact
4  have taken if Coopers & Lybrand had issued an
5  unqualified opinion on any AHERF or DVOG financial
6  statements?
7    A.   An unqualified opinion?
8    Q.   I'm sorry.  A qualified opinion.
9    A.   I thought so, because I didn't --
10    Q.   I'm sorry.
11    A.   Yes.  At that point that is a severe red
12  flag, you know.  It is -- I can't recall in my
13  career, you know, where I have made a loan or
14  approved a loan to an entity -- a new loan.  And
15  sometimes you have to renew loans that are
16  outstanding, but a new loan to an entity that has a
17  qualified opinion.
18        The -- we would have immediately, had we
19  even considered -- continued to consider extending
20  credit, you know, we would have immediately contacted
21  with the company's approval Coopers and tried to get
22  to the very bottom of what it was, you know, that
23  caused them to issue that qualified opinion, you
24  know.
25        It's -- it's challenging to me to think

Page 172

1  that there would have been an outcome there that
2  would have -- that we would have continued to pursue.
3        Now, concurrently, had there been a
4  qualified opinion, the credit never would have gotten
5  investment grade status from Moody's and Standard &
6  Poors, and that -- if you think back to my earlier
7  comments, the two of the necessary conditions for me
8  to sign approving this, one was an investment-grade
9  status, and the other was an unqualified opinion.
10  The absence of one brings about the absence of the
11  other in that order.  I'm sorry.  In that reverse
12  order.
13        The absence of the unqualified opinion
14  brings about the absence of the investment-grade
15  rating, and it's a nonstarter.
16    Q.   Do you have any understanding of what was
17  the chronological relationship between Coopers &
18  Lybrand's issuance of an audit opinion on the fiscal
19  year '96 financial statements of AHERF and its
20  affiliates with respect to the approval decision?
21    A.   No.  That -- I think that was asked
22  previously, and I do not.
23    Q.   Do you personally know what the effects of
24  any steps that any creditor of AHERF or its
25  affiliates could have taken in response to a -- to

Page 173

1  learning of a GAP violation would have been?
2    A.   It would be speculative on my part.
3    Q.   Do you personally know what would the
4  effect have been of any steps of any creditor of
5  AHERF or its affiliates could have taken in response
6  to learning of any material misstatement in the
7  financial statements of AHERF or any of its
8  affiliates?
9    A.   Well, the -- let me ask, are you including
10  any creditor, including PNC?
11    Q.   Yes.
12    A.   You've asked that in some questions and not
13  others.
14        The -- then let me amend that because
15  either a GAP violation or, you know, a material
16  misstatement would likely be a violation of the
17  covenants which again, as you know, I'm no expert in
18  the documentation of this particular transaction, but
19  as part of boilerplate, you know, you would have
20  material misstatement and GAP violations, typically,
21  you know, and that would have led to a covenant
22  default, you know, and -- or the existence of an
23  event of default that could have been declared a
24  capital letters event of default and with the
25  potential for acceleration thereafter.

44 (Pages 170 to 173)

Page 174

1    Q.  Do you know what would in fact have been
2  the particular steps PNC or other creditors would
3  have taken in response to learning of GAP violations
4  or material misstatements?
5    A.  I can't --
6    MS. HACKETT:  Other than what he's already
7  testified to?
8    THE WITNESS:  Yeah.  That's really kind of
9  the same thing I just said, you know.  The -- there
10 would have been a very intensive, you know,
11 discussion with the company and with Coopers &
12 Lybrand, you know, and the -- you know, the
13 potential, you know, for the declaration of an event
14 of default, you know, out of -- capital letters event
15 of default out of that condition of default.
16 BY MR. TERUYA:
17   Q.  Do you know what the effect would have been
18 of any steps that could have been taken?
19   A.  The -- I don't know specifically, but, you
20 know, again, probably a restructuring of the credit,
21 the hiring of a crisis manager, potentially, you
22 know.  A step along those lines.
23   Q.  Do you know whether a crisis manager in
24 fact would have been able to successfully avert
25 AHERF's bankruptcy?

