RALPH S. MICHAEL

Page 195

1    THE WITNESS: It could.
2    MR. COGAN: Okay.
3    Q.   And then finally, you'll notice that the
4  next sentence says, "The restricted fund balance at
5  1/31/96 is $136.8 million of which $30 million is
6  designated for the Obligated Group's debt service."
7    A.   Yes.
8    Q.   Would that be a mitigating factor?
9    A.   Yes.
10    MR. TERUYA: Objection.
11    THE WITNESS: Strong mitigant there.
12    MR. COGAN: Okay.
13    Q.   You can put that exhibit aside now
14  Mr. Michael. Just a couple more questions.
15        In your experience has it ever been the
16  case that you have ignored a covenant violation when
17  the covenant violation has been brought to your
18  attention?
19    A.   Not that I can ever recall.
20    Q.   Can you recall any such instance where PNC,
21  upon learning of a covenant violation, simply ignored
22  that violation?
23    A.   Not -- not consciously.
24    Q.   Would I be correct that typically once you
25  become aware -- you, I'm speaking generically about

Page 196

1  PNC --
2    A.   Yes.
3    Q.   -- become aware of policy, or, excuse me,
4  of a covenant violation, that that triggers an
5  analysis as to what PNC should do in the face of that
6  covenant violation?
7    A.   Yes.
8    MR. TERUYA: Objection.
9  BY MR. COGAN:
10    Q.   And am I correct from your testimony to
11  understand that the circumstances as they exist at
12  the time of that covenant violation will dictate in
13  many respects what action PNC would ultimately take?
14    A.   Yes.
15    Q.   Okay.
16        Finally, Mr. Michael, you indicated that
17  you were sitting on was it three corporate boards?
18    A.   Yes.
19    Q.   I'm just sort of curious. What boards were
20  you sitting on?
21    A.   Board of Ohio Casualty Corporation, Key
22  Energy Services, Inc., and Integrated Alarm Services
23  Group.
24    Q.   And I think you also said you served on at
25  least two audit committees?

Page 197

1    A.   Yes. I chair the audit committees at Key
2  Energy and Integrated Alarm Services, and I'm on the
3  audit committee and chair the finance committee at
4  Ohio Casualty.
5    Q.   As a member of those audit committees, has
6  it been your expectation that if the company's
7  accountants became aware of material misstatements in
8  financial statements, that they would bring that to
9  your attention as a member of audit committee?
10    A.   It's a requirement.
11    Q.   And similarly, if the auditors became aware
12  of any internal control deficiencies, that they would
13  bring that to your attention?
14    A.   Absolutely. It's a requirement, and
15  currently a requirement under Sarbanes-Oxley Act 404.
16    Q.   And if the auditors had concerns with the
17  integrity of management, would that likewise be a
18  fact that you would expect the auditors to bring to
19  your attention?
20    A.   Yes.
21    Q.   And would that have been true back -- based
22  on your experience back in the period of time 1996
23  and 1997 that your expectation would be that auditors
24  would bring those sorts of facts to your attention?
25    MR. TERUYA: Objection.

Page 198

1    THE WITNESS: The rules were different at
2  that time with respect to the codification of
3  behavior. Sarbanes-Oxley wasn't passed, and it
4  wasn't enacted at the time. But my expectation would
5  be that issues of internal control would be, if not
6  taken directly to the audit committee, you know,
7  would be presented to the audit committee in the
8  annual management letter.
9  BY MR. COGAN:
10    Q.   And the management letter is the letter
11  from the accountants?
12    A.   Yes. From the accountants to the -- to
13  management and copied to the audit committee and, in
14  many cases, to the Board.
15    Q.   Have you had occasion in your experience
16  sitting on the audit committee to invite the auditors
17  into executive session?
18    A.   At every meeting.
19    Q.   And just for the benefit of people who may
20  some day watch this tape and not know what an
21  executive session means, can you explain that to me?
22    A.   An executive session is a portion of the
23  meeting where management is excused from the room,
24  and the meeting is strictly between the Board and the
25  audit committee. I'm sorry. The Board and the --

49 (Pages 195 to 198)

Miller Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS LLP*

---

## LESLIE ANN MILLER
*May 17, 2004*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*


**MILLER, LESLIE ANN - Vol. 1**



LEGALINK
A WORDWAVE COMPANY

Case 2:00-cv-00684-DSC    Document 127-12    Filed 07/11/2005    Page 4 of 25

LESLIE ANN MILLER

**Page 26**

1 times as similar to a rotten onion. The more we peeled away
2 the layers, the more rotten the core appeared.
3       It was a financial nightmare, as I recall.
4 And, again, my memory is fuzzy, but it was certainly about
5 that time that you could start to pinpoint real financial
6 difficulties. I remember specifically that Sherif had
7 announced a hope to acquire the Cooper Medical System in New
8 Jersey shortly after Hahnemann and those plans had to be put
9 on hold because of finances.
10     Q    You were a member of the AHERF board of
11 trustees when the Hahnemann acquisition was done?
12     A    Yes, and I was a member of the negotiating team
13 both times. There was a small team of us from AHERF that met
14 with a small group from Hahnemann.
15     Q    The first time, the time that it didn't happen,
16 why didn't it happen at that time?
17     MS. MEADEN: Objection; foundation.
18     A    Inability to come to mutually agreeable terms
19 and I think real concern ultimately about the financial
20 stability of Hahnemann as well. No, I take that back. It
21 wasn't so much I think financial concerns as it really was
22 governance concerns.
23 BY MR. FRIESEN:
24     Q    By governance concerns, do you mean the
25 difficulties of integrating two totally different medical

**Page 27**

1 schools at different physical locations?
2     A    Well, that certainly, but also with it the
3 integration of two strong boards.
4     Q    And then how long after that did you become a
5 member of the negotiating committee for the second time?
6     A    I think it was within about two years.
7     Q    And were the governance concerns that you had
8 the first time, did they go away in the intervening two years?
9     A    No. And certainly I remember a very big battle
10 with Sherif that continued until after the meeting when he
11 chastised me for questioning his motives over the ongoing name
12 and identity of the institution.
13     Q    Had you questioned his motives?
14     A    Yes. Sure.
15     Q    And can you remember -- this was at an AHERF
16 board meeting?
17     A    I honestly don't remember exactly. I remember
18 it was centered around promises that he -- or representations
19 that he had made about the name and the configuration of the
20 board.
21     Q    Let's start with the name. What can you
22 remember about what he thought the name should be and what you
23 thought the name should be?
24     A    I don't remember what -- I can't speak as to
25 what he thought, but the ongoing concern was that the

**Page 28**

1 Hahnemann name would take precedence over the Medical College
2 of Pennsylvania name or that there would be some ridiculous
3 configuration, the possibilities of which were endless if you
4 just let your mind wander.
5     Q    And that was a concern that you had?
6     A    Yes, sure. And certainly not that I alone had.
7 It was the board and the faculty, particularly the
8 long-standing members of the faculty.
9     Q    Because MCP had been known and respected as MCP
10 for a long time?
11     A    Yes. And, frankly, there was a certain elitism
12 among the Medical College of Pennsylvania vis-a-vis the
13 caliber of its medical education and its hospital. Hahnemann
14 did not enjoy a particularly strong reputation for either
15 medical educators or hospitals. It was not a hospital that
16 someone would go to by choice.
17     Q    So the ultimate name of MCP-Hahnemann is
18 something that Mr. Abdelhak wanted?
19     MS. MEADEN: Objection.
20     A    Well, no, I don't think it was something --
21 again, I can't speak for himself. I mean it was -- some kind
22 of compromise was necessary.
23 BY MR. FRIESEN:
24     Q    So you had this discussion about the name first
25 at the meeting, at a board meeting?

