MICHAEL W. MOYER

Page 226

1 had worked in my treasury department. She
2 moved to their treasury department, and I
3 think -- I'm guessing at what her concerns --
4 Angela was concerned, but Angela is the type of
5 person that will never discuss business with
6 someone who does not have the need and the
7 right to know. I no longer had the need nor
8 the right to know. She knew that if I did, I'd
9 go to her boss to get it. So, she's -- I mean,
10 she doesn't even discuss with her husband, you
11 know, the things that occur in work, nor does
12 he. He happens to be the provost at the
13 University of Pittsburgh. He doesn't discuss
14 with her those things. They're just an
15 extremely moral, down-to-earth couple, and so
16 she would never tell me what her concerns were,
17 but I had known her for ten years. I knew she
18 was concerned, okay, and, in general, it didn't
19 take a genius to know that she works with cash
20 and she's concerned with cash and what was
21 happening with that cash.
22 Q.   And you connected the dots from there?
23 A.   Of course. It does not take a genius to do
24    that.
25        MR. KRUSKO: That's all I have,

Page 227

1    Mr. Moyer. Thank you.
2        MR. TAMBURRI: I have no further
3    questions either.
4        THE VIDEOGRAPHER: With there being
5    no further questions, the deposition is
6    concluded at 3:54 p.m.
7            - - - -
8    (The proceedings were concluded at 3:54 p.m.)
9            - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 228

1 COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2 COUNTY OF ALLEGHENY        )  SS:
3    I, JoAnn M. Brown, RMR, a Court Reporter and
4 Notary Public in and for the Commonwealth of
5 Pennsylvania, do hereby certify that the witness,
6 MICHAEL W. MOYER, was by me first duly sworn to
7 testify to the truth; that the foregoing deposition
8 was taken at the time and place stated herein; and
9 that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13    I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17    I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21    IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 19th day of
23 November, 2002.
24    _____
25        Notary Public

Page 229

1 COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY        )   S H E E T
2
   I, MICHAEL W. MOYER, have read the foregoing
3 pages of my deposition given on Friday, November 15,
   2002, and wish to make the following, if any,
4 amendments, additions, deletions or corrections:
5 Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21    _____
        MICHAEL W. MOYER
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2002.
24    _____
        Notary Public
25 AKF Reference No. JB72890

MANHATTAN REPORTING CORP., a LegaLink Company

Murasko Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## DR. DONNA MARIE MURASKO
### April 8, 2004

---

# *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

MURASKO, DR. DONNA MARIE



LEGALINK
A MERRILL COMPANY

Page 162

Dr. Donna M. Murasko

1        Dr. Donna M. Murasko
2   payment delay.
3        That was a recurrent theme through
4   Board meetings, on whether or not we were
5   getting that money in quickly enough.        03:00PM
6        So this is consistent with that.
7    Q.   Do you know why Len and Sherif said
8   that, "we were fine"?
9    A.   Probably that the individuals are
10  now doing fine.  Previous Board book said --   03:01PM
11  you have actually given me today said that
12  there are concerns with that.  So their
13  comments were probably saying that that has
14  been addressed.
15   Q.   If you go to the next page, Delaware  03:01PM
16  Valley Obligated Group, Combining Statement of
17  Changes in Net Assets For the Year Ending June
18  30, 1997.
19       It says, "Bob Palmer," colon,
20  "realize conditions were difficult but did we  03:01PM
21  do the best we could.  Sherif, I believe so.
22  Recruitment last year was needed, but we're
23  paying for it.  Len, we've made some faculty
24  adjustments but," dot, dot, dot, takes --
25  sorry, "take one year to see change at        03:01PM

Page 163

Dr. Donna M. Murasko

1        Dr. Donna M. Murasko
2   minimum."
3        Do you know what that was about?
4    A.   It's consistent with what I just
5   said.                          03:01PM
6        If you hire new physicians, it takes
7   a year in order for their revenue to be
8   totally represented in the financials because
9   of the billing and the time that those
10  receivables come in.                03:02PM
11   Q.   Well, what do you think, "we're
12  paying for it," means?
13   A.   When you hire faculty, even though
14  you're not getting their revenue in, you have
15  to give them their monthly salary.        03:02PM
16   Q.   And then it says, "Potamkin," colon,
17  PR is management repair.  Are losses real.  Need
18  to know correct spin."
19       Do you know what that's all about?
20       MR. UNICE:  Object to form.      03:02PM
21   A.   I don't know.  I can't go back and
22  interpret that.
23   Q.   But this would be something that Mr.
24  Potamkin said?
25   A.   Not directly; it is obviously a     03:03PM

Page 164

Dr. Donna M. Murasko

1        Dr. Donna M. Murasko
2   paraphrase and a summary on my part.  But I
3   can't decipher it at this point.
4        MR. FRIESEN:  We need to change
5   the tape briefly.               03:03PM
6        VIDEO SPECIALIST:  We are now
7   going off the video record.  That
8   concludes Videotape No. 2.  The time,
9   3:03.
10       (Short recess.)            03:03PM
11       VIDEO SPECIALIST:  We are now
12  back on the videotape record.  This
13  commences Videotape No. 3.  The date,
14  April 8, 2004.  The time, 3:13.
15       You may continue.          03:13PM
16  BY MR. FRIESEN:
17   Q.   Do you recall that Mr. Abdelhak was
18  terminated in June of 1998?
19   A.   Yes, I do.
20   Q.   And when was the first time that you  03:13PM
21  ever heard any discussion whatsoever about his
22  potential termination?
23   A.   I cannot recall the date.  I...
24   Q.   Do you recall how much before the
25  actual termination it was?            03:14PM

Page 165

Dr. Donna M. Murasko

1        Dr. Donna M. Murasko
2    A.   No.
3    Q.   Whether it was a day or a week?
4    A.   I cannot.
5    Q.   Were you involved at all in the      03:14PM
6   decision to terminate him?
7    A.   I was not.
8    Q.   Do you recall how you learned that
9   he was terminated?
10   A.   I do not.                 03:14PM
11   Q.   Did you -- strike that.
12       Do you know when the first time was
13  that you heard that anyone had lost confidence
14  in Mr. Abdelhak?
15   A.   No.                     03:14PM
16       MR. UNICE:  Object to form.
17  BY MR. FRIESEN:
18   Q.   Were you aware that, prior to his
19  termination, a group of AHERF doctors had lost
20  confidence in him?               03:14PM
21   A.   I do not know that.  I do not
22  remember learning that.
23   Q.   And did you ever lose confidence in
24  Mr. Abdelhak prior to his termination?
25   A.   Confidence, no; concern, yes.      03:15PM

42 (Pages 162 to 165)

Page 166

Dr. Donna M. Murasko

1  Dr. Donna M. Murasko
2  Q.  And, again, do you know when that
3  concern started, whether it's in time or
4  related to particular events?
5  A.  I can't pinpoint it to anything        03:15PM
6  specific.
7  Q.  And what was your concern?
8  A.  Things were moving too quickly.
9  Q.  In a negative trajectory?
10  A.  No.                                    03:15PM
11  Q.  No?
12  A.  The growth that was occurring in the
13  system was too quick.  I am a fiscal
14  conservative.
15  Q.  And you don't know whether this was   03:16PM
16  in '96 or seven or eight?
17  A.  I can't put it in a time frame.
18  Q.  How about Mr. McConnell; do you
19  remember ever losing confidence in Mr.
20  McConnell prior to his termination?        03:16PM
21       MR. UNICE:  Object to form.
22  A.  I can't remember formulating an
23  opinion at that time.
24  Q.  Do you know why Mr. Abdelhak was
25  terminated?                                03:16PM

Page 167

Dr. Donna M. Murasko

1  Dr. Donna M. Murasko
2  A.  I do not.
3  Q.  Prior to the time that you became
4  concerned about Mr. Abdelhak, what was your
5  general impression of him?                  03:17PM
6  A.  He was a man who had a defined
7  direction and had the energy to go in that
8  direction.
9  Q.  Did you consider him someone who was
10  open to other people's ideas?             03:17PM
11  A.  Anyone at the top has very defined
12  opinions.  I personally found him more willing
13  to listen than many people at the top.
14  Q.  Just to be clear, than you had
15  thought of many people at the top or that than 03:17PM
16  other people at the top had thought of him?  I
17  am just trying --
18       MR. KOLANKSY:  I --
19  A.  I don't understand your question.
20  Q.  Well, you said you found him more     03:17PM
21  willing to listen than other people at the
22  top.  And I just don't know if you meant other
23  people at the top thought differently or he
24  was different than other people at the top.
25  A.  Oh, probably neither.                 03:18PM

