ROBERT PALMER

Page 230

1  A.  Yes.
2  Q.  And you wanted this data so that you could pay
3      closer attention I presume to what was your
4      bottom line; is that fair?
5  A.  Yes.
6  Q.  And you wanted it as a management tool?
7  A.  Yes.
8  Q.  As a part of -- strike that.
9          You also talked at some length about
10     what you called at one point a challenging
11     marketplace, the Philadelphia market in
12     particular for healthcare --
13 A.  In particular.
14 Q.  -- or a brutal marketplace I think was another
15     word you used.  Do you recall that testimony
16     briefly?
17 A.  Yes.
18 Q.  And part of the factors that you were referred
19     to by Mr. Luft that might have affected the
20     market included managed care, government
21     reimbursement, rate reductions, strong
22     competitors, risk contracting, things of that
23     nature.
24         Do you recall that testimony
25     generally?

Page 231

1  A.  Yes.
2  Q.  Is it fair to say that in these kinds of market
3      times and facing these kinds of market
4      conditions, that accurate financial data,
5      whether internally generated or as a part of
6      the audited financial statements, is critical
7      as a management tool for board members sitting
8      on not-for-profit healthcare boards?
9          MR. LUFT:  Objection.
10 A.  Yes, it's critical.
11 Q.  And why is that so?
12 A.  Because you must understand what it is you are
13     dealing with.  If -- there's an old phrase
14     which I happen to think is correct.  If you
15     can't measure it, you can't manage it, to put
16     it simply.
17 Q.  And is it also -- strike that.
18         You mentioned that the IDS or the
19     integrated development strategy is a broad
20     strategy, an integrated development system as a
21     broad strategy in a --
22 A.  Integrated delivery was the --
23 Q.  I'm sorry, I'm misspeaking, and I appreciate
24     it.
25 A.  I think that's the term you used, IDS.

Page 232

1          MR. LUFT:  Integrated delivery, yes.
2  A.  And I think it refers to integrated delivery.
3  Q.  I have misspoken, and I apologize.
4          Integrated delivery system was a
5      strategy pursued, not just by AHERF, but others
6      in the healthcare market in the mid to late
7      1990s.  Do you recall that testimony?
8  A.  Yes.
9  Q.  And I think your testimony will reflect that
10     you responded -- strike that.  That as a part
11     of this strategy, you could not recall specific
12     objections on your part to it at the time it
13     was being proposed to you or announced to you
14     by management.
15         Do you recall that?
16         MR. LUFT:  Objection.
17 A.  I think that I said that I was in agreement
18     with the broad concept.  There were pieces of
19     it that I had varying degrees of comfort or
20     support for.
21 Q.  And I think two things for which you expressed
22     less comfort and, in fact, fairly significant
23     caution were the acquisition of physician
24     practices on a going-forward basis and risk
25     contracting; is that right?

Page 233

1          MR. LUFT:  Objection.
2  A.  I think we had -- I think I voiced those
3      concerns this morning.  You would be accurate
4      in saying I had concerns in those areas, and I
5      believe that I voiced some concern.  I know
6      that I did this morning in terms of the risk
7      contracts, the insurance computation, whatever
8      you want to refer -- I know I did that.  I
9      think I voiced some concern this morning in
10     terms of the physician practice purchase
11     program.
12 Q.  In any event, you had the concerns about the
13     physician practices program?
14 A.  Yes, I did.
15 Q.  And my question to you is:  If --
16 A.  Concerns, Mr. Jones, in terms of feeling that
17     it needed to be very carefully handled moving
18     forward and step by step.  That doesn't mean
19     that I was totally out of agreement that we
20     should do it, right?  In fact, I agreed to be
21     on the board of that organization to help in
22     the governance, but I had -- but it was an area
23     that I thought required real cautious.
24 Q.  Real cautious management and attention?
25 A.  (Nodding head up and down.)

59 (Pages 230 to 233)

ROBERT PALMER

Page 234

1  Q.   Is that right?
2  A.   Yes, yes.
3  Q.   And my question to you is:  If these strategies
4       that were deployed and employed in the mid to
5       late 1990s -- well, let me rephrase that.
6            While these strategies were being
7       deployed in the mid 1990s and late 1990s at
8       AHERF, you were always careful to watch the
9       internal and audited financial statements for
10      financial performance measurement as a part of
11      that cautionary exercise?
12           MR. LUFT:  Objection.
13  A.   I think that's fair to say.
14  Q.   And had those results shown significantly worse
15      financial performance, you would have had, for
16      in particular fiscal years 1996 and 1997, you
17      would have had increased caution about the IDS
18      idea and strategy?
19           MR. LUFT:  Objection.
20  A.   We'd have to spend some real time on the word
21      "significant," and where the issues or
22      discrepancies might be within the context of
23      our business because some are way more
24      important than others.  So I have to be
25      careful -- I can't just say yes to your

Page 235

1       question.
2  Q.   Let me rephrase it slightly.
3            Materially worse financial conditions
4       on a consolidated basis in fiscal years 1996
5       and 1997 would have caused you more caution
6       about the wisdom of a continuing IDS strategy?
7            MR. LUFT:  Objection.
8  A.   Materially used in a financial context, as that
9       word is generally used as I know it being a
10      banker, et cetera, yes, I would agree yes to
11      your question.
12  Q.   You certainly wouldn't have ignored those
13      circumstances; is that fair to say?
14           MR. LUFT:  Objection.
15  A.   If it is what an accountant would call
16      material.
17  Q.   I am right then?
18  A.   I would agree with you.
19  Q.   And, in fact, you talked with Mr. Luft about
20      how you were proceeding or monitoring or
21      watching the procession toward an IDS strategy
22      cautiously, I think you put it in steps or one
23      step at a time.  Is that a fair way to
24      characterize the way you viewed it?
25           MR. LUFT:  Objection.

Page 236

1  A.   With a couple of issues in particular.  The
2       capitation contracts in particular, and to some
3       extent that was true with the physician
4       practices.
5  Q.   And, again, materially different financial
6       performance in fiscal year '96 and fiscal year
7       '97 would have caused you as a board member to
8       have stopped the stepping or perhaps reduced
9       the stepping --
10           MR. LUFT:  Objection.
11  Q.   -- or at least considered it?
12           MR. LUFT:  Objection.
13  A.   I can't say that it would have stopped.  It
14      might well have had us further consider, or
15      whatever your term was, at the end, but we have
16      to make sure we are talking about what an
17      accountant would call materially.
18           A million dollars is a big number.  A
19      million dollars as a proportion of a company
20      that had revenues of a billion 6 or 7 or so at
21      the time, I wouldn't call it material.  I don't
22      think an accountant would call that material if
23      we are talking about a bottom line or something
24      of that nature.
25           So you have to be real careful with

Page 237

1       these terms in relation to exactly what is it
2       we are talking about, what piece, what action,
3       how big.
4  Q.   I understand.  That's why I chose your
5       definition from an accounting perspective
6       materially misstate -- materially worse, and my
7       question stands.  Materially worse performance
8       from a financial perspective in '96 and '97
9       would have caused you to consider stopping the
10      steps, reducing the steps, or at least
11      considering whether that ought to be done?
12           MR. LUFT:  Objection.
13  A.   It would have -- it likely would have caused
14      in-depth examination of the steps.
15  Q.   And what kind of in-depth examination do you
16      mean?
17  A.   We -- let's take an example, physician practice
18      purchases.  We knew, we planned to lose money
19      in I believe the first three years.  I cannot
20      recall exactly what the plan was, but I know
21      the numbers were to be red, and then at
22      approximately that time we were to move into
23      the black.  I believe that the losses were to
24      be a low seven-figure number I think in the
25      first year, but I'm not sure that's right.

LEGALINK MANHATTAN  (212) 557-7400

ROBERT PALMER

Page 238

1          Now, if the number is -- all right.
2     So the fact that we are reporting losses does
3     not cause me, I can't speak for everyone else,
4     me as a board member to say this is
5     unacceptable.  If the losses are materially
6     different, i.e. something like 50 percent
7     greater than we are talking, then that causes
8     you to examine more closely.  If the number is
9     5 percent greater, it probably doesn't call for
10    me to get in and dig and probe and challenge,
11    no.
12  Q.   Part of the way you monitored the success of
13    any steps that were taken in this regard
14    towards an IDS was a review of the internal and
15    the audited financial statements in each of the
16    years, fiscal years '95, '96, and '97?
17  A.   Part of, yes, that was one tool.
18  Q.   An important tool?
19         MR. LUFT:  Objection.
20  A.   Yes, it is an important tool, but now I got to
21    tell you about my own upbringing in business,
22    and that is that the auditors are very
23    important, very essential tool, but they are no
24    excuse whatsoever for you not doing your
25    business right to begin with.  You shouldn't

Page 239

1     sit around and wait for your auditor to tell
2     you you got a problem, whether it's in the
3     numbers or the context.  But, yes, they exist
4     for good reasons, and, yes, as a board member
5     or a senior manager I use them.
6   Q.   And at AHERF in your board service for a
7     not-for-profit enterprise and on the subsidiary
8     boards of which you were a member, you reviewed
9     the audited financial statements for each of
10    the years of your board service?
11  A.   Yes, I did.
12  Q.   And relied on them?
13  A.   Yes, I did.
14  Q.   We talked, and "we" is the wrong word, you and
15    Mr. Luft spoke earlier a little bit about the
16    Graduate Health Systems sale of certain
17    hospitals and enterprises that were ultimately
18    made a part of the AHERF system earlier today.
19         Do you recall that testimony?
20  A.   Yes.
21  Q.   And I think you mentioned that you recall being
22    involved in some board deliberation and/or
23    meeting in November or December of 1996, at
24    which that transaction or the precursor of it
25    was discussed.

