UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br><br>Defendant. | Civil Action No. 00-684<br><br>Judge David Stewart Cercone |

**APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)**

VOLUME 3

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

**Kaye Dep.**

## In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.,*

---

## *DONALD KAYE, M.D.*
### June 17, 2003

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

KAYE, M.D., DONALD



LEGALINK
A **WORDWAVE** COMPANY

Page 98

1  the West was paying for any expenses in
2  the East; it was the first time you
3  heard them described as a loan or as
4  support?
5  A.  It was an aberrant, as a differing
6  type of payment than what the normal
7  payments would have been, which would
8  have been on an ongoing basis because
9  certainly the West was responsible for
10 part of the operations of the medical
11 school.
12 Q.  Okay. And you indicated that the
13 board meeting where you heard these
14 payments or part of these payments
15 described as a loan occurred in December
16 of 1997?
17 A.  Thereabouts. I recall that there
18 was a question from Mr. Gumberg about
19 what it was, what it was for, and there
20 was discussion of -- indicating that it
21 was a loan and would be repaid.
22 Q.  Now, Dr. Kaye, is there something
23 about your recollection of that meeting
24 that causes you to place it in December
25 as opposed to some different month in

Page 99

1  1997?
2  A.  No. It just -- I recall it was
3  toward the end of '97. I've been
4  through many of these questions many
5  times before, and so I basically have
6  come up with certain time frames for
7  certain things. And I said December or
8  thereabouts.
9  Q.  Okay.
10 A.  I mean, it could have been in
11 November, but I think it was in
12 December.
13 Q.  Do you recall which organization
14 was having the meeting that you referred
15 to during which this concept of a loan
16 was raised by Mr. Gumberg?
17 A.  No, I don't, but it was one of the
18 Eastern boards. It could have been the
19 medical school board; it could have been
20 the hospital board. If I had to guess,
21 and I've been told not to guess, but
22 since I'm prefacing it by saying it's a
23 guess, I would say it was a medical
24 school board.
25 Q.  Do you have any recollection, Dr.

Page 100

1  Kaye, of the issue of transfers in the
2  range of a hundred million dollars from
3  the West to the East coming up in an
4  October meeting held in the West, in
5  Pittsburgh?
6  A.  I have no recollection of that,
7  but it could have happened.
8  Q.  Now, Dr. Kaye, I'm going to go
9  into the area of your review of the
10 financial statements for the various
11 components of the AHERF organization and
12 what they may or may not have revealed
13 to you. And I start with the
14 acknowledgment that you've testified a
15 couple times here already that you don't
16 have a financial background. But let's
17 start with the Eastern hospitals for
18 which you were acting as president or
19 CEO at various times during the 1990s.
20      Did you ever have occasion to
21 review monthly, quarterly, annual
22 financial statements with respect to
23 those entities?
24 A.  Yes. I reviewed, or at least I
25 saw the financial statements on a

Page 101

1  monthly basis, and on an annual basis
2  always really with Chuck Morrison
3  explaining to me what was there and what
4  it meant. And when we started having
5  problems was when he couldn't explain to
6  me what was there and why it was there
7  or why numbers would change when we had
8  no reason in terms of the numbers of
9  admissions and numbers of patient days
10 and things like that for it to be
11 changing.
12      I depended heavily on Chuck
13 because he was the finance person. I
14 thought and I think very highly of him
15 in terms of competence, honesty, and so
16 on. And so, yeah, he would explain to
17 me.
18      I spent my time really with
19 the revenue and the expense statements,
20 and really did not pay much attention
21 because I never really understood them
22 well, or maybe I should say even at all,
23 the cash flow statements.
24 Q.  You indicated in your answer that
25 you reviewed or at least you saw monthly

Page 102

1  statements.
2  A. I reviewed them.
3  Q. Okay. And what do you recall
4  would constitute your review? What
5  would it entail on your part?
6  A. I'd look at the revenue, I'd look
7  at the expenses, I'd look at the
8  components of the revenue and the
9  components of the expenses and then see
10 what the bottom line was, by hospital
11 and by system.
12 Q. And after you reviewed that
13 information, were there occasions where
14 you did something about it or was this
15 informational, from your standpoint, in
16 terms of understanding what had been
17 reported?
18 A. This was primarily informational,
19 and as long as the bottom lines were
20 positive, that is, that the -- taking
21 the bottom line plus depreciation into
22 account was positive, I would be
23 somewhat reassured.
24     And when those figures were
25 negative, I would be concerned and try

Page 103

1  to find out why they were negative,
2  whether it was lack of revenue or
3  whether our expenses had suddenly jumped
4  somewheres over what had been budgeted,
5  and try to take action to correct
6  whichever it was.
7  Q. Dr. Kaye, is it fair to say that
8  throughout the entire 1990s there were
9  often occasions where at least some of
10 the hospitals within the East were
11 negative in terms of revenues not
12 exceeding the operating expenses and
13 depreciation?
14 A. Yes. There were times, and it was
15 primarily with the smaller hospitals and
16 the less important hospitals with the
17 bigger hospitals basically having bottom
18 lines that were able to carry or
19 compensate for the smaller hospitals.
20 Q. And did there come a time when
21 even the bigger hospitals turned
22 negative?
23 A. Yes, there was.
24 Q. And when did that occur,
25 approximately?

