IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
        Plaintiff,
   vs.                                  Civil Action
PRICEWATERHOUSECOOPERS,               No. 00-684
LLP,
        Defendant.


      Continued Videotaped Deposition of
MARK D. KIRSTEIN, called for examination under
the Applicable Rules of Federal Civil
Procedure, taken before me, Michele E. Eddy, a
Registered Professional Reporter and Notary
Public in and for the State of Ohio, pursuant
to notice and stipulations of counsel, at the
offices of Jones Day, 222 East 41st Street,
Suite 400, New York, New York, on Thursday, the
13th day of May, 2004, at 8:30 a.m.

- - - - -

VOLUME III


- - - - -

Mark Kirstein                                                                    Volume 3

Page 584

1  substantive review role for all areas at the
2  managerial level or manager level for fiscal
3  year 1997?
4       MR. RYAN:  Objection to form.
5       A.   From a manager's perspective, she    08:55:32
6  would be the person that would do that, yes.
7       Q.   I think you've told us you don't
8  remember AHERF moving to a new bad debt
9  reserving methodology for fiscal year 1997, so
10 I think I can anticipate the answer to this    08:55:51
11 question, but forgive me.  Did you ever learn
12 that anyone at AHERF was involved in the
13 process of developing a new methodology for
14 fiscal year 1997, anyone internal or employed
15 by AHERF, internal to or employed by AHERF?    08:56:06
16      A.   I don't recall hearing that.
17      Q.   Do you recall learning that either
18 Mr. Cancelmi or those at the patient financial
19 services group were involved in such an
20 endeavor?                                       08:56:19
21      A.   No, sir.
22      Q.   Do you have a view as you sit here
23 today about who would have been better suited
24 to prepare a new or a methodology for fiscal
25 year 1997 between Mr. Cancelmi and those in    08:56:32

Page 585

1  his -- on his staff or those at the patient
2  financial services group?
3       MR. RYAN:  Objection.  Vague.  Lack
4  of foundation.
5       A.   What do you mean by better suited?   08:56:42
6       Q.   I would just ask you if you had a
7  view.
8       A.   I put everyone -- you talked about
9  AHERF people.  It's AHERF's financial
10 statements and AHERF's system of internal       08:56:51
11 controls.  I don't know who's better suited.  I
12 don't know what you mean by that.  But if they
13 were developing a new process, I would assume
14 they would do whatever reviews and dialogue and
15 discussions and consultation they felt          08:57:03
16 necessary amongst their own people.
17      Q.   Do you recall any discussions with
18 anyone at AHERF about, or at Coopers & Lybrand
19 about a proposed or implemented new bad debt
20 reserve methodology for fiscal year '97?        08:57:15
21      A.   No, I have no recollection.
22      Q.   You recall, however, that for
23 fiscal year -- let me withdraw that.
24      You recall, Mr. Kirstein, that for
25 fiscal year 1997, AHERF was moving to a         08:58:02

Page 586

1  consolidated audit?
2       A.   You mean in '97 AHERF would have
3  one audit for all of AHERF?  Yes.
4       Q.   In connection with that, do you
5  recall issues arising with respect to the       08:58:21
6  debt-holders for the various obligated groups?
7       A.   What sort of issues?
8       Q.   Issues about whether a consolidated
9  audit at AHERF complied with the terms of the
10 debt instruments at the various obligated        08:58:40
11 groups.
12      A.   What I recall is management
13 asked -- management engaged in dialogue with us
14 in the planning process in the -- for fiscal
15 '97 about doing a consolidated audit.            08:58:57
16      Coming off of '96 where we had just
17 done the DVOG audit, and I think there was an
18 AGH obligated group audit, what I recall is
19 that Coopers & Lybrand, we had said to
20 management, we can do whatever audit you want     08:59:10
21 us to do, you can engage us for the scope, but
22 you need -- you, AHERF, need to consult with
23 your debt-holders and your legal counsel
24 eventually to ensure that whatever audit report
25 we issue will be sufficient for your debt        08:59:26

Page 587

1  purposes.
2       Q.   Do you recall with whom at AHERF
3  you may have had any such discussions?
4       A.   It's the same general group I've
5  given you the last two days.  I mean, finance    08:59:40
6  folks.  I don't remember specific discussion.
7  But planning for '97 was pretty much with Dan
8  Cancelmi, Steve Spargo, Al Adamczak.
9       Q.   Do you recall that Mr. Spargo left
10 the organization sometime in 1997?               09:00:05
11      A.   Yes, sometime early during the
12 planning stage.  I don't remember the exact
13 date.
14      Q.   Do you recall who assumed his
15 responsibilities?                                09:00:14
16      A.   I believe Al Adamczak, but I don't
17 know if that was a one-for-one assumption of
18 responsibilities.  I don't know everything that
19 Steve did and everything that Mr. Al did.
20      Q.   The reason I raise it, when Mr.        09:00:28
21 Spargo left, you didn't start communicating
22 with somebody new; the group with whom you
23 primarily communicated just got one person
24 smaller; is that fair to say?
25      A.   Yes.                                   09:00:39

7 (Pages 584 to 587)

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Mark Kirstein                                                              Volume 3

Page 588

1      Q.    There wasn't a replacement for Mr.
2  Spargo, whose name we haven't mentioned?
3      A.    No, not that I'm aware of.
4      Q.    Mr. Kirstein, I'm going to hand you
5  a rather large exhibit and ask you not to be        09:00:51
6  afraid.  It is an exhibit you've seen before in
7  the SEC proceeding and I think we're going to
8  leave it just like it was there because the
9  copy is superior to some of the
10 documents, and we will flip back and forth in       09:01:05
11 it from time to time, but we are going to have
12 to look at the whole thing.
13     A.    Okay.
14     Q.    It is -- I'm going to need to mark
15 that.  I apologize.                                  09:01:12
16         It is Exhibit 377 in the SEC
17 proceeding, I believe, and we would like to
18 mark it in this case as exhibit next.
19         MR. TORBORG:  Spelled N E X T.
20     Q.    And that number is 4403.                   09:01:33
21         - - - - -
22         (Thereupon, Deposition Exhibit 4403
23         was marked for purposes of
24         identification.)
25         - - - - -                                    09:01:39

Page 589

1      Q.    I will direct your attention
2  obviously to a relative few pages in this
3  document from time to time this afternoon --
4  this morning.
5      A.    Okay.                                      09:01:53
6      Q.    The first one today -- as you may
7  recall, it is a combination of a number of
8  documents, and I know not whether they are
9  supposed to be related, but it was used in that
10 prior deposition and really did have superior       09:02:04
11 quality copies on a number of pages.
12         I'm going to ask you to look at
13 page 28 now, which I think is a distinct
14 document within it.  It's a single-page
15 document.                                            09:02:19
16     A.    Where is the page number, bottom in
17 the lower right?
18     Q.    They are in the lower right-hand
19 corner, yes.
20         They start with the prefix PwCK2 in         09:02:23
21 all instances, and, for our ease, I'm just
22 going to refer to the last two digits on the
23 far right side.
24     A.    Hang on.  Document dated August
25 15th at the top?                                     09:02:33

Page 590

1      Q.    Yes, it is an AHERF audit update,
2  August 15, 1997, is that right?
3      A.    Yes.
4      Q.    Does it contain your handwriting?
5      A.    Yes, it does.                              09:02:40
6      Q.    I'm going to refer you in
7  particular -- well, take a moment to read the
8  document and your notes.
9      A.    Great, thanks.
10         Okay.                                        09:04:01
11     Q.    The notes are all yours in your
12 hand?
13     A.    I believe so, yes.
14     Q.    I'm going to refer you to the point
15 with the black diamond next to it which appears     09:04:09
16 about a quarter of the way down the page headed
17 debt.
18     A.    Okay.
19     Q.    And beneath that, the first
20 subpoint reads, "Written representation from        09:04:19
21 bondholders regarding financial statements,"
22 and then beneath that, "Need for individual
23 compliance letters" with three question marks.
24         Do you see that?
25     A.    Yes.                                       09:04:32

Page 591

1      Q.    What is the handwritten note that
2  appears to have a line drawn to one or both of
3  those subpoints?  How does that read?
4      A.    It's only drawn to the -- looks --
5  appears to be only drawn to the second bullet,      09:04:43
6  title, Need for Individual Compliance Letters.
7  It says C&L to draft, and then, in parentheses,
8  Christa, Brian to research.
9      Q.    Having had a chance to read the
10 document, do you think, first of all, that you      09:04:55
11 prepared this audit update?
12     A.    The actual typed part?
13     Q.    Yes.
14     A.    I don't recall.
15     Q.    Do you recall reviewing it before         09:05:02
16 today?
17     A.    Sometime during preparation.
18     Q.    Do you recall, as you sit here
19 today, what the handwritten note means to you,
20 or do you know what the handwritten note means?     09:05:13
21         MR. RYAN:  You mean that note that
22 we've read?
23         MR. JONES:  Yes, the one he just
24 read into the record.
25     A.    I don't recall writing it, but it         09:05:23

