MARCELLA KNITTEL

Page 62

```
1              - - - -
2    A.   I don't recognize this actual document.
3    Q.   You recall that there was a credit agreement
4         between certain AHERF-related entities and PNC
5         Bank?
6    A.   Yes.
7    Q.   And do you recall that that was a line of
8         credit to --
9    A.   Yes.
10   Q.   -- the AHERF-related entities?  Just turning
11        for a second to the page with the Bates No. PNC
12        38159 in the bottom right corner, it's close to
13        the back of the document.  When you get there I
14        was -- I'm going to ask you do you see that
15        there's a signature page there?
16   A.   Yes.
17   Q.   Do you see that signing for PNC Bank there's
18        someone named Emery D. Holloway?
19   A.   Yes.
20   Q.   And was he a prior relationship manager for
21        AHERF or one its predecessors?
22   A.   Yes.
23   Q.   Let me just for simplicity's sake, when I
24        mention AHERF, is it okay for purposes of the
25        deposition today I mean AHERF or any of its
```

Page 63

```
1         predecessors?  I understand it went by
2         different names earlier in time.
3    A.   Yes.
4    Q.   Did you have any responsibility when you were
5         relationship manager for AHERF to monitor
6         AHERF's compliance or its affiliates'
7         compliance with this credit agreement?  Maybe
8         not this actual document, but your
9         understanding of the fact that there was a
10        credit agreement?
11   A.   Yes.
12   Q.   And what kind of responsibilities did you have
13        with respect to the credit that was extended by
14        PNC to AHERF's affiliates?
15   A.   For any -- for any credit agreement that PNC
16        had with any of the AHERF affiliates, it would
17        have been part of my responsibility to make
18        sure that they were in compliance with the
19        aspect -- any aspect of the credit agreement.
20   Q.   Do you know who typically prepared any -- or
21        were you involved in the preparation of any
22        credit agreements between PNC Bank and any
23        AHERF affiliates?
24   A.   When we approved credit while I was
25        relationship manager, I would have been one
```

Page 64

```
1         of -- one of those reviewing the credit
2         document, the credit agreements to make sure
3         that everything that we needed as far as
4         covenants and assurances and so forth was
5         included in the credit agreement, alongside
6         appropriate legal counsel.
7    Q.   Who would actually negotiate credit agreements
8         to the extent you were involved in preparing
9         them?
10   A.   Myself, plus our legal counsel.
11   Q.   And you said yourself and legal counsel would
12        be involved in the drafting process whereby the
13        credit agreements were ultimately prepared?
14   A.   That's right.
15   Q.   Turning for a second to the page with Bates No.
16        ending 38147, do you see on this page there's a
17        line that says, Financial and Other Reporting
18        Information, Quarterly Financials?
19   A.   Yes.
20   Q.   Do you recall that from time to time pursuant
21        to this credit agreement while you were
22        relationship manager, the United Hospitals, St.
23        Christopher's Hospital For Children, and
24        Horizon Medical Corporation provided to PNC
25        quarterly financial statements?
```

Page 65

```
1    A.   Yes.
2    Q.   And was one of your responsibilities to make
3         sure that these entities were actually
4         providing their financial statements, quarterly
5         financial statements on a timely basis?
6    A.   Yes.
7    Q.   And do you recall also that annual financial
8         statements were provided by those entities as
9         well?
10   A.   Yes.
11   Q.   And, again, your responsibility would be to
12        make sure they were coming in?
13   A.   Yes.
14   Q.   Do you recall whether AHERF itself, the parent
15        company, presented financial statements on a
16        quarterly basis to you under this credit
17        agreement?
18   A.   I don't recall.
19   Q.   Do you recall whether AHERF's credit in any way
20        backed this particular credit agreement?
21   A.   I don't remember.
22   Q.   If you turn to page ending with 38130, PNC
23        38130, which is near the front, do you see that
24        under the definition of guarantor --
25   A.   Yes.
```

17 (Pages 62 to 65)

MARCELLA KNITTEL

Page 290

1  Q.   And I take it that the senior loan committee,
2       by the fact that the bonds were issued,
3       ultimately felt that risk was one that it was
4       willing to take?
5  A.   By the fact it was approved as a credit, yes.
6            MR. TERUYA:  Why don't we go off the
7       record to change the tape and also break for
8       the day.
9            THE VIDEOGRAPHER:  We are now going
10      off the record.  The time is 5:02 p.m.
11
12      (The proceedings were adjourned at 5:02 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 292

1  COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
   COUNTY OF ALLEGHENY         )   S H E E T
2
3       I, Marcella Knittel, have read the foregoing
   pages of my deposition given on Wednesday, July 23,
   2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read         Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19            In all other respects, the transcript is true and
20      correct.
21      _____
              MARCELLA KNITTEL
22
        Subscribed and sworn to before me this
23      _____ day of _____, 2003.
24      _____
              Notary Public
25      AKF Reference No. HW76496

Page 291

1  COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3       I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  MARCELLA KNITTEL, was by me first duly sworn to
7  testify to the truth, the whole truth, and nothing
8  but the truth; that the foregoing deposition was
9  taken at the time and place stated herein; and that
10 the said deposition was recorded stenographically by
11 me and then reduced to printing under my direction,
12 and constitutes a true record of the testimony given
13 by said witness.
14      I further certify that I am not a relative or
15 employee of any of the parties, or a relative or
16 employee of either counsel, and that I am in no way
17 interested directly or indirectly in this action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19 and affixed my seal of office this 28th day of July,
20 2003.
21
22
23      _____
24            Notary Public
25

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *MARCELLA KNITTEL*
*July 24, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**KNITTEL, MARCELLA**



**LEGALINK**

A **WORDWAVE** COMPANY

MARCELLA KNITTEL

Page 490

1    Q.    To save time let me just ask, you recall as you
2          mentioned in the abstract but with reference to
3          this particular form of document, you recall
4          receiving documents like this in the ordinary
5          course?
6    A.    Yes.
7    Q.    And this in particular, just to go through this
8          example, this received stamp November 8, 1996,
9          does that indicate the date that some group at
10         PNC received this document?
11   A.    Yes.
12   Q.    And you received this type -- and would that be
13         true generally speaking of this form of
14         document?
15   A.    Yes.
16   Q.    And with respect to this form of document, did
17         you receive these documents, this form of
18         document within a reasonable amount of time
19         after it was supposed to be delivered to you?
20               MR. COGAN:  Objection.
21   A.    I don't -- I don't know what the -- this looks
22         like Joe Dionisio signed it on October 16th.  I
23         don't know what the requirement was, the number
24         of days, if it was 120 or --
25   Q.    Okay.  I'm sorry.

Page 491

1    A.    So it looks like it was within a reasonable
2          period of time.  I don't know if it complied
3          with the number of days that were required in
4          the indenture.
5    Q.    Let me restate it a different way.  Do you
6          recall that in the ordinary course AHERF or one
7          of its affiliates sent certificates like this
8          one to you pursuant to its obligations under
9          various credit agreements --
10   A.    Yes.
11   Q.    -- with PNC?
12   A.    Yes.
13   Q.    And do you recall that those officer's
14         certificates were delivered to you in a timely
15         fashion?
16   A.    To the best of my recollection, yes.
17   Q.    And that was as a practice?
18   A.    Yes.
19               MR. TERUYA:  You can set that
20         document aside.  Let me mark as Exhibit 1753 a
21         officer's certificate for Allegheny General
22         Hospital Obligated Group for June 30, 1996,
23         with Bates Nos. PNC 24549 through 52.
24               - - - -
25         (Exhibit 1753 marked for identification.)

Page 492

1                    - - - -
2    BY MR. TERUYA:
3    Q.    Do you recognize this document?
4    A.    Yes, this is another officer's certificate for
5          the AGH Obligated Group submitted by Joe
6          Dionisio to the bank, and it included covenant
7          calculations as required under the
8          reimbursement security agreement for the
9          letters of credit.
10   Q.    And is this a type of officer's certificate
11         that was sent from Allegheny General Hospital
12         Obligated Group to PNC in the ordinary course?
13   A.    Yes.
14   Q.    And that was pursuant to the letters of credit
15         that PNC entered into with Allegheny General
16         Hospital Obligated Group?
17   A.    Yes.
18   Q.    Just to be clear, the last exhibit we looked at
19         was the type of officer's certificate that was
20         sent pursuant to the master trust indenture in
21         the ordinary course?
22   A.    Yes.
23   Q.    And do you recall that you received the type of
24         officer's certificate that Exhibit 1753 is in a
25         timely fashion?

