BERNARD J. KORMAN, ESQ.

Page 122

1 intention.                                    12:12:44
2 Q.  Can you tell me in any more detail what oral    12:13:02
3 assurances you received from Mr. Abdelhak that    12:13:04
4 AHERF would in fact complete the second step of the  12:13:06
5 transaction?                                  12:13:09
6 A.  Yes.  It's referenced here, somewhat      12:13:09
7 cryptically, on Page 414, referenced the United    12:13:13
8 Hospital transaction, which was a transaction with   12:13:17
9 which I was quite familiar.  And that's exactly how  12:13:20
10 they did that transaction, as well.           12:13:23
11        So I was familiar with the process,   12:13:29
12 I was familiar with what he represented was his    12:13:31
13 internal process.  We were concerned about the   12:13:35
14 external processes.  And I was comfortable that   12:13:37
15 that was his intent and relied upon those     12:13:43
16 representations.                             12:13:50
17 Q.  Did Mr. Abdelhak ever tell you in words or   12:13:51
18 substance that, notwithstanding the formalities of  12:13:55
19 the SDN stage of the transaction, that you could be  12:14:05
20 assured that AHERF would in fact assume ownership  12:14:11
21 of the GHS entities?                         12:14:20
22 A.  The answer is yes.                       12:14:23
23        But getting back to my previous       12:14:25
24 answer on a previous question, we tried to tie up   12:14:27
25 that gap, possible gap, by the language in the    12:14:33

Page 123

1 agreements, which provided for the unwinding of the  12:14:40
2 situation if it did not occur.                12:14:41
3 Q.  So on one hand he assured you it would occur,   12:14:44
4 and on the other hand, in caution in the documents,  12:14:47
5 you provided for the situation in which it didn't   12:14:51
6 occur?                                       12:14:54
7 A.  That was the attempt of our counsel, yes.   12:14:54
8 Q.  Good counsel.                            12:14:56
9        Do you recall any particular          12:14:58
10 instances in which Mr. Abdelhak gave you any   12:15:02
11 assurances that, leaving aside formalities, that   12:15:04
12 AHERF would in fact assume control of the Graduate  12:15:09
13 entities?                                    12:15:12
14 A.  Yes; in our initial conversations, when we   12:15:17
15 structured the transaction.                   12:15:21
16        The intent always was for AHERF to   12:15:24
17 do this.  And there were reasons, external reasons,  12:15:27
18 to go through the SDN situation, both on his side   12:15:32
19 and our side.                                12:15:35
20        Because timing was of the essence in   12:15:37
21 this transaction so as to not have any instability  12:15:43
22 operationally.                               12:15:46
23        And I fully understood the process    12:15:47
24 he had to go through with his Board, in terms of   12:15:50
25 appropriate due diligence.  And that's why the    12:15:53

Page 124

1 transaction was structured the way it was.     12:15:57
2        But from day one it was the intent   12:16:00
3 to do a two-step transaction.                 12:16:04
4 Q.  You mentioned, I believe, also that Mr.   12:16:07
5 Abdelhak sent you a letter confirming that the    12:16:09
6 second step of that transaction would in fact be   12:16:14
7 completed.                                   12:16:17
8        Can you describe -- do you recall   12:16:18
9 approximately when that letter was sent?      12:16:19
10 A.  The letter wasn't addressed just to the second  12:16:22
11 step of the transaction.  It was prior to the    12:16:24
12 closing.                                     12:16:29
13        I requested from him a written       12:16:37
14 communication that what he was representing to me,  12:16:44
15 on behalf of SDN, was also being represented as the  12:16:49
16 chief executive officer of AHERF.            12:16:57
17        And he sent me such a letter.  It    12:17:00
18 was a fairly short letter.                   12:17:02
19 Q.  Looking again at Exhibit 251, Page 16904, and  12:17:32
20 the -- pardon me, at Exhibit 251, which includes   12:17:37
21 the September 12 letter.                     12:17:44
22 A.  I have it.                              12:17:45
23 Q.  And the paragraph relating to The Graduate   12:17:48
24 Hospital, which I looked at in error last time   12:17:50
25 around.                                      12:17:54

Page 125

1        There is a reference in that         12:17:56
2 paragraph in which it states that, quote, SDN,   12:17:57
3 Inc., will assume the current obligation of GHS to  12:18:00
4 The Graduate Hospital.                       12:18:03
5        Do you see that?                      12:18:04
6 A.  Yes.                                    12:18:07
7 Q.  Do you have any understanding of -- well, let  12:18:12
8 me rephrase that.                            12:18:14
9        What obligation or obligations of   12:18:17
10 GHS to The Graduate Hospital were you referring to  12:18:19
11 there?                                       12:18:23
12 A.  There was an intercompany debt outstanding   12:18:25
13 between Graduate Hospital and Graduate Health   12:18:29
14 System, and that's the obligation we are talking   12:18:33
15 about.                                       12:18:35
16        MS. MEADEN:  I'm sorry.  Could you   12:18:55
17 read the answer back, please.                12:18:58
18        (The reporter read the record as    12:18:58
19 requested.)                                  12:19:09
20 BY MR. BROOKS:                               12:19:09
21 Q.  And looking at the next page of this      12:19:10
22 collection.                                  12:19:12
23 A.  Yes.                                    12:19:13
24 Q.  The draft letter to yourself, from an unnamed  12:19:13
25 person at AHERF.                             12:19:18

BERNARD J. KORMAN, ESQ.

Page 210

1  it more properly, more likely Mr. Huber.        16:21:41
2  Q.  Do you recall whether or not you had ever    16:21:41
3  informed either Mr. Durishan or Mr. Huber, whoever  16:21:44
4  was in that position at that time, that they were  16:21:47
5  to then notify the controllers and CFOs of the   16:21:49
6  hospitals that Coopers & Lybrand was going to be   16:21:53
7  involved in the process?        16:21:55
8  A.  I would not have had that kind of        16:21:57
9  conversation.  They would have -- either one of   16:21:57
10  those would have known how to manage the process   16:22:00
11  once they understood what the process was.       16:22:03
12  Q.  Is it your belief that Mr. Huber or Mr.     16:22:07
13  Durishan, again, whoever held that position, was   16:22:11
14  aware that Coopers & Lybrand was to be given full   16:22:13
15  access to information with respect to the closing   16:22:19
16  out of the '96 books?        16:22:20
17  A.  Not only were they aware of it, they        16:22:23
18  interacted with them because they were involved in   16:22:25
19  the process.        16:22:27
20  Q.  Did you ever receive any sort of information   16:22:29
21  that Coopers & Lybrand was dissatisfied with the   16:22:32
22  access it was given to financial information or any   16:22:37
23  information that it wanted to review in connection   16:22:41
24  with closing out the '96 books?        16:22:42
25  A.  I never received any information like that.   16:22:44

Page 211

1  Q.  Are you aware of anyone within the GHS system   16:22:47
2  who did receive any such notification?       16:22:49
3  A.  No.        16:22:51
4        On the contrary, my belief is that        16:22:52
5  everything went quite well and that we were able to   16:22:57
6  keep to a time schedule and get things done.       16:23:00
7        If anything, the Coopers involvement        16:23:03
8  extended the audit period.        16:23:08
9  Q.  Why do you say that?        16:23:11
10  A.  Because of their interaction with Deloitte.  I   16:23:20
11  mean, the additional hours that were spent in this   16:23:23
12  process until we closed out the audit.       16:23:25
13  Q.  Was it your understanding that Coopers &     16:23:34
14  Lybrand had also been retained by AHERF to        16:23:36
15  participate in the due diligence review of the        16:23:38
16  acquisition of the hospitals?        16:23:40
17  A.  Yes; yes.        16:23:42
18  Q.  And how is it that you had that understanding?   16:23:43
19  A.  I was told specifically that -- and our        16:23:46
20  people, I know, worked with them and interacted        16:23:50
21  with them, the AHERF staff as well as the Coopers   16:23:54
22  staff.        16:23:56
23  Q.  When you say, "AHERF staff," are we talking   16:23:57
24  about employees of AHERF that were involved?       16:23:59
25  A.  Yes; yes.  I am talking about Mr. McConnell   16:24:01

Page 212

1  and his folks.        16:24:04
2  Q.  Are you aware of whether the management of the  16:24:15
3  hospitals were instructed by anyone to cooperate   16:24:25
4  fully with Coopers & Lybrand and AHERF in their due  16:24:29
5  diligence review?        16:24:33
6  A.  I believe that Mr. Matthews, to whom the        16:24:34
7  hospital executives reported, operating executives   16:24:39
8  reported, passed that information on to them.       16:24:42
9  Q.  Did you receive any notification at any time   16:24:47
10  that either AHERF or Coopers was dissatisfied with   16:24:50
11  the access they were given to information that they   16:24:53
12  needed to complete their due diligence review?       16:24:56
13  A.  No.        16:24:59
14  Q.  Are you aware of anyone within the GHS system   16:24:59
15  or the hospital who had heard complaints from        16:25:02
16  either AHERF or Coopers about the access they were   16:25:04
17  given to information that they needed to complete   16:25:08
18  their due diligence review?        16:25:11
19  A.  No.        16:25:14
20  Q.  Do you have any reason to believe that        16:26:07
21  information was withheld from AHERF or Coopers &   16:26:07
22  Lybrand by anyone from either the hospitals or GHS   16:26:07
23  in connection with the due diligence review?       16:26:07
24  A.  No.        16:26:07
25        MR. BROOKS:  Objection.  Lack of        16:26:07

Page 213

1  foundation.        16:26:07
2  BY MS. MEADEN:        16:26:07
3  Q.  Do you have any reason to believe that any   16:26:07
4  information was withheld from Coopers & Lybrand or   16:26:07
5  AHERF in connection with closing out the '96 books   16:26:07
6  of the hospitals?        16:26:07
7        MR. BROOKS:  Same objection.        16:26:07
8  A.  No.        16:26:07
9  Q.  I think you had testified earlier that there   16:26:38
10  was a mechanism within the documentation for the   16:26:39
11  SDN transaction that provided that if AHERF chose   16:26:43
12  not to absorb the hospitals into its system, that   16:26:49
13  the transaction would be unwound?        16:26:53
14  A.  I don't believe the documents reference AHERF   16:26:56
15  choosing.  If for any reason, by a certain date, I   16:27:00
16  believe some time in '97, it did not occur, then   16:27:05
17  the transaction was to be unwound.        16:27:08
18  Q.  Had there been discussion within DHS as to   16:27:10
19  what it would do with the hospitals if, for        16:27:14
20  whatever reason, the transaction with AHERF was not  16:27:18
21  consummated?        16:27:23
22  A.  No.        16:27:24
23  Q.  Was there any thought on your part as to what   16:27:26
24  GHS would do with those hospitals if AHERF did not   16:27:31
25  ultimately absorb the hospitals?        16:27:36

MANHATTAN REPORTING CORP., a LegaLink Company

BERNARD J. KORMAN, ESQ.

