Page 162

1    250. Now, it is 307.
2    BY MR. RYAN:
3    Q      I am talking first about the November
4    30th, 1996, figure of 238.
5    A      Right.
6    Q      So during those two months it looks like
7    the number of physicians in the AIHG network declined
8    slightly; is that right?
9    A      From September 13th to November 30th it
10   looks like it did.
11   Q      And there is a reference on the top of
12   this page in Exhibit 1304 to closures, consolidations
13   and turnover during the third quarter?
14   A      Right.
15   Q      Were you involved at all in closing
16   certain practices or in consolidating practices?
17   A      Yes.  This is part of that effort that I
18   was talking about getting doctors to move in together
19   and whatever to cut down the losses.
20   Q      So during this time period even in the
21   fall of 1996 you were working actively to try to
22   consolidate money losing practices?
23   A      Yes, that's correct.
24   Q      Then between November 30th, 1996, and
25   February 28th, 1997, the number of physicians in the

Page 163

1    AIHG network seems to have increased by about 70,
2    from 238 to 307; right?
3    A      That's right.
4    Q      And there is a reference at the top to
5    the addition or planned addition of Founders
6    practices in Pennsylvania and New Jersey?
7    A      That's correct.
8    Q      Were those about 70 doctors?
9    A      That's about what they were.
10   Q      So is it generally the case that except
11   for the addition of the Founders practice network
12   during this timeframe fall of 1996, early 1997 there
13   was very little, if any, additional acquisition
14   activity taking place?
15   A      That's correct.
16   Q      And did that continue for the remainder
17   of the time that you were at AIHG, that the
18   acquisition activity was very low?
19   A      That's correct.  We didn't have any more
20   money to do it with.
21   Q      And that's then the timeframe when you
22   then gradually shifted into working on operations?
23   A      That's correct.
24          MR. RYAN:  Let me mark, please, as
25   Exhibit 1305 a document with Bates numbers

Page 164

1    PR.Dr.K.09-1450 to 58.
2          (Whereupon, the Court Reporter
3          marked a document as Exhibit 1305.)
4    BY MR. RYAN:
5    Q      Do you recognize Exhibit 1305, Mr. Levy?
6    A      No.
7    Q      Do you know who Janet Walz is?
8    A      She was Carol Calvert's secretary.  At
9    this point she was -- was Carol Calvert still here
10   then?
11   A      I don't believe so.
12   A      Then she was Donald Kaye's secretary.
13   Q      And the letterhead here is from an office
14   in Cheltenham?
15   A      That's where our corporate center was,
16   yes.
17   Q      And, I mean, you had an office there?
18   A      That, I did.
19   Q      The cover memo refers to a practice
20   review follow-up meeting?
21   A      Yes.
22   Q      Then the attachments appear all to be
23   summaries of practice review meetings.  Are those
24   meetings that you are familiar with?
25   A      Yes.

Page 165

1    Q      What kind of meetings were those?
2    A      These were discussions as to how the
3    practice -- like it says, Bensalem profit losses
4    $400,000, budget $200,000, decreased -- you know, it
5    was discussions as to various practices and what we
6    could do either financially or about admissions.  So
7    it was to discuss how practices were doing.
8    Q      And were these practice reviews part of
9    an effort to try to run the practices better?
10          MS. BUTLER:  Object to form and
11   foundation.
12          THE WITNESS:  I guess, yes.
13   BY MR. RYAN:
14   Q      And do you recall attending such practice
15   review meetings with Dr. Kaye and others in the
16   spring of 1996?
17   A      Yes.
18   Q      Who else was active at that time in the
19   effort to improve performance of the AIHG practices?
20          MS. BUTLER:  Object to form and
21   foundation.
22          THE WITNESS:  Dr. Segal.  That's
23   probably all.
24   BY MR. RYAN:
25   Q      Let me show you a letter from Dr. Segal.

HARVEY LEVY

Page 166

1 It's contained in a rather large previously marked
2 exhibit, so let me hand you Exhibit 495. Let me just
3 ask you at the outset, as you look at the cover page
4 and the table of contents on the next page, is this a
5 book or binder that is familiar to you?
6 A    Yes.
7 Q    What sort of book was it?
8 A    This was a summary of the practices and
9 the new structure and whatever else from Allegheny
10 Integrated Health Group. It was a summary of how the
11 practices were doing, where they were, who was
12 involved in each one, all of that.
13 Q    Do you know who prepared this book?
14 A    No.
15 Q    On the cover page it says, Allegheny
16 Integrated Health Group, Book No. 3. Were there
17 previous or subsequent books?
18 A    To tell you the truth, I used to get
19 stuff all of the time and never even looked at it, so
20 I don't know. There probably were. I'm sure there
21 probably were.
22 Q    Let me ask you to turn, please, to Page
23 32 of 160, using the numbers in the bottom right-hand
24 margin.
25 A    The bottom right-hand margin?

Page 167

1 Q    See these ones printed sideways on the
2 page.
3 A    Oh, what page?
4 Q    Page 32.
5 A    Okay.
6 Q    Do you see this is a July 9th, 1997,
7 letter from Dr. Segal to you and Dr. Turtz?
8 A    Yes.
9 Q    It appears to be a lengthy list of 26
10 numbered items relating to areas of AIHG's operation
11 that Dr. Segal is interested in understanding.
12 A    Yes.
13 Q    And was this letter part of the effort
14 that Dr. Segal and Dr. Turtz and you undertook around
15 this July 1997 timeframe to try to improve the
16 efficiency of the AIHG group?
17 A    By efficiency -- not only in financial
18 efficiency, but in referral and capturing of risk
19 patients, yes. It was all of that. It wasn't just
20 money.
21 Q    And I think you said earlier that it was
22 your opinion that Dr. Segal was quite effective in
23 doing that; is that right?
24 A    Yes.
25        MR. RYAN: Let me mark, please, as

Page 168

1 Exhibit 1306, a document with Bates Nos. DM2989,
2 Pages 1 to 4.
3        (Whereupon, the Court Reporter
4        marked a document as Exhibit 1306.)
5 BY MR. RYAN:
6 Q    Is this a memorandum that you sent to Dr.
7 Kaye on or about August 20th, 1997?
8 A    Yes.
9 Q    And in it you set forth a plan for
10 practice consolidations and changes?
11 A    Yes. And other things as well, opening
12 up stress echo labs. It was all sorts of things.
13 Q    And these were ideas that you had for,
14 among other things, improving the financial
15 performance of the AIHG practices; right?
16 A    And capturing a bigger portion of the
17 patients, yes.
18 Q    To the AHERF hospitals?
19 A    Or at least not out of our system, yes.
20 Q    Were you able to implement most of these
21 recommendations?
22 A    A lot of them.
23 Q    And do you believe those changes, in
24 fact, did improve the --
25 A    The losses were basically half or better

Page 169

1 than half of what they were.
2 Q    There is a reference to that on the last
3 page, Page 4 of the document. Do you see the
4 Heading, Financial Impact?
5 A    Yes.
6 Q    And the second paragraph begins, Total
7 budgeted loss for fiscal year 1998 is $37 million?
8 A    Right.
9 Q    Is that for the eastern region practice
10 group?
11 A    Yes. I didn't have anything to do with
12 the other one.
13 Q    And then if I understand what you are
14 saying right, you calculated that the improvements
15 that you were making would result, you believed in a
16 loss of $11.05 million by June 2000; is that right?
17 A    That's correct.
18 Q    So that was in effect sort of a
19 three-year plan to cut the losses to about $11
20 million a year?
21 A    And maintain the sites that we had. In
22 other words, like, we couldn't close up that -- some
23 of the -- this is including all of the OB practices
24 and -- yes, that we couldn't stop losing money on.
25 Q    Couldn't stop losing money because you

43 (Pages 166 to 169)

HARVEY LEVY

Page 250

1  think it was sold. I don't know if he is still
2  involved in it.
3  Q      Do you know where the company was based?
4  A      It was in New Jersey somewhere. Maybe
5  around Cherry Hill.
6  Q      Do you know to whom Joel Schreiber sold
7  the company?
8  A      No.
9  Q      Do you know whether David McConnell
10  withheld information from Coopers & Lybrand?
11        MS. BUTLER: Objection to
12  foundation.
13        THE WITNESS: No.
14  BY MR. RYAN:
15  Q      Did you receive any portion of your
16  compensation in the form of an incentive for the
17  acquisition of physician practices?
18  A      Yes.
19  Q      Was it an amount per practice acquired?
20  A      $1,000.
21  Q      And that came on top of your base salary?
22  A      That's correct.
23  Q      Did the incentive amount per practice
24  acquired vary depending on how profitable the
25  practice was?

Page 251

1  A      No.
2        MR. RYAN: That's all I have.
3        VIDEOTAPE OPERATOR: That now
4  concludes this videotape deposition and Tape No. 3.
5  The time 4:24 p.m.
6        (The deposition concluded at
7        approximately 4:25 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 252

1
2
3
4
5
6  _____, 2003
7
8
9        I hereby certify that the evidence
10  and proceedings are contained fully and
11  accurately in the notes taken by me of
12  the testimony of the within witness who
13  was duly sworn by me and that this is a
14  correct transcript of the same.
15
16
17
18
19        _____.
      Maureen Stewart, RPR
20      Notary Public
21
22
23
24
25

MANHATTAN REPORTING CORP., A LegaLink Company

**Lisman Dep.**

CHARLES W. LISMAN, JR.

