the record. The time on the screen is 1:27.

----

EXAMINATION

----

BY MR. RYAN:

Q. Good afternoon, Mr. Lydon. Let me mark, please, as Exhibit 199 a document with Bates numbers DBR-AA 12651 through 55.

----

(Deposition Exhibit 199 marked for identification.)

----

BY MR. RYAN:

Q. Exhibit 199 is called Financial Statement Highlights, Allegheny General Hospital, June 30, 1997; right?

A. Yes.

Q. If you could take a look, please, at the last page of the document, do you see a computer file name there in the footer?

A. Yes.

Q. Do you see that that has a directory JTL?

A. Yes.

Q. Was that a computer directory that you used for files you created?

A. Yes, although I don't remember creating these highlights, but go ahead.

Q. Well, do you recall that there were each month for Allegheny General Hospital documents called Financial Statement Highlights?

A. Yes.

Q. Who created them?

A. I do not recall. It may very well have been me, but I -- we had to go through every month obviously and look at the financial statements, prepare highlights. I just don't recall preparing them. It may very well be me. I'm sure it was a group effort between myself, Al and Jack Nelson.

Q. Okay. Mr. Nelson was the manager for AGH?

A. That's correct.

Q. Do you know who received the monthly financial statement highlights for AGH?

A. IT would probably have gone to from Al to Steve Spargo.

Q. Do you know whether it went to Mr. Dionisio?

A. That's quite possible that they went to Joe Dionisio.

Q. All right. You can put that aside. If you

could go back, please, to Exhibit 198, which again was a comparative cushion summary, particularly the third page which was a cushion roll forward.

A. Okay.

Q. We talked a little bit about how this schedule showed certain reserves being established and then certain reserves being taken into income; right?

A. Yes.

Q. At the time did you consider the use of cushions as set forth on this third page of Exhibit 198 to be appropriate accounting?

A. Yes.

Q. Can you explain that a little for us, please?

A. Just the fact, again, to control the unexpected, I guess. Cushions happen. I mean, reserves are established through charge differentials and uncollectible allowances.

We didn't always take those to income when we knew for that month if the reserve exceeded the amount that should have been recorded. I felt it was appropriate. Yes.

Q. Can you think of any accounting entries that you made while you were at AHERF that you

believed at the time were inappropriate?

A. No, no.

Q. Did you ever hear of any accounting entries being made by others at AHERF that you believed at the time were inappropriate?

A. Not that I recall.

Q. As you sit here today are you aware of any accounting entries where some people may be saying that they were inappropriate?

MR. JONES: Object to form.

A. I'm not sure who some people --

Q. Anyone. I mean, have you heard about any accounting entries at AHERF where anyone has alleged that they may have been inappropriate?

A. Obviously, through all of this, the bankruptcy and all this, the endowment entries were questioned, but that's -- I mean at the time we felt they were appropriate, and we knew that Coopers was going to look at them.

So, I mean, it was unusual, but we felt it was appropriate at the time. We thought what we were doing was suggested in the FASB.

Q. When you were involved in the FASB 117 classification project in 1996, you knew that there was a question as to whether AHERF would ever be able to get access from the trustee to the Lockhart trust funds; right?
A. I don't know if I knew that at the time. I think we were going ahead and booking the entry based on what we had from an accounting perspective. I don't know that it was established that there was a question.
I don't recall if I knew that there was going to be an issue getting the dollars. I was charged with basically recording what we thought what should happen from 117.
Q. I didn't intend to ask you if you knew about -- if AHERF was going to get access to cash or not since I understand that was something that the folks in treasury dealt with; right?
A. Yes, yes.
Q. My question was intended to be whether you were -- strike that. Did the thought cross your mind at the time that you were involved in the FASB 117 classification project that AHERF might or might not be able ultimately

to get access to the cash in these trust funds from the trustee?
A. I don't recall, but I don't think so. I mean, again, I think we were looking at the FASB and what we thought the interpretation of it was and recording it correctly.
I don't know that I ever -- maybe I did at the time. I just don't recall at this point in time the question whether the cash was to follow. I may have. I just don't recall.
Q. Now, FASB 116 and 117 were changes in the rules for accounting for endowment funds; right?
A. Right.
Q. So you thought at the time, didn't you, that it was a bit unusual that AHERF was able to move such significant amounts of money out of restricted net assets?
A. Sure, absolutely. Changes in the law and pronouncement, tax law, these things created all the time, it appears unusual, but it happens. Yes, I did think it was unusual.
Q. Did you think that the classification of the endowment fund under FASB 116 and 117 was a

bit of a gray area?
MR. JONES: Object to form.
A. I don't know. I may -- again, it goes to the unusual piece did I think it was gray or unusual or both? I'm not sure there is a big definition or there is a fine -- I'm not sure there is a big divide between those two.
But I knew regarding it, it was going to be looked at by others, so that if it was not -- if it was unusual and we were doing it wrong, we would have been told by Coopers that it was wrong, it was incorrect.
Q. Now, Coopers & Lybrand were the independent auditors for AHERF; right?
A. That's correct.
Q. Who do you recall dealing with from Coopers during their audit?
A. Basically the people in charge were Amy Frazier and Mark Kirstein. Probably mostly dealt with Amy Frazier. There were several senior accountants and whatever levels they were. I don't recall all of them.
Mark Panucci was one, I think, Brian -- I don't recall his last name -- and then there is Kristen one year. You know how

accounting firms work, every year there are new faces. Amy and Mark Kirstein were there a few years in a row.
Q. Is Brian maybe Brian Christian?
A. Brian Christian, yes.
Q. And you mentioned one further person. Let me throw out two different names to you and ask you whether it was either of those people. There is somebody called Christa Porter and somebody called Kristen Heinlein?
A. I do remember both now that you throw them out.
Q. You actually had interactions with them both?
A. Yes.
Q. Is there anyone else from Coopers you remember?
A. Other than the partner Bill Beuttner.
Q. Did you ever deal directly with Mr. Beuttner?
A. We had occasion to talk once in a while in group meetings, but any kind of issues probably wouldn't have gone through me. They would have gone through Al, Dan or Steve.
Q. That's Mr. Adamczak, Mr. Cancelmi or Mr. Spargo?
A. That's correct.

