Page 98

1   Q.   He being?
2   A.   Whoever the consultant was.  And said, "As of
3   tomorrow you are no longer needed here, so pack up and
4   get out."
5   Q.   Ceremoniously, okay.  And I assume that's then
6   what happened?
7   A.   Yes.
8   Q.   And if I understand your testimony earlier,
9   you filed a claim for the amounts due under your
10  employment agreement, correct?
11  A.   For the time that I had already worked, yes.
12  Q.   I'm sorry.  From the time you already had
13  worked that you hadn't been paid for?
14  A.   Correct.
15  Q.   And that was in the AHERF bankruptcy?
16  A.   Correct.
17  Q.   And you believe you received a check sometime
18  last year as payment for that claim?
19  A.   Correct.
20  Q.   Do you recall what the amount of the payment
21  was?
22  A.   120,000, something in that range.
23  Q.   Was that the amount that you had claimed as
24  well or did you claim something more?
25  A.   I think that was close to the amount that I

Page 99

1   claimed.
2   Q.   Did you have legal representation?
3   A.   Yes.
4   Q.   Who was representing you in that, processing
5   that claim?
6   A.   It was a lawyer in the Mescrov firm in
7   Philadelphia.  M-E-S-C-R-O-V.
8   Q.   Do you recall the name of the lawyer?
9   A.   No.
10  Q.   Getting back to the board meetings that you
11  attended during the time of October of 1996 to September
12  of 1998, I think you told me you attended -- you were
13  invited to Centennial board meetings?
14  A.   Correct.
15  Q.   And to AHERF board of trustee meeting,
16  correct?
17  A.   Correct.  I don't know if I was invited to all
18  of them, but I was invited to a number of them.
19  Q.   Do you know if you were invited to all of the
20  Centennial board meetings?
21  A.   I believe I was.
22  Q.   How often did that board meet during that
23  time?  Do you recall?
24  A.   Not very often.
25  Q.   Two or three times a year?

Page 100

1   A.   I don't recall.
2   Q.   Did you more often than not attend those
3   Centennial board meetings to which you were invited?
4       MS. ZACH:  Objection.
5   A.   If I was invited, I attended.
6   BY MS. MEADEN:
7   Q.   What about the AHERF board meetings, did you
8   always attend the meetings to which you were invited?
9   A.   Yes.
10  Q.   Was it your understanding you were invited for
11  a particular purpose when you were invited to the AHERF
12  board of trustee meetings?
13  A.   It was usually to report on the Graduate
14  hospitals.
15  Q.   All of the Graduate hospitals or only those
16  for which you were responsible?
17  A.   Sometimes all of those, even though I wasn't
18  responsible for them.
19  Q.   Somewhat of a fluid situation then?
20      MS. ZACH:  Objection.
21  A.   Yes.
22  BY MS. MEADEN:
23  Q.   If I understand your testimony correctly, your
24  responsibilities and the hospitals for which you were
25  responsible seem to change during that two-year period

Page 101

1   that you were employed by AHERF, correct?
2   A.   Yes.
3   Q.   Was it your view that the changes and the
4   frequency in the changes in your responsibilities was
5   something that was well thought out?
6       MS. ZACH:  Objection.
7   A.   I think it probably was.
8   BY MS. MEADEN:
9   Q.   Who was making those decisions, as you
10  understood it, as to what your responsibilities would be
11  or the hospitals for which you would be responsible for
12  over a given period of time?
13  A.   I think it was coming from Sherif's office.
14  Q.   Would he be the one who would be conveying the
15  information regarding how your responsibilities were
16  changing?
17  A.   No, Dr. Kaye would.
18  Q.   I want to ask you about a couple of other
19  hospitals that you have mentioned earlier.  One is
20  Rolling Hills.  Was that known by any other name?
21  A.   Elkins, E-L-K-I-N-S, Park.
22  Q.   And the Warminster Hospital, was that also
23  known as the Bucks County Hospital?
24  A.   Yes.
25  Q.   Do you recall when or do you have any

26 (Pages 98 to 101)

Page 102

1 knowledge of when the discussions between Graduate
2 Health System and AHERF started over a possible
3 acquisition?
4    A.   No, I wouldn't.  I think it was sometime near
5 the end of '95 or part of '96.
6    Q.   And if I understand your testimony earlier,
7 you were not involved in those discussions with AHERF
8 people?
9    A.   Correct.
10   Q.   Who from Graduate Health Systems was primarily
11 involved in those discussions?
12   A.   I think mostly the board.
13   Q.   When you say the --
14   A.   The Graduate Health System board.  Bernie
15 Korman for the most part.  K-O-R-M-A-N.
16   Q.   Did you have any understanding as to who he
17 was dealing with at AHERF in these discussions?
18   A.   Yes.
19   Q.   And who was that?
20   A.   It was Sherif Abdelhak and David McConnell and
21 Nancy Wynstera, W-Y-N-S-T-E-R-A.
22   Q.   And would Mr. Korman report regularly to the
23 Graduate Health System board, to your knowledge, about
24 the progress of those discussions?
25   A.   As far as I recall, I think he did, yes.

Page 103

1    Q.   And do you recall when -- I assume at some
2 point Mr. Korman notified the Graduate Health System
3 board that the discussions had progressed to the point
4 where there was discussion of a possible acquisition and
5 a deal was likely to be done, correct?
6    A.   Correct.
7    Q.   Do you recall when Mr. Korman advised the
8 board of such event?
9    A.   No, I don't.
10   Q.   Do you believe it was several months before
11 October 1996?
12   A.   Yes.
13   Q.   Did you have any understanding prior to
14 October of 1996 why AHERF was interested in Graduate
15 hospitals?
16        MS. ZACH:  Objection.
17   A.   My understanding was they wanted to build up a
18 volume of hospitals and then regions so they can better
19 negotiate with the insurance companies there.
20 BY MS. MEADEN:
21   Q.   Did you have any understanding as to why
22 Graduate Health Systems would be interested in a
23 possible transaction with AHERF at that time?
24        MS. ZACH:  Objection.  Asked and answered.
25   A.   I think all of us believed that it was in the

Page 104

1 best interest of the hospitals and the doctors and
2 employees to do it.  They thought AHERF would make the
3 hospitals more substantial, put capital into the
4 hospitals, and they will all be better off than they
5 were without AHERF.
6 BY MS. MEADEN:
7    Q.   Did you have any understanding or was any
8 information conveyed to you regarding AHERF's purported
9 financial condition at that time?
10   A.   The only thing I recall was, quote, the
11 billions of dollars they had available.
12   Q.   Billions with a B?
13   A.   Yes.  Billions with a B, on their balance
14 sheet.
15   Q.   Did you see or do you know if any of the other
16 board members saw financial statements from AHERF prior
17 to agreeing to a deal?
18   A.   Yes.
19   Q.   Do you recall specifically what financial
20 statements from AHERF you would have seen?
21   A.   No.
22   Q.   Would it have been audited financial
23 statements?
24        MS. ZACH:  Objection.
25   A.   I would think that it was.

Page 105

1 BY MS. MEADEN:
2    Q.   Do you believe it was audited financial
3 statements for the completed fiscal year immediately
4 before the transaction occurred?
5        MS. ZACH:  Objection.
6    A.   I don't know, but I would think that it was.
7 BY MS. MEADEN:
8    Q.   Was it your understanding that these billions
9 of dollars that were available as reflected on AHERF
10 balance sheet was something that the board of Graduate
11 Health Systems found very persuasive in deciding to go
12 forward with the deal with AHERF?
13   A.   I think it helped.
14        MS. ZACH:  Objection.
15 BY MS. MEADEN:
16   Q.   Do you recall whether there were specific
17 representations made by AHERF as to the amount of
18 capital they were willing to put into the Graduate
19 hospitals?
20        MS. ZACH:  Objection.
21   A.   I don't recall that.
22 BY MS. MEADEN:
23   Q.   Well, did you have an understanding that AHERF
24 was going to make capital improvements to the hospitals?
25   A.   Yes.

1    Q.   And where is it that you got that
2    understanding?
3    A.   Just from discussions with principals there.
4    Q.   Principals at AHERF?
5    A.   Yes.
6    Q.   Specifically, do you recall who?
7    A.   Abdelhak, McConnell.
8    Q.   After the acquisition, did you see significant
9    improvements, capital improvements, in the Graduate
10   hospitals?
11   A.   Not that I'm aware of.
12   Q.   Did you ever have any understanding as to why
13   those capital improvements weren't made?
14   A.   I just think it was all a matter of timing.
15   They did use capital to purchase or entice physicians to
16   come to Graduate Hospital.  So there were dollars spent
17   from that aspect.
18   Q.   That would have been as far as salaries for
19   those doctors, correct?
20   A.   No.  They enticed a significant orthopedic
21   practice to come there, and I guess they paid them some
22   sort of stipend, significant stipend, to attract them
23   there.
24   Q.   But that would have been money that would have
25   gone to salaries or stipends as opposed to money that

1    was put into improving the facilities at the Graduate
2    hospitals, correct?
3         MS. ZACH:  Objection.
4    A.   That's correct, but the Graduate Hospital got
5    the benefit of all those patients that came in the
6    practice.
7    BY MS. MEADEN:
8    Q.   But you had said earlier that it was at least
9    your understanding that there would be significant
10   monies put into capital improvements at the hospitals.
11   Were you thinking of infrastructure when you made that
12   statement?
13        MS. ZACH:  Objection.
14   A.   I'm sorry.  There were.  It was based on the
15   capital budgets that were produced each year.  So if the
16   hospital produced the capital budget, usually AHERF
17   followed along and provided those equipment needs at the
18   hospitals.  So there weren't any specific
19   structural-type, building-type things that were done.
20   These were mostly equipment.
21   BY MS. MEADEN:
22   Q.   Well, were the Graduate hospitals in need of
23   structural or building changes prior to the acquisition?
24   A.   The only one that was really in need, I guess,
25   would be Rancocas.

