RALPH S. MICHAEL

1    THE WITNESS: It could.
2    MR. COGAN: Okay.
3    Q. And then finally, you'll notice that the
4 next sentence says, "The restricted fund balance at
5 1/31/96 is $136.8 million of which $30 million is
6 designated for the Obligated Group's debt service."
7    A. Yes.
8    Q. Would that be a mitigating factor?
9    A. Yes.
10    MR. TERUYA: Objection.
11    THE WITNESS: Strong mitigant there.
12    MR. COGAN: Okay.
13    Q. You can put that exhibit aside now
14 Mr. Michael. Just a couple more questions.
15    In your experience has it ever been the
16 case that you have ignored a covenant violation when
17 the covenant violation has been brought to your
18 attention?
19    A. Not that I can ever recall.
20    Q. Can you recall any such instance where PNC,
21 upon learning of a covenant violation, simply ignored
22 that violation?
23    A. Not -- not consciously.
24    Q. Would I be correct that typically once you
25 become aware -- you, I'm speaking generically about

1 PNC --
2    A. Yes.
3    Q. -- become aware of policy, or, excuse me,
4 of a covenant violation, that that triggers an
5 analysis as to what PNC should do in the face of that
6 covenant violation?
7    A. Yes.
8    MR. TERUYA: Objection.
9 BY MR. COGAN:
10    Q. And am I correct from your testimony to
11 understand that the circumstances as they exist at
12 the time of that covenant violation will dictate in
13 many respects what action PNC would ultimately take?
14    A. Yes.
15    Q. Okay.
16    Finally, Mr. Michael, you indicated that
17 you were sitting on was it three corporate boards?
18    A. Yes.
19    Q. I'm just sort of curious. What boards were
20 you sitting on?
21    A. Board of Ohio Casualty Corporation, Key
22 Energy Services, Inc., and Integrated Alarm Services
23 Group.
24    Q. And I think you also said you served on at
25 least two audit committees?

1    A. Yes. I chair the audit committees at Key
2 Energy and Integrated Alarm Services, and I'm on the
3 audit committee and chair the finance committee at
4 Ohio Casualty.
5    Q. As a member of those audit committees, has
6 it been your expectation that if the company's
7 accountants became aware of material misstatements in
8 financial statements, that they would bring that to
9 your attention as a member of audit committee?
10    A. It's a requirement.
11    Q. And similarly, if the auditors became aware
12 of any internal control deficiencies, that they would
13 bring that to your attention?
14    A. Absolutely. It's a requirement, and
15 currently a requirement under Sarbanes-Oxley Act 404.
16    Q. And if the auditors had concerns with the
17 integrity of management, would that likewise be a
18 fact that you would expect the auditors to bring to
19 your attention?
20    A. Yes.
21    Q. And would that have been true back -- based
22 on your experience back in the period of time 1996
23 and 1997 that your expectation would be that auditors
24 would bring those sorts of facts to your attention?
25    MR. TERUYA: Objection.

1    THE WITNESS: The rules were different at
2 that time with respect to the codification of
3 behavior. Sarbanes-Oxley wasn't passed, and it
4 wasn't enacted at the time. But my expectation would
5 be that issues of internal control would be, if not
6 taken directly to the audit committee, you know,
7 would be presented to the audit committee in the
8 annual management letter.
9 BY MR. COGAN:
10    Q. And the management letter is the letter
11 from the accountants?
12    A. Yes. From the accountants to the -- to
13 management and copied to the audit committee and, in
14 many cases, to the Board.
15    Q. Have you had occasion in your experience
16 sitting on the audit committee to invite the auditors
17 into executive session?
18    A. At every meeting.
19    Q. And just for the benefit of people who may
20 some day watch this tape and not know what an
21 executive session means, can you explain that to me?
22    A. An executive session is a portion of the
23 meeting where management is excused from the room,
24 and the meeting is strictly between the Board and the
25 audit committee. I'm sorry. The Board and the --

49 (Pages 195 to 198)

**Miller Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS LLP*

---

## *LESLIE ANN MILLER*
### *May 17, 2004*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**MILLER, LESLIE ANN - Vol. 1**



LEGALINK
A WORDWAVE COMPANY

## Page 26

1  times as similar to a rotten onion. The more we peeled away
2  the layers, the more rotten the core appeared.
3              It was a financial nightmare, as I recall.
4  And, again, my memory is fuzzy, but it was certainly about
5  that time that you could start to pinpoint real financial
6  difficulties. I remember specifically that Sherif had
7  announced a hope to acquire the Cooper Medical System in New
8  Jersey shortly after Hahnemann and those plans had to be put
9  on hold because of finances.
10     Q      You were a member of the AHERF board of
11  trustees when the Hahnemann acquisition was done?
12     A      Yes, and I was a member of the negotiating team
13  both times. There was a small team of us from AHERF that met
14  with a small group from Hahnemann.
15     Q      The first time, the time that it didn't happen,
16  why didn't it happen at that time?
17         MS. MEADEN: Objection; foundation.
18     A      Inability to come to mutually agreeable terms
19  and I think real concern ultimately about the financial
20  stability of Hahnemann as well. No, I take that back. It
21  wasn't so much I think financial concerns as it really was
22  governance concerns.
23  BY MR. FRIESEN:
24     Q      By governance concerns, do you mean the
25  difficulties of integrating two totally different medical

## Page 27

1  schools at different physical locations?
2     A      Well, that certainly, but also with it the
3  integration of two strong boards.
4     Q      And then how long after that did you become a
5  member of the negotiating committee for the second time?
6     A      I think it was within about two years.
7     Q      And were the governance concerns that you had
8  the first time, did they go away in the intervening two years?
9     A      No. And certainly I remember a very big battle
10  with Sherif that continued until after the meeting when he
11  chastised me for questioning his motives over the ongoing name
12  and identity of the institution.
13     Q      Had you questioned his motives?
14     A      Yes. Sure.
15     Q      And can you remember -- this was at an AHERF
16  board meeting?
17     A      I honestly don't remember exactly. I remember
18  it was centered around promises that he -- or representations
19  that he had made about the name and the configuration of the
20  board.
21     Q      Let's start with the name. What can you
22  remember about what he thought the name should be and what you
23  thought the name should be?
24     A      I don't remember what -- I can't speak as to
25  what he thought, but the ongoing concern was that the

## Page 28

1  Hahnemann name would take precedence over the Medical College
2  of Pennsylvania name or that there would be some ridiculous
3  configuration, the possibilities of which were endless if you
4  just let your mind wander.
5     Q      And that was a concern that you had?
6     A      Yes, sure. And certainly not that I alone had.
7  It was the board and the faculty, particularly the
8  long-standing members of the faculty.
9     Q      Because MCP had been known and respected as MCP
10  for a long time?
11     A      Yes. And, frankly, there was a certain elitism
12  among the Medical College of Pennsylvania vis-a-vis the
13  caliber of its medical education and its hospital. Hahnemann
14  did not enjoy a particularly strong reputation for either
15  medical educators or hospitals. It was not a hospital that
16  someone would go to by choice.
17     Q      So the ultimate name of MCP-Hahnemann is
18  something that Mr. Abdelhak wanted?
19         MS. MEADEN: Objection.
20     A      Well, no, I don't think it was something --
21  again, I can't speak for himself. I mean it was -- some kind
22  of compromise was necessary.
23  BY MR. FRIESEN:
24     Q      So you had this discussion about the name first
25  at the meeting, at a board meeting?

