MICHAEL W. MOYER

Page 226

1  had worked in my treasury department. She
2  moved to their treasury department, and I
3  think -- I'm guessing at what her concerns --
4  Angela was concerned, but Angela is the type of
5  person that will never discuss business with
6  someone who does not have the need and the
7  right to know. I no longer had the need nor
8  the right to know. She knew that if I did, I'd
9  go to her boss to get it. So, she's -- I mean,
10  she doesn't even discuss with her husband, you
11  know, the things that occur in work, nor does
12  he. He happens to be the provost at the
13  University of Pittsburgh. He doesn't discuss
14  with her those things. They're just an
15  extremely moral, down-to-earth couple, and so
16  she would never tell me what her concerns were,
17  but I had known her for ten years. I knew she
18  was concerned, okay, and, in general, it didn't
19  take a genius to know that she works with cash
20  and she's concerned with cash and what was
21  happening with that cash.
22  Q.   And you connected the dots from there?
23  A.   Of course. It does not take a genius to do
24  that.
25       MR. KRUSKO:  That's all I have,

Page 227

1       Mr. Moyer. Thank you.
2       MR. TAMBURRI:  I have no further
3  questions either.
4       THE VIDEOGRAPHER:  With there being
5  no further questions, the deposition is
6  concluded at 3:54 p.m.
7            - - - -
8  (The proceedings were concluded at 3:54 p.m.)
9            - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 228

1  COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3       I, JoAnn M. Brown, RMR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  MICHAEL W. MOYER, was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 19th day of
23  November, 2002.
24       _____
25            Notary Public

Page 229

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY        )   S H E E T
2
       I, MICHAEL W. MOYER, have read the foregoing
3  pages of my deposition given on Friday, November 15,
   2002, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read     Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21       _____
            MICHAEL W. MOYER
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24       _____
            Notary Public
25  AKF Reference No. JB72890

MANHATTAN REPORTING CORP., a LegaLink Company

Murasko Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## DR. DONNA MARIE MURASKO
### April 8, 2004

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

MURASKO, DR. DONNA MARIE



LEGALINK
A MERRILL COMPANY

Page 162

Dr. Donna M. Murasko

1
2  payment delay.
3       That was a recurrent theme through
4  Board meetings, on whether or not we were
5  getting that money in quickly enough.        03:00PM
6       So this is consistent with that.
7    Q.  Do you know why Len and Sherif said
8  that, "we were fine"?
9    A.  Probably that the individuals are
10 now doing fine.  Previous Board book said --   03:01PM
11 you have actually given me today said that
12 there are concerns with that.  So their
13 comments were probably saying that that has
14 been addressed.
15   Q.  If you go to the next page, Delaware   03:01PM
16 Valley Obligated Group, Combining Statement of
17 Changes in Net Assets For the Year Ending June
18 30, 1997.
19       It says, "Bob Palmer," colon,
20 "realize conditions were difficult but did we   03:01PM
21 do the best we could.  Sherif, I believe so.
22 Recruitment last year was needed, but we're
23 paying for it.  Len, we've made some faculty
24 adjustments but," dot, dot, dot, takes --
25 sorry, "take one year to see change at         03:01PM

Page 163

Dr. Donna M. Murasko

1
2  minimum."
3       Do you know what that was about?
4    A.  It's consistent with what I just
5  said.                                           03:01PM
6       If you hire new physicians, it takes
7  a year in order for their revenue to be
8  totally represented in the financials because
9  of the billing and the time that those
10 receivables come in.                            03:02PM
11   Q.  Well, what do you think, "we're
12 paying for it," means?
13   A.  When you hire faculty, even though
14 you're not getting their revenue in, you have
15 to give them their monthly salary.              03:02PM
16   Q.  And then it says, "Potamkin," colon,
17 PR is management poor.  Are losses real.  Need
18 to know correct spin."
19       Do you know what that's all about?
20       MR. UNICE:  Object to form.           03:02PM
21   A.  I don't know.  I can't go back and
22 interpret that.
23   Q.  But this would be something that Mr.
24 Potamkin said?
25   A.  Not directly; it is obviously a       03:03PM

Page 164

Dr. Donna M. Murasko

1
2  paraphrase and a summary on my part.  But I
3  can't decipher it at this point.
4       MR. FRIESEN:  We need to change
5  the tape briefly.                              03:03PM
6       VIDEO SPECIALIST:  We are now
7  going off the video record.  That
8  concludes Videotape No. 2.  The time,
9  3:03.
10      (Short recess.)                        03:03PM
11      VIDEO SPECIALIST:  We are now
12 back on the videotape record.  This
13 commences Videotape No. 3.  The date,
14 April 8, 2004.  The time, 3:13.
15      You may continue.                      03:13PM
16 BY MR. FRIESEN:
17   Q.  Do you recall that Mr. Abdelhak was
18 terminated in June of 1998?
19   A.  Yes, I do.
20   Q.  And when was the first time that you   03:13PM
21 ever heard any discussion whatsoever about his
22 potential termination?
23   A.  I cannot recall the date.  I...
24   Q.  Do you recall how much before the
25 actual termination it was?                     03:14PM

Page 165

Dr. Donna M. Murasko

1
2    A.  No.
3    Q.  Whether it was a day or a week?
4    A.  I cannot.
5    Q.  Were you involved at all in the        03:14PM
6  decision to terminate him?
7    A.  I was not.
8    Q.  Do you recall how you learned that
9  he was terminated?
10   A.  I do not.                               03:14PM
11   Q.  Did you -- strike that.
12      Do you know when the first time was
13 that you heard that anyone had lost confidence
14 in Mr. Abdelhak?
15   A.  No.                                     03:14PM
16      MR. UNICE:  Object to form.
17 BY MR. FRIESEN:
18   Q.  Were you aware that, prior to his
19 termination, a group of AHERF doctors had lost
20 confidence in him?                             03:14PM
21   A.  I do not know that.  I do not
22 remember learning that.
23   Q.  And did you ever lose confidence in
24 Mr. Abdelhak prior to his termination?
25   A.  Confidence, no; concern, yes.          03:15PM

42 (Pages 162 to 165)

Page 166

Dr. Donna M. Murasko

1
2  Q.  And, again, do you know when that
3  concern started, whether it's in time or
4  related to particular events?
5  A.  I can't pinpoint it to anything          03:15PM
6  specific.
7  Q.  And what was your concern?
8  A.  Things were moving too quickly.
9  Q.  In a negative trajectory?
10  A.  No.                                     03:15PM
11  Q.  No?
12  A.  The growth that was occurring in the
13  system was too quick.  I am a fiscal
14  conservative.
15  Q.  And you don't know whether this was     03:16PM
16  in '96 or seven or eight?
17  A.  I can't put it in a time frame.
18  Q.  How about Mr. McConnell; do you
19  remember ever losing confidence in Mr.
20  McConnell prior to his termination?          03:16PM
21          MR. UNICE:  Object to form.
22  A.  I can't remember formulating an
23  opinion at that time.
24  Q.  Do you know why Mr. Abdelhak was
25  terminated?                                  03:16PM

Page 167

Dr. Donna M. Murasko

1
2  A.  I do not.
3  Q.  Prior to the time that you became
4  concerned about Mr. Abdelhak, what was your
5  general impression of him?                    03:17PM
6  A.  He was a man who had a defined
7  direction and had the energy to go in that
8  direction.
9  Q.  Did you consider him someone who was
10  open to other people's ideas?                03:17PM
11  A.  Anyone at the top has very defined
12  opinions.  I personally found him more willing
13  to listen than many people at the top.
14  Q.  Just to be clear, than you had
15  thought of many people at the top or that than 03:17PM
16  other people at the top had thought of him?  I
17  am just trying --
18          MR. KOLANKSY:  I --
19  A.  I don't understand your question.
20  Q.  Well, you said you found him more       03:17PM
21  willing to listen than other people at the
22  top.  And I just don't know if you meant other
23  people at the top thought differently or he
24  was different than other people at the top.
25  A.  Oh, probably neither.                    03:18PM

Page 168

Dr. Donna M. Murasko

1
2  Q.  Okay.
3  A.  It's people in a position of his
4  authority generally do not -- are not willing
5  to listen to people in the middle at all.  I   03:18PM
6  found him one who would listen.  So not just
7  in Allegheny, but generally people in power.
8  Q.  Now, by "in the middle," what do you
9  refer to?
10  A.  A department head.                       03:18PM
11  Q.  Because you are a Trustee, as well,
12  that's can what I am trying to get at.
13  A.  Key --
14  Q.  In your role as a Trustee, did you
15  consider him someone who was willing to listen 03:18PM
16  to Trustees?
17  A.  My -- you asked for my opinion in
18  general, and I have to do it based on my
19  personal interaction with him.
20          And, as I said before, it was a --   03:18PM
21  it was not just a Trustee; I was a faculty
22  member and a department head.  So I cannot
23  tell you whether or not my interaction with
24  him is universal with everybody.
25          I can tell you specifically how he   03:19PM

