Marc A. Panucci

Page 262

1    Q.    Mr. Panucci, thank you for your
2    diligence in hanging with us this
3    afternoon but we're nearly concluding.
4        I'm going to ask you to refer
5    quickly back to Exhibit 4110 which you
6    have before you, I believe.
7    A.    Yes.
8    Q.    To Bates page ED 141. This is
9    on sort of the left-hand portion of the
10   document. And actually I lied. Could you
11   look a few pages prior to that, to ED 149.
12   A.    Okay.
13   Q.    And do you see that that is
14   another face page for another trust, this
15   one entitled the Edith Ann Oliver and
16   Edith Oliver Rea trust?
17   A.    Yes.
18   Q.    With Mellon trust number
19   510-OOO?
20   A.    Yes.
21   Q.    Do you recall reviewing this
22   page or this trust during your audit work
23   in 1996?
24   A.    I do not recall.
25   Q.    I'm going to ask you to skip a

Page 263

1    couple of pages to ED 141 now, which I
2    think you'll tell me is a page that looks
3    to be the beginning of the trust document
4    and has the words, "this agreement" at the
5    top of it.
6    A.    Yes.
7    Q.    It appears to be a document
8    dated AD 1915; is that right?
9    A.    Yes.
10   Q.    Do you recall reviewing
11   documents that old in your endowment and
12   investment work at AHERF in fiscal year
13   1996 or for fiscal year 1996?
14   A.    I know some of the endowments
15   were old. I do not know the specific
16   years they were originated in.
17   Q.    This page has some language
18   describing income and proceeds of the sale
19   of securities. I'm going to ask you to
20   look at and then tell me whether you
21   recall reviewing it or language to its
22   effect.
23       In the first whereas clause, it
24   reads, the document reads, "Whereas the
25   said parties of the first part desire to

Page 264

1    establish a trust fund, the income from
2    which shall be expended for the
3    maintenance of the Allegheny General
4    Hospital in the north side Pittsburgh,
5    Pennsylvania."
6        Do you see that?
7    A.    Yes.
8    Q.    Do you recall reviewing that
9    language?
10   A.    I do not recall.
11   Q.    And then in the next paragraph,
12   which reads, "now" or starts, rather,
13   "Now, therefore, this agreement," and goes
14   on from there. Do you see that beginning
15   phrase?
16   A.    Yes.
17   Q.    It describes in the sentence
18   that follows or the phrase that follows,
19   the handing over of certain sum of money.
20   Do you see that, or stock, rather?
21       MR. RYAN:    Stock, I think.
22   Q.    Let me read it. It reads,
23   "External loan bonds." Do you see that?
24   "The parties of the first part do hereby
25   assign, transfer, set over and deliver to

Page 265

1    the party of the second part $260,000 par
2    value of Anglo French five year five
3    percent external loan bonds."
4        Have I read that right?
5    A.    I couldn't tell if it was 250 or
6    two -- okay. It's 260 in the words, yes.
7    Q.    And then the next phrase says,
8    "To have and to hold the said securities
9    and the proceeds of the sale or conversion
10   of the same to said party of the second
11   part, its successors and assigns in trust
12   nevertheless for the following uses and
13   purposes."
14       Do you recall reading that
15   language during your audit effort?
16   A.    I do not recall.
17   Q.    You have had a chance during our
18   last break to review briefly Exhibit 4111
19   marked previously in the SEC proceedings
20   as Exhibit 134. Am I right?
21   A.    Yes, briefly, briefly review it.
22   Q.    Is there anything that arose
23   from that review that indicates to you
24   that Exhibit 4111 is, indeed, a copy of
25   the notebook or that you received from

67 (Pages 262 to 265)

Marc A. Panucci

Page 266

1  either Mr. Zwirn or Ms. Cafarro in your --
2  as a part of your work, rather, on the
3  fiscal year 1996 audit?
4      A.   Nothing that I could recall that
5  that would be the binder.
6      Q.   Having now the two before you
7  and hands folded over one, do you have any
8  basis for telling us that you believe one
9  or the other is more likely a copy of the
10  volume or the notebook you received from
11  Mr. Zwirn, more likely to be the copy of
12  the volume or notebook you received from
13  Mr. Zwirn?
14          MR. LUFT:  Objection.
15      A.   The only thing, as I sit here
16  today, would be the size of the binder
17  given to me is similar to Exhibit 4110,
18  but that's all I could tell you is the
19  size would approximate that.
20      Q.   And is it fair to say that you
21  are not telling us under oath that Exhibit
22  4110 is not the binder Mr. Zwirn gave you.
23  Is that accurate?
24      A.   Can you repeat that one more
25  time.

Page 267

1      Q.   Yes, that had too many negatives
2  I think we could parse it out, but it had
3  too many negatives.  Let me try it again.
4          Can you testify with certainty
5  today that Exhibit 4110 is not a copy of
6  the binder that Mr. Zwirn gave you?
7      A.   I cannot recall one way or the
8  other if this is the full binder that was
9  given to me or not.
10      Q.   So the short answer is you can't
11  say with certainty that it's not the
12  binder or a copy of the binder; is that
13  right?
14      A.   In certainty whether it's not or
15  it is, yes.
16      Q.   Have you ever seen Exhibit 4110
17  or Exhibit 4111 before today in perhaps
18  your preparations -- strike the question.
19          Do you recall reviewing
20  yesterday in your preparation session
21  Exhibit 4110 or 4111?
22      A.   Can you repeat that?
23      Q.   Yes.  Do you recall reviewing
24  yesterday Exhibit 4110 or 4111 or at any
25  other time in preparation for this

Page 268

1  deposition?
2      A.   I can't recall any other time
3  but yesterday, parts of 4110 were either
4  shown to me or read to me.
5      Q.   And why do you think that?
6      A.   Well, based upon meeting with
7  counsel yesterday.
8      Q.   I'm saying, slightly different
9  thing.  Did you see this exhibit on the
10  table and that's why you think that parts
11  of it were read to you or shown to you?
12      A.   Well, I just can't say for
13  certainty whether it was that exact
14  exhibit that were being shown to me.
15      Q.   But language like I read to you
16  today was read to you yesterday?
17      A.   Yes.
18      Q.   From a document that looked a
19  lot like Exhibit 4110?
20      A.   Yes.
21      Q.   And that was done by counsel?
22      A.   Yes.
23      Q.   Do you recall contacting any
24  third party about endowment or investment
25  work you were doing other than the tying

Page 269

1  of sums for any reason?
2      A.   The only other contact that I
3  would know of is we also got SAS 70
4  reports from third parties.
5      Q.   What are SAS 70 reports?
6      A.   They are reports done by the
7  financial institution or third party's
8  independent accountants on the internal
9  control environment at that third party
10  site.
11      Q.   So they have to do with internal
12  controls at the financial institutions,
13  for example, in place there?
14      A.   Correct.
15      Q.   Did you ever learn, as a part of
16  your audit work, or after, that AHERF
17  stripped the dividend or interest income
18  from the Lockhart trust accounts and moved
19  it to a separate concentration or other
20  account at one of the Mellon
21  institutions --
22          MR. LUFT:  Objection.
23      Q.   -- on a monthly or other
24  periodic basis?
25      A.   Can you repeat that again?  I'm

68 (Pages 266 to 269)

Marc A. Panucci

Page 302

1    Q.   Do you recall whether it gave
2  you any set of instructions?
3    A.   I cannot recall if it did.
4    Q.   Were you ever asked either in
5  that communication or at another time to
6  preserve or gather documents or electronic
7  data related to the audit?
8    A.   Can you repeat that again?
9    Q.   Maybe.
10   A.   Sorry.
11   Q.   Were you ever asked at any time
12 to gather documents or preserve documents
13 or gather electronic data or preserve
14 electronic data regarding your AHERF audit
15 work?
16   A.   I know for sure it was during
17 the subpoena, I was asked to gather the
18 information and --
19   Q.   That was --
20   A.   I don't remember any specifics
21 of when it was told to gather the
22 information other than outside the
23 subpoena.
24   Q.   And the subpoena you referred to
25 is the subpoena for your testimony in the

Page 303

1  SEC proceeding?
2    A.   Yes.
3    Q.   Before that time, did you
4  receive any such instruction about
5  gathering or preserving information from
6  anyone, that you can recall?
7    A.   Not that I can recall.
8    Q.   Have you ever been involved in
9  any other audit that has become the
10 subject of litigation or a government
11 investigation or proceeding?
12   A.   In my current role at National,
13 I've received work paper documentation
14 retention requirements.
15   Q.   About some other litigation?
16   A.   About other litigation --
17   Q.   I mean, do you know --
18   A.   -- or potential litigation. I'm
19 not sure.
20   Q.   So you've been asked to retain
21 documents about other matters, other audit
22 work?
23   A.   Yes.
24   Q.   In connection with work recently
25 completed in your new post?

Page 304

1    A.   Yes.
2    Q.   And not work completed in the
3  Pittsburgh office of Coopers & Lybrand
4  while you were there?
5    A.   Correct.
6    Q.   And do you know from whom you
7  received the request?
8    A.   Relating to the new post?
9    Q.   Yes.
10   A.   It was from the engagement teams
11 out in the practice offices.
12   Q.   And do you know what engagement
13 it was?
14   A.   Handleman Company.
15   Q.   That's the name of a client?
16   A.   Yes.
17   Q.   And do you know anything more
18 about it than what you've just told us?
19   A.   No. Except that I believe it's
20 an SEC investigation.
21   Q.   What's your current work
22 address?
23   A.   Sorry for the pause, but it's
24 relatively new.
25   Q.   That's okay.

