**Ray Dep.**

## In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

*RICHARD RAY*
*June 29, 2004*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

RAY, RICHARD - Vol. 1



LEGALINK
A WORDWAVE COMPANY

Page 102

1  unknown to you, your employment contract or
2  your employment, you became employed by, I
3  guess, AHERF itself?
4  A. Yes, an AHERF subsidiary. That's correct.
5  Q. Okay. Do you -- or can you tell me if your
6      employment contract with AHERF was accepted or
7      rejected during the bankruptcy process, if you
8      know?
9  A. Well, I presume it was accepted, because I am
10     still there working under that contract.
11 Q. Well, and you never received any notice that it
12     was being rejected, correct?
13 A. Was rejected. That's correct, yeah.
14 Q. And so from January 1, 1997, you became an
15     employee of a subsidiary of AHERF, and then
16     have continued with its successor entity as an
17     employee to this day, is that fair?
18 A. Well, in January of 1997, it was Allegheny
19     General Hospital.
20 Q. Okay.
21 A. Somewhere along the line, it became this AHERF
22     entity, and then we lived in a limbo state that
23     we didn't understand, and then when West Penn
24     merged with Allegheny General, they formed a
25     new group which is the Allegheny Specialty

Page 103

1      Practice Network, which is now my employer.
2  Q. Okay. Thank you. That certainly clarifies it.
3           Earlier, you testified that you
4      trusted or relied on the financial people that
5      were on the AHERF board to understand AHERF's
6      financial statements and financial conditions
7      better than you. Do you recall that testimony?
8  A. I don't remember exactly what I said, but I had
9      more confidence in their ability to understand
10     these reports than I did in my own.
11 Q. All right. Was there someone or were there
12     persons in particular that you were thinking
13     about when you made that statement?
14 A. We had at least two members of the board that
15     worked for banks, and I believe we had the CFO
16     of United States Steel as a board member.
17 Q. And do you recall who those -- the names of
18     those individuals, the two who worked for a
19     bank?
20 A. David Barnes worked for Mellon Bank, and there
21     was someone from PNC. I don't remember the
22     name right now.
23 Q. Mr. O'Brien?
24 A. Yes.
25 Q. And the CFO from U.S. Steel?

Page 104

1  A. Hernandez.
2  Q. Anyone else in particular that you would put in
3      that category?
4  A. Well, we had the former CEO of Dollar Bank,
5      Mr. Nimick.
6  Q. Mr. --
7  A. Nimick, and a number of businessmen.
8  Q. When you were on the board of AHERF for that
9      one-year period, you were not on the Audit
10     Committee of AHERF, correct?
11 A. I was not.
12 Q. And you were not on the Finance Committee of
13     AHERF, correct?
14 A. I was not.
15 Q. And at some point in time, the Audit Committee
16     and the Finance Committee merged and became the
17     Audit and Finance Committee. Were you aware of
18     that?
19 A. I don't remember that happening.
20 Q. Is it safe to say then you weren't a member of
21     what became the Finance and Audit Committee?
22 A. No.
23 Q. No, you were not?
24 A. I was not.
25 Q. I think Mr. Walker asked you earlier about the

Page 105

1      outside auditors for AHERF, and you testified
2      you were aware that Coopers & Lybrand performed
3      audit services for AHERF, correct?
4  A. Yes.
5  Q. Were you aware that Coopers & Lybrand was the
6      outside auditors during that one-year period on
7      which you served on the board of AHERF?
8  A. I remember approving them as the auditors.
9  Q. I take it there was a vote at a board meeting?
10 A. Yes, we approved them. One of the few things
11     we voted on, actually.
12 Q. And was that based on the recommendation of the
13     Audit Committee that Coopers & Lybrand should
14     be retained as the auditors, to the best of
15     your recollection?
16 A. I don't know which entity approved it, but I
17     presume the Audit Committee would recommend it.
18 Q. Do you have a recollection of someone making a
19     presentation stating that we would now have a
20     vote on retaining Coopers & Lybrand as the
21     outside auditors?
22 A. I don't remember any presentations.
23 Q. Okay. Do you remember how the issue came
24     before the board?
25 A. It was an agenda item. Approving the auditors

27 (Pages 102 to 105)

Page 106

1 was an agenda item.
2 Q. And did you vote in favor of approving
3    Coopers & Lybrand?
4 A. Yes.
5 Q. Do you recall anyone dissenting in that vote?
6 A. No.
7 Q. I'd like to talk to you a little bit about what
8    your understanding is of what the outside --
9    the services the outside auditors performed for
10   AHERF.
11         First, let me ask you was it your
12   understanding that the Audit Committee of the
13   board of AHERF was the entity that had direct
14   interaction with the outside auditors?
15 A. No, that was not my understanding.
16 Q. All right. Well, did you have an understanding
17   contrary to that?
18 A. No.
19 Q. Just no understanding at all?
20 A. Right.
21 Q. Okay. Do you recall there being a time when
22   findings of the outside auditors were presented
23   to the board at a meeting at which you
24   attended?
25 A. I don't specifically remember that.

Page 107

1 Q. Did you have any understanding as to whether it
2    was the role of the Audit Committee to address
3    any issues that Coopers & Lybrand presented
4    with respect to matters they had found during
5    the course of their audit?
6 A. Would you repeat that question?
7 Q. Sure.
8         MS. MEADEN: Can you read it back?
9    See if I can do a better job.
10        - - - -
11   (The record was read back by the Reporter.)
12        - - - -
13 BY MS. MEADEN:
14 Q. And if you need me to rephrase, let me know.
15 A. I would have presumed that, but I don't know
16   why I would have.
17 Q. Are you familiar with the term clean opinion as
18   that's used in the accounting Lexicon?
19 A. No.
20 Q. Was it your understanding that at the end of an
21   audit, auditors present an opinion with respect
22   to what they found during the course of their
23   review?
24         MR. WALKER: Objection to form.
25 A. That they do or that they should was the

Page 108

1 question?
2 Q. Well, if there's a difference -- you know, if
3    you think there's a difference, let me know
4    that.
5 A. I don't know what they do, but I would think
6    they should.
7 Q. Well, you talked about earlier your books were
8    audited by an outside accounting firm.
9 A. Yes.
10 Q. Do you recall receiving a written report from
11   those auditors?
12 A. Yes. Yes.
13 Q. And did that report, to your recollection,
14   state that they found that the financial
15   statements they had reviewed fairly and
16   accurately represented the financial condition
17   of your practice?
18 A. Yes.
19 Q. Do you recall ever hearing of or seeing a
20   similar type of report from Coopers & Lybrand
21   with respect to their audit of AHERF financial
22   statements?
23 A. I do not remember that specifically.
24 Q. Was it your understanding that if Coopers &
25   Lybrand, as AHERF's outside auditors, found

Page 109

1    issues that raised concerns about fraud in the
2    financial statements, that that was something
3    that they would present either to the AHERF
4    Audit Committee or to the board?
5         MR. WALKER: Objection.
6 A. Would I have expected that to happen?
7 Q. Yes.
8 A. The answer is yes.
9 Q. And similarly, would you have expected
10   Coopers & Lybrand, if they had found material
11   misstatements in AHERF's audited -- in AHERF's
12   financial statements, to bring that matter to
13   either the AHERF Audit Committee or to the
14   board?
15        MR. WALKER: Objection.
16 A. Yes, that would have been my expectation.
17 Q. And if Coopers & Lybrand had found issues that
18   raised questions about the integrity of AHERF's
19   financial management during the course of their
20   audit of AHERF's books, would you have expected
21   Coopers & Lybrand to bring that to the
22   attention of the AHERF Audit Committee or the
23   AHERF board?
24        MR. WALKER: Objection.
25 A. Yes.

