UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>PRICEWATERHOUSECOOPERS, LLP, )<br><br>Defendant. ) | Civil Action No. 00-684<br><br>Judge David Stewart Cercone |

**APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)**

VOLUME 4

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

**Rocha-Sinha Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

## *EMMELINE ROCHA-SINHA*
*August 5, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

ROCHA-SINHA, EMMELINE



**LEGALINK**
A WORDWAVE COMPANY

Page 114

Emmeline Rocha-Sinha

receive audited financial statements on an annual basis at a minimum in order to accurately measure what the financial standing of the institution was, assuming that the audited financial statements were accurate. We never went back and questioned as to whether they were accurate or not. We took it at its face value that yes indeed, they are accurate. It was absolutely critical that we obtain that information because it gave us a measure of how well or poorly the institution was performing.

Q. Why was it important for MBIA to have that understanding?

A. Because that is the basis under which we are making our decisions as to whether we should insure a particular transaction or not.

Q. I understand that, perhaps I asked a confusing question. What I am asking is why is it important for MBIA to receive annual statements once bond insurance has been provided?

A. Because it enables us to perform a valid monitoring function and it gives us early warning signals that there might be difficulty that this institution might face in the near

Page 115

Emmeline Rocha-Sinha

future. It's extremely important for us to monitor a transaction on an ongoing basis because we look to detect and see any changes in the financial standing of the institution and whatever changes we see then we will pursue those changes further with management in terms of determining the reasons for the change, what kind of remedial action management is taking to change that situation, do they expect the situation to continue, what is causing that particular change to have occurred and what are management's plans.

And if we're not satisfied with the answers we obtain from management, we will then require management to go out and obtain a consultant and come in and do an analysis of the institution, all in the hope of never ever, ever getting to a situation of where we will have to make a payment under our policy. So it's extremely critical that we obtain these audited financial statements on an annual basis

Q. I believe you testified that at a minimum MBIA required in a typical case annual financial statements, correct?

A. Audited annual financial statements

Page 116

Emmeline Rocha-Sinha

at a minimum, absolutely. We also required quarterly financial statements. Now, these quarterly financial statements are not audited, but we absolutely would take a look at them and this is a responsibility of the monitoring side of our operations of MBIA.

Q. In terms of crafting of financial reporting requirement, that was in part a function of the health care unit with respect to health care bonds that MBIA provided insurance for?

MS. MITCHELL: Objection.

A. Correct.

Q. Was it also the case that MBIA could request monthly unaudited financial statements as a condition of providing bond insurance?

A. Typically not at the time of providing bond insurance. Monthly statements would be required if we start seeing some deterioration in financial performance.

Q. Am I correct then in seeing a deterioration in financial performance, you would assess the trend over time?

A. Yes.

Page 117

Emmeline Rocha-Sinha

Q. In assessing the trend over time you would rely the quarterly statements, in addition to the annual statements?

A. Correct.

Q. Am I correct that the quarterly statements provided in the typical case more timely information than the annual statements?

A. Yes.

Q. So you would use both to establish a trend for a particular issuer?

A. Yes.

MR. KRUSKO: Let's go off the record.

THE VIDEOGRAPHER: Off the record at 12:18.

(Off-the-record discussion held.)

THE VIDEOGRAPHER: Back on the record, it's 12:19 tape 2.

(Document Bates numbered MBIA 010762 through MBIA 010929, marked Exhibit 1865 for identification.)

(Document Bates numbered MBIA 001785 through MBIA 001808, marked Exhibit 1866 for identification.)

Page 118

1           Emmeline Rocha-Sinha
2       Q.    If you would take just a minute to
3   review Exhibit 1865 which bears the Bates
4   numbered MBIA 010762 through MBIA 010929.
5           MS. MITCHELL: Is there something
6   specific you would like her to look at?
7       Q.    I would like you to focus your
8   attention in the page ending with the Bates
9   number 762, again of this Exhibit 1865. Do you
10  recognize Exhibit 1865 as the offering statement
11  for the Allegheny General Hospital bonds issued
12  in 1991?
13      A.    Yes.
14      Q.    Do you recall that MBIA provided
15  bond insurance for certain of the bonds issued by
16  Allegheny General Hospital in 1991?
17      A.    Yes.
18      Q.    If I could direct your attention to
19  the first page of the document which I think
20  you're looking at. Is it consistent with your
21  recollection that MBIA insured roughly 25 million
22  of this bond issuance?
23          MR. WITTEN: What number did you
24  say?
25          MR. KRUSKO: It's the first page,

Page 119

1           Emmeline Rocha-Sinha
2   I'm directing the witness' attention to the break
3   down in the terms of the bonds which appears --
4           MR. WITTEN: Your question was 25
5   million?
6           MR. KRUSKO: Roughly.
7           MS. MITCHELL: If she recalls that?
8       Q.    I'm just asking you whether that's
9   consistent with your recollection, that MBIA
10  provided bond insurance for roughly 25 million in
11  bonds offered by Allegheny General Hospital?
12      A.    Honestly I don't recollect what the
13  amount was that we insured on this deal.
14      Q.    Do you recall an entity, Allegheny
15  General Hospital?
16      A.    Yes.
17      Q.    What's your recollection of that
18  entity?
19      A.    That we insured their transaction,
20  but I do not recall the exact amount.
21      Q.    By transaction, do you mean the 1991
22  bond offering?
23      A.    I also do not recall whether we
24  insured them in 1991 or which year for that
25  matter we insured them.

