Page 246

1              E R R A T A
2        I, Emmeline Rocha-Sinha, wish to make the
3    following changes, for the following reasons:
4
5    PAGE LINE
6            CHANGE:
7            REASON:
8            CHANGE:
9            REASON:
10           CHANGE:
11           REASON:
12           CHANGE:
13           REASON:
14           CHANGE:
15           REASON:
16           CHANGE:
17           REASON:
18
19
20        EMMELINE ROCHA-SINHA
21
22    Subscribed and sworn to before me
23    this       day of          2003.
24
25    Notary Public

LEGALINK MANHATTAN  (212) 557-7400

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## RANDALL  RUSSELL, Ph.D.
### September 29, 2003

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**RUSSELL, Ph.D.,  RANDALL**



**LEGALINK**

A WORDWAVE COMPANY

RANDALL RUSSELL, Ph.D.

Page 98

1  Q.  That's correct?
2  A.  That's correct.
3  Q.  A while back you mentioned that you didn't
4      recall till I guess the very end of the
5      enterprise here seeing anything alarming that
6      made you feel like the sky was falling at
7      AHERF. Do you remember generally discussing
8      that topic?
9  A.  Yes.
10         MR. FRIESEN: Objection.
11  Q.  Did you at some point obtain a sense that
12      indeed the sky was falling as you used that
13      term at AHERF?
14  A.  I would say that the meeting that I referred to
15      in which it became clear that these assets had
16      been moved and transferred, that at that
17      point in time it came out that the -- at least
18      from my perspective, it came out that the
19      Mellon Bank loan had been called, yes, at that
20      point in time there was -- it was clear to me
21      that there was, you know, I can't say the sky
22      is falling, but there is obviously a severe --
23      some severe issues that needed to be dealt
24      with.
25  Q.  And this meeting occurred subsequent to, your

Page 99

1      understanding, of the payment of the Mellon
2      loan?
3         MR. FRIESEN: Objection.
4  A.  Yes, I believe that's correct.
5  Q.  Are you aware that the Mellon repayment took
6      place in the third week of April 1998?
7         MR. McCLENAHAN: I'll object to that.
8      I think that was actually -- I'll object to the
9      form of the question. I don't think that you
10      are right.
11  A.  I don't know the exact date.
12  Q.  On or about April 26th or 7th, 1998?
13         MR. FRIESEN: Objection, he already
14      says he doesn't remember.
15  Q.  Does that help refresh your memory, the
16      specific dates?
17  A.  I don't remember the date honestly.
18  Q.  But in any event, the meeting you are telling
19      me about happened after the payment, whenever
20      that happened?
21  A.  That was my recollection.
22  Q.  You talked a little bit this morning about the
23      10/30/1997 finance committee meeting that you
24      attended. Do you recall discussing that with
25      Mr. Friesen?

Page 100

1  A.  Yes.
2  Q.  And I think you mentioned earlier today that at
3      that meeting management made some
4      representations about plans that they had in
5      place to try to address some of the system's
6      financial problems. Do you remember that?
7  A.  Yes.
8  Q.  At that meeting, at this 10/30/97 meeting, did
9      you have any sense that the AHERF system was
10      in -- well, to use your terms, the sky was
11      falling --
12  A.  No.
13  Q.  -- with the AHERF system?
14  A.  No, I didn't at that point.
15  Q.  Do you remember any discussions at the AHERF
16      finance committee meetings that you attended
17      regarding the system's decision to switch to a
18      consolidated audit format for the presentation
19      of its financial statements?
20  A.  I read that this morning. Do I remember that
21      before that, no, I don't.
22  Q.  So you have no independent recollection of that
23      discussion?
24  A.  No, I don't.
25  Q.  Do you recall during the October 1997 finance

Page 101

1      committee meeting that we have discussed today
2      ever doubting or having serious doubts about
3      management's representations regarding the
4      plans they had to address the system's
5      financial problems?
6  A.  I think that I would -- that I was concerned
7      about the losses and amounting losses, and at
8      that point I would say that I think we felt --
9      I felt it was more environmental than it was
10      management-related at that point; environmental
11      meaning the reasons we were given for the
12      problems were, you know, Medicaid reductions in
13      payments and a number of different changes in
14      reimbursement and so forth, which were -- which
15      was the environment of the medical community at
16      that point in time, as opposed to saying that I
17      thought the management at that point were
18      totally derelict in their responsibilities or
19      anything of that nature.
20  Q.  In response to Mr. Friesen's, one of his prior
21      questions, I think he asked you if you had
22      confidence that management could improve the
23      situation, and I think you responded that yes,
24      or you would have strenuously objected or
25      perhaps resigned from the board. Do you

RANDALL RUSSELL, Ph.D.

Page 102

1  remember discussing that?
2  A.  Mm-hmm.
3  Q.  Is that a yes?
4  A.  Yes.
5  Q.  Any other options that you would have in your
6      mind as a finance committee member if you did
7      have serious doubts about management's
8      competence to lead the enterprise through its
9      financial problems?
10         MR. FRIESEN:  Objection, calls for
11     speculation.
12  A.  Yeah, I -- at that point no, I don't think so.
13  Q.  At that point you are referring back to October
14     of '97?
15  A.  Right.
16  Q.  Did you ever attend any board meetings at
17     AHERF -- I'm sorry, any committee meetings at
18     AHERF at which a decision to file bankruptcy
19     was discussed?
20  A.  No.
21  Q.  And you had no discussions personally with any
22     of AHERF's lenders regarding alternative
23     financing?
24  A.  No.
25  Q.  Towards the end of your discussion with

Page 103

1      Mr. Friesen, you were asked a series of
2      questions about the format and content and size
3      of board meetings and committee meetings.  Do
4      you remember that testimony?
5  A.  Yes.
6  Q.  At any point during your service at AHERF, did
7      you ever feel like you weren't prepared to
8      fulfill your fiduciary duties to the system or
9      its subsidiary boards?
10  A.  No.
11  Q.  You have an understanding, I assume, that
12     Coopers & Lybrand was, in fact, the system's
13     external auditors during the time you were a
14     committee member at AHERF; right?
15  A.  Yes.
16  Q.  What is your understanding or what was your
17     understanding, if any, of Coopers' role as
18     external auditor?
19  A.  I assumed their role as the external auditor
20     would be no different than being the external
21     auditor of any company, that is they would
22     provide an overview of the finance function,
23     the operating function of the system; and they
24     would assure the board that the financial
25     reporting was in accordance with proper

Page 104

1      standards, accounting standards; and that they
2      would in essence wind up giving us a management
3      letter, if you like, and also a audited,
4      hopefully an unqualified statement; that they
5      would look at fraud issues or some other issues
6      perhaps that were evident.
7          But all that being said, you know, my
8      knowledge of accounting and my knowledge of
9      auditing is certainly not what I do for a
10     living, but I know in my own companies even
11     that they rely heavily on the management of the
12     company to report things accurately, and I
13     don't think they are there as watchdogs to find
14     fraud and they might stumble on it if -- I
15     won't say lucky, but you have -- you have them
16     there for a different purpose I think than
17     that.
18         MR. FRIESEN:  I'm sorry, just so the
19     transcript is clear, did you say not watchdogs?
20         MR. UNICE:  I believe he testified
21     they were -- you can go ahead and answer that
22     one.
23  Q.  I think you testified that one role of the
24     auditor was as a watchdog to suspect fraud from
25     management.

Page 105

1  A.  Right, if they saw fraud or any other unusual
2      practice that would lead them to have any
3      concern, that they would bring to the board or
4      bring to the outside directors.
5  Q.  In your board experience outside of AHERF, has
6      there ever been an occasion when entities'
7      outside auditors did, in fact, bring to your
8      attention suspected fraud on the part of
9      management?
10  A.  No.
11  Q.  Did that -- while at AHERF, did the external
12     auditors ever bring to your attention any
13     concerns they had with expected fraud -- I'm
14     sorry, suspected fraud on the part of
15     management?
16  A.  No.
17         MR. FRIESEN:  Objection.  He had no
18     contact with them.
19  A.  Yeah, well, the answer's no, but not --
20  Q.  I'm sorry?
21  A.  I said the answer's no.
22  Q.  Would you expect if the auditors of AHERF did,
23     in fact, find fraud on the part of financial
24     management in the presentation of financial
25     information that was given to them, that the

27 (Pages 102 to 105)

RANDALL RUSSELL, Ph.D.

