ROBIN SCHAFFER

Page 62

1  Christian. Those were the two that I
2  remember, but those are the two that I can
3  remember talking to about that.
4  Q.  Again, I realize this was years ago, but can
5  you recall anything that either of them said
6  in terms of how they were analyzing MCP,
7  EPPI's bad debt methodology?
8  A.  The only specific thing I remember was again
9  when I had provided them the actual system
10  aging reports so that they could take them
11  and put them into the AGH model and try to
12  get a sense of where we thought we needed --
13  they thought we needed to be. That's the one
14  specific thing I remember.
15  Q.  Is there anything else that you can generally
16  recall about what they thought about or told
17  you about the MCP, EPPI bad debt methodology?
18  A.  No. That's all.
19  Q.  Do you have any understanding as to what the
20  result was of applying the AGH bad debt
21  method to the MCP account aging?
22  A.  I know generally that we would have been
23  short. We definitely would have had less
24  reserves than under the AGH method.
25      Now, I don't know that from recalling

Page 63

1  specifically seeing their analysis, but
2  knowing how AGH was done and how MCP, EPPI
3  was done, I'm sure there was an adjustment
4  that needed to be made to increase the bad
5  debt reserve.
6  Q.  Because it was your understanding at the time
7  that AGH had a more conservative methodology?
8  A.  Yes.
9  Q.  Do you have any idea what the quantitative
10  difference was between using the AGH method
11  and using the MCP, EPPI method on the MCP,
12  EPPI accounts in '96?
13  A.  No. I don't know what the true dollars were.
14  Again, I recall after you said it, the $17
15  and a half million adjustment, but I'm not
16  sure that covered the entire problem because
17  I don't remember what the magnitude of it
18  was.
19  Q.  So you don't recall whether it was greater or
20  less than $17 and a half million?
21  A.  Right. That's correct.
22  Q.  Now, I think the second thing you said about
23  concerns that Coopers & Lybrand expressed to
24  you in the '96 audit about the bad debt
25  methodology to the DVOG hospitals was that

Page 64

1  the loss percentages were different?
2  A.  Not necessarily. They didn't like that they
3  were different because, of course, it would
4  be easier to audit one consistent bad debt
5  methodology. So I guess, yes, they had
6  concerns they were different.
7      But their biggest concern was that
8  they were not high enough to cover the bad
9  debt based on how old the receivables were.
10  Q.  Who developed the loss percentages that were
11  used in '96 for the bad debt allowance at the
12  various DVOG hospitals?
13  A.  Those were the methodologies that were in
14  place when we acquired the hospitals, so I'm
15  not sure who actually developed the
16  methodologies.
17  Q.  Are you aware of any effort by anyone at
18  AHERF prior to the '96 audit to determine
19  whether the loss percentages that were being
20  used were appropriate?
21  A.  Prior to '96 I don't recall anybody doing any
22  specific analyses on that with AHERF, but I
23  do know that most of us felt that they
24  probably weren't what they needed to be. But
25  I don't recall any specific analyses being

Page 65

1  done on what.
2  Q.  When you say most of us, who are you talking
3  about?
4  A.  Myself, Dan Cancelmi, Steve Spargo.
5  Q.  Did you interact directly with Steve Spargo
6  on these issues?
7  A.  Very rarely.
8  Q.  Why did you believe that the loss percentages
9  used in '96 might not have been high enough?
10  A.  Generally speaking, going back to MCP, EPPI,
11  their own methodology didn't make sense only
12  reserving self-pay for one thing. Just in
13  looking at the PATCOM agings, if an account
14  is over 270 days old, and we are only
15  reserving maybe 25 percent, it just didn't
16  seem right, that there was not in my mind a
17  75 percent likelihood that they were going --
18  you were going to collect that receivable.
19      That percentage I threw out was a --
20  I don't know if that's what it actually was.
21  I'm just giving you an example. It just
22  didn't seem we were reserving enough just
23  looking at it on the surface.
24  Q.  Now, when you say that the MCP, EPPI bad debt
25  methodology didn't make sense, is that a

17 (Pages 62 to 65)

ROBIN SCHAFFER

Page 66

1    conclusion you reached on your own, or is
2    that a result of having spoken with Coopers &
3    Lybrand?
4  A.    I actually reached that on my own prior to
5    them coming in just because when you have a
6    bucket of receivables over a year old that
7    maybe half of it is insurance balance and
8    half of it patient balance, the fact we only
9    reserved the patient portion didn't seem
10    right to me. I would have thought that
11    before Coopers said anything.
12  Q.    Are you aware of any consideration by anyone
13    at AHERF to change the method at MCP, EPPI
14    before the '96 audit?
15  A.    Specifically, no, but I vaguely remember that
16    the issue we had talked about changing it.
17    And because of the impact that it would have
18    had on the income statement, no one ever
19    really just said let's do this. And then
20    when -- we knew it was going to be an issue
21    when Coopers came in, so we let them deal
22    with it.
23  Q.    When you say that we had talked about it, is
24    that you and Mr. Cancelmi?
25  A.    Yes.

Page 67

1  Q.    Was anyone else involved in those
2    conversations?
3  A.    I'm sure Chuck Lisman was probably involved.
4    Not always but Chuck was -- Dan normally kept
5    Chuck apprised of everything that was going
6    on.
7  Q.    And the reason I think you indicated why the
8    change wasn't made was due to what you felt
9    the impact would be on the income statement?
10  A.    I think it was more we -- Dan and I and
11    Chuck, whoever was involved, just felt that
12    any time you're going to adversely affect
13    earnings from an accounting change, it
14    doesn't -- it's not something that people
15    want to hear. That's just how it is.
16       So it's not that -- like Steve
17    Spargo, people were aware the issue was out
18    there, but it wasn't quantified, and no one
19    was in a big hurry, I guess, to say this is
20    the dollar impact, this is what we need to
21    do, let's deal with it.
22       We just knew that Coopers when they
23    came in would look at it, and coming from
24    them it would probably be heard louder than
25    coming from us internally.

Page 68

1  Q.    Was Mr. Spargo aware of this issue with the
2    bad debt methodology at MCP, EPPI before the
3    '96 audit?
4  A.    I would say yes.
5  Q.    Now, as part of the '96 audit that Coopers
6    conducted, you provided them, I take it, with
7    various schedules?
8  A.    Yes.
9  Q.    And did those include schedules for the
10    calculation of the bad debt allowance?
11  A.    Yes.
12  Q.    And that included then, I take, it a schedule
13    for MCP, EPPI?
14  A.    Yes.
15  Q.    Did you tell Coopers anything about the
16    concerns that you had with the MCP, EPPI bad
17    debt methodology?
18  A.    I know we had conversations about it. I
19    don't know if I brought it up or they brought
20    it up, but I know we openly talked about it.
21    I just don't recall specifically if I walked
22    in and said here it is, I think it's not very
23    good. I probably didn't say that exactly,
24    but we had very open conversations about it.
25    I don't recall who brought it up.

Page 69

1  Q.    Do you think it's likely that that's an issue
2    that Coopers uncovered on their own and then
3    came to you?
4  A.    I wouldn't necessarily say they uncovered it
5    on their own. I would say that we all -- we
6    in accounting and Coopers knew it was an
7    issue. Coopers was the one to pursue the
8    quantifying end, seeing how to fix it.
9  Q.    Now, during fiscal year 1996, three of the
10    DVOG hospitals converted from the PATCOM to
11    the Invision accounting system?
12  A.    Yes.
13  Q.    I think you testified even before Coopers
14    came in to do the '96 audit you felt the
15    PATCOM loss percentages didn't seem right; is
16    that right?
17  A.    During the '96 audit?
18  Q.    Yes.
19  A.    Yes, yes. I just felt, generally speaking,
20    that maybe some of the older receivables were
21    not being adequately reserved, yes.
22  Q.    Is that an issue that you discussed with
23    Coopers & Lybrand?
24  A.    Again, I remember specifically us discussing
25    it and working together like me providing

18 (Pages 66 to 69)

ROBIN SCHAFFER

Page 86

1      organizations?
2  A.      Yes.
3  Q.      Who was the senior director?
4  A.      That was Dan Cancelmi.
5  Q.      And who were the chief executive officers and
6      chief operating officers of the individual
7      organizations?
8  A.      They varied for each of the hospitals.  The
9      hospitals all had their own chief executive
10     officers and chief operating officers.  I
11     don't recall specific names of all of the
12     people that we dealt with.
13         We had monthly meetings with those
14     titled people, and we met with them and
15     explained the results.  I don't remember the
16     names of everybody.
17  Q.      When you say we had monthly meetings, who
18     would actually go and meet with them?
19  A.      Normally it would be Dan Cancelmi, myself,
20     Jack Ellsworth and Chuck Lisman.  That was
21     the normal group.
22  Q.      Did you go out to Philadelphia to do this?
23  A.      Yes.
24  Q.      Would Mr. Morrison or members of his staff
25     also take part in these meetings?

Page 87

1  A.      No.
2  Q.      Were there separate monthly meetings for each
3      of the DVOG hospitals?
4  A.      Yes.
5  Q.      So you went out to Philadelphia for a day or
6      two and met with these various hospital
7      executives?
8  A.      Yes.  Usually a couple of days it took us to
9      go to each hospital and meet with them.
10  Q.      Did you meet with Dr. Kaye?
11  A.      No.
12  Q.      He was one level above them?
13  A.      Yes.
14  Q.      Did you discuss issues like the bad debt
15     allowance with the hospital executives?
16  A.      The allowance not necessarily.  Bad debt
17     expense, yes.  Most of the operations people
18     wanted to understand the bad debt expense and
19     the levels that we had been experiencing.
20  Q.      Were they concerned about increasing bad debt
21     expense?
22  A.      Yes.
23  Q.      Did you have an understanding as to why they
24     were concerned about that?
25  A.      My understanding was because it was

Page 88

1      negatively impacting their operations, their
2      results, that they had concerns as to what
3      was going on and why it was happening.
4  Q.      All right.  Do you see the next to last
5      bullet point under the heading of Primary
6      Responsibilities says, Managing and preparing
7      timely and accurate financial reports,
8      including revenue by payor type, bad debt
9      expense analyses, rate and volume analyses?
10  A.      Yes.
11  Q.      And do you believe that while you were at
12     AHERF you, in fact, prepared accurate reports
13     of revenue by payor type?
14  A.      Yes.
15  Q.      And did you prepare accurate reports of bad
16     debt expense analyses?
17  A.      Yes.
18  Q.      And did you prepare accurate reports of rate
19     and volume analyses?
20  A.      Yes.
21  Q.      You see the next bullet point says Managing
22     and coordinating the annual external audit of
23     the account records and financial reports of
24     the aforementioned organizations?
25  A.      Yes.

Page 89

1  Q.      Which organizations are those?
2  A.      That would be for the eastern region
3      hospitals and the university, the portions of
4      the audit that I would be responsible for,
5      meaning patient revenue and receivables.
6  Q.      What did you do in terms of coordinating the
7      annual external audit?
8  A.      What I would do is we would get from
9      Coopers -- they would provide us with an
10     audit request list, which was basically a
11     list of this is what I want from you when I
12     come in for the prelim audit and for the
13     year-end audit.
14         I would get a copy of that from Chuck
15     Lisman or Dan Cancelmi and go through that
16     with my staff to make sure that everything
17     that Coopers needed was prepared and ready
18     for them when they came in to do their audit.
19  Q.      Then when they actually came in, did you meet
20     with people from Coopers then?
21  A.      Yes.  And normally I met with whoever was in
22     charge of the patients and accounts
23     receivable portion of the audit, which was
24     normally like a first or second-year auditor.
25  Q.      It would usually be a person each time?

