ROBIN SCHAFFER

Page 447

1    Past Statute and Pat Com write-off?
2  A.  Yes.
3  Q.  And did you similarly then post the associated
4    contractual allowances to the bad debt
5    allowance account?
6  A.  Yes.
7  Q.  And those then partially offset the initial
8    Past Statute and bad debt write-off, right?
9  A.  Yes.
10      MR. RYAN:  Let me mark, please, as
11    Exhibit 138 the document with Bates Nos.
12    DBR-RS-0063 through 71.
13      - - - -
14      (Deposition Exhibit 138 marked for
15    identification.)
16      - - - -
17  BY MR. RYAN:
18  Q.  Do you recognize the schedule on the first page
19    of Exhibit 138, Ms. Schaffer?
20  A.  Yes.
21  Q.  What is it?
22  A.  This is a summary of the Past Statute and Pat
23    Com write-offs that occurred in fiscal 1997,
24    and it also shows the contractual reserve that
25    we would have had on those write-offs, and the

Page 448

1    final column is the net unreserved balance of
2    the write-off.
3  Q.  Okay.  So this middle section is what we've
4    talked about already, the associated
5    contractual allowances that you identified?
6  A.  Yes.
7  Q.  And those totalled $19 and a half million or
8    so?
9  A.  Correct.
10  Q.  So that the net effect of the Past Statute and
11    Pat Com write-offs, in your understanding, was
12    this $60,456,059 figure in the bottom right?
13  A.  Yes.
14  Q.  Now, there's some handwriting down at the
15    bottom.  Is that your handwriting?
16  A.  Yes.
17  Q.  Could you read that for us, please?
18  A.  Given to Kristen during FY '97 audit.
19  Q.  Did you make that note on the document in 1998
20    when you gave the document to the SEC?
21  A.  Yes.
22  Q.  And Kristen is Kristen Heinlein?
23  A.  Yes.
24  Q.  Did you intend that note just to refer to this
25    first page of Exhibit 138 or to more than just

Page 449

1    that?
2  A.  It would be for the first page and the actual
3    documents behind it showing the write-offs by
4    payor.
5  Q.  All right.  Are all pages of Exhibit 138 after
6    the first one -- well, that's not quite right.
7    Strike that.
8      The third page of Exhibit 138, Bates
9    65, looks like just an earlier iteration of the
10    schedule that was completed in June, and that
11    is the first page, right?
12  A.  Yes.  That would have been as of March when
13    Coopers would have been in here for their
14    prelim audit.  So they would have received it
15    at that time as well.
16  Q.  Okay.  Apart from Bates 63 and 65, are the
17    other pages in Exhibit 138 documents that were
18    created by the patient financial services
19    group?
20  A.  Yes.
21  Q.  And they then provided those documents to you
22    in your capacity as the person in the general
23    accounting department responsible for accounts
24    receivable issues?
25  A.  Yes.

Page 450

1  Q.  Was Mr. Gedman, in your understanding, in
2    charge of the Past Statute and Pat Com
3    write-off project?  And I'm asking only because
4    lots of these documents seem to come from him.
5  A.  I think Greg Snow was probably in charge, but
6    Bill Gedman was responsible for reporting what
7    had happened.
8  Q.  Do you know who actually went through and
9    identified the accounts that needed to be
10    written off as part of this Past Statute and
11    Pat Com write-off project?
12  A.  No.  I know that it was Greg Snow's area, but I
13    don't know who in his area did that.
14      MR. RYAN:  Let me mark, please, as
15    Exhibit 139 the document at Bates DBR-RS-0233
16    through 0243.
17      - - - -
18      (Deposition Exhibit 139 marked for
19    identification.)
20      - - - -
21  BY MR. RYAN:
22  Q.  Do you recognize Exhibit 139, Ms. Schaffer?
23  A.  Yes.
24  Q.  What is it?
25  A.  This is a memo from Dan Cancelmi to Steve

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN SCHAFFER

Page 555

1        MR. COGAN: Objection.
2  A.   Yes.
3  Q.   And this includes the $21 million transfer from
4        Graduate to DVOG, right?
5  A.   Correct.
6  Q.   So since you don't recall whether you had
7        Exhibit 43 back in 1997, I take it you never
8        provided Exhibit 43 to Coopers & Lybrand?
9  A.   To my knowledge, no, but I can't recall one way
10       or the other.
11 Q.   And you don't recall, do you, ever providing
12       Exhibit 164, the other July 3, 1997 memo, to
13       Coopers & Lybrand, do you?
14 A.   I don't recall doing that, no.
15        MR. RYAN:  Why don't we break for the
16       day.
17        THE WITNESS:  Okay.
18        THE VIDEOGRAPHER:  We're now going
19       off the record.  The time on the screen is
20       5:11.
21             - - - -
22       (The proceedings were temporarily
23       adjourned at 5:11 p.m.)
24             - - - -
25

Page 556

1  COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3      I, JoAnn M. Brown, RMR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the foregoing
6  deposition of ROBIN R. SCHAFFER was taken at the time
7  and place stated herein; and that the said deposition
8  was recorded stenographically by me and then reduced
9  to printing under my direction, and constitutes a
10 true record of the testimony given by said witness.
11     I further certify that I am not a relative or
12 employee of any of the parties, or a relative or
13 employee of either counsel, and that I am in no way
14 interested directly or indirectly in this action.
15     IN WITNESS WHEREOF, I have hereunto set my hand
16 and affixed my seal of office this 10th day of June,
17 2002.
18
19
20        _____
21              Notary Public
22
23
24
25

Page 557

1  COMMONWEALTH OF PENNSYLVANIA )  E R R A T A
   COUNTY OF ALLEGHENY      )  S H E E T
2
      I, ROBIN R. SCHAFFER, have read the foregoing
3  pages of my deposition given on Thursday, June 6,
   2002, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21        _____
              ROBIN R. SCHAFFER
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2002.
24
          _____
              Notary Public
25        AKF Reference No. JB70547

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN R. SCHAFFER

Page 558

```
1           IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF PENNSYLVANIA
2
                              - - - -
3
      THE OFFICIAL COMMITTEE OF        )
4     UNSECURED CREDITORS OF           )
      ALLEGHENY HEALTH, EDUCATION &    )
5     RESEARCH FOUNDATION,             )
                                       )
6             Plaintiff,               )
                                       )
7             -vs-                     )    Civil Action
                                       )    No. 00-684
8     PRICEWATERHOUSECOOPERS, L.L.P.   )
                                       )
9             Defendant.               )
10
                              - - - -
11
                          VIDEO TAPE
12        DEPOSITION OF:  ROBIN R. SCHAFFER
                          VOLUME III
13
                              - - - -
14
15            DATE:     July 23, 2002
                        Tuesday, 9:12 a.m.
16
17        LOCATION:     MANION McDONOUGH & LUCAS
                        14th Floor, USX Tower
18                      Pittsburgh, PA  15219
                        412-232-0200
19
20        TAKEN BY:     Defendant
21
          REPORTED BY:  Claire Gross, CRR, RDR
22                      Notary Public
                        AKF Reference No. Cg71172
23
24
25
```

ROBIN R. SCHAFFER

Page 591

1     on what's being posted in the billing system.
2     But I don't really recall what we used that
3     for specifically.
4 Q.   All right. So looking at account 1205010,
5     KHPE was Keystone Health Plan East?
6 A.   Correct.
7 Q.   And account 1205015 USHC was U.S. Healthcare?
8 A.   Correct.
9 Q.   And 1205016 DC 33 was District Counsel
10     No. 33?
11 A.   Correct.
12 Q.   That was labor union?
13 A.   Yes.
14 Q.   1205020, that relates to Health Partners;
15     right?
16 A.   Correct.
17 Q.   So basically all these clearing accounts from
18     1205000 and up really should be zero at
19     year-end except for the kind of timing
20     difference that you explained; right?
21 A.   Correct.
22 Q.   So these are cash amounts that eventually are
23     going to be posted to some other account?
24 A.   They will eventually -- the cash that we
25     receive will be posted against the patient

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 592

1     A/R accounts 1201000, and the offset, you
2     normally debit the 1205 account and credit
3     the control A/R account to reduce the A/R
4     that's in the billing system. So it's a wash
5     between -- within the patient accounts
6     receivable.
7 Q.   All right. And to the extent that the cash
8     clearing account hasn't been cleared out and
9     netted to zero, the accounts receivable are
10     somewhat overstated; is that right?
11 A.   With cash clearing, that would be correct,
12     yes. When you get into the PIP it's a
13     different story, but cash clearing, yes.
14 Q.   As a result because of how the bad debt
15     allowance methodology worked, as a result the
16     bad debt allowance required by formula would
17     be slightly overstated; right?
18 A.   Yes.
19 Q.   Did you ever attempt to do a calculation to
20     see how material that formula overstatement
21     for bad debt allowance was?
22 A.   No. But normally since the patient receipts
23     are posted on a timely basis, the lag is
24     normally like a one or two-day lag. So most
25     likely what is sitting in clearing would be

