JOSEPH SCHARF

Page 82

1       intermediaries doing the audits beforehand.
2       We had just taken over doing these cost
3       reports. We had not been audited. They had
4       not been final settled, and for me to say,
5       well, there is a credit balance here, yes,
6       that's probably all income, no, I couldn't do
7       that. I would have no way of knowing it.
8   Q.    If you had a specific concern about an
9       account, and it was not -- did not amount to
10      the entirety of the tentative settlement,
11      would you be able to say that part of the
12      amount you received is a tentative
13      settlement?
14   A.    Yes.
15   Q.    Now, you mentioned that you worked with
16      Coopers & Lybrand reviewing the reserves in
17      the CRA accounts; is that correct?
18   A.    As I recall, they had one of the auditors
19      come in, and we gave them all the
20      correspondence that we received during that
21      fiscal year, so we gave them -- there was
22      settled cost reports. We would give them the
23      settlement work papers. We would give them
24      the tentative settlements if the rates were
25      changed during the years they received those,

Page 83

1       all the correspondence that came through.
2       We had a separate file that we gave
3       that to them. They reviewed that with their
4       analysis of the account, and they came back
5       and asked questions in regards to that.
6       The auditor then referred it to the
7       manager. The manager had certain questions,
8       and it went up to I guess it was the senior
9       manager for any final questions.
10   Q.    So initially it was a lower level auditor who
11      came in and met with you who you gave all
12      this information to?
13   A.    Yes.
14   Q.    And then they would come back and ask you
15      whatever questions they had?
16   A.    Yes.
17   Q.    And when they asked you those questions,
18      would you convey to them any information that
19      you believe to be relevant about the
20      accounts?
21   A.    Yes.
22   Q.    And you said a manager came in. Do you
23      recall if the manager's name in fiscal year
24      '97 was Duane Jirol?
25   A.    I'm sure it was.

Page 84

1   Q.    Mr. Jirol was a specialist in this area; is
2      that right?
3          MR. TORBORG: Objection.
4   A.    Yes.
5   Q.    How long have you known Mr. Jirol?
6   A.    I believe he came to Blue Cross, started --
7      met him at Blue Cross.
8   Q.    When you were at Blue Cross?
9   A.    Yes.
10   Q.    Was he in the same field as you?
11   A.    Yes.
12   Q.    And then again you interacted with him at
13      AHERF when he was working at Coopers &
14      Lybrand?
15   A.    Yes.
16   Q.    And he would come in for a couple days every
17      year to discuss the report, your CRAs with
18      you after you had given this information to a
19      lower level auditor; is that correct?
20   A.    Well, he never came in and talked to me for a
21      couple of days. He came in and talked to me
22      for a short period of time.
23   Q.    Okay.
24   A.    He had reviewed what the auditors --
25      supposedly he reviewed what the auditors had

Page 85

1       done, and what questions he had he met with
2       me to go over those. That was all. It
3       wasn't -- we did not sit down for a couple of
4       days and go over this.
5   Q.    Okay. So he would ask you what questions he
6      had after having reviewed the body of
7      information which you had given to Coopers &
8      Lybrand?
9   A.    Yes.
10   Q.    And once he had asked you these questions, he
11      and Coopers & Lybrand would come to their own
12      independent conclusions on the CRAs; is that
13      correct?
14          MR. TORBORG: Objection.
15   A.    I never got anything, any further feedback
16      from them what they did.
17   Q.    Okay. So you never met with them to finalize
18      conclusions or to hear what their final views
19      are on the CRA accounts?
20   A.    No.
21   Q.    Do you know if Mr. Jirol had any questions
22      regarding the CRAs if he ever consulted with
23      Amy Frazier?
24   A.    Amy was the manager on the job. She was
25      running the jobs, as I recall, and I'm sure

JOSEPH SCHARF

Page 86

1     he did.
2  Q.   Did you ever meet with Amy Frazier during the
3     fiscal year '97 audit?
4  A.   I believe one of the years I met with her.
5  Q.   Did you discuss the CRAs?
6  A.   Yes.
7  Q.   Do you recall what you discussed with her?
8  A.   No.
9  Q.   Do you recall doing any work with Brian
10     Christian?
11  A.   Yes.
12  Q.   Who is Brian Christian?
13  A.   Brian Christian was the auditor that, as I
14     recall, when I was on the job for a couple of
15     years. At least I know the first or second
16     year, first and second year he was the one
17     that did all the preliminary workup on the
18     CRA accounts.
19  Q.   Do you recall if Dana Bleckman ever did a
20     similar job as Mr. Christian?
21  A.   That name doesn't ring a bell at all.
22     MR. LUFT: I'd like to like to mark
23     as Deposition Exhibit 312 a document
24     that's --
25     MR. TORBORG: 1312. You said 312.

Page 87

1     MR. LUFT: 1312. My mistake, CAN DEP
2     01343 through 01354.
3     - - - -
4     (Exhibit 1312 marked for identification.)
5     - - - -
6  Q.   Take a minute and review the document.
7  A.   ((Witness reviews document.)
8  Q.   Do you recognize this document?
9  A.   It looks like a standard memo that went out
10     before Coopers come in to do their audit.
11  Q.   And you were copied on this document;
12     correct?
13  A.   Yes.
14  Q.   If you could turn to page 3, which is Bates
15     numbered CAN DEP 01347. Do you see the
16     section in the middle of the page entitled
17     Patient Accounts Receivable Including CRA/
18     Professional Fee Revenue?
19  A.   Yes.
20  Q.   And the section continues on to the next
21     page; correct?
22  A.   Yes.
23  Q.   Can you turn to the next page, page 4. I
24     think it's bullet points four points down.
25     It states, Provide a summary of CRA activity

Page 88

1     at March 31, 1997 and updated through
2     June 30, 1997. Summary should include
3     beginning balances, cash receipts, cash
4     payments, other activity and ending balances;
5     is that correct?
6  A.   Yes.
7  Q.   Were you responsible for making sure that
8     this information was provided to Coopers &
9     Lybrand during the fiscal year '97 audit?
10  A.   I can't recall.
11  Q.   Do you recall anyone else who may have been
12     responsible for this?
13  A.   If it was asked I would have been the one to
14     have furnished it.
15  Q.   Do you know if this information was provided
16     to Coopers & Lybrand?
17  A.   I imagine so.
18  Q.   Do you have any reason to believe it wasn't?
19  A.   No.
20  Q.   I think the next bullet point states, Analyze
21     ending CRA balances for all open years. This
22     should include the current year estimate. Do
23     you know if this information was provided to
24     Coopers & Lybrand?
25  A.   I'm not sure in some cases we really had a

