Page 85

1          Gary Seybold
2     You mean in terms of dollar amounts?
3  Q.  No; just number of different lines
4  of credits.
5     MR. BOCCASSINI:  A specific
6  time frame?
7  A.  I would simply be guessing.
8     MR. TORBORG:  At any specific
9  time during his time at CoreStates.
10  A.  (Continued.)  I would be guessing.
11  I mean, I honestly -- I would be guessing.
12     I just do not -- I would have to
13  think about all the relationships, think about
14  whether there was a borrowing relationship.  I
15  would be guessing.
16  Q.  Was it under ten?
17  A.  Possibly.
18  Q.  Was it over 50?
19  A.  No.
20     MR. TORBORG:  I have no more
21  questions for you, Mr. Seybold.  Thank
22  you very much.
23     VIDEO SPECIALIST:  That now
24  concludes this videotaped deposition and
25  Tape No. 1.  The time is 11:38.

Page 86

1          Gary Seybold
2     (Witness excused.)
3     (Deposition concluded at 11:38
4  a.m.)
5           - - -

Page 87

1          INDEX
2  WITNESS                    PAGE
3  GARY SEYBOLD
4     By Mr. Payne          4
5     By Mr. Torborg        66
6           - - -
7        EXHIBITS
8  NO.     DESCRIPTION        PAGE
2730  Master Note Agreement, 3/6/95    9
2731  Master Note Agreement, 1/30/95   12
2732  Document entitled "Hahnemann
        University"              15
2733  Letter from Ms. Chittick, to
        Mr. McKeown, 1/20/93    21
2734  Credit/Contact Memorandum,
        6/24/94                29
2735  Memo from Mr. Seybold, to
        Mr. Hobensack, 6/28/94   32
2736  Credit/Contact Memorandum,
        6/28/94                35
2737  Waiver and Direction to Bond
        Trustee                38
2738  Letter from Ms. Landy, to
        Mr. Seybold, 11/4/94    40
2739  Hahnemann University Financial
        Statements for the Years Ended
        June 30, 1994 and 1993   41
2740  Hahnemann University Hospital
        Detailed Balance Sheet,
        Actual & %             77

Page 88

1
2     I have read the foregoing
3  transcript of my examination given on
4  Friday, September 24, 2004, and it is
5  true, correct and complete, to the best
6  of my knowledge, recollection, and
7  belief, except for the corrections noted
8  hereon and/or list of corrections, if
9  any, attached on a separate sheet
10  herewith.
11
12
13
14  ------------------------
            GARY SEYBOLD
15
16
17
18
19
    Subscribed and sworn to
20  before me this____day
    of_____, ____
21
22
23
24  ------------------------
    Notary Public
25

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS,L.LP.*

---

## *THOMAS W. SINGLETON*
### *February 23, 2005*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### PH: 212-557-7400 / FAX: 212-692-9171

**SINGLETON, THOMAS W.**



THOMAS W. SINGLETON

Page 2

1    VIDEOTAPE DEPOSITION OF THOMAS W. SINGLETON,
a witness, called by the Defendant for examination,
2    in accordance with the Federal Rules of Civil
Procedure, taken by and before G. Donavich, RPR, CRR,
3    a Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania, at the offices of
4    Jones, Day, Reavis & Pogue, 500 Grant Street,
31st Floor, Pittsburgh, PA 15219, on Wednesday,
5    February 23, 2005, commencing at 9:11 a.m.
6    - - - -
7    APPEARANCES:
8    FOR THE PLAINTIFF:
James E. Young, Esq.
9    JONES, DAY, REAVIS & POGUE
North Point
10    901 Lakeside Avenue
Cleveland, OH 44114-1190
11    216-586-3939
216-579-0212
12    jamesyoung@jonesday.com
and
13    Laura Meaden, Esq.
John Unice, Esq.
14    JONES, DAY, REAVIS & POGUE
500 Grant Street, 31st Floor
15    Pittsburgh, PA 15219
412-391-3939
16
FOR THE DEFENDANT:
17    Gregory E. Birkenstock, Esq.
CRAVATH, SWAINE & MOORE, LLP
18    Worldwide Plaza
825 Eighth Avenue
19    New York, NY 10019-7475
212-474-1040
20    212-474-3700
gbirkenstock@cravath.com
21    and
Joseph McDonough, Esq.
22    MANION McDONOUGH & LUCAS
882 U.S. Steel Tower
23    Pittsburgh, PA 15219
412-232-0200
24
ALSO PRESENT:
25    Matthew Martin, Videographer

Page 3

1    * I N D E X *
2    Examination by Mr. Birkenstock - - - - - - - - - 4
3    Certificate of Court Reporter - - - - - - - - - 283
Errata Sheet - - - - - - - - - - - - - - - - - 284
4
5
* INDEX OF EXHIBITS *
6
Deposition Exhibit No. 6012 - - - - - - - - - - - 6
7    Deposition Exhibit No. 6013 - - - - - - - - - - - 75
Deposition Exhibit No. 6014 - - - - - - - - - - - 216
8    Deposition Exhibit No. 6015 - - - - - - - - - - - 267
Deposition Exhibit No. 6016 - - - - - - - - - - - 270
9    Deposition Exhibit No. 6017 - - - - - - - - - - - 275
10
11    * INDEX OF PREVIOUSLY MARKED EXHIBITS *
12    Deposition Exhibit No. 73 - - - - - - - - - - - 123
Deposition Exhibit No. 901 - - - - - - - - - - - 200
13    }
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    - - - -
2    P R O C E E D I N G S
3    - - - -
4    THE VIDEOGRAPHER:  This is the video
5    operator speaking.  My name is Matthew Martin
6    of LegaLink Action Video, 420 Lexington Avenue,
7    New York, New York.  Today is February 23rd,
8    2005.  The time indicated on the screen is
9    9:12 A.M.
10    We are at the offices of Jones Day,
11    500 Grant Street, Pittsburgh, Pennsylvania,
12    31st Floor, to take the videotaped deposition
13    of Thomas Singleton in the matter of Allegheny
14    Health, Education and Research Foundation
15    versus PriceWaterhouse in the U.S. District for
16    the Western District of Pennsylvania, Civil
17    Action No. 00-684.
18    Will counsel please introduce
19    themselves for the record.
20    MR. BIRKENSTOCK:  Frank Birkenstock
21    from Cravath, Swaine & Moore representing the
22    defendant, PriceWaterhouseCoopers.
23    MR. McDONOUGH:  Joseph McDonough with
24    Mr. Birkenstock.
25    MS. MEADEN:  Laura Meaden from Jones

Page 5

1    Day on behalf of the plaintiff, the Official
2    Committee of Unsecured Creditors of AHERF.
3    MR. YOUNG:  James Young from Jones
4    Day on behalf of the official committee.
5    THE VIDEOGRAPHER:  If the court
6    reporter will swear in the witness, we may
7    begin.
8    - - - -
9    THOMAS W. SINGLETON,
10    being first duly sworn,
11    was examined and testified as follows:
12    - - - -
13    EXAMINATION
14    - - - -
15    BY MR. BIRKENSTOCK:
16    Q.    Good morning, Mr. Singleton.
17    A.    Good morning.
18    Q.    Would you please state your name for the
19    record.
20    A.    Thomas W. Singleton.
21    Q.    And you're appearing today as an expert witness
22    on behalf of the plaintiffs in this case.  Is
23    that correct?
24    A.    That is correct.
25    MR. BIRKENSTOCK:  I would like to

2 (Pages 2 to 5)

THOMAS W. SINGLETON

Page 6

1   have marked as Exhibit No. 6012 a document that
2   I'm sure the witness will recognize.
3               - - - -
4         (Deposition Exhibit No. 6012 marked
5   for identification.)
6               - - - -
7         MR. BIRKENSTOCK:  I would ask you,
8   Mr. Singleton, if you recognize Exhibit 6012.
9         THE WITNESS:  Yes.
10  BY MR. BIRKENSTOCK:
11  Q.   Could you tell me what it is, please?
12  A.   It is my report in regards to this case on the
13  turn-around evaluation.
14  Q.   This is the original report you signed on, I
15  believe, September 2nd of 2004.  Is that right?
16  A.   I'll have to look, because I don't remember
17  exactly the date I did sign it.
18              - - - -
19        (The witness reviewed the document.)
20              - - - -
21        THE WITNESS:  Yes.  September 2nd.
22  BY MR. BIRKENSTOCK:
23  Q.   Okay.  Have you testified at a deposition
24  before?
25  A.   Yes.

Page 7

1   Q.   Have you done that on several occasions?
2   A.   Yes.
3   Q.   You testified once before as a witness in this
4   case.  Is that right?
5   A.   Yes.
6   Q.   Have you testified before as an expert witness
7   in any other case?
8   A.   Yes.
9   Q.   How many times have you testified as an expert
10  witness in other cases?
11  A.   Probably twice, to the best of my recollection.
12  Q.   Could you turn to Exhibit 1 of Exhibit 6012,
13  please.
14  Q.   Exhibit 1?
15  Q.   Exhibit 1.
16  A.   Oh, I see.  I'm sorry.  Okay.
17  Q.   Is this exhibit a copy of your recent
18  curriculum vitae?
19  A.   Yes.
20  Q.   To your knowledge, is it an accurate copy of
21  your CV?
22  A.   Yes.  I believe it is.
23  Q.   You're familiar, I believe, generally with the
24  structure of how a deposition works.  Is that
25  right?

