GREGORY SNOW

---

Page 206

1    patient financial services.
2  Q.   And what job duties did Mr. Laing have in that
3       role as the director of financial reporting
4       within the patient financial services group?
5  A.   We published a series of daily, weekly, and
6       monthly reports as far as various indicators of
7       collection activity, et cetera, for the
8       hospitals that we were performing the service
9       for, and it was Mr. Laing's department which
10      had maybe five or six people in it in total to
11      be able to provide this information.
12 Q.  Do you recall when Mr. Laing started at AHERF?
13 A.   I believe it was in either May or June,
14      probably June of 1995.
15 Q.  Do you recall who recruited Mr. Laing to AHERF?
16 A.   We ran an ad in the paper, a classified ad, I
17      believe, in the Post-Gazette, I believe,
18      advertising for the position; and at that
19      particular point in time he was with UPMC, and
20      he responded to the ad.
21          He went through an interview process
22      just like every other viable candidate, and he
23      was the one who was selected for a position.
24 Q.  Did you make the decision to hire Mr. Laing?
25 A.   Yes.
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 207

1  Q.   Did you have an understanding that Mr. Laing
2       had an extensive background in accounts
3       receivable and patient revenue issues when you
4       hired him?
5  A.   Yes.
6  Q.   Why did you go about hiring someone like
7       Mr. Laing to work under you at PFSG?
8          MR. LUFT:  Objection.
9          THE WITNESS:  Because I wanted to
10      make sure that we had accurate -- bad choice of
11      words -- that we had information available to
12      us on a daily basis from an internal
13      perspective again such as cash reports,
14      productivity measurements, various AR reports.
15         We were being asked to perform
16      analysis on various swings or -- "swings" is,
17      again, probably not a good choice of words, but
18      various activities or flows within the accounts
19      receivable on a month-to-month basis, and I
20      needed some assistance in providing that
21      analysis.
22 BY MR. TORBORG:
23 Q.  You needed someone with a stronger accounting
24      background than yourself?
25 A.   Not only a stronger accounting background, but
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 208

1       more someone who had more of a
2       financial/analytical background to help assist
3       in this area.
4  Q.  Specifically relating to the areas of accounts
5       receivable and patient revenue and other issues
6       particular to health care receivables?
7  A.   Yes.
8  Q.  Did you understand that Mr. Laing was
9       particularly experienced in those areas?
10         MR. LUFT:  Objection.
11         THE WITNESS:  Yes.
12 BY MR. TORBORG:
13 Q.  Now, you've worked at several different patient
14      financial groups at health care systems.
15 A.   Yes.
16 Q.  You've worked at Cleveland Clinic twice and now
17      Duke.
18 A.   Yes.
19 Q.  Is it typical for the patient financial
20      services or the billing office to have someone
21      in Mr. Laing's role?
22 A.   I don't know if it's typical in the industry,
23      but it's something I have always insisted on
24      everywhere I've worked.
25 Q.  Let me back up.  At the other places you've
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 209

1       worked, have you had occasion to interact with
2       auditors, the outside auditors of the entity?
3  A.   Yes.
4  Q.  What has been the nature of those interactions?
5  A.   Very much similar to what we had at AHERF.  The
6       auditors would come in annually and do an
7       audit, have a preaudit conference.
8          We'd be given a list of documents we
9       needed to supply, plus our annual reports,
10      would be asked to provide a status on the
11      various accounts that were selected at random,
12      and we'd provide that information to the
13      auditors and answer any questions and any audit
14      comments that would come back.
15 Q.  During your time at AHERF, do you believe that
16      Mr. Laing was a particularly fertile source of
17      information regarding financial reporting
18      issues in the accounts receivable and patient
19      revenue areas?
20         MR. LUFT:  Objection.
21         THE WITNESS:  Yes.
22 BY MR. TORBORG:
23 Q.  Would you have expected the outside auditors to
24      ask Mr. Laing any questions, should they have
25      any questions?
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

53 (Pages 206 to 209)

GREGORY SNOW

Page 210

1  A.   I believe so, yes.
2  Q.   Why do you say that?
3  A.   Well, every time that we had the preconference
4       audits, Russell was designated as the point
5       person from a patient accounting perspective to
6       interact with the auditors.
7            If they needed anything, they would
8       go to Russell. If they needed additional
9       reports, Russell was to be the liaison with the
10      audit fund.
11 Q.   What is the extent of your knowledge about what
12      reports the patient financial services group
13      gave to Coopers & Lybrand during
14      Coopers & Lybrand's audits or other engagements
15      of AHERF's receivables?
16 A.   We gave whatever we were asked for.
17 Q.   It wasn't just information relating to 25 or 30
18      samples, was it?
19 A.   I believe --
20           MR. LUFT:  Objection.
21           THE WITNESS:  I believe there was a
22      letter put out. I believe it's called a
23      preaudit letter. I'm not sure of the exact
24      title, but there was a letter produced for
25      AHERF at the time, AHERF as a whole.
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 211

1            I believe it was being managed from a
2       general accounting perspective through a
3       gentleman by the name of Jack London -- or
4       Lydon, excuse me -- and of the documents that
5       were provided, a subset of the data that was
6       necessary came from -- was to come from patient
7       and financial services.
8            MR. TORBORG:  Mr. Snow, I'd like to
9       show you what has been previously marked as
10      Exhibit 1312, and I think you'll tell me that
11      this is the type of -- the type of a request
12      that you were just referring to.
13               - - - -
14      (Deposition Exhibit No. 1312
15      previously marked for identification.)
16               - - - -
17           THE WITNESS:  Yes.
18 BY MR. TORBORG:
19 Q.   And I'd like to specifically ask that you turn
20      to the page that ends with the Bates number
21      01347 in the bottom right-hand corner.
22 A.   Yes.
23 Q.   Just for the record, I know that Exhibit 1312
24      is an April 18, 1997, memo from John Lydon to
25      distribution and includes, among others,
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 212

1       Mr. Snow; and if you go on Page 47 to about the
2       middle of the page where it says patient
3       accounts receivable, have you had a chance to
4       review the items that on that page that go
5       to -- over to Page 48 until the subheading
6       student accounts receivable?
7  A.   Yes.
8  Q.   How much involvement did you have personally in
9       collecting this documentation and providing it
10      to Coopers & Lybrand?
11 A.   Basically none. This would have been Russell
12      and Bill Gedman's responsibility to provide
13      this information.
14 Q.   Would some of the information listed on here
15      also possibly come from the general accounting
16      office, as well?
17 A.   Yes.
18           MR. LUFT:  Objection.
19           Mr. Snow, I'll ask the same thing
20      that Mr. Torborg asked of you. Give me time.
21           THE WITNESS:  Yes.
22           MR. LUFT:  Thank you.
23           THE WITNESS:  No problem.
24 BY MR. TORBORG:
25 Q.   Is it fair to say you're not particularly
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 213

1       knowledgeable about the materials that
2       Coopers & Lybrand would have received in
3       conjunction with their audits of AHERF and its
4       affiliates' receivables?
5  A.   No. I didn't say that. I just said it was
6       someone else's responsibility to obtain the
7       information that they requested to be able to
8       provide to them.
9            I think I'm, in most of these cases,
10      very aware of what they were looking for.
11 Q.   Okay. Did you have an opinion on Mr. Laing's
12      abilities as an accountant?
13 A.   I thought he was brilliant.
14 Q.   And why do you say that?
15 A.   When he took the CPA exam, I believe he was
16      either -- had the second or third highest score
17      that year in the State of Pennsylvania.
18           Also, from an accounts receivable
19      perspective, he had very insightful analysis in
20      regards to fluctuations in receivables or
21      changes in receivables. In my opinion, he
22      added a tremendous amount of value.
23 Q.   Now, we've talked earlier about some of the
24      substance abuse problems that Mr. Laing had.
25      Did you think that that affected his
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

54 (Pages 210 to 213)

LEGALINK MANHATTAN  (212) 557-7400

GREGORY SNOW

Page 214

1    performance in the various roles that he had in
2    the organization as you've previously described
3    them?
4  A.  No.
5  Q.  Do you think it would be fair for someone who
6    was assessing the credibility of Mr. Laing's
7    opinions or other findings in the area of
8    AHERF's accounts receivables to place
9    particular importance on any substance abuse
10   problems he might have had?
11        MR. LUFT:  Objection.
12        THE WITNESS:  No.
13        MR. TORBORG:  Why do you say that?
14        MR. LUFT:  Objection.
15        THE WITNESS:  I don't think it
16   affected his work.
17            - - - -
18        (Deposition Exhibit No. 1760 marked
19   for identification.)
20            - - - -
21        MR. TORBORG:  For the record, what
22   we've marked as Exhibit 1760 bears the Bates
23   numbers DDRAA 52476 through 84.
24        If you would take a quick look at
25   that, Mr. Snow --

Page 215

1            - - - -
2    (The witness reviewed the document.)
3            - - - -
4        THE WITNESS:  Yes.
5  BY MR. TORBORG:
6  Q.  Are you familiar with this document?
7  A.  Yes.
8  Q.  I do note that your name is in the upper
9    right-hand corner of the document.
10       Can you explain what this document
11   is.
12  A.  It's a daily cash report.
13  Q.  What was the purpose of this?
14  A.  This is a report that was implemented when I
15   first arrived to show monies received from the
16   various payors on a daily basis for a
17   particular month in time.
18       Down at the bottom, there is a
19   targeted cash goal, which is derived off of net
20   revenue from several months prior.  It's a
21   formula I've been using for years.
22  Q.  Let me follow up on that.  Targeted cash goal;
23   can you explain what that is again?
24  A.  It's a number that is derived from --
25   I believe at the time the formula we

