J. BRANDON SNYDER

Page 174

1    that started with if someone had told you this
2    or if someone had told you that or if Coopers &
3    Lybrand had done that, or if Coopers & Lybrand
4    had done that. To your knowledge and
5    recollection, did any of the things Mr. Jones
6    covered as hypotheticals actually occur?
7  A.   None of them occurred.
8  Q.   Okay. You were asked questions, again,
9    hypothetically, that if the board had
10   discovered that the 1996 statements were $40
11   million worse than -- than what was presented
12   or if --
13         MR. MCCLENAHAN: I think the
14   question -- what was asked was whether they
15   were $80 million worse in 1996.
16         MR. MCDONOUGH: I think that was the
17   '97.
18         MR. JONES: No, it was 80 million.
19  Q.   All right. Let me ask the question generally
20   then. Do you remember those questions, that if
21   the results were worse, might something have
22   happened, and you indicated that it might have?
23  A.   Right.
24  Q.   With respect to actual situations, Mr. Snyder,
25   you recall that in the first quarter of 1998,

Page 175

1    just 3 months, AHERF experienced a $42 million
2    loss; correct?
3  A.   Yes.
4  Q.   Do you recall the board doing anything about
5    that?
6  A.   I do not.
7  Q.   Okay. Now, I would like to go back to the
8    question you were asked about your review of
9    audited financial statements.
10  A.   Okay.
11  Q.   Is it correct, Mr. Snyder, that in your
12   capacity as a trustee of AHERF and as a member
13   of the finance committee, you received
14   regularly internally generated financial
15   statements of management?
16  A.   That's correct.
17  Q.   Do you recall whether you got those monthly or
18   quarterly or --
19  A.   I think it was -- it was quarterly.
20  Q.   So quarterly you would receive management's
21   numbers with respect to the balance sheet and
22   operations of AHERF; correct?
23  A.   Correct.
24  Q.   Okay. Now, when you received audited financial
25   statements for any specific year end of AHERF,

Page 176

1    do you recall ever taking those financial
2    statements and comparing them to the management
3    financial statements?
4  A.   I mean, that was pretty much done all the time.
5    I mean --
6  Q.   By whom?
7         MR. MCCLENAHAN: Let him finish his
8    answer.
9  Q.   I'm sorry. I'm sorry.
10  A.   By different members of the board. I mean, if
11   they had been materially different, they would
12   have been realized.
13  Q.   Okay. And I don't disagree with that,
14   Mr. Snyder, but my question to you was limited
15   to you. Do you recall --
16  A.   Yes.
17  Q.   -- taking the audited financial statements and
18   comparing them to the internally generated
19   management statements?
20  A.   I'm not saying I spent hours on it, but you
21   could just take a few revenues, net incomes. I
22   mean if things were adding up pretty much the
23   same --
24  Q.   So in connection with your having done that, do
25   you recall any occasion where your comparison

Page 177

1    generated any questions in your mind?
2  A.   No.
3  Q.   Okay. Do you recall ever asking management any
4    questions about the internal statements versus
5    the audited statements?
6  A.   No.
7  Q.   And I take it from your prior testimony you
8    certainly don't recall asking the auditors any
9    such questions?
10  A.   No. I don't believe I ever talked to an
11   auditor ever.
12  Q.   That was the point of my question. Okay. Now,
13   you indicated at one point in your answer to
14   questions from Mr. Jones that at June of '97,
15   you had no recollection of thinking that AHERF
16   was in terrible financial condition.
17  A.   Correct.
18  Q.   Okay. Was there a subsequent date when you
19   changed your view or did that remain your view
20   during your service on AHERF?
21  A.   Pretty much remained my view. I mean, it
22   wasn't till the newspapers began to talk about
23   it that I realized there was quite a problem.
24  Q.   So that would have been after -- when you say
25   the newspapers started talking about it, you

45 (Pages 174 to 177)

J. BRANDON SNYDER

Page 186

1   COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2   COUNTY OF ALLEGHENY         )  SS:
3       I, Anthony Jude Cordova, RPR, a Court Reporter
4   and Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness, J.
6   BRANDON SNYDER was by me first duly sworn to testify
7   to the truth; that the foregoing deposition was taken
8   at the time and place stated herein; and that the
9   said deposition was recorded stenographically by me
10  and then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 30th day of
23  September, 2003.
24  _____
25          Notary Public

Page 187

1   COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
    COUNTY OF ALLEGHENY           )   S H E E T
2
        I, J. BRANDON SNYDER, have read the foregoing
3   pages of my deposition given on Friday, September 26,
    2003, and wish to make the following, if any,
4   amendments, additions, deletions or corrections:
5   Pg. No. Line No.   Change and reason for change:
6
7
8
9
10
11
12
13
14
15
16
17
18
19  In all other respects, the transcript is true and
20  correct.
21  _____
            J. BRANDON SNYDER
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
            Notary Public
25          AKF Reference No. AC77439

W.P. Snyder Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *WILLIAM SNYDER, III*
### *July 15, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**SNYDER, III, WILLIAM**



**LEGALINK**

A **WORDWAVE** COMPANY

WILLIAM SNYDER, III

Page 90

1  that acquisition?
2  A.   I don't know.  I'd have to go back and read a
3       lot more about it before I could tell you why
4       we tried to acquire Graduate.
5  Q.   Do you see here in Exhibit 80, in
6       Mr. Abdelhak's letter, the third sentence
7       reads:  I consulted extensively with Bill
8       Snyder, and he is in full agreement with the
9       proposed action?
10 A.   Yes.
11 Q.   Do you remember anything about Mr. Abdelhak
12      consulting with you?
13            MR. WHITNEY:  About Graduate?
14            MR. RYAN:  Yes.
15 A.   All I can remember is that he consulted with me
16      about that and all the rest of the hospitals.
17      He says in here, the -- extensively is the word
18      he uses, so I assume that he talked to me a lot
19      about it.
20 Q.   Why don't -- if you would, why don't you take a
21      moment to review the next two pages --
22 A.   All right.
23 Q.   -- which are entitled Overview of Proposal for
24      Certain Graduate Health System Entities to
25      Become Part of SDN, Inc.

Page 91

1  A.   Okay.
2  Q.   Has this helped at all to bring back two
3       reasons why AHERF was acquiring Graduate?
4  A.   Yes.  Yes.
5  Q.   All right.  And what reasons are those?
6  A.   What's your question?
7  Q.   Based on having now reviewed this overview,
8       what reasons do you recall AHERF having for
9       making the Graduate acquisition?
10 A.   There again, I believe for the same reason, to
11      provide more patients for all the hospitals.
12 Q.   So that the idea was that by increasing in
13      size, the acquisition would improve the overall
14      financial strength of the eastern region?
15 A.   More economies of scale.
16 Q.   Okay.  Economies of scale with the Graduate
17      hospitals and the existing hospitals in the
18      eastern region?
19 A.   That's correct.  Just in the east.
20 Q.   So that would be the hospitals we've talked
21      about, MCP, United and Hahnemann?
22 A.   Hahnemann, yes.
23 Q.   Do you recall that AHERF was making the
24      Graduate acquisition through a corporation
25      called SDN, Inc.?

Page 92

1  A.   Yes.
2            MR. WHITNEY:  Objection.  Foundation.
3  Q.   And what do you recall about that?
4  A.   I recall, as far as I can remember, was that it
5       was an effort to not put more debt on the AHERF
6       balance sheet and to have it over to the side,
7       but reserving the right to put that hospital
8       into the AHERF family when the time seemed
9       appropriate.
10 Q.   And you didn't believe, did you, that there was
11      anything improper about the use of SDN, Inc.?
12 A.   It worried me, but I asked Nancy, and she said
13      she thought it was perfectly legal.
14 Q.   When you say that it worried you, what worried
15      you about it?
16 A.   Well, just from what you said.  Why are we
17      doing things off to the side?  I'm always leery
18      of off-balance sheet things, and this was an
19      idea that -- I don't know who hatched this
20      idea, whether it was Sherif or Nancy or who it
21      was, but --
22 Q.   All right.  So you consulted with Ms. Wynstra
23      about it?
24 A.   Yes, in conjunction with Sherif.
25 Q.   And she told you that this was a perfectly

Page 93

1  legal mechanism?
2  A.   Yes.
3  Q.   Do you recall anything else that she may have
4       told you about SDN?
5  A.   No.
6  Q.   Did you consult at all with Coopers & Lybrand
7       about SDN?
8  A.   No.
9  Q.   Did you consult with Coopers & Lybrand about
10      the Graduate acquisition in general?
11 A.   No.
12 Q.   If you take a look, please, it's the page with
13      number -- the number ending in 2668, using
14      these little numbers in the bottom right, these
15      Bates numbers.
16 A.   2668.  I've got it.
17 Q.   Are you with me on a schedule called Actual
18      Statement of Revenue and Expenses 11 Months
19      Ended May 31, 1996?
20 A.   Yes, sir.
21 Q.   Do you know whether you reviewed this kind of
22      financial information for the Graduate
23      hospitals prior to the acquisition?
24            MR. MCCLENAHAN:  Objection to the
25      form.  What do you mean by this kind of

24 (Pages 90 to 93)

