Stephen Spargo

Page 166

1  auditors, yes, it could have.
2      Q.   It's the kind of schedule you're
3  used to seeing --
4      A.   Yeah.
5      Q.   -- at the time you were there?
6      A.   Yes.
7      Q.   Ask you to turn to the second page
8  and there's a note there in typewritten fashion
9  in fairly small print, but I'll try it.
10      It says, "C & L does not propose
11  any entry for the difference between the two
12  reserve calculations because C & L has prepared
13  an additional analysis for bad debt reserve
14  using AGH's reserve percentages and the client
15  has booked an additional reserve." Do you see
16  that?
17      A.   I see that.
18      Q.   Do you recall any of that?
19      A.   No.
20      Q.   Do you recall ever seeing the
21  analysis?
22      A.   No.
23      Q.   Do you recall any request for or
24  any booking of additional reserve based on such
25  analysis?

Page 167

1      A.   No.
2      MR. JONES:  Let's take our next
3  break here.
4      VIDEO TECHNICIAN:  Going off the
5  record at 2:03.
6      (Brief recess.)
7      VIDEO TECHNICIAN:  Going back on
8  the record at 2:24.
9      Q.   Mr. Spargo, thank you for your
10  continuing attention here with the number of
11  documents this afternoon.
12      A.   You're welcome.
13      Q.   We were speaking when last we --
14  just before we broke, rather, about accounts
15  receivable reserving and the difficulties, in
16  particular, at the Delaware Valley Obligated
17  Group hospitals in fiscal years 1995 and 1996.
18  That's generally what we were talking about.
19      A.   Yes, sir.
20      Q.   Let me ask you this.  Do you recall
21  that Coopers & Lybrand focused any particular
22  level of attention on the substantive area of
23  accounts receivable for the 1996 audit in
24  particular?
25      A.   Oh, yeah.

Page 168

1      Q.   And why do you recall that being
2  the case?
3      A.   Because that would have -- that
4  statement is true in every year.
5      Q.   Were there any particular changes
6  going on in the accounts receivable or the
7  patient financial services group area around
8  this time, fiscal year 1996?
9      A.   Yes.  They were migrating to a new
10  system.  We've talked about PATCOM and
11  Invision.  They were trying to consolidate
12  operations back in Pittsburg, not unlike what I
13  was trying to do with the accounting functions.
14      Mr. Oxendale left sometime around
15  that time to go be the CFO at Children's
16  Hospitals, so Mr. Snow became the man.
17      Q.   That's Greg Snow?
18      A.   Greg Snow, correct.
19      Q.   These are all things that would
20  heighten the sensitivity of an auditor, in your
21  view?
22      A.   Yes.
23      Q.   Do you recall becoming aware of any
24  particular new tests, new analytical approaches
25  or other methods of review that Coopers

Page 169

1  undertook in fiscal year 1996 that they had not
2  undertaken in prior fiscal year audits?
3      A.   I don't recall.
4      Q.   I'm going to ask you to take a look
5  at another exhibit for me now.  It's Exhibit
6  1525.  And I think you'll identify it for us as
7  a faxed cover sheet and a second page that
8  appears to have been sent from Mr. Jeff Womer
9  at Coopers & Lybrand on February 23rd, 1996 to
10  Mr. Al Adamczak; is that right?
11      A.   Yes.  Yes, it is.
12      Q.   Does that refresh your
13  recollection, that is, the fax cover sheet,
14  about the auditor at Coopers & Lybrand who
15  we've been referring to as sometimes Mr.
16  Womack, sometimes Mr. Womer, at least by me
17  earlier today?
18      A.   Yes.
19      Q.   And his name, in fact, now is, in
20  your best recall, Jeff Womer, W-o-m-e-r?
21      A.   That's his name.
22      Q.   Here he appears to write to
23  Mr. Adamczak about a set of analyses that
24  Coopers & Lybrand would need for their interim
25  A/R project.  And suggests that if Mr. Adamczak

43 (Pages 166 to 169)

Stephen Spargo

Page 174

1  what the assessment level was, risk assessment
2  level was?
3      A.   Correct.
4      Q.   But it is, indeed, consistent with
5  your view that 1996 was to be a year in which
6  accounts receivable were to be a focus?
7      A.   Correct.
8      Q.   The second sub bullet point in this
9  memo indicates that in fiscal year 1996, the
10  sample selection size was dramatically
11  increased over what was used for fiscal year
12  1995.  Do you see that?
13     A.   I do.
14     Q.   Do you recall that being the case?
15     A.   I don't.  No.
16     Q.   Were you at all involved in
17  collecting any information for this heightened
18  receivables review?
19     A.   No, sir.
20     Q.   Mr. Spargo, I'm going to hand you
21  now what we've marked before as Exhibit 21.
22  I'm going to ask, do you recall having received
23  and reviewed this document?
24     A.   I don't recall.
25     Q.   It's headed, "Bullet Point List of

Page 175

1  Possible Management Comments."  Do you recall
2  receiving documents similarly titled?
3      A.   I do not.
4      Q.   Whether or not you recall this
5  document or documents like it, you do, however,
6  recall, consistent with your testimony earlier
7  today, providing written and oral comments to
8  the Coopers & Lybrand auditors on their
9  proposed management letters?
10     A.   Yes.
11     Q.   And, in fact, you recall indicating
12  to them in fiscal year 1996 in draft language,
13  "to strengthen the caution about the health of
14  accounts receivable, particularly in eastern
15  hospitals."
16     A.   Correct.
17     Q.   And you did that in writing on a
18  draft version of the management letter?
19     A.   Yes.
20     Q.   That was submitted to Coopers &
21  Lybrand?
22     A.   Yes.
23     Q.   And you did that because you
24  thought that would have been a fair
25  presentation of the scope of the problem?

Page 176

1      A.   Yes.
2      Q.   And the severity of the problem?
3      A.   Right.
4      Q.   And it was an accounts receivable
5  management problem with respect to the Delaware
6  Valley Obligated Group hospitals, in
7  particular, methodology problem and a reserving
8  problem?
9      A.   Fair enough.  Yes.
10     Q.   And it was significant in material,
11  in your view?
12     A.   Definitely.
13         MR. RYAN:  Objection.
14     Q.   A problem you were trying to get
15  fixed, but hadn't been successful in bringing
16  enough attention to it before; is that right?
17     A.   Correct.
18     Q.   Let me ask you to look back at
19  Exhibit 22, which is the September 23, 1996,
20  fiscal year 1996 management letter.  Do you
21  have that, sir?
22     A.   I do, sir.
23     Q.   I'm going to ask you to flip
24  quickly to the page which is -- I'm sorry, my
25  thumb isn't working as swiftly as I'd like.

Page 177

1  Page 5.
2      A.   Okay.
3      Q.   Like I said, page 1.  I apologize.
4      A.   Okay.
5         MR. RYAN:  Page 1, which is Bates
6  page 4 of 16?
7         MR. JONES:  That's right.
8      Q.   Do you see that it has a general
9  overview section?
10     A.   Yes.
11     Q.   It's headed by a face page that
12  says, "Accounts Receivable Observations," which
13  is Page 3 of 16, am I right, if you flip back
14  one?
15     A.   Yes, sir.
16     Q.   And has a general overview and a
17  revenue and accounts receivable overview; am I
18  right?
19     A.   That's correct.
20     Q.   You flip down to the second to last
21  paragraph on Page 1, or Page 4 of 16.  Could
22  you read the sentence there that starts, "as a
23  result"?
24     A.   "As a result of our procedures" --
25     Q.   You're going to need to read it

45 (Pages 174 to 177)

Stephen Spargo

Page 178

1  slower for the record and the court reporter.
2      A.   Sorry.  My apologies.
3          "As a result of our procedures, we
4  have concluded that the controls over the
5  establishment and monitoring of accounts
6  receivable reserves are designed appropriately
7  and are operating effectively, so as to
8  properly adjust accounts receivable balances to
9  their estimated net realizable value.
10     Q.   Net realizable value?
11     A.   Correct.
12     Q.   Does that paragraph comport with
13 the edits you provided?
14     A.   No.
15         MR. RYAN:  Objection.
16     Q.   What do you recall telling Coopers
17 & Lybrand through your edits, or otherwise in
18 weekly update meetings, about what should be
19 included in the management letter about
20 accounts receivable for this fiscal year?
21     A.   Whether it's this year or the year
22 before, year before that, we need to
23 acknowledge the deficiencies within the patient
24 financial services group.  We need to put it in
25 black and white, basically.

Page 179

1      Q.   And we needed to do that so -- for
2  what reason?
3      A.   So that we devote appropriate
4  attention to fixing the problem.
5      Q.   And that management and the board
6  of trustees is appropriately informed?
7      A.   Correct.
8      Q.   Do you recall, when you received
9  this management letter, Exhibit 22, being
10 disappointed that your comments didn't make it?
11     A.   I can't tell you specifically
12 recall, but I'm sure I was.
13     Q.   Do you recall expressing your
14 disappointment with anyone?
15         MR. RYAN:  Objection.
16     A.   No, because by the time this letter
17 would have come out, I would have been well
18 aware that we were taking a softer approach.
19 So I didn't need to wait to see this to know
20 that we were, once again, going to walk away
21 from the issue.
22     Q.   Would you have appreciated support
23 from Coopers & Lybrand in your efforts?
24         MR. RYAN:  Objection.
25     A.   I begged for it.

Page 180

1      Q.   In fact, in other testimony and
2  other actions you've used the word "plead" as a
3  synonym for begging; isn't that right?
4      A.   I have.
5      Q.   You did that with whom?
6      A.   Bill Buettner, Mark Kirstein.
7      Q.   What was the response when you
8  begged or pleaded?
9      A.   They're taking it up with
10 Mr. McConnell, Mr. Dienisio.
11     Q.   And did you hear back after that?
12     A.   Yeah.  Yeah.
13     Q.   And the word was?
14     A.   That we found a way to get
15 comfortable with the current A/R balances and
16 this is the comments that we're going to put in
17 the management letter.
18     Q.   And you found that frustrating?
19     A.   Very.
20     Q.   Do you believe the comments
21 capsulized in the paragraph you just read from
22 the management letter to be accurate?
23     A.   No.
24     Q.   Do you maintain any of the drafts
25 of the management letter on which you wrote

Page 181

1  manually comments?
2      A.   I doubt it.  I mean I didn't
3  maintain them to this day.  I doubt that I
4  would have maintained them at all.
5      Q.   Do you recall to whom you actually
6  dispatched these written comments?
7      A.   Probably Al and Dan to forward to C
8  & L.
9      Q.   Do you recall sending them directly
10 to C & L yourself?
11     A.   No, because I didn't send much to C
12 & L myself.
13     Q.   Okay.  You may have, but you don't
14 recall it as you sit here today?
15     A.   Yeah, I don't think I would have.
16     Q.   In any event, you would have shared
17 the same concerns orally during the weekly
18 update meetings anyway?
19     A.   Absolutely.
20     Q.   Why do you think Coopers & Lybrand,
21 in particular, and, in particular, Mr. Buettner
22 did not include the comments you requested,
23 whether orally or in writing, about accounts
24 receivable?
25         MR. RYAN:  Objection.

