Stephen Spargo

1    Q.  Do you recall -- do you recall
2  anything more about the conversation?
3    A.  Not really.
4    Q.  Was anybody else present?
5    A.  No.
6    Q.  Do you recall anything, ever
7  learning anything about the outcome of any
8  conversation Mr. McConnell might have had with
9  Ms. Wynstra?
10    A.  Again, through previous
11  depositions, I believe Ms. Wynstra was going to
12  write a legal opinion that said it was her
13  opinion that we had access to the funds.
14    Q.  Do you recall Mr. McConnell ever
15  telling you that while you were at AHERF, or
16  did you only learn that subsequently, to your
17  employment there?
18    A.  Subsequently.
19    Q.  So you never heard back from
20  Mr. McConnell while you were at AHERF about any
21  outcome from Nancy Wynstra, conversation that
22  he might have had?
23    A.  I did not.
24    Q.  Do you remember anything more about
25  the conversation with Mr. McConnell than that

1  he was going to take the issue up with
2  Ms. Wynstra?
3    A.  No.  Other than he's very
4  protective of Mr. Martin, so I believe I was
5  disappointed with Mike's efforts.  As well as
6  his staff, in soliciting clarification from
7  Mellon Bank.  And then likewise disappointed in
8  Mr. Kennedy's efforts in that regard.
9        So Mr. McConnell's response to take
10  it up with Ms. Wynstra, although I learned
11  about it, the outcome later was consistent.  He
12  would have protected Mike and shifted
13  responsibility to legal.
14    Q.  Do you recall any response to
15  Mr. McConnell's statements that you made?
16    A.  No.
17    Q.  As you sit here today, and I know
18  it's several years after the fact, and you saw
19  documents today that showed that -- or
20  purported to show that certain dividend or
21  interest income may have been paid out to AHERF
22  on an as-you-go basis, at least by 1989, and
23  that the original trust donations, at least as
24  the memo reflects them, one of the memos
25  reflects them, were in, in fact, largely, in

1  four out of five circumstances securities and
2  stock, does it give you any, looking back on
3  it, concern about the classifications that were
4  originally made with respect to the growth in
5  the Lockhart trusts?
6        MR. RYAN:  Objection.
7    A.  It does.  It does.  Although, what
8  it really tells me is that we should have
9  pushed legal and Mellon a little harder to go
10  to orphan's court, or whatever the proper
11  procedure is go convince some unbiased party
12  that the intent of the endowment had been
13  satisfied all along.  I was always informed
14  that that was an option.
15    Q.  In other words, looking back on it,
16  further efforts might have been made?
17    A.  I would hope, at least considered.
18  Because we would have pushed them.  Perhaps
19  Mr. Abdelhak wouldn't have been accused of
20  raiding the endowments.
21    Q.  Do you recall having any
22  disagreements with treasury about the
23  classifications of the growth of the trusts
24  with anyone?
25    A.  The treasury?

1    Q.  With anyone at treasury?
2    A.  No.  I don't even know if they had
3  an opinion on how they should be classified.
4    Q.  Upon receipt of the letter from Ms.
5  Robinson marked as Exhibit 20, do you recall
6  anyone ever discussing or you ever considering
7  that anyone ought to call or inform Coopers &
8  Lybrand of the receipt of the memo?
9    A.  No.
10    Q.  Do you know whether they ever got a
11  copy --
12    A.  I don't.
13    Q.  -- as you sit here today?
14    A.  I do not know.
15    Q.  And the reason you didn't -- you
16  don't remember that becoming a topic of your
17  consideration or conversation is why?
18    A.  In my mind this was not done.  We
19  weren't done.  This is just, you know, we still
20  had a hill to climb to get to where we needed
21  to get to, and this, what we thought would be
22  helpful, wasn't helpful.
23    Q.  This was one person's statement,
24  and was not, in your view, the end of the
25  inquiry?

42 (Pages 443 to 446)

Stephen Spargo

1      A.   Yeah.
2         MR. RYAN:  Objection.
3      A.   Yeah.  Exactly.  I wondered
4  oftentimes the relationship we had with Mellon
5  Bank in various other capacities, which we're
6  all well aware of in terms of loans, authorized
7  by Mr. Kowitt and others, why we didn't go sit
8  down with Mellon, use the clout that we had and
9  say, look, we want some help, help us here.
10 Help us make an interpretation.  Help us
11 understand what the restrictions are, what
12 we're trying to accomplish with these funds
13 that were donated to support that hospital.
14     Q.   Or at least give a more definitive
15 answer?
16        MR. RYAN:  Objection.
17     A.   Absolutely.  Tell us what our
18 options were.
19     Q.   I may have asked you this, and for
20 that I'll apologize in advance.  Do you recall
21 during the weekly update meetings during the
22 fiscal year 1996 audit the classification
23 effort with respect to the Lockhart trusts, and
24 other endowments for that matter, coming up?
25        MR. RYAN:  Objection.

1      A.   I don't recall having been a big
2  topic of conversation, no.
3      Q.   May have come up, you just don't
4  recall it?
5      A.   Yeah.  Yeah.  Could have.
6      Q.   Do you know whether the contents or
7  the content of the letter from Ms. Robinson to
8  Mr. Martin at the end of the month 1996 was
9  shared with anyone at Coopers & Lybrand around
10 that time, separate and apart from the actual
11 written document?
12     A.   I don't know.
13     Q.   You're aware -- are you aware of
14 any effort to hide that letter from anyone at
15 Coopers & Lybrand?
16        MR. RYAN:  Objection.
17     A.   No.  No, sir.
18     Q.   Do you believe that that letter is
19 necessary to anyone's understanding of the
20 accounting issues with respect to the Lockhart
21 trusts?
22        MR. RYAN:  Objection.
23     A.   No.  One way or the other, no.
24 That's a non-entity.
25     Q.   Mr. Spargo, we've handed you now

1  what's been marked as 1577.  And it's another
2  compilation of documents which include at the
3  outset a series of pages headed, AHERF analysis
4  of reserves; am I right?
5      A.   Yes, sir.
6      Q.   And on it you'll see about
7  two-thirds of the way down on the first page
8  there is a 6/30/96, as of 6/30/96 entry for
9  $50 million as a potential favorable adjustment
10 with a row header that reads, SFAS 117
11 endowment transfers at AHERF; am I right?
12     A.   That's correct.
13     Q.   And on the second page -- I'm
14 sorry, just below that, there is another SFAS
15 117 entry for prior period amount exposure in
16 the amount of $54 million; do you see that as
17 well?
18     A.   I do.
19     Q.   And, in fact, on the next page
20 similar entries are made at the bottom of the
21 page.
22     A.   Correct.
23     Q.   Do you recall receiving this
24 cushion or analysis of reserves?
25     A.   I don't recall it.  Certainly would

1  have had access to it and probably did receive
2  it.
3      Q.   Do you recall that the FASB 117
4  analyses and classifications that had been
5  undertaken in fiscal year 1996 were considered
6  both cushion opportunity and potential exposure
7  risk at AHERF in finance?
8         MR. RYAN:  Objection.
9      A.   I think we knew that.
10     Q.   And that's consistent with your
11 prior testimony today about the use of the
12 cushion as being a partial motivator for the
13 classification?
14     A.   Yes.  Yes.
15     Q.   And what was the perceived risk?
16     A.   The risk was the extent to which
17 that accounting treatment was definitively
18 determined to be improper.
19     Q.   The risk is you might have been
20 wrong?
21     A.   Correct.  Correct.  Not unlike the
22 CRA.
23     Q.   What do you recall knowing, as you
24 sit here today, about the audit steps that
25 Coopers & Lybrand undertook with respect to the

Stephen Spargo

Page 475

1  couldn't and others, I have no idea. And why
2  Sherif didn't hold them accountable, I'll
3  probably never understand.
4      Q.  Did you understand what the risk
5  contracting enterprise that AHERF launched in
6  or about this time period was one that could
7  have been altered or modified?
8      A.  I believe it could have been, yes.
9      Q.  How so?
10     A.  By approaching U.S. Healthcare,
11  renegotiating the terms. We didn't have an
12  obligation to make them wealthy on our behalf.
13  We wanted to explore a concept that was being
14  explored throughout the country, that is,
15  providers taking on a certain element of risk,
16  and providers throughout the country have
17  recognized that that's not something they're
18  very good at. So you unwind the deal.
19     Q.  And do you know whether those
20  approaches were ever made?
21     A.  No, I don't believe they were.
22     Q.  Did you recommend them?
23     A.  To Mr. McConnell, yes. To
24  Mr. Abdelhak, no.
25     Q.  Is it fair to say then that your

Page 476

1  opinion at the time, and it is today, that a
2  certain amount, a significant amount of
3  improvement and implementation might have
4  improved financial performance significantly?
5      A.  Absolutely.
6         MR. RYAN: Objection.
7      A.  Absolutely. No doubt about it. I
8  think Tenet and Drexel are living proof.
9      Q.  And they are, again, acquirers?
10     A.  Yes, they are, sir.
11     Q.  Of certain portions of what were
12  AHERF enterprises?
13     A.  Frankly, all of Delaware Valley
14  operations, I believe, in their entirety.
15     Q.  Separate and apart from the western
16  enterprises?
17     A.  Yes, sir. Yes, sir.
18     Q.  Mr. Adamczak, I'm going to hand you
19  now what we've marked as Exhibit 193.
20     A.  Please.
21     Q.  That's twice.
22     A.  At least it's not Snow or Laing, or
23  Martin or Dienisio. We can go down the list.
24     Q.  I apologize.
25     A.  I had a lot of friends at

Page 477

1  Allegheny, Adamczak was one.
2      Q.  This memo has actually got his name
3  on it, so I have half of an excuse.
4      A.  That's all right. That's fine.
5      Q.  Mr. Spargo, I'm handing you a memo
6  apparently authored by Mr. Adamczak marked as
7  Exhibit 193.
8      A.  You had to save this to the end.
9      Q.  It is, indeed, such a memo?
10     A.  It is, a memo from Al to Jack, yes,
11  sir.
12     Q.  And it's in Mr. Adamczak's
13  handwriting?
14     A.  Yes.
15     Q.  With which you came to be familiar
16  over time?
17     A.  Yes, most definitely.
18     Q.  And you've, I think, mentioned in
19  first line where it says, per discussions with
20  Steve, 1.6 million of C. Calvert, and I can't
21  read the next word, maybe you can help me.
22     A.  Payment.
23     Q.  Payment is to be capitalized as
24  tort settlement and amortized over five years?
25     A.  Yes, correct.

