Richard L. Spielvogel, M.D.

vote to continue them. And I don't know the exact answer, but it had been many years, in the range of eight to ten years.

Q. Now, as a trustee for AHERF, why would it be important to you to have auditors who would review the information presented by management for GAP compliance, for example?

MR. FRIESEN: Objection.

A. From my viewpoint, the function of those types of auditors are to certify that the -- not that the information they have given is correct information, but that with the figures that they're given from management, to assure that the statements about the financial health of the company are a correct interpretation of the actual finances, and then also to make sure that the reporting of those meets the legal standard.

Q. When you say "legal standard," what are you referring to, sir?

A. What I think I'm referring to is the fact that finances, profit and loss, monies in, monies out, have to be reported to the government and to certain certifying bodies in

Richard L. Spielvogel, M.D.

a standard format that meets -- that's generally acceptable principles.

Q. The GAP principles you mentioned earlier?

A. The GAP principles.

Q. And as a trustee, why would that certification be important to you?

MR. FRIESEN: Objection.

A. It's important to me because I have virtually no knowledge of these accounting principles and so forth. And since I don't or didn't suspect that people were lying or providing false information, I had no reason to suspect that, I felt that it was another reassurance that the numbers as bad as they were getting were correct, were a correct display of what was actually going on.

Q. Is it fair to say then that you would rely upon Coopers & Lybrand during your tenure as an AHERF trustee to perform its duties competently as an auditor?

A. Oh, yes.

Q. And to perform its duties with integrity during the course of an audit?

Richard L. Spielvogel, M.D.

A. Yes.

Q. Did you have any understanding of what interaction AHERF's audit committee had with Coopers & Lybrand during the course of the annual audit?

A. No, I don't have a full understanding. They certified the local information provided with them and I assume would answer questions if there were questions.

Q. So in a general sense, you understood as far as the AHERF organization was concerned, the audit committee was the primary contact with the auditors?

A. Yes, and probably the chief executive -- probably Sherif and the other people yes, McConnell.

Q. As well as senior financial management; correct?

A. Yes.

Q. And senior financial managers in your view would include whom?

A. McConnell and a fellow Chuck -- somebody out here in the east. I've forgotten

Richard L. Spielvogel, M.D.

his last name. He was the person we usually dealt with as McConnell's messenger. And in each organization, there was sort of a CFO.

Q. Would it be Charles Morrison?

A. Morrison. That's it.

Q. Dr. Spielvogel, have you ever heard the term "clean opinion" in the context of an annual audit report?

A. Yes.

Q. What's your understanding of that term?

A. My understanding, which may or may not be right, is that the auditing company such as Pricewaterhouse says that based upon the information that was provided to me, the financial statements are correct in the way they're presented and we certify that or somehow approve it.

Q. During the course of your tenure as an AHERF trustee, do you ever recall receiving anything other than a clean opinion from the external auditors?

A. No. I don't know that every time they said it was a clean opinion, but I don't

Richard L. Spielvogel, M.D.

recall anybody questioning any of their opinions or assessments of the numbers.

Q. You mentioned earlier today that one way in which you would use quarterly financial information presented by management would be to gauge how the system was performing on an ongoing basis; correct?

A. Yes.

Q. Can you tell me how, if at all, you as a trustee would use the annual audited financial statements to gauge the system's financial performance?

A. Well, as I remember, I didn't use them too much because we by the time the annual audited statement came out, we were already in the next quarter or possibly had seen the next quarter. And so they were to me just a restatement of what we had already seen in the past and sort of old news you might say but a legal necessity that had to be done.

Q. If during the course of their audit work Coopers & Lybrand had discovered information that they believed called into question the internal financial data that had

Richard L. Spielvogel, M.D.

been distributed, would you have wanted to know that?

MR. FRIESEN: Objection.

A. Yes, I would have liked to have known.

Q. And why would that type of disclosure be important to you?

A. Well, I'm not sure I would have done anything with it, but the natural thing would be we would then question our senior management at these meetings as to why there was this discrepancy and how did they explain the discrepancy or you would expect them to present it to us too.

Q. Them being whom?

A. Well, if there was -- both sides. You would expect the auditors to present it to us and the senior management to say there was a discrepancy.

Q. If you had learned during the course of Coopers & Lybrand's audit let's just say in 1996, for example, that they had discovered what they considered to be material misstatements in the information presented by

Richard L. Spielvogel, M.D.

management, would that be a matter of concern to you?

A. Yes.

MR. FRIESEN: Objection.

Q. And you certainly wouldn't have ignored such disclosures; correct?

MR. FRIESEN: Objection.

A. I certainly wouldn't have ignored them. What I would have done with the information, I'm not sure.

Q. You would have asked questions of management? Do you believe your practice would have been to have asked questions of management?

MR. FRIESEN: Objection; calls for speculation based on the prior answer.

A. My belief, probably I would have asked Sunstein and Palmer what should I do with this because we were always under the threat of -- an implied threat of repercussions with your job and status and title. So whether it's the fault of myself or not, I might not have stood up at the meeting.

Richard L. Spielvogel, M.D.

I certainly would have said to somebody what's the meaning of this, you know, what should be done.

Q. And the two trustees you just mentioned were two of those who had more financial experience than you had?

A. In my opinion, they did.

Q. And would that be one of the reasons you would go to them if you had concerns about the financial statements?

A. Yes. And I also considered them more than any other trustees friends, people I could talk to about affairs without going on the record.

Q. Now, you mentioned a moment ago you felt you may have been under an implied threat?

A. Yes.

Q. Was there any statements made by any managers at AHERF actually threatening that you could suffer repercussions if you spoke out?

A. No, there was not a threat like that.

Richard L. Spielvogel, M.D.

would run through your mind at that point in time.

Q. And they ran through your mind as early as 1995?

A. Yes, as early or probably shortly after I took that position with the clinical practice group and realized that Dr. Atkinson had wanted this very much. And she told me I think at some point that Dr. Kaye and Mr. Abdelhak were not greatly in favor of doing anything that coordinated the doctors or had the potential to make the doctors a lobby or a political entity. They weren't so much afraid of our clinical practice. They were afraid of actually all the doctors getting together as a single force.

