# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## KARLEEN CARLSON STRAYER
*October 8, 2003*

---

# LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

CARLSON STRAYER, KARLEEN



Page 22

```
1        KARLEEN CARLSON STRAYER      10:31:03
2     A.   Two, two primary ways:  One is by  10:31:10
3  very diligent monitoring of the credit's    10:31:13
4  performance over time; and the second is that  10:31:15
5  when the transactions are underwritten, there  10:31:18
6  are various covenants put in place that allow  10:31:20
7  us certain rights and remedies in the event    10:31:25
8  there is a problem.              10:31:27
9     Q.   What was your position when you    10:31:37
10 joined the Surveillance Department in December  10:31:38
11 of 1992?                  10:31:40
12    A.   I was the vice-president in the     10:31:42
13 Healthcare Group.              10:31:43
14    Q.   Do you recall how many groups      10:31:46
15 there were in the Surveillance Department      10:31:47
16 department at this point in time?          10:31:53
17    A.   Not exactly; maybe six, something  10:31:55
18 like that; at least, we have a public finance  10:31:57
19 side and a structured finance side and the     10:32:02
20 public finance side, which is where I was,     10:32:05
21 probably had about six.            10:32:07
22    Q.   You mentioned that you were, you   10:32:09
23 joined MBIA as a vice-president:  What were    10:32:11
24 the other positions within the Healthcare      10:32:14
25 Group at that point in time?          10:32:15
```

Page 23

```
1        KARLEEN CARLSON STRAYER      10:32:15
2     A.   In terms of the other individuals  10:32:18
3  in the group?              10:32:20
4     Q.   Not specifically individuals'     10:32:21
5  names, I'm just trying to gain a sense in     10:32:24
6  terms of the titles of people who worked in    10:32:26
7  the group at that point in time; in other     10:32:29
8  words, you were a vice-president.  I take it    10:32:31
9  there was a director?            10:32:33
10    A.   We didn't have that title in 1992.  10:32:34
11    Q.   Okay.                10:32:36
12    A.   I can't recall the exact title     10:32:38
13 structure but I believe in the Healthcare      10:32:40
14 Group there was one other vice-president, and  10:32:43
15 I reported to a vice-president who was      10:32:46
16 actually part-time in the Utility Group,       10:32:50
17 part-time in the Healthcare Group, and then    10:32:55
18 there were two other more junior analysts and  10:32:57
19 I don't recall their titles.          10:33:02
20    Q.   Who were the two other junior      10:33:14
21 analysts, that you recollect?          10:33:15
22    A.   Their names?              10:33:17
23    Q.   Yes.                10:33:18
24    A.   Leo Roland and Susan Epstein.      10:33:18
25    Q.   And who is the other        10:33:23
```

Page 24

```
1        KARLEEN CARLSON STRAYER      10:33:23
2  vice-president that you're recollecting?       10:33:25
3     A.   Rich Quimby.              10:33:28
4     Q.   Who was the vice-president to whom  10:33:29
5  you reported?              10:33:31
6     A.   Tim McKeon.              10:33:34
7     Q.   What were your responsibilities in  10:33:37
8  this position as vice-president?          10:33:40
9     A.   To monitor the healthcare      10:33:42
10 portfolio and certain credits within the       10:33:45
11 healthcare portfolio and, over time, to        10:33:48
12 remediate various credits.            10:33:53
13    Q.   How were you given assignments?    10:34:00
14    A.   My manager would assign various    10:34:05
15 credits to me.              10:34:07
16    Q.   When you say "manager," did you    10:34:14
17 mean the vice president to whom you reported,  10:34:14
18 Mr. McKeon?                10:34:16
19    A.   Mr. McKeon and Mr. Quimby.        10:34:16
20    Q.   During your, let's say, first two  10:34:27
21 years as a vice-president in the Surveillance  10:34:29
22 Department, do you recall working on any      10:34:32
23 Pennsylvania- or New Jersey-based healthcare   10:34:35
24 credits?                  10:34:40
25    A.   In the first two years, '90 --     10:34:41
```

Page 25

```
1        KARLEEN CARLSON STRAYER      10:34:41
2     Q.   '93 to '94, yes.            10:34:45
3     A.   '93 to '94... Yes.          10:34:48
4     Q.   Which credits do you recall      10:34:55
5  working on in this time frame?          10:34:56
6     A.   The primary credit that became my  10:34:59
7  responsibility during that time that was in    10:35:01
8  that area was Sacred Heart Hospital, but there  10:35:03
9  -- actually, I should point out during that    10:35:09
10 time I became manager of the group and then    10:35:11
11 the group's staffing changed significantly; so  10:35:13
12 I was basically responsible for the entire     10:35:17
13 healthcare portfolio during that time.        10:35:20
14    Q.   You mentioned "Sacred Heart";      10:35:24
15 that's in Norristown, Pennsylvania?        10:35:27
16    A.   Yes.                10:35:29
17    Q.   Do you recall any other        10:35:30
18 Pennsylvania- or New Jersey-based healthcare   10:35:30
19 credits that you worked on in this time frame,  10:35:34
20 '93, '94?                  10:35:35
21    A.   In terms of -- well, I was      10:35:38
22 responsible for the entire portfolio, so       10:35:40
23 anything that was in our portfolio at the time  10:35:43
24 was my responsibility to ensure that it was    10:35:45
25 monitored; in terms of remedial work, I don't  10:35:48
```

7 (Pages 22 to 25)

Page 26

1         KARLEEN CARLSON STRAYER        10:35:48
2    recall that time period. We did spend a lot  10:35:53
3    of time on Sacred Heart Hospital.        10:35:56
4         Q.    Were these functions split at this  10:36:00
5    point in time; by "functions," I mean      10:36:06
6    monitoring credits and remediation?        10:36:08
7         A.    I don't think I understand the    10:36:14
8    question.                    10:36:14
9         Q.    If I understood you correctly, I  10:36:14
10   believe you testified that when you joined in  10:36:16
11   '92, you had general responsibility to monitor  10:36:18
12   all the existing healthcare credits of MBIA?  10:36:25
13        A.    Well, it wasn't my function in    10:36:27
14   1992 to monitor all the credits; only the    10:36:35
15   credits that I was assigned to monitor.      10:36:35
16        Q.    Let me ask you this: When did you  10:36:35
17   become manager of the Healthcare Group in the  10:36:37
18   Surveillance Department?            10:36:38
19        A.    I believe it was mid-to-late 1993;  10:36:40
20   it might have been earlier; it was some time  10:36:44
21   during 1993.                  10:36:47
22        Q.    And how long did you hold that    10:36:49
23   position?                    10:36:50
24        A.    Till 2001.              10:36:54
25        Q.    And what was your next position?  10:36:59

Page 27

1         KARLEEN CARLSON STRAYER        10:36:59
2         A.    I became head of the new business  10:37:02
3    group, healthcare new business group at MBIA  10:37:05
4    doing originations.              10:37:09
5         Q.    What's your current title?      10:37:12
6         A.    My current title?          10:37:14
7         Q.    Yes.                10:37:16
8         A.    I'm the managing director.      10:37:16
9         Q.    You're the managing director of  10:37:24
10   the Healthcare Group on the new business side,  10:37:26
11   is that right?                10:37:28
12        A.    No. About four, five months ago I  10:37:29
13   became head of the Municipal Structured Group  10:37:31
14   at MBIA; it's basically our housing group.    10:37:34
15        Q.    So as of four to five months ago  10:37:39
16   you no longer handle healthcare credits?    10:37:42
17        A.    That's right.            10:37:45
18        Q.    So I take it then in mid-to-late  10:37:56
19   1993 when you were made manager of the      10:37:58
20   Healthcare Group in the Surveillance        10:38:01
21   Department, at that point in time you were    10:38:03
22   given full responsibility for monitoring all  10:38:05
23   of the healthcare credits that MBIA had at    10:38:07
24   that time?                    10:38:09
25        A.    That's right.            10:38:10

Page 28

1         KARLEEN CARLSON STRAYER        10:38:10
2         Q.    Were you also given responsibility  10:38:11
3    for all of the remediation efforts, if any,    10:38:14
4    that MBIA was undertaking at that point in    10:38:18
5    time with respect to healthcare credits?      10:38:20
6         A.    Yes.                10:38:22
7         Q.    When you became manager of the    10:38:28
8    Healthcare Group in mid-to-late 1993, I      10:38:29
9    believe you mentioned that the Healthcare    10:38:35
10   Group was re-shuffled as a staffing matter, is  10:38:40
11   that right?                  10:38:43
12        A.    Yes.                10:38:43
13        Q.    What was the structure of the    10:38:43
14   group after you joined as manager?        10:38:45
15        A.    After I became manager?      10:38:49
16        Q.    Yes.                10:38:51
17        A.    I had to hire staff for the entire  10:38:52
18   group. I started with an intern who later    10:38:58
19   became an analyst and over time hired a fair  10:39:02
20   number of people.              10:39:05
21        Q.    Who was the individual who started  10:39:08
22   as an intern and later became an analyst?    10:39:10
23        A.    Ethan Parks.            10:39:13
24        Q.    Were there any other analysts --  10:39:16
25   withdrawn.                    10:39:20

Page 29

1         KARLEEN CARLSON STRAYER        10:39:20
2         Did you hire any other analyst in    10:39:21
3    this rough time frame, late 1993 to 1994?    10:39:24
4         A.    1994... I can't recall every one.  10:39:28
5    It was primarily hiring not from the outside  10:39:35
6    but internal moves; so, '93, '94, I suspect I  10:39:37
7    probably ended up with five or so people in my  10:39:44
8    group; maybe more. At one point I had 10 or  10:39:47
9    12 in my group but I don't -- I'm sure it    10:39:50
10   wasn't that many in '93, '94.          10:39:54
11        Q.    At what point in time did you have  10:39:57
12   10 or 12 in your group?            10:39:58
13        A.    Probably around '98 or '99. And I  10:40:01
14   also had responsibilities for some groups    10:40:08
15   besides healthcare, so that's part of the    10:40:11
16   reason my group was larger.          10:40:14
17        Q.    What are the other reasons why    10:40:17
18   your group expanded at this point in time?    10:40:19
19        A.    Meaning other than the additional  10:40:23
20   sectors that were being followed?        10:40:26
21        Q.    Yes. Yes.              10:40:28
22        A.    I think that because of the      10:40:29
23   concern that MBIA had over certain credits in  10:40:34
24   the portfolio, there was additional staffing  10:40:38
25   added to my group.              10:40:41

Page 30

1      KARLEEN CARLSON STRAYER         10:40:41
2      Q.   Do you recall any of those credits  10:40:46
3  during this time frame MBIA had additional    10:40:49
4  concern about?                      10:40:54
5      A.   In '93 or '94?              10:40:54
6      Q.   No, I'm sorry, I thought you were  10:40:55
7  talking about '98.                  10:40:56
8      A.   Oh, '98, '99... There were a    10:40:57
9  number of credits in '98 and '99. I mean,  10:41:05
10  certainly in '98, the AHERF credit was first  10:41:08
11  and foremost, and a number of other credits  10:41:12
12  would have been very aggressively tracked, as  10:41:15
13  well; I don't know if you're looking for names  10:41:19
14  or.                            10:41:22
15      Q.   What were those other credits that  10:41:22
16  were being aggressively tracked as well in  10:41:24
17  this time frame?                    10:41:26
18      MS. HACKETT: I don't know whether  10:41:27
19  or not you've been -- I don't know the terms  10:41:28
20  of the protective order in this case but I  10:41:30
21  think that when she discloses any names of  10:41:34
22  other customers, which I think are wholly  10:41:35
23  irrelevant to this, it should be put under the  10:41:39
24  terms of the protective order in this case, so  10:41:42
25  that this portion of the transcript is marked  10:41:43

Page 31

1      KARLEEN CARLSON STRAYER         10:41:43
2  "confidential."                     10:41:47
3      MR. KRUSKO: Okay.              10:41:47
4      MS. HACKETT: Great.            10:41:48
5      MR. KRUSKO: I'm happy to do that  10:41:49
6  because; obviously, relevancy isn't a viable  10:41:51
7  objection.                         10:41:51
8      MS. HACKETT: I'm just happy --   10:41:53
9      MR. KRUSKO: I'm happy to include  10:41:55
10  whatever clients' she names in this time frame  10:41:56
11  under whatever applicable provisions of the  10:41:58
12  protective order that you would like them to  10:42:01
13  be included under.                  10:42:03
14      MS. HACKETT: Well, is there a    10:42:04
15  protective order entered in this case? I'm  10:42:04
16  assuming there is.                  10:42:07
17      MR. KRUSKO: Why don't I suggest  10:42:08
18  this? Why don't I suggest that I ask her my  10:42:09
19  questions along these lines and during the  10:42:14
20  break we can take a look at the protective  10:42:14
21  order and maybe we can make a stipulation off  10:42:17
22  the record and then go back on the record.  10:42:17
23      MR. WITTEN: There is a protective  10:42:19
24  order that covers the depositions and I don't  10:42:19
25  have it with me.                    10:42:21

Page 32

1      KARLEEN CARLSON STRAYER         10:42:21
2      MR. KRUSKO: I do have it but I    10:42:22
3  don't want to take a break now and look at it  10:42:23
4  because I would like to continue with the  10:42:25
5  questions.                         10:42:26
6      MS. HACKETT: I can't do that. I  10:42:27
7  mean, you're asking her for customer names  10:42:28
8  that have credit issues.              10:42:31
9      MR. KRUSKO: I'm not asking her to  10:42:33
10  disclose that. I'm just asking her for the  10:42:35
11  types of clients. Disclosure is another  10:42:42
12  issue; I'm telling you, we can put that under  10:42:45
13  the protective order.               10:42:45
14      MS. HACKETT: Okay, I don't draw  10:42:45
15  the same distinction between disclosure and  10:42:45
16  testify. To me, once she names them in the  10:42:45
17  public record, they're disclosed, and I would  10:42:45
18  like to have them under a protective order. I  10:42:46
19  appreciate your representation but I don't  10:42:48
20  know what the terms of those are.    10:42:49
21      MR. KRUSKO: Sure. Okay. Let's do  10:42:50
22  this: I will come back to this line of    10:42:51
23  questioning and we'll work it out during the  10:42:54
24  break.                         10:42:57
25      MS. HACKETT: Sure. Perfect.     10:42:57

