KARLEEN CARLSON STRAYER

1   KARLEEN CARLSON STRAYER
2  renegotiate this covenant?
3      A.   Because in my experience, it's not
4  common for a healthcare entity to renegotiate
5  a set of documents to their detriment and
6  potentially create a situation where they will
7  be in default of a covenant.  They would be --
8  that would be very inadvisable for them to do
9  something like that and I think they were way
10  too smart for that.
11      Q.   Right.  AHERF's management got a
12  good deal in this covenant and they weren't
13  going to give it up?
14          MR. WITTEN: Objection.
15          MS. HACKETT: Objection, that's
16  inappropriate to ask her.
17          MR. KRUSKO: I press the question.
18  I don't think it's inappropriate; I'm not
19  trying to be argumentative.
20      Q.   I would just simply like your view
21  as to whether AHERF's management thought they
22  got a good deal and they weren't going to
23  negotiate this test away?
24      A.   You know, it's hard for me to
25  comment on that because any time a deal is

KARLEEN CARLSON STRAYER

1   KARLEEN CARLSON STRAYER
2  done of this sort, the bond documents are
3  substantial and there are many, many tests
4  within the documents, and the way these things
5  get decided is through a negotiation process.
6          So, I, I can't say nothing privy
7  to that negotiation process, whether AHERF's
8  management thought -- had specifically
9  negotiated this point, whether it was a
10  carry-over from some other documents, I don't
11  know how that got in there and whether the
12  management team thought that was a good thing
13  or a bad thing.  Maybe they had asked for a 12
14  percent in total assets and were disappointed
15  at the eight, I don't know.
16      Q.   Okay.
17          (Deposition Exhibit 2196 for
18  identification, an e-mail message to Patrick
19  L. Mathis, production numbers MBIA-SUB 01011.)
20      Q.   Let me show you what we've marked
21  as Exhibit 2196.
22          MR. KRUSKO: For the record, I
23  would note that Exhibit 2196 bears the Bates
24  number MBIA-SUB 01011.
25      A.   Okay.

KARLEEN CARLSON STRAYER

1   KARLEEN CARLSON STRAYER
2      Q.   Do you recognize this as an e-mail
3  message from you to Patrick L. Mathis sent
4  Wednesday, December 9th, 1998 at roughly 2:11
5  in the afternoon?
6      A.   Only because that's what it says;
7  I don't have -- I don't remember this specific
8  e-mail.
9      Q.   Okay.  Did you have any reason to
10  doubt that you did, in fact, send this e-mail
11  to Mr. Mathis?
12      A.   No, I don't have any reason to
13  doubt that.
14      Q.   In this time frame, December 1998,
15  was Mr. Mathis your boss?
16      A.   December 1998, yes, he was.
17      Q.   Do you recall the impetus for your
18  e-mail to Mr. Mathis?
19      A.   I don't know why I would have done
20  this.  I mean, clearly I'm conveying a lessons
21  learned and something we should think about in
22  future underwriting but why at this point in
23  time I decided to do that, I don't know.
24          I'm calling it an "AHERF memo
25  addition," I don't know what that means.

KARLEEN CARLSON STRAYER

1   KARLEEN CARLSON STRAYER
2      Q.   Let me ask you more generally:  Do
3  you recall writing a AHERF memo, something
4  with the title "AHERF memo"?  I'm just trying
5  to understand your reference to the
6  subheading.
7      A.   I don't recall.  I wrote many
8  memos on AHERF and I'm not sure to what I'm
9  referring it here.
10      Q.   You and I have both written many
11  memos on AHERF.
12          The heading which appears in bold
13  is: "Standard Asset Transfer Provisions Do
14  Not Protect Us Against Large Cash Transfers."
15  Do you see that?
16      A.   Yes .
17      Q.   I take it that is your conclusion
18  and then you provide some support for that
19  conclusion in the passage immediately below
20  it?
21      A.   Yes.
22      Q.   In the last line, you have written
23  "Two lessons here:  One, our standard asset
24  transfer test should incorporate a second test
25  specifically restricting cash transfers, and

1        KARLEEN CARLSON STRAYER
2   though, is that I'm expressing frustration
3   that there was no covenant triggered and our
4   hands were tied, in effect, because we're
5   seeking a way to trigger something so that we
6   have some leverage and nothing is getting
7   triggered; I think that's a key point here.
8        Q.    It's your recollection that the
9   DVOG entities filed for bankruptcy without
10  triggering any violation of any covenant in
11  the MBIA bond documents?
12       MR. WITTEN: Objection.
13       A.    Well, I, at the time of the
14  bankruptcy filing, my recollection is that it
15  was our belief that we did not have a covenant
16  breach, but my understanding subsequent to
17  that is that we actually did have a covenant
18  breach, it just wasn't presented in the
19  financial statements.
20       Q.    What covenant breach or what
21  possible covenant breach are you referring to?
22       A.    It's my understanding, and again,
23  this is all subsequent to the bankruptcy
24  filing, that the 1996 financial statement
25  should have indicated a different net income

1        KARLEEN CARLSON STRAYER
2   number, and had the correct number been used
3   there would have been a covenant breach at
4   that time.
5        Q.    Are you referring to the FY '96
6   audited financial statements for DVOG?
7        A.    Yes.
8        Q.    What's your understanding as to
9   what the net income number should have been in
10  fiscal year 1996 for the DVOG?
11       MR. WITTEN: I have to object to
12  the extent that this will cause -- this
13  question invades the attorney-client
14  privilege.
15       MR. KRUSKO: Are you instructing
16  her not to answer?
17       MR. WITTEN: No, because I'm not
18  entirely sure I know what the answer is but to
19  the extent that the question, to the extent
20  that you answer the question and it requires
21  you to divulge conversations that you've had
22  with your counsel or counsel to the creditors
23  committee, then that would be attorney-client
24  privilege.
25       Since you're not my witness, I

1        KARLEEN CARLSON STRAYER
2   can't really instruct you to answer or not to
3   answer.
4        MS. HACKETT: Well, you could
5   follow his advice.
6        And she can answer, again, to the
7   extent it's not based on advice from counsel,
8   but if it's based on advice from counsel, you
9   should not answer the question.
10       THE WITNESS: I'm sorry, if it's
11  not based on advice, does that mean if it's
12  not based on things that I've heard from
13  counsel or?
14       MS. HACKETT: Correct, if it's not
15  based on what you've been told or in meetings
16  with counsel, you can answer, but if it's been
17  based on information gathered by or learned
18  from meetings with counsel, you should not
19  answer the question based upon the
20  attorney-client privilege.
21       THE WITNESS: Okay. Well, I think
22  I cannot answer the question, then.
23       Q.    What covenant was possibly
24  violated as a result of this supposed
25  incorrect net income amount in fiscal year

1        KARLEEN CARLSON STRAYER
2   1996?
3        A.    The rate covenant calculation.
4        Q.    Do you have an understanding as to
5   what it should have been?
6        MR. WITTEN: Objection.
7        MS. HACKETT: That would be the
8   same objection.
9        MR. WITTEN: Same objection.
10       MS. HACKETT: Because that's, in
11  essence, the same question. So therefore --
12       MR. KRUSKO: Well, the ball's in
13  the witness' court. I think now it's based on
14  whether she has an understanding, for one
15  thing, and whether that understanding was
16  gained through conversations with counsel.
17       MS. HACKETT: I disagree with you
18  and I'm instructing her not to answer because
19  I think you're asking her the same thing.
20       Now, to the extent she thinks she
21  can answer because she learned information
22  independent from counsel, again, she knows she
23  can answer it.
24       A.    I did not learn it independent of
25  counsel.

KARLEEN CARLSON STRAYER

1       KARLEEN CARLSON STRAYER
2       Q.   Do you recall being frustrated in
3   the general 1997 to 1998 time frame, I guess
4   leading up to the bankruptcy in July of '98,
5   about the fact that there hadn't been any rate
6   covenant violation that could have resulted in
7   MBIA taking remedial actual?
8       A.   Yes.
9       Q.   And did you express that
10  frustration to anyone at MBIA?
11      A.   I can't recall.
12      Q.   Did you memorialize that
13  frustration in any sort of writing, did you
14  write a memo to files or did you write a memo
15  to anyone else that you can recall, perhaps?
16      MR. WITTEN: Objection.
17      A.   Well, in some sense, the memo I've
18  written here is one indication.  I would not
19  have -- I would have had no reason to write a
20  memo to the file saying I'm frustrated that
21  they haven't breached their covenant, but in
22  any remedial situation we are always focused
23  on the covenant and looking for the breach
24  because that is the only source of leverage,
25  real leverage we have.

