# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## W. BRUCE THOMAS
### September 16, 2003

---

# LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
#### PH: 212-557-7400 / FAX: 212-692-9171

THOMAS, W. BRUCE



LEGALINK
A WORLDWAVE COMPANY

W. BRUCE THOMAS

Page 106

1    I've seen. I wanted to make sure it was
2    consistent with your recollection, that you've
3    left all of your AHERF boards or active service
4    toward the end of the year '97 or the beginning
5    of the calendar year '98?
6  A.  That's right, yeah.
7  Q.  I think if that is, in fact, the case, you were
8    not a board member and actively involved in
9    AHERF matters at the time Mr. Abdelhak was
10   discharged; is that accurate?
11 A.  That's correct.
12 Q.  Did you have any input or were you asked any
13   questions or have any conversations with anyone
14   about that at the time?
15 A.  Oh, when I'd see Bill Snyder or Bob Hernandez,
16   who sort of took my place there, I'd ask them
17   what was going on. I never got much out of
18   them. I think they were concerned to not talk
19   about the subject themselves. I think if I
20   tried to talk to anybody, I didn't find out
21   anything.
22 Q.  You didn't have any --
23 A.  I found out more from Pamela Gainor than
24   anybody else.
25 Q.  She's a journalist?

Page 107

1  A.  Yeah, right.
2  Q.  You didn't have any formal input; is that
3    accurate?
4  A.  Pardon me?
5  Q.  You didn't have any formal input into the
6    determination to remove Mr. Abdelhak?
7  A.  Oh, no, no, I read about it in the paper.
8  Q.  Do you recall anything you learned from
9    Mr. Hernandez or others?
10 A.  Any what?
11 Q.  Anything that you learned from Mr. Hernandez or
12   others about the topic --
13 A.  No, and I think he probably had been told not
14   to discuss it is my guess because we had been
15   friends for years.
16 Q.  And I take it then that you were also not a
17   part of any formal conversations or meetings at
18   which the discharge of Mr. McConnell, the chief
19   financial officer of AHERF --
20 A.  That's correct.
21 Q.  -- was discussed; is that right?
22 A.  That's correct.
23 Q.  And I take it that also that you were not a
24   part of any board deliberations or decision
25   that led to the discharge of Coopers & Lybrand,

Page 108

1    then PriceWaterhouseCoopers, as the auditors
2    for AHERF; right?
3  A.  That's right. As a matter of fact, I didn't
4    even realize that it happened, until you just
5    told me.
6        MR. McDONOUGH: Well, and I'm going
7    to object to the form, using the word
8    "discharge," but go ahead.
9  Q.  I'm not sure I heard your testimony earlier
10   today about whether Coopers & Lybrand, while
11   you were a member of the audit committee, ever
12   took the audit committee up on its offer of
13   executive session.
14       Do you recall whether that ever
15   happened?
16 A.  I don't remember that they did. It would not
17   have surprised me if they did. I'm wondering
18   if, and I wondered then, if we might have asked
19   them to stay afterwards and meet with us. I
20   seem to have some recollection of that. There
21   may have been something we wanted to discuss
22   with them, and we wanted to have the -- anyone
23   from the hospital involved, and I have a vague
24   recollection that we did that but --
25 Q.  Do you recall the topic?

Page 109

1  A.  No, I don't.
2  Q.  Do you recall the outcome of the discussions?
3  A.  No.
4  Q.  Do you recall when you might have had that --
5  A.  It may never have happened.
6  Q.  -- event? So you don't recall when?
7  A.  No.
8  Q.  In your experience at AHERF on the audit
9    committee and as a member of the board,
10   Mr. Thomas, what did you see as the Coopers &
11   Lybrand's role with respect to the review and
12   presentation of the financial statements every
13   year?
14       MR. McDONOUGH: Object to form.
15 A.  That was the principal thing that they did was
16   review, and that's typically the principal
17   thing that an outside accounting firm does. If
18   you have an internal audit group, they -- they
19   do the operational type audit, you know,
20   looking for defalcations, that sort of thing.
21   They do that sort of thing, and they did
22   have -- when I first went on the board, it
23   didn't have an internal audit, but we had one
24   established. I was instrumental in getting
25   that going.

28 (Pages 106 to 109)

W. BRUCE THOMAS

Page 110

1  Q.  An internal audit function?
2  A.  Yeah, and they did -- they had a good one. It
3      was run by a woman, Diane Schrecengost, who was
4      quite good, and --
5          THE REPORTER:  I'm sorry, you said
6      run by a woman?
7          MR. JONES:  Diane Schrecengost.
8  A.  Diane Schrecengost, I'll take a shot at it,
9      S-c-h-r-e-n-g-o-s-t I think, something like
10     that.  What were we --
11 Q.  I was asking you the role of the outside
12     auditors, Coopers & Lybrand, what did you see
13     their role?
14 A.  I don't believe that they were ever retained
15     for any consulting or any of that activity.
16     They just did the conventional balance sheet
17     and profit and loss statement audits,
18     certifying of the books and so forth.  I can't
19     think of -- I'm sure sure we never asked them
20     to do anything beyond the normal CPA
21     activities.
22 Q.  And what did you see as a member of the audit
23     committee and the board at AHERF as the
24     importance or the significance of the auditor's
25     report every year on the financial statements?

Page 111

1  A.  Well, it told you the financial health of the
2      institution, relied on that, the operating
3      financial results and the balance sheet results
4      and the fact that the trustee funds were intact
5      and had not been invaded, that sort of thing.
6  Q.  And --
7  A.  We used to have a pretty thorough discussion of
8      the financial statements at the audit committee
9      meeting and then again at the board meeting
10     following -- the next board meeting that
11     followed the audit committee meeting.
12 Q.  And how did you use the financial statements
13     yourself in your work as a board member?
14 A.  Basically to see how the organization --
15 Q.  The audited financial statements?
16 A.  Yeah, how the organization was doing
17     financially, and fortunately for many years it
18     was a very happy story.  You know, until these
19     problems that we were discussing earlier today
20     came up, they had substantial surplus, cash
21     surplus, operating surplus every year.  So it
22     was kind of, you know, an easy thing to deal
23     with.
24 Q.  Did you indeed then review the audited
25     financial statements when they came out every

Page 112

1      year?
2  A.  Pardon me?
3  Q.  Did you indeed then review the audited
4      financial statements when they came out every
5      year?
6  A.  Yes.
7  Q.  And you reviewed also the management letter
8      that would come out roughly at the same time
9      every year?
10 A.  That's correct.
11 Q.  And what did you see the role of the
12     management -- as the role of the management
13     letter that Coopers & Lybrand would provide?
14 A.  Assuring that they had followed the appropriate
15     procedures and that they have found nothing
16     that they needed to bring to the attention of
17     management, that they found nothing that needed
18     correction and so forth.  They had pretty good
19     records at Allegheny.
20         When -- when things that were done
21     that were improper, using the trust funds and
22     so forth, when that came about, I was gone for
23     several years, so I don't -- I don't know
24     anything about the presentation of the
25     statements at that time, but I thought they

Page 113

1      were good, very good.  Lybrand, Coopers &
2      Lybrand were I think the biggest firm
3      specializing in hospital work in the country,
4      and so they had people that knew that business
5      very well and very capable.
6  Q.  And you learned that from what source?
7  A.  Pardon me?
8  Q.  And you learned that from what source?
9  A.  Literature.
10 Q.  Did Coopers & Lybrand share that with you as
11     well?
12 A.  Yeah, uh-huh.
13 Q.  When you offered executive session to the
14     auditors in your meetings, why is it that you
15     do that or did that?
16 A.  You -- I did it because that's what we did at
17     US Steel.  We had I thought a very good audit
18     committee, US Steel.  US Steel had one of the
19     first ones that were in effect in the country
20     way back in the '50s or '60s, and because we
21     had formed an audit committee while I was there
22     and I was the first chairman, we pretty well
23     used the US Steel system, but I think that's
24     pretty much runs through the whole country.
25         You want to be able to have a given

29 (Pages 110 to 113)

W. BRUCE THOMAS

Page 114

1  group, whether it's the internal auditors just
2  sit with you and have some frank discussions
3  with them and as you are hoping -- or you are
4  not hoping, but you do it because there may be
5  something that they don't want to say with the
6  chief financial officer or the CEO sitting
7  there, and the same way with the accounting
8  firm, the outside accountants, and the same way
9  with the management.
10        And as I say, the only ones I
11  remember who ever took us up was the management
12  on a couple of things that were so early in
13  development that they didn't want them rooted
14  about, and I guess internal audit would stay in
15  on those normally, but it was a healthy thing
16  to do, and I insisted that they put that in the
17  record every time, that we had made that offer.
18        And also about once or twice a year I
19  would tell the internal audit people, the
20  outside auditors and also the management
21  people, that anybody who wanted to talk to the
22  committee or to me privately was perfectly free
23  to do so, and when we had the organization
24  chart, we showed a line going from the internal
25  audit and the chief financial officer and so

