# In The Matter Of:

## *AHERF v.*
## *PRICEWATERHOUSECOOPERS, LLP*

---

## *RICHARD  WEILL*
### *June 15, 2004*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### PH: 212-557-7400 / FAX: 212-692-9171

### WEILL, RICHARD



LEGALINK
A WORDWAVE COMPANY

Page 74

```
 1            RICHARD WEILL
 2    company.  And -- is that right?
 3        MS. SPRINGER:  Not Lou Lenzi.
 4        THE WITNESS:  Oh, gee.  Oh, I'm sorry,
 5    Ron Wertheim.  I apologize.  That's a Freudian
 6    slip.
 7            Lou was general counsel before Ron.
 8    And I read the interrogatories last night
 9    because I remembered Venetia signed them at
10    least in part and because these guys said I
11    could.
12        MR. WITTEN:  Who signed them?
13        THE WITNESS:  They were signed by
14    Karleen, but Venetia is a notary, my secretary,
15    my administrative assistant.
16  BY MR. KRUSKO:
17      Q.   So Mr. Wertheim is now the general
18    counsel of MBIA, is that correct?
19      A.   Yes, he is.
20      Q.   What if anything did Mr. Witten say to
21    you during this meeting if anything?
22        MR. WITTEN:  Objection.
23        MR. KRUSKO:  What's the basis for the
24    objection?
25        MR. WITTEN:  Attorney-client privilege
```

Page 75

```
 1            RICHARD WEILL
 2    and common trust doctrine, work product as well.
 3  BY MR. KRUSKO:
 4      Q.   In addition to the responses to the
 5    contention interrogatories, did you review any
 6    other document?
 7      A.   No.
 8      Q.   Did you speak with anyone about this
 9    deposition other than the three individuals you
10    mentioned and your spouse?
11      A.   I told Karleen that I was going to
12    have the deposition.
13      Q.   What if anything did Ms. Strayer say
14    in response?
15      A.   She smiled.  Didn't say a word.
16      Q.   A woman who has been deposed many
17    times.
18      A.   I think I got it all.  I think the
19    implication was it was going to be a long day
20    and I accepted that with a smile back.
21      Q.   In addition to Ms. Strayer, and
22    excepting the people we mentioned before, did
23    you discuss your deposition with anyone else?
24      A.   No.
25      Q.   Is it your recollection that MBIA
```

Page 76

```
 1            RICHARD WEILL
 2    provided insurance for fixed rate bonds issued
 3    by the Delaware Valley Obligated Group in the
 4    June 1996 timeframe?
 5      A.   Yes.
 6      Q.   Did you understand at the time that
 7    the Delaware Valley Obligated Group was an
 8    obligated group that belonged to AHERF?
 9      A.   At the time?
10      Q.   Yes.
11      A.   No.  Didn't know the deal that
12    detailed.
13      Q.   Is it your understanding sitting here
14    today that the DVOG was an affiliate of AHERF?
15      A.   Yes.
16      Q.   Is it your recollection that MBIA had
17    first provided insurance for bonds issued but an
18    AHERF affiliate in 1989?
19      A.   I wouldn't have known that then.
20      Q.   Do you know that now?
21      A.   Yes.
22        (Exhibit 2618, Document Bates Stamped
23    MBIA 051300 through 316, marked for
24    identification)
25  BY MR. KRUSKO:
```

Page 77

```
 1            RICHARD WEILL
 2      Q.   If I could show you what we have just
 3    marked as Exhibit 2618.
 4            For the record, I would note that
 5    Exhibit 2618 is Bates Numbered MBIA 051300
 6    through MBIA 051316.
 7            Mr. Weill, do you recognize any of
 8    these pages?
 9      A.   Sure.  They are the -- I don't
10    recognize -- I would hate to be nitpicky.  I
11    mean, just looking at them, it is a MBIA
12    financial guarantee insurance policy for the
13    DVOG deal and the surety bond policy.
14      Q.   I should make clear you recognize the
15    form of this exhibit?
16      A.   Yes, of course.
17      Q.   Do you recognize MBIA 051300 through
18    304 as relating to the series A bonds issued by
19    the DVOG?
20      A.   Only by looking at the document, yes.
21      Q.   What is the purpose of the financial
22    guarantee?  Or what is the purpose of a
23    financial guarantee insurance policy executed by
24    MBIA?
25      A.   We insure principal and interest for
```

20 (Pages 74 to 77)

Page 78

RICHARD WEILL

1  RICHARD WEILL
2  the benefit of the holder of the bond in the
3  event that those monies are not deposited with
4  the trustee or paying agent of the deal.
5     Q.   Do you recognize pages 051305 through
6  309 as the insurance policy applying to series B
7  of the DVOG bonds?
8     A.   Only because it says so on its face,
9  but the answer is yes.
10    Q.   Do you recognize page 051350 through
11 051312 as applying to series C of the DVOG
12 bonds?
13    A.   Says so on its face, yes.
14    Q.   Can you turn with me to page 051315?
15    A.   Sure.  I am there.
16    Q.   Do you see the subparagraph number two
17 about three quarters of the way down?
18    A.   Sure.
19    Q.   Do you see the reference to premium in
20 the amount of $6,257,000?
21    A.   Yes, I do.
22    Q.   Did you understand that to be the
23 amount of money that MBIA was paid to provide
24 insurance for the DVOG series A through C bonds?
25    A.   Yes.  And the surety bond as well as

Page 79

1  RICHARD WEILL
2  the insurance policy, remember they are
3  different, but yes is the answer.
4     Q.   Thank you.  Are you aware of any other
5  compensation that MBIA received in exchange for
6  the insurance and surety bonds?
7     A.   No.
8         (Exhibit 2619, Document Bates Stamped
9  MBIA 051333 through 352, marked for
10 identification)
11 BY MR. KRUSKO:
12    Q.   If I can show you what we have just
13 marked as Exhibit 2619, Mr. Weill, do you
14 recognize the form of any of the documents that
15 encompass Exhibit 2619?
16    A.   By the title of the documents, I know
17 what the documents are generally, if that's the
18 answer to the question that you are looking for.
19    Q.   Do you recognize pages 051333 through
20 051339?
21    A.   I don't mean to parse words with you,
22 I really don't.  I don't know what the word
23 "recognize" in that sentence means.
24    Q.   I apologize.  Do you recognize the
25 form of document that encompasses those pages?

Page 80

1  RICHARD WEILL
2     A.   You mean have I seen a financial
3  guarantee agreement before, is that the
4  question?
5     Q.   Yes.
6     A.   Okay.  The answer is I probably have
7  seen financial guarantee agreements before, yes.
8     Q.   What is your understanding in brief
9  and general terms as to the functions of a
10 financial guarantee agreement?
11    A.   They are additional understandings
12 between, in this case, because I can read the
13 document, the obligor and MBIA.  But they are
14 different.  This is a financial guarantee
15 agreement between the issuer and the insurer --
16 between the obligor and the insurer, I'm sorry.
17    Q.   How does a financial guarantee
18 agreement differ from a financial guarantee
19 insurance policy?
20    A.   Well, the policy is attached in some
21 fashion, not literally any more, but it used to
22 be literally to the bond and it runs with the
23 bond and anyone who owns the bond gets the
24 benefit of the insurance policy.
25        In its form it is very, very simple.

Page 81

1  RICHARD WEILL
2  It merely says that we will pay principal and
3  interest when due to the degree that the money
4  isn't at the trustee's office.
5         A financial guarantee agreement is a
6  more crafted document that is the understanding
7  between, in this case the obligor and the
8  insurer, and is more specific.  The insurance
9  policy is actually filed -- is a form filed with
10 the State of New York.  Actually it is filed
11 with a lot of states, but filed with the State
12 of New York for sure.
13        (Exhibit 2620, Document Bates Stamped
14 MBIA 051353 through 372, marked for
15 identification)
16        (Exhibit 2621, Document Bates Stamped
17 MBIA 051373 through 392, marked for
18 identification)
19 BY MR. KRUSKO:
20    Q.   If I could also show you what we have
21 marked as Exhibit 2620 and Exhibit 2621.
22        MR. WITTEN:  What is the Bates number
23 range for 2620?
24        MR. KRUSKO:  I was just going to read
25 it into the record.  MBIA 051353 through 051372.

