WALTER WILLIAMSON

Page 174

1   Q.   -- by Allegheny Valley?
2              MR. WALKER: I'm going to object.
3   A.   -- with the right exchange of patients, you
4        know, where you might send a -- maybe a
5        patient, we couldn't do it at Allegheny Valley,
6        but if we sent them to Allegheny General, why,
7        there might be a phase in there if they are
8        supposed to be in the hospital for ten days,
9        why, after five days they could come back and
10       continue there, stay at Allegheny Valley
11       Hospital.
12             Of course there are some other
13       things, I'm trying to think of some other
14       things that might not even appear here. I
15       don't know whether that was when the skilled
16       nursing facilities were in hospitals and, here
17       again, we thought we could pick up those --
18       yeah, skilled, SNFUs.
19  Q.   Did you believe at the time prior to the merger
20       when you were discussing the idea with the
21       folks from AHERF that AHERF had funds available
22       to it to subsidize Allegheny Valley if it
23       encountered financial troubles in the future?
24  A.   I think the -- they certainly expected us to
25       carry our own, but, again, I think we looked at

Page 175

1        things here like maybe purchasing power to
2        negotiate with insurance companies would
3        improve, the general things I think that you
4        would see anybody why they are going to
5        consolidate, they can save expenses from the
6        administration.
7   Q.   Do you recall having a discussion with the
8        Allegheny Valley Hospital board level prior to
9        the merger about the financial condition of
10       AHERF as it was reflected in the financial
11       statements that you had provided?
12  A.   We had a couple number crunchers on the board
13       at the time, and with the information that we
14       had, yes.
15  Q.   So that was something that was a topic of
16       discussion, was AHERF a financially sound
17       organization and should we consider that before
18       deciding to merger with them --
19  A.   Yes.
20  Q.   -- was that part of the discussion?
21  A.   (Nodding head up and down.)
22  Q.   Yes?
23  A.   Yes. Of course when you started to -- I
24       shouldn't say of course. The other thing is,
25       and I think you learn maybe the hard way,

Page 176

1        because in banking I was used to audits, and we
2        had our own internal audit, and I thought it
3        was very good is that sometimes the figures
4        that you looked at that an auditor has to do,
5        they have to get good figures to start with
6        too, and I think a lot of that came out later
7        on, such as these funds that I was talking
8        about that might have been endowment, should
9        they really have been placed there, that type
10       of thing.
11  Q.   Have you ever sat on the audit committee of any
12       board of directors or trustees that you've been
13       a part of?
14  A.   The audit -- yes, the audit committee we did
15       not have I think -- I'm trying to think back,
16       Allegheny Valley Hospital would have been
17       through the finance committee. I'm not sure
18       whether we had strictly audit committee. I
19       can't --
20  Q.   And none of the other not-for-profit boards
21       that you've talked about earlier today, you
22       didn't sit on audit committees for those
23       boards?
24  A.   Maybe sat on the finance committee, but that
25       would have been about it.

Page 177

1   Q.   And the finance committee in some of those
2        cases may have functioned --
3   A.   Right.
4   Q.   -- as an audit committee as well, is that what
5        you are saying?
6   A.   Well, they would maybe have functioned at, but
7        they would have used outside accountants at
8        that time, such as the Swedenborg Foundation,
9        yes, we also used an outside bookkeeping or
10       accountants.
11  Q.   Did Allegheny Valley Hospital have audits of
12       its financial statements performed by
13       independent auditors?
14  A.   Yes.
15  Q.   And was that Coopers & Lybrand as the outside
16       auditor?
17  A.   Yeah, I think it was at that time.
18  Q.   At the time of the merger between Allegheny
19       Valley Hospital and AHERF, did you have any
20       understanding that Coopers & Lybrand was the
21       outside auditors for AHERF?
22  A.   I don't remember at that time. At that time we
23       had the financial officer who was with the
24       bank, Joe Calig handled that end of it, and I
25       felt that he was very good in that, and I had a

45 (Pages 174 to 177)

WALTER WILLIAMSON

Page 178

1    lot of confidence in him.
2  Q.   Do you know if at the time of the merger if
3    folks from Coopers & Lybrand were advising
4    AHERF about merging with Allegheny Valley?
5  A.   I have -- I don't know.
6  Q.   Mr. Walker may have asked you this question
7    earlier, and I don't mean to repeat him, but I
8    just want to make sure I'm clear.
9        You never served on the audit
10   committee of the AHERF board, did you?
11 A.   No.
12 Q.   And you never served on the finance committee
13   of the AHERF board; correct?
14 A.   No.
15 Q.   And at some point in time, those two committees
16   merged and became one committee called the
17   finance and audit committee of the AHERF board?
18 A.   I think that might have been even after the
19   reorganization or after the bankruptcy that we
20   filed.
21 Q.   But you never served on that committee --
22 A.   No.
23 Q.   -- is that correct?
24 A.   No.
25 Q.   Did you have an understanding of what the role

Page 179

1    of the audit committee of the AHERF board was
2    at the time you served on the AHERF board?
3  A.   I guess I would have to look back, not just
4    there, but I think that the audit committee
5    would not only choose a outside accounting firm
6    to do that, but also would go over the reports,
7    you know, maybe with them, you know, to see
8    what the outcomes might be.
9  Q.   Do you recall being at AHERF board meetings
10   where someone from the AHERF audit committee
11   reported on what the committee was doing with
12   respect to the audit being conducted by the
13   outside auditors?
14 A.   I think there was a short at one time. I can't
15   remember who was the head of the audit
16   committee, whether it was Mr. Nimick or
17   Mr. Barnes, that they had been audited, and I
18   don't think that was -- and everything looked
19   good, we didn't have any reports back yet.
20 Q.   I'm going to show you what's been previously
21   marked as Exhibit No. 58, and I will represent
22   to you for the record that these are the
23   consolidated financial statements for the year
24   ended June 30, 1997, for AHERF and its
25   affiliates.

Page 180

1        Do you recall having seen these
2    financial statements before?
3  A.   No, I think -- no.
4  Q.   Well, you can put them aside then.
5        But was it your understanding that it
6    was the one function of the audit committee of
7    the AHERF board was to interact with the
8    entity's outside auditors?
9  A.   Yes.
10 Q.   And do you recall ever being at any meeting of
11   the AHERF board where there were
12   representatives of Coopers & Lybrand in
13   attendance at the meeting?
14 A.   No. I -- I took a while there because I do
15   know that when we had them, that our finance
16   committee, this is Allegheny Valley Hospital,
17   would review the report with them, and I think
18   that -- I'd have to look at our old Allegheny
19   Valley Hospital, but even then we would report
20   to the board, and they might go over if there
21   were any exceptions.
22 Q.   And this is -- this is before the merger?
23 A.   Right, but I think that was also -- and they
24   were very willing to do that for some -- that
25   if we wanted them to, they were available to do

Page 181

1    it. I don't think it was like, well, here's
2    your audit report and we are going to report
3    right to the board, but that if you would like
4    us to come and explain our report, we will.
5  Q.   Okay. Again, that's at Allegheny Valley --
6  A.   Right.
7  Q.   -- before the merger, but you don't recall any
8    representatives of Coopers & Lybrand ever
9    attending an AHERF board meeting --
10 A.   No.
11 Q.   -- to go over audited financial statements?
12 A.   No.
13 Q.   Are you familiar with the term clean opinion as
14   that term is used in auditing parlance? As a
15   former banker, I guess I shouldn't ask you.
16 A.   Yeah, I would say that to me a clean opinion
17   means that I think it says somewhere in there
18   it says with the records and whatever we have
19   been -- have been submitted to us, that we
20   have -- do not find any exceptions or find
21   the -- or find exceptions.
22        But I can remember that's -- I can't
23   remember who it was said, you know, this is
24   clean and this is why we can say this, but
25   that's why we have I'll call it the disclaimer

