**INTERROGATORY NO. 3**:  Identify each and every alleged material misstatement that you contend was made in the audited financial statements of AHERF and/or its affiliates on which C&L opined for fiscal year 1996, and state each and every reason why you contend that such statement is untrue.

**RESPONSE:**  The Committee incorporates by reference each of its General Objections. The Committee also objects to this interrogatory on the ground that it is overly broad and unduly burdensome in its request that the Committee state "each and every reason" supporting its contentions regarding the material misstatements in the referenced audited financial statements. The reasons supporting the misstatements will be the subject of expert reports and testimony and are reflected in documents, testimony, and accounting and auditing standards too extensive to catalogue practicably here.  C&L's position as AHERF's auditor provides PwC with detailed knowledge of the misstatements and the reasons therefor.  The Committee understands this interrogatory to call for an identification of material misstatements in the audited financial statements themselves and not any misstatements in C&L's accompanying audit opinions or reports, and the Committee answers accordingly.  Subject to and without waiving its objections, the Committee states that, in the aggregate, AHERF's audited consolidated statement of operations for the fiscal-year 1996 overstated net income by approximately $100 million.  The audited consolidated balance sheet overstated unrestricted net assets and temporarily restricted net assets at June 30, 1996, by more than $70 million and $50 million, respectively.  These material misstatements on AHERF's audited consolidated financial statements were derived from the individual and grouped misstatements described below.

- ***Failure to provide properly for uncollectible patient accounts receivable***

    The fiscal-year 1996 audited financial statements for DVOG understated bad debt reserves for patient accounts receivable by approximately $30 million.  C&L, in auditing those statements, failed to request that AHERF's Delaware Valley Obligated Group ("DVOG") reduce

- 10 -

patient accounts receivable to net realizable value or failed to qualify its opinion on the 1996

statements in this regard when any such request was disregarded. C&L knew that the DVOG

hospitals utilized varying and inconsistent methodologies for setting bad debt reserves, and C&L

knew that these methodologies were unreasonable and did not follow relevant accounting

guidelines for development of a reasonable estimate of the net realizable value of the receivables.

For example, C&L permitted the bad debt reserve methodology used by the

Medical College of Pennsylvania Hospital ("MCPH") and the Eastern Pennsylvania Psychiatric

Institute ("EPPI") even though C&L knew that the methodology calculated reserves only on self-

pay receivables and the patient portion of other payor classes (*i.e.*, co-payments and deductibles)

and did not estimate bad debts for millions of dollars of doubtful receivables owed by third-party

payors. The reserving methodologies used at the other DVOG hospitals, including Hahnemann

University Hospital ("HUH"), St. Christopher's Hospital for Children ("SCHC"), Bucks County

Hospital ("Bucks"), and Elkins Park Hospital ("Elkins"), were flawed as well. At these hospitals,

the reserve percentages on certain aging-by-payor buckets, particularly for accounts greater than

180 days old, were too optimistic, unjustifiable, and inconsistent with actual results and industry

norms. These unreasonable bad debt methodologies contrasted with the more reasonable

methodology utilized by Allegheny General Hospital ("AGH"), an AHERF hospital that had

better controls in writing off doubtful accounts, better billing and collection practices, and a less

stringent payor mix from which payments arrived more reliably. While C&L preferred the

methodology used by AGH and recommended that AHERF apply that or a similar methodology

to the DVOG hospitals, C&L performed no analytics in its 1996 audit work to assess DVOG's

reserves using the AGH methodology although it had done so in its fiscal-year 1995 audit work.

C&L knew these facts (and also knew that it had not performed satisfactory testing), but

- 11 -

nonetheless accepted the DVOG hospitals' bad debt reserve percentages and the insufficient reserves that those percentages generated.

C&L knew that the bad debt reserves on the DVOG hospitals' books at fiscal-year-end 1996 were significantly understated. But instead of insisting that AHERF increase the reserves to a reasonable level, C&L agreed to or acquiesced in an effort to conceal the bad debt reserve shortfall. C&L agreed to overlook the bad debt reserve shortfall if AHERF made adjustments to bad debt reserves at year-end 1996 totaling a wholly insufficient $17.5 million and AHERF also agreed to "correct" the 1996 bad debt reserve shortfall in future years.

The $17.5 million of adjustments was not determined by any principled, reasoned, or factually supported analysis of needed bad debt reserves, and the manner in which they were recorded improperly avoided a negative impact on DVOG's reported net income. As C&L knew, the $17.5 million of balance-sheet credits were created through a number of inter-account transfers, most of which, as discussed below, violated GAAP and served to improperly understate DVOG's bad debt expense for fiscal-year 1996. The audited financial statements, in final form, did not even properly disclose the $17.5 million increase to bad debt reserves.

Applying a bad debt reserving methodology that was reasonable for the age and condition of the subject receivables and for the DVOG hospitals' collection experience, market, and operational deficiencies would have called for an additional adjustment of approximately $30 million as of June 30, 1996.

- ***Misstatements relating to gains on irrevocable trusts***

In implementing Statement of Financial Accounting Standards Nos. 116, 117, and 124 for fiscal-year 1996, AHERF's audited financial statements misclassified the realized and unrealized gains on five trusts, J.M. Lockhart No. 500-007, J.M. Lockhart No. 500-017, J.M. Lockhart No. 500-022, E.A. Oliver No. 510-000, and Lewis A. Park No. 505-208 (collectively,

- 12 -

"AHERF Irrevocable Trusts"), upon which AHERF had become the sole income beneficiary. The trust documents provided that gains from the sale of trust assets were to be added to the trusts' corpus and were not to be considered income. None of the trusts permitted use of trust corpus by AHERF.

By the close of the fiscal-year 1996 books, the audited financial statements misclassified approximately $29 million of realized and unrealized gains related to the five trusts as "unrestricted" net assets. This $29 million included over $15 million of current-year and prior-year realized and unrealized gains that were improperly included in AHERF's fiscal-year 1996 net income. In addition, as of June 30, 1996, the audited financial statements misclassified on the balance sheet nearly $53 million of trust assets as "temporarily restricted" net assets. By its review of trust documents or the review it should have undertaken, C&L knew or should have known that the "unrestricted" classification could not be supported by the language of the trust. C&L knew or should have known, too, that the "temporarily restricted" classification was baseless and that it was selected to create a "cushion" with which to improve earnings in future years. C&L passed on these classifications just the same.

- ***Use of cushions relating to third-party settlement accounts***

C&L was aware that the fiscal-year 1996 audited financial statements were, in significant part, the product of improper "earnings management." Earnings management is the deceptive practice of moving or shifting income and expenses between different financial-reporting periods to "cushion" against or "soften" downturns in real earnings. AHERF continually tallied the amount and nature of "general reserves" or "cushions" through "Analysis of Reserves" schedules, referred to by some within AHERF as "the X-files." Particularly at the DVOG entities, AHERF essentially emptied the reserve "cookie jar" during fiscal-year 1996.

- 13 -

C&L knowingly acquiescenced in this earnings management, further masking a decline in operational performance during this fiscal year at the DVOG entities.

Manipulations in contractual rate adjustment ("CRA") accounts supplied some of this improper cushion. CRA accounts were supposed to reflect reasonably estimated liabilities and receivables owed between AHERF hospitals and various third-party payors. Going into fiscal-year 1996, the audited financial statements unreasonably overestimated amounts that the hospitals would have to repay to the payors, failed to reduce CRA reserves despite information that the obligations were no longer probable, and/or failed to recognize favorable settlements as revenue. Reversing these cushion reserves in fiscal-year 1996 inappropriately increased fiscal-year 1996 earnings by approximately $25 million.

C&L allowed CRA cushion accounting by failing to require substantiation under GAAP for large CRA accruals. Indeed, when cushions were found or created through other, non-CRA related accounts, both AHERF and C&L proposed moving, and often did move, these cushions into CRA accounts.

Because there were no legitimate bases for certain CRA-related accruals as of June 30, 1995, the reversal of these accruals during fiscal-year 1996 should have been reflected as prior-period adjustments. Instead, the reversal of the accruals improperly inflated reported revenues or improperly covered unrelated expenses in 1996. Examples of these CRA account manipulations follow.

