Colloquy                          Page 5

1    family's here, mother, father, brothers and sisters, brother-

2    in-laws, and that one of them wants to make a statement on

3    behalf of all with your permission.

4            THE COURT:  All right, certainly.  It -- actually,

5    she ought to go on the witness stand, yeah.

6            MR. SANTAGUIDA: Okay.

7            THE COURT: While she's doing that, for the record the

8    report is dated July 23rd, revised August the 11th, and it uses

9    the sentencing guideline manual effective November 1, 1996

10   because of ex post facto problems.

11   JAIME CLAIR, WITNESS, SWORN

12           THE CLERK: State your full name for the record

13   please.

14           MS. CLAIR: Jaime Clair.

15           THE COURT: Will you spell your last name please?

16           MS. CLAIR: C-L-A-I-R.

17           THE COURT: Thank you.

18           THE CLERK: You may proceed.

19           THE COURT: Mr. Santaguida?

20           MR. SANTAGUIDA:  Sorry.  Did you want to make a

21   statement on behalf of your sister on behalf of the family?

22           MS. CLAIR:  Okay.

23           MR. SANTAGUIDA: Judge, do you mind if she reads it?

24           THE COURT: Certainly.  Uh-huh.  You're a sister?

25           MS. CLAIR: Yes, I am.

1    THE COURT: Okay.

2    MS. CLAIR:  My sister, Carol Calvert, first began

3    working when she was 14 years old at a pretzel stand in the

4    Oxford Valley Mall.  Our mother would drive her to work after

5    school every day, and then pick her up at the end of her shift.

6    It wasn't long before the manager Delores entrusted Carol with

7    the added tasks of opening the store, ordering supplies, and

8    cashing out at the end of the night.

9    Carol continuously was employed throughout high

10   school, where she graduated in the top five in her class of

11   approximately a thousand students.  Carol worked all through

12   her college years, while still maintaining high scholastic

13   grades.  She was always the manager or supervisor for every job

14   that she has ever had since age 14.

15   After graduating from college in only three-and-a-

16   half years, she got a job with Touche Ross, which was one of

17   the big eight accounting firms.  She was promoted twice in two

18   years, which was unheard of at the first -- at the time.  She

19   left that position because her largest client offered her a

20   tremendous opportunity and a significant raise in salary.

21   Carol was always a hard worker, and achieved what she aspired

22   to do.

23   During any career move, her motivation was to go

24   higher.  Her work ethics were flawless, and she worked long and

25   hard hours.  Any promotion that she earned was always through

Clair - Statement                    Page 7

1   her hard work.   In her last employment, any management

2   promotion or raise always was approved by the compensation

3   committee of the Board of Directors.   Since she has stopped

4   working, she has given much of her time to helping me with my

5   child, and also our brother and sister-in-law with his two sets

6   of twins.

7          Also Carol cared for her boyfriend's step-father for

8   a year-and-a-half, until his death in September 2002.   Carol

9   changed soiled sheets and went food shopping for him.   She gave

10  him a quality of life that he would not have had otherwise.

11  This man was not a relative.

12         It's unfortunate that the person who interviewed

13  Carol for 60 minutes could not report on her many virtues, and

14  had to mischaracterize Carol in such a personal and biased way.

15  My point is that she's very giving, and a good person who helps

16  her entire family, both financially and emotionally.   She's

17  always been self-sufficient, and does not rely on anyone or any

18  -- does not rely on anyone for money or anything.

19         Please be fair and recognize that she has a good

20  moral character, and has hurt no one but herself by the filing

21  of the false tax return.   She has paid the entire tax amount

22  herself, without any contribution by her ex-husband.   I know

23  that she regrets her actions, and that she will never engage in

24  this type of wrongful conduct ever again.   Thank you.

25         MR. SANTAGUIDA:   I have nothing further, Judge.

Colloquy                                Page 8

1          THE COURT:  Okay.  Mr. Hall, do you have any

2     questions?

3          MR. HALL:  No, Your Honor.

4          THE COURT: All right.  Thank you very much.

5          MR. SANTAGUIDA: Judge, now that -- do you want me to

6     say something before Ms. Calvert?

7          THE COURT:  Well I have a couple of questions, and I

8     also want to point out whether Mr. Hall has any evidence.  You

9     have no other evidence, is that correct?

10         MR. SANTAGUIDA: Me?

11         THE COURT: Yeah.

12         MR. SANTAGUIDA: No other evidence to introduce except

13    -- no.

14         THE COURT: Okay, fine.  I will note for the record

15    there are eight or nine family members who are here in support

16    of Mrs. Calvert.  Now, Mr. Hall, do you have any evidence?

17         MR. HALL:  No, Your Honor.

18         THE COURT: Okay.  Now the questions I have, Mr.

19    Santaguida, first of all the tax liability is 79,749?

20         MR. SANTAGUIDA: Yes, Your Honor.

21         THE COURT: Has that been paid?

22         MR. SANTAGUIDA:  Yes.

23         THE COURT: Okay.  Now what's the status of the

24    penalties and interest?

25         MR. SANTAGUIDA: Judge, since she came into my office

Colloquy                                    Page 9

1    we've been trying to establish an amount.  We didn't find out

2    the true amount of the tax, plus who it was to be paid to,

3    until yesterday.  So, you know, they keep on saying they're

4    going to get back to us, going to get back to us, but so far

5    they haven't, Judge.

6            THE COURT: Okay.  Mr. Hall, do you have any

7    information on that?

8            MR. HALL: My understanding, Your Honor, is that they

9    -- the -- the IRS is going to assess the penalties and interest

10   separately, that the --

11           THE COURT: Well we know that since she's already paid

12   the taxes, so it would have to be separate.

13           MR. HALL:  Right.  And they -- and they -- and that

14   they have not told me that figure yet, and that that's in the

15   -- in the works.

16           THE COURT:  Okay.  So then it seems to me that as a

17   condition of her probation or supervised release, she should

18   pay the penalty and interest when it has been assessed within

19   60 days.

20           MR. HALL:  All right.

21           THE COURT: Okay.  She wants to talk to you about

22   that.

23       (Defendant confers with counsel)

24           MR. SANTAGUIDA:  She just wanted to know if that was

25   jointly with her ex-husband.

Colloquy                          Page 10

1       THE COURT: Pardon?

2       MR. SANTAGUIDA: She just wanted to know if that

3   penalty and interest would be assessed jointly with her ex-

4   husband.

5       THE COURT: I have no idea.  But if they -- I thought

6   -- that was the next question I have.  Her sister said that she

7   paid the whole thing.

8       MR. SANTAGUIDA: She did.

9       THE COURT:  But I thought I read in the presentence

10  report somewhere that the liability -- tax liability had been

11  bifurcated, some for the husband and some for the wife.  Is

12  that not correct?

13      MR. SANTAGUIDA: No, I don't think so.

14      THE COURT: That's not correct?

15      MS. CALVERT: No.

16      MR. SANTAGUIDA:  No, no.

17      MS. CALVERT: I paid the full amount, sir.

18      THE COURT: Okay.  And there's no other tax due on

19  that return?

20      MR. SANTAGUIDA: No.

21      THE COURT: Okay.  And the --

22      MR. SANTAGUIDA:  Judge, --

23      THE COURT: -- full amount was largely because of his

24  -- his inflated or exaggerated or falsified expenses?

