COUNT 4     THEFT BY FAILURE TO MAKE     18 Pa. C.S. §3927(a)
REQUIRED DISPOSITION OF FUNDS     3RD Degree Felony
RECEIVED

On or about June, 1998, the Actor, David McConnell, obtained property, namely approximately $16,692.06, which was to be utilized for stadium box seating renovations at Three Rivers Stadium, belonging to another, namely, Allegheny Health, Education and Research Foundation (AHERF), upon agreement, or subject to a known legal obligation to make specified payments or other disposition of the property or its proceeds or from his own property to be reserved in an equivalent amount namely, to reimburse the vendors providing services and/or materials, and said actor intentionally dealt with the property so obtained as his own and failed to make the required disposition, in violation of 3927(a) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S.§3927(a).

COUNT 5                CRIMINAL CONSPIRACY          18 Pa. C.S. §903(a)(1)
                                                        3nd Degree Misdemeanor

On or about March 26, 1996 through and including June 26, 1998, the Actor, David McConnell, with the intent of promoting or facilitating the crime of Violation of the PA Election Code, the Actor, David McConnell, conspired or agreed with others, namely, Sherif Abdelhak, and/or Nancy A. Wynstra, and/or Curtis B. Copeland, and/or Joan Chrestay that they, or one or more of them, would engage in conduct constituting such crimes, and in furtherance thereof, did commit the overt acts, namely, Sherif Abdelhak, as Chief Executive Officer for Allegheny Health, Education and Research Foundation (AHERF), Nancy A. Wynstra, as General Counsel to AHERF, and David McConnell, as Chief Financial Officer of AHERF, directed and/or authorized AHERF lobbyist and employee, Curtis B. Copeland's $60,000 net salary increase and AHERF lobbyist and employee, Joan Chrestay's $40,000 net salary increase, and that Nancy Wynstra and David McConnell each received $50,000 in 1996 and another $50,000 each in 1997, to be utilized for the illegally funneling of AHERF's money to various political candidates as campaign contributions, knowing that the use of AHERF money for campaign contributions was illegal, in violation of Section 903(a)(1) of the PA Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §903(a)(1).

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of

| | | | | |
|---|---|---|---|---|
| 1. ___3927___ | ___(a)___ | of the ___PCC___ | ___1___ |
| (Section) | (Subsection) | (PA Statute) | (counts) |
| 2. ___4113___ | ___(a)___ | of the ___PCC___ | ___1___ |
| (Section) | (Subsection) | (PA Statute) | (counts) |
| 3. ___903___ | ___(a)(1)___ | of the ___PCC___ | ___2___ |
| (Section) | (Subsection) | (PA Statute) | (counts) |

4.   1927        (a)        of the       PCC        1
Case 2:00-cv-00684-DSC   Document 130-5   Filed 07/11/2005   Page 2 of 25
(Section)        (Subsection)        (PA Statute)        (counts)

3.   I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made. (In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed and sworn to before the issuing authority.)

4.   I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA.C.S. § 4904) relating to unsworn falsification to authorities.

_____, 19__        _____

                                                            (Signature of Affiant)

AND NOW, on this date _____, 19__, I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed in order for a warrant to issue.

_____        _____ SEAL

(Magisterial District)                  (Issuing Authority)

AOPC 412-(6/96)                2 - 3

| Defendant's Name:  Nancy Wynstra |
| Docket Number: |

**POLICE**

## CRIMINAL COMPLAINT

### AFFIDAVIT of PROBABLE CAUSE

### (See Attached Presentment)

I, _____, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, 19 ____.

_____ Date

_____, District Justice

My commission expires first Monday of January, _____.

**SEAL**

IN THE COURT OF COMMON PLEAS
ALLEGHENY COUNTY, PENNSYLVANIA

IN RE:                                    :  SUPREME COURT OF PENNSYLVANIA
                                          :  149 W.D. MISC. DKT. 1998
THE FOURTEENTH STATEWIDE                  :
                                          :  ALLEGHENY COUNTY COMMON PLEAS
INVESTIGATING GRAND JURY                  :  NO. 1182 M.D. 1998
                                          :
                                          :  NOTICE NO. 9


## ORDER ACCEPTING PRESENTMENT NO. 10

    1.    The Court finds Presentment No. 10 of the Fourteenth Statewide Investigating Grand Jury is within the authority of said Grand Jury and is in accordance with the provisions of the Investigating Grand Jury Act, 42 Pa.C.S. § 4541, et seq. Accordingly, this Presentment is accepted by the Court.

