PR-PLD-022-00203

AHERF Bylaws
with amendments thru 8/21/96

of Trustees may determine, to such officers and/or employees of the corporation occupying positions of trust and confidence.

## ARTICLE VIII
### ORDERS FOR THE PAYMENT OF MONEY AND EXECUTION OF INSTRUMENTS

**Section 8.1   Checks.**

All checks, drafts, or orders for the payment of money, shall be executed in the name of the corporation in such manner by such officer or officers or employees as the Board of Trustees shall determine by resolution or order.

**Section 8.2   Contracts.**

When the execution of any contracts, conveyances or other instruments has been authorized without specifying the executing officers, any two officers may execute the same in the name and on behalf of this corporation, provided that the Board of Trustees may designate any single officer or employee to execute an instrument or instruments on behalf of the corporation. Such authority may be general or confined to specific instances and unless so authorized by the Board, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose.

**Section 8.3   Execution of Conveyances and Mortgages.**

Except as otherwise required by law or any other provision of these Bylaws, no purchase of real property shall be made by the corporation nor shall it sell, mortgage, lease away or otherwise dispose of its real property, unless such a transaction is authorized by the Board.

PR-PLD-022-00204

All mortgages, notes, evidence of indebtedness, contracts, conveyances or other instruments in writing, or any assignment or endorsement thereof, executed or entered into by or on behalf of this corporation shall be executed and, if need be, acknowledged in the name of the corporation by the Chair of the Board, a Vice Chair or the President and Chief Executive Officer, and the Secretary or Treasurer or their assistants. In the absence of the President, he/she may designate, in writing, a Vice President or other individual who may execute documents during such absence. No person may execute, acknowledge or verify any instrument in more than one capacity.

## Section 8.4  Facsimile or Electronic Transmission of Signatures.

Whenever the execution of a document on behalf of the corporation by any officer of the corporation or any trustee is authorized by these Bylaws or by other action of the Board of Trustees, the signature of such officer or trustee on any such document may be transmitted by facsimile or other electronic means.

## ARTICLE IX
## COMMITTEES

## Section 9.1  Committees.

The Board of Trustees may from time to time establish such standing or special committees as it shall deem appropriate to conduct the activities of the corporation and to advise the Board and shall define the powers and responsibilities of such committees. In addition, the Chair of the Board, subject to the approval of the Board of Trustees, may establish standing or special committees of the Board to carry out any functions which may lawfully be assigned to such a committee. The Board of Trustees shall define or ratify, as the case may be, the powers and responsibilities of committees established either by the Board or

PR-PLD-022-00205

by the Chair of the Board, provided that powers and authority of the Board shall only be assigned to an Executive Committee of the Board, which, if formed by action of the Board or Chair of the Board as specified above, shall be composed exclusively of three or more trustees.   No committee shall have any power or authority as to the following:

(i)      action that would be required to be submitted to members of a membership corporation for approval under the Pennsylvania Nonprofit Corporation Law of 1988, as amended;

(ii)     the filling of vacancies in the Board;

(iii)    the adoption, amendment or repeal of these Bylaws or the Articles of Incorporation;

(iv)     the amendment or repeal of any resolution of the Board;

(v)      action on matters committed by these Bylaws or resolutions of the Board to another committee of the Board;

(vi)     the approval of any action or the exercise of any authority requiring the approval of more than a majority of a quorum of the Board of Trustees under the laws of the Commonwealth of Pennsylvania, the Articles of Incorporation, or these Bylaws; and

(vii)    any other action which may not be delegated to it under the laws of the Commonwealth of Pennsylvania.

The members and chairs of all committees shall be appointed by the Chair of the Board for a one (1) year term or until their successors are duly appointed.   The Chair of the Board of Trustees shall advise the Board of any such appointments.   While such appointments are not required to be approved by the Board of Trustees, any appointee shall be subject to removal at any time by vote of a majority of the Board of Trustees then in office.

PR-PLD-022-00206

AHERF Bylaws
with amendments thru 6/21/96

No committee, other than an advisory committee (an "advisory committee" being a group of individuals appointed to assist the Board in a specific matter, but having no independent authority), shall consist of fewer than three (3) trustees. Persons other than trustees may be appointed as committee members by the Chair, provided the chairs of all committees shall be trustees of this corporation. Committees shall meet as necessary to carry out their designated responsibilities. The voting rights of committee members other than trustees shall be specified by the Chair of the Board at the time such appointment is made. A committee may have such specific powers and responsibilities as set forth in these Bylaws or as may be determined by the Board of Trustees.

The Board reserves the right, upon review of the actions, recommendations or reports of any committee, to direct that the committee reconsider its action or recommendation.

Any scheduled committee meeting may be cancelled, but only by agreement of the committee Chair and the Board Chair.

**Section 9.2  Executive Committee.**

The Executive Committee of the Board shall consist of selected trustees of the corporation and shall include the Chair of the Board, Vice Chair, President and Chief Executive Officer of the System, the Chair of the AHERF Finance Committee, Chairs of the boards of each of the supported organizations as listed in Section 6.5 of these Bylaws, all of whom shall serve <u>ex officio</u>. In addition, the Chair of the Board of this corporation may appoint other Board members to the Committee.

The Chair of the Board of this corporation shall serve as Chair of the Executive Committee.

PR-PLD-022-00207

AHERF Bylaws
with amendments thru 6/21/96

The Committee shall meet at the call of the Chair, between meetings of the Board, and shall have and may exercise the full authority of the Board in all aspects of the management and control of the corporation, unless otherwise prohibited by law or by these Bylaws.  The Committee shall report to the Board on any actions taken and may recommend to the Board such action as it deems desirable.

## Section 9.3  Compensation Committee.

The Compensation Committee shall be a Standing Committee of the Board with authority to establish compensation programs for AHERF and its subsidiaries consistent with overall Allegheny system policy.  The Committee shall exercise oversight over the compensation and benefit programs of AHERF and its subsidiaries and the establishment of senior executive compensation within AHERF.

The AHERF Compensation Committee shall be chaired by the Chair of the Board and shall include only external trustees.  Members of the Committee shall be appointed by the Chair of this Board.

The responsibilities of the AHERF Compensation Committee shall include:

(a)  To monitor the application of AHERF directed compensation policies within AHERF and its subsidiaries;

(b)  to review and act upon the compensation for senior executives at AHERF and its subsidiaries who are assigned full time to AHERF or its subsidiaries, but are employed by AHERF;

(c)  to review and establish guidelines for compensation for the senior executives employed by AHERF or its subsidiaries;

(d)  to oversee implementation of compensation and benefit policies for AHERF or its subsidiaries consistent with

PR-PLD-022-00208

AHERF Bylaws
with amendments thru 6 21 96

the policies established by AHERF for the Allegheny system;

(e)  to provide other advice to the Chief Executive Officer of AHERF as requested on compensation issues relative to AHERF or its subsidiaries; and

(f)  to recommend to the Board annual goals and objectives for the President and Chief Executive Officer of this corporation and to present to a special session of the Board, as required by Section 6.2 of these Bylaws, an annual review of the performance of management.

## Section 9.4  Finance Committee.

The AHERF Finance Committee is primarily composed of external trustees.  The Chief Financial Officer of AHERF and the AHERF General Counsel serve as _ex officio_ members.  AHERF's Chief Executive Officer serves as a member of the committee with full voting privileges.  One of the external Board members is appointed by the Chairman of the Board to serve as the Chairman of the Committee.

The Committee's purpose is to oversee financial matters involving AHERF and all of its subsidiaries; to monitor the current financial status of AHERF and its subsidiaries; to oversee the centralized information systems function to assure that the needs of AHERF are met; and to assure the continued financial viability of AHERF.  The charge of the Committee is:

I.  To receive and take final action on the following items:

(a)  Investments made on behalf of AHERF and its subsidiaries. This may include review of investment managers and their performance and recommending changes of investment managers or changes in investment strategy.

(b)  The status of information systems services that are provided to AHERF and its subsidiaries on a centralized

PR-PLD-022-00209

AHERF Bylaws
with amendments thru 6/21/96

basis. This review may include review of status reports on the implementation of major upgrades to information systems capabilities as well as reviewing and recommending changes to existing systems.

(c)    Financial policies for the entire system to assure consistency.

(d)    Intercompany financing to assure that all transactions are supportive of AHERF's mission and are in compliance with applicable local, state and federal laws.

(e)    Budget targets and objectives for all AHERF members.

(f)    Interim financial statements.

II.    The Committee shall review and make recommendations to the Board with respect to the following items:

(a)    Annual capital and operating budgets for AHERF and its subsidiaries.

(b)    The capital plan developed by the Chief Executive Officer of AHERF.

(c)    The self-insured activities within the system including, but not limited to, professional and general liability, workers' compensation and health insurance. This may include recommendations to consider additional activities for inclusion under one of the self-insured programs.

