| Class | Description | Class Treatment | Projected Distribution on Effective Date | Class Status | Class Voting Rights |
|-------|-------------|-----------------|------------------------------------------|--------------|---------------------|
| 7 | Insurance Claims | Retain proceeds from any applicable Insurance Policy. | No other distributions under Plan. | Impaired. | Deemed to reject the Plan. |
| 8 | Allowed Membership Interests | Retain Membership Interests. | Retain 100% of Membership Interests. | Unimpaired | Deemed to accept the Plan. |

Under the Plan, the Chapter 11 Trustee proposes to effectuate a distribution of the Cash currently held in the Debtors' Estates and continue the liquidation of the non-Cash assets of the Estates remaining as of the Effective Date (including the significant pending Recovery Actions being pursued by the Chapter 11 Trustee or the Creditors' Committee, see Section IV(B) herein) through a continuing post-confirmation vehicle defined in the Plan as Liquidating AHERF. Any net litigation recoveries ultimately realized by Liquidating AHERF will be paid to secured and unsecured creditors in accordance with the distribution scheme and adjustments embodied in the Plan at certain defined intervals. Under Section 6.6(b) of the Plan, at the time the Chapter 11 Trustee, at the direction of the Creditors' Committee, determines to make a distribution of the first $50 million of net litigation recoveries, holders of MBIA/PNC Claims will receive $15 million, holders of Centennial Bondholder Claims will receive $12.5 million and holders of Allowed Unsecured Claims will receive their Pro Rata share of the remaining $22.5 million. At the time the Chapter 11 Trustee, at the direction of the Creditors' Committee, determines to make a distribution of the second $50 million of net litigation recoveries, holders of MBIA/PNC Claims will receive $15 million with the remaining $35 million being distributed Pro Rata to holders of Allowed Unsecured Claims. At the time the Chapter 11 Trustee, at the direction of the Creditors' Committee, determines to make any subsequent distributions after the first $100 million has been recovered, holders of MBIA/PNC Claims will receive 20% of all such distributions until such holders have been paid $10 million and the remaining amounts will be distributed Pro Rata to holders of Allowed Unsecured Claims.

*Prosecution of Recovery Actions and Other Liquidation Activities.* The cornerstone of the Plan is the pursuit by the Chapter 11 Trustee and the Creditors' Committee of lawsuits already commenced, or to be commenced, after the occurrence of the Effective Date with the hope of augmenting the recovery of secured and unsecured creditors under the distribution scheme described above. The Plan balances the goals of providing a meaningful initial Cash distribution to creditors and establishing a substantial reserve to fund the pursuit of lawsuits reasonably believed to result in significant post-confirmation distributions from net litigation recoveries.

Under the Plan, Liquidating AHERF, the Chapter 11 Trustee and the Creditors' Committee will continue all activities attendant to the wind-down of the Debtors' Estates. Once the Cash of the Debtors' Estates on the Effective Date is distributed and allocated pursuant to the Plan, the Recovery Actions will represent substantially all of the assets remaining to be liquidated for the benefit of the

Estates' secured and unsecured creditors. The Creditors' Committee shall have responsibility for and authority over all substantive and material decisions respecting the prosecution of all Recovery Actions, including the engagement and direction of counsel, subject to the terms of the Plan and the Liquidating AHERF Bylaws. The Creditors' Committee will continue to pursue, as named plaintiff, the Recovery Actions pending against certain former officers and trustees of the Debtors and against the Debtors' pre-petition auditor, PricewaterhouseCoopers, LLP. Under the Creditors' Committee's oversight, William J. Scharffenberger, in his ongoing capacity as Chapter 11 Trustee, will continue to be the named plaintiff in the other Recovery Actions. Mr. Scharffenberger, as Chapter 11 Trustee, will also be appointed as sole trustee and Chief Liquidating Officer of Liquidating AHERF, subject to the supervision of the Creditors' Committee.

Liquidating AHERF will be funded initially by a Liquidation Administrative Claim Reserve Amount of not less than $30 million to cover the professional fees and expenses and other costs attendant to the prosecution of the Recovery Actions and other wind-down activities, although the Chapter 11 Trustee and the Creditors' Committee will be able to proceed with the confirmation of the Plan with less than $30 million in the Liquidation Expense Reserve Account to the extent that they believe proceeding with confirmation to be appropriate under the circumstances. The Liquidation Administrative Claim Reserve Amount may be supplemented from net litigation recoveries, or otherwise adjusted to amounts deemed sufficient to cover estimated ongoing litigation costs.

The ongoing retention of respective counsel to the Chapter 11 Trustee and the Creditors' Committee to prosecute the Recovery Actions is not dependent on, nor will the cessation of their services be subject to, any requisite level of funds in the Liquidation Expense Reserve Account. The Chapter 11 Trustee and the Creditors' Committee will continue to pursue vigorously the Recovery Actions, seeking damages for the benefit of secured and unsecured creditors against the persons and entities believed to have culpability for the circumstances resulting in the Debtors' financial demise and other actions.

NO ASSURANCES CAN BE GIVEN, AND NO PREDICTIONS CAN BE MADE, AS TO THE OUTCOME OF ANY RECOVERY ACTIONS BEING PURSUED BY THE CHAPTER 11 TRUSTEE OR THE CREDITORS' COMMITTEE. AS A RESULT, NO ASSURANCE OR OTHER REPRESENTATION CAN BE OR IS BEING MADE THAT SECURED OR UNSECURED CREDITORS WILL RECEIVE ANY DISTRIBUTIONS OTHER THAN THE INITIAL DISTRIBUTIONS OF CASH TO BE MADE OUT OF CASH AVAILABLE ON THE EFFECTIVE DATE. The Chapter 11 Trustee and the Creditors' Committee believe that the Recovery Actions allege meritorious causes of action for wrongdoing committed, egregious omissions or failures to act, and/or voidable transfers made or other events occurring in connection with the Debtors' financial downfall and ultimate Chapter 11 filings.

*   *   *   *   *   *

AS SET FORTH MORE FULLY IN SECTION VI HEREOF, IN THE EVENT THAT ANY CLASS THAT VOTES TO REJECT THE PLAN (AND THE BANKRUPTCY COURT DETERMINES THAT, AS A RESULT THEREOF, THE PLAN IS UNCONFIRMABLE), THE CHAPTER 11 TRUSTEE RESERVES THE RIGHT TO (1) SEEK TO CONFIRM THE

PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITHOUT RESOLICITING VOTES TO ACCEPT OR REJECT THE PLAN AND BALLOTS CAST RESPECTING SUCH CLASSES WOULD BE DISREGARDED OR (2) PROPOSE ALTERNATIVE TREATMENT UNDER THE PLAN WITH RESPECT TO SUCH CLASSES OR AN ALTERNATIVE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE CHAPTER 11 TRUSTEE BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS. FURTHERMORE, ALTHOUGH THE CHAPTER 11 TRUSTEE HAS MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN OUTSIDE ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS IN THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED. ALTHOUGH THE CHAPTER 11 TRUSTEE HAS MADE EVERY EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE VOTE ON THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT THAT CERTAIN EVENTS, SUCH AS THOSE MATTERS DISCUSSED IN SECTION VIII BELOW ENTITLED "RISK FACTORS," DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

### C. Voting and Confirmation Procedures

Accompanying this Disclosure Statement are copies of the following documents: (1) the Plan, which is annexed hereto as Exhibit A, (2) an Order of the Bankruptcy Court (the "Disclosure Statement Approval Order") (a) approving this Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, (b) approving the forms of Ballots and (c) approving the notice of and fixing the time for (i) submitting acceptances or rejections to the Plan, (ii) the hearing to consider confirmation of the Plan and (iii) filing objections to confirmation of the Plan and (3) forms of Ballots to be executed by holders of impaired Claims for voting to accept or reject the Plan.

This Disclosure Statement, the forms of Ballots and the related materials delivered together herewith (collectively, the "Solicitation Materials"), are being furnished, for purposes of soliciting votes on the Plan, to holders of (1) Centennial Bonds, as determined by, among other things, the names (or the names of whose nominees) appearing as of the Voting Record Date (defined below) on the security holder lists maintained by the Centennial Indenture Trustee, (2) MBIA/PNC Claims, (3) General Unsecured Claims, (4) Centennial Unsecured Claims, (5) Convenience Claims and (6) Centennial Convenience Claims.  With regard specifically to the Centennial Bonds held by banks or brokers (the "Record Holders") for the beneficial ownership of other entities or individuals (the "Beneficial Holders"), the Chapter 11 Trustee, or such other balloting agent as may be retained by the Chapter 11 Trustee, will provide a sufficient number of copies of this Disclosure Statement, the Plan and the Ballots to the Record Holders for transmission to each of the Beneficial Holders.  The Chapter 11 Trustee shall request that the Record Holders send copies of the Disclosure Statement, the Plan and the Ballots to the respective Beneficial Holders  and to collect completed Ballots from such Beneficial Holders on the Chapter 11 Trustee's behalf.  The Record Holders shall be asked to summarize the results of the votes received from the Beneficial Holders on a summary form, i.e., a "Master Ballot," which will be provided to each Record Holder by the Chapter 11 Trustee's balloting agent.

