Creditors' Committee has alleged that such actions constituted breaches of fiduciary duty, gross negligence and mismanagement and corporate waste in violation of applicable state law. The Creditors' Committee is seeking actual damages, including compensatory and consequential damages, in an amount to be determined at trial, punitive damages and pre-judgment interest and costs. The parties have commenced discovery regarding the facts and circumstances surrounding this Recovery Action.

      (d)    <u>The Graduate Actions</u>.

The Graduate Health System Acquisition resulted in the addition of substantial debt to the AHERF System's highly leveraged capital structure. On April 13, 2000, the Chapter 11 Trustee filed a complaint against Philadelphia Health Care Trust, successor to the Graduate Health System ("PHCT"), alleging that the Graduate Health System Acquisition was a fraudulent transfer, in violation of Sections 544 and 550 of the Bankruptcy Code and relevant Pennsylvania state law, that rendered Centennial insolvent, left Centennial with unreasonably small capital with which to conduct operations and/or caused Centennial to be unable to pay its debts as they became due. The Chapter 11 Trustee alleges that the transaction led to the assumption by Centennial of liabilities so far exceeding the assets acquired that Centennial was incapable from the outset to satisfy those liabilities as they became due. The Chapter 11 Trustee seeks actual damages in an amount to be determined at trial. PHCT moved to dismiss the complaint for failure to state a cause of action. Following briefing by both parties, the Court heard oral argument on the motion on August 2, 2000.

In litigation related to the Graduate Health System Acquisition, PHCT filed a motion in the Bankruptcy Court for relief from the automatic stay to allow PHCT to pursue its claims for indemnification and offset against approximately $13 million in an escrow fund. The Chapter 11 Trustee, in conjunction with the Creditors' Committee and BNY, has opposed PHCT's motion. Based on his investigation and discovery in connection with the motion, the Chapter 11 Trustee challenges the validity of PHCT's claims to the funds in the escrow account. The Chapter 11 Trustee has recommended that the issues on the motion for relief from stay be tried jointly with the related fraudulent transfer adversary proceeding and PHCT's claims filed in the Chapter 11 Cases. At a hearing on August 2, 2000, the Court adjourned the hearing on PHCT's motion for relief from stay and indicated that there would be a status conference on that motion after the Court decides PHCT's motion to dismiss the fraudulent transfer complaint.

BNY, as successor master indenture trustee of the Centennial Bonds, has filed two proceedings, one pending in the United States District Court for the Eastern District of Pennsylvania (the "Federal Court Action") and the other pending in the Philadelphia County Court of Common Pleas (the "State Court Action"). In such proceedings, BNY alleges that PHCT, as successor to the Graduate Health System, and certain of its officers and directors fraudulently structured and effected a merger, among other things, which stripped at least $27 million from the Centennial Bondholders, weakened the hospitals comprising the obligated group, diminished the cash position of the post-merger obligated group, and thereby set in motion a four-year string of transactions by which the defendants damaged the Centennial Bondholders.

In the Federal Court Action, BNY is the named plaintiff suing Bernard J. Korman, Harold Cramer and Robert Mathews under the Racketeering Influence Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"). In the State Court Action, BNY is the named plaintiff suing PHCT and certain officers and/or directors thereof for fraud, negligent misrepresentations and omissions, tortious interference with contract, conversion, unjust enrichment, breach of contract and conspiracy in violation of applicable state law and violations of RICO. Under Section 5.3(d) of the Plan, the aggregate Allowed Unsecured Claim of the Centennial Bondholders will be reduced by the amount of any recoveries from these two lawsuits.

(e)     KeySOP Litigation.

In January 1998, AHERF created the KeySOP, a key employee stock option plan that allowed Abdelhak, McConnell, Wynstra, Donald Kaye, Dwight Kasperbauer and Anthony M. Sanzo to move their deferred compensation to a new plan where it would vest sooner and with more certainty. Also in effect was a key employee loan program that included the same six AHERF executives, enabling the executives to obtain personal loans totaling in the aggregate at least $5.8 million. Some if not all of these loans were co-signed by Messrs. Abdelhak and McConnell as representatives of AHERF. Shortly before the Petition Date, the six executives accelerated the vesting of the remaining deferred compensation amounts in the KeySOP, allowing those amounts to be distributed immediately to, or for the benefit of, the six executives. Together, the executives recovered more than $5.7 million from KeySOP. Three of the executives-Kaye, Kasperbauer and Sanzo- have returned the monies to the Chapter 11 Trustee.

On April 23, 1999, the Chapter 11 Trustee filed a complaint against Messrs. Abdelhak and McConnell and Ms. Wynstra for recovery of $3,858,995.24 in the aggregate (including the amount of payments made directly to these individuals, plus taxes withheld and paid to governmental authorities) in distributions made to them or for their benefit from the KeySOP. The Chapter 11 Trustee has alleged that these payments were a preference or a fraudulent transfer in violation of the Bankruptcy Code and other applicable laws. The Chapter 11 Trustee seeks to recover the entire amounts of the outstanding KeySOP distributions, plus interest and costs. The Chapter 11 Trustee has moved for summary judgment against all three defendants on the preference count of the complaint, and the defendants have moved to dismiss the two counts alleging actual and constructive fraudulent transfers. On August 7, 2000, the Bankruptcy Court heard oral arguments on the summary judgment motion and deferred argument on the motions to dismiss pending decision on the summary judgment motion.

(f)     Miscellaneous Preference and Other Avoidance Actions.

During the pendency of these Chapter 11 Cases, the Chapter 11 Trustee, in conjunction with the Creditors' Committee, has investigated recovering potentially voidable transfers from certain vendors who received payments from the Debtors' estates within 90 days prior to the Petition Date in violation of Section 547 of the Bankruptcy Code. The Chapter 11 Trustee has identified parties who received such payments and has sent demand letters to each such party prior to commencing litigation. The Chapter 11 Trustee has commenced adversary proceedings against several vendors and is continuing to negotiate with all such vendors to determine whether the parties can avoid litigation through a consensual resolution. The Chapter 11 Trustee will continue to pursue the

Avoidance Actions at the direction of the Creditors' Committee subsequent to the occurrence of the Effective Date of the Plan.

    2.   Other Causes of Action Impacting the Executive Protection Policies.

Following is a brief description of Causes of Action brought by the Chapter 11 Trustee or other interested parties in the Chapter 11 Cases that implicate the Executive Protection Policies by virtue of, among other things, claims made by former directors and trustees of AHERF and the Non-Debtor Entities, who are insureds under the Executive Protection Policies, for indemnity or defense costs related to such actions.

    (a)    The Injunction Action.

In conjunction with the Creditors' Committee, the Chapter 11 Trustee has sought to prevent the dissipation of the proceeds of the Executive Protection Policies. Proceeds from the Executive Protection Policies may ultimately result in distributions to creditors of the Estates. Accordingly, on March 3, 1999, the Chapter 11 Trustee filed an expedited motion to enforce the automatic stay of Section 362 of the Bankruptcy Code and to request injunctive relief in order to enjoin all lawsuits, including two pending class actions, against persons and entities who may be insured under the Executive Protection Policies. On March 31, 1999, the Bankruptcy Court entered an order staying all actions against non-debtors and actions that may implicate the Executive Protection Policies (the "D&O Injunction"), which has remained in place since March 31, 1999, preventing such lawsuits from proceeding except in very limited circumstances. Federal Insurance Co. ("Federal") has been monitoring defense costs of the parties pursuant to an agreement.

    (b)    The Rescission Action and Related Lawsuits.

The Chapter 11 Trustee commenced an adversary proceeding against the carriers of the Executive Protection Policies seeking a declaration that the Executive Protection Policies are not subject to rescission as against AHERF or the Debtors (the "Rescission Action"). Prior to commencing the Rescission Action, the Chapter 11 Trustee was concerned that the carriers intended to seek to rescind the policies on the grounds that unspecified misrepresentations and non-disclosures by the pre-petition AHERF Board of Trustees justify rescission. The Chapter 11 Trustee believes that there is no basis for rescinding the Executive Protection Policies as to AHERF or the Debtors. The parties are conducting discovery regarding the factual predicates for this action.

