the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall have the authority to compromise, settle otherwise resolve or withdraw any objection without further order of the Bankruptcy Court.

4.  Discharge.

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors of any debt of the Debtors that arose before the Effective Date, and any debt of the Debtors of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of Claim based on such debt, obligation or equity interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim has accepted the Plan; provided, however, that the foregoing discharge shall not apply to rights of holders of Insurance Claims to nominally name the Debtors as defendants in any litigation solely to obtain a right of recovery against any applicable Insurance Policy (but not to enforce a judgment against any property of the Debtors or Liquidating AHERF).

5.  Injunction Relating to the Plan.

As of the Effective Date, except as otherwise provided in the Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against the Debtors, their Estates or the Chapter 11 Trustee, on account of or respecting any Claims, debts, rights, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

6.  Exemption from Transfer Taxes.

In accordance with Section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such

instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

      7.   <u>Retention of Jurisdiction</u>.

The Plan provides that the Bankruptcy Court will have exclusive jurisdiction of the following specified matters arising out of, and related to, the Chapter 11 Cases, the Plan and Liquidating AHERF pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code:

      (a)   to hear and determine the Recovery Actions or matters related thereunder to enable the Chapter 11 Trustee and the Creditors' Committee to prosecute the Recovery Actions;

      (b)   to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims or to liquidate or estimate any Disputed Claim, provided that only the Chapter 11 Trustee, and the Creditors' Committee may file objections to Claims;

      (c)   to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses, pursuant to Section 3.2(b) of the Plan;

      (d)   to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

      (e)   to enforce the provisions of the Plan subject to the terms thereof;

      (f)   to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, Plan Documents or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

      (g)   to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein;

      (h)   to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code; and

      (i)   to determine such other matters as may be provided for in the Confirmation Order.

      8.   <u>Rejection of Executory Contracts and Unexpired Leases</u>.

The Plan provides that any executory contracts or unexpired leases (other than Insurance Policies) which (a) have not expired by their own terms on or prior to the Confirmation Date, (b) have not been assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (c) are not the subject of a motion to assume or reject the same which is pending at the time of the Confirmation Date, shall be deemed rejected on the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

      9.   <u>Rejection Damage Claims</u>.

If the rejection of an executory contract or unexpired lease by the Debtors pursuant to Section 9.1 of the Plan results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, Liquidating AHERF or their respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Chapter 11 Trustee on or before forty-five days following the Confirmation Date. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan. The Chapter 11 Trustee shall have the right to object to any rejection damage claims filed in accordance with the preceding sentence.

10. Certain Agreements Unaffected by Plan or Disclosure Statement.

Nothing in the Disclosure Statement or the Plan shall alter, amend or supersede (1) that certain asset purchase agreement among Tenet Healthcare Corporation, Tenet HealthSystem Philadelphia, Inc. (collectively, "Tenet"), the Debtors and Diversified Health Group (together, the "Sellers") dated September 29, 1998, and amended November 10, 1998 (the "Tenet Purchase Agreement") and any related agreements including, inter alia, the Grant Escrow Agreement dated November 10, 1998 among Tenet, Philadelphia Health Education Corporation ("PHEC"), the Sellers and Chicago Title Company, or the Agreement of Settlement of Issues Relating to Accounts Receivable, Grants and Grant Indemnification by and between the Chapter 11 Trustee and Tenet (together with the Tenet Purchase Agreement, the "Tenet Agreements") or (2) the orders dated October 1, 1998 and October 30, 1998 with respect to the Tenet Purchase Agreement, and any other orders enforcing, interpreting or pertaining to the Tenet Sale Orders, including, but not limited to, any order pertaining to rejection, assumption and assignment of contracts, cure reserves and indemnity escrow accounts (collectively, the "Tenet Sale Orders").

Nothing in the Disclosure Statement or the Plan shall alter, amend or supersede (1) that certain settlement agreement dated as of June 30, 1999 among certain of the Non-Debtor Entities, the Debtors, the Chapter 11 Trustee, the Creditors' Committee and the Healthcare Alliance for Western Pennsylvania, Inc. (the "West Penn Settlement Agreement") and any related agreements including, inter alia, that certain Pension Obligation and Release Agreement dated as of June 30, 1999 among the Pension Benefit Guaranty Corporation ("PBGC"), certain of the Non-Debtor Entities, the Chapter 11 Trustee, the Debtors, the Creditors' Committee, the Healthcare Alliance for Western Pennsylvania, Inc. and the Western Pennsylvania Health System (collectively, "West Penn") (the "PBGC Settlement Agreement") or (2) the order dated July 23, 1999 approving the West Penn Settlement Agreement and the PBGC Settlement Agreement (the "West Penn Orders").

