DBR-CG-001700

Paul:

DBR-CG-001701

#3 palm

palm

3

1920s

5-10

114

100

fast 116 117

26

entities

DBR-CG-001703



DBR-CG-001704

REDACTED

*[handwritten notes — illegible]*

REDACTED

Joe: [illegible]

hre: [illegible]

ams [illegible] 87 [illegible] 60 [illegible] forbes [illegible] av [illegible] 27 mil [illegible] aherf.

[illegible] 26 [illegible] 92 [illegible] 98.

[illegible] residual [illegible]

[illegible] # [illegible]

[illegible] 96 agh [illegible]

[illegible] recipeans [illegible]

[illegible] agh [illegible]

[illegible] 18.5 [illegible]

DBR-CG-001706

DBR-CG-001707

REDACTED

[illegible]

[illegible]

DBR-CG-001708

DBR-CG-001709

REDACTED

DBR-CG-001710

REDACTED

DBR-CG-001711

DBR-CG-001712

DBR-CG-001713

REDACTED

REDACTED

Powar

[illegible]

REDACTED

Powar

[illegible]

REDACTED

[illegible]

Sanyo

DBR-CG-001715

(b) (9 candid [illegible]

[illegible] 90 [illegible]

[illegible]

REDACTED

6: [illegible]

[illegible] 97 [illegible]

[illegible] 1985 [illegible]

[illegible]

REDACTED

DBR-CG-001716

[illegible] 98 [illegible]

palm [illegible]

[illegible] re Lockhart [illegible] juiced [illegible]

upp [illegible] focus [illegible] Lock [illegible] focus [illegible]

[illegible] 98 [illegible]

[illegible] 98 [illegible]

[illegible] table [illegible]

DBR-CG-001717

[illegible]

REDACTED

DBR-CG-001718

Korbele

lock

Dow

media

REDACTED

DBR-CG-001719

REDACTED

DBR-CG-001720

[illegible]

REDACTED

DBR-CG-001722

DBR-CG-001721

REDACTED

[illegible]

REDACTED

DBR-CG-001723



REDACTED

DBR-CG-001724

REDACTED

[illegible]

REDACTED

REDACTED

REDACTED

DBR-CG-001726

**REDACTED**

DBR-CG-001727

REDACTED

DBR-CG-001728

palm

REDACTED

nose

expedience

adversarial

DBR-CG-001729

REDACTED

[illegible]

DBR-CG-001730

REDACTED

REDACTED

DBR-CG-001731

**REDACTED**

*[handwritten shorthand notes — illegible]*

**REDACTED**

DBR-CG-001732

Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee, September 1, 1998

NOTE from transcriptionist:

( ) means I did not write anything in that spot at the meeting.

__________ means I cannot read it now.

____?____ means I do not know who said it.

Meeting began 7:03 a.m. Continuation of meeting of last Thursday, August 28.

III. A. Summary of Discussions

Barnes: Last week, Harry Edelman was concerned because he wasn't sure that the statements made were correct. He agrees, they were not correct, but we recorded what was said and not to verify that what was said was correct. Minutes approved.

Edelman: Question: Were we talking about the updated status of intercompany borrowings in IV. A? Would like to have update today as to where that process stands because I thought we had agreed that we would put that into place. The way this is worded, it says that process was removed. Don't have to solve it now but would like to see it reinstated.

Barnes: Process was deferred. Issue was in terms of getting a group of people to meet to write out procedures. Since we are repaying loans, we are doing more important things, and why don't we defer it since we are repaying loans. Now we can't make loans.

Sanzo: I agree with Mr. Edelman - it may not be the most important thing, but there still may be the possibility of intercompany loans among the non-filed entities, and we should do it.

Barnes: Okay, we will get moving on it.

Palmer: In IV. C. In the area of Information Services, we know the future is very unsure and some of this may be irrelevant of the debtor organization, and I am very concerned about the ability of this company in the field of Information Services and when in July I read the management letter of Coopers and they were critical of some of our Information Services, is that something that we should now be very concerned about or are we making an assumption that the organization will

be in the driver's seat going forward and Finance and Audit needs to dwell on?

