REDACTED

DBR-CG-001843

representation

supplemental

#5

integrity

DBR-CG-001841

DBR-CG-001839

sympathy

fraud

Ben

integrity

DBR-CG-001837

DBR-CG-001835

DBR-CG-001833

[illegible]

sanded [illegible]

[illegible] 133 [illegible]

[illegible] subp [illegible]

Ben [illegible]

[illegible] univers [illegible]

[illegible] cherf rejection [illegible]

[illegible] 96

A 133 [illegible]

DBR-CG-001831

Pgh grand jury subpoena

criminal nature

subp

sec

us gov

us gov

5

f: forensic

forensic

govt

IRS

fbi

DBR-CG-001829

DBR-CG-001827

focus

96 97

lawyer

2/3

testimony

DBR-CG-001825

[illegible] [illegible]
[illegible] [illegible]
[illegible] [illegible] ) parallel
[illegible] [illegible] )
[illegible] [illegible]
[illegible] [illegible]
[illegible] lockhart [illegible]
[illegible] [illegible]
[illegible] [illegible]
[illegible]
[illegible]
[illegible] [illegible]
[illegible] [illegible]
[illegible] [illegible]
[illegible]
[illegible] K + L DBR-CG-001823
[illegible] [illegible]
[illegible] [illegible]
[illegible] 117 [illegible] impression [illegible]
[illegible]
[illegible] [illegible]
[illegible] [illegible]
[illegible] [illegible]
[illegible] [illegible]
[illegible]

[illegible]

pdo

— 3x

adj 2 55

offer of exec session to C+L no

DBR-CG-001821

Transcription of Shorthand Notes of Carol Gordon - Finance and Audit Committee, October 28, 1998

NOTE from transcriptionist:

( ) means I did not write anything in that spot at the meeting.

__________ means I cannot read it now.

____?____ means I do not know who said it.

Meeting began 12:05 p.m.

Barnes: Question of whether we should restate the financial statements which makes possible the filing of the 133 statement. In my mind, this is __________ than the 1997 statement because it has to do with federal funding in East and West, and it is now considerably overdue. Another issue: How did we get into this predicament? Have left that issue alone because the No. 1 priority was to sell the hospitals because there are a lot of employees in Philadelphia, and it is an enormous number of patients and people who are affected. So we need to get that sold and feel that is consistent with our fiduciary obligation to satisfy our obligations to the creditors. Now we have to get at that issue and that is a new problem for all of our auditors who found it extremely difficult, if not impossible, to rely on statements that our people produced. There are a couple of issues I would like to touch on. One is our relationship with PricewaterhouseCoopers. As you know, Coopers was, for a long time, our accountants. We decided to release them after this situation came up and have done so. On the other hand, in our intense desire to get a 1997 restatement, which makes possible the 133 report, we felt that they could do the best job or were more likely to come up with the 133. I am not optimistic that that would be all good news. At this time, we don't know what our long term relationship with PriceWaterhouse will be. They may be defendants in which we allege that they were responsible for our problems or contributed to the problems. This is an issue that is taken extremely seriously at PriceWaterhouse. I think our role with the PriceWaterhouse people is to listen and ask questions but not to go further and make commitments. With this brief opening of the meeting, I will turn to Chuck and let him speak.

Queenan: As I am sure most of you are aware, except under state laws, an accounting firm does not have a privilege with clients as there is with attorneys. Anything that Price Waterhouse tells us, they will have to be subpoenaed, testify to the SEC, etc. Nevertheless, in terms of these meetings, one way to characterize what they tell us is that they are disclosing this to us with our attorneys present in order to enable them to provide us with appropriate legal advice. From the standpoint of our

GOR0000112

asking questions, we should feel free to ask them questions but in terms of asking our lawyers any questions, we should wait until PriceWaterhouse is not present. You can ask that at Executive Session. That would be privileged communication. Dave explained quite well the position that PricewaterhouseCoopers is under. They have, so far as giving us clean certificates, they have two problems: One they will enunciate and one Dave has already enunciated, and that is they are likely targets of the SEC and of civil litigation in which case if that litigation is running from an AHERF entity against them they are obviously in a conflicting situation and would have a difficult time issuing a clean accounting report. The second thing is if they have discovered certain improprieties, if they found some of those, they would have a difficult time relying on any certificates AHERF or its personnel gave to them–whether these were given to them by just one person or by someone higher up. So you also know, as part of the common literature, having discovered an impropriety, they have a professional obligation to report it to us. Once that is done, we have certain obligations to report that to the SEC, and if they find we do not report it, they have an obligation to report it. So that is background information. I have heard the last time that they were going to appear before the SEC last Thursday. Someone said they did.

Palmer: When we talk about the PriceWaterhouse issuing the 133, what report are we talking about, 97 or 98?

Queenan: 97. At an earlier meeting of this Committee, I am reading that PriceWaterhouse was near completion of the audit for Fiscal Year 1997, so almost two years ago, we were near completion. Was that accurate?

