DBR-CG-002118

4. Tab 6

[illegible]

DBR-CG-002116

DBR-CG-002114

theater

200

prep

kardio

cancer

DBR-CG-002112

Siemens

Barry

2 qtr

1'3

neutral

DBR-CG-002110

[illegible]

6 [illegible] 3

L 30 [illegible]

canons [illegible]

[illegible]

160

MR 9 [illegible]

9.5

C 4, 4 [illegible]

C 4, 4

L 30

1 BC [illegible]

canons

etc

C 1.7, 1.8

[illegible]

DBR-CG-002108

B5.

collapse

DBR-CG-002106

DBR-CG-002104

[illegible]

Feb Mar

DK [illegible] steps [illegible]

May June

actuarial

[illegible]

3 [illegible]

3-4

[illegible]

DBR-CG-002102

cg Tony gave overview of finance aspects of the Cardiology program.

Sanzo: Look at the market; it is crowded, but we are a dominant player. Combination of Shadyside and UPMC is an incredible dominance in Allegheny County - most of our strength is outside Allegheny County. Biggest challenge: Capture Allegheny County market. Want to quantify how important Cardiology service is to the hospitals we represent in the Western Region.

cg Note: Showed slides. Talked about (1) percentage of hospital business, (2) net revenue and total cost, (3) payor mix based on gross charges, (4) benchmark data - average net revenue and total cost per case, (5) benchmark data acuity, (6) benchmark data - average net revenue and total cost per case (acuity adjusted) (7) benchmark data - average length of stay - Sherif talked about the yield, i.e., how many diagnostic procedures require a surgical intervention. In AGH case, it is on the low side; at ___________, it is 50%, practically five times. (8) benchmark data - average total west and variable cost per case.

___?___ From CC point of view, as long as we keep our investments and infrastructure down, we will have ......

___?___ Given that this is a very important clinical service, we believe we should move forward and implement strategies that will get us to those market share goals, i.e., by 2000, go from 92.% CC market share to 11% and bring it to 12.7%. That would be a growth from 95 to 2000 of 2000 additional cases. We believe we could accommodate all or almost all of that growth with the growth that has occurred.

___?___ Strategy budget impact.

Gumberg: Competition has provided us with a periphery strategy instead of a market strategy.

___?___ Page 6 of book. Talked about market place. Have we considered the possibility of a West Penn and even out the playing field in light of what UPMC did with Shadyside?

Abdelhak: As you know, we had an opportunity to look at Shadyside. If you look at the population, half of the Allegheny County population lives in the east. If you look at Shadyside and West Penn, you forfeit all of the east to that entity.

___?___ I think it is enormous opportunity.

____?____ It will impact the referrals to AGH in a significant way.

____?____ Three questions: Are we going to be better off as an institution? Our patients? Our students? Our staff?

cg Note: Question about Page 17 - streamlining development across the organizations. Connie talked about consistent medical staff development plans across the organization. Talked about thinking as four different medical staffs and four separate organizations or thinking as a region.

____?____ What we have suggested is that we move toward regional planning. We need to think as one.

____?____ Question about cost effectiveness referral in terms of West Penn and Shadyside.

____?____ Last point: We have a huge opportunity in the region with Forbes Regional Services. They are a big factor to Shadyside and we need to be able to turn that around.

Abdelhak: Main point is to acquire the business rather than the facility.

A. Minutes approved.

B. Finance - AGH Financial Statements

Abdelhak: With additional information, turn to AGH balance sheet, Page 43. Note Assets section, Assets Limited as to Use - amount under Board of Trustees, $164,000 million - balance today is closer to $58 million in light of the fact that the Finance Committee approved the use of some of those assets to deal with in the Delaware Valley. Income is being recorded to AGH on a current basis and the principle will be repaid within the next 12-24 months. In addition, Page 45 - you will see a huge transfer into AGH from AIHG - some transfer of all transfers, $43 million, $73 million - it transferred to AGH. We have accumulated a transfer amount of assets at AGH, and I don't see any point in maintaining them there. These are assets that have been paid for by AGH and we have transferred them back.

Dionisio: In the interests of time, I will be brief about presenting the June 30 financial statements. Page 41 - Executive Summary highlights- inpatient revenue - substantial positive variance from the amount published because (1) enjoyed positive variance of 1300 inpatient cases over the amount budgeted for Fiscal Year 1997. Enjoyed substantial positive rate variance per case. Net average rate

GOR0000134

per case was 10,400 positive variance. With respect to inpatient revenue, comparing 1997 to 1996, total variance was 2400 cases, primarily result of recruiting of specialists and expansion of primary care network and investment in AIHG. Outpatient revenue increased over budget by 22%. We had budgeted 5% increase between 1996 and 1997. The combination of both volume and positive rate variances in investment income turned out to be $20 million compared to budget of $16 million. Positive impact of $4 million is a result of higher yield. More importantly, we had the sale and leaseback of the East Wing. Also, however, paying rent back for higher expenses. Total revenue finished year with $478 million in revenue compared to budget of $425 million. Expenses: $41 million ahead of budget. Turn to Page 50, 51 and I will outline briefly reasons for increases in expenses: (1) Salaries, wages, fees, fringe benefits, increased volume of about 1300. (Gave more detail. Page 52, talked about unfavorable variance in purchased services - garage and East Wing.) Go back to Page 41 - Produced approximately $21 million of income compared to adjusted budget of $9 million compared to last year's actual of $20 million. Effective January 1, 1997, ASRI was no longer a subsidiary of AGH but was transferred to University. As a result, support which AGH provided to ASRI is now treated as an expense item on the statement of operations. Adjusted budget column to reflect that change in accounting took place January 1, 1997. Net income for the year $12 million.

Comment about 1997 earnings compared to 1996: The quality of the earnings in 1997 are substantially better than the quality of earnings in 1996 because in 1996 we recognized the gain on the sale of the IBM Building and had a requirement that we began recognizing the positive impact of gifts and contributions. Page 41, CPAD, which excludes the impact of AUHS for reserve, improved 3% over the budget for 1997 and improved 4% for the prior year. Call took into account the financial results of March 31, 1996. Year end CPAD 5778, which was much better than anticipated when we prepared budget. Productivity in 1996 was 9%, which is a first year improvement in productivity of 13%.

Balance sheet, Page 43, included non restricted assets of $164 million - is an amount that had been advanced to associates as a revolving loan agreement - other assets of $68 million compared to $24 million last year. Those are the AIHG expenses. Liability side of balance sheet, Accounts Payable and expenses have increased over the prior year. You are aware of the reasons - an effort to balance payables to receivables. $17 million - talked about unamortized gain on the sale of the parking garages and the East Wing. Have to defer the gain and amortize. Combination of this and the invested income received on the sale is slightly greater than the real expense.

