officer did an act or omitted doing an act which he was under a recognized duty to another to do, knowing or having reason to know that the act or omission created a substantial risk of actual harm to the person or property of another.

## Section 11.4  Preservation of Rights.

The provisions of this Article relating to the limitation of trustees and officers liability shall constitute a contract between the corporation and each of its trustees and officers.  No amendment or repeal of this Article shall adversely affect any right or protection extended to an officer or trustee hereunder for an act or failure to act occurring prior to the time of such amendment or repeal.  Each officer or trustee shall be deemed to act in such capacity in reliance upon the limitations of liability hereunder.

## ARTICLE XII
## AMENDMENTS TO ARTICLES AND BYLAWS

## Section 12.1  Amendments to Articles and Bylaws.

The Articles of Incorporation of this corporation and these Bylaws may be amended, altered, restated, or otherwise revised by the affirmative vote of a majority of the trustees then in office. Any notice of meeting of the Board of Trustees at which a proposed amendment to the Articles of Incorporation or these Bylaws is to be considered shall include a copy of the proposed amendment or a summary of the changes to be effected thereby.

## Section 12.2  Technical Amendments.

The Secretary shall have the authority to change the Bylaws without any requirement of Board or Member approval when, in the Secretary's judgment and after review and approval by the General Counsel or his/her designee, the Bylaws require technical

DBR-LI
0183369

modification or clarification, such as renumbering, changes in punctuation, spelling or errors of grammar or expression, changes in reference to statutory citation, or changes made solely to reflect alteration of organization name, structure or titles. All such amendments shall be reported to the Board.

## ARTICLE XIII
### MISCELLANEOUS

**Section 13.1  Parliamentary Authority.**

The current edition of Robert's Rules of Order shall govern the Board's procedures in the transaction of its business in all cases to which such rules are applicable and in which they are no inconsistencies with these Bylaws and any special rules or order which the Board may adopt.

### ADOPTION AND EFFECTIVE DATE

These Bylaws were adopted by the Board of Trustees of the corporation at a duly called meeting held on the 12th day of December, 1996 and, in accordance with the terms of such adoption by the Board, became effective on December 12, 1996.

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

3/26/97

Nancy A. Wynstra
Secretary

1/31/95: kcs
4/27/95: kcs
6/21/96: kcs: aa

PGH: 7900.1

33

DBR-LI
0183370

AHERF Bylaws
with amendments thru 12/12/96

3/20/97:kcs
3/20/97:kcs

PGH: 7900.1

34

DBR-LI
0183371

## CERTIFICATE OF SECRETARY

I, Nancy A. Wynstra, do hereby certify that I am the Secretary of **ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,** (the "corporation") and do further certify that the Bylaws attached hereto are a true, correct and complete copy of the Bylaws of the corporation, including all amendments thereto, as duly approved by the Board of Trustees and are in full force and effect as the Bylaws of the corporation in the form attached hereto as of the date hereof.

Date:  _3-20-97_

_Nancy A. Wynstra_
Nancy A. Wynstra
Secretary

```
AHERF.BL
IBM Disk #2
1/19/93
4/28/93
11/4/93: nll
04/08/94  kcs
1/31/95:kcs
4/27/95:kcs
6/21/96:kcs;aa
2/12/97
3/20/97:kcs
```

PGH: 7900.1

DBR-LI
0183372

AHERF Bylaws
with amendments thru 12/12/96

**ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION
SCHEDULE OF BYLAW AMENDMENTS**

Article III, Current first paragraph numbered as Section 3.1 and titled "Fiscal Year". New Section 3.2 added pursuant to action of the Board on June 26, 1992, effective upon approval by the Boards of subsidiary corporations of appropriate Bylaw amendments. This was done at the March, 1992 Board meetings.

Article IV, Purposes. Amended pursuant to Board action on June 21, 1996.

Article VI: New sections added and section renumbered per Board action of December 16, 1994. See kcs Document 9945 for changes and renumbering.

Article VI, Section 6.1, Management and Duties. Amended per Board action on June 21, 1996.

Article VI, Section 6.2 amended pursuant to action of the Board on March 16, 1987, March 17, 1988, November 6, 1989, October 8, 1990, December 17, 1993. Renumbered as Section 6.3 pursuant to action of the Board on December 16, 1994.

(New) Article VI, Section 6.2 added pursuant to action of the Board on December 16, 1994, June 21, 1996.

Article VI, Section 6.3 amended pursuant to action of the Board on December 20, 1985 and December 16, 1994.

Article VI, Section 6.5 amended pursuant to action of the Board on March 17, 1988 and December 16, 1994.

New Article VI, Section 6.5 added pursuant to action of the Board on December 18, 1992. Old Section 6.5 through 6.15 renumbered as Section 6.6 through 6.16. Amended pursuant to Board action December 16, 1994.

Article VI, Section 6.6 amended pursuant to action of the Board on March 16, 1987, December 16, 1994, April 6, 1995.

Article VI, Section 6.6 (new) added and current 6.6 through 6.17 renumbered as 6.6 through 6.18 pursuant to action of the Board on March 17, 1988, December 16, 1994, April 6, 1995.

Article VI, Section 6.7 amended pursuant to action of the Board of March 16, 1987 and March 17, 1988, December 16, 1994.

DBR-LI
0183373

Article VI, Section 6.8, Ex Officio Trustees, amended pursuant to action of the Board on April 6, 1995.

Article VI, Section 6.10 amended pursuant to action of the Board on December 20, 1985 and December 16, 1994.

Article VI, Section 6.11, Regular and Special Meetings of the Board of Trustees.  Amended pursuant to action of the Board on June 21, 1996.

Article VI, Section 6.12, Special Meetings.  Amended pursuant to action of the Board on June 21, 1996.

Article VI, Section 6.13 (New), Executive and/or Special Session. Amended pursuant to action of the Board on June 21, 1996.

Article VI, Section 6.16, Quorum.  Amended pursuant to action of the Board on June 21, 1996.

Article VI, Section 6.14 amended pursuant to action of the Board on December 20, 1985 and March 16, 1987 and December 16, 1994.

Article VI, Section 6.15 amended pursuant to action of the Board on October 20, 1988 and December 16, 1994.

Article VI, Section 6.20, Annual Conflict of Interest, added pursuant to action of the Board on December 16, 1994.

Article VI, Section 6.21, Disclosure of Transactions, added pursuant to action of the Board on December 16, 1994; Amended 12/12/96, pursuant to action of the Board to Annual Conflict of Interest Statement.

Article VI, Section 6.22, Disclosure of Transactions, amended pursuant to action of the Board on December 12, 1996.

Article VII, Section 7.6 amended pursuant to action of the Board on June 27, 1989, June 21, 1996.

Article VIII, Section 8.3 amended pursuant to action of the Board on December 16, 1994.

Article IX, Section 9.1 amended pursuant to action of the Board on June 27, 1989, June 21, 1996.

(New) Article IX, Section 9.2, added pursuant to action of the Board on December 16, 1994, June 21, 1996.

DBR-LI
0183374

AHERF Bylaws
with amendments thru 12/12/96

(New) Article IX, Section 9.3, Compensation Committee. Added pursuant to action of the Board on June 21, 1996; Amended pursuant to action of the Board on December 12, 1996.

(New) Article IX, Section 9.4, Finance Committee. Added pursuant to action of the Board on June 21, 1996.

(New) Article IX, Section 9.5, Committee on Trustees. Added pursuant to action of the Board on June 21, 1996.

