# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )
 )
      Plaintiff, )     Civil Action No. 00-684
 )
      v. )
 )     Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP, )
 )
      Defendant. )

## APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

### VOLUME 15

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

# COMMITTEE APPENDIX

## Tab 26

# PRIVILEGED

### DRAFT

### MINUTES OF MEETING OF THE EXECUTIVE COMMITTEE OF
### THE BOARD OF TRUSTEES OF THE
### ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

### June 13, 1998

An informational meeting of the Executive Committee of the Board of Trustees of the Allegheny Health, Education and Research Foundation was held at 9:00 AM on June 13, 1998 on the 29th Floor, 120 Fifth Avenue Pittsburgh, Pennsylvania. Each member of the Executive Committee attended in person or by telephone. Invited guests included Charles J. Queenan, Jr,. and William T. Cullen of Kirkpatrick & Lockhart, David McConnell, Nancy Wynstra, Joseph Dionisio and Chuck Morrison of AHERF.

The purpose of the meeting was informational. As scheduled at its June 5, 1998 meeting, the Committee met to receive a report of the financial condition of the Foundation.

Mr. Sanzo addressed the Committee and reported that the Foundation's financial condition was difficult. The losses in the Eastern operations were extensive and there was no plan to stem those losses in place. Mr. Sanzo also reported on the status of the transaction with Vanguard.

Mr. McConnell provided additional detail as to the financial conditions including cash flow short falls expected in the near future.

The Committee discussed suggestions of receivable financing and sale lease backs of real property.

The sense of the Committee was that the foregoing suggestions were short run solutions and that a long term as well as a short term plan needed to be formed. After further discussion, the Committee approved the retention of the Hunter Group to provide assistance to management in determining operational strengths and weaknesses as well as in forming a plan to stem losses and correct operational deficiencies. The Committee directed management to study ways of cutting expenses as rapidly as possible in order to improve cash flows. The Committee suggested that any and all cost saving measures should be considered. The Committee also determined it prudent to review alternatives if cost savings and operational changes were not sufficient under the circumstances. The Committee requested Kirkpatrick & Lockhart to advise it with regard to reorganization processes under the Bankruptcy Code as well as the legal consequences to cost cutting measures considered by management.

The Committee adopted resolutions adding Robert Hernandez and Clare Gargalli to the Executive Committee in order to provide additional financial experience to the Committee in its deliberations.

The meeting adjourned at approximately 11:45 AM EDT.

PRIVILEGED

TAC055156 CM

6/13/98 Attendance – AHERF Executive Committee Meeting

J. David Barnes ✓                      Cullen
Frank Couhet ✓                         Quenon
Douglas D. Danforth ✓
Harry R. Edelman ✓
Robert L. Fletcher ✓
Ira Gumberg ✓
Robert B. Palmer (by phone) ✓
Anthony M. Sanzo ✓
William P. Snyder ✓
Mr. Nimick ✓

Joe Dionisio ✓
Dave McConnell ✓
Al Adamczyk ✓
Chuck Morrison
Nancy Wynstra ✓

_Loss_
135,000 E.
35,000 AHERF
60,000 AUMP

If regionalized          Investment Income $64m.
E. – 170 m. loss/10m.
W. – 1.5m. profit
A – 18 m. loss

_Balance Sheet_
Degradation of assets by $250m. – w-$20m. $227m. – E

~~Current~~ Free of cash $100m.
Retired $90m. debt.

TAC055157 CM

ANTICIPATED ATTENDANCE

**Meeting of the Allegheny Health, Education and Research Foundation**
**Executive Committee**

**Saturday, June 13, 1998 at 8:00 a.m.**
**Allegheny Health, Education and Research Foundation**
**Fifth Avenue Place, Conference Room**

**Committee Members**

| | |
|---|---|
| J. David Barnes | Robert L. Fletcher |
| Frank V. Cahouet | Francis B. Nimick, Jr. |
| Douglas D. Danforth | Robert B. Palmer * meet-me line |
| Harry R. Edelman, III | W.P. Snyder III |

**Invited Guests**

| | |
|---|---|
| Al Adamczak | Chuck Morrison |
| Joseph D. Dionisio | Anthony M. Sanzo |
| Ira J. Gumberg | Nancy A. Wynstra, Esq. |
| David W. McConnell | |

