Corporation would have the power to indemnify such person against such liability or expense by law or under the provisions of this Article. The Corporation may create a trust fund, grant a security interest, cause a letter of credit to be issued or use other means (whether or not similar to the foregoing) to ensure the payment of such sums as may become necessary to effect indemnification as provided herein.

5.4   NON-EXCLUSIVITY; NATURE AND EXTENT OF RIGHTS.

The right of indemnification provided for herein (1) shall not be deemed exclusive of any other rights, whether now existing or hereafter created, to which those seeking indemnification hereunder may be entitled under any agreement, bylaw or charter provision, vote of Directors or otherwise, (2) shall be deemed to create contractual rights in favor of persons entitled to indemnification hereunder, (3) shall continue as to persons who have ceased to have the status pursuant to which they were entitled or were denominated as entitled to indemnification hereunder and shall inure to the benefit of the heirs and legal representatives of persons entitled to indemnification hereunder and (4) shall be applicable to actions, suits or proceedings commenced after the adoption hereof, whether arising from acts or omissions occurring before or after the adoption hereof. The right of indemnification provided for herein may not be amended, modified or repealed so as to limit in any way the indemnification provided for herein with respect to any acts or omissions occurring prior to the effective date of any such amendment, modification or repeal.

5.5   PERSONAL LIABILITY OF DIRECTORS.

To the fullest extent that the laws of the Commonwealth of Pennsylvania, as now in effect or as hereafter amended, permit elimination or limitation of the liability of Directors, no Director of the Corporation shall be personally liable for monetary damages as such for any action taken, or any failure to take any action, as a Director. Any amendment or repeal of this Section 5.5 which has the effect of increasing Director liability shall operate prospectively only, and shall not affect any action taken, or any failure to act, prior to its adoption.

ARTICLE SIX:   GENERAL PROVISIONS

6.1   INCOME.

Substantially all of the income of the Corporation shall be distributed evenly between St. Christopher's Hospital for Children and Allegheny United Hospitals, Inc. or their respective successors, in the manner designated by the Board.

6.1  <u>FISCAL YEAR</u>.

The Board shall determine the Corporation's fiscal year.

6.2  <u>CORPORATE SEAL</u>.

The Corporation shall have a corporate seal containing the name of the Corporation, its year of incorporation and the words "Corporate Seal -- Pennsylvania".

6.3  <u>LEGAL HOLIDAYS</u>.

If any designated meeting of the Board of Directors shall fall on a legal holiday, such meeting shall be held on the next succeeding day not a legal holiday, unless a different date shall be designated by the Board.

6.4  <u>NOTICE</u>.

Whenever written notice is required to be given to any person by law, the Articles of Incorporation or these Bylaws, it may be given to such person, either personally or by sending a copy thereof through the mail, or by telegram, charges prepaid, to the address appearing on the books of the Corporation or supplied by such person to the Corporation for the purpose of notice.  If the notice is sent by mail or by telegraph, it shall be deemed to have been given to the person entitled thereto when deposited in the United States mail or with a telegraph office for transmission to such person.  Such notice shall specify the place, day and hour of the meeting.

6.5  <u>WAIVER OF NOTICE</u>.

Whenever any written notice is required to be given by law, the Articles of Incorporation or these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.  Neither the business to be transacted at nor the purpose of the meeting need be specified in the waiver of notice of such meeting.

6.6  <u>WAIVER BY ATTENDANCE</u>.

Attendance of a person at any meeting shall constitute a waiver of notice of such meeting, except where a person attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened.

DC 3130

6.7   <u>PARTICIPATION BY CONFERENCE TELEPHONE</u>.

One or more Directors may participate in a meeting of the Board of Directors or of a Committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

6.8   <u>CORPORATE RECORDS</u>.

The Corporation shall keep at its registered office or principal place of business an original or duplicate record of the proceedings of the Board of Directors, and the original or a copy of its Bylaws including all amendments or alterations thereto to date, certified by the Secretary of the Corporation. The Corporation shall also keep appropriate, complete and accurate books or records of account, which may be kept at its registered office or at its principal place of business.

6.10   <u>CONSTRUCTION OF TERMS</u>.

Words used in these Bylaws shall be read as the masculine and feminine gender and as singular and plural as the context requires.

ARTICLE SEVEN:  AMENDMENTS

7.1   <u>AMENDMENT BY BOARD OF DIRECTORS</u>.

