# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )
           )
         Plaintiff, )      Civil Action No. 00-684
           )
         v. )
           )      Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP, )
           )
         Defendant. )

## APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

### VOLUME 5

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

# COMMITTEE APPENDIX

## Tab 2

**EXHIBIT 0007**

17

# Coopers &Lybrand

Coopers & Lybrand L.L.P.

a professional services firm

October 16, 1995

To the Board of Trustees of
Allegheny Health, Education and
  Research Foundation:

In planning and performing our audits of the various separate and consolidated financial statements of Allegheny Health, Education and Research Foundation and subsidiaries (AHERF) for the year ended June 30, 1995, we considered AHERF's internal control structure in order to determine our auditing procedures for the purpose of expressing our opinion on the separate and consolidated financial statements of AHERF.

Although our audits were not designed to provide assurance on the internal control structure, we noted certain matters involving the internal control structure and its operation that we believe are deserving of your consideration. These matters are identified herein along with related recommendations designed to help AHERF make improvements and achieve further operational efficiencies. These comments reflect our desire to be of continuing assistance to AHERF in its ongoing operations.

The accompanying comments and recommendations are intended solely for the information and use of the Board of Trustees, management and others within the organization.

Very truly yours,

 L.L.P.


DEPOSITION EXHIBIT
AKF

Coopers & Lybrand L.L.P., a registered limited liability partnership, is a member firm of Coopers & Lybrand (International)

X

18

**ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION**
**Internal Accounting Control Observations**

## INDEX

|                                   | Pages    |
|-----------------------------------|----------|
| Accounts Receivable Observations  | 1 - 7    |
| Information System Observations   | 8 - 14   |
| Other General Observations        | 15 - 20  |

DC8221 page 2 of 22

19

ACCOUNTS RECEIVABLE OBSERVATIONS

**20**

### General Overview

During fiscal 1995, AHERF management completed a reorganization to facilitate the integration of Hahnemann University into the AHERF organization. This reorganization resulted in several new corporate entities which required changes in reporting requirements. The most significant change was the creation of the Medical College of Pennsylvania and Hahnemann University (MCPHU) and the Medical College of Pennsylvania and Hahnemann University Hospital System (MCPHUHS). Our 1995 audit approach was modified to consider issues related to the conversion of information systems and the reassignment of personnel which have occurred as a result of the creation of these entities.

In conjunction with the reorganization, AHERF commenced the centralization of accounting, finance and certain other support functions in the Pittsburgh area in order to achieve certain operating efficiencies and economies of scale. We noted in our April 1995 report to the Audit Committee that such centralization was a proactive step that should reap future rewards for AHERF. In completing our audit procedures, it was evident that the centralization has strengthened the control environment from the standpoint of finance functions. Both management and Coopers & Lybrand (C&L) were able to realize the benefits of this centralization through improved communications and coordination of efforts in regard to auditing the financial statements of the Pittsburgh and Delaware Valley entities.

### Revenue and Accounts Receivable Overview

As a result of the substantial volumes of patients treated and the diversity of services rendered within the AHERF system hospitals, the billing and collection of accounts receivable has become an increasingly complex task. Regulatory requirements and a proliferation of third party insurers (particularly managed care plans) have added to this growing complexity. In order to effectively manage accounts receivable in a system such as AHERF, an integrated system of internal controls must be in place and operational. AHERF has such a system which integrates the activities of various departments, including medical records, billing, collections and accounting. In order to plan our audit and to design specific tests over the revenue system and accounts receivable, C&L obtained an understanding of this system of internal controls and tested its operations. In general, we believe that AHERF's internal control system operates effectively.

Fiscal year 1995 was a challenging year for AHERF with respect to accounts receivable management. While the centralization discussed above was completed within management's anticipated time frame and was implemented successfully, management was still faced with very difficult challenges in coordinating the consolidation of staff and resources and integrating the operating activities. In order to ensure that the operations continued and controls remained in effect, AHERF management elected to outsource the Delaware Valley receivables management process to HealthCare Business Management (HBM) during the latter part of the year. This outsourcing allowed AHERF to focus its energies on the consolidation of its system wide billing operations and the transition to Pittsburgh. However, as discussed later, certain operational issues, such as increased receivable balances, deterioration in the aging of receivables and the timeliness of cash applications emerged.

