



DEPOSITION
EXHIBIT

313

AKF

CL 013380



June 1997 - Elkins Park

|  | Month | | YTD | | | |
|---|---|---|---|---|---|---|
|  | Actual | Budget | Actual | Budget | | |
| Admits | 701 | 642 | 8,778 | 7,980 | 8,077 | 7,338 |
| Discharges | 668 | 622 | 8,754 | 7,985 | 8,036 | 7,363 |
| Days | 3,303 | 3,591 | 44,345 | 44,982 | 41,042 | 41,391 |
| | | | | | | |
| I/P Gross | $9,001 I/9 | $9,041 | $118,654 | $113,966 | $107,653 | $104,925 |
| O/P Gross | 5,854 B | 4,301 | 66,521 | 52,328 | 60,667 | 48,027 |

*Gross revenue adjusted for L. Griffin account which was overstated. $330

B C/L notes that O/P Gross income per the I/S totals $5,790,000. The difference of $64,000 is deemed immaterial

| Rate | YTD |
|---|---|
|  | FY97 | FY96 |
| I/P | 32.7% | 33.1% |
| O/P | 35.4% | 38.3% |

| IP Net Revenue per Admission | | IP Gross Revenue per Admission | |
|---|---|---|---|
| FY97 Average | $4,283 | FY97 Average | $13,269 |
| FY96 Average | 4,338 | FY96 Average | 13,011 |

| IP Net Revenue Per Day | | IP Gross Revenue per Day | |
|---|---|---|---|
| FY97 Average | $848 | FY97 Average | 2,631 |
| FY96 Average | 799 | FY96 Average | 2,395 |

CL 013381



June 1997 - Bucks County

| | Month | | YTD | | | |
|---|---|---|---|---|---|---|
| | Actual | Budget | Actual | Budget | | |
| Admits | 486 | 563 | 6,777 | 6,877 | 6,291 | 6,314 |
| Discharges | 490 | 567 | 6,777 | 6,877 | 6,287 | 6,310 |
| Days | 2,586 | 3,164 | 37,367 | 38,946 | 34,781 | 35,782 |
| I/P Gross | $7,671 I/S | $7,850 | $98,461 | $97,804 | $90,790 | $89,954 |
| O/P Gross | 5,631 C | 3,547 | 53,256 | 43,151 | 47,625 | 39,604 |

C. CAL notes that I/P and O/P Gross Income per line I/S totals $5,635,000 The difference at $14,000 is deemed immaterial

| | YTD FY97 | FY98 |
|---|---|---|
| Rate | | |
| I/P | 30.7% | 33.2% |
| O/P | 40.1% | 48.2% |

| I/P Net Revenue per Admission | | I/P Gross Revenue per Admission | | I/P Net Revenue Per Day | | I/P Gross Revenue per Day | |
|---|---|---|---|---|---|---|---|
| FY97 Average | $4,459 | FY97 Average | $14,529 | FY97 Average | $808 | FY97 Average | $2,535 |
| FY96 Average | 4,562 | FY96 Average | 13,795 | FY96 Average | 791 | FY96 Average | 2,380 |

CL 013382



June 1997 - SCHC

| | Month | | YTD | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Budget | Actual | Budget | | | | |
| Admits | 805 | 849 | 11,015 | 10,960 | | 10,210 | | 10,111 |
| Discharges | 814 | 846 | 11,023 | 10,960 | | 10,209 | | 10,114 |
| Days | 3,611 | 4,223 | 47,731 | 54,135 | | 44,100 | | 50,112 |
| | | | | | | | | |
| IP Gross | $18,245.95 | $19,818 | $237,224 | $253,316 | | $218,979 | | $233,498 |
| O/P Gross | 6,664.95 | 4,522 | 67,548 | 54,950 | | 60,084 | | 50,428 |

| Rate | FY97 | FY96 |
|---|---|---|
| IP | 41.6% | 43.7% |
| O/P | 50.8% | 51.5% |

IP Net Revenue per Admission
FY97 Average    18,960
FY96 Average     9,958

IP Gross Revenue per Admission
FY97 Average    21,536
FY96 Average    23,042

IP Net Revenue Per Day
FY97 Average    $2,068
FY96 Average     2,010

IP Gross Revenue per Day
FY97 Average    $4,970
FY96 Average     4,651

CL 013383



June 1997 - Hahnemann

*Admissions decreased approximately 300 on May as a result of loss of moms and babies budget for this is approximately 400/month

June 1997 - Graduate Hospital

D CdL notes that OIP Gross Income per the I/S totals $12,439,000. The difference of $3,000 is deemed immaterial

June 1997 - Mt. Sinai

G does not include $5 on HSI deferred revenue

CL 013384

**EXHIBIT  0324**



RESTATED MASTER TRUST INDENTURE

PR-BINDER-01-00001



DEPOSITION
EXHIBIT
324
AKF

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
24019
EXHIBIT NO.

