4282C:1592/008

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01.   Existence.................................   18
Section 5.02.   Tax-Exempt Organization ..................   19
Section 5.03.   Power, Authorization and No Conflicts.....   19
Section 5.04.   Governmental and Other Approvals..........   19
Section 5.05.   Validity and Binding Effect...............   19
Section 5.06.   No Litigation.............................   19
Section 5.07.   No Violations.............................   19
Section 5.08.   Compliance................................   20
Section 5.09.   No Liens..................................   20
Section 5.10.   Third Party Reimbursement.................   20
Section 5.11.   Financial Information.....................   20
Section 5.12.   ERISA.....................................   21
Section 5.13.   Absence of Events of Default Under
                Master Indenture..........................   21
Section 5.14.   Insurance ................................   21
Section 5.15.   Incorporation of Representations
                and Warranties by Reference ..........   21

# ARTICLE VI

## GENERAL COVENANTS

Section 6.01.   Maintenance of Existence; Mergers.........   22
Section 6.02.   Compliance with Governmental Rules, Etc. .   22
Section 6.03.   Maintenance of Insurance..................   22
Section 6.04.   Compliance with Related Documents
                and Other Contracts.......................   22
Section 6.05.   Visitation Rights.........................   23
Section 6.06.   Keeping of Books..........................   23
Section 6.07.   Maintenance of Properties.................   23
Section 6.08.   Reporting Requirements....................   23
Section 6.09.   Satisfaction of Series B Note ............   26
Section 6.10.   Amendments to Bond Documents or
                Master Indenture..........................   26
Section 6.11.   Financial Covenants.......................   26
Section 6.12.   ERISA.....................................   27
Section 6.13.   Preservation of Tax-Exempt Status.........   27
Section 6.14.   Information to be Furnished to
                the Bank..................................   27
Section 6.15.   Maintenance of Reimbursement
                Eligibility...............................   28
Section 6.16.   Further Assurances........................   28
Section 6.17.   Appointment of Remarketing Agent..........   28
Section 6.18.   Payment of Taxes; Removal of Liens .......   28

PNC18948

ii.

AH- 13938

4282c::592/008

## ARTICLE VII

## DEFAULTS AND REMEDIES

Section 7.01.   Defaults.................................   29
Section 7.02.   Remedies.................................   32
Section 7.03.   Waivers; Consents.......................   32
Section 7.04.   No Waivers; Remedies Cumulative..........   32
Section 7.05.   Set-Off.................................   32

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01.   Notices.................................   33
Section 8.02.   Successors and Assigns...................   33
Section 8.03.   Survival ...............................   34
Section 8.04.   Counterparts............................   34
Section 8.05.   Costs, Expenses and Taxes...............   34
Section 8.06.   Amendments..............................   34
Section 8.07.   Severability; Interest Limitation........   34
Section 8.08.   Complete Agreement......................   35
Section 8.09.   Consent to Jurisdiction; Venue;
                  Waiver of Jury Trial...................   35
Section 8.10.   Governing Law...........................   36
Section 8.11.   Participation...........................   36
Section 8.12.   Headings................................   37


EXECUTION                                                 37

EXHIBIT A - Form of Letter of Credit ...................   A-1
EXHIBIT B - Form of Opinion of Counsel to Corporation....   B-1

PNC18949

iii.

AH- 13939

4282c:1592/008

## LETTER OF CREDIT, REIMBURSEMENT AND SECURITY AGREEMENT

THIS AGREEMENT made as of the February 1, 1988 between ALLEGHENY HEALTH, EDUCATION AND RESEARCH CORPORATION (the "Corporation"), a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania and, PITTSBURGH NATIONAL BANK (the "Bank"), a national banking association.

### W I T N E S S E T H

A.  Allegheny County Hospital Development Authority (the "Issuer") proposes to issue its Adjustable Convertible Extendable Securities, Hospital Revenue Bonds (Allegheny Health Education and Research Corporation) Series 1988A through Series 1988D in the aggregate principal amount of $60,000,000 (the "Bonds") under a Trust Indenture dated as of February 1, 1988 (the "Indenture") between the Issuer and Mellon Bank, N.A., as Trustee (including any successor trustee, the "Trustee").

B.  In order to facilitate the issuance and sale of the Bonds and to enhance the marketability of the Bonds and thereby achieve interest cost savings and other savings, the Bank has agreed to issue its irrevocable Letter of Credit (together with any substitute letter of credit issued pursuant to the terms hereof, the "Letter of Credit") to the Trustee and the Tender Agent for the account of the Corporation authorizing the Trustee or the Tender Agent to make one or more draws on the Bank up to an aggregate of $61,208,220 (as reduced and reinstated from time to time in accordance with the provisions hereof and of the Letter of Credit (the "Letter of Credit Amount"), of which (i) $60,000,000 (the "Principal Component") shall be in respect of principal of the Bonds and (ii) $1,208,220 (the "Interest Component") shall be in respect of interest accrued on the Bonds.  The purpose of the Letter of Credit is to provide funds for the payment of the principal and purchase price of and interest on the Bonds to the extent other funds are not available therefor in accordance with the provisions of the Indenture.

C.  The Bank is willing to issue the Letter of Credit upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the undertakings herein set forth, and intending to be legally bound, the Corporation and the Bank hereby agree as follows:

PNC18950

AH- 13940

4282C:1592/008

## ARTICLE I

## DEFINITIONS

Section 1.01.  Definitions.  In this Agreement (except as otherwise expressly provided for or unless the context otherwise requires), defined terms may be used in the singular or the plural, the use of any gender includes all other genders and the following terms have the following meanings:

"Bank Documents" means this Agreement, the Letter of Credit, the Pledge Agreement, the Series B Note and any other document or instrument executed and delivered by the Corporation and the Bank in connection with the transactions contemplated herein.

"Bond Documents" means the Bonds, the Indenture, the Lease, the Sublease, the Remarketing Agreement, the Purchase Contract and any other agreements or instruments relating thereto.

"Bonds" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Business Day" means any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in Pittsburgh, Pennsylvania, the State of New York or in any other city where the principal corporate trust office of the Trustee or Tender Agent or the principal office of the Bank is located are required or authorized by law (including executive order) to be closed or on which the principal corporate trust office of the Trustee or the principal office of the Bank is closed for a reason not related to financial condition, (iii) a day on which The New York Stock Exchange is closed, or (iv) a day on which the Remarketing Agent is closed.

"Capitalization" shall mean the principal amount of all Long-Term Indebtedness outstanding plus the equity accounts of the Obligated Group (i.e., unrestricted fund balances including any shareholder equity determined in accordance with GAAP).  In the case of Long-Term Indebtedness issued or incurred at a discount, such Long-Term Indebtedness shall be valued at the accreted value thereof.

"Code" means the Internal Revenue Code of 1986 and the rules and regulations thereunder, including any amendments and successor provisions thereto.

"Contribution Agreements" shall have the meaning ascribed to such term in the Master Indenture.

PNC18951

-2-

AH- 13941

€ 2 8 2 c : 1 5 9 2 / 0 0 8

"Conversion Draft" shall have the meaning ascribed to such term in the Letter of Credit.

"Custodian" means the Trustee in its capacity as Custodian under the Pledge Agreement.

"Daily Mode" shall have the meaning ascribed to such term in the Indenture.

"Date of Issuance" shall mean the date on which the Letter of Credit is issued.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and, unless the context otherwise requires, the rules and regulations promulgated thereunder from time to time.

"Event of Default" shall have the meaning ascribed to such term in Section 7.01.

"Facilities" means all Property which is property, plant and equipment under GAAP.

"Final Draft" shall have the meaning ascribed to such term in the Letter of Credit.

"Fiscal Year" means the annual accounting year of the Corporation, which currently begins on July 1 in each calendar year.

"Flexible Mode" shall have the meaning ascribed to such term in the Indenture.

"GAAP" means generally accepted accounting principles.

"Governmental Person" means the government of the United States or the government of any state or locality therein, any political subdivision or any governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body or entity, or other regulatory bureau, authority, body or entity of the United States or any state or locality therein, including the Federal Deposit Insurance Corporation, the Comptroller of the Currency or the Board of Governors of the Federal Reserve System, any central bank or any comparable authority.

"Governmental Rule" means any law, rule, regulation, ordinance, order, judgment or decision of any Governmental Person.

"Income Available for Debt Service" shall have the meaning ascribed to such term in the Restated Master Indenture.

PNC18952

AH- 13942

4282C:1592/008

"Indebtedness" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Indenture" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Interest Component" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Interest Draft" shall have the meaning ascribed to such term in the Letter of Credit.

"Interest Mode" shall have the meaning ascribed to such term in the Indenture.

"Issuer" means the Allegheny County Hospital Development Authority.

"Lease" shall mean the Lease dated of even date herewith between the Corporation, as lessor, and the Issuer, as lessee, as the same may be amended or supplemented from time to time.

"Leased Premises" shall mean the real estate described in Exhibit A of the Lease.

"Letter of Credit Amount" shall have the meaning ascribed to such term in the Letter of Credit.

"Lien" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Long-Term Indebtedness" shall have the meaning ascribed to such term in the Restated Master Indenture and shall include payments being made with respect to any Guaranty and Commitment Indebtedness (as that term is defined in the Restated Master Indenture).

"Master Indenture" shall mean the Master Trust Indenture dated as of December 1, 1983 between the Corporation and Pittsburgh National Bank, as Trustee, as amended and supplemented by a First Supplemental Master Trust Indenture dated as of December 1, 1983, a Second Supplemental Master Indenture dated as of February 1, 1988, and the Third Supplemental Master Indenture dated as of February 1, 1988 and as the same may be amended or supplemented from time to time.

"Multi-employer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA.

PNC18953

-4-

AH- 13943

4282C:1542/008

"Obligated Affiliate" shall have the meaning ascribed to such term and to the term "Restricted Affiliate" in the Master Indenture and, in all events, shall include the Corporation.

"Obligated Group" means the Corporation, Allegheny General Hospital, Allegheny Singer Research Institute and any other persons who from time to time become members of the Restricted Group or the Obligated Group, as appropriate, under the terms of the Master Indenture.

"Obligated Group Representative" shall have the meaning ascribed to such term in the Master Indenture.

"Outstanding" when applied to the Bonds shall have the meaning ascribed to such term in the Indenture.

"Partial Principal Draft" shall have the meaning ascribed to such term in the Letter of Credit.

"Participating Banks" shall have the meaning ascribed to such term in Section 8.12.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Liens" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Person" means any natural person, corporation, partnership, association, joint-stock company, trust, unincorporated organization, joint venture, Governmental Person, public body or other legal entity.

"Plan" means any employee benefit plan (other than a Multi-employer Plan) maintained for employees and covered by Title IV of ERISA.

"Pledge Agreement" means the Pledge and Security Agreement dated of even date herewith between the Corporation and the Bank.

"Pledged Bonds" or "Bank Bonds" shall have the meaning ascribed to the term Pledged Bonds in the Pledge Agreement.

