## ALLEGHENY UNIVERSITY MEDICAL CENTERS

### CONSOLIDATING STATEMENT OF OPERATIONS
(Dollars in Thousands)

| | Forbes Hospitals for the period January 1, 1997 through June 30, 1997 | Allegheny Valley Hospital for the period March 1, 1997 through June 30, 1997 | FHS Insurance, Ltd. for the period January 1, 1997 through June 30, 1997 | Elim. | Consolidated AUMC |
|---|---|---|---|---|---|
| Unrestricted revenues, gains and other support: | | | | | |
| Net patient service revenue | $ 74,078 | $ 28,981 | $ - | $ - | $ 103,059 |
| Investment income | 6,484 | 371 | 27 | - | 6,882 |
| Net assets released from restrictions used for operations | 741 | - | - | - | 741 |
| Other revenue | 1,066 | 876 | 250 | (230) | 1,962 |
| Total revenues, gains and other support | 82,369 | 30,228 | 277 | (230) | 112,644 |
| Expenses: | | | | | |
| Salaries, wages and fringe benefits | 39,318 | 13,812 | - | - | 53,130 |
| Materials, supplies and services | 28,588 | 8,471 | 77 | - | 37,136 |
| Depreciation and amortization | (1,263) | (123) | - | - | (1,386) |
| Interest | 2,607 | 1,100 | - | - | 3,707 |
| Total expenses | 69,250 | 21,260 | 77 | - | 92,587 |
| Net income | 13,119 | 6,968 | 200 | (230) | 20,057 |
| Unrealized appreciation of investments | 2,914 | 1,276 | (2) | - | 4,188 |
| Transfers to affiliates, net | (7,610) | (397) | - | - | (8,007) |
| Other | (804) | - | 690 | 65 | (49) |
| Increase in unrestricted net assets | $ 7,619 | $ 7,847 | $ 888 | $ (165) | $ 16,189 |

12

TN CBC43B 00926

## ALLEGHENY UNIVERSITY MEDICAL CENTERS

### CONSOLIDATING STATEMENT OF CHANGES IN NET ASSETS
(Dollars in Thousands)

| | Forbes Hospitals for the period January 1, 1997 through June 30, 1997 | Allegheny Valley Hospital for the period March 1, 1997 through June 30, 1997 | FHS Insurance, Ltd. for the period January 1, 1997 through June 30, 1997 | Elim. | Consolidated AUMC |
|---|---|---|---|---|---|
| **Unrestricted net assets:** | | | | | |
| Net income | $ 13,119 | $ 6,968 | $ 200 | $ (230) | $ 20,057 |
| Unrealized appreciation/(depreciation) of investments | 2,914 | 1,276 | (2) | - | 4,188 |
| Transfers to affiliates | (7,610) | (397) | - | - | (8,007) |
| Other | (804) | - | 690 | 65 | (49) |
| Increase in unrestricted net assets | 7,619 | 7,847 | 888 | (165) | 16,189 |
| **Permanently restricted net assets:** | | | | | |
| Investment income | 735 | | | | 735 |
| Unrealized appreciation of investments | 1,419 | | | | 1,419 |
| Acquisition of affiliates | 17,539 | | | | 17,539 |
| Other | (241) | | | | (241) |
| Increase in permanently restricted net assets | 18,952 | | | | 18,952 |
| Increase in net assets | | | | | |
| Net assets, beginning of year | 26,571 | 7,847 | 888 | (165) | 35,141 |
| Net assets, end of year | $ 26,571 | $ 7,847 | $ 888 | $ (165) | $ 35,141 |

33

TN CBC43B 00927

ALLEGHENY UNIVERSITY MEDICAL CENTERS
CONSOLIDATING STATEMENT OF CASH FLOWS
(Dollars in Thousands)

| | Forbes Hospitals for the period January 1, 1997 through June 30, 1997 | Allegheny Valley Hospital for the period March 1, 1997 through June 30, 1997 | FHS Insurance, Ltd. for the period January 1, 1997 through June 30, 1997 | Elim. | Consolidated AUMC |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Change in net assets | $ 26,371 | $ 7,047 | $ 888 | $ (165) | $ 33,141 |
| Adjustments to reconcile change in net assets to net cash provided/(used) by operating activities: | | | | | |
| Depreciation and amortization | (1,263) | (123) | | | (1,386) |
| Net assets balances related to business combinations | (17,539) | | | | (17,539) |
| Increase/(decrease) in cash from changes in: | | | | | |
| Receivables | (5,591) | (4,626) | 201 | | (10,016) |
| Inventories | (2) | 22 | | | 20 |
| Prepaid expenses | 859 | 768 | 13 | | 1,640 |
| Accounts payable and accrued expenses | (7,011) | (3,076) | 229 | | (10,718) |
| Self-insurance liabilities | | | 361 | | 361 |
| Other | (427) | 593 | (887) | 165 | (556) |
| Net cash provided by/(used) by operating activities | (5,263) | 1,355 | 835 | | (3,073) |
| Cash flows from investing activities: | | | | | |
| Acquisition of property and equipment, net | (3,218) | (932) | | | (4,150) |
| Decrease/(increase) in assets limited or restricted as to use, net | 296 | (2,205) | (211) | | (1,920) |
| Cash balances related to business combinations | 931 | 942 | 24 | | 1,852 |
| Net cash provided/(used) by investing activities | (1,941) | (2,200) | 3 | | (4,228) |
| Cash flows from financing activities: | | | | | |
| Due to affiliates | 12,213 | 4,319 | | | 16,632 |
| Issuance/(repayments) of long-term debt | 40 | (692) | | | (652) |
| Net cash provided by financing activities | 12,253 | 3,627 | | | 15,980 |
| Net increase in cash and cash equivalents | 5,149 | 3,692 | 888 | | 8,729 |
| Cash and cash equivalents, beginning of year | | | | | |
| Cash and cash equivalents, end of year | $ 5,149 | $ 3,692 | $ 888 | $ | $ 8,729 |
| Supplemental disclosure: | | | | | |
| Cash paid for interest, net of capitalized interest | $ 2,013 | $ 6 | $ | $ | $ 2,019 |

34

TN CBC43B 00928

DELAWARE VALLEY OBLIGATED GROUP
COMBINING BALANCE SHEET
as of June 30, 1999
(Dollars in Thousands)

ASSETS

| | MCP Hospital | Elkins Park Hospital | Bucks County Hospital | Hahnemann Hospital | Management Support Services | St. Christopher's | Allegheny University of the Health Sciences | Elim. | Combined Delaware Valley Obligated Group |
|---|---|---|---|---|---|---|---|---|---|
| Current assets: | | | | | | | | | |
| Cash and cash equivalents | $ 6,122 | $ 311 | $ 449 | $ 11,703 | $ 307 | $ 3,437 | $ 35 | $ - | $ 20,444 |
| Short-term investments | | | | | 5 | 6 | | | 0 |
| Assets limited or restricted as to use | 1,383 | | | 6,239 | | 1,202 | 17,330 | | 26,167 |
| Receivables: | | | | | | | | | |
| Patient accounts, net | 45,201 | 12,264 | 10,158 | 36,451 | 1,311 | 35,261 | 40,968 | | 201,914 |
| Grants and other | 2,911 | 201 | 17 | 3,205 | 49 | 2,142 | 31,787 | | 40,312 |
| Inventories | 2,990 | 631 | 516 | 6,759 | 274 | 1,493 | 70 | | 12,733 |
| Prepaid expenses | 1,270 | 185 | 254 | 1,779 | 122 | 449 | 369 | | 4,508 |
| Total current assets | 57,277 | 13,692 | 11,394 | 66,196 | 2,268 | 43,990 | 90,727 | | 306,144 |
| Assets limited or restricted as to use, net of current portion | 5,648 | 37 | | 26,908 | | 10,559 | 141,330 | | 204,332 |
| Property and equipment, net | 70,387 | 21,715 | 21,524 | 132,565 | 5,104 | 77,320 | 93,516 | | 476,191 |
| Due from affiliates | 5,840 | 3,946 | 4,341 | 44,660 | 22,679 | 8,966 | | (90,440) | |
| Other assets | 8,982 | 4,026 | 4,359 | 9,160 | 2,210 | 9,170 | 4,946 | | 41,638 |
| Total assets | $ 156,947 | $ 31,406 | $ 41,518 | $ 239,489 | $ 32,621 | $ 162,925 | $ 330,519 | $ (90,449) | $ 1,028,295 |

LIABILITIES AND NET ASSETS

| | MCP Hospital | Elkins Park Hospital | Bucks County Hospital | Hahnemann Hospital | Management Support Services | St. Christopher's | Allegheny University of the Health Sciences | Elim. | Combined Delaware Valley Obligated Group |
|---|---|---|---|---|---|---|---|---|---|
| Current liabilities: | | | | | | | | | |
| Accounts payable and accrued expenses | $ 26,313 | $ 6,139 | $ 3,728 | $ 42,203 | $ 9,427 | $ 13,283 | $ 26,595 | $ | $ 129,683 |
| Deferred revenue | 55 | | 160 | | (1) | 836 | 16,372 | | 17,823 |
| Line of credit | 15,000 | 13,000 | | 15,000 | 14,100 | | 3,000 | | 57,100 |
| Current portion of long-term debt | 1,318 | 1,219 | 1,094 | 6,577 | | 1,185 | | | 12,903 |
| Total current liabilities | 42,686 | 8,848 | 4,831 | 64,140 | 23,527 | 17,309 | 45,967 | | 217,409 |
| Long-term debt, net of current portion | 58,003 | 51,240 | 18,929 | 178,004 | | 46,234 | 36,066 | | 396,418 |
| Self-insurance liabilities | | | | 3,886 | | | 3,414 | | 7,320 |
| Due to affiliates | | 23,594 | 16,003 | | | 137 | 91,363 | (90,440) | 40,992 |
| Other noncurrent liabilities | | 56 | 110 | | 44 | | 19,343 | | 19,690 |
| Total liabilities | 100,591 | 89,728 | 39,956 | 246,230 | 23,571 | 63,680 | 196,573 | (90,440) | 679,889 |
| Net assets: | | | | | | | | | |
| Unrestricted | 52,651 | (18,166) | 1,527 | 67,691 | (949) | 88,318 | 20,858 | | 191,330 |
| Restricted: | | | | | | | | | |
| Temporarily | 2,006 | 244 | 35 | 8,025 | (1) | 11,031 | 35,657 | | 56,997 |
| Permanently | 1,699 | | | 17,143 | | 4,006 | 27,431 | | 50,119 |
| Total net assets | 56,356 | (18,122) | 1,562 | 92,859 | (950) | 103,355 | 133,946 | | 348,406 |
| Total liabilities and net assets | $ 156,947 | $ 31,406 | $ 41,518 | $ 339,089 | $ 22,621 | $ 162,925 | $ 330,519 | $ (90,449) | $ 1,028,295 |

31

TN CBC43B 00929

DELAWARE VALLEY OBLIGATED GROUP

COMBINING STATEMENT OF OPERATIONS
For the year ended June 30, 1997
(Dollars in Thousands)

| | MCP Hospital | Elkins Park Hospital | Bucks County Hospital | Hahnemann Hospital | Management Support Services | St. Christopher's | Allegheny University of the Health Sciences | Elim. | Combined Delaware Valley Obligated Group |
|---|---|---|---|---|---|---|---|---|---|
| **Unrestricted revenues, gains and other support:** | | | | | | | | | |
| Net patient service revenue | $ 217,699 | $ 61,207 | $ 51,593 | $ 230,099 | - | $ 133,029 | $ 163,263 | - | $ 956,980 |
| Research and training support | 1,350 | | 17 | 3,706 | | 2,111 | 58,910 | | 66,077 |
| Academic activities | 2 | 134 | 7 | | | 791 | 63,490 | | 64,434 |
| Investment income | 468 | 25 | 14 | 6,501 | | 4,665 | 6,130 | | 17,796 |
| Net assets released from restrictions used for operations | 176 | 19 | | 512 | | 911 | 6,754 | | 8,386 |
| Other revenue | 9,477 | 651 | 944 | 6,552 | 5,106 | 6,720 | 87,279 | (53,288) | 63,941 |
| Total revenues, gains and other support | 229,172 | 62,126 | 52,575 | 347,370 | 5,106 | 148,227 | 386,326 | (53,288) | 1,177,614 |
| **Expenses:** | | | | | | | | | |
| Salaries, wages and fringe benefits | 108,281 | 27,213 | 22,640 | 161,514 | 17,770 | 66,041 | 257,911 | | 661,370 |
| Materials, supplies and services | 95,474 | 23,823 | 20,679 | 145,343 | (17,383) | 63,325 | 133,105 | (53,288) | 411,078 |
| Depreciation and amortization | 10,383 | 3,193 | 3,205 | 18,800 | 6,312 | 7,833 | 7,290 | | 57,099 |
| Interest | 3,377 | 5,131 | 1,871 | 9,547 | (1,593) | 2,740 | 3,293 | | 24,366 |
| Total expenses | 217,515 | 59,360 | 48,435 | 335,207 | 5,106 | 139,939 | 401,599 | (53,288) | 1,153,913 |
| Net income (loss) | 11,657 | 2,766 | 4,100 | 12,163 | - | 8,288 | (15,273) | - | 23,701 |
| Net assets released from restrictions used for acquisition of property and equipment | | | | | | 20 | 208 | | 228 |
| Unrealized depreciation of investments | (96) | | | (6,113) | | | | | (7,915) |
| Transfers (to)/from other net assets | (150) | 25 | | (159) | | (719) | (987) | | (1,667) |
| Transfers (to)/from affiliates, net | (3,245) | 1,001 | 1,331 | (2,820) | | 400 | (1,781) | | 25,997 |
| Other | | 1 | | | | 6,553 | 23,177 | | 1 |
| Increase in unrestricted net assets | $ 8,166 | $ 3,793 | $ 5,431 | $ 3,071 | $ - | $ 14,542 | $ 3,342 | $ - | $ 40,345 |

