PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT NO. A-304677        January 29, 1993

Telex No.  866-533 (Answerback:  FIRSTBANK PGH)
Telecopier No.  (412) 762-5960

Presentation of any such sight draft and certificate shall be made at our office located at 237 Fifth Avenue, Third Floor Annex, Pittsburgh, Pennsylvania 15222, Attention:  Standby Letter of Credit Department (the "Principal Office"), with a copy to Pittsburgh National Bank, Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania  15222, Attention:  Vice President, Health Care Group, or at any other office in the City of Pittsburgh, Pennsylvania, that may be designated by us by written notice delivered to you.  We hereby agree that all drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored by us upon delivery of the certificate(s), as specified, if presented at such office on or after the date hereof and on or before the Termination Date.  If a drawing is made by you hereunder at or prior to 10:00 a.m., prevailing local time in Pittsburgh, Pennsylvania, on a Business Day (as defined in paragraph 4 hereof), and provided that such drawing and the documents presented in connection therewith conform to the terms and conditions hereof, payment shall be made to you or your designee of the amount specified, in immediately available funds, at or before 3:30 p.m. on the same Business Day.  If a drawing is made by you hereunder after 10:00 a.m., prevailing local time in Pittsburgh, Pennsylvania, on a Business Day, and provided that such drawing and the documents presented in connection therewith conform to the terms and conditions hereof, payment shall be made to you or your designee of the amount specified, in immediately available funds, at or before 3:30 p.m. on the next succeeding Business Day.  If a demand for payment made by you hereunder does not, in any instance, conform to the terms and conditions of this Letter of Credit, we shall give you prompt telephonic notice that the demand for payment was not effected in accordance with the terms and conditions of this Letter of Credit; provided, however, that any failure to give such notice shall not affect the Bank's rights and liabilities hereunder.

4.  As used herein, "Business Day" shall mean a day of the year on which banks located in the city in which the

Page 3 of 18

D0016876

PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT NO. A-304677                    January 29, 1993

Principal Office of the Bank is located are not required or
authorized by law (including executive order) to remain closed.

    5.  Drawings in respect of payments hereunder honored
by us shall not, in the aggregate, exceed that Stated Amount, as
the Stated Amount may have been reinstated by us as set forth
below.  Subject to such reinstatement, each drawing honored by
the Bank hereunder shall pro tanto reduce the amount available
under this Letter of Credit.

    6.  The Stated Amount shall be reinstated by us under
the following conditions:

        (a)  Upon receipt by us of reimbursement in full by the
Hospital of any amounts due the Bank because of an A Drawing
hereunder, so long as no Event of Default (as defined in the
Reimbursement Agreement) shall have occurred and be continuing,
the obligation of the Bank to honor demands for payment hereunder
with respect to the portion of the purchase price of Notes equal
to the principal amount of Notes delivered to you for purchase
will be reinstated up to the total amount therefor specified
herein (subject to any reductions of the Stated Amount made
pursuant to the terms hereof) and we will promptly give notice of
such reinstatement to you.

        (b)  Upon receipt by us of reimbursement in full by the
Hospital of any amounts due the Bank because of a C Drawing or D
Drawing hereunder, the obligations of the Bank to honor demands
for payment hereunder for interest or portion of purchase price
equal to interest on the Notes will be reinstated up to the total
amount therefor specified herein (subject to any reductions of
the Stated Amount made pursuant to the terms hereof), provided
that this Letter of Credit shall be automatically so reinstated
not later than the tenth day following the day on which drawing
was made, notwithstanding our failure to receive such
reimbursement, unless prior to such date you shall have received
notice in writing that an Event of Default shall have occurred
and is continuing and that this Letter of Credit shall not be so
reinstated.

                        Page 4 of 18

                                            D0016877

PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT NO. A-304677                    January 29, 1993

        7.  Upon (a) any partial redemption or maturity or (b)
defeasance of the outstanding principal amount of the Notes
during the term of this Letter of Credit, of which you shall give
us notice, the Stated Amount shall be reduced to an amount that
is equal to (i) the aggregate principal amount of the Notes
outstanding (within the meaning of the Financing Agreement)
immediately following such partial redemption or defeasance, plus
(ii) 45 days' interest on such aggregate principal amount
computed at a rate of 12.0% per annum.  Whenever the Stated
Amount shall be partially reduced pursuant to this paragraph 7,
the Bank shall have the right to require the Paying Agent to
surrender this Letter of Credit to the Bank on or before the
tenth Business Day following the effective date of such partial
reduction of the Stated Amount.  Simultaneously with such
surrender, we shall either, at our option, (a) return this Letter
of Credit after amendment thereof to reflect the amount of such
reduction or (b) cancel this Letter of Credit and issue to the
Paying Agent in substitution therefor a substitute irrevocable
letter of credit in the form of Exhibit A to the Reimbursement
Agreement, dated the date of such surrender, for an amount equal
to the amount to which the Stated Amount shall have been so
reduced but otherwise having terms identical to this Letter of
Credit.

        8.  Only you, as Paying Agent, may make a drawing under
this Letter of Credit.  If requested by you, payment under this
Letter of Credit may be made by deposit of immediately available
funds into a designated account that you maintain with us.  For
purposes of this Letter of Credit, we shall be deemed to have
"honored" a demand for payment at the time at which we commence a
wire transfer, deposit or deliver a check, all of immediately
available funds, in accordance with your instructions, and we
shall not thereafter be obligated to make any further payments
under this Letter of Credit in respect of such sight draft to you
or any other person who may have made to you or makes to you a
demand for payment of principal of, purchase price of, or
interest on, any Note.

        9.  This Letter of Credit applies only to the payment,
on or prior to the Termination Date, of principal or purchase
price of the Notes and up to 45 days' interest accruing on the

                        Page 5 of 18


                                            D0016878

PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT NO. A-304677                January 29, 1993

Notes (assuming a maximum interest rate on the Notes of 12.0% per annum), or the purchase price of Notes equal thereto on or prior to the stated maturity of the Notes, and does not apply to any interest that may accrue thereon after such maturity.

10.   Upon the earliest to occur of the following dates (the "Termination Date"):  (i) our close of business on January 29, 1998 or, if said date shall not be a Business Day, on the first Business Day next succeeding said date (the "Stated Termination Date"); (ii) our close of business on the Business Day on which the Bank honors a B Drawing following our receipt of a B Drawing certificate appropriately completed and containing the certification provided for in the eighth numbered paragraph thereof; (iii) the tenth day following the date of your receipt of notice from us that an Event of Default under the Reimbursement Agreement has occurred and is continuing; (iv) the payment by the Bank of the draft hereunder that, when aggregated with all other drafts paid hereunder, and taking into account all reinstatements made pursuant to the terms hereof, equals the Stated Amount as then in effect; or (v) the date on which this Letter of Credit is surrendered for cancellation, this Letter of Credit shall automatically terminate and be delivered to the Bank for cancellation.

11.   This Letter of Credit shall be governed by the laws of the Commonwealth of Pennsylvania, including Article 5 of the Uniform Commercial Code as in effect in said Commonwealth. This Letter of Credit shall be supplemented by the provisions (to the extent that such provisions are consistent with this Letter of Credit) of the Uniform Customs and Practice for Documentary Credits, 1983 Revision, International Chamber of Commerce Publication No. 400 (the "Uniform Customs").  Communications with respect to this Letter of Credit shall be in writing and addressed to us at our Principal Office, or at any other office in the City of Pittsburgh, Pennsylvania, that may be designated by us by written notice delivered to you, specifically referring therein to Pittsburgh National Bank, Irrevocable Letter of Credit No. A-304677.

12.   This Letter of Credit is transferable in its entirety (but not in part) to any transferee who has succeeded to

D0016879

PITTSBURGH NATIONAL BANK
IRREVOCABLE LETTER OF CREDIT NO. A-304677                    January 29, 1993

you as Paying Agent under the Financing Agreement, and such transferred Letter of Credit may be successively transferred. Transfer of the available drawing(s) under this Letter of Credit to such transferee shall be effected by the presentation to us of this Letter of Credit accompanied by the transfer form attached hereto as Annex 5.

      13.  All amounts paid by us pursuant to drawings under this Letter of Credit shall be made exclusively from our funds; in no event shall any such payment be made from or in reliance upon funds of the Hospital, including, without limitation, any funds that the Hospital may have on deposit with us.

      14.  This Letter of Credit sets forth in full our undertaking, and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein (including, without limitation, the Notes), except only the certificate(s) and the sight draft(s) referred to herein and the Uniform Customs; and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement except for such certificate(s) and sight draft(s) and the Uniform Customs.

                Very truly yours,

                PITTSBURGH NATIONAL BANK


                By:_____
                   Authorized Signature

D00168S0

Annex 1 to Pittsburgh National Bank
<u>Irrevocable Letter of Credit No. A-304677</u>

<u>CERTIFICATE FOR "A DRAWING"</u>

[Date]

Pittsburgh National Bank
237 Fifth Avenue, Third Floor Annex
Pittsburgh, Pennsylvania  15222

Attention:  Standby Letter of Credit Department

   The undersigned, a duly authorized officer of [Name of Paying Agent] hereby certifies to Pittsburgh National Bank (the "Bank"), with reference to Irrevocable Letter of Credit No. A-304677 (the "Letter of Credit"; any capitalized term used herein and not defined herein shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in favor of the Paying Agent, that:

   (1)  The Paying Agent is the Paying Agent under the Financing Agreement for the owners of the Notes.

   (2)  The Paying Agent is making a drawing under the Letter of Credit with respect to payment of the portion of the purchase price of Notes equal to the principal amount of Notes delivered to the Paying Agent for purchase.

   (3)  No Notes referred to in paragraph (2) above are held in the name of the Hospital or by the Paying Agent for the account of the Hospital.

   (4)  The amount of the sight draft(s) accompanying this Certificate does not exceed the amount of the portion of the purchase price that is due and payable.