Page 175

1    A.  I don't know whether a crisis manager would
2  have been able to avert the bankruptcy, but I'm
3  highly confident a crisis manager would have caused
4  the creditors to result in a higher realization on
5  their claims.  That -- of that I have a very, very
6  high degree of confidence.
7    Q.  What's the basis for your belief?
8    A.  His- -- just seeing countless situations of
9  similar nature.  Professional experience.
10   Q.  What -- do you have any sense of what the
11 quantitative effects would have been in terms of
12 realization by creditors?
13   A.  I'm not close enough to it to know.
14   Q.  Do you personally know what would have been
15 the quantitative effect of any steps that PNC or
16 other creditors could have taken in response to
17 learning of material misstatements or GAP violations?
18   A.  It would be speculation on my part.
19   Q.  Did you ever perform any studies or do you
20 know of anyone performing any studies of what
21 creditors' recovery could have been under different
22 scenarios as things unfolded at AHERF?
23   A.  I'm not aware of any.  Doesn't mean they
24 don't exist.
25   Q.  Do you personally know what the particular

Page 176

1  consequence is -- actually, let me strike that.
2    Do you personally know whether the term
3  "unrestricted fund balance" in any letter of credit
4  agreement between PNC and AHERF in fact excludes
5  intercompany loans?
6    MS. HACKETT:  Can I have that back, please?
7  BY MR. TERUYA:
8    Q.  Do you personally know whether the term
9  "unrestricted fund balance" in any letter of credit
10 agreement between PNC and AHERF in fact excludes
11 intercompany loans?
12   MS. HACKETT:  Objection.  Lack of
13 foundation.  He has to look at the documents to know
14 that.
15   THE WITNESS:  You took the words out of my
16 mouth.
17   MS. HACKETT:  There you go.
18   THE WITNESS:  I would not have used
19 "objection" and "foundation," but I am not familiar
20 with the letter of credit documents.
21 BY MR. TERUYA:
22   Q.  And therefore you don't know?
23   A.  Therefore I don't know.
24   Q.  Do you personally know the present extent
25 of the bankrupt AHERF's estate's net in solvency?

Page 177

1    A.  No.
2    Q.  Do you know who was charged, if anyone,
3  with monitoring that -- the present extent of the
4  bankrupt estate's net in solvency?
5    A.  No.
6    MS. HACKETT:  I was going to say you mean
7  PNC or beyond that, but I don't think he knows either
8  way.
9    MR. TERUYA:  I just meant PNC.
10   THE WITNESS:  No.
11 BY MR. TERUYA:
12   Q.  Have you had any conversations with any
13 lawyers with Jones Day before this deposition?
14   A.  No.
15   MS. HACKETT:  Relating to the deposition;
16 correct?
17   MR. TERUYA:  Yeah.  In relating to the
18 deposition.
19   THE WITNESS:  No.  I was going to say I had
20 a conversation with Mickey Pohl, I think, back in
21 1994, but it wasn't about AHERF.
22 BY MR. TERUYA:
23   Q.  Did you have any conversations with anyone
24 else about this deposition before the deposition?
25   A.  No.

45 (Pages 174 to 177)

RALPH S. MICHAEL

Page 178

1    MS. HACKETT: Other than me.
2    THE WITNESS: I'm sorry. Exactly. That's
3 right.
4    MS. HACKETT: Other than me.
5    THE WITNESS: I'm sorry.
6 BY MR. TERUYA:
7    Q.  Did you meet with anyone from Reed Smith in
8 preparation for this deposition?
9    A.  Yes. I met with Mary yesterday for an hour
10 or less.
11    Q.  Anyone else?
12    A.  No.
13    Q.  And other than your meeting for an hour or
14 less, did you have any other conversations with
15 anyone from Reed Smith?
16    A.  No.
17    Q.  Do you have any present plan to testify at
18 any trial in this case?
19    A.  I sure hope not.
20    Q.  Are you involved in this litigation in any
21 way other than testifying at this deposition?
22    A.  No.
23    Q.  Have you ever had any discussions with
24 anyone about this litigation? Just "yes" or "no."
25    A.  No.

Page 180

1    Q.  I want to just ask a few -- a couple more
2 questions that I skipped over.
3    Do you personally know the effect of any
4 steps that any creditor of AHERF or its affiliates,
5 including PNC, could have taken in response to
6 learning of covenant noncompliance by AHERF or its
7 affiliates?
8    MS. HACKETT: Objection. Wasn't that asked
9 and answered --
10    MR. TERUYA: I asked about GAP violations
11 and material misstatements.
12    Q.  If you're answer would be the same --
13    A.  Yeah.
14    Q.  Do you personally know the effect of any
15 steps that any creditor of AHERF or its affiliates,
16 including PNC, could have taken if any event of
17 default had been declared?
18    MS. HACKETT: Objection. Asked and
19 answered.
20 BY MR. TERUYA:
21    Q.  Same answer?
22    A.  Yeah. Same answer.
23    Q.  Can you tell me what were the circumstances
24 of your departure from PNC?
25    A.  The -- a relatively complex set of