**Page 29**

1     A    There were ongoing discussions around that
2 time, yes.
3     Q    And then Mr. Abdelhak chastised you after the
4 board meeting?
5     A    Again, this is all very fuzzy recollection, but
6 yes, I remember.
7     Q    Do you recall what it was that set him off?
8     A    No, I do not.
9     Q    And do you recall what he said to you after the
10 meeting?
11     A    No, no. Just very unhappy with my challenging
12 him or suggesting that -- just with my challenging him.
13 Strike that last part.
14     Q    And what was your reaction when you received
15 this chastising?
16     A    Duly noted, move along. It was certainly not
17 anything new. And Sherif and I enjoyed a healthy sparring
18 relationship throughout my tenure. I mean he knew that I was
19 going to be an ongoing bur in his saddle, a polite one, and I
20 think that he ultimately respected me. My positions were not
21 irresponsible or ill conceived, and I think the fact that he
22 not only kept me on the board but put me in positions of
23 responsibility demonstrated that, but he knew that I was not a
24 yes person. But we battled regularly.
25     Q    Did you observe Mr. Abdelhak intimidating other

8 (Pages 26 to 29)

Page 30

1  members of the board?
2      MS. MEADEN:  Objection.
3      A      Well, I'm not sure that I'd use the word
4  "intimidate," but I mean clearly there were different, quote,
5  classes of members of the board.
6  BY MR. FRIESEN:
7      Q      Tell me about that.
8      A      Well, there were employees.  There were members
9  of the medical faculty who were dependant upon Sherif for
10  their continuing livelihood who wished to continue to be a
11  part of that system.  He was their boss.  So, obviously, they
12  didn't enjoy the independence that I, as a totally untethered
13  board member, did.
14          And, as with any board, there were a certain
15  number of sycophants who seemed to think that by toeing the
16  Abdelhak line they might advance themselves or their own
17  respective positions, and so there was less of a tendency on
18  the part of them to question.
19          And, again, Sherif was a very powerful
20  personality.  He was very smart, very skilled, and he had the
21  ability I think to lull a lot of people into a false sense of
22  security.
23      Q      And you thought that at the time?
24      A      I thought that continuously, yes.  And to his
25  credit, there certainly was a period of time when the

Page 31

1  Allegheny Health System certainly in the Philadelphia area was
2  the system by which all others were being measured.  You need
3  only look to the hospital of the University of Pennsylvania
4  and the financial crisis that it fell into to find a perfect
5  example.  Bill Kelly, in his zeal to keep pace with Sherif's
6  acquisition of practices, put that system into the red, you
7  know, a big red hole.
8      Q      And this was the gentleman from Penn?
9      A      Yes, this was the CEO of Penn.
10      Q      Specifically relating to the strategy to expand
11  AHERF with the hospital acquisitions and physician practice
12  acquisitions, that strategy, do you recall, other than perhaps
13  yourself -- and you can tell me if you would be included in
14  this group -- do you recall any trustees really challenging
15  Mr. Abdelhak on that direction, on that strategy?
16      A      Certainly there were others.  I was by no means
17  alone.
18      Q      Do you recall any specific people?
19      A      Other than the ones that I've already pointed
20  to on this list, no.  Again, that doesn't mean that there
21  weren't others.
22      Q      Did you ultimately agree with the strategy or
23  did you just -- essentially, were you outvoted?
24      MS. MEADEN:  Objection.
25      A      Well, for a time it was hard not to agree,

Page 32

1  because from all outward appearances the strategy was very
2  successful.  So, you know, I certainly had no objective reason
3  not to agree, again, based upon the information that was
4  disseminated to the board.
5          But, again, I point to the acquisition of
6  Graduate as a time that I think the concerns of many of us
7  rose to the surface again, because we had enough information,
8  enough financial information to realize that all was not as
9  rosy as we had hoped, but not enough to comprehend the depth
10  and breadth of the problem.
11  BY MR. FRIESEN:
12      Q      And that testimony just now, you're referring
13  to prior to the Graduate acquisition being approved?
14      A      Yes, and continuing afterwards.
15      Q      How did you find out about the Graduate
16  acquisition, do you recall?
17      A      Well, again, it would have been through some
18  type of communication from Sherif to the board.  Again, it was
19  no surprise, because Harold Cramer, who was then the CEO of
20  Graduate, had made numerous overtures to Sherif about some
21  kind of a merger or partnership or whatever, and, as I recall,
22  he had been turned down a number of times.
23          (1994 trustees' evaluation marked as Exhibit
24  Number 2574.)
25  BY MR. FRIESEN:

Page 33

1      Q      Let me mark an exhibit as Exhibit 2574.  This
2  is a document Bates numbered PR-PLD-020-02184 through 89 and
3  it says trustees' evaluation on the top.  Now this document
4  does not have a date on it, but I will represent to you that
5  it comes from a stack of trustees' evaluations with a tab on
6  top of it saying 1994 trustees' evaluations.  Is that your
7  signature on the last page?
8      A      Yes, I recognize my writing.  Yes, sure is.
9      Q      And this is your handwriting on the form?
10      A      Yes, it is.
11      Q      Do you recall filling out this form?
12      A      Not specifically.
13      Q      You have no doubt that you did?
14      A      No, I have no reason to disagree nor with any
15  of the contents of it.
16      Q      If you go to the page, the second page, 2185.
17      A      Yes.
18      Q      The question is:  "Do you have any specific
19  comments or suggestions about the number of board and
20  committee meetings or the length of meetings?"  Could you read
21  what you wrote there?
22      A      "It would be helpful if some time could be
23  built in to bond with other board members."
24      MR. MILLER:  Too fast.
25      A      I'm sorry.  "It would be most helpful if

LESLIE ANN MILLER

Page 62

1 ultimately sickened by Sherif. I think that's a pretty vague
2 but fair description of the nature of the discussions that we
3 would have had.
4          Walter had been a prodigious fund-raiser for
5 the institution, so he probably more than many was devastated
6 by the invasion of the endowment, because he had been largely
7 responsible for the growth of that during his tenure, not the
8 least of which was the dedication of a specific endowment in
9 honor of his late wife, Betty, which I think grew to seven
10 figures very quickly. And so he was twice invested in that
11 tragic outcome.
12          MR. FRIESEN: Why don't we take another quick
13 break and I think I may be done very quickly if I have a
14 chance to just look at my notes again.
15          THE VIDEO OPERATOR: We are now going off
16 camera. The time is 1:23.
17          (Recess.)
18          THE VIDEO OPERATOR: We are now back on camera.
19 The time is 1:28.
20 BY MR. FRIESEN:
21     Q     Just a few more questions. The physician
22 practice acquisitions, do you recall learning how they were
23 doing financially after they'd been acquired? Was that
24 something that you were kept apprised of?
25     A     I have no specific recollection.

Page 63

1     Q     You don't know one way or the other whether
2 they are doing well or not doing well?
3     A     I beg your pardon. No, I don't.
4     Q     Prior to the deposition today, did you meet
5 with Ms. Meaden or anyone else from Jones Day about the
6 deposition?
7     A     No, I did not have the pleasure.
8     Q     Did you talk to any of them on the phone?
9     A     No.
10     Q     And we've never met?
11     A     No, we have not.
12          MR. FRIESEN: That is all I have, subject to a
13 few more questions once Ms. Meaden is finished.
14     A     Thank you very much.
15          MR. FRIESEN: Thank you for coming in.
16
17          CROSS-EXAMINATION
18
19 BY MS. MEADEN:
20     Q     Ms. Miller, I introduced myself earlier, but I
21 am Laura Meaden and I represent the plaintiff, the Official
22 Committee of Unsecured Creditors of AHERF, in this action, and
23 you will be pleased to know that I have considerably fewer
24 questions for you than Mr. Friesen had today.
25          MR. MILLER: Excuse me, off the record.

Page 64

1          (Discussion held off the record.)
2          (Letter dated November 26, 1996 marked as
3 Exhibit Number 2576.)
4 BY MS. MEADEN:
5     Q     I wanted to ask you and try and pinpoint with a
6 little bit more preciseness the date of your resignation from
7 the AHERF board and its affiliate boards, so I'm going to ask
8 the court reporter to mark a letter that I have here dated
9 November 26th, 1996 to you from Sherif Abdelhak, and we will
10 mark this as Exhibit 2576.
11     A     Okay.
12     Q     The letter begins: "Dear Leslie: It is with
13 regret that I accept your resignation from the Boards Of
14 Trustees of Allegheny University of the Health Sciences and
15 Allegheny Health, Education and Research Foundation," and it
16 goes on from there. But, as I said earlier, this letter is
17 dated November 26th, 1996. Does this help refresh your
18 recollection as to perhaps what month in 1996 you resigned
19 from those boards?
20     A     It would suggest that it was November.
21     Q     Do you recall what period of time elapsed
22 between the time you tendered your resignation and receiving
23 this letter from Mr. Abdelhak?
24     A     I honestly do not. I am sorry.
25     Q     You can put that aside. That's all the

Page 65

1 questions I have on that document. Now, you were a volunteer
2 trustee on all of the boards on which you served within the
3 AHERF system; correct?
4     A     Yes.
5     Q     And so that was not a full-time job for you to
6 be a trustee of those organizations; correct?
7     A     No.
8     Q     And certainly you couldn't give that job the
9 effort that you otherwise gave to your full-time job; correct?
10     A     No.
11     Q     But during your entire tenure, I assume that
12 you exercised your fiduciary duty in the best possible way
13 that you could; correct?
14     A     I certainly attempted to.
15     Q     And can you tell me what you viewed your role
16 as a trustee as?
17     A     One of oversight of management, and by that I
18 don't mean micromanaging, but certainly to review on an
19 ongoing basis the decisions of management vis-a-vis the
20 institutions for which they were responsible.
21     Q     And you were assisted in discharging your
22 fiduciary duties in that role by outside professionals,
23 weren't you?
24          MR. FRIESEN: Objection.
25     A     What do you mean by outside professionals?