Page 168

Dr. Donna M. Murasko

1  Dr. Donna M. Murasko
2  Q.  Okay.
3  A.  It's people in a position of his
4  authority generally do not -- are not willing
5  to listen to people in the middle at all.  I  03:18PM
6  found him one who would listen.  So not just
7  in Allegheny, but generally people in power.
8  Q.  Now, by "in the middle," what do you
9  refer to?
10  A.  A department head.                     03:18PM
11  Q.  Because you are a Trustee, as well,
12  that's can what I am trying to get at.
13  A.  Key --
14  Q.  In your role as a Trustee, did you
15  consider him someone who was willing to listen 03:18PM
16  to Trustees?
17  A.  My -- you asked for my opinion in
18  general, and I have to do it based on my
19  personal interaction with him.
20       And, as I said before, it was a --    03:18PM
21  it was not just a Trustee; I was a faculty
22  member and a department head.  So I cannot
23  tell you whether or not my interaction with
24  him is universal with everybody.
25       I can tell you specifically how he    03:19PM

Page 169

Dr. Donna M. Murasko

1  Dr. Donna M. Murasko
2  interacted with me, where he was willing to
3  listen to alternate points of view.
4  Q.  Well, when you were at these Board
5  meetings with other Trustees, and when you    03:19PM
6  wrote notes about this Trustee saying this and
7  that one shaking his head, et cetera, et
8  cetera, did you have a sense at those meetings
9  that Mr. Abdelhak was open to the suggestions
10  of other Trustees?                         03:19PM
11  A.  Yes.  He was listening to people and
12  seemed receptive.
13       MR. FRIESEN:  Let me mark
14  Exhibit 2528.
15       (Document marked for
16  identification as Exhibit 2528.)
17       MR. FRIESEN:  This is a
18  documents Bates numbered PR-PLD-066-00492
19  through 497.  And it says, "1995
20  Trustee's Evaluation."  It says,             03:20PM
21  "Murasko," at the top.  Then there is
22  some handwriting throughout and X's.
23  BY MR. FRIESEN:
24  Q.  Is this your handwriting in the
25  responses to this?                          03:20PM

43 (Pages 166 to 169)

Page 174

Dr. Donna M. Murasko

1
2      Q.   But in terms of your employment,
3   your employment for the system was a full-time
4   job?
5      A.   Yes, it was.                    03:29PM
6      Q.   And your time as Trustee was
7   something that you did above and beyond your
8   duties as an employee for the AHERF system?
9      A.   Yes, it was.
10      Q.   Now, in the discharge of your duties  03:30PM
11   as a Trustee, were you assisted in any way by
12   outside professionals that management would
13   hire from time to time?
14      A.   What do you mean by "assistance from
15   professionals"?                        03:30PM
16      Q.   For example, would management from
17   time to time hire consultants to come in and
18   help management and the Board learn about
19   different issues facing the healthcare system?
20      A.   Occasionally.                   03:30PM
21      Q.   And would the managers on a yearly
22   basis allow external auditors to help them
23   prepare and issue financial statements in an
24   audited format?
25      A.   Yes.                           03:30PM

Page 175

Dr. Donna M. Murasko

1
2      MR. FRIESEN:  Objection.
3      A.   (Continued.) Yes, there were
4   outside financial auditors.
5      Q.   Can you recall any other type of    03:30PM
6   outside advisors, besides consultants and
7   auditors, that you were aware of, being
8   retained by AHERF management?
9      A.   I can't recall any.
10      Q.   Now, let's talk for a moment about   03:30PM
11   the manner in which you as a Trustee utilized
12   or relied upon the services of these outside
13   professionals.
14      What was your understanding of the
15   role of AHERF's outside auditing firm, Coopers  03:31PM
16   & Lybrand, during the time you served as a
17   Trustee?
18      A.   My understanding was that Coopers &
19   Lybrand would make sure that there were no
20   abnormalities in the financial reporting for   03:31PM
21   the institution.  And I relied on that audit.
22      Q.   Can you give me anymore details --
23   knowing that you nor I aren't financial
24   people -- what abnormalities you are speaking
25   of?                                    03:31PM

Page 176

Dr. Donna M. Murasko

1
2      A.   I cannot read these financials as
3   thoroughly as a financial person.
4      I was relying on external auditors
5   to look through the financials to make sure    03:31PM
6   there was no inconsistencies, inappropriate
7   activity.  Because I wasn't looking at the
8   daily logs and I wouldn't be able to recognize
9   such things because I'm not a trained eye.
10      Q.   Why would it be important for you,   03:32PM
11   as an external Trustee -- I am sorry, as a
12   Trustee, without a trained eye towards
13   financials, to have external auditors do this
14   check?
15      A.   In my field, as well as the medical  03:32PM
16   profession, we rely on consultants to give us
17   advice in areas where we are lacking
18   expertise.  It is from this perspective that I
19   relied on the auditors to give me that
20   information.                           03:32PM
21      Q.   As an AHERF Trustee, why did you
22   hold it important to have accurate financial
23   statements?
24      A.   We couldn't survive if we weren't
25   financially sound and doing things          03:32PM

Page 177

Dr. Donna M. Murasko

1
2   appropriately financially.
3      Q.   So it is fair to say that you relied
4   upon the audited financial statements as a
5   check on the internal financial statements    03:32PM
6   that were presented for audit?
7      A.   That is correct.
8      MR. FRIESEN:  Objection.
9   BY MR. UNICE:
10      Q.   And you relied on the audited       03:33PM
11   financial statements as a check on whether or
12   not the financials presented for audit were
13   presented with integrity?
14      A.   That is correct.
15      Q.   And you understood the role of the   03:33PM
16   external auditor to disclose to AHERF if
17   during the course of the audit they had
18   uncovered issues that raised integrity
19   questions with them?
20      A.   Yes.                           03:33PM
21      Q.   Now, as your role as an AHERF
22   Trustee, to whom, to your understanding, would
23   the auditors have had to disclose issues of
24   integrity if such issues had arisen?
25      A.   I understood that it would be       03:33PM

45 (Pages 174 to 177)

Page 178

Dr. Donna M. Murasko

1      included in the reports that we got, if there
2      were any inconsistencies.
3      Q. And the reports you are speaking of
4      are the audited report?                    03:33PM
5      A. The statement. As I said, the
6      letter, and then the summary of any problems
7      that may have arisen.
8      Q. And they were presented to the Board
9      on an annual basis; correct?               03:34PM
10     A. Yes, they were.
11     Q. Who presented the annual audited
12     financial statements for approval to the
13     Board?
14     A. I believe it was Dave McConnell, but 03:34PM
15     I can't remember. I can't remember who
16     presented it to us.
17          No; it was the Chairman of the Audit
18     Committee of the Board. Yes, that's who did
19     it.                                        03:34PM
20     Q. Does the name David Barnes ring any
21     bells?
22     A. Yes; I believe he was Chairman of
23     the committee.
24     Q. Let's focus for a minute on a        03:34PM
25

Page 179

Dr. Donna M. Murasko

1      certain time frame.
2          To your recollection, was Mr. Barnes
3      the Chair of AHERF's Audit Committee during
4      Fiscal Years '96 and '97?                  03:34PM
5      A. Years are a problem to me.
6          I know that Mr. Barnes was the head
7      of the committee for a number of years. I
8      cannot specifically tell you what years.
9      Q. So as you understood the process of 03:34PM
10     an audit, the Audit Committee would be the
11     primary committee at AHERF working with the
12     external auditing firm in terms of any
13     communication issues the auditors had to make
14     towards the firm -- towards AHERF?         03:35PM
15     A. That was my understanding.
16     Q. And once the audit report was
17     completed, it went to the Audit Committee
18     first for approval?
19     A. That was my understanding.            03:35PM
20     Q. And then it was your understanding
21     that, after approval by the Audit Committee,
22     the Chair of that committee would make his
23     recommendation to the full Board for its
24     approval?                                  03:35PM
25

Page 180

Dr. Donna M. Murasko

1      A. Correct.
2      Q. Do you ever recall not approving
3      financial statements presented for audit
4      during a Board meeting?                    03:35PM
5      A. No, I do not remember -- recall that
6      at all.
7      Q. Do you have any recollection of any
8      issues with respect to the integrity of
9      AHERF's financial statements being raised by 03:35PM
10     the Audit Committee Chair at a Board meeting?
11     A. No, I do not recall that.
12     Q. Can you recall any other functions
13     of the Audit Committee, aside from presenting
14     the yearly financial statements for approval? 03:36PM
15     A. No, I can't.
16     Q. Can you recall whether or not on a
17     yearly basis the Audit Committee Chair would
18     come to the Board with a recommendation of
19     which external auditors to hire for the next 03:36PM
20     year?
21     A. I remember a discussion of who to
22     hire. I can't remember if it was an annual
23     discussion or not.
24     Q. And that discussion was raised by   03:36PM
25