Page 240

1          Do you recall that testimony?
2   A.   Yes.  There was a -- there was a board meeting,
3     and there was a vote which I participated which
4     formally authorized the purchase by AHERF,
5     where I was a board member, of those Graduate
6     Hospitals.
7   Q.   Do you recall, Mr. Palmer, today, that even
8     after this meeting and the vote you refer to,
9     AHERF -- that the due diligence on the
10    acquisition or due diligence on the financial
11    wherewithal and condition of The Graduate
12    Hospitals that were contemplated to be acquired
13    went on?
14  A.   I don't recall it going on in terms of the
15    definition due diligence.  I recall that once
16    something's a part of us, we rigorously examine
17    the numbers, report on the numbers, et cetera.
18    I don't think of it in terms of diligence.  I
19    don't recollect that by the definition of due
20    diligence it went on.
21  Q.   Do you recall ever learning that the former
22    Graduate Health System enterprises, including
23    some hospitals, that ultimately became a part
24    of the AHERF system did not formally become a
25    part of the AHERF system until May 1, 1997?

Page 241

1   A.   I -- I wouldn't have recalled that without your
2     saying.  I now have some recollection that
3     there was a piece for which some additional
4     work needed to be done before that, but I don't
5     recollect what it was, and I can't discuss it.
6     I mean I'm not able to discuss it knowingly.
7   Q.   You recall there was an issue and the details
8     of it you don't recall; is that right?
9   A.   Yes.
10  Q.   You saw documents earlier today as exhibits
11    that showed you what -- a number that looked
12    like, although we are not certain of its exact
13    figure because of the quality of the copy, $42
14    million in operating losses for the first
15    quarter or first -- yes, I believe it was the
16    first quarter of fiscal year 1998.
17  A.   Yes, I do.
18  Q.   You recall that testimony?
19  A.   Yeah.  I --
20  Q.   That it happened?
21  A.   Yes.
22  Q.   I don't expect you to recall the specifics of
23    it.
24         My question was that I think your
25    testimony generally talked about the things

ROBERT PALMER

Page 242

1  that were undertaken then in response to those
2  adverse operating results, and they included an
3  initiative with respect to cost reduction, some
4  layoffs that were ultimately effected, although
5  we don't know when, more caution on any future
6  acquisitions and things of that nature.
7       Do you recall your testimony on that?
8       MR. LUFT:  Objection.
9       MR. McCLENAHAN:  Objection.  I'm not
10 sure he said anything about caution on future
11 acquisitions.
12 Q.  Well, you recall talking about the initiatives
13     that were undertaken to stem the tide --
14 A.  I recall the subject matter, yes.
15 Q.  Do you recall from any prior set of financial
16     statements, audited financial statements in
17     particular, thinking that those kinds of
18     significant measures that you did testify about
19     that were done in response to the September 30,
20     1997 financial statements should have been
21     taken at an earlier time?
22      MR. LUFT:  Objection.  I believe he
23 testified that was one of a number of warning
24 signs.
25      MR. JONES:  I'm sorry?

Page 243

1       MR. LUFT:  I believe his testimony
2  was that the responses he took was one of a
3  number of warning signs for why he took the
4  action.
5       MR. JONES:  I don't recognize that as
6  an objection.
7  BY MR. JONES:
8  Q.  But go ahead.  You can answer my question.
9  A.  Jim, could you ask the question again?
10 Q.  Let me try again.
11 A.  Yeah.
12 Q.  Do you recall realizing in September or shortly
13     after the end of September 1997 --
14 A.  October, whatever.
15 Q.  -- that certain measures needed to be taken to
16     stem the tide of red ink or losses, operating
17     losses incurred by the enterprise, that much
18     you recall?
19 A.  Yes, I do.
20 Q.  Do you recall ever seeing financial statements,
21     internal or audited, before that date that
22     thought -- that triggered in your mind the same
23     reaction, that immediate measures needed to be
24     taken?
25 A.  Not of the scope, such as 1,000 to 1,200

Page 244

1  physicians being eliminated with all the
2  ramifications, that I don't recall feeling the
3  need for that sort of --
4  Q.  This was in your view a time to act, that is at
5      the very least?
6  A.  A time to act more significantly than we had
7      been acting.  We thought we had been acting,
8      but now we need to act more significantly.
9  Q.  And, in fact, after that time period, a number
10     of actions were undertaken by management and
11     the board in efforts to remedy the situation;
12     is that right?
13 A.  Yes.
14 Q.  And, in fact, some of those actions were taken
15     involved the discharge of management
16     ultimately?
17      MR. LUFT:  Objection.
18 A.  Discharge of management, I don't -- I don't
19     recollect.
20 Q.  You recall that Mr. Abdelhak was ultimately
21     fired?
22 A.  Oh, that wasn't part of the cost-cutting.
23 Q.  I didn't mean it in that way.  I mean as part
24     of your reaction to continuing losses?
25      MR. LUFT:  Objection.

Page 245

1  A.  Continuing losses was a major factor in our
2      losing confidence in him.
3  Q.  And ultimately Mr. McConnell was fired; is that
4      correct?
5  A.  Yes.
6  Q.  Do you recall believing at the time that the
7      loss of confidence in either of these
8      gentlemen, Mr. Abdelhak or Mr. McConnell, was
9      in part occasioned on your part by questions
10     about their integrity as well as their
11     performance?
12      MR. LUFT:  Objection.
13 A.  On -- make sure I understand your question, on
14     my part.
15 Q.  Yes.
16 A.  Whatever feelings I might have had, was
17     integrity a part of --
18 Q.  Your concerns?
19 A.  -- my concerns?
20 Q.  Yes, about either gentleman.
21 A.  In the very late stages, yes.
22 Q.  And what was that concern?
23 A.  I had great concerns about the actions around
24     decisions and the timing of the repayment of
25     the $90 million bank loan and what that

62 (Pages 242 to 245)

ROBERT PALMER

Page 246

1    reflected to me about management competence and
2    whether the board was being kept apprised of
3    what was a huge issue.
4  Q.   And you thought it was more than a competence
5    issue, but also an integrity issue, given my
6    question?
7        MR. LUFT:  Objection.
8  A.   I thought I touched on integrity, yes.
9  Q.   And if you had had -- let me try that again.
10    If you had been told by the auditors that they
11    had questions about either Mr. Abdelhak or
12    Mr. McConnell's integrity at a prior time,
13    would you have acted on that report?
14        MR. LUFT:  Objection.
15  A.   They would have had to do more than say that
16    they had a question.  They would have had to
17    sit and define that, describe that in some
18    detail, and then I, and I would imagine
19    another, would have to judge the voracity of
20    that.  It could have led to, but I can't
21    hypothesize.  I don't know what it was, so I
22    don't know how you react.
23  Q.   Right.  But my question is it would not have
24    been something that would have been ignored,
25    you would have acted upon the information in

Page 247

1    some fashion?
2        MR. LUFT:  Objection.
3  Q.   Is that fair to say?
4        MR. LUFT:  Objection.
5  A.   If, this is all hypothetical, if they had come
6    with charges of concern, with documentation,
7    with substantive examples, et cetera, then I
8    believe that would have raised questions in my
9    mind.
10  Q.   And you would have had --
11  A.   And it would have required a lot more than a
12    statement that I'm not sure that I trust Mr. X.
13    What does that mean, you know.
14  Q.   I'm not presuming that, and that wasn't part of
15    my hypothetical.  I am suggesting substantial
16    charges documented and the charges you believe
17    to be true.
18        MR. LUFT:  Objection.
19  A.   I imagine that I would have -- that would have
20    raised red flags, and I would have wanted that
21    pursued to its outcome.
22  Q.   Or at least reasonably credible charges, same
23    answer?
24        MR. LUFT:  Objection.
25  A.   Reasonably credible?

Page 248

1  Q.   Yes.  I mean you couldn't -- without
2    certainty -- you couldn't with certainty know
3    that the charges were true when they were
4    brought, but if you thought they were
5    reasonably credible, would you have pursued
6    them?
7  A.   Well, you would do --
8        MR. McCLENAHAN:  Can we just review
9    the bedding here so that we have a decent
10    record?  What charges are you talking about?
11        MR. JONES:  Charges about whether or
12    not -- or charges that the integrity of two
13    management officials, either Mr. McConnell or
14    Mr. Abdelhak, were engaged in activities that
15    the auditors believed to bring into question
16    their integrity.
17  Q.   And if you thought those charges were
18    reasonably credible, my question is, would you
19    then have acted?
20        MR. LUFT:  Objection.
21  A.   I would have asked for documentation and
22    possibly would have asked for our organization
23    to pursue investigation around those charges,
24    if they were really material, but you have to
25    tell me what it is before I can tell you

Page 249

1    what -- a lot of substance of what I would do.
2  Q.   And I'm not asking you for a whole lot more
3    detail right now.
4        You mentioned to us, Mr. Palmer, that
5    at some point, and I think the points in time
6    were roughly May or June of '98, the board or
7    key members of it lost confidence in both
8    Mr. Abdelhak and Mr. McConnell, you recall
9    that?
10  A.   Yes.
11        MR. LUFT:  Objection.
12  Q.   Ultimately the board --
13  A.   It was separate situations, my awareness and
14    the discussions were separate.
15  Q.   I understand.  Do you recall what the reasons
16    were for the loss of confidence in
17    Mr. McConnell that you became aware of?
18  A.   Certainly one of the areas had to do with the
19    situation that I mentioned a few minutes ago,
20    having to do with the whole way that the
21    negotiations and actions of the multi -- the
22    four-bank consortium loan was handled.
23  Q.   Do you recall anything else?
24  A.   It's the one that comes to mind that's most
25    significant.  There may have been others.  I

63 (Pages 246 to 249)

ROBERT PALMER

Page 306

COMMONWEALTH OF PENNSYLVANIA   )    E R R A T A
COUNTY OF ALLEGHENY              )    S H E E T

 2

 3       I, Robert Palmer, have read the foregoing pages
     of my deposition given on Friday, August 8, 2003, and
     wish to make the following, if any, amendments,
 4   additions, deletions or corrections:
 5   Page/Line  Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21       _____
                     ROBERT PALMER
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2003.
24   _____
              Notary Public
25       AKF Reference No. HW76730

LEGALINK MANHATTAN  (212) 557-7400

**Panucci Dep.**

Marc A. Panucci

1

2　UNITED STATES DISTRICT COURT

3　WESTERN DISTRICT OF PENNSYLVANIA

4　- - - - - - - - - - - - - - - - - - -x

5　THE OFFICIAL COMMITTEEE OF UNSECURED

　　CREDITORS OF ALLEGHENY HEALTH, EDUCATION

6　& RESEARCH FOUNDATION,

7　　　　　　　　　　　Plaintiff,

8　　　　　-against-

9　PRICEWATERHOUSECOOPERS, LLP,

10　　　　　　　　　　Defendant.

11　- - - - - - - - - - - - - - - - - - -x

12　　　　　　　　　825 Eighth Avenue

　　　　　　　　　　New York, New York

13

　　　　　　　　　　November 18, 2003

14　　　　　　　　　9:07 a.m.