Page 104

1  A. It occurred in July of 1997 with
2  me seeing it probably -- obviously after
3  the end of July, but mid-August, end of
4  August.
5  Q. Were these changes to negative
6  bottom lines attributable to the changed
7  environment that you testified to
8  earlier, or were there other reasons you
9  recall for that?
10     MR. WHITNEY: Objection.
11 Foundation.
12     THE WITNESS: I had great
13 difficulty in understanding precisely
14 why it had happened. Some of it was
15 clearly change in environment because we
16 didn't know as of the beginning of July
17 just exactly what the Medicare changes
18 were going to be, because they weren't
19 going to occur until, I think, October,
20 so that there was a -- basically a
21 accounting for negative changes because
22 that's what we thought was going to
23 happen. We didn't know.
24     And the revenue just went to
25 pot. And that's when we really started

Page 105

1  to try to find out what was going on in
2  Pittsburgh, which was doing the billing.
3  When the July figures came in, the
4  middle or end of August, Mr. Abdelhak
5  had just had surgery done and I flew out
6  there to show him because I was very
7  concerned. His answer was, "Well, July
8  is often a difficult month to
9  interpret," and so on. "So don't worry
10 about it. Wait until you see the August
11 figures."
12     Well, when the August figures
13 came in, they were equally bad, and that
14 was about the middle of September.
15 BY MR. McDONOUGH:
16 Q. Okay. Now, you indicated in your
17 review of the financial statements that
18 you would have the statements or various
19 entries thereon explained to you by
20 Chuck Morrison.
21 A. As best he could.
22 Q. As best he could. And you
23 indicated that when you had problems was
24 when he couldn't explain them. When do
25 you recall the first time this began to

Page 278

1  that would be good.
2      MR. WHITNEY: Or we may
3  decide, if he's -- if Joe is windy and
4  goes as he did today until 1:00. And
5  all, we may decide we need to take that
6  break. But I'd like to avoid that.
7      MR. ISTVAN: Okay.
8      MR. McDONOUGH: That's what I
9  get for letting you choose when to have
10 the lunch break.
11     THE VIDEOGRAPHER: Off the
12 video --
13     MR. ISTVAN: Well, I just was
14 hoping somebody other than me would be
15 the one who wussed out. But, I mean, if
16 nobody else is going to wuss out, I'll
17 step up to the plate. I mean, I'll
18 wuss.
19     MR. McDONOUGH: Okay. So we
20 start at 9:00 tomorrow?
21     MR. ISTVAN: Fair enough.
22     MR. McDONOUGH: Okay. Thank
23 you.
24     THE VIDEOGRAPHER: This is
25 the end of tape number four. The time

Page 279

1  is 7:20.
2      MR. McDONOUGH: 5:20.
3      (The deposition adjourned at
4  5:20 p.m.)

Page 280

1  WITNESS CERTIFICATION
2
3      I hereby certify that I have
4  read the foregoing transcript of my
5  deposition testimony, and that my
6  answers to the questions propounded,
7  with the attached corrections or
8  changes, if any, are true and correct.

_____    _____
DATE            DONALD KAYE, M.D.


_____
PRINTED NAME

**Kennedy Dep.**

VIDEOTAPED DEPOSITION OF WILLIAM C. KENNEDY
CONDUCTED ON THURSDAY, AUGUST 15, 2002

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3   _____
 4   THE OFFICIAL COMMITTEE OF UNSECURED  )
 5   CREDITORS OF ALLEGHENY HEALTH,       )
 6   EDUCATION AND RESEARCH FOUNDATION,   )
 7                          Plaintiff,)  CIVIL ACTION
 8   v.                              )   NO. 00-684
 9   PRICEWATERHOUSECOOPERS, LLP,    )
10                         Defendant.)
11   _____
12         Videotaped Deposition of WILLIAM C. KENNEDY
13                  Charlottesville, Virginia
14                  Thursday, August 15, 2002
15                         9:00 a.m.
16                       Pages 1 - 274
17          Reported by:  Karen L. Hart, RMR-CRR
18
19
20
21
22
23
24
25
```

MANHATTAN REPORTING CORP.
(212) 557-7400

VIDEOTAPED DEPOSITION OF WILLIAM C. KENNEDY
CONDUCTED ON THURSDAY, AUGUST 15, 2002

Page 226