8 (Pages 588 to 591)

**Page 592**

1  looks like it's just a note that says Christa
2  Porter and Brian Christian were to research
3  something related to debt compliance letters.
4      Q.  Do you recall that there was an
5  effort on Cooper & Lybrand's part to assist its   09:05:34
6  client in evaluating whether the consolidated
7  financial statements that were proposed for the fiscal
8  statements that were proposed for the fiscal
9  year 1997 would comply with the various debt
10 agreements of the various obligated groups?       09:05:51
11         THE WITNESS:  Could you read that
12 again, please?
13         (Record read.)
14     A.  I don't recall that.
15         All I recall is what I said          09:06:19
16 earlier, that C&L had told AHERF management
17 that they need to consult with their legal
18 counsel and other appropriate parties for them
19 to ensure that what we would audit and provide
20 to them would be sufficient for their debt        09:06:31
21 purposes.
22     Q.  Did you ever learn that Mr. -- that
23 Brian or Christa, Mr. Christian or Miss Porter
24 ever did any research?
25         MR. RYAN:  Objection.  I think        09:06:41

**Page 593**

1  that's a misleading way of asking the question
2  because the topic that they are supposed to
3  research is a completely different topic the
4  witness has indicated from the topic of the
5  previous sentence.  So I'll object.             09:06:54
6      Q.  Do you recall whether they did the
7  research?
8          MR. RYAN:  Objection.  What
9  research?
10         MR. JONES:  Referred to in his        09:07:02
11 note.
12     A.  I said I don't recall what research
13 that would be, so I just don't know.
14     Q.  You recall seeing no results of
15 research that had anything to do with debt from    09:07:09
16 those two individuals, is that fair to say?
17     A.  I don't recall.
18     Q.  Did you ever do any research
19 yourself on the topic of debt at the various
20 obligated groups in connection with the           09:07:23
21 consolidated financial statements that were
22 proposed?
23         MR. RYAN:  Objection to form.
24     A.  In '97?
25     Q.  Yes, for fiscal year '97.             09:07:31

**Page 594**

1      A.  Not that I recall.
2      Q.  Do you recall --
3      A.  And I assume in your last question
4  you is Mark Kirstein?
5      Q.  Yes, I meant you personally.           09:07:41
6      A.  Not that I recall.
7      Q.  Do you recall becoming aware of an
8  effort on the part of AHERF to secure written
9  representation from the various bondholders to
10 the effect that the consolidated financial        09:08:05
11 statements that were proposed would comply with
12 the terms of their debt agreements?
13         MR. RYAN:  Would you read that
14 again, please?
15         (Record read.)                         09:08:07
16         THE WITNESS:  One more time,
17 please?  I'm sorry.
18         (Record read.)
19     A.  I don't recall becoming aware of
20 that, but I also believe that Amy Frazier and     09:08:56
21 Bill Buettner addressed matters with management
22 related to debt covenants and required
23 communications that might be necessary with
24 AHERF and their legal counsel.  I think that
25 was Foley & Lardner.                              09:09:12

**Page 595**

1      Q.  Regarding debt compliance matters
2  in connection with the audited financial
3  statements?
4      A.  Yes, it's my understanding, not
5  recollection, understanding some of that may be   09:09:20
6  from prep.  But I do recall Bill and Amy dealt
7  with the debt covenant pieces as the audit
8  wrapped up, I recall that.
9          Different times during preparation
10 I've seen, you know, Amy and Bill I believe       09:09:32
11 worked with AHERF management and their counsel
12 Foley & Lardner to determine what was required
13 from a debt compliance perspective.
14     Q.  And in preparation you mean either
15 in connection for this deposition or             09:09:48
16 depositions in the SEC proceeding?
17     A.  Correct.
18     Q.  Let me ask you to look at the last
19 diamond under debt on page 28 of Exhibit 4403.
20     A.  Okay.                                   09:10:05
21     Q.  It says, "Potential debt covenant
22 violations," and then it has three question
23 marks next to it.  Is that correct?
24     A.  Yes.
25     Q.  Do you recall becoming involved in     09:10:13

Mark Kirstein                                                      Volume 3

Page 628

1    A.    Yes.
2    Q.    You have that before you again?
3    A.    Yes.
4    Q.    Do you recall reviewing the
5    provision I asked you to review, 440.6, on        10:08:35
6    page -- the second page of the exhibit before
7    today?
8    A.    No.
9    Q.    I'm going to ask you now to look at
10   page 26 of Exhibit 58, which itself is the        10:08:50
11   consolidated financial statements at AHERF for
12   the year-ending June 30, '97.
13   A.    Okay.
14   Q.    What did you understand in
15   connection with your audit work at AHERF the      10:09:05
16   purpose of this report at page 26 to be?
17   A.    It's a report that -- the language
18   pretty much does a nice job of explaining what
19   it is. It's a report that is on supplemental
20   information. So it's not a required part of       10:09:34
21   the AHERF consolidated financial statements
22   that is informing whoever would be reading this
23   that it is supplemental information and it's
24   telling them that it's not -- that the audit
25   was not designed to audit necessarily the         10:09:46

Page 629

1    detailed information in there. But, as it
2    says, this is presented for additional
3    analysis, this does not require -- a required
4    part of the consolidated financial statements.
5        Then it goes on and does give an          10:10:00
6    opinion or at least -- yeah, an opinion that
7    says, "The supplementary consolidated financial
8    information has been subjected to the auditing
9    procedures applied in audit of the consolidated
10   financials and in our opinion is fairly stated    10:10:12
11   in all material respects in relation to the
12   consolidated financial statements taken as a
13   whole.
14   Q.    Let me ask you to put that aside
15   for a moment. I'm going to ask you now about      10:10:40
16   another set of issues related to your work on
17   the fiscal year 1997 audit at AHERF. In
18   particular, the transfer of certain reserves to
19   the Delaware Valley Obligated Group hospitals.
20       When I ask you these next questions,      10:11:02
21   I'm going to refer to the Graduate hospitals
22   and the Delaware Valley Obligated Group
23   hospitals.
24       You understand those to be two sets
25   of hospitals within the AHERF family in fiscal    10:11:11

Page 630

1    year 1997?
2    A.    Yes.
3    Q.    The Graduate hospitals included
4    hospitals with names like the Graduate
5    Hospital, Mt. Sinai, Rancocas, City Avenue and    10:11:24
6    Parkview, is that consistent with your
7    recollection?
8    A.    Yes.
9    Q.    The Delaware Valley Obligated Group
10   hospitals to which we referred both today and     10:11:33
11   yesterday included hospitals named Hahnemann,
12   MCPH, EPPI?
13   A.    Right.
14   Q.    St. Chris, Elkins and Bucks?
15   A.    I think that's right.            10:11:45
16   Q.    For purposes of my questions that
17   follow, I'm going to use those definitions. Is
18   that fair to you?
19   A.    Sure.
20   Q.    When do you -- when do you first      10:11:56
21   recall, Mr. Kirstein, learning that AHERF had
22   set up 50 million dollars of reserves in
23   connection with purchase price accounting for
24   the acquisition of the Graduate hospitals and
25   then transferred those reserves to the DVOG       10:12:17

Page 631

1    hospitals?
2        MR. RYAN: Can I get that read
3    back, please?
4    Q.    Bad debt reserve.
5        MR. RYAN: Sorry, Jim, I didn't       10:12:25
6    mean -- I didn't realize you weren't done.
7        (Record read.)
8    Q.    Reserve accounts.
9    A.    Sometime early in the year-end
10   phase of the audit, so say August I recall        10:12:54
11   learning -- I believe I learned that from Amy
12   Frazier.
13   Q.    When do you first recall learning
14   that AHERF was planning to do what I just said,
15   or considering doing what I just said?            10:13:15
16       MR. RYAN: Objection to form.
17   Q.    Let's start with planning.
18   A.    I don't recall ever learning that
19   they were planning to do that. The first time
20   I recall learning that they had transferred       10:13:27
21   reserves set up through purchase accounting was
22   in early August.
23   Q.    So the first time you learned of
24   it -- of the transfer of reserves or any
25   planning or consideration of it at all was in     10:13:39

18 (Pages 628 to 631)

Page 632

this early August time frame, 1997?
A. That's my recollection.
Q. So you never learned of it in advance of believing that it had already occurred, is that fair to say? 10:13:56
THE WITNESS: Could you read that one again?
(Record read.)
A. I don't understand that question.
Q. I'm sorry. 10:14:09
The first time you heard or had any awareness of transfers of purchase accounting reserves established in connection with the Graduate hospitals' acquisition by AHERF to the Delaware Valley Obligated Group hospitals' bad 10:14:30 debt reserve was at a time when you believe the transfers had already been effected or had occurred?
A. I believe that's what happened. I mean, in -- as I recall, I mean, I learned 10:14:48 early in the year-end phase of the audit that C&L had received the purchase accounting support, the support for the opening balance sheet of Graduate hospitals. At that point that's when Amy Frazier learned that there was 10:15:02