Page 493

1    A.    To the best --
2               MR. COGAN:  Objection.
3    A.    -- of my recollection, yes.
4    Q.    And, again, with respect to this kind of
5          officer's certificate, the stamp received
6          November 8, 1996, reflects the date that some
7          group at PNC received this document?
8    A.    Yes.
9               MR. TERUYA:  You can set that aside,
10         please.  Could we go off the record for one
11         moment.
12               THE VIDEOGRAPHER:  We are going off
13         the video record.  The time indicated on the
14         screen is 1:04 p.m.
15               - - - -
16         (There was a discussion off the record.)
17               - - - -
18               THE VIDEOGRAPHER:  We are back on the
19         video record.  The time as indicated on the
20         screen is 3:10 p.m.
21               MR. TERUYA:  I have no further
22         questions on direct.  I'll cover a couple of
23         documents that I'm waiting for on redirect.
24
25

51 (Pages 490 to 493)

MARCELLA KNITTEL

Page 494

1          - - - -
2          EXAMINATION
3          - - - -
4   BY MR. COGAN:
5   Q.   Good afternoon, Ms. Knittel. As you know, I
6        introduced myself on the record. My name is
7        Kevin Cogan, and I am appearing here today on
8        behalf of the Unsecured Creditors Committee.
9             I have some questions I'd like to ask
10       you, and hopefully we can keep this pretty
11       brief.
12            Towards the end of your direct
13       examination here, you were asked a series of
14       questions. One of those questions was do you
15       have any personal knowledge of GAAP violations
16       in the AHERF financial statements and the DVOG
17       financial statements. Do you recall that
18       question?
19  A.   Yes.
20  Q.   And as I understood your answer, you have no
21       personal knowledge of those financial
22       statements containing any GAAP violations; is
23       that right?
24  A.   That's right.
25  Q.   Now, if, in fact, there were GAAP violations in

Page 495

1        the financial statements of AHERF and DVOG, is
2        that information that you would have liked to
3        have had as the relationship manager for the
4        AHERF account?
5   A.   Absolutely.
6   Q.   And similarly, you were asked whether you had
7        any personal knowledge of any material
8        misstatements contained in those financial
9        statements. Do you recall that?
10  A.   Yes.
11  Q.   And, again, as you sit here today, I think your
12       testimony was you have no personal knowledge of
13       material misstatements in the financial
14       statements; is that right?
15  A.   That's right.
16  Q.   However, can I assume that if there were
17       material misstatements in the audited financial
18       statements that were provided to you and
19       thereby to PNC, you would have liked to have
20       known that fact?
21  A.   Yes, absolutely.
22  Q.   And why would you and, of course, PNC have
23       wanted to know whether the audited financial
24       statements that AHERF and its obligated group
25       were providing to you contained GAAP violations

Page 496

1        or material misstatements?
2             MR. TERUYA: Objection.
3   A.   Because -- because as lenders we place a great
4        deal of reliance on the audited financial
5        statements, and that's the receive -- that's
6        the reason we ask to have audited financial
7        statements on an annual basis.
8   Q.   Now, if the audited financial statements that
9        you were provided contained material
10       misstatements or GAAP violations and as a
11       result you didn't discover that there were, in
12       fact, debt covenant violations, would that be
13       of significance to you?
14  A.   Yes.
15            MR. TERUYA: Objection.
16  Q.   And if, in fact, there had been violations of
17       the various debt covenants that were contained
18       in the different credit agreements that you had
19       with AHERF and its affiliates, would you have
20       wanted to know about those violations?
21  A.   Absolutely.
22            MR. TERUYA: Objection.
23  Q.   And could you just tell us if, in fact, back in
24       1996 or 1996 you had learned of debt covenant
25       violations, would you or PNC have simply

Page 497

1        ignored those debt covenant violations?
2             MR. TERUYA: Objection.
3   A.   Absolutely not.
4   Q.   I assume it was never the practice of either
5        you as the relationship manager or in your
6        experience at PNC to simply ignore debt
7        covenant violations; is that right?
8             MR. TERUYA: Objection.
9   A.   That's correct.
10  Q.   Typically in the face of a debt covenant
11       violation, does that trigger some sort of
12       response from PNC?
13  A.   Yes.
14            MR. TERUYA: Objection.
15  Q.   And could you tell us typically, or not
16       typically, could you tell us what are some of
17       the things that a relationship manager might do
18       in the face of discovering debt covenant
19       violations?
20            MR. TERUYA: Objection.
21  A.   Well, the first thing we would -- as a
22       relationship manager I would have done was
23       taken it to my manager and to the appropriate
24       people who needed to know within PNC, and then
25       we would have done whatever was necessary to --

MARCELLA KNITTEL

Page 498

1    we would have discussed that violation with the
2    management of the company, whether it be AHERF
3    or any other company, and determine how we were
4    going to move forward at that point; and like
5    I've inside the past, that would be -- the
6    actions would have been taken -- the actions
7    that would have been taken would have been
8    determined by the circumstances at the time,
9    but certainly the knowledge of the violation
10   and the documentation of the violation gives us
11   the right to take certain actions.
12 Q.   And am I correct that when a debt violation
13   occurs, that may trigger some remedies
14   depending on the terms and conditions as they
15   are set forth in the credit agreements?
16       MR. TERUYA:  Objection.
17 A.   Absolutely.
18 Q.   Now, one of the documents that you were shown
19   towards the end here was a officer's
20   certificate dated June 30th, 1996, and it was
21   marked as Exhibit 1753.  Do you have that in
22   front of you?
23 A.   Yes.
24 Q.   And as I would understand it, Exhibit 1753 is
25   the officer's certificate that was provided by

Page 499

1    Allegheny General Hospital pursuant to the
2    letter of credit dated February 1, 1988, and
3    January 29, 1993; is that your understanding?
4 A.   Yes.
5 Q.   Now, one of the covenants that AGH was required
6    to maintain was a consolidated unrestricted
7    fund balance of at least $200 million; is that
8    right?
9 A.   That's correct.
10 Q.   Now, would you have wanted to know that -- or
11   would you have wanted to know if in calculating
12   that unrestricted fund balance Allegheny
13   General Hospital in 1996 and in 1997 was using
14   or including in the calculations loans to
15   affiliates?
16       MR. TERUYA:  Objection.
17 A.   Yes.
18 Q.   Did anybody ever bring to your attention that
19   in calculating the unrestricted fund balance
20   pursuant to the covenants contained in those
21   letters of credit of February 1988 and January
22   1993 that Allegheny General Hospital was, in
23   fact, including loans to affiliates in
24   calculating the unrestricted fund balance?
25       MR. TERUYA:  Objection, form and

Page 500

1    foundation.
2 A.   I don't ever remember a conversation about
3    that.
4 Q.   Two other exhibits I'd like to talk to you
5    about.  Exhibit 1739 and 1708, do you have
6    those in front of you?
7 A.   Yes.
8 Q.   Now, Exhibit 1708 as I understand --
9        MR. TERUYA:  Can you hold on for one
10   second.  Let me get those out.
11       MR. COGAN:  Yes.
12       MR. TERUYA:  Okay.
13 Q.   Just going back, can you think of any occasion
14   as you are sitting here that you learned of a
15   debt covenant violation for any credit for
16   which you had a relationship management that
17   you simply ignored the violation?
18 A.   Never.
19 Q.   Directing your attention now to Exhibit 1708,
20   do you have that in front of you?
21 A.   Yes.
22 Q.   I understand that this is one of the quarterly
23   credit memo forms that you completed for the
24   Allegheny General Hospital; is that right?
25 A.   Yes.

Page 501

1 Q.   And the date of this form that has been marked
2    as Exhibit 1708 is December 31st, 1995; is that
3    right?
4 A.   That's right.
5 Q.   Now, in section (a) of that form, and as
6    Mr. Teruya pointed out, nine of those 10
7    categories were down, performance categories;
8    is that right?
9 A.   That's right.
10 Q.   And yet when we go to section (b), you were
11   asked whether there had been any payment
12   delays, covenant violations -- well, let me
13   back up.
14       Going back to section (a) where we
15   have a performance that is down from the last
16   quarterly review in nine of those 10
17   categories, you were asked are you concerned
18   about these developments, are you not?
19 A.   Right, yes.
20 Q.   And your answer there was no?
21 A.   That's right.
22 Q.   Now, would I be correct that one of the reasons
23   that you were not concerned about those down
24   performances is because at least as of that
25   date there had been no delays on any payments

53 (Pages 498 to 501)

MARCELLA KNITTEL

Page 542

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY          )  SS:
3      I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  MARCELLA KNITTEL, was by me first duly sworn to
7  testify to the truth, the whole truth, and nothing
8  but the truth; that the foregoing deposition was
9  taken at the time and place stated herein; and that
10 the said deposition was recorded stenographically by
11 me and then reduced to printing under my direction,
12 and constitutes a true record of the testimony given
13 by said witness.
14     I further certify that I am not a relative or
15 employee of any of the parties, or a relative or
16 employee of either counsel, and that I am in no way
17 interested directly or indirectly in this action.
18     IN WITNESS WHEREOF, I have hereunto set my hand
19 and affixed my seal of office this 28th day of July,
20 2003.
21
22
23  _____
24          Notary Public
25

Page 543

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
   COUNTY OF ALLEGHENY           )  S H E E T
2
3      I, Marcella Knittel, have read the foregoing
   pages of my deposition given on Thursday, July 24,
   2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21  _____
           MARCELLA KNITTEL
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2003.
24 _____
           Notary Public
25 AKF Reference No. HW76522