Page 214

1 A. I had no reason to believe that the 16:27:38
2 transaction would not occur. 16:27:42
3 Q. I understand that. 16:27:46
4 A. After October 31. 16:27:47
5 Q. All right. Well, let's talk about, then, 16:27:48
6 prior to October 31. 16:27:50
7 If for some reason SDN, the first 16:27:54
8 step of the process, was not completed, had there 16:27:56
9 been discussions within the GHS system, either the 16:28:00
10 Board or among others that you were involved in, as 16:28:04
11 to what the next step would be from your 16:28:06
12 perspective as to what you would do at the 16:28:10
13 hospitals? 16:28:13
14 A. No. We reached by, I guess, the middle of 16:28:13
15 August, we had an understanding as to a 16:28:19
16 transaction, and we closed by October 31. 16:28:21
17 There was no reason to contemplate, 16:28:31
18 or we had no cause for even considering that 16:28:31
19 because everything was moving along as the parties 16:28:33
20 seemed to intend it to happen. 16:28:34
21 And there was nothing in the due 16:28:37
22 diligence process which gave us any pause. 16:28:39
23 Q. Those talks with AHERF commenced, I think you 16:28:43
24 said, in June or July? 16:28:49
25 A. June or July. 16:28:51

Page 215

1 Q. Of '96; correct? 16:28:52
2 A. Yes; yes. 16:28:54
3 Q. Again, let's step back prior to those 16:28:55
4 discussions. 16:28:56
5 Had you had any contemplation or 16:28:57
6 discussion among the members of the Board or 16:28:59
7 management of the hospitals, if AHERF weren't 16:29:04
8 interested when you approached them about these 16:29:06
9 hospitals, what you were going to do with them? 16:29:08
10 A. No. That was not the sequence of events. 16:29:11
11 Q. Why don't you explain to me, then, what the 16:29:13
12 sequence of events was. 16:29:16
13 A. The sequence of events was that we had had 16:29:23
14 discussions, as I stated previously, with Blue 16:29:26
15 Cross. 16:29:31
16 Q. Uh-huh. 16:29:31
17 A. And then when they fell through, and we 16:29:32
18 entered into the transaction with HSI, we thought 16:29:34
19 everything was moving along appropriately. 16:29:40
20 When we determined that that was not 16:29:42
21 working as we had thought it would work, we had 16:29:43
22 discussions with other hospitals and hospital 16:29:48
23 systems. And in my previous depositions I have 16:29:51
24 outlined those discussions. There was reference to 16:29:55
25 some of them today. 16:29:57

Page 216

1 And AHERF was at the end of the line 16:29:59
2 in those discussions. So it really was a 16:30:02
3 culmination of those discussions. AHERF was a 16:30:05
4 culmination of those discussions. 16:30:08
5 And, as I said, we had those 16:30:10
6 discussions in June, July, we reached agreement in 16:30:11
7 August, and we closed in October. 16:30:14
8 So that time line really did not -- 16:30:18
9 and there was nothing in that period of time which 16:30:20
10 would indicate that we were not on a course to 16:30:23
11 successfully conclude that which we had planned. 16:30:26
12 Q. With AHERF being at the end of the line? 16:30:33
13 A. AHERF -- 16:30:33
14 Q. That was your phrase. 16:30:33
15 A. AHERF was the successful acquirer. 16:30:34
16 Q. And I guess my question really goes to whether 16:30:38
17 or not you had thought beyond AHERF. 16:30:40
18 Whether there were any other 16:30:42
19 potential either merger partners or acquiring 16:30:43
20 entities that you had considered or were thinking 16:30:46
21 about if, for whatever reason, the AHERF deal 16:30:49
22 didn't happen? 16:30:54
23 A. We thought we found heaven with AHERF. 16:30:54
24 Q. Was there ever any discussion or contemplation 16:31:04
25 by the Board of closing any of the four hospitals 16:31:08

Page 217

1 that were ultimately transferred to AHERF, prior to 16:31:10
2 that transaction? 16:31:13
3 A. Four? 16:31:16
4 Q. Four? How many were there at Graduate? 16:31:19
5 A. There was Graduate, there was Mt. Sinai, 16:31:21
6 Parkview -- 16:31:23
7 Q. City Avenue? 16:31:25
8 A. -- City Avenue, Rancocas, and Zurbrugg. 16:31:26
9 Q. You're right. I'm sorry. Six. I always 16:31:30
10 forget Rancocas. 16:31:33
11 Is that five or six? 16:31:36
12 A. Rancocas and Zurbrugg would be considered one, 16:31:37
13 they were combined. 16:31:39
14 The one that was left out was 16:31:41
15 Reading, which was outside the AHERF transaction. 16:31:43
16 Q. I'm sorry. Getting back to the correct 16:31:45
17 number, let's say we had five, then. 16:31:49
18 Was there ever any discussion or 16:31:50
19 contemplation of closing any of those hospitals 16:31:52
20 prior to the discussions with AHERF? 16:31:54
21 A. No. 16:31:56
22 Q. Was there ever any contemplation or discussion 16:31:57
23 of filing for bankruptcy on behalf of any one of 16:31:59
24 those hospitals? 16:32:02
25 A. Pardon me? 16:32:03

55 (Pages 214 to 217)

BERNARD J. KORMAN, ESQ.

Page 246

1      I have read the foregoing transcript
2   of my examination given on Wednesday, August 28,
3   2002, and it is true, correct and complete, to the
4   best of my knowledge, recollection, and belief,
5   except for the corrections noted hereon and/or list
6   of corrections, if any, attached on a separate
7   sheet herewith.
8
9
10
11      -------------------------
12      BERNARD J. KORMAN, ESQ.
13
14
15
16   Subscribed and sworn to
17   before me this____day
18   of_____, ____
19
20
21      -------------------------
22      Notary Public.
23
24
25

Page 247

1      I HEREBY CERTIFY that the
2   proceedings and evidence are contained fully and
3   accurately in the stenographic notes taken by me
4   upon the foregoing matter on Wednesday, August 28,
5   2002, and that this is a correct transcript of
6   same.
7
8
9
10      -------------------------
11      Debra Ann Whitehead
12
13
14
15
16
17
18
19
20      (The foregoing certification of this
21   transcript does not apply to any reproduction of
22   the same by any means, unless under the direct
23   control and/or supervision of the certifying
24   reporter.)
25

MANHATTAN REPORTING CORP., a LegaLink Company

Laing Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

**RUSSELL LAING**
*April 22, 2003*

---

# *MANHATTAN REPORTING CORP.*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

LAING, RUSSELL

RUSSEL LAING

Page 14

1  take in order to receive your Bachelor of Science
2  in accounting?
3  A.      I don't remember the exact number.  I
4  would say that-- I can say that I spent three
5  semesters at Slippery Rock and took only
6  accounting courses, as I had a prior baccalaureate
7  degree and waived all general and other
8  requirements.  So three semesters of probably a
9  slightly higher than average load.  I think it was
10 probably like about 16 or 17 credits.  That would
11 work out to roughly about 50 to 55, if I'm doing
12 the math right, credit hours concentrating in
13 accounting and tax and audit.
14 Q.      Did you take courses in financial
15 accounting?
16 A.      Yes, I did.
17 Q.      And managerial accounting?
18 A.      Yes, I did.
19 Q.      Auditing?
20 A.      Yes, I did.
21 Q.      How many courses in auditing did you
22 take?
23 A.      I took one course in auditing.
24 Q.      Okay.
25         It also says here on your resume that

Page 15

1  you have an MBA?
2  A.      Yes.
3  Q.      First of all, can you tell me what an
4  executive MBA is?
5  A.      The executive MBA is a program
6  provided by the CAT School of Business at the
7  University of Pittsburgh.  And what it involves is
8  essentially a group of people who typically have
9  15 to 20 years of business experience who are then
10 enrolled in this class and as a group graduate
11 together over a two-year period.
12         It involves alternatively going to
13 class on Friday all day one day and then the
14 following week going to class all day Saturday the
15 following week.  It's kind of an intensified
16 concentrated program.  And it's usually--
17 typically the enrollment is-- is directed towards
18 people that have a fair amount of business or
19 similar-type experience.
20 Q.      Did you take any additional accounting
21 courses during your MBA program?
22 A.      Several as part of that.
23 Q.      What types of courses?
24 A.      They were like basic accounting
25 courses, financial management courses, a few

Page 16

1  courses in investments, things of that nature.
2  Q.      Okay.
3         Are you currently a CPA?
4  A.      No, I'm not.
5  Q.      Okay.
6         But you were at one point, right?
7  A.      Yes, I was.  I was a CPA during most
8  of the time when I was at the accounting firm of
9  Coopers & Lybrand.  I was also recertified shortly
10 after I got my MBA, because at that point,
11 although I had been out of public accounting and I
12 had developed enough educational credits through
13 my MBA program that I was able to requalify to be
14 certified by virtue of that.  So for a period of a
15 couple years after my MBA I was certified at that
16 point, as well.
17 Q.      Now, the-- the reason you no longer
18 have a CPA has nothing to do with the fact that
19 you face any disciplinary action or anything?
20 A.      Absolutely not.
21 Q.      It's just because you haven't taken
22 the continuing education courses?
23 A.      Right.
24 Q.      Because you don't have any--
25 A.      I don't have any need to practice as a