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA

2

                              - - - -

3

THE OFFICIAL COMMITTEE OF          )
4  UNSECURED CREDITORS OF           )
   ALLEGHENY HEALTH, EDUCATION &    )
5  RESEARCH FOUNDATION,             )
                                    )
6                  Plaintiff,       )
                                    )
7              -vs-                 )      Civil Action
                                    )      No. 00-684
8  PRICEWATERHOUSECOOPERS, L.L.P.   )
                                    )
9                  Defendant.       )

10

11                      - - - -

12                      VOLUME I
                       VIDEO TAPE
13   DEPOSITION OF:   CHARLES W. LISMAN, JR.

14                      - - - -

15

                   DATE:   May 22, 2002
16                         Wednesday, 9:00 a.m.

17

                   LOCATION:   MANION McDONOUGH & LUCAS
18                             14th Floor, USX Tower
                              Pittsburgh, PA  15219
19                             412-232-0200

20

                   TAKEN BY:   Defendant

21

22                 REPORTED BY:   JoAnn M. Brown, RMR
                                 Notary Public
23                               AKF Reference No. JB70344

24

25

CHARLES W. LISMAN, JR.

Page 126

1 Q. Do you specifically remember that Mr. Cancelmi
2     used the words "he bought off on it?"
3 A. Can I specifically sit here? No, because if I
4     could specifically say that, I could cite to
5     you what office and at what time frame it was
6     done in. I can't do that.
7 Q. So he could have used other words?
8 A. Sure.
9 Q. Do you remember any other conversations with
10    anyone from Coopers & Lybrand about the $50
11    million reserve transfer?
12 A. It would have had to have come up when they
13    wanted the backup for one of the liability
14    accounts in the Graduate purchase accounting
15    entries, what was in the asset and what was in
16    the liability. It would have had to have come
17    up at that point.
18 Q. Is there a specific meeting that you remember
19    where that came up?
20 A. There was a conversation that I had that was the
21    makeup of one of the liability accounts, and I
22    can't think of the name, and I don't know the
23    number, it was a four number, and it detailed
24    out by hospital what the entries were making it
25    up, and out to the right it even showed what

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 127

1    the entry was on the other side where it
2    transferred through intercompanies. That I
3    would have had the conversation potentially
4    with someone that did PP&E, because one piece
5    of one of the schedules dealt with PP&E, and
6    that's where we ultimately found it in their
7    work papers, because so many of them had asked
8    me for this document because it hit so many
9    different areas, and I had given it to them on
10    disk. I finally got fed up, and I went back to
11    their -- I think they were in the internal
12    audit section of the thing at that point, and I
13    remember sitting down at their computer and
14    having them walk me through where is this
15    document referenced, because it wasn't the old
16    paper system that I was used to, and they would
17    keep jumping me around, okay, where does that
18    go, where does that go, where does that go, and
19    ultimately I think we found it in PP&E.
20    There's the document you guys keep asking me
21    and I say I've given to each one of you
22    already, but everyone seemed to have lost it.
23    But I remember going through because I was mad
24    because every single one of them kept asking me
25    for it, and I knew I had given it to all of

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 128

1    them.
2 Q. All right. Well, after lunch, I'll show you
3    what may be this document you're talking about.
4 A. Okay.
5 Q. Let me just ask you one question now which is:
6    In the answer you just gave, you said often
7    they, and I guess you were referring to people
8    from Coopers?
9 A. Coopers. Correct. It would have been various
10    staff people from Coopers.
11 Q. Do you know which staff people those were?
12 A. I think when I sat down to go through the
13    computer, it was Christa doing the walking me
14    through it, Christa Porter I think that was,
15    and then there were a couple other staff
16    members in that same room at the same time,
17    because I kept wanting to see, okay, is it in
18    your permanent documentation because this is an
19    acquisition? That's where it would have filed
20    when I was auditing or it would have been in
21    liabilities in support for that number, but
22    their system was all in the computer, so you
23    had to kept referencing around till you found
24    it, and I didn't know how to use it, so she was
25    getting me through the system.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 129

1 Q. Was Ms. Frazier there at that time?
2 A. I don't know. I don't. Mark, Amy and Bill
3    were in at varying points. They were not there
4    in a day-to-day capacity. They would come in
5    and do reviews in certain time frames, not
6    every day, though.
7 Q. Okay. So you can't recall if any of the three
8    of them was at that meeting you're talking
9    about where you sat down with the class system?
10 A. No, I can't.
11       MR. RYAN: Okay. Why don't we take a
12    break for lunch at this point.
13       THE VIDEOGRAPHER: We're now going
14    off the record. The time indicated on the
15    screen is 12:34.
16       - - - -
17       (There was a luncheon recess in the
18    proceedings.)
19       - - - -
20       THE VIDEOGRAPHER: We're now back on
21    the record. The time on the screen is 1:35.
22       - - - -
23       (Deposition Exhibit 8 marked for
24    identification.)
25       - - - -

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 130

BY MR. RYAN:

1
2  Q.  All right.  We've marked as Exhibit 8 a
3      document with the Bates Nos. CLIS 0168 through
4      0170.  Do you recognize this document,
5      Mr. Lisman?
6  A.  Yes.
7  Q.  It's a memorandum from Mr. Cancelmi to
8      Mr. Spargo dated April 14, 1997, is that right?
9  A.  Correct.
10 Q.  Is this the memo you were talking about before
11     when you said that you saw a memo from
12     Mr. Cancelmi about the $50 million reserve
13     transfer?
14 A.  Yes.
15 Q.  Now, if you look at the list of people who are
16     copied on the last page, it's Joe Dionisio,
17     Chuck Morrison, Greg Snow and Al Adamczak, is
18     that right?
19 A.  Correct.
20 Q.  Do you believe that you received a copy of this
21     memo close to the time when it's dated?
22 A.  Yes.
23 Q.  Did you ever provide this memo to Coopers &
24     Lybrand?
25 A.  Not that I recall.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 131

1  Q.  Do you know whether anybody else at AHERF
2      provided this memo to Coopers & Lybrand?
3  A.  I can't say that for sure, no.
4  Q.  Has anybody ever told you that they provided
5      this memo to Coopers & Lybrand?
6  A.  I don't remember.
7          MR. RYAN:  Let me mark, please, as
8      Exhibit 9 the document with the Bates Nos. CL
9      013232 through 013236.
10         - - - -
11         (Deposition Exhibit 9 marked for
12     identification.)
13         - - - -
14 BY MR. RYAN:
15 Q.  All right.  If you could turn, please, to the
16     second page of Exhibit 9.  Is this schedule
17     familiar to you?
18 A.  Yes --
19 Q.  Is -- sorry.  Go ahead.
20 A.  Not necessarily in this format.  Mine would
21     have been landscaped, the one that I had.  That
22     looks like similar data that would have been my
23     schedule.
24 Q.  I understand.  And what happens is when
25     schedules go into the class system, sometimes

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 132

1      they can get printed out in different format,
2      but I guess if you wouldn't mind taking a close
3      look at the three pages with the Bates numbers
4      in the bottom right corner ending in 33, 34 and
5      35 and letting us know whether you think that
6      these are schedules that you prepared and
7      provided to Coopers & Lybrand?
8  A.  Something similar to this, yes.
9  Q.  Now, there's one schedule for The Graduate
10     Hospital, is that right?
11 A.  Correct.
12 Q.  And the second schedule is for Mt. Sinai
13     Hospital?
14 A.  Correct.
15 Q.  And the third schedule is for Rancocas
16     Hospital?
17 A.  Correct.
18 Q.  Were those the three former Graduate Health
19     System hospitals for which you had accounting
20     responsibilities?
21 A.  Yes.
22 Q.  Do you know whether anyone at AHERF prepared a
23     schedule like this for the Parkview or City
24     Avenue hospitals?
25 A.  I don't remember.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 133

1  Q.  Could you describe for us what the purpose of
2      these three schedules is?
3  A.  This was detailing out the activity relative to
4      the Graduate acquisition.  This should have
5      been the balances that went into the liability
6      account and, I believe, the account numbers
7      after you get past -- and I'm looking from the
8      left side of the page going into the right.
9      After you get by description, then you have
10     2501900.  If I had a general ledger, I would be
11     able to tell you the account name for that, but
12     I think that is the liability account.  Then
13     any of the accounts beyond the total of 2501900
14     would say where the corresponding liabilities
15     or the other side to the entries went to, and
16     then out to the right where it says Other G/L
17     number -- second column in from the right,
18     Other G/L --
19 Q.  Right.
20 A.  -- is where the other side would have
21     ultimately gone to.
22         MR. JONES:  Note my objection to
23     foundation in that I don't think he has
24     testified that he prepared these particular
25     schedules.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 162

1    a sentence that you already read, that it is
2    not technically the appropriate -- most
3    technically appropriate resting place. That it
4    wasn't necessarily right, but it might not
5    necessarily be wrong, but that's how the
6    transaction was going to go.
7  Q.  Right. And I see what he says here in this
8    memo.
9  A.  Okay.
10 Q.  What I'm asking you is to try to recall whether
11   or not you had a view, after speaking to
12   Mr. Cancelmi, about whether the transfer of
13   reserves, the $50 million of reserves was
14   improper?
15 A.  And my answer probably still would be, yes, I
16   probably had a question on it.
17 Q.  Did you feel uncertain as to whether it was
18   proper or improper?
19 A.  I think there's -- whether it's proper or
20   improper, this memo even tells you it's not the
21   most technically appropriate place. However,
22   my boss and our outside accounting firm was
23   okay with the transaction being recorded in
24   that method, so we got the entries written up
25   to record in that method.
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 163