Q. Do you recall dealing with Mr. Panucci on the FASB 117 classification project?
A. If I remember correctly -- again, it's been quite a while -- I thought that Mr. Panucci and Amy Frazier and I sat in my office and discussed what we had done for 117, particularly with regards to the Lockhart funds.
Q. What can you remember about that meeting?
A. Just basically what our thought process was going through, what I had done. A lot of details I'm sure I just can't remember. It's just too long ago.
Q. Sure. Do you recall providing Coopers with certain schedules that you had prepared relating to the endowment classification?
A. If I didn't provide them, they were provided to them. They had access to all those schedules. Any of those roll forwards we had they -- it should have been provided to them and had access to all of them.
Q. So you're talking about schedules like the first page of Exhibit 19?
A. Yes, yes. And any of the journal entries they had access to all of those, but they

should have been provided the roll forwards as part of their -- as part of the year-end analysis.
Q. All right. Now, when you say that Coopers had access to the journal entries, you don't mean AHERF actually as a matter of course provided Coopers with copies of all of AHERF's journal entries?
A. No, no. They would have probably had to be requested, but they definitely would have gotten the roll forward schedules. Some of those roll forwards they may have attached journal entries.
It depended on what the entries were. I mean, I can't remember any criteria, but if they thought it helped better explain.
Q. Do you recall providing Ms. Frazier or Mr. Panucci with excerpts from the Lockhart agreements that you prepared to show them the language about the uses of income that were permissible?
MR. JONES: Object to form.
A. I don't recall. I don't recall. I don't know if I specifically showed them that or I directed them back to treasury. I just don't

recall.
Q. Do you recall discussing with Ms. Frazier or Mr. Panucci the language in the Lockhart trust agreements that says things like income can be used for charitable purposes and so forth?
A. I think that's what I was referring to when we said we had a meeting.
Q. Okay. So --
A. We talked about that. That's my recollection.
Q. So this topic of what the Lockhart trust agreement said about the uses of income came up with Coopers?
A. That's my recollection, yes.
Q. And you believe that you explained to Coopers your thinking about how AHERF could satisfy those uses through the general charitable services that it provided?
A. Yes.
Q. Do you recall discussing with Coopers provisions in the Lockhart trust agreements that talk about whether capital gains should be classified as part of corpus or part of income?

MR. JONES: Object to form.
A. I don't recall specifically, no.
Q. Do you recall anything about discussing that subject with Coopers?
A. No, I don't.
Q. The only language from the Lockhart trust agreement that you can remember discussing with Coopers is the language about the use of income; right?
MR. JONES: Object, mischaracterization.
A. Yes. I think we had a general discussion as to what my logic was going forward with it as to why we deemed it to be appropriate to move it from permanently to temporary, permanently restricted to temporarily restricted.
Q. Okay. And now in terms of the actual trust agreements or other legal documents establishing these trust funds, can you remember discussing with Coopers any provisions other than the provisions about the use of the income that was allowed under these documents?
A. I don't recall.
Q. You yourself did not provide any of the

Page 182

would be reviewing the general ledger and looking at the changes in these accounts to me indirectly shows approval of what was done.
Q. That would show approval or assent. Do you remember in advance of the process anyone suggesting to you what the outcome ought to be before the actual classification work had been started by you?
A. No, no, I don't.
Q. Do you recall in fiscal year '96 when you were about the business of performing FASB 116, 117 classification that AHERF was experiencing a cash crunch, if you will?
A. Yes. I'm sure, I'm sure at the time I was aware of that.
Q. And that was something that was discussed by superiors to you in the accounting organization at the time?
MR. RYAN: Objection.
A. I mean, I don't know. Discussed with me as a specific subject? I don't know that it was brought up. I mean, the numbers are the numbers. You're looking at the general ledger you're looking at the cash accounts,

Page 183

you know what the cash flow is.
Q. When you say the numbers are the numbers and the gesture the way you did for the purpose the paper record, you meant the financial statements --
A. They are there.
Q. -- would have revealed the cash situation was not what you would have hoped it to be?
A. That's correct.
Q. I ask you to turn back to Exhibit 184 for a moment, Mr. Lydon. You testified, I believe, in response to questions from Mr. Ryan that you had seen Exhibit 184 before; am I right?
A. Yes. I believe I recall seeing this.
Q. My question to you now is merely one that tries to put a finer point on the time at which you would have seen it, and I guess that is do you recall having this document with you when you or having had a chance to read it either at the time you were performing your FASB classification project or before?
A. I would assume that I had it in my possession when I did the reclass because the reclass was not done until fiscal '96, which would

Page 184

have been June of '96.
Q. That's the end of fiscal '96?
A. Yes.
Q. And you now told us that you assumed you had it in front of you, and I think in part maybe perhaps you're cc'd on this here in handwriting?
A. That's correct.
Q. My question is do you recall as you sit here today in the year 2002, referring back to this memorandum or some other memorandum perhaps or some other writing in helping you do your classification work?
A. Specifically referring back to it, no, I don't.
Q. Let me fix on the second part of what was a multipart question. Do you recall referring back to any written documentation during your classification work other than the trust or endowment documents themselves, the endowment organic document themselves, and the FASBs?
A. Other than the FASBs?
Q. And the trust documents?
A. I don't recall specifically, no.
Q. You have no reason to doubt if this document

Page 185

was available, that is, Exhibit 184, you might have looked back at it?
A. That's correct.
Q. When you conducted the FASB classification review, Mr. Lydon, you had never done that before?
A. No. That's correct, because it was a --
Q. Of the Lockhart funds in particular?
A. Yes.
Q. And the question, the answer to the question was self-evident. It was a new rule, and this was the first time for you in doing such a classification review?
A. That's correct.
Q. And did you take comfort in the fact that your work would be looked upon or looked at rather by others?
A. Absolutely. Going through it, I knew that I was making these entries and the outcome was going to be reviewed by superiors and also that Coopers was going to take a look, Coopers would look at it at year-end and let us know if we booked something incorrectly or inappropriately.
Q. And you consider both of those kinds of

Page 186

things, a review by superiors and a review by Coopers & Lybrand, as an independent check on your work at what you considered at the time to be a new classification arena?
A. That's correct.
Q. I think it was your testimony that Coopers undertook such a review because you discussed it with Ms. Frazier and Mr. Panucci; is that right?
MR. RYAN: Objection.
A. That's my recollection. That's correct.
Q. You discussed the Lockhart funds and your FASB review of them with those two Coopers & Lybrand employees?
A. That's my recollection as to what my logic was going through.
Q. And your recollection is that took place in your office?
A. Yes. That's my recollection.
Q. At the Clark Building?
A. That's correct.
Q. I could give you the floor or office number --
A. 44 --
Q. 429 or 431?