1         VIDEOGRAPHER:  We have about three minutes
2    left on this tape.  Going off the video record at 12:07
3    p.m.
4         (Discussion off the record)
5         VIDEOGRAPHER: Back on the video record at
6    12:09 p.m.
7    BY MS. MEADEN:
8    Q.   Mr. Mathews, was the level of AHERF investment
9    in the Graduate hospitals after the acquisition the
10   level that you had anticipated prior to the acquisition?
11   A.   I think so.
12   Q.   Do you have any knowledge as to what the level
13   of debt that the Graduate hospitals was in the October
14   1996 time period?
15   A.   I remember 135,000 for Graduate and Mount
16   Sinai combined.
17   Q.   135,000 --
18   A.   Million.  Million.
19   Q.   For Graduate and Mount Sinai?
20   A.   And Mount Sinai.
21   Q.   When you say Graduate, you mean the Graduate
22   Hospital?
23   A.   Right.
24   Q.   What about the other hospitals?
25   A.   I don't recall the debt on those hospitals.

1    Q.   Do you know if it was greater than or lesser
2    than the 135 --
3    A.   Lesser, I would think.
4    Q.   In total for the other hospitals or each
5    individual hospital?
6    A.   I don't recall.
7    Q.   And do you have any understanding as to the
8    total amount of debt that the AHERF system ultimately
9    ended up assuming as a result of the Graduate Hospital's
10   acquisition?
11   A.   I don't recall.
12   Q.   Let me ask you this:  Do you know if the AHERF
13   system did in fact assume the debt of the Graduate
14   hospitals as a result of the AHERF --
15   A.   That was my understanding.
16   Q.   Do you know if they assumed -- they being
17   AHERF, assumed all of the debt of the Graduate hospitals
18   as a result of the acquisition?
19   A.   Again, that's what I thought.
20   Q.   Was it your understanding that Graduate Health
21   System was going to transfer certain funds over a
22   three-year period of time to the Graduate Hospital as
23   part of this transaction with AHERF?
24   A.   Yes.
25   Q.   What was your understanding as to the amount

Page 134

1    A.    No.
2    Q.    Did you talk to anyone from Miss Zach's law
3    firm of Cravath, Swaine & Moore other than someone to
4    discuss the scheduling of your deposition? Did you meet
5    or talk with anyone from that law firm?
6    A.    No.
7    Q.    Did you meet or talk to anyone from
8    PricewaterhouseCoopers prior to this deposition?
9    A.    No.
10    Q.    Did you review any documents in preparing for
11    this deposition?
12    A.    No.
13    Q.    And you were shown hundreds of pages of
14    documents earlier today, very voluminous exhibits, and
15    you were asked specific questions about select portions
16    of those documents, correct?
17          MS. ZACH: Objection.
18    A.    Correct.
19    BY MS. MEADEN:
20    Q.    And you certainly didn't have the time or
21    probably the wherewithal to read through all of the
22    pages that were contained in those exhibits, correct?
23    A.    Correct.
24    Q.    So, it is possible that there may be
25    information contained within those exhibits that, had

Page 135

1    you read it, would have changed some of the answers you
2    gave here today, correct?
3          MS. ZACH: Objection.
4    A.    I doubt it.
5    BY MS. MEADEN:
6    Q.    But you certainly didn't read all the pages in
7    those documents?
8    A.    I did not. That's correct.
9    Q.    Couple more questions. On the Vanguard
10    transaction that we had talked about earlier, do you
11    have any understanding as to why Vanguard didn't
12    ultimately consummate a deal with AHERF?
13    A.    My only understanding was that financials
14    were -- at the time they were looking at completing the
15    transaction -- much worse than were projected, and that
16    Tenet was willing to step up and pay the dollars or take
17    responsibilities that Vanguard wasn't.
18    Q.    Did you ever have any discussions specifically
19    with anyone from Vanguard as to why they weren't going
20    to consummate the transaction?
21    A.    Exactly what I just told you.
22    Q.    I'm trying to find out from whom did you get
23    that understanding.
24    A.    I think it was Galloway or Hough. Probably
25    both of them.

Page 136

1    Q.    Do you have any involvement with the Graduate
2    Health System today?
3    A.    No. Oh, other than I get a pension from the
4    Graduate Health System.
5    Q.    But you are not a member of the Graduate
6    Health System board or anything like that, correct?
7    A.    Actually, there is no Graduate Health System
8    anymore anyway.
9    Q.    I apologize. You are right. There was a
10    successor foundation set up now known as the
11    Philadelphia Health Care --
12    A.    Health Trust.
13    Q.    Health Trust.
14          MS. MEADEN: I don't believe I have any more
15    questions, but Miss Zach may.
16          REDIRECT EXAMINATION
17    BY MS. ZACH:
18    Q.    You stated a couple times, I believe, that you
19    weren't given access to certain documents while you were
20    president of Centennial. Do you recall making that
21    statement?
22    A.    Yes.
23    Q.    Let me first ask you whether you ever
24    requested any documents regarding any of the hospitals
25    within AHERF system that you were refused?

Page 137

1    A.    No.
2    Q.    So, when you say that you weren't given access
3    to documents, you were meaning that you were not
4    voluntarily being given certain documents relating to
5    hospitals that were not within Centennial?
6    A.    Correct.
7          MS. MEADEN: Objection.
8    BY MS. ZACH:
9    Q.    Do you have any reason to believe that you
10    would have been refused such documents had you requested
11    them?
12    A.    No.
13    Q.    You had a brief discussion with Miss Meaden
14    regarding possible representations that had been made
15    about AHERF during negotiations for the acquisition of
16    the Graduate hospitals. Do you recall that discussion?
17    A.    Yes.
18    Q.    Is it fair to say that you have no degree of
19    certainty regarding what information had passed between
20    AHERF and Graduate Health System regarding the
21    acquisition of the hospitals?
22    A.    That's correct.
23    Q.    And you don't know with any certainty whether
24    Graduate Health System had received any audited
25    financial statements for AHERF or any of AHERF

35 (Pages 134 to 137)

Page 138

1   hospitals?
2       MS. MEADEN: Objection.
3       A.   I don't know with certainty. I thought we had
4   seen audited statements.
5   BY MS. ZACH:
6       Q.   You believe you had seen them?
7       A.   Yes.
8       Q.   You also discussed briefly the allocation of
9   corporate overhead to the various AHERF hospitals. Do
10  you recall that?
11      A.   Yes.
12      Q.   And you said that you did have certain issues
13  regarding how corporate allocations had been determined
14  for the Centennial hospitals for which you were
15  responsible?
16      A.   Well, I don't know if it was just Centennial
17  hospitals. I have had issues with that over the years
18  working with hospitals with allocations coming down, so
19  I just -- they were there. I'm used to just accepting
20  corporate allocations. It doesn't do you any good to
21  argue about them, so that's the only reason I said that.
22      Q.   And that was my question. Was there anything
23  about corporate allocations under the AHERF system that
24  caused you greater concern than you had seen through
25  your work with other healthcare systems?

Page 139

1       A.   No.
2       MS. ZACH: I believe that's all I have.
3           RECROSS EXAMINATION
4   BY MS. MEADEN:
5       Q.   I do want to follow up on a couple things.
6   You talked about the documents that you hadn't seen,
7   hadn't seen all documents I think is what you said. I'm
8   a little confused about what you meant by that.
9       A.   I just said that because through discussions I
10  heard about things that happened that were going on, I
11  had just never seen any documents to back up what those
12  discussions were. Not that I should have seen them. I
13  just --
14      Q.   Were those things that were going on within
15  the Centennial hospitals or within the AHERF system as a
16  whole or both?
17      A.   As a whole. Anything involving Centennial I
18  usually had access or I got without any trouble.
19      Q.   Do you believe you had access to -- full
20  access to all financial information related to
21  Centennial hospitals?
22      A.   Yes.
23      MS. ZACH: Objection.
24  BY MS. MEADEN:
25      Q.   And from whom would you get financial

Page 140

1   information for the Centennial hospitals?
2       A.   Either from the hospitals themselves or from
3   McConnell or Morrison.
4       Q.   Did you deal directly with Mr. McConnell on
5   financial information for the Centennial hospitals?
6       A.   Once in a while. Not routinely.
7       Q.   Would that be because of the nature of the
8   information that you were seeking, you'd go straight to
9   McConnell?
10      A.   If I had a question about the financials that
11  the CFO at the hospital couldn't answer, I would go to
12  him and find out what the answer was.
13      Q.   And did you -- were you satisfied with the
14  answers that you received from Mr. McConnell in response
15  to your questions?
16      A.   Yes. Yes.
17      MS. MEADEN: Nothing further.
18      MS. ZACH: Nothing.
19      VIDEOGRAPHER: That concludes today's
20  deposition. The time on the monitor is 12:51 p.m. We
21  are now off the record.
22      MS. MEADEN: The court reporter should forward
23  the transcript to Mr. Mathews.
24      You will get 30 days from the receipt of the
25  transcript to fill out an errata sheet, if you find that

Page 141

1   something was misstated, and then there will be an
2   address to which you can return it.
3       THE WITNESS: I can fill names in I remember?
4       MS. MEADEN: Sure.
5       (Whereupon, at 12:52 p.m., the deposition was
6   concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