## Page 29

1     A      There were ongoing discussions around that
2  time, yes.
3     Q      And then Mr. Abdelhak chastised you after the
4  board meeting?
5     A      Again, this is all very fuzzy recollection, but
6  yes, I remember.
7     Q      Do you recall what it was that set him off?
8     A      No, I do not.
9     Q      And do you recall what he said to you after the
10  meeting?
11     A      No, no. Just very unhappy with my challenging
12  him or suggesting that -- just with my challenging him.
13  Strike that last part.
14     Q      And what was your reaction when you received
15  this chastising?
16     A      Duly noted, move along. It was certainly not
17  anything new. And Sherif and I enjoyed a healthy sparring
18  relationship throughout my tenure. I mean he knew that I was
19  going to be an ongoing bur in his saddle, a polite one, and I
20  think that he ultimately respected me. My positions were not
21  irresponsible or ill conceived, and I think the fact that he
22  not only kept me on the board but put me in positions of
23  responsibility demonstrated that, but he knew that I was not a
24  yes person. But we battled regularly.
25     Q      Did you observe Mr. Abdelhak intimidating other

8 (Pages 26 to 29)

LESLIE ANN MILLER

Page 30

1  members of the board?
2      MS. MEADEN: Objection.
3      A      Well, I'm not sure that I'd use the word
4  "intimidate," but I mean clearly there were different, quote,
5  classes of members of the board.
6  BY MR. FRIESEN:
7      Q      Tell me about that.
8      A      Well, there were employees. There were members
9  of the medical faculty who were dependant upon Sherif for
10  their continuing livelihood who wished to continue to be a
11  part of that system. He was their boss. So, obviously, they
12  didn't enjoy the independence that I, as a totally untethered
13  board member, did.
14          And as with any board, there were a certain
15  number of sycophants who seemed to think that by toeing the
16  Abdelhak line they might advance themselves or their own
17  respective positions, and so there was less of a tendency on
18  the part of them to question.
19          And, again, Sherif was a very powerful
20  personality. He was very smart, very skilled, and he had the
21  ability I think to lull a lot of people into a false sense of
22  security.
23      Q      And you thought that at the time?
24      A      I thought that continuously, yes. And to his
25  credit, there certainly was a period of time when the

Page 31

1  Allegheny Health System certainly in the Philadelphia area was
2  the system by which all others were being measured. You need
3  only look to the hospital of the University of Pennsylvania
4  and the financial crisis that it fell into to find a perfect
5  example. Bill Kelly, in his zeal to keep pace with Sherif's
6  acquisition of practices, put that system into the red, you
7  know, a big red hole.
8      Q      And this was the gentleman from Penn?
9      A      Yes, this was the CEO of Penn.
10      Q      Specifically relating to the strategy to expand
11  AHERF with the hospital acquisitions and physician practice
12  acquisitions, that strategy, do you recall, other than perhaps
13  yourself -- and you can tell me if you would be included in
14  this group -- do you recall any trustees really challenging
15  Mr. Abdelhak on that direction, on that strategy?
16      A      Certainly there were others. I was by no means
17  alone.
18      Q      Do you recall any specific people?
19      A      Other than the ones that I've already pointed
20  to on this list, no. Again, that doesn't mean that there
21  weren't others.
22      Q      Did you ultimately agree with the strategy or
23  did you just -- essentially, were you outvoted?
24      MS. MEADEN: Objection.
25      A      Well, for a time it was hard not to agree,

Page 32

1  because from all outward appearances the strategy was very
2  successful. So, you know, I certainly had no objective reason
3  not to agree, again, based upon the information that was
4  disseminated to the board.
5          But, again, I point to the acquisition of
6  Graduate as a time that I think the concerns of many of us
7  rose to the surface again, because we had enough information,
8  enough financial information to realize that all was not as
9  rosy as we had hoped, but not enough to comprehend the depth
10  and breadth of the problem.
11  BY MR. FRIESEN:
12      Q      And that testimony just now, you're referring
13  to prior to the Graduate acquisition being approved?
14      A      Yes, and continuing afterwards.
15      Q      How did you find out about the Graduate
16  acquisition, do you recall?
17      A      Well, again, it would have been through some
18  type of communication from Sherif to the board. Again, it was
19  no surprise, because Harold Cramer, who was then the CEO of
20  Graduate, had made numerous overtures to Sherif about some
21  kind of a merger or partnership or whatever, and, as I recall,
22  he had been turned down a number of times.
23          (1994 trustees' evaluation marked as Exhibit
24  Number 2574.)
25  BY MR. FRIESEN:

Page 33

1      Q      Let me mark an exhibit as Exhibit 2574. This
2  is a document Bates numbered PR-PLD-020-02184 through 89 and
3  it says trustees' evaluation on the top. Now this document
4  does not have a date on it, but I will represent to you that
5  it comes from a stack of trustees' evaluations with a tab on
6  top of it saying 1994 trustees' evaluations. Is that your
7  signature on the last page?
8      A      Yes, I recognize my writing. Yes, sure is.
9      Q      And this is your handwriting on the form?
10      A      Yes, it is.
11      Q      Do you recall filling out this form?
12      A      Not specifically.
13      Q      You have no doubt that you did?
14      A      No, I have no reason to disagree nor with any
15  of the contents of it.
16      Q      If you go to the page, the second page, 2185.
17      A      Yes.
18      Q      The question is: "Do you have any specific
19  comments or suggestions about the number of board and
20  committee meetings or the length of meetings?" Could you read
21  what you wrote there?
22      A      "It would be helpful if some time could be
23  built in to bond with other board members."
24      MR. MILLER: Too fast.
25      A      I'm sorry. "It would be most helpful if

9 (Pages 30 to 33)

LESLIE ANN MILLER

Page 62

1 ultimately sickened by Sherif. I think that's a pretty vague
2 but fair description of the nature of the discussions that we
3 would have had.
4          Walter had been a prodigious fund-raiser for
5 the institution, so he probably more than many was devastated
6 by the invasion of the endowment, because he had been largely
7 responsible for the growth of that during his tenure, not the
8 least of which was the dedication of a specific endowment in
9 honor of his late wife, Betty, which I think grew to seven
10 figures very quickly. And so he was twice invested in that
11 tragic outcome.
12          MR. FRIESEN: Why don't we take another quick
13 break and I think I may be done very quickly if I have a
14 chance to just look at my notes again.
15          THE VIDEO OPERATOR: We are now going off
16 camera. The time is 1:23.
17          (Recess.)
18          THE VIDEO OPERATOR: We are now back on camera.
19 The time is 1:28.
20 BY MR. FRIESEN:
21      Q      Just a few more questions. The physician
22 practice acquisitions, do you recall learning how they were
23 doing financially after they'd been acquired? Was that
24 something that you were kept apprised of?
25      A      I have no specific recollection.

Page 63

1      Q      You don't know one way or the other whether
2 they are doing well or not doing well?
3      A      I beg your pardon. No, I don't.
4      Q      Prior to the deposition today, did you meet
5 with Ms. Meaden or anyone else from Jones Day about the
6 deposition?
7      A      No, I did not have the pleasure.
8      Q      Did you talk to any of them on the phone?
9      A      No.
10     Q      And we've never met?
11     A      No, we have not.
12          MR. FRIESEN: That is all I have, subject to a
13 few more questions once Ms. Meaden is finished.
14     A      Thank you very much.
15          MR. FRIESEN: Thank you for coming in.
16
17          CROSS-EXAMINATION
18
19 BY MS. MEADEN:
20     Q      Ms. Miller, I introduced myself earlier, but I
21 am Laura Meaden and I represent the plaintiff, the Official
22 Committee of Unsecured Creditors of AHERF, in this action, and
23 you will be pleased to know that I have considerably fewer
24 questions for you than Mr. Friesen had today.
25          MR. MILLER: Excuse me, off the record.

Page 64

1          (Discussion held off the record.)
2          (Letter dated November 26, 1996 marked as
3 Exhibit Number 2576.)
4 BY MS. MEADEN:
5      Q      I wanted to ask you and try and pinpoint with a
6 little bit more preciseness the date of your resignation from
7 the AHERF board and its affiliate boards, so I'm going to ask
8 the court reporter to mark a letter that I have here dated
9 November 26th, 1996 to you from Sherif Abdelhak, and we will
10 mark this as Exhibit 2576.
11     A      Okay.
12     Q      The letter begins: "Dear Leslie: It is with
13 regret that I accept your resignation from the Boards Of
14 Trustees of Allegheny University of the Health Sciences and
15 Allegheny Health, Education and Research Foundation," and it
16 goes on from there. But, as I said earlier, this letter is
17 dated November 26th, 1996. Does this help refresh your
18 recollection as to perhaps what month in 1996 you resigned
19 from those boards?
20     A      It would suggest that it was November.
21     Q      Do you recall what period of time elapsed
22 between the time you tendered your resignation and receiving
23 this letter from Mr. Abdelhak?
24     A      I honestly do not. I am sorry.
25     Q      You can put that aside. That's all the

Page 65

1 questions I have on that document. Now, you were a volunteer
2 trustee on all of the boards on which you served within the
3 AHERF system; correct?
4      A      Yes.
5      Q      And so that was not a full-time job for you to
6 be a trustee of those organizations; correct?
7      A      No.
8      Q      And certainly you couldn't give that job the
9 effort that you otherwise gave to your full-time job; correct?
10     A      No.
11     Q      But during your entire tenure, I assume that
12 you exercised your fiduciary duty in the best possible way
13 that you could; correct?
14     A      I certainly attempted to.
15     Q      And can you tell me what you viewed your role
16 as a trustee as?
17     A      One of oversight of management, and by that I
18 don't mean micromanaging, but certainly to review on an
19 ongoing basis the decisions of management vis-a-vis the
20 institutions for which they were responsible.
21     Q      And you were assisted in discharging your
22 fiduciary duties in that role by outside professionals,
23 weren't you?
24          MR. FRIESEN: Objection.
25     A      What do you mean by outside professionals?