Page 169

Dr. Donna M. Murasko

1
2  interacted with me, where he was willing to
3  listen to alternate points of view.
4  Q.  Well, when you were at these Board
5  meetings with other Trustees, and when you    03:19PM
6  wrote notes about this Trustee saying this and
7  that one shaking his head, et cetera, et
8  cetera, did you have a sense at those meetings
9  that Mr. Abdelhak was open to the suggestions
10  of other Trustees?                           03:19PM
11  A.  Yes.  He was listening to people and
12  seemed receptive.
13          MR. FRIESEN:  Let me mark
14  Exhibit 2528.
15          (Document marked for
16  identification as Exhibit 2528.)
17          MR. FRIESEN:  This is a
18  documents Bates numbered PR-PLD-066-00492
19  through 497.  And it says, "1995
20  Trustee's Evaluation."  It says,             03:20PM
21  "Murasko," at the top.  Then there is
22  some handwriting throughout and X's.
23  BY MR. FRIESEN:
24  Q.  Is this your handwriting in the
25  responses to this?                           03:20PM

43 (Pages 166 to 169)

Dr. Donna M. Murasko

1
2   Q.   But in terms of your employment,
3   your employment for the system was a full-time
4   job?
5        A.   Yes, it was.                          03:29PM
6        Q.   And your time as Trustee was
7   something that you did above and beyond your
8   duties as an employee for the AHERF system?
9        A.   Yes, it was.
10       Q.   Now, in the discharge of your duties  03:30PM
11  as a Trustee, were you assisted in any way by
12  outside professionals that management would
13  hire from time to time?
14       A.   What do you mean by "assistance from
15  professionals"?                                 03:30PM
16       Q.   For example, would management from
17  time to time hire consultants to come in and
18  help management and the Board learn about
19  different issues facing the healthcare system?
20       A.   Occasionally.                         03:30PM
21       Q.   And would the managers on a yearly
22  basis allow external auditors to help them
23  prepare and issue financial statements in an
24  audited format?
25       A.   Yes.                                  03:30PM

Dr. Donna M. Murasko

1
2        MR. FRIESEN:  Objection.
3        A.   (Continued.)  Yes, there were
4   outside financial auditors.
5        Q.   Can you recall any other type of     03:30PM
6   outside advisors, besides consultants and
7   auditors, that you were aware of, being
8   retained by AHERF management?
9        A.   I can't recall any.
10       Q.   Now, let's talk for a moment about    03:30PM
11  the manner in which you as a Trustee utilized
12  or relied upon the services of these outside
13  professionals.
14            What was your understanding of the
15  role of AHERF's outside auditing firm, Coopers  03:31PM
16  & Lybrand, during the time you served as a
17  Trustee?
18       A.   My understanding was that Coopers &
19  Lybrand would make sure that there were no
20  abnormalities in the financial reporting for    03:31PM
21  the institution.  And I relied on that audit.
22       Q.   Can you give me anymore details --
23  knowing that you nor I aren't financial
24  people -- what abnormalities you are speaking
25  of?                                             03:31PM

Dr. Donna M. Murasko

1
2        A.   I cannot read these financials as
3   thoroughly as a financial person.
4            I was relying on external auditors
5   to look through the financials to make sure     03:31PM
6   there was no inconsistencies, inappropriate
7   activity.  Because I wasn't looking at the
8   daily logs and I wouldn't be able to recognize
9   such things because I'm not a trained eye.
10       Q.   Why would it be important for you,     03:32PM
11  as an external Trustee -- I am sorry, as a
12  Trustee, without a trained eye towards
13  financials, to have external auditors do this
14  check?
15       A.   In my field, as well as the medical   03:32PM
16  profession, we rely on consultants to give us
17  advice in areas where we are lacking
18  expertise.  It is from this perspective that I
19  relied on the auditors to give me that
20  information.                                    03:32PM
21       Q.   As an AHERF Trustee, why did you
22  hold it important to have accurate financial
23  statements?
24       A.   We couldn't survive if we weren't
25  financially sound and doing things             03:32PM

Dr. Donna M. Murasko

1
2   appropriately financially.
3        Q.   So it is fair to say that you relied
4   upon the audited financial statements as a
5   check on the internal financial statements      03:32PM
6   that were presented for audit?
7        A.   That is correct.
8            MR. FRIESEN:  Objection.
9   BY MR. UNICE:
10       Q.   And you relied on the audited         03:33PM
11  financial statements as a check on whether or
12  not the financials presented for audit were
13  presented with integrity?
14       A.   That is correct.
15       Q.   And you understood the role of the     03:33PM
16  external auditor to disclose to AHERF if
17  during the course of the audit they had
18  uncovered issues that raised integrity
19  questions with them?
20       A.   Yes.                                   03:33PM
21       Q.   Now, as your role as an AHERF
22  Trustee, to whom, to your understanding, would
23  the auditors have had to disclose issues of
24  integrity if such issues had arisen?
25       A.   I understood that it would be          03:33PM

**Page 178**

Dr. Donna M. Murasko

1    included in the reports that we got, if there
2    were any inconsistencies.
3    Q. And the reports you are speaking of
4    are the audited report?                03:33PM
5    A. The statement. As I said, the
6    letter, and then the summary of any problems
7    that may have arisen.
8    Q. And they were presented to the Board
9    on an annual basis; correct?            03:34PM
10   A. Yes, they were.
11   Q. Who presented the annual audited
12   financial statements for approval to the
13   Board?
14   A. I believe it was Dave McConnell, but  03:34PM
15   I can't remember. I can't remember who
16   presented it to us.
17       No; it was the Chairman of the Audit
18   Committee of the Board. Yes, that's who did
19   it.                                03:34PM
20   Q. Does the name David Barnes ring any
21   bells?
22   A. Yes; I believe he was Chairman of
23   the committee.
24   Q. Let's focus for a minute on a        03:34PM

**Page 179**

Dr. Donna M. Murasko

1    certain time frame.
2        To your recollection, was Mr. Barnes
3    the Chair of AHERF's Audit Committee during
4    Fiscal Years '96 and '97?              03:34PM
5    A. Years are a problem to me.
6        I know that Mr. Barnes was the head
7    of the committee for a number of years. I
8    cannot specifically tell you what years.
9    Q. So as you understood the process of   03:34PM
10   an audit, the Audit Committee would be the
11   primary committee at AHERF working with the
12   external auditing firm in terms of any
13   communication issues the auditors had to make
14   towards the firm -- towards AHERF?      03:35PM
15   A. That was my understanding.
16   Q. And once the audit report was
17   completed, it went to the Audit Committee
18   first for approval?
19   A. That was my understanding.          03:35PM
20   Q. And then it was your understanding
21   that, after approval by the Audit Committee,
22   the Chair of that committee would bring his
23   recommendation to the full Board for its
24   approval?                          03:35PM

**Page 180**

Dr. Donna M. Murasko

1    A. Correct.
2    Q. Do you ever recall not approving
3    financial statements presented for audit
4    during a Board meeting?               03:35PM
5    A. No, I do not remember -- recall that
6    at all.
7    Q. Do you have any recollection of any
8    issues with respect to the integrity of
9    AHERF's financial statements being raised by  03:35PM
10   the Audit Committee Chair at a Board meeting?
11   A. No, I do not recall that.
12   Q. Can you recall any other functions
13   of the Audit Committee, aside from presenting
14   the yearly financial statements for approval? 03:36PM
15   A. No, I can't.
16   Q. Can you recall whether or not on a
17   yearly basis the Audit Committee Chair would
18   come to the Board with a recommendation of
19   which external auditors to hire for the next  03:36PM
20   year?
21   A. I remember a discussion of who to
22   hire. I can't remember if it was an annual
23   discussion or not.
24   Q. And that discussion was raised by    03:36PM