Page 305

1    A.   500 Campus Drive, Florham Park,
2  New Jersey 07932.
3    Q.   And your current home address?
4    A.   706 Sterling Drive, Florham
5  Park, New Jersey 07932.
6    Q.   You walk to work?
7    A.   No, but I have a short drive.
8    Q.   If you give me one minute, I
9  think we'll be done.
10   A.   Sure.
11   Q.   Mr. Panucci, I'm handing you now
12 what has been marked as Exhibit 435 in
13 this litigation, which is, I will tell
14 you, or at least purports to be a letter
15 from Ms. Barbara Robinson at Mellon
16 Private Capital Management to Mr. Mike
17 Martin at AHERF, dated October 30, 1996.
18 Have you ever seen Exhibit 435 before
19 today?
20   A.   Not that I can recall.
21       MR. JONES: That's all I have.
22       (Time noted: 5:25 p.m.)
23
24   _____
25       MARC A. PANUCCI

Marc A. Panucci

Page 306

```
 1  _____
 2  Subscribed and sworn to
 3  before me this _____
 4  day of _____,
 5  2003.
 6
 7  _____
 8     Notary Public
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 308

| | Description | Page | Line |
|---|---|---|---|
| 3 | 4112  Work papers | 273 | 4 |
| 4 | 4113  Work papers | 278 | 12 |
| 5 | 4114  Work papers | 280 | 20 |
| 6 | 4115  Work paper | 282 | 23 |

Page 307

INDEX TO TESTIMONY

| | | Page | Line |
|---|---|---|---|
| Examination by Mr. Jones | | 5 | 16 |

INDEX TO EXHIBITS

| Description | | Page | Line |
|---|---|---|---|
| 4096 | Resume | 24 | 17 |
| 4097 | Healthcare Audit Approach and Practice Aids | 44 | 18 |
| 4098 | Work papers | 60 | 4 |
| 4099 | Time budget | 68 | 22 |
| 4100 | Consolidated time budget | 75 | 6 |
| 4101 | Work papers | 109 | 12 |
| 4102 | Work papers | 141 | 9 |
| 4103 | Work papers | 147 | 22 |
| 4104 | Work papers | 150 | 24 |
| 4105 | Work papers | 156 | 23 |
| 4106 | Work paper | 173 | 23 |
| 4107 | Work paper | 184 | 14 |
| 4108 | Work papers | 186 | 22 |
| 4109 | Larger text version of Exhibit 4108 | 191 | 13 |
| 4110 | SEC exhibit | 225 | 21 |
| 4111 | SEC exhibit | 236 | 19 |

Page 309

CERTIFICATION

I, Barbara P. Goldsmith, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness. I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of November 2003.

_____
BARBARA P. GOLDSMITH

**Porter Dep.**

Christa Porter

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF ALLEGHENY

HEALTH, EDUCATION & RESEARCH FOUNDATION,

        Plaintiff,

   vs.                   Case No.

PRICEWATERHOUSECOOPERS, LLP,      00-684

        Defendant.


- - - - -

     Videotaped deposition of CHRISTA

PORTER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Wendy L. Klauss, a Notary

Public in and for the State of Ohio, at the


offices of Jones Day, 500 Grant Street, Suite


3100, Pittsburgh, Pennsylvania, on Thursday,


January 29, 2004, at 9:33 o'clock a.m.


- - - - -

Christa Porter

Page 86

1    A.   I don't remember.
2    Q.   As you sit here today, would it
3  have been your expectation that Ms. Heinlein
4  would have been doing that check?
5    A.   I can't answer what documents she
6  looked at to do the calculations.
7    Q.   As the person who was the reviewer
8  of that particular work paper that talked about
9  testing the covenants for AGH, as you sit here
10 today, was it your understanding -- is it your
11 understanding that that's something that Ms.
12 Heinlein would have been checking to see,
13 whether or not AGH was deducting everything it
14 was supposed to deduct from that calculation?
15   A.   Can you repeat the question.
16   Q.   As you sit here today, do you
17 believe that the person at Coopers who was
18 responsible for checking compliance with the
19 debt covenants at AGH would have compared what
20 AHERF was deducting from the unrestricted fund
21 balance covenant for the Morgan reimbursement
22 letter of credit agreement with what the
23 agreement called for with respect to deducting
24 items from that calculation?
25   A.   I don't recall whether that was

Page 87

1  something they specifically did or not, but I'm
2  sure they would have done whatever comparison
3  needed to feel comfortable that it was
4  appropriate.
5    Q.   When you say feel comfortable, what
6  do you mean by that?
7    A.   I just mean to be able to feel
8  confident that their work was complete.
9    Q.   Do you recall -- we talked earlier
10 about for objectively determinable covenants,
11 that Coopers would be recalculating the
12 covenant, right?
13   A.   Yes.
14   Q.   Was it your understanding that
15 somebody at Coopers was going back to the debt
16 agreement and figuring out what needed to be
17 reduced from the unrestricted fund balance
18 calculation and recalculating the covenant
19 based upon that?
20   MR. LUFT:  Objection.  She said she
21 doesn't recall working on this.
22   Q.   So you don't recall, right?
23   A.   No.
24   Q.   As you sit -- actually, I think I
25 asked that question, so I'll move on.

Page 88

1    I had pointed you towards Bates
2  ending 802 of this page, correct?
3    A.   Correct.
4    Q.   Have you had a chance to look at
5  that page?
6    A.   No.
7    Q.   Before I ask about that, let me try
8  this question again.
9    As you sit here today, looking back
10 at the audit steps in some of the documents I
11 have shown you here, is it your understanding
12 that the audit program called for Coopers &
13 Lybrand to check with the debt agreement -- I'm
14 sorry, to make sure that AHERF and AGH were
15 deducting all the items that needed to be
16 deducted for purposes of the Morgan covenant?
17   A.   The audit step required us to
18 review the debt covenants and review those
19 calculations.
20   Q.   And in order to assure that it was
21 calculated correctly for this particular
22 covenant, wouldn't you have to go back to the
23 debt agreement?
24   A.   Not necessarily.
25   Q.   Why not?

Page 89

1    A.   If there were no changes to the
2  agreement based on discussions with management
3  or other knowledge, and there was a summary in
4  our work papers from the prior year, they may
5  not have gone back to the original debt
6  agreement.
7    Q.   How would you know if AHERF
8  actually deducted the things it was supposed to
9  deduct unless you looked at the debt agreement?
10   A.   Like I said, based upon the prior
11 year's work papers, they reviewed it and there
12 were no changes and they followed practices
13 consistent with that, they may not have looked
14 back at the original documents.
15   Q.   Finally onto this document.  Do you
16 recall pages that looked like this, whether or
17 not you recall this particular one dated
18 September 18, 96?
19   A.   No, I do not.
20   MR. TORBORG:  Why don't we take a
21 quick break here.
22   MS. KISTLER:  We are now going off
23 the record.  The time indicated is 11:39 a.m.
24   (Recess taken.)
25   - - - - -

Christa Porter

Page 90

1    (Thereupon, Deposition Exhibit 4239
2    was marked for purposes of
3    identification.)
4         - - - - -
5    MS. KISTLER: We are now back on
6    the record. The time indicated is 11:53 a.m.
7    Q.  Welcome back.
8    Ms. Porter, I have handed you what
9    has been marked as Exhibit 4239. It bears
10   Bates number CL 006236 through 42, and it
11   appears to contain some documents, all of which
12   are relevant to debt compliance issues for
13   Allegheny General Hospital Obligated Group for
14   the fiscal year 1996 audit.
15        If you would take a look through
16   those documents, and then I'll have some
17   specific questions for you.
18   A.  (Witness reviewing document.)
19   Q.  Ms. Porter, before I ask you
20   specifics on this document, do you recall that
21   the CLASS System had a number of different
22   numbered sections that related to specific
23   substantive areas of the audit? For example, I
24   think section 53 would be assets or patient
25   receivables, I think section 70 related to

Page 91

1    liabilities and debt, which we have seen
2    before.
3         Do you remember there was a section
4    of the audit called general and administrative?
5    A.  Yes.
6    Q.  And what was the purpose of that
7    section?
8    A.  I believe that was where we
9    documented planning type matters. I don't
10   really recall what else was in there.
11   Q.  I will represent to you that the
12   set of documents I have shown you was a section
13   that was taken out of the general and
14   administrative section of the audit.
15   A.  Okay.
16   Q.  Although it all seems to relate to
17   debt compliance type concerns that normally
18   would be contained in a different section of
19   the audit, I believe, different sections of the
20   audit, I should say.
21        Do you know why these particular
22   pages were in the general administrative
23   section of the audit?
24   A.  No, I do not.
25   Q.  Let me ask first do you recall any

Page 92

1    of these documents --
2    A.  No.
3    Q.  -- in this collection?
4    A.  No, I do not.
5    Q.  Flipping to the third page of the
6    exhibit, Bates ending 238, there is a one-page
7    schedule not unlike a schedule I asked you to
8    look at in the larger document marked as
9    Exhibit 434; do you see that?
10   A.  Yes.
11   Q.  Do you recognize the handwriting on
12   that document?
13   A.  Yes, I do.
14   Q.  And whose handwriting is that?
15   A.  That's mine.
16   Q.  Can you read for me what that note
17   says?
18   A.  Sure. It says, "Note: In PY"
19   which stands for prior year, "AGH included
20   current portion also. DVOG debt specifically
21   excludes current portion in their calculation.
22   AGH covenants are silent as to whether current
23   portions should be included. Bond counsel
24   recommended that to be consistent and follow
25   general industry calculations, such as Moody's,

Page 93

1    the current portion should be excluded." And
2    it says, "C&L does not take exception."
3    Q.  Do you recall whether or not for
4    this particular issue -- well, let me ask, do
5    you recall this particular issue at all?
6    A.  No, I don't.
7    Q.  Do you recall whether or not
8    Coopers & Lybrand ever asked the lender
9    involved here, Morgan Guaranty -- or credit
10   enhancer, I should say, Morgan Guaranty about
11   this particular issue?
12   A.  No, I don't know whether that was
13   done or not.
14   Q.  Whether or not the current portion
15   of long term debt should be included in the
16   numerator of the indebtedness total
17   capitalization ratio?
18   A.  That's correct.
19   Q.  Now, there is some handwritten
20   marks on here next to some of the numbers.
21   They look like Rs; do you see that?
22   A.  Yes. They appear to be Rs.
23   Q.  What do the Rs stand for, do you
24   know?
25   A.  I have no idea.

24 (Pages 90 to 93)

Christa Porter

Page 94