Page 110

1  Q. And if Coopers & Lybrand had found intentional
2     misstatements in AHERF's financial statements
3     during the course of their audit, would you
4     have expected Coopers & Lybrand to bring that
5     to the attention of the AHERF Audit Committee
6     or the AHERF board?
7        MR. WALKER: Objection.
8  A. I don't believe I could answer that question.
9  Q. I'm sorry?
10 A. I don't believe I can answer that question the
11    way you phrased it.
12 Q. An intentional misstatement, is that what's
13    hanging you up?
14 A. Yes.
15 Q. Okay. If Coopers & Lybrand had determined that
16    there was information on AHERF's financial
17    statements that was intentionally misstated,
18    someone had the intent to misrepresent the
19    financial condition of AHERF, if Coopers &
20    Lybrand had determined that during the course
21    of their audit work, would you have expected
22    them to bring that to the attention of either
23    the AHERF Audit Committee or the AHERF board?
24       MR. WALKER: Objection.
25 A. If there was a misstatement and they corrected

Page 111

1     it, it would no longer be a misstatement.
2  Q. My question is if they had determined that
3     someone misstated it intentionally for the
4     purpose of deceiving readers of the financial
5     statement as to the financial condition of
6     AHERF, would you have expected that to be
7     brought to the attention of the board?
8  A. So, where was the origin of the misstatement?
9        MR. WALKER: Objection.
10 A. What was the origin of the misstatement?
11 Q. I'm suggesting that the group that was
12    preparing the financial statements within AHERF
13    presented those financial statements to the
14    auditors for review, and if the auditors came
15    to the conclusion that those financial
16    statements had been intentionally misstated,
17    would you have expected Coopers & Lybrand to
18    bring that to the attention of the Audit
19    Committee or the board?
20       MR. WALKER: Objection.
21 A. Yes.
22 Q. During your tenure either on the board or
23    during your employment at Allegheny General
24    Hospital, at any time did you ever hear or
25    learn that Coopers & Lybrand had brought any of

Page 112

1     these types of issues to the attention of
2     anyone on the Audit Committee or the AHERF
3     board?
4  A. Not to my memory.
5  Q. And do you recall who was the chair of the
6     AHERF Audit Committee during your tenure on the
7     AHERF board?
8  A. I believe it was David Barnes, but I'm not
9     sure.
10 Q. And if Coopers & Lybrand had raised issues of
11    the type that we just got done discussing to
12    the AHERF Audit Committee, was it your
13    expectation that the Audit Committee would have
14    taken some action to investigate the
15    allegations raised by Coopers & Lybrand?
16       MR. WALKER: Objection.
17 A. I would think that would be the function of the
18    Audit Committee.
19 Q. Did you ever learn at some point in time that a
20    decision was made to not continue retaining
21    Coopers & Lybrand as the outside auditors for
22    AHERF?
23 A. During 1997?
24 Q. Or later. It was --
25 A. I believe at some point later, another auditor

Page 113

1     was selected, but I don't remember when.
2  Q. Were you involved at all in that decision to
3     choose another auditor?
4  A. No. No.
5  Q. And did you ever hear any reasons as to why
6     another auditor was brought in and Coopers &
7     Lybrand not retained?
8  A. I think I was probably told, but I don't
9     remember the reason.
10 Q. Do you recall by whom you may have been told?
11 A. I think probably would have been at an AGH
12    board meeting, so presumably the chairman of
13    the board.
14 Q. Do you recall, in the September 1998 time
15    period, a press release was issued stating that
16    the audited financial statements for AHERF and
17    its affiliates for fiscal year 1997 should no
18    longer be relied upon?
19 A. I do not remember that.
20 Q. Do you recall at some point in time that
21    Mr. McConnell's employment with AHERF was
22    terminated?
23 A. Yes.
24 Q. Were you involved in that decision at all?
25 A. I don't remember.

Page 114

1  Q. Do you recall hearing the reason as to why his
2     employment was terminated at the time?
3  A. I don't remember being given a reason, but I
4     don't think I had any question of it.
5  Q. Do you want to share what your belief was?
6  A. He was in charge when the ship sunk.
7  Q. Who was in charge what?
8  A. He was in charge when the ship sunk.
9        MS. MEADEN: I don't believe I have
10    any further questions for you. Thank you.
11       MR. THURMAN: Dr. Ray, I have just a
12    few for clarification.
13             - - - -
14          EXAMINATION
15             - - - -
16 BY MR. THURMAN:
17 Q. You testified, I believe, that as a result of
18    being present at the Allegheny General Hospital
19    medical staff, you were an ex-officio member of
20    both the AHERF board and the Allegheny General
21    Hospital board, is that correct?
22 A. That was my understanding.
23       MR. WALKER: Counsel, maybe we better
24    give you one since you're going to be asking
25    questions.

Page 115

1        MR. THURMAN: There won't be many,
2     but I'll try and --
3        THE VIDEOGRAPHER: Thank you.
4        MR. THURMAN: You're certainly
5     welcome. Do I need to repeat that question?
6        THE VIDEOGRAPHER: No, it picked up
7     well enough.
8        MR. THURMAN: Okay.
9  BY MR. THURMAN:
10 Q. What was your tenure on the Allegheny General
11    Hospital board? From when to when?
12 A. My tenure was to have been six years.
13 Q. Um-hum.
14 A. And it started when I was the -- was elected to
15    be the president of the medical staff in
16    January of 1995 and was to continue two years
17    past the time that I was -- completed my tenure
18    as president of the medical staff when I was
19    immediate past president. In actuality, the
20    board was changed at the end of 1998, so I only
21    served four of those six years.
22 Q. So, it was from the beginning of 1995 to the
23    end of 1998, is that --
24 A. That's correct.
25 Q. Okay. Now, when you made a reference in your

Page 116

1     deposition to the fact that you were on several
2     medical staff committees that were board
3     committees in the sense that they reported to
4     the board, to which board were you referring?
5  A. Allegheny General Hospital.
6  Q. Okay. Now, you were shown and if you would
7     take a look at Exhibit 1655. I can give you
8     mine, but I sort of need it to ask questions.
9     It's the one that is the minutes of the
10    Thursday, October 30, 1997 AHERF board meeting.
11    That's it right there.
12          You testified earlier, if my memory
13    is correct, that you said that you would
14    sometimes take financial statements after the
15    meeting and discuss them and try and get
16    Dr. McMaster to explain them to you, is that
17    correct?
18 A. Yes.
19 Q. And is Dr. McMaster shown as being an attendee
20    at this meeting on its minutes?
21 A. He was -- he's shown as being an invitee.
22 Q. Okay. I'll just let it stand. Let it speak
23    for itself.
24          Now, going to page number 7 of that
25    set of minutes, the very first full item there