Page 120

1           Emmeline Rocha-Sinha
2       Q.    It's possible that MBIA might have
3   provided bond insurance in multiple years,
4   correct?
5       A.    Possibly, I don't recall.
6       Q.    Do you recall the health care unit
7   under your supervision at this time, January 1991
8   or thereabouts, performing any due diligence of
9   Allegheny General Hospital in connection with a
10  bond offering about that time?
11      A.    No, I do not recall any due
12  diligence.
13      Q.    Do you recall an organization by the
14  name of the Allegheny Health, Education &
15  Research Foundation or AHERF?
16      A.    Yes, I do recall an organization by
17  that name.
18      Q.    Is it your recollection that that
19  entity was the parent company of Allegheny
20  General Hospital?
21      A.    Yes.
22      Q.    Do you recall any conversations with
23  anyone at AHERF in this time frame, January 1991,
24  with respect to a 1991 bond offering by Allegheny
25  General Hospital?

Page 121

1           Emmeline Rocha-Sinha
2           MS. MITCHELL: Objection,
3   conversations between whom?
4       Q.    Do you understand the question?
5       A.    No, I don't understand the question.
6       Q.    In the late 1990 to early 1991 time
7   frame, do you recall having discussions with
8   anyone in AHERF in connection with an upcoming
9   bond issuance by Allegheny General Hospital?
10      A.    I do not recall any specific
11  conversations with AHERF, no, I don't recall.
12      Q.    Do you recall when you first learned
13  or became familiar with Allegheny General
14  Hospital?
15      A.    No, I don't recall when, but I
16  imagine it's in relation to this bond issue.
17      Q.    I believe you have before you
18  Exhibit 1866, which is Bates numbered MBIA 001785
19  through MBIA 001808; do you have that document
20  before you?
21      A.    Yes.
22      Q.    If I could direct your attention to
23  the page 001804, I apologize for skipping ahead a
24  little bit, do you recognize this exhibit, 1866,
25  as a loan agreement between the Pennsylvania

Page 242

1       Emmeline Rocha-Sinha
2       MS. MITCHELL: Objection.
3       A.      I don't recall.
4       Q.      Do you recall being concerned at the
5  time that after a number of acquisitions,
6  including the Hahnemann University Hospital
7  System, that AHERF had not yet achieved any real
8  market share in the Philadelphia area?
9       A.      That would have been too detailed an
10 item for me to recall; no, I don't recall.
11      MR. KRUSKO: Let's go off the
12 record.
13      THE VIDEOGRAPHER: Going off the
14 record at 5:02. This is tape number 4.
15      (Time noted: 5:02 p.m.)
16
17
18
19      EMMELINE ROCHA-SINHA
20
21 Subscribed and sworn to before me
22 this      day of      , 2003.
23
24
25      Notary Public

Page 243

1       Index
2  August 5, 2003
3
   WITNESS      EXAMINATION BY       PAGE
4
   Emmeline Rocha-  Mr. Krusko        4
5  Sinha
6
7       EXHIBITS
8  NUMBER
9  1861 Document Bates numbers MBIA 048091 through
        048106...page 81
10
   1862 Document Bates numbered MBIA 048125 to MBIA
11     048137...page 102
12 1863 Document Bates numbered MBIA 003587 to MBIA
        003691...page 107
13
   1864 Document Bates numbered MBIA 003560 through
14     MBIA 003572...page 109
15 1865 Document Bates numbered MBIA 010762 through
        MBIA 010929...page 117
16
   1866 Document Bates numbered MBIA 001785 through
17     MBIA 001808...page 117
18 1867 Document Bates numbered MBIA 048107 through
        MBIA 048115...page 126
19
   1868 Document Bates numbered MBIA 003573 to MBIA
20     003586...page 137
21 1869 Document Bates numbered MBIA 048916 to MBIA
        048917...page 140
22
   1870 Document Bates numbered MBIA 024186 through
23     MBIA 024188...page 156
24 1871 Document Bates numbered MBIA 047924 through
        MBIA 047929...page 156
25

Page 244

1       Index
2  August 5, 2003
3
        EXHIBITS
4
   NUMBER
5
   1872 Document Bates stamped MBIA 046039 to MBIA
6      046040...page 187
7  1873 Document Bates numbered MBIA 045955 to MBIA
        045964...page 198
8
   1874 Document Bates stamped MBIA 045951 to MBIA
9      045954...page 206
10 1875 Document Bates numbers MBIA 023051 through
        MBIA 023054...page 220
11
12
   PREVIOUS EXHIBITS INTRODUCED:
13
   Exhibits Numbered: 672
14                    338
                      933
15                    408
                      618
16                    619
17
18
19
20
21
22
23
24
25

Page 245

1       E R R A T A
2       I, Roberta Caiola, a Shorthand
3  Reporter and Notary Public within and
4  for the State of New York, do hereby
5  certify:
6
7       That the statements, colloquy
8  and testimony contained herein is a
9  true record of the proceedings in
10 this matter.
11
12      I further certify that I am not
13 related to any of the parties
14 involved in this proceeding, and that
15 I am in no way interested in the
16 outcome of this matter.
17
18
19
20      ROBERTA CAIOLA
21
22
23
24
25