Page 106

1    auditors would bring that to the board's
2    attention?
3            MR. FRIESEN:  Objection.  He's not on
4    the board.
5    Q.   Go ahead.
6    A.   Yes, I would expect them to.
7    Q.   You also mentioned that one of the roles of an
8    auditor in your understanding was to provide or
9    to present unqualified opinions?
10           MR. McCLENAHAN:  I'm not sure that's
11   exactly what he said.
12           MR. FRIESEN:  Objection.
13   A.   I said one would -- one would hope for an
14   unqualified opinion.
15   Q.   That was poorly phrased.  One of the roles of
16   an external auditor is to provide an opinion on
17   the financial statements of the enterprise, and
18   I think one type of those opinions that you
19   mentioned is an unqualified opinion; is that
20   right?
21   A.   Yes, yes, right.
22   Q.   Thanks for the clarification.  What is your
23   understanding of an unqualified opinion as you
24   used that term?
25   A.   My understanding would be that the financial

Page 107

1    reporting systems and the information that you
2    see presented in a financial -- in a report or
3    an annual report or year-end report, whatever
4    is being audited, would comply with, you know,
5    generally accounting standards, which -- which
6    you know, I'm not an auditor, I'm not a finance
7    person, so I don't know if they have different
8    ones for medical systems versus corporations
9    versus whatever.
10           But there are -- there are, to my
11   understanding, standards that have to be met,
12   generally accepted principles, and that's what
13   they are there to do is to see that that's
14   accomplished, to state that.
15   Q.   Now, if Coopers & Lybrand did arrive at the
16   conclusion that the financial information
17   presented to them by AHERF management was
18   presented in violation of generally accepted
19   accounting principles, would you expect that to
20   be something that the auditors would bring to
21   the board's or audit committee's attention?
22           MR. FRIESEN:  Objection.
23   A.   In a general sense, yes.
24   Q.   If Coopers & Lybrand had discovered that
25   information presented by management was

Page 108

1    intentionally misstated by management, would
2    that be a fact that you would expect the
3    auditors to bring to the board or audit
4    committee's attention?
5    A.   Yes, I would.
6            MR. FRIESEN:  Objection.
7    Q.   If the auditors, in fact, had concerns about
8    the integrity or competence of financial
9    management at AHERF, would those issues be some
10   which you expect the auditors to bring to the
11   board or the audit committee's attention?
12           MR. FRIESEN:  Objection.
13   A.   Yes.
14   Q.   If the auditors had come to you personally
15   during your tenure at AHERF, during your
16   service of tenure at AHERF, with any of those
17   revelations, would that have impacted your view
18   on the success of management's implementation
19   of its business strategy that you discussed
20   earlier with Mr. Friesen?
21           MR. FRIESEN:  Objection.
22           MR. McCLENAHAN:  Yeah, I'm going to
23   object to the form of the question.  I don't
24   know what you mean by of any of, quote, those
25   revelations.

Page 109

1            MR. UNICE:  The ones that you and I
2    just discussed, and I can break it down by
3    question if you prefer.  I'll do that for you,
4    David.
5    BY MR. UNICE:
6    Q.   If financial management had come to -- I'm
7    sorry, if the external auditors had come to you
8    with questions they had concerning the
9    competence or integrity of financial
10   management, would that have raised questions in
11   your mind as to the success or wiseness of
12   AHERF management's implementation of its
13   business strategy?
14   A.   Yes.
15           MR. FRIESEN:  Objection.
16   Q.   Would your response be the same if the auditors
17   had come to you with the concern that the
18   financial information presented to them had
19   been materially misstated?
20           MR. FRIESEN:  Objection.
21   A.   Yes.
22   Q.   Would your response be the same if the auditors
23   had come to you with information that they
24   believed showed that the financial information
25   presented to them was prepared in violation of

28 (Pages 106 to 109)

RANDALL RUSSELL, Ph.D.

Page 110

1     generally accepted accounting principles?
2         MR. FRIESEN: Objection.
3 A.  Yes.
4 Q.  And would your response be the same if the
5     auditors had come to you with a belief that the
6     information presented to them by AHERF
7     management was procured by -- was created by
8     fraud?
9         MR. FRIESEN: Objection.
10 A.  Yes.
11 Q.  Now, if any of those revelations that you and I
12     just discussed had been made to you, can you
13     explain to me what options you would have had
14     as a member of a subsidiary board or the
15     finance committee of AHERF to respond to such
16     concerns?
17         MR. FRIESEN: Objection, calls for
18     speculation.
19         MR. McCLENAHAN: You can answer if
20     you are able to.
21 A.  Well, I -- I don't know what I would do in that
22     situation. I wasn't confronted with that.
23 Q.  Okay. Would one option though be the perhaps
24     retention of outside consultants to further
25     examine the issue?

Page 111

1         MR. FRIESEN: Objection.
2 Q.  Would that be one of the options available to
3     you whether or not you knew, in fact, you would
4     have done that?
5         MR. FRIESEN: Objection.
6 A.  I think that would be premature at that point.
7 Q.  Why is that?
8 A.  As a member of the board -- of a subboard,
9     which I was --
10 Q.  Yes.
11 A.  -- the first thing I would do is go to the
12     chairman of the board and the chairman of the
13     audit committee and say I have been approached
14     with this information and what would you --
15     what is the situation, what is going on.
16         And, quite frankly, I'm serving in a
17     committee that doesn't have authority to
18     respond in that area other than, you know, as a
19     trustee, my fiduciary responsibility to go to
20     those people. So, yes, if I were on those
21     committees and you asked me is that an
22     alternative, yeah, it might be.
23 Q.  So any of the -- I'm sorry, go ahead, sir.
24 A.  Your last question, would it be appropriate to
25     get outside -- somebody else to come in and

Page 112

1     look, and the answer would be if I were on
2     those committees, my judgment, depending on the
3     circumstances, that might be an option, yes.
4 Q.  So in the position you were actually in at
5     AHERF, you would have made further inquiry to
6     either the board or the audit committee?
7 A.  Yes, I would have, yes, under those
8     circumstances.
9 Q.  Do you recall that in the end of the summer of
10     1998 AHERF elected to not retain
11     PriceWaterhouseCoopers for its fiscal year 1998
12     audit?
13 A.  Yes.
14 Q.  Tell me what you recall about that decision.
15 A.  I -- I recall that that occurred. I can't
16     recall the specifics of the meeting to be
17     honest with you.
18 Q.  I've just handed you what's already been marked
19     in this litigation as Exhibit 2105. They
20     appear to be minutes of the 8/27/1998 finance
21     and audit committee. They are in draft form
22     and are not signed.
23         This document bears the Bates numbers
24     CL 150833 through 38. Take a moment to review
25     this document, and let me know if you have ever

Page 113

1     seen it before today.
2         - - - -
3     (The witness reviewed the Exhibit.)
4         - - - -
5         MR. McCLENAHAN: Do you want the
6     witness to tell you whether he has seen this
7     document before? Is that your question?
8         MR. UNICE: That's my preliminary
9     question, yeah.
10 A.  I don't recall seeing this document.
11 Q.  Do you note on the first page under members
12     present, the last one appears to be your name?
13 A.  Yes.
14 Q.  Do you know whether or not you attended this
15     meeting --
16 A.  I would -- I would suspect I was there, yes.
17 Q.  So you have no reason to believe you didn't
18     attend?
19 A.  I have no reason to believe I didn't attend.
20 Q.  Have you had a chance to review the document?
21 A.  I'm still reading. There's a lot of stuff
22     here.
23         MR. McCLENAHAN: Well, is there
24     something you want to call his attention to?
25 Q.  Yes, let me do it this way. Based on what

29 (Pages 110 to 113)

RANDALL RUSSELL, Ph.D.