23 (Pages 86 to 89)

ROBIN SCHAFFER

Page 90

1  A.    Yes.
2  Q.    Now, see under Other Accomplishments the
3        first bullet point says, Manage the
4        consolidation and relocation of the
5        aforementioned revenue reporting functions
6        from Philadelphia to Pittsburgh?
7  A.    Yes.
8  Q.    Is that what you were talking about earlier,
9        the consolidation that occurred in 1995?
10 A.    Yes.
11 Q.    Then you see the next bullet point, Directed
12       the integration and consolidation of all
13       financial accounting functions associated
14       with the acquisition of the Graduate System
15       hospitals?
16 A.    Yes.
17 Q.    What work did you do in that regard?
18 A.    Similar to what we did in 1995.  For
19       Graduate, Mt. Sinai and Rancocas I was
20       responsible for going to Philadelphia,
21       meeting at the individual hospitals with the
22       accounting staff and going through what they
23       did as far as recording entries and closing
24       the books and had to learn it so that I could
25       bring the responsibility back to Pittsburgh

Page 91

1        and perform it there.
2  Q.    When was that accounting function brought
3        back to Pittsburgh?
4  A.    I don't remember specifically.  I don't
5        remember exactly when that all happened.
6  Q.    Was the patient accounting function for the
7        Graduate hospitals also brought back to
8        Pittsburgh?
9  A.    Patient accounting, no.
10 Q.    That stayed out in Philadelphia?
11 A.    Yes.
12 Q.    Is that under Ron Longabucco?
13 A.    Yes.
14 Q.    Did you deal directly with him?
15 A.    Yes.
16 Q.    Did you also deal directly with the staff
17       that reported to Ron Longabucco?
18 A.    Yes.
19 Q.    Who was that?
20 A.    Mike.  Of course I don't know the last name
21       but Mike something.  That was the main person
22       that I worked without there that reported
23       directly to Ron.
24 Q.    Now, I think you mentioned earlier that you
25       did have interactions with Mr. Morrison's

Page 92

1        staff?
2  A.    Yes.
3  Q.    That's primarily I think you indicated Kathy
4        Stephans and Randy Jacobson?
5  A.    Correct.
6  Q.    What types of matters would you interact on
7        with them?
8  A.    They would call and ask questions about
9        financial statements, specific questions,
10       what was going on, why was this the way it
11       was.
12           I also dealt a lot with Kathy and
13       Randy on the receivable issues because once
14       Chuck Morrison began being concerned about
15       the negative results between bad debt and
16       these missed contractuals, he asked Kathy and
17       Randy to start looking at some of the
18       detailed patient accounts just like I was in
19       Pittsburgh to try to understand what was
20       going on, what is happening.
21 Q.    Were there any accounting functions for which
22       Mr. Morrison's staff had responsibility?  I
23       mean, accounting issues that they did and
24       that you just then took their results?
25 A.    We did most -- as far as like actually

Page 93

1        recording journal entries and preparing
2        financial statements, we in Pittsburgh were
3        responsible for that.
4            I know that Kathy and Randy did their
5        own analyses in their group based on the
6        results, but they really didn't have any
7        direct involvement in the monthly closing
8        process.
9  Q.    Do you see the next bullet point, the last
10       one on the first page of your resume says,
11       Managed the successful conversion of six
12       hospital billing systems to SMS Invision?
13 A.    Yes.
14 Q.    I think we talked a little bit about that
15       previously today.  I'm wondering what the six
16       hospital billing systems were that are
17       mentioned there.
18 A.    That would be MCP, EPPI, Elkins, Bucks, St.
19       Chris and Hahnemann.
20 Q.    I guess I get five.
21 A.    EPPI is separate.
22 Q.    I see.  Okay.  Got it.  So those would be the
23       DVOG hospitals?
24 A.    Yes.
25 Q.    Did you consider the conversion of those

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN SCHAFFER

Page 182

1  Q.    Now, do you see the next column which is
2        headed Provisions IH/DNFB?
3  A.    Yes.
4  Q.    Is that In-house Discharge Not Final Billed?
5  A.    Yes.
6  Q.    Why is that column blank?
7  A.    We normally did not put bad debt on accounts
8        that were still in-house or discharged not
9        final billed. I think that column was later
10       removed because we never used it.
11 Q.    So the next column which is headed Total
12       seems at least on this schedule to be the
13       same as the column headed ATB; right?
14 A.    It looks like it. I don't know why that is,
15       though. That's what it looks like, yes.
16 Q.    The next column is headed Ending Balance;
17       right?
18 A.    Yes.
19 Q.    Your understanding for any given month do you
20       move along the row to get from the beginning
21       balance and then add or subtract the various
22       items in the other columns to get to the
23       ending balances?
24 A.    Yes.
25 Q.    If you look at the second column from the

Page 183

1        right where it says Calculated Reserve
2        Amount --
3  A.    Okay.
4  Q.    -- can you tell us what that represents,
5        please?
6  A.    Yes. That would be us calculating what we
7        thought the required reserve should be based
8        on the balance sheet method.
9  Q.    All right. So at the end of the year I take
10       it you would compare the ending balance,
11       which here is $2,647,782 with the required
12       amount calculated according to the balance
13       sheet method, which on this schedule is
14       $2,537,953?
15 A.    Yes.
16 Q.    That's what's shown in the right-hand-most
17       column?
18 A.    Yes.
19 Q.    So this shows that at June 30, 1996, the
20       Bucks County inpatient bad debt allowance
21       account was overreserved by $109,829 correct?
22 A.    Correct, based on the methodology, balance
23       sheet methodology, that was being used at
24       that time.
25 Q.    That's the method that you were using at

Page 184

1        AHERF and provided to Coopers; right?
2  A.    Yes.
3  Q.    Now, this information here toward the bottom
4        of the schedule where it says Bad Debt
5        Flux -- and there are various entries
6        underneath that -- was that something that
7        was originally on the schedule when you
8        prepared it or added later?
9  A.    That was added later.
10 Q.    So if we could turn, please, to the second
11       page. Does this outpatient bad debt
12       allowance schedule generally work the same
13       way as the inpatient schedule that we were
14       just looking at?
15 A.    Yes.
16 Q.    So this shows that at June 30, '96, the Bucks
17       County outpatient bad debt allowance account
18       was underreserved by $163,718?
19 A.    Correct.
20 Q.    I take it your approach at AHERF was, in
21       effect, to net out the inpatient and
22       outpatient 109,000 overreserve amount,
23       163,000 underreserve amount and to say
24       basically it works out?
25 A.    Yes. We looked at it in total.

Page 185

1        MR. RYAN: Let me mark, please, as
2        Exhibit 109 the document Bates Nos. CL000997
3        through 001006.
4        - - - -
5        (Deposition Exhibit 109 marked for
6        identification.)
7        - - - -
8  BY MR. RYAN:
9  Q.    Do you recognize Exhibit 109, Ms. Schaffer?
10 A.    Yes.
11 Q.    What is it?
12 A.    This is a spreadsheet that we would have
13       provided to Coopers. This is basically our
14       aging of accounts receivable for Bucks County
15       which was also used to calculate the bad debt
16       provision.
17 Q.    Is this just the schedule for the PATCOM
18       account balances?
19 A.    I would say yes because all the earlier
20       balances are zero, so this would have been
21       the PATCOM stuff that was still sitting in
22       the system.
23 Q.    That's because at some point during fiscal
24       year '96 the patient accounting group
25       switched over from PATCOM to Invision?

47 (Pages 182 to 185)

ROBIN SCHAFFER

---

Page 186

1  A.   Correct.
2  Q.   So no new patient charges were being
3       recorded, generally speaking, in the PATCOM
4       system?
5  A.   That's correct.
6  Q.   They would all be in individual?
7  A.   Right.
8       MR. RYAN:  Let me mark, please, as
9       Exhibit 110 a document with Bates Nos. CL
10      000992 through 96.
11          - - - -
12      (Deposition Exhibit 110 marked for
13      identification.)
14          - - - -
15 BY MR. RYAN:
16 Q.   Now, I realize again there be some additions,
17      but do you recognize the basic schedules in
18      Exhibit 110, Ms. Schaffer?
19 A.   Yes.
20 Q.   And what are they?
21 A.   This is similar for the other schedule we
22      looked at, 109.  This is an aging of accounts
23      receivable, and this is after the system was
24      converted to Invision.  This is the Invision
25      piece of it.  This is also where we calculate

---

Page 187

1       the provision for bad debt as well.
2  Q.   Now, do you see the schedule on the top half
3       of the first page of Exhibit 110 there is a
4       note which says, The reserve calculation
5       below is based on the age by final billed
6       date methodology?
7  A.   Yes.
8  Q.   Is that note something that was on the
9       schedule that you provided to Coopers?
10 A.   I think we had something similar on our
11      schedules, but I don't know if it was exactly
12      worded.  I think at the top of ours it just
13      said age by final bill date so that the
14      viewer or user would know how it was aged,
15      but this looks like something Cooper might
16      have typed in themselves.
17 Q.   Did you provide Coopers for Bucks County
18      inpatient Invision account balances both
19      aging schedules aged by final bill date and
20      aging schedules aged by discharge date?
21 A.   Yes, we did, at their request.
22 Q.   Do you know why they made that request?
23 A.   I'm not sure.
24 Q.   Did they tell you that they wanted to see
25      what quantitative impact those two aging

---

Page 188

1       methods might have?
2  A.   They didn't tell me that, but because they
3       always compared the DVOG hospitals to how AGH
4       did things, I would imagine they wanted to
5       look at the DVOG and put it into the same
6       perspective as AGH was.
7  Q.   Now, do you see there is a note A here which
8       says, Commercial reserve is calculated based
9       on gross A/R less estimated contractual
10      percentage?
11 A.   Yes.
12 Q.   That's the same 20 percent contractual
13      allowance for commercial accounts we were
14      talking about earlier; right?
15 A.   Yes, it is.
16 Q.   Is that note something that was already on
17      the schedule when you provided it to Coopers?
18 A.   We would have had a similar note, but it
19      looks like they have prettied this up a
20      little bit and made complete sentences out of
21      our notes, so --
22 Q.   But you were the ones who told Coopers that
23      you were using this 80 percent rate; right?
24 A.   Yes.
25 Q.   Now, if I understand these schedules right,

---

Page 189

1       the schedules on the first page show the bad
2       debt allowance calculated using the balance
3       sheet method; is that right?
4  A.   This is the balance sheet method, yes.
5  Q.   And then the schedule on the third page, page
6       994, shows the net account balance; is that
7       correct?
8  A.   I can't tell from the heading on here if this
9       is the gross or the net.  I'm not sure.  It's
10      either the actual agings as we keyed them in
11      or this is the result after bad debt was
12      taken because we provided both to Coopers.
13 Q.   Now, the last page, page 996, is the loss
14      percentages; right?
15 A.   That's correct.
16 Q.   These are percentages that you and your
17      colleagues at AHERF came up with; correct?
18 A.   These are not the percentages that we used in
19      '97 based on Dan's later evaluation, but I
20      would imagine -- and I don't recall how we
21      developed these, but I would imagine that
22      either we did or Coopers did by telling us to
23      use AGH possibly.  I'm not sure.  I don't
24      remember.  These don't look familiar like
25      they did in 1997.