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 593

1     adjusted against the current budget of
2     receivables where the bad debt reserve is
3     pretty light normally.
4 Q.   Now, if you could turn, please, to the second
5     page of Exhibit 288, and look down at the
6     accounts for Hahnemann University Hospital.
7     Do you see account 1205013, which is
8     described as HIP NJ cap clearing?
9 A.   Yes.
10 Q.   Does that relate to the HIP New Jersey health
11     plan?
12 A.   Yes.
13 Q.   There is an amount there of a little bit over
14     $1,113,000; right?
15 A.   Yes.
16 Q.   Is that the large capitation clearing account
17     amount at Hahnemann that you can recall
18     discussing with Kristen Heinlein you
19     mentioned the first day of your deposition?
20 A.   Yes.
21 Q.   Because I think the first day I think you
22     said you thought that was the DC 33 clearing
23     account, and the schedule seemed to show it
24     was the HIP New Jersey clearing account?
25 A.   Actually, I'm not sure what I said the first

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 594

1     day, but when Kristen was asking me about
2     this account, I knew it was the HIP New
3     Jersey account because of the situation that
4     was going on with it.
5 Q.   All right. Do you recall what was going on
6     with the Hahnemann University Hospital HIP
7     New Jersey capitation clearing account at
8     June 30, '97?
9 A.   Yes. The issue with this was even though the
10     hospital received 100 percent of the money
11     related to HIP New Jersey, not all of the
12     money was revenue for the hospital. A
13     portion of it belonged to profee or the
14     physician side.
15     Because the agreement was somewhat
16     hard to interpret and we were having trouble
17     getting our hands on it, we could not
18     determine at year-end how much of that was
19     our income on the hospital side because to
20     relieve that we would have debited this
21     account and credited income.
22     Because we didn't know what portion
23     was hospital, we were trying to be
24     conservative by believing the entire balance
25     in the capitation clearing account until we

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

ROBIN R. SCHAFFER

Page 595

1  could determine what belonged on the hospital
2  and what belonged on the physician side.
3  Q.    But all of the income from the HIP New Jersey
4  account belonged to AHERF; right?
5  A.    Yes.
6  Q.    It was only a question as to which part of
7  AHERF?
8  A.    That's correct.
9  Q.    And so that entire $1,113,000 amount at June
10  30, '97, was income to AHERF; right?
11  A.    From what I can remember, yes. I don't
12  believe any of it belonged outside of the
13  system.
14  Q.    And so leaving it in the capitation clearing
15  account like this was very conservative;
16  right?
17  A.    Yes, yes.
18       MR. JONES:  Anthony, as we go to a
19  new exhibit, do you mind if we go to a short
20  break?
21       MR. RYAN:  Not at all. Let's just go
22  off the record.
23       THE VIDEOGRAPHER:  We are now going
24  off the record.  The time on the screen is
25  1002.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 596

1            - - - -
2       (There was a recess in the proceedings.)
3            - - - -
4       THE VIDEOGRAPHER:  We are now back on
5  the record.  The time on the screen is 10:16.
6       MR. RYAN:  Let me mark, please, as
7  Exhibit 289 a set of schedules with Bates
8  numbers CL013544 A through M.
9            - - - -
10      (Deposition Exhibit 289 marked for
11  identification.)
12           - - - -
13  BY MR. RYAN:
14  Q.    I realize some of these schedules may have
15  some notes on them that were added, but
16  basically do you recognize the schedules in
17  Exhibit 289, Ms. Schaffer?
18  A.    Yes.
19  Q.    What are they?
20  A.    Pages -- I don't know how the pages work. A
21  through K are the in and outpatient bad debt
22  reserve calculations for Bucks County
23  Hospital, and L and M are the summary of the
24  bad debt allowance or reserve accounts for
25  Bucks County in and outpatient.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 597

1  Q.    And are the schedules on pages L and M
2  sometimes referred to as bad debt roll
3  forwards?
4  A.    Yes.
5  Q.    Now, do you see I think every one of these
6  pages has a computer file name in the bottom
7  left-hand corner?
8  A.    Yes.
9  Q.    And they all appear to be in a drive S.  Do
10  you see that?
11  A.    Yes.
12  Q.    And then the directory is PGHA, CCTG and a
13  subdirectory is PAP A/R?
14  A.    Yes.
15  Q.    Does that stand for Pittsburgh accounting and
16  patient accounts receivable?
17  A.    Yes.
18  Q.    And is that a directory that you and your
19  staff used for schedules that you created?
20  A.    Yes.
21  Q.    And then the next subdirectory is June 1997
22  to reflect that all these schedules are as of
23  June 30, 1997; right?
24  A.    Yes.
25  Q.    So the schedule on page A shows all the

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 598

1  inpatient accounts receivable at Bucks County
2  Hospital broken down by payor category and by
3  aging category; is that right?
4  A.    Yes.
5  Q.    And then the second page, Schedule B, shows
6  the associated bad debt reserve calculated
7  for the balances on schedule A; is that
8  right?
9  A.    Yes.
10  Q.    And Schedule C shows the outpatient accounts
11  receivable by payor category by aging
12  category carried at gross; right?
13  A.    Yes.
14  Q.    And then the next schedule on page D shows
15  the same outpatient accounts receivable but
16  reduced to net; right?
17  A.    Yes.
18  Q.    So that's net of any contractual allowances
19  that you and your staff calculated?
20  A.    Correct.
21  Q.    And that process of going from gross accounts
22  receivable to net accounts receivable for the
23  outpatient accounts is shown on the schedule
24  on Bates page E; right?
25  A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

11 (Pages 595 to 598)

MANHATTAN REPORTING CORP., a LegaLink Company

ROBIN R. SCHAFFER

Page 599

1  Q.    And then the schedule on Bates page F shows
2        the bad debt reserve that's been calculated
3        off the net outpatient accounts receivable
4        balances; right?
5  A.    Yes.
6  Q.    And the schedule on Bates page G shows the
7        loss percentages for the inpatient accounts
8        by payor category and aging category; right?
9  A.    Yes.
10 Q.    And the schedule on Bates page H shows the
11       loss percentages for the outpatient accounts;
12       right?
13 A.    Yes.
14 Q.    And then the schedule on Bates page I shows
15       an additional reduction to net for certain
16       payor categories; is that right?
17 A.    This is actually -- I is actually the
18       contractual percentages that we used to come
19       up with page -- if I can find it here -- page
20       D. So it's just summarizing -- wait. I'm
21       sorry. They might be inpatient.
22            No. They are outpatient. That's
23       just summarizing the contractual allowance
24       percentages we are using to get to net
25       receivables before bad debt is calculated.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 600

1  Q.    Okay. And then the schedule on Bates page J
2        shows the inpatient accounts receivable net
3        of the bad debt reserve that is calculated
4        earlier; right?
5  A.    Correct.
6  Q.    And the schedule on Bates page K shows the
7        outpatient account receivable net of the bad
8        debt reserve calculated earlier; right?
9  A.    Yes.
10 Q.    In all the schedules that we've just walked
11       through are ones that you and your staff
12       prepared that you then provided to Coopers &
13       Lybrand for their audit?
14 A.    Yes.
15 Q.    Now, looking at the inpatient bad debt roll
16       forward on Bates page L, do you see the notes
17       down at the bottom, lower case A through I?
18 A.    Yes.
19 Q.    Those are notes that you wrote for this
20       schedule, aren't they?
21 A.    They are notes that after I reviewed the
22       first draft of these schedules from my staff,
23       I tried to go in and make the notes
24       consistent for all the hospitals, so I helped
25       to edit or clarify the notes as part of my

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 601

1        review process.
2  Q.    All right. So that these are notes that your
3        staff drafted and that you edited and that
4        were on the schedule when you provided it to
5        Coopers & Lybrand?
6  A.    Yes.
7  Q.    Now, do you see note F refers to a $3 million
8        transfer from Graduate?
9  A.    Yes.
10 Q.    And that was recorded for March 1997; right?
11 A.    Yes.
12 Q.    And note G refers to a $4 million transfer
13       from Graduate?
14 A.    Yes.
15 Q.    And that was recorded for April 1997; right?
16 A.    Yes.
17 Q.    Those are the only amounts that are
18       identified on this schedule as transfers from
19       Graduate; right?
20 A.    Yes.
21 Q.    And those $3 million and $4 million amounts
22       totalling $7 million are the Bucks County
23       portion of the $50 million reserve transfer;
24       right?
25 A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 602

1  Q.    Are there additional reserve transfers from
2        Graduate that are in any way included in the
3        numbers on this schedule?
4  A.    Yes and no.
5  Q.    Okay.
6  A.    Never easy. If you look at footnote I, there
7        is an item listed as $59,000 for a shortfall
8        adjustment. If you recall looking back at
9        some of Dan's, after booking a 50 there was
10       still a $25 million shortfall related to
11       writeoff after all the past statute accounts
12       and the continued deterioration of the
13       agings.
14            Part of the shortfall adjustment, the
15       reserves came from Graduate. Part of them
16       came from the individual DVOG hospitals like
17       within DVOG, which is why they were called
18       shortfall adjustments. Basically that was
19       taken from Dan's memo, that wording.
20            So of the $25 million, I think 21
21       million of it was from Graduate, 4 million
22       was within DVOG. We didn't break that out as
23       in detail on here, the 4 versus the 21.
24 Q.    So the memo you're talking about I think is
25       what we looked at earlier this morning as

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

12 (Pages 599 to 602)