Page 89

1     lot of documentation to furnish them. We
2     could tell them what the activity was, so in
3     cases where in '97, basically what we talked
4     about earlier, we didn't have anything per
5     '95 or '96 because the years were not audited
6     or final settled. So it was based on, well,
7     here's the documentation we received from the
8     third-party payors, and there is nothing, no
9     activity for those years, so beginning
10     balance and ending balance for most cases
11     remained the same.
12  Q.   Did you have reason to believe that the
13     analysis, the ending CRA balances for all
14     open years was not provided to Coopers &
15     Lybrand?
16  A.   It wouldn't have changed. I mean, it would
17     have been carried forward from year to year
18     if they were open.
19  Q.   But you would have provided them with the
20     information you had; correct?
21  A.   Maybe just verbally from the point of this
22     was the same as it was last year. There was
23     nothing to give them.
24  Q.   In all cases where you actually had some
25     documentation, though, you gave that over to

23 (Pages 86 to 89)

JOSEPH SCHARF

Page 226

1   COMMONWEALTH OF PENNSYLVANIA   )     E R R A T A
    COUNTY OF ALLEGHENY           )     S H E E T
2

3       I, JOSEPH SCHARF, have read the forgoing pages
    of my deposition given on Tuesday, March 25, 2003,
4   and wish to make the following, if any, amendments,
    additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change

6

7

8

9

10

11

12

13

14

15

16

17

18

19
    In all other respects, the transcript is true and
20  correct.

21     _____
              JOSEPH SCHARF
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
           Notary Public
25       AKF Reference No. Cg74731

MANHATTAN REPORTING CORP., A LegaLink Company

Schrecengost Dep.