Page 8

1   A.   Yes, I am.
2   Q.   I'll be asking you questions about the topics
3   at issue here.  If you don't understand any of
4   the questions I ask you, please ask me to
5   explain or clarify whatever the problem is that
6   you have.  Will you do that, please?
7   A.   Yes.
8   Q.   Thank you.
9         Now, I note in Exhibit 1 you have a
10  bachelor's degree from Vanderbilt University,
11  and you have an MBA from the University of
12  Chicago.
13        Do you have any other formal
14  education aside from those two degrees?
15  A.   No.
16  Q.   Are you a certified public accountant?
17  A.   No.
18  Q.   And since you said you have no other formal
19  education than the degrees listed in your CV,
20  is it correct then that you are not an MD?
21  A.   Yes.  That is correct.
22  Q.   Would you turn, please, to Exhibit 2 of your
23  report.
24  A.   Yes.
25  Q.   This is a list of five speaking engagements

Page 9

1   from September of 2001 through November of
2   2002.
3         Other than these five speaking
4   engagements, have you had any other speaking
5   engagements in the last four years?
6   A.   Not to my recollection.
7   Q.   In any of these engagements that are listed on
8   this exhibit, have you discussed your
9   experiences with AHERF?
10  A.   I believe so.
11  Q.   In which of these engagements do you believe
12  you've discussed your AHERF experiences?
13  A.   I really don't remember.  This was the AHERF
14  experience in 1998, not the current AHERF
15  experience.
16  Q.   Right.  And when you say "AHERF experience in
17  1998," that is when you were retained to
18  perform a turn-around evaluation on what is
19  called the Delaware Valley Obligated Group of
20  hospitals.  Is that correct?
21  A.   Generally that is correct.  There was a little
22  more to it than that, but that is generally
23  correct.
24  Q.   What was it that was more to it than my
25  description.

THOMAS W. SINGLETON

Page 10

1  A.  Well, I think you have a copy of the engagement
2      letter.  If you want me to answer that
3      question, I'll need to refer to that.
4  Q.  We don't need to get into that right now.
5           On Exhibit 2 to your report, the
6      fourth engagement appears to be a panel
7      discussion concerning a distressed hospitals
8      case study.  Is that correct?
9  A.  That's what it says, yes.
10 Q.  Do you have any independent recollection of
11     that engagement?
12 A.  I really don't.
13 Q.  Can you tell me whether the hospital that was
14     discussed there would be an AHERF hospital or
15     not?
16 A.  No, I cannot.
17 Q.  Can you tell us who your current employer is,
18     please.
19 A.  Cambio Health Solutions, LLC.
20 Q.  Now, is that an organization that was formerly
21     known as the Intensive Resources Group?
22 A.  Yes.
23 Q.  And could you explain just briefly the history
24     of Cambio or the Intensive Resources Group?
25 A.  The Intensive Resource Group began as a

Page 11

1      division of a company called Hospital
2      Management Professionals in 1989, as a
3      turn-around management consulting group.
4           It grew in the '90s -- or late '80s,
5      early '90s, and in 1992 Hospital Management
6      Professionals was acquired by Quorum, and then
7      the Intensive Resource Division was merged with
8      a small turn-around management group that
9      Quorum had and was made into a separate LLC, a
10     wholly owned subsidiary of Quorum, and changed
11     its name to the Intensive Resource Group.
12          It stayed the Intensive Resource
13     Group and grew until 19 -- probably 2000 when
14     it changed the name to Cambio Health Solutions,
15     LLC, still a wholly owned subsidiary --
16     actually a wholly owned subsidiary of IRG,
17     which was a wholly owned subsidiary of Quorum,
18     I believe was the corporate structure.
19          Then in December of 2004, the
20     employees purchased -- I'm sorry -- 2003, in
21     December of 2003 the employees of Cambio
22     purchased Cambio, LLC, from Quorum or IRG, and
23     now it's totally owned by the employees, still
24     an LLC.
25 Q.  Thank you.

Page 12

1           Will you turn, please, to the last
2      page of your report that is Exhibit 6012.  You
3      note here just on the line above your signature
4      that you had not testified as an expert witness
5      within the last four years.  Do you see that?
6  A.  Yes.
7  Q.  Have you testified as an expert witness since
8      the date of this report?
9  A.  No.
10 Q.  You told me earlier, I believe, that you had
11     testified previously as an expert witness.
12     Would that be then more than four years ago?
13 A.  Yes.
14 Q.  Can you tell me how many times you have
15     testified as an expert witness.
16 A.  At least once, possibly twice, both in a
17     bankruptcy environment, so it's not quite as
18     clear as it is in this environment whether it
19     was an expert witness or not.
20 Q.  You say at least once.  Is there one particular
21     occasion you remember somewhat clearly?
22 A.  Yes.
23 Q.  And what was that?
24 A.  It was a situation where I was an expert
25     witness on evaluation of a couple of hospitals.

Page 13

1  Q.  Do you recall where those hospitals were
2      located?
3  A.  In Hernando County, Florida.
4  Q.  Do you recall what their names were, whether
5      they were affiliated with a group that you
6      might recall its name or any other information
7      about them?
8  A.  Yeah.  It was --
9           Give me a second to recall the names.
10     One of them was Spring Hill Hospital.
11     The other was Brooksville Regional.
12 Q.  Thank you.
13          You described a moment ago the
14     background of Cambio.  And if I use the term
15     "Cambio" to refer to all of its previous names,
16     is that clear enough for you?
17 A.  Yes.  That's fine.
18 Q.  Could you tell me the range of services that
19     Cambio provides to its clients.
20 A.  Currently?
21 Q.  Currently for starters, yes.
22 A.  We will do consulting services, we will do
23     turn-around management, and there's kind of a
24     hybrid which we call the chief implementation
25     officer model where we don't have full

4 (Pages 10 to 13)

THOMAS W. SINGLETON

Page 90

1    I'm not trying to be difficult, but I
2  want to make sure I have a clear understanding
3  of your question.
4    Could you explain what you mean by
5  "initiate."
6  Q.  What causes a turn-around consultant to be
7  retained and asked to prepare a turn-around
8  plan?
9  A.  In relationship to this particular engagement?
10 Q.  Yes, sir.
11 A.  It would be our assumption that the release of
12 a financial report of the nature that
13 Mr. Berliner restated, the 1996 financial
14 report, that would be the reason why the board
15 would be retaining a turn-around consultant.
16 Q.  Can I ask you why in the sentence that we've
17 been looking at you chose around September,
18 1996?
19 A.  Because that's when we felt like that the audit
20 report would have been issued, sometime around
21 that period.
22 Q.  And so it's approximately September of 1996
23 then that the reactions to the audit statement
24 you mentioned would have begun happening.  Is
25 that correct?

Page 91

1  A.  That was my assumption, yes.
2  Q.  What assumption did you make as to when a
3  turn-around consultant would actually begin
4  work on this project that is presented in your
5  report?
6  A.  Late September or October of 1996.
7  Q.  Can you tell me what assumption you made as to
8  the amount of time a turn-around consultant
9  would have needed to prepare a turn-around plan
10 having begun in late September or October of
11 1996.
12 A.  Probably 90 to 120 days for a full plan.
13 Q.  And could you tell me, please, what assumption
14 you made as to the amount of time that would
15 pass between the preparation of a full plan and
16 beginning of implementation of that plan.
17 A.  Well, the implementation of that plan would
18 begin sometime at the end of September or
19 beginning of October.
20 Q.  Of 1996?
21 A.  Right.
22 Q.  What portions of that plan would begin
23 implementation at the end of September or
24 beginning of October of 1996?
25 A.  Well, certainly we would begin to preserve as

Page 92

1  much cash as possible.  We would begin to take
2  action subject to board approval of various
3  pieces of the turn-around plan as they were
4  developed, the operational pieces.
5  Q.  So it's your assumption -- let me withdraw
6  that.
7    Am I correct in understanding you to
8  say that you have proceeded on the assumption
9  that a turn-around consultant would have
10 received board approval for the initial stages
11 of a turn-around plan by the end of
12 September or beginning of October of 1996?
13 A.  Repeat the question again.
14 Q.  Am I correct in understanding you to say that
15 you have proceeded on the assumption that a
16 turn-around consultant would have received
17 board approval for the initial stages of a
18 turn-around plan by the end of September or the
19 beginning of October of 1996?
20 A.  I wouldn't phrase it exactly --
21    That would not be my assumption, no.
22 Q.  How would you phrase it then?
23 A.  I would assume that we would have been engaged
24 as managers at the end of September or
25 beginning of October by the board, and during

Page 93

1  that period of time, we would immediately start
2  developing a plan, but as managers, we would
3  also be implementing that part of the plan that
4  as the board approved it --
5    Elements of the plan would probably
6  be a better term than parts of the plan.
7    That's the way our process normally
8  works.  We don't wait until the full plan is
9  developed before we start implementation.
10 Q.  Let me see if I have this correctly then.
11    As each element of the plan is
12 completed, you would seek board approval of
13 that; and once board approval is received, you
14 would begin to implement that element.  Is that
15 correct?
16 A.  Close enough.
17 Q.  To what extent is it wrong?
18 A.  I didn't say that it was wrong.  I just said --
19    Let me just say --
20    Well, repeat your characterization
21 and let me respond.
22 Q.  Is it correct that as each element of the plan
23 is completed, you would seek board approval of
24 that element; and once board approval is
25 received, you would begin to implement that