Page 216

1    were using was we would take 96 percent of net
2    revenue from 60 days prior plus three percent
3    of all AR over 90 days old, and that would
4    become our cash target for that particular
5    month.
6        So in this particular case we were
7    looking at March.  We would use net revenue
8    numbers from January of 1996 as the basis to
9    establish the March, 1996, cash target.
10  Q.  So they're based on net revenues as reported in
11   the monthly financial statements?
12  A.  Yes.
13  Q.  Do you have any concerns about that, the fact
14   that your targeted cash goals were based upon
15   the net revenues as reported in the monthly
16   financial statements?
17  A.  I had no reason to question net revenues at
18   that time.
19  Q.  Did you later have reason to question the net
20   revenues?
21        MR. LUFT:  Objection.
22        THE WITNESS:  I don't know.
23  BY MR. TORBORG:
24  Q.  What would you need to know in order to answer
25   that question?  Just your recollection

Page 217

1    refreshed or --
2  A.  No.  It was just subjective.  I believe at the
3    time, if anything, I thought that the net
4    revenues would be overstated because the
5    reserves, in my opinion, were not sufficient.
6  Q.  Well, I'll certainly come back to that issue.
7        Do you know who developed these
8    reports?  Was it automatically printed off a
9    system?
10  A.  No.  These were --
11       This is a report that I had developed
12   five years prior to that, and it came with me
13   from a previous job, and they were
14   manual-generated reports on a daily basis
15   within Russell Laing's area.
16  Q.  Who all within AHERF, if you know, would have
17   received this document or documents similar to
18   it?
19  A.  Everyone within PFSG would have received these
20   documents.  They were specifically sent to Joe
21   Dionisio on a daily basis and were available to
22   anybody within AHERF who would request them,
23   and it was widely known that these reports
24   existed.
25  Q.  Now, I think we saw earlier a monthly report, I

GREGORY SNOW

Page 218

1   believe marked as Exhibit 902. I want to ask
2   you to get it out.
3        Did you keep a binder of those
4   monthly reports in your office?
5        It's Exhibit 902. It had a cover
6   memo from Mr. Gedman --
7   A.   Okay.
8   Q.   -- if that helps you remember what it is.
9   A.   Yes. Sure. If I didn't have it in my office,
10   I had access to them on a -- within five
11   minutes.
12  Q.   Did you, likewise, keep copies of the daily
13   cash summaries?
14  A.   Same thing.
15  Q.   Okay. Do you know if Coopers & Lybrand, as
16   AHERF's outside auditors, ever asked for or
17   received either of these two documents?
18  A.   I don't know.
19  Q.   If they would have asked for them, would you
20   have provided it to them?
21       MR. LUFT: Objection.
22       THE WITNESS: Yes.
23       MR. TORBORG: Do you have any doubts
24   about the accuracy of the amounts actually
25   reported as cash collections on the schedule?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 219

1        MR. LUFT: Objection.
2        THE WITNESS: No.
3   BY MR. TORBORG:
4   Q.   In your work with other health care companies,
5   have you had occasion to provide collection
6   information to outside auditors?
7   A.   Yes.
8   Q.   And let me ask a few follow-ups on that.
9        Number one, what particular entity or
10   what particular job was that in?
11  A.   Cleveland Clinic and Duke.
12  Q.   Okay. And to the best of your knowledge, why
13   did they want that information?
14       MR. LUFT: Objection.
15       THE WITNESS: Could you rephrase the
16   question or re-ask it, repeat the question,
17   please.
18  BY MR. TORBORG:
19  Q.   Do you know why the auditors auditing the
20   Cleveland Clinic and the Duke Medical System --
21  A.   The University Health System.
22  Q.   -- University Health System -- sorry -- why
23   they requested collection information such as
24   this?
25  A.   It's part of their standard annual audit.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 220

1   Q.   And would it help them determine if the revenue
2   reported was consistent with the cash -- the
3   amount of cash collected?
4        MR. LUFT: Objection.
5        THE WITNESS: I believe they're
6   requesting it in most cases to verify the
7   receivables and the collectibility of the
8   receivables.
9        MR. TORBORG: So are they using it in
10   the context of evaluating or supporting the bad
11   debt reserves?
12       MR. LUFT: Objection.
13       MR. TORBORG: Do you understand my
14   question?
15       MR. LUFT: Objection.
16       THE WITNESS: Could you repeat the
17   question, please.
18       MR. TORBORG: Do you know if the
19   auditors auditing the Duke University Health
20   System and Cleveland Clinic are using the
21   collection information such as we see in
22   Exhibit 1760 to evaluate the sufficiency of the
23   bad debt reserves?
24       MR. LUFT: Objection.
25       THE WITNESS: I don't believe the

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 221

1   report labeled 1760 would help you evaluate bad
2   debt reserves, but evaluating bad debt reserves
3   is part of any standard audit.
4        MR. TORBORG: What would you do to
5   evaluate the sufficiency of bad debt reserves?
6        MR. LUFT: Objection.
7        THE WITNESS: I'd define final
8   collectibility analysis and also look at a
9   thing called zero balance analysis.
10       - - - -
11   (There was a discussion off the record.)
12       - - - -
13       THE WITNESS: Zero balance analysis.
14  BY MR. TORBORG:
15  Q.   Okay. Let me follow up on those one at a time.
16   What's a zero balance analysis?
17  A.   You can take your accounts where the balances
18   have been reduced to zero over a period of time
19   and determine the historical credibility of the
20   accounts in question.
21  Q.   The second item you said you said you are looking at
22   collection information.
23  A.   We pull a sampling of the accounts and
24   determine if the accounts have been worked in
25   an attempt to determine the collectibility and

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

56 (Pages 218 to 221)

GREGORY SNOW

Page 246

1          MR. LUFT: Objection.
2          THE WITNESS: I don't remember.
3   Sorry.
4          MR. TORBORG: Do you think if they
5   had asked for that information, you would know
6   about it?
7          MR. LUFT: Objection.
8          THE WITNESS: If anyone had asked for
9   information, we would have provided it at the
10  time. I just don't remember in that particular
11  instance if it was asked for or not.
12         MR. TORBORG: I want to mark this as
13  our next exhibit. We'll mark this as our next
14  Exhibit, 1762.
15              - - - -
16  (Deposition Exhibit No. 1762 marked
17  for identification.)
18              - - - -
19         MR. TORBORG: I'll note for the
20  record what we have marked as Exhibit 1762
21  appears to be a May 30, 1996, memorandum from
22  Zack Allison to a number of people, including
23  Mr. Snow. Just let me know when you've had a
24  chance to just briefly glance at that memo.
25              - - - -
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 247

1              - - - -
2   (The witness reviewed the document.)
3              - - - -
4          THE WITNESS: Okay.
5   BY MR. TORBORG:
6   Q.  Do you recall this document?
7   A.  Yes.
8   Q.  Was this a document that was prepared on a
9       regular basis?
10  A.  We were attempting to prepare this on a regular
11      basis. I do not remember the exact frequency
12      of how and when it was produced.
13  Q.  And do you recall if anyone requested this
14      analysis be done? Do you know who it was that
15      requested that this be done?
16  A.  Me.
17  Q.  You?
18  A.  Yes.
19  Q.  And I'd like to draw your attention to the
20      third paragraph about halfway through. There
21      is some language there, managed care payors
22      continue to reject more claims than any other
23      financial class.
24              Their near 50 percent rejection rate
25      for both inpatient and outpatient claims seems
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 248

1   to be a function of a more thorough review of
2   utilization and authorization criteria, strict
3   eligibility requirements, and strict
4   informational needs.
5          Is that language consistent with your
6   recollection regarding the rejection of rates
7   of managed care payors?
8   A.  Yes.
9   Q.  I think you testified earlier that managed care
10      had a much higher penetration in the
11      Philadelphia market than they did in the
12      Pittsburgh market.
13  A.  Yes.
14  Q.  Do you recall if there was ever any discussion
15      about the need to increase the bad debt expense
16      at the Philadelphia area hospitals to take into
17      account a phenomena such as this?
18         MR. LUFT: Objection.
19         THE WITNESS: Yes.
20  BY MR. TORBORG:
21  Q.  Okay. What discussions do you remember about
22      that topic?
23  A.  There were numerous discussions, but the one
24      that sticks out the most in my mind was, and I
25      don't remember the exact time frame, but I
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 249

1   believe it was in calendar year 1997, and it
2   was centering around -- I believe it had to be
3   like in the April or May time frame of 1997
4   with respect to the bad debt -- with respect to
5   budgets and, therefore, the bad debt budget for
6   the upcoming fiscal year.
7          I believe earlier I had testified
8   that the bad debt budget for Hahnemann for bad
9   debt charity care was about $200,000 a month,
10  and according to national averages, it should
11  have been somewhere in the $4 million to
12  $5 million range.
13         At the time Mr. Morrison and
14  Mr. Dionisio and myself and I believe at that
15  point in time --
16         I don't remember if Ron Longabucco
17  was there or not, but he might have been. I
18  don't remember when he was hired, but Russell
19  Laing was certainly there.
20         We basically pointed out that the bad
21  debt budget for the coming year for Hahnemann
22  was insufficient, and we were told, instructed
23  at that time, that that would be taken up with
24  Mr. Abdelhak and Mr. McConnell.
25         The next time we met, which I believe
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

GREGORY SNOW

Page 250

1   was several weeks later, we inquired as far as
2   the outcome of their discussions as far as
3   increasing bad debt, the bad debt expense, and
4   we were told it wasn't going to happen because
5   Mr. Abdelhak would not approve it saying that
6   he couldn't afford it, and we'd have to take
7   care of it next year.
8  Q.   When you say Mr. Abdelhak said he couldn't
9       afford it, does that mean the financial
10      statements and purported performance couldn't
11      afford it?
12 A.   That was my understanding.
13           MR. LUFT:  Objection.
14           MR. TORBORG:  In other words, raising
15      bad debt expense to sufficient levels would
16      lower the bad debt expense sufficiently to
17      Mr. Abdelhak.
18           MR. LUFT:  Objection.
19           THE WITNESS:  That was my
20      understanding.
21 BY MR. TORBORG:
22 Q.   Ever face that problem at any other hospital
23      system that you worked at?
24 A.   Faced what problem?
25 Q.   Faced the problem of limitations on the amount