Page 94

1   financial information?  You mean did he review
2   this particular sheet?
3   Q.   Do you know whether you reviewed an income
4   statement, whether it was this schedule or
5   another income statement schedule, for the
6   Graduate hospitals before the acquisition?
7   A.   I don't recall.
8   Q.   And this schedule appears to show a net loss
9   for this 11-month period of $9,697,000?
10  A.   That's what it shows.
11  Q.   And two rows up, a loss from operations of
12  $20,124,000?
13  A.   Yes.
14  Q.   Do you recall a discussion at the board of
15  trustees about how the Graduate hospitals were
16  doing in terms of their financial condition?
17  A.   No.  I don't remember that discussed.
18  Q.   I think you mentioned in the context of SDN
19  that you do recall that there was a possibility
20  that only certain of the Graduate hospitals and
21  not all of them would be integrated into AHERF,
22  is that right?
23  A.   That isn't what we were talking about.  We were
24  talking about, I said, it was possible in the
25  future that the hospitals could be integrated

Page 95

1   into AHERF.
2   Q.   Oh, I see.
3   A.   I mean, that was left open.
4   Q.   Was there a discussion of whether it would be
5   all of the Graduate hospitals or none or if
6   some hospitals might be selected to be
7   integrated into the system?
8   A.   Yes, there was discussion of what entities we
9   should acquire.
10  Q.   And what do you recall about that?
11  A.   I don't remember what they were, but I remember
12  there was people talking about one and the
13  other.
14  Q.   There was a view that certain hospitals might
15  not be as desirable as other hospitals?
16  A.   Right.  Right.
17  Q.   Who then was going to decide which of the
18  Graduate hospitals would be integrated into
19  AHERF?
20  A.   I would assume Sherif.  Assume.  I say it was
21  Sherif that would decide that.
22  Q.   And do you recall that the board of trustees
23  gave him authority to make that decision?
24  A.   No, I don't recall that.
25  Q.   Let me hand you, Mr. Snyder, what's previously

Page 96

1   been marked as Exhibit 832, and let me just ask
2   you first does this appear to be a copy of the
3   minutes of what's referred to as the Annual
4   Meeting of the Board of Trustees of AHERF held
5   on Thursday, December 12, 1996?
6   A.   It does.
7   Q.   And what I'd like to call your attention to, if
8   I could, is beginning on page 4, the section
9   headed Reorganization of Certain Graduate
10  Health System Entities, and then there are a
11  number of resolutions that continue on to
12  page 10.
13  A.   Yeah.  Okay.
14  Q.   Let me ask you first, since I don't have the
15  benefit for this meeting of the type of
16  transcription of shorthand notes that we saw
17  earlier, does a review of the minutes here that
18  you've just looked at help you to recall what
19  was said at this meeting about the Graduate
20  acquisition?
21  A.   Not too much, no.
22  Q.   Do you recall any member of the board of
23  trustees speaking against the Graduate
24  acquisition?
25  A.   No, I don't recall that.  I'd like to help

Page 97

1   there, but I don't recall that.
2   Q.   Do you recall any member of the board raising
3   any questions or concerns about the acquisition
4   even if it didn't rise to the level of speaking
5   against it, so to speak?
6   A.   Well, there's a difference between recalling
7   exactly what we're talking about and the
8   impression left in my mind about these
9   acquisitions.  That's all I can say.  There's a
10  difference there, but since I can't be
11  specific, I can't answer that.
12  Q.   Do you remember any trustee raising with you
13  the issue of the fact that AHERF management had
14  announced the acquisition of the Graduate
15  hospitals before consulting with the full
16  board?
17  A.   No.
18  Q.   And you're shown as being present at this
19  meeting of the board, right?
20  A.   I was there, yes.
21  Q.   And I assume that you voted in favor of the
22  resolutions --
23  A.   Yes.
24  Q.   -- relating to the Graduate acquisition?
25  A.   Well, I guess I did if the minutes show it.

WILLIAM SNYDER, III

Page 142

1  A.   I remember there was a discussion of it. I
2       don't remember whether we did it or not.
3  Q.   And was it your understanding, there again,
4       that the idea would be to get cash in the
5       short-term?
6  A.   Right.
7  Q.   Was it your feeling at this time in the fall of
8       1997 into the spring of 1998 that AHERF
9       management was undertaking a number of
10      proactive measures to try to improve the
11      organization's condition?
12 A.   Absolutely.
13 Q.   And did you approve of the measures that they
14      were undertaking?
15 A.   Did I personally approve of them?
16 Q.   Yes, sir.
17          MR. MCCLENAHAN: I mean, I will
18      object to the question as vague. You've listed
19      a number of such measures. There may be other
20      measures, and I'm not sure whether he would
21      give the same answer as to each and every one.
22 A.   Yes, that's very true. I approved of the
23      leaseback sale, and what other ones are you
24      referring to? Accounts receivable?
25 Q.   Yes. The layoffs, the closing of Mt. Sinai

Page 143

1       Hospital, the other cost reductions --
2  A.   I approved of those, yes.
3  Q.   -- and the sale of the eastern hospitals to
4       Vanguard?
5  A.   Yes.
6  Q.   Do you recall that in April 1998, AHERF repaid
7       a loan from the Mellon Bank?
8  A.   Yes, I do.
9  Q.   And what do you recall about that?
10 A.   All I could tell you about that is that Sherif
11      came to see me one morning early in my office
12      and said he was forced to pay the Mellon Bank
13      off. I don't remember the figure, but it sort
14      of runs in my mind it was $98 million. I may
15      be wrong on that by now, but that's a figure
16      that's in the back of my head, and that he had
17      to do it or the Mellon Bank was going to
18      foreclose. That's all I can remember. And I
19      said to him, I think you should have taken that
20      to the board before you took such drastic
21      action. He said he didn't have time.
22 Q.   Why did you consider that to be drastic action?
23 A.   Well, we had all kinds of other debts, and just
24      to single out one creditor and pay them back
25      didn't seem right without full authority.

Page 144

1  Q.   And when you made this point to him, his
2       response was that he hadn't had time?
3  A.   He had no time. He said he was given an hour
4       or something like that to make up his mind.
5  Q.   Did you then talk about this Mellon Bank
6       repayment with anyone else besides
7       Mr. Abdelhak?
8  A.   Well, it became a matter of general discussion
9       immediately among -- at all the meetings, but I
10      don't think that I specifically called anybody
11      and said, hey, we just paid the Mellon Bank
12      back.
13 Q.   And when you say at meetings, you're talking
14      about meetings of the board or of committees of
15      the board?
16 A.   Yes. Right.
17 Q.   And what was the nature of that discussion?
18 A.   Well, the propriety of doing it and how much
19      time did we really have? Did the Mellon Bank
20      really put the squeeze on us? That's about it.
21 Q.   And were there trustees who expressed the view
22      that Mr. Abdelhak should not have repaid the
23      loan?
24 A.   I don't remember if there was anybody that said
25      they disapproved of it. I think they

Page 145

1       disapproved of the manner in which it was done
2       so quickly.
3  Q.   Without consulting the board?
4  A.   Without consulting the proper authorities. It
5       was a lot of money.
6  Q.   And did you also personally believe that
7       Mr. Abdelhak should have consulted the board?
8  A.   Yes.
9  Q.   Did Mr. Abdelhak's handling of the Mellon Bank
10      repayment play a role in his being replaced as
11      chief executive officer of AHERF?
12 A.   The answer is that, among others.
13 Q.   What were the other factors as you understood
14      them?
15 A.   Well, the condition of the corporation as a
16      whole and his handling of it. Where are we now
17      in the time frame? When was bankruptcy? What
18      was the end date?
19 Q.   The bankruptcy, I think I can tell you, was
20      filed on July 21, 1998.
21 A.   So what we're talking about is how many months
22      before then?
23 Q.   The Mellon Bank repayment?
24 A.   Yeah.
25 Q.   I think it was three months before that.

37 (Pages 142 to 145)

WILLIAM SNYDER, III

Page 146

1  A.  Three months.  Okay.  I just want to get the
2      time frame in my head.
3  Q.  So you've mentioned, I think, as factors for
4      why Mr. Abdelhak was replaced, his handling of
5      the repayment of the Mellon Bank loan, and then
6      the condition of the corporation as a whole and
7      his handling of that?
8  A.  The condition of the whole situation.  We were
9      in dire straits.
10 Q.  Who decided to replace Mr. Abdelhak as CEO?
11 A.  I did, with consultation with some of the
12     senior board members.
13         I had a meeting with three other
14     senior doctors on a Sunday afternoon, and they
15     said that they were going to leave and pull a
16     lot of the doctors out of Allegheny with them
17     if Abdelhak didn't go.  It was about a
18     three-hour meeting.  Then when I got back from
19     that meeting, I called a number of the leading
20     trustees and asked them what they thought, and
21     they all said we think he should go.  So I
22     didn't see him on Monday because of some
23     reason, I don't know whether his or mine, but,
24     anyway, I called him down to the office on
25     Tuesday and fired him.