46 (Pages 178 to 181)

Stephen Spargo

Page 182

1    A.   I can only assume that it was
2  suggested to them through Mr. McConnell, or
3  others, that we not do so.
4    Q.   Do you think that the relationship
5  issues referred to earlier were involved?
6    A.   I do --
7        MR. RYAN:  Objection.
8    A.   -- as a matter of fact.
9    Q.   What about them do you believe to
10 be involved, those issues?
11       MR. RYAN:  Objection.
12   A.   There's only a limited extent of
13 which a client is able to express and have his
14 wishes carried out by an auditing firm.  If you
15 get too close, then those wishes get clouded,
16 and those desires cloud judgment.
17       I can't imagine a perfect hindsight
18 and perfect candor that anyone could sit there
19 and say, I'm glad we didn't disclose the
20 accounts receivable problem at AHERF.  How many
21 people have to lose their jobs?  It's all
22 Sherif.
23   Q.   Sherif is Mr. Abdelhak?
24   A.   Mr. Abdelhak.
25   Q.   Do you believe, then, that by

Page 183

1  fiscal year 1996 Coopers & Lybrand had lost its
2  independence as an outside independent auditor?
3        MR. RYAN:  Objection.
4    A.   I do.
5    Q.   Put it this way.  How would you
6  characterize their level of independence by
7  fiscal year 1996?
8        MR. RYAN:  Objection.
9    A.   I would characterize it as minimal
10 at best.  Not unlike what we read about more
11 currently in the newspapers.
12   Q.   And you refer to newspaper articles
13 about which topics?
14   A.   Bell South, Enron, WorldCom.
15   Q.   Mr. Spargo, I've just handed you
16 now Exhibit 105, which I think you'll identify
17 for us as a July 15, 1996 memo from you to
18 Mr. Snow about A/R balances at June 30, 1996;
19 is that right?
20   A.   That's correct.
21   Q.   And you recall preparing and
22 dispatching this memo about that time?
23   A.   I do.
24   Q.   You've copied a number of other
25 folks, include Mr. McConnell, Mr. Adamczak, and

Page 184

1  Mr. Cancelmi?
2    A.   Yes.
3    Q.   And Mr. Dienisio?
4    A.   Correct.
5    Q.   What do you mean -- what do you
6  recall meaning to convey when you wrote this
7  memorandum?
8    A.   That I needed Mr. Snow's
9  cooperation, and I did not want to suggest that
10 we were threatening the impending year-end
11 audit as a means of facilitating or generating
12 or soliciting his cooperation.
13       So in a spirit of collegiality,
14 which really didn't exist between he and I,
15 this was more for show and for the benefit of
16 the two of the carbon copyees to say, hey,
17 Greg, how much ponying up some information here
18 so we have a clue what the hell is going on in
19 the patient accounting.
20   Q.   This was your effort to try to get
21 as much information in as candid as a way as
22 you could from that department so you
23 understood the situation, the auditors would
24 understand the situation, and everyone would
25 understand the situation?

Page 185

1    A.   Everyone would understand the
2  situation.
3    Q.   Is that right?
4    A.   That's correct.
5    Q.   I've characterized your intent?
6    A.   You have.
7    Q.   Fairly?
8    A.   You have.
9    Q.   What do you mean by prior year
10 confusion that haunted you throughout 1996,
11 haunted the organization, that is?
12   A.   This was confusion that he alleged
13 that existed in 1995 with respect to PATCOM
14 balances, Medicaid accounts past statute,
15 inconsistencies in classifying balances between
16 insurance and patient responsibility, things
17 that made it difficult for him to be responsive
18 to requests for information, because of his
19 alleged confusion.
20   Q.   If someone had suggested to you
21 that this memo may reveal an intent to not be
22 as forthcoming with the auditors as one might,
23 how would you respond?
24   A.   I would respond that that's bunk,
25 that that's intended to try and draw out some

Stephen Spargo

Page 214

1  remember writing this?
2      A.   I don't.
3      Q.   Do you remember what you were
4  trying to convey, generally, other than what
5  you just read to us?
6      A.   It appears what I was trying to
7  convey, I guess, are two things. Number one,
8  let's fully reserve anything over a year old.
9  Let's get that crap off the books right now and
10 then deal with whatever reserve is appropriate
11 for the -- anything under a year old.
12      And then at the time I think they
13 were talking about turning over the PATCOM and
14 other old accounts to an outside party to
15 collect, even the ones greater than a year old.
16 And what I'm saying here is that's all well and
17 good, but whatever they collect we'll then
18 reinstate or put back into the reserve, if and
19 when they ever collect it.
20      As well as gradually increasing the
21 reserve 1 to $2 million a month through, I
22 assume, just accounting adjustments.
23      Q.   By taking bad debt expense charge?
24      A.   Yeah.
25      Q.   Fair to say that from this memo and

Page 215

1  your recollection otherwise that even in late
2  September of '96 the accounts receivable
3  problem in the Delaware Valley wasn't getting
4  better?
5      A.   Correct. Correct.
6      Q.   It was, indeed, something that was
7  still on your mind and how to handle it --
8      A.   Correct.
9      Q.   -- was something you had to deal
10 with?
11      A.   Correct. The acknowledgment of a
12 $30 million shortfall and the parent agreement
13 to rectify it over time, although three years
14 is a long time, that was just a small step as
15 part of the solution. I was not personally
16 satisfied with that.
17      But I was reminded that it was more
18 of an acknowledge than we've ever made in the
19 past. This was no victory, nor was it
20 envisioned to be a solution. Nowhere do you
21 hear anybody talk about the operations, why
22 can't we build accounts, why do we have such a
23 problem in the business office.
24      Once again, we sort of circumvented
25 the issue. So this acknowledgment was no --

Page 216

1  was not met with elation by myself or
2  Mr. Cancelmi or anyone else, I don't think.
3      Q.   And that acknowledgment was the
4  closing meeting acknowledgment we discussed
5  earlier?
6      A.   The fact everybody had
7  acknowledged, now we have a $30 million problem
8  we've got to fix.
9      Q.   Either before or at the closing
10 meeting?
11     A.   Right, any time.
12     Q.   Is it fair to say now that you do
13 recall that there was a discussion at the
14 closing meeting, or at some other time during
15 the audit process, that this $30 million
16 problem needed to be addressed over time?
17          MR. RYAN:   Objection.
18     Q.   Meaning years going forward.
19          MR. RYAN:   Objection. Misstates
20 prior testimony.
21          MR. JONES:   I asked him if that's
22 his best recollection.
23     A.   I recall an outcome of the audit
24 being an acknowledgment of a $30 million
25 deficit, whether it was at a closing meeting or

Page 217

1  a bathroom meeting, or any kind of meeting.
2      Q.   You recall that conclusion?
3      A.   Right.
4      Q.   And that conclusion had been
5  discussed with Coopers & Lybrand?
6      A.   Yes.
7      Q.   Do you recall that deficit in
8  the reserve also was determined to be corrected
9  over time going forward?
10          MR. RYAN:   Objection.
11 Mischaracterizes prior testimony.
12          MR. JONES:   I just asked him --
13     A.   Was intended to be corrected, yes.
14     Q.   The hope was that it would be?
15     A.   Yes. Yes.
16          - - - - -
17          (Thereupon, Deposition Exhibit 1684
18          was marked for purposes of
19          identification.)
20          - - - - -
21     Q.   Can you -- I'm sorry, Mr. Spargo,
22 this document before you now is Exhibit 1684,
23 correct?
24     A.   That's correct.
25     Q.   And it is another version of the

55 (Pages 214 to 217)

Page 218

1  same September 20, 1996 memo that we just
2  marked as 1683, correct?
3      A.  That's correct.
4      Q.  And it has a handwritten note from
5  you to David.  Do you recall, is that right?
6      A.  It is a handwritten note from me to
7  David McConnell, yes.
8      Q.  And David McConnell, in this memo
9  you are telling him what, if you could read it
10  for us?
11     A.  I am telling him, "David, this memo
12  demonstrates, rather convincingly, that our bad
13  debt variance through August is attributable to
14  a significant deterioration in the aging, which
15  we could essentially fix through the direct
16  write-off of aged accounts.  Perhaps we can
17  discuss further.  Steve."
18     Q.  So was this your idea to do the
19  direct write-off of the aged accounts?
20     A.  Yes.  This is consistent with what
21  we read in 1683 in that sloppy handwriting.
22  Basically getting rid of everything a year old.
23     Q.  Why did you suggest this as part of
24  the resolution?
25     A.  To get the -- to acknowledge that

Page 219

1  the old stuff -- the collectability is highly,
2  highly questionable.  Let's just write them off
3  and get rid of it.  And then focus our
4  attention on the more current stuff.
5      Q.  Do you recall discussing this
6  write-off of aged accounts with Coopers at this
7  time?
8      A.  I don't.
9      Q.  Do you recall learning from anyone
10  that they were otherwise aware of this proposed
11  write-off?
12     A.  No.
13         MR. RYAN:  When?
14     Q.  At the time, September 20, 1996,
15  roughly around there.
16     A.  No.  There was no magic to this.
17  If you leave them in, leave the old accounts on
18  the books, then you need a substantial reserve
19  to offset those accounts.
20         If you write them off against the
21  reserve, you're still left with the same net
22  position, but you're not always hampered by
23  these 360-plus-day accounts that really are a
24  distraction.  They don't deserve attention.
25  We're not going to get anything.  So, Snowbird,

Page 220

1  quit talking about MA past statute and all this
2  other stuff.  Just get rid of them and let's
3  spend our time where we might have some fruit
4  for our efforts.
5      Q.  And "Snowbird" is Mr. Snow at PFSG?
6      A.  That's correct.  Have you already
7  talked to him yet, do you know?
8      Q.  Mr. Snow has not been deposed in
9  this case, I don't believe.  I think he's
10  scheduled.
11     A.  All right.
12     Q.  I'm going to show you yet another
13  exhibit.
14     A.  I was busy.
15     Q.  This one previously marked as
16  Exhibit 1450.  I think I gave you two.  If you
17  might share one with Mr. Quinn.
18         This is a September 24 memo from
19  Mr. Cancelmi to you on the same or similar
20  topic, the Delaware Valley accounts receivable
21  reserves; is that right?
22     A.  I believe so, yes.
23     Q.  And it has your handwritten note
24  and signature on it?
25     A.  Yes.