Page 478

1      Q.  Remaining piece --
2      A.  Expense.
3      Q.  -- expensed to institution cost?
4      A.  Institutional cost center, I
5  believe.
6      Q.  As salary. Is that what he says?
7      A.  Correct.
8      Q.  And he closes with the phrase,
9  please adjust?
10     A.  Correct.
11     Q.  In February close?
12     A.  Yes.
13     Q.  You do recall as you sit here today
14  there were certain circumstances that came to
15  your attention regarding the departure of
16  employment of an individual named Carol Calvert
17  from AHERF?
18     A.  Yes. Yes, sir.
19     Q.  What do you recall about that
20  departure?
21     A.  That it was a long time coming,
22  number one, about three years late. And that
23  she was whisked into Pittsburgh, literally the
24  day that all the termination papers were
25  signed. And it was alleged to be in response

50 (Pages 475 to 478)

Stephen Spargo

Page 479

1  to her threats of suing the organization. So
2  it was characterized as a tort settlement.
3      Q.   What did you understand to be the
4  alleged threats about -- what was the suit
5  about?
6      A.   I have no idea.
7      Q.   Okay.
8      A.   None whatsoever.
9      Q.   Why do you say, in your opinion,
10 this was a long time coming?
11     A.   Her value to the organization was
12 minimal. In fact, she was a liability. Her
13 performance was substandard. She was -- she
14 had no respect amongst her peers or her
15 subordinates. She was not a very effective
16 manager.
17     Q.   And why do you say all of those
18 things?
19     A.   Because she was terrible at what
20 she did.
21     Q.   What exposure did you have to her?
22     A.   Oh, good God. Yikes. More than I
23 care to. She headed up the AIHG process, and
24 until Don Klein was appointed the CFO of AIHG,
25 I was responsible for baby-sitting Carol

Page 480

1  Calvert.
2      Q.   And you found her in your
3  interactions to be less than a knowledgeable
4  manager?
5      A.   Very less.
6      Q.   And that had always been the case?
7      A.   Always to my knowledge, yes, my
8  interactions, yes.
9      Q.   Do you recall ever hearing in
10 discussions that Ms. Calvert was having an
11 affair or other untoward relationship with
12 members of senior management?
13     A.   Yes, that was word on the street,
14 yes, sir.
15     Q.   And who were the member or members,
16 who was the member or who were the members of
17 senior management?
18     A.   Mr. Abdelhak and Mr. McConnell.
19     Q.   And from whom did you hear such
20 discussions?
21     A.   Whoever might be flying on the
22 plane that day. Certainly my staff.
23     Q.   It was a common conversation among
24 the finance department?
25     A.   Oh, yes.

Page 481

1      Q.   And other departments?
2      A.   And others, yes.
3      Q.   And it was -- was it ever confirmed
4  to you by either Mr. Abdelhak, Mr. McConnell,
5  or Ms. Calvert?
6      A.   No. No, sir.
7      Q.   Do you know whether any of the
8  auditors at C & L ever heard these same
9  discussions?
10         MR. RYAN:  Objection.
11     A.   I would assume they did. I don't
12 know for a fact.
13     Q.   Do you remember ever discussing it
14 with any of them yourself?
15     A.   I don't remember specific
16 conversations.
17     Q.   Do you remember a general
18 conversation?
19         MR. RYAN:  Objection.
20     A.   It would have been a topic of
21 conversation with the auditors.
22     Q.   You believe it was?
23     A.   I believe it was, yes.
24         MR. RYAN:  Objection.
25     Q.   At a weekly update meeting?

Page 482

1          MR. RYAN:  Objection.
2      A.   No. No. No. No. In the hallway,
3  having a cigarette, lunch.
4      Q.   A more casual conversation?
5          MR. RYAN:  Objection.
6      A.   Absolutely. Yes.
7      Q.   It was so commonly discussed that
8  it would have been hard for the auditors not to
9  be involved in one of those considerations, is
10 that your characterization?
11         MR. RYAN:  Objection.
12     A.   I would characterize it that way,
13 yes.
14     Q.   Do you recall the discussions that
15 Mr. Al Adamczak appears to refer in Exhibit
16 193, with you?
17     A.   I don't recall them specifically.
18     Q.   Do you recall how you learned that
19 there was to be some sort of settlement
20 agreement and payment to Ms. Calvert?
21     A.   Mr. McConnell.
22     Q.   How was it expressed to you by him?
23     A.   That we're paying off Carol and
24 she's here signing her papers. I think that
25 day he shared that with me because it was in

Stephen Spargo

Page 483

1  Fifth Avenue Place and, of course, that's where
2  my office was, so I knew full well she was
3  there. Everyone knew when she was there. And
4  he said we're going to record it in response to
5  tort settlement.
6      Q.   Did you have a reaction to that?
7      A.   Probably like similar to Mr.
8  Paroos'.
9      Q.   Yes.
10     A.   And he probably would have said
11  yes.
12     Q.   Mr. Paroo was another individual
13  who departed AHERF with some form of legal
14  agreement in payment?
15     A.   That's correct.
16     Q.   Did you have a question at the time
17  about whether it was appropriate to
18  characterize the settlement either as a tort or
19  anything else?
20     A.   Yes. I told Mr. McConnell we
21  needed some documentation to support it. And I
22  assumed this would not be 1099-able or
23  W-2-able. And he said, yes.
24     Q.   And what do you mean by that for
25  those who aren't IRS proficient?

Page 484

1      A.   Taxable income to the recipient of
2  the funds.
3      Q.   So it was your understanding that
4  Mr. McConnell was telling you to create either
5  documentation or at least a request for a
6  payment that would not be taxable to the
7  recipient?
8      A.   No.
9          MR. RYAN:  Objection.
10     A.   I didn't create any documents.
11     Q.   Yes.
12     A.   I was instructed when the payment
13  went through the accounting system to make sure
14  that we knew, number one, to capitalize all or
15  a majority of it and amortize it.
16          Number two, to instruct Mr. Deasy
17  not to include it in taxable income.
18     Q.   To whom, taxable income to whom?
19     A.   To Ms. Calvert, correct.
20     Q.   So at the time you're dealing with
21  an IRS kind of a question?
22     A.   Yes.
23     Q.   And you're also dealing with an
24  accounting question because you're being asked
25  to capitalize?

Page 485

1      A.   Yes.
2      Q.   And did you have any reaction to
3  the request to capitalize any portion of this
4  payment over time?
5      A.   No. No.
6      Q.   Did you have any reaction about the
7  concern about the appropriateness of
8  capitalizing a tort settlement?
9      A.   No. No. My concerns were more IRS
10  generated, you know her settlement, I don't
11  know if it represented three years of income,
12  but we could have easily paid it out monthly
13  over three years and to record the expense over
14  three years would have been proper. So to
15  capitalize it and amortize it, characterization
16  was not driven by the desire to accounting
17  treatment. It was designed by or driven by the
18  desire to alleviate Ms. Calvert from her income
19  tax responsibilities.
20     Q.   Do you have any idea why it wasn't
21  just paid out?
22          MR. RYAN:  Objection.
23     Q.   All in one sum?
24     A.   It was, wasn't it?
25          MR. RYAN:  Objection.

Page 486

1      A.   It was, I believe.
2      Q.   And then amortized?
3      A.   And then amortized.
4      Q.   Do you have any idea why it was
5  amortized?
6      A.   Spread the expense out over five
7  years.
8      Q.   So that would have been the
9  accounting issue?
10     A.   Yeah. That could have been the
11  accounting issue, yeah.
12     Q.   Which is to spread expense and not
13  take it all in one year?
14     A.   Right. Right.
15     Q.   Did you ever understand from
16  Mr. McConnell or otherwise that some portion of
17  the rationale for the capitalizing of the
18  expense was that there was some view that this
19  tort settlement was also in part or in full a
20  covenant not to compete?
21     A.   From Carol?
22     Q.   Yes.
23     A.   Maybe if she would have competed we
24  would have done a little better. No, I did not
25  know that.