Q. Becoming a power base?

A. Becoming a power base. That's what they were mainly afraid of.

MR. FRIESEN: I don't have anything else.

MR. UNICE: I just have two followups.

BY MR. UNICE:

Richard L. Spielvogel, M.D.

Q. During the course of your tenure as an AHERF trustee, did you ever have a personal belief that financial management was cooking the financial records?

A. No.

Q. And if, in fact, that was being done, as a trustee, would you have wanted to know that?

A. Yes.

MR. UNICE: That's all I have.

MR. FRIESEN: Thanks.

MR. UNICE: Before you leave, you want to advise him of his right to read and sign?

MR. FRIESEN: Yes.

You have a right to receive a copy of the transcript and to read it and to sign it if it's okay. And if there are any transcription mistakes, not that you want to change your answers, but if there are any mistakes in the court reporter's typing up of your answers, then you can correct them. You have the right to do that or you don't have to do

Richard L. Spielvogel, M.D.

that. You can waive that right. It's totally up to you.

THE WITNESS: I'd like to do it just so I can remember what I said in case there are additional -- I don't want to contradict myself with the vague stuff, so for that purpose.

MR. FRIESEN: We can just send that to your home?

THE WITNESS: Just send it to the same address on the letter which I put away. You can send it to my home too if you'd like. Also you can send it to the address this was sent to.

MR. FRIESEN: Okay. Good. Thanks.

THE VIDEOGRAPHER: That now concludes this videotape deposition and Tape No. 2; the time, 12:53.

(Whereupon the deposition adjourned at 12:55 p.m.)

- - -

I have read the foregoing transcript of my deposition given on May 19, 2004, and it is true, correct, and complete, to the best of my knowledge, recollection, and belief, except for the corrections noted hereon and/or list of corrections, if any, attached on a separate sheet herewith.

______________________________
RICHARD L. SPIELVOGEL, M.D.

Subscribed and sworn to before me this ____ day of _____________, 2004.

___________________________
Notary Public

**Stevens Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

***DAVID C. STEVENS***
***February 10, 2004***

---

***LEGALINK MANHATTAN***
***420 Lexington Avenue - Suite 2108***
***New York, NY 10170***
***PH: 212-557-7400 / FAX: 212-692-9171***

STEVENS, DAVID C.



department shared my views.
Q. And that's reflected here in Exhibit 2314, the e-mail from Ms. Strayer to Mr. Mathis with respect to Howard County, correct?
MR. WITTEN: Objection.
A. I think it certainly is reflected in Strayer's comment. Yes.
Q. Ms. Strayer's comment, "I guess we are not getting more conservative in light of AHERF"?
A. Yes, and also the 3 rated, underlined. What she's undoubtedly suggests is the deal was misrated a 3 and it should have been rated something much less than that.
Q. Misrated by individuals at MBIA's new business side?
A. Yes. I think that's -- you'd have to look into this, I can't. But it appears to me from reading this that the new business side rated a triple B minus rated S&P credit, which typically would result in a 5 or 6 rating from MBIA, that would be the equivalent for us, 5 or 6, was rated a 3, equivalent to an A. In their mind -- because there is a line of credit running

to the hospital was not factored in by S&P. So in the mind of the new business analyst, as I read this e-mail, this was a better credit than S&P thought and Karleen reflects that when she under lines 3 rated. She doesn't agree with 3. She thinks it should have been probably a 5 or 6.
Q. Based on your experience in the surveillance department and as the head of that department, did you believe that MBIA's new business side tended to assign ratings to credits that weren't entirely accurate?
MR. BROWN: Objection. Go ahead and answer.
A. I think they did on some occasions. I couldn't give you a scientific answer that they did it on the majority of the occasions or a minority of the occasions or a third of the occasions. But remember that the credits that I tended to get in touch with were the ones that ended up being 8. That was mainly what I did.
And so in that small universe of credits, what you had typically was a long history, by definition, since the credit got to

that point, those are the credits that had a long history of inaccurate assumptions on the part of MBIA. To say, though, what you said, which is there was a systemic overrating of credits, I'm not prepared to say that by the new business analysts. The credits that slipped into 8, which were a tiny minority of all the credits, were probably overrated. Because if they had been rated accurately someone with some sort of pressing would have said oh, this is an 8, let's not do it.
Q. Let me show you what we previously marked as Exhibit 1898.
A. Okay.
Q. Mr. Stevens, do you recall writing this letter, Exhibit 1898, along with Mr. McCool in the early July 1998 time frame?
A. Yes. I remember the letter. I don't know if I wrote it. It might have been McCool who drafted it and we might have made a couple of comments. But I remember the letter now that you put it in front of me.
Q. Do you recall who developed this proposal? In other words, was it you, was it

Mr. McCool, was it both of you, was it someone else?
A. It was probably a group of people, including me, McCool, Strayer, Mathis, possibly David Hunter from the Hunter Group, possibly our attorneys. I can't remember all the people, but generally something like this is done by a large group of people. You don't have two guys doing this in a vacuum. There's usually quite a bit of volume from a lot of different constituencies.
Q. Do you recall why these amounts are referenced, 160 million, not more than 50 million which was to be available through August 15th, 1998?
A. I don't remember why that was done that way.
Q. The third paragraph begins, "We have heard that the AHERF board has recently expressed strong reservations with respect to making the credit of the west available to support the east." Do you see that?
A. Yes.
Q. Does that statement and the statements in that paragraph following that

opening sentence refresh your recollection in any way as to the position of the board with respect to making AHERF's western assets available to support the east?
A. Yes, it does. When you started asking me these questions -- this has been kind of the pattern all afternoon, that a lot of things you asked me about I haven't remembered and when you put the thing in front of me I remember. So yes, the answer is yes.
Q. Do you recall why it was that the board was not willing to make AHERF's western assets available to support the eastern assets?
MR. WITTEN: Objection as to foundation.
A. I couldn't possibly tell you that. How would I know what the board was thinking? So I guess the answer is no, I don't know why the board said no.
Q. No one at AHERF, be it a board member or a member of senior management, communicated to you why the board rejected this proposal?
A. Certainly not any board member. I can tell you what we thought. We thought that