Page 33

1      KARLEEN CARLSON STRAYER         10:42:57
2      Q.   Am I correct, then, that the    10:42:59
3  group, you know, the Healthcare Group in the  10:43:00
4  Surveillance Department went from roughly five  10:43:03
5  employees in the '92/'93 time frame to about  10:43:05
6  78 employees in the mid-1990s to about ten to  10:43:10
7  12 employees in the 1998/1999 time frame?  10:43:13
8      MR. WITTEN: Objection.          10:43:19
9      A.   That would roughly be what the  10:43:21
10  numbers were, I can't recall exactly. And  10:43:24
11  also, to be more specific, the ten to 12 in  10:43:27
12  the later years was also because we were  10:43:30
13  monitoring not only healthcare but student  10:43:34
14  loans and housing, so we had additional  10:43:35
15  responsibilities in addition to healthcare.  10:43:38
16      Q.   When did your group receive    10:43:41
17  responsibility for student loans and housing?  10:43:45
18      A.   Actually, I believe it was --   10:43:50
19  actually it was probably more like 2001, 2000  10:43:57
20  to 2001. But also, earlier than that they  10:44:01
21  started including something that was called  10:44:16
22  the "pool group," so there was -- so the  10:44:18
23  student loans and housing came in 2000 to  10:44:21
24  2001, probably early 2001; the pool group came  10:44:24
25  prior to that time, and that probably would  10:44:28

9 (Pages 30 to 33)

1      KARLEEN CARLSON STRAYER       14:35:06
2  concerned in the 1996 to 1998 time frame with  14:35:10
3  the costs of the physician practice       14:35:16
4  acquisitions versus the annual costs in    14:35:18
5  supporting the expenses of those practices?  14:35:22
6      A.  That's probably too strong of a    14:35:25
7  statement.  I don't -- I mean, we were very  14:35:27
8  focused on the capital costs but I don't -- I  14:35:30
9  don't think we would have ignored the expense  14:35:33
10  side of the equation either.       14:35:35
11      Q.  So you were very concerned, "you"   14:35:38
12  being MBIA, with both components of the     14:35:40
13  support that DVOG and AGH, the AGH Obligated  14:35:42
14  Group made to AIHG?        14:35:48
15      A.  We were concerned with the amount   14:35:51
16  of support in general that was being required  14:35:53
17  for those physician practices; I don't know  14:35:58
18  that we were specifically differentiating   14:36:01
19  between the two types of support.       14:36:04
20      Q.  Is it your recollection that in    14:36:06
21  this rough time frame, calendar 1995 and    14:36:08
22  calendar 1996, that the support provided by  14:36:13
23  the DVOG and the AGH Obligated Group        14:36:16
24  increased?         14:36:19
25      A.  I don't know.  They were on    14:36:23

1      KARLEEN CARLSON STRAYER       14:36:23
2  fiscal-year basis, so we would have been   14:36:28
3  looking at their financials on a fiscal-year  14:36:31
4  basis, and I actually wasn't reviewing the   14:36:33
5  credit at all in 1995, I, personally was not.  14:36:38
6      Q.  The very last sentence that    14:36:44
7  appears on page A-9 of Exhibit 408 states:   14:36:48
8  For the ten-month period ended April 30, 1996,  14:36:52
9  the total of such support is 38,256,000; do  14:36:55
10  you see that?         14:37:02
11      A.  Yes.        14:37:02
12      Q.  Is that consistent with your    14:37:02
13  recollection as to the level of support that  14:37:03
14  AIHG was receiving in this time frame?      14:37:06
15      MR. WITTEN:  Objection.       14:37:13
16      A.  I don't have a specific numeric   14:37:14
17  recollection of the amount of support.      14:37:15
18      Q.  At any point in time after the    14:37:27
19  DVOG bond offering, did you discuss with    14:37:32
20  anyone at MBIA the condition of the parent   14:37:34
21  company, AHERF, the parent company, in the   14:37:42
22  months leading up to the DVOG offer?        14:37:44
23      A.  No.        14:37:46
24      Q.  Did you ever again after the DVOG  14:37:48
25  bond offering discuss with anyone at MBIA the  14:37:51

1      KARLEEN CARLSON STRAYER       14:37:51
2  condition of the DVOG entities in the months  14:37:56
3  leading up to the DVOG offering?       14:37:59
4      MR. WITTEN:  Objection.       14:38:01
5      MR. KRUSKO:  Just out of curiosity,    14:38:03
6  what's your objection?        14:38:05
7      MR. WITTEN:  I didn't understand     14:38:06
8  the question because there were too many time  14:38:06
9  periods.         14:38:08
10      MR. KRUSKO:  Okay.  I appreciate     14:38:09
11  it.          14:38:10
12      Q.  Again, after the DVOG bond     14:38:12
13  offering, when you, as manager of the       14:38:13
14  Healthcare Group in the Surveillance        14:38:19
15  Department were responsible for the monitoring  14:38:22
16  functions with respect to DVOG, in that time  14:38:23
17  frame, do you recall discussing with anyone at  14:38:25
18  MBIA the condition of the DVOG entities in the  14:38:28
19  months leading up to the DVOG offer?        14:38:31
20      A.  We did review -- subsequent to the  14:38:41
21  bond offering, the audited financial reports  14:38:42
22  came out on DVOG and DVOG and the analyst who  14:38:46
23  assigned to review the credit reviewed those  14:38:53
24  financial reports, and expressed concern over  14:38:55
25  the transfers to the physician group; so,    14:38:58

1      KARLEEN CARLSON STRAYER       14:38:58
2  given that some of those transfers might have  14:39:02
3  occurred during the part of the year before   14:39:04
4  the bond offering, I guess the answer to your  14:39:06
5  question would be yes.        14:39:10
6      Q.  Okay.  Now, I appreciate that.    14:39:12
7  Let me just hopefully conclude with what    14:39:16
8  should be a simple question:       14:39:19
9      Did you ever discuss with anyone     14:39:20
10  at MBIA at any point in time the condition of  14:39:23
11  AHERF during the first half of calendar 1996?  14:39:28
12      A.  Not specifically the first half   14:39:36
13  1996; I'm not sure I ever saw those numbers.  14:39:38
14      Q.  And so I take it you don't recall  14:39:44
15  ever learning whether AHERF, the parent      14:39:46
16  entity, experienced financial difficulties in  14:39:49
17  April 1996?         14:39:53
18      A.  No.  I mean, we -- if we felt they  14:39:56
19  were having financial difficulties, we would  14:40:01
20  not have insured the credit, so clearly, we   14:40:02
21  didn't believe they were having financial    14:40:05
22  difficulties at this point in time.      14:40:08
23      Q.  So it's your belief that MBIA had  14:40:12
24  learned of losses in April of 1996 at AHERF,  14:40:15
25  the parent company, that that would have been  14:40:19

Page 150

```
 1        KARLEEN CARLSON STRAYER       14:40:19
 2  a negative factor in terms of MBIA's decision  14:40:22
 3  to provide bond insurance?            14:40:24
 4      A.   It could have been.  It would      14:40:30
 5  depend, you know; it would be case-specific to  14:40:32
 6  the case and it would depend on the reason for  14:40:37
 7  the losses and the extent of the losses and  14:40:38
 8  how the rest of the system had looked and    14:40:40
 9  whole host of the factors that would go into  14:40:43
10  our thinking on that.               14:40:46
11      Q.   Just so we're clear, is it your    14:40:47
12  recollection that the DVOG was on a June 30  14:40:49
13  calendar year?                    14:40:51
14      A.   Yes.                  14:40:52
15         MR. WITTEN:  Fiscal year.        14:40:54
16         MR. KRUSKO:  Thank you.        14:40:55
17      A.   Fiscal year.             14:40:56
18         MR. WITTEN:  They're in a different  14:40:59
19  universe.                      14:41:00
20      Q.   I believe you testified earlier    14:41:02
21  that some time after the DVOG bond offering an  14:41:03
22  analyst in the Healthcare Group in the      14:41:11
23  Surveillance Department received the FY '96  14:41:12
24  audited financial statements for the DVOG    14:41:17
25  entities?                     14:41:19
```

Page 151

```
 1        KARLEEN CARLSON STRAYER       14:41:19
 2      A.   Yes.                  14:41:20
 3      Q.   Who was that analyst?         14:41:21
 4      A.   Dick Heberton.            14:41:23
 5      Q.   Did you assign the Delaware Valley  14:41:33
 6  Obligated Group to Mr. Heberton?        14:41:33
 7      A.   Apparently I did; he was the      14:41:33
 8  analyst who tracked it, so I must have.      14:41:33
 9      Q.   When you say "he was the analyst  14:41:37
10  who tracked it," what period of time did you  14:41:39
11  have in mind in making that statement?      14:41:44
12      A.   He tracked -- he was the first     14:41:46
13  person that surfaced this credit to me as    14:41:51
14  potentially experiencing financial problems,  14:41:56
15  so that would have been whenever he received  14:41:59
16  the financial statements for 1996.        14:42:06
17         And then, during the early part of  14:42:09
18  1997, he was the analyst; at some point during  14:42:13
19  that year he transitioned to a different group  14:42:18
20  and a different person took over, so he was    14:42:22
21  following it very closely for at least through  14:42:25
22  part of 1997.                   14:42:29
23      Q.   What was Mr. Heberton's next      14:42:35
24  position after he left the Healthcare Group in  14:42:37
25  the Surveillance Department?            14:42:39
```

Page 152

```
 1        KARLEEN CARLSON STRAYER       14:42:39
 2      A.   He stayed in the Surveillance      14:42:40
 3  Department; he became manager of, I believe it  14:42:43
 4  was a Tax-Backed Group.              14:42:47
 5      Q.   Did you say "tax," t-a-x?        14:42:50
 6      A.   Yes, tax-backed, insured         14:42:53
 7  tax-backed bonds.                 14:42:56
 8      Q.   Do you recall whether Mr. Heberton  14:42:58
 9  stayed in that position through July of 1998?  14:42:59
10      A.   I believe so.             14:43:06
11      Q.   When Mr. Heberton left the       14:43:07
12  Healthcare Group in the Surveillance       14:43:09
13  Department, who assumed his responsibilities  14:43:11
14  with respect to the DVOG?             14:43:13
15      A.   Chip Reilly.              14:43:15
16      Q.   In this rough time frame, July of  14:43:24
17  1996 through mid-1997 when Mr. Heberton left  14:43:26
18  the Healthcare Group, who was responsible for  14:43:30
19  monitoring Allegheny General Hospital?      14:43:35
20      A.   I don't recall.  It very likely    14:43:40
21  was Dick because they were such related      14:43:48
22  entities, but I think it was Dick.  I don't    14:43:51
23  think we would have had anyone else working on  14:43:56
24  that one.                     14:43:58
25      Q.   And that would have been your     14:43:59
```

Page 153

```
 1        KARLEEN CARLSON STRAYER       14:43:59
 2  decision to make?                 14:44:00
 3      A.   Yes.                  14:44:02
 4      Q.   Do you recall whether, when      14:44:06
 5  Mr. Reilly assumed Mr. Heberton's functions  14:44:09
 6  sometime in 1997 with respect to the DVOG,    14:44:13
 7  whether he assumed monitoring functions for  14:44:16
 8  AGH, as well?                   14:44:20
 9      A.   I believe so.             14:44:23
10      Q.   And again, that would have been    14:44:24
11  your decision to make?              14:44:25
12      A.   Yes.                  14:44:27
13      Q.   If I could show you what we       14:44:33
14  previously marked as 1884.            14:44:35
15         MR. WITTEN:  You know, we only took  14:44:46
16  a break not long ago, can I take another    14:44:49
17  bathroom break?                  14:44:55
18         MR. KRUSKO:  Sure.          14:44:57
19         THE VIDEO OPERATOR:  Going off the  14:44:58
20  record at 2:44.                  14:44:58
21         (Recess taken.)            14:45:03
22         THE VIDEO OPERATOR:  Returning to  14:48:06
23  the record at 2:48 from 2:44.          14:48:06
24      Q.   Welcome back, Ms. Strayer.       14:48:09
25         Do you have before you Exhibit    14:48:11
```

39 (Pages 150 to 153)

KARLEEN CARLSON STRAYER          14:48:11

1    KARLEEN CARLSON STRAYER          14:48:11
2   1884?                               14:48:12
3       A.    Yes.                      14:48:13
4       Q.    Do you recognize Exhibit 1884 as a  14:48:13
5   copy of the FY '96 audited financial    14:48:16
6   statements for the Delaware Valley Obligated   14:48:20
7   Group, among some other documents?     14:48:24
8       A.    Yes.                       14:48:25
9       Q.    If you'll turn with me to the    14:48:34
10  second page of this exhibit, do you see here a   14:48:36
11  letter dated October 31st, 1996 from Kelly    14:48:41
12  Mertz to Emmeline Rocha-Sinha?         14:48:48
13      A.    Yes.                       14:48:50
14      Q.    In this letter, Ms. Mertz     14:48:50
15  indicates that she has provided the FY '96    14:48:52
16  audited financial statements for the DVOG, is   14:48:56
17  that right?                          14:48:58
18      A.    Yes.                       14:48:59
19      Q.    And towards the bottom of this   14:48:59
20  letter, Ms. Rocha-Sinha has written "11/11/96   14:49:01
21  Karleen FYR, E," is that correct?     14:49:07
22      A.    Yes.                       14:49:11
23      Q.    I take it "FYR" is "for your    14:49:11
24  review"?                            14:49:13
25      A.    Yes.                       14:49:14

1    KARLEEN CARLSON STRAYER          14:49:14
2       Q.    Do you recall receiving these    14:49:16
3   audited financial statements?         14:49:17
4       A.    No, I don't recall.        14:49:20
5       Q.    Do you recall reviewing these    14:49:21
6   audited financial statements?         14:49:23
7       A.    I recall looking at them much   14:49:28
8   later than this date.                14:49:29
9       Q.    "Much later" meaning sometime in  14:49:33
10  calendar 1997?                       14:49:35
11      A.    I believe so. I would have --   14:49:38
12  this is something that would have gone to the  14:49:42
13  analyst that was reviewing this credit; I    14:49:44
14  wouldn't preview every credit that we had on  14:49:47
15  the portfolio myself.                14:49:49
16      Q.    Did you have an understanding at  14:49:54
17  the time why Ms. Rocha-Sinha was directing    14:49:55
18  these statements to you personally, given that  14:49:56
19  you didn't review all the statements sent to  14:49:58
20  you?                                14:50:01
21      A.    Sure. I was manager of the group  14:50:01
22  and Emmeline had no way of knowing who I had  14:50:04
23  assigned various credit reviews to, so she    14:50:08
24  would send them all to me.            14:50:10
25      Q.    And you would, in turn, forward  14:50:11