1       KARLEEN CARLSON STRAYER
2           And it also is important to us
3   because often, when we go to speak to
4   management and the board, we get a little
5   more-receptive audience when we actually walk
6   in the door and we have a covenant breach.
7           So it's something that is very
8   typical for us to look for.  And the fact that
9   AHERF had the kinds of numbers they did coming
10  out in '96 and '97, and there was nothing
11  being breached, I'm sure I was extremely
12  frustrated during that whole time, but did I
13  put a memo in the file about it, no, I suspect
14  I did not.  It would have been inferred from
15  memos similar to this.
16      Q.   I think you alluded to this
17  earlier, though: The covenants were
18  established as a result of the negotiation
19  process between MBIA and AHERF, such that once
20  the policies were made effective and the bonds
21  issued, there was nothing that MBIA could do
22  to change those covenants outside of the
23  context of a covenant violation?
24      A.   That's right.
25      (Deposition Exhibit 2197 for

1       KARLEEN CARLSON STRAYER
2   identification, a memorandum dated July 23rd,
3   1998, production numbers MBIA 030071 through
4   MBIA 030076.)
5       MR. WITTEN: 2197?
6       MR. KRUSKO: That's right.
7       MR. KRUSKO: For the record, I
8   would note that Exhibit 2197 bears the Bates
9   numbers MBIA 030071 through MBIA 030076.
10      Q.   Ms. Strayer, do you recognize this
11  document?
12      A.   Yes.
13      Q.   Do you recognize this document as
14  a memorandum that you and David Stevens wrote
15  for Dick Weill dated July 23rd, 1998?
16      A.   Yes, I think I wrote it and David
17  reviewed it.
18      Q.   The subject line on the first page
19  of this exhibit states "AHERF talking points
20  for Fidelity visit."  Do you see that?
21      A.   Yes.
22      Q.   What did you refer to there?
23      A.   I am preparing talking points
24  because, evidently, Dick Weill is going to
25  participate in a meeting with Fidelity.

1       KARLEEN CARLSON STRAYER
2       Q.   In this time frame, Fidelity was
3   an investment company?
4       A.   Yes.  Fidelity typically buys many
5   MBIA bonds, MBIA insured bonds, so they are a
6   large bondholder.
7       Q.   These are bonds, just to be clear,
8   issued by MBIA so that MBIA can raise debt?
9       A.   No.  I actually was referring to
10  -- it's possible Fidelity owns our corporate
11  bonds.
12      Q.   Oh.
13      A.   But Fidelity is a large purchaser
14  of MBIA insured bonds in the market.
15      Q.   Thanks.  I just re-read your
16  answer, I noticed that you did say "MBIA
17  insured bonds."
18          Do you have a sense as to the
19  dollar value of the bonds owned by Fidelity in
20  this time frame?
21      A.   I don't.
22      Q.   Do you recall why Mr. Weill was
23  scheduled to visit with representatives of
24  Fidelity in this time frame?
25      A.   I think in this time frame because

Page 367

1          KARLEEN CARLSON STRAYER
2          THE VIDEO OPERATOR:  Going off the
3   record at 11:39.  This is the end of tape
4   number four.
5          (Luncheon Recess taken: 11:39
6   a.m.)

Page 368

1          KARLEEN CARLSON STRAYER
2          A F T E R N O O N   S E S S I O N
3                12:22 p.m.
4          THE VIDEO OPERATOR:  Beginning
5   tape number five and returning to the record
6   at 12:22.
7   K A R L E E N  C A R L S O N  S T R A Y E R,
8   resumed, having been previously duly sworn,
9   was examined and testified further as follows:
10         CONTINUED EXAMINATION
11  BY MR. KRUSKO:
12      Q.   Welcome back, Ms. Strayer.  Before
13  the lunch break we were discussing remedial
14  options, and if I understood your testimony
15  correctly, I believe you testified that
16  bringing in a consultant was one of MBIA's
17  first remedial options in the 1997 time frame.
18      A.   It was one of our first remedial
19  preferences but it wasn't an option for us.
20      Q.   What were some of the other
21  initial remedial preferences that MBIA had at
22  this point in time, 1997?
23      A.   I think in that time frame, one of
24  the things we would have liked to have seen
25  was some sort of guarantee of the DVOG

Page 369

1   entities coming from the Western entities.  We
2   still had a view that the Western entities
3   were fairly strong so we wanted to see a
4   guarantee of some sort or a combination of
5   obligated groups that would support the
6   entities in the East, specifically, DVOG.
7       Q.   Some sort of binding guarantee, I
8   take it?
9       A.   Yes, it would have had to be a
10  binding guarantee to be worth anything to us,
11  yes.
12      Q.   What other initial preferences did
13  MBIA have at this time frame, in this time
14  frame with respect to remediation?
15      A.   Again, could you repeat the time
16  frame you're talking about?
17      Q.   Calendar 1997.
18      A.   Calendar 1997?
19      Q.   Yes.
20      A.   Well, certainly at the beginning
21  of the year, a preference was that they
22  preserve their cash and I don't know if you
23  want to characterize that as a remedial issue
24  or not.

Page 370

1          KARLEEN CARLSON STRAYER
2       I'm sure if we could have been
3   able to get them to agree to a day's
4   cash-on-hand covenant we would have done so,
5   so that's something we often look for when we
6   do remediations.
7       As 1997 went on, we began to have
8   discussions with them about their plans to
9   sell parts of the system to Vanguard and that
10  was an attractive remedial issue to us;
11  again, I don't know if you would characterize
12  that as "remedial" but that's something that
13  we certainly would view as a positive; so, we
14  had discussions about that.
15      I think that we may have talked
16  about, I believe, AHERF, the parent, had a
17  foundation or somewhere in the system was a
18  foundation that we thought had some cash in
19  it, so we were looking at that.
20      You know, had we had the choice,
21  I'm sure we would have tried to get additional
22  security.  And again, I mean, without a
23  covenant breach, we didn't have a right to do
24  any of this.  Had we had leverage and
25  understood the full extent of the problem, we

KARLEEN CARLSON STRAYER

1  might have been able to get some of these.
2      And I would also add if we could
3  have, if we could have better understood the
4  full extent of the problem and the board had
5  better understood the full extent of the
6  problem, there might have been actions that we
7  could have convinced them to take, and those
8  could have also included sales of other assets
9  and even at times we go seeking some sort of
10 political support because, obviously, there
11 were a lot of jobs on the line, these were
12 non-profit entities, so there were a lot of
13 constituents in the city and the state that
14 would have an interest in the financial
15 health.
16     And, you know, that also is a
17 remedial option in times to finding support in
18 the city and state.
19    Q.    As of the fall of 1997, did you or
20 any member of your staff at your direction ask
21 AHERF for a guarantee of financial support
22 from the Western AHERF entities to the Eastern
23 AHERF entities?
24    A.    My recollection is that we did

KARLEEN CARLSON STRAYER

1  have a conversation like that and it revolved
2  around the fact that around that time period
3  there was dialogue going on with Merrill
4  Lynch, whereby -- and we had meetings about
5  this, as well, whereby we were being asked to
6  take a look at a financing on the East and
7  another financing on the West.
8      And we put a lot of thought into
9  whether we one want to do that. And clearly
10 the only incentive for us to do that was to
11 somehow get support out of the East, so our
12 conversations centered around how do we get
13 that support from the West and how much would
14 we have to insure to make that an attractive
15 alternative to management and the board at
16 AHERF.
17    Q.    Going by Exhibit 2197, the first
18 page of the "AHERF Actions chronology" that
19 you've sketched out, page 030072, the first
20 instance of Merrill Lynch I see on this page
21 is in November 1997, correct?
22    A.    Yes.
23    Q.    So I guess what I'm asking you is,
24 at any point prior to the 1997 time frame, did

KARLEEN CARLSON STRAYER

1  you or anyone else at MBIA, based on your
2  instruction, request that AHERF make a
3  guaranty, a financial guaranty that resources
4  were going to be directed from the Western
5  AHERF entities to support the Eastern AHERF
6  entities?
7          MR. WITTEN: Objection, that's the
8  same question that she just answered.
9          MR. KRUSKO: She hasn't answered
10 it.
11    A.    You're saying prior to 1997?
12    Q.    Prior to 1997, to November 1997?
13    A.    To November 1997 or prior to 1997?
14    Q.    Prior to November 1997.
15    A.    Prior to November '97, did anyone
16 ask for a guaranty?
17    Q.    Yes.
18    A.    I, I don't have a specific
19 recollection of that.
20    Q.    Okay. And did you?
21    A.    Did I ask for it?
22    Q.    Yes.
23    A.    I don't recall asking for it.
24    Q.    Did anyone on your staff ask for

KARLEEN CARLSON STRAYER

1  it at your direction?
2      A.    It's possible; I don't recall.
3      Q.    Again, up to this point in time,
4  November of 1997, did you or anyone on your
5  staff at your direction request from AHERF
6  that it undertake an effort to preserve cash
7  through, for example, a day's cash on-hand
8  covenant that would be binding on AHERF?
9      A.    I don't recall. I'm quite
10 confident we did not, because, again, it is
11 not, in my experience, it's not likely that a
12 management team would give us a covenant for
13 nothing; I mean, we could ask for it but they
14 would have no incentive to put a new covenant
15 that they potentially could breach in their
16 bond documents. I would, I would, frankly,
17 question their judgment, if they agreed to
18 such a thing.
19    Q.    Up to this point in time, November
20 1997, did you or did any member of your staff
21 at your direction request that AHERF, the
22 parent, or AHERF, the foundation, make a
23 binding pledge of cash or other resources to
24 the DVOG entities?