Page 115

1  forth coming up to the audit committee outside
2  of their normal administrative reporting, and
3  encouraged them if they ever had something they
4  wanted to talk about, come and see me. Nobody
5  ever did.
6  Q.  Did you since -- let me start that again.
7        Did you ever question the integrity
8  or competence of Mr. Abdelhak while you were a
9  member of the board, either the audit committee
10  or the board itself?
11  A.  No, I didn't. I think I said this, that I had
12  some concerns later on, after this plan was in
13  place and everything else, that he never was
14  unable to answer a question. He always knew
15  the answer to every question, and I don't think
16  there's anybody like that, and so that made
17  me a little uneasy, but that was after all
18  these policies had been adopted and we were
19  into this business.
20  Q.  Do you recall when that question or concern
21  came up in your mind?
22  A.  Probably would have been not too long before I
23  left the board. I thought back, and I thought,
24  geez, you know, he was never at a loss to come
25  up with persuasive and documented things right

Page 116

1  out of his head.
2  Q.  Did you ever have a question yourself about the
3  competence or integrity of Mr. McConnell, the
4  chief financial officer of AHERF --
5  A.  No.
6  Q.  -- while you were a member of the board?
7  A.  No, I would say no to that.
8  Q.  Did you ever --
9  A.  There was never any question in the whole
10  organization about who was the boss, and
11  because of Sherif's work habits, working, you
12  know, all day and all night sometimes, he got
13  down into detail levels that sometimes a CEO
14  doesn't do. That's good in some ways but also
15  has some disadvantages in, you know, people not
16  feeling they are doing a final work product,
17  that somebody else is looking at them all the
18  time.
19        But he was remarkably efficient and
20  remarkably knowledgeable and remarkably
21  diligent. He was an impressive -- I don't know
22  that I've ever seen anybody who had a grasp of
23  all the -- what was going on in that company,
24  in that institution. I've never seen anybody
25  with that kind of a grasp.

Page 117

1  Q.  Did you ever share your concerns about his
2  ability to always have an answer with anyone
3  else when --
4  A.  Not --
5  Q.  -- they first surfaced?
6  A.  -- not while I was still on the board, no.
7  Q.  Did you do it at some time?
8  A.  It was just a, you know, an intuitive feeling,
9  and he may have been absolutely correct in
10  every one of those occasions. He did have an
11  answer. I mean, if so, he's the only person I
12  ever saw who was like that.
13  Q.  Did you ever share those concerns after you
14  left the board with anyone else?
15  A.  Maybe in a conversation like this with somebody
16  who was -- had been on the board and
17  couldn't -- might have been with, say, a Doug
18  Danforth who I know and see socially, and we
19  would both talk about -- we would talk about
20  those things. I might very well have said
21  that.
22  Q.  In a casual social conversation?
23  A.  Yeah, after, you know, the whole thing had hit
24  the fan and it was no longer in the hands of a
25  board or anything, it was long --

30 (Pages 114 to 117)

W. BRUCE THOMAS

Page 118

1   Q.   This would have been after the bankruptcy?
2   A.   Yeah, right.
3   Q.   Did you --
4   A.   Before that, anybody who was on the board, if
5        I, you know, I think mentioned it, would ask
6        somebody something, they wouldn't discuss it,
7        socially, again, socially for me, but it wasn't
8        socially for them.
9   Q.   I think you may have answered this at least
10       indirectly in response to one of
11       Mr. McDonough's questions, but forgive me if
12       that's the case.
13            Before you left the board, did you
14       ever have -- or the audit committee, did you
15       ever have a question about the accuracy of the
16       audited financial statements that had been
17       presented to you as --
18  A.   No.
19  Q.   -- a member of the board?
20  A.   I never did.  I was always impressed with the
21       quality of the financial statements.
22            I tell you one difference I had with
23       Sherif, I saw it again here this morning.  When
24       they developed their mission statement I guess
25       it was, it had a one-line mission statement

Page 119

1        that was for education, teaching and solving
2        health problems, people's health problems,
3        something like that.  I tell you, you got this
4        backwards.  This hospital is supposed to be
5        solving -- taking care of people and helping
6        them, and the teaching and that supplement
7        that.  So I says you ought to turn it around
8        and then put that in the first place.
9             And he wouldn't agree with that, and
10       he got some support out of some other people,
11       but I thought they were putting the cart before
12       the horse.  That was the only thing, and he
13       didn't like the fact that I questioned him I
14       don't think.  That was the only time we ever
15       exchanged any words that were other than
16       pleasant.
17  Q.   You were shown today, Mr. Thomas, some board
18       packages or minutes from the AIHG board, the
19       Allegheny Integrated Health Group --
20  A.   Yeah.
21  Q.   -- board?
22  A.   Yeah.
23  Q.   You didn't attend those meetings, did you?
24  A.   No.  I was never a part of that.
25  Q.   Had you ever seen those materials before today?

Page 120

1   A.   I don't believe so.  I wouldn't have seen the
2        minutes I don't think because they would report
3        in sort of summary form at the board meetings,
4        but they didn't distribute all the committee
5        meetings to everybody on the board.
6   Q.   And you also testified a few times about
7        objections that were or were not raised by
8        board members with respect to certain pieces of
9        Mr. Abdelhak's business strategy.  Do you
10       recall that testimony?
11  A.   The only ones I remember is that I heard, not
12       directly, but I heard that some of the doctors
13       didn't like the idea of getting a bunch of
14       Philadelphia hospitals and were concerned maybe
15       money might go from Pittsburgh to Philadelphia.
16       Now, I never heard a doctor say that at a board
17       meeting, and they were -- again, some
18       representatives of this medical staff were in
19       every board meeting, but I heard grumblings,
20       you know.
21  Q.   Do you recall anybody in particular who
22       rumbled?
23  A.   No.  It could have been any one of about the
24       six doctors that I see off the Allegheny board
25       staff.  I got a periodontologist, they cost

Page 121

1        more than a periodontist, and they put an o-l-o
2        in there and the price goes up.  I got a
3        dermatologist.  I got a urologist.  I got a
4        cardiologist.  I got a bone guy.  I don't know
5        what you call them, ortho something or other,
6        and there's one more.  There's seven on my list
7        of telephone numbers.  It could have been one
8        of them might have said something.
9   Q.   But you don't remember with specificity today?
10  A.   No.
11  Q.   Okay.  Let me ask you this:  Do you -- you
12       acknowledged I think in your testimony earlier
13       today that you missed some board meetings and
14       that you missed more board meetings after you
15       retired from US Steel; is that right?
16  A.   Right, that's right.
17  Q.   If it wasn't --
18  A.   That ultimately is why I tendered my
19       resignation.  I didn't feel comfortable not
20       going to the board meeting.
21  Q.   And when you answered questions today, you
22       didn't mean to speak for those who might have
23       been in attendance at a meeting when you
24       weren't there and voiced an objection; is that
25       accurate?

31 (Pages 118 to 121)

W. BRUCE THOMAS

Page 122

1          MR. McDONOUGH: Object to form.
2    A.   Say that again?
3    Q.   Let me try it again.
4          For the meetings that you did not
5    attend --
6    A.   Yeah.
7    Q.   -- you couldn't really know whether a present
8    member had an objection or a concern about a
9    hospital acquisition or a physician practice
10   acquisition --
11   A.   Oh, that's right. Yeah, I wouldn't know that.
12   Q.   -- or a risk management contract --
13   A.   I didn't go around and ask everybody did you
14   object to this or anything like that.
15   Q.   So there may have been objections or concerns
16   that you didn't hear; is that right?
17   A.   That could -- that could very well be.
18   Q.   Let me ask you things about what I don't think
19   you ultimately heard, and that is
20   communications from Coopers & Lybrand on a
21   couple of topics.
22          Would you, when you were a member of
23   the committee, the audit committee or the AHERF
24   board or the AGH board for that matter, would
25   you have expected Coopers & Lybrand to bring to

Page 123

1    your attention material misstatements in the
2    financial statements that they were presented
3    for audit that management would not correct?
4          MR. McDONOUGH: Object to form.
5    A.   I think, yes.
6    Q.   That would be part of their duties there?
7    A.   Yes, the principal part.
8    Q.   Would you expect Coopers & Lybrand as well to
9    bring to your attention intentional
10   misstatements in the financial statements that
11   they might have uncovered?
12   A.   Even more so.
13   Q.   Would you have expected Coopers & Lybrand to
14   bring to your attention concerns they had
15   regarding the competence of financial
16   management?
17   A.   In general, yes. I wouldn't expect them to run
18   down a list of people and that sort of thing.
19   Q.   I understand. Senior, senior financial
20   management, Mr. McConnell --
21   A.   Yeah.
22   Q.   -- Mr. Abdelhak?
23   A.   Yeah, and they would remark on that just about
24   every meeting. They would -- when I would ask,
25   you know, how they were being treated, were