21 (Pages 78 to 81)

Page 166

RICHARD WEILL

1    Q.    Are you aware of any instance in your
2  time at MBIA in which MBIA accelerated the debt
3  of a healthcare entity?
4    A.    No, we have never done that, but we
5  have never come even close to this kind of a
6  situation, so the answer is no.  There isn't a
7  comparable situation of this kind of cover
8  breach of this kind of situation.
9          And going back to your point, I
10  believe that these paragraphs were written in
11  time.  You must know when this was written.  I
12  assume you know when this was written.  Was this
13  written after the statements, the financial
14  statements were redone or before?  The question
15  that I would want to know before I would accept
16  every sentence in here as being perfectly
17  accurate.
18          In other words, if in fact this is
19  based on the financial statements that were
20  given to IPM when he wrote this, that would be
21  one answer.  If these were based on financial
22  statements that were later redone that would
23  have reflected different facts, I am sure he
24  would have written a different paper.  You would

Page 167

RICHARD WEILL

1  need to know when this was written and when the
2  restated financial statements were given to Mr.
3  Stevens and Mr. Mathis to put this in historic
4  perspective.
5    Q.    Does MBIA have the power to accelerate
6  the debt it assumed that had been issued on
7  behalf of Sacred Heart Hospital?
8    A.    I don't remember.
9    Q.    Do you recall whether MBIA
10  investigated that possibility?
11    A.    I don't remember.
12    Q.    Mr. Stevens and Mr. Mathis continue:
13  "A rate covenant failure between 1.0 and 1.2
14  times coverage allowed for the retention of a
15  consultant chosen solely by management."
16          Do you see that sentence?
17    A.    Yes, I do.
18    Q.    They continue in the next paragraph:
19  "This effectively excluded the use of
20  consultants like the Hunter Group or Quorum
21  which IPM generally favors.  Giving exclusive
22  control of the selection of consultants to
23  creditors may breach lender liability
24  guidelines, but requiring the consent of both

Page 168

RICHARD WEILL

1  issuer and insurer of consultants to cure rate
2  covenant violations is a structure which we
3  would strongly prefer to work with in future
4  workouts."
5          Do you see that?
6    A.    Yes, I do.
7    Q.    So that reflects a recommendation by
8  Mr. Stevens and Mr. Mathis as to how bond
9  covenants should be written in the future?
10    A.    It is their opinion of something that
11  we should try to get into deals, yes.
12    Q.    So is it your understanding, then,
13  that had the DVOG violated the debt service
14  coverage ratio, the DVOG alone had the ability
15  to bring in a consultant of its own choosing?
16    A.    I believe that's what the document
17  said.
18    Q.    MBIA could have done nothing under the
19  master trust indenture to stop the DVOG from
20  doing so, correct?
21    A.    Well, the answer to your question
22  is -- let's divide the question into parts so
23  that we answer it fairly.
24          You have come up with the correct

Page 169

RICHARD WEILL

1  legal answer, you haven't come up with what
2  happens in the real world.  In the real world if
3  you understand how bad a situation is, you have
4  the capacity to talk with both management and,
5  frankly, ultimately the trustees and point out
6  to them the difficulty of the situation.
7          I can point to other situations in
8  David Stevens and Pat Mathis' regime in which
9  they found, not in a hospital, but they found
10  covenant violations that allowed for a call in
11  and it was exclusively held by the issuer -- I
12  am using the word -- or obligor, whatever word
13  you want to use, the issuer -- and the issuer
14  wanted to pick someone who we didn't think was a
15  very good choice, we persuaded either the
16  management, and in two cases we actually
17  persuaded the board to pick who we thought
18  should be picked, and in fact because of the
19  situation, that management was actually not
20  accepted going forward.
21          Now, so I am telling you that although
22  he is correct in what he says, if we had known
23  of the violation we could have used other means
24  available to us to persuade AHERF, trustees or

43 (Pages 166 to 169)

Page 170

RICHARD WEILL

1    management to choose a consultant that we
2    thought was appropriate.
3        Q.   What other means are those?
4        A.   My experience is that the people that
5    act as trustees of these institutions, the
6    difference between a nonprofit and a profit is
7    that the people who do these things, if they
8    knew the facts and are given the facts to them
9    by someone they trust, listen and attempt to do
10   the right things.
11        If they don't have the facts and they
12   are not able to have someone talk to them
13   directly, then unfortunately they often don't
14   have the ability or the time or the energy or,
15   frankly, in some cases they are lazy, to delve
16   deeply into the facts.
17        But if we had known the facts, we
18   would have done what we did in other
19   circumstances which is to talk to the
20   directors -- the trustees directly and point out
21   to them what the management was doing and what
22   we thought was wrong.
23        Q.   Is it your recollection that for some
24   months prior to the bankruptcy filing MBIA had

Page 171

RICHARD WEILL

1    urged AHERF to retain a turn-around consultant?
2        A.   Yes.
3        Q.   Is it also correct that AHERF up until
4    July 1998 refused to retain such a consultant as
5    urged by MBIA?
6        A.   I don't know that.  I don't know that.
7        Q.   If I can show you what we have marked
8    as Exhibit 2201?
9        A.   Sure.
10        Q.   Mr. Weill do you recognize Exhibit
11   2201 as a February 3rd, 1998 downgrade
12   announcement placing the DVOG on credit watch
13   list B?
14        A.   Yes.
15        Q.   Here MBIA has rated the DVOG as an 8B
16   credit, correct?
17        A.   That's correct.
18        Q.   So separate and apart from the
19   classified list, the only other lower rating
20   would be an 8 C, correct?
21        A.   I'm not sure there was a significant
22   difference between 8 B and 8 C.  Yes, it is
23   serious.
24        Q.   So this is basically rock bottom of

Page 172

RICHARD WEILL

1    the MBIA internal ranking?
2        A.   That's correct.
3        Q.   Is it your belief that at this point
4    in time going forward MBIA was advocating that
5    AHERF retain a consultant?
6        A.   I don't know the time table in which
7    those things were done.
8        Q.   Is it your recollection more
9    generally, though, that MBIA was not successful
10   in urging AHERF to retain a consultant?
11        A.   You know, my recollection, and again,
12   this is solely -- I don't want you to believe
13   that I am saying this as some sort of fact.
14        My recollection was that they actually
15   did retain a consultant, and they may not have
16   followed the advice of the consultant, but my
17   recollection was that AHERF did retain a
18   consultant, and I think they even retained one
19   of the two companies that we thought was
20   desirous.  But I am not going to tell you that I
21   know that for sure.
22        Q.   I am told we should change the tapes
23   so let's go off the record.
24        THE VIDEOGRAPHER:  Going off the

Page 173

RICHARD WEILL

1    record at 1:03 p.m.
2        (Recess)
3        THE VIDEOGRAPHER:  Beginning tape
4    number three and returning to the record at 1:09
5    from 1:03.
6    BY MR. KRUSKO:
7        Q.   Mr. Weill, let me show you what has
8    been previously marked as 2197.
9        A.   This is the same -- this is the
10   fidelity document, right?
11        Q.   Yes.
12        A.   Okay.  I am not supposed to ask you a
13   question, I guess.
14        Q.   Exhibit 2197 consists of talking
15   points that Mr. Stevens and Ms. Strayer have
16   drafted for you dated July 23rd, 1998.  If you
17   turn with me to the second page of the document,
18   you will see a time line with subheading AHERF
19   actions, do you see that?
20        If you turn with me to the fourth page
21   of the document, 030074, here begins a time line
22   of MBIA actions, correct?
23        A.   That's what it says, yes.
24        Q.   Towards the very bottom you will see a

44 (Pages 170 to 173)

Page 206

RICHARD WEILL

1
2    Q.    Had you met with David McConnell?
3    A.    No.
4    Q.    Had you met with any member of AHERF
5    management?
6    A.    No.
7    Q.    Do you recall discussing with Mr.
8    Stevens any meeting that he might have had with
9    AHERF board members?
10    A.    I don't recall that David Stevens had
11    a conversation with AHERF board members but I
12    could be wrong. No, I don't recall David
13    telling me that he had conversations with an
14    AHERF board member, trustee.
15    Q.    I take it prior to June 25, 1998, Mr.
16    Stevens had been very involved in remediation
17    efforts with the DVOG?
18    A.    I think that's correct, yes. I mean,
19    "vary" is a funny word, but he was involved.
20    Very day to day -- he was involved, yes. I
21    think Mathis and -- I think Karleen and Pat were
22    doing it all -- more of the detail work, but
23    David was involved.
24    Q.    I take it, though, in the calendar
25    1998 timeframe leading up to June 25, 1998, Mr.

Page 207

RICHARD WEILL

1
2    Stevens was the senior most individual at MBIA
3    working on the DVOG remediation?
4    A.    Yes.
5    Q.    I take it you had faith in Mr.
6    Stevens' judgment?
7    A.    Yes, I did.
8    Q.    I take it you were relying on him for
9    advice and counsel as to what MBIA should do
10    with respect to the DVOG?
11    A.    He was the officer in charge and I had
12    a great deal of faith in him. In addition, I
13    had a good relationship with him so that I felt,
14    and I guess I still feel, that David and I
15    talked about things often enough, deep enough
16    that he had whatever input I could help,
17    whatever assistance I could give to him at any
18    time that he needed it.
19    Q.    You have no reason to believe that
20    based on your interactions with Mr. Stevens, he
21    at any point kept any information from you that
22    you should have known?
23    A.    My relationship with David Stevens was
24    such that I don't think if you had asked him if
25    he had to give me any information he would have

Page 208

RICHARD WEILL

1
2    said yes to that. That wasn't our
3    understanding.
4        He did give me information. I suspect
5    that there was information that happened in the
6    course of his job, maybe not course of AHERF, in
7    which he chose not to give me some information
8    that maybe I would have found desirous. But, my
9    gosh, we didn't talk 24 hours a day, we talked
10    for a few minutes each day and he gave me what
11    he thought was the most relevant information and
12    the most important information.
13    Q.    In response to this memorandum,
14    Exhibit 1894, did you contact any member of
15    AHERF's board to try to gain an understanding as
16    to the perspective of the AHERF board?
17    A.    I did not.
18    Q.    Did you direct anyone to?
19    A.    I don't think I directed anybody to
20    either. This was a communication that we were
21    going to have with someone. This conversation
22    was not with a board member, this was with an
23    officer of the company.
24    Q.    Show you what was previously marked as
25    Exhibit 1898.