WALTER WILLIAMSON

Page 182

1   in a way, bad word I know, but it's like a
2   computer, if you have garbage in, garbage out.
3   If you don't give me the stuff, I can't audit
4   it.
5   Q.   Did you ever hear from anyone during your
6   tenure on the AHERF board that Coopers &
7   Lybrand issued something other than a clean
8   opinion on the financial statements presented
9   to them by AHERF for audit?
10  A.   No.
11  Q.   Do you have any view as to what significance
12  there is to a clean opinion on -- on audited
13  financial statements?
14  A.   State it again.
15  Q.   Okay.  Let me try and be more clear.
16        What significance, if any, to you is
17  a clean opinion on an entity's audited
18  financial statements?
19  A.   That we have audited the information that you
20  have given us, and this is our opinion of it.
21  Now, of course, even with that, sometimes
22  they'll say, you know, this is great or change,
23  but I think when I look at an outside
24  accounting firm or auditing, that is their --
25  whatever you -- whatever you give them, they

Page 183

1   are going to look at.
2   Q.   Did you have any expectations or any -- maybe a
3   better word is understanding as to the types of
4   things that auditors should bring to the
5   attention of a board if they find during the
6   course of their audit of an entity's financial
7   statements?
8   A.   I guess it would take some continuity at times,
9   so that of course I imagine that auditors would
10  look at back records that this looks like it's
11  gone up or down considerably or why -- even as
12  far as some expenses, and what else would be in
13  that.  I'm trying think of --
14  Q.   Well, let me ask you --
15  A.   Back at the bank, even though I was in human
16  resources, they still came in and audited the
17  payroll and insurance.  I can remember at one
18  time -- and even purchasing, and said do you do
19  this, why don't you do this, you know.
20  Q.   Well, did you expect that if the auditors
21  during the course of an AHERF audit had found
22  fraud --
23  A.   Yes.
24  Q.   -- in the presentation of financial statements
25  that that was something they should have

Page 184

1   brought to --
2   A.   Yes, they should have.
3   Q.   -- brought forward?
4   A.   Right.
5        MR. WALKER:  Objection.
6   Q.   And if the auditors had found material
7   misstatements in the financial records of
8   AHERF, did you expect the outside auditors to
9   bring that to the attention of the board?
10  A.   Yes.
11  Q.   If the auditors found intentional misstatements
12  in the financial statements that were presented
13  to them by AHERF for review, did you expect --
14  A.   Yes.
15  Q.   -- the auditors to bring that to the attention
16  of the board?
17        MR. WALKER:  Objection.
18  A.   (Nodding head up and down.)
19  Q.   And if the auditors came across issues
20  reflecting on the integrity of financial
21  management of AHERF during the course of their
22  audit, did you expect them to bring that to the
23  attention of the board?
24  A.   Yes.
25  Q.   At any time during your tenure on the AHERF

Page 185

1   board, did you ever come to learn that the
2   auditors had told the audit committee or the
3   board that they had found instances of any of
4   those examples we just talked about?
5   A.   No.
6   Q.   Do you have any recollection that at some point
7   in time the AHERF board of directors decided
8   not to continue retaining the services of
9   PriceWaterhouseCoopers, which at that time had
10  succeeded to Coopers & Lybrand?
11  A.   State that again?
12  Q.   Let me back up.  At some point in time, are you
13  familiar with the concept that Coopers &
14  Lybrand merged with PriceWaterhouse --
15  A.   Okay.
16  Q.   -- and formed the entity called
17  PriceWaterhouseCoopers?
18  A.   Right.
19  Q.   And at some point in time, did you or do you
20  recall that at some point in time the AHERF
21  board decided that they were not going to
22  continue retaining the services of an entity
23  that was now PriceWaterhouseCoopers as the
24  outside auditors of AHERF?
25  A.   No.

47 (Pages 182 to 185)

WALTER WILLIAMSON

Page 186

1  Q.  I'm going to show you a document that's been
2      previously marked as Exhibit 1992, which for
3      the record is sort of a skeleton form of
4      meeting minutes it appears for a meeting of the
5      board of directors of AHERF that was held on
6      August 27th, 1998, and ask you if you've ever
7      seen this document before?
8              - - - -
9          (The witness reviewed the Exhibit.)
10             - - - -
11 A.  I don't remember that discussion at all.
12 Q.  All right.  Well, let me ask you a few
13     questions.  I know you've read ahead.
14 A.  Oh, I'm sorry.
15 Q.  That's all right.  I will represent to you that
16     in all the millions of pages of documents that
17     have been produced in this litigation, we have
18     not found a complete set of minutes from this
19     particular meeting, but it does appear that
20     there was a meeting held on August 27th, 1998,
21     of the AHERF board.
22          On this skeleton form of minutes, you
23     are listed as a member present.  Do you have
24     any recollection of attending an AHERF board
25     meeting in the August 27th, 1998 time period?

Page 187

1  A.  If it said I was there, I was there.
2  Q.  All right.  And, again, I can't represent to
3      you that you were, in fact, there.  These
4      aren't the official minutes.  I'm asking for
5      your best recollection.
6          There is on the last page of this
7      document some handwriting.  Do you recognize
8      this handwriting?
9  A.  No, I don't.
10 Q.  It's not your handwriting?
11 A.  (Shaking head side to side.)
12 Q.  If you look on that last page, under Roman
13     numeral V there, it says, Audit committee
14     report, then across the way it says D. Barnes,
15     and then the handwriting says, Met this a.m.,
16     discussed two issues, will meet again Tuesday
17     to discuss quality of statements.
18          And then below in handwriting it
19     says, Also discussed auditors.  C & L has been
20     for long time.  Merged W slash, presumably W, P
21     & W.  Then there's a little A with a circle
22     around it, to retain.  Think will have serious
23     conflicts with, W/, C & L.  R-E-C, period,
24     changing.
25          Do you recall if there was a

Page 188

1      discussion at any meeting that you attended
2      about the need to change outside auditors?
3  A.  No.
4  Q.  Do you recall being in an AHERF board meeting
5      where there was any discussion of the quality
6      of the audit work performed by Coopers &
7      Lybrand of the AHERF entities?
8  A.  No, no, I don't.
9  Q.  Do you recall there ever being a vote of --
10 A.  Changing auditors?
11 Q.  Yes.
12 A.  No.
13 Q.  If you look at that handwriting, further down
14     it says, right below where it says R-E-C,
15     period, changing, it says, KPMG or Deloitte,
16     both good firms, decided on KPMG for W, period.
17     Deloitte to do procedures for E, period, if
18     Court approves.
19          Does that refresh your recollection
20     where perhaps the auditors were changed from
21     PriceWaterhouseCoopers to KPMG?
22 A.  No.
23 Q.  All right.  And you don't recall ever being
24     asked to vote on an issue of whether --

Page 189

1  A.  To change?
2  Q.  -- to change auditors?
3  A.  (Shaking head side to side.)
4  Q.  No?
5  A.  You mean nobody's claimed this yet?
6  Q.  Do you recall a time when there was a press
7      release announcing that the audited financial
8      statements for AHERF for fiscal year 1997
9      should no longer be relied upon?
10 A.  A press release?
11 Q.  Or an announcement to the public?
12 A.  I remember -- not to the public essentially.  I
13     remember at a meeting, I think in a meeting it
14     was discussed that they were -- that they were
15     going public with it, that they hadn't released
16     that information.  I think that I can remember
17     that much.
18 Q.  Do you recall any specifics of that discussion?
19 A.  No.
20 Q.  Do you recall any discussion of the quality of
21     the work performed by the auditors?
22 A.  No, not at that time.
23 Q.  At any time?
24 A.  No.
25 Q.  I'm going to show you a document that's been

48 (Pages 186 to 189)

WALTER WILLIAMSON

Page 190

1    previously marked as Exhibit 1289 and see if
2    this refreshes your recollection about that
3    issue a little bit more.
4          For the record, this is a two-page
5    document. It has a memo from Anthony Sanzo as
6    the first page, and the date of the memo is
7    September 2nd, 1998. The second page appears
8    to be a press release, it says for immediate
9    release, and the title is AHERF Considers
10   Restatement of Consolidated Financial
11   Statements.
12             - - - -
13        (The witness reviewed the Exhibit.)
14             - - - -
15   Q.   The first paragraph of this press release
16   states, The finance and audit committee of the
17   board of trustees of Allegheny Health,
18   Education and Research Foundation, together
19   with new senior management of AHERF and
20   PriceWaterhouseCoopers, LLP, are reviewing
21   certain accounting and reporting issues related
22   to the June 30, 1997, consolidated financial
23   statements of AHERF and its affiliates which
24   they believe may require revision.
25   Accordingly, pending completion of their