First, the audited financial statements carried over into fiscal-year 1996 approximately $13.4 million of unrecognized income on HUH's books attributable to a favorable Medicare reimbursement determination that HUH received relating to its Graduate Medical Education ("GME") program. The determination served to increase the amount that Medicare

- 14 -

owed HUH on settled cost reports from 1985-1991 by approximately $7.4 million, and AHERF
projected a favorable impact of at least $6 million for open cost-reporting years. As noted in
C&L's workpapers, HUH should have recognized, but did not recognize, approximately
$13.4 million of revenue during fiscal-year 1995 resulting from the favorable determination.
Instead, $7.4 million of the amount was parked in an account called "other non-current
liabilities." The remaining $6 million was unrecorded. During fiscal-year 1996, as C&L knew,
the $7.4 million "other non-current liabilities" reserve, created the previous fiscal year, was
reversed into income as a part of a series of 1996 adjustments booked to meet budgeted earnings
targets.

Second, throughout fiscal-years 1994 and 1995, HUH carried a large liability
balance in its fiscal-year 1994 Medicare CRA account. The balance totaled approximately
$13.5 million as of June 30, 1995. This amount closely approximated the amount of "prior year
CRA" reserves at HUH on contemporary AHERF "X-files," and witnesses have admitted that
these amounts were cushions. During fiscal-year 1996, the $13.5 million credit balance was
reduced to a credit balance of less than $125,000. This reduction in the accrual was not used to
cover any settlement relating to the fiscal-year 1994 cost report, its stated intention. Instead, the
reduction in accrual was used, in part, as a cushion to cover unfavorable (but not-accrued-for)
developments that occurred during fiscal-year 1996, thereby inflating patient revenue during
fiscal-year 1996 and violating GAAP and the accounting policies set forth in the footnotes to the
audited financial statements.

Third, the audited financial statements carried over into fiscal-year 1996
unneeded liability balances of approximately $1.3 million and $1 million in HUH's 1993 and
1994 Blue Cross CRA accounts, respectively. As of June 30, 1995, there were no legitimate

- 15 -

bases for these accruals under GAAP. As noted in C&L's workpapers, these "reserves" were reversed during the last quarter of fiscal-year 1996. Reversals of these reserves inflated revenues and reduced unrelated expenses.

Fourth, the audited financial statements carried over into fiscal-year 1996 unneeded liability balances totaling approximately $2.3 million in MCPH's 1990 through 1993 Blue Cross CRA accounts. Over $2 million of the credit balance was carried in the 1990 account. As of June 30, 1995, there were no legitimate bases for these accruals under GAAP. These accruals were reversed during fiscal-years 1996 and 1997 to increase income or cover unrelated expenses, in the amounts of approximately $1.7 million and $600,000, respectively.

Fifth, the audited financial statements carried over into fiscal-year 1996 an unneeded credit balance in a SCHC 1992 Medicaid CRA account of approximately $1.9 million. As of June 30, 1995, there was no legitimate basis for the accrual under GAAP. This amount, plus a final settlement of over $800,000 that SCHC received from Medicaid on the 1992 Medicaid cost report, was utilized to increase SCHC's allowances for doubtful accounts — together constituting $2.7 million of the aforementioned year-end $17.5 million adjustment to the DVOG hospitals' bad debt reserves rather than charging SCHC bad debt expense.

- ***Recognition of contingent gains relating to third-party settlement accounts***

C&L knew that a second component of the $17.5 million adjustments was enabled by the recording of $4 million of additional debit (receivable) balances on HUH Medicare CRA accounts for the fiscal-years 1990 through 1993. Since the Medicare fiscal intermediary had not agreed to reopen the cost reports to consider HUH's position that it was entitled to additional GME and Indirect Medical Education reimbursement relating to its residency programs, these contingent gains should not have been recorded. The testimony of the C&L specialist charged with auditing the CRA accounts indicated the contingent gains should

- 16 -

not have been recorded. Nonetheless, AHERF recorded the receivables as a way to generate

additional bad debt reserves without incurring a charge to the income statement, but C&L did not

qualify its opinion.

- ***Use of prior-year credit balances contained in Periodic Interim Payment accounts to increase patient revenue***

    At the end of fiscal-year 1995, the DVOG hospitals, collectively, carried large

credit balances in their Periodic Interim Payment ("PIP") clearing accounts. This was

particularly true at HUH with respect to Medicare-related PIP accounts, for which HUH carried a

net credit balance of more than $14 million. During fiscal-year 1996, credit balances contained

in HUH's Medicare 1992 and 1993 PIP clearing accounts, totaling approximately $5.4 million at

year-end 1995, were used to boost reported patient revenues at HUH. Because the PIP accounts

should not involve an "estimate" — particularly with respect to older PIP clearing accounts like

the 1992 and 1993 Medicare accounts — the reversals of amounts in HUH's Medicare 1992 and

1993 PIP clearing accounts should have been treated as prior-period adjustments instead of

income earned in 1996.

- ***Use of prior-year interest expense to avoid bad debt expense and otherwise increase earnings***

    AHERF and its affiliates' audited financial statements did not always capitalize

interest on construction-in-progress, as required under GAAP. Apparently at the suggestion of

C&L, which was aware of the failure to capitalize interest, AHERF reversed this treatment at the

end of fiscal-year 1996 and capitalized current and certain prior-year interest costs in the

amounts of $4.5 million for the DVOG entities and over $7 million for AGH. Two million

dollars of the DVOG capitalized interest and approximately $6.5 million of the AGH capitalized

interest related to fiscal years before 1996.

- 17 -

AHERF used $2 million of previously unrecorded prior-year interest costs to create additional bad debt reserves as part of the year-end $17.5 million adjustments to the DVOG hospitals' bad debt reserves. This improper accounting treatment, of which C&L was aware, violated GAAP because the retroactive capitalization of prior-year interest expense should have been treated as a prior-period adjustment, and the increase in bad debt reserves should have been charged against 1996 income.

In conjunction with capitalizing over $7.1 million of AGH interest expense, the audited financial statements placed a cushion of approximately $7.1 million in AGH's CRA accounts. As C&L knew, this treatment violated GAAP and was done simply to create another cushion on the books. Instead of carrying over the entire $7.1 million as a future-year cushion, the audited financial statements should have recorded the amount of capitalized interest relating to prior years, approximately $6.5 million, less an appropriate amount of accumulated amortization, as a prior-period adjustment. Moreover, the audited financial statements failed to reflect the capitalization of approximately $600,000 of interest costs incurred in fiscal-year 1996. These statements also failed to reflect approximately $1.5 million of accumulated amortization on the $7.1 million figure. There was also no reasonable basis for C&L to include the entire $7.1 million as a positive income adjustment on their 1996 SUD.

The fiscal-year 1997 audited financial statements improperly inflated AGH patient revenue by approximately $4 million through reversals from the illegitimate AGH CRA cushion.

- ***Use of cushions relating to accumulated depreciation accounts***

C&L knew that another piece of the $17.5 million year-end adjustments was enabled by the improper "reclass" of $6 million of "excess accumulated depreciation" reserves. As noted in C&L's workpapers, $5 million of the depreciation reserves, $2.5 million from MCPH

- 18 -

and $2.5 million from AUHS, were known to include excessive amounts as of June 30, 1995. Like many other cushions used to increase the 1996 bottom line, the existence of depreciation cushions was no secret to C&L. These cushions were listed in contemporaneous "X-files" (as "PP&E Reserves") and other AHERF documents, and were largely identified in C&L's workpapers. Accordingly, the reversal of these known cushions should have been treated as prior-period adjustments in the audited financial statements.

AHERF reversed $5 million of accumulated depreciation ($2.5 million each from MCPH and AUHS), and increased bad debt reserves by $5 million without charging earnings.

An additional $1 million worth of reclassified accumulated depreciation reserves came from HUH. This $1 million appears to have been related to excess current-year depreciation expense. For this amount, the audited financial statements should have reflected decreased depreciation expense and increased bad debt expense.