25      MR. SANTAGUIDA: Right.  There was --

Colloquy                                    Page 11

1      THE COURT: Yeah.

2      MR. SANTAGUIDA: -- that's what happened, Judge.  I

3  mean again, nobody's here to justify it --

4      THE COURT: Yeah, okay.

5      MR. SANTAGUIDA: -- it was certainly what I would say

6  something that was situational.  Ms. Calvert received a

7  settlement that was not taxable, but part of her settlement

8  agreement was a $30,000 a month consulting fee which was

9  taxable.  And when it came time to do the taxes, my personal

10 opinion is that her husband, in order to justify his existence,

11 said let me do the taxes, I can save you some money.

12     THE COURT: Well now you objected to personal comments

13 about her in the presentence report.  I don't know --

14     MR. SANTAGUIDA:  Well --

15     THE COURT: -- he's not even here to defend himself.

16     MR. SANTAGUIDA: -- Your Honor, --

17     THE COURT: She can.

18     MR. SANTAGUIDA: Well --

19     THE COURT:  Which she did through her sister's

20 comments.

21     MR. SANTAGUIDA: Anyway, he -- he -- he took the --

22 and he filled out the tax return.  She was certainly in -- you

23 know, criminally responsible for not checking it out and put --

24 you know, adding her name to it.  And, therefore, that's where

25 her responsibility lies.  But here's -- she's the one who --

Colloquy                              Page 12

1    he's the one who filled out the form.  And because, I guess, he

2    went into -- and she came into the Government to cooperate in

3    reference to what they originally were investigating us for.

4           The original investigation had to do with her

5    relationship with AHER.  She went in, told them what she knew.

6    It didn't amount to enough to I guess amount to a 5(k)(1).  The

7    husband, who didn't work for AHER, he went in and said what he

8    did and what she -- that she acknowledged it.  He's getting a

9    5(k)(1).  How that works out is beyond me, but --

10          THE COURT: Because he was willing to testify against

11   her.  That's in the report.

12          MR. SANTAGUIDA: No, but she would have -- she's the

13   one who told them about him, so -- okay.

14          THE COURT: Okay.

15          MR. SANTAGUIDA: But anyway, --

16          THE COURT: Let's get back to the questions I need

17   answered.

18          MR. SANTAGUIDA: Certainly, Judge.

19          THE COURT: She is in agreement then to pay the

20   penalties and interest when they are assessed --

21          MR. SANTAGUIDA: Yes.

22          THE COURT: -- within 60 days thereafter --

23          MR. SANTAGUIDA: Yes.

24          THE COURT: -- as a condition of her supervision?

25          MR. SANTAGUIDA:  Yes.

Colloquy                                    Page 13

1        THE COURT: All right.  Now the next thing is, as I

2   understand from the facts -- now I want to make sure

3   everybody's in agreement on this -- that her husband conceived

4   of the plan to overstate the expenses, and he prepared the

5   return, and he signed her name to it, without her signing it,

6   and that the expenses that were either falsified or overstated

7   related to his business, not to hers?

8        MR. SANTAGUIDA:  I think what it did --

9        THE COURT: Are -- are those facts correct?

10       MR. SANTAGUIDA: I think that she had given her

11  husband monies during the course of the year -- I think it was

12  $80,000 or something like that -- and he put that down for

13  salaries when, in fact, it went to him.  So that's the way it

14  worked.

15       THE COURT: Well I don't understand that at all.  If

16  she gave him money, --

17       MR. SANTAGUIDA:  She -- she gave him money --

18       THE COURT: -- he -- he's not going to pay tax on it.

19       MR. SANTAGUIDA:  No.  And it -- I mean it was -- he

20  -- she just gave it to him out of largesse and he -- he --

21  that's the figure he used for the salaries.

22       THE COURT: Whose salary?

23       MR. SANTAGUIDA:  The -- the -- the phoney salaries,

24  the --

25       THE COURT: Oh, the expense salary?

Colloquy                                  Page 14

1    MR. SANTAGUIDA: Yes.  Yes.

2    THE COURT:  He took money that she gave to him and

3    said that was expense that he paid out to somebody else?

4    MR. SANTAGUIDA: Right

5    THE COURT: Okay.  All right.  Now, Mr. Hall, do you

6    agree with that factual recitation?

7    MR. HALL: And I would only add one other fact, Your

8    Honor, and that is that the expenses were designed to offset

9    this --

10    THE COURT: Her income.

11    MR. HALL: -- her income.

12    THE COURT: Okay.  All right.  Mr. Weinberger, do you

13    agree with the way I've stated it?

14    MR. WEINBERGER: Yes, sir.

15    THE COURT: Okay, thank you.  All right.  Then the

16    other -- only other thing I need to know is he has been

17    prosecuted in the Western District.  What's the status of that

18    case?

19    MR. SANTAGUIDA: I think he's not going to get

20    sentenced for a while.

21    MS. CALVERT: December.

22    MR. SANTAGUIDA: December.

23    THE COURT: December?  All right.  What did he plead

24    guilty to?

25    MS. CALVERT: A level 14, but he's awaiting a 5 --

Colloquy                                        Page 15

1           THE COURT: 5(k)(1).

2           MS. CALVERT: -- (k)(1).  And he has been led to

3     believe that he's getting complete probation, --

4           THE COURT: Yeah, okay.

5           MS. CALVERT: -- no time for anything.

6           THE COURT:  What -- yeah.  What did -- you said

7     11/14?

8           MR. SANTAGUIDA: No, level 14.

9           THE COURT: Oh, level 14. Okay.

10          MR. SANTAGUIDA: Fourteen, prior record --

11          THE COURT: What was the offense that he was --

12          MR. SANTAGUIDA: -- offense --

13          THE COURT: -- he pled guilty to?

14          MR. SANTAGUIDA: Same thing, Judge.

15          THE COURT: Same thing?

16          MR. SANTAGUIDA: Yes.

17          THE COURT: Well he wouldn't be aiding and abetting.

18    He did it.

19          MR. SANTAGUIDA: I didn't say aiding and abetting, I

20    said level 14.

21          MS. CALVERT: I just know it's a level --

22          THE COURT: The offense.

23          MR. SANTAGUIDA: The offense is income tax evasion, or

24    -- or that was -- well that was hers.

25          THE COURT: Do you know, Mr. Hall?

Santaguida - Argument                    Page 16

1    MR. HALL:  It's subscribing to a false tax return,

2    Your Honor.

3    THE COURT: All right, thank you.  All right, thank

4    you.  Now, Mr. Santaguida, I'll hear any argument you would

5    like to make.

6    MR. SANTAGUIDA: Again, Judge, I -- I've been living

7    with this case now for a while, and I've seen, you know, the

8    attitude of Ms. Calvert in our -- the remorse that she's shown

9    at least to me, the emotional stress that she went under having

10   this hanging over her head.  The stress that it's had on her

11   family.  It's affected her physically, emotionally, and there

12   was absolutely no reason for it.  There's no question about

13   that.