    2.    The County for conducting the trial of all charges pursuant to this Presentment shall be Allegheny County.

    3.    The Attorney General of the Commonwealth of Pennsylvania, or his designee, is hereby authorized to prosecute as recommended in this Presentment by instituting appropriate criminal proceedings in the aforesaid County.


SO ORDERED this *17TH* day of *February*, 2000.


G. THOMAS GATES
Supervising Judge
The Fourteenth Statewide Investigating
    Grand Jury

IN THE COURT OF COMMON PLEAS
ALLEGHENY COUNTY, PENNSYLVANIA

IN RE:                              : SUPREME COURT OF PENNSYLVANIA
                                    : 149 W.D. MISC. DKT. 1998
THE FOURTEENTH STATEWIDE            :
                                    : ALLEGHENY COUNTY COMMON PLEAS
INVESTIGATING GRAND JURY            : NO. 1182 M.D. 1998
                                    :
                                    : NOTICE NO. 9


TO THE HONORABLE G. THOMAS GATES, Supervising Judge:


<u>PRESENTMENT NO. 10</u>

    We, the Fourteenth Statewide Investigating Grand Jury, duly charged to inquire into

offenses against the criminal laws of the Commonwealth, have obtained knowledge of such

matters from witnesses sworn by the Court and testifying before us. We find reasonable grounds

to believe that various violations of the criminal laws have occurred. So finding with not fewer

than twelve concurring, we do hereby make this Presentment to the Court.


Foreperson - The Fourteenth Statewide
Investigating Grand Jury


DATED: FEB. 17 , 2000



# POLICE CRIMINAL COMPLAINT

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF:

Magisterial District Number: 05-2-28

District Justice Name:   HON. OSCAR PETITE, JR.

Address:            912 Fifth Avenue
                    Pittsburgh, PA 15219
Telephone:   ( 412 ) 261-2660

COMMONWEALTH OF PENNSYLVANIA

VS:

DEFENDANT:    NANCY A. WYNSTRA
              6105 Walnut Street
              Pittsburgh, PA 15208

Docket No.:

Date Filed:

OTN:

| Defendant's Race/Ethnicity <br> x White  ☐ Asian  ☐ Black <br> ☐ Hispanic ☐ Native American ☐ <br> Unknown | Defendant's Sex <br> x Female <br> ☐ Male | Defendant's D.O.B. <br><br> 06/25/41 | Defendant's Social Security # <br><br> 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 | Defendant's SID |
|---|---|---|---|---|
| Defendant's A.K.A. | Defendant's Vehicle Information: <br> Plate Number        State | Registration Sticker (MM/YY) | Defendant's Driver's License Number <br> State | |
| Complaint/Incident Number   21-790 | Complaint/Incident Numbers if other Participants   21-790 | | UCR/NIBRS Code | |

District Attorney's Office    ☐Approved    ☐Disapproved because: _____
(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. Pa.R.Cr.P.107.)

_____          _____     _____
(Name of Attorney for Commonwealth - Please Print or Type)          (Signature of Attorney for Commonwealth)          (Date)

We,  Special Agents Joseph Lawlor and William Wells    (724) 832-5418                    59 & 156
         (Name of Affiant - Please Print or Type)                                              (Officer Badge Number/I.D.)

of    PA Office of Attorney General - BCI, 2910 Seminary Drive, Greensburg, PA   PA065015A           21-790
Number)      (Originating Agency Case Number (OCA))

do hereby state: (check the appropriate box)
1.  x We accuse the above named defendant who lives at the address set forth above
    ☐ I accuse the defendant whose name is unknown to me but who is described as _____
    _____
    ☐ I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have therefore
       designated as John Doe
       with violating the penal laws of the Commonwealth of Pennsylvania at _____ Pittsburgh, PA _____
                                                                       (Place-Political Subdivision)

in    Allegheny              County on or about    March, 1996 to July 1998

Participants were: (if there were participants, place their names here, repeating the name of above defendant)
        Sherif Abdelhak, Nancy A. Wynstra and David McConnell

2.   The acts committed by the accused were:
     (Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged.  A citation to the statute allegedly violated,
     without more, is not sufficient.  In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)

**POLICE**

**CRIMINAL COMPLAINT**

| Defendant's Name: Nancy A. Wynstra |
|---|
| Docket Number: |

COUNT 1 | THEFT BY FAILURE TO MAKE REQUIRED DISPOSITION OF FUNDS | 18 PA C.S. §3927(a)
3RD Degree Felony

On or about February 11, 1998, through and including July 2, 1998, the Actor, Nancy A. Wynstra, obtained property, namely, approximately $52,442,975.00, which was diverted from various trust accounts into the General Operating Account of Allegheny Health, Education and Research Foundation (AHERF), these monies belonging to AHERF, upon agreement or subject to the known legal obligation to make specified payments or other disposition of the property or its proceeds, and said Actor intentionally dealt with the property so obtained as her own and failed to make the required disposition or payment, in violation of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §3927(a).