**Section 9.5  Committee on Trustees.**

The Committee on Trustees shall review and report to the AHERF Board and other boards in the Allegheny system, as appropriate, on the Board(s) membership, organization, and performance. The Committee shall work with the Board(s) Chairmen on the definition of the Board(s) role and the organization and processes through which it carries it out. The Committee's work includes, but is not limited to, recommending: role(s) of the Board(s) and their performance in relation hereto; guidelines for the composition of

PR-PLD-022-00210

AHERF Bylaws
with amendments thru 6/21/96

the Board(s); criteria for Board membership and process for monitoring compliance with established criteria; changes in Board membership such as retirement and recruitment; committees of the Board(s), their defined roles and desired size, structure, and process of Board meetings; working relationship between Board(s) and management; and terms of office of Board chairmen and process for selecting successors.

**Section 9.6  Audit Committee.**

The AHERF Audit committee shall be composed entirely of external trustees. One of the external Board members shall be appointed by the Chair of the AHERF Board to serve as the Chair of the Audit Committee.

The role of the Audit Committee is to assist the AHERF Board in meeting and exercising its fiduciary responsibilities. The Audit Committee assists the AHERF Board in its responsibility to safeguard the organization's assets, monitor the financial performance of the organization and ensure the integrity of the financial information upon which the Board relies. The charge of the Audit Committee is to:

(a)  Review the adequacy of the organization's system of internal control;

(b)  review and approve the annual AHERF Internal Audit Department work plan and operating budget;

(c)  review the activities, organizational structure and qualifications of the Internal Audit function and staff;

(d)  recommend to the Board the selection of independent auditors;

(e)  review the independent auditor's proposed audit scope and approach;

PR-PLD-022-00211

(f)  review the independent auditors' fee arrangements and performance;

(g)  review the findings of external financial statement audits, debt compliance reviews and the independent auditor's management letter;

(h)  review matters related to controls, financial reporting and/or compliance for sensitive, high exposure areas (e.g., executive expense reporting, government reviews, regulatory examinations, special investigations, fraud, etc.).

(i)  provide opportunities for management, Internal Audit and the external auditors to meet with the Audit Committee in executive session, as necessary, to discuss confidential and/or sensitive matters; and

(j)  perform other oversight functions as requested by the AHERF Board.


**Section 9.7  Foundation Ethics Committee.**

The charge to the Foundation Ethics Committee shall be to:

(a)  Exercise general oversight to the development and amendment of the AHERF Code of Ethics;

(b)  oversee the implementation of a system-wide ethics training program; and

(c)  exercise general oversight over the Allegheny system's conflict of interest program.


## ARTICLE X

## INDEMNIFICATION


**Section 10.1  Indemnification of Trustees and Officers.**

The corporation shall indemnify any officer or trustee of the corporation who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, including actions by or in the right of the

PR-PLD-022-00212

corporation, whether civil, criminal, administrative or investigative by reason of the fact that such person is or was a representative of the corporation, or is or was serving at the request of the corporation as a representative of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding unless the act or failure to act giving rise to the claim for indemnification is determined by a court to have constituted willful misconduct or recklessness.

## Section 10.2  Advancement of Expenses.

Expenses (including attorneys' fees) incurred by an officer or trustee of the corporation in defending any action, suit, or proceeding referred to in Section 10.1 shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall be determined ultimately that the person is not entitled to be indemnified by the corporation.

## Section 10.3  Insurance.

The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a representative of the corporation, or is or was serving at the request of the corporation as a representative of another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against such person or the corporation and incurred by such person or the corporation in any such capacity, or arising out of such person's status as such, whether or not the

PR-PLD-022-00213

AHERF Bylaws
with amendments thru 6/21/96

corporation would have the power to indemnify such person against such liability under the provisions of this Article.


## Section 10.4  Advice of Counsel.

Neither the corporation nor its trustees or officers nor any person acting on its behalf shall be liable to anyone for any determination as to the existence or absence of conduct which would provide a basis for making or refusing to make any payment under this Article or for taking or omitting to take any other action under this Article, in reliance upon the advice of counsel.


## Section 10.5  Rights not Exclusive.

The indemnification of and advancement of expenses to officers and trustees of the corporation provided by or pursuant to this Article shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Articles of Incorporation, any insurance or other agreement, vote of disinterested trustees or otherwise, both as to actions in their official capacity and as to actions in another capacity while holding an office, and shall continue as to a person who has ceased to be a trustee or officer and shall inure to the benefit of the heirs, executors and administrators of such person.


## Section 10.6  Preservation of Rights.

The provisions of this Article relating to indemnification and the advancement of expenses shall constitute a contract between the corporation and each of its trustees and officers.  No amendment or repeal of this Article shall adversely affect any right or protection extended to an officer or trustee hereunder for an act

PR-PLD-022-00214

AHERF Bylaws
with amendments thru 6/21/96

or failure to act occurring prior to the time of such amendment or repeal. Each officer or trustee shall be deemed to act in such capacity in reliance upon the rights of indemnification and advancement of expenses hereunder.

**Section 10.7  Indemnification of Employees and Other Persons.**

To the extent permitted by law, the corporation may, by action of its Board of Trustees and to the extent provided in such action, indemnify employees and other persons as though they were officers or trustees, pursuant to Sections 10.1 - 10.2 of these Bylaws.

## ARTICLE XI
## LIABILITY OF TRUSTEES AND OFFICERS

**Section 11.1  Liability of Trustees.**

Except for responsibility or liability of a trustee pursuant to any criminal statute or for payment of taxes pursuant to local, State or Federal law, a trustee of the corporation shall not be personally liable for monetary damages for any action taken or any failure to take any action after January 27, 1987 unless (a) such trustee has breached or failed to perform his fiduciary duties as provided in Section 11.2 hereof and (b) the breach or failure to perform constitutes self-dealing, willful misconduct or recklessness.

**Section 11.2  Standard of Care and Justifiable Reliance.**

(a)    As provided in Section 5712 of the Pennsylvania Nonprofit Corporation Law of 1988, as amended, 15 Pa. C.S.A. §5712, et seq., each trustee of this corporation shall stand in a fiduciary relation to the corporation and shall perform

PR-PLD-022-00215

AHERF Bylaws
with amendments thru 6/21/96

his or her duties as a trustee, including his or her duties as a member of any committee of the Board upon which he/she may serve, in good faith, in a manner he/she reasonably believes to be in the best interests of the corporation, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his or her duties, a trustee shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

    (1)    One or more officers or employees of the corporation whom the trustee reasonably believes to be reliable and competent in the matters presented.

    (2)    Counsel, public accountants or other persons as to matters which the trustee reasonably believes to be within the professional or expert competence of such person.

    (3)    A committee of the Board upon which the trustee does not serve, duly designated in accordance with law, as to matters which its designated authority, which committee the trustee reasonably believes to merit confidence.

(b)    A trustee shall not be considered to be acting in good faith if he/she has knowledge concerning the matter in question that would cause his or her reliance to be unwarranted.

(c)    In discharging the duties of their respective positions, the Board of Trustees, committees of the Board and individual trustees may, in considering the best interests of the corporation, consider the effects of any

PR-PLD-022-00216

AHERF Bylaws
with amendments thru 6/21/96

action upon employees, upon suppliers and customers of the corporation and upon communities in which offices or other establishments of the corporation are located, and all other pertinent factors. The consideration of those factors shall not constitute a violation of Section 11.2(a).

(d)  Absent breach of fiduciary duty, lack of good faith or self-dealing, actions taken as a trustee or any failure to take any action shall be presumed to be in the best interests of the corporation.

## Section 11.3  Liability of Trustees and Officers.

As provided in 42 Pa. C.S.A. §8332.2 and so long as the corporation is qualified under Section 501(c)(3) of the Internal Revenue Code, no trustee or officer of the corporation who serves without compensation, other than reimbursement for actual expenses, shall be liable for any civil damages as a result of any acts or omissions relating solely to the performance of his duties as a trustee or officer, unless (a) the conduct of such trustee or officer falls substantially below the standards generally practiced and accepted in like circumstances by similar persons performing the same or similar duties, and (b) it is shown that the trustee or officer did an act or omitted doing an act which he was under a recognized duty to another to do, knowing or having reason to know that the act or omission created a substantial risk of actual harm to the person or property of another.

## Section 11.4  Preservation of Rights.

The provisions of this Article relating to the limitation of trustees and officers liability shall constitute a contract between the corporation and each of its trustees and officers.    No

PR-PLD-022-00217

AHERF Bylaws
with amendments thru 6/21/96

amendment or repeal of this Article shall adversely affect any right or protection extended to an officer or trustee hereunder for an act or failure to act occurring prior to the time of such amendment or repeal. Each officer or trustee shall be deemed to act in such capacity in reliance upon the limitations of liability hereunder.

## ARTICLE XII
### AMENDMENTS TO ARTICLES AND BYLAWS

**Section 12.1  Amendments to Articles and Bylaws.**

The Articles of Incorporation of this corporation and these Bylaws may be amended, altered, restated, or otherwise revised by the affirmative vote of a majority of the trustees then in office. Any notice of meeting of the Board of Trustees at which a proposed amendment to the Articles of Incorporation or these Bylaws is to be considered shall include a copy of the proposed amendment or a summary of the changes to be effected thereby.

**Section 12.2  Technical Amendments.**

The Secretary shall have the authority to change the Bylaws without any requirement of Board or Member approval when, in the Secretary's judgment and after review and approval by the General Counsel or his/her designee, the Bylaws require technical modification or clarification, such as renumbering, changes in punctuation, spelling or errors of grammar or expression, changes in reference to statutory citation, or changes made solely to reflect alteration of organization name, structure or titles. All such amendments shall be reported to the Board.