On August 4, 2000, the Chapter 11 Trustee filed a motion seeking to temporarily allow certain Claims for voting purposes, disallow certain other Claims for voting purposes and establish procedures relating to the temporary allowance of Claims for voting purposes.  A hearing on this

motion is scheduled for August 17, 2000. If the Bankruptcy Court grants the motion, the Claims of certain unsecured creditors will be temporarily allowed solely for purposes of voting on the Plan, and the Claims of certain other unsecured creditors will be disallowed solely for voting purposes. The motion also establishes procedures, pursuant to Rule 3018 of the Bankruptcy Rules, that such unsecured creditors must follow if they advocate temporary allowance of their Claim other than as set forth in the motion. The motion proposes that creditors whose Claims are affected by the motion will receive a notice setting forth the proposed treatment of their Claim for voting purposes and the procedures referenced in the preceding sentence along with the Plan, the Disclosure Statement and the other solicitation materials approved by the Court.

    1.  <u>Who May Vote.</u>

Under the Bankruptcy Code, impaired classes of claims or equity interests are entitled to vote to accept or reject a plan of reorganization. A class which is not "impaired" is deemed to have accepted a plan of reorganization and does not vote. A class is "impaired" under the Bankruptcy Code unless the legal, equitable and contractual rights of the holders of claims or equity interests in such class are not modified or altered. For purposes of the Plan, Beneficial Holders of Centennial Bondholder Claims in Class 3 and holders of MBIA/PNC Claims in Class 4, General Unsecured Claims in Class 5(A), Centennial Unsecured Claims in Class 5(B) Convenience Claims in Class 6(A) and Centennial Convenience Claims in Class 6(B) are impaired and are entitled to vote on the Plan.

With respect to creditors holding identical unsecured Claims against more than one Debtor, the Chapter 11 Trustee will treat each such creditor as either a holder of a General Unsecured Claim (Class 5(A) of the Plan) or a Centennial Unsecured Claim (Class 5(B) of the Plan), or with respect to Claims below $1,000 or $5,000, as a holder of a Convenience Claim (Class 6(A)) or a Centennial Convenience Claim (Class 6(B)), respectively, solely for purposes of voting on the Plan. A creditor will be treated as a holder of a General Unsecured Claim or Convenience Claim, as the case may be, solely for purposes of voting on the Plan if the creditor has filed identical Claims against Centennial and at least one of the other Estates and if (a) no Claim appears on the Debtors' schedules of assets and liabilities (the "Schedules") against any of the Debtors with respect to such creditor or (b) a Claim appears on the Schedules against one of the Estates, but not Centennial. A creditor will be treated as a holder of a Centennial Unsecured Claim or Centennial Convenience Claim, as the case may be, solely for purposes of voting on the Plan only if the creditor has filed identical Claims against Centennial and at least one of the other Estates and a Claim appears on the Schedules against Centennial only and no other Estate. A creditor that has filed identical Claims against Centennial and at least one of the other Estates and has a Claim listed on the Schedules against Centennial and at least one of the other Estates will be permitted to vote on the Plan as a holder of a General Unsecured Claim or Convenience Claim, as the case may be, and as a holder of a Centennial Unsecured Claim or Centennial Convenience Claim, as the case may be. A creditor entitled to vote as a holder of both a General Unsecured Claim and Centennial Unsecured Claim or as a holder of a Convenience Claim and a Centennial Convenience Claim, as the case may be, or any combinations thereof, will receive a distribution, if such Claims are valid, based on the allowance of a single Claim in which the underlying liabilities will be properly allocated among Centennial and the other Debtors' Estates.

THESE GUIDELINES HAVE BEEN PROMULGATED FOR VOTING PURPOSES ONLY. THE CHAPTER 11 TRUSTEE RESERVES THE RIGHT THROUGH HIS CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO ALLOW ANY CLAIMS FOR DISTRIBUTION PURPOSES UNDER THE PLAN BASED ON AN APPROPRIATE ALLOCATION OF LIABILITIES AMONG CENTENNIAL AND THE OTHER DEBTORS' ESTATES.

   2.   <u>Voting Instructions</u>.

   All votes to accept or reject the Plan must be cast by using the form of Ballot enclosed with this Disclosure Statement. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed _____ __, 2000 at 5:00 p.m. (Pittsburgh time) as the time and date (the "Voting Record Date") for the determination of the Beneficial Holders of the Centennial Bondholder Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, please indicate your acceptance or rejection of the Plan on the appropriate Ballot and return such Ballot in the enclosed envelope to:

<table>
<tr>
<td>

BY MAIL:<br>
Donlin, Recano & Company, Inc.<br>
Re:   Allegheny Health, Education and<br>
      Research Foundation <i>et al</i>.<br>
P.O. Box 2034<br>
Murray Hill Station<br>
New York, NY 10156-0701<br>
(212) 481-1411

</td>
<td>

IF BY HAND DELIVERY OR OVERNIGHT COURIER:<br>
Donlin, Recano & Company, Inc.<br>
Re:   Allegheny Health, Education and<br>
      Research Foundation <i>et al</i>.<br>
419 Park Avenue South<br>
Suite 1206<br>
New York, NY 10016

</td>
</tr>
</table>

   **BALLOTS MUST BE RECEIVED NO LATER THAN 5:00 P.M. (PITTSBURGH TIME) ON _____ __, 2000 (THE "VOTING DEADLINE"). ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON SHALL NOT BE COUNTED. ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO BE AN ACCEPTANCE. ANY BALLOT THAT IS FAXED WILL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN.**

   If you have any questions regarding the procedures for voting on the Plan, please contact the Chapter 11 Trustee's balloting agent, Donlin, Recano & Company, Inc., at the above address and telephone number.

   3.   <u>Acceptance or Rejection of the Plan</u>.

   Pursuant to the Bankruptcy Code, a voting class of claims is deemed to have accepted the Plan if it is accepted by creditors in such class who, of those voting on the plan of reorganization, hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.

If the Plan is not accepted by all impaired Classes of Allowed Claims, the Plan may still be confirmed by the Bankruptcy Court pursuant to Section 1129(b) of the Bankruptcy Code if (a) the Plan has been accepted by at least one impaired Class of Claims and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class. If the Plan is not accepted by all impaired Classes of Allowed Claims, the Debtors reserve the right to request the Bankruptcy Court to find that the Plan does not discriminate unfairly and is fair and equitable with respect to each such impaired Class that has not accepted the Plan. See Section VI for a discussion of Acceptance and Confirmation of the Plan.

### 4. Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

Pursuant to Section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing before the Honorable M. Bruce McCullough, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Western District of Pennsylvania, 600 Grant Street, USX Tower, 54th Floor, Courtroom B, Pittsburgh, Pennsylvania 15222, for _____, 2000 at _____. A notice setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

### 5. Objections.

Any objection to confirmation of the Plan must be in writing, must comply with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court and must be filed and served as required by the Bankruptcy Court pursuant to the Disclosure Statement Approval Order. A copy of the Disclosure Statement Approval Order accompanies this Disclosure Statement and contains all relevant procedures relating to the submission of objections to confirmation of the Plan. Parties submitting objections should review the Disclosure Statement Approval Order in its entirety.

## II.

## BACKGROUND AND EVENTS PRECIPITATING
## THE CHAPTER 11 FILING

EACH OF THE RECOVERY ACTIONS COMMENCED AND BEING PURSUED BY THE CHAPTER 11 TRUSTEE OR THE CREDITORS' COMMITTEE SETS FORTH CAUSES OF ACTION AGAINST THE RESPECTIVE NAMED DEFENDANTS BASED ON EVENTS THAT PRECEDED, AND IN CERTAIN INSTANCES FOLLOWED, THE COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES. FOR A DISCUSSION OF THE RECOVERY ACTIONS, SEE SECTION IV HEREIN.