On May 9, 2000, the Chapter 11 Trustee filed an uncontested motion to intervene in an adversary proceeding commenced by the Non-Debtor Entities who allege that the Federal Policy covers them for, among other things, amounts that the Non-Debtor Entities advance as defense costs with respect to certain actions brought against trustees and officers of AHERF and/or of the Non-Debtor Entities by the Creditors' Committee. Federal has denied that it has any defense or indemnity obligation under the Federal Policy with respect to the Creditors' Committee D&O Action. Federal contends that the Creditors' Committee Action falls within the Federal Policy's "insured v. insured" exclusion. In their Complaint, the Non-Debtor Entities seek a declaration that Federal is obligated to reimburse the Plaintiffs for defense costs that have been incurred and that may be incurred in the future by such entities in response to demand for advancement of defense costs in connection with

the Creditors' Committee's D&O Action and related relief. The Chapter 11 Trustee intervened because the applicability of the insured versus insured exclusion to the Creditors' Committee D&O Action will determine the viability of a key coverage defense asserted by Federal in that action and thus affect the administration of the Debtors' Estates. The Bankruptcy Court approved the motion.

(c)     Browne v. Abdelhak, et al.

On December 24, 1998, a class action lawsuit was commenced in the United States District Court for the Eastern District of Pennsylvania against former directors and trustees of AHERF in connection with the alleged use of Restricted Funds for unauthorized purposes, including, the plaintiffs allege, to pay raises, make the Repayment to Mellon Bank, and improperly fund AHERF's operations. The plaintiffs have alleged violations of the Racketeering Influence Corrupt Organizations Act ("RICO") and various state law causes of action, including breach of charitable trust, diversion of charitable funds, breach of fiduciary duty, breach of contract, promissory estoppel, tortious interference with contract, fraud and misrepresentation, conversion, civil conspiracy, conspiracy to defraud, negligence and breach of duty to render an accounting. This class action lawsuit has been stayed generally pursuant to the D&O Injunction, except to permit the defendants' motions to dismiss to be determined. In the event that this lawsuit proceeds, the directors and trustees may be entitled to recover defense costs from the Executive Protection Policies. In the event that the plaintiffs prevail, the directors and trustees may be entitled to be indemnified out of the proceeds of the Executive Protection Policies.

(d)     Spitzer v. Abdelhak, et al..

On December 14, 1998, a class action was commenced in the United States District Court for the Eastern District of Pennsylvania by several doctors against former directors and trustees of AHERF based on the allegation that the defendants misrepresented that AUH-East was a viable entity. The plaintiffs allege that AUH-East was operated for the financial benefit of the defendants and the Pittsburgh Operations. The plaintiffs have alleged a RICO cause of action, civil conspiracy and intentional interference with current and prospective contract relationship because the defendants' conduct allegedly interfered with the plaintiffs' relationship with their patients in violation of applicable state law. This class action lawsuit has been stayed pursuant to the D&O Injunction except to permit the defendants' motions to dismiss to be determined (they were denied). In the event that this lawsuit proceeds, the directors and trustees may be entitled to recover defense costs from the Executive Protection Policies. In the event that the plaintiffs prevail, the directors and trustees may be entitled to be indemnified out of the proceeds of the Executive Protection Policies.

(e)     Tenet HealthSystem/Commonwealth of Pennsylvania Litigation.

On February 23, 2000, Tenet and the Commonwealth, by and through its Attorney General, commenced litigation against certain former directors and trustees of AHERF, some of whom are also defendants in the D&O Action. The complaint alleges that the defendants improperly used restricted endowment funds by liquidating, borrowing or diverting charitable restricted assets held by Mellon Bank as trustee. The plaintiffs allege that these actions constituted conversion, breaches of fiduciary duty and negligence in violation of applicable state law. The plaintiffs further allege that the former directors and trustees violated Pennsylvania statutory law regarding the use of such

restricted assets and engaged in a civil conspiracy. The plaintiffs are seeking compensatory and punitive damages at an amount to be determined at trial. In the event that this lawsuit proceeds, the directors and trustees may be entitled to recover defense costs from the Executive Protection Policies. In the event that the plaintiffs prevail, the directors and trustees may be entitled to be indemnified out of the proceeds of the Executive Protection Policies. Tenet also commenced a separate adversary proceeding against Mellon Bank for its role in the use of the Restricted Assets.

### 3. The Steadfast Insurance Company Administrative Expense Claim.

The Steadfast Insurance Company ("Steadfast"), acting as a "fronting" insurance company, issued certain medical malpractice and general liability insurance policies (the "Steadfast Policies") to the Debtors, Non-Debtor Entities and other affiliated entities and individuals. AHSPIC, a Cayman Island insurance company and wholly owned subsidiary of AHERF, reinsured the obligations of, among others, Steadfast under the Steadfast Policies. Under this arrangement, premiums were paid to Steadfast who, in turn, paid premiums to AHSPIC in an amount equal to the premiums paid to Steadfast, less Steadfast's ceding commission, claims handling fees, and federal excise taxes. Currently, AHSPIC's assets consist of investments with a value of approximately $50 million, maintained primarily in agency and trust accounts used to satisfy AHSPIC's obligations to Steadfast and the other insurance companies that are reinsured by AHSPIC. Steadfast has filed an application asserting a $14,162,719 claim against the Debtors' estates and is seeking payment of $8,271,283 of such amount as an administrative expense claim for alleged outstanding retroactive earned premiums that Steadfast asserts are the joint and several obligations of the Debtors and other insureds. The Chapter 11 Trustee, however, disputes the amount and priority of Steadfast's claim. To the extent that the Chapter 11 Trustee and Steadfast are unable to resolve their differences, the parties will seek to have the Bankruptcy Court estimate the extent and priority of Steadfast's claim prior to confirmation of the Plan.

## C. The Post-Effective Date Liquidation

Liquidating AHERF will be established pursuant to the Plan as a mechanism to distribute additional Cash recovered upon the disposition of the Debtors' remaining assets, including the liquidation of the Recovery Actions, as described above, after the occurrence of the Effective Date. Liquidating AHERF will be funded by not less than a $30 million Cash reserve in the Estates as of the Effective Date, subject to adjustment to fund the Disputed Claim Reserve and other payments under the Plan. As described below, Liquidating AHERF will distribute amounts recovered consistent with the classification scheme set forth in the Plan and further described herein.

### 1. Purpose of Liquidating AHERF.

Liquidating AHERF shall be maintained for, among other things, the purpose of liquidating and distributing the Estate Assets and resolving and administering Claims.

### 2. Transfer of Assets to Liquidating AHERF.

(a)    On the Effective Date, right, title and interest to all property and assets of the Estate of AHERF shall re-vest in Liquidating AHERF.

(b)    Pursuant to Article 2 of the Plan, on the Effective Date, the Estates of AUHS, AUMP, Centennial and AUH-East shall be deemed to assign, set over, transfer and convey to Liquidating AHERF all of their right, title, and interest in the Estate Assets.  To the extent that certain Estate Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be assigned, set over, transferred or conveyed to Liquidating AHERF on the Effective Date, such Estate Assets shall be deemed assigned, set over, transferred and conveyed to Liquidating AHERF as soon as practical after the Effective Date.

(c)    On the Effective Date, the Chapter 11 Trustee shall continue as plaintiff in all Recovery Actions in which he is a party, on behalf of the Beneficiaries, and the Creditors' Committee shall continue as plaintiff in the D&O Action and the PWC Action and all other Recovery Actions in which it is a plaintiff, on behalf of the Beneficiaries.  All recoveries and proceeds arising from the Recovery Actions shall be deemed assigned, set over, transferred and conveyed to Liquidating AHERF upon receipt thereof.  All fees and costs of the Chapter 11 Trustee and the Creditors' Committee arising from or related to pursuing the Recovery Actions shall be Liquidation Administrative Expenses.

(d)    The transfer of the Estate Assets to Liquidating AHERF shall be made for the benefit of the Beneficiaries, in each case, only to the extent the Beneficiaries are entitled to distributions under the Plan.

3.    Liquidation of Estates Assets; Responsibilities of Chapter 11 Trustee and Creditors' Committee

(a)    Responsibility of Chapter 11 Trustee.  The Chapter 11 Trustee shall exercise reasonable business judgment to administer the Estate Assets and to make timely distributions from Liquidating AHERF, subject in all respects to the direction of the Creditors' Committee.

(b)    Responsibility of Creditors' Committee.  The Creditors' Committee shall have responsibility for and authority over all substantive and material decisions respecting the administration of Liquidating AHERF, including the timing and amount of all distributions from Liquidating AHERF and the prosecution of the Recovery Actions, including the engagement and direction of counsel, subject to the terms of the Plan and the Liquidating AHERF Bylaws.