The Tenet Agreements, the Tenet Sale Orders, the West Penn Settlement Agreement, the PBGC Settlement Agreement and the West Penn Orders shall continue to remain in full force and effect and shall govern the rights and liabilities of the Chapter 11 Trustee, the Debtors' Estates, the Creditors' Committee, Liquidating AHERF, Tenet, PHEC, Philadelphia Health Research Corporation, those Non-Debtor Entities party to the West Penn Settlement Agreement and the PBGC Settlement Agreement, West Penn and the PBGC with respect to the rights and obligations of such

parties arising thereunder or related thereto, including, but not limited to, the maintenance of segregated escrow accounts with respect to the Tenet indemnity escrow and/or the cure reserves.

11. Retiree Benefits.

Under the Plan, payment of any Retiree Benefits shall be continued solely to the extent, if any, and for the duration of the period the Debtors are contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtors under applicable law. The Chapter 11 Trustee is not aware of any continuing obligations to provide Retiree Benefits.

12. Compensation and Benefit Programs.

Except as otherwise provided in the Plan, all employment and severance practices and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their directors, officers or employees, including, without limitation, all savings plans, retirement plans, health care plans, severance benefit plans, incentive plans, workers' compensation programs and life, disability and other insurance plans are treated either as executory contracts pursuant to Section 9.1 of the Plan, or as permitted under applicable non-bankruptcy law.

13. Bankruptcy Officers.

As of the Effective Date, the Debtors and Liquidating AHERF (as successor to the Debtors) shall assume all obligations related to Indemnification Claims of Bankruptcy Officers consistent with the Bankruptcy Officer Indemnification Order.

14. Post-Confirmation Fees, Final Decree.

The Plan provides that Liquidating AHERF shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C.§ 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered. A final decree shall be entered as soon as practicable after initial distributions have commenced under this Plan.

15. Reservation of Rights.

Notwithstanding any language in the Plan or the Confirmation Order to the contrary, MBIA, PNC and the Centennial Indenture Trustee on behalf of the Centennial Bondholders reserve all of their rights and Claims against any Person or entity which is not a Debtor, the Chapter 11 Trustee, Liquidating AHERF, the Creditors' Committee or their respective Professionals and the Allowed amount of Claims hereunder shall be binding only with respect to the treatment afforded to MBIA, PNC and the Centennial Bondholders pursuant to the terms of the Plan and shall not be binding on MBIA, PNC or the Centennial Indenture Trustee on behalf of the Centennial Bondholders in connection with any Claim against any Person or entity other than the Debtors, the Chapter 11 Trustee, the Creditors' Committee, Liquidating AHERF and their Professionals. The Plan does not create, and shall not be construed as creating, any rights enforceable by any Person against MBIA, PNC, the DVOG Master Indenture Trustee, the DVOG Series Bond Indenture Trustee, the Centennial Bondholders or the Centennial Indenture Trustee other than the Debtors, the Chapter 11 Trustee, the Creditors' Committee, and Liquidating AHERF.

## F.  PROVISIONS REGARDING CONDITIONS PRECEDENT TO EFFECTIVE DATE AND EFFECTS OF CONFIRMATION

1.  Conditions to Effectiveness.

The Plan shall not become effective unless and until the following conditions and the conditions set forth in Section 11.3 of the Plan shall have been satisfied or waived pursuant to Section 11.2 of the Plan or Section 11.3 (as to the condition therein):

(a)     none of the material Recovery Actions shall have been settled, compromised or discontinued unless at the direction of the Creditors' Committee;

(b)     the Confirmation Order, in form and substance reasonably acceptable to the Chapter 11 Trustee and the Creditors' Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(c)     each of the Plan Documents, in form and substance reasonably acceptable to the Chapter 11 Trustee and the Creditors' Committees, shall have been effected or executed and delivered;

(d)     all actions, other documents and agreements necessary to implement the Plan shall have been effected or executed and delivered;

(e)     the Estates shall have sufficient Cash to meet all Cash funding obligations under the Plan and to make all payments required to be made on the Effective Date, including without limitation, sufficient Cash, as determined by the Creditors' Committee, to establish the Liquidation Expense Reserve Account to prosecute the Recovery Actions; provided, however, that an amount of at least $30 million shall be deemed sufficient for such purposes as of the Effective Date and the appropriate amount for such purposes thereafter shall be determined by the Creditors' Committee in accordance with the Liquidating AHERF Bylaws.