Dionisio: As I recall that management report, I think their primary area of concern was respect to Information Services that were not under the management or control of the Information Services department. That was a concern then and it continues to be a concern. One of the items this Committee had addressed is our preparedness for the Year 2K. We agreed we would prepare a status report on this issue. Given the subject at hand today, my understanding is that we would make that a priority for the next Finance and Audit Committee meeting. I have a new status report, and I could distribute it to the members tomorrow and have a discussion at our next meeting. What is our responsibility going to be going forward for Information Services? Right now, our activities as it relates to the Eastern Region are to continue to make progress toward Y2K compliance, but at best we are in a maintenance mode in the East because of Information Services, and the tremendous turnover and our inability to recruit people. The other major activity is developing transition plans with Vanguard and Tenet, both of whom want to take over responsibility for Information Services as close to the closing date as practical. Tenet - right away, Vanguard - there may be some months of transition.

Palmer: This is a critical matter, but since we are still the AHERF Finance and Audit, and I presume our responsibility is to all of the entities. Who is looking after the whole range of system issues and the report says we haven't performed in that area in several years, not just the Y2000. Someone will be managing AHERF in the West going forward, and we are the AHERF Committee, not just the debtor Committee, but I think there is a broader question that just the Y2K. This organization said it is getting better, and none of us really yelled as we should have.

Dionisio: We have converted all the systems in the Delaware Valley to the SMS Invision product, and all the core systems in the Delaware valley are Y2K compliant, and with respect to the Invision they are not. Major exception would be at Hahnemann where the decision was made to suspend any further development when the Hunter Group came in and in the Delaware Valley that is where we have the greatest risk. In the case of the Western Region, we are proceeding with conversion plans to convert from Medipac to Invision at Forbes and Allegheny Valley, and both AGH and Forbes are in the process of reinitiating that project on their own without AHERF. I haven't read that management report from Coopers & Lybrand, but I had a different read as it relates to Information Services. I thought they were talking about making systems progress in Information Services with the exception of distributed systems.

Barnes: Why don't we let Joe send his current report out to the Committee members, and we still need to function and get back to regular issues. We should schedule a meeting toward the latter part of September, and with that report in hand we can discuss the subject. There are legitimate questions from the old meetings, and we will look into this at the next meeting.

Palmer: We need to remember that there may be an ongoing organization that will need good systems work.

Gumberg: In listening to Bob Palmer, and I am very much in agreement with his concerns - but one point he mentioned is that AGH would be in bankruptcy. What do you mean by that? What is your reason for the statement?

Palmer: While I don't have the data to document it, your Finance Department may be pressed to pay more bills than necessary. Secondarily, I have the feeling that the Creditors' Committee for the East will understand the consolidated style of this organization over several years, for example, the decision at the AHERF level to get a consolidated audit because we knew the finances were run on a consolidated basis, and if I was a creditor, I would go after the West because that is where the money is and I can show the finance decisions for this organization were dictated out of the West, and I generally feel for the West, but I think it is going to be drawn into the bankruptcy and wished it had come in originally.

Gumberg: What would be the difference in coming in originally and coming in in a couple of months?

Palmer: There is a protection factor in bankruptcy, and the West may wish they would have gotten that protection in July rather than November.

Gumberg:

Powar:

REDACTED

Gumberg:

Powar:

IV. A. Other Matters

Dionisio: Last week, I indicated as a result of questions by board members, our senior management, and creditors and other information that has come to my attention, it appears to me, based on inquiries we have made including consolidations with PriceWaterhouse, particularly because of presentation of the Fiscal Year 1997 financial statements on a consolidated basis and some of the accounting decisions that were made in consideration of the consolidated financial statements, it is my judgment that restatement or revision of the FY 97 financial statements are required. Would like to share with the Committee how we use these terms. When we speak in terms of restating or revising the prior year financial statements, we don't necessarily mean we would go through a process of making changes and redistributing them. We are talking about in connection with the preparation of current financial statements, FY 98 to the extent that there are changes necessary to prior year statements, those revisions would be made in the current year financial statements. For example, if you changed a balance sheet account, you would make that change in the 1998 financial statements and make a full disclosure of the change and reason for change. We are not reissuing FY97 statements. If we agree that revisions are necessary and we are obligated to advise potential users that they shouldn't be relied upon. PriceWaterhouse also has a professional obligation whereby if, in their opinion, they believe the financial statements shouldn't be relied upon, they have an obligation to notify users that they shouldn't be relied upon.