Barnes: That was accurate at that time.

Queenan: My guess is they would say they have completed enough to issue a certificate but to do that we need various certifications from AHERF personnel, having found what we now found in terms of irregularities, and we are reluctant to issue anything that we can't rely on, anything that AHERF personnel will tell us.

Review of Minutes

___?___ Defer approval until next meeting. Review with great care to make sure they are accurate.

IV. A. Introduction of PriceWaterhouse Representatives.

Barnes: We met with PriceWaterhouse on September 1, and our principal reason was to

bring about a revised audit statement for 1997, which would then make it possible to fix the 133 audit, which is possibly a very material issue. We hoped to have that by the end of the month. PriceWaterhouse has slipped from the timetable, and our people only had so much time. We were concentrating on the sale. With that introduction, here is Jim Stalder.

Stalder: First item: Reference to the September 1 meeting. Joe did a fine job in disclosing the items we have been discussing with him regarding the need for re-stating the 1997 accounts. At that time, there were four specific items that Joe disclosed, and we will come back to those. The focus is that we specifically tried to get a handle on this immediately, but it is clear on our part we have, as auditors for 1997, the point we have made to Joe and Dave Barnes is that the issues we have before us, particularly to the entree of the SEC - when they look at the issues that were disclosed to you when we last met, they will turn to the key term of fraud and be exorcized that events that were discussed in this summer and fall certainly contradict and do not support the facts that were known when the statements were sent out. There is a professional standard we operate under known as SAS 82, which says that we need to make sure that everyone understands that that potentiality is known to us. So we need to know what the focus of the SEC will be. Bottom line is that the fundamental operations that caused the bankruptcy are not driven by these accounting issues. When they understand more what happened, they will get very exorcized. What is the relationship of where we are as to timing? The whole issue is the requirement to file reports with various government agencies for the A-133 for Fiscal Year 1997. Those reports were due July 31, 1998. They have not been filed to date, and the principal impediment major issue is that that report must be placed around an audited financial statement for the year and issuing audited financial statements that have to be restated, we can't collectively issue financial statements with the uncertainty with representations that are inherent as to their accuracy. Chuck Queenan and I will tell you that there is not much precedent here. A-133 have been filed late, but we are not aware of any situation in our firm when they have not been filed. There is grant money at issue for the year. Presumably, they have an option, and one of those options is to come back and get their money. Reissuing means we would put out a new packet of 1997 statements, but in the 1998 statements, we would restate that the balances for that year would be restated.

What are our options to resolve that issue? There is a possibility of sitting down with the agencies while we are waiting for these reports to discuss the dilemma we are in to talk about a special purpose report. This is an operational issue as much as a filing issue. Need to make sure you understand what you heard on September 1. Different information was discovered this summer which makes

those statements wrong. We need to prove that. We have to make sure you understand the issues and what our recommendation is to move forward.

Barnes: Is there a clock running as to time?

Stalder: No. The time started in our first discussions with management when the letter was received in June.

Barnes: Refresh what SAS 82 is.

Korbly: Addresses fraud in the context of financial statements. That could occur two major ways. People misrepresenting facts or people can take actions which cause your assets to vanish or liabilities to be incurred. At this time, we are talking about the former, that is, information that was known to people or wasn't shared or people say they knew or understood but it wasn't their job to deal with it. It would also have to do with false entries or entries that were prepared in a way that wouldn't be seen. On the Lockhart funds in terms of your Fiscal Year 1996 report issued in late September or October 1996, the trustee of the Lockhart funds obtained a copy of the report, met with management, told management that the Lockhart Trust was not properly classified with respect to the financial statements. Beginning in 1996, there was an entry to classify these funds properly. Bank said we think your classification is incorrect. Bank wrote a letter (late October, 1996) and it has been handled by people in Legal, in Treasury and in Accounting. The timing is that the Coopers people know the letter exists, June 1998 (18 months late), so what happened since the letter was issued, the 1997 year occurred and the 1997 financial statements were treated in a manner inconsistent with what the Trustee thought. When letter came to attention of Coopers, there was some conversation with Joe about it.

Barnes: I don't understand what we are supposed to do. Who is supposed to notify the SEC?

Korbly: Question is, who did know about the letter? There were notations on the letter; there was an address on the letter. If it was not brought to the attention of senior management, why wasn't it brought to the attention of the Chief Financial Officer or the Board, and why weren't the accounts addressed with respect to the 1996 and 1997 statements?

What does SAS 82 require? It requires this Committee to deal with: do you have integrity with your employees that you have to address? You obviously rely on key employees of management, and it is a question here that there are some people you may not be able to rely on.

Gumberg: Back to Jim's first comment with the 133 - Do you think we could obtain it and wrap it around a qualified opinion?

Stalder: We should negotiate that.

(They talked about how they could get it).