___?___ Question: Transfer from AIHG of assets? How much was intangible and what

were they?

Abdelhak: In many cases, they are non compete provisions that are amortized over a certain period of time.

____?____ Is it much of the $17 million?

McConnell: Page 45, $43.8 million. Bulk was intangible.

____?____ Why bother transfer the intangible assets?

Abdelhak: Question of who paid for them. Question of maintaining consistent system.

McConnell: There is a second piece to that. Flip side of entry of adding asset back which strengthens our financial position. AIHG is not in any Obligated Group and is not contemplated to be in any Obligated Group.

____?____ Question: Page 47, total margin profitability ratio - are we looking at comparable numbers between 1996 and 1997?

Dionisio: Yes, the only thing we are excluding is the profitability of taking into account the AUHS support of $9+ million. On this page, I would also note that there is continued improvement in the management of Accounts Receivable from last year to this year. We have cut off another five days.

Edelman: What is the $9 million he is talking about?

Dionisio: Page 41. Above net income of $11.8 support to AUHS (six months support to Singer), 9.283, 4.42 without AUHS, 2.48 reflects net income of 11.843.

Abdelhak: In the past, when ASRI was a subsidiary of AGH, whatever was provided was a funded balance transfer of $16 million.

Edelman What will we show next year?

____?____ It is an expense.

Abdelhak: All of the expenses associated with the University are expenses that incur here in the West. There are no expenses of the University that are allocated to the West. It represents the research cost that was previously put in ASRI and the academic cost that was previously put in AGH. This is basically the faculty that are at AGH

for AGH and no one else. Only contribution AGH has made to the University is the 15% of its income that it pays on an annual basis.

Approved.

B.

Roth: The statements are for the Year End June 30, 1997. Page 57. Since this is the first meeting, these are the consolidated health system of Forbes Regional, Metropolitan, Hospice, and Nursing Center. Merger on January 1; Allegheny Valley on March 1. None on Canonsburg. Statements reflect net income of $20 million, better than budget. Significantly higher margin 17.8 vs. 14.7. Outpatient volume was strong, cost per admission was at budget or slightly better. Expenses slightly above budget, mostly comprised of salary and wage and benefit category.

Moyer: Barry mentioned briefly the issue of Medicare recapture and negative good will, amortization. The merger of Forbes and Allegheny Valley into AUMC was handled from accounting standpoint as a purchase, the purchase price being the outstanding debt and liabilities. Price was $110 million and take assets and place a value on your assets that isn't greater than $110 million. Since Forbes brought into the merger more than $110 in cash assets. So all of the PPE is written off into zero. Note on Page 59 at the beginning balance sheet was no PPE. Once that happened, there were still more assets that you could allocate to the purchase price, so we recorded a negative good will. That leads to Medicare depreciation recapture. Since assets were written down to zero, M_______ has been paying us their share of depreciation. M________ should be paying us faster. We can go back and reclaim that and we estimate that can be claimed in the amount of $30 million. We are recognizing $28 million on financial statements at $7 million for the next four years. Statements still have included the $7 million as a receivable and as income. Negative good will turned out to be about $31 million, and we will be amortizing that over ten years. Page 58 you will see that as of June 30, the PPE net is about $4.5 million for assets purchased after the purchase date of both organizations. Difficult to make comparison on balance sheet between January 1 and June 30 because Allegheny Valley came in on March 1. On the income statement, Page 60, depreciation and amortization will be a negative number as we put it in the negative good will.

(Barry covered June 30 statements).

Abdelhak: Two important facts to point out: Depreciation recapture is not an option. It is the law. In addition, we will try and recapture all $60 million although we are

GOR0000137

reflecting them at ½ the value to present it in a conservative way, and we anticipate recapturing that.

Motion approved.

III. Information

No questions.

IV. Tab 6.

Abdelhak: There have been a couple of developments since the budget was put together, most notably the agreement we reached with Blue Cross and that represented an annualized reduction in terms of revenue from Blue Cross in terms of $5 million and that was retroactive to July 1.

Sanzo: General comment: When you look at the highlights in the income statement, AGH lagged behind its plan by $5 million and recorded a loss of $3.5 million. There are some estimates in here because we usually don't have statements to share with you on the 15th of the month. (Talked about activity first at AGH). Admissions were (        ) over plan. We still exceeded our planned growth in outpatient activity. Total revenue for the first quarter was about $3.5 million over plan. Average Length of Stay .2 days lower than plan; acuity slightly higher. Variances behind expenses: First, patient care related expenses tied to volume increase. Salaries over plan. Half of that is for overtime. Our goal is to staff with nurses at the third quartile, but we have been increasing number of nurses because we believe it has a direct impact on the quality of the experience and on outcomes. We have 70 vacancies in the nursing staff. Other areas are also patient care related - supplies over plan also but are favorable on a patient day basis by 1%. Will consolidate our purchasing power.

Second broad category of expenses were "University" expenses, however, these were hospital related expenses before we had University expenses. Also have a system problem in Western Pennsylvania - employing physicians who have been working under a different provider number and need to be re-credentialed and until that happens, we cannot bill for them. This is corrected in the new Blue Cross contract. David estimated the total outstanding revenue stream owed to us from blue Cross at about $4 million. We think we have some double accounting of overhead in today's expenses, which we estimate to be about $5 million per year.

Finally, the issue of research - when ASRI was subsidiary, we underwrote development of research and now it shows up as expense. Next week I will meet with Dr. Ross, etc., to establish a focus for research on the AGH campus. Need to continue to pursue new knowledge in research.

Abdelhak: Tony was confronted with a real problem which precipitated my asking him to have this meeting scheduled. The Federal North project has been on the books for a long time. We asked the city to tear down the theater, etc., to develop the street. City needs commitment by the end of the month. Initially, there were considerations of using 200,000 sq. ft. For research. That is an $11 million carrying cost on an annual basis. I made the decision we will not develop it for research. We will develop it for offices. Can vacate a lot of offices when leases expire. So we will not have facilities to expand or research facilities here. Need to continue to expand research in cardiovascular, cancer. Need to make sure people at the University got the message and make sure space is provided on a priority basis. This is a preliminary decision. Decisions about whether we incur another $11 million of carrying cost. The answer is No.

Roth: Financial Statements - The statements included Canonsburg for the first quarter. Talked about drop in revenue due to decline in admissions. Drop in length of stay. Outpatient - we continue to see significant revenue growth of three acute care facilities - continued to increase - referred to positive impact of AHERF contract with Siemens in purchased services. Investment income significantly better than budget. Have been preparing cost reductions because of the Medicare changes with respect to the balanced budget - $113 million - hope to make these neutral throughout the year.