(New) Article IX, Section 9.6, Audit Committee. Added pursuant to action of the Board on June 21, 1996.

(New) Article IX, Foundation Ethics Committee. Added pursuant to action of the Board on June 21, 1996.

Article X, Sections 10.9 thru 10.18 amended pursuant to action of the Board on March 16, 1987.

Article XI, Sections 11.1 thru 11.4 - new Article XI added pursuant to action of the Board on March 16, 1987.

Article XII, Article XI renumbered as Article XII pursuant to action of the Board on March 16, 1987.

(New) Article XIII, Section 13.1 added pursuant to action of the Board on December 16, 1994.

4/27/95:kcs
6/21/96:kcs:aa
3/20/97:kcs

PGH: 7900.1

38

DBR-LI
0183375

### Corporate Reorganization
### December 20, 1991

#### ALLEGHENY HEALTH SERVICES, INC.
#### now known as
#### ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

12/20/91: Allegheny Health Services, Inc. renamed as Allegheny Health, Education and Research Foundation effective upon merger of Allegheny Health Foundation into Allegheny Health Services, said date being July 1, 1992. Amended and Restated Bylaws of Allegheny Health, Education and Research Foundation approved pursuant to action of the Board of Trustees of AHS at its meeting of December 20, 1991.

### Bylaws Revised
### October 25, 1993

10/25/93: Bylaws revised by action of the Board of Directors at its meeting of October 25, 1993. See KCS document No. 1240 dated 10/20/93(2) for exact changes.

04/08/94: Bylaws revised to replace Board of Directors with Board of Trustees. Approved by AHERF at its meeting of April 8, 1994.

AHSI;d2-13;kcs
(AHS/IBM;Disk #2;CUR;7/5/91)
07/01/92;IBM Disk #4 (final)
12/18/92 moved to IBM Disk #2
1/19/93
4/28/93
11/4/93: nll
04/08/94  kcs
1/31/95:kcs
4/27/95:kcs
6/21/96:kcs:aa
3/20/977:kcs

DBR-LI
0183376

# COMMITTEE APPENDIX

## Tab 22

Westlaw.
NewsRoom

4/20/97 PITTSPOST F4                                          Page 1


4/20/97 Pitt. Post-Gazette F4
1997 WLNR 2876461

                    Pittsburgh Post-Gazette (PA)
                  Copyright 1997 PG Publishing Co.

                          April 20, 1997


                        Section: BUSINESS

           HOSPITAL EXECUTIVES HERE PULL DOWN HEALTHY SALARIES

             PAMELA GAYNOR, POST-GAZETTE STAFF WRITER

They don't make the big bucks that Pittsburgh's corporate chieftains do, but alongside
their peers across the country, the top health-care administrators here could hardly argue
any hardship.

    Only one has so far made it into the million-dollar circle: Sherif Abdelhak, president
of Allegheny General Hospital's parent company, the Allegheny Health Education and
Research Foundation. Abdelhak received total compensation of $1.22 million for the fiscal
year ended in June 1995, the latest data most hospitals have reported to the Internal
Revenue Service. Reports for the fiscal year ended last June are expected to be filed
soon.

    Few yardsticks exist for judging the compensation of hospital system executives, like
Abdelhak, who manage a number of hospitals under the same parent corporation. However, one
survey by Hewitt & Associates suggests he's got nothing to complain about. The survey of
23 hospital systems, also performed during the June 1995 fiscal year, showed the median
total compensation for chief executives was $380,000. AHERF, during the June 1995 fiscal
year, was significantly larger than the median. In addition to AGH, it included five
Philadelphia hospitals and had combined revenues of $1.7 billion. The median system
surveyed had $1 billion in gross revenues, said Jim Freundt, a health-care compensation
specialist with Hewitt.

    However Abdelhak's pay also far outstripped that of Jeffrey Romoff, the University of
Pittsburgh Medical Center chief. Romoff made $386,706 in fiscal 1995, when his
pre-merger-binge institution included only four Oakland hospitals.

    So how did the rest of the CEOs fare? Here are some benchmarks: A Hay Group study in
fiscal 1995 showed the average hospital CEO at institutions with 500 beds or more made
$328,000.

    Of the top officials at the five biggest hospitals here, all of which are about that
large or larger, even the lowest paid, former Pittsburgh Mercy Hospital President Edward
Wenzke, made 13 percent more.

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PHOTO (2), CHART

 PHOTO Henry A. Mordoh/$453,401 in fiscal 1995
PHOTO Charles M. O'Brien Jr./$469,174 in fiscal 1995
PHOTO Jeffrey A. Romoff/$386,706 in fiscal 1995
CHART: Post-Gazette: (Hospital executives)

                     ---- INDEX REFERENCES ----

COMPANY: HEWITT ASSOCIATES INC

NEWS SUBJECT:  (HR & Labor Management (1HR87); Business Management (1BU42); Compensation
(1CO80))

REGION:  (Pennsylvania (1PE71); USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AGH; AHERF; ALLEGHENY GENERAL HOSPITAL; ALLEGHENY HEALTH EDUCATION;
CEOS; HAY GROUP; HEWITT; HEWITT ASSOCIATES; HOSPITAL; INTERNAL REVENUE; PITTSBURGH MERCY
HOSPITAL; RESEARCH FOUNDATION; UNIVERSITY OF PITTSBURGH MEDICAL CENTER)  (Abdelhak; Edward
Wenzke; HEALTHY SALARIES; Henry A. Mordoh; Jeffrey A. Romoff; Jeffrey Romoff; Jim Freundt;
M. O'Brien Jr.; Romoff; Sherif Abdelhak)  (SALARY)

EDITION: TWO STAR

Word Count: 436
4/20/97 PITTSPOST F4

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# Part 4: Running on the edge

Thursday, January 21, 1999
By Steve Massey, Post-Gazette Staff Writer

By January 1998, Bill Snyder had had enough. He'd been deluged with complaints that Allegheny wasn't paying its bills.

For some time, the health care giant had been stretching out its payments to suppliers, from 60 to 90 days and beyond. It was a way to preserve cash, an increasingly rare commodity these days. And it wasn't as if Allegheny was the only one in the health care industry doing it. Insurance companies were notorious for waiting 90 days or longer to pay hospitals for services.



But several suppliers weren't willing to take it anymore, and they let Snyder, chairman of Allegheny's parent foundation, know. He called Harry Edelman, a longtime member of the organization's board and chairman of a group of Allegheny's Philadelphia hospitals where the suppliers were complaining the loudest.

Snyder wanted to know what the heck was going on — and to make sure that the glitch in the system got fixed so that suppliers could get their money.

If only it had been just a glitch.

A decade of spending — on hospital mergers, new offices and renovations, on doctors, escalating salaries and executive perks — had caught up to the health care giant.

Money was going out a lot faster than it was coming in. And the well of reserves that had seemed so deep a decade before was running dry.

There had been steep cutbacks the previous October, when Allegheny axed 1,200 Philadelphia hospital workers and vowed to slash the pay of top managers by 20 percent. That was on top of another 500 workers who were laid off with the closure of its Mt. Sinai hospital, acquired as part of the Graduate Health System merger the year before.

It was hoped the cost-cutting measures would stem the rising tide of red ink, but the losses just kept coming. And the problems went much deeper than declining government reimbursements and the increasing power of cost-conscious managed-care insurance plans. Years of miscalculations, missteps and running on the edge were taking their toll.