* meet-me line number (359-8236)

TAC055158 CM

PGH: 35030.1

**AHERF EXECUTIVE COMMITTEE**
June 13, 1998

| | ITEM | PRESENTER |
|---|---|---|
| I. | **Call to Order** | W. P. Snyder III |
| II. | **Review of Financial Position**<br>**April 30, 1998** | A. Sanzo |
| III. | **Review of Cash Position** | A. Sanzo |

- May 31, 1998
- June 30, 1998 Projection
- July 31, 1998 Projection
- Accounts Payable: May 31, 1998
- IBM Personal Computer Leases

| | | |
|---|---|---|
| IV. | **Review of Fund Balances** | A. Sanzo |

- Unrestricted, Temporarily Restricted
  And Permanently Restricted,
  May 31, 1998
- Lockhart Fund
- Graduate Fund

| | | |
|---|---|---|
| V. | **Vanguard** | A. Sanzo |
| VI. | **Contingency Plan** | A. Sanzo |
| VII. | **Governance/Executive Committee** | A. Sanzo |
| VIII. | **Hunter Group** | A. Sanzo |
| IX. | **Executive Session** | W. P. Snyder III |
| X. | **Other Business** | W. P. Snyder III |
| XI. | **Adjournment** | W. P. Snyder III |

TAC055159 CM

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Executive Committee
June 13, 1998

Receivables Financing:

First Chicago Capital Marketing ("FCCM"), a subsidiary of First Chicago NB Bank ("FCNBB") has made a proposal to finance patient accounts receivable ("Receivables") of Allegheny University Hospitals, Hahnemann; St. Christopher's Hospital for Children, Allegheny University Hospitals, MCP, Allegheny University Medical Practices for the Eastern practices, and Allegheny University of the Health Sciences (hereinafter collectively referred to as the "East Facilities").

The program requires the seller, which would be Allegheny Health Education and Research Foundation ("AHERF"), to establish a special purpose corporation in Delaware, which would be sufficiently isolated from the East Facilities to be protected from their debts and obligations. The Receivables of the East Facilities would be sold without recourse to AHERF and AHERF, in turn would sell without recourse the Receivables to the special purpose corporation under a true sale opinion of AHERF's outside counsel. The special purpose corporation will then sell the Receivables of the East Facilities without recourse, in accordance with generally accepted accounting principles, to another special purpose corporation created by FCCM. Receivables sold by the East Facilities of AHERF will exceed the amount paid by FCCM to allow for dilutions, losses, delinquencies as well as the discount. FCCM obtains funding by selling commercial paper secured by the aggregate amount of receivables it has purchased from various sources.

The percentage payment indexed to receivables sold will be in the range of $70 Million to $85 Million. The transaction amount will be dependent upon due diligence by FCCM, which will include looking at concentration of receivable payor class, quality of receivables as well as accounts receivable systems, procedures and policies.

**WHEREAS, The Board of Trustees of Allegheny Health, Education and Research Foundation ("AHERF") has determined that operations of Allegheny University Hospitals, Hahnemann, St. Christopher's Hospital for Children, Allegheny University Hospitals, MCP, Allegheny University Medical Practices for the Eastern practices, and Allegheny University of the Health Sciences (hereinafter collectively referred to as "East Facilities") requires a maximization of cash flow; and**

**WHEREAS, Management has proposed a sale of accounts receivable ("the Sale") of the East Facilities to improve cash flow; and**

**WHEREAS, After review, the Board of Trustees of AHERF has determined that the Sale would improve cash flow of the East Facilities and therefore intends to adopt and authorize the Sale;**

TAC055160 CM

NOW THEREFORE BE IT RESOLVED, That the Board of Trustees of AHERF recommends to the respective Boards of Trustees of Allegheny University Hospitals East, Allegheny University of the Health Sciences, and Allegheny University Medical Practices "AUMP" (for the Eastern practices) that the East Facilities make a true sale as defined by generally accepted accounting principles, without recourse, of outstanding accounts receivable ("the Accounts Receivable") as of and after the Effective Date (as hereinafter defined) to AHERF;

FURTHER RESOLVED, That the Board of Trustees of AHERF hereby accepts the sale of the Accounts Receivable;