The Board of Directors shall have the power to make, amend and repeal these Bylaws by a majority vote of the whole Board at any regular or special meeting duly convened after five (5) days written notice to the Board of that purpose.

DC 3131

SECRETARY'S CERTIFICATE

THIS IS TO CERTIFY THAT the foregoing Amended and Restated Bylaws of SDN, Inc. (the "Corporation") were duly adopted by the Board of Directors of the Corporation on the __ day of _____, 1991.

IN WITNESS WHEREOF, the undersigned, the Secretary of the Corporation, has signed this Certificate and affixed the seal of the Corporation this ____ day of _____, 1991.


(SEAL)                          _____
                                Secretary

DC 3132

UNITED HOSPITALS, INC.
A Pennsylvania Nonprofit Corporation

UNANIMOUS CONSENT OF DIRECTORS

Pursuant to Section 5727(b) of the Pennsylvania Nonprofit Corporation Law of 1988, as amended, the undersigned, being all of the directors of United Hospitals, Inc. (the "Corporation"), hereby unanimously consent and agree that the following action be taken, and that resolutions be, and they hereby are, adopted by the Board of Directors as follows:

RESOLVED, that article I of the Articles of Incorporation of the Corporation shall be amended to read in its entirety as follows:

"ARTICLE ONE
Name

The name of the corporation is:
SDN, INC."

FURTHER RESOLVED, that the Chairman and any other appropriate officers of the Corporation are hereby each severally authorized to execute and file with the Commonwealth of Pennsylvania articles of amendment and any and all other documents as may be necessary or appropriate to effectuate the change of name of the Corporation; and

FURTHER RESOLVED, that the Chairman and any other appropriate officers of the Corporation are hereby each severally authorized in the name of and on behalf of the Corporation to

do or cause to be done any and all acts or undertakings as may be proper, necessary or desirable to carry out the foregoing resolutions.

This document may be signed in counterpart.

Dated as of July 1, 1991

Sherif S. Abdelhak

Nancy A. Wynstra

David W. McConnell

08238.Am5

DC 3134

# COMMITTEE APPENDIX

## Tab 31

| Coopers & Lybrand L.L.P. | 600 Grant Street | telephone (412) 355-8000 |
|---|---|---|
| | 35th Floor | |
| **Coopers** | Pittsburgh, Pennsylvania | facsimile  (412) 355-8089 |
| **&Lybrand** | 15219-2777 | |
| a professional services firm | | |

**CONFIDENTIAL**

August 26, 1996

Mr. David W. McConnell
Executive Vice President and CFO
SDN, Inc.
Fifth Avenue Place
120 Fifth Avenue, Suite 2900
Pittsburgh, PA 15222

Dear Mr. McConnell

We are pleased to submit this letter of understanding concerning the work you have asked Coopers & Lybrand L.L.P. ("Coopers & Lybrand") to undertake with respect to the acquisition of certain entities in the Graduate Health System including Graduate Hospital, Mt. Sinai Hospital, City Avenue Hospital, Parkview Hospital, Rancocas Hospital, SSMOB, Founders Health Care, GHS Ltd., Zurbrugg Foundation and Graduate Health Foundation (collectively "Graduate") by SDN, Inc., ("SDN").  For your convenience, we have organized it into the following sections: Objectives; Approach; Timing; Terms, Conditions and Fees; Scope of Services; Indemnification; and Conflict of Interest.

*Objectives*

Subject to the cooperation of Graduate's management and the availability of necessary information, the objective of this engagement is to assist SDN in obtaining information regarding the business and financial practices, and financial characteristics of Graduate for SDN to make certain decisions with respect to the acquisition.  In that regard, based on our discussions with you, the services we expect to provide are identified in the "Due Diligence Check List" prepared by your staff, with input from Coopers & Lybrand, and attached hereto as Exhibit A.

It is understood that as our engagement progresses, some of the services listed in the Due Diligence Check List may be determined by you to be unnecessary and that you may direct us to perform additional services which are not listed.

*Approach*

We plan to address the objectives listed above through analysis of the books, records, and other information of Graduate, provided to us by its management, as well as through interviews with Graduate's management and the application of our financial experience.

CL 046537

Coopers & Lybrand L.L.P. is a member of Coopers & Lybrand International, a limited liability association incorporated in Switzerland.