DC8221 page 4 of 22

**21**

Over the course of fiscal year 1995, total accounts receivable increased approximately $63 million. This increase occurred principally within the Delaware Valley hospitals. Although overall Pittsburgh accounts receivable have not changed significantly, the discharged not final billed category increased approximately $14 million from the prior year. Based on discussions with management, in addition to planned and/or anticipated causes for increases in receivables, such as charge increases and volume changes, the increase in the Delaware Valley is primarily attributed to the transition from Philadelphia to Pittsburgh. Management has stated that for the period from December 1994 to March 1995, there were difficulties in mailing bills and following up on collections because of staffing problems. As discussed earlier, HBM was engaged to help in this transition, however, the Delaware Valley entities still experienced continued increases in accounts receivable. With respect to the increase in discharged not final billed accounts in the Pittsburgh area, management believes that, among other things, delays in obtaining physician attestations have contributed to the increase. It should be noted that the physician attestation requirement has been legislatively lifted effective October 1, 1995.

In accordance with the previously discussed initiative to centralize certain operations, all patient accounting departments have or soon will be relocated to Pittsburgh and all aspects of accounts receivable will be managed from a central location. As part of this centralization, and with the intent of improving the management of receivables, AHERF has begun to reengineer both the billing and collection processes.

**Findings:**

As discussed above, in order to design our tests of the revenue system, we obtained an understanding of the internal control system and tested its operation through various techniques, including inquiry and sampling applications. Generally, the control system appears to be operating effectively at each of the AHERF system hospitals. However, certain matters were identified during the course of the audit which should be considered by management. These are summarized below along with C&L's recommendations.

**Deterioration of Accounts Receivable Aging**

During fiscal year 1995, the accounts receivable agings deteriorated from those which existed at June 30, 1994. Approximately $18 million of Delaware Valley hospital accounts, net of established reserves, are greater than 180 days old as of June 30, 1995. Management continues to assess the collectibility of these accounts and has established reserves that, in their judgment, approximate the amount that will not be collected. While the established reserves appear reasonable, it appears that management should increase efforts to pursue collection of these aged accounts.

**Recommendation:**

Management should continue focusing on the underlying reasons for the deterioration in the aging of receivables and dedicate resources to pursue collection of all aged receivables.

3

DC8221 page 5 of 22

**Management's Response:**

Management has responded to the increases experienced in aged accounts receivable for the Delaware Valley (DV) hospitals through both immediate accelerated activity and longer term initiatives intended to remedy the underlying causes for those increases.

Most immediately, management has been able to stabilize the increases experienced in the Accounts Receivable by withdrawing the Hahnemann University Hospital (HUH) Accounts Receivable in its entirety from management by HealthCare Business Management (HBM) effective July 1, 1995. The Medical College of Pennsylvania (MCP) and the Eastern Pennsylvania Psychiatric Institute (EPPI) Accounts Receivable resident on the Invision system was also removed from operational oversight by HBM effective July 1, 1995. The rationale provided for this withdrawal is due to that of the increases that occurred in the DV hospitals during fiscal year 1995, HUH alone experienced an increase in Accounts Receivable of eighty-seven percent (87%) or approximately $29 million of the total Accounts Receivable increase from fiscal year 1994 to 1995. Eighty-four percent (84%) of this increase occurred between February 1, 1995 and June 30, 1995 under HBM's management.

The original intent behind engaging HBM was to allow for the outsourcing of management and daily operational oversight of the Philadelphia hospital's activities while the Pittsburgh PFSG continued to build an infrastructure sufficient to support the combined operations. As we have seen that this plan did not meet with the anticipated outcomes, PFSG accelerated its activities to accommodate the rapid assimilation of the DV hospitals into its operations.

Management contends that where focus may have been placed primarily on consolidation activities during fiscal year 1995, it is necessary that the focus now be placed on building the mechanisms to ensure more timely resolution of overall Accounts Receivable. For this reason, throughout fiscal year 1996, management will focus on optimizing the core processes by which Accounts Receivable reductions may be realized. Firstly, correction and on-going management of the Charge Description Master (CDM) will serve as a primary goal throughout this fiscal year. Implementation of multiple system parameters such as automatic insurance rebilling, automatic bad debt transfer criteria and changes in the patient statement cycles will seek to define and further refine ways by which cash flow may be facilitated.