RESTATED AND AMENDED MASTER TRUST INDENTURE

ALLEGHENY GENERAL HOSPITAL,
ALLEGHENY SINGER RESEARCH INSTITUTE,
ALLEGHENY NEUROPSYCHIATRIC INSTITUTE
AND OTHER MEMBERS OF THE OBLIGATED GROUP

and

PNC BANK, as Trustee,
Pittsburgh, Pennsylvania

Dated  April 7, 1993

Restating and amending a Master Trust Indenture dated as
of December 1, 1983, as supplemented and amended

PR-BINDER-01-00002

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS AND OTHER PROVISIONS
CONCERNING INTERPRETATION

Section 1.01.  Definitions . . . . . . . . . . . . . . . . . .  2
Section 1.02.  Interpretation . . . . . . . . . . . . . . . .  13

ARTICLE II
AUTHORIZATION, ISSUANCE AND TERMS OF NOTES AND GUARANTIES

Section 2.01.  Series and Amount of Notes and Guaranties . .  14
Section 2.02.  Designation of Notes . . . . . . . . . . . . .  14
Section 2.03.  Medium and Place of Payment . . . . . . . . .  14
Section 2.04.  Mutilated, Destroyed, Lost and Stolen Notes .  15
Section 2.05.  Execution and Authentication of Notes
               and Guaranties . . . . . . . . . . . . . . . .  16
Section 2.06.  Interchangeability of Notes . . . . . . . . .  16
Section 2.07.  Negotiability and Transfer of Notes
               and Guaranties . . . . . . . . . . . . . . . .  16
Section 2.08.  Persons Deemed Owners . . . . . . . . . . . .  17
Section 2.09.  Provisions with Respect to Transfers
               and Exchanges . . . . . . . . . . . . . . . .  17
Section 2.10.  Supplemental Indenture Creating
               Series of Notes or a Guaranty . . . . . . . .  17
Section 2.11.  Conditions to Issuance of Notes or a
               Guaranty Issued Hereunder . . . . . . . . . .  18

ARTICLE III
REDEMPTION OF NOTES

Section 3.01.  Right to Redeem . . . . . . . . . . . . . . .  18
Section 3.02.  Selection of Notes to be Redeemed . . . . . .  19
Section 3.03.  Partial Redemption of Fully Registered Notes .  19
Section 3.04.  Effect of Call for Redemption . . . . . . . .  19
Section 3.05.  Notice of Redemption . . . . . . . . . . . . .  19
Section 3.06.  Redemption of Notes and Related Bonds . . . .  20

ARTICLE IV
FORM OF NOTES

Section 4.01.  Form of Notes Generally . . . . . . . . . . .  20
Section 4.02.  Form of Notes . . . . . . . . . . . . . . . .  20
Section 4.03.  Form of Guaranties Generally . . . . . . . . .  27

i

PR-BINDER-01-00003

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS AND OTHER PROVISIONS
CONCERNING INTERPRETATION

Section 1.01.   Definitions . . . . . . . . . . . . . . . .   2
Section 1.02.   Interpretation . . . . . . . . . . . . . .   13

ARTICLE II
AUTHORIZATION, ISSUANCE AND TERMS OF NOTES AND GUARANTIES

Section 2.01.   Series and Amount of Notes and Guaranties . .   14
Section 2.02.   Designation of Notes . . . . . . . . . . . .   14
Section 2.03.   Medium and Place of Payment . . . . . . . . .   14
Section 2.04.   Mutilated, Destroyed, Lost and Stolen Notes .   15
Section 2.05.   Execution and Authentication of Notes
                and Guaranties . . . . . . . . . . . . . .   16
Section 2.06.   Interchangeability of Notes . . . . . . . . .   16
Section 2.07.   Negotiability and Transfer of Notes
                and Guaranties . . . . . . . . . . . . . .   16
Section 2.08.   Persons Deemed Owners . . . . . . . . . . .   17
Section 2.09.   Provisions with Respect to Transfers
                and Exchanges . . . . . . . . . . . . . . .   17
Section 2.10.   Supplemental Indenture Creating
                Series of Notes or a Guaranty . . . . . . .   17
Section 2.11.   Conditions to Issuance of Notes or a
                Guaranty Issued Hereunder . . . . . . . . .   18

ARTICLE III
REDEMPTION OF NOTES

Section 3.01.   Right to Redeem . . . . . . . . . . . . .   18
Section 3.02.   Selection of Notes to be Redeemed . . . . . .   19
Section 3.03.   Partial Redemption of Fully Registered Notes .   19
Section 3.04.   Effect of Call for Redemption . . . . . . . .   19
Section 3.05.   Notice of Redemption . . . . . . . . . . . .   19
Section 3.06.   Redemption of Notes and Related Bonds . . . .   20