"Prime Rate" means the fluctuating rate of interest per annum (computed on the basis of a year of 365 or 366 days, as the case may be) publicly announced by the Bank from time to time as the prime rate of the Bank, adjusted automatically as of the date of an announcement of any change in such prime rate. The prime rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers and

PNC18954

-5-

AH- 13944

neither is tied to any external rate of interest or index, nor necessarily reflects the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

"Principal Component" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Principal Draft" shall have the meaning ascribed to such term in the Letter of Credit.

"Projected Long-Term Debt Service Requirement" shall mean the aggregate of all amounts actually payable to holders (or to any trustee or paying agent for such holders) of Long-Term Indebtedness during the succeeding twelve-month period.  To the extent that the interest on such Long-Term Indebtedness is calculated at a varying rate per annum, a formula rate or a fixed rate per annum based on a varying index, then the provisions of Section 5.07(e) of the Restated Master Indenture shall be used for computing such interest during the period in question.

"Property" means any and all right, title and interest in and to any and all property whether real or personal, tangible or intangible and wherever situated.

"Purchase Contract" means the Contract of Purchase dated February 22, 1988 between The First Boston Corporation and the Issuer and approved by the Corporation.

"Purchase Date", when used with respect to any Bond, means the date upon which the Tender Agent, as defined in the Indenture, is obligated to effect the purchase of such Bond on the terms described in Article X of the Indenture.

"Purchase Price" of any Bond required to be purchased pursuant to the terms of Article X of the Indenture means an amount equal to 100% of the principal amount of such Bond plus interest, if any, accruing thereon from the most recent Interest Payment Date as defined in the Indenture, but not including the Purchase Date.

"Related Documents" means the Bank Documents, the Bond Documents, the Contribution Agreements, the Master Indenture and any notes issued pursuant thereto.

"Remarketing Agent" means the placement or remarketing agent designated as the Remarketing Agent for purposes of the Indenture.

"Remarketing Agreement" shall have the meaning ascribed to such term in the Indenture.

AH- 13945

4282C11592/008

termination of the Letter of Credit, the Company shall pay to the Bank a Letter of Credit commitment fee computed at the rate of eighteen one hundredths percent (.18%) per annum on the average daily Letter of Credit Amount during the preceding quarterly period (or portion thereof in the case of the termination of the Letter of Credit on a day other than a March 15, June 15, September 15, or December 15); provided that, for purposes of computing such average daily Letter of Credit Amount, the Letter of Credit Amount shall be treated as having been reinstated with respect to each drawing with an Interest Draft theretofore honored by the Bank in respect of which the Bank may be required to reinstate the Letter of Credit pursuant to the terms thereof but shall not be treated as having been reinstated with respect to each drawing with a Tender Draft theretofore honored by the Bank in respect of which the Letter of Credit may be required to be, but has not been, reinstated pursuant to the terms thereof. Computations of Letter of Credit commitment fees under this Section shall be for the actual number of days in the applicable period, based on a 365 or 366-day year, as the case may be.

(c)      The Corporation shall pay to the Bank all reasonable transaction charges that the Bank may make for drawings under the Letter of Credit. Such transaction charges shall be payable quarterly at the same times as the fees described in Section 2.02(b) hereof are payable, upon submission to the Corporation by the Bank of the Bank's bill therefor. In addition, the Corporation shall pay to the Bank on demand any and all reasonable charges and expenses which the Bank may pay or incur relative to the Letter of Credit. The Corporation shall pay to the Bank upon each transfer of the Letter of Credit in accordance with its terms a transfer fee, together with any and all reasonable costs and expenses of the Bank incurred in connection with such transfer. Any fees or charges imposed pursuant to this Section 2.02(c) shall not exceed those customarily charged by the Bank ($50 being the charge presently made by the Bank for drawings under letters of credit).

(d)      If, after the date of this Reimbursement Agreement, the adoption of any applicable Governmental Rule, any change in any applicable Governmental Rule, any change in the interpretation or administration of any applicable Governmental Rule by any Governmental Person charged with its interpretation or administration or compliance by the Bank with any request or directive (whether or not having the force of law) of any such Governmental Person (including, with respect to the Letter of Credit, any Governmental Rule regarding capital adequacy):

(1)    shall subject the Bank to any tax, duty or other charge with respect to any amount drawn on

PNC18958

AH-13949

4282c::1592/008

the Letter of Credit, the Letter of Credit, the Bank
Bonds, the collateral securing the Letter of Credit or
its obligation to make any payment under the Letter of
Credit or to maintain the Letter of Credit or shall
change the basis of taxation of payments to the Bank
of any amounts due under this Agreement, any amount
drawn on the Letter of Credit, the Letter of Credit,
the Bank Bonds, the collateral securing the Letter of
Credit or such obligation (except for changes in the
rate of tax on the overall net income of the Bank
imposed by the income tax laws of the United States or
the jurisdiction in which the Bank's principal office
is located); or

(2)  shall impose, modify or deem applicable
any reserve (including, without limitation, any
imposed by the Board of Governors of the Federal
Reserve System), special deposit or similar
requirement against assets of, deposits with or for
the account of, credit extended by, or letters of
credit issued or maintained by, or collateral subject
to a lien in favor of the Bank, shall impose any
capital adequacy requirement with respect to the
Letter of Credit or shall impose on the Bank any other
condition affecting any amount drawn on the Letter of
Credit, the Letter of Credit, the Bank
Bonds, the collateral securing the Letter of Credit or
its obligation to make any payment under the Letter of
Credit or to maintain the Letter of Credit;

and the result of any of the foregoing (without regard to
whether the Bank shall have participated portions of its
obligations under the Letter of Credit and the obligations of
the Corporation under the Bank Bonds, this Agreement and any
Related Documents) is to increase the cost to or to impose a
cost on the Bank of making or maintaining any amounts payable
hereunder, of maintaining the Letter of Credit or of having a
lien upon the Bank Bonds, the collateral securing the Letter of
Credit, or to reduce the amount of any sum received or
receivable by the Bank under this Agreement, or (in the case of
any such capital adequacy requirement) to reduce the rate of
return on the Bank's capital as a consequence of its obligations
under this Agreement and the Letter of Credit to a level below
that which the Bank would have received but for the imposition
of such requirement (taking into consideration the Bank's
capital adequacy policies), then:

(i)  The Bank shall promptly deliver to the
Corporation a certificate stating the change which
has occurred or the reserve requirements or other
conditions which have been imposed on the Bank or
the request, direction or requirement with which

PNC18959

-11-

AH- 13950

it has complied, together with the date thereof; and

(ii)   the Corporation agrees to pay to the Bank within 30 days of the written request of the Bank and thereafter during the term of this Agreement, which request shall state the amount of increased cost, reduction or payment and the way in which such amount has been calculated, such amount or amounts as will compensate the Bank for the additional cost, reduction or payment incurred by the Bank; if such written request is given within 90 days of the event which results in such increased cost, reduction or payment, such amounts will be calculated from the date of such event; otherwise, such amounts will be calculated as of the date on which the Bank makes the aforesaid written request.  The written request of the Bank as to the additional amounts payable pursuant to this paragraph delivered to the Corporation shall be conclusive evidence of the amount thereof in the absence of manifest error.  The protection of the preceding sentence shall be available to the Bank regardless of any possible contention of invalidity or inapplicability of the law, regulation or condition which has been imposed.

(e)   Whenever any payment pursuant to this Article shall be due on any day that is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day.  Except as otherwise provided in Section 2.02(a), all payments to the Bank under this Agreement (including, without limitation, all payments becoming due under Sections 2.02 and 8.05) shall be accompanied by interest thereon, from the date such payments become due (whether or not a Business Day) until they are paid in full, at a fluctuating rate per annum equal to two percent (2%) per annum above the Prime Rate. All payments by or on behalf of the Corporation to the Bank under this Agreement shall be made in lawful currency of the United States at the Bank's office at Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania 15265, Attention:  Manager, Health Care Group, or at such other address and to the attention of such other person as the Bank may stipulate by written notice to the Corporation, or by a wire transfer in immediately available funds from the Corporation or on behalf of the Corporation to the Bank in accordance with written wire instructions given to the Corporation by the Bank.  All payments hereunder shall be made in immediately available funds at such office of the Bank or other address as the Bank may so stipulate by written notice to the Corporation.

PNC18960

-12-

AH- 13951

4282C:1592/008

(f) The Bank shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Corporation and the amounts payable and paid from time to time hereunder. In any legal action or proceeding in respect of this Agreement, the entries made in such account or accounts shall be presumptive evidence of the existence and amounts of the obligations of the Corporation therein recorded. The failure to record any such amount shall not, however, limit or otherwise affect the obligations of the Corporation hereunder to repay all amounts owed hereunder together with all interest accrued thereon as provided herein.

Section 2.03.    Transfer of Letter of Credit; Reduction of Letter of Credit Amount; Reinstatement.

(a)  The Letter of Credit may be transferred in accordance with the provisions set forth in the Letter of Credit.

(b)  The Letter of Credit Amount and the respective Principal Component and Interest Component thereof shall be automatically reduced as specified in the Letter of Credit.  With respect to any reductions of the Letter of Credit Amount pursuant to the terms of the Letter of Credit as a result of Bonds ceasing to be Outstanding, the Bank shall have the right, at its option, to require the Trustee to surrender promptly the outstanding Letter of Credit to the Bank and to accept in substitution therefor a substitute letter of credit in the form of Exhibit A attached hereto, dated the date of such substitution, for an amount equal to the Letter of Credit Amount as so reduced, but otherwise having terms identical to the then outstanding Letter of Credit.

(c)  In the event of a drawing under the Letter of Credit with an Interest Draft and/or a Tender Draft, the Interest Component and the Principal Component, respectively, of the Letter of Credit Amount shall, as provided in the Letter of Credit and subject to the conditions therein set forth, be automatically reinstated by an amount equal to the amount of such drawing.

(d)  The consent of the Bank shall be required in the event of a drawing with a Partial Principal Draft or a Final Draft, to the extent that either involves an optional redemption of the Bonds; provided, however, that the Bank will consent to such optional redemption if the Corporation demonstrates to the reasonable satisfaction of the Bank that sufficient moneys will be available to reimburse the Bank for the amount to be drawn on the Letter of Credit in connection with such optional redemption.

Section 2.04.   Obligations Absolute.  The obligations of the Corporation under this Article shall be absolute, unconditional and irrevocable, and shall be performed strictly

PNC18961

AH-13952

4282C:1592/008

in accordance with the terms of this Agreement, under all circumstances whatsoever, including without limitation the following circumstances (i) any lack of validity or enforceability of this Agreement, the Related Documents or any other agreement or document relating thereto; (ii) any amendment or waiver of or any consent to or departure from this Agreement, the Related Documents or any document relating thereto; (iii) the existence of any claim, set-off, defense or other right which the Corporation may have at any time against the Trustee (or any persons or entities for whom the Trustee may be acting), the Bank or any other person or entity, whether in connection with this Agreement, the transactions described herein or any unrelated transaction, or (iv) any of the circumstances contemplated in clauses (i) through (vii), inclusive, of Section 2.06.