36

TN CBC43B 00930

DELAWARE VALLEY OBLIGATED GROUP

COMBINING STATEMENT OF CHANGES IN NET ASSETS
For the year ended June 30, 1997
(Dollars in Thousands)

| | MCP Hospital | Elkins Park Hospital | Bucks County Hospital | Hahnemann Hospital | Management Support Services | St. Christopher's | Allegheny University of the Health Sciences | Elim | Combined Delaware Valley Obligated Group |
|---|---|---|---|---|---|---|---|---|---|
| **Unrestricted net assets:** | | | | | | | | | |
| Net income/(loss) | $ (11,657) | $ 2,766 | $ 4,100 | $ 12,163 | $ - | $ 8,210 | $ (15,171) | $ - | $ 22,701 |
| Net assets released from restrictions used for acquisition of property and equipment | (96) | - | - | - | | 70 | 700 | | 120 |
| Unrealized depreciation of investments | (150) | 25 | - | (6,111) | | (119) | (907) | | (7,913) |
| Transfers (to)/from other net assets | (3,243) | 1,001 | 1,231 | (159) | | 400 | (1,781) | | (6,647) |
| Transfers (to)/from affiliates | - | - | - | (2,820) | | 6,551 | 22,177 | | 21,997 |
| Other | 1 | 1 | - | - | | - | - | | 1 |
| **Increase in unrestricted net assets** | 8,166 | 3,793 | 3,631 | 3,073 | | 14,542 | 5,242 | | 40,365 |
| **Temporarily restricted net assets:** | | | | | | | | | |
| Contributions | 5 | 23 | 25 | 3 | | 2,221 | 8,032 | | 10,393 |
| Investment income | 636 | 2 | - | 2,967 | | 744 | 14,448 | | 19,047 |
| Net assets released from restrictions | (176) | (10) | (14) | (312) | | (931) | (6,963) | | (8,614) |
| Unrealized depreciation of investments | (181) | - | - | (461) | | - | (1,834) | | (2,303) |
| Transfers (to)/from other net assets | 150 | (33) | - | 173 | | 3 | 2,170 | | 3,471 |
| Transfers from affiliates | - | - | - | - | | - | 5,848 | | 5,848 |
| **Increase in temporarily restricted net assets** | 517 | 41 | 11 | 3,174 | | 2,039 | 22,122 | | 26,944 |
| **Permanently restricted net assets:** | | | | | | | | | |
| Contributions | 29 | - | - | - | | 966 | 1,694 | | 2,689 |
| Investment income | 15 | - | - | - | | - | 355 | | 370 |
| Unrealized appreciation of investments | - | - | - | 1,733 | | - | (16) | | 1,607 |
| Transfers to other net assets | - | - | - | (16) | | (40) | (187) | | (606) |
| Transfers from affiliates | - | - | - | - | | 388 | 8,534 | | 8,946 |
| **Increase in permanently restricted net assets** | 44 | - | - | 1,737 | | 951 | 10,154 | | 12,996 |
| **Increase in net assets** | 9,727 | 3,834 | 3,642 | 6,982 | (935) | 17,532 | 37,618 | | 80,165 |
| Net assets, beginning of year | 47,129 | (42,156) | (2,080) | 15,877 | | 65,781 | 96,318 | | 268,271 |
| **Net assets, end of year** | $ 55,996 | $ (38,322) | $ 1,562 | $ 22,859 | $ (935) | $ 101,355 | $ 133,946 | $ | $ 344,436 |

37

TN CBC43B 00931

COMBINING STATEMENT OF CASH FLOWS
For the year ended June 30, 1997
(Dollars in Thousands)

| | MCP Hospital | Elkins Park Hospital | Bucks County Hospital | Hahnemann Hospital | Management Support Services | St. Christopher's | Allegheny University of the Health Sciences | Elim | Combined Delaware Valley Obligated Group |
|---|---|---|---|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | | | | | |
| Change in net assets | $ 8,727 | $ 3,834 | $ 5,442 | $ 6,982 | $ | $ 17,372 | $ 37,628 | $ | $ 90,105 |
| Adjustments to reconcile change in net assets to net cash provided by operating activities: | | | | | | | | | |
| Depreciation and amortization | 10,303 | 3,193 | 3,205 | 18,600 | 6,312 | 7,013 | 7,290 | | 57,099 |
| Transfers from affiliates | (12,363) | (8,101) | (5,103) | (12,446) | | (12,302) | (4,624) | | (18,119) |
| Net assets balances related to business combinations | | | | | | | (33,303) | | (33,303) |
| Increase/(decrease) in cash from changes in: | | | | | | | | | |
| Short-term investments | | | | | | (6) | | | (6) |
| Receivables | (3,784) | 990 | (120) | 11,361 | (1,503) | 5,869 | (11,336) | | 2,643 |
| Inventories | (81) | 35 | 64 | (210) | (65) | 346 | (70) | | 18 |
| Prepaid expenses | (407) | 6 | 87 | (542) | 12 | (14) | (230) | | (1,181) |
| Accounts payable and accrued expenses | 4,242 | 733 | (459) | 8,336 | 4,609 | (9,618) | (841) | | 6,984 |
| Deferred revenue | (193) | | | (62) | | 239 | 314 | | 18 |
| Self-insurance liabilities | | | | (644) | | | (1,466) | | (2,110) |
| Other | 468 | (19) | 13 | (7) | (1,110) | (226) | (4,449) | | (4,403) |
| **Net cash provided by operating activities** | 9,010 | 562 | 120 | 31,163 | 7,709 | 8,603 | (7,313) | | 46,600 |
| **Cash flows from investing activities:** | | | | | | | | | |
| Acquisition of property and equipment, net | (3,377) | (460) | (468) | (12,040) | (2,117) | (10,498) | (16,518) | | (16,143) |
| Decrease/(increase) in assets limited or restricted as to use, net | (1) | (3) | | 3,561 | 3 | (6,129) | (3,353) | | (23,569) |
| **Net cash used by investing activities** | (3,345) | (443) | (604) | (9,299) | (2,123) | (16,634) | (19,773) | | (77,195) |
| **Cash flows from financing activities:** | | | | | | | | | |
| Net drawdowns/(repayments) on lines of credit | 4,000 | | | 4,000 | 11,500 | | (3,900) | | 18,800 |
| Due to/from affiliates | (3,769) | 34 | 659 | (21,018) | (17,360) | (1,314) | 49,617 | | 6,940 |
| Issuance/(repayments) of long-term debt | 14 | (183) | (900) | 1,849 | | 19 | 120 | | 120 |
| **Net cash provided/(used) by financing activities** | 245 | (149) | (241) | (15,169) | (5,869) | (1,295) | 45,617 | | 23,560 |
| **Net increase/(decrease) in cash and cash equivalents** | (93) | (731) | (831) | 6,695 | 108 | (11,306) | (691) | | (6,834) |
| **Cash and cash equivalents, beginning of year** | 4,315 | 1,039 | 1,070 | 5,045 | 199 | 14,945 | 744 | | 27,182 |
| **Cash and cash equivalents, end of year** | $ 4,172 | $ 311 | $ 449 | $ 11,762 | $ 303 | $ 3,437 | $ | $ | $ 20,348 |
| **Supplemental disclosure:** | | | | | | | | | |
| Cash paid for interest, net of capitalized interest | $ 3,855 | $ 3,034 | $ 3,244 | $ 10,032 | $ 1,393 | $ 2,888 | $ 2,303 | $ | $ 24,932 |

10

TN CBC43B 00932

ALLEGHENY HOSPITALS, CENTENNIAL

COMBINING BALANCE SHEET

as of June 30, 1997

(Dollars in Thousands)

ASSETS

| | Graduate Hospital | Mt. Sinai Hospital | City Avenue Hospital | Parkview Hospital | Elim. | Combined Allegheny Hospitals, Centennial |
|---|---|---|---|---|---|---|
| **Current assets:** | | | | | | |
| Cash and cash equivalents | $ 903 | $ 65 | $ - | $ - | $ - | $ 968 |
| Short-term investments | 500 | | | | | 500 |
| Assets limited or restricted as to use | 8,945 | 2,750 | | | | 11,695 |
| Receivables: | | | | | | |
| Patient accounts, net | 29,336 | 6,781 | 6,640 | 6,837 | | 49,622 |
| Gross and other | 5,077 | 203 | 66 | 42 | 4,581 | 10,849 |
| Inventories | 5,597 | 189 | 779 | 573 | | 7,130 |
| Prepaid expenses | 1,417 | 162 | 30 | 55 | | 1,694 |
| Total current assets | 52,995 | 10,220 | 7,533 | 7,507 | 4,581 | 82,436 |
| Assets limited or restricted as to use, net of current portion | 54,333 | 3,907 | | 30,312 | | 38,240 |
| Property and equipment, net | 80,086 | 6,135 | 24,866 | | | 144,123 |
| Due from affiliates | 13,876 | | | | (13,876) | - |
| Other assets | 7,475 | 57,341 | 26,615 | 14,203 | | 105,834 |
| Total assets | $ 209,097 | $ 79,813 | $ 59,006 | $ 52,022 | $ (9,295) | $ 390,643 |

LIABILITIES AND NET ASSETS

| | Graduate Hospital | Mt. Sinai Hospital | City Avenue Hospital | Parkview Hospital | Elim. | Combined Allegheny Hospitals, Centennial |
|---|---|---|---|---|---|---|
| **Current liabilities:** | | | | | | |
| Accounts payable and accrued expenses | $ 30,011 | $ 12,641 | $ 9,646 | $ 7,930 | $ - | $ 48,077 |
| Deferred revenue | 62 | | 549 | 531 | | 1,142 |
| Current portion of long-term debt | 5,840 | 1,645 | 155 | 469 | | 7,912 |
| Total current liabilities | 43,953 | 13,886 | 10,351 | 8,939 | | 77,131 |
| Long-term debt, net of current portion | 117,714 | 41,640 | 3,799 | 2,872 | | 166,025 |
| Due to affiliates | 24,393 | 24,293 | 44,749 | 40,501 | (9,295) | 100,240 |
| Other noncurrent liabilities | 11,979 | 27 | | | | 12,006 |
| Total liabilities | 173,646 | 79,846 | 58,901 | 52,313 | (9,295) | 355,411 |
| **Net assets:** | | | | | | |
| Unrestricted | 10,494 | (33) | 105 | (291) | | 10,275 |
| Restricted: | | | | | | |
| Temporarily | 17,776 | | | | | 17,776 |
| Permanently | 7,121 | | | | | 7,131 |
| Total net assets | 35,441 | (33) | 105 | (291) | | 35,222 |
| Total liabilities and net assets | $ 209,097 | $ 79,813 | $ 59,006 | $ 52,022 | $ (9,295) | $ 390,643 |

TN CBC43B 00933

ALLEGHENY HOSPITALS, CENTENNIAL

COMBINING STATEMENT OF OPERATIONS
For the period May 1, 1997 through June 30, 1997
(Dollars in Thousands)

| | Graduate Hospital | Mt. Sinai Hospital | City Avenue Hospital | Parkview Hospital | Elim. | Combined Allegheny Hospitals, Centennial |
|---|---|---|---|---|---|---|
| Unrestricted revenues, gains and other support: | | | | | | |
| Net patient service revenue | $ 40,603 | $ 5,092 | $ 11,106 | $ 8,042 | - | $ 64,843 |
| Research and training support | 96 | - | - | - | - | 96 |
| Investment income | 952 | 54 | - | - | - | 1,006 |
| Net assets released from restrictions used for operations | 189 | - | - | - | - | 189 |
| Other revenue | 1,061 | 863 | 67 | 202 | (55) | 2,138 |
| Total revenues, gains and other support | 42,901 | 6,009 | 11,173 | 8,244 | (55) | 68,272 |
| Expenses: | | | | | | |
| Salaries, wages and fringe benefits | 12,689 | 3,255 | 5,919 | 4,185 | - | 26,048 |
| Materials, supplies and services | 18,141 | 1,906 | 4,192 | 3,618 | (55) | 27,802 |
| Depreciation and amortization | 431 | 262 | 610 | 443 | - | 1,746 |
| Interest | 1,197 | 586 | 322 | 264 | - | 2,369 |
| Total expenses | 32,458 | 6,009 | 11,043 | 8,510 | (55) | 57,965 |
| Net income/(loss) | 10,443 | - | 130 | (266) | - | 10,307 |
| Unrealized appreciation/(depreciation) of investments | 73 | (33) | - | - | - | 40 |
| Transfers to affiliates, net | (22) | - | (25) | (25) | - | (72) |
| Increase/(decrease) in unrestricted net assets | $ 10,494 | $ (33) | $ 105 | $ (291) | $ - | $ 10,275 |