   (5)  The amount of the sight draft(s) accompanying this Certificate, plus the aggregate amount of all previous or contemporaneous "A Drawings" as to which the Paying Agent has not received notice of reinstatement and "B Drawings", does not exceed $_____, which is the amount available on the date

Page 8 of 18

D0016881

RE:  PITTSBURGH NATIONAL BANK
     IRREVOCABLE LETTER OF CREDIT NO. A-304677


hereof to be drawn under the Letter of Credit in respect of principal of the Notes.

Please (deposit) (wire transfer) (remit by check) the amount hereby demanded (in our account number _____ with _____) (to _____ at _____).

IN WITNESS WHEREOF, the Paying Agent has executed and delivered this Certificate as of the ___ day of _____, 19___.


_____
as Paying Agent


By_____
Title_____


Page 9 of 18

D0016882

Annex 2 to Pittsburgh National Bank
<u>Irrevocable Letter of Credit No. A-304677</u>

<u>CERTIFICATE FOR "B DRAWING"</u>

[Date]

Pittsburgh National Bank
237 Fifth Avenue, Third Floor Annex
Pittsburgh, Pennsylvania  15222

Attention:  Standby Letter of Credit Department

      The undersigned, a duly authorized officer of [Name of Paying Agent] hereby certifies to Pittsburgh National Bank (the "Bank"), with reference to Irrevocable Letter of Credit No. A-304677 (the "Letter of Credit"; any term used herein and not defined herein shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in favor of the Paying Agent, that:

      (1)  The Paying Agent is the Paying Agent under the Financing Agreement for the owners of the Notes.

      (2)  The Paying Agent is making a drawing under the Letter of Credit with respect to payment of principal of the Notes when due, upon maturity, acceleration, redemption or otherwise.

      (3)  No Notes referred to in paragraph (2) above are held in the name of the Hospital or by the Paying Agent for the account of the Hospital.

      (4)  The amount of principal of the Notes that is due and payable is $_____, and the amount of the sight draft(s) accompanying this Certificate does not exceed such amount of principal.

      (5)  The amount of the sight draft(s) accompanying this Certificate, together with the aggregate of all prior and contemporaneous "A Drawings" as to which the Paying Agent has not received notice of reinstatement and "B Drawings", does not exceed $_____, which is the amount available on the date

Page 10 of 18

D0016883

RE:  PITTSBURGH NATIONAL BANK
     IRREVOCABLE LETTER OF CREDIT NO. A-304677

hereof to be drawn under the Letter of Credit in respect of
principal of the Notes.

(6)  The amount of the sight draft(s) accompanying this
Certificate does not exceed the amount permitted to be drawn
under the Letter of Credit in accordance with the Letter of
Credit.

(7)  Upon your honoring the sight draft accompanying
this Certificate, the Stated Amount shall be reduced to an amount
that is equal to (a) $_____, the aggregate principal amount
of the Notes outstanding (within the meaning of the Financing
Agreement) immediately following the partial redemption or
maturity giving rise to the delivery of this Certificate, plus
(b) $_____, 45 days' interest on such aggregate principal
amount computed at a rate of 12% per annum.

[(8)  The Notes have become due upon the maturity,
acceleration or redemption thereof in whole, and at the close of
business on the Business Day on which the sight draft
accompanying this Certificate is honored, the Letter of Credit
shall terminate.]*

(9)  In the case of a drawing to pay principal of the
Notes upon optional redemption of the Notes pursuant to Section
301 of the Financing Agreement, the Paying Agent has received
written notice from the Bank that the Bank has consented to such
optional redemption.**

Please (deposit) (wire transfer) (remit by check) the
amount hereby demanded (in our account number _____ with

---

* Paragraph (8) is to be included IF AND ONLY IF this Certificate is being
  delivered in connection with one of the events referred to in such paragraph
  with respect to all of the Notes.

** Paragraph (9) is to be included IF AND ONLY IF this Certificate is being
   delivered in connection with an optional redemption.

Page 11 of 18

D0016884

RE:  PITTSBURGH NATIONAL BANK
     IRREVOCABLE LETTER OF CREDIT NO. A-304677


_____) (to _____ at
_____).

        IN WITNESS WHEREOF, the Paying Agent has executed and
delivered this Certificate as of the \_\_\_\_ day of _____,
19\_\_\_.


_____
as Paying Agent


By_____
Title_____

D0016885

Annex 3 to Pittsburgh National Bank
Irrevocable Letter of Credit No. A-304677

CERTIFICATE FOR "C DRAWING"

[Date]

Pittsburgh National Bank
237 Fifth Avenue. Third Floor Annex
Pittsburgh, Pennsylvania  15222

Attention:  Standby Letter of Credit Department

The undersigned, a duly authorized officer of [Name of Paying Agent] hereby certifies to Pittsburgh National Bank (the "Bank"), with reference to Irrevocable Letter of Credit No. A-304677 (the "Letter of Credit"; any term used herein and not defined herein shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in favor of the Paying Agent, that:

(1)  The Paying Agent is the Paying Agent under the Financing Agreement for the owner of the Notes.

(2)  The Paying Agent is making a drawing under the Letter of Credit with respect to a payment of interest on the Notes when due.

(3)  No Notes referred to in paragraph (2) above are held in the name of the Hospital or by the Paying Agent for the account of the Hospital.

(4)  Interest on the Notes is due and payable, and the amount of the sight draft(s) accompanying this Certificate does not exceed the amount of interest on the Notes that is due and payable.

(5)  The amount of the sight draft(s) accompanying this Certificate, plus the aggregate amount of all previous or contemporaneous "C Drawings" or "D Drawings" as to which the Paying Agent has received timely notice of non-reinstatement, does not exceed $_____, which is the amount available on the date hereof to be drawn under the Letter of Credit in respect

Page 13 of 18

D0016886

RE:  PITTSBURGH NATIONAL BANK
     IRREVOCABLE LETTER OF CREDIT NO. A-304677

of payment of interest accrued on the Notes on or prior to their
stated maturity date.

          Please (deposit) (wire transfer) (remit by check) the
amount hereby demanded (in our account number _____ with
_____) (to _____ at
_____).

          IN WITNESS WHEREOF, the Paying Agent has executed and
delivered this Certificate as of the ___ day of _____,
19___.

                    _____
                    as Paying Agent


                    By_____
                    Title_____

                         Page 14 of 18

D0016887

Annex 4 to Pittsburgh National Bank
Irrevocable Letter of Credit No. A-304677

CERTIFICATE FOR "D DRAWING"

[Date]

Pittsburgh National Bank
237 Fifth Avenue, Third Floor Annex
Pittsburgh, Pennsylvania  15222

Attention:  Standby Letter of Credit Department

The undersigned, a duly authorized officer of [Name of Paying Agent] hereby certifies to Pittsburgh National Bank (the "Bank"), with reference to Irrevocable Letter of Credit No. A-304677 (the "Letter of Credit"; any term used herein and not defined herein shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in favor of the Paying Agent, that:

(1)  The Paying Agent is the Paying Agent under the Financing Agreement for the owner of the Notes.

(2)  The Paying Agent is making a drawing under the Letter of Credit on a date other than an Interest Payment Date (as defined in the Reimbursement Agreement) with respect to payment of the portion of purchase price of Notes delivered to the Paying Agent for purchase equal to the amount of accrued and unpaid interest on such Notes to the date of purchase thereof.

(3)  No Notes referred to in paragraph (2) above are held in the name of the Hospital or by the Paying Agent for the account of the Hospital.

(4)  The amount of the sight draft(s) accompanying this Certificate does not exceed the amount of such portion of purchase price that is due and payable.

(5)  The amount of the sight draft(s) accompanying this Certificate, plus the aggregate amount of all previous or contemporaneous "C Drawings" or "D Drawings" as to which the Paying Agent has received timely notice of non-reinstatement,

Page 15 of 18

D0016888

RE:  PITTSBURGH NATIONAL BANK
     IRREVOCABLE LETTER OF CREDIT NO. A-304677


does not exceed $_____, which is the amount available on
the date hereof to be drawn under the Letter of Credit in respect
of the portion of the purchase price equal to accrued interest on
the Notes so delivered to the Paying Agent.

          Please (deposit) (wire transfer) (remit by check) the
amount hereby demanded (in our account number _____ with
_____) (to _____ at
_____).

          IN WITNESS WHEREOF, the Paying Agent has executed and
delivered this Certificate as of the ___ day of _____,
19___.


                    _____
                    as Paying Agent


                    By_____
                    Title_____

D0016889

Annex 5 to Pittsburgh National Bank
<u>Irrevocable Letter of Credit No. A-304677</u>

[DATE]

Pittsburgh National Bank
Fifth Avenue and Wood Street
Pittsburgh, PA  15222

Attention:  Manager, Corporate Trust Department

Re:  Pittsburgh National Bank Irrevocable Letter of
<u>Credit No. A-304677</u>

Ladies and Gentlemen:

For value received, the undersigned beneficiary
irrevocably transfers to:

(Name of Transferee)
(Address)

all rights of the undersigned beneficiary to draw under the above
Letter of Credit in its entirety or up to the remaining available
balance if prior drawing has been made under the Letter of
Credit.

By this transfer, all rights of the undersigned
beneficiary in such Letter of Credit are transferred to the
transferee who shall have the sole rights as beneficiary thereof,
including sole rights to any amendments whether now existing or
hereafter made.  All amendments are to be advised directly to the
transferee without necessity of any consent of or notice to the
undersigned beneficiary.

We are returning the original Letter of Credit to you
herewith in order that you may deliver it to the transferee
together with your customary letter of transfer.

Enclosed is remittance of $75 in payment of your
transfer commission, and, in addition thereto, we agree to pay to

Page 17 of 18

D0016890

RE:  PITTSBURGH NATIONAL BANK
     IRREVOCABLE LETTER OF CREDIT NO. A-304677


you on demand any expenses that may be incurred by you in
connection with this transfer.