Page 179

1    Q.  And do you know if your -- going back to
2 that question I asked you earlier. Do you know if
3 your stock holdings were ever publicly-disclosed in
4 any of PNC's public filings?
5    A.  They're -- I know that they are disclosed
6 and vastly overstated, you know. And when I say
7 this, because you'll find it anyway, if you go to
8 Yahoo, for instance, you'll find a form 4 filing that
9 they pick up that includes, you know, some restricted
10 stock that by virtue of leaving PNC I did not
11 collect. So, you know, I think that's still out in
12 the public domain, and it's not correct. I wish it
13 was. Man, do I wish that.
14    Q.  You told me --
15    MR. TERUYA: Actually, can we take a quick
16 break? I just want to look at my notes. I think
17 we're done.
18    MS. HACKETT: Sure. Sure.
19    THE WITNESS: Yes.
20    THE VIDEOGRAPHER: The time is 3:35 p.m.
21 We're off the record.
22    (Whereupon a break was taken.)
23    THE VIDEOGRAPHER: Time is 3:43 p.m. We're
24 back on the record.
25 BY MR. TERUYA:

Page 181

1 circumstances, but I resigned voluntarily.
2
3    (Whereupon pages 181-186 are contained in a
4 separate confidential transcript.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

RALPH S. MICHAEL

Page 187

1    THE VIDEOGRAPHER:  Any questions on your
2  side?
3    MR. COGAN:  Yes.
4    THE VIDEOGRAPHER:  Let me give you a
5  microphone.
6    MR. COGAN:  Okay.
7    THE VIDEOGRAPHER:  Can we go off the record
8  for just a second?
9    MR. COGAN:  Sure.
10    THE VIDEOGRAPHER:  The time is 3:51 p.m.
11  we're off the record.
12    (Whereupon a recess was taken.)
13    THE VIDEOGRAPHER:  Time is 3:53 p.m.  We're
14  back on the record.
15
16  EXAMINATION
17  BY MR. COGAN:
18    Q.  Mr. Michael, I have just a, oh, brief
19  series of questions for you.  Hopefully this won't
20  take too long.
21    You had indicated during your -- in some of
22  your responses to Mr. Teruya's questions that the
23  audited financial statements give you a much more
24  complete picture, as it were, of the company that
25  you're contemplating extending credit to; is that

Page 188

1  correct?
2    A.  Yes.  Whether it's a complete picture, more
3  complete picture than interim statements, by virtue
4  of the fact that those statements are validated by an
5  outside third party, you know, it's a much more
6  reliable -- traditionally much more reliable picture.
7    Q.  And you indicated that one of the things
8  that you had understood the outside auditors were
9  doing would be a balance sheet reconciliation; is
10  that right?
11    A.  In the -- frequent audits with which I'm
12  familiar, there would be a reconciliation of such
13  items as accounts receivable, accounts payable, you
14  know, to verify the existence in particular on the
15  assets side of the balance sheet.
16    Q.  And with respect to the -- and of course
17  accounts receivable would be on the assets side of
18  the balance sheet?
19    A.  Yes, they would.  Yes.
20    Q.  And given your experience -- long-time
21  experience as a lender, is it important that accounts
22  receivables be stated at their net-realizable value?
23    A.  Absolutely.
24    Q.  And why is that?
25    A.  Well, because that's -- you want to have in

Page 189

1  any -- you want your financial statements to project
2  a true and correct, you know, picture of the
3  financial viability of the firm, and to the extent
4  that the accounts receivable are stated in an amount
5  in excess of their realizable value, they're not
6  doing that.  You know, you have a situation where
7  the -- the value of the firm as reflected in equity
8  or in fund balances is overstated.
9    Q.  And has it been your experience that if the
10  accounts receivables are overstated, there is also
11  the potential that income has been overstated?
12    MR. TERUYA:  Objection.
13    THE WITNESS:  That is correct, yes.
14  BY MR. COGAN:
15    Q.  And is the reason for that being that in
16  order to increase your bad debt reserves in order to
17  get accounts receivables to their net-realizable
18  value, you have to make a charged income?
19    THE WITNESS:  That's correct.
20    MR. TERUYA:  Objection.
21  BY MR. COGAN:
22    Q.  Now, if you would, do you have Exhibit 1722
23  in front of you?
24    A.  Yes, I do.
25    Q.  You were asked during the direct

Page 190

1  examination to -- questions about the structural risk
2  with -- well, not just the structural risks but
3  different risks with respect to the extension of
4  credits, and in particular, those credit issues which
5  identify the risk appeared on page 2333 and 34.
6    A.  Okay.
7    Q.  And do you remember that there was some
8  discussion about those risks during your direct
9  examination?
10    A.  Yes.
11    Q.  And if I understood your testimony, you
12  indicated that there were factors which would have
13  mitigated the fact that AHERF was not guaranteeing
14  the debt.
15    Do you recall that?
16    A.  Yes.
17    Q.  And of course the guaranteeing of the debt
18  was identified was one of the structural risks;
19  right?
20    A.  Correct.
21    Q.  And what I'd like to do is if I could just
22  direct your attention first to page 23363.
23    A.  Okay.
24    Q.  And under "Competition," do you see that in
25  Section 5?