17 (Pages 62 to 65)

LESLIE ANN MILLER

Page 66

1  BY MS. MEADEN:
2      Q      Well, certainly there were outside auditors
3  that assisted the board in the financial, reviewing the
4  financial affairs of the institution; correct?
5          MR. FRIESEN:  Objection.
6      A      I do not recall, quite honestly, whether we
7  relied on external auditors or not.
8  BY MS. MEADEN:
9      Q      You have no recollection of whether AHERF had
10 any independent auditors during your tenure as a member of the
11 AHERF board?
12     A      No, I do not, honestly.
13     Q      If I told you that Coopers and Lybrand were the
14 outside auditors during the 1990s time period at least, would
15 that refresh your recollection at all?
16     A      Honestly, no.
17     Q      And you don't recall reviewing audited
18 financial statements then during your tenure as a member of
19 the AHERF parent board?
20     A      No, I do not.
21     Q      At any time during your tenure on the AHERF
22 board, do you ever recall receiving any information that any
23 of the information contained in AHERF's financial statements,
24 whether they be internal or audited, was in any way
25 inaccurate?

Page 67

1      A      When you say received information.
2      Q      Yes, either in writing or verbally.
3      A      Well, as I suggested in my responses to
4  Mr. Friesen's questions, there were I think it fair to say
5  regular expressions of concern about the adequacy of the
6  financial information that was provided to the trustees to
7  perform their oversight responsibility.
8      Q      When you say adequacy, are you talking about
9  the completeness?
10     A      Yes.
11     Q      The volume of information?
12     A      Completeness.
13     Q      But do you ever recall being told by anyone
14 that the information you were receiving was inaccurate?
15     A      No, I do not.
16     Q      Were you familiar with the audit committee of
17 the AHERF board?
18     A      No.  I mean I knew one existed, but...
19     Q      You never served on it?
20     A      No.
21     Q      Did you have any understanding of what the role
22 of the audit committee was during your tenure on the AHERF
23 board?
24     A      Well, it was a more focused form of the overall
25 oversight responsibility of the board, specifically to review

Page 68

1  the ongoing audits of the financials of the institution.
2      Q      I guess what I'm trying to get at is were you
3  aware when you were on the board that the financial statements
4  were being audited?
5      A      No.  You know, I take that back.  I don't
6  remember.  I can't imagine that I wouldn't have been, but I
7  don't have any specific recollection.
8      Q      And you have no recollection of audited
9  financial statements being presented to the board for the
10 board's approval at any time during your tenure?
11     A      I don't specifically recollect it, but if you
12 were to tell me that they would, I wouldn't disagree with you.
13     Q      Have you ever served on the audit committee of
14 any other organization of which you've been a member of the
15 board?
16     A      No, I have not.
17     Q      Do you ever recall hearing at any time during
18 your tenure on the AHERF board that any financial statements
19 of AHERF did not receive a clean opinion from outside
20 auditors?
21     A      No, I did not.
22     Q      Do you have any understanding of what the term
23 "clean opinion" is with respect to financial statements?
24     A      Only a very basic one.
25     Q      Why don't you tell me what that is.

Page 69

1      A      I presume that they had questions about the
2  accuracy of those reports.
3      Q      I'm sorry, that would be a clean opinion or
4  that would not be a clean opinion?
5      A      That would be a dirty opinion, I guess.
6      Q      Okay.
7      A      Soiled.  See why they never put me on an audit
8  committee, off the record.
9      Q      Based on your experience as a professional and
10 based on your experience on other boards and the AHERF board,
11 do you or did you have any expectation as to the types of
12 things that outside auditors would bring to the attention of
13 the board of directors?
14         MR. FRIESEN:  Objection; lack of foundation.
15     A      At that point in time?
16 BY MS. MEADEN:
17     Q      Yes.
18     A      Honestly, no.
19     Q      You had testified earlier that you didn't have
20 enough information to know how bad the situation at AHERF was
21 becoming, and I think you testified that that was some time
22 prior to talk of the acquisition of Graduate; is that correct?
23     A      I'm not sure whether it was prior to or
24 contemporaneously with, at or about that time.
25     Q      The Graduate, talk of the Graduate acquisition?

LEGALINK MANHATTAN (212) 557-7400

LESLIE ANN MILLER

Page 70

1   A       Yes, yes, yes.  And when I say -- never mind,
2   go ahead.
3   Q       Well, that's what I'm going to ask you, what
4   you meant by that statement.  Were you talking about the
5   financial condition --
6   A       Yes.
7   Q       -- of the entity?
8   A       And about the extent of, the increasing amount
9   of debt that the system was taking on in contrast to assets.
10  Certainly we were aware and concerned about the very rapid
11  acquisition of practices and systems by Allegheny, but we had
12  been led to believe that there was not only justifica --
13  strategic justification for doing so, but also financial
14  justification.
15          And it was, as I said, at or about the time of
16  the Graduate -- well, it was not an acquisition at the time,
17  because, as we know, it didn't take place for a while, but at
18  the time that Graduate was under consideration that it first
19  became clear that all was not as rosy as it may have seemed.
20          And one of the reasons for this is because
21  simultaneously with the consideration of Graduate was the
22  consideration of the Cooper Medical System, the strategy
23  always being that, again, for dominance in the southeastern
24  region we had to have a presence in southern New Jersey,
25  which, as you know, is right across the river from

Page 71

1   Philadelphia.
2           And when we heard that Sherif had to cancel
3   consideration of the Cooper System, I think it was a red flag
4   for all of us, because it was not been characteristic of him
5   to set out on a, quote, conquest only to retreat.
6   Q       To put some parameters on this, when you talk
7   about consideration of the Graduate acquisition, are you
8   talking about the August-September 1996 time period?
9   A       Yes.  I was going to say early '96.  As I said
10  before, Graduate, consideration of the Graduate system was not
11  new in 1996.  It was a topic that had been under discussion
12  for almost the entire Allegheny -- the entire time that
13  Allegheny controlled the system.  I think shortly after the
14  merger Harold Cramer sought out Sherif to begin discussions.
15  Q       But your specific discussion with respect to
16  concerns about the financial condition of AHERF, you were
17  talking about the fall-summer of 1996?
18          MR. FRIESEN:  Objection.
19  A       No, I'm talking about all of 1996.
20  BY MS. MEADEN:
21  Q       You said you were led to believe that the
22  Graduate acquisition had a strategic and a financial
23  justification.  By whom were you led to believe that?
24  A       By Mr. Abdelhak.
25  Q       AHERF management?