Page 181

Dr. Donna M. Murasko

1      the Audit Committee Chair?
2      A. Yes, it was.
3      Q. Do you recall the Audit Committee
4      Chair coming to the Board for its approval of 03:36PM
5      the yearly audit plan presented from Coopers &
6      Lybrand?
7          MR. FRIESEN: Objection. Vague
8      as to time.
9      A. I cannot remember specifically going 03:36PM
10     through a plan.
11     Q. I am going to show you a document
12     that I only have one copy of. It has already
13     been marked as an exhibit in this case.
14          My purpose in showing it to you and  03:37PM
15     your counsel and Jeff is just to refresh your
16     memory of whether or not audit plans presented
17     at Board meetings for approval.
18          This document is Exhibit 2056. And
19     it purports to be minutes of a 6/21/96 AHERF  03:37PM
20     Board meeting. You were listed as being a
21     member present. And the document is Bates
22     labeled GOV 53197-53203.
23          Take a moment to just peruse this,
24     and then turn to Page 53200.               03:38PM
25

46 (Pages 178 to 181)

Page 182

Dr. Donna M. Murasko

1
2    A.  I don't remember what the plans
3  would have looked like.
4    Q.  I understand that.  But my only
5  point in showing you this document is, does it 03:38PM
6  refresh your memory that part of the audit
7  process involved the Audit Committee Chair
8  coming to the Board and presenting to the
9  Board for its approval the fiscal year audit
10 plan?                              03:38PM
11   A.  It is in the report, but I still
12 don't have independent recollection of that.
13   Q.  Understood.
14        Any reason to doubt the accuracy of
15 the minutes you just reviewed?          03:39PM
16   A.  No.
17        MR. UNICE:  Jeff, do you want
18   to see it?
19 BY MR. UNICE:
20   Q.  Do you have an understanding of what 03:39PM
21 the term "clean opinion" means in the context
22 of a financial statement?
23   A.  No, I do not.
24   Q.  Did you ever attend an Audit
25 Committee meeting at AHERF?             03:39PM

Page 183

Dr. Donna M. Murasko

1
2    A.  No, I did not.
3    Q.  Do you recall ever a representative
4  of Coopers & Lybrand ever attending an AHERF
5  Board meeting?                      03:39PM
6    A.  I don't remember.
7    Q.  So, to your recollection, you didn't
8  have any personal interaction with AHERF's
9  external auditors; is that right?
10   A.  I did not.             03:39PM
11   Q.  So you relied upon presentations
12 from the Audit Committee to get an
13 understanding of how the audit was
14 progressing, as well as the results of the
15 audited report?                    03:39PM
16   A.  Yes, I did.
17   Q.  Now, as you understood the role of
18 the Audit Committee, was one of the functions
19 of that committee to address any concerns
20 raised by the independent auditors during the 03:40PM
21 course of the audit with respect to the
22 information that financial management had
23 given Coopers to audit?
24   A.  My understanding was that they were
25 the interface between the two, yes.    03:40PM

Page 184

Dr. Donna M. Murasko

1
2    Q.  And you expected the auditors to
3  raise with the Audit Committee, then, any
4  material misstatements that they would have
5  uncovered, if they would have uncovered any   03:40PM
6  material misstatements in the financials
7  presented by management for audit?
8        MR. FRIESEN:  Objection.
9    A.  I was absolutely dependent on the
10 external Audit Committee letting us know if   03:40PM
11 there was something wrong.
12   Q.  And then you would also expect the
13 auditors to report to the Audit Committee if
14 the auditors had uncovered intentional
15 misstatements in the financials presented by   03:41PM
16 management for audit?
17   A.  I was absolutely sure that, if there
18 was something wrong, external auditors would
19 tell us.
20   Q.  And the "us" in your sentence is      03:41PM
21 whom?
22   A.  That they would tell the Audit
23 Committee, and then the Audit Committee would
24 tell the full Board.
25   Q.  And you would also expect the        03:41PM

Page 185

Dr. Donna M. Murasko

1
2  external auditors, if they have uncovered what
3  they deemed to be fraud in the financial
4  statements presented for audit by management,
5  that that be disclosed to the Audit Committee, 03:41PM
6  as well?
7    A.  Yes.
8        MR. FRIESEN:  Objection.
9        You are just going to have to
10   let me get in my objection.         03:41PM
11       THE WITNESS:  I'm sorry.
12       MR. FRIESEN:  Objection.
13       THE WITNESS:  Sorry.
14   A.  (Continued.)  Yes.
15   Q.  Are you aware of whether Coopers &   03:41PM
16 Lybrand ever raised those types of concerns
17 with the Audit Committee during your time as
18 an AHERF Trustee?
19   A.  To my knowledge, no concerns were
20 raised.                           03:41PM
21   Q.  Now, if the auditors had come to the
22 Audit Committee with a concern with respect to
23 the information presented for audit, was it
24 your understanding that the role of the Audit
25 Committee would have been to investigate that 03:42PM

47 (Pages 182 to 185)

Page 186

Dr. Donna M. Murasko

1    Dr. Donna M. Murasko
2  matter?
3      MR. FRIESEN:  Objection.
4    A.   That is my understanding, that the
5  Audit Committee would have investigated it.    03:42PM
6    Q.   And you would rely on the Audit
7  Committee's investigation in terms of arriving
8  at a resolution of whatever matters the
9  auditors brought to their attention?
10     MR. FRIESEN:  Objection.         03:42PM
11   A.   That would be my assumption and
12 expectation.
13   Q.   Now, if the Audit Committee had,
14 upon disclosure of concerns by Coopers &
15 Lybrand, conducted such an investigation, and   03:42PM
16 then come forward to the Board with a
17 recommendation on how to resolve the issue,
18 what options would have been available to you
19 as a Board member?
20     MR. FRIESEN:  Objection. Calls  03:43PM
21   for speculation.
22   A.   I would not know.  There was no
23 instance where this occurred.
24     My only assumption is, if there was
25 a problem, we would need to resolve it.  And    03:43PM

Page 187

Dr. Donna M. Murasko

1  that would be essential, that the Board follow
2  through to make sure whatever problem it was
3  was resolved.
4      But that's just speculation, because  03:43PM
5  we never had an instance.
6      MR. KOLANKSY:  Don't speculate
7    anymore.
8      THE WITNESS:  Okay.  Yes, sir.
9  BY MR. UNICE:
10   Q.   Now, the AHERF Board, let's talk
11 about it generally for a moment now, the Board
12 itself.
13     Can you recall how many members
14 there were of the AHERF Board in Fiscal Years  03:43PM
15 1996 and '97?
16   A.   I would have to go to the list and
17 count.
18   Q.   Well, this isn't a memory test, but
19 I am just trying to get a general sense here.   03:43PM
20     Take a look at Exhibit 1655, for
21 example.  It is the 10/30/97 minutes.
22   A.   Okay.
23   Q.   And there is roughly between 30 and
24 40 Board members listed?               03:44PM

Page 188

Dr. Donna M. Murasko

1    A.   That looks about right.
2    Q.   Roughly.  Okay.
3      Now, in the context of a Board of
4  this size, do you recall in 1996 or 1997    03:44PM
5  whether there were certain Trustees that were
6  more active than others during a normal Board
7  discussion?
8      MR. FRIESEN:  Objection.  I
9    think I asked that already.  But, go    03:44PM
10   ahead.
11   A.   In different meetings, different
12 people spoke, yes.
13     MR. UNICE:  And I think on
14   cross-examination we are allowed to get    03:44PM
15   into issues that were raised on direct,
16   and that's all I am doing.
17 BY MR. UNICE:
18   Q.   Can you recall for me any of the
19 individuals who you thought were more active   03:44PM
20 than other members of the Board?
21   A.   Mr. Barnes, Mr. Edelman.  And the
22 AHERF Board, they were the two that stand out
23 in my mind.
24   Q.   Does the name Ira Gumberg ring any   03:45PM

Page 189

Dr. Donna M. Murasko

1  bells to you?
2    A.   Yes.  He did sometimes.
3    Q.   Did what?
4    A.   He spoke out sometimes.         03:45PM
5    Q.   In your experience on the AHERF
6  Board, did you find that on occasion Mr.
7  Edelman and Mr. Barnes would probe management
8  and ask questions regarding the presentations
9  management put forth?               03:45PM
10   A.   Yes.
11   Q.   Would the same go for Mr. Gumberg,
12 as well?
13   A.   Yes.
14   Q.   Likewise, on the committees on which  03:45PM
15 you sat, can you recall any individuals that
16 stand out as committee leaders, so to speak?
17   A.   I sat on no AHERF committees.
18   Q.   How about on subsidiary Boards; for
19 example, the AUHS?                  03:45PM
20   A.   What is the question?
21   Q.   Can you recall any individuals that
22 stand out in your mind as leaders of that
23 committee or subsidiary Board?
24   A.   Yes.                      03:46PM