15

16　　　　　DEPOSITION of MARC A. PANUCCI, a

17　witness in the above-entitled action, held

18　at the above time and place, taken before

19　Barbara P. Goldsmith, a Shorthand Reporter

20　and Notary Public of the State of New

21　York, pursuant to Subpoena, the provisions

22　of the Federal Rules of Civil Procedure,

23　and stipulations between Counsel.

24

25

Marc A. Panucci

Page 70

1    on the document in a couple places. I
2    will, however, tell you that this was
3    found in the fiscal year '96 files
4    produced by Coopers & Lybrand and that the
5    completed and last modified dates are all
6    in October of 1996. It may be a computer
7    error in printing or copying, but save and
8    except for the two instances where I see
9    6/30/95 on the page, does everything else
10   about it lead you to believe that it was,
11   indeed, for fiscal year '96?
12       MR. LUFT:  Objection.
13       A.   I do not know if it would be for
14   fiscal year '95 or fiscal year '96.
15       Q.   Let me then take you through --
16   let me ask you what the following would
17   indicate to you.  Top of the page says,
18   "AHERF 6/30/96."  That indicates, given
19   AHERF's fiscal year, a fiscal year '96
20   budget, correct?
21       A.   Correct.
22       Q.   The completion or the completed
23   by and last modified dates in October of
24   '96 indicate it relates to fiscal year of
25   '96 --

Page 71

1        MR. LUFT:  Objection.
2        Q.   -- is that fair to say?
3        A.   That I am not sure because I
4    would not know if the '95 database was
5    still open or not.
6        Q.   In any event, audit work in
7    October of '96 is quite unlikely to have
8    been done with respect to fiscal year '95.
9    Am I right?
10       A.   That is correct, but there's
11   times where you're still doing
12   administrative things to closeout an
13   account.
14       Q.   I understand.  Let me also ask
15   you, as you understand the class database
16   as it existed in fiscal year 1996, the
17   completion and modified dates are
18   generated automatically by the computer
19   system at the time someone makes the
20   entries.
21       A.   Correct.
22       Q.   So that would indicate that this
23   work paper was, indeed, generated in
24   October of '96?
25       A.   Well, I don't know if it was

Page 72

1    generated in October of '96.  The
2    completion and last modification would
3    have been October of '96.
4        Q.   We can talk about that issue
5    later, but I understand your answer.
6        A.   Okay.
7        Q.   In any event, if we assume, and
8    I'd like you to for purposes of the next
9    few questions, that this was produced from
10   the class database for fiscal year 1996
11   and, therefore, relates to fiscal year
12   1996, the budget for you indicates client
13   hours in various weeks on page 2 of the
14   document; is that right?
15       A.   That is right.
16       Q.   And it indicates hours
17   predominantly by total in two categories.
18   That is, pro fee, p-r-o f-e-e, and
19   endowments and investments.  Am I also
20   right?
21       A.   That is correct.
22       Q.   Could you explain for us what
23   you recall the pro fee topical area to be?
24       A.   I do not recall.
25       Q.   If I told you that I have seen

Page 73

1    documents that indicate that pro fee
2    related to fees for physician services,
3    does that help you recall what pro fee
4    relates to, as in professional fees?
5        A.   That does not help.
6        Q.   Okay.  Endowments and
7    investments, however, is, in your memory,
8    as relating to work on endowments,
9    investments and investments for AHERF or
10   its affiliates in fiscal year '96?
11       A.   Correct.
12       Q.   You do recall working in that
13   field?
14       A.   Correct.
15       Q.   You do not recall working in pro
16   fee?
17       A.   Correct.
18       Q.   And can you tell from looking at
19   this document, Mr. Panucci, whether these
20   are hours actually spent or whether these
21   are hours budgeted?
22       A.   I cannot tell from looking at
23   the document.
24       Q.   Looking at the budget which has
25   some entries in some other areas other

19 (Pages 70 to 73)

Marc A. Panucci

Page 74

1  than pro fee and endowments/investments,
2  can you recall, as you sit here today,
3  involved in any other aspects in the
4  fiscal year 1996 AHERF audit besides
5  endowments and investments?
6    A.   Other assets in intercompany
7  accounts I remember having some
8  involvement.
9    Q.   And what involvement do you
10  recall having?
11    A.   I could not tell you the
12  specifics, but I know I did some
13  procedures in those areas.
14    Q.   Can you describe generally what
15  you understood those areas to be for the
16  jurors?
17    A.   Well, not recalling in specific
18  what I did on this engagement,
19  intercompany accounts is typically just to
20  make sure they reconcile and eliminate
21  between the affiliates and the other
22  assets, you know, it's obtaining support
23  for what is included in that category.
24    Q.   That it exists and that the
25  amounts are appropriate, that the assets

Page 75

1  exist and that the amounts for them are
2  appropriate, generally?
3    A.   Correct.  And that they're --
4  and the amounts should be capitalized as
5  an asset.
6       (Consolidated time budget was
7       hereby marked as Exhibit 4100 for
8       identification, as of this date.)
9    Q.   Mr. Panucci, we've now just
10  handed you 4100, Exhibit 4100.  And it
11  again, is -- not again but is, in fact,
12  titled a consolidated time budget.  Am I
13  right?
14    A.   Correct.
15    Q.   And that working paper name
16  appears just below AHERF and the date
17  6/30/96, which would indicate by itself
18  that it related to the fiscal year '96
19  audit?
20       MR. LUFT:  Objection.
21    A.   By itself correctly, but in the
22  title we have the '95 issue again.
23    Q.   And there is in the middle of
24  the page there is the date 6/30/95 which
25  neither you nor I apparently have an

Page 76

1  explanation for; is that fair?
2    A.   That's fair.
3    Q.   The completed and last modified
4  dates are, again, the same date, 10/17/96,
5  as the prior exhibit, correct?
6    A.   That is correct.
7    Q.   And if you turn to page 2 of the
8  document, you see a table of hours with
9  associates or other auditors' initials
10  across the top, and tasks down the
11  left-hand margin.  Am I right?
12    A.   That is correct.
13    Q.   And in -- for each associate set
14  of initials, there are hours by task.  Is
15  that right?
16    A.   Correct.
17    Q.   And off to the right-hand or
18  toward the right-hand margin, we have a
19  total column for hours, a budgeted amounts
20  column for hours, and a difference column.
21  Do you see that?
22    A.   Yes.
23    Q.   From your familiarity with hours
24  record keeping at the time frame of fiscal
25  year 1996, does this document, in your

Page 77

1  opinion and with your experience, indicate
2  to you a total hours associates or other
3  accountants or auditors worked, the
4  budgeted amounts that were initially
5  established, and then the difference
6  between those two figures?
7    A.   I do not know specifically
8  that's what this document is doing, but we
9  have models similar to this we have used
10  in the past that showed this.
11    Q.   Have you seen documents that
12  looked like this for engagements?
13    A.   Yes.
14    Q.   Tracking hours and budgeted
15  hours?
16    A.   Yes.
17    Q.   Do you recall seeing this one?
18    A.   I do not recall seeing this one.
19    Q.   You do recall, however,
20  recording time for your engagements and
21  doing your best to do so accurately
22  because you knew Coopers & Lybrand tracked
23  those hours and compared it to budgeted
24  amounts?
25    A.   Yes.

20 (Pages 74 to 77)

Marc A. Panucci

Page 78

```
1    Q.   And when you recorded time, you
2  did your best to allot it to the various
3  tasks you were engaged in in the audit
4  work?
5    A.   Yes, but it was more -- we
6  looked at it more from a total hours than
7  usually by specific item area.
8    Q.   However, you have no reason to
9  doubt, as you sit here today, that you did
10 your best to log your hours at least by
11 the categories set forth on the left-hand
12 margin of Exhibit 4100. Am I right?
13   A.   As of today, yes, that's
14 correct.
15   Q.   And, in fact, this document,
16 like its immediate predecessor, indicates
17 that you spent the predominant amount of
18 your time on both pro fee and
19 endowments/investments, 108.5 hours and 90
20 hours respectively; is that right?
21   A.   Correct.
22   Q.   This document -- because those
23 numbers fall in the category headed MP, am
24 I right, for Mark Panucci?
25   A.   Correct.
```

Page 79

```
1    Q.   The column immediately to the
2  right of yours bears the initial PF, and
3  whomever it is that the initials PF
4  referred to has a significant amount of
5  time, at least compared to you, on the
6  order of 79 hours, on endowments and
7  investments. Do you see that?
8    A.   I see that.
9    Q.   And do you recall whether you
10 worked with anybody on endowments and
11 investments with the initials PF in fiscal
12 year 1996 with respect to the AHERF audit?
13   A.   I do not recall.
14   Q.   Do you recall the name Patty
15 Francioni? And forgive me if I've
16 mispronounced it.
17   A.   I do recall that name, yes.
18   Q.   And have I pronounced it
19 accurately?
20   A.   I think it's Francioni, but --
21   Q.   Francioni with a softer C?
22   A.   I think so.
23   Q.   Thank you.
24        And do you recall her now that I
25 have mentioned her -- is it a her?
```