```
 1        WILLIAM C. KENNEDY
 2   Mike ever calling me asking me questions about what I   15:57:55
 3   might have meant or not meant. And I -- Mike and I      15:57:58
 4   worked very well together, so I -- you know, I          15:58:03
 5   just -- if I were involved in a call with Mike, I       15:58:06
 6   would remember it, and I just -- I don't remember       15:58:13
 7   one.                                                    15:58:16
 8      Q.  Okay.  Is it your opinion that any realized      15:58:24
 9   or unrealized gains that were had on the Lockhart       15:58:33
10   fund -- and I'm referring specifically to the three     15:58:37
11   accounts that are actually titled Lockhart and have     15:58:40
12   all the same language in the case of a security, that   15:58:43
13   language -- is it your belief that any gain on that     15:58:50
14   sale or any value appreciation on those funds other     15:58:55
15   than unspent income is part of principal?               15:59:01
16          MR. RYAN:  Objection.                            15:59:08
17          THE WITNESS:  I think any monies that are        15:59:09
18   made on the sale of the securities would be             15:59:10
19   considered a premium or profit and that would be        15:59:14
20   corpus.  If you're getting a dividend -- you're         15:59:17
21   holding on to the stock and you're receiving            15:59:23
22   dividends, it would seem to me that in that instance    15:59:25
23   you're probably talking about income.                   15:59:29
24   BY MR. TORBORG:                                         15:59:33
25      Q.  Okay.  Now, when you -- you said that you        15:59:33
```

Page 227

```
 1        WILLIAM C. KENNEDY
 2   weren't concentrating on Barbara Robinson's first two   15:59:38
 3   paragraphs when you looked at this?                     15:59:41
 4      A.  Right.                                           15:59:43
 5      Q.  You were simply looking at the language          15:59:43
 6   itself?                                                 15:59:44
 7      A.  Yes.                                             15:59:45
 8      Q.  Were you able to make the determination you      15:59:46
 9   just made for me without looking at her first two       15:59:48
10   paragraphs?                                             15:59:53
11          MR. RYAN:  Objection.                            15:59:56
12          THE WITNESS:  I hadn't thought of it that        15:59:56
13   way.  I was really responding specifically to the       15:59:58
14   questions that you've posed and trying to clarify my    16:00:02
15   answer.                                                 16:00:07
16   BY MR. TORBORG:                                         16:00:12
17      Q.  My question is simply this.                      16:00:12
18      A.  Reading the language, yeah.                      16:00:15
19      Q.  Do you need this letter to determine             16:00:15
20   whether or not any gains on the sale that are not       16:00:17
21   attributable to interest income or dividend income      16:00:22
22   are permanently restricted and part of principal?       16:00:25
23          MR. RYAN:  Objection.                            16:00:29
24          THE WITNESS:  That's an interesting              16:00:32
25   question.                                               16:00:33
```

Page 228

```
 1        WILLIAM C. KENNEDY
 2   This goes back to the question of there not             16:00:49
 3   being a provision in the document for the use of        16:00:51
 4   principal.                                               16:00:53
 5          MR. TORBORG:  Well --                            16:00:55
 6          THE WITNESS:  And whether this -- we just        16:00:56
 7   got done talking about premiums being income as         16:00:57
 8   opposed to being principal.  So not having the          16:01:00
 9   language in front of me, is it fair for me to           16:01:08
10   conclude that realized or unrealized gains could be     16:01:10
11   used is the question?                                   16:01:13
12   BY MR. TORBORG:                                         16:01:15
13      Q.  If the -- let me ask it a different way:         16:01:17
14   If there were language in the trust agreement that      16:01:19
15   said principal is permanently restricted or corpus is   16:01:22
16   permanently restricted --                               16:01:25
17      A.  Uh-huh.                                          16:01:31
18      Q.  -- would you need the Barbara Robinson           16:01:31
19   letter to determine the availability of capital         16:01:32
20   appreciation on the trust?                              16:01:37
21          MR. RYAN:  Objection.                            16:01:37
22          THE WITNESS:  I think I would, but I             16:01:44
23   respect that someone that's much more knowledgeable     16:01:45
24   with regard to the way trusts function and work and     16:01:48
25   perhaps who are more familiar with the specific --      16:01:54
```

Page 229

```
 1        WILLIAM C. KENNEDY
 2   even these specific instruments might not have needed   16:01:58
 3   it.  I think that my approach to this would be to go    16:02:03
 4   back to the document, even if I had a gut feeling one   16:02:07
 5   way or the other.                                       16:02:11
 6   BY MR. TORBORG:                                         16:02:12
 7      Q.  But you would rely on that underlying            16:02:12
 8   document?                                               16:02:14
 9          MR. RYAN:  Objection.                            16:02:15
10          THE WITNESS:  I would rely on the                16:02:15
11   underlying document.                                    16:02:16
12          MR. TORBORG:  Okay.  I think we can put          16:02:23
13   this aside.                                             16:02:23
14          THE WITNESS:  Good.                              16:02:25
15   BY MR. TORBORG:                                         16:02:25
16      Q.  You talked earlier about a severance             16:02:28
17   agreement that you prepared for Carol Calvert.          16:02:34
18      A.  Yes.                                             16:02:36
19      Q.  What do you remember about the                   16:02:38
20   circumstances leading to that severance agreement?      16:02:40
21      A.  I was told that she was being let go by          16:02:51
22   David McConnell.  My conversations were all with        16:02:56
23   David, not with Mr. Abdelhak.  David came to me --      16:03:00
24   and again, this is at a time Nancy's not there -- we    16:03:07
25   need a severance agreement for Carol, basically what    16:03:11
```

58 (Pages 226 to 229)