Page 633

a transfer.
Q. And is it -- should I take from that answer that you learned of this transfer of reserves -- was the amount 50 million that you first heard of? 10:15:18
A. I don't specifically recall today the amount, but that's consistent.
Q. That's consistent with what?
A. It's consistent generally with any numbers that I've heard throughout, you know -- 10:15:25 during the audit. I mean, I can't sit here today and say that day Amy told me it's 50 million dollars.
Q. You later learned that this purchase price accounting reserve amount that 10:15:35 was transferred to bad debt reserve was in the amount of 50 million dollars; is that fair to say?
A. Yes.
Q. Sometime after -- at or after early 10:15:44 August of 1997?
A. Correct.
Q. My question was, is it fair to say from your answer, an answer or two ago, that you learned of this development from Miss 10:15:55

Page 634

Frazier?
A. Yes.
Q. How is it that you learned of it, through a letter, through a face-to-face conversation, otherwise? 10:16:13
A. No. I believe, as I recall, I believe Amy had received opening balance sheet information related to Graduate or some sort of information related to the Graduate acquisition. I was over at the Clark Building. 10:16:24 We talked earlier about my role being a managerial role. At some point, I don't remember the date or time, Amy informed -- discussed with me at that point that she had learned that they had transferred reserves to 10:16:34 Delaware Valley and that she was undertaking audit procedures.
Q. Was anybody else present?
A. I don't recall.
Q. What do you recall about the 10:16:43 conversation?
A. I don't recall specifics about the conversation.
Q. Do you recall being concerned about the fact that she had revealed to you? 10:16:51

Page 635

MR. RYAN: Objection to form.
A. No.
Q. Do you recall her expressing concern over the fact that she had revealed to you? 10:17:07
MR. RYAN: Objection.
Q. The fact of the transfers.
MR. RYAN: Objection to form.
A. No.
Q. Did either of you discuss whether 10:17:14 or not at this time the transfers would have been in compliance with Generally Accepted Accounting Principles?
A. No. All I generally recall is learning that Amy learned of a transfer and 10:17:29 that she was going to undertake audit procedures. You don't typically make judgments and assessments of whether it's GAAP or allowable or unallowable until you complete audit procedures. 10:17:41
Q. Did you at that time form an opinion that you should take this to Mr. Buettner promptly, this revelation?
MR. RYAN: Objection to form.
A. I don't know what you mean by 10:17:52

Mark Kirstein                                                                          Volume 3

Page 648

1      Q.    I would like to turn your attention
2   to page 45 of the notes.  At the top of the
3   page there's a header that is underlined that
4   reads, Dan C period, 4-18, and I think
5   continues with the names Buettner slash        10:32:47
6   Frazier.  Am I right?
7      A.    Yes.
8      Q.    Does having a chance to see that
9   and looking at the notes refresh your
10  recollection that these are notes of a         10:32:57
11  conversation among those three people and you?
12     MR. RYAN:  Objection.
13     A.    I believe they're notes of a
14  conversation amongst Bill Buettner, Amy
15  Frazier, Dan Cancelmi.  I don't recall the     10:33:13
16  specific conversation that these notes
17  reference, but --
18     Q.    You recall being involved yourself
19  as well?
20     A.    I don't recall this specific         10:33:20
21  meeting on April 18th, but the nature of my
22  note taking is to write the attendees at the
23  top.
24     Q.    Do you write your own name down is
25  what I'm getting at?                            10:33:30

Page 649

1      A.    No.
2      Q.    Or do you typically not do so?
3      A.    I typically do not do that.
4      Q.    So if you followed your protocol,
5   this was a meeting or at least a phone call in  10:33:38
6   which you were a participant at some level?
7      A.    Correct.
8      Q.    Do you recall whether it was a
9   meeting or a phone call?
10     A.    I don't recall.                        10:33:45
11     Q.    You typically date your notes on
12  the day the communication took place?
13     A.    Yes.
14     Q.    Do you have any reason to doubt
15  that this communication took place on April 18, 10:34:00
16  1997 today?
17     MR. RYAN:  Objection.
18     A.    Doubt that it took place?
19     Q.    Yes.
20     A.    I suspect it did take place.           10:34:07
21     Q.    So you don't have a reason to doubt
22  it, I'm right?
23     A.    Correct.
24     Q.    What does the line across the
25  middle of the page mean to you, if anything, in 10:34:24

Page 650

1   connection with your note taking practices?
2      A.    It doesn't mean anything.
3      Q.    Can you read the first two lines
4   beneath that line across the middle of the page
5   for us?                                         10:34:41
6      A.    50 million dollar reserves at
7   Graduate, will have 80 million dollars C slash
8   O, charge-offs, in DV by 6-30-97, and then in
9   parens, gross number on A/R outpatient.
10     Q.    The C/O means charge-offs?            10:35:03
11     A.    I believe so, yes.
12     Q.    Does the DV mean the Delaware
13  Valley Obligated Group?
14     A.    I don't know what the DV means in
15  this situation.                                 10:35:12
16     Q.    I just asked you before if DV in
17  your answer meant Delaware Valley Obligated
18  Group.  So does having me refresh your
19  recollection there lead you to believe that DV
20  most likely means Delaware Valley Obligated     10:35:25
21  Group in these notes?
22     MR. RYAN:  Objection.  Misstates
23  prior question and answer.
24     A.    No, don't read anywhere DV meaning
25  any one thing at any one time.  You would have  10:35:36

Page 651

1   to be at the place of a meeting to know the
2   context of DV.  The reason I say that is
3   Delaware Valley is a common term used by the
4   audit team as well as by AHERF management to
5   discuss the eastern region, the Philadelphia    10:35:52
6   and eventually later New Jersey hospitals.  It
7   also happens to be the Delaware Valley
8   Obligated Group.  But in most cases in dialogue
9   with management throughout the year as you're
10  planning for the audit, you're really talking   10:36:04
11  about hospitals.  You're not usually talking
12  about financial statements.
13     So I would say it's actually
14  probably more Delaware Valley references
15  entities than it does an obligated group, which 10:36:17
16  tends to happen later on when financial
17  statements are being prepared.
18     Q.    So as you sit here today, you know
19  that C/O, C slash O means charge-offs to the
20  best of your ability to read your note?         10:36:31
21     A.    Yes.
22     Q.    You don't know whether the DV means
23  Delaware Valley Obligated Group, is that right?
24     A.    That's right.
25     Q.    What does the gross number on A     10:36:35

23 (Pages 648 to 651)

Mark Kirstein                                                                    Volume 3

Page 652

1  slash R outpatient mean?
2      A.   I don't recall.
3      Q.   Do you recall knowing at this time
4  frame, that is, in the spring or April -- in
5  the spring of or April of 1997 that AHERF       10:36:52
6  accounting had written off a large amount of
7  accounts on the books of the DVOG entities,
8  accounts receivable, that is?
9      A.   Yes.
10     Q.   Do you recall the quantum, roughly?     10:37:06
11     A.   I believe and I generally recall 80
12  million dollars being a number I heard at
13  different points in time during planning, that
14  AHERF had charged off some old accounts
15  receivable related to the system conversions we  10:37:19
16  talked about yesterday and the day before from
17  PATCOM to Envision.  There might have been
18  another -- another conversion in there as well.
19     Q.   I'm going to ask you to read the
20  next line of your notes.                         10:37:31
21     A.   Placing reserves on Graduate
22  entities to be used for DVAR at Y slash E,
23  year-end.
24     Q.   What does that mean to you today?
25  Or do you recall what you meant to write when    10:37:47

Page 653

1  you wrote that note?
2      A.   No, I --
3      MR. RYAN:  Objection.
4      A.   No, I don't recall this meeting and
5  I think, therefore, I don't know what the        10:37:54
6  context was, so I don't know what I was writing
7  there.
8      Q.   Do you recall today whether DV
9  meant the Delaware Valley Obligated Group or
10  some other group of hospitals?                   10:38:05
11     A.   I can't even tell you it meant a
12  group of hospitals.  It could have meant the
13  entity.  It could have meant the region
14  Delaware Valley.
15     Q.   What does the next line of your         10:38:17
16  notes say?
17     A.   "Does not believe there is any
18  general reserves other than 50 million
19  dollars."
20     Q.   Do you recall what that means          10:38:25
21  today?
22     A.   No, sir.
23     Q.   Can you read the next two lines?
24     A.   "Becomes part of PP&E slash
25  intangible as part of purchase adjustment from  10:38:37