**Korbly Dep.**

Ben Korbly

```
 1              UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                 Case No.  00-684
 3
 4   THE OFFICIAL COMMITTEE OF   :
     UNSECURED CREDITORS OF              Deposition of:
 5   ALLEGHENY HEALTH, EDUCATION :
     and RESEARCH FOUNDATION,           BEN B. KORBLY
 6                                :
              Plaintiff,
 7                                :
        vs.
 8                                :
     PRICEWATERHOUSECOOPERS, LLP,
 9                                :
              Defendants.
10   ---------------------------:
11
12        TRANSCRIPT of testimony as taken by and
13   before PATRICIA A. SANDS, a Shorthand Reporter
14   and Notary Public of the States of New York and New
15   Jersey, at the offices of CRAVATH, SWAINE & MOORE,
16   LLP, 825 Eighth Avenue, New York, New York on
17   Tuesday, December 16, 2003, commencing at 9:09 in
18   the forenoon.
19
20
21
22
23
24
25
```

Ben Korbly

Page 222

1    Q.    Did you have a role in preparing
2 either the cover memo or the attached document
3 headed "Issues for consideration - retention of
4 PricewaterhouseCoopers"?
5    A.    Yes.
6    Q.    And what was your role?
7    A.    I was one of the drafters.
8    Q.    And what was your purpose in
9 preparing the document?
10    A.    To present the issues for consideration of
11 the audit committee of AHERF, and why we thought it
12 made sense to continue the relationship with us.
13    Q.    And it was addressed from
14 Mr. Stalder to Mr. Dionisio, at least by way of
15 cover letter, dated August 26th, 1998?
16    A.    Yes.
17    Q.    And towards the end of the document
18 on the final page, under the heading "Why
19 PricewaterhouseCoopers is uniquely positioned to
20 assist," under the phrase "timing" or the bullet
21 point "timing" you are -- I presume Mr. Stalder was
22 the other participant in preparing the document?
23    A.    He was another participant in preparing the
24 document.
25    Q.    Were there others?

Page 223

1    A.    I believe there probably were.
2    Q.    Do you know who they were?
3    A.    Probably Mel. I would guess Erica Baird
4 looked at a draft of it.
5    Q.    At this time were you showing
6 Ms. Baird, or other counsel, communications with
7 AHERF in advance of their dispatch?
8    A.    At this time I think this is real
9 communication that I had with AHERF, so the answer
10 to that would be, yes.
11    Q.    And did you subsequently or after
12 this communication run communications by Ms. Baird
13 or other counsel first?
14    A.    Not all of them.
15    Q.    But significant communications you
16 did?
17    A.    You would use the word -- communications
18 regarding a significant and potentially
19 controversial topic. How's that?
20    Q.    Is that your phrase?
21    A.    That will be my phrase.
22    Q.    All right. And were there other
23 lawyers besides Ms. Baird that you ran
24 communications or other documents by during your
25 work on AHERF?

Page 224

1    A.    I believe there were.
2    Q.    And who were they?
3    A.    I think Frank Barron may have looked at
4 some things.
5    Q.    Do you recall what Mr. Barron looked
6 at?
7    A.    No.
8    Q.    Do you recall when he was first
9 involved in your work on AHERF?
10    A.    No.
11    Q.    But it was sometime in the late
12 summer to fall of 1998?
13    A.    It was before I visited with that group of
14 regulators, as well as before I visited with the
15 grand jury.
16    Q.    At least that early?
17    A.    I would understand that somewhere I came to
18 have an understanding that my firm may have been
19 contacted by the SEC or somebody on the topic of
20 AHERF. So, you know, that's an event that normally
21 gives you rise to talk to outside counsel.
22    Q.    Do you recall Mr. Barron or any
23 outside counsel being involved in communicating
24 with you about AHERF matters before your knowledge
25 of the SEC contact?

Page 225

1    A.    No.
2    Q.    Were there any other in-house or
3 PricewaterhouseCoopers-employed, with a hyphen
4 between those two words, lawyers that you
5 communicated with on AHERF matters, other than
6 Ms. Baird?
7    A.    Yes.
8    Q.    And who were they?
9    A.    It was probably -- I should say I believe I
10 could well have. Julie Crocket, who is a lawyer
11 who reports to Erica Baird and who is someone I
12 work with quite commonly. So --
13    Q.    Go ahead.
14    A.    More on the, you know, what makes the most
15 developing editorial sense of, you know, how do I
16 construct, how do I write, what do I say. Because
17 Erica might not have been available to answer the
18 phone or whatever.
19    Q.    As a matter of your practice, you
20 commonly work with this other lawyer as well?
21    A.    Yes.
22    Q.    And did so at the time?
23    A.    Yes.
24    Q.    And where are the two lawyers
25 situated by way of office, if you know?

57 (Pages 222 to 225)

Ben Korbly

Page 226

1    A.    1301 Sixth Avenue, New York.
2        Q.    And were they so situated in the
3    fall and summer of 1998?
4    A.    Actually, that's where they were the fall
5    of 1998. They have now moved down to 1177 Avenue
6    of the Americas.
7        Q.    Here in New York?
8    A.    Yes.
9        Q.    And do you believe that this
10   memorandum entitled "Issues for Consideration -
11   Retention of PricewaterhouseCoopers" fairly
12   presented the reasons for continuing to retain
13   PricewaterhouseCoopers for the work underway?
14   A.    You used the term "fairly presented,"
15   that's like just an English term, not a term of art
16   of an auditor?
17       Q.    I did not mean it as a term of art.
18   A.    Because I cannot respond as a term of art,
19   as a term of English, yes.
20       Q.    Thank you.
21       I'm going to hand you now what has
22   previously been marked in this case as Exhibit
23   2105, and ask you if you have ever seen it before?
24       It is, for the record, or at least
25   purports to be for the record, a set of Allegheny

Page 227

1    Health Education and Research Foundation finance
2    and audit committee minutes for the meeting held on
3    Thursday, August 27, 1998.
4    A.    I have seen the document, yes.
5        Q.    Do you recall when you saw it?
6    A.    Most recently, yesterday.
7        Q.    Did you see it before yesterday?
8    A.    I don't have a positive recollection.
9        Q.    It notes your presence at the
10   meeting under the heading "Other Invitees" along
11   with your colleague, Mr. Stalder.
12       Am I right?
13   A.    Yes.
14       Q.    Do you recall attending a meeting in
15   late August?
16   A.    Yes.
17       Q.    And it was indeed the first meeting
18   of the AHERF finance and audit committee, or any
19   AHERF board committee that you did attend?
20   A.    Yes.
21       Q.    And under heading IV on page 2, you
22   and Mr. Stalder appear by name after the name of
23   Joseph Dionisio, and under the subheading
24   "Potential Restatement of Prior Year Financial
25   Statements and Communication Plan."

Page 228

1        Is that fair?
2    A.    Under Roman numeral IV, item A?
3        Q.    Yes.
4    A.    Yes, there is reference.
5        Q.    Is the handwriting that appears on
6    either side of the paragraph below Roman numeral
7    IV A yours?
8    A.    No.
9        Q.    Is the handwriting on the rest of
10   the document, and it appears only limitedly, yours?
11   A.    The handwriting that appears only limitedly
12   is not mine.
13       Q.    In your prior review of the minutes
14   have you had any opportunity to notice anything
15   inaccurate in them?
16       MR. RYAN: Objection.
17   A.    Yes.
18       Q.    What is it that you have noticed?
19   A.    My name is misspelled.
20       Q.    Anything else?
21       MR. RYAN: Objection.
22   A.    I believe that if these are draft minutes
23   as it is marked at the top, I don't know who marked
24   "draft," then we would have reviewed them and
25   provided commentary on their accuracy. And without

Page 229

1    an opportunity to sit for several hours and read
2    and contemplate, I don't know what other redactions
3    we might suggest.
4        Q.    And you, in fact, recall either from
5    your work yesterday or just generally, that you did
6    have an opportunity or took an opportunity rather
7    to offer some comments on at least certain sets of
8    minutes of AHERF committee meetings?
9    A.    Yes, we did.
10       Q.    And was the "we" in that sentence,
11   in fact, you?
12   A.    Among others, it was me.
13       Q.    Was it a sort of a joint or
14   cumulative effort?
15   A.    Yes.
16       Q.    But it was communicated only one
17   time?
18   A.    Yes.
19       Q.    And by you?
20   A.    It may have been under my signature.
21       Q.    As we don't have time for the hours
22   of reflection, I will show you the communication of
23   suggested edits. And it is a document which falls
24   under the prior Exhibit number 1985.
25   A.    (Reviewing document.)

58 (Pages 226 to 229)

Ben Korbly

Page 230

1    Q.    Is this the set of minute, suggested
2  minute edits that you were just discussing with me?
3    A.    Yes.
4    Q.    And you did your best, with the
5  input of others, to give all of the edits to the
6  minutes that are attached to your letter of
7  November 20th, 1998 that you thought were
8  appropriate?
9        Is that fair?
10   A.    That's fair.
11   Q.    And the cover letter, which is
12 actually pages 2 and 3 of the exhibit, bears your
13 signature?
14   A.    No.
15   Q.    It is signed for you by someone
16 else?
17   A.    Yes.
18   Q.    And do you know who that someone
19 was?
20   A.    No.
21   Q.    Did you ever have occasion to,
22 including today, to disagree with its content?
23   A.    The letter's content?
24   Q.    Yes. Or the edits, for that matter.
25   A.    No.