Page 17

1  CPA in any of the positions that I've been at or
2  the career path that I've desired to follow since
3  the time I left public accounting.
4  Q.      It also appears that you had the third
5  highest score on the CPA exam.  Is that for the
6  State of Pennsylvania?
7  A.      For the State of Pennsylvania, the
8  November 1980 CPA exam.
9  Q.      Congratulations.
10 A.      Thank you.
11 Q.      What do you attribute that success on
12 that?
13 A.      I attribute everything in my life to
14 God.  Anything that I have that's in my life I
15 attribute to God.
16 Q.      Did you have any honors in college?
17 A.      I won an-- an award for being-- for
18 outstanding academics when I was at Slippery Rock
19 University when I graduated.  I graduated with a
20 4.0, and having taken only accounting courses,
21 basically completed all of the requirements for a
22 Bachelor of Science in accounting, which also
23 qualified me to sit for the CPA exam in my final
24 and third semester at Slippery Rock and by virtue
25 of that was awarded an-- the PICPA academic award,

5 (Pages 14 to 17)

RUSSEL LAING

Page 18

1  which is a statewide award to people that have
2  outstanding academic skill demonstrated in the
3  course of their college career.
4  Q.      Subsequent to leaving Slippery Rock
5  and other than your executive MBA program at the
6  University of Pittsburgh, have you had occasion to
7  take any other accounting-type continuing
8  education courses?
9  A.      Since the time that I left Slippery
10 Rock?
11 Q.      Yes.  But excluding the MBA program in
12 Pittsburgh.
13 A.      Yes, whenever I was in Coopers &
14 Lybrand, throughout the time that I was there, I
15 continuously took continuing education credits to
16 maintain my CPA certification.  And also as part
17 of the programs, part of the firm's general
18 education program and requirements.
19 Q.      It says here that you were at Coopers
20 & Lybrand from 1981 to 1987?
21 A.      Correct.
22 Q.      Was Coopers & Lybrand your first job
23 out of Slippery Rock?
24 A.      Yes, it was.
25 Q.      Okay.

Page 19

1      And did you start as a Staff A?
2  A.      Staff B.
3  Q.      A Staff B.  And then promoted to a
4  Staff A?
5  A.      Right, correct.
6  Q.      And then?
7  A.      Then promoted to senior accountant and
8  then to supervisor and then to manager.  The
9  path-- the career track or the time from initial
10 entry to manager was, I believe, five years, which
11 is the fastest track that they have at the firm.
12     So it was an accelerated promotion and
13 I believe I spent about a year and a half as an
14 audit manager at Coopers & Lybrand.
15 Q.      Okay.
16     You refer to some courses you took
17 during your career at Coopers & Lybrand.  Did any
18 of them-- were any of those courses specific to
19 the healthcare industry?
20 A.      Yes, they were.  Some of them were
21 courses that dealt with accounting and auditing
22 within the healthcare industry.  And while I was
23 at Coopers & Lybrand, all three of the
24 healthcare partners of the firm commissioned me,
25 basically, to develop a course for the firm for

Page 20

1  the purposes of-- of promoting and developing more
2  efficient healthcare audits.  And also because
3  of-- and I had developed a certain expertise in
4  the industry at that point.
5      And I produced that course, taught it
6  and had produced, apparently, very good results.
7  They expanded the course to our Philadelphia
8  office and at the time that I left the firm, we
9  were getting inquiries from out in the Midwest, I
10 think it was our Kansas office that was looking to
11 take that on, too, so...
12 Q.      Who were the three healthcare
13 partners?
14 A.      Those partners were Howard
15 VonShaven (phonetic), Greg Finnerty (phonetic) and
16 Bill Buettner.
17 Q.      While you were at Coopers, did Coopers
18 have a particular expertise in the healthcare
19 field?
20 A.      At the time they had a pretty strong
21 healthcare practice, I thought.
22 Q.      And why did you think that?
23 A.      They audited a number of hospitals,
24 both larger facilities like in the academic
25 community, like Children's Hospital, and at the

Page 21

1  same time had a pretty broad range of hospitals
2  over the Western Pennsylvania area.  They had a
3  pretty-- fairly extensive practice and our office
4  was typically pretty busy during the late spring
5  and summertime with healthcare auditing.
6      It was enough for me to make it
7  essentially almost three quarters of my career
8  time around the time that I-- I was a senior
9  accountant and thereafter, at least half or three
10 quarters of my-- my practice was organized around
11 the healthcare industry.
12 Q.      Do you recall what sorts of healthcare
13 clients you had while-- while you were an auditor
14 at Coopers & Lybrand?
15 A.      I had a mix.  The largest facility
16 that I've audited then was Children's Hospital.
17 The-- I had a number of intermediate or smaller
18 facilities.  The Braddock Medical Center.  Oil
19 City Hospital, United Community Hospital.
20     That Shenango Valley Medical Center.
21 Medical Center of Beaver County.  Those are the
22 ones that I remember.
23 Q.      Now, the-- the audit approach for
24 healthcare entities that you assisted in
25 developing for Coopers & Lybrand, was one of the

6 (Pages 18 to 21)

RUSSEL LAING

Page 22

1  areas that that study focused on the area of
2  patient revenue and accounts receivable?
3  A.    It was--
4        MR. LUFT: Objection.
5  A.    It was specifically organized around
6  that, since that is the area that is unique to
7  healthcare separate and apart from private
8  industry. And part of what had made me be in the
9  position to be selected to develop this course was
10 that I had produced-- although the audit
11 engagements that I was managing generally and
12 almost consistently produced very favorable
13 results because they were efficient and they were
14 efficient because I understood the revenue and
15 reimbursements cycles in healthcare, having spent
16 a lot of time on my own studying them and being
17 able to develop an understanding of them and then
18 developed an ability to audit them in-- in an
19 efficient and, hopefully, intelligent manner.
20 BY MR. TORBORG:
21 Q.    Now, you referred to the fact that
22 patient revenue accounts receivable was unique in
23 the healthcare industry?
24 A.    Yes.
25 Q.    Why is that?

Page 23

1  A.    Because it's a mix of-- of payors.
2  The-- in private industry you have payors that
3  are, generally speaking, customers engaging at an
4  arm's length exchange. In healthcare, you have a
5  mix of payors who are funded by the federal
6  government, such as Medicare, or funded by the
7  federal government through a state agency such as
8  Medicaid or medical assistance. You also have
9  quasi-public entities, like Blue Cross, which is
10 really a nonprofit organization that's national in
11 scope, but it is a separate insurer. And then you
12 have a host of smaller insurance-- private
13 insurance companies of varying sizes.
14       And all of those arrangements are
15 specific each-- to each payor, the manner in which
16 the same services are paid by individual payors
17 can be different amongst-- amongst them.
18       So Blue Cross may pay and use a
19 certain mechanism and they may pay a certain rate
20 for a certain type of service. Medicare or
21 Medicaid may pay a different way. And a private
22 insurance carrier may pay, yet, a way that's
23 different from any of those other three.
24       So the manner in which services are
25 paid for and recognized by each of those

Page 24

1  individual payors is unique to themselves. There
2  is no common rules. A lot of times it's very
3  complex.
4        And in addition to that, over the
5  landscape of healthcare in the past 20 or 30
6  years, we've gone from basically a cost
7  reimbursing primary mechanism in the federal
8  payors, Medicare and Medicaid, and also Blue
9  Cross, which followed their example, excuse me, to
10 a prospective payment system by-- in varying
11 shapes and forms ranging from a fee for service to
12 fully capitated systems by some of those payors.
13       And those rules, of course, vary from
14 state to state, too, depending on what the-- for
15 example, the Medicaid or medical assistance payors
16 are and their rules are in any particular state.
17 So it's complex for that reason, that-- that there
18 is-- in the nature of healthcare as a business and
19 as an industry is that it's highly technical.
20 There is-- there is also a level of subjectivity
21 in terms of diagnosing patients, arriving at a
22 diagnosis, the course of treatment that's
23 recommended and those types of things.
24       So there is really a lot of
25 complexities that-- that attend to it that are

Page 25

1  very unique to the healthcare industry.
2  Q.    In relation to the audit as a whole,
3  how important is the audit of the patient revenue
4  accounts receivable area?
5  A.    It's extremely important. It's the
6  most variable and the most susceptible to judgment
7  area of the entire audit.
8  Q.    Now, you referred to judgments. What
9  kind of judgments are you talking about?
10 A.    Excuse me, I'm losing my voice here.
11 Q.    It happens to me all the time.
12 A.    The-- the judgment can be involved in
13 some ways that are typical and similar to private
14 industry. For example, in the valuation of
15 accounts receivable, there are established
16 reserves that reduce those receivables down to
17 their net expected, estimated net realizable
18 value. That's-- that's an area that is similar to
19 private industry. It does the same thing,
20 although it's, I think, significant and more
21 complex. It involves significantly a more higher
22 level of technical complexity in-- in arriving at
23 that estimation in the healthcare setting.
24       In addition to that, healthcare also
25 involves other items, such as cost reporting,

7 (Pages 22 to 25)