1  Q.  Did you consider talking to anybody other than
2    Mr. Cancelmi about this $50 million reserve
3    transfer?
4  A.  No. You mean like Steve or someone above Dan?
5    No. No.
6  Q.  Did you think about talking directly to Coopers
7    about the $50 million reserve transfer?
8  A.  Talking to Bill Buettner about it?
9  Q.  To anyone at Coopers.
10 A.  Well, if it was Bill that was the one making
11   the decisions, it would have to have come from
12   Bill because it would be third party if you
13   talked to anyone else, but, no, I would not
14   have called Coopers to see their viewpoint. I
15   had no reason to disbelieve Dan telling me
16   that.
17 Q.  Now, at a later point in fiscal year 1997,
18   AHERF transferred some additional reserves from
19   the Graduate hospitals to the DVOG hospitals,
20   right?
21 A.  I recall something else transferring. I don't
22   know what it is off the top of my head.
23 Q.  Do you know who decided to make those
24   additional reserve transfers?
25 A.  Who decided?
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 164

1  Q.  Yes.
2  A.  No. Who would have notified me how much had to
3    come from each hospital, I would have gotten
4    that from Dan. Who made the decision as to
5    where, when, why and how, I don't know.
6  Q.  Did you ever speak to anybody from Coopers &
7    Lybrand about these additional reserve
8    transfers?
9  A.  Not that I recall.
10 Q.  Did you ever discuss with Mr. Cancelmi whether
11   he had spoken to Coopers & Lybrand about the
12   additional reserve transfers?
13 A.  I don't recall.
14 Q.  Did you ever speak to Ms. Schaffer about
15   whether she spoke to Coopers & Lybrand about
16   the additional reserve transfers?
17 A.  I don't remember.
18 Q.  Have you ever heard of anybody at AHERF
19   speaking to Coopers & Lybrand about the reserve
20   transfers beyond the $50 million?
21 A.  Specifically, no.
22 Q.  Even generally?
23 A.  I would have seen a memo on it. I don't know
24   if that memo went to them, but in an audit of
25   the intercompany activity, not just that they
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 165

1    balance, but if you audit the large
2    transactions, it should have kicked out, in
3    auditing those transactions, what is the
4    support for this, but I don't know that, yes,
5    it was discussed with them one way or another
6    or if they performed that audit of the
7    intercompany transactions versus just looking
8    to make sure everything balanced out and they
9    were fine.
10 Q.  So just to be clear, you never heard anybody at
11   AHERF claim that they told Coopers & Lybrand
12   about reserve transfers beyond the $50 million?
13 A.  I don't remember.
14      MR. JONES: Object to form.
15 Q.  Do you know why AHERF made those additional
16   reserve transfers beyond the $50 million?
17 A.  Sitting here today, no. I know there was a
18   memo on it.
19      MR. RYAN: Let me mark, please, as
20   Exhibit 10, a packet of documents with the
21   Bates Nos. TN C9A 01320 through 01376.
22      - - - -
23      (Deposition Exhibit 10 marked for
24   identification.)
25      - - - -
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 166

1  BY MR. RYAN:
2  Q.   Now, I've been told you, Mr. Lisman, that these
3       documents come from files associated with you,
4       but I'd like you to try to look through this
5       and see if you can verify that, if you
6       recognize these documents, the handwriting on
7       the file folder, et cetera?
8  A.   When you say associated with me, what are
9       you -- that these came out of folders that were
10      in my office?
11 Q.   I've been told that C9A means Chuck Box 9A?
12 A.   Okay.
13      MR. JONES: Who told you that for the
14      benefit of the witness and me?
15      MR. RYAN: There's an index to the
16      trustee's repository that indicates that.
17      MR. JONES: I thought TN stands for
18      Tenet?
19      MR. RYAN: Right.
20      MR. JONES: And that's where these
21      were housed at some point -- became housed at
22      some point?
23      MR. RYAN: Right.
24      THE WITNESS: That these became --
25      anything that went to Tenet would have been
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 167

1       copies. The originals all remained at AHERF.
2       MR. RYAN: Okay.
3       THE WITNESS: So I'm just trying to
4       clarify his comment that these went to Tenet.
5       These would have been copies that made it to
6       Tenet. The originals would have stayed with
7       AHERF.
8       MR. RYAN: Okay.
9       MR. JONES: Mr. Lisman, because
10      you're apparently an unrepresented non-party
11      witness, it's fair, I think -- Antony, correct
12      me if I'm wrong -- to tell you that just
13      because Antony or his colleagues think that's
14      where they came from and have every reason to
15      believe, it doesn't mean that it, with all
16      certainty, occurred that way, and you may
17      ultimately say I've never seen these documents
18      or whatever you want. He's not telling you
19      believe him at pain of penalty of, you know,
20      imprisonment. He's telling you this is where I
21      think these documents came from. You can tell
22      him whatever you want about where they really
23      came from if you know.
24      THE WITNESS: Okay.
25 BY MR. RYAN:
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 168

1  Q.   Absolutely. That's the first thing I'm trying
2       to get straight in the record is whether these
3       really are from your files or not?
4  A.   Okay. I recognize most of them.
5  Q.   Do you recognize the handwriting on what
6       appears to be a file label on the first and
7       second pages of Exhibit 10?
8  A.   That would be my writing.
9  Q.   All right. Does that say fiscal year '96
10      year-end adjustments?
11 A.   Yes.
12 Q.   Do you recall that you maintained a file of
13      documents relating to year-end adjustments?
14 A.   Yes.
15 Q.   And does this appear to be that file?
16 A.   It appears to be some component of it, yes.
17 Q.   Now, if you could turn, please, to the third
18      page of the exhibit which has the Bates No.
19      1322, do you see a schedule entitled Delaware
20      Valley Year-End Adjustments?
21 A.   Yes.
22 Q.   Are you able to tell from the computer file
23      name who typed up this schedule?
24 A.   I can tell you whose drive it was stored on. I
25      can't tell you physically who typed it up. An
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 169

1       S would be the shared drive on the AHERF
2       system, and then Jodie would be Jodie Finn, our
3       secretary. 123 indicating it's Lotus.
4       Delaware -- DVY -- DV, Delaware Valley, year
5       end, YE, adjustment, and depending on the
6       timing, if Jodie started it and 4:30 rolled
7       around and she had to leave, I may have ended
8       up having to finish it or she may have done the
9       whole thing. I don't know sitting here which
10      logical pattern it went, but that did often
11      occur, that I would start a file, she would
12      finish it when she came in, or she'd start one
13      and I'd finish it.
14 Q.   Do you recognize the handwriting on this page?
15 A.   Yes.
16 Q.   Whose handwriting is it?
17 A.   That would be my writing.
18 Q.   Is all of it, so far as you can tell, your
19      writing?
20 A.   It appears to be.
21 Q.   Who prepared the typed schedule? That is, who
22      came up with the idea to create the schedule
23      like this?
24 A.   This schedule?
25 Q.   Yes.
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 202

1    I can't say for sure.
2  Q.  Do you remember anything about the journal
3     entries shown on this page?
4  A.  Not as we sit here now, no. There would be
5     something in support of -- these numbers
6     wouldn't have been just picked out of thin air
7     by corp. without having something else in
8     support of it, and I assume we're going to get
9     to that, but I don't know. We wouldn't have --
10     there would be something giving me these
11     numbers and how much to record on each of the
12     hospitals and what they were for.
13  Q.  Okay. Could you turn, please, to Bates No. 53
14     and 54?
15  A.  Okay.
16  Q.  Do you see this is a document headed AHERF
17     Analysis of Reserves?
18  A.  Yes.
19  Q.  Is this a schedule that you prepared?
20  A.  This would be a schedule that was on my
21     computer, yes, based on information that I got
22     from various people at various points in time
23     that was used to track or to keep track of the
24     reserves at various hospitals.
25  Q.  All right. So you were, in effect, the

Page 203

1     custodian of this schedule? You would update
2     it and so forth?
3  A.  Whenever I was asked to give an update of it,
4     yes. I don't know who did it prior. There was
5     some other version. Obviously, I didn't start
6     till March of '95. There was some handwritten
7     version tracking these items prior to that. So
8     this is just taking that version and prettying
9     it up and updating it.
10  Q.  Did you begin to maintain this schedule shortly
11     after you started at AHERF?
12  A.  I don't remember when I started maintaining it.
13     You would have to look in my computer to see
14     when the file was created. I don't remember
15     when I did it.
16  Q.  But it was something you did over a period of
17     years?
18  A.  This would be from beginning -- this could be
19     updated if Dan said he wanted an update this
20     month and then he wanted an update two months
21     from now and might not want another update for
22     six months, and usually there was either a tab
23     added or another column and you'd hide columns
24     and you'd add new columns and you'd hide old
25     columns. So I don't know that actual -- how

Page 204

1     many columns and how many updates there were of
2     this file.
3  Q.  All right. So there could have been other
4     columns in the computer file that you may have
5     used to hide functions so that they didn't
6     appear on the printout?
7  A.  Columns, yes, not rows. I would hide the
8     columns generally.
9  Q.  Did Mr. Cancelmi tell you to maintain this
10     schedule?
11  A.  He would have asked me to do this. He would
12     have given me the original handwritten version
13     or some component of it, if Al had all the
14     Pittsburgh ones and he had the Delaware Valleys
15     or Chuck had them, and we would have put them
16     into the computer and kept track of them from
17     there.
18  Q.  For what purpose did you maintain this reserve
19     schedule?
20  A.  This was just a simple way so that you did not
21     have to go and research through the general
22     ledger to find where you had potential reserves
23     on a given hospital. This just kept a
24     top-level picture of any hospital at that point
25     in time, whatever the point was.