Page 187

A. One of those two.
Q. My next question is do you recall when approximately that conversation took place? Was it apparently during the audit process? My question is can you fix it in a month?
A. I don't think I can.
Q. Can you fix it in fiscal year 1996, the audit work done in connection with fiscal year 1996?
A. Yes, yes.
Q. And that's when it took place?
A. Yes.
Q. Do you recall Ms. Frazier and Mr. Panucci or anyone else from Coopers asking you for specific documentation regarding the Lockhart trusts and your FASB classification of the funds therein?
A. I don't recall specifically them asking me for that. Again, we prepared packages for each work papers for each general ledger account, and they were given the work papers.
Q. Would it have been your practice if asked for documentation or information regarding the Lockhart funds or trusts and your FASB review to have complied and provided the

Page 188

information?
A. Absolutely.
MR. RYAN: Objection.
Q. Similarly any documentation that might have been requested, would it have been your practice to provide?
A. Yes.
MR. RYAN: Objection.
Q. Sir, in your time at AHERF in the accounting department, Mr. Lydon, do you recall ever denying anyone from Coopers documentation or information that they requested in the audit process?
A. No. Coopers had access to everything that we had, general ledger accounts, schedules, journal entries. It was all there.
Q. I'm going to ask you to refer quickly back to Exhibit 20, which was marked about the time -- shortly before Exhibit 187, I believe, in this deposition. It is the October 30 memo of 1996 to Mr. Martin from Mellon Bank in the person of Barbara Robinson.
A. Okay.
Q. At an earlier time today you and Mr. Ryan

Page 189

discussed the trust document language at the top of page 2 of this letter referred to in the text letter as article X, Roman numeral X. Are you with me?
A. Yes.
Q. The language that reads, In the case of the sale of any securities of the trust fund at a premium or profit, such premium or profit shall become a part of the corpus and not income. Do you see that quote again?
A. Yes.
Q. Mr. Ryan asked you and I believe you responded to his question. The question was having read that language or if you had read that language in the trust document quoted there, you would have classified the income as restricted. Do you recall that testimony?
A. I think so, yes.
MR. RYAN: Objection.
Q. My question is do you mean to say permanently restricted?
A. I don't know that I know that. I don't know what my thought was at the time going through it, if I even saw that.
Q. If you read it now and knowing whatever you

for your time, Mr. Lydon. Mr. Lydon, perhaps on the record is the best way to do it since you didn't appear to be represented today.

You have the right, as we all, I think, understand it -- if somebody disagrees with me, shout -- to read this transcript, make changes to it under the Federal Rules of Civil Procedure.

The court reporter can make it available for you, and you can also decline to do that if you so choose, but we wanted to make sure you knew you had the opportunity.

THE WITNESS: Okay. Thank you.

THE VIDEOGRAPHER: With there being no further questions this deposition is concluded at 4:10.

----

(The proceedings were concluded at 4:10 p.m.)

----

COMMONWEALTH OF PENNSYLVANIA ) CERTIFICATE
COUNTY OF ALLEGHENY ) SS:

I, Claire Gross, RDR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, John T. Lydon, was by me first duly sworn to testify to the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to printing under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that the inspection, reading and signing of said deposition were NOT waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 19th day of June, 2002.

____________________________
Notary Public

COMMONWEALTH OF PENNSYLVANIA ) ERRATA
COUNTY OF ALLEGHENY ) SHEET

I, John T. Lydon, have read the foregoing pages of my deposition given on Tuesday, June 18, 2002, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line Should Read Reason for Change

In all other respects, the transcript is true and correct.

____________________________
John T. Lydon

Subscribed and sworn to before me this ________ day of ______________, 2002.

____________________________
Notary Public

AKF Reference No. Cg70722

**Maher Dep.**

# In The Matter Of:

***AHERF***
***PRICEWATERHOUSECOOPERS, LLP***

---

## *ANGELA MAHER*

***February 24, 2003***

---

***MANHATTAN REPORTING CORP.***
***420 Lexington Avenue – Suite 2108***
***New York, NY 10170***
***PH: 212-557-7400 / FAX: 212-692-9171***

**MAHER, ANGELA (2/24/2003)**

**Word Index included with this condensed transcript**

discussions?

A. If there was a discussion, I would have been a part of a larger group listening to this because I didn't have one-on-one discussions with David McConnell, so what you see here is what there is, I guess.

Q. When you were deposed last time Mr. Hamilton asked you about Forbes'' merger with AHERF, and I believe you said that at that time, at that time period there was a lot of consolidation going on in the healthcare market; is that true?

A. Yes.

Q. In what regions was that occurring? Did that include Pittsburgh?

A. That included Pittsburgh. It was a national phenomenon, and in Pittsburgh UPMC, which you're probably familiar with, was acquiring various facilities in the city, and AHERF wanted to reach out and acquire hospitals as well; and since it had medical schools in the east, it made sense for it to acquire facilities in the east, eastern part of the state, and they wanted to acquire facilities here in Pittsburgh as well. At the time

AHERF and UPMC were considered to be strong rivals.

Q. What was the rationale behind consolidating like that?

MR. HAMILTON: Object to form.

Q. You can answer.

A. My understanding was that it had to do with the economics, that in a system you could gain economies of scale, you can close some facilities, you could use some facilities as feeders into other facilities, you could take departments that were only doing -- you could get rid of the duplication of various departments and reduce staff and so forth. And also I had the sense that when one entity started that strategy, it became necessary for others to follow that strategy for fear that they would be left behind.

Q. And why is it that Forbes then wanted to merge with AHERF?

A. Well, I didn't make that decision, and I wasn't part of those discussions. I can only surmise that Forbes felt that it couldn't survive in the long term without aligning with a stronger partner.

Q. I think you mentioned at your prior deposition that there were financial pressures on Forbes; is that correct?

A. Yes.

Q. What were those pressures?

A. Well, reimbursement continued to decline for Medicare, Medicaid. There were the HMOs that were continuing to reduce their per capita fees. PPOs were entering into the market. By and large the overall reimbursement situation continued to get worse and worse.