36 (Pages 138 to 141)

Page 142

```
1          CERTIFICATE OF OATH
2
3   THE STATE OF FLORIDA, )
    COUNTY OF PALM BEACH. )
4
5
6       I, Jodi Harmon, Registered Professional
7   Reporter and Notary Public in and for the State of
8   Florida at Large, hereby certify that the foregoing
9   witness personally appeared before me and was first duly
10  sworn by me.
11      WITNESS MY HAND AND OFFICIAL SEAL, this
12  3rd day of July, 2003.
13
14      Jodi Harmon, RMR, CRR
        Notary Public, State of Florida
15      Commission Number:  CC854931
        Expires:  July 22, 2003
16
17
18
19
20
21
22
23
24
25
```

Page 143

```
1       REPORTER'S DEPOSITION CERTIFICATE
2
3   THE STATE OF FLORIDA, )
                          )
    COUNTY OF PALM BEACH. )
4
5       I, Jodi Harmon, Court Reporter, certify that
    the foregoing deposition was taken before me in this
6   cause at the time and place and in the presence of
    counsel as shown herein; that the foregoing pages
7   contain a true and correct transcription of the
    testimony of said witness.
8
9       I further certify that I am neither attorney
    for any party nor am I related to or employed by any
    attorney or party connected with the action, nor am I
10  financially interested in the action.
11      The foregoing certification of this transcript
    does not apply to any reproduction of the same by any
12  means unless under the direct control and/or direction
    of the certifying reporter.
13
        So certified, this 3rd day of
14
    July, 2003.
15
16
17      Jodi Harmon, RMR, CRR
18
19
20
21
22
23
24
25
```

McCool Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *THOMAS MCCOOL*
*October 28, 2003*

---

# *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**MCCOOL, THOMAS - Vol. I**



LEGALINK
A WORDWAVE COMPANY

1    under this agreement.
2  A.   Again, if an event of default has occurred and
3      is continuing uncured, the bank may do the four
4      things enumerated here.
5  Q.   Can you tell me what --
6        Is Provision 1 under 7.02(a)(1) that
7      the bank can ask the trustee to declare an
8      event of default with respect to the bonds?
9        THE WITNESS:  Yes.  It says what it
10     says, notify the trustee.
11 BY MR. TERUYA:
12 Q.   And would that cause the bonds to be
13     accelerated?
14 A.   According to the way 7.02(1) is written, yes.
15 Q.   And was another option that was available to
16     PNC for PNC itself to cause the obligated
17     group's obligations to become immediately due
18     and payable?
19 A.   One of our options was to notify the trustee of
20     such event of default, yes.
21 Q.   What were the remedies that you considered at
22     the time to be available to you in dealing with
23     Allegheny General Hospital obligated group's
24     issues at the time you were dealing with that
25     credit?
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

1  A.   The document speaks for itself.  That's our
2      outline.
3  Q.   Other than the remedies that are available
4      under 7.02, are there any other remedies that
5      you are aware of that PNC had available to it?
6  A.   I'm not sure how you define "remedies," per se.
7      I mean, there's remedies that are enumerated
8      and defined in contract.
9        Is that what you mean?
10 Q.   I mean other than remedies that are defined in
11     this contract, was there any other options that
12     PNC considered to be available to it in dealing
13     with any of the problems that you faced with
14     Allegheny General Hospital Obligated Group?
15 A.   Options are different than --
16       MR. COGAN:  Keep in mind, Item No. 4
17     here is pretty broad.
18       MR. TERUYA:  Sure.
19       MR. COGAN:  It's exercise, or cause
20     to be exercised, any and all such remedies as
21     it may have under this agreement or any other
22     document or at law or in equity.
23       MR. TERUYA:  I'm just trying to see
24     if there's anything else you would have
25     considered at the time in evaluating your
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

1    options other than what's spelled out in this
2    letter of credit agreement.
3        MS. HACKETT:  At the time in
4    evaluating options.  What time are you talking
5    about?
6        MR. TERUYA:  At the time you were
7    dealing with any problems or issues relating to
8    Allegheny General Hospital Obligated Group.
9        THE WITNESS:  I think I understand
10   where you're going with the question, and
11   that's why I wanted to be careful that we're
12   talking about options as opposed to per se
13   remedies.
14       The document outlines in black and
15   white what various words mean and what
16   contractual relationship exists.
17       To the extent, though, that this is a
18   living, breathing company entity on the one
19   hand with management and people involved, and
20   to the extent the bank's comprised of a
21   parallel universe in a sense, there are
22   numerous discussions, assessments, and options
23   explored, so that it's not ultimately reduced
24   to a single determination.
25       It's a pretty broad approach we take
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

1    in trying to make.the assessment of whether or
2    not there are other options available,
3    including time or extensions of time or some
4    ameliorative characteristic that we might want
5    to put in place to both save ourselves the loss
6    and save the company itself.
7  BY MR. TERUYA:
8  Q.   Do you recall whether at some point in time you
9      started dealing with issues relating to the AGH
10     Obligated Group?
11 A.   Yes.
12 Q.   Do you recall approximately when that was?
13 A.   Generally in dealing with the problems in the
14     AGH entity, I'd have to say it was probably
15     sometime in July of 1998.
16 Q.   How about just in dealing with the AGH
17     Obligated Group in general?  Was there some
18     earlier point in time you started dealing with
19     it?
20 A.   No.
21 Q.   You mentioned --
22       We were talking about DVOG earlier.
23     Could you tell me when you first became
24     involved with issues at DVOG.
25 A.   May of 1998.
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

16 (Pages 58 to 61)

Page 62

1  Q.  What was the event that triggered your
2      involvement with issues at DVOG in May of '98?
3  A.  There was a meeting in Philadelphia, I don't
4      recall the exact date, at which the AHERF
5      management basically made a presentation to the
6      creditors, including PNC and MBIA, of what the
7      situation was and what they intended to do.
8  Q.  And what was the situation as reported at that
9      time by AHERF management?
10 A.  That AHERF management generally had devised a
11     scenario that they wanted to explain to us that
12     would involve basically, as I defined it,
13     basically orphaning the Philadelphia entity,
14     closing up the gates at Fortress Allegheny, and
15     leaving us to our fate.
16         I believe that's exactly how I put it
17     when I got home.
18 Q.  When you say "orphaning" the Philadelphia
19     operations, can you explain what you mean by
20     that.
21 A.  They meant to abandon them.
22 Q.  Into bankruptcy?
23 A.  Into whatever it took.  In general terms, I
24     don't think they devised or determined what
25     process would be entailed, but the general
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 63

1      tenor of their approach was to abandon
2      Philadelphia to its fate, button up the gates
3      in western Pennsylvania, and hope that nobody
4      crossed the moat.
5  Q.  So are you saying that the support and credit
6      from AHERF and its western operations would no
7      longer be extended to the Philadelphia
8      operations?
9  A.  That was my understanding from that meeting,
10     yes.
11 Q.  Do you recall which members of AHERF management
12     were present?
13 A.  No, I don't.  I believe Tony Sanzo and a number
14     of other people were there, a number of the
15     trustees were there; but I didn't take
16     attendance, and I don't recall exactly who was
17     there.
18 Q.  So when you said AHERF management, you don't
19     mean simply management in terms of officers,
20     but you're also including trustees, some
21     trustees, as well?
22 A.  My recollection is, and I could be wrong
23     because, as I said, I didn't take attendance at
24     the meeting, and I didn't keep an attendance
25     list.  I have a general awareness of who was in
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 64

1      the meeting and where it took place, and it was
2      actually not a bad lunch.
3          Beyond that, I don't recall.
4  Q.  Just to clarify that last answer, do you have a
5      general recollection that some trustees were
6      present, as well?
7  A.  Again, my memory could well be faulty.
8  Q.  Sure.
9  A.  But as I recall, there may have been a couple
10     of the trustees there, yes.
11 Q.  Do you recall being told at that time who had
12     made that decision to, as you put it, abandon
13     the Philadelphia operations?
14 A.  It was not attributed to any single individual,
15     no.
16 Q.  Do you know if any discussion was made as to
17     whether the board of AHERF had considered that
18     decision?
19 A.  Again, there was no attribution, as I recall,
20     to who determined that strategy.
21 Q.  Do you recall how long that meeting lasted for,
22     that presentation?
23 A.  Several hours, because it extended over lunch.
24 Q.  Was there any catalyzing event that triggered
25     your involvement with issues at the AGH
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 65

1      Obligated Group in July of '98?
2  A.  The determination basically that a bankruptcy
3      petition would be filed on behalf of the DVOG
4      and AHERF as the parent, and that the AGH
5      entity would not be involved in that.
6  Q.  So were you ever in any position to evaluate --
7          Actually, let me take one step back.
8          Did there ever come a time where you
9      evaluated your options under the AGH Obligated
10     Group letter of credit agreements in terms --
11 A.  Yes, certainly.
12 Q.  When was that?
13 A.  Likely it would have been in the same time
14     frame, early July '98.
15 Q.  Was there any failure on the part of the AGH
16     Obligated Group to comply with any obligations
17     under the letter of credit agreement?
18 A.  I don't recall whether there was any technical
19     obligation.
20 Q.  Do you recall what options you considered with
21     respect to the Allegheny General Hospital
22     obligated group in terms of this loan
23     agreement?
24 A.  In general terms, in early July we had
25     determined that no matter what strategy they
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

17 (Pages 62 to 65)