LESLIE ANN MILLER

Page 66

BY MS. MEADEN:

2    Q    Well, certainly there were outside auditors
3  that assisted the board in the financial, reviewing the
4  financial affairs of the institution; correct?
5         MR. FRIESEN:  Objection.
6    A    I do not recall, quite honestly, whether we
7  relied on external auditors or not.
8  BY MS. MEADEN:
9    Q    You have no recollection of whether AHERF had
10  any independent auditors during your tenure as a member of the
11  AHERF board?
12    A    No, I do not, honestly.
13    Q    If I told you that Coopers and Lybrand were the
14  outside auditors during the 1990s time period at least, would
15  that refresh your recollection at all?
16    A    Honestly, no.
17    Q    And you don't recall reviewing audited
18  financial statements then during your tenure as a member of
19  the AHERF parent board?
20    A    No, I do not.
21    Q    At any time during your tenure on the AHERF
22  board, do you ever recall receiving any information that any
23  of the information contained in AHERF's financial statements,
24  whether they be internal or audited, was in any way
25  inaccurate?

Page 67

1    A    When you say received information.
2    Q    Yes, either in writing or verbally.
3    A    Well, as I suggested in my responses to
4  Mr. Friesen's questions, there were I think it fair to say
5  regular expressions of concern about the adequacy of the
6  financial information that was provided to the trustees to
7  perform their oversight responsibility.
8    Q    When you say adequacy, are you talking about
9  the completeness?
10    A    Yes.
11    Q    The volume of information?
12    A    Completeness.
13    Q    But do you ever recall being told by anyone
14  that the information you were receiving was inaccurate?
15    A    No, I do not.
16    Q    Were you familiar with the audit committee of
17  the AHERF board?
18    A    No.  I mean I knew one existed, but...
19    Q    You never served on it?
20    A    No.
21    Q    Did you have any understanding of what the role
22  of the audit committee was during your tenure on the AHERF
23  board?
24    A    Well, it was a more focused form of the overall
25  oversight responsibility of the board, specifically to review

Page 68

1  the ongoing audits of the financials of the institution.
2    Q    I guess what I'm trying to get at is were you
3  aware when you were on the board that the financial statements
4  were being audited?
5    A    No.  You know, I take that back.  I don't
6  remember.  I can't imagine that I wouldn't have been, but I
7  don't have any specific recollection.
8    Q    And you have no recollection of audited
9  financial statements being presented to the board for the
10  board's approval at any time during your tenure?
11    A    I don't specifically recollect it, but if you
12  were to tell me that they would, I wouldn't disagree with you.
13    Q    Have you ever served on the audit committee of
14  any other organization of which you've been a member of the
15  board?
16    A    No, I have not.
17    Q    Do you ever recall hearing at any time during
18  your tenure on the AHERF board that any financial statements
19  of AHERF did not receive a clean opinion from outside
20  auditors?
21    A    No, I did not.
22    Q    Do you have any understanding of what the term
23  "clean opinion" is with respect to financial statements?
24    A    Only a very basic one.
25    Q    Why don't you tell me what that is.

Page 69

1    A    I presume that they had questions about the
2  accuracy of those reports.
3    Q    I'm sorry, that would be a clean opinion or
4  that would not be a clean opinion?
5    A    That would be a dirty opinion, I guess.
6    Q    Okay.
7    A    Soiled.  See why they never put me on an audit
8  committee, off the record.
9    Q    Based on your experience as a professional and
10  based on your experience on other boards and the AHERF board,
11  do you or did you have any expectation as to the types of
12  things that outside auditors would bring to the attention of
13  the board of directors?
14         MR. FRIESEN:  Objection; lack of foundation.
15    A    At that point in time?
16  BY MS. MEADEN:
17    Q    Yes.
18    A    Honestly, no.
19    Q    You had testified earlier that you didn't have
20  enough information to know how bad the situation at AHERF was
21  becoming, and I think you testified that that was some time
22  prior to talk of the acquisition of Graduate; is that correct?
23    A    I'm not sure whether it was prior to or
24  contemporaneously with, or at or about that time.
25    Q    The Graduate, talk of the Graduate acquisition?

18 (Pages 66 to 69)

LESLIE ANN MILLER

Page 70

1    A    Yes, yes, yes. And when I say -- never mind,
2    go ahead.
3    Q    Well, that's what I'm going to ask you, what
4    you meant by that statement. Were you talking about the
5    financial condition --
6    A    Yes.
7    Q    -- of the entity?
8    A    And about the extent of, the increasing amount
9    of debt that the system was taking on in contrast to assets.
10   Certainly we were aware and concerned about the very rapid
11   acquisition of practices and systems by Allegheny, but we had
12   been led to believe that there was not only justifica-
13   strategic justification for doing so, but also financial
14   justification.
15          And it was, as I said, at or about the time of
16   the Graduate -- well, it was not an acquisition at the time,
17   because, as we know, it didn't take place for a while, but at
18   the time that Graduate was under consideration that it first
19   became clear that all was not as rosy as it may have seemed.
20          And one of the reasons for this is because
21   simultaneously with the consideration of Graduate was the
22   consideration of the Cooper Medical System, the strategy
23   always being that, again, for dominance in the southeastern
24   region we had to have a presence in southern New Jersey,
25   which, as you know, is right across the river from

Page 71

1    Philadelphia.
2          And when we heard that Sherif had to cancel
3    consideration of the Cooper System, I think it was a red flag
4    for all of us, because it was not been characteristic of him
5    to set out on a, quote, conquest only to retreat.
6    Q    To put some parameters on this, when you talk
7    about consideration of the Graduate acquisition, are you
8    talking about the August-September 1996 time period?
9    A    Yes. I was going to say early '96. As I said
10   before, Graduate, consideration of the Graduate system was not
11   new in 1996. It was a topic that had been under discussion
12   for almost the entire Allegheny -- the entire time that
13   Allegheny controlled the system. I think shortly after the
14   merger Harold Cramer sought out Sherif to begin discussions.
15   Q    But your specific discussion with respect to
16   concerns about the financial condition of AHERF, you were
17   talking about the fall-summer of 1996?
18         MR. FRIESEN: Objection.
19   A    No, I'm talking about all of 1996.
20   BY MS. MEADEN:
21   Q    You said you were led to believe that the
22   Graduate acquisition had a strategic and a financial
23   justification. By whom were you led to believe that?
24   A    By Mr. Abdelhak.
25   Q    AHERF management?

Page 72

1    A    Yes.
2    Q    Did you ever receive any information from
3    AHERF's outside auditors that acquiring the Graduate Health
4    System could threaten the continued viability of the AHERF
5    system?
6          MR. FRIESEN: Objection.
7    A    I personally did not, no.
8    BY MS. MEADEN:
9    Q    Are you aware of anyone else on the AHERF board
10   who heard such a thing?
11   A    No.
12   Q    The Cooper Medical System that you were talking
13   about, can you tell me exactly how Mr. Abdelhak conveyed to
14   you or other members of the board, I'm not quite sure in what
15   context he conveyed this, but that he was not going through
16   with the Cooper acquisition?
17   A    It was never formally conveyed, because, to the
18   best of my recollection, he never had formal authorization to
19   pursue it, which would not have been out of the ordinary,
20   because it was characteristic of him to bring propositions to
21   the table, if you will. So through the grapevine, we knew
22   that it was under consideration by management, and through
23   that same grapevine we heard that it was off the table.
24   Q    I'm trying to understand.
25   A    It was never a subject of board discussion,

Page 73

1    formal board discussion.
2    Q    The grapevine that you're referring to, did
3    that include members of AHERF's staff or management?
4    A    I honestly can't tell you. Just...
5    Q    Or whether they were community rumors? You
6    just don't recall?
7    A    No.
8    Q    And the reason that you heard through the
9    grapevine that it wasn't going through with the Cooper
10   acquisition was because of what?
11   A    I remember it was in the context of doing the
12   due diligence on Graduate. Apparently when the reality of the
13   extent of the Graduate debt came to the surface, obviously,
14   there had to be an adjustment made.
15   Q    But you don't recall anything more specific
16   about that then?
17   A    No, I do not. There was certainly no formal
18   board action.
19   Q    I take it from your earlier testimony that if
20   issues were brought to your attention that you had concerns
21   about, you didn't hesitate to raise those, any questions that
22   you had with Mr. Abdelhak within the context of a board
23   meeting or otherwise; correct?
24         MR. FRIESEN: Objection.
25   A    Correct.