**Page 181**

Dr. Donna M. Murasko

1    the Audit Committee Chair?
2    A. Yes, it was.
3    Q. Do you recall the Audit Committee
4    Chair coming to the Board for its approval of  03:36PM
5    the yearly audit plan presented from Coopers &
6    Lybrand?
7        MR. FRIESEN: Objection. Vague
8    as to time.
9    A. I cannot remember specifically going  03:36PM
10   through a plan.
11   Q. I am going to show you a document
12   that I only have one copy of. It has already
13   been marked as an exhibit in this case.
14       My purpose in showing it to you and    03:37PM
15   your counsel and Jeff is just to refresh your
16   memory of whether or not audit plans presented
17   at Board meetings for approval.
18       This document is Exhibit 2056. And
19   it purports to be minutes of a 6/21/96 AHERF   03:37PM
20   Board meeting. You were listed as being a
21   member present. And the document is Bates
22   labeled GOV 53197-53203.
23       Take a moment to just peruse this,
24   and then turn to Page 53200.           03:38PM

46 (Pages 178 to 181)

Page 182

Dr. Donna M. Murasko

1
2    A.   I don't remember what the plans
3  would have looked like.
4    Q.   I understand that. But my only
5  point in showing you this document is, does it 03:38PM
6  refresh your memory that part of the audit
7  process involved the Audit Committee Chair
8  coming to the Board and presenting to the
9  Board for its approval the fiscal year audit
10  plan?                              03:38PM
11    A.   It is in the report, but I still
12  don't have independent recollection of that.
13    Q.   Understood.
14        Any reason to doubt the accuracy of
15  the minutes you just reviewed?          03:39PM
16    A.   No.
17        MR. UNICE:  Jeff, do you want
18    to see it?
19  BY MR. UNICE:
20    Q.   Do you have an understanding of what 03:39PM
21  the term "clean opinion" means in the context
22  of a financial statement?
23    A.   No, I do not.
24    Q.   Did you ever attend an Audit
25  Committee meeting at AHERF?            03:39PM

Page 183

Dr. Donna M. Murasko

1
2    A.   No, I did not.
3    Q.   Do you recall ever a representative
4  of Coopers & Lybrand ever attending an AHERF
5  Board meeting?                        03:39PM
6    A.   I don't remember.
7    Q.   So, to your recollection, you didn't
8  have any personal interaction with AHERF's
9  external auditors; is that right?
10    A.   I did not.              03:39PM
11    Q.   So you relied upon presentations
12  from the Audit Committee to get an
13  understanding of how the audit was
14  progressing, as well as the results of the
15  audited report?                     03:39PM
16    A.   Yes, I did.
17    Q.   Now, as you understood the role of
18  the Audit Committee, was one of the functions
19  of that committee to address any concerns
20  raised by the independent auditors during the 03:40PM
21  course of the audit with respect to the
22  information that financial management had
23  given Coopers to audit?
24    A.   My understanding was that they were
25  the interface between the two, yes.      03:40PM

Page 184

Dr. Donna M. Murasko

1
2    Q.   And you expected the auditors to
3  raise with the Audit Committee, then, any
4  material misstatements that they would have
5  uncovered, if they would have uncovered any    03:40PM
6  material misstatements in the financials
7  presented by management for audit?
8        MR. FRIESEN:  Objection.
9    A.   I was absolutely dependent on the
10  external Audit Committee letting us know if   03:40PM
11  there was something wrong.
12    Q.   And then you would also expect the
13  auditors to report to the Audit Committee if
14  the auditors had uncovered intentional
15  misstatements in the financials presented by  03:41PM
16  management for audit?
17    A.   I was absolutely sure that, if there
18  was something wrong, external auditors would
19  tell us.
20    Q.   And the "us" in your sentence is      03:41PM
21  whom?
22    A.   That they would tell the Audit
23  Committee, and then the Audit Committee would
24  tell the full Board.
25    Q.   And you would also expect the        03:41PM

Page 185

Dr. Donna M. Murasko

1
2  external auditors, if they have uncovered what
3  they deemed to be fraud in the financial
4  statements presented for audit by management,
5  that that be disclosed to the Audit Committee, 03:41PM
6  as well?
7    A.   Yes.
8        MR. FRIESEN:  Objection.
9        You are just going to have to
10    let me get in my objection.          03:41PM
11        THE WITNESS:  I'm sorry.
12        MR. FRIESEN:  Objection.
13        THE WITNESS:  Sorry.
14    A.   (Continued.)  Yes.
15    Q.   Are you aware of whether Coopers &   03:41PM
16  Lybrand ever raised those types of concerns
17  with the Audit Committee during your time as
18  an AHERF Trustee?
19    A.   To my knowledge, no concerns were
20  raised.                            03:41PM
21    Q.   Now, if the auditors had come to the
22  Audit Committee with a concern with respect to
23  the information presented for audit, was it
24  your understanding that the role of the Audit
25  Committee would have been to investigate that 03:42PM

47 (Pages 182 to 185)

Page 186

Dr. Donna M. Murasko

1
2  matter?
3       MR. FRIESEN: Objection.
4       A.  That is my understanding, that the
5  Audit Committee would have investigated it.    03:42PM
6       Q.  And you would rely on the Audit
7  Committee's investigation in terms of arriving
8  at a resolution of whatever matters the
9  auditors brought to their attention?
10      MR. FRIESEN: Objection.    03:42PM
11      A.  That would be my assumption and
12 expectation.
13      Q.  Now, if the Audit Committee had,
14 upon disclosure of concerns by Coopers &
15 Lybrand, conducted such an investigation, and    03:42PM
16 then come forward to the Board with a
17 recommendation on how to resolve the issue,
18 what options would have been available to you
19 as a Board member?
20      MR. FRIESEN: Objection. Calls    03:43PM
21 for speculation.
22      A.  I would not know.  There was no
23 instance where this occurred.
24      My only assumption is, if there was
25 a problem, we would need to resolve it.  And    03:43PM

Page 187

Dr. Donna M. Murasko

1
2  that would be essential, that the Board follow
3  through to make sure whatever problem it was
4  was resolved.
5       But that's just speculation, because    03:43PM
6  we never had an instance.
7       MR. KOLANKSY:  Don't speculate
8  anymore.
9       THE WITNESS:  Okay.  Yes, sir.
10 BY MR. UNICE:
11      Q.  Now, the AHERF Board, let's talk
12 about it generally for a moment now, the Board
13 itself.
14      Can you recall how many members
15 there were of the AHERF Board in Fiscal Years    03:43PM
16 1996 and '97?
17      A.  I would have to go to the list and
18 count.
19      Q.  Well, this isn't a memory test, but
20 I am just trying to get a general sense here.    03:43PM
21      Take a look at Exhibit 1655, for
22 example.  It is the 10/30/97 minutes.
23      A.  Okay.
24      Q.  And there is roughly between 30 and
25 40 Board members listed?    03:44PM

Page 188

Dr. Donna M. Murasko

1
2       A.  That looks about right.
3       Q.  Roughly.  Okay.
4       Now, in the context of a Board of
5  this size, do you recall in 1996 or 1997    03:44PM
6  whether there were certain Trustees that were
7  more active than others during a normal Board
8  discussion?
9       MR. FRIESEN:  Objection.  I
10 think I asked that already.  But, go    03:44PM
11 ahead.
12      A.  In different meetings, different
13 people spoke, yes.
14      MR. UNICE:  And I think on
15 cross-examination we are allowed to get    03:44PM
16 into issues that were raised on direct,
17 and that's all I am doing.
18 BY MR. UNICE:
19      Q.  Can you recall for me any of the
20 individuals who you thought were more active    03:44PM
21 than other members of the Board?
22      A.  Mr. Barnes, Mr. Edelman.  And the
23 AHERF Board, they were the two that stand out
24 in my mind.
25      Q.  Does the name Ira Gumberg ring any    03:45PM

Page 189

Dr. Donna M. Murasko

1
2  bells to you?
3       A.  Yes.  He did sometimes.
4       Q.  Did what?
5       A.  He spoke out sometimes.    03:45PM
6       Q.  In your experience on the AHERF
7  Board, did you find that on occasion Mr.
8  Edelman and Mr. Barnes would probe management
9  and ask questions regarding the presentations
10 management put forth?    03:45PM
11      A.  Yes.
12      Q.  Would the same go for Mr. Gumberg,
13 as well?
14      A.  Yes.
15      Q.  Likewise, on the committees on which    03:45PM
16 you sat, can you recall any individuals that
17 stand out as committee leaders, so to speak?
18      A.  I sat on no AHERF committees.
19      Q.  How about on subsidiary Boards; for
20 example, the AUHS?    03:45PM
21      A.  What is the question?
22      Q.  Can you recall any individuals that
23 stand out in your mind as leaders of that
24 committee or subsidiary Board?
25      A.  Yes.    03:46PM