```
1     Q.  I don't either.
2         How about it looks like a sigma
3  symbol to the right of some of the calculated
4  ratios?
5     A.  That's a CL for Coopers & Lybrand,
6  I think.  It just means it was recalculated.
7  The math was checked.
8     Q.  Do you know whose handwriting those
9  symbols are in, and if it is different between
10 R and C&L, if you could tell?
11    A.  No, I can't tell.  The Rs don't
12 look like my handwriting.  The CLs do.
13    Q.  So you believe that to mean that
14 C&L recalculated, checked the math for those
15 ratios?
16    A.  Yes.
17    Q.  Do you know if Coopers & Lybrand
18 would have had a schedule anywhere that showed
19 that they recalculated it, or is just the
20 initials next to it, I guess, the evidence that
21 they recalculated it?
22    A.  Yes.  That's what that means, that
23 that person -- at least that's what I
24 documented was that I recalculated those
25 numbers, and that's how I documented it.
```

Page 95

```
1     Q.  So you believe that because the CLs
2  are in your initials, that you are the one who
3  recalculated them?
4     A.  Yes.
5     Q.  Now, with respect to the last
6  covenant on this page, D, "Maintain a
7  consolidated unrestricted fund balance of at
8  least 200 million dollars," I believe that
9  stands for, I don't see a CL next to that one.
10 Do you know why that is?
11    A.  No, I do not.
12    Q.  Based upon your recollection of
13 your practices at the time, do you believe that
14 means that you did not recalculate that
15 covenant?
16    A.  I couldn't answer that.  Based upon
17 looking at this work paper at this point in
18 time, it doesn't appear that there is any
19 documentation there that I did, but it may have
20 been done elsewhere.
21    Q.  Ms. Porter, I'm handing you what
22 has been marked before as Exhibit 428.  And for
23 the record, Exhibit 428 appears to be another
24 work paper related to the 1996 audit.  This one
25 relating to Section 0025 Preliminary Analytical
```

Page 96

```
1  Procedures, and it appears to be both some
2  steps there as well as a schedule.  It starts
3  on Bates page ending 200.
4         I'm going to ask you now to flip to
5  Bates page ending 201.  Also I think I probably
6  should have you look at the entirety of this
7  particular schedule that starts at Bates page
8  ending 199 to 201.  I think that's a cover,
9  sheet to the schedule and notes that follow.
10    A.  (Witness reviewing document.)
11    Q.  Ms. Porter, does this appear to be
12 a preliminary balance sheet analytic for AGH
13 for the 1996 audit?
14    A.  Yes, it does.
15    Q.  Do you recall working on
16 preliminary analytical procedures for the 96
17 audit?
18    A.  No, I don't.
19    Q.  I gather then you probably don't
20 recollect this specific document either?
21    A.  No, I don't.
22    Q.  If you look at the Bates page
23 ending 200, that's the one-page chart there
24 under balance sheet, is there an item under
25 Receivables?
```

Page 97