Page 117

1     is number C, Recommendation of appointment of
2     external auditors for fiscal year 1998.
3           Do you have any recollection if that
4     is the agenda item that you were talking about
5     where Coopers & Lybrand was reappointed
6     auditors that you attended?
7  A. I believe that's it, yes.
8  Q. Okay. Now, flipping back one page to page 6,
9     that begins something called the Report of the
10    Audit Committee. Do you see that there?
11 A. Yes.
12 Q. Roman Numeral V, and it indicates that
13    Mr. Barnes presented the report of the fiscal
14    year 1997 audited financial statements.
15          Is this the place in the agenda, if
16    you recall, where the year ended June 30, 1997
17    audit was approved by the board of AHERF?
18 A. It appears to be so.
19       MR. THURMAN: Nothing further.
20             - - - -
21          EXAMINATION
22             - - - -
23 BY MS. MEADEN:
24 Q. For clarification, would you look back at that
25    report from the Audit Committee that

Page 118

1  Mr. Thurman just asked you about.
2      If you would just look -- I was
3  trying to count how many lines down here --
4  eight lines down, I believe, in that paragraph
5  where it states, Mr. McConnell noted that the
6  audit work was completed September 4, 1997,
7  however, the report of the independent auditors
8  has not been signed. Management is waiting for
9  official waivers from the Graduate bond
10 trustees related to debt covenant violations
11 which are expected shortly. The audited
12 financial statements will be signed and issued
13 once the waivers are received. Discussion
14 followed.
15     Do you have any recollection at that
16 meeting that you were presented with a draft of
17 the audit opinion for fiscal year 1997 as
18 opposed to a final opinion from Coopers &
19 Lybrand?
20 A. I don't remember.
21 Q. Okay. You have no recollection of that at all?
22 A. No.
23 Q. That's fine.
24    MS. MEADEN: Thank you. Those are
25 all the questions I have.

Page 119

1  MR. WALKER: Nothing further.
2  THE VIDEOGRAPHER: With there being
3  no further questions, the deposition is now
4  concluded at 4:56 p.m. Thank you very much.
5  - - - -
6  (The proceedings were concluded at 4:56 p.m.)
7  - - - -

Page 120

1  COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2  COUNTY OF ALLEGHENY          )  SS:
3      I, JoAnn M. Brown, RMR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  RICHARD L. RAY, M.D., was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 6th day of July,
23 2004.
24 _____
25         Notary Public

Page 121

1  COMMONWEALTH OF PENNSYLVANIA )   E R R A T A
   COUNTY OF ALLEGHENY          )   S H E E T
2
3      I, RICHARD L. RAY, M.D., have read the
   foregoing pages of my deposition given on Tuesday,
   June 29, 2004, and wish to make the following, if
4  any, amendments, additions, deletions or corrections:
5  Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21             _____
                    RICHARD L. RAY, M.D.
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2004.
24 _____
          Notary Public
25 AKF Reference No. JB81465

**Reilly Dep.**

## In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *CHARLES E. REILLY*
*November 21, 2003*

---

## *LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

REILLY, CHARLES E.



LEGALINK
A WORDWAVE COMPANY

**Page 26**

consents group to join the special revenue of higher education group?

A. Management decided to reorganize the staff to have all the analysts keep the responsibility of the waivers and consents as opposed to a small team of quasi paralegals that reported to me at the time. We thought that would be a better alignment of responsibility.

Q. In addition to AGH and the DVOG, what other healthcare credits did you assist with in the 1997 to 1999 time frame?

A. I worked on many from a ratings responsibility. But only visited a few more challenged credits.

Q. And when you say a ratings responsibility, what do you mean by that?

A. Every month we would be responsible for rating a certain amount of the portfolio in order to achieve your ratings objectives by the end of the year to make sure that we were on top of our portfolio, make sure that we were comfortable with what we had, that it was appropriately rated and we knew where the risks were, where potential problems were.

**Page 27**

Q. What percentage of your time assisting the healthcare group did you spend fulfilling your ratings responsibilities functions?

A. Overall, probably half of that time or less.

Q. And how would you go about conducting a ratings review?

A. We would do spreads, financial statements, seek out demand statistics. Frequently they would come with the financial statements, not always. And we would typically call management to ask questions about the financial statements or footnotes as well as material events or issues that may not be disclosed in the financials but we might be familiar with just because of the macro environment.

Q. Just so the record's clear, can you define what you meant by spreads?

A. I'm sorry, a spreadsheet. It's a financial spreadsheet. Electronic. You would basically lay out the balance sheet, income statement, cash flow and certain pertinent

**Page 28**

ratios.

Q. Was the program that you used in this time frame known as the 2020 trend program?

A. I don't remember it called that. I don't remember.

Q. You just don't remember one way or the other?

A. Right.

Q. To produce these spreads, did you use unaudited financial information in addition to audited financial information?

A. Sometimes.

Q. Did you also use projections provided to you by existing credits?

A. Sometimes.

Q. Was there any rule of thumb as to when you would use projections?

A. On some of the more challenged credits we would look to see what management expected of themselves, what kind of results they were expecting.

Q. And why did you do that?

A. It gave them and us a benchmark to hold them to to see that they'd be able to

**Page 29**

resolve whatever financial challenges they were facing.

Q. Was it the case that MBIA in this time frame took these projections at face value, or did you and perhaps others, if you know, contact existing credits to challenge the projections that were provided to MBIA?

MR. BROWN: Objection as to form.

A. It's easy. We would not take a projection at face value, and we would use it as a basis to dialogue with management to see if they were -- to check on the credibility and just how realistic the objectives were.

Q. Was there any rule of thumb as to when you used unaudited financial information in producing spreads?

A. More -- well, I guess there would be two times. One would be if we were rating a credit that was well into the year, and so the year end financial statements may have been a little dated so we would try to -- we would spread the interim numbers in order to have something to work with.

And then on problem credits where you

Page 30

2  would monitor them more frequently, you would
3  have to work with the most current financial
4  statements because some credits you would
5  actually have to review on a quarterly basis.
6      Q.  Just to be clear, when you say
7  review, you mean review the internal rating that
8  MBIA had assigned?
9      A.  Yes.
10     Q.  I believe you testified earlier that
11 you visited a few healthcare credits in this time
12 frame.
13     A.  Yes.  Or certain management teams
14 would have come to Armonk.  But either way we
15 would interface personally.
16     Q.  Do you recall any of those credits?
17     A.  One was general health.  That was I
18 believe in Baton Rouge, Louisiana.  Of course in
19 addition to the management team at AHERF we also
20 met with the management team at AGH.  And some
21 management teams from the Boston area.  Hospitals
22 I remember meeting with but I can't remember
23 specifically which hospitals.
24     Q.  Are you familiar with the term
25 "academic health center"?