Page 114

1    you've reviewed so far in the document, does
2    this refresh your memory at all about any
3    discussions at the finance and audit committee
4    meeting regarding the decision to not retain
5    PriceWaterhouseCoopers?
6        And I'll point your attention to page
7    Bates numbered CL 150837, the middle of which
8    contains a resolution recommending that the
9    AHERF board replace PriceWaterhouseCoopers as
10   external auditor for AHERF and its
11   subsidiaries.
12 A.  I'm sorry, would you repeat the question?
13 Q.  Sure.  Does that passage I just referenced to
14   you refresh your memory as to any discussions
15   that you took part in regarding the decision to
16   replace PriceWaterhouseCoopers?
17 A.  I don't remember any -- any specific
18   discussions or who said what at the meeting.  I
19   do remember that we did decide to replace the
20   auditors, that we were disappointed with the
21   management, we were disappointed with the
22   outcome, the circumstances.  We were generally
23   disappointed with, you know, the condition of
24   the -- of the system at that point in time, and
25   so it seemed perhaps prudent to make a change,

Page 115

1    if for no other reason to be sure that we were
2    getting a fresh look at it and where we were.
3    So I think that -- I think I can say that with
4    some degree of certainty.
5  Q.  Do you recall a vote being taken at this
6    finance and audit committee meeting regarding
7    the replacement of Coopers -- I'm sorry, of
8    PriceWaterhouseCoopers?
9  A.  I don't remember.  I'm sure there was if it's
10   stated there was, but I don't remember.
11 Q.  I take it you don't recall which way you voted?
12 A.  I don't.  However, in all honesty I doubt that
13   I would have objected to this, but I don't
14   remember specifically.
15 Q.  Do you recall any discussion by Mr. -- well,
16   let me ask you a different question.  Do you
17   know who Joe Dionisio is?
18 A.  I remember the name now that I see it.
19 Q.  Do you recall his role in AHERF?
20 A.  It was in the finance function somewhere.
21 Q.  Do you recall any comments he made at this
22   meeting regarding any pros and cons of
23   replacing --
24 A.  No.
25 Q.  -- PriceWaterhouseCoopers?

Page 116

1  A.  No.
2  Q.  And reviewing this document doesn't refresh
3    your memory as to any comments he may have had;
4    is that right?
5  A.  No, it really doesn't.
6  Q.  Did you take part in any discussions that led
7    to the termination of either Mr. Abdelhak or
8    Mr. McConnell?
9  A.  No.
10 Q.  Did you see any documents during your service
11   at AHERF regarding the termination of either of
12   those individuals?
13 A.  No.
14 Q.  Were you aware that the fall of 1998
15   PriceWaterhouseCoopers and AHERF issued a press
16   release stating that the fiscal year 1997
17   audited financial statements should no longer
18   be relied upon?
19 A.  I remember something to that effect.
20 Q.  Can you explain your recollection to me?
21 A.  Basically what you just said, couldn't rely on
22   the financial statements.
23 Q.  Did you take part in any meetings at which the
24   decision to make that press release was made?
25 A.  No.

Page 117

1  Q.  Do you recall any --
2  A.  Or I don't recall.  I don't recall.
3  Q.  Okay.  Do you recall any reasons supporting the
4    decision to make that press release?
5  A.  No.
6  Q.  Now, the exhibit we just spoke about, 2105,
7    lists you as a member of the finance and audit
8    committee.  Do you recall when that committee
9    was formed at AHERF?
10 A.  No.
11 Q.  Do you have an understanding as to how you
12   became a member of the finance and audit
13   committee?
14 A.  I believe it was -- I won't say I believe.  I
15   was a member of the finance committee for
16   AHERF, and it was my -- it is my understanding
17   that that committee continued on after -- after
18   the bankruptcy filing.  So, therefore, I was a
19   member of the prior committee, I continued to
20   be a member of the committee.
21 Q.  Can you tell me when your committee service
22   ended on the finance and audit committee?
23 A.  No, I don't remember.
24 Q.  And at the 8/27/98 meeting, do you recall any
25   comments by Anthony Sanzo regarding his views

30 (Pages 114 to 117)

RANDALL RUSSELL, Ph.D.

Page 122

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3      I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  RANDALL RUSSELL, Ph.D., was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 1st day of
23 October, 2003.
24     _____
25              Notary Public

Page 123

1  COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
   COUNTY OF ALLEGHENY           )    S H E E T
2
       I, Randall Russell, Ph.D., have read the
3  foregoing pages of my deposition given on Monday,
   September 29, 2003, and wish to make the following,
4  if any, amendments, additions, deletions or
   corrections:
5
   Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20 In all other respects, the transcript is true and
   correct.
21
   _____
22           RANDALL RUSSELL
23 Subscribed and sworn to before me this
   _____ day of _____, 2003.
24
   _____
25      Notary Public
        AKF Reference No. HW77452

32 (Pages 122 to 123)

**Sanzo Dep.**

# In The Matter Of:

*OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCTION, etc. v. PRICEWATERHOUSECOOPERS*

---

## *ANTHONY SANZO*
### *July 2, 2003*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

SANZO, ANTHONY - Vol. 2



**A WORDWAVE COMPANY**

Page 354

```
1    was different than what Mr. Abdelhak had
2    advised?
3  A.   Mr. Abdelhak had apparently --
4         I was told by Mr. Gumberg who told me
5    that he learned of this directly from
6    Mr. Abdelhak.
7  Q.   Okay.  So at some point -- and you don't, I
8    take it, think that you learned that in the
9    conversation with Mr. Gumberg over the Memorial
10   Day weekend.  It was prior to that.
11 A.   It was prior to that.
12 Q.   So at some point, Mr. Gumberg advised you that
13   the payment -- the $90 million payment was
14   actually made from assets of AGH and Forbes,
15   and that he had learned that from Mr. Abdelhak.
16 A.   Yes, sir.
17 Q.   What do you recall about that conversation?
18   What were Mr. Gumberg's observations or your
19   own?
20 A.   Mr. Gumberg was livid in expressing this to me,
21   angry in expressing this to me, indicated that
22   he learned it in the context of Mr. Abdelhak
23   asking him for help in getting the other
24   trustees to accept -- he and other trustees to
25   accept this action.
```

Page 355

```
1         He was -- when I said livid, livid
2    that request would have been made to him, and
3    he told me that he directed Mr. Abdelhak to
4    immediately report this to both the chairman of
5    the AHERF board and the chairman of the AUH
6    West board, who at that time was Frank --
7    Mr. Cahouet.
8         My reaction, of course, was a punch
9    in the stomach kind of reaction.
10 Q.   Now, up to the point where you learned that
11   Mr. Abdelhak had utilized assets of AGH and
12   Forbes to repay a bank loan -- something the
13   prior agreements said would not happen without
14   your consent --
15        Correct?
16 A.   Correct.
17 Q.   -- and that, in fact, something different than
18   Mr. Abdelhak had told you he had done with
19   respect to repayment of that loan, up to that
20   point, what was your opinion, your personal
21   opinion, of Mr. Abdelhak's skills as a
22   manager -- I'm going to ask you three
23   questions -- skills as a manager, number one;
24   number two, dedication to the progress of
25   AHERF; and, number three, loyalty to the AHERF
```

Page 356

```
1    organization and its constituent parts; so
2    first, skills.
3  A.   I've said on many occasions, and I will say
4    today under oath, that I thought and still
5    think that Sherif Abdelhak was perhaps one of
6    the brightest people I ever worked for.  He was
7    skilled, may still be skilled; I don't know.
8         And he was articulate, he was fast on
9    his feet, he could analyze complex situations
10   faster than anyone else and, in fact, he was a
11   deal-maker, and I think the reason many of us
12   had confidence that the Vanguard deal would get
13   done was because he said it would get done.  I
14   mean, he had done deals in the past, several,
15   so there was that level of confidence.
16        Did you say dedication?
17 Q.   Dedication to the AHERF system and its
18   constituent parts.
19 A.   He was definitely dedicated to all of AHERF.  I
20   think what hurt especially Old Alleghenians --
21   I was not a member.  I joined Old Allegheny in
22   1986, but especially the Old Allegheny alums,
23   medical staff, members of the board, his
24   dedication to the greater AHERF, all of AHERF
25   and all of its constituent parts, hurt those
```

Page 357

```
1    who believed that they were the fountainhead,
2    or the organization from which they hailed was
3    the fountainhead of the AHERF organization, but
4    he was definitely dedicated.
5         I mean, even when he was wrong, he
6    made decisions based on what he thought was
7    going to be in the best interest of AHERF.
8         Notwithstanding all of that, he did
9    have some trouble with ego and humility, and he
10   was perhaps not --
11        He was perhaps arrogant, and when I
12   say that, I don't mean rude.  I mean that I
13   think he understood that he was smarter than
14   the average bear and acted sometimes as if he
15   were.
16        So I would say that that was --
17   before this, after this, that was something
18   that any of us, if we were under oath and asked
19   to testify what do we think about Sherif,
20   that's probably not as --
21        He was -- sometimes I think he let
22   his ego get the better of his managerial
23   decisions.
24 Q.   And just to fill out this question, Mr. Sanzo,
25   what were your observations about his work
```