---

48 (Pages 186 to 189)

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN SCHAFFER

Page 190

1  Q.   Do you actually recall Coopers & Lybrand
2       playing any role in coming up with the loss
3       percentages used in the DVOG hospitals in
4       1996?
5  A.   The only thing I recall again is where they
6       wanted us to use AGH as a comparison. I
7       don't recall specifically them helping us
8       develop these particular percentages.
9  Q.   And so then are the required allowance
10      figures on the first page the result of
11      taking the account balances on the third page
12      and multiplying them by the respective loss
13      percentages on the last page?
14 A.   If that third page is the ATB generated from
15      the system prior to bad debt, yes, that would
16      be the case. You would take those balances,
17      times the percentages on the last page to get
18      the required reserve.
19 Q.   Now, if we look at -- let's look, for
20      example, at the first row, Medicaid, 31 to 60
21      days on the third page it says 56,157; right?
22 A.   Which column are you in? Medicaid -- there
23      we go, 56,157, okay.
24 Q.   If we go to the last page there is a loss
25      percentage of five percent?

Page 191

1  A.   Yes.
2  Q.   If we go to the first page it says $2,808?
3  A.   Yes.
4  Q.   That's five percent of $56,157?
5  A.   It looks like it would be. I can't do math
6       in my head. It looks close.
7  Q.   Now, if we look at Exhibit 109, the PATCOM
8       account aging for Bucks County?
9  A.   Yes.
10 Q.   There is an initial section which is headed
11      Inpatient Totals. Do you see that?
12 A.   Yes.
13 Q.   Is it your understanding that the calculated
14      allowance required for those accounts is the
15      amount shown on the page with Bates No. 999
16      of $650,030?
17 A.   Yes.
18 Q.   So now there is another section of accounts
19      called Rehab Totals?
20 A.   Yes.
21 Q.   Are those an additional class of patients at
22      Bucks County?
23 A.   Yes. Those would be patients that were
24      admitted as rehab, went into the rehab part
25      of the hospital.

Page 192

1  Q.   They were just tracked separately?
2  A.   Yes. They were reimbursed separately, so
3       they were tracked separately.
4  Q.   Was the calculated bad debt allowance amount
5       for the rehab patients at Bucks County on the
6       PATCOM system in '96 the $23,029 figure on
7       Bates 001?
8  A.   Yes.
9  Q.   And the next section is headed Mental Health?
10 A.   Yes.
11 Q.   That was again a patient class that was
12      tracked separately?
13 A.   Yes. That's the psych department.
14 Q.   And the calculated allowance required for the
15      mental health patients on the PATCOM system
16      at Bucks County in 1996 was $751,386 as shown
17      on Bates 1004?
18 A.   Correct.
19 Q.   Is it your understanding then that the total
20      bad debt allowance required for inpatient
21      accounts at Bucks County would be the sum of
22      those three figures we just looked at on the
23      PATCOM aging schedule, Exhibit 109, plus the
24      required reserve shown on the Invision
25      schedule, Exhibit 110?

Page 193

1  A.   It should be.
2  Q.   If you wouldn't mind, since I have this
3       calculator here, if you wouldn't mind just
4       adding those four figures for me.
5  A.   On the Bates or the 110 I'm assuming we were
6       using still the discharge date required
7       reserve. I'm not sure but I think that's
8       what we would have been using, the 1,232,158.
9       I get a total of $2,705,698.
10 Q.   Would you mind using the calculation by using
11      the aged billing date --
12 A.   Sure. 2,587,049. It's close. I could have
13      keyed it in wrong.
14 Q.   Do you mind just trying that again because
15      I'm not sure I got the same result you get.
16 A.   Sure. 2,537,954.
17 Q.   All right. If you compare that to the
18      calculated reserve amount of June 30, '96,
19      schedule 108, that's $2,537,953?
20 A.   Correct.
21 Q.   It's just a $1 rounding difference?
22 A.   Yes.
23 Q.   So is it your understanding that that was, in
24      fact, how you calculated the calculated
25      inpatient bad debt allowance amount for Bucks

49 (Pages 190 to 193)

ROBIN SCHAFFER

Page 194

1      County as of June 30, '96?
2  A.   Yes.
3  Q.   By adding those four figures from Exhibits
4      109 and 110?
5  A.   Yes.
6  Q.   Then similarly the calculated outpatient bad
7      debt allowance amount on Exhibit 108 of
8      1,043,859 should be the sum of the required
9      outpatient amounts in the bad debt allowance
10     calculations for PATCOM and Invision on
11     Exhibits 109 and in the exhibit I have yet to
12     give you which I'll mark now. So let me
13     strike that and mark a new exhibit.
14        Can I mark, please, as Exhibit 111 a
15     document which Bates Nos. CL 001008 through
16     1013.
17        - - - -
18        (Deposition Exhibit No. 111 marked
19     for identification.)
20        - - - -
21  BY MR. RYAN:
22  Q.   Do you recognize Exhibit 111, Ms. Schaffer?
23  A.   Yes.
24  Q.   What is it?
25  A.   This is similar to the document labeled 110,

Page 195

1      however, this is the outpatient agings for
2      the Invision receivables.
3  Q.   And this is also a Bucks County Hospital for
4      June 30, '96?
5  A.   Yes.
6  Q.   Are these schedules that your staff prepared?
7  A.   Yes.
8  Q.   And that you reviewed?
9  A.   Yes.
10  Q.   And that you then provided to Coopers?
11  A.   Yes.
12  Q.   That's the case with Exhibits -- really all
13     of Exhibits 108 through 111?
14  A.   That is correct.
15        THE VIDEOGRAPHER: Hold on a minute.
16        - - - -
17     (There was a recess in the proceedings.)
18        - - - -
19        THE VIDEOGRAPHER: We are now back on
20     the record. The time on the screen is 2:34.
21  BY MR. RYAN:
22  Q.   Let me just backtrack the question. There
23     was a technical problem. So are Exhibits 108
24     and 109, 110 and 111 all bad debt schedules
25     related to Bucks County that you or your

Page 196

1      staff prepared in fiscal 1996?
2  A.   Yes.
3  Q.   If it was somebody on your staff who prepared
4      it, you would have reviewed the schedules
5      yourself; right?
6  A.   Yes.
7  Q.   Ant you then provided these schedules to
8      Coopers for their audit?
9  A.   Yes.
10  Q.   Now, Exhibit 111 was the calculation for the
11     outpatient bad debt allowance account; right?
12  A.   For Invision, yes.
13  Q.   For Invision. Thank you. And toward the
14     back of Exhibit 109 there is a section of the
15     schedule that deals with the calculation of
16     the required bad debt allowance account for
17     the PATCOM account balances for Bucks County
18     at June 30, 1996; right?
19  A.   Yes.
20  Q.   And that number was $265,616 as shown on
21     Bates 1006; right?
22  A.   Yes.
23  Q.   And the required amount for the outpatient
24     Invision accounts was $778,234 as shown on
25     Exhibit 111; right?

Page 197

1  A.   Yes.
2  Q.   If you could add up those two amounts.
3  A.   See if I can get this. $1,043,850.
4  Q.   And that's just $9 off from the $1,043,859
5      figure on the second page of Exhibit 108;
6      right?
7  A.   Right, correct.
8  Q.   Is it your understanding that was how you at
9      AHERF calculated the required bad debt
10     allowance amount for outpatient account
11     balances at Bucks County on June 30, 1996?
12  A.        MR. RYAN: Let me mark, please, as
13     Exhibit 112 the document at Bates Nos. CL
14     1281 through 82.
15        - - - -
16        (Deposition Exhibit 112 marked for
17     identification.)
18        - - - -
19  BY MR. RYAN:
20  Q.   Now, I realize the format may have changed
21     somewhat because of the way this was printed
22     out off a computer system, but do you
23     otherwise recognize the schedule in Exhibit
24     112, Ms. Schaffer?

ROBIN SCHAFFER

Page 198

1  A.  Yes. And what they are, this is a roll
2     forward of Elkins Park's bad debt allowance
3     account for both inpatient and outpatient as
4     of 6-30-96.
5  Q.  The way you originally prepared these, these
6     were larger but easier to read printed
7     sideways on the page?
8  A.  Yes. They were landscaped.
9  Q.  Do you see that the inpatient bad debt
10    allowance for Elkins Park at June 30, 1995
11    was $613,935?
12 A.  Yes.
13 Q.  And June 30, '96 was $2,132,204; right?
14 A.  Yes.
15 Q.  That's more than three times as much; right?
16 A.  Yes.
17 Q.  If you go to the next page, do you see that
18    the outpatient bad debt allowance account for
19    Elkins Park June 30, 1995, was $565,871?
20 A.  Yes.
21 Q.  June 30, 1996 it was $1,522,187; right?
22 A.  Yes.
23 Q.  And so that, too, is a little bit shy of
24    three times as much; right?
25 A.  Correct.

Page 199

1  Q.  Now, if I understand the schedule right, the
2     $2,132,204 amount in the general ledger for
3     inpatient balances at June 30, 1996, was
4     $44,666 more than the calculated amount;
5     right?
6  A.  Correct.
7  Q.  So here the Bucks -- Elkins Park inpatient
8     accounts were slightly overreserved?
9  A.  Correct.
10 Q.  Now, the next page the $1,522,187 balance at
11    June 30, 1996, was $44,481 less than the
12    calculated amount; right?
13 A.  Correct.
14 Q.  So the outpatient balances would have been
15    very slightly underreserved?
16 A.  Correct.
17 Q.  This is another example of what we spoke
18    about earlier that the practice at AHERF was
19    to compare the inpatient and outpatient
20    account balances put together, and here you
21    concluded the reserve amount was just about
22    right?
23 A.  Correct.
24 Q.  Now, do you see again on the inpatient
25    schedule, just as we saw with Exhibit 108,

Page 200

1     the bad debt rolled forward for Bucks County,
2     do you see that the writeoffs seem to stop in
3     October 1995?
4  A.  Yes.
5  Q.  Does this schedule give you any greater
6     understanding as to why that was the case?
7  A.  I vaguely remember -- this is very vaguely --
8     that there was -- patient accounting did stop
9     writing off accounts at some point until they
10    was given approval by operations, but I don't
11    remember that being in '96 when they were
12    looking for operations to make the call on
13    bad debt.
14       But I just remember something vaguely
15    that patient accounting was directed to stop
16    writing off accounts. I don't know exactly
17    what the issue was in '96.
18 Q.  I think when you're talking about patient
19    accounting needing approval from operational
20    folks, I think you indicated that you thought
21    that was in early fiscal '98?
22 A.  I thought that was closer to the end of '97
23    or earlier in '98. So there may have been a
24    different reason in '96 we stopped --
25 Q.  Okay.

Page 201

1  A.  -- patient accounting stopped.
2  Q.  We'll look later at various documents about
3     that in that second time frame.
4  A.  Okay.
5  Q.  Do you know what the entries are in the Other
6     column here on Exhibit 112?
7  A.  Not specifically.
8  Q.  Now, some of the entries in the provision
9     column here is $1,639,176; is that right?
10 A.  Yes.
11 Q.  That's for just for Elkins Park inpatient;
12    right?
13 A.  Yes.
14 Q.  If I went and looked at bad debt expense for
15    Elkins Park in 1996, would this number here
16    in the provisions column tie to the expense
17    figure?
18 A.  It should.
19 Q.  Did you have any separate schedules that you
20    used to keep track of what the bad debt
21    expense totals were at the various DVOG
22    hospitals?
23 A.  We used our income statement for that. I
24    didn't do any comparisons of that column to
25    the bad debt expense on the income statement,

ROBIN SCHAFFER

Page 202

1    but the income statement would have been the
2    source for that number.
3  Q.   For that number meaning the actual bad debt
4    expense as reported?
5  A.   Correct.
6  Q.   Let me mark, please, as Exhibit 113 the
7    document with Bates Nos. DC4532, page 1
8    through page 27.
9         - - - -
10         (Deposition Exhibit 113 marked for
11    identification.)
12         - - - -
13  BY MR. RYAN:
14  Q.   Now, the first page of Exhibit 113 looks like
15    the same schedule we were looking at before
16    nor March 1996?
17  A.   Yes.
18  Q.   This one is for June '96; correct?
19  A.   Right.
20  Q.   So this schedule sums up the calculated
21    reserves required for the PATCOM and the
22    Invision system balances?
23  A.   Yes.
24  Q.   And then compares that to the amount on the
25    general ledger?