ROBIN R. SCHAFFER

Page 603

1    Exhibit 43, a July 3, '97 memo from
2    Mr. Cancelmi; is that right?
3 A.    Yes, correct.
4 Q.    That shows the $25,038,000 bad debt reserve
5    shortfall on the first page?
6 A.    Yes.
7 Q.    And then attachment A on the second page is
8    entitled Reserves Used to Cover Bad Debt
9    Shortfall?
10 A.    Yes.
11 Q.    Again, I apologize that the numbers are a
12    little bit cut off on the second page in the
13    last column, but I think if we consult the
14    handwritten version that you received from
15    Mr. Cancelmi on the third page of Exhibit
16    284, I think we'll see a $25,331,000 in total
17    reserves utilized?
18 A.    Total reserves utilized, yes. The bad debt
19    piece was the $25,083,000, which is at the
20    top.
21 Q.    That includes certain reserves that were
22    existing DVOG reserves, namely the
23    capitalized interest reserves and the
24    depreciation reserves at Hahnemann University
25    Hospital?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 604

1 A.    Correct.
2 Q.    And then beginning where it says Graduate
3    reserves down through the end, those were
4    reserves transferred from the Graduate
5    entities; right?
6 A.    Correct.
7 Q.    Now, Mr. Cancelmi in his memo referred to
8    that as reserves used to cover bad debt
9    shortfall; right?
10 A.    Yes.
11 Q.    What you're saying is the $59,000 shortfall
12    adjustment in note I on Bates page L in
13    Exhibit 289 is a portion of that $25 million
14    amount?
15 A.    Correct.
16 Q.    There is no way from the face of this
17    schedule itself to determine whether that
18    $59,000 amount was transferred from Graduate;
19    there?
20 A.    From the face of this schedule, no.
21 Q.    Now, if we look at attachment A to
22    Mr. Cancelmi's July 3 memo, the $59,000 is
23    shown at Bucks County Hospital as the use of
24    capitalized interest reserves; right?
25 A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 605

1 Q.    And we see earlier when we compared various
2    schedules and looked at your handwritten note
3    to Mr. Lisman, that the capital -- that the
4    use of capitalized interest reserves to cover
5    the bad debt shortfall was accompanied by a
6    credit to bad debt expense; right?
7 A.    Debit to bad debt expense
8 Q.    Where the use of the Graduate reserves was
9    not accompanied by any entry to bad debt
10    expense?
11 A.    Correct.
12 Q.    So that we know from other documents that
13    this $59,000 shortfall adjustment in note I
14    was expensed, but there is no way to tell
15    that from the face of the schedule; right?
16 A.    Correct.
17 Q.    So if we go, please, to the next page, Bates
18    page M in Exhibit 289, this is the outpatient
19    bad debt roll forward for Bucks County;
20    right?
21 A.    Yes.
22 Q.    And there are no amounts on this schedule
23    that are identified as transfers from
24    Graduate, are there?
25 A.    No.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 606

1 Q.    Are there any amounts on the schedule that,
2    in fact, were reserves transferred from
3    Graduate even though they are not identified
4    as such?
5 A.    Yes.
6 Q.    What amount is that?
7 A.    The 1.5 million that's labeled Account
8    Shortfall Adjustment.
9 Q.    That's in note H?
10 A.    Yes.
11 Q.    For June 1997?
12 A.    Yes.
13 Q.    And if we look now again at attachment A to
14    Exhibit 43, we can see that same $1,500,000
15    amount in reserve transferred from the
16    Graduate Hospital; right?
17 A.    Yes.
18 Q.    And we know from the other documents that
19    we've looked at today that that amount was
20    not expensed at Bucks County; right?
21 A.    Correct.
22 Q.    But there is no way to tell from the
23    outpatient bad debt roll forward provided to
24    Coopers & Lybrand that the $1,500,000
25    shortfall adjustment involved transfer of

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

ROBIN R. SCHAFFER

Page 607

```
1        reserves from Graduate; is there?
2   A.   Correct, no.
3   Q.   And there is no way to tell that that amount
4        was not expensed as opposed to the shortfall
5        adjustment in the inpatient account which, in
6        fact, was expensed; correct?
7   A.   Correct.
8            MR. RYAN:  Let me mark, please, as
9        Exhibit 290 a set of schedules with Bates
10       numbers CL013556 A through M.
11           - - - -
12           (Deposition Exhibit 290 marked for
13       identification.)
14           - - - -
15  BY MR. RYAN:
16  Q.   Do you recognize the schedule in Exhibit 290,
17       Ms. Schaffer?
18  A.   Yes.
19  Q.   What are they?
20  A.   These are the same schedules we just looked
21       at before in Exhibit 289, but they are for
22       Elkins Park and not Bucks County, as we
23       looked at before.
24  Q.   So these are again schedules that you or your
25       staff prepared and that you reviewed as part
```
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 608

```
1        of your calculation of the bad debt allowance
2        required for Elkins Park on June 30, '97?
3   A.   Yes.
4   Q.   And you then provided these schedules to
5        Coopers & Lybrand for their audit?
6   A.   Yes.
7   Q.   Do you see on the very first page here there
8        is a tick mark B by an entry for 20 percent?
9   A.   Yes.
10  Q.   And that relates to contractual allowance on
11       so-called commercial accounts; is that right?
12  A.   Yes.
13  Q.   And do you see then tick mark B reads Based
14       upon historical data from patient accounting?
15  A.   Yes.
16  Q.   Is that tick mark B something that was
17       already on the schedule when you provided it
18       to Coopers?
19  A.   I don't think it was.
20  Q.   All right.  Do you believe that you told
21       someone from Coopers & Lybrand that the 20
22       percent contractual allowance for commercial
23       accounts was based upon historical data from
24       patient accounting?
25  A.   No, only because we always just used an 80-20
```
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 609

```
1        split not based on any actual data.  It was
2        just we knew we weren't going to get 100
3        percent of charges, so we tended to assume 80
4        percent.  So I don't believe I would have
5        said that it was historical data from patient
6        accounting.
7   Q.   You don't recall telling anyone from Coopers
8        & Lybrand, do you, that you had any
9        historical data that was inconsistent with
10       the 80-20 split?
11  A.   No.
12  Q.   If you could turn, please, to the Elkins Park
13       inpatient bad debt roll forward on Bates page
14       L.  Now, this schedule shows a $3 million
15       transfer from Graduate in note G for March,
16       1997; right?
17  A.   Yes.
18  Q.   And then a $5 million transfer from Graduate
19       in note H for April 1997?
20  A.   Correct.
21  Q.   That $8 million amount is the only amount
22       that's identified on the schedule as a
23       transfer from Graduate; right?
24  A.   Yes.
25  Q.   And the next page, Bates page M, which is the
```
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 610

```
1        outpatient bad debt roll forward for Elkins
2        Park, there are no amounts that are
3        identified as transfers from Graduate, are
4        there?
5   A.   No.
6   Q.   And on each of the schedules in inpatient and
7        outpatient, the note for the other amount for
8        June includes a shortfall adjustment; right?
9   A.   Yes.
10  Q.   $24,000 for inpatient and $2,700,000 for
11       outpatient?
12  A.   Yes.
13  Q.   And there is no way to tell from these
14       schedules how much of that amount involved
15       the transfer of reserves from Graduate, is
16       there?
17  A.   No.
18  Q.   And there is no way to tell from these
19       schedules which portion of the so-called
20       shortfall adjustment was expensed and which
21       portion was not expensed; right?
22  A.   Correct.
23           MR. RYAN:  Can we mark, please, as
24       Exhibit 291 a set of schedules with Bates
25       numbers CL013568 A through N as in Nancy.
```
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

14 (Pages 607 to 610)

ROBIN R. SCHAFFER

Page 611

1          - - - -
2          (Deposition Exhibit 291 marked for
3      identification.)
4          - - - -
5  BY MR. RYAN:
6  Q.    Do you recognize the schedules in Exhibit
7      291, Ms. Schaffer?
8  A.    Yes.
9  Q.    What are they?
10 A.    Again, these are similar to Exhibits 289 and
11     290, except they are for Hahnemann Hospital,
12     and they are the in and outpatient bad debt
13     reserve calculations and the in and
14     outpatient bad debt roll forward analyses.
15 Q.    As with the previous two exhibits, these are
16     schedules that you or your staff prepared and
17     that you reviewed as part of your calculation
18     of the bad debt allowances for the DVOG
19     hospitals at June 30, '97?
20 A.    Yes.
21 Q.    And you then provided the schedules to
22     Coopers & Lybrand as part of their audit?
23 A.    Yes.
24 Q.    Now, if you could look, please, at the
25     inpatient bad debt roll forward on Bates page

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 612

1      M as in Mary, do you see note E states
2      Transfer of reserves from Graduate?
3  A.    Yes.
4  Q.    And that refers to a $5 million amount in
5      March and a $5 million amount in April?
6  A.    Yes.
7  Q.    For a total of $10 million?
8  A.    Yes.
9  Q.    And in your understanding is that Hahnemann
10     University Hospital's portion of the $50
11     million reserve transfer?
12 A.    Yes.
13 Q.    Are there any other amounts either on the
14     inpatient or outpatient bad debt roll forward
15     that are identified as reserves transferred
16     from Graduate?
17 A.    No.
18 Q.    Do you believe that there are additional
19     amounts that, in fact, were reserves
20     transferred from Graduate?
21 A.    Yes.
22 Q.    And where are those identified?
23 A.    In footnote F on schedule M and footnote D on
24     schedule N.
25 Q.    And those are notes that in each case just

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 613

1      read bad debt shortfall adjustments; right?
2  A.    Correct.
3  Q.    Is there any way that you can tell from
4      looking at these schedules how much of the
5      $691,047, amount in the other column for the
6      inpatient bad debt allowance for June was a
7      transfer of reserves from Graduate?
8  A.    No.
9  Q.    And is there any way that you can tell from
10     looking at these schedules that you provided
11     to Coopers & Lybrand how much of the
12     $10,638,000 amount in the other column of the
13     outpatient bad debt roll forward for June was
14     reserves transferred from Graduate?
15 A.    No.
16 Q.    Is there any way you can tell on either of
17     these schedules how much of the shortfall
18     adjustments were expense?
19 A.    No.
20        MR. RYAN:  Let me mark, please, as
21     Exhibit 292 a set of schedules with Bates
22     numbers CL013580 A through G.
23        - - - -
24        (Deposition Exhibit 292 marked for
25     identification.)