DIANE SCHRECENGOST

Page 212

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF PENNSYLVANIA
 2
                            - - - -
 3
    THE OFFICIAL COMMITTEE OF        )
 4  UNSECURED CREDITORS OF           )
    ALLEGHENY HEALTH, EDUCATION &    )
 5  RESEARCH FOUNDATION,             )
                                     )
 6                Plaintiff,         )
                                     )
 7             -vs-                  )    Civil Action
                                     )    No. 00-684
 8  PRICEWATERHOUSECOOPERS, L.L.P.   )
                                     )
 9                Defendant.         )
10
11                        - - - -
12                      VOLUME II
13     VIDEOTAPE DEPOSITION OF:  DIANE SCHRECENGOST
14                        - - - -
15
                  DATE:    November 8, 2002
16                         Friday, 9:00 a.m.
17
                  LOCATION:  MANION McDONOUGH & LUCAS
18                           14th Floor, USX Tower
                             Pittsburgh, PA  15219
19                           412-232-0200
20
                  TAKEN BY:   Defendant
21
22                REPORTED BY:   JoAnn M. Brown, RMR
                                 Notary Public
23                               AKF Reference No. JB72791
24
25
```

DIANE SCHRECENGOST

Page 217

1   A.   I don't. I don't remember.
2   Q.   Do you remember whether AHERF used similar
3        acquisition corporations in any of the previous
4        acquisitions?
5   A.   I don't remember.
6   Q.   Do you know who handled the legal structuring
7        of the Graduate transaction for AHERF?
8   A.   I don't know. I don't even know if it would
9        have been in-house legal or out-of-house legal.
10              MR. RYAN: Let me mark, please, as
11       Exhibit 807 a document with Bates Nos. DBR DKS
12       22402 through 422.
13              - - - -
14       (Deposition Exhibit 807 marked for
15       identification.)
16              - - - -
17  BY MR. RYAN:
18  Q.   Do you recognize Exhibit 807,
19       Mrs. Schrecengost?
20  A.   It's a checklist, like a program for the
21       conduct of the due diligence for the Graduate
22       acquisition.
23  Q.   Did you prepare this checklist?
24  A.   Yes. It would have been carried forward from
25       previous analyses.

Page 218

1   Q.   So you had experience from the past
2        acquisitions as to what items ought to be on
3        the checklist?
4   A.   We used the same checklist for acquisitions
5        tailoring it a little bit if the candidates had
6        different kinds of operations.
7   Q.   All right. And if I understand how this
8        document works, in the left on each page under
9        the heading Area is a listing of the area into
10       which you were doing due diligence, is that
11       right?
12              MR. JONES: Object to form.
13  A.   It may represent an area that would be looked
14       at or documents to be produced or -- it
15       includes both documents and topics.
16  Q.   All right. What is the significance of the
17       series of columns in the middle where it says
18       produced by?
19  A.   That would be who was supposed to supply the
20       information, where would we get the information
21       from.
22  Q.   And who is GCO?
23  A.   I don't think it's a person. I'm not sure, but
24       I think it may be general counsel's office.
25  Q.   Would that refer to the Graduate Health System

Page 219

1        general counsel's office?
2   A.   I would think so. They would have to produce
3        the information about their organization.
4   Q.   The next column under the heading Produced By
5        states DDL. Do you know who that is?
6   A.   I don't know who or what that means. I can't
7        even think of who that might be.
8   Q.   All right. Then over on the right is a section
9        headed Reviewed By, is that right?
10  A.   Yes.
11  Q.   And then the first column underneath there says
12       FL. Do you know who that is?
13  A.   That would be Foley & Lardner.
14  Q.   And that was an outside law firm that AHERF and
15       SDN used, is that right?
16  A.   They're an -- yeah, they're an outside law firm
17       who participated in the review.
18  Q.   Then the next column is C&L. Is that Coopers &
19       Lybrand?
20  A.   Yes, it is.
21  Q.   Then the next column is DBR. Do you know who
22       that is?
23  A.   That's Drinker Biddle & Reath.
24  Q.   All right. Then there's a column headed Other,
25       and there are some entries in this column. Let

Page 220

1        me refer you to page 10 of the document. Do
2        you see there there's an entry that reads
3        TLHST?
4   A.   Yes.
5   Q.   Do you know who that is?
6   A.   Tillinghast is their name. There might be
7        other names in it, but that's Tillinghast to
8        me.
9   Q.   And they're an actuarial firm?
10  A.   I don't know. I don't know.
11  Q.   If you could turn then, please, to page 12, do
12       you see that along with some more entries for
13       Tillinghast, there's an entry that reads HM?
14  A.   Yes.
15  Q.   Do you know who that is?
16  A.   Honigman Miller.
17  Q.   I think you mentioned them yesterday. They're
18       a law firm?
19  A.   I think they are.
20  Q.   If you could turn to the next page, please,
21       page 13, along with some more listings for
22       Tillinghast and Honigman Miller, there's a
23       listing -- well, two listings, actually, for
24       MN?
25  A.   Yes.

3 (Pages 217 to 220)

DIANE SCHRECENGOST

Page 221

1  Q.  Do you know what that is?
2  A.  Marsh McLennan. I don't know if I'm saying
3     that right.
4  Q.  They're an insurance specialist?
5  A.  They reviewed insurance-type areas. I don't
6     know exactly what their business is.
7  Q.  If you could turn to page 15, please, do you
8     see that there are half a dozen entries there
9     for SPEC. Do you know what that is?
10 A.  I can't think of the firm name. I can only
11    think that it's short for some specialist or --
12    I don't know. I can't remember.
13 Q.  All right. Well, this seems to be in the
14    environmental compliance section?
15 A.  Yes.
16 Q.  So apparently AHERF and SDN retained some sort
17    of outside environmental specialist?
18 A.  I don't remember.
19 Q.  And the last column under the Reviewed By
20    heading says MGMT. Is that management?
21 A.  That would have been some internal Allegheny
22    persons or person.
23 Q.  All right. So if there's an X in the due
24    diligence checklist in the management column
25    and not in any of the columns for the external

Page 222

1     reviewers, does that mean that that aspect of
2     due diligence was handled by a member of
3     management of the Allegheny system?
4         MR. JONES: Object to form and
5     foundation.
6  A.  There would have been several iterations of this as
7     the due diligence project would be kicked off.
8     I don't know if this is a final or an interim
9     version of it, but at least at the time of this
10    checklist, that would have meant that it was
11    planned that someone from management would
12    review that document or that area.