24 (Pages 90 to 93)

THOMAS W. SINGLETON

Page 94

1  element of the plan?
2  A.  In general, yes.  I would answer yes to that
3  question.
4  Q.  You said a moment ago, I believe, you proceeded
5  on the assumption you would have been retained
6  as managers by the board.  Is that correct?
7  A.  Yes.
8  Q.  Is that the full managerial authority type of
9  engagement we discussed earlier this morning?
10  A.  Yes, for these assets.
11  Q.  So then a Cambio person would be installed as
12  the CEO of these portions of AHERF.  Is that
13  correct?
14  A.  Yes, for these portions, yes.
15  Q.  You also --
16  A.  Let me clarify.
17  Q.  Please do.
18  A.  And also other key officers of these portion of
19  the assets as needed.
20  Q.  So other Cambio personnel might be installed as
21  the chief financial officers of some of these
22  assets.  Is that right?
23  A.  Correct.
24  Q.  And you might possibly have someone installed
25  as a chief implementation officer at some

Page 95

1  place.  Is that correct?
2  A.  Possibly, yes.
3  Q.  You state on Page 3 of your report that
4  hospitals of a similar kind to the DVOG
5  entities sold at multiples of between five and
6  eight times EBITDA.
7       Do you see that portion of the
8  report?
9  A.  What page are you on?
10  Q.  Page 3.  It is towards the bottom of the page
11  under Summary.
12  A.  Towards the bottom of the last paragraph on --
13       Did you say three or four?
14  Q.  Three.
15  A.  I'm sorry.  I was on four.  I apologize.
16              - - - -
17       (The witness reviewed the document.)
18              - - - -
19       THE WITNESS:  Okay.
20  BY MR. BIRKENSTOCK:
21  Q.  Actually, let me ask you to back up one
22  sentence now.
23       You refer in the previous sentence to
24  financial stability.  Do you see that?
25  A.  Could be restored to financial stability?  Is

Page 96

1  that where you're talking about?
2  Q.  Yes.
3  A.  Yes.  I see that.
4  Q.  The sentence reads, it is my opinion that DVOG
5  could have been restored to a position of
6  financial viability upon --
7  A.  Where are you?
8  Q.  I'm sorry.  I'm in the previous sentence now.
9  A.  Okay.
10  Q.  Which reads, it is my opinion that DVOG could
11  have been restored to a position of financial
12  viability upon a timely intervention by AHERF's
13  board or others around the end of September,
14  1996.
15  A.  Okay.
16  Q.  Is that an accurate statement of the opinions
17  that you have formed through your work in this
18  case?
19       MR. YOUNG:  That one sentence are we
20  talking about?
21       MR. BIRKENSTOCK:  Let me be clear.
22  I'm not asking if that sentence is the entirety
23  of your opinions.
24       Is it accurate as far as it goes?
25       THE WITNESS:  I believe so.

Page 97

1  BY MR. BIRKENSTOCK:
2  Q.  Now, in the next sentence that begins with, for
3  purposes of this analysis, you describe what
4  you mean by financial stability; and without
5  going through every word of it, is it correct
6  that by "financial stability" you mean that the
7  DVOG entities would have a sufficiently
8  positive amount of EBITDA so that they could be
9  sold without losses to the creditors?  Is that
10  correct?
11  A.  I'm sorry.  Is what correct?  That they could
12  be sold without loss to the creditors?
13  Q.  Is it clear that by "financial stability" you
14  meant that the hospitals could have been sold
15  without losses to the creditors?
16  A.  I certainly intend to say they could have been
17  sold without loss to creditors; and in that
18  sentence, that is the way I'm using "financial
19  stability."
20       I'm sure that's not the only way you
21  could define that, but --
22  Q.  Sure.
23       Have you attempted to determine what
24  level of EBITDA would be necessary at DVOG in
25  order to allow those hospitals to be sold

25 (Pages 94 to 97)

THOMAS W. SINGLETON

Page 266

1    you add that to the beginning cash balance, and
2    that's the ending cash balance.
3    Q.   Okay.  Could you tell me if you've considered
4         any information provided by Mr. Berliner on
5         AHERF cash flows?
6    A.   Well, in order to get our EBITDA improvement
7         plan, we used his EBITDA, or we derived the
8         EBITDA from his numbers which goes into our
9         cash flow.
10            Other than that, to the best of my
11        recollection, we didn't use any other
12        information related to cash flow from
13        Mr. Berliner.
14   Q.   Okay.  Have you ever written or cowritten a
15        book or an article on the subject of health
16        care governance?
17   A.   No.
18   Q.   Have you written or cowritten any books or
19        articles on the field of health care in
20        general?
21   A.   Books or articles?  Certainly no books.
22   Q.   All right.
23   A.   And no articles, to my recollection.
24   Q.   Okay.  Have you ever performed a consulting
25        engagement that focused on corporate or health

Page 267

1    care system governance issues as opposed to the
2    sort of operational and turn-around issues that
3    we've been discussing today?
4    A.   Well, a number of our projects include
5         governmental -- system governmental issues that
6         we have to address and make recommendations on.
7    Q.   I think I've been unclear.  I intended to refer
8         to governance rather than the government.
9    A.   I'm sorry.  I used the wrong word.  I
10        understood you meant the governance of the
11        system.
12            I'm saying in a lot of our
13        turn-around projects we make recommendations
14        and work with the governance on improving the
15        governance or restructuring the governance of
16        the organization.
17   Q.   Have you ever been involved in a consulting
18        engagement or a turn-around engagement that was
19        specifically focused on governance issues?
20   A.   If I understood your question, you said have I
21        ever been engaged in a turn-around project
22        specifically focused on governance issues.
23   Q.   Let me restate the question.
24   A.   Okay.
25   Q.   Have you ever been involved in a consulting

Page 268

1    engagement that was specifically focused on
2    governance issues?
3    A.   Only on governance issues?  Is that --
4    Q.   That is correct.
5    A.   I don't usually like to say never, but to my
6         recollection, I can't think of one.
7    Q.   Okay.
8            MR. BIRKENSTOCK:  I would like to
9         mark as the next exhibit corrections that were
10        received from Mr. Singleton on February 14th.
11                - - - -
12            (Deposition Exhibit 6015 marked for
13        identification.)
14                - - - -
15            MR. BIRKENSTOCK:  This is
16        Exhibit 6015.
17            THE WITNESS:  At least they're
18        getting thinner.
19   BY MR. BIRKENSTOCK:
20   Q.   Mr. Singleton, could you tell me who wrote this
21        document that is Exhibit 6015?
22   A.   I would say that Seth Sharpe drafted it, and I
23        made major revisions to it.  It's not very
24        long, the written part.
25   Q.   Could you tell me who created the exhibits that

Page 269

1    are attached to this Exhibit 6015?
2    A.   Either Seth Sharpe or Rob Wright.
3    Q.   On Page 1 of the February 14th document, you
4         discuss an error in the formula that was used
5         to calculate the hour variance.
6            Is this an issue we discussed this
7         morning when we were looking at Exhibit 3 and
8         its figures for hour variance?
9    A.   I don't remember discussing this.
10            We discussed the sale reference error
11        which was covered in an earlier revision.  I
12        think it was covered in the rebuttal report,
13        January 11th.
14   Q.   Is it correct in general to say that the error
15        that is corrected in this document is that a
16        number was divided in the original and rebuttal
17        reports and it should have been multiplied to
18        be correct?
19   A.   I think that's a fair statement.
20   Q.   Correcting this error, you now say that the
21        EBITDA improvement opportunity for productivity
22        is $137.5 million.
23   A.   Yes, still using the 1996 benchmarks.
24            I'm sorry.  Using the 1999
25        benchmarks.  It's 137.5.

68 (Pages 266 to 269)

THOMAS W. SINGLETON

Page 270

1  Q.   And you also present in this document a set of
2       calculations that are based on the 1996
3       Solution benchmarks.  Is that right?
4  A.   Yes.  That is correct.
5  Q.   Based on the 1996 benchmarks, you determine a
6       productivity opportunity of $115.9 million.  Is
7       that right?
8  A.   Yes.
9  Q.   Have you determined in connection with this
10      document or elsewhere to replace the figures in
11      your previous reports by one or the other of
12      the $137.5 million and 115.9 million figures
13      that are presented in this document?
14  A.  I think we replaced them with --
15          Let me just look and see before I --
16                    - - - -
17      (The witness reviewed the document.)
18                    - - - -
19          THE WITNESS:  On one of the tables in
20      the back, which is the Revised Summary of
21      EBITDA Improvement, it says, to replace table
22      on Page 8 of the January 11th report, we used
23      the 115,949,000 number.  That is the number
24      that we're going to use going forward.
25  BY MR. BIRKENSTOCK:

Page 271

1  Q.   So is it correct to say then that as of the
2       February 14th date of Exhibit 6015, in your
3       best professional judgment as an expert, the
4       correct amount for the productivity improvement
5       opportunity is now 115.9 million,
6       approximately?
7  A.   I would say the conservative estimate is 115.
8       We decided to use the '96, because that was the
9       most conservative.
10  Q.  But is it correct that in your best judgment,
11      the calculations that reached these figures for
12      1996 and for 1999 are the best and most correct
13      versions of these calculations?
14  A.  I believe that the formula error has been
15      corrected and that both calculations using 1999
16      and 1996 are made in this report are
17      correct, mathematically.
18          MR. BIRKENSTOCK:  I would like to
19      mark as Exhibit 6016 a set of corrections that
20      were submitted by Thomas W. Singleton on
21      February 18th, 2005.
22                    - - - -
23          (Deposition Exhibit 6016 marked for
24      identification.)
25                    - - - -