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 251

1   of bad debt expense to be recorded based on
2   considerations on how it would affect the --
3   the reported financial performance identity?
4  A.   No.
5  Q.   Is that your handwriting at the bottom of the
6       page, sent to Joe, David, and Chuck?
7  A.   Yes.
8  Q.   Do you recall whether --
9            And I presume Joe is Joe Dionisio,
10      David is David McConnell, and Chuck is Chuck
11      Morrison.
12 A.   Yes.
13 Q.   Do you recall if they had asked for this
14      analysis?
15 A.   I don't remember, but I don't believe so.
16 Q.   Do you recall whether you yourself or, to your
17      knowledge, anyone else at AHERF ever discussed
18      the concerns about an inadequate bad debt
19      expense with Coopers & Lybrand?
20           MR. LUFT:  Objection.
21           THE WITNESS:  Could you repeat the
22      question, please.
23 BY MR. TORBORG:
24 Q.   That was pretty artful.  I'm going to have to
25      read it off the screen.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 252

1  A.   That was tough.
2  Q.   Do you recall whether you yourself or, to your
3       knowledge, anyone else at AHERF ever discussed
4       the concerns about inadequate bad debt expense
5       with Coopers & Lybrand?
6  A.   I never discussed it with them, and I don't
7       know whether anyone else did or not.
8  Q.   You testified earlier, I think, Mr. Snow, that
9       you wrote off some receivables off Hahnemann
10      University Hospital in the late summer to fall
11      of 1995 upon taking over the billing and
12      collection operations of that entity.
13 A.   Yes.
14 Q.   I think you recalled that without prompting.
15      Any reason why it still sticks in your head?
16 A.   No.
17 Q.   What process did you do to analyze whether the
18      accounts you wrote off were, in fact,
19      uncollectible?
20 A.   The first was a timeliness test.
21 Q.   And what do you mean by that?
22 A.   On a payer-by-payer basis comparing the dates
23      of service with statute of limitations for each
24      respective payor.
25           The second piece was we ran reports

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 253

1   to determine if accounts had been -- that there
2   was a payment on the account with no
3   corresponding contractual where there were
4   different transaction codes, so it was a
5   relatively easy report to run.
6        It was a payment posting issue in the
7   Delaware Valley when I arrived, in other words,
8   what was happening was that the accounts were
9   not being netted down at the time of final
10  billing for contractuals, and when payments
11  were coming in or arriving, the payment would
12  be posted and the contractual would not be --
13  was being overlooked by the payment-poster at
14  that point in time; so, therefore, it was
15  balances still being carried on the accounts
16  that were inaccurate.
17 Q.  Who specifically was doing that analysis?  Do
18     you remember?
19 A.  I had a variety of different people doing it at
20     the time because the third step of this was to,
21     as people were going through reviewing accounts
22     and making collection calls, they were to
23     provide documentation or notes on accounts that
24     were -- they deemed to be uncollectible.
25 Q.  Do you recall roughly the amount of write-off

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

64 (Pages 250 to 253)

GREGORY SNOW

Page 254

1    involved with Hahnemann in the summer -- late
2    summer, early fall, time frame of 1995?
3    A.   I believe we wrote off somewhere between
4    $10 million to $16 million prior to being told
5    to stop, but I'm not sure of the exact number.
6    Q.   Is there any doubt in your mind that those
7    amounts that you wrote off were, in fact,
8    uncollectible accounts?
9    A.   There's no doubt whatsoever.
10   Q.   Did you come during your tenure at AHERF to
11   hear the notion that PFSG was writing off
12   collectible accounts?
13   A.   Yes.
14   Q.   Who did you hear those --
15   A.   General accounting and more specifically Steve
16   Spargo.
17   Q.   Do you recall the time frame that he was making
18   those complaints?
19   A.   No. I'm sorry. I do not.
20   Q.   Was it something that was fairly frequent
21   during your time at AHERF?
22   A.   What do you mean "frequent"? What was
23   "frequent"?
24   Q.   The complaints that PFSG was writing off
25   accounts that were collectible.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 255

1    A.   I mean, I heard it. I would say yes, we heard
2    it on a frequent basis, and I think there
3    were --
4         We were hearing it for several
5    reasons. One, it was, in my opinion, a
6    diversionary tactic to try to shift
7    responsibility away from the real problem; and
8    the other thing, I believe that it was --
9         There was, in doing that much in the
10   way of write-offs at Hahnemann, it was a direct
11   reflection upon the due diligence that was done
12   at the time of the acquisition of Hahnemann,
13   and Mr. Spargo was in charge of the due
14   diligence.
15   Q.   Meaning that you believe it's possible that
16   insufficient reserves were set up during the
17   due diligence process?
18        MR. LUFT: Objection.
19        THE WITNESS: I believe they didn't
20   do a very thorough job of analyzing the
21   accounts receivable during the acquisition of
22   Hahnemann.
23        MR. TORBORG: Either that or they had
24   already used all the reserves that they would
25   have set up.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 256

1         MR. LUFT: Objection.
2         THE WITNESS: I can't answer that. I
3    don't know.
4    BY MR. TORBORG:
5    Q.   You don't know. Okay.
6         What was your reaction to the notion
7    that PFSG was writing off collectible accounts?
8    A.   It was bogus, and I asked people to prove it.
9    Q.   Was anyone ever able to prove it?
10   A.   No. I believe, just to add something to that,
11   I believe that again, going back to some of the
12   previous exhibits, yes, we were writing items
13   off which we deemed to be uncollectible, and
14   people don't want to hear about the fact that
15   their intake processes were lacking.
16   Q.   And that's the real problem that you referred
17   to earlier?
18   A.   Yes. In other words, the real problem was
19   there was a sufficiency in the operations of
20   the respective hospitals. Patient accounting,
21   to use an example, is like a funnel. Patient
22   accounting is at the bottom of that funnel.
23   Anytime anyone up above that makes a mistake,
24   it ultimately ends up in patient accounting,
25   and patient accounting is a very convenient

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 257

1    place to say, well, we did our job but they're
2    not. They're not collecting.
3         Well, I believe you'll notice in many
4    of these reports it talks about the lack of
5    quality data and data-gathering.
6         That, to me, is an operational issue
7    and is paramount to the success of a patient
8    accounting department.
9    Q.   Now, these deficiencies that you just
10   explained, these are things that are fixable.
11   A.   Yes.
12   Q.   Right?
13   A.   Yes.
14   Q.   If pressure is brought to bear, these are
15   things that could be improved?
16        MR. LUFT: Objection.
17        THE WITNESS: It would be helpful if
18   you weren't in denial, so --
19   BY MR. TORBORG:
20   Q.   Mr. Luft asked you earlier some questions about
21   the various performance statistics that PFSG
22   would be measured upon, and I believe that one
23   of them was days revenue outstanding.
24   A.   Yes.
25   Q.   Now, would writing off improve that

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

65 (Pages 254 to 257)

GREGORY SNOW

**Page 258**

1  measurement?
2  A.  As previously stated, yes.
3  Q.  Did you ever write off collectible accounts for
4      the sole purpose of improving that ratio?
5  A.  No, because as previously stated, I didn't
6      believe in the ratio to start with, so why
7      would I want to do anything to improve it?
8  Q.  Your most important goal was generating cash?
9  A.  Our job was to collect as much money as humanly
10     possible.
11 Q.  And writing off direct accounts is in direct
12     conflict with doing that?
13 A.  In my opinion, yes.
14     MR. TORBORG:  I'd like to show what
15     we've previously marked as Exhibit 822.  I
16     suspect you've seen this document before
17        - - - -
18     (Deposition Exhibit No. 822
19     previously marked for identification.)
20        - - - -
21     (The witness reviewed the document.)
22        - - - -
23 BY MR. TORBORG:
24 Q.  For the record, Exhibit 822 is an October 2nd,
25     1995, memorandum from Gregory Snow to Joseph
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

**Page 259**

1  Dionisio.
2      Mr. Snow, do you recall this
3      document?
4  A.  Yes.
5  Q.  And I think you'll tell me that this document
6      memorializes something you said more than once
7      today, which is you were given direction not to
8      write off accounts with dates of service prior
9      to July 1, 1995 --
10 A.  That's correct.
11 Q.  -- for any reason.
12 A.  That's correct.
13 Q.  Why did you write this memo to Mr. Dionisio?
14 A.  Two reasons.  One, to have a paper trail and
15     documentation if that decision ever was
16     called -- or if that action was ever called
17     into question, and also Mr. Dionisio instructed
18     me to write the memo.
19 Q.  Do you recall whether it was, if you know,
20     Mr. Dionisio's decision to require you to stop
21     writing off these accounts or whether it was
22     someone else's decision?
23 A.  It was Mr. McConnell's decision.
24 Q.  And you recall that from a meeting you
25     testified about earlier that was in McConnell's
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

**Page 260**

1  office?
2  A.  It was in the Clark Building on a Friday.  It
3      was McConnell's staff meeting.
4      MR. LUFT:  Objection.
5      THE WITNESS:  And I was invited to
6      the meeting to give an update on receivables
7      and basically to be instructed not to perform
8      this task any longer, and I believe it was on
9      the third floor conference room of the Clark
10     Building.
11 BY MR. TORBORG:
12 Q.  Do you recall who all was at that meeting?
13 A.  Mr. McConnell, Mr. Dionisio, Mr. Morrison,
14     Mr. Spargo -- I forget the lady's name --
15     Diane.  She was the head of internal audit.
16 Q.  Schrecengost?
17 A.  Yes, thank you; Rene Sutay, who I believe was
18     the administrator for the Ohio Valley at the
19     time.
20     I don't remember if anyone else was
21     there or not.  It was a full room.  There had
22     to be anywhere from five to ten people in the
23     room at the time.
24 Q.  Do you recall whether anyone expressed
25     disagreement with this new rule not to write
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