Page 147

1  Q.  So the first event in the sequence of events,
2      as you recall, was this meeting that you had
3      with three Allegheny General Hospital doctors?
4  A.  This was the first what?
5          MR. McCLENAHAN:  That would depend on
6      when you begin the sequence.
7  Q.  The first event in the series of events that
8      led to Mr. Abdelhak being fired was a meeting
9      you had with three Allegheny General doctors?
10 A.  Yes, that was the first.  Yes.
11 Q.  Who were those doctors?
12 A.  Dr. McGovern, Jr., Dr. Shannon, Richard
13     Shannon, and Dr. Jeffrey Cohen.
14 Q.  Could you spell that last one, please?
15 A.  C-O-H-E-N.  He's chief of urology.  Still is.
16 Q.  And where did this meeting with the doctors
17     take place?
18 A.  At Dr. Shannon's house in Sewickley.
19 Q.  And who called the meeting, so to speak?
20 A.  It was Dr. Shannon called me, I believe, on
21     Saturday and asked if I could meet tomorrow
22     afternoon, and I said certainly.
23 Q.  And the meeting lasted --
24 A.  For three hours.
25 Q.  And what issues did the three doctors raise

Page 148

1      with you in the meeting?
2  A.  Well, they mostly said the damage that happened
3      to Allegheny General, that was their main beef,
4      because they were all Allegheny General
5      Hospital, and they thought that the hospital
6      was being put in a very -- had been put in an
7      extremely bad position, and it was getting
8      worse every day, and that they weren't going to
9      stay if he stayed.
10 Q.  Dr. Cohen, I think you mentioned, was the chief
11     of urology?
12 A.  Yes.  Dr. Shannon is chief of medicine.
13 Q.  And Dr. McGovern is a heart doctor?
14 A.  He's a thoracic surgeon.
15 Q.  And I take it that these were all three very
16     eminent medical doctors?
17 A.  Yes, and all reasonably young.  Not real young,
18     but reasonably young.
19 Q.  And they told you that if Mr. Abdelhak wasn't
20     fired, they would leave Allegheny General?
21 A.  If he wasn't what?
22 Q.  That if Mr. Abdelhak wasn't fired, they would
23     leave Allegheny General Hospital?
24 A.  Yes, and take as many others with them as they
25     could.

Page 149

1  Q.  At this meeting that you had at Dr. Shannon's
2      house on Sunday afternoon, did you attempt to
3      argue with them or --
4  A.  No.  No.  I just let them talk and explain why
5      they felt that way and why others felt that
6      way.
7  Q.  And I take it after that meeting, you then met
8      or called up some other board members?
9  A.  Yes, I did.
10 Q.  Who were they?
11 A.  I called them on the phone.
12 Q.  Who were they?
13 A.  I know Barnes was one, and I think I talked to
14     Nimick and --
15 Q.  Francis Nimick?
16 A.  Yes.  I don't recall all who I called, I really
17     don't, but I called four or five of them.
18 Q.  If we just look back at the minutes of the
19     executive committee, I don't know if that would
20     at all help you to refresh your recollection as
21     to which trustees you may have called.
22 A.  Well, is that important to you to know which
23     ones?
24 Q.  It is, yes.  Yes, it is.
25 A.  I'll do my best.

38 (Pages 146 to 149)

Page 150

1    Q.   It's Exhibit 1651 just a few exhibits ago.
2    A.   Danforth. Douglas Danforth. I know I called
3         him. I'm pretty sure I called Sculley. He's
4         my neighbor, and I trusted him a lot, but I
5         can't be certain, but I'm pretty sure I would
6         have called him. I don't know about Edelman.
7         I did not call Brenner, because he's in
8         Philadelphia. I'd say I called Barnes and
9         Danforth, Sculley, and maybe Edelman.
10   Q.   And Mr. Nimick as well?
11   A.   I think I called Nimick. I'm not positive of
12        that, but I think I did. He's an old -- very
13        old hand -- old head.
14   Q.   And when you called these other board members,
15        I take it that you started off by explaining to
16        them what Dr. Shannon and the other doctors had
17        told you?
18   A.   I opened the meeting -- the conversation with
19        my meeting with those four doctors and
20        explained what they said and how they felt, and
21        that I could heartily agree that it was time to
22        pull the plug on him.
23   Q.   I'm sorry. I didn't quite hear that.
24   A.   It was time for him to go.
25   Q.   All right. So that was a view that you

Page 151

1         expressed when you called up these other board
2         members?
3    A.   Yes, yes, yes.
4    Q.   Do you recall what views, if any, they
5         expressed in these telephone calls with you?
6    A.   Well, they all agreed. I do remember that. I
7         don't know what views they expressed, but they
8         agreed in one form or another.
9    Q.   Do you remember any trustee coming to you
10        before this Sunday afternoon meeting at
11        Dr. Shannon's house --
12   A.   That's a very good question.
13   Q.   -- to suggest that Mr. Abdelhak should be
14        replaced?
15   A.   I can't give you a name, but it runs in the
16        back of my head that somebody did come to me
17        about that. I don't remember who it was,
18        though, and it certainly was in my mind too.
19   Q.   Do you recall whether the topic of the
20        repayment of the Mellon Bank loan was part of
21        the conversation at Dr. Shannon's house?
22   A.   I can't recall whether it was or not. That's a
23        good point, though. I just don't remember.
24   Q.   And so then on Tuesday, you called Mr. Abdelhak
25        into your office and fired him?

Page 152

1    A.   Yes.
2    Q.   And what did he say in this meeting?
3    A.   You don't want to put that in the minutes.
4    Q.   He was upset?
5    A.   Oh, that's putting it very mildly. The main
6         thing he said to me was that I was making the
7         biggest mistake of my entire life, and he was
8         raving, climbing the walls, so to speak.
9    Q.   Had you ever given any previous warning to him
10        that his job was in jeopardy?
11   A.   No. No.
12   Q.   Well, I think I may have marked this last week,
13        but I don't have the marked version here, so
14        I'll mark as Exhibit 1677 a one-page document
15        with Bates No. TACO 52826.
16                    - - - -
17        (Exhibit 1677 marked for identification.)
18                    - - - -
19   BY MR. RYAN:
20   Q.   And if you could just take a moment to review
21        that, please, Mr. Snyder.
22   A.   Yes, sir.
23   Q.   And is this a letter that you sent to
24        Mr. Abdelhak dated June 5, 1998?
25   A.   Yes.

Page 153

1    Q.   And I take it then this letter you more
2         formally, in writing, advised him of a decision
3         you had already told him about already?
4    A.   That's what it was for.
5    Q.   And do you recall that before you sent this
6         letter, there was a meeting of the executive
7         committee of the board to discuss it?
8    A.   Yes.
9    Q.   And what do you recall about that meeting?
10   A.   Nothing, except that, as far as I know, it was
11        unanimous to go through with this.
12   Q.   And whom -- well, strike that.
13             Who was selected to replace
14        Mr. Abdelhak?
15   A.   Anthony Sanzo.
16   Q.   And who made that decision?
17   A.   Well, we had a meeting, a discussion about it,
18        and I don't know whether it was in executive
19        committee or what it was, but there were a
20        number of people, trustees that were in on
21        that. It was also my recommendation.
22   Q.   And why was Mr. Sanzo your --
23   A.   Well, he had all kinds of experience in this
24        field, and he was known by all the trustees.
25        He reported at nearly all the board meetings.

WILLIAM SNYDER, III

Page 186

1  might be associated with those something that
2  you were previously focused on?
3  A.  Well, Sherif had talked to me about them, but
4  that's all I can say.
5  Q.  Sherif Abdelhak, I assume, thought they were a
6  good idea?
7  A.  Oh, yes.
8  Q.  Did he also talk about how they were novel to
9  the organization?
10  A.  No.  Maybe he did.  I don't remember that.
11  Q.  Do you remember him talking about the
12  short-term problems with getting up and running
13  with the infrastructure needed to support risk
14  contracts?
15  A.  No.
16      MR. RYAN:  Okay.  Why don't we call a
17  halt today, and I'll try to wrap it up as soon
18  as I can tomorrow morning, Mr. Snyder.
19      THE WITNESS:  All right.
20      THE VIDEOGRAPHER:  We're now going
21  off the record.  The time on the screen is
22  4:00.
23      - - - -
24  (The proceedings were recessed at 4:00 p.m.)
25      - - - -

Page 188

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
   COUNTY OF ALLEGHENY      )  S H E E T
2
      I, WILLIAM SNYDER, III, have read the foregoing
3  pages of my deposition given on Tuesday, July 15,
   2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read      Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19      In all other respects, the transcript is true and
20  correct.
21      _____
                WILLIAM SNYDER, III
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
             Notary Public
25  AKF Reference No. JB76368

Page 187

1  COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
2  COUNTY OF ALLEGHENY      )  SS:
3      I, JoAnn M. Brown, RMR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  WILLIAM SNYDER, III, was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21      IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 18th day of July,
23  2003.
24  _____
25          Notary Public

**Spargo Dep.**

Stephen Spargo

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                        Civil Action

        Plaintiff,                        No. 00-684

    vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

      Defendant.



    Videotape deposition of STEPHEN H.
SPARGO, called for examination under the statute,
taken before me, Jaci R. Traver, RPR, CRR, and
Notary Public in and for the State of Ohio, at
the offices of Jones Day, 500 Grant Street,
Pittsburgh, Pennsylvania, on Thursday, the 17th
day of July 2003 at 9:30 a.m.