Page 221

1      Q.  Do you have any doubt that you
2  received it and then dispatched it onto
3  Mr. McConnell at or about the time in the memo?
4      A.  No, I have no doubt.
5      Q.  And the memo to Mr. McConnell is
6  written in your hand?
7      A.  Yes, it is, sir.
8      Q.  And bears your first name
9  signature?
10     A.  Yes.
11     Q.  The memo reads, I think Dan has
12  captured the essence of our bad debt problems
13  and I am in agreement with his recommendation.
14  If we are able to start now, perhaps we can
15  better focus on operating unit performance and
16  necessary corrective action.
17         Have I read that right?
18     A.  I believe you have, yes.
19         MR. RYAN:  Can I ask, there was one
20  word, was it "start now," or "start anew"?
21     A.  Anew.
22     Q.  Thank you.
23     A.  Yes, I believe that's right.  Thank
24  you.
25     Q.  And that was your sentiment at the

Stephen Spargo

Page 222

1  time?
2      A.   Yes, it was.
3      Q.   Can you explain to us generally
4  what Mr. Cancelmi is suggesting in this
5  document?
6      A.   In addition to trying to get
7  certain personnel focused on Mr. Snow's
8  operations and enhance the billing and
9  collection of accounts, we were also faced with
10  a number of inquiries from the operating
11  personnel, meaning Dr. Kay, who was the --
12  responsible for operations in the Delaware
13  Valley, and his staff.  They were constantly
14  questioning the impact that bad debt expense
15  was having on their operating unit performance.
16          And especially Dr. Kay, he was a
17  master of deflection.  It was a lot easier for
18  him to go into Sherif's office and say, you
19  know, our P & L stunk July and August because
20  of bad debts, and avoid any conversations about
21  our admissions are down, our staffing levels
22  are up, we have too many temporary nurses in
23  the hospital, our ER is belabored with no-pay
24  patients.  Everything became, well, we're doing
25  a crappy job because bad debts are crappy.

Page 223

1          So this is a little bit different
2  focus.  This is basically saying, hey, David,
3  let's get rid of some of these old accounts,
4  let's bite the bullet once and for all and
5  maybe take away from Dr. Kay and his colleagues
6  the ability to always say their operating
7  performance is negatively impacted by bad debt
8  expense and allow Dr. Kay to manage his
9  hospitals, which is I believe what he was
10  charged with doing.
11          So I know it's hard to read that
12  into here, but that's where we were headed with
13  this.
14      Q.   Mr. Cancelmi writes in the second
15  paragraph in the second sentence, the questions
16  that all of us have been struggling with is how
17  much is the amount of bad debt -- bad accounts,
18  rather, and can we afford to write the accounts
19  off.  Do you see that?
20      A.   Yes, I do.
21      Q.   That was a question you were
22  struggling with?
23      A.   Yes.
24      Q.   What did he mean by, can we afford
25  to write off the accounts, as you understood

Page 224

1  it?
2      A.   Can we suffer the effect on our
3  operating performance.
4      Q.   That's really not a question of can
5  we, it's whether you're willing to; is that
6  fair to say?
7      A.   Right.  Right.
8      Q.   It's also fair to say that given
9  the aging categories here, that you believed at
10  the time it was unlikely, if not implausible,
11  that anything would be collected on accounts as
12  old as those listed here?
13      A.   That's correct.
14      Q.   Mr. Cancelmi's approach to write
15  off not only accounts over 360 days old, but
16  also he's contemplating on a write-off of
17  accounts over 211 or 271 days, as well as all
18  PATCOM accounts, right?
19      A.   That's what it appears, yes.  Yes.
20      Q.   Do you know why this approach was
21  proposed?
22      A.   I don't offhand.  Although, when
23  you get over 271 days, you got pretty much the
24  same argument you got when something is a year
25  old.

Page 225

1      Q.   He later states, assuming any --
2  I'm sorry.  I'm looking for the -- assuming any
3  further write-offs for the remainder of fiscal
4  1997, I'm looking at the base of Page 2, are
5  not significant, we may be able to build the
6  bad debt reserve back up in the 25 to
7  $30 million range by June 30, 1997.
8          Do you see that?
9      A.   I do.
10      Q.   Did you believe at the time that
11  this was a feasible plan?
12      A.   No.
13      Q.   Why is that?
14      A.   Because on the third paragraph on
15  the first page, although somewhat hidden, his
16  third sentence, fourth sentence says,
17  essentially, assuming the billing and
18  collection processes function as designed, the
19  aging categories should not deteriorate, et
20  cetera, et cetera.
21      Q.   You just didn't believe that was
22  likely to be the case; is that right?
23      A.   That's correct.  I think somewhere
24  I see he also refers to now that we have our
25  operations, our billing operations consolidated

57 (Pages 222 to 225)

Stephen Spargo

Page 278

1  objection................................. 209:8
2  objection................................. 216:17
3  objection................................. 216:19
4  objection................................. 217:10
5  objection................................. 227:7
6  objection................................. 228:18
7  objection................................. 232:10
8  objection................................. 232:18
9  object..................................... 233:5
10 objection................................. 233:25
11 objection................................. 241:12
12 objection................................. 241:17
13 objection................................. 241:21
14 objection................................. 257:14
15 objection................................. 257:17
16 objection................................. 259:21
17 objection................................. 267:18
18 objection................................. 268:21
19
20
21
22
23
24
25

Page 279

1           SIGNATURE OF WITNESS
2
3
4
5
6        The deposition of STEPHEN H.
7  SPARGO, taken in the matter, on the date, and
8  at the time and place set out on the title page
9  hereof.
10       It was requested that the
11 deposition be taken by the reporter and that
12 same be reduced to typewritten form.
13       It was agreed by and between
14 counsel and the parties that the Deponent will
15 read and sign the transcript of said
16 deposition.
17
18
19
20
21
22
23
24
25

Page 280

1              AFFIDAVIT
2  The State of Ohio,  )
3                      ) SS:
4  County of Cuyahoga  )
5
6
7
8     Before me, a Notary Public in and for
9  said County and State, personally appeared
10 STEPHEN H. SPARGO, who acknowledged that he/she
11 did read his/her transcript in the
12 above-captioned matter, listed any necessary
13 corrections on the accompanying errata sheet,
14 and did sign the foregoing sworn statement and
15 that the same is his/her free act and deed.
16     In the TESTIMONY WHEREOF, I have hereunto
17 affixed my name and official seal at this
18 day of             A.D 2003.
19
20
21
22        Notary Public
23
24
25        My Commission Expires:

Page 281

1        DEPOSITION ERRATA SHEET
2
3  RE:     OFFICIAL COMMITTEE OF UNSECURED
4          CREDITORS OF ALLEGHENY HEALTH,
5          EDUCATION & RESEARCH FOUNDATION
6          VS.
7          PRICEWATERHOUSECOOPERS, L.L.P.
8  RRS File No.:    7472
9  Deponent:       STEPHEN H. SPARGO
10 Deposition Date:   July 17, 2003
11
12 To the Reporter:
13 I have read the entire transcript of my
14 Deposition taken in the captioned matter or the
15 same has been read to me.  I request that the
16 following changes be entered upon the record
17 for the reasons indicated.  I have signed my
18 name to the Errata Sheet and the appropriate
19 Certificate and authorize you to attach both to
20 the original transcript.
21
22
23
24
25

71 (Pages 278 to 281)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                    Civil Action

           Plaintiff,              No. 00-684

    vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

          Defendant.

Videotaped deposition of STEPHEN
SPARGO, called for examination under the statute,
taken before me, Jaci R. Traver, RPR, CRR, and
Notary Public in and for the State of Ohio, at
the offices of Jones Day, 500 Grant Street,
Pittsburgh, Pennsylvania, on Thursday, the 17th
day of July 2003 at 9:30 a.m.

- - - - -

VOLUME II

- - - - -

Stephen Spargo                                                                    Volume 2

---

Page 283

APPEARANCES:

On behalf of the Plaintiff:
   Jones Day, by
      JAMES M. JONES, ESQ.
      500 Grant Street
      Suite 3100
      Pittsburgh, Pennsylvania 15212
      (412) 391-3939

   Jones Day, by
      DAVID S. TORBORG, ESQ.
      51 Louisiana Avenue, N.W.
      Washington, D.C. 20001-2113
      (202) 879-5562

On behalf of the Defendant:
   Cravath, Swaine & Moore, by
      ANTONY L. RYAN, ESQ.
      Worldwide Plaza
      825 Eighth Avenue
      New York, New York 10019-7475
      (212) 474-1296

---

Page 284

APPEARANCES, Continued:

On behalf of the Witness:
   Compliance Concepts, Inc., by
      ANDREW S. QUINN, ESQ.
      Stonewood Commons II
      103 Bradford Road, Suite 320
      Wexford, Pennsylvania 15090
      (724) 940-0077

ALSO PRESENT:
   Shawn Lewis, Video Technician

---

Page 285

1      VIDEO TECHNICIAN: We're on the
2  record at 8:38, taken on July 18, 2003, this is
3  the continuing videotape deposition of Stephen
4  H. Spargo.
5      Court reporter, would you please
6  swear in the witness.
7      MR. JONES: I don't think we need
8  to do that if everybody here agrees.
9      MR. RYAN: Yes.
10  CONTINUED EXAMINATION OF STEPHEN H. SPARGO
11  BY MR. JONES:
12     Q.  Mr. Spargo, you understand you're
13  still under oath today?
14     A.  I do.
15     Q.  The oath you took yesterday?
16     A.  I do, indeed.
17     Q.  Thank you, sir.
18     A.  You're welcome.
19     MR. JONES: But thank you,
20  Mr. Videographer, nonetheless.
21     Q.  Mr. Spargo, continuing your
22  deposition today, I hand you Exhibit 1343,
23  marked in a previous deposition in this case,
24  and I'm going to ask you to take a peek at it
25  and identify it for me, if you can.

---

Page 286

1      A.  (Witness reviewing document.)
2      Okay.
3      Q.  Can you identify the document?
4      A.  It's a handwritten note from me to
5  David McConnell, with copies to Mr. Cancelmi,
6  Mr. Scharf, Mr. Adamczak, regarding our reserve
7  position as of March 31st, 1995.
8      Q.  And in particular the reserve
9  position of the Delaware Valley?
10     A.  That's correct, yes.
11     Q.  And it is a document in your
12  handwriting that you recall creating and
13  shipping to Mr. McConnell about early May of
14  1995?
15     A.  I don't recall, but it certainly
16  looks like that's what I did.
17     Q.  You don't have any doubt that you
18  did it, do you?
19     A.  Oh, no, I don't.
20     Q.  And it is, in its second page a
21  document that is a reserve analysis, not unlike
22  the reserve analyses that we looked at
23  yesterday; is that fair to say?
24     A.  Yes, that's very fair to say.
25     Q.  And it gives a current year, which

---

Stephen Spargo

Volume 2

Page 287

1   I assume would be fiscal year 1995, and prior
2   year view of these analyses, of these reserves
3   in the Delaware Valley; is that right?
4       A.   The current year means reserves
5   that would have been realize -- or materialized
6   in the current year and prior meetings that
7   materialized in other years.
8       Q.   Okay.  Could it have been more than
9   fiscal year 1994 and before?
10      A.   Correct.
11      Q.   Okay.  And there is a total at the
12  base of the page, which I think you note in
13  your cover memo sums to some $47 million?
14      A.   That's correct.
15      Q.   For both the current year and prior
16  years combined.
17      A.   That's correct.
18      Q.   Okay.  And it's fair to say then,
19  from both the memo you wrote and your
20  recollection of events, at the time, that these
21  analyses of reserves were done periodically and
22  monitored by you and others in the finance
23  department at AHERF throughout the fiscal
24  years?
25      A.   That's correct.