52 (Pages 483 to 486)

Stephen Spargo

Page 491

1    Q.   Only because it was behind Exhibit
2  15, and you already have it. Did I not show it
3  to you before?
4    A.   Yeah, probably.
5        MR. RYAN:  I'm sorry, Jim, this is
6  what exhibit?
7        MR. JONES:  Exhibit 16.
8        MR. RYAN:  I don't believe we've
9  seen that in this case, in this deposition, I
10  mean.
11        MR. JONES:  Well, I was informed
12  that we had, and if we haven't, we'll find it.
13    A.   Number 16?
14    Q.   Yes. Potential adjustments at the
15  top of the page.
16        We like to do this towards the end
17  of the day to make sure we're all energized.
18    A.   Good exercise.
19        (Discussion held off the record.)
20    Q.   Having located Exhibit 16, after
21  some effort, it is, again, a potential
22  adjustment sheet; is that right?
23    A.   Yes, sir.
24    Q.   And I'm going to refer your
25  attention to the second page.

Page 492

1    A.   Yes, sir.
2    Q.   And it appears that both the
3  Calvert tort settlement and the Paroo tort
4  settlement are listed as potential adjustments
5  and potential expense adjustments, in fact?
6    A.   Correct.
7    Q.   Summing to $4.9 million?
8    A.   Yes, sir.
9    Q.   So do you recall now that there was
10  continuing concern about the propriety of the
11  capitalizing of these settlements and that
12  there was concern that these may be potential
13  expense items at some future point?
14    A.   I think this helps my recollection,
15  yes.
16    Q.   Do you recall that part of your job
17  was developing budgets?
18    A.   I'm sorry, sir.
19    Q.   Do you recall that part of your
20  job, Mr. Spargo, was developing budgets at
21  AHERF?
22    A.   Yes.
23    Q.   And, in fact, not only developing
24  them, but dealing with the budgets developed by
25  others?

Page 493

1    A.   Correct, compiling budgets is
2  probably the best description.
3    Q.   Those budgets would include earning
4  targets, board projections, and things like
5  we've seen earlier today?
6    A.   Correct.
7    Q.   For AHERF and its affiliate
8  operations?
9    A.   Correct.
10    Q.   Who assisted you in this effort?
11    A.   Mr. Adamczak primarily.
12    Q.   Do you recall from time to time
13  there were edicts from Mr. Abdelhak about
14  improvements in either productivity, expense
15  reduction, or things of that nature?
16    A.   Edicts about?
17    Q.   Increased productivity or expense
18  reduction or things of that nature?
19    A.   Yeah, I think so.
20    Q.   In the budgeting process?
21    A.   Yeah.
22    Q.   Do you recall any -- experiencing
23  any frustration with some of these goals from
24  time to time?
25    A.   I recall thinking that they -- it

Page 494

1  was doubtful they would be achieved.
2    Q.   Did you have any sense that they
3  may be arbitrarily imposed?
4    A.   Oh, yeah.
5    Q.   And why so?
6    A.   Well, they normally came out of the
7  big office without any data going in first.
8    Q.   And the big office was
9  Mr. Abdelhak's?
10    A.   Mr. Abdelhak's, yes, yes.
11    Q.   Did you find that the budgets from
12  time to time were more optimistic than you
13  would have made them, the budget requirements?
14    A.   I can't say that. There was always
15  some glimmer of hope that there would have been
16  sufficient pressures placed on the operating
17  units to achieve some of those budgeted targets
18  and expectations.
19    Q.   Did you or anyone else at finance
20  though feel any amount of pressure to help
21  fulfill what might have been optimistic goals
22  from time to time, if you could, via accounting
23  treatments?
24    A.   Yeah, I think we recognize that we
25  wanted to try and hit our targets as best we

Volume 2

Stephen Spargo

Page 495

1   could.
2       Q.   Mr. Spargo, flipping back to
3   another category of questions for a second, if
4   C & L would have asked you, would you have told
5   them that the payments to Ms. Calvert and
6   Mr. Paroo were tort settlements?
7       A.   Sure I would have.
8           MR. RYAN: Objection.
9       A.   Absolutely.
10      Q.   Or were for tort settlements?
11      A.   Yes, there's nothing to hide. The
12  disturbing part about those settlements, given
13  their timing, was that we were having cash, and
14  senior management somehow felt the need to pay
15  out $5 million to two bone heads.
16          You know, the accounting treatment,
17  I hate to say this, I could have cared less
18  about the accounting treatment. I had the
19  accountants responsible to me. I also had Dave
20  Deasy every day asking if he could pay Cardinal
21  Health or Baxter or -- and we're paying those
22  two people 5 million bucks.
23      Q.   You're aware that during your time
24  at AHERF, performance bonuses were paid to
25  management?

Page 496

1       A.   Yes.
2       Q.   And it was a system designed to
3   reward executives in the event of achieving
4   certain benchmarks?
5       A.   Yes.
6       Q.   In a typical year, what did those
7   bonuses run for people at your level of
8   seniority and responsibility at the company?
9       A.   Ten to 30 percent.
10      Q.   Did you have a view about whether
11  those were middling or high in the industry?
12      A.   I thought they were high.
13      Q.   Was achievement of those bonuses by
14  management and people in the finance
15  department, like yourself, in part contingent
16  upon meeting certain financial goals?
17      A.   Yes.
18      Q.   And what were those goals?
19      A.   I don't recall, but I don't even
20  know if budget was one, something to do with
21  net equity, probably bond ratings, patient
22  satisfaction, quality. There was like four or
23  five indicators. Fairly standard in the
24  industry.
25      Q.   When you say budget was one, what

Page 497

1   do you mean by budget?
2       A.   Whether we achieved our budget
3   targets or not.
4       Q.   In terms of net income?
5       A.   Net income, yeah, maybe revenues.
6       Q.   I'm sorry, you said something after
7   net income?
8       A.   Maybe revenues, whatever. No. No.
9   No. One of the big targets was cost per
10  adjusted discharge, CPAD, how could I forget.
11  Sherif would shoot me. That was a big deal
12  about whether we had achieved cost per adjusted
13  discharged targets.
14      Q.   What does that mean?
15      A.   That means you take your expenses
16  and go through some crazy gyration to equate it
17  to how much does it cost to treat a patient.
18  East, west, I don't know that we did a
19  consolidated, but probably in the regions where
20  they had hospitals.
21          - - - - -
22          (Thereupon, Deposition Exhibit 1700
23          was marked for purposes of
24          identification.)
25          - - - - -

Page 498

1       Q.   Mr. Spargo, we just handed you
2   Exhibit 1700, which is a September 6, 1996 memo
3   from Dwight Kasperbauer to Mr. Buettner; is
4   that fair to say?
5       A.   Yes, sir.
6       Q.   With a copy to Al Adamczak?
7       A.   Yes, sir.
8       Q.   And in it Mr. Kasperbauer tells
9   Mr. Buettner that he is providing certain
10  information; is that right?
11      A.   Yes.
12      Q.   And part of that information is a
13  description of the criteria with respect to the
14  bonuses we've just been discussing; is that
15  right?
16      A.   That's correct.
17      Q.   And does that refresh your
18  recollection about the criteria involved?
19      A.   As soon as I go through them it
20  does.
21      Q.   And the categories briefly are
22  admissions, cost per adjusted discharge, which
23  you just mentioned?
24      A.   Correct.
25      Q.   Net income?

55 (Pages 495 to 498)

Stephen Spargo

**Page 499**

1    A.   Correct.
2    Q.   Net equity?
3    A.   Correct.
4    Q.   Uncompensated care?
5    A.   Correct.
6    Q.   And the level of external funds
7    secured for research?
8    A.   Yes.
9    Q.   In what connection was Mr.
10   Kasperbauer providing this information to
11   Mr. Buettner?
12   A.   He was asking Mr. Buettner to
13   review and verify the accuracy of the
14   underlying calculations.
15   Q.   This was a certain agreed upon
16   procedure project?
17   A.   Yes.  Coopers would do that every
18   year.  In fact, the first year I really got to
19   know Dan Cancelmi, he was the senior manager on
20   the AHERF job and he was tasked with doing
21   exactly what Mr. Buettner is doing here in this
22   calculation.
23   Q.   Do you recall ever being -- ever
24   having discussions with Coopers on these
25   engagements, on compensation?