the AHERF board was coming to the realization that they had a train wreck in the east and they didn't want to have two train wrecks, one in the west as well. So they decided to tie a tourniquet around the diseased part of the system and let it die.
Q. I take it you mean that it's your view that AHERF's board decided to put certain AHERF affiliates into bankruptcy to protect the assets of AHERF's western affiliates?
A. Yes. That's what we believed. But again, if you're asking me why the board did something, I can't answer it. I can only tell you what we believed.
Q. Had the board made AHERF's western assets available to support the east, do you believe that the bankruptcy filing could have been forestalled or avoided?
MR. BROWN: Objection. Go ahead and answer.
A. I think it would have been at least postponed.
Q. Why do you say that?
A. It would have taken a while for -- I

mean, I don't know what would have happened. But at the very least, if there were new assets and cash flows coming in to support the debt, it would have taken a while for both systems to degrade to the level of the east system. I think the west system did degrade over time. I think after I left I believe I heard that the west system was downgraded into the, what, the C range or something like that. So probably it would have just been postponed. Not avoided. But that's just guesswork on my part.
Q. Was the idea that interim financing for the DVOG or a pledge of assets from the western entities would provide enough time for AHERF to sell off one or more of the DVOG hospitals?
A. That was part of the idea because there was an active marketing going on trying to sell the hospitals.
Q. And is it your recollection that an entity known as Vanguard had expressed some interest in possibly purchasing one or more of the DVOG hospitals?
A. Yes.

Q. Do you recall a proposal by MBIA for AHERF to sell off the entire system, not just certain assets in the east?
A. No, I don't.
Q. Let me show you this last document and then we'll take a break.
A. Okay, I remember it now.
Q. Mr. Stevens, I believe you have in front of you Exhibit 1642, is that correct?
A. Yes.
Q. What is it that you now recall having reviewed this document?
A. I recall that I drafted this letter along with Pat Mathis on behalf of Dick Weill. We tried to elevate this. It was pretty much I think a last ditch effort to keep them from filing bankruptcy. We had engaged Goldman Sachs to help us with the sale of the system.
Basically the appeal was at a high level with respect to all this language about healthcare service delivery and education in Pennsylvania to try to appeal to the civic responsibilities of the board and in effect put the financial welfare of the west at some risk in

to what steps MBIA might have taken if it had been given additional information about the financial condition of AHERF and/or its affiliates at an earlier point in time?

MR. WITTEN: Aside from his eight years of experience?

A. I don't know what other personal information I could have other than my eight years of experience. I don't understand the premise of the question.

Q. Did you ever see a document that MBIA put together outlining steps it would take if there was a covenant violation at the DVOG?

A. I don't recall.

Q. Did you ever put together such a document?

A. I don't recall.

Q. Did you direct anyone to put together such document?

A. I don't recall.

Q. Mr. Stevens, thank you, I think that's all I have for now.

MR. WITTEN: I have no questions.

MR. KRUSKO: I'd like to make a quick

statement on the record. I'd like to keep this deposition open for the simple fact that I don't know that we have been given the monthly surveillance reports and the surveillance manual that Mr. Stevens has testified about. I will go back and investigate those two questions. But right now I'm going to keep this deposition open.

MR. WITTEN: I don't agree to that but we can discuss that not right now but when we review everything.

Q. Thank you again.

THE VIDEOGRAPHER: This concludes the videotaped deposition of David C. Stevens at 6:22 p.m. on February 10th, 2004. We're going off the record.

(TIME NOTED: 6:22 p.m.)

__________________________

DAVID C. STEVENS

Subscribed and sworn to before me this _____ day of __________, 2004.

______________________________________

STATE OF NEW YORK ) Pg__of__Pgs
ss:
COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________

CERTIFICATE

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, SUZANNE PASTOR, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That DAVID C. STEVENS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this ____ day of ___________, 2004.

__________________________

SUZANNE PASTOR

**Stickler Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *DANIEL L. STICKLER*

*May 9, 2003*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

STICKLER, DANIEL L.

LEGALINK®

A WORDWAVE COMPANY

DANIEL STICKLER

is that right, to the best of your memory?

A. That's my recollection, and then I thought I made a mistake when I read this, but now I go back to my recollection.

Q. And as to the package for the whole set of Philadelphia region hospitals, to the best of your recollection, that fell through sometime around the bankruptcy, you recalled before, but maybe it was after; is that right?

A. No. I'm thinking, now that I read these minutes, that this proposal was part of the package of filing for bankruptcy, and that the bankruptcy counsel wanted and did receive what they called a stalking horse bid, and I recollect now, I think, it's very fuzzy, that that's what this was. But I'm not positive.

Q. Could you explain what your understanding is of a stalking horse bid, or is that some term that's unique to AHERF, as far as you are concerned?

A. I think it's a term that's unique to the bankruptcy process. My understanding of it was that it created a base for other proposals, but that's about as much recollection as I have

DANIEL STICKLER

on that.

Q. When you say a base for other proposals, did you mean that you had an understanding that the Vanguard bid would sort of be publicly known and other bidders in the bankruptcy process would have to beat that bid, essentially?

A. Whether it was publicly known, I don't know. I don't recall.

Q. But you recall that was the deal on the table --

A. I recall at some point in time there was discussion about a stalking horse bid, and Vanguard did put in a bid that was considered the stalking horse bid. That's about as much as I recall about it.

Q. And in terms of the general recollection you have of a meeting where there was video conferencing between Allegheny General Hospital on the west and I assume Hahnemann University on the east, do you have any recollection of what that meeting was about?

A. Only what I recall -- you know, what these minutes tell me.

DANIEL STICKLER

Q. I mean, does looking at these minutes refresh your memory at all, or are you able to see what's on them?

A. It makes me think that this must have been it, but I don't know whether I would testify that this was it based on that.