1    KARLEEN CARLSON STRAYER          14:50:11
2   them on to the analyst that was responsible   14:50:14
3   for the particular credit?            14:50:17
4       A.    Yes.                       14:50:19
5       Q.    Did you ever contact AHERF and   14:50:22
6   direct them to send financial statements     14:50:26
7   directly to Mr. Heberton or another analyst   14:50:29
8   working in the Surveillance Department?    14:50:33
9       A.    I don't recall.            14:50:35
10      Q.    Do you remember directing anyone  14:50:39
11  in your staff to contact AHERF in that manner?  14:50:39
12      A.    I don't recall.            14:50:45
13      Q.    I believe you testified that it's  14:50:54
14  your understanding that Mr. Heberton, on    14:50:55
15  reviewing these statements, was concerned    14:50:57
16  about the transfers from the DVOG to Allegheny  14:51:00
17  Integrated Health Group?              14:51:06
18      A.    Yes.                       14:51:08
19      Q.    Would you turn with me to page   14:51:22
20  MBIA 015821, I believe it's Page 3 of the   14:51:25
21  document.                            14:51:30
22            Do you recognize this as the    14:51:38
23  fiscal year 1996 audited income statement for  14:51:39
24  the DVOG?                            14:51:43
25      A.    Yes, I guess they're calling it   14:51:47

1    KARLEEN CARLSON STRAYER          14:51:47
2   the "combined statement of operations" but    14:51:57
3   it's the income statement.            14:51:57
4       Q.    Do you notice the very last --   14:51:57
5   excuse me, the second-to-last entry to     14:51:57
6   "transfers to affiliates, net"?       14:52:01
7       A.    Yes.                       14:52:03
8       Q.    And listed is $73,676,000?      14:52:03
9       A.    Yes.                       14:52:09
10      Q.    Is it your recollection that it's  14:52:11
11  that transfer that caught Mr. Heberton's    14:52:13
12  attention?                           14:52:15
13      A.    Yes.                       14:52:18
14      Q.    And so, Mr. Heberton was able, by  14:52:21
15  conducting a review of the fiscal year 1996   14:52:25
16  audited financial statements for the DVOG, to  14:52:28
17  determine that the Delaware Valley Obligated  14:52:33
18  Group was transferring tens of millions of    14:52:34
19  dollars outside the Obligated Group?   14:52:39
20      A.    Yes.                       14:52:41
21      Q.    And do you recall him calling    14:52:42
22  these transfers to your attention?    14:52:43
23      A.    Yes.                       14:52:45
24      Q.    And what did you do as a result?  14:52:48
25      A.    We contacted the people at the   14:52:52

1    KARLEEN CARLSON STRAYER    14:52:52
2   hospital, had multiple conversations with    14:52:55
3   them; at some point had visits; and internally  14:52:58
4   we downgraded the credit.    14:53:02
5       Q.   When you say "hospital," I'm just   14:53:07
6   concerned to have a clear record because it's  14:53:09
7   my understanding that the Delaware Valley    14:53:11
8   Obligated Group was comprised of many    14:53:12
9   hospitals; was that your understanding?    14:53:14
10      A.   That's true.    14:53:15
11      Q.   Okay.  So when you say "we    14:53:16
12  contacted the hospital," what did you mean by  14:53:17
13  that?    14:53:19
14      A.   I believe that the person we were  14:53:20
15  in primary contact with was Michael Martin.   14:53:22
16      Q.   It's my understanding that    14:53:28
17  Mr. Martin was vice-president of AHERF's    14:53:28
18  Treasury Department; is that your    14:53:30
19  recollection?    14:53:32
20      A.   I remember him being treasurer,    14:53:33
21  so; I don't know his official title.    14:53:36
22      Q.   Do you recall any contact or    14:53:40
23  communication you had with Mr. Martin in the  14:53:43
24  November 1996 time frame concerning these    14:53:46
25  transfers to affiliates?    14:53:48

1    KARLEEN CARLSON STRAYER    14:54:57
2   dialogue was primarily of him explaining the  14:55:00
3   transactions, the reasons for the    14:55:04
4   transactions, and what was happening.    14:55:06
5       Ultimately, they agreed to stop    14:55:09
6   acquiring physician practices or they told us  14:55:14
7   they were going to stop acquiring physician   14:55:16
8   practices.    14:55:19
9       Q.   But is it fair to say, then, your  14:55:20
10  initial contact, during your initial contacts  14:55:23
11  with Mr. Martin, he simply explained the    14:55:26
12  physician practice acquisition strategy to    14:55:31
13  you?    14:55:36
14      A.   Right.  And the reasons for the   14:55:37
15  transfer.    14:55:39
16      Q.   Did you ask Mr. Martin for any    14:55:40
17  representations that additional transfers were  14:55:43
18  not to be made?    14:55:46
19      A.   I'm sure we encouraged him not to  14:55:49
20  make additional transfers but I don't believe  14:55:52
21  at that point in time he was willing to do    14:55:54
22  that.    14:55:56
23      Q.   When you say "I'm sure we    14:55:57
24  encouraged him," is there any document that   14:55:59
25  reflects your encouragement to Mr. Martin that  14:56:01

1    KARLEEN CARLSON STRAYER    14:53:48
2       A.   We had conversations with Mike   14:53:55
3   Martin about these transfers; I don't know    14:53:56
4   that it was November; it was probably after   14:53:59
5   November.    14:54:02
6       Q.   Did you express concerns to him   14:54:03
7   about these transfers?    14:54:05
8       A.   Yes.    14:54:08
9       Q.   Why?    14:54:08
10      A.   Because they were large.    14:54:08
11      Q.   Why would that matter?    14:54:10
12      A.   Because it showed that there were  14:54:13
13  significant resources that were leaving the   14:54:16
14  Obligated Group, and being spent on physician  14:54:18
15  practices which could be a good strategy but,  14:54:22
16  in this case, it was costing a lot of money   14:54:27
17  and we thought it was very significant.    14:54:29
18      Q.   And that was reflected fairly in  14:54:35
19  the audited fiscal year 1996 Delaware Valley  14:54:36
20  Obligated Group financial statements?    14:54:41
21      A.   Yes.    14:54:43
22      MR. WITTEN:  Objection.    14:54:43
23      Q.   What was Mr. Martin's response?   14:54:45
24      A.   I recall that -- a lot, at this  14:54:53
25  stage, at the very initial stages, our    14:54:57

1    KARLEEN CARLSON STRAYER    14:56:01
2   AHERF not pursue additional physician practice  14:56:04
3   acquisitions?    14:56:10
4       A.   I don't recall.    14:56:10
5       Q.   And do you recall specifically    14:56:13
6   what you told Mr. Martin in an attempt to    14:56:14
7   dissuade AHERF from pursuing additional    14:56:18
8   physician practice acquisitions?    14:56:22
9       A.   No, I don't.    14:56:24
10      Q.   So you don't have any basis for   14:56:27
11  saying that you're sure that you told him that  14:56:28
12  MBIA would prefer that AHERF not engage in    14:56:31
13  additional physician practice acquisitions?   14:56:34
14      MR. WITTEN:  Objection.    14:56:36
15      A.   I -- the basis is that we had    14:56:40
16  downgraded a credit and I believe we    14:56:42
17  downgraded it to the caution list, which was a  14:56:45
18  sign of what we felt was financial distress;  14:56:48
19  the primary reason was the large amounts that  14:56:50
20  were being transferred over to the physician  14:56:53
21  practice, and given that we had these    14:56:55
22  conversations with Mike, I -- I remember    14:57:00
23  having the conversations; I cannot tell you   14:57:07
24  the specifics of the conversations, but this  14:57:08
25  was the big issue, initially, that we were    14:57:10

41 (Pages 158 to 161)

Page 162

KARLEEN CARLSON STRAYER          14:57:10
1  discussing with them and the reason for our     14:57:12
2  initial concern.                          14:57:16
3     Q.   Do you have an understanding as to  14:57:20
4  what a "below-the-line entry" is?          14:57:23
5     A.   Yes.                      14:57:28
6     Q.   And what's your understanding of   14:57:28
7  that term?                          14:57:29
8     A.   "Below-the-line," my understanding  14:57:30
9  is that would be an entity that would not    14:57:32
10 affect the net income of the entity.         14:57:35
11    Q.   Did you say "an entry that would   14:57:40
12 affect the net income of an entity"?         14:57:42
13    A.   Right, an item, an expense or       14:57:44
14 something like that.                     14:57:47
15    Q.   So looking here at Page 3 of        14:57:49
16 Exhibit 1884, where would the line be?       14:57:53
17    A.   Well, you could say it is either    14:58:00
18 the net loss of 1.3 million or you could also  14:58:04
19 say it's the 26.8 because those items that are  14:58:16
20 after the 26.8 are one-time accounting-type   14:58:16
21 entries that don't affect cash or, you know,   14:58:22
22 the true income number, or anything else.    14:58:22
23       So I believe analysts could call     14:58:26
24 either one of those numbers "below-the-line."  14:58:28

Page 163

KARLEEN CARLSON STRAYER          14:58:28
1     Q.   "Transfers to affiliates, net"      14:58:32
2  appears below the line on Page 3, under either  14:58:35
3  definition of what the "line" is, correct?    14:58:42
4     A.   That's true.                    14:58:44
5     Q.   And as a result, it doesn't have    14:58:45
6  any impact on net income before extraordinary  14:58:48
7  item and change in accounting principles for   14:58:52
8  net loss?                             14:58:57
9     A.   That's true.                    14:58:58
10    Q.   Was that a concern to you as        14:58:59
11 manager of MBIA's Healthcare Group in the     14:59:01
12 Surveillance Department?                 14:59:03
13    A.   Yes, it was.                    14:59:04
14    Q.   And why was it a concern to you?    14:59:05
15    A.   Because it clearly was a          14:59:08
16 dissipation of the financial strength of the   14:59:12
17 Delaware Valley Obligated Group, and yet, it   14:59:14
18 would not trigger our covenant because it was  14:59:16
19 below the line.                        14:59:19
20    Q.   When you say "our covenant," which  14:59:20
21 are you referring to?                    14:59:22
22    A.   The debt service coverage ratio.    14:59:23
23    Q.   And why would a below-the-line     14:59:28
24 entry such as "transfers to affiliates, net"   14:59:29

Page 164

KARLEEN CARLSON STRAYER          14:59:29
1  not trigger the debt service coverage ratio?   14:59:32
2     A.   Because of the way that definition  14:59:35
3  is defined in the bond documents.          14:59:37
4     Q.   And these are bond documents that   14:59:39
5  MBIA either drafted or approved in connection  14:59:42
6  with its decision to provide insurance for the  14:59:44
7  fixed rate DVOG bonds?                   14:59:50
8     A.   Yes.                        14:59:53
9     Q.   Did you, as the manager of the     14:59:56
10 Healthcare Group in the Surveillance         14:59:58
11 Department, view the drafting of the debt     15:00:00
12 service coverage ratio as a problem for that   15:00:04
13 reason?                             15:00:08
14    A.   It -- that definition is very      15:00:10
15 common in the industry and remains so today;   15:00:13
16 so while it wasn't our preferred way of       15:00:17
17 calculating or, or measuring the financial    15:00:19
18 strength, it is, it is an industry standard.   15:00:23
19    Q.   Okay.  And so while it wasn't      15:00:26
20 MBIA's preferred way of measuring the         15:00:28
21 financial strength, it was one that MBIA      15:00:31
22 agreed to in connection with its decision to   15:00:33
23 provide bond insurance to the DVOG entities?   15:00:36
24    A.   I wouldn't say "MBIA"; I would say  15:00:42

Page 165

KARLEEN CARLSON STRAYER          15:00:42
1  me.  You know, I would have preferred a       15:00:44
2  different calculation.  I can't speak to the   15:00:48
3  new business analysts; they were perhaps      15:00:49
4  comfortable with it, I don't know.          15:00:52
5     Q.   In this time frame, late October   15:01:12
6  to earlier November calendar 1996 when you    15:01:15
7  discussed this issue with Mr. Heberton, and    15:01:21
8  possibly Mr. Martin, did you contact anyone in  15:01:24
9  the Healthcare Group on the new business side  15:01:32
10 to discuss this issue?                   15:01:35
11       MR. WITTEN:  Objection.            15:01:36
12    A.   I don't recall.  I could point out  15:01:40
13 that we did issue an Alert Report, which was   15:01:45
14 disseminated to the people in the new business  15:01:48
15 Healthcare Group, that would have indicated    15:01:51
16 our downgrade of the credit and our concerns.  15:01:54
17    Q.   If I can show you what's been       15:02:25
18 previously marked as Exhibit 1885.  And if I   15:02:27
19 could ask you at the outset, Ms. Strayer, do   15:02:54
20 you recognize this document?              15:02:58
21    A.   No.                        15:02:59
22    Q.   Do you recall in the October 1996  15:03:03
23 time frame hearing that AHERF had requested    15:03:06
24 extensions of various financial reporting      15:03:14

42 (Pages 162 to 165)

KARLEEN CARLSON STRAYER          15:14:35
1
2     A.   No, I did not.          15:14:35
3     Q.   No, you did not suggest any     15:14:36
4 changes to the transcript?          15:14:38
5     A.   That's correct.          15:14:39
6     Q.   Now, I put before you Exhibit   15:14:42
7 2192:  Do you recognize this as a copy of the  15:14:45
8 transcript of that day's deposition?     15:14:50
9     A.   Yes.          15:14:55
10    Q.   Would you turn with me to Page 83,  15:14:57
11 I'm going in a sort of minuscript format.  I'm  15:15:05
12 going according to the page numbers that are   15:15:10
13 sort of in the center and they go off to the   15:15:13
14 right.          15:15:20
15    A.   Okay.          15:15:20
16    Q.   Let me, if I could, direct you to  15:15:21
17 your answer and then, why don't you take as    15:15:23
18 much time as you need to just sort of     15:15:25
19 familiarize yourself again with the testimony:  15:15:29
20       There's some questioning, rather,  15:15:36
21 about some financial statements and then you   15:15:38
22 give the testimony beginning on line 6:     15:15:40
23       "Well, we would like the financial   15:15:43
24 statements as soon as we would get them, so    15:15:44
25 that we are working with current information."  15:15:47