KARLEEN CARLSON STRAYER

1
2 talking to Coopers about how they should treat
3 a line item on the income statement or balance
4 sheet, that wouldn't be something we did.
5    Q.   Right, but in this time frame, you
6 and others at MBIA are looking for a covenant
7 violation which will give MBIA certain
8 remedial rights, correct?
9    A.   Right.  But it's not year-end.  I
10 mean, this memo is dated March; their year end
11 is not till June; their financial statements
12 won't come out till three, four months after
13 that; so, they're -- we just, we wouldn't have
14 a reason in March of '98 to be contacting the
15 CPAs about what the June statements might look
16 like and whether or not there's a default.
17    Q.   Do you remember, though, when the
18 covenant compliance -- withdrawn.
19        Do you remember any of the
20 covenant compliance reporting dates with
21 respect to the DVOG entities?
22    A.   I don't remember.  I know our
23 standard requirement is that they come out
24 along with the audits, they would be based on
25 the audits.

KARLEEN CARLSON STRAYER

1
2    Q.   So in certain cases, MBIA had
3 standard requirements with respect to, at the
4 very least, reporting requirements; you just
5 used the term "standard requirement"?
6    A.   Yes, actually, because reporting
7 requirements are an attachment to our
8 commitment letters, so there is a piece of
9 paper that shows reporting requirements that
10 gets attached to commitment letters; it's used
11 on virtually all of our commitment letters,
12 unless there's a specific negotiation that
13 would otherwise be made for those particular
14 requirements.
15    Q.   Do you recall whether such a
16 re-negotiation had occurred with respect to
17 the DVOG entities?
18    A.   Well, I only recall that earlier
19 this morning we talked about the fact that the
20 -- that we had agreed to allow them to give
21 their financial statements later than -- we
22 had provided an amendment to the initial
23 documents; so, yes, I guess we had agreed to a
24 change from the initial documents.
25    Q.   I see.  I think you're referring

KARLEEN CARLSON STRAYER

1
2 to your testimony yesterday morning; that,
3 subsequent to --
4    A.   Is it yesterday morning?
5        MS. HACKETT: Yes.
6    Q.   Yes, believe it or not.
7    A.   Okay.
8    Q.   Subsequent to the DVOG offering in
9 October of 1996 there was this renegotiation
10 of the reporting requirements?
11    A.   Yes.
12    Q.   Okay. With respect to page 030075
13 of Exhibit 2197, the April 1998 entry, I take
14 it you and others employed by MBIA met with
15 Mr. Abdelhak and with certain AHERF board
16 members on the same day?
17    A.   Yes.
18    Q.   And do you recall at that meeting
19 Mr. Abdelhak rejecting the idea of a
20 turn-around consultant being brought in?
21    A.   Yes.
22    Q.   And was this the first instance
23 that you can recall of anyone at MBIA making a
24 pitch to Mr. Abdelhak that a turn-around
25 consultant be brought in?

KARLEEN CARLSON STRAYER

1
2    A.   This is the first time we had the
3 opportunity to personally sit down in front of
4 him and have a discussion like this.  As I
5 mentioned, our earlier meeting, he did not
6 show up for.
7    Q.   But you don't happen to recall one
8 way or the other whether that occurred or not,
9 right?
10    A.   The meeting that --
11    Q.   The meeting that he didn't show up
12 for?
13        MS. HACKETT: Objection, asked and
14 answered extensively.
15        MR. KRUSKO: I know.
16        MS. HACKETT: Then why ask her
17 again?
18        MR. KRUSKO: Because she's looking
19 now at something, at least narrowing down a
20 monthly time frame for a meeting that might
21 have helped her recall this meeting with
22 Mr. Abdelhak, and I think it's actually a
23 significant event, which is why I asked.
24        I know this is a repetitive
25 question; thank you for bearing with me, but I

Page 459

KARLEEN CARLSON STRAYER

1  think it's an important issue in the case.
2      Q.  Do you recall, in addition to
3  Mr. Barnes and Mr. Gumberg, meeting with
4  anyone else at this April 1998 meeting, any
5  other board members, I should say?
6      A.   There may have been, there may
7  have been more, I don't recall.  Again, I'm
8  sure we did a memo about it but I don't
9  remember right now who was at that meeting.
10     Q.   Is this the first time that you
11 recall anyone at MBIA pitching the notion of a
12 turn-around consultant being brought in for
13 the DVOG situation to members of the AHERF
14 board of trustees?
15     A.   I believe it was.
16     Q.   Did these board members make any
17 representations to you as to what they were
18 going to say to other board of trustees
19 members with respect to this notion of
20 bringing in a turn-around consultant?
21     A.   I don't recall.
22     Q.   Did you or did anyone else at your
23 direction follow-up with any other board
24 members, subsequent to this meeting, to find

Page 460

KARLEEN CARLSON STRAYER

1  out whether the parent board as a whole was
2  receptive to the idea of bringing in a
3  turn-around consultant?
4      A.   I don't remember that we
5  specifically made that request, no.
6      Q.   Do you know why you didn't?
7      A.   As I recall, we were having -- we
8  had a consultant helping us and advising us
9  who was well-known in the Philadelphia area,
10 and we were working -- I believe as a result
11 of this meeting we were having a dialogue with
12 the board members about the need to have or
13 not have a university as part of an academic
14 medical center, have a university actually
15 owned by the academic medical center.
16     So there were ongoing
17 conversations during this period of time;
18 whether or not we specifically requested
19 someone to speak to the full board about a
20 consultant, I, I don't recall.
21     Q.   Let me show you what we previously
22 marked as Exhibit 1667, and if you could keep
23 that other exhibit at hand, as well, I think
24 these two coincide in some respects.

Page 461

KARLEEN CARLSON STRAYER

1      Ms. Strayer, do you recognize
2  Exhibit 1667 as a site visit memo specific to
3  this April '98 meeting with representatives of
4  AHERF concerning the situation at the DVOG?
5      A.   Yes.
6      Q.   Does this refresh your
7  recollection that this meeting took place
8  April 29th, 1998?
9      A.   Let's see, April 29th... yes.
10     Q.   And you participated in the three
11 meetings that are listed here on the first
12 page of the exhibit, a 9 a.m. meeting, a 10
13 a.m. meeting and a 12 p.m. meeting?
14     A.   Yes, I'm not remembering right now
15 a 10 a.m. meeting but I'm clearing remembering
16 the 9 and the 12.
17     Q.   When you say you're clearly
18 remembering the 9 a.m. meeting, if you turn to
19 the second page which I believe provides a
20 summary of that meeting:
21     Do you recall at this meeting
22 Mr. Abdelhak blaming the difficult revenue
23 environment for the losses of the DVOG?
24     A.   Yes.

Page 462

KARLEEN CARLSON STRAYER

1      Q.   And did you agree with that
2  statement Mr. Abdelhak made?
3      A.   I agree that -- I would have
4  agreed that that was one of the factors.
5      Q.   At this meeting, Mr. Abdelhak
6  apparently estimated a 2- to 300 million
7  dollars loss for fiscal year 1998; do you see
8  that reference?
9      A.   Yes.
10     Q.   Do you recall him making that
11 representation?
12     A.   Yes.
13     Q.   Do you recall being concerned at
14 the time about that representation?
15     A.   Yes.
16     Q.   The middle passage states that
17 Mr. Abdelhak had revised AHERF's strategy and
18 admits that previous strategies have
19 contributed to the current losses; do you see
20 that?
21     A.   Yes.
22     Q.   Did you take away from this
23 meeting with Mr. Abdelhak the impression that
24 he viewed AHERF's pursuit of an integrated

KARLEEN CARLSON STRAYER

1  delivery system strategy largely as a failure
2  at this point in time?
3      A.   I don't know that he specifically
4  made that comment, but they clearly were going
5  to shift their strategy, to some extent.
6      Q.   Did you believe at this time
7  frame, possibly as a result of this meeting,
8  that AHERF's strategy had largely failed?
9      A.   Certainly, if by "strategy" you
10  mean the rapid growth strategy, that clearly
11  had not been either a good strategy or had not
12  been executed well, one or the other.
13     Q.   Do you know one way or the other
14  or do you have a view one way or the other
15  whether it was a good strategy or one that was
16  just executed poorly by AHERF's management?
17     A.   I would suspect it would be
18  components of both.
19     Q.   Would you turn with me to page
20  030212. This is a meeting -- this is a
21  summary, rather, of a meeting that you,
22  Mr. Stevens, Ms. Tain, Mr. Reilly and Bob
23  Cathcart had with David Barnes and Ira
24  Gumberg, is that right?