Page 124

1    they given access, that sort of thing, they
2    would say yes, we have no problem.
3    Q.   Coopers, Coopers & Lybrand would say that?
4    A.   Yeah, would say that we have complete access,
5    there's nothing that we can't see and we are
6    getting very good cooperation out of the
7    financial staff.
8    Q.   Would you expect -- have expected Coopers &
9    Lybrand to bring to you concerns that they held
10   about the integrity of financial management,
11   Mr. McConnell, Mr. Abdelhak or others, if they
12   had such concerns?
13   A.   Yes, pursuant, you know, to the procedure I
14   mentioned before of telling them if you -- if
15   there's anything you want to discuss, you can
16   come to me or to the committee in executive
17   session. We invite that from you. You have
18   total access. You don't have to go through the
19   chief financial officer. You don't have to go
20   through anybody else. I did that in US Steel,
21   and I did that with every audit committee I
22   chaired. I chaired some other audit committees
23   too.
24   Q.   And I take it your answer's going to be the
25   same but --

Page 125

1    A.   You are going to get tired of hearing it.
2    Q.   I take it your answer's going to be the same,
3    but you tell me, if Coopers & Lybrand had
4    uncovered what they thought was fraud on the
5    part of financial management, you would have
6    expected to hear that from them as well?
7    A.   Yes.
8    Q.   If Coopers & Lybrand had told you that the
9    fiscal year 1996 or 1997 financial statements
10   that they were presented for audit were
11   materially misstated and that C & L was,
12   therefore, going to issue an adverse opinion on
13   those statements, would that have caused you
14   concern?
15          MR. McDONOUGH: Object to form,
16   hypothetical.
17   A.   Yes.
18   Q.   And why is that?
19   A.   Well, you want to be a part of anything,
20   particularly in the role like the chairman of
21   the audit committee or even on the audit
22   committee where you hear something like that
23   and are concerned.
24   Q.   And there are things you can do if you hear
25   something like that; is that right?

32 (Pages 122 to 125)

W. BRUCE THOMAS

Page 126

1  A.  You can start an investigation, yeah.
2  Q.  You can start an investigation?
3  A.  Pardon me?
4  Q.  You said you can start an investigation?
5  A.  I would -- you would try to get an
6      investigation underway as to whether what they
7      told you was correct or not.
8  Q.  And you could have some other options as well?
9  A.  Not until you completed the investigation.
10     That would be the first step.
11 Q.  You could instruct your auditors to expand the
12     scope of their audit work for one thing?
13 A.  Yeah, but if they had already found
14     something -- well, you mean to pursue that.
15 Q.  To do more work.
16 A.  Oh, yeah, sure, yeah.
17 Q.  Do additional procedures, for instance?
18 A.  Yeah.
19 Q.  You could engage other consultants if you
20     thought it appropriate?
21 A.  You could, yeah.
22 Q.  And you could ultimately evaluate the
23     competence and integrity of financial
24     management yourself based on what you learned?
25 A.  That's right.

Page 127

1  Q.  And if you weren't satisfied with their
2      competence or integrity, what options would you
3      have?
4  A.  You'd talk to the chief executive officer and
5      expect that if there was substantiation for
6      what you were telling him, that he would take
7      some action and maybe discharge the person or
8      give them some kind of a punishment of some
9      sort, like a lack of a bonus or something like
10     that.
11 Q.  And if -- if what you learned involved in a
12     negative way the chief executive officer
13     himself, you had options as well?
14 A.  Go to the chairman of the board.
15 Q.  And the chairman of the board with the board
16     could do what?
17 A.  He would or should, if there was
18     substantiation, again, for improper actions of
19     some kind, run his own investigation, and
20     presumably if he found something wrong, he
21     would take action and terminate the CEO; if it
22     weren't that serious, maybe withhold his bonus
23     too, something like that, make him pay for the
24     transgression in some way.
25 Q.  If you had learned what I suggested in my

Page 128

1      question, that C & L was going to issue an
2      adverse opinion on the financials, with the
3      options you just discussed, you would have
4      followed those options as they made sense?
5  A.  If they had told me that?
6  Q.  Yes.
7  A.  Yeah.  I would think I'd have no choice.
8  Q.  Would you -- strike that.
9          If Coopers & Lybrand had told you
10     that net income in each of fiscal year 1996 and
11     1997 had been overstated by $80 million or more
12     by the internal accounting department in the
13     financial statements presented to Coopers &
14     Lybrand for their audit in violation of
15     generally accepted accounting principles, would
16     that have concerned you?
17         MR. McDONOUGH:  Object to form.
18 A.  Yeah.
19 Q.  And you would have had the same kinds of
20     options available to you if that had been the
21     case?
22 A.  That's right, yeah.
23 Q.  And you would have followed them?
24 A.  Yeah.
25 Q.  If Coopers & Lybrand had told you that the

Page 129

1      fiscal year 1996 or 1997 financial statements
2      presented for their audit had been
3      intentionally misstated by management, would
4      that have concerned you as well?
5  A.  That would have concerned me.
6  Q.  And you would have had the same options that we
7      discussed?
8  A.  Right.
9  Q.  And you would have followed them?
10 A.  Yeah.
11 Q.  If Coopers & Lybrand had told you that the
12     fiscal year 1996 or 1997 financial statements
13     presented for their audit were the product of
14     fraud on the part of financial management or
15     suspected fraud on the part of financial
16     management, would that have concerned you?
17 A.  It would have.
18 Q.  And would you have had the same options
19     available to you?
20 A.  I would think so.
21 Q.  And would you have followed them?
22 A.  Yeah.
23 Q.  Were any of those communications made to you?
24 A.  No.
25         MR. McDONOUGH:  Well, I'm going to

33 (Pages 126 to 129)

W. BRUCE THOMAS

Page 130

1   object to form to the whole line of questions
2   as they assume facts not in evidence and are
3   merely stating hypotheticals with no
4   foundation.
5   Q.   Mr. Thomas, you've been a member of a number of
6       audit committees, we discussed that earlier?
7   A.   Yeah.
8   Q.   Have auditors, independent, outside auditors in
9       any of the audit committee meetings that you've
10      attended for organizations other than Allegheny
11      General or AHERF come to the audit committee
12      with any suspicions of fraud or inappropriate
13      comment on the part of financial management in
14      your experience?
15  A.   I can't remember any.
16  Q.   Do you recall that any outside auditors coming
17      to a committee of which you were a member
18      outside of your AHERF work with a report of
19      suspected incompetence or insufficient
20      competence on the part of financial management?
21  A.   I can't remember any.
22  Q.   Do you ever recall discharging auditors in
23      other audit committee work?
24  A.   No.  Discharging them?
25  Q.   Yes.

Page 131

1   A.   No.  That's a recent phenomenon.  Didn't use to
2       do that.
3   Q.   Mr. Thomas, you've been given a number of very
4       thick documents today?
5   A.   That's right.
6   Q.   And we've all been sitting here, and it has not
7       been possible for you to review every page of
8       the thick documents; that accurate?
9   A.   That's correct.  Fast reader but not that fast.
10  Q.   Neither am I.  Do you recall as you sit here
11      today whether you were at the board meeting at
12      which The Graduate Hospital's acquisition was
13      discussed?
14  A.   I don't believe so.
15  Q.   And any objections that might have been raised
16      at that meeting, you wouldn't have been there
17      to hear; is that fair to say?
18  A.   That's right.  I think I would remember if I
19      had been.
20  Q.   Did you ever learn during your service on the
21      board or the audit committee at AGH or AHERF
22      about Coopers & Lybrand's involvement in a
23      lawsuit regarding the PharMor bankruptcy?
24  A.   I remember the PharMor bankruptcy, but I can't
25      say that I remember what accounting firm was

Page 132

1   involved.
2   Q.   Did you ever learn of a lawsuit against Coopers
3       & Lybrand or ever -- or any of its partners or
4       employees that arose from that bankruptcy?
5   A.   If I did, I've forgotten it.
6           MR. JONES:  I don't have anything
7       further.
8               - - - -
9           RE-EXAMINATION
10              - - - -
11  BY MR. McDONOUGH:
12  Q.   Mr. Thomas, a few follow-up questions.  I think
13      we established previously that there were some
14      meetings of the audit committee for the board
15      of trustees of AHERF which you did not attend;
16      correct?
17  A.   Yeah, in the later years quite a few.
18  Q.   You did, however, am I correct, get the minutes
19      of every meeting --
20  A.   Oh, yeah.
21  Q.   -- the ones you attended and the ones you
22      didn't attend?
23  A.   That was part of the advance material.
24  Q.   And would it be fair to say, Mr. Thomas, that
25      you also had opportunities to converse with