Page 209

RICHARD WEILL

1
2    A.    Oh, I know this one. No, I don't know
3    this one. I thought it was my letter. Okay.
4    Q.    Mr. Weill, if you would just take a
5    moment with the first two pages of Exhibit 1898,
6    I would just like to know whether you recall
7    seeing this letter at any point in time?
8        (Pause)
9    A.    I do not specifically recall seeing
10    this letter. However, I could have.
11    Q.    Do you believe that you saw it and
12    approved Mr. Stevens signing this letter?
13    A.    He told me what the proposal was going
14    to be and I am sure we generally talked about
15    this letter. I may have even seen a draft of
16    this letter, that would not have been that
17    unusual in that time period. But I don't think
18    that I specifically told him you can go ahead
19    and sign the letter.
20    Q.    In the proposal that you have alluded
21    to was a joint proposal by MBIA and PNC to lend
22    AHERF up to 160 million, is that correct?
23    A.    That's correct.
24    Q.    50 million was going to be available
25    to AHERF up through August 15, 1998?

53 (Pages 206 to 209)

Page 210

RICHARD WEILL

2    A.   That's what it says, yes.
3    Q.   Is it your recollection that the loan
4  was to be made to AHERF and its western entities
5  which in turn would provide collateral for the
6  loan?
7    A.   I have no recollection.  Sorry.
8    Q.   If I can direct your attention to the
9  second paragraph of the first page, just skim
10  that and let me know whether that refreshes your
11  memory at all?
12    A.   It won't refresh my recollection, it
13  only tells me that's what the proposal was.
14    Q.   Okay.
15    A.   Yes, that's what the letter says the
16  proposal was.
17    Q.   That's consistent with your
18  recollection?
19    A.   Absolutely.
20    Q.   As to MBIA's --
21    A.   General position.
22    Q.   -- general position on this issue?
23    A.   Yes, perfect.
24    Q.   I take it similar to the earlier
25  proposal that we saw, MBIA made this proposal

Page 211

RICHARD WEILL

2  because at the time it thought that the
3  bankruptcy filing could be avoided if the DVOG
4  received this additional influx of liquidity?
5    A.   And support from the western entities,
6  yes, is the answer, with the addition.
7    Q.   Was MBIA's position in any way
8  influenced by comments or feedback from any
9  outside party or consultant retained by MBIA?
10    A.   The answer is I don't know because
11  David and I were talking about this.  He may
12  well retained outside consultants.  In fact, my
13  recollection is that he did and they may have
14  been giving him advice.  It was not David's
15  style, however, to accept outside consultants'
16  advice without thinking it through and coming to
17  a totally independent decision.
18        So I doubt if any outside consultant
19  told David what to think.  They may have taken a
20  similar position, they may have advised him,
21  they may have given him an opinion, but David
22  formed his own opinions.
23    Q.   Is it your recollection that the AHERF
24  board rejected this proposal?
25    A.   You know, I don't know what happened.

Page 212

RICHARD WEILL

1  I assume the AHERF board rejected this proposal.
2  It didn't go through.  But I can't even tell you
3  with certainty that the board did that.  I don't
4  know who rejected it.  It didn't occur.
5        It was transmitted, I do know that.
6    Q.   More generally, is it your
7  recollection that the AHERF board was very
8  reluctant to pledge assets of AHERF's western
9  affiliates to support AHERF's eastern
10  affiliates?
11    A.   That's what we were told, that's
12  correct.  I don't know that.
13    Q.   Told by whom?
14    A.   By personnel at AHERF.
15    Q.   By who?
16    A.   I don't know, but I assume whoever we
17  were talking about to.  I don't know a name.
18    Q.   Did you follow up with the board to
19  try to change anyone's mind in that regard?
20    A.   I don't know if we did or not.
21    Q.   You used the plural pronoun.  I am
22  asking you --
23    A.   I did not.
24    Q.   Did you direct anyone to?

Page 213

RICHARD WEILL

2    A.   Again, I doubt if I directed anyone to
3  do that.  I am sure we talked about it but I
4  didn't direct anyone to do that.  We had to
5  do -- we talked through what the options were
6  and it may well have been that we didn't have
7  good access to those people.  You have to have
8  good access.
9    Q.   Good access to the board?
10    A.   Yes.  I mean, good access means some
11  sort of relationship.
12    Q.   It is your recollection that MBIA did
13  not have a relationship with the AHERF board?
14    A.   We did not have a strong independent
15  relationship with the AHERF board.
16    Q.   Did you do anything to try to improve
17  MBIA's relationship with the AHERF board?
18    A.   I am sure that if I went through --
19  that if I talked with everybody, I would find
20  that we tried very hard to do that.
21    Q.   Sitting here today what --
22    A.   I don't know what we did.
23    Q.   Sitting here today, did you do
24  anything --
25    A.   No.

54 (Pages 210 to 213)

Page 218

RICHARD WEILL

1    Mr. Sanza who was then president and CEO of
2    AHERF would circulate it to the AHERF board?
3        A.    That was what we were hoping for, yes.
4        Q.    Hoping for or was that your
5    understanding, sir?
6        A.    Understanding.  I would have no way of
7    knowing what he would do.  We hoped that he
8    would -- when you send a letter like this to an
9    officer, you don't know for sure that he will
10   circulate it.  Our hope was that he would
11   circulate it, but we had no other way -- this is
12   the way to contact him.
13       Q.    So why didn't MBIA take whatever steps
14   necessary to contact each AHERF board member
15   with this proposal?
16       A.    I suspect that we wanted to get this
17   letter out quickly.  I suspect that Tony may
18   have told us that he was going to circulate it
19   for us to the board.  All those things were
20   probably in the suspect, but I can't tell you
21   with certainty that it was circulated to the
22   AHERF board.  It wasn't sent to him, it was sent
23   care of.
24       Q.    Do you recall whether prior to this

Page 219

RICHARD WEILL

1    point in time July 11, 1998, MBIA had sent any
2    other appeal or correspondence to the AHERF
3    board?
4        A.    It says that we sent one right here on
5    July 7.  You just showed it to me.
6        Q.    The David Cook letter?
7        A.    Right.
8        Q.    Signed by Mr. Stevens?
9        A.    Yes.
10       Q.    Yes.  I apologize.  In addition to
11   that piece of correspondence do you recall --
12       A.    I don't recall any other.
13       Q.    You don't recall you personally
14   sending any correspondence to the AHERF board?
15       A.    I do not recall.
16       Q.    By this point in time had MBIA
17   retained Goldman Sachs to assist it in --
18       A.    It is my recollection that we had.
19       Q.    Third paragraph, the opening sentence,
20   appears the statement:  "Our advisors indicate
21   that the sale of the entire system would very
22   likely yield a purchase price well in excess of
23   all debt."
24       Do you see that statement?

Page 220

RICHARD WEILL

1        A.    Yes, I do.
2        Q.    Is that based on advice from the
3    investment banking firm Goldman Sachs?
4        A.    I can't say that with certainty but I
5    sure think that's what it means, yes.
6        Q.    I take it you believed that at the
7    time?
8        A.    Absolutely.
9        Q.    I take it you wanted to send this
10   letter to the board to build pressure on the
11   board to keep AHERF and the DVOG out of
12   bankruptcy?
13       A.    Absolutely.
14       Q.    Did you ever learn that a subcommittee
15   of the AHERF parent board met at some point in
16   time to consider this proposal?
17       A.    I don't -- no, I do not know that.
18       Q.    Do you recall that the AHERF board
19   rejected this proposal?
20       A.    I don't recall that either.
21       Q.    Do you recall that the AHERF board
22   failed to act on this proposal?
23       A.    That's a certainty, yes, I mean that's
24   just a fact.

Page 221

RICHARD WEILL

1        Q.    Were you disappointed by that?
2        A.    Yes.
3        Q.    I take it you were disappointed by
4    that because you felt that selling the entire
5    system would avoid the need for a bankruptcy
6    filing?
7        A.    You know, that's exactly how I felt on
8    that day, that is exactly correct.
9        Q.    Do you recall at a later point in time
10   making another offer of financial assistance to
11   AHERF?
12       A.    Yes.
13       Q.    Do you recall roughly what was
14   entailed with that offer?
15       A.    I couldn't do it from memory, no, but
16   I do know we made another offer.  Or they asked
17   us -- they asked us for an offer and we must
18   have made a counteroffer is my recollection.  It
19   had to do with liquidity rather than this kind
20   of letter.  It was a different proposal.
21       Q.    So in other words, it was a proposal
22   for financial assistance as opposed to a
23   proposal to sell --
24       A.    My recollection, that's my

56 (Pages 218 to 221)

Page 222

RICHARD WEILL

1 recollection.
2     Q.   If I can show you what we previously
3 marked as Exhibit 1243?
4     A.   July 13. Okay.
5     Q.   Mr. Weill, does Exhibit 1243 embody
6 the liquidity proposal that you had in mind?  Or
7 does it reflect --
8     A.   You know, it is interesting.  That
9 isn't my -- I am sure that it does, but I don't
10 recall it at thirty -- it must be.  My
11 recollection is that it was a smaller amount.
12 I could be wrong.  Remember, I didn't go back
13 and look at anything so I can't help you
14 exactly, but that's -- you know, this is the
15 letter that was sent.  It says that MBIA is
16 involved in this offer so this must be the offer
17 that we made on July 13.
18     Q.   This joint offer contains no
19 requirement for a pledge of assets held by
20 AHERF's western affiliates, correct?
21     A.   I don't know.  I would have to read it
22 because I don't know the offer.
23     Q.   Okay.
24     A.   So the answer is I don't know.
25