Page 191

1    review, no further reliance should be placed on
2    the financial statements or the Coopers &
3    Lybrand report thereon, and it goes on from
4    there.
5          Does this refresh your recollection
6    at all about any discussion that you may have
7    been involved with concerning the issue of
8    whether the '97 audited financial statements
9    could continue to be relied upon?
10   A.   This might have been when they were -- might
11   have come up at a meeting when they talk
12   about -- when you talk about earnings and
13   trading games from certain restricted funds
14   might have been the -- what things I had
15   mentioned before, endowments or trusts that may
16   have been incorrectly reported as net assets.
17   Q.   And you are reading from this --
18   A.   Right.
19   Q.   -- news release that I just read from?
20   A.   Right, yeah, yeah. No, that might have been
21   where I got that.
22   Q.   Do you recall who would have reported on that
23   at that meeting?
24   A.   No. I can remember that even after that there
25   was a lot of -- or not a lot, as to the legal

Page 192

1    document under which those restricted funds or
2    trust funds had been given to the -- I think
3    most of them were Allegheny General Hospital's
4    that were, you know, merging with AHERF.
5    Q.   Do you recall any representatives of either
6    Coopers & Lybrand or PriceWaterhouse or
7    PriceWaterhouseCoopers making any presentation
8    in that regard?
9    A.   At that point?
10   Q.   Yeah.
11   A.   That was -- no, I don't remember them.
12   Q.   At any point in time, you don't recall anyone
13   from Coopers or PriceWaterhouse or
14   PriceWaterhouseCoopers?
15   A.   I think -- I think if they had, it would have
16   been through the audit committee and the audit
17   and finance committee would have handled that.
18   Q.   Well, as a member of the board of AHERF, did
19   you look to the audit committee to be the ones
20   to deal with issues related to audits of AHERF
21   and its affiliates?
22   A.   Yes.
23   Q.   And any issues arising therefrom; correct?
24   A.   Right. I looked to the committee to do that.
25   Q.   Was there anyone in particular on the committee

Page 193

1    that you looked to or the committee as a whole?
2    A.   The committee as a whole.
3    Q.   Would you take a look at the document that we
4    marked today as 2729, it's the three-page
5    document that has your handwriting on a number
6    of those pages, might have been the last
7    document we marked.
8    A.   2729?
9    Q.   Yes.
10   A.   Okay.
11   Q.   If you would take a look at the back of the
12   second page --
13   A.   Okay.
14   Q.   -- on the right-hand side there, maybe a third
15   of the way down, I think you said that said
16   reserves for bad debts. See where I'm
17   referring to?
18   A.   Oh, yeah, okay.
19   Q.   Do you have any recollection as to what you
20   were referring to by that notation?
21   A.   Might have been a throwback to banking.
22   Q.   Do you recall as to whether there was any issue
23   at AHERF with respect to the reserves AHERF had
24   set for its bad debts?
25   A.   No, I don't remember any discussion.

49 (Pages 190 to 193)

WALTER WILLIAMSON

Page 194

1  Q.  At any time?
2  A.  No.  Reserve for bad debts, I think that might
3      have been a throwback, you know, why didn't we,
4      because usually in banking that would have been
5      loan write-offs.
6  Q.  Are you saying that there was an issue that
7      AHERF wasn't reserving enough for its bad
8      debts?  I'm not clear.
9  A.  Well, this is something that -- that I put
10     down, you know, did we have such a thing,
11     should we have such a thing, but I don't
12     remember it tying into any financial things at
13     all.
14 Q.  When you just a few moments ago talked about
15     relying on the audit committee, was it your
16     expectation that if the audit committee had
17     been made aware that there were irregularities
18     in the financial statements of AHERF, that they
19     would have taken some action to further
20     investigate --
21         MR. WALKER:  Objection.
22 Q.  -- the issues related thereto?
23 A.  I certainly hope so, if they found anything,
24     that they would come back to the board and said
25     this is what we found and we are going to

Page 195

1      investigate it.
2  Q.  And you have no reason to believe that they
3      wouldn't have taken any action had they been
4      informed that there were irregularities in
5      AHERF's financial statements --
6  A.  No.
7  Q.  -- do you?
8         MR. WALKER:  Objection.
9  Q.  I'm sorry, you ever to make your response
10     audible.
11 A.  No, no, no, that's where I certainly would have
12     counted on them to come back.
13         MS. MEADEN:  I don't believe I --
14     well, if you'll give me 30 seconds to look
15     through my notes, I may be done here.
16             - - - -
17     (There was a discussion off the record.)
18             - - - -
19 BY MS. MEADEN:
20 Q.  Oh, I do have a couple more questions.
21         On this issue related to the vesting
22     of a deferred compensation plan, I'm just
23     trying to get in my mind the time period.  You
24     believe it was before bankruptcy?
25 A.  Yes.

Page 196

1  Q.  And you believe it was before Mr. Abdelhak's
2      employment --
3  A.  Right.
4  Q.  -- with AHERF was terminated?
5  A.  Right.
6  Q.  What was the purpose of bringing this issue to
7      the board?  Do you recall?  Was it
8      informational?  Were you being asked to vote on
9      it?
10 A.  I think it had gone by, but it was one of those
11     things that had already been done, and it
12     was -- I'm not sure whether it was
13     informational or whether it came up because we
14     were supposed to -- let's see, what do they
15     call it when you do something and then you want
16     it approved.
17 Q.  Ratified?
18 A.  I guess that would be it, ratified, that this
19     had taken place.
20 Q.  Do you recall actually being asked to vote on
21     it then?
22 A.  I don't remember that.  I just remember that I
23     thought it was really goofed up, and it upset
24     me to see something like that happen.
25 Q.  And you spoke up about it at that time?

Page 197

1  A.  Yes.
2         MS. MEADEN:  All right.  I don't
3      believe I have any further questions.  Thank
4      you.  Mr. Walker may.
5         MR. WALKER:  Nothing for me.
6         MR. VINCLER:  Let me just explain.
7      You have the right to waive signature on this,
8      or you can take a look at this and make sure it
9      was taken down properly.
10         It's my recommendation to you that
11     you waive signature unless you really want to
12     read this.
13         THE WITNESS:  No, I'd like to see it,
14     but I'm going to waive signature on it.
15         THE VIDEOGRAPHER:  With there being
16     no further questions, this deposition is
17     concluded.  Thank you.
18             - - - -
19     (The proceedings were concluded at 3:52 p.m.)
20             - - - -
21
22
23
24
25

50 (Pages 194 to 197)

WALTER WILLIAMSON

Page 198

```
1    COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE
2    COUNTY OF ALLEGHENY        )      SS:
3        I, Heidi H. Willis, RPR, CRR, a Court Reporter
4    and Notary Public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the witness,
6    WALTER WILLIAMSON, was by me first duly sworn to
7    testify to the truth, the whole truth, and nothing
8    but the truth; that the foregoing deposition was
9    taken at the time and place stated herein; and that
10   the said deposition was recorded stenographically by
11   me and then reduced to printing under my direction,
12   and constitutes a true record of the testimony given
13   by said witness.
14       I further certify that the inspection, reading
15   and signing of said deposition were waived by counsel
16   for the respective parties and by the witness.
17       I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 25th day of June,
23   2004.
24   _____
25                  Notary Public
```