C&L concluded that AHERF did not provide support for its conclusion that all $6 million of accumulated depreciation reserves used to increase bad debt reserves were excessive. C&L therefore proposed a SUD entry to increase bad debt expense in the amount of $2.2 million.

Other excessive accumulated depreciation reserves were also used during fiscal-year 1996, before the $17.5 million of year-end adjustments, to create bad debt reserves. These reclassifications were in the amounts of approximately $1.1 million at SCHC, approximately $600,000 at Elkins, and approximately $1 million at Bucks. Because these adjustments utilized liability accruals with no legitimate bases under GAAP as of June 30, 1995, the elimination of these reserves during fiscal-year 1996 should have occasioned prior-period adjustments on the

- 19 -

audited financial statements, and bad debt expense should have been charged in 1996 when the bad debt reserves were recorded.

- ***Recording of equity ownership in Health Partners during fiscal-year 1996***

Before fiscal-year 1996, MCPH and SCHC failed to record approximately $4.8 million of undistributed equity in Health Partners, as required by GAAP. This failure was noted in C&L's 1995 SUD. When that equity ownership was recorded during 1996, as C&L knew, it should have been treated as a prior-period adjustment in the audited financial statements because the failure to record the equity in prior years was an error. Instead, the amount was used to increase net income during fiscal-year 1996.

- ***Use of cushions in corporate services accrual accounts***

The audited financial statements carried over into fiscal-year 1996 an unneeded liability accrual of approximately $6.5 million in a "corporate services accrual" account on the parent company's books. As of June 30, 1995, C&L's own workpapers reflected that there was no legitimate basis for the accrual under GAAP. The amount of accrual decreased by nearly $6 million during fiscal-year 1996, and was utilized to cover a variety of costs incurred in fiscal-year 1996, which costs improperly were not charged against earnings. Since the accrual in the account as of June 30, 1995 was an error, reversals from that account during fiscal-year 1996 should have been treated as prior-period adjustments in the audited financial statements.

At fiscal-year-end 1997, the audited financial statements carried a balance of over $2 million as cushion in the parent-level corporate services accrual account. This balance largely emanated from the transfer of a similar cushion from the AGH corporate services accrual account, an amount carried over with no legitimate basis from the 1995 and 1996 audited financial statements. Because there was no basis for this account under GAAP, and because the

- 20 -

accrual was derived from AGH's books, the amount should have been removed from AHERF books and treated as a prior-period adjustment.

- ### *Use of HUH inventory cushion*

    The audited financial statements carried over into fiscal-year 1996 an unneeded cushion of approximately $1.5 million in an inventory account. One million dollars of this accrual was used during fiscal-year 1996 to reduce improperly Materials, Supply and Services expense, and the remaining amount was utilized during fiscal-year 1997 to cover improperly a portion of Health Partners' deficits. Since the existence of the accrual at June 30, 1995 was an error, the reversal of these accruals during fiscal-years 1996 and 1997 should have been treated as prior-period adjustments.

- ### *Recognition of gain on sale and leaseback transaction*

    During fiscal-year 1996, AGH improperly recognized a gain of approximately $6.7 million related to the sale of the IBM Building. As noted in C&L's workpapers and on its 1996 SUD, the gain should have been amortized and deferred over the period of the lease as required by sale/leaseback accounting under GAAP. Moreover, the audited financial statements failed to reduce the improperly recorded gain by the amount of "improvements" to the building paid for by AGH, an amount of approximately $1.5 million.

- ### *Failure to record expenses related to tort settlements*

    During fiscal-year 1996, the audited financial statements failed to expense amounts of $3.3 million and $1.6 million related to tort settlements with former AHERF employees Iqbal Paroo and Carol Calvert, respectively. Under GAAP, costs related to the settlement of tort claims should be expensed in the year incurred. Instead, with the acquiescence of C&L, the amounts were capitalized as "other assets" under the theory that the settlements contained "covenants not to compete" that somehow provided future benefits to AHERF.

- 21 -

Classification of the payments as "other assets" was not justified by any "noncompete" provision in the settlement agreements. Both settlements made clear that the settlement amount was specifically tied to the settlement of a disputed tort claim. The only noncompete language contained in the separation agreements related or referred to conditions to payment from long-term incentive plans, pension plans, executive retirement accounts, and flexible benefit plans held for Mr. Paroo or Ms. Calvert, funds that had nothing to do with the settlement payments. The misstatement contained in the audited financial statements would be offset by approximately $500,000 and $1 million of amortization expense recognized on the "other assets" in fiscal-years 1996 and 1997, respectively.

- ***Overstated patient revenue and patient accounts receivable through the failure to properly contractualize accounts***

As of June 30, 1996, the DVOG hospitals carried approximately $5 million of inpatient accounts receivable on their balance sheets that had not been properly reduced or "contractualized" to reflect the amounts that third-party payors would actually pay for services provided. C&L was aware of these "accounts at gross." The audited financial statements should have reflected an accrual to properly reduce revenue and receivables accordingly.

- ***Improper recognition of investment gains***

In adopting Statements of Financial Accounting Standards Nos. 117 and 124 during fiscal-year 1996, AHERF made a determination that donor restrictions on nearly $3 million of investments held by SCHC had expired in earlier years. However, instead of recording the expiration of the restrictions through a prior-period adjustment, the audited financial statements improperly included the roughly $3 million sum as income in fiscal-year 1996.

- 22 -

- ***Failure to disclose violation of debt covenants and their ramifications***

     *See* Answer to Interrogatory No. 6.

- ***Items included on the C&L Summaries of Unadjusted Differences (SUDs)***

     The Committee anticipates that the reports of its experts may also indicate that the fiscal-year 1996 and 1997 financial statements were materially misstated for reasons identified in C&L's SUDs for the fiscal-years 1995, 1996, and 1997, including but not limited to the areas of malpractice, workers' compensation, and pension liabilities.

     **INTERROGATORY NO. 4**:   Identify each and every alleged material misstatement that you contend was made in the audited consolidated financial statements of AHERF on which C&L opined for fiscal year 1997, and state each and every reason why you contend that such statement is untrue.

     **RESPONSE:** The Committee incorporates by reference each of its General Objections. It also incorporates by reference the objections set forth in its response to Interrogatory No. 3. Subject to and without waiving its objections, the Committee states that, in the aggregate, AHERF's audited consolidated statement of operations for fiscal-year 1997 overstated net income by more than $140 million and the audited consolidated balance sheet overstated unrestricted net assets at June 30, 1997 by more than $220 million.  These material misstatements on AHERF's consolidated audited financial statements were derived from the individual and grouped misstatements described below and in the Committee's response to Interrogatory No. 3.

- ***Failure to provide properly for uncollectible patient accounts receivable and Health Partners' deficits and the improper transfer of reserves from the Graduate hospitals to the DVOG hospitals***

     Throughout fiscal-year 1997, AHERF's Patient Financial Services Group wrote off of the DVOG hospitals' books a large amount of old receivables that both this Group and the

PII-1102058v1

general accounting department agreed were uncollectible. In large part, these were the same old (and largely worthless) accounts that were inadequately reserved at the end of fiscal-year 1996.

AHERF was faced with a huge bad debt reserve shortfall during fiscal-year 1997 at its DVOG hospitals in an amount that AHERF calculated to approximate $75 million. Some of the bad debt reserve accounts had even moved into debit positions after write-offs of worthless accounts had exhausted existing bad debt reserves.

Because a considerable portion of the bad debt reserve shortfall was known by both AHERF finance department personnel and C&L to have existed during the preparation and finalization of the 1996 audit, GAAP required a restatement of the fiscal-year 1996 DVOG audited financial statements. Also, the 1997 audited financial statements should have included an additional charge to bad debt expense to rectify the amount of shortfall attributable to fiscal-year 1997. Even if the entirety of the shortfall at June 30, 1997 was attributable to a "change in accounting estimate" (and it was not), GAAP required a charge to bad debt expense to rectify the entire shortfall.