14   I mean she would have been prepared to pay the taxes.

15   She's prepared to pay them now.  She did pay them now.  I don't

16   see how -- you know, what benefit to society any incarceration

17   would do.  I think that a probationary sent -- under the court

18   (sic) has an option to be able to substitute some house arrest,

19   which I would suggest maybe six months would be sufficient,

20   which was the minimum term of imprisonment allowed, six months

21   to 12 months -- six months house arrest.  That she be allowed

22   to work.  And I would believe that that would be a proper

23   sentence in this situation.

24   THE COURT: Okay.  Probation's also recommended

25   community service.

1      MR. SANTAGUIDA: Fine, Judge.

2      THE COURT: Uh-huh.  What do you think about the fine?

3      MR. SANTAGUIDA: Judge, I think the fine was a little

4  high since she's taken it on the chin to pay the -- not only

5  the tax, but whatever the fine and penalty is.  So that fine --

6  she's already going to get a fine because, you know -- because

7  of the taxes.  So I don't see why there should be an additional

8  fine imposed.

9      THE COURT:  Of course, the taxes are due on her

10 money.

11     MR. SANTAGUIDA: Yes.

12     THE COURT: They got a benefit because he inflated the

13 expenses.

14     MR. SANTAGUIDA: Yes.

15     THE COURT: But if he had not done that, she would

16 still be paying these taxes.

17     MR. SANTAGUIDA: She would have paid them, sure.  Uh-

18 huh.

19     THE COURT: Okay.

20     MR. SANTAGUIDA: But not -- not the interest and

21 penalty.

22     THE COURT: Uh-huh.  Right.  Well we don't -- and we

23 don't know yet whether IRS is going to assess interest and

24 penalty, or how much.

25     MR. SANTAGUIDA: I'm sure they will, Judge.

1    THE COURT: Well they've -- they've been known to

2    compromise those matters.

3    MR. SANTAGUIDA: Okay.

4    THE COURT:  All right, thank you.

5    MR. SANTAGUIDA: Thank you.

6    THE COURT: Now, Mr. Hall?

7    MR. HALL: Your Honor, may I approach sidebar with

8    counsel?

9    THE COURT: Sure.

10    MR. HALL: And -- and with Ms Calvert, if she'd like?

11    (Sidebar begins)

12    MR. HALL:  Your Honor, this is a matter that's not

13    relevant to the people in the gallery, and that's the reason --

14    THE COURT: Uh-huh.

15    MR. HALL: -- I came to the side.  And I would only

16    disagree with the characterization of Ms. Calvert's sister in

17    that the facts establish that her rise at AHER and her

18    settlement there were not a result of strictly hard work, but

19    also personal relationships that she engaged in --

20    THE COURT: Well that was very clearly set forth in

21    the presentence report.

22    MR. HALL:  And I just wanted to state that for the

23    record, but not in public.

24    THE COURT: Uh-huh.

25    MS. CALVERT: Can I say something?

Hall - Argument                    Page 19

1          THE COURT:  You may.

2          MS. CALVERT: His comment with respect that I didn't

3     come to work and that I didn't know what I was doing is largely

4     because I was responsible for a brand new business venture that

5     had never been done in the country.  And I was given

6     responsibility for an area that was legal in nature, which was

7     contrary -- but, you know, that's the truth.  I had no idea

8     what I was doing, and I'm sure that that person that's at --

9     agreed to -- that she was a school teacher.  So I mean I was

10    over my head, and I kept trying to turn down

11    responsibilities --

12         THE COURT:  Uh-huh.

13         MS. CALVERT: -- and they kept giving them to me.  Now

14    towards the end, when people started leaving things right on my

15    desk, it was sexual apparatus on my desk and things like that,

16    I did stop going in.  But I --

17         THE COURT: Uh-huh.

18         MS. CALVERT: -- felt like I had every right not to.

19    I was promoted by not just the men I had relationships with.

20    And every promotion went before the Board of Directors, which

21    was conforming to the community leaders and everything else.

22    Every raise.

23         THE COURT: Uh-huh.

24         MS. CALVERT: So I mean maybe --

25         THE COURT: Okay.

1      MS. CALVERT: -- you know, I --

2      THE COURT: All right.  Well I understand that.  It's

3  -- it's perfectly appropriate for the probation officer to put

4  this information in the report because it's your whole

5  background, --

6      MS. CALVERT: Right.

7      THE COURT: -- and that's part of it.

8      MS. CALVERT: Right.

9      THE COURT: But on the other hand, it does have very

10 little weight to do with what I -- I decide in the case.

11     MR. SANTAGUIDA: Thank you.

12     MS. CALVERT: Thank you.

13     MR. HALL:  And the only other comment I would say is

14 to find -- would be I understand the merits of what was just

15 said, like we just said.  I have no doubt that IRS will impose

16 additional penalties.

17     THE COURT: Oh, I agree.

18     MR. HALL: So that the Government would recommend,

19 Your Honor, a fine in the middle of the upper range.

20     THE COURT: It might be what I just wrote down.

21     MS. CALVERT: And -- and am I that -- I'm not clear.

22 Am I going to pay the full amount, or is it half of what it's

23 due?

24     THE COURT:  Well you just agreed to pay the full

25 amount.

Hall - Argument                              Page 21

1          MS. CALVERT: Okay.

2          THE COURT: And I think that --

3          MS. CALVERT: No, I just --

4          THE COURT: -- if you think it's -- you -- and that --

5          MS. CALVERT: I --

6          THE COURT: -- doesn't prevent you from collecting

7    something from your ex-husband.

8          MS. CALVERT: Yeah, he's milking me dry.  I just had

9    to give him $28,000 to get the house out of foreclose 'cause he

10   won't take my name off the --

11         THE COURT: Uh-huh.

12         MS. CALVERT: He's killing me.

13         THE COURT: Well are you in the house, or is it --

14         MS. CALVERT: He won't take my name off the mortgage.

15         THE COURT: Okay.

16         MS. CALVERT: And it went into foreclosure.

17         THE COURT: Well let it be foreclosed.

18         MS. CALVERT: I -- he's already ruined my credit

19   rating.

20         THE COURT: Uh-huh.

21         MS. CALVERT: I mean I -- see he's got me between a

22   rock and a hard place.

23         THE COURT: Well -- well you're not the first.  I know

24   a lot --

25         MS. CALVERT:  A --

1  THE COURT: -- of other women and men who have been in

2  that same situation.

3  MS. CALVERT: And is -- is there any way that it could

4  be written that it's -- since I paid the full brunt of the

5  taxes -- because, by the way, he has all the records, hasn't

6  shared them with me, he -- he sat down with someone --

7  THE COURT: Uh-huh.  The --

8  MS. CALVERT: -- and they came up with the numbers.  I

9  don't -- I still don't even know that -- where that 79 came

10  from.

11  THE COURT: Yeah.  Well you'll have to work that out

12  with Mr. Santaguida and your husband.  I don't have anything to

13  do with that.

14  MS. CALVERT: But you can't say that I'm paying half

15  of the penalty and interest?

16  THE COURT: Oh, I certainly can say that, but that

17  doesn't mean IRS will agree with that, but --

18  MS. CALVERT: Yeah.  I --

19  THE COURT: It's just a matter of whether --

20  MS. CALVERT: Okay.

21  MR. SANTAGUIDA: But they're going to probably assess

22  it against both.

23  THE COURT: They will assess it against both, and

24  they'll try to collect it against both.  And as always happens,

25  the person with the money has to pay.