COUNT 2 | MISAPPLICATION OF ENTRUSTED PROPERTY | 18 PA C.S. §4113(a)
2nd Degree Misdemeanor

On or about February 11, 1998, through and including July 2, 1998, the Actor, Nancy A. Wynstra applied or disposed of property, namely, approximately $52,442,975.00, that had been entrusted to her as a fiduciary, in a manner which she knew was unlawful and involved substantial risk of loss or detriment to Allegheny Health, Education & Research Foundation (AHERF), the owner of the property or the person for whose benefit the property was entrusted, all of which is in violation of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §4113(a).

COUNT 3 | CRIMINAL CONSPIRACY | 18 Pa. C.S. §903(a)(1)
3rd Degree Felony

On or about February 11, 1998 through and including July 2, 1998, the Actor, Nancy A. Wynstra, with the intent of promoting or facilitating the crimes of Theft by Failure to Make Required Disposition of Funds and Misapplication of Entrusted Property, conspired or agreed with others, namely, Sherif Abdelhak and/or David McConnell, that they, or one or more of them, would engage in conduct constituting such crimes, and in furtherance thereof, did commit the overt acts, namely Sherif Abdelhak authored a memorandum directing $70 million be diverted from various endowment accounts to the General Operating Account and approximately $52,422,975, of this money was utilized by Actors Sherif Abdelhak, David McConnell, and/or Nancy Wynstra, to pay Allegheny Health, Education and Research Foundation's (AHERF) accounts payable, satisfy payroll needs, and fund various wire transfers relating to the operations of AHERF, knowing the diversion of this money was illegal and in direct disregard of the intent for which the endowments were established, in violation of Section 903(a)(1) of the PA Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §903(a)(1).

On or about March 26, 1996 through and including June 26, 1998, the Actor, Nancy A. Wynstra, with the intent of promoting or facilitating the crime of Violation of the PA Election Code, the Actor, Nancy A. Wynstra, conspired or agreed with others, namely, David McConnell, and/or Sherif Abdelhak, and/or Curtis B. Copeland, and/or Joan Chrestay that they, or one or more of them, would engage in conduct constituting such crimes, and in furtherance thereof, did commit the overt acts, namely, Sherif Abdelhak, as Chief Executive Officer for Allegheny Health, Education and Research Foundation (AHERF), Nancy A. Wynstra, as General Counsel to AHERF, and David McConnell, as Chief Financial Officer of AHERF, directed and/or authorized AHERF lobbyist and employee, Curtis B. Copeland's $60,000 net salary increase and AHERF lobbyist and employee, Joan Chrestay's $40,000 net salary increase, and that Nancy Wynstra and David McConnell each received $50,000 in 1996 and another $50,000 each in 1997, to be utilized for the illegally funneling of AHERF's money to various political candidates as campaign contributions, knowing that the use of AHERF money for campaign contributions was illegal, in violation of Section 903(a)(1) of the PA Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §903(a)(1).

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. | 3927 | (a) | of the | PCC | | 1 | |
| | (Section) | (Subsection) | | (PA Statute) | | (counts) | |
| 2. | 4113 | (a) | of the | PCC | | 1 | |
| | (Section) | (Subsection) | | (PA Statute) | | (counts) | |
| 3. | 903 | (a)(1) | of the | PCC | | 2 | |
| | (Section) | (Subsection) | | (PA Statute) | | (counts) | |

3.    I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made. **(In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed and sworn to before the issuing authority.)**

4.    I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA.C.S. § 4904) relating to unsworn falsification to authorities.

5.

_____, 19___

_____
(Signature of Affiant)

AND NOW, on this date _____, 19___, I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed in order for a warrant to issue.

_____        _____ SEAL

(Magisterial District)                              (Issuing Authority)

AOPC 412-(6/96)                         2 - 3

| Defendant's Name:  Nancy Wynstra |
| Docket Number: |

**POLICE**

**CRIMINAL COMPLAINT**

## AFFIDAVIT of PROBABLE CAUSE

### (See Attached Presentment)

I, _____, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, 19 _____.