PR-PLD-022-00218

AHERF Bylaws
with amendments thru 6/21/96

# ARTICLE XIII
## MISCELLANEOUS

**Section 13.1  Parliamentary Authority.**

The current edition of <u>Robert's Rules of Order</u> shall govern the Board's procedures in the transaction of its business in all cases to which such rules are applicable and in which they are no inconsistencies with these Bylaws and any special rules or order which the Board may adopt.

## ADOPTION AND EFFECTIVE DATE

These Bylaws were adopted by the Board of Trustees of the corporation at a duly called meeting held on the 21st day of June, 1996 and, in accordance with the terms of such adoption by the Board, became effective on June 21, 1996.

ALLEGHENY HEALTH, EDUCATION AND
RESEARCH FOUNDATION


Nancy A. Wynstra
Secretary

AHERF.BL
AHERF/IBM; Disk #2;07/01/92
(Done by Drinker/Biddle/Reath -
Transferred to AHERF/IBM Disk #4 07/01/92)
12/18/92 moved to IBM Disk #2
1/19/93
4/23/93
11/4/93:nll
04/08/94 kcs
1/31/95:kcs
4/27/95:kcs
6/21/96:kcs:aa

PGH:7900.1

33

PR-PLD-022-00219

AHERF Bylaws
with amendments thru 6/21/96

## CERTIFICATE OF SECRETARY

I, Nancy A. Wynstra, do hereby certify that I am the Secretary of **ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION**, (the "corporation") and do further certify that the Bylaws attached hereto are a true, correct and complete copy of the Bylaws of the corporation, including all amendments thereto, as duly approved by the Board of Trustees and are in full force and effect as the Bylaws of the corporation in the form attached hereto as of the date hereof.

Date: _7 - 15 - 96_

_Nancy A. Wynstra_
Nancy A. Wynstra
Secretary

AHERF.BL
IBM Disk #2
1/19/93
4/28/93
11/4/93: nll
04/08/94  kcs
1/31/95:kcs
4/27/95:kcs
6/21/96:kcs;aa
2/12/97

PGH:7900.1                          34

PR-PLD-022-00220

AHERF Bylaws
with amendments thru 6/21/96

**ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION**
**SCHEDULE OF BYLAW AMENDMENTS**

Article III, Current first paragraph numbered as Section 3.1 and titled "Fiscal Year". New Section 3.2 added pursuant to action of the Board on June 26, 1992, effective upon approval by the Boards of subsidiary corporations of appropriate Bylaw amendments. This was done at the March, 1992 Board meetings.

Article IV, Purposes. Amended pursuant to Board action on June 21, 1996.

Article VI: New sections added and section renumbered per Board action of December 16, 1994. See kcs Document 9945 for changes and renumbering.

Article VI, Section 6.1, Management and Duties. Amended per Board action on June 21, 1996.

Article VI, Section 6.2 amended pursuant to action of the Board on March 16, 1987, March 17, 1988, November 6, 1989, October 8, 1990, December 17, 1993. Renumbered as Section 6.3 pursuant to action of the Board on December 16, 1994.

(New) Article VI, Section 6.2 added pursuant to action of the Board on December 16, 1994, June 21, 1996.

Article VI, Section 6.3 amended pursuant to action of

PR-PLD-022-00221

MASTER ELECTION AND/OR CONSENT SCHEDULE FOR COMPONENT MEMBERS OF A CONTROLLED GROUP OF CORPORATIONS

Corporation Filing Original Election and/or Consent:
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
320 East North Avenue
Pittsburgh, PA  15212

Year Ended:                      June 30, 1996
EIN:                                    25-1481622
Service Center Where Original Filed:  Ogden, UT

The undersigned corporations, component member of a controlled group of corporations, with respect to the taxable year of each corporation, hereby elect and/or consent to the following apportionment of the taxable income brackets and specific deduction under IRC Section 651(a)(1) and Section 512(b)(12)(a), respectively.

APPORTIONMENT OF
TAXABLE INCOME BRACKETS

|  | TAXABLE YEAR ENDED | $50,000 BRACKET | $25,000 BRACKET | $9,925,000 BRACKET | SIGNATURE and TITLE of AUTHORIZED OFFICER |
|---|---|---|---|---|---|
| Allegheny Health, Education and Research Foundation 320 East North Avenue Pittsburgh, PA  15212 EIN# 25-1481622 | 6/30/96 |  |  | $1,336,250 | _Daniel D. Cancemi_ Executive Vice President and CFO, AHERF |
| Allegheny General Hospital 320 East North Avenue Pittsburgh, PA  15212 EIN# 25-1322626 | 6/30/96 | $ 10,000 | $5,000 | $1,000,000 | _[signature]_ Senior Vice President and CFO, AGH |
| Allegheny-Singer Research Institute 320 East North Avenue Pittsburgh, PA  15212 EIN# 25-1320493 | 6/30/96 |  |  | $1,000,000. | _[signature]_ Senior Vice President and CFO, AGH |

PR-PLD-022-00222

## APPORTIONMENT OF TAXABLE INCOME BRACKETS

| | TAXABLE YEAR ENDED | $50,000 BRACKET | $25,000 BRACKET | $9,925,000 BRACKET | SIGNATURE and TITLE of AUTHORIZED OFFICER |
|---|---|---|---|---|---|
| Allegheny University of the Health Sciences<br>3300 Henry Avenue<br>Philadelphia, PA 19129<br>EIN# 23-1352693 | 6/30/96 | | | $1,168,125 | *David W. McConnell*<br>David W. McConnell<br>(Treasurer) |
| Allegheny University Hospitals<br>3300 Henry Avenue<br>Philadelphia, PA 19129<br>EIN# 23-2665045 | 6/30/96 | | | $1,168,125 | Stephen H. Spargo<br>(Assistant Treasurer) |
| Allegheny United Hospitals<br>100 West Laurel Avenue<br>Cheltenham, PA 19012<br>EIN# 23-2609240 | 6/30/96 | | | $ 500,000 | Stephen H. Spargo<br>(Assistant Treasurer) |
| St. Christopher's Hospital for Children<br>Erie Avenue at Front Street<br>Philadelphia, PA 19133<br>EIN# 23-2649168 | 6/30/96 | | | $1,000,000 | Stephen H. Spargo<br>(Assistant Treasurer) |
| Hahnemann University Hospital<br>Broad and Vine Streets<br>Philadelphia, PA 19102<br>EIN# 23-2771720 | 6/30/96 | | | $1,000,000 | Stephen H. Spargo<br>(Assistant Treasurer) |

PR-PLD-022-00223

## APPORTIONMENT OF TAXABLE INCOME BRACKETS

| | TAXABLE YEAR ENDED | $50,000 BRACKET | $25,000 BRACKET | $9,925,000 BRACKET | SIGNATURE and TITLE of AUTHORIZED OFFICER |
|---|---|---|---|---|---|
| Horizon Medical Corporation 100 West Laurel Avenue Cheltenham, PA 19012 EIN# 23-2195893 | 6/30/96 | | | $500,000 | *David W. McConnell* David W. McConnell (Treasurer) |
| Medical College of Pennsylvania Self Insurance Plan Trust Fund One Bala Plaza Bala Cynwyd, PA 19004 EIN# 23-2177711 | 6/30/96 | | | | *Boa Lynch* Boa Lynch (PNC Trustee) |
| Allegheny Integrated Health Group 320 East North Avenue Pittsburgh, PA 15212 EIN# 25-1752032 | 6/30/96 | $40,000 | $20,000 | $1,252,500 | *Donald J. Kline* Donald Kline (Vice President and CFO, AIHG) |
| TOTAL: | | $ 50,000 | $ 25,000 | $9,925,000 | |

s:\1123data\generalconsent wk4) (tulus)

02 May '97

PR-PLD-022-00224

# COMMITTEE APPENDIX

## Tab 10

.33    The auditor should obtain an understanding of those control activities relevant to planning the audit. As the auditor obtains an understanding of the other components he or she is also likely to obtain knowledge about some control activities. For example, in obtaining an understanding of the documents, records, and processing steps in the financial reporting information system that pertain to cash, the auditor is likely to become aware of whether bank accounts are reconciled. The auditor should consider the knowledge about the presence or absence of control activities obtained from the understanding of the other components in determining whether it is necessary to devote additional attention to obtaining an understanding of control activities to plan the audit. Ordinarily, audit planning does not require an understanding of the control activities related to each account balance, transaction class, and disclosure component in the financial statements or to every assertion relevant to them.

### Information and Communication

.34    The information system relevant to financial reporting objectives, which includes the accounting system, consists of the methods and records established to record, process, summarize, and report entity transactions (as well as events and conditions) and to maintain accountability for the related assets, liabilities, and equity. The quality of system-generated information affects management's ability to make appropriate decisions in controlling the entity's activities and to prepare reliable financial reports.

.35    Communication involves providing an understanding of individual roles and responsibilities pertaining to internal control over financial reporting.

.36    The auditor should obtain sufficient knowledge of the information system relevant to financial reporting to understand—

- The classes of transactions in the entity's operations that are significant to the financial statements.

- How those transactions are initiated.