THIS DISCLOSURE STATEMENT PROVIDES ONLY A BRIEF SUMMARY OF CERTAIN HISTORICAL EVENTS RESPECTING THE DEBTORS AND THE PRE-PETITION AND POST-PETITION PERIODS.   THIS SUMMARY HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE BY CREDITORS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND IS INTENDED ONLY FOR SUCH USE.  THIS SUMMARY IS NOT, AND SHALL NOT CONSTITUTE, AN ADMISSION AGAINST THE INTERESTS OF THE CHAPTER 11 TRUSTEE, THE CREDITORS' COMMITTEE, THE ESTATES OR THE ESTATES' CREDITORS. ALL STATEMENTS AND REPRESENTATIONS MADE IN THE DISCLOSURE STATEMENT SHALL BE CONSTRUED AS STATEMENTS MADE IN THE COURSE OF SETTLEMENT NEGOTIATIONS AND, ACCORDINGLY, SHALL NOT BE ADMISSIBLE FOR ANY PURPOSE, PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

## A.  Historical Overview of the Debtors

Prior to the commencement of the Chapter 11 Cases on July 21, 1998 (the "Petition Date"), AHERF was the parent entity of an integrated healthcare system (the "AHERF System") that operated in Pennsylvania and New Jersey.  AHERF was organized in 1983 as a Pennsylvania not-for-profit corporation.  AHERF is the sole member of the other Debtors, which as of the Petition Date maintained hospital, educational and related medical operations in the Greater Philadelphia metropolitan area (the "Philadelphia Operations").  The AHERF System also maintained, through non-debtor Pennsylvania not-for-profit corporations, hospital and related medical operations in the Pittsburgh and Allegheny County area (the "Pittsburgh Operations") and in New Jersey. Annexed hereto as Exhibit B is an organizational chart showing the relationship among the Debtors and certain-affiliated entities.

The AHERF System operated for the charitable purposes of providing health care for the sick, injured, disabled, indigent or infirm, preserving and promoting the general health, rehabilitation and social needs of the public, educating individuals pursuing careers in the health sciences and engaging in other activities that supported its healthcare and related purposes.  As of the Petition Date, the AHERF System consisted of 55 legal entities, including 14 hospitals, one medical school, two captive insurance companies and 248 physician practices.  The AHERF System had ten separate boards of trustees and in excess of 100 trustees and directors.  Sherif S. Abdelhak was President and Chief Executive Officer of AHERF from 1986 until June 5, 1998 when his employment was terminated by AHERF's Board of Trustees.  David C. McConnell was Executive Vice President, Chief Financial Officer and Treasurer of AHERF from November 1991 until he resigned in June 1998.  Nancy A. Wynstra was Executive Vice President, General Counsel and Secretary of AHERF from 1983 until her employment was terminated in August 1998.

AHERF served as the general and administrative service provider for all of the affiliated entities comprising the AHERF System.  AHERF entered into individual management contracts with its subsidiaries regarding various centralized corporate and management services, including payroll, accounting and information services.  AHERF provided centralized cash management for the entire AHERF System, receiving virtually all cash receipts of each operating entity, paying substantially all bills for services and supplies provided to the operating entities, and controlling each subsidiary's

investments, endowments and other restricted, designated and unrestricted funds and accounts. In certain instances, endowments provided to a specific entity or facility were transferred to the books of AHERF. Expenses incurred by one AHERF affiliate for the benefit of another were to be reconciled through inter-company charges. In lieu of procedures set forth in the intercompany management contracts, costs were allocated based on budget estimates and paper entries in the AHERF System's central accounting journals, in theory, but often (particularly immediately prior to the Petition Date) not in practice, subject to subsequent reconciliation.

 1. The Pittsburgh Operations and Other Affiliates.

 In 1983, AHERF was established as a statutory non-membership not-for-profit corporation and was the sole member of Allegheny General Hospital ("AGH"), a 670-bed hospital in Pittsburgh that, at that time, had a teaching affiliation with the University of Pittsburgh Medical Center. In 1997, AHERF formed the not-for-profit corporation Allegheny University Medical Centers ("AUMC") to operate three community hospital affiliates that had been acquired by AHERF in the Pittsburgh area — Forbes Hospital, Allegheny Valley Hospital and Canonsburg Hospital. The not-for-profit corporation Allegheny-Singer Research Institute ("ASRI") was established in connection with certain research activities being conducted in connection with the Pittsburgh Operations. The not-for-profit corporation Allegheny University Hospitals-West ("AUH-West") was established to serve a centralized management function for the Pittsburgh Operations at or about the time of the Petition Date. AGH, AUMC, ASRI and AUH-West (collectively, the "Non-Debtor Entities") did not file petitions for relief under Chapter 11 of the Bankruptcy Code.

 In addition to the Non-Debtor Entities described above, AHERF established Allegheny Health Services Providers Insurance Company ("AHSPIC"), a Cayman Island insurance company and wholly-owned subsidiary of AHERF, to provide professional liability reinsurance for the benefit of the AHERF System's facilities. Under the Plan, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause AHSPIC to dissolve, merge or file for insolvency protection or the appointment of a receivor, pursuant to applicable law, without the need for further Bankruptcy Court approval or entry of a final order.

 2. The Philadelphia and New Jersey Operations.

 Beginning in the late 1980's, the AHERF System expanded into the Philadelphia metropolitan area and New Jersey. In 1987, AHERF acquired the Medical College of Pennsylvania ("MCP"), which operated a medical school and an associated hospital in Philadelphia (MCP Hospital and Eastern Psychiatric Institute). In 1991, AHERF acquired United Hospitals, Inc., a system of four hospitals in Philadelphia ("United Hospitals"), and Suburban Medical Associates, a group of primary care physician practices outside that city. United Hospitals operated St. Christopher's Hospital for Children in Philadelphia and three other hospitals: Warminster (later known as Bucks County Hospital), Rolling Hills (later known as Elkins Park Hospital) and Lawndale (which was closed a year after the acquisition).

 In 1993, AHERF acquired Hahnemann Medical College ("Hahnemann") and its affiliated medical center in Philadelphia, the 638-bed Hahnemann University Hospital. In 1994, AHERF merged its two Philadelphia medical schools to create MCP-Hahnemann School of Medicine, which

later became AUHS, one of the Debtors herein.  MCP Hospital, Elkins Park Hospital, Bucks County Hospital and Hahnemann Hospital were owned and operated by AUH-East, one of the Debtors herein.

From 1991 through 1997, AHERF acquired 182 physician practices in Philadelphia and an additional 66 physician practices in Pittsburgh.  AHERF organized the physician practices it acquired through AUMP.

During the period from August 1996 through May 1997, six hospitals in the greater Philadelphia and New Jersey area that had comprised the Graduate Health System, now known as Philadelphia Health Care Trust ("PHCT"), were integrated into AHERF (the "Graduate Health System Acquisition").  Four of these hospitals - Graduate Hospital, Parkview Hospital, City Avenue Hospital and Mt. Sinai Hospital - were organized under Centennial, which assumed substantial amounts of liabilities of Graduate Health System and its affiliates, including the approximately $160 million Centennial Bond debt.  Two hospitals in New Jersey acquired from the Graduate Health System, including Zurbrugg Health Foundation and Rancocas Hospital, were organized into a not-for-profit, AHERF subsidiary-Allegheny Hospitals, New Jersey ("AHNJ"), which is not a Debtor.

## B. Pre-Petition Institutional Debt

During the period from 1987 to 1998, the AHERF System's long-term bond debt increased from approximately $70 million to $1 billion.  Annual payments on this bond debt exceeded $90 million per year.  Prior to the Petition Date, the Debtors' debt structure included a working capital facility with Mellon Bank and long-term debt consisting primarily of the Centennial Bonds and the DVOG Bonds.  The AHERF System consisted of six "Obligated Groups," of which the Delaware Valley Obligated Group ("DVOG"), which consisted of AUH-East and AUHS, and the Centennial obligated group comprised the Debtors' significant pre-petition institutional debt.