(c)    Authority to Grant Releases.  Without limiting the generality of Section 6.3(b) of the Plan, in connection with the compromise and settlement of any Recovery Actions, the Creditors' Committee and the Chapter 11 Trustee (with prior consent of the Creditors' Committee), are authorized to release and discharge, to the fullest extent permitted by law, the non-Debtor parties to the Recovery Actions from all Claims and Causes of Action that the Debtors, the Creditors' Committee or the Chapter 11 Trustee ever had or may have whether known or unknown against such Persons.  Any settlement effectuated prior to the Confirmation Date, upon notice thereof to the Bankruptcy Court, shall be deemed incorporated into the Plan and entry of the Confirmation Order including the provisions of such settlement shall be deemed a settlement pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code.

4.  Attorney-Client Privilege.

Any attorney-client privilege, work-product privilege or other privilege or immunity that the Estates, the Chapter 11 Trustee or Creditors' Committee are entitled to assert in the Recovery Actions shall vest in the Chapter 11 Trustee and the Creditors' Committee (and their respective attorneys and agents) and they shall be entitled to assert such privilege and immunity to the same extent that they are entitled to do so prior to the Effective Date; provided, however, that the Confirmation Order shall provide that if the Chapter 11 Trustee (with the prior consent of the Creditors' Committee) or the Creditors' Committee determine to waive any aspect of the Estates' or their attorney-client privilege (including any other applicable privileges or other immunities from disclosure) in connection with requests for documentation and information heretofore sought or to be sought by governmental agencies or other third parties investigating and litigating matters related to the Debtors such determination shall be deemed as (i) a reasonable exercise of the Creditors' Committee's and the Chapter 11 Trustee's business judgment, as the case may be, and (ii) in the best interest of the Beneficiaries.

5.  Payment of and Reserve for Liquidation Administrative Expenses.

Liquidation Administrative Expenses will be satisfied by Liquidating AHERF. With the consent of the Creditors' Committee, the Chapter 11 Trustee may pay Liquidation Administrative Expenses upon receipt of an invoice therefor without the need for further Bankruptcy Court authorization or entry of a Final Order. If the Creditors' Committee and any Person cannot agree on the amount or timing of payment of Liquidation Administrative Expenses to be paid to such Person, such amount or timing shall be determined by the Bankruptcy Court.

On the Effective Date, the Chapter 11 Trustee shall transfer all Estate Assets remaining after the initial distributions required under the Plan to the Liquidation Expense Reserve Account and thereafter, with the consent of the Creditors' Committee, transfer such amounts from the Estate Assets, and retain such amounts in the Liquidation Expense Reserve Account as are reasonably necessary to meet Liquidation Administrative Expenses, subject to the Liquidating AHERF Bylaws; provided, however, that an increase of the amount of $30 million in the Liquidation Expense Reserve Account to prosecute the Recovery Actions will require appropriate notice and a hearing. The Liquidating AHERF Bylaws will provide, inter alia, that creditors may make reasonable requests to the Chapter 11 Trustee for information regarding the fees and expenses of the professionals prosecuting the Recovery Actions on behalf of the Creditors' Committee and the Chapter 11 Trustee.

6.  Distributions of Estate Assets.

From time to time in accordance with the provisions of the Plan and the Liquidating AHERF Bylaws, the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall distribute to the Beneficiaries all net Cash income plus all net Cash proceeds held by Liquidating AHERF (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall retain such amounts in the Liquidation Expense Reserve Account as are reasonably necessary to meet future Liquidation Administrative Expenses, subject to the Liquidating AHERF Bylaws. The Liquidating AHERF Bylaws shall provide that upon the resolution of discrete Recovery Actions the Creditors' Committee will evaluate, upon the advice

of its counsel, whether it is appropriate to reduce the amount retained in the Liquidation Expense Reserve Account. The Chapter 11 Trustee may also withhold from amounts distributable to any Person any and all amounts, determined in the Chapter 11 Trustee's and Creditors' Committee reasonable discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement. The Chapter 11 Trustee shall not be under any obligation to make any distributions from Liquidating AHERF to the Beneficiaries unless the aggregate amount to be distributed equals or exceeds $50,000,000, unless such distribution is the last such distribution to be made under the Plan or is otherwise directed by the Creditors' Committee.

Distributions by Liquidating AHERF pursuant to the Plan shall be made to the following Persons in the following order of priority, with no payment being made unless and until all prior items have been fully satisfied.

The first $50 million of distributions from Liquidating AHERF shall be made as follows:

**FIRST**, Pro Rata to holders of Series A Bondholder Secured Liquidation Participations (for purposes of clarification, MBIA/PNC shall receive 15/27.5 of each of the first dollars distributed until their Series A Bondholder Secured Liquidation Participation in the amount of $15 million is satisfied in full, and the Centennial Bondholders shall receive 12.5/27.5 of each of the first dollars distributed until their Series A Bondholder Secured Liquidation Participation in the amount of $12.5 million is satisfied in full); and

**SECOND**, Pro Rata to holders of Unsecured Claim Liquidation Participations; provided, however that the Chapter 11 Trustee shall transfer to the Small Payment Reserve and the Disputed Claims Reserve such amounts as are required to be reserved in accordance with Sections 6.8(b) and 6.9(a) of the Plan, respectively.

The next $50 million of distributions from Liquidating AHERF shall be made as follows:

**FIRST**, Pro Rata to MBIA/PNC until their Series B Bondholder Secured Liquidation Participations in the amount of $15 million is satisfied in full; and

**SECOND**, Pro Rata to holders of Unsecured Claim Liquidation Participations; provided, however that the Chapter 11 Trustee shall transfer to the Small Payment Reserve and the Disputed Claims Reserve such amounts as are required to be reserved in accordance with Sections 6.8(b) and 6.9(a) of the Plan, respectively.

All subsequent distributions from Liquidating AHERF shall be made as follows: (a) Holders of Series C Bondholder Secured Liquidation Participations shall receive 20% of each dollar distributed from Liquidating AHERF, to be distributed Pro Rata to such holders, until all Series C Bondholder Secured Liquidation Participations in the amount of $10 million are fully satisfied and (b) all other distributions from Liquidating AHERF shall be made Pro Rata to holders of Unsecured Claim Liquidation Participations; provided, however that the Chapter 11 Trustee shall transfer to the Small Payment Reserve and the Disputed Claims Reserve such amounts as are required to be reserved in accordance with Sections 6.8(b) and 6.9 (a) of the Plan, respectively.

7. ˙Excess Estate Assets.

To the extent that (a) there are any Estate Assets remaining after payment, in full, of all Liquidation Administrative Expenses, Series A, B and C Bondholder Secured Liquidation Participations, and Unsecured Claim Liquidation Participations, including any applicable interest, or (b) the final distribution to holders of Unsecured Claim Liquidation Participations would aggregate less than $100,000, such excess Estate Assets shall be transferred in accordance with the Liquidating AHERF Bylaws (x) first Pro Rata to the holders of any Allowed Subordinated Claim until such Claims are fully satisfied and (y) then to such charitable purposes as the Chapter 11 Trustee, at the direction of the Creditors' Committee, in its reasonable discretion, shall determine; provided, however that such charitable purposes shall be related to providing health care for the sick, injured, disabled, indigent or infirm or promoting the general health of the public.

8. Method of Distributions under the Plan.

(a)     In General.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by Liquidating AHERF (by the Chapter 11 Trustee or its disbursing agent) to the holder of each Allowed Claim shall be mailed to the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Chapter 11 Trustee has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.

(b)     Distributions of Cash.  Any payment of Cash made by Liquidating AHERF (by the Chapter 11 Trustee or its disbursing agent) pursuant to the Plan shall be made by check drawn on a domestic bank; provided, however, that after the occurrence of the Effective Date, the Chapter 11 Trustee is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); provided, further that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was greater than or equal to ten dollars ($10) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions it would otherwise be entitled.

(c)     Timing of Distributions.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)     ˈFractional Cents.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of .50 or less and rounding up in the case of more than .50).

(e) Distributions to Holders of Allowed Centennial Bondholder Claims. Payments to be made pursuant to this Plan to holders of Allowed Centennial Bondholder Claims shall be made by the Chapter 11 Trustee to the Centennial Indenture Trustee and distributed to holders of Allowed Centennial Bondholder Claims pursuant to the terms of the Centennial Master Trust Indenture.

(f) Distributions to Holders as of the Distribution Record Date. As of the close of business on the Distribution Record Date, the Chapter 11 Trustee's claims register shall be closed, and the Chapter 11 Trustee shall not recognize any further changes in the record holders of any Claims. The Chapter 11 Trustee shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those holders of record as of the close of business on the Distribution Record Date.