2.  Waiver of Conditions.

Upon the written consent, which consent shall not be unreasonably withheld, of each of the Chapter 11 Trustee, MBIA, PNC, the Centennial Indenture Trustee and the Creditors' Committee, filed by the Chapter 11 Trustee with the Bankruptcy Court, one or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.1 above may be waived, except that the parties may not waive the condition that the Estates will have sufficient Cash to meet all payment and funding obligations under Articles 3 and 5 and Section 6.9 of the Plan upon the occurrence of the Effective Date.

3.  Deadline for Effective Date.

In the event that the Effective Date has not occurred on or prior to December 15, 2000, unless such deadline is waived in writing by the Chapter 11 Trustee, the Creditors' Committee, MBIA, PNC and the Centennial Indenture Trustee, upon notification thereof submitted by the Chapter 11 Trustee to the Bankruptcy Court (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Estates and all Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred

and all obligations of the Estates to holders of Claims shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estates or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

    4.   Continuation of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

    5.   General Release of Liens.

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the payments and distributions to be made on the Effective Date, all mortgages, deeds of trust, liens or other security interests against property of the Estates are hereby released and extinguished, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests will revert to Liquidating AHERF as successor of the Debtors.

    6.   Full and Final Satisfaction.

All payments and all distributions hereunder and under the Plan Documents shall be in full and final satisfaction, settlement, release and discharge of all Claims, except as otherwise provided in the Plan.

    7.   Administration Pending Effective Date.

Prior to the Effective Date, the Chapter 11 Trustee shall continue to administer the liquidation of the Estates and the Chapter 11 Trustee and the Creditors' Committee shall continue to prosecute the Recovery Actions, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules, except as provided in Section 3.2(b) of the Plan.

    8.   Setoffs.

Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Estates of any rights of setoff the Estates may have against any Person.

**G.  Corporate Action**

    1.   Effectuating Documents and Further Transactions.

Each of the Debtors, the Creditors' Committee, the Chapter 11 Trustee, and Liquidating AHERF, as the case may be, is authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

    2.   Corporate Action.

Pursuant to 15 Pa. Con. Stat. Ann. § 5903, all terms of the Plan may be put into effect and carried out without further action by the Chapter 11 Trustee or the members, boards of trustees or

directors of the Debtors, who shall be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated therein.

3. <u>Dissolution of the Debtors other than AHERF.</u>

Pursuant to 15 Pa. Con. Stat. Ann. § 5903, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause the Debtors to dissolve, merge or otherwise consolidate, each pursuant to applicable state law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

4. <u>Dissolution and Consolidation of Subsidiaries.</u>

The Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause the Subsidiaries to dissolve, merge or otherwise consolidate the Subsidiaries, each pursuant to applicable state law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

5. <u>Dissolution of Liquidating AHERF.</u>

Pursuant to 15 Pa. Con. Stat. Ann. §5903, upon completion of all obligations under the Plan and the distribution of all Estate Assets, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, shall cause Liquidating AHERF to dissolve pursuant to applicable state law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

6. <u>Dissolution or Insolvency Proceeding of AHSPIC.</u>

Pursuant to 15 Pa. Con. Stat. Ann. § 5903, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause AHSPIC to dissolve, merge or file for insolvency protection or the appointment of a receivor, pursuant to applicable law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**H. Post-Confirmation Administration**

1. <u>Continuation of Creditors' Committee.</u>

On the Effective Date, the Creditors' Committee shall, among other things, continue to act as plaintiff in the Recovery Actions, pursuant to Section 1123(3)(B) of the Bankruptcy Code, to which it is a party, and to fulfil its other obligations under the Plan, as a five member committee consisting of one representative of each of MBIA, PNC, the Centennial Indenture Trustee, Aetna US Healthcare, Inc. and Health America. The other four members of the original nine member Creditors' Committee have either merged their business with another member of the Creditors' Committee, or have made a business decision to no longer participate as a member of the Creditors' Committee.

2. <u>Continuation of Chapter 11 Trustee.</u>

On the Effective Date, the Chapter 11 Trustee shall, among other things, continue to act as plaintiff in the Recovery Actions, pursuant to Section 1123(3)(B) of the Bankruptcy Code, to which he is a party and to fulfill his other obligations under the Plan and shall be appointed as sole trustee

and chief liquidating officer of Liquidating AHERF, subject in all respects to the supervision of the Creditors' Committee and the provisions of the Plan.