Page 2 of outline and talk about four issues: 1. (Joe read No. 1). The $16 million is made up of two separate trust accounts. Approximately $11 million in the name of AHERF and a $5 million trust account in the name of Hahnemann, neither of which were recorded at the end of June, 1997. These were established in connection with unqualified retirement accounts and executive benefits. Many of our physicians and faculty participated in this plan. 120 at AHERF.

Edelman:

Powar:

REDACTED

Dionisio: Don't have definite answer. I believe it is the retirement account. Pension restoration is a separate trust account at Mellon Bank. Need to focus on whether the $11 million, just the executive retirement account, or does that encompass both of the plans.

Edelman: Were these trusts established prior to the beginning of 1997?

____?____ Yes, they are five or six years old.

Edelman: How could they be missed all these years? Were assets transferred in?

Dionisio: Yes. I believe transfers were made over a period of years.

Sanzo: I can't remember exactly when it was, but in late August, a third or fourth level person in the Finance Department sent a memorandum telling us about the AHERF account of $11 million. We have not been able to find the record anywhere, and we think it was deliberately not recorded.

Neuwirth: Is there a related liability account which would also have to be recorded in connection with these accounts?

Dionisio: Yes. There is also an unrecorded liability of the same amount. These were funds that were set aside for pension benefits for the non-qualified group. There is no profit and loss change.

Neuwirth: These retirement accounts, while technically assets of the institution, really on any basis other than bankruptcy would not really belong to the institution, would they?

Dionisio: My understanding is that they are assets of the institution, and to the extent they are funded to private retirement benefits and until a participant vests, they would remain an asset of the institution. However, in this case, the significance of bankruptcy, these now become assets of the estate which would enure to the benefit of all creditors and not just the Plan participant. They become general creditors, and as they are vested, would experience a shortfall.

Powar:

REDACTED

Edelman: In finding these, do we have any assurance that there aren't others?

Dionisio: We don't have any assurance at this time that we don't have any others.

Typically, what we do is send out bank confirmation forms that anyone we have bank accounts with and specifically what we know we have on deposit, etc. Also ask them to advise the auditors of any other bank accounts that are in existence. The S11 million was with National City Bank. I would have expected, since we have other accounts there, that it would have shown up.

Sanzo: Isn't it fair to say that the members of the Finance Department who worked for David are sharing with us information that we did not previously have?

Dionisio: Tony and I have met with members of the Finance staff and we have asked them to identify any such accounts or any such issues that they thought we should be aware of, and I think it is as a result of asking this question that this came to light.

Powar: REDACTED

Korbly: One of the steps would be to reconfirm with all of the banks about the accounts. One of the steps would be for the hospital to identify the accounts you have.

Powar: REDACTED

Stalder: Rabbi Trust - Even though we agree that this should be a matter for consideration, the accounting principal has been very mixed as to whether you record them or not. The vast majority of those are not booked. The liability that is undoubtedly due these folks is of limited value. They are just setting aside the money. The accounting is just now identifying these issues, but by not booking them in the past, other companies did the same thing and it was an accepted practice.

Powar: REDACTED

Korbly: Assuming that this circumstance meets the definition, it would not have required financial statement recognition at June 30, 1997 or even today. The point is, while the entity can change its accounting for the circumstances, that is a change in accounting as opposed to a revision.

Stalder: It might also be worth noting as to audit, as we auditors might do when there is any issue of this sort, there might have been a recording at year end of a different compensation Plan that was booked and was a separate issue that was in the representation letter that there was no understated accounts.

Dionisio:

REDACTED

Powar:

Edelman: Question: When I take cash out of an organization to put it into a fund like this, what is the other entry?

Dionisio: It would be an expense on the income statement.

Edelman: So it would go through the P&L?

Dionisio: Yes. And if we recorded it, it won't have any P&L effect now.

Palmer: Given that we have missed these accounts, have we had the time and do we think it appropriate to give these accounts a real close look right now to assure that nothing was done improper to these accounts?