Stalder: We need to decide if we are prepared to stand behind them and the independents on why these things happened and who caused them to happen, and if there is anything else like that. Do not want to find any more surprises. Need to sit down with the people still in place who made these adjustments.

Korbly: You are in a position to examine other records also.

Barnes: I thought there was something where someone had to report to the SEC if it wasn't honest and correct.

Dionisio: We are in the process of doing that when we expressed a view that they shouldn't be relied upon.

(Talked about who is responsible to tell the SEC).

Korbly: In the first instance, the auditor has the responsibility to notify Audit Committee of material control weakness. I consider this situation to be a material control weakness. I have an SEC filing; the concept within the SEC is a reportable condition. At this point, you don't have any active financial statements in the public arena. If you go forward, we would have to look at what you tell them is a reportable condition. Had things occurred in a normal time line that was a reportable condition, you would have to put that in your disclosure.

____?____ Item 3 is where we are here. You will hear from the SEC very soon that they are concerned. Mel and Ben are auditors - we are talking with the people who made these entries and what their purpose was.

Korbly: Item 4 - On the concept of the past, most of the reserves were set up in connection with Graduate acquisition accounting. That occurred in November 1996, and entries that were booked in April and June. All of the dollars that we are talking about, $99 million, came from Graduate records. You can break that down to $28 million that went as an adjustment to the statement of operations to prop up the earnings and $71 million as reserves for receivables balances or patient

reimbursements as needed then. $28 million of items where reserves were moved to the East and released to income. You have transfer of reserves/acquisition accounting. Let's hear how these reserves got established in the first place - on which books were they? What justification would their establishment appear to be. Was that addressed by management, the Board, outside, etc.? Help us to understand how the reserves got established before we transferred them. These first four items were adjustments per AHERF's process, so what we are saying is the first item is where reserves were set up in connection with the acquisition of Graduate accounting on Graduate books. The reserves' accounting entries were recorded in April and June, 1997. How did they come up on Graduate books? Our understanding is when Graduate was acquired by SDN, there would be established certain reserves under purchase accounting and the corresponding asset is good will to correspond with the reserve that was set up. So assets were increased by good will on the left and reserves on the right and that is all balance sheet entries and no P&L charge. Was there any justification for the good will? Yes, there were justifications given and the reserves were established for a reason.

Dionisio: My understanding is as part of acquisition accounting there is always contingent liability, so you set up reserves for contingent liabilities - things that will surface in the future that you don't know about at the date of acquisition, so the entry here as part of the acquisition accounting, which is a debit to good will and a credit to reserves for contingent liabilities. You do not use the word "contingent" liability. Difference is intangible assets, which you can't identify called good will. Under the rules of the game, management has one year from purchase to make those true. If liability is different, the impact falls in the period in which it arises. This resulted in about $99 million in reserves.

____?____ More like $190 million.

____?____ What is the relationship of that $200 million to the total assets?

Dionisio: Guess Graduate was about ½ billion in assets.

Stalder: That is a material issue, and whether it bore any reality that is what we don't know. They identified a variety of reasons associated with the impacts of merger restructuring, and things such as that some normal based collectibles.

(Talked about writing down the reserves rather than setting up a good will item.)

Stalder: The idea of purchase accounting is that on the date of acquisition you don't want to charge P&L six months later, so you put it on the books to properly capture

GOR0000117

what you bought at the beginning. Chuck has an obvious area of concern; it is one of the six-twelve items where games could be played. So you could be faking the values. Total value would be about $470 million worth of assets on the books at the end of 1997.

Queenan: Now that we have these assets and reserves on the books at Graduate, tell us what was done to transfer them elsewhere and to what entities were they transferred and what accounting entries were and then what happened with reversal to bring them to a different entity.

Korbly: Through a series of entries, April through June, these $99 million on the books of Graduate were moved down and put back on the books of the DVOG.

Dionisio: On the Graduate system books, we moved the reserve to an intercompany receivable. We debited a balance sheet account for $99 million, set up a receivable. The receivable was from DVOG, which was most of the Eastern Region hospitals except Graduate.

Queenan: Where we have a reserve on Graduate, how did we take it away?

___?___ You would debit the Graduate account, credit DVOG, DVOG debits intercompany receivables and credit......

Queenan: So you moved a liability from a reserve to a payable. Now we have a reserve in the East on DVOG. After you made the entries, the reserves moved to the DVOG books on the other entities, not Graduate.

Gumberg: Ben, you talk about a series of entries at once. What kind of numbers?

Korbly: Pool No. 1. Had 14 entries coming out of Graduate, five into DVOG. Pool ____ 21 out, 21 in. Pool 3, 15 out, 15 in. High of $8 million in Pool 1 to low of $1 million. High Pool 2, low. Pool 3, high, low. Etc.

___?___ Do we know why they were done in pieces? In terms of setting up a payable, was that a short term liability or longer?