Moyer: Comments on balance sheet, Page 3. June 30 does not include Canonsburg. For our next meeting we will make it July 1 to make it more comparable. That accounts for much of the difference in the categories. Accounts Receivable has grown about $915 million. About $4 million was Canonsburg. We had about (            ) at Blue Cross, which has again back. We are currently sitting on about $1.7 million - $1.8 million of items in our Skilled Nursing Facility and Facility Practice Plan because the state has not issued provider number since the merger, so we could bill it. That will drop significantly by end of December. Under Assets Limited as to Use, $160 million of that has grown by $11 million from June 30. About $4 million was from Canonsburg.

Approved.

B. 5.

McConnell: Tab 7, Resolution. With the development and growth of AUMC, the debt

GOR0000139

documents are cumbersome and limiting. The law works in that when you combine two sets of documents, the most restrictive prevail. Canonsburg's documents are restrictive. Complications are so great that we created a separate corporation until AUMC, until we implement the financing and then collapse the corporation. We want to re-finance all AUMC and AGH debt, as that should be the way to go. Studying to see how complicated. If it is more simple to get a better deal. Would like to combine Western credit into one set of documents and reduce our cost of debt. Based on rates of this morning, I believe we can effect this and save money. Wouldn't do it if the rates go bad. Predicts we have 5% savings. Some of it can be tax exempt. We are also asking, based on prior approvals, to finance capital improvements

Moved. Approved.

B. 6.

___?___ Any questions about impact information?

Vi. AHERF Retirement Plan

Kasperbauer: Summarize the steps and actions: Goal is to merge all of our employees into a single AHERF retirement program. This has been our policy. Steps involve AUMC assuming plan sponsorship for the existing plans. Legal necessity.

cg Note: Dwight reviewed steps. Had legal and actuarial advice.

Moved. Approved.

___?___ Any questions on other information items? Meeting three times per year. Plan in advance. Anticipate Committee will be named shortly and Committee Chair.

cg
wp:05301
Transcription date: 5-31-01

# COMMITTEE APPENDIX

## Tab 21

**CORPORATE BYLAWS**

**ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION**

(Including amendments through December 12, 1996)

PGH: 7900.1

DBR-LI
0183337

# ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

## BYLAWS

### ARTICLE I

### NAME

The name of this corporation shall be Allegheny Health, Education and Research Foundation (AHERF).

### ARTICLE II

### PLACE OF BUSINESS

The corporation shall have its principal office in the City of Pittsburgh, Pennsylvania, and may have such other offices as the Board of Trustees may from time to time determine.

### ARTICLE III

### FISCAL YEAR AND FISCAL RESPONSIBILITY

**Section 3.1 Fiscal Year.**

The fiscal year of this corporation shall be the period extending from July 1 of each year through June 30 of the following year.

**Section 3.2 Fiscal Responsibility.**

The corporation shall have the authority to determine how any and all excess cash generated by its supported organizations is allocated within the Allegheny System in pursuit of the overall

Allegheny mission. For purposes of this section, "excess cash" shall mean the amount of cash added in prior periods as reflected in the audited statements of cash flows for each supported organization. AHERF allocation of such excess cash would occur only after insuring compliance with any and all debt covenants.

## ARTICLE IV
## PURPOSES

**Section 4.1 Purposes.**

The corporation will have the purposes or powers as stated in its Articles of Incorporation, or any amendments thereto, and, unless otherwise limited by the Articles of Incorporation, shall also have whatever powers are or may be granted by the Pennsylvania Nonprofit Corporation Law of 1988, or under the Pennsylvania laws relevant to Pennsylvania nonprofit corporations, or any successor legislation.

## ARTICLE V
## CORPORATE MEMBERSHIP

The corporation shall have no voting members. Any provision of law requiring notice to, the presence of, or the vote, consent, or other action of voting members of the corporation in connection with such matter shall be satisfied by notice to, the presence of, or the vote, consent, or other action of the Board of Trustees of the corporation.

## ARTICLE VI
## BOARD OF TRUSTEES

**Section 6.1 Management and Duties.**

The business and the affairs of the corporation shall be directed, controlled, and managed by the Board of Trustees which shall be the governing body of the corporation, and which shall be

DBR-LI
0183339

appointed by the Member of the corporation. The Board of Trustees shall direct the management of all of the affairs, the property and funds of the corporation, and shall have the duty and authority to do and perform all acts consistent with these Bylaws, the Articles of Incorporation of the corporation and any amendments thereto, and the laws of the Commonwealth of Pennsylvania.

The Board is responsible for monitoring and evaluating the performance of the President and Chief Executive Officer of this corporation.

The Board shall act on and approve annual capital and operating budgets and shall review and approve the annual audited financial statements and management's response.

The Board may delegate such duties and authorities as it deems appropriate to committees of the Board in a manner consistent with these Bylaws, the Articles of Incorporation of the corporation and any amendments thereto, and the laws of the Commonwealth of Pennsylvania.

The Board of Trustees shall have such other duties as may be prescribed by law.

**Section 6.2 Annual Review of Management.**

At least once a year, the external members of the Board will meet in Special Session to review the performance of management. The results of this review will be communicated through the Board Chair to the AHERF Chief Executive Officer.

**Section 6.3 Number of Trustees.**

The Board of Trustees shall consist of not less than ten (10) nor more than thirty-five (35) persons, including <u>ex officio</u>

DBR-LI
0183340

trustees, as such number may be determined by the Board of Trustees from time to time. Trustees shall be appointed, based on the recommendation of the Committee on Trustees. Trustees shall generally be appointed at the annual meeting of the Board of Trustees, but may be appointed at any annual, regular or special meeting of the Board.

**Section 6.4 Terms of Office of Trustees.**

The initial term, for all trustees who have not previously served on the Board of this corporation or any other corporation within the Allegheny system, shall be one (1) year. Thereafter, members of the Board of Trustees shall serve for three year terms except that one-third of the initial Board of Trustees shall be appointed to serve for three (3) years, one-third shall be appointed to serve for two (2) years, and one-third shall be appointed to serve for one (1) year. All trustees shall retain their respective position as trustees until their successors shall be duly appointed and qualified, except _ex officio_ trustees, who shall retain their position as trustees only during their tenure in the position from which _ex officio_ status is derived.

**Section 6.5 Representation of Supported Organizations.**

At all times, at least one member of the Board of Trustees of each of the Supported Organizations (as defined in the corporation's Articles of Incorporation and listed below) shall be serving concurrently as a trustee of the corporation. At no time shall a majority of the trustees of the corporation be composed of persons serving concurrently as trustees of any single corporation in which the corporation has a sole, majority, or controlling ownership or voting interest, whether direct or indirect.