To many, the Graduate merger was the final straw. Outsiders and even some high-ranking insiders couldn't understand this one. It's true that the earlier acquisitions of the MCP and Hahnemann medical schools, their hospitals and the United group of hospitals had appeared to work out.

The hospitals were making money, which was more than many of their brethren were doing. But profit margins were starting to erode, just as they were at hospitals throughout Philadelphia, the state and the nation.

From fiscal 1994 to fiscal 1995, the United group and its St. Chris affiliate reported that revenue over expenses — hospital-speak for income — nearly doubled, from a combined $9.6 million to $15.7 million, before falling back to a combined $3.3 million in the fiscal year ended June 1996.

And MCP and Hahnemann, which had merged to form one medical school, were losing money on operations — their day-to-day costs. But they also were bringing new money in — federal and private research dollars at the combined schools totaled $75 million in fiscal 1996, and would top $120 million a year later. In contrast, Allegheny General a decade earlier — when it had no medical school — took in less than $10 million for research. The MCP-Hahnemann faculty wasn't getting along all that well. But combine any two schools and there would be clashes, particularly med schools, where egos are sensitive and often unyielding.

The bottom line: As 1997 was approaching, the board was comfortable that Allegheny's Philadelphia experiment was working, but that it needed more time to work out the kinks. And it bought into the idea that, in a struggling market, the best defense is a good offense: Buy market share on the cheap and, when the good times start rolling again, you make out like a bandit.

For Snyder and other board members, these were heady times.

Allegheny's strategy was paying dividends. It had more than quadrupled in size in less than 10 years, and had risen in stature in medical circles, attracting big-name researchers and serving as a new model for growth and survival in the pressure-packed health care business.

Still, Graduate, which Allegheny began managing in the summer of 1996 and formally acquired the following spring, presented a challenge. It came with a lot of problems, the least of which was that its hospitals were drifting into the red.

A dispute with the region's biggest insurer, Independence Blue Cross, threatened to drive business away. Independence had made a stab at buying Graduate in 1994, and there remained bad blood.

And four of Graduate's six medical facilities, including its flagship hospital, were in the city, where over-capacity and a high concentration of poor patients made for a deadly fiscal mix. Graduate's network of hospitals had been patched together over the past decade, and its management feared it was still too small to survive on its own in the ever-tougher environment of medicine in the 1990s.

Graduate also brought to the table $174 million of debt, primarily bonds assigned junk ratings by the major credit-rating agencies. At the time, Abdelhak said the debt would remain Graduate's responsibility, but ultimately it ended up under the Allegheny umbrella. Maybe that wouldn't have been so bad if Allegheny had also obtained Graduate's pot of gold — about $70 million in reserves from the previous sale of a managed-care venture. But that money would stay with Graduate's surviving foundation, which was not part of the deal.

But Abdelhak was a builder, and a convincing one at that. With Graduate, he told the board, he could build the biggest hospital system in Philadelphia, leapfrogging past No. 1 University of Pennsylvania and No. 2 Jefferson Health Systems, with a 13 percent share of metropolitan Philadelphia hospital beds.

He had designs on creating a nationally renowned sports medicine center, as well as a women's hospital, filling holes in Allegheny's Philadelphia network.

**Snapshot of AHERF**
June 30, 1996

**Employees: 20,243**
**Revenue: $1.62 billion**
**Assets: $1.87 billion**
**Debt: $750.6 million**
**Inpatient admissions:**
**86,415**

* Based on Allegheny Health Education and Research Foundation and tax documents

Allegheny also would pick up Graduate's physician practices subsidiary, adding 100 doctors to its growing network. Remember: If you control the hospitals and doctors, you have more control over your destiny. And as the biggest kid on the block, Allegheny would have more control than anyone.

It was time to let the world know it. Allegheny hung its banner on its Philadelphia-area hospitals and its medical school, putting them all under the Allegheny University name. (The signs were often just canvas, presenting no problems two years later when new owner Tenet Healthcare took them down to put up its own.) It struck a multimillion-dollar deal for advertising and promotions with the Philadelphia Eagles and Veterans Stadium.

And the big-bucks announcements kept coming: In October 1996, it committed $100 million to cancer research; in December 1996, it created a New Jersey subsidiary and pledged to grow it to six or seven hospitals; and in March 1997, it unveiled plans for two Center City buildings totaling 450,000 square feet and costing $100 million.

But even as it was drawing the attention and praise of political leaders who saw the promise of jobs and prosperity, the pillars were starting to crack. The announcement that Graduate's Mt. Sinai hospital would close came in August 1997, followed by the 1,200 layoffs in the Graduate system in October.

Allegheny tried to put the best spin on the situation. It said it remained committed to Philadelphia and that Pittsburgh wouldn't be affected. But as often was the case, what Allegheny said was at odds with reality. The truth was, the empire was coming apart at the seams.

Just as it was completing its takeover of Graduate, the full impact of revenue-reducing changes in Medicaid and Medicare programs — which shifted a large portion of recipients into managed-care plans and forced hospitals to accept more free-care patients — started to hit. By the end of 1997, Allegheny officials estimated, those pressures were reducing revenue at their Philadelphia hospitals at the rate of at least $100 million a year.

The decline came as costs continued to rise. In 1997, annual payments on the Allegheny system's bond debt alone totaled $91 million, a chunk of which was added in June 1996 when the organization issued $365 million of bonds for its Philadelphia hospitals and medical school.

Costs were rising in other areas, too. For example, Allegheny's strategy of buying primary care physicians to funnel more patients to its hospitals was failing miserably. Losses at the medical practices subsidiary would swell to $60 million in the 12 months ended June 1997, and continued to mount into 1998.

It's not hard to understand why. Allegheny may have owned the practices, but the doctors legally couldn't be forced to refer all their patients to Allegheny hospitals for high-priced specialty care. Many had long-standing relationships with other Philadelphia hospitals, and their

loyalties lay there. Many of their patients preferred other hospitals as well.

Moreover, like other hospital companies snapping up practices, Allegheny overpaid. It sometimes offered doctors guaranteed salaries and even raises, and the price of the buyouts often represented twice what the clinics were generating in revenue in a year. It hoped to make up the costs by squeezing expenses and luring more customers, and by including performance standards for the doctors.

But those performance clauses didn't appear to be worth much. Allegheny, like other hospital companies across the country, wanted doctors and was in a buying frenzy — and the doctors knew it. So, after working all hours to make their businesses go and then selling them to Allegheny, some worked less, not more, causing a decline, not an increase, in office revenue.

And Allegheny's expectations for making the offices more efficient proved wildly optimistic.

Take its centralized billing system. Doctors at clinics that were bought say Allegheny insisted that it handle the billing. Yet it often was slow to bill clients, and did a poor job at going after insurers for payments on small claims.

Never mind that small claims make up the bulk of a clinic's business. Allegheny's billing system was geared toward the big bills hospitals try to collect; it couldn't be bothered with what must have seemed like nickel-and-dime stuff.

"If they had a $100 bill denied, the hospital didn't follow up," said Joseph Calhoun, a partner in a North Hills primary care practice, Pine Richland Medical Associates, which Allegheny General opened in 1993.

Adding to its problems was what proved to be a deadly third rail in Allegheny's desire to be a full-range player in the health care business: insurance.

It didn't actually provide insurance, but it did contract with HealthAmerica and U.S. Healthcare in Pittsburgh and Philadelphia to provide medical services to 500,000 of their managed-care clients at a price equal to roughly 80 percent of the premiums the insurers collected.