FURTHER RESOLVED, That the Board of Trustees of AHERF hereby authorizes the formation of a Delaware corporation ("the Corporation") on either a stock or-non-stock basis, as management shall determine, for the sole purpose of purchasing the Accounts Receivable and the purchase of 100% of the stock of the corporation, if so constituted;

FURTHER RESOLVED, That the Board of Trustees of AHERF hereby authorizes the true sale, without recourse, of the Accounts Receivable to the Corporation in a manner which is consistent with generally accepted accounting principles permits the outside counsel of AHERF to render an opinion that the sale is a true sale, which will not violate the applicable covenants of any bond or other financing;

FURTHER RESOLVED, That the Board of Trustees of AHERF hereby authorizes the Board of Directors of the Corporation to enter into a transaction with FCCM to purchase the Accounts Receivable at a discount to be determined by management pursuant to the terms and conditions of the Term Sheet dated May 4, 1998 or such other terms as management deems appropriate;

FURTHER RESOLVED, That the Board of Trustees of AHERF hereby authorizes these actions to be effective on or before July 20, 1998 (the "Effective Date") or at such time thereafter as management may determine; and

FURTHER RESOLVED, That the Board of Trustees of AHERF hereby authorizes the President and Chief Executive Officer, the Secretary, the Treasurer, and such other officers as they may designate to execute all such contracts and agreements and take all such further actions as are necessary to carry out this resolution.

NAW:mcz:35048
6/13/98(5)

TAC055161 CM

# COMMITTEE APPENDIX

## Tab 27

ALLEGHENY
HEALTH,
EDUCATION AND
RESEARCH
FOUNDATION

---

320 East North Avenue
Pittsburgh, PA 15212-4772

June 18, 1996

Ms. Marcie D. Knittel
Vice President
PNC Bank, National Association
Regional Health Care Group
One PNC Plaza
249 Fifth Avenue, 5th Floor
Pittsburgh, PA  15222-2707

Re:    $8,000,000 Line of Credit Letter Agreement dated
       September 3, 1992 (the "Agreement") extended to
       The Medical College of Pennsylvania and
       Hahnemann University Hospital System and
       The Medical College of Pennsylvania and Hahnemann University

Dear Marcie:

As you are aware, Allegheny University Hospitals and Allegheny University for Health Sciences (collectively, the "Borrowers") are expecting to refund the revenue bonds issued in 1989 and 1991 by the Pennsylvania Higher Educational Facilities Authority which are secured by the Loan and Security Agreement dated as of January 1, 1989 referred to in paragraph (7)(a) of the Agreement. The Borrowers expect that the refunding will occur on June 19, 1996. Concurrently with such refunding, the Borrowers expect to enter into a Master Trust Indenture, as supplemented and amended by a First Supplemental Master Trust Indenture, each dated as of May 15, 1996 (the "Master Indenture"), by and among the Borrowers, Hahnemann University Hospital, Allegheny United Hospitals, Inc., St. Christopher's Hospital for Children and Horizon Medical Corporation, as the initial Members of the Obligated Group established thereunder, and Norwest Bank Minnesota, National Association, as master trustee (the "Master Trustee").

*Members of the Allegheny Health, Education and Research Foundation*
*Allegheny General Hospital • Allegheny Integrated Health Group • Medical College of Pennsylvania and Hahnemann University •*
*Medical College of Pennsylvania and Hahnemann University Hospital System • St. Christopher's Hospital for Children*

F&L-01-014164

Marcie D. Knittel
June 18, 1996
Page 2

Pursuant to the Master Indenture the Members of the Obligated Group, including the Borrowers, will grant to the Master Trustee a security interest in their Gross Revenues (as defined therein) as security for the payment of all Obligations (as defined in the Master Indenture) issued thereunder.

Allegheny Health, Education and Research Foundation ("AHERF") requests, on behalf of the Borrowers, that PNC Bank sign the acknowledgment below agreeing to the following modifications to your letter of September 3, 1992 extending the above-described Line of Credit.