Mr. McConnell
August 26, 1996
Page 2

We believe you understand that the scope of our engagement, as described above, is intended to provide information that might be useful in your evaluation of Graduate. However, our procedures will not constitute an attest service as that term is defined by the American Institute of Certified Public Accountants. Accordingly, we will be unable to express an opinion on any of the financial or other data that will be contained in our report. We also can make no representation as to the adequacy of our procedures for your purposes.

We may obtain historical proforma financial statements and/or financial forecasts and the underlying assumptions, from the management of Graduate or from you. Our work with respect to any prospective financial information will not constitute an examination, compilation, or agreed-upon procedures engagement of a financial forecast in accordance with standards established by the American Institute of Certified Public Accountants, and we will express no assurance of any kind on it. There usually will be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.

At the completion of our work, we will prepare a summary report, setting forth our comments and findings. Because of the confidential nature of our work, our report is intended to be used solely by SDN in evaluating the proposed acquisition of Graduate. Our report should not be referred to or distributed for any purposes to anyone who is not a member of the management of SDN or their advisors. We will have no responsibility to update this report for events and circumstances occurring after the date of this report.

### Timing

We plan to begin fieldwork at Graduate's offices in Philadelphia, Pennsylvania during the week of September 3, 1996, subject to the availability of Graduate's management and the necessary information requested by us and to complete our report by November 1, 1996. We will meet periodically with you and other members of SDN's due diligence team to discuss the status of the due diligence efforts and preliminary findings.

### Terms, Conditions and Fees

To facilitate meeting our mutual objectives, Graduate will provide in a timely manner the information necessary for us to accomplish the tasks described above, as well as working space and clerical assistance as mutually agreed upon and as is normal and reasonable in the circumstances. When and if for any reason Graduate is unable to provide such information and assistance, we will revise our fee estimate to reflect additional services, if any, required of us to achieve these objectives.

Our fees for this engagement will be based on time incurred for personnel utilized based upon our standard hourly billing rates. Based on our experience with engagements of this type we estimate

Mr. McConnell
August 26, 1996
Page 3

that our fees will be in a range of approximately $175,000 to $190,000. We will also bill for out-of-pocket and allocated expenses incurred in connection with this engagement. Such expenses will include all travel, lodging, subsistence and an allocation of office charges in support of our services. In order to assist you in monitoring the costs of this engagement we will provide you with an invoice semi-monthly based upon actual hours incurred for the personnel involved. Invoices rendered are due and payable upon receipt.

Our fees will not be contingent upon the successful completion of the acquisition of Graduate by SDN. Should requests by you for additional work or other unforeseen circumstances appear likely to cause our fees to exceed the estimated amounts, we will inform you on a timely basis.

## Scope of Services

This engagement relates solely to services for the due diligence phase of the Graduate transaction. Other services such as an audit or attestation relating to a closing date balance sheet will be the subject of another arrangement. Other consulting services or services relating to the transaction or transition of Graduate to SDN will also be the subject of other arrangements.

With respect to the due diligence phase, our services have been limited to the areas set forth in the *Objectives* section above. Should you request any such services, they will be billed at our hourly rates for the personnel involved.

## Indemnification

SDN agrees to indemnify and hold harmless Coopers & Lybrand and its affiliates and their respective partners, principals, directors, officers, agents, employees and each other person, if any, controlling Coopers & Lybrand or its affiliates (collectively hereinafter referred to as the "Indemnified Parties") to the full extent lawful from and against any losses, claims, damages, liabilities or actions related to or arising out of the engagement of Coopers & Lybrand hereunder or the performance of its duties hereunder, and which are attributable to claims or actions made by SDN, or its agents, and agrees to reimburse the party entitled to be indemnified hereunder for expenses, including reasonable counsel fees which are incurred by any indemnified party in connection with investigating, preparing or defending any such action or claim whether or not in connection with pending or threatened litigation, provided that SDN will not, however, be responsible to indemnify and hold harmless the Indemnified Parties for any claims, liabilities, losses, damages, or expenses including reasonable counsel fees which are determined to have resulted primarily from any illegal act or other act of gross negligence or willful or wanton misconduct by any of the Indemnified Parties. If, as a result of SDN's decision not to complete the proposed acquisition, litigation is brought against Coopers & Lybrand, then SDN will agree to reimburse Coopers & Lybrand for all costs and expenses, including reasonable counsel fees, which are incurred by Coopers & Lybrand in connection with investigating, preparing or

CL 046539

Mr. McConnell
August 26, 1996
Page 4

defending such litigation, regardless of the party who brings such litigation. We will provide you with prompt notice upon learning of any matter for which indemnification may be sought.