Concentrated focus placed on the way in which accounts are worked through the use of dedicated units to exclusively process outpatient receivables will serve to respond to the upward shift in the volume of these services. Additionally, management anticipates that efforts such as implementation of electronic payment posting, enhanced electronic billing and planned improvements in admitting through reengineering will seek to correct previous operational shortcomings during fiscal year 1996.

4

DC8221 page 6 of 22

23

**Methodology for Establishing Bad Debt Reserves should be Applied Consistently:**

Each AHERF hospital utilizes a different methodology to establish reserves for bad debts. While such methods have been used consistently by each organization, we recommend that management consider utilizing a consistent methodology for all AHERF affiliated hospitals. The use of a consistent methodology will allow management to evaluate their reserves based on a comparison to other hospitals within the AHERF system.

**Recommendation:**

Management should establish a system-wide methodology for calculating the reserve for bad debts using aging percentages by payor based on actual historical data. We believe that the current methodology utilized by AGH should be considered for application at all AHERF hospitals.

**Management's Response:**

We agree that a uniform, standardized bad debt reserve methodology should be established. In light of the fact that the Delaware Valley affiliates will be converting to one standard patient accounting system (i.e., SMS Invision) in the near future, we will re-evaluate the bad debt reserve methodologies for each hospital and develop a consistent methodology across the AHERF system. We expect that the uniform methodology ultimately selected will be similar to the AGH methodology, to the extent practical.

**Periodic Interim Payment (PIP) Accounts should be Reconciled and Differences Resolved on a Periodic Basis:**

The AHERF Delaware Valley hospitals have approximately $31 million of credit balances in various PIP accounts at June 30, 1995. These credit balances may represent either unapplied remittance advices or payables to third party payors as a result of overpayments. These credit balances should be analyzed and appropriately resolved in order to enhance management's ability to properly assess outstanding patient accounts.

In addition, we noted that the details of the PIP accounts are not being reconciled to the general ledger on a periodic basis. This reconciliation should be completed monthly to ensure that the items included in the accounts are appropriately classified and that any differences are promptly resolved.

**Recommendation:**

PIP account credit balances should be resolved in order to allow management to accurately analyze accounts receivable balances. In addition, procedures should be implemented whereby the PIP account detail is reconciled to the general ledger on a monthly basis.

DC8221 page 7 of 22

**Management's Response:**

Effective July 1, 1995, procedures were implemented for Periodic Interim Payment (PIP) reconciliation. Under the procedure, PIP vouchers will be reconciled to the General Ledger (GL) on a monthly basis. Various resources have been expended during fiscal year 1995 on this matter as certain reconciliations have been performed during the year. A large portion of these efforts, which are ongoing, have focused on fiscal year 1995 activity. The status of PIP activity related to fiscal year 1994 and prior is not resolved primarily due to uncertainties inherent in the activity related to fiscal year 1994 and prior, especially the Hahnemann University Hospital (HUH) data prior to HUH's affiliation with AHERF.

Management agrees with this recommendation and is committed to resolving the status of all PIP account credit balances (and will devote the requisite resources) during fiscal year 1996.

**Patient Liability Amounts Should Be Reclassified To Self-Pay:**

During our audit, we noted that the patient liability portion of major payor accounts such as Blue Cross and Medicare were not reclassified to self-pay but rather remained in the third party payor's aging for all hospitals in the Delaware Valley, with the exception of MCPH. These misclassifications may result in delayed billings to patients and could impair collection efforts.

**Recommendation:**

Management should implement policies and procedures similar to those at MCPH which identify the patient liability portion of major payor accounts, reclassify these balances to self-pay and process related bills on a timely basis.

**Management's Response:**

Effective July 1, 1995, implementation of procedures began with the Delaware Valley hospitals to correct the classification to self-pay of amounts due by the patient subsequent to receipt of payment by a third party payor. Efforts are currently underway to standardize reporting of self-pay amounts across AHERF entities, and will be complete in fiscal year 1996.

**Procedures to Identify Charity Care should be Enhanced in the Delaware Valley:**

Historically, the Delaware Valley entities have reported an estimate of the amount of charity care that is provided to patients based on the zip codes where patients reside. In addition, documentation supporting fiscal year 1995 charity care amounts was not prepared on a routine basis.