ARTICLE IV
FORM OF NOTES

Section 4.01.   Form of Notes Generally . . . . . . . . . .   20
Section 4.02.   Form of Notes . . . . . . . . . . . . . . .   20
Section 4.03.   Form of Guaranties Generally . . . . . . . .   27

i

PR-BINDER-01-00003

## ARTICLE V
### PARTICULAR COVENANTS OF THE OBLIGATED GROUP

Section 5.01.  Pledge of Unrestricted Receivables;
               Payment of Guaranties and Principal
               of and Interest on Notes . . . . . . . . . . .  27
Section 5.02.  Covenants as to Corporate Existence,
               Maintenance of Properties, Etc. . . . . . . .  27
Section 5.03.  Insurance. . . . . . . . . . . . . . . . . . .  29
Section 5.04.  Limitations on Creation of Liens. . . . . . .  30
Section 5.05.  Limitations on Incurrence of Additional
               Indebtedness . . . . . . . . . . . . . . . . .  33
Section 5.06.  Restrictions on Guaranties . . . . . . . . . .  36
Section 5.07.  Calculation of Debt Service and Debt
               Service Coverage . . . . . . . . . . . . . . .  36
Section 5.08.  Debt Service Coverage Ratio . . . . . . . . .  39
Section 5.09.  Sale, Lease or Other Disposition of Assets . .  39
Section 5.10.  Consolidation, Merger, Sale or Conveyance . .  40
Section 5.11.  Filing of Financial Statements, Certificate
               of No Default, Other Information . . . . . . .  42
Section 5.12.  Parties Becoming Obligated Affiliates . . . .  43
Section 5.13.  Insurance and Condemnation Proceeds . . . . .  43
Section 5.14.  Additional Covenants Pertaining to
               Obligated Affiliates . . . . . . . . . . . . .  44

## ARTICLE VI
### DEFAULT AND REMEDIES

Section 6.01.  Events of Default . . . . . . . . . . . . . .  44
Section 6.02.  Acceleration; Annulment of Acceleration . . .  46
Section 6.03.  Additional Remedies and Enforcement
               of Remedies  . . . . . . . . . . . . . . . . .  46
Section 6.04.  Application of Revenues and Other
               Moneys After Default. . . . . . . . . . . . .  47
Section 6.05.  Remedies Not Exclusive . . . . . . . . . . . .  49
Section 6.06.  Remedies Vested in the Trustee . . . . . . . .  49
Section 6.07.  Noteholders' Control of Proceedings . . . . .  49
Section 6.08.  Termination of Proceedings . . . . . . . . . .  50
Section 6.09.  Waiver of Event of Default . . . . . . . . . .  50
Section 6.10.  Appointment of Receiver  . . . . . . . . . . .  50
Section 6.11.  Remedies Subject to Provisions of Law . . . .  51
Section 6.12.  Notice of Default  . . . . . . . . . . . . . .  51

ii

PR-BINDER-01-00004

## ARTICLE VII
### THE TRUSTEE

Section 7.01.  Certain Duties and Responsibilities . . . . .  52
Section 7.02.  Certain Rights of Trustee . . . . . . . . . .  53
Section 7.03.  Right to Deal in Notes and Related Bonds . . .  55
Section 7.04.  Removal and Resignation of the Trustee . . . .  55
Section 7.05.  Compensation and Reimbursement. . . . . . . .  56
Section 7.06.  Recitals and Representations . . . . . . . . .  57
Section 7.07.  Separate or Co-Trustee . . . . . . . . . . . .  57

## ARTICLE VIII
### SUPPLEMENTAL INDENTURES

Section 8.01.  Supplemental Indentures Not Requiring
               Consent of Noteholders . . . . . . . . . . .  59
Section 8.02.  Supplemental Indentures Requiring
               Consent of Noteholders . . . . . . . . . . .  60
Section 8.03.  Execution and Effect of Supplemental
               Indenture  . . . . . . . . . . . . . . . . .  61

## ARTICLE IX
### SATISFACTION AND DISCHARGE OF INDENTURE

Section 9.01.  Satisfaction and Discharge of Indenture . . .  62
Section 9.02.  Payment of Notes and Guaranties after
               Discharge of Lien . . . . . . . . . . . . . .  63

## ARTICLE X
### CONCERNING THE NOTEHOLDERS

Section 10.01. Evidence of Acts of Noteholders . . . . . . .  63
Section 10.02. Notes or Related Bonds Owned by Members
               of Obligated Group . . . . . . . . . . . . .  64
Section 10.03. Instruments Executed by Holders Bind
               Future Holders . . . . . . . . . . . . . . .  65

## ARTICLE XI
### MISCELLANEOUS PROVISIONS

Section 11.01. Limitation of Rights . . . . . . . . . . . .  65
Section 11.02. Severability . . . . . . . . . . . . . . . .  66
Section 11.03. Holidays . . . . . . . . . . . . . . . . . .  66
Section 11.04. Governing Law . . . . . . . . . . . . . . . .  66
Section 11.05. Counterparts . . . . . . . . . . . . . . . .  66
Section 11.06. Immunity of Individuals . . . . . . . . . . .  66
Section 11.07. Binding Effect . . . . . . . . . . . . . . .  67
Section 11.08. Notices  . . . . . . . . . . . . . . . . . .  67