Section 2.05.  Indemnification.  To the extent permitted by applicable law, the Corporation hereby agrees to indemnify and hold harmless the Bank (and its directors, officers, employees and agents) from and against any and all claims, damages, losses, liabilities, costs or expenses (including reasonable attorneys' fees) whatsoever that the Bank may incur (or which may be claimed against the Bank by any person or entity whatsoever) by reason of or in connection with (a) the issuance or a transfer of, or payment or failure to pay under, the Letter of Credit, (b) any breach by the Corporation of any representation, warranty, covenant, term or condition in, or the occurrence of any default under, this Agreement or the Related Documents, including all reasonable fees or expenses resulting from the settlement or defense of any claims or liabilities arising as a result of any such breach or default, (c) by reason of any inaccuracy or alleged inaccuracy in any material respect, or any untrue or alleged untrue statement of any material fact, contained in the offering memorandum or similar document for the Bonds or any amendment or supplement thereto, or by reason of the omission or alleged omission to state therein a material fact necessary to make statements, in light of the circumstances under which they were made, not misleading, and (d) involvement of the Bank in any suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the Bank's issuance of the Letter of Credit, its entering into this Agreement or any other event or transaction contemplated by any of the foregoing; provided the Corporation shall not be required to indemnify the Bank for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by (i) the willful misconduct or gross negligence of the Bank or (ii) the Bank's willful failure to pay under the Letter of Credit after the presentation to it by the Trustee or the Tender Agent of a sight draft and certificate strictly complying with the terms and conditions of the Letter of Credit, unless the Bank in good

PNC18962

-14-

AH-13953

: 2 8 2 c : : 5 9 2 / 0 0 8

faith and upon advice of counsel believes that it is prohibited
by law or other legal authority from making such payment.

Section 2.06.  Liability of Bank.  As between the
Corporation and the Bank, the Corporation assumes all risks of
the acts or omissions of the Trustee, the Remarketing Agent, the
Tender Agent or any of their agents with respect to each's use
of the Letter of Credit.  Neither the Bank nor any of its
officers or directors shall be liable or responsible for (i) the
use which may be made of the Letter of Credit or for any acts or
omissions of the Trustee, the Remarketing Agent, the Tender
Agent or any of their agents in connection therewith; (ii) the
form, validity, sufficiency, accuracy or genuineness of any
documents (including without limitation any documents presented
under the Letter of Credit), or of any statement therein or
endorsement thereon, even if any such documents, statements or
endorsements should in fact prove to be in any or all respects
invalid, insufficient, fraudulent, forged, inaccurate or untrue;
(iii) the payment by the Bank against presentation of documents
which do not comply with the terms of the Letter of Credit
including failure of any documents to bear any reference or
adequate reference to the Letter of Credit; or any other failure
by the Trustee, the Tender Agent or any of their agents to
comply fully with conditions required in order to effect a
drawing under the Letter of Credit; (iv) the validity or
sufficiency of any instrument transferring or assigning or
purporting to transfer or assign the Letter of Credit or the
rights or benefits thereunder or proceeds thereof, in whole or
in part, which may prove to be invalid or ineffective for any
reason; (v) errors, omissions, interruptions or delays in
transmission or delivery of any messages by mail, cable,
telegraph, telex, telephone or otherwise; (vi) any loss or delay
in the transmission or otherwise of any document or draft
required in order to make a drawing under the Letter of Credit;
or (vii) any other circumstances whatsoever in making or failing
to make payment under the Letter of Credit; except only that the
Corporation shall have a claim against the Bank, and the Bank
shall be liable to the Corporation, to the extent, but only to
the extent, of any direct, as opposed to consequential, damages
suffered by the Corporation which the Corporation proves were
caused by (x) the Bank's willful misconduct or gross negligence
or (y) the Bank's willful failure to pay under the Letter of
Credit after the presentation to it by the Trustee or the Tender
Agent of a draft and certificate strictly complying with the
terms and conditions of the Letter of Credit, unless the Bank in
good faith and upon advice of counsel believes that it is
prohibited by law or other legal authority from making such
payment.  In furtherance and not in limitation of the foregoing,
the Bank may accept documents that appear on their face to be in
order, without responsibility for further investigation,
regardless of any notice or information to the contrary;
provided that if the Bank shall receive written notification

PNC18963

AH- 13954

4282C:1592/008

from both the Trustee or the Tender Agent and the Corporation
that documents conforming to the terms of the Letter of Credit
to be presented to the Bank are not to be honored, the Bank
agrees that it will not honor such documents.

ARTICLE III

SECURITY

Section 3.01.  Subrogation.  The Corporation and the
Bank intend that, in the event of one or more draws under the
Letter of Credit and the application thereof to the payment of
Bonds, the Bank will be subrogated pro tanto to the rights of
the Trustee and the holders of such Bonds in and to all funds
and security held by the Trustee under the Bond Documents for
the payment of the principal of and interest on such Bonds,
including, without limitation, all construction funds, revenue
funds, debt service funds, reserve funds, redemption funds and
other funds and securities and other instruments comprising
investments thereof but excluding the Rebate Fund (and earnings
on investments of funds held under the Bond Documents to the
extent such earnings may be subject to rebate under the
applicable provisions of the Internal Revenue Code).

Section 3.02.  Pledge of Rights to Certain Funds and
Investments.  To secure the Corporation's obligations to the
Bank under this Agreement, the Corporation hereby pledges,
assigns and grants a security interest to the Bank in all of the
Corporation's right, title and interest in and to (but not its
duties or obligations with respect to) all funds and investments
thereof now or hereafter held by the Trustee under the Bond
Documents as security for the payment of the Bonds, including
without limitation any and all construction funds, revenue
funds, debt service funds, reserve funds, redemption funds and
other funds (but excluding the Rebate Fund and earnings on
investment of funds held under the Bond Documents to the extent
such earnings may be subject to rebate under the applicable
provisions of the Internal Revenue Code) and securities and
other instruments comprising investments thereof and interest
and other income derived therefrom held as security for the
payment of the Bonds.  The Bank's rights under this Section are
in addition to, and not in lieu of, its rights described in
Section 3.01 and are subject to the prior rights of the Trustee
and the holders of the Bonds.

Section 3.03.  Financing Statements.  The Corporation
will execute such financing statements and continuation
statements under the Uniform Commercial Code or other applicable
law as the Bank may specify in connection with the Bank's

PNC18964

AH-13955

4282C:1592/008

security interests under this Agreement and will pay the costs of filing the same in such public offices as the Bank may designate.

Section 3.04.  Pledge Agreement.  As security for payment of the obligations of the Corporation hereunder, the Corporation agrees to enter into the Pledge Agreement with respect to Bonds which have not been remarketed.

ARTICLE IV

CONDITIONS PRECEDENT

Section 4.01.  Documentation.  As conditions precedent to the Bank's issuance of the Letter of Credit, the Bank shall have received all of the following in form and substance satisfactory to the Bank:

(a)  An executed copy of this Agreement, the Series B Note and the Pledge Agreement and true and correct copies of executed copies of the other Related Documents and all documentation delivered in connection therewith;

(b)  Certified copies of the Articles of Incorporation and the Bylaws of each Obligated Affiliate and authorizing resolutions of the Corporation;

(c)  A certificate signed by the chief executive officer and the chief financial officer of the Corporation as of the date of execution and delivery hereof stating that (i) the representations and warranties contained in Article V are true and correct and (ii) no Event of Default has occurred and is continuing, and no event has occurred and is continuing which, with the giving of notice or lapse of time or both, would constitute an Event of Default;

(d)  An opinion (or opinions) of counsel to the Corporation covering the matters set forth in Exhibit B hereto and covering such additional matters relating to the transactions contemplated hereby or by the other Related Documents as the Bank may reasonably request and an opinion of counsel to the other Obligated Affiliates substantially in the same form, with such variations, omissions and insertions as approved by the Bank and its counsel;

(e)  receipt by the Bank of a copy of each opinion, certificate and other document (in each case addressed to it if so requested by the Bank) required to be delivered under the Purchase Contract (as in effect immediately after the signing thereof and without regard to any waiver thereunder or

PNC18965

-17-

AH-13956

4282C::1592/008

amendment thereto) to the Underwriters including documentation confirming the due issuance and delivery of the Bonds; and

(f)  Audited consolidated financial statements of the Obligated Group for the Fiscal Year ended June 30, 1987 and unaudited consolidated financial statements of the Obligated Group for the six months ended December 31, 1987 which include the information set forth in Section 5.11;

(g)  Evidence of the insurance required under Section 6.03;

(h)  Certificates executed by the Obligated Affiliates other than the Corporation acknowledging that they are Restricted Affiliates under the Master Indenture and, assuming they do not exercise their respective rights under Section 5.14 of the Master Indenture, will be Obligated Affiliates under the Restated Master Indenture and reconfirming that their obligations under the Contribution Agreements are and remain in full force and effect and they derive benefits in such capacity; and

(i)  receipt by the Bank of all other documents and opinions it may reasonably request relating to the existence of the Corporation, the authority of and the validity, binding effect and enforceability of this Agreement and each other Related Document and any other matters relevant hereto or thereto, all in form and substance satisfactory to the Bank.

Section 4.02.  _Issuance of Bonds_.  On the date of execution and delivery hereof, all conditions precedent to the issuance and sale of the Bonds shall have been satisfied and the Bonds shall have been duly issued and delivered.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

The Corporation represents and warrants as follows:

Section 5.01.  _Existence_.  Each Obligated Affiliate is a Pennsylvania nonprofit corporation, duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.  Each Obligated Affiliate has all necessary material permits, licenses, certifications and qualifications to conduct its business as it is presently being conducted.

PNC18966

AH- 13957

4282C:1592/008

Section 5.02.  Tax-exempt Organization.  Each Obligated
Affiliate is an organization described in Section 501(c)(3) of
the Code, is exempt from federal income tax under Section
501(a) of the Code and is not a "private foundation" as defined
in Section 509(a) of the Code.

Section 5.03.  Power, Authorization and No Conflicts.
The execution, delivery and performance by the Corporation of
this Agreement and the Related Documents are within its powers
and by the other Obligated Affiliates of their respective
Contribution Agreements are within their respective powers,
have been duly authorized by all necessary action of the Boards
of Trustees of the Obligated Affiliates and do not contravene
the Articles or Certificate of Incorporation or the Bylaws of
the Obligated Affiliates or any Governmental Rule applicable to
such Obligated Affiliate or any agreement or contractual
restriction binding on or affecting such Obligated Affiliate or
any of its properties.

Section 5.04.  Governmental and Other Approvals.  No
authorization, approval or other action by, and no notice to or
filing with, any Governmental Person is required for the due
execution, delivery and performance by the Corporation or any
other Obligated Affiliate of this Agreement or any Related
Document, except such as have been obtained (including
compliance with certificate of need requirements).