40

TN CBC43B 00934

ALLEGHENY HOSPITALS, CENTENNIAL

COMBINING STATEMENT OF CHANGES IN NET ASSETS
For the period May 1, 1997 through June 30, 1997
(Dollars in Thousands)

| | Graduate Hospital | Mt. Sinai Hospital | City Avenue Hospital | Parkview Hospital | Elim. | Combined Allegheny Hospital, Centennial |
|---|---|---|---|---|---|---|
| Unrestricted net assets: | | | | | | |
| Net income/(loss) | $ 10,443 | $ - | $ 130 | $ (266) | $ - | $ 10,307 |
| Unrealized appreciation/(depreciation) of investments | 73 | (33) | - | - | - | 40 |
| Transfers to affiliates | (22) | - | (25) | (25) | - | (72) |
| Increase/(decrease) in unrestricted net assets | 10,494 | (33) | 105 | (291) | - | 10,275 |
| Temporarily restricted net assets: | | | | | | |
| Contributions | 89 | - | - | - | - | 89 |
| Investment income | 158 | - | - | - | - | 158 |
| Net assets released from restrictions | (189) | - | - | - | - | (189) |
| Unrealized appreciation of investments | 978 | - | - | - | - | 978 |
| Acquisition of affiliates | 16,740 | - | - | - | - | 16,740 |
| Increase in temporarily restricted net assets | 17,776 | - | - | - | - | 17,776 |
| Permanently restricted net assets: | | | | | | |
| Contributions | 56 | - | - | - | - | 56 |
| Acquisition of affiliates | 7,115 | - | - | - | - | 7,115 |
| Increase in permanently restricted net assets | 7,171 | - | - | - | - | 7,171 |
| Increase/(decrease) in net assets | 35,441 | (33) | 105 | (291) | - | 35,222 |
| Net assets, beginning of year | - | - | - | - | - | - |
| Net assets, end of year | $ 35,441 | $ (33) | $ 105 | $ (291) | $ - | $ 35,222 |

41

TN CBC43B 00935

ALLEGHENY HOSPITALS, CENTENNIAL

COMBINING STATEMENT OF CASH FLOWS
For the period May 1, 1997 through June 30, 1997
(Dollars in Thousands)

| | Graduate Hospital | Mt. Sinai Hospital | City Avenue Hospital | Parkview Hospital | Elim | Consolidated Allegheny Hospitals, Centennial |
|---|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | | |
| Change in net assets | $ 35,441 | $ (13) | $ 105 | $ (204) | $ | $ 35,222 |
| Adjustments to reconcile change in net assets to net cash used by operating activities: | | | | | | |
| Depreciation and amortization | 431 | 262 | 610 | 443 | | 1,746 |
| Net assets balances related to business combinations | (29,494) | | | | | (29,494) |
| Increase/(decrease) in cash from changes in: | | | | | | |
| Short-term investments | (100) | | | | | (59) |
| Receivables | (623) | (104) | (375) | (1,351) | | (1,383) |
| Inventories | (950) | 15 | (320) | (15) | | (1,214) |
| Prepaid expenses | (977) | (38) | 124 | 76 | | (161) |
| Accounts payable and accrued expenses | (10,313) | (6,594) | (3,104) | (2,330) | | (10,001) |
| Deferred revenue | | | | | | |
| Self-insurance liabilities | | | | | | |
| Other | (1,460) | (454) | (37) | | | (1,951) |
| Net cash used by operating activities | (13,176) | (7,302) | (3,461) | (3,920) | | (28,304) |
| **Cash flows from investing activities:** | | | | | | |
| Acquisition of property and equipment, net | (3,117) | (115) | (944) | (15) | | (4,104) |
| Decrease/(increase) in assets limited or restricted as to use, net | 217 | (1,420) | 93 | | | (498) |
| Cash balances related to business combinations | 4,906 | | | | | 4,906 |
| Net cash provided/(used) by investing activities | 2,016 | (1,535) | (848) | (15) | | (2) |
| **Cash flows from financing activities:** | | | | | | |
| Net repayments of lines of credit | 11,351 | 9,314 | (3,755) | (2,601) | | (6,154) |
| Due to/from affiliates | | | 8,072 | 6,437 | | 33,394 |
| Issuance/(repayment) of long-term debt | (119) | 9 | (4) | (91) | | (204) |
| Net cash provided by financing activities | 11,663 | 9,233 | 4,313 | 3,915 | | 29,254 |
| Net increase in cash and cash equivalents | 903 | 65 | 4 | | | 948 |
| Cash and cash equivalents, beginning of year | | | | | | |
| Cash and cash equivalents, end of year | 902 | $ 65 | $ 4 | $ 33 | $ | $ 998 |
| **Supplemental disclosure:** | | | | | | |
| Cash paid for interest, net of capitalized interest | 848 | | 63 | 33 | | 944 |

42

TN CBC43B 00936

**EXHIBIT  0326**

13367.2

EXECUTION COPY

LETTER OF CREDIT, REIMBURSEMENT AND SECURITY AGREEMENT

Dated as of January 29, 1993

Between

ALLEGHENY GENERAL HOSPITAL

and

PITTSBURGH NATIONAL BANK

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
**24018**
EXHIBIT NO.



DEPOSITION
EXHIBIT
326
AKF

D0016838

15387.2



## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS .................................... 2

     Section 1.01.  Definitions ........................... 2
     Section 1.02.  Rules of Construction; Time of Day ...... 6

     Section 2.01.  Issuance of Letter of Credit ........... 7
     Section 2.02.  Reimbursement and Other Payments ........ 7
     Section 2.03.  Transfer of Letter of Credit;
                      Reduction of Stated Amount;
                      Reinstatement ......................... 10
     Section 2.04.  Obligations Absolute ................... 11
     Section 2.05.  Indemnification ....................... 11
     Section 2.06.  Liability of Bank ..................... 12

ARTICLE III - SECURITY .................................... 13

     Section 3.01.  Subrogation ........................... 13
     Section 3.02.  Pledge of Rights to Certain Funds
                      and Investments ....................... 13
     Section 3.03.  Financing Statements .................. 13
     Section 3.04.  Pledge Agreement ...................... 14

ARTICLE IV - CONDITIONS PRECEDENT ......................... 14

     Section 4.01.  Documentation ......................... 14
     Section 4.02.  Issuance of Notes ..................... 15

ARTICLE V - REPRESENTATIONS AND WARRANTIES ................ 15

     Section 5.01.  Existence ............................. 15
     Section 5.02.  Tax-exempt Organization ............... 15
     Section 5.03.  Power, Authorization and No Conflicts ... 15
     Section 5.04.  Governmental and Other Approvals ........ 16
     Section 5.05.  Validity and Binding Effect ........... 16
     Section 5.06.  No Litigation ......................... 16
     Section 5.07.  No Violations ......................... 16
     Section 5.08.  Compliance ............................ 17
     Section 5.09.  No Liens .............................. 17
     Section 5.10.  Third Party Reimbursement ............. 17
     Section 5.11.  Financial Information ................. 17
     Section 5.12.  ERISA ................................. 17
     Section 5.13.  Absence of Events of Default Under
                      Master Indenture ...................... 17
     Section 5.14.  Insurance ............................. 17
     Section 5.15.  Incorporation of Representations and
                      Warranties by Reference ................ 18

ARTICLE VI - GENERAL COVENANTS ............................ 18

     Section 6.01.  Maintenance of Existence; Mergers ....... 18

D0016839

16367.2

Section 6.02.    Compliance with Governmental
                 Rules, Etc. ............................ 18
Section 6.03.    Maintenance of Insurance ............... 19
Section 6.04.    Compliance with Related Documents and
                 Other Contracts ........................ 19
Section 6.05.    Visitation Rights ...................... 19
Section 6.06.    Keeping of Books ....................... 19
Section 6.07.    Maintenance of Properties .............. 19
Section 6.08.    Reporting Requirements ................. 19
Section 6.09.    Satisfaction of Series D Note .......... 22
Section 6.10.    Amendments to Note Documents or
                 Master Indenture ....................... 22
Section 6.11.    Financial Covenants .................... 22
Section 6.12.    ERISA .................................. 23
Section 6.13.    Preservation of Tax-Exempt Status ...... 23
Section 6.14.    Information to be Furnished to
                 the Bank ............................... 23
Section 6.15.    Maintenance of Reimbursement
                 Eligibility ............................ 24
Section 6.16.    Further Assurances ..................... 24
Section 6.17.    Appointment of Remarketing Agent ....... 24
Section 6.18.    Payment of Taxes; Removal of Liens ..... 24
Section 6.19.    Ownership of Notes ..................... 25

ARTICLE VII - DEFAULTS AND REMEDIES ......................... 25

Section 7.01.    Defaults ............................... 25
Section 7.02.    Remedies ............................... 27
Section 7.03.    Waivers; Consents ...................... 28
Section 7.04.    No Waiver; Remedies Cumulative ......... 28
Section 7.05.    Set-Off ................................ 28

ARTICLE VIII - MISCELLANEOUS ................................ 29

Section 8.01.    Notices ................................ 29
Section 8.02.    Successors and Assigns ................. 29
Section 8.03.    Survival ............................... 29
Section 8.04.    Counterparts ........................... 30
Section 8.05.    Costs, Expenses and Taxes .............. 30
Section 8.06.    Amendments ............................. 30
Section 8.07.    Severability; Interest Limitation ...... 30
Section 8.08.    Complete Agreement ..................... 31
Section 8.09.    Consent to Jurisdiction; Venue;
                 Waiver of Jury Trial ................... 31
Section 8.10.    Governing Law .......................... 32
Section 8.11.    Participation .......................... 32
Section 8.12.    Headings ............................... 32

D0016840

:5357.:

EXECUTION COPY

LETTER OF CREDIT, REIMBURSEMENT AND SECURITY AGREEMENT

    THIS LETTER OF CREDIT, REIMBURSEMENT AND SECURITY AGREEMENT
(the "Agreement") made as of the 29th day of January, 1993
between ALLEGHENY GENERAL HOSPITAL (the "Hospital"), a nonprofit
corporation organized and existing under the laws of the
Commonwealth of Pennsylvania, and PITTSBURGH NATIONAL BANK (the
"Bank"), a national banking association.

                    W I T N E S S E T H

    A.  The Hospital proposes to issue its Variable Interest
Rate Demand Notes, Series of 1993, maturing July 1, 2012, at a
variable taxable money market rate in the aggregate principal
amount of $30,000,000 (the "Notes") under a Financing Agreement
dated January 29, 1993 (the "Financing Agreement") between the
Hospital and Morgan Guaranty Trust Company of New York, as
trustee of various trusts and on behalf of certain clients for
whom it acts in a fiduciary capacity (including any successor in
interest thereto, "Morgan").

    B.  In order to facilitate the issuance and sale of the
Notes and to enhance the marketability of the Notes and thereby
achieve interest cost savings and other savings, the Bank has
agreed to issue its irrevocable Letter of Credit (together with
any substitute letter of credit issued pursuant to the terms
hereof, the "Letter of Credit") to Pittsburgh National Bank, as
Paying Agent (the "Paying Agent") for the account of the Hospital
authorizing the Paying Agent to make one or more draws on the
Bank up to an aggregate of $30,450,000 (as reduced and reinstated
from time to time in accordance with the provisions hereof and of
the Letter of Credit (the "Stated Amount"), of which (i)
$30,000,000 (the "Principal Component") shall be in respect of
principal of the Notes and (ii) $450,000 (the "Interest
Component") shall be in respect of interest accrued on the Notes.
The purpose of the Letter of Credit is to provide funds for the
payment of the principal and purchase price of and interest on
the Notes in accordance with the provisions of the Financing
Agreement.

    C.  The Bank is willing to issue the Letter of Credit upon
the terms and conditions hereinafter set forth.

    NOW, THEREFORE, in consideration of the foregoing and the
undertakings herein set forth, and intending to be legally bound,
the Hospital and the Bank hereby agree as follows:

D0016841

ARTICLE I

DEFINITIONS

Section 1.01.  Definitions.  In this Agreement (except as otherwise expressly provided for or unless the context otherwise requires), defined terms may be used in the singular or the plural, the use of any gender includes all other genders and the following terms have the following meanings:

"Bank Documents" means this Agreement, the Letter of Credit, the Pledge Agreement, the Series D Note and any other document or instrument executed and delivered by the Hospital and the Bank in connection with the transactions contemplated herein.

"Business Day" means a day of the year on which banks located in the city in which the Principal Office of the Bank is located are not required or authorized by law (including executive order) to remain closed.

"Capitalization" shall mean the principal amount of all Long-Term Indebtedness outstanding plus the equity accounts of the Obligated Group (i.e., unrestricted fund balances including any shareholder equity determined in accordance with GAAP).  In the case of Long-Term Indebtedness issued or incurred at a discount, such Long-Term Indebtedness shall be valued at the accreted value thereof.

"Code" means the Internal Revenue Code of 1986 and the rules and regulations thereunder, including any amendments and successor provisions thereto.

"Contribution Agreements" shall have the meaning ascribed to such term in the Original Master Indenture.

"Date of Issuance" shall mean the date on which the Letter of Credit is issued.

"Effective Date" shall have the meaning ascribed to such term in the Restated Master Indenture.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and, unless the context otherwise requires, the rules and regulations promulgated thereunder from time to time.

"Event of Default" shall have the meaning ascribed to such term in Section 7.01.

"Facilities" means all Property which is property, plant and equipment under GAAP.

- 2 -

D0016842

"Financing Agreement" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Fiscal Year" means the annual accounting year of the Hospital, which currently begins on July 1 in each calendar year.

"GAAP" means generally accepted accounting principles.

"Governmental Person" means the government of the United States or the government of any state or locality therein, any political subdivision or any governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body or entity, or other regulatory bureau, authority, body or entity of the United States or any state or locality therein, including the Federal Deposit Insurance Corporation, the Comptroller of the Currency or the Board of Governors of the Federal Reserve System, any central bank or any comparable authority.