                              Yours very truly,


SIGNATURE AUTHENTICATED


_____          _____
        (Bank)                          (Beneficiary)


_____          _____
  (Authorized Signature)           (Authorized Signature)

Page 18 of 18

D0016891

**EXHIBIT  0327**

CLOSING ITEM NO. A-1

REIMBURSEMENT AND SECURITY AGREEMENT

dated as of

April 1, 1995,

among

ALLEGHENY GENERAL HOSPITAL

ALLEGHENY-SINGER RESEARCH INSTITUTE

and

MORGAN GUARANTY TRUST COMPANY OF NEW YORK

DEPOSITION
EXHIBIT
327
AKF

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
24017
EXHIBIT NO.

D0016892

TABLE OF CONTENTS*

                                                              Page

SECTION 1.    Definitions . . . . . . . . . . . . . . . .     2

SECTION 2.    Reimbursement and Other Payments . . . . .     12

SECTION 3.    Issuance of the Letter of Credit;
              Conditions Precedent to
              Issuance . . . . . . . . . . . . . . . . .     22

SECTION 4.    Reduction and Reinstatement of
              Letter of Credit Amount . . . . . . . . .     26

SECTION 5.    Obligations Absolute . . . . . . . . . . .     26

SECTION 6.    Representations and Warranties . . . . . .     27

SECTION 7.    Covenants . . . . . . . . . . . . . . . .     32

SECTION 8.    Events of Default . . . . . . . . . . . .     43

SECTION 9.    Amendments and Waivers . . . . . . . . . .     46

SECTION 10.   Notices . . . . . . . . . . . . . . . . .     46

SECTION 11.   No Waiver; Remedies . . . . . . . . . . .     47

SECTION 12.   Indemnification . . . . . . . . . . . . .     47

SECTION 13.   Continuing Obligation . . . . . . . . . .     48

SECTION 14.   Transfer of the Letter of Credit . . . . .     48

SECTION 15.   Limited Liability of the Bank . . . . . .     48

SECTION 16.   Costs, Expenses and Taxes . . . . . . . .     49

SECTION 17.   Severability . . . . . . . . . . . . . . .     50

SECTION 18.   Extension of Letter of Credit . . . . . .     50

SECTION 19.   Governing Law . . . . . . . . . . . . . .     51

SECTION 20.   Consent to Jurisdiction . . . . . . . . .     51

_____

*The Table of Contents is not a part of this Agreement.

i

D0016893

                                                    Page

SECTION 21.  Counterparts; Integration . . . . . . . .   51

SECTION 22.  Headings . . . . . . . . . . . . . .   51

SECTION 23.  WAIVER OF JURY TRIAL . . . . . . . . .   51

SECTION 24.  Successors and Assigns . . . . . . . . .   51


Exhibit A    –   Irrevocable Letter of Credit

                 Exhibit 1 to the Letter of Credit

                 Exhibit 2 to the Letter of Credit

                 Exhibit 3 to the Letter of Credit

                 Exhibit 4 to the Letter of Credit

Exhibit B    –   Form of Opinion of Special Counsel
                 for the Bank

Exhibit C-1  –   Form of Opinion of Counsel for the
                 Obligated Group

Exhibit C-2  –   Form of Opinion of General Counsel
                 of AHERF

Exhibit D    –   Form of Trustee's and Tender Agent's
                 Letter

Exhibit E    –   Form of Security Agreement

ii

D0016894

## REIMBURSEMENT AND SECURITY AGREEMENT

REIMBURSEMENT AND SECURITY AGREEMENT dated as of April 1, 1995 among ALLEGHENY GENERAL HOSPITAL (together with its successors, "AGH") and ALLEGHENY-SINGER RESEARCH INSTITUTE (together with its successors, "ASRI") (collectively, the "Members of the Obligated Group" or the "Obligated Group" and each individually a "Member of the Obligated Group"), each a Pennsylvania nonprofit corporation, and MORGAN GUARANTY TRUST COMPANY OF NEW YORK (the "Bank").

WHEREAS, the Allegheny County Hospital Development Authority, a body politic and corporate and a public instrumentality of the Commonwealth of Pennsylvania (the "Issuer"), having, inter alia, the powers set forth in the Municipality Authorities Act of 1945, approved May 2, 1945, P.L. 382, as amended, proposes to issue $50,000,000 aggregate principal amount of its Allegheny County Hospital Development Authority Variable Rate Hospital Revenue Bonds, Series B of 1995 (Allegheny General Hospital Project) (the "Bonds") pursuant to a Trust Indenture dated as of March 1, 1995 between the Issuer and Mellon Bank, N.A., as bond trustee (with its successors, the "Trustee"), as amended and supplemented by the First Supplemental Trust Indenture dated as of April 1, 1995 (as amended and supplemented from time to time in accordance with the terms thereof and hereof, the "First Supplemental Indenture") (the Original Bond Indenture, as amended and supplemented by the First Supplemental Indenture and as further amended and supplemented from time to time in accordance with the terms thereof and hereof, being referred to herein as the "Bond Indenture"), and to make the proceeds of the Bonds available to AGH pursuant to a Loan Agreement dated as of March 1, 1995 (the "Original Loan Agreement") between the Issuer and AGH, as amended and supplemented by the First Supplemental Loan Agreement dated as of April 1, 1995 (as amended and supplemented from time to time in accordance with the terms thereof and hereof, the "First Supplemental Loan Agreement") (the Original Loan Agreement, as amended and supplemented by the First Supplemental Loan Agreement and as further amended and supplemented from time to time in accordance with the terms thereof and hereof, being referred to herein as the "Loan Agreement"), for the purpose of (i) financing a portion of the costs of the construction, renovation and equipment of the Northwest wing of AGH's hospital campus and the acquisition of certain capital equipment and other capital improvements at such hospital campus, (ii) financing a portion of the costs of the acquisition of an off-campus facility for AGH and renovation and equipment of such facility for health care and

D0016895

related purposes and (iii) paying certain costs of issuing the Bonds; and

WHEREAS, in order to secure the obligations of AGH to the Issuer under the Loan Agreement, the Members of the Obligated Group will execute and deliver to the Issuer their promissory note in the principal amount of $50,000,000 (as amended and supplemented from time to time in accordance with the terms thereof and hereof, the "Series 1995B Master Note") under the Master Trust Indenture (as defined below), as supplemented by the First Supplemental Master Trust Indenture dated June 17, 1994, the Second Supplemental Master Trust Indenture dated as of March 1, 1995 and the Third Supplemental Master Trust Indenture dated as of April 1, 1995, among the Members of the Obligated Group and the Master Trustee (as defined below), which Series 1995B Master Note will be assigned to the Trustee as security for the Bonds pursuant to the Bond Indenture; and

WHEREAS, in order to support payment when due of the principal of and interest accrued at a rate of up to 12% per annum (calculated on the basis of the actual number of days elapsed in a year of 365 or 366 days, as applicable) for up to a 46-day period on the Bonds and to provide liquidity in case the Tender Agent is required to purchase the Bonds on behalf of Members of the Obligated Group pursuant to the Bond Indenture and the Bonds, the Members of the Obligated Group have requested that the Bank issue an irrevocable transferable letter of credit, substantially in the form of Exhibit A hereto (as amended or supplemented from time to time, the "Letter of Credit"), in an aggregate amount of $50,756,165 (as the same may be reduced or reinstated from time to time as provided therein, the "Letter of Credit Amount") of which up to $50,000,000 may be drawn upon in respect of principal of the Bonds or the portion of the purchase price of Bonds tendered or deemed tendered under the Bond Indenture equal to the principal amount thereof and up to $756,165 of which may be drawn upon in respect of interest on the Bonds or the portion of the purchase price of the Bonds tendered or deemed tendered under the Bond Indenture equal to the interest accrued thereon; and

WHEREAS, in order to evidence and secure their obligations to the Bank under this Agreement, the Members of the Obligated Group will execute and deliver to the Bank their promissory note in a principal amount not to exceed $50,756,165 (as amended and supplemented from time to time in accordance with the terms thereof and hereof, the "Series 1995C Master Note") under the above-referenced Master Trust Indenture;

2

D0016896

NOW, THEREFORE, in consideration of the premises and in order to induce the Bank to issue the Letter of Credit, the Members of the Obligated Group, jointly and severally, hereby agree as follows:

SECTION 1.  (a)  <u>Definitions</u>.  The following terms, as used herein, have the following respective meanings:

"Adjusted London Interbank Offered Rate" has the meaning specified in Section 2(a)(ii)(B).

"Affiliate" of any Person means any Person controlling, controlled by, or under common control with, such Person.  For purposes of this definition, "control" means the power to direct the management and policies of a Person through the ownership of a majority of its voting securities, the right to determine or elect a majority of the members of its board of directors or other governing body or by contract or otherwise, <u>provided</u>, that, without limiting the generality of the foregoing, any Person having an independent board of directors which is managed by any other Person pursuant to an arm's-length management contract shall not be deemed to be controlled by such other Person solely by virtue of the existence of such management contract.

"Agreement" means this Reimbursement and Security Agreement, as the same may from time to time be amended, supplemented or modified.

"AHERF" means Allegheny Health, Education and Research Foundation, a Pennsylvania non-profit corporation.

"Applicable Lending Office" means (i) in the case of Domestic Drawings, the Domestic Lending Office and (ii) in the case of Eurodollar Drawings, the Euro-Dollar Lending Office.

"Base Rate" means, for any day, a rate per annum equal to the higher of (i) the Prime Rate for such day and (ii) the sum of 1/2 of 1% plus the Federal Funds Rate for such day.

"Benefit Arrangement" means at any time an employee benefit plan within the meaning of Section 3(3) of ERISA which is not a Plan or a Multiemployer Plan and which is maintained or otherwise contributed to by any member of the ERISA Group.

"Bond Indenture Event of Default" has the meaning ascribed to the term "Event of Default" under the Bond Indenture.