47 (Pages 187 to 190)

RALPH S. MICHAEL

Page 191

```
1     A.  Yes, I do.
2     Q.  And if you go to the second paragraph after
3  the first sentence there, it says, "The Obligated
4  Group" -- meaning DVOG here -- "compares favorably to
5  its peers in regards to EBITDA margin" -- EBITDA
6  being E-b-i-t-d-a.
7        Do you see that?
8     A.  Yes, I do.
9     Q.  And would that be an example of one of the
10 risks, or, excuse me, one of the factors that would
11 mitigate the fact that AHERF was not guaranteeing the
12 debt?
13       MR. TERUYA:  Objection.
14       THE WITNESS:  It would be one, yes.
15       MR. COGAN:  Okay.
16    Q.  And let my have you, if you would, turn to
17 the next page, please.
18       And do you see where it talks about fiscal
19 year-end results for 6-30-95?
20    A.  Yes.
21    Q.  First sentence says, "revenues grew 7.6
22 percent from fiscal year 1994."
23       Do you see that?
24    A.  Yes.
25    Q.  Would you consider that to be another
```

Page 192

```
1  factor which may fall within that category of
2  mitigating the fact that AHERF was not guaranteeing
3  the debt?
4        MR. TERUYA:  Objection.
5        THE WITNESS:  It could quite possibly.  It
6  would depend on -- on comparable rates of growth.
7        Just as the fact that the operating margin
8  in your prior question is an excessive industry
9  average is -- typically indicates that DVOG in this
10 case had a -- was a lower cost operator than its
11 competitors.  You know, that's a positive.
12       If you told me that revenues were growing
13 7.6 percent in an environment where everyone else's
14 were growing at 20 percent, I would tell you that's a
15 negative.
16       If in fact, however, revenues were growing
17 at a pace, you know, that exceeded the competition
18 and EBITDA margins were stronger here, then that's a
19 very good sign.
20 BY MR. COGAN:
21    Q.  And I noticed down in the third paragraph
22 under that same section it indicates that there was
23 improvement in the EBITDA margins.
24       Do you see that?
25    A.  In the --
```

Page 193

```
1     Q.  If you go two more paragraphs.
2     A.  Yes.  Yes, I do.
3     Q.  Again, I take it that might be at least one
4  factor that would be taken into account in
5  determining whether or not it was appropriate to go
6  forward with the extension of credit, even though it
7  wasn't being guaranteed by AHERF?
8     A.  Correct.
9     Q.  And you'll also see, if you go further
10 down, it talks about the results for the seven months
11 ending 1-31-96.
12       Do you see that?
13    A.  How much further down?
14    Q.  So, about two-thirds of the way down.
15       MS. HACKETT:  It says, "for the seven
16 months ending."
17       THE WITNESS:  Oh, yes, I do.
18 BY MR. COGAN:
19    Q.  And you'll see that there apparently had
20 been a calculation of the revenues on an annualized
21 basis, and it's indicated that they continued to be
22 on an upward trend.
23       You see that?
24    A.  Yes.
25    Q.  And I take it the fact that revenues are
```

Page 194

```
1  growing is typically viewed by you as a lender as a
2  positive fact?
3     A.  Yes.
4     Q.  And so again, this might qualify as one of
5  those mitigating factors?
6     A.  Yes.  Again with the caveat that growth
7  relative to others in the industry.
8     Q.  And then you'll notice under category seven
9  where it says, "current financial strength."
10       Do you see that, "strength" --
11    A.  Yes, Uh-huh.
12    Q.  And it indicates in the second sentence,
13 "At 1-31-96 cash and board designated assets totaled
14 59.7 million."
15       Do you see that?
16    A.  Yes.
17    Q.  And then if you go down even a little
18 further, it indicates that liquidity is going to be
19 improved because there's going to be some repayment
20 of a line of credit to PNC.
21       Do you see that?
22    A.  Yes.
23    Q.  And would that also qualify as another one
24 of these mitigating factors or assets?
25       MR. TERUYA:  Objection.
```

48 (Pages 191 to 194)