Page 72

1   A       Yes.
2   Q       Did you ever receive any information from
3   AHERF's outside auditors that acquiring the Graduate Health
4   System could threaten the continued viability of the AHERF
5   system?
6           MR. FRIESEN:  Objection.
7   A       I personally did not, no.
8   BY MS. MEADEN:
9   Q       Are you aware of anyone else on the AHERF board
10  who heard such a thing?
11  A       No.
12  Q       The Cooper Medical System that you were talking
13  about, can you tell me exactly how Mr. Abdelhak conveyed to
14  you or other members of the board, I'm not quite sure in what
15  context he conveyed this, but that he was not going through
16  with the Cooper acquisition?
17  A       It was never formally conveyed, because, to the
18  best of my recollection, he never had formal authorization to
19  pursue it, which would not have been out of the ordinary,
20  because it was characteristic of him to bring propositions to
21  the table, if you will.  So through the grapevine, we knew
22  that it was under consideration by management, and through
23  that same grapevine we heard that it was off the table.
24  Q       I'm trying to understand.
25  A       It was never a subject of board discussion,

Page 73

1   formal board discussion.
2   Q       The grapevine that you're referring to, did
3   that include members of AHERF's staff or management?
4   A       I honestly can't tell you.  Just...
5   Q       Or whether they were community rumors?  You
6   just don't recall?
7   A       No.
8   Q       And the reason that you heard through the
9   grapevine that it wasn't going through with the Cooper
10  acquisition was because of what?
11  A       I remember it was in the context of doing the
12  due diligence on Graduate.  Apparently when the reality of the
13  extent of the Graduate debt came to the surface, obviously,
14  there had to be an adjustment made.
15  Q       But you don't recall anything more specific
16  about that then?
17  A       No, I do not.  There was certainly no formal
18  board action.
19  Q       I take it from your earlier testimony that if
20  issues were brought to your attention that you had concerns
21  about, you didn't hesitate to raise those, any questions that
22  you had with Mr. Abdelhak within the context of a board
23  meeting or otherwise; correct?
24          MR. FRIESEN:  Objection.
25  A       Correct.

19 (Pages 70 to 73)

LESLIE ANN MILLER

Page 74

BY MS. MEADEN:

1   BY MS. MEADEN:
2      Q      If information had been brought to your
3   attention by AHERF's outside auditors that the acquisition
4   strategy that AHERF was engaged in threatened the viability of
5   the system going forward, would that have caused you concern?
6             MR. FRIESEN:  Objection.  When?
7      A      Indeed.
8             MS. MEADEN:  During her tenure as a member of
9   the board.
10     A      Sure.
11  BY MS. MEADEN:
12     Q      And do you believe that you would have wanted
13  an investigation to have been conducted into the basis of
14  those statements by the outside auditors --
15            MR. FRIESEN:  Objection.
16  BY MS. MEADEN:
17     Q      -- and their reasons for believing that the
18  acquisition strategy would threaten the viability of the
19  system?
20            MR. FRIESEN:  Objection.
21     A      I certainly hope that I would have.
22  BY MS. MEADEN:
23     Q      It's something you would not have ignored had
24  you heard that; correct?
25            MR. FRIESEN:  Objection.

Page 75

1      A      I can't imagine that I would have, no.
2   BY MS. MEADEN:
3      Q      You had mentioned earlier that you ran into
4   Mr. Cook sometime after the bankruptcy was filed and asked him
5   didn't you have any idea what was going on.  I don't think you
6   told us what his response to that question was.
7      A      Essentially it was a response that he didn't,
8   didn't know.
9      Q      Do you recall --
10     A      No way of knowing.  Again, it was the age
11  old...
12     Q      Didn't have enough financial --
13     A      Didn't have enough financial information to be
14  able to tell.
15     Q      Do you recall if Mr. Cook ever sat on the audit
16  committee of AHERF?
17     A      No, I do not.
18            MS. MEADEN:  I don't believe I have any further
19  questions pending what Mr. Friesen may ask you now.
20            MR. FRIESEN:  I'm not going to ask you
21  anything.
22     A      Thank you very much.
23            MR. FRIESEN:  Thanks very much.
24            THE VIDEO OPERATOR:  This deposition is now
25  concluded.  The time is 1:47.

Page 76

1   (The deposition was concluded at 1:47 p.m. )

Page 77

1   STATE OF PENNSYLVANIA:
                        : ss
2   COUNTY OF DAUPHIN   :
3         I, Sherry Bryant, a Reporter Notary-Public,
4   authorized to administer oaths within and for the Commonwealth
5   of Pennsylvania and take depositions in the trial of causes,
6   do hereby certify that the foregoing is the testimony of
7         LESLIE ANNE MILLER.
8         I further certify that before the taking of
9   said deposition, the witness was duly sworn; that the
10  questions and answers were taken down stenographically by the
11  said reporter Sherry Bryant, a Reporter Notary-Public,
12  approved and agreed to, and afterwards reduced to typewriting
13  under the direction of the said Reporter.
14        I further certify that the proceedings and
15  evidence contained fully and accurately in the notes by me on
16  the within deposition, and that this copy is a correct
17  transcript of the same.
18        In testimony whereof, I have hereunto
19  subscribed my hand this 18th day of May 2004.
20
21
22        Sherry Bryant, RMR, CRR
23  My commission expires:
    December 13, 2005
24
25

20 (Pages 74 to 77)

Morrison Dep.

## In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

### CHARLES MORRISON
*May 14, 2003*

---

### LEGALINK MANHATTAN
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**MORRISON, CHARLES**



**LEGALINK®**

A WORDWAVE COMPANY

Page 354

1    only referring to the due diligence reserves.
2  Q.  Let me hand you, Mr. Morrison, what has
3    previously been marked as Exhibit 35. Do you
4    recognize this document?
5  A.    Yes. It's a memo from Dan Cancelmi to me
6    regarding intangible assets on the Graduate
7    entities.
8  Q.    And one of the intangible assets on the
9    Graduate entities that Mr. Cancelmi lists
10   here on the schedule -- I'm referring to the
11   second row -- is bad debt reserves for DVAR?
12  A.  Yes.
13  Q.  That's in the amount of $50 million?
14  A.  Yes.
15  Q.  Was it your understanding when you received
16   this memo that was a reference to what we've
17   been calling $50 million reserve transfer?
18  A.  Yes.
19  Q.  Are you familiar with any of the familiar
20   intangible assets that were capitalized in
21   the Graduate entities listed on this schedule
22   Exhibit 35?
23  A.    The estimated loss on disposal of Mt. Sinai
24   I'm generally familiar with. It was an
25   estimate of what the shutdown costs

Page 355

1    associated and the carrying costs associated
2    with the closure of that facility.
3  Q.    Did you play a role in coming up with the
4    $5,046,000 estimate?
5  A.    I think my staff provided support to that
6    effort, yes.
7  Q.    To the best of your knowledge, was that a
8    good estimate of the estimated loss on
9    disposal of Mt. Sinai?
10  A.    I have no reason to think otherwise.
11  Q.    I interrupted you. Are there other
12   intangible assets with which you're familiar?
13  A.    The topics, I'm familiar with how the amounts
14   were determined, and what their probability
15   of exposure are I am not familiar with.
16  Q.  Which other topics were you familiar with?
17  A.    The SSMOB was a medical office building.
18  Q.  That was known as The Church?
19  A.    I thought it was a medical office building
20   associated with Parkview Hospital.
21  Q.    Okay.
22  A.    The estimated loss on disposal of Zurbrugg
23   facility is an issue I'm aware of. I'm not
24   familiar with the amount. Those are the ones
25   that I have recollection of.

Page 356

1  Q.    Were you involved at all in what is known as
2    the HSI Technology?
3  A.    No.
4  Q.    Were you familiar with what was called the 4G
5    System?
6  A.    I'm aware of it, yes.
7  Q.    What was the 4G System?
8  A.    It was a piece of software that was being
9    developed. I don't actually even recall what
10   the software was designed to do, but I'm
11   aware that it was a piece of software that
12   was being developed within the Graduate
13   organization in some fashion that Graduate
14   had made some investment in.
15  Q.    Does HSI stand for Health System
16   International?
17  A.    That's my understanding, yes.
18  Q.    Were you aware of the fact that AHERF had
19   purchased the 4G software program from Health
20   System International?
21  A.    I don't have any specific knowledge of that.
22   I believe in the course of conversations in
23   the hallway I was aware that was the case,
24   yes.
25  Q.    And who at AHERF was involved with that, to

Page 357

1    the best of your knowledge?
2  A.    Involved with?
3  Q.    The purchase of the 4G software program from
4    Health System International.
5  A.    Well, it would have been -- at least as far
6    as I know, it would have been part of the due
7    diligence process that involved the
8    acquisition of all the Graduate entities.
9    David McConnell was involved, Dan Kelly was
10   involved, the due diligence team, counsel for
11   Foley & Lardner.
12  Q.    Why was Mr. Cancelmi providing you with this
13   information about intangible assets on the
14   Graduate entities?
15  A.    As best I recall was information so that we
16   were aware of what the items in the balance
17   sheet represented, and also I believe it was
18   so that we could incorporate the amortization
19   into the budgeting process.
20  Q.    Because you were involved with a Graduate
21   budgeting process by this time?
22  A.    We would have been developing the fiscal
23   '98 -- yes, fiscal '98 budgets for the
24   Graduate organization.
25  Q.    Let me hand you, Mr. Morrison, what's