48 (Pages 186 to 189)

Page 190

Dr. Donna M. Murasko

1     Q.   Who were they for me?
2     A.   Mr. Palmer, Mr. Neuwirth, Mr. Cook,
3  and Dorothy Brown.
4     Q.   And which entity are we discussing?   03:46PM
5     A.   AUHS.
6     Q.   The Board itself?
7     A.   Uh-huh.
8     Q.   And, likewise, you found that from
9  time to time those individuals would challenge 03:46PM
10  management with their presentations that
11  management brought for the Board's approval?
12     A.   Yes.
13     Q.   Did you have any sense while you
14  were an AHERF Trustee of any leaders on the   03:46PM
15  Audit Committee?
16     A.   The only person that comes to mind
17  is Mr. Barnes.
18     Q.   And what makes you form that
19  impression?                              03:46PM
20     A.   He was the one who made the
21  presentations and asked many of the questions
22  regarding financials in general.  You know,
23  the Audit Committee itself, he made the
24  presentations.                           03:47PM

Page 191

Dr. Donna M. Murasko

1     Q.   At the AHERF Board meetings?
2     A.   Yes.
3     Q.   I believe Mr. Friesen asked you if
4  at some point you began to lose confidence in  03:47PM
5  either Mr. Abdelhak or Mr. McConnell.
6        Do you remember discussing that?
7     A.   Yes.
8     Q.   At any point during your tenure on
9  the AHERF Board did you have any concerns with 03:47PM
10  the integrity of either Mr. Abdelhak or Mr.
11  McConnell in leading the AHERF system?
12     A.   I don't remember any specific
13  instance where I questioned their integrity.
14     Q.   Do you recall whether any other   03:47PM
15  Board members expressed to you their concerns
16  with respect to the integrity of either Mr.
17  Abdelhak or Mr. McConnell?
18     A.   I don't have any recollection of
19  such discussion.                         03:48PM
20     Q.   Did you ever hear at a Board meeting
21  any Audit Committee member who was present at
22  that meeting question the integrity of either
23  Mr. Abdelhak or Mr. McConnell?
24     A.   I don't remember anything like that. 03:48PM

Page 192

Dr. Donna M. Murasko

1     Q.   Now, from time to time as a Board
2  member you would receive internal financial
3  statements with those large Board packets that
4  were sent to you before the meeting; correct? 03:48PM
5     A.   Yes.
6     Q.   Were those typically sent quarterly?
7     A.   Right before every Board meeting.
8  So, yes, I guess quarterly.
9     Q.   And then once a year you would be    03:49PM
10  presented with the audited financial
11  statements for that whole fiscal year;
12  correct?
13     A.   Yes.
14     Q.   At any time do you ever recall       03:49PM
15  discussing at a Board meeting any
16  inconsistencies between the audited financial
17  statements and the financial statements you
18  were provided on a quarterly basis?
19     A.   I don't remember that discussion.    03:49PM
20     Q.   Generally as a Board member, can you
21  describe to me how you would use the internal
22  quarterly financial statements to assess the
23  system's direction?
24     A.   I would read them.  I would pull out 03:49PM

Page 193

Dr. Donna M. Murasko

1  what I had for the last quarter.  I would
2  compare them to see how we were going, just to
3  see if we're on target.
4        But I pulled out the previous Board   03:49PM
5  book to compare with the current one.
6     Q.   Explain to me, if it is different at
7  all, what you would do with the audited
8  financial statements to help you as a Board
9  member gauge how the system was performing?   03:50PM
10     A.   I would take the most recent --
11  whatever report was closest to that audit
12  report, and pull it out to see if they looked
13  about the same.
14     Q.   Do you ever recall at an AHERF Board 03:50PM
15  meeting not approving the audited financial
16  statements that the Audit Committee Chair
17  presented for approval?
18     A.   I do not remember such an action.
19     Q.   Were you aware that in the fall of   03:50PM
20  1998, after AHERF had filed for bankruptcy, a
21  press release was issued stating that the
22  Fiscal Year 1997 financial statements should
23  no longer be relied upon?
24     A.   I would not be able to tell you that 03:51PM

49 (Pages 190 to 193)

Page 194

Dr. Donna M. Murasko

1       Dr. Donna M. Murasko
2   was 1997.
3       But I do remember a release saying
4   that there was one year that we couldn't rely
5   on the financials. I wouldn't have been able  03:51PM
6   to tell you now that it was '97. It was a
7   year, though.
8       Q.  How did you learn about that
9   release?
10      A.  I don't remember.                03:51PM
11      Q.  Can you recall what reaction you had
12  upon learning about it?
13      A.  Yes.
14      Q.  Explain that to me.
15      A.  My reaction was, I thought they were  03:51PM
16  audited, how can there be something wrong.
17  That was my gut reaction.
18      Q.  So you were surprised that there was
19  a need to restate the financial statements
20  because they had been audited by an       03:51PM
21  independent firm that you relied upon;
22  correct?
23      A.  Absolutely.
24      Q.  So it is fair to say you were
25  surprised upon learning of the press release?  03:52PM

Page 195

Dr. Donna M. Murasko

1       Dr. Donna M. Murasko
2       A.  That's a very fair description.
3       Q.  Did you discuss your reaction to the
4   press release with any other Board members?
5       A.  Not to my recollection.          03:52PM
6       Q.  Do you recall discussing the press
7   release with any AHERF managers?
8       A.  I don't remember.
9       Q.  Finally, do you recall discussing
10  the AHERF press release with any of Coopers &  03:52PM
11  Lybrand's auditors who worked on the AHERF
12  audit?
13      A.  Definitely not.
14      Q.  I have given you, Dr. Murasko,
15  Exhibit 1992. It has already been marked in  03:52PM
16  this case. They are -- well, the exhibit is
17  an agenda and partial minutes to a meeting of
18  the 8/27/1998 AHERF Board.
19      I will represent to you that a
20  thorough search has not been able to locate  03:53PM
21  official copies of the minutes, and this is
22  all we were able to find.
23      On the first page, there is a column
24  for Members Present, and you are listed as
25  attending.                           03:53PM

Page 196

Dr. Donna M. Murasko

1       Dr. Donna M. Murasko
2       Do you see that?
3       A.  Yes.
4       Q.  Do you recall sitting here today
5   attending this meeting?                03:53PM
6       MR. KOLANKSY:  When was the
7   bankruptcy?
8       MR. UNICE:  The bankruptcy was
9   filed July 21, 1998.
10      I don't remember if I attended this  03:53PM
11  or not. I don't know.
12      Q.  Upon reviewing the members present,
13  any reason to doubt that you attended?
14      A.  No.
15      Q.  Now, turn for me, if you will, to   03:53PM
16  the last page of this exhibit.
17      Are you there with me?
18      A.  Yes, I am.
19      Q.  And there is some handwriting on
20  this page.                           03:54PM
21      A.  Yes.
22      Q.  After looking at many examples of
23  yours, I assume you are going to tell me this
24  is not your handwriting?
25      A.  This is not my handwriting.       03:54PM

Page 197

Dr. Donna M. Murasko

1       Dr. Donna M. Murasko
2       Q.  Now, I am going to point your
3   attention to the middle of this page. And I
4   am going to read some of the text. If I
5   misread it, let me know.               03:54PM
6       It says, "Also discussed auditors, C
7   & L has been for long time. Merged with P &
8   W. Think will have serious conflicts with C &
9   L. Recommend," or, "rec changing. KPMG or
10  Deloitte both good firms. Decided on KPMG  03:54PM
11  for," I believe that's, "W," for West, "and
12  Deloitte to do procedures for E," or East, "if
13  court approves."
14      MR. FRIESEN:  Well, you missed
15  one line, which is an at sign, "to   03:54PM
16  retain."
17      MR. UNICE:  Thank you. Thank
18  you. That's right below the merge with
19  PriceWaterhouse. Thank you.
20  BY MR. UNICE:                        03:54PM
21      Q.  Does this refresh your memory at all
22  as to any discussions at an AHERF Board
23  meeting regarding the decision to not retain
24  Coopers & Lybrand, or PriceWaterhouse Coopers?
25      A.  I don't remember this discussion.  03:55PM