Page 80

```
1    A.   It is a her.
2    Q.   Having mentioned her just now,
3  do you recall that she was, indeed,
4  involved in the auditing of endowments and
5  investments with you?
6    A.   Yes.
7    Q.   In fiscal year '96?
8    A.   Yes.
9    Q.   Do you recall what she was
10 engaged in that was different from you?
11 Let me put that more generally. Do you
12 recall what she was engaged in at all?
13   A.   She assisted in, from what I can
14 remember, she assisted in the confirmation
15 process of the investment area.
16   Q.   And what would that process
17 entail?
18   A.   The tying out of the information
19 from the third-party providers, from the
20 financial institutions we talked about
21 earlier to the general ledger.
22   Q.   The work you referred to in
23 discussing the '95 audit program that was
24 placed before you?
25   A.   Correct.
```

Page 81

```
1    Q.   And that's primarily what you
2  recall her being involved in?
3    A.   Yes.
4    Q.   Do you recall her being involved
5  in anything else in the endowments and
6  investment topic or field?
7    A.   Not that I can recall.
8    Q.   And was she, in fact, junior to
9  you at the time?
10   A.   She was in her first year with
11 the firm.
12   Q.   So she was slightly junior to
13 you?
14   A.   Yes.
15   Q.   Did she, indeed, report to you?
16   A.   She discussed any items -- she
17 discussed items that she encountered with
18 me, but then ultimately I would send her
19 to another supervisor or I would talk to
20 the super -- another supervisor.
21   Q.   Do you recall any particular
22 discussions that she brought to your
23 attention or any particular topics,
24 rather, that she brought to your attention
25 in her discussions with you?
```

21 (Pages 78 to 81)

Marc A. Panucci

Page 82

1     A.   Nothing specific.
2     Q.   Anything in general?
3     A.   Nothing that I can recall.
4     Q.   If there was anything of moment
5  or importance to you that she brought to
6  your attention, we would find it in a work
7  paper, or mention of it in a work paper?
8     A.   It all depends.  If it was an
9  issue that needed an ultimate conclusion,
10 then it would be in a work paper.  But if
11 there was no issue with it or, you know,
12 could be a misunderstanding of something,
13 we might not see that in a work paper.
14    Q.   If recordation or recording,
15 perhaps better put, of any of your
16 discussions with Ms. Francioni does not
17 exist in a work paper, is there any other
18 document in which that discussion might be
19 recorded?
20    A.   Not that I CAN think of.
21    Q.   And that is because the work
22 papers are the place where these kinds of
23 matters of significance are to be
24 reflected?
25         MR. LUFT:  Objection.

Page 83

1     A.   Well, as I've mentioned, if
2  there was something of significance, it
3  would be in the work papers.
4     Q.   That was my question.
5          I'm looking at the budget again
6  with the actual versus budgeted amounts on
7  Exhibit 4100, and I see only one other
8  person with any time recorded for
9  endowments and investments, and that
10 person's initials are MS.  Do you see the
11 two hour figure for the individual, MS?
12    A.   Yes.
13    Q.   Do you recall whether anybody
14 with those initials worked with you or
15 above you or beneath you on investments
16 and endowments in that fiscal year or for
17 that fiscal year?
18    A.   I remember an individual by the
19 name of Mike Stewart with those initials.
20 I do not recall if he worked for me or
21 under me for -- as part of the
22 investments.
23    Q.   And it's fair to say, then,
24 having gone through this budget just now,
25 the two people you recall being involved

Page 84

1  on the front line, in any event, with
2  respect to investments and endowments
3  were you and Ms. Francioni?
4     A.   Correct.
5     Q.   You reported to others at the
6  time?
7     A.   Yes.
8     Q.   And on endowments and
9  investments, to whom was that?
10    A.   Principally to Amy Frazier.
11    Q.   And when you say principally,
12 does that mean you reported to someone
13 else from time to time as well?
14    A.   Amy was the primary person, but,
15 you know, there was conversations with
16 Mark Kirstein and Christa Porter who was
17 the overall lead senior at that point in
18 the '96 audit.
19    Q.   And what was Amy Frazier's
20 title?
21    A.   Amy Frazier was a manager, I
22 believe, in '96.
23    Q.   When you say Ms. Porter was the
24 lead senior, she was the lead senior what,
25 associate or manager?

Page 85

1     A.   Overall lead senior associate.
2     Q.   Christine was, indeed, a
3  manager?
4     A.   Christa.
5     Q.   No.  Mr. Kirstein.
6     A.   Oh, I'm sorry.  He was a
7  manager, yes.
8     Q.   And Ms. Frazier was what at the
9  time?
10    A.   A manager.
11    Q.   And between the two of them, did
12 Ms. Frazier, as you understood it, report
13 to Mr. Kirstein?
14    A.   I do not know.
15    Q.   Did you have any
16 understanding -- I don't -- let my
17 question be as clear as it can be.  I
18 don't mean to inquire about whether you
19 understood what the formal relationship
20 between the two people in the engagement
21 was.  What I mean to ask you is, do you
22 recall having any understanding of who was
23 senior to whom on the AHERF audit between
24 Ms. Frazier and Mr. Kirstein in fiscal
25 year '96?

22 (Pages 82 to 85)

Marc A. Panucci

Page 122

1  of this audit step to identify and
2  document the client's approach for
3  adopting the new standard, receiving
4  information from someone at AHERF other
5  than Ms. Cafarro?
6      A.   Are we talking specifically
7  about the Delaware Valley entities or are
8  we talking about all of AHERF?
9      Q.   Well, at first I'd like to talk
10 about whether you received written
11 information from someone other than
12 Ms. Cafarro about the East, the Delaware
13 Valley enterprises, if you can recall
14 today.
15     A.   I do recall Carolyn directing me
16 to other places for additional
17 information.
18     Q.   Do you recall what those other
19 places were or by whom they were peopled?
20     A.   I do not recall.
21     Q.   Do you recall receiving anything
22 from any other places other than
23 Ms. Cafarro with respect to the Delaware
24 Valley endowments and investments?
25     A.   Yes.

Page 123

1      Q.   From whom?
2      A.   I do not recall.
3      Q.   What do you recall receiving?
4      A.   I just remember there was
5  conversations going through our audit and,
6  you know, I said Carolyn, I don't -- I
7  don't see the support in the binder for
8  it.  And she directed me to other places.
9  To who, I don't know.
10     Q.   Do you recall speaking with
11 people in the treasury department of AHERF
12 in Pittsburgh?
13     A.   I do not recall if it was in
14 treasury or not.
15     Q.   Do you recall speaking with
16 people in the development department of
17 the eastern hospitals, or departments?
18     A.   Again, I don't recall if it was
19 the specific development departments or
20 not.
21     Q.   Do you recall receiving anything
22 in hard copy, electronic or other tangible
23 readable format, from anyone other than
24 Ms. Cafarro, regarding the eastern owned
25 endowments?

Page 124

1      A.   I remember a request to other
2  individuals and receiving something, yes.
3      Q.   Do you recall what it was?
4      A.   I do not recall what it was.
5      Q.   Is it fair to say that to the
6  extent you thought information that you
7  received important in your analysis in
8  your work, you mention it in your work
9  papers?
10         MR. LUFT:  Objection.
11     A.   Again, I can't speak for what's
12 in the work papers back in '96.
13     Q.   I'm not asking you to memorize
14 or to have memorized work papers and
15 regurgitate them for me.  What I'm asking
16 is, was it your practice, in or about the
17 time of this audit, to record in the work
18 papers your receipt or your failure to
19 find important documentation?
20     A.   In the work papers would provide
21 information of where we would receive
22 something and the support for our
23 conclusions.  But being it's the company's
24 adoption, I don't know if all the
25 information -- you know, all the

Page 125

1  information we received from them would
2  not be included in the work papers.
3      Q.   You don't know if it would?
4      A.   I don't know if it would or not.
5      Q.   If there was a lack of
6  documentation that made it impossible for
7  you, in your judgment, to accurately
8  determine the appropriateness of the
9  company's work with respect to the
10 adoption of these new FASBs, would you
11 have noted that in your work papers, that
12 you completed?
13     A.   I don't remember any discussion
14 of a lack of documentation that was needed
15 from the company on the adoption of the
16 new standards.
17     Q.   You don't recall that being a
18 fact; is that fair to say, that there was
19 a lack of documentation?  You don't recall
20 that being a fact?
21         MR. LUFT:  Objection.
22     A.   What I remember is the company
23 adopted 116, 117, that they had enough
24 support to give their conclusion of the
25 classifications for 116, 117.  And we were

32 (Pages 122 to 125)

Marc A. Panucci

Page 126

```
 1   able to do an independent review of that
 2   support, but it was mentioned because
 3   you're talking about old endowments that,
 4   you know, the documentation might not be
 5   complete, but there was enough information
 6   contained within there to make that
 7   assessment.
 8       Q.   To make your assessment?
 9       A.   No.  To make the company's
10   assessment, and we did our independent
11   review of that assessment.
12       Q.   Right.  And you do not recall,
13   as you sit here today, putting in a work
14   paper that you did not have enough
15   information to make your own independent
16   assessment; is that right?
17       A.   I don't recall anything saying
18   that, no.
19       Q.   No.  And you don't recall
20   concluding that; is that right?
21       A.   Correct.
22       Q.   Who was it, then, from whom you
23   received any of the same kinds of
24   documentation, what you called the
25   underlying work papers and support for the
```

Page 127

```
 1   adoption of SFAS 116 and 117 for
 2   enterprises other than the eastern
 3   Delaware Valley enterprises, that is, the
 4   western enterprises, or AHERF, the parent
 5   enterprise?
 6       A.   I remember an individual by the
 7   name of Al Zworn providing information.
 8       Q.   And I only correct this to the
 9   extent it is a correction because I've
10   seen his name recently on a subpoena, but
11   I believe the gentleman that worked at
12   AHERF was named Al Zwirn, and maybe we're
13   saying the same word, but I think his name
14   is spelled Z-w-i-r-n.  Does that sound
15   right to you?
16       A.   That name sounds familiar.  The
17   correction of the spelling I do not know.
18       Q.   You were saying Z-w-o-r-n, at
19   least in your own mind and voice, correct?
20       A.   Correct, and I thought that was
21   the spelling of that name.
22       Q.   That's fine, and I want your
23   testimony, not mine.  But by prompting you
24   that I have seen the name Z-w-i-r-n, I'm
25   curious if that refreshed your
```