Page 654

1  SDN to AHERF."  Then there's an indent.  Defers
2  A/R problem to be deferred.
3      Q.   Did you understand SDN at the time
4  to be an enterprise that was somehow involved
5  in some intermediate ownership or -- let's       10:38:56
6  leave it at intermediate ownership of the
7  Graduate hospitals?
8      A.   I don't know the legal structure,
9  but SDN was an entity that I believe the
10  Graduate hospitals were going to sit in until    10:39:09
11  AHERF acquired them legally, whatever had to
12  happen legally.
13     Q.   Do you recall today what you meant
14  by saying "defers A slash R problem to be
15  deferred"?                                        10:39:24
16     A.   No, I don't, sir.
17     Q.   Do you recall any discussions with
18  Mr. Cancelmi or Mr. Buettner or Miss Frazier at
19  any time about deferring an A/R problem at the
20  Delaware Valley Obligated Group hospitals?        10:39:38
21     A.   No, I don't recall a discussion.  I
22  don't recall becoming aware of an A/R problem.
23     Q.   Do you recall any discussions with
24  anyone at Coopers & Lybrand during your fiscal
25  year 1997 audit work regarding deferring an A/R  10:39:51

Page 655

1  problem at any set of hospitals?
2      A.   No, I don't recall that being a
3  matter that I discussed that year.
4      Q.   Do you recall it being a matter
5  that you discussed in any year, deferring A/R     10:40:06
6  problems?
7      A.   No, I don't recall discussing
8  deferring problems.  We talked in '96 they had
9  increases in A/R and other things that could be
10  A/R problems, but I don't know what the defer    10:40:18
11  reference is here in these notes.
12     Q.   Do you ever --
13     I'm going to ask you to flip one
14  page back to page 44 of your notes.
15     A.   Okay.                                    10:40:48
16     Q.   At the top of the page you've
17  written the word or the -- I think the date
18  4-21 and the word conference call or an
19  abbreviation for it.
20     Is that right?                                10:41:01
21     A.   Yes.
22     Q.   Do you believe today that these are
23  notes of a 4-21-97 conference call --
24     MR. RYAN:  Objection.
25     Q.   -- written in your hand?                 10:41:11

24 (Pages 652 to 655)

Mark Kirstein

Page 656

1    A.    Yes, at least the top part.  I
2  don't know if the bottom part is written at
3  some other time or not.  I don't know.
4    Q.    Let's look then at the top part.
5  Read the note for me that follows the heading.    10:41:21
6    A.    50 million dollar additional A D D
7  T, apostrophe L, additional reserves.
8    Q.    Can you read the note on the
9  left-hand margin that appears to either be
10 drawn to that first note or to a place above    10:41:36
11 it?
12    A.    Write down 50 million dollars
13 paren, parenthesis, put half against A/R.
14    Q.    Do you have any recollection today
15 what either one of those notes means?    10:41:49
16    A.    No, sir.
17    Q.    Can you read the rest of that note
18 regarding the 4-21-97 conference call for us
19 starting with the 40 million dollar reference?
20    A.    Sure.  40 million dollar --    10:42:14
21    Q.    Let me give you one caution on it.
22 I apologize for interrupting.  If you'd read it
23 a little more slowly than some of the other
24 reading we've been doing, the court reporter
25 will be happier.    10:42:24

Page 657

1    A.    She'll be my friend?
2    Q.    Perhaps.
3    A.    40 million dollar debt at Mt. Sinai
4  to Graduate.  Then there's a bullet.  Mt. Sinai
5  to be sold for ten million dollars.  Subbullet,    10:42:33
6  merge with AHERF, question mark.  Prior or
7  subsequent, question mark.  New bullet.  D E P
8  R, depreciation.  Recapture.  Subbullet, view
9  as NOL under 109.  Then the number one GW,
10 probably good will.  The number two, other    10:42:58
11 intangibles.  The number three, a down arrow.
12 Probably means decrease in expense.
13    Q.    Does NOL mean net operating loss?
14    A.    I believe so, yes.
15    Q.    What is under 109 mean to you?    10:43:10
16    A.    As it relates to AHERF or is it
17 just in this note or what?
18    Q.    As it relates to this note in
19 particular.
20    A.    I don't recall writing the note,    10:43:19
21 so, I mean, do you want me to speculate?
22    Q.    In your note-taking practices as an
23 auditor at Coopers & Lybrand, does that give
24 you any context to tell us what you think 109
25 meant at the time?    10:43:34

Page 658

1    A.    109 is a FASB related to taxes, an
2  SFAS statement related to taxes.  Net operating
3  loss is a concept related to taxes.
4    Q.    Do you have any reason today to
5  doubt that the page -- the rest of the notes on    10:43:47
6  the page below the line that crosses it to
7  which you referred earlier were taken on the
8  same day?
9        MR. RYAN:  Objection.
10    A.    I don't know when they were    10:44:03
11 written.
12    Q.    Do you know one way or the other
13 whether they were written on the same day as we
14 sit here today?
15    A.    No, I don't.    10:44:10
16    Q.    Look at item one under summary of
17 conclusions.  Can you read that for us?
18    A.    "Debits generated by purchase
19 accounting to PP&E over 30 years.  Subbullet,
20 will occur at time to AHERF."    10:44:30
21    Q.    Do you know what that means today?
22 Do you have any recollection?
23    A.    I don't recall writing the note, so
24 I can't give you a specific recollection.  It
25 seems to reference the concept of amortization    10:44:49

Page 659

1  of items recorded as part of purchase
2  accounting when they were recorded against
3  PP&E.
4    Q.    So the line "will occur at time to
5  AHERF" means at the time transferred to AHERF    10:45:03
6  ownership?
7    A.    I don't know what it means.
8        MR. RYAN:  Objection.
9    A.    I don't remember the meeting, so I    10:45:11
10 don't know exactly what it is, but you asked me
11 to generally try to speculate what number one
12 might reference.  And I tried to help you with
13 that.
14    Q.    I didn't ask you to generally
15 speculate.  I asked me to give me your best    10:45:18
16 effort to read the note in context.
17       Is it true that your best effort to
18 read the note in context would cause you to say
19 that the note will occur at time, to AHERF
20 means entrance into AHERF or ownership by    10:45:35
21 AHERF?
22       MR. RYAN:  Objection.
23    A.    I don't know.  I don't know what
24 that means.
25    Q.    In the left-hand margin, the lower    10:45:40

Mark Kirstein                                                                          Volume 3

Page 660

1  left-hand corner, you have apparently written
2  the words in a box or a part of a box "view
3  consolidated basis as acquisition."
4         Did I read that right?
5     A.   Yes.                          10:45:53
6     Q.   Do you know what that means today?
7     A.   I do not.
8     Q.   Do you have any recollection of
9  what it meant when you wrote it down?
10    A.   No, I don't.                   10:45:58
11    Q.   I'm going to ask you to flip back a
12 couple pages to page 37 of the exhibit.  Page
13 37 through 41, I think, if you take a moment to
14 review them, are another set of your
15 handwritten notes.  If you could confirm that   10:46:33
16 for me and then that would be great and I will
17 have a few questions about.
18        MR. JONES:  And this is a good spot
19 to change the tape.
20        THE VIDEOGRAPHER:  Off the record   10:46:49
21 at 10:47, end of the first videotape.
22        (Recess had.)
23        THE VIDEOGRAPHER:  On the record at
24 10:56.  Videotape number two, volume three.
25    Q.   Mr. Kirstein, I had a quick        10:56:22

Page 661

1  follow-up question to the set of notes we were
2  just looking at, in particular, on page 44.
3     A.   Okay.
4     Q.   Which those notes are headed with
5  the 4-21 conference call phrase.           10:56:35
6     A.   Okay.
7     Q.   Do you know who was on this
8  conference call as you sit here today?
9     A.   No, I do not.
10    Q.   Let's again refer you back again to   10:56:53
11 page 37 through 41.  These are notes in your
12 hand?
13    A.   Yes.
14    Q.   They're dated 6-10, is that right?
15    A.   Correct.                       10:57:19
16    Q.   Do you believe that to be 6-10-97?
17    A.   Yes.
18    Q.   You've numbered the pages one
19 through five through five of five?
20    A.   Correct.                       10:57:29
21    Q.   In the upper right-hand corner?
22    A.   Yes, sir.
23    Q.   The heading on the first page of
24 the note says "AHERF issue"?
25    A.   Might be plural issues, but yes.   10:57:36