Page 231

1    Q.    Did you authorize someone to sign it
2  on your behalf and dispatch it?
3    A.    Yes.
4    Q.    You just can't recall who it was; is
5  that right?
6    A.    That's correct.
7    Q.    Why did you take the opportunity to
8  send the suggested edits to the August 27, 1998,
9  September 1, 1998 finance and audit committee
10 minutes along with a set of edits on a March 11th,
11 1998 meeting?
12   A.    The latter two, August 27 to September 1,
13 1998 were the dates for meetings which I attended.
14   Q.    Yes.
15   A.    And someone had asked for our comments.
16   Q.    Do you know who had asked?
17   A.    I thought it was the chair.
18   Q.    Well, the reason I --
19   A.    Or we pro offered that we had comments, at
20 any rate, and they said they would appreciate our
21 input.
22   Q.    And the reason I ask is the cover
23 letter to Mr. Barnes from a set of lawyers
24 indicates that he doesn't quite know what to make
25 of it, that is your letter and proposed edits, and

Page 232

1  pass it along -- and that he passes it along to the
2  lawyers for their consideration, which led me to
3  think that he was not expecting the communication
4  from you.
5        Do you recall now whether you were
6  asked to provide edits, or whether you provided
7  them, as you say, in a proactive way?
8        MR. RYAN: Objection.
9    A.    I would tell you I would understand he was
10 expecting them, and I don't see how you can read
11 his letter uniquely to say what you've interpreted
12 it to say.
13   Q.    Well, I don't know that I have
14 interpreted it to say anything other than what it
15 says, which was my paraphrase of it.
16   A.    It doesn't say I'm surprised to receive it.
17 I believe it says I don't quite know what to make
18 of it.
19   Q.    Right. Here's my question:
20       Do you recall being asked to submit
21 edits on any committee meeting, edits on the
22 minutes of any committee meeting?
23   A.    Yes.
24   Q.    And from whom did you receive that
25 request?

Page 233

1    A.    As it states in my letter to David Barnes,
2  "You indicated you would appreciate our input."
3    Q.    And so you recall a conversation
4  with Mr. Barnes today, or is it just you're relying
5  on the written document?
6    A.    I don't know that it was a conversation as
7  much as it was a meeting with the audit committee.
8    Q.    Do you recall the meeting or what,
9  the conversation in the meeting?
10   A.    No.
11   Q.    Had you ever in your audit practice
12 before provided comments on minutes that you
13 attended?
14   A.    Yes.
15   Q.    To audit committees?
16   A.    Without fail.
17   Q.    All right.
18   A.    It's a required practice.
19   Q.    And --
20   A.    If there's information that is or can be
21 materially misinterpreted, you have a professional
22 responsibility to attempt to have the record
23 redacted.
24   Q.    And that's why you did it here?
25   A.    Yes.

59 (Pages 230 to 233)

Ben Korbly

Page 258

1   We never agreed with that.  They were immaterial,
2   so there wasn't the generally accepted accounting
3   principles for those transactions changed during
4   that era, and did require that they be put on the
5   books.
6           But, technically speaking, they were
7   not violating accounting rules by not presenting
8   them on the books.  They were violating rules of
9   forthrightness with the auditor by not telling them
10  about the plans.
11          The third item had to do with the
12  ninety-nine.  And as we left the party, it was
13  unsubstantiated that the adjustment that Joe
14  proposed in 1996 belong there.
15  Q.    What adjustment was that?
16  A.    He was proposing some bifurcation of the
17  ninety-nine that went back against the -- he was
18  proposing some bifurcation of the $99 million so
19  that some of it went back to the June 30th of 1996
20  accounts, some went to the June of '97.  We had no
21  evidence that supported his argument for '96.  So I
22  don't think we ever brought that to resolution
23  either.
24  Q.    Was it your conclusion, however,
25  that at least the '97 financial statements needed

Page 259

1   to be restated for some portion of the ninety-nine,
2   if the other issues could be resolved, that is the
3   Lockhart issue?
4   A.    No.
5   Q.    And why is that?
6   A.    Materiality was an assessment that would
7   have to have been made.
8   Q.    And you didn't make it?
9   A.    We didn't have the numbers in which to make
10  it, because you have to have all of the preliminary
11  numbers.
12  Q.    And is it fair to say, then, that
13  the work just wasn't completed that would allow you
14  to make the determination?
15  A.    The client did not do the things necessary
16  to facilitate supporting their own assertion of
17  restatement and to support our auditing it.
18  Q.    At least at the time you were
19  separating from your work on the matter?
20  A.    Yes.
21          MR. JONES:  Let's take a quick break
22  here.
23          THE VIDEO OPERATOR:  Going off the
24  record at 3:43 p.m.
25          (Recess, 3:43 to 3:47.)

Page 260

1           THE VIDEO OPERATOR:  We are back on
2   the record at 3:47 p.m.
3   BY MR. JONES:
4   Q.    Mr. Korbly, I hand you now what has
5   been marked as Exhibit 1289 in these proceedings,
6   which is a copy of a memo from Anthony Sanzo to
7   various, apparently lists of individuals at AHERF
8   dated September 2, 1998 attaching a press release
9   for immediate release with a contact person with
10  the name of Thomas Chakurda.
11          Have I described the exhibit
12  accurately?
13  A.    Yeah, yes.
14  Q.    And is this a copy, that is page 2
15  of the document, a copy of the press release to
16  which you were referring before we took our last
17  break?
18  A.    Yes.
19  Q.    And this is the press release in
20  final form, to the best of your recollection, that
21  PricewaterhouseCoopers approved for release?
22          MR. RYAN:  Objection.
23  A.    We -- I don't think we had the authority to
24  approve it for release.  I think our role was we
25  agreed with how we were being described in it.

Page 261

1   Q.    And how did you communicate that
2   agreement?
3   A.    We talked to Joe, or whomever.
4   Q.    And when you say the "we", you mean
5   the phrase that refers to PricewaterhouseCoopers in
6   or about the third line of the press release?
7   A.    And what follows that.  You know, one of
8   the points, the only time you see the word
9   "restatement" is you see "considers restatement",
10  and the signal then in the body of the memo is
11  that, they, AHERF believes their financial
12  statements may require revision.
13  Q.    And I guess I'm trying to do this
14  fairly straightforwardly.  In any event, you saw
15  personally a copy of this press release with this
16  text before it went out, and voiced to those
17  sending it out that you had no objection to the way
18  PricewaterhouseCoopers was presented in the press
19  release?
20          Is that fair?
21  A.    That's fine.
22  Q.    And including Price Waterhouse's
23  role with respect to anything said in the press
24  release?
25          Is that accurate?

66 (Pages 258 to 261)

Ben Korbly

Page 262

1   A.    Including whatever you just said.
2        Q.    Well, what I mean is you saw it
3   before it went out and you didn't have any problem
4   with the way PricewaterhouseCoopers's role in the
5   no reliance statement that exists here -- let me
6   try that again.
7        What I mean to say is you saw the
8   statement before it went out, and you had no
9   problem with the way PricewaterhouseCoopers's work
10  or role with respect to the potential restatement
11  or the no reliance on the financial statements that
12  was being announced here?
13       Is that fair?
14       MR. RYAN:    Objection.
15  A.    It's neither fair nor accurate.
16       Q.    All right.    When you say you
17  agree --
18  A.    Can I perhaps tell you what I think I did?
19       Q.    Well, let's try it this way:
20       First, break it down.    Did you see
21  the draft before it went out with this text?
22  A.    I saw numerous drafts.
23       Q.    And you saw the final draft before
24  it went out?
25  A.    I believe so.

Page 263

1        Q.    And you communicated that from Price
2   Waterhouse's perspective, it was okay to
3   disseminate?
4        Is that fair?
5   A.    Yes.
6        Q.    And now can you tell me what you
7   think you were doing by communicating that was
8   okay?
9   A.    We could live with the press release after
10  working long hours and days with too many lawyers
11  and accountants on the phone wordsmithing words
12  that were about fifty words trying to get people to
13  understand concepts of responsibility, and how they
14  could or couldn't do things to the market.
15       So we end up with these words which
16  are tolerable, acceptable, whatever phraseology you
17  want.    I'm not saying that what's in here is wrong.
18  One of the fundamental questions was is it better
19  or not better to do this, for which there is still
20  some substantial doubt about the answer to that.
21       Q.    But what you're telling me is that
22  you okayed the ultimate language as at least
23  accurate?
24  A.    No, what I'm telling me is when your
25  client elects to withdraw their financial

Page 264

1   statements, which they can do at will without any
2   consultation with the auditor, very rare is the
3   auditor who would leave their opinion out on the
4   street if the client withdraws their financial
5   statements.
6        Our counsel to this client was
7   different.    Our counsel to this client was
8   accelerate your efforts, resolve these issues, come
9   to a conclusion on restatement, and then go.    And
10  we stuck with that counsel until they had burned
11  much time up.
12       Q.    Let me get back to my question.
13  A.    My point is there was a terrible sense of
14  compromise in here that you're kind of asking me to
15  say this is accurate.    I mean, I did not -- I
16  agreed that they could go to market with this and
17  it was acceptable to me.
18       Was it accurate?    Was it the best
19  answer?    Was it the right way to go?    There's a
20  awful lot of questions that don't jump into
21  accurate.    So I can't agree that this accurate.
22       Q.    Is there anything in here, in this
23  press release, that you believed, then, in
24  September 1998, was wrong?
25  A.    No.