RUSSEL LAING

Page 26

1  which is largely phased out as of now, but was
2  big, more prominent, 5, 10 and 15 years ago. And
3  that involves various complexities, including
4  financing mechanisms like periodic interim payment
5  and things like that, that are not easily
6  understood by someone that's used to the normal,
7  more straightforward accounting mechanics of
8  private industry.
9  Q.      Okay.
10          During your career at Coopers &
11  Lybrand, did you have occasion ever to work with
12  Bill Buettner?
13  A.      Yes, I did.
14  Q.      Which audits did you work with
15  Mr. Buettner?
16  A.      There was a medical center that has
17  now long since merged with another hospital and
18  probably actually even closed. It was in downtown
19  Pittsburgh. I can't remember the name of it.
20  Q.      Is it Central Medical Center?
21  A.      Central Medical, thank you, yes, that
22  was the name of it, and I worked for him in that
23  engagement. And I believe there might have been a
24  private company that I also did an audit for that
25  I worked with Bill on, too. But I remember the

Page 27

1  Central Medical audit, in particular, and there
2  may have been one other, I'm not sure.
3  Q.      And how many years did you work with
4  Mr. Buettner?
5  A.      I worked with Bill, not directly, but
6  I worked in the firm with him over the course of
7  the entire time that I was at Coopers & Lybrand.
8  Bill was there when I started and I believe he
9  made partner during the time that I was a-- an
10  audit manager and shortly before I left.
11  Q.      Okay.
12          Did you ever work with an individual
13  by the name of Mark Christine while you were at
14  Coopers & Lybrand?
15  A.      The name is very vaguely familiar, but
16  I don't believe I ever worked with him.
17  Q.      How about Andy Frasier?
18  A.      The same answer.
19  Q.      Okay.
20          Now, I see here that you left Coopers
21  & Lybrand in 1987. Was there any particular
22  reason for leaving?
23  A.      For career advancement. I wanted to--
24  I felt that I had exhausted the-- the interest
25  that I had in public accounting and wanted to get

Page 28

1  into private industry.
2  Q.      Your next job looks like it was as
3  vice president of finance at Greater Canonsburg
4  Health System?
5  A.      Yes, correct.
6  Q.      Can you explain to me what your job
7  was there, in a broad sense?
8  A.      I was hired initially by the then CFO
9  Ron Park. Ron hired me as director of finance.
10  It would be unusual for a hospital of that size to
11  hire somebody-- which was basically a smaller
12  community hospital, to hire somebody with my
13  credentials and background.
14          And part of the reason in hiring me
15  was that they had an enormous number of problems
16  and issues of an unusual complexity owing to the
17  departure shortly before I got there of their then
18  chief executive officer, Sherif Abdelhak.
19          And I think as a consequence, part of
20  the reason I was brought in was that they just
21  simply needed more than a normal amount of fire
22  power that would be appropriate for a smaller
23  hospital of that size.
24  Q.      What-- so Sherif Abdelhak was the CEO
25  of Greater Canonsburg?

Page 29

1  A.      Prior to--
2  Q.      Prior to you being there.
3  A.      Prior to the time that I came there.
4  Q.      What types of problems-- I think you
5  said that they were owing to Mr. Abdelhak being
6  there?
7  A.      Yes. The-- the hospital at that time,
8  and it was known as the Greater Canonsburg Health
9  System, had been a small community hospital, maybe
10  about 100, 110 beds.
11          My understanding and knowledge from
12  being there was that Sherif Abdelhak had come as
13  chief executive officer and had engaged them in a
14  number of ventures and things that eventually led
15  to their bankruptcy. Some of those-- or not-- not
16  their bankruptcy, but basically it financially
17  crippled them.
18          Those things were, for example, the
19  acquisition of a sister facility known as-- let's
20  see. It was a-- it was a hospital that was
21  located out in Oakland. I forget the exact name
22  of it now. But it was a hospital that they had
23  acquired, so they actually had two hospitals in
24  the system. I know I'd know the name of it if I
25  heard it.

RUSSEL LAING

Page 54

1  A.      With the accounts?
2  Q.      Yeah.
3  A.      No, as-- as-- as far as the way that
4  it worked was, you-- you-- at the time we were-- I
5  mean, we were-- we had processed a huge number of
6  transactions.  Many of those were processed
7  electronically.  Some of them involved payments
8  that were received in the forms of checks and had
9  to be manually applied to individual patient
10  accounts.  It was, you know, extremely vast,
11  complex data management task.
12          There was a cash application manager.
13  I believe her name was Mary Brooke, if I remember
14  correctly, that oversaw that function.  And there
15  was probably about 14 or 15 individual employees
16  staff that-- that were involved in applying
17  payments that were separately kind of an
18  information services technical-type guy who was
19  involved with the electronic cash application
20  process and-- but it didn't involve me actually
21  specifically looking up individual patient
22  accounts.
23          However, in-- in the course of that
24  and other duties that I had, I did bring in an
25  individual who, with me, designed and developed

Page 55

1  a-- what we call a data warehouse, which was the
2  ability to extract information from mainframe
3  systems, put it in a central repository where we
4  then had the ability to more quickly sort and go
5  through that information.  And we used a-- what's
6  called-- a fifth generation software called Focus,
7  I believe was the name of it, to be able to sort
8  through that database and pull out information to
9  develop profiles to look for certain conditions in
10  the data and-- and so forth and so on.
11          So more through that process than
12  through the cash application process that I-- I
13  did get an exposure to the individual accounts and
14  workings and things like that.
15  Q.      And who was that assistant you just
16  spoke of?
17  A.      The assistant?
18  Q.      I think you said you brought on
19  somebody who helped develop the Focus system?
20  A.      There was an individual that I had
21  worked with at UPMC.  And his name was Al Dodson,
22  who I believe-- I'm trying to remember now, it's
23  been a while-- but he had formed-- I think when I
24  left and went to Allegheny, around that time he
25  had left UPMC and began working for a software

Page 56

1  company.  And Al was initially the individual I
2  worked with in terms of establishing this data
3  warehouse.
4          And then later there was a fellow that
5  I hired as a consultant.  I just remember his
6  first name, I believe was Tom.  But he was brought
7  in and he kind of was somebody that would operate
8  this system to produce reports and develop
9  specific things that when I would ask him to do
10  that would require someone with programming
11  expertise.
12  Q.      You spoke in the part of your-- you
13  said part of your analysis, part of your job was
14  financial analysis?
15  A.      Yes.
16  Q.      When you say "financial analysis,"
17  what do you mean?
18  A.      Well, it really takes in a lot of
19  things, but it-- it could mean something that is
20  reactive.  For example, we would get an analysis--
21  and this is very often how some of these types of
22  things happen.  An analysis would be generated by
23  the general accounting department talking about
24  a-- a fluctuation or a phenomenon in the current
25  month financial statements that affected them that

Page 57

1  would be attributed to something that happened in
2  the revenue division.  And I would get that
3  analysis and-- through my boss, Greg Snow or
4  sometimes directly, but most often through Greg.
5  And I would be asked to respond to it and, you
6  know, develop an understanding of whether it was
7  accurate or not.
8          And usually these analyses were like
9  analogous to like taking a little sliver of the
10  pie and putting it in front of me and saying based
11  on the-- the, you know, facts and circumstances
12  presented in this-- this limited contained
13  analysis, do you agree with it?  Is it correct?
14  What's your-- what's your perception of it?
15          And I would have to write up or
16  develop a response based on-- on my review of
17  that.
18          Other forms of this analysis, though,
19  in another venue would be, for instance, with this
20  data warehouse, we would develop profiles that
21  would look for certain conditions that would tell
22  us that there might be, you know, an opportunity
23  to collect something faster or that something
24  wasn't being billed or contractualized correctly
25  by the system in some cases.  Things like that.

RUSSEL LAING

Page 58

1     So the system could actually be
2  designed to look for certain indications that
3  might indicate-- that weren't necessarily a
4  problem, but might indicate a presence of a
5  problem. And then that information would be taken
6  to one of those senior directors who was in charge
7  of that particular payor class to follow up on and
8  find out if they could find out what the-- if
9  there was an underlying problem or not. Things
10 like that.
11 Q.     Was there anybody else at AHERF who
12 worked in PFSG that did the type of analysis that
13 you did? Was your position unique?
14 A.     My position was unique. I had people
15 that assisted me. There was several people that
16 worked in the-- the department that assisted me.
17 But the assistance that they gave me was basically
18 responding to requests to get details or
19 information, for the most part, rather than to do
20 analysis.
21     There was nobody that I can remember
22 being there, other than maybe an individual that I
23 had hired and was developing into somebody that
24 could be capable of doing that. But for all
25 intents and purposes, I was basically the only one

Page 59

1  at PFSG that was doing that.
2  Q.     Who was that person that you hired?
3  A.     Dan Malloy. He was hired, I guess he
4  was with the Army before he came with us. In
5  fact, he was in their intelligence service, which
6  I thought made him a good candidate for working in
7  the role that I was doing at PFSG. But he was
8  somebody that had both the intelligence, the
9  initiative and the-- the drive to be able to-- to
10 understand and deal with a lot of these issues. So
11 he was developing that ability at the time that I
12 left. And he was very excellent employee.
13 Q.     What did Bill Gedman do?
14 A.     Bill Gedman at-- at various times did
15 things by way of producing routine ongoing
16 analyses and-- and parts of the reporting system.
17 For example, we developed a daily cash report that
18 showed how much cash was coming in. Greg Snow
19 kind of designed it, but I believe Bill might have
20 been involved in maintaining reports like that,
21 that were sort of our routine operational
22 day-to-day reporting.
23     Bill worked on some special projects.
24 I think for a time Bill might have even stepped in
25 and-- and done some things with the cash

Page 60

1  application process. Bill assisted me in some of
2  the requests of-- in developing some of the
3  analyses. If I needed information or reports,
4  Bill was the kind of guy that I could go to.
5  Because you have to recall, at the time, that this
6  was a collection of a number of different
7  hospitals, each with their own reporting systems.
8  Bill would help gather the information to produce
9  the analyses.
10 Q.     Now I want to go back to Exhibit 1247
11 real quick.
12     The subject line of this memo is
13 "Delaware Valley Charge Differential
14 Calculations."
15 A.     Uh-huh.
16 Q.     Can you give me an understanding of
17 what Mr. Cancelmi means in or around November
18 29th, '95, where the Delaware Valley is?
19 A.     Yes. It was a reference to the
20 collection of hospitals and the academic medical
21 center, Hahnemann and Medical College of
22 Pennsylvania, that they comprised the eastern
23 operations of-- of AHERF.
24 Q.     Were the other hospitals St.
25 Christopher's Hospital For Children?