Page 205

1  Q.  Did you and Mr. Cancelmi have a term that you
2     used to refer to this reserve schedule?
3  A.  The X File.
4  Q.  Is that like on the T.V. show the X Files?
5  A.  I don't know how it came about. I honestly
6     don't. I just remember we used to call it the
7     X File. I don't know why. I don't know.
8  Q.  X for excess or what?
9  A.  I have no idea at this point in time. It was a
10     name that stuck, and that's just what we --
11     we'd refer to it as that or we could call it
12     the analysis of reserves.
13  Q.  When you just normally talked about this
14     schedule, what term would you use?
15  A.  We would call it the X File.
16  Q.  Did you ever provide the X File to Coopers?
17  A.  No. I would have provided the X File to Dan.
18  Q.  Is there anybody besides Dan Cancelmi that you
19     provided the X File to?
20  A.  If he would have directed me to give it to
21     someone, I would have given it to them.
22  Q.  Do you recall any instance where he asked you
23     to give it to anybody else?
24  A.  Not directly that I recall.
25  Q.  Who else knew that the X File existed?

CHARLES W. LISMAN, JR.

Page 206

1  A.  I don't know who all knew that it existed. I
2     think quite a few people knew that it existed.
3  Q.  Other people who worked with you and Dan
4     Cancelmi?
5  A.  Yes. I think there were people -- I don't know
6     if anyone from Coopers had this or not. I know
7     there were people -- Dan obviously shared it,
8     because that one we were just referring to, I
9     saw a copy to Steve Spargo. He had it. I know
10    there was one that David McConnell had. I know
11    Sherif that was on one. I know that various
12    staff members within AHERF, that our staff knew
13    that this file existed. But all it was is it
14    brought reserves that if you looked at any
15    given account on a hospital that you were
16    responsible for -- if an accountant had
17    responsibility for Temple, like Jeff Bamburak
18    on St. Christopher's, he would have known he
19    had a reserve on his set of books. This just
20    brought it to one place, but in the revenue
21    section, Jeff wouldn't have known what he had
22    in the revenue section, so Robin would have
23    provided that piece of information. This is
24    just one -- this is a management tool to know
25    what everything was on each of the hospitals.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 207

1  Q.  Is it your understanding that the X File was
2     supposed to be a helpful general overview of
3     the reserve position at the various hospitals?
4  A.  That's what I would view it as, yes.
5  Q.  But you can't recall ever mentioning to Coopers
6     that the X File existed, right?
7  A.  Not that I recall, no, but if you're auditing
8     every account, this is just bringing it all in
9     one pretty picture is all this did, but, no, I
10    don't recall giving it to them.
11  Q.  Now, the numbers that are listed for the
12    various rows, do they always correspond to
13    current balances on the general ledger or could
14    they be simply portions of a general ledger
15    account that, through some other process, were
16    considered to be reserves?
17  A.  They would be a part. Some would be direct
18    dollar for dollar. Some would be a part of a
19    larger number potentially.
20  Q.  Okay. So if I went to the general ledger for
21    AHERF for June 30, 1995 or for June 30 of 1996,
22    I wouldn't necessarily be able to find all
23    these figures in the general ledger, right?
24  A.  If you went to an AHERF general ledger, you
25    wouldn't find any of these. You would have to

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 208

1     go to each hospital.
2  Q.  I apologize. If I went to the AHERF hospitals'
3     general ledgers at either June 30 of 1995 or
4     June 30 of 1996, I wouldn't necessarily be able
5     to find all these figures on the X file
6     schedule in the general ledgers, would I?
7        MR. JONES: Object to form.
8  A.  You would not necessarily find each one of
9     these dollar for dollar in the ledger. Some of
10    them you might see dollar for dollar in the
11    ledger.
12  Q.  Other would be, in effect, buried in larger
13    account balances, right?
14  A.  They wouldn't be buried. They would be a
15    component of a larger balance that if you had
16    the account makeup, it should be a portion of
17    the account makeup of that account.
18  Q.  Now, do you know whether Mr. Cancelmi used the
19    X File in making year-end adjustments?
20  A.  I don't know that I've said that Mr. Cancelmi
21    made year-end adjustments. This is what this
22    document -- Exhibit 10, Bates No. 22 is what
23    would have been given to me. I don't know if
24    Dan made that decision or if he would have sat
25    down with Steve, gone through the potential

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 209

1     reserves that were available on a hospital, and
2     then Steve would have in turn gone to David
3     McConnell. I don't know where the link went.
4     I'm not saying that Dan made the decision to
5     book these entries. My only documents from
6     Dan that told me how much to take and record on
7     the various hospitals. Who he got his marching
8     orders from, I assume, was Steve. So he did
9     not make the decision to make year-end
10    adjustments.
11  Q.  Did Mr. Cancelmi ever tell you whether he and
12    the people who were superior to him, such as
13    Mr. Spargo and Mr. McConnell, used the X File
14    in deciding what year-end adjustments to make?
15  A.  There were various points in time, because I
16    know this file. This one happens to say, when
17    I go to document 54, cc S. Spargo. I would
18    have to print this document again potentially
19    taking cc Spargo off and making it cc Abdelhak
20    and McConnell, and then potentially when Dan
21    later had to go through it with Al, I would
22    have completely tumble this thing around,
23    because Al liked to see Pittsburgh entities
24    first. So that meant that AHERF and AGH and
25    any of his original hospitals would have to

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 210

1    come to the top of the schedule, and the
2    Delaware Valley stuff would have to get moved
3    down. It all depended who this went to, but
4    there were copies that had cc Abdelhak, cc
5    McConnell, and this one happens to be cc
6    Spargo.
7  Q.  All right. You recall that from time to time
8    you provided copies of the X Files both to
9    Mr. Abdelhak and to Mr. McConnell?
10 A.  No. I provided it to Dan. Based on who he
11   told me to put on the cc, I would hand to Dan.
12   Dan, I assume, went to Steve. I don't believe
13   Dan went and sat down with Mr. Abdelhak or
14   Mr. McConnell. I think he went and sat down
15   with Steve. Steve in turn would take the cc
16   Abdelhak and McConnell and sit down with them
17   was my understanding of how the process went.
18 Q.  Okay. And that's what Mr. Cancelmi told you?
19 A.  Well, based on the fact that because it said
20   cc, I didn't physically put it in the
21   intercompany mail and send it to David
22   McConnell or Sherif Abdelhak. I would give the
23   cc Steve to Dan, and I would also give the cc
24   McConnell and Sherif to him, who I presume he
25   would then give to Steve so that he could go

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 211

1    and talk to them with.
2  Q.  All right. But you printed out at various
3    times copies of the X File that, in your
4    understanding, were intended to be provided to
5    Mr. Abdelhak and Mr. McConnell?
6  A.  Yes.
7  Q.  Do you have -- strike that.
8        Do you recall, as of what times
9    Mr. Abdelhak or Mr. McConnell saw copies of the
10   X File?
11 A.  No, I don't. It would be whenever Dan would
12   ask me for a copy, and he would tell me who, if
13   anyone, he wanted as the cc.
14 Q.  All right. So looking at the schedule on Bates
15   53, do you see the first row at Allegheny
16   University is revenue reserve from Center City?
17 A.  Okay.
18 Q.  Do you know what that represents?
19 A.  No. I don't remember.
20 Q.  Do you see the second row is accrued severance?
21 A.  Correct.
22 Q.  Do you know what that represents?
23 A.  There were numerous -- I'm going to just tell
24   you what I know about it. I don't know the
25   specifics. There was a potential severance

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 212

1    package given to numerous doctors that they
2    were terminating or potentially terminating,
3    and later this doesn't necessarily mean that it
4    went -- got reversed. It could have actually
5    been paid to those people. I don't remember
6    the specifics around the transaction, but it
7    did relate to termination of some doctors or
8    group of doctors.
9  Q.  So, let me just follow up on a comment you just
10   made. The fact that a reserve amount on the X
11   File is present at one date and it's gone the
12   next date --
13 A.  Correct.
14 Q.  -- doesn't necessarily mean that it was taken
15   into income all in one fell swoop?
16 A.  Correct. Some of these are timing issues.
17   PP&E reserve is the next one in line.
18 Q.  Right.
19 A.  If you do nothing with PP&E reserve, by the end
20   of the depreciable life of that asset, it will
21   have caught itself up, or you can correct it
22   today. You have that option. Some of them go
23   away on their own or you can take them now.
24 Q.  All right. I think we already spoke about
25   capitalizing School of Public Health costs, so

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 213

1    let me move to the next row which is Hamot,
2    H-A-M-O-T, Hamot restricted monies.
3  A.  Yes.
4  Q.  Do you recall what that represents?
5  A.  No.
6  Q.  Is that something Carolyn Cafaro would know?
7  A.  Carolyn or Dan.
8  Q.  All right. You see the next entry, the first
9    one under St. Christopher's Hospital for
10   Children, it says accrual of fiscal year '97
11   expenses?
12 A.  Yes.
13 Q.  Do you know what that represents?
14 A.  Without looking back, no.
15 Q.  Do you know whether those were advertising
16   costs?
17 A.  Was that St. Christopher's? One of the
18   hospitals did have some sort of advertising
19   cost. I don't remember which one. That could
20   be. I don't know for sure.
21 Q.  Do you believe that this is a timing issue from
22   different years?
23 A.  I can't say factually today, but it's possible.
24 Q.  So two rows down there's an entry
25   for revenue reserve again?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 214