I believe that many in management felt that they couldn't -- that Forbes would not be viable over the long term if it didn't find a suitable partner that could give it the economies of scale that it needed.

----

(Exhibit 1191 marked for identification.)

----

Q. You've been handed what's marked Exhibit 1191 which has the Bates numbers ABM 001565, and then it skips to 67 for some reason. I don't know if there is a page 1566 or not.

I believe you looked at least at the second page of this at your deposition with

Mr. Hamilton. Do you recall that?

A. Yes.

Q. I believe you said that these are suggestions that you came up with in the spring of '98; is that right? Strike that. Do you know when you came up with these suggestions?

A. I don't know when I came up with them, but I remember having a discussion with Mike Martin about them. I was concerned that it was probably in the fall of '97 when AHERF let go 1,200 employees in Philadelphia, and I became alarmed because when you have that kind of a downsizing it doesn't speak well for the long-term viability of the organization, or at least it gives you a hint there are things that need to be fixed.

I sat down and I started writing out ideas that I thought were worth pursuing, and I gave them to him. I don't know what he did with them.

Q. Besides Mr. Martin, did you give your list to anybody else?

A. No.

Q. Did you have discussions about any of these ideas with anyone else within AHERF?

A. Oh, I probably had discussions with my coworkers.
Q. Ms. Gilbert and Ms. Mertz?
A. Probably.
Q. Do you know if there were other people within AHERF attempting to come up with ideas to improve the situation at the time?
A. There may have been others. There should have been others. If this weren't, it was clear that there needed to be having major discussions about how to fix things.
Q. Were you involved in any discussions about how to fix things?
A. No. As I said, I became alarmed and just sat down and wrote these because it disturbed me the way things were going. I only shared this with Mike Martin as far as I can remember.
Q. And do you have any opinion as to whether these undertakings would have prevented the bankruptcy?
A. You know, it's hard to separate what you know afterwards from what you know at the time. Sitting here I know a lot more today than I knew then. Particularly there is a very well

written newspaper article that lasted through seven, I think, series of what went wrong with AHERF, and it's hard for me to separate what I think now from what I thought then.
But I was just very concerned, and I don't know if there was anything that could have fixed it given the commitments that were made to various entities. I mean, you really would have gone after it with a real sharp knife and just cut out all sorts of things that at the time were supposed to make sense like buying these physician practices, which I think was probably what really pushed them over the edge. But there were probably many other things as well.
Q. What commitments were you talking about?
A. Well, for instance, I mean, like salaries would have been a perfect one. I suspect that AHERF really had salaries that were just really very, very high in comparison to other facilities who had that kind of responsibility, and I think that that's a commitment, that maybe you should go back and talk about people voluntarily reducing some of these extraordinary salaries that they

had. The difference between the salaries at AHERF and at Forbes were extraordinary. It was more than double. So that's one thing. I don't know.
Q. I think Mr. Hamilton asked you this, but I'll ask again. Do you know what you meant by the bullet points under sacred cows?
A. Well, I don't know why I called it sacred cows other than to say these are taboo things you wouldn't want to talk about, like lowering the management's salaries and maybe everybody else's a little bit too.
Management capabilities, I'm not sure that the management was -- the management could have been better. If they were, they probably wouldn't be in that spot. Board issues, probably from that I might have meant -- I'm only guessing now -- that if the board were -- you know, I didn't have the sense -- I didn't really understand whether the board had the sense of the urgency that I felt I had, and so I guess that would have been an issue, are they really aware of all of the things, are they really getting good information? Didn't have any way to know.

Q. Last one.
----
(Exhibit 1192 marked for identification.)
----
Q. You've been handed what's been marked as Exhibit 1192, which I believe you also discussed at your prior deposition?
A. Yes.
Q. The Bates numbers of this document ABM 1001823 and 1825. I don't know if there is a 1824 because I haven't seen it. Do you recognize this letter?
A. Yes.
Q. You wrote this letter?
A. I did.
Q. And the handwriting on the page that's 1825 is yours?
A. It is.
Q. Now, you never attended any board meetings; is that right?
A. No.
Q. You never reviewed the material that was provided to them --
A. No, none.
Q. -- apart from the investment reports which

you had a role in preparing?
A. Yes.
Q. How much interaction did you have with the trustees?
A. I had no interaction with the trustees in a professional nature.
Q. The first sentence of this letter says, I'm writing this letter to alert you to the near collapse of the Allegheny system. What was your basis in March of '98 for believing that Allegheny was near collapse?
A. All right. Let me just give you some information about this letter.
Q. Sure.
A. I would go home at night and think -- you know, I would see money coming out of our funded depreciation, and I was not used to that. I came from an organization where we only put money in, we didn't take it out, and we only -- we were quite solvent at Forbes, and so I had not seen this phenomenon where large amounts of cash were being taken out of the funds that were available to the system.
So I saw that and I also saw that we were letting go 1,200 people. We were having

trouble meeting our bond covenants. I was hearing they did a salary study on UPMC and Allegheny and the salaries for Allegheny were just extraordinary.
You know, pulling all these pieces together. It's a kaleidoscope of information, and I would think about this and think, well, if I were a board member, would I want -- would I want to react to some of this.
I thought well, maybe they don't know about it. And I said, well, maybe they do know about it. I didn't know what to think. One afternoon I just sat down and wrote this. But then I never sent it to anyone. No one saw that before it became part of the materials that I gave to the deposition the first time.
I never sent it to anybody because I didn't know what anybody knew and I didn't feel as though I really knew everything. So to send a letter like this which could have been a bomb, was that responsible? So I didn't do it. I never sent it. You know how you write in a moment of passion? That's

what I wrote, so that's what this is.
Q. Did you share this letter with anybody else within treasury?
A. No. No one saw it. No one saw the light of day. Nothing. No one saw it. No one in my family, no one.
Q. Did you ever discuss the types of concerns that you had written down with anybody within AHERF?
A. Steady drain of cash flow, we talked about that in the treasury department. The inaction for so many months. As I said, there is a steady drain, you're losing all these employees, things are going bad. It occurs to me that we need to take charge. We need to do something, make some specific moves.
Now, maybe the reduction of staff and the -- in the East was considered to be the move to make. Maybe that was the response. And whereas I saw it as one more symptom, they may have said this is the answer, this is going to make the difference.
Q. So you don't know what moves the board had considered or was taking?