1    sought to employ in the DVOG side of the
2    company structure, the Allegheny General
3    reimbursement agreement was going to be in
4    default; and so if the generalized plan that we
5    had discussed or had discussed with us by AHERF
6    management was that they would seek to most
7    quickly abandon the eastern operations and,
8    yet, continue to keep the western operations
9    viable, it seemed a bit short-sighted to me,
10    because under the scenario they outlined, the
11    AGH obligations would be in default.
12 Q.   So what particular options did you consider at
13    that point in time that PNC could take in
14    responding to what you perceived as a
15    forthcoming default by the AGH Obligated Group?
16 A.   Declaring the default and accelerating the debt
17    by causing a draw under the letter of credit.
18 Q.   Were there any other options that you were
19    considering at the time?
20 A.   There were numerous other options in the global
21    sense that we had been discussing not only with
22    the DVOG and AHERF, but because they had an
23    effect on the AGH operations, those were under
24    consideration, yes.
25 Q.   Could you tell me what those other options
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

1    were.
2 A.   Yes, given the liquidity position of the DVOG,
3    we devised really a term sheet that we had
4    offered to AHERF and its management that would
5    have basically come up with more liquidity for
6    them to meet their obligations in return for
7    which they would have agreed to pledge the
8    western assets to the generalized corporate
9    structure, all the obligations owed to both us
10    and MBIA.
11 Q.   That's with respect to DVOG?
12 A.   AHERF in a sense, the way we looked at it, was
13    more globally from a liquidity standpoint. In
14    a day-to-day standpoint, it doesn't matter so
15    much who has to make good on the obligation,
16    whether it's to a vendor or whether it's
17    payroll or whether it's any other liquidity
18    need.
19        It was a sense that the company, as a
20    whole, needed liquidity in some amount; and
21    what we devised was a structure that would have
22    provided some liquidity to the company, but we
23    wanted a quid pro quo.
24        We'd put up a liquidity; they had to
25    put up the assets, all of the assets.  They
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

1    refused, by the way.
2 Q.   We'll come back to that term sheet.  I just
3    wanted to back up one step and ask you, did
4    AHERF have any -- the parent corporation --
5    have any obligations to PNC at the time you
6    were involved with AHERF?
7 A.   Other than to the extent that they're involved
8    as a named party on the letters of credit, no.
9    I'm not aware of any.
10 Q.   You're not aware of any obligations that AHERF
11    had in terms of particular responsibilities
12    under any agreements to PNC?
13 A.   Again, it's five years ago.  I'm not aware of
14    any in particular.
15 Q.   In addition to the term sheet that you
16    mentioned that was one option that was being
17    considered in accelerating the AGH Obligated
18    Group letter of credit, were there any other
19    options that you were considering in mid 1998
20    with respect to any AHERF entities?
21 A.   Again, it was partly based on the constant
22    assessment of the circumstances, the liquidity
23    need of the organization generally as to what
24    could possibly be done.
25        There were numerous meetings that
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

1    occurred in Philadelphia that discussed
2    possible outcomes, and there were lots of
3    potential formulations that ultimately got
4    reduced to that term sheet.
5 Q.   In addition to the various options you
6    mentioned, can you think of any others you were
7    considering at the time?
8 A.   No.  We ran the gamut of what the possible
9    outcomes were and our responses to them,
10    everything from bankruptcy to simply making
11    money available to them under the loosest
12    possible circumstances, so --
13        Part of the function we serve at the
14    bank is to basically try and cover the
15    waterfront in a sense of what various options
16    were available, not in the formal offered sense
17    to the company, but trying to sort of estimate
18    or formulate in our own minds what happens if I
19    do this, what happens if I don't do this or I
20    do something else.
21        I mean, that's the everyday activity
22    we engage in is constantly making that
23    assessment.
24 Q.   As a result of that process of assessing the
25    circumstances, you mentioned two options that
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 70

1    were considered at the time; one embodied in
2    the term sheet that was offered to AHERF, and
3    another was accelerating the AGH Obligated
4    Group letter of credit.
5         Were there any other options that
6    came about as a result of that process that you
7    discussed that you can recall?
8  A.  I don't recall.
9         MS. HACKETT:  Can we take a break?
10        MR. TERUYA:  Sure.  Why don't we take
11   a quick break.
12        THE VIDEOGRAPHER:  We're going off
13   the record.  The time is 10:30.
14        - - - -
15   (There was a recess in the proceedings.)
16        - - - -
17        THE VIDEOGRAPHER:  We are back on the
18   record.  It is 10:46.
19   BY MR. TERUYA:
20  Q.  I think when we left off we were talking about
21   some of the options that were being considered
22   prior to the bankruptcy by PNC, and you
23   mentioned accelerating the AGH Obligated Group
24   letter of credit and a term sheet that was
25   offered to AHERF, and I was wondering was any
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 71

1    consideration ever given to accelerating the
2    DVOG letters of credit?
3  A.  I don't recall.
4  Q.  Am I correct that these options were being
5    considered --
6         Actually, let me strike that last
7    question.
8         Let me show you what's been
9    previously marked as -- we'll spend less time
10   on this document -- but what has been
11   previously marked as Exhibit 326 which, just
12   for the record, is the letter of credit,
13   reimbursement and security agreement, dated as
14   of January 29, 1993, between AGH and Pittsburgh
15   National Bank.
16        - - - -
17   (Exhibit No. 326 previously marked for
18        identification.)
19        - - - -
20   BY MR. TERUYA:
21  Q.  Let me ask you as you flip through it if you
22   recognize this document.
23  A.  Yes.
24  Q.  Can you tell me what you recognize it as.
25  A.  It's a letter of credit, reimbursement and
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 72

1    security agreement.
2  Q.  Is this an agreement between the AGH Obligated
3    Group and PNC?
4  A.  Yes.
5  Q.  So it's another letter of credit agreement that
6    was in place at the time between AGH and PNC?
7  A.  Yes.
8  Q.  Do you know if this letter of credit agreement
9    was also irrevocable from PNC's perspective?
10  A.  That's my understanding.
11  Q.  And if you could just flip to Page 25 of this
12   agreement, do you see there's a Section 7.01,
13   default, that runs through to Page 27?
14  A.  Yes.
15  Q.  And does this section set forth all the
16   possible events of default under this letter of
17   credit agreement?
18  A.  Yes.
19  Q.  Looking at 7.01 B, in particular, is there in
20   this letter of credit agreement, like in the
21   last one, a provision that allows AGH Obligated
22   Group 30 days to try to cure any covenant
23   noncompliance?
24  A.  It looks basically like the same language
25   that's in the other one, yes.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 73

1  Q.  And I think you mentioned that you were aware
2    of no policy or practice at PNC with respect to
3    extending the 30-day cure period.  Is that
4    right?
5  A.  That's correct.
6  Q.  Was that at least an option that PNC have
7    available to it, to extend the period within
8    which AGH Obligated Group would try to cure any
9    covenant noncompliance?
10  A.  It certainly was an option, yes.
11  Q.  And we earlier were discussing the various
12   options that you were considering before the
13   bankruptcy with respect to the AGH Obligated
14   Group.
15        Were those options ones that you were
16   considering both under the last letter of
17   credit agreement, as well as under this letter
18   of credit agreement?
19  A.  Yes.
20  Q.  Okay.  You can set this document aside.
21        In the '90s, were you involved in any
22   way with credit analysis of any AHERF entities?
23  A.  In the '90s?
24  Q.  In the '90s.
25  A.  Yes.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 178

1  Q.  Did you participate in any valuation analyses
2      or oversee any valuation analyses of AHERF's
3      hospitals?
4  A.  I'm sure I did over time, sure.
5  Q.  Looking at this particular document, do you see
6      how there's a discussion on the second page of
7      it for enterprise valuation that shows various
8      publicly traded acute care entities and how
9      they're valued in the market?
10 A.  Yes.
11 Q.  Am I correct that essentially this document is
12     taking the prices of those entities and
13     dividing by the revenue to come up with an
14     average value-per-revenue ratio?
15 A.  Yes. It's calculated on those four and then an
16     average drawn.
17 Q.  And is that a methodology that you employed at
18     the time to do any valuations of AHERF
19     entities?
20 A.  Did I employ?
21 Q.  Yeah. Did you employ or oversee the valuations
22     using that method?
23 A.  No. That wasn't a method I employed, no.
24 Q.  What kind of valuations did you perform or
25     oversee the performance of?
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 179

1  A.  In large part, I relied on what was being
2      offered for the enterprises.
3  Q.  By potential buyers?
4  A.  By potential third parties, yeah.
5  Q.  Are you referring to the bids that were made
6      around the time of the bankruptcy by Vanguard
7      and Tenet?
8  A.  Yes.
9  Q.  Other than valuations by looking at those
10     potential bids, did you perform any other types
11     of valuations or oversee the performance of any
12     other types of valuations?
13 A.  Of what entity?
14 Q.  Of AHERF hospitals.
15 A.  Of each individually or all of them
16     collectively or --
17 Q.  Either individually or grouped in any way.
18 A.  We attempted in large part, as this does in its
19     essence, to try and figure out whether or not
20     the AGH entity, which we still believed to have
21     an actual value as opposed to an imaginary
22     value of the other entities, how that would
23     impact our carrying value. Those are the
24     analyses that I was doing.
25 Q.  And what kinds of -- what methodology did you
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 180