19 (Pages 70 to 73)

Page 74

BY MS. MEADEN:

1  Q    If information had been brought to your
2  attention by AHERF's outside auditors that the acquisition
3  strategy that AHERF was engaged in threatened the viability of
4  the system going forward, would that have caused you concern?
5       MR. FRIESEN: Objection. When?
6  A    Indeed.
7       MS. MEADEN: During her tenure as a member of
8  the board.
9  A    Sure.
10 BY MS. MEADEN:
11 Q    And do you believe that you would have wanted
12 an investigation to have been conducted into the basis of
13 those statements by the outside auditors --
14      MR. FRIESEN: Objection.
15 BY MS. MEADEN:
16 Q    -- and their reasons for believing that the
17 acquisition strategy would threaten the viability of the
18 system?
19      MR. FRIESEN: Objection.
20 A    I certainly hope that I would have.
21 BY MS. MEADEN:
22 Q    It's something you would not have ignored had
23 you heard that; correct?
24      MR. FRIESEN: Objection.

Page 75

1  A    I can't imagine that I would have, no.
2  BY MS. MEADEN:
3  Q    You had mentioned earlier that you ran into
4  Mr. Cook sometime after the bankruptcy was filed and asked him
5  didn't you have any idea what was going on. I don't think you
6  told us what his response to that question was.
7  A    Essentially it was a response that he didn't,
8  didn't know.
9  Q    Do you recall --
10 A    No way of knowing. Again, it was the age
11 old...
12 Q    Didn't have enough financial --
13 A    Didn't have enough financial information to be
14 able to tell.
15 Q    Do you recall if Mr. Cook ever sat on the audit
16 committee of AHERF?
17 A    No, I do not.
18      MS. MEADEN: I don't believe I have any further
19 questions pending what Mr. Friesen may ask you now.
20      MR. FRIESEN: I'm not going to ask you
21 anything.
22 A    Thank you very much.
23      MR. FRIESEN: Thanks very much.
24      THE VIDEO OPERATOR: This deposition is now
25 concluded. The time is 1:47.

Page 76

1  (The deposition was concluded at 1:47 p.m. )

Page 77

1  STATE OF PENNSYLVANIA:
        : ss
2  COUNTY OF DAUPHIN   :
3       I, Sherry Bryant, a Reporter Notary-Public,
4  authorized to administer oaths within and for the Commonwealth
5  of Pennsylvania and take depositions in the trial of causes,
6  do hereby certify that the foregoing is the testimony of
7       LESLIE ANNE MILLER.
8       I further certify that before the taking of
9  said deposition, the witness was duly sworn; that the
10 questions and answers were taken down stenographically by the
11 said reporter Sherry Bryant, a Reporter Notary-Public,
12 approved and agreed to, and afterwards reduced to typewriting
13 under the direction of the said Reporter.
14      I further certify that the proceedings and
15 evidence contained fully and accurately in the notes by me on
16 the within deposition, and that this copy is a correct
17 transcript of the same.
18      In testimony whereof, I have hereunto
19 subscribed my hand this 18th day of May 2004.
20
21
22      Sherry Bryant, RMR, CRR
23 My commission expires:
   December 13, 2005
24
25

20 (Pages 74 to 77)

Morrison Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## CHARLES MORRISON
*May 14, 2003*

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**MORRISON, CHARLES**



**LEGALINK**

A WORDWAVE COMPANY

Page 354

```
 1          only referring to the due diligence reserves.
 2   Q.     Let me hand you, Mr. Morrison, what has
 3          previously been marked as Exhibit 35.  Do you
 4          recognize this document?
 5   A.     Yes.  It's a memo from Dan Cancelmi to me
 6          regarding intangible assets on the Graduate
 7          entities.
 8   Q.     And one of the intangible assets on the
 9          Graduate entities that Mr. Cancelmi lists
10          here on the schedule -- I'm referring to the
11          second row -- is bad debt reserves for DVAR?
12   A.     Yes.
13   Q.     That's in the amount of $50 million?
14   A.     Yes.
15   Q.     Was it your understanding when you received
16          this memo that was a reference to what we've
17          been calling $50 million reserve transfer?
18   A.     Yes.
19   Q.     Are you familiar with any of the familiar
20          intangible assets that were capitalized in
21          the Graduate entities listed on this schedule
22          Exhibit 35?
23   A.     The estimated loss on disposal of Mt. Sinai
24          I'm generally familiar with.  It was an
25          estimate of what the shutdown costs
```

Page 355

```
 1          associated and the carrying costs associated
 2          with the closure of that facility.
 3   Q.     Did you play a role in coming up with the
 4          $5,046,000 estimate?
 5   A.     I think my staff provided support to that
 6          effort, yes.
 7   Q.     To the best of your knowledge, was that a
 8          good estimate of the estimated loss on
 9          disposal of Mt. Sinai?
10   A.     I have no reason to think otherwise.
11   Q.     I interrupted you.  Are there other
12          intangible assets with which you're familiar?
13   A.     The topics, I'm familiar with how the amounts
14          were determined, and what their probability
15          of exposure are I am not familiar with.
16   Q.     Which other topics were you familiar with?
17   A.     The SSMOB was a medical office building.
18   Q.     That was known as The Church?
19   A.     I thought it was a medical office building
20          associated with Parkview Hospital.
21   Q.     Okay.
22   A.     The estimated loss on disposal of Zurbrugg
23          facility is an issue I'm aware of.  I'm not
24          familiar with the amount.  Those are the ones
25          that I have recollection of.
```

Page 356

```
 1   Q.     Were you involved at all in what is known as
 2          the HSI Technology?
 3   A.     No.
 4   Q.     Were you familiar with what was called the 4G
 5          System?
 6   A.     I'm aware of it, yes.
 7   Q.     What was the 4G System?
 8   A.     It was a piece of software that was being
 9          developed.  I don't actually even recall what
10          the software was designed to do, but I'm
11          aware that it was a piece of software that
12          was being developed within the Graduate
13          organization in some fashion that Graduate
14          had made some investment in.
15   Q.     Does HSI stand for Health System
16          International?
17   A.     That's my understanding, yes.
18   Q.     Were you aware of the fact that AHERF had
19          purchased the 4G software program from Health
20          System International?
21   A.     I don't have any specific knowledge of that.
22          I believe in the course of conversations in
23          the hallway I was aware that was the case,
24          yes.
25   Q.     And who at AHERF was involved with that, to
```

Page 357

```
 1          the best of your knowledge?
 2   A.     Involved with?
 3   Q.     The purchase of the 4G software program from
 4          Health System International.
 5   A.     Well, it would have been -- at least as far
 6          as I know, it would have been part of the due
 7          diligence process that involved the
 8          acquisition of all the Graduate entities.
 9          David McConnell was involved, Dan Kelly was
10          involved, the due diligence team, counsel for
11          Foley & Lardner.
12   Q.     Why was Mr. Cancelmi providing you with this
13          information about intangible assets on the
14          Graduate entities?
15   A.     As best I recall was information so that we
16          were aware of what the items in the balance
17          sheet represented, and also I believe it was
18          so that we could incorporate the amortization
19          into the budgeting process.
20   Q.     Because you were involved with a Graduate
21          budgeting process by this time?
22   A.     We would have been developing the fiscal
23          '98 -- yes, fiscal '98 budgets for the
24          Graduate organization.
25   Q.     Let me hand you, Mr. Morrison, what's
```

27 (Pages 354 to 357)