48 (Pages 186 to 189)

Page 190

Dr. Donna M. Murasko

1
2   Q.   Who were they for me?
3   A.   Mr. Palmer, Mr. Neuwirth, Mr. Cook,
4   and Dorothy Brown.
5   Q.   And which entity are we discussing?   03:46PM
6   A.   AUHS.
7   Q.   The Board itself?
8   A.   Uh-huh.
9   Q.   And, likewise, you found that from
10  time to time those individuals would challenge 03:46PM
11  management with their presentations that
12  management brought for the Board's approval?
13  A.   Yes.
14  Q.   Did you have any sense while you
15  were an AHERF Trustee of any leaders on the   03:46PM
16  Audit Committee?
17  A.   The only person that comes to mind
18  is Mr. Barnes.
19  Q.   And what makes you form that
20  impression?                        03:46PM
21  A.   He was the one who made the
22  presentations and asked many of the questions
23  regarding financials in general.  You know,
24  the Audit Committee itself, he made the
25  presentations.                     03:47PM

Page 191

Dr. Donna M. Murasko

1
2   Q.   At the AHERF Board meetings?
3   A.   Yes.
4   Q.   I believe Mr. Friesen asked you if
5   at some point you began to lose confidence in 03:47PM
6   either Mr. Abdelhak or Mr. McConnell.
7        Do you remember discussing that?
8   A.   Yes.
9   Q.   At any point during your tenure on
10  the AHERF Board did you have any concerns with 03:47PM
11  the integrity of either Mr. Abdelhak or Mr.
12  McConnell in leading the AHERF system?
13  A.   I don't remember any specific
14  instance where I questioned their integrity.
15  Q.   Do you recall whether any other   03:47PM
16  Board members expressed to you their concerns
17  with respect to the integrity of either Mr.
18  Abdelhak or Mr. McConnell?
19  A.   I don't have any recollection of
20  such discussion.                   03:48PM
21  Q.   Did you ever hear at a Board meeting
22  any Audit Committee member who was present at
23  that meeting question the integrity of either
24  Mr. Abdelhak or Mr. McConnell?
25  A.   I don't remember anything like that. 03:48PM

Page 192

Dr. Donna M. Murasko

1
2   Q.   Now, from time to time as a Board
3   member you would receive internal financial
4   statements with those large Board packets that
5   were sent to you before the meeting; correct? 03:48PM
6   A.   Yes.
7   Q.   Were those typically sent quarterly?
8   A.   Right before every Board meeting.
9   So, yes, I guess quarterly.
10  Q.   And then once a year you would be   03:49PM
11  presented with the audited financial
12  statements for that whole fiscal year;
13  correct?
14  A.   Yes.
15  Q.   At any time do you ever recall   03:49PM
16  discussing at a Board meeting any
17  inconsistencies between the audited financial
18  statements and the financial statements you
19  were provided on a quarterly basis?
20  A.   I don't remember that discussion.   03:49PM
21  Q.   Generally as a Board member, can you
22  describe to me how you would use the internal
23  quarterly financial statements to assess the
24  system's direction?
25  A.   I would read them.  I would pull out 03:49PM

Page 193

Dr. Donna M. Murasko

1
2   what I had for the last quarter.  I would
3   compare them to see how we were going, just to
4   see if we're on target.
5        But I pulled out the previous Board  03:49PM
6   book to compare with the current one.
7   Q.   Explain to me, if it is different at
8   all, what you would do with the audited
9   financial statements to help you as a Board
10  member gauge how the system was performing?  03:50PM
11  A.   I would take the most recent --
12  whatever report was closest to that audit
13  report, and pull it out to see if they looked
14  about the same.
15  Q.   Do you ever recall at an AHERF Board 03:50PM
16  meeting not approving the audited financial
17  statements that the Audit Committee Chair
18  presented for approval?
19  A.   I do not remember such an action.
20  Q.   Were you aware that in the fall of   03:50PM
21  1998, after AHERF had filed for bankruptcy, a
22  press release was issued stating that the
23  Fiscal Year 1997 financial statements should
24  no longer be relied upon?
25  A.   I would not be able to tell you that 03:51PM

49 (Pages 190 to 193)

Page 194

Dr. Donna M. Murasko

1         Dr. Donna M. Murasko
2  was 1997.
3         But I do remember a release saying
4  that there was one year that we couldn't rely
5  on the financials. I wouldn't have been able  03:51PM
6  to tell you now that it was '97. It was a
7  year, though.
8     Q.  How did you learn about that
9  release?
10    A.  I don't remember.                     03:51PM
11    Q.  Can you recall what reaction you had
12 upon learning about it?
13    A.  Yes.
14    Q.  Explain that to me.
15    A.  My reaction was, I thought they were  03:51PM
16 audited, how can there be something wrong.
17 That was my gut reaction.
18    Q.  So you were surprised that there was
19 a need to restate the financial statements
20 because they had been audited by an          03:51PM
21 independent firm that you relied upon;
22 correct?
23    A.  Absolutely.
24    Q.  So it is fair to say you were
25 surprised upon learning of the press release? 03:52PM

Page 195

Dr. Donna M. Murasko

1 
2     A.  That's a very fair description.
3     Q.  Did you discuss your reaction to the
4  press release with any other Board members?
5     A.  Not to my recollection.              03:52PM
6     Q.  Do you recall discussing the press
7  release with any AHERF managers?
8     A.  I don't remember.
9     Q.  Finally, do you recall discussing
10 the AHERF press release with any of Coopers &  03:52PM
11 Lybrand's auditors who worked on the AHERF
12 audit?
13    A.  Definitely not.
14    Q.  I have given you, Dr. Murasko,
15 Exhibit 1992. It has already been marked in   03:52PM
16 this case. They are -- well, the exhibit is
17 an agenda and partial minutes to a meeting of
18 the 8/27/1998 AHERF Board.
19       I will represent to you that a
20 thorough search has not been able to locate   03:53PM
21 official copies of the minutes, and this is
22 all we were able to find.
23       On the first page, there is a column
24 for Members Present, and you are listed as
25 attending.                                    03:53PM

Page 196

Dr. Donna M. Murasko

1 
2     Do you see that?
3     A.  Yes.
4     Q.  Do you recall sitting here today
5  attending this meeting?                       03:53PM
6     MR. KOLANKSY:  When was the
7  bankruptcy?
8     MR. UNICE:  The bankruptcy was
9  filed July 21, 1998.
10    A.  I don't remember if I attended this   03:53PM
11 or not. I don't know.
12    Q.  Upon reviewing the members present,
13 any reason to doubt that you attended?
14    A.  No.
15    Q.  Now, turn for me, if you will, to    03:53PM
16 the last page of this exhibit.
17       Are you there with me?
18    A.  Yes, I am.
19    Q.  And there is some handwriting on
20 this page.                                    03:54PM
21    A.  Yes.
22    Q.  After looking at many examples of
23 yours, I assume you are going to tell me this
24 is not your handwriting?
25    A.  This is not my handwriting.          03:54PM

Page 197

Dr. Donna M. Murasko

1 
2     Q.  Now, I am going to point your
3  attention to the middle of this page. And I
4  am going to read some of the text. If I
5  misread it, let me know.                      03:54PM
6        It says, "Also discussed auditors, C
7  & L has been for long time. Merged with P &
8  W. Think will have serious conflicts with C &
9  L. Recommend," or, "rec changing. KPMG or
10 Deloitte both good firms. Decided on KPMG      03:54PM
11 for," I believe that's, "W," for West, "and
12 Deloitte to do procedures for E," or East, "if
13 court approves."
14    MR. FRIESEN:  Well, you missed
15 one line, which is an at sign, "to           03:54PM
16 retain."
17    MR. UNICE:  Thank you. Thank
18 you. That's right below the merge with
19 PriceWaterhouse. Thank you.
20 BY MR. UNICE:                                 03:54PM
21    Q.  Does this refresh your memory at all
22 as to any discussions at an AHERF Board
23 meeting regarding the decision to not retain
24 Coopers & Lybrand, or PriceWaterhouse Coopers?
25    A.  I don't remember this discussion.    03:55PM