```
1     A.  Yes.
2     Q.  It says From Affiliates of, I
3  believe that to be, 25,771,000, right?
4     A.  Yes.
5     Q.  And then there is a footnote B that
6  states on the next page, "Increase in
7  receivable from affiliate due to approximately
8  $65,771 of funding provided to the Delaware
9  Valley to help fund their operations.
10 $25,771,000 of the receivable is recorded as an
11 affiliate receivable.  The remaining 400
12 million is recorded in investments limited or
13 restricted as to use."
14        MR. MCDONOUGH:  40 million?
15    Q.  I'm sorry, 40 million.  "The
16 rationale for this approach is when the bond
17 restructuring goes through for the DV, the $40
18 million will be repaid out of the proceeds and
19 put back into the restricted assets (this is
20 where the money was originally liquidated
21 from)."
22        Do you recall whether you drafted
23 that particular language, Ms. Porter?
24    A.  No, I don't recall.
25    Q.  When someone is marked as
```

25 (Pages 94 to 97)

Christa Porter

Page 158

1  were the only ones that I can remember.  The
2  other detail steps I don't recall.
3      Q.   Are you familiar with a concept
4  called the slope reserve percentages?
5      A.   No.
6      Q.   Have you ever faced a situation in
7  auditing the bad debt reserve accounts where
8  the client did not have historical cash
9  collection results for you to look at in
10  assessing the reasonableness of the amounts?
11      A.   I don't know, because I don't
12  recall whether that was something that I
13  specifically looked at or not.
14      Q.   Is the audit of the allowance for
15  uncollectible accounts an important area of the
16  audit for a health care client?
17      A.   Yes.
18      Q.   And why is that?
19      A.   Because it determines or is a
20  review of the net realizable value of the
21  accounts receivable.
22      Q.   And would also impact whether the
23  net patient service revenue is right too,
24  right?
25      A.   Yes.

Page 159

1      Q.   Do you recall whether you received
2  any training specific to the auditing of the
3  allowance for uncollectible accounts at
4  Coopers?
5      A.   I don't recall whether it was
6  specific classroom training or whether it was
7  more on-the-job training.
8      Q.   Do you recall when in the 1997
9  audit you started to review Ms. Heinlein's
10  accounts receivable audit work?
11      A.   No, I don't.
12      Q.   Do you recall that there are
13  different stages of the audit?
14      A.   Yes.
15      Q.   What are those stages?
16      A.   There are two main stages that were
17  referred to as preliminary field work and
18  year-end field work.
19      Q.   Go ahead.
20      A.   Preliminary field work was usually
21  conducted prior to their fiscal year end, and
22  year end was, of course, after their fiscal
23  year end.
24      Q.   Besides the timing, what is the
25  difference between preliminary field work and

Page 160

1  the year-end field work?
2      A.   Preliminary field work deals mainly
3  with -- it depends.  It could vary from
4  engagement to engagement, but typically you
5  looked at control risk assessment, did all of
6  the monitoring and application controls and
7  reviewing those and possibly doing some
8  preliminary work on maybe reviewing a
9  preliminary general ledger and looking at some
10  preliminary roll forwards.  It would just
11  depend.
12          - - - - -
13          (Thereupon, Deposition Exhibit 4248
14          was marked for purposes of
15          identification.)
16          - - - - -
17      Q.   For the record, what I have marked
18  as Exhibit 4248 is a collection of what I
19  believe to be accounts receivable related work
20  papers for the 97 audit.  It was also marked as
21  one exhibit in Ms. Porter's SEC examination as
22  Exhibit 221, and bears the Bates numbering PWC
23  010082 through PWC 010334.L, and it has a cover
24  page on the front that says 0053 patient AR
25  file 1 of 2.

Page 161

1          Ms. Porter, let me ask you first do
2  you recall this collection of documents being
3  shown to you during your SEC examination?
4      A.   I do recall reviewing or seeing
5  various patient AR documents during the course
6  of my depositions.  I don't know if -- I don't
7  recall specifically this one.
8      Q.   That's fair.  I don't expect you to
9  be able to tell me if this is the exact copy of
10  what you saw.
11          Let me ask you first to flip to the
12  Bates page ending 136 in the right-hand corner
13  of the document.  That particular page is an
14  audit step work paper, I believe, step name,
15  Determine the Hospital's Payer Mix at 6-30-97,
16  and the step description states, "Using the
17  revenue in AR balances, determine the
18  hospital's payer mix.  Compare the mix to
19  3-31-97 and analyze significant fluctuations,
20  i.e. changes greater than 3 percent such as BC
21  decreasing from 35 percent to 31 percent.
22  Determine if the payer mix had an adverse
23  effect on contractual allowances."  And the
24  objective is Accuracy.
25          Ms. Porter, do you recall what

41 (Pages 158 to 161)

Christa Porter

Page 162

1  purpose in the audit evaluating the AR payer
2  mix served? What was the purpose of evaluating
3  that in tracking any fluctuations?
4      A.  I believe it just helped us
5  understand what kind of mix the hospital had in
6  terms of the payer mix that they had and how
7  that would -- depending upon the payer, they
8  had different agreements and how that would
9  affect their various balances.
10     Q.  How would that affect your audit,
11  if at all, of the net realizable value of the
12  account receivable?
13     A.  I believe the different payers had
14  different contractual allowance, contractual
15  agreements with the hospital, so if the payer
16  mix shifted drastically, it would affect the
17  ultimate net realizable value of the
18  receivables.
19     Q.  If I can ask you to flip to the
20  page with the Bates number ending 159.  This is
21  work paper 0053-51 with the name Days in A/R,
22  6-30-97, and then behind it are two different
23  copies of the same schedule.  It appears as
24  though PWC was kind enough to enlarge a lot of
25  these various schedules so we can read them on

Page 163

1  a piece of paper.  So when you see small print
2  like we see on 60, the following page would be
3  a good place to look.
4      Let me ask you, do you recall what
5  was the purpose in the audit of analyzing the
6  days in accounts receivable?
7      A.  We looked at days in accounts
8  receivable as it would give an indication if
9  there were issues relative to collecting
10  accounts receivable, that if it had
11  deteriorated.
12     Q.  If you found that there were issues
13  with the receivables and deterioration, what if
14  anything would that cause Coopers & Lybrand to
15  do?
16     A.  In general, I think we would check
17  it to understand, you know, why it was
18  deteriorating and what steps the hospital was
19  taking to curtail it.
20     Q.  Would it call for expanded audit
21  testing?
22     A.  It may or may not.  I think it
23  would be circumstance dependent.
24     Q.  What circumstances would call for
25  an expanded audit?

Page 164

1      A.  I mean I couldn't point to a
2  specific circumstance.  It could be anything.
3  I mean it would just depend on the
4  circumstances under which -- how drastic it
5  was, things like that.
6      Q.  If you would flip with me back to
7  the work papers starting at Bates ending 151?
8      A.  151?
9      Q.  Yes.  And this is another audit
10  step work paper, I believe, that has a step
11  name of Obtain Or Prepare a Comparative Summary
12  at 6-230-97.  The step description is, "Obtain
13  or prepare a summary of patient receivables by
14  general ledger account balances at 6-30-97 and
15  perform the following: A, agree amounts to the
16  general ledger; B, perform fluctuation analysis
17  from the 3-31-97 balances."
18      What was the purpose of performing
19  a fluctuation analysis from the 3-31-97
20  balances?
21      A.  If we had done -- in general, if
22  you do some preliminary work at prelim, such as
23  3-31-97, you would want to compare those
24  balances to your year end work as well.  So I
25  would assume in this case that we were just

Page 165

1  comparing the 6-30-97 balances to the 3-31-97
2  balances.
3      Q.  But why would you want to do that
4  comparison?
5      A.  To see if there was any significant
6  fluctuations in that time period to see how the
7  accounts moved or if something changed.
8      Q.  If there were significant
9  fluctuations, what would that tell you?
10     A.  It would depend on what the
11  fluctuations were or what accounts they were
12  in. It would require more questions to the
13  client to understand why it changed, what
14  caused the change, et cetera.
15     Q.  Does the document that starts on
16  the next page Bates ending 52 and then
17  continues on through Bates page ending 158,
18  does that appear to be the work paper that
19  purports to satisfy the audit step that we just
20  saw on Bates page ending 151?
21     A.  It is definitely a schedule
22  summarizing the accounts receivable general
23  ledger balances at June 30, 97, but it compares
24  to 6-30-96 versus 3-97.
25     Q.  3-31-97?

42 (Pages 162 to 165)

Christa Porter

Page 166

1    A.   Yes.  Sorry.
2    Q.   Well, does it appear that the work
3  paper from 152 to 158 satisfies the audit steps
4  that we saw on the first page at 151?
5    A.   I mean it is not comparing to
6  3-31-97, no.
7    Q.   So it is not satisfying the audit
8  step?
9    A.   That's not necessarily true.
10    Q.   Why not?
11    A.   Well, without looking at 3-31-97 to
12  see, I don't remember how much work was done.
13  If we didn't do substantive work at 3-31-97, we
14  wouldn't compare to 3-31-97, we would compare
15  it to the prior year.
16    Q.   Why don't we go to Bates page
17  ending 113 through 121.
18        For the record, the document at
19  Bates ending 113 appears to be another audit
20  step work paper, this one with step name Obtain
21  or Prepare a Comparative Summary at 3-31-97,
22  and it has a step description, "Obtain or
23  prepare a summary of patient receivables by
24  general ledger account balances at 3-31-97 and
25  perform the following:  Agree amounts to the

Page 167

1  general ledger; and B, perform fluctuation
2  analysis from prior year balances."
3        Does the schedule that follows
4  through Bates page ending 121 appear to be the
5  work paper that satisfied that audit step?
6    A.   Yes, it does.
7    Q.   So does it appear as though Coopers
8  did perform some testing at 3-31-97?
9    A.   Yes.  I mean it appears that we did
10  a comparison between 6-30-96 and 3-97 relative
11  to those general ledger account balances, but I
12  don't recall how much detail testing we did on
13  the 3-30-97 balances -- or 3-31-97, sorry.
14    Q.   But you did do an AR lead schedule
15  as of 3-31-97, right?
16    A.   Yes, we did.
17    Q.   So if you wanted to do a work paper
18  that satisfied the audit step we saw 151 to
19  compare general ledger account balances at
20  6-30-97 and perform a fluctuation analysis from
21  3-31-97, you could have done that, right?
22    A.   Yes.
23    Q.   Do you know why you didn't do that?
24    A.   No.  I don't recall why we didn't
25  specifically prepare such a schedule.

Page 168

1    Q.   When I saw you, I mean Coopers &
2  Lybrand, not you personally?
3    A.   Correct.
4    Q.   You don't recall any discussions
5  about that?
6    A.   No.
7    Q.   If you go back to the 3-31 AR
8  schedule, specifically at Bates page ending
9  119.
10        Actually why don't we start with
11  118.  I'm going to be asking you about the
12  schedule specific to Graduate Hospital, and
13  then the items I want to ask you about are on
14  the next page, 119.
15        Do you see that the third row down
16  there account 1201092 is called Other
17  Reserves-PFMA, and it has a credit balance of
18  7,500,000 with a footnote CC next to it?
19    A.   Which one are you on?
20    Q.   Bates page ending 119, third row,
21  this is for the schedule for Graduate Hospital,
22  there is an account number 121902 that has a
23  title Other Reserves-PFMA.
24    A.   Yes.
25    Q.   In the amount of 7,500,000?

Page 169

1    A.   Okay.
2    Q.   Footnote CC.  Let me ask you first,
3  do you recall the initials PFMA?
4    A.   It has something to do with the
5  police and firemen.  That's all I remember.
6    Q.   Does it appear as of 3-31-97 there
7  was a reserve for something related to PFMA?
8    A.   Yes, it does.
9    Q.   And you don't recall any of the
10  specifics for why there was a reserve set up
11  for PFMA?
12    A.   No, I don't.
13    Q.   If you would read the footnote on
14  121, then I'm going to ask you if that
15  refreshes your recollection at all about that
16  issue.
17        MR. MCDONOUGH:  Footnote CC?
18        MR. TORBORG:  CC.
19        MS. KISTLER:  We have about five
20  minutes left on this tape.
21    A.   (Witness reviewing document.)
22    Q.   Does reading the footnote CC
23  refresh your recollection at all about why
24  there was a reserve of over $7 million for
25  something called PFMA at 3-31-97?

43 (Pages 166 to 169)

Christa Porter

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF ALLEGHENY

HEALTH, EDUCATION & RESEARCH FOUNDATION,

          Plaintiff,

       vs.                              Case No.

PRICEWATERHOUSECOOPERS, LLP,            00-684

          Defendant.


              - - - -


          Continued videotaped deposition of

CHRISTA PORTER, called for examination under

the Applicable Rules of Federal Civil

Procedure, taken before me, Wendy L. Klauss, a

Notary Public in and for the State of Ohio, at

the offices of Jones Day, 500 Grant Street,

Suite 3100, Pittsburgh, Pennsylvania, on

Friday, January 30, 2004, at 9:16 o'clock a.m.

              - - - - -


          Volume II


              - - - - -

Christa Porter

Volume 2

Page 326

```
 1        MR. MCDONOUGH:  Yes, because I am
 2   trying to remain quiet, and when you castigate
 3   me for making a comment to an inappropriate
 4   question, it causes me to remind you that there
 5   are a lot of things I could raise and I don't.
 6   Go ahead, please.
 7        Q.   Do you understand my question?
 8        A.   Could you please repeat it.
 9        Q.   Okay.  As you sit here today, given
10   the nature of the $50 million of transfers from
11   Graduate to DVOG, do you believe that Ms.
12   Heinlein would have created an issue document
13   and typed it no further action required without
14   consulting someone more senior to her on the
15   audit?
16        A.   I don't know.
17        MR. TORBORG:  And just for the
18   record, I will continue to, if I believe the
19   witness has not been responsive to my question,
20   I will continue to point out, and I believe
21   what I did in a very nice way, of stating I
22   don't think that's responsive.  I have every
23   right to try to seek what I believe to be a
24   responsive answer to my question.
25        MR. MCDONOUGH:  I'll let you have
```

Page 327

```
 1   the last word.  I have already made my view
 2   clear and will continue to do the same.
 3        - - - - -
 4        (Thereupon, Deposition Exhibit 4261
 5        was marked for purposes of
 6        identification.)
 7        - - - - -
 8        MR. MCDONOUGH:  Let me also say it
 9   is 12:30, so when you are finished with this
10   exhibit, we can take a lunch break.
11        MR. TORBORG:  We can do that.
12        Q.   For the record, what I have shown
13   the witness as Exhibit 4261 is an issue topic
14   titled 50 million Reserve Entry.  This one
15   created by Kristen Heinlein on June 9, 1997,
16   and this one last modified by Kristen Heinlein
17   on August 13, 97, and this was printed off a
18   different earlier version of the CLASS System.
19   This one with a title Hipkiss Disc, which is
20   what the Bates label on the first page is
21   intended to reflect.  And again the back of
22   this document has some metadata information.
23        Have you had a chance to look at
24   this document, Ms. Porter?
25        A.   Yes, I have.
```

Page 328