Page 31

2      A.  Yes.
3      Q.  Do you recall whether you visited
4  with any representatives from any academic health
5  centers in the Boston area?  Again, in connection
6  with this work.
7      A.  I don't remember.
8      Q.  When you testified about meeting with
9  representatives of AHERF, did you mean to
10 distinguish between representatives of AHERF and
11 representatives of AGH?
12     A.  Both.
13     Q.  Do you recall meeting with
14 representatives of the Delaware Valley Obligated
15 Group?
16     A.  Yes.
17     Q.  Who do you recall meeting with on
18 behalf of AHERF?
19     A.  Sherif Abdelhak and a number of board
20 members.  I think David Barnes, one other
21 gentleman whose name escapes me.
22     Q.  Did you meet these individuals all at
23 the same meeting, or are you recollecting
24 different meetings?
25     A.  We met with Sherif in a separate

Page 32

2  meeting from the meeting with the board members.
3      Q.  Did you meet with the board members
4  the same day that you met with Mr. Abdelhak?
5      A.  Yes.
6      Q.  Do you recall meeting with any other
7  representatives of AHERF at any point in time?
8      A.  Yes.  Well, I mean AHERF specifically
9  would be Sherif and the board members.  And then
10 from there I think -- I guess the answer is yes
11 because David McConnell and Mike Martin, I guess
12 that infrastructure was at the AHERF level.
13     Q.  Do you recall how many times you met
14 with Mr. McConnell?
15     A.  I would say two to four times in
16 person.
17     Q.  Thank you for the clarification.  I
18 have been speaking about personal meetings.
19     A.  Me too.
20     Q.  And we're on the same page.
21     A.  Good.
22     Q.  Do you recall how many times you met
23 personally with Mike Martin?
24     A.  Probably one or two more times.
25 Maybe two or three times more often than with

Page 33

2  McConnell.  Maybe half a dozen times.
3      Q.  When you met with Mr. McConnell, was
4  it the case that you talked about issues facing
5  both the DVOG and AGH?
6      A.  Yes.  But mostly concerned about
7  DVOG.
8      Q.  Is the same true with respect to your
9  personal meetings with Mr. Martin?
10     A.  Yes.
11     Q.  And the meeting that you recollected
12 having with Mr. Abdelhak, Mr. Gumberg, Mr. Barnes
13 and perhaps others, do you recall the subject
14 matter of that meeting?
15         MR. WITTEN:  Objection.  It was more
16 than one meeting he said.
17         MR. KRUSKO:  Did he say that?
18         MR. WITTEN:  He said he met Abdelhak
19 separately.
20         MR. KRUSKO:  I apologize.
21     A.  The subject -- go ahead.
22     Q.  I'm sorry, I just want to withdraw
23 that question in light of counsel's objections.
24 I want the record to be clear on this.
25         Do you recall the subject matter of

Case 2:00-cv-00684-DSC   Document 128-16   Filed 07/11/2005   Page 12 of 20
CHARLES E. REILLY

Page 34

1
2  the personal meeting that you had with
3  Mr. Abdelhak?
4     A.  Yes.
5     Q.  And what was that?
6     A.  Our concern over the financial
7  condition of DVOG.
8     Q.  Did this meeting occur in the late
9  April 1998 time frame?
10    A.  I can't be confident, but it sounds
11 about right.
12    Q.  What topics do you recall discussing
13 with Mr. Gumberg, Mr. Barnes and perhaps other
14 board members?
15    A.  Similar.  We also discussed the
16 merits of owning an academic institution.  We
17 discussed that with Sherif as well actually.  So
18 we talked about financial condition, we talked
19 about the merits of owning an academic center
20 given the costs.  We discussed the transfers and
21 the support from the west for the east and their
22 commitment to DVOG.  I think that would relate to
23 both meetings with all those individuals.
24    Q.  I take it you're drawing a
25 distinction between transfers and support.  And

Page 35

1
2  I'm wondering if you can elaborate on that.
3     A.  There is a distinction.  The
4  distinction is that the transfers out were to
5  acquire medical practices.  And that was draining
6  their cash flow.  And DVOG did not have a lot of
7  resources by itself to support that, and they
8  were receiving support from the west.  It may
9  have been in the form of loans.  But they had no
10 legal obligation to do so, so we were concerned
11 about what their intent was.
12    Q.  I take it you're recollecting that
13 AGH had no legal obligation to support the DVOG
14 at any point in time.
15    A.  That's right.
16    Q.  And you understood that in the 1998
17 time frame?
18    A.  Yes.
19    Q.  Do you recall whether there was ever
20 any confusion at MBIA as to whether that was in
21 fact the case?
22    A.  There's no confusion as to the
23 absolute financial commitment from AGH.  There
24 was some blurring where AHERF and AGH would
25 provide services for each other and then there

Page 36

1
2  were transfers associated with that, whether AGH
3  was training hospitals at DVOG hospitals or DVOG
4  was being charged by AHERF overhead.  So that's
5  separate.
6     Q.  Do you recall meeting with
7  representatives of AGH?
8     A.  Yes.
9     Q.  A repetitive question.  Do you recall
10 specifically who you met with on behalf of AGH?
11    A.  Yes.  Tony Sanzo, Joe Dionisio were
12 the two I remember.  We met more than just that,
13 but those are the two I remember.
14    Q.  Are you recollecting one meeting at
15 which time you met both gentleman, or are you
16 recollecting more than one meeting?
17    A.  More than one meeting.
18    Q.  Can you give an estimate as to how
19 many meetings you had with Mr. Sanzo, personal
20 meetings?
21    A.  Maybe two or three.
22    Q.  And can you give an estimate with
23 respect to Mr. Dionisio?
24    A.  Maybe just one or two more.
25    Q.  Do you recall meeting with anyone

Page 37

1
2  else on behalf of AGH?
3     A.  Yes, but I don't remember their
4  names, sorry.
5     Q.  And lastly, with respect to the DVOG,
6  do you recall meeting with representatives of the
7  DVOG?
8     A.  Yes.  I'm trying to recall the
9  gentleman's name.  He would have been the CFO for
10 DVOG.
11    Q.  Are you thinking of Chuck Morrison?
12    A.  Yes, thank you.  He as well as
13 certain other individuals, but I don't remember
14 their names.  Most of our interactions were with
15 Mike Martin and then Dave McConnell and others
16 supporting them in their accounting or finance
17 functions.
18    Q.  Did you receive any training from
19 MBIA when you began to assist the healthcare
20 group in the 1997 time frame?
21    A.  No.  I mean, minimal as far as just
22 adapting to MBIA's systems, their spreadsheet,
23 which I think you may have referred to as a
24 2020.  It may have been called that, I don't
25 know.  But things like that.  I was already a