Page 358

1  ethic and so on? Was he a part-time guy or --
2  A.  No. He may not have been working at the
3      office, but the guy worked all the time. He
4      called me --
5          I felt that he had a device that knew
6      when I had an out-of-town guest, because I
7      would get a call especially when I wanted to be
8      someplace else. Some portion of our working
9      career that overlapped, we lived within two
10     miles of each other. You might consider that
11     convenient. I did not, but, I mean, he
12     definitely was a hard worker. He probably --
13         Well, I don't know. He was a hard
14     worker.
15 Q.  And then the last element of this, Mr. Sanzo,
16     is loyalty, by which I intend to convey the
17     question of was this a guy who was making deals
18     for himself or creating financial incentives
19     for himself as opposed to a loyalty to the
20     organization for which he was working, from
21     your observations?
22 A.  I think he was motivated first by his loyalty
23     to the organization, but he was definitely
24     motivated by what his accomplishments may mean
25     financially to him. I don't think he was

Page 359

1      superhuman in that way.
2  Q.  Did you ever become aware, either while you
3      were at Allegheny General or afterward, of
4      Sherif Abdelhak diverting or taking any money
5      or property out of the AHERF organization for
6      his personal use or personal gain?
7  A.  No, sir.
8  Q.  You never heard anyone else discuss that
9      either?
10 A.  I think people discussed compensation and other
11     perks that all were apparent to anyone who had
12     access to the full books, but no acquisition
13     of --
14         I'm taking your question to mean
15     stealing and --
16 Q.  Essentially that.
17 A.  No. I never heard any such acquisitions.
18 Q.  Mr. Sanzo, did you --
19         When you learned about the potential
20     removal of Sherif Abdelhak, did you have any
21     opinion at that point as to what that might do
22     to the proposed sale of eastern hospitals to
23     Vanguard?
24 A.  Maybe not at the exact time that I heard that,
25     but it was actually something that I not only

Page 360

1      thought about, but I discussed. Having never
2      met Charlie Martin, Charles Martin, the CEO of
3      Vanguard, or the team with whom he had been
4      working to do the diligence in Philadelphia,
5      there was some concern that, you know, a new
6      face could possibly change the deal; and I
7      shared the concern. I was --
8          My concerns were mitigated by my
9      knowledge that David McConnell had been
10     intimately involved in the discussions, and I
11     ultimately I think that's the side we came down
12     on.
13 Q.  Okay. And with whom did you --
14         You said you had a concern and you
15     shared a concern regarding whether a new face
16     in the Vanguard transaction -- I take it, could
17     delay or jeopardize it. Was that your concern?
18 A.  I was more concerned about a delay than I was
19     killing the deal, so to speak.
20 Q.  And with whom did you have --
21         With whom did you share that concern?
22 A.  I talked to David McConnell about it. I talked
23     to Nancy Wynstra, or "Wynstra," about it. I
24     may or may not have talked to trustees about
25     it. I don't know.

Page 361

1  Q.  Do you recall having those conversations before
2      Mr. Abdelhak was terminated or afterward?
3  A.  Afterwards.
4  Q.  So those conversations are conversations you
5      would have had after Mr. Abdelhak was
6      terminated after you became the president of
7      AHERF and, in effect, after Mr. McConnell and
8      Ms. Wynstra became folks who were reporting to
9      you?
10 A.  That's correct, sir. I would not have presumed
11     to have those conversations otherwise.
12 Q.  Prior to becoming the CEO of AHERF in June of
13     1998, as I understand your testimony, you had
14     no responsibility for any of the eastern
15     operations of AHERF.
16 A.  That's a correct statement.
17 Q.  Having said that, prior to your becoming the
18     CEO of AHERF, did you have any opinion
19     regarding the quality of the management that
20     was responsible for the operations in the east?
21 A.  I may have had some PIPs. They're not
22     remarkable.
23 Q.  And by "not remarkable," you mean what?
24 A.  If you're asking if I thought they were a bunch
25     of bozos in the east and why don't they put

28 (Pages 358 to 361)

Page 394

1    of the medical staff.
2  Q.  Okay. Turning the page, there is a FAX cover
3       sheet for this from Ira Gumberg to Anthony
4       Sanzo. Do you see that?
5  A.  I do.
6  Q.  And then attached to that is a two-page letter
7       dated July 7, 1998, addressed to the members of
8       the board of trustees of AHERF and signed
9       jointly by PNC Bank and MBIA Insurance
10      Corporation.
11 A.  Yes, sir.
12 Q.  And the letter shows a CC to, among others,
13      you.
14 A.  Yes, sir.
15 Q.  Do you recognize the handwriting or the
16      printing on this letter?
17 A.  I do not.
18 Q.  Now, the letter is dated July 7 of 1998.
19      Correct?
20 A.  Yes, sir.
21 Q.  And it is signed on behalf of both PNC and
22      MBIA?
23 A.  It is.
24 Q.  Now, it states, Mr. Sanzo, does it not, that
25      based upon your expressed need for system-wide

Page 395

1    financing on an urgent basis, we enclose a
2    proposed term sheet. Subject to the conditions
3    of the term sheet, we would be prepared to lend
4    a maximum of up to $160 million dollars, of
5    which not more than $50 million will be
6    available through August 15, 1998.
7  A.  Yes, sir.
8  Q.  Is second paragraph indicates that the loan
9       would be made jointly and severally to AHERF,
10      AGH, Forbes, Canonsburg, and Allegheny Valley.
11      Do you see that?
12 A.  I do, sir.
13 Q.  Those are the western entities. Correct?
14      Except for AHERF, those are the western
15      hospital entities.
16 A.  Correct.
17 Q.  And it indicates the loan would be fully
18      secured by all assets of the borrowers, which
19      in this letter includes the western hospital
20      entities.
21 A.  Correct.
22 Q.  The next paragraph states, we have heard that
23      the AHERF board has recently expressed strong
24      reservations with respect to making the credit
25      of the west available to support the east.

Page 396

1        The board's current position is
2    inconsistent with its actions in the past and
3    is particularly unfortunate in view of the
4    system-wide need for financing.
5        Mr. Sanzo, do you recall at or about
6    this time, early July of 1998, a combination of
7    PNC and MBIA were proposing to lend up to a
8    maximum of $160 million, and that a major issue
9    with respect to that effort became the question
10   of whether the assets of the west would be
11   available to secure repayment of the loan?
12 A.  I do recall, yes.
13 Q.  Can you tell me whether at any point the
14      members of the board of trustees of AHERF
15      during that period or the officers of AHERF
16      during that period, which included you, ever
17      agreed to a proposal to allow the assets in the
18      west to be used as collateral for loans that
19      would be used system-wide, meaning west and
20      east?
21 A.  Yes. There was no such agreement.
22 Q.  Was that a consistent position adopted by the
23      board of trustees, that they would not allow
24      that to occur; consistent, I mean, throughout
25      the time frame up to and including the

Page 397

1    bankruptcy filing?
2  A.  I believe so. The reason I reflected, I was
3       trying to remember if there were any board
4       resolutions acting on it formally, or if it was
5       just -- and now that I see what was attached to
6       the front of this, I think this list could have
7       been generated by either PNC or Mr. McCool so
8       that they could make sure that these
9       individuals directly got this letter, so that
10      position was well known, and it was, indeed,
11      the directive under which I operated.
12 Q.  Now, the letter concludes, does it not, we are
13      willing to undertake this emergency financing
14      in the interest of preserving vital assets of
15      our communities. We urge you to carefully
16      consider this proposal in light of the needs of
17      the AHERF organization.
18 A.  It does.
19 Q.  And I think you've already testified,
20      Mr. Sanzo, that the proposal was, indeed,
21      considered by the AHERF boards and AHERF
22      management.
23 A.  I believe this was delivered directly to at
24      least the members identified A through Q on the
25      front sheet.