Page 203

1  A.   Correct.
2  Q.   This is the schedule that you or your staff
3    prepared?
4  A.   Yes.
5  Q.   And are the schedules that follow in Exhibit
6    113, accounts receivable, aging and bad debt,
7    allowance calculation schedules for Invision
8    and PATCOM account balances?
9  A.   Yes. Yes, they are.
10  Q.   They are both inpatient and outpatient
11    calculations here; right?
12  A.   Yes.
13  Q.   Let me mark, please, as Exhibit 1 -- strike
14    that. And are all these schedules, the
15    remaining schedules here in Exhibit 113 after
16    the first page, all schedules that
17    you or your staff prepared?
18  A.   Yes.
19         MR. RYAN: Let me now mark as Exhibit
20    114 a document with the Bates Nos. CL1357
21    through 58.
22         - - - -
23         (Deposition Exhibit 114 marked for
24    identification.)
25         - - - -

Page 204

1  BY MR. RYAN:
2  Q.   Now, making again allowance for possible
3    formatting differences from the computer
4    printout, do you recognize the schedules,
5    Exhibit 114; Ms. Schaffer?
6  A.   Yes.
7  Q.   What are they?
8  A.   This is the in and outpatient roll forwards
9    of the bad debt allowance account for St.
10    Christopher's Hospital or St. Christopher's
11    Hospital for Children at 6-30-96.
12  Q.   These are schedules that you or your staff
13    prepared?
14  A.   Yes.
15  Q.   And that you them provided to Coopers &
16    Lybrand?
17  A.   Yes.
18  Q.   Do you see again that the inpatient account
19    writeoffs seem to end after October '95?
20  A.   Yes.
21  Q.   That's consistent with what we saw on the
22    other schedules, too; right?
23  A.   Yes.
24  Q.   Do you know what this entry is on the other
25    column for March '96 of $1,133,478?

Page 205

1  A.   Not specifically.
2         MR. RYAN: Let me mark, please, as
3    Exhibit 115 the documents at Bates Nos.
4    DC4529, page 1 through page 24.
5         - - - -
6         (Deposition Exhibit 115 marked for
7    identification.)
8         - - - -
9  BY MR. RYAN:
10  Q.   What are the schedules in Exhibit 115,
11    Ms. Schaffer?
12  A.   The first page is the again the summary of
13    taking the PATCOM plus Invision required
14    reserves in comparison to the general ledger
15    and showing the surplus or deficit based on
16    that comparison. And all of the schedules
17    behind the summary schedule are the agings of
18    both in and outpatient accounts for Invision
19    and PATCOM and the bad debt calculation for
20    St. Christopher's Hospital.
21  Q.   And did you or your staff prepare all the
22    schedules of Exhibit 115?
23  A.   Yes.
24  Q.   And did you provide at least all the
25    schedules after the summary page, all the

52 (Pages 202 to 205)

ROBIN SCHAFFER

Page 206

1    schedules from pages 2 through 24 to Coopers
2    & Lybrand?
3  A.    Yes.
4  Q.    Do you know what the adjustment to reserve of
5    $350,000 on the summary schedule in the first
6    page of Exhibit 115 is?
7  A.    I don't recall.
8        MR. RYAN:  Let me mark, please, as
9    Exhibit 116 a document with Bates No. CL1110
10    through 1111.
11        - - - -
12    (Deposition Exhibit 116 marked for
13    identification.)
14        - - - -
15  BY MR. RYAN:
16  Q.    Do you recognize Exhibit 116, Ms. Schaffer?
17  A.    Yes.
18  Q.    What is it?
19  A.    This is the roll forward of Hahnemann's or
20    Center City, as it was changed at some point
21    in time -- the roll forward of their in and
22    outpatient bad debt allowance accounts at
23    6-30-96.
24  Q.    And the notes and the bad debt flux at the
25    bottom of these schedules are not items that

Page 207

1    were on schedules when you prepared them; is
2    that correct?
3  A.    That's correct.
4  Q.    Now, for Hahnemann, both inpatient and
5    outpatient there are no entries at all in the
6    Writeoffs or Recoveries columns; is that
7    correct?
8  A.    Yes.
9  Q.    Do you know why that is?
10  A.    I don't remember again specifically.
11  Q.    Do you recall whether --
12  A.    I do know why.  I'm sorry.
13  Q.    Okay.
14  A.    Their writeoffs and recoveries went directly
15    to the income statement, which ultimately has
16    the same effect.  Instead of hitting this
17    account as a debt or credit and adjusting
18    this account balance, they went directly to
19    the income statement.
20        So the adjustment that you would make
21    based on the provision just wouldn't include
22    the changes based on those two categories.
23  Q.    So when you say it went directly to the
24    income statement, what account would writeoff
25    at Hahnemann hit?

Page 208

1  A.    Bad debt expense.
2  Q.    I see.  So then would the bad debt expense
3    for Hahnemann in a given year be the sum of
4    the provisions column on the schedule and the
5    net writeoff amount which is not shown here?
6  A.    Correct.
7  Q.    Why was that done differently at Hahnemann
8    from the other DVOG hospitals?
9  A.    It again was just another way that they did
10    their bad debt when we inherited or took over
11    the hospitals, and it was never changed
12    because the ultimate result was the same to
13    bad debt expense.
14  Q.    And that wouldn't make any difference on the
15    bad debt allowance number either, would it?
16  A.    No, it wouldn't.
17  Q.    Did you have a separate schedule where you
18    could keep track of what the net writeoffs
19    were at Hahnemann University Hospital?
20  A.    Yes.  For all of the DVOG hospitals I had a
21    report that we generated, a Lotus schedule
22    that would show what all the writeoffs were
23    by month in a given fiscal year.
24  Q.    What did that report look like?
25  A.    I don't remember exactly.  It just would have

Page 209

1    had probably the month down the left and
2    maybe inpatient writeoffs in one column,
3    outpatient in another and then totals,
4    something like that.
5  Q.    Do you recall that schedule being part of the
6    package that you would give to Coopers &
7    Lybrand each year during their audit?
8  A.    Specifically no.  But they probably would
9    have asked for that, and, if so, I would have
10    given it to them because it was a useful
11    schedule.  I don't recall specifically giving
12    it to them, no.
13  Q.    So you can't recall anyone from Coopers
14    actually requesting that schedule?
15  A.    I can't recall that, no.
16  Q.    And you don't know whether you told Coopers
17    that you had the schedule?
18  A.    I don't recall specifically, but I think I
19    probably did.
20  Q.    Do you recall actually telling somebody at
21    Coopers that?
22  A.    Again, specifically no.  But based on a lot
23    of their follow-up questions it's my
24    inclination that I -- they may have asked me
25    about the level of writeoffs, and I would

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN SCHAFFER

Page 210

1     have provided them that schedule because it
2     was a summary of just that.
3  Q.    Is it possible that they never ended up
4     getting that schedule, though?
5        MR. COGAN: Objection.
6  A.    If they would have asked for something more
7     detailed, it would have been provided.
8  Q.    You just can't recall if they asked that
9     question or not?
10  A.    Correct.
11  Q.    Now, at Hahnemann -- strike that. At
12     Hahnemann there is no separate column for
13     calculated reserve amount as there was on the
14     right for the bad debt roll forwards of the
15     previous hospitals we looked at?
16  A.    Correct.
17  Q.    And is that because Hahnemann used the
18     balance sheet method of calculating monthly
19     bad debt expense?
20  A.    Yes.
21  Q.    So that the ending balance as it's shown here
22     in Exhibit 116 should be based each month on
23     the balance sheet method?
24  A.    That is correct.
25  Q.    So at Hahnemann you couldn't even build up

Page 211

1     surplus for deficit over the year, that was
2     corrected each month?
3  A.    Right.
4  Q.    Whereas the other four DVOG hospitals it was
5     corrected at the end of each fiscal year?
6  A.    Always at the end of the fiscal year. There
7     may have been times during the year that we
8     adjusted it as well, but it was always done
9     for year-end audit.
10  Q.    And the bad debt allowance increased from
11     June 30, '95, to June 30, '96, both for
12     inpatient and outpatient accounts at
13     Hahnemann; right?
14  A.    Yes.
15  Q.    And I can't recall whether I asked you this
16     for St. Christopher's, so if you go back and
17     look at Exhibit 114, if you wouldn't mind.
18     The bad debt allowance amounts increased
19     significantly for inpatient and outpatient
20     account balances from June 30, '95, to June
21     30, '96, at St. Christopher's, too; right?
22  A.    Yes.
23        MR. RYAN: Let me mark, please, as
24     Exhibit 117 a document with Bates Nos.
25     CL 1097 through 1101.

Page 212

1        - - - -
2        (Deposition Exhibit 117 marked for
3     identification.)
4        - - - -
5  BY MR. RYAN:
6  Q.    Do you recognize Exhibit 117, Ms. Schaffer?
7  A.    Yes, I do.
8  Q.    What is it?
9  A.    This is Hahnemann University Hospital's
10     inpatient bad debt calculation at 6-30-96.
11  Q.    And this shows a required reserve of
12     $15,058,248?
13  A.    Yes.
14  Q.    And that ties to the ending balance in the
15     general ledger account for the Hahnemann
16     inpatient bad debt allowance account as shown
17     in the roll forward in Exhibit 116; right?
18  A.    Yes.
19  Q.    Do you believe that the schedules in
20     Exhibit 117 were the basis for calculating
21     the required bad debt allowance used in
22     Exhibit 116?
23  A.    Yes.
24        MR. RYAN: Let me mark, please, as
25     Exhibit 118 the documents with Bates Nos. CL

Page 213

1     001103 through 07.
2        - - - -
3        (Deposition Exhibit 118 marked for
4     identification.)
5        - - - -
6  BY MR. RYAN:
7  Q.    Except perhaps for the way it's printed out,
8     portrait rather than landscape, do you
9     recognize Exhibit 118, Ms. Schaffer?
10  A.    Yes.
11  Q.    What is it?
12  A.    This is Hahnemann University Hospital's
13     outpatient bad debt reserve calculation for
14     6-30-96.
15  Q.    And the required outpatient bad debt reserve
16     according to the calculations here was
17     $10,227,284; right?
18  A.    Correct.
19  Q.    And that ties to within a dollar to the
20     $10,227,283 figure on the second page of
21     Exhibit 116; right?
22  A.    Correct.
23  Q.    Now, do you believe that the calculations in
24     Exhibit 118 were the basis for calculating
25     the general ledger amount for Hahnemann

54 (Pages 210 to 213)