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 614

1          - - - -
2  BY MR. RYAN:
3  Q.    I apologize for the small type on some of the
4      pages. Do you recognize the schedule in
5      Exhibit 292, Ms. Schaffer?
6  A.    Yes.
7  Q.    What are they?
8  A.    These are the same schedules we have just
9      looked at in the previous three exhibits for
10     MCC and EPPI. It's the bad debt reserve
11     calculation and the roll forwards for in and
12     outpatient.
13 Q.    MCC was the main clinical campus of the
14     Medical College of Pennsylvania Hospital;
15     right?
16 A.    Correct.
17 Q.    Also known as MCP?
18 A.    Yes.
19 Q.    So Bates page F shows on the top the bad debt
20     roll forward for EPPI; right?
21 A.    Yes.
22 Q.    The Eastern Pennsylvania Psychiatric
23     Institute?
24 A.    Yes.
25 Q.    And the bottom of Bates page F shows the bad

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

15 (Pages 611 to 614)

ROBIN R. SCHAFFER

Page 615

1    debt roll forwards for MCP inpatient?
2 A.   Yes.
3 Q.   And Bates page G shows the bad debt roll
4    forward for MCP outpatient; right?
5 A.   Yes.
6 Q.   And now is it your understanding that as of
7    June 30, '97, the EPPI bad debt allowance
8    account was closed out and combined with the
9    MCP inpatient account?
10 A.   Yes.
11 Q.   And that's why the ending balance for the bad
12    debt allowance account at EPPI is zero?
13 A.   Yes.
14 Q.   And the balance in the account was then
15    transferred to the MCP inpatient account;
16    right?
17 A.   Correct.
18 Q.   And the required bad debt allowance of MCP
19    inpatient that you calculated then was the
20    required amount for the inpatient accounts
21    receivable at MCP plus the required amount
22    for the accounts receivable at EPPI?
23 A.   Yes.
24 Q.   Now, the only amounts that are identified on
25    any of these three bad debt roll forwards for

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 616

1    MCP Hospital and EPPI as being the transfer
2    of reserves from Graduate is $15 million in
3    note F on the MCP inpatient bad debt roll
4    forward; correct?
5 A.   Correct.
6 Q.   And now again note G at MCP inpatient and
7    note D on MCP outpatient refer to a YE
8    shortfall adjust or adjustment; right?
9 A.   Yes.
10 Q.   Is it your understanding that those so-called
11    shortfall adjustments included the transfer
12    of reserves from Graduate?
13 A.   Yes.
14 Q.   But there is no way to tell from these roll
15    forward schedules how much of that shortfall
16    adjustment involved transfer of reserves from
17    Graduate, is there?
18 A.   No.
19 Q.   There is no way to tell how much of the
20    shortfall adjustment was expensed; right?
21 A.   No.
22        MR. RYAN:  Let me mark, please, as
23    Exhibit 293 a schedule with Bates number
24    CL13584 A through M.
25        - - - -

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 617

1        (Deposition Exhibit 293 marked for
2    identification.)
3        - - - -
4 BY MR. RYAN:
5 Q.   Do you recognize the schedules in Exhibit
6    293, Ms. Schaffer?
7 A.   Yes.
8 Q.   What are they?
9 A.   Again, this is the same type of schedules we
10    were looking at in the previous four
11    exhibits, but this one is for St.
12    Christopher's Hospital.  It's the bad debt
13    reserve calculations and the corresponding in
14    and outpatient bad debt reserve roll
15    forwards.
16 Q.   These schedules, as with the schedules in the
17    previous four exhibits, were prepared by you
18    or your staff and were reviewed by you as
19    part of your calculation of the bad debt
20    allowances at the DVOG hospitals at June 30,
21    1997; right?
22 A.   Yes.
23 Q.   And you then provided these schedules to
24    Coopers & Lybrand for their audit?
25 A.   Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 618

1 Q.   And if we look at the inpatient bad debt roll
2    forward for St. Christopher's on Bates page
3    L, there is a $6 million Graduate Hospital
4    transfer identified in note F; is that right?
5 A.   Yes.
6 Q.   And then an additional $4 million Graduate
7    Hospital revenue transfer in note G; is that
8    right?
9 A.   Yes.
10 Q.   And that $10 million amount is St.
11    Christopher's portion of the $50 million
12    transfer of reserves from Graduate?
13 A.   Yes.
14 Q.   Those are the only amounts expressly
15    identified on this bad debt roll forwards as
16    transfer of reserves from Graduate; is that
17    right?
18 A.   Yes.
19        MR. RYAN:  Let me mark, please, as
20    Exhibit 294 documents with Bates numbers TNP
21    00568 through 601.
22        - - - -
23        (Deposition Exhibit 294 marked for
24    identification.)
25        - - - -

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

16 (Pages 615 to 618)

ROBIN R. SCHAFFER

Page 619

1  BY MR. RYAN:
2  Q.    Now, let me direct you to a specific page
3        here which is the page ending in 75.  Do you
4        recognize this page, Ms. Schaffer?
5  A.    Yes.
6  Q.    What is it?
7  A.    This is Hahnemann's summary of bad debt
8        reserves for inpatient as of 6-30-97.  This
9        is the draft right after my staff prepared
10       the initial roll forward.
11 Q.    And the print date for this schedule as shown
12       in the upper right-hand corner is July 22,
13       '97; right?
14 A.    Yes.
15 Q.    Is the handwriting on this page yours?
16 A.    Yes.
17 Q.    All of it?
18 A.    Yes.
19 Q.    So these were the edits that you made to the
20       Hahnemann inpatient bad debt allowance roll
21       forward before you provided the final version
22       to Coopers & Lybrand for their audit;
23       correct?
24 A.    Correct.
25 Q.    And if you look at what used to be note 6
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 620

1        which you've changed to note E, do you see
2        that you've written there by hand Transfer of
3        reserves from Graduate?
4  A.    Yes.
5  Q.    And that's associated with the $10 million
6        that are part of the $50 million reserve
7        transfer from Graduate; is that right?
8  A.    Yes.
9  Q.    And then you wrote in what used to be note 7
10       that is now note F -- you added the words bad
11       debt before shortfall adjustments; right?
12 A.    Yes.
13 Q.    And you did not indicate there that those
14       shortfall adjustments included the transfer
15       of reserves from Graduate, did you?
16 A.    No.  I didn't think to do that at the time,
17       no.
18 Q.    Now, if you could look up, please, at what
19       used to be note 1, do you see the original
20       version of this roll forward schedule said
21       July through September other pertains to
22       bottom line adjustments?
23 A.    Yes.
24 Q.    Do you have an understanding as to what the
25       term bottom line adjustment refers to?
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 621

1  A.    Yes.  Those were most likely relating -- and
2        I don't remember the exact number -- to those
3        contractual adjustments that were booked
4        earlier in the year to increase the net
5        research and reduce the contractuals, and
6        later those adjustments were put into the bad
7        debt reserve account.
8  Q.    Okay.  So those are the entries in September
9        '96 that we talked about on the previous
10       days?
11 A.    Yes.
12 Q.    And the term bottom line adjustment reflects
13       the fact that those adjustments increased net
14       income; right?
15 A.    Correct.
16 Q.    Net income is referred to sometimes as the
17       bottom line; right?
18 A.    Correct.
19 Q.    And you edited what originally was note one
20       that reads reserve adjustments?
21 A.    Right.
22 Q.    If we go back to the Hahnemann inpatient bad
23       debt roll forward as provided to Coopers &
24       Lybrand -- that's here in Exhibit 291, Bates
25       page M as in Mary, note A now reads reserve
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 622

1        adjustments the way you edited it in Exhibit
2        294; right?
3  A.    Yes.
4  Q.    And note E reads transfer of reserves from
5        Graduate the way you edited in what used to
6        be note 6 which became note E?
7  A.    Yes.
8  Q.    And note F reads bad debt shortfall
9        adjustments as you edited in what used to be
10       note 7 which became note F; right?
11 A.    Yes.
12 Q.    If you could turn, please, to the next page
13       in Exhibit 294, Bates page 576, is this the
14       original outpatient bad debt roll forward for
15       Hahnemann Hospital prepared by your staff?
16 A.    Yes.
17 Q.    Is the handwriting here your edits?
18 A.    Yes.
19 Q.    That includes the edit to what used to be
20       note 5 which became note D as in door, which
21       reads bad debt shortfall adjustments; right?
22 A.    Yes.
23 Q.    Now, if you could turn, please, to Bates page
24       578.
25 A.    I don't know where the page numbers are on
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