13 Q.  Were there, in connection with the Graduate
14    acquisition, due diligence meetings held?
15 A.  There were meetings of the team, yes.
16 Q.  And were they out in Philadelphia?
17 A.  Yes.
18 Q.  Who attended those meetings?
19 A.  My recollection is that representatives of
20    these firms attended and internal people.
21 Q.  Do you remember who from Foley & Lardner
22    attended those meetings?
23 A.  I worked with different people on different
24    things. It's hard to remember who worked on
25    what. I'm not sure, but it may have been Paul

Page 223

1     Cooney.
2  Q.  Do you remember who from Coopers & Lybrand
3     attended those meetings?
4  A.  I remember sometimes Bill Buettner did. I
5     don't know if he was the only one or if he was
6     there every time.
7  Q.  Do you remember anybody else from Coopers?
8  A.  No, not specifically.
9  Q.  Do you remember who attended from Drinker,
10    Biddle & Reath?
11 A.  I think Amy Davis.
12 Q.  Going back from when we went to Foley &
13    Lardner, did Bob Zimmerman attend these
14    meetings?
15 A.  He's one of the people that I know from
16    other -- from a lot of projects, and I don't
17    remember whether it was Paul or Bob or both.
18 Q.  How about Becky Serafini?
19 A.  I remember the name, but I can't -- I mean, I
20    can't picture a face, so I'm not sure if I've
21    ever met Becky. I remember the name.
22 Q.  How frequently were these meetings of the due
23    diligence team held?
24 A.  I don't know. A lot of these people were from
25    other locations, and I don't remember whether

Page 224

1     they were as-needed or regularly scheduled. I
2     don't remember.
3  Q.  What sorts of topics were discussed at these
4     meetings?
5  A.  I remember people saying the status of what
6     they had -- where they were or what they had
7     reviewed, and in case there was any need for
8     cross-knowledge sharing, that would be the
9     forum for that to occur in.
10 Q.  Did the team at these meetings go through this
11    due diligence checklist?
12 A.  I don't think so. Everybody had it and knew
13    what their pieces of it were.
14 Q.  Were there at these meetings discussions about
15    whether or not AHERF should proceed with the
16    transaction?
17 A.  This group was not the decision-making body.
18    This group was charged with seeing what all of
19    this information disclosed. This was not a
20    group that was doing any review of upside
21    potential or anything like that, so it wouldn't
22    have been appropriate for this group to make a
23    decision. There were other factors not part of
24    this forum that would be needed to make a
25    decision on yes or no or good idea, bad idea.

4 (Pages 221 to 224)

DIANE SCHRECENGOST

Page 225

1  Q.  To whom did the due diligence group report its
2     findings?
3  A.  There were written reports prepared. They were
4     actually like tabbed binders, and they were
5     given to senior management at AHERF. I don't
6     know where else they may have gone.
7  Q.  And when you say senior management, whom do you
8     have in mind?
9  A.  Mr. Abdelhak, Nancy Wynstra, Mr. McConnell.
10  Q.  Do you know whether any of the due diligence
11     reports were provided to the AHERF board?
12  A.  I didn't give them any of them, so I don't know
13     that.
14  Q.  Did any members of the AHERF board ever ask you
15     any questions about how the Graduate due
16     diligence was going?
17  A.  No. All things considered, I was pretty low on
18     the totem pole. I don't remember.
19  Q.  But you were in charge of coordinating Graduate
20     due diligence, right?
21  A.  Yes. We had a due diligence area. We had file
22     cabinets. We had files that matched these
23     captions.
24  Q.  Who besides you from within Allegheny attended
25     these due diligence meetings associated with

Page 226

1     the Graduate acquisition?
2  A.  Dwight Kasperbauer. He was in charge of human
3     resources. I think Steve Spargo. He was in
4     finance. Dave McConnell. Anne Kelly. I don't
5     know whether to consider her AHERF or Graduate,
6     but she was from Graduate and eventually stayed
7     on and worked for AHERF. Nancy Wynstra.
8     Possibly Bob McNair. I'm not certain on Bob,
9     but -- I don't think everybody was at every
10     meeting. I don't think scheduling permitted
11     that.
12  Q.  Do you remember anybody from the finance
13     department besides Mr. McConnell and Mr. Spargo
14     being at these meetings?
15  A.  Possibly Dan Cancelmi.
16  Q.  Did anything come up at any of the due
17     diligence meetings that gave you concern about
18     whether AHERF should be proceeding with the
19     acquisition?
20  A.  I didn't view that as, you know, my call to
21     make. Problems or issues that would have been
22     identified by anybody would be discussed, yes.
23     Whether any of them constituted a deal breaker
24     was not my judgment call.
25  Q.  Do you remember any particular problems or

Page 227

1     issues associated with the acquisition of
2     Graduate entities?
3  A.  Truthfully, I can only remember like one
4     meeting. As you're asking who's attending, I'm
5     trying to go around the table and picture who's
6     there.
7        For some reason, the only thing I can
8     remember is employee benefit items that Amy
9     Davis talked about. I don't know if they were
10     reporting failures or -- it's such a long time
11     ago.
12  Q.  Was employee benefits an area for which
13     Drinker, Biddle & Reath had particular
14     responsibility?
15  A.  I think so. That was Amy Davis' expertise.
16  Q.  And that's confirmed if we look, I think, at
17     pages 10 to 11 of Exhibit 807? There are a
18     bunch of X's in the Drinker, Biddle & Reath
19     column there?
20  A.  That's what Amy Davis' specialty was.
21  Q.  Do you remember any of the details of what
22     these employee benefit issues were?
23  A.  It seems to me that they were mostly issues of
24     compatibility and, you know, if you have to
25     terminate a plan, what that means and move

Page 228

1     people into another plan. There may have been
2     some reporting, like compliance reporting
3     deficiencies. A lot of this same team worked
4     on other due diligence projects together, and
5     they kind of mix in my head. There were other
6     due diligence initiatives going on at the same
7     time as Graduate in Western Pennsylvania.
8  Q.  Such as the Forbes Health System?
9  A.  Yes.
10  Q.  And Allegheny Valley Hospital?
11  A.  Yes.
12  Q.  Do you remember anybody, whether it be in these
13     due diligence meetings or in some other forum,
14     raising with you any concerns about proceeding
15     with the Graduate acquisition?
16  A.  In any kind of a formal way, no.
17  Q.  How about in an informal way?
18  A.  Not particularly. I mean, it was going to be a
19     lot of work for everybody. In conversation,
20     somebody may have said, you know, I wish we
21     wouldn't do this, but I don't think that's what
22     you mean.
23  Q.  You don't remember anybody ever saying if they
24     thought this was a bad acquisition for AHERF?