Page 272

1  BY MR. BIRKENSTOCK:
2  Q.   Is it correct, sir, that the purpose of this
3       document is to correct the depiction of bad
4       debt percentages that were presented in a chart
5       in your January 11th report?
6  A.   Well, the front says January 11th.  I was
7       trying to find --
8           Oh, there it is.  Okay.  Yes.  This
9       chart was originally presented in the
10      January 11th report.
11  Q.   And this document, Exhibit 6016, presents
12      corrections to that chart from the January 11th
13      report.
14  A.   Yes, yes.
15  Q.   Would you agree that in the graph that is shown
16      on the corrected version at the bottom of
17      Page 1 of Exhibit 6016 there is a continuing
18      upward trend in bad debt as a percentage of
19      gross revenue from 1993 through 1996?
20  A.   Could you repeat the question.
21  Q.   Would you agree that in the graph that is shown
22      on the corrected version at the bottom of
23      Page 1 in Exhibit 6016, there's a continuing
24      upward trend in bad debt as a percentage of
25      gross revenue from 1993 through 1996?

Page 273

1                    - - - -
2       (The witness reviewed the document.)
3                    - - - -
4           THE WITNESS:  I would agree that the
5       chart, as presented here, shows an upward
6       trend, but I would also point out that it is my
7       opinion that a large part of the 1996 bad debt
8       expense is prior year bad debt expense and
9       should be spread back in the previous years as
10      we say in this report.
11  BY MR. BIRKENSTOCK:
12  Q.   And is it true that you have based the figures
13      in this corrected chart at the bottom of Page 1
14      of this exhibit on figures from Mr. Berliner
15      concerning bad debt expense?
16  A.   I used Mr. Berliner's numbers for 1996 and 1995
17      bad debt expense.
18  Q.   Uh-huh.
19  A.   Well, let me restate that.
20          In 1995, I added to 1995 the bad debt
21      expense as calculated by AHERF, an
22      $11.5 million increase that Mr. Berliner said
23      related in 1995; and in 1996, that bar reflects
24      the bad debt expense as reported by
25      Mr. Berliner.

69 (Pages 270 to 273)

THOMAS W. SINGLETON

Page 282

1    Mr. Singleton, do you consider this exhibit to
2    be correcting and incorporated into the
3    previous versions of your report?
4  A.  Yes.
5  Q.  Could you just tell me who created this
6    Exhibit 6017.
7  A.  Rob Wright created the tables.
8  Q.  Okay.
9  A.  They were printed out here.
10 Q.  And have you reviewed them before this morning?
11 A.  Yes.  I reviewed them before they were printed
12   out.
13 Q.  At this point in time, Mr. Singleton, do you
14   intend to provide any corrections to your
15   report other than the ones we've already
16   received?
17 A.  I don't intend to, but if I find another error,
18   I probably will.
19 Q.  You're not currently aware of any other error
20   that requires correction.  Is that right?
21 A.  That is correct.
22      MR. BIRKENSTOCK:  Well, barring any
23   further corrections then, I am finished.
24      MR. YOUNG:  I have no questions.
25      MR. BIRKENSTOCK:  Mr. Singleton,

Page 283

1    thank you for your time.
2      THE WITNESS:  Thank you.
3      THE VIDEOGRAPHER:  Here marks the end
4    of Videotape No. 5 in the deposition of Thomas
5    Singleton.  We are now going off the record.
6    The time is 6:20 P.M., February 23rd, 2005.
7      Thank you very much.
8      - - - -
9    (The proceedings were concluded at 6:20 p.m.)
10     - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 284

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY      )   SS:
3      I, G. Donavich, RPR, CRR, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  THOMAS W. SINGLETON, was by me first duly sworn to
7  testify to the truth, the whole truth, and nothing
8  but the truth; that the foregoing deposition was
9  taken at the time and place stated herein; and that
10 the said deposition was recorded stenographically by
11 me and then reduced to printing under my direction,
12 and constitutes a true record of the testimony given
13 by said witness.
14     I further certify that I am not a relative or
15 employee of any of the parties, or a relative or
16 employee of either counsel, and that I am in no way
17 interested directly or indirectly in this action.
18     IN WITNESS WHEREOF, I have hereunto set my hand
19 and affixed my seal of office this 27th day of
20 February, 2005.
21     _____
22     Notary Public
23
24
25

Page 285

1  COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
   COUNTY OF ALLEGHENY      )   S H E E T
2  I, THOMAS W. SINGLETON, have read the foregoing
3  pages of my deposition given on February 23, 2005,
   and wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
   In all other respects, the transcript is true and
19 correct.
20     _____
       THOMAS W. SINGLETON
21
   Subscribed and sworn to before me this
22 _____ day of _____, 2005.
23 _____
       Notary Public
24 AKF Reference No. 85906
25

72 (Pages 282 to 285)

COMMONWEALTH OF PENNSYLVANIA    )
                                    )    ERRATA SHEET

COUNTY OF ALLEGHENY              )

        I, THOMAS W. SINGLETON, have read the foregoing pages of my deposition given on February 23, 2005, and wish to make the following, if any, amendments, additions, deletions or corrections:

| Page, Line | Change, Reason |
|---|---|
| Page 14, Line 7 | change "mean" to "indicate" correction to transcript |
| Page 14, Line 16 | change "a turn-around plan." to "and implement a turn-around plan." correction to testimony |
| Page 50, Line 1 | change "H&P" to "HMP" correction to transcript |
| Page 103 Line 20 | change "capital," to "capital." correction to transcript |
| Page 103 Line 21 | change "plus net working capital." to "Okay, plus net working capital." correction to transcript |
| Page 103 Line 22 | change "To do your calculation" to "So to do your calculation" correction to transcript |
| Page 120 Line 14 | change "wanted" to "want" correction to transcript |
| Page 166 Line 14 | change "sale" to "cell" correction to transcript |
| Page 170 Line 12 | change "sale" to "cell" correction to transcript |
| Page 223 Line 10 | change "in" to "and" correction to transcript |
| Page 230 Line 15 | change "sales?" to "cells?" correction to transcript |
| Page 230 Line 20 | change "sales" to "cells" correction to transcript |

| | |
|---|---|
| Page 233<br>Line 1 | change "$86.1" to "$8.6"<br>correction to transcript |
| Page 240,<br>Line 4 | delete the word "cash"<br>correction to testimony |
| Page 269<br>Line 10 | change "sale" to "cell"<br>correction to transcript |
| Page 280<br>Line 2 | change "sale." to "cell."<br>correction to transcript |
| Page 157,<br>Lines 10, 15;<br>Page 163,<br>Lines 6, 13;<br>Page 172,<br>Lines 22, 25;<br>Page 174,<br>Line 15;<br>Page 205,<br>Line 3;<br>Page 225,<br>Line 21;<br>Page 228,<br>Lines 4, 7;<br>Page 260,<br>Lines 7, 19, 21;<br>Page 261,<br>Line 12;<br>Page 270,<br>Line 3 | "Solution" or "Solutions" should be "Solucient"<br>correction to transcript |

In all other respects, the transcript is true and correct.

*Thomas W Singleton*
Thomas W. Singleton

Subscribed and sworn to before me
this 24th day of March, 2005.

*Sarah Kenley-Paulk*
Notary Public
Commission Expires 6/26/06

**Snow Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *GREGORY SNOW*
### *July 25, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### PH: 212-557-7400 / FAX: 212-692-9171

SNOW, GREGORY



**LEGALINK®**

A **WORDWAVE** COMPANY

Page 98

1    back?
2         - - - -
3    (The record was read back by the reporter.)
4         - - - -
5    BY MR. LUFT:
6    Q.   Why don't I clear it up and we can save time
7         right now.
8             Mr. Snow, at the completion date you
9         referred to of March and April of 1996, that
10        would be about the last quarter of fiscal year
11        1996.  Correct?
12   A.   Yes.
13   Q.   Let me show you a document that has previously
14        been marked as Exhibit 901 in this collection.
15        - - - -
16            (Deposition Exhibit No. 901
17        previously marked for identification.)
18        - - - -
19            MR. LUFT:  Take as much time as you
20        need to review the document.
21        - - - -
22        (The witness reviewed the document.)
23        - - - -
24   BY MR. LUFT:
25   Q.   Do you recognize this document, Mr. Snow?
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 99

1    A.   I've never seen the cover letter, but I'm aware
2         of the document.
3    Q.   Okay.  What is the document absent the cover
4         letter?
5    A.   The document was prepared, I believe, in late
6         calendar year 1996 and the first part of
7         calendar year 1997 by Joe Dionisio with respect
8         to the status of the patient accounting
9         functions for AHERF.
10   Q.   And the cover letter of this document says it's
11        a February 18th, 1997, letter from David M.
12        McConnell to the board of trustees at Allegheny
13        Health, Education and Research Foundation.
14        Correct?
15   A.   Yes.
16   Q.   Do you have any reason to believe that this is
17        not a cover letter for the following report
18        that you just described?
19   A.   No.
20   Q.   Would you have been privy to what was given to
21        a member of the board of trustees at AHERF?
22   A.   No.
23   Q.   I'm going to ask you to turn to what is marked
24        as Bates Page 929 through 930, which is Pages 5
25        and 6, I believe, of the memo, and I believe
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 100