**Page 261**

1  off accounts with dates of service prior to
2  July 1, 1995?
3  A.  Other than myself, no.
4  Q.  What disagreement did you express then?
5  A.  I believe at the time I stated something to the
6      effect that I thought it was wrong, and all it
7      was going to do was continue to clutter up the
8      active receivables, and that we were going to
9      have collectors that were going to be tripping
10     over these accounts on a regular basis because
11     they were still residing in active, so they
12     were residing in our collector work files.
13 Q.  Do you think the fact that these accounts were
14     still sitting on the books impeded the
15     collection efforts on other receivables?
16 A.  It wasted time.
17 Q.  Do you believe that it impacted the amount of
18     cash that came in the door?
19 A.  It had the potential.  I can't tell you
20     specifically if it did reduce cash, but it
21     certainly wasted time of collectors that could
22     be working towards accounts that had balances
23     that could be collected
24     MR. TORBORG:  I'd like to show you
25     what we've marked as Exhibit 823.
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

GREGORY SNOW

**Page 262**

1          - - - -
2          (Deposition Exhibit No. 823
3     previously marked for identification.)
4          - - - -
5     (The witness reviewed the document.)
6          - - - -
7          MR. TORBORG:  If you would, take a
8     look at that document, including the
9     handwritten note toward the bottom of the page.
10         For the record, I'll note that
11    Exhibit 823 is a March 25, 1996, memorandum
12    from Gregory Snow to Joseph Dionisio.
13         MR. LUFT:  The date you just said,
14    did you mean 1996?
15         MR. TORBORG:  I did mean that.  Did I
16    say something else?
17         - - - -
18    (There was a discussion off the record.)
19         - - - -
20         MR. TORBORG:  See, he's trying to get
21    me back.
22         THE WITNESS:  Okay.
23    BY MR. TORBORG:
24    Q.   Do you recall this document, Mr. Snow?
25    A.   Yes.
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

**Page 263**

1     Q.   Now, in this document, the circled paragraph
2          reaffirms what you've written in Exhibit 822.
3          Right?
4          MR. LUFT:  Objection.
5          THE WITNESS:  Yes.
6          MR. TORBORG:  Actually, it's a little
7     different.  This one says on October 18, '95, I
8     was informed by Mr. McConnell and yourself not
9     to write off any accounts prior to July 1,
10    whereas your other one refers to a conversation
11    on Friday, September 29.
12         MR. LUFT:  Objection.
13         MR. TORBORG:  What's the nature of
14    the objection?  What am I missing here?
15         MR. LUFT:  I believe the way you're
16    stating the document is incomplete.  You
17    stopped mid sentence for the last few words of
18    the sentence you were reading.
19         MR. TORBORG:  Okay.
20         THE WITNESS:  I made a mistake on
21    Exhibit 823 with respect to the dates in the
22    circled paragraph.
23    BY MR. TORBORG:
24    Q.   My next question focuses on the note, the
25    handwritten note.  Do you recognize that to be
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

**Page 264**

1     Mr. Spargo's handwriting?
2     A.   No.  I believe --
3     Q.   The one that starts with Greg Snow, please
4          note?
5     A.   I don't know whose handwriting it is.  I'm
6     sorry.
7     Q.   Okay.  Whoever wrote that, and I think
8     Mr. Spargo has testified that he, in fact,
9     wrote the note --
10    A.   Okay.
11    Q.   -- it says please note Mr. McConnell's
12    approval above, which is in recognition of the
13    fact that the referenced account balances are
14    actually, quote, missed, end quote, contractual
15    allowances, and then it continues.  Do you
16    recall that --
17         Well, let me back up.  Strike that.
18         What was the policy if AHERF received
19    a payment on one of these accounts dated prior
20    to July 1, 1995, regarding the ability to write
21    off any remaining balance after payment was
22    received?
23    A.   If there was a full balance on the account
24    prior to today -- dates of service prior to
25    July 1, 1995, and a payment was received at a
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

**Page 265**

1     later time, the payment in would be posted to
2     the account, and the contractual would be taken
3     at the same time.
4          We did not have the ability to go
5     back and clear up any accounts that had missed
6     contractuals prior to those dates of service or
7     the payment had already been posted prior to
8     July 1st, 1995, also.
9     Q.   So you wouldn't be allowed to do a review of
10    the accounts to determine any balances that
11    might represent contractual allowances that
12    probably had not been taken and then write them
13    off?
14    A.   We performed a review.  We knew they existed
15    and there were missed contractuals out there,
16    and we were not allowed to do anything about
17    it.
18         MR. TORBORG:  I'm about ready to go
19    on to a new subject.  It's right about five, so
20    maybe it's a good time to break for the day.
21    We'll convene tomorrow.
22         THE VIDEOGRAPHER:  We're now going
23    off the record.  The time is 5:01 P.M.
24         MR. LUFT:  Thank you, Mr. Snow.
25         MR. TORBORG:  Thank you Mr. Snow.
      MANHATTAN REPORTING CORP., A LEGALINK COMPANY

67 (Pages 262 to 265)

GREGORY SNOW

Page 266

```
 1                - - - -
 2     (The proceedings were recessed at 5:03 p.m.)
 3                - - - -
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25        MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

Page 268

```
 1   COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
     COUNTY OF ALLEGHENY           )    S H E E T
 2
 3       I, GREGORY SNOW, have read the foregoing pages
     of my deposition given on Friday, July 25, 2003, and
     wish to make the following, if any, amendments,
 4   additions, deletions or corrections:
 5   Page/Line   Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21       _____
              GREGORY SNOW
22
     Subscribed and sworn to before me this
23   _____ day of _____, 2003.
24   _____
            Notary Public
25        AKF Reference No. Gd76542
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