        - - - - -

Stephen Spargo

Page 58

1    A.  SMS.
2    Q.  What is the general purpose of the
3  general ledger at a hospital?
4    A.  To --
5    Q.  Or at a health system.
6    A.  Keep track of or to record
7  basically all the transactions that represent
8  in financial terms everything that goes on in
9  an organization or in a hospital or healthcare
10  system.
11    Q.  And it is from the general ledger
12  system that the financial statements are
13  eventually generated?
14    A.  That's correct.
15    Q.  And in particular, the statement of
16  operations and the balance sheet?
17    A.  That's correct.
18    Q.  In the AHERF general ledger system,
19  during the time period we just referred to in
20  1993 and 1997, were all affiliates' activities
21  tracked in the same general ledger?
22    A.  I believe so.
23    Q.  Who all had the ability or
24  authorization to make entries into the general
25  ledger system?  Was it a great number of

Page 59

1  people, limited number of people, or do you
2  recall?
3    A.  A great number of people.
4    Q.  And were those folks all officed or
5  housed in Pittsburgh, or could general ledger
6  entries be made by people who might be working
7  or resident in the east during the time you
8  were involved?
9    A.  Well, during the majority of the
10  time, up until about the very end, it was both
11  east and west, but eventually it became housed
12  in Pittsburgh.
13    Q.  Okay.  And was there a level of
14  seniority that attached to somebody authorized
15  to make entries into the general ledger or did
16  they simply have to have the authority or
17  signoff of somebody else to make the entry?
18    A.  Many times it's just the signoff of
19  somebody else.
20    Q.  Who had signoff authority for the
21  entry?
22    A.  An accounting supervisor, an
23  accounting manager, an accounting director.
24  All the way up to me or Mr. McConnell,
25  technically.

Page 60

1    Q.  Did you have to have a number of
2  signatures, or could any of these people you
3  just identified authorize an entry, if you
4  know?
5    A.  I don't know.  I mean, ideally, all
6  the way down to the accountants could initiate
7  an entry, and depending on the magnitude of the
8  entry and the accounts affected, that entry
9  could be made with only signoff of their
10  immediate supervisor.
11    Larger items or different types of
12  items may be a supervisor would have to
13  initiate based on input from a staff
14  accountant.  And a manager would have to
15  initial that.
16    Q.  I think what you're describing, and
17  correct me if I'm wrong, is that there was a
18  protocol in place, you may not now recall the
19  detail of it, or you may not have known it at
20  the time because of your sort of lofty post, if
21  you will, but there was a protocol involved
22  with respect to signoffs that may have involved
23  dollar amounts?
24    A.  I believe there was.  Yes.
25    Q.  You were, obviously, involved with

Page 61

1  the audit process at AHERF on an annual basis?
2    A.  Yes, I was.
3    Q.  In the position you held both at
4  AGH and at AHERF?
5    A.  That's correct.
6    Q.  And as a part of the audit process
7  or otherwise, did you come to understand or
8  know that Coopers & Lybrand folks would have
9  access to general ledger information?
10    A.  Oh, yes.
11    MR. RYAN:  Objection.
12    Q.  As a part of their only audit work.
13    A.  Absolutely.
14    Q.  How is it that you came to know
15  that?
16    A.  Well, the whole purpose, I mean in
17  order to conduct an audit, you've got to
18  provide your auditors with basically
19  unrestricted access to whatever records they
20  felt they needed to support the balances and
21  entries made in our books and records.
22    Q.  So they could examine the general
23  ledger activity electronically or in paper
24  format?
25    A.  Yes.

16 (Pages 58 to 61)

Stephen Spargo

Page 62

1    Q.   Was that the case for you when you
2    were at an auditor and audited the other
3    healthcare organizations we mentioned earlier
4    today?
5    A.   Yes.  Although, you know, way back
6    when, there was just more paper and less
7    electronic, you know, visualization.
8    Q.   Right.
9    A.   But always unrestricted access to
10   records.
11   Q.   Were you ever aware of anyone ever
12   denying Coopers access to the general ledger
13   electronically or in paper format?
14   A.   Never.
15   Q.   If that had come to your attention,
16   would you have told them that that should not
17   be the case?
18   A.   Absolutely.
19   Q.   Did you ever yourself -- let me ask
20   this question, rather than the one I just
21   started.
22        Was the move to more electronically
23   based general ledger systems one that
24   facilitated the work of internal accounting
25   personnel and auditors in reviewing

Page 63

1    transactions history as compared to paper
2    trails, in your view?
3    A.   I think so, yes.
4    Q.   Why is that the case?
5    A.   Because you have more instant
6    access to more vaster amounts of information.
7    Q.   Also --
8    A.   Quickly.
9    Q.   -- less likely to have things lost?
10   A.   Yes.  Yes.
11   Q.   Let's shift gears momentarily to
12   the preparation of financial statements.
13        AHERF and its affiliates during the
14   time you were at AHERF prepared various types
15   of financial statements.  Am I right?
16   A.   Yes.
17   Q.   At least various in that they were
18   prepared for various time periods.
19   A.   Various time periods and various
20   entities.
21   Q.   Yes.  And it depended on the
22   organizational structure and breadth of the
23   system as it developed, in part.
24   A.   Correct.
25   Q.   AHERF and its affiliates prepared

Page 64

1    monthly financial statements --
2    A.   That's correct.
3    Q.   -- during this time period?
4    A.   That's correct.
5    Q.   '93 to '97?
6    A.   That's correct.
7    Q.   How, generally, were those
8    compiled, the monthly -- I take it these are
9    internal financial statements that we're
10   referring to?
11   A.   Yes.
12   Q.   Or that you were referring to in
13   response to my question.
14   A.   That's correct.
15   Q.   How were these internal financial
16   statements compiled, generally?
17   A.   We had a closing process that was
18   very formalized.  Mr. Cancelmi and Mr. Adamczak
19   would publish prior to the close of a month
20   what the closing schedule would be for that
21   month by day and what types of entries had to
22   be posted by day three, which ones by day four,
23   when did they do the review by day five, when
24   did they present it to me for day six, and when
25   Mr. McConnell saw it day seven.  And they

Page 65

1    basically set about the task of making sure all
2    the entries were posted, all accounts balanced
3    and where possible, accounts reconciled in
4    conjunction with that predetermined schedule.
5    Q.   Did Mr. Adamczak and Mr. Cancelmi
6    assign responsibilities for individual
7    hospitals to individual accountants?
8    A.   They did.
9    Q.   Okay.  So there would have been a
10   lead accountant for, at various times, HUH,
11   MCP, Bucks, and the like?
12   A.   That's correct.
13   Q.   And then Mr. Cancelmi and Adamczak
14   would then have reviewed the financial
15   statements generated by these point persons for
16   any consolidating that needed to be done, or
17   for at least review purposes?
18   A.   Correct.  In between Mr. Cancelmi,
19   Mr. Adamczak and these point persons would be
20   managers who would have the first review,
21   before it got to Dan or Al.
22   Q.   What level of -- who were the
23   managers, generally?
24   A.   Chuck Lisman for the east and Jack
25   Lydon for the west.

17 (Pages 62 to 65)

Stephen Spargo

Page 122

1  helps calculate the allowance; is that right?
2      A.  Yes, sir.
3      Q.  It has aging groupings as a row
4  across the top, and I know it's difficult to
5  read, but they range, I think, if my eyesight
6  is accurate, from zero to 30 days out, to 211
7  to 360 days out; is that fair to say?
8      A.  That's correct.
9      Q.  And this is, I believe, I can tell
10 you that the document appears to be produced by
11 Coopers & Lybrand, but in your experience with
12 the Coopers & Lybrand audits of AHERF, the type
13 of schedule that they would request and review
14 in connection with their audit of accounts
15 receivable at the organization?
16     A.  Yes.
17     Q.  And how were the percentages that
18 we see applied to these various aging buckets
19 ranging from, I think, in the first sets of
20 rows under self-pay from 1 percent to
21 75 percent, arrived at, in your experience?
22     A.  How were they arrived at?
23     Q.  Yes.
24     A.  Educated guesses.
25     Q.  Was it based on historical

Page 123

1  experience, to the extent it was available?
2      A.  If --
3          MR. RYAN:  Objection.
4      A.  If it's available, you base it on
5  historical experience, yes.
6      Q.  And if --
7      A.  Availability of meaningful data is
8  not as easy as it sounds.
9      Q.  If not historical experience, were
10 you aware of testing, other than historical
11 experience, conducted at AHERF with respect to
12 these percentages or percentages like them?
13     A.  Yes.
14     Q.  What kind of testing was done?
15     A.  We would, Mr. Cancelmi particularly
16 would model different percentages, particularly
17 looking at accounts receivable on a historical
18 basis, and then compare the results of using
19 those percentages to what was really written
20 off as bad debts over a defined time period, 3,
21 6, 9, 12 months, to see if those percentages in
22 total were close to what really happened.
23          You wouldn't really know if
24 Medicare was right on and Blue Cross was off
25 and self-pay was real low, but you would know

Page 124

1  the whole bucket approach was close.
2      Q.  Was that kind of testing done while
3  you were in AHERF, both for eastern and western
4  hospital organizations?
5      A.  Yes, it was.
6      Q.  I note that this particular
7  schedule does not have a category for an
8  accounts receivable bucket beyond 360 days old.
9  Do you -- am I reading the schedule right?
10     A.  You are.  But I can't say as a
11 matter of factly, but what I would assume from
12 the schedule is what that last column really
13 says is 211 and greater.  I doubt they would
14 have ignored anything over 360 days or less.
15     Q.  That was going to be my next
16 question.  From your experience both at AGH and
17 at AHERF, do you recall whether there was a
18 reason for not having a category of 360 days
19 plus?
20     A.  No.  No.  Unless -- and I don't
21 know if we used this at Allegheny, but I see
22 this at clients more currently is sometimes
23 anything over a year old you don't need to
24 apply this bucket approach, because you're
25 assuming 100 percent is going to be written