Page 288

1       Q.   And for what purpose?
2       A.   Well, so that we knew or at least
3   had a pretty good idea at any point in time
4   what reserves were available to us.
5       Q.   And available to you for use in
6   what way?
7       A.   To mitigate any unforeseen negative
8   consequences that may materialize over the
9   course of a year.
10      Q.   Financial consequences?
11      A.   Yes, financial.  That's primarily
12  what they were for.
13      Q.   And they were general reserves then
14  used periodically for offsetting negative
15  financial performance at a given period?
16      A.   That's correct.
17      MR. RYAN:  Objection.
18      Q.   I'm going to ask you to now take a
19  peek at another exhibit we're about to mark.
20          - - - - -
21      (Thereupon, Deposition Exhibit 1689
22      was marked for purposes of
23      identification.)
24          - - - - -
25      Q.   Exhibit 1689, Mr. Spargo, has just

Page 289

1   been handed to you.  And it is, I think you'll
2   tell me, again, another analysis of reserves;
3   am I right?
4       A.   Yes.
5       Q.   And these analyses are reserves I
6   think you told us yesterday were sometimes
7   referred to as cushion analyses; is that
8   correct?
9       A.   That's correct.
10      Q.   And cushion is a term that refers,
11  I guess, almost metaphorically to the softening
12  of negative financial performance by the use of
13  the reserves; is that fair to say?
14      A.   That's fair to say.
15      Q.   Much like the cushion in this chair
16  softens the blow of me sitting in it; is that
17  about accurate?
18      A.   I guess so, yeah.
19      Q.   In these reserves, parenthetical
20  entries are not softeners, but are in fact
21  expected potentially negative exposures; is
22  that fair to say?
23      A.   Yes.
24      Q.   Is the analysis of reserves a
25  little bit like a score sheet, so you can see

Page 290

1   your net position on reserves over time --
2       A.   That's correct.
3       Q.   -- or in a particular period?
4       A.   Yes.  Yes.
5       Q.   I'm looking now at Exhibit 1689, as
6   you are, and ask you to look at the total that
7   went for the Delaware Valley Obligated Group,
8   or that was assigned to the Delaware Valley
9   Obligated Group at the base of the first page.
10          It looks to me that between
11  6/30/95 and 6/30/96, the reserve position for
12  the Delaware Valley Obligated Group has
13  diminished from $44 million, roughly, to
14  $10.5 million, roughly; is that right?
15      A.   That's correct.
16      Q.   So there were less dollars
17  available for mitigating negative financial
18  performance eventualities at year-end
19  6/30/96 than there were dollars available at
20  year-end 6/30/95?
21      A.   That's correct.
22      Q.   These analyses and these use of
23  cushions, or reserves, were not new phenomena
24  or new events in fiscal years 1995 and 1996; is
25  that right?

3 (Pages 287 to 290)

Stephen Spargo

Volume 2

Page 291

1      A.   Could you say that again.
2      Q.   The use of reserves to soften or
3  mitigate negative financial performance and the
4  creation of analyses of reserves was not a new
5  event in fiscal year '95 and '96?
6      A.   No, it was not.
7      Q.   It had been done historically at
8  AHERF since the time you were there, right?
9      A.   And most organizations, yes.
10     Q.   Are these reserves when they're not
11 in the parentheticals, Mr. Spargo, typically
12 credit balances on the balance sheet?
13     A.   Typically.  Typically.  They're
14 either credit balances on the balance sheet or
15 debit balances that have not yet been recorded.
16     Q.   Or they could be income items that
17 people at AHERF finance were aware of or
18 learned of, but had not yet been recorded?
19     A.   Yes.  Yes.
20     Q.   And as you sit here today, and I
21 think from documents we saw yesterday, your
22 recall may be refreshed, but is it your recall
23 that the CRA accounts were a particularly
24 commonplace from which cushions were posted to
25 these analyses and considered?

Page 292

1      A.   Yes.  Yes.  Definitely.
2      Q.   And why is that the case, as you
3  recall?
4      A.   Well, because CRA accounts have the
5  most -- there's the greatest likelihood of
6  significant settlements when cost reports are
7  finally audited and settled by Medicare and
8  Medicaid, Blue Cross and others, so a lot of
9  estimations go into developing cost reports and
10 CRA balances.  And many times those estimations
11 are conservative in nature, when they're
12 initially determined.
13     Q.   Is it fair to say, as I understand
14 the accounting -- let me try that question
15 again.
16          Is it fair to say that the
17 accounting for CRA reserves or cushions at
18 AHERF during your time there went something
19 like this:  A balance sheet liability entry was
20 made without revenue recognition at the outset,
21 and then once the CRA was settled, income could
22 be taken.
23          MR. RYAN:  Objection.
24     A.   No, I don't -- I didn't follow that
25 right.

Page 293

1      Q.   Help me out then --
2      A.   Okay.
3      Q.   -- in explaining the way it might
4  have been accounted for.
5      A.   The way the CRAs normally work, and
6  they still do to this day in other
7  institutions, is you prepare your year-end cost
8  report filings with a great deal of
9  conservatism, particularly in light of all this
10 compliance environment.
11          You certainly don't want to push
12 the envelope when you're making, filing a claim
13 with Medicare, even though you might think
14 you're justified in pushing the envelope, you
15 elect not to and rather deal with it when the
16 Medicare comes out to do the audit.
17          So Mr. Scharf would prepare cost
18 reports for the various entities in a purposely
19 conservative manner, and perhaps his cost
20 report might show for Elkins Park that at the
21 end of '95, we think Medicare owes us a million
22 dollars, when our gut and our brain tells us
23 they really owe us $4 million.  But we're going
24 to deal with that when they send their auditors
25 out.  We're not going to put it on the cost

Page 294

1  report.
2          So that additional 3 million, if we
3  truly believe it's realizable someday, it's a
4  reserve.  It's not been recorded anywhere, it's
5  out there because Joe Scharf knows it's out
6  there.
7      Q.   Where was it booked?
8      A.   It wasn't booked anywhere.
9      Q.   I see.
10     A.   So when Medicare comes in to do the
11 audit, we're going to get 4 million, we really
12 believe.  We had got a million booked already.
13 So that would have no income effect.  And the
14 additional 3 million could go right to income.
15     Q.   In a later year?
16     A.   In a later year.
17     Q.   Post settlement?
18     A.   Yes.  Exactly.
19     Q.   We're marking a new exhibit,
20 Mr. Spargo, I believe it will be 1690.
21          - - - - -
22          (Thereupon, Deposition Exhibit 1690
23          was marked for purposes of
24          identification.)
25          - - - - -

4 (Pages 291 to 294)

Stephen Spargo                                                              Volume 2

Page 303

1      Q.   Was that always the case?
2         MR. RYAN:  Objection.
3      A.   I believe so.  Throughout the
4   industry, I think.  Maybe do we need a point of
5   clarification?
6      Q.   Maybe.  If you would like to offer
7   one.
8      A.   Well, don't confuse prior period
9   adjustments, which is an accounting term, with
10  prior period allowances, which is a standard
11  practice in healthcare.  Footnote one clearly
12  says, you estimate amounts you think you're
13  owed due, and any time you find out
14  differently, you record it in the year you find
15  out.
16        So to record a 1991 loss or gain in
17  1995 does not warrant bottom of the income
18  statement disclosure in your audit that says,
19  this is a prior period adjustment.  All parties
20  pay attention.  Not in healthcare.  I mean
21  those are the rules so footnote number one
22  clearly says, you do your best when you know
23  it, and when you find out differently, maybe
24  ten years later, you just record it in that
25  tenth year.

Page 304

1      Q.   So you weren't referring to prior
2   period adjustments on the financial statements?
3      A.   No, sir.
4      Q.   When you --
5      A.   No, sir.
6      Q.   When you just answered?
7      A.   No.
8      Q.   So you would take what the prior
9   period earning, if you will, in the current
10  year, and not footnote it?
11     A.   Not footnote it.
12     Q.   Is that right?
13     A.   That's correct.
14     Q.   And this was done routinely at
15  AHERF while the time you were there?
16     A.   And throughout the hospital
17  industry.
18     Q.   And were some cushions kept even
19  after final settlement?
20     A.   Yes.
21     Q.   CRAs?
22     A.   Yes.  If a cost report was final
23  settlement, we got an MPR and we didn't need
24  the extra income, it would become a general
25  reserve as opposed to a specific cost report

Page 305

1   reserve.
2      Q.   Or the free reserve as you referred
3   to in the prior memo?
4      A.   That's correct.
5      Q.   And I think you told us yesterday,
6   but I want to make sure I understand it.
7         This use of cushions or free
8   reserves, or debatable or less debatable
9   reserves, was a part of AHERF finance and
10  accounting that was openly discussed with the
11  auditors?
12        MR. RYAN:  Objection.
13     A.   Yes.  Yes.
14     Q.   At routine update meetings?
15     A.   Yes.
16        MR. RYAN:  Objection.
17     Q.   Conversations to which you were a
18  party?
19     A.   Yes.
20     Q.   During fiscal years '95, '96 and
21  '97?
22     A.   Every fiscal year I was part of the
23  audit.
24     Q.   Do you recall Coopers & Lybrand
25  asking you to see the analyses of reserves, the

Page 306

1   written analyses of reserves that we've marked
2   as exhibits here today from time to time?
3      A.   Yes.  Yes.  In fact, I think the
4   very first exhibit referred to a follow-up of a
5   meeting I had with Coopers staff, or maybe that
6   was the second exhibit today.  Or the third,
7   I'm sorry, 1991.
8         MR. RYAN:  Could you just identify
9   what the number was?
10     A.   Exhibit 1690, references follow-up
11  to a meeting with my staff and Hoover, Dowdell
12  and Barger.
13        MR. RYAN:  Thank you.
14     A.   Sure.  So yes, I mean, that's an
15  audit procedure to roll forward last years'
16  reserves to where we are today, whether it's an
17  interim planning meeting or a year-end meeting.
18     Q.   And these analyses were provided to
19  Coopers?
20     A.   Yes.
21        MR. RYAN:  Objection.
22     Q.   Upon request?
23     A.   I believe they were, yes.  Perhaps
24  not even upon request.  It's kind of like,
25  here's why we are, our reserves position.

                                    7 (Pages 303 to 306)

Stephen Spargo

Page 307

1    Q.  So perhaps more freely than upon
2  request?
3    A.  Exactly.
4    Q.  Without prompting?
5      MR. RYAN: Objection.
6    A.  Without prompting.
7    Q.  You have recollection of that?
8    A.  Yes.
9    Q.  Do you know whether Coopers
10  themselves had a separate score sheet or
11  tracking mechanism for the amounts of cushions
12  AHERF had on its books during fiscal years at
13  which you were employed by AHERF?
14      MR. RYAN: Objection.
15    A.  I don't know for a fact they did,
16  but they certainly should have.
17    Q.  Do you recall ever being counselled
18  by anyone at Coopers that these general
19  reserves or cushions were being inappropriately
20  used by AHERF?
21    A.  No.
22    Q.  Do you ever recall being encouraged
23  by Coopers & Lybrand to use the general
24  reserves or cushions in the way that AHERF had
25  been using them?