**Page 500**

1    A.   Not too much.  No, because I
2    purposely dealt with Dwight.
3    Q.   And who was Mr. Kasperbauer, by
4    title?
5    A.   He was the executive vice president
6    and chief human resource officer.
7    Q.   Do you recall that any AHERF
8    executives received bonuses for acquisitions?
9    A.   Yes.
10   Q.   Who were they and do you recall?
11   A.   Yes.  Mr. Abdelhak, Mr. McConnell,
12   Ms. Wynstra, of course, Dr. Kaye, Mr. Dienisio.
13   I don't know if Mr. Sanso.  Mr. Sanso may have
14   as well.
15   Q.   It was based on hospital
16   acquisitions?
17   A.   I believe so, yes.
18   Q.   Were there any bonuses paid on
19   physician practice acquisitions?
20   A.   I think there may have been.  Oh,
21   yes, there was.  Yeah.
22   Q.   To whom?
23   A.   Whoever the guy was that cavorted
24   around with Carol.
25   A.   Harvey --

**Page 501**

1    Q.   Leavy?
2    A.   Harvey Leavy, yeah.  And probably
3    Carol as well.
4    Q.   How were you made aware of these
5    bonuses?
6    A.   Mr. Deasy.
7    Q.   Told you?
8    A.   Yes.
9    Q.   Do you recall bonuses being paid
10   for anything else?
11   A.   Yes.
12   Q.   What?
13   A.   Securing additional debt.
14   Q.   Who received those bonuses?
15   A.   Mr. Martin, Ms. Gilbert.  I don't
16   know who else.
17   Q.   What were you -- do you have any
18   opinions on the appropriateness of the bonuses
19   we just discussed?
20   A.   Yeah.
21   MR. RYAN:  Objection.
22   Q.   What about them?
23   A.   There was no need for it.  You
24   don't give people bonuses to do their job.  I
25   think the acquisitions used to piss me off, but

**Page 502**

1    the debt really, like come on, but --
2    Q.   Was it your view that these were
3    unnecessary and excessive?
4    MR. RYAN:  Objection.
5    A.   Yes, it was, indeed.
6    Q.   Well, if I've overstated your
7    opinion, tell me.
8    A.   No.
9    Q.   How would you characterize --
10   A.   No, this was very excessive.
11   People should be fired, they shouldn't be
12   getting bonuses.
13   Q.   Do you recall the Exuplex program?
14   A.   Yes, I do, as a matter of fact.  It
15   was a creditor.
16   Q.   What was it?
17   A.   It was a basically an executive
18   perk package where we were allotted a certain
19   amount of money, and I don't recall exactly how
20   much, and with that money we could select
21   different types of benefits of short-term
22   disability, I think we had access to some
23   executive life insurance, and then there would
24   be a residual amount after we went benefit
25   shopping that we would keep for two years and

56 (Pages 499 to 502)

Volume 2

Stephen Spargo

Page 503

1    then have ready access to.
2        Q.   What was the quantum, if you can,
3    as a percentage of salary that you were
4    committed as an allotment to do this shopping?
5        A.   20 percent.
6        Q.   I think you testified earlier in
7    other litigation it was as much as 33 percent?
8        A.   Thirty-three.
9        Q.   Is that your best recollection?
10       A.   Yes.  Yes.  Thirty-three.  Yes.
11       Q.   Do you recall any other executive
12   benefits?
13       A.   Yes.  We got sort of like a car
14   allowance thrown into our salary.  And that was
15   intended, number one, for cars, so you didn't
16   have to submit the milage to and from the
17   airport and that crap.  It was also intended to
18   cover legal fees, financial advisors, tax
19   preparation fees, those kind of things.  That
20   was like $22,000 a year or something.
21       Q.   Do you recall that these benefits
22   that we've just discussed over the last few
23   minutes were benefits that were available to
24   not only persons of your position in the
25   company, but those above you like

Page 504

1    Mr. McConnell, Ms. Wynstra and Mr. Abdelhak?
2        A.   Yes.
3        Q.   And were there levels of
4    individuals in the company beneath you who got
5    these benefits and bonuses?
6        A.   Perhaps.  Maybe down in the vice
7    president level.
8        Q.   But certainly above you the
9    benefits and bonuses that we've talked about
10   today applied?
11       A.   Oh, yeah, yeah, definitely.
12       MR. JONES:  Let's break here so
13   people can make their flights.  We will
14   obviously reconvene and maybe take a few
15   minutes to talk about when.  I will be, if not
16   done, and I may just say I'm done, very, very
17   close to done, on the order of a half hour to
18   an hour, but no more.  I appreciate everyone's
19   stamina.
20       VIDEO TECHNICIAN:  Going off the
21   record at 3:48.
22
23       (Deposition adjourned.)
24       - - - - -
25

Page 505

1        CERTIFICATE
2    The State of Ohio,  )
3              SS:
4    County of Cuyahoga.  )
5
6        I, Jaci R. Traver, RPR, CRR and
7    Notary Public, duly commissioned and qualified,
8    do hereby certify that the within named
9    witness, STEPHEN SPARGO, was by me first duly
10   sworn to testify the truth, the whole truth and
11   nothing but the truth in the cause aforesaid;
12   that the testimony then given by the
13   above-referenced witness was by me reduced to
14   stenotypy in the presence of said witness;
15   afterwards transcribed, and that the foregoing
16   is a true and correct transcription of the
17   testimony so given by the above-referenced
18   witness.
19       I do further certify that this
20   deposition was taken at the time and place in
21   the foregoing caption specified and was
22   completed without adjournment.
23
24
25

Page 506

1        I do further certify that I am not
2    a relative, counsel or attorney for either
3    party, or otherwise interested in the event of
4    this action.
5        IN WITNESS WHEREOF, I have hereunto
6    set my hand and affixed my seal of office at
7    Cleveland, Ohio, on this      day of
8        , 2003.
9
10
11
12
13
14       Jaci R. Traver, Notary Public
15       within and for the State of Ohio
16
17   My commission expires July 15, 2003.
18
19
20
21
22
23
24
25

Volume 2

Stephen Spargo

Page 515

SIGNATURE OF WITNESS

1
2
3
4
5
6        The deposition of STEPHEN SPARGO,
7   taken in the matter, on the date, and at the
8   time and place set out on the title page
9   hereof.
10        It was requested that the
11  deposition be taken by the reporter and that
12  same be reduced to typewritten form.
13        It was agreed by and between
14  counsel and the parties that the Deponent will
15  read and sign the transcript of said
16  deposition.
17
18
19
20
21
22
23
24
25

Page 517

DEPOSITION ERRATA SHEET

1
2
3   RE:    OFFICIAL COMMITTEE OF UNSECURED
4         CREDITORS OF ALLEGHENY HEALTH,
5         EDUCATION & RESEARCH FOUNDATION
6         VS.
7         PRICEWATERHOUSECOOPERS, L.L.P.
8   RRS File No.:    7472
9   Deponent:    STEPHEN SPARGO
10  Deposition Date:    JULY 18, 2003
11
12  To the Reporter:
13  I have read the entire transcript of my
14  Deposition taken in the captioned matter or the
15  same has been read to me.  I request that the
16  following changes be entered upon the record
17  for the reasons indicated.  I have signed my
18  name to the Errata Sheet and the appropriate
19  Certificate and authorize you to attach both to
20  the original transcript.
21
22
23
24
25

Page 516

AFFIDAVIT

1
2   The State of Ohio,  )
3                )  SS:
4   County of Cuyahoga   )
5
6
7
8      Before me, a Notary Public in and for
9   said County and State, personally appeared
10  STEPHEN SPARGO, who acknowledged that he/she
11  did read his/her transcript in the
12  above-captioned matter, listed any necessary
13  corrections on the accompanying errata sheet,
14  and did sign the foregoing sworn statement and
15  that the same is his/her free act and deed.
16     In the TESTIMONY WHEREOF, I have hereunto
17  affixed my name and official seal at this
18  day of          A.D 2003.
19
20
21
22     Notary Public
23
24
25     My Commission Expires:

Stephen Spargo

Page 518

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,

        Plaintiff,

    vs.

PRICEWATERHOUSECOOPERS,
LLP,

        Defendant.

Civil Action
No. 00-684

      Continued Videotaped Deposition of
STEPHEN H. SPARGO, called for examination under
the Applicable Rules of Federal Civil
Procedure, taken before me, Michele E. Eddy, a
Registered Professional Reporter and Notary
Public in and for the State of Ohio, pursuant
to notice and stipulations of counsel, at the
offices of Manion McDonough, 600 Grant Street,
Suite 1400, Pittsburgh, Pennsylvania, Ohio, on
Tuesday, the 4th day of November, 2003, at 9:00
a.m.

- - - - -

VOLUME 3

- - - - -

Stephen Spargo

Page 523

1  that you have attached a schedule which depicts
2  47 million dollars of reserves on the books in
3  our DV or Delaware Valley Hospitals, is that
4  right?
5      A.   That's correct.
6      Q.   Indeed the attached page in the
7  second page of Exhibit 1343 is that listing of
8  reserves for the Delaware Valley as of 3-31-95.
9        Am I right?
10     A.   Yes, it is.
11     Q.   And then Exhibit 1689, the one next
12 to you and now in your hands is, again,
13 another, this time, two-page listing of AHERF
14 reserves.  This time it says after proposed
15 adjustments.  And these reflect reserves as of
16 6-30-95 and 6-30-96, is that right?
17     A.   They do.
18     Q.   On both of these exhibits,
19 Mr. Spargo, we have an entry for prior year
20 CRAs under the heading of the Hahnemann
21 Hospital or the category that relates at least
22 to the Hahnemann Hospital.  Am I right in that?
23     A.   I'm sure you are.  I'm just looking
24 for it.
25     Q.   Let me help you.  Look at Exhibit

Page 524

1  1343 first.
2      A.   Okay.
3      Q.   The first entry is for the HUH --
4      A.   Right.
5      Q.   -- hospital.  And that is
6  Hahnemann?
7      A.   That is Hahnemann.
8      Q.   In the parlance in the accounting
9  department at this time.
10     A.   Yes, sir.
11     Q.   And then if you look at 1689's
12 first page, the Allegheny University Hospital
13 would be again Hahnemann Hospital again?
14     A.   Yes.  Thank you.
15     Q.   If you skip down just a few lines
16 under both of those headings you will see on
17 both documents an entry for prior year CRAs.
18     A.   That's correct.
19     Q.   In the Delaware Valley listing,
20 Exhibit 1343, the amount is 13 million dollars.
21 Is that right?
22     A.   Yes, sir.
23     Q.   That's a significant sum, am I
24 right?
25     A.   It is.