Q. You don't have any recollection of your own at this point?

A. No.

MR. TERUYA: I would like to mark as Exhibit 1554 a document with Bates numbers HUNT 4502 through 4505, dated June 16, 1998. It seems to be an engagement letter between The Hunter Group and AHERF dated June 16, 1998.

(Deposition Exhibit 1554 for identification, document Bates stamped HUNT 4502 through HUNT 4505.)

A. Okay.

Q. Do you recognize this document?

A. I see it and read it. I'm sure I saw it before, but I don't recall.

Q. Does this appear to you to be the engagement letter between The Hunter Group and AHERF?

DANIEL STICKLER

A. It appears to be the engagement letter between The Hunter Group and AHERF relative to the interim management services. I think I stated to you earlier that there was performance improvement planning responsibility. I had thought that was all in one engagement letter. There must have been separate engagement letters, is all I can conclude, because I don't see it mentioned here.

Q. I will just mention, I have a series of engagement letters, and I was just trying to understand the differences between them. So I am taking out new ones, and if you are wondering what I am doing.

So does this appear to be the initial engagement letter between AHERF and The Hunter Group?

A. It appears to be, yes.

Q. Do you see the signature on page 4 of the document of Larry Scanlan?

A. Yes.

Q. Was he the president of The Hunter Group at the time?

A. Yes.

Page 146

DANIEL STICKLER

Q. Is he still the president of The Hunter Group, to the extent there is one, at present?

A. I don't know what his exact title is now.

MR. D'ANGEL: He's a managing director at Navigant. He's a Navigant employee now.

Q. Back at the time in 1998, did Larry Scanlan have any kinds of involvement in the AHERF engagement, other than signing off the engagement letter, to your knowledge?

A. Not to my knowledge. He may have had in relationship to David Hunter, but I don't recall in relationship with me.

Q. And do you recognize this to be his handwriting on page 4?

A. No.

Q. You don't know?

A. No.

Q. But you don't have any reason to believe that this is not the engagement letter?

A. No.

Q. And at this point in time, is it

Page 147

DANIEL STICKLER

correct that this was an engagement letter just for services by you and David Hunter in terms of providing interim management services?

A. That's what I see here, yes.

Q. And at the time do you know why or what was the objective in terms of obtaining interim management services from The Hunter Group, if you know?

A. If I'm not mistaken, this was within days after the departure of Sherif and Donald Kaye, the eastern regional executive, and they were trying to plug a hole, I think.

Q. Do you remember who contacted whom? Did AHERF contact The Hunter Group, or vice versa?

A. I don't know. I was riding down the Coraner Turnpike in Ohio with my wife when I got a call on my cell phone that said can you be in Philadelphia Monday morning.

Q. That was on a Friday, you said, they gave you a call, and said be at work on Monday?

A. Friday or Saturday.

Q. And you were in Ohio, you said, at the time?

Page 148

DANIEL STICKLER

A. Yes.

Q. Was that on a different engagement?

A. No, I was visiting my in-laws.

Q. At that time you were still residing down in Florida?

A. Yes.

Q. Did you have to move up to Pennsylvania for the AHERF engagements?

A. No. I got a corporate apartment there in town, and used that, and went home on weekends when I could.

Q. Were most of the members of the engagement team from The Hunter Group who worked at AHERF residents of Pennsylvania?

A. I couldn't even --

Q. Or put differently, were there a lot of people who were in the same boat as you, coming from Florida to Pennsylvania, or were there lots of people who were from Pennsylvania?

A. Our people are scattered to live all over the country, and live wherever they want to, and fly to work Monday morning. And one guy on the engagement was from New Jersey, and he drove in. I think he drove in every day most of the

Page 149

DANIEL STICKLER

time, and drove back. There was another guy that I think his residence was in Philadelphia, in the Philadelphia area, who drove in and back.

I'm trying to think who else was there. I don't even remember. Honan's residence was in Florida at the time, I think.

Q. Were there any individuals other than yourself who had had management experience in Pennsylvania in terms of running hospitals, who were on the engagement team?

A. Well, David Hunter, of course. Alan Dzija was on the engagement team and had had experience in the Philadelphia area. I don't remember whether he had -- he worked for one of the consulting firms. I don't know whether he had direct hospital experience or not. I don't recall others.

Q. Was David Hunter actually on the engagement team, or did he just arrange for the engagement to occur and then left it to you?

A. He spent some time there. I couldn't tell you exactly how much. But he spent some time there, and he also spent some time on the phone with me relative to it. But my

DANIEL STICKLER

today were three. Going off the record. The time is 3:12 p.m.

______________________
DANIEL L. STICKLER

Subscribed and sworn to before me this _____ day of _________, 2003.

________________________________

DANIEL STICKLER

STATE OF NEW YORK )
ss:
COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE ___ ___
CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ________________________

______________________
DANIEL L. STICKLER

Subscribed and sworn to before me this _____ day of ________, 2003.

________________________________

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, JACK FINZ, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That DANIEL L. STICKLER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this ____ day of ___________, 2003.

______________________
JACK FINZ, C.S.R.

E X H I B I T S

DESCRIPTION PAGE LINE

(Deposition Exhibit 1550 for identification, document bearing Bates numbers HUNT 4821 through HUNT 4857.)...... 7 18

(Deposition Exhibit 1551 for identification, document Bates stamped SA 309, 24 pages.)........................ 44 8

(Deposition Exhibit 1552 for identification, document Bates stamped PR-MM-06-1925 through PR-MM-06-1932.)..... 85 21

(Deposition Exhibit 1553 for identification, document bearing Bates numbers GOV 53486 through GOV 53492.).... 139 17

(Deposition Exhibit 1554 for identification, document Bates stamped HUNT 4502 through HUNT 4505.)............ 144 15

(Deposition Exhibit 1555 for identification, document Bates stamped HUNT 4493.).............................. 151 7

(Deposition Exhibit 1556 for identification, document Bates stamped HUNT 4547 through HUNT 4549.)............ 151 21

(Deposition Exhibit 1557 for identification, document bearing Bates stamps HUNT 4500 and HUNT 4501.)......... 155 12

(Deposition Exhibit 1558 for identification, document Bates stamped HUNT 4494 through HUNT 4498.)............ 163 20

(Deposition Exhibit 1559 for identification, document entitled "Summary Cover Sheet, Fees and Expenses Application," consisting of 96 pages.)................................ 167 21

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *DANIEL L. STICKLER*
*May 28, 2003*

---

*LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

STICKLER, DANIEL L.