KARLEEN CARLSON STRAYER          15:15:47
1
2 Do you see that?          15:15:49
3     A.   Yes.          15:15:50
4     MS. HACKETT: I'm on the wrong     15:15:52
5 page.          15:15:54
6     MR. KRUSKO: 83.          15:15:55
7     MS. HACKETT: Okay, thank you.    15:16:00
8     A.   Okay.          15:16:15
9     Q.   So I take it, with respect to   15:16:18
10 troubled credits, MBIA would like the     15:16:23
11 financial statements as soon as it could get   15:16:28
12 them so they could work with current     15:16:31
13 information?          15:16:34
14    A.   Sure.  Actually, with any credit,  15:16:35
15 but in particular, troubled credits.     15:16:37
16    Q.   Right.          15:16:39
17       So when you received -- pardon me   15:16:44
18 -- when you discussed with Mr. Heberton the FY  15:16:49
19 '96 audited financial statements from DVOG,    15:16:51
20 you didn't raise the issue of reporting    15:16:59
21 requirements?          15:17:01
22    A.   No.          15:17:02
23    Q.   Because you were counting on     15:17:04
24 Mr. Heberton to make the decision whether     15:17:05
25 those reporting requirements should be    15:17:10

KARLEEN CARLSON STRAYER          15:17:10
1
2 changed?          15:17:13
3     A.   Well --          15:17:19
4     MR. KRUSKO: Let me withdraw that,   15:17:19
5 let me withdraw that.  I think I understand    15:17:21
6 where the trouble may be with that question.   15:17:22
7     Q.   I take it you didn't raise this   15:17:25
8 issue with Mr. Heberton because you were     15:17:26
9 relying on Mr. Heberton to raise with you any  15:17:29
10 problems that he saw with respect to     15:17:34
11 reporting requirements in the Financial    15:17:37
12 Guaranty Agreement?          15:17:41
13    MR. WITTEN: Objection.          15:17:41
14    A.   I would have expected Dick to   15:17:44
15 bring to my attention if he was having concern  15:17:46
16 over the timeliness of the receipt of the     15:17:50
17 financial information; I don't know     15:17:53
18 specifically whether we would have been    15:17:54
19 focusing on the document requirements.     15:17:56
20    Q.   But in addition to concerns about  15:18:00
21 the timeliness of the reporting requirements,  15:18:03
22 did you also expect him to call to your     15:18:07
23 attention potential problems that he foresaw   15:18:10
24 with reporting requirements based on his   15:18:15
25 knowledge of the financial condition of the    15:18:18

KARLEEN CARLSON STRAYER          15:18:18
1
2 credit?          15:18:21
3     A.   Sure.  If they, if they had had   15:18:23
4 been outside of the bounds of what we normally  15:18:25
5 expect to see in this industry, it is -- it's  15:18:27
6 something that an analyst would look at.    15:18:32
7       I guess what I'm saying is that    15:18:40
8 the numbers that are showing up in these   15:18:41
9 documents are not unusually long periods of    15:18:45
10 times, they're within industry norms, so we    15:18:47
11 would have had no reason to focus on that.     15:18:50
12    Q.   I take it industry norms -- I take  15:18:53
13 it by "industry norms" you mean to say that    15:19:01
14 there are norms in terms of reporting     15:19:04
15 requirements for credits that are not     15:19:06
16 experiencing any financial problems?     15:19:08
17    A.   Well, we have -- these reporting   15:19:13
18 requirements are put into the bond documents   15:19:16
19 when the bonds are issued, and typically those  15:19:18
20 bond documents are not amended unless there's  15:19:21
21 a request or -- a request from the client; so,  15:19:24
22 it's not, it's not something we focus on    15:19:30
23 regularly.  It goes in the documents and it is  15:19:33
24 what it is.  But there are standards for the   15:19:35
25 documents that we would expect to see, yes.    15:19:37

45 (Pages 174 to 177)

Page 178

KARLEEN CARLSON STRAYER          15:19:37

1      KARLEEN CARLSON STRAYER          15:19:37
2      Q.   Okay.  And MBIA does not have the   15:19:40
3   power to unilaterally alter the terms of bond   15:19:42
4   documents?                       15:19:49
5      A.   That's true.                15:19:49
6      Q.   And I guess what I'm getting at   15:19:53
7   with this is when you say that these ranges   15:19:54
8   that you're seeing with respect to the request   15:19:57
9   for an extension letter, those ranges are   15:19:59
10  within industry norms?              15:20:03
11     A.   Yes.                      15:20:05
12     Q.   If I'm understanding your      15:20:05
13  testimony correctly.                15:20:06
14     A.   Yes.                      15:20:09
15     Q.   Okay.                     15:20:09
16          And what I'm asking you, though,   15:20:11
17  is if in light of what you saw weeks later in   15:20:12
18  the financial statements, you were counting on   15:20:15
19  Mr. Heberton to call to your attention   15:20:18
20  potential problems he saw with those reporting   15:20:21
21  requirements?                    15:20:24
22     A.   I guess that's assuming that he   15:20:31
23  saw problems with reporting requirements, so   15:20:33
24  given how quickly he was looking at the   15:20:43
25  financial statements -- I don't know that   15:20:44

Page 179

1      KARLEEN CARLSON STRAYER          15:20:44
2   that's something that would have even   15:20:46
3   registered at that point in time.  This was   15:20:55
4   not really outside the bounds of, of what we   15:20:55
5   would have expected.                15:20:55
6      Q.   So when you say "given how quickly   15:20:58
7   he was looking at the financial statements," I   15:20:59
8   take it you were under the impression that   15:21:02
9   Mr. Heberton was conducting a cursory review   15:21:05
10  of the audited FY '96 DVOG financial   15:21:09
11  statements?                      15:21:12
12     A.   No, no.  By "quickly," I meant   15:21:13
13  timely, not how fast he did it.  I meant the   15:21:16
14  timeliness in terms of the fact that the   15:21:20
15  audits -- this transaction had very recently   15:21:23
16  closed.  We would have had no reason to   15:21:29
17  anticipate that there was a problem with this   15:21:30
18  credit, and getting the financial statements   15:21:33
19  of what we assumed to be a healthy credit by   15:21:36
20  November of that year would not have been   15:21:39
21  outside the norm.                 15:21:41
22          And the fact that Dick looked at   15:21:42
23  them and we downgraded it, I believe by   15:21:44
24  February, is a very, to me, a very proactive   15:21:47
25  response to the financial situation as it was   15:21:52

Page 180

1      KARLEEN CARLSON STRAYER          15:21:52
2   unfolding, so I think Dick did exactly what he   15:21:57
3   should have done.                 15:22:00
4      Q.   Okay.  Let me just make sure I'm   15:22:01
5   understanding your testimony correctly:   15:22:03
6          Mr. Heberton, as the analyst in   15:22:06
7   the Healthcare Group of the Surveillance   15:22:10
8   Department, received Exhibit 1885 and   15:22:14
9   forwarded it to Mr. Reilly?          15:22:17
10         MR. WITTEN:  Objection.        15:22:21
11     A.   No, I didn't say that.         15:22:21
12     Q.   Okay.                     15:22:22
13     A.   I doubt, I doubt Chip Reilly even   15:22:25
14  looked at those financial statements at that   15:22:27
15  time.                           15:22:32
16     Q.   Okay.  But I'm sorry, perhaps   15:22:32
17  we're on different pages?            15:22:34
18     A.   Did I misunderstand the question?   15:22:35
19     Q.   We may be on different pages.     15:22:37
20     A.   Okay.                     15:22:39
21     Q.   If you could take out Exhibit   15:22:39
22  1885.                           15:22:41
23     A.   Okay.                     15:22:43
24     Q.   Okay?  How is it that this       15:22:44
25  document arrived on Mr. Reilly's desk, so to   15:22:49

Page 181

1      KARLEEN CARLSON STRAYER          15:22:49
2   speak, for his signature?            15:22:56
3          MR. WITTEN:  Objection.        15:22:59
4      Q.   Because the letter's addressed to   15:23:00
5   Emmeline Rocha-Sinha, correct?       15:23:01
6      A.   Yes.                      15:23:03
7      Q.   So it wouldn't have gone to      15:23:06
8   Mr. Reilly as a function of how MBIA delivers   15:23:08
9   its mail, correct?                 15:23:13
10     A.   That's correct.              15:23:15
11     Q.   So do you have any understanding   15:23:16
12  as to how it would have went to Mr. Reilly   15:23:17
13  given that you're the manager of the   15:23:20
14  Healthcare Group in the Surveillance   15:23:22
15  Department at this time?             15:23:25
16     A.   Emmeline would have sent it either   15:23:29
17  down to my group or to the Waivers and   15:23:29
18  Consents Group; more likely my group.   15:23:34
19     Q.   So it's more likely than not that   15:23:36
20  Mr. Heberton saw this document?      15:23:39
21         MR. WITTEN:  Objection.        15:23:42
22     Q.   You just testified "more likely my   15:23:44
23  group."                          15:23:46
24     A.   Right.                    15:23:46
25     Q.   And my understanding is that      15:23:48

46 (Pages 178 to 181)

Page 190

KARLEEN CARLSON STRAYER                 15:43:18
1
2  wouldn't be concerned; if it was 60 percent, I  15:43:20
3  would be.                                  15:43:22
4      Q.   If it were 60 percent and you were  15:43:24
5  concerned, would you take a look at the       15:43:26
6  reporting requirements?                    15:43:31
7      A.   No. No.          15:43:33
8      Q.   I believe you testified that     15:43:41
9  shortly after the FY '96 audited financial    15:43:43
10  statements were received by MBIA, MBIA      15:43:49
11  downgraded the DVOG to its caution list?     15:43:53
12     A.   Yes.              15:43:57
13     Q.   What was MBIA's caution list at   15:43:59
14  this point in time?                        15:44:02
15     A.   That was the equivalent of a      15:44:03
16  six-rating in our rating scale, and credits   15:44:05
17  that went on to the caution list were under --  15:44:10
18  were credits for which we had concern       15:44:15
19  sufficient that we began monitoring them more  15:44:17
20  frequently.                                15:44:21
21     Q.   More frequently than no later than  15:44:26
22  once a year?                               15:44:27
23     A.   Yes.              15:44:29
24     Q.   Let me show you what's been       15:44:42
25  previously marked as Exhibit 1887.          15:44:44

Page 191

KARLEEN CARLSON STRAYER                 15:44:44
1
2      Ms. Strayer, do you recognize        15:45:31
3  Exhibit 1887?                              15:45:32
4      A.   I recognize the form that we were  15:45:35
5  using at that time.                        15:45:39
6      Q.   This document is entitled "MBIA   15:45:41
7  Insured Portfolio Management Department,      15:45:44
8  Hospital Rating & Review Form."             15:45:47
9      A.   Yes.              15:45:50
10     Q.   I take it the Hospital Rating &   15:45:50
11  Review Form was something that MBIA used in   15:45:55
12  its usual course of business at this time?    15:46:00
13     A.   Yes.              15:46:03
14     Q.   And what was the purpose of this   15:46:04
15  hospital unit rating and review form?       15:46:06
16     A.   This is simply the form that the   15:46:10
17  analysts filled out as they rated a credit,   15:46:13
18  and a copy went into our files.             15:46:17
19     Q.   Is it your recollection that this   15:46:23
20  document dated February 28th, 1997, is the    15:46:26
21  first rating that was done by MBIA's         15:46:30
22  Surveillance Department after the June 1996   15:46:35
23  DVOG bond offering?                        15:46:38
24     A.   I believe so.        15:46:41
25     Q.   If you turn with me to the first   15:47:36

Page 192

KARLEEN CARLSON STRAYER                 15:47:36
1
2  page of the entity, 1887, the new rating, the  15:47:36
3  stand-alone rating is listed as 6B; do you see  15:47:36
4  that?                       15:47:36
5      A.   The rating, 6B?       15:47:36
6      Q.   Yes.              15:47:36
7      A.   Yes, I see it.        15:47:36
8      Q.   I'm just crossing the column and   15:47:36
9  the row headings.                          15:47:36
10     A.   I see that.          15:47:36
11     Q.   And the previous rating was 4B and  15:47:36
12  a date affixed there, 5/23/96?              15:47:36
13     A.   Yes.              15:47:36
14     Q.   So this is the downgrade          15:47:36
15  announcement that you were referring to      15:47:36
16  earlier?                    15:47:36
17     A.   This is the downgrade, this is the  15:47:36
18  form of the downgrade. In terms of the       15:47:36
19  announcement, that would have been a different  15:47:44
20  form, but this -- this is Dick's analysis of   15:47:44
21  the credit, so this was part of it.          15:47:47
22     Q.   So this document reflects the fact  15:47:49
23  that MBIA's Surveillance Department is        15:47:53
24  lowering its internal rating on this credit?   15:47:56
25     A.   Yes.              15:47:59

Page 193

KARLEEN CARLSON STRAYER                 15:47:59
1
2      Q.   Do you see the row "To: File" and  15:48:00
3  then there's a file listed after that? On the  15:48:04
4  top left-hand corner of the first page.       15:48:08
5      A.   Oh, yes, um-hum.       15:48:11
6      Q.   Do you have an understanding as to  15:48:13
7  which file this document was directed?       15:48:15
8      A.   It's our -- it was our            15:48:19
9  surveillance files.                        15:48:21
10     Q.   Who had access to this document at  15:48:22
11  this point in time, if you know?            15:48:26
12     A.   Probably Dick and myself. Like I   15:48:30
13  said, there was a different document that was  15:48:33
14  disseminated throughout the organization, so   15:48:35
15  it would have been a more concise analysis    15:48:37
16  than what would be in this document.         15:48:41
17     Q.   The document that you just made    15:48:43
18  reference to, was that the Alert Report?      15:48:45
19     A.   Yes.              15:48:48
20     Q.   So the Alert Report that was       15:48:48
21  disseminated, when you say "throughout the     15:48:50
22  organization," all of MBIA or just the        15:48:52
23  Healthcare Group in the Surveillance          15:48:55
24  Department and on the new business side or     15:48:58
25  what do you mean by that?                   15:48:59