KARLEEN CARLSON STRAYER

1      A.   Yes.
2      Q.   Here it states "The board members
3  appear to be relative open-minded about
4  re-thinking strategy" at the very top,
5  correct?
6      A.   Yes.
7      Q.   And in your memo to Mr. Weill,
8  Exhibit 2197, in referring to this meeting,
9  you stated "board members appear to be much
10  more open to our discussions about the need
11  for a consultant." Do you see that?
12     A.   Yes.
13     Q.   When you left this day of meetings
14  with AHERF in late April 1998, did you take
15  away the feeling that the situation at that
16  point in time at the DVOG could have been
17  different if the board had been involved
18  earlier in the remediation efforts with
19  respect to the DVOG?
20     A.   In what respect?
21     Q.   Well, for one, that a consultant
22  could have been brought in at some point in
23  time prior to late April 1998 to help the DVOG
24  work out its problems.

KARLEEN CARLSON STRAYER

1      A.   I'm sure our view was that the
2  earlier they had brought in a consultant, the
3  greater their chances would have been for
4  executing a successful turnaround, yes.
5      Q.   I guess what I'm asking you is
6  whether you came away from this meeting with
7  these two board members with the view that,
8  had MBIA met with one or more of the board
9  members at some point in time, prior to April
10  1998, and involved the board more in
11  remediation efforts of the situation at the
12  Delaware Valley Obligated Group could have
13  been different at that point in time?
14     A.   I don't know that we necessarily
15  could have drawn the conclusion from this
16  meeting because, even though the board
17  appeared to be more open, they did not
18  immediately go out and hire consultants.
19         So, I think what the board and
20  MBIA did not have a full appreciation for,
21  that could have made a difference, is how
22  serious the extent of financial difficulties
23  were, and I don't know that any of us
24  understood even at this late date how bad

KARLEEN CARLSON STRAYER

1  things really were.
2      Q.   You stated at the outset of your
3  testimony just now, "I don't know that we
4  necessarily could have drawn the conclusion
5  from this meeting," and then you continued.
6         I'm not asking to speculate
7  whether you personally could have or not; I'm
8  just asking whether you recall concluding
9  that, had MBIA involved the AHERF board
10  earlier with respect to remediation efforts,
11  that the situation at the DVOG could have been
12  different?
13     A.   No, I don't recall ever drawing
14  that conclusion.
15     Q.   Do you know why, subsequent to
16  this meeting, the full AHERF board did not
17  retain a management consultant in a timely
18  fashion?
19     A.   I do not.
20     Q.   Did you view that as a problem?
21     A.   We would have liked for them to
22  retain a consultant; so, you know, they
23  clearly disagreed with our view about the
24  urgency of bringing in a consultant.

Page 467

KARLEEN CARLSON STRAYER

1
2    Q.    On page 030212 of Exhibit 1667,
3    there's a passage summarizing discussions with
4    David Barnes; do you see that in the middle?
5        A.    That starts with "David Barnes"?
6        Q.    Yes.
7        A.    Okay.
8        Q.    Do you recall coming away from
9    this meeting with the impression that
10    Mr. Barnes was generally happy with the job
11    that AHERF management was doing up to this
12    point in time?
13        A.    I think we came away with the
14    impression that David Barnes felt that the
15    recent actions that management had taken were
16    a very positive step, and I believe we
17    remained concerned that David wasn't
18    understanding fully the extent of the
19    problems.
20        Q.    Did you personally or did anyone
21    else on your behalf undertake any effort to
22    drive those points home with Mr. Barnes?
23        A.    Yes, that was the whole purpose of
24    the meeting.
25        Q.    No. I'm sorry, perhaps it wasn't

Page 468

KARLEEN CARLSON STRAYER

1
2    a clear question. I meant, subsequent to the
3    meeting, I think you testified that you left
4    the meeting thinking that David Barnes
5    essentially sort of didn't get what MBIA was
6    trying to communicate.
7        And I'm just asking you whether
8    you or anyone else at your instruction
9    followed up with Mr. Barnes to make another
10    attempt at communicating to him MBIA's
11    concerns?
12        A.    We did communicate with them
13    further. One of the things that had been sort
14    of a theme throughout this day of discussions
15    was that we had come to the conclusion, and I
16    think this was, in part, for the advice of our
17    consultant, that the medical schools were an
18    issue and that perhaps if they decided to
19    separate themselves from the medical schools,
20    that that might be a positive.
21        And so, part of our dialogue here
22    was to discuss the ability of AHERF to retain
23    its reputation in Philadelphia without
24    necessarily owning the medical schools.
25        So subsequent to this meeting, we

Page 469

KARLEEN CARLSON STRAYER

1
2    did do what we had promised the board members,
3    which was we prepared for them a list of
4    premier hospitals that did not have medical
5    schools.
6        So there was a follow-up with the
7    trustees after this meeting; specific
8    comments, other than the general medical
9    school issue, I can't recall at this point in
10    time, but I definitely know there was
11    follow-up.
12        Q.    Was any action taken, if you know,
13    with respect to this proposal of selling the
14    combined medical school?
15        A.    I am not aware of any action that
16    was taken, no.
17        Q.    So you essentially provided the
18    board with some information about the idea of
19    selling the combined medical school and it
20    didn't go anywhere?
21        A.    It didn't go anywhere. I mean, at
22    this point in time, we're two months away from
23    the bankruptcy filing, they're just about
24    ready to let Sherif Abdelhak go. There's a
25    lot going on at the organization right now; so

Page 470

KARLEEN CARLSON STRAYER

1
2    whether they had follow-up discussions at
3    their board meetings about the sale of the
4    medical schools, I can't say, but we, you
5    know, it wasn't too long after this thing sort
6    of spun out of control.
7        Q.    I guess that's sort of my point.
8    I mean, this is about 15, 14 months into the
9    remediation efforts after the first downgrade
10    and after the first warning signs?
11        A.    Yes.
12        Q.    And I'm just curious to know
13    whether you think this meeting, this very
14    important meeting with the CEO of the
15    organization and two board members --
16        A.    Yes.
17        Q.    -- occurred too late in the
18    process?
19        A.    I think the reason it occurred,
20    when it did, is that none of us, and I can't
21    speak for the board members but I can speak
22    for myself, I think none of us in May of 1998,
23    while we understood that this situation was
24    very, very serious, I don't know that we
25    understood that the hospital system was two

KARLEEN CARLSON STRAYER
1    KARLEEN CARLSON STRAYER
2    months away from, from bankruptcy.
3        And to my earlier point:  Had the
4    financial statements indicated the losses that
5    subsequently we realized should have been
6    presented, we would have had a dramatically
7    different response in 1996, as I believe the
8    board would have also.
9        So was this late?  Yes.  Was it
10    because we weren't paying attention?  No.  It
11    was because we did not have the full
12    information that we needed.
13        Q.    But at this point in time, this
14    credit was an 8C credit according to the MBIA
15    internal rating.
16        A.    Yes.
17        Q.    And had been for roughly two
18    months.
19        A.    Yes.
20        Q.    And there's no lower to go on the
21    MBIA internal rating than 8C in the absence of
22    payments being made by MBIA?
23        A.    Well, in the absence of a payment
24    default on the part of our creditor.
25        Q.    Right, right.

1    KARLEEN CARLSON STRAYER
2        A.    Credit, excuse me.
3        Q.    Do you recall any statements that
4    Mr. Gumberg might have made with respect to
5    his view of the job that management was doing?
6        A.    I don't recall.
7        Q.    The third-to- last bullet with
8    respect to this meeting states that "The
9    trustees agree with Sherif that the
10    reimbursement problems are the significant
11    factor, depressing revenues and causing the
12    losses."  Do you see that?
13        A.    Yes.
14        Q.    Just to be clear, does that
15    statement reflect the fact that Mr. Barnes and
16    Mr. Gumberg believed that the revenue problems
17    were the major factor, the most important
18    factor, depressing revenues and causing the
19    losses?
20        A.    It simply says they are the
21    significant factor; so, they apparently felt
22    that it was, was important.  I don't know if
23    they considered this the "most important" but
24    that was clearly something they were concerned
25    about.