Page 133

1   your colleagues who are also directors --
2   A.   That's right.
3   Q.   -- because of your other business associations
4       and social associations?
5   A.   Right.
6   Q.   Now --
7   A.   Yeah, I knew pretty much relatively intimately
8       everybody on the board from United Way or
9       company associations or something.
10  Q.   Now, all of my questions, Mr. Thomas, that I
11      addressed to you about did you ever hear any
12      trustee raise objections or say this shouldn't
13      be done or express opposition to Mr. Abdelhak's
14      various expansion efforts, I intended those
15      questions -- and I think so did you, but just
16      to be precise -- I intended those questions to
17      cover any and all conversations, whether they
18      occurred in meetings which you attended,
19      whether they were reported in minutes of
20      meetings which you attended or did not attend,
21      which covered private conversations or social
22      conversations, taking all of those situations
23      into account, does it remain true, Mr. Thomas,
24      as you've testified, that you don't recall
25      trustees opposing the various expansion efforts

34 (Pages 130 to 133)

W. BRUCE THOMAS

Page 154

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
   COUNTY OF ALLEGHENY          )  S H E E T
2
        I, W. Bruce Thomas, have read the foregoing
3  pages of my deposition given on Tuesday, September
   16, 2003, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Pg. No.  Line No.    Change and reason for change:
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20  correct.
21  _____
              W. BRUCE THOMAS
22
   Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24  _____
           Notary Public
25  AKF Reference No. HW77259

Page 155

1        AKF REPORTERS, INC.
             AKF Building
2        436 Boulevard of the Allies
         Pittsburgh, PA  15219
3           (412) 261-2323
4
5  September 19, 2003
   TO:  W. Bruce Thomas
6     Route 4, Blackburn Road
      Sewickley, PA 15143
7     412-741-8591
8     RE:  DEPOSITION OF W. BRUCE THOMAS
9        NOTICE OF NON-WAIVER OF SIGNATURE
10     This is your completed deposition transcript
      which you requested to read.
11
        All corrections, if any, are to be noted on the
12  preceding page titled Errata Sheet.  If there are no
    corrections, write "No Corrections" in the body of
13  that page.  You must then sign the Errata Sheet and
    have it notarized.  If it is inconvenient for you to
14  appear at our offices to have it notarized, you may
    have it notarized by any Notary Public.
15
        After it has been signed and notarized, send
16  the entire transcript back to me so it may be
    distributed to all counsel who ordered a transcript.
17
        You must read and sign your transcript within
18  thirty (30) days of your receipt of this Notice.
19
20
   Heidi H. Willis, RPR, CRR
21  Court Reporter
    AKF Reporters, Inc.
22
23
24
25

40 (Pages 154 to 155)

J. William Tillett, CPA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION
    Plaintiff,
  vs.        Civil Action
PRICEWATERHOUSECOOPERS,  No. 00-684
LLP,
     Defendant.


- - - - -

   Videotaped Deposition of JOSEPH W.
TILLETT, JR., called for examination under the
Applicable Rules of Federal Civil Procedure,
taken before me, Michele E. Eddy, a Registered
Professional Reporter and Notary Public in and
for the State of Ohio, pursuant to notice and
stipulations of counsel, at the offices of
Cravath, Swaine & Moore, 825 Eighth Street,
Worldwide Plaza, New York, New York, on
Wednesday, the 2nd day of March, 2005, at 9:00
a.m.


- - - - -

J. William Tillett, CPA

Page 182

1    A.   No.
2    Q.   Was Mr. Panucci inexperienced for
3 the work he undertook?
4    A.   He was a younger staff accountant,
5 a very bright individual.  I would probably        13:58:50
6 feel fortunate to have somebody like that on my
7 engagements.  I think he, I don't recall, I
8 think this is from depositions, but like the
9 highest grade on the CPA exam and that kind of
10 thing.                             13:59:06
11    Q.   Did you consider him to be
12 inexperienced, though, is my question.
13    A.   He had -- I wouldn't say
14 inexperienced.  He was a staff level person and
15 obviously he would have much less experience      13:59:17
16 than Miss Frazier or Mr. Kirstein or
17 Mr. Buettner, and he would have the same level
18 of experience the other staff accountants would
19 have.
20    Q.   Did you believe Mr. Kirstein and     13:59:29
21 Miss Frazier had appropriate experience for the
22 staffing roles they filled?
23    A.   Yes, I think I just testified to
24 that.
25    Q.   Did you explore Mr. Kirstein or      13:59:40

Page 183

1 Miss Frazier's background other than by reading
2 their transcripts?
3    A.   The transcripts of their
4 depositions?
5    Q.   Yes, in either this matter or the     13:59:55
6 SEC matter.
7    A.   When you say explore, what -- can
8 you help me --
9    Q.   Did you ask questions of anyone,
10 undertake any other independent work to try to   14:00:07
11 arrive at their experience base with earlier
12 clients?
13    A.   I may have discussed with
14 Mr. Crouse and Mr. Carlson his experience as I
15 -- my understanding of his experience as a       14:00:33
16 result of reading the transcripts of his
17 deposition to see if they knew of anything else
18 or that -- I don't recall any specific
19 conversations, but that could have occurred.
20    Q.   Do you recall agreeing with any of   14:00:47
21 the opinions expressed by Mr. Wallace in his
22 rebuttal report?
23         MR. RYAN:  Objection.
24    A.   I don't recall.  By the nature of
25 his report, it was just a rebuttal of mine, so    14:01:02

Page 184

1 pretty much by definition I can safely say I
2 didn't agree with any of his opinions.
3    Q.   You mentioned that Mr. Buettner had
4 some experience with the client?
5    A.   Yes, sir.                    14:01:17
6    Q.   Do you know today how long that
7 experience ran?
8    A.   Several years.  I don't have a -- I
9 don't remember the exact number of years.
10    Q.   Is experience with a client always  14:01:26
11 a benefit to an auditor?
12    A.   There are certainly benefits.
13    Q.   Is it always a benefit?
14    A.   In some people's mind, maybe not.
15 Others usually it is.  Maybe it's mostly good,   14:01:38
16 a little bad, you know.  People have opinions
17 on that.
18    Q.   Do you have an opinion on it?
19    A.   Yes, I do.
20    Q.   What is that?                14:01:48
21    A.   I think experience with a client is
22 very good.
23    Q.   What are the opinions -- it's fair
24 to say that there has been some public debate
25 about whether long-time experience or long-term  14:01:59

Page 185

1 experience is beneficial, is that fair to say?
2    A.   That is very fair to say.
3    Q.   Reported in the media and other
4 places?
5    A.   Yes, sir.                    14:02:07
6    Q.   And the criticism, in summary form,
7 has been that long-time experience with the
8 same audit client can impair one's
9 independence; is that an accurate statement?
10    A.   I have heard that.              14:02:20
11    Q.   You don't agree with that?
12    A.   I don't disagree that it might
13 occur.  It's been my experience in 36 years
14 that I have never observed an impairment of
15 independence as a result of the partner serving  14:02:33
16 the account for a long period of years.
17    Q.   Have you ever observed an
18 impairment of independence as a result of the
19 significance of the revenue stream generated by
20 the client for a given partner?            14:02:49
21    A.   I've heard those allegations or
22 allegations of that.
23    Q.   Have you ever observed it yourself?
24    A.   No.
25    Q.   I just want to ask you to flip to   14:02:58

47 (Pages 182 to 185)

J. William Tillett, CPA

Page 186

1 page 11 of your report. Towards the bottom of
2 the page, in the final paragraph that appears
3 there, you write, "The information contained in
4 working papers constitutes the principal record
5 of the work that the auditor has done and the        14:03:38
6 conclusions that he has reached concerning
7 significant matters."
8         Is that right?
9     A.    That's right.
10    Q.    You believe that to be true?        14:03:47
11    A.    Yes.
12    Q.    Was the amount of the 17.5 million
13 dollar adjustment to the allowance for doubtful
14 accounts at DVOG in fiscal year 1996 a
15 significant matter?        14:04:02
16    A.    Was the amount?
17         MR. RYAN:  Objection.
18    Q.    Yes.
19    A.    I haven't formed an opinion on
20 that.        14:04:12
21    Q.    Have you formed an opinion about
22 whether the audit team's acceptance of the
23 amount should have been reflected in the work
24 papers for the '96 audit of the DVOG hospitals,
25 Delaware Valley Obligated Group hospitals?        14:04:27