Page 223

RICHARD WEILL

1     Q.   More generally, do you recall whether
2 in this timeframe MBIA was willing to lend the
3 DVOG a small amount of money without requiring a
4 pledge of assets from AHERF's western entities?
5     A.   Yes, it is my recollection that we
6 were willing.  One of the problems that I have
7 not repeated every single time because I am
8 trying to be a gentleman about this whole thing,
9 is that people were working from information
10 that turned out to be totally faulty.
11         Everybody was working from financial
12 statements that turned out not to represent -- I
13 am not calling them fraudulent, but I am calling
14 them inaccurate.  So all the information that
15 everybody is working on at this time, all of
16 this may have been a waste because in fact we
17 didn't have the correct information as to the
18 financial situation of any of these
19 institutions.  We may have been throwing money
20 down a rat hole at this point.
21         So these were honest attempts by us to
22 try to -- to help the situation.  Yes is the
23 answer to your question.
24     Q.   Is it also correct that you don't
25

Page 224

RICHARD WEILL

1 recall reviewing or relying on the audited
2 fiscal year 1997 financial statements for AHERF?
3     A.   They weren't available on July -- for
4 '97?  The '96s come out in June of -- well, of
5 course we would have relied on financial
6 statements.  We looked at this credit and we
7 looked at the financial statements that were
8 delivered to us.
9     Q.   Did you personally to the best of your
10 recollection review the audited FY '97 financial
11 statements --
12     A.   I did not.
13     Q.   -- for AHERF or any of its affiliates?
14     A.   I did not.
15     Q.   And you don't recall, then, relying on
16 those statements for making any decision?
17     A.   Yes.  Implicit in all of the
18 discussions that we had at MBIA was a belief
19 that the information that we were receiving was
20 accurate and correct, that there weren't any
21 misstatements in it.  It is how you make
22 decisions.  You don't go around and say I am
23 assuming the accuracy of these financial
24 statements that are delivered to me.
25

Page 225

RICHARD WEILL

1     What you do is, in the real world, is
2 you take a statement that's delivered to you,
3 you read it and you believe it.  Then you say --
4 you prepare a report like Dick Heberton's report
5 that describes what was in the income statement
6 that was delivered to you.
7         Just putting it in perspective, the
8 board didn't have the information either when
9 they rejected these offers.
10     Q.   How do you know that, sir?
11     A.   Because the statements subsequently
12 were restated by the auditors.
13     Q.   So by the information, what do you
14 mean the information?
15     A.   Correct financial information was not
16 available.  I am assuming that no auditing firm
17 restates financial statements if they were
18 correct when issued.  You only restate financial
19 statements when they are incorrect.
20     Q.   Do you have any basis for concluding
21 that the AHERF board would have done anything
22 different?
23     A.   No basis.
24     Q.   Had --
25

57 (Pages 222 to 225)

Page 226

RICHARD WEILL

1
2     A.   I have no basis for knowing that.
3  However, let's be fair.  Having correct
4  information makes decisions more -- correct
5  decisions to be made easier to make.  No one
6  tries to make decisions from false information,
7  from fraudulent information.
8        And I haven't done this for every
9  question because I didn't think it was fair to
10  you, but inherent in this is that the financial
11  statements were restated.
12     Q.   Okay.  So why are they fraudulent?
13        MR. WITTEN:  Let him finish if he is
14  answering a question.
15     A.   I didn't say they were fraudulent, I
16  don't know that.
17     Q.   Just to be clear, you have no basis
18  for saying that the audited fiscal year 1997
19  consolidated statements for AHERF and its
20  affiliates are in any way fraudulent?
21     A.   I didn't say that any of them were
22  fraudulent.  I said that a number of them were
23  restated which means they were incorrect when
24  delivered.  I don't know if they were
25  fraudulent.  That's a legal issue.

Page 227

RICHARD WEILL

1
2        MR. WITTEN:  Why don't we go off the
3  record.
4        THE VIDEOGRAPHER:  Going off the
5  record at 2:08 p.m.
6        (Recess)
7        THE VIDEOGRAPHER:  Returning to the
8  record at 2:22 from 2:08.
9        (Exhibit 2626, Document Bates Stamped
10  MBIA 030141 through 030142, marked for
11  identification)
12  BY MR. KRUSKO:
13     Q.   Welcome back.  Let me show you what we
14  just marked as Exhibit 2626.
15     A.   Why didn't we date anything in those
16  days?
17        (Pause)
18     A.   Okay.
19     Q.   Do you recognize Exhibit 2626, Mr.
20  Weill?
21     A.   No.
22     Q.   I should back up one second.
23        For the record, Exhibit 2626 is Bates
24  numbered MBIA 030141 through 030142.
25        Is it your belief that Mr. Stevens has

Page 228

RICHARD WEILL

1
2  prepared this document for you to use in
3  addressing a letter to the MBIA board concerning
4  AHERF and/or the DVOG?
5     A.   I don't know what the purpose of this
6  memorandum was, I'm sorry.  I don't remember.
7     Q.   Did Mr. Stevens at any point in time
8  draft information for you to include in a letter
9  that you in turn submitted to the MBIA board?
10     A.   Not within my recollection, I'm sorry.
11  I don't recall sending a letter to the board.
12  But it says if you would -- says board letter
13  paragraphs for DVOG.
14     Q.   Right?
15     A.   But I don't recall it.
16     Q.   Okay.
17     A.   By the way, it may not have been sent,
18  too.  I may have asked for information for a
19  letter.  I may have even drafted the letter and
20  may have concluded at some point to do it orally
21  or to do it differently.  But clearly this was
22  done, at least he thought he was writing a
23  letter for the board.
24     Q.   In your capacity as president, do you
25  recall instances in which you submitted a letter

Page 229

RICHARD WEILL

1
2  to the MBIA board or otherwise briefed the
3  board?
4     A.   I briefed them orally.  I don't --
5  this was such a large issue that it is
6  conceivable that we would have written them a
7  letter, but historically even to this day that
8  isn't how we communicate with the board.
9     Q.   If you would turn with me to the
10  second page of the document, specifically the
11  second full paragraph, begins "up to the date,"
12  do you see that?
13        Here Mr. Stevens has written that up
14  to the date of bankruptcy filings as he has
15  testified to earlier, the DVOG did not breach a
16  legal covenant, correct?
17     A.   That's what it says.
18     Q.   That's consistent with your
19  recollection, correct?
20     A.   That's what he told me, that's
21  correct.  By the way, again, just for the
22  record, it did not on the basis of the
23  information that we had, violate a legal
24  covenant.  Maybe if we had different information
25  it would have.

58 (Pages 226 to 229)

Page 238

RICHARD WEILL

1  RICHARD WEILL
2  to which some of the obligations that MBIA had
3  with respect to the DVOG had been ceded pursuant
4  to some treaties that had been entered?
5      A.  Before that.
6      Q.  Prior to the DVOG bond offering?
7      A.  Right.  As an annual treaty, it was
8  part of an annual treaty.  I am just guessing
9  but I am almost sure I am right.
10     Q.  In the 1996 timeframe did you have any
11 responsibilities with respect to the reinsurance
12 treaties that MBIA entered into?
13     A.  No.
14     Q.  Do you recall dealing with anybody
15 over at Capital Re regarding the DVOG at any
16 point in time?
17     A.  No.
18     Q.  Do you recall participating in a
19 meeting with Capital Re in October 1998?
20     A.  I don't recall participating in this
21 meeting.
22     Q.  Does Exhibit 2627 appear to you to be
23 a handout that MBIA generated in connection with
24 a meeting with Capital Re in October 1999?
25     A.  Yes.

Page 239

1  RICHARD WEILL
2      Q.  If you turn with me to page 0461, the
3  second page of the document, do you see here the
4  subheading DVOG history?
5      A.  Yes.
6      Q.  The third bullet states:  DVOG was
7  considered an acceptable for the credit by MBIA
8  based on cash, 308 million in the west, and at
9  the parent, strong operating history of the
10 Pittsburgh affiliates offsetting DVOG's limited
11 liquidity to an eight days cash on hand and high
12 leverage, 75 percent debt to cap.  DVOG received
13 investment grade shadow ratings.
14     Do you see those statements?
15     A.  I sure do.
16     Q.  I take it you agree with those
17 statements?
18     A.  Actually I can't possibly agree with
19 them, because now it says 28 days and before it
20 said 32 or 54, so it is, again, different
21 analysts looking at different things
22 differently.
23     But I think what he was -- I think the
24 person that was trying to set this up was trying
25 to explain in that person's perspective why we

Page 240

1  RICHARD WEILL
2  insured this deal.
3      Q.  In general terms, it was true, was it
4  not, that the DVOG had limited liquidity at the
5  time MBIA provided a financial guarantee?
6      A.  Yes.
7      Q.  It is true that the DVOG had a high
8  leverage as measured by a debt to capitalization
9  ratio?
10     A.  That's correct.
11     Q.  Is it also true, though, that MBIA was
12 encouraged by the amount of cash in the west and
13 at the parent entity?
14     A.  It appears that that's what this says.
15 I don't know if we were.  You have to read the
16 underwriting documents to draw that conclusion.
17 I suspect that this document was not written by
18 someone either in new business underwriting or
19 IPM.  I believe this document was probably
20 written by someone in finance, just guessing.
21     Q.  But you have no reason to know one way
22 or the other --
23     A.  I have no reason to know one way or
24 the other --
25     Q.  -- the author of this document?