LEGALINK MANHATTAN (212) 557-7400

**Woodward Dep.**

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE COOPERS LLP*

---

## *THOMAS C. WOODWARD*
*July 22, 2004*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

### WOODWARD, THOMAS C.



Page 74

1          Thomas C. Woodward
2          MR. BOCCASSINI:  Objection.
3     A.  I would say very little because the point
4  would be that this document would only direct the
5  analyst and ultimately the approvers to consider
6  these things, to think about these things, but in
7  many cases, particularly where there were overriding
8  factors or other mitigants or things that just
9  rendered the conclusions that might otherwise be
10  drawn here is really just not that relevant, so
11  again, like I said, using my expression from
12  earlier, we wouldn't do anything in a vacuum.
13        So if there were points that were being
14  suggested for consideration here, it was really at
15  the end of the day with the approval.  The approval
16  would really need to decide whether or not these
17  things were important, whether or not they were
18  relevant and whether or not they ultimately were
19  going to affect his or her decision to move forward
20  with an approval.  But it was within the approver's
21  prerogative to do with this what they would want to
22  do with it, is I guess what I would --
23     Q.  Okay.
24        When First Union was reviewing the
25  financial statements to determine whether the credit

Page 75

1          Thomas C. Woodward
2  would be renewed, what were the analyses that would
3  play an important role in the final determination?
4          MS. MCGUIRE:  Objection.
5          MR. BOCCASSINI:  Objection to form.
6     A.  The individual approver employed by the bank
7  typically would look at, I think I said this
8  earlier, the overall financial condition of the
9  borrower as well as any other factors that were
10  relevant in why we would want or not want to do a
11  loan or to continue in our relationship or to
12  modify, change the terms of the credit.
13     Q.  And when they reviewed the overall financial
14  condition, was there any particular document that
15  would show First Union's analysis of the overall
16  financial condition?
17          MR. BOCCASSINI:  Objection.
18     A.  I'm sorry.  Can you repeat the question?
19     Q.  What I'm trying to get at is just trying to
20  find out whether there is a particular summary or
21  document that addresses the financial performance of
22  HUH which was used as the determining factor for the
23  approver with determining whether to renew the line
24  of credit.
25     A.  Yeah; I mean we -- the package that would be

Page 76

1          Thomas C. Woodward
2  assembled around a credit undertaking would
3  typically include a risk assessment summary, which
4  could be a memo or a document.  It could be --
5  again, depending on the circumstances, it could be
6  upwards of 20 pages.  If it was deemed necessary, it
7  could be a very brief memo.  It would just depend on
8  what the circumstances were that the approver would
9  feel important and required to help in reaching a
10  decision on a particular credit.  But the package
11  would include not only the narrative in this risk
12  assessment summary, but it could also include
13  various memos or other exhibits, things that had
14  been collected along the way that were helpful in
15  the understanding of the borrower's situation or
16  other circumstances, and then it would also of
17  course include the financial spreadsheets which
18  would be, as we previously discussed, these
19  reductions from the audited or reviewed financial
20  statements given by the borrower.
21     Q.  I'm going to show you what has previously
22  been marked as Exhibit 2086 to the witness, and I'm
23  also going to show the witness what has been marked
24  as Exhibit 74.
25          Mr. Woodward, I'm going to have you

Page 77

1          Thomas C. Woodward
2  juggling a few documents right now.  I want to first
3  direct your attention back to Exhibit 2668, which is
4  your October 21, 1996 risk assessment summary.
5     A.  Okay.
6     Q.  I'm just trying to get clarification on your
7  statement in the last sentence on this page,
8  which --
9          MS. MCGUIRE:  What page are you looking
10  at?
11     Q.  -- is 903, which says "1994 includes combined
12  hospital and university operation; 1995 is the only
13  true audited financial statement for the hospital
14  alone (our borrower) and 1996 is extracted from the
15  footnotes and schedules provided in the audited
16  statement for the new Obligor Group."
17          My question is:  With respect to the
18  phrase 1995 is the only true audited financial
19  statement for the hospital alone, were you referring
20  to Exhibit 2086?
21     A.  To the best of my recollection, yes.  Is this
22  document one that you pulled from our file?
23     Q.  No, I'm not sure what file these are from.
24  I'm not sure of its production, but it is not from
25  the most reason one, Covier production.

Page 78

Thomas C. Woodward
1    Thomas C. Woodward
2    A.    My belief is yes unless we had a different
3    document in our file, but I believe this is the
4    document.
5    Q.    And these are the fiscal year 1996 -- I mean
6    this is the fiscal year 1995 financial statement for
7    HUH; is that correct?
8    A.    That appears to be what it says, yeah.
9    Q.    The next phrase you have in your October 21,
10   '96 memo states that "1996 is extracted from the
11   footnotes and schedules provided in the audited
12   statement for the new Obligor Group." And this
13   obligor group is DVOG, correct?
14   A.    Yeah, I believe so, yes.
15   Q.    Were you referring to the financial
16   statements that are in Exhibit 74?
17   A.    Yes. I'm sorry. Yes.
18   Q.    When you say "1996 is extracted from the
19   footnotes and schedules," which footnotes and
20   schedules are you referring to?
21   A.    Page 23 and Page 24 of that document.
22   Q.    And on Page 23 and 24 are there financial
23   statements for HUH?
24   A.    The column entitled "Allegheny Center City
25   Hospital" is the column we used.

Page 79

1    Thomas C. Woodward
2    Q.    And this is the column that you used for the
3    spreadsheet that was attached to Exhibit 2668?
4    A.    Yes --
5          MR. BOCCASSINI: Objection to form.
6    A.    -- I believe.
7          MS. MCGUIRE: That's okay. You can
8    answer. Go ahead.
9    A.    I believe, yes, that's -- I believe the
10   numbers --
11   Q.    Mr. Woodward, I want to now show you what
12   will be marked as Exhibit 2669. It bears the Bates
13   stamp WACH 00780 through 802.
14         (Exhibit 2669 was marked for
15   identification.)
16   A.    Okay.
17   Q.    This document is addressed to you; is that
18   correct?
19   A.    Yes.
20   Q.    And it's a letter dated August 29, 1995 from
21   Michael Burke?
22         MR. WITTEN: Objection as to the form.
23   A.    It appears to be, yeah.
24   Q.    Who is Michael Burke?
25   A.    I don't remember, but according to this, it

Page 80

1    Thomas C. Woodward
2    says he is a paralegal working for Allegheny Health,
3    Education, Research Foundation.
4    Q.    And this is a cover letter enclosing the grid
5    note for the HUH line of credit?
6          MR. BOCCASSINI: Objection.
7          MR. WITTEN: Objection.
8    A.    This says enclosing the allonge to the grid
9    note.
10   Q.    Let me have you take a look at WACH 783.
11   A.    Okay.
12   Q.    Is this the grid note that governed the First
13   Union line of credit -- I'm sorry -- the HUH line of
14   credit?
15         Take as much time as you need to --
16   A.    No, no.
17         To the best of my knowledge, yes, I
18   believe this is the underlying note or, I should
19   say, a copy of it, yeah.
20   Q.    Are the terms of this note similar to the
21   terms of other lines of credit that First Union
22   provided?
23         MR. BOCCASSINI: Objection.
24         MS. MCGUIRE: Objection.
25   A.    That would -- I would have to say no, if it's

Page 81

1    Thomas C. Woodward
2    a yes or no answer.
3    Q.    I'm just trying to get an idea if this is the
4    standard --
5    A.    No, to mark a note up like this -- I mean, as
6    you can see, it is a preprinted form. It is a form
7    note that might have been used, but with the amount
8    of modification and the number of riders that have
9    been -- this is a heavily negotiated document.
10   Q.    Under the terms of the grid note was HUH
11   required to provide financial statements to First
12   Union?
13         MR. BOCCASSINI: Objection.
14   A.    It doesn't appear to be a condition of the --
15   or I don't see it in this document as being a
16   requirement.
17   Q.    Are there any financial covenants in this
18   grid note?
19         MS. MCGUIRE: Objection to form.
20         MR. BOCCASSINI: Objection.
21         MR. WITTEN: Objection.
22   A.    The financial covenant defined as a -- like a
23   current ratio or something like that?
24   Q.    Exactly.
25   A.    I don't believe I see anything here to that

21 (Pages 78 to 81)

Thomas C. Woodward

1
2  effect, no.
3     Q.  Why is there no financial covenant in this
4  grid note?
5           MR. WITTEN:  Objection as to foundation.
6  Objection as to form.
7           MR. BOCCASSINI:  Same objection.
8     Q.  You can still answer.
9     A.  To the best of my knowledge, the credit
10  facility that the bank was offering Hahnemann
11  University was an offering facility.  It was not a
12  contractual commitment to lend money.  Therefore,
13  the bank, to my recollection at that time, would not
14  have typically included financial covenants or other
15  contractual attributes in this kind of a note.  This
16  note was established to evidence indebtedness but
17  really nothing beyond that.
18     Q.  So First Union did not determine that it was
19  necessary to have a financial covenant to protect
20  its line of credit with HUH?
21           MR. WITTEN:  Objection --
22           MS. MCGUIRE:  Objection.
23           MR. BOCCASSINI:  Objection.
24           MR. WITTEN:  -- as to form and object as
25  to lack of foundation.