None of this was done. Instead, with C&L's participation, the shortfall was improperly "fixed," but even then only partially, by transferring $50 million of bad debt reserves created in conjunction with the acquisition, and on the books, of former affiliates of the Graduate Health System ("GHS") to the bad debt reserve accounts of the DVOG hospitals. As C&L knew, this $50 million of reserves was created for the sole purpose of back-filling the bad debt reserve shortfall at the DVOG hospitals. From the outset, C&L improperly justified and allowed the transfers by rationalizing that, when "viewed on a consolidated basis," the fraudulent reserve transfers would be "immaterial" to the consolidated audited financial statements.

- 24 -

Given the green light by C&L to resolve bad debt reserve shortfalls at DVOG (without negative income-statement impact) through reserve transfers from other entities in other obligated groups, AHERF transferred another roughly $20 million of reserves from the Graduate hospitals to the bad debt reserve accounts of the DVOG hospitals. These transfers were not hidden from C&L. Such activity in the bad debt reserve accounts was reflected in the bad debt reserve rollforward schedules provided to C&L.

In addition to these transfers, AHERF transferred $1.2 million of reserves from these Graduate hospitals to the DVOG hospitals to cover deficits incurred at Health Partners, a shortfall that should have been remedied by a charge to expense.

- *Improper transfer of reserves from the Graduate hospitals to increase patient revenue*

With C&L's approval of intercompany and inter-obligated-group reserve transfers in hand, AHERF transferred yet another $28.3 million of excessive acquisition reserves from the books of the Graduate hospitals to the books of the DVOG hospitals to reduce net contractual allowance expense recorded on the DVOG hospitals' statements of operations. These transfers, like their predecessors, violated GAAP.

Again, these transfers could not have escaped C&L's attention. Indeed, AHERF representatives informed C&L auditors of at least some of the reserve transfers used to reduce contractual allowances at the DVOG hospitals.

- *Improper use of reserves from the Graduate Hospitals to increase patient revenue*

AHERF also used $6.5 million of excess acquisition reserves on the books of the Graduate hospitals to similarly reduce net contractual allowance expense on the books of Graduate and Rancocas hospitals in fiscal-year 1997.

- 25 -

- ***Overstated patient revenue and patient accounts receivable through the failure to properly contractualize accounts***

Between July and September 1997, before the issuance of the audited financial statements for fiscal-year 1997, AHERF determined and informed C&L that it was necessary to further reduce gross patient receivables at the DVOG hospitals to the actual net realizable (and contractually agreed-upon) value. But instead of properly treating this as a reduction of revenue in fiscal-1997 — and to thereby properly account for patient revenue — the missed contractual allowances were treated on the September 30, 1997 Statement of Changes in Net Assets as a "valuation allowance" in the amount of more than $23 million.

While there may have been some internal disagreement regarding the precise amount of unreserved missed contractual allowances that related to accounts billed prior to June 30, 1997, the amount was undoubtedly material. Under GAAP, an adjustment of at least $10 million should have been recorded in the 1997 audited financial statements to reduce the subject accounts receivable to their contractually agreed-upon value.

- ***Misstatements relating to opening balance sheet accounts of acquired entities***

As C&L was aware, AHERF created reserves in accounting for the acquisition of the Graduate hospitals that had no legitimate basis under GAAP. In addition to the $50 million of reserves created specifically for transfer to the DVOG hospitals' bad debt reserve accounts, AHERF set up "contingent liability" reserves through purchase accounting at the various Graduate hospitals. These reserves were created for ill-defined reasons and were not quantified in any demonstrable way. C&L's workpapers even referred to them as "cushions." A considerable portion of these reserves was used to improve inappropriately reported net income during 1997 (*see* infra), while some amounts improperly remained in the audited financial statements for use as cushions in future years.

- 26 -

In addition, AHERF established numerous reserves on the books of the Graduate hospitals before those hospitals were officially brought into the AHERF system. These reserves had no legitimate basis under GAAP. The lack of any real need for many of these reserves — including reserves for "PFMA," prudent buyer, "MA receivables," "Hill-Burton," bad debt, contractual allowance, and additional pension, workers' compensation, and malpractice liability — is evidenced by the fact that many of these reserves were transferred to the books of the DVOG hospitals. The existence of these reserves on the hospitals' books upon their entry into the AHERF system represent additional misstatements contained in the audited financial statements.

Additionally, in accounting for the acquisition of the Forbes Health System, AHERF set up approximately $10 million of reserves with no legitimate basis in GAAP. Most of this amount was placed into a "corporate services accrual" account. Both AHERF and C&L documents referred to the amount as "cushion."

- ***Misstatements relating to gains on AHERF Irrevocable Trusts***

During fiscal-year 1997, the audited financial statements incorrectly recognized more than $54 million of revenue from assets released from restrictions and investment income relating to improper accounting for the AHERF Irrevocable Trusts. At the end of fiscal-year 1997, approximately $86 million and $12 million of realized and unrealized gains relating to AHERF Irrevocable Trusts were misclassified on the balance sheet as "unrestricted" net assets and "temporarily restricted" net assets, respectively. They should have been classified as "permanently restricted" net assets.

- ***Improper accounting for intercompany loans***

AHERF repeatedly utilized liquid investments from its Western enterprises, specifically AGH, to fund money-losing operations throughout the AHERF System, specifically

- 27 -

hospitals in its Eastern region. These repeated intercompany transfers led to an outstanding

balance, at the end of fiscal-year 1997, of approximately $114 million owed by other affiliates to

AGH. The consolidating balance sheet did not properly account for and classify these

intercompany loans on the AGH column of that balance sheet. Instead, the balance sheet, with

C&L's full knowledge, participation, and encouragement, classified the $114 million of

intercompany receivables as "Assets limited or restricted as to use," despite a separate line on the

balance sheet for "Due from affiliates." As C&L knew, this change in the presentation on the

balance sheet was designed to conceal the extent to which AGH's liquid assets had been

depleted.

- ***Improper recognition of depreciation recapture revenue***

   The audited financial statements improperly included $7 million of income

relating to Medicare depreciation recapture filings on the books of Forbes Hospital System and

Allegheny Valley Hospital. As noted in C&L's workpapers, these contingent gains should not

have been recorded since there was considerable doubt about the ability of the hospitals to

recover on the recapture claims. In addition, C&L's engagement team ignored the guidance from

its technical specialist that if the recapture claims were recorded, they should be treated as assets

obtained in the mergers.

   The establishment through purchase accounting of the above-mentioned

"cushion" in the corporate services accrual account at Forbes to "reserve" against the contingent

nature of the recapture receivables, an idea that appears to have started with C&L, was not a fair

or appropriate way of avoiding a material misstatement, inasmuch as the reserve was recorded

through purchase accounting, with no charge against income.

- 28 -

- ***Improper recognition of deferred revenue***

     The audited financial statements improperly recognized approximately $10 million of deferred revenue on the books of Graduate Hospital, Parkview Hospital, and City Avenue Hospital relating to a contract with Qualmed (formerly known as Greater Atlantic). Because AHERF determined these entities had no future obligations under the Qualmed contract, the deferred revenue liability should have been removed through a purchase price adjustment.

- ***Use of cushions carried over into fiscal-year 1997 to distort earnings***

     *See* Answer to Interrogatory No. 3, under the headings "Use of cushions relating to third-party settlement accounts," "Use of prior-year interest expense to increase earnings," "Use of cushions in corporate services accrual accounts," and "Use of HUH inventory cushion."

- ***Effect of fiscal-year 1996 errors***

     Many of the alleged misstatements relating to the fiscal-year 1996 audited financial statements described in the Answer to Interrogatory No. 3 impact the fiscal-year 1997 financial statements.

- ***Failure to disclose violation of debt covenants and their ramifications***

     *See* Answer to Interrogatory No. 6. In addition to the debt-covenant violations discussed in the Answer to Interrogatory No. 6, the audited financial statements should have properly disclosed the ramifications of the Centennial Obligated Group's failure to meet the minimum Historical Debt Service Coverage Ratio covenant contained in Section 6.3 of the Master Trust Indenture governing the long-term bond debt associated with the Centennial Obligated Group. Because the Centennial Obligated Group failed to achieve a Historical Debt Service Coverage Ratio of a least 1.0:1.0, the retention of a consultant could not cure non-compliance with the covenant. Non-compliance with a historical covenant predicated on past financial performance cannot be "cured."