1          MR. SANTAGUIDA: Right, that's what happens.

2          THE COURT: Yeah.  Okay.

3          MS. CALVERT: Thank you.

4          THE COURT: Uh-huh.

5     (Sidebar ends)

6          THE COURT:  All right.  Now anything further, Mr.

7     Santaguida?

8          MR. SANTAGUIDA: No, Your Honor.

9          THE COURT: Okay.  Now, Mr. Hall?

10         MR. HALL: Nothing, Your Honor.

11         THE COURT: Now, Mrs. Calvert, is there anything you

12    would like to say before I impose sentence?  You have an

13    absolute right to tell me anything you think I should consider,

14    but you're not required to make a statement at this time.

15         MS. CALVERT: Yes, Your Honor, I'd like to make a

16    statement, but I'd like to read it if that's okay?

17         THE COURT: You may, sure.

18         MS. CALVERT: Shall I grab this thing --

19         THE COURT: As you wish.

20         MS. CALVERT: Your Honor, I have pled guilty and fully

21    accept my responsibility for aiding and abetting in the

22    presentation of a false tax return.  I most genuinely

23    appreciate the Government's acknowledged that my role in filing

24    the false tax return was minor, and that I received a

25    corresponding minor role adjustment.  I want to express my

1  sincere apologizes to the Court, the U.S. Government, its

2  citizens, my family and friends for my irresponsible act and

3  the resulting anguish and stress that I know I have caused.

4       As those who are closest to me know, I too have

5  suffered physically, emotionally, and financially over the past

6  six years.  I stand before you at my all time low, accepting

7  sole responsibility for my actions leading up to today.  In

8  addition to the real pain I have caused others, the cumulative

9  pain I have created within me has resulted in a feeling of deep

10  paralysis emotionally, and severe physical stress.

11       My daily existence is always flavored with a sense of

12  fear, shame, and anxiety.  The feeling of social alienation is

13  like a dark cloud under which I have been unable to escape.

14  However, I sit here now with more hope than I've had in the

15  last six years because my fate will be known today, and my life

16  will no longer hang in the balance.  Today is sentencing.  That

17  presents an opportunity to rebuild my life, my relationships,

18  and my health.  I look forward to the possibility of returning

19  to work, and once again contributing to the community in a

20  purposeful way.

21       I humbly request your leniency in my sentencing,

22  particularly the duration of home confinement.  I will, of

23  course, abide by any and all of the Court's decisions, and I

24  remain hopeful that the Court will consider the passage of time

25  since the crime was committed, and the suffering I have already

1    incurred in establishing my final sentence.  I assure you that

2    I will never engage in this type of wrongful conduct again.

3    Thank you.

4            THE COURT: All right, thank you.  All right.  Then

5    the Court accepts the plea agreement entered into between the

6    defendant and the United States in this case.  In this case, as

7    in every case, I must consider the nature and circumstances of

8    the -- of the offense and of the defendant, the need to deter

9    criminal conduct by the defendant and others, and the

10   rehabilitative needs of the defendant.

11           The guideline range does not exceed 24 months, and I

12   find no reason to part from the sentence called for by the

13   application of the guidelines inasmuch as the facts found are

14   the kind contemplated by the Sentencing Commission.

15           Now with reference to the sentence to be imposed, the

16   guideline range is six to 12 months.  The Probation Department

17   I think correctly analyzed that the Government was perhaps

18   generous in a legal sense in granting the minor role adjustment

19   in terms of applying the facts to the language of the

20   guideline.

21           But on the other hand, it also seems to me that

22   factually it does show that she was involved in a minor role in

23   this offense since it was her husband's idea to do this.  It

24   was his analysis of the -- of the expenses to be placed on the

25   return.  He was the one who prepared the return, and he, in

1    fact, forged her name to it.  So it seems to me that on a

2    common sense level, she did play a minor role in the offense,

3    and therefore I accept that reduction.

4          Now with reference to the sentence, it also seems

5    clear to me that probation is an appropriate sentence in this

6    case.  There would be no purpose served by incarcerating the

7    defendant, particularly when the offense would require six

8    months of incarceration, and the gentleman who was at the head

9    of AHER, who caused untold injuries and damages and heartache

10   and pain and suffering to untold numbers of people by his

11   actions, only received I believe it was 11-and-a-half to 23

12   months, or maybe 18 months.  Whatever it was.

13         So it seems to me probation is appropriate in this

14   case, and the minimum amount of home confinement would be --

15   under the guidelines is six months.  So I will impose a fine --

16   a sentence in that regard.  I think community confine --

17   community service is appropriate, as recommended by the

18   Probation Department, and I will place the fine at $5,000 in

19   view of the fact that she is well able to afford it.

20         And since these are taxes that she would have had to

21   pay in any event, had the false return not have been filed, it

22   seems to me that there should be some fine over the amount --

23         (Tape malfunctions / tape change)

24         THE COURT: -- judgment of the Court that the

25   defendant, Carol Calvert, is hereby placed on probation for a

The Court - Sentence                      Page 27

1   period of two years.  While she is on probation she shall not

2   commit another federal, state or local crime, shall not

3   illegally possess a controlled substance, shall not possess a

4   firearm or other dangerous weapon, and shall comply with the

5   standard conditions that have been adopted by this Court,

6   including the following.

7         That she shall be placed on home detention for a

8   period of six months to commence as soon as practicable.

9   During this time she shall remain at her place of residence,

10  except for employment and other activities approved in advance

11  by the probation officer.  She shall maintain a telephone at

12  her place of residence without any call forwarding, caller ID,

13  call waiting, modems, answering machines, cordless telephones,

14  or other special services for the above period.  She shall wear

15  an electronic device, and shall observe the rules specified by

16  the Probation Department.

17        Defendant is to pay the costs of the electronic

18  monitoring portion of the sentence, not to exceed the daily

19  contractual rate.  Payment for the electronic monitoring shall

20  be made in accordance with the probation officer's direction.

21  Changes to the established rate can be made by the probation

22  officer, subject to supervised reapproval.  The defendant shall

23  cooperate fully with both IRS and all state tax authority.

24        She shall also pay the penalties and interest

25  assessed by the Internal Revenue Service.  When those -- when

1    the penalty and interest has been assessed, she shall pay that

2    within 60 days of that assessment.  And that is without

3    prejudice to her right to collect at least one-half of that sum

4    from her ex-husband.

5            She shall also perform community service in -- for

6    300 hours over the course of the two years, as directed by the

7    Probation Department.  It is further ordered she shall pay the

8    United States a special assessment which shall be due

9    immediately, and she shall make pay -- and she shall pay a fine

10   in the amount of $5,000.

11           With reference to the -- her financial ability, I

12   find that she has a net worth of $930,000.  She could realize

13   $900,000 from the sale of assets.  That she can realistically

14   earn a total of at least $3500 per month while on supervision,

15   and that $500 of this total can be paid into court based upon

16   her financial needs.  She is, therefore, able to pay a full

17   fine.  And the fine in the amount of $5,000 shall be paid

18   during her supervision, and shall be paid within 120 days.

19           Defendant shall notify the U.S. Attorney for this

20   district within 30 days of any change of mailing or residence

21   address that occurs when a portion of the fine remains unpaid.