_____ Date                    _____, District Justice

My commission expires first Monday of January, _____.                **SEAL**

## INTRODUCTION

We, the members of the Fourteenth Statewide Investigating Grand Jury, have received and reviewed evidence pertaining to allegations of theft and criminal misapplication of endowment funds by executive officers of a hospital system. This investigation was conducted pursuant to Notice of Submission of Investigation Number 9 and, by this Presentment, this Grand Jury hereby makes the following findings of fact and recommendation of charges:

## FINDINGS OF FACT

In April, 1999, the Fourteenth Statewide Investigating Grand Jury began receiving testimony regarding the criminal theft of funds in the financial collapse of the Allegheny Health, Education and Research Foundation (AHERF), the supporting foundation for a number of entities which formed a statewide umbrella system of health care institutions.

Restricted Funds

Bernard F. Woolfley is a Senior Engagement Manager with Navigant Consulting, Inc., formerly Peterson Worldwide LLC. Since the Office of Attorney General began its criminal investigation, Woolfley has worked with the criminal side of the investigation. Woolfley provided the Grand Jury with a contextual background for the operations and history of AHERF in its decline into bankruptcy.

Woolfley testified that as of June 30, 1997, AHERF was one of the largest hospital networks in Pennsylvania with 14 hospitals in the state and some minor operations in West Virginia, Ohio and New Jersey. AHERF's operations also included certain medical schools and teaching facilities. On July 21, 1998, a portion of AHERF's operations was placed into bankruptcy. The majority of the entities in bankruptcy were based in the eastern part of

Pennsylvania. Woolfley outlined the three main reasons for bankruptcy: decreases in hospital occupancy; decreases in reimbursement rates; and excessive administrative costs. Woolfley explained that while most hospitals have administrative costs of less than 3% of operating costs, AHERF's administrative costs exceeded 10% of its operating costs.

Woolfley explained that AHERF was a non-profit and heavily endowed organization. Monies donated to AHERF could be in the form of restricted or unrestricted funds. Unrestricted funds could be used or distributed by AHERF as its officers saw fit. Restricted funds were funds established by a donor and could only be used for a specific purpose, such as scholarships or research into specific diseases. There were two sub-types of restricted funds. One type, an endowment fund, allowed interest generated on principal (or corpus) to be used for a specific purpose. All principal was considered to be "permanently restricted" and could not be used for any purpose. All income and interest was considered to be "temporarily restricted," meaning it could be used, but only for the purpose of meeting the donative intent. A second type of restricted fund, "specific purpose fund," allowed principal as well as interest and income to be used. Thus, the entire fund was considered to be "temporarily restricted," and could all be used, but only for the purpose of meeting the donative intent.

Woolfley testified that between February and July, 1998, $78 million in restricted funds were accessed by AHERF. This amount represented actual cash outflows from the various trusts into the AHERF Cash Concentration Account, which monies were then used to pay AHERF's accounts payable, satisfy payroll needs and fund various wire transfers related to the operations of AHERF. These restricted funds were accessed, mechanically, by either liquidations or "borrowings." In a liquidation, assets relating to a specific restricted fund were sold and the

balance of the individual fund was reduced by these sales. In a "borrowing," part of the assets of a specific fund were sold and replaced with a "note receivable." When AHERF calculated the balances in the funds after the "borrowing," it included the value of the receivable (or I.O.U.) as part of the fund balance. Woolfley testified, however, that no formalized loan documents or repayment plans were ever devised to support the premise that these conversions were actually "borrowings." Regardless of terminology, all liquidations or "borrowings" resulted in transfer of actual cash from the trust funds to the AHERF Cash Concentration Account.

Woolfley testified that the authorization to access the restricted funds came from AHERF's Chief Executive Officer, Sherif Abdelhak in a February 11, 1998 memorandum. The memorandum was directed to Donald Kaye, M.D., Chief Executive Officer of the Eastern Region, and Charles P. Morrison, Senior Vice-President of Finance for the Eastern Region, and reads as follows:

> Please be advised that you may access the temporarily restricted endowments at AUHS [Allegheny University for Health Sciences] for up to $70 million, as a loan, for your cash needs. I have reviewed the sources of the funding with our Treasury Department and have determined that such use would be entirely consistent with the intended purpose of those funds. Before any of those funds are released, you must secure the approval of the Loan Committee by providing them with a specific plan of repayment. Finally, you must utilize a portion of those funds to pay AHERF for the Delaware Valley employee benefits so we do not have an interruption of such benefits.

Woolfley testified that Charles Morrison subsequently sent a series of memoranda to Michael P. Martin, Vice-President, Treasury Operations, directing the transfer of the funds into the Cash Concentration Account. Woolfley testified that if AHERF had not invaded the restricted funds, the Cash Concentration Account would have had a negative balance as of March

3, 1998, and that the balance would have remained negative for the entire period up to the bankruptcy date.