- The accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of transactions.

- The accounting processing involved from the initiation of a transaction to its inclusion in the financial statements, including electronic means (such as computers and electronic data interchange) used to transmit, process, maintain, and access information.

- The financial reporting process used to prepare the entity's financial statements, including significant accounting estimates and disclosures.

In addition, the auditor should obtain sufficient knowledge of the means the entity uses to communicate financial reporting roles and responsibilities and significant matters relating to financial reporting.

### Monitoring

.37    An important management responsibility is to establish and maintain internal control. Management monitors controls to consider whether they are operating as intended and that they are modified as appropriate for changes in conditions.

# AU Section 326

# *Evidential Matter*

(Supersedes section 330, "Evidential Matter")

Sources: SAS No. 31; SAS No. 48; SAS No. 80.

See section 9326 for interpretations of this section.

Issue date, unless otherwise indicated: August, 1980

**.01**   The third standard of field work is:

> Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**.02**   Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter[1] concerning the assertions in such financial statements. The measure of the validity of such evidence for audit purposes lies in the judgment of the auditor; in this respect audit evidence differs from legal evidence, which is circumscribed by rigid rules. Evidential matter varies substantially in its influence on the auditor as he or she develops an opinion with respect to financial statements under audit. The pertinence of the evidence, its objectivity, its timeliness, and the existence of other evidential matter corroborating the conclusions to which it leads all bear on its competence.

## Nature of Assertions

**.03**   Assertions are representations by management that are embodied in financial statement components. They can be either explicit or implicit and can be classified according to the following broad categories:

- Existence or occurrence
- Completeness
- Rights and obligations
- Valuation or allocation
- Presentation and disclosure

**.04**   Assertions about existence or occurrence address whether assets or liabilities of the entity exist at a given date and whether recorded transactions have occurred during a given period. For example, management asserts that finished goods inventories in the balance sheet are available for sale. Similarly, management asserts that sales in the income statement represent the exchange of goods or services with customers for cash or other consideration.

---

[1] See section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .64 through .78, for further guidance on evidential matter. [Footnote added, May 1994, to cross-reference guidance on evidential matter to section 319.]

.05  Assertions about completeness address whether all transactions and accounts that should be presented in the financial statements are so included. For example, management asserts that all purchases of goods and services are recorded and are included in the financial statements. Similarly, management asserts that notes payable in the balance sheet include all such obligations of the entity.

.06  Assertions about rights and obligations address whether assets are the rights of the entity and liabilities are the obligations of the entity at a given date. For example, management asserts that amounts capitalized for leases in the balance sheet represent the cost of the entity's rights to leased property and that the corresponding lease liability represents an obligation of the entity.

.07  Assertions about valuation or allocation address whether asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts. For example, management asserts that property is recorded at historical cost and that such cost is systematically allocated to appropriate accounting periods. Similarly, management asserts that trade accounts receivable included in the balance sheet are stated at net realizable value. [As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

.08  Assertions about presentation and disclosure address whether particular components of the financial statements are properly classified, described, and disclosed. For example, management asserts that obligations classified as long-term liabilities in the balance sheet will not mature within one year. Similarly, management asserts that amounts presented as extraordinary items in the income statement are properly classified and described.

## Use of Assertions in Developing Audit Objectives and Designing Substantive Tests

.09  In obtaining evidential matter in support of financial statement assertions, the auditor develops specific audit objectives in the light of those assertions. In developing the audit objectives of a particular engagement, the auditor should consider the specific circumstances of the entity, including the nature of its economic activity and the accounting practices unique to its industry. For example, one audit objective related to the assertion about completeness that an auditor might develop for inventory balances is that inventory quantities include all products, materials, and supplies on hand.

.10  There is not necessarily a one-to-one relationship between audit objectives and procedures. Some auditing procedures may relate to more than one objective. On the other hand, a combination of auditing procedures may be needed to achieve a single objective. Paragraph .26 provides illustrative audit objectives for inventories of a manufacturing company for each of the broad categories of assertions listed in paragraph .03 and examples of substantive tests that may achieve those audit objectives.

.11  In selecting particular substantive tests to achieve the audit objectives he or she has developed, an auditor considers, among other things, the risk of material misstatement of the financial statements, including the assessed levels of control risk, and the expected effectiveness and efficiency of such tests. These considerations include the nature and materiality of the items

     Copyright © 1997, American Institute of Certified Public Accountants, Inc.

being tested, the kinds and competence of available evidential matter, and the nature of the audit objective to be achieved. For example, in designing substantive tests to achieve an objective related to the assertion of existence or occurrence, the auditor selects from items contained in a financial statement amount and searches for relevant evidential matter. On the other hand, in designing procedures to achieve an objective related to the assertion of completeness, the auditor selects from evidential matter indicating that an item should be included in the relevant financial statement amount and investigates whether that item is so included.

**.12**  The auditor's specific audit objectives do not change whether information is processed manually or electronically. However, the methods of applying audit procedures to gather evidence may be influenced by the method of processing. The auditor may use either manual auditing procedures, information technology-assisted audit techniques, or a combination of both to obtain sufficient competent evidential matter. Because of the growth in the use of computers and other information technology, many entities process significant information electronically. Accordingly, it may be difficult or impossible for the auditor to access certain information for inspection, inquiry, or confirmation without using information technology. [Paragraph added, effective for periods beginning after August 31, 1984, by Statement on Auditing Standards No. 48. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**.13**  The nature, timing, and extent of the procedures to be applied on a particular engagement are a matter of professional judgment to be determined by the auditor, based on the specific circumstances. However, the procedures adopted should be adequate to achieve the auditor's specific objectives and reduce detection risk to a level acceptable to the auditor. The evidential matter obtained should be sufficient for the auditor to form conclusions concerning the validity of the individual assertions embodied in the components of financial statements. The evidential matter provided by the combination of the auditor's assessment of inherent risk and control risk and on substantive tests should provide a reasonable basis for his or her opinion (see section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .79 through .82. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**.14**  In entities where significant information is transmitted, processed, maintained, or accessed electronically, the auditor may determine that it is not practical or possible to reduce detection risk to an acceptable level by performing only substantive tests for one or more financial statement assertions. For example, the potential for improper initiation or alteration of information to occur and not be detected may be greater if information is produced, maintained, or accessed only in electronic form. In such circumstances, the auditor should perform tests of controls to gather evidential matter to use in assessing control risk,[2] or consider the effect on his or her report (see paragraph .25 of this section). [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

---

[2] Section 319.81 states that ordinarily the assessed level of control risk cannot be sufficiently low to eliminate the need to perform any substantive tests for significant account balances and transaction classes and, consequently, the auditor should perform substantive tests for such balances and classes regardless of the assessed level of control risk. [Footnote added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

on evidence that is persuasive rather than convincing. Both the individual assertions in financial statements and the overall proposition that the financial statements as a whole are fairly presented are of such a nature that even an experienced auditor is seldom convinced beyond all doubt with respect to all aspects of the statements being audited. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.23**  An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost. The auditor must decide, again exercising professional judgment, whether the evidential matter available to him or her within the limits of time and cost is sufficient to justify expression of an opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

**.24**  As a guiding rule, there should be a rational relationship between the cost of obtaining evidence and the usefulness of the information obtained. The matter of difficulty and expense involved in testing a particular item is not in itself a valid basis for omitting the test. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

## Evaluation of Evidential Matter

**.25**  In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.[3] In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.[4] [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

---

[3]  The term *comprehensive basis of accounting other than generally accepted accounting principles* is defined in section 623, *Special Reports*, paragraph .04. [Footnote added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

[4]  See section 508, *Reports on Audited Financial Statements*, paragraphs .20 through .34 and .61 through .63, for further guidance on expression of a qualified opinion or a disclaimer of opinion. [Footnote added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

         Copyright © 1997, American Institute of Certified Public Accountants, Inc.

.05  Analytical procedures involve comparisons of recorded amounts, or ratios developed from recorded amounts, to expectations developed by the auditor. The auditor develops such expectations by identifying and using plausible relationships that are reasonably expected to exist based on the auditor's understanding of the client and of the industry in which the client operates. Following are examples of sources of information for developing expectations:

    *a.*  Financial information for comparable prior period(s) giving consideration to known changes

    *b.*  Anticipated results—for example, budgets, or forecasts including extrapolations from interim or annual data

    *c.*  Relationships among elements of financial information within the period

    *d.*  Information regarding the industry in which the client operates—for example, gross margin information

    *e.*  Relationships of financial information with relevant nonfinancial information

## Analytical Procedures in Planning the Audit

.06  The purpose of applying analytical procedures in planning the audit is to assist in planning the nature, timing, and extent of auditing procedures that will be used to obtain evidential matter for specific account balances or classes of transactions. To accomplish this, the analytical procedures used in planning the audit should focus on (*a*) enhancing the auditor's understanding of the client's business and the transactions and events that have occurred since the last audit date, and (*b*) identifying areas that may represent specific risks relevant to the audit. Thus, the objective of the procedures is to identify such things as the existence of unusual transactions and events, and amounts, ratios and trends that might indicate matters that have financial statement and audit planning ramifications.