1. <u>Mellon Bank Group Credit Facility.</u>

Prior to April 27, 1998, the Debtors were financed by a working capital facility consisting of a $100 million revolving line of credit (the "Revolver") pursuant to a Credit Agreement, dated as of March 7, 1997, with Mellon Bank, N.A. ("Mellon Bank"), Toronto Dominion (New York), Inc.; Bank One Akron, N.A. and the First National Bank of Chicago (collectively, together with Mellon Bank, the "Lenders").  Mellon Bank maintained a 28% participation, and each of the other Lenders held a 24% participation.  Under the overall credit availability Mellon Bank also could issue letters of credit on behalf of AHERF up to an aggregate principal amount of $25 million with corresponding reductions in credit availability under the Revolver.  The Credit Agreement provided for AHERF to borrow funds to meet the financial needs of its DVOG affiliates through corresponding inter-affiliate loans memorialized through promissory notes (the "Obligated Group Notes") issued by the borrowing affiliates of AHERF; in the case of DVOG, Obligated Group Notes were issued under the DVOG Master Trust Indenture.  The Obligated Group Notes issued to AHERF, in turn, were to be pledged to Mellon Bank as agent to the Lenders.  On April 27, 1998, the outstanding principal amount under the DVOG Obligated Note, and AHERF's corresponding indebtedness under the Credit Agreement, was $89.5 million, and AHERF was in default on certain financial covenants of

the Credit Agreement.  AHERF satisfied its obligations to the Lenders on April 27, 1998 by its payment of $89.5 million to Mellon Bank.  See discussion at Section III(C) below.  At that time, at least four members of AHERF's Board of Trustees were current or former officers or directors of Mellon Bank.

### 2.  The DVOG Bonds.

In June 1996, the Pennsylvania Higher Educational Facilities Authority (the "Authority") issued four series of revenue bonds known as the Pennsylvania Higher Educational Facilities Authority Health Services Revenue Bonds: (i) Series A in the amount of $228,875,000, (ii) Series B in the amount of $34,465,000, (iii) Series C in the amount of $43,990,000, (iv) Series D in the amount of $50,000,000 and (v) Series E commercial paper notes (collectively, the "DVOG Bonds").  Each series of DVOG Bonds was issued under a separate, though substantially similar, trust indenture entered into and dated as of May 15, 1996, by and between the Authority and Norwest Bank Minnesota National Association as bond trustee (in such capacity, the "DVOG Indenture Trustee"), except that the trust indenture for the Series D bonds was dated June 1, 1996.  MBIA insured the scheduled payments of principal and interest, on a "when due" basis, on Series A, B and C of the DVOG Bonds and PNC issued letters of credit on behalf of AUHS and AUH-East, as account party, with respect to Series D of the DVOG Bonds and Series E commercial paper notes.  The proceeds of the DVOG Bonds were, in turn, advanced as loans to the DVOG member entities.

As of the Petition Date, the indebtedness of AUHS and AUH-East under the DVOG Master Trust Indenture aggregated approximately $400 million, and the DVOG Indenture Trustee maintained reserves established for application against such indebtedness in the aggregate amount of $9.7 million.  After application of such reserves, MBIA/PNC held Claims aggregating $390.3 million, making them the largest creditors of the Estates.

The DVOG Master Trust Indenture purported to grant to the DVOG Indenture Trustee, for the benefit of MBIA/PNC, a security interest in and lien on certain assets of the DVOG member entities, including, without limitation, their "Gross Revenues," which MBIA/PNC asserted includes the accounts receivable and other receivable assets of such entities.  The Chapter 11 Trustee and the Creditors' Committee disputed whether the DVOG Master Trust Indenture was sufficient to create a security interest in any property of the Estates of AUH-East and AUHS, and, even if valid security interests were created, whether the financing statements filed in connection therewith were sufficient to perfect such a security interest.  See Section V for a discussion of the proposed compromise and settlement reached with respect to these issues among the Chapter 11 Trustee, the Creditors' Committee and MBIA/PNC, as embodied in the Plan.

### 3.  Centennial Bonds.

In connection with the Graduate Health System Acquisition, Centennial assumed the obligations of the obligor under Series A and Series B bonds of 1991 issued in the aggregate principal amount of $114,665,000, and the obligations of the obligor under the Series A and Series B bonds of 1993 issued in the aggregate principal amount of $57,985,000, as governed by, among other things, the Centennial Master Trust Indenture.  The Centennial Master Trustee was granted a security interest in and lien on certain assets of the obligors, including each issuer's "gross revenues"

as defined under the Centennial Master Trust Indenture. As of the Petition Date, after application of the debt service resource account maintained pursuant to the Centennial Master Trust Indenture, the aggregate outstanding amount of Centennial Bonds was $138.6 million. See Section V respecting the issues regarding Claims under the Centennial Bonds and the Centennial Master Trust Indenture addressed during the Chapter 11 Cases by the Chapter 11 Trustee, the Creditors' Committee and BNY, and the proposed resolution of those issues, including the settlements embodied in the Plan. BNY is the successor Centennial Indenture Trustee under the Centennial Master Trust Indenture.

## C. The Debtors' Downfall

Prior to the Petition Date, the Debtors experienced difficulties servicing their long-term debt and maintaining sufficient liquidity for operations. These difficulties stemmed from a number of factors, including, among other things, shifting market forces in the health care and insurance industries and cuts in Medicare and Medicaid payouts that reduced revenues and the AHERF System's assumption of a substantial amount of debt in connection with the acquisition of facilities in Philadelphia and Pittsburgh. These conditions were exacerbated by the lack of adequate oversight by the AHERF System's Board of Trustees and the failure of AHERF's accountants and other professionals to recognize the material adverse managerial, financial and operational factors. Ultimately, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code because they were unable to sustain operations. The Chapter 11 filing was timed to preserve a lawsuit against the Lenders for the $89.5 million payment made on April 27, 1998.

### 1. The Shift in the Health Care Industry.

At the time AHERF embarked on its strategy of horizontal and vertical integration, the health care industry was undergoing rapid changes. Notwithstanding AHERF's success in running AGH, several challenging market forces were on the horizon that would challenge AHERF's ability to sustain its financial success into the next decade. Among the more significant changes was a shift in the health insurance industry to managed care programs, which obtain discounts from hospitals, discourage hospital admissions, decrease the average duration of a patient's stay and curb the fees charged for specialty treatment. Together with improvements in out-patient care, the shift to managed care programs would ultimately decrease both the number of patients in hospital beds and the revenues generated from those patients. Restrictions in the growth of Medicare reimbursements and Medicaid cuts throughout the decade further decreased patient revenue.

### 2. AHERF's Acquisitions.

AHERF acquired facilities throughout Pennsylvania and parts of New Jersey to achieve economies of scale and enhance its bargaining power with managed care programs and insurance carriers. AHERF also hoped that size and coordinated, effective management would bring with it certain synergies and efficiencies that would overcome the substantial debt it was assuming. AHERF did not realize these goals.

In 1988, AHERF acquired MCP, which operated a medical school and an associated hospital in Philadelphia. At the time, MCP was in serious financial distress. MCP agreed to the acquisition when AHERF pledged an infusion of capital into MCP of $40-60 million over a five-year period.

Subsequently, AHERF acquired United Hospitals, and assumed over $137 million of bond debt. The 1993 acquisition of Hahnemann Medical College resulted in the addition of another $123 million of bond debt.

The acquisition of the Graduate Health System further saddled the AHERF System with substantial debt and other obligations. In order to acquire these hospitals in the Philadelphia area, Centennial assumed all assets and liabilities of the six hospitals, and the Graduate Health System was required to contribute an additional $25 million of capital to the hospitals over a three-year period. The transaction was structured so that the hospitals would initially be acquired by a shell corporation, SDN, Inc. ("SDN" is an acronym for the first names of Sherif Abdelhak, David McConnell and Nancy Wynstra) and later transferred to Centennial. It has been alleged that Abdelhak, McConnell and Wynstra structured the Graduate Health System Acquisition in this way to manipulate the accounting records of the Graduate Health System to boost its reported operating income and reduce reported operating costs so that the acquisition could be justified to the AHERF Board of Trustees. As a result of this acquisition, Centennial assumed $160 million in outstanding long term debt arising out of the Centennial Bonds and other obligations.

AHERF's acquisition of the AUMC hospitals- Forbes, Allegheny Valley and Canonsburg - also added to the AHERF System's highly leveraged capital structure. The acquisition of the three hospitals added another $121 million in long-term bond debt to the AHERF System's consolidated balance sheet.

Besides acquiring these facilities, AHERF expanded its physician network throughout Pennsylvania by purchasing primary care physician practices, which were organized under AUMP, by spending tens of millions of dollars on the practices without, it is alleged, conducting meaningful due diligence to determine the value of these practices. In addition, AHERF guaranteed high salaries to the physicians who agreed to join the AHERF System.

### 3. The AHERF Corporate Structure; Failure of Oversight.

As illustrated by the organizational chart annexed hereto as Exhibit B and summarized above, AHERF had created a complex corporate structure that was constantly changing as a result of numerous mergers, divisions and reorganizations within a compressed time period. The AHERF System's policies and procedures with respect to the recording of transactions were ineffective for AHERF's statewide integrated health care system because they were not updated as AHERF expanded its operations.