9. Reserve on Account of Disputed Claims.

(a) Establishment and Maintenance of Reserve for Disputed Claims. Liquidating AHERF shall maintain a reserve (the "Disputed Claims Reserve") equal to the aggregate of any distributable amounts of Cash and Unsecured Claim Liquidation Participations required to be set aside on account of Disputed Claims pursuant to Section 6.6 of the Plan equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or such lesser amount as required by a Final Order. For the purposes of effectuating the provisions of Section 6.9 of the Plan and the distributions to holders of Allowed Claims, the Bankruptcy Court, on or prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set, may fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed the amounts of the Disputed Claims for purposes of distribution under the Plan. In lieu of fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by agreement in writing by and between the Debtors and the holder of a Disputed Claim.

(b) Distributions Upon Allowance of Disputed Claims. The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any Reserve Income earned thereon. No holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve or Liquidating AHERF with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim except for any Reserve Income earned thereon.

10: Reversion to Estate Assets.

The following amounts shall become Estate Assets and shall be distributed pursuant to Section 6.6 of the Plan: (i) distributions under the Plan that are unclaimed for a period of one year after the date of such distribution and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or Cash Equivalents in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim plus Reserve Income related thereto.

11. Aggregation of Claims.

Subject to Article 2 of the Plan, each and every Unsecured Claim filed or to be filed in any of the Chapter 11 Cases against the Estates of AHERF, AUMP, AUHS or AUH-East shall be aggregated and deemed one Claim in Class 5(A) or Class 6(A), as the case may be. Subject to Article 2 of the Plan, each and every Unsecured Claim filed or to be filed against the Estate of Centennial shall be aggregated and deemed one Claim in Class 5(B) or Class 6(B), as the case may be.

12. Subordination of Claims.

The Chapter 11 Trustee and the Creditors' Committee reserve their right to move before the Bankruptcy Court, upon notice and hearing, to subordinate the payment of any Claim to the payment of all other Allowed Claims.

13. Investment Power.

The right and power of the Chapter 11 Trustee to invest assets transferred to, and retained by, Liquidating AHERF, the proceeds thereof or any income earned by Liquidating AHERF, shall be limited to the right and power to invest such assets in Cash Equivalents.

**V.**

**OVERVIEW OF THE PLAN**

**A. General**

The following summary is intended as a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is annexed hereto as Exhibit A. Holders of Claims are respectfully referred to the relevant provisions of the Bankruptcy Code and are encouraged to review the Plan and the Disclosure Statement with their counsel and financial advisor.

In general, a Chapter 11 plan of reorganization must (1) allocate claims and equity interests into separate categories and classes, (2) specify the treatment that each category and class is to receive under such plan and (3) contain other provisions necessary to implement the reorganization of a debtor. A Chapter 11 plan may specify that the legal, equitable and contractual rights of the holders of claims or equity interests in certain classes are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable

treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holders of claims or equity interests in such "unimpaired" classes. Pursuant to Section 1124(1) of the Bankruptcy Code, a class of claims or equity interests is "impaired," and entitled to vote on a plan, unless the plan "leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest."

The Chapter 11 Trustee believes that (1) holders of impaired Claims will obtain a greater recovery under the Plan than they would otherwise obtain if the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code and (2) the Plan will maximize and preserve the assets of the Debtors' estates for a distribution to creditors in an effective and cost efficient manner.

## B. Compromises Regarding Plan

### 1. Settlement with Three Primary Institutional Creditors.

THE CLASSIFICATIONS, DISTRIBUTIONS AND MEANS OF EXECUTION PROVIDED UNDER THE PLAN ARE THE PRODUCT OF NEGOTIATIONS AMONG THE CHAPTER 11 TRUSTEE, THE CREDITORS' COMMITTEE, MBIA, PNC AND BNY. THE CHAPTER 11 TRUSTEE BELIEVES THAT THOSE NEGOTIATIONS RESULTED IN A REASONABLE SETTLEMENT OF ALL OF THESE CLAIMS TO ACHIEVE THE BEST AVAILABLE, MOST EXPEDITIOUS AND MOST COST-EFFECTIVE RESOLUTION FOR CREDITORS OF THESE ESTATES.

In the Winter of 1999, the Chapter 11 Trustee and the Creditors' Committee commenced Plan negotiations with the three primary institutional creditors -- PNC, MBIA and BNY-- asserting security interests in and liens on certain assets of the Estates. The Creditors' Committee established a plan subcommittee to participate in the negotiations along with the Chapter 11 Trustee and his advisers to ensure proper representation of the interests of general unsecured creditors. By April 2000, the principal economic provisions of a plan, as reflected in the Plan and discussed herein, were agreed to by the parties.

At a Section 105 chambers conference before the Bankruptcy Court on April 18, 2000, the Chapter 11 Trustee, members of the Creditors' Committee and representatives of PNC, MBIA and BNY advised the Bankruptcy Court of this progress, and proceeded to draft the Plan and Disclosure Statement and address attendant issues. The treatment of the impaired Claims as set forth below is the product of such negotiations among the major creditor constituencies in the Chapter 11 Cases. The difference in treatment between the secured creditors can be attributed to a negotiated resolution of issues regarding the extent and validity of each of PNC's and MBIA's, on the one hand, and BNY's, on the other, purported security interests in and liens on certain of the Debtors' assets and the proceeds therefrom.

### (a)    Settlement with PNC and MBIA.

The Chapter 11 Trustee and the Creditors' Committee reached a consensual resolution with MBIA and PNC regarding the treatment of their purported security interest in the assets of AUHS and AUH-East. The DVOG Master Trust Indenture purported to grant to the holders of the DVOG Bond a security interest in and lien on certain assets of AUHS and AUH-East, including, without

limitation, the "Gross Revenues" of such Estates. The Chapter 11 Trustee and the Creditors' Committee disputed whether the Master Trust Indenture was sufficient to create a security interest in property of the Estates of AUH-East and AUHS, and, even if valid security interests were created, whether the financing statements filed in connection therewith were sufficient to perfect such a security interest.

Instead of pursuing costly and protracted litigation that would have depleted assets of the Estates and delayed the proposal of a plan of reorganization, the Chapter 11 Trustee and the Creditors' Committee engaged in extensive negotiations with MBIA and PNC to reach a consensus regarding the treatment of their Claims. The Chapter 11 Trustee and the Creditors' Committee negotiated a settlement that reflects an agreed upon value of the Secured Claim of the holders of MBIA/PNC Claims to be $50 million, of which $10 million will be paid on the Effective Date, and an Allowed Unsecured Claim in the amount of $340.3 million, subject to adjustment pursuant to Section 5.4(d) of the Plan. The remaining $40 million of the Allowed Secured Claim will be paid to holders of the MBIA/PNC Claims from Liquidating AHERF at subsequent intervals based on net litigation recoveries from the Recovery Actions. The Chapter 11 Trustee and the Creditors' Committee believe that this settlement is preferable to litigating the validity of MBIA's and PNC's security interests in and liens on assets of the Estates because such litigation would have been costly and protracted with an uncertain outcome. The factual and legal issues were also complicated and would have required the parties to expend substantial resources in conducting discovery.

The settlement is in the best interests of the creditors of the Estates because it permits the Chapter 11 Trustee to make a meaningful initial distribution upon the occurrence of the Effective Date to holders of Allowed Unsecured Claims. This structure also ensures adequate funding of Liquidating AHERF to permit the Chapter 11 Trustee and the Creditors' Committee to pursue the Recovery Actions, thereby potentially enhancing the Estates for the benefit of all creditors.

(b)     Settlement with BNY.

The Chapter 11 Trustee and the Creditors' Committee also reached a consensual resolution with BNY, on behalf of holders of Centennial Bondholders Claims, regarding the treatment of the claims and security interests securing repayment of such bonds from the assets of Centennial. BNY asserted a security interest in the "Gross Revenues" - primarily accounts receivable - of the Centennial estate. Given the difficulty of valuing uncollected healthcare receivables, the Chapter 11 Trustee, the Creditors' Committee and BNY negotiated a settlement designed to reflect the parties' assessment of the value of Centennial's accounts receivable and other receivable assets. Accordingly, under this Plan, the holders of the Centennial Bonds will receive an Allowed Secured Claim of $33 million, of which $20.5 million will be paid in Cash on the Effective Date. The remaining $12.5 million of the Allowed Secured Claim will be paid out of the first distribution of $50 million of Estate Assets from Liquidating AHERF. Holders of Centennial Bondholder Claims will also receive their pro rata portion of an Allowed Centennial Unsecured Claim in the amount of $105.6 million, subject to adjustment pursuant to Section 5.3(e) of the Plan.