    3. <u>Post-Confirmation Compensation for Bankruptcy Officers</u>.

    Prior to the confirmation hearing, the Chapter 11 Trustee will submit to the Bankruptcy Court an agreement with the Creditors' Committee setting forth, among other things, the compensation to be paid to the Bankruptcy Officers for post-Effective Date services provided to Liquidating AHERF.

**VI.**

**ACCEPTANCE AND CONFIRMATION OF THE PLAN**

    The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and confirmation of a plan of reorganization. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

**A. Acceptance of the Plan**

    This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the allowed Claims of that class that have actually voted or are deemed to have voted to accept or reject a plan.

    If one or more impaired Classes rejects the Plan, the Chapter 11 Trustee may, in his discretion, nevertheless seek confirmation of the Plan if the Chapter 11 Trustee believes that he will be able to meet the requirements of Section 1129(b) of the Bankruptcy Code for confirmation of the Plan (which are set forth below), despite lack of acceptance by all impaired classes. Also, in the event the Bankruptcy Court should determine that the Plan as presently constituted is not confirmable, the Chapter 11 Trustee reserves the right to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

**B. Confirmation**

    1. <u>Confirmation Hearing</u>.

    Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing of the Plan has been provided to all known holders of Claims or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

    Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be filed and served as required pursuant to the Disclosure Statement Approval Order.

2. Statutory Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Chapter 11 Trustee will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If so, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)     The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)     The Chapter 11 Trustee must have complied with the applicable provisions of the Bankruptcy Code;

(c)     The Plan must have been proposed in good faith and not by any means forbidden by law;

(d)     Any payment made or promised to be made by the Chapter 11 Trustee under the Plan for services or for costs and expenses in, or in connection with, these Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Chapter 11 of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)     The Chapter 11 Trustee must have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of each of the successors of the Debtors under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and equity interests and with public policy, and the Chapter 11 Trustee must have disclosed the identity of any insider that the Debtors' successors will employ or retain, and the nature of any compensation for such insider;

(f)     Best Interests of Creditors Test. Notwithstanding acceptance of the Plan by creditors, the Bankruptcy Court must find, whether or not anyone objects to confirmation, that the Plan is in the "best interests" of the creditors. Courts have defined "best interests" as the Bankruptcy Code's requirement that under any plan of reorganization, each member of an impaired Class must receive property with a present value at least equal to the present value of the distribution each creditor would have received if the Debtors were liquidated in respective Chapter 7 cases.

THE CHAPTER 11 TRUSTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the Chapter 7 liquidation value of each Debtor. In determining "best interests," the value of the assets must then be reduced by the costs of liquidation under Chapter 7 of the Bankruptcy Code, including costs incurred during the Chapter 11 cases and allowed in Chapter 7 (such as professionals' fees and expenses), costs incurred by a trustee in liquidating claims which would have been settled under the Plan, a trustee's fees and the fees and expenses of professionals retained by a trustee. The present value of the potential Chapter 7 liquidation distribution to each Class would also have to be reduced by the costs of additional delay caused by conversion to Chapter

7. Once the net present value of a Chapter 7 distribution to an impaired Class is calculated, it would then be compared to the distribution provided for that Class in the Plan.

(g)    Each Class of Claims has either accepted the Plan or is not impaired under the Plan;

(h)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense and Priority Tax Claims will be paid in full on the Effective Date;

(i)    At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class;

(j)    Feasibility.  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan.

   3.   Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class.  If any impaired classes reject or are deemed to have rejected the Plan, the Debtors reserve their right to seek the application of the statutory requirements set forth in Section 1129(b) of the Bankruptcy Code for confirmation of the Plan despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured Claims includes the requirements that (a) the holders of such secured Claims retain the liens securing such Claims to the extent of the allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (b) each holder of a secured Claim in the class receive deferred cash payments totaling at least the allowed amount of such Claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured Claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such Claim or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

## VII.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following summary addresses certain material federal income tax consequences of the Plan to the Debtors and to holders of Claims (the "Holders"). The summary is based upon the Chapter 11 Trustee's interpretation of provisions of the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial authority, and current Internal Revenue Service ("IRS") administrative rulings and practice, all of which are subject to change (possibly with retroactive effect), which could significantly affect the federal income tax consequences discussed below.