Dionisio: We haven't done that, and if you want us to we can do it in connection with the bankruptcy work, and I would recommend it. The issue is not only recording the account but what was the activity going in and out of the account.

Palmer: I have no evidence to say that there was anything improper, but in this environment, it is probably worth some time to be able to say we have examined the ins and outs of these accounts and are comfortable that nothing inappropriate was done. But: we will direct procedures in the trust accounts.

Edelman: Will we have to book this on the 98 statements?

Stalder: No, Fiscal Year 1999.

Korbly: There is a change in circumstances from bankruptcy for some of the entities. Talked about doing it in June, 1998 with companies in bankruptcy but when you push it back to 1997, there is a change in accounting rather than a restatement.

Dionisio: No. 2 of issues: When Graduate was acquired, most of its assets in connection with the acquisition were acquired by a company referred to as SDN, which was a company outside the AHERF umbrella. This was created a number of years ago in connection with the United Hospitals and was used the same way. That has no significance, just wanted you to know the acquisition was a two-step process. This was done because these acquisitions were done with some due diligence, but not necessarily complete due diligence so that the acquisitions were done in a two-step process. (Explained who SDN is, and Joe said they were the board of SDN). In connection with the acquisition of Graduate, in acquisition accounting, contingent reserves are set up to recognize and provide for the possibility of obligations and liabilities that might not be identified at the time of the acquisition. These would represent unforeseen circumstances. In connection with recording the revisions, after you assign fair values of tangible assets, the residual is then assigned to as an intangible account. In the case of Graduate, contingent liabilities of a substantial amount were recorded. Graduate was transferred from SDN into AHERF in May, 1997. Coincident with that, reserves were established on DVOG to increase Allowance for Doubtful Accounts. Thus the reserves for contingent liabilities at Graduate were used to absorb the additional reserves. By virtue of the DVOG hospitals using liabilities of the Graduate Hospital, the DVOG had created an obligation to Graduate, and Graduate set up an asset from DVOG. This entry in May and June, 1997 approximated $99 million. Most of this entry impacts the balance sheet which is eliminated in consolidation, and therefore, on a consolidated basis, there is no concern until you look at the companies on a stand alone basis. $28 million was used in 1997 to increase revenue for DVOG. $28 million overstates AHERF's net income and the net income of the DVOG. We have distributed original financial statements for 1997 and have distributed pro forma statements on a restated basis.

Gumberg: Want to understand: talked about the reserve set up through acquisition accounting. Assume that was non-cash.

Dionisio: Yes. At some point, it became monetized. If you set up a $99 million reserve at Graduate which you transfer to DVOG to solve receivables and you want to increase the bottom line, you had intercompany transfer. The other related issue is that the nature of acquisition accounting is more art than science, and it is not unusual to create these contingent reserves. In most cases it is done; would be the exception not to do it and the corresponding asset is usually intangible. What makes this problematic is that in subsequent periods you continue to evaluate those contingent reserves, and if unforeseen circumstances don't surface, you go back and adjust the acquisition accounting and that wasn't done in this case because they were used to relieve the DVOG of uncollectible receivables.

GOR0000098

Neuwirth: Did you say in the SDN accounts there were assets set up on the acquisition liabilities and the difference between the assets and liabilities there was effectively negative good will in some of reserves for contingent liabilities for the estate of $99 million?

Dionisio: It was positive good will.

Neuwirth: Will you walk me through the entries?

Morrison: David is still on Graduate books and intercompany was credited. Intangible still assets on Centennial books.

Palmer: Are these the accounts which Sherif sat in this room and told us that the entries were done when he was ill in late August and September and he didn't realize until March or April of this year?

Morrison: I don't know if I can connect the two things.

Edelman: I think what you are talking about is the $114 million of receivables.

Sanzo: Two separate items: One is the acquisition accounting, and the other was the use of AGH funded depreciation as a means of providing working capital for certain entities which I have heard him say were done while he was ill.