___?___ It would have been a short term against short term receivables.

Queenan: Have you focused on some of these entries that have bonds outstanding with current ratios to meet?

Korbly: No, the presumption is the intercompany accounts would settle on a monthly basis. My understanding is that Coopers & Lybrand had knowledge of $50 million of this $99 million. They saw it and were aware the monies were moved using this mechanism, put it on their effect schedule (no, it did not get on the effect schedule), but they were aware of it. Their vision was that within that one year period they would deal with the $50 million then. Were not aware that any other went to the P&L and would contemplate the effect this would have on funding requirements for debt. At the time, it didn't affect that and didn't impact debt reporting requirements.

Queenan: This was the year the decision was made to consolidate?

___?___ Yes.

___?___ But certifying to bondholders, would that have to be made on a separate basis?

___?___ No, in 1997 they provided bondholders with a consolidated set of financial statements and supplementary financial statements or supplementary financial data which was a balance sheet only.

___?___ Did they review the compliance certificates to the bondholders?

___?___ Yes, my understanding is in co-ordination with management there was inquiry that this would be an acceptable mechanism.

Dionisio: This is all passed on information I have obtained recently. When the recommendation was made to the Audit committee to go to a consolidated financial statement as opposed to individual statements, one of the questions that was addressed at the meeting is: Will the bondholders or the Trustees accept a consolidated financial statement as opposed to individual Obligated Group financial statements? The end story is that management indicated or was directed that they would communicate directly with the Trustees of the bonds to tell them they wanted to submit consolidated financial statements - would that be acceptable, and if not, let's talk about it. I don't know exactly the number of letters that were sent out; I believe eight or so letters were sent. Two responded saying it was acceptable, and no responses from the others. In addition, as Ben points out, Foley & Lardner issued a letter to management that was discussed at the Audit Committee meeting saying that in their view they didn't see any problem issuing a consolidated financial statement, but they recommended there be direct communication with the Trustees.

Queenan: What was the date of that letters?

Dionisio: Deliberations that led to conclusion of consolidated was about October, 1996 for 1997 fiscal year.

Queenan: Was that around the time of the Graduate acquisition?

Dionisio: Yes.

___?___ In terms of the recollection of most of you, what was the reason given for consolidating financial statements?

Sanzo: It reflects saving money and to show that we were acting as a coordinated system (per the minutes).

Dionisio: Deliberations per the minutes said there were two reasons: (1) Chance to save an amount of money, (2) The other was that there were new accounting pronouncements for entities such as AHERF, and given the nature of the organization, that consolidated financial statements generally are more significant than individual financial statements and individual financial statements could be misleading and in any event Coopers & Lybrand said they did not think they could issue individual opinions on the stand alone financial statements without unnecessarily burdening them with disclosures due to the inter-connectivity of the entities.

Queenan: One could look in hindsight and say management was looking at this consolidation to hide the inter-entity transactions, the other side of the coin is (don't know what in non-profit), but in profit, if you had 100% ownership and control, you would be required to consolidate. What is your professional opinion, assuming there is that control mechanism in the bylaws - was that consolidation a requirement rather than a choice?

Korbly: What I see as the key mechanism there is the bondholder. They have covenants and rated them and satisfy themselves that the bond covenants were met. No one told you you were not in compliance.

___?___ What motivations would management have?

___?___ Cost savings, structural changes, requirements. These were all done.

___?___ What do you understand was the reason these transfers were made in the first place?

Korbly: The only thing we knew about was the $50 million.

?: What was the reason the $99 million was made?

?: It was for collectibility of accounts receivables, patient reimbursement.

Queenan: On a professional basis, when you set up the reserves, you have a timeframe to look back and ascertain whether the charge was a P&L charge or whether you set it up appropriately and whether it was in an appropriate time frame.

Stalder: My understanding is that Coopers did appreciate the $50 million of the original purchase accounting was moved and did not go to P&L.

Korbly: What happened was not $50 million but $99 million, and $28 million hit the P&L. The explanation was to prop up the earnings to use the $28 million. Learned from Dan Cancelmi (I persuaded) who told him to do it, and I don't think he believes that he did it alone. I asked him who would have taken responsibility, and he said ultimately David McConnell would have been the person who took responsibility for the numbers overall, but he has not shared with me the line.

Queenan: I am trying to see where we can get in a position of whether this was reliability. We have to get everyone else together so t hat they can't say someone told him to do it.

Stalder: Dan said to Mel, "I did it to hit a target earnings number".

Queenan: Two issues on the table: (1) Lockhart issue and how that passed, (2) Transfer issue.

Stalder: That is $82 million of P&L credits in1996 when you reported a consolidated income of $22 million.

Queenan: Materiality is always a judgment, but when you swing a profit and loss number of that magnitude because you said it went in bite size rather than one, in your judgment were any of the entries to hit a targeted number - would that be irregularities?

Korbly: Yes, I think it is an irregularity.