(Supported Organizations:

Allegheny General Hospital

Allegheny University of the Health Sciences
Allegheny University Hospitals
St. Christopher's Hospital for Children
Allegheny Integrated Health Group)

**Section 6.6 Representation from the Philadelphia Area Entities**

(a) No fewer than two (2) members of the Board shall at all times be persons from the Philadelphia area who shall also be serving as trustees of the Allegheny University Hospitals (AUH).

(b) No fewer than two (2) members of the Board shall at all times be persons from the Philadelphia area who shall also be serving as trustees of the Allegheny University of the Health Sciences (AUHS);

(c) At least two (2) members of the Board shall be members of the AUHS Faculty;

**Section 6.7 <u>Ex Officio Trustees</u>.**

The following shall serve as <u>ex officio</u> trustees, with vote. An individual may fill more than one (1) <u>ex officio</u> position:

(a) The President and Chief Executive Officer of AHERF;

(b) Either the Chair of the Medical Staff Executive Committee, the Executive Vice President of Medical and Academic Affairs, or the President of the Medical Staff of St. Christopher's Hospital for Children, as designated from time to time by the corporation;

(c) Either the Chair of the Medical Staff Executive Committee or the President of the Medical Staff of MCP Hospital as designated from time to time by the corporation;

(d) Either the Chair of the Medical Staff Executive Committee or the President of the Medical Staff of Hahnemann University Hospital, as designated from time to time by the corporation;

(e) Either the Chair of the Medical Staff Executive Committee or the President of the Medical Staff of Allegheny

DBR-LI
0183342

General Hospital, as designated from time to time by the corporation;

(f) The Chair of each Supported Organization, as defined in this corporation's Articles of Incorporation and in Section 6.5 of these Bylaws. In the event that the Chair of any Supported Organization also is the Chair of the Board of this corporation, then the Vice Chair of that corporation shall fill the position of ex officio trustee that otherwise would be filled by the Chair;

(g) The Chair of Allegheny Health Services Providers Insurance Company.

In the event that any individual holds multiple ex officio positions and/or appointment pursuant to section 6.6 of these Bylaws, he/she shall have one (1) vote.

**Section 6.8 Removal of Trustees.**

Any trustee may be removed from office, with or without cause, by the vote of a majority of the trustees then in office.

**Section 6.9 Vacancies on the Board of Trustees.**

All vacancies on the Board of Trustees shall be filled by the Board of Trustees. A trustee appointed to fill a vacancy or to occupy a position resulting from an increase in the number of trustees shall serve for the unexpired portion of the term.

**Section 6.10 Annual Meetings of the Board of Trustees.**

The annual meeting of the Board of Trustees of the corporation shall be held during the fourth quarter of each year, at such time and place as the Board of Trustees shall determine for the purpose of appointing trustees and officers and transacting such other business as may properly be brought before the meeting. If less than a quorum of trustees appear for an annual meeting of the Board of Trustees, the holding of such annual meeting shall not be required and matters that might have been taken up at the annual

DBR-LI
0183343

meeting may be taken up at any later regular, special or annual meeting or by consent resolution.

**Section 6.11 Regular and Special Meetings of the Board of Trustees.**

Regular meetings of the Board of Trustees shall be held at such date, time, and place as shall be designated by the Board. The Board of Trustees shall meet as often as necessary, but no less often than semi-annually, to transact the business of the corporation. The Board, at its discretion, may meet in executive and/or special session. Fourteen (14) days prior written notice of the time and place of all regular meetings shall be given to all trustees.

**Section 6.12 Special Meetings.**

Special meetings of the Board may be called by the Member, the Chair of the Board, the President, or the Executive Committee, and shall be called by the Secretary upon the written request of five (5) trustees. Written notice of special meetings of the Board, stating the purpose of the meetings, shall be sent to each trustee at least five (5) days prior to the day named for the meeting. Other business matters in addition to those stated in the notice may be transacted at a special meeting upon a majority vote of the Trustees at any special meeting at which a quorum is present.

**Section 6.13 Executive and/or Special Session.**

The Board, or any Committee thereof, at its discretion, may meet in Executive and/or Special Session. Such meetings may be held in conjunction with any regular or special meeting of the Board or Committee or may be separately called. Where Executive or Special Sessions are held, other than in conjunction with a regular or special meeting of the Board or Committee, written notice of such meetings, stating the purpose of the meeting, shall be sent to

each eligible Trustee at least five (5) days prior to the day named for the meeting.

A meeting in Executive Session shall include all voting members of the Board or Committee. A meeting in Special Session shall include only external Trustees who are voting members of the Board or Committee. Attendance at either an Executive or Special Session may include, at the request of the Board or Committee, the officers of the Board and other individuals whose presence is deemed necessary to the consideration of an issue before the Board or Committee.

**Section 6.14 Waiver of Notice.**

Any meeting of the Board of Trustees may be deemed to have been validly and legally called if the trustees entitled to vote on the day of the meeting sign a written waiver of notice, either before or after the meeting. Attendance of a trustee at any meeting shall constitute a waiver of notice for that meeting and no written waiver need be obtained from that trustee except when the trustee attends the meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. All such waivers, consents or approvals shall be filed with the corporate records.

**Section 6.15 Actions by Unanimous Written Consent.**

Any action required or permitted at any meeting of the trustees may be taken without a meeting, without prior notice and without a vote if all of the trustees entitled to vote thereon consent in writing. Said written consents shall be filed with the minutes of the proceedings and shall have the same effect as a vote for all purposes.

**Section 6.16 Quorum of Trustees for Transacting Business.**

Unless otherwise specified in these Bylaws, a quorum for the transaction of business at any meeting of the Board of Trustees shall be one-half (1/2) of the voting trustees of the corporation, including ex officio voting trustees. Unless otherwise specified in these Bylaws, a quorum for the transaction of business at any meeting of a committee of the Board shall be one-half (1/2) of the members of the committee. To constitute a quorum at either a Board or committee meeting, at least one-half (1/2) of those Board or committee members present shall be external Board members (that is, individuals other than full-time employees of the corporation and/or members of the Medical Staff of the corporation [or of any other entity to which the corporation is related by common ownership or control]).

The vote of a majority of the trustees present at any meeting at which there is a quorum shall be the acts of the Board or of the committee except as a greater vote may be required by the laws of the Commonwealth of Pennsylvania, these Bylaws, or the Articles of Incorporation of the corporation, provided that a majority of the number of trustees comprising less than a quorum may adjourn any meeting of the Board of Trustees at which a quorum previously was present.