At the time, in late 1996, Allegheny felt it could provide the care for that price — the insurers kept the remaining 20 percent to cover the accounting and other administrative functions that they still provided.

But far from making money, the so-called shared-risk contracts were money losers. HealthAmerica alone contends Allegheny owes it more

than $100 million.

In some cases, the managed-care patients balked at going to Allegheny hospitals, forcing Allegheny to pay unaffiliated hospitals for care even though it had no control over their costs.

Even when patients came to its hospitals, Allegheny had trouble controlling costs. Its "mean administrative cost per adjusted discharge," a common benchmark used to measure hospital overhead, was an estimated $720, a third higher than the norm for Pennsylvania hospitals

It's not that surprising. Allegheny relished being a big spender well before it marched on Philadelphia, and in Philadelphia it spent even more freely, dangling big bucks in front of hospitals, doctors and medical researchers.

### Getting bigger all the time

On the way to bankruptcy, the Allegheny Health, Education and Research Foundation grew into Pennsylvania's largest health care system.

| | Revenues | Employees | Admissions |
|---|---|---|---|
| Allegheny Health, Education and Research Foundation | $2.05 billion | 31,270 | 128,338 |
| UPMC Health System | $1.5 billion | 23,000 | 76,430 |
| University of Pennsylvania Health System | $1.44 billion | 18,000 | 75,400 |
| Jefferson Health System | $1 billion | 13,600 | 69,913 |

Sources: The health systems, for fiscal year ended 6/30/97.

Stories are legion about management retreats at Rolling Rock Country Club in Ligonier, Nemacolin Woodlands near Uniontown, and Camp AHERF, the nickname given to an educational seminar held every six months or so at a North Carolina resort formerly owned by tobacco baron R.J. Reynolds.

Fat car allowances and regular golf outings at exclusive clubs were showered on top administrators and doctors. Executive and committee meetings were common at Pittsburgh's private, and pricey, Duquesne Club, the traditional home-away-from-home for the region's captains of industry.

And though they were working trips, quarterly meetings in places like Amsterdam, Paris and Reykjavik, Iceland, made the Cayman Islands insurance venture seem extravagant. Never mind that, by law, the offshore subsidiary was barred from holding meetings on the mainland, or that other hospital systems, including UPMC Health System, had similar

Case 2:00-cv-00684-DSC    Document 132-9    Filed 07/11/2005    Page 18 of 50

operations to save on malpractice premiums. It just didn't look good.

Then there was the pay. Allegheny administrators and star doctors earned top dollar, and were unapologetic about it. In 1997 alone, the base pay of 26 senior administrators averaged more than $350,000, almost as much as the median for CEOs of large not-for-profit health care companies surveyed by the benefits consulting concern Hay Group. At $1.17 million, Abdelhak's compensation package almost tripled the $393,000 reported by his counterpart at UPMC Health System, Jeffrey Romoff.

The cost of all those perks and pay were exacerbated by a health care system that, by most any measure, was bloated. Almost from the beginning, bureaucracy and Allegheny went hand in hand. Even in the mid-1980s, when it was just Allegheny General and a few subsidiary organizations, there were four different boards and three dozen directors.

But by mid-1997, the Allegheny system had ballooned to 10 separate boards, 55 different legal entities, 132 directors, 117 senior managers and a parent organization with nearly 2,000 employees. A common joke was that the Allegheny system had more vice presidents than most major Wall Street banks.

There was little overlap on the boards, and directors say they never were sure what was going on elsewhere in the empire — each was under orders to focus on his or her own part of the world, largely out of the design of Abdelhak and his inner circle. It wouldn't do to have too much meddling in the organization's affairs; carving it up into a bunch of groups helped get around that problem. "It was divide and conquer," a former director says.

By late 1997, however, even the parent board could tell something was amiss. Money was running short, and the environment for health care wasn't improving any. In fact, it was getting worse; insurers were demanding more discounts, and the government was tightening more.

Tired of watching Allegheny stretch out bill payments, vendors began asking for money up front. Members of the parent board were uncovering sizable loans and fund transfers that they did not recall approving. And Abdelhak was growing increasingly defensive, blaming his managers for questionable actions.

The patient — the Allegheny health system — was critical.

Pretty soon it would be Code Blue.



# COMMITTEE APPENDIX

## Tab 23

**AICPA AUDIT AND ACCOUNTING GUIDE**

AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

# HEALTH CARE
# ORGANIZATIONS

**With Conforming Changes as of
May 1, 1998**

**2.05** The illustrations are arranged by broad audit objectives. These classifications may be useful in the evaluation process, but the classifications are of secondary importance. Some specific objectives may serve to achieve more than one broad objective.

**2.06** Many of the illustrative control activities are premised on the existence of certain essential characteristics of internal control (for example, authorization of transactions, segregation of duties, documentation, supervision and review, and timeliness of procedures). To avoid repetition, these characteristics have not been emphasized in the illustrations.

## Inherent Risk

**2.07** In determining the scope of audit procedures to be performed, the independent auditor should be aware of certain aspects of the health care organization's operations that are usually subject to higher or lower levels of inherent risk. SAS No. 47, *Audit Risk and Materiality in Conducting an Audit* (AICPA, *Professional Standards*, vol. 1, AU sec. 312), provides guidance on the consideration of audit risk and materiality when planning and performing an audit of financial statements.

**2.08** In many health care organizations, certain accounts typically (*a*) will have a low volume of transactions, (*b*) will consist of transactions that are not complex, and (*c*) do not require the use of significant accounting estimates. Accounts such as inventories, marketable securities, assets whose use is limited, property and equipment, long-term debt, and equity frequently have these characteristics and may allow the auditor to assess inherent risk as being at a relatively low level. However, in certain circumstances, such as investments in complex derivative financial instruments, inherent risk may be higher. The auditor should use professional judgment in evaluating the factors relevant to assessments of inherent risk.

**2.09** Because of the large monetary amounts and the complexity of determining health care service revenue and receivables, there are risks associated with health care service revenue recognition and the valuation of the related receivables. A significant portion of services usually is paid for by third parties such as Medicare, Medicaid, and various health insurance carriers under statutory provisions or other arrangements in amounts that can be significantly different from, and frequently less than, the entity's established rates.

**2.10** Risks are associated with recognizing the liability for costs incurred by providers of prepaid health care services (for example, HMOs) because such costs may have been incurred but not yet reported to the providers. It is therefore necessary to estimate the liability for those costs. These estimates often require a high degree of management judgment. Management must consider historical experience as well as the effects of any changes in conditions such as seasonality trends and changes in subscriber population and in the services and benefits provided.

**2.11** Risks also are associated with contingencies for uninsured medical malpractice losses and obligations under continuing care contracts. A high degree of management judgment and complex analyses usually are involved in evaluating the related financial statement assertions.

**2.12** The risk of material misstatements, whether caused by error or fraud, and illegal acts by clients is present in all audit engagements. SAS No.

82, *Consideration of Fr...*
*sional Standards*, vol. 1,
(AICPA, *Professional St...*
responsibilities for detec...
They also describe the a...
errors, fraudulent acts, ...
entity.

**2.13** SAS No. 82 st...
tor's interest specificall...
misstatement of the fin...
relevant to the auditor's ...
misstatements arising fr...
arising from misappropr...

**2.14** SAS No. 82 do...
ering fraud, but it does ...
to formally consider and ...
factors.* Specifically, SA...

- Requires the au...
  statement due t...
  risk factors tha...
  ment. It provide...
  might indicate t...