1.    Effective June 5, 1996, the term "Borrowers" shall be defined as the following two entities:

Allegheny University for Health Sciences (formerly The Medical College of Pennsylvania and Hahnemann University)

Allegheny University Hospitals (formerly The Medical College of Pennsylvania and Hahnemann University Hospital System)

2.    On and after June 19, 1996, paragraph (7)(a) shall be deemed to read as follows:

(a)    The Borrowers will remain in full compliance with all of the terms and conditions as set forth in the Master Trust Indenture, as supplemented and amended by the First Supplemental Master Trust Indenture, each dated as of May 15, 1996 (as the same may from time to time be further supplemented and amended, the "Master Indenture"), by and among the Borrowers, Hahnemann University Hospital, Allegheny United Hospitals, Inc., St. Christopher's Hospital for Children and Horizon Medical Corporation, as the initial Members of the Obligated Group established thereunder, and Norwest Bank Minnesota, National Association, as master trustee (the "Master Trustee").

3.    On and after June 19, 1996, paragraph (7)(b) shall be deemed to read as follows:

(b)    Except for those already in existence on September 3, 1992, and except as permitted by the Master Indenture, the Borrowers will not create,

F&L-01-014165

Marcie D. Knittel
June 18, 1996
Page 3

assume, incur or suffer to exist any mortgage, pledge, encumbrance, security interest, lien or charge of any kind upon any property of any character or upon any leasehold interest now owned or hereafter acquired, or acquire or agree to acquire any kind of property under conditional sales or other title retention agreements; provided, however, the foregoing restrictions shall not prevent them from: [THE REMAINDER OF PARAGRAPH (7)(b) TO READ AS SET FORTH IN THE SEPTEMBER 3, 1992 AGREEMENT].

4.    The Borrowers acknowledge and confirm the enforceability of the Agreement, as amended, and the Note delivered in accordance therewith, and agree to be bound by the respective terms thereof.

5.    On the date hereof, the Borrowers are in compliance with all the terms, conditions, provisions and covenants contained in the Agreement and the Note, as amended hereby, except as otherwise previously disclosed to the Bank.

AHERF accepts and agrees that it shall be a condition to the effectiveness of these modifications that PNC Bank shall receive an opinion of counsel to the Members of the Obligated Group as to the due authorization, execution and delivery of, and the validity and enforceability of, the Master Indenture in substantially the form previously provided to the Bank.

Sincerely,

Susan M. Gilbert
Director, Treasury Operations

Acknowledgment:

Marcie D. Knittel                    Date 6/18/96

Pittsburgh National Bank
Pittsburgh, PA 15265

REC'D SEP  4 1992

# ▼ PITTSBURGH NATIONAL BANK

September 3, 1992

The Medical College of                    The Medical College Hospitals
  Pennsylvania                            300 Henry Avenue
300 Henry Avenue                          Philadelphia, Pennsylvania 19129
Philadelphia, Pennsylvania 19129

Re:  Line of Credit

Dear Sirs:

Pittsburgh National Bank (the "Bank") offers a line of credit (the
"Line of Credit") to THE MEDICAL COLLEGE OF PENNSYLVANIA and THE
MEDICAL COLLEGE HOSPITALS (the "Borrower") pursuant to which the
Bank's lending officers are authorized to make advances to the
Borrower, from time to time, but in no event later than the
Termination Date, in an amount in the aggregate not to exceed
$8,000,000.00.

The "Termination Date" shall mean September 30, 1993, or such later
date so designated by written notice from the Bank to the Borrower.

This offer is made subject to the fulfillment of each of the
following terms and conditions:

1.  Note.  The Borrower shall execute and deliver to the Bank a
note (the "Line of Credit Note") in form and content satisfactory
to the Bank.  The Line of Credit Note shall be enforceable only to
the extent of (i) the aggregate amount of the advances charged
thereto and (ii) interest on the advances from the dates they are
charged thereto.  In no event, however, shall (i) the aggregate
principal amount outstanding at any time under the Line of Credit
Note exceed $8,000,000.00, or (ii) any advance thereunder be made
after the Termination Date.

2.  Interest Rate.  The Borrower will pay interest on the unpaid
balance of the Line of Credit Note at the rate or rates per annum
as provided in the Line of Credit Note.

Where not prohibited by law, interest shall be computed on the
basis of a year of 360 days and paid on the actual number of days
elapsed.

3.  Terms of Payment.  The principal amount of the Line of Credit
shall be paid on the Termination Date.

A PNC BANK

F&L-01-014168

▼ **PITTSBURGH NATIONAL BANK**

Page -2-                                    September 3, 1992

The Medical College of Pennsylvania
The Medical College Hospitals

4.  <u>Fee</u>.  The Borrower shall pay to the Bank a fee as provided in the Line of Credit Note.