### Conflict of Interest

We have undertaken a limited review of our records to determine Coopers & Lybrand's professional relationships with the persons and entities you have identified. From time to time Coopers & Lybrand has performed certain consulting engagements for Graduate. Also, Coopers & Lybrand was previously the independent auditor for Community General Hospital, which is not part of the transaction with SDN. Other than those instances, we have advised you that no other relationships came to our attention. You should be aware that the due diligence team will not include persons who participated in engagements for Graduate without first receiving SDN's and Graduate's permission. We will notify you immediately if any additional relationships come to our attention. However, given the size, complexity, geographic dispersion and number of clients of Coopers & Lybrand, we cannot assure you that all such relationships have or will come to light.

* * * * * *

We appreciate the opportunity to be of continuing assistance to SDN. If the following is in accordance with you understanding, please sign the copy of this letter in the space provided and return it to us. If you have any comments or questions concerning this letter, please call William Buettner at 412-355-8034 or Steven Elek at (215) 963-8193.

Very truly yours,

Coopers & Lybrand LLP

Accepted by:

SDN, Inc.

---

David McConnell                                    Date
Executive Vice President and CFO

CL 046540

# COMMITTEE APPENDIX

## Tab 32

45

**AHERF**
**06/30/97**

**Issue Topic:**          Due Diligence Findings

**Issue Description:**    

**Link to Further Information:** Audit Program Step ▣ Audit program step

**Issue Type ▣:**         No further action required

**Audit Area(s)**
**Affected   ▯:**

**Client Site ▣ :**      _____

—



**Comments:**

All due diligence findings were appropriately addressed and resolved. _____

—

**Created By:**          Kristen Heinlein       **Date:** 08/04/97 04:25:43 PM
**Last Modified By:**     Christa L. Porter      **Date:** 09/22/97 10:22:53 AM
**Cleared By:**           Christa L. Porter      **Date:** 09/22/97 10:22:53 AM





CL 012634

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| **Forbes** | | |
| The A/R subledger did not reconcile to the amount reported in the G/L by approximately $800k. No adjustment was recorded at 6/30/96. | AHERF identified a $1.3 million difference and recorded the amount. | Per examination of the 6/30/97 reconciliation C&L noted that the difference has been properly resolved. and further review was waived. |
| There is a general reserve for potential amounts that would be due to third party payors in the further of $5.2 million at 6/30/96. It appears that there may be excess reserves in a range of $2.5 - $3 million. | Reserves for CRA's at 6/30/97 amounted to approx. $7 million. | These reserves, although slightly excessive on Forbes, may be necessary in other CRA amounts, therefore, no adjustment is proposed at this time. |
| Forbes should be accounting for interest rate swap agreements by including changes in market value in the statement of operations, and not using hedge accounting. E&Y posed an adjustment of $50,000 which was not booked at 6/30/96. | There was a $73,888 mark to market difference at 6/30/97 | As the difference was below the SUD limit at 6/30/97 C&L waived proposing an entry. The market value on the swap agreements will be analyzed during future periods to determine if adjustments will be necessary at that time. |
| Forbes accounts for its inventory on a LIFO basis. An increase in income of approx. $600k would result if AHERF adopts a conforming change to the FIFO method of inventory based upon Forbes 6/30/96 inventory. | AHERF recorded the LIFO adjustment in order to conform the accounting w/ other AHERF entities in accordance w/ FIFO. This was done w/ the opening balance sheet entries. | Forbes inventory is being accounted for on a FIFO basis, which is consistent w/ other AHERF entities. FURTHER REVIEW WAIVED. |
| Forbes does not determine its workers' comp accruals actuarially. It was recommended that AHERF's actuaries assess the adequacy of the worker's comp reserve in view of the PA analysis. | Forbes w/c was reviewed by Tillinghast | Accounting treatment at 6/30/97 is based on an actuarial valuation using assumptions consistent w/ the other AHERF entities. |