**Recommendation:**

Management should implement policies and procedures to track Delaware Valley charity care. In addition, supporting documentation for charity care amounts should be prepared, analyzed and maintained on a routine basis.

6

**25**

**Management's Response:**

A comprehensive Charity Care policy inclusive of documentation requirements has been provided to and is under consideration by AHERF Senior management. This policy will serve to outline a policy statement as well as the related procedures for accounts to qualify for charity care consideration at all AHERF entities.

7

26

INFORMATION SYSTEM OBSERVATIONS

27

### Overview of Computing Environment

AHERF's computing environment is complex and remains dynamic, with a variety of geographically-dispersed computer systems used to process numerous financial and patient care applications. The Pittsburgh data center is the heart of the processing environment and electronically linked via AHERF's state-wide computer network with peripheral computer sites throughout the Delaware Valley.

As in recent years, fiscal year 1995 was challenging for the Information Services department. In addition to maintaining AHERF's existing application systems, Information Services has completed a number of significant initiatives related to consolidating technology resources, standardizing application systems across the organization, and strengthening computer systems security, including:

- Migrating Hahnemann University Hospital's patient accounting and patient care systems to the Pittsburgh mainframe,

- Converting the Delaware Valley entities to a common payroll application that is processed on the Pittsburgh mainframe,

- Implementing common purchasing and accounts payable applications on a Local Area Network (LAN) in both Pittsburgh and the Delaware Valley,

- Converting the Medical College of Pennsylvania's academic systems to the common Hahnemann University-based academic systems that are processed on the Pittsburgh mainframe,

- Implementing a common Flexible Benefits application on LANs in both Pittsburgh and the Delaware Valley, and

- Implementing two new security systems over specific Delaware Valley applications processed on the Pittsburgh mainframe.

These were significant undertakings and the result of extensive planning and team work between Information Services and the affected user communities. Going forward, the Information Services department will remain challenged as they continue to standardize application systems across the organization and maintain or enhance the integrity of the various systems.

DC8221 page 11 of 22

## Scope

As part of the fiscal year 1995 audit, we reviewed the controls surrounding the maintenance and processing of selected financial computer applications that are significant to our audit process. Such applications include accounts payable, purchasing, payroll, flexible benefits, patient accounting, admissions/discharges/transfers, order entry, student billing and grant accounting. Nine different hardware platforms, which are located in both Pittsburgh and the Delaware Valley, as well as one independent service bureau is used to process these applications.

Our review focused on an assessment of the control procedures in place relative to the following areas:

- Software Maintenance - controls that ensure changes to application and system software are appropriately authorized, designed, documented, tested, and approved.

- Computer Operations - controls that ensure authorized programs are consistently and appropriately executed, correct versions of data files are used during processing, and processing can be properly resumed in the event of computer processing failures.

- Security - controls that ensure programs, data and other system resources are adequately protected, application functions are restricted based on job responsibilities, and computer hardware and magnetic media are secure from unauthorized access.

- Implementation - controls that ensure new application systems are appropriate to the needs of the organization, properly tested, adequately documented, and approved. These controls also help to ensure that data is completely and accurately converted from the previous application system.

During this year's audit, we executed two audit software packages, referred to as security toolkits, in order to improve the efficiency and effectiveness of our review of computer security controls. A security toolkit called Bindview was executed against the three LANs used to process the purchasing and accounts payable applications. Another security toolkit called CA-Examine was executed against certain financial systems on the Pittsburgh mainframe. The findings resulting from the use of these security toolkits have been incorporated in our feedback to management.

29

<u>Findings</u>

During the course of our review of the Information Services department, we identified various
opportunities for improving AHERF's control environment and have included our findings and
recommendations for improvement within this report. In addition, we have reviewed and concur
with the findings and recommendations reported by Internal Audit, specifically those that relate to
the areas within the scope of our audit. Since Internal Audit's findings are presented in periodic
reports to management and the audit committee, Coopers & Lybrand will not report on issues
previously identified by them. As the nature and scope of our reviews may differ from those
performed by Internal Audit, different control issues may be identified.

In general, the control environment at the Pittsburgh data center remains more established and
stable than that of the Delaware Valley peripheral computer sites. Information Services has made
considerable improvements to the control environment in the Delaware Valley; however, we have
noted areas where controls can be further strengthened.