iii

PR-BINDER-01-00005

ARTICLE XII
EFFECTIVE DATE

Effective Date . . . . . . . . . . . . . . . . . . . . 67

iv

PR-BINDER-01-00006

THIS RESTATED AND AMENDED MASTER TRUST INDENTURE, made, entered into and effective as of April 7, 1993 by and between Allegheny General Hospital, Pittsburgh, Pennsylvania; Allegheny Singer Research Institute, Pittsburgh, Pennsylvania; and Allegheny Neuropsychiatric Institute, Oakdale, Pennsylvania; all Pennsylvania nonprofit corporations (collectively, the "Obligated Group" and individually, an "Obligated Affiliate"); and PNC BANK, Pittsburgh, Pennsylvania, a national banking association organized under the laws of the United States, and being duly qualified to accept and administer the trusts created hereby (the "Trustee"); restating and amending a Master Trust Indenture dated as of December 1, 1983 between Allegheny Health, Education and Research Corporation (which, subsequent to such date, merged into Allegheny General Hospital) and the Trustee (the "Original Master Indenture"), as heretofore supplemented and amended,

## W I T N E S S E T H:

WHEREAS, each Obligated Affiliate is authorized and deems it necessary and desirable to reaffirm its obligations under the Original Master Indenture and to enter into this Restated and Amended Master Trust Indenture for the purposes of (i) revising certain covenants, eliminating certain other covenants and reaffirming certain other covenants, all included in the Original Master Indenture, and (ii) providing for the issuance from time to time by the Obligated Group of Notes and Guaranties (as herein defined) of one or more series, to finance or refinance the acquisition or betterment of health care facilities or other facilities, or for other lawful and proper corporate purposes; and

WHEREAS, all acts and things necessary to constitute this Indenture a valid indenture and agreement according to its terms have been done and performed, each Obligated Affiliate has duly authorized the execution and delivery of this Indenture, and each Obligated Affiliate, in the exercise of the legal right and power vested in it, executes this Indenture and proposes to make, execute, issue and deliver, or to execute and deliver to the Trustee, one or more Notes and to make, execute, issue and deliver Guaranties hereunder; and

WHEREAS, the Trustee agrees to accept and administer the trusts created hereby; and

WHEREAS, each Obligated Affiliate and the Trustee desire to restate and amend the Original Master Indenture with an effective date determined in accordance with Article XII hereof.

NOW, THEREFORE, in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, and of the giving of consideration for and acceptance of the Notes and Guaranties issued hereunder by the holders thereof, and for the purpose of fixing and declaring the terms and conditions upon which the Notes and Guaranties are to be issued, authenticated, delivered and accepted by all persons who shall from time to time be or

PR-BINDER-01-0000

become holders thereof, each Obligated Affiliate covenants and agrees with the Trustee, from and after the Effective Date hereof determined in accordance with Article XII hereof, for the equal and proportionate benefit of the respective holders from time to time of Notes and Guaranties issued hereunder, as follows:

## ARTICLE I

## DEFINITIONS AND OTHER PROVISIONS
## CONCERNING INTERPRETATION

Section 1.01. Definitions. For the purposes hereof unless the context otherwise indicates, the following words and phrases shall have the following meanings:

"Additional Indebtedness" shall mean any Indebtedness (including all Notes and all Guaranties) incurred on or subsequent to the Effective Date.

"Affiliate" shall mean, with respect to a Person, a corporation, partnership, joint venture, association, business trust or similar entity organized under the laws of the United States of America or a state thereof which directly or indirectly controls or is controlled by such Person. For purposes of this definition, control means the power to direct the management and policies of a Person through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of the members of its Governing Body, or by contract or otherwise.

"Balloon Indebtedness" shall mean Long-Term Indebtedness, 50% or more of the principal of which matures on the same date, which portion of the principal is not required to be amortized below such percentage by mandatory redemption or prepayment prior to such date; provided, however, Balloon Indebtedness shall not include Optional Tender Indebtedness.

"Book Value," when used in connection with Property of any Obligated Affiliate, shall mean the value of such Property, net of accumulated depreciation, as it is carried on the most recent audited Financial Statements of such Obligated Affiliate, and when used in connection with Property of the Obligated Group, means the aggregate of the values of such Property, net of accumulated depreciation, as reflected on the most recent audited Financial Statements of the Obligated Group, provided that the aggregate of such values shall be determined in such a manner that no portion of such value of Property of any Obligated Affiliate is included more than once.

2

PR-BINDER-01-00008

"Capitalized Interest" shall mean amounts deposited in escrow in connection with the issuance of Long-Term Indebtedness or Related Bonds to pay interest on such Long-Term Indebtedness or Related Bonds.

"Capitalized Lease" shall mean any lease of real or personal property which, in accordance with generally accepted accounting principles, is required to be capitalized on the balance sheet of the lessee.

"Commitment Indebtedness" shall mean the obligation of any Obligated Affiliate to repay amounts disbursed pursuant to a commitment from a financial institution to refinance or purchase when due, when tendered or when required to be purchased (a) other Indebtedness of such Obligated Affiliate, which other Indebtedness was incurred in accordance with the provisions of this Indenture or (b) Indebtedness of a Person who is not an Obligated Affiliate, which Indebtedness is guaranteed by a Guaranty of such Obligated Affiliate or secured by or payable from amounts paid on Indebtedness of such Obligated Affiliate, in either case which Indebtedness or Guaranty of such Obligated Affiliate was incurred pursuant to Sections 5.05 or 5.06 hereof, and the obligation of any Obligated Affiliate to pay interest payable on amounts disbursed for such purposes, plus any fees payable to such financial institution for, under or in connection with such commitment, in the event of disbursements pursuant to such commitment or in connection with enforcement thereof, including, without limitation, any penalties payable in the event of such enforcement.