Section 5.05.  Validity and Binding Effect.  This
Agreement and the Related Documents are the legal, valid and
binding obligations of the Corporation and, to the extent
applicable, any other Obligated Affiliate enforceable against
the Corporation or such Obligated Affiliate in accordance with
their terms, subject to the application by a court of general
principles of equity and to the effect of any applicable
bankruptcy, insolvency, reorganization, moratorium or similar
law affecting creditors' rights generally.

Section 5.06.  No Litigation.  Except as disclosed to
the Bank in writing prior to the date of execution and delivery
hereof, there is no pending action or proceeding before any
Governmental Person or arbitrator against or directly involving
an Obligated Affiliate and, to the best of the Corporation's
knowledge, there is no threatened action or proceeding
affecting any Obligated Affiliate before any Governmental
Person or arbitrator which, in any case, might materially and
adversely affect its financial condition or operations or the
validity or enforceability of this Agreement or any Related
Document.

Section 5.07.  No Violations.  No Obligated Affiliate
is in any material way in breach of or in default under (a) any
applicable law or administrative regulation of the Commonwealth

PNC18967

AH-13 50

4282C:1592/008

of Pennsylvania or the United States or any applicable judgment
or decree or (b) any loan agreement, indenture, lease,
sublease, bond, note, resolution, agreement or other instrument
to which it is a party or otherwise subject, and no event has
occurred and is continuing which, with the passage of time or
the giving of notice or both, would constitute an event of
default under any such instrument except for violations, if
any, which the Corporation has disclosed to the Bank in writing
and is proceeding in good faith to remove or correct.  The
Corporation has no knowledge of any violation, nor is there any
notice or other record of any violation, of any Governmental
Rule or restrictive covenant or other restriction applicable to
the Facilities of each Obligated Affiliate, except for
violations, if any, which the Corporation has disclosed to the
Bank in writing and is proceeding in good faith to remove or
correct.

        Section 5.08.  _Compliance_.  The operation of the
Facilities of each Obligated Affiliate does and shall, in all
material respects, comply with, and are lawful, permitted and
conforming uses under, all material applicable Governmental
Rules.

        Section 5.09.  _No Liens_.  There exist no Liens upon the
Facilities of each Obligated Affiliate other than Permitted
Liens.

        Section 5.10.  _Third Party Reimbursement_.

        (a)  Each Obligated Affiliate is duly authorized
and licensed and certified to operate its Facilities and
receive reimbursement therefor (to the extent reimbursement is
applicable and available) under the Governmental Rules of the
Commonwealth of Pennsylvania.

        (b)  No Obligated Affiliate has had or expects to
receive requests or assertions of claims for reimbursement or
repayment by such Obligated Affiliate of costs and/or payments
heretofore made by any third party payor which, if adversely
determined, would result in any material adverse change in the
condition, financial or otherwise, of such Obligated Affiliate.

        Section 5.11.  _Financial Information_.  The consolidated
balance sheet of the Obligated Affiliates as at June 30, 1987
and as at December 31, 1987 and the related consolidated
statements of revenues and expenses--general funds and changes
in fund balances and changes in financial position of such
Obligated Affiliates for the Fiscal Year and the six months
then ended, respectively, (a) have been prepared in accordance
with GAAP consistently applied, (b) with respect to the
information as at June 30, 1987, have been certified by Coopers
& Lybrand, Certified Public Accountants, (c) are true and

PNC18968

-20-

AH- 13959

4282C:1592/008

complete and present fairly the financial condition and results of operations of the Obligated Affiliates as of June 30, 1987 and as at December 31, 1987 for the period covered thereby, and (d) said balance sheet and the notes thereto accurately reflect all liabilities, including contingent liabilities, of each Obligated Affiliate as of the date thereof.

Section 5.12.  ERISA.  With respect to each Plan, each Obligated Affiliate is in material compliance with the applicable provisions of ERISA and the regulations and published interpretations thereunder.

Section 5.13.  Absence of Events of Default Under Master Indenture.  No event of default, as that term is defined in the Master Indenture, has occurred and is continuing nor has any event occurred which, with the giving of notice or lapse of time, or both, would constitute an event of default thereunder.

Section 5.14.  Insurance.  Each Obligated Affiliate currently maintains insurance which meets or exceeds the requirements of Section 6.03 and such insurance is of such type and in such amounts (or in excess of such amounts) as are customarily carried by, and insures against such risks as are customarily insured against by, health care facilities systems of like size and character to each Obligated Affiliate and its Facilities.  Any reserves maintained by any Obligated Affiliate with respect to its self insurance programs have been actuarily determined to provide reasonable reserves with respect to the risks involved.

Section 5.15.  Incorporation of Representations and Warranties by Reference.  The Corporation hereby makes to the Bank the same representations and warranties as are made by the Corporation and set forth in the other Related Documents, which representations and warranties, as well as the related defined terms contained therein, are hereby incorporated by reference with the same effect as if each and every such representation and warranty and defined term were set forth herein in its entirety.  No amendment to such representations and warranties or defined terms made pursuant thereto shall be effective to amend such representations and warranties and defined terms as incorporated by reference herein without the consent of the Bank.

PNC18969

-21-

AH- 13960

42826:1592/008

# ARTICLE VI

## GENERAL COVENANTS

So long as any amount is available under the Letter of Credit or any amount is due and owing to the Bank hereunder, the Corporation covenants that, except to the extent the Bank shall otherwise consent in writing, each of the following covenants shall be performed and complied with by the Corporation or party as indicated:

Section 6.01.  <u>Maintenance of Existence; Mergers</u>.  Each Obligated Affiliate will maintain its existence, rights, privileges and licenses and its right to do business in the Commonwealth of Pennsylvania, will not dissolve or otherwise dispose of all or substantially all of its assets and, unless permitted under the Master Indenture and if such action will not result in an Event of Default hereunder, will not consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it; to the extent a consolidation, merger or disposition of assets requires an instrument or opinion to be satisfactory to the trustee under the Master Indenture, it is agreed that such instrument or opinion also must be satisfactory to the Bank.

Section 6.02.  <u>Compliance with Governmental Rules, Etc</u>.  Each Obligated Affiliate will comply in all material respects with all applicable Governmental Rules the noncompliance with which could materially and adversely affect its operations or condition, except for any such Governmental Rules which such Obligated Affiliate is contesting in good faith by appropriate proceedings and the noncompliance with which during such contest would not materially and adversely affect the Obligated Affiliate's operations or condition if the result of such contest is adverse to such Obligated Affiliate.

Section 6.03.  <u>Maintenance of Insurance</u>.  Each Obligated Affiliate will maintain or cause to be maintained such insurance as is required under the Master Indenture and shall provide to Bank the same reports of the Insurance Consultant (as defined therein), Officer's Certificates (as defined therein) and any other information as is required to be provided to the trustee (and within the same time period as is required) thereunder.

Section 6.04.  <u>Compliance with Related Documents and Other Contracts</u>.  Each Obligated Affiliate will comply with all of its covenants and agreements under the Related Documents, as the same may hereafter be amended or supplemented from time to time, and comply with, or cause to be complied with, all material requirements and conditions of all contracts and

PNC18970

- 22 -

AH-13961

＃２８２Ｃ：：５９２／００８

insurance policies which relate to such Obligated Affiliate or its Facilities.

Section 6.05.  <u>Visitation Rights</u>.  Each Obligated Affiliate will, at any reasonable time and from time to time, permit the Bank or its agents or representatives to examine and make copies of and abstracts from the records except for confidential patient information, and books of account of, and visit the properties of such Obligated Affiliate and to discuss the affairs, finances and accounts of such Obligated Affiliate with the officers and accountants of such Obligated Affiliate.

Section 6.06.  <u>Keeping of Books</u>.  Each Obligated Affiliate will keep proper books of record and account, in which full and correct entries shall be made of financial transactions and the assets and operations of such Obligated Affiliate in accordance with GAAP.

Section 6.07.  <u>Maintenance of Properties</u>.  Each Obligated Affiliate will maintain and preserve all of its Property in good working order and condition, ordinary wear and tear excepted; not permit, commit or suffer any waste of any of its Property; not use or permit the use of any of its Facilities for any unlawful purpose or permit any nuisance to exist thereon; and not sell, lease, transfer or otherwise dispose of any substantial part of its Property, except in the ordinary course of its operations and except as permitted by the Restated Master Indenture.

Section 6.08.  <u>Reporting Requirements</u>.  The Corporation will furnish or cause to be furnished to the Bank the following:

(a)  as soon as available and in any event within 120 days after the end of each Fiscal Year a consolidated balance sheet of the Obligated Group as of the end of such Fiscal Year and the related consolidated statements of revenues and expenses and changes in fund balances and changes in financial position for the year then ended, setting forth in comparative form the corresponding figures for the immediately preceding Fiscal Year, which shall be prepared and audited by certified public accountants satisfactory to the Bank and certified as fairly presenting the combined financial position and the revenues and expenses and changes in fund balances and changes in financial position for, the Fiscal Year then ended, all in conformity with GAAP; together with a certificate of the chief financial officer of the Corporation (i) certifying that they fairly present the combined financial condition of the Obligated Group at the end of, and the results of operations of the Obligated Group for, such Fiscal Year, setting forth calculations in detail satisfactory to Bank demonstrating compliance with the provisions of Section 6.11(b) hereof, and (ii) stating that no Event of Default or event which, with the

PNC18971

AH-13962

4282C:1592/008

giving of notice or lapse of time or both, would constitute any
event of default, has occurred and is continuing or, if an
event of default or such event has occurred and is continuing,
a statement as to the nature thereof and the action which the
Obligated Group, proposes to take with respect thereto; stating
that such officer has reviewed the provisions of this Agreement
and the Related Documents and has made or caused to be made
under his supervision a review of the condition and operations
of the Obligated Affiliates during the period covered by such
financial statements for the purpose of determining whether or
not each Obligated Affiliate has complied with all of the
terms, provisions and conditions of this Agreement and the
Related Documents applicable to it, and to the best of his
knowledge each Obligated Affiliate has kept, observed,
performed and fulfilled each and every covenant, provision and
condition of this Agreement and the Related Documents on its
part to be performed and is not in default in the performance
or observance of any of the terms, covenants, provisions or
conditions hereof or thereof, or, if there is a default, such
certificate shall specify all such defaults, the nature and
status thereof and any remedial steps taken or proposed to
correct such default,

     (b)  as soon as available and in any event within
45 days after the end of the first three quarters of each
Fiscal Year, a consolidated balance sheet of the Obligated
Group as of the end of such quarter and the related
consolidated statements of revenues and expenses and changes in
fund balances and changes in financial position for the quarter
then ended, setting forth in comparative form the corresponding
figures for the corresponding date or period of the immediately
preceding Fiscal Year, all in reasonable detail and prepared in
accordance with GAAP, together with a certificate of the chief
financial officer of the Corporation (i) certifying that they
fairly present the combined financial condition of the
Obligated Group at the end of such quarter and the results of
the operations of the Obligated Group for such periods (subject
to normal year-end audit adjustments) and have been prepared in
accordance with GAAP, (ii) setting forth calculations in detail
satisfactory to Bank demonstrating compliance with the
provisions of Section 6.11(b) hereof, and (iii) stating that no
Event of Default, or event which, with the giving of notice or
lapse of time or both, would constitute any event of default,
has occurred and is continuing or, if an Event of Default or
such event has occurred and is continuing, a statement as to
the nature thereof and the action which the Obligated Affiliate
proposes to take with respect thereto;