"Governmental Rule" means any law, rule, regulation, ordinance, order, judgment or decision of any Governmental Person.

"Hospital" shall mean Allegheny General Hospital, as successor by merger to Allegheny Health, Education and Research Corporation.

"Income Available for Debt Service" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Indebtedness" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Interest Component" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Interest Draft" shall mean a sight draft under the Letter of Credit accompanied by a Certificate in the form of Annex 3 to the Letter of Credit.

"Lien" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Long-Term Indebtedness" shall have the meaning ascribed to such term in the Restated Master Indenture and shall include any Guaranty and Commitment Indebtedness (as those terms are defined in the Restated Master Indenture) during the periods that payments are being made pursuant thereto.

"Master Indenture" shall mean the Original Master Indenture and, upon the Effective Date, the Restated Master Indenture.

"Morgan" shall have the meaning ascribed to such term in the Recitals to this Agreement.

- 3 -

D0016843

"Multi-employer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA.

"Note Documents" means the Notes, the Financing Agreement, the Paying Agent Agreement and any other agreements or instruments relating thereto.

"Notes" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Obligated Affiliate" and "Restricted Affiliate" shall have the meanings ascribed to such terms in the Restated Master Indenture and the Original Master Indenture, respectively, and, in all events, shall include the Hospital.

"Obligated Group" means the Hospital, Allegheny Singer Research Institute, Allegheny Neuropsychiatric Institute and any other Persons which from time to time become members of the Restricted Group or the Obligated Group, as appropriate, under the terms of the Master Indenture.

"Obligated Group Agent" shall have the meaning ascribed to such term in the Restated Master Indenture.

"Original Master Indenture" shall mean the Master Trust Indenture dated as of December 1, 1983 between the Hospital and Pittsburgh National Bank, as Trustee, as amended and supplemented by a Supplemental Indenture No. One dated as of December 1, 1983, a Second Supplemental Master Trust Indenture dated as of February 1, 1988, a Third Supplemental Master Trust Indenture dated as of February 1, 1988, a Fourth Supplemental Master Trust Indenture dated as of July 1, 1988, a Fifth Supplemental Master Trust Indenture dated as of January 1, 1991, and a Sixth Supplemental Master Trust Indenture dated as of even date herewith, as further amended or supplemented from time to time.

"Outstanding" when applied to the Notes shall have the meaning ascribed to such term in the Financing Agreement.

"Participating Banks" shall have the meaning ascribed to such term in Section 8.11.

"Paying Agent" shall mean the Paying Agent under the Paying Agent Agreement.

"Paying Agent Agreement" shall mean that certain Paying Agent and Depository Agreement dated as of the date hereof between the Hospital and the Paying Agent.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Liens" shall have the meaning ascribed to such term in the Restated Master Indenture.

- 4 -

D0016844

"Person" means any natural person, corporation, partnership, association, joint-stock company, trust, unincorporated organization, joint venture, Governmental Person, public body or other legal entity.

"Plan" means any employee benefit plan (other than a Multi-employer Plan) maintained for employees and covered by Title IV of ERISA.

"Pledge Agreement" means the Pledge and Security Agreement dated of even date herewith between the Hospital and the Bank.

"Pledged Notes" or "Bank Notes" shall have the meaning ascribed to the term Pledged Notes in the Pledge Agreement.

"Prime Rate" means the fluctuating rate of interest per annum (computed on the basis of a year of 365 or 366 days, as the case may be) publicly announced by the Bank from time to time as the prime rate of the Bank, adjusted automatically as of the date of an announcement of any change in such prime rate. The prime rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index, nor necessarily reflects the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

"Principal Component" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Principal Draft" shall mean a sight draft under the Letter of Credit accompanied by a Certificate in the form of Annex 2 to the Letter of Credit.

"Principal Office" means the Bank's office located at 237 Fifth Avenue, Third Floor Annex, Pittsburgh, Pennsylvania 15222, Attention: Standby Letter of Credit Department, or any other office in the City of Pittsburgh which may be designated in writing to the Hospital.

"Projected Long-Term Debt Service Requirement" shall mean the aggregate of all amounts actually payable to holders (or to any trustee or paying agent for such holders) of Long-Term Indebtedness during the succeeding twelve-month period. To the extent that the interest on such Long-Term Indebtedness is calculated at a varying rate per annum, a formula rate or a fixed rate per annum based on a varying index, then the provisions of Section 5.07(e) of the Restated Master Indenture shall be used for computing such interest during the period in question.

"Property" means any and all right, title and interest in and to any and all property whether real or personal, tangible or intangible and wherever situated.

- 5 -

D0016845

"Related Documents" means the Bank Documents, the Note Documents, the Contribution Agreements, the Master Indenture and any notes issued pursuant thereto.

"Remarketing Agent" means the placement or remarketing agent designated as the Remarketing Agent for purposes of the Financing Agreement.

"Reportable Event" shall have the meaning ascribed to that term in Title IV of ERISA and the regulations thereunder.

"Restated Master Indenture" means the Restated and Amended Master Trust Indenture dated as of February 1, 1988 between the Obligated Group and Pittsburgh National Bank, as trustee, as created by the Second Supplemental Master Trust Indenture dated as of February 1, 1988 between the Corporation and such trustee. To the extent any term defined herein incorporates the definition of a term in the Restated Master Indenture, the definition herein shall not be affected (i) by an amendment or supplement to the Restated Master Indenture unless the Bank expressly consents in writing to such amendment or supplement or (ii) by whether or not the Restated Master Indenture is in effect.

"Series D Note" means the Series 1993D Note issued pursuant to the Master Indenture to the Bank as security for the obligations of the Hospital under this Agreement.

"Stated Amount" shall have the meaning ascribed to such term in the Letter of Credit.

"Tender Draft" shall mean sight drafts under the Letter of Credit accompanied by Certificates in the form of Annex 1 or 4.

"Termination Event" means (i) a Reportable Event described in Section 4043 of ERISA (other than a Reportable Event not subject to the provision for 30 day notice to the PBGC under the regulations promulgated under such Section) with respect to any Plan, (ii) the withdrawal of any Obligated Affiliate from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (iii) the cessation of operations of any facility of any Obligated Affiliate if, pursuant to Section 4062(e) of ERISA, such cessation causes such Obligated Affiliate to be treated as a "substantial employer," (iv) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, (v) the institution of proceedings by the PBGC to terminate a Plan, or (vi) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

Section 1.02. <u>Rules of Construction; Time of Day</u>. The words "hereof", "herein", "hereto", "hereby" and "hereunder" refer to

- 6 -

D0016846

this entire Agreement.  Unless otherwise indicated, all
references to particular Articles or Sections are references to
the Articles or Sections of this Agreement.  References to any
time of the day in this Agreement shall refer to Eastern standard
time or Eastern daylight saving time, as in effect in Pittsburgh,
Pennsylvania on such day.

    Section 2.01.  Issuance of Letter of Credit.  Subject to the
conditions precedent hereinafter set forth, the Bank will issue
to the Paying Agent pursuant to the request of the Hospital, on
the date of execution and delivery of this Agreement, the Letter
of Credit in the Stated Amount and substantially in the form
attached hereto as Exhibit A. The Interest Component of the
Stated Amount has been established on the basis of 45 days'
interest on the Notes at an interest rate of 12%.  The Letter of
Credit shall expire at 5:00 p.m. on January 29, 1998.  The Letter
of Credit is subject to prior automatic termination as provided
therein.  After June 1, 1997, the Bank will consider a written
request for an extension of the Letter of Credit.

    Section 2.02.  Reimbursement and Other Payments.

        (a)  The Hospital hereby agrees to pay or cause to be
paid to the Bank a sum equal to each amount drawn under the
Letter of Credit on the same Business Day that such amount is so
drawn, except for amounts drawn under the Letter of Credit with
respect to principal by a Tender Draft, which shall be payable
upon the occurrence of the earliest' of

            (i)  the remarketing of the Notes,

            (ii)  an Event of Default hereunder, or

            (iii)  the expiration or termination of the Letter
        of Credit.


        Except as otherwise provided herein, all sums payable
to the Bank under this Section 2.02(a) shall bear interest
payable on the first day of each month, from the date the
corresponding amount is drawn under the Letter of Credit until
such sums are paid in full (it being understood and agreed that
any sum paid after 3:00 p.m. on a Business Day shall bear
interest as if it was paid at 9:00 a.m. on the next following
Business Day), at a fluctuating rate per annum (computed for the
actual number of days elapsed, based on a 365 or 366-day year, as
the case may be) equal to the Prime Rate for the first 30 days,
the Prime Rate plus twenty-five one hundredths percent (.25%) for
the next 60 days and the Prime Rate plus fifty one hundredths
percent (.50%) thereafter.  Anything to the contrary
notwithstanding, if an Event of Default shall have occurred
hereunder, any sums or interest due and payable to the Bank under
this Agreement shall thereafter bear interest at a fluctuating
rate per annum (computed for the actual number of days elapsed,

- 7 -

D0016847

based on a 365 or 366-day year, as the case may be) equal to two percent (2%) per annum above the Prime Rate until such sum or interest and all other amounts due and payable under this Agreement having been paid in full. The Hospital may prepay any amount due hereunder by giving notice to the Bank at least one Business Day prior to the date on which such prepayment is to be made. All payments under this Section 2.02(a) shall be applied first to the payment of interest due and payable under this Section 2.02(a) and then to the reduction of the principal balance of sums due and payable under this Section 2.02(a).

(b)   On the date of execution and delivery hereof, the Hospital shall pay to the Bank a one-time up-front fee of $15,000.   On April 1, 1993 and quarterly on each July 1, October 1, January 1 and April 1 thereafter so long as any credit remains available to the Paying Agent under the Letter of Credit and on the date of termination of the Letter of Credit, the Hospital shall pay to the Bank a Letter of Credit commitment fee computed at the rate of thirty-five one hundredths percent (.35%) per annum on the average daily Stated Amount during the preceding quarterly period (or portion thereof in the case of the termination of the Letter of Credit on a day other than an April 1, July 1, October 1 or January 1); provided that, for purposes of computing such average daily Stated Amount, the Stated Amount shall be treated as having been reinstated with respect to each drawing with an Interest Draft theretofore honored by the Bank in respect of which the Bank may be required to reinstate the Letter of Credit pursuant to the terms thereof but shall not be treated as having been reinstated with respect to each drawing with a Tender Draft theretofore honored by the Bank in respect of which the Letter of Credit may be required to be, but has not been, reinstated pursuant to the terms thereof. Computations of Letter of Credit commitment fees under this Section shall be for the actual number of days in the applicable period, based on a 365 or 366-day year, as the case may be.

(c)   The Hospital shall pay to the Bank all reasonable transaction charges that the Bank may make for drawings under the Letter of Credit.   Such transaction charges shall be payable quarterly at the same times as the fees described in Section 2.02(b) hereof are payable, upon submission to the Hospital by the Bank of the Bank's bill therefor.   In addition, the Hospital shall pay to the Bank on demand any and all reasonable charges and expenses which the Bank may pay or incur relative to the Letter of Credit.   The Hospital shall pay to the Bank upon each transfer of the Letter of Credit in accordance with its terms a transfer fee, together with any and all reasonable costs and expenses of the Bank incurred in connection with such transfer. Any fees or charges imposed pursuant to this Section 2.02(c) shall not exceed those customarily charged by the Bank ($50 being the charge presently made by the Bank for drawings under letters of credit).

D0016848

(d) (i)   If any enactment, promulgation or adoption of or
change in any applicable Governmental Rule or in the
interpretation or administration thereof by any Governmental
Person charged with the interpretation or administration thereof,
or compliance by the Bank with any guideline, request or
directive (whether or not having the force of law) of any such
Governmental Person, shall either (A) impose, modify or deem
applicable any reserve, special deposit or similar requirement
(including without limitation a guideline, request or directive
which affects the manner in which the Bank allocates capital
resources to its commitments, including its obligations under
this Agreement and the Letter of Credit), (B) subject the Bank to
any tax or change the basis of taxation of the Bank (other than a
change in a rate of tax based on overall net income of the Bank),
or (C) impose on the Bank any other condition regarding this
Agreement or the Letter of Credit, and the result of any event
referred to in clause (A), (B) or (C) of this sentence shall be
to increase the direct or indirect cost to the Bank of issuing or
maintaining the Letter of Credit or the Bank's obligations under
this Agreement or to reduce the amounts receivable by the Bank
hereunder (which increase in costs or reduction in amounts
receivable shall be determined by the Bank's reasonable
allocation of such cost increase or reduction in amounts
receivable resulting from such event), then within 10 Business
Days after demand by the Bank, the Hospital shall pay to the
Bank, from time to time as specified by the Bank, additional
amounts that in the aggregate shall be sufficient to compensate
the Bank for such increased cost or reduction in amounts
receivable.  A certificate as to such increased cost or reduction
in amounts receivable by the Bank as a result of any event
mentioned in clause (A), (B) or (C) above to the Hospital shall,
in absence of manifest error, be conclusive and binding for all
purposes.