3

D0016897

"Business Day" means any day on which banks in Pittsburgh, Pennsylvania and New York, New York are open for commercial banking purposes and The New York Stock Exchange is not closed.

"Code" means the United States Internal Revenue Code of 1986, as amended, or any successor provision or provisions in that Code or any successor Federal tax code, and any regulations (including final, temporary and proposed regulations) under any such provision.

"Collateral" has the meaning specified in the Security Agreement.

"Consolidated Capitalization" means as of any date the sum of (i) consolidated unrestricted fund balances of the Obligated Group and (ii) Consolidated Obligated Group Debt, all determined as of such date. In the case of Consolidated Obligated Group Debt issued or incurred at a discount, such Consolidated Obligated Group Debt shall be valued at the accreted value thereof.

"Consolidated Obligated Group Debt" means at any time the consolidated Debt of the Obligated Group determined at such time.

"Date of Issuance" means the date on which the Letter of Credit is issued upon request of the Members of the Obligated Group pursuant to Section 3(a) hereof, which date shall in no event be later than May 15, 1995.

"Debt" of any Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business, (iv) all obligations of such Person as lessee under capital leases, (v) all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities or property, (vi) all obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit or similar instrument, (vii) all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person and (viii) all Debt of others Guaranteed by such Person. For purposes of this Agreement, Debt of the Members of the Obligated Group shall not include any Guarantee by any Member of the Obligated Group of Debt of another Member of the Obligated Group

4

D0016898

"Default" means any event or condition which constitutes an Event of Default or which with the giving of notice or the lapse of time or both would, unless cured or waived, become an Event of Default.

"Domestic Drawing" means a Tender Drawing which, pursuant to Section 2(a)(ii)(D), 2(f) or 2(g), bears interest at a rate of interest determined on the basis of the Base Rate in accordance with Section 2(a)(ii)(A).

"Domestic Lending Office" means the office designated as the Bank's Domestic Lending Office on the signature page hereto or such other office as the Bank may hereafter designate as its Domestic Lending Office by notice to the Members of the Obligated Group.

"Drawing Group" or "Group" means at any time a group of Tender Drawings consisting of (i) all Tender Drawings which are Domestic Drawings at such time or (ii) all Tender Drawings which are Eurodollar Drawings having the same Interest Period at such time; provided that, if a Eurodollar Drawing is converted to or made as a Domestic Drawing pursuant to Section 2(f) or 2(g), such Tender Drawing shall be included in the same Drawing Group from time to time as it would have been in if it had not been so converted or made.

"Environmental Laws" means any and all federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgements, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges or releases of pollutants, contaminants, petroleum or petroleum products, chemicals or industrial, toxic or hazardous substances or wastes into the environment including, without limitation, ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, petroleum or petroleum products, chemicals or industrial, toxic or hazardous substances or wastes or the clean-up or other remediation thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

"ERISA Group" means the Members of the Obligated Group and each of them and all members of a controlled group of corporations and all trades or business (whether or not incorporated) under common control which, together with all or any of them, are treated as a single employer under Section 414 of the Code.

5

D0016899

"Euro-Dollar Business Day" means any Business Day on which commercial banks are open for international business (including dealings in dollar deposits) in London.

"Euro-Dollar Drawing" means a Tender Drawing which, pursuant to Section 2(a)(ii)(D), bear interest at a rate of interest on the basis of an Adjusted London Interbank Offered Rate determined in accordance with Section 2(a)(ii)(B).

"Euro-Dollar Lending Office" means the Bank's office, branch or affiliate designated as the Bank's Euro-Dollar Lending Office on the signature page hereto or such other office, branch or affiliate of the Bank as the Bank may hereafter designate as its Euro-Dollar Lending Office by notice to the Members of the Obligated Group

"Euro-Dollar Reserve Percentage" has the meaning set forth in Section 2(a)(ii)(B).

"Event of Default" means any of the events specified in Section 8 hereof.

"Federal Funds Rate" means, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, as so published on such next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Morgan Guaranty Trust Company of New York on such day on such transactions.

"First Supplemental Master Trust Indenture" means the First Supplemental Master Trust Indenture dated June 17, 1994 among the Members of the Obligated Group and the Master Trustee, as amended and supplemented from time to time in accordance with the terms of the Master Indenture and the terms hereof.

"Guarantee" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds

6

D0016900

for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.  The term "Guarantee" used as a verb has a corresponding meaning.

"Interest Period" means, with respect to each Euro-Dollar Drawing, a period commencing on the date specified in the applicable Notice of Interest Rate Election and ending one, two or three months thereafter, as the Members of the Obligated Group may elect in the applicable Notice of Interest Rate Election; provided that:

(a)  any Interest Period that would otherwise end on a day that is not a Euro-Dollar Business Day shall be extended to the next succeeding Euro-Dollar Business Day unless such day falls in another calendar month, in which case such Interest Period shall end on the next preceding Euro-Dollar Business Day;

(b)  any Interest Period that begins on the last Euro-Dollar Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to the provisions of paragraph (c) of this proviso, end on the last Euro-Dollar Business Day of a calendar month; and

(c)  if any Interest Period includes a date on which a payment of principal of any Tender Drawing is required to be made under Section 2(a)(i)(B)(y) but does not end on such date, then (i) the principal amount (if any) of each Euro-Dollar Drawing required to be repaid on such date shall have an Interest Period ending on such date and (ii) the remainder (if any) of each such Euro-Dollar Drawing shall have an Interest Period determined as set forth above.

"Investment" means any investment in any Person, whether by means of share purchase, capital contribution, loan, time deposit or otherwise and any outright gift, donation or other transfer of property to any Person.

7

D0016901

"Investment Policy" has the meaning specified in Section 6(q) hereof.

"Letter of Representations" means the Letter of Representations dated the Date of Issuance from the Members of the Obligated Group to the Issuer and J.P. Morgan Securities Inc., as amended from time to time in accordance with the terms thereof and hereof.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, as well as the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"Master Indenture" means the Master Trust Indenture as amended and supplemented from time to time in accordance with the terms thereof and hereof.

"Master Trust Indenture" means the Restated and Amended Master Trust Indenture dated April 7, 1993 among the Members of the Obligated Group and the Master Trustee.

"Master Trustee" means PNC Bank, National Association, in its capacity as Master Trustee under the Master Indenture and any successor in such capacity.

"Material Debt" means (x) Debt of any Member of the Obligated Group and/or any of its Subsidiaries in an aggregate principal amount exceeding $2,500,000 or (y) any "Note" or "Guaranty" incurred under (and as defined in) the Master Indenture.

"Material Plan" means at any time a Plan having aggregate Unfunded Liabilities in excess of $5,000,000.

"Moody's" means Moody's Investors Service and its successors.

"Multiemployer Plan" means at any time an employee benefit pension plan within the meaning of Section 4001(a)(3) of ERISA to which any member of the ERISA Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions, including for these purposes any Person which ceased to be a member of the ERISA Group during such five year period.

"Notice of Interest Rate Election" has the meaning set forth in Section 2(a)(ii)(D).

D0016902

"Official Statement" means the Official Statement of the Issuer (including any documents incorporated therein by reference and any exhibits or attachments thereto and any amendments thereof or supplements thereto) dated April 7, 1995, relating to the Bonds.

"Parent" means, with respect to any Participant, any Person controlling such Participant.

"Participant" has the meaning set forth in Section 24(b); provided that, for purposes of Sections 2(h), (i) and (j), "Participant" also includes the Bank.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Person" means an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Plan" means at any time an employee pension benefit plan (other than a Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained, or contributed to, by any member of the ERISA Group for employees of any member of the ERISA Group or (ii) has at any time within the preceding five years been maintained, or contributed to, by any Person which was at such time a member of the ERISA Group for employees of any Person which was at such time a member of the ERISA Group.

"Pledged Bond" has the meaning specified in Section 2(b)(i).

"Prime Rate" means the rate of interest publicly announced by Morgan Guaranty Trust Company of New York in New York City from time to time as its Prime Rate.

"Purchase Contract" means the Contract of Purchase dated April 12, 1995 among the Issuer, AGH, PNC Securities Corp and J.P. Morgan Securities Inc. (including only those waivers thereof or amendments thereto approved by the Bank on or prior to the Date of Issuance).

"Purchase Notice" has the meaning specified in Section 2(c).

"Purchase Period" means the period from the Date of Issuance to and including the Termination Date.

9

D0016903

"Purchaser" has the meaning specified in Section 2(c).

"Related Documents" means the Bonds, the Original Bond Indenture, the First Supplemental Indenture, the Bond Indenture, the Original Loan Agreement, the First Supplemental Loan Agreement, the Loan Agreement, the Master Trust Indenture, the Third Supplemental Master Trust Indenture, the Master Indenture, the Series 1995B Master Note, the Series 1995C Master Note, the Purchase Contract, the Letter of Representations, the Security Agreement, the Remarketing Agreement, the Official Statement and any other agreement or instrument relating to the transactions contemplated hereby or thereby.

"Remarketing Agent" means J.P. Morgan Securities Inc., in its capacity as Remarketing Agent under the Bond Indenture, or any successor in such capacity designated pursuant to the Bond Indenture and the Remarketing Agreement.

"Remarketing Agreement" means (i) with respect to J.P. Morgan Securities Inc., as Remarketing Agent, the Remarketing Agreement dated as of April 1, 1995 between AGH and the Remarketing Agent, and (ii) with respect to any successor Remarketing Agent, the agreement among AGH and/or ASRI and such successor Remarketing Agent appointing such successor Remarketing Agent and otherwise in form and substance satisfactory to the Bank, in each case as amended or supplemented from time to time in accordance with the terms thereof and hereof.

"S&P" means Standard & Poor's Rating Group (a division of McGraw Hill, Inc.) and its successors.

"Scheduled Expiration Date" means April 1, 1998 or such later date to which the Scheduled Expiration Date may be extended pursuant to Section 18.