27 (Pages 354 to 357)

Page 358

1  previously been marked as Exhibit 41. Do you
2  recognize Exhibit 41?
3  A.   Yes.
4  Q.   What is it?
5  A.   A memo from Dan Cancelmi to me regarding the
6  Delaware Valley bad debt reserve shortfall.
7  Q.   He refers in the column headed Graduate
8  Reserves to the $50 million reserve transfer;
9  right?
10 A.   Yes.
11 Q.   And he reported to you that without that $50
12 million reserve transfer that DVOG bad debt
13 reserve shortfall as of May 31, '97, would
14 have been just over $75 million; right?
15 A.   Yes.
16 Q.   So after the $50 million reserve transfer
17 there was still a remaining bad debt reserve
18 shortfall at DVOG of just over $25 million;
19 right?
20 A.   Yes.
21 Q.   The date of this memo is June 20, '97; right?
22 A.   Yes.
23 Q.   Ten days before the end of the fiscal year?
24 A.   Yes.
25 Q.   And with one month to go there was a $25

Page 359

1  million shortfall still; right?
2  A.   That's what the memo says, yes.
3  Q.   When you received this memo did you know that
4  AHERF had to do something in June '97, the
5  last month of fiscal year, in order to plug
6  the $25 million shortfall?
7  A.   My recollection is it was my view that
8  whatever shortfall that was out there would
9  be resolved in the year-end financial
10 statements.
11 Q.   How did you think it would be resolved from
12 the year-end financial statements?
13 A.   Well, if the reserve transfer of $50 million
14 was a valid number, that would contribute to
15 the reduction of the financial statement
16 impact. Anything beyond that would have a
17 financial statement impact.
18 Q.   Through bad debt expense?
19 A.   Yes.
20 Q.   Why couldn't AHERF just leave a bad debt
21 reserve shortfall at the end of the fiscal
22 year?
23 A.   Well, to the extent that we acknowledge that
24 the reserve was inadequate, we would be
25 required to correct it.

Page 360

1  Q.   It would have been required by Coopers &
2  Lybrand; right?
3  A.   Generally accepted accounting principles.
4  Q.   But it was your view, wasn't it, and the view
5  of others at AHERF, so far as you knew, that
6  the reason AHERF had to do something in June
7  '97 to make up the $25 million bad debt
8  reserve shortfall was that otherwise Coopers
9  & Lybrand would come in for the year-end
10 audit and you would see that there is a
11 shortfall; isn't that right?
12        MR. COGAN:  Objection.
13 A.   Just to clarify, it wasn't my responsibility
14 to do the financial statements.  The
15 corporate accounting services held that
16 responsibility.  My view, which is what you
17 asked me, is that it would be resolved in the
18 course of the year-end financial statements
19 preparation and the audit.
20 Q.   And did you think to yourself at the time
21 that the fact that Coopers & Lybrand were
22 going to come in and do the year-end audit
23 was a reason why AHERF had to do something to
24 plug the shortfall?
25 A.   My recollection is that I expected that the

Page 361

1  year-end financial statements and the Coopers
2  audit would resolve the issue, either
3  supporting what had been done internally or
4  making appropriate adjustments.
5  Q.   Let me hand you what has previously been
6  marked as Exhibit 161.  Do you recognize
7  Exhibit 164, Mr. Morrison?
8  A.   I don't have any specific recollection of it.
9  I'm copied on the memo.
10 Q.   It's a July 3, '97 memo from Mr. Cancelmi to
11 Mr. Adamczak?
12 A.   Yes.
13 Q.   And you, Mr. McConnell, Mr. Dionisio and
14 Mr. Snow are all shown as being copied?
15 A.   Yes.
16 Q.   If you could turn, please, to the second page
17 of the memo.  Do you see there that the third
18 paragraph refers to the $50 million transfer
19 of Graduate reserves?
20 A.   Yes.
21 Q.   And then the fact that there is a $25 million
22 bad debt reserve shortfall still remaining as
23 we saw on Exhibit 41?
24 A.   Yes.
25 Q.   Do you see Mr. Cancelmi then writes, Since a

Page 454

```
1       3:30.
2              - - - -
3    (The proceedings were recessed at 3:30 p.m.)
4              - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 456

```
1   COMMONWEALTH OF PENNSYLVANIA  )      E R R A T A
    COUNTY OF ALLEGHENY           )      S H E E T
2
        I, CHARLES MORRISON, have read the forgoing
3   pages of my deposition given on Wednesday, May 14,
    2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
15
16
17
18
19
        In all other respects, the transcript is true and
20  correct.
21      _____
            CHARLES MORRISON
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24      _____
            Notary Public
25      AKF Reference No. Cg75479
```

Page 455