Page 234

```
1
2              INDEX
3    WITNESS                    PAGE
4    DR. DONNA MARIE MURASKO
5       By Mr. Friesen    4, 223, 232
6       By Mr. Unice       171, 231
7                - - -
8          EXHIBITS
9    NO.      DESCRIPTION      PAGE
10   2515 Packet of Special Meeting of
        the Board of Trustees of AHERF,
11      9/16/96            59
12   2516 Book II, Annual Meeting of the
        Board of Trustees of AHERF,
13      12/12/96           75
14   2517 Handwritten notes      92
15   2518 AHERF Budgeted Colsolidated
        Financial Statements, FY 1998  101
16
     2519 AHERF Consolidated Financial
17      Statements, 9/30/97   112
18   2520 Memo from Mr. Morrison, to
        Members of the Resource
19      Management Committee of AUHS,
        10/15/97           124
20
     2521 AUHS Financial Statements,
21      12/31/97           126
22   2522 Packet of Meeting of the Board
        of Trustees of AHERF, 3/12/98  130
23
     2523 Handwritten notes      142
24
25
```

Page 235

```
1
2          INDEX (Continued.)
3            EXHIBITS
4    NO.      DESCRIPTION      PAGE
5    2524 Fax from Ms. Anirim, to Dr.
        Murasko, 4/20/98     147
6
     2525 Handwritten notes      147
7
     2526 Packet of Meeting of the
8       Board of Trustees of AHERF,
        10/30/97           156
9
     2527 Packet of Meeting of the
10      Resource Management Committee
        of AHERF, 10/16/97   158
11
     2528 1995 Trustees' Evaluation   169
12
           - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 236

```
1
2        I have read the foregoing
3    transcript of my examination given on
4    Thursday, April 8, 2004, and it is true,
5    correct and complete, to the best of my
6    knowledge, recollection, and belief,
7    except for the corrections noted hereon
8    and/or list of corrections, if any,
9    attached on a separate sheet herewith.
10
11
12
13      ------------------------
        DR. DONNA MARIE MURASKO
14
15
16
17
18
     Subscribed and sworn to
19   before me this____day
     of_____, ____
20
21
22
23   ------------------------
     Notary Public
24
25
```

Page 237