Page 128

```
 1   recollection and I think you were telling
 2   me it did not.
 3       A.   Correct.
 4       Q.   Do you recall receiving any
 5   written information from anyone else
 6   besides Mr. Al Zwirn/Zworn with respect to
 7   the western enterprises or AHERF, the
 8   parent?
 9       A.   There was -- I know Carolyn was
10   not primarily responsible, but I don't
11   know who my primary contact was as it
12   related to the western side or AHERF, the
13   parent.
14       Q.   I will show you a work paper
15   shortly and will tell you now, just
16   because it will save me the time reaching
17   around and potentially bumping the court
18   reporter again, that a name appeared in
19   the work papers, that is, Jack Lydon.  Me
20   having given voice to that name, does that
21   refresh your recollection that he might
22   have been your contact for other
23   documentation besides Mr. Zwirn?
24       A.   I remember the name, Jack Lydon.
25   I don't recall if that was the specific
```

Page 129

```
 1   audit area I was working with Jack on.
 2       Q.   What do you recall receiving
 3   from either Mr. Zwirn or Mr. Lydon?
 4       A.   Similar information I received
 5   from the Delaware Valley entities, but it
 6   was -- the initial part of it was not as
 7   one neat place binder as the Delaware
 8   Valley's.  But there was a, you know, a
 9   schedule that the client prepared.  It
10   shows here's what our classifications are
11   and then another set of binders that had
12   the supporting documentation for the
13   company's classification of those
14   endowments.
15       Q.   Do you recall that the schedule
16   was in a binder or separately supplied?
17       A.   Separately supplied.
18       Q.   And the schedule was generally
19   in what kind of a format?
20       A.   I remember it was an Excel
21   spreadsheet that had the classification.
22       Q.   It wasn't parchment or slate, it
23   was an Excel spreadsheet?
24       A.   Correct.
25       Q.   And it was a multipage document
```

Marc A. Panucci

Page 130

1   or a single page document?
2       A.  I do not recall.
3       Q.  Do you recall, then, that you
4   received from Mr. Zwirn or Mr. Lydon --
5   and I'm going to use both names unless you
6   tell me you're certain it was Mr. Zwirn an
7   not Mr. Lydon. Can you tell me that with
8   certainty, that you received documentation
9   from only one of them and not either of
10  them?
11      A.  Mr. Zwirn was the one who
12  provided the binder to have the supporting
13  documentation for it.
14      Q.  And he may or may not have
15  provided the schedule. Is that what you
16  are intimating?
17      A.  He did not provide the schedule.
18  I don't know if it was Mr. Lydon who
19  provided the schedule or not, but it was
20  somebody else.
21      Q.  That's helpful and I appreciate
22  your offering that for me.
23          The question now is, do you
24  recall receiving from Mr. Zwirn, then, two
25  binders, three binders, one binder, or do

Page 131

1   you today really recall whether the
2   support information was all in one binder
3   or not?
4       A.  I do not recall if it was
5   multiple binders.
6       Q.  It could have been one, it could
7   have been more than one. Is that
8   accurate?
9       A.  It was at least one.
10      Q.  But I'm also right, it could
11  have been more than one?
12      A.  Correct.
13      Q.  Do you recall whether you
14  received this information all in one
15  installment or whether you got any
16  information in hard copy over time as you
17  sit here today?
18      A.  I can't recall.
19      Q.  When did you get the information
20  from Mr. Zwirn? The reason I ask it is
21  you mentioned that you got sort of at the
22  outset of your work on endowments and
23  investments, which you believe, I think,
24  to be in the final audit phase as opposed
25  to prelim from Ms. Cafarro. Did you get

Page 132

1   this documentation from Mr. Zwirn on
2   western enterprises and AHERF, the parent,
3   at the same time period, at the outset of
4   your work?
5       A.  For the AHERF parent, we did not
6   receive any information until the year end
7   work and it was after the Delaware Valley
8   entity information was received. The
9   reason was they were not ready to hand
10  over the adoption for 116, 117 at the
11  outset of our audit.
12      Q.  At the outset of --
13      A.  Our year end procedures.
14      Q.  Thank you. That helps me get,
15  also in my mind, to the right time period.
16          When you say AHERF, the parent,
17  do you also include in that any other
18  western enterprise like Allegheny General
19  Hospital?
20      A.  Yes.
21      Q.  So any western or parent level
22  endowment/investment support
23  documentation, whether by way of schedule,
24  three-ring binder, you got after the
25  eastern support data?

Page 133

1       A.  Correct.
2       Q.  And not quite at the outset of
3   your investment work as a part of your
4   year end audit work, but later in time
5   because the client was not ready yet to
6   give you the information?
7       A.  Correct.
8       Q.  And why is it that you
9   understood that the client was not ready
10  yet to give you the information?
11      A.  My understanding, the company
12  was still completing their analysis of the
13  adoption of 116, 117 as it related to the
14  western hospitals.
15      Q.  And from whom did you gain this
16  understanding?
17      A.  I could not recall who that
18  individual was.
19      Q.  Was it Mr. Zwirn?
20      A.  It was not Mr. Zwirn.
21      Q.  After that, do you have any idea
22  who it was?
23      A.  I do not know.
24      Q.  What did you understand
25  Mr. Zwirn's role at AHERF to be?

34 (Pages 130 to 133)

Marc A. Panucci

Page 134

1    A.   I do not know.
2    Q.   You understood Mr. Lydon to be a
3   part of the finance department, however?
4    A.   Yes.
5    Q.   Meaning the accounting
6   department, in general terms?
7    A.   Yes.
8    Q.   The process that you've just
9   described for us is really the same one
10   for both FASBs 116 and 117. Is that fair
11   to say? The process of understanding and
12   learning the client's approach for
13   adoption. You don't, in your mind, have
14   two sets of data retrieval in mind is what
15   I'm asking?
16    A.   No. And principally because
17   116 -- most of the information we talked
18   about was really the 116 adoption because
19   that deals with classifying the
20   investments. The 117 part really deals
21   with the financial statement presentation.
22    Q.   So this is all part and parcel
23   of the same process?
24    A.   Correct.
25    Q.   And the classification process,

Page 135

1   as you understood it, from reading the
2   FASBs, the relevant literature, and
3   discussing the topic with Ms. Frazier, was
4   what; what was the client supposed to do
5   as a matter of this new classification
6   protocol set forth in FASB 116 or 117?
7    A.   The company had to make a
8   determination based upon donor intent if
9   their investment should be classified as
10   unrestricted, temporarily restricted, or
11   permanently restricted.
12    Q.   And those were net asset
13   categories?
14    A.   I'm sorry. What do you mean?
15    Q.   When displayed on actual
16   financial statements, those categories of
17   assets were on the net asset side of the
18   balance sheet?
19    A.   They were on the asset side of
20   the balance sheet. They were investments.
21    Q.   And describe for me your
22   understanding of the categories. What
23   qualified investment amounts or endowment
24   amounts for classification in each of the
25   categories when you were performing your

Page 136

1   audit work?
2    A.   My understanding back in the '96
3   audit or my understanding today?
4    Q.   Well, if you have a recollection
5   of your understanding then, share it with
6   me.
7    A.   I don't think I'd have a
8   recollection as of '96 of what that was.
9   But as of today, and it's not worked in
10   the investment area in sometime now, as
11   far as not for the profit, but it's based
12   upon you have to look at the donor.
13    Q.   Let's stop for a second. And I
14   don't mean to interrupt, only that I think
15   it will be clearer this way.
16        As you sit here today, you don't
17   recall anything about what you understood
18   to be the distinction between the asset or
19   net asset classifications we just
20   discussed; is that right?
21    A.   Yeah. I don't think -- back in
22   '96, I cannot recall, you know, what my
23   understanding of those classifications
24   would be just because we are talking about
25   '96.

Page 137

1    Q.   No, and I don't mean to make
2   this more of a memory test than it is. I
3   only want to know if you can tell me one
4   way or the other whether you have any
5   independent recollection, of any kind, of
6   what you understood to be the distinction
7   between the categories or classifications
8   when you were doing the work in fiscal
9   year '96. If you've got some
10   understanding of it, I want you to share
11   it with me.
12    A.   Okay, fair. That understanding
13   was certainly it was going to be based
14   upon donor intention.
15    Q.   Right.
16    A.   That you no longer could have a
17   board designated fund be considered
18   temporarily or permanently restricted, so.
19    Q.   They would be considered
20   unrestricted?
21    A.   It would be considered
22   unrestricted.
23    Q.   Anything else?
24    A.   So then you would look at the
25   donor's intention, and based upon the

www.rennillo.com

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Marc A. Panucci

Page 190

1    Q.   You recall sampling those?
2    A.   Yes.
3    Q.   And when you say consolidated
4  AHERF, which I said much too rapidly, you
5  mean AHERF, the parent enterprise?
6    A.   And its subsidiaries.
7    Q.   You recall sampling both?
8    A.   Yes.
9    Q.   And how was the sample
10 determined and by whom?
11   A.   That I do not recall.
12   Q.   Do you recall doing it yourself,
13 that is, determining what the sample would
14 be?
15   A.   I do not recall.
16   Q.   Do you recall why the number
17 five was selected as the quantity or size
18 of the sample?
19   A.   I do not recall.
20   Q.   Do you recall that coming down
21 from a superior or do you recall that
22 being generated by somebody at your level
23 or below?
24   A.   I do not recall either way.
25   Q.   Because the schedule which is

Page 191

1  attached as the second to last page or a
2  portion of this schedule which is attached
3  as the second to last page of Exhibit 4108
4  is fairly fine in print, at least for my
5  eyes, we have blown it up, if you will,
6  and made it larger in type by printing the
7  same schedule from the class database and
8  that is the document I'm going to share
9  with you now.
10   A.   Okay.
11   Q.   And we will mark this as we
12 break for a change of our videotape.
13       (Larger text version of Exhibit
14   4108 was marked Exhibit 4109 for
15   identification, as of this date.)
16       (A recess was taken at 2:18 p.m.
17   and the Deposition continued at 2:28
18   p.m.)
19   Q.   Mr. Panucci, when we broke I had
20 just handed you what we've now marked as
21 4109 which is a slightly larger text
22 version of Exhibit 4108, I think you will
23 tell me if you have a chance to peak at
24 it.
25   A.   Yes.