Page 662

1     Q.   Then the word just beneath that, is
2  that the word review?
3     A.   You mean on the left-hand margin?
4     Q.   Yes.
5     A.   Revenues.                      10:57:47
6     Q.   I'm sorry, revenues.  Thank you.
7         Then you have a bullet point.  Can
8  you read what that bullet point says?
9     A.   "50 million dollar additional
10 reserve dash 25 million through March."  Next   10:57:58
11 line, "50 million through April."
12    Q.   Having had a chance to look at the
13 notes very briefly at our break and then see --
14 seeing now how they start off, do you recall
15 these to be notes of any meeting or call?      10:58:12
16    A.   I don't recall.
17    Q.   I believe that you have previously
18 testified that you had a belief that these
19 notes were of an internal update meeting with
20 Mr. Kirstein, Buettner and Frazier.  You don't   10:58:33
21 need to trust me on that, but now that I said
22 it, does that refresh your recollection, that
23 that may be what these notes are?
24    A.   Yes, I think my prior testimony was
25 I didn't recall what they came from, but        10:58:46

Page 663

1  looking at the nature of the content of the
2  five pages, it appears to be from some sort of
3  update meeting related to the audit.
4         I don't sitting here today recall
5  if Bill Buettner and Amy Frazier was there, but   10:59:00
6  I had to get the information from somebody to
7  write it down.
8     Q.   Do you believe it was a set -- a
9  meeting, though, with Coopers & Lybrand
10 personnel as you sit here today?                10:59:09
11    A.   I believe so, yes.
12    Q.   Do you recall -- can you recall
13 whether any AHERF personnel were in attendance?
14    A.   No, I don't have a specific
15 recollection of June 10th, of the meeting.  I   10:59:17
16 just tried to help in prior testimony and
17 again, for you, given the general nature what
18 it might be from.
19    Q.   When you read the first few lines
20 as you just did, or having so read them, do you   10:59:32
21 have any recollection today of what you meant
22 by using the word thru in short form, T H R U?
23    A.   No, I don't.
24    Q.   When you wrote that term in your
25 auditing work, did it have any specific meaning   10:59:52

26 (Pages 660 to 663)

Page 664

to you?
MR. RYAN: Objection.
A. No, I don't think -- no. Thru is not a generally accepted auditing term that I know of and I don't recall having a meaning to that. 11:00:04
Q. The next line reads how?
A. I'm sorry?
Q. How do you read the next line of text? 11:00:13
A. You would like me to read it or --
Q. I would.
A. "80 million dollar write-offs and offset by 50 million dollar reserve," and then there's a subbullet, "need current versus prior year breakout." 11:00:24
Q. Do you recall today what you meant when you wrote that?
A. No.
Q. In any of your work in reviewing documentation over the years, either in preparation for depositions or otherwise, have you come to an understanding of what you meant? 11:00:33
MR. RYAN: Objection.
A. No, I have not. 11:00:47

Page 665

Q. Do you recall any discussion of the topic of using the 50 million dollar of reserves established in purchase accounting in connection with the Graduate acquisition to offset the 80 million dollar charge-offs to which we referred earlier at the Delaware Valley Obligated Group? 11:01:14
MR. RYAN: I'm sorry, can I get that read back, please?
(Record read.) 11:01:22
MR. RYAN: I'll object to the lack of a time frame.
Q. There is no time frame. At any time.
A. Other than what we talked about a little earlier, learning of a potential, of the transfer in early August, that's the only time I recall hearing of something, something to that effect. 11:01:50
Q. So you -- all right. 11:02:01
Nothing before that on this topic?
A. No. In fact, as I said earlier, we, C&L, had been waiting, had told management we needed to see what the opening balance sheet and purchase accounting would be, and I don't 11:02:18

Page 666

believe we got that until the year-end audit phase. So even in June, while I don't recall the meeting, there was no purchase accounting detail that we had at this point in time.
Q. Had you discussed any of the purchase accounting approaches that AHERF was taking or was planning to take with AHERF personnel before August? 11:02:28
MR. RYAN: Objection.
A. Are you referencing like purchase versus pooling? 11:02:44
Q. I'm sorry?
A. Are you referencing like how they would account for it, like purchase accounting versus pooling? 11:02:52
Q. Yes.
A. I believe sometime early in planning, maybe January, February, March time frame, there was discussions that I was part of at certain points with management about how would the acquisition for Graduate and potentially others, I think Forbes and AGH, be accounted for by AHERF. 11:03:01
Q. Do you recall any discussion of offsetting reserves established in connection 11:03:16

Page 667

with the purchase of the Graduate enterprises against any write-offs in those discussions?
MR. RYAN: Objection.
A. No. As I said, I don't recall hearing that until August. 11:03:34
Q. As you sit here today, do you believe that offsetting 80 million dollars of write-offs at the Delaware Valley Obligated Group hospitals or charge-offs with 50 million dollars of reserves established in connection with the Graduate acquisition would have been wrong under GAAP? 11:03:54
MR. RYAN: Objection.
A. I think GAAP, at least when I think back, GAAP was assessed at the financial statement level. So in the case of AHERF, it would have been at the AHERF consolidated financial statement level. 11:04:10
So I guess it's possible that the transaction that you just talked about, if it even occurred, could theoretically be GAAP. You would have to know the facts and circumstances to make that determination. 11:04:24
Q. It certainly could also be non GAAP as well? 11:04:38

Page 720

the Delaware Valley Obligated Group hospitals, does that refresh your recollection about why you wrote where did it go?
A. No, sir.
Q. Did you ever come to learn that 13:12:46 what I just described occurred?
A. I believe subsequent in litigation preparing for depositions I've heard something similar to what you just described, yes.
Q. When you heard it then, did it 13:13:00 refresh your recollection about why you wrote where did it go?
A. No, sir.
Q. As you sit here today, you don't know why you wrote the words where did it go? 13:13:11
A. No, sir.
Q. What's in the circle just above the words PFMA contract?
A. Need docs, D O C S.
Q. Need, N E E D? 13:13:22
A. Correct.
Q. What is in the box just to the left of PFMA contract?
A. WFB write-up.
Q. What does WFB mean? 13:13:32

Page 721

A. Bill Buettner.
Q. What does write-up mean to you today?
A. I don't know. I don't remember writing this. 13:13:41
Q. When you wrote write-up in your -- the words write-up with -- next to somebody's initials -- when you wrote the words write-up next to somebody's initials in your audit work in connection with fiscal year 1997 or other 13:13:54 years, what did that typically mean to you?
MR. RYAN: Objection.
A. I don't think it has a typical meaning. I don't know.
Q. Does write-up -- I'm only asking, I 13:14:03 don't know the answer -- mean put together a memo, put together a written piece of some kind to you?
A. Not necessarily. I don't know what this meant. It could be put together. It 13:14:17 could be someone has a memo to read. I don't know.
Q. Have you ever used it in your business practices to mean that, write up a memo for me or write up something on a piece of 13:14:23

Page 722

paper for me?
MR. RYAN: Objection.
A. It's likely that I have. I don't recall specific instances, but that seems like a reasonable interpretation. 13:14:35
Q. Do you ever recall receiving a write-up or a memorandum or words on paper from Mr. Buettner or anyone on the PFMA contract or any reserve regarding the PFMA contract?
A. Me receiving something? 13:14:54
Q. Yes, sir.
A. No.
Q. Do you see --
Do you recall any discussions with anybody on the AHERF engagement at Coopers & 13:15:13 Lybrand about the PFMA contract other than what you've already shared with us, if anything?
MR. RYAN: Objection.
A. No, sir.
Q. Do you recall any conversations 13:15:23 with anybody at AHERF about the PFMA contract?
A. No, sir.
Q. Look down towards the bottom of the page under item two, Greater Atlantic. Do you see that? 13:15:53

Page 723

A. Yes.
Q. Can you read the next few words for me in that line?
A. Greater Atlantic enters, the letter K, contract is my -- would that mean, with 13:16:01 Philadelphia Fire.
Q. Looking down, the last subpoint with an arrow beneath that, you write, McNair, Beth Chang say something, I can't read the rest of it. Can you read that line for me? 13:16:19
A. McNair slash Beth Chang say liability is with GHS. That's underlined.
Q. GHS was the health system that formerly owned the Graduate hospitals?
A. I don't recall. 13:16:35
Q. You don't recall.
Do you know who Mr. McNair or Miss Chang were?
A. No idea who Beth Chang is. I think McNair was an attorney, an in-house attorney 13:16:46 with AHERF, I believe.
Q. Do you ever recall that they had advised that they believed that any liabilities for PFMA losses resided with parties other than AHERF or the Graduate hospitals? 13:16:59

Mark Kirstein                                                              Volume 3