Page 265

1        Q.    And you ultimately withdrew your
2   opinion on the fiscal year 1997 AHERF financial
3   statements, that is PricewaterhouseCoopers did?
4   A.    "No further reliance should be placed on
5   the financial statements or the Coopers & Lybrand
6   report thereon."
7        Q.    Was there -- and you're quoting the
8   press release?
9   A.    Yes.
10       Q.    Was there any other formal way in
11  which you withdraw your opinion?
12  A.    I believe that copies of this document were
13  furnished by the company to various places to
14  substantiate and accomplish notice.
15       Q.    Do you know?
16  A.    But there is no -- the formal process,
17  typically for a public company, this is not what,
18  you know, would result in a press release being
19  filed within the EDGAR system for public companies.
20  The SEC database system.
21       For this entity, I know copies of
22  this release were filed with the NRMSIR, so that
23  the bond holders would be aware that the financials
24  and the opinion had been pulled.    NRMSIR is
25  something like N-M-R-S-I-R and I've got five out of

67 (Pages 262 to 265)

Ben Korbly

Page 274

1   fraud or the SAS 82 implications of your work with
2   anybody at AHERF or the audit committee?
3   A.    In one of my early, if not my earliest
4   meetings with Joe.
5       Q.    What about the audit committee?
6   A.    Well, it was my understanding that it was
7   identified to them in executive session, and not
8   the SAS 82 word, but the improper or inappropriate
9   actions of management at the June 10th meeting.
10  And I will defer to others who were there for who
11  said what to whom.
12      Q.    And you learned that, however,
13  through conversations with Mr. Testoni or Mr.
14  Buettner?
15  A.    Or Amy.
16      Q.    All right.
17  A.    I, at our meeting on the 27th signaled to
18  the audit committee that they had a SAS 82 issue
19  that they needed to consider and put on their plate
20  and deal with.
21      Q.    How did you signal that?
22  A.    I said there is a SAS 82 issue here, which
23  the audit committee needs to address.
24      Q.    In the meeting?
25  A.    Yeah, the August 27th meeting.  I repeated

Page 275

1   that September 1, and we then sent a draft letter
2   to the chairman September 8th because we weren't
3   getting a lot of I hear you, this is really ugly,
4   kind of stuff.
5       Q.    So these edits are your suggestions
6   on the document.  Do you recall now what you were
7   editing?  Do you recall that you were editing a
8   proposed press release or some other document?
9   A.    I --
10      Q.    This is back to Exhibit 4149.
11  A.    I believe it was a briefing document of the
12  four points that went by Joe to the audit committee
13  on what were the issues that he was framing, or
14  trying to do some points on what were the issues
15  that he was framing about restatement.
16      Q.    All right.
17  A.    And as we went through the fact pattern
18  that you really don't have the facts to assert the
19  restatement yet, you're showing more of a
20  conclusion than exists.
21      Q.    I'm going to ask you to read in the
22  handwriting that you put at the bottom of the page,
23  and after the inserted parenthetical.  It looks to
24  me like it starts with SLB, but I can't really read
25  it.

Page 276

1   A.    "Dollars, $28,300,000 was related to --"
2       Q.    Or released?
3   A.    "Released to income as an increase in
4   patient revenue (to offset DVOG charge)."
5       Q.    And then the next sentence?
6   A.    "The balance of 71 million --" I don't
7   think there is a dollar sign, but the balance of
8   the 71 "remained on the balance sheet of DVOG at
9   year end in the form of patient receivable
10  reserves.  Further investigation is needed to --"
11      And then, you know, my editorial
12  was, you know, describe it how you want to, but
13  further investigation was needed to resolve it.
14      Q.    So, in other words, the handwriting
15  stops with the word "to" and then you were going to
16  voice other edits to Mr. Dionisio or whomever
17  drafted the document?
18  A.    Yes.
19      Q.    You have before you now
20  Exhibit 4150?
21  A.    Yes.
22      Q.    It appears to reorder some of the
23  points and perhaps take some edits, either yours or
24  that of others.
25      Do recall ever requesting that the

Page 277

1   order of the issues be changed?
2   A.    Yes.
3       Q.    And why is it that you requested
4   that and to whom did you make the request?
5   A.    It was communicated to AHERF.  The concept
6   was the first three items are issues about a
7   potential area of restatement.  The fourth item is
8   an issue about a potential area of revision.  So I
9   think the header now says potential areas of
10  revision, which is, therefore, I guess, deemed to
11  incorporate restatement or otherwise.
12      Q.    I see.  And you're referring to the
13  first three items and the forth item on Exhibit
14  4150 when you make those comments?
15  A.    Yes.
16      Q.    And the last exhibit is 4151 in this
17  set, which is a fax cover sheet from Mr. Stalder to
18  Mr. Dionisio dated the same date as the press
19  release, September 2, 1998.  And it reads on its
20  cover sheet:
21      "Joe:  As requested, I have marked
22  up the proposed press release to reflect matters
23  agreed to in our most recent conversation.  I
24  acknowledge your need to balance our input from all
25  of the other parties involved, but I seriously hope

70 (Pages 274 to 277)

Ben Korbly

Page 278

1  that you will consider our proposed changes."
2        Have I read that right?
3  A.    I think so.
4        Q.    And you were shown as a blind carbon
5  copy. Do you recall receiving this fax and its
6  attachment?
7  A.    No.
8        Q.    Do you have any doubt that you got
9  it?
10 A.    Not really, no. I mean, I --
11       Q.    Do you recall that the press release
12 was being worked in draft form even the day it was
13 released?
14 A.    I don't recall it, but that wouldn't
15 surprise me about a press release of this nature.
16       Q.    Is the handwriting on the next two
17 pages yours, or any of it?
18 A.    No.
19       Q.    Do you know whose it is?
20 A.    No.
21       Q.    Do you have any recollection now of
22 why the press release would have had, in any of its
23 iteration, the page number 30 beneath it or at the
24 bottom of it?
25 A.    No.

Page 279

1        Q.    Do you recall it being a large part
2  of some other document that you saw, or a small
3  part of some other large document that you saw?
4  A.    No.
5        Q.    Do you recognize the handwriting?
6  A.    No.
7        Q.    Do you recall who else had input
8  besides Coopers & Lybrand -- I'm sorry,
9  PricewaterhouseCoopers and AHERF, into the press
10 release?
11       And the reason I ask is Mr. Stalder
12 appears to refer to others in his fax cover sheet.
13 A.    No, I do not recall.
14       Q.    I'm handing you now, Mr. Korbly,
15 Exhibit 2063 which has been previously marked in
16 the case. And I believe you will tell me, instead
17 of the Tuesday September 1, 1998 minutes of the
18 finance and audit committee of AHERF, a meeting you
19 attended; am I right?
20 A.    Yes, I attended the meeting and yes, this
21 appears to be minutes of that meeting.
22       Q.    Did you see these minutes yesterday?
23 A.    Yes.
24       Q.    And you saw them at some prior time
25 because you commented on them?

Page 280

1  A.    Yes.
2        Q.    And here we see, on page two of the
3  exhibit, a series of descriptions of the four
4  issues of potential restatement, some of which
5  language, or the language of which may be similar
6  to what we just saw in the prior set of exhibits.
7        Am I right?
8  A.    I'm sorry, you are going to have to ask
9  your question again. I didn't understand it.
10       Q.    Stated in the minutes, under
11 subheading Roman numeral IV(a) are four issues of
12 potential restatement that were apparently
13 discussed, some of the language of which is not
14 dissimilar from the exhibits we just saw.
15       Am I right?
16 A.    Yes.
17       Q.    Does that jog your recollection that
18 in part, perhaps, that Exhibits 4148 through 4150
19 were prepared and commented upon by you. Prepared
20 by, and perhaps others and commented upon by you
21 for submission to the board as potential areas of
22 restatement?
23       MR. RYAN:  Objection. I think the
24 witness has already said that.
25       MR. JONES:  Well, if he has he can

Page 281

1  say yes.
2        MR. RYAN:  I'm just saying that the
3  document doesn't refresh his recollection if he's
4  already testified to it independently.
5        MR. JONES:  I'm not sure that's the
6  state of the testimony.
7        Q.    Let me ask you a real simple one.
8        Looking at the minutes that are
9  before you as Exhibit 2063, and having just seen
10 Exhibits 4148 through 4150, do you have a
11 recollection today as to whether these exhibits
12 were commented on by you and others in an attempt
13 to come up with issues of potential restatement to
14 be visited with, or to be visited about with the
15 board?
16       MR. RYAN:  Objection to form.
17       Q.    Or the audit committee or finance
18 committee?
19 A.    Well, I provided comments because my
20 handwriting is on a number of these. Similar
21 wording is in here. And what the uses were that
22 Joe Dionisio had, you know, if you asked me is it
23 logical to assume one of them or the primary one
24 was to put something in here, yes.
25       If you are asking me if I am happy

71 (Pages 278 to 281)

DEPOSITION ERRATA SHEET

RE:    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
       ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
       VS. PRICEWATERHOUSECOOPERS, L.L.P.