Page 61

1  A.     Correct. There was two smaller
2  hospitals in that-- the rural Pennsylvania/Elkins,
3  I forget the names-- the name of the other one,
4  but there was probably about five or six hospitals
5  all together. Hahnemann Medical Center, Medical
6  College of Pennsylvania, MCP, Elkins, St.
7  Christopher. And there's one that I'm
8  forgetting--
9  Q.     Bucks?
10 A.     Bucks. Bucks, thank you.
11     -- that was part of that.
12 Q.     Okay.
13     Did you have occasion to interact with
14 the general accounting office in your position?
15 A.     Yes, I did.
16 Q.     And when I say "general accounting
17 office," what did you-- do you take I mean by
18 that?
19 A.     The individuals that were under the
20 direction of Al Adamczak on behalf of Allegheny
21 General Hospital and Dan Cancelmi on behalf of the
22 so-called Delaware Valley hospitals collectively
23 reporting to or through Steve Spargo at one point
24 while he was there. And in turn, reporting to
25 executive management, as far as the financial

16 (Pages 58 to 61)

RUSSEL LAING

Page 90

1 the-- getting information from Artrac seemed to be
2 like a very difficult process, and especially
3 getting it in a form that was susceptible to any
4 kind of reasonable analysis was very difficult.
5         I-- if-- I-- this is a long time ago,
6 so I'm trying to remember exactly. But it's the
7 best I can do to say that my remembrance with
8 Artrac was that there were a lot of information
9 access problems. And to the extent that we could
10 get information it was more often in the form of
11 like just a raw dump of information, rather than
12 anything that was in any usable form.
13 Q.       Do you recall whether you were able to
14 get any information on these accounts?
15 A.       I-- I'm not able to answer that
16 question. I just don't-- I can't give you
17 specifics on-- on what that was. If I saw
18 something that was from that time I could-- I
19 could answer that better. But sight unseen, I
20 can't.
21 Q.       Okay.
22         Do you recall when-- when in time your
23 concerns about the collectibility of a Patcom
24 receivables arose?
25 A.       Well, it was-- it was instant. It

Page 91

1 was-- there was always an issue throughout the
2 time that I was there about the collectibility of
3 the Patcom receivables. There was never a time
4 when it was not an issue, that I can recall.
5         I recall it being an issue from almost
6 the first week that I was there and it was never
7 not an issue thereafter.
8 Q.       Do you recall any-- any discussions
9 with individuals in the general accounting office
10 about the collectibility of this subset of
11 receivables?
12 A.       I think there may have been some
13 general expressions of concern back and forth
14 between myself and individuals in accounting. And
15 I'm thinking specifically of Robin Schaffer and
16 Dan Cancelmi. I don't recall that there was
17 extensive detailed discussions of those-- of that
18 issue between myself and any of those individuals,
19 but I do recall that there was at least some
20 dialogue going back and forth. And that was one
21 issue that was on the landscape of many issues
22 that were out there. That was definitely
23 something that was-- that was one of them.
24 Q.       Do you recall whether any concerns
25 that you had regarding the collectibility of these

Page 92

1 Patcom receivables was shared with Coopers &
2 Lybrand?
3 A.       By me?
4 Q.       Yes.
5 A.       Not by me. I don't recall that I
6 had-- I can't recall-- bring to mind any
7 conversation that I had, any meeting that I had
8 with Coopers & Lybrand that got into a substantive
9 discussion of the accounts receivable valuation
10 process.
11         I can recall maybe one or two meetings
12 with Coopers & Lybrand specifically that I
13 attended that were convened by my boss, Greg Snow.
14         But I do not recall any substantive
15 direct discussion with them about the valuation of
16 the accounts receivable for any issue relating to
17 the receivable valuation at any time.
18 Q.       Did you find it odd that Coopers &
19 Lybrand never sought your-- your--
20 A.       I find it extremely odd.
21 Q.       Why is that?
22 A.       Well, for several reasons. One is I
23 was a known entity to them in the first several
24 weeks, probably from the first four to five weeks
25 that I was employed at Allegheny, I had in the

Page 93

1 course of trying to develop a-- a information
2 accessing system which later became this Focus
3 data warehouse, had met with Bill Buettner and had
4 lunch with him and-- and one of his associates for
5 the purpose of specifically discussing the
6 possible opportunities to engage Coopers & Lybrand
7 for the purpose of developing such a database.
8         Those discussions were not fruitful
9 and I didn't pursue them. But I was known-- and
10 they knew that I was at Allegheny at-- at that
11 point in time. I was known because-- to Coopers &
12 Lybrand as a healthcare industry specialist. I
13 was known as sort of the go-to guy in terms of
14 healthcare issues. I had developed a uniform
15 audit approach which had been basically taken over
16 from me by our Philadelphia office and expanded to
17 a larger product and had received praise from our
18 regional managing partner.
19         As far as its results and impact, I
20 was frequently called in as a-- as a consultant or
21 a reference on other healthcare engagements by
22 Coopers & Lybrand to consult on complex
23 healthcare-related issues.
24         And for all those reasons, I was both
25 a known entity and also known as kind of an

24 (Pages 90 to 93)

RUSSEL LAING

Page 94

1  industry technical expert with-- with an extensive
2  background. It struck me as extremely odd that
3  they didn't want to sit down and engage in a
4  conversation or-- or review with me issues
5  relating to the valuation of accounts receivable
6  and net revenue. I was very surprised at that.
7  Q.      Were they aware of the-- of what you
8  were doing at AHERF in your job?
9  A.      Yes, they were.
10       MR. LUFT: Objection.
11  A.      They were aware because I had-- in the
12  course of meeting with Bill Buettner for lunch, I
13  described my new position, what I was doing, that
14  type of thing in the course of conversation. And,
15  you know, I mean, they-- they were plainly aware.
16  And also from the fact that when we had meetings,
17  the-- the one or two occasion where I can remember
18  meeting physically with them in person, they were
19  introduced-- they were introduced to me not as if
20  they had to get a description of my title; they
21  seemed to already know that.
22       So they knew who I was and what I was
23  there-- what my role was. But-- so it wasn't like
24  they-- someone-- it wasn't when my boss convened
25  the meeting had to sit down and explain to them,

Page 95

1  "This is Russ Laing. Here's what he does for the
2  revenue division." I mean, it was just-- there
3  was a presumed knowledge of that.
4  Q.      If Coopers had come to you and asked
5  you questions and asked for your thoughts on the
6  valuation issues that you were working on, would
7  you have shared your thoughts with them?
8       MR. LUFT: Objection.
9  A.      Yes, I would in every respect that was
10  material and important to the process of financial
11  reporting.
12  BY MR. TORBORG:
13  Q.      Do you recall whether there was an
14  issue-- coming back to the Patcom accounts, if
15  there was an issue about whether those accounts
16  had been properly contractualized at the time that
17  they were billed?
18  A.      I couldn't-- from memory I could not
19  tell you specifically that I knew or didn't know
20  that. I don't-- I couldn't do that from memory.
21  I'd have to see at least some documents to refresh
22  my memory, but not-- not sight unseen from eight
23  years ago. I wouldn't be able to do that.
24       MR. TORBORG: I'd like to
25  mark as our next exhibit 1249; is that right?

Page 96

1  Actually going to mark as Exhibit 1249 and 1250.
2  Do you have a copy of Mr. Laing's
3  transcript? I'm going to mark Mr. Laing's copies
4  of both volumes of the SEC transcript, okay? This
5  will be the second one (indicating).
6       * * *
7       (Whereupon, Laing Deposition Exhibit
8  Nos. 1249 and 1250 marked for purposes of
9  identification.)
10       * * *
11       MR. TORBORG: For the record,
12  Exhibit 1249 is a copy of Mr. Laing's first
13  transcript from the SEC for his testimony dated
14  May 24th, 1999. And Exhibit 1250 would be the
15  second day of his testimony, which is dated next
16  day, May 25th, 1999.
17  BY MR. TORBORG:
18  Q.      Let me ask you a couple questions
19  about this, first.
20       Do you believe that your memory of the
21  events at AHERF were better four years ago than
22  they are today?
23  A.      Yes, I do.
24  Q.      Okay.
25       I'd like to direct you to Page 111 of

Page 97

1  that first-- actually it will be the first one, I
2  think. Do you have the right one? Yeah, you got
3  it.
4  A.      This one or this one (indicating)?
5  Q.      1249.
6  A.      1249?
7  Q.      Yeah. I'm sorry, 111. I'm sorry.
8  Page 111. Starting with Line 23.
9       You were providing some testimony
10  about these Patcom receivables, responses to the
11  SEC's questioning. All right.
12       I'm going to go ahead and read into
13  the record and you can follow along. I'm going to
14  start at Line 23.
15  A.      Okay.
16  Q.      You were asked: "Now, with respect to
17  Patcom, was there a large amount of
18  collectibles"-- "collectibles, securities--"
19       "ANSWER: Oh, yeah, absolutely,
20  totally.
21       "QUESTION: -- and were they not
22  contractualized?"
23       Your answer: "No, they were not. I
24  mean, there was-- it was known that there was a
25  very big portion of receivables sitting out there

25 (Pages 94 to 97)