1  A.  Correct.
2  Q.  Do you have any knowledge about this revenue
3      reserve?
4  A.  No.
5  Q.  All right. The next entry is prior year CRA.
6      Do you know what that represents?
7  A.  That would be a CRA number that would have come
8      out of Joe Scharf's group.
9  Q.  Did Joe Scharf determine what the reserves were
10     in the CRA accounts?
11 A.  He would have, with his people, determined,
12     based on what cost reports they filed, where
13     they thought they had additional potential
14     revenues coming out of those cost reports, and
15     I thought that they sat down with, I want to
16     say, Dwayne Jarrell of Coopers every year and
17     went through the cost report or the CRA's and
18     what cushions/reserves they had in the various
19     buckets.
20 Q.  Do you know whether anybody at AHERF outside
21     Mr. Scharf's group had the ability to overrule
22     him on the appropriate reserve amounts for
23     CRA's?
24 A.  Run that by me one more time.
25 Q.  Do you know whether anybody at AHERF outside

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 215

1      Mr. Scharf's group had the ability to overrule
2      Mr. Scharf as to what the appropriate reserves
3      should be in a CRA account?
4  A.  Overrule him?
5  Q.  Yes.
6  A.  Well, I don't know what you mean by overrule
7      him.
8  Q.  Could Dan Cancelmi say, Joe, I see you want to
9      have this amount of money in the account, but I
10     think it should be a different amount of money?
11 A.  I think he relied on Joe to tell him what he
12     thought he had, and a lot of times it wasn't
13     even Dan would sit down with Joe, it was Steve
14     would tell Dan that he and Joe had sat down
15     with CRA's. Here's what Joe thinks. Joe
16     didn't like to tell anyone how much excess he
17     potentially had in the CRA accounts, so he was
18     very touchy on that. So a lot of times Steve
19     would have to get that information from him.
20 Q.  I think we've already talked about, at least in
21     general, entries for PP&E reserve and Health
22     Partners unrecorded equity. You see the next
23     line says Temple O.R. reserve?
24 A.  Yes.
25 Q.  Do you know what that represents?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 216

1  A.  Back then, yes. Today, no. There was a
2      dispute with Temple, the doctors, and there was
3      an agreement with sending residents in and the
4      service they were providing, and there was some
5      O.R. reserve. I don't remember that particular
6      item, but there were numerous items relative to
7      the Temple account.
8  Q.  Do you know what O.R. stands for?
9  A.  I would assume it stands for operating room,
10     but I don't know that for sure what I was
11     thinking when I put O.R. there, but looking at
12     it now, O.R. means operating room to me.
13 Q.  All right. The next row says general accrual.
14     Is that the same type of general accrual
15     account we were talking about earlier?
16 A.  Yes. That would be the reference back to --
17     just trying to make a link between them. It
18     should be document 39 rounded to the thousands,
19     a million two.
20 Q.  In fact, it's the same amount of money,
21     $1,200,000, as on the schedule of year-end
22     adjustments at Bates 22, right, where it shows
23     reverse general accruals for St. Christopher's
24     of a $1,200,000?
25 A.  Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 217

1  Q.  All right. So the next item is inventory
2      reserve. Is that the type of reserve you were
3      describing for us before?
4  A.  Potentially, yes.
5  Q.  And there could be changes in that reserve if a
6      physical assessment of the inventory was
7      performed at some time?
8  A.  A physical inventory of the inventory was done.
9  Q.  Got it. Do you see a couple rows down there's
10     an entry for SHSH Building?
11 A.  Yes.
12 Q.  Do you know what that represents?
13 A.  It was the Shush Building, and there were
14     some -- that's just what I knew it by, and
15     that's actually going the opposite direction.
16 Q.  Well, I was going to ask you about that.
17 A.  There was something -- that was something -- I
18     think that related to some sort of a condemned
19     building, and we had a potential for that
20     amount. So that wasn't a reserve. That was a
21     potential exposure item. So that's why it
22     would be negative in here.
23 Q.  So it's your understanding that that was a
24     potential liability not carried on AHERF's
25     financial statements, is that right?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 246

```
 1   off the record.  The time on the screen is
 2   5:05.  We'll reconvene tomorrow.
 3          - - - -
 4          (The proceedings were temporarily
 5   adjourned at 5:05 p.m.)
 6          - - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 247

```
 1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
 2   COUNTY OF ALLEGHENY        )  SS:
 3       I, JoAnn M. Brown, RMR, a Court Reporter and
 4   Notary Public in and for the Commonwealth of
 5   Pennsylvania, do hereby certify that the witness,
 6   CHARLES W. LISMAN, JR., was by me first duly sworn to
 7   testify to the truth; that the foregoing deposition
 8   was taken at the time and place stated herein; and
 9   that the said deposition was recorded
10   stenographically by me and then reduced to printing
11   under my direction, and constitutes a true record of
12   the testimony given by said witness.
13       I further certify that the inspection, reading
14   and signing of said deposition were NOT waived by
15   counsel for the respective parties and by the
16   witness.
17       I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 27th day of May,
23   2002.
24
25          _____
            Notary Public
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

Page 248

```
 1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
     COUNTY OF ALLEGHENY        )  S H E E T
 2
         I, CHARLES W. LISMAN, JR., have read the
 3   foregoing pages of my deposition given on Wednesday,
     May 22, 2002, and wish to make the following, if any,
 4   amendments, additions, deletions or corrections:
 5   Page/Line  Should Read      Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21          _____
               CHARLES W. LISMAN, JR.
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2002.
24          _____
               Notary Public
25   AKF Reference No. JB70344
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

Page 249

```
 1          AKF REPORTERS, INC.
               AKF Building
 2          436 Boulevard of the Allies
             Pittsburgh, PA  15219
 3             (412) 261-2323
 4
     May 27, 2002
 5
     TO:  Charles W. Lisman, Jr.
 6        681 Valencia Road
          Mars, PA  16046
 7
     RE:  VOLUME I DEPOSITION OF CHARLES W. LISMAN, JR.
 8
          NOTICE OF NON-WAIVER OF SIGNATURE
 9
         Your deposition transcript is completed and
10   ready to be read and signed by you.
11       You must come to our office where your
     deposition transcript will be submitted to you, in
12   the privacy of a conference room, for reading and
     signing.  Please call our above number to make an
13   appointment.  Our office hours are 9:00 a.m. to 5:00
     p.m., Monday through Friday.
14
         All corrections, if any, are to be noted on an
15   Errata Sheet, which is part of the transcript.  We
     will then notarize your signed Errata Sheet and send
16   a copy to all attorneys who ordered a copy of the
     transcript.
17
         You must read and sign your transcript within
18   thirty (30) days of your receipt of this Notice.
19
20          JoAnn M. Brown, RMR
21   Court Reporter
     AKF Reporters, Inc.
22   AKF Reference No. JB70344
23   cc:  Antony L. Ryan, Esq.
          James M. Jones, Esq.
24
25
```

CHARLES W. LISMAN, JR.

1              IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF PENNSYLVANIA

2

                              - - - -

3

    THE OFFICIAL COMMITTEE OF        )
4   UNSECURED CREDITORS OF           )
    ALLEGHENY HEALTH, EDUCATION &    )
5   RESEARCH FOUNDATION,             )
                                     )
6              Plaintiff,            )
                                     )
7              -vs-                  )    Civil Action
                                     )    No. 00-684
8   PRICEWATERHOUSECOOPERS, L.L.P.   )
                                     )
9              Defendant.            )
10

                              - - - -

11

                         VOLUME II
12                       VIDEO TAPE
           DEPOSITION OF:  CHARLES W. LISMAN, JR.

13

                              - - - -

14
15              DATE:    May 23, 2002
                         Thursday, 9:05 a.m.

16
17              LOCATION:  MANION McDONOUGH & LUCAS
                           14th Floor, USX Tower
18                         Pittsburgh, PA  15219
                           412-232-0200

19
20              TAKEN BY:  Defendant
21
                REPORTED BY:  Claire Gross, CRR, RDR
22                            Notary Public
                              AKF Reference No. Cg70369

23
24
25

         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 263

1  A.   I believe it would have been Allegheny
2       General.
3  Q.   Do you recall how many Lockhart funds there
4       were?
5  A.   I don't know enough about it. I just
6       remember there was -- it was 5 to $6 million
7       that had grown, I want to say, to the
8       hundred, almost a hundred million mark from
9       that point in time.
10 Q.   Do you know when you prepared Exhibit 18?
11 A.   When meaning what, what date?
12 Q.   What date, yes.
13 A.   It wouldn't have been in 1996 because that's
14      back to what we had discussed yesterday.
15      That was west reporting, and I was on east
16      reporting.
17          This would have probably been done at
18      a later point in time when Dan took over more
19      the AHERF responsibilities and wanted to know
20      how they had recorded all of the various
21      pieces because no one could pull together
22      where all the activity had been booked and
23      how it was booked.
24 Q.   Do you recall Mr. Cancelmi asking you to put
25      together this schedule?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 264

1  A.   He would have versus myself just doing it out
2       of the blue?
3  Q.   Right.
4  A.   He would have asked me to do this because I
5       would have had no need to look at the
6       transactions relative to how Pittsburgh had
7       booked them and the Lockhart funds.
8  Q.   Do you know why Mr. Cancelmi was interested
9       in learning what the journal entries had been
10      in fiscal year 1996?
11 A.   I would have known then. I don't as we sit
12      here today.
13 Q.   Do you know whether Mr. Cancelmi was
14      concerned that the classification of the
15      Lockhart funds was improper?
16          MR. JONES: Object to form.
17 A.   I would have known then. I don't know today
18      why I had to prepare this specifically.
19 Q.   When you said that no one could recall how
20      the entries had been done in the fiscal year
21      1996, why didn't you just go and ask your
22      colleagues in the western region accounting
23      group?
24 A.   You could ask the west region people,
25      however, they did everything manual journal

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 265

1       entry, and there was no one place you could
2       see all the pieces.
3           They would have handed you a stack of
4       journal entries, here's this piece, here's
5       that piece, here's this piece. Well, Dan
6       would not have wanted to sit there and flip
7       through to see the impact of every journal
8       entry, so hence I would have taken all those
9       journal entry copies I would have gotten from
10      my west colleagues and then scheduled them
11      out as to what general ledger accounts they
12      basically hit.
13          And you see that I've indicated which
14      journal entry in the second column that they
15      did and which accounts are up right after the
16      headings. Like, for example, Participating
17      Trust they would have booked to account
18      2002190, and et cetera through the line.
19          So this would have been -- I would
20      have gotten the documents from the west
21      people, but then I would have brought it in
22      one page so that Dan could have seen the
23      total picture rather than sitting there and
24      reviewing through, it looks like, 20 to 25
25      individual entries and still not know what

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 266

1       the impact on any given account was.
2  Q.   So you actually received a stack of manual
3       journal entries from somebody in the western
4       region accounting group?
5  A.   I would have probably had someone run a
6       McCormick & Dodge activity on the various
7       accounts that we would have thought that any
8       of the activity would have hit and found out
9       the journal entries that they booked in and
10      then had to get copies from someone in the
11      west for those entries.
12          As you can see, all the dates were
13      around the same. They were between April of
14      1996 through June of 1996, so they would have
15      had them in probably three different month
16      end closing binders. It was a matter of them
17      going and pulling them out and getting
18      copies.
19 Q.   So did you have the manual journal entries in
20      front of you as you prepared this Lotus
21      schedule?
22 A.   I would have either had the journal entries
23      in front of me or I would have had the
24      printouts from the McCormick & Dodge activity
25      system which gave me all the pieces because

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 267