A. No. I had no idea.
Q. You had no idea what financial information they actually had available to them?
A. No.
Q. For how long a period did you believe that there were problems at AHERF?
A. Problems meaning financial problems?
Q. Yes, financial problems.
A. Well, I always questioned whether I knew what I knew and whether what I knew was really relevant to what was there. Probably in late '97 I started to think, you know, that this has got to be a problem, we are taking money out, we are using it. I don't see money coming in.
How this was going to turn around I didn't know, but I didn't -- I didn't know if the board had put in place things that would have changed the situation, so I always questioned -- I always worried, but I always questioned, well, maybe somebody knows, maybe somebody is doing something about this, maybe I'm not -- I don't have all the information, and I'm not privy to decisions that other people would make -- would change the

COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
COUNTY OF ALLEGHENY ) S H E E T

I, ANGELA MAHER, have read the forgoing pages of my deposition given on Monday, February 24, 2003, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line Should Read Reason for Change

In all other respects, the transcript is true and correct.

______________________________
ANGELA MAHER

Subscribed and sworn to before me this
________ day of ______________, 2003.

______________________________
Notary Public

AKF Reference No. Cg74257

**Mammarella Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*PAULA MAMMARELLA*
*July 28, 2003*

---

*LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

MAMMARELLA, PAULA

LEGALINK
A WORDWAVE COMPANY

Q. Do you see how there's that exception in the first clause that I read you?
A. I see that it says except for, yes.
Q. Do you recall learning at the time or in December of 1997 that Charles Morrison had drawn an exception to his statement that the financial statements, quarterly financial statements for Delaware Valley Obligated Group were prepared in compliance with GAAP?
A. I don't recall specifically the circumstances under which we got this or reading it, but I see that it evidences this per the certificate.
Q. Did you learn at any time in calendar year 1997 that certain parts of unaudited financial statements being presented to PNC were not prepared in compliance with GAAP?
A. I don't recall specifically when or how that happened.
Q. Do you recall learning at any point while you were senior financial analyst that certain members of AHERF management had alerted you or any other member representative of PNC that some part of a financial statement, a set of financial statements that had been prepared by AHERF, had been prepared not in compliance with

GAAP?
A. I recall that there were certificates that we received that had language in it that indicated that there were issues with their compliance meaning that something that -- a calculation for compliance with certain covenants that we had were not being met according to the calculation as it was originally to be set up.
Q. Do you recall ever learning about any instances where AHERF management was informing PNC about any parts of the financial statements not being prepared in accordance with GAAP as opposed to simply that there was some instance of a covenant noncompliance?
A. I don't remember the specifics of those kind of nuances and what was being communicated back and forth.
Q. Okay.
A. Because I just don't remember.
Q. Sure. Do you recall any discussions you might have had at PNC about any reported violations of GAAP or any violations of GAAP reported by AHERF management to PNC?
A. I don't recall.
Q. And, accordingly, you don't recall ever

speaking with any members or inquiring with any members of AHERF management about any violations of GAAP that they had informed you of or any members of PNC of?
A. I don't recall having those specific conversations with any members of AHERF management, although I was at a meeting with David McConnell; I can't remember the specifics, however, of what was discussed at that meeting.
Q. Do you recall ever having any conversations with the outside auditors of any AHERF entities?
A. I do not recall having any of those.
Q. And, in particular, you have no recollection of any conversation about any GAAP violations with --

Let me rephrase that.

Accordingly, you have no recollection of any conversations with any external auditors of AHERF entities about any GAAP violations that had been reported to you by AHERF management?

MR. POHL: Objection.

THE WITNESS: I have no recollection.

MR. TERUYA: Okay.

BY MR. TERUYA:

Q. At the time in December of '97, did you have any practice with respect to following up with questions about any officers' certificates you might have received at the time from AHERF management?
A. We had a practice of following up on any compliance certificates from any institution or any health care or any type of company we dealt with where we had questions with regard to anything that we didn't understand.

We were supposed to make sure we understood them and would follow up on anything we had questions on, not just AHERF.
Q. Do you know if under that practice -- or under that practice can you tell, looking at this certificate, whether you, in fact, followed up with members of AHERF management about the clause with respect to the $23 million approximately?
A. I can't remember the beginning of your question. What was the beginning of your question?

MR. TERUYA: Could you read that

back, please.

- - - -

(The record was read back by the Reporter.)

- - - -

THE WITNESS: I don't recall.

MR. TERUYA: Okay. We can set this document aside.

I'm going to mark as Exhibit 1785 a document bearing Bates Nos. 30 -- sorry, PNC 30833 through 930 and it appears to be a credit information sheet dated December 19, 1997, signed by, among other people, Paula Mammarella.

- - - -

(Deposition Exhibit No. 1785 marked for identification.)

- - - -

BY MR. TERUYA:

Q. Let me ask you as you flip through it whether you recognize this particular document.

A. I recognize it as a credit information sheet which is part of -- and then followed by a credit underwriting memorandum as part of a total credit underwriting memorandum.

Q. So this whole package of materials is what you

were referring to earlier as a credit underwriting memorandum?

A. There's a lot of stuff in here. Without looking through the whole thing, I can see what the beginning of it is, a credit underwriting memorandum package.

Q. Can you tell as you flip through it what the other parts of this document are?

A. It looks to be part of an entire package, a credit underwriting package. There's different dates on things in here. Some of it's dated January 30th. Some of this is dated December, so I don't know if this was all together or --

It looks like a couple things were combined. There's a risk rating grade that's dated January -- I'm sorry --

No. There's another date on here. I'm sorry. It's hard to say without looking through it very carefully. It appears to be all one package from December.

Q. Do you see handwritten at the bottom there's, at least on many of the pages, handwritten numbers that run for the most part sequentially through this document?

- - - -

(The witness reviewed the document.)

- - - -

THE WITNESS: Yes. I see them.

BY MR. TERUYA:

Q. Do those numbers appear to be written in your handwriting?

A. Yes. I haven't gone through the whole thing yet but --

Q. Oh, okay. You're saying as you look through those, that this appears to be all part of one package of materials?

A. We sure can kill trees, can't we?

There are just a couple that don't have numbers on them that aren't attached. There was like one or two in the middle that look like they should belong to the same package. I don't know about the spreads at the end.

Q. So with the exception of the last couple of pages at the back which you can't be sure about, it appears this is all one package from one document?