1      use in performing that kind of analysis?
2  A.  In part, it was based --
3          On the DVOG side, would have been
4      based on the third-party offers that would have
5      been made. On the AGH side, it was part and
6      parcel -- some of this methodology and other
7      estimates based on cash flow, asset values,
8      market share.
9          I mean, there are numerous estimates
10     one can make as to try and derive what an asset
11     value might be.
12 Q.  Did you come to any conclusion at the time as
13     to whether AHERF might be able to satisfy all
14     of its debt obligations through a sale of all
15     of its hospitals, both eastern and western?
16 A.  In large part, the term sheet addresses in some
17     respects that very issue.
18         The conclusion in formulating that
19     term sheet was that there was virtually no way
20     that the combined valuation would ever satisfy
21     fully all of the obligations, but there was a
22     way to lessen the amount of loss derived from
23     the east by doing a loan on a combined basis
24     and take them to a sale of all of the entities
25     together.
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 181

1  Q.  And by doing a loan on a combined basis leading
2      to a sale of all entities together, was that a
3      way that AHERF could minimize the losses, as
4      you said?
5          MR. COGAN: Objection.
6          THE WITNESS: That was my belief,
7      yes, that we would be able to minimize our
8      loss.
9  BY MR. TERUYA:
10 Q.  In case I misstated it, your view was that a
11     way to minimize the loss to PNC and other
12     creditors was for AHERF to utilize its western
13     region credit, take out a loan for the whole
14     system essentially, and then to proceed with a
15     sale of all of its assets, both eastern and
16     western?
17 A.  Yes.
18 Q.  And did you discuss that opinion with anyone at
19     PNC?
20 A.  Quite a number of people, yes.
21 Q.  Who would you have had discussions with?
22 A.  Ted Paisley, Dave Cook; numerous other people.
23     That's how we devised that term sheet.
24 Q.  Did you have any discussions with anyone at
25     AHERF about that proposal?
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

46 (Pages 178 to 181)

Page 182

1  A.  Once we gave them the term sheet, yes.
2  Q.  Who did you have interactions with about the
3      term sheet?
4  A.  Tony Sanzo, numerous other people at the
5      meetings; but they were all focused primarily
6      through Tony.
7  Q.  Do you recall ever having any meetings with
8      AHERF representatives that included board
9      members relating to the term sheet?
10 A.  Yes.  In the days leading up to the actual
11     bankruptcy filing, the week or so prior to
12     that, I believe we had a number of meetings
13     with AHERF management and a number of the
14     trustees.
15 Q.  Do you remember which trustees came to those
16     meetings?
17 A.  You know, I just don't remember which names.  I
18     can't remember if Ira Gumberg was there or --
19         I really just don't remember.
20 Q.  Do you remember any discussions that you had
21     with any AHERF trustees in particular by name?
22 A.  Again, I just don't recall who from the trustee
23     side attended the meeting.
24 Q.  Let me step away from that particular meeting
25     or set of meetings and just ask you generally.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 183

1      Do you recall any particular AHERF trustees
2      that you had interaction with during 1998?
3  A.  I think I just went through that.  I can't
4      recall the names of specific trustees that I
5      met with on specific days.  I just don't
6      recall.  I know they were trustees.  I know
7      they were there.  I just don't remember their
8      names.
9  Q.  In terms of the valuations that you did
10     perform, do you know who assisted you in
11     performing those valuations, either at PNC or
12     advisors to PNC?
13 A.  Ones that I prepared?  I prepared them.
14 Q.  Oh, you did them yourself?
15 A.  Sure.
16 Q.  And what kinds of --
17         What methodology in particular did
18     you use in valuing the AGH entities?
19 A.  Mostly multiple EBITDA and cash flow.
20 Q.  So some of those same types of methodologies
21     that are in this document?
22 A.  Sure.
23 Q.  Is this a standard method --
24         Are these standard methods for
25     valuing entities?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 184

1  A.  I believe so, yes.
2  Q.  Do you have any sense as to whether -- or why
3      in particular David Cook was performing this
4      valuation that's embodied in this document?
5  A.  I don't know why he would have done this in
6      this particular way, although I suspect
7      somebody asked him to.
8  Q.  You can set aside this document.
9          Let me mark as Exhibit No. 2077 a
10     two-page document with Bates numbers PNC 12024
11     through 12025.
12         It appears to be a letter dated
13     September 3rd, 1998, from Thomas McCool to
14     Robert Maloney of Toronto Dominion Securities,
15     Incorporated.
16             - - - -
17         (Deposition Exhibit No. 2077 marked
18     for identification.)
19             - - - -
20     (The witness reviewed the document.)
21             - - - -
22 BY MR. TERUYA:
23 Q.  Let me ask you as you look at it if you
24     recognize this document.  Can you tell me what
25     this document is if you recognize it?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 185

1  A.  It looks like a letter to Bob Maloney at TD.
2  Q.  Do you recall what the issue was that led to
3      you sending this letter to Robert Maloney?
4  A.  I believe TD was a participant in the AGH
5      letters of credit and was questioning, as he
6      properly thought he should, whether or not
7      there was a way for them to get out from under
8      their obligation under their part of the letter
9      of credit.
10 Q.  I take it this is, in fact, a letter --
11         Would you recognize your signature on
12     the second page of this?
13 A.  Oh, that's me.
14 Q.  And do you recall actually sending this letter
15     to Robert Maloney on or around September 3rd of
16     '98?
17 A.  It looks like I did.
18 Q.  Do you recall what the resolution was of any
19     discussion you had with Mr. Maloney about
20     Toronto Dominion's obligation as a participant
21     in the letter of credit?
22 A.  When the draw occurred, they funded it.
23 Q.  What questions did Mr. Maloney raise as to
24     whether Toronto Dominion was obligated as a
25     participant under the letter of credit?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

47 (Pages 182 to 185)

Page 198

1    category, yeah.
2  Q.  It went down?
3  A.  It was an attempt to cap the growth in the
4      Medicare piece of the budget.
5  Q.  Were you involved in any discussions with AHERF
6      about negotiating a waiver under the -- of
7      certain reported noncompliance under the letter
8      of credit agreements?
9  A.  With AGH?
10 Q.  With either AGH or with DVOG.
11 A.  I remember discussions with AGH about that, but
12     I don't recall with DVOG.
13 Q.  Do you know if at or around the bankruptcy
14     David Cook and Frank Taucher were still
15     involved in negotiating with AHERF about
16     various items relating to the letters of
17     credit, including, for example, waivers?
18 A.  I don't recall.
19 Q.  More generally, do you know if David Cook and
20     Frank Taucher were still in the picture in
21     terms of dealing with AHERF at or around the
22     time of the bankruptcy?
23 A.  I don't believe that they generally, no.
24     They may have been involved to the extent the
25     AGH piece was still there, because I was
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 199

1    focused on the AHERF/DVOG piece.
2  Q.  Let me just quickly mark as Exhibit 2078
3      a May 26, 1998, document, a letter from Mike
4      Martin to David Cook with Bates numbers
5      PNC 23702 through 709.
6          - - - -
7      (Deposition Exhibit No. 2078 marked
8      for identification.)
9          - - - -
10 BY MR. TERUYA:
11 Q.  I don't think you're a recipient under this
12     document, but all I was curious about is do you
13     see that in this letter in the first sentence
14     there's a reference to it was good seeing you,
15     as well as Tom and Frank, on the 22nd; thanks
16     for coming across the river; and then there's a
17     discussion below about various items of
18     noncompliance at the AHERF entities?
19 A.  Yes.
20 Q.  Do you see that on the second page, for
21     example, there's a discussion there in a matrix
22     of various items that are being negotiated with
23     with respect to a, among other things, a waiver
24     under the letter of credit agreement?
25 A.  Yes.
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 200

1  Q.  Is the reference to Tom in the first paragraph
2      a reference to you, if you know?
3  A.  I believe it is.
4  Q.  Does looking at this refresh your recollection
5      as to whether Frank Taucher and David Cook
6      around this time frame were still involved in
7      negotiating a waiver in conjunction with you?
8  A.  It doesn't refresh my recollection, because
9      that's not the question you asked me.
10         The question you asked me was at or
11     around the bankruptcy filing.  May 26 is not at
12     or around the bankruptcy filing.  May 26 is at
13     least six weeks prior to the bankruptcy filing.
14     And in your view, that may be at or around, but
15     in my view, that's a lifetime away.
16 Q.  In May of '98 and June of '98, were Frank
17     Taucher and David Cook still involved in
18     negotiating a waiver with AHERF?
19 A.  In May of '98, they clearly were.  In early
20     June of '98 they may well have been, because
21     the earlier memo was a response to a meeting
22     that Paula and Jeff Dickson went to, June 4th.
23 Q.  Were you involved in these efforts --
24 A.  Absolutely.
25 Q.  -- to negotiate a waiver?
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 201

1  A.  I was involved in these efforts to discover the
2      parts of this that have to do with, for
3      instance, the monthly cash budget for each
4      AHERF entity, the quarterly cash budget for
5      each AHERF entity, projections of LTDC
6      liquidity and DSC ratios through April, May,
7      and June, cash budgets for AHERF and each
8      entity for July and August with and without
9      Vanguard, monthly reports of actual versus
10     budget for all AHERF entities, approval by PNC
11     of use of proceeds from Vanguard, status of all
12     intercompanies between each AHERF entity
13     beginning with 3-98 --
14         Yes; I was involved in all those
15     questions.
16 Q.  And who had primary responsibility in May and
17     early June of '98 for negotiating a waiver with
18     AHERF entities?
19 A.  I'm sure David and Frank were still intimately
20     involved in that, because to me, that's just a
21     documentation issue at the time.
22 Q.  Were they reporting to you at this time?
23 A.  No, not formally.
24 Q.  Who had the call as to whether to enter into a
25     waiver under any of the letter of credit
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

51 (Pages 198 to 201)