Page 358

1　　previously been marked as Exhibit 41. Do you
2　　recognize Exhibit 41?
3　A.　Yes.
4　Q.　What is it?
5　A.　A memo from Dan Cancelmi to me regarding the
6　　Delaware Valley bad debt reserve shortfall.
7　Q.　He refers in the column headed Graduate
8　　Reserves to the $50 million reserve transfer;
9　　right?
10　A.　Yes.
11　Q.　And he reported to you that without that $50
12　　million reserve transfer that DVOG bad debt
13　　reserve shortfall as of May 31, '97, would
14　　have been just over $75 million; right?
15　A.　Yes.
16　Q.　So after the $50 million reserve transfer
17　　there was still a remaining bad debt reserve
18　　shortfall at DVOG of just over $25 million;
19　　right?
20　A.　Yes.
21　Q.　The date of this memo is June 20, '97; right?
22　A.　Yes.
23　Q.　Ten days before the end of the fiscal year?
24　A.　Yes.
25　Q.　And with one month to go there was a $25

Page 359

1　　million shortfall still; right?
2　A.　That's what the memo says, yes.
3　Q.　When you received this memo did you know that
4　　AHERF had to do something in June '97, the
5　　last month of fiscal year, in order to plug
6　　the $25 million shortfall?
7　A.　My recollection is it was my view that
8　　whatever shortfall that was out there would
9　　be resolved in the year-end financial
10　　statements.
11　Q.　How did you think it would be resolved from
12　　the year-end financial statements?
13　A.　Well, if the reserve transfer of $50 million
14　　was a valid number, that would contribute to
15　　the reduction of the financial statement
16　　impact. Anything beyond that would have a
17　　financial statement impact.
18　Q.　Through bad debt expense?
19　A.　Yes.
20　Q.　Why couldn't AHERF just leave a bad debt
21　　reserve shortfall at the end of the fiscal
22　　year?
23　A.　Well, to the extent that we acknowledge that
24　　the reserve was inadequate, we would be
25　　required to correct it.

Page 360

1　Q.　It would have been required by Coopers &
2　　Lybrand; right?
3　A.　Generally accepted accounting principles.
4　Q.　But it was your view, wasn't it, and the view
5　　of others at AHERF, so far as you knew, that
6　　the reason AHERF had to do something in June
7　　'97 to make up the $25 million bad debt
8　　reserve shortfall was that otherwise Coopers
9　　& Lybrand would come in for the year-end
10　　audit and you would see that there is a
11　　shortfall; isn't that right?
12　　　MR. COGAN: Objection.
13　A.　Just to clarify, it wasn't my responsibility
14　　to do the financial statements. The
15　　corporate accounting services held that
16　　responsibility. My view, which is what you
17　　asked me, is that it would be resolved in the
18　　course of the year-end financial statements
19　　preparation and the audit.
20　Q.　And did you think to yourself at the time
21　　that the fact that Coopers & Lybrand were
22　　going to come in and do the year-end audit
23　　was a reason why AHERF had to do something to
24　　plug the shortfall?
25　A.　My recollection is that I expected that the

Page 361

1　　year-end financial statements and the Coopers
2　　audit would resolve the issue, either
3　　supporting what had been done internally or
4　　making appropriate adjustments.
5　Q.　Let me hand you what has previously been
6　　marked as Exhibit 161. Do you recognize
7　　Exhibit 164, Mr. Morrison?
8　A.　I don't have any specific recollection of it.
9　　I'm copied on the memo.
10　Q.　It's a July 3, '97 memo from Mr. Cancelmi to
11　　Mr. Adamczak?
12　A.　Yes.
13　Q.　And you, Mr. McConnell, Mr. Dionisio and
14　　Mr. Snow are all shown as being copied?
15　A.　Yes.
16　Q.　If you could turn, please, to the second page
17　　of the memo. Do you see there that the third
18　　paragraph refers to the $50 million transfer
19　　of Graduate reserves?
20　A.　Yes.
21　Q.　And then the fact that there is a $25 million
22　　bad debt reserve shortfall still remaining as
23　　we saw on Exhibit 41?
24　A.　Yes.
25　Q.　Do you see Mr. Cancelmi then writes, Since a

Page 454

```
1          3:30.
2                    - - - -
3     (The proceedings were recessed at 3:30 p.m.)
4                    - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 456

```
1    COMMONWEALTH OF PENNSYLVANIA  )     E R R A T A
     COUNTY OF ALLEGHENY           )     S H E E T
2
        I, CHARLES MORRISON, have read the forgoing
3    pages of my deposition given on Wednesday, May 14,
     2003, and wish to make the following, if any,
4    amendments, additions, deletions or corrections:
5    Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
        In all other respects, the transcript is true and
20   correct.
21   _____
                 CHARLES MORRISON
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2003.
24   _____
             Notary Public
25       AKF Reference No. Cg75479
```

Page 455