Page 234

```
1
2          INDEX
3   WITNESS                    PAGE
4   DR. DONNA MARIE MURASKO
5      By Mr. Friesen     4, 223, 232
6      By Mr. Unice          171, 231
7            - - -
8          EXHIBITS
9   NO.     DESCRIPTION         PAGE
10  2515 Packet of Special Meeting of
        the Board of Trustees of AHERF,
11      9/16/96              59
12  2516 Book II, Annual Meeting of the
        Board of Trustees of AHERF,
13      12/12/96             75
14  2517 Handwritten notes       92
15  2518 AHERF Budgeted Colsolidated
        Financial Statements, FY 1998  101
16
    2519 AHERF Consolidated Financial
17      Statements, 9/30/97     112
18  2520 Memo from Mr. Morrison, to
        Members of the Resource
19      Management Committee of AUHS,
        10/15/97             124
20
    2521 AUHS Financial Statements,
21      12/31/97             126
22  2522 Packet of Meeting of the Board
        of Trustees of AHERF, 3/12/98  130
23
    2523 Handwritten notes      142
24
25
```

Page 235

```
1
2          INDEX (Continued.)
3          EXHIBITS
4   NO.     DESCRIPTION         PAGE
5   2524 Fax from Ms. Anirim, to Dr.
        Murasko, 4/20/98      147
6
    2525 Handwritten notes      147
7
    2526 Packet of Meeting of the
8       Board of Trustees of AHERF,
        10/30/97             156
9
    2527 Packet of Meeting of the
10      Resource Management Committee
        of AHERF, 10/16/97    158
11
    2528 1995 Trustees' Evaluation   169
12
            - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 236

```
1
2          I have read the foregoing
3   transcript of my examination given on
4   Thursday, April 8, 2004, and it is true,
5   correct and complete, to the best of my
6   knowledge, recollection, and belief,
7   except for the corrections noted hereon
8   and/or list of corrections, if any,
9   attached on a separate sheet herewith.
10
11
12
13      -------------------
        DR. DONNA MARIE MURASKO
14
15
16
17
18
    Subscribed and sworn to
19  before me this_____day
    of_____, ____
20
21
22
23  -------------------------
    Notary Public
24
25
```

Page 237