```
 1        Q.   Do you recall this document?
 2        A.   No, I don't.
 3        Q.   Is there any reason why you recall
 4   the first issue document on the 50 million but
 5   not this one?
 6        A.   Specifically because of the journal
 7   entries down at the bottom.  That's what I
 8   recall the issue looking like.
 9        Q.   Do you have any knowledge about why
10   the journal entries were removed from this
11   version of this issue topic?
12        A.   No, I don't.
13        Q.   And do you see that this one is
14   issue type Audit Implication?
15        A.   Yes, I do.
16        Q.   And from your experience at
17   Coopers, what did the issue type audit
18   implication mean?
19        A.   Audit implication was something
20   that warranted additional investigation.
21        Q.   Do you have any insight as to why
22   the issue type was changed from no further
23   action required to audit implication?
24        A.   No, I don't.
25        MR. TORBORG:  Why don't we break
```

Page 329

```
 1   for lunch.
 2        MS. KISTLER:  We are now going off
 3   the record.  The time indicated 12:32 p.m.
 4        (Luncheon recess taken.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

28 (Pages 326 to 329)

Page 330

1    AFTERNOON SESSION
2    CONTINUED EXAMINATION OF CHRISTA PORTER
3    BY MR. TORBORG:
4        MS. KISTLER:  We are now back on
5    the record.  The time is 1:25 p.m.
6        - - - - -
7        (Thereupon, Deposition Exhibit 4262
8        was marked for purposes of
9        identification.)
10       - - - - -
11   Q.   Welcome back, Ms. Porter.
12   A.   Thank you.
13   Q.   For the record, I have marked as
14   4262 a work paper that was printed off the
15   final version of the CLASS disc, which is why
16   it has the JD Final CLASS Disc Bates number on
17   it, but it is a working paper name $50 million
18   Bad Debt Reserve Entry, working paper reference
19   number 0053-75.
20       And I have printed off the work
21   paper from final version of the CLASS and then
22   again attached some metadata type information
23   toward the back of the document.  Ms. Porter, I
24   ask that you take a look at that.
25       Have you had a chance to look at

Page 331

1    this?
2    A.   Yes, I have.
3    Q.   Do you recall this document?
4    A.   No, I don't.
5    Q.   now, this particular document has
6    the same title as the two previous issue
7    documents we looked at, right, $50 million bad
8    debt reserve entry?
9    A.   The only difference is this one
10   says bad debt, the others didn't.
11   Q.   Right.  But it appears to have at
12   least the same text under the issue
13   description, right, as the version I marked
14   that has the Bates label JD Hipkiss CLASS Disc?
15       MR. MCDONOUGH:  Exhibit 4261?
16       MR. TORBORG:  Yes.
17   A.   Yes, it does appear to be
18   consistent.
19   Q.   Do you know why the issue topic was
20   changed into a working paper?
21       MR. MCDONOUGH:  Object to form.
22   A.   No, I don't recall why that was
23   done.
24   Q.   Let me ask you just a CLASS related
25   question.  Do you see your name there in the

Page 332

1    last modified by field?
2    A.   Yes, I do.
3    Q.   And then on the second page there
4    is a field called modification history?
5    A.   Yes.
6    Q.   Do you know why you would be in the
7    last modified by field yet not be in the
8    modification history field?
9    A.   No, I don't recall what prompted
10   the inclusion in the modification history.
11   Q.   Let me just toss this out as an
12   explanation.  I don't know if it is right or
13   not.
14       If you marked a document reviewed,
15   I think you indicated previously that you would
16   be in the last modified field as well, if you
17   marked it reviewed?
18   A.   I believe that's correct.
19   Q.   If you just marked a document
20   reviewed but made no other changes to the text
21   of the document, would that mean you wouldn't
22   show up in the modification history?
23   A.   I don't know.
24   Q.   I'm done with that one.
25       Did you ever consider yourself, Ms.

Page 333

1    Porter, whether or not the transfers of the 50
2    million of reserves from the Graduate entities
3    to the DVOG entities could result in a material
4    misstatement of the AHERF financial statements?
5    A.   No.  That was nothing that I had
6    looked at or considered.
7    Q.   Did you know at the time when you
8    knew about the transfers at some point during
9    the 1997 audit, were you aware of at the time
10   that the transfers allowed the DVOG entities to
11   increase their collective bad debt reserve
12   accounts without a charge to bad debt expense?
13   A.   No.  From what I recall, I thought
14   it was just transferring reserves, AR reserves
15   from one entity to another.  That was my
16   recollection.  So in total it wouldn't have
17   changed.
18   Q.   If you could again pull out the
19   collection of AR work papers.
20       MR. MCDONOUGH:  Exhibit 4248.
21       MR. TORBORG:  Exhibit 4248.
22   Q.   Then I'm going to ask you, please,
23   to flip to the Bates ending 290.L and .M.
24   A.   L and M?
25   Q.   Yes.  These are the roll forward

29 (Pages 330 to 333)

Christa Porter

Page 338

1    0026-801 titled Graduate Goodwill Entry that I
2    have printed off the Final CLASS version, and
3    the Bates number was put on by Jones Day to
4    reflect that.  It also again contains some what
5    I referred to as metadata information in the
6    back.
7          Ms. Porter, if you could take a
8    look through that document.
9       A.  (Witness reviewing document.)
10      Q.  Ms. Porter, do you recall any
11   portion or portions of this document?
12      A.  It looks vaguely familiar with
13   these account numbers at the top, but other
14   than that, the document itself doesn't look
15   familiar.
16      Q.  Do you know who prepared this
17   document, whether it be Coopers & Lybrand or
18   AHERF?
19      A.  I don't know for certain, but the
20   only thing I would say is on the working paper
21   type it does say prepared by client under the
22   OLE, Prepared by Client.
23      Q.  If I can ask you to flip to the
24   second page of the document.  Do you see the
25   second item there has a description of record

Page 339

1    allowance, and then an amount of $20 million?
2       A.  Yes.
3       Q.  And then it has a footnote B next
4    to it?
5       A.  Okay.
6       Q.  And then if you look at the next
7    page, the third item down states, "Record bad
8    debt allowance," and then there is an amount of
9    $5 million there, again with a footnote B?
10      A.  Yes.
11      Q.  And finally on the third page there
12   is an entry, the second item down has a
13   description of, "Record bad debt allowance,"
14   and then an amount of $9 million?
15      A.  Yes.
16      Q.  Again with a footnote B.  And those
17   three amounts aggregate to $34 million?
18      A.  Okay.
19      Q.  Did you come to learn at any time
20   during the 1997 audit that the 20 million, the
21   5 million and the 9 million were part of the 50
22   million of reserves set up at Graduate that
23   were transferred to DVOG?
24      A.  My recollection regarding the 50
25   million is that they were bad debt reserves set

Page 340

1    up at the Graduate entities that were
2    transferred to the DVOG entities.  I'm not sure
3    if that answers your question or not.
4          MS. KISTLER:  We have about five
5    minutes left on the tape.
6       Q.  Do you have an understanding of
7    what this schedule is doing, these schedules,
8    the second, third and fourth pages?
9       A.  No, I don't.
10      Q.  Do these appear to be a description
11   of the purchase price adjustments recorded in
12   conjunction with AHERF's affiliation with -- or
13   Graduate's affiliation with AHERF?
14      A.  Yes, they appear to be some kind of
15   purchase price adjustments or adjustments
16   related to those entities.
17      Q.  And I think you recalled earlier
18   today that the 50 million that was set up at
19   Graduate Hospital and transferred to DVOG was
20   set up on the Graduate Hospitals through
21   purchase price adjustments?
22      A.  I believe that's correct.
23      Q.  Do you see anything else on these
24   schedules which I think you just said appear to
25   be the detail behind the purchase price

Page 341

1    adjustments that could be a component of the 50
2    million?
3       A.  I don't know.  I don't recall what
4    all the components of the 50 million were.
5       Q.  I would like to hand you two more
6    exhibits that have already been marked.  For
7    the record I have shown Ms. Porter -- or I have
8    handed Ms. Porter Exhibit 4123, which is
9    working paper the number 0026-401 titled City
10   Avenue Hospital opening balance sheet analysis.
11         Ms. Porter, I'm going to ask you,
12   please, to flip to the second page of the
13   document, Bates ending 40.  Do you see there is
14   a cell there for purchase price adjustments?
15      A.  Yes, I do.
16      Q.  And then do you see the second line
17   item there is something titled Additional Bad
18   Debt Reserve, and then the figure 8,000.  Do
19   you see that to mean 8 million?
20      A.  I don't know.
21      Q.  Would you assume for me that that
22   does refer -- that it does mean to refer to 8
23   million?
24      A.  Okay.
25      Q.  And then if you would go to Exhibit

31 (Pages 338 to 341)