10 (Pages 34 to 37)
LEGALINK MANHATTAN (212) 557-7400

Page 38

2  proficient healthcare analyst before coming to
3  MBIA.
4      Q.   My understanding is that you joined
5  MBIA in February of 1994. What was your position
6  immediately prior to that?
7      A.   I was with Mitsui Trust and Banking
8  Corporation which is in New York City. And I was
9  a loan officer. I was there for four years. The
10 first two years I headed up their public finance
11 group which included all public finance credits
12 including hospitals. And for my last two years
13 there I was a real estate workout officer. And
14 that would have been from I think August of '90
15 to February of '94.
16     Q.   What line of business was Mitsui
17 Finance Group in?
18     A.   They're an international Japanese
19 bank. I believe they've been consolidated into
20 something else recently. But it was a major
21 Japanese trust bank that was in the business of
22 providing credit enhancement, letters of credits
23 and direct loans, private placements, et cetera.
24     Q.   In the 1990 to 1992 time frame you
25 had responsibility with respect to healthcare

Page 39

2  organizations, is that right?
3      A.   It was all public finance. It
4  included some healthcare.
5      Q.   And what were your responsibilities
6  during this time frame in connection with
7  healthcare?
8      A.   It would have been originating new
9  business, monitoring the portfolio, dealing with
10 any waivers or consents that would come in.
11 Pretty comprehensive loan officer
12 responsibilities.
13     Q.   Do you recall whether Mitsui had any
14 healthcare clients in the State of Pennsylvania
15 in this time frame for which you were
16 responsible?
17     A.   I do not remember.
18     Q.   Do you recall being responsible for
19 any healthcare clients of Mitsui in this time
20 frame that existed in the State of New Jersey?
21     A.   Again, I don't remember the specific
22 clients. Sorry.
23     Q.   In this time frame, 1990 to 1992, as
24 a result of -- withdrawn.
25          In this time frame, 1990 to 1992, did

Page 40

2  you gain an understanding of the healthcare
3  market on a national level?
4      A.   Yes.
5      Q.   Did you gain an understanding of
6  healthcare reimbursement programs such as
7  Medicare and Medicaid?
8      A.   Yes.
9      Q.   Did you gain an understanding of the
10 healthcare insurance market?
11     A.   Yes.
12     Q.   What did you do prior to joining
13 Mitsui in 1990?
14     A.   I was with Continental Insurance
15 Corporation's financial guarantee subsidiary from
16 1986 to 1990. And we provided financial
17 guarantees for middle market real estate,
18 municipalities and corporate credits. Industrial
19 revenue bonds, municipal leases, things of that
20 nature.
21     Q.   In this four-year time frame did your
22 responsibilities touch on the healthcare
23 industry?
24     A.   No.
25     Q.   What did you do prior to this point

Page 41

2  in time?
3      A.   I was with Associates Commercial
4  Corp. from '82 to '86 in factoring and
5  receivables and inventory financing, some
6  equipment financing.
7      Q.   In this four-year time frame did your
8  employment responsibilities in any way deal with
9  healthcare?
10     A.   No.
11     Q.   Were you in Baruch's part-time MBA
12 program?
13     A.   Yes.
14     Q.   I take it you gained your MBA roughly
15 at the time you joined MBIA.
16     A.   Yes, roughly, yes.
17     Q.   Was there any concentration or focus
18 in your MBA course work?
19     A.   Yes, finance. As a general master's
20 of business administration, but concentration was
21 in finance.
22          MR. KRUSKO: Let's take a break.
23          THE VIDEOGRAPHER: We are going off
24 the record. The time is 9:58.
25          (Recess taken.)

CHARLES E. REILLY

Page 78

```
 1
 2  affiliates?
 3    A.  Yes.
 4    Q.  And did you take that as a positive?
 5    A.  Yes.  But there was no commitment.
 6  So it's not something you can bank on.
 7    Q.  Did you relay Mr. McConnell's
 8  statements to Ms. Strayer?
 9    A.  In the memo, yes.
10    Q.  Did Ms. Strayer contact you about
11  this memo?
12    A.  She was right next to me.  Her office
13  is right next to me.  So we discussed it.
14    Q.  And what did Ms. Strayer say to you
15  about this memorandum and the meeting more
16  generally?
17    A.  She acknowledged the memo, the
18  meeting and shared our concerns.
19    Q.  At this point in time did you believe
20  the general transferring of money across the
21  AHERF affiliates was going to benefit the DVOG in
22  the long-run, harm the DVOG in the long-run or
23  had you not formed an opinion one way or the
24  other?
25        MR. BROWN:  Objection.
```

Page 79

```
 1
 2    A.  We had not formed an opinion.  The
 3  magnitude concerned us.
 4    Q.  You and Mr. Heberton I believe have
 5  used the word "surreptitiously."  Why did you
 6  choose that word?  I don't want to turn this into
 7  sort of a grammar test.  I'm just trying to get a
 8  sense as to what you were trying to convey to the
 9  reader by discussing surreptitious transfers.
10    A.  We did not have a lot of comfort that
11  David was extremely disciplined about managing
12  each respective obligated group so that it would
13  support itself.  Because that's the way these
14  things are built.  They're supposed to support
15  themselves.
16        And by moving money around from one
17  obligated group to another is -- in one way there
18  might be business to conduct, but in one way you
19  could be damaging another entity.  And we thought
20  that the way he characterized it was a little too
21  casual.
22    Q.  In light of your concerns about
23  Mr. McConnell, did you attempt to raise this
24  issue with Mr. Abdelhak, the CEO of AHERF?
25    A.  We did.
```

Page 80

```
 1
 2    Q.  And when did you do that, if you
 3  recall?
 4    A.  When we met with him.
 5    Q.  Do you recall when you met with him?
 6    A.  Not specifically.  But it was after
 7  this meeting.  It was the same day we met with
 8  the board members I believe.
 9    Q.  Let me show you what we've previously
10  marked as Exhibit 1667.
11    A.  Okay.
12    Q.  Just for the record I would note that
13  this document, Exhibit 1667, is entitled "site
14  visit memo, May 4, 1998" to David Stevens and Pat
15  Mathis from you, Mr. Reilly, and Ms. Strayer, is
16  that correct?
17    A.  Right.
18    Q.  And in this memo, among other things
19  you and Ms. Strayer attempt to summarize the
20  meeting that you and others had with
21  Mr. Abdelhak, is that correct?
22    A.  Yes.
23    Q.  And this meeting occurred on May 4,
24  1998, is that correct?
25        MR. WITTEN:  Objection.
```

Page 81

```
 1
 2        MR. BROWN:  Objection.
 3    Q.  Withdrawn, I apologize.
 4        This meeting occurred on the 29th of
 5  May 1998, correct?
 6    A.  Right.
 7        MR. BROWN:  Objection.
 8        MR. WITTEN:  Objection.
 9        MR. BROWN:  You have the wrong
10  month.  April.
11        MR. KRUSKO:  I apologize.  I
12  apologize.
13    Q.  So the record's clear, this document,
14  Exhibit 1667, is entitled "site visit memo, May
15  4, 1998," is that correct?
16    A.  Yes.
17    Q.  And this memo attempts to summarize a
18  meeting that you, Ms. Strayer and others had with
19  Mr. Abdelhak, among others, on April 29th, 1998,
20  is that correct?
21    A.  Yes.
22    Q.  Is this the meeting with Mr. Abdelhak
23  that you are recollecting?
24    A.  Yes.
25    Q.  Your meeting with Mr. McConnell
```