37 (Pages 394 to 397)

Page 398

1 Q. Okay. But that there never was a departure by
2 any of the AHERF officers or trustees from the
3 position that no assets of the west will be
4 available to secure this line?
5 A. It was an issue that was discussed, but no
6 departure from that position was taken.
7 Q. Okay.
8                - - - -
9 (Deposition Exhibit No. 1642 marked
10 for identification.)
11                - - - -
12 BY MR. McDONOUGH:
13 Q. Mr. Sanzo, I'm going to show you next what's
14 been marked as Exhibit 1642. It is a letter
15 dated July 11, 1998, from MBIA to the board of
16 AHERF in care of you.
17 A. Yes.
18 Q. Now, in reviewing this letter, Mr. Sanzo, do
19 you have any recollection of having received it
20 at or about the date of July 11, 1998?
21 A. I believe I received it, yes.
22 Q. And just chronologically, this would have been
23 about a week or so prior to the actual filing
24 of bankruptcy petitions on behalf of some of
25 the AHERF entities.

Page 399

1 A. Yes. I think it was about ten or twelve days.
2 Q. Now, this letter states, dear board member, as
3 president of MBIA Insurance Company, insurer of
4 $300 million of Delaware Valley Obligated Group
5 bonds and $71 million of AGH bonds, I am
6 writing concerning the difficult choices
7 currently facing the board of AHERF. Correct?
8 A. Correct.
9 Q. And it goes on to state, we at MBIA have been
10 given to understand that the board is
11 considering bankruptcy filings for one or more
12 entities within the AHERF system. We believe
13 such a filing could have highly deleterious
14 effects on the delivery of health care services
15 and education in Pennsylvania.
16 Finally, Mr. Anthony Sanzo, your new
17 CEO, has told us that the board has not
18 actively considered the sale of the whole AHERF
19 system as a means of avoiding a bankruptcy
20 filing.
21 Our advisors indicate that the sale
22 of the entire system would very likely yield a
23 purchase price well in excess of all debt. The
24 need for a bankruptcy filing would be obviated,
25 subject to receipt of interim financing, which

Page 400

1 MBIA would be pleased to consider providing,
2 just as we have already provided interim
3 financing proposals which the board has
4 rejected.
5 Now, I didn't frankly mean to read
6 that much into the record. I apologize but,
7 Mr. Sanzo, here are my questions with you with
8 respect to this.
9 Do you recall any consideration by
10 the AHERF board of the position taken by MBIA
11 in this letter that a sale of the entire AHERF
12 system could be achieved at a price that would
13 repay in full all debt and, in fact, in excess
14 of all debt?
15 A. I do recall, again to the best of my ability,
16 that the options of combining the entirety of
17 the AHERF system in any form of reorganization,
18 restructuring, or sale, was rejected, was
19 considered and rejected, rejected again not
20 with -- without debate and without dissension
21 by certain members of the board, and no, I
22 can't remember who would have dissented at this
23 point in time, but it was largely split
24 between, shouldn't be a surprise, but those
25 members based in western Pennsylvania and those

Page 401

1 members who were based in eastern Pennsylvania.
2 But it was rejected on the basis that
3 there was a fairly strong belief that the
4 entities, including the New Jersey hospital
5 entities and all entities in the west, if freed
6 from their -- from the financial burden of
7 eastern operations, would be able to survive on
8 their own and, therefore, since they were
9 separately obligated debts, they should be
10 treated as separate organizations, and
11 individual decision should be made on behalf of
12 each rather than one on behalf of the whole.
13 Yes. I have some recollection of
14 those discussions.
15 Q. And were those discussions and decisions a
16 further reflection of what we've been talking
17 about, a decision in the west that no further
18 value from the west was going to be extended to
19 benefit the east?
20 A. I think it was a reflection of that position,
21 yes, sir.
22 Q. Now, Mr. Sanzo, do you recall any analysis
23 within the AHERF organization with respect to
24 whether the statement made here by a major bond
25 insurance company, to the effect that if the

38 (Pages 398 to 401)

LEGALINK MANHATTAN (212) 557-7400

Page 402

1    AHERF system were sold, as a whole, that would
2    very likely yield a purchase price well in
3    excess of all debt?
4  A.  No, sir. I recall no such analysis being
5    completed.
6  Q.  So it's not as if within the board or with the
7    board's advisors there was an effort to
8    determine whether this statement was true or
9    not. It was, in the current vernacular, a
10   nonstarter because it would have involved
11   utilizing western assets to potentially benefit
12   eastern operations?
13 A.  There is no analysis done. It was a position
14   that was taken based on our belief that certain
15   entities had the ability to operate on their
16   own merit and should be given that opportunity.
17           - - - -
18       (Deposition Exhibit No. 1243
19       previously marked for identification.)
20           - - - -
21 BY MR. McDONOUGH:
22 Q.  Mr. Sanzo, I show you next a copy of a letter
23   dated July 13, 1998. This is two days after
24   the prior letter we just looked at?
25 A.  Yes, sir.

Page 403

1  Q.  This is addressed to you as president and CEO
2    of AHERF.
3  A.  Yes, sir.
4  Q.  And signed by an individual from PNC Bank.
5    Correct?
6  A.  Yes, sir.
7  Q.  There is handwriting on this letter. Do you
8    recognize the handwriting?
9  A.  I recognize it, and I believe it to be the
10   handwriting of Connie Cibrone.
11 Q.  Connie Cibrone at that point in time would have
12   been the president of AGH?
13 A.  That's right.
14 Q.  Can you decipher it? I mean, actually it's
15   quite good handwriting, but it says, increase
16   to a hundred. Would that be one hundred
17   thousand or one hundred million?
18 A.  It says a hundred thousand. I'm not going to
19   interpret it. I'll read it for you. It says,
20   increase to a hundred thousand. If attached
21   to --
22 Q.  Do you know what U dot or V dot would refer to?
23 A.  No.
24 Q.  This letter states, following our conversation
25   of yesterday, I can confirm that PNC and MBIA

Page 404

1    are willing to consider interim financing for
2    members of the Delaware Valley Obligated Group
3    in an amount up to $33 million, which you
4    indicated would be a sufficient amount of
5    financing to take the eastern region of AHERF
6    through August 7, 1998.
7        Do you recall, Mr. Sanzo, that at or
8    about July 13, MBIA and PNC made a proposal to
9    lend $33 million to just the eastern region?
10 A.  I recall that --
11       I don't think it was a firm proposal.
12   I do believe that terms of a proposal were
13   being discussed at that point, yes, sir.
14 Q.  And were those terms set forth in this letter?
15 A.  I would like to read it.
16 Q.  Yeah, please do.
17           - - - -
18       (The witness reviewed the document.)
19           - - - -
20       THE WITNESS:  Okay, sir.
21 BY MR. McDONOUGH:
22 Q.  Okay. Now, if only I can remember the
23   question, but let me try to approach it this
24   way, Mr. Sanzo.
25       Was this a proposal or an outline of

Page 405

1    a proposal to lend $33 million to only the
2    Delaware Valley obligors as opposed to the
3    western ones?
4  A.  It seems to be an outline of the proposal that
5    they were willing to consider.
6  Q.  Okay. Along the lines that I discussed?
7       MR. COGAN:  Objection.
8  A.  I don't understand.
9  BY MR. McDONOUGH:
10 Q.  Let me withdraw the question.
11       What I'm trying to establish is this
12   letter doesn't say that the cash or the assets
13   in the west would need to be provided to secure
14   this loan. Correct?
15 A.  Well --
16       MR. COGAN:  Objection.
17       THE WITNESS:  It does in a way, sir.
18   It says that AHERF and its affiliates would be
19   required to subordinate any debt owing to them
20   in favor of this debt to PNC and MBIA.
21 BY MR. McDONOUGH:
22 Q.  Okay.
23 A.  So in some way I think it does obligate at
24   least whatever was outstanding then and owed.
25 Q.  I don't disagree with that, Mr. Sanzo. What I

39 (Pages 402 to 405)

Page 434

```
1    Penn?
2              MR. COGAN:  Objection.
3              THE WITNESS:  Had I noticed that?
4    Yes.  I did notice that.
5              MR. McDONOUGH:  That's all the
6    questions I have.  Thank you, Mr. Sanzo.
7              MR. COGAN:  Why don't we go off the
8    record.
9              THE VIDEOGRAPHER:  We're now going
10   off the record.  The time on the screen is
11   1:34.
12              - - - -
13   (The proceedings were recessed at 1:34 p.m.)
14              - - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 436