ROBIN SCHAFFER

Page 214

1    University Hospital outpatient bad debt
2    allowance at June 30, '96?
3    A.   Yes.
4    Q.   And were all these schedules in Exhibit 116,
5    117 and 118 prepared by you or your staff?
6    A.   Yes.
7    Q.   And if they were prepared by your staff, then
8    you reviewed them?
9    A.   Correct.
10   Q.   And you provided them to Coopers?
11   A.   Yes.
12        MR. RYAN:   Let me mark, please, as
13   Exhibit 119 document at Bates No. DC4535,
14   page 2.
15        - - - -
16        (Deposition Exhibit 119 marked for
17   identification.)
18        - - - -
19   BY MR. RYAN:
20   Q.   Do you recognize Exhibit 119, Ms. Schaffer?
21   A.   It looks familiar, yes.
22   Q.   What is it?
23   A.   This is a Hahnemann University Hospital bad
24   debt reserve adjustment at June 30, 1996.
25   Q.   Now, do you see the first row says Required

Page 216

1    Q.   Does looking at this schedule, Exhibit 119,
2    help you to recall any more specifically what
3    that may have involved?
4    A.   No, not yet.
5    Q.   Is it your understanding from Exhibit 119
6    that AHERF initially had $28,019,898 in the
7    general ledger for the inpatient and
8    outpatient bad debt allowance accounts
9    combined and then reduced those accounts by
10   $2,734,366 to match the reserve calculation?
11   A.   From this schedule, it looks like that, yes.
12   Q.   And from looking at Exhibit 116, is it your
13   understanding that that reduction in the
14   general ledger amount is something that was
15   done before Coopers' year-end audit?
16   A.   Yes.
17   Q.   Do you know why that was done?
18   A.   No.  I don't recall what we were comparing to
19   here to get the $28 million.  I'm not sure
20   what that was.
21        MR. RYAN:  Let me mark, please, as
22   Exhibit 120 a document at CL 001201 through
23   1203.
24        - - - -
25        (Deposition Exhibit 120 marked for

Page 215

1    reserve per calculation?
2    A.   Yes.
3    Q.   And the $15,058,248 figure in the inpatient
4    column ties to the schedule in the first page
5    of Exhibit 116; correct?
6    A.   Yes.
7    Q.   And $10,227,284 figure in the outpatient
8    column in Exhibit 119 ties except for the $1
9    variance to the figure in the schedule on the
10   second page of Exhibit 116; right?
11   A.   Yes.
12   Q.   So that the total reserve required according
13   to the bad debt allowance calculation was
14   $25,285,532; right?
15   A.   Yes.
16   Q.   Do you see there is a line which says CRA
17   Reserve Designated as Bad Debt Reserve?
18   A.   Yes.
19   Q.   And that totals $4 million?
20   A.   Yes.
21   Q.   Do you remember when you looked earlier at a
22   document that referred to $4 million in CRA
23   reserves being reclassed to Hahnemann
24   University Hospital?
25   A.   Yes.

Page 217

1    identification.)
2        - - - -
3    BY MR. RYAN:
4    Q.   Do you recognize Exhibit 120, Ms. Schaffer?
5    A.   Yes.
6    Q.   What is it?
7    A.   This is for MCP -- MCC East Falls.  It was
8    called many different things, EPPI and
9    outpatient.  This is their roll forward of
10   the allowance for bad debt accounts at
11   6-30-96.
12   Q.   So MCC and East Falls are both just other
13   names for what we've generally been calling
14   MCP?
15   A.   Right.
16   Q.   And MCP Hospital had associated with it the
17   psychiatric institute known as EPPI; right?
18   A.   Correct.
19   Q.   So that's why in Exhibit 120 we've got three
20   bad debt roll forwards instead of two?
21   A.   That's correct.
22   Q.   Does the first schedule show that MCP
23   inpatient bad debt allowance account was
24   slightly underreserved when compared to the
25   calculated required amount in the amount of

ROBIN SCHAFFER

Page 218

1    $72,432?
2    A.    Yes.
3    Q.    And does the second page then show that EPPI
4    was under reserve in the amount of $735,660?
5    A.    Yes.
6    Q.    Does the third page show that MCP outpatient
7    was overreserved by $690,831?
8    A.    Yes.
9    Q.    So within $100,000 or so the net result of
10    the three schedules is that MCP and EPPI had
11    the amount of bad debt allowance called for
12    by the calculation; right?
13    A.    Yes, correct.
14    Q.    And you or your staff prepared the schedules
15    here in Exhibit 120; right?
16    A.    Yes.
17    Q.    And then provided them to Coopers?
18    A.    Yes.
19    Q.    Let me mark, please, as Exhibit 121 a
20    document with Bates No. DC4534, page 1
21    through page 8.
22            - - - -
23            (Deposition Exhibit 121 marked for
24    identification.)
25            - - - -

Page 219

1    BY MR. RYAN:
2    Q.    Do you recognize Exhibit 121, Ms. Schaffer?
3    A.    Yes, I do.
4    Q.    What is it?
5    A.    This is for MCC or MCP, as we've been calling
6    it, the outpatient bad debt reserve
7    calculation as of 6-30-96. I'm just looking
8    to see if inpatient is in here as well. It
9    looks like the inpatient is also included at
10    6-30-96 along with EPPI.
11    Q.    Now, does the first page of Exhibit 121 show
12    that the required bad debt allowance for MCP
13    Hospital outpatient at June 30, 1996 was
14    $2,467,604?
15    A.    Yes.
16    Q.    And does that tie to the amount of the
17    calculated reserve amount column in the bad
18    debt roll forward in Exhibit 120?
19    A.    Yes.
20    Q.    And does page 7 of Exhibit 121 show that the
21    calculated bad debt allowance for MCP
22    Hospital inpatient for June 30, '96, was
23    $2,930,547?
24    A.    Yes.
25    Q.    Does that tie to the amount of the calculated

Page 220

1    reserve amount column on the first page of
2    Exhibit 120?
3    A.    Yes.
4    Q.    And does page 8 of Exhibit 121 show that the
5    calculated bad debt allowance amount for EPPI
6    was $1,214,576 at June 30, 1996?
7    A.    Yes.
8    Q.    And does that tie to the bad debt roll
9    forward on the second page of Exhibit 120?
10    A.    Yes.
11    Q.    Is it your understanding then that the
12    schedules in Exhibit 121 were the basis for
13    the calculated bad debt allowance amounts on
14    the roll forwards in Exhibit 120?
15    A.    Yes.
16    Q.    Did you or your staff prepare the schedules
17    in Exhibit 121?
18    A.    Yes.
19    Q.    And did your -- if your staff prepared them,
20    you would have reviewed them?
21    A.    Yes.
22    Q.    You then provided these schedules to Coopers
23    for their year-end audit?
24    A.    Yes.
25            MR. RYAN:  Let me mark, please, as

Page 221

1    Exhibit 122 the document Bates No. TN RC013
2    01853.
3            - - - -
4            (Deposition Exhibit 122 marked for
5    identification.)
6            - - - -
7    BY MR. RYAN:
8    Q.    Do you recognize Exhibit 122, Ms. Schaffer?
9    A.    No.
10    Q.    Do you recognize the handwriting?
11    A.    Yes.
12    Q.    Whose handwriting is it?
13    A.    Dan Cancelmi's.
14    Q.    Now, do you see the first column in the top
15    half of the schedule? It looks like it's
16    called Unadjusted Balance?
17    A.    Yes.
18    Q.    Do you see that totals -- assuming the
19    numbers are in thousands, you see that totals
20    $50,627,000?
21    A.    Yes.
22    Q.    Now, if we compare those numbers to the bad
23    debt roll forwards that we've been looking
24    at?
25    A.    Okay. Starting with East Falls?

56 (Pages 218 to 221)

ROBIN SCHAFFER

Page 222

1  Q.  Sure.  Let's start with MCP or East Falls,
2      Exhibit 120.  Are the amounts that according
3      to the schedules in Exhibit 120 are in the
4      ending bad debt allowance account balances
5      for MCP or EPPI, the $2,858,115 figure on
6      page 1 plus the $478,916 figure on page 2
7      plus the $3,158,435 figure on page 3?
8  A.  What's your question?  Is that the numbers?
9  Q.  Right.
10 A.  Yes.
11 Q.  For the -- here is the ending balance in the
12     general ledger for MCP Hospital and EPPI at
13     June 30, 1996?
14 A.  That's correct.
15 Q.  I think you'll find if we add those three
16     figures, we'll get to at least within a
17     thousand dollars of the unadjusted balance
18     here in Exhibit 122?
19 A.  Can I try that?
20 Q.  Yes.  Please go ahead.
21 A.  Yes.  I get 6,490,466 compared to 6,496
22     rounded on Exhibit 122.
23 Q.  So for Elkins Park, if we looked back at
24     Exhibit 112, the general ledger balance would
25     be the sum of $2,132,204 on page 1 and

Page 223

1      $1,522,187 on page 2; correct?
2  A.  Correct.
3  Q.  And if you add those figures what do you get?
4  A.  3,654,391.
5  Q.  And again that's within a thousand dollars of
6      the amount shown here on Exhibit 122; right?
7  A.  Correct.
8  Q.  If we take Bucks County's bad debt roll
9      forwards in Exhibit 108, the general ledger
10     amounts according to the roll forwards would
11     be $2,647,782 on page 1 and $880,141 on
12     page 2; right?
13 A.  Correct.
14 Q.  If you add those two numbers what do you
15     get?
16 A.  $3,527,923.
17 Q.  That ties to the $3,528,000 figure here in
18     Exhibit 122; right?
19 A.  Yes.
20 Q.  So for Center City, that's the same as
21     Hahnemann University Hospital; right?
22 A.  Correct.
23 Q.  So if we look at the bad debt roll forwards
24     in Exhibit 116, according to those schedules
25     the ending general ledger account balances

Page 224

1      for the bad debt allowance account should be
2      $15,058,248 on page 1 plus $10,227,283 on
3      page 2; right?
4  A.  Correct.
5  Q.  If you add those two numbers, what do you
6      get?
7  A.  $25,285,531.
8  Q.  Rounded to the nearest thousand that ties to
9      the $25,286,000 figure on Exhibit 122; right?
10 A.  Yes.
11 Q.  And then if we look at the St. Christopher's
12     Hospital bad debt roll forwards on Exhibit
13     114, the ending general ledger account
14     balances for the bad debt allowance accounts
15     should be $5,148,754 as shown on page 1 plus
16     $3,524,062 as shown on page 2; right?
17 A.  Yes.
18 Q.  If you add those two numbers, what do you
19     get?
20 A.  $8,672,816.
21 Q.  Rounded to the nearest thousand that ties to
22     the $8,673,000 figure shown on Exhibit 122?
23 A.  That's correct.
24 Q.  So for all five DVOG hospitals the amounts
25     here, the unadjusted balance column of

Page 225

1      Exhibit 122 tied to the bad debt roll
2      forwards; correct?
3  A.  That's correct.
4  Q.  Did you play any roll in coming up with the
5      bad debt allowance figure for Allegheny
6      University at June 30, '96?
7  A.  In '96 I don't think so, but I don't recall
8      specifically.
9  Q.  Do you recall who that would have been in the
10     AHERF accounting department?
11 A.  At 6-30-96 that could have been a girl named
12     Jennifer, and I don't remember her last name.
13     Worked under Chuck Lisman, but I don't
14     remember who did it for sure.
15 Q.  All right.  Now, the second column in
16     Exhibit 122 is headed Adjustments; right?
17 A.  Yes.
18 Q.  That shows a total -- assuming these numbers
19     are in thousands, that shows a total of
20     $17,500,000; right?
21 A.  Yes.
22 Q.  Do you believe that that's the same $17 and a
23     half million figure we were talking about
24     earlier this morning when you testified that
25     it was your understanding that Mr. Beuttner