17 (Pages 619 to 622)

ROBIN R. SCHAFFER

Page 655

1    $7 million of reserve transfers from Graduate
2    in May 1997?
3  A.    Yes.
4        MR. RYAN:  Let me mark, please, as
5    Exhibit 302 a document with Bates numbers
6    DBCM 2800058 through 70.
7        - - - -
8        (Deposition Exhibit 302 marked for
9    identification.)
10       - - - -
11 BY MR. RYAN:
12  Q.    Do you recognize Exhibit 302, Ms. Schaffer?
13  A.    The only pages that I recognize in Exhibit
14    302 are pages 61 through 70, which are what
15    we have been calling the cheat sheets.
16  Q.    So Bates pages 61 through 70 are cheat sheets
17    that you prepared?
18  A.    Again, I would have prepared every one except
19    Parkview and City, which I don't even know if
20    they are in here.  Yes.  Parkview and City
21    would have most likely been either prepared
22    by myself -- but I don't think I did them --
23    or Frank Insana who was under Al Adamczak.
24  Q.    But all the other ones, the five DVOG
25    hospitals, the Graduate Hospital, St. Sinai

Page 656

1    Hospital and Rancocas Hospital you did?
2  A.    Yes.
3  Q.    Now, if we look at your Delaware Valley
4    patient revenue analysis on the second page
5    of Exhibit 300, the actual year to date
6    inpatient net revenue was $264,941,000 is;
7    right?
8  A.    Yes.
9  Q.    If we look at the June 1997 Hahnemann cheat
10    sheet on Bates page 61 of Exhibit 302, the
11    actual year to date admissions were 20,437;
12    is that right?
13  A.    Yes.
14  Q.    You see in the middle left-hand column headed
15    Net Revenue there is a line Fiscal Year '97
16    Average?
17  A.    Yes.
18  Q.    That says $12,964?
19  A.    Yes.
20  Q.    Would that figure be calculated by taking the
21    actual year to date in patient net revenue
22    and dividing by the actual year to date
23    admissions?
24  A.    That's how it should work, yes.
25  Q.    Would you mind seeing if that calculation

Page 657

1    works using the $260,941,000 figure from
2    Exhibit 300.
3  A.    Yes.  12,964,000 is what calculates -- or
4    12,964.
5  Q.    So it's $12,964 per admission?
6  A.    Correct.
7  Q.    So these cheat sheets here attached to
8    Exhibit 302 are based on the same revenue
9    figures that you had in your July 17, '97
10    memo in Exhibit 300?
11  A.    Yes.
12  Q.    And they include in net revenue the $7
13    million of reserve reserves taken into
14    income in May; right, so that, for example, a
15    note I on Bates 61 we see the $5 million
16    transferred from Graduate to Hahnemann
17    Hospital?
18  A.    Yes.
19  Q.    But they don't include any reserve transfers
20    into income for June, do they?
21  A.    No, and I don't know why they don't.
22        MR. RYAN:  Let me mark, please, as
23    Exhibit 303 a document with Bates numbers DLC
24    NR 011858 through 62.
25        - - - -

Page 658

1        (Deposition Exhibit 303 marked for
2    identification.)
3        - - - -
4  BY MR. RYAN:
5  Q.    Now, if you could turn, please, to the second
6    page of Exhibit 303.  This is a June 1997
7    cheat sheet for Hahnemann; right?
8  A.    Yes.
9  Q.    And the typed schedule is identical to the
10    one on Bates page 61 in Exhibit 302; is that
11    right?
12  A.    Yes.
13  Q.    Is that your handwriting on this page?
14  A.    Yes.
15  Q.    Now, if we turn back to the first page of
16    Exhibit 303, this is a revised version of the
17    same June '97 Hahnemann cheat sheet, isn't
18    it?
19  A.    Yes.
20  Q.    So that there is a note J by the June '97
21    inpatient net revenue per admission that
22    wasn't on the previous sheet; right?
23  A.    Correct.
24  Q.    And that note reads Include $10 million
25    general reserve adjustment?

26 (Pages 655 to 658)

ROBIN R. SCHAFFER

Page 659

1  A.    Yes.
2  Q.    And the inpatient net revenue per admission
3        has gone from $11,370 for that month to
4        $19,382; right?
5  A.    Yes.
6  Q.    Do you believe that's $10 million in reserves
7        transferred from Graduate into the Hahnemann
8        inpatient contractual allowance account?
9  A.    I'm not sure if it was all from Graduate or
10       not since I did specifically above that say
11       Graduate.  So I would think that it's at
12       least part of it came from Graduate, but I
13       don't know if the whole $10 million did or
14       not.
15 Q.    But certainly it's a transfer of reserves
16       into the contractual allowance account at
17       Hahnemann?
18 A.    Right.
19 Q.    And that transfer of reserves operated to
20       reduce the contractual allowance and sort of
21       make inpatient net revenue appear to be
22       higher than it actually was?
23 A.    Yes.
24 Q.    Now, is what you're doing in the upper
25       right-hand corner of the second page of

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 660

1        Exhibit 303 calculating the volume and rate
2        variance for Hahnemann for June '97?
3  A.    Yes.  It looks like I'm taking the total
4        variance and then breaking it out between
5        volume and rate.
6  Q.    And that's a variance to budget?
7  A.    Yes.
8  Q.    So the $5,084,000 volume variance is based on
9        the calculation on the next page, Bates 1860;
10       is that right?
11 A.    Yes.
12 Q.    And that's a calculation that you did; right?
13 A.    Yes.
14 Q.    You prepared the typed schedule and then you
15       made the handwritten additions in the bottom;
16       right?
17 A.    Yes.
18 Q.    And the $2,200,000 rate variance that you
19       have in the upper right-hand corner of Bates
20       1859 is based on the schedule at Bates 1861
21       to 62; right?
22 A.    Yes.
23 Q.    And then there are two other particular
24       variances that you knew about prior year CRA
25       variance?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 661

1  A.    Yes.
2  Q.    And a variance described as pharmacy
3        corrections?
4  A.    Yes.
5              MR. RYAN:  Let me mark, please, as
6        Exhibit 304 a document with Bates numbers DLC
7        NR 011732 through 36.
8                - - - -
9              (Deposition Exhibit 304 marked for
10       identification.)
11               - - - -
12 BY MR. RYAN:
13 Q.    So the second page of Exhibit 304 is the
14       original June '97 cheat sheet for MCP
15       Hospital; is that right?
16 A.    It looks that way, yes.
17 Q.    And that ties to the cheat sheet on Bates 62
18       in Exhibit 302; right?
19 A.    Yes.
20 Q.    And the first page of Exhibit 304 is a
21       revised cheat sheet?
22 A.    Yes.
23 Q.    Revised to include, as stated in note E, a $3
24       million general reserve adjustment?
25 A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 662

1  Q.    Now, the total year to date admission --
2        let's do the monthly admissions.  So the
3        total admissions for the month of June '97 at
4        the main clinical campus and EPPI combined
5        would be 1,085 plus 223?
6  A.    Yes.
7  Q.    So that's 1,308?
8  A.    Yes.
9  Q.    Could you calculate them, please, what the
10       effect on net revenue per admission for that
11       month would be of a $3 million general
12       reserve adjustment as shown in note E?
13 A.    It would be $2,294 per admission.
14 Q.    If you compare the original net revenue per
15       admission for June '97 at MCP in the second
16       page of Exhibit 304 to the revised number on
17       the first page, the difference is that same
18       $2,294 figure; is it not?
19 A.    Let me just make sure.  Yes.
20 Q.    So it's the $3 million general reserve
21       adjustment that's accounting for the change
22       in inpatient net revenue per admission for
23       June '97; right?
24 A.    Yes.
25 Q.    And that's also what's increasing the fiscal

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

27 (Pages 659 to 662)

ROBIN R. SCHAFFER

Page 683

1      (Deposition Exhibit 312 marked for
2    identification.)
3        - - - -
4  BY MR. RYAN:
5  Q.    Exhibit 312 consists of a series of June '97
6    cheat sheets; right?
7  A.    Yes.
8  Q.    And you recall generally that you gave
9    Coopers & Lybrand during the '97 audit or
10    probably during every year's audit a version
11    of the cheat sheets; right?
12  A.    Yes.
13  Q.    To help them look at the relationship between
14    gross and net revenues?
15  A.    Yes.
16  Q.    Now, if you could dig out Exhibit 304 which
17    is the revised and original MCP June '97
18    cheat sheets.  In Exhibit 304 the fiscal year
19    '97 average inpatient net revenue per
20    admission is $11,169; right?
21  A.    Yes.
22  Q.    And Exhibit 304 there is a footnote E which
23    explains that includes the $3 million general
24    reserve adjustment; right?
25  A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 684

1  Q.    Now, Exhibit --
2  A.    I'm sorry.  That's by the month of June, not
3    the average.
4  Q.    Right.  Okay.  That's listed for the month of
5    June.
6  A.    Correct.
7  Q.    Now, in Exhibit 312 there is the same fiscal
8    year '97 average in patient net revenue per
9    admission of $11,169; right?
10  A.    Yes.
11  Q.    And there is no footnote anywhere on the
12    schedule that would inform the reader that
13    there had been a use of reserves at MCP, is
14    there?
15  A.    No, that it wasn't there before either on the
16    average.
17  Q.    It was there by the monthly figure?
18  A.    That's correct.
19  Q.    Now, the next page in Exhibit 312 is the June
20    '97 cheat sheet for Elkins Park from the
21    Coopers & Lybrand production; right?
22  A.    Yes.
23  Q.    If we look back at Exhibit 306 the fiscal
24    year '97 average inpatient net revenue per
25    admission of $4,283 ties to the revised June