25  A.  That's not my decision to make. You know, that

5 (Pages 225 to 228)

DIANE SCHRECENGOST

Page 357

1  Q.   And the memo is copied to them with an
2       attachment, right?
3  A.   Yes.
4  Q.   Apart from Mr. Abdelhak, Mr. Dionisio,
5       Dr. Kaye, Mr. Morrison and Ms. Harrington, are
6       you aware of anybody outside AHERF's internal
7       audit department who received a copy of the
8       special billing project report marked as
9       Exhibit 796?
10 A.   I don't remember.  I don't remember.  Without
11      some kind of trigger, I don't know.
12              MR. RYAN:  I have nothing further.
13      Thank you.
14              THE WITNESS:  Oh, thank you.
15              MR. JONES:  And I have nothing as
16      well.
17              THE WITNESS:  Thank you.
18              THE VIDEOGRAPHER:  With there being
19      no further questions, this deposition is
20      concluded at 1:57.
21              - - - -
22      (The proceedings were concluded at 1:57 p.m.)
23              - - - -
24
25

Page 358

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )  SS:
3      I, JoAnn M. Brown, RMR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  DIANE SCHRECENGOST, was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13      I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17      I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 12th day of
23 November, 2002.
24      _____
25              Notary Public

Page 359

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY        )   S H E E T
2
       I, DIANE SCHRECENGOST, have read the foregoing
3  pages of my deposition given on Friday, November 8,
   2002, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21      _____
              DIANE SCHRECENGOST
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2002.
24 _____
              Notary Public
25 AKF Reference No. JB72791

MANHATTAN REPORTING CORP., a LegaLink Company

**Schwartz Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *JAMES SCHWARTZ*
### *March 11, 2005*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### PH: 212-557-7400 / FAX: 212-692-9171

**SCHWARTZ, JAMES - Vol.**



JAMES SCHWARTZ

Page 50

1   about?
2       A   It is.
3       Q   I'm just curious.  Who is the publisher
4   of the book?
5       A   Publisher of the book was Jossey-Bass.
6   They're no longer a separate house.  I think
7   they've been merged a couple of times.  The
8   royalty checks changed names several times.  They
9   weren't so big, but they changed names.
10      Q   And what kind of -- at the time that the
11  book was published, what -- what kind of a
12  publishing house was Jossey-Bass?
13      A   They were a publishing house that I was
14  told published in this area, and somebody on our
15  behalf contacted them.  And they said they were
16  interested, and so we chatted with them about it.
17      Q   In the area of corporate governance?
18      A   In the area of corporate governance and
19  health care generally.
20      Q   As far as you can tell, they are a
21  reputable publisher?
22      A   I certainly think so.
23      Q   Do you know what kind of standards they
24  had for their authors?

Page 51

1       A   No, I don't.
2       Q   Do you know of any other publishing
3   houses that publish in the field of corporate
4   governance and health care?
5       A   At the time the -- the American Hospital
6   Association had a -- a publishing arm I think, and
7   I believe we talked to somebody there as well.
8   They were interested in publishing.
9       Q   And -- I'm sorry?  They were interested
10  in publishing this book?
11      A   They were interested in publishing as
12  well.
13      Q   So -- and you chose between the two of
14  them?
15      A   That's correct.
16      Q   Any others other than Jossey-Bass and the
17  American Hospital Association?
18      A   I don't remember any.
19      Q   Okay.  I'm just curious.  If you open the
20  front flap.
21      A   Mm-hmm.
22      Q   Look at the flap.
23      A   Mm-hmm.
24      Q   Do you recall who wrote the paragraphs on

Page 52

1   the front flap whether that's something that you
2   as the author wrote or the publisher put there
3   or -- or what?
4       A   I don't recall.
5       Q   If you look at the last paragraph on that
6   front flap there --
7       A   Mm-hmm.
8       Q   -- it describes you and your co-author,
9   Mr. -- Mr. Horn --
10      A   Mm-hmm.
11      Q   -- as "The nation's leading experts in
12  the health care conversion field."
13      A   Mm-hmm.
14      Q   Closed quote.
15  I take it that's something that you would
16  agree with?
17      A   Well, we would try to be more humble than
18  that, but we think we're very well-qualified in
19  the area.
20      Q   So it may be the publisher who put that
21  there?
22      A   That might very well be.
23      Q   Okay.  And you're confident in the
24  publisher's ability to check what they put on

Page 53

1   their flaps?
2       MS. MEADEN:  Objection.
3       THE WITNESS:  I don't know the answer to that.
4   I -- I'm assuming that as I read that that it says
5   we did this in clear and concise nonlegal
6   language.  I hope that's true.  That's what we
7   were trying to do.
8       Q   And your understanding, I take it, is
9   that they would want to publish authors who were
10  leaders in their field, not just some schmuck,
11  right?
12      MS. MEADEN:  Objection.  Foundation.  Form.
13      THE WITNESS:  I would hope so, but I --
14      MR. FRIESEN:  Q  Let me show you your report.
15  This may have been marked already in another
16  deposition, but I'm going to mark it here as
17  Exhibit 6040.
18          (WHEREUPON Exhibit 6040 was marked
19          for identification)
20      MR. FRIESEN:  Q  And do you recognize this,
21  sir, as a copy of your expert report submitted in
22  this matter?
23      A   Yes.
24      Q   Okay.  This is not the first time you

14 (Pages 50 to 53)

JAMES SCHWARTZ

Page 54

1  have seen this report I take it?
2      A   That's a fair statement.
3      Q   If you look at the first page carrying on
4  to the second page, third line from the bottom of
5  first page --
6      A   Okay.
7      Q   -- it says, "I am experienced and
8  knowledgeable both in the legal requirements and
9  constraints under which officers, directors and
10  senior management function in carrying out their
11  fiduciary obligations and in the manner in which
12  officers, directors and senior management of
13  nonprofit organizations operating in the health
14  care industry should and do react to consequential
15  matters facing their organizations."
16          Do you see that?
17      A   I do.
18      Q   And you would agree with me, would you
19  not, that just like anybody else, the way
20  directors of nonprofit organizations operating in
21  the health care industry should act is not always
22  the same as the way they do act?
23      A   That's a fair statement.
24      Q   Sometimes they do exactly what they

Page 55

1  should do, right?
2      A   Hopefully.
3      Q   And sometimes directors of nonprofit
4  organizations operating in the health care