1    what is on these pages is a list of
2    improvements that have been made by the patient
3    financial services group --
4    A.   Yes.
5    Q.   -- during the time you were there and were
6         coming from the consolidation.  Correct?
7    A.   Yes.
8    Q.   Was it your belief at the time that this memo
9         was written, which I believe was late fiscal
10        year 1996-1997, that there were improvements
11        being made by the patient financial services
12        group?
13   A.   Yes.
14            MR. TORBORG:  Object to form.
15            THE WITNESS:  Yes.  Yes.
16   BY MR. LUFT:
17   Q.   Do you believe that these improvements were
18        caused in part by the consolidation?
19   A.   Yes.
20   Q.   Do you believe these improvements were caused
21        in part by actions you had taken as the new
22        director of the patient financial services
23        group?
24   A.   I'd like to think so.
25   Q.   I wonder if you could walk me through some of
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 101

1    the improvements listed on Page 929 in the
2    bullet points and tell me how these
3    improvements would affect AHERF's receivables.
4    A.   Page 929, the bullet points were geared more
5         towards the efficiencies that were being gained
6         from a pure economic point of view.
7             It talks specifically about the
8         number of claims being processed, the increases
9         in claims over the past year or year and a half
10        with no additional staff, our internal
11        productivity measurements compared to national
12        averages, the cost to collect, and also gross
13        days revenue outstanding.
14   Q.   And these efficiencies which you referred to,
15        was it your belief that they would ultimately
16        lead to a smoother operation by the patient
17        financial services group?
18            MR. TORBORG:  Object to the form.
19            THE WITNESS:  Thought it would lead
20        to a smoother operation and increase cash
21        collections.
22   BY MR. LUFT:
23   Q.   Okay.
24   A.   At a reduced cost.
25   Q.   Who authored this memo?
         MANHATTAN REPORTING CORP., A LEGALINK COMPANY

26 (Pages 98 to 101)

GREGORY SNOW

Page 102

1  A.  Joe Dionisio.
2  Q.  Did you help author this memo?
3  A.  Yes, I did.
4  Q.  Do you recall if you had any input on the
5      section we just referred to regarding
6      improvements?
7  A.  Yes.
8  Q.  So you had conveyed to Mr. Dionisio that you
9      believed these improvements had taken place and
10     that greater efficiencies would come?
11 A.  Yes.
12 Q.  Do you recall if you expressed that sentiment
13     to anyone else in AHERF management?
14 A.  I'm sorry.  Again, please.
15 Q.  Do you recall if you expressed those sentiments
16     to anyone else in an AHERF management?
17 A.  I don't remember.  I'm sorry.
18 Q.  Do you recall having a understanding that other
19     members of senior AHERF management expected
20     improvements to arise from the consolidation?
21 A.  Yes.
22 Q.  And what was that understanding based on?
23 A.  To me, it was just simply a given.
24 Q.  A given because that's why one would do a
25     consolidation.  Correct?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 103

1  A.  That's correct.
2  Q.  Now, the cover letter of this memo is from
3      David McConnell to the board of trustees.  I
4      know you've said you have not seen this memo
5      before.
6  A.  That's correct.
7  Q.  Are you aware personally whether any members of
8      the AHERF board of trustees were made aware
9      that due to the consolidation of the AHERF
10     billing office there was anticipated that there
11     would be improvements in the AHERF billing and
12     collections function?
13 A.  I don't know what was conveyed to the board.
14 Q.  Okay.  Do you know if Mr. McConnell was aware
15     that PFSG and Mr. Dionisio believes that there
16     would be improvements arising from the
17     consolidation?
18 A.  I never had any direct conversations with
19     Mr. McConnell, but it was my understanding that
20     yes, he did.
21 Q.  Do you recall --
22         Let me just strike that.
23         Mr. Snow, did you have any
24     interactions with anyone from Coopers & Lybrand
25     while you were at AHERF?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 104

1  A.  Yes.
2  Q.  Who did you have interactions with?
3  A.  Norm Kalisevsky, I believe was his name, on a
4      very limited basis; Bill Buettner, and there
5      were other people, and I'm sorry, I don't
6      remember the name.
7  Q.  When you say you had interaction with
8      Mr. Buettner on a very limited basis, could you
9      explain what you mean.
10 A.  Once a year, usually in February of each year,
11     there would be a preaudit conference with
12     respect to the annual audit by Coopers.
13 Q.  And who was that, just you and Mr. Buettner?
14 A.  Mr. Buettner or any of his staff, and from a
15     PFSG perspective, generally speaking, it was
16     myself, Russell Laing, and anyone from his
17     staff that he would deem necessary to be there.
18 Q.  Do you recall if Norm Kalisevsky attended this
19     meeting every year or if he was just there in
20     fiscal 1996?
21 A.  I believe Norm was there every year, but I
22     don't remember specifically, but I believe he
23     was.
24 Q.  What was your understanding of Mr. Buettner's
25     position at Coopers & Lybrand?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 105

1  A.  He was a partner.  He was a partner in charge
2      of the AHERF audit.
3  Q.  In any of your conversations with Mr. Buettner,
4      did you ever express to him that due to the
5      consolidation you believed that there would be
6      improvements in PFSG's performance?
7  A.  I believe so, but I don't remember
8      specifically.
9  Q.  Do you recall ever telling anyone other than
10     Mr. Buettner who worked for Coopers & Lybrand
11     that due to the consolidation, you believed
12     there would be an improvement in PFSG's
13     performance?
14 A.  The only one I would have said anything to
15     probably would have been Norm.
16 Q.  Do you know if anyone else who worked at PFSG
17     ever told someone from Coopers & Lybrand that
18     due to the consolidation or any aspect of the
19     consolidation they expected an improvement in
20     PFSG's performance?
21 A.  I don't have any idea.
22 Q.  Okay.  Mr. Snow, let me show you what has been
23     marked as Exhibit 902.
24         - - - -
25         (Deposition Exhibit No. 902)

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

GREGORY SNOW

Page 106

1    previously marked for identification.)
2            - - - -
3    (The witness reviewed the document.)
4            - - - -
5        THE WITNESS: Okay.
6 BY MR. LUFT:
7 Q.  Do you recognize this document, Mr. Snow?
8 A.  Yes.
9 Q.  What is this document?
10 A.  I don't remember, again, seeing the cover memo,
11    but the attached document itself is -- even
12    though it states that it's a year-end report,
13    we would put out a --
14        We had what was called a monthly
15    reporting package that we put out, and this is
16    basically it.
17 Q.  Now, on the cover memo, it says from William
18    Gedman to Distribution, and under distribution,
19    do you see there's a G. Snow?
20 A.  Yes.
21 Q.  Is that Greg Snow?
22 A.  Yes.
23 Q.  Do you have any reason to believe did you not
24    receive this document?
25 A.  No.
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 107

1 Q.  I believe previously you told me that you
2    expected to start seeing improvements in March
3    or April of 1996.  Is that correct?
4 A.  Yes.
5 Q.  If I could turn you to the page that is Bates
6    stamped PR-SEC 00981, and I believe the first
7    bullet point on that page under the title
8    accounts receivable and revenue states, for the
9    third consecutive month, total AR fell in June.
10    The drop was approximately one percent from May
11    levels, nearly $4.3 million.
12        The total of $510.6 million (Hospital
13    and ProFee) is the lowest since October, 1995,
14    period.  This compares to a total of
15    $499.3 million at year-end June 1995.
16        Is that correct what I just read?
17 A.  According to this document, yes.
18 Q.  Do you recall an improvement in the AR levels
19    for AHERF in the last three months of fiscal
20    year 1996?
21 A.  Yes.
22 Q.  And that improvement would comport with your
23    previously stated notion that you expected to
24    see improvements at the end of fiscal year 1996
25    arising from the consolidation under your
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 108

1    leadership?
2 A.  Yes, but let me clarify one thing.  When I say
3    there's an improvement, there's an improvement
4    based upon what was being reported from a
5    system AR perspective.  I don't know what the
6    financial statements reported is and what the
7    AR results were at that time.
8 Q.  Were you responsible for the financial
9    statements?
10 A.  No.
11 Q.  Did you have any -- strike that.
12        Did you have any involvement in
13    creating the financial statements?
14 A.  No.
15 Q.  The numbers that are in this monthly form,
16    these come from PFSG.  Correct?
17 A.  Yes, which are taken from -- directly from
18    standardized reports within the various billing
19    systems.
20 Q.  And the PFSG department is your department.
21    Correct?
22 A.  Yes.
23 Q.  Do you have any reason to doubt the accuracy of
24    the information contained in the PFSG report?
25 A.  No.
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 109