Page 267

```
 1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
 2   COUNTY OF ALLEGHENY         )  SS:
 3       I, G. Donavich, RPR, CRR, a Court Reporter and
 4   Notary Public in and for the Commonwealth of
 5   Pennsylvania, do hereby certify that the witness,
 6   GREGORY SNOW, was by me first duly sworn to testify
 7   to the truth, the whole truth, and nothing but the
 8   truth; that the foregoing deposition was taken at the
 9   time and place stated herein; and that the said
10   deposition was recorded stenographically by me and
11   then reduced to printing under my direction, and
12   constitutes a true record of the testimony given by
13   said witness.
14       I further certify that I am not a relative or
15   employee of any of the parties, or a relative or
16   employee of either counsel, and that I am in no way
17   interested directly or indirectly in this action.
18       IN WITNESS WHEREOF, I have hereunto set my hand
19   and affixed my seal of office this 27th day of July,
20   2003.
21
22
23   _____
24        Notary Public
25     MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *GREGORY SNOW*
### *July 26, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**SNOW, GREGORY**



**LEGALINK**

A WORDWAVE COMPANY

GREGORY SNOW

---

Page 270

1  VIDEO TAPE DEPOSITION OF GREGORY M. SNOW,
   a witness, called by the Defendant for examination,
2  in accordance with the Federal Rules of Civil
   Procedure, taken by and before Claire Gross, CRR,
3  RDR, a Court Reporter and Notary Public in and for
   the Commonwealth of Pennsylvania, at the offices of
4  MANION McDONOUGH & LUCAS, 14th Floor, USX Tower,
   Pittsburgh, PA  15219, on Saturday, July 26, 2003,
5  commencing at 8:06 a.m.
6
             - - - -
7
8
9  APPEARANCES:
10 FOR THE PLAINTIFF:
   David S. Torborg, Esq.
   JONES DAY REAVIS & POGUE
11 51 Louisiana Avenue, N.W.
   Washington, D.C.  20001-2113
12 202-879-3939
13
14 FOR THE DEFENDANT:
   Avram E. Luft, Esq.
15 CRAVATH, SWAINE & MOORE, LLP
   Worldwide Plaza
16 825 Eighth Avenue
   New York, NY  10019
17 212-474-1296
   412-232-0200
18
19
20 FOR THE WITNESS:
   Charles A. De Monaco, Esq.
21 DICKIE McCAMEY & CHILCOTE
   Two PPG Place, Suite 400
22 Pittsburgh, PA  15222
   412-281-7272
23
24 ALSO PRESENT:
   Ken Ingersoll, videographer
25
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 272

1
2
   * INDEX OF PREVIOUSLY MARKED EXHIBITS *
3
4  Deposition Exhibit 7
   Deposition Exhibit 8
5  Deposition Exhibit 22
   Deposition Exhibit 28
6  Deposition Exhibit 30
   Deposition Exhibit 106
7  Deposition Exhibit 115
   Deposition Exhibit 117
8  Deposition Exhibit 137
   Deposition Exhibit 147
9  Deposition Exhibit 148
   Deposition Exhibit 822
10 Deposition Exhibit 823
   Deposition Exhibit 901
11 Deposition Exhibit 902
   Deposition Exhibit 903
12 Deposition Exhibit 905
   Deposition Exhibit 911
13 Deposition Exhibit 914
   Deposition Exhibit 1088
14 Deposition Exhibit 1251
   Deposition Exhibit 1258
15 Deposition Exhibit 1312
   Deposition Exhibit 1525
16
17
18
19
20
21
22
23
24
25
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 271

1         * I N D E X *
2  Examination by Mr. Torborg - - - - - - - - -  273
   Re-Examination by Mr. Luft  - - - - - - - - -  401
3  Re-Examination by Mr. Torborg - - - - - - - -  425
4
5  Certificate of Court Reporter - - - - - - - -  437
   Errata Sheet - - - - - - - - - - - - - - - -  438
6
7
8
    * INDEX OF EXHIBITS *
9
   Deposition Exhibit 1763 - - - - - - - - - - -  277
10 Deposition Exhibit 1764 - - - - - - - - - - -  278
   Deposition Exhibit 1765 - - - - - - - - - - -  286
11 Deposition Exhibit 1766 - - - - - - - - - - -  297
   Deposition Exhibit 1767 - - - - - - - - - - -  299
12 Deposition Exhibit 1768 - - - - - - - - - - -  311
   Deposition Exhibit 1769 - - - - - - - - - - -  384
13 Deposition Exhibit 1770 - - - - - - - - - - -  361
   Deposition Exhibit 1771 - - - - - - - - - - -  369
14 Deposition Exhibit 1772 - - - - - - - - - - -  373
   Deposition Exhibit 1773 - - - - - - - - - - -  384
15 Deposition Exhibit 1774 - - - - - - - - - - -  428
16
17
18
19
20
21
22
23
24
25
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 273

1         GREGORY M. SNOW,
2  being first duly sworn,
3  was examined and testified as follows:
4             - - - -
5         EXAMINATION
6             - - - -
7      THE VIDEOGRAPHER:  This is day two,
8  tape number one, of the deposition of Gregory
9  Snow.  We are now going back on the record.
10     The time is 8:06 a.m.
11 BY MR. TORBORG:
12 Q.    Good morning, Mr. Snow.
13 A.    Good morning.
14 Q.    Yesterday you gave some testimony to the
15 effect that you were afraid to inform Coopers
16 & Lybrand that you had certain concerns about
17 the uncollectability of accounts.  Do you
18 remember?
19 A.    Yes.
20 Q.    And I believe you said you had concerns over
21 whether you would stay employed at AHERF
22 should you have revealed your concerns?
23 A.    Yes.
24 Q.    I want to follow up on a couple of points on
25 that.  Number one, do you recall whether
   MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

2 (Pages 270 to 273)

GREGORY SNOW

Page 274

1    anyone at AHERF was ever terminated for
2    giving information to Coopers & Lybrand?
3  A.    I'm not aware of any situations, no.
4  Q.    And I believe you also made a distinction
5    yesterday that you never volunteered
6    information to Coopers & Lybrand?
7  A.    That's correct.
8  Q.    Do you recall whether Coopers & Lybrand ever
9    asked you whether you had any concerns about
10    the collectability of certain accounts?
11  A.    No. To the best of my knowledge I was never
12    asked.
13  Q.    Did Coopers & Lybrand ever ask you any
14    questions more generally about your concerns
15    about the collectability of accounts?
16          MR. LUFT:  Objection.
17  A.    I don't believe so. I believe that the only
18    questions that were ever asked were with
19    relation to the specific accounts that were
20    involved in the audit or in the annual audit,
21    and I believe there was a sample, generally
22    speaking -- sample is maybe 25 accounts out
23    of mid six figures.
24  Q.    If Coopers & Lybrand had asked you whether
25    you had any concerns on the overall

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 275

1    collectability of accounts, would you have
2    informed them of those concerns?
3          MR. LUFT:  Objection.
4  A.    I don't know. Most likely the answer would
5    be yes, but the first part of that would be I
6    would have gone to my bosses at that time and
7    would have informed them of what was being
8    asked, and the first step would be to ask for
9    guidance as far as how the situation should
10    be handled.
11  Q.    I would like to show you what we've marked
12    previously in this litigation Exhibit 905.
13    For the record, Exhibit 905 is an October 11,
14    '96, memoranda from Gregory Snow to Joseph
15    Dionisio and Charles Morrison, Subject:  Past
16    Statute DVR.
17          Mr. Snow, if you would take a look
18    through that document briefly. I'll have
19    some questions for you.
20  A.    (Witness reviews document).
21          Okay.
22  Q.    Do you recognize this document?
23  A.    Yes.
24  Q.    Do you recall drafting it?
25  A.    Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 276

1  Q.    Can you explain generally what you're
2    attempting to do in this document?
3  A.    The question was asked of me at the time by
4    Mr. Dionisio to document how much was past
5    statute, what the increase had been over a
6    period of time and attempt to give some
7    reasons why this took place and what was
8    being done to try to correct the situation or
9    make sure it doesn't happen in the future.
10  Q.    And you said in your first sentence Past
11    statute accounts are receivables whose
12    balances have not been resolved within
13    predetermined time frames as set by the
14    payors.  And then you have some time frames
15    in that table.
16          I want to talk about each of those
17    separately, but first talking about Medicare,
18    where did you get this deadline for Medicare?
19    I presume that your reference to 10-1-94 is
20    stating that any receivables with dates of
21    service prior to that date which have not yet
22    been collected are past statute.
23  A.    Yes.
24  Q.    And where did you get that date?
25  A.    The Federal Register.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 277

1          MR. TORBORG:  Why don't we mark as
2    our next exhibit 1763.
3          - - - -
4    (Exhibit 1763 marked for identification.)
5          - - - -
6  Q.    For the record what we've marked as Exhibit
7    1763 is a section of the Federal Register,
8    Section 424.44 -- I'm sorry.  Let me restate
9    that.  42 CFR, Section 424.44 titled Time
10    Limits For Filing Claims, and it also has a
11    section 42.40, but I'll be focusing on the
12    .44 language.  Have you had a chance to look
13    at this?
14  A.    Yes.
15  Q.    Is this the Federal Regulation to which you
16    just referred?
17  A.    Yes.
18  Q.    It says, Section 424.44, Time limits For
19    Filing Claims.  Basic limits, except as
20    provided in paragraph (b) of this section,
21    the claim must be mailed or delivered to the
22    intermediary or carrier as appropriate, and
23    then it has, (1), on or before December 31 of
24    the following year for services then
25    furnished during the first nine months of a

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

3 (Pages 274 to 277)

GREGORY SNOW

Page 402

1  Q.   Which other people would that be?
2  A.   I'm sorry.  I don't remember specific names.
3  Q.   Mr. Snow, how much contact did you have with
4       the AHERF board of trustees?
5  A.   None.
6  Q.   Did you ever attend any of the board of
7       trustee meetings?
8  A.   No.
9  Q.   Were you ever at a meeting where a member of
10      the board of trustees and Mr. Abdelhak was
11      present?
12 A.   No.
13 Q.   Did you ever have a meeting where any of the
14      board of trustees and Ms. Wynstra or
15      Mr. McConnell were present?
16 A.   No.
17 Q.   Do you have any idea how much authority the
18      board of trustees had at AHERF?
19 A.   No.
20 Q.   Now, how often did you meet with
21      Mr. Abdelhak, Mr. Snow?
22 A.   Never.
23 Q.   You never met Mr. Abdelhak?
24 A.   No.
25 Q.   So you have no personal knowledge as to what

Page 403

1       Mr. Abdelhak thought about any decisions made
2       at AHERF, do you?
3  A.   Personal direct knowledge?
4  Q.   Yes.
5  A.   No, none.
6  Q.   So you have no personal direct knowledge of
7       whether Mr. Abdelhak was in denial or not, do
8       you?
9  A.   No.
10 Q.   How often did you meet with Ms. Wynstra,
11      Mr. Snow?
12 A.   Never.
13 Q.   So do you have any personal direct knowledge
14      about whether Ms. Wynstra was in denial about
15      what was going on at AHERF?
16 A.   No.
17 Q.   Now, I assume you met with Mr. McConnell on a
18      fairly relatively frequent basis.  About how
19      often would you say you met with
20      Mr. McConnell?
21 A.   Maybe three or four times per year.
22 Q.   When you met with Mr. McConnell did those
23      meetings tend to focus on the Patient
24      Financial Services Group?
25 A.   Yes.

Page 404

1  Q.   Would you discuss other issues that were
2       going on at AHERF?
3  A.   No.
4  Q.   Would you discuss AHERF business strategy?
5  A.   No.
6  Q.   Would you discuss acquisitions AHERF was
7       considering?
8  A.   No.
9  Q.   Did you discuss anything outside of your
10      specific realm of responsibility, that being
11      the Patient Financial Services Group?
12 A.   Drag racing.
13 Q.   I'm assuming drag racing did not fall into
14      the category of information that would affect
15      the results of AHERF; am I correct?
16 A.   Correct.
17 Q.   So outside of the Patient Financial Services
18      Group do you have any direct personal
19      knowledge of whether Mr. McConnell was in
20      denial about anything else going on at AHERF?
21 A.   No.
22 Q.   Now, I believe yesterday Mr. Torborg was
23      asking you about average payment rates in
24      both Pittsburgh and Philadelphia.  Do you
25      recall that?

Page 405

1  A.   Yes.
2       MR. TORBORG:  Object to form.  I
3       believe I said payment cycles.
4  Q.   Do you recall giving testimony about average
5       payment cycles in Pittsburgh and
6       Philadelphia?
7  A.   Yes.
8  Q.   Do you recall saying that you believed the
9       difference between Pittsburgh and
10      Philadelphia was radically different?
11 A.   Yes.
12 Q.   How were they radically different?
13 A.   I believe I stated yesterday that Pittsburgh
14      was on one to four scale for managed care
15      penetration.  Pittsburgh was maybe one or one
16      and a half and Philadelphia was somewhere in
17      between a three and three a and a half range.
18 Q.   Do you remember in the context of
19      Mr. Torborg's questions he was asking you
20      about relative average days for payment