Page 125

1  off, so you may keep it off the schedule just
2  to make it less confusing.
3      Q.  You don't recall whether that was
4  AGH's approach in '96 or not?
5      A.  I don't.  I don't believe it was
6  their approach, to be honest with you.
7      Q.  But that is an approach that
8  healthcare organizations, in your experience,
9  have used?
10     A.  Yes.
11     Q.  The reasoning there is generally
12 that if it's more than a year old, in simple
13 terms, you ain't going to collect?
14     A.  No.  No.
15         MR. RYAN:  Objection.
16     Q.  Is that right?
17         MR. RYAN:  Objection.
18     A.  That's correct.  You don't have a
19 snowball's chance of, you know what, of
20 collecting it.
21     Q.  Let me ask you now to look at
22 another exhibit that we marked.  It's Exhibit
23 7, apparently very early on in the proceedings.
24         If you could identify the document
25 for me, it would be helpful.  I think you will

32 (Pages 122 to 125)

Stephen Spargo

Page 126

1 recognize it as an October 16, 1995 letter from
2 Coopers & Lybrand to the board of trustees of
3 Allegheny Health Education and Research
4 Foundation, commonly referred to as a
5 management letter?
6     A.  That's correct.
7     Q.  And you came to see management
8 letters from Coopers & Lybrand to the board
9 from time to time during your years at AHERF?
10    A.  Yes, annually.
11    Q.  And you got a copy as a matter of
12 course?
13    A.  Oh, yes.
14    Q.  I'm going to ask you to refer,
15 then, to a particular page of the document.
16 And it's 7 of 22, along the right-hand margin,
17 or 5, if you're looking at the numbers at the
18 base of the page.
19    A.  Okay.
20    Q.  And in management letters received
21 from Coopers & Lybrand while you were at AHERF,
22 they periodically would comment on accounts
23 receivable and the allowance for doubtful
24 accounts; is that consistent with your
25 recollection?

Page 127

1     A.  Yes.
2     Q.  Here they appear to so comment at
3 the top of the page under the heading,
4 "methodology for establishing bad debt reserves
5 should be applied consistently," and that's
6 underlined.  Do you see that?
7     A.  I sure do.
8     Q.  Do you recall that Coopers &
9 Lybrand auditors expressed to you, separate and
10 apart from this management letter, concern
11 about application of a consistent methodology
12 across hospitals?
13    A.  I don't recall specifically, but if
14 I had to surmise, we probably expressed a
15 concern to them, asked them to help express it
16 to us and others.
17    Q.  Who do you mean by us and others?
18    A.  Meaning the rest of the
19 organization.
20    Q.  Because you thought that was an
21 issue that ought to be addressed?
22    A.  Absolutely.
23    Q.  And your concern there was based on
24 what?
25    A.  On the fact that the accounts

Page 128

1 receivable balances were growing significantly.
2 The reserve for bad debts was not increasing in
3 proportion.  And with an underlying belief that
4 the patient accounting department was not
5 fulfilling their responsibilities.
6     Q.  And I think what you started to
7 tell us at the outset of this conversation
8 about these allowances, that, in fact, there
9 were different methodologies used in different
10 organizations?
11    A.  Yes.
12    Q.  I'm going to ask you to look down
13 at the recommendation portion of that
14 subsection of the management letter.
15    A.  Yes, sir.
16    Q.  Do you see that?
17    A.  I do.
18    Q.  Can you read the last sentence for
19 me.
20    A.  "We believe that the current
21 methodology utilized by AGH should be
22 considered for application at all AHERF
23 hospitals."
24    Q.  Do you recall that recommendation?
25    A.  Yes.

Page 129

1     Q.  And do you recall it being
2 expressed to you other than in this management
3 letter?
4     A.  I recall us expressing it.
5     Q.  To Coopers & Lybrand?
6     A.  To Coopers & Lybrand and to our
7 colleagues in finance.
8     Q.  Who do you mean by your colleagues
9 in finance.
10    A.  Mr. McConnell, Mr. Dienisio,
11 Mr. Snow.  Anybody who would listen.
12    Q.  So you recall bringing this to the
13 attention of the auditors as a problem area and
14 a potential assist in dealing with that problem
15 area?
16    A.  That's correct.
17    Q.  Do you recall any reaction you got
18 from Coopers & Lybrand, other than, perhaps,
19 the entry here in the management letter?
20    A.  Oh, I think they concurred, yeah.
21 It wasn't met with resistance.
22    Q.  Do you recall receiving the
23 management letter each year in connection with
24 the audit process while you were at AHERF?
25    A.  Yes.

33 (Pages 126 to 129)

Stephen Spargo

Page 130

1    Q.   So you believe you would have
2  received and reviewed this one at or about the
3  time it was issued, and I'm going here only
4  from the date of the letter, mid October 1995?
5    A.   I helped write these letters.
6    Q.   And you say you helped write these
7  letters?
8    A.   Yes.
9    Q.   In what way did you help write
10  these letters? First, can you answer my
11  question, you did receive them and review
12  them --
13    A.   Yes.
14    Q.   -- at the time they were issued?
15    A.   Yes.
16    Q.   In each of the fiscal years?
17    A.   Yes.
18    Q.   What do you mean by you helped
19  write the letters?
20    A.   I also received and review them
21  prior to their issuance and had an opportunity
22  to -- after we agreed on the content, in terms
23  of the items to be addressed, then an
24  opportunity to address or edit how they were
25  presented.

Page 131

1    Q.   And you proposed comments then to
2  Coopers & Lybrand?
3    A.   Yes. Verbally proposed comments.
4  And then once their draft came, inserted
5  suggested language that may have been stronger,
6  may have been softer, may have been more
7  grammatically correct. Anything was fair game.
8    Q.   And you moved, for the purposes of
9  the written record, you moved your hand there
10  in a way that suggested to me that you were
11  indicating that you actually wrote comments by
12  hand on drafts of the management letter; is
13  that correct?
14    A.   I did.
15    Q.   That's, in fact, what you did?
16    A.   That's exactly what I did.
17    Q.   And sometimes your comments were
18  accepted and sometimes they were not?
19    A.   Correct.
20    Q.   Do you have a recollection of
21  proposing in particular at the time of the
22  management letter that the AGH methodology
23  referred to in this management letter be
24  utilized across hospitals?
25    A.   I don't have a specific

Page 132

1  recollection, no.
2    Q.   Do you recall, Mr. Spargo, in
3  connection with this 1995 management letter, or
4  before it, that Coopers was made aware of or
5  expressed to you, either, a concern more than
6  just with the consistency of the application of
7  any given methodology, but also with the
8  validity or the accuracy of the underlying
9  methodology of accounts receivable, aging and
10  allowance determination?
11    A.   Yes.
12    Q.   And what was it that you recall
13  about that?
14    A.   Well, it was fairly widely
15  understood amongst we AHERF accountants and
16  Coopers how difficult it was to audit accounts
17  receivable, the difficulty in obtaining
18  meaningful information to facilitate that audit
19  process. And more importantly, the
20  deteriorating conditions of our accounts
21  receivable.
22    Q.   And the concern was shared by you
23  and the auditors that the actual valuation of
24  the allowance may be problematic, given the set
25  of circumstances?

Page 133

1    A.   Yes.
2    Q.   And may be inaccurate?
3    A.   Yes.
4    Q.   And needed to be addressed?
5    A.   Yes.
6    Q.   Was there a concern that this was
7  more a problem of eastern hospitals?
8    A.   Yes.
9    Q.   And particularly in the Delaware
10  Valley Obligated Group?
11    A.   Yes, definitely.
12    Q.   I'm going to hand you now what
13  we've marked as Exhibit 1523, apparently more
14  recently in the proceedings, and ask you to
15  take a look at that.
16       It has a face page entitled,
17  "Critical Matters." Again, appears to be a
18  schedule. This one headed, "Allegheny Health
19  Education and Research Foundation, Summary of
20  A/R Reserve, assuming AGH reserve philosophy,"
21  and it's dated June 30th, 1995. Do you see
22  that?
23    A.   I do.
24    Q.   Have you seen this document before?
25    A.   No, I don't believe so. It's not

34 (Pages 130 to 133)

Stephen Spargo

---

Page 134

1  in recent testimony.
2      Q.  Do you recall receiving it at the
3  time you were at AHERF?
4      A.  No, sir.
5      Q.  I'm going to direct your attention
6  to the note appended to the schedule at Page 2.
7  Are you with me?
8      A.  Handwritten or typed?
9      Q.  The typed.  The note reads, C
10 ampersand L, "C & L, assess the adequacy of
11 each of AHERF's individual hospitals," then it
12 lists certain of them parenthetically,
13 "accounts receivable reserves by applying AGH's
14 reserve percentage to each aging category of
15 outpatient and inpatient receivable."
16      Did I read that accurately?
17     A.  Uh-huh.
18     Q.  Do you recall -- is that a yes?
19     A.  Yes, that was a yes, I'm sorry.
20     Q.  Do you recall becoming aware that
21 this analysis was done in this time period by
22 Coopers & Lybrand?
23     A.  I don't recall, but I'm not
24 surprised it was done.
25     Q.  In the last sentence of the note --