Page 308

1    A.  No.
2    Q.  I'm going to ask you to flip back,
3  Mr. Spargo, to 1689.
4    A.  Okay.
5    Q.  We talked about the diminishment of
6  available cushions at the Delaware Valley
7  Obligated Group between year-end '95 and
8  year-end '96.
9      Do you recall discussions about
10  that state of the reserve account in the fiscal
11  year 1996 audit process?
12    A.  I don't recall them, no.
13    Q.  I'm going to ask you to take a look
14  at another exhibit for me.
15    A.  Sure.
16    Q.  This exhibit, Mr. Spargo, is
17  numbered 1088. And it is a memo from
18  Mr. Cancelmi to you dated December 18, 1995.
19  Am I right?
20    A.  Yes. Yes, sir.
21    Q.  And it is another in the series of
22  memos we looked at yesterday, this one, again,
23  headed, Delaware Valley Hospitals November,
24  this time 1995 financial statement results and
25  unusual patient revenue matters; is that right?

Page 309

1    A.  Yes, sir.
2    Q.  I'm going to ask you to skip after
3  your review of the first page to the second
4  page.
5    A.  Okay.
6    Q.  And at the top of the page,
7  Mr. Cancelmi writes to you, "it should be noted
8  that the year-to-date results have been
9  enhanced by the following favorable adjustments
10  that have been recorded in August, September
11  and October." Do you see that?
12    A.  I do.
13    Q.  And then there is a table which is
14  headed, favorable/unfavorable; am I right?
15    A.  Yes.
16    Q.  And it looks to me that the total
17  favorable adjustments sum to roughly
18  $18 million.
19    A.  Correct.
20    Q.  This kind of analysis was, in fact,
21  a routine kind of analysis at AHERF in fiscal
22  years '94, '95, '96 and '97?
23    A.  I believe so.
24      MR. RYAN: Objection.
25    Q.  Who requested these sort of --

Page 310

1  these regular memos on these kinds of matters?
2    A.  Oh, gosh, could have been in this
3  case Mr. Morrison, it could have been myself,
4  it could have been Mr. McConnell. It could
5  have been at no request, but rather an attempt
6  to highlight what we spent most of the day
7  talking about yesterday in terms of
8  deficiencies within the patient financial
9  services group. Could be many, many purposes
10  for and requests for this type of analysis.
11    Q.  The adjustments that I direct
12  your -- directed your attention to a moment ago
13  improved the bottom line or the income
14  performance of the enterprise, is that fair to
15  say, or the reflection of it?
16    A.  That is.
17    Q.  As a matter of accounting, do you
18  know how these were actually recorded, these
19  adjustments?
20    A.  I do not.
21    Q.  It was not something you were
22  involved in doing yourself?
23    A.  No, sir.
24    Q.  Who would have been involved?
25      MR. RYAN: Objection.

8 (Pages 307 to 310)

Volume 2

Stephen Spargo

Page 335

1    A.   Correct.
2    Q.   So it appears that the adjustments
3  proposed increased Delaware Valley total
4  income, net income, before extraordinary loss,
5  by $20,750,000?
6    A.   Yes, sir.
7    Q.   And, in fact, there's a special row
8  for that subtotal of adjustment amount itself?
9    A.   Yes, sir.
10   Q.   And then just beneath the adjusted
11 net income before extraordinary loss row, we
12 have a row headed, board projections?
13   A.   Yes, sir.
14   Q.   And its total for the Delaware
15 Valley is $28.7 million?
16   A.   Yes.
17   Q.   Do you recall reviewing or being
18 aware that schedules like this were being
19 generated in the fiscal years you were involved
20 in AHERF accounting that would show a
21 preliminary net income figure for a series of
22 hospitals or enterprises, set of adjustments,
23 an adjustment -- adjusted net income figure,
24 and then compare it to board projections?
25   A.   Yeah, I believe that is done on an

Page 336

1  annual basis.
2    Q.   And it was done for what reason?
3    A.   Well, to take -- to roll forward
4  the financial results from the first year-end
5  close to final year-end close, and not lose
6  sight of what we told the board we thought we'd
7  end the year with when we asked them to approve
8  this subsequent year's budget.
9    Q.   And you do recall that there were
10 year-end adjustments for the Delaware Valley
11 Obligated Group entities made post 6/30/96, or
12 after 6/30/96, adjustments to net income?
13   A.   Yes.  Yes.
14   Q.   And this appears to reflect them;
15 is that fair to say?
16   A.   It does.  Yes, it does.
17   Q.   And were you involved in setting
18 the amount of these adjustments?
19   A.   I would have probably had to
20 approve them, if not in total, or individually,
21 in total.
22   Q.   And these figures don't surprise
23 you as the figures that were proposed and made?
24   A.   In May?
25   Q.   And made.

Page 337

1    A.   Oh, and made, I'm sorry.
2    Q.   Yes.
3    A.   No, they don't surprise me.
4    Q.   In fact, they comport with your
5  best recollection today?
6    A.   Yes.  Yes.
7    Q.   If any of these adjustments in the
8  adjustment rows related to prior year reserves,
9  would this have the effect of distorting
10 current year operating results?
11       MR. RYAN:  Objection.
12   A.   It could.  Yes.
13   Q.   And at some point such adjustments
14 and any distortion that they occasion would
15 become problematic; is that fair to say?
16       MR. RYAN:  Objection.
17   Q.   For the reader of the financial
18 statements?
19   A.   Perhaps.
20   Q.   And why is that the case?
21   A.   Well, to the extent to which they
22 distort a true picture of the current year
23 operations, that could lead one to different
24 conclusions.
25   Q.   It could lead one to think that

Page 338

1  current year operations are financially -- were
2  financially better than they really were?
3        MR. RYAN:  Objection.
4    A.   It could.
5    Q.   When these adjustments were being
6  made in fiscal year 1996, and in other fiscal
7  years at which you were at AHERF, it's fair to
8  say that the adjustments were made at least
9  with the board projections in mind?
10   A.   Oh, yes.
11   Q.   You didn't want to disappoint
12 management about what management had told the
13 board likely financial outcomes were going to
14 be; is that fair to say?
15   A.   That's correct.
16   Q.   But if the auditors thought that
17 the adjustments and your effort to help
18 management please the board, perhaps, were
19 inappropriate, they certainly were retained to
20 tell you so; is that fair to say, also?
21       MR. RYAN:  Objection.
22   A.   I believe that's one of their
23 responsibilities, yes.
24   Q.   Their responsibilities extend to --
25 strike that.

15 (Pages 335 to 338)

Stephen Spargo

Page 339

1      Mr. Spargo, I'm going to change
2   topics here briefly before our next break. I'm
3   going to hand you in connection with that topic
4   switch another memo. Exhibit 154.
5      A.   All righty.
6      Q.   I think you told us yesterday that
7   you were involved in the due diligence effort
8   in connection with the ultimate acquisition of
9   the Graduate Hospitals and entities by AHERF;
10  is that fair to say?
11     A.   Yes, I was.
12     Q.   And as a part of those efforts, did
13  you become, yourself, involved in establishing
14  reserves on those hospitals, that is, the
15  Graduate Hospitals' books for a number of
16  reasons?
17     A.   I did.
18     Q.   Who all else was involved in that
19  effort?
20     A.   In the due diligence in the
21  establishment of reserves?
22     Q.   Yes.
23     A.   Yikes, who wasn't. Dan Cancelmi,
24  Al Adamczak, their respective staffs. Oh, boy.
25     Q.   Was Coopers & Lybrand involved?

Page 340

1      A.   Yes.
2      Q.   Who at Coopers & Lybrand?
3      A.   Mr. Buettner attended the due
4   diligence meetings. Somebody from their
5   Philadelphia office, whose name escapes me. I
6   don't know if Kirstein got too involved in
7   Graduate or not, but they had some Philadelphia
8   staff representation and participation in the
9   due diligence.
10     Q.   And the reserve establishment as
11  well?
12        MR. RYAN: Objection.
13     A.   Yes.
14     Q.   And what was the level of
15  participation in the reserve establishment?
16     A.   Well, it was the accounting or
17  finance staff's job to flush out any necessary
18  reserves or skeletons in the closet and then
19  bring those to our periodic due diligence
20  meet -- due diligence meetings that we held at
21  Hahnemann.
22        So they were put on the table for
23  general knowledge, and usually to solicit
24  people's input as to what else might be out
25  there, or do we fall short anywhere, or where

Page 341

1   do we miss the mark, what does other people --
2   what do they know that we haven't learned yet.
3      Q.   And that table was a table that was
4   shared with the Coopers & Lybrand due diligence
5   team?
6         MR. RYAN: Objection.
7      A.   Yes. Yes.
8      Q.   In other words, these proposals
9   with respect to reserve establishment were
10  discussed among the entire due diligence team,
11  including Coopers & Lybrand folks?
12     A.   Absolutely.
13     Q.   Looking at Exhibit 154, it is a
14  May 22nd, 1997 memorandum on Graduate
15  restructuring reserves from Dan Cancelmi to
16  distribution. And you, I think, if you'll
17  look -- if you'll look at the second page of
18  the document are the last person on the
19  distribution list?
20     A.   Yes.
21     Q.   Have I described the memo right?
22     A.   I believe you have, yes.
23     Q.   And do you recall receiving this
24  memo in May of '97?
25     A.   I don't necessarily recall it, but

Page 342

1   I probably did.
2      Q.   You don't have any doubt that you
3   did, do you?
4      A.   I don't have any doubt that I did.
5      Q.   The memo starts with the phrase,
6   "As a result of various items identified during
7   the due diligence process, certain
8   restructuring reserves have been recorded on
9   the Graduate Hospitals' financial statements
10  prior and subsequent to the hospitals being
11  acquired by SDN."
12        Have I read that right?
13     A.   Yes, you have.
14     Q.   And that's consistent with your
15  recollection about the establishment of certain
16  restructuring reserves?
17     A.   It is, indeed.
18     Q.   And SDN was an enterprise involved
19  in the initial phases of the acquisition of the
20  Graduate Hospitals?
21     A.   That's correct.
22     Q.   And I think we've heard more times
23  than Mr. Ryan and I can really count that SDN
24  stands for the initials of certain employees at
25  AHERF; is that right?

16 (Pages 339 to 342)

Volume 2

Stephen Spargo

Page 343

1  A.  I believe that's true, yes.
2  Q.  And the first names for which this
3  abbreviation was designed I guess are Sherif,
4  David, and Nancy; is that right?
5  A.  I thought it was Steve, Diane and
6  Norb.
7  Q.  You're kidding.
8  A.  Sherif, David and Nancy is correct,
9  sir, yes.
10  Q.  Thank you.
11  A.  You're welcome.
12  Q.  To establish restructuring
13  reserves, was a charge taken to the income
14  statements of the entities before and after
15  their acquisition by SDN?
16  A.  Yes.
17  Q.  And that would have been the way --
18  well, strike that.
19      I'm going to ask you to skip to the
20  list of restructuring reserves or schedule of
21  restructuring reserves, which is the final page
22  of the exhibit, and is the attachment to the
23  memo.
24  A.  Okay.
25  Q.  And having a moment or two to look

Page 344

1  at that, does that look to be the list of the
2  restructuring reserves?
3  A.  It does, yes, sir.
4  Q.  Do you recall in particular any of
5  these restructuring reserves that you had a
6  significant hand in establishing?
7  A.  Certainly Prudent Buyer, CRA
8  reserve up in the top half of the page, write
9  off of the Zurbrugg facility, definitely.
10  There's Prudent Buyer in the bottom half of the
11  page, there's a police and fire contract on the
12  bottom half of the page.
13  Q.  That's PFMA?
14  A.  PFMA, yes, sir.
15  Q.  There's several entries there, I
16  guess four, is that right?
17  A.  That's -- yeah, four.  Hill Burton
18  I recall.  Malpractice I recall.  You know,
19  there's -- I would have been aware of all these
20  at a point in time when they were identified.
21  Q.  And when the restructuring charge
22  was taken on the income statements of either
23  the Graduate Hospitals or SDN, that would have
24  diminished income; is that fair to say?
25  A.  Yes, sir.