Page 525

1      MR. RYAN:  Objection.
2      Q.   The entry for, on Exhibit 1689,
3  rather, for the prior year CRA at Hahnemann is
4  19.5 million, is that right?
5      A.   Yes, sir.
6      Q.   Again, a significant sum?
7      A.   Yes, sir.
8      MR. RYAN:  Objection.
9      Q.   And taking you back momentarily to
10 your testimony in your first deposition
11 session, these analyses of reserves were
12 documentation used by the finance department to
13 keep track of or score of what was referred to
14 as cushions.
15       Is that fair to say?
16     A.   Yes, it is.
17     Q.   And those cushions, in your
18 testimony, I think, were means of mitigating
19 unforeseen negative financial consequences?
20     A.   Yes.
21     Q.   Or otherwise offsetting negative
22 financial performance during a given period?
23     A.   Yes.
24     Q.   And these entries got to the
25 reserve analyses or cushion analyses by way of

Page 526

1  individuals in either the finance or other
2  departments at AHERF; the underlying data was
3  supplied to the finance department by certain
4  individuals, is that fair to say?
5      A.   Yes, sure.
6      Q.   With respect to prior year CRAs or
7  cost rate adjustments -- first of all, is that
8  what that refers to?
9      A.   A/R cost report adjustments, yes.
10     Q.   Synonymous terms?
11     A.   Yes.
12     Q.   Cost rate adjustment, cost report
13 adjustment meant the same thing to finance
14 department people at AHERF anyway?
15     A.   Yes.  It did.  It did.
16     Q.   The data for cost rate adjustment
17 or prior year cost rate adjustment or cost
18 report adjustment cushions would have come from
19 what source, what individual?
20     A.   Primarily Joe Scharf or his staff.
21     Q.   Now, a prior year cost rate
22 adjustment, as you understood it, at the time
23 these documents were generated and used would
24 have meant what?  What would a prior CRA entry
25 on these analyses of reserves or cushions have

3 (Pages 523 to 526)

Stephen Spargo

Page 527

1  meant to you?
2      A.   It would have meant that for a year
3  other than the current year, that the cost
4  reports, primarily Medicare, but to some extent
5  Medicaid, maybe Blue Cross in some cases, but
6  few, when those cost reports get final settled
7  after audit, that we could expect more
8  reimbursement than perhaps we recorded to date.
9      Q.   And instead of -- strike that.
10         Now, there was also a term used
11  with respect to the way hospitals are
12  reimbursed during the time you worked in the
13  AHERF finance department or with accounting at
14  AHERF that went by the initials PIP.
15         Do you remember that --
16     A.   Yes, I do.
17     Q.   -- set of initials?
18     A.   Yes, I do.
19     Q.   That term referred to periodic
20  interim payments?
21     A.   That's correct.
22     Q.   Can you, as you recall it, describe
23  for me the difference between a periodic
24  interim payment and a cost rate adjustment?
25     A.   I can try.

Page 528

1          Periodic interim payment or PIP is
2  a method of reimbursement that Medicare affords
3  very few hospitals that meet certain
4  preestablished criteria.
5          What Medicare basically says is
6  we're going to give you a flat amount of money
7  every two weeks irrespective of how many bills
8  you send us and how many claims we process in
9  response to those bills.
10         So your cash flow will be an even
11  five million dollars every two weeks no matter
12  what. One week you may send in eight million
13  dollars of bills, the next week you may take
14  the week off and send in a hundred thousand
15  dollars, but PIP is going to assure you
16  uninterrupted cash flow. The day of reckoning
17  will be when we settle the cost report for a
18  given year.
19         So PIP has nothing to do with the
20  cost report. It's merely cash advances in lieu
21  of making payments specific to individual
22  claims.
23         And a cost report adjustment is
24  basically one that fiscal intermediary, which
25  is usually Blue Cross in most cities or

Page 529

1  jurisdictions, comes in and audits the
2  hospital's equivalent of a tax return. The
3  cost report is yea thick.
4          It has everything on there from
5  interns and residents to bad debts and they'll
6  come in at the end of the day and say your cost
7  report shows that we owe you $100,000.
8          After audit we think we owe you
9  $4,100,000. If you agree, sign off on the
10  adjustments, case closed. Move on to the next
11  year. So they're really not -- PIP and CRAs
12  aren't related.
13     Q.   Do you recall during the time you
14  were involved with the generation and review of
15  the cushion analyses or analysis -- analyses of
16  reserves marked as Exhibit 1343 and Exhibit
17  1689, whether any PIP account amounts were
18  recorded on these analyses as cushions or
19  potential cushions?
20     A.   They shouldn't have been. I mean
21  true PIP balances, they're just -- just cash
22  flow issues. They don't have an income
23  statement impact. So --
24     Q.   Did you --
25     A.   Some hospitals will allow PIP

Page 530

1  accounts to also serve as CRA accounts. Once
2  the year is done, instead of closing out PIP
3  because nobody likes to reconcile PIP, they
4  just leave it in there and say the intermediary
5  is going to resolve everything when all is said
6  and done and we'll use that as part of our CRA
7  balance either owed to or owed from Medicare.
8      Q.   Do you know then as you sit here
9  today whether the prior year CRA entries on
10  Exhibits 1343 and 1689 included amounts like
11  you just described with respect to PIP
12  accounts, that is amounts that might be
13  cushion?
14     A.   They could have.
15         MR. RYAN:  Objection.
16     A.   They could have. I, again, don't
17  recall who was on PIP, to be honest with you.
18     Q.   When you say recall who, you don't
19  recall who would have been reporting PIP
20  amounts?
21     A.   No, which hospital was afforded
22  that luxury by Medicare.
23     Q.   I see.
24         Are there bookkeeping circumstances
25  that you recall where there were transfers

4 (Pages 527 to 530)

Stephen Spargo

Page 719

1   Coopers & Lybrand have been making this comment
2   about the capitalized interest even in the
3   prior year, they've been consistently making
4   this point, it's not something that they
5   just --
6       A.  No.
7       Q.  -- came up with on the spot for the
8   IBM Center?
9       A.  You are correct.  You are correct.
10      MR. JONES:  Object to form.
11      Q.  This is something Coopers &
12  Lybrand's consistently been telling AHERF for a
13  number of years?
14      MR. JONES:  Same objection.
15      A.  Yes.  Yes.
16      Q.  You would agree that there's
17  nothing inappropriate about having a SUD that
18  contains offsetting amounts, right?
19      A.  Oh, no.  Oh, no.  No.  That's what
20  you hope a SUD would do.
21      Q.  You don't think there's anything
22  inappropriate about either the SUD entries, do
23  you?
24      A.  No, I don't.
25      Q.  Either the IBM sale leaseback SUD

Page 720

1   entry or the 7.1 million capitalized interest
2   SUD entry?
3       A.  No.
4       MR. JONES:  Objection.  Asked and
5   answered.  And form.
6       Q.  Let me hand you what's previously
7   been marked as Exhibit 1590.
8       A.  Thank you.
9       Q.  Do you recognize Exhibit 1590, Mr.
10  Spargo?
11      A.  I do.  Looks like the management
12  rep letter for the 1996 audit.
13      Q.  Dated September 20th, 1996?
14      A.  Yes.
15      Q.  And signed by Mr. Abdelhak,
16  Mr. McConnell, you and Miss Wynstra?
17      A.  Yes.
18      Q.  I take it that is your signature on
19  the last page?
20      A.  Yes.
21      Q.  Do you recognize the signatures of
22  the other three signatures?
23      A.  I do, yes.  Quite a team we were.
24      Q.  This representation letter for
25  1996, like the one for 1995, states in

Page 721

1   paragraph one, "We are responsible for the fair
2   presentation in the consolidated financial
3   statements of our financial position, results
4   of operations, and cash flows, in conformity
5   with generally accepted accounting principles.
6       "Financial statements and related
7   notes include all disclosures necessary for a
8   fair presentation of the financial position.
9   Results of operations and cash flows of AHERF
10  and affiliates in conformity with generally
11  accepted accounting principles and disclosures
12  otherwise required to be included therein by
13  the laws and regulations to which the company
14  is subject."
15      Right?
16      A.  Yes.
17      Q.  So what that's basically saying is
18  the financial statements are GAAP, right?
19      MR. JONES:  Object to form.
20      A.  Yes.
21      Q.  That was the representation you
22  made to Coopers & Lybrand?
23      A.  Yes.
24      Q.  You believed that that was an
25  accurate statement for you to make?