LEGALINK
A WORDWAVE COMPANY

Page 372

DANIEL L. STICKLER

that was still being paid a significant salary sometime after he ceased serving that role, that I would have had some serious concerns about had I been the CEO.

Q. What was that person's name?

A. I knew you were going to ask me that. I can't think of it. That's one example that comes to my mind.

Q. Was that person being paid while you were there?

A. Until we found it and stopped it, yes.

Q. Have you ever heard of the name Carol Talbert?

A. I have, yes.

Q. And in what capacity have you heard of the name Carol Talbert?

A. She was on the corporate staff at one point in time. I don't think she was still there when I got there. She had -- I don't even remember exactly what -- I can't think exactly what her responsibilities were, whether it was physician practice acquisition or management of physician practices. I can't remember what her

Page 373

DANIEL L. STICKLER

responsibilities had been.

Q. Did you ever hear anything about the circumstances of her separation from AHERF?

A. No, I don't recall having heard that. I heard rumors surrounding her name, but those were all very much hearsay and history, and I don't think something that I could quote.

Q. Did you ever hear that she received a $1.6 million settlement to depart AHERF?

A. I don't think I ever heard that, no. I don't think so.

Q. Did you ever hear that she got a consulting contract that paid her $300,000, but that she didn't provide any services in exchange for that contract?

MR. TERUYA: Objection.

A. I don't think so. I assume those things all had happened prior to my arrival there, and, to be honest with you, I wouldn't have paid any attention to them if I had heard them if they were history.

Q. What were the rumors surrounding the name Carol Talbert that you referred to a few minutes ago?

Page 374

DANIEL L. STICKLER

A. Relative to potential personal relationships.

Q. That she was having affairs? Did you hear rumors that she was having an affair with someone else within AHERF?

A. I heard rumors that she had a close personal relationship with someone else within AHERF.

Q. Okay, we will leave it at that. It's already on the record.

Have you ever heard the name Iqbal Paroo?

A. I have, yes.

Q. In what capacity?

A. He was the president of AUHS prior to AHERF acquiring -- he was president of Hahnemann, I guess, prior to AHERF acquiring AUHS, and I think he remained in that role for some time period after they acquired it. I'm not certain.

Q. Did you ever learn or hear anything about the circumstances surrounding of Mr. Paroo's departure from AHERF?

A. No, I did not.

Q. Did you ever hear that he was paid a

Page 375

DANIEL L. STICKLER

settlement payment for $3 million to release a claim for intentional infliction emotional distress?

A. No, I did not.

Q. Did you ever have any conversations with trustees of AHERF where they indicated that they had known all along that AHERF's financial condition was far worse than the audited financial statements indicated?

MR. TERUYA: Objection.

A. I don't think I did, no.

Q. If you, meaning The Hunter Group, had been on the scene 18 months earlier, say in December of 1996, do you believe that you could have implemented a turnaround plan and avoided bankruptcy?

MR. TERUYA: Objection.

A. Yes, I believe we could have, yes.

Q. And what do you base that belief on?

A. I don't know that I could tie it to specifics, other than my understanding of the organization and the expense reductions that we felt we could make when we put that 30,000-foot plan together. It would have required some

DANIEL L. STICKLER

difficult decisions to be made, but I believe it could have been done.

Q. Is your belief also based in part on your experience in the hospital field?

A. Oh, obviously, yes.

Q. And is your belief based in part on other experience that you have had with other turnarounds?

A. Yes.

Q. And is your belief based in part on what experience that The Hunter Group, not just you, has had in other hospital turnarounds?

A. I guess to some extent.

MR. WITTEN: Let's go off the record for a minute and I will see if I have any more questions.

THE VIDEOGRAPHER: We will go off the record. It is 11:44. And this is tape 5.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record. It is 11:48, and this is tape 5.

BY MR. WITTEN:

Q. Mr. Stickler, I don't have the Tenet asset purchase agreement here, but I notice

DANIEL L. STICKLER

there's a provision in that asset purchase agreement relating to the fact that some of the monies, some of the purchase price, is going to be used to purchase malpractice insurance tails for the hospitals or the physicians. I don't, frankly, recall which. Do you remember anything about the discussion about the purchase of medical malpractice insurance tails?

A. I recall that the absence of any malpractice coverage was considered by Tenet to be an obstacle to their acquisition, because they were concerned that liability from previous cases may end up accruing to them in the absence of any insurance, and there would not have been any insurance or any way to buy insurance had that not been done.

Q. Was there an absence of insurance covering the AHERF eastern region or some of its assets?

A. My recollection is that there was an offshore insurance company, that there was a question about there being enough assets to cover potential liabilities, and that's one of the reasons why this tail purchase was considered to

DANIEL L. STICKLER

be necessary.

Q. This offshore is a subsidiary of AHERF, the parent?

A. That's my understanding, yes.

Q. Did AHERF go out and purchase its own insurance policies, or did that sub purchase reinsurance?

A. I couldn't answer that question for you.

MR. WITTEN: I don't have any other questions.

MR. TERUYA: I don't know what you folks want to do in terms of scheduling. I probably have about maybe 45 minutes or so to an hour of followup. I don't know if you want to take a quick lunch and come back. It's up to you.

THE WITNESS: Let's do it and get it over.

EXAMINATION BY MR. TERUYA:

Q. Earlier this morning you were talking about your experiences at Cedars Medical Center. Do you recall that?

A. Yes.

DANIEL L. STICKLER

Q. That's located down in Florida?

A. Miami, Florida.

Q. And did you previously mention that one of the steps you take -- on day one of your deposition did you mention that one of the steps that you would take in trying to come up with a turnaround plan and to judge its feasibility would be to study the market conditions in which a hospital operates, if you were going to try to turn around a hospital?