49 (Pages 190 to 193)

KARLEEN CARLSON STRAYER     15:48:59

1  
2   A.  It was a pretty wide distribution  15:49:01
3  list.  Most of senior management would have  15:49:02
4  been included, the new business healthcare  15:49:06
5  analysts would have been included,  15:49:06
6  reinsurance, legal, the rest of the portfolio  15:49:10
7  management, it was a broad distribution list.  15:49:13
8   Q.  This document, 1887, was for the  15:49:16
9  use of the insured portfolio management  15:49:19
10  department?  15:49:23
11   A.  Yes.  15:49:23
12   Q.  Who made the decision to downgrade  15:49:23
13  the DVOG from 4B to 6B?  15:49:26
14   A.  Dick and I would have talked about  15:49:31
15  it and decided upon it, together.  15:49:33
16   Q.  Ultimately, though, in this time  15:49:38
17  frame, February of 1997, was a downgrade such  15:49:40
18  as this within your discretion as manager in  15:49:47
19  the Healthcare Group and the Surveillance  15:49:51
20  Department?  15:49:51
21   A.  Yes.  15:49:53
22   Q.  Did you follow any guidelines in  15:49:53
23  deciding how far down to downgrade a credit?  15:49:55
24   A.  We had very general guidelines in  15:50:05
25  terms of what the different rating categories  15:50:07

KARLEEN CARLSON STRAYER     15:50:07

1  
2  meant and I would have felt that, given those  15:50:10
3  parameters, that the characteristics of this  15:50:13
4  credit were appropriate for a 6 rating.  15:50:16
5   Q.  And a 6 rating is equivalent to  15:50:22
6  the lowest investment grade rating?  15:50:26
7   A.  That's right.  15:50:29
8   Q.  And a B implies a stable trend?  15:50:30
9   A.  Yes, it does.  15:50:34
10   Q.  Will you turn with me to the  15:50:43
11  second page of Exhibit 1887.  The paragraph  15:50:44
12  beginning, the full paragraph beginning  15:50:53
13  immediately under the subheading  15:50:55
14  "St. Christopher's Hospital for Children,"  15:50:58
15  begins "This Obligated Group," do you see  15:51:00
16  that?  15:51:02
17   A.  Yes.  15:51:03
18   Q.  And that sentence states: "This  15:51:03
19  Obligated Group was brought together by AHERF  15:51:06
20  to create a strong integrated delivery system  15:51:07
21  in the Philadelphia area in order to gain a  15:51:10
22  competitive advantage in negotiating for  15:51:14
23  managed care contracts."  15:51:16
24   A.  Yes, I see it.  15:51:18
25   Q.  Then the last sentence of this  15:51:19

KARLEEN CARLSON STRAYER     15:51:19

1  
2  paragraph states: "Most of the members were  15:51:20
3  very lack lustre performers prior to their  15:51:22
4  affiliation with AHERF, with fairly weak  15:51:26
5  balance sheets."  Do you see that statement?  15:51:29
6   A.  Yes.  15:51:31
7   Q.  Did you concur in the statements  15:51:36
8  that Mr. Heberton made in this document?  15:51:38
9   A.  Well, Dick was an experienced  15:51:43
10  analyst and I would have read this and would  15:51:46
11  have not had any reason to, to doubt what he  15:51:49
12  was saying.  15:51:53
13   Q.  So when you testified earlier  15:51:56
14  about the underlying financial condition of  15:51:58
15  entities that were collected into a  15:52:02
16  newly-formed obligated group, and you were  15:52:06
17  discussing generally how you would look to the  15:52:16
18  relative health of those entities, it seems  15:52:18
19  here that Mr. Heberton is clearly stating that  15:52:21
20  the DVOG entities were "rather lack lustre  15:52:24
21  performers prior to their affiliation with  15:52:29
22  AHERF with fairly weak balance sheets,"  15:52:34
23  correct?  15:52:36
24   A.  Yes.  15:52:36
25   Q.  So this is an example of the type  15:52:37

KARLEEN CARLSON STRAYER     15:52:37

1  
2  of financial difficulties that you were  15:52:41
3  testifying about earlier?  15:52:42
4   A.  Well, it doesn't necessarily say  15:52:50
5  "financial difficulties."  It says "lack  15:52:51
6  lustre."  15:52:55
7   Q.  In a case such as this where a  15:53:06
8  newly-formed obligated group was comprised of  15:53:09
9  members, most of which were rather lack lustre  15:53:13
10  performers with fairly weak balance sheets,  15:53:16
11  did you view it appropriate that the  15:53:19
12  Surveillance Department engage in additional  15:53:22
13  vigilance with respect to monitoring efforts?  15:53:26
14   A.  Well, we did, based on the  15:53:31
15  financial statements that we had already seen  15:53:33
16  at this point in time; I don't know that it  15:53:35
17  had anything to do with the fact that the  15:53:37
18  obligated group was new or the history of  15:53:39
19  those entities had to do with the, the  15:53:42
20  financial performance as we saw in their  15:53:46
21  latest set of statements; so it was, it was  15:53:48
22  very real-time issue for us.  15:53:48
23   Q.  But one of the goals of MBIA's  15:53:56
24  Surveillance Department is to intervene as  15:53:59
25  early as possible and try to correct problems  15:54:05

50 (Pages 194 to 197)

Page 198

1    KARLEEN CARLSON STRAYER    15:54:05
2 it foresees with a troubled credit, correct?    15:54:07
3    A.    That's true.    15:54:09
4    MS. HACKETT: Objection, asked and    15:54:10
5 answered.    15:54:11
6    Q.    So when a newly-formed obligated    15:54:14
7 group is comprised of entities that are lack    15:54:17
8 lustre performers, did you believe in this    15:54:20
9 time frame, as manager, that there should have    15:54:23
10 been additional vigilance from the point in    15:54:26
11 time that the credit fell within the    15:54:30
12 responsibilities of the Surveillance    15:54:35
13 Department?    15:54:36
14    MR. WITTEN: Objection.    15:54:37
15    MS. HACKETT: Objection; asked and    15:54:37
16 answered.    15:54:39
17    MR. KRUSKO: I don't think it has    15:54:40
18 because what I'm getting at is the DVOG bonds    15:54:41
19 are offered in June of 1996, correct?    15:54:45
20    A.    That's right.    15:54:50
21    Q.    Okay. At what point in time did    15:54:51
22 monitoring those bonds become the function of    15:54:54
23 the Surveillance Department?    15:54:57
24    A.    Immediately after the bond --    15:54:59
25 after the transaction closed.    15:55:00

Page 199

1    KARLEEN CARLSON STRAYER    15:55:00
2    Q.    Okay. It's my understanding,    15:55:03
3 based on your testimony, that the Surveillance    15:55:06
4 Department didn't attach any particular extra    15:55:07
5 vigilance to monitoring that credit until    15:55:11
6 after the fiscal year 1996 audited financial    15:55:14
7 statements for DVOG came in in November of    15:55:16
8 1996?    15:55:20
9    A.    That's true.    15:55:20
10    Q.    Okay. And what I'm asking you is,    15:55:21
11 do you think that the Surveillance Department    15:55:24
12 should have attached additional vigilance to    15:55:26
13 its monitoring efforts beginning in June 1996,    15:55:29
14 immediately after the DVOG bonds were offered?    15:55:35
15    MS. HACKETT: And I believe that    15:55:38
16 has been asked and answered and I object, but    15:55:39
17 you can answer.    15:55:40
18    A.    When, when MBIA underwrites    15:55:43
19 credits, they undertake a very extensive due    15:55:46
20 diligence process and there had been an    15:55:48
21 extremely extensive due diligence process done    15:55:50
22 in May to, you know, prepare for the vote    15:55:52
23 that was taken, that represented the decision    15:55:57
24 to ensure the DVOG bonds; so, as manager of    15:56:01
25 the Surveillance Group, when I -- despite the    15:56:05

Page 200

1    KARLEEN CARLSON STRAYER    15:56:05
2 fact that a transaction had just closed with a    15:56:09
3 new obligated group, I would have been under    15:56:11
4 the impression, accurately, it appears, that    15:56:14
5 there was an extensive analysis made in May of    15:56:16
6 1996.    15:56:22
7    By June, July, August 1996, there,    15:56:24
8 frankly, was nothing for us to look at in    15:56:27
9 addition to what our new business analyst had    15:56:29
10 reviewed; so there was very little we could do    15:56:32
11 until we got additional financial information.    15:56:35
12    We also would have been under the    15:56:39
13 assumption that, you know, given the 4B rating    15:56:41
14 on the transaction, that there was no    15:56:45
15 impending crisis of any sort; so, the fact    15:56:48
16 that we, as soon as we got the financial    15:56:51
17 statements, we quickly looked at them and made    15:57:01
18 the decision to downgrade is, I think, a, a    15:57:01
19 great example of how proactive we were on this    15:57:01
20 particular credit.    15:57:04
21    This was a very unusual time frame    15:57:07
22 or type of occurrence within our organization.    15:57:10
23    Q.    I'm sorry, I'm not following what    15:57:18
24 you meant by "this was a very unusual time    15:57:20
25 frame or type of occurrence within our    15:57:23

Page 201

1    KARLEEN CARLSON STRAYER    15:57:23
2 organization."    15:57:24
3    A.    Because we -- our mandate for    15:57:25
4 healthy credit was to review those credits at    15:57:31
5 least once a year. If the new business    15:57:34
6 analyst had done a very extensive review in    15:57:36
7 May 1996, by our own, you know, surveillance    15:57:38
8 process, we wouldn't necessarily have had to    15:57:42
9 look at that credit again until May of 1997.    15:57:46
10    It's -- it seems obvious to me    15:57:49
11 that the reason we looked at it prior to May    15:57:52
12 1997 was the financial statements came out,    15:57:55
13 and because the audits came out we looked at    15:57:58
14 them on a, on a pretty quick basis and noticed    15:58:00
15 the large transfers, which was why Dick    15:58:06
16 brought that to my attention.    15:58:10
17    Q.    Okay.    15:58:11
18    A.    It is unusual that a credit    15:58:12
19 immediately after the underwriting would show    15:58:14
20 that level of, you know, of problem, a $70    15:58:16
21 million transfer, basically, that, that's very    15:58:22
22 unusual.    15:58:26
23    Q.    Well, isn't that all the more    15:58:26
24 reason to engage in additional vigilance?    15:58:27
25    A.    Absolutely.    15:58:30

51 (Pages 198 to 201)

Page 202

```
1          KARLEEN CARLSON STRAYER        15:58:30
2     Q.   Okay.                  15:58:31
3     A.   And we did.            15:58:31
4     Q.   Okay.                  15:58:32
5          When you say that "MBIA engaged in  15:58:35
6   extensive due diligence efforts," did you   15:58:38
7   participate in any due diligence efforts with  15:58:40
8   respect to the DVOG entities?       15:58:42
9     A.   You mean prior to the --   15:58:44
10    Q.   Prior to the bond offering.   15:58:46
11    A.   No, I did not.          15:58:48
12    Q.   And when you say "there was    15:58:49
13  nothing to look at after the DVOG bonds were  15:58:50
14  offered in June 1996," did MBIA request    15:58:54
15  unaudited financial statements on a monthly  15:59:00
16  basis going forward after June 1996?   15:59:03
17    A.   No, we did not.         15:59:06
18    Q.   Are you aware of anything that   15:59:07
19  would have prevented MBIA from making such a  15:59:09
20  request?                  15:59:11
21    A.   That would have prevented us from  15:59:16
22  making that request.           15:59:17
23    Q.   Yes. I'm --            15:59:19
24    A.   No, we could have made that   15:59:21
25  request, I'm sure.            15:59:22
```

Page 203

```
1          KARLEEN CARLSON STRAYER        15:59:22
2     Q.   Okay.                  15:59:23
3     A.   The obligated group would have had  15:59:23
4   no obligation to provide them to us but we   15:59:25
5   could have asked for them, yes.      15:59:28
6     Q.   What you described with respect to  15:59:34
7   the bonds being offered in June of the year  15:59:37
8   and the DVOG entities being in June of a   15:59:39
9   fiscal year, that's pure happenstance,   15:59:44
10  correct?                  15:59:47
11    A.   Yes.                  15:59:47
12    Q.   So essentially, it's really just a  15:59:48
13  coincidence that this timing was as you   15:59:52
14  described it, which is, I think, what your   15:59:55
15  testimony is?              15:59:58
16    A.   Happenstance that the bonds were   16:00:01
17  issued in the same month as the fiscal   16:00:02
18  year-end?                 16:00:05
19    Q.   Yes.                  16:00:06
20    A.   Yes, although, I suspect that   16:00:07
21  there was some incentive on the part of the  16:00:09
22  investment bankers to get them issued before  16:00:14
23  June 30th; otherwise, there would have been  16:00:16
24  the desire to include the audits in the   16:00:21
25  official statement and that would have delayed  16:00:24
```

Page 204

```
1          KARLEEN CARLSON STRAYER        16:00:24
2   the bond issue by several months; so it is not  16:00:26
3   unusual that the bankers would have wanted to  16:00:29
4   see these done before the end of the fiscal   16:00:32
5   year.                  16:00:34
6     Q.   Okay. But if that occurred, you   16:00:35
7   wouldn't do anything about it, right?   16:00:41
8         MS. HACKETT: Object, if that   16:00:43
9   occurred.                 16:00:44
10        MR. KRUSKO: What she just   16:00:44
11  described in terms of the involvement of   16:00:45
12  bankers in wanting to offer bonds before the  16:00:47
13  close of the fiscal year.       16:00:52
14    Q.   If that occurred in this instance  16:00:53
15  with respect to DVOG --         16:00:55
16    A.   In this instance, you're correct,  16:00:57
17  I, I am not aware of that conversation   16:00:58
18  actually occurring.           16:01:01
19    Q.   Okay. And in fact, you're not   16:01:02
20  aware that that actually happened in this   16:01:04
21  instance?                 16:01:06
22    A.   I'm not aware. Just from my   16:01:07
23  experience doing new business transactions,   16:01:08
24  I've heard that.            16:01:10
25    Q.   Okay. If you would return with me  16:01:11
```