1    KARLEEN CARLSON STRAYER
2        Q.    I was just asking you to draw, not
3    necessarily from this document, from just your
4    recollection of this meeting.
5        And I guess I'd just like to know
6    very briefly:  Does your testimony, drawing
7    from your memory, not from this document,
8    change in any way with respect to this
9    question, if you draw from your memory?
10        A.    Well, I think our overall
11    impression of the meeting was that the
12    trustees did not share the same level of
13    concern over the financial issues, and seemed
14    to be more optimistic about recent efforts to,
15    you know, downsize, in terms of personnel, to
16    complete a sale to Vanguard.
17        There were, there were activities
18    that were being undertaken to improve the
19    financial position and our view was the
20    trustees put more faith in those activities
21    than we did.
22        On the other hand, having met with
23    trustees at hospital organizations, many times
24    they, of course, aren't going to sit in a room
25    full of creditors and express dismay over

1    KARLEEN CARLSON STRAYER
2    their senior management team, no, I don't
3    believe I've ever seen that happen.
4        Q.    Did you discuss with either
5    Mr. Barnes or Mr. Gumberg the amount of
6    information that had been provided by AHERF to
7    MBIA relative to the amount of information
8    that had been provided by senior management at
9    AHERF to the AHERF board of trustees?
10        A.    I don't recall having that
11    conversation.
12        Q.    Okay.  Why didn't you raise with
13    Mr. Barnes and Mr. Gumberg the issue of the
14    information that you had received if you felt
15    that there was a gap in their understanding of
16    the financial situation of the DVOG relative
17    to your understanding of the financial
18    situation of the DVOG?
19        A.    Well, if I'm understanding the
20    question, we weren't, we weren't necessarily
21    concerned that they weren't being provided
22    with the appropriate financial reports.
23        I believe it had -- our difference
24    had to do with the way we were interpreting
25    things and the way we were viewing the

51 (Pages 471 to 474)

Page 550

KARLEEN CARLSON STRAYER

1    remember if I answered it. I don't recall.
2        Q.    You don't recall one way or the
3    other whether you personally did it?
4        A.    Whether I personally made that
5    point to senior management to, to be honest,
6    it is in some ways a stunningly obvious point
7    so I don't know if I would have made that
8    point to them.
9        Q.    At the top of the second page of
10   this exhibit, reference is made to legal
11   review of bond documents before an MBIA bond
12   insurance policy is provided; do you see that?
13       A.    Yes.
14       Q.    Do you have a general
15   understanding of the text that appears below?
16       A.    Yes.
17       Q.    And what's that understanding, I'm
18   just trying to gain a sense as to what this
19   passage is trying to convey?
20       A.    Well, we're discussing the issue
21   that was being debated at the creditors
22   committee about the collateral within our bond
23   documents, and that would affect our recovery.
24       Q.    At the top of the third page of

Page 551

KARLEEN CARLSON STRAYER

1    the document, 030080, it states: "It is
2    instructive to note that DVOG declared
3    bankruptcy without violating a single
4    covenant. The measurement of its covenant
5    compliance was based on audited financial
6    statements which had not yet been issued at
7    the time of the bankruptcy filing." Do you
8    see both of those statements?
9        A.    Yes.
10       Q.    Is it your understanding that the
11   second statement refers to fiscal year 1998
12   audited financial statements for the DVOG?
13       A.    That's how I would read that, yes.
14       Q.    And why is that a significant fact
15   with respect to covenant violations that could
16   have occurred at DVOG?
17       MR. WITTEN: Objection to form.
18       A.    Could you repeat the question?
19       MR. KRUSKO: Sure, would you repeat
20   that.
21       (Record read.)
22       A.    I don't know that there's a lot of
23   significance put on that comment. I think the
24   more important point that's being made in this

Page 552

KARLEEN CARLSON STRAYER

1    paragraph is that it is -- in some ways, we
2    were incredulous that you could have a system
3    like this go into bankruptcy without violating
4    any covenants at all and that was a concern to
5    us.
6        Q.    But given the need for early
7    intervention with respect to troubled credits,
8    isn't it more significant what could have
9    happened in 1996 or 1997 in terms of
10   remediation efforts as opposed to --
11       A.    Oh, absolutely, no question about
12   it.
13       Q.    Below is mentioned "discussions
14   with Mr. Abdelhak concerning consultants"; do
15   you see that?
16       A.    Yes.
17       Q.    You met with Mr. Abdelhak in late
18   April of 1998, and I'd like to know whether
19   you recall him discussing bringing in
20   consultants who would write reports as opposed
21   to doing hands-on operational tasks, whatever
22   that might mean.
23       A.    Yes, I believe that we discussed
24   the fact that they had brought in McKenzie,

Page 553

KARLEEN CARLSON STRAYER

1    and McKenzie, to my knowledge, is not
2    experienced in turning around hospitals, so we
3    were disappointed that they had chosen
4    McKenzie as opposed to someone like the Hunter
5    Group or Quorum.
6        Q.    Do you recall learning at some
7    point prior to the bankruptcy filing that
8    AHERF had brought in McKenzie to try to turn
9    things around for DVOG?
10       A.    I believe they retained McKenzie,
11   actually. To help with issues that -- with
12   the Western entities, which was another
13   surprise to us; that the consultant they did
14   bring in didn't appear to be responsible for
15   the DVOG entities.
16       Q.    Do you know whether McKenzie
17   reviewed in any way the operations of AHERF's
18   Eastern entities?
19       A.    I'm not aware of any review that
20   they did of the Eastern entities.
21       Q.    Did you personally or anyone at
22   your direction attempt to make -- to contact
23   the board and advise them that rather than
24   bringing McKenzie to take a look at the

Page 554

KARLEEN CARLSON STRAYER

1  KARLEEN CARLSON STRAYER
2  Western entities, AHERF should bring in some
3  sort of other consultant to look at the
4  Eastern entities?
5      A.   I don't recall specifically that
6  we had that conversation.  When we met with
7  Mr. Barnes and Mr. Gumberg, it's possible that
8  it came up.
9      Q.   But you don't know one way or the
10 other?
11     A.   I don't recall.
12     Q.   The statement again on this last
13 page, "some remediations fail."  Do you agree
14 with that statement?
15     A.   "Some remediations fail"?
16     Q.   Yes.
17     A.   Well, when you have a bankruptcy
18 filing, I think at MBIA we consider that a
19 failure.
20     Q.   And is that a fact just as it's a
21 fact that -- well, withdrawn.
22          At the bottom of this section, it
23 stated: "While IPM will continue its program
24 of early detection and intervention for
25 weakening credits, the AHERF experience is a

Page 555

1  KARLEEN CARLSON STRAYER
2  sobering reminder of the real-world limits of
3  credit remediation."  Do you see that?
4      A.   Yes.
5      Q.   And that reflects the fact that,
6  once bond insurance is provided, MBIA is
7  powerless to unilaterally change the
8  applicable bond covenants?
9          MS. HACKETT: Objection, asked
10 numerous times but you may answer.
11     A.   I believe that that is one part of
12 it.  I mean, certainly if we had had financial
13 statements in 19 -- for fiscal 1996 that
14 showed a rate covenant failure, we would have
15 been able to effect change better and
16 potentially had a successful remediation with
17 AHERF.
18     Q.   And what's your basis for that
19 statement?
20     A.   Because my basis for that
21 statement is that my understanding is that
22 the, the net income position of the 1996
23 financial statements was presented incorrectly
24 in the audit and, if it had been correctly
25 presented, there would have been a rate

Page 556

1  KARLEEN CARLSON STRAYER
2  covenant failure but also potentially a very
3  substantial negative number on the net income
4  line.
5          And the fact that the bonds had
6  just been issued in June of 1996 and a few
7  months later would have shown not only a rate
8  covenant failure but also a negative bottom
9  line and 70-plus million dollar asset transfer
10 would have been a real wake-up call, would
11 have led to, I'm sure, a stronger board
12 reaction than what actually occurred; would
13 have probably led to, you know, newspaper
14 reports on this occurrence.
15          In my almost 17 years of
16 experience in healthcare, I've never seen a
17 situation where public bond issue is done and
18 a few months later you have massive losses and
19 a covenant default; I've never seen that.
20          So it would have been news in the
21 industry; it would have been news in
22 Philadelphia, certainly; the doctors would
23 have gotten involved; so I believe there would
24 have been a lot of things that could have
25 happened in late 1996, if those statements

Page 557

1  KARLEEN CARLSON STRAYER
2  shown the loss that it should have.
3      Q.   Okay.  But that's just speculation
4  on your part, right; you don't have any basis
5  for knowing whether there was a GAAP violation
6  in any of the AHERF audited financial
7  statements?
8      A.   Could you repeat the question?
9      Q.   Sure.  Do you have any personal
10 knowledge of any GAAP violation in any of
11 AHERF financial statements?
12          MS. HACKETT: I'm going to object
13 to the extent that your knowledge is based
14 upon information that you've learned from
15 counsel or in the creditor's committee and, if
16 that is the source of your information, I
17 would instruct you not to answer.
18          THE WITNESS: Okay.
19     A.   Then, I can't answer.
20     Q.   Do you personally know of any GAAP
21 violation specifically to the DVOG financial
22 statements, audited financial statements?
23          MS. HACKETT: Same instruction.
24          MR. KRUSKO: Okay.
25     Q.   Do you know of any audit failure,

62 (Pages 554 to 557)

Page 558

KARLEEN CARLSON STRAYER

1　　　　KARLEEN CARLSON STRAYER
2　do you have personal knowledge of any audit
3　failure by Coopers & Lybrand?
4　　　A.　Do I have personal knowledge?
5　　　Q.　Yes.
6　　　A.　Depends on by "personal knowledge"
7　do you mean have I, have I done a review of
8　the statements or workpapers myself?
9　　　Q.　Yes.
10　　　A.　No, I have not.
11　　　Q.　Do you have any personal knowledge
12　of any failure but Coopers & Lybrand to comply
13　with GAAS, Generally Accepted Accounting
14　Standards?
15　　　A.　In the sense of have I looked at
16　their workpapers to determine whether or not
17　they've complied with GAAP, no, I did not.
18　　　Q.　With GAAS?
19　　　A.　With GAAS?
20　　　Q.　Yes, Generally Accepted Accounting
21　Standards?
22　　　MR. WITTEN: Auditing Standards?
23　　　MR. KRUSKO: Auditing Standards,
24　excuse me.
25　　　A.　No, I don't have personal

Page 559

1　　　　KARLEEN CARLSON STRAYER
2　experience with that.
3　　　Q.　Outside from the representations
4　from counsel, do you have any personal
5　knowledge of any failure by Coopers & Lybrand
6　to comply with its contract with AHERF and/or
7　its affiliates?
8　　　A.　I'm sorry, could you repeat the
9　question again?
10　　　MR. KRUSKO: Sure.
11　　　(Record Read.)
12　　　A.　I do not.
13　　　Q.　Do you have any personal knowledge
14　by Coopers & Lybrand to expose AHERF's
15　deteriorating financial condition, violations
16　of various dec covenants, deficient financial
17　controls and AHERF senior officials financial
18　manipulations?
19　　　A.　I do not.
20　　　Q.　Do you have any personal knowledge
21　as to which trustees, if any, of AHERF and/or
22　its affiliates were uninformed about the true
23　state of the financial condition of AHERF and
24　or its affiliates?
25　　　A.　Define "true state."