Page 187

1         MR. RYAN:  Objection.
2    A.    That the amount?
3    Q.    Should have been somewhere
4 reflected in the work papers and the C&L's team
5 acceptance of that amount.        14:04:38
6         MR. RYAN:  Same objection.
7    A.    I think it was reflected.
8    Q.    How do you come to that conclusion?
9    A.    Through review of the work papers.
10    Q.    Do you recall a work paper in which        14:04:47
11 anyone at C&L said 17.5 million dollars will be
12 the adjustment and we approve so, or words to
13 that effect?
14         MR. RYAN:  Objection.
15    A.    No, I don't -- I don't think that        14:04:56
16 was stated as such in the working papers.
17    Q.    Then what do you refer to in the
18 working papers?
19    A.    The adjustment itself.
20    Q.    The entries?        14:05:07
21    A.    The entries itself.
22    Q.    The journal entries?
23    A.    The journal entries, right, that
24 are summarized in the C&L work papers.
25    Q.    Do you see in the work papers for        14:05:15

Page 188

1 the '96 audit of the Delaware Valley Obligated
2 Group hospitals any mention of the clients or,
3 rather, C&L's 15 to 20 million dollar range for
4 the suitable amount of an adjustment to the
5 allowance for doubtful accounts as testified to        14:05:33
6 by Mr. Buettner?
7    A.    I don't see that number or range
8 documented in the work papers.
9    Q.    Would you expect, consistent with
10 your statement on page 11 of your report, that        14:05:43
11 that range should have been documented in the
12 work papers?
13    A.    Not necessarily.
14         MR. RYAN:  Objection.
15    Q.    You don't have an opinion one way        14:05:49
16 or the other?
17         MR. RYAN:  Objection.
18    A.    I would not be surprised to see it.
19 I would not be surprised not to see it.
20    Q.    Did you when, in your experience,        14:05:59
21 counsel for an adjustment to the allowance of
22 doubtful accounts at a not-for-profit hospital
23 reflect the suitable range or the acceptable
24 range for which you had counseled in your work
25 papers?        14:06:16

Page 189

1         THE WITNESS:  Can you read that
2 back?
3         (Record read.)
4    A.    I think I understand that.
5         The audit process -- it's been my        14:06:45
6 experience that the audit process is just that,
7 a process.  And the -- through the deposition
8 testimony I find both from AHERF individuals
9 and from C&L individuals to be quite
10 consistent.        14:07:09
11         What they are describing in that
12 process I find to be very common in a very
13 usual or normal process that would be
14 occurring.
15         Often in my career -- I hope this        14:07:20
16 is responsive -- we would form a preliminary
17 opinion that an allowance for doubtful account
18 should be increased and discuss it with clients
19 in a very similar fashion as Mr. Buettner and
20 Mr. Cancelmi I believe described whereby the        14:07:48
21 auditors say we think you should increase the
22 allowance.  The client may say, well, how much
23 do you think.  The auditor may say 15, 20
24 million dollars might be the number we would
25 feel better with, and then the client comes        14:08:03

48 (Pages 186 to 189)

Case 2:00-cv-00684-DSC     Document 129-14     Filed 07/11/2005     Page 14 of 25

Page 190

1   forth and makes an adjustment.
2        What's important is the adjustment
3   is made and it's dealt with.  If it had not
4   been dealt with, I think Mr. Buettner would
5   have posted it to a SUD along with some of the    14:08:23
6   other items involved in the journal entries and
7   had to, at that time, would have had to make a
8   determination whether the '96 SUD was -- the
9   items on the SUD, either as individual items or
10  in the aggregate, had a material impact on the    14:08:44
11  financial statements and would have had to
12  complete that process.
13       Under the facts, as I understand
14  them, where the adjustment was made, the 17.5
15  never got posted to the SUD and, in fact, items    14:09:00
16  that were on the SUD already, the preliminary
17  SUD got taken off the SUD.  So I think in his
18  words they got several things on the balance
19  sheet cleaned up at the same time.
20       Q.   My question, however, remains, in    14:09:15
21  your experience, when you counsel clients to
22  adjust the allowance for doubtful accounts in
23  an upward fashion, to increase it, did you put
24  the amount of the proposed adjustment in your
25  work papers, or any suitable range?    14:09:28

Page 191

1        MR. RYAN:  Objection.
2        A.   I may have.  It may have occurred
3   just as I tried to describe it.  It could have
4   been a preliminary judgment or assessment and
5   it -- the act that -- how it was proposed is,    14:09:43
6   of course, I can understand a great importance
7   to you right now, but at the time of the audit
8   and in conducting an audit, who proposed it or
9   whatever is not as relevant as at the end of
10  the day, the allowance was a reasonable amount    14:10:05
11  in the eyes of the auditor.
12       Q.   I don't want to dicker with you
13  about order of importance of items, but my
14  question is, can you think of an instance where
15  you proposed for one of your not-for-profit    14:10:15
16  hospital's clients that the allowance for
17  doubtful accounts be enhanced or increased at
18  year-end where you didn't document the amount
19  that would be suitable to you?
20       A.   I'm sure --    14:10:27
21       MR. RYAN:  You mean an actual
22  client, is that what you're asking?
23       Q.   No, can you think of an instance,
24  first?
25       A.   I'm sure there are.  I'm just    14:10:33

Page 192

1   telling you the process as I gained to
2   understand as a result of mainly from the
3   depositions reap along with the working papers
4   how all this happened, I find it not unusual
5   and something that I could put myself in I    14:10:52
6   think this has happened this way to me before.
7        Q.   Okay.
8        A.   Whether it's a specific hospital, I
9   wouldn't be able to recollect that.
10       Q.   Is it, in your view, the better    14:11:01
11  practice to document a suitable range or a
12  suitable amount --
13       MR. RYAN:  Objection.
14       Q.   -- in the work papers?
15       A.   It becomes important, particularly    14:11:07
16  if the client doesn't make the entry because
17  then you have to have an amount on the SUD that
18  supports it.  The fact that the adjustment is
19  made is not concerning to me.  It makes the
20  issue of having the documentation of less --    14:11:30
21  much less concern.
22       Q.   My question stands.  Do you believe
23  it to be a better practice to document such a
24  range or such an amount in the work papers?
25       MR. RYAN:  Objection.    14:11:40

Page 193

1        A.   Documentation, more is better, if I
2   can make that general comment and particularly
3   in situations like we have at hand here.  So I
4   guess I would give you generally speaking that
5   would be.    14:12:02
6        Q.   That would be your view?
7        A.   Yes.
8        Q.   Is that a yes?
9        A.   Yes.  I'm sorry.
10       Q.   Was the transfer of the 50 million    14:12:06
11  dollars of reserves that we discussed earlier
12  today from the Graduate hospitals or reserves
13  established in connection with the acquisition
14  of the Graduate hospitals to the Delaware
15  Valley Obligated Group hospitals' bad debt    14:12:23
16  reserves a significant matter, the existence of
17  which or the fact of which should have been
18  recorded in the work papers?
19       MR. RYAN:  Are you talking about
20  the 50?    14:12:33
21       MR. JONES:  The 50.  The big 50.
22       A.   The 50.
23       MR. RYAN:  Objection.
24       A.   I think it was recorded in the work
25  papers.    14:12:41

49 (Pages 190 to 193)

J. William Tillett, CPA

Page 194

1    Q.   Describe for me how.
2    A.   The adjustments made by the client
3   are summarized in the C&L work papers, the
4   March 25 million and the April 25 million.
5    Q.   Did you see any work papers,          14:13:02
6   though, that described the work done or any
7   audit conclusion reached in connection with
8   whether the transfer of the 50 million dollars
9   of reserves that we've just discussed complied
10  with GAAP?                                  14:13:23
11   A.   I saw Mr. Buettner's analysis where
12  he considered the effects of the 50 million
13  dollar transfer on the audited financial
14  statements.
15   Q.   Did that analysis expressly refer    14:13:38
16  to GAAP compliance or compliance with GAAP?
17       MR. RYAN:  Objection.
18   A.   I don't believe very many audit
19  schedules specifically make those kinds of
20  statements.                                 14:13:55
21   Q.   I understand that.  I'm really only
22  talking about one.
23       Did his analysis refer to GAAP?
24   A.   No, nor did I expect it to.
25   Q.   My question, did his analysis refer  14:14:07