Page 241

1  RICHARD WEILL
2      A.  I don't know who the author of the
3  document is.  I don't know whose handwriting
4  that is on the side, although I think I could
5  guess.
6      Q.  Whose handwriting do you think that
7  is?
8      A.  I think that it is -- it isn't David
9  Stevens, I think it is Judy Radasch.  But I
10 don't know that for sure.
11     Q.  The handwriting on page 0461 --
12     A.  461.
13     Q.  -- the same page you were just on, the
14 second page of the document, appears to state
15 the AHERF CFO stated that west would support
16 east, and then in quotations appears the
17 statement "moral commitment"?
18     A.  That's what it says.
19     By the way, you didn't read a key part
20 of the sentence.  It says DVOG received
21 investment grade shadow ratings, so as weak as
22 the credit was, it received investment grade
23 ratings.
24     Q.  I am virtually positive I read that
25 into the record, but the document speaks for

61 (Pages 238 to 241)

Page 242

RICHARD WEILL

1  itself.
2
3        If you turn with me to page 0466?
4    A.   66? I am there.
5    Q.   Do you see the third bullet which
6  states:  New CEO Sanzo hires Hunter Group" --
7    A.   What page?
8    Q.   0466?
9    A.   I am there.
10   Q.   Are you there?  Third bullet:  "New
11  CEO Sanzo hires Hunter Group (later he
12  discovered that Hunter scope was extremely
13  limited). "
14       Do you see that?
15   A.   I do.
16   Q.   And the heading here is April to July
17  '98 heating up, do you see that?
18   A.   Yes, I do.
19   Q.   Now, this passage reflects the fact
20  that AHERF hired the Hunter Group for a project
21  that was more limited in scope than MBIA would
22  have liked to have seen the Hunter Group
23  perform, correct?
24   A.   That's what it says.
25   Q.   Is that consistent with your

Page 243

RICHARD WEILL

1
2  recollection?
3    A.   Yes.
4    Q.   Is it also correct to say that MBIA
5  was powerless to influence AHERF to determine
6  the scope of the project that the Hunter Group
7  was retained for?
8    A.   "Powerless" is too strong.  We did not
9  have the power to cause them to do something.
10  We only had suasion, we didn't -- but powerless
11  would imply that you couldn't do anything.  I
12  think we tried to persuade them.
13   Q.   But short of persuading AHERF, did
14  nobody have any legal right to determine in part
15  or in whole the scope of the retention of the
16  Hunter Group by AHERF?
17   A.   Because the violation was not -- the
18  violations that the financial statements showed
19  were not severe enough to allow us to really
20  assert all of our rights.  The answer to your
21  question is yes.  Had the financial statements
22  been as later Coopers & Lybrand believed they
23  should have been when they restated them, we
24  would have had the power to accelerate and that
25  might have been the vehicle for suasion to get

Page 244

RICHARD WEILL

1
2  the Hunter Group to have more authority.
3    Q.   But that's just speculation on your
4  part, correct?
5        MR. WITTEN:  Objection.
6    A.   Well, it is not -- we would have had
7  more power, we would have had -- it is not
8  speculation that we would have had more power.
9    Q.   But when you say that might have been
10  the vehicle for suasion to get the Hunter Group
11  to have more authority?
12   A.   Yes.
13   Q.   That is speculation on your part?
14   A.   Well, it is not speculation.
15       MR. WITTEN:  Objection.
16   A.   It is an opinion of what more power
17  would have gotten you.  Speculation -- I guess
18  speculation means something that you are not
19  attributing.  The word "speculation" just means
20  guessing out of whole cloth, not what is more
21  logical.  Speculation is just a guess.
22       Here I am saying that if the facts
23  were as they were subsequently -- and I am
24  taking the facts as they were subsequently
25  because Coopers & Lybrand issued new

Page 245

RICHARD WEILL

1
2  statement -- those statements would have given
3  us more power.
4    Q.   What is your opinion as to the
5  likelihood that MBIA would have accelerated the
6  DVOG bonds?
7        MS. SPRINGER:  Can you say what time
8  period you are talking about now again?
9  BY MR. KRUSKO:
10   Q.   In the event of a covenant violation
11  in fiscal year 1997.
12   A.   Since I am allowed to have a view, my
13  view is that had we had that information, we
14  would have threatened to accelerate the bonds.
15  And the board, seeing that that covenant was
16  breached and that power was in the hands of
17  creditors, would have gotten more involved, made
18  more changes quicker than they did.
19       That's just -- but that would be the
20  logical result of what happened in other similar
21  situations.  That's how people act.
22   Q.   Why did MBIA not then acceleration
23  when the DVOG was placed on credit watch list B
24  in February 1998?
25       MR. WITTEN:  Objection.

62 (Pages 242 to 245)

Page 246

RICHARD WEILL

1    A.    I don't think it had the power to.  I
2  don't think it breached a covenant that allowed
3  us to do that.  I told you we don't threaten to
4  do things we can't legally do.
5    Q.    Did MBIA to the best of your knowledge
6  ever communicate to AHERF that had there been a
7  covenant violation in fiscal year 1997, it would
8  have accelerated the bonds?
9    A.    Of course not.  That would have
10  been -- that would be -- no one at MBIA knew
11  until the restatement that there was a covenant
12  violation.  We believed the financial
13  statements.
14    Q.    Is it correct that at some point in
15  time prior to the bankruptcy filing AHERF
16  representatives alerted MBIA to the fact that in
17  all likelihood at the end of fiscal year 1998 --
18    A.    Yes.
19    Q.    -- there was going to be a covenant
20  violation at the DVOG?
21    A.    That's absolutely correct.  But that
22  doesn't give you the power.  You got to
23  understand -- I want to finish the answer.
24       You have got to understand, someone
25

Page 247

RICHARD WEILL

1  telling you that something is going to happen,
2  you don't have it until you have the financial
3  statements.
4    Q.    Do you recall roughly when you learned
5  of that projection or prediction?
6    A.    No.
7    Q.    What was your response once you heard
8  that?
9    A.    Concern.
10    Q.    Did you formulate any written or
11  formal plan as to what MBIA would do if that
12  covenant was violated at the end of fiscal year
13  1998?
14    A.    Not to my knowledge.
15    Q.    Did anyone else at your direction?
16    A.    I'm sorry, "not to my knowledge" meant
17  that I don't know if one was created.  Certainly
18  no one did at my direction.  I didn't direct
19  anyone to.
20    Q.    Did you have in mind steps that MBIA
21  would take or that you would seek to take once
22  such a covenant violation occurred?
23    A.    No.  I mean, we would have talked with
24  counsel, we would have retained counsel and we

Page 248

RICHARD WEILL

1  would have examined all of our rights just as we
2  had done in lots of other situations, which I am
3  more than willing to recall for you what we have
4  done in other situations, and we would have
5  examined all the alternatives.
6    Q.    But it is your testimony that upon
7  hearing that there was going to be a covenant
8  violation at the end of fiscal year 1998, you
9  had no lists of options in mind as to what MBIA
10  would do?
11       MR. WITTEN:  Objection.
12    A.    First of all, the option I had in mind
13  was to check with legal counsel to see what we
14  could go when it occurred.  We wouldn't --
15    Q.    What you could do pursuant to the
16  master trust indenture?
17    A.    Absolutely.
18    Q.    Did you ever take that step?
19    A.    No, we never got those financial
20  statements before bankruptcy was filed.
21    Q.    Is it your recollection that AHERF in
22  early September 1998 announced that no further
23  reliance should be placed on its fiscal year
24  1997 consolidated audited financial statements?

Page 249

RICHARD WEILL

1    A.    That's my recollection.
2    Q.    This document is dated October 1998,
3  correct?
4    A.    That's correct.
5    Q.    If you turn with me to page 0467?
6    A.    Okay.  I am there.
7    Q.    Do you see the subheading, the July
8  '98 bankruptcy?
9    A.    Sure.
10    Q.    Does it appear to you that here
11  someone has written four points that they
12  believe describe what caused the July 1998
13  bankruptcy?
14    A.    Absolutely.  That's exactly what they
15  believed, whoever wrote this believed that.
16    Q.    If you turn to the next page to ACE
17  0468, here someone at MBIA has summarized the
18  DVOG failure for representatives of Capital Re,
19  correct?
20    A.    That's correct.  Number three is the
21  one we were referring to, I see.
22    Q.    Now, by three you are referring to
23  poor financial disclosure, hidden a hundred
24  million loss in fiscal year '97, misclassified

Page 286

RICHARD WEILL

1    RICHARD WEILL
2  fact have taken if they had had additional
3  financial information about the financial
4  condition of AHERF and/or its affiliates at an
5  earlier point in time?
6      A.   That would have been true speculation.
7  The answer is no.  Couldn't know that.
8      Q.   Do you know what in fact would have
9  been the effect if any of any steps that any
10  trustees of AHERF and/or its affiliates could
11  have taken?
12     A.   Yes.  I think if they had known the
13  facts they could have taken steps that -- I can
14  postulate steps that other hospitals have taken
15  that would have avoided this crisis.  I can
16  postulate them very easily.
17         They should have more quickly cut
18  costs and discontinued the physician
19  acquisition.  They should have known what their
20  cash position was and very, very quickly made
21  modifications.
22         They should have very quickly brought
23  in people to run their accounts receivable.
24  They should have very, very quickly looked at
25  the cost structure of the administration both