Thomas C. Woodward

1
2     A.  Given the absence of covenants in the
3  approval and in the understanding, I would have to
4  speculate that the approvers at the time determined
5  that they did not need financial covenants.
6     Q.  How did First Union monitor compliance with
7  the grid note?
8           MR. BOCCASSINI:  Objection.
9           MS. MCGUIRE:  Objection.
10     A.  I don't -- the line of credit on an offering
11  basis was simply the bank would either choose or not
12  choose to offer to make a loan and, in addition to
13  that activity, there, as I previously said, was a
14  routine financial review of the overall financial
15  condition of the borrower and it would be in the
16  course of that review that the bank would make the
17  determination to either renew or not renew, to
18  continue doing this or to not do this.
19           So that was really how they conformed
20  their activities with respect to this relationship
21  with the borrower.
22     Q.  So in the term of the grid note there was no
23  monitoring of the terms because it's just not how
24  the agreement operated?
25           MR. BOCCASSINI:  Objection.

Thomas C. Woodward

1
2           MS. MCGUIRE:  Objection.
3     A.  Yes, this wasn't --
4           MS. MCGUIRE:  You can answer.
5     A.  Well, obviously there are things in this
6  note, but it is not -- this note was not intended to
7  be a comprehensive loan agreement with a lot of
8  covenants or things like that that would have
9  required monitoring and that kind of thing.  It's
10  not a loan agreement; it's a note.
11     Q.  Take a look at Page 784, and I would direct
12  your attention to Section D with the heading "Events
13  of Default."  Pursuant to Section D of the grid
14  note, when would an event of default occur?
15     A.  Well, according to this document subject to
16  the various riders, and there are quite a few of
17  them here, that they are enumerated as, number one,
18  a breach of any term within the requirements of the
19  note, bankruptcy, insolvency, death, reorganization,
20  material misstatement or an adverse change.
21     Q.  It is hard to read that.
22     A.  I can't read what No. 5 is.  It's cut off.
23  The confession of judgment, garnishment, things like
24  that were a substantial --
25     Q.  What you are reading now, are those remedies

Thomas C. Woodward

1
2  or events of default?
3     A.  No, that is a continuation of events.  There
4  are seven or eight of them there, transfer of assets
5  and so forth.
6     Q.  Okay.
7           I'm going to provide you with a clearer
8  version of the grid note to show the missing part of
9  Section D.  This is going to be Exhibit 2686.  There
10  is a jump in the exhibit numbers.
11           MS. MCGUIRE:  2686?
12           MR. PAYNE:  Yes.  It bears -- it has the
13  Bates stamps Foley 21277 through 21287.
14     Q.  Mr. Woodward, if you could turn to Page
15  21282?
16     A.  Okay.
17     Q.  Is this an additional copy of the grid note
18  that governed the HUH line of credit?
19           MR. BOCCASSINI:  Objection to form.
20     A.  It appears to be incomplete, but it appears
21  to be -- what is of it appears to be consistent with
22  the other exhibit you gave me.
23     Q.  Incomplete in what way?
24     A.  The signature page is missing.  It stops at
25  Page 4.

Thomas C. Woodward

1    6/6. Is that why there are two ratings?
2
3    A.    Yes.
4    Q.    And when we see in First Union or First
5    Fidelity documents a 5/5, does the first number then
6    correspond to the borrower's grade or the borrower's
7    rating?
8    A.    Yes.
9    Q.    And the second refers to the risk rating of
10    that particular transaction?
11    A.    That's correct.
12    Q.    So on this first page, am I reading this
13    correctly, I see on the bottom right it says,
14    "Borrower grade:  51"?
15    A.    Yes.
16    Q.    How does that match up with the 1 through 9
17    system that you had previously described?
18    A.    It's a 5.  I'm not sure why the 1 is there.
19    That might be a typographical error.
20    Q.    I see.  We can set this document aside.
21    Thanks.
22    A.    Okay.
23    Q.    I'm going to hand the court reporter a
24    document with Bates Nos. WACH 895 through 901 to
25    mark as Exhibit 2692.

Thomas C. Woodward

1
2    (Exhibit 2692 was marked for
3    identification.)
4    Q.    Do you have Exhibit 2692 before you?
5    A.    Yes, I do.
6    Q.    Can you tell me what this document is?
7    A.    I mentioned earlier that I used the term
8    facility ticket when I described the document that
9    First Fidelity had used.
10    Q.    Yes.
11    A.    This is in the First Union system now at that
12    time known as an 1146.  It's their version of a
13    facility ticket, and it attempted to, much like the
14    other one I had described, to set forth the basic
15    terms of an approval, the exposure and any other
16    servicing or other data input that might be involved
17    in the approval or restructuring or extension of a
18    credit facility.
19    Q.    Can you take a look at Page 897?
20    A.    Okay.
21    Q.    Do see your name there, signature there,
22    twice?
23    A.    Yes.
24    Q.    Is that your signature?
25    A.    Yes.

Thomas C. Woodward

1
2    Q.    And is that -- I see it's dated next to your
3    signature twice 10/21/96?
4    A.    Uh-huh.
5    Q.    Is that your handwriting?
6    A.    Uh-huh.
7    Q.    Does this 1146 credit approval request form,
8    does this correspond to the decision to extend that
9    grid note five months through March 31, 1997?
10    A.    Yes, that's what this would have been doing.
11    Q.    Can you please take a look at the first page?
12    A.    Okay.
13    Q.    Do you see the rectangle just in the bottom
14    half of the document that says "Indicate the
15    Following"?
16    A.    Uh-huh.
17    Q.    And then it says "A, purpose:  To fund timing
18    differences in the collection of patient
19    receivables"?
20    A.    Uh-huh.
21    Q.    Can you elaborate upon what the purpose of
22    the money was to be used for?
23    A.    To fund accounts receivable is what that
24    would have meant.
25    Q.    If the accounts receivable weren't what they

Thomas C. Woodward

1
2    were portrayed to be, then the -- let me take that
3    back.
4    If that's the stated -- if to fund
5    timing differences and the collection of patient
6    receivables is the stated purpose of the grid note,
7    then it is important to note what is the accurate
8    amount of accounts receivable that Hahnemann
9    University Hospital had; is that right?
10    MR. PAYNE:  Objection.
11    A.    Yeah.  I mean if the stated purpose of a loan
12    is to support accounts receivable, you would be
13    interested or one would be interested in knowing not
14    only the overall level of the receivables, but also
15    the average rate at which they are being collected
16    as well as any other issues with slow pay or
17    uncollectible, so forth.
18    Q.    Under B, under, it says, "Repayment
19    Source/Method," then "Primary, cash flow from
20    operations."
21    A.    Uh-huh.
22    Q.    What does that mean?
23    A.    That would be in the normal course of
24    business the conversion cycle of receivables coming
25    back into cash as well as any earnings that would

Page 150

Thomas C. Woodward

1
2  together represent the cash flow of an enterprise.
3  Q.  And to understand the cash flow from the
4  enterprise, an accurate statement of the
5  enterprise's income is important; is that right?
6  A.  That's the only way you can do it.
7  Q.  The secondary repayment source/method here
8  says, quote, bank refinancing?
9  A.  Yes.
10  Q.  And that refers to the consolidated line of
11  credit that was expected --
12  A.  Yes.
13  Q.  -- at that time?
14  A.  Yes.
15  Q.  If both these repayment sources were viewed
16  by you as dubious, I take it that would have
17  affected your credit assessment?
18      MR. PAYNE:  Objection.
19  A.  Yes.
20  Q.  We can put this document aside.
21      MR. WITTEN:  Can you mark this as 2693?
22      (Exhibit 2693 was marked for
23  identification.)
24  Q.  Mr. Woodward, do you have before you what has
25  been marked as Exhibit 2693 with Bates Nos. WACH

Page 151

Thomas C. Woodward

1
2  00777 through 778?
3  A.  Yes.
4  Q.  Please take a moment to look at this document
5  and let me know, after you have, what the document
6  is?
7  A.  This is the second allonge to the grid note.
8  Q.  If you take a look at the second page with
9  me, do you see that it is dated October 31, 1996?
10  A.  Yes.
11  Q.  And take a look at the first page now.  Do
12  you see that under Paragraph 1, "Amendments," the
13  maturity date has been changed from October 31, 1996
14  to March 31, 1997?
15  A.  Yes.
16  Q.  Is this Exhibit 2693 the allonge that
17  extended the grid note by five months?
18  A.  Yes.
19  Q.  You can set this aside.
20      MR. WITTEN:  Can you mark this as 2694?
21      (Exhibit 2694 was marked for
22  identification.)
23  Q.  Mr. Woodward, do you have before you what the
24  court reporter has marked as Exhibit 2694 --
25  A.  Yes.