- 29 -

PII-1102058v1

C&L possessed correspondence between the Bond Trustee and Master Trustee for the outstanding debt, First Union National Bank, and AHERF reflecting that First Union informed AHERF that failure to achieve at least a 1.0:1.0 ratio was an Event of Default. Moreover, First Union did not grant the Centennial Obligated Group a waiver of non-compliance with the covenant. Nor, in any case, did the Centennial Obligated Group retain an independent consultant (it purported to hire AHERF). Despite these circumstances, the audited financial statements neither classified the associated debt as a current liability, nor disclosed the disagreement regarding the ramifications of the failure to achieve at least a 1.0:1.0 ratio or the potential for challenging whether AHERF could serve as a suitable consultant. Given the circumstances, the debt should have been classified as a current liability, and/or a separate disclosure of First Union's position that an Event of Default had occurred should have been provided in the financial statements.

**INTERROGATORY NO. 5**:  Identify each and every "affirmative action" that AHERF's "innocent Trustees" "could and would have taken" as contended in paragraph 30 of the First Amended Complaint, including but not limited to: (a) which Trustee(s) are "innocent Trustees"; (b) the information of which each "innocent Trustee" was unaware; (c) which Trustee(s) could and would have taken affirmative action; (d) what affirmative action could and would have been taken by such Trustee(s); (e) when such affirmative action could and would have been taken; (f) what the effect of such affirmative action would have been; (g) how such affirmative action could and would have brought "the wrongdoing to an end" and "halt[ed] the decline of AHERF"; and (h) which "wrongdoers" could and would have been "remove[d]".

**RESPONSE:** The Committee incorporates by reference its General Objections. The Committee also objects to this interrogatory on the ground that it is overbroad and unduly burdensome to the extent that it requests information about "each and every" step that the Trustees could and would have taken. The Committee further objects to this interrogatory because information responsive to these queries has been the subject of extensive testimony from the Trustees themselves and from other fact witnesses and will be the subject of expert testimony, as well.  Subject to and without waiving its objections, the Committee states as

- 30 -

financial statements also would have disclosed that DVOG was in violation of the Historical Debt Service Coverage Ratio covenants set forth in Section 6.3 of the DVOG Master Trust Indenture and Section 3.21 of the First Supplemental Master Trust Indenture.

DVOG's violations of the Historical Debt Service Coverage Ration covenants would also have constituted an Event of Default under: (i) Section 2.3 to Amendment No. 2 to the St. Chris-PNC Credit Agreement; (ii) part (b) of the "Events Of Default And Acceleration" provision of the Note signed by Hahnemann University Hospitals pursuant to the AUH-PNC Line of Credit Agreement; and (iii) Section D.1 of the HUH-First Fidelity Grid Note.

If MBIA and PNC had known of DVOG's actual financial performance and its violation of the Historical Debt Service Coverage Ratio covenants, MBIA and PNC could and would have taken the steps set forth below, or substantially similar steps to the same or substantially similar effect. They would have taken these steps, following receipt of the 1996 DVOG audited financial statements:

- ◆ MBIA and/or PNC would have retained a consultant or consultants experienced and knowledgeable about hospital and health system business operations to advise them throughout the workout process.

- ◆ MBIA and/or PNC would have coordinated their response activities with each other and with other creditors.

- ◆ MBIA and/or PNC would have downgraded their internal credit ratings of DVOG.

- ◆ MBIA and/or PNC would have monitored closely DVOG's operations and would have requested regularly updated financial information.

- ◆ MBIA and/or PNC would have communicated with AHERF's trustees to express their concerns over DVOG's financial performance.

- ◆ MBIA and/or PNC would have entered into a dialogue with the trustees regarding the trustees' evaluating and, if appropriate, replacing AHERF executive management.

- ◆ MBIA and/or PNC would have reviewed with AHERF's trustees and management AHERF's strategy of acquiring physician practices, and whether AHERF should consider

- 40 -

curtailing or ceasing acquisition of additional physician practices and unwinding unprofitable physician practices.

♦ MBIA and/or PNC would have reviewed with AHERF's trustees and management whether AHERF should consider not acquiring any additional hospitals.

♦ MBIA and/or PNC would have reviewed with AHERF's trustees and management whether AHERF should develop and implement a comprehensive cost-reduction and consolidation program throughout DVOG and AHERF.

♦ MBIA and/or PNC would have considered whether to seek meetings with AHERF's auditors to understand better AHERF's financial performance and condition.

♦ MBIA and/or PNC would have reviewed with AHERF's trustees and management whether AHERF should explore divesting all or part of AHERF's Eastern assets.

♦ MBIA and/or PNC would have exercised their rights to demand that DVOG retain a consultant.

♦ If MBIA and PNC had learned through properly audited financial statements that DVOG's Historical Debt Service Coverage Ratio fell below 1.0, then, depending on AHERF's actions, MBIA and/or PNC would have threatened to cause an Event of Default to be declared and would have threatened actions leading to acceleration of DVOG's debt under the 1996 bond and/or commercial note agreements. In addition, PNC had the right to demand repayment of the amounts outstanding under the St. Chris-PNC Credit Agreement (an obligation guaranteed by AHERF (parent)) and under the AUH/University-PNC Line Of Credit Agreement. If necessary, MBIA and/or PNC could and would have used their rights to accelerate DVOG's debt as leverage to accomplish the remedial actions described above, for other controls over use of AHERF assets, and/or to obtain a pledge of collateral from AHERF. MBIA and/or PNC would have exercised their rights to accelerate if inadequate action by AHERF necessitated such action or if exercising those rights were necessary to avoid even larger losses.

♦ PNC could and would have threatened not to renew two letters of credit that it issued to guarantee certain AGHOG bonds issued in 1988 and certain commercial paper that Allegheny General Hospital issued in 1993, as leverage to obtain adequate remedial action by AHERF or other controls over use of AHERF assets.

♦ The media, AHERF employees, physicians on AHERF's medical staffs, patients and prospective patients at AHERF hospitals, AHERF's vendors, suppliers and trade creditors, other AHERF stakeholders, and Philadelphia and Pennsylvania politicians would have learned that the DVOG hospitals were in precarious financial circumstances if C&L had properly audited DVOG's 1996 financial statements. The efforts of the creditors to cause AHERF's trustees to replace executive management and implement a turnaround plan would have been reinforced by similar pressure from these additional

- 41 -

CoreStates had the right to demand that Allegheny University Hospitals and Allegheny University for Health Sciences repay amounts borrowed, and to cause them to confess judgment, under Sections 4 and 13 of the AUH/University-CoreStates Master Note Agreement.

Among other provisions, Sections 7(b)(ii) and 8(c) of the Reimbursement and Security Agreement among Allegheny General Hospital, Allegheny-Singer Research Institute and Morgan Guaranty Trust Company of New York, dated April 1, 1995, set forth Morgan Guaranty's contractual rights arising from AGHOG's violation of the Consolidated Unrestricted Funds Balance covenant.

Among other provisions, Sections 6.01, 6.03(b), 6.03(d), 6.03(e), 7.01, and 7.02 of the Credit Agreement by and among Allegheny Health, Education and Research Foundation and The Lenders Parties Hereto From Time to Time and Mellon Bank, N.A., as Agent, dated March 7, 1997, set forth the Mellon Syndicate Banks' contractual rights arising from AHERF's, DVOG's, and AGHOG's violations of debt covenants.

Dated:  May ___7___, 2004

Respectfully submitted,

Laura E. Ellsworth (PA #39555)
James M. Jones (PA #81295)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, Suite 3100
Pittsburgh, Pennsylvania 15219
(412) 391-3939

Richard B. Whitney (OH #8004)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of Allegheny Health,
Education and Research Foundation

- 47 -

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this ___7th___ day of May, 2004, a true and correct copy of the foregoing Plaintiff's Responses to Defendant's Second Set of Interrogatories was served by overnight service upon Antony L. Ryan, Esq., Cravath, Swaine & Moore, Worldwide Plaza, 825 8th Avenue, New York, New York 10019-7475, and by regular U.S. mail upon Joseph F. McDonough, Esq., Manion, McDonough & Lucas, PC, 600 Grant Street, Suite 1414, Pittsburgh, Pennsylvania 15219, counsel for defendant.