22   Any questions on the sentence, Mr. Santaguida?

23           MR. SANTAGUIDA:  Judge, I note -- Ms. Calvert had

24   asked me before, twice a week, I think, she does some

25   babysitting for her sister.  She picks up the children at

1  school.  Will she be able to do that?

2          THE COURT:  Yes.

3          MR. SANTAGUIDA: Thank you.

4          THE COURT: Uh-huh.  All right.  Mr. Hall, do you have

5  any questions on the service -- the sentence?

6          MR. HALL: No, Your Honor.

7          THE COURT: Okay.  All right.  Then that will be the

8  sentence that is imposed.  Now, Ms. Calvert, I want to advise

9  you that you have the right to appeal your conviction and your

10  sentence.  With few exceptions, a notice of appeal must be

11  filed within ten days of judgment being entered in your case,

12  which will most likely occur tomorrow.

13          If you wish to file an appeal, you may request the

14  Clerk of the Court to prepare and file a notice of appeal on

15  your behalf.  If you're unable to pay for the cost of the

16  appeal, you may apply to the Court for leave to appeal without

17  paying that cost.

18          Now as you rightly pointed out, this is the

19  conclusion of a long period of uncertainty and unhappiness, and

20  I can understand that.  There are many people at your

21  institution who were living a very good life when they should

22  not have been living quite as good a life and -- but I think

23  now this is the end of your period of uncertainty.  You have to

24  comply with these conditions, which will not be overly

25  difficult for you.  But you can now look forward to starting

The Court - Sentence                          Page 30

1    your life anew and forgetting about all the rest of this.  Good

2    luck to you.

3            MS. CALVERT: Thank you.  Thank you.

4            MR. SANTAGUIDA: Thank you, Judge.  May I be excused?

5            THE COURT: Okay.  Court is adjourned.

6                        * * * * *

C E R T I F I C A T I O N

    I, Karen O'Malley, court approved transcriber, certify

that the foregoing is a correct transcript from the official

electronic sound recording of the proceedings in the above-

entitled matter.

                    _____
                    KAREN O'MALLEY
                    DIANA DOMAN TRANSCRIBING

Date: 10/27/03

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,       ) 03-CR-332
                                  )
                                  ) Philadelphia, Pa.
                                  ) June 10, 2003
    vs.                    ) 2:45 p.m.
                                  )
                                  )
CAROL CALVERT,                  )
                                  )
            Defendant.      )


TRANSCRIPT OF PLEA HEARING
BEFORE THE HONORABLE WILLIAM H. YOHN, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        CHRIS HALL, ESQ.
                           U.S. Attorney's Office
                           615 Chestnut Street
                           Philadelphia, Pa.  19106


For the Defendant:         JOSEPH SANTAGUIDA, ESQ.
                           121 S. Broad Street
                           Philadelphia, Pa.  19107


Audio Operator:           THOMAS J. McCANN


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-129
                           (856) 435-7172
                           FAX: (856) 435-7124
                           Email: Doman5123@snip.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

Page 2

## I N D E X

The Court                                Page

Carol Calvert                            3, 19, 31


Statement

Mr. Hall                                 18, 20

(NOTE:  Mr. Santaguida off microphone.  Defendant barely
audible at times)

Calvert - The Court                    Page 3

1    THE COURT:  All right.  This is the matter of the

2    United States versus Carol Calvert, file 3-332.  The Court

3    notes the presence of the defendant, her counsel, and the

4    Assistant U.S. Attorney assigned to this action.  And as I

5    understand it, we're here today for the entry of a guilty plea

6    to count one of the information.  Is that correct, --

7              MR. SANTAGUIDA: Yes.

8              THE COURT: -- Mr. Santaguida?

9              MR. SANTAGUIDA:  Yes, Your Honor.  Joseph Santaguida

10   for the defendant, Carol Calvert.

11             THE COURT:  Now would you swear the defendant please?

12   CAROL CALVERT, DEFENDANT, SWORN

13             THE CLERK: State your full name for the record

14   please.

15             MS. CALVERT: Carol Lynn Calvert.

16             THE COURT: Now, Ms. Calvert, I need first to ask you

17   some questions to make sure that you are able to understand

18   what is occurring here today.

19                         DIRECT EXAMINATION

20   BY THE COURT:

21   Q    Do you read, write, and understand the English language?

22   A    Yes, sir.

23   Q    And how far did you go in school?

24   A    I graduated from college.

25   Q    And how old are you?

Calvert - The Court                    Page 4

1   A    Forty-two.

2   Q    And are you subject to any mental illness or disease that

3   could affect your ability to understand what is occurring here

4   today?

5   A    No, sir.

6   Q    Have you ever been subject to any mental illness or

7   disease, or hospitalized for any mental illness or disease?

8   A    No, sir.

9   Q    Now have you taken any drugs, medicines, pills, or drunk

10  any alcoholic beverages in the last 24 hours?

11  A    Just prescription medication.

12  Q    Okay.  And what is that prescription?

13  A    I take Lipitor, Viox, Zoloft, Narspan (phonetic), and an

14  antibiotic.

15  Q    Okay.  Now a couple of those are drugs that do affect your

16  -- your mental capacity.  Do you -- do you --

17  A    Zoloft.

18  Q    -- yes.  Do you feel that you are able to understand what

19  is occurring here today?

20  A    Yes.

21  Q    Do you feel clear headed and if -- I need you to respond

22  verbally.

23  A    Yes, sir.

24  Q    All right.  And you've been taking them for some time I

25  take it?

Calvert - The Court                    Page 5

1    A    Yes.

2    Q    On the Zoloft, how -- what's the quantity that you take?

3    A    A hundred milligrams once a day.

4    Q    Okay.  That's a pretty minimal dose then, I believe.

5    A    (No audible response)

6    Q    Do you know, or you don't know?

7    A    I -- I'm --

8    Q    Yeah.

9    A    -- I think it's an average dose, so --

10   Q    Uh-huh.

11   A    -- I think you can take 25 up to about 200.

12   Q    Uh-huh.  Okay.  Now there was another one you mentioned

13   that sounded to me like it was a --

14   A    No, Viox is for --

15   Q    -- antidepressant.

16   A    -- tendinitis in my shoulder.

17   Q    Uh-huh.

18   A    I have an antibiotic.  And I take Narspan because I -- and

19   Lipitor because --

20   Q    For your cholesterol?

21   A    -- I have high cholesterol and high triglyceride.

22   Q    Okay.  All right.  Now do you understand that you are now

23   under oath, and if you answer any of my questions falsely your

24   answers could later be used against you in a separate criminal

25   prosecution for perjury or making a false statement?

Calvert - The Court                    Page 6

1    A    Yes.

2    Q    Has anybody respond -- instructed you to respond other

3    than truthfully to any of my questions?

4    A    No.

5    Q    Now in connection with this, have you received a copy of

6    the information listing the charge against you?

7    A    Yes.

8    Q    And have you had enough time to discuss your case with

9    your attorney?

10    A    Yes.

11    Q    Do you understand the charge against you?

12    A    Yes.

13    Q    Now you have not had a court appearance previously, and

14    you have the right to have that information read to you word

15    for word at this time if you care to do so, or you can waive

16    your right and we'll proceed without doing that.