David Deasy is the former Senior Director of Corporate Disbursements at AHERF, and, beginning in 1995, Deasy controlled accounts payable and payroll. Deasy testified before the grand jury and detailed the financial distress at AHERF. Deasy testified that AHERF "started having a cash flow issue" as early as 1996 when the amount of cash to pay bills through accounts payable became limited. In response, Deasy said, the Chief Financial Officer, David McConnell, put the accounts payable department on a daily allowance, meaning that he was given a certain and limited amount of money to pay vendors each day. The ability to pay bills varied depending on the services provided or the amount of cash on hand. However, by February, 1998, payment terms had been extended to 90 days. Shortly, he testified, invoices extended over 200 days without payment. Deasy testified that accounts payable were "at the bottom of the list" of items to be paid. Instead, cash coming into the organization would be used to meet payroll and "[e]verything that needed to be paid other than accounts payable," which would be paid with whatever was left. As a result, vendors would constantly and increasingly complain about the lack of payment. Deasy testified that "on any given day," he would get 150 to 200 calls from vendors upset about payment terms or lack of payment. Deasy said he shared these problems and complaints with his superiors. Specifically, Deasy testified, there was "no question" that McConnell knew the dire financial situation.

The grand jury learned about the invasion of restricted AHERF funds from Charles Morrison, Dr. Donald Kaye and Michael Martin, who testified pursuant to orders of immunity. Charles Morrison testified that in 1993, he became Senior Vice-President of Finance, essentially

the chief financial officer for the Eastern Region entities of AHERF.  He reported to David McConnell, the Chief Financial Officer of the AHERF system, and Dr. Donald Kaye, the Chief Executive Officer of the Eastern Region.  Morrison testified that the financial difficulties of the Eastern Region entities first became apparent during the course of fiscal year 1996.  The cash flow deteriorated and the Eastern Region began relying on borrowing from two principal sources: an external line of credit with Mellon Bank and borrowing within the organization from the Western Region of AHERF.  This cash flow shortfall continued through fiscal year 1997 and into 1998.  At the end of fiscal year 1997, the debt from these two sources was nearly $120 million, about half attributable to each source.

In August 1997 another $30 million was borrowed from Mellon Bank.  At this time, Morrison testified, accounts payable were extended to 90 days.  Demands for payment by vendors increased in frequency and urgency.  In response, Morrison said, Abdelhak authorized the use of any and all unrestricted and board designated funds (*i.e.,* funds that had been identified by the board for future capital acquisition but could be used for cash flow purposes with the approval of the board).  Morrison described this action as "a temporary fix."  Morrison testified that in the fall of 1997, AHERF also engaged in a major work-force downsizing.  Despite the layoffs and the use of the unrestricted funds, the aggregate cash flow of the organization continued to be negative in January, 1998.  Morrison testified that as a result of the incessant complaints from vendors about non-payment, "it was painfully apparent that there was financial difficulty."

Morrison testified that, thereafter, the restricted funds were the only cash or liquid asset remaining available on the organization's balance sheet.  On February 11, 1998, Morrison

received the previously quoted memorandum from Abdelhak authorizing the "borrowing" of the endowment funds. Morrison found the directive unusual and alarming because the endowment funds all had stipulations restricting their use and traditionally and historically were never accessed for the general operating purposes of the organization. Morrison testified that he was extremely uncomfortable about taking the endowment funds. He had legal, ethical and moral concerns.

After receiving the February 11 memo, Morrison and his staff, at his direction, conducted an analysis of the composition of the funds in question. Morrison reasoned that, historically, the organization used its general operating cash to support expenditures that might well have been financed from the restricted funds. Morrison used scholarships as an example. He testified that every year, the organization awarded scholarships, primarily to students in the school of medicine. The pattern had been to award these scholarships out of the general operating funds. Certain endowments existed to support exactly this kind of scholarship award. Since the donative intent of establishing such a fund was to award a scholarship and since the scholarship had been awarded out of general operational funds instead, Morrison rationalized that the restrictions of that specific fund had been met. Morrison determined that it would be defensible to use those endowed funds to reimburse the organization for the costs it had incurred from its operational account. Morrison testified: "Knowing that we had regularly incurred expenses that met the restrictions on these funds, we went through an analysis fund by fund to identify those areas where we had, in fact, met the restrictions and believed that we could legitimately access the funds to reimburse the operations for expenses that the operations had incurred that were consistent with the funds' stipulations." Morrison further testified that he initiated this study on

his own without any direction, encouragement or review by Abdelhak or other members of upper management.