.07  Analytical procedures used in planning the audit generally use data aggregated at a high level. Furthermore, the sophistication, extent and timing of the procedures, which are based on the auditor's judgment, may vary widely depending on the size and complexity of the client. For some entities, the procedures may consist of reviewing changes in account balances from the prior to the current year using the general ledger or the auditor's preliminary or unadjusted working trial balance. In contrast, for other entities, the procedures might involve an extensive analysis of quarterly financial statements. In both cases, the analytical procedures, combined with the auditor's knowledge of the business, serve as a basis for additional inquiries and effective planning.

.08  Although analytical procedures used in planning the audit often use only financial data, sometimes relevant nonfinancial information is considered as well. For example, number of employees, square footage of selling space, volume of goods produced, and similar information may contribute to accomplishing the purpose of the procedures.

## Analytical Procedures Used as Substantive Tests

.09  The auditor's reliance on substantive tests to achieve an audit objective related to a particular assertion[1] may be derived from tests of details, from

---

[1] Assertions are representations by management that are embodied in financial statement components. See section 326, *Evidential Matter*.

primarily by materiality and should be consistent with the level of assurance desired from the procedures. Determination of this amount involves considering the possibility that a combination of misstatements in the specific account balances, or class of transactions, or other balances or classes could aggregate to an unacceptable amount.[2]

.21   The auditor should evaluate significant unexpected differences. Reconsidering the methods and factors used in developing the expectation and inquiry of management may assist the auditor in this regard. Management responses, however, should ordinarily be corroborated with other evidential matter. In those cases when an explanation for the difference cannot be obtained, the auditor should obtain sufficient evidence about the assertion by performing other audit procedures to satisfy himself as to whether the difference is a likely misstatement.[3] In designing such other procedures, the auditor should consider that unexplained differences may indicate an increased risk of material misstatement. (See section 316, *Consideration of Fraud in a Financial Statement Audit.*)

## Analytical Procedures Used in the Overall Review

.22   The objective of analytical procedures used in the overall review stage of the audit is to assist the auditor in assessing the conclusions reached and in the evaluation of the overall financial statement presentation. A wide variety of analytical procedures may be useful for this purpose. The overall review would generally include reading the financial statements and notes and considering (*a*) the adequacy of evidence gathered in response to unusual or unexpected balances identified in planning the audit or in the course of the audit and (*b*) unusual or unexpected balances or relationships that were not previously identified. Results of an overall review may indicate that additional evidence may be needed.

## Effective Date

.23   This section is effective for audits of financial statements for periods beginning on or after January 1, 1989. Early application of the provisions of this section is permissible.

————————————

[The next page is 475.]

————————————

[2] See section 312, *Audit Risk and Materiality in Conducting an Audit*, paragraphs .24 through .26.

[3] See section 312.35.

# AU Section 333

# *Management Representations*

(Supersedes SAS No. 19)

Source: SAS No. 85.

See section 9333 for interpretations of this section.

Effective for audits of financial statements for periods ending on or
after June 30, 1998.

## Introduction

**.01**  This section establishes a requirement that the independent auditor
obtain written representations from management as a part of an audit of
financial statements performed in accordance with generally accepted auditing
standards and provides guidance concerning the representations to be obtained.

## Reliance on Management Representations

**.02**  During an audit, management makes many representations to the
auditor, both oral and written, in response to specific inquiries or through
the financial statements. Such representations from management are part
of the evidential matter the independent auditor obtains, but they are not
a substitute for the application of those auditing procedures necessary to
afford a reasonable basis for an opinion regarding the financial statements
under audit. Written representations from management ordinarily confirm
representations explicitly or implicitly given to the auditor, indicate and
document the continuing appropriateness of such representations, and
reduce the possibility of misunderstanding concerning the matters that are
the subject of the representations.[1]

**.03**  The auditor obtains written representations from management to
complement other auditing procedures. In many cases, the auditor applies
auditing procedures specifically designed to obtain evidential matter concern-
ing matters that also are the subject of written representations. For example,
after the auditor performs the procedures prescribed in section 334, *Related
Parties,* even if the results of those procedures indicate that transactions with
related parties have been properly disclosed, the auditor should obtain a
written representation to document that management has no knowledge of any
such transactions that have not been properly disclosed. In some circumstances,

---

[1]  Section 230, *Due Care in the Performance of Work*, states, "The auditor neither assumes that
management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism,
the auditor should not be satisfied with less than persuasive evidence because of a belief that
management is honest."

evidential matter that can be obtained by the application of auditing proce-
dures other than inquiry is limited; therefore, the auditor obtains written
representations to provide additional evidential matter. For example, if an
entity plans to discontinue a line of business and the auditor is not able to
obtain sufficient information through other auditing procedures to corroborate
the plan or intent, the auditor obtains a written representation to provide
evidence of management's intent.

.04  If a representation made by management is contradicted by other
audit evidence, the auditor should investigate the circumstances and consider
the reliability of the representation made. Based on the circumstances, the
auditor should consider whether his or her reliance on management's repre-
sentations relating to other aspects of the financial statements is appropriate
and justified.

## Obtaining Written Representations

.05  Written representations from management should be obtained for all
financial statements and periods covered by the auditor's report.[2] For example,
if comparative financial statements are reported on, the written repre-
sentations obtained at the completion of the most recent audit should address
all periods being reported on. The specific written representations obtained by
the auditor will depend on the circumstances of the engagement and the nature
and basis of presentation of the financial statements.

.06  In connection with an audit of financial statements presented in
accordance with generally accepted accounting principles, specific repre-
sentations should relate to the following matters:[3]

*Financial Statements*

a.  Management's acknowledgment of its responsibility for the fair
presentation in the financial statements of financial position, results
of operations, and cash flows in conformity with generally accepted
accounting principles

b.  Management's belief that the financial statements are fairly pre-
sented in conformity with generally accepted accounting principles

*Completeness of Information*

c.  Availability of all financial records and related data

d.  Completeness and availability of all minutes of meetings of stock-
holders, directors, and committees of directors

e.  Communications from regulatory agencies concerning noncompli-
ance with or deficiencies in financial reporting practices

---

[2] An illustrative representation letter from management is contained in appendix A, "Illustrative
Management Representation Letter" [paragraph .16].

[3] Specific representations also are applicable to financial statements presented in conformity
with a comprehensive basis of accounting other than generally accepted accounting principles. The
specific representations to be obtained should be based on the nature and basis of presentation of the
financial statements being audited.

# AU Section 342

# *Auditing Accounting Estimates*

**Source: SAS No. 57.**

**See section 9342 for interpretations of this section.**

**Effective for audits of financial statements for periods beginning on or after January 1, 1989, unless otherwise indicated.**

.01  This section provides guidance to auditors on obtaining and evaluating sufficient competent evidential matter to support significant accounting estimates in an audit of financial statements in accordance with generally accepted auditing standards. For purposes of this section, an *accounting estimate* is an approximation of a financial statement element, item, or account. Accounting estimates are often included in historical financial statements because—

    *a.*   The measurement of some amounts or the valuation of some accounts is uncertain, pending the outcome of future events.

    *b.*   Relevant data concerning events that have already occurred cannot be accumulated on a timely, cost-effective basis.

.02  Accounting estimates in historical financial statements measure the effects of past business transactions or events, or the present status of an asset or liability. Examples of accounting estimates include net realizable values of inventory and accounts receivable, property and casualty insurance loss reserves, revenues from contracts accounted for by the percentage-of-completion method, and pension and warranty expenses.[1]

.03  Management is responsible for making the accounting estimates included in the financial statements. Estimates are based on subjective as well as objective factors and, as a result, judgment is required to estimate an amount at the date of the financial statements. Management's judgment is normally based on its knowledge and experience about past and current events and its assumptions about conditions it expects to exist and courses of action it expects to take.

.04  The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them. Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors.

---

[1] Additional examples of accounting estimates included in historical financial statements are presented in paragraph .16.

# AU Section 550

# *Other Information in Documents Containing Audited Financial Statements*

**Source: SAS No. 8.**

**See section 9550 for interpretations of this section.**

**Issue date, unless otherwise indicated: December, 1975.**

.01 An entity may publish various documents that contain information (hereinafter, "other information") in addition to audited financial statements and the independent auditor's report thereon. This section provides guidance for the auditor's consideration of other information included in such documents.

.02 This section is applicable only to other information contained in (*a*) annual reports to holders of securities or beneficial interests, annual reports of organizations for charitable or philanthropic purposes distributed to the public, and annual reports filed with regulatory authorities under the Securities Exchange Act of 1934 or (*b*) other documents to which the auditor, at the client's request, devotes attention.

.03 This section is not applicable when the financial statements and report appear in a registration statement filed under the Securities Act of 1933. The auditor's procedures with respect to 1933 Act filings are unaltered by this section (see sections 634[†] and 711[††]). Also, this section is not applicable to other information on which the auditor is engaged to express an opinion.[1] The guidance applicable to auditing and reporting on certain information other than financial statements intended to be presented in conformity with generally accepted accounting principles is unaltered by this section (see sections 551[*] and 623[**]).

.04 Other information in a document may be relevant to an audit performed by an independent auditor or to the continuing propriety of his report. The auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document. However, he should read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements.[2] If the auditor concludes

---

[†] [Reference number 631, formerly 630, changed by the issuance of Statement on Auditing Standards No. 38 (superseded). Reference number 634, formerly 631, changed by the issuance of Statement on Auditing Standards No. 49.] (See section 634.)