AHERF's external auditors, Coopers and Lybrand (now known as PricewaterhouseCoopers LLP ("PwC")), audited and certified AHERF's consolidated financial statements for fiscal years ending June 30, 1996 and June 30, 1997. In each of fiscal years 1996 and 1997, PwC issued so-called "clean opinions" to the effect that the consolidated financial statements of AHERF "presented fairly, in all material respects, the financial position of [AHERF and its affiliates]. . . in conformity with generally accepted accounting principles." On September 2, 1998, more than one month after the Petition Date, AHERF acknowledged publicly that its audited financial statements for 1997 should not be relied upon pending further review. See the discussion at Section IV(B) below for a summary of the lawsuit being pursued against PwC by the Creditors' Committee.

### 4. .The Descent into Bankruptcy.

During the two fiscal years preceding the Petition Date, the AHERF System sustained substantial net operating losses in the magnitude of $559 million. During 1997, the AHERF System was losing millions of dollars monthly and lacked sufficient cash to pay its medical malpractice insurance coverage and other bills from suppliers and service providers as they became due in the ordinary course. In 1997, AHERF closed Mt. Sinai Hospital, which resulted in the layoff of approximately 500 employees, and terminated the employment of another 1,200 employees from the other Philadelphia-area hospitals. By late 1997, AHERF was in default of financial covenants and other provisions of the Mellon Bank facility, and by early 1998, AHERF failed to comply with provisions of the DVOG Master Trust Indenture. By the end of January 1998, for the first seven months of that fiscal year, the AHERF System had incurred a consolidated net loss exceeding $160 million.

Even as the AHERF System's cash problems worsened, during November and December 1997, and again in mid-1998, certain executives received substantial increases in compensation to a level significantly above industry average and other perquisites. In early 1998, AHERF instituted a key employee stock option plan (the "KeySOP") for six senior executives that, in conjunction with an Executive Loan Program also instituted in early 1998 for the same six senior executives, enabled the executives to obtain personal loans totaling in the aggregate of at least $5.8 million. Two weeks before the Petition Date, the Compensation Committee of AHERF's Board of Trustees accelerated the vesting of deferred compensation amounts under the KeySOP to the six KeySOP beneficiaries, allowing them to cash out their deferred compensation plans and pay down their personal loans. See the discussion at Section IV(B) below for a summary of the Chapter 11 Trustee's lawsuit against Messrs. Abdelhak and McConnell and Ms. Wynstra — the three officers who failed to repay the distributions made from the KeySOP to them or for their benefit.

On April 27, 1998, AHERF repaid $89.5 million to the Lenders. See discussion below at Section IV(B) for a summary of the Chapter 11 Trustee's lawsuit against Mellon Bank and the Lenders. A principal factor in the Debtors' determination to file their voluntary petitions on the Petition Date was the preservation of AHERF's ability to avoid this repayment under Section 547 of the Bankruptcy Code as a preferential transfer.

Also prior to the Petition Date, AHERF took actions to withdraw or otherwise liquidate and use millions of dollars from endowments, grants and other specified or designated accounts (collectively, the "Restricted Assets") to fund the Debtors' operations. The Creditors' Committee, Tenet Healthcare Corp., the Attorney General for the Commonwealth of Pennsylvania (the "Commonwealth") and others have filed lawsuits and, in the case of the Commonwealth commenced criminal prosecutions, against certain former officers and trustees of AHERF for improper and/or illegal use of the Restricted Assets. See discussion at Section IV(B) below for a summary of the lawsuits commenced with respect to the pre-petition use of the Restricted Assets.

In early 1998, AHERF entered into negotiations for the sale of certain of the Philadelphia hospitals to Vanguard Health Systems, Inc. ("Vanguard"), but these negotiations were terminated as a result of Vanguard's discovery of substantial inconsistencies in the AHERF System's financial reporting while conducting due diligence. Immediately prior to the Petition Date, AHERF and

Vanguard renewed negotiations and, on or about the Petition Date, announced a revised, "stalking horse" bid from Vanguard for certain Philadelphia hospitals. As described below, the deal with Vanguard was never consummated, and the Debtors ultimately sold certain of the operations to Tenet, and Drexel University assumed the management of the academic facilities.

In June 1998, for reasons including, but not limited to, revelations regarding the scope of AHERF System's liquidity problems, the AHERF Board terminated the employment of Mr. Abdelhak, and Mr. McConnell resigned shortly thereafter. By July 1998, AHERF required additional funding from outside sources to maintain operations, including to purchase critical medical supplies to keep the hospitals operational. AHERF's institutional creditors pursued discussions with AHERF to provide "bridge" financing outside of Chapter 11 filings to enable AHERF to meet its cash needs pending the anticipated sale of the Philadelphia Operations. Nevertheless, AHERF determined to file Chapter 11 petitions for the legal entities encompassing all aspects of the Philadelphia Operations to preserve the preference action against Mellon Bank and the Lenders, obtain "DIP" financing under the provisions of the Bankruptcy Code, and obtain the benefit of the automatic stay of Section 362 of the Bankruptcy Code.

### III.

### THE CHAPTER 11 CASES

#### A. Commencement of Chapter 11 Cases

On the Petition Date, each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' cases were assigned to the Honorable M. Bruce McCullough, United States Bankruptcy Court Judge for the Western District of Pennsylvania. The Debtors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Non-Debtor Entities in Pittsburgh and AHNJ did not file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Other for-profit and not-for profit affiliates of AHERF also did not file petitions for relief under Chapter 11 but ceased substantially all operations.

1. Initial Matters.

On the Petition Date, the Bankruptcy Court approved the Debtors' $150 million debtor-in-possession revolving loan facility (the "DIP Facility") with Madeleine L.L.C. ("Madeleine"), pursuant to which availability was determined based on an eligible accounts receivable borrowing base and included a $50 million letter of credit subfacility. The DIP Facility terminated in connection with the closing of the sale of the Philadelphia Operations to Tenet Healthcare Corporation and affiliated entities ("Tenet"). In addition, in order to attempt to stabilize the Debtors' day-to-day business operations, the Bankruptcy Court authorized, among other things, the Debtors to pay pre-petition amounts to employees and creditors in the ordinary course of business and to continue, maintain and use their consolidated cash management system, existing bank accounts and existing business forms. Since the Petition Date, the Debtors have filed their operating reports with the Office of the United States Trustees in compliance with the applicable guidelines.

On the Petition Date, the Bankruptcy Court authorized the Debtors to retain Hahn, Loeser & Parks, LLP, as bankruptcy counsel, Stonecipher, Cunningham, Beard & Schmitt, P.C. as Pittsburgh bankruptcy co-counsel, Deloitte & Touche Consulting Group LLC as financial consultants, and Poorman-Douglas Corporation as claims and noticing agent. The Debtors also were authorized to retain Hunter and Associates Management Services, Inc. to provide management services with respect to the Philadelphia Operations.

2. <u>Appointment of Creditors' Committee.</u>

On July 30, 1998, the Office of the United States Trustee for the Third Circuit appointed the Creditors' Committee. The Co-Chairs of the Creditors' Committee are Aetna U.S. Healthcare, Inc. and MBIA. The Creditors' Committee retained Jones, Day, Reavis & Pogue as counsel, Campbell & Levine, LLC as Pittsburgh co-counsel and Zolfo Cooper LLC as financial consultants.

The Creditors' Committee and its professionals have been involved in every phase of the Chapter 11 Cases, including playing an integral role in the negotiations respecting the Plan and the settlements embodied therein. The Creditors' Committee and the Chapter 11 Trustee and their respective professionals have maintained a close and constructive working relationship since the Chapter 11 Trustee's appointment in December 1998.

## B. Sale of the Philadelphia Operations

Unable to sustain operations, the Debtors determined to sell the Philadelphia Operations. The conduct and results of the post-petition sales process were significant factors in the appointment of the Chapter 11 Trustee.

As noted above, immediately prior to the Petition Date, the Debtors announced a revised Vanguard "stalking horse" bid for a purchase price of $100 million less than that proposed in Vanguard's aborted Spring 1998 offer. After the commencement of the Chapter 11 Cases, the Debtors continued to negotiate a sale of the Philadelphia-area hospitals to Vanguard and other potential bidders. The efforts to sell the Philadelphia Operations, including an intensive auction bidding process, ultimately culminated in the Bankruptcy Court's approval of a series of transactions, which closed on November 10, 1998, whereby Tenet acquired the eight hospitals of the Debtors, and affiliates of Drexel University assumed the management of the medical and health professional schools of the Debtors, for $345 million gross consideration, $115 million less than the original $460 million Vanguard bid. On the same day, the Bankruptcy Court also approved the sale of the assets of the AHERF System's New Jersey operations and other hospital assets to Our Lady of Lourdes Healthcare Corporation.