On the Effective Date, on account of its Allowed Centennial Unsecured Claim, holders of Centennial Bondholder Claims will receive a payment in Cash equal to 1.5% of such Allowed Claim. Holders of Allowed Centennial Unsecured Claims are receiving less than holders of Allowed

General Unsecured Claims because such treatment reflects that the amount of the Centennial Bonds secured by a security interest in and lien on assets of the Centennial Estate was greater than the assets available in the Centennial Estate. Accordingly, absent the settlements embodied in the Plan, holders of Allowed Centennial Unsecured Claims would receive no recovery, unless such claims could be charged against the collateral securing repayment of the Centennial Bonds pursuant to Section 506(c) of the Bankruptcy Code. The Chapter 11 Trustee and the Creditors' Committee believe that litigation regarding the extent of BNY's security interests in and liens on assets of the Estates would have been costly and protracted with an uncertain outcome. The factual and legal issues concerning the value of healthcare receivables were also complicated and would have required the parties to expend substantial resources in conducting discovery.

The settlement with BNY is in the best interests of the creditors of the Estates because it permits a meaningful initial distribution to be made to holders of Allowed Unsecured Claims upon the occurrence of the Effective Date. In addition, this structure permits Liquidating AHERF to be funded at a level that provides the Chapter 11 Trustee and the Creditors' Committee with the ability to pursue the Recovery Actions vigorously, thereby enhancing the likelihood that further recoveries and distributions can be made to secured and unsecured creditors of the Estates.

2. Substantive Consolidation.

An integral element of the Plan is the substantive consolidation of the Debtors' assets and liabilities. Substantive consolidation enables the assets and liabilities of the five Debtors to be pooled and all of the Debtors' creditors to share in the common pool, as provided in the Plan. As noted above, in order to promote a more equitable distribution of the pooled assets, distributions to holders of Allowed Unsecured Centennial Claims will be discounted by 70% relative to the distributions to holders of Allowed General Unsecured Claims. If the Debtors' estates were not substantively consolidated in the manner provided in the Plan, it would be necessary to have five separate plans of reorganization with each creditor receiving a distribution from the Debtor with which the particular creditor conducted business. Substantive consolidation of the Debtors' estates is necessary because the Debtors have operated and continue to operate as a single business enterprise and have no reliable or reasonable means of separating their assets and liabilities by individual Debtor in order to formulate five individual plans of reorganization. Moreover, a substantial majority of creditors of the Estates would similarly be unable to identify the particular Debtors with which they conducted business. Substantive consolidation is an equitable remedy that must be approved by the Bankruptcy Court. Accordingly, the Plan constitutes the Chapter 11 Trustee's motion for the substantive consolidation of the Estates.

Courts have found the power to substantively consolidate interrelated debtors' assets pursuant to a bankruptcy court's general equitable powers, which are set forth in Section 105 of the Bankruptcy Code. The two key factors on which courts focus in deciding the question of substantive consolidation are: (i) whether creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit, and (ii) whether the affairs of the debtors are so entangled that the consolidation will benefit all creditors of the debtors' estates. Within this framework, courts have considered other factors, including: (i) the presence or absence of consolidated financial statements, (ii) the existence of inter-company guarantees or loans, (iii) the

unity of interests and ownership between the various corporate entities, (iv) the transfer of assets without formal observance of corporate formalities, (v) the degree of difficulty in segregating and ascertaining individual assets and liabilities, (vi) the parent, its affiliates and subsidiaries having common directors or officers, (vii) the parent or its affiliates financing one another, and (viii) the commingling of assets and business functions.

The Chapter 11 Trustee and the Creditors' Committee believe that substantive consolidation of the Debtors' Estates will facilitate confirmation of the Plan, and is in fact mandated by the circumstances of these cases for the following reasons:

- *Creditors Conducted Business with the Debtors as a Single Economic Unit and Did Not Rely on Separate Identities in Extending Credit.*

In general, in making a determination respecting the extension of credit to any particular Debtor entity, creditors dealt with the Debtors as a single economic unit and did not rely on their separate corporate identities. Rather, in extending credit, creditors did so based on AHERF's credit. In particular, AHERF would provide creditors with the AHERF System's consolidated financial data rather than financial information regarding the individual Debtor. Thus, both trade and bank creditors relied on AHERF's purported consolidated financial strength in making a determination as to the extension of credit.

The foregoing conclusion is further buttressed by the fact that AHERF was a signatory to a number of executory contracts and leases that benefitted its affiliates, including the Debtors. AHERF was also clearly identified on substantially all customer invoices regardless of with which entity the creditor actually conducted business. In filing claims against the Estates, many creditors filed identical claims against each of the Debtors, demonstrating the creditor's uncertainty as to which entity was liable for amounts owed.

The Debtors' management also intended the AHERF System to be treated as one economic unit. The Debtors filed consolidated financial statements, and the Debtors had common directors and trustees. Other factors indicating a single economic unit as opposed to separate entities include the facts that (i) AHERF is the sole member of the other Debtors and (ii) AHERF served as the general and administrative service provider for all of the Debtors. AHERF exercised centralized cash management control for the Debtors and was generally responsible for the disbursement of funds to third parties. Specific administrative functions applicable to all of the Debtors, such as payroll, accounting and information services, also were centralized in AHERF.

- *The Affairs of the Debtors Are so Entangled that Consolidation Will Benefit All Creditors.*

In light of the Debtors' consolidated organizational and operational structure, the Chapter 11 Trustee would have to spend considerable time and expense and employ innumerable speculative assumptions in order to attempt a complete separation of the Debtors' business relationships and operations with each other and with individual creditors, unnecessarily expending resources. In addition, proceeds from certain post-petition events, including the West Penn Transaction, the Tenet sale and litigation recoveries already made, cannot be allocated easily among the Estates.

Creditors of the Estates will also benefit from substantive consolidation due to the elimination of inter-Debtor claims of approximately $200 million, which would otherwise be General Unsecured Claims against the Estates. In addition, by substantively consolidating the Estates, only one plan of reorganization needs to be filed and confirmed rather than five separate plans, thereby avoiding the expense of negotiating and drafting separate plans for each Estate, or even the possibility of litigation with the three secured creditor constituencies regarding the extent and validity of their security interests in certain assets of the Estates or the allocation of assets and liabilities among the Estates.

Creditors of the Centennial Estate also benefit from substantive consolidation. As explained above, the Centennial Bondholders' security interest in and lien on certain assets of the Centennial Estate would have depleted the assets of that Estate. As a result, without substantive consolidation, unsecured creditors of the Centennial Estate may not have received any distribution after payment was made to the Centennial Bondholders for their security interest. Accordingly, as a result of substantively consolidating the Debtors' Estates, unsecured creditors of the Centennial Estate receive a substantially higher distribution than would otherwise be possible. For these reasons, the Chapter 11 Trustee believes that substantive consolidation is appropriate in the Chapter 11 Cases.

Thus, as part of the Confirmation Order, the Debtors will seek to include, among other things, that on the Effective Date: (i) all assets (and all proceeds thereof) and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of AHERF, (ii) no distributions shall be made under the Plan on account of inter-company Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, and (iv) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors; provided, however, that (a) for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, the Debtors shall be treated as separate entities so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any of the Debtors may not be set-off against the debts of any of the other Debtors, (b) for purposes of determining the plaintiff of, and the availability of defenses to, Recovery Actions, the Debtors may, at the option of the Chapter 11 Trustee upon the direction of the Creditors' Committee, be treated as separate entities and (c) holders of Centennial Unsecured Claims shall be afforded the treatment set forth in Section 5.6 of the Plan for all purposes and shall not be deemed General Unsecured Creditors for purposes of distributing under or voting for the Plan. To the extent that a creditor, including, but not limited to, the Pension Benefit Guaranty Corporation, is holding an Allowed Claim against more than one of the Debtors' Estates arising out of the joint and several obligations of the Debtors, such creditor shall be treated as a holder of an Allowed General Unsecured Claim under Class 5(A) of the Plan.

## C. Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims and equity interests of a debtor's creditors and equity interest holders. In compliance with Section 1122 of the Bankruptcy Code, the Plan divides the holders of Claims into two categories and ten Classes, and sets forth the treatment offered to each Class.[2] These Classes take into account the differing nature and priority of Claims against the Debtors. Section 101(5) of the Bankruptcy Code defines "Claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured." A "Claim" against the Debtors also includes a Claim against property of the Debtors, as provided in Section 102(2) of the Bankruptcy Code.