The Chapter 11 Trustee's interpretation of the federal income tax consequences is not binding on the IRS, and the Chapter 11 Trustee has not and does not intend to request a ruling from the IRS with respect to any of the federal income tax aspects of the Plan, and no opinion of counsel has been or will be requested or obtained by the Chapter 11 Trustee with respect to any tax aspects of the Plan. Thus, there can be no assurance that the IRS will not take a different position concerning the consequences of the Plan and that any such position will not be sustained. In addition, this summary does not discuss any aspects of state, local, or foreign tax laws, and this summary does not purport to set forth all aspects of federal income taxation that may be relevant to certain types of holders of Claims (e.g., broker-dealers, mutual funds, regulated investment companies, banks, insurance companies, tax-exempt organizations, investors in pass-through entities, and foreign persons).

**THE FOLLOWING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL, FOREIGN, AND OTHER TAX LAWS.**

### A. Federal Income Tax Consequences to the Debtors

The Debtors are classified as exempt organizations under Section 501(c)(3) of the Code and as such, are not subject to tax on any income arising from activities that are conducted in accordance with their exempt purposes. The activities conducted pursuant to the Plan, including the prosecution of the Recovery Actions, should be treated as activities conducted in accordance with the Debtors' exempt purposes and income, if any, arising from the conduct of such activities and should not be subject to tax and should not jeopardize the Debtors' status as exempt organizations under Section 501(c)(3) of the Code. The Internal Revenue Service concluded in General Counsel Memorandum 39562 (October 8, 1986) that payments to a Section 501(c)(3) organization's creditors of debts reasonably incurred in carrying out an organization's charitable purposes, whether on time or late, was a charitable purpose of the organization and would not jeopardize the organization's tax-exempt status.

Accordingly, the filing of the Chapter 11 Cases, the subsequent winding down of the Debtors' Estates, the distribution of Cash to the Holders pursuant to the Plan, and all activities conducted by Liquidating AHERF pursuant to the Plan, including the prosecution of the Recovery

Actions, should not affect the Debtors' status as exempt organizations under Section 501(c)(3) of the Code. Furthermore, because the Debtors should maintain their status as exempt organizations under Section 501(c)(3) of the Code, any proceeds obtained by Liquidating AHERF as a result of the prosecution of the Recovery Actions should not be subject to taxation.

**B. Federal Income Tax Consequences to Holders**

The federal income tax consequences to a Holder receiving, or entitled to receive, a distribution under the Plan in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the Holder's method of accounting, and its own particular tax situation. Because the Holder's Claims and tax situations differ, Holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

A Holder receiving a distribution under the Plan in satisfaction of its Claim generally will recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis will include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Holder's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a Holder had claimed an ordinary bad debt deduction for the worthlessness of its Claim in whole or in part in a prior taxable year, any income realized by the Holder as a result of receiving a distribution under the Plan may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Holder's hands.

The federal income tax consequences of a distribution under the Plan to a Holder may depend initially upon, among other things, the nature of the original transaction pursuant to which the Claim arose. For example, a Distribution in repayment of the principal amount of a loan is generally not included in the Holder's gross income.

The federal income tax consequences of a distribution under the Plan to a Holder will also depend on whether the item to which the distribution relates has previously been included in the Holder's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the Holder's trade or business, and the Holder had previously included the amount of such receivable distribution in its gross income under its method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Holder but may, as discussed below, result in a loss. Conversely, if the Holder had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Holder generally would be required to include the amount of the distribution in income.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. ALL CREDITORS ARE STRONGLY URGED TO CONSULT**

WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

## VIII.

## RISK FACTORS

HOLDERS OF CLAIMS AND ALL OTHER IMPAIRED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

### A. Risks of Litigation

No assurances can be given as to the outcome of any Recovery Actions or other Causes of Action being pursued by the Chapter 11 Trustee or the Creditors' Committee. Each Recovery Action requires the Chapter 11 Trustee and the Creditors' Committee, as plaintiffs, to satisfy a certain burden of proof that the defendants are liable for the acts alleged in the complaint giving rise to the liability alleged in the complaint.

No assurances can be given as to when, if ever, the Chapter 11 Trustee or the Creditors' Committee will make recoveries from the Recovery Action. The pursuit of the Recovery Actions is time-consuming, potentially involving months of discovery, dispositive motions, a trial and then appeals. As a result, it may be several years until a Final Order is entered with respect to any of the Recovery Actions.

Pursuing the Recovery Actions will also be costly, as is all litigation involving sophisticated parties. Notwithstanding the uncertainty as to the outcome, and the time and expense of pursuing the Recovery Actions, the Chapter 11 Trustee's and the Creditors' Committee's professionals will continue to pursue the Recovery Actions. The ongoing retention of respective counsel to the Chapter 11 Trustee and the Creditors' Committee to prosecute the Recovery Actions is not dependent on, nor will the cessation of services be subject to, any requisite level of funds in the Liquidation Expense Reserve Account.