Dionisio: Item 3: Explanation - Beginning in the 1920's, the Lockhart family donated funds to AGH. Those funds started out as $5-$10 million and grew over the years totaling gains, etc., to in excess of $100 million. With new accounting, FASB 116 and 117, the accounting profession and non-profit organizations were given definitive guidelines on how to record endowments and other restricted funds as well as how to record earnings. In 1996, after consulting with FASB 116 and 117, the Finance Department reached a conclusion that the appreciation in these Lockhart funds qualified as income, and they recognized approximately $15 million as one in 1996 and $54 million in 1997, on the books of AHERF, which is where the Lockhart funds were recorded at the time.

Sanzo: Through a series of reorganizations dating back to 1987 that ended up on the books of AHERF. As I became aware of these entries, I made inquiries with PricewaterhouseCoopers, who were the ones who brought this to my attention, who raised questions in connection with their audit of 1998. In my judgment, I do not believe that this appreciation over the years should be recorded as revenue, because to do so implies that these are unrestricted funds. I believe they are restricted. Restricted means that only the annual income is available and the appreciation and principal needs to be kept intact. My conclusion is in 1996 our

GOR0000099

Treasury Department was asked to make inquiries of Mellon Bank as to whether or not this appreciation would be available for general use. Mellon Bank responded that they were restricted and not available. Treasury sent letter over to Legal. At the time, our Deputy General Counsel was Bill Kennedy. He reviewed it, added a notation, sent it back, and indicated in his judgment he agreed with Mellon Bank's conclusion that these funds were restricted. Notwithstanding that, the income of $15 million and $54 million were recorded in 1996 and 1997. This resurfaced when the Mellon line was repaid in 1998. Additional inquiries were made about the Lockhart fund to pay off the Mellon Bank loan.

Neuwirth:    Of the $15 million and $54 million, how much is earnings and how much is appreciation?

Dionisio:    I am not sure I have that answer right now. It looks like $21 million of the $71 million. Might have been investment gains. The other information that surfaced in 1998 was that when Tony became President, he asked Nancy Wynstra the same question that was asked about whether they were restricted, and Nancy, in June 1998 advised Tony in her judgment these were funds that were essentially restricted and while there may be some ambiguity, she felt they were restricted and the only way we could secure definitive clarification would be to petition the Orphans' Court. I believe the 1996 and 1997 entries should not have been made and I am suggesting revisions. The 1996 entry does not have any relevance to the 1997 statements. These funds were previously recorded as unrestricted assets, and I directed that they be recorded as permanently restricted going forward unless we get outside counsel's opinion to the contrary.

REDACTED

Powar:

Dionisio:    No, there were none. In this case, this was not a monetized transaction. The trust was already on the books, and what happened was that revenue was recognized on the income statement.

Sanzo:    While that is an accurate statement for 1996 and 1997, my understanding is that $27 million of the Lockhart funds was used to pay the Mellon consortium line of credit.

Dionisio:    I had forgotten.

Edelman:    How did Mellon disburse the money?

Sanzo:    Of the $87 million, $60 million came from funded depreciation of Forbes and Allegheny Valley, and I thought the $27 million came from AHERF. I think we

GOR0000100

need to answer that question as we are finalizing the audit for 1998.

Dionisio: I believe the residual funds came from unrestricted investments.

Dionisio: Last point - Classification of intercompany advances. This mostly impacts AGH. Beginning in 1996, AGH made advances to AHERF and Eastern Region affiliates. Initially, those advances were recorded on AGH books as Due From Affiliates and recipients recorded as Due To Affiliates. Funds originated from AGH funded depreciation accounts. A receivable was created which both interest at 8.5% and the transfers continued to be classified as Assets Restricted as to Use. My view is that the intercompany advances should be recorded as Due to Affiliates. On a consolidated basis, it wouldn't have a material effect on the consolidated statement, but we have a problem with this type of reporting on the consolidating information, and in looking at the entities on a stand alone basis. Approximately $114 million from AGH which needs to be reclassified. That is the highlights of the entries, and I will turn to the hand actions.

Edelman: No. 2 and No. 4 provide much with a need for a restatement. What are we getting for 1998?