?: We discussed the idea of what Coopers & Lybrand knew about this. They knew about the 50, the 50 is only on the balance sheet. We have been told they knew about more than Pool 31. We have seen no documentation of that.

Queenan: What are these pools?

GOR0000121

Korbly: There were 36 entries. We pooled them by time line. One set in April, two in June, 15 in June, balance in June. I would have expected that to be all of our single entries.

Queenan: Reasons for breaking them down?

Korbly: One reason is that they could be under the threshold of materiality.

Dionisio: Ask question and make observation; Ben, you said Coopers knew about the $50 million of the $99 million, and you have characterized the series of entries as being some evidence that it is being more irregular than regular - the $50 million Coopers knew about--was it a series?

Korbly: Yes.

___?___ If a series of entries were irregular and Coopers knew about it, then Coopers knew it was a series of irregular entries.

McClenahan: Is it your belief that these entries were made in a random way to avoid detection?

___?___ No one has told us.

___?___ Coopers was told there was $50 million, now we are told it was $99 million, and $71 was needed in 1996 and some in 1995. Some people are saying there were balances due us, that were never any good.

Sanzo: What is different today then when we met the last time? Is there something new today? I want to understand what is new.

Korbly: We have seen the evidence behind all this and we see the facts.

Stalder: Our concern is that the Audit Committee fully understands the relevance when the SEC knows.

Korbly: One piece of new evidence is the use of the $28 million.

Dionisio: I disagree. I reported that earnings were misstated by $28 million. I want the Committee to know that so far, the Lockhart funds, the reserves, and the $28 million was the subject of the restatement that we collaborated on. These are not new numbers. We are getting new information.

Queenan: It is the motivation that deals with the reliability of people signing off.

Dionisio: We made this observation briefly that AHERF earnings on consolidated basis were overstated by $88 million in 1997. I see that as a big number, and that is a material misstatement. Personally, I believe the misstatement at the DVOG is more significant and the reason is that the $57 million overstatement for the Lockhart funds was that AHERF didn't have any bonds outstanding.

Korbly: I need to respond to that - because of what we are talking about with SAS 82 is that I do not weigh these on a dollar basis but it is integrity. Rabbi Trust - this involves employee benefit plans. We understand there were two identified by Joe and the Committee, and it involves $15 million of items that are assets and liabilities on your balance sheet. On June 30, 1997, there was not an explicit requirement to set them up. They are assets under the control of the entity. Plans are there. $16 million in total, $11 million AHERF, $5 million Hahneman. New requirement in 1997. Put them on your balance sheet. You could do this in this process.

Queenan: I am sure you are right, that it strikes me that forgetting about the Rabbi Trust and you set up an unfunded contractual obligation, you should book it. Was that always accounting law?

Korbly: No. There is usually some form of annual trigger which would make it a plan that .......

Queenan: I am talking about a legal obligation.

____?____ Unfunded example. You would have to book. Here you have found a vehicle and this guidance was not clear with respect to these circumstances.

Queenan: Is there anything you discovered that would cause you to believe there was anything purposeful that it was not on our books?

Stalder: What is disconcerting to me is that - not numbers here - but there was another retired account and it was resolved how it should be handled and Coopers asked if there were any other accounts we should be aware of and put a specific comment on that there were no other accounts and they confirmed there were no other accounts. Rep letter was signed by Sherif, David, Nancy.

Stalder: In a sense, the process that has evolved is that management says everything I am telling you is true to the best of my knowledge - and when management says that it was and when Joe finds it this year....

Queenan: The end game is to say that we have addressed the personnel issue and now we are....

Stalder: We need to know why it was ignored and did they intentionally forget it?

Hope: You asked if we thought we had our arms around the retirement plans? There is a lot of sensitivity about executive retirement plans. We don't have enough information right now to conclude. There is nothing else to probe, and I would say that might be something you should continue to __________ yourself about.

K&L: Was there anything else like this?

Stalder: There was another unqualified account which Coopers learned about in an obtuse manner. It was not brought to their attention. It was the subject of meetings. It bothers me that with the focus they put it in the Rep letter, it illustrates there was some sensitivity and it is considered extremely confidential.

Queenan: Is that the historical aura?

Hope: It seems that, say, a year ago....

Stalder: Our pursuit of this issue with some of your people has produced a full spirit of cooperation.

Korbly: That is a fair statement.

Stalder: In the last week or so, the question was asked, "What about this account?" You didn't ask for it that way - the secretary said, "I can't give you something unless you ask for it in the right way". It is the integrity of the people.

Barnes: Move on. (3) Endowments. I believe we have covered this on the Lockhart funds. We are waiting for interpretation.

Dionisio: Two firms looking at the endowment funds. Spoke with Paul Neuwirth, who chairs the Committee looking at endowment funds for the Eastern Region. They have advanced recommendation that they had to suspend their effort because they had yet to get approval to engage a law firm or accounting firm to work with them, so it is not court-approved funds.