**Section 6.17 Conference Telephone.**

A member of the Board or of a committee designated by the Board may participate in a meeting by the means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another. Participation in a meeting in this manner constitutes presence in person at the meeting and shall count toward the quorum requirements.

**Section 6.18 Compensation.**

No member of the Board of Trustees shall be entitled to any compensation for his or her services as a trustee, provided that the foregoing shall not prevent the Board of Trustees from providing reasonable compensation to a trustee for services which are beyond the scope of his or her duties as a trustee or from reimbursing any trustee for expenses actually and necessarily incurred in the performance of his or her duties as a trustee or from entering into a contract, directly or indirectly, with a trustee for the providing of goods or services to the corporation if such contract is in the best interest of the corporation and on fair and reasonable terms.

**Section 6.19 Qualifications.**

Trustees shall be those individuals who have demonstrated the requisite experience, skills, interests and ability to represent various aspects of the community served by the corporation. Trustees need not be residents of the Commonwealth of Pennsylvania.

All new trustees will be provided with appropriate orientation relative to specific Board functions and procedures to educate them in their governing role and will also be provided with opportunities to attend continuing education programs designed to enhance their performance as Board members.

**Section 6.20 Board of Trustees' Confidentiality Agreement.**

Each member of the Board of Trustees, each new nominee to the Board and emeritus trustees who continue to be active in the organization shall be required to sign a Confidentiality Agreement (the "Agreement"), to be kept with the official records of the corporation, acknowledging the importance of maintaining the confidentiality of the affairs of the corporation and the matters discussed at Board or Committee meetings. Confidentiality shall be maintained pursuant to the organization's policy as set forth in

the Allegheny Health, Education and Research Foundation Code of Ethics. Any Board member contacted about confidential matters relating to the organization shall refer the inquiry to the authorized spokesperson for the organization.

**Section 6.21 Annual Conflict of Interest Statement.**

Each trustee, officer, member of a committee with Board delegated powers, key clinical or administrative manager employed by the corporation, or other individual who is in a position to exercise substantial influence over the decisions of the organization, shall submit to the Foundation Ethics Committee of Allegheny Health, Education and Research Foundation a periodic conflict of interest disclosure statement in a form prescribed by the Committee which, among other things, affirms that such person:

a. has received a copy of the conflict of interest policy,

b. has read and understands the policy,

c. has agreed to comply with the policy, and

d. understands that the corporation is a charitable organization and that in order to maintain its federal tax-exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

**Section 6.22 Conflict of Interest Policy.**

The Board of Trustees of Allegheny Health, Education and Research Foundation shall adopt a Conflict of Interest Policy applicable to each of the Allegheny corporations that is consistent with the provisions of Section 6.21, above, and that is in furtherance of the corporation's best interest and consistent with applicable policies and requirements of law.

## ARTICLE VII
## OFFICERS

**Section 7.1 Officers.**

The officers of this corporation shall consist of a Chair, one or more Vice Chairs, a President and Chief Executive Officer, a Secretary and a Treasurer and such other officers with such duties as may be authorized and determined by the Board of Trustees. The offices of the Secretary and Treasurer may be held by one and the same person, who in such case shall be termed the Secretary-Treasurer. The Chair and Vice Chair shall be selected from among the trustees of the corporation.

**Section 7.2 Appointment and Terms of Office.**

The officers of the corporation shall be appointed by the Board of Trustees at the annual meeting of the Board of Trustees, and shall serve at the pleasure of the Board. At all times, the Chair of the Board shall be selected from among those members of the Board of Trustees of AHERF who reside in the Pittsburgh area. The terms of office to be held by said officers thus appointed shall be for one (1) year or until their successors are duly appointed and qualified except, in the case of an officer of the corporation who is employed by the corporation to serve in an office, as otherwise provided in the employment agreement between the corporation and such officer. The officers thus appointed and qualified shall serve as the officers of the corporation and of the Board of Trustees.

**Section 7.3 Vacancies.**

In the event of a death, resignation, removal or other inability to serve of any officer, the Board of Trustees shall appoint a successor who shall serve until the expiration of the

normal term of such officer or until his or her successor shall be appointed.

**Section 7.4 Chair.**

The Chair shall preside at all meetings of the Board of Trustees and of the members of the corporation and shall be an _ex officio_ member of all committees. The Chair shall sign and execute on behalf of the corporation, all corporate records, documents, and instruments. He or she shall have and exercise all powers usually incident to the office of Chair of a non-profit corporation and shall perform such other duties as may be delegated by the Board of Trustees.

**Section 7.5 Vice Chair.**

The Vice Chair shall act as Chair in the absence or inability of the Chair to act and when so acting the Vice Chair shall have all of the powers and authority of the Chair. The Vice Chair shall also perform such other duties and functions as may be delegated by the Board of Trustees. If there is more than one Vice Chair, the Board shall designate their seniority.

**Section 7.6 President and Chief Executive Officer.**

Subject to such supervisory powers, if any, as may be given by the Board of Trustees to the Chair, the President and Chief Executive Officer shall be the Chief Executive Officer of the corporation and shall, subject to the direction of the Board of Trustees, have general supervision, direction and control of the business and affairs of the corporation and shall have the general powers and duties of management usually vested in the office of President and Chief Executive Officer and shall have other power and duties as may be prescribed by the Board of Trustees and by these Bylaws.

DBR-LI
0183350

The President and Chief Executive Officer shall preside at meetings of the Board of Trustees in the absence of the Chair and Vice Chair or if no Chair or Vice Chair have been elected and shall be privileged to attend and participate without vote in the meetings of all committees of which the President and Chief Executive Officer is not otherwise a member. Acting under the direction of the Board of Trustees and, on its behalf, the President and Chief Executive Officer shall perform all acts, execute and deliver all documents and take all steps authorized by the Board in order to effectuate the actions and policies of the Board.

<u>Appointment of President of Subsidiary Corporations</u>:

Unless otherwise provided in the bylaws of the corporation or in the laws of the Commonwealth of Pennsylvania, the President and Chief Executive Officer may appoint the President and Chief Executive Officer of any Subsidiary Corporation, after consultation with the Chair of the applicable Subsidiary Corporation and subject to the initial approval by both the Board of Trustees of the Subsidiary Corporation and this corporation. Following the initial approval by the Board of the Subsidiary Corporation and the Board of this corporation of the appointment of the President and Chief Executive Officer of any Subsidiary Corporation, no further ratifications of the appointment of the individual shall be required.

<u>Removal of President of Subsidiary Corporations</u>:

The President and Chief Executive Officer of any Subsidiary Corporation may be removed, with or without cause, by any one of the following:

(1) By the President and Chief Executive Officer of this corporation, after consultation with the Chair of the Subsidiary Corporation's Board of Trustees; or

(2) by the affirmative vote of the majority of trustees of the Subsidiary Corporation then in office; or,

(3) by action of the Board of this corporation.