- Offers guidance ...
  assessment.

- Reaffirms the r...
  stances of fraud ...
  committee and, ...

- Provides guidar...
  the risk of mate...

- Requires the au...
  assessment incl...
  tor's response th...

## Internal Control[1]

**2.15** SAS No. 55, *C...*
*ment Audit*, as amended ...
*Financial Statement Au...*
*sional Standards*, vol. 1, ...
control and explains ho...
control in planning and ...
fected by an entity's boar...
signed to provide reas...
objectives in the followin...
effectiveness and efficien...

---

* The AICPA has publishe...
*Audit: Practical Guidance for Ap...*
tive guidance on applying the ...
organizations. It also includes ...
schemes, and extended audit ...
Department at (888) 777-7077 o...

[1] [Footnote deleted.]

# COMMITTEE APPENDIX

## Tab 24

AHERF EXECUTIVE COMMITTEE 6/26/98

THERE ARE NO DRAFT OR FINAL MINUTES OF THIS
MEETING.

TAC055627 Cm

4/26    AHERF Exec.

WPS, Cabod, Hernandez, Ira, Barnes, Fletcher,
Chuck M.,
Joe D., D. Cullen, Al G., Kathy H., Dave McClenahan,
D. Danforth, Edelman, Danforth, AMS,
Claire, Bob Palmer (☰), Dan Stickler (☰)

Physician K's. — Kathy   — 600 K's / AUMP
   On. Review of AUMP K's
   AHERF Gitee K's — Health America ?

What is vision for 2001 ?
   2 separate entities or state-wide ^academic system ?

Be ready to file July 11
   Bd. meetings
   Further evaluation
   Communication Plan
      not just w. protecting self at
      expense of E.
      * If can get more inf., do so.
Consensus:
Plan : authorize prepare papers of each Bd.
   Call necessary meetings for July 11 10
   Exec. Comm. — 3 p.m. July 9

TAC055628 CM

Privileged and Confidential
Attorney-Client Communication
Attorney's Work Product

**AHERF**
**EXECUTIVE COMMITTEE**
**6/26/98**
**AGENDA**

1. Management Changes  — *Exec. Session*

2. Report of Physician and Other Contract Review

3. Progress Report on Chapter 11 Strategies:

    *they would use*
    *w part by use*
    *Kaye Scholer*

    - DIP financing
        - Foothill provided a draft commitment for up to $150 million in DIP financing (amount subject to an A/R and real estate availability formula)
        - CIT expressed interest but has not made a commitment
        - Mellon, PNC and Congress declined

    - ability to preserve some entities  — *probably defensible, but some risk*
        - substantive consolidation  *Could do in 2 steps*
        - piercing corporate veils  *Take 1-5 yrs. to get out of b'ruptcy.*
    - recommendation of DIP counsel  *Need more info on Univ. issues*

4. Report of Events of week of 6/20 through 6/25:

    - Cash situation
    - Short term cost cutting
        - Hunter Group
        - Management
    - Bond status report
    - D & O liability coverage

5. Selection of auditors in light of PW-C&L merger  — *rec. from Joe*

*Parkview*
*Penalties*

AHERF Agenda
    Update of Exec. Comm. discussions
    Exec. Session
       1. Cut expenses
       2. Contingency Plan
       3. Merger / Univ.  (defer for now)
       4. Vanguard


1. a. Hunter – 2Ks. < consulting Thru K+L
                mgmt  thru AHERF.
    Have David Hunter + Dan Stickler there
  b. Salaries – reduce people
         reduce salary – progressive %
           "    benefits
           "    tuition benefit
       life ins. policies
       cancel Duquesne Club suite
       sell plane
       stadium box
       Eagles K
       Ballet Board


Effect of not getting reapp't letter
AUHS – Special External Bd.  10 a.m. – 26th
       Council

TAC055630 CM

# COMMITTEE APPENDIX

## Tab 25



AHERF EXECUTIVE COMMITTEE 7/9/98

THERE ARE NO DRAFT OR FINAL MINUTES OF THIS MEETING.

TAC055696 C M

## ANTICIPATED ATTENDANCE

**Meeting of the Allegheny Health, Education and Research Foundation
Executive Committee**

**Thursday, July 9, 1998 at 3:00 p.m.
Allegheny Health, Education and Research Foundation
Fifth Avenue Place Conference Room, Pittsburgh**

### Committee Members

J. David Barnes ✓               Robert M. Hernandez ✓
Harry R. Edelman, III ✓         Francis B. Nimick, Jr. ✓
Robert L. Fletcher ✓            Robert B. Palmer ** ✓
Claire W. Gargalli ** ✓         W.P. Snyder III ✓
Ira J. Gumberg ✓

### Invited Guests

Al Adamczak ✓                   Charles P. Morrison ** ✓
Joseph D. Dionisio ✓            Anthony M. Sanzo ✓
Dwight Kasperbauer ✓            Nancy A. Wynstra, Esq. ✓
                                *Dan Stickler*
                                *David Hunter*
### Kirkpatrick & Lockhart        *Tom Honan*

William Cullen, Esq. ✓          David McClenahan, Esq. ✓
Kathy Hendrickson, Esq. ✓       David Murdock, Esq. ✓

                                *Merrilee Gerew - Hunter*

### Hahn, Loeser & Parks

Lee Powar, Esq. ✓

### Members Unable to attend

Frank V. Cahouet
Douglas D. Danforth

**MEET-ME-LINE Number 1-800-624-5133 extension 8240

PGH: 35030.1

TAC055697 CM

7/9/98     AHERF Exec. Comm.

SSA: To reach conclusion about reorging assets to come out of financial crisis.

Possible protection for AUH-E, AUH-C, AUMP, AUHS, AHERF. Can make payroll on Friday.

How divided analysis: Legal Team - Financing + Filing, Hunter - (1) strategies to keep org. out of filing, same [?]; (2) mgmt K - id how to reduce expenses, increase revenue.

Options for filing - Murdock

Cash crisis, concern re ability to meet payroll. Strategy - keep out those that can stand alone (AUH, AUMC); file those who can't - AUMC + AUHS - use as means to renegotiate K's; AUH-E + AUH-C (if can't sell). Sought DIP Financing - prob'ly Fort Hill. Also obtained disinterest counsel - Lee Power. Phil Beard - Stone, Cipher - to be local counsel. Also looked for financial adv. - re. Lehman Bros. + acct'ing firm (prob'ly E+Y)

AUHS
Legal diff. - Higher Ed. Act - if file, no longer eligible for Fed. funds. But only way to reject di. K's AHERF - if dues not paid, AHERF has prob. But also several large Ks. Also pay back to Bank group - could recoup if file before 7/22.

Rec. of K+L + Power - adopt resolutions permitting filing in W.Pa. Provided proposed resolution. AUH-E, AUMP, AUH-C.

TAC055698 CM

McClenbea - trying to get amendment to Higher Ed. Act. re
Fed. Financial Assit.  So far not successful.

David Hunter - Tom Horan  cash flow - literally out of cash.
+ 90 days ar. $30-40 m., problem large + serious.
Projected plan for next q'ter - $8804 (July - Sept.). inc. 30% retra Services + supplies
supplies threatened to be cut off.  No ready source of $.
Have reduced loss rate mo'ly somewhat.  Today have
$79 m., tomorrow have $15 m. payroll.  W. projected to
have $5 m. neg., AHERF - 3 m/mo.  Prob'ly 1000+ Ks
to review.