5.  <u>Loan Account</u>.  The Bank shall open and maintain on its books a loan account in the Borrower's name with respect to advances, payments and the computation and payment of interest and prepayment premiums, if any.  Such loan account shall be conclusive and binding on the Borrower as to the amount at any time due to the Bank from the Borrower except in the case of manifest error.

6.  <u>Use of Proceeds by The Medical College Hospitals</u>.  The proceeds of the Line of Credit shall be used by The Medical College Hospital only for the Main Clinical Campus Division.

7.  <u>Covenants</u>.  Unless compliance is waived in writing by the Bank and until payment in full of the Line of Credit:

(a) The Borrower will remain in full compliance with all of the terms and conditions as set forth in that certain Loan and Security Agreement dated January 1, 1989 between the Borrower and the Pennsylvania Higher Educational Facilities Authority.

(b) Except for those already in existence, the Borrower will not create, assume, incur or suffer to exist any mortgage, pledge, encumbrance, security interest, lien or charge of any kind upon any property of any character or upon any leasehold interest now owned or hereafter acquired, or acquire or agree to acquire any kind of property under conditional sales or other title retention agreements; <u>provided</u>, however, the foregoing restrictions shall not prevent it from:

(1) permitting or incurring liens for taxes, or assessments or governmental charges or levies on any of its properties if such taxes, assessments, governmental charges or levies shall not at the time be due and payable or can thereafter be paid without penalty or are being contested in good faith by appropriate proceedings diligently conducted and with respect to which it has created adequate reserves;

(2) making pledges or deposits to secure obligations under workers' compensation laws or similar legislation;

(3) incurring liens arising out of judgments or awards against it with respect to which it at the time shall currently be prosecuting an appeal or proceedings for review;

(4) granting security interests in favor of the Bank; or

A <u>PNC</u> BANK                                    F&L-01-014169

▼ **PITTSBURGH NATIONAL BANK**

Page -3-                                        September 3, 1992

The Medical College of Pennsylvania
The Medical College Hospitals

    (5) granting security interests in connection with leased equipment.

8.  <u>Necessary Documents</u>:  Prior to any advances being made under the Line of Credit by the Bank, the Borrower will deliver, or cause to be delivered to the Bank, the following, in form and content satisfactory to the Bank:

    (a) The Line of Credit Note appropriately completed by the Bank and executed by the Borrower.

    (b) A certified copy of the resolutions of the Board of the Directors of the Borrower authorizing the execution and delivery of, the performance under, and evidencing the authority of each person who has signed, or who will sign, this letter, the Line of Credit Note, the Security Documents, if any (as hereinafter defined), and any other documents related to, or required by, any of the foregoing.

    (c) An incumbency certificate executed by the Secretary or Assistant Secretary of the Borrower identifying the name and title and bearing the signatures of each person referred to in subparagraph (b) above.

    (d) Such other instruments and documents that the Bank may reasonably request.

9.  <u>Acceptance</u>.  The terms and conditions of this letter must be accepted and agreed to within 30 days of the date hereof by signing this letter where indicated below and returning it to the attention of the undersigned.

Pittsburgh National Bank is pleased to offer this accommodation to you and looks forward to a long and mutually beneficial relationship.

                 Very truly yours,

                 PITTSBURGH NATIONAL BANK

                 By _____
                 Title_____

A **PNC** BANK                                        F&L-01-014170

▼ **PITTSBURGH NATIONAL BANK**

Page -4-                                        September 3, 1992

The Medical College of Pennsylvania
The Medical College Hospitals

<u>ACCEPTANCE</u>

Intending to be legally bound hereby, the undersigned accepts and
agrees to all of the foregoing terms and conditions this 30ᵗʰ day
of _____*September*_____, 1992.

                         THE MEDICAL COLLEGE OF
                           PENNSYLVANIA

                         By _____
                         Title *TREASURER*

                         THE MEDICAL COLLEGE HOSPITALS

                         By _____
                         Title *TREASURER*

tlf-9/3/92

A **PNC** BANK                                    F&L-01-014171

NOTE

$8,000,000.00

Pittsburgh, Pennsylvania

September ___, 1992

FOR VALUE RECEIVED, the undersigned promises to pay to the order of PITTSBURGH NATIONAL BANK ("Bank"), its successors or assigns, at Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania, or at such other place as any holder may direct, on or before the Termination Date (as hereinafter defined), the principal sum of each advance made hereunder (each, an "Advance", collectively, "Advances"), if any, plus interest on each Advance from the date the Advance is made until the Interest Payment Date (as hereinafter defined) at the rates per annum specified below.