1

CL 012635

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| **Graduate, Mt. Sinai, Parkview, City Ave., Rancocas** | | |
| Omega Sale/Leaseback Transaction - The lease was classified as an operating lease. Based on a review by C&L, it was recommended that further review of the lease agreement occur w/ regards to classification between operating and capital. | Lease is properly being treated as operating. | Based on further review of the FAS 13 calculation and the lease agreement, it was determined that it was proper treatment to record the lease as operating. FURTHER REVIEW WAIVED. |
| Legal counsel should assess the impact of the transactions for the notes that GHS guaranteed Founders Health Care, Inc. | Legal counsel has assessed the impact and they are not aware of any issues which may requireadjustments to the financial statements | Further review waived |
| Legal counsel should assess whether there has been a default on the loan GHS had with FHC. The terms of the loan were that GHS must maintain its corporate existence and not dissolve or otherwise dispose of all, or substantially all of its assets, or consolidate with, or merge into another corporation. | Legal counsel has assessed the impact and they are not aware of any issues which may require adjustments to the financial statements | Further review waived |

CL 012636

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| The valuation methodologies of the FHC physician practice acquisitions were not consistent with IRS guidelines and approaches. Also, contrary to the IRS' recommended valuation guidelines, the practice valuations were internally prepared as compared to having them prepared by an independent third party. | Management is not aware of any issues or notifications received, and there is no mention of any actions in the legal letters. | Further review waived. |

**Graduate**

| | | |
|---|---|---|
| There is a general cushion in the unapplied patient accounts receivable cash account. Amounts are allocated to each payor based on a weighted average approach using gross A/R outstanding at month end as the factor in determining the weighted average. The balance in this account at 6/30/96 was approximately $996k of unapplied credits. | As of 6/30/97 the general cushion in the unapplied patient A/R accounts was reversed as of 6/30/97. | C&L reviewed the unapplied patient A/R account at 6/30/97 noting that the cushion had been removed. Further review waived. |

3

CL 012637

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| During 1995, after performing the bad debt reserve analysis, D&T proposed adjustments for additional reserves. The 1996 analysis indicated that Graduate's methodology was $1 million greater than the D&T analysis. No adjustment was proposed by D&T to reduce the reserve. During 1996, Graduate's provision was not sufficient to cover current year write-offs. This, supported by improved aging of the accts., indicates that an increase in the reserve was not considered necessary for future write-offs. | The method established by D&T was used for FY97 and it is believed to provide a reasonable estimate of the reserve. | Further review waived. |
| Under the Wise Choice capitated fee arrangement, Graduate recorded a liability of approximately $335k related to an overpayment received for patient referrals outside of the network which are not covered by the program. | The overpayment amount was offset on remittances reeived for payments during FY 96 and 97. The liability is gone at 6/30/97 | Further review waived. |
| As a result of the Greater Altantic/Health Systems transaction, Graduate received a $10 million lump sum payment as a guarantee payment to provide service for the subscribers of the health plan in the future. The payment has been invested in various investment security vehicles and has been included as a component of the Assets Limited or Restricted as to Use Board Designated Funds at 6/30/96. | During June 1997, AHERF took the remaining amount of deferred revenue into income to offset prudent buyer liabilities. | C&L proposed an entry to the sud to reverse the amounts taken into income. |

4

CL 012638

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| An physical inventory of the operating room was not conducted during FY96. | A physical inventory was not performed for operating room inventory during FY97 or at year end. | Included representation in the rep letter re: valuation. |
| Graduate received approximately $2,900,000 in research grants form the DHHS. Mgmt concluded that reporting under the requirements of OMB Circular A-133 were not applicable. It appears that there is a contractual affiliation relationship with the University of PA since Graduate's separation. This relationship and resulting reporting requirements, should be further analyzed based upon the clarification of an affiliation issued by DHHS in the 3/1/91 Federal Register. It should be further noted, based on the revised requirements of OMB Circular A-133 which were issue in the 4/30/96 Federal Register, entities which are defined as hospital organizations that received a minimum of $300k of federally funded dollars, excluding Medicare and Medicaid programs, will now be required to comply with the provisions by providing an organizational wide audit. | This grant requires an audit in accordance with OMB Circular A-133 for the year ended 6/30/97. | The grant will be examined during the A-133 audit which will be performed by C&L. |