Some of the issues we identified relate to strengthening security over financial systems processed
on LANs in both Pittsburgh and the Delaware Valley. The LAN in the Delaware Valley is
maintained by Information Services and the related control issue is therefore included in this IS
report. The LAN in Pittsburgh is maintained by the "client" (i.e., users). Accordingly, the related
control issue is reported outside of this IS report.

The issues identified specifically during our review of AHERF's data processing environment are
detailed on the following pages. In addition, other less significant control issues were identified
during our review and have been discussed with Information Services management. The purpose
of this report is to provide the organization with feedback from our review and to provide
recommendations for improvement of the control environment. Management must assess the
costs and benefits of implementing these control recommendations, establish priorities and
allocate the required resources to those issues that warrant attention.

<u>Segregation of Duties Over The Medical College of Pennsylvania Hospital's (MCPH)
Patient Care System Should be Improved</u>

Information Services is in the midst of an initiative to convert the Delaware Valley entities to
common patient accounting/care systems. MCPH's patient care (ADT/order entry) system has
not yet been converted to the new system. The current processing is being performed using the
SMS Action package on a Dec/Vax computer.

There are procedures within the current system to validate user access and restrict users to certain
application functions; however, programmers for the SMS Action system have access to initiate
transactions that update production data. This access is provided because IS has been given the
responsibility to update certain production tables, which requires that they execute certain
transactions. However, there is no back-end review of the table updates to ensure that only
approved updates are made. This lack of segregation of duties could result in unauthorized
access to data.

11

30

**Recommendation:**

Information Services and user management should review the risks related to the programmer access and determine the appropriate level of detective control procedures to implement. Given the plans to migrate off of this computer system, the most cost effective approach may be to implement some level of compensating controls to help mitigate the risks during the intervening period. If the migration plans are delayed, the adequacy of the controls may need to be revisited.

**Management Response:**

Management agrees with the recommendation and will implement an independent review of all updates to the production tables to ensure that only authorized updates have been made. As part of the Invision implementation, we will transition responsibility for production table maintenance to the client areas.

**Security over Hahnemann University Hospital's (HUH) Patient Accounting/Care Systems Could be Strengthened**

The SMS Invision package is currently used by HUH for patient accounting and patient management. A number of individuals have update access to the Invision production files and do not require such access, which presents a segregation of duties concern and could lead to unauthorized access to data. These individuals are within the Invision programming, computer operations and HUH help desk areas. We understand that this is the result of the SMS Invision package improperly requiring update access in order to execute utilities and submit/restart jobs, which these individuals need to perform as part of their normal job responsibilities. We also understand that Information Services has notified SMS of this problem, however, a solution has not yet been identified.

**Recommendation:**

Management should assign a high priority to working with SMS to resolve the issue of update access to the SMS Invision production files. Consideration should also be given to identifying compensating and detective controls to help mitigate the risk of unauthorized access to production files.

**Management Response:**

Management agrees with the recommendation and will make the resolution a high priority. If we are unable to achieve a practical resolution, alternative compensating controls will be established.

DC8221 page 14 of 22

**31**

### Security Over the Delaware Valley Purchasing/Payable Systems Should be Strengthened

Two Local Area Networks (LANs) are used to process Delaware Valley purchasing/materials management and accounts payable systems using the ESI software package. The following weaknesses exist related to the LANs that could result in ineffective security over production data:

- The number of technical support individuals with powerful security administrator access to the two ESI LANs appears excessive. Six individuals have access to one LAN and four to the other LAN. Although these individuals are in the technical support group that is responsible for supporting approximately sixty LANs, the large number of individuals with access to these key financial applications broadens the exposure related to uncoordinated and uncontrolled security administration activities.

- We noted security administration weaknesses that could result in logon-IDs being compromised. These weaknesses include logon-IDs that do not require a password, logon-IDs without a requirement to periodically change the password, and logon-IDs that have not been used in more than 120 days.

### Recommendation:

Management should give consideration to strengthening security over the ESI LANs by:

- Limiting the number of technical support individuals with powerful security administrator access. While the technical support group must be responsive to user requests (e.g., by ensuring individuals are available to promptly address problems), it must also ensure security administration activities are properly controlled (e.g., by limiting such powerful access to as few individuals as possible).