"Completion Indebtedness" shall mean any Long-Term Indebtedness incurred by any Obligated Affiliate for the purpose of (i) financing the completion of constructing or equipping facilities for which Long-Term Indebtedness has theretofore been incurred in accordance with the provisions hereof, to the extent necessary to provide a completed and equipped facility of the type and scope contemplated at the time that such Long-Term Indebtedness was originally incurred, and in accordance with the general plans and specifications for such facility as originally prepared with only such changes as have been made in conformance with the documents pursuant to which such Long-Term Indebtedness was originally incurred and (ii) providing for capitalized interest during the period of construction, funding or increasing the funding of a reserve fund and paying costs and expenses of issuing such Completion Indebtedness.

"Construction Index" shall mean the health care component of the implicit price deflator for the gross national product as most recently reported prior to the date in question by the United States Department of Commerce or its successor agency, or, if such index is no longer published, such other index which is certified to be comparable and appropriate by an Officer's Certificate of the Obligated Group Agent delivered to the Trustee.

3

"Consultant" shall mean a Person or firm who is not, and no member, stockholder, director, officer or employee of which is, an officer or employee of any Obligated Affiliate, and which is a nationally recognized professional consultant having the skill and experience necessary to render the particular report required by the provision hereof in which such requirement appears.

"Corporate Trust Office" shall mean the office of the Trustee at which its principal corporate trust business is conducted, which at the dated date hereof is located at One Oliver Plaza, 210 Sixth Avenue, Pittsburgh, Pennsylvania 15222.

"Cross-Over Date" shall mean, with respect to Cross-Over Refunding Indebtedness, the date on which the principal portion of the Cross-Over Refunded Indebtedness is paid or redeemed, or on which it is anticipated that such principal portion be paid or redeemed, from the proceeds of such Cross-Over Refunding Indebtedness.

"Cross-Over Refunded Indebtedness" shall mean Indebtedness of a Person refunded by Cross-Over Refunding Indebtedness.

"Cross-Over Refunding Indebtedness" shall mean Indebtedness of a Person issued for the purpose of refunding other Indebtedness of such Person if the proceeds of such Cross-Over Refunding Indebtedness are irrevocably deposited in escrow to secure the payment on the applicable Cross-Over Date of the Cross-Over Refunded Indebtedness and earnings on such escrow deposit are required to be applied to pay principal or interest on either or both of such Cross-Over Refunding Indebtedness or such Cross-Over Refunded Indebtedness until the Cross-Over Date.

"Current Value" shall mean (i) with respect to Property, Plant and Equipment:  (a) the aggregate fair market value of such Property, Plant and Equipment as reflected in the most recent written report of an appraiser and, in the case of real property, who is a member of the American Institute of Real Estate Appraisers (MAIA), delivered to the Trustee (which report shall be dated not more than three years prior to the date as of which Current Value is to be calculated) increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such report to the date as of which Current Value is to be calculated; plus (b) the Book Value of any Property, Plant and Equipment acquired since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such acquisition to the date as of which Current Value is to be calculated; minus (c) the greater of the Book Value or the fair market value (as reflected in such most recent appraiser's report) of any Property, Plant and Equipment disposed of since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease

4

PR-BINDER-01-00010

in the Construction Index from the date of such report to the date as of which Current Value is to be calculated, and (ii) with respect to any other Property, the fair market value of such Property, which fair market value shall be evidenced in a manner satisfactory to the Trustee.

"Effective Date" shall mean April 7, 1993 which is the date upon which this Indenture becomes effective, determined in the manner provided in Section 202 of the Second Supplemental Indenture and in Article XII hereof.

"Event of Default" shall mean any one or more of those events set forth in Section 6.01 hereof.

"Expenses" shall mean, for any period, the aggregate of all expenses calculated under generally accepted accounting principles, including without limitation any taxes, incurred by the Person or group of Persons involved during such period, minus interest on Long-Term Indebtedness, depreciation and amortization and extraordinary expenses (including without limitation losses on the sale of assets other than in the ordinary course of business and losses on the extinguishment of debt) and, if such calculation is being made with respect to the Obligated Group, excluding any such expenses attributable to transactions between any Member of the Obligated Group and any other Member of the Obligated Group.

"Financial Statements" shall mean, depending upon the context, the consolidated or combined financial statements of the Obligated Group which contain certain summarized consolidated or combined financial information concerning the Obligated Group or the financial statements of an Obligated Affiliate, in all cases prepared in accordance with generally accepted accounting principles.

"Governing Body" shall mean, when used with respect to any Obligated Affiliate, its board of directors, board of trustees, or other board or group of individuals in which the powers of the Obligated Affiliate are vested.