     (c)  from time to time upon Bank's request, any
Obligated Affiliate's internally prepared balance sheets and
statements of income and expenditures reasonably accurately
reflecting the financial condition of the Obligated Affiliate;

PNC18972

- 24 -

AH- 13963

4282C:1592/005

(d)  as soon as available and in any event within 30 days after the close of each Fiscal Year of each Obligated Affiliate, the Obligated Affiliate's budget and projection of cash flow for the next Fiscal Year (which may be in consolidated form), prepared in form and detail satisfactory to the Bank and approved by the Board of Trustees of the Obligated Affiliate;

(e)  promptly upon obtaining knowledge thereof, written notice of the commencement or threat of any litigation, arbitration or governmental proceeding against any Obligated Affiliate, or any governmental investigation or labor dispute pending or threatened against any Obligated Affiliate, which could reasonably be expected to interfere substantially with the usual operations of such Obligated Affiliate or materially adversely affect the financial condition, business or operations of such Obligated Affiliate;

(f)  from time to time such additional information regarding the business, properties or the condition or operations, financial or otherwise, of any Obligated Affiliate as the Bank may reasonably request;

(g)  as soon as possible and in any event (i) within 5 days after the occurrence of an Event of Default, (ii) within 30 days of becoming aware of the same, an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default, or (iii) a material adverse change in the condition, financial or otherwise, or operations of any Obligated Affiliate, a written statement of an officer of the Corporation setting forth the details of such Event of Default, event or material adverse change and the action which such Obligated Affiliate proposes to take with respect thereto;

(h)  (i) as soon as possible and in any event (i) within 30 days after any Obligated Affiliate knows or has reason to know that any Termination Event described in clause (i) of the definition of Termination Event with respect to any Plan has occurred, and (2) within 10 days after any Obligated Affiliate knows or has reason to know that any other Termination Event with respect to any Plan has occurred, a statement of the chief financial officer of the Corporation describing such Termination Event and the action, if any, which such Obligated Affiliate proposes to take with respect thereto, and (ii) promptly and in any event within two Business Days after receipt thereof by any Obligated Affiliate from the PBGC, copies of each notice received by any Obligated Affiliate of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan;

PNC18973

AH- 13964

4282C:1592/008

(i)  promptly after the incurrence by any
Obligated Affiliate of Long-Term Indebtedness in excess of
$10,000,000 a certificate substantially similar to that
required pursuant to the last paragraph of Section 5.05 of the
Restated Master Indenture.

Section 6.09.  <u>Satisfaction of Series B Note</u>.  Anything
to the contrary in Section 9.01 of the Restated Master
Indenture notwithstanding, the only securities or investments
which can be deposited to result in a satisfaction and
discharge of the Series B Note shall be direct obligations of,
or obligations the principal of and interest on which are fully
guaranteed by, the United States of America or such other
securities or investments as are satisfactory to the Bank.

Section 6.10.  <u>Amendments to Bond Documents or Master
Indenture</u>.  No Obligated Affiliate will consent to or enter
into any amendment of or supplement to the Bond Documents or
the Master Indenture without the prior consent of the Bank.

Section 6.11.  <u>Financial Covenants</u>.

(a)  No Obligated Affiliate will create, incur,
assume or permit to exist any mortgage, pledge, security
interest, encumbrance, license, right of way, restriction,
reservation or other Lien upon any of its Facilities, other than
Permitted Liens.

(b)  So long as the Letter of Credit has not
terminated or expired or any amount is due or owing to the Bank
hereunder, the Obligated Group shall, unless the Bank shall
otherwise consent in writing:

(i)  <u>Liquidity Ratio</u>.  Maintain a Liquidity
Ratio of at least 2:1; as used herein, Liquidity
Ratio is defined to mean current assets plus
unrestricted Board-designated funds plus funds
held by a trustee in a debt service, bond or
similar fund for payment on the next payment date
(excluding funds held in debt service reserve,
depreciation reserve and similar funds) divided by
current liabilities, all as defined by GAAP;

(ii) Maintain a ratio of total Indebtedness
to total Capitalization of not more than 66-2/3%;
provided, however, in calculating the amount of a
Guaranty (as defined in the Master Indenture) only
20% of the actual Indebtedness being guaranteed
shall be included unless payment is required under
such Guaranty, in which event 100% of such amount
shall be included;

PNC18974

-26-

AH-13965

4282C:1592/008

(iii) <u>Debt Service Coverage Ratio</u>. Maintain a Debt Service Coverage Ratio of at least 1.2:1; as used herein, Debt Service Coverage Ratio is defined to mean Income Available for Debt Service (for the preceding four quarters) divided by Projected Long-Term Debt Service Requirements.

Section 6.12. <u>ERISA</u>. No Obligated Affiliate will (i) voluntarily terminate any employee benefit or other plan maintained for employees of such Obligated Affiliate and covered by Title IV of ERISA (an "ERISA Plan"), so as to result in any material liability of such Obligated Affiliate to PBGC; (ii) enter into any Prohibited Transaction (as defined in Section 4975 of the Code and in ERISA) involving an ERISA Plan which results in any material liability of such Obligated Affiliate to PBGC; (iii) cause any occurrence of any Reportable Event which results in any material liability of such Obligated Affiliate to PBGC; or (iv) allow or suffer to exist any other event or condition known to such Obligated Affiliate which results in any material liability of such Obligated Affiliate to PBGC. Further, each Obligated Affiliate will comply with the applicable provisions of ERISA where the failure so to comply might reasonably be expected materially to impair the right of such Obligated Affiliate to carry on its business substantially as now being conducted or to materially and adversely affect the financial condition of such Obligated Affiliate.

Section 6.13. <u>Preservation of Tax-Exempt Status</u>. Each Obligated Affiliate will take whatever actions are necessary to continue to be organized and operated in a manner which will preserve and maintain its status as an organization exempt from Federal income taxes under Section 501(a) of the Code and will not (i) perform any acts or enter into any agreements that shall cause revocation or adverse modification of such Federal income tax status of such Obligated Affiliate; (ii) carry on or permit to be carried on in the Leased Premises (or with the proceeds of the Bonds or the proceeds of any loan refinanced with proceeds of the Bonds whether or not on the Leased Premises) any trade or business the conduct of which would cause the interest paid by the Issuer on the Bonds to be included in the gross income of the holders thereof; and (iii) take any action or permit any action to be taken on its behalf, or cause or permit any circumstances within its control to arise or continue, if such actions or circumstances would cause the interest paid by the Issuer on the Bonds to be included in the gross income of the holders thereof.

Section 6.14. <u>Information to be Furnished to the Bank</u>. The Corporation will cause all documents required to be furnished or submitted to the Master Trustee under the Master Indenture and to the Trustee under the Indenture, including all opinions, reports, requests, consents, notices and other documents, to be delivered to the Bank at the same time as the

PNC18975

-2-

AH- 13966

4282C:1592/008

same are required to be furnished to the Master Trustee or the Trustee.

Section 6.15.  <u>Maintenance of Reimbursement Eligibility</u>.  Each Obligated Affiliate shall establish and maintain its status as a provider of health care services eligible for reimbursement under the Medicare, Medicaid, Blue Cross and equivalent third party payment programs the revenues from which are material to the operations of such Obligated Affiliate, including future state and federal programs.

Section 6.16.  <u>Further Assurances</u>.  Each Obligated Affiliate will execute and deliver from time to time such further instruments and take such further actions as may be required to carry out the purposes and provisions of this Agreement and to assure the Bank of the security rights in favor of the Bank contemplated by Article III and the Indenture.

Section 6.17.  <u>Appointment of Remarketing Agent</u>.  Upon notice from the Remarketing Agent that it is terminating its rights and obligations under the Remarketing Agreement, the Corporation will appoint a successor remarketing agent promptly and in no event later than 30 days after the date of the notice from the Remarketing Agent.  In the event the Corporation determines to terminate the Remarketing Agent, the Corporation will appoint a successor remarketing agent a sufficient time prior to such termination in order to allow a smooth transition of such services.

Section 6.18.  <u>Payment of Taxes; Removal of Liens</u>.  Each Obligated Affiliate will pay all assessments or other governmental charges as the same become due, all taxes, assessments (general or special) and governmental charges of any kind whatsoever that may be at any time lawfully assessed or levied against or with respect to the Facilities or any interest therein and promptly discharge or cause to be discharged all Liens, encumbrances and charges on the Facilities or any part thereof other than Permitted Liens; provided, however, that no Obligated Affiliate shall be required to pay any tax, charge, assessment or imposition nor to remove any lien, charge or encumbrance nor to comply with any Governmental Rule so long as it shall contest, in good faith, the amount or validity thereof, in an appropriate manner or by appropriate proceedings which shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, assessment, levy, fee, rent, charge, Lien or encumbrance so contested, and the sale, forfeiture or loss of the Facilities or any part thereof, or of the rent or any portion thereof, to satisfy the same; provided (i) that no such contest shall subject the Bank to the risk of any liability; (ii) that the Obligated Affiliate will at all times effectively stay or prevent any official or judicial action detrimental to the interest of the Bank or the title, use or operation of the Facilities or any material part

PNC18976

A : 13967

4282C:1592/008

thereof; and (iii) that the Corporation shall give the Bank prompt written notice of any such contest.  Each such contest shall be promptly prosecuted to final conclusion (subject to the right of the Obligated Affiliate to settle any such contest), and in any event the Obligated Affiliate will save the Bank harmless against all losses, judgments, decrees and costs (including attorneys' fees and expenses in connection therewith) and will, promptly after the final determination of such contest or settlement thereof, pay and discharge the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interests, costs and expenses thereon or in connection therewith.

Notwithstanding the foregoing, if the Bank shall notify the Corporation that, in the opinion of counsel, by continued nonpayment of any of the foregoing items, the Facilities or any substantial part thereof will be subject to imminent loss or forfeiture, then the Corporation agrees to promptly pay or cause to be paid all such unpaid items and cause them to be satisfied and discharged.  In addition, the Bank shall have the right to request an opinion of counsel that a lien is a Permitted Lien if such lien is deemed to be "permitted" under Section 5.04(b)(v)(c) of the Restated Master Indenture.