(ii) If the Bank shall have determined that any enactment,
promulgation or adoption of or change in any applicable
Government Rule or guideline regarding capital adequacy, or in
the interpretation or administration thereof, by any Governmental
Person charged with the interpretation or administration thereof,
or compliance by the Bank (or any controlling affiliate or
entity) with any guideline, request or directive regarding
capital adequacy (whether or not having the force of law and
whether or not failure to comply thereunder would be unlawful) of
any such Governmental Person, affects or would affect the amount
of capital required or expected to be maintained by the Bank (or
any controlling affiliate or entity) and the Bank determines, on
the basis of reasonable allocations, that the amount of such
capital is increased by or is based on its issuance or
maintenance of the Letter of Credit or the Bank's obligations
under this Agreement, then, within 10 Business Days after demand
by the Bank, the Hospital shall pay to the Bank, from time to
time as specified by the Bank, additional amounts sufficient to
compensate the Bank therefor.  A certificate as to such amounts

- 9 -

D0016849

submitted to the Hospital by the Bank shall, in the absence of manifest error, be conclusive and binding for all purposes.

(e)  Whenever any payment pursuant to this Article shall be due on any day that is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day.  Except as otherwise provided in Section 2.02(a), all payments to the Bank under this Agreement (including, without limitation, all payments becoming due under Sections 2.02 and 8.05) shall be accompanied by interest thereon, from the date such payments become due (whether or not a Business Day) until they are paid in full, at a fluctuating rate per annum equal to two percent (2%) per annum above the Prime Rate.  All payments by or on behalf of the Hospital to the Bank under this Agreement shall be made in lawful currency of the United States at the Bank's office at Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania 15265, Attention: Manager, Health Care Group, or at such other address and to the attention of such other person as the Bank may stipulate by written notice to the Hospital, or by a wire transfer in immediately available funds from the Hospital or on behalf of the Hospital to the Bank in accordance with written wire instructions given to the Hospital by the Bank.  All payments hereunder shall be made in immediately available funds at such office of the Bank or other address as the Bank may so stipulate by written notice to the Hospital.

(f)  The Bank shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Hospital and the amounts payable and paid from time to time hereunder.  In any legal action or proceeding in respect of this Agreement, the entries made in such account or accounts shall be presumptive evidence of the existence and amounts of the obligations of the Hospital therein recorded.  The failure to record any such amount shall not, however, limit or otherwise affect the obligations of the Hospital hereunder to repay all amounts owed hereunder together with all interest accrued thereon as provided herein.

Section 2.03.  <u>Transfer of Letter of Credit; Reduction of Stated Amount; Reinstatement</u>.

(a)  The Letter of Credit may be transferred in accordance with the provisions set forth in the Letter of Credit.

(b)  The Stated Amount shall be automatically reduced as specified in the Letter of Credit.  With respect to any reductions of the Stated Amount pursuant to the terms of the Letter of Credit as a result of Notes ceasing to be Outstanding, the Bank shall have the right, at its option, to require the Paying Agent to surrender promptly the outstanding Letter of Credit to the Bank and to accept in substitution therefor a substitute letter of credit in the form of <u>Exhibit A</u> attached hereto, dated the date of such substitution, for an amount equal

- 10 -

D0016850

to the Stated Amount as so reduced, but otherwise having terms
identical to the then outstanding Letter of Credit.

(c)   In the event of a drawing under the Letter of
Credit with an Interest Draft and/or a Tender Draft, the Stated
Amount shall, as provided in the Letter of Credit and subject to
the conditions therein set forth, be automatically reinstated as
set forth in the Letter of Credit.

(d)   The consent of the Bank shall be required in the
event of a drawing with a Principal Draft, to the extent that it
involves an optional redemption of the Notes; provided, however,
that the Bank will consent to such optional redemption if the
Hospital demonstrates to the reasonable satisfaction of the Bank
that sufficient moneys will be available to reimburse the Bank
for the amount to be drawn on the Letter of Credit in connection
with such optional redemption.

Section 2.04.   <u>Obligations Absolute</u>.   The obligations of the
Hospital under this Article shall be absolute, unconditional and
irrevocable, and shall be performed strictly in accordance with
the terms of this Agreement, under all circumstances whatsoever,
including without limitation the following circumstances (i) any
lack of validity or enforceability of this Agreement, the Related
Documents or any other agreement or document relating thereto;
(ii) any amendment or waiver of or any consent to or departure
from this Agreement, the Related Documents or any document
relating thereto; (iii) the existence of any claim, set-off,
defense or other right which the Hospital may have at any time
against the Paying Agent (or any persons or entities for whom the
Paying Agent may be acting), the Bank or any other person or
entity, whether in connection with this Agreement, the
transactions described herein or any unrelated transaction, or
(iv) any of the circumstances contemplated in clauses (i) through
(vii), inclusive, of Section 2.06.

Section 2.05.   <u>Indemnification</u>.   To the extent permitted by
applicable law, the Hospital hereby agrees to indemnify and hold
harmless the Bank (and its directors, officers, employees and
agents) from and against any and all claims, damages, losses,
liabilities, costs or expenses (including reasonable attorneys'
fees) whatsoever that the Bank may incur (or which may be claimed
against the Bank by any person or entity whatsoever) by reason of
or in connection with (a) the issuance or a transfer of, or
payment or failure to pay under, the Letter of Credit, (b) any
breach by the Hospital of any representation, warranty, covenant,
term or condition in, or the occurrence of any default under,
this Agreement or the Related Documents, including all reasonable
fees or expenses resulting from the settlement or defense of any
claims or liabilities arising as a result of any such breach or
default, (c) by reason of any inaccuracy or alleged inaccuracy in
any material respect, or any untrue or alleged untrue statement
of any material fact, contained in any offering memorandum or
similar document for the Notes or any amendment or supplement

- 11 -

D0016851

thereto, or by reason of the omission or alleged omission to state therein a material fact necessary to make statements, in light of the circumstances under which they were made, not misleading, and (d) involvement of the Bank in any suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the Bank's issuance of the Letter of Credit, its entering into this Agreement or any other event or transaction contemplated by any of the foregoing; provided the Hospital shall not be required to indemnify the Bank for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by (i) the willful misconduct or gross negligence of the Bank or (ii) the Bank's willful failure to pay under the Letter of Credit after the presentation to it by the Paying Agent of a sight draft and certificate strictly complying with the terms and conditions of the Letter of Credit, unless the Bank in good faith and upon advice of counsel believes that it is prohibited by law or other legal authority from making such payment.

    Section 2.06. <u>Liability of Bank</u>. As between the Hospital and the Bank, the Hospital assumes all risks of the acts or omissions of the Remarketing Agent, the Paying Agent or any of their agents with respect to the use of the Letter of Credit by each of the foregoing. Neither the Bank nor any of its officers or directors shall be liable or responsible for (i) the use which may be made of the Letter of Credit or for any acts or omissions of the Remarketing Agent, the Paying Agent or any of their agents in connection therewith; (ii) the form, validity, sufficiency, accuracy or genuineness of any documents (including without limitation any documents presented under the Letter of Credit), or of any statement therein or endorsement thereon, even if any such documents, statements or endorsements should in fact prove to be in any or all respects invalid, insufficient, fraudulent, forged, inaccurate or untrue; (iii) the payment by the Bank against presentation of documents which do not comply with the terms of the Letter of Credit including failure of any documents to bear any reference or adequate reference to the Letter of Credit; or any other failure by the Paying Agent or any of its agents to comply fully with conditions required in order to effect a drawing under the Letter of Credit; (iv) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign the Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (v) errors, omissions, interruptions or delays in transmission or delivery of any messages by mail, cable, telegraph, telex, telephone or otherwise; (vi) any loss or delay in the transmission or otherwise of any document or draft required in order to make a drawing under the Letter of Credit; or (vii) any other circumstances whatsoever in making or failing to make payment under the Letter of Credit, except only that the Hospital shall have a claim against the Bank, and the Bank shall be liable to the Hospital, to the extent, but only to the extent, of any direct, as opposed to consequential, damages suffered by

- 12 -

D0016852

the Hospital which the Hospital proves were caused by (x) the Bank's willful misconduct or gross negligence or (y) the Bank's willful failure to pay under the Letter of Credit after the presentation to it by the Paying Agent of a draft and certificate strictly complying with the terms and conditions of the Letter of Credit, unless the Bank in good faith and upon advice of counsel believes that it is prohibited by law or other legal authority from making such payment.  In furtherance and not in limitation of the foregoing, the Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary; provided that if the Bank shall receive written notification from both the Paying Agent and the Hospital that documents conforming to the terms of the Letter of Credit to be presented to the Bank are not to be honored, the Bank agrees that it will not honor such documents.

ARTICLE III

SECURITY

Section 3.01.  <u>Subrogation</u>.  The Hospital and the Bank intend that, in the event of one or more draws under the Letter of Credit and the application thereof to the payment of Notes, the Bank will be subrogated pro tanto to the rights of the Paying Agent and the holders of such Notes in and to all funds and security held by the Paying Agent under the Note Documents for the payment of the principal of and interest on such Notes, including, without limitation, all debt service funds and other funds and securities and other instruments comprising investments thereof.

Section 3.02.  <u>Pledge of Rights to Certain Funds and Investments</u>.  To secure the Hospital's obligations to the Bank under this Agreement, the Hospital hereby pledges, assigns and grants a security interest to the Bank in all of the Hospital's right, title and interest in and to (but not its duties or obligations with respect to) all funds and investments thereof now or hereafter held by the Paying Agent under the Note Documents as security for the payment of the Notes, including without limitation any and all debt service funds and other funds and securities and other instruments comprising investments thereof and interest and other income derived therefrom held as security for the payment of the Notes.  The Bank's rights under this Section are in addition to, and not in lieu of, its rights described in Section 3.01 and are subject to the prior rights of the Paying Agent and the holders of the Notes.

Section 3.03.  <u>Financing Statements</u>.  The Hospital will execute such financing statements and continuation statements under the Uniform Commercial Code or other applicable law as the Bank may specify in connection with the Bank's security interests

D0016853

under this Agreement and will pay the costs of filing the same in such public offices as the Bank may designate.

Section 3.04. Pledge Agreement. As security for payment of the obligations of the Hospital hereunder, the Hospital agrees to enter into the Pledge Agreement with respect to Notes which have not been remarketed.

ARTICLE IV

CONDITIONS PRECEDENT

Section 4.01. Documentation. As conditions precedent to the Bank's issuance of the Letter of Credit, the Bank shall have received all of the following in form and substance satisfactory to the Bank:

(a) An executed copy of this Agreement, the Series D Note and the Pledge Agreement and true and correct copies of executed copies of the other Related Documents and all documentation delivered in connection therewith;

(b) Certified copies of the Articles of Incorporation and the Bylaws of each Obligated Affiliate and authorizing resolutions of the Hospital;

(c) A certificate signed by the chief executive officer and the chief financial officer of the Hospital as of the date of execution and delivery hereof stating that (i) the representations and warranties contained in Article V are true and correct and (ii) no Event of Default has occurred and is continuing, and no event has occurred and is continuing which, with the giving of notice or lapse of time or both, would constitute an Event of Default;

(d) An opinion (or opinions) of counsel to the Hospital covering such matters relating to the transactions contemplated hereby or by the other Related Documents as the Bank may reasonably request and an opinion of counsel to the other Obligated Affiliates substantially in the same form, with such variations, omissions and insertions as approved by the Bank and its counsel;

(e) receipt by the Bank of a copy of each opinion, certificate and other document (in each case addressed to it if so requested by the Bank) required to be delivered in connection with the due issuance and delivery of the Notes;

(f) Audited consolidated financial statements of the Obligated Group for the Fiscal Year ended June 30, 1992 and unaudited consolidated financial statements of the Obligated

- 14 -

D0016854

16367.2

Group for the three months ended September 30, 1992 which include the information set forth in Section 5.11;

(g)  Evidence of the insurance required under Section 6.03;

(h)  Certificates executed by the Obligated Affiliates other than the Hospital acknowledging that they are Restricted Affiliates under the Original Master Indenture and, assuming they do not exercise their respective rights under Section 5.15(a) of the Original Master Indenture, will be Obligated Affiliates under the Restated Master Indenture and reconfirming that their obligations under the Contribution Agreements are and remain in full force and effect and they derive benefits in such capacity; and

(i)  receipt by the Bank of all other documents and opinions it may reasonably request relating to the existence of the Hospital, the authority of and the validity, binding effect and enforceability of this Agreement and each other Related Document and any other matters relevant hereto or thereto, all in form and substance satisfactory to the Bank.

Section 4.02.  Issuance of Notes.  On the date of execution and delivery hereof, all conditions precedent to the issuance and sale of the Notes shall have been satisfied and the Notes shall have been duly issued and delivered.


ARTICLE V

REPRESENTATIONS AND WARRANTIES

The Hospital represents and warrants as follows:

Section 5.01.  Existence.  Each Obligated Affiliate is a Pennsylvania nonprofit corporation, duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.  Each Obligated Affiliate has all necessary material permits, licenses, certifications and qualifications to conduct its business as it is presently being conducted.

Section 5.02.  Tax-exempt Organization.  Each Obligated Affiliate is an organization described in Section 501(c)(3) of the Code, is exempt from federal income tax under Section 501(a) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code.

Section 5.03.  Power, Authorization and No Conflicts.  The execution, delivery and performance by the Hospital of this Agreement and the Related Documents are within its powers and by the other Obligated Affiliates of their respective Contribution Agreements are within their respective powers, have been duly authorized by all necessary action of the Boards of Trustees of

- 15 -

D0016855

the Obligated Affiliates and do not contravene the Articles or
Certificate of Incorporation or the Bylaws of the Obligated
Affiliates or any Governmental Rule applicable to such Obligated
Affiliate or any agreement or contractual restriction binding on
or affecting such Obligated Affiliate or any of its properties.