"Second Supplemental Master Trust Indenture" means the Second Supplemental Master Trust Indenture dated as of March 1, 1995 among the Members of the Obligated Group and the Master Trustee, as amended and supplemented from time to time in accordance with the terms of the Master Indenture and the terms hereof.

"Security Agreement" means the Security Agreement among the Members of the Obligated Group, the Tender Agent and the Bank, in substantially the form of Exhibit E hereto, as amended from time to time in accordance with its terms.

D0016904

"Subsidiary" of any Person means any corporation or other entity (i) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person or one or more other Subsidiaries of such Person or (ii) the governing documents of which provide that (x) substantially all of the assets thereof shall be distributed upon liquidation or dissolution to such Person and/or one or more other Subsidiaries of such Person or (y) a majority of the board of directors or other persons performing similar functions of which shall be appointed or otherwise selected, directly or indirectly, by the board of directors of such Person and/or one or more other Subsidiaries of such Person.

"Tender Agent" means Mellon Bank, N.A., in its capacity as Tender Agent under the First Supplemental Indenture, or any successor designated pursuant to the First Supplemental Indenture.

"Tender Drawing" means a drawing under the Letter of Credit pursuant to Section 5.05(b) of the First Supplemental Indenture to pay the purchase price of Bonds tendered or deemed to have been tendered for purchase to the Tender Agent pursuant to Section 5.03 or 5.04 of the First Supplemental Indenture.

"Tendered Bond" means any Bond purchased by the Tender Agent pursuant to Section 5.03 or 5.04 of the First Supplemental Indenture as a result of a Tender Drawing.

"Termination Date" means the earliest of (i) the Scheduled Expiration Date (or if such day is not a Business Day, on the next succeeding Business Day), (ii) the date on which the Bank receives notice from the Trustee in the form of Exhibit 3 to the Letter of Credit that the principal amount of and interest on all of the Bonds shall have been paid or payment thereof provided for (or deemed provided for) in full or that the interest rate on all the Bonds has been converted, as of a date not less than five Business Days prior to the date of such notice, to the Fixed Rate (as defined in the First Supplemental Indenture), (iii) the fifth Business Day following the date of receipt by the Trustee of notice from the Bank to the Trustee stating that an Event of Default under this Agreement has occurred and is continuing and that the Letter of Credit will terminate on such fifth Business Day and (iv) the date on which the Letter of Credit is surrendered by the Trustee to the Bank for cancellation.

"Third Supplemental Master Trust Indenture" means the Third Supplemental Master Trust Indenture dated as of

D0016905

April 1, 1995 among the Members of the Obligated Group and the
Master Trustee, as amended and supplemented from time to time
in accordance with the terms of the Master Indenture and the
terms hereof.

"Unfunded Liabilities" means, with respect to any
Plan at any time, the amount (if any) by which (i) the value
of all benefit liabilities under such Plan, determined on a
plan termination basis using the assumptions prescribed by the
PBGC for purposes of Section 4044 of ERISA, exceeds (ii) the
fair market value of all Plan assets allocable to such
liabilities under Title IV of ERISA (excluding any accrued but
unpaid contributions), all determined as of the then most
recent valuation date for such Plan, but only to the extent
that such excess represents a potential liability of a member
of the ERISA Group to the PBGC or any other Person under Title
IV of ERISA.

"Unremarketed Bond" means any Tendered Bond that the
Remarketing Agent has not remarketed.

(b)  Incorporation of Defined Terms.  Capitalized
terms used but not defined in this Agreement shall have the
same meanings as set forth in (or incorporated by reference
in) the Bond Indenture.  No amendment to any capitalized term
that is defined in any other Related Document and incorporated
by reference herein shall be effective to amend such
capitalized term as incorporated by reference herein without
the consent of the Bank.

(c)  Accounting Terms and Determinations.  Unless
otherwise specified herein, with respect to the Obligated
Group, all accounting terms used herein shall be interpreted,
all accounting determinations hereunder shall be made, and all
financial statements required to be delivered hereunder shall
be prepared in accordance with generally accepted accounting
principles as in effect from time to time, in each case
applied on a basis consistent (except for changes approved by
the Obligated Group's independent public accountants and
subject, in the case of financial statements prepared as of a
date other than the end of a fiscal year, to normal year-end
adjustments) with the most recent audited consolidated
financial statements of the Obligated Group delivered or
required to be delivered to the Bank pursuant to Section 6(c)
or 7(a).

SECTION 2.  Reimbursement and Other Payments.
(a)(i)  The Members of the Obligated Group, jointly and
severally, agree to pay to the Bank:

12

D0016906

(A)  with respect to a drawing under the Letter of Credit other than a Tender Drawing, a sum equal to the amount so drawn immediately after (and on the same Business Day as) such drawing;

(B)  with respect to any Tender Drawing, a sum equal to the amount so drawn, payable (x) during the Purchase Period from time to time upon the remarketing of the Tendered Bonds acquired with the proceeds of such Tender Drawing, the principal amount of such repayment to be made on the date of receipt of proceeds of such remarketing and in an amount equal to the amount of such Tender Drawing used to acquire the Tendered Bonds so remarketed, each such repayment to be attributed to Tender Drawings in the inverse order of when such Tender Drawings were made and (y) after the Termination Date, in ten equal semi-annual installments (based on the unpaid amount of such Tender Drawing as of the Termination Date), commencing on the day which is six months following the Termination Date, and thereafter on each day which is six months after the last such date; provided that if a Default has occurred and is continuing on the Termination Date, all amounts with respect to any Tender Drawing shall be due and payable on the Termination Date;

(C)  upon notice from the Bank, any and all usual, customary and reasonable charges and expenses, including a fee of $250.00 in connection with each drawing under the Letter of Credit (and interest on such charges and expenses as provided in clause (F) below), which the Bank may pay or incur relative to the Letter of Credit or such drawing;

(D)  upon notice from the Bank of the amount thereof, upon each transfer of the Letter of Credit in accordance with its terms a sum (and interest on such sum as provided in clause (F) below) in such amount as shall be necessary to cover the usual and customary costs and expenses of the Bank incurred in connection with such transfer;

(E)  interest on the amount of any Tender Drawing from the date of such Tender Drawing until repayment thereof is due, payable at a fluctuating interest rate per annum as provided in Section 2(a)(ii); provided that Members of the Obligated Group shall, on the date of any repayment, in whole or in part, of any Tender Drawing, pay interest accrued on the amount repaid;

13

D0016907

(F)  interest on any and all amounts unpaid by
Members of the Obligated Group when due under this
Agreement for each day from the date such amounts become
due (except, in the case of amounts due under clause (C)
or (D) above, interest from the Business Day following
the date on which notice is given by the Bank) until
payment of such amount is made in full, payable on
demand, at an interest rate per annum equal to 3% per
annum above the Base Rate for such day; and

(G)  if a Default occurs, any and all reasonable
expenses incurred by the Bank (including, without
limitation, reasonable fees and disbursements of its
counsel) in enforcing any rights under this Agreement or
under any Bonds held by it for its account pursuant to
the Security Agreement or under any of the Related
Documents.

(ii) (A) Each Domestic Drawing shall bear interest
on the outstanding principal amount thereof, for each day
from the date such Tender Drawing is made or converted
into a Domestic Drawing, as the case may be, until such
Domestic Drawing is converted to a Euro-Dollar Drawing or
is required to be repaid hereunder, as the case may be,
at a rate per annum equal to the Base Rate for such day.
Such interest shall be payable quarterly in arrears on
the last day of each March, June, September and December.

(B)  Each Euro-Dollar Drawing shall bear interest on
the outstanding principal amount thereof, for each day
during the Interest Period applicable thereto, at a rate
per annum equal to the sum of 0.25% plus the Adjusted
London Interbank Offered Rate applicable to such Interest
Period.  Such interest shall be payable quarterly in
arrears on the last day of each March, June, September
and December.

The "Adjusted London Interbank Offered Rate"
applicable to any Interest Period means a rate per annum
equal to the quotient obtained (rounded upward, if
necessary, to the next higher 1/100 of 1%) by dividing
(i) the applicable London Interbank Offer Rate by (ii)
1.00 minus the Euro-Dollar Reserve Percentage.

The "London Interbank Offered Rate" applicable
to any Interest Period means the rate per annum (rounded
upward, if necessary, to the next higher 1/16 of 1%) at
which deposits in dollars are offered to Morgan Guaranty
Trust Company of New York in the London interbank market
at approximately 11:00 A.M. (London time) two Euro-Dollar
Business Days before the first day of such Interest

14

D0016908

Period in an amount approximately equal to the principal amount of the Euro-Dollar Drawing to which such Interest Period is to apply and for a period of time comparable to such Interest Period.

"Euro-Dollar Reserve Percentage" means for any day that percentage (expressed as a decimal) which is in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement for a member bank of the Federal Reserve System in New York City with deposits exceeding five billion dollars in respect of "Eurocurrency liabilities" (or in respect of any other category of liabilities which includes deposits by reference to which the interest rate on Euro-Dollar Drawings is determined or any category of extensions of credit or other assets which includes loans by a non-United States office of the Bank to United States residents).  The Adjusted London Interbank Offered Rate shall be adjusted automatically on and as of the effective date of any change in the Euro-Dollar Reserve Percentage.

(C)  The Bank shall determine each interest rate applicable to the Tender Drawings hereunder.  The Bank shall give prompt notice to the Members of the Obligated Group of each rate of interest so determined, and its determination thereof shall be conclusive in the absence of manifest error.