```
1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF ALLEGHENY        )  SS:
3       I, Claire Gross, RDR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   CHARLES MORRISON, was by me first duly sworn to
7   testify to the truth; that the forgoing deposition
8   was taken at the time and place stated herein; and
9   that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 15th day of May,
23  2003.
24      _____
25             Notary Public
```

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## CHARLES P. MORRISON
*June 29, 2004*

---

# LEGALINK MANHATTAN
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**MORRISON, CHARLES P. - 30(b)(6)**



Page 186

CHARLES P. MORRISON

1
2      They would be actions in the
3  Bankruptcy Court, so they would be on the
4  docket of the Bankruptcy Court.
5      There was an action against
6  Mr. Ambuhack, Mr. McConnell and Mr. Weinstein
7  to recover payments that were made under a
8  KESOP benefit program.
9      There are actions currently
10 pending against two third-party payers related
11 to receivable recoveries that are in process,
12 and there are I believe a handful of cases
13 related to claims that are pending before the
14 Bankruptcy Court as well.
15      Q    That is whether a claim should
16 be allowed or not?
17      A    Yes.
18      Q    What are the actions against the
19 two third-party payers to which you referred?
20      A    One is -- I take that back.  One
21 of them has been settled, that was with --
22 against Health Partners, a third-party HMO in
23 Philadelphia.
24      The substance of the case is we
25 engaged a collection agency to evaluate the

Page 187

CHARLES P. MORRISON

1
2  billings that had been rendered to third-party
3  payers and to make an assessment as to whether
4  we were paid all of the amounts that we were
5  entitled to under the contractual arrangements.
6      They reviewed the accounts,
7  rebilled those accounts where they believed we
8  were underpaid, and the vast majority of those
9  claims were paid in the normal course by the
10 third-party payers.
11      This case and the one that's
12 pending, the one that's pending is against U.S.
13 Healthcare, relate to payers that for whatever
14 reason have refused to pay us, and so because
15 we believe we are entitled to the money, we
16 have initiated litigation to pursue recovery.
17      Q    Do you know what the amount of
18 recovery was in the action against Health
19 Partners?
20      A    It was $60,000, I think it was.
21      Q    Do you know what the amount of
22 money at issue is in the action against U.S.
23 Healthcare?
24      A    I believe it is roughly $180,000
25 to $185,000.

Page 188

CHARLES P. MORRISON

1
2      Q    And U.S. Healthcare is now
3  affiliated with the insurance company Aetna,
4  right?
5      A    Yes.
6      Q    Which is a member of the
7  Creditors Committee, right?
8      A    Yes.
9      Q    You referred to preference
10 actions against creditors, and I understand
11 that there is a Bankruptcy Court docket, but it
12 is many thousands of pages long, so it's made
13 it difficult for me to know exactly what might
14 have taken place in the bankruptcy.
15      Are there any preference actions
16 that come to mind other than the one we have
17 already discussed against the Mellon Bank group
18 that were in a material amount?
19      A    Most of the preference claims
20 were resolved through negotiation with the
21 creditors.
22      The ones where we couldn't reach
23 a suitable settlement were pursued in
24 litigation.
25      The most notable one that I can

Page 189

CHARLES P. MORRISON

1
2  think of is with United Creditors Alliance,
3  which was a collection agency.
4      The Bankruptcy Court has
5  rendered a judgment in the amount of $126,000,
6  $127,000.  The creditors appealed to the Third
7  Circuit.
8      Q    Are there any other parties whom
9  the Chapter 11 Trustee has considered suing in
10 connection with damages caused before the
11 bankruptcy to the Debtors' estates?
12      MR. FRIEDMAN:  Objection.  Again,
13 I advise the witness not to divulge any
14 conversations with counsel.
15      A    None that come to mind.
16      Q    The Chapter 11 Trustee has
17 decided not to sue PricewaterhouseCoopers,
18 right?
19      MR. COGAN:  Objection.
20      MR. FRIEDMAN:  Objection.
21      A    As far as I know that's correct,
22 yes.
23      Q    Let me now turn to the
24 bankruptcy plan.
25      MR. RYAN:  Let me mark this

48 (Pages 186 to 189)



Page 190

CHARLES P. MORRISON

1
2       please as the next exhibit number.
3             (The above described document was
4       marked Exhibit 2765 for identification as
5       of this date.)
6       Q       You have before you, sir,
7       Exhibit 2765?
8       A       Yes.
9       Q       That is the second amended
10      consolidated liquidating plan of reorganization
11      under Chapter 11 of the Bankruptcy Code?
12      A       Yes.
13      Q       That's quite a mouthful.
14              It's my understanding that what
15      this is is the plan by which distributions are
16      made to various categories of creditors, is
17      that right?
18      A       Among other provisions, yes.
19      Q       Let me turn, if you would turn
20      with me, please, to Page 15.
21      A       15?
22      Q       Yes, Section 5.4 of the plan.
23      A       Yes.
24      Q       This refers to secured claims of
25      holders of MBIA/PNC claims?

Page 191

CHARLES P. MORRISON

1
2       A       Yes.
3       Q       Is this the provision of the
4       plan to which we referred in general terms
5       earlier that provides a partial secured claim,
6       that is, that grants a secured claim in a
7       partial amount of the total claim, to MBIA and
8       to PNC Bank?
9       A       Yes.
10              MR. FRIEDMAN: Objection.
11      Q       Combining the two of them, their
12      secured claim is $50 million?
13      A       Yes.
14      Q       The remainder of their claim
15      that is unsecured, and that's in the amount of
16      $340.3 million combined?
17      A       Yes.
18              MR. RYAN: Let me mark this two
19      page document as Exhibit 2766.
20              (The above described document was
21      marked Exhibit 2766 for identification as
22      of this date.)
23      Q       Are you familiar, Mr. Morrison,
24      with Exhibit 2766?
25      A       Yes.

Page 192

CHARLES P. MORRISON

1
2       Q       Could you describe for us,
3       please, what it is?
4       A       It is a recitation of the
5       distributions that have been made to creditors
6       since the approval of the plan, the percentage
7       recoveries to unsecureds and admin and priority
8       claimants, secured, unsecured, admin and
9       priority claimants.
10      Q       The first page of Exhibit 2766
11      reflects that the cumulative recovery to date
12      for general unsecured claims of non-Centennial
13      creditors has been 19.25 percent, is that
14      right?
15      A       For the non-Centennial unsecured
16      creditors, yes, that's correct.
17      Q       And that's beginning with an
18      initial amount that was distributed in December
19      of 2000 and goes here through a distribution in
20      December of 2003, right?
21      A       Yes.
22      Q       Now, the recovery of general
23      unsecured creditors of Centennial has been less
24      than that as shown here in the right column,
25      right?

Page 193

CHARLES P. MORRISON

1
2       A       Yes.
3       Q       Why is it that the Centennial
4       creditors are recovering at a lower rate than
5       the non-Centennial creditors?
6       A       In the course of the case it
7       became apparent that the assets available
8       within the Centennial estate may not have been
9       sufficient to cover the administrative costs of
10      the estate, let alone the claims of the estate,
11      and ultimately the plan established a separate
12      class of creditors for those creditors with
13      claims against the Centennial hospitals for
14      payment on an unsecured basis at 30 percent of
15      whatever the recovery rate for the general
16      unsecured creditors were.
17      Q       That's because there were fewer
18      assets for that Debtor than for the other
19      Debtors?
20      A       Yes.
21      Q       The creditors for the other four
22      Debtors had their claims all consolidated, is
23      that right?
24      A       Yes, they are all -- all of the
25      entities have been consolidated, the claims

49 (Pages 190 to 193)

Page 290

CHARLES P. MORRISON

1
2  were entered into between 1988 and January 1,
3  1996?
4       A    Yes.
5            MR. FRIEDMAN:  Objection.
6            MR. COGAN:  Objection.
7            MR. RYAN:  I think that may be
8  all I have.  Let me just take a break
9  and review my notes.
10           THE VIDEOGRAPHER:  Going off the
11  record at 5:55 p.m.
12           (At this point in the proceedings
13  there was a recess, after which the
14  deposition continued as follows:)
15           THE VIDEOGRAPHER:  We are back on
16  the record at 5:58 p.m.
17       Q    Mr. Morrison, we have been
18  discussing the professional fees paid out of
19  the bankruptcy that were, with fees and
20  expenses, have been a little over $90 million
21  since the bankruptcy filing, right?
22       A    Yes.
23       Q    Is it correct that there have
24  been other costs of the bankruptcy
25  administration process that have been borne by

---

Page 292

CHARLES P. MORRISON

1
2  record, and subject to those, I have
3  nothing further.
4            MR. COGAN:  I have no questions.
5            THE VIDEOGRAPHER:  This concludes
6  today's testimony of Charles P.
7  Morrison.  The time on the record is
8  6:00 p.m.  This also concludes tape
9  number 4.
10
11  _____
                CHARLES P. MORRISON
12  Subscribed and sworn
13  to before me this _____
14  day of _____, 2004.
15
16  _____
17       Notary Public
18
19
20
21
22
23
24
25

---

Page 291

CHARLES P. MORRISON

1
2  the Debtor estates?
3       A    The costs of the bankruptcy
4  office itself, myself and the staff that
5  support the bankruptcy office, have been paid
6  from the estate as well, yes.
7       Q    So that would involve the
8  payment for your time and the time of other
9  employees of the Chapter 11 Trustee's office?
10      A    Yes.
11      Q    As well as the fees of people
12  working on a contract basis?
13      A    Yes.
14      Q    The costs of leasing office
15  space in Pittsburgh?
16      A    Yes.
17      Q    And to identify those amounts,
18  would I go then to the monthly operating
19  reports filed with the court?
20      A    Yes.
21           MR. RYAN:  I have no further
22  questions at this time.  Thank you very
23  much for your time, Mr. Morrison.
24           There were some outstanding items
25  that we spoke about previously on the

---

Page 293

CHARLES P. MORRISON

1
2       E X H I B I T S
3  EXHIBIT                           FOR IDENT.
4  2741 Subpoena                          5
5  2742 Document entitled "First Status   14
        Report of William J.
6       Scharffenberger, Chapter 11 Trustee
        of Allegheny Health, Education &
7       Research Foundation for the Period
        of December 10, 1998 through
8       January 31, 1999"
9  2743 Affidavit                         18
10 2744 Document entitled "Report of Sale"  23
11 2745 Document on the letterhead of Tenet  34
        addressed to the Board of Trustees
12      of AHERF dated July 30, 1998
13 2746 Monthly operating report for the   41
        month ending November 30, 1998
14
   2747 Document entitled "Afffidavit of   49
15      Patrick M. Hurst"
16 2748 Document entitled "Motion to       50
        Approve Indemnity Escrow Settlement
17      Agreement Pursuant to Section
        105(a) of the Bankruptcy Code and
18      Bankruptcy Rule 9019(a) dated
        December 9, 2002
19
   2749 Proof of Claim filed by Allegheny  78
20      General Hospital
21 2750 Proof of Claim filed by Allegheny  84
        University Medical Centers
22
   2751 Order approving settlement        89
23
   2752 Document headed "Allegheny Health, 113
24      Education & Research Foundation,
        AHERF, Status Update and Review of
25      Liquidation Objectives" dated

---

74 (Pages 290 to 293)

## Page 294