```
1                     `
2        I HEREBY CERTIFY that the
3    proceedings and evidence are contained
4    fully and accurately in the stenographic
5    notes taken by me upon the foregoing
6    matter on Thursday, April 8, 2004, and
7    that this is a correct transcript of
8    same.
9
10
11
12
13
     ---------------------------
14      Debra Ann Whitehead
15
16
17
18
19
20       (The foregoing certification of
21   this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)
25
```

60 (Pages 234 to 237)

O'Brien Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

### *THOMAS O'BRIEN*
*October 16, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

O'BRIEN, THOMAS



**LEGALINK**
A WORDWAVE COMPANY

Page 86

1  A.  Yes.  I'd say that's a legitimate statement.
2  Q.  Okay.  And it was your practice, and you don't
3      have any reason to believe you varied from it,
4      to review the audited financial statements when
5      you received them?
6  A.  That's correct.
7  Q.  And I understand that Exhibit 1653, for reasons
8      stated in the package, was a draft set of the
9      audited 1997 financial statements, but you
10     don't have any reason today to doubt that you
11     would have reviewed that draft when it was
12     forwarded to you?
13 A.  If it was forwarded to me, I'm sure I did.
14 Q.  And when you received those financial
15     statements and, in both instances, ultimately
16     the clean opinions the audit report contained
17     within them, what did you understand that to
18     mean?
19 A.  It means, as any clean opinion does, that, to
20     the best of their ability, the auditors have
21     reviewed the financial data for the period so
22     stated, reviewed the internal controls and the
23     integrity of them, and that, in their opinion,
24     those statements fairly present the financial
25     condition and the financial results of whatever

Page 87

1      period they chose to report on.
2  Q.  Did you at the time you received those clean
3      opinions believe them to be important to the
4      enterprise?
5  A.  Well, it was one of the most important things.
6      I mean, when you're on a board like that, you
7      look at a third-party provider of financial
8      information, in this case audited information,
9      and that gives you great comfort that a third
10     party has reviewed the financial data and
11     opined that it fairly presents the condition
12     and represents the operations of the stated
13     period.
14 Q.  Did you consider the third-party aspect of this
15     review a check on internal financial
16     management?
17         MR. FRIESEN:  Objection.
18 A.  Well, as in any full audit, they clearly review
19     certain of the internal controls.  There's no
20     question about that.
21 Q.  And in your everyday job, you knew -- or as a
22     consequence of your experience in your everyday
23     job, you knew that audited financial statements
24     were reviewed by people outside the
25     organization itself as well, is that fair to

Page 88

1      say?
2  A.  I'm not sure I follow what you mean.
3  Q.  That -- I think what I mean to say is that when
4      you were a member of the AHERF board, you
5      understood that the audited financial
6      statements that you received and reviewed were
7      also made available to parties outside of
8      AHERF, for instance, creditors?
9  A.  Oh, certainly.  Yes.
10 Q.  And that they reviewed and relied upon those
11     statements as well?
12 A.  And bond agencies and, you know, investment
13     bankers and so forth and so on.
14 Q.  And those various parties you knew to receive
15     and review those financial statements and rely
16     upon them at the time they received them?
17 A.  Certainly.
18 Q.  So that the audited financial statements were
19     important internally for management purposes
20     and externally to others, at least as you
21     understood it at the time?
22 A.  That's correct.
23 Q.  Did you use the audited financial statements
24     that you reviewed for fiscal year 1996 and
25     fiscal year 1997 -- and for the latter, either

Page 89

1      in draft or final form -- to help you gauge the
2      performance of the enterprise?
3  A.  Yes.  I'd say that's a legitimate question,
4      particularly the fiscal year 1997, seeing that
5      they were cash flowing at a meaningful rate
6      during that previous 12 months.
7  Q.  Let me ask you to flip quickly back to the 1996
8      audited financial statements, and page 3 at the
9      bottom of those which you'll find at Exhibit
10     1661.
11         MR. SHAPIRA:  What's the page number?
12         MR. JONES:  I'm sorry.
13         THE WITNESS:  1661.
14         MR. JONES:  It's Exhibit 1661, page 3
15     at the bottom of the page.
16 BY MR. JONES:
17 Q.  That page presents the Consolidated Statement
18     of Operations, is that right?
19 A.  I have 1661 here which is also page 55.
20 Q.  No.  I'm sorry.  It was Exhibit 1661.
21         MR. SHAPIRA:  You want him to look at
22     page 2, right?
23         MR. JONES:  Page 3, the Statement of
24     Operations.
25         MR. SHAPIRA:  Right at the beginning.

23 (Pages 86 to 89)

Page 90

1          THE WITNESS:  Right at the beginning.
2          MR. SHAPIRA:  Right.
3  BY MR. JONES:
4  Q.    And I think in response to questions by
5        Mr. Friesen, you indicated that you did look at
6        net income as a part of your review of the
7        financial statements, am I right?
8  A.    Um-hum.
9  Q.    Is that a yes?
10  A.    Let me -- I was reading.  I didn't hear you.
11  Q.    I'm sorry.  I think in response to questions
12        from Mr. Friesen, you said you paid particular
13        attention to the statement of operations and
14        the net income line, is that correct?
15  A.    Yeah.  One of the things, yeah.
16  Q.    And here we see the net income line has a
17        figure of what?  Before extraordinary item and
18        change in accounting principle, the figure is
19        six-and-a-half million dollars, roughly?
20  A.    That's correct.
21  Q.    And so in 1996, the audited financial
22        statements reflected net income before
23        extraordinary item and change in accounting
24        principle of $6.5 million, and I think that the
25        figure in 1997 you and Mr. Friesen discussed

Page 91

1        was a little over $20 million, is that fair to
2        say?
3  A.    That's correct.
4  Q.    So the trend is up at least at year end --
5        fiscal year end 1997?
6          MR. FRIESEN:  Objection.
7  A.    That's correct.
8  Q.    When seeing these financial statements and
9        seeing the trend we just discussed, you used
10        the information in the statements to help you
11        gauge the financial performance of the
12        enterprise and the financial ability of
13        management to run the enterprise too, is that
14        fair to say?
15  A.    That's correct.  Yes.  Um-hum.
16  Q.    You also, I think, testified that you recalled
17        receiving at least quarterly internal financial
18        statements, is that right?
19  A.    To the best of my recollection, we got those.
20        There were interim statements.  Quarterly, I
21        presumed, but there were interim statements,
22        most of which, as I say, I received and then
23        also got updates at the AUMC meetings.
24  Q.    And do you recall ever receiving a quarterly
25        internal financial statement -- strike that.

Page 92

1          Do you recall ever receiving an
2        audited financial statement that caused you to
3        question the accuracy of an internal financial
4        statement?
5  A.    I don't believe so.
6  Q.    Did you use the audited financial statements as
7        a part of the tools available to you to monitor
8        performance of particular initiatives at AHERF,
9        for instance, the acquisition strategies that
10        we discussed earlier today?
11  A.    Well, I would say this:  I would say that we
12        weren't divorced from the realities that
13        certain things were losing money and that there
14        were negative trends in certain things, but
15        when you looked at the audited financials and
16        saw that they were still cash flowing in a
17        meaningful way, that gave you comfort that
18        while things weren't wonderful, they were
19        clearly still operationally solid.
20          THE VIDEOGRAPHER:  Excuse me.  I have
21        to change tapes.  We are now going off the
22        record.  The time is 12:38 p.m.
23              - - - -
24        (There was a recess in the proceedings.)
25              - - - -

Page 93

1          THE VIDEOGRAPHER:  We are now going
2        back on the record.  The time is 12:39 p.m.
3  BY MR. JONES:
4  Q.    We're back on the record after a brief break,
5        Mr. O'Brien.
6          When you were a member of the AHERF
7        board, did you expect Coopers & Lybrand to
8        raise, either with the audit committee or with
9        the board itself, any material misstatements in
10        the financial statements presented for their
11        audit that they became aware of?
12          MR. FRIESEN:  Objection.
13  A.    Well, I would say, again, generically, in any
14        board, I would expect the auditor to raise
15        those kinds of issues probably through the
16        audit committee, and then up to the full board.
17  Q.    Would you also expect Coopers & Lybrand during
18        this time period to have raised with the audit
19        committee or ultimately the full board any
20        intentionally misstatements they found in the
21        statements presented for their audit?
22          MR. FRIESEN:  Objection.
23  A.    Without question.
24  Q.    Would you also expect Coopers & Lybrand, and
25        did you while you were a member of the board,

1  to raise with the audit committee or the full
2  board any concerns that Coopers & Lybrand had
3  with the integrity or competence of financial
4  management?
5      MR. FRIESEN: Objection.
6  A.  Absolutely.
7  Q.  Why is that so important?
8  A.  Well, I think it's, again, just prima facie.
9      You know, it's obvious that's what the board
10     hires outside auditors to do is, you know,
11     fundamentally report on the integrity of the
12     financial data which includes the integrity of
13     the management that's preparing them.
14 Q.  Did you -- strike that.
15     Before the bankruptcy was
16     announced -- and I think we talked a little bit
17     about the fact that you learned about it
18     through means you don't recall, but it must
19     have been at or about the time of the
20     bankruptcy. When you learned of it, and at any
21     time before it, did you have any reason to
22     question the accuracy of the audited financial
23     statements presented to you?
24 A.  No. Really, no. None.
25 Q.  If Coopers & Lybrand had told you that the

1  fiscal year 1996 or 1997 financial statements
2  presented for their audit were indeed
3  materially misstated and that they were,
4  therefore, going to issue an adverse opinion on
5  those statements, would that have caused you
6  concern?
7      MR. FRIESEN: Objection.
8  A.  Well, clearly.
9  Q.  And for the jury, why is that such a concerning