Page 192

1    Q.   It's stapled somewhat
2  differently because of the larger text,
3  but does that look that way to you?
4    A.   Yes.
5    Q.   I'd like to -- the title of this
6  document is called classification testing;
7  is that right?
8    A.   Yes.
9    Q.   And let me correct myself.  What
10 has been provided to you in large text
11 copy as Exhibit 4109 is only the
12 classification testing portion of Exhibit
13 4108; is that right, not the first page of
14 Exhibit 4108?
15   A.   That is correct.
16   Q.   And this classification testing
17 is marked as completed by you, last
18 modified by you on two different dates,
19 and then the modification history lists
20 only you; is that right?
21   A.   That is correct.
22   Q.   And so that means to the extent
23 that has C&L work product contained within
24 it, that work product is yours?
25   A.   Once again, we're dealing with

Page 193

1  an Excel spreadsheet.  So there is the
2  possibility of somebody else documenting
3  something on this.
4    Q.   In the same way you described
5  earlier?
6    A.   Yes.
7    Q.   But having had a chance to look
8  at the document, is it your testimony
9  today, to the best of your recollection,
10 that portion of it that is not client
11 provided was, indeed, primarily your work
12 product?
13   A.   That is correct.
14   Q.   And is there any portion of the
15 document, at least the portion of it
16 contained in the footnotes that you
17 believe to be somebody else's work
18 product, as you sit here today?
19   A.   I would not know one way or the
20 other if somebody else was involved or
21 not.
22   Q.   But you don't see anything today
23 that triggers your memory that somebody
24 else was involved; is that fair to say?
25   A.   That's fair to say.

49 (Pages 190 to 193)

Marc A. Panucci

Page 194

1    Q.   Do you also believe, as you just
2  testified, that this blown-up version
3  includes client supply data, at least the
4  dollar figures in the columns on the
5  spreadsheet?
6    A.   The dollar values in the columns
7  in the other information in the
8  spreadsheet, i.e., the cost center trust
9  number description would be client
10  supplied information.
11    Q.   Whereas the footnotes, as we've
12  just heard would be C&L and primarily you
13  provided information?
14    A.   Correct.
15    Q.   In this analysis of endowments,
16  is labeled as including the permanently
17  restricted endowments, is that right, in
18  the left-hand -- upper left-hand corner?
19    A.   That is the title that I read as
20  of today, yes.
21    Q.   And do you recall that there
22  were certain permanently restricted
23  endowments carried at the AHERF parent
24  enterprise level at AHERF in fiscal year
25  1996 that were commonly referred to as the

Page 195

1  Lockhart trusts?
2    A.   I do not recall specifically.
3    Q.   Having the opportunity to read
4  the descriptions of the five trusts listed
5  in Exhibit 4109, the first three of which
6  include the initials JM and the surname
7  Lockhart, does that refresh your
8  recollection?
9    A.   It does not refresh my
10  recollection.
11    Q.   So as you sit here today, I say
12  the words -- when I say the words Lockhart
13  trust to you, that really is meaningless?
14    A.   Correct.
15    Q.   All right.  These endowments
16  listed on Exhibit 4109 have a series of
17  different values assigned to them.  That
18  is, dollar figures generally, is that
19  right, in just describing the schedule in
20  a general way?
21    A.   That is correct.
22    Q.   If I start and read this,
23  perhaps counter-intuitively, at least to
24  me from right to left, I read the initial
25  contribution amounts in a column headed

Page 196

1  contribution, is that right, as you
2  understand the schedule?
3    A.   I do not know if it's an
4  original contribution, but it's in a
5  column titled contribution.
6    Q.   And the five trusts amount or
7  the five amounts for the trusts in that
8  contribution column sum total roughly 5.4
9  million dollars?
10    A.   Correct.
11    Q.   And then the next sets of
12  columns which are two, are headed realized
13  gain/loss; is that right?
14    A.   Correct.
15    Q.   And we have two periods or two
16  times at which these realized gains are
17  purportedly measured by your read of the
18  schedule, is that right, June 30, '95 and
19  June 30, '96?
20    A.   That is the title in the
21  columns, yes.
22    Q.   And the June 30, '95 total for
23  the realized gains or losses on the five
24  listed trusts is roughly 61.1 million
25  dollars?

Page 197

1    A.   That is correct.
2    Q.   And the sum for realized gain as
3  of June 30, '96 is 7.4 million dollars?
4    A.   Correct.
5    Q.   And does it appear to you that
6  the subtotal that is derived from adding
7  5.4 million dollars, 61.1 million dollars
8  and 7.4 million dollars is the book value
9  in the next column to the left of roughly
10  74 million dollars?
11    A.   As an estimate, that could work,
12  yes.
13    Q.   All right.  And then continuing
14  to read the spreadsheet from right to
15  left, we have unrealized gains and loss in
16  two columns; is that fair to say?
17    A.   Yes.
18    Q.   And here we have the measurement
19  again at June 30, '95 and at June 30, '96,
20  one column for each?
21    A.   Yes, that's the title June 30 of
22  '95 and June 30 of '96.
23    Q.   And as of June 30, '95, the
24  unrealized gains were apparently measured
25  at 9.6 million dollars roughly?

www.rennillo.com

Marc A. Panucci

**Page 206**

1    Q.   It may have, but you don't
2    recall?
3    A.   Right.
4    Q.   And that would be the same for
5    footnote A. It may have included the
6    word, income. It may have included
7    realized/unrealized gains. You just don't
8    recall today?
9    A.   Correct. In your second part,
10   you asked about the temporarily restricted
11   classification?
12   Q.   I did. Why is it, if you can
13   recall, that the prior year amounts were
14   maintained, the prior year's sums were
15   maintained as temporarily restricted?
16   A.   Again, the understanding today
17   because the company would not have known
18   if they received the money and expensed it
19   all in the same current year or all as it
20   related in the same years and the prior
21   year. So you would not have that option
22   under FAS 116 to include it all within
23   unrestricted.
24   Q.   It's a matching issue to you?
25   A.   Matching or timing issue of when

**Page 207**

1    you receive and expense the amount.
2    Q.   When, then, if ever, would it be
3    appropriate to release those amounts as
4    unrestricted?
5    MR. LUFT: Objection.
6    Q.   Those that were maintained in
7    temporarily restricted categories in
8    fiscal year '96?
9    A.   Do you mean release them from
10   temporarily restricted?
11   Q.   Into unrestricted, which is, I
12   think, where they go at that point. Am I
13   right?
14   A.   Yes, based upon FAS 116 and not
15   knowing the details of the audit, but as
16   relates to FAS 116, when you expense the
17   items, what you want to expense it for,
18   both the expense and the income will go
19   into the unrestricted fund. So again, the
20   net effect would be zero.
21   Q.   I guess maybe we're talking past
22   each other or I'm being less than accurate
23   in my question. But if this prior year
24   sum that was left as temporarily
25   restricted during fiscal year 1996, or at

**Page 208**

1    year end, was not released as
2    unrestricted, at that point, when in the
3    future if ever, could it be given your
4    matching scenario?
5    MR. RYAN: I believe he just
6    answered that, Jim.
7    MR. JONES: He may have, but I
8    would like to hear it again or maybe
9    in different words.
10   Q.   Is it ever appropriate to
11   release it in the future, in your view?
12   A.   Yes, whenever you have expensed
13   the amounts for that purpose. So the
14   expense and the income will show up in the
15   unrestricted fund at the same time.
16   Q.   So what you're assuming is that
17   if there were prior expense amounts
18   incurred in prior years, because you
19   couldn't do an effective matching, you
20   don't take it in one year, but you leave
21   it and you perhaps take it in going
22   forward years to the extent appropriate
23   expense matching can be documented?
24   MR. LUFT: Objection.
25   Q.   Is that a fair characterization?

**Page 209**

1    A.   You can record it when you have
2    made and recorded the expenses. Then both
3    the income and the expense would be
4    recorded in the unrestricted fund in the
5    same year.
6    Q.   I'm going to ask you to look at
7    footnote G briefly. And footnote G, I
8    believe you'll tell me, refers to portions
9    of the realized gain set forth in the
10   Schedule 4 or as of June 30, '95; is that
11   right?
12   A.   Yes.
13   Q.   Footnote G reads, "Amount
14   represents income on the endowments from
15   fiscal year '95 and before. In accordance
16   with SFAS 116, the only part that should
17   be in permanent is the original
18   contribution. Therefore, the prior year
19   amounts were reclassified to temporary and
20   permanent."
21   Do you know what that means?
22   A.   I do not know what that means.
23   Q.   It seems to say that only the
24   original contributions will be classified
25   as permanent and then the next clause, it

53 (Pages 206 to 209)

Marc A. Panucci

Page 210

1  seems to say that prior year's amounts
2  will be classified as temporary and
3  permanent.  Is that a grammatical issue or
4  problem perhaps?
5    A.   It could be.  I do not know.
6    Q.   Then you don't have any recall
7  of it at this point?
8    A.   I do not.
9    Q.   This does not need to be marked.
10   A.   Okay.  Sorry.  Just didn't know
11  the protocol.
12   Q.   A break with habit.
13      Mr. Panucci, I've just handed
14  you what has been marked earlier in this
15  litigation, but apparently not that much
16  earlier, as Exhibit 4061 which I think,
17  upon your review, you will tell me is a
18  copy of a permanent binder in the files of
19  Coopers & Lybrand related to endowments at
20  AHERF and AGH; is that right?
21   A.   It is an AHERF permanent binder
22  that is titled endowments.
23   Q.   Do you recall reviewing the
24  permanent binder for AHERF or AGH
25  endowments during your work on AHERF