Page 724

1     A.   No.
2     Q.   At the top of the same page, you've
3  got a note in the upper right-hand corner or
4  toward the upper right-hand corner that's
5  circled. Can you read that for us?        13:17:32
6     A.   Up here?
7     Q.   Yes.
8     A.   "Not through income slash move to
9  DV reserves for A/R."
10     Q.   Do you know what that means today?   13:17:41
11     A.   No, sir.
12     Q.   It says, "Move to DV reserves for
13  A/R." Is that right?
14     A.   Yes.
15     Q.   Does that mean the Delaware         13:17:55
16  Valley -- does that mean the Delaware Valley
17  Obligated Group hospitals and their reserves to
18  you today?
19     A.   I don't know what it means. I
20  mean, I don't remember the meaning. I don't   13:18:05
21  know what I was thinking when I wrote the note,
22  sitting here today, so I don't know what that
23  interpretation would be.
24     Q.   Did you ever see a legal memorandum
25  from Miss Chang on the topic of the PFMA       13:18:16

Page 725

1  contract or any losses or reserves in
2  connection with it?
3     A.   I don't recall seeing one.
4     Q.   Did you ever ask for one, a legal
5  opinion, or a legal memorandum?              13:18:31
6     A.   I don't believe I did, no.
7     Q.   Do you recall any discussions about
8  a legal memorandum on this topic in your work
9  at AHERF?
10     A.   Personally, no. I mean, this        13:18:43
11  wasn't an area that I was working on.
12     Q.   Do you recall anyone coming to a
13  conclusion about whether any liabilities, as a
14  member of the Coopers & Lybrand engagement
15  team, coming to a conclusion about who would be   13:19:07
16  liable for the PFMA losses?
17        MR. RYAN:  Could you read that
18  again, please?
19        (Record read.)
20     A.   I don't -- are you talking at the    13:19:35
21  time of the audit?
22     Q.   Yes, during your audit work for
23  AHERF.
24     A.   I don't recall.
25     Q.   Did you learn about who became      13:19:42

Page 726

1  liable subsequently for those losses?
2     A.   I don't know if I learned who
3  became liable. That sounds like a legal
4  determination. I think in preparing for
5  depositions I've seen some work papers that Amy   13:19:54
6  Frazier had done where I believe she made a
7  determination as to whether or not there should
8  be a reserve for PFMA, and I think she
9  considered it in one of her analyses.
10     Q.   I'm going to ask you to look a       13:20:11
11  little bit further down in the document, page
12  27 of Exhibit 4403, to the heading CRA Review,
13  A, Cushion slash Open Items.
14     Q.   Do you recall any discussions of
15  cushions at this audit meeting?             13:20:28
16        MR. RYAN:  Objection to form.
17        MR. JONES:  What is that objection
18  based on?
19        MR. RYAN:  I think we previously
20  established that is a term that has multiple   13:20:35
21  meanings, so I'm not sure what meaning you were
22  using the word cushion.
23        MR. JONES:  I don't know that I
24  attached a particular meaning.
25     Q.   Do you recall discussions that      13:20:44

Page 727

1  included the word cushions?
2     A.   No, sir.
3     Q.   Do you see that there are amounts
4  written in your handwriting that have a line
5  drawn back to the word cushions?            13:21:00
6     A.   Yes.
7     Q.   Those amounts say AGH 2 million
8  dollars, is that right?
9     A.   Yes.
10     Q.   And Forbes 7 million dollars?       13:21:05
11     A.   Correct.
12     Q.   Do you know what those amounts were
13  for?
14     A.   No, I do not.
15     Q.   Do you recall that those were       13:21:10
16  amounts that someone determined were cushions
17  on the books of those hospitals?
18     A.   I don't recall what they are in
19  this meeting.
20     Q.   Do you recall today from any other   13:21:19
21  source?
22     A.   No, sir. I wouldn't -- you have to
23  understand, these are notes from an update
24  meeting. So what typically happens after these
25  meetings is whatever information we gather,    13:21:32

42 (Pages 724 to 727)

FROM CRAVATH SWAINE & MOORE LLP

## DEPOSITION ERRATA SHEET

RE:  THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION AND RESEARCH FOUNDATION v. PRICEWATERHOUSE
COOPERS, LLP

I, Mark Douglas Kirstein, make the following corrections, additions, or deletions to the
transcript of my deposition, taken on May 11-13, 2004, for the following reasons. By my
signature below, I authorize you to attach this errata sheet to the transcript.

| Page: Line | Change | Reason |
|---|---|---|
| 11:9 | "ACP" should be "HCP" | Error |
| 33:8 | Answer should end at "Kocak", A new question begins with "thank you" and ends at "bad debt" | Error |
| 36:15 | "grade" should be "rate" | Error |
| 80:5 | "I do not, no" should be "I do not know" | Error |
| 95:15 | "when" should be "went" | Error |
| 101:15 | "what it says" should be "Is that what it says?" | Clarification |
| 103:17 | "reserve that" should be "reserve. That" | Error |
| 145:5 | "fluct" should be "flux" | Error |
| 149:4 | "There's" should be "That's" | Error |
| 152:24 | "that" should be "a" | Clarification |
| 155:5 | "it's an audit" should be "I saw it" | Error |
| 163:23 | "of an" should be "of" | Error |
| 196:10 | "Cancelmi" should be "McConnell or" | Error |
| 205:11 | "Marie" should be "Murray" | Error |
| 212:7 | "WL" should be "WO" | Error |
| 217:25, 219:12, 224:9, 302:20, 303:3, 303:14 | "Calosheski" should be "Kaliszewski" | Error |
| 224:16 | "Collections. He" should be "collections, and even" | Error |
| 224:17 | "referred them" should be "further" | Error |
| 239:5 | "inpatients instead" should be "inpatients. Instead" | Error |
| 239:6 | "aging. Day" should be "aging day" | Error |
| 239:8 | "billed. Where" should be "billed -- Where" | Error |
| 250:23 | "Christa" should be "Kristen" | Error |
| 291:7 | "17. I" should be "17 I" | Error |

| Page: Line | Change | Reason |
|---|---|---|
| 332:17 | "about, what FAS or FAS" should be "about -- in what FAS or SAS" | Error |
| 335:6 | "Envision" should be "Invision" | Error |
| 357:6 | "same" s/b "self" | Error |
| 380:13 | "D&FB" should be "DNFB" | Error |
| 385:20 | "to control" should be "of controls" | Error |
| 395:7 | "Elkins box St. Chris" should be "Elkins, Bucks, St. Chris" | Error |
| 397:18 | "that" should be "that--" | Error |
| 401:13 | "contractual is a bad debt, yes" should be "contractuals, a bad debt--yes" | Error |
| 403:5 | "number" should be "level" | Error |
| 437:19 | "entries" should be "interest" | Error |
| 452:10 | "Elsworth" should be "Ellsworth" | Error |
| 460:10 | "BP&E" should be "PP&E" | Error |
| 461:10 | "CR" should be "CRA" | Error |
| 465:21 | "I do not, no." should be "I do not know" | Error |
| 472:2 | "I do not, no." should be "I do not know" | Error |
| 481:7 | "can" should be "can't" | Error |
| 507:9 | "us" should be "this" | Error |
| 523:1 | "Lyden" should be "Lydon" | Error |
| 527:11 | "throw" should be "flow through" | Error |
| 533:7 | "Might" should be "Might've" | Error |
| 543:12 | "line" should be "of" | Error |
| 543:13 | "adjusted" should be "unadjusted" | Error |
| 544:8 | "No" should be "No. I don't recall that" | Clarification |
| 572:7 | "Jenker Bittel" should be "Drinker Biddle" | Error |
| 583:10 | "Chris" should be "Kristen" | Error |
| 587:19 | Remove "that Mr." | Error |
| 623:4 | "A." should be "Q." | Error |
| 625:12 | "and assets" should be "of net assets" | Error |
| 626:19 | "answer you" should be "give you" | Error |
| 629:3 | "does not" should be "is not" | Error |

FROM CRAVATH SWAINE & MOORE LLP

3

| Page: Line | Change | Reason |
|---|---|---|
| 645:3 | "plan" should be "part" | Error |
| 662:11 | "50" should be "25" | Error |
| 664:13 | Insert quotation mark after "offs" | Error |
| 664:14 | Insert quotation mark before "offset" | Error |
| 666:22 | "AGH" should be "AVH" | Error |
| 688:4 | "you" should be "you've" | Error |
| 692:4 | "document" should be "audit" | Error |
| 716:10 | Remove "time of the" | Error |
| 731:9, 738:17 | "Mary Bess" should be "Maribess" | Error |
| 741:13 | "imbedding" should be "embedding" | Error |
| 789:25 | "PricewaterhouseCoopers" should be "Pricewaterhouse" | Error |
| 795:6 | "from Carl Wease" should be "phone call once" | Error |
| 806:3 | "Casperbauer" should be "Kasperbauer" | Error |
| 822:3 | "Wackly and Marty Bennett" should be "Wockley and Marne Betta" | Error |

I have read the transcript of my deposition taken May 11-13, 2004 and swear that, with the above changes, the transcript is true and correct.