I, Ben Korbly, wish to make the following amendments, additions, deletions or
corrections to my deposition given on December 16, 2003, for the following reasons. I
have signed my name to the errata sheet and authorize you to attach it to the original
transcript.

| Page/Line # | Amendment | Reason for Change |
|---|---|---|
| 3:11; 46:22; 73:23; 143:6, 161:21; 170:19; 187:3; 202:15; 239:23; 240:21,23,24; 303:24; 304:9; 324:2; 350:3 | "PWC" should read "PwC" | Clarification |
| 22:22; 44:5,6 | "GASS" should read "GAAS" | Error |
| 48:10 | "insurance" should read "assurance" | Error |
| 68:23-4 | First sentence should read, "I learned from Amy that she had received it." | Clarification |
| 75:10 | "payer" should read "payor" | Error |
| 82: 11,12,17,22; 97:17; 98:13; 99:15; 105:21; 115:17; 117:7; 119:12; 120:2; 136:4; 199:15 | "Cipielik" should read "Cepielik" | Error |

| | | |
|---|---|---|
| 98:2 | "an" should read "and" | Error |
| 113:23,25; 134:12,25; 135:16; 136:6; 137:5,25; 140:17; 142:9; 143:18: 173:18,22; 197:3; 330:18 | "Kirsteen" should read "Kirstein" | Error |
| 126:21 | "not" should read "now" | Error |
| 147:18 | Insert "to" between "going" and "get" | Clarification |
| 167:1 | "technicality" should read "technically" | Clarification |
| 172:7 | "Sharif" should read "Sherif" | Error |
| 181:5 | "what" should read "that" | Error |
| 189:4 | "Mike K." should read "Mike M." | Clarification |
| 191:21 | Insert "had" between "Amy" and "been" | Clarification |
| 195:6 | "negotiation" should read "negotiate" | Clarification |
| 198:15 | "Adamzik" should read "Adamczak" | Error |
| 246:16-18 | Answer should read, "Bullet one, 'Why the June 98 audit committee meeting not minuted?'" | Clarification |
| 286:23 | "I don't" should read "I didn't" | Clarification |
| 350:6-7 | Answer should read, "I don't know that I have, but I believe I did." | Clarification |
| 350:21 | Insert "was" between "I" and "talking" | Clarification |
| 356:13 | Insert "not" between "is" and "different" | Error |
| 356:23 | "Graduate" not "graduate" | Error |

In all other respects, the transcript is true and correct.

_____
Signature

Subscribed and sworn to before me this ___10th___ day of ___February___, 2003.4

_____
Notary Public

File/Reference Number: 7472

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Portia Drake, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Nov. 4, 2007
Member, Pennsylvania Association Of Notaries