MANHATTAN REPORTING CORP., A LegaLink Company

RUSSEL LAING

1   say whether I knew or didn't know what they-- they
2   were aware of.
3   Q.      Fair enough.
4          Do you recall any discussions about
5   concerns that these Patcom accounts were not
6   properly reserved?
7   A.      Could you repeat that, please?
8   Q.      Do you recall any discussions with
9   accounting, okay, regarding the fact that the
10  Patcom receivables may not be adequately reserved?
11  A.      Yes.
12             MR. LUFT:  Objection.
13  A.      I-- I recall comments and some
14  dialogue to the effect that there was concern
15  about the-- the valuation of the Patcom
16  receivables with accounting.  And specifically
17  probably more with Robin Schaffer, maybe with Dan
18  Cancelmi, as well.
19  BY MR. TORBORG:
20  Q.      Now, how did you come to know that
21  there was this problem with-- the fact that these
22  accounts weren't properly contractualized?
23  A.      Well, we knew, everyone-- everyone
24  knew what was contractualized and not
25  contractualized within the-- the Patcom billing

1   system, the fact that it was not contractualizing
2   accounts and that they were being carried at
3   gross, that was a matter of fact.  That was
4   something that could be known by anybody.
5   Q.      How did you know that?
6   A.      Probably somebody on the-- in the PSFG
7   division related that to me.  It might have been
8   Mary Brooke, in the course of talking about, you
9   know, cash receipts; it could have been any number
10  of individuals.  But I can't tell you specifically
11  who told me that.  But my guess is that it would
12  probably have come via Greg Snow, in the course of
13  his describing the issues and problems surrounding
14  those Patcom receivables.
15          But there was probably-- in-- in
16  truth, there was probably a number of people
17  that-- that had related to me or mentioned or
18  brought up coincidentally the fact that there
19  were, you know, issues about how those were being
20  contractualized or that they were not being
21  contractualized within the Patcom system.
22  Q.      Now, I think you also just said at the
23  beginning of your answer, this is something that
24  was just a matter of fact, that anyone could know?
25  A.      Correct.

1   Q.      How would they know?
2   A.      Well, because they would know the--
3   the setup and capabilities of the Patcom system.
4   And if it's not contractualizing the accounts at
5   all, which is, I believe, what the comments were
6   in here, that they're being carried at gross,
7   which means that they were being carried without
8   any contractualization being applied to them at
9   all at the time of billing, they're being carried
10  at the-- at the initial price that they were
11  billed at, regardless of what the expected net
12  reimbursement was from a particular payor.  They're
13  being carried at gross.
14          That's a system capability or system
15  attribute that would be commonly known by anybody
16  that's dealing with the Patcom issue from the--
17  the revenue division standpoint and it would
18  certainly be known by anybody on the accounting
19  department with respect to their understa-- their
20  ability to weigh the, you know, net realizable
21  value issues relating to establishing reserves, as
22  they did, for instance, with all the other items
23  described in the first memo that you gave to me.
24          The-- also, there is a-- a-- an
25  illusion to a directive not to write off these

1   balances.  The last-- it's Line No. 14.
2   Q.      Uh-huh.
3   A.      And to me, I-- I recall, whether it
4   was this specific time and this issue or whether
5   it was a separate one, I-- I'm not sure.  I know
6   at one point there was such a level of concern
7   about the collection efforts by the revenue
8   division that a directive came down.  And I
9   believe it was from Sherif Abdelhak, although I
10  don't have firsthand knowledge of that, but I was
11  told that it was, that-- that virtually all
12  account write-offs or accounts receivable had to
13  be approved by a senior executive, which I think
14  at that time represented people at the executive
15  management level meeting, not Greg Snow even, but
16  rather his boss, Joe Dionisio and up, by way of
17  trying to enforce a discipline that-- that caused,
18  you know, an intense scrutiny of accounts.  And I
19  think, I can't be certain, but I think this-- this
20  directive came down around the same time that this
21  Patcom issue was very active.  And I think that
22  that was in force for probably about three or four
23  months.  Maybe-- maybe a maximum of three months
24  before it was found to be completely disruptive
25  and counterproductive and-- and unmanageable and

27 (Pages 102 to 105)

RUSSEL LAING

Page 106

1    was abandoned.
2    Q.       Now, you said that the-- I want to go
3    back to the Patcom-- the fact that these accounts
4    weren't contractualized properly.
5            Is this something that Coopers &
6    Lybrand could have figured out in the audit, if
7    they had access to the materials?
8            MR. LUFT:  Objection.
9    A.       They either-- either-- they could not
10   have not known that there was a large body of
11   receivables called Patcom out there.  Knowing that
12   information, speaking from my experience as a
13   former audit manager specializing in the
14   healthcare industry, it would have been reckless
15   for them not to have asked and gotten sufficient
16   information to understand specifically how those
17   accounts were being contractualized and what
18   reserves were being provided to them and what
19   other exigent circumstances might surround those
20   receivables that-- that would give rise to other
21   valuation allowances, like a bad debt reserve
22   because of the passage of time.
23   Q.       I want to show you what we've marked
24   previously as Exhibit 14.  And you're free to take
25   a glance through the-- this entire document,

Page 107

1    Mr. Laing, but I'm going to be asking you
2    specifically about the page ending with Bates 428,
3    the bottom right-hand corner.
4            Excuse me.  I'm losing my voice, too.
5                    * * *
6            (Short pause)
7                    * * *
8    A.       I'm going to need a minute to read
9    the preceding page for context.
10   BY MR. TORBORG:
11   Q.       Yeah, sure.
12                   * * *
13           (Short pause)
14                   * * *
15   A.       Okay.
16   BY MR. TORBORG:
17   Q.       Okay.
18           Let me ask you, first, whether or not
19   you recall this document at all?
20   A.       I recall that there was some kind of
21   a-- a study that was done.  I don't remember a lot
22   of specifics about it, but it's not totally
23   unfamiliar with me.  I seem to recall something
24   about trying to get a-- a large selection of
25   documents, but I don't remember very much about

Page 108

1    it.
2    Q.       Okay.
3    A.       So no, I don't have a good memory of
4    it.
5    Q.       You referred to a study.  Was that a
6    study by Coopers & Lybrand or by AHERF?
7    A.       It was a study by Coopers & Lybrand,
8    is my recollection.
9    Q.       Do you recall any of the circumstances
10   surrounding this study?
11   A.       No, I don't.
12           MR. LUFT:  Objection.
13   A.       Not off the top of my head, no.
14   BY MR. TORBORG:
15   Q.       Do you recall whether it was a part of
16   the Coopers 1996 audit?
17   A.       I couldn't say that with certainty
18   right now, no.
19   Q.       Could you say without certainty?
20           MR. LUFT:  Objection.
21   A.       No, I could not.
22   BY MR. TORBORG:
23   Q.       Okay.
24           Were you involved at all in this study
25   that Coopers & Lybrand was doing that you just

Page 109

1    vaguely remember?
2    A.       If I was, I don't have much of a
3    memory of it.  I don't-- if I was, it was probably
4    just in the nature of reviewing findings or
5    looking at that type of thing.  I know I was not
6    specifically, to the best of my memory, involved
7    in any kind of trying to locate or pull documents.
8    And particularly I know that would have probably
9    been outside of the scope of what Greg Snow would
10   have wanted me to be working on.
11           So I don't remember being involved in
12   actually pulling documents.  I may have been
13   involved in looking at the outcome or I may have
14   been hearing periodic updates from other people
15   about the progress of it, but that's about the
16   best I can do with that one.
17   Q.       Do-- do you recall who at AHERF would
18   have assisted in pulling documentation for the
19   study?
20   A.       My guess is that some of the people in
21   some of the different actual billing areas, some
22   of those senior managers that reported to Greg
23   might have been involved in it.  It's possible
24   that-- because they describe some of the documents
25   being held by ancillary departments, they may have

28 (Pages 106 to 109)

RUSSEL LAING

Page 146

1    Reserves, about a third of the way down through
2    the document--
3    A.        Uh-huh.
4    Q.        -- do you see you have a past statute
5    exposure row?
6    A.        Uh-huh.
7    Q.        And then you have columns for March
8    '96, June of '96 and June of '97.
9            As of June of '96 you've identified a
10   number of $44 million?
11   A.        Uh-huh.
12   Q.        Do you have an understanding of where
13   you got that figure?
14   A.        It was probably summarized from the
15   data that had been collected previously, probably
16   by Bill Gedman.  We had probably had, like, a
17   working body of information that was used that I
18   think Bill kind of primarily gathered the
19   information.  And I may have drawn on that, but it
20   was probably from some such source that I got
21   that-- that figure.
22   Q.        If you can go back to Exhibit 9-- I'm
23   sorry, it's marked as 1251, I believe.  It's the
24   Gedman June 7, '96--
25   A.        Uh-huh.

Page 147

1    Q.        -- document.
2            If you go to the Bates ending 83,
3    PR-Laing 83.
4            Does this appear to be a schedule that
5    Mr. Gedman or someone has prepared dated February
6    29th, '96, that's attempting to identify the
7    amount of past statute accounts as of that date?
8    A.        Yes, it is.
9    Q.        And you see the total amount he has is
10   23.7?
11   A.        Uh-huh.
12   Q.        Which is roughly approximate to what
13   you have in your Exhibit 904, right?
14   A.        Uh-huh.  Yeah.
15   Q.        24 million?
16   A.        Correct.
17   Q.        Would it be fair to infer that you--
18   that the June 1996 data, 44 million, was taken
19   from a schedule, albeit of a different date, but
20   similar to what we've marked here as Exhibit 1251?
21           MR. LUFT:  Objection.
22   A.        It's overwhelmingly likely.
23   BY MR. TORBORG:
24   Q.        And would you have any other source to
25   get this number?