```
1      you could, once you knew the journal entry
2      numbers, do a printout of the computer to
3      know all the entries that were affected on
4      the account or all the accounts that were
5      affected on a journal entry.
6   Q.    As you were engaged in the project of
7      preparing this schedule, did you speak to any
8      of your colleagues in the western region
9      accounting group about the classification of
10     the Lockhart funds in 1996?
11  A.    I would have -- then I probably would have.
12     Who I spoke with, sitting here today, I don't
13     know.  It would have probably been Nick
14     because Nick was the -- Nick meaning
15     Vidovich -- was in charge of AHERF accounting
16     at that time.  Nick or Jack Lydon.
17  Q.    By AHERF you mean AHERF the parent
18     corporation?
19  A.    AHERF the parent.  But Jack didn't have the
20     month end closing books.  Nick would have had
21     them, so I would have had to have gotten
22     entries probably from Nick.
23  Q.    And Jack is Jack Lydon?
24  A.    Correct.
25  Q.    After you prepared this schedule summarizing
```

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 268

```
1      the 1996 journal entries with respect to the
2      Lockhart funds, did you reach any conclusion?
3   A.    At that point I would have handed it to Dan
4      who was more versed in 116, 17 and 24.  He
5      and Carolyn and potentially Al would have
6      tried to sift through to figure out what was
7      done versus what should have been done.
8   Q.    That's Carolyn Cafaro and Al Adamczak?
9   A.    Correct.
10  Q.    Did you have any view at the time about
11     issues surrounding the classification of the
12     Lockhart funds in fiscal year 1996?
13  A.    In 1996?
14  Q.    At the time that you prepared this summary
15     schedule did you have any views about the
16     classification back in fiscal year 1996 for
17     the Lockhart funds?
18     MR. JONES:  Object to form.
19  A.    I don't know if I did.  I probably would have
20     had some view.  I don't know what that view
21     was because again I was not -- I did not read
22     through 116 and 17 in-depth because I didn't
23     have to implement it.  That would have been
24     Dan and Carolyn would have taken care of the
25     investments.
```

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 269

```
1   Q.    Can you remember even whether you had a view
2      as to whether the classification was proper
3      or improper?
4   A.    No.  I don't recall.
5   Q.    Do you know anything about what Mr. Cancelmi
6      or others at AHERF may have done with this
7      summary schedule that you prepared?
8   A.    At one point in time there was something on
9      the analysis of reserves we referred to
10     yesterday relative to the Lockharts or the
11     investments.  I don't recall exactly what
12     numbers, if they came from here or some other
13     source that made it into that file at some
14     point in time.
15  Q.    By the analysis of reserves, you're referring
16     to the X file?
17  A.    I'm referring to -- yes, we had referred to
18     it as the X files, Exhibit 10 -- something
19     similar to Bates number TNC9A01354.  That
20     would have been done at varying points in
21     time.  And I recall investments being an item
22     at some point.
23  Q.    Do you remember who decided to make an entry
24     in the X file that related to the Lockhart
25     funds?
```

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 270