A. It appears, yes.

Q. Is this the kind of package you put together from time to time while you were senior

financial analyst?

A. Yes.

Q. And did you prepare packages like this in the ordinary course of your work as senior financial analyst?

A. I prepared packages with cover sheets, the credit information sheet, and, you know, the attachments, the risk rating grids, the what's called RAROC, R-A-R-O-C, report. The nature of what's contained in it was obviously specific to Allegheny General, AHERF, all those entities, but this is the makeup of the type of report I would have prepared, yes.

Q. Are there any parts of this report that you would not have prepared in the ordinary course?

A. When I'm speaking about in the ordinary course of preparing a review, there's a lot of discussion in here if you look through here about concern is growing over this because of the nature of what's going on here, S&P downgraded its rating, there's specifying in here that address was going on with the analysis of their financials and the downgrades, et cetera.

That is not ordinary. That is

specific to what is going on with maybe the entity we were looking at.
Q. I just meant this type of document, is this --
A. The format of it, yes.
Q. This type of document is the type of document you prepared in the ordinary course?
A. The format, yes.
Q. And you would store documents like this in PNC's files in the ordinary course, as well?
A. I would --
Q. Store documents like this in PNC's files?
A. Yes.
Q. Would this go into the credit file that you referred to?
A. Yes.
Q. Can you tell what this particular credit information sheet was prepared for?
A. The reason for submission on the front page of the credit information sheet, or CIS, is annual review. There's a block that's checked called annual review on the first one.
On the second one, there are other blocks checked, including annual review. There's modification of commitment and commitment renewal. That one's for AGH

specifically. Allegheny University Medical Centers' commitment renewal and annual review. That looks like the only ones we have.
Q. The signatures on the first three pages next to the typewritten name, Paula Mammarella, are those your signatures?
A. My signature appears by my name.
Q. Do you see how for each of the first three pages there are a number of other signatures for Frank Taucher, W. Alex Eliason, C. David Cook, and Frank R. Krepp?
A. Yes.
Q. Are those the people you referred to earlier who would have to sign credit information sheets like these in order to approve actions mentioned in them?
A. Those are the signatories, yes.
Q. See how there's a stamp at the bottom that says recorded in the minutes of the market credit committee dated January 28, '98, and it says recording secretary and there's some initials above it?
A. Yes.
Q. Do you have any idea what that stamp and handwriting refers to?

A. It's my recollection and it's based on PNC's way of doing the signature method of approval, getting away from the committee as we talked about before, it's my understanding and my recollection that this would actually record things in minutes that you would naturally have in a committee being taken as you're sitting there during the committee, but it's my understanding that this is how it's documented in the --
Q. Let me see if I understand this properly. At this point in time when the five of you who are listed on this document had signed off on the credit information sheet, for practical purposes the actions requested were approved. Is that correct?
A. They were approved as of that date, yes, of the signatories.
Q. Was there any further approval that was required by any other person at PNC in order for the actions requested to be approved?
A. I'm sorry. You were saying?
Q. Let me rephrase that. Did anyone else have to sign off on the credit information sheet other than the five people listed here?

A. Is there's a signature. There's a line below the signatures that says highest credit signatory affirmation that signatures are complete, and there's initials there, and that's the affirmation that you've gotten to the level that you need to. Someone's attesting to that.
Q. Does that look like the initials FRK?
A. Yes.
Q. For Frank R. Krepp?
A. Correct.
Q. To your understanding, was that after he signs off on that that the actions requested in this credit information sheet were approved?
A. Yes.
Q. And the stamp reflects the creation of minutes after that?
A. Yes.
Q. And would those minutes reflect the discussions that had occurred between the five signatories?
A. No.
Q. What would those minutes reflect?
A. I'm not sure everything that they would reflect, but a person that's stamping this wasn't in the discussions and meetings with the

that it's an executed form that indicates an acceptance of the terms for renewal of the letter of credit.

MR. TERUYA: Is it pretty standard practice while you were senior financial analyst for PNC to send to various health care credits proposed terms and conditions in advance of reaching any formalized agreement?

MR. POHL: Objection.

THE WITNESS: It's my understanding that in banking, if you -- to have something set up where you submit terms to a customer for them to accept it, just the terms and conditions, that that's pretty typical.

MR. TERUYA: Okay. We can set this document aside.

I'm going to mark as Exhibit 1791 a one-page document with Bates No. PNC 191, and it appears to be a letter from Paula Mammarella to Michael Martin dated January 6th, 1998.

- - - -

(Deposition Exhibit No. 1791 marked for identification.)

- - - -

- - - -

(The witness reviewed the document.)

- - - -

BY MR. TERUYA:

Q. I'll ask you as you look at it if you recognize this document.

A. I recognize it as a memo that I sent over to Mike Martin in January.

Q. Do you recognize your signature down at the bottom?

A. Yes.

Q. Could you tell me why you sent this memo to Mike Martin.

A. As I'm reading it, it indicates that I'm asking him to send me financial projection information outlining plans to meet the liquidity covenant by June 30th of 1998.

Q. Does looking at this refresh your memory in any way that PNC had asked AHERF for plans as to how it could meet the liquidity covenant by 6-30-98?

MR. POHL: Objection.

THE WITNESS: Only as I read it here it refreshes --

MR. TERUYA: I think you mentioned this, but let me ask you, was one of the steps

you mentioned that might have occurred either at the meeting with David McConnell in April of -- in April -- on April 1st, would one of the steps at that meeting have been to discuss AHERF's plans for dealing with noncompliance with one of the covenants in one of the letters of credit between AHERF and PNC?

MR. COGAN: Objection.

THE WITNESS: I can't recall specifically what all was discussed then.

BY MR. TERUYA:

Q. Do you ever recall having any discussions while you were a senior financial analyst at PNC about what AHERF's plans were to respond to any noncompliance by any AHERF entities?

A. I can't recall.

Q. Sort of on the flip side, I take it you don't recall any discussions with any members of AHERF management about their plans for dealing with any noncompliance by any AHERF entities.

A. I don't recall specifics of the conversation that was held on April 1st, but there was a discussion on April 1st in a meeting that I was attending. I don't remember the agenda.

Q. And other than that meeting, do you recall any

other discussions you might have had with AHERF management on that issue?