Page 202

1    agreements with any of the AHERF entities in
2    May of '98 or early June of '98?
3  A.   The bank did.
4  Q.   Would it be Frank Taucher and David Cook's side
5    of the bank or your side?
6  A.   The bank had the call, because the bank in the
7    collective sense makes the call. In a credit
8    of this size, no individual is going to be
9    given free rein to say aye or nay.
10       We're talking about a relationship
11   here that exceeded $100 million. It would have
12   involved David; it would have involved Frank;
13   it would have involved me; it would have
14   involved Ted Paisley; and I'm sure at some
15   stage it would have involved Jim Rohr, Helen
16   Pudlin, and even Tom O'Brien.
17 Q.   What position did Helen Pudlin hold at this
18   time?
19 A.   She's a chief counselor.
20 Q.   How about Jim Rohr?
21 A.   He's the president of the bank.
22 Q.   Would the SAC committee have had any
23   involvement in making a decision to enter into
24   a waiver?
25 A.   No.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 203

1  Q.   How about a senior loan committee?
2  A.   No.
3  Q.   Just the individuals you mentioned?
4  A.   The approval process in a sense, the SAC
5    committee doesn't have anything to do with
6    approval of waivers or amendments or anything
7    else. It's a reporting body that reflects on
8    the asset value in the sense of the balance
9    sheet items the bank holds in its loan
10   portfolio.
11       The approval process for waivers and
12   amendments is the same as for making a new
13   loan. In a sense, it's the same general
14   people, except when it's in workout, and it
15   comes through a slightly different avenue,
16   namely, it has to come down my street or
17   somebody like me.
18       But in this particular circumstance,
19   given the size of the credit and the nature of
20   the credit, it would have involved more than
21   just the normal sort of committee process.
22 Q.   I think you said normally a senior loan
23   committee is involved in making credit
24   decisions. Is that right?
25 A.   Yes.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 204

1  Q.   In this instance with respect to this
2    particular credit given the size, was there no
3    senior loan committee involvement?
4  A.   I think the same people who would have
5    generally been involved in discussions would
6    probably have populated that senior loan
7    committee, so maybe not formally but informally
8    they would have been part of the process.
9  Q.   Okay. And you said the special asset, or the
10   SAC committee, reported to -- or was it a
11   reporting committee?
12       Who did it report to?
13 A.   The chairman of the committee, in essence,
14   would have reported to the chief policy officer
15   at the bank. That would have been Ted Paisley.
16 Q.   And what does SAC stand for?
17 A.   Special assets committee.
18       It's like D-Day. D stands for day,
19   so it's day-day. So in SAC committee, it's the
20   Special Asset Committee committee.
21 Q.   Got it.
22       Did you ever come to know of what
23   strategies AHERF was pursuing in the months
24   leading up to the bankruptcy in terms of its
25   operations of its hospitals?
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 205

1  A.   All we saw was the evidence of the outcome of
2    those strategies.
3  Q.   So you had no understanding of whether AHERF
4    was pursuing a integrated delivery system
5    strategy?
6  A.   I didn't, because I wasn't part of any of the
7    underwriting.
8  Q.   Did you ever come to --
9        Did you ever have any reason to study
10   what strategies AHERF had followed in the past
11   before you got involved?
12 A.   Based on the evidence in front of me, I didn't
13   think it was a worthwhile exercise.
14 Q.   So you focused on what was the situation as you
15   encountered it when you first got involved?
16 A.   Yes.
17 Q.   And I think we've already talked about the
18   attempted sale of AHERF's hospitals to
19   Vanguard, as well as sale/lease-back and
20   accounts receivable, financing transactions.
21       Do you recall at any point in time
22   coming to learn that AHERF had closed down
23   Mt. Sinai Hospital and had laid off about
24   several thousand of its employees in the
25   Delaware Valley region?
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

52 (Pages 202 to 205)

Page 234

1  A.   No.  You mean in terms of day-to-day
2       operations?
3  Q.   Overseeing its day-to-day operations and what
4       it was doing?
5  A.   No.
6  Q.   Did anyone at PNC, to your knowledge?
7  A.   Not -- except through the committee, to the
8       extent the committee was involved, the
9       unsecured committee.
10 Q.   Do you know if any representatives of the
11      committee or PNC observed what operations were
12      going on at AHERF after the bankruptcy?
13 A.   You're going to have to define "operations" for
14      me.
15 Q.   I just mean like in terms of how the hospitals
16      were doing and what kinds of management
17      decisions were being made to preserve value.
18 A.   You mean financial reports or cash flow reports
19      or --
20 Q.   No, I mean actual operations of the hospitals
21      like how the sale process was going, how, you
22      know, the doctor and patient situation that you
23      described was being handled, how the faculty
24      situation was being handled, et cetera.
25 A.   Did we oversee it?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 235

1  Q.   Are you aware of anyone at PNC --
2  A.   Are you talking about overseeing in terms of
3       managing?  That's what an overseer is.  What do
4       you mean?
5  Q.   Did anyone monitor, anyone at PNC or any
6       members of the creditors' committee, monitor
7       the operations of the AHERF hospitals?
8  A.   Generally we had regular meetings with our
9       advisors and accountants, we met with the
10      company's advisors and accountants, and we met
11      with the company on a regular basis.
12 Q.   Do you recall ever learning of any problems
13      that AHERF was facing in terms of attempting to
14      sell the eastern region hospitals after the
15      bankruptcy?
16 A.   Yeah, a whole series of them.  It's almost
17      impossible to enumerate all of them.
18 Q.   Do you recall ever hearing that there was any
19      problem in terms of managing the due diligence
20      process with respect to the hospitals?
21 A.   That was one of them.
22 Q.   Do you recall hearing that --
23 A.   I actually caused a good bit of that, thank
24      you.
25 Q.   You how was that?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 236

1  A.   Because I know what a due diligence process is
2       supposed to entail.  In large part, it's an
3       establishment of a data center and a data room,
4       whether it's at one of the hospitals or one
5       room at all of the hospitals.  These guys
6       didn't have anything like that.
7  Q.   AHERF management did not?
8  A.   No.
9  Q.   Who was running the due diligence process at
10      AHERF?
11 A.   In large part it was Tony and Joe Dionisio, I
12      think, and they may have designated other
13      people, but we thought they were generally
14      responsible for it.
15          Whether they had the Hunter Group --
16          I think they confined the Hunter
17      Group, as I recall, to more or less the
18      day-to-day hospital operations, and they were
19      going to take care of the sale themselves; but
20      I remember specifically asking them to take me
21      to the data room.
22 Q.   Did you view it as a mistake that prior to that
23      time AHERF management had not created a data
24      room where all the documents were kept?
25 A.   It may or may not be characterized as a

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 237

1       mistake, but I'm unaware of any corporate sale
2       that has ever taken place without one.
3  Q.   Do you recall having any concerns about any of
4       management's conduct in running the sale
5       process and due diligence process with respect
6       to the eastern regional hospitals after the
7       bankruptcy other than what you just mentioned?
8  A.   I just thought from the committee's standpoint,
9       this was not a well-oiled machine --
10 Q.   What do you mean by that?
11 A.   -- in any sense.
12          They simply didn't approach the tasks
13      they were charged with as professionally -- or
14      with professional advice.
15          Whatever they did, they didn't seem
16      to do very well.
17 Q.   Did you think there was any problem with the
18      fact that AHERF had not approached other
19      potential buyers other than Vanguard and Tenet
20      prior to the bankruptcy?
21          MR. COGAN:  Objection.
22          THE WITNESS:  I don't know whether
23      that may or may not have been a root cause of
24      the basic problem.  I don't think limiting it
25      to two --

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 238

1        They could have had ten.
2  BY MR. TERUYA:
3  Q.   They just weren't handling the process well?
4  A.   I didn't think so.
5  Q.   Did you or any other representatives of MBIA or
6       the committee ever take any steps to intervene
7       in terms of management's conduct in running the
8       sale and due diligence process other than what
9       you said about asking that a data room be
10      created?
11 A.   I think we made suggestions and comments, but
12      as creditors and ultimately even as members of
13      the unsecured creditors' committee, this isn't
14      a process where you can simply step in ala the
15      European process, damn it, step in and just
16      take over and do it yourselves.
17          This arrangement and this legal
18      system simply doesn't permit that to occur.  We
19      can have opinions; we can even express those
20      opinions, but whether they have effect on the
21      parties to whom we're expressing them, though,
22      is a different story.
23          Here, they apparently had little
24      effect.
25 Q.   If an event of formal default had been declared
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 239

1       by PNC, could PNC then have forced management
2       to make certain decisions with respect to the
3       sale process?
4  A.   To the extent that it would have caused them to
5       end up in the bankruptcy sooner, I don't think
6       it would have had substantial effect, because
7       they still would have been in place.  They
8       still would have been the same people.
9  Q.   After PNC declares an event of default in terms
10      of the available remedies that PNC has, can PNC
11      force management of a borrower to make certain
12      decisions at that point?
13 A.   We can negotiate it for that.
14 Q.   I'm sorry?
15 A.   We can negotiate for that outcome; but in terms
16      of forcing it as if forcing it will lead to its
17      implementation, no, that's not how it works.
18 Q.   Can PNC ever force management to make certain
19      decisions in terms of the rights it has
20      available to it under the letters of credit
21      agreement?
22 A.   We have made it a --
23          We have done it in the past where we
24      requested or required that for, say, new money
25      advances that the company would alter
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 240