```
1    COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2    COUNTY OF ALLEGHENY        )  SS:
3        I, Claire Gross, RDR, a Court Reporter and
4    Notary Public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the witness,
6    CHARLES MORRISON, was by me first duly sworn to
7    testify to the truth; that the forgoing deposition
8    was taken at the time and place stated herein; and
9    that the said deposition was recorded
10   stenographically by me and then reduced to printing
11   under my direction, and constitutes a true record of
12   the testimony given by said witness.
13       I further certify that the inspection, reading
14   and signing of said deposition were NOT waived by
15   counsel for the respective parties and by the
16   witness.
17       I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 15th day of May,
23   2003.
24   _____
                 Notary Public
25
```

52 (Pages 454 to 456)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *CHARLES P. MORRISON*
### *June 29, 2004*

---

# *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
**PH: 212-557-7400 / FAX: 212-692-9171**

**MORRISON, CHARLES P. - 30(b)(6)**



Page 186

CHARLES P. MORRISON

1
2       They would be actions in the
3   Bankruptcy Court, so they would be on the
4   docket of the Bankruptcy Court.
5       There was an action against
6   Mr. Ambuhack, Mr. McConnell and Mr. Weinstein
7   to recover payments that were made under a
8   KESOP benefit program.
9       There are actions currently
10  pending against two third-party payers related
11  to receivable recoveries that are in process,
12  and there are I believe a handful of cases
13  related to claims that are pending before the
14  Bankruptcy Court as well.
15      Q       That is whether a claim should
16  be allowed or not?
17      A       Yes.
18      Q       What are the actions against the
19  two third-party payers to which you referred?
20      A       One is -- I take that back. One
21  of them has been settled, that was with --
22  against Health Partners, a third-party HMO in
23  Philadelphia.
24      The substance of the case is we
25  engaged a collection agency to evaluate the

Page 187

CHARLES P. MORRISON

1
2   billings that had been rendered to third-party
3   payers and to make an assessment as to whether
4   we were paid all of the amounts that we were
5   entitled to under the contractual arrangements.
6       They reviewed the accounts,
7   rebilled those accounts where they believed we
8   were underpaid, and the vast majority of those
9   claims were paid in the normal course by the
10  third-party payers.
11      This case and the one that's
12  pending, the one that's pending is against U.S.
13  Healthcare, relate to payers that for whatever
14  reason have refused to pay us, and so because
15  we believe we are entitled to the money, we
16  have initiated litigation to pursue recovery.
17      Q       Do you know what the amount of
18  recovery was in the action against Health
19  Partners?
20      A       It was $60,000, I think it was.
21      Q       Do you know what the amount of
22  money at issue is in the action against U.S.
23  Healthcare?
24      A       I believe it is roughly $180,000
25  to $185,000.

Page 188

CHARLES P. MORRISON

1
2       Q       And U.S. Healthcare is now
3   affiliated with the insurance company Aetna,
4   right?
5       A       Yes.
6       Q       Which is a member of the
7   Creditors Committee, right?
8       A       Yes.
9       Q       You referred to preference
10  actions against creditors, and I understand
11  that there is a Bankruptcy Court docket, but it
12  is many thousands of pages long, so it's made
13  it difficult for me to know exactly what might
14  have taken place in the bankruptcy.
15      Are there any preference actions
16  that come to mind other than the one we have
17  already discussed against the Mellon Bank group
18  that were in a material amount?
19      A       Most of the preference claims
20  were resolved through negotiation with the
21  creditors.
22      The ones where we couldn't reach
23  a suitable settlement were pursued in
24  litigation.
25      The most notable one that I can

Page 189

CHARLES P. MORRISON

1
2   think of is with United Creditors Alliance,
3   which was a collection agency.
4       The Bankruptcy Court has
5   rendered a judgment in the amount of $126,000,
6   $127,000. The creditors appealed to the Third
7   Circuit.
8       Q       Are there any other parties whom
9   the Chapter 11 Trustee has considered suing in
10  connection with damages caused before the
11  bankruptcy to the Debtors' estates?
12      MR. FRIEDMAN: Objection. Again,
13  I advise the witness not to divulge any
14  conversations with counsel.
15      A       None that come to mind.
16      Q       The Chapter 11 Trustee has
17  decided not to sue PricewaterhouseCoopers,
18  right?
19      MR. COGAN: Objection.
20      MR. FRIEDMAN: Objection.
21      A       As far as I know that's correct,
22  yes.
23      Q       Let me now turn to the
24  bankruptcy plan.
25      MR. RYAN: Let me mark this

48 (Pages 186 to 189)

Page 190

CHARLES P. MORRISON

1       CHARLES P. MORRISON
2       please as the next exhibit number.
3               (The above described document was
4       marked Exhibit 2765 for identification as
5       of this date.)
6       Q       You have before you, sir,
7       Exhibit 2765?
8       A       Yes.
9       Q       That is the second amended
10      consolidated liquidating plan of reorganization
11      under Chapter 11 of the Bankruptcy Code?
12      A       Yes.
13      Q       That's quite a mouthful.
14              It's my understanding that what
15      this is is the plan by which distributions are
16      made to various categories of creditors, is
17      that right?
18      A       Among other provisions, yes.
19      Q       Let me turn, if you would turn
20      with me, please, to Page 15.
21      A       15?
22      Q       Yes, Section 5.4 of the plan.
23      A       Yes.
24      Q       This refers to secured claims of
25      holders of MBIA/PNC claims?

Page 191

CHARLES P. MORRISON

1       CHARLES P. MORRISON
2       A       Yes.
3       Q       Is this the provision of the
4       plan to which we referred in general terms
5       earlier that provides a partial secured claim,
6       that is, that grants a secured claim in a
7       partial amount of the total claim, to MBIA and
8       to PNC Bank?
9       A       Yes.
10              MR. FRIEDMAN:  Objection.
11      Q       Combining the two of them, their
12      secured claim is $50 million?
13      A       Yes.
14      Q       The remainder of their claim
15      that is unsecured, and that's in the amount of
16      $340.3 million combined?
17      A       Yes.
18              MR. RYAN:  Let me mark this two
19      page document as Exhibit 2766.
20              (The above described document was
21      marked Exhibit 2766 for identification as
22      of this date.)
23      Q       Are you familiar, Mr. Morrison,
24      with Exhibit 2766?
25      A       Yes.

Page 192

CHARLES P. MORRISON

1       CHARLES P. MORRISON
2       Q       Could you describe for us,
3       please, what it is?
4       A       It is a recitation of the
5       distributions that have been made to creditors
6       since the approval of the plan, the percentage
7       recoveries to unsecureds and admin and priority
8       claimants, secured, unsecured, admin and
9       priority claimants.
10      Q       The first page of Exhibit 2766
11      reflects that the cumulative recovery to date
12      for general unsecured claims of non-Centennial
13      creditors has been 19.25 percent, is that
14      right?
15      A       For the non-Centennial unsecured
16      creditors, yes, that's correct.
17      Q       And that's beginning with an
18      initial amount that was distributed in December
19      of 2000 and goes here through a distribution in
20      December of 2003, right?
21      A       Yes.
22      Q       Now, the recovery of general
23      unsecured creditors of Centennial has been less
24      than that as shown here in the right column,
25      right?

Page 193

CHARLES P. MORRISON

1       CHARLES P. MORRISON
2       A       Yes.
3       Q       Why is it that the Centennial
4       creditors are recovering at a lower rate than
5       the non-Centennial creditors?
6       A       In the course of the case it
7       became apparent that the assets available
8       within the Centennial estate may not have been
9       sufficient to cover the administrative costs of
10      the estate, let alone the claims of the estate,
11      and ultimately the plan established a separate
12      class of creditors for those creditors with
13      claims against the Centennial hospitals for
14      payment on an unsecured basis at 30 percent of
15      whatever the recovery rate for the general
16      unsecured creditors were.
17      Q       That's because there were fewer
18      assets for that Debtor than for the other
19      Debtors?
20      A       Yes.
21      Q       The creditors for the other four
22      Debtors had their claims all consolidated, is
23      that right?
24      A       Yes, they are all -- all of the
25      entities have been consolidated, the claims

Page 290

CHARLES P. MORRISON

1
2  were entered into between 1988 and January 1,
3  1996?
4      A    Yes.
5          MR. FRIEDMAN:  Objection.
6          MR. COGAN:  Objection.
7          MR. RYAN:  I think that may be
8  all I have.  Let me just take a break
9  and review my notes.
10         THE VIDEOGRAPHER:  Going off the
11  record at 5:55 p.m.
12         (At this point in the proceedings
13  there was a recess, after which the
14  deposition continued as follows:)
15         THE VIDEOGRAPHER:  We are back on
16  the record at 5:58 p.m.
17     Q    Mr. Morrison, we have been
18  discussing the professional fees paid out of
19  the bankruptcy that were, with fees and
20  expenses, have been a little over $90 million
21  since the bankruptcy filing, right?
22     A    Yes.
23     Q    Is it correct that there have
24  been other costs of the bankruptcy
25  administration process that have been borne by

Page 291

CHARLES P. MORRISON

1
2  the Debtor estates?
3      A    The costs of the bankruptcy
4  office itself, myself and the staff that
5  support the bankruptcy office, have been paid
6  from the estate as well, yes.
7      Q    So that would involve the