```
1                    `
2          I HEREBY CERTIFY that the
3   proceedings and evidence are contained
4   fully and accurately in the stenographic
5   notes taken by me upon the foregoing
6   matter on Thursday, April 8, 2004, and
7   that this is a correct transcript of
8   same.
9
10
11
12
13      --------------------------
14      Debra Ann Whitehead
15
16
17
18
19
20          (The foregoing certification of
21  this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)
25
```

60 (Pages 234 to 237)

LEGALINK MANHATTAN (212) 557-7400

**O'Brien Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *THOMAS O'BRIEN*
*October 16, 2003*

---

# *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

O'BRIEN, THOMAS



**LEGALINK**

A WORDWAVE COMPANY

Page 86

1  A.   Yes.  I'd say that's a legitimate statement.
2  Q.   Okay.  And it was your practice, and you don't
3       have any reason to believe you varied from it,
4       to review the audited financial statements when
5       you received them?
6  A.   That's correct.
7  Q.   And I understand that Exhibit 1653, for reasons
8       stated in the package, was a draft set of the
9       audited 1997 financial statements, but you
10      don't have any reason today to doubt that you
11      would have reviewed that draft when it was
12      forwarded to you?
13 A.   If it was forwarded to me, I'm sure I did.
14 Q.   And when you received those financial
15      statements and, in both instances, ultimately
16      the clean opinions the audit report contained
17      within them, what did you understand that to
18      mean?
19 A.   It means, as any clean opinion does, that, to
20      the best of their ability, the auditors have
21      reviewed the financial data for the period so
22      stated, reviewed the internal controls and the
23      integrity of them, and that, in their opinion,
24      those statements fairly present the financial
25      condition and the financial results of whatever

Page 87

1       period they chose to report on.
2  Q.   Did you at the time you received those clean
3       opinions believe them to be important to the
4       enterprise?
5  A.   Well, it was one of the most important things.
6       I mean, when you're on a board like that, you
7       look at a third-party provider of financial
8       information, in this case audited information,
9       and that gives you great comfort that a third
10      party has reviewed the financial data and
11      opined that it fairly presents the condition
12      and represents the operations of the stated
13      period.
14 Q.   Did you consider the third-party aspect of this
15      review a check on internal financial
16      management?
17           MR. FRIESEN:  Objection.
18 A.   Well, as in any full audit, they clearly review
19      certain of the internal controls.  There's no
20      question about that.
21 Q.   And in your everyday job, you knew -- or as a
22      consequence of your experience in your everyday
23      job, you knew that audited financial statements
24      were reviewed by people outside the
25      organization itself as well, is that fair to

Page 88

1       say?
2  A.   I'm not sure I follow what you mean.
3  Q.   That -- I think what I mean to say is that when
4       you were a member of the AHERF board, you
5       understood that the audited financial
6       statements that you received and reviewed were
7       also made available to parties outside of
8       AHERF, for instance, creditors?
9  A.   Oh, certainly.  Yes.
10 Q.   And that they reviewed and relied upon those
11      statements as well?
12 A.   And bond agencies and, you know, investment
13      bankers and so forth and so on.
14 Q.   And those various parties you knew to receive
15      and review those financial statements and rely
16      upon them at the time they received them?
17 A.   Certainly.
18 Q.   So that the audited financial statements were
19      important internally for management purposes
20      and externally to others, at least as you
21      understood it at the time?
22 A.   That's correct.
23 Q.   Did you use the audited financial statements
24      that you reviewed for fiscal year 1996 and
25      fiscal year 1997 -- and for the latter, either

Page 89

1       in draft or final form -- to help you gauge the
2       performance of the enterprise?
3  A.   Yes.  I'd say that's a legitimate question,
4       particularly the fiscal year 1997, seeing that
5       they were cash flowing at a meaningful rate
6       during that previous 12 months.
7  Q.   Let me ask you to flip quickly back to the 1996
8       audited financial statements, and page 3 at the
9       bottom of those which you'll find at Exhibit
10      1661.
11           MR. SHAPIRA:  What's the page number?
12           MR. JONES:  I'm sorry.
13           THE WITNESS:  1661.
14           MR. JONES:  It's Exhibit 1661, page 3
15      at the bottom of the page.
16 BY MR. JONES:
17 Q.   That page presents the Consolidated Statement
18      of Operations, is that right?
19 A.   I have 1661 here which is also page 55.
20 Q.   No.  I'm sorry.  It was Exhibit 1661.
21           MR. SHAPIRA:  You want him to look at
22      page 2, right?
23           MR. JONES:  Page 3, the Statement of
24      Operations.
25           MR. SHAPIRA:  Right at the beginning.

23 (Pages 86 to 89)

Page 90

1          THE WITNESS:  Right at the beginning.
2          MR. SHAPIRA:  Right.
3  BY MR. JONES:
4  Q.    And I think in response to questions by
5       Mr. Friesen, you indicated that you did look at
6       net income as a part of your review of the
7       financial statements, am I right?
8  A.    Um-hum.
9  Q.    Is that a yes?
10  A.    Let me -- I was reading.  I didn't hear you.
11  Q.    I'm sorry.  I think in response to questions
12       from Mr. Friesen, you said you paid particular
13       attention to the statement of operations and
14       the net income line, is that correct?
15  A.    Yeah.  One of the things, yeah.
16  Q.    And here we see the net income line has a
17       figure of what?  Before extraordinary item and
18       change in accounting principle, the figure is
19       six-and-a-half million dollars, roughly?
20  A.    That's correct.
21  Q.    And so in 1996, the audited financial
22       statements reflected net income before
23       extraordinary item and change in accounting
24       principle of $6.5 million, and I think that the
25       figure in 1997 you and Mr. Friesen discussed

Page 91

1       was a little over $20 million, is that fair to
2       say?
3  A.    That's correct.
4  Q.    So the trend is up at least at year end --
5       fiscal year end 1997?
6          MR. FRIESEN:  Objection.
7  A.    That's correct.
8  Q.    When seeing these financial statements and
9       seeing the trend we just discussed, you used
10       the information in the statements to help you
11       gauge the financial performance of the
12       enterprise and the financial ability of
13       management to run the enterprise too, is that
14       fair to say?
15  A.    That's correct.  Yes.  Um-hum.
16  Q.    You also, I think, testified that you recalled
17       receiving at least quarterly internal financial
18       statements, is that right?
19  A.    To the best of my recollection, we got those.
20       There were interim statements.  Quarterly, I
21       presumed, but there were interim statements,
22       most of which, as I say, I received and then
23       also got updates at the AUMC meetings.
24  Q.    And do you recall ever receiving a quarterly
25       internal financial statement -- strike that.

Page 92

1          Do you recall ever receiving an
2       audited financial statement that caused you to
3       question the accuracy of an internal financial
4       statement?
5  A.    I don't believe so.
6  Q.    Did you use the audited financial statements as
7       a part of the tools available to you to monitor
8       performance of particular initiatives at AHERF,
9       for instance, the acquisition strategies that
10       we discussed earlier today?
11  A.    Well, I would say this:  I would say that we
12       weren't divorced from the realities that
13       certain things were losing money and that there
14       were negative trends in certain things, but
15       when you looked at the audited financials and
16       saw that they were still cash flowing in a
17       meaningful way, that gave you comfort that
18       while things weren't wonderful, they were
19       clearly still operationally solid.
20          THE VIDEOGRAPHER:  Excuse me.  I have
21       to change tapes.  We are now going off the
22       record.  The time is 12:38 p.m.
23              - - - -
24       (There was a recess in the proceedings.)
25              - - - -

Page 93

1          THE VIDEOGRAPHER:  We are now going
2       back on the record.  The time is 12:39 p.m.
3  BY MR. JONES:
4  Q.    We're back on the record after a brief break,
5       Mr. O'Brien.
6          When you were a member of the AHERF
7       board, did you expect Coopers & Lybrand to
8       raise, either with the audit committee or with
9       the board itself, any material misstatements in
10       the financial statements presented for their
11       audit that they became aware of?
12          MR. FRIESEN:  Objection.
13  A.    Well, I would say, again, generically, in any
14       board, I would expect the auditor to raise
15       those kinds of issues probably through the
16       audit committee, and then up to the full board.
17  Q.    Would you also expect Coopers & Lybrand during
18       this time period to have raised with the audit
19       committee or ultimately the full board any
20       intentionally misstatements they found in the
21       statements presented for their audit?
22          MR. FRIESEN:  Objection.
23  A.    Without question.
24  Q.    Would you also expect Coopers & Lybrand, and
25       did you while you were a member of the board,

Page 94

1    to raise with the audit committee or the full
2    board any concerns that Coopers & Lybrand had
3    with the integrity or competence of financial
4    management?
5         MR. FRIESEN: Objection.
6    A.   Absolutely.
7    Q.   Why is that so important?
8    A.   Well, I think it's, again, just prima facie.
9         You know, it's obvious that's what the board
10        hires outside auditors to do is, you know,
11        fundamentally report on the integrity of the
12        financial data which includes the integrity of
13        the management that's preparing them.
14   Q.   Did you -- strike that.
15        Before the bankruptcy was
16        announced -- and I think we talked a little bit
17        about the fact that you learned about it
18        through means you don't recall, but it must
19        have been at or about the time of the
20        bankruptcy. When you learned of it, and at any
21        time before it, did you have any reason to
22        question the accuracy of the audited financial
23        statements presented to you?
24   A.   No. Really, no. None.
25   Q.   If Coopers & Lybrand had told you that the

Page 95

1    fiscal year 1996 or 1997 financial statements
2    presented for their audit were indeed
3    materially misstated and that they were,
4    therefore, going to issue an adverse opinion on
5    those statements, would that have caused you
6    concern?
7         MR. FRIESEN: Objection.
8    A.   Well, clearly.
9    Q.   And for the jury, why is that such a concerning
10        thing?
11        MR. FRIESEN: Objection.
12   A.   Well, you're obviously looking as, again, a
13        member of the board or any other constituency
14        where these things are used. You're looking to
15        make sure that they are high integrity, and you
16        base judgments on performance and risk, all
17        those things.
18   Q.   What kind of options does a board member and a
19        board have when faced with these kinds of
20        circumstances?
21        MR. FRIESEN: Objection.
22   A.   With what kinds of circumstances?
23   Q.   When an auditor comes to the board or the audit
24        committee and tells them that the financial
25        statements presented for their audit were

Page 96

1    indeed materially misstated and an adverse
2    opinion is to be issued?
3         MR. FRIESEN: Objection. Vague.
4    A.   Well, I mean, speaking again on a generic
5         basis, you would clearly -- the audit committee
6         would clearly probably establish or the board
7         would establish a special committee to review
8         those allegations and determine whether they
9         are correct or not and would get to the bottom
10        of whether or not they are, in fact, correct.
11   Q.   So you have the option of making inquiry?
12   A.   Certainly.
13   Q.   And indeed you also have the option of
14        recharging the auditors to expand their
15        procedures and scope, perhaps?
16        MR. FRIESEN: Objection.
17   A.   I mean, all of that would come from this
18        special committee or whatever you would set up
19        to look into those allegations by the auditor.
20   Q.   Is engagement of additional consultants a part
21        of the options that committee would have?
22        MR. FRIESEN: Objection.
23   A.   There would be all kinds of different options,
24        but that -- it would be a full inquiry into the
25        allegations. That's all I would say.

Page 97

1    Q.   If Coopers & Lybrand had told you that the
2         fiscal year 1996 or 1997 financial statements
3         presented for their audit were intentionally
4         misstated, what reaction would you have had?
5         MR. FRIESEN: Objection. Calls
6    for -- sorry.
7    A.   I would have been quite alarmed. Yeah.
8         MR. FRIESEN: Calls for speculation.
9    A.   Yes.
10   Q.   You may answer.
11   A.   I can answer?
12        MR. SHAPIRA: Yeah, you can go ahead.
13   A.   Yeah. I'd be quite alarmed, obviously.
14   Q.   And would you have the same kinds of options we
15        just discussed?
16   A.   I would demand them.
17   Q.   And if the result of the inquiry or the options
18        that we discussed led you to question or
19        brought into question the integrity of
20        financial management or its competence, what
21        other options did you have at that point?
22        MR. FRIESEN: Objection.
23   A.   Well, you clearly replace them.
24   Q.   If Coopers & Lybrand had told you that the net
25        income on the fiscal year -- that net income on

25 (Pages 94 to 97)

Page 98

1   the fiscal year 1996 statement of operations
2   presented for audit had been overstated
3   contrary to Generally Accepted Accounting
4   Principles by approximately $80 million, what
5   reaction would you have had?
6          MR. FRIESEN: Objection.
7   A.   My reaction would have been, again, quite
8   alarmed.
9   Q.   And you would have had the same options and the
10   same recourse?
11          MR. FRIESEN: Objection.
12   A.   Yeah, and, again, those were all functions and
13   roles of the audit committee that would
14   immediately deal with those issues and report
15   to the board.
16   Q.   Your answer wouldn't change if I changed the
17   circumstance to fiscal year 1997 and a similar
18   report from the auditors about the
19   overstatement of net income, is that fair to
20   say?
21   A.   Um-hum.
22          MR. FRIESEN: Objection.
23   A.   Certainly.
24   Q.   A part of your options at that point, either in
25   1996 or in 1997, would have been to order that

Page 99

1   the financial statements be restated, is that
2   accurate?
3          MR. FRIESEN: Objection.
4   A.   Had we been made aware by an independent
5   auditor that there was a meaningful
6   misstatement, obviously, it would have been my
7   reaction that we would have to go back in, do
8   the proper accounting, and restate the results.
9   Q.   If Coopers & Lybrand had told you that --
10   during the time you were on the board had told
11   you that they had concerns about the integrity
12   or competence of financial management,
13   including Mr. McConnell or Mr. Abdelhak, what
14   reaction would you have had?
15          MR. FRIESEN: Objection.
16   A.   I would have wanted to get to the bottom of it
17   quickly, and probably if it was corroborated
18   and nothing was done, I would have resigned.
19   Q.   And the option about doing something would be
20   to --
21   A.   To eliminate them.