Christa Porter

Page 342

```
1   4125, which is work paper 0026-301 titled
2   Parkview Open Balance Sheet Analysis. The
3   second page, there is again a cell for purchase
4   price adjustments, and again an entry for
5   something titled additional bad debt reserve,
6   again in the amount of $8 million?
7      A.   Yes.
8      Q.   And if you add those two, 8 million
9   to the 34 million we saw earlier, you would get
10  50 million, right?
11     A.   Yes.
12     Q.   Are you comfortable now inferring
13  that the collective 34 million we saw set up on
14  Exhibit 4263 for record bad debt allowance had
15  reference to the 50 million that was eventually
16  transferred from Graduate to DVOG?
17         MR. MCDONOUGH: Object to the form.
18     A.   As I stated before, from what I
19  recall, the 50 million that was transferred was
20  from bad debt reserve to bad debt reserve was
21  my recollection.
22         MS. KISTLER: Can I ask that we
23  pause for a tape change. We are now going off
24  the record. The time is 1:46 p.m.
25         (Pause.)
```

Page 344

```
1      A.   Yes.
2      Q.   And can you explain what that is?
3      A.   That was where in a work paper we
4   could highlight a section or a number or a word
5   and add additional commentary that related to
6   that item.
7      Q.   And then I think if you go to 4125
8   to the Bates ending 35, do you see that there
9   is a pop up box similar to the one we saw on
10  the previous exhibit that relates to the 8
11  million entry for additional bad debt reserve?
12     A.   Yes, I see that.
13     Q.   With the same description?
14     A.   Yes.
15     Q.   And that's the same description
16  that we saw in the footnote B on Exhibit 4263,
17  right? If you need to check it, feel free.
18     A.   They appear consistent.
19     Q.   And that footnote states, "Prior
20  experience with the Delaware Valley entities
21  led to the 50 million reserve for bad debts.
22  AHERF management believed that when the DV
23  entities were brought into the AHERF system,
24  the entities did not have sufficient reserves
25  on their books for bad debts. Therefore,
```

Page 343

```
1          MS. KISTLER: We are now back on
2   the record. The time is 1:47 p.m. this the
3   beginning of tape seven.
4      Q.   Ms. Porter, if you would flip with
5   me on Exhibit 4263, the Graduate Goodwill Entry
6   work paper?
7      A.   Okay.
8      Q.   To the fourth page of that exhibit
9   that has a -- starts with a footnote A through
10  E. Are you with me there?
11     A.   Yes.
12     Q.   And is it your understanding that
13  the footnote B on this footnote B here has
14  reference to the items that had the footnote B
15  on the 20 million and the 5 million and the 9
16  million?
17     A.   Yes.
18     Q.   And then if you look at on both
19  Exhibits 4123 and 4125 the City Avenue and
20  Parkview opening balance sheet analysis work
21  papers, do you see if you would flip first to
22  Bates ending 042 on Exhibit 4123?
23     A.   Okay.
24     Q.   Are you familiar with the concept
25  on CLASS of having a pop up box?
```

Page 345

```
1   management wanted to have sufficient reserves
2   for the Graduate Hospitals when they were
3   brought into AHERF. AHERF management discussed
4   its decision with the C&L partner who agreed
5   that a reserve should be established."
6          Do you know who it was -- first of
7   all, do you know if this was a footnote that
8   was drafted by Coopers?
9          MR. MCDONOUGH: You mean the pop up
10  box?
11         MR. TORBORG: And the footnote B on
12  the schedule that I'm referring to.
13     A.   Yes, I believe it was.
14     Q.   Do you know who at Coopers drafted
15  that?
16     A.   No, I do not.
17     Q.   Do you know when the footnote was
18  drafted?
19     A.   No, I do not.
20     Q.   I have supplied in the back of this
21  document, in the metadata information, the
22  third sheet in from that, do you see one that
23  has a date create field?
24     A.   Yes.
25     Q.   Of August 20, 1997?
```

32 (Pages 342 to 345)

Christa Porter

Page 350

1  clear, you are asking whether at the time that
2  I left if I knew that those reserves that were
3  set up in the opening balance sheet were set up
4  specifically for Delaware Valley reserves?
5      Q.   No.  Graduate Hospital bad debt
6  reserves.
7      A.   Specifically for Graduate Hospital.
8  That was my understanding that they were set up
9  during the opening balance sheet for the
10  Graduate entities.
11      Q.   And at some point prior to leaving
12  the audit, leaving Coopers, you became aware of
13  the fact that these 50 million of reserves were
14  transferred to the Delaware Valley entities,
15  right?
16      A.   That's correct.
17      Q.   Do you recall doing any analysis of
18  whether or not the Graduate Hospitals needed
19  additional bad debt reserves?
20      A.   I don't recall any analysis that I
21  did.
22      Q.   Do you know at all who at Coopers
23  was concluding on whether it was appropriate to
24  set up additional bad debt reserves for the
25  Graduate Hospitals?

Page 351

1      A.   No.  As I said when I left, I know
2  that the 50 million was an issue that was still
3  being looked at as well as some other topics
4  that I don't recall exactly who was involved
5  and who was performing that analysis.
6      Q.   I would like to show you two
7  additional exhibits at the same time.  I have
8  marked or I have shown the witness what has
9  been marked as Exhibit 4124 and Exhibit 4126,
10  which I think, Ms. Porter, you will agree with
11  me appear to be similar but perhaps different
12  in time work papers relating to the City Avenue
13  and Parkview opening balance sheet analysis.
14      If you could review both of those
15  documents and tell me whether you agree with
16  that representation.
17      Again for clarity of the record,
18  these were work papers that were printed off an
19  earlier version of the CLASS System, this one
20  labeled the Hipkiss disc.
21      A.   (Witness reviewing document.)
22      Q.   Ms. Porter, does this appear to be
23  a similar work paper as the work papers we saw
24  in Exhibit 4123 and Exhibit 4125?
25      A.   Yes, they do, and they have the

Page 352

1  same work paper reference number.
2      Q.   If you would go to the second page
3  of Exhibit 4124, there is again a cell for
4  purchase price adjustments.
5      A.   Okay.
6      Q.   And the second item there again,
7  this one says additional bad debt reserve for
8  DV A/R, and the amount is again $8 million,
9  right?
10      A.   Okay.
11      Q.   Did you know any difference between
12  the description on this version of the opening
13  balance sheet analysis and the previous
14  version?
15      A.   Yes, I do.
16      Q.   And what is that difference?
17      A.   This 4124 refers to additional bad
18  debt reserve for DV A/R, whereas the previous
19  document just said additional bad debt reserve.
20      MR. MCDONOUGH:  And the previous
21  document being exhibit --
22      A.   4123.  Sorry.
23      Q.   Ms. Porter, do you recall anything
24  about that change?
25      A.   No, I don't.

Page 353

1      Q.   Do you have an understanding --
2  what would your understanding have been back in
3  1997 with respect to the phrase for DV A/R?
4      A.   Sorry.  Repeat the question.
5      MR. TORBORG:  Can you read it back.
6      (Record read.)
7      A.   As I sit here today, to me that
8  would mean that it is a reserve set up for the
9  Delaware Valley.
10      Q.   And what was your understanding
11  back in 1997 of what Delaware Valley referred
12  to?
13      A.   The DVOG hospitals, what you have
14  referred to as DVOG.
15      Q.   And with respect to the Exhibit
16  4125 and 4126, I think you would see the same
17  change with respect to the removal of the
18  language for DV A/R, and would your answer be
19  the same with respect to that change, that you
20  don't recall?
21      MR. MCDONOUGH:  I object to your
22  use of the word "change."  These are different
23  documents.  Do you mean difference?
24      MR. TORBORG:  Sure.
25      A.   Yes.  My answer is consistent with

Christa Porter

Page 354

1  previously.
2      Q.   I have handed Ms. Porter what has
3  previously been marked in this case as Exhibit
4  1068, also has a Bates stamp number from the
5  SEC investigative depositions of Exhibit 521.
6  It is a document that refers to pages titled
7  AHERF Affiliation Analysis, June 30, 1997.
8          And, Ms. Porter, if you could
9  review that document to the extent you feel
10  necessary and tell me whether you recall it.
11     A.   (Witness reviewing document.)
12     Q.   Ms. Porter, do you recall this
13  document or any portion thereof?
14     A.   No, I do not.
15     Q.   Do you recognize the handwriting on
16  the second page of the document?
17     A.   No.
18     Q.   I have handed the witness what has
19  previously been marked as Exhibit 1067.  It is
20  a June 20, 1997 AHERF memorandum from Dan
21  Cancelmi to Charles Morrison.  The subject is
22  Intangible Assets on the Graduate Entities, and
23  also what was been marked as Exhibit 713 in the
24  SEC investigative depositions.
25     A.   (Witness reviewing document.)

Page 355

1      Q.   Ms. Porter, do you remember this
2  document at all?
3      A.   This document does look familiar,
4  but I don't recall whether I'm remembering it
5  from the SEC depositions or from prior to that.
6      Q.   I know that's difficult sometimes
7  to remember.
8          Do you see that there is a chart on
9  the first page of Mr. Cancelmi memo?
10     A.   Yes.
11     Q.   That had some language on the far
12  left column there starting with net
13  unrestricted deficit as of SDN acquisition
14  date, right?
15     A.   Yes.
16     Q.   And then if you compare it to
17  Exhibit 1068, the top line of that one, of that
18  chart, also has a description net unrestricted
19  deficit as of SDN acquisition date?
20     A.   Yes, I see that.
21     Q.   And then you skip to the third one,
22  there is an -- or to the fourth line of Exhibit
23  1068, there is something described as net
24  unrestricted deficit as of AHERF system entry
25  date 5-1-97?