LEGALINK MANHATTAN (212) 557-7400

Page 82

2  occurred on April 24th, 1997. And by that I mean
3  the meeting we were just discussing where
4  Mr. McConnell made some representations about
5  asset transfers, correct?
6      A.   Yes.
7      Q.   So if I understand you correctly,
8  over a year elapsed before you or anyone else at
9  MBIA, to the best of your knowledge, raised asset
10 transfer concerns with Mr. Abdelhak.
11         MR. BROWN: Objection. Lack of
12 foundation.
13     A.   I wouldn't say that's necessarily
14 true.
15     Q.   Do you recall personally raising
16 asset transfer concerns with Mr. Abdelhak any
17 time before April 29th, 1998?
18     A.   Not specifically.
19     Q.   Do you recall meeting with
20 Mr. Abdelhak or otherwise communicating with
21 Mr. Abdelhak at any point in time prior to
22 April 29th, 1998?
23     A.   Not specifically.
24     Q.   Do you know whether anyone in MBIA's
25 surveillance department spoke with Mr. Abdelhak

Page 83

2  about the asset transfer issues you and
3  Mr. Heberton raised in your memo prior to
4  April 29th, 1998?
5      A.   Not specifically. No.
6      Q.   Why didn't you try to contact
7  Mr. Abdelhak if you didn't have any comfort about
8  Mr. McConnell's willingness to observe corporate
9  formalities in terms of asset transfers?
10         MR. WITTEN: Objection.
11         MR. BROWN: Objection as to lack of
12 foundation.
13     A.   We did try. We were working with
14 both Mike Martin and Dave McConnell. We would
15 have phone calls with them and we did request
16 meetings.
17     Q.   And your requests were turned down?
18     A.   Put off, delayed, excuses, meetings
19 scheduled, canceled.
20     Q.   Did you try to raise your concerns
21 with the AHERF board?
22     A.   Yes, at this meeting.
23     Q.   Did you try to raise your concerns
24 with the AHERF board at any time prior to
25 April 29th, 1998?

Page 84

2      A.   No.
3      Q.   And why did you not do that?
4      A.   It's appropriate to first meet with
5  the individual running the organization. And if
6  you're not satisfied with the answers or the
7  meeting, then you would then go to the next level
8  of authority, which would be the board.
9           And because things were delayed, we
10 asked for meetings with the board the same day we
11 were asking for meetings with Sherif. This would
12 not be typical, but because we were delayed and
13 we didn't have any leverage to require a meeting
14 and we got one as soon as we could, we wanted a
15 separate meeting with the board members.
16          You'll note that our meeting with
17 Barnes and Gumberg didn't include Sherif. And
18 that's very deliberate.
19     Q.   Were you frustrated, were you
20 personally frustrated during this year lag time
21 between your meeting with Mr. McConnell and your
22 meeting with Mr. Abdelhak?
23     A.   Yes.
24     Q.   Did you act on that frustration in
25 any way?

Page 85

2      A.   Yes.
3      Q.   How did you act on it?
4      A.   Repeated calls, getting updates,
5  requesting meetings. Getting the attention of
6  the most senior people.
7      Q.   I believe you've testified that you
8  got excuses from Mr. Abdelhak in terms of why he
9  wasn't able to meet with MBIA.
10     A.   Perhaps not from him but maybe from
11 Mike Martin who was really our primary contact
12 who would seek to set up meetings with McConnell
13 and Sherif and the board members.
14     Q.   But that frustration never reached
15 the point of you attempting to contact any member
16 of the AHERF board, the parent board.
17         MR. BROWN: Objection.
18     A.   That's right.
19     Q.   After the meeting on the 24th of
20 April with Mr. McConnell, did you recommend to
21 Ms. Strayer or to Mr. Mathis that MBIA seek some
22 sort of binding guarantee that asset transfers
23 out of the DVOG would stop at a certain point in
24 time?
25         MR. WITTEN: Objection.

Page 142

2  reports such as this were disseminated throughout
3  MBIA in this time frame, is that correct?
4      A.  Well, to a certain distribution list,
5  which could be two or three dozen senior managers
6  at MBIA.
7      Q.  Across various groups or
8  departments?
9      A.  That's right.
10     Q.  What was the purpose of sending this
11 out across various groups and departments?
12     A.  To -- there were a number of
13 purposes.  One was to -- first to let the new
14 business people know that we've got a point of
15 stress in the portfolio and that they should be
16 aware of that when being solicited for new
17 business with this entity or with an entity that
18 might be feeling vulnerable to the same pressure
19 points.  Our reinsurers -- at a certain point we
20 tell our reinsurers either when it gets down to a
21 6 or a 7.  There's a schedule.  We also send
22 these to our accountants and let them know.
23         It's a pretty transparent process.
24 The intent is to let the most senior management
25 know.  Our chairman is told of this as well.

Page 143

2      Q.  I think in the first section here
3  you've indicated that MBIA was downgrading ADVOG,
4  which is the Allegheny Delaware Obligated Group,
5  "to 7-B to reflect the decreasing liquidity,
6  increasing managed care pressures on operating
7  margins, high debt levels, labor issues and
8  continuing losses from recently acquired
9  physician practices."  Do you see that sentence?
10     A.  Yes.
11     Q.  Do you recall looking at any
12 information that AHERF might have provided to
13 MBIA in arriving at that conclusion?
14     A.  Financial statements and
15 conversations with management.
16     Q.  So these would have been interim
17 fiscal year 1998 financial statements that MBIA
18 had received?
19         MR. WITTEN:  Objection.
20     A.  No, this is a '97 document, so it
21 would have to be -- the latest you might get
22 would be September 30th, 1997.
23     Q.  Is it your recollection that AHERF
24 and its affiliates were on a calendar -- a June
25 30 fiscal year?

Page 144

2      A.  Yes.
3      Q.  So December of 1997 would be fiscal
4  year 1998, correct?
5      A.  No.  June 30, '97 would be fiscal
6  year '97.  F/Y '97.  You could see here we've got
7  a December 2nd document in '97.  All the
8  references here are F/Y '97 and before.
9      Q.  Can you point me -- can you direct me
10 to one of the references to which you're
11 referring?
12     A.  Second paragraph, second line.
13 Talking about the decrease in cash.
14     Q.  I see.  So the impetus for this
15 downgrade was your review of draft audited
16 financial statements, consolidated audited
17 financial statements for AHERF for fiscal year
18 1997.
19     A.  Yes.
20     Q.  The very last sentence -- in the very
21 last sentence you stated "IPN," which I take to
22 be internal portfolio management, is that right?
23     A.  Yes.
24         MR. WITTEN:  Insure.
25     A.  That's right, insured.