```
1
2    COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
     COUNTY OF ALLEGHENY          )    S H E E T
3        I, ANTHONY M. SANZO, have read the foregoing
     pages of my deposition given on Wednesday, July 2,
4    2003, and wish to make the following, if any,
     amendments, additions, deletions or corrections:
5
     Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20   In all other respects, the transcript is true and
     correct.
21
22   _____
                  ANTHONY M. SANZO
23   Subscribed and sworn to before me this
     _____ day of _____, 2003.
24   _____
25             Notary Public
     AKF Reference No. 76211
```

Page 435

```
1    COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2    COUNTY OF ALLEGHENY          ) SS:
3        I, G. Donavich, RPR, CRR, a Court Reporter and
4    Notary Public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the witness,
6    ANTHONY M. SANZO, was by me first duly sworn to
7    testify to the truth, the whole truth, and nothing
8    but the truth; that the foregoing deposition was
9    taken at the time and place stated herein; and that
10   the said deposition was recorded stenographically by
11   me and then reduced to printing under my direction,
12   and constitutes a true record of the testimony given
13   by said witness.
14       I further certify that I am not a relative or
15   employee of any of the parties, or a relative or
16   employee of either counsel, and that I am in no way
17   interested directly or indirectly in this action.
18       IN WITNESS WHEREOF, I have hereunto set my hand
19   and affixed my seal of office this 5th day of July,
20   2003.
21
22
23   _____
24             Notary Public
25
```

Schaffer Dep.

ROBIN SCHAFFER

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
2

                          -  -  -  -
3

    THE OFFICIAL COMMITTEE OF        )
4   UNSECURED CREDITORS OF           )
    ALLEGHENY HEALTH, EDUCATION &    )
5   RESEARCH FOUNDATION,             )
                                     )
6           Plaintiff,               )
                                     )
7             -vs-                   )    Civil Action
                                     )    No. 00-684
8   PRICEWATERHOUSECOOPERS, L.L.P.   )
                                     )
9           Defendant.               )
10

                          -  -  -  -
11

                      VIDEO TAPE
12  DEPOSITION OF:  ROBIN R. SCHAFFER
                      VOLUME I
13

                          -  -  -  -
14
15            DATE:     June 4, 2002
                        Tuesday, 9:03 a.m.
16

17            LOCATION:  MANION McDONOUGH & LUCAS
                        14th Floor, USX Tower
18                      Pittsburgh, PA  15219
                        412-232-0200
19

20            TAKEN BY:  Defendant
21

              REPORTED BY:  Claire Gross, CRR, RDR
22                        Notary Public
                          AKF Reference No. Cg70512
23
24
25
```

ROBIN SCHAFFER

Page 26

1 booking bad debt at a budgeted level because
2 with the increased agings and some of the
3 other issues with the bad debt methodologies,
4 he was concerned about booking at budgeted
5 levels.
6 Q. Who decided to book bad debt expense at
7 budgeted levels?
8 A. I can't say. I know why it happened, but I
9 don't know who made the call. My guess would
10 be that Chuck Morrison did, but that's simply
11 a guess on my part.
12 I know the big concern was that bad
13 debt expense was all over the place, meaning
14 it was not a consistent number, and it just
15 kept getting higher and higher.
16 I think people in operations who
17 Chuck Morrison had to talk with and deal with
18 had concerns about whether bad debt expense
19 was right and why it was so high and what was
20 going on.
21 Because of that they tried to smooth
22 the bad debt expense out and book it at
23 budgeted levels until they could get their
24 arms around the issue.
25 I think it came from Chuck Morrison,

Page 27

1 the directive, based on his dealings with
2 operations, but I can't say that 100 percent
3 for sure.
4 Q. What was Mr. Morrison's role at AHERF?
5 A. He was the CFO, the chief financial officer,
6 of the eastern region hospitals, so he
7 actually was located in Philadelphia. He had
8 a very large staff out there, a big
9 accounting staff just like we had in
10 Pittsburgh, and his people were supposed to
11 be more operational.
12 Like he had Kathy Stephans, for
13 example, reported directly to him, and she
14 was supposed to be like the direct contact
15 with Hahnemann Hospital dealing with their
16 operations people and trying to understand
17 what was going on. Randy Jacobson was
18 another one that reported to Chuck. Those
19 were his top two people.
20 Peter Keyes prepared the budgets for
21 Chuck Morrison. So he was out there in
22 Philadelphia with his own accounting staff,
23 and he was the chief financial officer of all
24 the hospitals out there.
25 Q. Did you have an understanding as to why there

Page 28

1 was an accounting group in Pittsburgh and a
2 separate accounting group out in
3 Philadelphia?
4 A. Well, I know initially the logic was let's
5 consolidate all the accounting and save
6 money, and we did actually save money from
7 doing that. We closed down a lot of the
8 detailed accounting work that was being done
9 out in Philadelphia.
10 The reason that they still needed to
11 maintain a presence out there is because
12 that's where the hospitals were physically
13 located, and they needed people that could go
14 to the hospitals and deal with the hospitals
15 directly on operational issues and finance
16 issues so that there was a presence out
17 there.
18 Q. Now, you said that there were concerns that
19 bad debt expense was all over the place?
20 A. Yes.
21 Q. I was wondering what you meant by that.
22 A. Instead of it being consistent from month to
23 month or in line with budget, it was normally
24 going up higher and higher each month. It
25 wasn't a consistent number, and it wasn't in

Page 29

1 line with budget. It was always well over
2 the budgeted levels.
3 Q. You mentioned it was your understanding that
4 people in operations had concerns?
5 A. Yes.
6 Q. Who are these people in operations?
7 A. Well, I know one of the people who Chuck
8 Morrison reported to -- he was an older
9 gentleman, and as soon as you asked me that
10 his name just went out of my head.
11 Q. Dr. Kaye?
12 A. Dr. Kaye. That was one of the main people
13 that had concerns. That's the name I heard
14 that was questioning it.
15 Q. Do you know when those concerns over bad debt
16 expense began?
17 A. From the perspective of the operations
18 people, probably in fiscal '97 when they
19 really started seeing it. From Coopers
20 perspective it would be '96 because they had
21 concerns about the way we recorded bad debt
22 and whether or not our bad debt methodologies
23 were adequate as far as like calculating our
24 reserves that we needed.
25 Q. When you say that Coopers had concerns, are

8 (Pages 26 to 29)

ROBIN SCHAFFER

Page 30

1  you talking about during the '96 audit?
2  A.    During the audit, yes.
3  Q.    And who from Coopers did you speak with about
4    those issues?
5  A.    Actually with those issues I dealt some with
6    Amy directly, and I think that Brian
7    Christian was actually doing the '96 audit,
8    if I recall correctly.  But one of the things
9    they did as an example is they took our
10    agings for our hospitals and dumped them into
11    the AGH model, the Allegheny General Hospital
12    model, just to see how far off we were if we
13    used their methodology which Coopers was very
14    comfortable with.
15  Q.    When you say our hospitals, you're talking
16    about DVOG hospitals?
17  A.    DVOG, yes.
18  Q.    And AGH is Allegheny General Hospital?
19  A.    Yes.
20  Q.    They had a different method of calculating
21    bad debt allowance for the DVOG hospitals?
22  A.    Yes.
23  Q.    Is there anyone you can remember from Coopers
24    talking to about bad debt issues in the '96
25    audit other than Ms. Frazier and

Page 31

1    Mr. Christian?
2  A.    Me specifically talking to anyone else, I
3    don't recall.
4  Q.    Now, you said that they had concerns?
5  A.    Concerns, yes.
6  Q.    Can you tell us what you can recall about
7    what they told you about what their concerns
8    were?
9  A.    What I recall is just when they -- one, we
10    had different methodologies and, two, the
11    percentages we were using, depending on how
12    old the receivables were, were different
13    among the hospitals and not always probably
14    as high as they should have been.
15        What I recall specifically is them
16    looking at our bad debt the way we recorded
17    bad debt, not being very comfortable with the
18    percentages themselves because of the aging
19    of the receivables and just saying that, you
20    know, if we used the DVOG numbers in the AGH
21    model, what would we need as a reserve at
22    that point because I felt they were more
23    comfortable with the AGH methodology and the
24    percentages that were being used.
25        So they were more -- I was providing