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN SCHAFFER

Page 242

1    right?
2  A.   Yes.
3  Q.   As well as Randy Jacobson?
4  A.   Yes.
5  Q.   He was somebody that was on Mr. Morrison's
6       staff?
7  A.   Yes.
8  Q.   Now, this memo refers to reserves that have
9       been recorded on a monthly basis for probable
10      health partners operating losses?
11 A.   Yes.
12 Q.   Then you see down at the bottom it says, It
13      should be noted that the above reserves do
14      not take into consideration AHERF's
15      unrecorded equity interest in Health Partners
16      we have discussed in the past?
17 A.   Yes.
18 Q.   Do you have an understanding as to what the
19      difference was between the reserves for
20      Health Partners operating losses and the
21      reserves for AHERF's unreported equity
22      interest in Health Partners?
23 A.   No.
24 Q.   If you look back at the year-end adjustment
25      schedule, Exhibit 10, at Bates No. 1322, you

Page 243

1       see we looked earlier at a row which says
2       Record Health Partners Deficit-Randy J.?
3  A.   Yes.
4  Q.   That's Randy Jacobson in your understanding?
5  A.   Correct.
6  Q.   Was Mr. Jacobson particularly involved in the
7       accounting for AHERF's investments and Health
8       Partners?
9  A.   Yes, he was.
10 Q.   Why was that?
11      MR. COGAN:  Objection.
12 A.   He had the history on the arrangement with
13      Health Partners, and he was the one that
14      helped to educate Dan Cancelmi, I believe, on
15      what that relationship was.
16 Q.   Does looking at Exhibit 124 refresh your
17      recollection on how the year-end adjustments
18      were calculated for Health Partners'
19      operating losses as shown in the schedule in
20      Exhibit 10?
21 A.   No, because the numbers aren't the same from
22      what I can tell.  I know that we would record
23      the Health Partners deficit based on the
24      prior quarter or even prior month financials.
25      The financial statements weren't timely.  But

Page 244

1       other than that I'm not sure the two of these
2       actually correlate, meaning Exhibit 124 and
3       1322 in Exhibit 10.
4  Q.   You see there is a difference of about
5       $500,000 between the handwritten figure by
6       East Falls Hospital in Exhibit 124 and the
7       typewritten amount for the reserves already
8       recorded?
9  A.   Your comparing the million, three -- I'm
10      sorry.  What are you comparing there?
11 Q.   I'm comparing the 1,066 -- maybe it's hard to
12      read -- 826 dollar figure to the $567,000
13      figure.
14 A.   Where did you get the first 1 million figure?
15 Q.   Looking in the left margin.
16 A.   1 million, 066 in comparison to what now?
17 Q.   The $567,000.
18 A.   Okay.
19 Q.   Do you see there is a $500,000 difference?
20 A.   Yes.
21 Q.   Do you see for Center City there is a
22      $150,000 difference between the figure in the
23      left margin and the printed figure in the
24      reserve already recorded?
25 A.   Yes.

Page 245

1  Q.   Those are the same numbers as in the year-end
2       adjustment schedule; right?
3  A.   It looks like it, yes.
4  Q.   Do you know whose handwriting this is in
5       Exhibit 124?
6  A.   It looks like Dan Cancelmi's again.
7  Q.   So you weren't involved in determining the
8       appropriate amounts to record for the Health
9       Partners operating losses?
10 A.   No.
11 Q.   Going back to Exhibit 11, this exhibit refers
12      to recording income for AHERF's investment
13      and Health Partners using the equity method
14      of investment; right?
15 A.   Yes.
16 Q.   Do you know when you first learned that this
17      was an issue?
18 A.   That we didn't have it recorded?
19 Q.   Right.
20 A.   The equity?  I would have to imagine it was
21      probably in fiscal '96 sometime, but I don't
22      recall specifically.
23 Q.   You don't recall knowing that during the '95
24      audit, do you?
25 A.   I don't recall, no.

62 (Pages 242 to 245)

ROBIN SCHAFFER

Page 246

1    Q.    Do you know anything about how the issue
2          first arose within AHERF of the need to
3          record income for the investment in Health
4          Partners?
5    A.    I believe it was brought up by Randy Jacobson
6          at some point.  That was Randy Jacobson
7          communicated it to Dan Cancelmi at some
8          point.
9    Q.    Is that something that you think you learned
10         through Mr. Cancelmi?
11   A.    It would have been, yes.
12         MR. RYAN:  Let me mark, please, as
13         Exhibit 125 a document Bates No. RN RC014
14         01181.
15              - - - -
16         (Deposition Exhibit 125 marked for
17         identification.)
18              - - - -
19   BY MR. RYAN:
20   Q.    Do you recognize Exhibit 125, Ms. Schaffer?
21   A.    Yes.
22   Q.    What is it?
23   A.    This is for the Allegheny University
24         Hospitals and St. Christopher's Hospital For
25         Children.  It's the statement of patient

Page 247

1          accounts receivable as of June 30, '96.
2    Q.    So Allegheny University Hospitals, is that
3          the four DVOG adult hospitals?
4    A.    Yes.
5    Q.    So the five hospitals shown on this schedule
6          are what we've been calling DVOG?
7    A.    Correct.
8    Q.    Did you prepare a schedule of patient
9          accounts receivable in this format on a
10         regular basis?
11   A.    Yes.
12   Q.    Who did you provide it to?
13   A.    Dan Cancelmi would get it every month, and
14         Coopers would get this normally at prelim and
15         year-end audit.
16   Q.    Now, you see there is a handwritten notation
17         in the right-hand margin?
18   A.    Yes.
19   Q.    Is that your handwriting?
20   A.    Yes.
21   Q.    Can you read that, please?
22   A.    It says Includes 17.5 million.
23   Q.    And do you know what that refers to?
24   A.    I'm guessing it refers to the $17 and a half
25         million of adjustments that we had recorded

Page 248

1          after the first draft of the financial
2          statements.
3    Q.    So that's the same $17 and a half million of
4          adjustments to the DVOG bad debt allowance
5          accounts at year-end 1996 that we've spoken
6          about before?
7    A.    Yes.
8    Q.    Let me mark, please, as Exhibit 126 a
9          document at Bates No. CL 010584 through 85.
10              - - - -
11         (Deposition Exhibit 126 marked for
12         identification.)
13              - - - -
14   BY MR. RYAN:
15   Q.    Now, I realize there are lots of check marks
16         and handwritten notations of various types,
17         but do you recognize, Ms. Schaffer, the typed
18         schedule on the first page of Exhibit 126?
19   A.    Yes.
20   Q.    Is this a schedule that you prepared?
21   A.    Yes.
22   Q.    And then provided to Coopers & Lybrand?
23   A.    Yes.
24   Q.    Was this intended as backup for footnote 8 in
25         the DVOG audited financial statement?

Page 249

1    A.    Yes.
2    Q.    If you look down at the last line at the
3          typed schedule, unfortunately there is a
4          three-hole punch mark that obscures some of
5          the text there.  Do you know whether that row
6          originally said in its entirety bad debt
7          expense?
8    A.    Yes.
9    Q.    So that shows $47,023,000 in bad debt expense
10         for the DVOG hospital plus the University in
11         fiscal year 1996?
12   A.    Is this 1996?  I don't see -- the total is
13         correct.  I can't tell what year this is.
14   Q.    All right.  You'll see on the second page.
15         These I realize aren't things you prepared,
16         but you'll see some notations above the date
17         1996.
18   A.    Okay, yes.
19   Q.    And did you and your staff come up with the
20         figure for DVOG bad debt expense in 1996?
21   A.    In preparing this schedule, yes.
22   Q.    You then provided that to Coopers for their
23         audit; right.  Correct?
24         MR. RYAN:  Let me mark, please, as
25         Exhibit 127 the document at Bates No. CL

63 (Pages 246 to 249)

ROBIN SCHAFFER

Page 278

1    was, well, I believe Amy already knows about
2    it, so she shouldn't be surprised when you
3    tell her. That was my comment.
4  Q.   Is there anything else you can remember about
5    this conversation between you and Kristen
6    Heinlein?
7  A.   No.
8  Q.   Do you have any knowledge as to when Kristen
9    Heinlein then brought this matter to Amy
10   Frazier's attention?
11 A.   I don't.
12 Q.   So you don't know whether that took place
13   already during the preliminary field work or
14   whether it may not have occurred until the
15   year-end field work?
16 A.   I don't know that. That's correct.
17 Q.   Apart from the conversation you were having
18   with Amy Frazier about the valuation
19   allowance when Mr. Cancelmi walked by and
20   made the comment about quit beating her up,
21   apart from that conversation did you ever
22   speak to Amy Frazier directly about the $50
23   million reserve transfer?
24 A.   Not until she came back with
25   PricewaterhouseCoopers in '98.

Page 279

1  Q.   All right. But there is no other instance
2    that you can recall in '97 when you spoke to
3    Ms. Frazier about this?
4  A.   No.
5  Q.   And that first instance isn't really one
6    where you spoke to her either, it's an
7    inference you draw about how she understood
8    Mr. Cancelmi's remark?
9  A.   That's correct.
10     MR. COGAN: Objection.
11 Q.   Did you ever speak to Mr. Mark Kirstein about
12   the $50 million reserve transfer?
13 A.   No.
14 Q.   Did you ever speak to Bill Beuttner about the
15   $50 million reserve transfer?
16 A.   Not until he came back in '98.
17 Q.   But not back in '97?
18 A.   No.
19 Q.   Did you ever speak to Brian Christian about
20   the $50 million reserve transfer?
21 A.   I vaguely remember Brian Christian being down
22   in the Clark Bar with us with the group like
23   Keith Reabe, Chuck Lisman, Dan and myself
24   when the $50 million came up in
25   drinking-a-beer conversation.

Page 280

1  Q.   Can you recall anything about what was said
2    in that conversation?
3  A.   No.
4  Q.   Do you know whether Brian Christian was even
5    trying to actually follow the detailed
6    accounting issues being talked about?
7  A.   We really didn't talk about it in a detailed
8    manner. It was just again the topic of this
9    did come up quite frequently because of the
10   magnitude and the nature of the type of
11   entry. We weren't talking debts and credits.
12   It was just more, again, what about that 50,
13   that type of conversation.
14 Q.   When you say the $50 million reserve transfer
15   came up frequently, you're primarily talking
16   about conversations that were just AHERF
17   people; right?
18 A.   Primarily.
19 Q.   Do you know whether Mr. Cancelmi was the
20   source of the understanding that all of you
21   in this group, you and Mr. Lisman and
22   Mr. Reabe and Ms. Hershberger and
23   Mr. Ellsworth, had about Coopers & Lybrand's
24   reaction to the $50 million reserve transfer?
25 A.   No. It wasn't just Dan. I remember Chuck

Page 281

1    Lisman, I believe, had conversations as well
2    with other people at Coopers about the $50
3    million.
4  Q.   Did Mr. Lisman tell you about his
5    conversations with people at Coopers &
6    Lybrand about the $50 million?
7  A.   Generally, yes. Specifically what was said,
8    no.
9  Q.   Can you remember anything about what
10   Mr. Lisman told you about conversations he
11   had with people at Coopers & Lybrand about
12   the $50 million reserve transfer?
13 A.   Today I can't, no.
14 Q.   Did Mr. Reabe ever tell you anything about
15   having conversation with people at Coopers &
16   Lybrand about the $50 million reserve
17   transfer?
18 A.   No.
19 Q.   How about Ms. Hershberger?
20 A.   No.
21 Q.   How about Mr. Ellsworth?
22 A.   No.
23 Q.   Is there anyone else from AHERF who told you
24   that he or she had conversations with Coopers
25   & Lybrand about the $50 million reserve