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 685

1    '97 cheat sheet; right?
2  A.    Yes.
3  Q.    But footnote F, which explains that there was
4    a $1 million use of reserves, isn't on the
5    version provided to Coopers & Lybrand; right?
6  A.    Again, no.  But it wasn't on the one before
7    either, not by the average.
8  Q.    If you could just skip ahead to the last page
9    of Exhibit 312.  See in the middle there is a
10    cheat sheet for the Graduate Hospital?
11  A.    Yes.
12  Q.    If we compare that one to the revised and
13    original Graduate Hospital cheat sheets we
14    marked as Exhibit 308, you'll see the $11,100
15    figure for fiscal year '97 average inpatient
16    net revenue per admission ties?
17  A.    Yes.
18  Q.    Here for the Graduate Hospital one of the
19    footnotes remains footnote G; right?
20  A.    Yes.
21  Q.    Which says Does not include $9.4 million HSI
22    deferred revenue?
23  A.    Right.
24  Q.    Do you believe that what you did with the
25    cheat sheet file before you provided to it

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 686

1    Coopers & Lybrand was that you went and
2    eliminated the monthly entries with their
3    associated footnotes?
4  A.    Yes, because they look at fiscal years, they
5    didn't look at the months.
6  Q.    Right.
7  A.    So that was probably that request is my
8    guess.
9  Q.    Coopers isn't auditing results for the months
10    of April, May or June?
11  A.    That's correct.
12  Q.    They are just auditing the annual AHERF
13    financial statements?
14  A.    Correct.
15  Q.    So they didn't need to know the information
16    about, for instance, inpatient net revenue
17    per admission for the particular months;
18    right?
19  A.    Correct.
20  Q.    They want to know what the yearly total was,
21    though?
22  A.    That's right.
23  Q.    Wouldn't you have thought, though, they would
24    still be interested in knowing the
25    information in the footnotes that there had

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

33 (Pages 683 to 686)

ROBIN R. SCHAFFER

Page 687

1  been millions of dollars in reserve
2  adjustments?
3  A.  I wasn't at the time thinking they didn't
4  know. I just gave them what they
5  specifically asked for.
6  Q.  But in the files that you gave them for each
7  of the DVOG hospitals here in Exhibit 312,
8  MCP, Elkins Park, Bucks County, St.
9  Christopher's and Hahnemann, there is no way
10  to tell from this file that there were
11  millions of dollars of uses of reserves to
12  increase net income; right?
13  A.  Right.
14  Q.  And you believed that this is the version
15  that you gave to Coopers; right?
16  A.  If it was on that diskette, most likely it
17  came from my audit directory. So I would say
18  yes, but I would have to look at my audit
19  directory to be sure. I don't know if they
20  did something. Maybe they deleted stuff
21  after I gave it to them. I don't know for
22  sure.
23        MR. RYAN: Let me mark as Exhibit 313
24  a version of the same file printed off of the
25  Coopers & Lybrand class system with Bates
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 688

1  numbers CL013380 through 84.
2        - - - -
3        (Deposition Exhibit 313 marked for
4  identification.)
5        - - - -
6  BY MR. RYAN:
7  Q.  I apologize. This is a little bit hard to
8  read. Except for certain additional notes
9  that have been placed on the version in
10  Exhibit 313, do you agree that the underlying
11  schedules in 312 and 313 are identical?
12  A.  Yes.
13  Q.  Now, if you could look at the note in the top
14  of the first page of Exhibit 313, do you see
15  it says, Per conversation with Robin
16  Schaffer, C & L notes that Dan Cancelmi and
17  Robin analyzed this gross net revenue
18  trend report to determine the rate variances
19  between months -- sorry -- to determine if
20  the rate variance between months for
21  inpatient and outpatient are consistent. For
22  rate fluctuate, Dan and Robin will
23  investigate the reason for the variance?
24  A.  Yes.
25  Q.  Is net -- is gross to net revenue trend
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 689

1  report -- is gross to net revenue trend
2  report the formal name for what we've been
3  calling the cheat sheets?
4  A.  It may be their formal name. Ours was the
5  cheat sheets.
6  Q.  So you and Dan just called it cheat sheets?
7  A.  Right.
8  Q.  Do you believe that you told someone from
9  Coopers & Lybrand the substance of what's
10  stated here in this note that we just read?
11  A.  That we analyzed -- specifically, no. But I
12  may have told them that we do review the
13  cheat sheets every month to look for unusual
14  variances or unusual trends, but I don't
15  specifically remember saying that as it's
16  worded here.
17  Q.  But if Kristen Heinlein had asked you what
18  this schedule was, why you had given it to
19  her, is this eventually the explanation you
20  would have provided her?
21  A.  Most likely I would have said that this is
22  used to summarize or highlight the months'
23  results, and it's used as an analytical tool
24  to determine if anything usual had gone on,
25  so most likely I would have said something
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 690

1  like that.
2  Q.  Do you remember Kristen Heinlein asking you
3  any questions about these cheat sheets in
4  Exhibits 312 and 313?
5  A.  No.
6  Q.  I take it you didn't volunteer to
7  Ms. Heinlein that included in the figures in
8  the cheat sheets were substantial reserves
9  from Graduate?
10  A.  No. Our normal procedure was to give them
11  what they asked for, and they would come to
12  us and ask specific questions, which they did
13  not.
14  Q.  Having looked at these various documents, do
15  you believe then that Exhibits 312 and 313
16  are the versions of the cheat sheets that we
17  previously marked as Exhibits 303 through 309
18  that you provided to Coopers & Lybrand?
19  A.  Yes.
20  Q.  And as we discussed before you gave the cheat
21  sheets to Coopers & Lybrand, you stripped out
22  the monthly information with the footnotes
23  explaining the adjustments including the
24  reserves from Graduate; right?
25  A.  Yes. Again, if this 312 is what was on the
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

34 (Pages 687 to 690)

ROBIN R. SCHAFFER

Page 691

1    diskette that I gave to Amy when she came
2    back in '98, I would say yes. I'm just not
3    100 percent who stripped out the months,
4    whether it was me or Coopers. If it was on
5    that disk, I did it.
6  Q.    Okay. So if Exhibit 312 is a printout from
7    that disk, then you would agree you're the
8    one who removed that information?
9  A.    Yes.
10 Q.    Before giving the schedule to Coopers &
11   Lybrand?
12 A.    Yes.
13       MR. RYAN: Let me mark, please, as
14   Exhibit 314 a nine-page unBates stamped
15   document that I obtained from the bankruptcy
16   trustee's repository from a box called
17   Schaffer B-24 with bar code K 85208.
18            - - - -
19       (Deposition Exhibit 314 marked for
20   identification.)
21            - - - -
22 BY MR. RYAN:
23 Q.    Do you recognize Exhibit 314, Ms. Schaffer?
24 A.    Vaguely, yes.
25 Q.    What is it?
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 692

1  A.    This looks like -- I'm just trying to
2    determine which account number I'm trying to
3    summarize here or someone is trying to
4    summarize. It's a trend from July '96 to
5    June '97 of what appears to be
6    contractual-type reserve adjustments for
7    inpatient and outpatient for MCP, EPPI, Bucks
8    County, Elkins Park, St. Christopher's and
9    Hahnemann.
10 Q.    Even though the schedule is headed for the
11   twelve months ending June 30, '97, do you
12   agree that it's only filled out through May
13   '97?
14 A.    Yes.
15 Q.    You don't recall providing this or any other
16   summary of inpatient/outpatient adjustments
17   to Coopers & Lybrand, do you?
18 A.    I can't even recall today putting this thing
19   together, so I'm not sure what I did it for.
20   I know it looks like something I would have
21   done, but I don't know what it's purpose was
22   for or when it was done or why. So I can't
23   say that I gave it to Coopers either.
24 Q.    If you could turn to the fifth page of the
25   exhibit, please, which is page for Elkins
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 693

1    Park. Do you see that four lines down under
2    the heading Other Adjustments there is a row
3    for transfer for Centennial?
4  A.    Yes.
5  Q.    Was the Centennial Bond Obligated Group the
6    name for the four former Graduate Health
7    System hospitals located in the Commonwealth
8    of Pennsylvania?
9  A.    Yes.
10 Q.    You see there is an entry there for May '97
11   of $1 million?
12 A.    Yes.
13 Q.    If you turn to the next page, which is the
14   schedule for St. Christopher's, do you see
15   there is also a row there for transfer of
16   reserves from Centennial?
17 A.    Yes.
18 Q.    And again there is a $1 million in May '97;
19   right?
20 A.    Yes.
21 Q.    If you turn two pages further on to the next
22   to last page of the exhibit you see there the
23   schedule for Hahnemann inpatient?
24 A.    Yes.
25 Q.    Do you see five lines down there is a row for
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 694