5  industry do not react to consequential matters
6  facing their organization the way they should,
7  right?
8      A   That's also true.
9      Q   And that's why -- one of the reasons why
10  it's helpful for nonprofit directors to have a
11  book like the one that -- that you wrote or to
12  listen to you at a speaking engagement or to hire
13  you, right?
14      A   The latter particularly.
15      Q   You'll get your royalty on the book.
16          One of things that you mentioned earlier
17  that a nonprofit director or trustee -- I may use
18  those words interchangeably as you might.  But
19  when I say "nonprofit director," you understand
20  that sometimes they're called trustees, right?
21      A   I'll assume you're talking about
22  corporate directors and trustees as distinguished
23  from those with a -- with a trust itself.
24      Q   Yes, yes.  Exactly.

Page 56

1          One of things that you mentioned earlier
2  this morning that a nonprofit director has is a
3  duty of care, right?
4      A   That's correct.
5      Q   Okay.  And would you agree with me that
6  the duty of care is frequently violated by
7  nonprofit directors?
8      MS. MEADEN:  Objection.  Vague.
9      THE WITNESS:  I don't know that that's a fair
10  statement.  I would hope it's infrequent.
11      MR. FRIESEN:  Q  So just as starkly as I
12  stated it, you couldn't agree with that?
13      A   No, I --
14      MS. MEADEN:  Same objection.  Vague.
15  Foundation.
16      THE WITNESS:  I can't -- I can't generalize
17  like that.
18      MR. FRIESEN:  Q  How many ways are there to
19  violate the duty of care?
20      MS. MEADEN:  Objection.  Vague.
21      THE WITNESS:  I think that's a function of the
22  creativity of the people who are violating it.
23  The standards are -- are reasonably clear.  But if
24  one is intent on violating the duty of care, I

Page 57

1  assume one could be fairly creative and find
2  multiple ways to do so.
3      MR. FRIESEN:  Why don't we take our -- our
4  quick break.  Good time for a break?
5      MS. MEADEN:  Sure.
6      THE VIDEOGRAPHER:  We are going off the
7  record.  The time is 9:20 a.m.
8          (Whereupon a break was had)
9      THE VIDEOGRAPHER:  Okay.  We're back on the
10  video record.  The time is 9:31 a.m.
11      MR. FRIESEN:  Q  Mr. Schwartz, we spoke
12  earlier about things that you believe nonprofit
13  boards should do when faced with the prospect of a
14  sale or conversion of an asset to a for-profit
15  organization, and I will ask you just a couple
16  more questions about that now.
17          Is -- is one of things that -- that a
18  board should do in terms of making sure that the
19  process goes appropriately to get advice from --
20  from an outside consultant?
21      A   It's not required under the law, but it
22  is oftentimes useful to have investment banking
23  firms assist in the -- in the sale of substantial
24  assets.

15 (Pages 54 to 57)

JAMES SCHWARTZ

Page 224

| | | |
|---|---|---|
| 02:56:30 | 1 | IN THE UNITED STATES DISTRICT COURT |
| 02:56:30 | 2 | FOR THE WESTERN DISTRICT OF PENNSYLVANIA |
| 02:56:30 | 3 | THE OFFICIAL COMMITTEE OF          ) |
| | | UNSECURED CREDITORS OF ALLEGHENY) |
| 02:56:30 | 4 | HEALTH, EDUCATION AND RESEARCH  ) |
| | | FOUNDATION,                     ) |
| 02:56:30 | 5 | ) |
| | | Plaintiff,              ) |
| 02:56:30 | 6 | ) |
| | | vs.                     ) Case No. 00-684 |
| 02:56:30 | 7 | ) |
| | | PRICEWATERHOUSECOOPERS, LLP,    ) |
| 02:56:30 | 8 | ) |
| | | Defendant.              ) |
| 02:56:30 | 9 | |
| 02:56:30 | 10 | I hereby certify that I have read the |
| 02:56:30 | 11 | foregoing transcript of my deposition given at the |
| 02:56:30 | 12 | time and place aforesaid, consisting of Pages 1 to |
| 02:56:30 | 13 | 225, inclusive, and I do again subscribe and make |
| 02:56:30 | 14 | oath that the same is a true, correct, and |
| 02:56:30 | 15 | complete transcript of my deposition so given as |
| 02:56:30 | 16 | aforesaid, and includes changes, if any, so made |
| 02:56:30 | 17 | by me. |
| 02:56:30 | 18 | |
| 02:56:30 | 19 | _____ |
| 02:56:30 | 20 | JAMES SCHWARTZ |
| 02:56:30 | 21 | SUBSCRIBED AND SWORN TO before me this |
| 02:56:30 | 22 | _____ day of _____, 2005. |
| 02:56:30 | 23 | _____ |
| 02:56:30 | 24 | Notary Public |

JAMES SCHWARTZ

Page 225

| | | |
|---|---|---|
| 02:56:30 | 1 | CASE:  AHERF V. PRICEWATERHOUSECOOPERS |
| 02:56:30 | 2 | DATE TAKEN:  3-11-05 |
| 02:56:30 | 3 | DEPONENT:  JAMES SCHWARTZ |
| 02:56:30 | 4 | PAGE  LINE              ERRATA SHEET |
| 02:56:30 | 5 | 21   24   CHANGE: "Conversionary" to "reversionary" |
| 02:56:30 | 6 | ___  ___   REASON:  mistranscribed |
| 02:56:30 | 7 | 37   14   CHANGE:  "Jeff" to "Chet" |
| 02:56:30 | 8 | ___  ___   REASON:  mistranscribed |
| 02:56:30 | 9 | 74   20   CHANGE:  add "and" after "long" |
| 02:56:30 | 10 | ___  ___   REASON:  word omitted. |
| 02:56:30 | 11 | 158  24   CHANGE:  add "and" after "Janes" |
| 02:56:30 | 12 | ___  ___   REASON:  word omitted |
| 02:56:30 | 13 | ___  ___   CHANGE: _____ |
| 02:56:30 | 14 | ___  ___   REASON: _____ |
| 02:56:30 | 15 | ___  ___   CHANGE: _____ |
| 02:56:30 | 16 | ___  ___   REASON: _____ |
| 02:56:30 | 17 | ___  ___   CHANGE: _____ |
| 02:56:30 | 18 | ___  ___   REASON: _____ |
| 02:56:30 | 19 | ___  ___   CHANGE: _____ |
| 02:56:30 | 20 | ___  ___   REASON: _____ |
| 02:56:30 | 21 | ___  ___   CHANGE: _____ |
| 02:56:30 | 22 | ___  ___   REASON: _____ |
| 02:56:30 | 23 | (SIGNED) _____ |
| 02:56:30 | 24 | Reporter:  Janyce Booth |

**Sculley Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## DAVID W. SCULLEY
*December 3, 2003*

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
#### PH: 212-557-7400 / FAX: 212-692-9171

SCULLEY, DAVID W.



LEGALINK
A WORDWAVE COMPANY

DAVID W. SCULLEY

Page 142

1    AHERF, loans being discussed in this meeting?
2  A.  No.
3  Q.  Do you recall any sense of disappointment in or
4    concern or stronger sentiments on the part of
5    anyone in the room with respect to the
6    revelations that intercompany loans from
7    western enterprises to eastern enterprises
8    within AHERF had been -- had come to light?
9        MR. FRIESEN:  Objection.
10 A.  I don't recall that.
11 Q.  And I apologize for the probing at length.  I'm
12   just trying to make sure that if I have the
13   opportunity to prod your memory with a few
14   issues, I've exercised it, and I just have a
15   couple more.
16       Do you recall discussions of the
17   repayment of the line of credit in a
18   substantial amount, that is tens of millions,
19   to any Mellon related financial institution
20   being discussed in this meeting or in any
21   conversations you had about Mr. Abdelhak's
22   departure?
23 A.  No.
24 Q.  Have you told us everything that you can recall
25   about the meeting?

Page 143

1  A.  I've racked my brain.  Maybe sodium Pentothal
2    would be better.
3  Q.  I have none handy.
4        MR. FRIESEN:  Maybe next time.
5  Q.  And I appreciate the effort.
6        Mr. Sculley, you told us about your
7    not-for-profit and your for-profit board
8    service, and I'm not going to revisit that, but
9    suffice it to say, you have some experience in