1 Q.  And was Mr. Gedman in charge of compiling these
2    reports?
3 A.  Mr. Laing was the person in charge of it, and
4    Mr. Gedman worked for Mr. Laing.
5 Q.  So it was your understanding at the time that
6    AR levels were decreasing in the last quarter
7    of fiscal year 1996.  Correct?
8 A.  Yes.
9 Q.  So headed into fiscal year 1997, the
10    improvements that were anticipated coming out
11    of consolidation were manifesting themselves
12    some way on the AR levels of AHERF.  Correct?
13 A.  In my opinion, yes.
14 Q.  Mr. Snow, did you ever have any interactions
15    with members of AHERF operating units, i.e.,
16    the hospitals of AHERF and the physician
17    practices?
18 A.  Yes.
19 Q.  Who did you interact with?
20 A.  It would depend upon the issue.  It could range
21    anything -- everywhere from a registrar, a
22    nonhourly registrar, up to the CEO of the
23    hospital, depending upon the issue.
24 Q.  And certainly there would be different issues
25    for why would you speak to a CEO than a
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

28 (Pages 106 to 109)

GREGORY SNOW

Page 114

1  penetration in the Delaware Valley?
2  A.  Very much so. Philadelphia at the time was
3  being compared to other marketplaces like
4  Minneapolis and California as far as the level
5  of managed care penetration.
6  Q.  And there was significant managed care
7  penetration in Minneapolis and California?
8  A.  They were leaders in the country as far as
9  managed care penetration was concerned.
10 Q.  And I think we discussed earlier where there is
11 managed care, you typically receive less
12 reimbursement for the same operation than you
13 would under an indemnification system. Right?
14 A.  You receive less reimbursement and also the
15 administrative liabilities concerned with those
16 contracts is much greater; so, therefore, it's
17 going to result in further reduced payments.
18 Q.  And I think we also discussed earlier that
19 these were the same managed care providers who
20 engaged in a payment slowdown in the Delaware
21 Valley --
22 A.  Yes.
23     MR. TORBORG: Object to the form.
24     THE WITNESS: Yes.
25 BY MR. LUFT:

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 115

1  Q.  Thank you.
2      Now, you also mentioned that you felt
3  that the hospitals were not doing a very good
4  job adapting to the growth in managed care in
5  the Philadelphia market. Is that correct?
6  A.  Yes.
7  Q.  In your opinion, what were they failing to do?
8  A.  They were failing to control the input or the
9  intake of patients and the administrative
10 duties that are associated with those various
11 contracts.
12 Q.  Now, is it your understanding that previously
13 these Delaware Valley hospitals had been
14 separate entities, had not been all one unit
15 when AHERF purchased them?
16     Let me strike that.
17     Each of the Delaware Valley hospitals
18 had been purchased by AHERF or one of its
19 predecessor organizations. Is that correct?
20 A.  That's my understanding.
21 Q.  Prior to purchase, they had separate CEOs,
22 separate staff, and separate contracts. Is
23 that correct?
24 A.  That's my understanding.
25 Q.  Do you believe the fact that there were all

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 116

1  these different systems prior to purchase by
2  AHERF led to the greater problems adapting to
3  the managed care?
4  A.  Define "systems."
5  Q.  I'm sorry?
6  A.  Define "systems."
7  Q.  Why don't I just try to ask the question again
8  so it's clear.
9  A.  Okay.
10 Q.  Were you ever of the belief that the fact that
11 each of these entities had previously been
12 independent and were not a consolidated group
13 prior to the purchase of AHERF led to greater
14 problems adapting to the rise of managed care
15 in Philadelphia?
16     MR. TORBORG: Object to the form.
17     THE WITNESS: I really don't have an
18 opinion. I don't know.
19 BY MR. LUFT:
20 Q.  Now, I asked you previously who you spoke with
21 at Coopers & Lybrand, and I believe you told me
22 about once a year would you speak to
23 Mr. Buettner.
24 A.  Yes.
25 Q.  You spoke with Mr. Kalisevsky at the same

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 117

1  meeting where would you speak to Mr. Buettner?
2  A.  Yes.
3  Q.  How often would you speak to Mr. Kalisevsky
4  aside from that meeting?
5  A.  Maybe two times a year.
6  Q.  And when would those times be?
7  A.  There would be an audit preconference.
8  Q.  That's the meeting where you were with
9  Mr. Buettner?
10 A.  There would be a preliminary finding of
11 results, and there would be a final
12 presentation of the results of the audit, and
13 there may have been some interaction in between
14 time as far as hallway conversation, as far as
15 a quick update as far as what they're finding,
16 but nothing --
17     Most of the workings or dealings with
18 Coopers in the department was between Russ
19 Laing and Coopers.
20 Q.  Did you ever speak with Amy Frazier?
21 A.  I don't know. I know the name. I don't
22 remember who she is.
23 Q.  Okay. Do you recall ever speaking with anyone
24 who was a manager at Coopers & Lybrand?
25 A.  I believe Nora was a manager.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

30 (Pages 114 to 117)

GREGORY SNOW

Page 118

1  Q.   Do you recall ever speaking to the manager of
2       the AHERF -- the manager on the AHERF audit or
3       the managers on the AHERF audit?
4  A.   I thought it was Nora.
5  Q.   Do you recall ever speaking with Mr. Kirstein,
6       Mark Kirstein?
7  A.   Again, I know the name.  I probably did, but I
8       don't remember the specifics or anything like
9       that.
10 Q.   So you have no specific recollections of any
11      conversations with either Mr. Kirstein or
12      Ms. Frasier?
13 A.   Other than --
14          No.  The only time I can think that
15      we would have spoken would have been in these
16      various updates as far as the results, and I
17      don't have specific recollection of times,
18      dates, places, or basically the extent of the
19      conversations.  Most of my interaction was with
20      Nora.
21 Q.   And, in fact, you don't even recall who
22      Mr. Kirstein and Ms. Frazier specifically are.
23      Correct?
24 A.   If they walked in the room right now, I
25      wouldn't know.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 119

1  Q.   Okay.  Do you recall ever having any
2       conversations Christa Porter?
3  A.   I'm sorry.  Who?
4  Q.   Christa Porter.
5  A.   I don't know who that is.  No.
6  Q.   So you have no recollection of having --
7  A.   No.
8  Q.   Do you recall having any conversations with
9       Christa Heinlein?
10 A.   No.  Again, I'm sorry.  I don't have any
11      recollection.
12 Q.   Did you recall having any conversations with
13      Brian Christian?
14 A.   No, I'm sorry.  I do not.
15 Q.   When you spoke with Mr. Buettner, what was the
16      purpose of those conversations?
17 A.   Coopers presented their audit plan for the year
18      and what documents they needed from us to be
19      able to perform their audit.
20 Q.   The audit plan they presented, was that for all
21      of AHERF or just specific to the patient --
22 A.   Specific to patient accounting.
23 Q.   Would you have input --
24          Would you give Mr. Buettner any input
25      at those meetings what you thought should be

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 120

1       looked at by Coopers & Lybrand?
2          MR. TORBORG:  Object to the form.
3          THE WITNESS:  No.  The only time I
4       ever suggested anything to anyone, I believe it
5       was in the February, 1997, time frame, that
6       without coming out directly and saying
7       anything, you should just please be very
8       thorough in your audit.
9  BY MR. LUFT:
10 Q.   I believe you just said without saying anything
11      directly.  Is that correct?  Did I hear that
12      correctly?
13 A.   That's correct.
14 Q.   Why do you say without saying anything
15      directly?
16 A.   There were accounts in the active accounts
17      receivable that had been there since 1995 that
18      were uncollectible.  If I had said anything
19      directly, I would have been terminated.
20 Q.   I'm going to come back to both parts of that.
21          When you say 1995, are you referring
22      to fiscal year 1995?
23 A.   Calendar year 1995.
24 Q.   So that would be fiscal year 1996?
25          MR. TORBORG:  Object to the form.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 121

1          THE WITNESS:  The conversation took
2       place --
3          MR. LUFT:  Let me strike that.
4  BY MR. LUFT:
5  Q.   Do you know if those accounts were fiscal year
6       1996 or fiscal year 1995?
7  A.   These were accounts with dates of service prior
8       to June 30th, 1995.
9  Q.   Now, the second part, I believe, what you said
10      was if you said anything, you would have been
11      terminated.
12 A.   That's correct.
13 Q.   Who would have terminated you?
14 A.   Who would have directly terminated me would
15      have been Mr. Dionisio, and he would have been
16      told to terminate me by my bosses, and that's
17      my opinion.  It's strictly an opinion.
18 Q.   Was it your understanding that if you told
19      Coopers & Lybrand certain information about
20      accounts receivable, you would be fired?
21          MR. TORBORG:  Object to form.
22          THE WITNESS:  Could you repeat the
23      question, please.
24 BY MR. LUFT:
25 Q.   Let me ask you this.  You said that you believe

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

31 (Pages 118 to 121)

GREGORY SNOW

Page 122

1    you would be fired.
2  A.  Yes.
3  Q.  What do you believe you would have had to have
4      done to precipitate your being fired?
5  A.  In September of 1995 -- excuse me.
6          In August and September of 1995, we,
7      as a patient accounting department, had
8      identified approximately $50 million of
9      accounts receivable that were uncollectible.
10     We had started attempting to write some of
11     those accounts off at that time.  At a staff
12     meeting --
13         At Mr. McConnell's staff meeting in
14     the Clark Building in September of 1995, I was
15     told to stop the activity of writing those off,
16     and that they would be taken care of at a later
17     time.
18         Okay.  Well, as of the first part of
19     1997, the accounts were still in the active
20     receivables.
21 Q.  And you believe if you told Coopers & Lybrand
22     about these accounts, you would be fired?
23 A.  Yes.
24 Q.  What was your belief that you would be fired
25     based on?