21      cycles for Medicare, Medicaid and various
22      HMOs?
23 A.   Yes.
24 Q.   Would those cycles have been longer in
25      Pittsburgh or in Philadelphia?

35 (Pages 402 to 405)

GREGORY SNOW

Page 406

1  A.    For some payors such as Medicare they would
2        have been the same.
3  Q.    How about for HMOs?
4  A.    Generally speaking, it would be longer in
5        Philadelphia.
6  Q.    So when you say that when you were forming
7        these averages, the higher numbers of these
8        averages you would expect to come from
9        Philadelphia, not Pittsburgh; correct?
10 A.    Correct.
11             MR. TORBORG:  Object to form to the
12        last question.
13 Q.    Mr. Snow, you've testified on a couple of
14        occasions about being told you were not
15        allowed to write off Hahnemann accounts early
16        in fiscal year 1996.  Do you remember that?
17 A.    I was told in September of 1995 that I could
18        not write off Delaware Valley accounts which
19        included Hahnemann.
20 Q.    Right.  In September of '95 would be early in
21        fiscal year '96; correct?
22 A.    Yes.
23 Q.    Did you think that information to be
24        pertinent to your ability to perform your
25        job?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 407

1  A.    Yes.
2  Q.    Did you tell Coopers & Lybrand that you were
3        not allowed to write off any accounts?
4  A.    No.
5  Q.    Did you instruct anyone else to tell Coopers
6        & Lybrand that you were not allowed to write
7        off accounts?
8  A.    No.
9  Q.    Did you think your inability to write off
10        accounts would have been information that
11        would have been pertinent to Coopers &
12        Lybrand?
13 A.    Yes.
14 Q.    If you believed that information to be
15        pertinent to Coopers & Lybrand why didn't you
16        either tell them yourself or direct someone
17        else to tell Coopers & Lybrand?
18 A.    Two reasons.  Number one, as I previously
19        stated, if I had divulged that information
20        directly, I would have been, in my opinion --
21        I would have been terminated.  And the second
22        thing, they never asked.
23 Q.    But you did believe that information to be
24        important to them; correct?
25 A.    I believe it would be important to anyone who

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 408

1        was trying to do a financial analysis of the
2        receivables at AHERF.
3  Q.    Now, Mr. Snow, previously Mr. Torborg asked
4        you a number of different examples, if
5        Coopers & Lybrand would have asked for
6        information, would you have told them, and I
7        believe you said what you would have done was
8        you would have spoken to one of your
9        superiors; is that correct?
10 A.    That would have been my first step.
11 Q.    So your first step would have been to ask
12        your superiors whether you could tell Coopers
13        & Lybrand; correct?
14 A.    Correct.
15 Q.    And previously you've testified that both
16        with regard to Hahnemann accounts and with
17        regard to writing off of other accounts
18        receivable which you deemed to be
19        uncollectible, that even though you were
20        aware of that information being relevant to
21        Coopers & Lybrand, you made conscious
22        decisions not to tell them due to fear for
23        your job; correct?
24 A.    Correct.
25 Q.    And you had this fear for your job because

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 409

1        you believed that was the culture of AHERF;
2        correct?
3  A.    Correct.
4  Q.    If I could just ask you to take out Exhibit
5        823.  It's an exhibit that Mr. Torborg showed
6        you yesterday.  It is a March 25, '96 memo
7        from yourself to Joe Dionisio.
8  A.    Just a minute, please.
9  Q.    Sure.
10             MR. De MONACO:  Did you say 823?
11             MR. LUFT:  Yes.
12 A.    Is there another copy by any chance?  Thank
13        you.
14 Q.    Okay.  Do you see that there is some circled
15        text?
16 A.    Yes.
17 Q.    I believe Mr. Torborg read a portion of it to
18        you yesterday?
19 A.    Yes.
20 Q.    In fact, that sentence that you wrote reads,
21        On October 18, 1995 I was informed by
22        Mr. McConnell and yourself not to write off
23        any accounts prior to July 1, 1995, for any
24        reason without approval.  Did I read that
25        correctly?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

36 (Pages 406 to 409)

GREGORY SNOW

Page 426

1    something to me that there wasn't an issue
2    with Russell Laing, in your opinion.
3  A.    That's correct.
4  Q.    Is that right?
5  A.    Yes.
6  Q.    I believe you also indicated that the
7    problems he had were resolved fairly early in
8    his career at AHERF?
9  A.    In my opinion, yes.
10 Q.    And you don't think that any of these issues
11    dealing with his purported alcohol problem
12    had any impact on his ability to perform his
13    duties at AHERF?
14 A.    No, I do not believe it had any impact
15    whatsoever.
16 Q.    You're familiar with what an aged trial
17    balance is?
18 A.    Yes.
19 Q.    Do you recall whether or not Coopers &
20    Lybrand received those in the course of their
21    audits?
22        MR. LUFT: Objection.
23 A.    I'm assuming they did because it should be --
24    we can double-check the list of the requests,
25    but it should be a standard part of any
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 427

1    standard audit.
2  Q.    I want to ask you, but you just referred to,
3    I believe, the list of the audit requests?
4  A.    Yes.
5  Q.    And Exhibit 1312, which is a John Lydon
6    April 18, 1997 memorandum, to Distribution,
7    has a list of items to provide in their
8    patient account receivables, and the fourth
9    bullet is Prepare a comparative aged A/R
10    summary by significant payor type based on
11    date of service for outpatient and date of
12    discharge for inpatients; right?
13 A.    Yes.
14 Q.    Given the fact that -- well, let me back up.
15    Would you have expected Coopers & Lybrand to
16    have reviewed that schedule?
17        MR. LUFT: Objection.
18 A.    I didn't make judgments as far as what I
19    expected them to do. It was our job to
20    provide them with the information that was
21    requested.
22 Q.    And Mr. Luft just asked you whether or not
23    you told anyone at Coopers & Lybrand that you
24    are not allowed to write off accounts with
25    dates of service prior to July 1, 1995,
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 428

1    without prior approval. I think you said no.
2        Given the fact that Coopers & Lybrand
3    would get schedules that showed accounts by
4    date and age, did you think you needed to
5    tell them that there were a bunch of old
6    accounts sitting on the books?
7        MR. LUFT: Objection.
8  A.    It should have been readily apparent by
9    looking at the aging that there was a
10    substantial portion of the A/R over 90 days
11    old and also in this particular case over 365
12    days old.
13        MR. TORBORG: I'd like to mark as
14    another exhibit -- the topic was brought up.
15    I think we are at 17 --
16        MR. LUFT: 74.
17        MR. TORBORG: 1774, some additional
18    language from the MIM manual.
19            - - - -
20    (Exhibit 1774 marked for identification.)
21            - - - -
22 Q.    I also note for the record that the
23    underlining in the copy that you received is
24    mine. Do you recognize this as language from
25    the Medicare Intermediary Manual.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 429

1  A.    Yes.
2  Q.    And do you see there it's titled Time Limits
3    For Filing Appeals?
4  A.    Yes.
5  Q.    It says, The time limit for filing a request
6    for reconsideration is 60 days from the date
7    of receipt of the utilization notice or
8    denial letter, whichever is later.
9  A.    Correct.
10 Q.    Now, Mr. Luft had just asked you some
11    questions about the ability of Patient
12    Financial Services to still gain payment on
13    accounts; right?
14        MR. LUFT: Objection.
15 A.    I believe he was asking me to confirm what he
16    was reading from a manual with respect to
17    time and filing deadlines. I don't think we
18    were passing judgment on the collectibility
19    of accounts.
20 Q.    Is the language in the MIM section I just
21    read to you about the time limits of filing
22    appeals consistent with your recollection?
23 A.    Yes.
24 Q.    Mr. Luft also asked you some questions about
25    whether or not you informed Coopers & Lybrand
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

41 (Pages 426 to 429)

GREGORY SNOW

---

Page 430

1    of the fact that there were accounts sitting
2    at gross in the billing system.
3  A.    Yes.
4  Q.    And I think you indicated that, no, you did
5    not have those conversations. Were those
6    conversations that you would have expected
7    that general accounting would have had with
8    Coopers & Lybrand?
9        MR. LUFT: Objection.
10 A.    I don't know. I can't speak for general
11   accounting.
12 Q.    If Coopers & Lybrand would have asked you to
13   provide a report of all account balances
14   within 90 percent of gross charges, would you
15   have provided that information?
16 A.    Most likely yes, but I would have still asked
17   my superiors first before I would have given
18   that information. And if I had been told no,
19   not to do it, then I would have a moral
20   dilemma at that point.
21 Q.    Do you recall whether auditors from Coopers &
22   Lybrand as part of their audits went into the
23   AHERF billing office?
24 A.    Yes.
25 Q.    Did they have access to the electronic

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 431

1    billing systems?
2  A.    I believe so, yes.
3  Q.    To run searches and inquiries on various
4    accounts?
5  A.    I believe so but I don't think that was
6    something that they did on a routine basis
7    because part of -- we would supply, again,
8    age trial balances, detailed listings of
9    accounts or what they called a detailed age
10   trial balance.
11       There would be a random selection of
12   accounts made, and then it was our
13   responsibility to provide documentation to
14   Coopers with respect to the accounts that had
15   been selected.
16 Q.    But if they wanted to utilize the patient
17   accounting system, it was open to them?
18       MR. LUFT: Objection.
19 A.    We would have provided security access to
20   whomever it was deemed appropriate to give
21   security access to.
22 Q.    Now, you left AHERF, I believe, in November
23   of 1998?
24 A.    Yes.
25 Q.    Was that upon the acquisition of Tenet, by

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 432

1    Tenet of certain of the Delaware Valley
2    hospitals?
3  A.    It was after the acquisition by Tenet.
4  Q.    Do you know what happened to the billing
5    system databases when after you left AHERF?
6  A.    After.
7        MR. LUFT: Objection.
8  A.    After I left, no.
9  Q.    Okay.
10 A.    Before I left I don't remember an exact date,
11   but I believe it was sometime in the time
12   frame of May or June, April, May, June of
13   1998.
14       What had been formerly the
15   centralized business office located in office
16   was divided into two pieces, and the staff
17   was split accordingly where half the staff
18   worked or some portion of the staff was
19   retained and working on Delaware Valley
20   accounts working directly for Tenet, and some
21   portion of the staff or myself were there to
22   work Western Region accounts.
23 Q.    Was the billing inpatient account data for
24   the Eastern hospitals removed from any
25   billing database that was in Pittsburgh?

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

Page 433

1  A.    I don't believe so.
2  Q.    Do you know if Tenet Healthcare received that
3    data?
4  A.    Yes.
5  Q.    Do you know what happened to the -- if
6    someone wanted to see patient level
7    information for, let's say, the PATCOM
8    receivables, that system, is that available?
9  A.    I believe --
10       MR. LUFT: Objection.
11 A.    -- it was available on microfiche.
12 Q.    When you were there it was available on
13   microfiche?
14 A.    Well, up until whenever the system was shut
15   down you could view the system. But you
16   could view microfiche. The accounts were
17   archived and placed upon microfiche, I
18   believe, at that point in time.
19 Q.    Where were those microfiche located?
20 A.    I believe they were in Pittsburgh.
21 Q.    Do you know in the billing office?
22 A.    I'm sorry. I don't know. Per Medicare regs
23   you have to retain all that information for a
24   minimum of seven years.
25 Q.    How about for the MCP and Hahnemann Hospitals

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

---

42 (Pages 430 to 433)

GREGORY SNOW

Page 438