---

Page 135

1  or of the first paragraph of the note, rather,
2  says, "C & L then used this adjusted difference
3  to," something, it seems to be missing a word,
4  "the amount to be posted to the summary of
5  unadjusted differences."
6      Did I read that accurately?
7      A.  You did.
8      Q.  And the summary of unadjusted
9  differences is what, as you understood the
10 audit process ongoing between AHERF and its
11 auditors?
12     A.  That's the schedule of adjustments
13 that could be booked that weren't.
14     Q.  Or that might be?
15     A.  That might be.
16     Q.  Do you recall any specific
17 weaknesses about the DVOG, or Delaware Valley
18 Obligated Group, methodologies that you
19 discussed with the auditors that may have led
20 them to do testing like this or comparisons
21 like this between those enterprises and AGH?
22     A.  I don't.  I don't recall those
23 discussions.  You know, I don't know that the
24 fact that they used different methodologies was
25 as troubling as the fact that the Delaware

---

Page 136

1  Valley was under-reserved.  I mean they could
2  have definitely had a different methodology,
3  and had it produced a reserve that we all felt
4  was appropriate, there would be no issue with
5  using different methodologies.  That comment
6  wouldn't have existed in the management letter.
7      It's the fact that the reserve was
8  understated that led to, hey, you might want to
9  think about using a different methodology.
10     Q.  I think what you're telling us is
11 that the fundamental concern that the auditors
12 had and that you had was that you were
13 under-reserved in the Delaware Valley?
14     A.  That's absolutely right.
15     Q.  And you knew this from interactions
16 at the various weekly meetings?
17     A.  Yes.
18     Q.  During the audit year?
19     A.  Yes.
20     Q.  I'm handing you now, and trying not
21 to you have cut by a staple, Exhibit 113.
22     A.  I wouldn't want to cut this short.
23     Q.  Mr. Spargo, which is another set of
24 schedules I'm going to ask you to review for
25 me, briefly.

---

Page 137

1      Starts on the page that reads,
2  "Allegheny University Hospitals, Elkins Park,"
3  and it has a summary set of rows with headings
4  that include the words "PATCOM and Invision
5  reserves."  Do you see that?
6      A.  I do.
7      Q.  What do you recall the words
8  "PATCOM and Invision" refer to?
9      A.  PATCOM was the patient accounting
10 system that they had used historically at some
11 of the hospitals in the east, which was being
12 phased out and all the hospitals were put on
13 the Invision system.
14     Q.  When you say "patient accounting
15 system," you mean sort of a collections and
16 accounts receivable system?
17     A.  Yes.  Billing and collections and
18 accounts receivable.
19     Q.  Do you see the figure in row titled
20 A-d-j, or adjusted, inpatient R-e-q A-l-l-o-w?
21     A.  I do.
22     Q.  Do you recall receiving this
23 schedules or set of schedules during your time
24 at AHERF?
25     A.  I can't tell you that I recall, but

---

35 (Pages 134 to 137)

Stephen Spargo

Page 138

1   I very well could have.
2       Q.   You received schedules like this,
3   in any event?
4       A.   Yeah.
5       Q.   Do you see that the number under
6   the row we just mentioned has a total of --
7   under the Invision reserve has a total of
8   $931,792?
9       A.   Yes.
10      Q.   If you would flip to Page 3 of the
11  document, you'll see a page that starts, again,
12  with the heading, "Elkins Park Hospital
13  inpatient bad debt reserve calculation," and
14  that totals that to same figure.
15      A.   Yes, it does.
16      Q.   That's with a row heading,
17  "required reserve"; is that right?
18      A.   Yes.
19      Q.   And those two figures then tie?
20      A.   Yes, they do.
21      Q.   Ask you to flip to Page 18 of the
22  document.
23      A.   Eighteen of 27?
24      Q.   Yes, sir.  Again, we find that --
25  we find a total inpatient requirement allowance

Page 139

1   in roughly the same figure, $983,000 there
2   under billed and unbilled total, do you see
3   that, under total inpatient requirements
4   allowance?
5       A.   I do.
6       Q.   Are you able to conclude from
7   that -- I'm sorry, it's 983,000, ties with the
8   PATCOM reserve at the front page?
9       A.   Yes, it does.
10      Q.   The opening page?
11      A.   Yes, it does.
12      Q.   The $983,000 figure?
13      A.   Correct.
14      Q.   Are you able to conclude from that
15  that the first pages is, that is 2 to 12 of the
16  document, deals with Invision accounts, while
17  the remainder deals with, starting on Page 13,
18  deals with PATCOM accounts, from a quick
19  review?
20      A.   Certainly looks that way, yes.
21      Q.   I want to compare just a couple of
22  these reserve percentages with you briefly.  If
23  you look at Page 4 of 27.
24      A.   Okay.
25      Q.   You see here some Invision account

Page 140

1   percentages, am I right, for various payors or
2   bucket percentages?
3       A.   I'm assuming they're Invision, yes.
4       Q.   We note that Blue Cross, for
5   instance, has a percentage, if you look in the
6   out buckets, that is, the 181 to 270 days out
7   we see a percentage of 60 percent, right?
8       A.   Right.
9       Q.   271 to 365 days out carries a
10  percentage of 70 percent?
11      A.   Correct.
12      Q.   Medicare, under the Medicare payor
13  row, those percentages go from 40 to
14  60 percent?
15      A.   Correct.
16      Q.   Ask you to turn now to Page 17 of
17  27.  Let your fingers do the walking.
18      A.   Okay.  Good to go.
19      Q.   In a similar payor category we now
20  look at Medicare again.
21      A.   Correct.
22      Q.   We see very different percentages
23  in the same aging buckets; am I right?
24      A.   We do.
25      Q.   Those percentages are, in fact,

Page 141

1   what?
2       A.   For Medicare they're 5 and
3   30 percent.
4       Q.   Significantly lower?
5       A.   Definitely.
6           MR. RYAN:  Objection.
7       Q.   I would ask you to look at the Blue
8   Cross percentage, too.
9       A.   Blue Cross is 10 and 30 as opposed
10  to what we see before, 60 and 70.
11      Q.   Can you explain why these
12  percentages were so different?
13      A.   No.
14      Q.   Which one appears to be more
15  conservative?
16      A.   Certainly Page 4 of 27.
17      Q.   So Invision was significantly more
18  conservative, at least on these accounts, than
19  PATCOM?
20      A.   Correct.
21      Q.   But for the same patients, the same
22  hospitals, and the same payor groups?
23      A.   Correct.
24      Q.   Which percentages in your
25  experience both auditing hospital organizations

36 (Pages 138 to 141)

Stephen Spargo

Page 142

1   in this time period and working in the position
2   you worked in at AHERF appear to be more
3   reasonable?
4          MR. RYAN: Objection.
5      A.   The Invision percentages,
6   certainly.
7      Q.   Did you discuss the adequacy of
8   these percentages, that is, the PATCOM
9   percentages, with others at AHERF at the time?
10     A.   I don't recall discussing the
11  individual reserve percentages. I do recall
12  trying to make a case that the PATCOM balances
13  in their entirety should be a hundred percent
14  reserved.
15     Q.   Did you make that case with the
16  auditors as well?
17     A.   I don't know.
18     Q.   You certainly discussed the problem
19  with the auditors?
20     A.   Yes.
21     Q.   With whom did you have those
22  discussions?
23     A.   It would have been at our Friday
24  meetings.
25     Q.   So the usual attendees would have

Page 143

1   heard you?
2      A.   Definitely.
3      Q.   This would have -- these
4   conversations would have taken place during the
5   fiscal year 1995 and 1996?
6      A.   Yes. Yes.
7      Q.   Did you ever receive any
8   instructions from Coopers & Lybrand that the
9   percentages at PATCOM were to be changed and
10  the reserves elevated?
11     A.   Not to my knowledge, no.
12     Q.   Would you have done so if asked?
13     A.   I've been asking for that -- it
14  wouldn't have taken them to get me to be able
15  to do so. If I had the ability to do so, it
16  would have been done so years before.
17     Q.   And it would have been helpful for
18  them to ask, though?
19         MR. RYAN: Objection.
20     A.   It would have been helpful for them
21  to assert that case to others; not ask, just
22  say, the reserves are inadequate.
23     Q.   And they need to be moved?
24     A.   Right.
25     Q.   And they need to be increased?

Page 144

1      A.   And they need to be increased
2   substantially.
3      Q.   Who would that case have been made
4   -- who would it have been helpful, in your
5   view, for that case to have been made to?
6      A.   Mr. McConnell and Mr. Dienisio and
7   Mr. Snow.
8      Q.   And to your knowledge, it wasn't
9   made?
10     A.   No.
11     Q.   Why were you yourself not allowed
12  to implement that change, do you know?
13     A.   Because I was a keeper of the
14  books. Mr. Dienisio was responsible for the
15  accounting, or patient accounting function, and
16  Mr. Snow was his direct report. So it was his
17  responsibility to accumulate charges, to
18  prepare claims for submission to the payors, to
19  ultimately receive cash, assess the
20  credit-worthy collectability on account
21  balances.
22     Q.   Was it also ultimately
23  Mr. McConnell's call?
24     A.   Oh, yeah.
25     Q.   Did you ever raise the suggestion

Page 145

1   with Mr. McConnell that these percentages
2   needed to be changed?
3      A.   I raised the suggestion with
4   Mr. McConnell that our reserves were woefully
5   inadequate.
6      Q.   So same principle, maybe a little
7   less specific?
8      A.   Correct.
9      Q.   His response was?
10     A.   I hear you.
11     Q.   But to your knowledge, you don't
12  know whether anything was done or not?
13     A.   We didn't do much.
14     Q.   During the time you were at AHERF,
15  do you think that problem was adequately
16  addressed?
17         MR. RYAN: Objection.
18     A.   No, sir, I do not.
19     Q.   Mr. Spargo, this is another set of
20  reserve schedules, this one for
21  St. Christopher's Hospital, which was another
22  Delaware Valley Obligated Group Hospital,
23  correct?
24     A.   That correct.
25     Q.   It, again, is a document that you

37 (Pages 142 to 145)

Stephen Spargo

Page 146

1  may not recognize today as having received, but
2  certainly is of the kind of schedules that you
3  received during the year and during the audit
4  process while you were at AHERF; am I right?
5      A.  That's correct.
6      Q.  And it, again, has a PATCOM reserve
7  and Invision reserve set of columns on its face
8  page?
9      A.  Correct.
10     Q.  I'm going to ask you to look at
11 Page 4 first.
12     A.  Yes, sir.
13     Q.  For the Invision percentages for
14 Blue Cross and Medicare. Can you tell us what
15 those are for the last two categories of aging?
16     A.  Blue Cross is 70 percent for both
17 categories, and Medicare is 60 and 90 percent,
18 respectively.
19     Q.  I'm going to ask you to flip, if
20 you would then, to Page 17 of the document.
21 Tell us what you understand to be the, if
22 that's the way you understand it, the PATCOM
23 percentages for the similar pair of groups in
24 the similar aging categories.
25     A.  I can't find Blue Cross. Page 17.