Page 345

1  Q.  Decreased it?
2  A.  Yes, sir.
3  Q.  And the balance sheet, the
4  corresponding balance sheet entry would have
5  been a credit or a liability on the balance
6  sheet of the enterprises?
7  A.  Yes, sir.  Or a reduced asset, but
8  recorded via credit, you're right.
9  Q.  I'm going to hand you now, Mr.
10  Spargo, a memo marked as Exhibit 1533, which I
11  believe you're going to tell me you prepared
12  and sent to Mr. Abdelhak and Mr. McConnell on
13  or about its date, which is March 13, 1997; is
14  that right?
15  A.  I believe so.
16  Q.  And it has a heading of Graduate
17  projections.
18  A.  Yes.
19  Q.  And is that, again, your
20  administrative assistant's or secretary's
21  initials next to your name?
22  A.  No.  Those are mine.
23  Q.  I'm going to ask you to skip to the
24  second page of the memo in which you state in
25  the second sentence of the first paragraph, "I

Page 346

1  should point out, however, that the reserves
2  that are being established on the various
3  hospitals, Graduate Hospitals' books, while in
4  SDN and Horizon,(some of which are quite
5  significant), will be immediately available
6  upon transfer to AHERF to smooth out earnings,
7  to offset unexpected revenue declines or
8  expense overages, et cetera."
9      Do you see that?
10  A.  I do.
11  Q.  And do you recall informing Mr.
12  Abdelhak and Mr. McConnell of this expectation?
13  A.  Yes.
14  Q.  And, therefore, it was your
15  expectation at the time that reserves were
16  established that they might be available post
17  or after establishment for other purposes; is
18  that fair to say?
19  A.  Yes.  Yes.
20  Q.  And I know you have testified in
21  other proceedings about this, but I would ask
22  you now briefly to tell me, when establishing
23  the reserves that we noted on the schedule in
24  Exhibit 154, or any of the other -- or any of
25  the other restructuring reserves at the

17 (Pages 343 to 346)

Stephen Spargo

Page 347

1  Graduate Hospitals, is it fair to characterize
2  your approach and the approach of your
3  colleagues at AHERF as one of erring on the
4  high side or the higher dollar amount side of
5  the establishment in the establishment
6  analysis?
7      A.  Definitely.  Definitely.
8  Especially in a post acquisition environment.
9      Q.  And at the time everyone involved
10  in the enterprise knew that we were erring on
11  the side of creating potentially more reserves
12  than we might need?
13      MR. RYAN:  Objection.
14      A.  Everyone involved should have known
15  that, yes.
16      Q.  Including the Coopers & Lybrand
17  auditors?
18      MR. RYAN:  Objection.
19      A.  Certainly.
20      Q.  And was this particularly true of
21  PFMA?
22      MR. RYAN:  Objection.
23      A.  It would been true of every item on
24  that sheet.
25      Q.  I'm sorry?

Page 348

1      A.  It would have been true of every
2  item on that sheet.
3      Q.  And at the time you were doing
4  this, did you expect that the excess reserve
5  amounts that were being established over those
6  that might be required would be used to smooth
7  out earnings or offset unexpected revenue
8  declines or expense overages at the Graduate
9  Hospitals?
10      A.  Sure.
11      Q.  Did you expect they might be used
12  at other hospitals, these reserves, that is
13  outside the Graduate Hospitals at the time they
14  were established?
15      A.  Not at the time they were
16  established, no, sir.
17      Q.  Do you recall whether AHERF set up
18  excess reserves during the Hahnemann
19  acquisition?
20      A.  I believe we did.
21      Q.  Do you recall --
22      A.  Yes.
23      Q.  -- that process occurring in any
24  other acquisitions with which you were
25  familiar?

Page 349

1      A.  Hahnemann was my first.  CPE and
2  United had been completed prior to my
3  transition at AHERF.
4      Q.  Do you remember which reserves
5  specifically at Hahnemann included excess
6  amounts?
7      A.  I don't offhand.
8      Q.  CRA, would that have been one?
9      MR. RYAN:  Objection.
10      A.  That certainly would have been one,
11  yes.  Severance costs and Prudent Buyer.
12          - - - - -
13          (Thereupon, Deposition Exhibit 1693
14          was marked for purposes of
15          identification.)
16          - - - - -
17      Q.  Mr. Spargo, I just handed you a new
18  exhibit, 1693, which is dated March 31, 1997.
19  It is a memo from you to Mr. Abdelhak, with a
20  subject line, GHS, which is, I think, an
21  abbreviation for the Graduate Hospital System;
22  is that right?
23      A.  Yes, sir.  Yes, sir.
24      Q.  And it's the subject line goes on
25  to say, hospital projections.

Page 350

1          Do you recall preparing and
2  distributing this memo to Mr. Abdelhak and the
3  copyees, Mr. McConnell, Kaye, and Morrison, in
4  March of '97?
5      A.  I'm sure I did.
6      Q.  And at the base of the page, the
7  first page, that is, you note, "I should point
8  out that the above reserves," which are listed
9  on the document for the various Graduate
10  Hospitals, "many of which we have been
11  established as a part of our ongoing due
12  diligence are largely discretionary in nature.
13  We have also recorded various other reserves
14  which are not included above, as these relate
15  to specific issues and liabilities."
16          What did you mean by those two
17  sentences?
18      A.  I meant that of the 40-some million
19  of due diligence reserves, these are the ones
20  that we feel we can influence whether or not
21  they're ever needed.  And particularly, Prudent
22  Buyer reserves, which Mr. Abdelhak assured me
23  would not be necessary once he had a chance to
24  influence Mr. DiBona, the president of
25  Independence Blue Cross.

18 (Pages 347 to 350)

Volume 2

Stephen Spargo

Page 367

1  was, indeed, a continuing bad debt reserve
2  shortfall in approximately this amount, these
3  dollars, that is, for these entities?
4      A.   That would be consistent with my
5  understanding, yes.
6          - - - - -
7          (Thereupon, Deposition Exhibit 1695
8          was marked for purposes of
9          identification.)
10         - - - - -
11     Q.   Mr. Spargo, I just handed you
12 Exhibit 1695, which is, I believe you're about
13 to tell me, a memo dated April 11, 1997, from
14 Mr. Cancelmi to you, and the subject line is
15 restructuring charges earmarked for bad debt
16 reserves; is that right?
17     A.   Yes, that's correct.
18     Q.   It appears to be a draft memo, and
19 I say that because there's a handwritten note,
20 I believe you'll tell me is in Mr. Cancelmi's
21 hand, at the top right-hand corner of the page
22 that says, Steve, could you please review
23 before I issue this.  Thanks, Dan; am I right?
24     A.   That's correct.
25     Q.   Do you recall receiving this memo

Page 368

1  around April 11, 1997?
2      A.   I don't recall, but I have no doubt
3  I didn't.
4      Q.   Why don't you take a minute and
5  familiarize yourself with it and tell me if you
6  now do recall.
7      A.   (Witness reviewing document.)
8      Q.   Another help might be that, if you
9  could identify the other handwriting at the top
10 of the page, if that's yours, patient
11 accounting file.
12     A.   Yes.
13     Q.   Does that lead you to believe you
14 did receive the memo?
15     A.   Oh, I believe I did, I just don't
16 recall specifically having received it, but I'm
17 familiar with the contents.
18     Q.   The first line of the memo says, in
19 an effort to alleviate the Delaware Valley
20 patient accounts receivable estimated bad debt
21 reserve shortfall, a decision has recently been
22 made to record approximately 50 million --
23 50 million of restructuring reserves on the
24 various Graduate Hospitals; is that a correct
25 reading of the first sentence?

Page 369

1      A.   Yes, it is.
2      Q.   Do you recall learning at some
3  point before April 11, 1997 that such a
4  decision had been made?
5      A.   I recall learning at or around or
6  before that time that that option existed of
7  creating $50 million of additional reserves for
8  the express purpose of transferring them to the
9  Delaware Valley Hospitals, yes.
10     Q.   Okay.  It wasn't -- if it was -- if
11 you received this on or about April 11, 1997,
12 it wasn't news to you when you saw it, you had
13 discussions about it with people before
14 April 11, 1997; is that fair to say?
15     A.   That's fair to say.
16     Q.   You don't recall being surprised by
17 receiving this memo?
18     A.   No, sir.
19     Q.   No, sir, you don't recall being
20 surprised, that's right?
21     A.   No, sir, I don't recall being
22 surprised.
23     Q.   That's right.  How was it that you
24 first learned then, before April 11 of 1997,
25 that a decision would be or had been made to

Page 370

1  record these $50 million of restructuring
2  reserves for the purposes of transfer to the
3  Delaware Valley?
4      A.   I believe the concept of creating
5  additional reserves on Graduate in the
6  neighborhood of $50 million in an effort to
7  alleviate our bad debt reserve problem was
8  first communicated to me by Mr. McConnell and
9  Mr. Buettner.
10     Q.   Do you recall how long before April
11 11 of 1997 that --
12     A.   Very close to that date.  Very
13 early April.
14     Q.   So early April of 1997?
15     A.   That's correct.
16     Q.   And was this in a face-to-face
17 meeting?
18     A.   Yes, it was.
19     Q.   Do you recall where you were?
20     A.   Mr. McConnell's office.
21     Q.   Anybody else in attendance?
22     A.   No, sir.
23     Q.   Tell me what you can then about the
24 conversation.
25     A.   I recall being asked to come in to

23 (Pages 367 to 370)

Stephen Spargo

**Page 371**

1 Mr. McConnell's office to discuss this
2 particular accounting idea with the expressed
3 purpose, obviously, of trying to rectify our
4 reserve for bad debt problem that we spent the
5 last day and a half talking about.
6     Q.    Do you recall who raised the topic
7 of a transfer of establishing reserves at the
8 Graduate and transferring them to Delaware
9 Valley?
10     A.    I don't know if it was Mr.
11 McConnell or Mr. Buettner, but my suspicions
12 tell me that this would have been beyond
13 Mr. McConnell's technical abilities.
14     Q.    In any event, all three of you
15 discussed the topic?
16     A.    Yes.
17     Q.    And did Mr. Buettner express any
18 dissatisfaction with the idea?
19     A.    No.
20     Q.    Did he express support for the
21 idea?
22     A.    Yes.
23     Q.    Do you recall how it is that he
24 expressed that support, what he said?
25     A.    I don't recall the specifics, but