Page 722

1       A.  Yes.
2       MR. JONES:  Same objection, and to
3   foundation.
4       Q.  You knew that the auditors at
5   Coopers & Lybrand were going to rely on those
6   statements, right?
7       A.  I knew they were going to be given
8   everything they needed to make their own
9   judgment.  That's what I really knew.
10      So when I sat down and said, David,
11  you know, do I need you to sign this, and my
12  signature would go on first, so if I signed it,
13  he signs it.  If he signs, Sherif signs it.  If
14  Sherif signs it, if she'll go get Nancy to sign
15  it.
16      The bottom line is are they going
17  to know what they need to determine what their
18  audit opinion's going to be?  Absolutely.
19  That's what that's all about.
20      Did Adamczak make it -- is the
21  draft he's going to give them on Monday morning
22  GAAP?  Who the hell knows.  But they'll have --
23  they can make that determination.  So --
24      Q.  And you're aware from your
25  experience as an auditor and from working in

52 (Pages 719 to 722)

Stephen Spargo

Page 723

1   management at a number of institutions that one
2   of the things that auditors place reliance on,
3   in addition to various schedules they review
4   and so forth, are representations from their
5   clients' management, right?
6       A.   Yes.  Yes.  And full disclosure.
7       Q.   That's what this is supposed to be,
8   right?
9       A.   Yes.  Yes.
10          MR. JONES:  Object to form.
11      Q.   If you could turn to the next page.
12      A.   Yes, sir.
13      Q.   Do you see there paragraph eight
14  again states that, "The receivables have been
15  appropriately reduced to their estimated net
16  realizable value," right?
17      A.   Yes, I see it.
18      Q.   Did you believe at the time you
19  signed it that that was a correct statement?
20          MR. JONES:  Object to form.
21      A.   I can't imagine I did, but -- no,
22  because, you know, obviously this was signed in
23  September of 1996.  Probably there around the
24  same time Mr. Cancelmi came out with his little
25  memos that he wrote on a monthly basis at my

Page 724

1   urging and McConnell's request basically saying
2   our reserves are understated by an exorbitant
3   sum of money.
4          So did I believe eight?  No.  Did I
5   believe the ball was in somebody else's court
6   to decide whether the A/R is going to be fairly
7   presented on the financials?  Yes.  Did they
8   hit the ball over the net?  No.
9       Q.   In fact, I think September 20th is
10  the date of the first in this series of memos
11  from Dan Cancelmi that we looked at the other
12  day?
13      A.   Really, the same day as this?
14      Q.   Same day.
15      A.   Okay.  Probably coincidence more
16  than anything, in all honesty.
17      Q.   So when you signed the management
18  representation letter marked as Exhibit 1590,
19  you knew that the receivables, in fact, had not
20  been appropriately reduced to their estimated
21  net realizable value?
22          MR. JONES:  Object as asked and
23  answered.
24      A.   Yeah, I knew the reserve for bad
25  debt was understated.

Page 725

1       Q.   If you would turn, please, to
2   paragraph 17.  You see that reads, "Settlements
3   due to or due from third-party payers recorded
4   on the balance sheet are stated at amounts
5   which reflect assessments resulting from
6   settlements already made or from those
7   contemplated by third-party payers"?
8       A.   I see that.
9       Q.   And your understanding is that is
10  saying the CRA accounts are properly stated?
11      A.   I don't know what the hell that
12  states.
13          MR. JONES:  Note my objection to
14  foundation.
15      A.   I mean, I don't know.  Maybe --
16  maybe I should have read this a little
17  closer -- I don't know what it says.  I guess
18  that's what they're trying to say.  But to say,
19  you know, this year's assessment has to be
20  based on a prior year assessment, that's --
21  that could be irrelevant, especially if
22  Medicare comes up with a new payment scheme or
23  something.
24          It's an outdated way of trying to
25  say the CRA is reasonably stated.

Page 726

1       Q.   Did you believe when you signed
2   this letter that the CRA accounts were
3   reasonably stated?
4       A.   I believe I did.  Or, more
5   importantly, I believe that they would have
6   everything they need to make their own
7   determination.  It's like telling your mother
8   at Thanksgiving, that turkey was great and you
9   walk out saying I don't want any leftovers.
10  You know the obvious.  You tell me.
11      Q.   If you'd look at paragraph 21
12  toward the bottom of the page.  Do you see that
13  reads --
14      A.   Yes.
15      Q.   -- "AHERF has confirmed to AIHG in
16  a letter dated September 9th, 1996 that it will
17  continue to support the future operations of
18  AIHG," right?
19      A.   I see that, yes, sir.
20      Q.   That's a reference to the support
21  letter required in the absence of which there
22  could have been a going concern qualification,
23  right?
24      A.   Yes.  Yes.  In fact, I believe in
25  the 1995 rep letter, a statement similar to

53 (Pages 723 to 726)

Volume 3

Stephen Spargo

Page 727

1  that was made for the University, I believe.
2  Q.   Yes, for MCPHU.
3  A.   MCPHU, right. Right.
4  Wow, were you working there
5  somewhere? How did you get all the right
6  lingo?
7  Q.   MCPHU or M C P H U is what was
8  later renamed AUHS, right?
9  A.   Yes. Yes.
10  Q.   If you could look, please, at
11  paragraph 22 of Exhibit 1590.
12  A.   Okay.
13  Q.   You see that reads, "We have
14  adopted financial accounting standards board
15  statements, FAS number 116, accounting for
16  contributions received and contributions made;
17  number 117, financial statements of
18  not-for-profit organizations; and number 124,
19  accounting for certain investments held by
20  not-for-profit organizations, and have complied
21  with the requirements of these statements in
22  the preparation of our financial statements."
23  A.   Yes, sir.
24  Q.   Are these the statements that we've
25  had occasion to refer to as FAS 116, FAS 117,

Page 728

1  and FAS 124?
2  A.   Yes, sir.
3  Q.   The statement that you and your
4  colleagues at AHERF management were making here
5  was that you had complied with FAS 116, 117,
6  124 in preparing the 1996 consolidated
7  financial statements, right?
8  A.   Yes.
9  Q.   Did you believe that to be true at
10  the time?
11  A.   Dan and Al said so. Yes, I did.
12  The other three who signed this?
13  They didn't have a clue.
14  Q.   But you believed it was true, and
15  that's what you told --
16  A.   Yeah.
17  Q.   -- I guess Dave McConnell?
18  A.   Yeah. Either that or sign this.
19  That's usually how it worked. Here is the rep
20  letter. There's nothing here to get excited
21  about. Just sign it. And, oh, by the way,
22  we're signing it and the audit is over.
23  Q.   Are you aware of anything in this
24  representation letter other than the sentence
25  we discussed in paragraph eight about

Page 729

1  receivables being appropriately reduced to
2  their estimated net realizable value that you
3  didn't believe was true at the time you signed
4  it?
5  MR. JONES:  Object to form.
6  A.   I don't know.  I'd have to read it
7  word for word.
8  Q.   Would you mind doing that?
9  A.   "Fairly described or properly
10  recorded in the accounting records."
11  Maybe we should have put 3(a), Dear
12  Bill, Dionisio insisted on recording that damn
13  IBM building despite our advice to the contrary
14  and you're going to break the tie.  Thanks.
15  Is that material?  Yes, six, seven
16  million dollars.  Is it properly recorded?  No.
17  He overrode Al Adamczak, who has more
18  accounting brains than Joe will ever have.
19  So -- I mean, I bet there's -- you could
20  probably look through every little nitpicky
21  item here and say, you know, is there anything
22  in here that could be an issue.
23  But the issues are to be resolved
24  by our independent auditors.  All we have to do
25  is give them the information they need to make

Page 730

1  an informed judgment.  But I hope we have title
2  to all assets.  We put provisions in for
3  obviously inventories.
4  I mean, the general sense of the
5  letter is here they are to the best of our
6  abilities.  We need your help now to assess
7  presentation, fairness and break ties on
8  certain issues.
9  Q.   Are there any transactions or
10  agreements that you were aware of when you
11  signed this letter other than the IBM building
12  sale leaseback that you believed were not
13  fairly described or properly recorded in the
14  accounting record?
15  MR. JONES:  Object to form.
16  A.   When did we sign --
17  MR. JONES:  And foundation.
18  A.   -- Iqbal, February '96, is that
19  right?  No.  Carol Calvert, hell, no.  Are they
20  going to listen to me?  No.  Will they listen
21  to Bill Buettner?  Maybe.  I don't know.
22  Q.   So you believed at this time in
23  September 1996 that the agreements relating to
24  Miss Calvert and to Iqbal Paroo were recorded
25  improperly?

54 (Pages 727 to 730)

Stephen Spargo

Page 787

SIGNATURE OF WITNESS

1
2
3
4
5
6      The deposition of STEPHEN H.
7  SPARGO, taken in the matter, on the date, and
8  at the time and place set out on the title page
9  hereof.
10      It was requested that the
11  deposition be taken by the reporter and that
12  same be reduced to typewritten form.
13      It was agreed by and between
14  counsel and the parties that the Deponent will
15  read and sign the transcript of said
16  deposition.
17
18
19
20
21
22
23
24
25

Page 788

AFFIDAVIT

1
2  The State of Ohio,  )
3               ) SS:
4  County of Cuyahoga  )
5
6
7
8      Before me, a Notary Public in and for
9  said County and State, personally appeared
10  STEPHEN H. SPARGO, who acknowledged that he/she
11  did read his/her transcript in the
12  above-captioned matter, listed any necessary
13  corrections on the accompanying errata sheet,
14  and did sign the foregoing sworn statement and
15  that the same is his/her free act and deed.
16      In the TESTIMONY WHEREOF, I have hereunto
17  affixed my name and official seal at this
18  day of          A.D 2003.
19
20
21
22      Notary Public
23
24
25      My Commission Expires:

Page 789

DEPOSITION ERRATA SHEET

1
2
3  RE:    OFFICIAL COMMITTEE OF UNSECURED
4       CREDITORS, ETC.    VS.
5       PRICEWATERHOUSECOOPERS, LLP
6  RRS File No.:    7472
7  Deponent:    STEPHEN H. SPARGO
8  Deposition Date:  NOVEMBER 4, 2003
9
10  To the Reporter:
11  I have read the entire transcript of my
12  Deposition taken in the captioned matter or the
13  same has been read to me.  I request that the
14  following changes be entered upon the record
15  for the reasons indicated.  I have signed my
16  name to the Errata Sheet and the appropriate
17  Certificate and authorize you to attach both to
18  the original transcript.
19
20
21
22
23
24
25

69 (Pages 787 to 789)

Page 790

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
   Plaintiff,
  vs.                          Civil Action
PRICEWATERHOUSECOOPERS,               No. 00-684
LLP,
   Defendant.