A. That would be one of the steps, yes.

Q. And I take it you have never performed any comparison of the market conditions in Florida as they existed while you were in charge of Cedars Medical Center and the market conditions in Philadelphia at the time you were there --

A. We never did a comparison of that, no.

Q. And as you mentioned before, you didn't perform any study of the market conditions in Philadelphia because you didn't have time?

A. That's right. There were reports of a market analysis that had been done by AHERF

Page 440

DANIEL L. STICKLER

THE VIDEOGRAPHER: We are going off the record. It's 1:03. This is tape 5.

(Discussion off the record.)

THE VIDEOGRAPHER: Back on the record. It's 1:04, tape 5.

MR. TERUYA: I have no further questions on redirect.

MR. WITTEN: Thank you. I just have a handful of questions. It shouldn't take very long.

EXAMINATION BY MR. WITTEN:

Q. Mr. Teruya elicited testimony from you comparing and contrasting the AHERF system from the University of Pennsylvania system.

A. Yes.

Q. You recall that?

A. Yes.

Q. And you testified that the Allegheny University of the Health Sciences is not as prestigious a university as the University of Pennsylvania Medical School; is that right?

A. That's correct.

Q. And was it also your testimony that the hospitals that make up AHERF were not as

Page 441

DANIEL L. STICKLER

prestigious as the Hospital of the University of Pennsylvania and Pennsylvania Hospital?

A. That's correct.

Q. Even taking into account the reputation -- excuse me, let me start that over.

Taking into account your understanding of the reputation of AHERF, lower generally than the University of Pennsylvania system, does that alter your view about whether a turnaround was achievable for AHERF?

MR. TERUYA: Objection.

A. No.

Q. Turning to the 30,000-foot plan that we have referenced this day and the last day, I believe I know the answer but I want to make sure the record is clear on this, of all the exhibits that you looked at, that I have shown you and Mr. Teruya has shown you, is it right that you did not recognize any of the documents or any part of the documents that you looked at, that we drew your attention to, as memorializing that 30,000-foot plan?

A. I did not recognize them as a specific document that I had seen before. As to

Page 442

DANIEL L. STICKLER

whether the contents of that document is exactly what we put together back then, I couldn't testify.

Q. And is that in part because of the passage of time?

A. Yes, mainly because of the passage of time.

MR. WITTEN: I don't have any other questions.

MR. TERUYA: I don't have any other questions. Thank you for your time.

THE VIDEOGRAPHER: We will go off the record. The time is 1:06. And this is the end of Tape No. 5.

(Time noted: 1:06 p.m.)

______________________
DANIEL L. STICKLER

Subscribed and sworn to before me this _____ day of _________, 2003.

__________________________________

Page 443

DANIEL L. STICKLER

STATE OF NEW YORK )
ss:
COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE ___ ___
CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________
___ ___ CHANGE FROM: ________________
CHANGE TO: ________________
REASON: ____________________

____________________
DANIEL L. STICKLER

Subscribed and sworn to before me this ____ day of ________, 2003.

**Strayer Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

*KARLEEN STRAYER*
*March 14, 2005*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**STRAYER, KARLEEN**



Page 18

KARLEEN STRAYER

Exhibit 2803 a document with Bates numbers HLAH 0015757 through 69.

(Deposition Exhibit 2803 for identification, Committee Bylaws, production numbers HLAH 0015757 through 69.)

Q. If you can just take a moment, Ms. Strayer, to take a look at Exhibit 2803 and let me know if this document is familiar to you.

A. Yes, it is familiar.

Q. Is this a copy of the bylaws of the Committee?

A. Yes.

Q. I note on page 12 of this document there is a section for an attestation it's called where there are blanks where this could be dated and signed by the law firm of Jones Day. Do you see that?

A. Yes.

Q. Do you know whether that ever occurred?

A. I don't.

MR. RYAN: Could I request, Jesse, that if there is a sign or perhaps the term is attested copy of the bylaws of the Committee

Page 19

KARLEEN STRAYER

that we could be provided with it.

MR. WITTEN: Sure. Okay.

INFORMATION REQUESTED TO BE SUPPLIED:

------------------------------

Q. Now this appears to be from October 1998 as you can see by the blank attestation block on page 12 of the exhibit. Do you know whether there have been any changes since that time frame to the bylaws of the Committee?

A. I don't recall.

Q. Would you turn, please, to page 3, section 1.6 which is entitled Chairpersons. There is a reference there to what I think you already have testified to, which is that a meeting held on July 30, 1998 the Committee elected MBIA and Aetna as its co-chairpersons; is that right?

A. Yes.

Q. Let me ask you, Ms. Strayer, a question as designee of MBIA. Do you consider MBIA to be a co-chair for the other bondholders or for all of the creditors?

A. For all of the creditors.

Q. In acting on behalf of MBIA on the

Page 20

KARLEEN STRAYER

Committee, do you attempt in any way to advance the interests of MBIA and the other bondholders?

MR. WITTEN: Objection. You can answer it if you can.

A. Could you repeat the question.

Q. Sure. In acting on behalf of MBIA on the Committee, do you attempt to advance the interests of MBIA and the other bondholders?

A. No. I mean just to clarify, there was a point in time when we were specifically negotiating in the Global Settlement Agreement how MBIA would be treated. In those cases we would have discussion that would obviously represent MBIA's interests, but in general that's the only time I can think of that we were representing MBIA's interest versus the full Committee's.

Q. So there were discussion that took place to arrive at a global settlement where MBIA and other bondholders had interests that differed from those of the vendor creditors; is that right?

A. We had a different security position so it was a discussion to determine how

Page 21

KARLEEN STRAYER

things would be allocated given those security positions.

Q. Did those discussions take place at meetings of the Committee or at separate meetings?

A. There was a Subcommittee formed to discuss that.

Q. What was the name of that Subcommittee? Or how did you refer to that Subcommittee, is there some sort of designation or subject matter that you would use to refer to it?

A. There may have been at the time. I don't recall if there was a name given to that Subcommittee. I am sure there was some sort of name attached to it, but I don't recall the name of it now.