Page 205

```
1          KARLEEN CARLSON STRAYER        16:01:11
2   to the second page of Exhibit 1887, I'm on   16:01:17
3   page 029894.              16:01:25
4     A.   Okay.                  16:01:28
5     Q.   Are you there?          16:01:31
6     A.   Yes.                  16:01:33
7     Q.   In the second-to-last paragraph,   16:01:33
8   reference is made to $17 million in transfers  16:01:38
9   in the first quarter of fiscal year 1997?   16:01:43
10    A.   Yes.                  16:01:46
11    Q.   I take it Mr. Heberton learned of  16:01:48
12  those additional transfers through review of  16:01:53
13  interim unaudited financial statements?   16:01:57
14        MS. HACKETT: Objection, lack of   16:02:01
15  foundation.               16:02:02
16    A.   I don't know. It would either   16:02:05
17  have been that or conversations with the   16:02:06
18  treasurer, I assume.          16:02:09
19    Q.   Would you turn with me to the   16:02:47
20  third page of Exhibit 1887. If you would just  16:02:48
21  take a moment to review the first paragraph, I  16:03:06
22  would just like to ask you some general   16:03:09
23  questions about it.           16:03:12
24    A.   Okay.                  16:04:06
25    Q.   This paragraph reflects, among   16:04:15
```

52 (Pages 202 to 205)

Page 254

KARLEEN CARLSON STRAYER    17:09:43

1    KARLEEN CARLSON STRAYER    17:09:43
2    determining overhead charges within a complex  17:09:49
3    system there is some degree of judgment that's  17:09:52
4    called for and it's not necessarily a black  17:09:55
5    and white thing because it's one entity    17:09:58
6    basically charging another.    17:10:00
7        And I think what Mr. McConnell is  17:10:04
8    suggesting here is that one way to move funds  17:10:06
9    around is to adjust the level of overhead  17:10:09
10    charges.    17:10:16
11        Q.   And provided there was a rational  17:10:17
12    basis for doing so, Mr. McConnell had the    17:10:21
13    ability to do that?    17:10:25
14        A.   I, I can't -- I don't know what  17:10:29
15    Mr. McConnell had the ability to do; I assume  17:10:32
16    he did, but.    17:10:36
17        Q.   When Mr. Reilly and Mr. Heberton  17:10:39
18    say that Mr. McConnell's disregard for the    17:10:41
19    integrity of the individual Obligated Group's  17:10:46
20    financial statements was disconcerting, does  17:10:49
21    that reflect the fact that just as money can  17:10:51
22    be moved around the AHERF system to support  17:10:54
23    the DVOG, so, too, can money be moved out of  17:10:55
24    DVOG to support other obligated group's or    17:11:01
25    entities within the system?    17:11:03

Page 255

1    KARLEEN CARLSON STRAYER    17:11:03
2        A.   That was like part of it.    17:11:05
3        Q.   And what was the other cause of or  17:11:08
4    the other reason, rather, why Mr. Reilly and  17:11:10
5    Mr. Heberton found these statements    17:11:14
6    disconcerting, to the extent you know?    17:11:17
7        A.   Well, it was, in part, likely  17:11:21
8    because we also insured AGH, so presuming that  17:11:23
9    some of this cash was coming from AGH, it was,  17:11:27
10    in fact, harming our other obligated group.  17:11:30
11        And also, I think, just the    17:11:32
12    fundamental premise that existed at that time;  17:11:36
13    that the obligated group is a separate and    17:11:39
14    discrete credit entity should be treated as    17:11:42
15    such, and not necessarily have large cash    17:11:44
16    transfers going in and out of it.    17:11:48
17        Q.   So these statements imply a lot of  17:11:51
18    activity, I take it, that would have an impact  17:11:57
19    on MBIA because, as you've described, there  17:11:59
20    could be the robbing Peter to pay Paul    17:12:02
21    scenario, whereby money was taken from AGH on  17:12:05
22    transfers to DVOG or money it was transferred  17:12:08
23    from DVOG to AGH, correct; is that a correct  17:12:12
24    scenario?    17:12:17
25        MS. HACKETT: Objection, there are  17:12:19

Page 256

1    KARLEEN CARLSON STRAYER    17:12:19
2    four scenarios in there.  Do you want to break  17:12:21
3    that down a little more?    17:12:22
4        MR. KRUSKO: Fair enough.    17:12:23
5        Q.   One scenario that I believe is  17:12:24
6    covered by your statement is the statement  17:12:26
7    where Mr. McConnell has transferred money from  17:12:28
8    AGH to the DVOG?    17:12:31
9        A.   Yes.  I'm just hesitating because  17:12:33
10    I know that -- I believe some of the cash  17:12:37
11    transfers didn't originate from AGH but    17:12:40
12    perhaps other Eastern or Western entities, so  17:12:43
13    I'm just saying, using that as an example but  17:12:47
14    I think some money did come out of AGH.    17:12:51
15        Q.   Conversely, Mr. McConnell could  17:12:57
16    have taken money from the DVOG and transferred  17:13:01
17    it to AGH or the AGH Obligated Group which may  17:13:04
18    have included other entities in the Western  17:13:11
19    part of Pennsylvania?    17:13:13
20        A.   Yes.    17:13:14
21        Q.   And there's another scenario,    17:13:14
22    which is Mr. McConnell can take money from  17:13:17
23    either the AGH or the AGH Obligated Group or  17:13:21
24    DVOG, so it leaves the obligated group's for  17:13:25
25    which MBIA had provided bond insurance?    17:13:29

Page 257

1    KARLEEN CARLSON STRAYER    17:13:29
2        A.   Yes.    17:13:32
3        Q.   All of those scenarios have    17:13:35
4    financial impacts for MBIA, because MBIA had  17:13:38
5    provided bond insurance for the DVOG bonds and  17:13:42
6    for bonds issued on behalf of AGH, correct?  17:13:45
7        A.   Well, it would have a financial  17:13:49
8    impact for the entity that has the cash    17:13:50
9    flowing in and out.  It wouldn't necessarily  17:13:55
10    have impact on MBIA unless, of course, we had  17:13:57
11    a bankruptcy or inability to make debt    17:14:00
12    service.    17:14:03
13        Q.   Or a bond covenant?    17:14:04
14        A.   Or a bond covenant default, yes.  17:14:06
15        Q.   At this point in time, the DVOG  17:14:09
16    was experiencing financial difficulties?    17:14:11
17        A.   Yes.    17:14:14
18        Q.   As reflected by the Alert Report  17:14:15
19    that we just saw?    17:14:18
20        A.   Yes.    17:14:21
21        Q.   What, if any, steps did you take  17:14:24
22    to get to the bottom of what's being described  17:14:26
23    here?    17:14:29
24        A.   We were, during this time period,  17:14:31
25    having very frequent conversations with Dave  17:14:33

65 (Pages 254 to 257)

Page 258

| | | |
|---|---|---|
| 1 | KARLEEN CARLSON STRAYER | 17:14:33 |
| 2 | McConnell and Mike Martin and, I believe, | 17:14:36 |
| 3 | other people at DVOG, primarily David, | 17:14:40 |
| 4 | Mr. McConnell and Mr. Martin. | 17:14:46 |
| 5 | We were asking for reports and, | 17:14:51 |
| 6 | again, I cannot specify the exact time frame | 17:14:53 |
| 7 | we were doing these things but we were having | 17:14:57 |
| 8 | more frequent meetings with them. | 17:14:58 |
| 9 | This was a very -- this was | 17:15:09 |
| 10 | becoming a very active remediation at this | 17:15:09 |
| 11 | point in time; there was a lot of activity | 17:15:09 |
| 12 | going on with this and a lot of many, many | 17:15:09 |
| 13 | conversations occurring. | 17:15:11 |
| 14 | Q.  These statements that are | 17:15:13 |
| 15 | contained in this passage, the last paragraph | 17:15:14 |
| 16 | on the first page of Exhibit 2194, correct? | 17:15:17 |
| 17 | serious ramifications for MBIA, correct? | 17:15:21 |
| 18 | MR. WITTEN: Objection. | 17:15:25 |
| 19 | A.  Could you clarify your question? | 17:15:31 |
| 20 | Q.  Okay. This transferring around of | 17:15:33 |
| 21 | funds from one obligated group to another | 17:15:41 |
| 22 | that's described here could have serious | 17:15:43 |
| 23 | ramifications for MBIA, given that MBIA, | 17:15:46 |
| 24 | again, had insured DVOG and AGH bonds? | 17:15:50 |
| 25 | A.  Well, you know, just given what | 17:15:55 |

Page 259

| | | |
|---|---|---|
| 1 | KARLEEN CARLSON STRAYER | 17:15:55 |
| 2 | Dick and Chip are describing here, it's clear | 17:15:58 |
| 3 | they see this as sort of a double-edge sword | 17:16:01 |
| 4 | in that we did view at that time AGH as a | 17:16:06 |
| 5 | strong entity; and, so, the fact that they | 17:16:09 |
| 6 | were moving cash out of the West to support | 17:16:12 |
| 7 | the East, while we did not like the fact that | 17:16:15 |
| 8 | they were not -- they were sort of | 17:16:18 |
| 9 | disregarding the integrity of the obligated | 17:16:19 |
| 10 | group, if the cash transfers were going that | 17:16:23 |
| 11 | way, it did benefit us. So there was, there | 17:16:24 |
| 12 | was a positive to what they were doing. | 17:16:28 |
| 13 | Now, the risk, as you mentioned | 17:16:31 |
| 14 | earlier, is that the cash could go back out | 17:16:33 |
| 15 | and, in fact, that did eventually happen. | 17:16:35 |
| 16 | But, at this point in time, it appears that | 17:16:37 |
| 17 | they are supporting the East with the West and | 17:16:41 |
| 18 | that, that did give us a little bit of | 17:16:44 |
| 19 | comfort, I think. | 17:16:46 |
| 20 | Q.  Right. But additional money was | 17:16:48 |
| 21 | being taken out of DVOG to fund the physician | 17:16:49 |
| 22 | practice acquisition strategy that was being | 17:16:52 |
| 23 | pursued by AHERF at this point in time? | 17:16:54 |
| 24 | MS. HACKETT: Objection, asked and | 17:16:56 |
| 25 | answered. | 17:16:57 |

Page 260

| | | |
|---|---|---|
| 1 | KARLEEN CARLSON STRAYER | 17:16:57 |
| 2 | You can answer. | 17:16:59 |
| 3 | A.  It's true, but those were -- I'm | 17:17:02 |
| 4 | sure that DVOG people would have called those | 17:17:05 |
| 5 | "investments," in that they -- you know, it | 17:17:08 |
| 6 | wasn't just cash being transferred out for no | 17:17:11 |
| 7 | reason, it was cash they were transferring | 17:17:14 |
| 8 | out, assuming that they would increase their | 17:17:17 |
| 9 | volume by doing so. So, you know, the | 17:17:19 |
| 10 | strategy ended up not being effective but that | 17:17:22 |
| 11 | was their plan and had their plan worked we | 17:17:25 |
| 12 | might not have been that troubled by those | 17:17:28 |
| 13 | transfers. | 17:17:30 |
| 14 | Q.  My understanding is that as | 17:17:34 |
| 15 | manager of the Healthcare Group in the | 17:17:37 |
| 16 | Surveillance Department, when you were | 17:17:41 |
| 17 | confronted with the remediation, you first | 17:17:41 |
| 18 | started your responsibility to have | 17:17:47 |
| 19 | discussions with the CFO, correct? | 17:17:48 |
| 20 | A.  We frequently did. | 17:17:52 |
| 21 | Q.  I'm talking about yourself, | 17:17:53 |
| 22 | though, as manager? | 17:17:56 |
| 23 | A.  As manager? | 17:17:57 |
| 24 | Q.  Yes. | 17:17:58 |
| 25 | A.  It would depend on the extent of | 17:17:58 |

Page 261

| | | |
|---|---|---|
| 1 | KARLEEN CARLSON STRAYER | 17:17:58 |
| 2 | the people and the majority of the analyst | 17:18:01 |
| 3 | that was assigned to that particular credit. | 17:18:03 |
| 4 | Q.  Let me ask you this more | 17:18:05 |
| 5 | generally: To the extent you received answers | 17:18:06 |
| 6 | from the CFO that you weren't happy with, was | 17:18:08 |
| 7 | it your practice, as manager of the Healthcare | 17:18:11 |
| 8 | Group in the Surveillance Department, to then | 17:18:14 |
| 9 | take the matter up with the entity's CEO? | 17:18:15 |
| 10 | A.  Yes; although, I would -- it | 17:18:22 |
| 11 | wasn't necessarily that we weren't happy with | 17:18:25 |
| 12 | the answers. We, you know, as -- as we became | 17:18:27 |
| 13 | aware of more financial difficulty, it would | 17:18:35 |
| 14 | be neutral for us to sort of increase the | 17:18:38 |
| 15 | seniority of the individuals we were talking | 17:18:40 |
| 16 | with; so a next step would have been the CEO | 17:18:42 |
| 17 | after the CFO. | 17:18:46 |
| 18 | Q.  Okay. After you received this | 17:18:47 |
| 19 | Call Memorandum, Exhibit 2194, did you attempt | 17:18:50 |
| 20 | to contact Sherif Abdelhak, the CEO of AHERF? | 17:18:54 |
| 21 | A.  I believe that after this point we | 17:19:01 |
| 22 | did try to organize a meeting with him and | 17:19:04 |
| 23 | some others, and I cannot be specific on the | 17:19:09 |
| 24 | time frame, I'm not sure, but we did have a | 17:19:12 |
| 25 | meeting planned. | 17:19:15 |

66 (Pages 258 to 261)