Page 560

1　　　　KARLEEN CARLSON STRAYER
2　　　Q.　Well, I believe you've testified
3　that it's now your belief that the audited FY
4　'96 financial statements for the DVOG were
5　misstated?
6　　　A.　Yes.
7　　　Q.　Do you have any personal knowledge
8　as to which trustees were uninformed about
9　this alleged misstatement at the time the
10　statements were issued?
11　　　A.　I'm not aware of that any of them
12　were informed.
13　　　Q.　Do you have any personal knowledge
14　as to the steps, if any, any trustees of AHERF
15　and/or its affiliates would, in fact, have
16　taken if they had additional information about
17　the financial condition of AHERF and/or its
18　affiliates at an earlier point in time?
19　　　MR. WITTEN: Objection, asked and
20　answered, I think.
21　　　MS. HACKETT: And your question was
22　actions the trustees would have taken if they
23　had known earlier?  Objection, lack of
24　foundation, but you can answer.
25　　　MR. KRUSKO: And again, I'm asking

Page 561

1　　　　KARLEEN CARLSON STRAYER
2　for your personal knowledge.
3　　　A.　I would only look at their
4　behavior in 1998 when they became aware of the
5　extent of the problems, when they asked Sherif
6　to resign, and the various activities they
7　undertook at that time as somewhat indicative
8　of what they might have done earlier had they
9　known the extent of the problems.
10　　　Q.　But I believe you've also
11　testified that AHERF trustees decided not to
12　pledge the assets of AHERF's Western entities
13　to support the Eastern entities, so, in fact,
14　there would have been no difference in the
15　eventual outcome, correct?
16　　　MR. WITTEN: Objection.
17　　　A.　Absolutely not, I don't agree with
18　that statement at all.
19　　　Q.　Do you have any personal knowledge
20　of any steps that any trustees of AHERF and/or
21　its affiliates could have taken that would, in
22　fact, have halted AHERF's financial demise?
23　　　A.　At what point in time?
24　　　Q.　At any point in time from the time
25　of the DVOG bond offering up to the

Page 578

```
1          KARLEEN CARLSON STRAYER
2     A.   No.
3     Q.   Is it your belief that the time
4  frame of the bankruptcy auction process had a
5  negative impact on the amount of recovery MBIA
6  was able to obtain?
7     A.   I don't know that I've ever
8  analyzed that.  It was a short time frame; on
9  the other hand, hospitals were running out of
10  cash and there was -- I think some of the
11  speed with which this was being done was
12  because the senior management at DVOG did not
13  have sufficient cash to keep the doors open
14  and there were discussions about potentially
15  closing the doors to all the hospitals.
16     Q.   Who at MBIA was involved with you
17  in the post bankruptcy filing remediation
18  process?
19     A.   The two individuals really driving
20  this initiative were David Stevens and Pat
21  Mathis.
22          MR. KRUSKO: I don't have any
23  further questions.
24          MS. HACKETT: We will read the
25  transcript.  Do you have anything further?
```

Page 580

```
1  STATE OF NEW YORK        )    Pg__of__Pgs
2                             ss:
3  COUNTY OF NEW YORK        )
4     I wish to make the following changes,
5  for the following reasons:
6  PAGE LINE
7  ____ ____   CHANGE: _____
8            REASON: _____
9  ____ ____   CHANGE: _____
10            REASON: _____
11  ____ ____   CHANGE: _____
12            REASON: _____
13  ____ ____   CHANGE: _____
14            REASON: _____
15  ____ ____   CHANGE: _____
16            REASON: _____
17            REASON: _____
18            REASON: _____
19  ____ ____   CHANGE: _____
20            REASON: _____
21  ____ ____   CHANGE: _____
22            REASON: _____
23
24
25
```

Page 579

```
1          KARLEEN CARLSON STRAYER
2          MR. WITTEN: Nothing further.
3          MS. HACKETT: We will read the
4  transcript, please.
5          THE VIDEO OPERATOR:  This
6  concludes the videotaped deposition of Karleen
7  Strayer on October 9th, 2003.  The time is
8  5:32 p.m. and this is the end of tape number
9  seven.
10          (Time noted: 5:32 p.m.)
11
12          _____
13          KARLEEN CARLSON STRAYER
14
15  Subscribed and sworn to before me
16  this _____ day of _____, 2003.
17
18  _____
19
20
21
22
23
24
25
```

Page 581

```
1          C E R T I F I C A T E
2  STATE OF NEW YORK   )
3                      : ss.
4  COUNTY OF NEW YORK  )
5
6          I, PHYLISS SALIMBENE, a Registered
7  Professional Reporter and Notary Public within
8  and for the State of New York, do hereby
9  certify:
10          That KARLEEN CARLSON STRAYER, the
11  witness whose continued deposition is
12  hereinbefore set forth (pages 274 through 581)
13  was previously duly sworn, and that such
14  continued deposition is a true record of the
15  testimony of said witness.
16          I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage, and that I am in no way
19  interested in the outcome of this matter.
20          IN WITNESS WHEREOF, I have
21  hereunto set my hand this _____ day of
22  _____, 2003.
23
24          _____
25          PHYLISS SALIMBENE, RPR
```

68 (Pages 578 to 581)

Sunstein Dep.

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS LLP*

---

## LEON C. SUNSTEIN, JR.
*May 6, 2004*

---

## LEGALINK MANHATTAN
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

SUNSTEIN, JR., LEON C. - Vol. 1



LEGALINK
A WORDWAVE COMPANY

Page 114

Leon C. Sunstein, Jr.

1
2    A.   Right.
3    Q.   Okay.
4    A.   I assume I did, but I cannot -- I
5    cannot remember looking at this statement.
6    Q.   After you were no longer a Trustee
7    of the big AHERF Board, did you remain a
8    Trustee of some of the Boards that were
9    affiliated --
10   A.   I was --
11   Q.   I'm sorry.  Can you let me finish my
12   question.
13   A.   I'm sorry.  Excuse me.
14   Q.   That's all right.  It makes it
15   easier for the court reporter.  And, frankly,
16   I was stumbling over my words, so let me
17   rephrase.
18        After you were no longer a member of
19   the AHERF Board of Trustees, did you remain a
20   Trustee of some of the Boards of affiliated
21   entities within the AHERF system?
22   A.   Well, I was on the Hahnemann Board,
23   and I forget the names of the Board.  But I
24   was in the East, and I stayed there.
25   Q.   Meaning that you were on Boards for

Page 115

Leon C. Sunstein, Jr.

1
2    eastern entities; is that what you mean?
3    A.   Yes.  Right.
4    Q.   And I wanted to ask you, during your
5    entire tenure with the AHERF Board and all of
6    the other affiliated Boards that you may have
7    been on, you believed you were exercising your
8    fiduciary duty as a Trustee; correct?
9    A.   Yes.
10   Q.   To the best of your ability;
11   correct?
12   A.   Yes.
13   Q.   Do you recall knowing during the
14   time that you were on the AHERF Board that the
15   independent outside auditors for AHERF was the
16   firm of Coopers & Lybrand?
17   A.   Yes, I thought it was Coopers.
18   Q.   Do you recall ever meeting anyone
19   who was part of the audit team from Coopers &
20   Lybrand?
21   A.   No, I don't remember meeting any.
22   The reason I hesitate, I was on the Board of
23   Hahnemann earlier, and I met some of the
24   auditors.  But, this was before the merger.
25   Q.   Do you know who the --

Page 116

Leon C. Sunstein, Jr.

1
2    A.   But I -- I don't even remember what
3    firm it was.
4    Q.   That was my next question.  Do you
5    recall what firm --
6    A.   No, I don't remember what firm
7    Hahnemann had.
8    Q.   Prior to the acquisition --
9    A.   That's right.
10   Q.   -- right?
11   A.   Probably changed, anyway.
12   Q.   Do you recall in general terms that
13   each year the Audit Committee would present to
14   the Board as a whole the audited financial
15   statements for approval by the Board as a
16   whole of the audited financial statements?
17        MR. FRIESEN:  Objection.
18        You mean the AHERF Board?
19        MS. MEADEN:  Yes, I do.
20   A.   I don't remember that being done,
21   but expect it was.  But, I don't remember
22   that.
23   Q.   Okay.  Now, as a member of the AHERF
24   Board, did you have an understanding that
25   there were outside professionals, such as

Page 117

Leon C. Sunstein, Jr.