Page 195

1   to GAAP?
2    A.   I don't recall that it did.
3    Q.   I'm going to hand it to you now or
4   at least a set of documents that included, I
5   believe, from his deposition, and they were   14:14:15
6   marked as Exhibit 4473 to that deposition.  If
7   you will quickly just confirm to me that the
8   analysis by which you just referred by
9   Mr. Buettner is included in Exhibit 4473, that
10  would be great.                              14:14:30
11   A.   Yes, sir.
12   Q.   In particular, which pages do you
13  refer to?
14   A.   They're all -- all these are
15  somewhat related, but I think the principal   14:14:58
16  schedules would be CL 036438 and CL 036439.
17   Q.   Are you aware of any other work
18  papers, to the extent these can be so
19  considered, but any work papers, besides these
20  pages you just referred to, that address the   14:15:27
21  materiality of the 50 million dollars in
22  reserve transfers?
23       MR. RYAN:  Objection.
24   A.   I think his schedule is doing more
25  than just addressing the materiality, but I do  14:15:41

Page 196

1   believe that it is addressing materiality.
2        I'm not -- I am not aware if there
3   is other work papers that specifically address
4   the materiality of the 50 million dollar
5   transfer.                                    14:15:57
6    Q.   Do you consider these handwritten
7   notes -- they are handwritten notes, is that
8   right?
9        MR. RYAN:  Just these two pages?
10   A.   The two pages.                        14:16:03
11   Q.   The pages you just referred to.
12   A.   That's right.  Many of the
13  attachments or accompanying schedules and data
14  are not handwritten, but you could tell it's
15  his -- it appears to be his handwriting from  14:16:15
16  them that he's using to work on this analysis.
17   Q.   But nonetheless, the handwritten
18  notes to which you just referred, do you
19  consider them to be work papers for the '97
20  audit?                                       14:16:28
21   A.   Yes.
22   Q.   You understand they were maintained
23  in separate files from the rest of the work
24  papers?
25   A.   Yes.  And specifically the auditing  14:16:32

Page 197

1   standards provide that that may be the case.
2    Q.   Are you aware of any independent
3   expectation of the estimate of the allowance
4   for doubtful accounts undertaken by C&L that
5   included a reference to the range 15 to 20    14:16:59
6   million dollars or the amount of the adjustment
7   17.5 million dollars at DVOG in '96?
8    A.   We're back on the 17 five?
9    Q.   Yes.  We're ping-ponging.  I
10  apologize.                                   14:17:12
11   A.   That's okay.
12       MR. RYAN:  If I could get that read
13  back.
14       MR. JONES:  Don't bother because
15  I'll withdraw it and try it again.           14:17:17
16   Q.   Are you aware of any work papers
17  that expressly purport to develop an
18  independent or reflect an independent
19  expectation of the estimate of the allowance
20  for doubtful accounts at DVOG in fiscal year  14:17:33
21  1996 that include reference to the 15 to 20
22  million dollar range or the 17.5 million dollar
23  actual adjustment?
24   A.   I don't believe so.
25   Q.   I'm going to represent to you that   14:17:45

50 (Pages 194 to 197)

# DEPOSITION ERRATA SHEET
## JOSEPH WILLIAM TILLETT, JR.
## MARCH 2, 2005

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 10 | 10 | Strike "primary" | Cannot have two primary |
| 10 | 11 | Strike "is" | Correct grammar |
| 11 | 6 | "—TR, LLC ?" s/b "JWTJR, LLC" | Correct name |
| 28 | 13 | "control" s/b "controlled" | Correct spelling |
| 43 | 6 | "Coram" s/b "Quorum" | Correct name |
| 43 | 16 | "Coram" s/b "Quorum" | Correct name |
| 43 | 22 | "Coram" s/b "Quorum" | Correct name |
| 47 | 13 | Insert the "that" between the words "company" and "purchased" | Clarify |
| 48 | 10 | "Speakman" s/b "Spearman" | Correct name |
| 73 | 11 | "panning" s/b "playing" | Correct spelling |
| 88 | 9 | Strike "on" | Correct grammar |
| 100 | 21 | "Comb" s/b "Cone" | Correct name |
| 100 | 22 | "Ken Flow" s/b "KENFLO" | Correct name |
| 100 | 24 | "Ken Flow" s/b "KENFLO" | Correct name |
| 101 | 24/25 | "Grand Care" s/b Grancare" | Correct name |
| 102 | 4 | "Orenda" s/b "ORNDA" | Correct name |
| 103 | 14 | "Kusaro" s/b "Kusserow" | Correct name |
| 104 | 8 | "stud" s/b "stub" | Correct spelling |
| 120 | 18 | "HF" s/b HFMA" | Correct name |
| 128 | 10 | "Bobby" s/b "Javy" | Correct name |
| 129 | 8 | "that was" s/b "these were" | Correct grammar |
| 170 | 19 | "Wynett" s/b "Gwinnett" | Correct name |
| 170 | 20 | "Decab" s/b "DeKalb" | Correct name |
| 174 | 14 | Insert the word "may" prior to the word "be" | Correct grammar |
| 192 | 3 | "reap" s/b "read" | Correct spelling |
| 204 | 7-9 | "Girol" s/b "Kaliszewski" (see page 245 for correction) | Correct name |
| 207 | 17 | "Girol" s/b "Kaliszewski" (see page 245 for correction) | Correct name |
| 209 | 11 | "substantive" s/b "subsequent" | Correct spelling/word |
| 217 | 12 | "see" s/b "say" | Correct word |
| 246 | 6 | "Orenda" s/b "ORNDA" | Correct name |
| 246 | 22 | "Orenda" s/b "ORNDA" | Correct name |
| 247 | 11 | "Orenda" s/b "ORNDA | Correct name |
| 247 | 18 | "Orenda" s/b "ORNDA" | Correct name |
| 255 | 25 | "data" s/b "dated" | Correct word |
| 260 | 14 | "admitted" s/b "omitted" | Correct word |
| 274 | 5 | "call" s/b "see" | Correct word |
| 324 | 23 | "an accountant's not a lawyer" s/b "I'm an | Correct word(s) |

| | | accountant, not a lawyer" | |
|---|---|---|---|

SIGNATURE: _____     DATE 4/12/05

1

2                          VOLUME II

3           IN THE UNITED STATES DISTRICT COURT

4        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

5                        - - -

6    THE OFFICIAL COMMITTEE OF  :   CIVIL ACTION

     UNSECURED CREDITORS OF      :

7    ALLEGHENY HEALTH, EDUCATION:

     AND RESEARCH FOUNDATION     :

8                                :

           vs.                   :

9                                :

     PRICEWATERHOUSE COOPERS,    :   CASE NO.

10   LLP                         :   00-684 (W.D.Pa.)

11

                        - - -

12

              Philadelphia, Pennsylvania

13            Tuesday, August 20, 2002

14                      - - -

15         Continued videotape deposition of MYLES

16   GEORGE TURTZ, M.D., taken pursuant to notice, at the

17   law offices of Harkins Cunningham, 2800 One Commerce

18   Square, 2005 Market Street, on the above date,

19   beginning at approximately 9:29 a.m., before Cynthia

20   A. Whyte, Registered Professional Reporter and

21   Notary Public.

22                      - - -

23

24

25

Page 378

Myles George Turtz, M.D. - Volume II

1      Myles George Turtz, M.D. - Volume II
2   that correct?
3      A.  Oh, yes.
4      Q.  From the bankruptcy court?
5      A.  Yes.  That's where the judge made some        12:12 PM
6   inappropriate comments in my opinion.
7      Q.  Did you ever have occasion to read the
8   consolidated financial statements of AHERF?
9      A.  You mean while I was working for them?
10     Q.  Yes.                                           12:13 PM
11     A.  I got -- the consolidated financials were
12   distributed widely throughout Allegheny, I mean
13   boxes and boxes and boxes of those annual reports.
14   I mean the consolidated statement would be in the
15   annual report, were distributed widely.  I mean I    12:13 PM
16   even have them when I was going out when I would
17   make presentations to boards about would you want to
18   be affiliated with us or anything.  I would go and
19   distribute them to the whole board, so I mean that
20   was widely distributed.                              12:13 PM
21     Q.  Did you have any involvement in the
22   preparation of the financial statements?
23     A.  Zero.
24     Q.  None at all?
25     A.  None.                                          12:13 PM

Page 379

1      Myles George Turtz, M.D. - Volume II
2      Q.  Did you ever have any contact with any of the
3   people from Coopers & Lybrand?
4      A.  No.  In Allegheny?
5      Q.  That's correct.                                12:13 PM
6      A.  At United I had a lot of contact with them.
7      Q.  Were Coopers & Lybrand the accountants for
8   United as well?
9      A.  Yes, they were.
10     Q.  What was your experience with the people from  12:14 PM
11   Coopers & Lybrand while you were at United?
12     A.  Great, great, very critical.  After I created
13   United, their first management report must have run
14   for 500 pages of criticisms of our systems.  We
15   fixed them.  I was pleased.                          12:14 PM
16     Q.  So you were pleased to receive that
17   criticism?
18     A.  I personally as a CEO was delighted.
19     Q.  Why?
20     A.  Well, you know, my credentials to be the CEO   12:14 PM
21   of a hospital system was largely only because I had
22   credibility as a surgeon that I was given the job in
23   the first place and that I was an honest man and
24   with integrity so there was no foolishness, but I
25   had to hire people -- my main role was to hire       12:15 PM