Page 287

1    RICHARD WEILL
2  east and west.  They could have done fifty
3  things if not a hundred things if they had had
4  the proper information and had acted on that
5  proper information.  Yes is the answer.
6      Q.   But you have no personal knowledge
7  about that, you are just going by your
8  experience?
9      A.   In similar situations, that's right.
10  I am using the experience of MBIA having insured
11  lots of hospitals and seen lots of hospitals
12  have financial difficulties in the period of
13  '99, 2000, 2001, and survive, easily.
14     Q.   Do you recall MBIA advocating any of
15  the steps that you just listed that the AHERF
16  trustees could have pursued?
17     A.   Absolutely, I am sure.  Was I in those
18  conversations?  No.  But that was the exact
19  purpose of having the Hunter Group in and giving
20  them an unlimited right to look at things.
21  That's exactly what the Hunter Group did when it
22  came into situations, that's exactly what we
23  were asking for.
24     Q.   That's exactly what didn't happen
25  here, correct, because MBIA couldn't in any way

Page 288

1    RICHARD WEILL
2  determine the scope of the Hunter Group's
3  retention?
4      A.   Because we didn't have the power to
5  force the Hunter Group on the folks because the
6  statement's misstated and didn't tell us that we
7  had the default right under the documents.  We
8  didn't know that we had less than one coverage.
9         If we had known that we would have had
10  the leverage or would have applied the leverage
11  to have gotten the Hunter Group in there, or
12  would have attempted to apply the leverage.
13     Q.   If MBIA didn't have veto power over
14  selection of a consultant, if a consultant was
15  purely up to selection of AHERF, by leveraged
16  you mean the threat of acceleration?
17     A.   Absolutely.
18     Q.   Do you mean to imply anything else?
19     A.   Well, I think that if the financial
20  statements had been correct, the board would
21  have been more listening to people as to what
22  was going on at the hospital.
23         The board of trustees, whether they
24  did it by negligence or misconduct or anything
25  else, whatever the reason was, they did not have

Page 289

1    RICHARD WEILL
2  adequate information upon which to oversight the
3  hospital's operations.
4         The information they had was wrong.
5  It was faulty.  I am not saying it is fraudulent
6  because I don't know that.  But I do know that
7  PricewaterhouseCoopers determined that it was
8  wrong and faulty and issued new statements.
9      Q.   Move to strike.
10         What other leverage did MBIA have
11  other than the threat of acceleration?
12         MR. WITTEN:  Objection.  We have been
13  through this for hours.
14         MS. SPRINGER:  Asked and answered.
15         MR. WITTEN:  But go ahead, answer it
16  again.
17     A.   I will answer.  We could have gone to
18  the newspapers which we have done in other
19  circumstances.  We could have gone to the
20  governor.  We could have -- we could have done
21  lots of things that we have done in other
22  situations.
23     Q.   Okay.  With respect to going to the
24  newspapers, isn't it the case that your letter
25  was released by MBIA to newspapers to in part

Page 290

RICHARD WEILL

1    apply pressure to the AHERF board?
2        A.    Yes.
3        Q.    So that a bankruptcy filing could be
4    avoided?
5        A.    Absolutely.  The problem was -- what
6    was the date of that letter?  Let's examine that
7    for a second.  It is my recollection that that
8    date is June of 1998.  If the information that I
9    am talking about had been available in February
10   of 1997, the situation would have been totally
11   different.  You would not have been that close
12   to bankruptcy then.
13       The events that occurred between the
14   misstatements and June of 1998 could have been
15   alleviated, could have been ameliorated by
16   events that could have taken place.
17       Q.    February 1997 is in what was AHERF's
18   fiscal year 1997, correct?
19       A.    I think it is -- aren't those the
20   '96 -- weren't the '97 financials delivered --
21   '96 financials delivered in '97?
22       Q.    I can actually represent to you that
23   they weren't delivered in calendar '97.  The
24   audited fiscal year 1996 statements for AHERF

Page 291

RICHARD WEILL

1    were not delivered to MBIA in calendar '97.
2        MR. WITTEN:  Well, we have seen a
3    document already that shows that the '96s were
4    delivered in November of 1997.
5        MR. KRUSKO:  Correct.
6        MR. WITTEN:  To MBIA.
7        MR. KRUSKO:  Yes.
8        MR. WITTEN:  Okay.
9        MR. KRUSKO:  That's all I wanted to
10   establish.
11       Q.    I just wanted to establish that it
12   seems to me you are talking about two different
13   fiscal years.  In other words --
14       A.    I am talking about two different
15   fiscal years, you are absolutely correct.  You
16   are absolutely correct.
17       Q.    That's important because there are
18   different allegations about each fiscal year?
19       A.    Fine, that's fair.
20       Q.    With respect to going to the
21   government, meaning the mayor of Philadelphia
22   and/or the government of Pennsylvania that's
23   something that MBIA did as well, correct?
24       A.    No, we didn't -- well, we did it but

Page 292

RICHARD WEILL

1    it was way too late.  But let me tell you what
2    we did in other circumstances so you can
3    understand what you really can do in the real
4    world.
5        If we had known about this in a timely
6    fashion, in other situations we were able to get
7    statutes passed in Congress that allowed people
8    to get a tax ruling that they needed.  We
9    lobbied state senators to change the
10   reimbursement program -- excuse me, yes, United
11   States senators to reimburse -- for
12   reimbursement programs.
13       And I am not saying that any of these
14   things would necessarily have been done in this
15   setting, but they were all cut off.  All those
16   alternatives were cut off because the
17   information wasn't available.
18       Q.    The information wasn't available even
19   though the DVOG was an 8B credit as of February
20   1998?
21       A.    It defaulted in June of 1998.
22       Q.    Correct.  But if I am understanding
23   your testimony correctly, you are saying in
24   February 1998 when it was an 8B credit, MBIA

Page 293

RICHARD WEILL

1    didn't have enough information to act upon?
2        A.    That's correct.  It didn't even know
3    it had a default, and I am not convinced that we
4    didn't have a default sooner than that.  I don't
5    know that.  I mean, your point is well taken, I
6    don't know what -- I would have to study the
7    financial statements and allegations and the
8    restated financial statements.  But certainly
9    the restated financial statements would have
10   been delivered in a more -- if they had been
11   delivered in a timely fashion correctly -- the
12   '96 financial statements were for the period
13   that ended June 30, 1996, is that correct?
14       Q.    Correct.
15       A.    I just heard that they were delivered
16   in November of 1997.
17       MR. WITTEN:  1996.
18       A.    In November of 1996.  If -- I'm sorry,
19   that's what I thought.  I'm sorry.  The reason
20   February was when we wrote -- we downgraded,
21   that's what I thought.  Thank you.  I knew the
22   facts were wrong.  I knew you stated it wrong.
23       MR. WITTEN:  I meant to say earlier
24   November of '96.

74 (Pages 290 to 293)

Page 294

RICHARD WEILL

1     MR. KRUSKO: I thought he did,
2  actually, but be that as it may.
3     MS. SPRINGER: I think it was
4  confusing between what you said and --
5     A.    The fact is, if that information had
6  been available to us and was correct in '97,
7  whether it was late '96 or early 1997, and we
8  knew that we had a more difficult problem or
9  even a breach, lots of things could have
10 happened before money was expended.
11    Q.    So, for example, if the DVOG had
12 violated the asset transfer test in fiscal year
13 1996, MBIA would have had certain rights and
14 responsibilities that you are saying it would
15 have pursued to the fullest degree?
16    A.    I am going to sound weak.  Pursued to
17 the fullest degree, we would have pursued.  I
18 don't know what the fullest degree means.  I am
19 not going to pretend that I know what the
20 fullest degree means.  We would have pursued.
21    If the debt coverage test had broken
22 one, we knew about it in '97, we would have had
23 more power, more ability to cause the board to
24 look at costs, to cause Hunter to be inserted,

Page 295

RICHARD WEILL

1  to do all kinds of things, obviously always with
2  the threat of causing there to be an
3  acceleration.
4     But that's exactly what happens in the
5  real world in these situations, is that you
6  don't go to the -- to use your word, to the
7  absolute extent that you could go to.  You don't
8  do that.  That isn't how this works.  You work
9  with people, but you have to have the right to
10 assert things, and we didn't know we had the
11 right, because the financial statements that
12 were given to us turned out to be, at least
13 according to Coopers & Lybrand, incorrect
14 because they restated them.
15    Q.    Has anyone at MBIA ever communicated
16 to you that had the asset transfer test met
17 MBIA's standard underwriting guideline, that the
18 DVOG would have violated the test in fiscal year
19 1996?
20    A.    I can only look at the documents
21 themselves.  I'm sorry, are you asking if they
22 had violated the test that was in DVOG?
23    Q.    Correct.
24    A.    I don't know -- we would have pursued

Page 296

RICHARD WEILL

1  it, yes.
2     Q.    Perhaps just a little unclear.  What I
3  am asking is whether anyone at MBIA has ever
4  represented to you that had MBIA's standard
5  asset transfer test been adopted, that DVOG
6  would have violated the test in fiscal year
7  1996?
8     A.    I don't know what you are talking
9  about when you say standard.  You mean put in
10 the documents when originally done?
11    Q.    Yes.
12    A.    I'm sorry.  We never look at things
13 that way.  The answer is I don't know what we
14 would have done.  I am only arguing, just so you
15 understand my point -- I got to repeat my point.
16    The only thing that you worry about
17 after the deal is done is what the deal itself
18 says.  There is no value in anyone spending
19 time, although I am sure they do, worrying about
20 a provision that you wish you would have had.
21    I am not saying you can't find someone
22 who said that.  You probably can.  But it is
23 useless.
24    Q.    Do you know what MBIA would have done