Page 152

Thomas C. Woodward

1
2  Q.  -- with Bates No. WACH 00735?
3  A.  Yes.
4  Q.  Can you please tell me what this document is?
5  A.  This is an interoffice memorandum that I
6  prepared.
7  Q.  Is it a memo from you to the Hahnemann
8  University Hospital file?
9  A.  Credit file, yes.
10  Q.  And is it dated February 20, 1997?
11  A.  Yes.
12  Q.  And is that your signature here on the
13  bottom?
14  A.  Yes.
15  Q.  Do you happen to remember this particular
16  memo?
17  A.  I don't particularly remember it.
18  Q.  In this memo at the beginning you confirm
19  that the new RC agented by Mellon is in
20  documentation.  What's an RC?
21  A.  Revolving credit.
22  Q.  That's the consolidated line of credit that
23  we discussed earlier?
24  A.  Yes.
25  Q.  And it says, "Payout of our line of credit to

Page 153

Thomas C. Woodward

1
2  occur on or before 3/15/97."  Do you see that?
3  A.  Yes.
4  Q.  The final sentence here, third paragraph,
5  final sentence, says, "No additional analysis at
6  this time due to the pending payoff as previously
7  anticipated."  Do you see that?
8  A.  Uh-huh.
9  Q.  Do you recall actually not doing analysis
10  because of your expectation that the Mellon line of
11  credit was in documentation?
12      MS. MCGUIRE:  Objection to form.
13  A.  I don't recall one way or another, but it
14  would appear that I chose to waive it.
15  Q.  Why would you have been performing analysis
16  at this time frame but for the Mellon revolving
17  credit, "this time frame" being February 20, 1997?
18  A.  I believe we had Hahnemann -- and I believe I
19  saw this in one of the exhibits earlier today -- we
20  had Hahnemann as a semiannual servicing profile,
21  meaning that -- from the scoring sheets that this
22  was one that would he looked at twice a year, so the
23  December midyear with the June fiscal year end would
24  typically be the way we would do the twice-a-year
25  look.

39 (Pages 150 to 153)

Page 170

1
2                    CERTIFICATE
3          I HEREBY CERTIFY that the proceedings,
4    evidence and objections are contained fully and
5    accurately in the stenographic notes taken by me
6    on July 22, 2004, and that this is a true and
7    correct transcript of same.
8
9
10
11
12          _____
13               Cynthia A. Whyte, RPR
14
15
16          (The foregoing certification of this
17    transcript does not apply to any reproduction of
18    the same by any means, unless under the direct
19    control and/or supervision of the certifying
20    reporter.)
21
22
23
24
25

44 (Page 170)

**Zwirn Dep.**

Albert Zwirn

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

              Plaintiff,.

      vs.                   Civil Action

PRICEWATERHOUSECOOPERS,     No. 00-684

LLP,

           Defendant.

      Videotaped Deposition of ALBERT

ZWIRN, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 500 Grant Street, Suite 3100,

Pittsburgh, Pennsylvania, on Thursday, the 20th

day of November, 2003, at 9:00 a.m.

- - - - -

Albert Zwirn

Page 22

```
 1   value would be and what its market value would
 2   be?
 3          MR. LUFT: Objection.
 4       A.   Yes.  The book value would be
 5   basically the cost -- the stocks and bonds,
 6   whatever, the cost of them that is in the --
 7   that is in the endowment at the bank itself,
 8   the market value would be what those stocks or
 9   bonds or whatever it is could be sold at -- in
10   the market.
11       Q.   Mr. Zwirn, I've referenced the term
12   Lockhart before.
13          Do you recall there being
14   irrevocable endowments that AGH was originally
15   the income beneficiary for, later transferred
16   to AHERF, in the name of Lockhart?
17       A.   I guess I'm not that familiar with
18   the term irrevocable, but I believe that the
19   endowments that at one time I believe that were
20   in AGH did go to AHERF, I believe that's
21   correct, yes, sir.
22       Q.   Did you do the account -- did you
23   do the accounting for those trusts?
24       A.   Yes, sir.
25       Q.   From 1972 until how long?
```

Page 23

```
 1       A.   I stopped doing the main bulk of
 2   them around the fall of 1990.  That was given
 3   to somebody else.  And then I kept just the
 4   Allegheny General Hospital endowments until
 5   approximately the 1st of January of 1997.
 6       Q.   Until -- I'm sorry -- what happened
 7   in January of 1997?
 8       A.   Again, those endowments were
 9   transferred to other people, the accounting for
10   them.
11       Q.   So then you no longer even
12   accounted for AGH endowments after 1997?
13       A.   That's right.
14       Q.   Have you had any responsibility for
15   accounting for endowments today at all?
16       A.   Not really.  No, I have very little
17   contact or anything with endowments today.
18   Almost nothing.
19          MR. TORBORG: I would like to mark
20   this.
21              - - - - -
22          (Thereupon, Deposition Exhibit 2221
23          was marked for purposes of
24          identification.)
25              - - - - -
```

Page 24

```
 1          For the record, I have marked a
 2   large collection of documents that bears the
 3   Bates numbers DBR-ZWR-01962 through 02639.
 4       Q.   Mr. Zwirn, I'm going to ask you to
 5   just quickly flip through this document.
 6   Obviously I can't ask you to look at every page
 7   in detail.  That would take a very long time,
 8   unfortunately.
 9       A.   Yes.
10       Q.   Have you had a chance to flip
11   through it already?
12       A.   Yes, sir.
13       Q.   Good enough to recognize it?
14       A.   Yes, sir.
15       Q.   Do you recall this collection of
16   documents?
17       A.   Yes, sir.
18       Q.   Was this a collection of documents
19   that was in your files?
20       A.   Yes, sir.
21       Q.   And how do you know that?
22       A.   Well, I remember it.  When you
23   say -- is that what you mean?
24       Q.   Yeah.
25          The first page has some handwriting
```

Page 25

```
 1   at the top.  It says -- I think there's a T
 2   there.  Endowments, trusts, agency and other
 3   amounts or accounts?
 4       A.   Accounts, m-hm.
 5       Q.   Is that your handwriting?
 6       A.   Yes, sir.
 7       Q.   And the next page indicates table
 8   of contents and correspondence.  Is that your
 9   handwriting?
10       A.   I believe it is, yes, sir.
11       Q.   Do you recall making this
12   collection of documents available in response
13   to a document subpoena?
14       A.   Yes, sir.
15       Q.   Issued by the SEC?
16       A.   Yes, sir.
17       Q.   I want to mark another -- actually,
18   I don't want to mark this, but I want to show
19   it to you.
20          Do you mind if I keep this one?
21          MR. THURMAN: No.  I'm going to
22   give this one back to you, in fact.
23       Q.   For the record, this particular
24   document was marked as Exhibit 4111 two days
25   ago at a deposition.  I don't want to remark
```

Albert Zwirn

Page 26

1  it, but, just for the record, it's the same
2  document. It also bears an Exhibit number SEC
3  134 from the SEC investigative proceedings.
4        Mr. Zwirn, if you would take a flip
5  through that document briefly.
6    A.  Yes, sir.
7    Q.  Do you recognize this collection of
8  documents?
9    A.  Yes, sir.
10    Q.  Now, this one has a cover page on
11  it that says Allegheny General Hospital
12  Endowments, Trusts, Agency and Other Accounts.
13  Right?
14    A.  Yes.
15    Q.  Which matches the front page at
16  least in terms?
17    A.  Yes.
18    Q.  Not in form, but in terms?
19    A.  Yes.
20    Q.  Do you recall that you gave that --
21  I'm sorry. Strike that.
22        Do you recall that the SEC took
23  possession of a collection of documents that
24  was in a black binder?
25    A.  Yes, sir.