_James M. James_
One of the Attorneys for Plaintiff The Official
Committee of Unsecured Creditors of
Allegheny Health, Education and Research
Foundation

STATE OF NEW YORK

COUNTY OF WESTCHESTER:

## VERIFICATION

I, Karleen C. Strayer, first being cautioned and sworn, state that I am an employee of MBIA Insurance Company, which company is a member of The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation (the "Committee"), and that I have been authorized on behalf of the Committee to verify Plaintiff's Responses to Defendant's Second Set of Interrogatories in the Committee's action against PricewaterhouseCoopers, LLP. The facts set forth in those responses are not all within my personal knowledge, nor am I aware of another Committee representative whose personal knowledge would include all of these facts. The responses have been made upon information assembled by the Committee's counsel and/or those engaged by that counsel and are true and correct to the best of the Committee's knowledge and belief.


_Karleen C. Strayer_
Karleen C. Strayer


Sworn to and subscribed before me

this _7_ day of May, 2004.

_Venetia Heintz_
Notary Public

VENETIA HEINTZ
Notary Public, State of New York
No. 4913666
Qualified in Westchester and Putnam Counties
Commission Expires 07-05-20__

My Commission Expires:

PII-1103097v1

# COMMITTEE APPENDIX

## Tab 5

6/9/03 Government's Arraignment and Plea Memorandum

9/17/03 Transcript of Sentencing of Carol Calvert

6/10/03 Transcript of Plea Hearing of Carol Calvert




# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA **FILED**

       v.                      JUN 0 9 2003     CRIMINAL NO. 03 - 332

CAROL CALVERT         MICHAEL E. KUNZ, Clerk

                              By _____ : Dep. Clerk

## GOVERNMENT'S ARRAIGNMENT AND PLEA MEMORANDUM

I.        <u>INTRODUCTION</u>

      The United States Attorney filed a one-count information against defendant Carol

Calvert on May 20, 2003 charging aiding in the presentation of a false tax return in violation of

26 U.S.C. §7602(2).  The charge arises from the filing of a false tax return on Calvert's behalf for

calendar year 1996.  The return represented that $300,000 in consulting income which Calvert

had received from the now-defunct Allegheny Health Education and Research Foundation was

offset by expenses from an unrelated entity totaling $243,279.  In fact, the true expenses were

substantially less.

II.       <u>PLEA AGREEMENT</u>

      Calvert has entered into a plea agreement (copy attached) with the government,

the principal terms of which follow:

          1.      Calvert agrees to plead guilty to count one of the information, charging

aiding and assisting in the preparation of a false income tax return in violation of 26 U.S.C.

§7206(2).

2.      The government reserves the right to make whatever sentencing recommendation it deems appropriate.

3.      The defendant agrees that she will cooperate fully with the Internal Revenue Service as follows:

a.      Prior to sentencing, the defendant will pay $79,749 of unpaid taxes. The defendant understands that the IRS may assess additional taxes, interest and penalties finally determined to be due and owing. The defendant further agrees to pay all state and local taxes due and owing for the year in question within the period of her supervised release or probation. The defendant agrees that this is an appropriate condition of supervised release or probation.

b.      Defendant agrees to provide the IRS Examination Division, prior to sentencing, with all requested documents and information for the purpose of a civil audit.

c.      Defendant agrees that she will make no objection to the entry of an order under Fed.R.Crim.P. 6(e) permitting the IRS Criminal Investigation Division to disclose to the IRS Examination and Collection Divisions (for purposes of a civil audit) all of the documents obtained, and the IRS reports produced, during the criminal investigation, whether or not such documents or reports are considered to be grand jury material within the meaning of Rule 6(e).

4.      The parties enter into the following stipulations under the Sentencing Guidelines §6B1.4 understanding that they do not bind the Court or Probation Office:

a.      The defendant has demonstrated acceptance of responsibility for her offense making the defendant eligible for a 2-level downward adjustment under §3E1.1(a);

2

   b.  The defendant is entitled to a 2 level reduction of her offense level because she played a minor role pursuant to §3B1.2.

   5.  The defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction or sentence, except that the defendant may file a direct appeal to raise the claims that:

     1.  the defendant's sentence exceeds the statutory maximum;

       or

     2.  the sentencing judge erroneously departed upward from the otherwise applicable sentencing guideline range.

III.   STATUTORY MAXIMUM SENTENCE

   The Court may impose the following statutory maximum sentence: Count 1 (aiding in the presentation of a false tax return), 3 years imprisonment, a 1 year period of supervised release, a $250,000 fine, a $100 special assessment, and payment of costs of prosecution, and of all taxes, interest, and penalties due.

   The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by 1 year in the case of Class E felonies. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

IV.        ELEMENTS AND EVIDENCE

    A.    Elements

The elements of 26 U.S.C. § 7602(2) follow:

    2.    The defendant willfully aided or assisted in, or procured, counseled, or advised,

    3.    the preparation or presentation of a tax return

    4.    which was fraudulent or was false as to any material matter.

    B.    Evidence

The government would offer the following evidence if the case proceeded to trial:

Joint 1996 Form 1040 for Carol and Wayne Calvert. The joint 1996 Form 1040 for Carol and Wayne Calvert is signed by Wayne Calvert. The return discloses on Schedule C $300,000 in consulting income paid to Carol Calvert by the Allegheny Health Education and Research Foundation (AHERF). The Schedule C offsets this with $243,279 in expenses for net Schedule C business income of $56,721.

Janet M. Walz. Walz would testify at trial that she was employed by AHERF between 1991 and July 1998. She was assigned to work as Carol Calvert's secretary from 1991 to February 1996, when Calvert was fired. Calvert held the position of president of AHERF's physician practice subsidiary, Allegheny Integrated Health Group (AIHG).

Calvert confided in Walz that she had had affairs with both David McConnell, AHERF's CFO, and Sherif Abdelhak, AHERF's CEO.

Calvert told Walz that she was quitting in February 1996. Calvert mentioned that she might do some consulting work for AHERF and that she had some things to wrap up.

4

Calvert also stated that she had received a severance package but could not go into details because it was confidential.

Walz would further testify that Dr. Kaye, the man who took over Calvert's responsibilities after Calvert left, asked Walz to set up meetings with Calvert on a few occasions. Walz could not get ahold of Calvert though.

Walz never saw Calvert at AIHG after Calvert left the organization. Waltz did not do any work for Calvert anytime after she left; nor did anyone else at AIHG. The last time Walz ever spoke to Calvert was in March 1996.

Donald Kaye, M.D. Dr. Kaye would testify at trial that he held a number of executive positions within AHERF, primarily as President and Chief Executive Officer of AHERF's eastern division (the cluster of hospitals located in Philadelphia). Sometime in 1996, his duties expanded, and Kaye also became the president of an administrative entity called Allegheny Integrated Health Group (AIHG), Carol Calvert's former position. AHERF acquired physician practice groups through its AIHG subsidiary.

During a meeting with Sherif Abdelhak (AHERF's President) in Pittsburgh on or about February 15, 1996, Kaye was informed that Calvert had been fired. Kaye assumed responsibility for running AIHG almost immediately upon Calvert's dismissal. Abdelhak asked Kaye if he Calvert as a consultant. Kaye told Abdelhak he wanted her available to answer questions on an as needed basis but did not need her as a consultant because he already "had a feel" for the job.

Abdelhak never told Kaye that Calvert had been retained as a consultant, and Kaye was never made aware of that fact.

5

Kaye attempted to contact Carol on a few occasions but she did not respond. Calvert called him back once but Kaye had already gotten the information he needed from another source.

Gerald H. Escovitz, M.D. Escovitz would testify at trial that he worked closely with Calvert for approximately two and one half years at AIHG. Escovitz spoke with Calvert on the telephone a few times after she left AHERF. Calvert said she was going to take time off and spend the summer at the shore. She did not mention working for anyone as a consultant.