17            MR. SANTAGUIDA: Judge, we'll waive our right --

18            THE COURT: Well let -- let me hear -- hear from her.

19            MS. CALVERT: I will waive my rights.

20    BY THE COURT:

21    Q    Okay.  Now this is a (sic) information, which is basically

22    a piece of paper signed by the U.S. Attorney.  Now under our

23    Constitution, you have the right to be charged only by an

24    indictment, as opposed to an information.  Indictment is by a

25    grand jury.  But you can waive that right and consent to be

Calvert - The Court                          Page 7

1    charged by the information signed by the U.S. Attorney.  Do you

2    understand that?

3    A    Yes.

4    Q    Do you understand the charges in this case are being

5    brought by an information rather than an indictment?

6    A    Yes, I understand.

7    Q    Now that -- you did not waive your right to indictment.

8    You cannot be charged with a felony such as this unless a grand

9    jury finds, by returning an indictment, that there's probable

10   cause to believe the crime has been committed, and that you

11   committed it.  And if you do not waive indictment, the

12   Government may present this case to a grand jury to request

13   that it indict you.

14        The grand jury's composed of at least 16, not more than 23

15   persons, and at least 12 of those grand jurors must find

16   there's probable cause to believe that you committed the crime

17   with which you are charged before you may be indicted.  If the

18   case went to the grand jury, it might or might not indict you.

19   But if you waive indictment by the grand jury, then the case

20   proceeds against you on the U.S. Attorney's information, just

21   the same as if you had been indicted.  Do you understand all

22   that?

23   A    Yes.

24   Q    Has anybody made any threats or promises to you to get you

25   to waive your right to indictment by a grand jury?

Calvert - The Court                          Page 8

1    A    No.

2    Q    Is it your desire to waive your right to indictment by a

3    grand jury?

4    A    Yes.

5              THE COURT:  Okay.  And do we have the indictment form

6    -- waiver form?

7              MR. SANTAGUIDA: Yes, Your Honor.

8    BY THE COURT:

9    Q    All right.  I have the waiver form in my hand now.  Is

10   that your signature on the document?

11   A    Yes, Judge.

12             THE COURT:  All right.  Then the Court finds the

13   defendant has knowingly, intelligently, and voluntarily waived

14   her right to indictment by a grand jury, and will proceed just

15   the same as if she had been indicted.  Now I need to go into

16   the general issues in connection with your guilty plea.  And

17   under our Constitution and laws, you have a lot of rights that

18   you're giving up by entering a guilty plea, and I want to make

19   sure you understand them in general terms.

20   BY THE COURT:

21   Q    Under the Constitution, you have the right to plead not

22   guilty to this charge.  You have the right to be tried by a

23   jury, during which time you have the right to be assisted by an

24   attorney.  You have the right to confront and cross-examine the

25   witnesses against you, and you have the right not to be

Calvert - The Court                         Page 9

1   compelled to testify yourself if you chose not to testify.  Do

2   you understand you're giving up all those rights by pleading

3   guilty?

4   A    Yes.

5   Q    During the trial you would not have to prove that you were

6   innocent.  Rather you would be presumed to be innocent, and the

7   Government would have to prove you guilty by proof beyond a

8   reasonable doubt.  Do you understand you're giving up those

9   rights?

10  A    Yes.

11  Q    Even before the trial began, you would have the right to

12  challenge the manner in which the Government obtained evidence

13  against you, including any admissions or confessions made by

14  you, or any physical evidence obtained, or any tape recordings,

15  and you could seek to suppress that evidence, meaning that it

16  could not be used against you during the trial because it had

17  been illegally obtained by the Government.  Do you understand

18  you're giving up your right to challenge the evidence in that

19  manner?

20  A    Yes.

21  Q    Also if you went to trial, a panel of 45 to 50 residents

22  of the Eastern District of Pennsylvania would be selected at

23  random.  They'd be brought into this courtroom.  You and your

24  attorney could participate in selecting a jury of 12 from that

25  group, and all 12 would have to unanimously agree that you were

Calvert - The Court                    Page 10

1   guilty before you could be found guilty of this charge.  Do you

2   understand you're giving up those rights?

3   A    Yes.

4   Q    You also would have the right to request a non-jury trial,

5   meaning that I would hear the evidence, and I would decide

6   whether you're guilty or not guilty, rather than a jury of 12.

7   Do you understand you're -- that you're giving up that right?

8   A    (No audible response)

9   Q    If you went to trial, the Government would have to bring

10  in witnesses to testify in your presence.  Your attorney could

11  cross-examine those witnesses, object to any evidence offered

12  by the Government, and also offer evidence on your own behalf.

13  Do you understand you're giving up those rights?

14  A    Yes.

15  Q    You also would have the right to subpoena witnesses in

16  order to compel their attendance on your behalf, and to present

17  those witnesses, as well as non-subpoenaed witnesses, and

18  including character witnesses whose testimony could raise a

19  reasonable doubt as to your guilt.  Do you understand you're

20  giving up those rights?

21  A    Yes.

22  Q    You would also have the right to testify if you chose to

23  do so.  But if you chose not to testify, I would instruct the

24  jury they could not hold that against you in any way because it

25  was your Constitutional right.  Do you understand you're giving

Calvert - The Court                    Page 11

1    up those rights?

2    A    Yes.

3    Q    Also during the trial your attorney could argue to the

4    jury or to the Court on your behalf against the Government's

5    case.  Do you understand you're giving up those rights?

6    A    Yes.

7    Q    By pleading guilty you're waiving -- that means giving up

8    forever your right to a trial of any kind, as well as all the

9    other rights just discussed.  There will be no trial.  The

10   Court will enter a judgment of guilty, and sentence you on the

11   basis of your guilty plea after considering a presentence

12   report and conducting a sentencing hearing.  Do you understand

13   that?

14   A    Yes.

15   Q    By pleading guilty, you are giving up your right to appeal

16   from any conviction after trial because there will be no trial,

17   and the only appeal from a guilty plea would be if I imposed an

18   illegal sentence, or if there are any errors in this proceeding

19   or the sentencing proceeding.  Do you understand that?

20   A    Yes, Judge.

21   Q    And you have the right to be represented by an attorney at

22   every stage of the proceeding against you.  And if you cannot

23   afford the fees of an attorney to try your case, then one will

24   be appointed to represent you free of charge.  Do you

25   understand that?

Calvert - The Court                              Page 12

1    A    Yes.

2    Q    Are you satisfied with your attorney's representation in

3    this matter?

4    A    Yes.

5    Q    The decision to enter a guilty plea is yours and yours

6    alone.  Your attorney can give you the benefit of his training,

7    experience and advice, but only you can decide whether you want

8    to plead guilty.  Do you understand that?

9    A    Yes, Judge.

10   Q    Is it your desire to enter a plea of guilty to this

11   charge?

12   A    Yes, Judge.

13   Q    Now in connection with this, the maximum penalty for you

14   is that you could go to jail up to three years, followed by up

15   to one year on supervised release.  You could be fined up to

16   $250,000.  And I must impose a special assessment of $100.  Do

17   you understand that?

18   A    Yes, Judge.

19   Q    While you're on probation or supervised release, if you

20   get in any trouble with the law, or you violate any of the

21   other conditions of your probation or supervised release, I can

22   send you to jail for an additional period of time because of

23   those violations.  Do you understand that?