Morrison noted that the February 11, 1998, memo from Abdelhak required approval of the Loan Committee and a repayment plan before using the restricted endowment funds. Morrison testified that, to his knowledge, the Loan Committee never met and, certainly, never approved the taking of the endowment funds. Moreover, he said, because of the financial distress of the organization, a repayment plan was impossible to devise. Nevertheless, Morrison, having identified certain endowment funds for which restrictions had been met, accessed those funds as authorized by Abdelhak's directive and used the funds for cash flow purposes. According to Morrison's testimony, he determined that approximately $25 million out of the $70 million of endowment monies identified in the Abdelhak memorandum could be accessed justifiably because the restrictions had been met. (Having reviewed the supporting documents of the "Morrison Study," Bernard Woolfley subsequently testified that the exact amount of the 240 endowment funds that Morrison accessed because of his determination that restrictions had been met was actually $27,526,813.) With this authorization and justification, Morrison directed that those funds be accessed and used for general operating expenses. Morrison further determined on the basis of his study, that the remainder of the endowment funds, approximately $45 million, could not legally be accessed because the restrictions had not been met.

Morrison testified that at an operational management meeting at the end of March, 1998, senior executives from the Eastern Region reiterated the financial difficulties being faced, including the fact that inability to pay vendors was beginning to affect the ability to acquire goods and services to support the operation. Abdelhak's response was to ask Morrison, in very

strong terms, why he had not accessed the remaining monies. Morrison learned that same day, from Chief Financial Officer David McConnell, that there was insufficient cash to meet the physicians' payroll. McConnell told Morrison that he would have to access the remaining restricted funds in order to meet that payroll.

That same day, Morrison testified, he and Dr. Donald Kaye, the Chief Executive Officer of the Eastern Region, met with McConnell and Nancy Wynstra, AHERF General Counsel. He testified that he and Dr. Kaye were uneasy about accessing the remaining restricted funds and requested the meeting to raise three specific issues. First, they questioned the legality of taking the endowment money. Second, Morrison and Kaye were concerned about "borrowing" the money when it was clear that a repayment plan was not viable. Lastly, they questioned the appropriateness of accessing the funds without approval of the board or the loan committee. The February 11, 1998, memorandum from Abdelhak clearly required these two preconditions before borrowing from the restricted funds. Wynstra told Morrison that if Abdelhak had authorized the taking of the funds, then he should accept that as appropriate authority to proceed. She offered no other legal opinion. Morrison also testified that McConnell said it was not necessary that a repayment plan be drafted prior to the accessing of the funds. On this basis Morrison then accessed the remaining $45 million in endowment funds and used the money for the general operations of the organization.

Dr. Donald Kaye testified before the grand jury, corroborating Morrison's testimony regarding their concerns about the legal and procedural propriety in accessing the endowment funds. Kaye testified that at the March 1998 operational meeting, Morrison told Abdelhak that he was not comfortable that restrictions had been met on the funds that Abdelhak had authorized

accessing. Kaye said that, in response, Abdelhak angrily told Morrison to use the money. Kaye further testified that he and Morrison sought Nancy Wynstra's legal advice on the question of accessing the restricted funds and that she told them that Abdelhak had the authority to do whatever needed to be done and "the bottom line is you better do it." Kaye also said that a plan to repay the restricted funds was impractical given the financial condition of AHERF.

Michael Martin testified before the Grand Jury that he was the Senior Vice-President of Treasury Operations at AHERF. He said a copy of Abdelhak's February 11, 1998, memorandum was sent to him. He observed that the memorandum stated that Abdelhak had consulted with Treasury about the propriety of accessing the restricted funds and that Treasury had given its approval. In fact, Martin testified, such a consultation never occurred.

Nevertheless, Martin testified, he was directed by David McConnell to begin liquidating investments to raise cash to meet Abdelhak's directive. Martin was concerned not only because such actions involved accessing endowment funds, but also because those actions would violate covenants with outside lenders. Martin testified that they were already in violation of covenants that required a specific amount of cash on hand at any given point in time. As required, Martin had notified Mellon Bank of the violation; indeed, negotiations were ongoing to correct the problem. Martin was concerned that accessing the entire $70 million as authorized by Abdelhak would result in further violations of covenants. Martin recommended to McConnell that they keep some of the money in reserve. Martin testified that McConnell agreed.