[††] [Reference changed by issuance of Statement on Auditing Standards No. 37.] (See section 711.)

[1] Mere reading of other information is an inadequate basis for expressing an opinion on that information.

[*] [Reference changed by issuance of Statement on Auditing Standards No. 29.] (See section 551.)

[**] [Reference changed by issuance of Statement on Auditing Standards No. 62.] (See section 623.)

[2] In fulfilling his responsibility under this section, a principal auditor may also request the other auditor or auditors involved in the engagement to read the other information. If a predecessor auditor's report appears in a document to which this section applies, he should read the other information for the reasons described in this paragraph.

that there is a material inconsistency, he should determine whether the financial statements, his report, or both require revision. If he concludes that they do not require revision, he should request the client to revise the other information. If the other information is not revised to eliminate the material inconsistency, he should consider other actions such as revising his report to include an explanatory paragraph describing the material inconsistency, withholding the use of his report in the document, and withdrawing from the engagement. The action he takes will depend on the particular circumstances and the significance of the inconsistency in the other information.

**.05** If, while reading the other information for the reasons set forth in paragraph .04, the auditor becomes aware of information that he believes is a material misstatement of fact that is not a material inconsistency as described in paragraph .04, he should discuss the matter with the client. In connection with this discussion, the auditor should consider that he may not have the expertise to assess the validity of the statement, that there may be no standards by which to assess its presentation, and that there may be valid differences of judgment or opinion. If the auditor concludes he has a valid basis for concern he should propose that the client consult with some other party whose advice might be useful to the client, such as the client's legal counsel.

**.06** If, after discussing the matter as described in paragraph .05, the auditor concludes that a material misstatement of fact remains, the action he takes will depend on his judgment in the particular circumstances. He should consider steps such as notifying his client in writing of his views concerning the information and consulting his legal counsel as to further appropriate action in the circumstances.

———————————

**[The next page is 915.]**

# AU Section 558

# *Required Supplementary Information*

(Supersedes section 553)[*]

Source: SAS No. 52.

See section 9558 for interpretations of this section.

Issue date, unless otherwise indicated: April, 1988.

.01  The Financial Accounting Standards Board (FASB) and Governmental Accounting Standards Board (GASB) develop standards for financial reporting, including standards for financial statements and for certain other information supplementary to financial statements.[1] This section provides the independent auditor with guidance on the nature of procedures to be applied to supplementary information required by the FASB or GASB, and describes the circumstances that would require the auditor to report such information.

## Applicability

.02  This section is applicable in an audit in accordance with generally accepted auditing standards of financial statements included in a document that should contain supplementary information required by the FASB or GASB

---

[*] This section also withdraws the following Statements on Auditing Standards:
• Statement on Auditing Standards No. 28, *Supplementary Information on the Effects of Changing Prices* [Formerly section 554].
• Statement on Auditing Standards No. 40, *Supplementary Mineral Reserve Information* [Formerly section 556].
• Statement on Auditing Standards No. 45, *Supplementary Oil and Gas Reserve Information* [Formerly section 557].
SAS No. 45 was reissued as an auditing interpretation, see section 9558.01–.06.

[1] The FASB and GASB's roles in setting standards for financial reporting have been recognized by the AICPA Council. The FASB's authority to establish standards for disclosure of financial information outside of the basic financial statements is described in the following resolution:
That as of (September 19, 1987), the FASB, in respect of statements of financial accounting standards finally adopted by such board in accordance with its rules of procedure and the bylaws of the Financial Accounting Foundation, be, and hereby is, designated by this Council as the body to establish accounting principles pursuant to rule 203 and standards on disclosure of financial information for such entities outside financial statements in published financial reports containing financial statements under rule 202 of the *Rules of the Code of Professional Conduct* of the American Institute of Certified Public Accountants provided, however, any accounting research bulletins, or opinions of the accounting principles board issued or approved for exposure by the accounting principles board prior to April 1, 1973, and finally adopted by such board on or before June 30, 1973, shall constitute statements of accounting principles promulgated by a body designated by Council as contemplated in rule 203 of the *Rules of the Code of Professional Conduct* unless and until such time as they are expressly superseded by action of the FASB.
The GASB's authority to establish standards for financial reporting is described in the following resolution:
That as of (September 19, 1987), the GASB, with respect to statements of governmental accounting standards adopted and issued in July 1984 and subsequently in accordance with its rules of procedure and the bylaws of the FASB, be, and hereby is, designated by the Council of the American Institute of Certified Public Accountants as the body to establish financial accounting principles for state and local governmental entities pursuant to rule 203, and standards on disclosure of financial information for such entities outside financial statements in published financial reports containing financial statements under rule 202.

However, this section is not applicable if the auditor has been engaged to audit such supplementary information.[2]

.03 Some entities may voluntarily include, in documents containing audited financial statements, certain supplementary information that is required of other entities. When an entity voluntarily includes such information as a supplement to the financial statements or in an unaudited note to the financial statements, the provisions of this section are applicable unless either the entity indicates that the auditor has not applied the procedures described in this section or the auditor includes in an explanatory paragraph in his report on the audited financial statements a disclaimer on the information.[3] The following is an example of a disclaimer an auditor might use in these circumstances:

> The [identify the supplementary information] on page XX (or in Note XX) is not a required part of the basic financial statements, and we did not audit or apply limited procedures to such information and do not express any assurances on such information.

When the auditor does not apply the procedures described in this section to a voluntary presentation of required supplementary information required for other entities, the provisions of section 550, apply.

## Involvement With Information Outside Financial Statements

.04 The objective of an audit of financial statements in accordance with generally accepted auditing standards is the expression of an opinion on such statements. The auditor has no responsibility to audit information outside the basic financial statements in accordance with generally accepted auditing standards. However, the auditor does have certain responsibilities with respect to information outside the financial statements. The nature of the auditor's responsibility varies with the nature of both the information and the document containing the financial statements.

.05 The auditor's responsibility for other information not required by the FASB or GASB but included in certain annual reports—which are client-prepared documents[4]—is specified in section 550. The auditor's responsibility for information outside the basic financial statements in documents that the auditor submits to the client or to others is specified in section 551. The auditor's responsibility for supplementary information required by the FASB or GASB (called *required supplementary information*) is discussed in the paragraphs that follow.

## Involvement With Required Supplementary Information

.06 Required supplementary information differs from other types of information outside the basic financial statements because the FASB or GASB con-

---

[2] This section is not applicable to entities that voluntarily present supplementary information not required by the FASB or GASB. For example, entities that voluntarily present supplementary information on the effects of inflation and changes in specific prices, formerly required by FASB Statement No. 33, *Financial Reporting and Changing Prices*, are guided by section 550, *Other Information in Documents Containing Audited Financial Statements*.

[3] When supplementary information is presented in an auditor-submitted document outside the basic financial statements, the guidance in section 551, *Reporting on Information Accompanying the Basic Financial Statements in Auditor-Submitted Documents*, as amended by SAS No. 52, *Omnibus Statement on Auditing Standards—1987*, should be followed.

[4] Client-prepared documents include financial reports prepared by the client but merely reproduced by the auditor on the client's behalf.

       Copyright © 1997, American Institute of Certified Public Accountants, Inc.

siders the information an essential part of the financial reporting of certain entities and because authoritative guidelines for the measurement and presentation of the information have been established. Accordingly, the auditor should apply certain limited procedures to required supplementary information and should report deficiencies in, or the omission of, such information.

## Procedures

.07  The auditor should consider whether supplementary information is required by the FASB or GASB in the circumstances. If supplementary information is required, the auditor ordinarily should apply the following procedures to the information.[5]

a.  Inquire of management about the methods of preparing the information, including (1) whether it is measured and presented within prescribed guidelines, (2) whether methods of measurement or presentation have been changed from those used in the prior period and the reasons for any such changes, and (3) any significant assumptions or interpretations underlying the measurement or presentation.

b.  Compare the information for consistency with (1) management's responses to the foregoing inquiries, (2) audited financial statements,[6] and (3) other knowledge obtained during the examination of the financial statements.

c.  Consider whether representations on required supplementary information should be included in specific written representations obtained from management (section 333, *Management Representations*).

d.  Apply additional procedures, if any, that other statements, interpretations, guides, or statements of position prescribe for specific types of required supplementary information.

e.  Make additional inquiries if application of the foregoing procedures causes the auditor to believe that the information may not be measured or presented within applicable guidelines.

## Circumstances Requiring Reporting on Required Supplementary Information

.08  Since the supplementary information is not audited and is not a required part of the basic financial statements, the auditor need not add an explanatory paragraph to his report on the audited financial statements to refer to the supplementary information or to his limited procedures, except in any of the following circumstances:[7] (a) the supplementary information that

---

[5]  These procedures are also appropriate when the auditor is involved with voluntary presentations of such information required for other entities (see paragraph .03).

[6]  GASB Statement No. 5, *Disclosure of Pension Information by Public Employee Retirement Systems and State and Local Governmental Employers*, requires presentation of certain 10-year historical trend information relating to pension activities as supplementary information outside the basic financial statements. Such information is generally derived from financial statements. If such required supplementary information has been derived from audited financial statements and is presented outside the basic financial statements in an auditor-submitted document, the auditor may report on this information as indicated in section 552, *Reporting on Condensed Financial Statements and Selected Financial Data*, paragraph .10.