In accordance with the asset purchase agreement with Tenet, three escrows were established out of the gross sales proceeds to address post-closing liabilities for which adequate information was not readily available at closing. A $30 million indemnity escrow was established to address claims asserted by Tenet in connection with the Debtors' representations and warranties at closing. Tenet has asserted indemnification claims in excess of the balance of this escrow, and the Chapter 11 Trustee is investigating the merits of Tenet's claims. Absent a negotiated resolution, the Chapter 11 Trustee expects to object to Tenet's indemnification claims. A $14 million "cure" escrow was

established to fund the cure of liabilities under contracts and leases assumed and assigned to Tenet. The "cure" escrow is anticipated to be sufficient to cure those costs. Finally, a $3 million escrow was established to cover shortfalls in grants respecting the university operations that were transferred to Drexel. The Chapter 11 Trustee has agreed that the full amount of this escrow is payable to Drexel.

In connection with the sale, the Debtors and Tenet entered into an Extended Business Office Services Agreement pursuant to which Tenet agreed to act as the Debtors' agent to collect the outstanding receivables of the Debtors, which were not sold to Tenet, and to perform other business office functions that the Debtors were unable to perform effectively upon the sale and resultant loss of employees and resources. The Chapter 11 Trustee addressed disputes with Tenet over this arrangement in negotiations, and the agreement was terminated in November 1999.

## C. Appointment of the Chapter 11 Trustee

On November 17, 1998, due to a loss of confidence in the Debtors' trustees and executive officers to make decisions that would maximize the value of the Estates for the benefit of the creditors thereof, the Creditors' Committee made a motion for the appointment of an independent chapter 11 trustee to displace the Debtors' management, which was granted by the Bankruptcy Court. On December 10, 1998, the Office of the United States Trustee appointed William J. Scharffenberger to the position of Chapter 11 Trustee of AHERF.

In its motion, the Creditors' Committee asserted that the Debtors' mismanaged numerous fundamental aspects of the asset sale process, including, among other things, failing to explore other potential transactions before entering into the purchase agreement with Vanguard that was proposed to the Court, providing information to other potential purchasers in a piecemeal, disorganized fashion and failing to include a provision in an asset purchase agreement for the assumption or payment of liabilities of AUHS, or for otherwise continuing to fund AUHS, a critical component of the Philadelphia Operations because it provides residents and medical staff for the operation of the Debtors' Philadelphia-area hospitals. The Debtors also lost credibility with potential purchasers of the Philadelphia Operations when they announced in September 1998 that AHERF's financial statements for fiscal year 1997 could not be relied upon.

The Creditors' Committee was also concerned that the Debtors would not adequately address issues being raised by the Pennsylvania Attorney General on behalf of the Commonwealth regarding AHERF's membership interest in the Non-Debtor Entities. In October 1998, the Pennsylvania Attorney General filed a petition in the Orphans' Court Division of the Allegheny County Court of Common Pleas (the "Orphans' Court") to amend the Non-Debtor Entities' articles of incorporation and remove AHERF as their sole member, thereby preventing creditors of the Estates from recovering any of the value of a potential settlement with the Non-Debtor Entities in a sale to a third-party purchaser. The Debtors refused to take appropriate steps to oppose the Commonwealth's motion. Accordingly, the Creditors' Committee sought and obtained a restraining order from the Bankruptcy Court to enjoin the Commonwealth from taking any further action in the Orphans' Court. The situation became more dire in October and November 1998 when the Debtors transferred hundreds of employees and resources to the Non-Debtor Entities, making it difficult for the Debtors to continue to operate their remaining businesses.

The Creditors' Committee also expressed concern that the Debtors would be unwilling to investigate potential causes of action against AHERF's pre-petition management and others responsible for the Debtors' financial demise, including possible lawsuits arising from:

- multi-million dollar payments on the day before these bankruptcy filings to management and other insiders in connection with KeySOP;

- massive transfers of endowment funds and other restricted funds to pay AHERF System expenses, including the $89.5 million repayment to the Lenders under the Credit Agreement;

- the assumption of millions of dollars of debt in connection with the Graduate Health System Acquisition; and

- other improprieties and irregularities in the Debtors' business and financial affairs that, together with the questionable transactions described above, resulted in the impanelment of two federal grand juries and at least a dozen investigations by federal and state governmental agencies and insurance carriers.

Amidst this chaos and the Creditors' Committee's dissatisfaction with the direction of the Chapter 11 Cases, Mr. Scharffenberger was appointed to the position of Chapter 11 Trustee. At that time, the Bankruptcy Court also issued orders that no further checks be issued by the Debtors without the Bankruptcy Court's prior written approval, or the written approval of the Creditors' Committee's financial advisors, Zolfo Cooper LLC.

Upon his appointment, the Chapter 11 Trustee retained Mr. Fred Chbosky, an experienced senior financial executive with bankruptcy and turnaround experience, Proskauer Rose LLP, as legal counsel with the requisite bankruptcy, health care and litigation expertise, and the Pittsburgh firm of Sable, Pusateri, Rosen, Gordon & Adams, LLC. Subsequently, the Chapter 11 Trustee retained Donlin, Recano & Company, Inc. as claims reconciliation consultant. On August 18, 1999, in order to avoid the duplication of services and contain administrative expenses, the Bankruptcy Court expanded the appointment of the Chapter 11 Trustee to include the other Debtors. As a result, among other things, the services of the Debtors' separate legal counsel were terminated.

Since his appointment, the Chapter 11 Trustee implemented a myriad of business decisions and strategies on behalf of AHERF and the Debtors' Estates. In light of the Debtors' inability to sustain their operations, the role of the Chapter 11 Trustee has been to supervise the liquidation of the Debtors' remaining assets, including the settlement with the Non-Debtor Entities and the pursuit of the Recovery Actions, both as described below. The Chapter 11 Trustee has attempted to forge a consensus with the Creditors' Committee and the other major constituencies while discharging his duties to the Estates. At all times, the Chapter 11 Trustee and his professionals have maintained regular communications with the Creditors' Committee and its professionals and the Office of the United States Trustee.

**D. Transfer of Sole Membership of Western Operations and Settlement of Litigation with Pennsylvania Attorney General**

Upon his appointment, the Chapter 11 Trustee was immediately required to address the sale process commenced by the board of trustees of the Non-Debtor Entities. In November 1998, the Non-Debtor Entities had retained Salomon Smith Barney as their investment advisor for a contemplated transaction between the Non-Debtor Entities and a new financial partner. At the time, it appeared that the Creditors' Committee would be excluded from the sale process and the Debtors would not realize the value of a potential settlement with the Non-Debtor Entities. In July 1999, a transaction was consummated with Western Pennsylvania Healthcare Corporation ("West Penn") that won the approval of the Commonwealth and the Orphans' Court, and resulted in, among other things, a payment in excess of $26 million that resolved outstanding issues between the Debtors and the Non-Debtor Entities (the "West Penn Transaction").

The West Penn Transaction was the result of months of negotiations among the Chapter 11 Trustee, the Creditors' Committee, the Non-Debtor Entities and West Penn. The parties negotiated a sale protocol that permitted the Chapter 11 Trustee and the Creditors' Committee access to and input in any transaction contemplated by the Non-Debtor Entities. The Chapter 11 Trustee and the Creditors' Committee were likewise able to negotiate a standstill agreement with the Pennsylvania Attorney General regarding the ongoing litigation in the Orphans' Court respecting AHERF's membership interest in the Non-Debtor Entities as long as the sale process proceeded consensually.

The Chapter 11 Trustee and the Creditors' Committee consummated a transaction implementing a settlement agreement dated as of June 30, 1999 (the "Global Settlement Agreement") that resolved outstanding issues among the Estates, the Creditors' Committee and the Non-Debtor Entities. The Healthcare Alliance for Western Pennsylvania, Inc. replaced AHERF as the member of the Non-Debtor Entities under the terms of the West Penn Transaction. The Global Settlement Agreement provided for, among other things, a transfer of certain AHERF assets and the assignment of certain executory contracts and unexpired leases to West Penn, AHERF's rejection of certain designated executory contracts and unexpired leases, the release of inter-company and other claims by the parties to the Global Settlement Agreement, including, but not limited to, claims filed by Allegheny General Hospital for $147,750,933 and $7,544,069 (Claim Nos. 2232 and 5841, respectively) and one claim filed by Allegheny University Medical Center for $84,602,326 (Claim No. 2230), the Non-Debtor Entities' continued provision of administrative services to the Debtors during a transitional phase, the termination — pursuant to a settlement with the Pension Benefit Guaranty Corporation ("PBGC") — of the Debtors' defined benefit plans and resolution of claims of the PBGC in connection therewith, and in excess of $26 million as a settlement payment to the Debtors.