For the holder of a Claim to participate in a reorganization plan and receive the treatment offered to the class in which it is classified, its Claim must be Allowed. Under the Plan, an Allowed Claim is defined as (a) a Claim that has been listed by the Debtors in their Schedules and (i) is not listed as disputed, contingent or unliquidated and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of Claim has been filed as of the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or (d) any Claim allowed under the Plan or pursuant to the Confirmation Order.

---

[2]     A debtor is required under Section 1122 of the Bankruptcy Code to classify the claims and equity interests of its creditors and interest holders into classes containing claims that are substantially similar to the other claims or equity interests in such class. Although the Chapter 11 Trustee believes that his classification of all Claims is in compliance with the provisions of Section 1122 of the Bankruptcy Code, it is possible that a holder of a Claim may challenge the Chapter 11 Trustee's classification scheme, and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intention of the Chapter 11 Trustee, to the extent permitted by the Bankruptcy Court, to modify the Plan to provide for whatever reasonable classification might be required by the Bankruptcy Court for confirmation of the Plan, and to use the acceptances received by the Chapter 11 from any holder of a Claim pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder of a Claim is ultimately deemed to be a member.

**D. Treatment of Claims Under the Plan**

The Plan segregates the various Claims against the Debtors into Administrative Expense Claims, Priority Tax Claims, Class 1 consisting of Priority Claims, Class 2 consisting of General Secured Claims, Class 3 consisting of Secured Claims of holders of Centennial Bondholder Claims, Class 4 consisting of Secured Claims of holders of MBIA/PNC Claims, Class 5(A) consisting of General Unsecured Claims, Class 5(B) consisting of Centennial Unsecured Claims, Class 6(A) consisting of Convenience Claims, Class 6(B) consisting of Centennial Convenience Claims, Class 7 consisting of Insurance Claims and Class 8 consisting of Membership Interests.

Under the Plan, Claims in Classes 1, 2 and 8 are unimpaired, and Claims in Classes 3, 4, 5(A), 5(B), 6(A), 6(B) and 7 are impaired. In the Chapter 11 Trustee's opinion, the treatment accorded to the impaired Classes of Claims under the Plan represents the best treatment that can be provided to such Classes under the circumstances and is superior to the treatment that would be afforded to such Classes in the event of a Chapter 7 liquidation of the Debtors. Set forth below is a summary of the Plan's treatment of the various categories and Classes of Claims. This summary is qualified in its entirety by the full text of the Plan. In the event of an inconsistency between the Plan and the description contained herein, the terms of the Plan shall govern. The Plan is complicated and substantial. Time should be allowed for its analysis; consultation with a legal and/or financial advisor is recommended and should be considered.

 1.  Unclassified Categories of Claims.

  (a)  Category 1 — Administrative Expense Claims.

Administrative Expense Claims include the actual and necessary costs and expenses incurred during the Chapter 11 Cases. Under the Plan, all Administrative Expense Claims shall be paid in full, in Cash, in such amounts as (a) are incurred in the ordinary course of business by the Debtors pursuant to the normal business terms between the parties, (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (c) may be agreed upon between the holder of such Administrative Expense Claim and the Chapter 11 Trustee and the Creditors' Committee. Such Administrative Expense Claims shall include undisputed costs incurred in the operation of the Debtors' businesses after the Petition Date and fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

Professional Compensation and Expense Reimbursement Claims. All entities, including, without limitation, the individual members of the Creditors' Committee, seeking an award by the Bankruptcy Court of professional fees, including the fees of the Chapter 11 Trustee, or of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Confirmation Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Expense Claim becomes an Allowed Administrative

Secured Claim, in full and complete satisfaction thereof on the later of the Effective Date and the date such General Secured Claim becomes Allowed, or as soon thereafter as is practicable or (iii) an Allowed General Secured Claim shall be reinstated and rendered unimpaired in accordance with Section 1124(2) of the Bankruptcy Code.

(c)    Class 8 — Allowed Membership Interests.

On the Effective Date, record holders of Membership Interests shall continue to hold such membership interest until the dissolution of such Subsidiaries pursuant to Section 13.3 of the Plan, subject in all respects to the provisions of the Plan.

3.    Impaired Classes.

Pursuant to Section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired unless the legal, equitable and contractual rights of the holders of Claims or equity interests in such class are not modified or altered. Holders of allowed claims and equity interests in impaired classes are entitled to vote on a debtor's plan of reorganization. Under the Chapter 11 Trustee's Plan, the Classes of Secured Claims of holders of Centennial Bondholder Claims (Class 3), Secured Claims of holders of MBIA/PNC Claims (Class 4), General Unsecured Claims (Class 5(A)), Centennial Unsecured Claims (Class 5(B)), Convenience Claims (Class 6(A)) and Centennial Convenience Claims (Class 6(B)) are impaired and, therefore, are entitled to vote on the Chapter 11 Trustee's Plan. Holders of Insurance Claims (Class 7) will not receive or retain any property, and, therefore, are deemed to reject the Plan.

(a)    Class 3 — Secured Claims of Holders of Centennial Bondholder Claims.

Allowance of Centennial Bondholder Claims. On the Effective Date, holders of Centennial Bondholder Claims shall be granted an Allowed Secured Claim in the amount of $33 million and an Allowed Centennial Unsecured Claim in the amount of $105.6 million, subject to Section 5.3(e) of the Plan. With respect to the distribution on account of the Allowed Centennial Unsecured Claim, a holder of a Centennial Bondholder Claim is not permitted to elect treatment under the Allowed Centennial Convenience Class (Class 6(B)).

Impairment and Voting. Class 3 is impaired by the Plan. Consequently, each holder of an Allowed Centennial Bondholder Claim shall be entitled to vote to accept or reject the Plan. Each vote cast for or against the Plan by the holder of an Allowed Centennial Bondholder Claim shall be deemed a vote of such holder's Secured and Unsecured Claims. 33/138.6 of each Allowed Centennial Bondholder Claim voted shall be attributable to such holder's Secured Claim and shall be deemed a vote to accept or reject Class 3 of the Plan. 105.6/138.6 of each Allowed Centennial Bondholder Claim voted shall be attributable to such holder's Unsecured Claim and shall be deemed a vote to accept or reject Class 5(B) of the Plan.

Distributions. A Centennial Bondholder with an Allowed Claim will receive a distribution on account of its Secured and Unsecured Claim. Distributions on account of each Allowed Secured Claim will be made as follows: on the Effective Date, each holder of an Allowed Centennial Bondholder Claim shall receive, in full and final satisfaction of its Allowed Secured Claim, its Pro Rata share of: (w) $20.5 million Cash, and (x) a Series A Bondholder Secured Liquidation

Participation in the amount of $12.5 million. Distributions on account of the Allowed Unsecured Claim will be made as follows: each holder of an Allowed Centennial Bondholder Claim shall receive, in full and final satisfaction of its Allowed Unsecured Claim, its Pro Rata share of distributions payable under the Plan on account of an Allowed Centennial Unsecured Claim in the amount of $105.6 million, subject to adjustment pursuant to Section 5.3(e) of the Plan.

Retention of Rights. The Centennial Indenture Trustee, on behalf of the Centennial Bondholders, may continue to pursue at its own cost the BNY PHCT Actions and, pursuant to the BNY Stay Relief Order, continue to collect all uncollected collateral for which it was granted relief from stay pursuant to the BNY Relief Order, including, without limitation, all of the Medicare Claims of the Centennial Estate, and shall be entitled to receive the proceeds of any recoveries related thereto as a secured party holding a valid and perfected Secured Claim for such amounts; provided, however, that the aggregate Allowed Unsecured Claim of the holders of Allowed Centennial Bondholder Claims shall be reduced by the amount of any such recoveries. The entry of the Confirmation Order shall constitute the entry of an order pursuant to 42 U.S.C. §1395 g(c), 42 U.S.C. §1395 u(b)(6) and 42 U.S.C. §1396 (a)(32) requiring the United States Department of Health and Human Services to pay all Medicare Claims of the Centennial Estate to the Centennial Indenture Trustee. Notwithstanding anything to the contrary contained in this Plan, the Centennial Indenture Trustee shall retain its lien on any collateral for which it was granted relief from stay pursuant to the BNY Stay Relief Order. The Centennial Indenture Trustee, with respect to Centennial Medicare Claims, and the Chapter 11 Trustee, with respect to the Medicare Claims asserted by Debtors other than Centennial, shall cooperate with each other in their respective collection efforts, but such agreement to cooperate shall in no way impair the ability of each, independent of the other, to pursue, settle and compromise its respective Medicare Claims. Pursuant to the BNY Stay Relief Order, the Centennial Indenture Trustee shall bear all costs incurred by it and its predecessor indenture trustee, and otherwise shall be responsible for all matters arising from or relating to the collection of Centennial receivables and the pursuit of Centennial Medicare Claims from and after the date of the BNY Stay Relief Order.