### B. Insurance Coverage

A discussion of the insurance coverage available for the Recovery Actions is provided in Section III(E) of the Disclosure Statement. However, as described above in Section IV(B)(2), the Chapter 11 Trustee has been litigating with its insurers about insurance coverage for the Recovery Actions since March 1998. Because of the general risks involved in litigation, and because of the risks involved with respect to the effects of various potential rulings by the Bankruptcy Court or an appeal thereof, the ultimate value of the Executive Protection Policies for the Recovery Actions is uncertain. Resolution of various issues will affect the value of the Executive Protection Policies available to the Estates, including but not limited to: whether the insurers can rescind the Executive Protection Policies, the costs of defense by the various executives, and various other legal and factual issues that carriers have raised as defenses to their obligation to pay for the wrongdoing of the former AHERF executives.

## C. Liquidation of Claims

As of the date hereof, certain Claims asserted against the Debtors remain unresolved, including the $8.3 million administrative expense claim being asserted by Steadfast. There can be no assurance that any or all of these or other Disputed Claims can be liquidated or otherwise resolved without protracted and costly litigation, or that the outcome will be favorable to the Estates. As a result, assets may be diminished by litigating such Claims, thereby reducing such funds available for distribution to holders of Allowed Claims.

Additionally, if the aggregate amount of Allowed Claims in any Class exceeds the Chapter 11 Trustee's present estimate of such Allowed Claims, the recovery obtained by holders of Allowed Claims in such Class will be adversely affected.

## D. Certain Bankruptcy Related Considerations

### 1. Risk of Non-Confirmation of the Plan.

Although the Chapter 11 Trustee believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for confirmation of the Plan, that such negotiations would not adversely affect the holders of Claims or that such modifications would not necessitate the resolicitation of votes.

### 2. Nonconsensual Confirmation.

In the event any impaired class of Claims does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of reorganization, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes. In the event that any class votes to reject the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Chapter 11 Trustee reserves the right to request nonconsensual confirmation of the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

## IX.

## ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following (1) an alternative plan could be proposed or confirmed or (2) the Chapter 11 Cases could be converted to liquidation cases under Chapter 7 of the Bankruptcy Code.

## A. Alternative Plans

As previously mentioned, with respect to an alternative plan, the Chapter 11 Trustee and his professional advisors have explored various alternative scenarios and believe that the Plan enables holders of Claims to realize the maximum recovery under the circumstances. The Chapter 11 Trustee believes the Plan is the best plan that can be proposed and serves the best interests of the Debtors' creditors and other parties-in-interest.

## B. Chapter 7 Liquidation

If no plan of reorganization for the Debtors can be confirmed, each of the Chapter 11 Cases may be converted to Chapter 7 of the Bankruptcy Code, in which event a single trustee for all Debtors or multiple trustees for each or for groups of Debtors would be elected or appointed to liquidate the assets of each Estates. No assurance can be given with respect to whether the Debtors would be substantively consolidated on any basis.

If a Chapter 7 conversion resulted in individual Chapter 7 cases for each Debtor, the unsecured creditors of each Debtor would not receive any payment whatsoever until all amounts due to more senior classes, including the following, were paid or reserved in full: (a) secured creditors (to the extent of the value of their collateral), (b) Chapter 7 administrative expense creditors, (c) Chapter 11 administrative expense creditors and (d) all other priority creditors.

The Chapter 11 Trustee believes that a Chapter 7 liquidation would result in substantially reduced recoveries -- at a much later point in time -- than the recoveries creditors are expected to receive pursuant to the Plan. Substantial administrative expenses would result from the appointment of a Chapter 7 trustee or trustees and additional professionals. Additional expenses and Claims, some of which would be entitled to priority, would be generated in connection with a resolution of all outstanding Claims, issues and matters that will be addressed during the Cases and are resolved under the Plan. The Chapter 7 trustee or trustees might be required to determine, or to seek a determination, as to each Debtors' allocable interest in assets and liabilities the Estates. The pre-petition inter-company claims that would likely be asserted by each Estate against the others would likely be substantial. Furthermore, it would be inefficient for a Chapter 7 trustee to begin pursuing the Recovery Actions at this time after the Chapter 11 Trustee and the Creditors' Committee have expended considerable resources conducting discovery and filing lawsuits against such persons responsible for the AHERF System's financial demise.