Dionisio: We aren't completely resolved yet, but for the non-debtor entities, we will have a separate audit for each group, i.e., AGH, AUMC, and an issue to be resolved is whether we want it separate for Canonsburg because it is not in AUMC's Obligated Group. Don't think it is necessary, but will reflect on it. With respect to the Debtor-in-Possession companies, ordinarily we would not have traditional audits on the Debtor-in-Possession entities. The Creditors' Committee and their representatives are also in agreement with that. We would have special audit procedures, however, one of the proposed purchasers, Vanguard, has a requirement to have an audit of the entities that they are acquiring in order to obtain financing, and given that circumstance, Lee and I have been working with Vanguard officials and others to try to reach an understanding as to what the ultimate requirements are, and whether we can meet that timeframe is another matter.

REDACTED

Powar:

Dionisio: In April of 1998, Sherif directed that intercompany advances of $111 million between DVOG and Graduate Hospital System should be reversed. My view is that at the time, we were contemplating selling certain hospitals to Vanguard, and Vanguard wasn't acquiring liabilities, and he directed that the intercompany liabilities and receivables be reversed.

GOR0000101

Morrison: Yes, we were eliminating intercompany between Centennial and DVOG in anticipation of the Vanguard transaction. There was some general recognition that it was not a cash transaction. The reserves never represented cash, and it would be inappropriate to leave a liability on the books that would have to be liquidated prior to the sale.

Dionisio: For the record, in June, after consulting with Chuck, I directed that the April, 1998 entry be reversed, putting the accounts back to their former state.

Gumberg: Why?

Dionisio: At the time, I didn't think it was an appropriate entry, and I believe the recording .............

Morrison: We had transactions here that were recorded that were then forgiven, and I think we just reversed the forgiveness transaction and the second step is what we are considering here as to whether the original transaction was correct in the first place.

Powar: REDACTED

Dionisio: Turn to the pro forma consolidated balance sheet, Page 1, on a consolidated basis shows audited balances as of June 30, 1997 with pro forma adjustments for the four entries I have talked about. (Joe reviewed the entries).

Dionisio: You might be wondering if there are any other adjustments. I am not aware of any other adjustments with the possible statement that I am not involved with the special task force - something might come of that.

Danforth: So the bottom line is, instead of $21 million net profit, we have a ( ) net loss.

Edelman: Has anyone thought of whether or not, whether the action taken to move Lockhart was done with the owner's intention in mind - moving it from AGH?

Sanzo: What may have happened is that in 1977, AGH became AHERF. On June 27, 1977, AGH, during a special meeting, changed it's name to AHERC. At the same meeting, a new subsidiary of AHERC was created, and that was made AGH. Lockhart funds were in the transfer.

Dionisio: We have an obligation to communicate our findings and if I may, I would like to

outline what we should do.

REDACTED

Palmer: Motion?

Dionisio: I would like to make a recommendation my advice would be that you not take definitive action to approve these revisions but rather my objective is to advise you that I believe there is a good likelihood that there will be revisions, and when we get to the type of communication we do not take a definitive statement that there will be revisions and for that reason people shouldn't rely on the financial statements. There are a number of questions that have been asked, and I would like to have the opportunity to consult with our new accountants.

Palmer: At some point, I am coming to be asked to approve recommendations. I am going to ask you to buttress your recommendations, but I need help from current outside accounting firm before I can agree.

Barnes: Move on to press release. This is a release that Tom, Jim Stalder and I have worked on. (Joe read it).

Dionisio: My recommendation is: I believe Tom and I should work together to prepare a communication to all our constituent board members and that should be the first that goes out. Lee and I have scheduled meetings for the balance of the day to talk to a number of constituents that will have an interest in this issue - Merrill Lynch, investment bankers, representatives of the Creditors' Committee of the Debtors-in-Possession, and representatives from Vanguard, Tenet and Catholic Health East to share this information with them. After having done all that, with your permission, I would recommend that we go ahead and issue the press release.

Edelman: Concerned that we are speaking for AHERF.

Sanzo: We should say it is the Finance and Audit Committee.

Talked about the word "likely".

Neuwirth: Have problem with the process. Don't object to speaking to the various constituents, but if we take Mr. Palmer's concern, what we are doing has a built in inconsistency. Press release says we are likely to have revisions and therefore don't rely on them, but you are not prepared to say what they are. When you are prepared to go to various constituencies and say what the revisions are. So you tell constituencies what you have told us this morning, so if you are willing to do that, why can't we tell them?