Sanzo: for a variety of reasons, the Trustees, Paul Neuwirth and Claire Gargalli believed that they needed to pick their own counsel, and we warned them it would be unlikely to get another set approved. We tried to tell them this would happen.

Queenan: On the scope of that inquiry - does it deal with reserve funds?

REDACTED

GOR0000124

Dionisio: Beyond all government assets. Anyway, I talked to Paul. He will report further at the next meeting.

Queenan: We are looking to see whether those funds were inappropriately used. Were they also looking how the funds were used?

Dionisio: With respect to federal reserve funds, the government disburses those funds on a retrospective basis - you have to spend the dollar, submit the request to the federal agency, federal agency reviews the request and disburses the funds so consideration is funds have not been misused. Also, we get funds when we conduct clinical trials - pharmacy company will make periodic payments, usually a quarter in advance. We believe those were used for general operations and people are asking for an accounting of those funds. With respect to the endowment funds, my understanding is that money was borrowed from restricted funds with the intention that they would be replaced on another day, but the issue as we have come to understand it that is a common practice and is generally accepted practice but there has to be a trueing up. Must be replaced within the same fiscal year; that has not been done as we can determine and we think that is a problem.

Hope: You asked whether the legal opinion would be restricted to the Lockhart funds. They are looking at that issue also.

Dionisio: In the West, the Committee reviewing endowment funds, Bob Fletcher - head, they have chosen a law firm and he is working with Jack McGinley and have engaged CPA, Schneider, Downs. They are in the initial stages of their review and will be issuing a report on Western Region endowment funds and, in particular, the Lockhart funds which are intact.

Thurman: In clarification, the charge that the Committee in the West has been given originally to every kind of restricted fund.

Dionisio: Will have future report.

___?___: Intercompany accounts do not relate to consolidated financial statements relates to supplementary financial data. I think the question of how you present it begs the issue of why they accepted financial data.

Queenan: Any integrity issue?

Korbly: I think it was discussed with Coopers in a phone call - consolidated statements did not have Fiscal Year 1997 supplementary schedules. In fairness for the record, the record will show that a change was made at the 11th hour. The draft statements

GOR0000125

reviewed by this Board listed it one way and the final statement showed it another way. I am told there is a draft where it was shown as intercompany and the last minute changes are reflected. October, 1997.

Dionisio: When you were clearing the last drafts of the June, 1997 audit report....

Stalder: No integrity issues - not a great concern. People on your side, Joe, both people knew this, so it is not an issue.

Gumberg: You are saying 11th hour it was cleaned up. They ended up reporting it, which is now under fire, saying that is misleading report.

Korbly: I think the burden is on the debtholder for sufficiency of information.

?: SDN accounting, new item.

?: We do not believe this triggers any change. We have focused on it. We believe acquisitions were made in a series of events. Some of the acquisition entities were first acquired by SDN and held there while additional approvals were obtained and moved and into AHERF. Gives rise to a technical question of when it became part of AHERF. This will trigger questions by the SEC.

Queenan: Was it used only for Graduate?

Hope: My understanding is it has been used for years. They didn't have access to SDN and don't know. SDN has been around.

Dionisio: What I know about it is hearsay and secondhand information. SDN, Inc. stands for Sherif, David, Nancy, and it was an organization that I believe came into existence in 1991 in connection with the United Hospitals acquisition that took place in 1990 or 1991. I believe in connection with that acquisition some for profit entities there may be those above hospitals may have gone through SDN for licensing purposes. Maybe Hahneman.

Thurman: What I understand is it was never used for any Western acquisition. The two I can confirm were United Hospitals and Graduate, and I believe those were the only two.

Queenan: Was there any scenario where reserves were set up, good will, etc.?

Korbly: Those were set up regardless of the entity.

Queenan: Just wondering whether the Graduate pattern was a pattern that was set up.

Queenan: Did Coopers have access to the books and records of SDN?

___?___ Presumably, but I don't know.

___?___ Who owns it?

___?___ AHERF sole member.

___?___ AHERF was not sole member. Sole members were Sherif, David, Nancy.

Thurman: It is a non membership corporation.

___?___ What was it used for?

Korbly: I am comfortable with the answer Joe has given...

Dionisio: Our pattern was to do the acquisition and then do the due diligence later. Our pattern was to do very high level 30-day due diligence, reach a letter of agreement, run it through SDN, identify issues, and to the extent there were any issues leave them in SDN and move the good stuff to AHERF.

Queenan: In terms of the subpoenas, was SDN turned over to?

Thurman: REDACTED

Barnes: One of the people who subpoenaed you was worried about finance liquidation and the Grand Cayman.

Thurman: REDACTED

Korbly: Is it a special purpose entity too?

___?___ We are saying that we understand KPMG is looking at consolidations that occurred. SEC will go at this; the point is that we are satisfied with the transactions that went through SDN.