"Subsidiary Corporation" shall mean any corporation in which this corporation has a sole, majority or controlling ownership or voting interest.

**Section 7.7 Vice Presidents.**

There may be one or more Vice Presidents who shall have such duties as are determined from time to time by the President and Chief Executive Officer. In the absence or disability of the President and Chief Executive Officer, the Vice President, or Vice Presidents in order of their rank as fixed by the President and Chief Executive Officer, or if not ranked, the Vice President designated by the President and Chief Executive Officer, shall perform all duties of the President and Chief Executive Officer and when so acting shall have all of the powers and be subject to all of the restrictions of the President and Chief Executive Officer. When Vice Presidents have been appointed, one or more such Vice Presidents shall be designated who shall perform the duties of the President and Chief Executive Officer in the President and Chief Executive Officer's absence.

**Section 7.8 Secretary.**

The Secretary shall attend all meetings of the Board of Trustees. He or she shall preserve in record books the full and correct minutes of the proceedings of all such meetings. He or she shall be custodian of the corporate Articles of Incorporation, Bylaws and minute books. It shall be the duty of the Secretary to

sign and execute all corporate documents and instruments whereupon his or her signature may be lawfully required. He or she shall also serve all notices required by law, these Bylaws, or by resolution of the Board of Trustees and it shall be his or her duty to cause to be prepared and filed with appropriate bodies, official reports and documents required by law to be filed by non-profit corporations. He or she shall also perform such other duties as may be delegated by the Board of Trustees.

**Section 7.9 Treasurer.**

The Treasurer shall keep or cause to be kept in books belonging to the corporation, complete and accurate accounts of all receipts and disbursements, resources and liabilities, and shall deposit all monies and funds and other valuable effects of the corporation, in the name of and to the credit of the corporation, in such depository or depositories as may be designated by the Board of Trustees. He or she shall disburse the funds of the corporation in payment of its obligations, taking proper vouchers and receipts for such disbursements. He or she shall render to the Chair and to the trustees at the meetings of the trustees, or whenever otherwise requested, correct statements and reports showing the financial condition of the corporation. He or she may sign corporate documents and instruments as necessary.

**Section 7.10 Other Officers.**

The Board of Trustees may appoint such other officers with such titles and responsibilities including, but not limited to, assisting the officers of the corporation in performing the duties and obligations enumerated above, as the Board of Trustees acting in sole judgment and discretion may direct.

**Section 7.11 Delegation of Duties of Officers to President and Chief Executive Officer.**

The Board of Trustees may delegate to the President and Chief Executive Officer by appropriate resolution, rule or regulation, such part or portions of the duties and obligations enumerated above as the Board of Trustees acting in its sole judgment and discretion may direct.

**Section 7.12 Bonding of Officers and/or Employees.**

The Board of Trustees may require any of its officers or officers of the corporation, or any of the employees of the corporations to furnish a bond or bonds to the corporation with such surety or sureties and in such amount or amounts as shall be sufficient in the judgment of the Board of Trustees to secure the corporation against loss or damage by reason of any act, neglect, or omission on the part of such officers or employees. These bonding provisions are intended to apply specifically, as the Board of Trustees may determine, to such officers and/or employees of the corporation occupying positions of trust and confidence.

## ARTICLE VIII

## ORDERS FOR THE PAYMENT OF MONEY AND EXECUTION OF INSTRUMENTS

**Section 8.1 Checks.**

All checks, drafts, or orders for the payment of money, shall be executed in the name of the corporation in such manner by such officer or officers or employees as the Board of Trustees shall determine by resolution or order.

**Section 8.2 Contracts.**

When the execution of any contracts, conveyances or other instruments has been authorized without specifying the executing officers, any two officers may execute the same in the name and on behalf of this corporation, provided that the Board of Trustees may designate any single officer or employee to execute an instrument or instruments on behalf of the corporation. Such authority may be general or confined to specific instances and unless so authorized by the Board, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose.

**Section 8.3 Execution of Conveyances and Mortgages.**

Except as otherwise required by law or any other provision of these Bylaws, no purchase of real property shall be made by the corporation nor shall it sell, mortgage, lease away or otherwise dispose of its real property, unless such a transaction is authorized by the Board.

All mortgages, notes, evidence of indebtedness, contracts, conveyances or other instruments in writing, or any assignment or endorsement thereof, executed or entered into by or on behalf of this corporation shall be executed and, if need be, acknowledged in the name of the corporation by the Chair of the Board, a Vice Chair or the President and Chief Executive Officer, and the Secretary or Treasurer or their assistants. In the absence of the President, he/she may designate, in writing, a Vice President or other individual who may execute documents during such absence. No person may execute, acknowledge or verify any instrument in more than one capacity.

**Section 8.4 Facsimile or Electronic Transmission of Signatures.**

Whenever the execution of a document on behalf of the corporation by any officer of the corporation or any trustee is

authorized by these Bylaws or by other action of the Board of Trustees, the signature of such officer or trustee on any such document may be transmitted by facsimile or other electronic means.

## ARTICLE IX
## COMMITTEES

**Section 9.1 Committees.**

The Board of Trustees may from time to time establish such standing or special committees as it shall deem appropriate to conduct the activities of the corporation and to advise the Board and shall define the powers and responsibilities of such committees. In addition, the Chair of the Board, subject to the approval of the Board of Trustees, may establish standing or special committees of the Board to carry out any functions which may lawfully be assigned to such a committee. The Board of Trustees shall define or ratify, as the case may be, the powers and responsibilities of committees established either by the Board or by the Chair of the Board, provided that powers and authority of the Board shall only be assigned to an Executive Committee of the Board, which, if formed by action of the Board or Chair of the Board as specified above, shall be composed exclusively of three or more trustees. No committee shall have any power or authority as to the following:

(i) action that would be required to be submitted to members of a membership corporation for approval under the Pennsylvania Nonprofit Corporation Law of 1988, as amended;

(ii) the filling of vacancies in the Board;

(iii) the adoption, amendment or repeal of these Bylaws or the Articles of Incorporation;

(iv) the amendment or repeal of any resolution of the Board;

(v) action on matters committed by these Bylaws or resolutions of the Board to another committee of the Board;

(vi) the approval of any action or the exercise of any authority requiring the approval of more than a majority of a quorum of the Board of Trustees under the laws of the Commonwealth of Pennsylvania, the Articles of Incorporation, or these Bylaws; and

(vii) any other action which may not be delegated to it under the laws of the Commonwealth of Pennsylvania.