  Hunter - Looking for cash alternatives + ways to
avoid filing.  U - Penn. State., Geisinger, Temple,
Jeff.  Possible sales - U., Tenet, Universal.
U. negotiation for 9 h. - needed $649 m. - lowest
possible $619 m.  U. offer 502 m. + we do working cap. to close.  - doesn't get us
there

  Temple - strong int. in taking U. + SCHC, but
can't make offer today cuz of no time for dd.
Letter of interest, but no firm committment.

  MBIA + PNC  - letter w/ offer - have refined
but doesn't really solve prob. - inc. F. involvement numerous issues

  AMS - not sure can deal w/ problems outside cts.
Asked K. drs. for cuts - potential $20m. - $3½m
only agreed.

TAC055699 CM

Can we keep others out?  Flow of $ & E to W so no basis for fraudulent transfer claims.  Board overlap (9 members on AHERF + AGH).  Murdock - more than 50% chance of keeping out.

AMS - if used MBIA loan + W. assets would buy several mos. - not sure if those months would be well used.

Barnes - core business bad.  Don't think can fix w/o b'

Hernandez - concern re d+o exposure.  Need to be sure don't have viable plan w/o filing

Murdock - fid. obl. - what alternatives short of filing?

AMS - will make payroll, but only because not paying vendors.

Clair - any possibility of external solutions.

Dave - Can deal w/ separate assets separately.  Could prob'ly get deal w/ Temple closed in 1 mo.  Temple wouldn't be taint-ed by(AUH3) filing.  S. can buy w/o liabilities

* Escrow all tuition payments

Call from Gov. to seek working cap of $10m./mo.  Says appropriate cabinet members reviewing.  Could keep U. out for a while if we get.

Is SCHC a condition?  They want it.

Hunter - can we reorg. w/o filing?  Haven't had time to thoroughly explore options.

TAC055700 CM

Power – MBIA imposes unrealistic time frame + forces
into liquidation.

Stickler – concern re K's. Need a major reorg ever
in b.

AMS – if can save U. thru merger – keep only (+ SCHC)
would do (consolidate mcp + good.)
wel HUH – Sell K., EP, Bucks, close City + P'view.
If can't keep U. – do ped + adult H.

W. – AUH-W (w/o long-term care h.).
Remain a system.

Palmer – Have to consider that E. won't want
to be w/ W. if file w/o ACH.

Dave – Have ability to file plan w/in 120 days.

Clair – prob. w/ W. entities not being part of filing.
think will be pulled in – better opp'ty to reorg to
benefit of all if W. is in.


Read Confidentiality Provision tomorrow.
Concern re adopting res. w/o financing in place.


Adjourn meeting to call of Chair. – only provide
update.


Sign agmt when enter meeting.

Joe D. resolution

TAC055701 CM

## RESOLUTIONS OF THE BOARD OF TRUSTEES OF
## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

WHEREAS, this Corporation has suffered recent financial losses and is currently unable to meet its obligations to its creditors; and,

WHEREAS, after reviewing the history and present circumstances of this Corporation and the markets in which it operates, and after consulting with the Corporation's advisors, the members of this Board of Trustees have concluded that it is desirable and in the best interests of this Corporation, its creditors, employees and other interested parties that a petition be filed by the Corporation seeking relief under the provisions of Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code");

NOW, THEREFORE, BE IT RESOLVED, that the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation or each of their respective duly elected or appointed successors in office be, and hereby are, authorized and empowered to cause a Petition to be filed on behalf of this Corporation in the United States Bankruptcy Court for the Western District of Pennsylvania and to cause to be prepared and filed such applications, motions, pleadings, lists, schedules, notices, disclosure statements, plans of reorganization and other papers as shall be required or appropriate in connection with such bankruptcy case (the "Bankruptcy Case"); all such actions to be taken only if and when any such officer, in the exercise of his or her sole discretion, shall deem them to be necessary or appropriate to protect this Corporation's best interests in light of the circumstances then existing; and it is further

RESOLVED, that the Chair, the Vice Chair and the President and Chief Executive Officer of this Corporation are each hereby authorized and directed on behalf of this Corporation to take such other measures as shall be necessary and appropriate in the sole determination of such officer to continue this Corporation in the management of its affairs and the operation of its business as a debtor-in-possession under the Bankruptcy Code; and it is further

RESOLVED, that the Corporation borrow from Foothill Capital Corporation debtor-in-possession financing, and grant to Foothill Capital Corporation mortgages on and security interests in the property of the Corporation and of the bankruptcy estate of the Corporation, upon the terms and subject to conditions substantially as set forth in that certain Letter of Intent dated July 2, 1998, and such other or additional terms as the Chair, Vice Chair, and/or the President and Chief Executive Officer of this corporation may deem necessary, advisable or appropriate; and that any of the Chair, Vice Chair, and/or the President and Chief Executive Officer of this Corporation are hereby authorized and directed on behalf of this Corporation to execute and deliver to Foothill Capital Corporation such loan documents and related documents, instruments and other papers and to make such filings and take such other measures as may be necessary or required by Foothill Capital Corporation to obtain and secure such debtor-in-possession financing; and it is further

RESOLVED, that the law firm of Hahn Loeser & Parks LLP be, and hereby is, employed under a general retainer as attorneys for this Corporation for all purposes in the Bankruptcy Case, and that any of the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be, and are

hereby, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case an application to employ Hahn Loeser & Parks LLP; and it is further

RESOLVED, that the law firm of Stonecipher, Cunningham, Beard & Schmitt, P.C. be, and hereby is, employed under a general retainer to assist Hahn Loeser & Parks LLP in the Bankruptcy Case as local counsel, and that any of the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in the office be, and are hereby, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case an application to employ Stonecipher, Cunningham, Beard & Schmitt, P.C.; and it is further

RESOLVED, that any of the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be, and are hereby, authorized and directed on behalf of this Corporation to identify and retain a nationally recognized accounting firm for the purpose of providing all accounting services to this Corporation that shall be necessary or appropriate in connection with such Bankruptcy Case, and to execute and file in the Bankruptcy Case an application to employ such accounting firm; and it is further

RESOLVED, that the investment bank of Lehman Brothers be, and hereby is, retained as investment bankers for this Corporation for the purpose of providing investment banking services in connection with the potential sale of assets of the Corporation, and that any of the Chair, the Vice Chair and the President and Chief Executive Officer of the Corporation and each of their respective duly elected or appointed successors in office be, and hereby are, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case an application to employ Lehman Brothers; and it is further

RESOLVED, that the consulting firm of Hunter and Associates Management Services, Inc. and The Star-Rosen Group be, and hereby are, retained as management consultants and public relations consultants, respectively, for this Corporation to provide such management and public relations services to this Corporation that shall be necessary or appropriate in connection with such Bankruptcy Case; and that any of the Chair, the Vice Chair and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be, and hereby are, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case applications to employ Hunter and Associates Management Service, Inc. and The Star-Rosen Group; and it is further

RESOLVED, that the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be and hereby are authorized and empowered, in the name and on behalf of the Corporation, to do such other acts and things that any such officer may deem necessary, advisable or appropriate in furtherance of the foregoing resolutions, including, without limitation, retaining such other professionals in connection with the Bankruptcy Case as such officers shall deem appropriate; and that this Board of Trustees hereby ratifies, approves and confirms all such acts and things that any such officer has done or may do in connection with any of the matters described in these resolutions.