This Note is executed and delivered under and pursuant to the terms of that certain letter agreement dated September 3, 1992, between the Bank and the undersigned ("Agreement"), all of the terms and conditions of which are specifically incorporated herein by reference. All capitalized terms not otherwise defined in this Note are used herein with the same meaning as used and defined in the Agreement, unless the context otherwise requires.

DEFINITIONS. As used in this Note, the following terms shall have the meanings so specified, unless the context otherwise requires:

"Applicable Margin" as to any Eurodollar Rate Advance, means 1-3/8%.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Pittsburgh, Pennsylvania are required or authorized to close.

"Domestic Dollar Advances" means Prime Rate Advances.

"Eurodollar Advances" means Advances hereunder at such time as they are made and/or being maintained at a rate of interest based upon the Eurodollar Rate.

"Eurodollar Base Rate" means, with respect to each Interest Period pertaining to Eurodollar Advances, the rate per annum equal to the rate per annum at which Bank is offered dollar deposits two (2) Working Days prior to the beginning of such Eurodollar Interest Period in the interbank eurodollar market as at or about 10 A.M., New York time, for delivery on the first day of such Interest Period for the number of days comprised thereof and in an amount equal to the amount of the Eurodollar Advance to be outstanding during such Interest Period.

F&L-01-014172

"Eurodollar Rate" means a rate per annum calculated as follows:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

"Eurodollar Reserve Percentage" means for any day the percentage (expressed as a decimal fraction, rounded upward to the nearest 1/100 of 1%), which is in effect for such day as determined in good faith by Bank (which determination shall be conclusive), as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirements (including, without limitation, supplemental, marginal and emergency reserve requirements) with respect to any eurocurrency funding (currently referred to as "Eurocurrency liabilities") by Bank on such day.

"Fixed Rate Advance" means any Eurodollar Rate Advance.

"Interest Payment Date" means (a) as to any Prime Rate Advance, the last day of each March, June, September, and December commencing on the first of such days to occur after a Prime Rate Advance is made or any Advance is converted to a Prime Rate Advance, (b) as to any Eurodollar Advance in respect of which the undersigned has selected an Interest Period of one (1), two (2) or three (3) months, the last day of such Interest Period; and (c) as to any Eurodollar Advance in respect of which the undersigned has selected a longer Interest Period than the periods described in clause (b), (i) each day which is three (3) months, after the first day of such Interest Period, and (ii) the last day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Advance:

(i) initially, the period commencing on, as the case may be, the advance or conversion date with respect to such Eurodollar Advance and ending one (1), two (2), three (3) or six (6) months thereafter, as the case may be, as selected by the undersigned in its request for Advances as provided herein or its notice of conversion or continuation as provided herein; and

(ii) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Advance and ending one (1), two (2), three (3) or six (6) months thereafter, as selected by the undersigned by irrevocable notice to Bank not less than three (3) Working Days prior to the last day of the then current Interest Period with respect to such Eurodollar Advance;

provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(A) if any Interest Period pertaining to a Eurodollar Advance would otherwise end on a day which is not a Working Day, that

F&L-01-014173

Interest Period shall be extended to the next succeeding Working Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Working Day;

(B) any Interest Period that would otherwise extend beyond the Termination Date shall end on the Termination Date;

(C) if the undersigned gives a notice of continuation pursuant hereto with respect to any Eurodollar Advance but shall fail to give notice of the length of the Interest Period to be applicable thereto as provided in clause (i) or (ii) above, the undersigned shall be deemed to have selected an Interest Period of two (2) months for the affected Eurodollar Advance; and

(D) any Interest Period pertaining to a Eurodollar Advance that begins on the last Working Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Working Day of a calendar month.

"Prime Rate" means the rate per annum publicly announced from time to time by Bank in Pittsburgh, Pennsylvania as its prime rate. The Prime Rate is determined from time to time by Bank as a means of pricing some loans to its borrowers and neither is it tied to any external rate of interest or index, nor doesn't necessarily reflect the lowest rate of interest actually charged by Bank to any particular class or category of customers.