5

CL 012639

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| For grant funding, Graduate defers recognition until the cash is received. All expenses are accumulated on the B/S as a grant receivable and recognized as revenue and expense when funds are received. This treatment should result in a gross-up the I/S with no impact of excess of revenues and gains over expenses. The balance in ending receivable was approximately $531k. | When Graduate came into the AHERF system, this accounting treatment was corrected and is now consistent w/ the other AHERF entities. | Further review waived. |
| Graduate has loans to physicians with a balance of $3,380,000. There is a reserve against these loans of $2.3k. The physicians are no longer making payments. Legal counsel should investigate the appropriateness of utilizing surgery endowment funds to make payments on the Wolferth loan.<br>For the June 30, 1995 & 1996 audits, D&T indicated that loans to physicians represented a riskier audit area due to the weak pmt histories of the accounts. D&T proposed adjustments to increase the reserves on the loans to the entire outstanding balances in both years. It also recommended improving the controls over the accts. This should be continuing area of focus due to the tax ramifications to the physicians writing off the loans. | This amount was written off when the entity merged into SDN. | Further review waived |

6

CL 012640

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| Graduate has various receivables with physicians for rental income for practice offices. At 6/30/96, approx. $371k of the receivable is greater than 90 days with no reserve assigned to the balances. D&T did not propose an adjustment for the aged accounts, however, a recommendation was made to management to consider establishing such reserves for accounts greater than 90 days. | This amount was written off when the entity merged into SDN. | Further review waived |
| A receivable of approx. $766k form Bala Imaging, of which $242k is included in Due from Affiliates, is included in the 6/30/96 F/S. The collectibility of the receivable has been guaranteed by Health Systems International, Inc. and Graduate Health System. | Bala Imaging was rolled into Graduate effective 6/30/97. As such, the intercompany will be eliminated in consolidation. | Further review waived. |
| The patient acctg system provides a one day time lag between the transfer of accounts from discharged not final billed and final billed status. Mgmt continues to assess an estimated contractual allowance for those accts. included in the lag account at the end of each month until the amts. net at the time of transfer to final billed status. | This situation still exists at 6/30/97. The controller's report has a line item titled Last Day Report (Final I/P Billed) which is recorded at gross. The contractual allowance is then taken against these accounts. | C&L reviewed the above described reports and noted that the contractual allowance appears reasonable. Further review waived. |

7

CL 012641

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| Graduate terminated its noncontributory defined benefit plan in 1992. An adjustment continues to be recorded for the current expense related to the unfunded obligation which is recorded in the F/S. D&T's actuarial analysis recommended that the discount rate used in determining the obligation increase from 6.75% to 7.50%. They further recommended that the rate of return decrease from 9% to 8%. | Rates used in the valuations are relatively consistent with rates used by AHERF. | As rates used in the valuations appears reasonable, further review is waived. |
| D&T believes that there may be exposure related to the "72 Hour Rule". It was noted that D&T does not agree with mgmt's treatment of recording a contingent gain related to a 1991 Medicare appeal. The w/p's did indicate that there are potential favorable adjustments related to the 1995 files cost report for IME and DSH. | C&L noted that the amounts recorded as a potential gain for 1991 and 1995 MC remain outstanding at 6/30/97 however, the amounts are immaterial in comparison with total Graduate CRA ($306k and $112k, respectively) | Further review waived |
| Graduate has recorded a liability of approximately $2.8 million related to Blue Cross's Prudent Buyer clause. At the time of C&L's analysis, the analysis of Prudent Buyer exposure had not been finalized. No Prudent Buyer obligations were recorded for 1995 or 1994 fiscal years. | The accrual has been analyzed and increased to $7.3 million which approximates the amount payable. | Further review waived |

8

CL 012642

| Issue | Accounting Treatment | Resolution |
|---|---|---|

**Mt. Sinai**

| | | |
|---|---|---|
| It was noted that as a result of inaccurate links between the HDS and SMS system, several procedures were inaccurately billed resulting, in some cases, in lost revenue. It was recommended that the control over the HDS/SMS interface could be enhanced through implementation of basic review and monitoring procedures. | The accounts are being reviewed and monitored and Mike Malatesta is not aware of any interfacing problems. | Further review waived. |
| The bad debt reserve was recording reserves for bad debts using a general reserve percentage. It was now indicated that is tests general reserves use for A/R utilizing the analytical review process developed by D&T. | The A/R reserve percentages being utilized at 6/30/97 were developed by Deliotte and Touche and appear to be conservative and reasonable. | Further review waived |
| Mt. Sinai has a 50% interest in MSH/US Regional Occupational Sport Medicine, Inc. The hospital has approximately $200k invested in the joint venture. It does not appear that the operating losses form this venture are properly recorded under the equity method of acctg. | This balance was written down and is only about $42k at 6/30/97 which is immaterial | Further review waived. |