- Performing a review of all logon-IDs, as it relates to password controls and potential obsolescence, and implementing appropriate corrective actions.

### Management Response:

Management agrees with the recommendation and will determine the appropriate number of individuals to have security administrator access to ensure that risk is minimized and support is maximized. We will also perform a review of all logon-IDs related to password control and obsolescence.

DC8221 page 15 of 22

**32**

### User Access Rights for Allegheny General Hospital's Patient Care Systems Should be Periodically Reviewed

A periodic review of user access rights helps ensure that users' access to application functions remains authorized and commensurate with job responsibilities. Currently, a review of user access rights for the Medipac and Clinipac patient care systems has not been performed. A review of Clinipac user logon-IDs has been performed, however, this review only focused on identifying terminated employees.

### Recommendation:

A review of user access rights for the Clinipac and Medipac systems should be initiated by Information Services and performed by user management on a periodic basis. It should include a review to ensure that access is commensurate with job responsibilities and that logon-IDs do not exist for terminated employees. As part of this process, it may be beneficial to reinforce the fact that it is user management's responsibility, not Information Services', to verify and approve access to user controlled data.

### Management Response:

Management agrees with the recommendations and will initiate quarterly reviews of user access rights for MediPac and CliniPac.

DC8221 page 16 of 22

**33**

OTHER GENERAL OBSERVATIONS

**34**

**Accounts Payable Observations:**

**Development of Expanded Accounts Payable Reports Should be Considered:**

Currently, due to various system limitations, management does not have access to accounts
payable reports that provide invoice specific detail of total outstanding accounts payable for each
operating unit within the AHERF system. The existence of such a detail report by entity would
facilitate the monthly reconciliation of the general ledger and the invoice detail. It should be
noted that this information is currently available on-line on a vendor specific basis.

**Recommendation:**

To assist in the monthly reconciliation of accounts payable, system alternatives should continue to
be explored to obtain a detail accounts payable report for each entity within AHERF.

**Management's Response:**

We agree that a hardcopy of a detail accounts payable report by entity from the ESI system would
be advantageous. Accordingly, significant amounts of internal and external resources have been
expended over the past several months in an effort to generate such a report. However, due to
insurmountable ESI system limitations, a detail accounts payable report by entity could not be
produced. As a result, alternative internal hardcopy reconciliation procedures were performed
and provided to C&L in order to satisfy the necessary audit requirements.

It should be noted that the ESI system is an on-line, real-time system that is automatically updated
on a daily basis for receipts of goods and services and disbursements. Due to the automated
nature of the system, many checks and balances are to be performed on-line by Accounts Payable
personnel as opposed to using hardcopy documents for reconciliation purposes, which are
typically utilized for manual or less automated systems. Despite the lack of an accounts payable
report by entity, all necessary review and audit procedures can be performed on-line through the
system to ensure the propriety of the data.

However, to facilitate internal and external reviews through the use of hardcopy reports,
discussions have been held with ESI personnel to update the ESI system to be able to generate
detail accounts payable reports by entity. ESI personnel have indicated that a software upgrade is
being developed and will be distributed to AHERF sometime in fiscal year 1996 that will enable
generation of such a report.

DC8221 page 18 of 22

35

### Security and Recovery Procedures For the Pittsburgh Materials Management/Accounts Payable Systems Should be Strengthened

A local area network (LAN) is used to process Allegheny General Hospital's materials management and accounts payable systems using the ESI software package. The administration of computer security over the system resides within the Materials Management department. We recognize that the ESI system was implemented in February 1995 and, as a result, not all the related security and recovery procedures have been finalized. However, we noted the following security administration weaknesses which could result in ineffective security over hospital data:

· Procedures do not exist to perform a periodic review of user access rights and system/user-id password settings. Such a periodic review would serve to ensure that users' access privileges are commensurate with current job responsibilities and that security settings remain appropriate.

· A formal disaster recovery plan does not exist for the LAN environment. Such a plan would serve to identify backup hardware and recovery procedures to be used if the LAN becomes inoperable.

· The ESI backup tapes are not stored in an environmentally sound and secured area. In addition, the backups are not maintained in an off-site storage location during business hours to protect against damage to the on-site facilities.