"Governmental Restrictions" shall mean federal, state or other applicable governmental laws or regulations affecting the Obligated Group and its facilities, which place restrictions and limitations on the (i) fees and charges to be fixed, charged and collected or revenues to be earned by the Obligated Affiliates or (ii) timing of receipt of such revenues.

"Guaranty" shall mean all obligations of an Obligated Affiliate guaranteeing in any manner, whether directly or indirectly, any obligation of any other Person, which obligation of such other Person would, if such obligation were the obligation of such Obligated Affiliate, constitute Indebtedness hereunder, unless the obligation of such other Person is other than for payment of a sum certain,

5

PR-BINDER-01-00011

and expressly includes any Guaranty issued under the Original Master Indenture and which is Outstanding on the Effective Date and any Guaranty issued hereunder.

"Historical Long-Term Debt Service Coverage Ratio" shall mean, for any period of time, the ratio consisting of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Long-Term Debt Service Requirement for such period and a denominator of one; provided, however, that in calculating the Long-Term Debt Service Requirement for such period, the principal amount of any Indebtedness included in such calculation which is paid during such period shall be excluded to the extent such principal amount is paid from the proceeds of other Indebtedness incurred in accordance with the provisions of this Indenture.

"Historical Long-Term Pro Forma Debt Service Coverage Ratio" shall mean, for any period of time, the ratio consisting of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Maximum Annual Debt Service Requirement for the Long-Term Indebtedness then Outstanding and the Long-Term Indebtedness then proposed to be issued and a denominator of one.

"Income Available for Debt Service" shall mean, with respect to the Obligated Group, as to any period of time, the excess of Revenues over Expenses of the Person or group of Persons involved.

"Indebtedness" shall mean all obligations for borrowed money, installment sales obligations and Capitalized Leases incurred or assumed by an Obligated Affiliate, including Guaranties (other than any Guaranty by any member of the Obligated Group of Indebtedness of any other member of the Obligated Group) and Commitment Indebtedness, except obligations of a member of the Obligated Group to another member of the Obligated Group.

"Insurance Consultant" shall mean a Person or firm who is not, and no member, director, officer or employee of which is, an officer or employee off any Obligated Affiliate and who is qualified to survey risks and to recommend insurance coverage or hospitals, health-related facilities and services and organizations engaged in such operations.

"Lien" shall mean any mortgage, pledge or lease of, security interest in or lien, charge, restriction or encumbrance on any Property of any Obligated Affiliate in favor of or which secures any Indebtedness or any other obligation to any Person, other than a member of the Obligated Group.

"Long-Term Debt Service Requirement" shall mean, with respect to the period of time for which calculated, the aggregate of the payments required to be made during such period in respect of

6

PR-BINDER-01-00012

principal of (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on Outstanding Long-Term Indebtedness of each Person with respect to which calculated; provided that: (a) the amount of such payments for a future period shall be calculated in accordance with the assumptions contained in Sections 5.05, 5.06 and 5.07 hereof; (b) interest shall be excluded from the determination of Long-Term Debt Service Requirement to the extent that Capitalized Interest is available to pay such interest; and (c) principal and/or interest on Long-Term Indebtedness shall be excluded from the determination of Long-Term Debt Service Requirement to the extent that cash or Qualified Investments are on deposit in an irrevocable escrow in an amount sufficient, together with the earnings thereon without any regard to any reinvestment thereof, to pay such principal and/or interest.

"Long-Term Indebtedness" shall mean, with respect to any Person, all Indebtedness for any of the following:

(i)  Payments of principal and interest with respect to money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, longer than one year;

(ii)  Payments under installment sales obligations having an original term in excess of one year; and

(iii)  Capitalized Leases.

"Maximum Annual Debt Service Requirement" shall mean the highest Long-Term Debt Service Requirement for the current or any succeeding fiscal year.

"Non-Recourse Indebtedness" shall mean any Indebtedness secured by a Lien, the liability for which is effectively limited to the Property, the purchase, acquisition or improvement of which was financed or refinanced with the proceeds of such Non-Recourse Indebtedness and which is subject to such Lien with no recourse, directly or indirectly, to any member of the Obligated Group.

"Note" shall mean any Note issued, authenticated and delivered under the Original Master Indenture which is Outstanding on the Effective Date and any Note issued, authenticated and delivered under this Indenture.  References to a series of Notes or to Notes of a series shall mean the Notes or series of Notes issued pursuant to a single Supplemental Indenture.

"Noteholder" or "Holder" shall mean the registered owner of any Note or Guaranty.

7

"Obligated Affiliate" shall mean any Original Restricted Affiliate under the Original Master Indenture or which has become an additional Restricted Affiliate pursuant to Section 5.12 of the Original Master Indenture prior to the Effective Date or any Person which shall become an Obligated Affiliate pursuant to Section 5.12 hereof.

"Obligated Group" shall mean all Obligated Affiliates.

"Obligated Group Agent" means Allegheny General Hospital, or its successors or assigns.