ARTICLE VII

DEFAULTS AND REMEDIES

Section 7.01.  <u>Defaults</u>.  Each of the following shall constitute an event of default hereunder ("Event of Default"):

(a)  Failure by the Corporation to make any payment when due under this Agreement or under the Series B Note;

(b)  Failure by the Corporation to perform or comply with any of the other terms or conditions contained in this Agreement and continuance of such failure for 30 days after the earlier of written notice from the Bank to the Corporation or the Corporation has knowledge that such failure has occurred, or such longer period to which Bank may agree in the case of a default not curable by the exercise of due diligence within such 30 day period, provided that the Corporation shall have commenced to cure such default within such 30 day period and shall complete such cure as quickly as reasonably possible with the exercise of due diligence;

(c)  Any of the representations or warranties of the Corporation set forth in this Agreement, any Related Document or any other document furnished to the Bank pursuant to

PNC18977

-29-

AH-13968

4282C:1592/008

the terms hereof proves to have been materially false or incorrect when made;

(d)  Any material provision of this Agreement or the Series B Note shall at any time for any reason cease to be valid and binding on the Corporation, or shall be declared to be null and void, or shall be violative of any applicable law relating to a maximum amount of interest permitted to be contracted for, charged or received, or the validity or enforceability thereof shall be contested by the Corporation or any other Obligated Affiliate, or the Corporation shall deny that it has any or further liability or obligation under this Agreement or under the Series B Note;

(e)  The occurrence of an event of default as defined in any of the Related Documents;

(f)  Any Obligated Affiliate shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian or the like of the Obligated Affiliate or of property of the Obligated Affiliate, or (ii) admit in writing the inability of the Obligated Affiliate to pay its debts generally as they become due, or (iii) make a general assignment for the benefit of creditors, or (iv) be adjudicated a bankrupt or insolvent, or (v) commence a voluntary case under the United States Bankruptcy Code or file a voluntary petition or answer seeking reorganization, an arrangement with creditors or an order for relief or seeking to take advantage of any insolvency law or file an answer admitting the material allegations of a petition filed against the Obligated Affiliate in any bankruptcy, reorganization or insolvency proceeding, or action of the Obligated Affiliate shall be taken for the purpose of effecting any of the foregoing, or (vi) take any corporate action or other action to authorize any of the foregoing, or (vii) if without the application, approval or consent of the Obligated Affiliate, a proceeding shall be instituted in any court of competent jurisdiction, under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking in respect of such Obligated Affiliate an order for relief or an adjudication in bankruptcy, reorganization, dissolution, winding up or liquidation, a composition or arrangement with creditors, a readjustment of debts, the appointment of a trustee, receiver, liquidator or custodian or the like of such Obligated Affiliate or of all or any substantial part of the assets of such Obligated Affiliate or other like relief in respect thereof under any bankruptcy or insolvency law, and, if such proceeding is being contested by such Obligated Affiliate in good faith, the same shall (A) result in the entry of an order for relief or any such adjudication or appointment or (B) remain undismissed and undischarged for a period of 60 days;

PNC18978

-30-

AH-13969

4282c::1592/008

(g)  Any litigation or administrative proceeding ensues, and is not dismissed within 30 days, involving any Obligated Affiliate or any instrument, contract or document delivered to the Bank in compliance with this Agreement, and the adverse result of such litigation or proceeding would have, in the Bank's reasonable opinion, a materially adverse effect on the Corporation's or any other Obligated Affiliate's ability to pay its obligations and comply with the covenants under this Agreement or the Related Documents;

(h)  Any one or more judgments or orders are entered against any Obligated Affiliate, where such judgments or orders aggregate $500,000 or more and either (i) continue unsatisfied and unstayed for 30 days or (ii) a judgment lien on such Obligated Affiliate's Facilities is recorded in respect thereof and is not stayed pending appeal by a bond or other arrangement given or obtained by such Obligated Affiliate on terms which do not violate any of the covenants under this Agreement; or

(i)  Failure by any Obligated Affiliate to make any payment or payments in respect of (i) any obligation or obligations owing to the Bank, (ii) any amounts owing with respect to the Bonds, or obligations under the Master Indenture, or (iii) any obligation or obligations for the payment of borrowed moneys in an aggregate principal amount of $500,000 or more, when such payment or payments are due and payable (after the lapse of any applicable grace period) that results in the acceleration of such obligation or obligations or enables the holder or holders of such obligation or obligations or any person acting on behalf of such holder or holders to accelerate the maturity of such obligation or obligations (as used herein, "obligation for the payment of borrowed money" shall include, without limitation, obligations arising from guarantees of Indebtedness to others, obligations (other than accounts payable and other similar items arising in the normal course of business) for the deferred payment of the purchase price of property and lease obligations which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of the balance sheet, or leases required to be capitalized under GAAP) or the occurrence of any material default under any agreement, indenture or other instrument under or pursuant to which the Bonds or obligation for the payment of borrowed moneys is incurred, secured or issued, and continuance of such default beyond the period of grace, if any, allowed with respect thereto; or

(j)  a moratorium or repudiation shall not have been declared or announced (whether or not in writing) with respect to any Indebtedness of the Corporation or any Obligated Affiliate.

PNC18979

-31-

AH-13970

4282C:1592/008

Section 7.02.  <u>Remedies</u>.  (a) If an Event of Default has occurred and is continuing uncured, the Bank may

(1) notify the Trustee of such Event of Default and direct the Trustee to declare an event of default as defined in the Indenture, to accelerate the Bonds and draw on the Letter of Credit and/or to exercise remedies under the Bond Documents;

(2) take such action with respect to the Series B Note as permitted therein and under the Master Indenture;

(3) declare the Corporation's obligations hereunder to be, whereupon the same shall become, immediately due and payable; and

(4) Exercise, or cause to be exercised, any and all such remedies as it may have under this Agreement or any other document or at law or in equity.

(b)  Upon the occurrence of an Event of Default under Section 7.01(f), all of the Corporation's obligations hereunder shall automatically become immediately due and payable.

Section 7.03.  <u>Waivers; Consents</u>.  No waiver of, or consent with respect to, any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

Section 7.04.  <u>No Waiver; Remedies Cumulative</u>.  No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; and no single or partial exercise of any right hereunder shall preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies available under any other document or at law or in equity.

Section 7.05.  <u>Set-Off</u>.  Upon the occurrence and during the continuance of any Event of Default, the Bank is hereby authorized at any time and from time to time without notice to the Corporation or any other Obligated Affiliate (any such notice being expressly waived by the Corporation) and, to the fullest extent permitted by law, to set off and to apply any and all balances, credits, deposits (general or special, time or demand, provisional or final), accounts or moneys at any time held (excluding funds held by Pittsburgh National Bank, as trustee) and other indebtedness at any time owing by the Bank to or for the account of the Corporation or any other Obligated

PNC18980

AH- 13971

4282C:1592/008

Affiliate against any and all of the obligations of the Corporation or any other Obligated Affiliate now or hereafter existing under this Agreement or any other agreement or instrument delivered by the Corporation or any other Obligated Affiliate to the Bank in connection therewith, whether or not the Bank shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured. The rights of the Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Bank may have.

ARTICLE VIII

MISCELLANEOUS

Section 8.01. Notices. All notices and other communications provided for hereunder shall be in writing and sent by United States certified or registered mail, return receipt requested, or by telegraph, telex, telecopier or private delivery service, addressed as follows:

If to the Bank such notice shall refer to this Agreement and shall be sent to:

Pittsburgh National Bank
Fifth Avenue and Wood Street
Pittsburgh, Pennsylvania 15265

Attention: Manager, Health Care Group

If to the Corporation

Allegheny Health, Education and Research Corporation
320 East North Avenue
Pittsburgh, Pennsylvania  15212

Attention:  President

Either party hereto may change the address to which notices to it are to be sent by written notice given to the other persons listed in this Section. All notices shall, when mailed as aforesaid, be effective on the date indicated on the return receipt and all notices given by other means shall be effective when received.

Section 8.02. Successors and Assigns. This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

PNC18981

-33-

AH- 13972

4282C:1592/008

The Corporation may not assign its rights under this Agreement without the prior written consent of the Bank.

Section 8.03.  <u>Survival</u>.  All representations, warranties, covenants and agreements made by the Corporation herein and in any document delivered pursuant hereto shall survive the delivery of this Agreement and any advances under the Letter of Credit and shall continue in full force and effect until payment in full of all of the obligations of the Corporation hereunder, it being understood that the agreements of the Corporation found in Sections 2.06, 2.10, 2.12 and 8.05 hereof shall survive the payment in full of any other obligations of the Corporation hereunder.

Section 8.04.  <u>Counterparts</u>.  The execution hereof by each party hereto shall constitute a contract between them for the uses and purposes herein set forth, and this Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

Section 8.05.  <u>Costs, Expenses and Taxes</u>.  The Corporation agrees to pay on demand all costs and expenses of the Bank (including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Bank) in connection with (a) the negotiation, preparation, execution, delivery, administration, termination or the like of this Agreement, the Letter of Credit and any other documents that may be delivered in connection with this Agreement or the Related Documents including, without limitation, any waiver or consent hereunder or thereunder or any amendments hereto or thereto, and (b) any Event of Default or alleged Event of Default or the enforcement or interpretation of this Agreement and such other documents.  In addition, the Corporation shall pay any and all stamp, transfer, documentary and other taxes, assessments, charges and fees payable or determined to be payable in connection with the execution and delivery of this Agreement and such other documents and agrees to indemnify and to hold the Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omitting to pay such taxes, assessments, charges and fees, provided the Bank promptly notifies the Corporation of any such taxes, assessments, charges and fees.

Section 8.06.  <u>Amendments</u>.  This Agreement may be amended by an instrument in writing executed and delivered by the Corporation and the Bank.

Section 8.07.  <u>Severability; Interest Limitation</u>.  If any provision hereof is found by a court of competent jurisdiction to be prohibited or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only

PNC18982

-34-

AH- 13973

4282C:1592/008

to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision in such jurisdiction to the extent it is not prohibited or unenforceable, nor invalidate such provision in any other jurisdiction, nor invalidate the other provisions hereof, all of which shall be liberally construed in favor of the Bank in order to effect the provisions of this Agreement. Notwithstanding anything to the contrary herein contained, the total liability of the Corporation for payment of interest pursuant hereto shall not exceed the maximum amount, if any, of such interest permitted by applicable law to be contracted for, charged or received, and if any payments by the Corporation to the Bank include interest in excess of such a maximum amount, the Bank shall apply such excess to the reduction of the unpaid principal amount due pursuant hereto, or if none is due, such excess shall be refunded to the Corporation; provided that, to the extent permitted by applicable law, in the event the interest is not collected, is applied to principal or is refunded pursuant to this sentence and interest thereafter payable pursuant hereto shall be less than such maximum amount, then such interest thereafter so payable shall be increased up to such maximum amount to the extent necessary to recover the amount of interest, if any, theretofore uncollected, applied to principal or refunded pursuant to this sentence. Any such application or refund shall not cure or waive any Event of Default. In determining whether or not any interest payable under this Agreement exceeds the highest rate permitted by law, any non-principal payment (except payments specifically stated in this Agreement to be "interest") shall be deemed, to the extent permitted by applicable law, to be an expense, fee, premium or penalty rather than interest.

Section 8.08. __Complete Agreement.__ Taken together with the other instruments and documents delivered in compliance herewith, this Agreement is a complete memorandum of the agreement of the Corporation and the Bank. Waivers or modifications of any provision hereof must be in writing signed by the party to be charged with the effect thereof.