Section 5.04.  <u>Governmental and Other Approvals</u>.  No
authorization, approval or other action by, and no notice to or
filing with, any Governmental Person is required for the due
execution, delivery and performance by the Hospital or any other
Obligated Affiliate of this Agreement or any Related Document,
except such as have been obtained (including compliance with
certificate of need requirements).

Section 5.05.  <u>Validity and Binding Effect</u>.  This Agreement
and the Related Documents are the legal, valid and binding
obligations of the Hospital and, to the extent applicable, any
other Obligated Affiliate enforceable against the Hospital or
such Obligated Affiliate in accordance with their terms, subject
to the application by a court of general principles of equity and
to the effect of any applicable bankruptcy, insolvency,
reorganization, moratorium or similar law affecting creditors'
rights generally.

Section 5.06.  <u>No Litigation</u>.  Except as disclosed to the
Bank in writing prior to the date of execution and delivery
hereof, there is no pending action or proceeding before any
Governmental Person or arbitrator against or directly involving
an Obligated Affiliate and, to the best of the Hospital's
knowledge, there is no threatened action or proceeding affecting
any Obligated Affiliate before any Governmental Person or
arbitrator which, in any case, might materially and adversely
affect its financial condition or operations or the validity or
enforceability of this Agreement or any Related Document.

Section 5.07.  <u>No Violations</u>.  No Obligated Affiliate is in
any material way in breach of or in default under (a) any
applicable law or administrative regulation of the Commonwealth
of Pennsylvania or the United States or any applicable judgment
or decree or (b) any loan agreement, indenture, lease, sublease,
bond, note, resolution, agreement or other instrument to which it
is a party or otherwise subject, and no event has occurred and is
continuing which, with the passage of time or the giving of
notice or both, would constitute an event of default under any
such instrument except for violations, if any, which the Hospital
has disclosed to the Bank in writing and is proceeding in good
faith to remove or correct.  The Hospital has no knowledge of any
violation, nor is there any notice or other record of any
violation, of any Governmental Rule or restrictive covenant or
other restriction applicable to the Facilities of each Obligated
Affiliate, except for violations, if any, which the Hospital has
disclosed to the Bank in writing and is proceeding in good faith
to remove or correct.

D0016856

Section 5.08. <u>Compliance</u>. The operation of the Facilities of each Obligated Affiliate does and shall, in all material respects, comply with, and are lawful, permitted and conforming uses under, all material applicable Governmental Rules.

Section 5.09. <u>No Liens</u>. There exist no Liens upon the Facilities of each Obligated Affiliate other than Permitted Liens.

Section 5.10. <u>Third Party Reimbursement</u>.

(a) Each Obligated Affiliate is duly authorized and licensed and certified to operate its Facilities and receive reimbursement therefor (to the extent reimbursement is applicable and available) under the Governmental Rules of the Commonwealth of Pennsylvania.

(b) No Obligated Affiliate has had or expects to receive requests or assertions of claims for reimbursement or repayment by such Obligated Affiliate of costs and/or payments heretofore made by any third party payor which, if adversely determined, would result in any material adverse change in the condition, financial or otherwise, of such Obligated Affiliate.

Section 5.11. <u>Financial Information</u>. The consolidated balance sheet of the Obligated Affiliates as at June 30, 1992 and as at September 30, 1992 and the related consolidated statements of revenues and expenses--general funds and changes in fund balances and changes in financial position of such Obligated Affiliates for the Fiscal Year and the three months then ended, respectively, (a) have been prepared in accordance with GAAP consistently applied, (b) with respect to the information as at June 30, 1992, have been certified by Coopers & Lybrand, Certified Public Accountants, (c) are true and complete and present fairly the financial condition and results of operations of the Obligated Affiliates as of June 30, 1992 and as at September 30, 1992 for the period covered thereby, and (d) said balance sheet and the notes thereto accurately reflect all liabilities, including contingent liabilities, of each Obligated Affiliate as of the date thereof.

Section 5.12. <u>ERISA</u>. With respect to each Plan, each Obligated Affiliate is in material compliance with the applicable provisions of ERISA and the regulations and published interpretations thereunder.

Section 5.13. <u>Absence of Events of Default Under Master Indenture</u>. No Event of Default, as that term is defined in the Original Master Indenture, has occurred and is continuing nor has any event occurred which, with the giving of notice or lapse of time, or both, would constitute an Event of Default thereunder.

Section 5.14. <u>Insurance</u>. Each Obligated Affiliate currently maintains insurance which meets or exceeds the

- 17 -

D0016857

requirements of Section 6.03 and such insurance is of such type
and in such amounts (or in excess of such amounts) as are
customarily carried by, and insures against such risks as are
customarily insured against by, health care facilities systems of
like size and character to each Obligated Affiliate and its
Facilities. Any reserves maintained by any Obligated Affiliate
with respect to its self insurance programs have been actuarially
determined to provide reasonable reserves with respect to the
risks involved.

    Section 5.15. <u>Incorporation of Representations and
Warranties by Reference</u>. The Hospital hereby makes to the Bank
the same representations and warranties as are made by the
Hospital and set forth in the other Related Documents, which
representations and warranties, as well as the related defined
terms contained therein, are hereby incorporated by reference
with the same effect as if each and every such representation and
warranty and defined term were set forth herein in its entirety.
No amendment to such representations and warranties or defined
terms made pursuant thereto shall be effective to amend such
representations and warranties and defined terms as incorporated
by reference herein without the consent of the Bank.


                          ARTICLE VI

                       GENERAL COVENANTS

    So long as any amount is available under the Letter of
Credit or any amount is due and owing to the Bank hereunder, the
Hospital covenants that, except to the extent the Bank shall
otherwise consent in writing, each of the following covenants
shall be performed and complied with by the Hospital or party as
indicated:

    Section 6.01. <u>Maintenance of Existence; Mergers</u>. Each
Obligated Affiliate will maintain its existence, rights,
privileges and licenses and its right to do business in the
Commonwealth of Pennsylvania, will not dissolve or otherwise
dispose of all or substantially all of its assets and, unless
permitted under the Master Indenture and if such action will not
result in an Event of Default hereunder, will not consolidate
with or merge into another entity or permit one or more other
entities to consolidate with or merge into it; to the extent a
consolidation, merger or disposition of assets requires an
instrument or opinion to be satisfactory to the trustee under the
Master Indenture, it is agreed that such instrument or opinion
also must be satisfactory to the Bank.

    Section 6.02. <u>Compliance with Governmental Rules, Etc</u>.
Each Obligated Affiliate will comply in all material respects
with all applicable Governmental Rules the noncompliance with
which could materially and adversely affect its operations or
condition, except for any such Governmental Rules which such

                          - 18 -

                                        D0016858

Obligated Affiliate is contesting in good faith by appropriate
proceedings and the noncompliance with which during such contest
would not materially and adversely affect the Obligated
Affiliate's operations or condition if the result of such contest
is adverse to such Obligated Affiliate.

     Section 6.03.  Maintenance of Insurance.  Each Obligated
Affiliate will maintain or cause to be maintained such insurance
as is required under the Master Indenture and shall provide to
Bank the same reports of the Insurance Consultant (as defined
therein), Officer's Certificates (as defined therein) and any
other information as is required to be provided to the trustee
(and within the same time period as is required) thereunder.

     Section 6.04.  Compliance with Related Documents and Other
Contracts.  Each Obligated Affiliate will comply with all of its
covenants and agreements under the Related Documents, as the same
may hereafter be amended or supplemented from time to time, and
comply with, or cause to be complied with, all material
requirements and conditions of all contracts and insurance
policies which relate to such Obligated Affiliate or its
Facilities.

     Section 6.05.  Visitation Rights.  Each Obligated Affiliate
will, at any reasonable time and from time to time, permit the
Bank or its agents or representatives to examine and make copies
of and abstracts from the records, except for confidential
patient information, and books of account of, and visit the
properties of, such Obligated Affiliate and to discuss the
affairs, finances and accounts of such Obligated Affiliate with
the officers and accountants of such Obligated Affiliate.

     Section 6.06.  Keeping of Books.  Each Obligated Affiliate
will keep proper books of record and account, in which full and
correct entries shall be made of financial transactions and the
assets and operations of such Obligated Affiliate in accordance
with GAAP.

     Section 6.07.  Maintenance of Properties.  Each Obligated
Affiliate will maintain and preserve all of its Property in good
working order and condition, ordinary wear and tear excepted; not
permit, commit or suffer any waste of any of its Property; not
use or permit the use of any of its Facilities for any unlawful
purpose or permit any nuisance to exist thereon; and not sell,
lease, transfer or otherwise dispose of any substantial part of
its Property, except in the ordinary course of its operations and
except as permitted by the Master Indenture.

     Section 6.08.  Reporting Requirements.  The Hospital will
furnish or cause to be furnished to the Bank the following:

     (a)  as soon as available and in any event within 120
days after the end of each Fiscal Year a consolidated balance
sheet of the Obligated Group as of the end of such Fiscal Year

- 19 -

D0016859

and the related consolidated statements of revenues and expenses and changes in fund balances and changes in financial position for the year then ended, setting forth in comparative form the corresponding figures for the immediately preceding Fiscal Year, which shall be prepared and audited by certified public accountants satisfactory to the Bank and certified as fairly presenting the combined financial position and the revenues and expenses and changes in fund balances and changes in financial position for, the Fiscal Year then ended, all in conformity with GAAP; together with a certificate of the chief financial officer of the Hospital (i) certifying that they fairly present the combined financial condition of the Obligated Group at the end of, and the results of operations of the Obligated Group for, such Fiscal Year, setting forth calculations in detail satisfactory to Bank demonstrating compliance with the provisions of Section 6.11(b) hereof, and (ii) stating that no Event of Default, or event which, with the giving of notice or lapse of time or both, would constitute any Event of Default, has occurred and is continuing or, if an Event of Default or such event has occurred and is continuing, a statement as to the nature thereof and the action which the Obligated Group proposes to take with respect thereto; stating that such officer has reviewed the provisions of this Agreement and the Related Documents and has made or caused to be made under his supervision a review of the condition and operations of the Obligated Affiliates during the period covered by such financial statements for the purpose of determining whether or not each Obligated Affiliate has complied with all of the terms, provisions and conditions of this Agreement and the Related Documents applicable to it, and to the best of his knowledge each Obligated Affiliate has kept, observed, performed and fulfilled each and every covenant, provision and condition of this Agreement and the Related Documents on its part to be performed and is not in default in the performance or observance of any of the terms, covenants, provisions or conditions hereof or thereof, or, if there is a default, such certificate shall specify all such defaults, the nature and status thereof and any remedial steps taken or proposed to correct such default;

(b)  as soon as available and in any event within 60 days after the end of the first three quarters of each Fiscal Year, a consolidated balance sheet of the Obligated Group as of the end of such quarter and the related consolidated statements of revenues and expenses and changes in fund balances and changes in financial position for the quarter then ended, setting forth in comparative form the corresponding figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, together with a certificate of the chief financial officer of the Hospital (i) certifying that they fairly present the combined financial condition of the Obligated Group at the end of such quarter and the results of the operations of the Obligated Group for such periods (subject to normal year-end audit adjustments) and have been prepared in accordance with GAAP, (ii)

- 20 -

D0016860

setting forth calculations in detail satisfactory to Bank demonstrating compliance with the provisions of Section 6.11(b) hereof, and (iii) stating that no Event of Default, or event which, with the giving of notice or lapse of time or both, would constitute any Event of Default, has occurred and is continuing or, if an Event of Default or such event has occurred and is continuing, a statement as to the nature thereof and the action which the Obligated Affiliate proposes to take with respect thereto;

        (c)  from time to time upon Bank's request, any Obligated Affiliate's internally prepared balance sheets and statements of income and expenditures reasonably accurately reflecting the financial condition of such Obligated Affiliate;

        (d)  as soon as available and in any event within 30 days after the close of each Fiscal Year of each Obligated Affiliate, the Obligated Affiliate's budget and projection of cash flow for the next Fiscal Year (which may be in consolidated form), prepared in form and detail satisfactory to the Bank and approved by the Board of Trustees of the Obligated Affiliate;

        (e)  promptly upon obtaining knowledge thereof, written notice of the commencement or threat of any litigation, arbitration or governmental proceeding against any Obligated Affiliate, or any governmental investigation or labor dispute pending or threatened against any Obligated Affiliate, which could reasonably be expected to interfere substantially with the usual operations of such Obligated Affiliate or materially adversely affect the financial condition, business or operations of such Obligated Affiliate;

        (f)  from time to time such additional information regarding the business, properties or the condition or operations, financial or otherwise, of any Obligated Affiliate as the Bank may reasonably request;

        (g)  as soon as possible and in any event (i) within 5 days after the occurrence of an Event of Default, (ii) within 30 days of becoming aware of the same, an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default, or (iii) a material adverse change in the condition, financial or otherwise, or operations of any Obligated Affiliate, a written statement of an officer of the Hospital setting forth the details of such Event of Default, event or material adverse change and the action which such Obligated Affiliate proposes to take, with respect thereto;

        (h)  (i) as soon as possible and in any event (1) within 30 days after any Obligated Affiliate knows or has reason to know that any Termination Event described in clause (i) of the definition of Termination Event with respect to any Plan has occurred, and (2) within 10 days after any Obligated Affiliate knows or has reason to know that any other Termination Event with

- 21 -

D0016861

19397.2

respect to any Plan has occurred, a statement of the chief
financial officer of the Hospital describing such Termination
Event and the action, if any, which such Obligated Affiliate
proposes to take with respect thereto, and (ii) promptly and in
any event within two Business Days after receipt thereof by any
Obligated Affiliate from the PBGC, copies of each notice received
by any Obligated Affiliate of the PBGC's intention to terminate
any Plan or to have a trustee appointed to administer any Plan;

(i)  promptly after the incurrence by any Obligated
Affiliate of Long-Term Indebtedness in excess of $10,000,000 a
certificate substantially similar to that required pursuant to
the last paragraph of Section 5.05 of the Restated Master
Indenture.