(D)  All Tender Drawings made on any Purchase Date shall initially be Domestic Drawings.  Thereafter, the Members of the Obligated Group may from time to time elect to change or continue the type of interest rate borne by each Drawing Group (subject in each case to the provisions of Sections 2(f) and 2(g)), as follows:

(i)  if such Tender Drawings are Domestic Drawings, the Members of the Obligated Group may elect to convert such Tender Drawings to Euro-Dollar Drawings as of any Euro-Dollar Business Day; and

(ii)  if such Tender Drawings are Euro-Dollar Drawings, the Members of the Obligated Group may elect to convert such Tender Drawings to Domestic Drawings or elect to continue such Tender Drawings as Euro-Dollar Drawings for an additional Interest Period, in each case effective on the last day of the then current Interest Period applicable to such Tender Drawings.

15

D0016909

Each such election shall be made by delivering a notice (a "Notice of Interest Rate Election") to the Bank at least three Euro-Dollar Business Days before the conversion or continuation selected in such notice is to be effective. A Notice of Interest Rate Election may, if it so specifies, apply to only a portion of the aggregate principal amount of the relevant Drawing Group; provided that (i) such portion is allocated ratably among the Tender Drawings comprising such Drawing Group and (ii) the portion to which such Notice of Interest Rate Election applies, and the remaining portion to which it does not apply, are each at least $5,000,000.

(E) Each Notice of Interest Rate Election shall specify:

(i) the Drawing Group (or portion thereof) to which such notice applies;

(ii) the date on which the conversion or continuation selected in such notice is to be effective, which shall comply with the applicable clause of clause (D) above;

(iii) if the Tender Drawings comprising such Drawing Group are to be converted, the new type of Tender Drawings (i.e. Domestic or Euro-Dollar) and, if such new Tender Drawings are Euro-Dollar Drawings, the duration of the initial Interest Period applicable thereto; and

(iv) if such Tender Drawings are to be continued as Euro-Dollar Drawings for an additional Interest Period, the duration of such additional Interest Period.

Each Interest Period specified in a Notice of Interest Rate Election shall comply with the provisions of the definition of Interest Period.

(F) A Notice of Interest Rate Election shall be irrevocable upon the Bank's receipt of such Notice of Interest Rate Election from the Members of the Obligated Group pursuant to clause (E) above. If the Members of the Obligated Group fail to deliver a timely Notice of Interest Rate Election to the Bank for any Group of Euro-Dollar Drawings, such Tender Drawings shall be converted into Domestic Drawings on the last day of the then current Interest Period applicable thereto.

16

D0016910

(b)  (i) If any Tender Drawing is made under the
Letter of Credit, then to the extent such Tender Drawing is
not immediately repaid in full pursuant to Section 2(a)(i)(B)
hereof, the Members of the Obligated Group shall promptly
deliver or cause to be delivered to the Tender Agent, as
custodian for the Bank, to be held in accordance with the
provisions hereof and of the Security Agreement as collateral
for the benefit of the Bank all Unremarketed Bonds in respect
of which such Tender Drawing was made.  In each case, such
Unremarketed Bonds (herein referred to as the "Pledged
Bonds"), shall be registered promptly on the date of the
related Tender Drawing in the name of the Bank (or its
designee).

(ii)  All payments received on or with respect to
Pledged Bonds will be used to reimburse the Bank for any
amounts then owing to the Bank in the following order: first,
to any interest owing to the Bank pursuant to Section
2(a)(i)(F), second, to any interest owing to the Bank pursuant
to Section 2(a)(i)(E), third, to any reimbursement obligation
owing to the Bank pursuant to Sections 2(a)(i)(A) and (B), and
finally, to any other amounts owing to the Bank hereunder or
under the Security Agreement.  If the Members of the Obligated
Group or any of them shall receive any payment of principal
of, or interest on, any Pledged Bonds, the Members of the
Obligated Group agree to accept the same as the Bank's agent,
to hold the same in trust on behalf of the Bank and to deliver
the same forthwith to the Tender Agent acting in its capacity
as custodian for the benefit of the Bank.  The Members of the
Obligated Group agree to cause the Tender Agent acting in its
capacity as custodian for the benefit of the Bank to
distribute immediately to the Bank in payment or prepayment of
their obligations under this Agreement all payments of
principal of, or interest on, the Pledged Bonds received by
the Tender Agent acting in its capacity as custodian for the
benefit of the Bank.

(c)  Prior to 11:30 A.M. (New York City time) on any
Business Day on which the Tender Agent, on behalf of the Bank,
holds Pledged Bonds and so long as no Default has occurred and
is continuing, Members of the Obligated Group or their
designee, including, without limitation, the Remarketing
Agent, may deliver a notice (a "Purchase Notice") to the Bank
stating that it has located a purchaser (the "Purchaser") for
some or all of such Pledged Bonds and that such Purchaser
desires to purchase on such Business Day a minimum of $100,000
aggregate principal amount of such Pledged Bonds (or any
larger multiple of $100,000) at a price of par plus interest
accrued thereon to but excluding such Business Day.  The
Tender Agent will deliver such Pledged Bonds to the
Remarketing Agent by 3:00 P.M. (New York City time) on such

17

D0016911

Business Day against receipt by the Tender Agent for the account of the Bank in immediately available funds of the purchase price therefor plus any other amounts (including, without limitation, additional interest payable pursuant to Section 2(a)(i)(E)) payable by the Members of the Obligated Group in respect of the Tender Drawing for such Pledged Bonds. The Bank shall apply such purchase price and other amounts toward payment of the Tender Drawing pursuant to which such Pledged Bonds so sold were purchased by Members of the Obligated Group and interest accrued on such Tender Drawing, as required pursuant to Sections 2(a)(i)(B), (E) and (F) above.  Any sale of a Pledged Bond, or portion thereof, pursuant to this Section 2(c) shall be without recourse to the seller and without representation or warranty of any kind, to the fullest extent permitted by law.

(d)  Subject in the case of any Euro-Dollar Drawing to Section 2(j), the Members of the Obligated Group may upon at least three Business Days' notice to the Bank, prepay any Tender Drawing in whole at any time, or from time to time in part in amounts aggregating $100,000 or any larger multiple of $100,000, together with accrued interest thereon to the date of prepayment and upon receipt of such prepayment, together with interest thereon, the Bank shall direct the Tender Agent to release the Pledged Bonds relating to such Tender Drawing (or portion thereof) from the Lien created by the Security Agreement.  Each such optional prepayment shall be applied in inverse order against subsequent installments payable pursuant to Section 2(a)(i)(B)(y).

(e)  (i) The Members of the Obligated Group, jointly and severally, agree to pay to the Bank a letter of credit fee for each day at a rate per annum equal to the Letter of Credit Fee Rate for such day on the Letter of Credit Amount on each day, payable quarterly in arrears on the last day of each December, March, June, and September, commencing with the first such date after the Date of Issuance and on the Termination Date.

"Letter of Credit Fee" at any day means (i) 0.275% if Level I Pricing applies on such day and (ii) 0.40% if Level II Pricing applies on such day.

"Level I Pricing" applies on any day if, at such day, the senior unsecured and unenhanced long-term debt obligations of the Obligated Group are rated A- or higher by S&P and Baa1 or higher by Moody's.

"Level II Pricing" applies on any day if, at such day, Level I Pricing does not apply.

18

D0016912

(ii)  On the Date of Issuance, the Members of the Obligated Group will pay to the Bank a fee in an amount equal to 0.05% of the Letter of Credit Amount.

(f)  If prior to the first day of any Interest Period for any Group of Euro-Dollar Drawings:

(i)  deposits in dollars (in the applicable amounts) are not being offered to the Bank in the London interbank market for such Interest Period, or

(ii)  the Bank determines that the Adjusted London Interbank Offered Rate will not adequately and fairly reflect the cost to the Bank of funding the Euro-Dollar Drawings for such Interest Period,

the Bank shall forthwith give notice thereof to the Members of the Obligated Group, whereupon until the Bank notifies the Members of the Obligated Group that the circumstances giving rise to such suspension no longer exist, the obligations of the Bank to make or continue Euro-Dollar Drawings or to convert outstanding Domestic Drawings into Euro-Dollar Drawings shall be suspended and each outstanding Euro-Dollar Drawing shall be converted into a Domestic Drawing on the last day of the then current Interest Period applicable thereto.

(g)  If, on or after the date of this Agreement, the adoption of any applicable law, rule or regulation, or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or its Euro-Dollar Lending Office) with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for the Bank (or its Euro-Dollar Lending Office) to make, maintain or fund the Euro-Dollar Drawings, the Bank shall forthwith give notice thereof to the Members of the Obligated Group, whereupon until the Bank notifies the Members of the Obligated Group that the circumstances giving rise to such suspension no longer exist, the obligation of the Bank to make or continue Euro-Dollar Drawings or to convert outstanding Domestic Drawings into Euro-Dollar Drawings shall be suspended.  Before giving any notice to the Members of the Obligated Group pursuant to this subsection, the Bank shall designate a different Euro-Dollar Lending Office if such designation will avoid the need for giving such notice and will not, in the judgment of the Bank, be otherwise disadvantageous to the Bank.  If such notice is given, each Euro-Dollar Drawing then outstanding shall be converted to a Domestic Drawing either (i) on the last day of

19

the then current Interest Period applicable to such Euro-Dollar Drawing if the Bank may lawfully continue to maintain and fund such Tender Drawing as a Euro-Dollar Drawing to such day or (ii) immediately if the Bank shall determine that it may not lawfully continue to maintain and fund such Tender Drawing as a Euro-Dollar Drawing to such day.