```
1              CHARLES P. MORRISON
2
3            E X H I B I T S
4   EXHIBIT                    FOR IDENT.
5   2753 Document headed "Allegheny Health,    117
         Education & Research Foundation,
6        AHERF, Status Update and Review of
         Liquidation Objectives" dated May
7        13, 1999"
8   2754 Monthly operating report for the      121
         AHERF Debtors for June of 2000
9
    2755 E-mail from Todd Kevles to Mr.        136
10       Morrison from April 2000
11  2756 E-mail from Todd Kevles to Mr.        138
         Morrison from November 2000
12
    2757 E-mail from Todd Kevles to Mr.
13       Morrison from January 2001
14  2758 Complaint filed by the Chapter 11     152
         Trustee against Mellon Bank,
15       Toronto Dominion, Bank One and Bank
         of Chicago
16
    2759 Stipulation of settlement and order   156
17       relating to settlement of
         preference action against Mellon
18       Bank group
19  2760 Settlement agreement from January     158
         2002 settling various AHERF related
20       claims
21  2761 Complaint in lawsuit brought by the   159
         Official Committee of Unsecured
22       Creditors against certain officers
         and trustees of AHERF
23
    2762 Joint motion for approval of top      173
24       insurer settlement agreement with
         attachments
25
```

## Page 295

```
1              CHARLES P. MORRISON
2            E X H I B I T S
3   EXHIBIT                    FOR IDENT.
4
5   2763 Complaint brought by the Chapter 11   177
         Trustee against the Philadelphia
6        Health Care Trust
7   2764 Monthly operating report for AHERF    181
         for January 2001
8
    2765 Second amended consolidated           190
9        liquidating plan of reorganization
         under Chapter 11 of the Bankruptcy
10       Code
11  2766 Document listing distributions to     191
         creditors
12
    2767 Claims register run April 14, 2004    197
13       sorted by category code
14  2768 Summary of claims document            199
15  2769 Settlement with the United States     213
         Department of Health and Human
16       Services
17  2770 Monthly operating report for AHERF    215
         for April 2004
18
    2771 Proof of Claim filed by Allegiance    230
19       Healthcare Corporation
20  2772 Proof of Claim filed by Bell          234
         Atlantic Network Integration, Inc.
21
    2773 Proof of Claim of Ian Cummings,       236
22       M.D.
23  2774 Proof of Claim number 5128 filed by   251
         Sieman's Medical System
24
25
```

## Page 296

```
1              CHARLES P. MORRISON
2            E X H I B I T S
3   EXHIBIT                    FOR IDENT.
4
    2775 Proof of Claim number 2448 filed by   254
5        Steelcase Financial Services, Inc.
6   2776 Travelers' Administrative Proof of    256
         Claim
7
    2777 Proof of Claim number 6293 filed by   259
8        Waste Management of Pennsylvania,
         Inc.
9
    2778 Schedules regarding professional      265
10       fees
11  2779 Proof of Claim filed by Travelers     288
         Casualty & Surety Company
12
13            I N D E X
14  REQUESTS FOR DOCUMENTS/INFORMATION
15
16       Page    33
         Page   110
17
18
19
20
21
22
23
24
25
```

## Page 297