10     thing?
11     MR. FRIESEN: Objection.
12 A.  Well, you're obviously looking as, again, a
13     member of the board or any other constituency
14     where these things are used. You're looking to
15     make sure that they are high integrity, and you
16     base judgments on performance and risk, all
17     those things.
18 Q.  What kind of options does a board member and a
19     board have when faced with these kinds of
20     circumstances?
21     MR. FRIESEN: Objection.
22 A.  With what kinds of circumstances?
23 Q.  When an auditor comes to the board or the audit
24     committee and tells them that the financial
25     statements presented for their audit were

1  indeed materially misstated and an adverse
2  opinion is to be issued?
3      MR. FRIESEN: Objection. Vague.
4  A.  Well, I mean, speaking again on a generic
5      basis, you would clearly -- the audit committee
6      would clearly probably establish or the board
7      would establish a special committee to review
8      those allegations and determine whether they
9      are correct or not and would get to the bottom
10     of whether or not they are, in fact, correct.
11 Q.  So you have the option of making inquiry?
12 A.  Certainly.
13 Q.  And indeed you also have the option of
14     recharging the auditors to expand their
15     procedures and scope, perhaps?
16     MR. FRIESEN: Objection.
17 A.  I mean, all of that would come from this
18     special committee or whatever you would set up
19     to look into those allegations by the auditor.
20 Q.  Is engagement of additional consultants a part
21     of the options that committee would have?
22     MR. FRIESEN: Objection.
23 A.  There would be all kinds of different options,
24     but that -- it would be a full inquiry into the
25     allegations. That's all I would say.

1  Q.  If Coopers & Lybrand had told you that the
2      fiscal year 1996 or 1997 financial statements
3      presented for their audit were intentionally
4      misstated, what reaction would you have had?
5      MR. FRIESEN: Objection. Calls
6  for -- sorry.
7  A.  I would have been quite alarmed. Yeah.
8      MR. FRIESEN: Calls for speculation.
9  A.  Yes.
10 Q.  You may answer.
11 A.  I can answer?
12     MR. SHAPIRA: Yeah, you can go ahead.
13 A.  Yeah. I'd be quite alarmed, obviously.
14 Q.  And would you have the same kinds of options we
15     just discussed?
16 A.  I would demand them.
17 Q.  And if the result of the inquiry or the options
18     that we discussed led you to question or
19     brought into question the integrity of
20     financial management or its competence, what
21     other options did you have at that point?
22     MR. FRIESEN: Objection.
23 A.  Well, you clearly replace them.
24 Q.  If Coopers & Lybrand had told you that the net
25     income on the fiscal year -- that net income on

25 (Pages 94 to 97)

Page 98

1    the fiscal year 1996 statement of operations
2    presented for audit had been overstated
3    contrary to Generally Accepted Accounting
4    Principles by approximately $80 million, what
5    reaction would you have had?
6          MR. FRIESEN: Objection.
7  A.  My reaction would have been, again, quite
8    alarmed.
9  Q.  And you would have had the same options and the
10    same recourse?
11         MR. FRIESEN: Objection.
12  A.  Yeah, and, again, those were all functions and
13    roles of the audit committee that would
14    immediately deal with those issues and report
15    to the board.
16  Q.  Your answer wouldn't change if I changed the
17    circumstance to fiscal year 1997 and a similar
18    report from the auditors about the
19    overstatement of net income, is that fair to
20    say?
21  A.  Um-hum.
22         MR. FRIESEN: Objection.
23  A.  Certainly.
24  Q.  A part of your options at that point, either in
25    1996 or in 1997, would have been to order that

Page 99

1    the financial statements be restated, is that
2    accurate?
3         MR. FRIESEN: Objection.
4  A.  Had we been made aware by an independent
5    auditor that there was a meaningful
6    misstatement, obviously, it would have been my
7    reaction that we would have to go back in, do
8    the proper accounting, and restate the results.
9  Q.  If Coopers & Lybrand had told you that --
10    during the time you were on the board told
11    you that they had concerns about the integrity
12    or competence of financial management,
13    including Mr. McConnell or Mr. Abdelhak, what
14    reaction would you have had?
15         MR. FRIESEN: Objection.
16  A.  I would have wanted to get to the bottom of it
17    quickly, and probably if it was corroborated
18    and nothing was done, I would have resigned.
19  Q.  And the option about doing something would be
20    to --
21  A.  To eliminate them.
22  Q.  That is Mr. Abdelhak and Mr. McConnell?
23  A.  Yeah.
24  Q.  If you would have been informed by Coopers &
25    Lybrand that the fiscal 1996 or 1997 financial

Page 100

1    statements were the product of fraud or
2    suspected fraud on the part of internal
3    financial management, what would your reaction
4    have been?
5         MR. FRIESEN: Objection.
6  A.  The same as my other answers.
7  Q.  It would have been a concerning event,
8    obviously?
9  A.  Yes.
10  Q.  Would audit revelations like these that we have
11    just discussed have affected your view about
12    the financial success of the strategy in place
13    at AHERF at the time?
14         MR. FRIESEN: Objection. I don't
15    know what --
16  A.  I'm not sure.
17         MR. FRIESEN: -- revelations you're
18    talking about.
19  A.  Yeah. You better be a little more specific.
20  Q.  Well, let me start with -- yeah. Let me try
21    that.
22         If the revelations we just discussed
23    about material misstatements and suspected
24    integrity or competence problems among
25    financial management, if those revelations had

Page 101

1    been made to you or any of them, would that
2    have given you some concern about the validity
3    of any financial success that management was
4    claiming in operations?
5         MR. FRIESEN: Objection.
6  A.  Yeah, in all likelihood. It depended where the
7    misstatements were occurring or the fraud was
8    occurring, but, by and large, it clearly would
9    have been an overstatement, if that was one of
10    the hypothetical situations you said, so that
11    the enterprise was not performing at the levels
12    that we had assumed it was.
13  Q.  You mentioned that you thought you had heard
14    something about ex-officio appointments to
15    committees like the audit committee based on
16    chairpersonships at subsidiary boards. Do you
17    recall that testimony?
18  A.  I do recall that that's what I said. I
19    hypothesized that, yes.
20  Q.  Yeah, and I guess my question is do you really,
21    now as you sit here today, recall whether --
22    from whom you heard that and whether indeed it
23    was a fact that there was such an ex-officio
24    membership program?
25         MR. FRIESEN: Objection. Asked and

26 (Pages 98 to 101)

Page 102

1    answered.
2    A.    Yeah, I really -- somewhere there was a
3          document that indicated that. Yeah. I think
4          it probably got back to that restructuring and
5          fourth quarter -- fourth calendar quarter of
6          '97.
7    Q.    You were asked a question about, I think, what
8          you believed to be either the reason or part of
9          the reason for AHERF's bankruptcy at the time
10         you heard of it, what you believed at the time.
11         Do you recall that testimony?
12   A.    Somewhat.
13   Q.    Very briefly. My question to you is, at the
14         time, you didn't do an in-depth analysis about
15         reasons for AHERF's bankruptcy, is that fair to
16         say?
17   A.    That's correct. That was -- I don't even know.
18         I think that was after I had resigned from the
19         board.
20               MR. JONES: I believe that's all I
21         have.
22               MR. FRIESEN: Let me just ask a
23         couple of follow-up questions.
24               THE WITNESS: Sure.
25               - - - -

Page 103

1                     EXAMINATION
2               - - - -
3    BY MR. FRIESEN:
4    Q.    Mr. Jones gave you a number of hypotheticals
5          about Coopers & Lybrand hypothetically telling
6          you various things. Is it fair to say that you
7          don't know, sitting here today, apart from
8          setting up a special committee which is what
9          you've testified to, precisely what you would
10         do as a board member if any of those
11         hypotheticals had actually happened?
12               MR. JONES: Object to form.
13   A.    What I precisely would do?
14   Q.    Right.
15   A.    I know precisely what I would do, yes. I would
16         demand to have a special committee look into
17         the allegations. That special committee would
18         probably have been from the board, not just
19         from the audit committee, because of the
20         seriousness of the allegations.
21   Q.    Okay. If you will turn back to Exhibit 1661.
22   A.    Is it this one?
23   Q.    Yeah. That's the '96 fiscal year audited
24         financials, and if you go to page JB 01608
25         which is the Consolidated Statement of

Page 104

1    Operations that I think Mr. Jones pointed out
2    to you.
3    A.    Yes.
4    Q.    And you see that investment income is
5          $74,075,000?
6    A.    Right.
7    Q.    And then net income after -- sorry. Net income
8          before extraordinary item and change in
9          accounting principle is $6,547,000?
10   A.    That's correct.
11   Q.    Do you recall being aware at the time that you
12         received this that but for the investment
13         income, the net income would be tens of
14         millions of dollars less?
15               MR. JONES: Object to form.
16   A.    Well, I mean, on the face of it, but as I said
17         in the earlier one, if you look at the
18         depreciation and amortization at over
19         $95 million, those are non-cash charges, so
20         that you end up with a cash flow of over
21         $100 million before the extraordinary items,
22         and, therefore, investment income was a way --
23         and investment income was a significant factor
24         for the hospital in any event.
25   Q.    Just for the jury, what do you mean by non-cash

Page 105

1    charges?
2    A.    Charges that are against revenue but do not
3          really take any cash. So when you look at an
4          enterprise's ability to generate cash from
5          their operation, you add back into your net
6          income non-cash charges such as depreciation.
7               MR. FRIESEN: Okay. I don't have any
8          further questions.
9               MR. JONES: And I don't either.
10              THE WITNESS: Bravo.
11              THE VIDEOGRAPHER: If there are no
12         further questions, this deposition is
13         concluded. We are now going off the record.
14         The time is 12:54 p.m.
15              - - - -
16    (The proceedings were concluded at 12:54 p.m.)
17              - - - -
18
19
20
21
22
23
24
25

27 (Pages 102 to 105)

Page 106