Page 211

1  endowments and investments in fiscal year
2  '96?
3    A.   I do not recall.
4    Q.   At the top of the document
5  has -- the first page of the document has
6  some handwriting; is that right?
7    A.   Yes.
8    Q.   Is any of it yours?
9    A.   It does not appear to be.
10   Q.   What is a permanent binder,
11  generally, at C&L in this time period?
12   A.   Permanent binder was documents
13  or information that would -- that could or
14  could not be relevant year after year
15  during an audit.  So it was included in
16  the permanent binders in comparison to a
17  current year binder that, as you go
18  forward, is not relevant from an audit --
19  from each audit year.
20   Q.   Within a permanent binder is
21  material that is deemed to be of perhaps
22  enduring importance or significance?
23      MR. LUFT:  Objection.
24   Q.   Is that right?
25   A.   It could have an impact year

Page 212

1  over year on an audit.
2    Q.   But it isn't the practice to put
3  irrelevant, unimportant material in a
4  permanent binder; is that fair to say?
5    A.   I think there are times things
6  are put into a permanent binder that may
7  or may not have relevance in the future
8  and it could stay in a permanent binder.
9    Q.   It is not the purpose of the
10  permanent binder, however, to house
11  irrelevant material; is that fair to say?
12   A.   That is fair.
13   Q.   And it is, in fact, the purpose,
14  I think, as you've described it, to house
15  material that is at least noteworthy
16  enough that someone believes a future set
17  of auditors might want to look at it
18  during future audits?
19   A.   Yes.
20   Q.   There are apparently permanent
21  binders that are broken down by discrete
22  category of audit topics, including
23  endowments?
24   A.   It could range from a variety of
25  areas.  It could include topics, a

Page 213

1  specific endowment, to endowments or to
2  other wide ranges of items.
3    Q.   That's what I mean.  I mean, at
4  least this permanent binder appears to
5  relate only to endowments, fair to say, at
6  least by heading, where it says contents
7  endowments?
8    A.   By heading on the front cover,
9  yes.
10   Q.   And it's your practice and
11  understanding from your work at C&L that
12  there were permanent binders that are set
13  up for different topics?
14   A.   Yes.
15   Q.   And some may include multiple
16  topics, I think is what you're trying to
17  tell me?
18   A.   Yes.
19   Q.   I'm going to ask you to skip
20  into the page that bears the Bates label
21  31992, which is headed permanent binder
22  review sheet.  Do you see that?
23   A.   Yes.
24   Q.   And it has your initials in a
25  column for the fiscal year 1996; is that

54 (Pages 210 to 213)

www.rennillo.com
Cleveland (216) 523-1313          Akron (330) 374-1313

Marc A. Panucci

Page 238

1  that bears the title, rather, "Allegheny
2  General Hospital endowments and trusts
3  investment fund, John Marshall Lockhart
4  fund, Mellon trust number 500-O07 in
5  barely legible print. Is that right?
6      A.  Yes.
7      Q.  And it notes at the base of the
8  page that the type of restrictions on the
9  trust, at least by the author's account,
10 were "principal restricted and income
11 apparently unrestricted." Is that right,
12 by Xes, although it looks to me --
13     A.  There's a mark on the restricted
14 part for income that I don't know what
15 that is or what it means.
16     Q.  And the clearer X is with
17 unrestricted; is that right?
18     A.  Yes. As it relates to income,
19 yes.
20     Q.  In any event, this document is
21 not a Coopers & Lybrand generated
22 document, to your knowledge; am I right?
23     A.  That is correct.
24     Q.  It appears to you to be a client
25 generated document?

Page 239

1      A.  Yes.
2      Q.  And do you recall reviewing this
3  document during your '96 audit work?
4      A.  I do not recall reviewing this
5  document.
6      Q.  And you see that it reads,
7  "Special provisions: Income in the amount
8  of $250 per month is paid to the sole
9  survivor of the 12 original annuitants,"
10 and continues from there?
11     A.  Yes.
12     Q.  I'm going to ask you to look
13 further back into this set of documents
14 into the microfiche portion of the John
15 Marshall Lockhart endowment documents
16 which have 500, the number 500-O07 at the
17 top of the page. Are you with me?
18     A.  Yes.
19     Q.  And that's Bates page ED 53.
20     A.  Yes.
21     Q.  If you look at ED 53 -- in these
22 and the pages that follow for several are
23 black microfiche, hard copies of
24 microfiche that are black in background
25 with white print; am I right?

Page 240

1      A.  That's what it appears to be.
2      Q.  Do you recall reviewing copies
3  like this in the endowment document you
4  received or notebook you received from
5  Mr. Zwirn?
6      A.  I remember microfiche pages
7  included in the binder.
8      Q.  Microfiche copied like this?
9      A.  Yes.
10     Q.  Do you recall reviewing the John
11 Marshall Lockhart endowment documents that
12 started ED 53 and followed?
13     A.  Do you know where it ends in
14 this document?
15     Q.  I believe it ends with
16 amendments, certainly no later than ED 90.
17     A.  I do not recall specifically
18 reviewing the Lockhart agreement that
19 we're specifically looking at. I know
20 there's more than one.
21     Q.  Let me ask you to look at the
22 page Bates labeled ED 54. Do you see
23 under Article I the definition of "income
24 as rents, issues, interests, income, and
25 profits thereof, hereinafter called

Page 241

1  income"?
2      A.  Can you give me a paragraph
3  reference, please?
4      Q.  It's Article I, about halfway
5  through the first sentence.
6      A.  I'm sorry. Yes. Yes.
7      Q.  You recall reading that kind of
8  language or that language in the endowment
9  documents provided to you by Mr. Zwirn, as
10 you sit here today?
11     A.  I do not recall.
12     Q.  I'm going to ask you to skip to
13 page ED 62. And there I'm going to ask
14 you to look at article -- the top of the
15 page which is the end of the Article X
16 where it says, "In case of the sale of any
17 securities of the trust fund at a premium
18 or profit, such premium or profit shall
19 become a part of the corpus and not
20 income."
21         Do you see that?
22     A.  Yes.
23     Q.  Do you recall reading that
24 language or language to that effect in the
25 endowments provided to you by Mr. Zwirn or

61 (Pages 238 to 241)

Marc A. Panucci

Page 242

1  anybody else at AHERF in the fiscal year
2  1996 audit?
3      A.   I do not recall.
4      Q.   As you read that language today
5  with the familiarity of the
6  classifications called for by the FASBs
7  116, 117 and 124 that we've been
8  discussing, do you recall making any
9  determination about the propriety of how
10 the sums set forth -- described in that
11 sentence should be characterized or
12 classified?
13     MR. LUFT: Objection. Are you
14 asking about what he was reading today
15 or asking back then?
16     MR. JONES: I asked him about
17 what he's reading today and if he had
18 any recall.
19     MR. LUFT: I'm still unclear.
20     Q.   We just read a sentence.
21     A.   Yes.
22     Q.   About the event of the sale of
23 securities of the trust at a premium or a
24 profit, correct?
25     A.   Yes.

Page 243

1      Q.   Do you recall anything about how
2  you would have determined the propriety of
3  the classification of sums that were
4  reflected by the sale of securities of the
5  trust at a premium or a profit, at a
6  premium or profit during the 1996 audit
7  work?
8      A.   I do not recall.
9      Q.   You don't know how you passed on
10 their classification one way or the other?
11     A.   I mean, we would have --
12 management would have had their
13 classification and we would have done our
14 independent review. But, you know, I
15 don't recall any specific discussions
16 around this area or this sentence.
17     Q.   Do you recall -- or language
18 like this?
19     A.   Yes, correct.
20     Q.   Do you recall what management's,
21 that is, AHERF's classification of sums
22 that were derived from the sale of trust
23 securities at a premium or a profit was?
24     MR. LUFT: Objection. Are you
25 talking in general all endowments he

Page 244

1  looked at or are you referring to a
2  specific one?
3      MR. JONES: I'm speaking of any
4  endowment that he can recall.
5      A.   I do not recall.
6      Q.   Do you recall specifically for
7  the Lockhart trust we're reviewing now how
8  management classified sums that would be
9  derived from the sale of securities of the
10 fund at a premium or profit?
11     A.   I do not recall.
12     Q.   As you read the language today,
13 and if you were called upon to make the
14 determination about the propriety of the
15 classification of sums derived from the
16 sale of securities of the trust fund at a
17 premium or a profit and the rest of the
18 language that describes them here by
19 instructing that such premium and profit
20 shall become a part of the corpus and not
21 income, what classification would you
22 apply to those sums?
23     MR. LUFT: You're asking him to
24 make a determination today based on
25 this one sentence?

Page 245

1      MR. JONES: Yes, on this
2  sentence.
3      A.   Based upon today, I think I
4  would still want more information to get
5  clarification of what is meant by this
6  sentence. You know, talking to engagement
7  teams, talking to the client, and the
8  review of 116, 117.
9      Q.   What information would you need
10 from the client or the engagement team?
11     A.   Well, I think I would want to
12 try and get some understanding because
13 these agreements were written well before
14 FAS 116 or 117 was written. I'm trying to
15 obtain some understanding of what their
16 determination was, what their
17 classification was. And you know, based
18 upon that, whether we could agree to that
19 or not based upon 116, 117.
20     Q.   I understand. And if their
21 determination was either temporary or
22 unrestricted for these sums derived from
23 the sale of securities, would you agree
24 with it as you read it today?
25     MR. LUFT: Reading this

62 (Pages 242 to 245)

Marc A. Panucci

Page 250

1  disagreement with the client or a
2  difference of opinion with the client in
3  the way that it had classified unrealized
4  gains over time?
5      A.   Not that I can recall.
6      Q.   Do you recall having a
7  disagreement with the client or difference
8  of opinion with the client with respect to
9  any of its classifications under FASB 116
10  and 117?
11      A.   Well, as of today, I think we
12  reviewed one of those in the documents.
13      Q.   We saw one note, you're right.
14  Save and except for that, do you recall
15  any other disagreements?
16      A.   Not that I can recall.
17      Q.   In the language that we just
18  reviewed regarding gains on the sale of
19  securities, do you see any time
20  restriction?
21      MR. LUFT: You just want him to
22  review the language, just that
23  sentence, not the whole?
24      MR. JONES:  Yes.
25      A.   Just that sentence?