_____
Mark D. Kirstein

7/13/04
_____
Date

Sworn to before me
This 13th day of July, 2004

_____
Notary Public

OFFICIAL SEAL
M DOLORES MOYADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 08-25-07

Kite Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS LLP,*

---

## STEVEN B.  KITE
*February 25, 2005*

---

## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**KITE, STEVEN B.  - Vol. 1**



Page 114

1   he's required to?
2        A.   I really hadn't thought about that. I
3   mean, we have to think to the point simply if there is
4   a breach, there are remedies for creditors to take.
5        Q.   Okay. And I'm just trying to -- I'm just
6   trying to --
7        A.   Yeah, and what they might do I think is
8   something I -- you know, we can't speculate on it. I
9   mean, typically it involves getting a consultant and
10  implementing the recommendations of a consultant to
11  enhance revenues, cut expenses or sell off
12  non-productive assets.
13       Q.   Now, you've referred to a provision
14  requiring call-in of a consultant. And that would,
15  for example, be in Section 6.3 of this Master Trust
16  Indenture?
17       A.   Correct.
18       Q.   Let's talk a little bit about Section 6.3.
19  It's on pages 37 to 38; is that right?
20       A.   Right.
21       Q.   And this is a section entitled "Rates and
22  Charges;" is that right?
23       A.   Mm-hmm.
24       Q.   Have you heard this referred to sometimes

Page 115

1   as a rate covenant?
2        A.   Correct.
3        Q.   And do you agree that Section 6.3 then
4   contains a covenant that the obligated group will
5   operate all of its facilities on a revenue-producing
6   basis and will charge such fees and rates for its
7   facilities and services and will exercise such skill
8   and diligence as to provide income from its property
9   together with other available funds sufficient to pay
10  promptly all payments of principal and interest on its
11  indebtedness, all expenses of operation, maintenance
12  and repair of its facility and all other payments
13  required to be made by it hereunder to the extent
14  permitted by law"?
15       A.   Yes, Section 6.3 contains several
16  covenants, and that is one of them.
17       Q.   All right. So, this is in effect a
18  covenant to manage your business and to charge rates
19  in such a way that you'll be able to make the payments
20  you have to make?
21       A.   Correct.
22       Q.   All right. So, the second sentence
23  contains a related covenant which says if the
24  obligated group has to change its rates in order to be

Page 116

1   able to make all those payments, that they will change
2   their rates, right?
3        A.   Correct.
4        Q.   And that's why this is called a rate
5   covenant, right?
6        A.   Probably. That's part of it.
7        Q.   All right. Then the third sentence of
8   Section 6.3 states, "The Members of the Obligated
9   Group covenant and agree that they will cause the
10  officer certifying the report referred to in Section
11  6.6(b) hereof to calculate the Historical Debt Service
12  Coverage Ratio for the Fiscal Year covered by such
13  report and to deliver a copy of such calculation to
14  the Master Trustee," right?
15       A.   Right.
16       Q.   So, that's saying every year the obligated
17  group will calculate this ratio and an officer of the
18  company will deliver that to the Master Trustee?
19       A.   Right.
20       Q.   And in fact DVOG did that for 1996 and
21  1997, right?
22       A.   I don't think I ever saw a certificate.
23       Q.   Okay. You didn't ever review the
24  certificates that were provided by officers of DVOG?

Page 117

1        A.   I don't believe I ever saw that.
2        Q.   Okay. But at a minimum you don't have any
3   basis to say that DVOG didn't do what's stated there
4   in the third sentence of Section 6.3, right?
5        A.   Just don't know one way or the other.
6        Q.   Okay. Do you agree that DVOG in fact
7   operated its business and charged rates in such a way
8   that it was able to make the payments it needed to in
9   1996 and 1997?
10       A.   I don't have any basis to know that one way
11  or the other.
12       Q.   All right. Now, all three of the sentences
13  that we've reviewed so far contain the words
14  "covenant" and "agree," right?
15       A.   Okay. Yes.
16       Q.   Now, the next sentence, which now talks
17  about historical debt service coverage ratio of 1.10,
18  that sentence does not contain the words "covenant" or
19  "agree," does it?
20       A.   That's correct.
21       Q.   All right. Now, this is the sentence which
22  provides that if the historical debt service coverage
23  ratio is less than 1.1 to 1, then the obligated group
24  has to retain a consultant, right?

30 (Pages 114 to 117)

Page 118

1    A.    Yes.
2    Q.    Now, "consultant" is another one of our
3  defined terms; is that right?
4    A.    Right.
5    Q.    In fact, it's defined on page 4 of the
6  agreement.
7    A.    Okay.  I'm with you.
8    Q.    Now, do you agree with me that under the
9  DVOG Master Trust Indenture the obligated group can
10  choose who the consultant will be if a consultant has
11  to be called in through Section 6.3?
12    A.    Yes.
13    Q.    That is, the bond insurer or the letter of
14  credit bank doesn't have an ability to veto the
15  selection of consultant, right?
16    A.    Correct.
17    Q.    Do you agree with me that there is no
18  requirement that the consultant must be independent of
19  the obligated group?
20    A.    Correct.
21    Q.    Have you seen bond documents where the
22  definition of consultant in fact did include such a
23  requirement?
24    A.    Yes.

Page 119

1    Q.    And that was not included in the DVOG
2  Master Trust Indenture, right?
3    A.    Correct.
4    Q.    So that, to provide an example, the DVOG
5  could have retained AHERF as a consultant in the
6  manner that in 1977 the Centennial Obligated Group
7  retained AHERF as a consultant under the analogous
8  provision of its Master Trust Indenture, right?
9    A.    Subject to the caveat that the consultant
10  has to have a favorable reputation for skill and
11  experience in performing similar services.
12          And I noticed that in how they were dealing
13  with Centennial it struck me that it would be hard to
14  say that AHERF meets that definition.  But if AHERF
15  did meet that definition, yes, they could have been
16  appointed.
17    Q.    All right.  And you are aware, are you not,
18  that in 1997 AHERF and Centennial took a position that
19  AHERF in fact did meet the definition of a consultant?
20    A.    I believe -- I believe so, they took that
21  position.
22    Q.    And are you aware of the fact that the
23  trustee for the Centennial bonds never disagreed with
24  that position?

Page 120

1    A.    I -- somebody disagreed with it I remember
2  from reading something.  I don't recall whether it was
3  a trustee or one of the banks in the credit group, but
4  I remember reading something about somebody saying
5  AHERF shouldn't have been the consultant.  But I don't
6  remember who it was and I don't remember what the
7  trustee's position was.
8    Q.    Do you agree that the trustee for the
9  Centennial bonds never declared an event of default as
10  a result of Centennial's retention of AHERF as a
11  consultant?
12    A.    I'm not aware of an event of default.
13    Q.    All right.  Now, if you could return,
14  please, to Section 6.3, --
15    A.    Okay.
16    Q.    -- the next sentence, we're now on the
17  fourth paragraph of this section, the next sentence
18  provides that a copy of the consultant's report and
19  recommendations has to be filed with various people,
20  right?
21    A.    Right.
22    Q.    Then the next sentence states, "The
23  obligated group shall follow the recommendation of the
24  consultant to the extent feasible," right?

Page 121

1    A.    Right.
2    Q.    Then the next sentence is the one that I
3  believe you focus on in your report, right, that
4  contains a proviso relating to a hundred percent,
5  right?
6    A.    Correct.
7    MR. COGAN:  Objection.
8  BY MR. RYAN:
9    Q.    Now, this sentence states in part, "No
10  event of default shall be deemed to have occurred
11  hereunder," right?
12    A.    Right.
13    Q.    And you agree with me that "hereunder"
14  means under this Master Trust Indenture?
15    A.    Yes.
16    Q.    It does not mean under this section?
17    A.    Correct.
18    Q.    Now, you see, then, in the next sentence
19  that reads, "The foregoing provisions notwithstanding,
20  if in any fiscal year the historical debt service
21  coverage ratio is less than 1.10, the Master Trustee
22  shall not be obligated to require the members of the
23  obligated group to retain a consultant to make such
24  recommendations" if two certain instances obtain,

31 (Pages 118 to 121)