**Korman Dep.**

BERNARD J. KORMAN, ESQ.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3                          -   -   -
 4   THE OFFICIAL COMMITTEE OF  : CIVIL ACTION
     UNSECURED CREDITORS OF      :
 5   ALLEGHENY HEALTH,           :
     EDUCATION, AND RESEARCH     :
 6   Foundation                  :
                                 :
 7           vs.                 :
                                 :
 8   PRICEWATERHOUSE COOPERS,    : CASE NO.
     LLP                         : 00-684 (W.D.Pa.)
 9
                            -   -   -
10
                     Philadelphia, Pennsylvania
11               Wednesday, August 28, 2002
12                          -   -   -
13
14                   Videotape Deposition of BERNARD J.
15   KORMAN, ESQ., taken pursuant to notice, at the law
16   offices of Pelino & Lentz, One Liberty Place, 32nd
17   Floor, on the above date, beginning at
18   approximately 8:32 a.m., before Debra Ann
19   Whitehead, a Court Reporter, an Approved Reporter
20   of the United States District Court, and Notary
21   Public.
22                          -   -   -
23
24
25
```

MANHATTAN REPORTING CORP., a LegaLink Company

BERNARD J. KORMAN, ESQ.

Page 6

1  the possible closing of Graduate Hospital.    08:35:43
2  Q.   What experience or expertise did you have    08:35:49
3  prior to that time that led the University of    08:35:51
4  Pennsylvania to consult with you on that topic, if    08:35:56
5  you know?    08:35:58
6  A.   I was the CEO of a public hospital management    08:35:59
7  company, and I have had specifically previous    08:36:04
8  experience with the closing of Mercy Douglas    08:36:09
9  Hospital in Philadelphia.    08:36:12
10 Q.   What was the name of the hospital management    08:36:13
11 company of which you were CEO prior to 1975?    08:36:15
12 A.   American Medicorp, M-E-D-I-C-O-R-P.    08:36:18
13 Q.   And during what period of time were you CEO of    08:36:22
14 American Medicorp?    08:36:25
15 A.   From 1968 to 1976, I believe.    08:36:28
16 Q.   And after 1976, did you continue any    08:36:33
17 association with American Medicorp?    08:36:37
18 A.   Until the end of '76, I believe.    08:36:41
19 Q.   Now, you provided consulting services to the    08:36:48
20 University of Pennsylvania after 1975 relating to    08:36:53
21 The Graduate Hospital; correct?    08:36:58
22 A.   Yes.    08:36:59
23 Q.   And is it correct that in 1977, rather than    08:37:01
24 closing The Graduate Hospital, the University of    08:37:06
25 Pennsylvania spun it off as an independent entity?    08:37:09

Page 8

1       But attention, yes.    08:38:33
2  Q.   Did you consider it part of your    08:38:39
3  responsibility as a Graduate Board member to keep    08:38:41
4  yourself well informed about financial performance    08:38:44
5  of The Graduate Hospital and related entities?    08:38:54
6  A.   I considered -- I took my fiduciary duties as    08:38:57
7  a director very seriously, and I believe that I    08:39:02
8  exercised all appropriate judgments in that regard.    08:39:06
9  Q.   Mr. Korman, that's a legal conclusion.  I am    08:39:21
10 going to try not to ask you much about legal    08:39:24
11 conclusions today.    08:39:26
12      Let me ask --    08:39:27
13 A.   I apologize.  That's my impediment having    08:39:28
14 practiced law.    08:39:32
15 Q.   I understand that.  It damages all of us    08:39:32
16 permanently.    08:39:34
17 A.   Yes.    08:39:35
18 Q.   On a more practical level, did you, on an    08:39:36
19 ongoing basis as a Trustee of Graduate, consider it    08:39:41
20 part of your responsibility to keep yourself well    08:39:45
21 informed about the business performance of The    08:39:47
22 Graduate Hospital?    08:39:51
23 A.   Yes; yes.    08:39:51
24 Q.   And did you consider it part of your    08:39:53
25 responsibility to keep yourself well informed about    08:39:56

Page 7

1  A.   Yes.    08:37:12
2  Q.   And did you have anything to do with devising    08:37:13
3  the strategy that led to that spin-off rather than    08:37:19
4  closure of Graduate?    08:37:21
5  A.   Yes.    08:37:22
6  Q.   Were you in fact the one principally    08:37:26
7  responsible for developing that strategy?    08:37:30
8  A.   It was my plan, yes.    08:37:32
9  Q.   And am I correct that when that spin-off    08:37:36
10 became effective, that you, from the start, were a    08:37:41
11 member of the Board of Trustees of Graduate    08:37:44
12 Hospital?    08:37:48
13 A.   Board of Directors.    08:37:48
14 Q.   Pardon me.    08:37:51
15      Is that correct?    08:37:53
16 A.   That's correct.    08:37:54
17 Q.   And is it the case that from at least 1977    08:37:57
18 onward, up until the time that The Graduate    08:38:00
19 Hospital and associated hospitals were merged into    08:38:08
20 SDN, that throughout that entire time period, you    08:38:11
21 paid close attention to the business and strategy    08:38:17
22 of The Graduate Hospital?    08:38:21
23 A.   Attention.  I don't know that I would agree    08:38:25
24 with "close."  I don't know what you mean by    08:38:33
25 "close."    08:38:33

Page 9

1  developments affecting the health care industry    08:40:02
2  generally?    08:40:05
3  A.   I did; not only because of Graduate, but    08:40:07
4  because of my professional activity.    08:40:10
5  Q.   When Graduate became an independent entity in    08:40:18
6  1977, who became the first chief executive officer?    08:40:22
7  A.   Paul Skofield -- of Graduate Hospital?    08:40:28
8  Q.   Yes.    08:40:30
9  A.   Paul Skofield.    08:40:31
10 Q.   At the time of the divestiture of Graduate in    08:40:32
11 1977, was there created an independent parent    08:40:36
12 entity either called or as a predecessor to GHS?    08:40:41
13 A.   I don't recall.  I believe that the only    08:40:51
14 entity that was created was The Graduate Hospital.    08:40:56
15 I believe that's the case.    08:41:01
16 Q.   And at the time of the divestiture in 1977,    08:41:04
17 who became the first Chairman of The Graduate    08:41:09
18 Hospital?    08:41:12
19 A.   I -- it's not clear.  The first chairman, I    08:41:21
20 believe, was Harold Cramer, I believe.    08:41:26
21      There may have been somebody prior    08:41:29
22 to Harold during some interim period, but I believe    08:41:30
23 Harold was the first chairman.    08:41:34
24 Q.   And to summarize points that we will touch on    08:41:38
25 in more detail later, am I correct that you became    08:41:40

3 (Pages 6 to 9)

BERNARD J. KORMAN, ESQ.

Page 10

1  Chairman of the Board of GHS in 1995?        08:41:43
2  A.  Of the Graduate Health System.        08:41:48
3  Q.  Yes.                08:41:51
4  A.  As distinguished from Graduate Hospital.        08:41:51
5  Q.  Yes.                08:41:54
6  A.  That's correct.            08:41:54
7  Q.  Do you recall when the structure of GHS as    08:41:56
8  parent owning The Graduate Hospital was created?    08:42:03
9  A.  I don't recall the date.        08:42:09
10  Q.  Do you recall what the immediate cause of the  08:42:13
11  creation of that structure was?        08:42:18
12  A.  Well, it was part of a corporate        08:42:22
13  reorganization, which I believe was stimulated by a  08:42:25
14  number of activities other than Graduate Hospital  08:42:33
15  that we were getting involved in.        08:42:38
16      And upon the recommendation of        08:42:41
17  counsel, we created GHS as a parent holding    08:42:43
18  company, support organization.  I think it was a  08:42:53
19  501(c)(4), I think that's what it was.        08:42:58
20  Q.  Do you recall approximately when that    08:42:59
21  happened?                08:43:00
22  A.  My sense is early '80s.  That's my sense.    08:43:03
23  Q.  And after that time, did there continue to    08:43:09
24  exist a Board of Directors of The Graduate    08:43:10
25  Hospital?                08:43:14

Page 11

1  A.  Oh, yes.                08:43:14
2  Q.  And did you continue to be a member of that    08:43:16
3  Board?                08:43:18
4  A.  It's not clear to me whether there was some    08:43:25
5  overlap period of time.            08:43:32
6      I know that I resigned from that    08:43:34
7  Board and remained on the Board of the parent.  I  08:43:38
8  don't recall whether there was some overlap period  08:43:43
9  of time.                08:43:45
10  Q.  But, if so, it was not an extended period of  08:43:46
11  time?                08:43:48
12  A.  I don't believe so.            08:43:49
13  Q.  And did you become a member of the Board of  08:43:50
14  Directors of GHS at the time GHS was formed?    08:43:52
15  A.  Yes.                08:43:56
16  Q.  And am I correct that in 1996, upon the    08:44:01
17  conclusion of the merger of The Graduate Hospital  08:44:04
18  and other affiliated hospitals into SDN, that you  08:44:07
19  became CEO of Graduate Health Services?        08:44:12
20  A.  I became CEO of Graduate Health Services,    08:44:18
21  which I believe at that time the charter was    08:44:21
22  amended and the name was changed to Philadelphia    08:44:27
23  Health Care Trust.            08:44:32
24  Q.  The name change, as far as you recall,    08:44:32
25  happened essentially concurrently with that    08:44:35

Page 12

1  transaction?                08:44:37
2  A.  Or shortly thereafter.        08:44:38
3  Q.  Upon the completion of the SDN transaction,    08:44:41
4  did Philadelphia Health Care Trust, or Graduate    08:44:47
5  Health Systems, whatever its title was, continue to  08:44:52
6  own any operating health care entities?        08:44:56
7  A.  No.                08:45:03
8  Q.  As a Board member and chairman -- well, let me  08:45:23
9  start again.                08:45:27
10      As chairman of GHS between 1995 and    08:45:28
11  1996, can you tell me what your total compensation  08:45:33
12  from GHS was?  This is prior to the time that you  08:45:39
13  became CEO.                08:45:42
14  A.  Prior to becoming CEO, I think my total    08:45:50
15  compensation was as a director.        08:45:54
16  Q.  And can you tell me roughly what that was on  08:45:56
17  an annual basis, including base and meeting fees?  08:45:59
18  A.  I believe it was a total of $25,000.    08:46:04
19  Q.  And upon taking the position of CEO of GHS,    08:46:09
20  did you also remain Chairman of the Board of GHS?  08:46:15
21  A.  Yes; I was chairman and CEO.        08:46:25
22  Q.  And in that capacity, can you tell me roughly  08:46:25
23  what your annual compensation from GHS or    08:46:26
24  Philadelphia Health Care Trust was?        08:46:30
25  A.  My salary, which I believe at that time was    08:46:34

Page 13

1  $100,000, and director's fees.        08:46:37
2  Q.  Again, continuing to be approximately 25,000?  08:46:41
3  A.  That's correct.            08:46:43
4  Q.  At that time, that is, when you took the    08:46:45
5  position as CEO of GHS, what other employment    08:46:51
6  positions, if any, did you hold with other    08:46:59
7  entities?                08:47:02
8  A.  I don't believe I had any other employment    08:47:13
9  activity.                08:47:15
10  Q.  Were you at that time not CEO of any other    08:47:19
11  entity?                08:47:21
12  A.  In 1996, no.            08:47:23
13  Q.  Am I correct, however, that you were a Board    08:47:27
14  member of a number of other entities at that time?  08:47:30
15  A.  I was.                08:47:33
16  Q.  Let me show you a document that was marked at  08:47:47
17  your deposition in the prior litigation, an    08:47:50
18  incomplete document bearing Bates Nos. 1542 through  08:47:57
19  1546, and a handwritten designation of Korman    08:48:03