Page 148

1    A.        No, I wouldn't.
2            And it is my recollection, too, that
3    as the past statute issue evolved, that we had--
4    there was a process of continuously updating.  And
5    I remember that we-- I believe Bill was primarily
6    the architect of updating those schedules, but I
7    do recall that there was a process of keeping Greg
8    Snow apprised of the status of this past statute
9    issue, along with others, but that these schedules
10   were-- were updated for a period of time that I
11   think lasted approximately five or six months,
12   maybe a little bit longer.
13   Q.        Was there any consideration given to
14   sharing these analyses with Coopers & Lybrand for
15   purposes of their 1996 audit?
16           MR. LUFT:  Objection.
17   A.        To the extent that any such
18   consideration happened, it happened outside of
19   my-- my corner.  I was not involved in discussions
20   about what would or would not be shared with
21   Coopers & Lybrand by way of these past statute
22   schedules.
23           To my knowledge, they were available
24   to both revenue division and accounting internal
25   management.  Where they went from there, I don't

Page 149

1    know.
2    BY MR. TORBORG:
3    Q.        If Coopers & Lybrand had asked you for
4    information that had-- that attempted to quantify
5    the amount of past statute accounts such as this
6    document that we've marked as Exhibit 1251, would
7    you have given it to them?
8            MR. LUFT:  Objection.
9    A.        Yes, I would.
10   BY MR. TORBORG:
11   Q.        You said earlier that you thought it
12   was surprising that Coopers & Lybrand never met
13   with you to discuss issues regarding accounts
14   receivable and valuation?
15   A.        There were, at times, indications, and
16   this is in the form of just very small
17   coincidental anecdotal comments, but I just
18   understood the general rules of dealing with the
19   auditors were that the accounting department
20   controlled the audit process, and to the extent
21   that they needed any interaction with us that, you
22   know, we would be so directed by them.  But that
23   otherwise they pretty much kept the accounting and
24   auditing process under their jurisdiction.
25           So it was my feeling that-- that they

RUSSEL LAING

1  felt that the information that I had provided, put
2  into the-- to the overall equation was available
3  to them and they used it however they felt
4  appropriate.
5        They certainly understood the
6  information that I provided to them; that is, to
7  the accounting department. How it was used and in
8  what context with Coopers & Lybrand, I can't speak
9  to.
10       But yes, I was surprised that-- that
11 they didn't use that, but I was not-- it was kind
12 of consistent with the knowledge that there was
13 sort of an adversarial feeling between the
14 accounting department and the revenue division,
15 and particularly my role in the revenue division
16 as it related to the accounting department. And
17 it was in my mind probably-- the way I diced it up
18 was I felt that the accounting department simply
19 wanted to control that process. And they did.
20 Q.       Were there any other reasons why you
21 thought there was an adversarial relationship with
22 accounting and PSFG?
23 A.       A lot of our interactions were less
24 than-- than friendly between myself and some of
25 the people in the accounting side.

1        In one instance, I-- I know that
2  somebody in the accounting side specifically and
3  actually repeatedly resisted even giving me basic
4  accounting information that they had available to
5  them.
6        This would-- would have been Jack
7  Nelson. And I finally had to appeal to his boss,
8  Al Adamczak, to get the information that I needed.
9  And it was then provided, reluctantly.
10       Robin Schaffer was generally
11 cooperative in providing information on a limited
12 basis about schedules and specific things that--
13 that I needed to-- to do my job. But there were
14 times when getting that information was difficult
15 and reluctant. And I can't say that in every case
16 that I got everything that I wanted or that I
17 asked from them.
18 Q.       Do you recall what the information was
19 from-- that you asked Mr. Nelson for that he was
20 reluctant to give?
21 A.       Yes. There was a-- a schedule that
22 was used both for the Delaware Valley and there
23 was its equivalent that was used on the Allegheny
24 side. And that was a schedule that-- that
25 basically showed or indicated how the contractual

1  allowances were derived in total for all
2  receivables. The basic valuation, mechanics and
3  analyses that were used by the accounting
4  department to develop their reserves. And that
5  was the information that Jack had refused to
6  provide to me.
7        Getting that information on the
8  Delaware Valley side, I think generally happened,
9  but there were times when it was very slow and
10 forthcoming, and sometimes when it was just simply
11 withheld for a period of time and not available.
12       But I-- my remembrance with the
13 Delaware Valley is, generally speaking, that
14 information was ultimately provided to the extent
15 that I asked for it. But a lot of times it was
16 very slow and forthcoming. And sometimes it took
17 higher echelons to get it for me.
18 Q.       Do you recall whether there was a
19 policy that-- at AHERF that limited the amount of
20 bad debt write-offs to the amount of bad debt
21 expense that was budgeted for the month?
22       MR. LUFT: Objection.
23 A.       Yes, actually I do remember that.
24 That there was-- I-- there was probably things
25 that were written about it, but I remember

1  specifically discussions with accounting that said
2  that this was what was provided in the budget. And
3  I do remember some such policy and I believe that
4  it came down from the CFO on the Delaware Valley
5  side, whose name escapes me just at the moment.
6  He was the--
7  BY MR. TORBORG:
8  Q.       Chuck Morrison?
9  A.       Chuck Morrison. Thank you.
10       And I remember a specific policy. In
11 fact, I remember later, after that policy, around
12 the time or after it, there was a-- they
13 developed-- actually had developed a revenue
14 budget that was put in front of me for saying that
15 this is the revenue budget for the forthcoming
16 year, projection of revenue for the next year
17 ahead. And what they-- and it was presented to me
18 through my boss, Greg Snow, as being this is what
19 we think is-- is reasonable for the Delaware
20 Valley division to obtain, as far as net revenue
21 goes.
22       And I did an analysis of that revenue
23 and it was absurd. It was at least 15 percent
24 overstated by any reasonable reckoning. And I met
25 with-- specifically in a meeting with Chuck

MANHATTAN REPORTING CORP., A LegaLink Company

1              * * *
2  A.    Okay.
3  BY MR. TORBORG:
4  Q.         Do you recall this document?
5  A.    I vaguely do.
6  Q.         Does this appear to be either an
7  earlier or a later version of the previous
8  document?
9  A.         It strikes me as being a later version
10  of the document that was in draft form at this
11  point, the first document you showed me.
12  Q.         Why does it appear to be later?
13  A.    Because it seems like it's a little
14  bit more refined in terms of the writing.  It's
15  condensed.  And it-- the syntax and flow of the
16  document is much better, whereas the first one
17  looks like it's kind of like a quick, more
18  emotion-laden presentation of the same
19  information.  So it evidences, basically, the
20  refinement that would come from editing it
21  carefully and also looking at things a little bit
22  less emotionally and objectively after the fact.
23  Q.         Do you believe that you drafted this
24  document?
25  A.         I believe that I did, yes.

1  THE STATE OF   :
   WEST VIRGINIA  :
2              SS: C E R T I F I C A T E
   COUNTY OF OHIO :
3
4      I, TAMMIE PULS, Registered
   Professional Reporter and Notary Public
5  within and for the State of West Virginia duly
   commissioned and qualified, do hereby certify that
   the within-named witness, RUSSELL LAING, was by me
6  first duly sworn to testify to the truth, the
   whole truth and nothing but the truth in the cause
7  aforesaid, and the testimony then given by the
   witness was by me reduced to stenotype in the
8  presence of the witness; afterwards reduced to
   Computer Aided Transcription under my direction
9  and control; that the foregoing is a true and
   correct transcription of the testimony given by
10  said witness.
11      I do further certify that this
   testimony was taken at the time and place in the
12  foregoing caption specified, and was adjourned, to
   be completed at a later time.
13
14      I do further certify that I am not a
   relative, counsel or attorney of either party, or
15  otherwise interested in the event of this action.
16
       IN WITNESS THEREOF, I have
17  hereunto set my hand and affixed my seal of
   office at Wheeling, West Virginia, on the   day
18  of        2003.
19
20         _____
           TAMMIE PULS, Registered
           Professional Reporter and
21         Notary Public within and for
           the State of West Virginia
22
23  My commission expires September 22, 2003
24
25

1       MR. TORBORG:  Mr. Laing,
2  that's all the questions I have for you.  It
3  happens to be 5:00, anyway.  So I thank you very
4  much for your time.
5       THE WITNESS:  You're welcome.
6       MR. TORBORG:  And he may have
7  some questions after my questions, but thanks.
8       MR. LUFT:  And we'll reconvene
9  tomorrow at 5:00.
10       THE WITNESS:  We'll reconvene
11  at 5:00.
12       MR. LUFT:  Or at 9:00.
13       THE VIDEOGRAPHER:  The time is
14  4:54.  We're now going off the record.
15              * * *
16       (Whereupon, this deposition
17  was adjourned at 4:54 p.m.)
18              * * *
19
20
21
22
23
24
25

MANHATTAN REPORTING CORP., A LegaLink Company

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

RUSSELL LAING
*April 23, 2003*

---

# *MANHATTAN REPORTING CORP.*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

LAING, RUSSELL

RUSSELL LAING

Page 342

1  very demanding, driving style.  And he would set
2  goals and he would vigorously enforce everyone's
3  work efforts to achieve those goals.
4        I think-- you know, my perception of
5  the cash collection process that-- that was
6  effectuated as a result of Greg's very intense
7  driving style was that a lot of the good results
8  that were produced were-- were directly
9  attributable to that driving, intense style of
10 his, but it was very demanding.  It was daily.  It
11 was constant.
12       In my area, for example, in the cash
13 application area, we would apply probably
14 literally a million individual payments to patient
15 accounts on a daily basis of varying sizes and
16 even one of those payments being misapplied or
17 applied incorrectly would result-- could result,
18 potentially, in a very severe sounding out by
19 Greg, you know, profanity ladened, you know,
20 session, and you know, with strong remonstrances
21 to do better and to prevent it from happening
22 again, that type of thing.
23 Q.      When you were in these group meetings
24 you mentioned, did he react the same way to other
25 people at those meetings, or was this particular

Page 343

1  to you?
2  A.      No, I think he reacted that way to
3  pretty much everybody.  Particularly-- but with
4  the caveat that-- that to the extent that those
5  people performed positive affirmative
6  accomplishments that-- that they could demonstrate
7  in the meeting or that Greg was aware of, anyway,
8  he would tend to lighten up on those people.
9        And with respect to myself, I think
10 that over a period of time, that actually turned
11 into a very positive thing in my relationship with
12 him.  In the sense that although in the first
13 maybe six months I took my share of tongue
14 lashings, I think I built up a level of trust
15 and-- and accomplishment with him and-- to the
16 extent over a period of time, I was almost sort of
17 like in a protected class, because there came a
18 time when-- when it would be unheard of for him to
19 yell at me or to go off on me in a meeting.
20 Q.      Did you feel-- when you first started
21 during the six months he was yelling at you, did
22 you feel free to raise concerns and questions with
23 Greg at these group meetings in a public setting
24 that you-- about your work?
25 A.      Yes, I-- I pretty much did.