```
1   A.    When you say make an entry into the analysis
2      of reserves --
3   Q.    I mean do you recall who decided to include a
4      row in the X file schedule that referred to
5      the Lockhart funds?
6   A.    I would get anything relative to the analysis
7      of reserves.  I would take what was in there
8      from the prior time we did it, print it out,
9      update the pieces that I knew, talked to
10     people that I knew I had gotten pieces from
11     before.  I would given it to Dan, who was my
12     boss.
13        Dan would then give it back with
14     pencil changes, if he wanted to add new lines
15     in, add new numbers or change numbers based
16     on something that he knew speaking with
17     someone else.
18        So it wasn't an entry that would
19     go -- but who would have determined to put it
20     in there?  Dan would have told me to put it
21     in there.  Who would have told him to?  I do
22     not know that.
23  Q.    Now, I think you testified that you believe
24     that Mr. Cancelmi, Ms. Cafaro and
25     Mr. Adamczak may have discussed the
```

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 443

1  Q.    But the name of the account on the general
2        ledger was accrued miscellaneous; right?
3  A.    I don't know if it was accrued miscellaneous
4        or accrued miscellaneous other. Again, for a
5        general ledger look at account 4020501, at
6        least on any of the hospitals that I had
7        responsibility for, it would have the same
8        name on all of them presumably.
9  Q.    It wasn't called the slush account on the
10       general ledger, though, was it?
11 A.    No.
12       MR. RYAN:  Now, let me mark, please
13       as Defendant's Exhibit 48 a document with
14       Bates numbers DC4558, page 1 through page 3.
15                 - - - -
16       (Deposition Exhibit 48 marked for
17       identification.)
18                 - - - -
19 BY MR. RYAN:
20 Q.    Do you recognize Defendant's Exhibit 48,
21       please?
22 A.    Yes.
23 Q.    What is it?
24 A.    It's an analysis of the standing accruals.
25 Q.    It's for the three Graduate System hospitals

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 444

1        for which you had accounting
2        responsibilities; right?
3  A.    It's for Graduate accounts -- yes.
4  Q.    Are these schedules that you prepared?
5  A.    Yes.
6  Q.    Do you have any memory of providing these
7        standing accrual analyses to Coopers &
8        Lybrand?
9  A.    I don't recall specifically yes or no.
10 Q.    Do you recall anything about that?
11 A.    No.
12 Q.    If you could look, please, on the first page
13       of this schedule for the Graduate Hospital
14       down at the section called Other?
15 A.    Yes.
16 Q.    Do you see the first line says Trsf to
17       EPC/SCHC/HUH?
18 A.    Yes.
19 Q.    Does that represent a transfer to Elkins
20       Park, St. Christopher's and Hahnemann
21       Hospitals?
22 A.    Yes. That's what that represents.
23 Q.    And do you see that entry there in the amount
24       of $2,500,000?
25 A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 445

1  Q.    Do you see on the next page the schedule from
2        Mt. Sinai Hospital there is an entry for a $1
3        million transfer to DVOG hospitals?
4  A.    Yes.
5  Q.    Do you know what those entries are?
6  A.    They correlate to some set of entries. I
7        don't know if we have seen them yet or not
8        without trying to match up entries.
9  Q.    Did you in the ordinary course have entries
10       where amounts were transferred out of the
11       Graduate system accrued miscellaneous
12       accounts to DVOG hospitals?
13 A.    In the normal course?  I mean, going through
14       the normal monthly expenses, no.
15 Q.    So these seem to be unusual entries to you?
16 A.    Yes. Anything down at the other section was
17       usually an unusual.
18 Q.    Do you recall who directed you to include
19       those entries?
20 A.    I would have probably included them because
21       this crude miscellaneous 420501 account
22       should have corresponded directly to the
23       general ledger. So this basically provided
24       the activity that went through that account.
25       So I would have probably put that in there.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 446

1  Q.    But you weren't the one who decided to
2        transfer, say, $2 and a half million from
3        Graduate accrued miscellaneous account to
4        DVOG hospitals in May 1997, were you?
5  A.    No.
6  Q.    Who was it who directed you to do that?
7  A.    I would have gotten my work responsibilities
8        from Dan who was my superior.
9        MR. RYAN:  Let me mark, please, as
10       Defendant's Exhibit 49 a two-page document
11       with Bates number CLIS 205 through 206.
12                 - - - -
13       (Deposition Exhibit 49 marked for
14       identification.)
15                 - - - -
16 BY MR. RYAN:
17 Q.    Do you recognize Defendant's Exhibit 49,
18       Mr. Lisman?
19 A.    Yes.
20 Q.    What is that?
21 A.    An income statement information schedule.
22 Q.    Do you know who prepared it?
23 A.    It is under a Jodie meaning Jodie Finn
24       directory, but I don't know if the timing
25       again, since I have on page 2 of it Dan's

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 447

1 handwritten -- no. I don't know if Jodie
2 would have done the actual file or if -- no.
3 Jodie would have done this, based on the
4 looks of it, how it was set up.
5 Q.    So you think Jodie Finn typed the schedule?
6 A.    Dan would have given her a pencil copy of
7 some sort to then put into that format.
8 Q.    Is the handwriting on the second page all, as
9 far as you could tell, from Mr. Cancelmi?
10 A.    That's what it looks like.
11 Q.    Do you recall --
12 A.    Except the circled 6 of 1997 looks like my
13 writing.
14 Q.    So that's in the upper right of the second
15 page?
16 A.    Yes.
17 Q.    The rest of it, though, looks like
18 Mr. Cancelmi's?
19 A.    The rest of it looks like Dan's writing.
20 Q.    Do you recall Mr. Cancelmi providing you with
21 this schedule?
22 A.    I vaguely remember seeing this schedule.
23 Q.    What can you remember about it?
24 A.    Sitting here today, I don't. All the
25 schedules look the same, and they all have a
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 448

1 bunch of numbers on them, and they all have a
2 bunch of columns that pretty much say the
3 same thing. So I don't remember this
4 schedule specifically, but it looks familiar.
5 Q.    Now, the second column is headed Use of
6 Reserves; right?
7 A.    Yes.
8 Q.    And there is indicated here $22,800,000 used
9 at DVOG?
10 A.    Correct.
11 Q.    And that as indicated on this schedule took
12 the results -- the year to date results
13 through June 1997 from a profit of $74,000 to
14 a profit of $22,874,000 in reserves; right?
15 A.    Okay.
16 Q.    That's how the schedule reads to me?
17 A.    That's how the schedule reads to me.
18 Q.    Most of the reserves show as being used at
19 DVOG came from Graduate hospitals, didn't
20 they?
21       MR. JONES: Object to foundation.
22 A.    Yes.
23 Q.    And you knew that at the time that you
24 received this exhibit, didn't you?
25 A.    We've already looked at Exhibit 45 where the
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 449

1 31,550 was broken out.
2 Q.    So when you received Defendant's Exhibit 49
3 at the time and saw the use of 22,800,000 in
4 reserves at DVOG, you knew that most of those
5 reserves came from Graduate; right?
6 A.    Probably. But sitting here today I can't say
7 yes, I remember that occurring. I made the
8 correlation between the pieces, but I
9 probably knew that, yes.
10 Q.    Did you ever provide Defendant's Exhibit 49
11 to Coopers & Lybrand?
12 A.    Not that I recall.
13       MR. RYAN: Let me mark, please, as
14 Defendant's Exhibit 50 a document at Bates TN
15 C9A 01783 through 1785.
16       - - - -
17       (Deposition Exhibit 50 marked for
18 identification.)
19       - - - -
20 BY MR. RYAN:
21 Q.    Now, the first and third pages of Defendant's
22 Exhibit 50 look to be the same as the two
23 pages of Defendant's Exhibit 49, do they not?
24 A.    They appear to be, yes.
25 Q.    So if you could turn them, please, to the
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 450

1 second page of Defendant's Exhibit 50.
2 A.    Okay.
3 Q.    Do you recognize this schedule?
4 A.    Vaguely, yes.
5 Q.    What is it?
6 A.    Income statement information starting with
7 adjusted and then there is a column for
8 adjustments and then a net income loss.
9 Q.    Can you describe what this schedule
10 represents to you?
11       MR. JONES: Object to form.
12 A.    It looks like it's saying, as I sit here
13 today, column -- whatever the first column of
14 numbers, adjusted net income/(loss). That's
15 as reported. Column two, the adjustments
16 that were done year to date. Column 3 would
17 be what the consolidated income/(loss) would
18 have been without utilization of adjustments
19 year to date.
20 Q.    So schedule shows over $100 million in
21 adjustments for AHERF as a whole?
22 A.    That's what it appears, yes.
23 Q.    Those are all in fiscal year 1997; right?
24 A.    That's what this is saying, yes.
25 Q.    And you knew at the time in 1997 that AHERF
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

CHARLES W. LISMAN, JR.

Page 451

1     had made over $100 million in adjustments
2     that fiscal year; right?
3  A.   Compared to the schedule, yes, I would have
4     known that.
5  Q.   Did you consider that to be significant at
6     the time?
7  A.   Yes.  Looking at it now, it's still
8     significant.
9  Q.   Do you infer from this schedule that AHERF
10    may, in fact, have earned less in fiscal year
11    1997 than it reported on its income
12    statement?
13  A.   Without --
14        MR. JONES:  Object to form.
15  A.   Without looking at each component of this, a
16    lot of the adjustments could have been prior
17    expenses taken on the hospital and were valid
18    reversal of those expenses.
19  Q.   Did you ever tell anyone about the use of
20    over $100 million in adjustments at AHERF for
21    fiscal year 1997?
22  A.   Would I have told anyone at AHERF?
23  Q.   Anyone at all.
24  A.   I would have given this to Dan at his request
25    to prepare this.  That's who I reported to

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 452

1     was Dan.
2  Q.   Okay.  So you prepared the second page of
3    Defendant's Exhibit 50 at the direction of
4    Mr. Cancelmi?
5  A.   It looks like one of my schedules, yes.
6  Q.   The third column here is headed Without
7    Cushion Net Income/(Loss) Year to Date;
8    right?
9  A.   Yes.
10  Q.   What did you understand the term cushion to
11    mean at the time?
12  A.   The term cushion?
13  Q.   Yes.
14  A.   Cushion would be reserve excess, not
15    necessary.
16  Q.   Now, $84,959,000 of these adjustments are
17    indicated as having taken place at DVOG;
18    right?
19  A.   Correct.
20  Q.   And an additional $17,400,000 took place at
21    former Graduate Health System hospitals for
22    which you had accounting responsibility;
23    right?
24  A.   What was that last part again?
25  Q.   $17,400,000 of adjustments took place at

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 453

1     former Graduate Health System entities for
2    which you had accounting responsibility;
3    right?
4  A.   Yes.  And I just want to -- Rancocas or AH,
5    New Jersey wasn't a part of the Centennial
6    group of hospitals.  It was always referred
7    to as part of the Graduate acquisition, but
8    they were a separate reporting entity on
9    their own.  They were not a part of
10    Centennial, as you can see here.
11  Q.   All right.  So AHERF put the four
12    Pennsylvania hospitals that it required from
13    Graduate Health Systems into a bond obligated
14    group known as Centennial; right?
15  A.   I think that's how they had their own
16    obligating group also.  I don't think
17    Rancocas was a part of the Graduate, per se,
18    group because it was a New Jersey hospital.
19  Q.   Okay.  In any event, the four hospitals in
20    Centennial Obligated Group were the four
21    Pennsylvania-based hospitals that AHERF
22    required for the Graduate Health System?
23  A.   Yes, the SDN required from the Graduate
24    Health System.
25  Q.   And the AHERF that are acquired from SDN?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 454

1  A.   Yes.
2  Q.   And the Rancocas Hospital was on its own in
3    the Obligated Group Allegheny Hospital, New
4    Jersey?
5  A.   Yes.
6  Q.   AHERF ever made adjustments of this magnitude
7    at hospitals which you had accounting
8    responsibility in previous fiscal years?
9  A.   I thought we saw adjustments in 1996 on one
10    of the schedules.  Maybe not a hundred
11    million, but I thought we saw adjustments in
12    1996.
13  Q.   Right.  Those were adjustments in
14    substantially lower amounts; right?
15  A.   Lower than 107, yes.
16  Q.   Significantly lower; right?
17  A.   I don't know without looking back, but okay.
18  Q.   Did you have a view about these adjustments
19    at the time?
20  A.   Did I have a view?  I don't recall having any
21    view.  I would have probably discussed them
22    with Dan, but I don't recall what the final
23    outcome of those discussions were.
24  Q.   Do you remember whether you had any concerns
25    that some or all of these adjustments might

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 491

```
 1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
     COUNTY OF ALLEGHENY           )   S H E E T
 2
          I, CHARLES W. LISMAN, JR., have read the
 3   foregoing pages of my deposition given on Thursday,
     May 23, 2002, and wish to make the following, if any,
 4   amendments, additions, deletions or corrections:
 5   Page/Line  Should Read       Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21                    _____
                          CHARLES W. LISMAN, JR.
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2002.
24   _____
         Notary Public
25       AKF Reference No. Cg70369
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

Page 492

```
 1            AKF REPORTERS, INC.
 2              AKF Building
            436 Boulevard of the Allies
 3            Pittsburgh, PA  15219
                (412) 261-2323
 4
 5   May 28, 2002
 6   TO:  Charles W. Lisman, Jr.
          681 Valencia Road
 7        Mars, PA  16046
 8   RE:  VOLUME II DEPOSITION OF CHARLES W. LISMAN, JR.
 9        NOTICE OF NON-WAIVER OF SIGNATURE
10        Your deposition transcript is completed and
     ready to be read and signed by you.
11
          You must come to our office where your
12   deposition transcript will be submitted to you, in
     the privacy of a conference room, for reading and
13   signing.  Please call our above number to make an
     appointment.  Our office hours are 9:00 a.m. to 5:00
14   p.m., Monday through Friday.
15        All corrections, if any, are to be noted on an
     Errata Sheet, which is part of the transcript.  We
16   will then notarize your signed Errata Sheet and send
     a copy to all attorneys who ordered a copy of the
17   transcript.
18        You must read and sign your transcript within
     thirty (30) days of your receipt of this Notice.
19
20
21   Claire Gross, CRR, RDR
     Court Reporter
22   AKF Reporters, Inc.
     AKF Reference No. Cg70369
23
     cc:  Antony L. Ryan, Esq.
24        James M. Jones, Esq.
25
```