A. I can't recall.

Q. Okay. We can set 1791 aside.

I'm going to mark as Exhibit 1792 a one-page letter from Paula Mammarella to Michael Martin dated January 8, 1998, with Bates No. PNC 43090.

- - - -

(Deposition Exhibit No. 1792 marked for identification.)

- - - -

(The witness reviewed the document.)

- - - -

BY MR. TERUYA:

Q. Let me ask you as you look at it whether you recognize this document.

A. Again, just as I'm reading it.

Q. Oh, okay. Do you recognize it as you're reading it as a letter from you to Mike Martin notifying Mike Martin that the letter of credit that PNC had issued to Allegheny General Hospital Obligated Group was being renewed for a one-year term set to expire on January 29, 1999?

A. Yes, except it's to Allegheny General Hospital, not the group.
Q. Okay. Do you recall any discussion you had at the time? Does looking at this help you recall any discussions about this?
A. No. I don't recall.
Q. Do you recognize your signature at the bottom of this exhibit?
A. Yes.
Q. And you said that in the ordinary course you would write letters like this to AHERF management. Is that correct?
MR. COGAN: Objection.
THE WITNESS: There's no ordinary course for any --
MR. TERUYA: Sorry. I should have -- Let me rephrase it more generally. Do you recall writing letters --
You said you recalled writing letters from time to time to members of AHERF management, even if they weren't letters dealing with renewals. Is that right?
MR. POHL: Objection.
THE WITNESS: I recalled correspondence with folks for any client that I

would work on requesting financial information that might be by phone or FAX or the E-mail or whatever.
I don't recall specifics of what I sent back and forth between AHERF.
BY MR. TERUYA:
Q. Okay. Any letters that you did send to AHERF management or received from them, you would have in the ordinary course kept in the correspondence section of the credit file. Is that right?
A. In the ordinary course, yes.
Q. Do you recall receiving from time to time certain letters from AHERF management?
A. I don't recall.
Q. Okay. We can set 1792 aside.
I'm going to mark as Exhibit 1793 a document with Bates Nos. PNC 38971 through 74, and it's captioned Amendment to Letter of Credit Reimbursement and Security Agreement, and it appears to be signed by Paula Mammarella and appears to be dated as of January 29, 1998.
- - - -
(Deposition Exhibit No. 1793 marked for identification.)

- - - -
(The witness reviewed the document.)
- - - -
BY MR. TERUYA:
Q. And let me ask you as you look at it whether you recognize this document.
A. I recognize it as an amendment. I recognize my handwriting at the top. It looks like it says legal file and my signature on the back.
Q. Does this appear to be an amendment to a 1993 letter of credit issued by PNC to Allegheny General Hospital?
A. Yes.
Q. And does it appear to be an amendment which extends the expiration date of the letter of credit to 5 P.M. on January 29th, 1999?
A. Where do you see --
Q. I'm sorry; in the Section D on the first page.
A. Okay. Your question is?
Q. I'm sorry. Does this appear to be an amendment to a 1993 letter of credit issued by PNC to AGH to extend the expiration date of the letter of credit until 5 P.M. on January 29th, 1999?
A. Yes, and to amend certain provisions of the original agreement as provided in this

agreement.
Q. And is one of the other provisions that's being amended the fee that's being provided to PNC from Allegheny General Hospital? And I'm referring to the second page of the document now. Sorry about that.
A. Okay. A renewal fee of 55/100 percent, yes.
Q. So does this indicate that a renewal fee is now 55 basis points?
MR. COGAN: Objection.
BY MR. TERUYA:
Q. Why don't I word my question in a more open way. What's your understanding of what the amendment listed on Page 2 next to No. 1 means?
A. Page 2 next to No. 1?
Q. Yes. What does the first amendment listed on Page 2 mean?
A. There is to be added this paragraph that includes the verbiage that indicates that beginning in January 29th of 1998, and continuing as long as any credit remains available to the paying agent and a letter of credit on the date of termination of the letter of credit, the letter of credit commitment fee payable by the corporation to the bank shall be

COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
COUNTY OF ALLEGHENY ) S H E E T

I, PAULA MAMMARELLA, have read the foregoing pages of my deposition given on Monday, July 28, 2003, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line Should Read Reason for Change

In all other respects, the transcript is true and correct.

________________________________
PAULA MAMMARELLA

Subscribed and sworn to before me this _________ day of _______________, 2003.

________________________________________
Notary Public
AKF Reference No. Gd76557

**Marks Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

*STANLEY MARKS, M.D.*
*June 22, 2004*

---

*LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

MARKS, M.D., STANLEY - Vol.

LEGALINK

Page 82

threatening them that if they went with Allegheny, you know, that they'd put them out of business, they'd build a competing hospital. I mean that was UPMC's tactics at the time, even though I now work for them, that they threatened them that if they went with Allegheny, that there would be --
Q. Repercussions?
A. -- repercussions, negative, yeah, for them whereas in their dealings with Allegheny they just felt more comfortable and felt they'd make a better partner.
Q. And Barry Roth was CEO of Forbes at the time; is that right?
A. Yes.
Q. If you would take a look at Exhibit 1988, which is one of the exhibits that Mr. Walker showed you earlier today, and for the record, that is the special meeting of the board of trustees of Allegheny Health, Education and Research Foundation, September 16th, 1996.
You had flipped through this document and said you were obviously there. My question to you is that -- did you make that statement because you actually recall being present at

Page 83

that meeting or because you saw your name listed as a member on the third page of the document?
A. Well, I saw my name listed, but also I remember being at a board meeting at Fifth Avenue Place, so unless that wasn't the same one, but I'm pretty sure I was there.
Q. And the reason I mentioned that and I wanted to make sure you were aware that these were not minutes of that meeting, this would be a board packet that would have been submitted in advance of the meeting. So your name as a member doesn't necessarily indicate the fact that you were, in fact, there, but if you recall that, I just wanted to make sure.
A. Yes.
Q. Thank you. That's all I have on that document. There -- well, strike that.
Were you aware that there were various committees of the AHERF board of directors?
A. Yes.
Q. Do you recall having served on any of those committees of the AHERF board?
A. I don't recall. I don't think I did.