1       management, change management, hire a crisis
2       manager, take steps like that; and sometimes we
3       get what we want, and sometimes we don't.
4  Q.   It's still a negotiated process even in
5       instances like that?
6  A.   Unfortunately, given the U.S. legal system,
7       it's still a negotiated process, yes.
8          It's one of the flaws here, that and
9       the elimination of debtors' prison, but that's
10      just me.
11 Q.   I'm sorry.  That and what?
12 A.   The elimination of debtors' prisons, but that's
13      just me.
14 Q.   Do you have any understanding of whether there
15      was a refinancing of AHERF's -- or AGH's bonds
16      at some point in time after the bankruptcy
17      filing by AHERF?
18 A.   No, there was a refinancing of the West Penn
19      bonds and then a refinancing -- or reissuance
20      of certain of the AGH bonds as part of the West
21      Penn transaction.
22 Q.   So is it your understanding that the AGH bonds
23      were defeased using the proceeds of the West
24      Penn bond offer?
25 A.   No.
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 241

1  Q.   That's not your understanding?
2  A.   No.
3  Q.   Do you have any understanding of whether AGH
4       bondholders have been repaid?
5  A.   I believe they have.
6  Q.   Did PNC suffer any losses with respect to the
7       AGH Obligated Group letters of credit?
8  A.   Yes, we did.
9  Q.   What losses were suffered?
10 A.   In rough terms, I'm trying to recall, but it
11      would have been somewhere on the order of
12      $13 million to $14 million.
13 Q.   And what constituted those losses?
14 A.   The repayment of the bondholders under our
15      letter of credit, and the refinance -- the
16      purchase combination of West Penn and AGH and
17      the amount of money we actually received in
18      that transaction.
19 Q.   So even after the West Penn bond offering, AGH
20      Obligated Group still didn't have enough money
21      to repay the bondholders.  Is that what you're
22      saying?
23 A.   That's right.
24 Q.   Was the AGH Obligated Group able to repay the
25      bondholders to some extent?
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

61 (Pages 238 to 241)

Page 242

1  A.   The bondholders were paid in full.  They had
2       an LC.
3  Q.   A letter of credit?
4  A.   We, as the letter of credit holder, were not
5       paid in full, because we paid the bondholders;
6       but AGH did not pay us the full amount.
7  Q.   Okay.  So the total magnitude of the AGH
8       letters of credit, as we've seen, was far in
9       excess of $13 million.  Right?
10 A.   Our share of that was roughly $44 million.
11 Q.   $44 million.  Okay.
12 A.   Yes.
13 Q.   And you, PNC, recovered the amount of the
14      letters of credit except for $13 million to
15      $14 million.  Correct?
16 A.   The way the deal was structured in the West
17      Penn transaction is we received two-thirds in
18      cash, and we received one-third in a very soft,
19      very subordinated note, which we value at zero.
20 Q.   And what is the purpose of that note?
21 A.   Actually, you'd have to ask Morgan.  They
22      wanted it more than I did.
23 Q.   Do you know if that note is supposed to --
24      Well, let me rephrase that.  Who
25      still owes PNC the $13 million to $14 million?
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 243

1  A.   West Penn/Allegheny Health System.
2  Q.   And what are the terms of that -- or what is
3       the nature of that obligation of West Penn to
4       PNC?
5       MS. HACKETT:  What do you mean
6  "nature"?
7       MR. TERUYA:  How is it that West
8  Penn --
9       MR. COGAN:  A subordinated note.
10      THE WITNESS:  Yes.  It's a very
11 subordinated note.
12      MR. TERUYA:  So West Penn currently
13 doesn't have enough money to pay PNC.  Is
14 that --
15      MS. HACKETT:  Currently?  You mean as
16 of today?
17      MR. TERUYA:  Well, at the time
18 whenever this occurred, whenever the bond
19 offering occurred and PNC ended up being owed
20 $13 million to $14 million.  I'm just trying to
21 understand why is it --
22      THE WITNESS:  I would have to go
23 through the whole structure of the West
24 Penn/Allegheny merger, but in summary form,
25 Highmark advanced $125 million to West Penn in
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 244

1       the form of bridge financing to assure the
2       liquidity of the overall system which is first
3       as to priority in payment of West
4       Penn/Allegheny Health System, which is the
5       combined entity.
6            The next is the refinanced MBIA
7       bonds, as well as additional amounts that were
8       issued in order to make a cash payment to PNC,
9       Sumitomo, and Morgan, all of whom received
10      roughly two-thirds of their obligation in cash
11      and the other one third in junior notes that
12      are subordinated first to the $125 million in
13      Highmark debt and next to the $300 million or
14      $400 million of MBIA, slash, bondholder debt;
15      and then there's about $43 million in total of
16      these what are called -- I forget.  I think the
17      name we came up with actually were FRRCs,
18      floating rate restructuring certificates.
19 BY MR. TERUYA:
20 Q.   So currently right now the sum of that is that
21      PNC is owed $13 million to $14 million from
22      West Penn and --
23 A.   West Penn/Allegheny Health System.
24 Q.   And a note has been tendered or provided by
25      that system to PNC?
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 245

1  A.   Right, with a maturity date of the year 2030.
2  Q.   And that note is for $13 million to
3       $14 million?
4  A.   Face amount.
5       MR. COGAN:  That's what he said three
6  times, Kevin.
7       MR. TERUYA:  All right.  Well, I'm
8  just trying to make sure I understand it
9       MR. COGAN:  It is pretty clear.
10      THE WITNESS:  I think you're getting
11 it.
12 BY MR. TERUYA:
13 Q.   Do you have any understanding of whether the
14      DVOG bondholders have been repaid in full?
15 A.   They have.  From PNC's -- the bondholders that
16      were backed up by PNC, the letter of credit has
17      been paid in full.
18 Q.   Okay.  Let me just mark as Exhibit 2079 a copy
19      of a February 11, 2003, transcript from SEC
20      versus Buettner, et al., litigation; and this
21      is the 30(b)(6) deposition of Thomas J. McCool.
22           - - - -
23           (Deposition Exhibit No. 2079 marked
24      for identification.)
25           - - - -
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

62 (Pages 242 to 245)

Page 274

1   to privilege, the concern we have is we're
2   trying to understand what personal knowledge he
3   has and what he might testify about at trial if
4   he were ever called, and am I understanding you
5   correctly that by objecting on the grounds of
6   privilege that you and/or the committee aren't
7   going to call him as a witness to testify about
8   the topics that I asked about?
9        MS. HACKETT:  No.
10       MR. COGAN:  Now that's a silly
11  question.  I mean, you're going to be preparing
12  witnesses, and are you suggesting that in the
13  preparation of those witnesses that if I
14  inquire, force you to invoke the privilege,
15  then I can then turn around and say, oh, by the
16  way, all the Coopers & Lybrand witnesses can't
17  testify?
18       MR. TERUYA:  No.  I'm asking whether
19  he has personal knowledge of various topics
20  just to understand what he might testify about.
21       MS. HACKETT:  Let's go off the
22  record.  I want to go off the record.
23       THE VIDEOGRAPHER:  We are going off
24  the record.  It is 4:34.
25            - - - -
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 275

1   (There was a discussion off the record.)
2            - - - -
3        MR. TERUYA:  We are back on the
4   record.
5        THE VIDEOGRAPHER:  It is 4:36.
6        MR. TERUYA:  I just wanted to state
7   on the record that at various points in time
8   you've asserted privilege objections to certain
9   questions I've asked about what Mr. McCool has
10  personal knowledge about, and we're trying to
11  obtain discovery about what he knows, what he
12  might testify about from his personal
13  knowledge; and to the extent we've been
14  precluded from doing that, we reserve our
15  rights to consider our options and to seek
16  appropriate relief at an appropriate time from
17  the Court, if needed.
18       MS. HACKETT:  Whatever that may be,
19  of course.
20       MR. TERUYA:  Okay.
21       MS. HACKETT:  Okay.
22       MR. TERUYA:  And your position is
23  that he cannot --
24       MS. HACKETT:  Please don't do that.
25  I don't want to be led by you into some
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 276

1   position.  I'm not a deponent.  My position is
2   very clear on the record.
3        MR. TERUYA:  You stand by your
4   position that you've already stated?
5        MS. HACKETT:  Yes, yes, yes.  Okay?
6   Okay.  Thanks.
7        MR. COGAN:  Are you done?
8        MR. TERUYA:  With that qualifier, I
9   don't have any further questions on direct.
10           - - - -
11            EXAMINATION
12           - - - -
13       MR. COGAN:  I just have a couple
14  questions for you, Mr. McCool.
15       If you would, pull out Exhibit 2079,
16  which was your deposition before in the matter
17  of the SEC versus Mr. Buettner, et al.
18           - - - -
19  (There was a discussion off the record.)
20           - - - -
21  BY MR. COGAN:
22  Q.   I'm sorry, Mr. McCool.  I didn't have the
23       microphone on, so let me ask you, do you have
24       Exhibit 2079 in front of you?
25  A.   I do.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 277

1   Q.   You recognize that, of course, as your
2        deposition in the matter of the SEC versus
3        Mr. Buettner, et al.  Correct?
4   A.   Yes.
5   Q.   I would like to just direct your attention to
6        Page 136, which was a page that Mr. Teruya
7        directed you to.
8        In particular, I'd like to focus your
9        attention on Lines 10 through 16 in which you
10       testified, the lack of accurate and timely
11       financial information led us to a course of
12       action in the intervening period that we
13       arguably wouldn't have taken had we known that
14       the entities were in the condition that they
15       actually were in as opposed to what was
16       represented in the financial statements.
17       See that?
18  A.   Yes.
19  Q.   And I take it from your earlier responses you
20       continue to believe that that is true and
21       accurate testimony?
22  A.   Yes.
23  Q.   Do you stand by that testimony?
24  A.   Yes.
25  Q.   And I take it that having accurate and timely
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 278