8  payment for your time and the time of other
9  employees of the Chapter 11 Trustee's office?
10     A    Yes.
11     Q    As well as the fees of people
12  working on a contract basis?
13     A    Yes.
14     Q    The costs of leasing office
15  space in Pittsburgh?
16     A    Yes.
17     Q    And to identify those amounts,
18  would I go then to the monthly operating
19  reports filed with the court?
20     A    Yes.
21         MR. RYAN:  I have no further
22  questions at this time.  Thank you very
23  much for your time, Mr. Morrison.
24         There were some outstanding items
25  that we spoke about previously on the

Page 292

CHARLES P. MORRISON

1
2  record, and subject to those, I have
3  nothing further.
4          MR. COGAN:  I have no questions.
5          THE VIDEOGRAPHER:  This concludes
6  today's testimony of Charles P.
7  Morrison.  The time on the record is
8  6:00 p.m.  This also concludes tape
9  number 4.
10
11                      CHARLES P. MORRISON
12  Subscribed and sworn
13  to before me this _____
14  day of _____, 2004.
15
16  _____
17     Notary Public
18
19
20
21
22
23
24
25

Page 293

1              CHARLES P. MORRISON
2                  E X H I B I T S
3  EXHIBIT                         FOR IDENT.
4  2741 Subpoena                        5
5  2742 Document entitled "First Status    14
       Report of William J.
6      Scharffenberger, Chapter 11 Trustee
       of Allegheny Health, Education &
7      Research Foundation for the Period
       of December 10, 1998 through
8      January 31, 1999"
9  2743 Affidavit                      18
10 2744 Document entitled "Report of Sale"    23
11 2745 Document on the letterhead of Tenet    34
       addressed to the Board of Trustees
12     of AHERF dated July 30, 1998
13 2746 Monthly operating report for the    41
       month ending November 30, 1998
14
   2747 Document entitled "Afffidavit of    49
15     Patrick M. Hurst"
16 2748 Document entitled "Motion to        50
       Approve Indemnity Escrow Settlement
17     Agreement Pursuant to Section
       105(a) of the Bankruptcy Code and
18     Bankruptcy Rule 9019(a) dated
       December 9, 2002
19
   2749 Proof of Claim filed by Allegheny    78
20     General Hospital
21 2750 Proof of Claim filed by Allegheny    84
       University Medical Centers
22
23 2751 Order approving settlement         89
24 2752 Document headed "Allegheny Health,    113
       Education & Research Foundation,
25     AHERF, Status Update and Review of
       Liquidation Objectives" dated

74 (Pages 290 to 293)

Page 294

CHARLES P. MORRISON

E X H I B I T S

| EXHIBIT | FOR IDENT. |
|---|---|
| 2753 Document headed "Allegheny Health, Education & Research Foundation, AHERF, Status Update and Review of Liquidation Objectives" dated May 13, 1999" | 117 |
| 2754 Monthly operating report for the AHERF Debtors for June of 2000 | 121 |
| 2755 E-mail from Todd Kevles to Mr. Morrison from April 2000 | 136 |
| 2756 E-mail from Todd Kevles to Mr. Morrison from November 2000 | 138 |
| 2757 E-mail from Todd Kevles to Mr. Morrison from January 2001 | |
| 2758 Complaint filed by the Chapter 11 Trustee against Mellon Bank, Toronto Dominion, Bank One and Bank of Chicago | 152 |
| 2759 Stipulation of settlement and order relating to settlement of preference action against Mellon Bank group | 156 |
| 2760 Settlement agreement from January 2002 settling various AHERF related claims | 158 |
| 2761 Complaint in lawsuit brought by the Official Committee of Unsecured Creditors against certain officers and trustees of AHERF | 159 |
| 2762 Joint motion for approval of top insurer settlement agreement with attachments | 173 |

Page 295

CHARLES P. MORRISON

E X H I B I T S

| EXHIBIT | FOR IDENT. |
|---|---|
| 2763 Complaint brought by the Chapter 11 Trustee against the Philadelphia Health Care Trust | 177 |
| 2764 Monthly operating report for AHERF for January 2001 | 181 |
| 2765 Second amended consolidated liquidating plan of reorganization under Chapter 11 of the Bankruptcy Code | 190 |
| 2766 Document listing distributions to creditors | 191 |
| 2767 Claims register run April 14, 2004 sorted by category code | 197 |
| 2768 Summary of claims document | 199 |
| 2769 Settlement with the United States Department of Health and Human Services | 213 |
| 2770 Monthly operating report for AHERF for April 2004 | 215 |
| 2771 Proof of Claim filed by Allegiance Healthcare Corporation | 230 |
| 2772 Proof of Claim filed by Bell Atlantic Network Integration, Inc. | 234 |
| 2773 Proof of Claim of Ian Cummings, M.D. | 236 |
| 2774 Proof of Claim number 5128 filed by Sieman's Medical System | 251 |

Page 296

CHARLES P. MORRISON

E X H I B I T S

| EXHIBIT | FOR IDENT. |
|---|---|
| 2775 Proof of Claim number 2448 filed by Steelcase Financial Services, Inc. | 254 |
| 2776 Travelers' Administrative Proof of Claim | 256 |
| 2777 Proof of Claim number 6293 filed by Waste Management of Pennsylvania, Inc. | 259 |
| 2778 Schedules regarding professional fees | 265 |
| 2779 Proof of Claim filed by Travelers Casualty & Surety Company | 288 |

I N D E X

REQUESTS FOR DOCUMENTS/INFORMATION

Page   33
Page   110

Page 297

CHARLES P. MORRISON

C E R T I F I C A T E

I, STEPHEN J. MOORE, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That, CHARLES P. MORRISON, the witness whose deposition is hereinbefore set forth was duly sworn, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

_____

Stephen J. Moore, RPR, CRR

75 (Pages 294 to 297)

Page 298

1    CHARLES P. MORRISON
2    ERRATA SHEET
3
4  PAGE/LINE    CHANGE FROM   CHANGE TO
5  _____   _____  _____
6  _____   _____  _____
7  _____   _____  _____
8  _____   _____  _____
9  _____   _____  _____
10 _____   _____  _____
11 _____   _____  _____
12 _____   _____  _____
13 _____   _____  _____
14 _____   _____  _____
15 _____   _____  _____
16 _____   _____  _____
17 _____   _____  _____
18 _____   _____  _____
19 _____   _____  _____
20 _____   _____  _____
21 _____   _____  _____
22 _____   _____  _____
23 _____   _____  _____
24 _____   _____  _____
25 _____   _____  _____

76 (Page 298)

**Moyer Dep.**

MICHAEL W. MOYER

Page 1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA

2

                        - - - -

3

THE OFFICIAL COMMITTEE OF          )
4 UNSECURED CREDITORS OF            )
ALLEGHENY HEALTH, EDUCATION &       )
5 RESEARCH FOUNDATION,              )
                                    )
6              Plaintiff,           )
                                    )
7          -vs-                     )    Civil Action
                                    )    No. 00-684
8 PRICEWATERHOUSECOOPERS, L.L.P.    )
                                    )
9              Defendant.           )
10
11                  - - - -
12    VIDEOTAPE DEPOSITION OF:  MICHAEL W. MOYER
13                  - - - -
14
              DATE:    November 15, 2002
15                     Friday, 9:00 a.m.
16
              LOCATION:   MANION MCDONOUGH & LUCAS
17                        14th Floor, USX Tower
                          Pittsburgh, PA  15219
18                        412-232-0200
19
              TAKEN BY:   Defendant
20
21            REPORTED BY:   JoAnn M. Brown, RMR
                             Notary Public
22                           AKF Reference No. JB72890
23
24
25

MICHAEL W. MOYER

Page 198

1  just identify the document?
2  A.  It's basically a request for information so
3     that they could perform their audit for fiscal
4     year 1997, and it wanted certain pieces of
5     information and wanted it either in computer or
6     otherwise.
7  Q.  Just to be clear, this is information you
8     received from John Lydon and Chuck Lisman at
9     the request from them to provide information to
10    Coopers?
11 A.  Correct.
12 Q.  In connection with the '97 audit, is that
13    right?
14 A.  That's correct.
15 Q.  Okay. You don't recollect receiving this?
16 A.  Truthfully, it didn't jump into my mind. I do
17    not deny getting it, because I'm sure I did,
18    but since it would have been a standard --
19    nothing that jumps out that would have been odd
20    to me.
21 Q.  Do you have any reason to believe that you
22    failed to provide --
23 A.  Oh, I'm sure we provided all information that
24    was requested of us.
25 Q.  Okay. Was that your standard practice?

Page 199

1  A.  Our standard practice was -- and, truthfully,
2     had we not, I'm sure one of the managers would
3     have called me directly and said your people
4     are not providing information, and we did not
5     get a call. So, I'm sure when we received
6     this, that I just turned it over to those
7     people that would have provided the information
8     and moved on. Because, truthfully, looking at
9     the things that they've asked for, almost
10    everything that they ask for was information
11    that would have come from the accounting
12    people. None of them worked for me at this
13    point in time, okay, which is another reason
14    for me not necessarily to remember, because
15    even though I was on the distribution list, I'm
16    not sure that any of this information was under
17    my control any longer, and the people who did
18    control it were also on the distribution list,
19    so --
20 Q.  I know you mentioned earlier that you may have
21    had a discussion with David McConnell about
22    recapture?
23 A.  Correct.
24 Q.  And I'm not sure if I understood earlier that
25    you had told us about the entire conversation

Page 200

1     you had with him about that, and I just wanted
2     to give you a chance.
3  A.  I don't remember the entire conversation. I
4     know that it was not long. I'm sure that
5     probably in one of our one-on-one meetings that
6     we had occasionally, I asked him about the
7     recapture, I mean, just the philosophy that
8     they use since they had just done this at
9     Graduate Hospital as well, and the philosophy
10    that they use to come up with the numbers and
11    how they went about it. It was not a
12    confrontational meeting, because you did not do
13    that with David, it was just really, gee, I'd
14    like to understand what you did. It was
15    probably two or three minutes long, and that
16    was it.
17 Q.  When is the first time that you learned that
18    AHERF was planning on acquiring the Graduate
19    hospitals?
20 A.  I think that came up after we had started
21    discussions with AHERF about our own merger, if
22    I remember correctly, and I know it was a -- it
23    was a little bit of a concern, and I'm not sure