22   Q.   That is Mr. Abdelhak and Mr. McConnell?
23   A.   Yeah.
24   Q.   If you would have been informed by Coopers &
25   Lybrand that the fiscal 1996 or 1997 financial

Page 100

1   statements were the product of fraud or
2   suspected fraud on the part of internal
3   financial management, what would your reaction
4   have been?
5          MR. FRIESEN: Objection.
6   A.   The same as my other answers.
7   Q.   It would have been a concerning event,
8   obviously?
9   A.   Yes.
10   Q.   Would audit revelations like these that we have
11   just discussed have affected your view about
12   the financial success of the strategy in place
13   at AHERF at the time?
14          MR. FRIESEN: Objection. I don't
15   know what --
16   A.   I'm not sure.
17          MR. FRIESEN: -- revelations you're
18   talking about.
19   A.   Yeah. You better be a little more specific.
20   Q.   Well, let me start with -- yeah. Let me try
21   that.
22          If the revelations we just discussed
23   about material misstatements and suspected
24   integrity or competence problems among
25   financial management, if those revelations had

Page 101

1   been made to you or any of them, would that
2   have given you some concern about the validity
3   of any financial success that management was
4   claiming in operations?
5          MR. FRIESEN: Objection.
6   A.   Yeah, in all likelihood. It depended where the
7   misstatements were occurring or the fraud was
8   occurring, but, by and large, it clearly would
9   have been an overstatement, if that was one of
10   the hypothetical situations you said, so that
11   the enterprise was not performing at the levels
12   that we had assumed it was.
13   Q.   You mentioned that you thought you had heard
14   something about ex-officio appointments to
15   committees like the audit committee based on
16   chairpersonships at subsidiary boards. Do you
17   recall that testimony?
18   A.   I do recall that that's what I said. I
19   hypothesized that, yes.
20   Q.   Yeah, and I guess my question is do you really,
21   now as you sit here today, recall whether --
22   from whom you heard that and whether indeed it
23   was a fact that there was such an ex-officio
24   membership program?
25          MR. FRIESEN: Objection. Asked and

26 (Pages 98 to 101)

Page 102

1    answered.
2  A.   Yeah, I really -- somewhere there was a
3       document that indicated that.  Yeah.  I think
4       it probably got back to that restructuring and
5       fourth quarter -- fourth calendar quarter of
6       '97.
7  Q.   You were asked a question about, I think, what
8       you believed to be either the reason or part of
9       the reason for AHERF's bankruptcy at the time
10      you heard of it, what you believed at the time.
11      Do you recall that testimony?
12 A.   Somewhat.
13 Q.   Very briefly.  My question to you is, at the
14      time, you didn't do an in-depth analysis about
15      reasons for AHERF's bankruptcy, is that fair to
16      say?
17 A.   That's correct.  That was -- I don't even know.
18      I think that was after I had resigned from the
19      board.
20          MR. JONES:  I believe that's all I
21      have.
22          MR. FRIESEN:  Let me just ask a
23      couple of follow-up questions.
24          THE WITNESS:  Sure.
25              - - - -

Page 103

1              EXAMINATION
2              - - - -
3  BY MR. FRIESEN:
4  Q.   Mr. Jones gave you a number of hypotheticals
5       about Coopers & Lybrand hypothetically telling
6       you various things.  Is it fair to say that you
7       don't know, sitting here today, apart from
8       setting up a special committee which is what
9       you've testified to, precisely what you would
10      do as a board member if any of those
11      hypotheticals had actually happened?
12          MR. JONES:  Object to form.
13 A.   What I precisely would do?
14 Q.   Right.
15 A.   I know precisely what I would do, yes.  I would
16      demand to have a special committee look into
17      the allegations.  That special committee would
18      probably have been from the board, not just
19      from the audit committee, because of the
20      seriousness of the allegations.
21 Q.   Okay.  If you will turn back to Exhibit 1661.
22 A.   Is it this one?
23 Q.   Yeah.  That's the '96 fiscal year audited
24      financials, and if you go to page JB 01608
25      which is the Consolidated Statement of

Page 104

1    Operations that I think Mr. Jones pointed out
2    to you.
3  A.   Yes.
4  Q.   And you see that investment income is
5       $74,075,000?
6  A.   Right.
7  Q.   And then net income after -- sorry.  Net income
8       before extraordinary item and change in
9       accounting principle is $6,547,000?
10 A.   That's correct.
11 Q.   Do you recall being aware at the time that you
12      received this that but for the investment
13      income, the net income would be tens of
14      millions of dollars less?
15          MR. JONES:  Object to form.
16 A.   Well, I mean, on the face of it, but as I said
17      in the earlier one, if you look at the
18      depreciation and amortization at over
19      $95 million, those are non-cash charges, so
20      that you end up with a cash flow of over
21      $100 million before the extraordinary items,
22      and, therefore, investment income was a way --
23      and investment income was a significant factor
24      for the hospital in any event.
25 Q.   Just for the jury, what do you mean by non-cash

Page 105

1    charges?
2  A.   Charges that are against revenue but do not
3       really take any cash.  So when you look at an
4       enterprise's ability to generate cash from
5       their operation, you add back into your net
6       income non-cash charges such as depreciation.
7          MR. FRIESEN:  Okay.  I don't have any
8       further questions.
9          MR. JONES:  And I don't either.
10         THE WITNESS:  Bravo.
11         THE VIDEOGRAPHER:  If there are no
12      further questions, this deposition is
13      concluded.  We are now going off the record.
14      The time is 12:54 p.m.
15              - - - -
16     (The proceedings were concluded at 12:54 p.m.)
17              - - - -
18
19
20
21
22
23
24
25

27 (Pages 102 to 105)

Page 106

1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF ALLEGHENY          )  SS:
3       I, JoAnn M. Brown, RMR, CRR, a Court Reporter
4   and Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   THOMAS H. O'BRIEN, was by me first duly sworn to
7   testify to the truth; that the foregoing deposition
8   was taken at the time and place stated herein; and
9   that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 21st day of
23  October, 2003.
24      _____
25              Notary Public

Page 107

1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T
2
3       I, THOMAS H. O'BRIEN, have read the foregoing
    pages of my deposition given on Thursday, October 16,
    2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    In all other respects, the transcript is true and
20  correct.
21      _____
            THOMAS H. O'BRIEN
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24      _____
            Notary Public
25      AKF Reference No. JB77734

28 (Pages 106 to 107)

**Palmer Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

### *ROBERT PALMER*
*August 8, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**PALMER, ROBERT**



**LEGALINK**

A **WORDWAVE** COMPANY

ROBERT PALMER

Page 110

1    Sherif Abdelhak on the day that I
2    called, whatever day that was, was not -- was
3    traveling or something, was not available, but
4    Mr. Snyder said he would get word of my concern
5    to Mr. Abdelhak and that he would call me as
6    soon as he could, and, in fact, Mr. Abdelhak
7    called me the next morning.
8    Q.    And what was your concern that you wanted to
9        express to Mr. Abdelhak and which you did
10       express to Mr. Snyder?
11   A.    It was concern that this transaction had been
12       completed without a thorough review with all of
13       the trustees, as opposed to a limited number of
14       trustees, particularly trustees with a history
15       in the Philadelphia, the Eastern Pennsylvania
16       market, and I was concerned about whether it
17       fit with the strategy that I believe we were
18       following, and I was concerned that the
19       operational results of this transaction might
20       well not be favorable for our challenged
21       operating position, financial operating
22       position.
23   Q.    And your concern was for AHERF as the whole;
24       correct.
25   A.    Yes.

Page 111

1    Q.    Even though this transaction was conducted
2        by --
3    A.    As well as by eastern parts and the whole.
4    Q.    Okay. Now, you told me previously that this
5        transaction was done through SDN, which I
6        believe you said is a company owned by
7        three AHERF executives; correct?
8    A.    Yes, mm-hmm.
9    Q.    Why were you concerned about its effect on
10       AHERF if this was done by a separate
11       corporation?
12   A.    Because I believed I have -- I'm not an
13       investment banker, but, in fact, I have a fair
14       amount of familiarity with investment banking,
15       merger and acquisition work.
16           It's -- it is not uncommon for a
17       transaction to be done through a special
18       purpose company, but I thought it was quite
19       uncommon and not that wise to allow the
20       announcement -- and particularly in a community
21       service organization, which a hospital, a
22       medical school, nursing school and all of
23       these, I mean healthcare is really active
24       within the community, particularly when you
25       have a school of public health at any rate,

Page 112

1    once the announcement -- and the university,
2    Graduate system was known, well known to be a
3    troubled system in terms of financial
4    difficulties.
5        Once it would break in the newspaper
6    and the people would read it as not SDN, they
7    would read it as Allegheny buys Graduate, it
8    would possibly not allow the further steps of
9    the analysis, the diligence, et cetera, to
10   really have the effectiveness that it ought to
11   have because the public would have assumed that
12   that was a done deal; and if in the diligence
13   process over the coming weeks and months it was
14   judged by management and board of Allegheny
15   that this wouldn't be the right transaction,
16   the ability to undo it in the mind of the
17   public, et cetera, would be very, very
18   difficult.
19   Q.    And did your concerns come to fruition in that
20       after the announcement was made in the
21       newspaper, the AHERF management and board were
22       not able to take all the steps of diligence
23       which you would expect with regard to the
24       Graduate institutions prior to making a
25       decision about whether the Graduate institution

Page 113

1    should become part of AHERF?
2        MR. JONES: Object to form and
3    foundation.
4    A.    The form's very difficult. I'm going to break
5        up a couple of the pieces.
6            Was there a diligence exercise done?
7        Yes. Was it a thorough exercise? I believe it
8        was. But did at least this trustee feel that
9        he had the ability to reach a decision without
10       bearing the weight on his shoulders of
11       tremendously disappointing the Philadelphia
12       marketplace from people looking for healthcare,
13       people looking for education, people looking
14       for jobs who had jobs in the Graduate Health
15       System, et cetera, the expectations that had
16       been built up, I felt that my mind didn't have
17       the total freedom that it should have had to
18       weigh all the factors and the diligence. Yes,
19       the diligence was done.
20   Q.    Do you recall if any trustee ever voiced to you
21       that following the diligence but prior to
22       making the decision as to whether to include
23       Graduate as part of AHERF, that they too felt
24       as though that their decision was hampered by
25       the manner in which management had initially

29 (Pages 110 to 113)

ROBERT PALMER

Page 114

1    announced the deal between SDN and The Graduate
2    Hospitals?
3         MR. JONES: Object to form.
4    A.  Yes.
5    Q.  Do you recall which trustees raised those
6    concerns with you?
7         THE WITNESS: Is there a need for me
8    to mention names?
9         MR. McCLENAHAN: Yeah, I think that
10   he's titled to that information.
11   A.  Dorothy Brown.
12        MR. JONES: We couldn't hear you, I'm
13   sorry.
14   A.  Dorothy Brown would have been one that comes to
15   mind. I have a feeling there might have been
16   one or two others, but I don't have a clear
17   recollection of that. Dorothy Brown would have
18   been one who shared my concerns.
19   Q.  Did you ever raise your concerns on this issue
20   with the full board?
21   A.  Yes.
22   Q.  And this would have been at a board meeting?
23   A.  I believe so.
24   Q.  Do you recall if Ms. Brown ever voiced her
25   concerns about how?

Page 115

1    A.  Yes.
2    Q.  If I can turn you back to Exhibit 2099, I think
3    you referred to earlier that you had made
4    three --
5    A.  I'm sorry?
6    Q.  Your letter, the August 19th letter. -- that
7    you had made three points concerning your
8    concerns, and I believe the letter indicates
9    that you were not going to be able to attend a
10   meeting that Mr. Abdelhak was going to conduct
11   with the trustees, so you wanted these points
12   addressed?
13   A.  Yes.
14   Q.  And the first point I believe says, Why did
15   management not use the board for any advance
16   consultation when the transaction was of such
17   great strategic, financial, and operational
18   magnitude.
19        Did you ever receive an answer from
20   Mr. Abdelhak to that question?
21   A.  Yes, I did receive an answer. The answer was
22   that selected board members, particularly some
23   of the most active board members and executive
24   committee board members, were consulted, but
25   there was the acknowledgement that the full

Page 116

1    board -- and maybe my letter would have been
2    more articulate if when I said why did
3    management not use the board, I might have said
4    the full board. There were board members. I
5    mean I learned in my dialogue with Mr. Snyder,
6    with Mr. Abdelhak, and talking as the days went
7    by with some of the board members, yes, there
8    were -- there were some board members who were
9    consulted with as that transaction was
10   developing.
11   Q.  Do you recall if any trustee ever voiced the
12   opinion that they felt that the bringing of The
13   Graduate Hospitals into AHERF from SDN was
14   almost a fait accompli because of how the whole
15   transaction was handled in the first place?
16        MR. JONES: Object to form and
17   foundation.
18   A.  I think I've already said I was the trustee
19   who -- who felt that I didn't have the total
20   freedom of judgment that I would have liked to
21   have had because it was a published, and the
22   way the public would read that announcement,
23   what they would think that announcement said.
24   Q.  And I believe you mentioned Ms. Brown also had
25   similar sentiments?

Page 117

1    A.  (Nodding head up and down.)
2    Q.  Do you recall when you raised this issue at the
3    board meeting whether other members of the
4    board of trustees also voiced concern that the
5    substantial transaction had basically been
6    consummated without any consultation to the
7    members of the board of trustees other than the
8    ones that you mentioned --
9         MR. McCLENAHAN: Objection.
10   Q.  -- you referred to Mr. Abdelhak --
11        MR. McCLENAHAN: Objection.
12   Q.  -- citing to you?
13        MR. JONES: Object to form,
14   misrepresents facts.
15        MR. McCLENAHAN: I don't think you
16   are accurately summarizing his testimony, but
17   you can answer the question if you are able.
18   A.  Well, I'll just call your attention to one
19   piece.
20   Q.  Sure.
21   A.  There was one meeting on Thursday, August 22nd,
22   that I could not attend. Many trustees did
23   attend. It was held in Philadelphia to make
24   sure that Philadelphia trustees had an
25   opportunity. I can't tell you -- I wasn't

30 (Pages 114 to 117)

Page 226