Page 356

1      A.   Yes, I see that.
2      Q.   And that's the exact language that
3  we would see in the third entry on Exhibit
4  1067, right?
5      A.   Yes.
6      Q.   And then if we wanted to compare
7  some of those, at least going down to where the
8  descriptions no longer would apply to Graduate
9  entities, do you see a number of similarities?
10     A.   Yes, I do.
11     Q.   Do you know if somebody used -- let
12  me ask you first, Ms. Porter, if you know at
13  all whether Coopers & Lybrand or AHERF created
14  this schedule on the first page, Exhibit 1068?
15     A.   No, I don't know.
16     Q.   Do you know why the second item on
17  Exhibit 1068 says, general reserves but the
18  second item on Exhibit 1067 says bad debt
19  reserves for DVAR?
20     A.   No, I don't.
21     Q.   If I could ask you to flip back to
22  Exhibit 4248, which is a large packet of
23  account receivables work papers, and
24  specifically to the Bates page ending 307.
25          For the record, that page has

Page 357

1  working paper 0053-44, working paper name,
2  Parkview Bad Debt Reserves, 6-30-97, completed
3  by Kristen Heinlein, last modified and reviewed
4  by Christa Porter.
5          Ms. Porter, if you could review
6  that page as well as the two pages that follow
7  it.
8      A.   (Witness reviewing document.)
9      Q.   Ms. Porter, do you recall this work
10  paper?
11     A.   No, I don't.
12     Q.   Can you explain what it is?
13     A.   It appears to be some calculation
14  regarding AR reserve methodology.
15     Q.   Does it appear to you to be
16  although in a different form, the bad debt
17  reserve calculation for Parkview Hospital dated
18  June 30, 1997?  If you need to look at the
19  first page.
20         MR. MCDONOUGH:  As of June 30,
21  1997?
22         MR. TORBORG:  Yes.
23     A.   Yes, it appears to be a reserve
24  calculation for Parkview as of 6-30-97.
25     Q.   And then it has, although a little

35 (Pages 354 to 357)

Christa Porter                                                                                    Volume 2

---

Page 386

1  questions that you drafted?
2      A.  (Witness reviewing document.)
3      Q.  Ms. Porter, do you recall these
4  questions on this document?
5      A.  No, I don't.
6      Q.  Do you think these are ones that --
7  these are comments and questions that you would
8  have drafted though you can't recall whether
9  you did today?
10      A.  I'm not sure.
11      Q.  Who else could have been the person
12  who drafted these?
13          Let me add to that, is there
14  anything about the style of the writing or just
15  the format of the document that would refresh
16  your recollection at all about who else might
17  have drafted these?
18      A.  It may have been Amy, but quite
19  frankly, I'm not real sure.
20      Q.  What makes you state that you think
21  it may have been Amy?
22      A.  I don't recall knowing enough about
23  the CRAs to be able to draft these comments.
24      Q.  If you look at the last page of the
25  exhibit, the second to the last bullet

---

Page 387

1  provides, "Tom Hipkiss will be out on 20 and
2  21st. Duane out on 22. Will need access to
3  current year calculations and correspondence
4  throughout the year. We will provide with roll
5  forwards from your department."
6          Do you recall a Tom Hipkiss?
7      A.  No.
8      Q.  Whether or not he was on this audit
9  or not, you don't remember a Tom Hipkiss?
10      A.  No.
11          - - - - -
12          (Thereupon, Deposition Exhibit 4266
13          was marked for purposes of
14          identification.)
15          - - - - -
16      Q.  For the record, what I have marked
17  as Exhibit 4266 is an audit step work paper for
18  section 0072 Liabilities and Capital, file
19  section name Accrued Liabilities and Other
20  Payables, and the step name, "Obtain or prepare
21  a detailed analysis of accrued liabilities in
22  other payables account balances." Completed by
23  Anthony Carrabba and last modified by Christa
24  Porter.
25          Ms. Porter, if you could just look

---

Page 388

1  at that.
2      A.  (Witness reviewing document.)
3      Q.  Ms. Porter, do you recall being
4  involved with reviewing the accrued liabilities
5  substantive area of the audit for the fiscal
6  year 97?
7      A.  No.  I can't recall whether that's
8  an area that I looked at or not.
9      Q.  As a reviewer of this particular
10  audit step, what would your responsibilities
11  have been?
12      A.  If I were the reviewer of this
13  audit step, I would have reviewed the documents
14  that supported that audit step.
15      Q.  Would it also be to assure that the
16  step description was satisfied by a working
17  paper in the file?
18      A.  Yes.
19      Q.  And I would like to show you what
20  we have marked before as 4130, which is a
21  working paper number 0072-1 titled AHERF
22  Accrued Expenses, completed by Anthony
23  Carrabba, last modified by Dana Bleckman and
24  then reviewed by both Dana Bleckman and Christa
25  Porter.

---

Page 389

1          Ms. Porter, if you could take a
2  quick glance through the document to the extent
3  you feel necessary to tell me if you recall it,
4  and then I'll have some specific questions.
5      A.  (Witness reviewing document.)
6      Q.  Ms. Porter, do you recall this
7  document at all?
8      A.  No, I don't.
9      Q.  Do you believe as you sit here
10  today that this is a document that satisfies
11  the step description that we saw in exhibit --
12  the previous exhibit I showed you?
13      A.  It appears to be a review of the
14  accrued liabilities for each of the entities
15  and to be a summary of such along with analysis
16  regarding the balances that are in the
17  accounts.
18      Q.  I would like to show you what we
19  have marked previously as Exhibit 4132, which
20  is another audit step work paper in section
21  0072, the Audit For Accrued Liabilities and
22  Other Payables, this one the step name, "Test
23  accrued liabilities and other payables balances
24  for reasonableness, fluctuations and
25  omissions," and the step description provides,

---

Cleveland (216) 523-1313                                                      Akron (330) 374-1313

Christa Porter                                                                 Volume 2

Page 390

1    "Review the balances for reasonableness,
2    expected or unexpected fluctuations between
3    years and obvious omissions.  Obtain
4    explanations for any changes greater than or
5    equal to $500,000 and 5 percent."
6         Ms. Porter, do you know what the
7    purpose of this audit step was?
8         A.  I believe it was just to gain an
9    understanding of the change from year to year
10   between the accrued liability accounts.
11        Q.  And what would be the purpose of
12   attempting to gain an understanding of the
13   changes in the balances?
14        A.  I don't recall what level of detail
15   testing that we did on those accounts, so it
16   would give an understanding of any significant
17   changes or fluctuations between the balances.
18        Q.  Do you know where the, I guess,
19   materiality threshold, so to speak, of $500,000
20   and 5 percent came from?
21        MR. MCDONOUGH:  Object to form.
22        A.  No, I don't recall where that's
23   from.
24        Q.  Does the work paper I showed you at
25   Exhibit 4130, work paper 0072-1, does that

Page 391

1    appear to be the work paper that's purporting
2    to satisfy this audit step?
3         A.  In the step comments it does refer
4    to that work paper.
5         Q.  Oh, yes, you are right.
6         A.  Work paper 72-1.
7         Q.  Can I ask you to look at Bates page
8    ending 198 of work paper 72-1.
9         MR. MCDONOUGH:  Exhibit 4130.
10        Q.  I would like to ask you to focus on
11   the Graduate Hospital part of the schedule
12   here; do you see that?
13        A.  Yes.
14        Q.  And you see toward the bottom of
15   the schedule there is an account 4205001 for
16   accrued, I think that means accrued
17   miscellaneous, would you agree with me on that?
18        A.  Yes, that's what it appears to
19   mean.
20        Q.  And then there is a balance of
21   5,016,000 and change?
22        A.  Yes.
23        Q.  As of 6-30-97?
24        A.  Yes, I see that.
25        Q.  Is it your understanding since we

Page 392

1    are dealing with a liability side of the
2    balance sheet here that that would represent a
3    credit balance?
4         A.  Sorry.  I was just checking to make
5    sure the other ones appear the same.
6              Yes, that appears like a reasonable
7    assumption based on the other schedules.
8         Q.  Next to that figure is a footnote
9    D, and that footnote D states toward the bottom
10   of the page, "Amount represents general
11   reserves for unknowns related to purchase of
12   Graduate."
13             Do you recall that specific
14   language in this schedule?
15        A.  No, I don't recall the schedule.
16        MR. TORBORG:  We can stop.
17        MS. KISTLER:  We are now going off
18   the record.  The time is 3:39 p.m.
19        (Recess taken.)
20        MS. KISTLER:  We are now back on
21   the record.  The time indicated is 3:46 p.m.
22   This is the beginning of tape eight.
23        Q.  Welcome back.
24        A.  Thank you.
25        Q.  When we broke, I had asked you

Page 393

1    about footnote D on Bates page 198 of the
2    accrued liabilities work paper, and I think you
3    told me that you didn't recall this specific
4    language?
5         A.  Correct.
6         Q.  As you sit here today, what is your
7    understanding of what that footnote means?
8         A.  As I sit here today, I read it to
9    mean a general reserve relative to Graduate.
10        Q.  Would this be in the form of a
11   cushion?
12        A.  I know I tend to use those terms
13   interchangeably, so, yes.
14        Q.  If I could ask you to flip to the
15   next page 199, and this is a schedule that
16   carries over for Mt. Sinai Hospital, and I ask
17   you if you would to look at the same account
18   number, 4205001 for accrued miscellaneous, one
19   that has a footnote B next to it, balance of
20   7,698,000.  Are you with me there?
21        A.  Yes.
22        Q.  And then there is a footnote B that
23   states, "Amount represents remainder of accrual
24   for items related to purchase that AHERF was
25   not aware of at the time of the purchase.