Page 145

2      Q.  "IPN will review DVOG at least
3  quarterly and encourage AHERF to maintain certain
4  minimum cash balances at DVOG."  Do you see
5  that?
6      A.  Yes.
7      Q.  What did you mean by "encourage AHERF
8  to maintain certain minimum cash balances at
9  DVOG"?
10         MR. WITTEN:  Objection.
11         MR. BROWN:  Objection.
12     A.  That was part of the meeting with
13 Sherif and the trustees, that we were concerned
14 about the liquidity at AHERF, the cash transfers
15 out.  And we felt compelled to let them know that
16 we were concerned; it could have rating agency
17 ramifications.  We gave them all the good common
18 sense reasons why they should be concerned, too.
19     Q.  Did you at any point in time request
20 of AHERF that it agree to a quarterly liquidity
21 ratio with respect to the DVOG?
22     A.  I do not recall doing that.
23     Q.  Is that something based on your
24 experience with other credits that you have found
25 to be helpful in monitoring a troubled credit?

Page 146

2  A. Yes.
3  Q. Is that something you wish had been
4  imposed on the DVOG at some point in time to help
5  you with your remediations?
6      MR. BROWN: Objection.
7  A. It would have been helpful, but
8  because we didn't have breakage of any other
9  covenants, we didn't have leverage to
10 unilaterally require that. So it's certainly
11 something if they would have broken a covenant,
12 that it's something we would have required as
13 well as many other things.
14 Q. What are some of the other things
15 that MBIA would have required if a covenant had
16 been violated?
17 A. We would typically require consultant
18 call-in, more frequent financial reporting,
19 better cash controls and transfer controls. We
20 would look to design a plan which the objective
21 would be to shore up DVOG's balance sheet again.
22 That's what a workout officer would typically
23 do.
24 Q. Do you recall whether MBIA ever
25 requested of AHERF that it enter into a quarterly

Page 147

2  liquidity ratio with respect to DVOG?
3  A. No. We had no grounds to. We had
4  no -- all we could use is moral suasion. We
5  didn't have a stick. We didn't have leverage.
6      MR. KRUSKO: Let's go off the
7  record.
8      THE VIDEOGRAPHER: We are going off
9  the record. The time is 1:26.
10     (Luncheon Recess: 1:26 p.m.)

Page 148

1      AFTERNOON SESSION
2         2:51 p.m.
3      THE VIDEOGRAPHER: We are now back on
4  the record. The time is 2:51.
5
6      CHARLES E. REILLY,
7  resumed, having been previously duly sworn, was
8  examined and testified further as follows:
9      CONTINUED EXAMINATION MR. KRUSKO:
10 Q. Welcome back, Mr. Reilly.
11 A. Thank you.
12 Q. Before we broke we were discussing
13 some of the things that MBIA could perhaps have
14 insisted upon in the event of a covenant
15 violation. And I believe you ticked off a number
16 of things that I'd like to address right now.
17 A. Sure.
18 Q. One of the items I believe you
19 mentioned is a quarterly liquidity ratio. And I
20 believe you've testified that to the best of your
21 understanding a quarterly liquidity ratio was not
22 contained in the documents that governed the 1996
23 fixed rate DVOG bond offering.
24 A. I don't remember that being one.

Page 149

2  Q. I apologize if this is a little
3  repetitive, but do you remember making any
4  inquiry to determine why one was not included
5  from the start?
6  A. I do not know. That would have been
7  done at underwriting. And I wasn't involved in
8  the underwriting; I was involved in
9  surveillance.
10 Q. Did you ever raise the issue with
11 anyone on the underwriting side?
12 A. Yes, and I believe the response was
13 that there was a lot of cash at the parent.
14 Q. The parent meaning AHERF?
15 A. Yes.
16 Q. Was it then your understanding that
17 on that basis MBIA decided not to press AHERF for
18 a quarterly liquidity ratio?
19     MR. WITTEN: Objection.
20 A. I don't know. I don't know the
21 details. What I know is based on a quick
22 conversation looking to get a quick update, why
23 don't we do this, why don't we do that and we go
24 through. We don't really interrogate the new
25 business people the way I'm being asked right

Page 162

1
2  terms of putting together a plan in terms of what
3  it was going to do had there been a covenant
4  violation. And I think you testified about there
5  being the tangible prospect of a covenant
6  violation. Am I getting that right?
7      MR. WITTEN:  Objection.
8      MR. BROWN:  Objection.
9      A.   I think that's out of context. I'm
10 trying to recollect what we actually said.
11     Q.   I guess what I'd like to know is
12 whether you recall any sort of document which set
13 forth the steps that MBIA was going to take had
14 there been a covenant violation at the DVOG at
15 any point in time during the period of time you
16 assisted the healthcare group.
17     A.   I don't recall.
18     Q.   Is it fair to say that these
19 discussions that you've just recollected were
20 never advanced to the point of a plan being put
21 together for the simple fact that it never
22 appeared to MBIA that there was going to be a
23 covenant violation?
24     A.   I guess we were challenged by the
25 financial statements that were given to us

Page 163

1
2  because they didn't present one. The covenants
3  were annual and then I think things were
4  basically meeting or exceeding the technical
5  definition of the covenant. And then all of a
6  sudden it was either '98 or '99 the losses just
7  seemed to like flow. It was like there was
8  something behind the flood gates. Somebody
9  started off a fresh year and all of a sudden
10 skeletons were out of the closet.
11         So if we were novices, or if -- I'm
12 going back 20 years when I was just out of
13 college, I would be looking for something like
14 that.
15         But between David Stevens, Pat
16 Mathis, Karleen and myself, we had over 80 years
17 of experience in credit and workouts. They would
18 put one together like that basically and we would
19 know what would be reasonable and what was
20 obtainable and what our wish list would be. And
21 we could deal with that. I mean, you don't
22 really need a written road map for a workout,
23 especially because all workouts are different.
24 And while identifying red flags in a workout can
25 be very -- it can be taught with instruction.

Page 164

1
2  The actual workout is something that only
3  experience will give you and put you in a
4  position where you can leap once you're given the
5  green light.
6      Q.   Let me ask you this. If there had
7  been a covenant violation at the DVOG and a
8  quarterly liquidity ratio imposed by MBIA, how
9  would that have impacted MBIA's losses as a
10 result -- how would that have impacted MBIA's
11 position?
12     A.   That would have been a very big
13 deal. First of all, it wouldn't be just a
14 liquidity covenant. There would be other
15 performance measures and transfer limitations.
16 But bottom line, profitability issues, perhaps
17 accounts receivable agings, things of that
18 nature. What it would do, it would give you more
19 frequent reporting to hold management to. And as
20 they say they're going to do A, B and C, the next
21 month you get to see whether they've done it or
22 not. To the extent they don't, you certainly
23 alert them to it.
24         And if you don't get anywhere, again,
25 you go to Sherif, you go to the board. And if we

Page 165

1
2  could have seen Ira and David a year earlier,
3  that could have had a really big impact. The
4  Hunter Group said boy, just 60 or 90 days would
5  have made a big difference. Can you imagine what
6  a year would have made?
7      Q.   I take it you mean Ira Gumberg and
8  David Barnes.
9      A.   Yes.
10     Q.   Did anything prevent contacting
11 Mr. Gumberg at any point in time?
12     A.   Dealing with the protocol, dealing
13 with Mike Martin, going to McConnell, getting the
14 green light to see if you can talk to everyone.
15 When things got very bad or we were suspecting
16 that bankruptcy was around the corner, we did
17 approach the board of directors directly. We
18 tried to get their addresses, we sent them
19 letters at home and stuff trying to offer a
20 solution so that they didn't have to go down the
21 bankruptcy road. But it was too late. It was
22 too late. Timing's everything.
23     Q.   I take it is the same true with
24 respect to Mr. Barnes in terms of whether there
25 was anything preventing MBIA from contacting