Page 32

1    them agings, they were trying to run some of
2    their own calculations trying to figure out
3    what these guys really mean, meaning the DVOG
4    hospitals on their books as far as bad debt
5    versus what they have.
6  Q.    Did you ever see any calculations that
7    Coopers may have run on their own?
8  A.    The only one I recall seeing, I believe
9    Brian -- I believe it was Brian Christian
10    took my agings and tried to put them into the
11    AGH model.  I remember there was just some
12    things they asked me to take a peek at them
13    just to say did we do this correctly.
14        I just remember briefly looking at
15    them, maybe saying, well, no, this payor
16    really should be this one or that's that.
17    Just some general things that I added.  But
18    that was the extent of my looking at what
19    they did.  They usually presented that stuff
20    higher up than me after they came up with
21    their answers.
22  Q.    Do you know anything about what the result
23    was of any calculations that Coopers may have
24    run like that?
25  A.    I vaguely recall that we did book additional

Page 33

1    reserves in June.  I don't know how much,
2    June of '96.  I don't know how much or where
3    they came from exactly, but I do remember
4    that I think Bill Beuttner proposed that we
5    actually book something to try to help solve
6    the problem.
7  Q.    Do you recall that there was a $17 and a half
8    million amount of additional reserves that
9    were booked?
10  A.    That's the number.  Now that you say that
11    number I recall it.  I can actually see it on
12    a memo that Dan had written, yes.
13  Q.    Was it your understanding that the idea for
14    doing this came from Coopers?
15  A.    Yes.
16  Q.    Who did you get that understanding from?
17  A.    That the idea came from Coopers, that would
18    have been Dan.
19  Q.    How frequently generally while you were at
20    AHERF did you interact with Mr. Cancelmi?
21  A.    Very frequently.
22  Q.    Daily?
23  A.    Daily.
24  Q.    Hourly?
25  A.    No.  He was very busy.  I would say that I at

9 (Pages 30 to 33)

ROBIN SCHAFFER

Page 38

1    been in fiscal '96 that they actually
2    converted to Invision.  Then MCP and EPPI
3    came on to Invision later, and then Hahnemann
4    would have been the last one to be converted.
5  Q.    Do you remember when MCP and EPPI switched to
6    Invision system?
7  A.    I can't recall.  I don't remember if it was
8    in fiscal '97.  I can't remember exactly when
9    they came on board.  I know they were after
10    Elkins, Bucks and St. Christopher's, but I
11    don't remember the exact time frame.
12  Q.    Do you remember at all when Hahnemann came
13    onto the Invision system?
14  A.    Precisely, no.
15  Q.    Why were the hospitals being switched over to
16    the Invision system?
17  A.    I think it was for primarily because they
18    thought it was a better system to build a
19    receivables and collect the receivables from.
20    The decision to use Invision, I believe, came
21    from the Patient Financial Services Group,
22    the Greg Snow group.
23  Q.    Now, what type of accounting software
24    programs did you use in your job?
25  A.    I used Lotus a lot to put, organize that and

Page 39

1    do spread sheets and stuff.  We were on the
2    Dun & Bradstreet general ledger system.
3    That's the two basic things we used.
4  Q.    Was there some type of interface from the
5    patient accounting system to your general
6    ledger system?
7  A.    Yes.
8  Q.    How did that work?
9  A.    There was basically what they called a
10    conversion table that was built.  I was
11    responsible for building it initially and
12    maintaining it.
13    You basically took some key feeds
14    from the patient accounting system, linked
15    them to some key feeds in the general ledger
16    account like account cost center.
17    Every month you would accumulate the
18    data, inpatient accounting, patient
19    accounting system, run it through this table,
20    and it would be interfaced into our general
21    ledger.
22  Q.    Did you have direct access to the patient
23    accounting program?
24  A.    The only access I had, I could inquire on
25    accounts.  I could go in and look up a

Page 40

1    patient and see the detail of what was
2    charged to his account.  I couldn't edit
3    anything, change anything.  I didn't have
4    that type of access.  It was inquiry only.
5  Q.    But you were able to read data in the patient
6    accounting system from your own desk?
7  A.    Yes.
8  Q.    Is that a function that only you had, or did
9    others in the accounting department also have
10    that ability?
11  A.    I was the only one that had that.  I think
12    later on I may have given Brian Savchak or
13    one of the other staff accountants security,
14    but I was primarily the one that could do
15    that.
16  Q.    Now, I think we had gone on to this topic
17    because you were telling me that the
18    different DVOG hospitals actually had
19    different bad debt allowance methodologies;
20    is that correct?
21  A.    Yes.
22  Q.    What were the differences that you can
23    recall?
24  A.    The one that was the most unique would have
25    been MCP and EPPI.  They basically only

Page 41

1    reserved patient balances.  What I mean is
2    you can have a person that comes into the
3    hospital and has insurance coverage, but a
4    portion of the balance may be covered, they
5    have to pay it themselves.
6    In the bad debt methodology for MCP
7    and EPPI all they reserved for was the
8    patient balances on all the financial classes
9    meaning your Medicare, Blue Cross, your HMOs,
10    et cetera.
11    Whereas the normal is to reserve on
12    the entire account balance regardless of
13    whether or not it's insurance or patient.
14    The biggest difference between all five of
15    them were just the percentages that were used
16    as far as if an account was zero to 30 days
17    old, how much reserve was on that versus if
18    it was over a year old.
19    All the percentages were very
20    different.  The other difference is the way
21    we would book bad debt, meaning for Elkins,
22    Bucks, St. Chris and MCP, EPPI.
23    We would do what we call the income
24    statement method, which was taking a
25    historical percentage of bad debt in relation

11 (Pages 38 to 41)

ROBIN SCHAFFER

Page 42

1  to net revenue and booking bad debt that way
2  every month, and then on a quarterly basis or
3  even monthly basis looking at a balance sheet
4  method which is where you take the aging of
5  the receivables and reserve based on A/R
6  balances and seeing whether or not we were
7  over or under reserve using this income
8  statement method. Hahnemann always used a
9  balance sheet method. They booked based on
10  the receivable balance.
11 Q.  If I understood what you just testified to,
12  the balance sheet method involves dividing
13  the patient accounts into different payor
14  categories; right?
15 A.  First, yes.
16 Q.  And then you separate the accounts out into
17  different aging buckets; is that correct?
18 A.  Correct.
19 Q.  And then for each bucket for each payor
20  category you apply a loss percentage?
21 A.  That's correct. A bad debt reserve or
22  writeoff percentage, yes.
23 Q.  And that's how you would determine the
24  proportion of accounts in that bucket that
25  should be in the bad debt allowance?

Page 43

1  A.  Correct.
2  Q.  And at Hahnemann you applied the balance
3  sheet method every month?
4  A.  Every month, yes.
5  Q.  So who would actually perform that
6  calculation?
7  A.  That would be me and my staff that would do
8  that.
9  Q.  Would you do that or would Mr. Savchak or
10  Ms. Gall and Ms. Forte?
11 A.  Normally the staff would. Early on when we
12  were acquiring the DVOG hospitals I did a lot
13  of the detailed work myself. I actually did
14  most of it myself for the first couple of
15  months before it was brought back to
16  Pittsburgh. But normally the staff
17  accountants would do that.
18 Q.  Okay. So when you got hired in the spring of
19  '95 AHERF was in the middle of consolidating
20  accounting functioning back to Pittsburgh?
21 A.  That's correct.
22 Q.  Is that actually why you were hired? That
23  was all part of that, of that effort of
24  consolidation?
25 A.  Yes.