71 (Pages 278 to 281)

ROBIN SCHAFFER

Page 282

1 transfer apart from Mr. Cancelmi and
2 Mr. Lisman?
3 A.   Not that I can recall.
4 Q.   Now, I think you testified earlier this
5 morning that there was a total of
6 approximately $99 million in reserves that
7 were transferred from Graduate to DVOG in
8 fiscal year 1997?
9 A.   That's correct.
10 Q.   The additional $49 million, the ones after
11 the initial $50 million transfer -- strike
12 that.  Do you ever recall having any
13 communications with anyone from Coopers &
14 Lybrand about the full $99 million reserve
15 transfer?
16 A.   In pieces, yes.  Talking about it as $99
17 million, that did not occur until Amy came
18 back with Pricewaterhouse in '98.
19 Q.   We are talking about AHERF's bankruptcy?
20 A.   Yes.
21 Q.   When you say in pieces, can you explain what
22 you mean?
23 A.   Yes.  What we talked about before, there were
24 conversations about the 50, which was part of
25 the 99.  The other part of the 49 million was

Page 283

1 very specific reserves that were set up on
2 Graduate hospital and booked as restructuring
3 expense, I believe.  They were not purchase
4 price adjustments.
5      There were very specific reserves that
6 were used in the $49 million figure.  And,
7 for example, I remember Amy Frazier
8 specifically asking me about Graduate's PFMA
9 reserves.  It was 5 million, 50.  Basically
10 why did we use that reserve, don't you need
11 it any longer, something to that effect.
12      She also questioned an MA reserve
13 that we had set up on Graduate worth a
14 million, five, because it was gone when they
15 were looking at the June '97 books general
16 ledger.
17 Q.   Are there any other specific reserves that
18 you can think of that you discussed with
19 Coopers & Lybrand apart from the PFMA reserve
20 and the MA reserve?
21 A.   Most likely because of the $99 million, $21
22 million of that was also used to adjust bad
23 debt on those roll forward we were talking
24 about.  So not only did 50 come over from
25 Graduate, but there was an additional $21

Page 284

1 million, part of the $99 million, that was
2 used to cover the DVOG bad debt problem
3 because that was on those roll forward
4 schedules, that would have been discussed
5 with Kristen Heinlein.
6 Q.   So when you say there is an additional $21
7 million, you're saying that in total $71
8 million were transferred for bad debt
9 purposes?
10 A.   The number actually is $75 million that was
11 used to cover the bad debt problems, but $71
12 million of it came from Graduate.  The other
13 $4 million came from within the DVOG
14 hospitals.
15 Q.   All right.  So you're saying there is the $75
16 million of which $50 million was what we
17 talked about earlier, the first $50 million
18 reserve transfer from Graduate to DVOG?
19 A.   Correct.
20 Q.   And then you're saying there is an additional
21 $25 million in reserves used for bad debt
22 purposes at DVOG hospitals of which $21
23 million came from Graduate hospitals?
24 A.   Correct.
25 Q.   And the balance was just reclassified within

Page 285

1 DVOG hospitals?
2 A.   Yes.
3 Q.   Now, I think you testified just now you think
4 you would have discussed the additional $21
5 million or $25 million with Kristen Heinlein.
6 What I'm interested in those is whether you
7 can specifically recall discussing those
8 additional amounts with Ms. Heinlein?
9 A.   Specifically, no.
10 Q.   Do you even recall generally an actual
11 conversation with Ms. Heinlein about that?
12 A.   No.
13 Q.   Do you recall a conversation with anyone else
14 at Coopers & Lybrand about those additional
15 reserves used for bad debt purposes at the
16 DVOG hospitals in '97?
17 A.   Conversations, no.
18 Q.   When you say conversations, no, is there
19 anything else that you're thinking of?
20 A.   I'm just thinking that it was presented along
21 with the $50 million on that bad debt roll
22 forward schedule, and it was also footnoted
23 as part of that schedule.  So it was
24 definitely identified, presented to Coopers
25 as an unusual adjustment to the bad debt

72 (Pages 282 to 285)

ROBIN SCHAFFER

Page 286

1   allowance account.
2  Q.   So you're thinking about the entries in the
3       other column of the bad debt roll forwards
4       for June '97 and the accompanying footnotes?
5  A.   Correct.
6  Q.   Are there any other documents that you
7       provided to Coopers during the '97 audit that
8       related to the additional $21 or $25 million
9       in reserves used for bad debt purposes at
10      DVOG?
11 A.   Yes. I believe that Coopers also received
12      Exhibit 125 as of 6-30-97, and on this A/R
13      analysis there were two additional line items
14      added that showed the reserves coming from
15      Graduate, the $75 million.
16 Q.   If I represent to you that the June 30, '97
17      version of your schedule of aging accounts
18      receivables isn't anywhere in the Coopers
19      work papers, are you sure that you provided
20      that to them?
21 A.   They asked for it every year, so if I didn't
22      provide it to them in '97, it would surprise
23      me, yes.
24 Q.   Do you think you provided it to them when you
25      gave them a whole series of A/R schedules on

Page 287

1       a disk at the start of the year-end field
2       work?
3  A.   No. This would have been a subsequent
4       request, that it would have been provided
5       separately from the original audit request
6       files that we provided to them.
7  Q.   Do you agree that this schedule is not
8       included among the ones that you gave Coopers
9       on the initial disk?
10 A.   On the initial disk, yes.
11 Q.   Yes, meaning that it's --
12 A.   It's not.
13 Q.   It's not on that disk?
14 A.   Yes.
15 Q.   When you say that Coopers asked for it every
16      year, there wasn't any kind of formalized
17      schedule request for it?
18 A.   That's correct.
19 Q.   You're just saying that you can remember it
20      coming up generally during Coopers' audits?
21 A.   Yes.
22 Q.   Is it possible that Coopers made a request
23      for that schedule in '95 and '96, but that
24      Kristen Heinlein never happened to ask for it
25      in '97?

Page 288

1          MR. COGAN: Objection.
2  A.   No.
3  Q.   Why not?
4  A.   Because I specifically remember an item on
5       that schedule being highlighted and asked
6       what it was for, and I believe Kristen is the
7       one that asked the question.
8  Q.   What item do you remember being highlighted?
9  A.   It was under the Hahnemann column. There was
10      a line item. It was called D-V 33/other
11      capitation, and on Hahnemann it increased
12      over a million dollars from the prior fiscal
13      year to the current fiscal year.
14         I remember a specific question as to
15      what that was for and why it had increased.
16 Q.   You can see that increase in the D-V 33
17      capitation account on Hahnemann in the
18      account receivable lead schedule, too, can't
19      you?
20 A.   Not exactly a million because you would have
21      to add up various accounts to get to the
22      million dollar change. It wasn't just in one
23      general ledger account. It was in multiple
24      accounts.
25 Q.   Okay. Well, we'll come back on Thursday

Page 289

1       then.
2  A.   Okay.
3          MR. RYAN: I'll just ask one or two
4       more questions, and we'll break for the day.
5          MR. COGAN: Okay.
6  BY MR. RYAN:
7  Q.   We go back to the two specific reserves that
8       you mentioned, the PFMA reserve and the MA
9       reserve.
10 A.   Okay.
11 Q.   I think you said that you can remember
12      talking about how those reserves were no
13      longer on the books of June 30, 1997;
14      correct?
15 A.   Correct.
16 Q.   Whom from Coopers did you talk about that
17      with?
18 A.   Amy.
19 Q.   You talked about that with anybody other than
20      Amy Frazier?
21 A.   Not that I can recall.
22 Q.   And did you tell Amy Frazier that the
23      reserves had been transferred to DVOG?
24 A.   No.
25 Q.   So Amy Frazier may have believed that those

73 (Pages 286 to 289)

Page 290

1 reserves were being used at Graduate; right?
2        MR. COGAN: Objection.
3 A.    She may have.
4 Q.    Do you know of any reason why she wouldn't
5 have believed that?
6        MR. COGAN: Objection.
7 A.    I would imagine that -- first of all, her
8 question wasn't were they transferred, which
9 is why I didn't tell her that.  Her question
10 was do you not need them any longer?  And
11 then I would imagine because of the amount,
12 $5 million, 50, that they would have audited
13 that transaction to see where it actually
14 went, how it was recorded based on how they
15 did previous audits.
16 Q.    Do you recall telling Amy Frazier anything
17 about where the PFMA or MA reserves had gone
18 to?
19 A.    No.
20        MR. RYAN:  Okay.  Why don't we break
21 for the day.
22        THE VIDEOGRAPHER:  We are now going
23 off the record.  The time indicated on the
24 screen is 5:20.  We will continue on June 6.
25        - - - -

Page 291

1     (The proceedings were adjourned at 5:20 p.m.)
2        - - - -

Page 292

1 COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2 COUNTY OF ALLEGHENY         )  SS:
3     I, Claire Gross, RDR, a Court Reporter and
4 Notary Public in and for the Commonwealth of
5 Pennsylvania, do hereby certify that the witness,
6 ROBIN R. SCHAFFER, was by me first duly sworn to
7 testify to the truth; that the foregoing deposition
8 was taken at the time and place stated herein; and
9 that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 4th day of June,
23 2002.
24     _____
25          Notary Public

Page 293

1 COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
  COUNTY OF ALLEGHENY          )  S H E E T
2
3 pages of my deposition given on Tuesday, June 4,
   I, ROBIN R. SCHAFFER, have read the foregoing
   2002, and wish to make the following, if any,
4 amendments, additions, deletions or corrections:
5 Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
In all other respects, the transcript is true and
20 correct.
21        _____
              ROBIN R. SCHAFFER
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2002.
24 _____
        Notary Public
25 AKF Reference No. Cg70512

74 (Pages 290 to 293)

Page 294

1                    IN THE UNITED STATES DISTRICT COURT FOR THE
                        WESTERN DISTRICT OF PENNSYLVANIA

2                                   - - - -

3
    THE OFFICIAL COMMITTEE OF           )
4   UNSECURED CREDITORS OF              )
    ALLEGHENY HEALTH, EDUCATION &       )
5   RESEARCH FOUNDATION,                )
                                        )
6                   Plaintiff,          )
                                        )
7                   -vs-                )      Civil Action
                                        )      No. 00-684
8   PRICEWATERHOUSECOOPERS, L.L.P.      )
                                        )
9                   Defendant.          )

10                                 - - - -
11
12                           VOLUME II
          VIDEOTAPE DEPOSITION OF:  ROBIN SCHAFFER
13
                                   - - - -
14
15              DATE:     June 6, 2002
                          Thursday, 9:00 a.m.
16
17              LOCATION: MANION McDONOUGH & LUCAS
                          14th Floor, USX Tower
18                        Pittsburgh, PA  15219
                          412-232-0200
19
20              TAKEN BY:  Defendant
21
                REPORTED BY:  JoAnn M. Brown, RMR
22                            Notary Public
                              AKF Reference No. JB70547
23
24
25