1    transfer of reserves from Centennial?
2  A.    Yes.
3  Q.    And there is a $5 million amount for May '97?
4  A.    Yes.
5  Q.    That's the same $7 million May portion of the
6    transfer of reserves into the DVOG hospitals
7    contractual allowance accounts that we
8    discussed previously; right?
9  A.    Yes.
10 Q.    And on this schedule those are called
11   transfer of reserves from Centennial; right?
12 A.    Yes.
13       MR. RYAN: Now, let me mark, please,
14   as Exhibit 315 a two-page unBates stamped
15   document which I got from Schaffer box B-15,
16   bar code K85197 in the repository.
17            - - - -
18       (Deposition Exhibit 315 marked for
19   identification.)
20            - - - -
21 BY MR. RYAN:
22 Q.    Now, this is a similar summary of inpatient,
23   outpatient adjustments for Bucks County but
24   with the results filled in through June '97;
25   right?
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

35 (Pages 691 to 694)

ROBIN R. SCHAFFER

Page 715

1    fiscal year '98?
2  A.    Yes. But we also are reclassing this charity
3    care piece which is a big reason why we are
4    showing so much less bad debt expense. So I
5    would have to say a big piece of the reason
6    I'm saying it was somewhat conservative is we
7    were probably reserving accounts that we now
8    believed who have been charity care June 30,
9    '97, which wouldn't have changed the bottom
10    line. It just would have changed the bad
11    debt portion of the financial statements.
12 Q.    And it would have changed the required bad
13    debt allowance as of June 30, '97?
14 A.    Right.
15 Q.    That is, it would have meant that you needed
16    $10 million or so less than you actually had?
17 A.    If this amount on this analysis is accurate,
18    which I'm sure at the time I believed it was,
19    yes, I would agree with that.
20 Q.    And you prepared the schedule on the second
21    page of Exhibit 319; right?
22 A.    Yes. I did prepare the. I just
23    can't remember the exact methodology for
24    calculating that reclass, and that may or may
25    not have been my idea of how it should have
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 716

1    been calculated. I just can't remember. It
2    could have been, but I don't know.
3        MR. RYAN: Let me mark, please, as
4    Exhibit 320 a document with Bates numbers
5    DRB-RS-0048 through 60.
6        - - - -
7        (Deposition Exhibit 320 marked for
8    identification.)
9        - - - -
10 BY MR. RYAN:
11 Q.    Do you recognize Exhibit 320, Ms. Schaffer?
12 A.    Yes.
13 Q.    What is it?
14 A.    This was a document that -- this first page
15    was a document that was prepared for
16    PricewaterhouseCoopers when they came back in
17    1998 to try to show PricewaterhouseCoopers
18    that they were aware of the $99 million
19    figure that had then surfaced, which I don't
20    think any of us had really quantified until
21    $99 until that time.
22        This was put together to show them
23    that they did know of $75 million of the 99
24    simply by looking at our summary or bad debt
25    roll forwards at June 30, '97, which are also
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 717

1    attached here.
2  Q.    Who prepared the schedule on the first page
3    of Exhibit 320?
4  A.    I did.
5  Q.    It's headed Amounts Per Attached Analyses
6    Provided to Auditors; correct?
7  A.    Correct.
8  Q.    Amounts of what?
9  A.    The issue with PricewaterhouseCoopers coming
10    back in in the fall of or summer of '98 was
11    that they were saying that they did not know
12    what this $99 million was. These amounts are
13    75 -- well, they are actually $71 million of
14    the $99 million that had surfaced at that
15    point in time.
16        This means that these amounts were
17    disclosed in footnotes on the June 30, '97
18    roll forwards is what this is saying, and
19    those roll forwards were provided to the
20    auditors.
21 Q.    But only $50 million of the $75,103,000 was
22    disclosed as transfer of reserves from
23    Graduate; right?
24 A.    Yes. Specifically on the roll forward in the
25    footnote, yes. That's because again of the
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 718

1    remaining $25 million, not all of it came
2    from Graduate. And I didn't take the time to
3    go through and break out that footnote
4    further.
5  Q.    So all you did to prepare this was simply to
6    go through and identify on the bad debt roll
7    forwards the totals of amounts disclosed as
8    reserves from Graduate plus amounts disclosed
9    as year-end shortfall adjustments?
10 A.    Correct.
11 Q.    As we have seen before, some of the year-end
12    shortfall adjustments came from Graduate and
13    other portions came from within DVOG; right?
14 A.    That's correct.
15 Q.    And some portions of the year-end shortfall
16    adjustment were expensed and other portions
17    weren't; right?
18 A.    That's correct.
19 Q.    And at least at Hahnemann Hospital I think we
20    saw before that the other column for June '97
21    is netted, so that you can't even tell what
22    portions of the totals, in fact, are
23    shortfall adjustments and what portions are
24    something else; right?
25 A.    I think the only thing other than that
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

41 (Pages 715 to 718)

ROBIN R. SCHAFFER

Page 719

1    $100,000 that's really netted in there is the
2    transfer between in and outpatient, which
3    doesn't really affect the total. But yes,
4    there is that million, 973 that went from in
5    to outpatient.
6        Other than that there was that other
7    $100,000 on that query that I don't remember
8    specifically what that was. But that was not
9    pulled out of here separately for some
10   reason. It was probably just missed.
11 Q.  So you would agree then that the documents
12   attached to the covering schedule in Exhibit
13   320 could not be said to disclose the $71
14   million in reserve transfers from Graduate,
15   just the $50 million; right?
16 A.  It's hard to answer that question because I
17   believed then that Coopers knew the $71
18   million. I believe that they knew the $71
19   million was from Graduate.
20       Just because a description on a
21   footnote follows a description on a journal
22   entry doesn't change the issue in my mind.
23   So if you're going to on the surface just say
24   because it doesn't say transfers from
25   Graduate, they didn't know about it, the

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 720

1    answer would be yes.
2        The fact that it was footnoted and
3    called a shortfall adjustment and I was under
4    the impression that they knew about the $71
5    million, my answer is going to be no. It
6    depends on who you're asking, I guess.
7 Q.  And you yourself never told anyone from
8    Coopers that an additional $21 million of
9    reserves had been transferred from Graduate
10   to DVOG bad debt allowance accounts, did you?
11 A.  No one from Coopers ever asked me about that
12   June footnote, so it was my impression that
13   they were very much aware of that just as
14   they were of the 50 because no one ever asked
15   me.
16 Q.  And you never told them; right?
17 A.  I never went into their room and said I need
18   to tell you something, there is another 21,
19   no. I didn't think I needed to do that.
20 Q.  And it's possible that they didn't ask you
21   because they didn't know?
22 A.  I would hope that they would want to know
23   what that is, and my impression is because
24   they didn't ask, they knew because it's a
25   very big amount of money, it's $21 million.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 721

1        So I am today under the impression --
2    I was then and I am now -- that they knew
3    what the $21 million was. But no, they did
4    not ever ask me and I did not ever tell them
5    specifically what it was.
6 Q.  And don't really know whether they really
7    knew or not, right?
8 A.  Other than inferring that they did, no.
9        MR. RYAN: Let's change for just one
10   minute, switch tapes.
11         - - - -
12   (There was a recess in the proceedings.)
13         - - - -
14       THE VIDEOGRAPHER: We are now going
15   off the record. The time on the screen is
16   1:53.
17         - - - -
18   (There was a recess in the proceedings.)
19         - - - -
20       THE VIDEOGRAPHER: We are now back on
21   the record. The time on the screen is 1:56.
22       MR. RYAN: Let me mark, please, as
23   Exhibit 321 a document with Bates numbers
24   DRB-RS-0072 through 85.
25         - - - -

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 722

1        (Deposition Exhibit 321 marked for
2    identification.)
3          - - - -
4 BY MR. RYAN:
5 Q.  Do you recognize Exhibit 321, Ms. Schaffer?
6 A.  Yes.
7 Q.  What is it?
8 A.  Again, this is something that was prepared
9    specifically for PricewaterhouseCoopers when
10   they came back in the summer of '98. The
11   first page is a summary of all of the
12   accounts that this $28.3 million was sitting
13   in our general ledger.
14       It shows what the balance was as of
15   May and what the balance was as of June, I
16   believe. Let me just make sure. I'm sorry.
17   This is actually not the balance. I think
18   this is the accounts where the 28.3 million
19   came from when we recorded the net income
20   adjustments in May and June.
21       The next page is an actual trial
22   balance for Graduate Hospital that shows what
23   these accounts would have looked like. This
24   one happens to be as of May 31, '97. Again,
25   it's the same accounts that were on --

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

42 (Pages 719 to 722)

ROBIN R. SCHAFFER

Page 747

```
 1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T
 2
        I, ROBIN SCHAFFER, have read the foregoing
 3  pages of my deposition given on Tuesday, July 23,
    2002, and wish to make the following, if any,
 4  amendments, additions, deletions or corrections:
 5  Page/Line  Should Read       Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
        In all other respects, the transcript is true and
20  correct.
21      _____
                ROBIN SCHAFFER
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2002.
24      _____
             Notary Public
25      AKF Reference No. Cg71172
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

49 (Page 747)

ROBIN R. SCHAFFER

Page 748

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                   WESTERN DISTRICT OF PENNSYLVANIA
 2
                            - - - -
 3
      THE OFFICIAL COMMITTEE OF      )
 4    UNSECURED CREDITORS OF         )
      ALLEGHENY HEALTH, EDUCATION &  )
 5    RESEARCH FOUNDATION,           )
                                     )
 6                    Plaintiff,     )
                                     )
 7                    -vs-           )      Civil Action
                                     )      No. 00-684
 8    PRICEWATERHOUSECOOPERS, L.L.P. )
                                     )
 9                    Defendant.     )
10
11                          - - - -
12                        VOLUME IV
          VIDEOTAPE DEPOSITION OF:  ROBIN R. SCHAFFER
13
                            - - - -
14
15            DATE:    October 3, 2002
                       Thursday, 9:00 a.m.
16
17            LOCATION:  MANION McDONOUGH & LUCAS
                         14th Floor, USX Tower
18                       Pittsburgh, PA  15219
                         412-232-0200
19
20            TAKEN BY:  Plaintiff
21
              REPORTED BY:  JoAnn M. Brown, RMR
22                          Notary Public
                            AKF Reference No. JB72334
23
24
25
```