10   the role?
11 A.  Yes.
12 Q.  Both at AHERF and in other enterprises?
13 A.  Yes.
14 Q.  And in that experience, what do you see as the
15   role and what did you see as the role of a
16   not-for-profit board member during your AHERF
17   board service or AGH board service, the role of
18   the board member?
19 A.  I think to provide an experience and outside
20   overview, to ensure that governance issues were
21   followed, to ensure that the right management
22   was in place, to ensure the health of the
23   system and that -- to help ensure that
24   management delivered or came close to
25   delivering their financial commitments.

Page 144

1  Q.  And did you see as a part of that role that if
2    facts came to light that suggested that the
3    right management was not in place, that that
4    management be removed?
5  A.  Yes.
6  Q.  And as an outside board member, that is not an
7    employee of AHERF or AGH, did you look to
8    outside professionals like auditors and lawyers
9    and consultants to assist you in your role?
10 A.  In the role evaluating management?
11 Q.  In the role as a trustee generally first.
12 A.  As a trustee generally first, we looked first
13   to management in evaluating performance of the
14   organization, but obviously we would depend
15   upon auditors to ensure that the financial
16   numbers were sound.
17       In the case of compensation for the
18   executives, we would to some extent depend
19   upon, as I recall, surveys of other similar
20   institutions to get -- make sure that they were
21   in the right quartiles and so forth.
22 Q.  And what is the role that you understood that
23   the auditors at AHERF and AGH, Coopers &
24   Lybrand, played in connection with the review
25   and presentation of those enterprises'

Page 145

1    financial statements?
2  A.  I would think my understanding would be the
3    same as any organization I would be involved
4    with, whether it be public or private.
5  Q.  And generally what did you understand at the
6    time that those auditors did?
7  A.  Verify the -- the soundness of financial
8    statements as prepared by management.
9  Q.  And when you say verification, do you mean to
10   imply some sort of outside or independent
11   review of management's work?
12 A.  Yes.
13 Q.  What is the significance, as you understood it,
14   in the mid-'90s during your AGH and AHERF board
15   service of a clean auditor's opinion on an
16   annual basis?
17 A.  Certainly one that didn't have a going concern
18   issue to it, and I guess not being an
19   accountant, not having trained, not having
20   studied it, and I'm really not an expert in
21   reading management letters, but I can read the
22   words going concern, and so that would be the
23   one that would flash a whole lot of lights to
24   me.
25 Q.  And when you say going concern, for those who

37 (Pages 142 to 145)

DAVID W. SCULLEY

Page 146

1  may read your testimony or view the videotape
2  that don't know what those words meant to you,
3  what did they mean to you in this time period?
4  A.  They would mean that there was an unlikely
5  ability for the company to survive within the
6  next 12 months.
7  Q.  Did you ever see those words in a report from
8  the auditors for AHERF or AGH?
9  A.  I don't ever recall seeing those words.
10  Q.  You understood during your board service at
11  AHERF and AGH that enterprises or individuals
12  outside of AHERF reviewed these audited
13  financial statements as well?
14  A.  Are you talking about the auditors, or other
15  ones other than the auditors?
16  Q.  Third parties other than the auditors actually
17  saw the audited financial statements?
18  A.  Why don't you give me more on that.
19  Q.  Creditors, vendors --
20  A.  Oh.
21  Q.  -- bond trustees and the like?  Did you
22  understand that?
23  A.  I didn't know exactly the list, but certainly
24  for -- in the case of bond trustees, et cetera,
25  I would think that they would have access to

Page 147

1  that information.
2  Q.  And I think you told us this, but it was your
3  practice to review the audited financial
4  statements when you received them each year
5  during your board service with particular
6  attention in your practice to the profit and
7  loss statement?
8  A.  Yes, but, you know, primarily it was of benefit
9  to be at the meetings where the head of the
10  audit committee would take you through the
11  numbers.
12  Q.  And I understand --
13  A.  Because that to me was -- was very important to
14  understand the context and their point of view.
15  Q.  I understand that, and it was still nonetheless
16  your practice to review the actual documents
17  themselves when you got them?
18  A.  I wouldn't say I studied them in detail, but I
19  would thumb through it looking maybe at the P &
20  L and also scanning the audit letter to make
21  sure there wasn't anything catastrophic in
22  there, but I can't tell you that I sat down for
23  hours and studied the report from the auditors.
24  Q.  And when you say the audit letter, you mean the
25  report on the financial statement itself, the

Page 148

1  narrative report; is that what you meant to
2  refer to?
3  A.  I think the cover letter.
4  Q.  I'm sorry?
5  A.  The cover letter.
6  Q.  How did you use the audited financial
7  statements in your oversight function and any
8  report you received on them at a meeting?
9  MR. FRIESEN:  Objection.
10  A.  Well, I'm not sure I understand the question,
11  how I used them.
12  Q.  Let me try again.  You reviewed them in the way
13  you just described.  You listened to
14  management's or an audit committee
15  representative's description of the highlights
16  at these meetings.  Am I right so far?
17  A.  Mm-hmm.
18  Q.  Is that a yes?
19  A.  Yes.
20  Q.  And with that information, what did you do?
21  A.  If I had any questions, I would ask them at the
22  meeting.
23  Q.  Did you consider the information that you
24  learned through this process helpful to you in
25  engaging the financial performance of the

Page 149

1  enterprise?
2  A.  Reasonably.  I mean I would view, frankly,
3  the -- as long as there was a clean audit, I
4  was listening primarily to internal management.
5  Q.  But an unclean audit would have caused you
6  concern obviously then?
7  A.  If I had seen the words "going concern," I
8  would have had a whole lot of questions.
9  Q.  You I think testified earlier that you received
10  internally-generated financial statements on
11  essentially a quarterly basis as well?
12  A.  Yes.
13  Q.  And did you ever see anything in the audited
14  financial statements that you received that led
15  you to question the accuracy of the internal
16  financial statements that you had been
17  receiving?
18  A.  I don't recall that.
19  Q.  As I think we have established that it's your
20  recollection that though you may have served
21  for a very brief time on the audit committee,
22  you did not attend an audit committee meeting,
23  what do you recall about how the audited
24  financial statements were presented to the
25  larger AHERF board?

38 (Pages 146 to 149)

DAVID W. SCULLEY

Page 161