Page 123

1  A.  The culture of the organization.
2  Q.  Could you expand on what you mean by the
3      "culture of the organization"?
4  A.  The organization was basically, in my opinion,
5      controlled by three people, and if you did
6      anything that was deemed to be detrimental or
7      outside of that -- if you did something, you
8      did that --
9          If you performed the function or did
10     something you weren't supposed to allegedly do,
11     that the ultimate result of that action would
12     be termination.
13 Q.  Do you know if anyone else at AHERF believed --
14     strike that.
15         Did you ever hear anyone else at
16     AHERF express the belief that if they did
17     something which was not deemed as correct by
18     those controlling AHERF, that they, too, would
19     be fired?
20 A.  Yes.
21 Q.  Who expressed that opinion to you?
22 A.  Let's just say it was numerous people, and it
23     was a common belief within the organization.
24 Q.  Do you recall anyone specifically?
25 A.  No.

Page 124

1  Q.  In keeping with that belief, were you of the
2      opinion that you were not to share internal
3      information with anyone from the outside?
4          MR. TORBORG:  Object to the form.
5          THE WITNESS:  No.  I --
6          No.  If information was requested,
7      then I would provide it or attempt to get
8      clearance to provide it, but I was not going to
9      volunteer any information.
10 BY MR. LUFT:
11 Q.  Even if you believed that information to be
12     relevant?
13 A.  That's correct.
14 Q.  Did you ever seek clearance to give information
15     to Coopers & Lybrand but were told not to?
16 A.  I don't believe so.
17 Q.  And you would have sought clearance from
18     Mr. Dionisio?
19 A.  Yes.
20 Q.  Now, you said you wouldn't have volunteered
21     information to Coopers & Lybrand even if that
22     information was relevant to you.  Right?
23 A.  Yes.
24 Q.  And that was based on your belief that that
25     would lead to your termination?

Page 125

1  A.  Yes.
2  Q.  Do you know if Mr. Laing was of the same
3      opinion that if he volunteered information he
4      would be fired from Coopers and --
5          MR. TORBORG:  Object.
6  BY MR. LUFT:
7  Q.  Excuse me.  Do you know if Mr. Laing ever
8      expressed to you if he volunteered information
9      to Coopers & Lybrand, he would be fired by
10     AHERF?
11 A.  I don't remember any such conversation.  It
12     could have taken place.  I don't remember.
13 Q.  And you said that it was part of AHERF's
14     culture.  Correct?
15 A.  Yes.
16 Q.  Not something specific to the patient financial
17     services group?
18 A.  No.
19 Q.  Was Coopers & Lybrand viewed as an outsider to
20     AHERF?
21         MR. TORBORG:  Object to the
22     foundation.
23         THE WITNESS:  Define "outsider."
24 BY MR. LUFT:
25 Q.  Did you view Coopers & Lybrand to be outside of

32 (Pages 122 to 125)

GREGORY SNOW

Page 162

1   Q.   Do you recall how much was missed contractuals?
2   A.   No, I do not.
3   Q.   Do you recall if it was greater than
4        $52 million?
5   A.   I don't know the exact number. I'm sorry.
6   Q.   So a portion of that remaining money, the
7        $58 million, the difference between what you
8        estimated was you collected the 52, and the 110
9        was money that AHERF was never entitled to.
10  A.   That's correct.
11            MR. TORBORG: Object to form.
12  BY MR. LUFT:
13  Q.   Now, you said that there was no overlap?
14  A.   I don't believe there was any overlap between
15       the two.
16  Q.   Okay. So when we're talking about that, we're
17       discussing what? I guess the remaining
18       $52 million, if you started with 102 and
19       collected 58, there made be $52 million of
20       accounts on Patcom which you believe would be
21       either accounts at gross or past statute
22       accounts?
23  A.   Yes.
24  Q.   And do you recall knowing if those accounts had
25       been reserved for on the bad debt reserve by

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 163

1        AHERF?
2   A.   I have no idea.
3            MR. LUFT: I would like to mark as
4        Exhibit 1758 a document Bates stamped DC 0917,
5        Page 30 of 30.
6            - - - -
7            (Deposition Exhibit No. 1758 marked
8        for identification.)
9            - - - -
10           (The witness reviewed the document.)
11           - - - -
12  BY MR. LUFT:
13  Q.   Do you recognize this document, Mr. Snow?
14  A.   Yes.
15  Q.   What is this document?
16  A.   It was a confirmation that adjustments were
17       made for past statute write-offs in March,
18       1997, and it was the second phase of the --
19       from the new October, 1996, adjustments.
20  Q.   And these write-offs were taking place at MCC
21       St. Christopher, and Bucks. Right?
22  A.   Yes.
23  Q.   And this is, again, fiscal year 1997. Correct?
24  A.   Yes.
25           MR. LUFT: I'd like to show you a

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 164

1        document that has been previously marked as
2        Exhibit 903.
3            - - - -
4            (Deposition Exhibit No. 903 marked
5        for identification.)
6            - - - -
7   BY MR. LUFT:
8   Q.   Do you recognize this document, Mr. Snow?
9   A.   I believe I saw it in a previous deposition.
10  Q.   Do you recall seeing it absent prior to that
11       deposition?
12  A.   I don't remember, but at the same time I have
13       no reason to say that I didn't.
14  Q.   And this is a memo from Mr. Gedman to yourself
15       dated June 30th, 1997?
16  A.   Yes.
17  Q.   And as you just said, you have no reason to
18       believe that you didn't receive it.
19  A.   That's correct.
20  Q.   And what does this document refer to?
21  A.   It was an accumulation of past statute
22       write-offs that occurred during fiscal year
23       1997. We did this in four phases at
24       $20 million each and for a total of just under
25       $80 million.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 165

1   Q.   Does this refresh your recollection about how
2        much was written off in fiscal year 1997 from
3        AHERF's accounts receivable?
4   A.   Yes. I originally thought it was $50 million.
5        This is fine.
6   Q.   Okay. Did you have an understanding of what
7        effect an $80 million write-off would have on
8        AHERF's financial statements?
9   A.   Yes.
10  Q.   What was your understanding?
11  A.   That there were not sufficient reserves to
12       cover that type of a write-off at the time, and
13       this is the reason why we were told in
14       September of 1995 that we could not perform
15       these write-offs, and that it would have to be
16       taken care of over a period of time because
17       the -- because it would have a severe financial
18       impact to the profitability of AHERF.
19  Q.   And it's your understanding that the exact same
20       receivables that were at issue in September of
21       '99 were the same receivables that were
22       included in this financial statement --
23           MR. TORBORG: Object to the form.
24           MR. LUFT: Strike that. Let me
25       finish the question.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

42 (Pages 162 to 165)

GREGORY SNOW

Page 166

1      MR. TORBORG: If I can stop real
2  quick, if you can, give me just a fraction of a
3  second to get my objection in after he asks the
4  question so I don't have to interrupt him
5  trying to get it in there.
6      THE WITNESS: No problem.
7      MR. LUFT: Is it your understanding
8  that the same accounts receivable which you
9  identified as problematic in the beginning of
10  fiscal year 1996 were still the exact same
11  accounts receivable which were being written
12  off in fiscal year 1997?
13      MR. TORBORG: Object to form and
14  foundation.
15      THE WITNESS: Yes.
16  BY MR. LUFT:
17  Q.  And what do you base your understanding of that
18     on?
19  A.  I don't have any written documentation to that
20     effect, but I was simply there at the time.
21  Q.  Who made the decision to write off the
22     $80 million in fiscal year 1997?
23  A.  I believe it was Mr. McConnell.
24  Q.  Was this a decision made within the general
25     accounting office, to your knowledge?
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 167

1  A.  I have no idea.
2  Q.  Did Mr. McConnell ever call you and ask you if
3     you believed that AHERF should -- at October,
4     1996, begin writing off accounts receivable?
5  A.  No.
6  Q.  Prior to writing off the accounts receivable in
7     fiscal year 1997, did you check on the amount
8     of bad debt reserves that AHERF had?
9  A.  No.
10  Q.  And previously you told me that if you were to
11     make a judgment about whether to write off an
12     account, in your perspective, you would be
13     concerned with what the amount of bad debt
14     reserves were. Is that correct?
15  A.  Correct.
16  Q.  Whose responsibility would it have been to have
17     the accounts receivable accurately reflected on
18     the financial statements, if you know?
19  A.  General accounting.
20  Q.  Do you know who in general accounting in
21     particular?
22  A.  I don't know who specifically performed the
23     function, but the department was the
24     responsibility of Mr. Spargo.
25  Q.  Did you ever tell Coopers & Lybrand that AHERF
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 168

1     was writing off $80 million of accounts
2     receivable?
3  A.  No.
4  Q.  Do you know if Mr. Spargo ever told
5     Coopers & Lybrand that AHERF was writing off
6     $80 million in accounts receivable?
7  A.  I don't know.
8  Q.  Do you know if Mr. Cancelmi ever told
9     Coopers & Lybrand that AHERF was writing off
10     $80 million of accounts receivable in fiscal
11     year 1997?
12  A.  I don't know.
13  Q.  Do you know if Mr. Cancelmi ever told
14     Coopers & Lybrand that $80 million was being
15     written off of the accounts receivable prior to
16     the release of the fiscal year 1996 financial
17     statements?
18  A.  I don't know.
19  Q.  Did you ever tell Coopers & Lybrand that --
20     strike that.
21      Prior to the beginning of the
22     write-off of the $80 million in fiscal year
23     1997, did you ever tell Coopers & Lybrand that
24     you believed that there were accounts
25     receivable which needed to be written off?
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 169