```
1   COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
    COUNTY OF ALLEGHENY          )    S H E E T
2
        I, GREGORY M. SNOW, have read the forgoing
3   pages of my deposition given on Saturday, July 26,
    2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Page/Line  Should Read        Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
        In all other respects, the transcript is true and
20  correct.
21       _____
                 GREGORY M. SNOW
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
             Notary Public
25       AKF Reference No. Cg76137
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY
```

LEGALINK MANHATTAN  (212) 557-7400

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *J. BRANDON SNYDER*
### *September 26, 2003*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

### SNYDER, J. BRANDON - Vol. 1



**LEGALINK**

A WORDWAVE COMPANY

J. BRANDON SNYDER

Page 138

1      committee service at AHERF receiving and
2      reading management letters that were
3      distributed to you?
4  A.  Yes.
5  Q.  And you don't have any reason to doubt that you
6      read and received and reviewed Exhibits 168 and
7      2006 today; is that also accurate?
8  A.  Correct.
9  Q.  You just don't have a specific recollection now
10     of doing it, I think is your testimony?
11 A.  Right, or what specifically was in it.
12 Q.  All right. I understand. Let me ask you to
13     peek at Exhibit 168, the '96 management letter
14     just briefly.
15         MR. MCCLENAHAN: It's, I think,
16     Page 14 -- or I guess it starts -- the real
17     part starts at Page 17 of that.
18         MR. JONES: Yes, and, actually,
19     that's the page I'm going to ask him to look
20     at.
21 Q.  Page 17 of Exhibit 168. I'm going to ask you
22     to read the revenue and accounts receivable
23     overview for me that is a part of Page 17 --
24 A.  All right. I will.
25 Q.  -- Mr. Snyder, and continues on to Page 18.

Page 139

1  A.  All right.
2              - - - -
3      (The witness reviewed the Exhibit.)
4              - - - -
5  A.  Okay.
6  Q.  Thank you. When you received these management
7      letters on an annual basis as a part of your
8      board and committee service at AHERF, what did
9      you understand the purpose of the presentation
10     of the letter to the board member was?
11         MR. MCDONOUGH: Object to form. Go
12     ahead, Mr. Snyder.
13 A.  Well, I'm not sure that there was a stated
14     purpose, but for me, it gave an overview of the
15     auditor's feeling on how the health of the
16     hospital system was, and if there were any
17     problems, they were stated, and even specific
18     problems to accounts receivable, so not only
19     looking at statements themselves, it was a help
20     to me to read their comments.
21 Q.  And when you say the statements, you mean the
22     audited financial statements?
23 A.  Correct.
24 Q.  And I'm going to ask you to now turn your
25     attention to a specific paragraph in the

Page 140

1      revenue and accounts receivable overview that
2      you just read for me, and that is the
3      second-to-last paragraph on Page 17 which reads
4      as a result of our procedures, we have
5      concluded that the controls over the
6      establishment and monitoring of accounts
7      receivable reserves are designed appropriately
8      and are operating effectively so as to properly
9      adjust accounts receivable balances to their
10     estimated net realizable value. Did I read
11     that right?
12 A.  I think you did.
13 Q.  And what did that mean to you when you read it?
14 A.  It meant to me that they were satisfied with
15     how the accounts receivable -- accounts
16     receivable was being managed.
17 Q.  And if they had told you in the management
18     letter that they were dissatisfied, would that
19     have caused you concern?
20 A.  Yes.
21         MR. MCDONOUGH: Object to form.
22 Q.  And why is that?
23 A.  Because it would obviously impact the health of
24     the -- the financial health of the hospital.
25 Q.  And if it impacts the financial health, in what

Page 141

1      way in your understanding?
2  A.  Either receivables are written off because
3      they're uncollectible or the aging gets so far
4      out that -- that the timing issue comes in of
5      the cash coming in versus your payments going
6      out, things like that.
7  Q.  And am I right that the operating revenue
8      stream for a health care organization is part
9      and parcel of the accounts receivable process?
10 A.  Absolutely.
11 Q.  If you had learned that Coopers & Lybrand in
12     its management letter was dissatisfied with
13     accounts receivable controls or management at
14     AHERF, did you have any options as a board
15     member about what to do about it?
16         MR. MCDONOUGH: Object to form.
17 A.  Yes. First of all, you could talk with other
18     board members and you could also confront
19     management to explain what that meant.
20 Q.  And if you didn't like their explanations, did
21     you have other options?
22 A.  I think the options would be as a board to take
23     action. I'm not sure as an individual I had
24     options, but --
25 Q.  Right. But the board had options?

36 (Pages 138 to 141)

J. BRANDON SNYDER

Page 142

1  A.  Correct.
2  Q.  And they could include up to and including a
3     determination that perhaps management needed to
4     be changed if they couldn't handle the
5     situation?
6  A.  That's correct.
7  Q.  You would have read these management letters in
8     your board service at or about the time you
9     received them; is that fair to say?
10 A.  Correct.
11 Q.  And they're -- as we can see from their dates,
12    they appear to be typically dated and
13    dispatched in the fall of the year.  Does that
14    meet with your recollection?
15 A.  Correct.
16 Q.  The fall of the year following the fiscal year
17    about which the management letter is directed?
18 A.  Correct.
19 Q.  I'm going to ask you to look back to the
20    financial statements we looked at earlier
21    today, Mr. Snyder, and I'm going to start with
22    the fiscal year '95 statements which I think
23    you'll find at Exhibit 1226 and then go to
24    Exhibit 1661 which are the '96 statements.
25 A.  Okay.  I got you.

Page 143

1  Q.  I'm going to turn your attention first to the
2     Exhibit 1226, the fiscal year '95 audited
3     financial statements.  Do you recall each year
4     it was typical that you would receive the
5     audited financial statements in the fall of the
6     year as well after the fiscal year for which
7     they contained information?
8  A.  Correct.  Yes.
9  Q.  And you would review them upon their receipt?
10 A.  That's right.
11 Q.  And you used the audited financial statements
12    in what way in your board and committee
13    service?
14 A.  To review the -- you know, the health of the
15    organization, how it had done the previous
16    year, and also you would rely upon those
17    statements because they weren't internal
18    statements.  They were audited statements, and
19    therefore you felt you could rely upon them to
20    be the gospel.
21 Q.  And that was because they were audited
22    financial statements?
23 A.  Correct.
24 Q.  What did you see the role of the independent
25    outside auditor like Coopers & Lybrand for

Page 144

1     AHERF?
2  A.  Well, they were an unbiased party or should be
3     an unbiased party who is looking at the
4     financial health of the organization and its
5     management, and they were essentially guides
6     for the board to go by.
7  Q.  Did you rely on them in discharging your board
8     and committee duties, the auditors?
9  A.  Certainly.
10 Q.  And you relied on the statements each year?
11 A.  Certainly.
12 Q.  And what was the value to AHERF of the
13    auditors' clean opinion with the audited
14    financial statements each year?
15 A.  Well, I guess I'd say if they did not issue a
16    clean opinion, that meant there was something
17    in there that they thought was wrong for one
18    reason or another or fraudulent or numbers that
19    you couldn't rely upon.  So if you had a clean
20    opinion, you could rely upon the figures you
21    had been seeing all year.
22 Q.  And did that give you comfort, then, the clean
23    opinion on the numbers each year, in using
24    those financial statements as a guide to
25    discharge your duties on the finance committee

Page 145

1     and on the board generally?
2  A.  Absolutely.
3             - - - -
4     (There was a brief pause in the proceedings.)
5             - - - -
6  Q.  Mr. Snyder, before I call your attention to a
7     few items in the financial statements, and I
8     promise to do that fairly promptly, I wanted to
9     revisit for you your statement earlier in the
10    day, actually quite early in the day, about
11    what you saw the role of the finance committee
12    at AHERF to be, and I think you used terms like
13    or phrases like looking over the financial
14    condition of the enterprise and if something
15    was wrong to do something about it, and that
16    might include confronting management on items.
17    Do you recall that testimony generally?
18 A.  Yes, I do.
19 Q.  Did you use the audited financial statements as
20    a part of the method by which you looked over
21    the financial condition of the enterprise?
22 A.  Yes.
23 Q.  And did you also use those financial statements
24    each year including fiscal year '96 and '97
25    while you were still a part of the enterprise

37 (Pages 142 to 145)

J. BRANDON SNYDER

Page 162

1  Q.  Did you ever see anything in the financial
2       statements, the audited financial statements
3       that you reviewed, that led you to believe that
4       the AHERF system was incapable or soon to be
5       incapable of funding those losses at AIHG?
6  A.  No.
7  Q.  You said that in discussions with management,
8       you learned from Mr. Abdelhac that there --
9       there was projected to be substantial losses in
10      early years at AIHG.  Do you recall that
11      testimony?
12 A.  Yes.
13 Q.  Do you recall now today ever having an
14      understanding of the extent of the projected
15      losses?
16 A.  I don't recall today.  I don't think -- I don't
17      think Mr. Abdelhac duped us or intentionally
18      lied to us about it.
19 Q.  I understand that.  That's not my question.  My
20      question is do you recall ever having been
21      given a specific number or a specific time
22      period for the --
23 A.  No.
24 Q.  -- incurring of such losses?
25 A.  No, but I might have been.

Page 163

1  Q.  When you were shown the plans in the financial
2       commitment that was expected for AIHG, did you
3       anticipate that it would have financial rewards
4       as well?
5  A.  I think the anticipation was that it would
6       enhance the revenue of the hospitals.  I think
7       that was the goal, not necessarily that it was
8       going to be tremendously successful, but the