Page 147

1      Q.  But you can find Medicare?
2      A.  I can find Medicare percentages are
3  5 and 30.
4      Q.  Again, in your view, a significant
5  difference?
6      A.  Yes.
7      Q.  If you look back at Page 16, I
8  think you're going to find the Blue Cross
9  category, payor category, and I have the same
10 question then.
11     A.  Yes. Yes. Those percentages are
12 10 and 20.
13     Q.  Another significant difference, in
14 your view?
15     A.  Absolutely.
16     Q.  I'm going to hand you another
17 exhibit now, Mr. Spargo, which will be Exhibit
18 16 in these proceedings. If we escape this
19 without a paper cut, we'll be lucky.
20         Can you identify this document for
21 me?
22     A.  It's a reserve analysis.
23     Q.  And it is a --
24     A.  Or a cushion analysis, I guess.
25     Q.  Is it an analysis that was done

Page 148

1  periodically at AHERF?
2      A.  Yes.
3      Q.  While you were there?
4      A.  Yes.
5      Q.  And you received Exhibit 16 and
6  schedules like it from time to time to apprise
7  you of potential reserves that were available
8  for use or adjustments that were available to
9  be made?
10     A.  Correct.
11     Q.  Do you see that this particular
12 schedule of what is termed "potential
13 adjustments" has a potential exposure category
14 on the second page, toward the bottom, for
15 uncollectable PATCOM accounts?
16     A.  Yes.
17     Q.  Looks to be the second to last
18 entry in the sets of entries?
19     A.  Yes.
20     Q.  What's the figure there?
21     A.  25 million.
22     Q.  That would be a potential negative
23 exposure; am I right?
24     A.  That's correct.
25     Q.  Do you recall discussions about

Page 149

1  this with others at AHERF, this PATCOM
2  potential exposure of up to $25 million?
3      A.  Oh, yeah.
4      Q.  With whom had this -- did you have
5  these conversations?
6      A.  Mr. McConnell, Mr. Morrison,
7  Mr. Dienisio, Mr. Cancelmi, Mr. Adamczak, Mr.
8  Snow, Mr. Laing.
9      Q.  Were these discussions in fiscal
10 year 1996 and before?
11     A.  Yeah.
12     Q.  And do you recall having similar
13 discussions with the auditors about this
14 potential exposure?
15         MR. RYAN:  Objection.
16     A.  I can't honestly tell you I recall,
17 but it was a significant item that had to have
18 been discussed.
19     Q.  You can't recall maybe the specific
20 amount, but the PATCOM issue was discussed?
21     A.  Right. Correct.
22     Q.  And the potential exposure there?
23         MR. RYAN:  Objection.
24     A.  Correct.
25     Q.  This would have been at weekly update

38 (Pages 146 to 149)

Stephen Spargo

Page 150

1  meetings?
2      A.   At the planning meeting, weekly
3  update meetings, lunch, ball game.
4      Q.   Those conversations would have been
5  had with whom?
6      A.   Mr. Buettner, Mr. Kirstein, whoever
7  was present. Jeff, whatever his name is. Not
8  LeAnn Womack's brother.
9      Q.   Womer.
10     A.   Womer, who is auditing A/R in one
11 of the years. Brian Christian, I think,
12 brought it the one year. It was not a secret.
13     Q.   It was a widely-known phenomenon?
14     A.   Yes. Yes.
15     Q.   Do we -- do you recall as you sit
16 here today where the PATCOM percentages came
17 from, or did you ever have an understanding?
18     A.   No.
19     Q.   Whether or not you recall it today.
20     A.   I don't recall it, no. I don't
21 think any understanding would have been
22 believed.
23     Q.   What created, if you recall,
24 typically, exhibit -- I'm sorry, schedules like
25 the reserve analysis or potential adjustments

Page 151

1  marked as Exhibit 16?
2      A.   This is system-wide, so this could
3  have been AI, since it's basically all
4  entities. If it were just east, it would be
5  Dan. Either Dan or Al.
6      Q.   It wasn't something that you
7  created, but was something you received and
8  reviewed?
9      A.   Yes. Yes. I did definitely not
10 create it.
11     Q.   I notice it doesn't have any
12 markings confidential on it or restricted or
13 anything else that indicates to me, anyway, any
14 restricted list of distributees; am I right?
15     A.   No, there's no such list or
16 restriction, no.
17     Q.   Do you recall when these were
18 circulated that there was any instruction by
19 anyone not to share these with anyone,
20 including the auditors?
21     A.   Oh, no.
22         MR. RYAN: Objection.
23     A.   No.
24     Q.   You don't recall that that was the
25 case?

Page 152

1      A.   No.
2      Q.   In fact, if an auditor asked you
3  for this, would you have given it to him?
4      A.   Sure.
5         MR. RYAN: Objection.
6      Q.   Do you recall providing these to
7  auditors?
8      A.   I didn't provide anything to
9  auditors. My staff did.
10     Q.   I'm sorry, but do you have any
11 understanding of whether these were provided to
12 auditors?
13         MR. RYAN: Objection.
14     A.   I assume they were.
15     Q.   Would have been no reason to keep
16 them from them; is that fair to say?
17     A.   That's very fair to say.
18     Q.   Do you recall an auditor ever
19 complaining to you from Coopers & Lybrand that
20 there were reserve analyses, cushion analyses
21 or analyses of potential adjustments existing
22 that they didn't have access to?
23     A.   No.
24         - - - - -
25         (Thereupon, Deposition Exhibit 1681

Page 153

1          was marked for purposes of
2          identification.)
3          - - - - -
4          (Discussion held off the record.)
5      Q.   You have before you now
6  Exhibit 1681. I'm going to ask you to take a
7  look at that and then we're going to have a few
8  questions about it.
9      A.   (Witness reviewing document.)
10         Okay.
11     Q.   I'm going to point out for you,
12 Mr. Spargo, that the numbers at the base,
13 right -- lower right-hand corner of each page
14 indicate to me, and Mr. Quinn may know better,
15 that this document was produced from your file,
16 the SS is the initial from your files, at some
17 stage in some of these proceedings.
18         But do you recall as you sit here
19 today receiving this February 8, 1996 memo from
20 Ms. Shaffer to Mr. Cancelmi?
21     A.   No, I don't recall it.
22     Q.   It is the kind of a memo headed
23 "Delaware Valley Hospitals patient accounts
24 receivable agings" that you would have received
25 typically?

Stephen Spargo

Page 154

1    A.  Yes.
2    Q.  And, in fact, you are cc'ed on the
3  last page; do you see that?
4    A.  Yes.
5    Q.  Today you don't doubt that you got
6  it in or about the time period it was
7  generated?
8    A.  Oh, no, I don't doubt it, no, sir.
9    Q.  I'm going to ask you to look more
10  specifically at the second page of the document
11  with the heading Arabic numeral 3, where I
12  think it is Ms. Schaffer who writes, "reserve
13  calculated on self-pay balances and only the
14  patient liability balances for all other payor
15  classes."
16      Do you see that?
17    A.  I do.
18    Q.  And this refers to the MCC/EPPI
19  facility; is that right?
20    A.  Yes.
21    Q.  Do you recall that this hospital
22  reserved the self-pay balances and the patient
23  liability balances for all other payor classes?
24    A.  I don't, no.
25    Q.  Does that sound to you like a

Page 155

1  suspect method of reserving?
2    A.  Oh, yeah.
3      MR. RYAN:  Objection.
4    Q.  Why so?
5    A.  Well, it's basically suggesting
6  that every other payor category is going to pay
7  a hundred percent of what's on the books.
8    Q.  That isn't consistent with your
9  experience, is it?
10    A.  No, it is not.
11    Q.  If that were, in fact, the case --
12  well, strike that.
13      We're about to hand you what we're
14  going to mark as Exhibit 1682.
15    A.  It might be helpful for you to know
16  that the SS on the corner, somehow that must
17  have been described in one of my depositions,
18  but I turned over no documents in response to
19  my subpoena, other than my personnel files, so
20  my executive pension plan, anything related to
21  my contract.  But I kept and retained nothing
22  when I left.
23    Q.  It may be, just for your benefit,
24  probably more for Mr. Quinn's benefit, that you
25  didn't produce this individually, but somebody