**Page 372**

1 the essence of the conversation was, is the
2 Graduate acquisition and the impending
3 transition of Graduate from SDN into AHERF
4 presents an opportunity to once and for all
5 resolve this reserve for bad debt issue.
6     Q.    At the Delaware Valley?
7     A.    At the Delaware Valley.
8     Q.    And when you say you don't suspect
9 or didn't believe that it could have been
10 Mr. McConnell's idea or that he -- or that he
11 was the one that raised it, why do you say so?
12        MR. RYAN:    Objection.
13     A.    Because Mr. McConnell had not
14 demonstrated in the past in-depth familiarity
15 with accounting principles, accounting
16 practices.  He wasn't a detail-oriented CFO, by
17 any stretch.
18     Q.    And, therefore, what is your belief
19 as to whose idea this was?
20     A.    My belief is --
21        MR. RYAN:    Objection.
22     A.    -- it was Mr. Buettner's.  I
23 believe it was discussed at a lunch that Mr.
24 Buettner and Mr. McConnell had had that very
25 same day, and that the outcome of that lunch

**Page 373**

1 was the meeting back at Fifth Avenue Place to
2 which I was then called into.
3     Q.    And that's the meeting in
4 Mr. McConnell's office?
5     A.    That's correct.
6     Q.    And why do you say you believe it
7 was discussed at a lunch preceding your
8 meeting?
9     A.    Because my recollection is that on
10 that day, they went to lunch together at the
11 Duquesne Club, or wherever, they normally went
12 to the Duquesne Club, and this was a follow-up
13 to that lunch.
14     Q.    And would you tell me your reaction
15 when you heard this idea?
16     A.    My reaction was, I guess it was
17 somewhat surprised that it was all this easy to
18 rectify a problem that we had been pissing --
19 excuse me, debating and complaining and
20 studying for two years, plus.  And although I'm
21 not the best judge of appropriate accounting
22 practices, it just seemed like, and I think the
23 way I characterize is like manna from heaven,
24 all of a sudden it's like forget the last two
25 years, here's how we can do it and out of

**Page 374**

1 nowhere comes $50 million.
2     Q.    Seemed almost miraculous, is that
3 the metaphor you're creating?
4     A.    Yeah, I think the manna was
5 miraculous, so, yes.
6     Q.    How long was the meeting between
7 you, McConnell, and Mr. Buettner?
8     A.    Probably no more than ten minutes,
9 which would be typical for those types of
10 impromptu meetings.
11     Q.    Was there an action list or a task
12 list that you had when you left the meeting?
13     A.    No, sir.
14     Q.    Except to go forward and create the
15 necessary reserves and execute the transfer?
16     A.    Yes, for the most part, or go
17 forward and discuss this with Dan and Al.
18     Q.    About how to do it?
19     A.    About how to do it.  And I think
20 that's the purpose of this memo, not that a
21 final decision had been made, but this is how
22 it was worked out that this could be
23 accomplished.
24     Q.    So Dan is reporting back to you,
25 after -- do you remember having a subsequent

Stephen Spargo

Page 375

1  conversation then with Mr. Cancelmi after this
2  5 to 10-minute meeting, or 10-minute meeting?
3      A.  I believe I called them, Dan and Al
4  both, I'm not sure if it was a conference call
5  or one at a time, upon returning to my office,
6  which was about ten feet away from David's.
7      Q.  What as Mr. Cancelmi's reaction?
8      A.  I think he was equally surprised.
9  And, you know, quite frankly, amongst us girls,
10  like what the hell is this, you know.  We've
11  been pulling our hair out for ages.  But at the
12  same time, don't look a gift horse in the
13  mouth.
14      Q.  And when you say you were
15  surprised, did you take any comfort from the
16  fact that Mr. Buettner was being supportive or
17  participating in the decision?
18      A.  Oh, yes.  Sure.
19      Q.  And why is that?
20      A.  Because he's our auditor.  He has
21  final say.
22      Q.  And his final say was go forward
23  and execute the transactions?
24      MR. RYAN:  Objection.
25      A.  This is his idea or concept.

Page 376

1  There's no final say.  I mean, final say is
2  implied.
3      Q.  Did you --
4      A.  This --
5      Q.  Go ahead, I'm sorry.
6      A.  I mean, this is not entirely
7  atypical.  I think Mr. Buettner tried to work
8  with Allegheny, his client, in addressing
9  accounting and financial issues.  Some of his
10  ideas in the past had seemed to be a little bit
11  unusual.  His good bank, bad bank philosophy
12  that he brought one day to alleviate some of
13  our bad debt issues, which understandably we're
14  all aware of because Mellon Bank had done it,
15  but these weren't financial loans, this wasn't
16  that type of -- didn't lend itself to that.  So
17  that particular idea got poo-pooed.
18      So, you know, to get creative input
19  from one's audit partners is not atypical by
20  any stretch.
21      Q.  Did you have any response orally to
22  Mr. McConnell or Mr. Buettner in the meeting
23  when you heard first of the idea to create and
24  move the reserves?
25      A.  I think I expressed some surprise

Page 377

1  that this option existed.
2      Q.  And --
3      A.  And it wasn't ego surprise, like,
4  geez, I should have thought of this, because I
5  think they all knew that technical experts were
6  in the Clark Building, Dan and Al and their
7  staffs, they were the true CPA types, but I'm
8  like, geez, where did this come from all of a
9  sudden.
10      Q.  After you expressed that surprise,
11  do you recall any reaction on their part, that
12  is, the part of Mr. McConnell or Mr. Buettner?
13      A.  No.  No.
14      Q.  Do you recall that in that meeting
15  the number was -- that was discussed was in the
16  $50 million range, or was $50 million?
17      MR. RYAN:  Objection.
18      A.  I believe it was $50 million.
19      Q.  Okay.  And who used the $50 million
20  figure, Mr. McConnell or Mr. Buettner?
21      A.  Probably both.
22      Q.  That's your best recollection?
23      A.  Yes, it is, sir.
24      Q.  That both used the figure?
25      A.  Yes.

Page 378

1      Q.  So is it your testimony,
2  Mr. Spargo, that -- strike that.
3      And it was always your
4  understanding that these were additional
5  reserves on top of any other reserves that had
6  already been booked; is that fair to say?
7      A.  On top of the 47 million due
8  diligence?
9      Q.  Yes.
10      A.  Absolutely.  No doubt about it.
11      Q.  So the 47 million had already been
12  booked that we talked about, including PFMA,
13  Prudent Buyer and CRA, and it was always your
14  understanding that this additional sum of
15  50 million were new reserves created for the
16  purpose of transfer?
17      A.  Definitely.  I think prior memos to
18  Mr. Abdelhak would suggest that that were the
19  case as well.
20      Q.  Sir, let me show you another
21  exhibit which has been marked previously.  It
22  is Exhibit 8, which is an April 4, 1997 -- I'm
23  sorry, 14, 1997 memo.  It is remarkably similar
24  to the April 11, 1997 draft, I think you will
25  tell me after having had the opportunity to

25 (Pages 375 to 378)

Stephen Spargo

Page 379

1  compare them briefly.
2      A.  (Witness reviewing documents.)
3          First page is remarkably similar,
4  yes.  Which would suggest I didn't review and
5  edit it as Dan asked.
6      Q.  Or that you reviewed it and didn't
7  have any edits; is that accurate?
8      A.  That's true.  It's uncommon for me
9  not to have any edits.
10     Q.  Do you recall now receiving both a
11 draft and a final copy?
12     A.  I recall based on this that Dan
13 wrote a note to me and asked me to review the
14 draft, which I'm sure I did, and now I see it
15 issued in final form, which I'm sure I got a
16 copy of.
17     Q.  Do you recall making any changes to
18 the document?
19     A.  No, I don't.  It doesn't appear
20 that I did, sir.
21         I will remind you that at this
22 point in time in early April, Mr. Quinn, Mr.
23 Murray and I had already made our decisions
24 about the creation of a consulting company.
25 Although I had not given Mr. McConnell my

Page 380

1  formal notice, I knew I was history.
2      Q.  You knew you were leaving the
3  company?
4      A.  These issues weren't going to be my
5  issues anymore, so it's kind of like, okay.  So
6  I may have been a little more, less inclined to
7  review and edit memos than perhaps before.
8          Do you have any opinion about
9  whether Mr. Buettner knew that the $50 million
10 of reserves that were to be established and
11 transferred were separate and distinct from the
12 47 million of due diligence reserves that had
13 already been booked?
14     MR. RYAN:  Objection.
15     A.  I believe the discussion we had in
16 Mr. McConnell's office would suggest that this
17 was an additional -- this was brand new
18 50 million.  Brandy new.  Had it not been, I
19 would have had to run back to Mr. Abdelhak and
20 say, hey, that other memo about these reserves
21 being free and clear to help Graduate earnings
22 was issued in error, and I never did that.
23     Q.  In either its draft form or in its
24 final form, that is, in either the form of
25 Exhibit 1695 or the form of Exhibit 8, this

Page 381

1  memorandum is free of any confidential markings
2  or restrictions as on distribution; is that
3  fair to say?
4      A.  Oh, yeah.
5      Q.  Was there ever any attempt on your
6  part to hide this document from the auditors or
7  anybody else?
8      A.  Not on my part.
9      Q.  Did you ever become aware that
10 there was such actions on anybody's part?
11     A.  No.  Although, for this particular
12 memo, I wouldn't have probably have become
13 aware, but no, never.
14     Q.  Do you know who it was that would
15 have directed the establishment of the
16 reserves, the $50 million worth of reserves,
17 and the transfer, the entries that would have
18 been required to accomplish the task?
19     A.  Who would have directed them?
20     Q.  Yes.
21     A.  I think the conversations that Dan
22 and Al and I had would have put the thought
23 processes in place for Dan to come up with this
24 particular proposed set of entries, and that
25 ultimately, they would have been made only with

Page 382

1  Mr. Dienisio, Morrison, mine, and McConnell's
2  concurrence.
3          This is kind of typical of the
4  concept of 50 million comes out of the oval
5  office, and then beyond that, you guys work out
6  the details, so that's what this memo does is
7  work out the details, I believe.
8      Q.  I'm going to ask you to look back
9  at Exhibit 154, which was marked a little
10 earlier today, I believe.
11     A.  154?
12     Q.  Yes, 154.
13     A.  I got it.
14     Q.  You got it?
15     A.  Yep.
16     Q.  Before we get deeper into that memo
17 from Mr. Cancelmi, and we're not going to go
18 much deeper than we've gone, given
19 Mr. Cancelmi's reaction to your conversation
20 with him about Mr. Buettner and Mr. McConnell's
21 discussion with you about creating and moving
22 the $50 million of reserves, do you have a
23 belief about whether the initial idea to create
24 and move the reserves was Mr. Cancelmi's?
25     A.  Do I believe it was Mr. Cancelmi's?