   Continued Videotaped Deposition of
STEPHEN H. SPARGO, called for examination under
the Applicable Rules of Federal Civil
Procedure, taken before me, Michele E. Eddy, a
Registered Professional Reporter and Notary
Public in and for the State of Ohio, pursuant
to notice and stipulations of counsel, at the
offices of Manion McDonough, 600 Grant Street,
Suite 1414, Pittsburgh, Pennsylvania, Ohio, on
Wednesday, the 5th day of November, 2003, at
10:00 a.m.

    - - - - -

    VOLUME 4


    - - - - -

Stephen Spargo                                                                    Volume 4

Page 827

1  117, right?
2      A.   That is correct.  You're right.
3      Q.   Does reviewing Exhibits 116 and 117
4  refresh your recollection that, in fact, the
5  general accounting department at AHERF did
6  calculate and book a bad debt allowance at the
7  Delaware Valley hospitals at year-end fiscal
8  year 1996 based on bad debt formula reserving
9  methodology?
10     MR. JONES:  Object to form and
11 foundation.
12     A.   That certainly appears that's what
13 has happened, yes.
14     Q.   And then provided those amounts to
15 Coopers & Lybrand to audit, right?
16     MR. JONES:  Same objection.
17     A.   Yes, it appears so.
18     Q.   Do you recall ever telling Bill
19 Buettner or anybody else at Coopers & Lybrand
20 that you believed that the bad debt allowances
21 at the Delaware Valley hospitals, that the
22 general accounting department at AHERF had
23 provided Coopers & Lybrand to audit, were
24 understated?
25     MR. JONES:  Object to form and

Page 828

1  foundation.
2      A.   No, I don't recall those -- those
3  exact words, no.
4      Q.   You had conversations, I gather,
5  with Coopers & Lybrand where you told them that
6  you had concerns about how the patient billing
7  department was doing and you felt they weren't
8  collecting cash well, right?
9      A.   I did have those, yes.
10     Q.   But you can't recall conversations
11 where you said to anybody from Coopers &
12 Lybrand I think the bad debt reserve is wrong,
13 I think the financial statements are misstated
14 or anything like that, right?
15     MR. JONES:  Object to form.
16     A.   I did not say it like that, no.
17     Q.   You can't recall saying it in any
18 other way that would have conveyed that
19 message, can you?
20     MR. JONES:  Object to form.
21     A.   Yeah.  Our A/R includes junk.  I
22 don't know how you're going to get satisfied
23 with it this year.  But I know you do your own
24 little testing.  We have past statute accounts.
25 We have PATCOM crap that we've inherited.  We

Page 829

1  need help more than sending Norb in from
2  Harrisonburg or wherever he came from.  We've
3  got some serious problems here.
4      Q.   Do you have any reason to believe
5  that the 17 and a half million dollar
6  adjustment made as a result of the Coopers &
7  Lybrand fiscal year 1996 audit was not an
8  adjustment sufficient to state the bad debt
9  allowances at the Delaware Valley hospitals
10 fairly at fiscal year-end?
11     MR. JONES:  Object to form.
12     A.   Do I believe it was not sufficient?
13     Q.   Do you have any reason to
14 believe -- do you have any reason as you sit
15 here today to believe that that adjustment was
16 insufficient?
17     MR. JONES:  Same objection.
18     A.   Yes.
19     Q.   What reason is that?
20     A.   Dan Cancelmi's September 20th memo
21 to me and the September 24th memo and my
22 handwritten note to David McConnell.
23     Q.   Before you received Mr. Cancelmi's
24 September 20th, 1996 memo, and perhaps
25 conversations with Dan in the days leading up

Page 830

1  to that memo, did you have any reason to
2  believe that the bad debt reserve at the
3  Delaware Valley hospitals with the 17 and a
4  half million year-end adjustment was
5  insufficient?
6      MR. JONES:  Same object as asked
7  and answered.
8      A.   Yes.
9      Q.   What reason is that?
10     A.   None of this was a new problem.  We
11 knew we had issues in accounts receivable that
12 predate September 20th.
13     I don't want to keep harping on
14 past statute and PATCOM and accounts at gross
15 and different issues, but we knew they were
16 there.
17     How much?  It was secondary to we
18 weren't doing a good job at billing and
19 collecting cash.
20     So the 17 million or 17 and a half,
21 or whatever adjustments were posed, were
22 adequate for Mr. Buettner to get comfortable.
23 If he could recharacterize the CRA reserve to a
24 bad debt reserve to help ensure that the
25 reserve was more reasonably stated, fine.

11 (Pages 827 to 830)

Stephen Spargo                                                                          Volume 4

Page 831

1  That's okay.
2        My issue wasn't with the adequacy
3  of the reserves other than the fact that
4  that -- that might allow us to heighten the
5  ineptitude of our PFS&G group because, as I
6  said yesterday, I had the dubious distinction
7  of dealing with Mr. Deci and cash. Cash is
8  king. Today, too, in both of our lives and at
9  work, so --
10       Q.   Now, Bill Buettner isn't shown as
11  being copied on Mr. Cancelmi's September 20th,
12  1996 memo marked as Exhibit 1683, right?
13       A.   I don't believe he is.
14       Q.   Nor is anyone else from Coopers &
15  Lybrand shown as getting copies, right?
16       A.   I assume not. I can look at that
17  page.
18            No, sir, just Mr. Morrison, Snow
19  and Robin Schaffer.
20       Q.   Who are all AHERF people?
21       A.   Correct.
22       Q.   The same is true of Mr.
23  Mr. Cancelmi's memo dated September 24th, 1996
24  marked as Exhibit 1450, again, neither Mr.
25  Buettner nor anybody else from Coopers &

Page 832

1  Lybrand is shown as being copied, right?
2        A.   Correct.
3        Q.   Do you recall providing
4  Mr. Buettner a copy of Mr. Cancelmi's September
5  20th memo?
6        A.   No, I don't recall.
7        Q.   Do you recall providing a copy of
8  that memo to anyone at Coopers & Lybrand?
9        A.   No.
10       Q.   Do you recall providing
11  Mr. Buettner a copy of Mr. Cancelmi's September
12  24th memo?
13       A.   No.
14       Q.   Do you recall providing that memo
15  to anyone at Coopers & Lybrand?
16       A.   No.
17       Q.   I think we saw yesterday that the
18  management representation letter that you and
19  others in management at AHERF signed and
20  returned to Coopers & Lybrand was dated
21  September 20th, 1996, right?
22       A.   Correct.
23       Q.   When you signed that management
24  representation letter and provided it to
25  Coopers & Lybrand, did you tell Coopers &

Page 833

1  Lybrand about this series of memos from
2  Mr. Cancelmi?
3        A.   No, not that I recall.
4        Q.   Even though you felt in your mind
5  that the series of memos from Dan Cancelmi cast
6  doubt on the adequacy of the bad debt reserves
7  at June 30th, 1996?
8        A.   Yes.
9             MR. RYAN: Why don't we take a
10  break.
11            THE VIDEOGRAPHER: Going off the
12  record at 11:22.
13            (Recess had.)
14            THE VIDEOGRAPHER: Going back on
15  the record at 11:32.
16       Q.   Mr. Spargo, if you wouldn't mind
17  keeping out Exhibit 122, which was the
18  handwritten schedule, 17 and a half million
19  dollars in adjustments.
20       A.   Okay.
21       Q.   And looking at that in conjunction
22  with some pages from Exhibit 10.
23       A.   Okay.
24       Q.   If we could start with the page
25  with the Bates number ending in 1363.

Page 834

1        A.   Okay.
2        Q.   Do you see down on the second half
3  of this page there's a listing of certain CRA
4  reserves and capitalized interest and PP&E
5  reserves and then a notation in the margin,
6  adjustments to June 1996?
7        A.   I see that, yes.
8        Q.   And the reserves look fairly
9  similar to the list of reserves in Exhibit 122?
10            MR. JONES: Object to form.
11       A.   They look darn near identical.
12       Q.   And then up at the top of Bates
13  page 1363 in Exhibit 10 is a notation
14  apparently next to some CRA reserves that
15  reads, "Joe wants to switch these." Do you see
16  that?
17            MR. JONES: Object to form.
18       A.   I do.
19       Q.   Do you recognize the handwriting on
20  this page?
21       A.   Yes, that's Dan Cancelmi's
22  handwriting, I believe.
23       Q.   Let me show you one other page here
24  in this exhibit. It's 1368. It's a page
25  headed CRA entries, June 30th, 1996.