Q. But it is a Subcommittee to deal with the issue of security interest that the bondholders have?

A. That, right. That MBIA and PNC had.

Q. Was there a separate Subcommittee formed to deal with the security interest that

Page 22

KARLEEN STRAYER

the Centennial bondholders have?

A. I don't believe so.

Q. Just to be clear, I am asking you now as a representative of the Committee, who were the members of this Subcommittee on security interests of the DVOG bondholders?

A. I don't recall, but MBIA was not on that Committee. It was the -- people on the Subcommittee were determining the Committee's position toward MBIA and PNC's view of the securities, so we had, it was not appropriate for us to be on that Committee.

Q. I see. So this was, in effect, a Subcommittee from which MBIA and PNC were recused from being members of?

A. Yes. Yes.

Q. And were there then, in your understanding, separate meetings where this Subcommittee of the Committee had negotiations with representatives of MBIA or PNC?

A. Yes.

Q. Were you personally involved in any of those negotiations?

A. Yes.

Page 23

KARLEEN STRAYER

Q. On behalf of MBIA?

A. Yes.

Q. Well, let me then ask you as a representative of MBIA who do you recall being involved in the negotiations between MBIA and PNC on the one hand and the Committee on the other hand?

A. I am almost certain David Heiman was there as a representative, not as a representative but as providing advice to that Subcommittee.

Q. He is a lawyer from the law firm of Jones Day?

A. Yes. I am quite sure a representative from Aetna was there, but other than that I can't recall who was on that Subcommittee.

Q. Is the individual from Aetna the same person whose name you could not recall earlier?

A. I remember Aetna being there because they obviously being a co-chair of the Committee were important to these kind of discussions. I do not recall who specifically

Page 24

KARLEEN STRAYER

from Aetna was at that meeting.

Q. Who was there on behalf of MBIA and PNC?

A. I was there. I don't recall who from PNC was there.

Q. And what were the subjects of those negotiations?

A. We were simply negotiating how we would be treated in terms of distributions coming out of the AHERF estate, given our security position.

Q. Was there a dispute over what the amount of the security interest for MBIA and PNC should be?

A. Over the amount? I would say over the percentage.

Q. What do you mean by that?

A. Well, I'm not sure at the time we were having these discussions that there was the view that the estate proceeds would fully cover what we felt to be our claim.

So, the discussions were primarily being held because there were issues regarding the language within the documents concerning our

Page 25

KARLEEN STRAYER

security and the strength of that language. And that is really what the dispute revolved around.

So, we eventually came up with a resolution to that which, I know was outlined, I don't know if it was in the Global Settlement Agreement or in one of the documents it is outlined what the outcome was. But it basically, I think, ultimately we came up with an amount. But it was basically how we resolved what percentage MBIA would get of what we felt our secured claim was.

Q. Was there an effort made to value the accounts receivable?

A. I think by the point in time we were having these conversations that was a number that was either known or the majority of it was known. And we were relying on the professionals to provide us with that information.

Q. Do you know who provided you with that information?

A. I can't say specifically right now who provided that. It was, we had our attorneys helping us out and also had accountants helping

Page 26

KARLEEN STRAYER

us out as well.

Q. Was there a professional retained specifically by MBIA and PNC to represent their separate interests in valuing the accounts receivable for purposes of the security interest?

A. No.

Q. To your knowledge of professionals who were used, were ones who were retained by the Committee as a whole?

A. Yes.

Q. Did you ever consider whether that posed a conflict of interest?

A. Well, I think we obviously, the disagreement had to do with how any proceeds from receivables were split up. Not what the ultimate amount was.

I think MBIA's view was that we had faith in the numbers that were coming out of the Committee's professionals and that wasn't the number that was at dispute. It was simply of that amount, how did that get carved up.

Q. Was there then a dispute over whether the legal documents in fact gave MBIA

Page 27

KARLEEN STRAYER

and PNC a security interest or not?

A. There was disagreement over how clear the language was in that regard.

Q. And there were members of the Committee other than MBIA and PNC who were arguing the language was unclear; is that right?

A. Yes.

Q. And that as a result MBIA and PNC should not have a security interest?

A. I don't know if they were -- that's possible. They may also have indicated that it was simply impaired to some degree.

Q. Impaired meaning that it would be lesser amount?

A. Less. Less than 100 percent of it, yes.

Q. At the time you were involved in these negotiations did you understand that the greater the security interest that MBIA and PNC got, the smaller the amount of recovery for other creditors would be?

A. Yes.

Q. Did you feel that that conflict of interest among members of the Committee affected

Page 28

KARLEEN STRAYER

how the Committee then as a whole dealt with other issues later on?

MR. WITTEN: Objection.

A. No. I would say not. Not at all.

Q. Returning to asking questions as representative of the Committee, could you turn, please, to page 6. And specifically section 2.7. Do you see that section begins "While all Committee members acknowledge that they are acting in a fiduciary capacity as defined by law?" Do you see that?

A. Yes.

Q. And do you agree that members of a Committee of Unsecured Creditors are required by law to act in a fiduciary capacity?

A. Yes.

Q. What is your understanding of what that term means?

A. That by acting in a fiduciary capacity the members of the Committee have the responsibility to follow the bylaws and represent all of the unsecured creditors, whether they are on the Committee or not on the Committee.

Page 29

KARLEEN STRAYER

Q. Do you agree that members of a Committee of Unsecured Creditors may not use their positions as Committee members to advance only their individual interests?

A. Yes.

Q. Are you aware of any instance in which you believe a member of the Committee has done that?

A. I'm not aware of any, no.

Q. Do you see the next section on the same page of Exhibit 2803, section 2.8 is entitled Conflict of Interest?

A. Yes.

Q. The first sentence reads "Each Committee member shall disclose any conflict of interest with respect to any matter under consideration by the Committee?" Right?

A. Yes.

Q. Do you recall such disclosure having been made at any point in the meetings of the Committee?

A. A conflict of interest? There were people -- it was not unusual at all for people to abstain from voting on various points brought

KARLEEN STRAYER

issue?