Page 262

```
1           KARLEEN CARLSON STRAYER        17:19:15
2       We flew out to -- first we met in   17:19:16
3    Philadelphia with some people and then we flew  17:19:20
4    out in Pittsburgh, and I believe it was in   17:19:23
5    Pittsburgh we were supposed to meet with   17:19:25
6    Sherif Abdelhak, and when we arrived we were  17:19:29
7    told that he had an emergency and could not  17:19:31
8    meet with us; so it was actually at a later  17:19:32
9    meeting that we ended up meeting him.        17:19:35
10      Q.  When was that first meeting        17:19:38
11   scheduled for, if you know?             17:19:41
12      A.  I don't recall exactly.  There's  17:19:42
13   probably a memo about it somewhere.      17:19:43
14      Q.  Do you recall the year?         17:19:46
15      A.  The first meeting?            17:19:47
16      Q.  No.  Just to be specific -- the  17:19:48
17   first meeting in terms of the one where you  17:19:51
18   flew out and Mr. Abdelhak said that he wasn't  17:19:53
19   available and you weren't able to meet with  17:19:57
20   him, was that '97 or '98?            17:19:59
21      A.  I think '97.            17:20:02
22      Q.  But you're not certain?        17:20:10
23      A.  I'm not certain.            17:20:11
24      Q.  Do you recall how much time        17:20:13
25   elapsed between your first attempt to meet  17:20:14
```

Page 263

```
1           KARLEEN CARLSON STRAYER        17:20:14
2    with Mr. Abdelhak and the second time?      17:20:16
3       A.  I'm not sure how much time there  17:20:21
4    was.  But I should point out during this time  17:20:23
5    we're having a lot of conversations with David  17:20:28
6    McConnell and Mike Martin, and they are  17:20:38
7    providing us with lots and lots of      17:20:38
8    information, we're getting a lot of      17:20:38
9    information from them.            17:20:40
10      Q.  Right.            17:20:41
11      A.  So I think our purpose in meeting  17:20:42
12   with Sherif was more to make a point than to  17:20:45
13   ask questions.  We weren't trying to get  17:20:49
14   necessarily more information from him; we were  17:20:52
15   trying to convey a message to him.      17:20:54
16      Q.  In terms of lots and lots of      17:20:56
17   information, I take it you mean lots and lots  17:20:58
18   of unaudited financial information?      17:21:01
19      A.  And a lot of phone calls.  So we  17:21:05
20   would, we were doing a lot of phone calls with  17:21:07
21   the financial folks at AHERF to understand the  17:21:09
22   numbers that we had and what was going on.  17:21:13
23      Q.  So possibly some projections?      17:21:15
24      A.  Possibly.            17:21:19
25      Q.  But no additional audited      17:21:21
```

Page 264

```
1           KARLEEN CARLSON STRAYER        17:21:21
2    financial information, because again, the DVOG  17:21:23
3    was on a June 30 fiscal year?        17:21:29
4       A.  Well, we eventually got the 1997  17:21:32
5    financials, audited financial statements, but,  17:21:36
6    yes, we only got the audits as they came due.  17:21:41
7       Q.  So in this time frame, April 1997,  17:21:43
8    the lots and lots of information you're  17:21:46
9    receiving is unaudited financial information,  17:21:49
10   amongst other information?        17:21:51
11      A.  Yes.            17:21:54
12      Q.  Earlier you testified that with  17:21:56
13   respect to Sacred Heart Hospital you      17:21:58
14   personally met on at least three occasions  17:21:59
15   with the Sacred Heart Hospital Executive  17:22:02
16   Committee, correct?            17:22:06
17      A.  Yes.            17:22:07
18      Q.  And the Executive Committee was  17:22:08
19   comprised of trustees for Sacred Heart  17:22:09
20   Hospital?            17:22:13
21      A.  Yes.            17:22:14
22      Q.  On receiving this memorandum, did  17:22:15
23   you make any attempt to meet with the AHERF  17:22:17
24   board to discuss this surreptitious moving of  17:22:21
25   funds as described here?            17:22:25
```

Page 265

```
1           KARLEEN CARLSON STRAYER        17:22:25
2       A.  I don't believe so.        17:22:27
3       Q.  Why not?            17:22:27
4       A.  Because, for several reasons:      17:22:32
5    There -- I believe we had the view that the  17:22:36
6    problem was still controllable because some of  17:22:39
7    the, some of the things, for example, in the  17:22:44
8    prior memo, referred to the fact that the  17:22:46
9    physician -- the payments to the physicians  17:22:49
10   were yielding increased volume, we saw that as  17:22:51
11   a good sign.            17:22:55
12       I believe in this memo it says      17:22:56
13   that the physician acquisition strategy had  17:22:57
14   stopped.  And so, we felt that some of the  17:23:01
15   things -- some of the negative financial  17:23:05
16   affects of their reorganization and physician  17:23:08
17   acquisition strategy were at an end and there  17:23:12
18   would, perhaps, be some stability in the  17:23:17
19   system.            17:23:20
20       We were, in some sense, viewing  17:23:21
21   these cash transfers as a mitigant to us on  17:23:24
22   the DVOG side; so we wouldn't, we wouldn't at  17:23:27
23   this point have gone to the board to complain  17:23:31
24   about this because at this point the movement  17:23:34
25   of the funds was actually helping us; so we  17:23:36
```

67 (Pages 262 to 265)

Page 266

```
1        KARLEEN CARLSON STRAYER      17:23:36
2   wouldn't go to the board to try to stop that   17:23:41
3   from happening.                  17:23:42
4        Q.   Was there any guarantee at this   17:23:43
5   point in time that the movement of funds      17:23:45
6   described in Exhibit 2194 was going to        17:23:47
7   continue to help the DVOG?       17:23:50
8        A.   Well, there was no guarantee.   17:24:00
9   There was a representation that, by the CFO   17:24:02
10  here, that he moved around funds as necessary,  17:24:06
11  but there were certainly no guarantee that he  17:24:09
12  was going to do that.            17:24:13
13       Q.   Did you attempt to get such a   17:24:14
14  guarantee from Mr. McConnell or anyone else at  17:24:16
15  AHERF?                          17:24:21
16       A.   I don't know that, other than an  17:24:25
17  amendment to the bond documents, whether any  17:24:29
18  sort of guarantee would have been, would have  17:24:33
19  been something we could count on.      17:24:41
20       I mean, we would have needed a      17:24:43
21  contractual obligation from them, so we would  17:24:45
22  have had to have them amend the bond documents  17:24:47
23  in some fashion, I assume, and no, that wasn't  17:24:50
24  anything we asked for specifically.       17:24:54
25       Q.   Did you or did anyone on your   17:24:57
```

Page 267

```
1        KARLEEN CARLSON STRAYER      17:24:57
2   staff undertake any investigation to determine  17:25:01
3   whether the bond documents could be amended in  17:25:02
4   the way you're describing?       17:25:05
5        A.   No, we didn't.         17:25:08
6        Q.   Why not?              17:25:09
7        A.   Because I think -- a lot depends  17:25:13
8   on what time period you're talking about.   17:25:16
9        Q.   I'm talking about in the time   17:25:18
10  frame of this memorandum, April 30th, 1997.   17:25:19
11       A.   April.  Well, I think it's   17:25:25
12  important to remember that our view at this   17:25:29
13  time, while we were very concerned with the   17:25:30
14  cash position, we -- our understanding was   17:25:33
15  that DVOG, DVOG in and of itself, entities   17:25:36
16  operating within that system, were profitable.  17:25:44
17  And that the problem was, the severity of the  17:25:46
18  problem was really caused by the physician   17:25:49
19  practice plan.  And we viewed that as something  17:25:52
20  that could be controlled, to some extent.   17:25:54
21       So it was -- you know, we did not   17:26:00
22  view this as the operating entities within   17:26:01
23  DVOG were bleeding and needed the West   17:26:03
24  support; we viewed this as a specific problem  17:26:06
25  caused by the physician acquisitions.      17:26:09
```

Page 268

```
1        KARLEEN CARLSON STRAYER      17:26:09
2        Q.   And again, you personally believed  17:26:12
3   that this was a controllable problem?      17:26:14
4        A.   We felt, at least as, you know, at  17:26:17
5   April 1997, that this was a situation that   17:26:22
6   AHERF management team could correct, yes.   17:26:27
7        Q.   I'm specifically asking you   17:26:32
8   whether you personally thought that MBIA could  17:26:33
9   "control" this problem?          17:26:39
10       A.   MBIA could control this moment.  17:26:41
11       Q.   Yes, you several times used the   17:26:51
12  phrase "controllable problem."    17:26:51
13       A.   No, MBIA had no control rights   17:26:51
14  whatsoever.  We had no breach of a covenant.   17:26:51
15  We had -- you know, we never have the ability  17:26:53
16  to control management.           17:26:54
17       Our rights and remedies always   17:26:55
18  come through the bond documents, through the   17:26:57
19  covenants and nothing had been breached.   17:26:59
20       Q.   So this --              17:27:01
21       A.   We had no rights.        17:27:02
22       Q.   So the surreptitious moving of   17:27:03
23  funds described here was a controllable   17:27:08
24  problem, "controllable" meaning on the part of  17:27:10
25  AHERF, AHERF could control this?   17:27:13
```

Page 269

```
1        KARLEEN CARLSON STRAYER      17:27:13
2        MR. WITTEN:  Objection.       17:27:15
3        A.   Well, when I say "controllable   17:27:19
4   problem," I meant something broader than just   17:27:21
5   moving the funds around.  To us, moving the   17:27:22
6   funds, in some ways, wasn't necessarily a   17:27:26
7   problem; it was relieving DVOG, to some   17:27:28
8   extent.                         17:27:31
9        The problem to which I was       17:27:32
10  referring was the fact that they had these   17:27:34
11  major transfers going out to fund the   17:27:35
12  physician losses; so I guess it depends on   17:27:38
13  whether the cash transfers, if you're   17:27:41
14  referring to the cash transfers coming from   17:27:43
15  the West or if you're referring to the cash   17:27:45
16  transfers going out for the physician   17:27:48
17  acquisitions, and that we did view as a   17:27:49
18  problem and we did view that as a problem that  17:27:52
19  they could control.  I don't know if I'm being  17:27:54
20  clear, but that was my intention.      17:27:58
21       Q.   Final question:  But MBIA could   17:28:09
22  only attempt to influence AHERF physician   17:28:11
23  practice acquisition strategy, it didn't   17:28:16
24  control it?                      17:28:18
25       A.   Right.                 17:28:19
```

68 (Pages 266 to 269)

Page 270

```
                                              17:28:19
1          KARLEEN CARLSON STRAYER
2          MR. KRUSKO: Let's go off the     17:28:21
                                     17:28:21
3    record.
                                              17:28:25
4          THE VIDEO OPERATOR: Going off the
5    record at 5:28 p.m. This is the end the tape  17:28:25
                                           17:28:30
6    number three.
7          (Time Noted:  5:28 p.m.)         17:28:35
8
9    _____
10         KARLEEN CARLSON STRAYER
11
12   Subscribed and sworn to before me
13   this _____ day of _____, 2003.
14
15   _____
16
17
18
19
20
21
22
23
24
25
```

Page 272

```
1          KARLEEN CARLSON STRAYER
2          C E R T I F I C A T E
3    STATE OF NEW YORK   )
4                        : ss.
5    COUNTY OF NEW YORK  )
6
7          I, PHYLISS SALIMBENE, a Registered
8    Professional Reporter and Notary Public within
9    and for the State of New York, do hereby
10   certify:
11         That KARLEEN CARLSON STRAYER, the
12   witness whose deposition is hereinbefore set
13   forth, was duly sworn to by me and that such
14   deposition is a true record of the testimony
15   given by the witness.
16         I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage, and that I am in no way
19   interested in the outcome of this matter.
20         IN WITNESS WHEREOF, I have
21   hereunto set my hand this _____ day of
22   _____, 2003.
23
24   _____
25         PHYLISS SALIMBENE, RPR
```

Page 271

```
1          KARLEEN CARLSON STRAYER
2    STATE OF NEW YORK    )    Pg__of__Pgs
3                         ss:
4    COUNTY OF NEW YORK   )
5          I wish to make the following changes,
6    for the following reasons:
7    PAGE LINE
8    ____ ____  CHANGE: _____
9          REASON: _____
10   ____ ____  CHANGE: _____
11         REASON: _____
12   ____ ____  CHANGE: _____
13         REASON: _____
14   ____ ____  CHANGE: _____
15         REASON: _____
16   ____ ____  CHANGE: _____
17         REASON: _____
18   ____ ____  CHANGE: _____
19         REASON: _____
20   ____ ____  CHANGE: _____
21         REASON: _____
22   ____ ____  CHANGE: _____
23         REASON: _____
24
25
```

Page 273

```
1          KARLEEN CARLSON STRAYER
2          E X H I B I T S
     DESCRIPTION                    PAGE
3    (Deposition Exhibit 2191 for identification,
     two-page document, production numbers MBIA
4    047948 to MBIA 047949.)............... 109:16
5    (Deposition Exhibit 2192 for identification,
     copy of a transcript.)................ 173:12
6
     (Deposition Exhibit 2193 for identification,
7    Alert Report, production numbers MBIA 029899.)
     ...................................... 210:22
8
     (Deposition Exhibit 2194 for identification,
9    Call Memorandum dated April 30, 1997,
     production numbers MBIA 029900 through MBIA
10   029902.)............................. 244:5
11
12   EXHIBITS SHOWN THAT WERE PREVIOUSLY MARKED

     EXHIBIT         PAGE
13
14   1884 .................... 153:12
15   1885 .................... 165:17
16   1887 .................... 190:23
17
18
19
20
21
22
23
24
25
```

69 (Pages 270 to 273)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP,*

---

## *KARLEEN CARLSON STRAYER*
### *October 9, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**STRAYER, KARLEEN CARLSON - Vol. II**



**LEGALINK**

A WORDWAVE COMPANY



Page 303

KARLEEN CARLSON STRAYER

1    who all attended that meeting.
2    Q.    You're referring to David Barnes
3    and Ira Gumberg?
4    A.    Yes.
5    Q.    What did Mr. Barnes tell you at
6    this meeting about the Mellon repayment?
7    A.    I can't recall.  It was -- I can't
8    recall who finally told us that the payment
9    had been made; we did eventually discover the
10   payment had been made but we did not -- I
11   mean, this was happening over a matter of a
12   course of days, not weeks or months, so, so we
13   kept asking different people because some
14   people were saying "no" and, of course, we
15   knew it was imminent, so we were trying to
16   understand what was going on, but I can't
17   recall specifically what the trustees
18   indicated to us.
19   Q.    Just to be clear, I take it you
20   don't recall anything that Mr. Gumberg told
21   you at this meeting?
22   A.    I recall that the trustees, and I
23   don't know if specifically Mr. Gumberg, but I
24   recall that they were in some sense relieved