1
2    lawyers and independent auditors, who were
3    there to assist the Board members in
4    exercising their fiduciary duties?
5        MR. FRIESEN:  Objection.
6    A.   To assist the Board members?
7    Q.   To perform services for the Board or
8    for the entity.
9        MR. FRIESEN:  Objection.
10   A.   The answer is, I don't remember
11   that.
12   Q.   Do you recall -- let me back up.
13        Are you familiar with the term in
14   auditing parlance "clean opinion"?
15   A.   I can't give you a definition, but I
16   have an idea what you are talking about.
17   Q.   Why don't you explain to me what you
18   understand.
19   A.   Well, without -- some opinions come
20   down with a lot of footnotes, and there would
21   be a question on those.
22   Q.   I'm sorry?
23   A.   There could be a question on those,
24   whether it gives you a clean opinion.
25   Q.   Do you recall during your time as a

30 (Pages 114 to 117)

Page 118

Leon C. Sunstein, Jr.

1
2 member of the AHERF parent Board that AHERF
3 ever received something other than a clean
4 opinion on its audited financial statements?
5    A.  No, I don't recall.
6    Q.  And, again, you were aware during
7 your tenure as a Trustee at the AHERF parent
8 Board that there was an Audit Committee of the
9 Board; correct?
10   A.  Yes.
11   Q.  And was it your understanding that
12 the Audit Committee was responsible for
13 interacting with AHERF's outside auditors with
14 respect to the work that was being done to
15 audit the financial statements?
16   A.  The Audit Committee was, yes.
17   Q.  Yes.
18   A.  Yes.
19   Q.  And do you recall if you relied on
20 the Audit Committee as a Trustee of the parent
21 Board to work with the auditors and to address
22 any concerns that the auditors may have on the
23 financial statements that were presented to
24 them for review?
25   A.  I would take -- excuse me.  I would

Page 119

Leon C. Sunstein, Jr.

1
2 take that for granted.
3    Q.  Based on your experience as a broker
4 and your experience on other not-for-profit
5 Boards, did you have any expectations as to
6 the types of issues that Coopers & Lybrand, as
7 AHERF's outside auditors, should bring to the
8 attention of the Audit Committee?
9    A.  I can't remember that now, having
10 any.
11   Q.  Having any?
12   A.  I don't say I didn't or did.  I
13 don't remember.
14   Q.  Do you recall a time when the AHERF
15 Board, after the bankruptcy, made a decision
16 not to continue to retain the services of
17 Pricewaterhousecoopers, which became the
18 successor to Coopers & Lybrand?
19   A.  I wasn't on that Board.
20   Q.  No, I understand.  But you --
21   A.  I wasn't involved.
22   Q.  And you don't recall ever hearing
23 about that?
24   A.  No, I...
25   Q.  Do you recall there being a time

Page 120

Leon C. Sunstein, Jr.

1
2 after the bankruptcy filing where a press
3 release was issued stating that AHERF's 1997
4 audited financial statements could no longer
5 be relied upon?
6    A.  I don't remember that.
7    Q.  Do you recall during your tenure as
8 a member of the AHERF Board ever hearing that
9 Coopers & Lybrand had raised questions about
10 the accuracy or integrity of AHERF's financial
11 statements that had been presented to them for
12 audit?
13       MR. FRIESEN:  Objection.
14   A.  I don't remember.
15       MS. MEADEN:  Thank you, sir.
16 Those are all the questions.
17   A.  (Continued.)  I don't remember that.
18       MS. MEADEN:  Those are all the
19 questions I have for you this afternoon.
20       MR. FRIESEN:  I just have one
21 set of followup questions.
22 BY MR. FRIESEN:
23   Q.  If you look back on that one-page
24 exhibit, 2563 --
25   A.  Yes.

Page 121

Leon C. Sunstein, Jr.

1
2    Q.  -- which Ms. Meaden just talked to
3 you about, I just wanted to clarify one thing.
4       Since you can't remember seeing this
5 at the time, I take it, though, that you
6 believe that, hypothetically, if you had seen
7 it, just looking at it, you would have been
8 concerned?
9       MS. MEADEN:  Objection.
10   A.  I can say, yes, I would be
11 concerned.
12       MR. FRIESEN:  They are all the
13 questions I have.
14       MS. MEADEN:  Thank you.
15       VIDEO SPECIALIST:  That now
16 concludes this videotaped deposition.
17 The time, 1:58.
18       (Witness excused.)
19       (Deposition concluded at 1:58
20 p.m.)
21       -  -  -
22
23
24
25

31 (Pages 118 to 121)

Page 121

1          Leon C. Sunstein, Jr.
2      Q.  -- which Ms. Meaden just talked to
3   you about, I just wanted to clarify one thing.
4          Since you can't remember seeing this
5   at the time, I take it, though, that you
6   believe that, hypothetically, if you had seen
7   it, just looking at it, you would have been
8   concerned?
9          MS. MEADEN:  Objection.
10     A.  I can say, yes, I would be
11  concerned.
12         MR. FRIESEN:  They are all the
13  questions I have.
14         MS. MEADEN:  Thank you.
15         VIDEO SPECIALIST:  That now
16  concludes this videotaped deposition.
17  The time, 1:58.
18         (Witness excused.)
19         (Deposition concluded at 1:58
20  p.m.)
21             - - -
22
23
24
25

Page 122

1
2          INDEX
3   WITNESS
4   PAGE
5   LEON C. SUNSTEIN, JR.
6      By Mr. Friesen      4, 120
7      By Ms. Meaden       111
8          - - -
9       EXHIBITS
10  NO.    DESCRIPTION       PAGE
11  2561 Packet for Special Meeting of
        the Board of Trustees of AHERF,
12      1/5/98          17
13  2562 Packet for Special Meeting of
        the Board of Trustees, AHERF,
14      Meeting as the Member of
        Allegheny University
15      Hospitals - East      18
16  2563 Eastern Region Hospitals
        Combined Statement of Revenue
17      and Expenses for the Three
        Months Ended 9/30/97    67
18
    2564 Memo from Ms. White, to Members
19      of the AHERF Board of Trustees,
        12/30/97         80
20
    2565 Handwritten notes      92
21
    2566 Trustees' Evaluation    99
22
    2567 Trustees' Evaluation    104
23
             - - -
24
25

Page 123

1
2          I have read the foregoing
3   transcript of my examination given on
4   Thursday, May 6, 2004, and it is true,
5   correct and complete, to the best of my
6   knowledge, recollection, and belief,
7   except for the corrections noted hereon
8   and/or list of corrections, if any,
9   attached on a separate sheet herewith.
10
11
12         _Leon C. Sunstein Jr_
13
        LEON C. SUNSTEIN, JR.
14             COMMONWEALTH OF PENNSYLVANIA
15                 NOTARIAL SEAL
16           JANET COCCIA, Notary Public
             City of Philadelphia, Phila. County
17           My Commission Expires March 11, 2008
18
    Subscribed and sworn to
19  before me this  1  day
    of   August       , 04
20
21
22
23         _Janet Coccia_
        Notary Public
24
25

Page 124

1
2          I HEREBY CERTIFY that the
3   proceedings and evidence are contained
4   fully and accurately in the stenographic
5   notes taken by me upon the foregoing
6   matter on Thursday, May 6, 2004, and that
7   this is a correct transcript of same.
8
9
10
11
12
13
             -----------------------
             Debra Ann Whitehead
14
15
16
17
18
19         (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means,
22  unless under the direct control and/or
23  supervision of the certifying reporter.)
24
25

31 (Pages 121 to 124)

**Taylor Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *DEBORAH STEWART TAYLOR*
### *June 29, 2004*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### PH: 212-557-7400 / FAX: 212-692-9171

**TAYLOR, DEBORAH STEWART - Vol. 1**



Page 82

DEBRA STEWART TAYLOR
1
2  BY MR. KRUSKO:
3      Q.  Okay.  Do you recall at any point in time
4  receiving a communication from anyone at PNC Bank
5  complaining about the format of audited financial
6  statements that it received?
7      A.  No.
8      Q.  And do you recall receiving any complaint
9  from anyone on behalf of MBIA concerning the
10  format of any audited financial statements that it
11  received?
12         MR. TORBORG:  I'd like to object to that
13  question and the one before.
14         THE WITNESS:  No, I don't recall that.
15  BY MR. KRUSKO:
16      Q.  Are you familiar with the term master
17  continuing disclosure agreement?
18      A.  I'm familiar with continuing disclosure
19  agreement.
20      Q.  What's your understanding of what such an
21  agreement is?
22      A.  I think that document generally is what's
23  signed up and you send information out to the
24  repositories.
25      Q.  When you say you, are you referring to a