Page 380

1      Myles George Turtz, M.D. - Volume II
2   people who were knowledgeable and authoritative and
3   professionals as chief operating officers, as chief
4   financial officers, as human resources and
5   everything, and I was always somewhat concerned that 12:15 PM
6   I didn't know enough to have the right systems and
7   oversight in place.  I mean not-for-profit boards
8   are a joke.  Everybody wants to feel good.  So I
9   looked to the auditors.  As a matter of fact, the
10   first auditor I had when I took over St.             12:15 PM
11   Christopher's Hospital for Children, I said to him,
12   "I look to you to tell me what's wrong," and I
13   forget the name of the firm, but he said, "We're not
14   policemen."  That's what the auditor said to me.
15   "That is not our role.  We are not policemen."       12:15 PM
16        I said, "I need a cop because I don't
17   know what I'm doing here."  He said, "We are not
18   policemen."  So I fired him and brought in Coopers &
19   Lybrand.  Why Coopers?  Because one of our board
20   members was a retired -- was retired from Coopers &  12:16 PM
21   Lybrand, a fellow named Phillip Taylor, and then
22   created United, and they were -- so when they
23   presented a critical report of systems and checks
24   and balances, I was delighted because I felt now I
25   had -- this group was taking a look and rendering    12:16 PM

Page 381

1      Myles George Turtz, M.D. - Volume II
2   exactly what I was looking for and I had good people
3   and they implemented, so I was very pleased with
4   them.  I looked for that.
5      Q.  You say that not-for-profit boards are a       12:16 PM
6   joke.  What do you mean by that?
7      A.  In terms of -- you know, you asked me before
8   what authority did -- these are serious people by
9   and large, many of them running enormous industries
10   or large law firms who are very successful in the    12:17 PM
11   main but by and large park their critical senses at
12   the door before they would walk into any board
13   meeting.  They are so overwhelmed with the
14   complexity of it and they see themselves there as
15   doing a good work as opposed to running a business,  12:17 PM
16   and it is only when there is panic in the streets do
17   they bring their critical views to the board.  But
18   until that point they pretty much defer to
19   management.
20        Now, that may be true of the few -- for         12:17 PM
21   for-profit boards I have served on it has also been
22   true, but nowhere near to the degree of
23   not-for-profits.  They are interested in doing the
24   good work.  What's the program?  How many patients
25   are we taking care of?  Are you opening up a kidney   12:18 PM

MANHATTAN REPORTING CORP., a LegaLink Company

Page 382

1      Myles George Turtz, M.D. - Volume II
2   transplant unit?  But in terms of can you afford to
3   do that or where is the dollars or how are you going
4   to work it, that's very complicated business.
5          So even these great -- and they are      12:18 PM
6   super people.  Head of Rohm & Haas, magnificent.  I
7   can assure you they don't run their businesses the
8   way -- their board the way they run -- or the way
9   their participate in not-for-profits.  I don't mean
10  to demean them.  I'm just saying -- I have great      12:18 PM
11  respect for them, but they don't see themselves as
12  that's why they are there.
13   Q.  And was that your experience with the St.
14  Christopher's board?
15   A.  Because I didn't know what I was doing, I      12:19 PM
16  used to involve the St. Christopher's board a lot
17  more frequently.  For example -- and we were always
18  in trouble.  So when you are in trouble -- when you
19  are in trouble, all the boards pay attention.  They
20  start worrying about personal -- every board meeting 12:19 PM
21  you start the board meeting and I say, "Where are we
22  with our DNO insurance?"  You know they are paying
23  attention.  But when things are going along, they
24  don't know.
25          And so with me, because I wasn't a      12:19 PM

Page 383

1      Myles George Turtz, M.D. - Volume II
2   professional and because we were in trouble all the
3   time, I would meet with my -- the executive
4   committee of my board, which had the authority to
5   act in between meetings for stuff to be ratified      12:19 PM
6   subsequently at St. Chris and United, and it was not
7   uncommon for me to meet every week, sometimes twice
8   a week, and I would bring every damn issue to them.
9   I would say, "Here is what I want to do.  Now
10  examine me on it."  I'm very comfortable with this  12:20 PM
11  examination business.  That's the way I ran the
12  company.
13   Q.  So that's when you were still running United?
14   A.  That's when I ran United.
15   Q.  What about after you came back to St.      12:20 PM
16  Christopher's and St. Christopher's was in the AHERF
17  system; how did you find the board then?
18   A.  I don't know what meetings took place outside
19  of the board meeting.  They may have been meeting
20  with individual members on a regular basis.  I do  12:20 PM
21  know that the chief executive officer of St.
22  Christopher's, Calvin Bland, who I hired originally,
23  and the chairman of the board, Ralph Brenner,
24  probably talked almost every day.  So I mean I
25  wasn't privy to those conversations.      12:20 PM

Page 384

1      Myles George Turtz, M.D. - Volume II
2        If you ask me what took place at the
3   board meeting, it was a lot of form, not a heck of a
4   lot of substance, but there may have been a lot of
5   activity go on that I was not privy to, as there was 12:20 PM
6   when I ran it.
7    Q.  During the time when you were employed by
8   AHERF, were you always acting in what you thought
9   were the best interests of AHERF?
10   A.  Absolutely.                          12:21 PM
11   Q.  During that time did you ever act solely for
12  your own personal interests?
13   A.  No.
14   Q.  Did you ever use AHERF money for your own
15  personal benefit?                          12:21 PM
16   A.  Never.
17   Q.  Are you aware of any AHERF executive who
18  acted solely in his or her own personal interest in
19  the course of their employment by AHERF?
20   A.  No.                                  12:21 PM
21       MR. TORBORG:  Objection to the form.
22   Q.  The answer is no?
23   A.  No.
24   Q.  Are you aware of any AHERF executive who ever
25  embezzled money from AHERF?                  12:21 PM

Page 385

1      Myles George Turtz, M.D. - Volume II
2    A.  No.
3    Q.  Are you aware of any AHERF executive who ever
4   used AHERF money for his or her own personal
5   benefit?                                  12:21 PM
6        MR. TORBORG:  Object to form.
7    A.  No.
8        MR. BARRON:  Dr. Turtz, that's all the
9   questions I have.
10       THE WITNESS:  Sounds good to me.      12:21 PM
11       If you promise me a couple of hours and
12  we are out of here.
13       MR. TORBORG:  I think we will get done
14  today --
15       THE WITNESS:  Good.
16       MR. TORBORG:  -- depending on what Frank
17  has on reexamination.  Is now a good time to take a
18  lunch break do you think?
19       VIDEO TECHNICIAN:  We are now going off
20  the video record.  The time 12:22 and 30 seconds.  12:22 PM
21       (Luncheon recess.)
22       (Exhibit 590 was marked for
23  identification.)
24       VIDEO TECHNICIAN:  Back on.  The time
25  1:08.                                      01:08 PM

26 (Pages 382 to 385)

Page 446

Myles George Turtz, M.D. - Volume II
1
2 strategy and performance until not too long before
3 we went under was considered visionary by all our
4 competitors, who began to do whatever he did.
5   Q.  My question was, do you think that the      02:54 PM
6 perception of the fact that his strategy was working
7 led to additional acquisitions such as Graduate and
8 additional physician practices?
9   A.  It depends on who you ask.  If you ask me, I
10 would have said no.                              02:54 PM
11   Q.  What do you mean?
12   A.  I mean I didn't think it was a good
13 acquisition.  If you ask maybe many other people,
14 they would say yes.  At the time the wisdom, the
15 unexplored thinking, was that bigger is better.  It  02:54 PM
16 was just not an examined thing.  It was running the
17 organizations, not necessarily Allegheny, all of
18 them, by cliche, slow.
19   Q.  I'm going to hand you a document that has
20 previously been marked as Exhibit 473.  I will find  02:55 PM
21 the specific page I want to point you to and I will
22 give you the document.
23      Looking at Page 4 of that document, Mr.
24 Barron was asking you about that document and I
25 think pointed out the fact that the United hospitals  02:56 PM