Page 297

RICHARD WEILL

1  had the DVOG violated the asset transfer test in
2  fiscal year 1996?
3     A.    The one that was in the documents?
4     Q.    Yes.
5     A.    I do not know exactly what we would
6  have done, but we would have asserted that they
7  shouldn't do it any more.  We would have worked
8  our darn heart out to get them to make the
9  changes in their administration of that hospital
10 so that they weren't wasting money.  We would
11 have argued that Hunter should have been brought
12 in.  We would have argued a hundred things.  We
13 didn't have the power to do that because we
14 didn't have the information.  By the way, the
15 board didn't have it either.
16    Q.    You keep saying that the board didn't
17 have it.  Have you ever untaken any review of
18 what information was available to the AHERF
19 board at specific points in time?
20    A.    No.  But I do know that a board has
21 available to it financial statements that are
22 delivered to it by an auditing firm.  That's
23 what it has available to it, and they didn't
24 have correct financial statements, it turned

75 (Pages 294 to 297)

Page 322

RICHARD WEILL

1  Did I hear them directly?  The answer is no.
2  Q.    So since the time Mr. Stevens has left
3  MBIA, you have never heard him express any
4  statement about MBIA?
5  A.    I have never personally heard him
6  express any statement about MBIA, that is
7  correct.
8  Q.    That's all the questions I have.
9  MR. WITTEN:  I have nothing further.
10  THE VIDEOGRAPHER:  This concludes the
11  videotape deposition of Richard Weill at 4:28
12  p.m. on June 15, 2004.  This is the end tape No.
13  4.
14
15
16
17
_____
RICHARD WEILL
18
19
20  Subscribed and sworn to before me
21  this_____day of_____, 2004.
22
23
24
25

Page 323

RICHARD WEILL

1  STATE OF NEW YORK   )        Pg  of  Pgs
2  ) ss.:
3  COUNTY OF NEW YORK  )
4  I wish to make the following changes, for the
5  following reasons:
6  PAGE LINE
7  _____ _____   CHANGE: _____
8  _____ _____   REASON: _____
9  _____ _____   CHANGE: _____
10  _____ _____  REASON: _____
11  _____ _____  CHANGE: _____
12  _____ _____  REASON: _____
13  _____ _____  CHANGE: _____
14  _____ _____  REASON: _____
15  _____ _____  CHANGE: _____
16  _____ _____  REASON: _____
17  _____ _____  CHANGE: _____
18  _____ _____  REASON: _____
19  _____ _____  CHANGE: _____
20  _____ _____  REASON: _____
21  _____ _____  CHANGE: _____
22  _____ _____  REASON: _____
23  _____ _____  CHANGE: _____
24  _____ _____  REASON: _____
25

Page 324

1  RICHARD WEILL
2  C E R T I F I C A T E
3  STATE OF NEW YORK   )
4  ) :ss.
5  COUNTY OF NEW YORK  )
6  I, BRANDON RAINOFF, a Federal
7  Certified Realtime Reporter and Notary Public
8  within and for the State of New York, do hereby
9  certify:
10  That RICHARD WEILL, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by the witness.
14  I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18  IN WITNESS WHEREOF, I have hereunto
19  set my hand this_____day of_____, 2004.
20
_____
BRANDON RAINOFF, FCRR, CM
21
22
23
24
25

Page 325

1  RICHARD WEILL
2
3  INDEX OF EXHIBITS
4
5  2618 Document Bates Stamped MBIA 051300 through . 76
316
6
2619 Document Bates Stamped MBIA 051333 through . 79
7  352
8  2620 Document Bates Stamped MBIA 051353 through . 81
372
9
2621 Document Bates Stamped MBIA 051373 through . 81
10  392
11  2622 Document Bates Stamped PRPLD 040-01504 ..... 82
through 01586
12
2623 Document Bates Stamped PRPLD 040-01587 ..... 83
13  through 01668
14  2624 Document Bates Stamped PRPLD 040-01669 ..... 84
through 01751
15
2625 Deposition Transcript of Judith Radasch .... 149
16
2626 Document Bates Stamped MBIA 030141 through . 227
17  030142
18  2627 Document Bates Stamped ACE 0460 through .... 237
0475
19
2628 Document Bates Stamped MBIA 056738 through . 262
20  739
21  2629 Document Bates Stamped MBIA 056742 through . 262
743
22
2630 Document Bates Stamped MBIA 056740 through . 262
23  741
24  2631 Document Bates Stamped MBIA 012900 ......... 263
25

82 (Pages 322 to 325)

**Wicker Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## MARSHA WICKER
### February 25, 2004

---

# LEGALINK MANHATTAN
## 420 Lexington Avenue - Suite 2108
## New York, NY 10170
### PH: 212-557-7400 / FAX: 212-692-9171

WICKER, MARSHA



MARSHA WICKER

**Page 218**

1 side the PNC waiver issue?
2 A. We were negotiating with them. Our attorney
3 advised us that some of the things that they
4 were supposed to have sent as part of the new
5 loan agreement had not been provided despite,
6 you know, a couple of follow-ups from her.
7 Q. Did you or anyone else on Mellon's behalf
8 contact AHERF with the intention of perhaps
9 eliciting AHERF's help in getting an agreement
10 with PNC?
11 A. I know I reviewed PNC's proposed language with
12 Mike Martin and explained to him what our
13 objections were.
14 Q. And did Mr. Martin tell you that he would relay
15 your concerns to PNC, or did you understand at
16 the time that that would take place?
17 A. Yeah, you know, we could relay our concerns to
18 PNC ourselves, but we wanted him to be aware
19 of, you know, what our objection was to the
20 language that we were negotiating with PNC.
21 Q. Did Mr. Martin say anything to you in the
22 course of this conversation, if you recall?
23 A. He told me that he understood what our
24 objections were.
25 Q. Is that to say that Mr. Martin told you he

**Page 219**

1 sympathized with Mellon's position or he simply
2 understood the points that you were making?
3 A. Well, I mean he said the words to me I
4 understand your objections. Was he
5 sympathetic, I don't know.
6 Q. Do you know whether anyone at First Chicago
7 ever talked or met with anyone at PNC to try to
8 reach agreement with PNC on a waiver?
9 A. I'm not aware of any of those conversations.
10 Q. And aside from this one conversation with
11 Mr. Martin, are you aware of anyone at AHERF
12 having a meeting or a conversation with PNC to
13 try to get PNC to agree to the terms of the
14 waiver apart from just general recollections?
15 A. I don't know all of the conversations that went
16 on between PNC and AHERF.
17 Q. I understand from your prior testimony that you
18 believe you first learned that AHERF intended
19 to pay off the Mellon line of credit in full
20 during a four-way conversation that you
21 participated in with Mike Martin, Rich McKeown
22 and Mr. or Ms. Shurlow?
23 A. Nancy Shurlow.
24 Q. Shurlow. Do you recall what Nancy's -- excuse
25 me, what Nancy Shurlow's position was in this

**Page 220**

1 general time frame, April 1998?
2 A. She's an attorney with Reed Smith Shaw &
3 McClay.
4 Q. What, if anything, do you recall about that
5 conversation other than what I've relayed to
6 you based on my reading of your prior
7 testimony?
8 A. They told us that they were going to pay us
9 off. We had called them -- I'm trying to
10 remember when we called them. We had initiated
11 a phone conversation to begin the process of
12 taking collateral, identifying the assets that
13 would be pledged as collateral and walking
14 through the information that Nancy would need
15 to prepare the forms, and we were advised that
16 they intended to pay us off.
17 Q. By prepare forms, I take it you mean prepare
18 the necessary documentation for a restructured
19 loan?
20 A. No, for liens.
21 Q. And this is some sort of springing lien in the
22 favor of Mellon and/or First Chicago?
23 A. No, I don't recall the specifics of that
24 particular transaction, but whatever the
25 appropriate collateral form was, we would have

**Page 221**

1 discussed that.
2 Q. So in short, this discussion was to identify
3 and put in place a process by which the Mellon
4 line of credit would be collateralized?
5 A. That's right.
6 Q. By this point in time, had AHERF agreed to the
7 collateralization that you discussed in this
8 conversation, or were negotiations still
9 ongoing?
10 A. We were -- we were still negotiating the loan,
11 and putting this in place was one more step of
12 that loan.
13 Q. Were these negotiations in any way related to
14 the granting of a waiver for the continuing
15 violation of DVOG?
16 A. Well, condition precedent of that loan would
17 have been that all -- all other loan violations
18 would have been cured, so that would be, you
19 know, not a specific part of it but, you know,
20 to make one of the conditions precedent occur.
21 Q. Just to be clear, you said all other. I just
22 want to be perfectly clear that I understand
23 you. You mean all other aside from the
24 violation of the DVOG, or do you mean all
25 violations?