Page 27

1    Q.  They took the original copy?
2    A.  Yes, sir.
3    Q.  What did the original version of
4  the black binder, how was it -- how was it
5  connected? Do you recall?
6    A.  How was it bound?
7    Q.  Yes, how was it bound?
8    A.  I think with a metal fastener.
9    Q.  At the top? Do you recall if it
10  was at the top?
11    A.  No, I believe it was through the
12  side, the left side.
13    Q.  It was to the side?
14    A.  Yes, sir.
15    Q.  And did you make a copy --
16    A.  Yes, sir.
17    Q.  -- of that document before they
18  took it away?
19    A.  By that document you mean --
20    Q.  Exhibit 4111, the one that has the
21  sticker SEC 134. The one that has a typed
22  written cover page.
23    A.  Yes, sir.
24    Q.  Is that copy -- do you believe that
25  copy to be the document I've marked as 2221?

Page 28

1    A.  I mean, I would obviously, I would
2  have to go through every single page, but it
3  appears to be the same.
4    Q.  Yes.
5        Do you know why there wasn't a copy
6  of the cover page on this copy that we see in
7  Exhibit 2221?
8    A.  No, I don't.
9    Q.  But was the copy that -- was the
10  collection of documents that you had during
11  your time at AHERF before the SEC took this
12  document, was it what we've marked as Exhibit
13  4111?
14    A.  This one here?
15    Q.  Yes.
16    A.  I believe it was, yes, sir.
17    Q.  It wasn't what I've marked as 2221?
18    A.  Well, okay --
19        MR. LUFT: Objection.
20    A.  I think that basically, I mean,
21  except if I went page by page, but basically
22  they're probably the same except for the cover
23  itself.
24    Q.  I believe there are some slight
25  differences.

Page 29

1    A.  Okay.
2    Q.  Which --
3    A.  That may be.
4    Q.  Which I can go through. They're
5  not significant.
6        But do you recall making a copy
7  that has SEC 134 on the top of it when the SEC
8  came in and took possession of the original?
9        MR. LUFT: Objection.
10    Q.  Do you recall making a copy at that
11  time?
12        MR. LUFT: Objection.
13    A.  I actually don't remember. I
14  think -- I did make a copy so I could have a
15  copy for my files. That's all.
16    Q.  Do you recall whether you had two
17  different collections of what is in substance
18  what we see in both of these documents?
19        Did you have two different
20  collections of them, or did you just have the
21  one binder that was bound?
22    A.  I think I just had the one. You
23  mean originally?
24    Q.  Yes. Before the SEC came in.
25    A.  Originally just the one.

8 (Pages 26 to 29)

Albert Zwirn

Page 58

1    the account number 500-022?
2         A.   Yes, sir.  Again, assuming that
3    it's a copy of the original, yes, sir.
4         Q.   Yes.
5              And do you recall whether or not
6    your binder always had a copy of this endowment
7    in it?
8              MR. LUFT:  Objection.
9         A.   I believe it did.
10             MR. TORBORG:  What's the nature of
11   the objection?
12             MR. LUFT:  In light of his caveat
13   that he doesn't know if this is the same what's
14   originally in his binder and to ask if he knows
15   that this is what was in his binder, it lacks
16   foundation and is unfair.
17        Q.   Do you see anything unfair about my
18   question?  Am I asking you an unfair question?
19        A.   No, sir.
20             MR. LUFT:  I don't think his
21   opinion on that matters.
22        Q.   Do you recall whether you added
23   this particular document to your binder?
24        A.   No, I don't believe I did, no, sir.
25        Q.   If we could go to Bates ending 2221

Page 59

1    through 2233.
2              Mr. Zwirn, do you recognize this
3    document?
4         A.   Again, I believe it's what was in
5    my binder, yes, sir, a copy of it.
6         Q.   Does it appear to be another copy
7    of the indenture agreement for account number
8    500-022?
9         A.   Again, without comparing it to the
10   original, yes, it does.
11        Q.   Do you believe that your binder
12   always had a copy of this --
13        A.   Yes, sir.
14        Q.   -- in the form that it is here?
15        A.   Yes.
16             MR. LUFT:  Objection.
17        Q.   You don't recall adding this
18   particular --
19        A.   No, sir.
20        Q.   If we would go, please, to the
21   collection that starts with Bates 2236 and goes
22   to 2237.  If you would flip through that
23   document, please.
24        A.   Yes, sir.
25        Q.   Do you recognize this document?

Page 60

1         A.   Again, I believe it was in the
2    binder, yes, sir.
3         Q.   Does it appear to be a copy of the
4    endowment agreement for account number 510-000?
5         A.   Yes, sir.  Again, you know,
6    assuming that it's a copy of the original, it
7    does, yes, sir.
8         Q.   Do you recall that this particular
9    agreement was in your binder --
10        A.   Yes, sir.
11        Q.   -- at all times?
12             MR. LUFT:  Objection.
13        A.   As far as I know it was, yes, sir.
14        Q.   Now, let me clean up something.
15             For all four of the trusts I've
16   gone through so far, do you recall adding any
17   missing pages at any point, recalling I'm
18   missing some pages, I need to add some?
19             MR. LUFT:  Objection.
20        A.   No, sir.
21        Q.   If we could flip, please, to Bates
22   ending 2240.  Actually, why don't we start with
23   2238.
24             Have you had an opportunity to look
25   at 2238?

Page 61

1         A.   Yes, sir.
2         Q.   Does this appear to be a similar
3    sort of form page to the other five trusts?
4         A.   Yes.  The other four, you mean?
5         Q.   This one for account 505-208, the
6    Lewis A. Park?
7         A.   When you say the other four, do you
8    mean --
9         Q.   Yes.
10        A.   -- similar to the other four you
11   mean?
12        Q.   Yes.
13        A.   Yes, sir.
14        Q.   Then if you look at the one page,
15   2240, does this appear to be missing some
16   pages --
17             MR. LUFT:  Objection.
18        Q.   -- of this particular document?
19   Can you tell from looking at this?
20             MR. LUFT:  You said looking at this
21   one page?
22        Q.   Yes, did it appear as though it's
23   not a complete copy of an endowment agreement,
24   Mr. Zwirn?
25        A.   Yes, sir.  Yes, sir.

16 (Pages 58 to 61)

Albert Zwirn

Page 62

1    Q.   Do you recall ever having concerns
2  that you may not have had a full copy of this
3  particular endowment agreement?
4    A.   No, sir.
5    Q.   You don't recall any discussions
6  with anyone --
7    A.   No, sir.
8    Q.   -- about that?
9    A.   No, sir.
10   Q.   Do you know if you had a full copy
11 of this particular trust agreement anywhere
12 else in your files?
13   A.   The only thing I had in my files
14 was that one binder.
15   Q.   Mr. Zwirn, if I could ask you, do
16 you recall ever having a discussion with anyone
17 about the availability of the increase in the
18 principal value of any of the five AHERF trusts
19 from the original contribution amount?  In
20 other words, the difference between the book
21 value -- I'm sorry, strike that.  Let me start
22 over.
23        Do you recall ever having any
24 discussions with anyone regarding the
25 availability to AHERF of the increase in value

Page 63

1  reported in the account number on the balance
2  sheet from the original contribution amounts
3  for any of the five AHERF trusts?
4    A.   The availability, you mean what?
5  I'm not sure what you mean.
6    Q.   Whether AHERF could get access to
7  those -- to that increase in value.
8    A.   I don't recall that specifically.
9    Q.   Do you recall ever having any
10 discussions with anyone about the availability
11 of monies from the Lockhart Trust other than
12 net income?
13   A.   Not specifically, no, I don't.
14   Q.   Do you remember anything generally?
15   A.   Not really.  I did the accounting
16 the same as I always did.
17   Q.   If AHERF's external auditors wanted
18 to get a copy of your binder that you
19 maintained, would you have given them a copy of
20 it?
21        MR. LUFT:  Objection.
22   A.   I probably would have just
23 mentioned it to my boss to make sure that it
24 was okay, but I don't see why there would have
25 been any objection.