Escovitz became the Chief Operating Officer (COO) of AIHG after Calvert left AHERF. He worked closely with Dr. Kaye. Calvert never provided any services to AHERF/AIHG after she left. Escovitz would have known if Calvert had performed any consulting work after her departure.

Judy B. Harrington. Harrington would testify that she reported to Calvert at AIHG beginning in the spring of 1994. After Calvert left AHERF, Harrington reported to Dr. Kaye. Harrington never spoke to Calvert after she left. Harrington asked Calvert's former secretary, Janet Walz, to call Calvert once to enlist Calvert's help finding a file. Calvert never returned the call. Harrington did not speak to Calvert after Calvert left AHERF.

Wayne Calvert. Wayne Calvert would testify at trial that he was married to Carol Calvert in 1996 and that he prepared, signed, and filed their joint tax return for that year. Carol had received a $300,000 consulting fee from AHERF that year as part of a severance package. Carol did little if any work for this fee. They wanted to reduce their tax liability stemming from this income and discussed inflating expense figures on their Schedule C to that end. They talked about the false figures in person two or three times and also discussed them over the telephone.

6

Wayne would review and explain the false figures on the Schedule C as follows:

| Category | False Figure | Correct Figure | Difference |
|---|---|---|---|
| Cost of Goods Sold | $14,125 | $1,875 | $12,250 |
| Gross Income/Profit | $285,875 | $298,125 | $12,250 |
| Expenses: | | | |
| Advertising | $12,276 | $2,000 | $10,276 |
| Commission and Fees | $15,575 | $0 | $15,575 |
| Legal/Professional Services | $5,765 | $750 | $5,015 |
| Vehicle Rental | $7,496 | $0 | $7,496 |
| Other business property | $24,988 | $12,494 | $12,494 |
| Repairs | $5,856 | $0 | $5,856 |
| Supplies | $6,254 | $0 | $6,254 |
| Taxes and licenses | $1,485 | $0 | $1,485 |
| Travel | $18,463 | $3,000 | $15,463 |
| Meals and entertainment | $4,501 | $750 | $3,751 |
| Utilities | $15,248 | $7,624 | $7,624 |
| Wages | $88,256 | $0 | $88,256 |
| Totals  Expenses | $229,154 | $49,609 | $179,545 |
| | | | |
| Net Profit | $56,721 | $248,516 | $191,795 |

7

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney


CHRISTOPHER R. HALL
Assistant United States Attorney


Date: 6/6/2003

8

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

US DEPARTMENT OF JUSTICE
US ATTORNEY E.D. OF PA
2003 FEB -3 A 10: 31

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 02 - ___ |
| CAROL CALVERT | : | |

## GUILTY PLEA AGREEMENT

Under Rule 11 of the Federal Rules of Criminal Procedure, the government, the defendant, and the defendant's counsel enter into the following guilty plea agreement. Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania.

1.    The defendant agrees to plead guilty to one count of aiding and assisting in the preparation of a false income tax return in violation of Title 26, United States Code, Section 7206(2), all arising from the filing of her Form 1040 for the calendar year 1996 which grossly overstated costs of goods sold and other business expenses for the purpose of offsetting income from a consulting agreement she obtained from the now defunct Allegheny Health Education and Research Foundation (AHERF).

2.    The defendant agrees to pay the special victims/witness assessment in the amount of $100 before the time of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

3.    Defendant waives any claim under the Hyde Amendment, 18 U.S.C. 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

4.    At the time of sentencing, the government will:

    a.    Make whatever sentencing recommendation as to imprisonment, fines, and other matters which the government deems appropriate.

    b.    Comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing and to the character and any criminal conduct of the defendant; address the Court regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant. at sentencing.

5.    Nothing in this agreement shall limit the government in its comments in, and responses to, any post-sentencing matters.

6.    The defendant understands, agrees and has had explained to her by counsel that the Court may impose the following statutory maximum sentence: Count 1 (subscription to a false tax return), 3 years imprisonment, a 1 year period of supervised release, a $250,000 fine, a $100 special assessment, and payment of costs of prosecution, and of all taxes, interest, and penalties due.

The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by 1 year in the case of Class E felonies. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

7.    The defendant may not withdraw her plea because the Court declines to follow any recommendation, motion or stipulation by the parties to this agreement. No one has promised or guaranteed to the defendant what sentence the Court will impose.

8.    The defendant agrees that she will cooperate fully with the Internal Revenue Service as follows:

a.    Prior to sentencing, the defendant will pay $79,749 of unpaid taxes due on the undeclared income of $292,259 which is the subject of this criminal case. The defendant understands that the IRS may assess additional taxes, interest and penalties finally determined to be due and owing. The defendant further agrees to pay all state and local taxes due and owing for the year in question within the period of her supervised release or probation. The defendant agrees that this is an appropriate condition of supervised release or probation.

b.    Defendant agrees to provide the IRS Examination Division, prior to sentencing, with all requested documents and information for the purpose of a civil audit.

c.    Defendant agrees that she will make no objection to the entry of an order under Fed.R.Crim.P. 6(e) permitting the IRS Criminal Investigation Division to disclose to the IRS Examination and Collection Divisions (for purposes of a civil audit) all of the documents

3

obtained, and the IRS reports produced, during the criminal investigation, whether or not such

documents or reports are considered to be grand jury material within the meaning of Rule 6(e).

        d.      Nothing in this agreement shall limit the Internal Revenue Service
in its collection of any taxes, penalties or interest due from the
defendant.

        9.      Pursuant to § 6B1.4 of the Sentencing Guidelines, the parties enter into the

following stipulations under the Sentencing Guidelines Manual effective November 1, 1996.  It is

understood and agreed that: (1) the parties are free to argue the applicability of any other

provision of the Sentencing Guidelines, including offense conduct, offense characteristics,

criminal history, adjustments and departures; (2) these stipulations are not binding upon either

the Probation Department or the Court; and (3) the Court may make factual and legal

determinations that differ from these stipulations and that may result in an increase or decrease in

the Sentencing Guidelines range and the sentence that may be imposed:

        a.      As of the date of this agreement, the defendant has demonstrated

acceptance of responsibility for her offense making the defendant eligible for a 2-level downward

adjustment under Guideline Section 3E1.1(a).

        b.      The defendant is entitled to a two (2) level reduction of her offense

level because she played a minor role pursuant to Section 3B1.2 of the Sentencing Guidelines.

        10.      The defendant is satisfied with the legal representation provided by the

defendant's lawyer; the defendant and this lawyer have fully discussed this plea agreement; and

the defendant is agreeing to plead guilty because the defendant admits that she is guilty.

4

11.     In exchange for the undertakings made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. §3742, 28 U.S.C. §1291, 28 U.S.C. §2255, or any other provision of law.

          a.     Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

          b.     If the government does not appeal, then notwithstanding the appeal waiver provision set forth above, the defendant may file a direct appeal but may raise only claims that:

          1.     the defendant's sentence exceeds the statutory maximum;

                    or

          2.     the sentencing judge erroneously departed upward from the otherwise applicable sentencing guideline range.

If the defendant does appeal pursuant to this paragraph, no issue may be presented by the defendant on appeal other than those described in this paragraph.

5

12.     It is agreed that no additional promises, agreements or conditions have been entered into other than those set forth in this document, and none will be entered into unless in writing and signed by all parties.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney

CAROL CALVERT
Defendant

TIMOTHY R. RICE
Chief, Criminal Division
Assistant United States Attorney

JOSEPH C. SANTAGUIDA, ESQ.
Counsel for Defendant

CHRISTOPHER R. HALL
Assistant United States Attorney

Date: 11/30  2002

6

Attachment

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :

        v.                      :         CRIMINAL NUMBER

CAROL CALVERT               :

### ACKNOWLEDGMENT OF RIGHTS

I hereby acknowledge that I have certain rights that I will be giving up by pleading guilty.