24   A    Yes, Judge.

25   Q    While you're on probation or supervised release, if you

Calvert - The Court                      Page 13

1    get in any trouble with the law, or you violate any of the

2    other conditions of your probation or supervised release, I can

3    send you to jail for an additional period of time because of

4    those violations.  Do you understand that?

5    A    (No audible response)

6    Q    Now I don't know what your sentence will be as a result of

7    this guilty plea, and I won't make that determination until

8    after I have a presentence report from the probation

9    department.  But you could, on the basis of your guilty plea,

10   receive a sentence right up to the maximum permitted by law

11   that I just explained to you.  And even if I did that, you

12   would not be entitled to withdraw your guilty plea because I

13   imposed such a sentence.  Do you understand that?

14   A    Yes.

15   Q    Your sentence could be more severe than you expect, or

16   anyone else recommends, but you're still bound by your guilty

17   plea, and have no right to withdraw it because of that.  Do you

18   understand that?

19   A    Yes.

20   Q    This is a felony offense, and you may be deprived of

21   certain valuable civil rights, such as the right to hold -- the

22   right to vote, the right to hold public office, the right to

23   serve on a jury, and the right to possess any kind of a

24   firearm.  Do you understand that?

25   A    Yes.

Calvert - The Court                     Page 14

1   Q    Now in addition to the legal maximums that I have

2   mentioned to you, the U.S. Sentencing Commission has issued

3   guidelines that I must follow in determining what the sentence

4   is in your case within the legal range.  Do you understand

5   that?

6   A    Yes.

7   Q    Have you discussed with your attorney how the guidelines

8   might apply to your case?

9   A    Yes.

10  Q    Now I won't determine what those guidelines are until the

11  presentence report has been completed, and you and the

12  Government have had an opportunity to challenge the facts

13  reported by the probation officer.  Do you understand that?

14  A    Yes.

15  Q    After I determine what the guidelines are, I have the

16  authority in some circumstances to impose a sentence that is

17  more severe or less severe than that called for by the

18  guidelines.  Do you understand that?

19  A    Yes.

20  Q    Under the guidelines parole's been abolished.  And when

21  they talk in terms of a number of months in prison, you must

22  serve that period of time in prison.  You don't get released on

23  parole after serving some portion of it.  Do you understand

24  that?

25  A    Yes.

Calvert - The Court                     Page 15

1   Q    There are some stipulations in your guilty plea agreement.

2   Those are binding on you, and they're binding on the

3   Government, but they're not binding on me.  And I'll make a

4   determination at the sentencing hearing as to whether to accept

5   those stipulations.  Do you understand that?

6   A    Just one -- are those the --

7        (Defendant consults with counsel)

8   A    -- yes.

9   Q    Okay.  Now the amount of the tax loss that is involved

10  here has an effect upon the guidelines for your sentencing.

11  And the higher the loss is the higher -- the higher the

12  guideline sentence is.  Do you understand that?

13  A    Yes.

14  Q    Now in addition to that, you have in your guilty plea

15  agreement agreed that you will not file any appeal, or you will

16  not do what we call collaterally attack your judgment of

17  sentence.  And basically what I want you to know in that regard

18  is that you have the right ordinarily to appeal any sentence

19  that I impose on you to a higher court, which could modify or

20  set aside your sentence, or require me to resentence you.  The

21  Government also has the same right of appeal.

22       In addition to that, you have the right to bring later

23  proceedings, such as what we call a collateral attack by filing

24  a habeas corpus motion to vacate, set aside, or correct your

25  sentence.  Now you normally have those rights, do you

Calvert - The Court                         Page 16

1    understand that, to appeal, and then also to collaterally

2    attack your judgment of conviction and sentence.  Do you

3    understand that?

4    A    Yes.

5    Q    Now this plea agreement greatly limits your right to

6    appeal, and prevents you from using these later proceedings

7    that I mentioned to you to collaterally attack your judgment.

8    And you can only appeal on the limited grounds set forth in the

9    guilty plea agreement.  Do you understand that?

10             MR. SANTAGUIDA: Judge, she wants to ask me a

11   question.

12             THE COURT: Yeah, okay.

13        (Defendant consults with counsel)

14             MR. SANTAGUIDA:  Ordinarily, Judge, I put it on the

15   record that I usually don't agree with that -- with the

16   Government, but in this case they made a concession that the

17   guidelines -- guideline concession about the guidelines, and I

18   don't think this really will affect her later on.

19             THE COURT: Uh-huh.

20             MR. SANTAGUIDA: I don't think she'd be making a

21   collateral attack so --

22             THE COURT:  Okay.  Well that may be your judgment; I

23   want to make sure it's her judgment.

24             MR. SANTAGUIDA: Okay.

25   BY THE COURT:

Calvert - The Court                     Page 17

1    Q     Yeah.  Because she -- you're the one who's bound by it,

2    Ms. Calvert, not Mr. Santaguida.  Do you understand that?

3    A     Can I get something taken out?

4    Q     Well that you'd have to discuss.  I don't -- I don't

5    participate in settlement -- in the guilty plea agreements.

6              MR. SANTAGUIDA:  We agree with that.

7              THE COURT:  Okay

8    BY THE COURT:

9    Q     Now basically -- and in paragraph 11 of your agreement it

10   says in exchange for the undertakings made by the Government in

11   entering this plea agreement, the defendant voluntarily and

12   expressly waives all right to appeal or collaterally attack the

13   defendant's conviction, sentence, or other matters relating to

14   this prosecution, whether such a right of -- to appeal or

15   collateral attack arises under -- and then various -- or any

16   provision of law.

17         Now it does except from that that if the Government

18   appeals from the sentence, then the defendant may file a direct

19   appeal.  If the Government does not appeal, then you may file a

20   direct appeal, but raising only the claims that the defendant

21   exceed -- the sentence exceeds the statutory maximum, which

22   would be the three-year period, or that I erroneously departed

23   upward from the other applicable sentencing guideline range.

24         These are the only bases on which you could file an

25   appeal, and you cannot collaterally attack your sentence.  And

1    that's your agreement.  And if you want to proceed, then that's

2    part of the agreement.  If you don't want to agree to that,

3    then there's no guilty plea.

4    A    I agree.

5    Q    All right.  And that's your decision, not your attorney's,

6    and not the Government's.  It's your -- it has to be your

7    decision.  Do you understand that?

8    A    Yes, Judge.

9           THE COURT:  All right.  Now there has been a plea

10   agreement in this case.  And, Mr. Hall, would you summarize the

11   terms of the plea agreement?

12          MR. HALL:  Yes, Your Honor.  The defendant agrees to

13   plead guilty to the information as charged.  The Government

14   reserves the right to make whatever sentencing recommendation

15   it deems appropriate.  The defendant agrees to cooperate with

16   the IRS in a number of ways.

17          First, she agrees to pay $79,749 of unpaid taxes.

18   She agrees to provide the IRS with any information they request

19   for a civil audit.  She agrees that she will not object to an

20   entry of an order permitting the Civil Division of the IRS to

21   review the records collected as part of this criminal

22   investigation.