Shortly thereafter, Martin testified, Abdelhak asked him whether he had converted the specified funds into cash. Martin said he began to explain to Abdelhak what he had done, *i.e.*, keeping a portion of the funds in reserve, and that the decision was made after consultation with

-9-

McConnell. Martin testified that Abdelhak interrupted him and said if he (Martin) did not do what Abdelhak had ordered him to do, then he would be fired. Martin attempted to explain the rationale for his actions. Specifically, Martin told Abdelhak that some of the funds were restricted and that the restrictions had not been met. He further told Abdelhak that accessing these funds would constitute violations of covenants with outside lenders. According to Martin, Abdelhak's response was to insist that the funds be converted to cash. During this conversation, Abdelhak repeatedly threatened to fire Martin if Martin did not obey him. Martin testified that Abdelhak promised to personally call Mellon Bank about the covenants. Martin thereafter liquidated certain funds, including restricted funds, and transferred the money into AHERF's cash concentration account, where it was used to pay general operating expenses.

Ultimately, according to Bernard Woolfley, $52,442,975 in restricted funds were "borrowed" without any justification and without the underlying restrictions being met. This figure can be broken down as follows:

| | |
|---|---|
| Endowment borrowings | $26,192,970 |
| Specific purpose borrowings | $15,038,170 |
| Future scholarship awards | $ 2,900,000 |
| Liquidations - Graduate Hospital | $ 8,311,835 |
| | $52,442,975 |

## The Quaker Valley High School Contribution

Thomas Liberty testified that he was a teacher and football coach at Quaker Valley High School in Allegheny County, Pennsylvania. Sherif Abdelhak's son, John, played football for Liberty. Liberty came to know Sherif Abdelhak through that relationship.

Liberty testified that in 1998, Quaker Valley School District undertook "a massive reconstruction phase." This provided an opportunity to help improve the athletic complexes. In particular, Liberty hoped to expand the locker room facility at the football field. It was estimated that the cost for the improvements would be about $50,000. Liberty became involved in exploring sources for donations to accomplish this task.

Thereafter, at a wrestling banquet, Liberty had a private conversation with Abdelhak wherein Liberty informed him of the plans to expand the locker room facilities and the need for money to fund the project. He mentioned the cost estimate of $50,000. At the conclusion of the banquet, Abdelhak approached Liberty and told Liberty that he "had a group that looked for investment areas" and that they might be able to help. Liberty testified that Abdelhak did not further identify this group. The following week, Abdelhak sent Liberty a check for $50,000. The check, dated February 28, 1998 and made payable to Quaker Valley School District, was not a personal check from Abdelhak. Rather, this was an AHERF check signed by Chief Financial Officer David W. McConnell. Accompanying the check was a letter from Abdelhak to Liberty indicating the check was the "grant we discussed." In the letter, Abdelhak admonished Liberty to "please ensure that this is reported as an anonymous gift and that the origin of the gift is known by yourself and other relevant Quaker Valley administration."

<u>Political Contributions</u>

Curtis B. Copeland and Joan Chrestay, lobbyists for AHERF, testified pursuant to orders of immunity. Copeland testified that he was an attorney, employed by a variety of parent corporations in the AHERF organization beginning in 1987. One aspect of Copeland's responsibilities was government relations. Copeland testified that he proposed this role to

General Counsel Nancy A. Wynstra.  Wynstra and Chief Executive Officer Sherif Abdelhak approved his proposal and Copeland began establishing relationships with legislators.  Copeland testified that he operated out of the western part of Pennsylvania.  Eventually, Joan Chrestay provided a similar function in the eastern part of the state.  Copeland said he and Chrestay both had titles that equated to vice-president within the organization and both reported directly to Wynstra.

Copeland testified that he and Wynstra developed a "political strategy" that involved establishing "relationships" with legislators for the purpose of obtaining state and federal appropriations for AHERF.  A significant component of establishing these personal relationships with legislators involved making contributions to the legislators' political campaigns.  Copeland eventually told Wynstra that he and Chrestay did not make enough money "to make the kind of contributions that we think are necessary to reach the level of involvement in Harrisburg and in Washington that you told us you want the organization to achieve."  Thereafter, Copeland received a $60,000 bonus.  This was a net increase, he said, meaning that the amount was actually grossed up so that taxes were factored into the base amount.  Copeland testified that he understood that a corporation, even a non-profit corporation such as AHERF, could not give money to political candidates.  So, he said, he raised that legal issue with Wynstra.  Specifically, Copeland told Wynstra that a significant portion of the salary increase would be used for political contributions.  He asked Wynstra, "Is that acceptable legally?"  Wynstra responded that it met the letter of the law, but admonished Copeland not to advertise it to everyone.  Thereafter, in coordination with Chrestay, Copeland began using the increase for political contributions.