[7]  When required supplementary information is presented outside the basic financial statements in an auditor-submitted document, the auditor should disclaim an opinion on the information unless he has been engaged to examine and express an opinion on it (see section 551.15).

the FASB or GASB requires to be presented in the circumstances is omitted; (*b*) the auditor has concluded that the measurement or presentation of the supplementary information departs materially from prescribed guidelines; (*c*) the auditor is unable to complete the prescribed procedures; (*d*) the auditor is unable to remove substantial doubts about whether the supplementary information conforms to prescribed guidelines. Since the required supplementary information does not change the standards of financial accounting and reporting used for the preparation of the entity's basic financial statements, the circumstances described above do not affect the auditor's opinion on the fairness of presentation of such financial statements in conformity with generally accepted accounting principles. Furthermore, the auditor need not present the supplementary information if it is omitted by the entity. The following are examples of additional explanatory paragraphs an auditor might use in these circumstances.

### Omission of Required Supplementary Information

The (Company or Governmental Unit) has not presented [*describe the supplementary information required by the FASB or GASB in the circumstances*] that the (Financial or Governmental) Accounting Standards Board has determined is necessary to supplement, although not required to be part of, the basic financial statements.

### Material Departures From Guidelines

The [*specifically identify the supplementary information*] on page XX is not a required part of the basic financial statements, and we did not audit and do not express an opinion on such information. However, we have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the supplementary information. As a result of such limited procedures, we believe that the [*specifically identify the supplementary information*] is not in conformity with guidelines established by the (Financial or Governmental) Accounting Standards Board because [*describe the material departure(s) from the FASB or GASB guidelines*].

### Prescribed Procedures Not Completed

The [*specifically identify the supplementary information*] on page XX is not a required part of the basic financial statements, and we did not audit and do not express an opinion on such information. Further, we were unable to apply to the information certain procedures prescribed by professional standards because [*state the reasons*].

### Unresolved Doubts About Adherence to Guidelines

The [*specifically identify the supplementary information*] on page XX is not a required part of the basic financial statements, and we did not audit and do not express an opinion on such information. However, we have applied certain limited procedures prescribed by professional standards that raised doubts that we were unable to resolve regarding whether material modifications should be made to the information for it to conform with guidelines established by the (Financial or Governmental) Accounting Standards Board. [*The auditor should consider including in his report the reason(s) he was unable to resolve his substantial doubts.*]

Even though he is unable to complete the prescribed procedures, if, on the basis of facts known to him, the auditor concludes that the supplementary information has not been measured or presented within prescribed guidelines, he should suggest appropriate revision; failing that, he should describe the nature of any material departure(s) in his report.

.09  If the entity includes with the supplementary information an indication that the auditor performed any procedures regarding the information without also indicating that the auditor does not express an opinion on the information presented, the auditor's report on the audited financial statements should be expanded to include a disclaimer on the information.

.10  Ordinarily, the required supplementary information should be distinct from the audited financial statements and distinguished from other information outside the financial statements that is not required by the FASB or GASB. However, management may choose not to place the required supplementary information outside the basic financial statements. In such circumstances, the information should be clearly marked as unaudited. If the information is not clearly marked as unaudited, the auditor's report on the audited financial statements should be expanded to include a disclaimer on the supplementary information.

--------

**[The next page is 951.]**

Special Reports                    **1097**

## Report on Federal and State Income Taxes Included in Financial Statements[17]

### Independent Auditor's Report

We have audited, in accordance with generally accepted auditing standards, the financial statements of XYZ Company, Inc., for the year ended June 30, 19XX, and have issued our report thereon dated August 15, 19XX. We have also audited the current and deferred provision for the Company's federal and state income taxes for the year ended June 30, 19XX, included in those financial statements, and the related asset and liability tax accounts as of June 30, 19XX. This income tax information is the responsibility of the Company's management. Our responsibility is to express an opinion on it based on our audit.

We conducted our audit of the income tax information in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the federal and state income tax accounts are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures related to the federal and state income tax accounts. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the federal and state income tax accounts. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the Company has paid or, in all material respects, made adequate provision in the financial statements referred to above for the payment of all federal and state income taxes and for related deferred income taxes that could be reasonably estimated at the time of our audit of the financial statements of XYZ Company, Inc., for the year ended June 30, 19XX.

## Compliance With Aspects of Contractual Agreements or Regulatory Requirements Related to Audited Financial Statements

.19  Entities may be required by contractual agreements, such as certain bond indentures and loan agreements, or by regulatory agencies to furnish compliance reports by independent auditors.[18] For example, loan agreements often impose on borrowers a variety of obligations involving matters such as payments into sinking funds, payments of interest, maintenance of current ratios, and restrictions of dividend payments. They usually also require the borrower to furnish annual financial statements that have been audited by an independent auditor. In some instances, the lenders or their trustees may request assurance from the independent auditor that the borrower has complied with certain covenants of the agreement relating to accounting matters. The independent auditor may satisfy this request by giving negative assurance relative to the applicable covenants based on the audit of the financial statements. This assurance may be given in a separate report or in one or more par-

---

[17] See paragraph .16. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 77, November 1995.]

[18] When the auditor is engaged to test compliance with laws and regulations in accordance with *Government Auditing Standards* issued by the Comptroller General of the United States (Yellow Book), he or she should follow guidance contained in section 801, *Compliance Auditing Applicable to Governmental Entities and Other Specified Recipients of Governmental Financial Assistance.* [Footnote renumbered by the issuance of Statement on Auditing Standards No. 77, November 1995.]

agraphs of the auditor's report accompanying the financial statements. Such assurance, however, should not be given unless the auditor has audited the financial statements to which the contractual agreements or regulatory requirements relate and should not extend to covenants that relate to matters that have not been subjected to the audit procedures applied in the audit of the financial statements.[19] In addition, such assurance should not be given if the auditor has expressed an adverse opinion or disclaimed an opinion on the financial statements to which these covenants relate.

.20  When an auditor's report on compliance with contractual agreements or regulatory provisions is being given in a separate report, the report should include—

  *a.*  A title that includes the word *independent*.[20]

  *b.*  A paragraph that states the financial statements were audited in accordance with generally accepted auditing standards and that includes the date of the auditor's report on those financial statements. Furthermore, any departure from the standard report on those statements should also be disclosed.

  *c.*  A paragraph that includes a reference to the specific covenants or paragraphs of the agreement, provides negative assurance relative to compliance with the applicable covenants of the agreement insofar as they relate to accounting matters, and specifies that the negative assurance is being given in connection with the audit of the financial statements. The auditor should ordinarily state that the audit was not directed primarily toward obtaining knowledge regarding compliance.

  *d.*  A paragraph that includes a description and the source of significant interpretations, if any, made by the Company's management relating to the provisions of a relevant agreement.

  *e.*  A separate paragraph at the end of the report stating that the report is intended solely for the information and use of those within the entity and the parties to the contract or agreement or the regulatory agency with which the report is being filed, and is not intended to be and should not be used by anyone other than these specified parties. Such a restriction on the use of the report is necessary because the basis, assumptions, or purpose of such presentations (contained in such contracts, agreements, or regulatory provisions) are developed for and directed only to the parties to the contract or agreement, or regulatory agency responsible for the provisions.

  *f.*  The manual or printed signature of the auditor's firm.

  *g.*  The date.[21]

.21  When an auditor's report on compliance with contractual agreements or regulatory provisions is included in the report that expresses the auditor's opinion on the financial statements, the auditor should include a paragraph,

---

[19]  When the auditor is engaged to provide assurance on compliance with contractual agreements or regulatory provisions that relate to matters that have not been subjected to the audit procedures applied in the audit of the financial statements, the auditor should refer to the guidance in AT section 500A, *Compliance Attestation.* [Footnote renumbered by the issuance of Statement on Auditing Standards No. 77, November 1995; Reference changed, February 1997, to AT section 500A, to reflect the issuance of Statement on Standards for Attestation Engagements No. 3.]

[20]  See footnote 1. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 77, November 1995.]

[21]  See footnote 6. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 77, November 1995.]

# COMMITTEE APPENDIX

## Tab 11

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 00-684 |
| v. | ) ) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) | |

## DECLARATION OF RICHARD WEILL

I, Richard Weill, hereby depose and state as follows:

1.      I am over the age of 18 and am of sound mind and body.  I am submitting this Declaration in support of the Plaintiff's opposition to Defendant's Motion For Summary Judgment in the above-captioned matter.  I have personal knowledge of the facts set forth in this Declaration or have based my Declaration on information available to me, and would so testify if called as a witness in this matter.

2.      After earning my law degree in 1967, I was in the private practice of law until 1989.  From 1989 until 1994, I served as General Counsel of MBIA Insurance Corporation ("MBIA").  In 1994, I became President of MBIA and served in that capacity until 1998.  From 1999 until my retirement in July, 2004, I was MBIA's Vice-Chairman.  As President of MBIA, I was the second-highest ranking officer of the corporation.