On July 23, 1999, the Bankruptcy Court entered an order approving the Global Settlement Agreement, which had also been approved by the Orphans' Court and to which the Commonwealth had consented. On August 3, 1999, the West Penn Transaction closed.

In July 1999, the Chapter 11 Trustee obtained authority to exercise AHERF's membership interest to consent to the sale of Forbes Hospital, a hospital owned and operated by AUMC, a Non-Debtor Entity, to LifeCare Hospitals Pittsburgh, Inc. pursuant to a certain asset purchase agreement.

### E.  Overview of Claims and Assets

1.  <u>Claims</u>.

Pursuant to an Order dated October 16, 1998, the Bankruptcy Court established March 3, 1999 as the deadline by which all proofs of claim must have been filed against the Estates in the Chapter 11 Cases. Subsequently, pursuant to an Order dated May 28, 1999, the Bankruptcy Court established August 2, 1999 as a supplemental deadline relating only to certain creditors. On June 23, 2000, the Bankruptcy Court entered an Order establishing July 31, 2000 as the last date by which creditors that provided goods or services to the Debtors after the Petition Date through April 30, 2000 could file claims for the payment of administrative priority expenses.

Creditors of the Debtors' Estates hold 20,494 Claims (both filed and scheduled) aggregating approximately $5.9 billion of liability. The approximate breakdown of Claims among the Debtors is as follows: (a) 3,222 filed and scheduled Claims, totaling approximately $1.8 billion, against AHERF, (b) 3,884 filed and scheduled Claims, totaling approximately $552.0 million, against AUMP, (c) 4,596 filed and scheduled Claims, totaling approximately $1.4 billion, against AUH-East, (d) 6,412 filed and scheduled Claims, totaling approximately $1.0 billion, against AUHS (the total for non-Centennial Debtors is 18,114 claims totaling approximately $4.8 billion) and (e) 2,380 filed and scheduled Claims, totaling approximately $1.1 billion, against Centennial.

Through the Chapter 11 Trustee's claim reconciliation process, as of June 30, 2000, approximately 6,104 Claims will have been expunged, aggregating approximately $2.9 billion of liabilities. Pursuant to motions of the Chapter 11 Trustee, the Bankruptcy Court has Allowed over 7,830 Claims, aggregating approximately $88 million, and an additional $528 million in Claims will be Allowed under the Plan. Further, pursuant to the substantive consolidation and other provisions of the Plan and after additional duplicate Claim elimination, approximately 765 Claims totaling approximately $1.0 billion will be expunged. Accordingly, as of June 30, 2000, and including operation of applicable provisions and other eliminations and allowances under the Plan, the Chapter 11 Trustee will have reduced the number of unreconciled Claims to approximately 5,795 remaining Claims, totaling approximately $1.4 billion.

Set forth below is the Chapter 11 Trustee's projections of the total dollar amount of Claims by category and Class that will be allowed and disputed as of the Effective Date of the Plan. THE PROJECTIONS ARE THE CHAPTER 11 TRUSTEE'S QUALIFIED ESTIMATE OF ALLOWED CLAIMS AND DISPUTED CLAIMS RESERVES BASED ON INFORMATION AVAILABLE AS OF THIS DATE AND ARE SUBJECT TO REVISION AS CIRCUMSTANCES WARRANT:

| Class | Type | ($000)<br>Estimated<br>Allowed Claims | ($000)<br>Estimated Disputed<br>Claims Reserves |
|---|---|---|---|
| Not Applicable | Administrative Expense Claims | $ 20,511 | $ 6,690 |
| Not Applicable | Priority Tax Claims | $ 500 | $ 1,900 |
| 1 | Priority Claims | $ 1,370 | $ 1,870 |
| 2 | General Secured Claims | $ 1,300 | $ 974 |
| 3 | Secured Claims of holders of<br>Centennial Bondholder Claims | $ 33,000 | ----- |
| 4 | Secured Claims of holders of<br>MBIA/PNC Claims | $ 50,000 | ----- |
| 5(A) | General Unsecured Claims | $503,800 | $454,500 |
| 5(B) | Centennial Unsecured Claims | $111,600 | $128,500 |
| 6(A) | Convenience Claims | $ 1,200 | $ 500 |
| 6(B) | Centennial Convenience Claims | $ 625 | $ 300 |
| 7 | Insurance Claims | $305,208[1] | ----- |

2. **Assets.**

The Chapter 11 Trustee estimates that approximately $112 million of Cash will be available for distribution to secured and unsecured creditors upon the occurrence of the Effective Date after payment or satisfaction of all Administrative Expense, Priority Tax and Priority Claims. This amount is projected to be sufficient to meet all Effective Date Cash funding obligations under the Plan, including, without limitation, the payment to holders of Claims and the funding of the Liquidation Expense Reserve Account and the Disputed Claim Reserve. See Section IV(B) for a discussion of the Recovery Actions and Other Causes of Action Impacting the Executive Protection Policies.

3. **Executive Protection Insurance Policies.**

The Estates' insurance assets consist of a number of executive protection insurance policies purchased by AHERF which, for the policy period January 1, 1998 through January 1, 2000, insure AHERF and its affiliates, their officers, directors, trustees and employees for acts and omissions

---

[1]    This is the aggregate of the face amount of the filed Claims in this Class and does not include amounts for unliquidated Claims in this Class. Such Claims have not been reconciled because the Plan provides that Insurance Claims will receive no distribution other than the proceeds of the Insurance Policies.

committed by entities and individuals insured under the policies, and the proceeds of those policies. The executive protection insurance policies provide coverage for defense and indemnity costs up to a total of $200 million for all claims triggering coverage in a single policy year. Indemnity costs typically include judgments or amounts paid in settlement. The executive protection insurance policies were provided by Federal Insurance Co. (the "Federal Policy"), Continental Casualty Co. (the "Continental Policy"), Executive Risk Indemnity, Inc. (the "Executive Risk Policy"), National Union Fire Insurance Co. of Pittsburgh, PA (the "National Union Policy"), Reliance Insurance Co. (the "Reliance Policy"), Royal Insurance Co. of America (the "Royal Policy") and Zurich Insurance Co. (the "Zurich Policy"), (collectively, the "Executive Protection Policies").

The Federal Policy is a primary policy and therefore the first policy to respond to any claims made during the policy period. The other Executive Protection Policies are excess policies that provide for coverage after the $25 million limit of the primary Federal Policy has been exhausted. The excess insurance "layers" are:

| | |
|---|---|
| Executive Risk | $25,000,000 excess of $ 25,000,000 |
| Zurich | $25,000,000 excess of $ 50,000,000 |
| Royal | $25,000,000 excess of $ 75,000,000 |
| National Union | $50,000,000 excess of $100,000,000 |
| Reliance | $25,000,000 excess of $150,000,000 |
| Continental | $25,000,000 excess of $175,000,000. |

The Executive Protection Policies insure the Debtors and other insureds for covered claims brought against them directly by third parties. The Executive Protection Policies provide three distinct types of coverage: (1) coverage for claims asserted by third parties directly against the Debtors and other insured entities; (2) coverage for indemnification claims asserted against the Debtors or other insured entities by insured individuals arising from claims against those individuals; and (3) coverage for claims asserted against insured individuals, including directors, officers, trustees and employees of the Debtors or other insured organizations. All of the various entities and individuals insured under the policy are covered by the same $200 million fund.

The Executive Liability and Indemnification coverage section of the Federal Policy provides coverage for defense and indemnity costs subject to an aggregate policy limit of $25 million for each policy year. Additional limits apply to the other coverage sections of the policy. Moreover, under the Federal Policy, defense costs are part of and *not* in addition to the $25 million limit of liability. Coverage under the Federal Policy therefore could be exhausted by $25 million of defense costs, leaving no funds available for indemnity costs such as judgments or amounts paid in settlement. In general, the excess policies define "Insureds" to mean the entities and individuals so identified in the primary or underlying Executive Protection Policies and cover the same types of losses covered by the Federal Policy. The Executive Protection Policies are the subject of litigation with the insurance carriers. See Section IV(B)(2) for a discussion of the D&O Injunction Action and the Rescission Action.

In addition to the Executive Protection Policies described above, the Chapter 11 Trustee has identified a $50 million directors' and officers' insurance policy issued to SDN, Inc. ("SDN"), the

entity formed by Messrs. Abdelhak and McConnell and Ms. Wynstra and used as a vehicle for consummating the Graduate Health System Acquisition.