Reconciliation. Prior to each date on which the Centennial Bondholders are to receive distributions from Liquidating AHERF on account of their Allowed Centennial Unsecured Claims, the Centennial Indenture Trustee and the Chapter 11 Trustee shall in good faith reconcile and, to the extent necessary, reduce dollar for dollar, the aggregate Allowed Centennial Unsecured Claim granted to holders of Allowed Centennial Bondholder Claims by such amounts as are collected by the Centennial Indenture Trustee in accordance with Section 5.3(d) of the Plan. Upon giving effect to such reconciliation, holders of Allowed Centennial Bondholder Claims shall be entitled to receive subsequent distributions under the Plan only to the extent that such holders' aggregate distributions under the Plan are equal to the distributions that such holders would have received if the Allowed Centennial Unsecured Claim of such holders had been Allowed on the Effective Date in such reduced amount; provided, however that holders of Allowed Centennial Bondholder Claims shall not be required to disgorge any prior distributions.

Discharge of Obligations Owing on Centennial Bonds and Related Instruments. As of the Effective Date, the obligations of the Debtors under all Centennial Bonds, the Centennial Master Trust Indenture and all agreements, instruments and other documents evidencing Centennial

Bondholder Claims and the rights of the holders thereof against the Debtors shall be discharged and released but such agreements, instruments and documents shall not be canceled. Notwithstanding the foregoing, such discharge and release shall not impair the rights and duties under the Centennial Master Indenture as between the Centennial Indenture Trustee and the holders of the Centennial Bonds nor shall such discharge and release, impair, release, discharge or otherwise affect any Claim of the Centennial Bondholders against any Person or entity which is not a Debtor, the Chapter 11 Trustee, Liquidating AHERF or the Creditors' Committee or any of the Professionals, all such Claims being hereby expressly preserved.

Pending Litigation. All outstanding litigation between the Centennial Bondholders and the Chapter 11 Trustee and the Creditors' Committee shall be deemed dismissed with prejudice upon the occurrence of the Effective Date, and the Centennial Indenture Trustee and the Chapter 11 Trustee shall file a notice of dismissal of such litigation with prejudice with the Bankruptcy Court promptly upon the occurrence of the Effective Date.

Mutual Release. All potential Causes of Action of the Creditors' Committee, the Debtors, the Debtors' Estates, and the Chapter 11 Trustee, including without limitation, Avoidance Actions, against each of the Centennial Bondholders and the Centennial Indenture Trustee shall be deemed released, settled and compromised including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment provided to such creditors pursuant to the Plan. All potential Causes of Action of the Centennial Bondholders and the Centennial Indenture Trustee against each of the Debtors, the Debtors' Estates, the Chapter 11 Trustee and the Creditors' Committee shall be deemed released, settled and compromised including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment provided to each pursuant to the Plan.

      (b)    Class 4 — Secured Claims of Holders of MBIA/PNC Claims.

Allowance of MBIA/PNC Claims. On the Effective Date, the holders of MBIA/PNC Claims shall be granted an Allowed Secured Claim in the amount of $50 million and an Allowed Unsecured Claim in the amount of $340.3 million, subject to adjustment pursuant to Section 5.4(d) of the Plan.

Impairment and Voting: Class 4 is impaired by the Plan. Consequently, each holder of an Allowed MBIA/PNC Claim shall be entitled to vote to accept or reject the Plan. Each vote cast for or against the Plan by the holder of an Allowed MBIA/PNC Claim shall be deemed a vote of such holder's Secured and Unsecured Claims. 50/390.3 of each Allowed MBIA/PNC Claim voted shall be attributable to such holder's Secured Claim and shall be deemed a vote to accept or reject Class 4 of the Plan. 340.3/390.3 of each Allowed MBIA/PNC Claim voted shall be attributable to such holder's Unsecured Claim and shall be deemed a vote to accept or reject Class 5(A) of the Plan.

Distributions: A holder of an MBIA/PNC Claim will receive a distribution on account of the Allowed Secured Claims and Allowed Unsecured Claim. Distributions on account of the Allowed Secured Claim will be made as follows: each holder of an Allowed MBIA/PNC Claim shall receive on the Effective Date, in full and final satisfaction of its Allowed Secured Claim, its Pro Rata share of: (w) $10 million Cash, (x) a Series A Bondholder Secured Liquidation Participation in the amount of $15 million, (y) a Series B Bondholder Secured Liquidation Participation in the amount

of $15 million, and (z) a Series C Bondholder Secured Liquidation Participation in the amount of $10 million, subject to adjustment pursuant to Section 5.4(d) of the Plan. Distributions on account of the Allowed Unsecured Claim will be made as follows: each holder of an Allowed MBIA/PNC Claim shall receive, in full and final satisfaction of its Allowed Unsecured Claim, its Pro Rata share of distributions payable under the Plan pursuant to Section 5.5 of the Plan on account of an Allowed General Unsecured Claim in the amount of $340.3 million, subject to adjustment pursuant to Section 5.4(d) of the Plan.

Distribution Adjustment.  The Series C Bondholder Secured Liquidation Participation granted to holders of Allowed MBIA/PNC Claims pursuant to Section 5.4(c)(i)(z) of the Plan shall be increased, and the General Unsecured Claim granted pursuant to Section 5.4(c)(ii) of the Plan shall be concomitantly reduced, if necessary, so that the total distribution to holders of Allowed MBIA/PNC Claims on account of their Allowed Secured and Unsecured Claims equals at least $100 million at such time as $150 million of aggregate distributions from Liquidation AHERF have been made pursuant to Section 6.6 of the Plan; provided, however that in no event will such increase exceed $2 million.

Discharge of Obligations Owing on DVOG Bonds.  As of the Effective Date, the obligations of the Debtors under all DVOG Bonds, the DVOG Master Trust Indenture, the PNC Notes, the PNC Reimbursement Agreements, the DVOG Bond Insurance, and all agreements, instruments and other documents evidencing the MBIA/PNC Claims and the rights of the holders thereof against the Debtors shall be discharged and released but such agreements, instruments and documents shall not be canceled. Notwithstanding the foregoing, such discharge and release shall not impair the rights and duties (i) under the DVOG Master Trust Indenture as between the DVOG Master Indenture Trustee and MBIA/PNC or (ii) under the MBIA Series Trust Indentures as between the DVOG Series Bond Indenture Trustee and the DVOG/MBIA Bondholders, nor shall such discharge and release, impair, release, discharge or otherwise affect any Claim of MBIA/PNC or the DVOG/MBIA Bondholders against any Person or entity which is not a Debtor, the Chapter 11 Trustee, Liquidating AHERF or the Creditors' Committee or any of the Professionals, all such Claims being hereby expressly preserved.

DVOG/MBIA Bonds.  Except to the extent set forth in Section 5.4(e) of the Plan, the rights of the DVOG/MBIA Bondholders are unaffected by the terms of the Plan. The DVOG/MBIA Bonds, however, shall merely represent the right to collect payments from the DVOG Series Indenture Trustee from the proceeds of the DVOG Bond Insurance.

Certificate of Allowed Claims.  At the request of PNC, the Chapter 11 Trustee shall issue one or more certificates in assignable form and in the amounts and in the names of the beneficial holder of an Allowed MBIA/PNC Claim as directed by PNC representing the Allowed MBIA/PNC Claim of such holder in form and substance reasonably acceptable to PNC, as the case may be, and the Creditors' Committee.

Mutual Release.  All potential Causes of Action of the Creditors' Committee, the Debtors, the Debtors' Estates, and the Chapter 11 Trustee, including, without limitation, Avoidance Actions, against MBIA and/or PNC shall be deemed released, settled and compromised, including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment

provided to such creditors pursuant to the Plan. All potential Causes of Action of PNC and/or MBIA against each of the Debtors, the Debtors' Estates, the Chapter 11 Trustee and the Creditors' Committee shall be deemed released, settled and compromised including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment provided to each pursuant to the Plan.