## X.

## RECOMMENDATION AND CONCLUSION

The Chapter 11 Trustee and his professional advisors have analyzed different scenarios and believe that the Plan will provide for a greater distribution to holders of Claims than would otherwise result if an alternative restructuring plan were proposed or the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller distributions to the holders of Claims. Accordingly, the Chapter 11 Trustee urges all holders

of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than the Voting Deadline.

[INTENTIONAL END OF PAGE]

Dated:    Pittsburgh, Pennsylvania
          August 15, 2000

ALLEGHENY HEALTH, EDUCATION AND
RESEARCH FOUNDATION

By: _____
      WILLIAM J. SCHARFFENBERGER
      CHAPTER 11 TRUSTEE

ALLEGHENY UNIVERSITY OF THE HEALTH
SCIENCES

By: _____
      WILLIAM J. SCHARFFENBERGER
      CHAPTER 11 TRUSTEE

ALLEGHENY UNIVERSITY MEDICAL PRACTICES

By: _____
      WILLIAM J. SCHARFFENBERGER
      CHAPTER 11 TRUSTEE

ALLEGHENY HOSPITALS, CENTENNIAL

By: _____
      WILLIAM J. SCHARFFENBERGER
      CHAPTER 11 TRUSTEE

ALLEGHENY UNIVERSITY HOSPITALS - EAST

By: _____
      WILLIAM J. SCHARFFENBERGER
      CHAPTER 11 TRUSTEE

**PROSKAUER ROSE LLP**

By: _____
Alan B. Hyman (AH 6655)
A Member of the Firm
1585 Broadway
New York, New York 10036
(212) 969-3000

-and-

**SABLE, PUSATERI, ROSEN, GORDON & ADAMS, LLC**
Robert G. Sable (PA 00964)
Frick Building, 7th Floor
Pittsburgh, PA 15219
(412) 471-4996

Co-Counsel to William J. Scharffenberger, Chapter 11 Trustee of the Debtors

# COMMITTEE APPENDIX

## Tab 16

9‑3‑ 574

Microfilm Number _____    Filed with the Department of State on _____    OCT 0 9 1996

Entity Number 1564885    _____

Secretary of the Commonwealth

# ARTICLES OF MERGER - DOMESTIC NONPROFIT CORPORATION
## (DSCB: 15-5926)

In compliance with the requirements of 15 Pa. C.S. § 5926 (relating to articles of merger or consolidation), the undersigned nonprofit corporations, desiring to effect a merger, hereby state that:

1.    The name of the corporation surviving the merger is: SDN, Inc.

2.    The surviving corporation is a domestic nonprofit corporation and the address of its current (a) registered office in this Commonwealth  and the county of venue is (the Department is hereby authorized to correct the following address to conform to the records of the Department):

        SDN, Inc.
        100 West Laurel Avenue
        Cheltenham, PA 19012

            ATTENTION:  Legal Department

3.    The name and address of the registered office of each other domestic nonprofit corporation and qualified foreign nonprofit corporation which is a party to the plan of merger are as follows:

        The Fifth and Reed Hospital, d/b/a Mt. Sinai Hospital
        Fourth and Reed Streets
        Philadelphia, PA 19147

            ATTENTION:  Legal Department

4.    (Check, and if appropriate complete, one of the following):

        ____ The plan of merger shall be effective upon filing these Articles of Merger in the Department of State.

        XX The plan of merger shall be effective on October 31, 1996 at 11:59 PM.

DVR:45768.1

DSCB: 15- 5926

5.    The manner in which the plan of merger was adopted by each domestic corporation is as follows:

Name of Corporation

The Fifth and Reed Hospital,
d/b/a Mt. Sinai Hospital

SDN, Inc.

Manner of Adoption

Pursuant to 15 Pa. C.S.A. §5924(a)

Pursuant to 15 Pa. C.S.A. §5924(b)

6.    ~~(Strike out this paragraph if no foreign corporation is a party to the merger). The plan was authorized, adopted or approved, as the case may be, by the foreign nonprofit corporation (or each of the foreign nonprofit corporations) party to the plan in accordance with the laws of the jurisdiction in which it is incorporated.~~

7.    The plan of merger is set forth in full in Exhibit "A" attached hereto and made a part hereof.

IN WITNESS WHEREOF, each of the undersigned corporations has caused these Articles of Merger to be signed by a duly authorized officer thereof this 8th day of October, 1996.

THE FIFTH AND REED HOSPITAL, d/b/a MT. SINAI HOSPITAL

By:  Robert Mathews
Title: Prresident

SDN, INC.