Edelman: There is no way we can say what the amounts are.

Powar: REDACTED

Dionisio: We aren't obligated to have a press release. We have chosen that as something of an expedient. Ordinarily, what we would do would be to send letters to known users of the financial statements, and our obligation would be to advise them that they shouldn't rely on the financial statements. We are not obligated to tell them all of the reasons. There may be other issues that come to our attention. It is not unusual for commercial questions where there is potential for restatement. Our obligation is to report the specifics in a new audit report.

Powar: REDACTED

Sanzo:

Powar:

Chakurda: I agree, unless we give more detail and unless we are forthcoming with the disclosure, we will be hung out.

Barnes: Last week we talked about the philosophy of press releases, but our goal was to (a) give impression we are on top of things, and (b) be as candid and complete as we can, and it seems to me that either we back away from the philosophy we adopted five days ago or do it differently to say we are looking at this; this is what we know and this is what we are going to do about it. Think it is appropriate to say this is what we see and there may be more.

Danforth: REDACTED

Powar:

Barnes: Reviewed what it should say.

Danforth: REDACTED

REDACTED

Powar:

Dionisio: I commented last week, and my view is that these numbers impact 1997 and most of the buyers are looking at 1998 financial statements, and it impacts primarily intercompany accounting issues and employee benefit issues, but they need to see it if they are to understand it.

Chakurda: Has implications for what we are doing in 1998 also.

Palmer: I am interested in revenue and if I am paying for something and we have now shown that we have significant entries, i.e., Lockhart, that may have juiced revenue and how we have been handling restricted funds, I would want to know everything about the validity of the statements:

Morrison: I think you are correct, they will focus on revenue, but the Lockhart is something they focus on less because our assets are of less interest and they will focus on the patient revenue stream and is probably the one that will cause the most concern for the buyers. They will focus on 1998 and attempt to assure that there are no further issues like this in 1998.

Neuwirth: Creditors will focus on other assets and the Rabbi Trust and what their assets are.

Dionisio: I wasn't party to last week's discussions about the press release, and had I had that recommendation, I might have made a different recommendation. I wasn't trying to be non-specific.

Neuwirth: Suggest we tie this together by issuing press release that summarizes the types of adjustments without Committee approving them and indicate in the press release that investigation continues, subject to further information letter.

Chakurda: I think it could be done by using Joe's language at the beginning and then list areas to be explored.

Edelman: Not putting any order of magnitude on the bullets?

Chakurda: REDACTED

Powar:

____?____ No. 1 is a change in accounting and not a restatement.

GOR0000105

Korbly:      You have a concern about any information as well as lack of information. We are
             not done with these items. With respect to the Lockhart funds, we will get a legal
             statement as to whether they are restricted or not as to whether you want to restate
             this. Some issues still have to be addressed in order for you to know you have the
             numbers. In the Lockhart funds, if the attorneys were to say that some part of the
             funds were available, then the numbers would change. Intercompany advances
             are not part of this process. It wouldn't be part of the restatement. We agree the
             concerns are there, and there is a high likelihood and there is probably a need for
             an adjustment of the accounts.

Danforth:    It would be probably well to say further information will be forthcoming if there
             are material differences. #1 is an accounting issue.

Chakurda:    It always finds its way into the media.        REDACTED

Powar:

Gumberg:     Was the Lockhart fund ever touched until the last couple of years? So is it
             possible that when it grew so large and it was touched, it was even touched with
             the right intention to be touched.

Sanzo:       It is possible, and until our studies are done we can't say what the final statement
             of the Lockhart Fund is.

Chakurda:    We have no obligation to put this out, and we are still trying to resolve issues -
             why don't we say....        REDACTED

Powar:

Stalder:     The principal notes you are focusing on here is to tell them not to rely. If not, if
             you tell them the nature of the issues and you don't give an amount, it will still
             raise questions.

Barnes:      We know the issues, we just have to draft a press release today. And the numbers
             could change. PriceWaterhouse feels the need for disclosure is very real, and if
             we don't announce it, they would have to do something.

Palmer:      Could I hear from the smaller group, are you inclined to have some quantitative
             parameters or not at all?

Powar:                                        REDACTED