Queenan: Is the offshore insurance company part of the affiliation company?

McClenahan: How does the Centennial fit into the affiliated group?

Stalder: Important thing to focus on is that in the acquisitions there was a time lapse.

_____?_____ During the time it was held by SDN there was a significant loss so the books that were picked up when it went into AHERF did not show any loss?

Korbly: Yes, there was a loss, so therefore when you did consolidate you would have more good will.

Sanzo: Andy described it, that there is not a membership corporation. So this board has no responsibility for SDN.

Dionisio: Yes. I believe they wanted to insulate this board from any responsibility for SDN.

_____?_____ Does that mean that this board has no responsibility for SDN? I would like to have definitive answer. If it is true that it has no responsibility for SDN, when did AHERF and this board become responsible for management and governance for the Graduate Hospital?

Queenan: Well, if it was reacquired four-five months after.

Thurman: REDACTED

Barnes: No. 5. SAS. PriceWaterhouse spent a lot of time going through five points talking about the numbers and integrity of our people. I don't think it is quite fair if thinking of PriceWaterhouse as the only ones having problems. Other firms would have the same. The accounting industry laws in a major way on the representation letter - once you gt a few of those you have some seriously broken sticks that are not easy to mend. We have a major systemic problem unless we are prepared to point out that everything they have said is wrong we will have to move forward.

Stalder: I don't think anyone has suggested to me that what we are learning is wrong. Our challenge is the A-133 and the report. Our mutual challenge is that the representation process is so important to issuing financial statements that we have to get over that hurdle and become convinced that what we are told by the people keeping these books....

Barnes: The board and the Trustees and a lot of other people have been misled by these irresponsible numbers, and if we had not had these irresponsible problems we would not be in the problem we are in today. My point is that this is not an issue that is unique only to accounting firms but it is critical to us as Trustees.

Stalder: The issue of how do we get to the bottom of how it happened and why it happened. You have asked me if these people should be terminated. You needed them as the sale was pending. The SEC won't be sympathetic to that. I am telling you that Mel has sat with some of them and it is hard to get to the bottom of it. We don't understand what they did, why they did it, and who told them to do it with the hope that we all can become comfortable that that is all they have done and that we have identified all the issues as far as integrity. This is a very complicated set of books. If they did something else, it is not likely if with a comprehensive re-audit that we could say we have found it all. Management fraud is difficult to deal with this.

Korbly: Let's talk about management in the Board. You have the issues of what happened. We need to know what people did, why they did it, and under whose instructions to be able to assess the players.

(Talked about who told them to do it).

Barnes: People have said that it is not a legitimate valid defense that the accountants have responsibilities to come to people if they see things that don't stand up. I am wondering who told them to do an issue. Where does that take us?

Stalder: You have people on the signed Rep letter who are still here and people who are telling us now and feeding us information who are still here and they are still closing your books.

Barnes: How do people handle this matter? Are there people who can provide you with temporary finance departments?

Korbly: There are people who can provide you with that. There is outsourcing of an entire accounting function. What do you need to do to get where you want to be? Committee needs to know what management's role is in this. I believe in some way PricewaterhouseCoopers should be part in this meeting of your employees so that we can tell you what we have been told.

Sanzo: Are you going to give us some names?

Queenan: When you go into these meetings, you have to remember these kind of investigations have normally taken place where you will hire outside counsel to

GOR0000129

conduct investigation. They will remind the person that they can have counsel present. We can attempt to go through that process. You have given us at least five names and we can conduct some kind of inquiry into those five. As professionals we can tell them they are entitled to counsel. Their degree of being candid is of question or alternatively we can just take those five and dismiss them after having tried to interview them they would laugh it up because we have no subpoena power. The only sanction we have is to fire them.

Queenan: So we are in a position, unless we can go through the process of trying that, we can come back to PriceWaterhouse. This seemed to be the universe we have discovered. We appreciate what you are telling us and asking us for our representations.

Stalder: That is the only course we have. Joe, we could help you feel out the agencies for the 133 issue.

Dionisio: We have to get a long extension or a substitution.

Korbly: It is imperative that you begin communication with these agencies. We received a notice received by AHERF of a rejection of your 1996 A-133 filings from the Department of Health. They have reviewed 1996 filing and come up with the conclusion that the amount of dollars we reported is different than what we reported. So you have to explain why our numbers are not the same as theirs. Letter dated October 16.

Korbly: We covered all the items in No. 5.

Queenan: What is a forensic accountant?

Korbly: Some of the work we have done is forensic - figure out what happened, who did it, why.