The members and chairs of all committees shall be appointed by the Chair of the Board for a one (1) year term or until their successors are duly appointed. The Chair of the Board of Trustees shall advise the Board of any such appointments. While such appointments are not required to be approved by the Board of Trustees, any appointee shall be subject to removal at any time by vote of a majority of the Board of Trustees then in office.

No committee, other than an advisory committee (an "advisory committee" being a group of individuals appointed to assist the Board in a specific matter, but having no independent authority), shall consist of fewer than three (3) trustees. Persons other than trustees may be appointed as committee members by the Chair, provided the chairs of all committees shall be trustees of this corporation. Committees shall meet as necessary to carry out their designated responsibilities. The voting rights of committee members other than trustees shall be specified by the Chair of the Board at the time such appointment is made. A committee may have such specific powers and responsibilities as set forth in these Bylaws or as may be determined by the Board of Trustees.

DBR-LI
0183357

The Board reserves the right, upon review of the actions, recommendations or reports of any committee, to direct that the committee reconsider its action or recommendation.

Any scheduled committee meeting may be canceled, but only by agreement of the committee Chair and the Board Chair.

**Section 9.2 Executive Committee.**

The Executive Committee of the Board shall consist of selected trustees of the corporation and shall include the Chair of the Board, Vice Chair, President and Chief Executive Officer of the System, the Chair of the AHERF Finance Committee, Chairs of the boards of each of the supported organizations as listed in Section 6.5 of these Bylaws, all of whom shall serve ex officio. In addition, the Chair of the Board of this corporation may appoint other Board members to the Committee.

The Chair of the Board of this corporation shall serve as Chair of the Executive Committee.

The Committee shall meet at the call of the Chair, between meetings of the Board, and shall have and may exercise the full authority of the Board in all aspects of the management and control of the corporation, unless otherwise prohibited by law or by these Bylaws. The Committee shall report to the Board on any actions taken and may recommend to the Board such action as it deems desirable.

**Section 9.3 Compensation Committee.**

The Compensation Committee shall be a Standing Committee of the Board with authority to establish compensation programs for AHERF and its subsidiaries consistent with overall Allegheny system

policy. The Committee shall exercise oversight over the compensation and benefit programs of AHERF and its subsidiaries and the establishment of senior executive compensation within AHERF.

The AHERF Compensation Committee shall be chaired by the Chair of the Board and shall include only external trustees. Members of the Committee shall be appointed by the Chair of this Board.

The responsibilities of the AHERF Compensation Committee shall include:

(a) To monitor and oversee the application of AHERF-directed compensation and benefit policies within AHERF and its subsidiaries and to assure their reasonable application and that they are the result of arm's length bargaining;

(b) to review and act upon the compensation for senior executives at AHERF and its subsidiaries who are assigned full time to AHERF or its subsidiaries, but are employed by AHERF;

(c) to review and establish guidelines for compensation for the senior executives employed by AHERF or its subsidiaries;

(d) to oversee the acquisitions of physician practices and other provider services to assure that they do not result in inurement or impermissible private benefit;

(e) to oversee partnerships and joint venture arrangements with management service organizations and physician hospital organizations to assure that they conform with written policies, are properly recorded, reflect reasonable payments for goods and services, further charitable purposes and do not result in inurement or impermissible private benefit;

(f) to provide other advice to the Chief Executive Officer of AHERF as requested on compensation issues, agreements to provide health care and agreements with other health care providers, employees, and third party payors relative to AHERF or its subsidiaries to assure that they do not result in inurement or impermissible private benefit;

(g) To oversee all compensation and other economic arrangements to assure compliance with applicable AHERF-directed policies and procedures, and with applicable requirements of law; and

(h) to recommend to the Board annual goals and objectives for the President and Chief Executive Officer of this corporation and to present to a special session of the Board, as required by Section 6.2 of these Bylaws, an annual review of the performance of management.

In conducting the reviews required above, the Committee may engage outside consultants/advisors to assist them, but the use of such consultants/advisors shall not relieve the Committee of its responsibility for ensuring that the reviews are conducted.

**Section 9.4 Finance Committee.**

The AHERF Finance Committee is primarily composed of external trustees. The Chief Financial Officer of AHERF and the AHERF General Counsel serve as ex officio members. AHERF's Chief Executive Officer serves as a member of the committee with full voting privileges. One of the external Board members is appointed by the Chairman of the Board to serve as the Chairman of the Committee.

The Committee's purpose is to oversee financial matters involving AHERF and all of its subsidiaries; to monitor the current financial status of AHERF and its subsidiaries; to oversee the centralized information systems function to assure that the needs of AHERF are met; and to assure the continued financial viability of AHERF. The charge of the Committee is:

I. To receive and take final action on the following items:

(a) Investments made on behalf of AHERF and its subsidiaries. This may include review of investment managers and their performance and recommending changes of investment managers or changes in investment strategy.

(b) The status of information systems services that are provided to AHERF and its subsidiaries on a centralized basis. This review may include review of status reports on the implementation of major upgrades to information systems capabilities as well as reviewing and recommending changes to existing systems.

(c) Financial policies for the entire system to assure consistency.

(d) Intercompany financing to assure that all transactions are supportive of AHERF's mission and are in compliance with applicable local, state and federal laws.

(e) Budget targets and objectives for all AHERF members.

(f) Interim financial statements.

II. The Committee shall review and make recommendations to the Board with respect to the following items:

(a) Annual capital and operating budgets for AHERF and its subsidiaries.

(b) The capital plan developed by the Chief Executive Officer of AHERF.

(c) The self-insured activities within the system including, but not limited to, professional and general liability, workers' compensation and health insurance. This may include recommendations to consider additional activities for inclusion under one of the self-insured programs.

**Section 9.5 Committee on Trustees.**

The Committee on Trustees shall review and report to the AHERF Board and other boards in the Allegheny system, as appropriate, on the Board(s) membership, organization, and performance. The Committee shall work with the Board(s) Chairmen on the definition

of the Board(s) role and the organization and processes through which it carries it out. The Committee's work includes, but is not limited to, recommending: role(s) of the Board(s) and their performance in relation hereto; guidelines for the composition of the Board(s); criteria for Board membership and process for monitoring compliance with established criteria; changes in Board membership such as retirement and recruitment; committees of the Board(s), their defined roles and desired size, structure, and process of Board meetings; working relationship between Board(s) and management; and terms of office of Board chairmen and process for selecting successors.

**Section 9.6 Audit Committee.**

The AHERF Audit committee shall be composed entirely of external trustees. One of the external Board members shall be appointed by the Chair of the AHERF Board to serve as the Chair of the Audit Committee.