PCOM — non-repayment to them
made payment thru 6/30 on GME passthru

TAC055704 CM

letter from Andrea Gurlin

ssthru

TAC055705 CM

4 CM

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Executive Committee
July 9, 1998

Board and Officer Appointments:

WHEREAS, David W. McConnell no longer serves as Executive Vice President and Chief Financial Officer of Allegheny Health, Education and Research Foundation; and

WHEREAS, Joseph Dionisio has been appointed as Acting Chief Financial Officer of Allegheny Health, Education and Research Foundation;

NOW, THEREFORE, BE IT RESOLVED, That David W. McConnell is hereby removed from the following Boards of Directors and Committees and replaced, on an interim basis, by Joseph Dionisio:

AUH East, Resource Management Committee
AUH West, Resource Management Committee
Diversified Health Group, Director

FURTHER RESOLVED, That David W. McConnell is removed from the following positions as an officer of the following companies:

| | |
|---|---|
| Allegheny General Hospital | Assistant Treasurer |
| Allegheny Health, Education and Research Foundation | Treasurer |
| Allegheny University Hospitals, East | Assistant Treasurer |
| Allegheny Hospitals, Centennial | Assistant Treasurer |
| Allegheny Hospitals, New Jersey | Assistant Treasurer |
| Allegheny University of the Health Sciences | Treasurer |
| Allegheny University Medical Centers | Treasurer |
| Allegheny University Medical Practices | Vice Chair and Chief Executive Officer Acting President Eastern Region |
| Diversified Health Group | Chair |

FURTHER RESOLVED, That Joseph Dionisio is appointed, on an interim basis, to the following positions as an officer of the following companies:

| | |
|---|---|
| Allegheny Health, Education and Research Foundation | Treasurer |
| Allegheny University Hospitals, East | Assistant Treasurer |

PGH: 35630.1

TAC055706 CM

| | |
|---|---|
| Allegheny Hospitals, Centennial | Assistant Treasurer |
| Allegheny Hospitals, New Jersey | Assistant Treasurer |
| Allegheny University of the Health Sciences | Treasurer |
| Allegheny University Medical Centers | Treasurer |

**FURTHER RESOLVED, That Anthony M. Sanzo is appointed to the following positions as an officer of the following companies:**

| | |
|---|---|
| Allegheny University Medical Practices | Vice Chair and Chief Executive Officer |
| | Acting President Eastern Region |
| Diversified Health Group | President |

**FURTHER RESOLVED, That in the event David McConnell was serving as an officer, director or Chief Financial Officer of any other corporation within the AHERF system, the appointment is hereby rescinded. Joseph Dionisio, or such other member of management as may be determined by the Chairman of AHERF, is hereby appointed, on an interim basis, to perform said function.**

NAW:mcz:35630
7/9/98(5)

PGH: 35630.1

TAC055707 CM

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Executive Committee
July 9, 1998

External Financial Relationships

WHEREAS, from time to time, it is necessary to implement various administrative changes in the structures of various bond issues, financial arrangements or relationships, which impact entities within the Allegheny system; and

WHEREAS, such administrative changes do not affect the substantive requirements or obligations of such financial arrangements.

NOW THEREFORE BE IT RESOLVED, that the Executive Committee of Allegheny Health, Education and Research Foundation, acting on behalf of and with the full authority of the Board of Trustees of the organization, authorizes the Chief Executive Officer, the Chief Financial Officer and other members of management after appropriate consultation with the Chair of the Board of the affected entity, to make and implement such administrative changes as may be necessary for the smooth functioning of ongoing external financial relationships.

*I don't believe this was never put forward*
*sjd*

PGH: 35616.1

TAC055708 CM



AHERF EXECUTIVE COMMITTEE 7/9/98

THERE ARE NO DRAFT OR FINAL MINUTES OF THIS MEETING.

TAC055696 C M

## ANTICIPATED ATTENDANCE

**Meeting of the Allegheny Health, Education and Research Foundation
Executive Committee**

**Thursday, July 9, 1998 at 3:00 p.m.
Allegheny Health, Education and Research Foundation
Fifth Avenue Place Conference Room, Pittsburgh**

### Committee Members

J. David Barnes ✓ ✓                          Robert M. Hernandez ✓
Harry R. Edelman, III ✓                      Francis B. Nimick, Jr. ✓
Robert L. Fletcher ✓                         Robert B. Palmer ** ✓
Claire W. Gargalli ** ✓                      W.P. Snyder III ✓
Ira J. Gumberg ✓

### Invited Guests

Al Adamczak ✓                                Charles P. Morrison ** ✓
Joseph D. Dionisio ✓                         Anthony M. Sanzo ✓
Dwight Kasperbauer ✓                         Nancy A. Wynstra, Esq. ✓
                                             *Dan Stickler*
                                             *David Hunter*
### Kirkpatrick & Lockhart                    *Tom Honan*

William Cullen, Esq. ✓                        David McClenahan, Esq. ✓
Kathy Hendrickson, Esq. ✓                     David Murdock, Esq. ✓

                                             *Merrilee Gerew – Hunter*

### Hahn, Loeser & Parks

Lee Powar, Esq. ✓

### Members Unable to attend

Frank V. Cahouet
Douglas D. Danforth

**MEET-ME-LINE Number 1-800-624-5133 extension 8240

TAC055697 CM

PGH: 35030.1

7/9/98    AHERF Exec. Comm.

SSA: To reach conclusion about reorging assets to come out
of financial crisis.
    Possible protection for AUH-E, AUH-C, AUMP, AUHS, AHERF.
Can make payroll on Friday.
    How divided analysis: Legal Team - Financing + Filing,
Hunter - (1) strategies to keep org. out of filing, save $;
(2) mgmt K - id how to reduce expenses, increase revenue.


Options for filing - Murdock
    Cash crisis, concern re ability to meet payroll
Strategy - keep out those that can stand alone (AUH,
AUMC); file those who can't - AUMC + AUHS - use as
means to renegotiate K's; AUH-E + AUH-C (if can't
sell). Sought DIP Financing - prob'ly Fort Hill.
Also obtained disinterest counsel - Lee Powar. Phil
Beard - Store, Cipher - to be local counsel. Also looked
for financial adv. - re. Lehman Bros. + acc'ting
firm (prob'ly E+Y)
    AUHS
    Legal diff - Higher Ed. Act - if file, no longer eligible
for Fed. funds. But only way to reject di. K's
AHERF - if fees not paid, AHERF has prob. But also
several large Ks. Also payback to Bank group -
could recoup if file before 7/22.
    Rec. of K+L + Powar - adopt resolutions permitting
filing in W.Pa. Provided proposed resolution.
    AUH-E, AUMP, AUH-C.

TAC055698 CM

McClenahen - trying to get amendment to Higher Ed. Act. re
Fed. Financial Assist. So far not successful.

David Hunter - [Tom Horan] cash flow - literally out of cash.
+ 90 days ar. $30-40 m., problem large + serious.
Projected Plan for next q'ter - $88.4 (July - Sept.). Services + [inc. 30% a? extra] + Supplies threatened to be cut off. No ready source of $.
Have reduced loss rate mo'ly somewhat. Today have
$79 m., tomorrow have $15 m. payroll. W. projected to
have $5 m. neg., AHERF - 3 m/mo. Prob'ly 1000+ KS
to review.

Hunter - looking for cash alternatives + ways to
avoid filing. U - Penn. State., Geisinger, Temple,
Jeff. Possible sales - V., Tenet, Universal.
V. negotiation for 9 h. - needed $649 m. - lowest
possible $619 m. V. offer 502 m. + - doesn't get us [+ we do working cap. to close.]
there

Temple - strong int. in taking U. + SCHC, but
can't make offer today cuz of no time for dd.
Letter of interest, but no firm committment.