"Prime Rate Advances" means Advances hereunder at such time as they are made and/or being maintained at a rate of interest based upon the Prime Rate.

"Termination Date" means September 30, 1993 or, if such date is not a Working Day, the Working Day next preceding such date, or any subsequent date so designated by Bank by written notice to the undersigned or, if such subsequent date is not a Working Day, the Working Day next preceding such date.

"Working Day" means any day on which dealings in foreign currencies and exchange between banks may be carried on in Pittsburgh, Pennsylvania and London, England.

TYPES OF ADVANCES. Advances may be any type of Advance, or combination thereof, as determined by the undersigned and notified to Bank in accordance with the provisions hereof.

ADVANCES PROCEDURE. The undersigned may request Advances under this Note until the Termination Date on any Working Day if the Advance is a Eurodollar Advance or on any Business Day if the Advance is a Domestic Dollar Advance; provided that the undersigned shall give Bank irrevocable notice, which notice may be given by

3

F&L-01-014174

telephone but shall immediately be confirmed in writing, which notice must be received by Bank prior to 12:00 Noon, Pittsburgh time, three (3) Working Days prior to the requested Advance date, in the case of Eurodollar Advances, specifying (i) the amount to be advanced, (ii) the requested Advance date, (iii) whether the Advance is to be a Prime Rate Advance, a Fixed Rate Advance, or a combination thereof, and (iv) if the Advance is to be entirely or partly a Fixed Rate Advance, the length of the initial Interest Period for such Fixed Rate Advance. Each Advance pursuant hereto shall be in a principal amount equal to $100,000.00 or a whole multiple thereof, in the case of Prime Rate Advances, and $1,000,000.00 or a whole multiple thereof in the case of Eurodollar Advances. The proceeds of each Advance request will be made available to the undersigned by Bank by crediting the account of the undersigned with the amount of such Advance.

COMMITMENT FEE. The undersigned will pay to Bank a commitment fee for the period from the date hereof to the Termination Date computed at the rate of 3/16% per annum on the average daily unused portion of the principal amount of this Note in effect during the period for which payment is made. The commitment fee shall be payable quarterly on the last day of each March, June, September and December, commencing September 30, 1992, and on the Termination Date.

OPTIONAL PREPAYMENTS. On the last day of the relevant Interest Period if the Advances to be prepaid are in whole or in part Fixed Rate Advances, or at any time and from time to time if the Advances to be prepaid are Prime Rate Advances, the undersigned may prepay this Note, in whole or in part, without premium or penalty, by giving one (1) Business Day's prior irrevocable notice to Bank, which notice may be given by telephone but shall immediately be confirmed in writing (effective upon receipt), specifying the date and amount of prepayment and whether the payment is of Prime Rate Advances or Fixed Rate Advances or a combination thereof, and if of a combination thereof the amount of prepayment allocable to each. If such notice is given, the undersigned shall make such prepayment, and the payment amount specified in such notice shall be due and payable on the date specified therein. Partial prepayments of Prime Rate Advances shall be in an aggregate principal amount of $100,000.00 or a whole multiple thereof. Partial prepayments of Eurodollar Advances shall be in such amounts so that, after giving effect thereto, the aggregate then outstanding principal amount of each Eurodollar Advance shall be equal to $1,000,000.00 or a whole multiple thereof.

CONVERSION OPTIONS. (a) The undersigned may elect from time to time to convert any Advances to (A) Prime Rate Advances, by giving Bank at least one (1) Business Day's prior irrevocable notice (effective upon receipt) of such election, or (B) Eurodollar Advances by giving Bank at least three (3) Working Days' prior irrevocable notice (effective upon receipt) of such election,

4

F&L-01-014175

<u>provided</u> that any such conversion of Fixed Rate Advances shall, subject to the next following sentence, only be made on the last day of an Interest Period with respect thereto. All or any part of outstanding Advances may be converted as provided herein, <u>provided</u>, that no such conversion to a Fixed Rate Advance shall be permitted when any default hereunder has occurred and is continuing, and <u>provided</u>, <u>further</u> that each partial conversion from one type of Advance to another type of Advance shall be in such amounts so that, after giving effect thereto, the aggregate then outstanding principal amount, if any, of each Eurodollar Advance would be equal to $1,000,000.00 or a whole multiple thereof. All notices required by this subsection may be given by telephone but shall be immediately confirmed in writing.