**Parkview/City Ave.**

| | | |
|---|---|---|
| At June 30, 1996 and 1995, approximately $6.6 million and $2.4 million, respectively of negative cash was reclassified as A/P. | Situation is still consistent w/ prior years. negative cash has been reclassified to accounts payable per t/b's. | Further review waived. |

9

CL 012643

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| No formal charity care policy has been established for the Parkview/City Ave. hospitals. | This situation is still the same at 6/30/97 | A management letter comment has been proposed on this issue. |
| Parkview/City Ave. are participants in the Wise Choice fee capitation arrangement. A liability of approximately $700k was recorded related to these payments; however, it was unclear if this amt. represents unapplied cash or amts. owed related to referral outside of the network. | Amounts represent two pieces. (1) accrual for administrative fees as Qualmed is on an approx. 5 month lag in admin. expenses. The second piece is an amount due back to Qualmed for what is called the Bed day incentive based on utilization. | Further review waived. |
| Parkview/City Ave. Hospitals have recorded apron $1.6 million of deferred revenue related to the Greater Atlantic Health Services sale. This amt. is being amortized into income over a 3 year period which is inconsistent with the amortization period for Graduate's portion of the proceeds (10 years). | During June 1997, AHERF took the remaining amount of deferred revenue into income to offset prudent buyer liabilities. | C&L proposed an entry to reverse the amount taken into income. Further review waived. |
| Due to a large number of managed care contracts and the limited number of pay classes within the billing system, the hospitals use an estimated overall percentage to calculate contractual allowances for certain outpatient receivables. It was recommended that system enhancements be investigated. | Per discussion with Frank Insana, C&L noted that the O/P contractuals have been analyzed in great detail. Contractual allowance percentages are based on financial class totals, patient types, or insurance plan code levels. An overall average percentage is not used at 6/30/97. | Further review waived. |

10

CL 012644

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| It was noted that the SMS generated inpatient Medicare contractual allowance was overstated. The IME and Capital portions of the Medicare receivable balance appear to be understated at the time of billing but are subsequently adjusted at the point of payment. It was recommended that mgmt work with SMS to perfect the system generated contractual allowance at the point of final billing and eliminate the need for recurring manual adjustment at the time of payment. | This situation is still the same at 6/30/97. However, it has been noted that the contractual allowance is being manually adjusted and the contractual allowance appears reasonable. | Further review waived. |
| A physical inventory of fixed assets has not been performed for several years. Also, the properly and equipment in the physically labeled with an identifying number. Mgmt planed on doing the inventory during FY97. It was noted during the repair & maintenance expense analysis that a service contract with GHS Technology Mgmt, Inc. is in place to monitor biomedical equipment. | During the purchase of Parkview and City Avenue, Valuation Counselors performed an organization wide valuation. At that time, PP&E records / physicals would have been evaluated. | Further review waived. |
| The analysis of the 6/30/96 workers' comp liability utilizes a 7.5% discount rate which varies from AHERF's discount rate. | A 6% rate was used at 6/30/97 which is consistent with AHERF's rate. | Further review waived. |

11

CL 01264

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| The discount rate used in determining the reserves for professional liability claims was increased to 6% from the 5% used in FY95. It should be noted that the 6% discount varies from the AHERF discount rate. | Tillinghaust used a 7% rate for the FY97 valuation. C&L noted that the AHERF rate was 7% in FY 96 and 7.5% in FY 97 | Rates appear reasonable and consistent with the AHERF rate, further review waived. |
| Graduate is required to provide the City of Philadelphia an audit in accordance with Gov't Audit Stds and the City of Philadelphia Subrecipient Audit Guide for the Ryan White program funding. This audit report was prepared for the program period ending 4/3/96 and will be eligible for incorporation into an orgainzational-wide. | | The program will be examined during the A-133 audit which will be performed by C&L. |