### Recommendation:

Management should give consideration to strengthening security and recovery for the ESI system as follows:

· Develop procedures for user management to periodically review user access rights and for the LAN security administrator to periodically review the system/user-id password setups. These types of reviews are typically performed on an annual basis and evidenced by management.

· Develop a formal disaster recovery plan for the LAN environment. The plan should, at a minimum, identify basic recovery alternatives and procedures.

· Arrange for the ESI backup tapes to be kept in an environmentally sound and secured area. In addition, procedures should be developed to rotate appropriate backups to an off-site storage location during business hours.

DC8221 page 19 of 22

**Management Response:**

Following is management's response in the order listed above:

· We concur with this recommendation and are currently evaluating various reports to identify the most appropriate for these types of reviews. Formal procedures will be written, approved and implemented.

· We concur with this recommendation and will formalize our disaster recovery plan. Prior to the audit, a disaster recovery plan had been conceptualized with Network Services and specific hardware was purchased by Materials Management in accordance with that plan. Additional hardware purchases have been requisitioned by Network Services. We will work with Network Services to ensure appropriate hardware is in place and the disaster recovery plan is tested and ready for implementation.

· We concur with this recommendation and are currently investigating the purchase of appropriate security containers to protect ESI backup tapes while stored on-site and at an off-site location. Permanent procedures for storing and rotating backup tapes will be written, approved and implemented.

**Property & Equipment Observations:**

**Implementation of an In-House System should be Considered:**

With the exception of Hahnemann University Hospital, AHERF retains the services of Valuation Counselors, Inc. (VC) to maintain property and equipment ledgers based on information provided by the AHERF finance department. While VC is able to provide sufficient detailed records of property and equipment, the amount of effort required to maintain and update these records is significant and, at times, results in a substantial backlog of unprocessed information. The current system, while functional, is very difficult to manage and creates difficulties in reconciling the detailed balances to the general ledger.

**Recommendation:**

An in-house software package should be considered to efficiently maintain and report property and equipment information.

**Management's Response:**

Management concurs with the above recommendation and is currently in the process of evaluating the feasibility of installing an in-house property and equipment system. A Finance and I/S project committee has been working for the past several months on this matter and has recently selected an in-house system to utilize. The goal of the committee is to begin converting the existing property and equipment records to the new system during fiscal year 1996.

18

37

**Property and Equipment disposal procedures should be enhanced:**

Reporting of property and equipment disposals is essential to the proper recording of depreciation expense and the fair presentation of property and equipment assets in the financial statements. Based on our audit procedures, it appears that disposals are not reported or processed in a timely manner. While there is a formal policy related to disposal of property and equipment, management should periodically re-educate operations personnel as to the importance of adherence to this policy.

**Recommendation:**

The importance and necessity of accurate and timely reporting of property and equipment disposals should be communicated and emphasized to operating personnel on a periodic basis.

**Management's Response:**

Management concurs with this recommendation and has already initiated direct communication with specific departments concerning asset disposals. During fiscal year 1996, AHERF Finance personnel will formalize correspondence to operating personnel re-emphasizing the importance of timely reporting of property and equipment disposals.

**Consideration Should Be Given to the Performance of a Property and Equipment Physical Inventory Count:**

Physical inventories of property and equipment have not been performed for several years at the various AHERF affiliates. Many of AHERF's external funding sources require, under Office of Management and Budget Circular A-133, that annual physical inventories be conducted. It is our understanding that management plans to conduct these inventories in the near future.

**Recommendation:**

It is essential that property and equipment amounts are accurate to ensure that property and equipment and depreciation expense are properly presented in the financial statements. Conducting a physical inventory of property and equipment should enhance the accuracy and completeness of property and equipment ledgers and fulfill certain external funding requirements.

DC8221 page 21 of 22

**Management's Response:**

AHERF management is cognizant of the physical inventory requirements of our various external funding sources and will begin to conduct physical inventory counts during fiscal year 1996 at certain AHERF locations. Due to the time and effort required from internal and external resources to conduct a physical count of all property and equipment, it is impractical for the AHERF organization to conduct a physical inventory of all assets during fiscal year 1996. However, we will continue to conduct physical inventories in subsequent years with our goal being to convert to a permanent five year rotating cycle (i.e., all property and equipment will be counted over a five year period).