"Officer's Certificate" shall mean a certificate signed by the chairman of the Governing Body, or the president, chief executive officer or chief financial officer, or the chairman of the finance committee of the Governing Body, of a Person.  Each Officer's Certificate presented under this Indenture shall identify the section or subsection of this Indenture pursuant to which it is being delivered, and shall incorporate by reference and use in all appropriate instances all terms defined in Section 1.01 in this Indenture.  Each Officer's Certificate shall state (i) whether the terms thereof are in compliance with the requirements of the section or subsection pursuant to which such Officer's Certificate is delivered, or shall state in reasonable detail the nature of any noncompliance and the steps being taken to remedy such noncompliance, and (ii) that it is being delivered together with any opinions, schedules, statements or other documents required in connection therewith.

"Opinion of Bond Counsel" shall mean an opinion in writing signed by an attorney or firm of attorneys experienced in the field of municipal bonds whose opinions are generally accepted by purchasers of municipal bonds.

"Opinion of Counsel" shall mean an opinion in writing signed by an attorney or firm of attorneys who may be counsel for the Corporation.

"Optional Tender Indebtedness" shall mean Indebtedness which is payable or required to be purchased or redeemed, at the option the holder of such Indebtedness, prior to its stated maturity date.

"Original Master Indenture" shall mean the Master Trust Indenture dated as of December 1, 1983 between Allegheny Health, Education and Research Corporation (which, subsequent to such date, merged into Allegheny General Hospital) and the Trustee.

8

PR-BINDER-01-00014

"Original Restricted Affiliates" shall mean Allegheny General Hospital (into which Allegheny Health, Education and Research Corporation was merged subsequent to the date of the Original Master Indenture), Allegheny Singer Research Institute and Allegheny Neuropsychiatric Institute, all Pennsylvania nonprofit corporations.

"Outstanding," when used with reference to Indebtedness, shall mean, as of any date of determination, all Indebtedness theretofore incurred and not paid and discharged other than (i) Indebtedness evidenced by Notes or Guaranties theretofore canceled by the Trustee or delivered to the Trustee for cancellation, (ii) Indebtedness deemed paid and no longer Outstanding as provided in Section 3.04 and Article IX hereof, (iii) Notes in lieu of which other Notes have been authenticated and delivered or have been paid pursuant to Section 2.04 unless proof satisfactory to the Trustee has been received that any such Note is held by a bona fide purchaser, (iv) Notes for the sole security of which an Obligated Affiliate shall have deposited with a bank or trust company, including the Trustee, pursuant to an agreement between such Obligated Affiliate and such bank or trust company as trust funds Qualified Investments, the maturing principal of and interest on which when due will be sufficient to pay at maturity or upon redemption principal and interest then due and principal and interest due or to become due prior to such date and (v) Notes securing Related Bonds if, under the Related Bond Indenture pursuant to which such Related Bonds were issued, such Related Bonds are not outstanding.

"Permitted Liens" shall have the meaning given in Section 5.04 hereof.

"Person" shall mean an association, unincorporated organization, a corporation, partnership, joint venture, business trust or a government or an agency or a political subdivision thereof, or any other entity.

"Projected Long-Term Debt Service Coverage Ratio" shall mean, for any future period, the ratio consisting of a numerator equal to the amount determined by dividing the projected Income Available for Debt Service for that period by the Maximum Annual Debt Service Requirement for the Long-Term Indebtedness expected to be outstanding during such period and a denominator of one.

"Projected Rate" shall mean the projected yield at par of an obligation as set forth in the report of a Consultant. Such report shall state that in determining the Projected Rate, such Consultant reviewed the yield evaluations at par of not less than five obligations selected by such Consultant, the interest on which is generally excluded from the gross income of the holder thereof (or, if it is not expected that it will be reasonably possible to issue such obligations, then obligations the interest on which is

9

PR-BINDER-01-00015

included in the gross income of the holder thereof), which obliga-
tions such Consultant states in its report are reasonable compara-
tors for utilizing in developing such Projected Rate and which
obligations: (i) were outstanding on a date selected by the
Consultant, which date so selected occurred during the 45-day
period preceding the date of the calculation utilizing the
Projected Rate in question, (ii) to the extent practicable, are
obligations of Persons engaged in operations similar to those of
the Obligated Group and having a credit rating similar to that of
the Obligated Group, (iii) are not entitled to the benefits of any
credit enhancement, including, without limitation, any letter of
credit or insurance policy, and (iv) to the extent practicable,
have a remaining term and amortization schedule substantially the
same as the obligation with respect to which such Projected Rate is
being developed.

"Property" shall mean any and all rights, titles and interests
in and to any and all property, whether real or personal, tangible
or intangible, and wherever situated.

"Property, Plant and Equipment" shall mean all Property of the
members of the Obligated Group which is property, plant and
equipment under generally accepted accounting principles.