Section 8.09. __Consent to Jurisdiction; Venue; Waiver of Jury Trial.__ The Corporation and the Bank hereby irrevocably (i) agree that any suit, action or other legal proceeding arising out of or relating to this Agreement may be brought in any federal or state court located in Pittsburgh, Pennsylvania and consent to the jurisdiction of such court in any such suit, action or proceeding and (ii) waive any objection which either of them may have to the laying of venue of any such suit, action or proceeding in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. The Corporation hereby irrevocably consents to the service of any and all process in any such

PNC18983

AH-13974

4282c:1592/008

suit, action or proceeding by mailing of copies of such process to the Corporation at its address provided in Section 8.01. The Corporation agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. All mailings under this Section shall be by certified mail, return receipt requested. Nothing in this Section shall affect the right of the Bank to serve legal process in any other manner permitted by law or affect the right of the Bank to bring any suit, action or proceeding against the Corporation or its property in the courts of any other jurisdiction. The Corporation and the Bank hereby waive the right to trial by jury in any action arising hereunder or otherwise in connection herewith.

Section 8.10. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania without reference to its principles of conflicts of law.

Section 8.11. <u>Participation</u>. Notwithstanding any other provision of this Agreement, the Corporation understands that the Bank may at any time enter into participation agreements with one or more other participating banks (such other participating banks are hereinafter referred to as "Participating Banks") whereby the Bank will allocate to the Participating Banks certain percentages of the payment obligations of the Corporation under this Agreement and the funding obligations of the Bank under the Letter of Credit. The Corporation acknowledges that, for the convenience of all parties, the Corporation's obligations under this Agreement are and will be undertaken for the benefit of, and as an inducement to, the Participating Banks as well as the Bank. Without limiting the foregoing, the Corporation acknowledges that Sections 2.02(d) and 2.05 and the indemnity of the Bank under Section 8.05 are for the benefit of the Participating Banks as if such sections specifically referred to the Participating Banks and their participations in the payment obligations of the Corporation and the funding obligations of the Bank, and the Corporation agrees to make any payments required by such provisions for the account of any one or more Participating Banks to the Bank on demand of the Bank. The Corporation hereby grants to each Participating Bank, to the extent of its participation and to the extent permitted by applicable law, the right to set off deposit accounts maintained by the Corporation with such bank as if the Participating Banks were specifically referred to therein.

PNC18984

AH-13975

4282C::1592/008

Section 8.12. Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

IN WITNESS WHEREOF, the Corporation and the Bank have caused this Agreement to be duly executed and delivered as of the date first above written.

[CORPORATE SEAL]                    ALLEGHENY HEALTH, EDUCATION
                                    AND RESEARCH CORPORATION

Attest _____             By _____
Title _____              Title _____

                                    PITTSBURGH NATIONAL BANK

                                    By _____
                                    Title _____

PNC18985

-37-

AH-13976

4283c:1592/008

EXHIBIT A

[Letterhead of Bank]

Mellon Bank, N.A., as Trustee
   and Tender Agent
One Mellon Bank Center
Pittsburgh, PA  15258

Attention:  Corporate Trust Group

Dear Sirs:

        1.  We hereby establish, at the request and for the
account of Allegheny Health, Education and Research
Corporation, a Pennsylvania not-for-profit corporation (the
"Corporation), in your favor, as the Trustee and Tender Agent
under the Trust Indenture, dated as of February 1, 1988 (the
"Indenture"), between Allegheny County Hospital Development
Authority (the "Issuer") and you, as Trustee, pursuant to which
$60,000,000 in aggregate principal amount of the Issuer's
Adjustable Convertible Extendable Securities, Hospital Revenue
Bonds (Allegheny Health, Education and Research Corporation)
Series 1988A through Series 1988D (the "Bonds") are being
issued, this Irrevocable Letter of Credit No. 52891-IC in the
amount of $61,208,220 (such amount, as from time to time
reduced and reinstated in accordance with the terms hereof,
being hereinafter referred to as the "Letter of Credit
Amount").  Such Letter of Credit Amount shall be available for
drawing by you as set forth below in amounts (a) not to exceed
$60,000,000 (as from time to time reduced and reinstated in
accordance with the terms hereof, the "Principal Component")
with respect to unpaid principal of the Bonds, and (b) not t

PNC18986

AH-13977

428JC:1592/008

exceed $1,208,220 (as from time to time reduced and reinstated in accordance with the terms hereof, the "Interest Component") representing 49 days of interest on the Principal Component at a rate of 15% per annum (the "Maximum Rate"); at our option, we may deliver to you a written amendment in the form of Annex B hereto signed by an authorized signer (specifically referring to "Pittsburgh National Bank Irrevocable Letter of Credit No. 52891-IC") increasing the Interest Component (and the Letter of Credit Amount) to represent an increase in the number of days of interest on the Principal Component at the Maximum Rate. This Letter of Credit shall be effective immediately and shall expire at 5:00 p.m. on March 15, 1991 (the "Stated Termination Date"), unless, at our option, we deliver to you a written amendment in the form of Annex A hereto signed by an authorized signer (specifically referring to "Pittsburgh National Bank Irrevocable Letter of Credit No. 52891-IC") before the January 1 next preceding the Stated Expiration Date (as the Stated Expiration Date may have been previously extended) extending the Stated Expiration Date to the date set forth in such amendment, in which case this Letter of Credit shall expire on such extended Stated Expiration Date unless further extended, it being understood that we shall be under no obligation to grant any such extension.  This Letter of Credit is subject to automatic termination as provided in paragraph 7 hereof.

2.  We hereby irrevocably authorize you to draw on us, in an aggregate amount not to exceed the Letter of Credit Amount and in accordance with the terms and conditions and subject to the reductions in amount as hereinafter set forth, (a) in one or more drawings (subject to the provisions contained in paragraph 6 as to reinstatement) by one or more of your drafts, each drawn on us at Bank's Office, as hereinafter defined, payable at sight on a Business Day, as hereinafter defined, and accompanied by your written and completed certificate signed by you in the form of Annex C attached hereto (such draft accompanied by such certificate being hereinafter referred to as your "Interest Draft"), an amount equal to the face amount of such draft but not exceeding the Interest Component, (b) in one or more drawings by one or more of your drafts, each drawn on us at Bank's Office, payable at sight on a Business Day and accompanied by your written and completed certificate signed by you and consented to by us in the form of Annex D attached hereto (any such draft accompanied

PNC18987

AH-13978

4283c:1592/008

by such certificate being hereinafter referred to as your
"Tender Draft"), an amount equal to the face amount of such
draft but not exceeding the Letter of Credit Amount, (c) in one
or more drawings by one or more of your drafts, each drawn on
us at Bank's Office, payable at sight on a Business Day and
accompanied by your written and completed certificate signed by
you and consented to by us if involving an optional redemption
of the Bonds in the form of Annex E attached hereto (any such
draft accompanied by such certificate being hereinafter
referred to as your "Partial Principal Draft"), an amount equal
to the face amount of such draft but not exceeding the Letter
of Credit Amount, and (d) in a single drawing by your draft,
drawn on us at Bank's Office, payable at sight on a Business
Day and accompanied by your written and completed certificate
signed by you and consented to by us if involving an optional
redemption of the Bonds in the form of Annex F attached hereto
(such draft accompanied by such certificate being hereinafter
referred to as your "Final Draft"), an amount equal to the face
amount of such draft but not exceeding the Letter of Credit
Amount.

        3.    Funds under this Letter of Credit are available to
you against (a) your Interest Draft referring thereon to the
number of this Letter of Credit and accompanied by your written
and completed certificate signed by you in the form of Annex C
hereto attached, (b) your Tender Draft referring thereon to the
number of this Letter of Credit and accompanied by your written
and completed certificate signed by you in the form of Annex D
attached hereto, (c) your Partial Principal Draft accompanied
by your written and completed certificate signed by you and, if
involving an optional redemption of the Bonds, consented to by
us in the form of Annex E attached hereto, and (d) your Final
Draft referring thereon to the number of this Letter of Credit
and accompanied by your written and completed certificate
signed by you and, if involving an optional redemption of the
Bonds, consented to by us in the form of Annex F attached
hereto.  Each such draft and certificate shall be dated the
date of its presentation and shall be presented to us at Bank's
Office on a Business Day prior to the termination hereof.

        If we receive any such Interest Draft, Partial
Principal Draft, or Final Draft and certificate at Bank's
Office, all in strict conformity with the terms and conditions

PNC18988

AH-13979

4283C:1592/008

of this Letter of Credit, not later than 4:00 p.m. on such
Business Day, we will make same day funds available to you not
later than 1:00 p.m. on the later of the next succeeding
Business Day or the Business Day specified in such draft in
accordance with the terms hereof.  If we receive any such draft
and certificate at Bank's Office, all in strict conformity with
the terms and conditions of this Letter of Credit, after 4:00
p.m. on such Business Day, we will make same day funds
available to you not later than 1:00 p.m. on the later of the
second succeeding Business Day or the Business Day specified in
such draft in accordance with the terms hereof.

        If we receive any such Tender Draft and certificate at
Bank's Office, all in strict conformity with the terms and
conditions of this Letter of Credit, not later than 12:30 p.m.
on such Business Day, we will make same day funds available to
you not later than 3:30 p.m. on the later of such day or the
Business Day specified in such draft in accordance with the
terms hereof.  If we receive any such draft and certificate at
Bank's Office, all in strict conformity with the terms and
conditions of this Letter of Credit after 12:30 p.m., we will
make same day funds available to you not later than 1:00 p.m.
on the next succeeding Business Day in accordance with the
terms hereof.

        If a demand for payment made by you hereunder does
not, in any instance, conform to the terms and conditions of
this Letter of Credit, we shall give you prompt notice that the
purported negotiation was not effected in accordance with the
terms and conditions of this Letter of Credit, stating the
reasons therefor and that we are holding any documents at your
disposal or are returning the same to you, as we may elect.
Upon being notified that the purported negotiation was not
effected in accordance with this Letter of Credit, you may
attempt to correct any such nonconforming demand for payment
if, and to the extent that, you are entitled (without regard to
the provisions of this sentence) and able to do so.  For
purposes of this Letter of Credit, we shall be deemed to have
"honored" a demand for payment at the time at which we commence
a wire transfer of immediately available funds or a deposit

PNC18989

AH- 13980

4293<:1592/008

into an account of yours with us in accordance with your
instructions.

4. Payment under this Letter of Credit shall be made
by wire transfer of immediately available funds to your Federal
Reserve account or by deposit of same day funds into a
designated account that you maintain with us, in each case as
requested by you in a notice to us. Upon the payment to you or
your account of the amount specified in a sight draft
hereunder, we shall be fully discharged on our obligation under
this Letter of Credit with respect to such draft, and we shall
not thereafter be obligated to make any further payments under
this Letter of Credit with respect to such draft.