Section 6.09.  Satisfaction of Series D Note.  Anything to
the contrary in Section 9.01 of the Restated Master Indenture
notwithstanding, the only securities or investments which can be
deposited to result in a satisfaction and discharge of the Series
D Note shall be direct obligations of, or obligations the
principal of and interest on which are fully guaranteed by, the
United States of America or such other securities or investments
as are satisfactory to the Bank.

Section 6.10.  Amendments to Note Documents or Master
Indenture.  No Obligated Affiliate will consent to or enter into
any amendment of or supplement to the Note Documents or the
Master Indenture without the prior consent of the Bank.

Section 6.11.  Financial Covenants.

(a)  No Obligated Affiliate will create, incur, assume
or permit to exist any mortgage, pledge, security interest,
encumbrance, license, right of way, restriction, reservation or
other Lien upon any of its Facilities, other than Permitted
Liens.

(b)  So long as the Letter of Credit has not terminated
or expired or any amount is due or owing to the Bank hereunder,
the Obligated Group shall, unless the Bank shall otherwise
consent in writing:

(i)  Maintain a Liquidity Ratio of at least 2:1; as
used herein, Liquidity Ratio is defined to mean current
assets plus unrestricted Board-designated funds plus funds
held by a trustee in a debt service, bond or similar fund
for payment on the next payment date (excluding funds held
in debt service reserve, depreciation reserve and similar
funds) divided by current liabilities, all as defined by
GAAP;

(ii)  Maintain a ratio of total Indebtedness to total
Capitalization of not more than 66-2/3%; provided, however,
in calculating the amount of a Guaranty (as defined in the

- 22 -

D0016862

Master Indenture) only 20% of the actual Indebtedness being guaranteed shall be included unless payment is required under such Guaranty, in which event 100% of such amount shall be included;

(iii)  Maintain a Debt Service Coverage Ratio of at least 1.2:1; as used herein, Debt Service Coverage Ratio is defined to mean Income Available for Debt Service (for the preceding four quarters) divided by Projected Long-Term Debt Service Requirements;

(iv)  Maintain an unrestricted fund balance or equity of at least $200,000,000; and

(v)  Maintain $30,000,000 in cash or investments, unencumbered and satisfactory to the Bank.

Section 6.12.  ERISA.  No Obligated Affiliate will (i) voluntarily terminate any employee benefit or other plan maintained for employees of such Obligated Affiliate and covered by Title IV of ERISA (an "ERISA Plan"), so as to result in any material liability of such Obligated Affiliate to PBGC; (ii) enter into any Prohibited Transaction (as defined in Section 4975 of the Code and in ERISA) involving an ERISA Plan which results in any material liability of such Obligated Affiliate to PBGC; (iii) cause any occurrence of any Reportable Event which results in any material liability of such Obligated Affiliate to PBGC; or (iv) allow or suffer to exist any other event or condition known to such Obligated Affiliate which results in any material liability of such Obligated Affiliate to PBGC.  Further, each Obligated Affiliate will comply with the applicable provisions of ERISA where the failure so to comply might reasonably be expected materially to impair the right of such Obligated Affiliate to carry on its business substantially as now being conducted or to materially and adversely affect the financial condition of such Obligated Affiliate.

Section 6.13.  Preservation of Tax-Exempt Status.  Each Obligated Affiliate will take whatever actions are necessary to continue to be organized and operated in a manner which will preserve and maintain its status as an organization exempt from Federal income taxes under Section 501(a) of the Code and will not perform any acts or enter into any agreements that shall cause revocation or adverse modification of such Federal income tax status of such Obligated Affiliate.

Section 6.14.  Information to be Furnished to the Bank.  The Hospital will cause all documents required to be furnished or submitted to the Master Trustee under the Master Indenture and to the Paying Agent under the Financing Agreement or the Paying Agent Agreement, including all opinions, reports, requests, consents, notices and other documents, to be delivered to the Bank at the same time as the same are required to be furnished to the Master Trustee or the Paying Agent.

- 23 -

D0016863

Section 6.15. <u>Maintenance of Reimbursement Eligibility</u>.
Each Obligated Affiliate shall establish and maintain its status
as a provider of health care services eligible for reimbursement
under the Medicare, Medicaid, Blue Cross and equivalent third
party payment programs the revenues from which are material to
the operations of such Obligated Affiliate, including future
state and federal programs.

Section 6.16. <u>Further Assurances</u>.  Each Obligated Affiliate
will execute and deliver from time to time such further
instruments and take such further actions as may be required to
carry out the purposes and provisions of this Agreement and to
assure the Bank of the security rights in favor of the Bank
contemplated by Article III and the Financing Agreement.

Section 6.17. <u>Appointment of Remarketing Agent</u>.  Upon
notice from the Remarketing Agent that it is terminating its
rights and obligations as the Remarketing Agent, the Hospital
will appoint a successor remarketing agent promptly and in no
event later than 30 days after the date of the notice from the
Remarketing Agent.  In the event the Hospital determines to
terminate the Remarketing Agent, the Hospital will appoint a
successor remarketing agent a sufficient time prior to such
termination in order to allow a smooth transition of such
services.

Section 6.18. <u>Payment of Taxes; Removal of Liens</u>.  Each
Obligated Affiliate will pay all assessments or other
governmental charges as the same become due, all taxes,
assessments (general or special) and governmental charges of any
kind whatsoever that may be at any time lawfully assessed or
levied against or with respect to the Facilities or any interest
therein and promptly discharge or cause to be discharged all
Liens, encumbrances and charges on the Facilities or any part
thereof other than Permitted Liens; provided, however, that no
Obligated Affiliate shall be required to pay any tax, charge,
assessment or imposition nor to remove any lien, charge or
encumbrance nor to comply with any Governmental Rule so long as
it shall contest, in good faith, the amount or validity thereof,
in an appropriate manner or by appropriate proceedings which
shall operate during the pendency thereof to prevent the
collection of or other realization upon the tax, assessment,
levy, fee, rent, charge, Lien or encumbrance so contested, and
the sale, forfeiture or loss of the Facilities or any part
thereof, or of the rent or any portion thereof, to satisfy the
same; provided (i) that no such contest shall subject the Bank to
the risk of any liability; (ii) that the Obligated Affiliate will
at all times effectively stay or prevent any official or judicial
action detrimental to the interest of the Bank or the title, use
or operation of the Facilities or any material part thereof; and
(iii) that the Hospital shall give the Bank prompt written notice
of any such contest.  Each such contest shall be promptly
prosecuted to final conclusion (subject to the right of the

- 24 -

D0016864

Obligated Affiliate to settle any such contest), and in any event the Obligated Affiliate will save the Bank harmless against all losses, judgments, decrees and costs (including attorneys' fees and expenses in connection therewith) and will, promptly after the final determination of such contest or settlement thereof, pay and discharge the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interests, costs and expenses thereon or in connection therewith.

Notwithstanding the foregoing, if the Bank shall notify the Hospital that, in the opinion of counsel, by continued nonpayment of any of the foregoing items, the Facilities or any substantial part thereof will be subject to imminent loss or forfeiture, then the Hospital agrees to promptly pay or cause to be paid all such unpaid items and cause them to be satisfied and discharged.  In addition, the Bank shall have the right to request an opinion of counsel that a lien is a Permitted Lien if such lien is deemed to be "permitted" under Section 5.04(b)(v)(C) of the Restated Master Indenture.

Section 6.19.  Ownership of Notes.  No Obligated Affiliate shall be the owner (equitable or beneficial) of any of the Notes.


ARTICLE VII

DEFAULTS AND REMEDIES

Section 7.01.  Defaults.  Each of the following shall constitute an event of default hereunder ("Event of Default"):

(a)  Failure by the Hospital to make any payment when due under this Agreement or under the Series D Note;

(b)  Failure by the Hospital to perform or comply with any of the other terms or conditions contained in this Agreement and continuance of such failure for 30 days after the earlier of written notice from the Bank to the Hospital or the Hospital has knowledge that such failure has occurred, or such longer period to which Bank may agree in the case of a default not curable by the exercise of due diligence within such 30 day period, provided that the Hospital shall have commenced to cure such default within such 30 day period and shall complete such cure as quickly as reasonably possible with the exercise of due diligence;

(c)  Any of the representations or warranties of the Hospital set forth in this Agreement, any Related Document or any other document furnished to the Bank pursuant to the terms hereof proves to have been materially false or incorrect when made;

(d)  Any material provision of this Agreement or the Series D Note shall at any time for any reason cease to be valid and binding on the Hospital, or shall be declared to be null and

- 25 -

D0016865

void, or shall be violative of any applicable law relating to a
maximum amount of interest permitted to be contracted for,
charged or received, or the validity or enforceability thereof
shall be contested by the Hospital or any other Obligated
Affiliate, or the Hospital shall deny that it has any or further
liability or obligation under this Agreement or under the Series
D Note;

      (e)  The occurrence of an event of default as defined
in any of the Related Documents;

      (f)  Any Obligated Affiliate shall (i) apply for or
consent to the appointment of a receiver, trustee, liquidator or
Paying Agent or the like of the Obligated Affiliate or of
property of the Obligated Affiliate, or (ii) admit in writing the
inability of the Obligated Affiliate to pay its debts generally
as they become due, or (iii) make a general assignment for the
benefit of creditors, or (iv) be adjudicated a bankrupt or
insolvent, or (v) commence a voluntary case under the United
States Bankruptcy Code or file a voluntary petition or answer
seeking reorganization, an arrangement with creditors or an order
for relief or seeking to take advantage of any insolvency law or
file an answer admitting the material allegations of a petition
filed against the Obligated Affiliate in any bankruptcy,
reorganization or insolvency proceeding, or action of the
Obligated Affiliate shall be taken for the purpose of effecting
any of the foregoing, or (vi) take any corporate action or other
action to authorize any of the foregoing, or (vii) if without the
application, approval or consent of the Obligated Affiliate, a
proceeding shall be instituted in any court of competent
jurisdiction, under any law relating to bankruptcy, insolvency,
reorganization or relief of debtors, seeking in respect of such
Obligated Affiliate an order for relief or an adjudication in
bankruptcy, reorganization, dissolution, winding up or
liquidation, a composition or arrangement with creditors, a
readjustment of debts, the appointment of a trustee, receiver,
liquidator or Paying Agent or the like of such Obligated
Affiliate or of all or any substantial part of the assets of such
Obligated Affiliate or other like relief in respect thereof under
any bankruptcy or insolvency law, and, if such proceeding is
being contested by such Obligated Affiliate in good faith, the
same shall (A) result in the entry of an order for relief or any
such adjudication or appointment or (B) remain undismissed and
undischarged for a period of 60 days;

      (g)  Any litigation or administrative proceeding
ensues, and is not dismissed within 30 days, involving any
Obligated Affiliate or any instrument, contract or document
delivered to the Bank in compliance with this Agreement, and the
adverse result of such litigation or proceeding would have, in
the Bank's reasonable opinion, a materially adverse effect on the
Hospital's or any other Obligated Affiliate's ability to pay its
obligations and comply with the covenants under this Agreement or
the Related Documents;

- 26 -

D0016866

(h)   Any one or more judgments or orders are entered against any Obligated Affiliate, where such judgments or orders aggregate $500,000 or more and either (i) continue unsatisfied and unstayed for 30 days or (ii) a judgment lien on such Obligated Affiliate's Facilities is recorded in respect thereof and is not stayed pending appeal by a bond or other arrangement given or obtained by such Obligated Affiliate on terms which do not violate any of the covenants under this Agreement; or

(i)   Failure by any Obligated Affiliate to make any payment or payments in respect of (i) any obligation or obligations owing to the Bank, (ii) any amounts owing with respect to the Notes, or obligations under the Master Indenture, or (iii) any obligation or obligations for the payment of borrowed moneys in an aggregate principal amount of $500,000 or more, when such payment or payments are due and payable (after the lapse of any applicable grace period) that results in the acceleration of such obligation or obligations or enables the holder or holders of such obligation or obligations or any person acting on behalf of such holder or holders to accelerate the maturity of such obligation or obligations (as used herein, "obligation for the payment of borrowed money" shall include, without limitation, obligations arising from guarantees of Indebtedness to others, obligations (other than accounts payable and other similar items arising in the normal course of business) for the deferred payment of the purchase price of property and lease obligations which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of the balance sheet, or leases required to be capitalized under GAAP) or the occurrence of any material default under any agreement, indenture or other instrument under or pursuant to which the Notes or obligation for the payment of borrowed moneys is incurred, secured or issued, and continuance of such default beyond the period of grace, if any, allowed with respect thereto; or

(j)   a moratorium or repudiation shall have been declared or announced (whether or not in writing) with respect to any Indebtedness of the Hospital or any Obligated Affiliate.