(h)  If, on or after the date of this Agreement, the adoption of any applicable law, rule or regulation, or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Participant with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency (i) shall subject any Participant to any tax, duty or other charge with respect to the Letter of Credit or this Agreement (or on or in respect of its participation therein or hereunder), or shall change the basis of taxation of payments to such Participant of any amounts due under this Agreement (except for changes in the rate of tax on the overall net income of such Participant imposed by the jurisdiction in which its principal executive office is located) or (ii) shall impose, modify or deem applicable any reserve (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System, but excluding any such requirement included in an applicable Euro-Dollar Reserve Percentage), special deposit, insurance assessment or similar requirement against letters of credit issued by, or assets of, or deposits with or for the account of, or credit extended by, any Participant or (iii) shall impose on any Participant any other condition regarding this Agreement or the Letter of Credit (or on or in respect of its participation therein or hereunder) and the result of any of the foregoing is to increase the cost of such Participant of issuing or maintaining the Letter of Credit, or funding any drawings thereunder, or reduce the amount of any sum received or receivable by such Participant under this Agreement, by an amount deemed by such Participant to be material, then, within 15 days after demand by such Participant, the Members of the Obligated Group shall pay to such Participant all additional amounts which are necessary to compensate such Participant for such increased cost or reduction.  Each Participant will promptly notify the Members of the Obligated Group of any event of which it has knowledge, occurring after the date hereof, which will entitle such Participant to compensation pursuant to this subsection and, in the case of the Bank, will designate a different Applicable Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the Bank's judgment, be otherwise disadvantageous to the Bank.  A

20

D0016914

certificate of any Participant claiming compensation under
this subsection and setting forth the additional amount or
amounts to be paid to it hereunder shall be conclusive in the
absence of manifest error.  In determining such amount, such
Participant may use any reasonable averaging and attribution
methods.

(i)  If any Participant shall have determined that,
after the date hereof, the adoption of any applicable law,
rule or regulation regarding capital adequacy, or any change
in any applicable law, rule or regulation, or any change in
the interpretation or administration thereof by any
governmental authority, central bank or comparable agency
charged with the interpretation or administration thereof, or
any request or directive regarding capital adequacy (whether
or not having the force of law) of any such authority, central
bank or comparable agency, has or would have the effect of
reducing the rate of return on capital of such Participant (or
its Parent) as a consequence of its obligations hereunder or
under the Letter of Credit (or on or in respect of its
participation therein or hereunder) to a level below that
which such Participant (or its Parent) could have achieved but
for such adoption, change, request or directive (taking into
consideration its policies with respect to capital adequacy)
by an amount deemed by such Participant to be material, then
from time to time, within 15 days after demand by such
Participant, the Members of the Obligated Group, jointly and
severally, agree to pay to such Participant such additional
amount or amounts as will compensate such Participant for such
reduction.  The Bank will promptly notify the Members of the
Obligated Group of any event of which it has knowledge,
occurring after the date hereof, which will entitle the Bank
or a Participant to compensation pursuant to this subsection
and will designate a different Applicable Lending Office if
such designation will avoid the need for, or reduce the amount
of, such compensation and will not, in the Bank's judgment, be
otherwise disadvantageous to the Bank.  A certificate of the
Bank or such Participant claiming compensation under this
subsection and setting forth the additional amount or amounts
to be paid to it pursuant to this subsection shall be
conclusive in the absence of manifest error.  In determining
such amount, the Bank or such Participant may use any
reasonable averaging and attribution methods.

(j)  If any payment of principal with respect to any
Euro-Dollar Drawing is made or any Euro-Dollar Drawing is
converted to a Domestic Drawing (pursuant to Section 2(a),
2(f) or 2(g), or otherwise) on any day other than the last day
of the Interest Period applicable thereto, the Members of the
Obligated Group shall reimburse each Participant within 15
days after demand for any resulting loss or expense incurred

21

D0016915

by it, including (without limitation) any loss incurred in obtaining, liquidating or employing deposits from third parties, but excluding loss of margin for the period after any such payment or conversion; provided that such Participant shall have delivered to the Members of the Obligated Group a certificate as to the amount of such loss or expense, which certificate shall be conclusive in the absence of manifest error.

(k)  All obligations of the Members of the Obligated Group hereunder are joint and several obligations (whether or not expressly so stated herein) and all payments by the Members of the Obligated Group to the Bank or any other Participant hereunder shall be made in lawful currency of the United States and in immediately available funds (i) in the case of the Bank, at the Bank's principal New York office, which at the date hereof is located at 60 Wall Street, New York, New York 10260, and (ii) in the case of any other Participant, to the Bank, at such address, for the account of such Participant.  Whenever any payment hereunder shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day, and any interest payable thereon shall be payable for such extended time at the specified rate.

(l)  Interest based on the Prime Rate hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and paid for the actual number of days elapsed (including the first day but excluding the last day).  All other interest and fees shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day).

(m)  It is understood and agreed that the Bank may grant or withhold its consent to maintain the Letter of Credit in effect after the conversion of the interest rate on the Bonds to the Fixed Rate (as referred to in Section 2.02(i) of the First Supplemental Indenture) (and establish the terms of and the conditions for any such consent) in its sole and absolute discretion.

SECTION 3.  Issuance of the Letter of Credit; Conditions Precedent to Issuance.  (a)  On or before May 15, 1995, upon five Business Days' prior notice from or on behalf of the Members of the Obligated Group to the Bank and subject to satisfaction of the conditions precedent set forth in subsections (b), (c), and (d) of this Section, the Bank shall, on the terms and conditions as hereinafter set forth, issue the Letter of Credit in the Letter of Credit Amount, effective on the Date of Issuance and expiring on the Termination Date.

D0016916

(b)   As a condition precedent to the issuance of the Letter of Credit, the Bank shall have received on or before the Date of Issuance the following, each dated such date, in each case in form and substance satisfactory to the Bank:

(i)   an opinion of Foley & Lardner, counsel for the Members of the Obligated Group and an opinion of Nancy A. Wynstra, Esq., General Counsel of AHERF, substantially in the forms of Exhibit C-1 and Exhibit C-2, respectively, hereto;

(ii)   an opinion of Davis Polk & Wardwell, counsel for the Bank, substantially in the form of Exhibit B hereto;

(iii)   a letter from each of the Trustee and the Tender Agent to the Bank, in each case substantially in the form of Exhibit D hereto;

(iv)   copies of the resolutions of the Board of Directors of each Member of the Obligated Group authorizing the execution, delivery and performance by such Member of this Agreement, the Master Indenture (including the Third Supplemental Indenture but excluding any such resolutions authorizing the execution, delivery and performance by and such Member of only those provisions of any other "Supplemental Indenture" issued under (and as defined in) the Master Indenture that do not in any way relate to or otherwise affect the rights or interests of any holder of the Bonds, the Series 1995B Note or the Series 1995C Note) and each other Related Document to which it is a party, certified by the Treasurer, the Secretary or an Assistant Secretary of such Person (which certificate shall state that such resolutions are in full force and effect on the Date of Issuance, have not been modified or amended and constitute the only resolutions of the Board of Directors of such Person (or any committee thereof) relating to the subject matter thereof);

(v)   certified copies of all approvals, authorizations or consents of, or notices to or filings or registrations with, any governmental body, agency or official required for each Member of the Obligated Group to execute, deliver or perform this Agreement, the Master Indenture (including the Third Supplemental Indenture but excluding any such approvals, authorization, consents, notices, filings or registrations required for each such Member to execute, deliver or perform only those provisions of any other "Supplemental Indenture" issued under (and as defined in) the Master Indenture that do

23

D0016917

not in any way relate to or otherwise affect the rights or interests of any holder of the Bonds, the Series 1995B Note or the Series 1995C Note) and any other Related Document to which it is a party;

(vi)   a certificate of the Treasurer, the Secretary or an Assistant Secretary of each Member of the Obligated Group certifying as to the names and true signatures of the officers of such Person authorized to execute this Agreement and each other Related Document or other document to be delivered by it hereunder;

(vii)   counterparts hereof signed by each party hereto (or, in the case of any party as to which an executed counterpart shall not have been received, receipt by the Bank in form satisfactory to it of telegraphic, telex, facsimile or other written confirmation from such party of execution of a counterpart hereof by such party);

(viii)   counterparts of the Security Agreement signed by each of the parties thereto (or, in the case of any party as to which an executed counterpart shall not have been received, receipt by the Bank in form satisfactory to it of telegraphic, telex, facsimile or other written confirmation from such party of execution of a counterpart thereof by such party);

(ix)   an executed copy of the Series 1995C Master Note;

(x)   executed copies (or, when the Bank is not a party or a beneficiary thereof, certified copies thereof) of the Third Supplemental Master Trust Indenture, the Master Trust Indenture and each other Related Document (except the Related Documents referred to in clauses (vii), (viii) and (ix) above);

(xi)   a copy of each Officer's Certificate and Opinion of Counsel required to be delivered pursuant to Section 2.11 of the Master Indenture in connection with the incurrence of the Series 1995C Master Note (addressed to the Bank in the case of such Opinion of Counsel);

(xii)   a copy of each opinion, certificate and other document (in the case of each opinion, addressed to the Bank either directly or through a reliance letter) required to be delivered to any Person on or about the Date of Issuance under each Related Document (including, without limitation, the Purchase Contract as in effect at the signing thereof without regard to any waiver of any provision thereof or amendment thereto);

24

D0016918

(xiii)  the fee due on the Date of Issuance referred to in Section 2(e)(ii); and

(xiv)  such other documents, instruments, approvals (and, if requested by the Bank, certified duplicates of executed copies thereof) or opinions as the Bank may reasonably request, relating to this Agreement or the Related Documents or the transactions contemplated hereby or thereby.

(c)  The statements set forth in clauses (i) and (ii) below shall be true and correct on the Date of Issuance and the Bank shall have received a certificate signed by the President or another duly authorized officer or agent of each Member of the Obligated Group acceptable to the Bank dated the Date of Issuance, stating that:

(i)  the representations and warranties contained (or incorporated by reference) herein and in the Master Indenture (including the Third Supplemental Indenture but excluding the provisions of any other "Supplemental Indenture" issued under (and as defined in) the Master Indenture that do not in any way relate to or otherwise affect the rights or interests of any holder of the Bonds, the Series 1995B Note or the Series 1995C Note) and each other Related Document hereof are correct on and as of the Date of Issuance as though made on and as of such date; and

(ii)  no Default has occurred and is continuing or would result from the issuance of the Letter of Credit.