```
1              CHARLES P. MORRISON
2
3         C E R T I F I C A T E
4
5       I, STEPHEN J. MOORE, a Shorthand
6   Reporter and Notary Public of the State of New York,
7   do hereby certify:
8
9       That, CHARLES P. MORRISON, the witness
10  whose deposition is hereinbefore set forth was duly
11  sworn, and that such deposition is a true record of
12  the testimony given by such witness.
13
14      I further certify that I am not
15  related to any of the parties to this action by blood
16  or marriage; and that I am in no way interested in
17  the outcome of this matter.
18
19      _____
20          Stephen J. Moore, RPR, CRR
21
22
23
24
25
```

75 (Pages 294 to 297)

Page 298

1
2   CHARLES P. MORRISON
3       ERRATA SHEET

4   PAGE/LINE      CHANGE FROM      CHANGE TO
5   _____   _____   _____
6   _____   _____   _____
7   _____   _____   _____
8   _____   _____   _____
9   _____   _____   _____
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22  _____   _____   _____
23  _____   _____   _____
24  _____   _____   _____
25  _____   _____   _____

76 (Page 298)

**Moyer Dep.**

MICHAEL W. MOYER

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
2
                         - - - -
3
THE OFFICIAL COMMITTEE OF          )
4  UNSECURED CREDITORS OF          )
   ALLEGHENY HEALTH, EDUCATION &   )
5  RESEARCH FOUNDATION,            )
                                   )
6                Plaintiff,        )
                                   )
7             -vs-                 )    Civil Action
                                   )    No. 00-684
8  PRICEWATERHOUSECOOPERS, L.L.P.  )
                                   )
9                Defendant.        )
10
11                       - - - -
12      VIDEOTAPE DEPOSITION OF:  MICHAEL W. MOYER
13                       - - - -
14
                  DATE:   November 15, 2002
15                        Friday, 9:00 a.m.
16
                  LOCATION:   MANION McDONOUGH & LUCAS
17                            14th Floor, USX Tower
                              Pittsburgh, PA  15219
18                            412-232-0200
19
                  TAKEN BY:   Defendant
20
21                REPORTED BY:   JoAnn M. Brown, RMR
                                 Notary Public
22                               AKF Reference No. JB72890
23
24
25

MICHAEL W. MOYER

Page 198

1    just identify the document?
2  A.   It's basically a request for information so
3       that they could perform their audit for fiscal
4       year 1997, and it wanted certain pieces of
5       information and wanted it either in computer or
6       otherwise.
7  Q.   Just to be clear, this is information you
8       received from John Lydon and Chuck Lisman at
9       the request from them to provide information to
10      Coopers?
11 A.   Correct.
12 Q.   In connection with the '97 audit, is that
13      right?
14 A.   That's correct.
15 Q.   Okay. You don't recollect receiving this?
16 A.   Truthfully, it didn't jump into my mind. I do
17      not deny getting it, because I'm sure I did,
18      but since it would have been a standard --
19      nothing that jumps out that would have been odd
20      to me.
21 Q.   Do you have any reason to believe that you
22      failed to provide --
23 A.   Oh, I'm sure we provided all information that
24      was requested of us.
25 Q.   Okay. Was that your standard practice?

Page 199

1  A.   Our standard practice was -- and, truthfully,
2       had we not, I'm sure one of the managers would
3       have called me directly and said your people
4       are not providing information, and we did not
5       get a call. So, I'm sure when we received
6       this, that I just turned it over to those
7       people that would have provided the information
8       and moved on. Because, truthfully, looking at
9       the things that they've asked for, almost
10      everything that they ask for was information
11      that would have come from the accounting
12      people. None of them worked for me at this
13      point in time, okay, which is another reason
14      for me not necessarily to remember, because
15      even though I was on the distribution list, I'm
16      not sure that any of this information was under
17      my control any longer, and the people who did
18      control it were also on the distribution list,
19      so --
20 Q.   I know you mentioned earlier that you may have
21      had a discussion with David McConnell about
22      recapture?
23 A.   Correct.
24 Q.   And I'm not sure if I understood earlier that
25      you had told us about the entire conversation

Page 200

1       you had with him about that, and I just wanted
2       to give you a chance.
3  A.   I don't remember the entire conversation. I
4       know that it was not long. I'm sure that
5       probably in one of our one-on-one meetings that
6       we had occasionally, I asked him about the
7       recapture, I mean, just the philosophy that
8       they use since they had just done this at
9       Graduate Hospital as well, and the philosophy
10      that they use to come up with the numbers and
11      how they went about it. It was not a
12      confrontational meeting, because you did not do
13      that with David, it was just really, gee, I'd
14      like to understand what you did. It was
15      probably two or three minutes long, and that
16      was it.
17 Q.   When is the first time that you learned that
18      AHERF was planning on acquiring the Graduate
19      hospitals?
20 A.   I think that came up after we had started
21      discussions with AHERF about our own merger, if
22      I remember correctly, and I know it was a -- it
23      was a little bit of a concern, and I'm not sure
24      if I found out about it through the news or
25      whether I got word of it through Barry Roth who

Page 201

1       would have gotten word of it from Sherif
2       himself.
3  Q.   Why was it of concern?
4  A.   Were they biting off more than they could chew
5       kind of thing all at once to do the Graduate,
6       which was not a small system, and then at the
7       same time to be talking about Forbes and
8       Allegheny Valley, Canonsburg. This was just a
9       lot to do even for a huge staff that they had.
10 Q.   You mentioned that prior to AHERF's acquisition
11      of Forbes, you had reviewed materials about
12      AHERF that gave no indication that there was a
13      cash crunch I think is what you called it.
14      What did you review that helped you arrive at
15      that conclusion?
16 A.   We reviewed the audited financial statements
17      from the previous year end.
18 Q.   Which would have been?
19 A.   Which would have been -- let's see. When did
20      we do this? We did this in '96, right, because
21      the merger was effective January 1, '97? So we
22      were in '96. So we probably were using '95
23      year end, because we were doing this before
24      their audited financials would have been
25      complete for '96, so it's my guess that we were

51 (Pages 198 to 201)

MICHAEL W. MOYER

Page 202

1  looking at the year before, '95, and we
2  probably -- although I don't remember at the
3  moment, but I would think that we also had some
4  interim internal financial statements from them
5  as well that maybe took us through half year,
6  through January, but those would have been
7  unaudited statements.
8  Q.  Was there anything else that you would have
9  reviewed other than those two items?
10 A.  I do not remember getting cash flow information
11 from them, but, again, that's so long ago.  I
12 know we did not get a huge amount of
13 information from them, but we did at least have
14 some financial statement information, and
15 several years' worth, that we analyzed before
16 moving ahead.
17 Q.  Why didn't you think that David McConnell was a
18 truthful person?
19 A.  My association with Mr. McConnell goes back to
20 1980 when he applied to me for a job and I
21 didn't hire him.  I thought his background in
22 accounting was weak, personal view, and the
23 slipshod way that they ran their accounting
24 department which became apparent after the
25 merger.  We really had no knowledge of that

Page 203

1  prior to the merger.  I just didn't find -- I
2  found it easy when you have a slipshod
3  operation to shade the truth in the direction
4  that you want the truth to go, and it was just
5  my personal view that I did not think that they
6  ran a very tight ship.  I didn't think that
7  their accounting controls were very good.
8  Certainly, the information that they provided
9  to their managers was not very good in
10 comparison to what we did at Forbes, and I just
11 did not think that he was always being
12 truthful.
13 Q.  I guess it's one thing to have a slipshod
14 department, but it's probably another thing to
15 be untruthful.  Is there something other than
16 that?
17     I don't think I'm asking a good
18 question, but what I'm trying to understand is
19 was there something other than the nature of
20 the accounting department that operated at
21 AHERF that allowed -- or helped you arrive at
22 the conclusion that McConnell was not to be
23 trusted?
24 A.  Let's say the rumors that I heard about him and
25 the conduct of his life did not match the way I

Page 204

1  liked to live my life, so they were rumors, and
2  so I tend not to like to repeat rumors too
3  much, but I just didn't trust him.
4  Q.  When you were at Forbes and you had
5  responsibility for creating what you've called
6  CRA reserves --
7  A.  Yes.
8  Q.  -- what was your objective when you would
9  create those reserves?
10 A.  Okay.  A little history.  The year before I
11 went to Forbes, they had a loss from
12 operations, and one of the reasons that they
13 had a loss from operations was they settled a
14 prior year's cost report and they did not have
15 it properly reserved, so they had to pay back
16 some money that the government had paid them --
17 or Blue Cross, I don't remember -- and then
18 they had to take that all through the current
19 year which created a loss, which at the time
20 was only a couple hundred thousand dollars, but
21 for a hospital like in '78, '79, those were big
22 dollars.  The board was very upset, one of the
23 reasons I got hired.
24     My objective from day one at Forbes,
25 and my personal philosophy in finance

Page 205

1  accounting, is to be conservative.  So, we at
2  Forbes always took the conservative role.  I
3  always underbooked revenue.  I would always
4  reserve on the bad side to make sure that when
5  it happened, I was going to have a happy
6  surprise for the board and not a bad surprise
7  for the board, and I think in all of my years
8  at Forbes, we only had one bad surprise.  We
9  were very conservative in booking what we
10 thought people owed us as settlements so we
11 would end up with reserves that were reserves
12 that were really, you know, going to help us at
13 the end, because when we actually got the
14 settlement, we would end up with more money
15 than what we thought we said we were going to
16 get.
17 Q.  Were you bound by any requirements to make sure
18 that you did not -- were not overly
19 conservative?
20 A.  Yes.
21 Q.  What were those requirements?
22 A.  Well, obviously, again, the auditors are
23 concerned that we not misstate in either
24 direction, not overstate income or understate
25 income to any great degree, but most auditing

52 (Pages 202 to 205)

MANHATTAN REPORTING CORP., a LegaLink Company

MICHAEL W. MOYER

Page 206

1  firms are also going -- if you're going to make
2  a mistake, they would rather you made the
3  mistake of being more conservative rather than
4  less conservative has been my experience over
5  the years.
6  Q.  Why do you think that is?
7  A.  Well, because they would rather report that
8  your income was less than it was and be
9  surprised to the good in the future as well.
10  They don't want people thinking that you are
11  doing better than you are.
12  Q.  People who might be relying on the financial
13  statements?
14  A.  Which in our case was bondholders and bankers.
15  I mean, we had no stockholders, so those were
16  our two constituencies that we needed to make
17  sure that the statements were accurate for.
18  Q.  If you were to transfer reserves, CRA reserves
19  that had been established to another account,
20  for instance -- is there any reason why you
21  would not transfer reserves that you had
22  established, CRA reserves, to another account?
23  A.  Well, we go back to the same question as
24  earlier. I don't know why anyone would ever
25  transfer a CRA account. It's specific to the

Page 207

1  hospital, and it's specific to what happened at
2  that hospital. So there may be occasion, and
3  I'm not just seeing it being a rather
4  short-sighted person sometimes, as to why one
5  might want to transfer a reserve from one body
6  to another body, but at the moment, I can't --
7  in my own mind, I can't see why anyone would do
8  that.
9  Q.  Is the risk of doing that that if a reserve was
10  properly recorded -- let me step back.
11  If a risk -- if a reserve was
12  properly recorded for, and I'm specifically
13  talking about a CRA reserve, would the risk be
14  that if you transferred that reserve to another
15  account, you have essentially underreserved a
16  potential exposure?
17  A.  Well, there's always the risk that we had
18  underreserved and that we were going to then
19  collect less than we said or that we were going
20  to owe more than we said, whichever, both of
21  those would be an underreserve, but I know in
22  the case of Forbes, we did not underreserve.
23  It was not our practice to underreserve. It
24  was not our philosophy of the people who were
25  determining -- I personally did not determine

Page 208

1  the reserve. That was Barb Johnson's job. She
2  is the expert in reimbursement, one of the best
3  in town. So that was her job to come up with
4  the number and then convince me that it was
5  right. It did not take a lot of convincing.
6  She was the expert and I wasn't. But I know
7  our philosophy over 20 years, and our
8  philosophy was we are going to be conservative
9  in our reserves. So I'm sure that our CRA
10  reserve was conservative. I have no doubts in
11  my mind that it wasn't.
12  Q.  When did you learn that AHERF would be using a
13  consolidated financial statement for '97 -- for
14  its '97 financial statements?
15  A.  Probably not until late, but that was not a
16  surprise to me. I had assumed all along that
17  they would consolidate and use one statement.
18  We hadn't discussed it, so I didn't know for
19  sure until later in the process, but I just
20  assumed that that would be the case.
21  Q.  Did you have an opinion about the decision to
22  move to a consolidated financial statement?
23  A.  No, I didn't have an opinion one way or
24  another.
25      MR. TAMBURRI:  Let's go off the

Page 209

1  record. I'm going to take a look at my notes,
2  but I think I'm about there.
3      THE VIDEOGRAPHER:  We're going off
4  the record. The time indicated on the screen
5  is 3:25 p.m.
6      - - - -
7  (There was a recess in the proceedings.)
8      - - - -
9      THE VIDEOGRAPHER:  Back on the
10  record. The time indicated is 3:31 p.m.
11  BY MR. TAMBURRI:
12  Q.  Almost done, Mr. Moyer.
13      How many years in your career at
14  Forbes did you spend having some interaction or
15  responsibility for interacting with either the
16  bond-issuing authority or bondholders of
17  Forbes?
18  A.  I think my interaction with the bond authority
19  started almost immediately after I started with
20  the organization, so, truthfully, since like
21  1980. Even though it was not my direct
22  responsibility the first year or two, I
23  attended most of the meetings with the then
24  vice president of finance whose responsibility
25  it was, and in some cases just went to the

53 (Pages 206 to 209)

MANHATTAN REPORTING CORP., a LegaLink Company