```
 1   COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE
 2   COUNTY OF ALLEGHENY        )   SS:
 3        I, JoAnn M. Brown, RMR, CRR, a Court Reporter
 4   and Notary Public in and for the Commonwealth of
 5   Pennsylvania, do hereby certify that the witness,
 6   THOMAS H. O'BRIEN, was by me first duly sworn to
 7   testify to the truth; that the foregoing deposition
 8   was taken at the time and place stated herein; and
 9   that the said deposition was recorded
10   stenographically by me and then reduced to printing
11   under my direction, and constitutes a true record of
12   the testimony given by said witness.
13        I further certify that the inspection, reading
14   and signing of said deposition were NOT waived by
15   counsel for the respective parties and by the
16   witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 21st day of
23   October, 2003.
24        _____
25                    Notary Public
```

Page 107

```
 1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
     COUNTY OF ALLEGHENY        )   S H E E T
 2
 3        I, THOMAS H. O'BRIEN, have read the foregoing
     pages of my deposition given on Thursday, October 16,
     2003, and wish to make the following, if any,
 4   amendments, additions, deletions or corrections:
 5   Page/Line  Should Read       Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21        _____
               THOMAS H. O'BRIEN
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2003.
24   _____
           Notary Public
25   AKF Reference No. JB77734
```

28 (Pages 106 to 107)

**Palmer Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *ROBERT PALMER*
### *August 8, 2003*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**PALMER, ROBERT**



**LEGALINK®**

A **WORDWAVE** COMPANY

ROBERT PALMER

Page 110

1    Sherif Abdelhak on the day that I
2    called, whatever day that was, was not -- was
3    traveling or something, was not available, but
4    Mr. Snyder said he would get word of my concern
5    to Mr. Abdelhak and that he would call me as
6    soon as he could, and, in fact, Mr. Abdelhak
7    called me the next morning.
8  Q.    And what was your concern that you wanted to
9    express to Mr. Abdelhak and which you did
10    express to Mr. Snyder?
11  A.    It was concern that this transaction had been
12    completed without a thorough review with all of
13    the trustees, as opposed to a limited number of
14    trustees, particularly trustees with a history
15    in the Philadelphia, the Eastern Pennsylvania
16    market, and I was concerned about whether it
17    fit with the strategy that I believe we were
18    following, and I was concerned that the
19    operational results of this transaction might
20    well not be favorable for our challenged
21    operating position, financial operating
22    position.
23  Q.    And your concern was for AHERF as the whole;
24    correct.
25  A.    Yes.

Page 111

1  Q.    Even though this transaction was conducted
2    by --
3  A.    As well as by eastern parts and the whole.
4  Q.    Okay. Now, you told me previously that this
5    transaction was done through SDN, which I
6    believe you said is a company owned by
7    three AHERF executives; correct?
8  A.    Yes, mm-hmm.
9  Q.    Why were you concerned about its effect on
10    AHERF if this was done by a separate
11    corporation?
12  A.    Because I believed I have -- I'm not an
13    investment banker, but, in fact, I have a fair
14    amount of familiarity with investment banking,
15    merger and acquisition work.
16    It's -- it is not uncommon for a
17    transaction to be done through a special
18    purpose company, but I thought it was quite
19    uncommon and not that wise to allow the
20    announcement -- and particularly in a community
21    service organization, which a hospital, a
22    medical school, nursing school and all of
23    these, I mean healthcare is really active
24    within the community, particularly when you
25    have a school of public health at any rate,

Page 112

1    once the announcement -- and the university,
2    Graduate system was known, well known to be a
3    troubled system in terms of financial
4    difficulties.
5    Once it would break in the newspaper
6    and the people would read it as not SDN, they
7    would read it as Allegheny buys Graduate, it
8    would possibly not allow the further steps of
9    the analysis, the diligence, et cetera, to
10    really have the effectiveness that it ought to
11    have because the public would have assumed that
12    that was a done deal; and if in the diligence
13    process over the coming weeks and months it was
14    judged by management and board of Allegheny
15    that this wouldn't be the right transaction,
16    the ability to undo it in the mind of the
17    public, et cetera, would be very, very
18    difficult.
19  Q.    And did your concerns come to fruition in that
20    after the announcement was made in the
21    newspaper, the AHERF management and board were
22    not able to take all the steps of diligence
23    which you would expect with regard to the
24    Graduate institutions prior to making a
25    decision about whether the Graduate institution

Page 113

1    should become part of AHERF?
2    MR. JONES:  Object to form and
3    foundation.
4  A.    The form's very difficult. I'm going to break
5    up a couple of the pieces.
6    Was there a diligence exercise done?
7    Yes. Was it a thorough exercise? I believe it
8    was. But did at least this trustee feel that
9    he had the ability to reach a decision without
10    bearing the weight on his shoulders of
11    tremendously disappointing the Philadelphia
12    marketplace from people looking for healthcare,
13    people looking for education, people looking
14    for jobs who had jobs in the Graduate Health
15    System, et cetera, the expectations that had
16    been built up, I felt that my mind didn't have
17    the total freedom that it should have had to
18    weigh all the factors and the diligence. Yes,
19    the diligence was done.
20  Q.    Do you recall if any trustee ever voiced to you
21    that following the diligence but prior to
22    making the decision as to whether to include
23    Graduate as part of AHERF, that they too felt
24    as though that their decision was hampered by
25    the manner in which management had initially

29 (Pages 110 to 113)

ROBERT PALMER

Page 114

1    announced the deal between SDN and The Graduate
2    Hospitals?
3          MR. JONES: Object to form.
4  A.   Yes.
5  Q.   Do you recall which trustees raised those
6    concerns with you?
7          THE WITNESS: Is there a need for me
8    to mention names?
9          MR. McCLENAHAN: Yeah, I think that
10   he's titled to that information.
11 A.   Dorothy Brown.
12         MR. JONES: We couldn't hear you, I'm
13   sorry.
14 A.   Dorothy Brown would have been one that comes to
15   mind. I have a feeling there might have been
16   one or two others, but I don't have a clear
17   recollection of that. Dorothy Brown would have
18   been one who shared my concerns.
19 Q.   Did you ever raise your concerns on this issue
20   with the full board?
21 A.   Yes.
22 Q.   And this would have been at a board meeting?
23 A.   I believe so.
24 Q.   Do you recall if Ms. Brown ever voiced her
25   concerns about how?

Page 115

1  A.   Yes.
2  Q.   If I can turn you back to Exhibit 2099, I think
3    you referred to earlier that you had made
4    three --
5  A.   I'm sorry?
6  Q.   Your letter, the August 19th letter. -- that
7    you had made three points concerning your
8    concerns, and I believe the letter indicates
9    that you were not going to be able to attend a
10   meeting that Mr. Abdelhak was going to conduct
11   with the trustees, so you wanted these points
12   addressed?
13 A.   Yes.
14 Q.   And the first point I believe says, Why did
15   management not use the board for any advance
16   consultation when the transaction was of such
17   great strategic, financial, and operational
18   magnitude.
19         Did you ever receive an answer from
20   Mr. Abdelhak to that question?
21 A.   Yes, I did receive an answer. The answer was
22   that selected board members, particularly some
23   of the most active board members and executive
24   committee board members, were consulted, but
25   there was the acknowledgement that the full

Page 116

1    board -- and maybe my letter would have been
2    more articulate if when I said why did
3    management not use the board, I might have said
4    the full board. There were board members. I
5    mean I learned in my dialogue with Mr. Snyder,
6    with Mr. Abdelhak, and talking as the days went
7    by with some of the board members, yes, there
8    were -- there were some board members who were
9    consulted with as that transaction was
10   developing.
11 Q.   Do you recall if any trustee ever voiced the
12   opinion that they felt that the bringing of The
13   Graduate Hospitals into AHERF from SDN was
14   almost a fait accompli because of how the whole
15   transaction was handled in the first place?
16         MR. JONES: Object to form and
17   foundation.
18 A.   I think I've already said I was the trustee
19   who -- who felt that I didn't have the total
20   freedom of judgment that I would have liked to
21   have had because it was a published, and the
22   way the public would read that announcement,
23   what they would think that announcement said.
24 Q.   And I believe you mentioned Ms. Brown also had
25   similar sentiments?

Page 117

1  A.   (Nodding head up and down.)
2  Q.   Do you recall when you raised this issue at the
3    board meeting whether other members of the
4    board of trustees also voiced concern that the
5    substantial transaction had basically been
6    consummated without any consultation to the
7    members of the board of trustees other than the
8    ones that you mentioned --
9          MR. McCLENAHAN: Objection.
10 Q.   -- you referred to Mr. Abdelhak --
11         MR. McCLENAHAN: Objection.
12 Q.   -- citing to you?
13         MR. JONES: Object to form,
14   misrepresents facts.
15         MR. McCLENAHAN: I don't think you
16   are accurately summarizing his testimony, but
17   you can answer the question if you are able.
18 A.   Well, I'll just call your attention to one
19   piece.
20 Q.   Sure.
21 A.   There was one meeting on Thursday, August 22nd,
22   that I could not attend. Many trustees did
23   attend. It was held in Philadelphia to make
24   sure that Philadelphia trustees had an
25   opportunity. I can't tell you -- I wasn't

30 (Pages 114 to 117)

ROBERT PALMER

Page 226

1  Wendy.
2         MR. LUFT:  Okay.  Being mindful of
3  your time, Mr. Palmer, I truly appreciate the
4  time you offered today, and I have no further
5  questions at this time.
6         MR. JONES:  I will have a few
7  questions.  We have been at it almost precisely
8  another hour since our last break.  I would
9  propose that we break briefly, and if everyone
10 agrees that you'd like me to go forward this
11 afternoon, I'll do my best to complete.
12        MR. McCLENAHAN:  We don't need to
13 consult on whether we want you to go forward.
14        MR. JONES:  All right.
15        MR. McCLENAHAN:  We want you to
16 complete.
17        THE VIDEOGRAPHER:  We are now going
18 off the record.  The time is 3:36 p.m.
19            - - - -
20 (There was a recess in the proceedings.)
21            - - - -
22        THE VIDEOGRAPHER:  We are now going
23 back on the record.  The time is 3:43 p.m.
24
25

Page 227

1             - - - -
2            EXAMINATION
3             - - - -
4  BY MR. JONES:
5  Q.   Mr. Palmer, we have met, as we have
6     established.  My name is Jim Jones.  I am
7     indeed here on behalf of the Creditors
8     Committee.  I will have a relative few
9     questions for you I believe.
10         I would ask if, as it is getting late
11    in the day, if there's a time that I've spoken
12    too rapidly or you don't otherwise understand
13    me, you tell me, I'll do my best to rephrase it
14    so that we can understand one another.  Can we
15    have that agreement?
16 A.   Sure.
17 Q.   I'm also sitting quite a distance from you in
18    the room, and if you could try to hold your
19    voice up, that will help me.
20 A.   Sorry.
21 Q.   Thank you.  Mr. Palmer, from time to time you
22    were shown board packages of some considerable
23    length, some we measured at more than 200 pages
24    today; is that right?
25 A.   Yes.

Page 228

1  Q.   And it's fair to say for those of us and for
2     others who may read this transcript rather than
3     view a videotape of these proceedings that you
4     did not attempt today to read every page of
5     those larger packages that were marked as
6     exhibits; am I right?
7  A.   Correct.
8  Q.   And is it also fair to say that had you had the
9     opportunity to read those packages, it could be
10    that the context that exercise provided might
11    alter your responses?
12 A.   Possible.
13 Q.   You just don't know because you didn't have
14    that opportunity; is that right?
15 A.   Seems possible.
16 Q.   You were also asked some questions, not just
17    about the board packages or board books
18    distributed in advance of board meetings, but
19    about the minutes of those meetings themselves.
20    Do you recall that examination briefly?
21 A.   Very early in the morning, yes.
22 Q.   Right.  My question is:  You were asked some
23    questions about whether the minutes accurately
24    reflected the content of the meetings, and my
25    question is really in your experience in both

Page 229

1     nonprofit boards and for-profit boards and, in
2     fact, other organizations that keep minutes,
3     the minutes aren't intended to capture
4     everything spoken in the meeting; is that
5     right?
6  A.   That would be my belief.
7  Q.   And what is it in your experience that the
8     minutes are intended to capture?
9  A.   I can only give you a personal view.  I don't
10    know what the right answer to your question is.
11    In my personal view, I believe the minutes are
12    to make very clear decisions that were made and
13    responsibilities that come out of those
14    decisions so they can be referred to and
15    ongoing questions that need education,
16    decision-making, et cetera.
17 Q.   You mentioned in response to some questions
18    earlier in the day that you were interested in,
19    in particular, some cost and profitability data
20    that would track in the healthcare business
21    what you were making for various procedures
22    and/or various patient admissions and contacts
23    with your facilities.
24         Do you recall that testimony?
25        MR. LUFT:  Objection.

58 (Pages 226 to 229)