Page 251

1      Q.   Yes.
2      A.   I do not see any time
3  restrictions in that sentence.
4      Q.   Do you see any restriction that
5  would be lifted with the occurrence of an
6  event?
7      A.   Not in that sentence, no.
8      Q.   Or the happening of a condition?
9      A.   Not in that sentence, no.
10      Q.   I think you told us that you do
11  not recall conversations with AHERF
12  personnel or PriceWaterhouseCoopers
13  personnel about the classifications or
14  your concerns about the classifications or
15  any concerns about the classifications on
16  endowments and investments that AHERF had
17  arrived at?  Am I right?  That's
18  consistent with your recollection?
19      A.   Can you repeat that again?
20      Q.   Yes, I can.  That was a hard one
21  and I'm just trying to understand it.  I
22  think where we are, so that we don't have
23  to backtrack, is that, as you sit here
24  today, you cannot recall any disagreements
25  with the client regarding the

Page 252

1  classifications they made in compliance
2  with FASB 116 and 117 on their endowments
3  and investments in fiscal year '96 save
4  for the footnote we just discussed; is
5  that right?
6      A.   Not that I can recall, no.  No
7  final disagreements, no.
8      Q.   You can't recall any today,
9  correct?
10      A.   Right.
11      Q.   And then my question next is, do
12  you recall having any concerns -- do you
13  recall any intermediary concerns or
14  disagreements with the client on their
15  classifications, as you sit here today?
16      A.   Well, I mean, as part of the
17  audit process, there's the ongoing
18  dialogue of questions, issues, concerns,
19  as you go back and forth.  But in a final
20  determination, final conclusion, based
21  upon our independent review, I do not
22  recall any disagreements with the
23  classifications.
24      Q.   I understand.  And my question
25  is, do you recall any of those discussions

Page 253

1  or back and forth in which you were
2  voicing some concern about the propriety
3  of the classifications, as you sit here
4  today?
5      A.   Not that I can specifically
6  recall, no.
7      Q.   Do you recall anything in a
8  general way?
9      A.   Not that I could recall.
10      Q.   All right.  And then my next
11  question was, do you recall having any
12  concerns yourself about missing
13  documentation for the endowments and
14  investments that you were asked to review?
15      MR. LUFT:  Objection.
16      A.   Can you repeat that one more
17  time?  I'm sorry.
18      Q.   Let me break it down.  Do you
19  recall that in the binders that you were
20  given to review, AHERF investments and
21  endowments, whether by Ms. Cafarro or
22  Mr. Zwirn or anyone else, that there was
23  any missing documentation, in your view?
24      A.   Well, the representation we got
25  from management was here's the information

64 (Pages 250 to 253)

Marc A. Panucci

Page 254

1   that we have.  It was -- it could be
2   partial or full agreements, but there was
3   enough information for us to determine, as
4   management, the classification of the
5   endowments.  And when we did our
6   independent review, we did not take
7   exception that there was enough
8   information to determine those
9   classifications.
10      Q.   So what you are telling me is
11  that there may have been some missing
12  documentation, but in your view, or in
13  C&L's view, it wasn't sufficient to cause
14  you to take exception with the
15  classifications of the client?
16      MR. LUFT:  Objection.
17      A.   Management made a determination
18  there was enough information to classify
19  the investments.  And based upon our
20  independent review, there was nothing that
21  came to our attention that there needed to
22  be additional information to classify the
23  investments.
24      Q.   All right.  And then my
25  follow-up question is, did you,

Page 255

1   personally, ever have a concern about
2   missing documentation with respect to any
3   endowment or investment that you were
4   charged with reviewing?
5       MR. LUFT:  Objection.
6       A.   Not that I can recall.
7       Q.   Do you recall taking any steps
8   to secure additional documentation or what
9   was believed to be missing documentation
10  with respect to any of the endowments or
11  investments you were charged with
12  reviewing or auditing?
13      A.   Only in what we talked about
14  earlier today.  If it was not included in
15  the binder management, you know, sent me
16  to other people within the organization to
17  obtain that information.
18      Q.   Do you recall receiving any
19  documentation from anyone else, though, as
20  you sit here today?  I know you might have
21  had discussions, but the question I have
22  is, do you recall receiving anything
23  tangible in hard copy or electronic format
24  form?
25      A.   Not that I can recall.

Page 256

1       Q.   Do you recall going to any third
2   parties or requesting of any third parties
3   any additional documentation with respect
4   to any endowment or investment during your
5   fiscal year '96 audit work?
6       A.   Do you mean -- can you repeat
7   that?
8       Q.   Yes.  Do you recall going to or
9   inquiring of any third party regarding an
10  effort to get your hands on additional
11  endowment or trust or investment
12  documentation that might have been missing
13  in the material that the client had given
14  you during your fiscal year '96 audit
15  work?
16      A.   I do not recall specifically
17  trying to get third party information as
18  it related to documentation that was not
19  included in the binder.  But there is
20  third party information you receive on the
21  investments, i.e., the trustee statements.
22      Q.   You did some tying work where
23  you got written documentation to help you
24  with the tying?
25      A.   Correct.

Page 257

1       Q.   Among other things, perhaps?
2       A.   Correct.
3       Q.   But you don't recall trying to
4   find underlying endowment documentation or
5   investment vehicle documentation from
6   third parties; is that right?
7       A.   As it relates to the
8   classification of the investments, no, I
9   don't recall.
10      Q.   Do you recall trying to get that
11  underlying endowment or investment vehicle
12  documentation for any other purpose?
13      A.   Again, just what we talked
14  about, the confirmation process and the
15  trustee statement process.
16      Q.   Well, that is isn't an
17  underlying documentation, though.  That's
18  a statement of account balances; am I
19  right?
20      A.   Well, I would still define that
21  as underlying documentation for support of
22  the accounts.
23      Q.   I hear you and what I meant to
24  mean by underlaying documentation and what
25  I meant to say is the fundamental trust

65 (Pages 254 to 257)

Marc A. Panucci

Page 258

1  documents or investment vehicle documents.
2  You don't recall trying to get those for
3  any purpose; am I right?
4      A.  I don't recall, no.
5      Q.  I am right that you don't recall
6  trying to get them; is that right?
7      A.  That's correct.
8      Q.  You weren't on the phone with
9  Mellon Bank or any Mellon financial
10 institution or any other financial
11 institution asking for the fundamental
12 trust documents from any earlier point in
13 time; is that right?
14     A.  That is right.
15     Q.  And you do recall some of these
16 trust documents or endowment documents to
17 be old?
18     A.  Yes.
19     Q.  If you had made such a contact
20 with a third party to get additional
21 underlying trust or endowment
22 documentation, would that be reflected in
23 your work papers?
24     MR. LUFT:  Objection.
25     A.  Are you asking me as of today or

Page 259

1  in the fiscal year '96?
2      Q.  What you recall of your
3  practices in fiscal year '96.
4      A.  I do not recall any situation on
5  the entities I've audited and as it
6  relates to hospitals or not-for-profits
7  needing to go to third party confirmations
8  as it relates to endowment agreements, so.
9      Q.  So you don't really have a
10 practice?
11     A.  I don't have, right, I don't
12 have a standard to answer that question
13 upon.
14     Q.  Do you recall discussing with
15 anyone at PriceWaterhouseCoopers the
16 unavailability of any underlying trust or
17 endowment documentation?
18     A.  Not that I can recall, but I
19 know others were aware of it.  I don't
20 know if it was me telling them or not,
21 but --
22     Q.  How was it --
23     A.  -- I know Amy Frazier was aware
24 that there was a representation of, you
25 know, partial or incomplete

Page 260

1  documentations.
2      Q.  And how is it that you know that
3  Amy was aware of such a representation?
4      A.  Because Amy and I talked about
5  it.
6      Q.  And the conversation was
7  essentially that she was told the same
8  thing you were told?
9      A.  Yeah.  I don't know how the
10 context was.  I don't know if Amy was told
11 from the client, Amy told me or vice
12 versa.  I don't know the nature of how it
13 was told to us.
14     Q.  But you and she both understood
15 from the client, it is your belief, that
16 certain underlying trust documentation was
17 not at least in the client's files?
18     A.  Yes.
19     Q.  Do you recall discussing with
20 her, then, any efforts to get it from some
21 other source?
22     A.  Not that I can recall.
23     Q.  Do you recall discussing with
24 anyone at PriceWaterhouseCoopers such an
25 effort?

Page 261

1      A.  Not that I can recall.
2      Q.  Do you recall seeking out the
3  input of specialists or lawyers at
4  PriceWaterhouseCoopers with respect to
5  your classification audit work?
6      MR. LUFT:  Objection.
7      Q.  Other than Mr. Thomas.
8      A.  Except for Mr. Thomas, I can't
9  recall anybody else.
10     Q.  Do you recall discussing whether
11 a specialist in endowment or investment
12 auditing should -- or a lawyer should be
13 consulted as a part of your classification
14 work?
15     A.  Not that I can recall.
16     Q.  Do you recall ever yourself
17 coming to the conclusion that the trust or
18 endowment language that you reviewed
19 called for you to seek legal advice?
20     A.  Not that I can recall.
21     MR. JONES:  We'll break here and
22 we will shortly thereafter conclude.
23     (A recess was taken at 4:08 p.m.
24 and the Deposition continued at 4:19
25 p.m.)

66 (Pages 258 to 261)