# ERRATA SHEET
# FOR STEVEN B. KITE

| Page/Line | Should Read | Reason for Change |
|---|---|---|
| 6/14 | Change "Yeah" to "Yes" | Grammar |
| 8/5 | Change "enjoyed work" to "enjoyed working" | Grammar |
| 8/15 | delete "in" | Grammar |
| 9/10 | Change "their" to "its" | Grammar |
| 9/11 | Change "their" to "its" | Grammar |
| 9/12-17 | Change to read "and bond counsel's client is typically viewed for legal conflict of interest purposes as the borrower or the issuer." | Clarity |
| 11/18 | Change "party" to "entity" | Clarity |
| 12/11 | Change "yeah" to "yes" | Grammar |
| 12/19 | Change "represent" to "represents" | Grammar |
| 12/23 | Change "a couple of" to "two" | Grammar |
| 16/24 - 17/1 | Delete "I said" insert "company" at end of sentence" | Clarity |
| 17/14-16 | Revise sentence to read "I've represented them in the past, but not recently or currently." | Clarity |
| 18/24 | Change "Non-profit" to "Health Care" | Accuracy |
| 29/12 | Change "Yeah" to "Yes" | Grammar |
| 29/16 | Insert "for" before "selling" | Clarity |
| 30/18 | Change "you know" to "I would" | Clarity |
| 37/1 | Change "were" to "was" | Grammar |
| 46/24 | Change "relate d" to "related" | Typo |
| 47/4 | Change "graduate" to "Graduate" | Typo |
| 51/23 | Change "exemptions" to "exceptions" | Clarity |
| 55/13 | Change "ben" to "been" | Typo |
| 57/20 | Insert "up" after "picked" | Clarity |
| 59/2 | Change "yeah" to "Yes" | Grammar |
| 63/7 | Change "Yeah" to "Yes" | Grammar |
| 64/17 | Change "contain" to "contains" | Grammar |
| 65/1-2 | Change "has typically been" to "is typically" | Grammar |
| 65/12 | Insert "a" before "separate" | Grammar |
| 70/4 | Change "then kind of" to "that" | Clarity/Grammar |
| 74/9 | Change "Yeah" to "Yes" | Grammar |
| 81/21 | Change "we" to "they" and "our" to "their" | Grammar |
| 84/18 | Change "but" to "by" | Typo |
| 86/3 | Change "cuz" to "because" | Grammar |
| 101/6 | Change "as" to "is" | Typo |
| 103/23 | Change "restate d" to "restated" | Typo |
| 110/10 | Change "required" to "allowed" | Clarity |
| 114/3 | Change "think" to "get" | Clarity |
| 114/7 | Change "Yeah" to "Yes" | Grammar |
| 124/14 | Change "weeding" to "reading" | Typo |
| 125/6 | Change "Yeah" to "Yes" | Grammar |
| 136/15 | Insert "paper" after "commercial" | Clarity |
| 136/20 | Delete apostrophe in "agreement's" | Grammar |

| Page/Line | Should Read | Reason for Change |
|-----------|-------------|-------------------|
| 151/18 | Change "Yeah" to "Yes" | Grammar |
| 152/1 | Change "Yeah" to "Yes" | Grammar |
| 157/5 | Change "the" to "by" | Clarity |
| 160/17 | Change "what" to "was" | Clarity |
| 162/22 | Change "Yeah" to "Yes" | Grammar |
| 166/10 | Change "Yeah" to "Yes" | Grammar |
| 167/3 | Change "cuz" to "because" | Grammar |
| 169/2 | Change "Yeah" to "Yes" | Grammar |
| 169/7 | Change "Yeah" to "Yes" | Grammar |
| 170/3 | Change "Yeah" to "Yes" | Grammar |
| 171/6 | Insert "disclosure part" after "market" Change "till" to "until" | Clarity |
| 174/17 | Change "'em" to "them" | Grammar |
| 180/2 | Change "gonna" to "going to" | Grammar |
| 189/21 | Change "Yeah" to "Yes" | Grammar |
| 192/2 | Change "Yeah" to "Yes" in both places | Grammar |
| 216/21 | Change "in in" to "into" | Clarity |
| 217/4 | Change "out" to "over" | Clarity |
| 219/2 | Change "gonna" to "going to" | Grammar |
| 219/4 | Change "familiar" to "I remember" | Clarity |
| 220/13 | Change "gonna" to "going to" | Grammar |
| 221/7 | Change "Yeah" to "Yes" | Grammar |
| 227/4-5 | Change "cuz" to "because" | Grammar |
| 228/15 | Change "their" to "the" | Clarity |
| 232/12 | Change "in" to "an" | Typo |
| 234/2 | Change "kind of " to "tied to" | Clarity |
| 234/17 | Change "gonna" to "going to" | Grammar |
| 238/15 | Change "creditor's" to "creditors'" | Typo |
| 238/17 | Change "the" to "a" | Clarity |
| 244/12 | Change "covenant" to "consultant" | Clarity |
| 245/1 | Change "change" to "charge" | Typo |
| 254/10 | Change "gonna" to "going to" | Grammar |
| 254/23 | Change "waiving" to "waiting" | Typo |
| 255/5 | Change "gonna" to "going to" | Grammar |
| 260/9 | Change "change" to "charge" | Typo |
| 267/4 | Change "cuz" to "because" | Grammar |
| 267/9 | Change "Yeah" to "Yes" | Grammar |
| 267/18 | Change "490" to "495" | Checked Our Records |
| 268/15 | Change "either 400 or 420" to "410" | Checked Our Records |
| | Change "490" to "495" | Checked Our Records |
| 221/10 | Change "least" to "last" | Typo |
| 269/20 | Change "nineties" to "eighties" | Checked Our Records |
| 270/2 | Change "95" to "85" | Checked Our Records |

**Knittel Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## MARCELLA KNITTEL
*July 23, 2003*

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

KNITTEL, MARCELLA



**LEGALINK**

A **WORDWAVE** COMPANY

MARCELLA KNITTEL

Page 58

1    words or something, I might make some
2    suggestions or give the credit analyst more
3    information, but ultimately the credit analyst
4    was responsible for what they put into the
5    write-up.
6  Q.  Okay. But you would have had an understanding
7    of what it was based on your discussions with
8    them --
9  A.  Yes.
10 Q.  -- of what they were writing up?
11 A.  Yes.
12 Q.  Would you have approved of -- would you have to
13   approve what they wrote up?
14 A.  Yes.
15 Q.  Do you recall any instances where they wrote
16   something into their write-up that you didn't
17   agree with and then in turn submitted it to the
18   senior credit committee?
19 A.  Yes.
20 Q.  I mean --
21 A.  I mean that was common to have differing views
22   on how a certain piece of information might be
23   evaluated. Typically, typically we came to a
24   common understanding before the -- before it
25   went to senior credit committee, but there --

Page 59

1    there were places where we tended to disagree.
2  Q.  Would you have indicated that disagreement in
3    any way in the packages of information that
4    were submitted to the senior credit committee?
5  A.  More -- more in dialogue, in a question and
6    answer dialogue. If points were brought up
7    that I didn't agree with, I might say so in the
8    dialogue.
9  Q.  Were the disagreements that you recall about
10   how information was presented to the senior
11   credit committee limited to how information was
12   presented? Or let me rephrase that.
13     You mentioned you had some
14   disagreements from time to time with the credit
15   analysts as to information that went to the
16   senior credit committee, and was that limited
17   to how information was presented or do you
18   actually recall some instances where you
19   actually thought information that was presented
20   to the committee was incorrect?
21 A.  It's -- I would say -- the best way to
22   characterize this in terms -- it's not always
23   just information that's going to the senior
24   credit committee that we would either disagree
25   or agree on, and it's not really so much

Page 60

1    whether it's correct or incorrect, it's how you
2    would potentially interpret information or how
3    you would view, for instance, a change in the
4    financial statements, is this -- how good or
5    how bad is this. It's a matter of degree
6    typically, not a no, this is right or this is
7    wrong. It typically wasn't that black or
8    white.
9  Q.  So as to some of the attachments that were
10   attached to your report, you might have
11   disagreed with from time to time how
12   information was interpreted or presented?
13 A.  That's fair.
14 Q.  Do you recall any times where you actually
15   thought that the data that was submitted was
16   incorrect?
17 A.  No.
18 Q.  Before we take a break, the actual report that
19   had these attachments on it, was that authored
20   by you in most instances?
21 A.  The credit -- the credit -- the front part of
22   the credit offering memorandum was authored by
23   me.
24     MR. TERUYA:  Okay. Why don't we take
25   a break.

Page 61

1     MS. HACKETT:  Okay. Thank you.
2     THE VIDEOGRAPHER:  We are now going
3  off the record. The time is 10:04 a.m.
4      - - - -
5  (There was a recess in the proceedings.)
6      - - - -
7     THE VIDEOGRAPHER:  We are now going
8  back on the record. The time is now 10:17 a.m.
9     MR. TERUYA:  I'm going to mark as
10 Exhibit 1701 a document that appears to be a
11 credit agreement by and among Allegheny United
12 Hospitals, St. Christopher's Hospital For
13 Children, Horizon Medical Corporation, and PNC
14 Bank, National Association, dated January 6th,
15 1994, that has Bates Nos. PNC 38124 through
16 169.
17      - - - -
18 (Exhibit 1701 marked for identification.)
19      - - - -
20 BY MR. TERUYA:
21 Q.  I'll just ask you to take a look at the
22   document, and I was going to ask you if you
23   recognize it?
24      - - - -
25    (The witness reviewed the Exhibit.)

16 (Pages 58 to 61)