20  Exhibit 9.  It is difficult to describe because of  08:48:09
21  its fragmentary nature.            08:48:14
22      And, Mr. Korman, I am not going to    08:48:31
23  ask you to vouch for this document.  I have read    08:48:33
24  your prior testimony about it.  But I am going to    08:48:35
25  use it just as a springboard to ask some questions  08:48:37

MANHATTAN REPORTING CORP., a LegaLink Company

BERNARD J. KORMAN, ESQ.

Page 114

1  Osteopathic such as that reflected in your letter  11:57:01
2  of September 12?                          11:57:02
3  A.  No, I do not know.                    11:57:04
4  Q.  At the time that you wrote this letter in    11:57:36
5  September of 1996 -- strike that.  You probably   11:57:38
6  didn't write the letter.                  11:57:43
7        At the time you signed this letter   11:57:45
8  in September of 1996, did The Graduate Hospital or  11:57:46
9  Mt. Sinai Hospital or the obligated group    11:57:53
10  comprising those two hospitals have any obligation  11:57:57
11  for the debts of GHS Osteopathic?         11:57:59
12        MS. MEADEN:  Objection as to form   11:58:07
13  and foundation.                           11:58:08
14  A.  Not to my knowledge.                  11:58:10
15  Q.  As of September 1996 did GHS Osteopathic, or  11:58:28
16  the hospitals comprising GHS Osteopathic, having   11:58:32
17  gone bankrupt, would that have had a financial   11:58:40
18  impact on The Graduate Hospital or Mt. Sinai   11:58:44
19  Hospital, apart from rendering some or all of their  11:58:50
20  intercompany receivables from the Osteopathic   11:58:53
21  institutions uncollectable?               11:58:56
22        MS. MEADEN:  Objection.             11:58:58
23  A.  I'm not a bankruptcy attorney, so I really   11:59:00
24  can't answer that question in the manner in which  11:59:04
25  you are asking.                           11:59:08

Page 115

1  Q.  Let me ask you to answer that question to the  11:59:09
2  extent you have any understanding as a former Board  11:59:13
3  member of the parent entity, GHS.         11:59:16
4  A.  I think the question is still the same, in   11:59:21
5  whether there was any legal liability in that   11:59:24
6  regard.                                   11:59:26
7        And the answer is, I don't know   11:59:28
8  whether there is any legal liability, if that's the  11:59:29
9  question you are asking.                  11:59:31
10  Q.  You mentioned that Coopers & Lybrand had had  12:00:02
11  involvement in due diligence prior to the   12:00:07
12  finalizing of the 1996 audited financials by   12:00:10
13  Deloitte & Touche; correct?               12:00:13
14  A.  Yes.                                 12:00:14
15  Q.  Do you know whether Coopers & Lybrand had any  12:00:15
16  control over the contents or form of the audited   12:00:22
17  financials as finally issued by Deloitte & Touche?  12:00:26
18  A.  I know that they were directly involved with  12:00:30
19  Deloitte & Touche, because Mr. Abdelhak asked that  12:00:34
20  they be involved and asked our permission in that  12:00:39
21  regard, which we gave.                    12:00:43
22  Q.  Do you know what the nature of that   12:00:53
23  involvement was?                          12:00:54
24  A.  That was between Coopers and Deloitte and   12:00:56
25  Allegheny.                                12:01:00

Page 116

1  Q.  Do you know whether any changes to the   12:01:09
2  substance or presentation of the audited financials  12:01:12
3  were made at the request of Coopers & Lybrand?   12:01:15
4  A.  That's -- if they were made, that was between  12:01:19
5  those parties.                            12:01:22
6  Q.  That is, you don't know?              12:01:23
7  A.  The answer is, I don't know.          12:01:24
8  Q.  Now, as you pointed out to me in the September  12:01:47
9  12 letter, which is Exhibit 251 --        12:01:50
10  A.  Yes.                                 12:02:08
11  Q.  -- in addition to a representation on behalf  12:02:08
12  of GHS, you stated that, quote, Should such change,  12:02:11
13  that is, a transfer of control of assets, occur   12:02:18
14  prior to June 30, 1997, SDN, Inc., will assume the  12:02:23
15  current obligation of GHS to The Graduate Hospital.  12:02:33
16        Do you see that?                   12:02:33
17  A.  Yes.                                 12:02:33
18  Q.  Pardon me.  It does say that, but that's not  12:02:39
19  the language of interest.                 12:02:44
20        Let me take you to the sentence at   12:02:44
21  the end of the paragraph about GHS Osteopathic, in  12:02:47
22  which it says, quote, We have been assured that   12:02:48
23  should such, that is, a transfer of control, occur  12:02:55
24  prior to June 30, 1997, SDN, Inc., will provide the  12:02:57
25  same assurance as GHS.                    12:03:01

Page 117

1        And I understand that to be the   12:03:03
2  assurance to GHS Osteopathic; is that correct?   12:03:05
3  A.  Yes, that is.                        12:03:08
4        Yes, that's the second letter that's  12:03:10
5  attached hereto.                          12:03:12
6  Q.  And was a letter in the form appearing at PH  12:03:26
7  16905 in fact signed and provided to you by a   12:03:30
8  representative of AHERF?                   12:03:35
9  A.  I believe so.                        12:03:38
10        MR. BROOKS:  Let me mark as Exhibit  12:04:03
11  606, I believe, a letter on SDN letterhead, dated   12:04:05
12  October 3, 1996, bearing Bates Nos. DC 0618, Pages  12:04:12
13  1 and 2, from Steve Spargo, to Bernard Korman.   12:04:20
14        (Document marked for identification  12:04:20
15  as Exhibit 606.)                          12:04:48
16  BY MR. BROOKS:                            12:04:48
17  Q.  Mr. Korman, do you believe that you recall   12:04:53
18  seeing this document before?              12:04:55
19  A.  I don't have an independent recollection of   12:04:58
20  it, but it certainly does look familiar.   12:05:01
21  Q.  Does this letter appear to you to represent a  12:05:10
22  guarantee from SDN to assume the GHS obligation to  12:05:14
23  GHS Osteopathic that we have been discussing?   12:05:25
24        MS. MEADEN:  Objection as to form.   12:05:27
25  A.  If I read the second paragraph correctly, SDN  12:05:31

30 (Pages 114 to 117)

BERNARD J. KORMAN, ESQ.

Page 118

1  guarantees both obligations, Paragraph 1 and    12:05:36
2  Paragraph 2 of the letter which I sent to Deloitte.    12:05:46
3  Q.  Yes. But in particular --    12:05:51
4  A.  Yes. The answer is, yes.    12:05:52
5  Q.  And this letter identifies various sources of    12:05:59
6  funding which SDN identifies as enabling it to    12:06:05
7  stand behind such guarantees; correct?    12:06:13
8  A.  The letter speaks for itself.    12:06:16
9  Q.  Well, is that your understanding of what this    12:06:17
10  letter -- backing up.    12:06:21
11      Mr. Korman, you were the recipient    12:06:23
12  of this letter; is that correct?    12:06:25
13  A.  That is correct.    12:06:26
14  Q.  Were these guarantees important to you at the    12:06:28
15  time?    12:06:34
16  A.  They were important to Deloitte at the time.    12:06:34
17  Q.  Did you understand this letter to identify    12:06:42
18  various sources of funds which would enable SDN to    12:06:43
19  stand behind the guarantees being made here?    12:06:48
20  A.  There are six sources that are identified in    12:06:53
21  the letter; they are the six bullet points at the    12:06:57
22  bottom of the letter.    12:07:01
23      Yes. The answer is, yes.    12:07:03
24  Q.  SDN did not here identify any guarantee from    12:07:08
25  AHERF as a source of funds enabling it to stand    12:07:13

Page 119

1  behind its undertakings, did it?    12:07:17
2      MS. MEADEN:  Objection.    12:07:20
3  A.  This letter is a letter from SDN; it is not a    12:07:27
4  letter from AHERF.    12:07:30
5      MR. BROOKS:  Read back the question,    12:07:47
6  please.    12:07:48
7      (The reporter read the record as    12:07:48
8  requested.)    12:08:02
9  A.  (Continued.)  I don't know that that's the    12:08:03
10  case.    12:08:04
11      If you look at the second bullet    12:08:05
12  point, "Other sources of liquidity that may be    12:08:10
13  available to SDN." I don't know what SDN's    12:08:12
14  relationship was with AHERF.    12:08:15
15  Q.  Let me direct you to your testimony, your    12:08:36
16  previous testimony, at Page 416 of the Philadelphia    12:08:38
17  Health Care Trust litigation deposition.    12:08:42
18  A.  416?    12:08:49
19  Q.  Yes, sir.    12:08:50
20  A.  Yes.    12:09:01
21  Q.  And let me direct your attention particularly    12:09:03
22  to the testimony going from Line 10 through Line    12:09:05
23  24. I am going to ask you to look at that.    12:09:10
24  A.  Yes.    12:09:18
25  Q.  Was it in fact your understanding at the time    12:09:31

Page 120

1  of, say, September of 1996 that SDN itself did not    12:09:34
2  have substantial assets?    12:09:39
3  A.  So far as we knew, it didn't have any assets.    12:09:43
4  Q.  And you understood, did you not, that the    12:09:53
5  structure of the proposed merger was that, in the    12:09:56
6  first instance, the Graduate entities would be    12:09:59
7  merged into SDN, not into AHERF?    12:10:01
8  A.  No.  Our understanding was that there would be    12:10:05
9  a two-step transaction; that first we would go into    12:10:10
10  SDN, and then we would go into AHERF.    12:10:13
11  Q.  Did you have any -- did you receive any    12:10:20
12  representations or assurances as to how long the    12:10:23
13  period would be between the merger into SDN and the    12:10:28
14  roll into AHERF?    12:10:32
15  A.  Yes.  I received assurances from Mr. Abdelhak    12:10:33
16  that within a six-month period of time that would    12:10:39
17  occur.    12:10:42
18  Q.  He told you, did he not, that during that    12:10:42
19  period of time, they would, among other things,    12:10:45
20  conduct due diligence; correct?    12:10:47
21  A.  That's correct.    12:10:49
22  Q.  Did you and he discuss what would be done if,    12:10:57
23  in the course of that due diligence, anything was    12:11:01
24  discovered that made it, in the judgment of the    12:11:05
25  AHERF Board, inappropriate to consolidate the    12:11:09

Page 121

1  Graduate entities into AHERF?    12:11:12
2  A.  I believe in the merger documents, that we had    12:11:13
3  a provision that if it did not occur after a    12:11:16
4  certain period of time, that the transaction would    12:11:20
5  unravel.    12:11:24
6  Q.  Would unwind?    12:11:26
7  A.  Unwind. Excuse me, unwind.    12:11:27
8  Q.  Let me ask you to turn to Page 414 of this    12:11:44
9  same transcript.    12:11:47
10  A.  Yes.    12:11:49
11  Q.  And direct your attention to the testimony    12:12:03
12  from Line 7 through Line 24.    12:12:03
13  A.  Yes.    12:12:05
14  Q.  And in one of your answers you refer to the    12:12:06
15  fact that you were fine with the structure, the    12:12:11
16  two-step structure, so long as you had, quote, the    12:12:14
17  necessary assurances that ultimately we would have    12:12:17
18  Allegheny behind this transaction and that they    12:12:20
19  would be assuming full responsibility for this    12:12:23
20  transaction?    12:12:24
21  A.  Right.    12:12:27
22  Q.  Can you explain to me what assurances you feel    12:12:27
23  that you received from Mr. Abdelhak to that effect?    12:12:33
24  A.  I received oral assurances and I received a    12:12:38
25  letter from him to that effect, that that was his    12:12:40

MANHATTAN REPORTING CORP., a LegaLink Company