Page 344

1  Q.      To the extent you know, did anyone
2  ever tell you that they felt-- that they felt
3  comfortable in the group setting airing concerns
4  they had about the Patient Financial Service
5  Group?
6  A.      I didn't hear the first part of your
7  question, I'm sorry.
8  Q.      Okay.
9        Did anyone ever tell you that they
10 ever did not feel comfortable about airing
11 concerns they had about how their work was going
12 in the Patient Financial Service Group in these
13 public meetings with Greg?
14 A.      I never heard anybody say that they
15 were uncomfortable saying those kinds of things.
16 I think people were, as a matter of fact,
17 intimidated in those meetings and typically people
18 who are intimidated or cajoled, it's been my
19 experience, are reluctant to bring up problem
20 areas because it invites more investigation and so
21 forth.
22       But no one ever expressed to me, that
23 I recall, any kind of explicit statements that I
24 couldn't bring up a problem because I was afraid
25 Greg would yell at me.

Page 345

1        I did-- I do recall that in those
2  group meetings problems were brought up and
3  sometimes they were brought up, you know,
4  painfully, but they were-- I do recall problems
5  being brought up in those meetings.
6  Q.      Do you recall if anyone ever left the
7  Patient Financial Services Group because of poor
8  interactions with Greg?
9  A.      I can't say that-- that I-- I remember
10 any specific individual doing that.  I do recall
11 individuals leaving and it-- it would be my own
12 opinion that, at least in some cases, part of that
13 reason might be because of Greg's style.  But I
14 can't say that somebody came to me and said, I'm
15 leaving because I can't take it anymore with Greg,
16 nothing like that.
17 Q.      Okay.
18       Would you describe Mr. Snow as being a
19 trustworthy individual?
20 A.      No.
21 Q.      Why not?
22 A.      Greg seemed to be the kind of
23 individual that had a-- an agenda and he also
24 seemed a-- a very highly strung, emotional
25 individual.  So that it's been my experience that

8 (Pages 342 to 345)

RUSSELL LAING

Page 346

1  people that are like that are-- oftentimes have
2  multiple agendas and when they are very emotional
3  sometimes can run to one direction or another as
4  opposed to having like sort of a stable set of
5  values that they operate around.
6        And my impression of Greg was more
7  that he was kind of more in the category of
8  somebody that-- that was very emotionally driven
9  and that he frequently had some sort of
10 close-to-his-vest-type agendas that-- that I
11 didn't know about and didn't necessarily know
12 everything that was on his plate.
13       So in that sense, no, I didn't feel
14 like I had a total lock on-- on understanding him
15 and being able to relate to him in a very
16 straightforward way all the time.
17       At the same time, though, I would also
18 say that in my working relationship with Greg I
19 felt that I had a very strong sense of trust.  And
20 I'm sorry to sound like contradictory, but I had a
21 strong sense of trust that I knew what he expected
22 of me and what he wanted me to do and the level of
23 excellence that he wanted me to achieve and that
24 if I did those things I could depend on the-- the
25 working relationship that I had with him being a

Page 347

1  congenial, even supportive relationship, which, at
2  times, it was.
3  Q.        Do you know if Mr. Snow, from your own
4  knowledge of him, tended to be forthright in his
5  dealings with individuals?
6  A.        He would run to some extremes with
7  that.  Sometimes he would be extremely direct and
8  uncomfortably direct, painfully direct with
9  individuals.  And at other times I think that he
10 would-- he would be the type of person that would
11 not necessarily openly bring out something, but
12 rather hold it inside or to deal with it in a
13 different manner indirectly, which was, I think,
14 part of the trust issue.
15 Q.        Would you describe Mr. Snow as someone
16 who would base his actions based on his own
17 personal interest above the group?
18        MR. TORBORG:  Objection.
19 BY MR. LUFT:
20 Q.        From your experience working with
21 him.
22        MR. TORBORG:  Same objection.
23 A.        Yes, I would.
24 BY MR. LUFT:
25 Q.        Why would you say that?

Page 348

1  A.        It was the impression of the type of
2  person that he seemed to be.  He did not-- most
3  people have some strong measure of self-motivation
4  and, you know, self-interest, but they also have
5  sort of a balancing, organizationwide interest.
6  I-- I-- just as a personal impression, and only as
7  a personal impression, I think that-- that the
8  achievements that Greg accomplished and the things
9  that he did were very self-directed, very-- to an
10 extent greater than I've seen in other people,
11 but-- but not unusual for people at that level in
12 that type of a situation.
13 Q.        If I could just turn your attention
14 for a second to Exhibit 1196.
15 A.        Would you be so kind as to describe
16 that?
17 Q.        Sure.  It's a March 25th, 1996, memo
18 from Greg Snow to Joe Dionisio.  The subject is
19 the DRO.  And I'll wait until you find it.
20        This is what it looks like, Mr. Laing
21 (indicating).
22 A.        Okay.
23 Q.        I believe yesterday when you looked
24 at this document, Mr. Torborg was asking you about
25 it, you described it as a typical Greg Snow

Page 349

1  emotional response where the facts might not
2  exactly be right, but he was very interested in
3  getting something out quick.
4  A.        And conveying an impression.
5  Q.        Now when you say a typical-- I believe
6  you described it as a typical Greg Snow emotional
7  response, what exactly do you mean by "typical"?
8  A.        I think Greg was a very highly
9  intelligent individual, but he also was an
10 extremely emotional individual and-- and when he
11 felt embattled, and somebody that was in his
12 position would probably, in any event, feel
13 embattled almost all the time, he had a tendency
14 to sort of lash out.  And in lashing out, he would
15 take any information that would-- that would help
16 make the point that he wanted to make and-- and
17 just throw it out there.  Sometimes without--
18 without sitting back and counting to 10 about the
19 delivery or the content.
20 Q.        And by the content, in some cases,
21 such as in Exhibit 1196, even if it wasn't
22 factually accurate, he'd still toss it in there.
23        MR. TORBORG:  Objection.
24 A.        I think that when Greg put this memo
25 together, having worked with him, I believe he

9 (Pages 346 to 349)

RUSSELL LAING

Page 546

1  that were used at UPMC that came from the revenue
2  department, they were finally approved by you, but
3  the numbers and the data were coming from the
4  revenue department?
5  A.      Yes, that's correct.
6  Q.      And at AHERF the data that Dan
7  Cancelmi was using was housed in the general
8  accounting department?
9  A.      And originated there, that's correct,
10  too.
11          MR. LUFT:  Thank you very
12  much.
13          MR. TORBORG:  I'll let you
14  have the last word.
15          THE VIDEOGRAPHER:  The time is
16  1:32.  We are now going off the record.
17          THE REPORTER:  Does someone
18  want to explain signature?
19          MR. LUFT:  Mr. Laing, you have
20  the right, and I encourage you to take it, to read
21  your transcript within, I believe, 30 days of
22  receiving it and make any corrections.  There are
23  typographical-- there are sometimes things that
24  just don't come out that, you know, is not clear
25  on the record.  And our interest is having the

Page 547

1  most correct record possible.  So you have this
2  opportunity to have the transcript sent to you to
3  read it over and make any corrections that you
4  feel that are either clearer for the record or
5  typographical in nature.
6          THE WITNESS:  Who would I
7  communicate this to if I found such?
8          MR. TORBORG:  Why don't you do
9  it to me?  I'll give you my business card.
10          MR. LUFT:  Usually the form it
11  takes is simply a sheet that says whatever the
12  line number is and the page and the word change
13  that you think should have taken place and then
14  just some signature-- you know, some type of
15  statement that this is your corrections to your
16  testimony and you now believe this to be accurate
17  and correct.
18          THE WITNESS:  Okay.
19          * * *
20          (Whereupon, this deposition
21  was concluded at 1:32 p.m.)
22          * * *
23          (Whereupon, signature was not waived
24  by the witness.)
25          * * *

Page 549

1  THE STATE OF    :
   WEST VIRGINIA  :
2                  SS.  C E R T I F I C A T E
   COUNTY OF OHIO :
3
4      I, TAMMIE PULS, Registered
   Professional Reporter and Notary Public
   within and for the State of West Virginia duly
5  commissioned and qualified, do hereby certify that
   the within-named witness, RUSSELL LAING, was by me
6  first duly sworn to testify to the truth, the
   whole truth and nothing but the truth in the cause
7  aforesaid; and the testimony then given by the
   witness was by me reduced to stenotype in the
8  presence of the witness; afterwards reduced to
   Computer Aided Transcription under my direction
9  and control; that the foregoing is a true and
   correct transcription of the testimony given by
10 said witness.
11     I do further certify that this
   testimony was taken at the time and place in the
12 foregoing caption specified, and was completed
   without adjournment.
13
14     I do further certify that I am not a
   relative, counsel or attorney of either party, or
15 otherwise interested in the event of this action.
16
17     IN WITNESS THEREOF, I have
   hereunto set my hand and affixed my seal of
18 office at Wheeling, West Virginia, on the   day
   of        2003.
19
20          _____
            TAMMIE PULS,
            Registered Professional
21          Reporter and Notary Public
            within and for the
22          State of West Virginia
23 My commission expires September 22, 2003
24
25

Levy Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *HARVEY LEVY*
### *January 30, 2003*

---

## *MANHATTAN REPORTING CORP.*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**LEVY, HARVEY (1/30/2003)**

**Word Index included with this condensed transcript**