**Lydon Dep.**

JOHN LYNDON

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA

2                        - - - -

3
    THE OFFICIAL COMMITTEE OF         )
4   UNSECURED CREDITORS OF            )
    ALLEGHENY HEALTH, EDUCATION &     )
5   RESEARCH FOUNDATION,              )
                                      )
6              Plaintiff,             )
                                      )
7                 -vs-                )    Civil Action
                                      )    No. 00-684
8   PRICEWATERHOUSECOOPERS, L.L.P.    )
                                      )
9              Defendant.             )
10
                         - - - -
11
                        VIDEO TAPE
12       DEPOSITION OF:  JOHN T. LYDON
13                       - - - -
14
              DATE:    June 18, 2002
15                     Tuesday, 8:58 a.m.
16
              LOCATION:  MANION McDONOUGH & LUCAS
17                       14th Floor, USX Tower
                         Pittsburgh, PA  15219
18                       412-232-0200
19
              TAKEN BY:   Defendant
20
21            REPORTED BY:   Claire Gross, CRR, RDR
                             Notary Public
22                           AKF Reference No. Cg70722
23
24
25

JOHN LYNDON

Page 70

1  of sprawled across the middle of the page
2  that begins Al and Dan.
3  A.  Yes.
4  Q.  It looks like it's signed Steve?
5  A.  Yes.
6  Q.  Is that Mr. Spargo's handwriting?
7  A.  Yes, it is.
8  Q.  Do you recognize the handwriting then in the
9      upper left corner where it says Doesn't make
10     economic sense, question mark?
11 A.  I want to say that's Dan Cancelmi's, but I
12     don't know that for sure.  I don't know.
13 Q.  Okay.  If you don't know, then that's fine.
14 A.  Okay.
15 Q.  Are you able to recognize the handwriting in
16     the upper right with the initials that look
17     like D. C. and the date?
18 A.  Well, that would be Dan Cancelmi.  Oops,
19     sorry.  I just broke the microphone.  Yes.
20     That would definitely be Dan's.
21 Q.  Do you know whose handwriting it is where the
22     name Steve appears in the upper right?
23 A.  I'm sorry.  Right here?
24 Q.  Yes.
25 A.  I don't.

Page 71

1  Q.  Okay.  Do you recognize the handwriting of
2      the note which is sort of on the right hand
3      part of the page which looks like it's signed
4      Bill K.?
5  A.  No, I don't recognize that.
6  Q.  Do you remember someone at AHERF named Bill
7      Kennedy?
8  A.  The name sounds familiar, but I guess I would
9      say he was somewhere in legal counsel.  Yes,
10     I think so.  I don't know that I ever met
11     him.  The name sounds familiar.
12 Q.  Did you ever in the course of your duties at
13     AHERF have occasion to consult with members
14     of the AHERF legal department?
15 A.  Myself specifically, not that I recall.
16 Q.  Do you know whether Mr. Adamczak or
17     Mr. Spargo did?
18 A.  I would have to say almost definitely
19     Mr. Spargo did.  Mr. Adamczak, it would be a
20     guess, but probably on a sporadic basis.
21 Q.  Did you know people who worked in the AHERF
22     legal department?
23 A.  I'm sure I can recognize names -- I'm not
24     sure I recognize names, but I'm sure at the
25     time I was familiar with names, but I can't

Page 72

1  recall any now.  Obviously this Bill Kennedy,
2  it sounds like someone that was in legal, but
3  you got -- he could have worked at Mellon for
4  all I know.
5  Q.  All right.  Do you see down towards the
6      bottom of the page there is some handwriting
7      which looks to me like it says Presumably
8      realized gains, question mark?
9  A.  Yes.
10 Q.  Do you know whose handwriting that is?
11 A.  I don't.
12 Q.  How about toward the top of page 2 where it
13     looks like somebody has written Do we have
14     copies of this info, question mark?
15 A.  Again, that looks like Dan Cancelmi's
16     writing, but I'm guessing here.
17 Q.  Okay.  We'll come back to this, but let's
18     just go back for a moment to Exhibit 185,
19     which was Mr. Cancelmi's August 25, '98 memo.
20     Do you see the last textural paragraph on
21     that page begins, It is my understanding that
22     there was original uncertainty as to the
23     appropriate classifications of the five
24     trusts?
25 A.  Yes.

Page 73

1  Q.  Do you recall that at the time there was
2      uncertainty as to the appropriate
3      classification of the Lockhart trust?
4      MR. JONES:  Object to foundation.
5  A.  Yes.  I guess 116 and 117 when we adopted it,
6      there was some questions as to how we were
7      going to record it or what we were going to
8      do as we went through.
9  Q.  Do you see the next sentence reads, At the
10     time SFAS 117 was adopted, which was at the
11     beginning of fiscal year '96 or 7-1-95, a
12     determination was made to classify the
13     majority of trusts as temporarily restricted
14     ($70.7 million) and a portion as permanently
15     restricted ($5.4 million)?
16 A.  Okay.  Yes, I see that.
17 Q.  If you look back at Exhibit 19, which was the
18     schedule of the trusts, do you see that same
19     $5.4 million amount in the Contribution
20     column?
21 A.  Yes.
22 Q.  Do you see the same $70.7 million amount in a
23     row that reads Sub Total towards the bottom
24     of the page?
25 A.  Yes.

19 (Pages 70 to 73)

JOHN LYNDON

---

Page 74

1   Q.    Does reading this and looking at this
2     schedule help to refresh your recollection as
3     to which portions of the Lockhart funds were
4     classified as permanently restricted and
5     which were classified as temporarily
6     restricted?
7   A.    Well, looking at these papers, it's obviously
8     reported the contribution as permanent and
9     looks like everything else went to a
10     temporarily restricted.
11   Q.    Now, shown on this schedule here Exhibit 19,
12     the $70.7 million amount is the sum of the
13     columns Unrealized Gain at June 30, '95 and
14     Realized Gain at June 30, '95; right?
15   A.    That's correct.
16   Q.    So in terms of the total $87.3 million market
17     value as shown on this schedule, in addition
18     to the $5.4 million original contribution
19     amount and this $70.7 million amount for the
20     gains through June 30, 1995, there are also
21     the two columns for gains in fiscal year
22     1996; right?
23   A.    Okay, yes. The 3.3 and the 7.4, yes.
24   Q.    Right.
25   A.    Yes.

---

Page 75

1   Q.    So if we added up the $5.4 million, $70.7
2     million and the two numbers you were just
3     referring to, the $3.7 and the $7.4 million,
4     then we would get the total market value of
5     $87.3 million; right?
6   A.    That's correct.
7   Q.    Going back to Exhibit 185, Mr. Cancelmi's
8     memo, do you see the next sentence after the
9     one we were just looking at reads, It is my
10     understanding that the initial conclusion was
11     that investment earnings through the years
12     were unrestricted, however, the cumulative
13     earnings were set aside and classified as
14     temporarily restricted and viewed as a
15     reserve?
16   A.    Certainly.
17   Q.    I'm in the middle of this last textural
18     paragraph. Sentence begins, It is my
19     understanding.
20   A.    Okay, yes. I'm sorry.
21   Q.    I think you testified earlier that there were
22     some endowment funds held at AHERF for which
23     even though the principal amount was
24     restricted, the income in the form of
25     dividends or interest on bonds was

---

Page 76

1     unrestricted income; is that right?
2   A.    If that's what I recall. I mean, if I'm
3     recalling correctly, yes. I think I said
4     that.
5   Q.    Do you know whether that was the case for the
6     Lockhart funds?
7       MR. JONES: Object to form.
8   A.    I mean, until 117 -- I think what I said was
9     until 117 come in, it was the Lockhart funds
10     were restricted. I guess what I'm trying to
11     recall if -- if I said that what funds I'm
12     referring to that would have been restricted
13     and principal but unrestricted and income --
14     and I can't recall specifically what those
15     might be, so I don't know if that was a right
16     thing to say.
17   Q.    Now, at the end of the sentence we were just
18     looking at Mr. Cancelmi states that certain
19     amounts were classified as temporarily
20     restricted and viewed as a reserve?
21   A.    Okay.
22   Q.    Do you remember anything about amounts that
23     were classified as temporarily restricted
24     being viewed as a reserve?
25   A.    I think when we made the entries related to

---

Page 77

1     117, we did -- yes, I believe we did look at
2     that as a reserve, those monies that we
3     pulled out of that account as unrealized gain
4     is what we did is put them into a specific
5     account and looked at it as a reserve. Yes,
6     I do recollect, that I believe.
7   Q.    Now, was it your understanding of how FASB
8     117 worked that over time temporarily
9     restricted funds could be released from
10     restriction and then classified as
11     unrestricted?
12   A.    Yes. That was my understanding.
13   Q.    And is that why you viewed the amounts
14     classified as temporarily restricted as a
15     reserve, namely that in future periods they
16     could be released from restriction?
17       MR. JONES: Object to form.
18   A.    I don't know that. I mean, I don't know that
19     was my thought process at the time. We went
20     back and looked at the, quote, unquote,
21     Lockhart funds and determined what was
22     realized and unrealized, pulled those amounts
23     out.
24     But I think my -- I think my
25     understanding was that we had through time

---

20 (Pages 74 to 77)