Page 84

Q. For example, you were not a member of the AHERF finance committee; is that correct?
A. No.
Q. And at any time were you a member of the executive committee of the AHERF board?
A. No.
Q. And earlier today when you talked about being a member of the executive committee, your references were to the executive committee of the medical staff --
A. Yes.
Q. -- is that correct?
A. Yes.
Q. Were you aware that there was actually an audit committee of the AHERF board?
A. Yes.
Q. Did you at any time serve as a member of the audit committee?
A. Never.
Q. Did you have any understanding of what the role of the audit committee was?
A. No, just in, you know, simple terms they audited what went on at the board, at oversight committee.
Q. Did you understand that they were an oversight

Page 85

committee for the operations of the hospital or the entity --
A. I thought it was more financial but --
Q. Financial, okay. Did you have an understanding during your tenure as a member of the AHERF board that AHERF had independent outside auditors that reviewed the financial statements prepared by management?
A. Yes.
Q. Did you know who those outside auditors were?
A. I -- you know, I wouldn't know until I saw today. I mean I wouldn't remember.
Q. Do you recall now that it was Coopers & Lybrand that was the outside --
A. Yeah, now, but if you had asked me without seeing the documents, I wouldn't.
Q. Okay. Do you recall ever being at any board meeting where there were representatives of Coopers & Lybrand present?
A. I don't recall.
Q. Do you recall ever having any interaction in any arena with any member or employee of Coopers & Lybrand that was involved in the audit of the AHERF financial statements?
A. No, I don't think so. I don't recall anything.

Page 86

Q. Okay. All right. Did you have any understanding as to the service that was provided by Coopers & Lybrand as the outside independent auditors of AHERF?
A. No, again, just in general terms they did an independent audit of the financials.
Q. What was your understanding as to what it meant to have an outside independent audit of AHERF's financials?
A. Just in general to make sure that no one's cooking the books, that the financials are accurate.
Q. Do you recall ever seeing a report from Coopers & Lybrand with respect to what they had found in reviewing AHERF's audited financial statements?
A. Offhand I don't recall.
Q. Do you recall ever hearing that the auditors of Coopers & Lybrand had found anything irregular in AHERF's financial statements in any respect?
A. No.
MR. WALKER: Objection, foundation.
Q. Are you familiar with the term clean opinion as it relates to the audit of financial statements?

Page 87

A. No, I mean only what it sounds like it means, but I've never heard the term before.
Q. Okay. Did you have an understanding that after reviewing the financial statements that were presented by AHERF management, Coopers & Lybrand issued an opinion with respect to those financial statements?
A. That's -- you are asking me if that's what the audited statement is? That's what I assumed it meant.
Q. Okay. All right. And was it your understanding that at all times Coopers & Lybrand reported that it had found that AHERF's financial statements fairly represented the financial condition of AHERF and its affiliates?
A. I wasn't aware of anything other than that.
Q. Other than that?
A. Yeah.
Q. Okay. Did you have any view at the time you sat on the AHERF board as to the significance of receiving such an opinion from Coopers & Lybrand?
A. I mean I just thought it was routine.
Q. Okay.

Page 88

A. Routine business.
Q. Would it have been routine business if Coopers & Lybrand had notified the board that they found that the financial statements did not fairly and accurately represent the true financial condition of AHERF?
MR. WALKER: Objection, speculative.
Q. You can answer.
A. Would have raised flags.
Q. And would you have looked to the other members of the finance and audit committee to address those issues if they had been raised or those flags if they had been raised by Coopers & Lybrand?
A. Yes.
MR. WALKER: Same objection.
Q. And that's something that you would have expected the audit committee to address if such a circumstance had occurred; correct?
A. Yes.
Q. That was not something you felt was your role --
A. No.
Q. -- as a member of the board; correct?
A. Yes.

Page 89

Q. And you had mentioned Mr. Gumberg and Mr. Barnes and several others to be what you considered to be active members of the AHERF board. Do you recall knowing who the members of the audit committee of the AHERF board were during your tenure?
A. No.
Q. Do you recall the audit committee of the AHERF board presenting the audited financial statements to the board as a whole during meetings that you attended on an annual basis?
A. I don't recall.
Q. Do you ever recall hearing that at some point in time PriceWaterhouseCoopers, which became the successor to Coopers & Lybrand, their services with AHERF were terminated?
A. No.
Q. Do you recall there being a time when AHERF and PriceWaterhouseCoopers issued a press release stating that the audited financial statements for fiscal year 1997 of AHERF and its affiliates could no longer be relied upon?
A. No.
Q. Earlier today Mr. Walker asked you about Exhibit 1661 which contained the audited

financial statements of AHERF and its affiliates for fiscal year-end or fiscal year 1996, and he asked you about investment income --

A. Mm-hmm.

Q. -- and AHERF's reliance on investment income. Based on your experience in working at various hospitals, was it your understanding that hospitals, and particularly nonprofit hospitals, typically have to rely on investment income --

MR. WALKER: Objection.

Q. -- as a portion of their revenue?

A. Yes.

Q. Okay. Was that something that struck you as unusual, that AHERF relied on investment income as a portion of its revenue?

A. No, I mean certainly nowadays it's much worse than it used to be, but I can't recall back then if it was a big deal or not.

Q. Okay. When you say it's much worse than it used to be --

A. Well, because all hospitals have no profits on the operating side anymore for the most part.

Q. So they have to rely on their investment

income?

A. Mm-hmm.

Q. Was that a yes?

A. Yes.

MS. MEADEN: You have to keep your responses verbal. Just a quick minute here.

I don't believe I have any further questions for you. Thank you.

MR. WALKER: Nothing further, Doctor. Thanks.

THE VIDEOGRAPHER: There being no further questions. This deposition is concluded. Thanks.

- - - -

(The proceedings were concluded at 12:23 p.m.)

- - - -

COMMONWEALTH OF PENNSYLVANIA ) CERTIFICATE
COUNTY OF ALLEGHENY ) SS:

I, Heidi H. Willis, RPR, CRR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, STANLEY MARKS, M.D., was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to printing under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 23rd day of June, 2004.

______________________________
Notary Public

COMMONWEALTH OF PENNSYLVANIA ) ERRATA
COUNTY OF ALLEGHENY ) SHEET

I, Stanley Marks, M.D., have read the foregoing pages of my deposition given on Tuesday, June 22, 2004, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line Should Read Reason for Change

In all other respects, the transcript is true and correct.

______________________________
STANLEY MARKS

Subscribed and sworn to before me this
_________ day of _______________, 2004.
______________________________
Notary Public
AKF Reference No. HW81344