1   financial statements is important for the bank
2   in its relationships with its creditors. Is
3   that correct?
4   A.   Yes.
5   Q.   When you have timely and accurate financial
6   information, that allows you to make more
7   informed decisions. Is that right?
8   A.   Yes.
9   Q.   And when you don't have timely and accurate
10  information, the decisions that you make may
11  not be, as we say, well informed.
12  A.   Generally that's true, because they lack the
13  proper and sufficient information.
14  Q.   And if you had had --
15       If I understand this testimony, if
16  you had financial information that was more
17  accurate and was more timely, then you would
18  have been in a better position to assess the
19  various options that the bank may have had. Is
20  that right?
21       MR. TERUYA: Objection.
22       THE WITNESS: Generally, yes.
23       MR. COGAN: That's all. Thank you.
24       MR. TERUYA: Let me ask a couple of
25  questions just in follow-up.
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 279

1       - - - -
2       RE-EXAMINATION
3       - - - -
4   BY MR. TERUYA:
5   Q.   Am I correct that you still stand by your view
6   that even if you had had different financial
7   information about the AHERF system, you don't
8   know what steps PNC or yourself would have
9   taken that would have been different?
10  A.   No, I don't.
11  Q.   And you don't know what the effects would have
12  been of any steps that PNC or you might have
13  taken that would have been different based on
14  receiving different financial information?
15  A.   No, because we'd be speculating. As I said
16  here, it's really impossible to predict what
17  the outcome would have been, only that it would
18  have occurred sooner.
19       MR. TERUYA: I don't have any further
20  questions -- subject to the earlier qualifier,
21  I mean.
22       MS. HACKETT: Thank you.
23       THE VIDEOGRAPHER: With there being
24  no further questions, this deposition is
25  concluded.
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 280

1       - - - -
2   (The proceedings were concluded at 4:43 p.m.)
3       - - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 281

1   COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2   COUNTY OF ALLEGHENY          ) SS:
3       I, G. Donavich, RPR, CRR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   THOMAS McCOOL, was my first duly sworn to testify
7   to the truth, the whole truth, and nothing but the
8   truth; that the foregoing deposition was taken at the
9   time and place stated herein; and that the said
10  deposition was recorded stenographically by me and
11  then reduced to printing under my direction, and
12  constitutes a true record of the testimony given by
13  said witness.
14      I further certify that I am not a relative or
15  employee of any of the parties, or a relative or
16  employee of either counsel, and that I am in no way
17  interested directly or indirectly in this action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  and affixed my seal of office this 30th day of
20  October, 2003.
21
22
23  _____
            Notary Public
24
25
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

71 (Pages 278 to 281)

Page 282

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY        )   S H E E T
2
        I, THOMAS McCOOL, have read the foregoing pages
3  of my deposition given on Wednesday, October 28,
   2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19  In all other respects, the transcript is true and
    correct.
20
    _____
21          THOMAS McCOOL
22  Subscribed and sworn to before me this
    _____ day of _____, 2003.
23
    _____
24      Notary Public
        AKF Reference No. gd77905
25
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

LEGALINK MANHATTAN  (212) 557-7400

**McNair Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE COOPERS, LLP*

---

## *ROBERT MCNAIR*
*January 17, 2003*

---

## *MANHATTAN REPORTING CORP.*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

MCNAIR, ROBERT (1/17/2003)

**Word Index included with this condensed transcript**

ROBERT M. MCNAIR, JR.

Page 62

1  was dealing on his own with the HSI people.        10:17:57
2     Q.  Is the technology that you reference, is that 10:18:01
3  the 4G technology?                                10:18:02
4     A.  Yes.  That's correct.  Which had originated  10:18:04
5  at Graduate, but which had been sold off to QualMed as 10:18:07
6  part of the deal in which Greater Atlantic was sold.  10:18:10
7     Q.  And under the revised transaction deal      10:18:14
8  structure, was, essentially, the Graduate, former  10:18:19
9  Graduate hospitals, were they going to merge into SDN? 10:18:25
10    A.  That's my recollection, yes.               10:18:30
11    Q.  And then I guess the hospital entity,       10:18:30
12 Zurbrugg Memorial Hospital, was going to merge into  10:18:35
13 Horizon Medical Corporation?                      10:18:38
14    A.  That's correct.  That's correct.           10:18:42
15    Q.  And was SDN also going to acquire various   10:18:42
16 other former Graduate Health System entities?      10:18:43
17    A.  Yeah.  I think it took over most, if not all, 10:18:46
18 of those entities that were reflected on that      10:18:47
19 organizational chart.  I couldn't tell you with    10:18:50
20 absolute precision that they were all there, but many 10:18:54
21 of them were.                                     10:18:54
22    Q.  And were those acquisitions effectuated by a 10:18:54
23 merger or were they more like a stock transaction?  10:18:55
24    A.  No.  They kind of came along because we had  10:18:59
25 taken over the entities which ultimately -- which  10:19:00

Page 63

1  owned the stock.  Over time, after the transactions  10:19:04
2  were done, we merged many of them out of existence, as 10:19:05
3  I recall, and kind of tried to clean up the        10:19:09
4  organizational chart, but that was not done at that 10:19:12
5  time.                                             10:19:14
6     Q.  Did you draft many of the documents in     10:19:15
7  Exhibit No. 988?                                  10:19:18
8     A.  I did.                                     10:19:19
9     Q.  And did you -- to the extent certain       10:19:20
10 documents in here were filed with governmental     10:19:24
11 agencies, were you in charge of filing them?       10:19:25
12    A.  I prepared them for filing.  They were      10:19:28
13 actually filed, as I recall, by our senior paralegal 10:19:29
14 from Pittsburgh, Kathleen Saunders, who actually flew 10:19:32
15 in to Philadelphia one day and picked up the documents 10:19:36
16 and took them to Pittsburgh and filed them.  But they 10:19:40
17 were prepared for filing by our office, yes.       10:19:40
18    Q.  I notice on certain documents that there's a 10:19:42
19 little footer that says RMM?                       10:19:44
20    A.  That would be me.                           10:19:47
21    Q.  Anywhere we see that footer, does that mean 10:19:50
22 that document was at least initially prepared by you? 10:19:52
23    A.  Probably.  If you want to call my attention  10:19:54
24 to specific ones.  I wouldn't be surprised if somebody 10:19:56
25 put my initials on something that I prepared, but   10:19:59

Page 64

1  let's hope not.                                   10:20:01
2     Q.  I'm talking about little computer-generated 10:20:04
3  footers, and let me find an example.              10:20:06
4     A.  Yeah.  You'll see the DVR footers, which    10:20:09
5  are -- identified the Delaware Valley region.      10:20:13
6     Q.  If you turn to Page PH 7386, which is behind 10:20:16
7  Tab 5, or really it's right in front of Tab 6.     10:20:21
8     A.  Okay.  Yes.                                10:20:26
9     Q.  Do you see how it says RMM --               10:20:35
10    A.  Yes.  That's clearly me.  That's correct.   10:20:37
11    Q.  So anywhere we see a footer like that, that 10:20:39
12 means that you created that document?              10:20:41
13    A.  Presumptively, yeah.  I mean, if you want to 10:20:42
14 ask me about specific ones.  I would assume nobody  10:20:46
15 else would use that, but as I say, given what I've  10:20:47
16 learned since then, I wouldn't put anything past    10:20:51
17 anyone.                                           10:20:58
18    Q.  And at this time, were you assistant        10:21:00
19 secretary of SDN?                                 10:21:02
20    A.  Yes, I was.                                10:21:05
21    Q.  Do you recall when you first became assistant 10:21:06
22 secretary of SDN?                                 10:21:08
23    A.  I can't say that with great certainty.  I   10:21:11
24 will tell you that SDN was the remnant of United    10:21:14
25 hospitals.  In fact, it was the old United hospitals 10:21:26

Page 65

1  entity, which Mr. Abdelhak had not wanted to bring  10:21:26
2  into the Allegheny system, so he had sort of told me 10:21:26
3  back in the summer of '91 to, quote, make it go away, 10:21:26
4  but not make it go away in the sense of having the  10:21:30
5  corporation disappear.  He just didn't want -- he   10:21:33
6  wanted it to kind of be sitting out there, which it 10:21:34
7  did.                                             10:21:37
8        The SDN initials obviously stand for        10:21:37
9  Sherif, David and Nancy, who were the three directors. 10:21:41
10 I cannot tell you with certainly when I became an   10:21:44
11 assistant secretary, but, as best I recall, I was.  10:21:45
12    Q.  Was it before the GHS acquisition in '96?   10:21:50
13    A.  To the best of my recollection, yes.        10:21:53
14    Q.  Was Donald Kaye also one of the directors of 10:21:56
15 SDN?                                             10:21:59
16    A.  As I recall, yes, he was.                   10:22:00
17    Q.  And just to clarify, on PH 7414 --          10:22:04
18    A.  Which tab?                                 10:22:08
19    Q.  Which is right in front of Tab 12.          10:22:09
20    A.  Yes.                                       10:22:18
21    Q.  Do you see there's a different kind of footer 10:22:18
22 that says RMM:SSA?  Do you know what that means?    10:22:20
23    A.  Yeah.  What this means is, this was typed by 10:22:25
24 Beth Boyer, who was Mr. Abdelhak's assistant, and it 10:22:28
25 would have been something that I gave her to type,  10:22:32

17 (Pages 62 to 65)