24    if I found out about it through the news or
25    whether I got word of it through Barry Roth who

Page 201

1     would have gotten word of it from Sherif
2     himself.
3  Q.  Why was it of concern?
4  A.  Were they biting off more than they could chew
5     kind of thing all at once to do the Graduate,
6     which was not a small system, and then at the
7     same time to be talking about Forbes and
8     Allegheny Valley, Canonsburg. This was just a
9     lot to do even for a huge staff that they had.
10 Q.  You mentioned that prior to AHERF's acquisition
11    of Forbes, you had reviewed materials about
12    AHERF that gave no indication that there was a
13    cash crunch I think is what you called it.
14    What did you review that helped you arrive at
15    that conclusion?
16 A.  We reviewed the audited financial statements
17    from the previous year end.
18 Q.  Which would have been?
19 A.  Which would have been -- let's see. When did
20    we do this? We did this in '96, right, because
21    the merger was effective January 1, '97? So we
22    were in '96. So we probably were using '95
23    year end, because we were doing this before
24    their audited financials would have been
25    complete for '96, so it's my guess that we were

51 (Pages 198 to 201)

MICHAEL W. MOYER

Page 202

1    looking at the year before, '95, and we
2    probably -- although I don't remember at the
3    moment, but I would think that we also had some
4    interim internal financial statements from them
5    as well that maybe took us through half year,
6    through January, but those would have been
7    unaudited statements.
8  Q.  Was there anything else that you would have
9    reviewed other than those two items?
10  A.  I do not remember getting cash flow information
11    from them, but, again, that's so long ago.  I
12    know we did not get a huge amount of
13    information from them, but we did at least have
14    some financial statement information, and
15    several years' worth, that we analyzed before
16    moving ahead.
17  Q.  Why didn't you think that David McConnell was a
18    truthful person?
19  A.  My association with Mr. McConnell goes back to
20    1980 when he applied to me for a job and I
21    didn't hire him.  I thought his background in
22    accounting was weak, personal view, and the
23    slipshod way that they ran their accounting
24    department which became apparent after the
25    merger.  We really had no knowledge of that

Page 203

1    prior to the merger.  I just didn't find -- I
2    found it easy when you have a slipshod
3    operation to shade the truth in the direction
4    that you want the truth to go, and it was just
5    my personal view that I did not think that they
6    ran a very tight ship.  I didn't think that
7    their accounting controls were very good.
8    Certainly, the information that they provided
9    to their managers was not very good in
10    comparison to what we did at Forbes, and I just
11    did not think that he was always being
12    truthful.
13  Q.  I guess it's one thing to have a slipshod
14    department, but it's probably another thing to
15    be untruthful.  Is there something other than
16    that?
17    I don't think I'm asking a good
18    question, but what I'm trying to understand is
19    was there something other than the nature of
20    the accounting department that operated at
21    AHERF that allowed -- or helped you arrive at
22    the conclusion that McConnell was not to be
23    trusted?
24  A.  Let's say the rumors that I heard about him and
25    the conduct of his life did not match the way I

Page 204

1    liked to live my life, so they were rumors, and
2    so I tend not to like to repeat rumors too
3    much, but I just didn't trust him.
4  Q.  When you were at Forbes and you had
5    responsibility for creating what you've called
6    CRA reserves --
7  A.  Yes.
8  Q.  -- what was your objective when you would
9    create those reserves?
10  A.  Okay.  A little history.  The year before I
11    went to Forbes, they had a loss from
12    operations, and one of the reasons that they
13    had a loss from operations was they settled a
14    prior year's cost report and they did not have
15    it properly reserved, so they had to pay back
16    some money that the government had paid them --
17    or Blue Cross, I don't remember -- and then
18    they had to take that all through the current
19    year which created a loss, which at the time
20    was only a couple hundred thousand dollars, but
21    for a hospital like in '78, '79, those were big
22    dollars.  The board was very upset, one of the
23    reasons I got hired.
24    My objective from day one at Forbes,
25    and my personal philosophy in finance

Page 205

1    accounting, is to be conservative.  So, we at
2    Forbes always took the conservative role.  I
3    always underbooked revenue.  I would always
4    reserve on the bad side to make sure that when
5    it happened, I was going to have a happy
6    surprise for the board and not a bad surprise
7    for the board, and I think in all of my years
8    at Forbes, we only had one bad surprise.  We
9    were very conservative in booking what we
10    thought people owed us as settlements so we
11    would end up with reserves that were reserves
12    that were really, you know, going to help us at
13    the end, because when we actually got the
14    settlement, we would end up with more money
15    than what we thought we said we were going to
16    get.
17  Q.  Were you bound by any requirements to make sure
18    that you did not -- were not overly
19    conservative?
20  A.  Yes.
21  Q.  What were those requirements?
22  A.  Well, obviously, again, the auditors are
23    concerned that we not misstate in either
24    direction, not overstate income or understate
25    income to any great degree, but most auditing

52 (Pages 202 to 205)

MANHATTAN REPORTING CORP., a LegaLink Company

MICHAEL W. MOYER

Page 206

1    firms are also going -- if you're going to make
2    a mistake, they would rather you made the
3    mistake of being more conservative rather than
4    less conservative has been my experience over
5    the years.
6  Q.  Why do you think that is?
7  A.  Well, because they would rather report that
8    your income was less than it was and be
9    surprised to the good in the future as well.
10   They don't want people thinking that you are
11   doing better than you are.
12 Q.  People who might be relying on the financial
13   statements?
14 A.  Which in our case was bondholders and bankers.
15   I mean, we had no stockholders, so those were
16   our two constituencies that we needed to make
17   sure that the statements were accurate for.
18 Q.  If you were to transfer reserves, CRA reserves
19   that had been established to another account,
20   for instance -- is there any reason why you
21   would not transfer reserves that you had
22   established, CRA reserves, to another account?
23 A.  Well, we go back to the same question as
24   earlier. I don't know why anyone would ever
25   transfer a CRA account. It's specific to the

Page 207

1    hospital, and it's specific to what happened at
2    that hospital. So there may be occasion, and
3    I'm not just seeing it being a rather
4    short-sighted person sometimes, as to why one
5    might want to transfer a reserve from one body
6    to another body, but at the moment, I can't --
7    in my own mind, I can't see why anyone would do
8    that.
9  Q.  Is the risk of doing that that if a reserve was
10   properly recorded -- let me step back.
11       If a risk -- if a reserve was
12   properly recorded for, and I'm specifically
13   talking about a CRA reserve, would the risk be
14   that if you transferred that reserve to another
15   account, you have essentially underreserved a
16   potential exposure?
17 A.  Well, there's always the risk that we had
18   underreserved and that we were going to then
19   collect less than we said or that we were going
20   to owe more than we said, whichever, both of
21   those would be an underreserve, but I know in
22   the case of Forbes, we did not underreserve.
23   It was not our practice to underreserve. It
24   was not our philosophy of the people who were
25   determining -- I personally did not determine

Page 208

1    the reserve. That was Barb Johnson's job. She
2    is the expert in reimbursement, one of the best
3    in town. So that was her job to come up with
4    the number and then convince me that it was
5    right. It did not take a lot of convincing.
6    She was the expert and I wasn't. But I know
7    our philosophy over 20 years, and our
8    philosophy was we are going to be conservative
9    in our reserves. So I'm sure that our CRA
10   reserve was conservative. I have no doubts in
11   my mind that it wasn't.
12 Q.  When did you learn that AHERF would be using a
13   consolidated financial statement for '97 -- for
14   its '97 financial statements?
15 A.  Probably not until late, but that was not a
16   surprise to me. I had assumed all along that
17   they would consolidate and use one statement.
18   We hadn't discussed it, so I didn't know for
19   sure until later in the process, but I just
20   assumed that that would be the case.
21 Q.  Did you have an opinion about the decision to
22   move to a consolidated financial statement?
23 A.  No, I didn't have an opinion one way or
24   another.
25       MR. TAMBURRI: Let's go off the

Page 209

1    record. I'm going to take a look at my notes,
2    but I think I'm about there.
3        THE VIDEOGRAPHER: We're going off
4    the record. The time indicated on the screen
5    is 3:25 p.m.
6        - - - -
7    (There was a recess in the proceedings.)
8        - - - -
9        THE VIDEOGRAPHER: Back on the
10   record. The time indicated is 3:31 p.m.
11 BY MR. TAMBURRI:
12 Q.  Almost done, Mr. Moyer.
13       How many years in your career at
14   Forbes did you spend having some interaction or
15   responsibility for interacting with either the
16   bond-issuing authority or bondholders of
17   Forbes?
18 A.  I think my interaction with the bond authority
19   started almost immediately after I started with
20   the organization, so, truthfully, since like
21   1980. Even though it was not my direct
22   responsibility the first year or two, I
23   attended most of the meetings with the then
24   vice president of finance whose responsibility
25   it was, and in some cases just went to the

53 (Pages 206 to 209)