```
1    Wendy.
2          MR. LUFT:  Okay.  Being mindful of
3    your time, Mr. Palmer, I truly appreciate the
4    time you offered today, and I have no further
5    questions at this time.
6          MR. JONES:  I will have a few
7    questions.  We have been at it almost precisely
8    another hour since our last break.  I would
9    propose that we break briefly, and if everyone
10   agrees that you'd like me to go forward this
11   afternoon, I'll do my best to complete.
12         MR. McCLENAHAN:  We don't need to
13   consult on whether we want you to go forward.
14         MR. JONES:  All right.
15         MR. McCLENAHAN:  We want you to
16   complete.
17         THE VIDEOGRAPHER:  We are now going
18   off the record.  The time is 3:36 p.m.
19              - - - -
20   (There was a recess in the proceedings.)
21              - - - -
22         THE VIDEOGRAPHER:  We are now going
23   back on the record.  The time is 3:43 p.m.
24
25
```

Page 227

```
1               - - - -
2            EXAMINATION
3               - - - -
4    BY MR. JONES:
5    Q.  Mr. Palmer, we have met, as we have
6        established.  My name is Jim Jones.  I am
7        indeed here on behalf of the Creditors
8        Committee.  I will have a relative few
9        questions for you I believe.
10            I would ask if, as it is getting late
11       in the day, if there's a time that I've spoken
12       too rapidly or you don't otherwise understand
13       me, you tell me, I'll do my best to rephrase it
14       so that we can understand one another.  Can we
15       have that agreement?
16   A.  Sure.
17   Q.  I'm also sitting quite a distance from you in
18       the room, and if you could try to hold your
19       voice up, that will help me.
20   A.  Sorry.
21   Q.  Thank you.  Mr. Palmer, from time to time you
22       were shown board packages of some considerable
23       length, some we measured at more than 200 pages
24       today; is that right?
25   A.  Yes.
```

Page 228

```
1    Q.  And it's fair to say for those of us and for
2        others who may read this transcript rather than
3        view a videotape of these proceedings that you
4        did not attempt today to read every page of
5        those larger packages that were marked as
6        exhibits; am I right?
7    A.  Correct.
8    Q.  And is it also fair to say that had you had the
9        opportunity to read those packages, it could be
10       that the context that exercise provided might
11       alter your responses?
12   A.  Possible.
13   Q.  You just don't know because you didn't have
14       that opportunity; is that right?
15   A.  Seems possible.
16   Q.  You were also asked some questions, not just
17       about the board packages or board books
18       distributed in advance of board meetings, but
19       about the minutes of those meetings themselves.
20       Do you recall that examination briefly?
21   A.  Very early in the morning, yes.
22   Q.  Right.  My question is:  You were asked some
23       questions about whether the minutes accurately
24       reflected the content of the meetings, and my
25       question is really in your experience in both
```

Page 229

```
1    nonprofit boards and for-profit boards and, in
2    fact, other organizations that keep minutes,
3    the minutes aren't intended to capture
4    everything spoken in the meeting; is that
5    right?
6    A.  That would be my belief.
7    Q.  And what is it in your experience that the
8        minutes are intended to capture?
9    A.  I can only give you a personal view.  I don't
10       know what the right answer to your question is.
11       In my personal view, I believe the minutes are
12       to make very clear decisions that were made and
13       responsibilities that come out of those
14       decisions so they can be referred to and
15       ongoing questions that need education,
16       decision-making, et cetera.
17   Q.  You mentioned in response to some questions
18       earlier in the day that you were interested in,
19       in particular, some cost and profitability data
20       that would track in the healthcare business
21       what you were making for various procedures
22       and/or various patient admissions and contacts
23       with your facilities.
24            Do you recall that testimony?
25            MR. LUFT:  Objection.
```

58 (Pages 226 to 229)