44 (Pages 390 to 393)

Christa Porter

Page 394

1  Original amount of time of opening balance
2  sheet was $11,500,000."
3       Ms. Porter, do you recall that
4  language?
5    A.  No, I don't.
6    Q.  As you sit here today, what do you
7  take that language to mean?
8    A.  As I sit here today, it appears to
9  mean that there were amounts that they planned
10 to incur or expect to incur relative to the
11 purpose that this accrual relates to.
12   Q.  What do you take the term, "AHERF
13 was not aware of," to mean?
14   A.  It could mean a number things.  I
15 don't know.  As I sit here today, it could mean
16 they were things that they hadn't anticipated,
17 they were accruals at the time of purchase that
18 they weren't aware of but subsequently became
19 aware of.  I'm not sure.
20   Q.  Do you recall asking AHERF for a
21 substantiation of the figure that was accrued
22 at the opening balance sheet date in this
23 account?
24   A.  I don't recall what information we
25 requested relative to those balances.

Page 395

1    Q.  Who on the audit team would have
2  been doing that aspect of the audit?
3    A.  The opening balance sheet?  I don't
4  recall for certain.  I think maybe Tony
5  Carrabba might have been involved in some part
6  of the opening balance sheets.  I know I looked
7  at some of it, but I don't remember in what
8  capacity or else reviewed those documents.
9    Q.  This note references the fact that
10 the original amount in the account at the
11 opening balance sheet date was 11,500,000,
12 right?
13   A.  Yes.
14   Q.  And at the end of the year, two
15 months later, it has been reduce to do
16 7,698,000 and change, right?
17   A.  Yes.
18   Q.  Would that have satisfied the
19 materiality test for the fluctuation amount of
20 500,000 or 5 percent?
21     MR. MCDONOUGH:  I object to form.
22   A.  I'm not sure.  They may have had
23 enough information from their discussions to
24 satisfy them.
25   Q.  If we could go back to what I

Page 396

1  marked as Exhibit 4132, which is the audit
2  step, "Test accrued liabilities and other
3  payables balances for reasonableness,
4  fluctuations and omissions."
5       The last sentence of that audit
6  step says, "Obtain explanation for any changes
7  greater than or equal to $500,000 and 5
8  percent."
9       Does this footnote B provide an
10 explanation for why this particular account
11 balance was reduced from 11 and a half million
12 dollars to $7,698,000 and change?
13   A.  No, it does not say what the
14 reduction was used for.
15   Q.  If I could ask you, see if I can do
16 this quickly, to look at the Rancocas account
17 on the same page.
18   A.  Sure.
19   Q.  Accrued miscellaneous account
20 4205001, this one has a balance of $1,319,685
21 as of 6-30-97.  And there is a footnote there
22 that states next to that amount that states,
23 "Amount represents a remainder of accrual for
24 items related to purchase that AHERF was not
25 aware of at the time of purchase.  Original

Page 397

1  amount at time of balance sheet was $6
2  million."
3       Would your answers be the same with
4  respect to both the reason for the accrual in
5  the first place and also whether or not this
6  schedule contains an explanation for the change
7  in the balance from 6 million to $1,319,000?
8    A.  My answers would be consistent with
9  the previous answers, yes.
10   Q.  Do you recall just generally, not
11 with respect to this account or any of these
12 balances, any discussion at all about where
13 certain accounts, account balances at the
14 Graduate Hospitals, why they were reduced from
15 the opening balance sheet date to the year-end
16 date, any discussions along those lines?
17   A.  I don't remember any.
18     - - - - -
19     (Thereupon, Deposition Exhibit 4267
20     was marked for purposes of
21     identification.)
22     - - - - -
23   Q.  For the record, what I have marked
24 as Exhibit 4267 is an issue topic titled Non
25 Recurring Revenue that was printed off an

45 (Pages 394 to 397)

Christa Porter                                                                 Volume 2

Page 398

1  earlier version of the CLASS database, this one
2  from the one entitled Carrabba disc, and, Ms.
3  Porter, I note that you are the individual who
4  both created and last modified this document,
5  and to speed things along, if you could just
6  please read the item 3 for now.
7      A.  (Witness reviewing document.)
8      Q.  Ms. Porter, do you recall this
9  issue that is the subject of this -- this item
10  3, the $14 million of deferred revenue related
11  to a Qualmed contract that certain of the
12  Graduate Hospitals recorded into income during
13  the fiscal year 1997?
14     A.  No, I don't.
15     Q.  Do you know if you are the
16  individual who drafted this language in section
17  3?
18     A.  No, I don't.
19     Q.  On the second page toward the
20  bottom of this item is a sentence that starts
21  with, "AHERF's rationale was to say to IBC that
22  even though it wasn't included in 1996 revenue,
23  if AHERF had owned Graduate at that point, it
24  would have reversed the amounts to income
25  then."

Page 399

1         Do you have any idea who it was
2  that provide AHERF's rationale to that effect?
3      A.  No, I don't.
4      Q.  Do you have an understanding of
5  what that language is trying to say?
6      A.  No.
7      Q.  Okay.  Do you recall any
8  discussions with anyone else on the audit team
9  about the Qualmed deferred revenue issue?
10     A.  No.  I can't really remember the
11  issue.  The only thing I did want to say is
12  that the language where it talks on that second
13  page about they excluded the prudent buyer
14  calculation as they were an in-house plan, but
15  after it was sold, they failed to include them,
16  the issue itself isn't familiar to me, but that
17  bit of language is, and I don't know why.
18     Q.  Do you recall working on the
19  prudent buyer issues for the Graduate entities
20  for purposes of either the 1997 audit or any
21  other engagement related specifically to
22  prudent buyer issues?
23     A.  No.  I vaguely recall tying down
24  some numbers for prudent buyer, but I don't
25  recall doing any auditing work relative to it.

Page 400

1         - - - - -
2         (Thereupon, Deposition Exhibit 4268
3         was marked for purposes of
4         identification.)
5         - - - - -
6      Q.  What I have marked as Exhibit 4268
7  bears the Bates numbers CL 243357 and 58.  It
8  is an issue topic titled March vs. May Purchase
9  Accounting, and I believe this comes from an
10  earlier version of the class database as well.
11        It was created by last modified by
12  and cleared by Christa Porter.  If you could
13  look at that document.
14     A.  (Witness reviewing document.)
15     Q.  Ms. Porter, do you recall the issue
16  that is the subject of this issue topic, which
17  is the date at which the Graduate Hospitals
18  should have been accounted for in the AHERF
19  system financial statements?
20     A.  I do recall the topic.  I don't
21  recall this specific document, but I do recall
22  the topic or the issue of the March versus May,
23  yes.
24     Q.  What do you recall about that
25  topic?

Page 401

1      A.  I recall that when Graduate was
2  purchased, and I actually don't recall that
3  date, it went into an entity called SDN, and
4  there was an issue as to when effective control
5  transferred from SDN to AHERF management.
6         AHERF booked it as May, as the
7  opening balance sheet was May, and effective
8  control took place then, and C&L contended that
9  effective control took place prior to that,
10  which was March.
11     Q.  Do you know what it was
12  substantively that made Coopers & Lybrand
13  believe that effective control transferred on
14  March 1 instead of May 1?
15     A.  No.
16     Q.  Do you recall if it had anything to
17  do with the transfer of the Graduate reserves
18  to the DVOG through AHERF intercompany accounts
19  starting in March and then again in April of
20  1997, the 50 million?
21     A.  I'm not sure.  I don't remember.
22        - - - - -
23        (Thereupon, Deposition Exhibit 4269
24        was marked for purposes of
25        identification.)

46 (Pages 398 to 401)

03/11/2004  10:39  7245381442                GWII                        PAGE  02

FROM CRAVATH SWAINE & MOORE LLP          (WED) 3. 10' 04 19:09/ST. 19:08/NO. 4260048428 P  2

| DEPOSITION ERRATA SHEET | | |
|---|---|---|
| **PAGE** | **LINE** | |
| | | See Attachment A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

SIGNATURE:_____    DATE:_____

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE COMPANY
RECOGNIZED AND TRUSTED FOR OVER 30 YEARS
ERIEVIEW TOWER, 130° EAST NINTH STREET, CLEVELAND, OHIO 44114

03/11/2004  10:39    7245381442                    GWII                          PAGE  03

FROM CRAVATH SWAINE & MOORE LLP            (WED) 3.10'04 19:09/ST. 19:08/NO. 4260048428 P  3

**Attachment A**

| Page/Line | Change | Reason |
|---|---|---|
| page 5, line 9 | "Potter" to "Porter" | stenographical error |
| page 136, line 6 | "Christine" to "Kristen" | stenographical error |
| page 140, line 5 | "suggestions can" to "discussions with" | stenographical error |
| page 179, line 4 | "way" to "say" | stenographical error |
| page 190, line 7 | "end ever August" to "end of August" | stenographical error |
| page 249, line 4 | "assumes" to "assumption" | stenographical error |
| page 254, line 7 | "won" to "one" | stenographical error |
| page 260, line 19 | "go-forward" to "roll-forward" | stenographical error |
| page 321, line 13 | "initial" to "issue in" | stenographical error |
| page 381, line 13 | "Duane Groll" to "Duane Girol" | stenographical error |

I have read the transcript of my January 29-30, 2004 deposition and swear that my
testimony, with the above changes, is true and correct.

Christa Porter

Sworn to before me
this _11th_ day of March, 2004

Cheryl A. Davidson
Notary Public

Notarial Seal
Cheryl A. Davidson, Notary Public
Callery Boro, Butler County
My Commission Expires Apr. 15, 2004
Member, Pennsylvania Association of Notaries