CHARLES E. REILLY

Page 166

1  Mr. Barnes at any point in time?
2  
3      A.   Yes, that's right. You have to know
4  and understand the dynamics, when you're
5  interfacing with management and they're seniors
6  and you don't want to ruin your relationship with
7  McConnell and Sanzo by going over their heads and
8  going over Sherif's head, going to the board of
9  directors, until a certain point of time.
10 Right? It's just kind of like how everybody
11 conducts their business every day. You don't go
12 over your boss' head unless there's something
13 really dire going on. Right? It's just business
14 acumen. But there was nothing to prevent it,
15 except for common sense.
16     Q.   But perhaps I misunderstood you. I
17 thought earlier you testified that you believed
18 that Mr. McConnell did not sufficiently adhere to
19 the corporate formalities across the various
20 affiliates in terms of transferring funds. As a
21 result of that you were given a whole lot of
22 comfort.
23          I guess I'm wondering based on that
24 testimony why that was a relationship that you
25 didn't want to, quote, unquote, affect in a

Page 167

1  
2  negative way by going directly to the board.
3      A.   It would have been premature to go to
4  the board. And these guys were just getting
5  through their acquisition strategy, and we were
6  really starting off with these guys. I should
7  speak for myself I guess, and probably Dick too.
8  I think Carolyn may have had some history with
9  these guys.
10         But some of the things he said was
11 concerning. He was a little flip about how he
12 handled cash throughout the system. So that's a
13 red flag for us. And then as time goes on, if
14 our fears were to come to pass, then they should
15 be confronted. But not -- maybe not at that
16 time.
17         Going back in time I remember that
18 meeting at Merrill Lynch's offices, and that
19 would not have been the right time to approach
20 the board with that.
21     Q.   So you just testified generally about
22 fear of coming to pass. As a general matter did
23 the financial condition of the DVOG improve from
24 April 1997 to July 1998?
25     A.   I think that they stayed pretty

Page 168

1  
2  similar. I think there were like some more
3  transfers, receivables continued to be a concern
4  but didn't seem to be catastrophic. Leverage was
5  high -- I mean, things were pretty much -- they
6  stayed fairly steady state and then it seemed
7  like the losses all of a sudden just flowed.
8  It's one of those things you could hold things in
9  reserves and keep bad receivables on the books
10 and once you're going to bleed, you bleed. It
11 happens to some degree in corporate America. You
12 show it, and it seems like that's what happened
13 there.
14     Q.   But there was a downgrade in December
15 of '97 based on the -- excuse me, MBIA downgraded
16 its internal rating on the DVOG in December of
17 '97.
18     A.   Yes. I think that was mostly because
19 of the transfers and liquidity problems, right?
20     Q.   And there was another downgrade -- I
21 should ask you. Is it your recollection that
22 there was another downgrade in the spring of
23 1998?
24     A.   I think so, but I can't remember. I
25 have a document from '98 showing that it's an

Page 169

1  
2  8-C. So it was downgraded but I don't know
3  whether it was the spring of '98.
4      Q.   I'm sorry, which document?
5      A.   I have this May 4, '98 site visit.
6  It's the one where we met with the trustees and
7  Sherif.
8      Q.   Mr. Reilly, let me ask you this. At
9  some point prior to your meeting with
10 Mr. Abdelhak and with Mr. Barnes and Mr. Gumberg
11 MBIA had lowered its internal rating on the
12 DVOG --
13     A.   Right.
14     Q.   -- to the lowest numeric rating,
15 correct?
16     A.   No.
17     Q.   I'm sorry, second to lowest numeric
18 rating.
19     A.   That's right.
20     Q.   8. And that's short of 9 which
21 signifies payout.
22     A.   Default.
23     Q.   Default, thank you.
24         Now, is it your general recollection
25 that that downgrade occurred sometime during the

LEGALINK MANHATTAN   (212) 557-7400

Page 234

right? You're saying that if things were more adverse, if performance was weaker, what would everybody have done. And if their performance as reported was weaker than what was represented, we would have taken it that much more severely that much sooner.
   Q. Do you have any personal knowledge if any decrease in DVOG's income and/or assets for fiscal year '96 and/or fiscal year '97 would in fact have caused bondholders, credit enhancers and/or other creditors to have acted any differently?
   MR. BROWN: Objection.
   A. Same answer. We're speculating and I know what prudent lenders would do. I should say I know what I would expect them to do but I don't know what they would do. I know what I could recommend to my seniors.
   Q. Mr. Reilly, I have just a few more questions and then I'll be done.
   Do you have any knowledge if any decrease in AHERF's income and/or assets for fiscal year '96 and/or fiscal year '97 would in fact have caused any covenant violations?

Page 235

   A. Depends on the magnitude. If there were a loss that would quantify a trigger, then yes, obviously it would, right? And then things would have been very different.
   Q. But you don't have any personal knowledge as to the extent to which such a decrease in income would have had to have occurred?
   MR. BROWN: Objection.
   MR. WITTEN: Objection. Asked and answered I think. And to form.
   A. You could back into a ratio, you back into the coverage ratio and you know what was reported and you know basically if this hypothetical were to transpire, you would have breakage of the covenant. It's a simple break-even analysis.
   Q. I understand. Aside from a change in income at AHERF or DVOG, do you have any personal knowledge as to any other factor that would have in fact have caused a covenant violation at AHERF or DVOG?
   A. The typical ones such as filing for bankruptcy, things of that nature, boilerplate

Page 236

covenants. Other than that, offhand I can't remember specifically. They're in the documents.
   Q. Are you involved in this litigation in any other way other than testifying here at your deposition today?
   A. No.
   MR. BROWN: Objection. Do you understand the question?
   A. Yes. Have I been involved. I haven't. After the assets were sold to Tenet, that was pretty much my last -- near the last efforts I had with the healthcare group. And that was basically reassigned to just do special revenue. And I haven't touched AHERF since. I would just have Karleen and Ally working on the creditors committee sorting through things like this.
   Q. Incidentally, do you know when Ally Park left the employment of MBIA?
   A. No. I know she left but I can't tell you when. I have a tough enough time telling you when I switched jobs.
   Q. Mr. Reilly, thank you very much for

Page 237

your time. I don't have any further questions right now.
   A. You're welcome.
   MR. WITTEN: I don't have any questions.
   MR. BROWN: No questions.
   THE VIDEOGRAPHER: This marks the end of tape number 5 in the videotaped deposition of Charles Reilly. We are going off the record. The time is 5:05.
   (TIME NOTED: 5:05 p.m.)

   _____
   CHARLES E. REILLY

Subscribed and sworn to before me
this _____ day of _____, 2003.

_____