Page 44

1  Q.  Would you review the monthly calculation at
2  Hahnemann using the balance sheet method?
3  A.  Yes. If I didn't prepare it, I would review
4  it, yes.
5  Q.  Now, at the four other DVOG hospitals I think
6  you indicated on a monthly basis the bad debt
7  expense was determined using the income
8  statement method?
9  A.  Correct.
10 Q.  And that would be done using a percentage of
11  gross revenue; is that right?
12 A.  Net revenue. Normally it was net revenue.
13 Q.  What percentage was used?
14 A.  That I don't recall. It varied for each of
15  the different hospitals. We would look back
16  at where their bad debt expense was the prior
17  year in relation to net income and that's how
18  the percentages were developed.
19 Q.  At the end of each year was the balance sheet
20  method applied to the four DVOG hospitals
21  that on a monthly basis used the income
22  statement method?
23 A.  Yes.
24 Q.  So even if during a given year they were
25  either overbooking or underbooking expense,

Page 45

1  that problem would get fixed at year-end?
2  A.  Yes, for the audit, yes.
3  Q.  And did you prepare the calculations for
4  those four hospitals using the balance sheet
5  method at year-end?
6  A.  Either myself or the staff, one or the other.
7  Q.  And if the staff prepared it, would you have
8  a look at it?
9  A.  Yes.
10 Q.  You would see that it was right?
11 A.  Yes.
12 Q.  So those four hospitals would be Elkins Park,
13  Bucks, St. Christopher's and MCP?
14 A.  Yes.
15 Q.  Now, the patient accounting information from
16  the PFSG was gross revenue; is that right?
17 A.  Primarily. There were different buckets of
18  receivables. I'll explain that. There were
19  people that were in-house that were still
20  physically in the hospital. Those were gross
21  receivables or gross revenue.
22      There were people that had been
23  discharged but not final billed. Those were
24  also gross receivables. Some of the final
25  billed accounts would have been net

ROBIN SCHAFFER

Page 46

1  receivables.
2       The patient accounting systems had
3  what they called a PRM. It was a Payment
4  Responsibility Master or something like that,
5  that based on the actual contracts would go
6  in at time of bill and calculate the net what
7  they expected to collect, the net research.
8  That was on the inpatient side.
9       On the outpatient side there was a
10 mix, again some accounts had been
11 contractualized and some were at gross.
12 Q.  So PRM is P-R-M?
13 A.  P-R-M, yes.
14 Q.  When you say contractualized, that means
15 taking gross revenue and getting down to net
16 revenue?
17 A.  Correct.
18 Q.  What term did you use for the difference from
19 gross revenue to net revenue?
20 A.  Different things. Charge differential was
21 maybe something that people would use.
22 Contractual reserve. Those are the two main
23 things.
24 Q.  You used those two terms to mean that amount
25 between gross revenue and net revenue?

Page 47

1  A.  Yes.
2  Q.  So the patient accounting system carried the
3  in-house accounts and the discharge not final
4  billed accounts at gross; is that right?
5  A.  Yes.
6  Q.  Who then would make sure that those accounts
7  receivable would be brought down to a net
8  level?
9  A.  That would be my department in accounting.
10 Q.  How did you do that?
11 A.  We -- primarily the easiest way to explain
12 it, we looked at, for example, Medicare.
13 Medicare pays on a per case basis based on a
14 DRG. We would look at the number of cases in
15 the receivables at month end, and we would
16 calculate out based on these per case rates
17 that our reimbursement department, Joe
18 Scharf, would provide to us.
19      We would calculate out I have 10
20 cases, I'm going to be paid $10,000, I'm
21 going to be reimbursed 100,000, my gross
22 charges are 200, I need to contractualize
23 100,000.
24      For Blue Cross they were paid per
25 day. Again, we would get per day rates. We

Page 48

1  would either get them from reimbursement, the
2  reimbursement department, or we would
3  calculate based on historical payment data
4  what we were going to be paid, and we would
5  price everything out that way.
6  Q.  Now, I think you indicated that for the final
7  billed accounts, at least on the inpatient
8  side, most of the accounts were already
9  contractualized within the patient accounting
10 system?
11 A.  That's correct.
12 Q.  Was that done at the time of billing?
13 A.  Yes.
14 Q.  Were there certain categories of inpatient
15 final billed accounts that were not
16 contractualized within the patient accounting
17 system?
18 A.  Yes.
19 Q.  What categories were those?
20 A.  Normally on the inpatient side it wasn't
21 necessarily a particular category. It was a
22 result of problems with the PRM that the
23 system basically just wasn't working
24 appropriately.
25      The outpatient side is different, and

Page 49

1  I'll speak to that in a moment. But the
2  inpatient side, normally if an account went
3  to a final billed status on the inpatient
4  side, the rates should have been loaded into
5  this PRM, and the contractual should have
6  been taken. But there were problems and
7  issues with the data that was in the PRM.
8  Q.  Did you have an understanding as to why there
9  were problems with the PRM?
10 A.  I think one issue was with the conversion.
11 Some of the stuff may not have been set up
12 correctly in Invision. That was one issue.
13      Another issue was when a patient's
14 financial class would change, meaning if he
15 came in Medicare and later we found out he
16 really should have been Blue Cross, you
17 change the financial class. A lot of times
18 the PRM was reversing the contractual and not
19 putting a new contractual back on the
20 account.
21 Q.  So the first problem with the PRM that you
22 mentioned was conversion. That's conversion
23 from PATCOM to Invision?
24 A.  Correct.
25 Q.  Second problem you mentioned with the PRM is

13 (Pages 46 to 49)

ROBIN SCHAFFER

Page 58

1    that didn't happen?
2  A.    Greg Snow.
3  Q.    Now, we've moved on, I guess, to the
4    outpatient accounts. Were final billed
5    outpatient accounts generally carried in the
6    patient accounting system at gross or at net?
7  A.    Generally at gross. They tried to load --
8    patient accounting tried to load some of the
9    contracts into the PRM. But it's more
10    complicated, I think, on the outpatient side.
11    I don't know what the split was. It might
12    have been like 60-40, 60 percent gross, 40
13    percent net.
14        Our problem in accounting was always
15    trying to determine what we needed to reserve
16    and what we didn't based on what was at
17    gross. That was a frustration that we had
18    because they changed it constantly in patient
19    accounting.
20  Q.    For outpatient final billed accounts then was
21    it your responsibility to reduce those from
22    gross to net?
23  A.    If they were at gross, yes.
24  Q.    And did you then calculate the bad debt
25    allowance as a proportion of net accounts

Page 59

1    receivable?
2  A.    Yes. After we factored in the contractuals
3    that we manually would reserve in accounting,
4    they would then take a net receivable number
5    and calculate bad debt expense on that
6    number.
7  Q.    Now, a few minutes ago you were telling me
8    about the bad debt allowance methodology at
9    MCP, EPPI. That was, I think you testified,
10    a methodology that was reserved only for
11    self-pay accounts and for patient portions of
12    other accounts?
13  A.    Correct.
14  Q.    Do you recall any discussions that you may
15    have had about the MCP, EPPI bad debt
16    methodology with Coopers & Lybrand during the
17    1996 audit?
18  A.    I know specifically -- when I say that they
19    generally had concerns about our methodology,
20    the MCP, EPPI one was probably the biggest
21    concern because that one -- because of how it
22    was done, probably there was the most
23    exposure was on that particular group.
24  Q.    The most exposure meaning the greatest
25    potential that it was underreserved?

Page 60

1  A.    Yes.
2  Q.    Before you spoke to Coopers & Lybrand about
3    the MCP, EPPI bad debt methodology, had you
4    had your own concerns?
5  A.    In '96, yes. I'll have to say in '95, when I
6    first came to Allegheny to start doing
7    revenue I didn't have a lot of experience. I
8    had to learn pretty quickly.
9        In '96 I probably wasn't as concerned
10    as Coopers until Coopers brought it up. My
11    concern was, of course, after they started
12    bringing it up that we were going to have an
13    audit adjustment.
14        But I knew just from looking at the
15    methodologies that there were problems, but I
16    was really concerned when Coopers had the
17    same issues.
18  Q.    When you referred to an audit adjustment, can
19    you just explain what that is?
20  A.    Yes. Normally after Coopers would review our
21    financial statement, if they determined that
22    anything wasn't properly or adequately
23    recorded on our general ledger, they would
24    propose an adjustment to our financial
25    statements, sort of an after-the-fact

Page 61

1    adjustment because the financial statements
2    unaudited would have been presented to
3    various people in the organization.
4  Q.    Was an audit adjustment something you
5    generally tried to avoid?
6  A.    Generally.
7  Q.    Why?
8  A.    It's better from our perspective. In
9    accounting we are doing a better job if our
10    financial statements are accurate when
11    Coopers comes in.
12        We always try to make them as clean
13    as we could before Coopers came in. So
14    generally we didn't like audit adjustments
15    because it was a reflection maybe we weren't
16    doing our job.
17  Q.    A reflection meaning that more senior people
18    at AHERF might believe that the accounting
19    group wasn't doing its job?
20  A.    Yes.
21  Q.    Do you remember who from Coopers & Lybrand
22    you spoke to during the 1996 audit about the
23    MCP, EPPI bad debt methodology?
24  A.    Again, I think the two people I was most
25    involved with were Amy Frazier and Brian

16 (Pages 58 to 61)