ROBIN SCHAFFER

Page 319

1  and Fire issues, the PFMA issues, and he had a
2  sense of what some of the issues were.  It's
3  just something I can recall from back then.
4  Q.   Are you familiar with an organization called
5  Qualmed?
6  A.   Yes.
7  Q.   What was Qualmed?
8  A.   I don't remember.
9  Q.   Are you familiar with an organization called
10  Greater Atlantic?
11  A.   Yes.
12  Q.   What was Greater Atlantic?
13  A.   It's my understanding Greater Atlantic was an
14  insurance plan or insurance company that was
15  similar to like a Medicaid-type plan.  That's
16  the most that I know about it.
17  Q.   Do you know what AHERF's relationship was with
18  Greater Atlantic?
19  A.   Today, no.  I don't recall.
20  Q.   Are you familiar with an organization called
21  HSI?
22  A.   I've heard of it, yes.
23  Q.   Do you know what HSI was?
24  A.   Today, no.
25  Q.   Now, you mentioned, for the PFMA reserve, an

Page 320

1  amount of $5,050,000, and then you said that
2  you thought the total was $7,050,000?
3  A.   Yes.
4  Q.   What happened to the other $2 million?
5  A.   That was recorded on Parkview and City Avenue's
6  books.  Since I'm more familiar with Graduate,
7  I knew that $5,050,000 was put on Graduate's
8  books.
9  Q.   So when you're talking about Graduate's books,
10  you mean the books of The Graduate Hospital?
11  A.   By itself, yes.
12  Q.   And Mr. Adamczak and other people in his group
13  were more familiar with the PFMA reserve at
14  City Avenue and Parkview?
15  A.   Yes.
16  Q.   Now, I believe you testified on the first day
17  of your deposition that you recall a
18  conversation with Amy Frazier about the PFMA
19  reserve?
20  A.   Yes.
21  Q.   Since you were dealing only with revenue at
22  three of the Graduate hospitals, including The
23  Graduate Hospital, do you believe that the
24  conversation you had with Ms. Frazier was just
25  about the piece of the PFMA reserve at The

Page 321

1  Graduate Hospital as opposed to the piece at
2  City Avenue or Parkview?
3  A.   No.  I think she was referring to PFMA in its
4  entirety.
5  Q.   What can you remember about that conversation
6  between you and Ms. Frazier?
7  A.   The only thing I remember is her coming in and
8  asking me why we used or -- I can't remember if
9  she said why we used it, why is the PFMA
10  reserve gone, but the question wasn't where did
11  it go, it was to the effect of why is it no
12  longer on the books, and my answer was, it's my
13  understanding we no longer need it, but I have
14  no documentation for that; you need to see Dan
15  Cancelmi.
16  Q.   Do you know whether Ms. Frazier did speak with
17  Mr. Cancelmi about why the PFMA reserve was no
18  longer on the books?
19  A.   I know that she walked down the hall towards
20  his office, but whether or not she spoke to him
21  at that time, I don't know.
22  Q.   Do you know whether she ever spoke with him
23  about it?
24  A.   No.
25  Q.   Was it your understanding that she was going to

Page 322

1  speak with him about it?
2  A.   Yes.
3  Q.   Now, I think you just said that Amy Frazier
4  didn't ask you what AHERF had done with the
5  PFMA reserve, right?
6  A.   Right.
7  Q.   And you didn't volunteer to her what AHERF, in
8  fact, had done, did you?
9  A.   No.  She didn't ask the question, I didn't
10  answer it, but she would have had -- it would
11  have been easy for her to determine that
12  herself, so there's no reason for me not to
13  answer it or to keep it from her.
14  Q.   If Amy Frazier had asked you what AHERF had
15  done with the PFMA reserve, what would you have
16  said?
17  A.   I would have told her that it was transferred
18  to DVOG and used for whatever reason it was
19  used for.
20  Q.   Do you recall what reason the PFMA reserve was
21  used for?
22  A.   I know that it was recorded in either May or
23  June.  I think the entry was actually made in
24  June.  I don't know if part of that went
25  towards the $21 million for bad debt or if part

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN SCHAFFER

Page 323

1    or all of it went to the $28 million that just
2    reduced contractual allowances. I'm not sure.
3  Q.    In any event, you knew at the time that the
4    PFMA reserve was transferred to DVOG as part of
5    the $49 million, right?
6  A.    I'm sure that I did.
7  Q.    And Ms. Frazier didn't give you any indication
8    at the time that she already knew that, did
9    she?
10  A.    No.
11  Q.    Did you have any communications with anyone
12    else from Coopers & Lybrand about the PFMA
13    reserve?
14  A.    Not that I can recall.
15  Q.    Were there any other communications with
16    Ms. Frazier other than the one that you've just
17    told us about?
18  A.    Not that I can recall.
19  Q.    Did you have any communication with anyone from
20    Coopers & Lybrand about the MA reserve?
21  A.    Yes.
22  Q.    Could you tell us about that, please?
23  A.    I believe when Amy came into my office on the
24    same occasion, that she also asked about the MA
25    reserve as well, I believe. If it wasn't that

Page 324

1    time, it was at a different time.
2  Q.    Can you remember anything about that
3    conversation with Ms. Frazier about the MA
4    reserve?
5  A.    In that conversation, I believe I would have
6    told her that we no longer needed it, and I
7    actually knew why, that the billing issue with
8    MA had been resolved.
9  Q.    Okay. So that was a matter in which you may
10    not have needed to refer Ms. Frazier to
11    Mr. Cancelmi?
12  A.    Correct.
13  Q.    Did Ms. Frazier ask a similar question about
14    the MA reserve as she did about the PFMA
15    reserve, that is, why the MA reserve was no
16    longer on Graduate's books?
17  A.    Yes.
18  Q.    Did she ask you what AHERF had done with the MA
19    reserve?
20  A.    Not that I can recall.
21  Q.    Did you know at the time what AHERF had done
22    with the MA reserve?
23  A.    Most likely, I did.
24  Q.    Namely?
25  A.    That we had moved it to the DVOG entities to

Page 325

1    use it to either cover bad debt or contractual
2    allowance problems.
3  Q.    So the MA reserve was part of the $49 million?
4  A.    Yes.
5  Q.    Did Ms. Frazier give you any indication that
6    she already knew what had been done with the MA
7    reserve?
8  A.    No.
9  Q.    Now, the PFMA reserve and the MA reserve are
10    just two pieces out of many pieces that
11    altogether make up the $49 million, right?
12  A.    Correct.
13  Q.    Can you recall discussing any of the other
14    pieces of the $49 million with anyone from
15    Coopers & Lybrand?
16  A.    Not that I can recall.
17  Q.    Let me just ask you, since I think I may have
18    forgotten to, whether you ever spoke with
19    anyone from Coopers & Lybrand about the MA
20    reserve apart from the one conversation with
21    Ms. Frazier that you just told us about?
22  A.    Not that I can recall.
23  Q.    And you never had any written communications
24    with Coopers & Lybrand about any of the $49
25    million in reserves from Graduate that were

Page 326

1    transferred, did you?
2  A.    Written communication -- the $21 million would
3    have been on the bad debt roll forward
4    schedules, so I don't know if you consider that
5    written communication or not. I would.
6  Q.    Okay. So that $21 million on the bad debt roll
7    forwards, you're talking about amounts that are
8    included in the other column and then have a
9    footnote identifying them as a shortfall
10    adjustment?
11  A.    Yes.
12  Q.    And they're not identifying the roll forwards
13    any more specifically than that, are they?
14  A.    No. You know what, also, the A/R roll
15    forward -- that A/R schedule, the big long one
16    that we looked at the other day, that $75
17    million is also on that schedule on two
18    different lines, and I believe I testified that
19    I'm pretty sure that I gave that to Coopers as
20    well.
21  Q.    But you can't be positive about that, right?
22  A.    No.
23  Q.    Now, you've testified that you were not very
24    involved with the purchase price adjustments
25    that were made at Graduate, right?

9 (Pages 323 to 326)

ROBIN SCHAFFER

Page 443

1    June 30, 1996?
2  A.  I vaguely remember Al Adamczak requesting that
3     Dan and I provide him information which I think
4     he later tried to do what you're saying, and he
5     prepared some documents on his own trying to do
6     that. I don't remember Dan and I ever coming
7     up with that number ourselves, to my knowledge.
8  Q.  Now, let me ask you, if you would, please, to
9     look back at Exhibit 131 and turn to the second
10    summary schedule, the revised one on the 7th
11    page of the exhibit. If you look in the column
12    for MCP Hospital as of June 1996 --
13 A.  Okay.
14 Q.  -- do you see that originally there was
15    $3,337,000 of inpatient bad debt allowance?
16 A.  Yes.
17 Q.  And originally there was $3,158,731 of
18    outpatient bad debt allowance?
19 A.  Yes.
20 Q.  And then, as part of the $17 and a half million
21    adjustment, an additional $3.9 million was
22    reserved for bad debts at MCP?
23 A.  Yes.
24 Q.  And if you look now at the East Falls Hospital
25    schedule in Exhibit 136, Bates page 4, and if

Page 444

1     you look at the rows for reserve at June 30,
2     1996, do you agree that the calculations in
3     Exhibit 136 do not take into account the
4     $17 and a half million adjustment?
5  A.  Yes.
6  Q.  So that the shortfall that's calculated in
7     Exhibit 136 is overstated by at least that
8     amount, right?
9  A.  Yes. I should say, yes, if these were the June
10    agings that were used for this. Yes.
11 Q.  Right. Thank you.
12 A.  That's what I'm just not sure of.
13    MR. RYAN: Let me mark, please, as
14    Exhibit 137 a one-page document with Bates No.
15    DC 2921, page 34.
16    - - - -
17    (Deposition Exhibit 137 marked for
18    identification.)
19    - - - -
20 BY MR. RYAN:
21 Q.  Do you recognize Exhibit 136, Ms. Schaffer?
22 A.  137.
23    MR. COGAN: 137.
24 Q.  I apologize. Do you recognize Exhibit 137,
25    Ms. Schaffer?

Page 445

1  A.  Yes.
2  Q.  What is it?
3  A.  This is a memo from Bill Gedman to Greg Snow
4     regarding the writing off of the Past Statute
5     accounts during the month of October 1996.
6  Q.  All right. And Mr. Gedman is identified here
7     as a manager dash financial reporting, right?
8  A.  Yes.
9  Q.  And that was a group within the patient
10    financial services group, right?
11 A.  Correct.
12 Q.  Now, is that your handwriting down here on the
13    bottom right?
14 A.  Yes.
15 Q.  Could you read that for us, please?
16 A.  Dan: Your copy. I reclassed this contractual
17    expense against balance sheet bad debt
18    allowance today. Should be out of P&L of
19    Monday reports. Robin. 11-8.
20 Q.  So you wrote this note on November 8, 1996?
21 A.  Yes.
22 Q.  To Dan Cancelmi?
23 A.  Yes.
24 Q.  Why were you reclassifying the contractual
25    expense against the balance sheet bad debt

Page 446

1     allowance?
2  A.  Normally, when an account is written off to bad
3     debt, that is where it should -- it belongs on
4     the balance sheet against the bad debt reserve,
5     not against contractual expense.
6        It's my understanding that Gregg and
7     his group wanted to track these transactions
8     through their billing system, and the only way
9     to do that was to set them up as a write-off
10    account within the billing system that
11    ultimately mapped into contractual allowances
12    on our general ledger.
13 Q.  So there was a problem with the interface
14    program from the patient accounting system to
15    the general accounting system?
16 A.  I wouldn't say necessarily a problem. I guess
17    we just didn't go in and change our conversion
18    table to directly point these write-offs to the
19    bad debt reserve where they belonged.
20 Q.  So you went into the general accounting system
21    and put all these Past Statute and Pat Com
22    write-offs where they belonged, which is in the
23    bad debt allowance account, right?
24 A.  Correct.
25 Q.  And did you do that for the entirety of the

39 (Pages 443 to 446)