ROBIN R. SCHAFFER

Page 829

1  A.  Yes.
2  Q.  To provide information in response to requests?
3  A.  Yes.
4  Q.  Is it your belief that information was provided
5      to Coopers & Lybrand in response to any
6      requests they made to members of the general
7      accounting staff?
8  A.  Yes.
9  Q.  Did you -- if Coopers & Lybrand made a request
10     to you for information, before you would turn
11     the information over, did you have to clear it
12     with anybody?
13 A.  No.
14 Q.  So there wasn't some mandate or order that
15     said, well, before you give any information to
16     Coopers, somebody else has to see it?
17 A.  No.
18 Q.  Would it be fair then to say that Coopers had
19     complete access to any information they wanted
20     from the general accounting staff?
21 A.  Yes.
22     MR. RYAN:  Objection.
23 Q.  Do you have any reason to believe, as you sit
24     here today, that members of the general
25     accounting staff tried to keep information from

Page 830

1      Coopers?
2  A.  I would say it's the complete opposite.
3  Q.  And what does that mean?
4  A.  We probably, from my experience, provided
5      Coopers with more information than any other
6      audit I've ever seen.  We went to them and told
7      them there was problems with billing, which
8      I've never seen that done before in any other
9      audit I've been part of.
10 Q.  When you went to Coopers and told them that
11     there was problems with billing, what -- first
12     of all, who did you bring that -- to whom's
13     attention did you bring the problems with
14     billing?
15 A.  Normally, it was Amy Frazier.
16 Q.  And what would you have told Amy Frazier were
17     the problems with billing?
18 A.  The accounts at gross, issues like that.  I
19     mean, things that are telling the auditors that
20     you have problems with your financial
21     statements.  You've got accounts that aren't
22     being contractualized.  You've got accounts
23     that aren't being collected.  You've got a
24     patient account department that's not
25     cooperating with general accounting, and

Page 831

1      they're not disclosing information even to us
2      sometimes, and things like that, letting them
3      know that they need to go over to patient
4      accounting and find out what's going on.
5  Q.  And what was Amy Frazier's reaction when you
6      told her this, about the problems you were
7      having with billing?
8  A.  I believe she was concerned about it, because
9      she did -- like I said, Coopers did have that
10     special audit done which was very unusual.
11 Q.  And when was that special audit?
12 A.  I believe that had to have been -- it was some
13     time -- it was a result of the '96 audit, so it
14     was some time in probably around the June, July
15     '96 time frame or thereafter.  I don't remember
16     exactly.
17 Q.  Would you have told Amy Frazier on more than
18     one occasion about the problems that you
19     perceived existed with billing?
20 A.  Normally, because that was what I dealt with
21     was receivables, any time I would talk to Amy
22     about receivables, issues would come up, and I
23     would talk about problems I was having with
24     patient accounting or just things in general
25     that I had concerns about.  So it was a very

Page 832

1      open discussion normally about the issues with
2      patient accounting between Amy and myself.
3  Q.  And the issue with billing was -- I take it
4      that was a chronic problem?
5  A.  Yes.
6  Q.  So, in other words, this is something that you
7      would talk with Amy over a period of the
8      various audit years, is that right?
9  A.  That's correct.
10 Q.  I want to look at some exhibits if we could.
11     First of all, let's take a look at Exhibit 289.
12     Ms. Schaffer, in particular, we're
13     going to be talking about Schedules L and M on
14     289, but before we do, and just for the purpose
15     of the record, can you explain to me what
16     Exhibit 289 is?
17 A.  Yes.  This is Bucks County's bad debt
18     calculations for June 30, 1997, and the last
19     two pages are the roll-forwards of the bad debt
20     allowance account for in and outpatient for
21     Bucks County.
22 Q.  So if we look at Schedule L, that is the
23     summary of reserves for bad debt, is that
24     correct?
25 A.  Yes.

22 (Pages 829 to 832)

ROBIN R. SCHAFFER

Page 833

1   Q.   And it shows -- runs for a period of time July
2        through June, is that right?
3   A.   Yes.
4   Q.   And if we -- the first column is the beginning
5        balance, is that correct?
6   A.   Yes.
7   Q.   And then the second column is what?
8   A.   The second column is the actual write-offs that
9        patient accounting would initiate through their
10       area actually taking an account and writing it
11       off to bad debt.
12  Q.   And then the recovery column means what?
13  A.   Those are accounts that had been written off to
14       bad debt that are later collected and put back
15       into the bad debt allowance.
16  Q.   Then there's a column other, is there not?
17  A.   Yes.
18  Q.   And to identify the other, there are footnotes
19       that the reader would then have to go down and
20       read the footnotes, right?
21  A.   Yes.
22  Q.   So if we look at the entry for June under the
23       other column, we see there's a $2.9 million
24       entry, right?
25  A.   Yes.

Page 834

1   Q.   And to understand what the $2.9 million entry
2        is, you have to go to Footnote I, is that
3        right?
4   A.   Correct.
5   Q.   And if we go down to Footnote I, it recites
6        that it includes ($59,000) shortfall
7        adjustment, is that correct?
8   A.   Yes.
9   Q.   Now, do I take it that what has been marked as
10       Exhibit 289 and, in particular, this Schedule
11       L, this is a document that was provided to
12       Coopers & Lybrand?
13  A.   Yes.
14  Q.   Did anybody from Coopers & Lybrand come back
15       and ask you to provide information as to what
16       was meant by the shortfall adjustment?
17  A.   No.
18  Q.   Now, looking at paragraph -- or Footnote I, it
19       says, $3,008,000 bad debt reserve reclass.  Do
20       you see that?
21  A.   Yes.
22  Q.   Did anybody from Coopers make inquiry as to
23       what meant by that?
24  A.   No.
25  Q.   Did anybody from Coopers ask you to explain the

Page 835

1        other column and, in particular, the $2.9
2        million entry?
3   A.   No.
4   Q.   Did anybody from Coopers ever indicate to you
5        that they didn't understand Footnote I or the
6        $2.9 million other entry?
7   A.   No.
8   Q.   If we look over there, there's a note, correct?
9   A.   Yes.
10  Q.   And that actually -- that's not a note you put
11       on the schedule, is it?
12  A.   No.
13  Q.   That's a Coopers & Lybrand note, is that right?
14  A.   Yes, it is.
15  Q.   And the note indicates that AHERF is recording
16       the bad debt allowance according to the new
17       methodology developed in fiscal year '97 by Dan
18       Cancelmi and Robin Schaffer.  Do you see that?
19  A.   Yes.
20  Q.   And that new methodology is what we talked
21       about earlier, is it not?
22  A.   Yes.
23  Q.   The loss percentage figures that Mr. Cancelmi
24       came up with in July, August, September of
25       1996?

Page 836

1   A.   Yes.
2   Q.   Let's turn over, if we could, to the next page
3        which is Schedule M, and, again, this is a
4        summary of reserves for Bucks County, is it
5        not?
6   A.   Yes.
7   Q.   Whereas, Schedule L related to inpatient, this
8        relates to outpatient, doesn't it?
9   A.   Yes.
10  Q.   And, again, it's the reserves for bad debt,
11       right?
12  A.   Yes.
13  Q.   And like Schedule L, it has an other column,
14       does it not?
15  A.   Yes.
16  Q.   And if we look under the other column for the
17       June entry, there appears to be an entry for
18       $4.5 million, right?
19  A.   Yes.
20  Q.   And in order to understand what that entry is,
21       where do you have to turn to?
22  A.   To Footnote H.
23  Q.   And what does Footnote H -- well, let me change
24       that.
25            Footnote H provides that it includes

23 (Pages 833 to 836)

ROBIN R. SCHAFFER

Page 989

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3      I, JoAnn M. Brown, RMR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  ROBIN R. SCHAFFER, was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 7th day of
23 October, 2002.
24
25 _____
                Notary Public

Page 990

1  COMMONWEALTH OF PENNSYLVANIA )    E R R A T A
   COUNTY OF ALLEGHENY        )    S H E E T
2
       I, ROBIN R. SCHAFFER, have read the foregoing
3  pages of my deposition given on Thursday, October 3,
   2002, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21
   _____
22          ROBIN R. SCHAFFER

   Subscribed and sworn to before me this
23 _____ day of _____, 2002.
24 _____
          Notary Public
25 AKF Reference No. JB72334

MANHATTAN REPORTING CORP., a LegaLink Company

Scharf Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## JOSEPH  SCHARF
*March 25, 2003*

---

## MANHATTAN REPORTING CORP.
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX:  212-692-9171


**SCHARF, JOSEPH**