```
 1    COMMONWEALTH OF PENNSYLVANIA    )       E R R A T A

      COUNTY OF ALLEGHENY            )       S H E E T
 2

          I, David W. Sculley, have read the foregoing
 3    pages of my deposition given on Wednesday, December

      3, 2003, and wish to make the following, if any,
 4    amendments, additions, deletions or corrections:

 5    Page/Line   Should Read            Reason for Change

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

      In all other respects, the transcript is true and
20    correct.

21                       _____

                         DAVID  W.  SCULLEY
22

      Subscribed and sworn to before me this
23    7th  day of  January  ,  2004
                                  2003.
24    Dorothy A. Mitsdarfer

              Notary Public

25       AKF Reference No. HW78455
```

Notarial Seal
Dorothy A. Mitsdarfer, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Jan. 17, 2006
Member, Pennsylvania Association of Notaries

**Seybold Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE*

---

## GARY SEYBOLD
*September 24, 2004*

---

# LEGALINK MANHATTAN
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**SEYBOLD, GARY**



Page 5

Gary Seybold

1
2   Q.   Just as background, when did you
3   attend college?
4   A.   September 1979 to May of 1983.
5   Q.   And where did you attend college?
6   A.   Ursinus College, Collegeville, PA.
7   Q.   Do you have any Master -- I'm sorry.
8   Do you have any graduate degrees?
9   A.   I do.
10   Q.   And what are they?
11   A.   Master of Business Administration.
12   Q.   And where did you receive your
13   Master's from?
14   A.   Villanova University.
15   Q.   When did you graduate?
16   A.   December 1991.
17   Q.   Where are you currently employed?
18   A.   Loan Pro.
19   Q.   And what is Loan Pro?
20   A.   Loan Pro is a third-party outsource
21   provider for loan fulfillment.
22   Q.   And what is your title at Loan Pro?
23   A.   President and CEO.
24   Q.   How long have you been with Loan
25   Pro?

Page 6

Gary Seybold

1
2   A.   11 months.
3   Q.   When were you employed with
4   CoreStates?
5   A.   September 12, 1983, to August 25,
6   1995.
7   Q.   What were your titles when you were
8   employed with CoreStates? You can begin when
9   you were first employed in 1983.
10   A.   Commercial bank analyst, cash
11   management analyst --
12   Q.   And if you could just give me the
13   year, or approximately the year -- I know you
14   don't remember exactly -- when you changed
15   titles.
16   A.   1983 to December 1985 would be the
17   analyst positions; cash management officer
18   from 1985 to 1986; assistant vice-president
19   1986 to 1987; vice-president 1988 to 1995,
20   when I left.
21   Q.   Can you explain your duties when you
22   were cash manager?
23   A.   My responsibilities were to sell
24   cash-management products and services to the
25   large corporate clients of the bank, primarily

Page 7

Gary Seybold

1
2   in Southeast United States, Southwest, and
3   West Coast.
4   Q.   And what exactly would you do to
5   fulfill your responsibilities?
6   A.   I would work with the relationship
7   managers that actually managed the
8   relationships and were responsible for the
9   relationships in calling on the assistant
10   treasurers, treasurers, chief financial
11   officers in order to try to solicit their
12   business, their cash-management business, on
13   behalf of CoreStates.
14   Q.   And when you became vice-president,
15   what were your responsibilities then?
16   A.   I was a senior cash management
17   officer. And at that time I was doing both
18   sales and product development, primarily
19   focused on the retail industry.
20   Q.   And can you just give me more of a
21   description on what you actually did to
22   fulfill those responsibilities?
23   A.   I primarily worked on developing and
24   enhancing products, noncredit products, that
25   the retailers would use. And then my job was

Page 8

Gary Seybold

1
2   to create a marketing strategy and execute
3   that strategy in the retail industry.
4   I would then be charged with
5   defining the prospects, and then executing a
6   calling plan and calling on those clients for
7   potential business.
8   Q.   When you left CoreStates in 1995,
9   what was the reason?
10   A.   I had an opportunity to manage the
11   treasury group for GMAC Mortgage.
12   Q.   So you went with GMAC Mortgage. And
13   how long were you there?
14   A.   August 28, 1995, to January 3, 2003.
15   MR. PAYNE: I want to mark as
16   Exhibit 2730 a Subpoena that was issued
17   to Wachovia on July 14, 2004.
18   Do you know what, I am sorry,
19   it has been marked as Exhibit 2663.
20   MR. BOCCASSINI: 2663?
21   MR. PAYNE: Right.
22   BY MR. PAYNE:
23   Q.   Mr. Seybold, feel free to look at
24   the entire document, but I want to direct your
25   attention to the list of topics to be

Page 9

Gary Seybold

1
2  examined.
3        Have you reviewed this list of
4  topics before?
5     A.  Yes.
6     Q.  And on which topics are you prepared
7  to testify today?
8     A.  Topics 9 through 14.  Though 15 I'm
9  not -- I may, but I'm not sure because of the
10  date, how much information would be required,
11  since it is after I left.
12     Q.  On the last page, Topics 16 and 17?
13     A.  No.
14     Q.  What did you do to prepare to
15  testify on these topics?  And I'm not trying
16  to get the substance of any contact you had
17  with your attorneys.
18     A.  I received information from the
19  attorneys and I reviewed them, I think, three
20  times, and that was about all.
21        MR. PAYNE:  Now I actually want
22  to mark an exhibit.  This will be 2730.
23  It is a document bearing the Bates stamp
24  Foley 21266 through 21275.
25        (Document marked for

Page 10

Gary Seybold

1
2     identification as Exhibit 2730.)
3  BY MR. PAYNE:
4     Q.  Again, feel free to review the
5  entire document, but I do want to direct your
6  attention to the page with the stamp 21273.
7     A.  Okay.
8     Q.  Is this your signature on Page
9  21273?
10     A.  Yes.
11     Q.  And did you prepare this document?
12     A.  From the standpoint of reviewing it
13  and signing it, yes.
14     Q.  And what are you suggesting, certain
15  materials --
16     A.  These type of agreements are
17  prepared by the administrative assistant
18  within the group and handed to the respective
19  officer for signature, for review and
20  signature.
21     Q.  So the actual terms of the
22  agreement, are you saying that you didn't
23  necessarily prepare?
24     A.  This is just a standard agreement
25  that's reflective of the line that was in

Page 11

Gary Seybold

1
2  place at that time.
3     Q.  What is this document?
4     A.  It is a standard agreement between
5  the borrower and lender which outlines at a
6  high level the parameters by which the
7  borrower can borrow against the line of
8  credit.
9     Q.  And is it referred to as a Master
10  Note Agreement?
11     A.  Correct.
12     Q.  And the borrower on this Master Note
13  Agreement is Hahnemann University Hospital?
14     A.  Correct.
15     Q.  And it is dated March 6, 1995?
16     A.  Correct.
17     Q.  And it is for a $7.5 million line of
18  credit?
19     A.  Yes.
20     Q.  What was your role with respect to
21  the $7.5 million line of credit?
22     A.  In this instance, it was the renewal
23  of that line of credit.
24     Q.  And what is the renewal of a line of
25  credit?

Page 12

Gary Seybold

1
2     A.  Lines of credit are for a term.  And
3  this line of credit expired, the old one
4  expired, and so you have to put a new one in
5  place if the company wants to continue using
6  that line.
7        MR. PAYNE:  I want to mark as
8  Exhibit 2731 a document bearing the Bates
9  stamp 21185 through 21193.
10        MR. TORBORG:  That should be
11  Foley.
12        MR. PAYNE:  Yes.  I didn't say
13  it.  Okay.  So the Bates stamp is Foley
14  21185 through 21193.
15        (Document marked for
16     identification as Exhibit 2731.)
17  BY MR. PAYNE:
18     Q.  I want to direct your attention on
19  this document to the page Bates stamped 21192.
20     A.  Okay.
21     Q.  And, again, is this your signature?
22     A.  No.
23     Q.  And do you see the slash next to
24  your signature with the initials FEB?
25     A.  Yes.

3 (Pages 9 to 12)

Page 13

Gary Seybold

1
2  Q.  Do you know who those -- those
3  initials, do you know who they refer to?
4  A.  I can't recall.
5  Q.  Do those initials indicate that
6  someone signed this document for you?
7  A.  Yes.
8  Q.  Do you believe that you authorized
9  whoever signed this --
10  A.  Yes.
11  Q.  -- for you to sign it for you?
12  A.  Yes.
13  Q.  What is this document?
14  A.  This is also a Master Note
15  Agreement.
16  Q.  And who is the borrower?
17  A.  Medical College of Pennsylvania at
18  Hahnemann University Hospital System.
19  Q.  And the date of this Master Note
20  Agreement is January 30, 1995; correct?
21  A.  Yes.
22  Q.  Is the borrower also the Medical
23  College of Pennsylvania Hahnemann University,
24  as well as Medical College of Pennsylvania
25  Hahnemann University Hospital System?

Page 14

Gary Seybold

1
2  A.  Yes.
3  Q.  And this is for a $10 million line
4  of credit?
5  A.  Correct.
6  Q.  For ease of reference during this
7  deposition I will refer to this borrower as
8  "MCP."
9  Are the terms of this Master Note
10  Agreement standard as the terms of the
11  Hahnemann --
12  MR. BOCCASSINI:  Objection to
13  form.
14  Q.  -- line of credit?
15  MR. BOCCASSINI:  Sorry.
16  A.  Are you asking are they the same as?
17  Q.  No. You mentioned --
18  A.  This would be considered a standard
19  Master Note Agreement.
20  Q.  And what was your role with the MCP
21  line of credit?
22  A.  Again, it was a renewal.
23  Q.  It was a renewal?
24  A.  Uh-huh.
25  Q.  When you began working with these

Page 15

Gary Seybold

1
2  two lines of credit, the $7.5 million line of
3  credit and the $10 million line of credit,
4  there was a relationship that had already
5  formed between CoreStates and the borrowers;
6  is that correct?
7  A.  Yes.
8  MR. PAYNE:  I am going to mark
9  as Exhibit 2732 a document bearing the
10  Bates stamp WACH 1957 through 1995.
11  (Document marked for
12  identification as Exhibit 2732.)
13  BY MR. PAYNE:
14  Q.  After you have flipped through it, I
15  want to direct your attention to the page
16  numbered 1963.
17  A.  Okay.
18  Q.  And you see where it says,
19  "Relationship Manager," and it lists, "Gary
20  Seybold"?
21  A.  Yes.
22  Q.  And you were the relationship
23  manager at the time --
24  A.  Yes.
25  Q.  -- that this was written?

Page 16

Gary Seybold

1
2  And it is dated April 1994?
3  A.  Correct.
4  Q.  It says, "Prepared by Darron
5  Outler."
6  Who was Darron Outler?
7  A.  He was the relationship manager
8  before I was.
9  Q.  Do you know what time period he was
10  the relationship manager?
11  A.  No, I don't.
12  Q.  Did you assist Mr. Outler with
13  preparing this document?
14  A.  In a very small -- I mean, I was new
15  to the relationship, so he did the primary
16  review and analysis.
17  Q.  When did you come onto the
18  relationship with Hahnemann?
19  A.  February.
20  Q.  February of '94?
21  A.  Correct.
22  Q.  What is this document?
23  A.  This document is formally known as a
24  comprehensive memo.  In short they call it a
25  comp memo.

4 (Pages 13 to 16)