1  A.  No.
2  Q.  So throughout fiscal year 1996, you never told
3     Coopers & Lybrand that AHERF needed write off
4     accounts receivable?
5  A.  No.
6  Q.  In fiscal year 1997, did you ever tell
7     Coopers & Lybrand that you believed AHERF
8     needed to write off accounts receivable because
9     they were uncollectible?
10  A.  No.
11  Q.  In the fall of fiscal year 1997, were you
12     aware -- are you aware that
13     Coopers & Lybrand -- strike that.
14      Do you have any reason to believe in
15     the fall of fiscal year 1997 Coopers & Lybrand
16     was aware of the write-off of the $80 million?
17     MR. TORBORG: Object to form; the
18     wrong date.
19     MR. DeMONACO: I don't think she's
20     capturing what you're saying
21     MR. TORBORG: I guess I don't know
22     what fall of fiscal year 1997 means. That's
23     why I'm objecting.
24  BY MR. LUFT:
25  Q.  Okay. I can put months to it.
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

43 (Pages 166 to 169)

GREGORY SNOW

Page 186

1  Q.  So you have no knowledge of whether AHERF's bad
2      debt reserves ever increased by $17.5 million
3      during fiscal year 1996?
4  A.  No, sir, I do not.
5  Q.  If, in fact, $17.5 million had been added to
6      AHERF's bad debt reserve, at least as of this
7      May 31st, 1996, date, that would cover the
8      entire amount listed in the total unreserved
9      column.  Correct?
10 A.  For past statute, yes.
11 Q.  Now, I also want to ask you, there were a
12     number of managed care payors.  Correct?
13 A.  Yes.
14 Q.  And about how many would you say?
15 A.  I'm going to estimate 75 to 80.
16 Q.  75 to 80 managed care payors?
17 A.  Yes.
18 Q.  Each one had a distinct contract with AHERF.
19     Correct?
20 A.  Yes.
21 Q.  As part of that distinct contract, they each
22     negotiated a distinct period of time by which
23     AHERF had to submit its claims on accounts
24     receivable.  Correct?
25 A.  Yes.
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 187

1      MR. TORBORG:  Object to form.
2      THE WITNESS:  Yes.
3      MR. LUFT:  Do you recall if any of
4      those managed care payors had a period of time
5      greater than one year to pay?
6      MR. TORBORG:  Object to form.
7  BY MR. LUFT:
8  Q.  Strike that.  Mr. Snow, do you recall if any --
9      well, strike that.
10     Mr. Snow, were you privy to the
11     contracts between AHERF and the managed care
12     providers?
13 A.  They were available upon request.
14 Q.  And as part of your job heading the patient
15     financial services group, it was important that
16     you knew how long AHERF had to submit its
17     claims?
18 A.  Yes.
19 Q.  Are you aware of any contracts AHERF had with
20     the managed care provider which allowed for
21     greater than one year in which AHERF could
22     submit its claim?
23 A.  Blue Cross is the only thing, and I'm not even
24     sure on that.  Some of the managed care
25     plans -- Blue Cross could have been up to 18
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 188

1      months, but I don't remember specifically.
2  Q.  And Blue Cross is the only one in your
3      recollection which would have allowed for more
4      than one year to submit a claim of the 80-odd
5      managed care payors in the Delaware Valley
6      region?
7  A.  I can't think of any, but at the same time, I
8      can't remember.
9  Q.  Okay.  Mr. Snow, are you aware that -- strike
10     that.
11         - - - -
12         (Deposition Exhibit No. 8 previously
13     marked for identification.)
14         - - - -
15 BY MR. LUFT:
16 Q.  I want to show you a document.  Mr. Snow, I'd
17     like to show you what has been marked as
18     Deposition Exhibit No. 8.  Do you recognize
19     this document, Mr. Snow?
20 A.  Yes.
21 Q.  What is this document?
22 A.  It was a memo from Cancelmi to Stephen Spargo
23     with restructuring charges earmarked for bad
24     debt reserves.  The essence of it was reserves
25     were being moved from the Graduate Hospitals
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 189

1      into AHERF to cover the write-offs that needed
2      to take place.
3  Q.  And this is an April 14th, 1997, memo.
4      Correct?
5  A.  Yes.
6  Q.  Do you see on the third page of the document in
7      the carbon copy section you're listed?
8  A.  Yes.
9  Q.  And do you recall receiving this document?
10 A.  I believe so, yes.
11 Q.  Okay.  And I believe, as you just said, in the
12     first line it says, in an effort to alleviate
13     the Delaware Valley patient accounts receivable
14     estimated bad debt reserve shortfall, a
15     decision has recently been made to record
16     approximately $50 million of restructuring
17     reserves on the various Graduate Hospitals.
18         Do you recall that $50 million of
19     reserves from Graduate were moved to the
20     Delaware Valley for bad debt reserves?
21 A.  At the time, we were not aware of where the
22     reserves were coming from, but we knew that
23     monies being -- we had received phone calls
24     stating that it was okay to start writing some
25     of the accounts off in question.
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

48 (Pages 186 to 189)

GREGORY SNOW

Page 190

1 Q. If I can read the sentence after the one I just
2 said, it says, in turn, these reserves will be
3 transferred over to the AHERF Delaware Valley
4 hospitals via intercompany account transfers
5 which will serve to increase the hospital's bad
6 debt reserve balances.
7 Now, those two sentences informed you
8 that the reserves from coming from Graduate
9 Hospitals and going to the Delaware Valley
10 hospitals. Is that correct?
11 A. That's correct.
12 Q. So as of the time of your receipt of this memo,
13 you were aware of where the reserves were
14 coming from. Correct?
15 A. I remember seeing this memo in one of the
16 depositions. I do not remember seeing it at
17 the time when the memo came out.
18 I had received a call one day from
19 Mr. Dionisio saying that it was okay to start
20 writing off a portion of the accounts that had
21 been previously referred to.
22 At a later time it came to our
23 attention that the monies had come from
24 Graduate.
25 Q. As we noted, you're CC'd on this memo.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 191

1 Correct?
2 A. Yes, I am.
3 Q. Do you have any reason to believe you did not
4 receive this memo around the time it was
5 written on April 14th, 1997?
6 A. No.
7 Q. And if you received it, you would have been --
8 you would have understood the first paragraph
9 of it to tell you that reserves from Graduate
10 Hospital were being transferred to the Delaware
11 Valley hospitals?
12 A. Yes.
13 Q. Did you ever discuss the transfer of the
14 50 from the Graduate Hospitals to the Delaware
15 Valley hospitals in fiscal year 1997?
16 A. To the best of my knowledge, no.
17 Q. Did you ever discuss it with anyone in fiscal
18 year 1998?
19 A. To the best of my knowledge, no.
20 Q. Did you have any belief at the time you read
21 this memo or you were alternatively informed
22 about the transfer of reserves from Graduate to
23 the Delaware Valley about whether this transfer
24 was proper or not?
25 A. No. I never had any discussions of that kind.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 192

1 Q. Did anyone at AHERF ever express to you that
2 they did not believe that this transfer was
3 proper?
4 A. No, not to my recollection.
5 Q. Did you ever become aware of the transfer of
6 reserves from the Graduate Hospitals to the
7 Delaware Valley in addition to the $50 million
8 indicated in the April 14th, 1997, memo?
9 A. To the best of my knowledge, yes.
10 Q. So you never were aware of any additional
11 transfers beyond $50 million from the Graduate
12 Hospital to the Delaware Valley?
13 A. To the best of my knowledge, no.
14 Q. So you would have never discussed any transfers
15 beyond the initial $50 million?
16 A. Again, to the best of my knowledge, no.
17 Q. Okay. Now, did you ever discuss the transfer
18 of reserves from the Graduate Hospitals to the
19 Delaware Valley with anyone from
20 Coopers & Lybrand during the fiscal year 1997
21 audit?
22 A. No.
23 Q. Did you ever discuss it with them during any
24 point in time during fiscal year 1997?
25 A. No.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 193

1 Q. Did you ever discuss the transfer of reserves
2 from the Graduate Hospitals to the Delaware
3 Valley with anyone from Coopers & Lybrand?
4 A. No.
5 Q. Are you aware of anyone at AHERF who did
6 discuss the transfer of reserves from Graduate
7 to the Delaware Valley hospitals with -- strike
8 that.
9 Are you aware of anyone at AHERF who
10 did discuss with Coopers & Lybrand the transfer
11 of reserves from the Graduate Hospitals to the
12 Delaware Valley hospitals?
13 A. No.
14 Q. Mr. Laing, I believe earlier you mentioned --
15 MR. DeMONACO: Mr. Snow.
16 BY MR. LUFT:
17 Q. Mr. Snow. I'm sorry about that.
18 I believe earlier you mentioned
19 Mr. Laing worked for you.
20 A. Yes, he did.
21 Q. And that he was someone you hired.
22 A. Yes.
23 Q. Do you recall if during fiscal year 1997
24 Mr. Laing was ever involuntarily committed by
25 the State of Pennsylvania?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

49 (Pages 190 to 193)