9       revenue stream coming into the hospitals from
10      the referrals would outweigh whatever losses
11      AIHG was going to have and that it was a
12      necessary thing to do in the health care
13      environment of those days.
14 Q.  And you learned that from management?
15 A.  Yes.
16 Q.  Do you recall -- I know -- I think you
17      testified at the outset that when you first
18      learned of the AIHG proposals or business
19      plans, that you did not recall objections from
20      the board or committee members with whom you
21      served to it or to those plans?
22 A.  That's right.
23 Q.  Do you recall that as these losses were noted
24      in either board meetings or committee meetings,
25      that there came to be a time when some on the

Page 164

1       board, perhaps yourself included, did question
2       the continuing viability of the plan?
3  A.  I do not.
4  Q.  Do you recall yourself ever formulating that
5       question?
6  A.  I do not.
7  Q.  I want to take you back now to the role of
8       Coopers & Lybrand and the auditors in the
9       preparation of financial statements, management
10      letters and their other duties.  During the
11      time of your board service and committee
12      service at AGH and AHERF, did you expect that
13      Coopers & Lybrand would bring to the board or
14      the committee's attention material
15      misstatements in the financial statements that
16      had been presented to them for audit?
17 A.  Yes.
18 Q.  Did you expect Coopers & Lybrand to bring to
19      the board or the committee's attention
20      intention misstatements by management in
21      financial statements?
22 A.  Yes.
23 Q.  Did you expect Coopers & Lybrand to bring any
24      concerns they had regarding the competence of
25      financial management to the board or the

Page 165

1       committee's attention?
2  A.  I don't know.  That's a hard one.  I think
3       that's more subject active.  How far would they
4       go?  I don't know.
5  Q.  Well --
6  A.  Talking about fraud, I think they're going to
7       do it.
8  Q.  Well, let me ask the next question then.  The
9       next question is if they had concerns about the
10      integrity of financial management or fraud, you
11      expected those to be brought to your attention?
12 A.  Absolutely.
13 Q.  And the question previous was to financial
14      management's competence or ability to
15      adequately do the job.  If they had questions
16      about that, at least at the senior levels of
17      internal financial management, did you expect
18      to hear about it from the auditors?
19 A.  I guess so.
20 Q.  Did C and L ever raise those matters with you?
21 A.  No.
22 Q.  Or any committee or board that you were a
23      member of?
24 A.  Did Coopers & Lybrand ever -- no, they never
25      did.

42 (Pages 162 to 165)

J. BRANDON SNYDER

Page 166

1  Q.   Did you ever yourself question during your
2       board service or your committee service at
3       AHERF or Allegheny General the integrity or
4       competence of Mr. Abdelhac or Mr. McConnell?
5  A.   I did not.
6  Q.   Did you yourself ever question the
7       integrity -- integrity or competence of
8       Coopers & Lybrand?
9  A.   I did not.
10 Q.   Did you ever question yourself or did you ever
11      learn of questions from anybody else on the
12      committees and boards at AHERF on which you
13      served the accuracy of the audited financial
14      statements that you received and reviewed each
15      year?
16 A.   No.
17 Q.   If Coopers & Lybrand had come to the board or
18      the finance committee in fiscal year 1996 or
19      1997 and told you that the financial statements
20      that were presented to them for audit by
21      management were materially misstated and that C
22      and L was therefore issuing an adverse opinion
23      on those statements, would that have concerned
24      you?
25            MR. MCDONOUGH:  Objection.

Page 167

1  A.   Is it certainly would.
2  Q.   And why is that?
3  A.   Because it would tell you that if true,
4       management could not be trusted.
5  Q.   All right.  Would it also throw into question
6       the financial performance of the enterprise?
7  A.   Certainly.
8  Q.   And both of those things would be troubling?
9  A.   Absolutely.
10 Q.   If you learned that from the auditors, did you
11      have options?
12 A.   Certainly.  You could confront management
13      and -- along within the board and find out what
14      they had to say, and if they truly had
15      committed fraud, they would be fired.
16 Q.   Did you also have the opportunity to ask the
17      auditors to expand the scope of their work?
18 A.   Yes, you would, sure.
19 Q.   Or to hire additional consultants for
20      assistance?
21 A.   Yes.  I'm sure you could have.  It's never
22      happened to me before, so I didn't think of
23      that, but, sure, you could.
24 Q.   It would have been an unfortunate set of
25      circumstances?

Page 168

1  A.   Right.
2  Q.   Would you as a board member, a committee member
3       have acted in your view prudently to address
4       any concerns raised by the inquiries you just
5       suggested?
6  A.   What I --
7            MR. MCDONOUGH:  That who just
8       suggested?
9            MR. JONES:  I asked him what his
10      options were and he gave me some options.
11           MR. MCDONOUGH:  But the options were
12      based upon a hypothetical question.
13           MR. MCCLENAHAN:  Could I ask you to
14      rephrase the question?
15 Q.   I can rephrase the question.
16 A.   Yeah.  That was a tough --
17 Q.   I'm sorry, and I didn't mean for it to be.  Let
18      me rephrase it.  We have discussed a number of
19      options here today in the last few moments that
20      were available to board and committee members
21      like yourself should Coopers & Lybrand or had
22      Coopers & Lybrand come forward with a -- with
23      an adverse opinion on the financial statements
24      in the 2 fiscal years we referenced; right?
25 A.   I understand that.

Page 169

1  Q.   That's the predicate.
2  A.   I got it.
3  Q.   Great.  The only question I have now is do you
4       have any doubt that you would have acted on --
5       in the most prudent course you knew to conduct
6       based on the results of those options?
7  A.   I have no doubt.
8            MR. MCDONOUGH:  Object to form.
9  Q.   And would you have pursued the inquiry
10      diligently?
11 A.   Yes.
12           MR. MCDONOUGH:  Object to form.
13 Q.   And chosen the option with your colleagues that
14      you felt most appropriate?
15 A.   Yes.
16 Q.   You wouldn't have ignored the situation?
17 A.   Correct.
18 Q.   If C and L, or Coopers & Lybrand, had told you
19      that the fiscal year 1996 or 1997 financial
20      statements presented for audit had been
21      intentionally misstated by management, would
22      that have concerned you as well?
23 A.   Yes, it would.
24 Q.   You would have had similar options available to
25      you?

43 (Pages 166 to 169)

J. BRANDON SNYDER

Page 170

1 A.  Yes.
2 Q.  You would have followed the course you thought
3     most prudent at the time?
4 A.  Yes.
5 Q.  If C and L had told you that net income on the
6     fiscal year 1996 statement of operations, the
7     income statement presented for their audit had
8     been overstated contrary to generally accepted
9     accounting principles by $80 million or more,
10    would that have caused you concern?
11 A.  Yes.
12 Q.  And you would have had the same kinds of
13     options?
14 A.  Yes.
15 Q.  And you would have followed them to their
16     logical conclusion?
17 A.  Yes.
18 Q.  If Coopers & Lybrand had told you that the net
19     income -- or that net income on the fiscal year
20     1997 statement of operations presented for
21     audit had been overstated contrary to GAAP,
22     again, by more than a hundred million dollars,
23     I presume that would have caused you concern as
24     well?
25 A.  It would.

Page 171

1 Q.  And you would have had the same options?
2 A.  Correct.
3 Q.  And would have followed them in the same way?
4 A.  Yes.
5 Q.  If Coopers & Lybrand had informed you that the
6     fiscal year 1996 or 1997 financial statements
7     presented for their audit were the product of
8     fraudulent conduct or suspected fraudulent
9     conduct -- conduct on the part of financial
10    management, would that have concerned you as
11    well?
12 A.  Yes, it would.
13 Q.  And you would have had at least the same
14    options available to you?
15 A.  Yes.
16 Q.  And you would have inquired and investigated
17    until you were satisfied that you understood
18    the situation?
19     MR. MCDONOUGH:  Object to form.
20 A.  Yes.
21 Q.  Can you think of additional options you had
22    available to you other than those we've
23    discussed if that were the case?
24     MR. MCCLENAHAN:  Well, you say if
25 that were the case.  If what were the case?

Page 172

1 Q.  If the last set of facts I posited were the
2     case, that is that Coopers & Lybrand had come
3     to you and told you that the '96 or '97
4     financial statements were the product of fraud
5     or suspected fraud.
6 A.  You know, if it was bad enough, I suppose the
7     authorities would be brought in.
8 Q.  Would an adverse opinion on the financial
9     statements in fiscal year 1996 have caused you
10    concern about the prudence of going forward
11    with any additional hospital acquisitions?
12 A.  It could have.
13 Q.  Would it also be true that it would have caused
14    you concern about going forward with any
15    additional physician practice acquisitions?
16     MR. MCDONOUGH:  Object to form.
17 A.  It could have.
18 Q.  Were you ever told by the auditors or did you
19    ever see anything in the audited financial
20    statements that led you to believe that the
21    acquisition of the Graduate Hospitals could
22    threaten AHERF's ongoing financial viability?
23 A.  No.
24 Q.  Were you ever told by the auditors or did you
25    ever believe from a review of the audited

Page 173

1     financial statements that the continuing
2     acquisition of physician practices could
3     threaten the financial viability of AHERF?
4 A.  No.
5 Q.  Were you ever made aware either through the
6     public press or otherwise, Mr. Snyder, that
7     there was a -- there was an announcement by
8     AHERF, PriceWaterhouseCoopers and AHERF
9     management that the 1997 financial statements
10    should be the subject of no further reliance by
11    its -- by any readers?
12 A.  This is the first I've heard of it.
13 Q.  And when I cite PriceWaterhouseCoopers, did you
14    ever come to understand that the former Coopers
15    & Lybrand firm merged with the Price Waterhouse
16    firm?
17 A.  Yes.  I'm aware of that.
18     MR. JONES:  I believe that's all I
19     have.
20     - - - -
21     RE-EXAMINATION
22     - - - -
23 BY MR. MCDONOUGH:
24 Q.  Mr. Snyder, a few followup questions.
25    Mr. Jones repeatedly went through questions

44 (Pages 170 to 173)