Page 156

1  at one of the successor enterprises to the
2  hospital organization found this in what they
3  believe to be your files.
4      So I stand corrected if I
5  overstated, but that still indicates to me that
6  somebody at the time this was produced, and I
7  don't know who produced it as I sit here today,
8  believed it came from a file that you
9  maintained.  But if you don't think it was so
10  maintained, feel free to tell me.
11    A.  Oh, no.
12    Q.  I was just trying to help.
13      MR. QUINN:  He wanted to clarify.
14    Q.  You understand what limited
15  information I had about it.
16    A.  I understand.
17    Q.  But thank you for that
18  clarification.  It helps me.
19      - - - - -
20      (Thereupon, Deposition Exhibit 1682
21      was marked for purposes of
22      identification.)
23      - - - - -
24    Q.  I've handed you now, Mr. Spargo,
25  what we marked as Exhibit 1682.  Another set of

Page 157

1  schedules, surprise.  This one for the Medical
2  College Hospitals, which was a DVOG hospital;
3  is that right?
4    A.  That's recollect.
5    Q.  It is headed, Selected Accounts
6  Receivable Aged Trial Balance by Patient, or
7  P-a-t, Name; is that right?
8    A.  Yes.
9    Q.  It's dated 3/31/96?
10    A.  Correct.
11    Q.  That would have been in the fiscal
12  year 1996?
13    A.  That's correct.
14    Q.  Can you describe this document
15  generally for me?  Is it a document with which
16  you're familiar?
17    A.  Not really.  It looks like a
18  standard system-generated document.  And it is
19  on this front page just showing at the top by
20  aging category the gross balances that are in
21  accounts receivable, as well as the portion
22  attributable to insurers, and then the
23  remaining portion that's patient
24  responsibility.
25    Q.  And this is the MCC/EPPI hospital

40 (Pages 154 to 157)

Stephen Spargo

Page 158

1  that we just referred to moments ago; is that
2  right?
3      A.  I believe EPPI is in here as well.
4  Definitely MCP.
5      Q.  I'm going to direct your attention
6  to the top portion of the document.  It appears
7  to me in reading this schedule that of the
8  $35.7 million of receivables on the main
9  clinical campus, if that's indeed what we're
10  referring to here, only some $3.1 million were
11  patient balances; is that right?
12      A.  That's correct.
13      Q.  And does that mean then that there
14  were zero -- there was a zero percentage
15  reserve assigned to approximately 32.6 million
16  of these receivables on the main clinical
17  campus?
18      A.  Applying the methodology we saw in
19  that last exhibit, yes.
20      Q.  Likewise, if you go to the next
21  page, you'll see the EPPI figures, I believe.
22      A.  Yes.
23      Q.  And can you tell us -- seems to me
24  that if what you just told us holds true, that
25  it is really $11.4 million of receivables,

Page 159

1  against which there is no reserve percentage
2  applied of a total of 12.5 million; am I right?
3      A.  That's what it appears, yes.
4      Q.  Do you recall discussions with
5  others at AHERF or Coopers & Lybrand about this
6  particular reserve issue?
7      A.  I recall noting inadequate reserves
8  throughout the Delaware Valley, particularly at
9  St. Chris and MCP/EPPI.
10      Q.  So you can't say with specificity
11  that this particular issue was addressed, but
12  you noted these facilities as problematic
13  facilities from the accounts receivable
14  reserving perspective?
15      A.  That's correct.
16      Q.  And those would have been had at
17  the -- those conversations, that is, would have
18  been had periodically with AHERF personnel and
19  at the update meetings?
20      A.  Yes.
21      Q.  With the auditors?
22      A.  Yes.
23      Q.  Do you recall anyone at Coopers &
24  Lybrand or anyone else in AHERF finance
25  suggesting to you that we might evaluate and/or

Page 160

1  address the problem at MCPH/EPPI, at the
2  Medical College or at EPPI, by applying the HUH
3  methodology, the Hahnemann University Hospital
4  methodology?
5      A.  I don't recall that.
6      Q.  You don't recall that particular
7  analysis?
8      A.  No.  No.
9      Q.  Mr. Spargo, I'm now handing you
10  what has been previously marked as
11  Exhibit 1075.  It is another set of schedules
12  with it looks to me like it's a Coopers &
13  Lybrand work paper cover sheet.
14          Were you familiar with those over
15  time?
16      A.  No.
17      Q.  The work paper name, as printed on
18  the face of the page, however, says, "MCPH East
19  Falls inpatient bad debt analysis,
20  6/30/96 using HUH methodology."  Do you see
21  that?
22      A.  I sure do.
23      Q.  Then there's a set of schedules
24  that follow that; am I right?
25      A.  There are.

Page 161

1      Q.  Does this document or any of the
2  schedules that follow refresh your recollection
3  in any way that Coopers & Lybrand, in fact,
4  performed an analysis using HUH as a comparator
5  methodology?
6      A.  No, it does not.  Sorry.  I see
7  that they did, but it doesn't cause any
8  recollection on my part.
9      Q.  Handing you now, Mr. Spargo, what
10  has been marked as Exhibit 22 in this case,
11  which is another management letter.  I think
12  you'll tell me it's the management letter you
13  recall receiving for fiscal year 1996 dated
14  September 23, 1996; am I right?
15      A.  Yes.
16      Q.  I'm going to ask you just to flip
17  to the last page.  I'm sorry, the last section
18  of the document, which starts at Page 15 of 16.
19      A.  Okay.
20      Q.  And we're checking back in now with
21  the status, apparently, by the heading of the
22  face page of prior year observations, one of
23  which we discussed earlier today.
24          If you turn to Page 16 of 16, we
25  have a set about mid -- a set of comments about

41 (Pages 158 to 161)

Stephen Spargo

---

**Page 162**

1  midway down which says, "comments which are
2  still applicable for fiscal year 1996."
3        Are you with me?
4     A.  I am.
5     Q.  And there is a heading which
6  follows, which reads, "accounts receivable
7  observations"; am I right?
8     A.  That's correct.
9     Q.  And it says that, "as previously
10  discussed, management recognizes the unique
11  issues surrounding AHERF's accounts receivable
12  management.  Though, the following observations
13  have not been addressed during 1996,
14  appropriate follow-up procedures are currently
15  in the development stage."
16        Did I read that set of sentences
17  right?
18     A.  You did.  Yes.
19     Q.  And one of the bullet points
20  beneath that introductory set of sentences is,
21  "methodology for establishing bad debt reserves
22  should be applied consistently."
23     A.  Correct.
24     Q.  When you read this upon receipt,
25  what did that insert tell you?

---

**Page 163**

1     A.  When I'm reading it right now, it
2  tells me in that 1996 Coopers and management
3  were of the opinion that they still had not yet
4  established a bad debt reserve methodology.
5     Q.  When you read it then, you knew
6  that to be accurate or inaccurate?
7     A.  Accurate.
8     Q.  And you still thought it needed to
9  be done?
10     A.  I did.
11     Q.  You still thought, more
12  importantly, that the validity of the
13  underlying methodologies needed to be
14  addressed, especially in the east?
15     A.  Correct.
16     Q.  Do you recall learning at some
17  point in the -- while you were still with
18  AHERF, Mr. Spargo, that there was another
19  comparison effort made on the part of the
20  Coopers & Lybrand auditors, this one between
21  AGH and certain DVOG entities in fiscal year
22  1996?
23     A.  I don't recall, no.
24     Q.  Do you recall why the consistency
25  issue had not been addressed between the end of

---

**Page 164**

1  fiscal year 1995 and the end of fiscal year
2  1996?
3     A.  Yeah.  Because it would have
4  yielded a reserve that would have been
5  significantly larger than was on the books, the
6  offset of which would have been a huge hit to
7  the income statement.
8     Q.  And how was it that you believe
9  that to be the rationale?
10     A.  That's the only answer.
11     Q.  In that you were -- let me see if I
12  understand that.  Seems to me you and others
13  were telling senior management that this
14  problem needed to be addressed; is that right?
15     A.  Correct.
16     Q.  And the fact that no instructions
17  came down to have it so addressed leads you to
18  the conclusion that you just gave us?
19     A.  Correct.
20     Q.  Do you have any doubt as you sit
21  here today that Coopers & Lybrand, having
22  audited the organization and the accounts
23  receivable function in the organization both
24  years, was fully aware of this difficulty?
25        MR. RYAN:  Objection.

---

**Page 165**

1     A.  I have no doubt whatsoever.
2     Q.  And you base that statement on
3  what?
4     A.  Conversations I had with them
5  explicitly myself.
6     Q.  And those people that you refer to
7  are?
8     A.  Coopers & Lybrand audit team.
9     Q.  From Mr. Buettner on down?
10     A.  On down.
11     Q.  I'm going to ask you to look at
12  Exhibit 117 now, briefly, for me.  It is
13  another set of schedules.  This one entitled
14  Hahnemann University Hospital inpatient bad
15  debt reserve calculation dated 6/30/96.  Do you
16  see that?
17     A.  I do.
18     Q.  This is another schedule that you
19  recognize as having been run from AHERF's
20  accounting system and one that would have
21  either hit your desk or been made available to
22  the auditors at audit time; is that fair to
23  say?
24     A.  Wouldn't have hit my desk.  It
25  could have.  Or been made available for the

---

42 (Pages 162 to 165)