26 (Pages 379 to 382)

Stephen Spargo

1    Q.   Yes.
2    A.   I don't.
3    Q.   All right.  It would be
4  inconsistent with his expression of surprise;
5  is that fair to say?
6    A.   Correct.  It would be inconsistent
7  with his comment in Exhibit Number 8 where he
8  said, granted, the reallocation of these
9  reserves from the Graduate Hospitals to the
10  other Delaware Valley Hospitals is not the most
11  technically appropriate resting place.
12    Q.   That's a comment in which he's
13  conveying to you and anybody else that would
14  read it that he may not be entirely comfortable
15  with the treatment; is that fair to say?
16    A.   That is very fair to say.
17    Q.   That's the way you read it?
18    A.   Absolutely.
19    Q.   Now, to Exhibit 154 for another
20  moment.
21         It is the May 22nd, 1997 memo from
22  Mr. Cancelmi to the distribution list regarding
23  the Graduate system restructuring reserves; is
24  that right?
25    A.   Yes.  Yes.

1    Q.   On which you were copied.
2    A.   Yes.
3    Q.   It gives the $50 million total on
4  the second page in the chart.  Under the --
5  across from the row, accruals for the existing
6  AHERF Delaware Valley Hospitals bad debt
7  reserves?
8    A.   Correct.
9    Q.   Breaks out the accrual for how much
10  is attributable to each Graduate Hospital?
11    A.   Correct.
12    Q.   And then it notes a different
13  approach in the technical booking of the
14  reserves; is that accurate?
15    A.   Yes.  Yes, it is.
16    Q.   In fact, that difference is set out
17  at the top of the second page where
18  Mr. Cancelmi notes that certain reserves have
19  been recorded as a part of the purchase price
20  allocation, which are not, and he underlines
21  this portion, which are not reflected on the
22  income statement?
23    A.   Correct.
24    Q.   So we've gone from a restructuring
25  reserve to a purchase price allocation reserve?

1    A.   Correct.
2    Q.   Do you recall discussions about
3  that move?
4    A.   I don't.  I do not.  And I chose
5  not to participate in those discussions.  In
6  fact, I was cleaning out my office, spending
7  time in Philadelphia, because that was close to
8  where Pat and Andy resided, so I was not a
9  loyal AHERF employee, so I may owe them a
10  month's pay.
11    Q.   Pat and Andy are?
12    A.   Pat Marion and Andrew Quinn, my
13  business partners.
14    Q.   I see, your current business
15  partners?
16    A.   Correct.
17    Q.   You do recall reviewing the memo at
18  the time period, in the time period?
19    A.   I do.  I do and I know the topic
20  was being discussed about purchase price
21  allocations.
22    Q.   And how do you know that?
23    A.   Because I recall that.  I know it
24  was kind of deep for me, because that's rather
25  technical, but I also recall checking out the

1  process, and I don't -- you do what you want, I
2  really don't care how you record it.
3    Q.   Do you recall being surprised or at
4  all concerned that this additional benefit of
5  using purchase price allocations would permit
6  the establishment of the reserves without an
7  income, negative income statement effect?
8         MR. RYAN:  Objection.
9    A.   No, I don't.  No more surprised
10  than the $50 million.
11    Q.   You were about as surprised as you
12  could be?
13    A.   Yeah, I think that's surprised
14  enough.  I do find it interesting, as an aside,
15  that Mr. Cancelmi's distribution list now
16  includes the world.
17    Q.   What do you mean by that?
18    A.   There's a lot of accountants on
19  that list, a lot of people who now have, are
20  going to understand exactly how this
21  transaction is going to work.  So speak now or
22  forever hold your peace type.
23    Q.   So you read into that distribution
24  list that Mr. Cancelmi was looking for anyone
25  who wanted to voice a disagreement with the

27 (Pages 383 to 386)

Stephen Spargo

Page 387

1    approach to voice it?
2        A.    I think that's part of it.  That's
3    how I read it into it, yes.  We have not seen
4    Heron, Lisman, Lubarsky, Monkoski on my
5    previous documents today.
6        Q.    Did you agree with Mr. Cancelmi
7    that in his estimation that this was not the
8    most technically appropriate resting place?
9        A.    Yes.  Yes.
10       Q.    In fact, you might have deferred to
11   him as someone who would be somewhat more
12   proficient in these kinds of accounting issues?
13       A.    Dan?
14       Q.    Yes.
15       A.    Probably the most proficient as
16   anyone I've ever met.
17       Q.    Did you express your concerns or
18   surprise over this treatment with anybody other
19   than Mr. McConnell and Mr. Buettner?
20           MR. RYAN:  Objection.
21       A.    Mr. Cancelmi, Mr. Adamczak, Lord
22   knows who else.  When I'm in the Clark
23   Building, I'm not very mild in demure and soft
24   spoken, so if Mr. Lydon were present or
25   Mr. Lisman, who knows.

Page 388

1        Q.    Did these gentlemen share with you
2    the concern and surprise?
3        A.    I think so, yes.  I don't know
4    anyone who didn't.
5        Q.    And if Mr. Cancelmi wanted to hide
6    the move of -- the establishment of the move of
7    the $50 million in reserves, would it have been
8    wise to expand his distribution list?
9            MR. RYAN:  Objection.
10       A.    Not at all, especially people who
11   are in the process of losing their jobs.
12       Q.    Well, these same folks that he's
13   listed on the distribution list and the names
14   of whom you just read are folks with direct
15   contact with the auditors every year; isn't
16   that fair to say?
17           MR. RYAN:  Objection.
18       A.    Every one of them.
19       Q.    Did you ever instruct anyone or
20   ever learn that anyone else instructed anyone
21   in the finance department not to speak to the
22   auditors about this $50 million reserve
23   establishment and transfer?
24       A.    No.
25       Q.    Did you take some comfort in the

Page 389

1    fact that this surprising and concerning
2    approach had been approved and supported by
3    Mr. Buettner?
4            MR. RYAN:  Objection.
5        A.    Definitely.
6        Q.    How so?
7        A.    Because he's the last say, so
8    there's no -- there's nothing left to discuss,
9    nothing left to argue.  So, you know, when Joe
10   Scharf says, I want to book a CRA, we know that
11   the Coopers & Lybrand auditors are going to
12   want to understand it and question it and want
13   support for it.  When an idea comes with his
14   blessing already on it, you can skip the
15   support part.
16       Q.    Is Coopers' job to understand and
17   determine whether this kind of a treatment
18   would be appropriate under Generally Accepted
19   Accounting Principles?
20           MR. RYAN:  Objection.
21       A.    Was it their job?  Yeah.
22       Q.    And if they, in fact, were part and
23   parcel of the decision and supportive of it,
24   you would have expected that to mean that
25   that's what they thought, that it was so

Page 390

1    compliant; is that fair to say?
2            MR. RYAN:  Objection.
3        A.    Yes, sir.
4        Q.    If you ever had a concern about the
5    propriety, and you've expressed that you had
6    some of this establishing Graduate reserves for
7    the expressed purpose of moving those reserves
8    to bad debt reserves at the Delaware Valley
9    Obligated Group, if you ever had, and you said
10   you did have such a concern, do you think
11   expressing it to Coopers or Mr. McConnell after
12   that meeting with the two would have done any
13   good?
14       A.    I do.
15           MR. RYAN:  Objection.
16       A.    I do in retrospect.
17       Q.    What do you think it might have
18   done?
19       A.    Same thing as the good bank, bad
20   bank.  If I would have been around a little
21   longer or we would have talked amongst
22   ourselves and said, this isn't right, we would
23   have fought it, just like we did the good bank,
24   bad bank.
25           But the timing is such that, this

28 (Pages 387 to 390)

Volume 2

Stephen Spargo

Page 391

1  doesn't play well in depositions, but I didn't
2  give a hoot about any of it, really. Little
3  demoralized that this easy answer came after
4  years of frustrating experiences in meetings,
5  but I can't sit here and tell you that if we
6  would have fought this thing could we have been
7  successful. We could have been. Would we have
8  been? I don't really know, but we could have
9  been.
10     Q.  You don't know the outcome?
11     A.  I don't know the outcome at all.
12     Q.  But you didn't try in part because
13  Coopers had already signed off?
14     A.  Correct.
15     Q.  And any -- looking back now would
16  just be guesswork?
17     A.  Correct. Definitely conjecture.
18     Q.  More in the vein of wondering about
19  what you might have done?
20     A.  Oh, yeah.
21     Q.  And what effect it might have had?
22     A.  Yeah, who knows.
23     Q.  Did you ever come to be concerned
24  about the fact that we were discussing and
25  talking about the determinations to create and

Page 392

1  move reserves from the Graduate Hospitals to
2  the Delaware Valley Obligated Group Hospitals
3  before the acquisition had gone final, the
4  acquisition of the Graduate Hospitals, by
5  AHERF, that is.
6         Do you recall that issue coming
7  up?
8     A.  The issue being?
9     Q.  The issue being that we were going
10  to create reserves and move them to the
11  Delaware Valley Obligated Group Hospitals, in
12  fact, before the effective date of the Graduate
13  Hospital's entry into AHERF?
14     A.  No. I don't think. No.
15     Q.  I'm going to ask you to look back
16  at the 4/14 memo, Exhibit 8. I think the place
17  I'm going to ask you to look is the second
18  page, on which Mr. Cancelmi notes the timing of
19  recognition. Do you see that subheading?
20     A.  I do, yes, sir.
21     Q.  He writes there, "a determination
22  has been made that 25 million of reserves will
23  be recorded in the Delaware Valley Hospital's
24  March 1997 financial statements. The remaining
25  25 million will be recorded in the fourth

Page 393

1  quarter." Is that right?
2     A.  Yes.
3     Q.  And as I understand it, the first
4  page of the memo indicates that the Graduate
5  entities were not made or were not to be made a
6  part of the AHERF system officially until
7  May 1, 1997?
8     A.  That's correct.
9     Q.  So the premise of my question isn't
10  entirely flawed, is it?
11     A.  No, sir, it isn't.
12     Q.  But you just don't recall
13  discussions on the topic?
14     A.  No, not really. And timing, I mean
15  I guess to put it in perspective, is this --
16  the whole SDN thing lends itself to some
17  questions, I mean who is SDN, is it in AHERF or
18  out of AHERF.
19     Q.  SDN was out of AHERF for purposes
20  of accounting; am I right?
21     A.  For purposes of accounting, it was.
22  But the way we approached the acquisition of
23  Graduate is basically it was effective in
24  October when we marched out there and asserted
25  ourselves on all those poor people.

Page 394

1     Q.  Do you recall whether Mr. Buettner
2  ever took a position that you became aware of
3  about when the acquisition of Graduate
4  Hospitals by AHERF should be effective?
5     A.  I don't recall.
6     Q.  Do you recall whether AHERF ever
7  took a position that that ought to be effective
8  at sometime before May 1, 1997?
9     A.  I don't recall.
10     Q.  Do you recall whether anyone at
11  Coopers expressed such a position to you?
12     A.  I don't recall, not to me.
13     Q.  Do you recall becoming aware of it
14  from any other source?
15     A.  No. No.
16     Q.  And do you recall today making any
17  attempt to express a concern to Coopers &
18  Lybrand about this timing issue?
19     A.  No. No, sir.
20     Q.  Do you recall who made the decision
21  to do the 50 million in two $25 million
22  increments?
23     A.  I do not.
24     Q.  Do you recall whether Coopers
25  suggested it?

29 (Pages 391 to 394)