Stephen Spargo                                                              Volume 4

Page 923

1    were appropriate might well change?
2         MR. RYAN: Objection.
3         Q.   Is that fair to say?
4         A.   It might well change?
5         Q.   If you had the underlying data,
6    potentially your view of the appropriateness of
7    these actual reserves at establishment might
8    change?
9         A.   Potentially, yes.
10        MR. RYAN: Same objection.
11        A.   Potentially, yes.
12        Q.   In other words, you didn't have
13   enough information in front of you today given
14   that the events are several years in the past
15   to really pass judgment on the appropriate --
16   appropriateness of the amounts of reserves at
17   establishment?
18        MR. RYAN: Objection.
19        A.   That's correct.
20        Q.   Indeed, Mr. Spargo, you've been
21   shown over the course of the last two days of
22   your testimony several multi-page documents,
23   the entirety of which you did not have the
24   opportunity to review, is that right?
25        A.   Oh, yes.  Yes, definitely.

Page 924

1         Q.   In fact, you know from your
2    business experience and common sense that
3    sometimes your view of the content of a
4    document might change if the opportunity to
5    review it in full was given to you; is that
6    fair to say?
7         A.   Oh, yes.  Yes.
8         Q.   For instance, you didn't review
9    every line item in the two SUDs, Coopers &
10   Lybrand's SUDs that you were given this
11   morning, did you?
12        A.   I did not.
13        Q.   Or yesterday morning?
14        A.   No, I did not.
15        Q.   You don't feel qualified as you sit
16   here today to pass judgment as an accountant on
17   the appropriateness of any of those SUD
18   entries; is that also fair to say?
19        MR. RYAN: Objection.
20        A.   Yes, it is.
21        Q.   You don't consider yourself today
22   and didn't in fiscal years '95, '96 and '97 an
23   expert on the nuances, subtleties or even the
24   general rules that apply to Coopers & Lybrand's
25   SUDs; is that accurate?

Page 925

1         A.   That's accurate.
2         Q.   Mr. Spargo, I'm not going to ask
3    you to try to recall the entirety of
4    conversations you had a few years ago now with
5    Mr. Buettner at the time, at or about the time
6    of the closing of the fiscal year 1996 audit
7    work.
8         However, you were asked some
9    questions about that this morning by Mr. Ryan.
10   I think you said you could not recall with
11   certainty that you told Mr. Buettner that the
12   bad debt reserve at DVOG was understated during
13   those conversations, but you did say that you
14   recalled informing him that there were serious
15   problems, that there was junk, I think was the
16   word you used, in the accounts.
17        Do you recall that testimony?
18        A.   Yes, I do.
19        Q.   Among other things?
20        A.   Yes, yes.
21        Q.   Is it fair to say that your best
22   recollection today is that you conveyed
23   information to Mr. Buettner in those
24   conversations that you thought was sufficient
25   to inform him that the bad debt reserve at DVOG

Page 926

1    was understated at year-end fiscal year 1996?
2         MR. RYAN: Objection.
3         A.   Yes.
4         Q.   Is there any doubt in your mind
5    that he understood that based on the
6    information conveyed to him by you?
7         MR. RYAN: Objection.
8         A.   Not a speck.
9         Q.   Not a --
10        A.   Not a speck of doubt, no.
11        Q.   Thank you.
12        Mr. Spargo, you were shown a series
13   of management representation letters by
14   Mr. Ryan over the last couple of days.
15        Do you recall that testimony?
16        A.   I do.
17        Q.   You were also shown I think as
18   perhaps the last one the management
19   representation letter that coincided with the
20   fiscal year 1996 audit.
21        Do you recall that?
22        A.   I do.
23        Q.   You were asked to review it and
24   tell Mr. Ryan things that came to your mind
25   that you believed to be untrue.

Stephen Spargo                                                                                    Volume 4

Page 927

1      Do you recall that?
2      A.   Yeah.  Not in accordance with GAAP
3   I think may have been the question.
4      Q.   You recited certain things that you
5   did indeed believe to be inaccurate.  Is that
6   fair to say?
7      A.   Yes.
8      Q.   Is it also fair to say that you
9   have not had the benefit over the last few days
10  to review all of your testimony either in SEC
11  proceedings or in this case to help you -- help
12  refresh your recollection with respect to what
13  you might find inaccurate in that
14  representation letter today, is that right?
15     A.   Yes, that is correct, yes.
16     Q.   Indeed there may be more there that
17  you might find inaccurate had you had such an
18  opportunity?
19     A.   There indeed may be more, yes.
20     Q.   Is it also accurate -- strike that.
21        Is there any doubt in your mind
22  that Coopers & Lybrand knew about the
23  inaccuracies that you did happen to point out
24  today -- or yesterday in your testimony with
25  Mr. Ryan in regard to the management

Page 928

1   representation letter for fiscal year 1996 --
2      MR. RYAN:  Objection.
3      Q.   -- that they knew the underlying
4   facts?
5      MR. RYAN:  Objection.
6      A.   Oh, yes, they knew, sure.
7      Q.   They knew those facts from
8   conversations with you and your staff?
9      MR. RYAN:  Objection.
10     A.   Yes, yes.
11     Q.   And through documents provided to
12  them?
13     MR. RYAN:  Objection.
14     A.   Absolutely.
15     Q.   And from access to other
16  information, electronic and otherwise?
17     MR. RYAN:  Objection.
18     A.   Yes.
19     Q.   Telling them what they already knew
20  to you would seem unnecessary; is that fair to
21  say?
22     MR. RYAN:  Objection.
23     A.   Well, yeah.  They already knew it.
24     Q.   And you believed they did?
25     A.   I know they did.

Page 929

1      Q.   You were asked a question about a
2   particular paragraph in that September 20, 1996
3   management representation letter relating to
4   accounts receivable and whether or not they had
5   been reduced to their net realizable value.
6      Do you recall that testimony?
7      A.   I do.
8      Q.   In that testimony, you used the
9   phrase that at some point the ball was then in
10  somebody else's court.
11     To whom did you refer when you used
12  that metaphor, if you can recall?
13     A.   I don't know.  I assume Coopers,
14  but I don't know.
15     Q.   I'm going to ask you to look at the
16  audited financial statements for the fiscal
17  year 1996, briefly, and I think you'll find
18  them at Exhibit 1228.
19     Exhibit 1228.
20     A.   Oh, boy.
21     Q.   I'm going to just briefly ask you
22  to turn to the Bates stamped page 1578, which
23  is the consolidated balance sheet.  78 is the
24  balance sheet?
25     A.   Yes.

Page 930

1      Q.   You were asked about a million and
2   a half dollar figure regarding cash
3   equivalents.  Do you recall that?
4      A.   I do.
5      Q.   We've heard testimony in this case
6   from others about the fact that there may be a
7   reason not to have a lot of cash on hand during
8   the market environment, that is the securities
9   market environment that prevailed in the mid
10  1990s, and that being invested was a preferred
11  way to hold sums.
12     Do you recall that being a strategy
13  at AHERF and other hospitals at the time?
14     A.   Yes.
15     MR. RYAN:  Objection to the
16  introduction.
17     A.   Yes, especially if you have a line
18  of credit available to you.
19     Q.   The reason you say that is why?
20     A.   Many times the cash you show is
21  actually zero and your operating line of credit
22  provides the cash to meet your day-to-day
23  disbursement needs.
24     Q.   So you could keep your money,
25  invest it in earning, interest, dividends, or

36 (Pages 927 to 930)

Stephen Spargo                                                          Volume 4

Page 951

```
 1   objection        939    15
 2   object           940     9
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 953

```
 1              AFFIDAVIT
 2   The State of Ohio,  )
 3                       ) SS:
 4   County of Cuyahoga  )
 5
 6
 7
 8      Before me, a Notary Public in and for
 9   said County and State, personally appeared
10   STEPHEN H. SPARGO, who acknowledged that he/she
11   did read his/her transcript in the
12   above-captioned matter, listed any necessary
13   corrections on the accompanying errata sheet,
14   and did sign the foregoing sworn statement and
15   that the same is his/her free act and deed.
16      In the TESTIMONY WHEREOF, I have hereunto
17   affixed my name and official seal at this
18   day of          A.D 2003.
19
20
21
22          Notary Public
23
24
25          My Commission Expires:
```

Page 952

```
 1        SIGNATURE OF WITNESS
 2
 3
 4
 5
 6      The deposition of STEPHEN H.
 7   SPARGO, taken in the matter, on the date, and
 8   at the time and place set out on the title page
 9   hereof.
10      It was requested that the
11   deposition be taken by the reporter and that
12   same be reduced to typewritten form.
13      It was agreed by and between
14   counsel and the parties that the Deponent will
15   read and sign the transcript of said
16   deposition.
17
18
19
20
21
22
23
24
25
```

Page 954

```
 1        DEPOSITION ERRATA SHEET
 2
 3   RE:     OFFICIAL COMMITTEE OF UNSECURED
 4           CREDITORS, ETC.      VS.
 5           PRICEWATERHOUSECOOPERS, LLP
 6   RRS File No.:    7472
 7   Deponent:       STEPHEN H. SPARGO
 8   Deposition Date:   NOVEMBER 5, 2003
 9
10   To the Reporter:
11   I have read the entire transcript of my
12   Deposition taken in the captioned matter or the
13   same has been read to me. I request that the
14   following changes be entered upon the record
15   for the reasons indicated. I have signed my
16   name to the Errata Sheet and the appropriate
17   Certificate and authorize you to attach both to
18   the original transcript.
19
20
21
22
23
24
25
```

42 (Pages 951 to 954)

**Spielvogel Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## RICHARD L. SPIELVOGEL, M.D.,
*May 19, 2004*

---

## *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**SPIELVOGEL, M.D., RICHARD L.**



LEGALINK
A WORDWAVE COMPANY