A. I think our view was we wanted it to represent fairly the value behind the various assets. I don't think any of us on the Committee would have thought that Houlihan Lokey was there to somehow represent us over and above anyone else. So they presented what they thought was reasonable and we could agree or disagree with it.

Ultimately most of the things that mattered to the Committee came up for a vet and we voted on it. So there was no one Committee member or members that could drive a decision one way or another necessarily.

Q. Did the Trustee for the Centennial bond holders state at meetings of the Committee whether they had any separate advisors who were advising them individually on this issue?

A. I vaguely recall that they had other advisors. I couldn't give you any details on it. But I do vaguely recall they had other people they were talking with.

Q. Let me ask you as representative of MBIA, did MBIA and PNC have their own separate

KARLEEN STRAYER

advisors on this issue of the allocation of the Eastern region sale of assets between the obligated groups?

A. Given the time frame here at which we were taking these notes, this was not a huge issue in our mind. Our focus was on getting as much value as possible for the sale of the assets. And it was a compressed time frame. A lot of moving parts and our focus really was, MBIA's focus was really on that. And not so much how things got divided among the pieces.

That was something that, I guess we assumed could be worked out at a later date.

Q. Okay. At any point in time in the AHERF bankruptcy process did MBIA and PNC have separate advisors, apart from Houlihan Lokey, that is advisors who were advising you separately on this issue of the allocation of the sale proceeds between obligated groups?

A. I don't recall that we did, no.

Q. Going back to asking you now as a representative of the Committee, you made a reference to the ultimate consolidation of estates; is that right?

KARLEEN STRAYER

A. Yes.

Q. Is it the case that in the bankruptcy plan that was adopted and remains in effect today there is a lower rate of payout to creditors of Centennial than to creditors of the other estates?

A. A lower rate of payout? I believe that's true.

Q. Is that lower rate of payout to creditors of Centennial a reflection of a determination that Centennial had more liabilities in relation to its assets than did the other debtors?

A. I think there were a lot of things that went into it. Again, we relied on our professionals to help lead us through what would be fair in that regard.

Q. What factors did go into the lower rate of payout in the bankruptcy plan to Centennial creditors?

A. Well, I know they had, just in terms of the agreement, I mean obviously they were -- there was a part of the proposal determined how much of certain distributions

KARLEEN STRAYER

went to MBIA and PNC versus Centennial. And within those distributions Centennial did get less. Part of that had to do with the view of what the value of those assets was worth.

I believe part of it was just the amount of debt the Centennial bondholders had versus MBIA and PNC was less.

They also had some other sources of recovery that were outside of the estate as well.

So, I mean ultimately that was based on the professionals and based on what Centennial would accept that that was the agreement that everyone agreed to in the end. I can't tell you specifically how that was determined.

Q. Who was involved in working out that agreement?

A. Our professionals were involved. By agreement, I guess could you clarify which agreement you mean?

Q. Sure. Who was involved in working out the agreement as embodied in the bankruptcy plan that creditors of Centennial would get a

Page 106

KARLEEN STRAYER

lower rate of payout than creditors of the other estates?

A. I think it was primarily a combination of Jones Day and -- it was Jones Day. I am not sure at that point in time if some of the other professionals had also advised Jones Day.

Q. Jones Day is counsel to the Committee as a whole; is that right?

A. Yes.

Q. I am not sure I understand then how counsel to the Committee as a whole could be involved in negotiations over an agreement as to what the relative rate of payouts to creditors in the different estates would be. Aren't there different interests on the two sides there?

A. There are different interests, but in this specific example, Centennial would have been negotiating for their own interests. And Jones Day would have been looking out for the Committee interest.

Similar to when MBIA and PNC worked out their agreement, Jones Day was on the other side, we understood that as we talked with Jones

Page 107

KARLEEN STRAYER

Day at that point in time they were representing the Committee as a whole. They weren't representing us in any way.

Q. So it is your understanding then that Jones Day took the lead negotiating to protect the interests of creditors of the other four estates, that is the non-Centennial estates?

A. Well, they were, their responsibility was to ensure that the agreement that was reached was fair based on their due diligence. Yeah, I guess, you know, they were trying to negotiate something that was to the benefit of the estate overall.

Q. In the understanding of the Committee was Jones Day trying to negotiate an agreement that was for the benefit of creditors of all five estates, including a consideration of the interests of Centennial creditors or was Jones Day trying to negotiate a deal that was as favorable as possible for creditors of the four non-Centennial estates?

A. At the point all of this is happening this is also as the estates are being

Page 108

KARLEEN STRAYER

consolidated so that is why I am having a little trouble answering this question. That when these agreements were laid out they are within the document where the whole consolidation is laid out as well.

So, I guess I don't quite know how to answer that because Centennial had their representatives.

Q. Who was that?

A. I don't know. I wasn't a party to those discussions.

Q. Isn't it the case that if a creditors of DVOG would not have accepted a consolidation in which Centennial creditors got paid out at the same rate as DVOG creditors?

A. I would assume so.

Q. And in the bankruptcy plan that was adopted creditors of Centennial get paid out at 30 percent of the rate at which creditors of the other four estates get paid out; right?

MR. WITTEN: Objection.

A. That roughly sounds right.

Q. You made a reference earlier to certain amount that creditors of Centennial

Page 109

KARLEEN STRAYER

could recover outside the bankruptcy process; is that right?

A. Yes.

Q. And to what were you then referring?

A. I believe they had another suit of some sort going on where they expected fairly significant recovery.

Q. That was a lawsuit brought on behalf of the Centennial bondholders against the successor entity to the Graduate Health System; is that right?

A. Yes.

Q. Known as a Philadelphia Healthcare Trust; right?

A. That sounds right.

Q. Now that is a lawsuit that was being brought only on behalf of the Centennial bondholders; right? Not on behalf of other creditors of Centennial?

A. I'm not really familiar with the details of that.

Q. Was there a decision at the Committee on the topic of whether the vendor

KARLEEN STRAYER

STATE OF NEW YORK ) Pg 1 of 1 Pgs

ss:

COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE

116 15 CHANGE: "Ron" to "Ram"

REASON: incorrect name

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____

____ ____ CHANGE: ____

REASON: ____