Page 305

KARLEEN CARLSON STRAYER

1    knew at the time, that the bank did have some
2    leverage.
3    Q.    Did you subsequently learn
4    anything about the payment?
5    A.    We learned it had been repaid.
6    Q.    Let me ask you this:  Is it your
7    recollection that there were individuals who
8    served in this time frame both on the board of
9    Mellon Bank and on the AHERF board of
10   trustees?
11   A.    Yes.
12   Q.    Do you know one way or the other
13   whether any of those individuals exerted any
14   influence over the decision by AHERF to repay
15   the Mellon line of credit?
16   A.    I don't know.
17   MR. KRUSKO: Can I suggest a coffee
18   break?
19   THE VIDEO OPERATOR:  Going off --
20   MR. KRUSKO: Hearing no objection.
21   THE VIDEO OPERATOR:  Going off the
22   record at 10:17.
23   (Recess taken.)
24   THE VIDEO OPERATOR:  Returning to

Page 304

KARLEEN CARLSON STRAYER

1    because there had been an employee reduction
2    in force not too long before that and they saw
3    that as a -- something that could help the
4    health, financial health of the organization;
5    they saw that as a positive, so that they
6    talked about that.
7    Q.    But you don't remember any
8    comments that Mr. Gumberg may have made during
9    this meeting about the Mellon line of credit
10   repayment?
11   A.    Not specific comments, no.
12   Q.    When you say that "MBIA knew the
13   repayment was imminent," what's your basis for
14   your statement?  And I should be clear, I
15   believe you testified that going into this
16   meeting MBIA knew that the payment was
17   imminent.
18   A.    Yes.  I don't recall how we knew
19   that.
20   Q.    You just recall a feeling that
21   this was -- no, I'm just trying --
22   A.    No, I think they had a default of
23   some sort or it was expiring that -- the bank
24   had some leverage, I believe; that's all we

Page 306

KARLEEN CARLSON STRAYER

1    the record at 10:21.
2    MR. KRUSKO: I would note for the
3    record that Exhibit 2194 appears to be
4    identical to Exhibit 1895.
5    (Deposition Exhibit 2195 for
6    identification, document, production numbers
7    MBIA 007744 through MBIA 007756.)
8    Q.    Ms. Strayer, let me hand you what
9    has been marked as Exhibit 2195.
10   MR. KRUSKO: For the record, I
11   would note that Exhibit 2195 bears the Bates
12   numbers MBIA 007744 through MBIA 007756.
13   Q.    Ms. Strayer, if I could ask you at
14   the outset, do you recognize this document?
15   A.    Yes.
16   Q.    What is this document?
17   A.    It's a document that our group
18   would prepare on credits that were on the
19   caution list or weaker.
20   Q.    I take it, then, Mr. Heberton
21   performed this analysis in the wake of the
22   DVOG entities being placed on the caution list
23   in the February 1997 time frame?
24   A.    Yes, it looks like it.

9 (Pages 303 to 306)

Page 307

KARLEEN CARLSON STRAYER

1
2   Q.   And this is a standard form that
3   MBIA used at the time for performing this sort
4   of analysis?
5   A.   Yes.
6   Q.   Did you review this analysis after
7   Mr. Heberton had written it?
8   A.   Yes.
9   Q.   And did you approve of its
10  contents before it was filed?
11  A.   Well, we didn't -- I didn't
12  necessarily have an approval process for a
13  document like this.  Dick was simply -- he was
14  simply putting on paper what the conditions
15  were in the legal documents and some other
16  information; so, I reviewed it.  I wouldn't
17  necessarily have had to approve this kind of
18  document.
19  Q.   What happened, I just want to be
20  clear on the process, what happened after
21  Mr. Heberton wrote it and you reviewed it?
22  I'm just trying to get a sense as to what to
23  this file signifies.
24  A.   He's sending it to the file but
25  the purpose of the document is not necessarily

Page 309

KARLEEN CARLSON STRAYER

1
2   correct?
3   A.   Yes.
4   Q.   I'm sorry, waivers and control of
5   remedies, as well.
6        He then writes:  One problem is
7   that the asset transfer test does not follow
8   MBIA's standard conditions, and this has
9   allowed ADVOG to transfer substantial levels
10  of cash without breaking the covenant.  The
11  standard test is 10 percent of PP&E; in this
12  case, equal to 42 million.  The test in the
13  MTI allows ADVOG to transfer 8 percent of
14  all -- and "all" is underlined -- assets for
15  about 76 million per year.  Do you see that?
16  A.   Yes.
17  Q.   Do you have an understanding as to
18  what Mr. Heberton meant by the "standard test
19  is 10 percent of PP&E"?
20  A.   Well, a very common test in our
21  healthcare documents is 10 percent of PP&E,
22  but it's also not totally uncommon to see a
23  test based on total assets.
24  Q.   Is the 10 percent of PP&E test --
25  withdrawn.

Page 308

KARLEEN CARLSON STRAYER

1
2   to paper the file but, rather, this was a
3   document we could use during our remedial
4   activities.  It was a way to summarize some of
5   the key points within the legal documents so
6   that we could refer to this quickly as opposed
7   to constantly going back to the bond
8   documents.
9   Q.   So is it fair to say that Exhibit
10  2195 was a reference tool that MBIA's
11  Healthcare Group in the Surveillance
12  Department used during the remediation process
13  with respect to the DVOG?
14  A.   Yes.
15  Q.   Would you turn with me to page
16  007745, the second page of this document.
17  A.   Okay.
18  Q.   I take it this caption contains
19  Mr. Heberton's overview of the applicable
20  legal documents with respect to the DVOG
21  offering?
22  A.   Yes, he's summarizing them.
23  Q.   Mr. Heberton at the outset notes
24  that the documents appear in good shape and
25  give MBIA reasonable control over consents,

Page 310

KARLEEN CARLSON STRAYER

1
2        Was the 10 percent of PP&E test
3   MBIA's standard test for asset transfers in
4   this time frame?
5   A.   It was a, it was a common test.
6   It wasn't -- there was no mandate that that
7   was the test the analysts had to have, but it
8   was, it was common in these documents, in
9   these types of documents.
10  Q.   Was it a standard test?
11  A.   Define "standard."  I'm just, I'm
12  saying it's "common"; it wasn't unusual to
13  have used that.  He's using the word
14  "standard."  I doubt he put, he put a
15  tremendous amount of thought into that.
16       It was simply something that we
17  would frequently see in healthcare documents.
18  10 percent of PP&E was a fairly frequent test
19  and I think that's what he means by
20  "standard."
21  Q.   Do you know how the eight percent
22  of all assets test was incorporated into the
23  master trust indenture for the DVOG bond
24  offering, the circumstances surrounding that
25  decision?

10 (Pages 307 to 310)

Page 311

```
 1          KARLEEN CARLSON STRAYER
 2      A.    Oh, why it was eight percent
 3   versus something else?
 4      Q.    Yes.
 5      A.    I don't know.
 6      Q.    Did you ever undertake any
 7   investigation or direct anyone on your staff
 8   to undertake an investigation as to why the
 9   test was eight percent of all assets and not
10   10 percent of PP&E?
11      A.    No.
12      Q.    Why not?
13      A.    Because having a test based on all
14   assets was not totally uncommon.  It wasn't --
15   this would not have been the only time I had
16   ever seen a test based on total assets.
17          Also, as Dick points out, we just
18   had recently closed the transaction and at the
19   time the transaction closed we had a view of
20   this client as a very -- as a creditworthy
21   client, as a strong system, a strong
22   management team; so the fact that the
23   underwriter, the analyst who underwrote the
24   deal had chosen to give them a test that might
25   have been a little bit looser than we
```

Page 312

```
 1          KARLEEN CARLSON STRAYER
 2   frequently found was not -- that would not
 3   have set off alarm bells in my head.
 4          I would have wished for a tighter
 5   test because clearly the purpose of this
 6   document and the reason Dick is summarizing
 7   this is that in a remediation, MBIA is looking
 8   for some way to control what's happening with
 9   the credit, and so, he is trying to find a
10   covenant default of some sort to give us a
11   little bit of control; and clearly, from this,
12   he hasn't found it.
13      Q.    So given that you've testified
14   that a covenant default gives us, meaning
15   MBIA, a little bit of control, I take it MBIA
16   has no control over the remediation process in
17   the absence of a covenant default?
18      A.    We have no legal remedies, if
19   that's what you mean by "control."  We do not
20   have legal remedies until the covenant is
21   breached.
22      Q.    Is it your understanding that
23   Mr. Heberton derived these absolute amounts,
24   by that I mean 42 million and 76 million, from
25   a review of the FY '96 DVOG audited financial
```

Page 313

```
 1          KARLEEN CARLSON STRAYER
 2   statements?
 3      A.    I would assume so, since this
 4   report is dated subsequent to our receipt of
 5   those financial statements.
 6      Q.    And that would have been standard
 7   practice for an analyst under your supervision
 8   performing this sort of legal documents
 9   overview in this time frame?
10      A.    It would have been standard --
11   Dick, Dick is pointing out this particular
12   test in this set of documents, because this is
13   a -- an issue that AHERF is having in terms of
14   the cash transfers and it is a concern of
15   ours.
16          Each, each remedial initiative we
17   undertook was very specific to the issues that
18   that particular credit was having; so, in a
19   different client, we might have written
20   something totally different.
21          He is simply pointing this out for
22   AHERF because cash transfers was of particular
23   concern to us with, with AHERF.
24      Q.    I understand that.  All I asked
25   was that, was whether it was the practice of
```

Page 314

```
 1          KARLEEN CARLSON STRAYER
 2   analysts in the Healthcare Group in the
 3   Surveillance Department to refer back to the
 4   most recent audited annual financial
 5   statements in performing the legal documents
 6   overview, such as this, to the extent they
 7   needed to refer to some financial information.
 8      A.    Yes, to the extent they were
 9   trying to calculate a covenant, yes,
10   absolutely.
11      Q.    MBIA clearly knew in the months
12   leading up to the DVOG bond offering that the
13   entities that were going to comprise the DVOG
14   were making support payments to AIHG, the
15   physician practice acquisition organization,
16   correct?
17      A.    Yes.
18      Q.    And that was clearly reflected in
19   the official statement, Exhibit 408, which we
20   looked at yesterday?
21      A.    Yes.
22      Q.    In light of that knowledge,
23   shouldn't the healthcare analyst on the new
24   business side have paid particular attention
25   to the stringency of the asset transfer test?
```

11 (Pages 311 to 314)

KARLEEN CARLSON STRAYER

1           KARLEEN CARLSON STRAYER
2      A.   I cannot speak to what the
3  negotiations were and what they were thinking
4  at that time.  I, I -- you know, I would
5  assume that that was something the analyst
6  reviewed.
7      Q.   And that would have been your
8  expectation as someone who was responsible for
9  monitoring the credits after the decision had
10 been made to provide MBIA bond insurance?
11     A.   It would have been my expectation
12 that the analyst who underwrote the credit
13 would have a -- would have done a fair amount
14 of due diligence, would have understood the
15 dynamics of the credit and would have
16 negotiated documents that reflected their view
17 of the financial health of the credit.
18     Q.   Mr. Heberton notes that the test
19 in the MTI results in a ceiling on transfers
20 of 76 million per year; is that correct?
21          MR. WITTEN:  Objection.
22     A.   He's calculated it for that
23 particular year; that number would change
24 based on what year you're calculating it, but,
25 yes.

1           KARLEEN CARLSON STRAYER
2      Q.   Absolutely correct.
3          So to be specific, this is his
4  calculation of the ceiling in fiscal year
5  1996?
6      A.   Yes.
7      Q.   And is it your recollection that
8  in fiscal year 1996 the DVOG transferred to
9  affiliates $73 million?
10     A.   Roughly.  I think we looked at
11 that number yesterday, it was -- that sounds
12 about right.
13         Just wanted to look.
14     Q.   That's all right.  If you wanted
15 to take a look at the FY '96 audited financial
16 statements for DVOG, it's Exhibit 1894.
17     A.   Okay.
18     Q.   And specifically, I would refer
19 you to MBIA 015821.
20     A.   Yes, I see.
21     Q.   And this, again, is the income
22 statement for the DVOG for fiscal year 1996,
23 correct?
24     A.   Yes.
25     Q.   And "transfers to affiliates, net"

1           KARLEEN CARLSON STRAYER
2  is listed as 73,676,000, correct?
3      A.   Yes.
4      Q.   So using round numbers, that's
5  about 2 million shy of the ceiling that year
6  under the eight percent of all assets test?
7      A.   Yes.
8      Q.   So is it your view that someone at
9  AHERF figured out roughly how much money could
10 be transferred out of DVOG without triggering
11 this covenant and AHERF subsequently took
12 advantage of that?
13          MS. HACKETT:  Objection, lack of
14 foundation.
15     A.   I, I wouldn't know.  I have, I
16 have no idea what they were thinking at the
17 time; if they were focusing on, on this
18 specific test, it is possible, but I'd have no
19 way of knowing that.
20     Q.   Once of DVOG bonds had been issued
21 in June of 1996, did MBIA have any way of
22 going back and changing this test
23 unilaterally?
24     A.   No.
25     Q.   Is there any way after the DVOG

1           KARLEEN CARLSON STRAYER
2  bond offering that MBIA could have changed
3  this test?
4      A.   Yes.
5      Q.   What are those ways?
6      A.   If we had had a covenant breach
7  and if AHERF had come to us to waive the
8  covenant breach, we could have negotiated with
9  them a change to the documents of many
10 different forms, including changing this test.
11     Q.   Absent a covenant breach, could
12 MBIA have approached AHERF's senior management
13 and attempted to renegotiate this asset
14 transfer test?
15     A.   We could have tried; I doubt we
16 would have been successful.
17     Q.   Let me break that down into two
18 parts.  You say we could have tried, so I take
19 it MBIA did not try?
20     A.   No, I'm -- I don't believe we did.
21     Q.   And then you testified that you
22 doubt you would have been successful?
23     A.   Yes.
24     Q.   Why do you doubt that you would
25 have been successful, had you tried to

12 (Pages 315 to 318)