Page 83

DEBRA STEWART TAYLOR
1
2  master trustee?
3      A.  No.  Generally it's whoever the
4  dissemination agent is.
5         (Deposition Exhibit Number 2677 was marked
6  for identification and attached to the
7  transcript.)
8  BY MR. KRUSKO:
9      Q.  Ms. Taylor, I believe you have a copy of
10  Exhibit 2677, which was Bates stamped Foley 22546
11  to Foley 22571.
12         Ms. Taylor, you just referenced a
13  dissemination agent, correct?
14      A.  Uh-huh.
15      Q.  What's your understanding as to what the
16  functions of a dissemination agent are?
17      A.  You get the information and then you send
18  it out.
19      Q.  What information are you referring to?
20      A.  Whatever the, whatever the borrower sends
21  you, you send that out.
22      Q.  In the typical case, based on your
23  experience, did a master trustee also serve as a
24  dissemination agent?
25      A.  Are you speaking in general or --

Page 84

DEBRA STEWART TAYLOR
1
2      Q.  Just in general.
3      A.  It varies.
4      Q.  Okay.
5      A.  Because sometimes the obligor acts as
6  their own dissemination agent.
7      Q.  In the '95 to '98 time frame, do you
8  recall Norwest serving as a dissemination agent?
9      A.  On any deal?
10      Q.  In any deal.
11      A.  Probably.
12      Q.  Okay.
13      A.  But I couldn't say specifically what
14  deals.
15      Q.  Would the functions that Norwest performed
16  in its, in the capacity of a dissemination agent
17  be spelled out in a continuing disclosure
18  agreement?
19      A.  Could you repeat that?
20      Q.  Sure.  Was there any particular document
21  in those instances in which Norwest served as a
22  dissemination agent that would spell out Norwest's
23  functions in that capacity?
24      A.  As a dissemination agent?
25      Q.  Right.

Page 85

DEBRA STEWART TAYLOR
1
2      A.  Yes.
3      Q.  Okay.  And would that be the continuing
4  disclosure agreement?
5      A.  Yes, sometimes.
6      Q.  You have before you Exhibit 2677.
7      A.  Okay.
8      Q.  This is an unsigned document containing
9  the heading on the first page master continuing
10  disclosure agreement that came from the files of
11  Foley & Lardner.  Are you familiar with the law
12  firm Foley & Lardner.
13      A.  I've heard of them.  Who -- I guess what
14  capacity were they in?
15      Q.  That was actually a question I had for
16  you.
17      A.  Oh.
18      Q.  And that is whether you recall Foley &
19  Lardner?
20      A.  Oh, I'm sorry.
21      Q.  That's okay.  Do you recall whether Foley
22  & Lardner served as an advisor or a counselor to
23  AHERF at any point in time?
24      A.  I don't remember.  I don't know.
25      Q.  Okay.  This particular continuing

22 (Pages 82 to 85)

Page 86

DEBRA STEWART TAYLOR

1
2  disclosure agreement in the opening passage on the
3  first page, 22546, states that Allegheny
4  University Hospitals was to be the initial
5  obligated group agent. Do you see that?
6      A. Uh-huh.
7      Q. And then Norwest Bank of Minnesota is
8  identified as being the dissemination agent. Do
9  you see that?
10     A. I do.
11     Q. Okay. Do you recall whether Norwest
12 served as the dissemination agent with respect to
13 certain financial information that was required to
14 be produced under the master trust indenture for
15 the AHERF bonds?
16     A. I know that was -- could you, that was a
17 long --
18     Q. I apologize. My question for you is
19 whether you recall that in addition to being bond
20 trustee and master trustee, Norwest served as the
21 dissemination agent for information that was
22 required to be produced under the master trust
23 indenture for what you're referring to as the
24 AHERF bonds?
25     A. I don't remember that, but it's possible.

Page 87

DEBRA STEWART TAYLOR

1
2      Q. Based on your experience in '95 and
3  through '98, in the general case, would a
4  dissemination agent be responsible for collecting
5  and distributing annual audited financial
6  statements?
7      A. It would be generally annual information
8  and that's whatever the borrowers provide you
9  with. So I wouldn't say specifically audited
10 financial statements but, you know, whatever the
11 borrowers provided us with, that's what we would
12 send out.
13     Q. Do you see here in section 1 of Exhibit
14 2677, in the middle there, reference is made to an
15 annual report that the obligated group according
16 to this document was required to produce, again
17 it's in the middle of the passage there?
18     A. Where it says during the fiscal year
19 immediately preceding the date of such annual
20 report? No?
21     Q. Oh, I see, yeah, just before that, do you
22 see a reference about three lines before to an
23 annual report?
24     A. Where it says to disseminate an annual
25 report?

Page 88

DEBRA STEWART TAYLOR

1
2      Q. Right.
3      A. Okay, yes.
4      Q. Do you have an understanding of what an
5  annual report is just in a general sense?
6      A. I know it contains financial information.
7      Q. And at least according to the first page
8  of Exhibit 27 -- excuse me, 2677, Norwest Bank as
9  the dissemination agent was required to
10 disseminate this annual report among possibly some
11 other information, correct?
12         MR. MAGID: Objection, document speaks for
13 itself.
14         THE WITNESS: Based on this, let's see,
15 I'd really have to go through here and I don't
16 want to say yea or nay, but generally, continuing
17 disclosure agreements, the dissemination agent
18 would be required to send out the annual
19 information, wherever that might be.
20 BY MR. KRUSKO:
21     Q. And that's a reporting requirement similar
22 to what's contained in a master trust indenture?
23     A. I couldn't speak to that.
24     Q. Okay.
25         (Deposition Exhibit Number 2678 was marked

Page 89

DEBRA STEWART TAYLOR

1
2  for identification and attached to the
3  transcript.)
4  BY MR. KRUSKO:
5      Q. I believe you have what we've just marked
6  as Exhibit 2678. Ms. Taylor, the first page of
7  Exhibit 2678 is a letter from Becky Serafini to
8  Sue Gilbert, dated November 10th, 1997, to which
9  you were copied without enclosures, correct?
10     A. That's what it appears to say here.
11     Q. Do you recall receiving or reviewing this
12 letter?
13     A. No.
14     Q. Do you recall receiving or reviewing the
15 draft amendment which is attached to this letter?
16     A. No.
17     Q. Do you recall working with a woman by the
18 name of Becky Serafini at any point in time?
19     A. Yes.
20     Q. Is it your recollection that in this time
21 frame, November 1997, Ms. Serafini was an attorney
22 with Foley & Lardner?
23     A. That, I don't remember. I mean, I've
24 worked with her in the past. And I've worked with
25 her on different deals, so I couldn't really speak

23 (Pages 86 to 89)



Page 142

DEBRA STEWART TAYLOR

1  I meant but --
2  BY MR. KRUSKO:
3     Q.  More generally, in connection with what
4  you're terming the AHERF bonds, do you recall
5  providing information to PNC bank?
6     A.  I don't recall.  I mean, we sent a lot of
7  information out and so, you know, I can't say a
8  definite yes or a definite no.  But, you know, if
9  I said here that we were going to send it to them,
10 more than likely we did.
11    Q.  With respect to Exhibit 418, do you recall
12 seeing this letter at any point in time prior to
13 today?
14    A.  No.
15    Q.  Do you have any understanding as to what's
16 being conveyed in this letter?
17    A.  I mean, it sounds like they are sort of
18 changing the format of their financial reports or
19 their audited statements.
20    Q.  But that's just based on a quick scan of
21 the document here today?
22    A.  Yes.
23       MR. KRUSKO:  I don't have any further
24 questions.
25

Page 143

DEBRA STEWART TAYLOR

1     MR. TORBORG:  I have no further questions.
2     MR. MAGID:  We'll read and sign.
3        THE VIDEOGRAPHER:  We are going off the
4  record.  This marks the end of the deposition of
5  Ms. Taylor.  The total number of tapes used was
6  two.  The time now is 2:29 p.m. and we are off the
7  record.
8        (Signature having been not waived, the
9  deposition of DEBRA STEWART TAYLOR was concluded
10 at 2:29 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

ACKNOWLEDGMENT OF DEPONENT

1        I, DEBRA STEWART TAYLOR, do hereby
2  acknowledge that I read and examined the foregoing
3  testimony, and the same is a true, correct, and
4  complete transcription of the testimony given by
5  me and any corrections appear on the attached
6  Errata sheet signed by me.
7
8  _____
9    (DATE)                    (SIGNATURE)

Page 145

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

1        I, Cynthia R. Simmons, Registered
2  Merit Reporter, Certified Realtime Reporter,
3  the officer before whom the foregoing deposition
4  was taken, do hereby certify that the foregoing
5  transcript is a true and correct record of the
6  testimony given; that said testimony was taken by
7  me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for or related to, nor employed by
10 any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12        IN WITNESS WHEREOF, I have hereunto
13 set my hand and affixed my notarial seal this
14 5th day of July `2004.
15 My commission expires:
16   September 30, 2008
17
18 _____
19 NOTARY PUBLIC IN AND FOR
20 THE DISTRICT OF COLUMBIA

37 (Pages 142 to 145)

**Thomas Dep.**