Page 447

Myles George Turtz, M.D. - Volume II
1
2 had lost 4-1/2 million dollars in fiscal 1989 and
3 7-1/2 million dollars in fiscal 1990?
4   A.  Just the reverse.
5   Q.  I'm sorry.                                  02:56 PM
6   A.  It was 4-1/2 plus in 1989 and 7-1/2 plus in
7 1990.
8   Q.  I think that you had stated that the United
9 hospitals at the time they were acquired by AHERF
10 were in terrible shape?                          02:57 PM
11   A.  Right.
12   Q.  Right?  When you say they were in terrible
13 shape, was that because of the losses that are
14 reflected there or some other thing or a combination
15 of things?                                       02:57 PM
16   A.  Unrelenting losses.  As a matter of fact, by
17 19 -- this is June 3, 1990.  I might have been
18 dancing out of compliance on my debt covenants at
19 that time.
20   Q.  I think we talked about that earlier, and let  02:57 PM
21 me point you to -- we will go to Page 50.
22   A.  Page?
23   Q.  I'm just going to read some previous
24 testimony.
25   A.  Sure.                                      02:58 PM

Page 448

Myles George Turtz, M.D. - Volume II
1
2      MR. BARRON:  Where are you?
3      MR. TORBORG:  Bottom of Page 50, Line
4 25.
5      MR. BARRON:  Hold on for a second.      02:58 PM
6      MR. TORBORG:  Sure.
7      MR. BARRON:  Okay.
8   Q.  The question was "What impact did not being
9 in compliance with the covenants have on United?"
10 And I believe that was speaking about debt         02:58 PM
11 covenants.  Your answer was "Well, we were going
12 under."
13   A.  Right, unless we could get relief from them.
14   Q.  Why does a violation of debt covenants mean
15 you are going under?                             02:58 PM
16   A.  Well, the assumption is -- the projection is
17 when you first do the transaction -- and all of
18 these are done through the Philadelphia hospital
19 authority -- are that you are going to have
20 sufficient revenues to cover your debt service.    02:58 PM
21 Those are the projections.  So they establish
22 certain criteria to protect the bondholders.  If you
23 start to default, if you don't make your mortgage
24 payments, the situation is the same with a house
25 when you are not making your mortgage payment.  So  02:59 PM

Page 449

Myles George Turtz, M.D. - Volume II
1
2 certain criteria said you had to have enough to
3 cover this, and we were now not having enough.
4   Q.  But what about the actual violation of a
5 financial covenant?                              02:59 PM
6   A.  I can't speak with authority, but as I recall
7 at the time I could.  It gives -- as if you work
8 this thing -- it was I think a lease in a sublease.
9 It wasn't really ownership.  I don't know if I'm --
10 if memory will be sufficient to answer the question.  02:59 PM
PM
11 If I could, I would.
12   Q.  Do you have a general notion of what a
13 violation of debt covenants typically does to an
14 organization like United hospitals?
15   A.  All kind of things.  Whoever has the power by  03:00 PM
16 the documents to replace the board could replace
17 management, could sell off assets.  That's my
18 understanding; or could force you into declaring
19 some kind of bankruptcy.
20   Q.  It could lead to significant changes?        03:00 PM
21   A.  That's a good sentence, significant changes.
22 I could lose my job.
23   Q.  Do you recall whether at the time United
24 started suffering financial difficulties seeing an
25 increased participation by the board, the United     03:00 PM

42 (Pages 446 to 449)

Page 450

Myles George Turtz, M.D. - Volume II

1  board of trustees?
2  A. The United board was evidently atypical in
3  that they were very active all the time, maybe
4  somewhat more active towards the end, but as I    03:01 PM
5  reported in response to another question, it was not
6  uncommon for me when I was leading the shop there
7  and things were chaos, things were going down,
8  things were bad, for me to meet with the executive
9  committee twice a week. I used to get complaints    03:01 PM
10 from my executive committee members that they had
11 businesses to run. So there was a lot.
12 Q. You said that nonprofit boards are typically
13 a joke.
14 A. If I didn't say joke, I could have.    03:01 PM
15 Q. I think you said joke.
16 A. I don't want to demean them. Serious people.
17 It's just that there is no sense -- unless things
18 are bad, there is no sense that they have -- that
19 they are really interested in anything more than    03:02 PM
20 fostering programs within the institution as opposed
21 to paying a lot of attention on the numbers which
22 they kind of accept from management, and they have
23 one of two relations with the CEO. They either love
24 him and continue and everything is great or they    03:02 PM

Page 451

Myles George Turtz, M.D. - Volume II

1  don't like him and they can him. There is no middle
2  ground.
3  Q. Other than United and what contact you had
4  with various boards at AHERF, what other experience    03:02 PM
5  do you have with working with nonprofit boards?
6  A. That's it.
7  Q. That's it?
8  A. Well, religious schools.
9  Q. Which ones?    03:02 PM
10 A. Bethel in Cherry Hill, New Jersey, Kelman
11 Academy.
12 Q. I think you answered this before, but I will
13 ask again in case you didn't. Did you attend any of
14 the AHERF board meetings?    03:03 PM
15 A. No.
16 Q. So you wouldn't really know if those people
17 took their jobs seriously?
18 A. You know, I guess as a result of the
19 language, obviously you are using the same kind of    03:03 PM
20 language. By and large these were serious people,
21 CEOs of banks, ran large corporations, some lawyers,
22 of good reputation. These were not flakes. It is
23 just that they were interested in promoting programs
24 and were very proud to be a member of Allegheny,    03:03 PM

Page 452

Myles George Turtz, M.D. - Volume II

1  which was a prestigious, desirable board. But the
2  scrutiny with the numbers? Not why most of them
3  were there. Even people who would scrutinize the
4  hell out of numbers within their own shop and were    03:04 PM
5  capable of doing that, typically that's not what
6  most boards do. That has been my experience. Maybe
7  it has been a distorted experience, but I don't
8  think so.
9  Q. When you were the CEO at United, who had the    03:04 PM
10 ultimate responsibility for governing those
11 hospitals?
12 A. The board.
13 Q. And why is that?
14 A. That's the way it is. I mean the boards --    03:04 PM
15 that's the board's responsibility. Make sure
16 management is in place. That's my understanding.
17 Manager works at the pleasure of the board and the
18 contract the board has given him.
19 Q. I'm not going to have too many more documents    03:05 PM
20 I promise.
21 A. As long as you get done today, I don't care.
22 I'll stay here forever.
23    (Exhibit 593 was marked for
24 identification.)    03:05 PM

Page 453

Myles George Turtz, M.D. - Volume II

1  Q. Dr. Turtz, the court reporter has handed you
2  a book for St. Chris dated October 28, 1997, which I
3  believe Mr. Barron also marked, but I think Mr.
4  Barron's version is a little different than mine, so    03:06 PM
5  I went ahead and marked this one. And what I'm
6  going to ask you to do, if you would, is turn to the
7  page Bates'd at the bottom ending in 635.
8  A. "Draft Unaudited Financial Statements"?
9  Q. Yes.    03:06 PM
10 A. Uh-huh.
11 Q. Do you see here that the St. Chris board is
12 getting a copy of at least unaudited financial
13 statements for the fiscal year 1997 in October of
14 1997; is that right?    03:06 PM
15 A. That's what it looks like.
16 Q. Now, to the best of your knowledge, would
17 board members be looking at these financial
18 statements?
19 A. They would look at them with varying degrees    03:07 PM
20 of scrutiny. Some don't look at them at all. Some
21 look at them carefully, as you would expect.
22 Q. Do you know if this was typical for the AHERF
23 boards to get copies of year-end financial
24 statements before they received an audited opinion?    03:07 PM

43 (Pages 450 to 453)



Page 482

1
        INDEX (CONTINUED)
2
      E X H I B I T S
3
    No.      Description        Page
4
5    590   Consolidated Financial
            Statements, 6/30/98      385
6
     591   Letter, 4/23/96, to Dr.
7          Saradar from Ms. Cibrone    390
8    592   Letter, 4/28/97, to Dr.
           Turtz from Mr. McConnell     428
9
     593   Board Book, 10/28/97        452
10
     594   Letter, 11/9/97, to Mr.
11         Abdelhak from Ms. Hutchison    467
12   595   Article                469
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 483

1
2            CERTIFICATE
3        I HEREBY CERTIFY that the proceedings,
4    evidence and objections are contained fully and
5    accurately in the stenographic notes taken by me
6    on August 20, 2002, and that this is a true and
7    correct transcript of same.
8
9
10
11
12        _____
13        Cynthia A. Whyte, RPR
14
15
16       (The foregoing certification of this
17    transcript does not apply to any reproduction of
18    the same by any means, unless under the direct
19    control and/or supervision of the certifying
20    reporter.)
21
22
23
24
25

MANHATTAN REPORTING CORP., a LegaLink Company

**Weill Dep.**