56 (Pages 218 to 221)

MARSHA WICKER

Page 222

1　A.　As I recall that credit agreement, and, again,
2　　　I don't have it in front of me, but one of the
3　　　conditions precedent was that they had no
4　　　outstanding loan violations.  I'm paraphrasing
5　　　but --
6　Q.　Sure.
7　A.　-- that was the sense of it.
8　Q.　AHERF could have paid off a certain percentage
9　　　of the amount then outstanding on the Mellon
10　　　line of credit, and in so doing have brought
11　　　the DVOG into compliance with the liquidity
12　　　ratio; correct?
13　A.　Yes.
14　Q.　So I take it then full repayment was not
15　　　necessary to achieve compliance with the terms
16　　　of the line of credit?
17　A.　I don't believe so.
18　Q.　With that background in mind, did you have an
19　　　understanding at the time as to why AHERF was
20　　　paying the line of credit off in full?
21　A.　We were surprised.  We didn't understand why.
22　Q.　I take it you didn't understand why because in
23　　　your view it didn't make good business sense
24　　　for AHERF to pay off the line in full?
25　A.　I wouldn't say that.  I would say we were

Page 223

1　　　surprised because Nancy and I called with the
2　　　idea of continuing the negotiations on the
3　　　credit agreement, and this notion of paying us
4　　　off just came out of the blue.
5　Q.　And did you ask Mr. Martin or Mr. McKeown what
6　　　prompted this idea that the loan would be paid
7　　　off in full?
8　A.　No.  I think we just -- they said they were
9　　　going to pay us off, and we accepted that at
10　　　face value.
11　Q.　Is it your recollection that the repayment from
12　　　AHERF to Mellon occurred on April 27th, 1998?
13　A.　You know, after all these years, I don't -- I
14　　　can't believe that I don't remember that
15　　　specific date, but whatever the date was.
16　Q.　Let me mark this if I can Exhibit 2152 -- 2452.
17　　　　　　　　- - - -
18　　　(Exhibit 2452 marked for identification.)
19　　　　　　　　- - - -
20　Q.　For the record, I would note that Exhibit 2452
21　　　is Bates numbered FC 000048 through 49.
22　　　　　Ms. Wicker, do you recognize the
23　　　handwriting on page 2 of Exhibit 2452?
24　A.　Yeah, it's my secretary, my secretary at the
25　　　time's handwriting.

Page 224

1　Q.　Your secretary being Reggie, which I take it is
2　　　short for Regina?
3　A.　Yes.
4　Q.　Does it appear to you then that Exhibit 2452 is
5　　　a fax you directed her to send to the other
6　　　members of the loan syndicate alerting them to
7　　　the fact that AHERF was announcing repayment of
8　　　the loan in full on April 27th, 1998?
9　A.　Yes.
10　Q.　With this background in mind, are you able to
11　　　place in time when this conversation with
12　　　Mr. Martin and Mr. McKeown took place?
13　A.　A couple of days before the 27th, but I
14　　　couldn't be more specific than that.
15　Q.　Ms. Wicker, let me show you two documents that
16　　　we've previously marked as Exhibits 1933 and
17　　　1934.
18　　　　　Ms. Wicker, do you recognize Exhibit
19　　　1933 as a letter from Toronto Dominion to
20　　　Mellon Bank dated April 27th, 1998?
21　A.　Yes.
22　Q.　By this letter Toronto Dominion, as reflected
23　　　in the fourth paragraph, requests that Mellon
24　　　convene a meeting of the lenders during the
25　　　week of April 27th to discuss and vote upon

Page 225

1　　　acceleration of the loans; correct?
2　A.　That's what it says.
3　Q.　And in that passage, Mr. Maloney makes clear
4　　　that Toronto Dominion intended to vote in favor
5　　　of acceleration; correct?
6　A.　Yes.
7　Q.　And to be more specific, he also advises Mellon
8　　　that he has been told that Bank One will also
9　　　vote in favor of acceleration; is that correct?
10　A.　He does say that.
11　Q.　And do you recognize Exhibit 1934 as being a
12　　　virtually identical letter directed to Mellon
13　　　from Bank One containing much of the same
14　　　information?
15　A.　I do.
16　Q.　In your view did AHERF know about Toronto
17　　　Dominion's and Bank One's position in favor of
18　　　acceleration at any point in time before it
19　　　made the decision to repay the loan in full?
20　A.　I don't believe so.
21　Q.　Prior to the actual fact of repayment on the
22　　　27th of April, had Mellon ever given any
23　　　indication to AHERF that acceleration of the
24　　　loan was either being discussed or was
25　　　imminent?

57 (Pages 222 to 225)

MARSHA WICKER

Page 226

1    A.    No.
2    Q.    Do you recall being contacted by David Cook
3          with PNC on the date of the repayment?
4    A.    I don't recall if it was exactly on the date of
5          repayment, but certainly within a day or so of
6          that -- of that time frame.
7    Q.    Within a day or two after the repayment?
8    A.    You know, I don't -- I can't be -- it may have
9          been a day forward, a day after, but it was
10         very close.
11   Q.    Is it your recollection that during this
12         conversation Mr. Cook asked you that Mellon not
13         accept the full repayment being made by AHERF?
14   A.    Yes.
15   Q.    Did Mr. Cook give any reasons why he wanted
16         Mellon to reject the full repayment?
17   A.    He said that AHERF was going to pay us back but
18         they weren't very happy about it and we should
19         not accept it.
20   Q.    And I take it PNC Bank was not happy about it
21         because it resulted in a drain of liquidity
22         from the AHERF system?
23   A.    Well, you'd have to ask PNC what their point of
24         view was.
25   Q.    Did you ask Mr. Cook what his point of view was

Page 227

1          beyond what you just relayed?
2    A.    No.  I told him that I would confer with my
3          superiors and see what did we think about not
4          accepting the payment.
5    Q.    I take it you just didn't feel comfortable
6          making a representation to Mr. Cook on behalf
7          of Mellon Bank at that point in time?
8    A.    That's right.
9    Q.    My understanding is at some point shortly
10         thereafter you went before Mellon's credit
11         committee and relayed Mr. Cook's request; is
12         that correct?
13   A.    That's right.
14   Q.    And beyond the simple fact of relaying
15         Mr. Cook's request, did you provide the
16         committee with a recommendation?
17   A.    As I recall, my words were PNC has called us
18         and told us that AHERF is going to pay us back,
19         but they are unhappy about it and we shouldn't
20         accept the payment.  I told them I would ask
21         you what you think.  Do we think we should not
22         accept the payment, and they said we should
23         accept the payment.
24              I mean I'm paraphrasing.  I'm not --
25         those aren't my exact words, but they certainly

Page 228

1          convey the message.
2    Q.    Following the repayment, did you have any
3          conversations that you recall with Mr. Taucher,
4          Mr. Cook or anyone else at PNC about the
5          repayment itself?
6    A.    After the payment, I don't recall having any.
7    Q.    After the repayment, do you recall hearing that
8          someone else at Mellon had had a conversation
9          with someone at PNC about the repayment?
10   A.    I don't recall that.
11   Q.    Did you relay this conversation with Mr. Cook
12         to anyone at AHERF at any point in time?
13   A.    I don't believe so.
14   Q.    Did you relay this conversation to anyone at
15         First Chicago at any point in time?
16   A.    Conversation with Mr. Cook, I don't recall
17         specifically.
18   Q.    Were you concerned after the repayment had been
19         made that there would be less collateral that
20         AHERF could use to go back into the market and
21         obtain another loan either from Mellon or
22         another lender?
23   A.    We believed that there would be sufficient
24         liquid assets remaining at the parent level to
25         support the company's ability to get another

Page 229

1          loan.
2    Q.    I take it then you continued negotiating with
3          AHERF about the possibility of obtaining an
4          additional loan?
5    A.    No.  We believed that because they had repaid
6          us that they did not want to continue
7          negotiations on receiving a new loan.
8    Q.    Even if the terms and conditions were
9          different?
10   A.    They never asked us about that.
11   Q.    Okay.
12   A.    When we followed up to continue the process of
13         obtaining the collateral, they didn't
14         participate in that.  They simply told us that
15         they were going to pay us off, and you know, we
16         believed that their desire for a new loan was
17         off the table.
18   Q.    Do you recall you yourself contacting AHERF to
19         confirm that fact or directing anyone else to
20         contact AHERF to confirm that fact?
21   A.    To confirm the fact that they did not --
22   Q.    They weren't interested in the possibility of
23         another loan through Mellon.
24   A.    I did not contact them, and I'm not aware that
25         anyone else did.

MARSHA WICKER

Page 262

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY         )   SS:
3      I, Heidi H. Willis, RPR, CRR, a Court Reporter
4  and Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  MARSHA WICKER, was by me first duly sworn to testify
7  to the truth; that the foregoing deposition was taken
8  at the time and place stated herein; and that the
9  said deposition was recorded stenographically by me
10 and then reduced to printing under my direction, and
11 constitutes a true record of the testimony given by
12 said witness.
13     I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.
17     I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 26th day of
23 February, 2004.
24     _____
25              Notary Public

Page 263

1  COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
   COUNTY OF ALLEGHENY       )   S H E E T
2
       I, Marsha Wicker, have read the foregoing pages
3  of my deposition given on Wednesday, February 25,
   2004, and wish to make the following, if any,
4  amendments, additions, deletions or corrections:
5  Page/Line  Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   In all other respects, the transcript is true and
20 correct.
21     _____
            MARSHA WICKER
22
   Subscribed and sworn to before me this
23 _____ day of _____, 2004.
24 _____
            Notary Public
25 AKF Reference No. HW79593

67 (Pages 262 to 263)

LEGALINK MANHATTAN (212) 557-7400

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## WALTER WILLIAMSON
*June 23, 2004*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**WILLIAMSON, WALTER - Vol. 1**



LEGALINK
A WORDWAVE COMPANY