Page 64

1    Q.   Do you recall who was your boss in
2  the time period of 1995 through 1997?
3    A.   I can't -- I honestly don't
4  remember.  I've had so many bosses, I don't
5  know.
6        No.  I think, from '95 to '97, it
7  may have been Mr. Will Barry at that time.
8        MR. TORBORG:  Now is probably a
9  good time to take a quick break.  We've been
10 going awhile.
11        THE VIDEOGRAPHER:  Off the record
12 at 1:33.
13        (Recess had.)
14        THE VIDEOGRAPHER:  On the record at
15 1:43.
16   Q.   Welcome back, Mr. Zwirn.
17        I've asked you to put your finger
18 on 2138, as well as 2146.
19        2138 I think we identified earlier
20 as the first page of what appears to be a copy
21 of the indenture agreement for account 500-007,
22 right?
23   A.   Yes, sir.
24   Q.   And if you go to 2146, please, I'm
25 going to be reading some language on the record

Page 65

1  on Article X, Roman X, are you with me there?
2    A.   Yes, sir.
3    Q.   That article provides, "In case of
4  securities taken or purchased for the trust
5  fund at a premium, the trust shall not be
6  required to set aside any part of the income
7  thereof as a sinking fund to retire or absorb
8  such premium or to make any other provision for
9  such depreciation in the value of the
10 securities constituting the trust fund by
11 reason of the approaching maturity of said
12 securities or otherwise.
13        "In case of the sale of any
14 securities of the trust fund at a premium or
15 profit, such premium or profit shall become a
16 part of the corpus and not income."
17        Do you recall discussing that --
18 any of the language that I just read into the
19 record with anyone specifically?
20   A.   No, sir.
21   Q.   Do you recall having discussions
22 with anyone about language in any of the five
23 trusts that we've looked at?
24   A.   I do not, no, sir.
25   Q.   Do you recall that effective for

17 (Pages 62 to 65)

Albert Zwirn

Page 70

1   Bates number ending 68 is titled AHERF or
2   Allegheny Health, Education and Research
3   Foundation Endowment Classes.
4         Then it lists some endowments on
5   the left-hand corner which include the five
6   AHERF trusts that we've talked about today.
7       A.   M-hm.
8       Q.   As well -- and on the far
9   right-hand column there's a column called
10  Original Contribution.
11      A.   Yes, m-hm.
12      Q.   And then some attachments starting
13  at Bates ending 70 through 74 that -- do these
14  appear to provide support for the contribution
15  amounts that are listed in that column on Bates
16  ending 68?
17      MR. LUFT:  Objection.
18      A.   I'm sorry, on what page, sir?
19      Q.   Bates ending 68.
20       Does it appear --
21      A.   You mean backup like?
22      Q.   Yes.
23      A.   I -- I don't know.  This is not
24  familiar to me.
25      Q.   Okay.  So you don't recall being

Page 71

1   involved in helping determine the original
2   contribution amount for the five AHERF trusts?
3       A.   I don't recall that specifically.
4   It's possible, but I don't recall it
5   specifically.
6       Q.   Yeah.  I guess what I'm trying to
7   ask is whether you were involved in the --
8   strike that.
9        Do you recall being asked to
10  provide information from the trust documents so
11  that others could come up with the contribution
12  amounts, the original contribution amounts of
13  the five AHERF trusts?
14      A.   I don't recall that specifically.
15      Q.   Do you know -- and if you don't
16  know, that's fine -- do you know if anyone from
17  Coopers & Lybrand, who was AHERF's external
18  auditor throughout much of the time you were
19  there, whether they knew that you had a copy of
20  trust agreements in your files?
21      A.   I don't know that.
22      Q.   You don't know?
23      A.   No, sir.
24      Q.   Did you ever have any
25  correspondence with anyone at Coopers & Lybrand

Page 72

1   throughout your entire time at AHERF?
2       A.   Not that I recall, no, sir.
3        You mean written correspondence,
4   that kind of thing?
5       Q.   No, just oral correspondence, any
6   discussions.
7       A.   Well, they used to come in, check
8   my work papers to make sure that the
9   endowment -- the principal agreed with the
10  trust statements and the income was the same.
11      Q.   Do you recall whether anyone from
12  Coopers & Lybrand ever asked to see your binder
13  of documents?
14      A.   I don't recall that.
15      Q.   Do you recall if anyone at Coopers
16  & Lybrand knew that you had a collection of
17  documents?
18      A.   I don't know that.
19      Q.   And when -- I'm sorry, so the
20  record is clear, when I say collection of
21  documents, I meant the --
22      A.   The binder.
23      Q.   The binder.
24      A.   I don't recall that.
25      Q.   Mr. Zwirn, do you have any contact

Page 73

1   with the three Lockhart trusts today?
2       MR. LUFT:  Objection.
3       A.   Today?
4       Q.   Yes.
5       A.   No.  No, sir.
6       Q.   You're not involved in the
7   accounting for those today?
8       A.   No.  That ended -- the three of the
9   five from those five that you originally talked
10  about?  Yes.  No.  The accounting for that?
11      Q.   M-hm.
12      A.   I stopped that around the fall of
13  1990.
14      MR. TORBORG:  Mr. Zwirn, I have no
15  further questions at this time.  I appreciate
16  your time and patience.
17      EXAMINATION OF ALBERT ZWIRN
18  BY MR. LUFT:
19      Q.   Mr. Zwirn, if you would just give
20  me a brief second.
21      A.   Sure.
22      Q.   Stay on the record.  I'll check if
23  I have anything I would like to ask you about.
24      Mr. Zwirn, you mentioned your black
25  binder.  I believe Mr. Torborg asked you how it

19 (Pages 70 to 73)

Albert Zwirn

---

Page 74

1  was held together.
2      A.   Yes, sir.
3      Q.   I think you said some type of metal
4  fastener.
5      A.   Yes, sir.
6      Q.   Now, when you say, I'm just trying
7  to understand, is that the type of metal
8  fastener that you could stick through paper and
9  open up and close?
10     A.   Yes, sir.
11     Q.   So you could open it up, take
12 things out, close it?
13     A.   Yes, sir.
14     Q.   And just to be clear, I think
15 you've said a number of times this morning that
16 you stopped working on the accounting for the
17 Lockharts in the fall of 1990?
18     A.   Yes, sir.
19     Q.   I know you said you didn't recall
20 ever speaking to Coopers & Lybrand about the
21 Lockharts, but if, perhaps, you had a
22 conversation about work papers regarding
23 Lockhart, such as the time you mentioned about
24 Coopers & Lybrand, that would have been
25 sometime before the fall of 1990?

---

Page 75

1      A.   Yes, sir.
2          MR. LUFT:  I have no further
3  questions.
4          MR. TORBORG:  I have no follow-up.
5  Thanks again.
6          THE VIDEOGRAPHER:  Off the record
7  at 1:58.
8
9          (Deposition concluded.)
10             - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 76

1              CERTIFICATE
2  The State of Ohio,  )
3                     SS:
4  County of Cuyahoga.  )
5
6          I, Michele Eddy, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, ALBERT ZWIRN,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19         I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

---

Page 77

1          I do further certify that I am not a
2  relative, counsel or attorney for either party,
3  or otherwise interested in the event of this
4  action.
5          IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this       day of
8          , 2003.
9
10
11
12
13
14     Michele Eddy, Notary Public
15     Within and for the State of Ohio
16
17 My commission expires May 22, 2005.
18
19
20
21
22
23
24
25

---