1.     I understand that I do not have to plead guilty.

2.     I may plead not guilty and insist upon a trial.

3.     At that trial, I understand

     a.     that I would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with my attorney, I would have the right to participate in the selection of that jury;

     b.     that the jury could only convict me if all twelve jurors agreed that they were convinced of my guilt beyond a reasonable doubt;

     c.     that the government would have the burden of proving my guilt beyond a reasonable doubt and that I would not have to prove anything;

     d.     that I would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that I was guilty;

     e.     that I would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if I could not afford to hire a lawyer, the court would appoint one for me free of charge;

     f.     that through my lawyer I would have the right to confront and cross examine the witnesses against me;

7

g.    that I could testify in my own defense if I wanted to and I could subpoena witnesses to testify in my defense if I wanted to;

h.    that I would not have to testify or otherwise present any defense if I did not want to and that if I did not present any evidence, the jury could not hold that against me.

4.    I understand that if I plead guilty, there will be no trial and I would be giving up all of the rights listed above.

5.    I understand that if I decide to enter a plea of guilty, the judge will ask me questions under oath and that if I lie in answering those questions, I could be prosecuted for the crime of perjury, that is, for lying under oath.

6.    I understand that if I plead guilty, I have waived my right to appeal, except as set forth in paragraph 11 of the plea agreement.

7.    Understanding that I have all these rights and that by pleading guilty I am giving them up, I still wish to plead guilty.


_Carol Calvert_
_____
Defendant


_____
JOSEPH C. SANTAGUIDA, ESQ.
Counsel for the Defendant

8

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing court paper has been served

by first class United States mail, postage prepaid, upon the following counsel of record:

Joseph C. Santaguida, Esq.
North American Building, Second Floor
121 South Broad Street
Philadelphia, PA 19107

CHRISTOPHER R. HALL
Assistant United States Attorney

DATED:  6/6/03

FILED

JUN 0 9 2003

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

9

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | DATE FILED: | **MAY 2 0 2003** |
| v. | : | CRIMINAL NO. | 03-332 |
| CAROL CALVERT | : | VIOLATION: | 26 U.S.C. §7602(2) (Aiding in the presentation of a false tax return - 1 Count) |

## INFORMATION

### Count One

THE UNITED STATES ATTORNEY CHARGES THAT:

On or about October 15, 1997, at Philadelphia, in the Eastern District of

Pennsylvania, defendant

## CAROL CALVERT

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to

the Internal Revenue Service, of her United States Individual Income Tax Return, Form 1040,

Schedule C, for the calendar year 1996, which was false and fraudulent as to a material matter, in

that it represented that consulting income of $300,000 from the now-defunct Allegheny Health

Education and Research Foundation was offset by costs of goods sold of $14,125 and business

expenses of $229,154 from an unrelated entity, whereas the defendant, CAROL L. CALVERT, then

and there well knew and believed that the true and correct costs of goods sold and other business

expenses were substantially less than the reported amounts.

In violation of Title 26, United States Code, Section 7206(2).



PATRICK L. MEEHAN
United States Attorney



# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

03-332

## INFORMATION

DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:   615 Chestnut Street, Suite 1250, Phila., PA 19106-4476

Post Office:   Philadelphia                County:   Philadelphia

Address of Defendant:      570 Frassetto Drive, Southampton, PA 18966

Post Office:   Southampton                County:   Bucks

Register number: N/A

Place of accident, incident, or transaction:    Eastern District of Pennsylvania

Post Office:   Philadelphia                County:   Philadelphia
(use reverse side for additional space)

CRIMINAL:   (Criminal Category - FOR USE BY U.S. ATTORNEY ONLY)

| | | |
|---|---|---|
| 1. | ( ) | Antitrust |
| 2. | (X) | Income Tax and other Tax Prosecutions |
| 3. | ( ) | Commercial Mail Fraud |
| 4. | ( ) | Controlled Substances |
| 5. | ( ) | Violations of 18 U.S.C. Chapters 95 and 96 (Sections 1951-55 and 1961-68) and Mail Fraud other than commercial |
| 6. | ( ) | General Criminal (U.S. ATTORNEY WILL PLEASE DESIGNATE PARTICULAR CRIME AND STATUTE CHARGED TO BE VIOLATED AND STATE ANY PREVIOUS CRIMINAL NUMBER FOR SPEEDY TRIAL ACT TRACKING PURPOSES) 26 U.S.C. §7602(2) (Aiding in the Presentation of a False Tax Return - 1 Count) |

DATE:   5/20/03

CHRISTOPHER R. HALL
Assistant United States Attorney

Information
File No. 2002R00366
U.S. v. Carol Calvert

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,          )  03-CR-332
                                   )
                                   )  Philadelphia, Pa.
                                   )  September 17, 2003
         vs.                       )  2:45 p.m.
                                   )
                                   )
CAROL CALVERT,                     )
                                   )
              Defendant.           )

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE WILLIAM H. YOHN, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        CHRIS HALL, ESQ.
                           U.S. Attorney's Office
                           615 Chestnut Street
                           Philadelphia, Pa.  19106


For the Defendant:         JOSEPH SANTAGUIDA, ESQ.
                           121 S. Broad Street
                           Philadelphia, Pa.   19107


Audio Operator:            THOMAS J. McCANN


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-129
                           (856) 435-7172
                           FAX: (856) 435-7124
                           Email: Doman5123@snip.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

# I N D E X

| Statement | Page |
|---|---|
| Ms. Clair | 6 |
| Ms. Calvert | 23 |

| Argument | |
|---|---|
| Mr. Santaguida | 16 |
| Mr. Hall | 18 |

| The Court | |
|---|---|
| Sentence | 25 |

Colloquy                                Page 3

1          THE COURT: All right.  This is the matter of the

2    United States verus Carol Calvert, file 3-332. The Court notes

3    the presence of the defendant, her counsel, and the Assistant

4    U.S. Attorney assigned to this action.  And we're here today

5    for sentencing on count one of the information.  A presentence

6    report has been prepared by the Probation Department and mailed

7    to the parties.  And, Mr. Santaguida, do you have any

8    additions, changes or corrections to that report?

9          MR. SANTAGUIDA: Judge, nothing that would alter the

10   -- either the offense gravity score or the prior record score.

11   I thought that a lot of the comments by the probation writer

12   were inappropriate, mentioning about her weight or what her

13   demeanor was, or the fact that she shopped or didn't shop, or

14   who she treated and who she didn't treat was nothing -- had

15   nothing to do with the case.  And why he put it in there, I

16   don't know.

17         THE COURT: All right.  Well it seemed to me it was

18   all relevant, so I'll allow it.  Mr. Hall, do you have any

19   additions, changes or corrections to that report?

20         MR. HALL: No, Your Honor.

21         THE COURT: Okay.  Mrs. Calvert, I assume you have

22   seen the presentence report that I'm holding in my hand.

23         MS. CALVERT: Yes, sir.

24         THE COURT: Now do you have any additions, changes, or

25   corrections to that report?

                          Colloquy                          Page 4

1              MS. CALVERT: No.

2              THE COURT: Is anything inaccurate in the report that

3       you want to change?

4              MS. CALVERT:  I -- I just thought that it was a bit

5       personal in nature, and a lot of things that --

6              THE COURT: That's what --

7              MS. CALVERT: -- that --

8              THE COURT: -- presentence reports do.  It's your --

9              MS. CALVERT: Well --

10             THE COURT: -- whole history.

11             MS. CALVERT: -- but that the case is about taxes, not

12      about my prior employment.

13             THE COURT:  Well that -- that's another issue, but

14      that's what happens in these things.  All right.  Then the

15      presentence report is placed in the record under seal with the

16      Probation Department.  The Court adopts the factual findings

17      and the guide on application in the presentence report.

18             Specifically, the total offense level is ten, the

19      criminal history category is one, yielding a super -- an

20      imprisonment range of six to 12 months, a supervised release

21      range of one year, and a fine range of 2,000 to $20,000.  Now I

22      don't believe there are any motions, so I'll hear any evidence

23      or argument you want to make, Mr. Santaguida.

24             MR. SANTAGUIDA:  Thank you.  Judge, I believe that

25      what -- I want the Court to recognize that Ms. Calvert's