23          The parties entered into the following stipulations,

24   Your Honor.  First of all, the defendant is entitled to a two-

25   level downward adjustment for acceptance of responsibility, and

Calvert - The Court                         Page 19

1    another two-level downward adjustment for a minor role.  And

2    then the waiver of appellate rights, Your Honor, that Your

3    Honor's already reviewed with her.  The defendant understands

4    that these agreements as to the guidelines do not bind the

5    Court or the probation office in its independent review of the

6    guidelines that apply.  And that's the summary, Your Honor.

7             THE COURT: Uh-huh.  All right.

8    BY THE COURT:

9    Q    Now, Ms. Calvert, does that accurately summarize the terms

10   of the plea agreement as you understand them?

11   A    Yes.

12   Q    Uh-huh.  Now that -- the actual agreement is not that

13   summary, but it is the written document, the written guilty

14   plea agreement.  Do you understand that?

15   A    Yes.

16            THE COURT:  Who has the original of that?

17            MR. HALL: I do, Your Honor.

18            THE COURT: Okay.

19            MR. HALL: May I approach?

20            THE COURT: You may.

21   BY THE COURT:

22   Q    Now I'm holding that document in my hand now.  Did you

23   read and understand this document?

24   A    Yes.

25   Q    Did you have enough time to discuss it with your attorney,

1    and to make your decision to plead guilty based on the terms of

2    this agreement?

3    A    Yes.

4    Q    Is that your signature at the end?

5    A    Yes, the -- oh, yes.

6    Q    Okay.  And has anybody forced you or threatened you to get

7    you to plead guilty based on this agreement?

8    A    No.

9    Q    Has anybody made any promises to you, other than the terms

10   of the plea agreement, to get you to plead guilty?

11   A    No.

12   Q    Now does the written document contain the terms of your

13   agreement with the Government as you understand them?

14   A    Yes.

15   Q    And do you agree with those terms?

16   A    I have to, yes.

17   Q    No, you don't have to.  You --

18   A    Well, yes.

19   Q    You do?  Okay.  I mean you don't have to if you --

20   A    I know, but it -- I -- yes.

21            THE COURT:  All right.  All right.  Now I'm going to

22   have Mr. Hall explain to you what we call the essential

23   elements of the charge.  This is a legal description of the

24   charge, and it's important to you because if you went to trial,

25   I would instruct the jury that they had to unanimously agree

Hall - Statement                           Page 21

1  that you were guilty of every element of the charge before they

2  could find you guilty of this charge.  Mr. Hall?

3           MR. HALL:  Your Honor, the -- the elements follow.

4  First, that the defendant willfully aided or assisted in, or

5  procured or counseled; two, the preparation of a tax return;

6  and three, that it was fraudulent or false as to any material

7  or important matter.

8  BY THE COURT:

9  Q    All right.  Do you understand the essential elements of

10  the charge against you?

11  A    Yes.  That includes --

12           MR. HALL:  I can repeat that if that would be

13  helpful.

14           MS. CALVERT:  Please.

15           MR. HALL:  The first element is that you willfully

16  aided or assisted, and the second element is the preparation of

17  a tax return.  And the third element is that that tax return

18  was false or incorrect as to an important or material matter.

19           THE COURT:  All right.  Do you understand the

20  essential elements?

21           MS. CALVERT:  Yes.

22           The court:  Okay.  Now I'm going to have Mr. Hall set

23  forth the facts the Government would be prepared to prove at

24  trial.  I want to make sure those facts fit the charge against

25  you, and I want to make sure you admit doing what they say you

1    did.  Mr. Hall?

2           MR. HALL:  Your Honor, the -- the first and most

3    important exhibit would be the actual tax return for Ms.

4    Calvert and her former husband filed for fiscal -- for calendar

5    year 1996.  And that tax return showed that Ms. Calvert had

6    received, in addition to other compensation from -- from the

7    former Allegheny Health Education and Research Foundation, she

8    received a $300,000 consulting agreement which was part of the

9    severance package.

10          In addition to declaring that $300,000 on the

11   schedule "C", that was offset by business expenses related to

12   an unrelated business endeavor by her husband of $243,279.

13   That resulted in a combined net income on the schedule "C" of

14   only $56,721.  The other evidence in the case, if it proceeded

15   to trial, would be approximately four witnesses.  And I'll just

16   say their names, Walz, W-A-L-Z, Dr. Kaye, K-A-Y-E, Gerald

17   Escovitz, and a Judy Harrington.

18          Those employees knew Ms. Calvert from her work at

19   AHER.  And during the period of time that she was covered by

20   this consulting agreement, they would testify that she did

21   essentially no work for AHER.  And the inference the Government

22   would draw from that is that she had no expenses during that

23   period of time associated with that.  And finally, Your Honor,

24   the Government would call her former husband, --

25          MR. SANTAGUIDA:  That's not the element of the crime,

1    Judge.   The element of the crime is that her husband put

2    down --

3              MS. CALVERT: He made up --

4              MR. SANTAGUIDA: -- deductions --

5              MS. CALVERT: -- expenses --

6              MR. SANTAGUIDA: -- that were not expenses.  Not that

7    she didn't do any work.  We never agreed to that.

8              MS. CALVERT:  I was in the retainer --

9              MR. SANTAGUIDA: The retainer, the $300,000 --

10             THE COURT: Just a minute.  One at a time.

11             MR. SANTAGUIDA:  -- was a retainer, and she didn't

12   have to do any work for that.  They would be on call if they

13   needed her for anything.  That was a negotiation that they

14   agreed with.  Whether it was fair or unfair, or whether she --

15             THE COURT:  Whether it was a consulting contract or a

16   severance pay doesn't seem to me that it makes any difference.

17             MR. SANTAGUIDA: It doesn't.

18             THE COURT: Yeah.

19             MR. SANTAGUIDA:  No.  So I don't know why --

20             MS. CALVERT: My --

21             MR. SANTAGUIDA: -- those witnesses don't --

22             THE COURT:  So -- just a minute please.

23             MS. CALVERT: Okay.

24             THE COURT: Okay.

25             MR. SANTAGUIDA:  No, but --

1          THE COURT:  So in --

2          MR. SANTAGUIDA: -- it's going to make her think that

3     -- that that's not the element to why she's pleading guilty.

4     She's pleading guilty because she --

5          THE COURT: The expenses were false.

6          MR. SANTAGUIDA: -- had a $300,000 income, and her

7     husband said they had like say $180,000 --

8          THE COURT:  Well it wasn't just her husband.

9          MR. SANTAGUIDA: I'm sorry?

10         THE COURT: It wasn't just her husband, or otherwise

11    she wouldn't be here.

12         MR. SANTAGUIDA: No, no.  And she agreed.

13         THE COURT: Yeah.

14         MR. SANTAGUIDA: She signed -- she signed it and she

15    said that we --

16         THE COURT: I don't think she did --

17         MR. SANTAGUIDA: -- we have those expenses --

18         THE COURT: -- sign the tax return.

19         MR. SANTAGUIDA:  Well, but he signed for her.  She

20    agreed --

21         THE COURT:  Now, Mr. Hall, it doesn't seem to me that

22    the issue of whether she was -- whether this was a consulting

23    fee, or whether a severance pay, or whether she worked for it

24    or not makes any difference.  Does it make a difference to you?

25         MR. HALL:  Well, Your Honor, this -- the Government