-12-

Often, Copeland decided  which candidates would receive contributions.  Copeland testified, however, that on several occasions Sherif Abdelhak specifically directed him to make contributions.  Furthermore, Abdelhak instructed Copeland that if he needed additional sources of money for a candidate, he could solicit David McConnell and Nancy Wynstra for political contributions.  Copeland testified that in fact he did successfully solicit political contributions from both McConnell and Wynstra.

Copeland further testified that during his tenure at AHERF the Board of Trustees adopted a policy that asked employees not to make or solicit political contributions.  Indeed, Copeland said he drafted the policy for the Board at Abdelhak's instruction.  Copeland testified, "I wrote that policy at Mr. Abdelhak's request and then ignored it at his direction."

Joan Chrestay testified that she was employed as a lobbyist for AHERF and stationed in Philadelphia.  She said that she and Copeland coordinated their efforts to establish a government relations program for AHERF.  The ultimate goal was to cultivate potential funding sources.

Chrestay testified that since she and Copeland were required to register as lobbyists, they were constantly solicited by political candidates or political committees to give contributions.  Chrestay said it was generally understood that lobbyists made political contributions; therefore, in order for them to be effective, they would also have to make contributions.  This presented a financial burden.  Chrestay said that she and Copeland had discussions about this situation and that Copeland, in turn, raised the issue with their boss, Nancy Wynstra.  Chrestay and Copeland recommended the establishment of a political action committee, to allow for a broader base of contributions that could further AHERF's agenda.  Chrestay testified that Sherif Abdelhak categorically rejected this suggestion. Chrestay said that, instead, she and Copeland were given

-13-

pay increases "to take care of what needed to be taken care of." Chrestay testified that she "knew" that the additional money was for the purpose of making "political contributions." The bonuses, she said, were given in 1997 (about $25,000 net) and 1998 ($40,000 net). Chrestay testified that this money was used by her and Copeland to make political contributions. The majority of the time she and Copeland would collaboratively make the decision as to which candidates would receive contributions. On other occasions, she testified, Copeland instructed her that Sherif Abdelhak wanted them to contribute to specific candidates. These included both state and federal candidates.

Chrestay related an anecdote to the Grand Jury which demonstrated that these bonuses were not simply pay increases to use as she exclusively saw fit. Once, she testified, she and Copeland were each required by Sherif Abdelhak to write a $3,750 check for a Democratic National Committee dinner. Chrestay further testified that Abdelhak decided that even though she wrote the check, a more senior AHERF executive went in her place to the dinner. Chrestay ostensibly paid the money for the dinner, but AHERF took the benefit. Thus, clearly, the bonuses paid to Chrestay were a means of channeling corporate money to political candidates or organizations.

Michele Zatezalo testified that she was employed by AHERF and worked directly under Nancy Wynstra. Zatezalo's duties were originally secretarial in nature but she gradually took on more administrative and supervisory responsibilities. Zatezalo testified that she was aware that Copeland and Chrestay were receiving additional money for their governmental relations activity. She said the purpose was to use the money to "provide some political contributions to certain people who could help the organization to further the organization's interest." Zatezalo

-14-

further testified that Copeland would direct Wynstra to make political contributions. She said that these solicitations began after Wynstra's salary was increased. She noted that Wynstra had never been politically active before and found it "abnormal" that Wynstra suddenly sprouted a political interest.

David Deasy, who managed payroll, testified that McConnell and Wynstra each received $50,000 bonuses in April, 1996 and again in October, 1997. These were net amounts, meaning they were grossed up to include any tax liabilities. Deasy testified that McConnell told him these amounts were for the purpose of making political contributions. Deasy said McConnell told him it was Sherif Abdelhak's idea to funnel money to McConnell and Wynstra for the purpose of making political contributions.

William F. Wells testified that he is employed as the Regional Director, Greensburg, Office of Attorney General. Previously, Wells was employed for 28 years as an investigator for the Internal Revenue Service. Wells was assigned by the Attorney General's Office to investigate the collapse of AHERF. Wells testified that he reviewed documents subpoenaed by the grand jury, including canceled checks, bank statements, W-2 forms and campaign Expense Reports. Wells testified that in 1996-98, Copeland contributed $47,125 to 131 state and local campaigns. This scheme of making political contributions effectively ended with Abdelhak's termination in early June 1998. After June 17, 1998, Copeland made only one $250 contribution. Wells testified that in 1996-98, Chrestay contributed $19,850 to 66 state and local political campaigns. Wells testified that McConnell made contributions to state and local campaigns totaling $13,000 in 1996 and $3,000 in 1997. Wynstra contributed $4,000 in 1996 according to Wells.