**Background On MBIA's Business**

3.      MBIA is in the bond insurance business. MBIA sells insurance policies to entities

that raise money through the issuance of tax-exempt bonds, such as hospitals, public utilities,

school districts, universities, airports, highway transportation authorities, and others. In return

for a premium, MBIA issues insurance policies guaranteeing that MBIA will pay bondholders in

the event that, for any reason, MBIA's customer (the obligor on the bonds) is unable to pay.

4.      As part of many bond insurance transactions, MBIA's customers need to agree to

certain financial covenants regarding the customer's financial performance and condition. The

precise covenants will vary from transaction to transaction. One typical covenant, sometimes

referred to as a debt service coverage ratio covenant, requires that the ratio of a customer's

income available for debt service divided by annual debt service requirements exceed a certain

amount. Pursuant to the bond transaction documents, compliance with covenants is typically

measured annually using the customers' audited financial statements.

5.      One of the important purposes of financial covenants, including a debt service

coverage ratio covenant, is to give MBIA advance notice that its customer is experiencing

financial difficulties and to alert MBIA to the possible need to intervene.

6.      Depending on the terms of the bond transaction documents, MBIA has certain

rights and remedies in the event that a customer violates a financial covenant. In addition, when

a customer has violated a financial covenant, MBIA can employ "moral persuasion" to press the

customer to make changes in its operations to improve financial performance.

7.      One of the MBIA departments that reported to me while I was President and

Vice-Chairman was the Insured Portfolio Management Department, formerly called the

Surveillance Department. This department monitors MBIA customers whose bonds are insured

by MBIA. The purpose of this monitoring is to enable MBIA to know whether any of its

customers are experiencing financial difficulties and, therefore, pose a risk that MBIA would have to pay their bondholders. Many of the bonds insured by MBIA are repaid over a period of many years, so it is important to MBIA to monitor its customers' financial performance.

### MBIA's Insurance Policies Issued To AHERF Affiliates

8.      In 1991, MBIA insured $22,250,000 in bonds issued by AHERF affiliates in Pittsburgh, including Allegheny General Hospital ("Allegheny General Hospital Obligated Group" or "AGHOG"). In 1995, MBIA insured an additional $50 million in bonds issued by AGHOG.

9.      In June 1996, MBIA insured $306,150,000 in bonds issued by certain AHERF affiliates. These AHERF affiliates, known as the "Delaware Valley Obligated Group," or "DVOG," were jointly obligated under these bonds.

10.     The DVOG bond transaction documents required DVOG to comply with certain financial covenants. One such covenant was a debt service coverage ratio covenant set forth in Section 6.3 of the DVOG Master Trust Indenture ("DVOG Debt Service Coverage Ratio Covenant"). This covenant required DVOG to maintain a ratio of income available for debt service divided by maximum annual debt service of at least 1.1:1.0. A financial covenant to the same effect is set forth in Section 3.21 of the DVOG First Supplemental Master Trust Indenture.

11.     Under the DVOG bond transaction documents, including Sections 1.4 and 6.6 of the DVOG Master Trust Indenture, DVOG's compliance with the DVOG Debt Service Coverage Ratio Covenant was to be measured annually based on the annual audited financial statements of DVOG.

12.     According to DVOG Debt Service Coverage Ratio Covenant, if DVOG's debt service coverage ratio fell below 1.1:1.0, as measured based on the annual audited financial

statements, then DVOG was required to retain a consultant or else MBIA could declare an Event of Default and exercise certain legal remedies. If the DVOG ratio fell below 1.0:1.0, however, MBIA could declare an Event of Default and DVOG could not unilaterally prevent that from happening by retaining a consultant.

13.    If MBIA declared an Event of Default, its remedies would include, under Section 2.3 of the Master Trust Indenture, requiring DVOG to immediately deposit with the Master Trustee all gross revenues then on hand as well as future gross revenues. The Master Trustee then would have the discretion, working with a consultant, to spend the gross revenues on operations, maintenance and debt service.

14.    In addition, if MBIA were to declare an Event of Default, it could have required acceleration of the outstanding obligations on the DVOG bonds, making DVOG liable for the outstanding principal and interest.

### Remedial Actions

15.    I understand that the Plaintiff's forensic accounting experts have determined that Coopers & Lybrand ("Coopers") did not conduct their 1996 and 1997 audits of the AHERF entities, including DVOG, in accordance with generally accepting auditing standards ("GAAS"). I further understand that the Plaintiff's forensic accounting experts have determined that, had the 1996 audit of DVOG been conducted in accordance with GAAS, the audit would have revealed that DVOG had breached the DVOG Debt Service Coverage Ratio Covenant. I understand that the ratio would have been 0.88:1.00, instead of 2.77:1.00, which was the ratio derived from DVOG's 1996 audited financial statements provided to MBIA.

16.    In addition, I understand that the DVOG audited financial statements reported that DVOG earned $26.9 million in net income before extraordinary item and change in accounting

principle, whereas, according to Plaintiff's forensic accounting experts, the DVOG audited

financial statements should have reported it as a loss of $39.1 million.

17.    I also understand that plaintiff's forensic accounting experts have determined that

Coopers' failure to perform its audit work in accordance with GAAS led to the following

misstatements and errors:

- AHERF's net income before extraordinary item and change in accounting
  principles on a consolidated basis was reported as $6.5 million when it should
  have been a negative $89.8 million.

- AHERF's unrestricted net assets were reported as $559.2 million when they
  should have been reported as only $473.1 million.

18.    If the 1996 audited financial statements had reported the information that the

Plaintiff's forensic accounting experts have determined should have been reported, I and others

at MBIA would have been extraordinarily concerned.  The information that should have been

provided is much more troubling than the audited financial statements that were actually

provided to us.

19.    Upon receiving such dire news about DVOG's financial performance and the

financial performance and condition of AHERF, the parent of the DVOG entities, MBIA would

have taken aggressive remedial action and would have attempted to work first with AHERF's

management and, if no suitable actions were promptly taken, then directly with its Board of

Trustees to achieve a favorable resolution of the situation.  We would not have hesitated to go

directly to the Board if we felt that AHERF's management was not appropriately responsive to

our concerns.  Because of the magnitude of the potential for a loss of over $300 million, if the

truth had been revealed, the Insured Portfolio Management Department would have kept me

apprised of any developments.  I would have briefed MBIA's Chief Executive Officer and also

the MBIA Board of Directors, and I would have kept them apprised of any developments as well.

20.    I would have ensured that immediate arrangements were made for a meeting between MBIA and members of AHERF's management and Board in the Fall of 1996 to express MBIA's concern. Depending upon the quality and level of response that we had already received from AHERF's management and Board, I may even have attended the meeting myself. In any case, I would have closely monitored the developments of the meeting because I would have considered the DVOG matter one of the most important matters facing MBIA.

21.    We would have explained to the members of AHERF's management and Board that MBIA was very concerned about DVOG and urged AHERF to develop a plan to turn around DVOG's operations. We would have sought improvements in a number of areas. For example, we would have urged AHERF's management and Board to cease acquisitions of physician practices. We also would have pressed AHERF's management and Board to cease acquisitions of hospitals, such as the hospitals that were part of Graduate Health System in Philadelphia. In addition, we would have pressed AHERF's management and Board to ensure that AHERF implement a cost containment program and that all reasonable opportunities for cost cutting be pursued. In MBIA's experience, cutting costs is by far the most effective way that MBIA customers in financial distress are able to turn themselves around.

22.    Given the magnitude and the suddenness of the revelations, we would have also advised the AHERF Board that MBIA's faith in AHERF's management had been shaken and would have told the Board to seriously consider whether new management was needed.

23.    We would also have pressed AHERF's management and Board to consider selling its Philadelphia operations to another health system capable of managing them more effectively than AHERF had been.

24.    We would also have pressed AHERF's management and Board to retain a qualified and aggressive consulting firm to assist in the turnaround effort. Specifically, we would have pressed AHERF's management and Board to hire The Hunter Group, which was known to us as an effective health care consulting firm that advises troubled hospitals in turnarounds.

25.    We would have explained to AHERF's management and Board that how DVOG responded to its situation would have important implications for AHERF's Western affiliates. Specifically, we would have explained that Allegheny General Hospital's relationships with its creditors and its future ability to borrow money would predictably be influenced by whether AHERF reacted responsibly to the concerns of DVOG's creditors.

26.    If AHERF did not respond sincerely and adequately to the financial problems at DVOG, I am certain that MBIA would have exercised legal remedies available to it under the DVOG bond transaction documents. Exactly what steps MBIA would have taken would depend, of course, on how AHERF's management and Board reacted and I do not know with certainty just how they would have acted. Nonetheless, as it would have been in the interests of the AHERF Board to cause AHERF to implement a meaningful turnaround effort, I do not expect that MBIA would have been forced to exercise legal remedies. Nonetheless, MBIA had legal remedies at its disposal and would have used them if necessary.

27.    As noted, if the DVOG audited financial statements had been presented as the Plaintiff's forensic accounting experts have determined they should have been, then DVOG would have violated the DVOG Debt Service Coverage Ratio. Under those circumstances, the Master Trust Indenture and the First Supplemental Master Trust Indenture would allow MBIA to declare an Event of Default. If AHERF did not respond adequately to implement a meaningful