## IV.

## ADVERSARY PROCEEDINGS AND THE DEBTORS' LIQUIDATION

### A. Overview

During the pendency of the Chapter 11 Cases, the Chapter 11 Trustee and the Creditors' Committee have investigated potential wrongdoing by former executives of AHERF, present and former executives of Mellon Bank, professionals of PwC and others and have commenced the Recovery Actions to augment the Estates and resultant distribution to creditors. Any net recoveries realized by the Chapter 11 Trustee or the Creditors' Committee from the Recovery Actions prior to the occurrence of the Effective Date will be available for distribution to holders of Allowed Claims upon the occurrence of the Effective Date.

After the Effective Date, the Creditors' Committee and the Chapter 11 Trustee will continue to pursue the Recovery Actions to a final disposition, whether through a negotiated settlement or a judgment, and Liquidating AHERF will be funded by at least a $30 million Cash reserve as of the Effective Date to cover the potential cost of prosecuting the Recovery Actions, subject to certain adjustments. Any net recoveries realized from the Recovery Actions, after allocation to the Liquidation Expense Reserve Account as necessary to satisfy Liquidation Administrative Expenses, will be distributed to creditors in accordance with the Plan. The Chapter 11 Trustee will serve as the sole trustee and Chief Liquidation Officer of Liquidating AHERF. The Creditors' Committee will have responsibility for and authority over all substantive and material decisions respecting the administration of Liquidating AHERF and the prosecution of the Recovery Actions.

### B. Adversary Proceedings and Contested Matters

As described below, numerous adversary proceedings have been commenced by the Chapter 11 Trustee, the Creditors' Committee and other interested parties in connection with pre- and post-petition circumstances that resulted in and from the Debtors' financial demise. Set forth below is a summary of each Recovery Action, the lawsuits that implicate the Executive Protection Policies and an ongoing contested matter related to the payment of an administrative expense claim.

1. The Recovery Actions.

The Chapter 11 Trustee or the Creditors' Committee, as applicable, commenced the Recovery Actions described below based on their investigations of wrongdoing committed by, or other liability resulting from the acts or failures to act of, various former officers and trustees of the Debtors, Mellon Bank, PwC and others that received payments or other consideration and benefits in furtherance of the Debtors' demise and to the prejudice of the Debtors' creditors.

The Chapter 11 Trustee and the Creditors' Committee have been pursuing, and intend to continue to pursue, the prospects of attaining a negotiated settlement of any Recovery Actions, as the circumstances and developments in each case warrant, and consistent with their charge to optimize recovery to creditors. However, no assurances can be given, and no predictions can be

made, as to the timing and ultimate success of any such settlement initiatives, or the disposition of any Recovery Action. The Chapter 11 Trustee and the Creditors' Committee reserve the right to bring additional Recovery Actions not described herein at any time.

        (a)    The Mellon Bank Litigation.

As described above, as AHERF's financial condition worsened, on April 27, 1998, AHERF made a $89.5 million repayment to Mellon Bank and the other Lenders to satisfy its outstanding obligations under the Credit Agreement (the "Repayment"). At the time, several directors of Mellon Bank also occupied influential positions on AHERF's Board of Trustees (the "AHERF/Mellon Executives").

On September 15, 1999, the Chapter 11 Trustee filed a complaint alleging that the Repayment to Mellon Bank and the other Lenders constituted a preference in violation of Section 547 of the Bankruptcy Code. The Chapter 11 Trustee seeks to recover the full amount of the Repayment plus interest and costs.

In addition to the preference claim against the Lenders, the Chapter 11 Trustee seeks compensatory and punitive damages in an amount to be determined at trial against Mellon Bank alone for aiding and abetting and inducing breaches of fiduciary duty arising from and relating to the Repayment. The Chapter 11 Trustee alleges in the complaint that Messrs. Abdelhak and McConnell breached their fiduciary duties as officers and/or trustees of AHERF by, among other things, permitting restricted assets to be reported on AHERF's balance sheet as unrestricted assets, thereby creating the appearance that AHERF had the resources to pay the Lenders out of unrestricted assets and concealing the true reasons for the Repayment in order to prevent review and formal approval by AHERF's Board of Trustees.

The Chapter 11 Trustee avers that the AHERF/Mellon Executives breached their fiduciary duties by, among other things, imposing covert demands on AHERF to repay the Lenders, knowingly preventing and/or not requiring appropriate review in advance of the Repayment by the AHERF Board of Trustees, acting, and failing to act, at a time when they knew it was not in the best interests of AHERF to repay the Lenders, and acting, and failing to act, at a time when they knew they were misusing their positions on the Boards of AHERF entities to advance the interests of Mellon Bank and the other Lenders. The Chapter 11 Trustee has alleged that Mellon Bank substantially assisted the breaches of duties of Abdelhak and McConnell, through the actions of the AHERF/Mellon Executives which were undertaken solely on behalf of, and to advance the interests of, Mellon Bank. The complaint further avers that Mellon Bank substantially assisted the breaches of fiduciary duties by Abdelhak, McConnell, and the AHERF/Mellon Executives by permitting and/or encouraging the AHERF/Mellon Executives to use their positions on the AHERF Board to advance the interests of Mellon Bank.

On March 22, 2000, the United States District Court for the Western District of Pennsylvania denied the Lenders' motion to withdraw the reference to the Bankruptcy Court. On June 1, 2000, the Bankruptcy Court denied Mellon Bank's motion to dismiss the cause of action for aiding and abetting a breach of fiduciary duty with prejudice. The parties continue to conduct discovery with respect to this litigation.

(b)     The PricewaterhouseCoopers Litigation.

PwC audited and certified AHERF's consolidated financial statements for fiscal years ending June 30, 1996 and June 30, 1997, and also prepared "special reports" and rendered other services to AHERF. In each of fiscal years 1996 and 1997, PwC issued so-called "clean opinions" representing that AHERF's consolidated financial statements were in conformity with generally accepted accounting principles ("GAAP"). On September 2, 1998, AHERF acknowledged publicly that its audited financial statements for 1997 were inaccurate and unreliable. The Creditors' Committee believes that in each of fiscal years 1996 and 1997 PwC knew or should have known, and should have disclosed in its reports on AHERF's consolidated financial statements, that they were not prepared in accordance with GAAP.

On April 11, 2000, the Creditors' Committee commenced an adversary proceeding alleging that PwC, as AHERF's external auditors and accountants, failed to disclose to independent trustees on AHERF's board that AHERF's accounting records were being manipulated and that the AHERF System lacked adequate financial controls. The Creditors' Committee asserts that had PwC issued qualified or adverse opinions, or had timely and adequately disclosed reportable conditions in accordance with generally accepted auditing standards and its own commitments to AHERF and its trustees, the independent trustees, regulators and other responsible officials would have taken corrective action to halt the decline of the AHERF System. The Creditors' Committee has alleged that such actions or omissions constituted professionals negligence and a breach of PwC's contract with AHERF in violation of applicable state law. The Creditors' Committee is seeking actual damages, including compensatory and consequential damages, in an amount to be determined at trial, up to and including the full extent of the Debtors' insolvency plus prejudgment interest and costs. On June 2, 2000, PwC filed an answer arguing that the Creditors' Committee's complaint fails to state a claim upon which relief can be granted and denying the allegations of the complaint. The parties have commenced discovery regarding the facts and circumstances surrounding this Recovery Action.

(c)     The D&O Action.

As described in detail above, many parties in interest, including the Chapter 11 Trustee, the Creditors' Committee and the Commonwealth, believe that AHERF's financial demise is attributable in substantial part to the mismanagement and misconduct of AHERF's pre-petition trustees and/or officers. On November 15, 1999, the Creditors' Committee commenced an adversary proceeding against the former officers and trustees of AHERF arising out of breach of their stewardship obligations to the Debtors. Among other things, the Creditors' Committee alleges that the former officers and trustees of AHERF should be held liable for failing to direct and manage the AHERF System in a manner consistent with sustaining financial viability or, in the latter stages, at least minimizing the extent of losses. The Creditors' Committee alleges that the defendants undertook acquisitions without any realistic expectations for a financially viable operation, mishandled the accounting for and reporting of the AHERF System's financial affairs, thereby concealing its true and troubled financial circumstances, conferred excessive compensation and perquisites on insiders, misapplied restricted funds, mishandled the sale of the Philadelphia Operations to Tenet, and diverted financial and personnel resources from the Debtors in favor of the Non-Debtor Entities. The