  (c)  <u>Class 5(A) — General Unsecured Claims</u>.

  Each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive, on the Effective Date, in full and final satisfaction of such Allowed Claim: (a) a payment in Cash equal to five percent (5%) of such Allowed Claim and (b) an Unsecured Claim Liquidation Participation equal to such Allowed Claim.

  (d)  <u>Class 5(B) — Centennial Unsecured Claims</u>.

  Each holder of an Allowed Centennial Unsecured Claim as of the Distribution Record Date shall receive, on the Effective Date, in full and final satisfaction of such Allowed Claim: (a) a payment in Cash equal to one and one-half percent (1.5%) of such Allowed Claim and (b) an Unsecured Claim Liquidation Participation, equal to thirty percent (30%) of such Allowed Claim.

  (e)  <u>Class 6(A) — Convenience Claims</u>.

  Each holder of an Allowed Convenience Claim, in full and final satisfaction of such Claim, shall receive Cash in an amount equal to ten percent (10%) of such holder's Allowed Convenience Claim on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, and shall receive no other distributions on account of such Claim. A creditor will be treated as a holder of a Convenience Claim if such creditor is a single holder of a Claim which would otherwise be included in Class 5(A) but whose Claim is either (i) $1,000 or less in the aggregate, or (ii) greater than $1,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce to $1,000 by making a Convenience Class Election.

  In the event that a Recovery Action is settled prior to the Confirmation Date resulting in a material recovery to the Estates, the Chapter 11 Trustee, subject to the consent of the Creditors' Committee, reserves the right to amend the Plan pursuant to Section 14.3 thereof to provide for a higher distribution to holders of Allowed Convenience Claims or to eliminate such Class and treat such claimants as holders of a Claim in Class 5(A). In the event that the Plan is amended to eliminate Class 6(A), votes cast to accept or reject the Plan shall be deemed votes to accept or reject Class 5(A) of the Plan and the Claims of holders that made a Convenience Class Election shall be restored to their full Allowed amount.

  (f)  <u>Class 6(B) — Allowed Centennial Convenience Claims</u>.

  Each holder of an Allowed Centennial Convenience Claim, in full and final satisfaction of such Claim, shall receive Cash in an amount equal to three percent (3%) of such holder's Allowed Centennial Convenience Claim on the later of the Effective Date and the date such Centennial Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, and shall receive no other distributions on account of such Claim. A creditor will be treated as a holder of a Centennial Convenience Claim if such creditor is a single holder of a Claim which would otherwise

be included in Class 5(B) but whose Claim is either (i) $5,000 or less in the aggregate, or (ii) greater than $5,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce to $5,000 by making a Centennial Convenience Class Election.

In the event that a Recovery Action is settled prior to the Confirmation Date resulting in a material recovery to the Estates, the Chapter 11 Trustee, subject to the consent of the Creditors' Committee, reserves the right to amend the Plan pursuant to Section 14.3 thereof to provided for a higher distribution to holders of Allowed Centennial Convenience Claims or to eliminate such Class and treat such claimants as holders of a Claim in Class 5(B). In the event that the Plan is amended to eliminate Class 6(B), votes cast to accept or reject the Plan shall be deemed votes to accept or reject Class 5(B) of the Plan and the Claims of holders that made a Centennial Convenience Class Election shall be restored to their full Allowed amount.

(g)    Class 7 — Insurance Claims.

Each holder of an Insurance Claim shall retain all proceeds derived from any applicable Insurance Policy but shall receive no other distributions under the Plan on account of its Insurance Claim. Upon the occurrence of the Effective Date, the automatic stay will be lifted in order to permit holders of Insurance Claims to pursue their Claims against the Insurance Policies. To the extent that a medical malpractice, tort or other claim is not covered by an Insurance Policy by virtue of coverage defenses, policy limitations or for any other reason, then the holders of such Claims shall be treated as a holder of a General Unsecured Claim or Centennial Unsecured Claim, as the case may be. With respect to holders of a claim that would otherwise be covered by a self-insurance plan known as the "Hahnemann Trust," which covered Hahnemann University and its residents for certain claims made between July 1, 1987 through December 30, 1991 (the "Hahnemann Trust Claims"), the Chapter 11 Trustee filed the "Trustee's Supplement to Disclosure of Debtors' Professional and General Liability Insurance Program" dated September 1, 1999 stating that the Chapter 11 Trustee had been informed that the Hahnemann Trust has approximately $3,000 in assets, so that there is essentially no primary coverage for the Hahnemann Trust Claims. The Chapter 11 Trustee believes that the Pennsylvania Property and Casualty Insurance Guaranty Association ("PIGA"), established pursuant to Pa. St. §§ 991.1801 et seq., may provide a means for payment of the Hahnemann Trust Claims in light of the insolvency of the Hahnemann Trust. Accordingly, the Chapter 11 Trustee will undertake all reasonable efforts to assist holders of a Hahnemann Trust Claim in obtaining the payment of such claims from PIGA including, but not limited to, seeking a declaration that the Hahnemann Trust is insolvent. As a result thereof, holders of Hahnemann Trust Claims will be treated as holders of an Insurance Claim under Class 7 of the Plan. In the event that PIGA will not provide a means for the payment of Hahnemann Trust Claims, such holders will be treated as a holder of a General Unsecured Claim, or Convenience Claim, as the case may be, and to the extent that such claims are presently disputed or unliquidated, such claims shall be treated as Disputed Claims pursuant to Section 6.9 of the Plan as described in Section IV(C)(9) hereof.

Non-Bankruptcy Officer Indemnification Claims. Notwithstanding anything to the contrary contained in the Plan, all Persons (other than Bankruptcy Officers) holding or asserting Indemnification Claims (whether directly, by subrogation or otherwise) shall be entitled, to the extent payable, to obtain recovery on account of such Claims solely from the proceeds of any applicable

directors' and officers' or executive protection Insurance Policy maintained by the Debtors, as the case may be, to which they may be entitled as a name insured, and shall not, under any circumstances, be entitled to obtain a recovery in respect of such Indemnification Claims from the Debtors or Liquidating AHERF.

Insurance Policies. The provisions of the Plan shall not diminish or impair the enforceability of any Insurance Policies that may cover Insurance Claims or Recovery Actions.

## E. Description of Other Provisions of the Plan

1.  Cancellation of Existing Securities and Agreements.

Except as may otherwise be provided in the Plan, including without limitation, as provided in Sections 5.3(f) and 5.4(e) of the Plan, on the occurrence of Effective Date and the making of the initial distribution to the holders of Secured and Unsecured Claims, the promissory notes, share certificates, bonds and other instruments evidencing Claims against the Debtors, except to the extent set forth in Section V(E)(10) below, shall be canceled without further act or action by any Person under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under any promissory notes, share certificates, bonds and other instruments evidencing any Claim shall be deemed discharged and released.

2.  Effect of Convenience Class Election and Centennial Convenience Class Election.

By voting to accept the Plan and marking the ballot in the space provided for electing such treatment, the holder of a General Unsecured Claim or Centennial Unsecured Claim, as the case may be, aggregating in excess of $1,000 or $5,000, respectively, may elect to reduce the aggregate amount of such holder's Claim to $1,000 or $5,000, respectively, and, in such event, only receive treatment as an Allowed Convenience Claim or Allowed Centennial Convenience Claim, as the case may be, in the amount of $1,000 or $5,000, respectively, and receive the treatment provided to such holders pursuant to Sections 5.7(b) or 5.8(b) of the Plan, respectively. Such an election constitutes a waiver of the amount of the General Unsecured Claim or Centennial Unsecured Claim in excess of such amounts and the holder of such Allowed Claim shall be deemed to release the Debtors from any and all liability for such excess amounts. With respect to the Allowed Centennial Unsecured Claim granted to holders of Centennial Bondholder Claims, such holders may not elect to be treated as holders of a Centennial Convenience Claim under Class 6(B) of the Plan.

3.  Objections to and Resolution of Administrative Expense Claims, Claims and Liquidation Administrative Expenses.

Except as to applications for allowances of compensation for services rendered and reimbursement of expenses incurred on or prior to the Confirmation Date under Sections 330 and 503 of the Bankruptcy Code (with respect to which procedures respecting objections shall be governed by Section 3.2(b) hereof and the Confirmation Order or other Final Order), the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall have the right to determine the validity and amount of Administrative Expense Claims or any other Claims incurred after entry of the Confirmation Order either on behalf of Liquidating AHERF or otherwise; provided, however, that