By:  Donald Kaye, M.D.
Title: Vice Chairman and Chief Executive Officer

RMMcN
10/06/96

DVR:45768.1                                2

9/-9- 576

EXHIBIT " A"

to

Articles of Merger

## AGREEMENT AND PLAN OF MERGER

by and between

### THE FIFTH AND REED HOSPITAL
(a Pennsylvania nonprofit corporation)

and

### SDN, INC.
(a Pennsylvania nonprofit corporation)

AGREEMENT AND PLAN OF MERGER, dated as of  October 4,  1996 (the "Agreement"), by and between The Fifth and Reed Hospital, a Pennsylvania nonprofit corporation ("Merging Corporation"), and SDN, Inc.,  a Pennsylvania nonprofit corporation ("Surviving Corporation") (both hereinafter collectively referred to as the "Constituent Corporations").

<u>BACKGROUND</u>

Each of the Constituent Corporations is duly organized and validly existing under the laws of the Commonwealth of Pennsylvania.   Graduate Health System, Inc., a Pennsylvania  nonprofit corporation, is  the sole Member of the Merging Corporation.  SDN, Inc. is a non-membership corporation.

This Agreement has been approved and duly adopted by each of the Boards of Trustees of the

DVR:45473.1

Exhibit "A"

Constituent Corporations and by Graduate Health System, Inc. as the sole Member of the Merging Corporation .

The parties are entering into this Agreement in order to set forth the terms and conditions of the merger of Merging Corporation with and into Surviving Corporation (the "Merger"), the mode of carrying the same into effect, and such other details and provisions as are deemed desirable.

NOW, THEREFORE, in consideration of the premises, covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

1.1    Merger of Merging Corporation into Surviving Corporation : In accordance with the provisions of this Agreement and the Pennsylvania Nonprofit Corporation Law of 1988, as amended (the "Nonprofit Law"), at the Effective Time (as hereinafter defined),Merging Corporation shall be merged with and into the Surviving Corporation which shall be the surviving corporation. After the Effective Time, the Surviving Corporation shall continue its corporate existence as a Pennsylvania nonprofit corporation.

1.2    Effect of the Merger:    At the Effective Time, the separate existence of the Merging Corporation shall cease and the Surviving Corporation shall succeed, by operation of law and without other transfer (all as provided by applicable provisions of the Nonprofit Law), to all rights, property and assets of the Merging Corporation in existence as of or accruing from prior to the Effective Time and shall be subject to all debts and liabilities of the Merging Corporation in existence as of or accruing from prior to the Effective Time in the same manner as if the Surviving Corporation had itself incurred such debts and liabilities. All rights of creditors and all liens upon the property of each of the Constituent Corporations shall be preserved unimpaired against the Surviving Corporation and its property.

DVR:45473.1

Exhibit "A"
2

9(7)- 578

## ARTICLE II

2.1 Effective Date: The Merger shall become effective at 11:59 P. M., Eastern Time on the later of the following dates: (a) October 31, 1996; or (b) the date of filing of this Plan and Agreement of Merger along with the Articles of Merger in the Pennsylvania Department of State. The date and time when the Merger becomes effective shall be the "Effective Time" referred to in this Agreement.

## ARTICLE III

3.1 Articles of Incorporation: At and after the Effective Time, the Articles of Incorporation of the Surviving Corporation shall be the Articles of Incorporation of the Surviving Corporation in effect as of the Effective Time, as they may be amended or restated subsequent to the Effective Time.

3.2 Trustees: The Trustees of the Surviving Corporation in office immediately prior to the Effective Time shall continue after the Effective Time as the trustees of the Surviving Corporation.

3.3 Members: The Surviving Corporation shall have no members from and after the Effective Date.

## ARTICLE IV

4.1 Termination: This Agreement may be terminated and the Merger abandoned without further obligation at any time prior to the filing of Articles of Merger in the Pennsylvania Department of State upon unilateral action of the Board of Trustees of the Surviving Corporation.

96 - 579

4.2    Counterparts:  This Agreement may be executed in two counterparts, each of which shall be deemed to be an original, but which together shall constitute a single agreement.

4.3    Governing Law:  This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the Commonwealth of Pennsylvania.

IN WITNESS WHEREOF, each of the Constituent Corporations has caused this Agreement to be executed as of the day and year first above written.

ATTEST:                                THE FIFTH AND REED HOSPITAL


*Elizabeth Cheng*                      By: _____

ATTEST:                                SDN, INC,


_____               By: *Donald Kaze* _____

RMMcN
10/01/96