Barron: They have gotten subpoenaed from SEC and two offices from the Department of Justice, U. S. Attorney in Pittsburgh and U. S. Attorney in Philadelphia. They are broad in the amount of documents they seek from us. The indications, in looking at them, is that the Justice Department is acting for the other government agencies, IRS, postal, FBI. Mr. Queenan mentioned his own concern about analyzing mail fraud or wire fraud. Statutes that are wide are the statutes related to those issues. It is clear to me that there is a very intense level of interest in various government agencies about this situation. They are following it closely. They are reading the press. Senior people are taking an interest. Dick Walker, new head of enforcement of the SEC in Washington, is taking a personal interest. Want to move it ahead very quickly. They met with the SEC staff last Thursday in Philadelphia, and their purpose in doing that was trying to get them to focus a little more because if we were to produce all the documentation they have asked

GOR0000130

for we would need two trucks. They had already identified most of the accounting issues we have discussed today. They don't have a clear understanding based on the inquiries they have made or what they have read. They have put a great deal of emphasis on intercompany transfers. They seem interested in getting on top of that issue. We have made our work papers available to them in Philadelphia at Coopers' office, the work papers for Fiscal Year 1996 and 1997, and they have asked for it. A lawyer and two accountants looked over those documents and asked for copies of two-thirds of that. They have follow-up questions. They would like to begin taking testimony from Coopers' people as early as middle of November. The two Justice Department offices having heard from me that they have asked for so much has said, "Hold off, you don't have to produce anything yet. We would like to talk to you at some point and in the near future to focus what we ask for." We will probably meet with them sometime in the week after next in Philadelphia, and we are trying to do this only once with everyone who needs to be involved.

Gumberg: What are the certain topics you think they are honing on?

Barron: It was my impression that they were already informed to some extent on the topic headings of the accounting issues we have discussed today. They knew about the Lockhart fund issue, the reserve issue, and the intercompany transfers issue. They had those in mind, and I am not sure what level they understand them. They do seem to be most focused on the intercompany transfer issue; I don't know quite why because it had the highest number of $117 million.

Queenan: It is possible they believe that issue relates to the information given out on outstanding bonds. Have you given any thought because we now have a parallel criminal and civil investigation - taken any action in trying to hold off the civil?

Barron: I know that is an issue, and we haven't gotten very far in thinking about that.

K&L: Did anyone give the SEC the impression that PricewaterhouseCoopers was not permitted to meet with the SEC because of a request by AHERF?

Barron: I had the impression they thought that and I told them that was a misimpression.

Barnes: Any more questions? Thank you.

Meeting adjourned, 2:55 p.m.

Offer of Executive Session to PricewaterhouseCoopers. The offer was declined.

cg
wp:05281
Transcription date: 5-28-01

GOR0000131

**EXHIBIT 20**

Audit Cte 3/14/97
Finance Cte 3/14/97
Audit Cte 10/15/97
W. Region RMC 10/15/97
Finance Cte 10/30/97

#1

Steno Notes

80 SHEETS 6x9
EYE-EASE®
GREGG 26

National® 36-746

DBR-CG-002007

NATIONAL ■ HOLYOKE, MASSACHUSETTS 01040
Made in USA

W. Region

DBR-CG-002103

focus

diseases

DBR-CG-002105

cardio p. 2

mortality

p. 16

p. 16

cardiology

DBR-CG-002107



DBR-CG-002109

[illegible] diagnostic [illegible]

[illegible] 50,000

5x

(8) [illegible]

[illegible] 2000

[illegible] 9.2,

[illegible]

12.7.

[illegible] 95 [illegible] 2000

[illegible] 2000 [illegible]

[illegible] etc

[illegible]

(n) CV strategy [illegible]

[illegible] forfeit [illegible]

[illegible] entity [illegible]

[illegible] periphery [illegible]

p. 6 [illegible]

[illegible]

[illegible] p. 17

[illegible] 1/2 [illegible]

DBR-CG-002113

connie [illegible]
[illegible]
[illegible] sa [illegible]
[illegible]
[illegible]
[illegible]
[illegible] A. 1. [illegible]
[illegible]
[illegible] B. Finance
[illegible] ① agh f/s
sa [illegible]
[illegible]
[illegible] agh
[illegible] bar & p 43:
[illegible]
[illegible]
[illegible] huge [illegible]
[illegible] forbes [illegible]
[illegible]
[illegible]
[illegible] 164 000
[illegible]

DBR-CG-002115



DBR-CG-002117

DBR-CG-002119

DBR-CG-002121

[illegible] 5778

-96 [illegible] -96 19 [illegible]

[illegible]

prod -96

[illegible]

— prod

13

Bal & p 43

p. 41

164

[illegible]

assoc

3, [illegible]

1997

4, [illegible] 68

24

[illegible]

31, 96

DBR-CG-002123

intangible

17 mil

unamortized amortized

17 mil

amortize p. 45

43.8

Bulk of intangible

OB 2 intangible

DBR-CG-002126

4.42

2.48

11,843

16

26

15

approved

B

(2)

Barry

L3097

p. 57.

DBR-CG-002124

frag metro WM

hospice / nursing

AV

amortization

DBR-CG-002122

17.8 VS

14.7

op

110

DBR-CG-002120