The role of the Audit Committee is to assist the AHERF Board in meeting and exercising its fiduciary responsibilities. The Audit Committee assists the AHERF Board in its responsibility to safeguard the organization's assets, monitor the financial performance of the organization and ensure the integrity of the financial information upon which the Board relies. The charge of the Audit Committee is to:

(a) Review the adequacy of the organization's system of internal control;

(b) review and approve the annual AHERF Internal Audit Department work plan and operating budget;

(c) review the activities, organizational structure and qualifications of the Internal Audit function and staff;

(d) recommend to the Board the selection of independent auditors;

(e) review the independent auditor's proposed audit scope and approach;

(f) review the independent auditors' fee arrangements and performance;

(g) review the findings of external financial statement audits, debt compliance reviews and the independent auditor's management letter;

(h) review matters related to controls, financial reporting and/or compliance for sensitive, high exposure areas (e.g., executive expense reporting, government reviews, regulatory examinations, special investigations, fraud, etc.).

(i) provide opportunities for management, Internal Audit and the external auditors to meet with the Audit Committee in executive session, as necessary, to discuss confidential and/or sensitive matters; and

(j) perform other oversight functions as requested by the AHERF Board.

**Section 9.7 Foundation Ethics Committee.**

The charge to the Foundation Ethics Committee shall be to:

(a) Exercise general oversight to the development and amendment of the AHERF Code of Ethics;

(b) oversee the implementation of a system-wide ethics training program; and

(c) exercise general oversight over the Allegheny system's conflict of interest program.

## ARTICLE X

## INDEMNIFICATION

**Section 10.1 Indemnification of Trustees and Officers.**

The corporation shall indemnify any officer or trustee of the corporation who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, including actions by or in the right of the corporation, whether civil, criminal, administrative or investigative by reason of the fact that such person is or was a representative of the corporation, or is or was serving at the request of the corporation as a representative of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding unless the act or failure to act giving rise to the claim for indemnification is determined by a court to have constituted willful misconduct or recklessness.

**Section 10.2 Advancement of Expenses.**

Expenses (including attorneys' fees) incurred by an officer or trustee of the corporation in defending any action, suit, or proceeding referred to in Section 10.1 shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall be determined ultimately that the person is not entitled to be indemnified by the corporation.

**Section 10.3 Insurance.**

The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a representative of the corporation, or is or was serving at the request of the corporation as a representative of another corporation,

partnership, joint venture, trust or other enterprise, against any liability asserted against such person or the corporation and incurred by such person or the corporation in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under the provisions of this Article.

**Section 10.4 Advice of Counsel.**

Neither the corporation nor its trustees or officers nor any person acting on its behalf shall be liable to anyone for any determination as to the existence or absence of conduct which would provide a basis for making or refusing to make any payment under this Article or for taking or omitting to take any other action under this Article, in reliance upon the advice of counsel.

**Section 10.5 Rights not Exclusive.**

The indemnification of and advancement of expenses to officers and trustees of the corporation provided by or pursuant to this Article shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Articles of Incorporation, any insurance or other agreement, vote of disinterested trustees or otherwise, both as to actions in their official capacity and as to actions in another capacity while holding an office, and shall continue as to a person who has ceased to be a trustee or officer and shall inure to the benefit of the heirs, executors and administrators of such person.

DBR-LI
0183365

**Section 10.6 Preservation of Rights.**

The provisions of this Article relating to indemnification and the advancement of expenses shall constitute a contract between the corporation and each of its trustees and officers. No amendment or repeal of this Article shall adversely affect any right or protection extended to an officer or trustee hereunder for an act or failure to act occurring prior to the time of such amendment or repeal. Each officer or trustee shall be deemed to act in such capacity in reliance upon the rights of indemnification and advancement of expenses hereunder.

**Section 10.7 Indemnification of Employees and Other Persons.**

To the extent permitted by law, the corporation may, by action of its Board of Trustees and to the extent provided in such action, indemnify employees and other persons as though they were officers or trustees, pursuant to Sections 10.1 - 10.2 of these Bylaws.

## ARTICLE XI
## LIABILITY OF TRUSTEES AND OFFICERS

**Section 11.1 Liability of Trustees.**

Except for responsibility or liability of a trustee pursuant to any criminal statute or for payment of taxes pursuant to local, State or Federal law, a trustee of the corporation shall not be personally liable for monetary damages for any action taken or any failure to take any action after January 27, 1987 unless (a) such trustee has breached or failed to perform his fiduciary duties as provided in Section 11.2 hereof and (b) the breach or failure to

perform constitutes self-dealing, willful misconduct or recklessness.

**Section 11.2 Standard of Care and Justifiable Reliance.**

(a) As provided in Section 5712 of the Pennsylvania Nonprofit Corporation Law of 1988, as amended, 15 Pa. C.S.A. §5712, et seq., each trustee of this corporation shall stand in a fiduciary relation to the corporation and shall perform his or her duties as a trustee, including his or her duties as a member of any committee of the Board upon which he/she may serve, in good faith, in a manner he/she reasonably believes to be in the best interests of the corporation, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his or her duties, a trustee shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(1) One or more officers or employees of the corporation whom the trustee reasonably believes to be reliable and competent in the matters presented.

(2) Counsel, public accountants or other persons as to matters which the trustee reasonably believes to be within the professional or expert competence of such person.

(3) A committee of the Board upon which the trustee does not serve, duly designated in accordance with law, as to matters which its designated authority, which committee the trustee reasonably believes to merit confidence.

(b) A trustee shall not be considered to be acting in good faith if he/she has knowledge concerning the matter in question that would cause his or her reliance to be unwarranted.

(c) In discharging the duties of their respective positions, the Board of Trustees, committees of the Board and individual trustees may, in considering the best interests of the corporation, consider the effects of any action upon employees, upon suppliers and customers of the corporation and upon communities in which offices or other establishments of the corporation are located, and all other pertinent factors. The consideration of those factors shall not constitute a violation of Section 11.2(a).

(d) Absent breach of fiduciary duty, lack of good faith or self-dealing, actions taken as a trustee or any failure to take any action shall be presumed to be in the best interests of the corporation.

**Section 11.3 Liability of Trustees and Officers.**

As provided in 42 Pa. C.S.A. §8332.2 and so long as the corporation is qualified under Section 501(c)(3) of the Internal Revenue Code, no trustee or officer of the corporation who serves without compensation, other than reimbursement for actual expenses, shall be liable for any civil damages as a result of any acts or omissions relating solely to the performance of his duties as a trustee or officer, unless (a) the conduct of such trustee or officer falls substantially below the standards generally practiced and accepted in like circumstances by similar persons performing the same or similar duties, and (b) it is shown that the trustee or