MBIA + PNC - letter w/ offer - have refined
but doesn't really solve prob. - inc. W. involvement [numerous issues]

AMS - not sure can deal w/ problems outside cts.
Asked K. drs. for cuts - potential $20 m. - $3½ m
only agreed.

TAC055699 CM

Can we keep others out?  Flow of $ & E to W so no basis for fraudulent transfer claims.  Board overlap (9 members on AHERF + AGH).  Murdock - more than 50% chance of keeping out.

AMS - if used MBIA loan + W. assets would buy several mos. - not sure if those months would be well used.

Barnes - core business bad.  Don't think can fix w/o b'

Hernandez - concern re d+o exposure.  Need to be sure don't have viable plan w/o filing

Murdock - fid. obl. - what alternatives short of filing?

AMS - will make payroll, but only because not paying vendors.

Clair - any possibility of external solutions.

Dave - Can deal w/ separate assets separately.  Could prob'ly get deal w/ Temple closed in 1 mo.  Temple wouldn't be taint-ed by[AuH3] filing.  T. can buy w/o liabilities

* Escrow all tuition payments

Call from Gov. to seek working cap of $10m./mo.  Says appropriate cabinet members reviewing.  Could keep U. out for a while if we get.

Is SCHC a condition?  They want it.

Hunter - can we reorg. w/o filing?  Haven't had time to thoroughly explore options.

TAC055700 CM

Power - MBIA imposes unrealistic time frame + forces into liquidation.

Stickler - concern re K's.   Need a major reorg even in b.

AMS - if can save U. thru merger - keep only HUH - Sell R., EP, Bucks, close City + P'view.
(+ SCHC)
would do (consolidate mgt+ good.)
wel

If can't keep U. - do ped + adult H.

W. - AUH-W (w/o long-term care h.).

Remain a System.

Palmer - Have to consider that E. won't want to be w. W. if file w/o AGH.

Dave - Have ability to file plan w/in 120 days.

Clair - prob. w. W. entities not being part of filing. think will be pulled in - better opp'ty to reorg to benefit of all if W. is in.


Read Confidentiality Provision tomorrow.
Concern re adopting res. w/o financing in place.


Adjourn meeting to call of Chair. - only provide update.


Sign agmt when enter meeting.

Joe D. resolution

TAC055701 CM

## RESOLUTIONS OF THE BOARD OF TRUSTEES OF
## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

WHEREAS, this Corporation has suffered recent financial losses and is currently unable to meet its obligations to its creditors; and,

WHEREAS, after reviewing the history and present circumstances of this Corporation and the markets in which it operates, and after consulting with the Corporation's advisors, the members of this Board of Trustees have concluded that it is desirable and in the best interests of this Corporation, its creditors, employees and other interested parties that a petition be filed by the Corporation seeking relief under the provisions of Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code");

NOW, THEREFORE, BE IT RESOLVED, that the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation or each of their respective duly elected or appointed successors in office be, and hereby are, authorized and empowered to cause a Petition to be filed on behalf of this Corporation in the United States Bankruptcy Court for the Western District of Pennsylvania and to cause to be prepared and filed such applications, motions, pleadings, lists, schedules, notices, disclosure statements, plans of reorganization and other papers as shall be required or appropriate in connection with such bankruptcy case (the "Bankruptcy Case"); all such actions to be taken only if and when any such officer, in the exercise of his or her sole discretion, shall deem them to be necessary or appropriate to protect this Corporation's best interests in light of the circumstances then existing; and it is further

RESOLVED, that the Chair, the Vice Chair and the President and Chief Executive Officer of this Corporation are each hereby authorized and directed on behalf of this Corporation to take such other measures as shall be necessary and appropriate in the sole determination of such officer to continue this Corporation in the management of its affairs and the operation of its business as a debtor-in-possession under the Bankruptcy Code; and it is further

RESOLVED, that the Corporation borrow from Foothill Capital Corporation debtor-in-possession financing, and grant to Foothill Capital Corporation mortgages on and security interests in the property of the Corporation and of the bankruptcy estate of the Corporation, upon the terms and subject to conditions substantially as set forth in that certain Letter of Intent dated July 2, 1998, and such other or additional terms as the Chair, Vice Chair, and/or the President and Chief Executive Officer of this corporation may deem necessary, advisable or appropriate; and that any of the Chair, Vice Chair, and/or the President and Chief Executive Officer of this Corporation are hereby authorized and directed on behalf of this Corporation to execute and deliver to Foothill Capital Corporation such loan documents and related documents, instruments and other papers and to make such filings and take such other measures as may be necessary or required by Foothill Capital Corporation to obtain and secure such debtor-in-possession financing; and it is further

RESOLVED, that the law firm of Hahn Loeser & Parks LLP be, and hereby is, employed under a general retainer as attorneys for this Corporation for all purposes in the Bankruptcy Case, and that any of the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be, and are

hereby, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case an application to employ Hahn Loeser & Parks LLP; and it is further

RESOLVED, that the law firm of Stonecipher, Cunningham, Beard & Schmitt, P.C. be, and hereby is, employed under a general retainer to assist Hahn Loeser & Parks LLP in the Bankruptcy Case as local counsel, and that any of the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in the office be, and are hereby, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case an application to employ Stonecipher, Cunningham, Beard & Schmitt, P.C.; and it is further

RESOLVED, that any of the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be, and are hereby, authorized and directed on behalf of this Corporation to identify and retain a nationally recognized accounting firm for the purpose of providing all accounting services to this Corporation that shall be necessary or appropriate in connection with such Bankruptcy Case, and to execute and file in the Bankruptcy Case an application to employ such accounting firm; and it is further

RESOLVED, that the investment bank of Lehman Brothers be, and hereby is, retained as investment bankers for this Corporation for the purpose of providing investment banking services in connection with the potential sale of assets of the Corporation, and that any of the Chair, the Vice Chair and the President and Chief Executive Officer of the Corporation and each of their respective duly elected or appointed successors in office be, and hereby are, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case an application to employ Lehman Brothers; and it is further

RESOLVED, that the consulting firm of Hunter and Associates Management Services, Inc. and The Star-Rosen Group be, and hereby are, retained as management consultants and public relations consultants, respectively, for this Corporation to provide such management and public relations services to this Corporation that shall be necessary or appropriate in connection with such Bankruptcy Case; and that any of the Chair, the Vice Chair and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be, and hereby are, authorized and directed on behalf of this Corporation to execute and file in the Bankruptcy Case applications to employ Hunter and Associates Management Service, Inc. and The Star-Rosen Group; and it is further

RESOLVED, that the Chair, the Vice Chair, and the President and Chief Executive Officer of this Corporation and each of their respective duly elected or appointed successors in office be and hereby are authorized and empowered, in the name and on behalf of the Corporation, to do such other acts and things that any such officer may deem necessary, advisable or appropriate in furtherance of the foregoing resolutions, including, without limitation, retaining such other professionals in connection with the Bankruptcy Case as such officers shall deem appropriate; and that this Board of Trustees hereby ratifies, approves and confirms all such acts and things that any such officer has done or may do in connection with any of the matters described in these resolutions.

TAC055703 CM

PCOM — non-repayment to them
made payment thru 6/30 on GME passthru

TAC055704 CM

letter from Andrea Gurlia

passthru

TAC055705 CM

4 CM