(b) Any Fixed Rate Advances may be continued as such upon the expiration of an Interest Period with respect thereto so long as the undersigned gives Bank appropriate notice thereof within the appropriate time period provided for in subsection (a) of this Section with respect to a conversion to such type of Advance; <u>provided</u>, that no Fixed Rate Advance may be continued as such when any default hereunder has occurred and is continuing, but shall be automatically converted to a Prime Rate Advance on the last day of the then expiring Interest Period with respect thereto.

(c) Any Fixed Rate Advances with respect to which Bank does not receive an appropriate notice of conversion or continuation within the time periods specified in subsections (a) and (b) of this Section prior to the expiration of an Interest Period with respect thereto shall be automatically converted to Prime Rate Advances on the last day of such then-expiring Interest Period.

INTEREST RATE AND PAYMENT DATES. (a) Each Eurodollar Advance shall bear interest for the period from the first day of each Interest Period with respect thereto to, but not including, the last day of such Interest Period at a rate per annum equal to the Eurodollar Rate determined for such Eurodollar Interest Period in accordance with the terms hereof <u>plus</u> the Applicable Margin.

(b) Each Prime Rate Advance shall bear interest for the period from and including the date made to, but not including, the date of payment or the date of conversion to another type of Advance at a rate per annum equal to the Prime Rate.

(c) If all or a portion of the principal amount of any of the Advances made hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such Advance, if a Fixed Rate Advance, shall be converted to a Prime Rate Advance at the end of the then current Interest Period therefor. Any such overdue principal amount shall bear interest at a rate per annum which is 1% above the rate which would otherwise be applicable pursuant to this Section from the date of such non-payment until paid in full (as well after as before judgment).

5

F&L-01-014176

(d) Interest shall be payable in arrears on each Interest Payment Date.

COMPUTATION OF INTEREST. (a) Interest on the Prime Rate Advances shall be calculated on the basis of a 365 or 366 day year (as the case may be) for the actual days elapsed. Interest on the Eurodollar Advances shall be calculated on the basis of a 360 day year for the actual days elapsed. Bank shall as soon as practicable notify the undersigned of each determination of a Eurodollar Rate. Any change in the interest rate on this Note resulting from a change in the Prime Rate shall become effective as of the opening of business on the day on which such change in the Prime Rate shall become effective. Bank shall as soon as practicable notify the undersigned of the effective date and the amount of each such change in the Prime Rate.

(b) Each determination, pursuant to and in accordance with any provision of this Note, of any interest rate applicable to a Eurodollar Advance for any Interest Period by Bank shall be conclusive and binding on the undersigned in the absence of manifest error. Bank shall, at the request of the undersigned, deliver to the undersigned a statement showing the quotations given by Bank and the computations used by Bank in determining any interest rate pursuant hereto.

INABILITY TO DETERMINE INTEREST RATE. In the event that Bank shall have determined (which determination shall be conclusive and binding upon the undersigned), that by reason of circumstances affecting the interbank eurodollar market or the market for certificates of deposit, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate applicable pursuant hereto for any Interest Period with respect to (a) a proposed Advance that the undersigned has requested to be made as a Eurodollar Advance, (b) a Eurodollar Advance that will result from the requested conversion of another type of Advance into a Eurodollar Advance, or (c) the continuation of a Eurodollar Advance as such for an additional Interest Period (any such Eurodollar Advance being herein called an "Affected Advance"), Bank shall forthwith give telex notice of such determination, confirmed in writing, to the undersigned at least one (1) day prior to, as the case may be, the requested Advance date for such Affected Advance, the requested conversion date of a Advance to such an Affected Advance or the last day of the then current Interest Period for such Affected Advance that is to be continued as the same type of Advance for an additional Interest Period. If such notice is given (i) any requested Affected Advance shall be made as a Prime Rate Advance, (ii) any Advance that was to have been converted to an Affected Advance shall be continued as or converted to a Prime Rate Advance, as the case may be, and (iii) any outstanding Affected Advance shall be converted, on the last day of the then current Interest Period with respect thereto, to a Prime Rate Advance. Until such notice has been withdrawn by Bank, no further Affected Advances shall be made, nor shall the

F&L-01-014177