**Rancocas**

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| There are credit balances in the inpatient patient accounts receivable accounts in which a large balance were aged over 120 days. There were also credit balances in outpatient accounts receivable in which a portion are aged over 120 days. Most of the balance in the over 120 day category consists of misc. accounts. A high priority is not placed on resolving the balances due to the high volume of accounts. The potential need exists to use cash to refund the balances to the patients or make a pmt to New Jersey under any escheat laws. | C&L reviewed the detail listing of inpatient patient accounts receivable for credit balances greater than $25,000 at 6/30/97 and noted only two patient accounts, which totaled $52,325. C&L inquired of management noting that these are old accounts which are being investigated and resolved. | As amounts noted are immaterial and are being investigated, further review is waived. |

12

CL 012646

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| In Sept. 1995, Zurbrugg consolidated its Riverside Division with the Rancocas Division. Mgmt intends to sell the Riverside facility. At 12/31/95, the facility was included as Other Current Assets in the amt. of $ 1 million. To the extent a sale of this facility is expected at less than $1 million a loss will be incurred on the disposal. | Facility is still for sale. Amount is reflected in PP&E. Due to immateriality, no reclass will be made to other current assets. | Further review waived. |
| At 12/31/95, the due to third party acct. includes amts. for New Jersey Blue Cross (NJBC). To C&L's knowledge, NJBC has not performed any audits or collected any monies under the prudent buyer provision of the contracts. Consequently, there are potential excess third party reserves of $2,086,000.<br><br>NOTE: Anthem Blue Cross Blue Shield of Ohio, which is in the process of acquiring NJBC, is beginning to pursue collection in Ohio under its prudent buyer contract language. | The excess reserves for NJBC have been reversed as of 6/30/97. | Further review waived. |

13

CL 012647

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| At 12/31/95, the medical malpractice IBNR reserve was $925,500. E&Y estimated that this acct. had an excess reserve of approx. $475k. | All malpractice liabilities related to Captive were turned over the MIIX via a portfolio transfer. They also purchased commercial insurance on a claims made basis for the calendar year 1997. IBNR reserve for the commercial policy was determined based on a valuation prepared by Tillinghast. | Accounting treatment appears appropriate. Further review waived. |
| Zurbrugg was not in compliance with the Debt Service Coverage Ratio of at least 1.10 for the year ended 12/31/95. | Graduate continues to be in noncompliance of their debt service coverage ratio. | Will be properly disclosed in the financial statements. |

**AVH**

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| SFAS 124 was not adopted as of 6/30/96. FAS 124 is required to be adopted for FY97. | During the purchase accounting entries, 124 adjustments were recorded. | FAS 124 was adopted when AVH merged w/ AUMC on 3/1/97. Further review waived. |
| The Blue Cross contract with AVH expired on 7/1/96. The contract was subsequently renewed with a reduction of approx. 13%, on avg., in rates that will be paid to the hospital. BC mgmt informed AVH that they were prepared not to sign a contract with the hospital as a provider. | This contract was signed in October 1996. Thus this issue is resolved | Further review waived. |

14

CL 012648

| Issue | Accounting Treatment | Resolution |
|---|---|---|
| AVH has a commitment to purchase $3.1 million of preferred shares of Pyramid Health. Subsequent to 6/30/96, AVH invested an add'l $460,000 in Pyramid. Through 6/30/96, AVHS had written off its entire investment in Pyramid based on a determination that the investment had lost its value. The add'l investment and the commitment to purchase future shares should be considered by AHERF in light of its ownership of voting interest of Pyramid which AHERF, Forbes, & AVHS are aggregated. | AVH investment in Pyramid was written down to zero due to the impending loss on contract that will be recognized. | C&L reviewed and documented the Pyramid loss and AHERF's ownership interest in it via a critical matter on risk contracts. See the critical matter for final resolution. |
| AHVS is self insured for its workers comp. insurance with a stop loss coverage maintained of $300k per occurrence or in the aggregate. At 6/30/96, AVH had accrued approx. $775k related to potential workers comp. liabilities. This liability was funded through a separate trust acct. at a level of approx. $200k. AHERF's actuaries should assess the adequacy of the worker's comp. reserve using generally accepted actuarial methods. | Tillinghast completed an actuarial valuation of the AVH plan with assumptions similar to AHERF valuations | Further review waived. |
| The billing system utilized by AVH provides for contractual allowances to be posted automatically, however, AVH has elected to manually adjust the contractuals. | At 6/30/97, AHERF has continued to contractualize all accounts manually. It appears that AHERF has done an appropriate analysis of the contractual requirements. | Further review waived. |

15

CL 012649