**EXHIBIT 0008**

# AHERF

**Allegheny Health, Education and
Research Foundation**

*D.L. Clark Building, 4th Floor
Pittsburgh, Pennsylvania 15212*

*Memorandum*

TO:      Stephen H. Spargo
         Senior Vice President, Corporate Support Services

FROM:    Daniel J. Cancelmi
         Senior Director, Financial Services

DATE:    April 14, 1997

SUBJECT: Restructuring Charges Earmarked for Bad Debt Reserves

In an effort to alleviate the Delaware Valley patient accounts receivable estimated bad debt reserve shortfall, a decision has recently been made to record approximately $50 million of restructuring reserves on the various Graduate Hospitals. In turn, these reserves will be transferred over to the AHERF Delaware Valley hospitals, via intercompany account transfers, which will serve to increase the hospitals' bad debt reserve balances.

These reserves will be recorded on the various Graduate hospitals financial statements as restructuring costs while the hospitals still reside in the SDN organization. At the present time, the Graduate hospitals are expected to officially enter the AHERF system May 1, 1997. This approach will enable us to establish reserves for the bad debt reserve shortfall without the attendant adverse income statement impact on the AHERF system since SDN is not consolidated into AHERF's financial statements. The justification for recording these reserves on the Graduate hospitals financials is that our experience suggests that similar to other AHERF acquisitions, it is inevitable that unknown loss contingencies exist related to the Graduate hospitals that were not identified during the due diligence process. Granted, the reallocation of these reserves from the Graduate hospitals to the other Delaware Valley hospitals is not the most technically appropriate resting place. However, since only one audited set of financial statements will be prepared at the consolidated AHERF level, the precise placement of the reserves on the individual hospitals' financial statements becomes less critical. The key element is that at the consolidated level, sufficient consolidated reserves exist to cover the consolidated patient receivable balances.

A brief summary of the accounting entries that will be recorded follows:

B/S = Balance Sheet        I/S = Income Statement

Delaware Valley Financial Statements

| | | |
|---|---|---|
| Intercompany Receivable (B/S account) | $50,000,000 | |
| Patient A/R Bad Debt Reserve (B/S account) | | $50,000,000 |

To record the reserves on the Delaware Valley books.

DEPOSITION
EXHIBIT
#8
ACF

Stephen H. Spargo
April 11, 1997
Page 2

### Graduate Hospitals Financial Statements

| | | |
|---|---|---|
| Restructuring Expenses (I/S account) | $50,000,000 | |
| Accrued Liabilities (B/S account) | | $50,000,000 |

To record the restructuring expenses on Graduate's books.

| | | |
|---|---|---|
| Accrued Liabilities (B/S account) | $50,000,000 | |
| Intercompany Liability (B/S account) | | $50,000,000 |

To transfer the reserves from Graduate to the Delaware Valley.

Other noteworthy matters related to these restructuring charges include the following:

· Timing of recognition
· Allocation of the reserves among the hospitals.

### Timing of Recognition

A determination has been made that $25 million of reserves will be recorded in the Delaware Valley hospitals March 1997 financial statements. The remaining $25 million will be recorded in the fourth quarter.

I am proposing that these reserves be recorded on the Graduate hospitals January 1997 financial statements, which coincides with the date the last Graduate hospital (Rancocas) entered the SDN organization.

### Allocation of the Reserves

Based primarily on the Delaware Valley bad debt reserve shortfalls identified in my memorandum dated April 7, 1997, I am proposing that the reserves of $50 million be allocated among the Delaware Valley hospitals as follows:

| | Allocation of Reserves | | | Estimated Bad Debt Reserve Shortfall (April 7 Memo) |
|---|---|---|---|---|
| | Initial $25m March 1997 | Final $25m 4th Qtr 1997 | Total | |
| | ($ in 000s) | | | |
| Bucks County | $3,000 | $4,000 | $7,000 | $7,820 |
| Elkins Park | 3,000 | 5,000 | 8,000 | 9,578 |
| Hahnemann | 5,000 | 5,000 | 10,000 | 13,333 |
| MCP | 8,000 | 7,000 | 15,000 | 17,311 |
| St. Christopher's | 6,000 | 4,000 | 10,000 | 11,382 |
| | $25,000 | $25,000 | $50,000 | $59,424 |