"Qualified Investment" shall mean any of the following:

(i)   United States Government Obligations;

(ii)  Bonds, debentures, notes or other evidences of
indebtedness issued by any of the following: Federal Home Loan
Banks, Federal Home Loan Mortgage Corporation (including
participation certificates), Federal Financing Bank, or any
other agency or instrumentality of the United States of
America (created by an Act of Congress) substantially similar
to the foregoing in its legal relationship to the United
States of America;

(iii) Interest-bearing time or demand deposits, certifi-
cates of deposit, repurchase agreements or other similar
banking arrangements with any government securities dealer,
bank, trust company, national banking association or other
savings institution (including the Trustee), provided that
such deposits, certificates, repurchase agreements and other
arrangements are (a) fully insured by the Federal Deposit
Insurance Corporation, or (b) fully collateralized by Quali-
fied Investments defined in (i) and (ii) above and held by a
custodian pursuant to the terms of a custody agreement, or (c)
in or with a government securities dealer, bank, trust
company, national banking association or other savings
institution rated in either of the two highest rating catego-
ries by Moody's Investors Service or Standard & Poor's
Corporation; and

10

PR-BINDER-01-00016

(iv) Such other investments which at the time of the acquisition thereof shall be listed as permissible investments or trusteed funds in an indenture, resolution, official statement, offering circular or prospectus with respect to Indebtedness which is secured under this Indenture.

"Related Bonds" shall mean (i) revenue bonds or other obligations issued by the Commonwealth of Pennsylvania or any other State of the United States of America or any municipal corporation or political subdivision formed under the laws thereof or any constituted authority or agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof ("governmental issuer"), pursuant to a single Related Bond Indenture, the proceeds of which are loaned or otherwise made available to any member of the Obligated Group in consideration of the execution, authentication and delivery of a Note or Notes to or for the order of such governmental issuer or (ii) direct obligations of any Obligated Affiliate issued pursuant to a Related Bond Indenture and that are secured by a Note or Notes issued hereunder.

"Related Bond Indenture" shall mean any indenture, bond resolution or other comparable instrument pursuant to which a series of Related Bonds are issued.

"Related Bond Issuer" shall mean the issuer of any issue of Related Bonds.

"Related Bond Trustee" shall mean the trustee and its successors in the trusts created under any Related Bond Indenture, and if there is no such trustee, shall mean the Related Bond Issuer.

"Revenues" shall mean, for any period (i) in the case of any Person providing health care services, the sum of (a) gross patient service revenues less contractual allowances and provisions for uncollectible accounts, free care and discounted care, plus (b) other operating revenues, plus (c) nonoperating revenues (other than income derived from the sale of assets not in the ordinary course of business or any gain or loss from the extinguishment of debt or other extraordinary item), all as determined in accordance with generally accepted accounting principles; and (ii) in the case of any other Person, gross revenues less sale discounts and sale returns and allowances, as determined in accordance with generally accepted accounting principles, but excluding in any event (a) any gains or losses on the sale or other disposition of investments or fixed or capital assets not in the ordinary course or (b) earnings resulting from any reappraisal, revaluation or write-up of assets; provided, however, that, if such calculation is being made with respect to the Obligated Group, such calculation shall be made in such a manner so as to exclude any revenues attributable to transactions between any member of the Obligated Group and any other member of the Obligated Group.

11

PR-BINDER-01-00017

"Second Supplemental Indenture" shall mean the Second Supplemental Indenture dated as of February 1, 1988 between Allegheny Health, Education and Research Corporation and the Trustee, supplementing, amending and restating the Original Master Indenture.

"Short-Term Indebtedness" shall mean all Indebtedness for money borrowed with an original term, or renewable at the option of the borrower for a period from the date originally incurred, of one year or less.

"Supplemental Indenture" shall mean, prior to the Effective Date, an indenture supplemental both to the Original Master Indenture and to this Indenture and, after the Effective Date, an indenture supplemental to, and authorized and executed pursuant to the terms of, this Indenture for the purpose, among others, of creating a particular series of Notes or a particular Guaranty issued hereunder.

"Tax-Exempt Organization" shall mean a person organized under the laws of the United States of America or any state thereof which is an organization described in Section 501(c)(3) and exempt from federal income taxes under Section 501(a) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of federal income tax laws from time to time in effect.

"Tender Date" shall mean (i) any date on which an owner of Optional Tender Indebtedness may elect to have such Optional Tender Indebtedness paid, purchased or redeemed by or on behalf of the underlying obligor prior to its stated maturity date or (ii) any date on which Optional Tender Indebtedness is required to be paid, purchased or repurchased from the owner by or on behalf of the underlying obligor (other than at the option of the owner) prior to its stated maturity date, other than pursuant to any mandatory sinking fund or other similar fund or due to acceleration.

"Total Fund Balance" shall mean the unrestricted fund balance or a similar designation of an amount equal to total unrestricted assets less total unrestricted liabilities.

"Trustee" shall mean PNC Bank and its successors in the trust created hereunder.

"United States Government Obligations" mean direct obligations of, or obligations the principal of and interest on which are fully guaranteed by, the United States of America and (i) evidences of a direct ownership interest in future interest or principal payments on obligations issued or guaranteed by the United States of America, which obligations are held in a custody account by a custodian pursuant to the terms of a custody agreement, and (ii) obligations issued by any state of the United States of America or any political subdivision, public instrumentality or public

12