5. Upon our honoring any drawing hereunder, the
Principal Component or the Interest Component, as the case may
be (and correspondingly the applicable Letter of Credit Amount)
immediately shall be reduced by the amount of such drawing. In
addition, upon receipt by us of your written and completed
certificate signed by you in the form of Annex H attached
hereto (relating to a redemption, payment upon maturity or
conversion to a Fixed Rate (as defined in the Bonds) of less
than all of the Bonds outstanding), the Principal Component and
the Interest Component (and correspondingly the Letter of
Credit Amount) shall be reduced by the amount stated therefor
in such certificate. No drawing hereunder honored by us shall
exceed the Letter of Credit Amount (or the respective Interest
and/or Principal Components thereof) at the time of such
drawing, as the Letter of Credit Amount (or the respective
Interest and/or Principal Components thereof) has been reduced
and reinstated in accordance with the terms hereof.

6. The Principal Component or the Interest Component,
as the case may be (and correspondingly the applicable Letter
of Credit Amount) as reduced in accordance with the provisions
of Paragraph 5 shall be reinstated (but never to an amount in
excess of the amount prior to the applicable drawing) only as
follows:

(a) in the case of a reduction resulting from
payment against an Interest Draft, the Interest Component (and

PNC18990

AH- 13981

correspondingly the Letter of Credit Amount) shall be
reinstated automatically effective the 11th calendar day from
the date of such payment by an amount equal to the amount of
such payment, unless you have received notice in writing from
us not later than your close of business on the 10th calendar
day following the date of such payment of an event of default
as set forth in the form of Annex G attached hereto; and

        (b) in the case of a reduction resulting from
payment against a Tender Draft, the Principal Component and the
Interest Component, if applicable (and correspondingly the
Letter of Credit Amount) shall be reinstated when we receive
(i) from the Corporation or from you on behalf of the
Corporation reimbursement for any amount drawn hereunder by
such Tender Draft or (ii) notice from you of the reimbursement
of such payment in immediately available funds in the form of
Annex I attached hereto; in either case, the Principal
Component shall be reinstated in an amount equal to the portion
of such payment attributable to reimbursement of the portion of
such Tender Draft representing principal of the Bonds and the
Interest Component shall be reinstated in an amount equal to
the portion of such payment attributable to reimbursement of
the portion of such Tender Draft representing interest on the
Bonds.

        7.  Upon the earliest of (i) our honoring your Final
Draft presented hereunder, (ii) the date on which this Letter
of Credit is surrendered for cancellation, (iii) the date on
which we received written notice from you that there are no
longer any Bonds Outstanding (as defined in the Indenture), and
(iv) the Stated Termination Date, this Letter of Credit shall
automatically terminate.  This Letter of Credit shall be
promptly surrendered by you to us upon such expiration.

        8.  As used herein the term "Business Day" means any
day other than (i) a Saturday or Sunday, (ii) a day on which
banking institutions in Pittsburgh, Pennsylvania, the State of
New York or in any other city where either your principal
corporate trust office or principal office or our principal
office is located are required or authorized by law (including
executive order) to close or on which your principal corporate
office or our principal office is closed for a reason not
related to financial condition, or (iii) a day on which The New

PNC18991

AH-13982

628JC:1592/008

York Stock Exchange is closed. References to any time of day in this Letter of Credit shall refer to Eastern standard time or Eastern daylight saving time, as in effect in Pittsburgh, Pennsylvania on such day.

9. This Letter of Credit is transferable in its entirety (but not in part) to any transferee who you certify to us has succeeded you as Trustee under the Indenture, and may be successively transferred. Transfer of the available balance under this Letter of Credit to such transferee shall be effected by the presentation to us of this Letter of Credit accompanied by a certificate in the form of Annex J attached hereto. Upon such presentation we will forthwith transfer the same to your transferee or, if so requested by your transferee, issue a letter of credit to your transferee with provisions therein consistent with this Letter of Credit.

10. All documents presented to us in connection with any demand for payment hereunder, as well as all notices and other communications to us in respect of this Letter of Credit, shall be in writing and addressed and presented to us at Pittsburgh National Bank, Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania 15265, Attention: International Banking Division/Letter of Credit Department ("Bank's Office"), with a copy to Pittsburgh National Bank, Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania 15265, Attention: Manager, Health Care Group (or, in either case, at such other office or offices as we may designate by written notice to you), and shall make specific reference to this Letter of Credit by number. Such documents, notices and other communications shall be personally delivered to us, or may be sent to us by tested telex or by a tested telecopier to the following numbers, as applicable:

|  |  |
|---|---|
| Telex No.: | 866533 |
|  | (Answerback: FIRSTBANK PGH) |
| Telecopier No.: | 412-762-5022 |

If any such document, notice or other communication is sent by you to us by tested telex or tested telecopier, it shall be accompanied by your certification that the original, signed document, notice or other communication has been sent by

PNC18992

AH- 13983

428Jc::592/008

overnight courier to us simultaneously with such telex or
telecopy and shall be followed by a telephone advice by you
that the same has been sent to us at the following number:
Telephone No. 412-762-2201 or such other telephone number which
we may designate by written notice to you.

11.   This Letter of Credit is subject to the Uniform
Customs and Practice for Documentary Credits (1983 Revisions),
International Chamber of Commerce, Publication No. 400 (the
"Uniform Customs").  This Letter of Credit shall be deemed to
be a contract made under the laws of the Commonwealth of
Pennsylvania, including Article 5 of the Uniform Commercial
Code, and shall, as to matters not governed by the Uniform
Customs, be governed by and construed in accordance with the
laws of the Commonwealth of Pennsylvania, without regard to
principles of conflicts of law.

12.   This Letter of Credit sets forth in full our
undertaking and such undertaking shall not in any way be
modified, amended, amplified or limited by reference to any
document, instrument or agreement referred to herein
(including, without limitation, the Bonds), except only the
certificates, Annexes and the sight drafts referred to herein;
and any such reference shall not be deemed to incorporate
herein by reference any document, instrument or agreement
except for such certificates, Annexes and such drafts.

Very truly yours,

PITTSBURGH NATIONAL BANK

By: _____

Title: _____

PNC18993

AH- 43984

4283C:1592/008

<u>Annex A</u>

NOTICE OF EXTENSION OF LETTER OF CREDIT

[Date]

Mellon Bank, N.A., as Trustee
 and Tender Agent
 under the Indenture
 referred to below
One Mellon Bank Center
Pittsburgh, Pennsylvania  15258

Attention:  Corporate Trust Group

Gentlemen:

        Reference is made to Irrevocable Letter of Credit No.
52891-IC (the "Letter of Credit") dated February 24, 1988,
issued by us in your favor, as Trustee and Tender Agent under a
Trust Indenture dated as of February 1, 1988 by and between the
Allegheny County Hospital Development Authority (the "Issuer")
and you, pursuant to which the Issuer has issued $60,000,000 in
aggregate principal amount of its Adjustable Convertible
Extendable Securities, Hospital Revenue Bonds (Allegheny
Health, Education and Research Corporation) Series 1988A
through Series 1988D.

        This constitutes our notice to you that, subject to
further extension by us at any time, the expiration date
specified in the first sentence of the first paragraph of the
Letter of Credit is hereby extended to _____, 19___ (which
date is a "Business Day" as defined in the Letter of Credit).

PNC18994

AH-13985

cc83c:1592/008

    The undersigned represents that he/she is authorized
to sign this Notice.

                              Very truly yours,

                              PITTSBURGH NATIONAL BANK


                              By: _____
                              Name:
                              Title:

PNC18995

Page 10 of 31

AH-139-7.

428JC::1592/008

Annex B


NOTICE OF CHANGE IN INTEREST COMPONENT
AND LETTER OF CREDIT AMOUNT


[Date]


Mellon Bank, N.A., as Trustee
  under the Indenture
  referred to below
One Mellon Bank Center
Pittsburgh, Pennsylvania 15258

Attention:    Corporate Trust Group

Gentlemen:

       Reference is made to Irrevocable Letter of Credit No.
52891-IC (the "Letter of Credit") dated February 24, 1988,
issued by us in your favor, as Trustee and Tender Agent under a
Trust Indenture dated as of February 1, 1988 by and between the
Allegheny County Hospital Development Authority (the "Issuer")
and you, pursuant to which the Issuer has issued $60,000,000 in
aggregate principal amount of its Adjustable Convertible
Extendable Securities, Hospital Revenue Bonds (Allegheny
Health, Education and Research Corporation) Series 1988A
through Series 1988D.

       This constitutes our notice to you that, subject to
further increases by us at any time, the Interest Component of
the Letter of Credit is increased to $_____, representing
_____ days of interest on the Principal Component at the Maximum
Rate, and the Letter of Credit Amount is increased accordingly
to $_____.

       The undersigned represents that he/she is authorized
to sign this Notice.

PNC18996

Page 11 of 31

AH- 13987

4283C:1592/008

Any capitalized terms used herein and not defined
shall have the respective meaning set forth in the Letter of
Credit.

Very truly yours,

PITTSBURGH NATIONAL BANK

By: _____
Name:
Title:

PNC18997

AH- 13988

628JC:1592/008

## Annex C

CERTIFICATE FOR DRAWING IN CONNECTION WITH THE PAYMENT OF
INTEREST ("INTEREST DRAFT") ON THE
ALLEGHENY COUNTY HOSPITAL DEVELOPMENT AUTHORITY
ADJUSTABLE CONVERTIBLE EXTENDABLE SECURITIES,
HOSPITAL REVENUE BONDS (ALLEGHENY HEALTH
EDUCATION AND RESEARCH CORPORATION)
SERIES 1988A THROUGH SERIES 1988D (THE "BONDS")


The undersigned, a duly authorized officer of the
undersigned Trustee (the "Trustee") hereby certifies to
Pittsburgh National Bank ("the Bank"), with reference to
Irrevocable Letter of Credit No. 52891-IC (the "Letter of
Credit"; any capitalized terms used herein and not defined shall
have the respective meaning set forth in the Letter of Credit)
issued by the Bank in favor of the Trustee, as follows:

(1)  The Trustee is the Trustee under the
Indenture for the holders of the Bonds.

(2)  The Trustee is making a drawing under the
Letter of Credit with respect to

(a)  a regularly scheduled payment of
interest on the Bonds in the amount of $_____
(which payment is due on the date requested below)
and/or

(b)  a monthly deposit of interest in the
amount of $_____ to be held under the
Indenture and applied to the next regularly
scheduled payment of interest;

payment of the draft is due on _____.  None of such Bonds
is held of record by any member of the Obligated Group or by the
Trustee or the Tender Agent for the account of any member of the
Obligated Group.

PNC18998

AH-13989

a283c:1592/008

(3)  The amount of the Interest Draft accompanying this Certificate is $_____.  It was computed in compliance with the terms and conditions of the Bonds and the Indenture, and does not exceed the Interest Component nor include any amount of interest which is included in any Tender Draft, Partial Principal Draft or Final Draft presented on or prior to the date of this Certificate.

Please [deposit/wire transfer] the amount hereby demanded [in our account number _____ with _____/ to _____ at _____ ].

IN WITNESS WHEREOF, the Trustee has executed and delivered this Certificate as of the ____ day of _____, 19__

                    MELLON BANK, N.A.,
                    as Trustee

                    By_____
                       [Name and Title]

PNC18999

AH-13990