Section 7.02.   Remedies.   (a)   If an Event of Default has occurred and is continuing uncured, the Bank may

(1)   notify the Paying Agent and the purchaser of the Notes (if there exists only one such purchaser) of such Event of Default and direct the Paying Agent to declare an event of default as defined in the Financing Agreement, to accelerate the Notes and draw on the Letter of Credit and/or to exercise remedies under the Note Documents;

(2)   take such action with respect to the Series D Note as permitted therein and under the Master Indenture;

- 27 -

D0016867

          (3)  declare the Hospital's obligations hereunder
to be, whereupon the same shall become, immediately due and
payable; and

          (4)  exercise, or cause to be exercised, any and
all such remedies as it may have under this Agreement or any
other document or at law or in equity.

     (b)  Upon the occurrence of an Event of Default under
Section 7.01(f), all of the Hospital's obligations hereunder
shall automatically become immediately due and payable.

     Section 7.03.  <u>Waivers; Consents</u>.  No waiver of, or consent
with respect to, any provision of this Agreement shall in any
event be effective unless the same shall be in writing and signed
by the Bank, and then such waiver or consent shall be effective
only in the specific instance and for the specific purpose for
which it was given.

     Section 7.04.  <u>No Waiver; Remedies Cumulative</u>.  No failure
on the part of the Bank to exercise, and no delay in exercising,
any right hereunder shall operate as a waiver thereof; and no
single or partial exercise of any right hereunder shall preclude
any other or further exercise thereof or the exercise of any
other right.  The remedies herein provided are cumulative and not
exclusive of any remedies available under any other document or
at law or in equity.

     Section 7.05.  <u>Set-Off</u>.  Upon the occurrence and during the
continuance of any Event of Default, the Bank is hereby
authorized at any time and from time to time without notice to
the Hospital or any other Obligated Affiliate (any such notice
being expressly waived by the Hospital) and, to the fullest
extent permitted by law, to set off and to apply any and all
balances, credits, deposits (general or special, time or demand,
provisional or final), accounts or moneys at any time held
(excluding funds held by Pittsburgh National Bank, as trustee)
and other indebtedness at any time owing by the Bank to or for
the account of the Hospital or any other Obligated Affiliate
against any and all of the obligations of the Hospital or any
other Obligated Affiliate now or hereafter existing under this
Agreement or any other agreement or instrument delivered by the
Hospital or any other Obligated Affiliate to the Bank in
connection therewith, whether or not the Bank shall have made any
demand hereunder or thereunder and although such obligations may
be contingent or unmatured.  The rights of the Bank under this
Section are in addition to other rights and remedies (including,
without limitation, other rights of set-off) which the Bank may
have.

- 28 -

D0016868

ARTICLE VIII

MISCELLANEOUS

Section 8.01.   Notices.   All notices and other communications provided for hereunder shall be in writing and sent by United States certified or registered mail, return receipt requested, or by telegraph, telex, telecopier or private delivery service, addressed as follows:

If to the Bank such notice shall refer to this Agreement and shall be sent to:

    Pittsburgh National Bank
    Fifth Avenue and Wood Street
    Pittsburgh, Pennsylvania 15222

    Attention: Manager, Health Care Group

If to the Hospital:

    Allegheny General Hospital
    320 East North Avenue
    Pittsburgh, Pennsylvania  15212

    Attention:  President

If to Morgan:

    Morgan Guaranty Trust Company of New York
    9 West 57th Street
    New York, New York  10019

    Attention:  Mr. Robert Meiselas

Either party hereto and the Paying Agent may change the address to which notices to it are to be sent by written notice given to the other persons listed in this Section.  All notices shall, when mailed as aforesaid, be effective on the date indicated on the return receipt and all notices given by other means shall be effective when received.

Section 8.02.   Successors and Assigns.   This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.  The Hospital may not assign its rights under this Agreement without the prior written consent of the Bank.

Section 8.03.   Survival.   All representations, warranties, covenants and agreements made by the Hospital herein and in any document delivered pursuant hereto shall survive the delivery of

- 29 -

D0016869

this Agreement and any advances under the Letter of Credit and shall continue in full force and effect until payment in full of all of the obligations of the Hospital hereunder, it being understood that the agreements of the Hospital found in Sections 2.06, 2.10, 2.12 and 8.05 hereof shall survive the payment in full of any other obligations of the Hospital hereunder.

Section 8.04. <u>Counterparts</u>. The execution hereof by each party hereto shall constitute a contract between them for the uses and purposes herein set forth, and this Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

Section 8.05. <u>Costs, Expenses and Taxes</u>. The Hospital agrees to pay on demand all costs and expenses of the Bank (including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Bank) in connection with (a) the negotiation, preparation, execution, delivery, administration, termination or the like of this Agreement, the Letter of Credit and any other documents that may be delivered in connection with this Agreement or the Related Documents including, without limitation, any waiver or consent hereunder or thereunder or any amendments hereto or thereto, and (b) any Event of Default or alleged Event of Default or the enforcement or interpretation of this Agreement and such other documents. In addition, the Hospital shall pay any and all stamp, transfer, documentary and other taxes, assessments, charges and fees payable or determined to be payable in connection with the execution and delivery of this Agreement and such other documents and agrees to indemnify and to hold the Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omitting to pay such taxes, assessments, charges and fees, provided the Bank promptly notifies the Hospital of any such taxes, assessments, charges and fees.

Section 8.06. <u>Amendments</u>. This Agreement may be amended by an instrument in writing executed and delivered by the Hospital and the Bank.

Section 8.07. <u>Severability; Interest Limitation</u>. If any provision hereof is found by a court of competent jurisdiction to be prohibited or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision in such jurisdiction to the extent it is not prohibited or unenforceable, nor invalidate such provision in any other jurisdiction, nor invalidate the other provisions hereof, all of which shall be liberally construed in favor of the Bank in order to effect the provisions of this Agreement. Notwithstanding anything to the contrary herein contained, the total liability of the Hospital for payment of interest pursuant hereto shall not exceed the maximum amount, if any, of such interest permitted by

- 30 -

D0016870

applicable law to be contracted for, charged or received, and if
any payments by the Hospital to the Bank include interest in
excess of such a maximum amount, the Bank shall apply such excess
to the reduction of the unpaid principal amount due pursuant
hereto, or if none is due, such excess shall be refunded to the
Hospital; provided that, to the extent permitted by applicable
law, in the event the interest is not collected, is applied to
principal or is refunded pursuant to this sentence and interest
thereafter payable pursuant hereto shall be less than such
maximum amount, then such interest thereafter so payable shall be
increased up to such maximum amount to the extent necessary to
recover the amount of interest, if any, theretofore uncollected,
applied to principal or refunded pursuant to this sentence.  Any
such application or refund shall not cure or waive any Event of
Default.  In determining whether or not any interest payable
under this Agreement exceeds the highest rate permitted by law,
any non-principal payment (except payments specifically stated in
this Agreement to be "interest") shall be deemed, to the extent
permitted by applicable law, to be an expense, fee, premium or
penalty rather than interest.

        Section 8.08.  <u>Complete Agreement</u>.  Taken together with the
other instruments and documents delivered in compliance herewith,
this Agreement is a complete memorandum of the agreement of the
Hospital and the Bank.. Waivers or modifications of any provision
hereof must be in writing signed by the party to be charged with
the effect thereof.

        Section 8.09.  <u>Consent to Jurisdiction; Venue; Waiver of
Jury Trial</u>.  The Hospital and the Bank hereby irrevocably (i)
agree that any suit, action or other legal proceeding arising out
of or relating to this Agreement may be brought in any federal or
state court located in Pittsburgh, Pennsylvania and consent to
the jurisdiction of such court in any such suit, action or
proceeding and (ii) waive any objection which either of them may
have to the laying of venue of any such suit, action or
proceeding in any such court and any claim that any such suit,
action or proceeding has been brought in an inconvenient forum.
The Hospital hereby irrevocably consents to the service of any
and all process in any such suit, action or proceeding by mailing
of copies of such process to the Hospital at its address provided
in Section 8.01. The Hospital agrees that a final judgment in any
such action or proceeding shall be conclusive and may be enforced
in other jurisdictions by suit on the judgment or in any other
manner provided by law.  All mailings under this Section shall be
by certified mail, return receipt requested.  Nothing in this
Section shall affect the right of the Bank to serve legal process
in any other manner permitted by law or affect the right of the
Bank to bring any suit, action or proceeding against the Hospital
or its property in the courts of any other jurisdiction.  THE
HOSPITAL AND THE BANK HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN
ANY ACTION ARISING HEREUNDER OR OTHERWISE IN CONNECTION HEREWITH.

- 31 -

Section 8.10. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania without reference to its principles of conflicts of law.

Section 8.11. <u>Participation</u>. Notwithstanding any other provision of this Agreement, the Hospital understands that the Bank may at any time enter into participation agreements with one or more other participating banks (such other participating banks are hereinafter referred to as "Participating Banks") whereby the Bank will allocate to the Participating Banks certain percentages of the payment obligations of the Hospital under this Agreement and the funding obligations of the Bank under the Letter of Credit. The Hospital acknowledges that, for the convenience of all parties, the Hospital's obligations under this Agreement are and will be undertaken for the benefit of, and as an inducement to, the Participating Banks as well as the Bank. Without limiting the foregoing, the Hospital acknowledges that Sections 2.02(d) and 2.05 and the indemnity of the Bank under Section 8.05 are for the benefit of the Participating Banks as if such sections specifically referred to the Participating Banks and their participations in the payment obligations of the Hospital and the funding obligations of the Bank, and the Hospital agrees to make any payments required by such provisions for the account of any one or more Participating Banks to the Bank on demand of the Bank. The Hospital hereby grants to each Participating Bank, to the extent of its participation and to the extent permitted by applicable law, the right to set off deposit accounts maintained by the Hospital with such bank as if the Participating Banks were specifically referred to therein the date first above written.

Section 8.12. <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

IN WITNESS WHEREOF, the Hospital and the Bank have caused this Agreement to be duly executed and delivered as of the date first set forth above.

ATTEST:                          ALLEGHENY GENERAL HOSPITAL


_____Chg S. White_____     By: _____
                                 Name:    Stephen H. Spargo
                                 Title:   Vice President,
                                          Finance/Administration


- 32 -                                    D0016872

16387.2

PITTSBURGH NATIONAL BANK

By: _____

Name:  Emery D. Holloway
Title: Vice President
       Health Care Group

D0016873

- 33 -

PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT
NO. A-304677


January 29, 1993


Pittsburgh National Bank, as Paying Agent
One Oliver Plaza, 23rd Floor
Pittsburgh, PA  15222

Attn:  Manager, Corporate Trust Department


Ladies and Gentlemen:

        1.  You, as the paying agent (the "Paying Agent") under
the Financing Agreement dated January 29, 1993 (the "Financing
Agreement"), between Morgan Guaranty Trust Company of New York
and Allegheny General Hospital (the "Hospital"), pursuant to
which $30,000,000 in aggregate principal amount of the Hospital's
Variable Interest Rate Demand Notes, Series of 1993 (the "Notes")
are being issued, and pursuant to the Paying Agent and Depository
Agreement dated January 29, 1993, among the Hospital and you, are
hereby irrevocably authorized to draw on Pittsburgh National Bank
(the "Bank") Irrevocable Letter of Credit No. A-304677, for the
account of the Hospital, available by your drafts at sight upon
the terms and conditions hereinafter set forth, an amount not
exceeding $30,450,000 (the "Stated Amount") of which (a) an
amount not exceeding $30,000,000 may be drawn to pay (i) the
principal of the Notes when due upon maturity, acceleration,
redemption or otherwise and (ii) the portion of the purchase
price of Notes equal to the principal amount of Notes delivered
to the Paying Agent for purchase and (b) an amount not exceeding
$450,000 may be drawn to pay (i) up to 45 days' accrued interest
on the Notes when due (assuming an interest rate on the Notes of
12.0% per annum) and (ii) the portion of the purchase price of
Notes, equal to up to 45 days' accrued interest thereon (assuming
an interest rate on the Notes of 12.0% per annum), delivered to
the Paying Agent for purchase, in any case effective as of the

                    Page 1 of 18

D0016874

PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT NO. A-304677            January 29, 1993

date hereof and expiring on the Termination Date (as defined in
paragraph 10 hereof).  This Letter of Credit is issued pursuant
to a Letter of Credit, Reimbursement and Security Agreement dated
as of January 29, 1993, between the Hospital and the Bank (as
amended from time to time, the "Reimbursement Agreement").

     2.  Funds under this Letter of Credit are available to
you against your sight draft(s) drawn on us, stating on their
face:  "Drawn under Irrevocable Letter of Credit No. A-304677
accompanied by:

          (A)  if the drawing is being made with respect to
payment of the portion of purchase price of Notes equal to the
principal amount of Notes that are delivered to the Paying Agent
for purchase (an "A Drawing"), a written certificate signed by
you in the form of Annex 1 attached hereto appropriately
completed;

          (B)  if the drawing is being made with respect to
payment of principal of the Notes when due upon maturity,
acceleration, redemption or otherwise (a "B Drawing"), your
written certificate signed by you in the form of Annex 2 attached
hereto appropriately completed;

          (C)  if the drawing is being made with respect to
payment of interest on the Notes when due (a "C Drawing"), your
written certificate signed by you in the form of Annex 3 attached
hereto appropriately completed; and

          (D)  if the drawing is being made with respect to
payment of the portion of purchase price of Notes, equal to the
interest accrued to the date of purchase thereof, that have been
delivered to the Paying Agent (a "D Drawing"), a written
certificate signed by you in the form of Annex 4 hereto
appropriately completed.

     3.  Any sight draft or certificate delivered by you
hereunder may be either (a) in the form of a letter on your
letterhead or (b) in the form of a tested telex or other writing
transmitted by any telecommunication facility sent by you to the
following number(s) as applicable:

D0016875