(d)  On or before the Date of Issuance:

(i)  the Issuer shall have duly adopted resolutions authorizing the execution, delivery and performance by the Issuer of the Bonds and each of the other Related Documents to which the Issuer is a party and approving the transactions contemplated hereby and thereby and certified copies of such resolutions shall have been delivered to the Bank;

(ii)  the Bank shall have received a copy of the resolutions referred to in clause (i) above certified by the Secretary of the Issuer as being in full force and effect on the Date of Issuance, as not having been amended or supplemented through the date thereof and as being the only resolutions adopted by the Issuer or any committee thereof relating to the execution, delivery or performance by the Issuer of the Bonds or any of the other Related Documents to which the Issuer is a party or

25

D0016919

the other Related Documents or this Agreement or the
transactions contemplated hereby or thereby;

(iii)  the Issuer and the Trustee shall have duly
authorized the execution, delivery and performance of,
and shall have duly executed and delivered, the Original
Bond Indenture and the First Supplemental Indenture, and
the Bond Indenture shall be in full force and effect;

(iv)  all conditions precedent to the issuance of
the Bonds (and to their purchase under the Purchase
Contract as specified therein) shall have occurred; and

(v)  the Issuer shall have duly executed, issued and
delivered the Bonds and the Trustee shall have duly
authenticated the Bonds and the Underwriters (as defined
in the Purchase Contract) shall have duly paid for and
purchased the Bonds.

SECTION 4.  Reduction and Reinstatement of Letter of
Credit Amount.  The Letter of Credit Amount shall be
automatically reduced and reinstated as specified in the
third, fourth and sixth paragraphs of the Letter of Credit.

SECTION 5.  Obligations Absolute.  The obligations
of each Member of the Obligated Group under this Agreement
shall be absolute, unconditional and irrevocable, and shall be
performed strictly in accordance with the terms of this
Agreement, under all circumstances whatsoever, including
without limitation the following circumstances:

(a)  any lack of validity or enforceability of the
Letter of Credit, this Agreement, the Series 1995C Master
Note or any of the other Related Documents;

(b)  any amendment to, waiver of or consent to
departure from any provision of, any of the Letter of
Credit, the Series 1995C Master Note or any of the other
Related Documents or this Agreement;

(c)  the existence of any claim, set-off, defense or
other right which any Member of the Obligated Group may
have at any time against the Trustee, any beneficiary or
any transferee of the Letter of Credit (or any Persons
for whom the Trustee, any such beneficiary or any such
transferee may be acting), the Bank, any Participant, the
Issuer or any other Person, whether in connection with
the Letter of Credit, this Agreement, the Related
Documents or any unrelated transaction, provided that
nothing herein shall prevent the assertion of any such

26

D0016920

claim, defense or other right by separate suit or compulsory counterclaim;

(d)  any statement or any other document presented under the Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(e)  payment by the Bank under the Letter of Credit against presentation of a draft or certificate or both which does not comply with the terms of the Letter of Credit; provided that the Bank's determination that documents presented under the Letter of Credit comply with the terms thereof shall not have constituted gross negligence or wilful misconduct of the Bank; or

(f)  any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

SECTION 6.  Representations and Warranties.  The Members of the Obligated Group represent and warrant as follows:

(a)  Corporate Existence and Power.  Each Member of the Obligated Group is a nonprofit corporation duly incorporated, validly existing and in good standing under the law of the Commonwealth of Pennsylvania, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and has all corporate powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.  Each of AGH and ASRI is a "Member of the Obligated Group" (as such term is defined in the Master Indenture) and AGH and ASRI constitute the only "Members of the Obligated Group" (as so defined) as of the Date of Issuance.

(b)  Corporate and Governmental Authorization; Contravention.  (i) The execution, delivery and performance by or on behalf of each Member of the Obligated Group of this Agreement and each of the Related Documents to which it is a party are within such Person's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with any governmental body, agency or official (except the Issuer, which has taken all action required to be taken by it), and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the Articles of Incorporation or bylaws, of such Person or of any

27

D0016921

agreement, judgment, injunction, order, decree or other instrument binding upon any Member of the Obligated Group or any of its assets or result in the creation or imposition of any Lien on any asset of such Person except as provided herein or in the Related Documents.

(ii)  This Agreement and each Related Document to which any Member of the Obligated Group is a party constitute valid and binding agreements of such Member of the Obligated Group.

(c)  Financial Information. (i)  The audited consolidated and consolidating balance sheets of AGH and its consolidated Subsidiaries as of June 30, 1994 and the related consolidated and consolidating statements of revenue and expenses and consolidated statements of changes in net equity and cash flows, reported on by Coopers & Lybrand, a copy of which has been delivered to the Bank, fairly present, in conformity with generally accepted accounting principles, the consolidated and consolidating financial position of AGH and its consolidated Subsidiaries as of such date and their consolidated and consolidating results of operations and their consolidated cash flows for such fiscal year.

(ii)  Since June 30, 1994 there has been no material adverse change in the respective businesses, financial positions, results of operations or prospects of any Member of the Obligated Group.

(d)  Litigation.  There is no action, suit or proceeding pending against, or to the knowledge of any Member of the Obligated Group threatened against or affecting, any Member of the Obligated Group or any Affiliate of any of them before any court or arbitrator or any governmental body, agency or official (i) in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, financial position, results of operations or prospects of any Member of the Obligated Group, (ii) which in any manner draws into question the validity or enforceability of this Agreement or any Related Document or (iii) which in any manner draws into question the validity, effectiveness, enforceability or perfection of the Lien on the Collateral or the fact that the Collateral will not be subject to any other Lien.

(e)  Compliance with ERISA.  Each member of the ERISA Group has fulfilled its obligations under the minimum funding standards of ERISA and the Code with respect to each Plan and is in compliance in all material

28

D0016922

respects with the presently applicable provisions of
ERISA and the Code with respect to each Plan.  No member
of the ERISA Group has (i) sought a waiver of the minimum
funding standard under Section 412 of the Code in respect
of any Plan, (ii) failed to make any contribution or
payment to any Plan or Multiemployer Plan or in respect
of any Benefit Arrangement, or made any amendment to any
Plan or to any Benefit Arrangement, which has resulted or
could result in the imposition of a Lien or the posting
of a bond or other security under ERISA or the Code or
(iii) incurred any liability under Title IV of ERISA
other than a liability to the PBGC for premiums under
Section 4007 of ERISA.

     (f)  <u>Income Tax Status</u>.  Each Member of the
Obligated Group is an organization described in Section
501(c)(3) of the Code exempt from taxation under Section
501(a) of the Code, is an organization described in
Section 170(b) of the Code, is not a "private foundation"
as defined by Section 509(a) of the Code and has received
a determination letter to this effect from the Internal
Revenue Service which is in full force and effect on the
date hereof.

     (g)  <u>Not an Investment Company</u>.  None of the Members
of the Obligated Group is an "investment company" within
the meaning of the Investment Company Act of 1940, as
amended.

     (h)  <u>Pledged Bonds</u>.  Upon the delivery of any
Pledged Bonds to the Tender Agent acting in its capacity
as custodian for the benefit of the Bank, (i) Members of
the Obligated Group will have, subject to the interest of
the Bank granted hereunder, all right, title and interest
in and to such Pledged Bonds and neither the Issuer, the
Tender Agent, the Trustee nor any other Person
(including, without limitation, the holder of any Bond)
have any right, title or interest in and to such Pledged
Bonds, (ii) Members of the Obligated Group will have full
power, authority and legal right to pledge all of their
right, title and interest in and to the Pledged Bonds
pursuant to the Security Agreement and (iii) the Bank
will have a valid and enforceable and perfected security
interest in such Pledged Bonds and the Pledged Bonds will
be subject to no other Lien.

     (i)  <u>Official Statement</u>.  The Official Statement
does not contain any untrue statement of a material fact
or omit to state a material fact necessary in order to
make the statements made therein, in light of the
circumstances in which they were made, not misleading.

D0016923

(j)  Incorporation of Representations and Warranties
by Reference.  Each Member of the Obligated Group hereby
makes to the Bank the same representations and warranties
as are made by it in the Master Indenture (including the
Third Supplemental Indenture but excluding the provisions
of any other "Supplemental Indenture" issued under (and
as defined in) the Master Indenture that do not in any
way relate to or otherwise affect the rights or interests
of any holder of the Bonds, the Series 1995B Note or the
Series 1995C Note) and each other Related Document, which
representations and warranties, as well as the related
defined terms contained therein, are hereby incorporated
by reference with the same effect as if each and every
such representation and warranty and defined term were
set forth herein in its entirety.  No amendment to any
such representations and warranties or defined terms made
pursuant to any such Related Document shall be effective
to amend such representations and warranties and defined
terms as incorporated by reference herein without the
prior consent of the Bank.

(k)  Certificate of Need.  No Certificate of Public
Need is required to be obtained under Pennsylvania law,
in connection with the financing of the 1995 Project by
the Issuer and each Member of the Obligated Group as
contemplated by the Related Documents.

(l)  Environmental Matters.  In the ordinary course
of their respective businesses, each Member of the
Obligated Group conducts ongoing reviews of the effect of
Environmental Laws on the business, operations and
properties of each Member of the Obligated Group and its
respective Subsidiaries, in the course of which they
evaluate associated liabilities and costs (including,
without limitation, any capital or operating expenditures
required for clean-up or closure of properties presently
or previously owned or operated, any capital or operating
expenditures required to achieve or maintain compliance
with environmental protection standards imposed by law or
as a condition of any license, permit or contract, any
related constraints on operating activities, including
any periodic or permanent shutdown of any facility or
reduction in the level of or change in the nature of
operations conducted thereat and any actual or potential
liabilities to third parties, including employees, and
any related costs and expenses).  On the basis of this
review, each Member of the Obligated Group has reasonably
concluded that (except as described in Section 6(d))
Environmental Laws are unlikely to have a material
adverse effect on the business, financial condition,

D0016924