results of operations or prospects of any Member of the Obligated Group.

(m) <u>Full Disclosure</u>. All information heretofore furnished by any Member of the Obligated Group to the Bank for purposes of or in connection with this Agreement or the Related Documents or any transaction contemplated hereby or thereby is, and all such information hereafter furnished by any Member of the Obligated Group to the Bank will be, true and accurate in all material respects on the date as of which such information is stated or certified. Each Member of the Obligated Group has disclosed to the Bank in writing any and all facts which materially and adversely affect or may affect (to the extent such Member of the Obligated Group can now reasonably foresee), the business, operations or financial condition of any Member of the Obligated Group, or the ability of any of them to perform its obligations under this Agreement and the Related Documents to which it is party.

(n) <u>Commitment Indebtedness</u>. The obligations of the Members of the Obligated Group under this Agreement constitute "Commitment Indebtedness" incurred under (and as defined in) the Master Indenture.

(o) <u>Third Party Reimbursement</u>. (i) Each Member of the Obligated Group is duly authorized and licensed and certified to operate its Facilities (as hereinafter defined) and receive reimbursement therefor (to the extent reimbursement is applicable and available) under applicable Pennsylvania law. As used herein, "Facilities" means any and all right, title and interest in and to property, plant and equipment of the Members of the Obligated Group.

(ii) No Member of the Obligated Group has received or expects to receive requests or assertions of claims for reimbursement or repayment by such Member of costs and/or payments made by any third party payor which, if adversely determined, would result in any material adverse change in the business, financial condition, results of operations or prospects of such Member of the Obligated Group.

(p) <u>Subsidiaries</u>. As of the Date of Issuance, AGH has no Subsidiaries other than ASRI.

(q) <u>Investment Policy</u>. As of the Date of Issuance, the Allegheny Health, Education and Research Foundation Pension Master Trust Statement of Investment

31

D0016925

Policy, the Allegheny Health, Education and Research Foundation Donor and Restricted Funds Statement of Investment Policy and the Allegheny Health, Education and Research Foundation Reserves for Property, Plant and Equipment Statement of Investment Policy, each adopted on June 30, 1994 and a copy of each of which has been delivered to the Bank (collectively, the "Investment Policy"), constitute the only written materials specifying requirements or guidelines pursuant to which the Investments of the Obligated Group (other than Investments by any Member of the Obligated Group in any Affiliate) are made or maintained.

SECTION 7.  Covenants.  The Members of the Obligated Group, jointly and severally, covenant that, during the term of this Agreement:

(a)  Information.  They will deliver, or cause to be delivered, to the Bank:

(i)  as soon as available but in any event not later than 150 days after the end of each fiscal year of the Obligated Group, the audited consolidated and unaudited or, if available, audited consolidating balance sheets of the Obligated Group as of the fiscal year then ended and the related audited consolidated and unaudited or, if available, audited consolidating statements of revenue and expenses, changes in net equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, and, in the case of each audited financial statement, reported on by (x) Coopers & Lybrand L.L.P. or (y) other independent public accountants of nationally recognized standing;

(ii)  as soon as available and in any event within 60 days after the end of each fiscal quarter of the Obligated Group, the unaudited consolidated and consolidating balance sheets of the Obligated Group as of the end of such fiscal quarter and the related consolidated and consolidating statements of revenue and expenses for the fiscal quarter then ended and for the portion of the Obligated Group's fiscal year ended at the end of such quarter, setting forth in each case in comparative form the figures for the corresponding quarter and the corresponding portion of the Obligated Group's previous fiscal year, all certified (subject to normal year-end adjustments) as to fairness of presentation, generally accepted accounting principles and consistency by the chief financial officer or the chief accounting officer of AGH;

D0016926

(iii)  concurrently with the delivery thereof to the Trustee or the Master Trustee, as the case may be, a copy of all notices, certificates and other writings required to be delivered by any Member of the Obligated Group to the Trustee or the Master Trustee under the Bond Indenture or the Master Indenture (other than such notices, certificates and other writings delivered to the Master Trustee solely with respect to any "Note" or "Guaranty" (other than the Series 1995B Note or the Series 1995C Note) issued under (and as defined in) the Master Indenture and that do not in any way relate to or otherwise affect the rights or interests of any holder of the Bonds, the Series 1995B Note or the Series 1995C Note), respectively;

(iv)  simultaneously with the delivery of each set of financial statements referred to in clauses (i) and (ii) above, a certificate of the chief financial officer or the chief accounting officer of AGH (x) setting forth in reasonable detail the calculations required to establish whether the Members of the Obligated Group were in compliance with the requirements of Sections 7(b), (c) and (e) on the date of such financial statements and (y) stating whether any Default exists on the date of such certificate and, if any Default then exists, setting forth the details thereof and the action which such Person is taking or proposes to take with respect thereto;

(v)  simultaneously with the delivery of each set of financial statements referred to in clause (i) above, (A) a statement of each of the firms of independent public accountants which reported on such statements (x) whether anything has come to their attention to cause them to believe that any Default existed on the date of such statements and (y) confirming the calculations set forth in the officer's certificates delivered simultaneously therewith pursuant to clause (iv) above and clause (B) below, and (B) a certificate of the chief financial officer or the chief accounting officer of AGH setting forth in reasonable detail the calculations required to establish whether the Members of the Obligated Group were in compliance with the requirements of Section 7(d) on the date of such financial statements;

(vi)  within five days after the occurrence of any Default, if such Default is then continuing, a certificate of the chief financial officer or the chief accounting officer of the relevant Member of the Obligated Group setting forth the details thereof and the

33

D0016927

action which the Obligated Group is taking or proposes to take with respect thereto;

(vii) if and when any member of the ERISA Group (A) gives or is required to give notice to the PBGC of any "reportable event" (as defined in Section 4043 of ERISA) with respect to any Plan which might constitute grounds for a termination of such Plan under Title IV of ERISA, or knows that the plan administrator of any Plan has given or is required to give notice of any such reportable event, a copy of the notice of such reportable event given or required to be given to the PBGC; (B) receives notice of complete or partial withdrawal liability under Title IV of ERISA or notice that any Multiemployer Plan is in reorganization, is insolvent or has been terminated, a copy of such notice; (C) receives notice from the PBGC under Title IV of ERISA of an intent to terminate, impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or appoint a trustee to administer any Plan, a copy of such notice; (D) applies for a waiver of the minimum funding standard under Section 412 of the Code, a copy of such application; (E) gives notice of intent to terminate any Plan under Section 4041(c) of ERISA, a copy of such notice and other information filed with the PBGC; (F) gives notice of withdrawal from any Plan pursuant to Section 4063 of ERISA, a copy of such notice; or (G) fails to make any payment or contribution to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement or makes any amendment to any Plan or Benefit Arrangement which has resulted or could result in the imposition of a Lien or the posting of a bond or other security, a certificate of the chief financial officer or the chief accounting officer of AHERF or the chief financial officer or the chief accounting officer of the relevant Member of the Obligated Group, setting forth details as to such occurrence and action, if any, which the relevant Member of the Obligated Group or applicable member of the ERISA Group, required or proposes to take;

(viii) concurrently with the delivery thereof, a copy of each compliance certificate and report delivered to the Trustee or the Master Trustee pursuant to the Bond Indenture or the Master Indenture, respectively;

(ix) as soon as available but in any event not later than 150 days after the end of each fiscal year of the Obligated Group, written information of the type described in Items 7, 8 and 9 of Exhibit A to the Original Loan Agreement (as in effect on the date hereof) with respect to the Members of the Obligated Group with

34

D0016928

respect to such fiscal year, certified as to accuracy and completeness by the chief financial officer or the chief accounting officer of AGH;

(x)  as soon as available and in any event within 30 days after the end of each fiscal year of the Obligated Group, the consolidated and, if available, consolidating budget and projections of cash flow for the Members of the Obligated Group for the succeeding fiscal year that have been approved by the Board of Trustees of the applicable Member of the Obligated Group; and

(xi) from time to time such additional information regarding the financial position, results of operations, business or prospects of any Member of the Obligated Group or any of its Subsidiaries, as the Bank may reasonably request.

(b)  Capitalization.  (i)  Consolidated Obligated Group Debt shall not at any time exceed 66 2/3% of Consolidated Capitalization.  For purposes of calculating the principal amount of the Debt of any Person Guaranteed by Members of the Obligated Group to be included in Consolidated Obligated Group Debt for purposes of this subsection at any date, only 20% of the aggregate principal amount of such Guaranteed Debt shall be included in Consolidated Obligated Group Debt unless payment is then required under such Guarantee, in which case 100% of the aggregate principal amount of such Guaranteed Debt shall be included in Consolidated Obligated Group Debt.

(ii)  The Consolidated Unrestricted Fund Balances (as hereinafter defined) shall be $200,000,000 at all times. As used herein, "Consolidated Unrestricted Fund Balances" means at any date the consolidated unrestricted fund balances of the Obligated Group, less the amount (to the extent reflected in determining such consolidated unrestricted fund balances) of (x) all write-ups (other than write-ups resulting from foreign currency translations and write-ups of assets of a going concern business made within twelve months after the acquisition of such business) subsequent to June 30, 1994 in the book value of any assets owned by a Member of the Obligated Group, (y) all loans to and other Investments in Affiliates which are not Members of the Obligated Group and all equity Investments in Persons which are not Subsidiaries and (z) all unamortized debt discount and expense, unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, anticipated future benefit of tax loss carry-forwards, copyrights, organization or developmental expenses and other intangible assets, all determined as of such date.

D0016929

(c)  <u>Liquidity</u>.  The Liquidity Ratio (as defined below) shall not be less than 2:1 at any time:

As used herein "Liquidity Ratio" means, at any time, the ratio of (i) the sum of (A) the consolidated current assets of the Obligated Group plus (B) the consolidated unrestricted Board-designated funds of the Obligated Group plus (iii) the aggregate amount of funds held by a trustee in a debt service, bond or similar fund for the payment of "Indebtedness" or "Related Bonds" (as defined in the Master Trust Indenture), but excluding funds held in debt service reserve, depreciation reserve and similar funds, to (B) the consolidated current liabilities of the Obligated Group, in each case determined at such time.

(d)  <u>Debt Service Coverage Ratio</u>.  (A) The Members of the Obligated Group agree that the ratio of Income Available for Debt Service (as defined below) for the period of four consecutive fiscal quarters most recently ended to Projected Long-Term Debt Service Requirements (as defined below) for the succeeding twelve-month period will not be less than 1.20.

(B)  For purposes of this subsection 7(d), the following terms have the following meanings:

"Expenses" means, for any period, the consolidated expenses of the Obligated Group for such period.

"Income Available for Debt Service" means, for any period, the sum (without duplication) of (A) the excess of Revenues over Expenses for such period plus (B) the aggregate amount of consolidated depreciation, amortization and non-cash extraordinary expenses of the Obligated Group for such period plus (C) the aggregate amount of interest accruing during such period on Consolidated Obligated Group Debt (including the interest portion of payments under capitalized leases and any capitalized interest but excluding any amortization of debt discount and expense).

"Projected Long-Term Debt Service Requirements" means, for any period, the aggregate of all amounts actually payable to holders (or to any trustee or paying agent for such holders) of Consolidated Obligated Group Debt during such period, including amounts payable during such period to reimburse any bank or other Person in respect of amounts scheduled to be paid under a letter of credit or similar instrument.  To the extent that interest on any such Consolidated Obligated Group Debt is calculated at a varying rate per annum, a formula rate or

36

D0016930

a fixed rate per annum based on a varying index, then, for the purpose of determining the amount of debt service payable on such Consolidated Obligated Group Debt to be included in Projected Long-Term Debt Service Requirements for such period, interest on such Consolidated Obligated Group Debt shall be computed by assuming that the rate of interest applicable to such period is equal to the average of the rate of interest which was in effect on the last day of each of the three full consecutive calendar months immediately preceding the first day of such period; _provided_ that if any such Consolidated Obligated Group Debt has not been outstanding for such three-month interest determination period, the rate of interest applicable to such period shall be deemed to be the rate of interest borne by such Consolidated Obligated Group Debt when incurred.

"Revenues" means, for any period, the consolidated gross operating and nonoperating revenues of the Obligated Group, less contractual allowances and provisions for uncollectible accounts, free care and discounted care with respect to gross patient services revenues for such period and excluding (i) any gains or losses on the sale or other disposition of investments or fixed or capital assets not in the ordinary course and (ii) earnings resulting from any reappraisal, revaluation or write-up of assets.

(e) _Negative Pledge_. No Member of the Obligated Group nor any of its Subsidiaries will create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except Permitted Liens (as hereinafter defined).  As used herein, "Permitted Liens" means the Liens described in clauses (i) through (xix) of Section 5.04(b) of the Master Trust Indenture; _provided_ that (i) Liens described in clause (ii) or (iv) of Section 5.04(b) of the Master Trust Indenture which are created by the agreement or consent of any Member of the Obligated Group to secure, or in lieu of, stay or appeal bonds or any judgment against any Member of the Obligated Group shall not secure obligations in an aggregate amount (excluding amounts covered by insurance issued by an insurance company qualified to do business in the Commonwealth of Pennsylvania) exceeding $10,000,000 at any time; and (ii) the fair market value (as determined in good faith by the Members of the Obligated Group) of "Property" secured by Liens under clause (xv) of Section 5.04(b) of the Master Trust Indenture shall not exceed 10% of the "Book Value" of the total assets of the Obligated Group as shown on the "Financial Statements" (as such terms are defined in the Master Trust Indenture) for the most recent fiscal year.

37

D0016931

(f)  Investments.  The Members of the Obligated Group will promptly (i) notify the Bank of any amendment, supplement, modification or termination of the Investment Policy or of the effectiveness of any other policy or guidelines governing or otherwise relating to the Investments of the Obligated Group (other than Investments by any Member of the Obligated Group in any Affiliate) and (ii) deliver to the Bank a copy or (if such amendment, supplement or modification or such other policy or guidelines are not in writing) description thereof.  In addition, the Members of the Obligated Group will deliver to the Bank, as soon as available and in any event within 45 days after the end of each fiscal year of the Obligated Group, a list setting forth the type and amount of each Investment held by each Member of the Obligated Group as of the end of such fiscal year (other than Investments by any Member of the Obligated Group in any Affiliate).

(g)  Amendment, Supplement, Modification, Termination or Waiver of Related Documents; Additional Agreements, Etc.  (i)  The Members of the Obligated Group will not, directly or indirectly, amend, supplement or otherwise modify, or consent to any amendment, supplement or modification of, any description of the Bank, the Letter of Credit or this Agreement, or its rights and obligations under this Agreement, the Letter of Credit or any other Related Document, contained in the Official Statement without the Bank's prior consent.  In addition, the Members of the Obligated Group agree that they will not, directly or indirectly, amend, supplement or modify, or consent to any amendment, supplement or modification of, any other portion of the Official Statement unless it has notified the Bank of the substance of such amendment, supplement or other modification at least ten Business Days prior to the effective date thereof.

(ii) No Member of the Obligated Group will enter into or consent to any amendment, supplement or modification to, or termination or waiver of, and will not accept the benefit of any waiver of, any provision of any of the other Related Documents without the Bank's prior consent if such amendment, supplement, modification, termination or waiver might in any way adversely affect the rights or interests of the Bank hereunder or thereunder; provided, however, that this paragraph (ii) shall not prohibit any issuance of additional "Notes" or "Guaranties", or any addition of any "Obligated Affiliate", under (and as defined in) the Master Indenture if no Default has occurred and is continuing and if the conditions precedent or other conditions applicable to the issuance of such additional "Notes" or "Guaranties" or the addition of such "Obligated Affiliate" (whether under this

D0016932

Agreement or under the Master Indenture or otherwise) have been satisfied.

(iii)   Without limiting the generality of the foregoing, the Members of the Obligated Group will not, directly or indirectly, enter into any contract, agreement or other instrument, or enter into or otherwise consent to any amendment, supplement or other modification to the Master Indenture (as in effect on the date hereof) or any other contract, agreement or other instrument in effect as of the date hereof, which would have the effect of restricting the ability of the Members of the Obligated Group to pay cash collateral under Section 8 hereof to any greater extent than Sections 5.01(c) and 5.04(b) of the Master Trust Indenture.

(h)   Maintenance of Reimbursement Eligibility.   Each Member of the Obligated Group will establish and maintain its status as a provider of health care services eligible for reimbursement under the Medicare, Medicaid, Blue Cross and equivalent third party payment programs, the revenues from which are material to the operations of such Member of the Obligated Group, including future state and federal programs.

(i)   Lien on Pledged Bonds.   The Members of the Obligated Group agree that they will not create, incur or permit to exist any Lien on, or option with respect to, any of the Collateral, or any interest therein, except for the Lien provided for by the Security Agreement and, with respect to the Pledged Bonds, Permitted Liens under clause (xiii) of Section 5.04(b) of the Master Trust Indenture, and with respect to amounts on deposit in the Collateral Account established pursuant to the Security Agreement, Permitted Liens, and that it will defend the Bank's right, title and interest in and to the Collateral against the claims and demands of all other Persons.   Each Member of the Obligated Group agrees to do or cause to be done all acts and things as may be necessary to make a sale or sales of any portion or all of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at such Person's expense.   The Members of the Obligated Group further agree that a breach of any of the covenants contained in this paragraph (h) will cause irreparable injury to the Bank and that the Bank has no adequate remedy at law in respect of such breach and, as a consequence, agree that each and every covenant contained in this paragraph shall be specifically enforceable against such Person to the fullest extent permitted by applicable law.   To the fullest extent permitted by applicable law, each Member of the Obligated

39

D0016933

Group hereby waives and agrees not to assert any defense against an action for specific performance of such covenants except for a defense that no Default has occurred or that such actions would be inconsistent with such obligations or prohibited by law.

(j)  <u>Incorporation of Covenants by Reference</u>.  The Members of the Obligated Group agree that they will perform and comply with each and every obligation, covenant and agreement required to be performed or observed by them or any of them in or pursuant to the Master Indenture (including the Third Supplemental Indenture but excluding the provisions of any other "Supplemental Indenture" issued under (and as defined in) the Master Indenture that do not in any way relate to or otherwise affect the rights or interests of any holder of the Bonds, the Series 1995B Note or the Series 1995C Note) and each other Related Document, which provisions, as well as the related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety.  To the extent that any such incorporated provision permits the Trustee or the holders of one or more Bonds or any other Person or Persons to waive compliance with such provision or requires that a document, opinion or other instrument or any event or condition be acceptable or satisfactory to the Trustee or the holders of one or more Bonds or any other Person or Persons, for purposes of this Agreement, such provision shall be complied with only if it is waived by the Bank and such document, opinion or other instrument and such event or condition shall be acceptable or satisfactory only if it is acceptable or satisfactory to the Bank.  No amendment to such obligations, covenants and agreements or defined terms made pursuant to any of the Related Documents shall be effective to amend such obligations, covenants and agreements and defined terms as incorporated by reference herein without the consent of the Bank.

(k)  <u>Maintenance of Properties; Insurance</u>.  (i) Each Member of the Obligated Group shall keep all of its properties that are useful and necessary to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(ii)  Each Member of the Obligated Group will maintain with financially sound and responsible insurance companies, insurance on all its properties in at least such amounts and against at least such risks (and with such risk retentions) as are usually insured against in the same general area by companies of established repute engaged in the same or

40

D0016934

similar businesses; and will furnish to the Bank, upon
request, information presented in reasonable detail as to the
insurance so carried.

(1)  <u>Payment of Obligations</u>.  Each Member of the
Obligated Group will, and will cause its Subsidiaries to, pay
and discharge all its material obligations and liabilities,
including, without limitation, tax liabilities, except where
the same may be contested in good faith by appropriate
proceedings, and will maintain, in accordance with generally
accepted accounting principles, appropriate reserves for the
accrual of any of the same.

(m)  <u>Compliance with Laws</u>.  Each Member of the
Obligated Group will, and will cause its Subsidiaries to,
comply in all material respects with all applicable laws,
ordinances, rules, regulations, and requirements of
governmental authorities (including, without limitation,
Environmental Laws and ERISA and the rules and regulations
thereunder) except where the necessity of compliance therewith
is contested in good faith by appropriate proceedings.

(n)  <u>Further Assurances</u>.  Each Member of the
Obligated Group shall, from time to time, record, register and
file all such notices, statements and other documents and take
all such other actions, including, without limitation,
permitted amendments to the Related Documents and any
instruments creating or perfecting Liens thereunder or
hereunder, as may be necessary or, in the judgment of the
Bank, advisable to render fully valid and enforceable under
all applicable laws the rights, Liens and first priority of
the Bank with respect to all Collateral from time to time
furnished under this Agreement or intended to be so furnished,
in each case in such form and at such times as shall be
satisfactory to the Bank, and pay all reasonable fees and
expenses (including, without limitation, reasonable attorneys'
fees and expenses) incident to compliance with this Section
7(n).

(o)  <u>Inspection of Property, Books and Records</u>.
Each Member of the Obligated Group will keep proper books of
record and account in which full, true and correct entries
shall be made of all dealings and transactions in relation to
its business and activities; and will permit representatives
of the Bank at the Bank's expense to visit and inspect any of
its properties, to examine and make abstracts from any of its
books and records (except those records protected by laws
respecting confidentiality of patient records and/or patient
rights) and to discuss its affairs, finances and accounts with
its officers, employees and independent public accountants,

41

D0016935

all at such reasonable times and as often as may reasonably be
desired.

(p) <u>Pari Passu</u>.  Each Member of the Obligated Group
agrees that (i) the Series 1995C Master Note will rank at all
times <u>pari passu</u> in priority of payment and in all other
respects with the Series 1995B Master Note and with all other
"Notes" and "Guaranties" at any time outstanding under (and as
defined in) the Master Indenture (other than any such "Note"
or "Guaranty" secured by additional Liens constituting
Permitted Liens, as provided in the Master Indenture) and (ii)
its obligations hereunder will rank at least <u>pari passu</u> in
priority of payment with all other Debt (other than Debt
secured by Permitted Liens) of the Members of the Obligated
Group or any of them.

(q) <u>Obligated Group</u>.  (i) AGH will not withdraw as
an "Obligated Affiliate" pursuant to (and as defined in) the
Master Indenture without the prior consent of the Bank.

(ii)  The Members of the Obligated Group will notify
the Bank prior to any withdrawal of ASRI or any other Person
as an "Obligated Affiliate", or any other Person becoming an
"Obligated Affiliate", pursuant to (and as defined in the
Master Indenture).

(r) <u>Substitution of Letter of Credit</u>.  The Members
of the Obligated Group shall not cause or permit the
substitution for the Letter of Credit of another "Credit
Facility" under (and as defined in) the First Supplemental
Indenture unless (i) the Letter of Credit is surrendered to
the Bank for cancellation not later than five Business Days
following the effective date of such Alternate Credit Facility
and (ii) as a condition to, and on or prior to, the delivery
of such Alternate Credit Facility to the Trustee or the Tender
Agent (as the case may be) all amounts payable hereunder
(including all Tender Drawings and accrued interest thereon)
are paid in full.

(s) <u>Appointment of Remarketing Agent</u>.  If the
Remarketing Agent resigns, is removed or is dissolved, or if
the property or affairs of the Remarketing Agent are taken
under control of any state or federal court or administrative
body because of bankruptcy or insolvency, or for any other
reason, the Members of the Obligated Group will use their best
efforts to appoint, prior to the effectiveness of such
resignation, removal, dissolution or control, a successor
Remarketing Agent which is not legally prohibited from
remarketing the Bonds and performing the other duties and
responsibilities of the Remarketing Agent under the Bond
Indenture.

42

D0016936

SECTION 8.  <u>Events of Default</u>.  The following events
shall be Events of Default hereunder unless waived in writing
by the Bank:

(a)  the Members of the Obligated Group shall fail
to pay when due any amount payable under Section
2(a)(i)(A), 2(a)(i)(B), 2(a)(i)(E) or 2(a)(i)(F) or under
the Series 1995C Master Note;

(b)  the Members of the Obligated Group shall fail
to pay within three Business Days of the date when due
any other amount payable hereunder;

(c)  the Members of the Obligated Group shall fail
to observe or perform any of the covenants contained in
Sections 7(b) through (e), 7(g) through (i), 7(p),
7(q)(i) and 7(r);

(d)  any Members of the Obligated Group shall fail
to observe or perform any covenant or agreement contained
(or incorporated by reference) in this Agreement (other
than those covered by clauses (a), (b) or (c) above) for
20 days after written notice thereof has been given to
it;

(e)  any representation, warranty, certification or
statement made by any Member of the Obligated Group in
this Agreement or the Master Indenture (including the
Third Supplemental Indenture but excluding any such
representation, warranty, certification or statement made
with respect to only those provisions of any other
"Supplemental Indenture" issued under (and as defined in)
the Master Indenture that do not in any way relate to or
otherwise affect the rights or interests of any holder of
the Bonds, the Series 1995B Note or the Series 1995C
Note) or, any other Related Document, or any certificate,
financial statement or other document delivered pursuant
hereto or thereto, shall have been incorrect in any
material respect when made (or deemed made);

(f)  the Obligated Group shall fail to make any
payment in respect of any Material Debt, or any event or
condition shall occur which results in the acceleration
of the maturity of any Material Debt, or enables (or,
with the giving of notice or lapse of time or both, would
enable) the holder of such Material Debt or any person
acting on such holder's behalf to accelerate the maturity
thereof;

(g)  any Member of the Obligated Group shall (i)
commence a voluntary case or other proceeding seeking

D0016937

liquidation, reorganization or other relief with respect
to itself or its debts under any bankruptcy, insolvency
or other similar law now or hereafter in effect or
seeking the appointment of a trustee, receiver,
liquidator, custodian or other similar official of it or
any substantial part of its property, (ii) consent to any
such relief or to the appointment of or taking possession
by any such official in an involuntary case or other
proceeding commenced against it, (iii) make a general
assignment for the benefit of creditors, (iv) fail
generally to pay its debts as they become due or (v) take
any corporate action to authorize any of the foregoing;

(h)  an involuntary case or other proceeding shall
be commenced against any Member of the Obligated Group
seeking liquidation, reorganization or other relief with
respect to it or its debts under any bankruptcy,
insolvency or other similar law now or hereafter in
effect or seeking the appointment of a trustee, receiver,
liquidator, custodian or other similar official of it or
any substantial part of its property, and such
involuntary case or other proceeding shall remain
undismissed and unstayed for a period of 60 days; or an
order for relief shall be entered against any Member of
the Obligated Group under the federal bankruptcy laws as
now or hereafter in effect;

(i)  any member of the ERISA Group shall fail to pay
when due an amount or amounts aggregating in excess of
$1,000,000 which it shall have become liable to pay under
Title IV of ERISA; or notice of intent to terminate a
Material Plan shall be filed under Title IV of ERISA by
any member of the ERISA Group, any plan administrator or
any combination of the foregoing; or the PBGC shall
institute proceedings under Title IV of ERISA to
terminate, to impose liability (other than for premiums
under Section 4007 of ERISA) in respect of, or to cause a
trustee to be appointed to administer any Material Plan;
or a condition shall exist by reason of which the PBGC
would be entitled to obtain a decree adjudicating that
any Material Plan must be terminated; or there shall
occur a complete or partial withdrawal from, or a
default, within the meaning of Section 4219(c)(5) of
ERISA, with respect to, one or more Multiemployer Plans
which could cause one or more members of the ERISA Group
to incur a current payment obligation in excess of
$1,000,000;

(j)  a Bond Indenture Event of Default or an Event
of Default under (and as defined in) the Loan Agreement
shall have occurred and be continuing; or

44

D0016938

(k)  any Lien created by the Security Agreement shall for any reason cease to be a valid and, if perfected, perfected Lien, subject, with respect to cash deposited into the Collateral Account established pursuant to the Security Agreement, to Permitted Liens and subject, with respect to all other Collateral, to no prior or equal Lien, or any Member of the Obligated Group shall so assert in writing.

If an Event of Default occurs and is continuing, the Bank may, in its sole discretion, take any or all of the following actions (i) notify the Tender Agent, the Master Trustee and the Trustee of such occurrence and state that the Letter of Credit will terminate on the fifth Business Day following the date of receipt by the Trustee of such notice, (ii) notify the Tender Agent and the Trustee of such occurrence and demand that the principal of and interest accrued on the Bonds be declared immediately due and payable as provided in Section 6.02 of the First Supplemental Indenture, (iii) notify the Master Trustee of such occurrence and demand that the principal of the Series 1995B Master Note and the Series 1995C Master Note, together with interest accrued thereon, be declared immediately due and payable as and to the extent permitted and provided in the Master Trust Indenture, (iv) declare all amounts payable hereunder to be, whereupon the same shall become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Member of the Obligated Group; _provided_ that in the case of any of the Events of Default specified in clause (g) or (h) above, all amounts payable hereunder shall be immediately due and payable without the giving of any notice to Members of the Obligated Group or the taking of any other action by any Person and (v) exercise any rights and remedies available to it by law or hereunder or under any Related Document or otherwise.  Upon receipt by the Trustee of notice pursuant to clause (i) above from the Bank, the Trustee shall immediately declare all Bonds then outstanding to be immediately due and payable pursuant to Section 6.02 of the First Supplemental Indenture and, to the extent it has not already done so, the Trustee shall immediately draw under the Letter of Credit pursuant to Section 6.02 of the First Supplemental Indenture in the amount required thereby.

Each Member of the Obligated Group hereby agrees, in addition to the provisions of the foregoing paragraph, that upon the occurrence and during the continuance of any Event of Default, it shall, if requested by the Bank but subject to applicable limitations under any contract, agreement or other instrument in effect on the date hereof on the ability of the Members of the Obligated Group to pay cash collateral

45

D0016939

hereunder (which limitations the Members of the Obligated Group have been unable to remove after using their best efforts to do so), pay (and, in the case of any Event of Default described in clause (g) or (h) of this Section 8, forthwith, without any demand or the taking of any other action by the Bank, be automatically obligated to pay) to the Bank an amount in immediately available funds equal to the Letter of Credit Amount (as defined in the Letter of Credit), which funds will be held by the Bank in the Collateral Account maintained pursuant to (and as defined in) the Security Agreement, and be subject to investment and withdrawal only as provided therein. If the Members of the Obligated Group would not be obligated to pay cash collateral hereunder as a result of the limitation contained in the preceding sentence, the Members of the Obligated Group shall use their best efforts so as not to be subject to such limitation, including, without limitation, using their best efforts to obtain any necessary consents or waivers and to terminate any applicable restriction contained in any contract, agreement or other instrument referred to above.

SECTION 9. <u>Amendments and Waivers</u>. No amendment or waiver of any provision of this Agreement nor consent to any departure by any Member of the Obligated Group therefrom shall in any event be effective unless the same shall be in writing and signed by such Person and the Bank. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 10. <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including bank wire, telex, facsimile transmission or similar writing) and shall be given to such party, addressed to it, at its address, telephone number or telex number set forth below or such other address, telephone number or telex number as such party may hereafter specify for the purpose by notice to the other parties. Each such notice, request or other communication shall be effective (i) if given by telex, when such telex is transmitted to the telex number specified below and the appropriate answerback is received, (ii) if given by mail, 72 hours after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (iii) if given by any other means, when delivered at the address specified below.

46

D0016940

| Party | Address |
|-------|---------|
| Any Member of the Obligated Group | c/o Allegheny Health, Education and Research Foundation 320 East North Avenue Pittsburgh, Pennsylvania 15212 Telex: Attention: President |
| Morgan Guaranty Trust | c/o J.P. Morgan Services Inc. P.O. Box 6071 Newark, Delaware 19713-2107 Attn: International Trade Services Telecopier: 302-992-1838 With a copy to: 60 Wall Street New York, New York 10260 Attn: Public Finance - Credit Origination Group Telecopy: (212) 648-5256 Telex: 420230 |

SECTION 11.  No Waiver; Remedies.  No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder or under any Related Documents shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder or under any Related Documents preclude any other further exercise thereof or the exercise of any other right.  The remedies herein and in the Related Documents provided are cumulative and not exclusive of any remedies provided by law.

SECTION 12.  Indemnification.  Each Member of the Obligated Group, jointly and severally, hereby indemnifies and holds harmless the Bank from and against any and all claims, damages, losses, liabilities, cost or expenses whatsoever which the Bank may incur (or which may be claimed against the Bank by any Person whatsoever) (i) arising from any cause whatsoever in connection with this Agreement or any other Related Document, (ii) by reason of any untrue statement or alleged untrue statement of any material fact contained or incorporated by reference in the Official Statement, or in any supplement or amendment thereof, or the omission or alleged omission to state therein a material fact necessary to make such statements, in the light of the circumstances under which they are or were made, not misleading; or (iii) by reason of or in connection with the execution and delivery or transfer of, or payment or failure to pay under, the Letter of Credit; provided that the Members of the Obligated Group shall not be required to indemnify the Bank for any claims, damages,

47

D0016941

losses, liabilities, costs or expenses to the extent, but only
to the extent, (x) caused by the willful misconduct or gross
negligence of the Bank or (y) incurred by reason of any untrue
statement contained in information furnished in writing by the
Bank to the Members of the Obligated Group expressly for use
in Appendix F to the Official Statement.  The Bank agrees
promptly to notify Members of the Obligated Group of the
institution against it of any suit or proceeding which could
entitle the Bank to indemnification pursuant to this Section
and will from time to time notify Members of the Obligated
Group of the progress of such suit or proceeding.  In the
event that the Bank fails to take reasonably appropriate
action to defend any such suit or proceeding, Members of the
Obligated Group shall be entitled to undertake the defense
thereof.  Nothing in this Section is intended to, nor shall,
limit the obligations of the Members of the Obligated Group
contained in Section 2 hereof.  No Member of the Obligated
Group will refer to the Bank or the Letter of Credit, or
permit the Bank to be referred to, in any materials used in
marketing the Bonds without the prior written consent of the
Bank.  For purposes of the preceding sentence, the Bank agrees
to the reference to the Bank contained in the Official
Statement; provided that such consent shall not limit any
rights of the Bank to indemnification under this Section
(including without limitation any such rights arising from or
in connection with such reference to the Bank in the Official
Statement or any description of the Bank, the Letter of Credit
or this Agreement contained therein).

        SECTION 13.    Continuing Obligation.    The obligations
of Members of the Obligated Group under this Agreement shall
continue until the latest of the Termination Date and the date
upon which all amounts due and owing to the Bank hereunder and
under the Series 1992C Master Note shall have been paid in
full and shall (a) be binding upon Members of the Obligated
Group and their respective successors and assigns and (b)
inure to the benefit of and be enforceable by the Bank and its
successors, transferees and assigns, provided, however, that
(i) no Member of the Obligated Group may assign all or any
part of this Agreement without the prior written consent of
the Bank and (ii) the obligations of Members of the Obligated
Group pursuant to Sections 2(b), 2(c), 2(h), 2(i), 2(j), 12
and 16 shall survive the termination of this Agreement.

        SECTION 14.    Transfer of the Letter of Credit.    The
Letter of Credit may be transferred only in accordance with
the provisions set forth therein.

        SECTION 15.    Limited Liability of the Bank.    The
Members of the Obligated Group assume all risks of the acts or
omissions of the Trustee and the Tender Agent and any

48

D0016942

beneficiary transferee of the Letter of Credit with respect to
its use of the Letter of Credit or the proceeds thereof.
Neither the Bank nor any of its officers or directors shall be
liable or responsible for:  (a) the use which may be made of
the Letter of Credit or for any acts or omissions of the
Trustee or the Tender Agent or any beneficiary or transferee
in connection therewith; (b) the validity, sufficiency or
genuineness of documents, or of any endorsement(s) thereon,
even if such documents should in fact prove to be in any or
all respects invalid, insufficient, fraudulent or forged; (c)
payment by the Bank against presentation of documents which do
not comply with the terms of the Letter of Credit, including
without limitation failure of any documents to bear any
reference or adequate reference to the Letter of Credit; or
(d) any other circumstances whatsoever in making or failing to
make payment under the Letter of Credit, except only that the
Members of the Obligated Group shall have a claim against the
Bank, and the Bank shall be liable to each Member of the
Obligated Group, to the extent, but only to the extent, of any
direct, as opposed to consequential, damages suffered by such
Member of the Obligated Group which it can prove were caused
by (i) the Bank's willful misconduct or gross negligence in
determining whether documents presented under the Letter of
Credit comply with the terms thereof or (ii) the Bank's
willful failure to pay under the Letter of Credit after the
presentation to it by the Trustee or the Tender Agent or any
transferee or beneficiary thereof of a draft and certificate
strictly complying with the terms and conditions of the Letter
of Credit.  In furtherance and not in limitation of the
foregoing, the Bank may accept documents that appear on their
face to be in order, without responsibility for further
investigation, regardless of any notice or information to the
contrary.

    SECTION 16.  Costs, Expenses and Taxes.  The Members
of the Obligated Group, jointly and severally, agree to pay on
demand all reasonable costs and expenses, including, without
limitation, reasonable attorneys' fees and expenses, incurred
or paid by the Bank in connection with the preparation and
negotiation of this Agreement, the Related Documents and such
other documents which may be delivered in connection with this
Agreement, any waiver or amendment of, or the enforcement of,
this Agreement or the Related Documents and such other
documents which may be executed, delivered, filed or recorded
in connection with this Agreement or the Related Documents
(including, without limitation, such expenses as are incurred
to preserve the value of the Collateral or the validity,
perfection, rank and value of any Lien granted pursuant to the
Security Agreement or in connection with the collection, sale
or other disposition of any of the Collateral).  In addition,
the Members of the Obligated Group, jointly and severally,

D0016943

agree to pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing and recording of this Agreement or the Related Documents and such other documents which may be executed, delivered, filed or recorded in connection with this Agreement or the Related Documents or in connection with the purchase or sale by or on behalf of the Bank of Bonds as contemplated by Section 2 hereof or in connection with the transactions contemplated by the Security Agreement (including, without limitation, any rebate of any amounts in the Collateral Account pursuant to Section 148 of the Code) or by reason of the security interests granted pursuant to the Security Agreement and agree to hold the Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omitting to pay such taxes and fees, <u>provided</u> that the Bank agrees promptly to notify Members of the Obligated Group of any such taxes and fees which are incurred by the Bank.

SECTION 17. <u>Severability</u>. Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

SECTION 18. <u>Extension of Letter of Credit</u>. Prior to each anniversary date of this Agreement falling on or prior to the then Scheduled Expiration Date, the Members of the Obligated Group may by written notice to the Bank request that the Scheduled Expiration Date be extended for one year after the then Scheduled Expiration Date. The Bank shall notify the Members of the Obligated Group of its decision, which shall be in the Bank's sole and absolute discretion, within 60 days of receipt of such notice from the Members of the Obligated Group, it being understood and agreed that the failure of the Bank to notify the Members of the Obligated Group of any decision within such 60-day period shall be deemed to be a rejection of such request and the Bank shall not incur any liability or responsibility whatsoever by reason of its failure to notify the Members of the Obligated Group within such 60-day period. The Bank's consent to any such extension of the Scheduled Expiration Date shall be conditioned upon the preparation, execution and delivery of documentation in form and substance satisfactory to the Bank and its counsel. No extension of the Scheduled Expiration Date shall be effective unless the Bank shall have consented in writing to such extension. If the Scheduled Expiration Date is so extended,

D0016944

the Members of the Obligated Group may request further one-year extensions on the terms provided above.

SECTION 19.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

SECTION 20.  <u>Consent to Jurisdiction</u>.  Each Member of the Obligated Group irrevocably submits to the jurisdiction of any New York State or federal court sitting in The City of New York over any suit, action or proceeding arising out of or relating to this Agreement or any Related Document.  Each Member of the Obligated Group irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action, or proceeding has been brought in an inconvenient forum.

SECTION 21.  <u>Counterparts; Integration</u>.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 22.  <u>Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

SECTION 23.  <u>**WAIVER OF JURY TRIAL**</u>.  EACH MEMBER OF THE OBLIGATED GROUP AND THE BANK HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 24.  <u>Successors and Assigns</u>.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u> that the Members of the Obligated Group may not assign or otherwise transfer any of their respective rights under this Agreement without the prior consent of the Bank.

(b)  The Bank may at any time grant to one or more banks or other institutions (each a "Participant") participating interests herein and in the Letter of Credit. In the event of any such grant by the Bank of a participating

<div align="center">51</div>

D0016945

interest to a Participant, whether or not upon notice to the Members of the Obligated Group, the Bank shall remain responsible for the performance of its obligations hereunder and under the Letter of Credit, and the Members of the Obligated Group, the Trustee and the Tender Agent shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations under this Agreement and under the Letter of Credit. Members of the Obligated Group agree that each Participant shall, to the extent provided in its participation agreement, be entitled to the benefits of Section 2(h), 2(i) or 2(j) with respect to its participating interest. An assignment or other transfer shall be given effect for purposes of this Agreement only to the extent of a participating interest granted in accordance with this subsection (b).

(c)  The Bank may at any time assign all or any portion of its rights under this Agreement to a Federal Reserve Bank. No such assignment shall release the Bank from its obligations hereunder.

(d)  No Participant or other transferee of the Bank's rights shall be entitled to receive any greater payment under Section 2(h), 2(i) or 2(j) than the Bank would have been entitled to receive with respect to the rights transferred, unless such transfer is made with the prior consent of the Members of the Obligated Group.

D0016946

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

ALLEGHENY GENERAL HOSPITAL

By: _____
    Title:

ALLEGHENY-SINGER RESEARCH INSTITUTE

By: _____
    Title:

53

D0016947

MORGAN GUARANTY TRUST COMPANY
OF NEW YORK

By: _____
Title:  Vice President

Domestic Lending Office:
    Morgan Guaranty Trust Company
        of New York
    60 Wall Street
    New York, New York  10260-0060

Euro-Dollar Lending Office:
    Morgan Guaranty Trust Company
        of New York
    c/o J.P. Morgan Services Inc.
    Euro-Loan Servicing Unit
    902 Market Street
    Wilmington, Delaware  19801
    Telex No./Answerback:
        177425 MBDEL UT

D0016948

EXHIBIT A

[FORM OF LETTER OF CREDIT]

IRREVOCABLE LETTER OF CREDIT
No. 867121

April 13, 1995

Mellon Bank, N.A., as Trustee
Two Mellon Bank Center
Suite 325
Pittsburgh, Pennsylvania 15259-0001
Attention:  Corporate Trust Administration
Telex No.:  199103

Mellon Bank, N.A.
  as Tender Agent
Two Mellon Bank Center
Suite 325
Pittsburgh, Pennsylvania 15259-0001
Attention: Corporate Trust Administration

Dear Sirs:

        We hereby establish, at the request and for the
joint and several account of Allegheny General Hospital and
Allegheny-Singer Research Institute, each a Pennsylvania
nonprofit corporation (each a "Member" and collectively, the
"Members of the Obligated Group"), in your favor, as Trustee
(the "Trustee") and as Agent (the "Tender Agent"),
respectively, under the Trust Indenture dated as of March 1,
1995 between the Allegheny County Hospital Development
Authority (the "Issuer") and the Trustee (the "Original Bond
Indenture"), as amended and supplemented by the First
Supplemental Trust Indenture dated as of April 1, 1995 (as
amended and supplemented from time to time in accordance with
the terms thereof and hereof, the "First Supplemental
Indenture") (the Original Bond Indenture, as amended and
supplemented by the First Supplemental Indenture and as
further amended and supplemented from time to time in

D0016949

accordance with the terms thereof and hereof, being referred to herein as the "Bond Indenture"), pursuant to which $50,000,000 in aggregate principal amount of the Issuer's Allegheny County Hospital Development Authority Variable Rate Hospital Revenue Bonds, Series B of 1995 (Allegheny General Hospital Project) (the "Bonds") are being issued, our Irrevocable Letter of Credit No. 867121 (the "Letter of Credit"), in the amount of $50,756,165 (as more fully described below), effective on and after the date hereof and expiring on the Termination Date. As used herein, "Termination Date" shall mean the earliest of (i) April 13, 1998 (or, if such day is not a business day, on the next succeeding business day), (ii) the date on which we receive notice from you in the form of Exhibit 3 hereto that the principal amount of and interest on all of the Bonds shall have been paid or provided for in full or that the interest rate on all the Bonds has been converted, as of a date not less than five business days prior to the date of such notice, to the Fixed Rate (as defined in the First Supplemental Indenture), (iii) the fifth business day following the date of receipt by the Trustee of notice by tested telex from us to you stating that an Event of Default under the Reimbursement and Security Agreement dated as of April 1, 1995 (as amended from time to time, the "Reimbursement Agreement") among us and the Members of the Obligated Group has occurred and is continuing and that this Letter of Credit will terminate on such fifth business day and (iv) the date on which this Letter of Credit is surrendered by you to us for cancellation.

We hereby irrevocably authorize you to draw on us in accordance with the terms and conditions hereinafter set forth, by your draft, an aggregate amount not exceeding $50,756,165 (the "Letter of Credit Amount") of which $50,000,000 shall be the "Principal Portion" and $756,165 shall be the "Interest Portion". Of the Letter of Credit Amount, (i) an aggregate amount not exceeding its Principal Portion may be drawn upon with respect to payment when due (whether upon maturity, redemption, acceleration or otherwise) of the unpaid principal amount of the Bonds or payment of the portion of the purchase price thereof equal to the principal amount of Bonds tendered or deemed tendered for purchase pursuant to Section 5.03 or 5.04 of the First Supplemental Indenture (hereinafter referred to as "Tendered Bonds") and (ii) an aggregate amount not exceeding its Interest Portion (but no more, in the case of any drawing, than an amount equal to the interest accrued on the Bonds for the immediately preceding 46 days at a rate per annum not exceeding 12% (calculated on the basis of the actual number days elapsed in a year of 365 or 366 days, as applicable)) may be drawn upon with respect to payment of interest accrued on the Bonds representing interest thereon. The Letter of Credit Amount

2

D0016950

shall be reduced from time to time upon notice from the Trustee in the form of Exhibit 3 hereto of the payment or redemption of Bonds by (x) in the case of the amount referred to in clause (i) above, by the aggregate principal amount of the Bonds so paid or redeemed and (y) in the case of the amount referred to in clause (ii) above, by an amount that bears the same proportion to $756,165 as the principal amount of Bonds so paid or redeemed bears to $50,000,000. All drafts under and in compliance with the terms of this Letter of Credit will be duly honored by the Bank with its own funds. Notwithstanding any other provision of this Letter of Credit, you are not authorized to draw on the Bank hereunder with respect to any payment of principal, purchase price or interest on any Bonds registered in the name of the Members of the Obligated Group or, to the best of your knowledge, any Affiliate of the Members of the Obligated Group or, to the best of your knowledge, held for the account of the Members of the Obligated Group or any Affiliate of the Members of the Obligated Group.

Drawings in respect of payments hereunder honored by us shall not, in the aggregate, exceed the Letter of Credit Amount and each drawing honored by the Bank hereunder shall pro tanto reduce the amount available under this Letter of Credit.

In addition, the Letter of Credit Amount shall be reduced from time to time upon notice from the Trustee in the form of Exhibit 3 hereto to the amount set forth in such notice.

Only you, as Trustee or Tender Agent, as the case may be, may make drawings under this Letter of Credit. Upon the payment to you or your account of the amount specified in a draft drawn hereunder, we shall be fully discharged on our obligation under this Letter of Credit with respect to such draft, and we shall not thereafter be obligated to make any further payments under this Letter of Credit in respect of such draft to you or to any other person, firm, corporation, or other entity, who may have made to you or who makes to you a demand for payment of principal of or interest on any Bond or any other payment.

On the seventh day following each drawing hereunder pursuant to Section 4.02(c) of the First Supplemental Indenture to pay scheduled interest on the Bonds on an Interest Payment Date, and effective as of the date of such drawing, the amount so drawn on the Bank shall be restored to the amount available to be drawn hereunder in respect of payment of interest on the Bonds (including the portion of the purchase price thereof representing accrued interest thereon)

3

D0016951

unless you shall have received written notice from the Bank
theretofore that an Event of Default under the Reimbursement
Agreement has occurred and is then continuing and that the
Letter of Credit will terminate on the fifth business day
following your receipt of such notice and demanding that the
Bonds be declared immediately due and payable.  If after any
drawing hereunder (as indicated in the drawing certificate in
the form of Exhibit 2 hereto) to pay the purchase price of
Tendered Bonds, such drawing is repaid in full to the Bank
(together with all other amounts payable under the
Reimbursement Agreement in respect of such drawing), the
portion of the purchase price of such Tendered Bonds so drawn
shall be restored to the amount of principal and interest,
respectively, available to be drawn hereunder.  Subject to the
two preceding sentences, drawings in respect of payments
hereunder honored by the Bank shall not, in the aggregate,
exceed the Letter of Credit Amount and each drawing honored by
the Bank hereunder shall pro tanto reduce the Letter of Credit
Amount.

        Funds under this Letter of Credit are available to
you against (a) your draft(s) payable on the date such
draft(s) is drawn on us, stating on its face:  "Drawn under
Morgan Guaranty Trust Company of New York, Irrevocable Letter
of Credit No. 867121 and (b)(i) if the drawing is being made
with respect to a payment of principal of and/or interest on
the Bonds, a certificate signed by you in the form of
Exhibit 1 attached hereto appropriately completed and (ii) if
the drawing is being made with respect to a payment of the
purchase price of Tendered Bonds, a certificate signed by you
in the form of Exhibit 2 attached hereto appropriately
completed.  Such draft(s) and certificate(s) shall be dated
the date of presentation, which shall be made to our
International Trade Services Department as provided below (or
to any other office which may be designated by us by written
notice delivered to you).  Drafts and certificates presented
by mail should be mailed to Morgan Guaranty Trust Company of
New York, c/o J.P. Morgan Services Inc., P.O. Box 6071 Newark,
Delaware, 19714-9857, Attention: International Trade Services.
Courier or physical deliveries should be addressed to Morgan
Guaranty Trust Company of New York, c/o J.P. Morgan Services
Inc., 500 Stanton Christiana Road, Newark, Delaware
19713-2107, Attention: International Trade Services.  Although
we prefer that physical presentations be made to our Newark,
Delaware location, our 15 Broad Street, New York, New York
location is also available for you physical presentations.
Should you use our 15 Broad Street address for physical
presentations, drafts and certificates must be directed to the
Brokers Loan Unit at such address, Basement A, Attention:
International Trade Services.  If we receive your draft(s) and
certificate(s) at such office, all in strict conformity with

D0016952

the terms and conditions of this Letter of Credit, at or prior to 1:00 p.m., New York City time, on a business day on or prior to the Termination Date, we will honor the same by 3:00 p.m., New York City time, on the same business day in accordance with your payment instructions. If we receive your draft(s) and certificate(s) at such office, all in strict conformity with the terms and conditions of this Letter of Credit, after 1:00 p.m., New York City time, but prior to 4:00 p.m., New York City time, on a business day prior to the Termination Date, we will honor the same by 10:00 a.m., New York City time, on the next business day in accordance with your payment instructions provided that such next business day is on or prior to the Termination Date. If requested by you, payment under this Letter of Credit may be made by wire transfer of federal funds to your account with any bank located in New York, New York or Pittsburgh, Pennsylvania or by deposit of immediately available funds into a designated account that you maintain with us. All payments made by us under this Letter of Credit will be made out of the Bank's general funds (it being understood that in no event shall any funds in the Collateral Account maintained pursuant to (and as defined in) the Security Agreement dated as of April 1, 1995 among the Members of the Obligated Group, the Bank and the Tender Agent (as amended from time to time) constitute part of the Bank's general funds).

    As used herein, (i) "business day" shall mean any day on which banks in Pittsburgh, Pennsylvania and New York, New York are open for commercial banking purposes and The New York Stock Exchange is not closed and (ii) "Affiliate of a Member of the Obligated Group" means each other Member of the Obligated Group and any person, firm, corporation or other entity which is in control of or controlled by, or under common control by the same person as, any Member of the Obligated Group or any other Affiliate of any Member of the Obligated Group. For purposes of the preceding sentence, "control" means the power to direct the management and policies of a person, firm, corporation or other entity through the ownership of a majority of its voting securities, the right to determine or elect a majority of the members of its board of directors or other governing body or by contract or otherwise. The Trustee shall be deemed to be in receipt of the telex notice referred to in clause (iii) of the last sentence of the first paragraph hereof when such telex is transmitted to the Trustee at the telex number specified herein (or to any other telex number notified by you to us in writing for such purpose) and the appropriate answerback is received.

    Upon the earlier of (i) the honoring by us of the last drawing available to be made hereunder which is not

5

D0016953

subject to reinstatement or (ii) the Termination Date, this Letter of Credit shall automatically terminate.

This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revisions), International Chamber of Commerce, Publication No. 500 (the "Uniform Customs"). This Letter of Credit shall be deemed made under the laws of the State of New York, including Article 5 of the Uniform Commercial Code, and shall, as to matters not governed by the Uniform Customs, be governed and construed in accordance with the laws of said State. Communications with respect to this Letter of Credit shall be in writing and shall be addressed to us at c/o J. P. Morgan Services Inc., P.O. Box 6071, Newark, Delaware 19714-9857, Attention: International Trade Services (with a copy to Morgan Guaranty Trust Company of New York, 60 Wall Street, New York, New York 10260, Attention: Public Finance – Credit Origination Group) or to such other address as the Bank shall have notified the Trustee and the Tender Agent in writing, specifically referring to the number of this Letter of Credit.

This Letter of Credit is transferable in its entirety (but not in part) to any transferee who has succeeded you as Trustee or as Tender Agent, as the case may be, under the Bond Indenture and may be successively so transferred. Transfer of the available balance under this Letter of Credit to such transferee shall be effected by the presentation to us of this Letter of Credit accompanied by a certificate substantially in the form of Exhibit 4 attached hereto appropriately completed.

6

D0016954

This Letter of Credit sets forth in full our undertaking, and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein (including, without limitation, the Bonds, the First Supplemental Indenture, the Bond Indenture and the Reimbursement Agreement), except only the certificates and the drafts referred to herein; and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement except for such certificates and such drafts.

Very truly yours,

MORGAN GUARANTY TRUST COMPANY
   OF NEW YORK

By _____
   Title:

7

D0016955

EXHIBIT 1 TO THE
LETTER OF CREDIT

CERTIFICATE FOR THE PAYMENT
OF PRINCIPAL OF AND/OR INTEREST ON
OR PAYMENT UPON THE ACCELERATION
OF ALLEGHENY COUNTY HOSPITAL DEVELOPMENT
AUTHORITY VARIABLE RATE HOSPITAL REVENUE BONDS,
SERIES B OF 1995 (ALLEGHENY GENERAL HOSPITAL PROJECT)

The undersigned, a duly authorized officer of Mellon Bank, N.A. (the "Trustee"), hereby certifies to Morgan Guaranty Trust Company of New York (the "Bank"), with reference to Irrevocable Letter of Credit No. 867121 (the "Letter of Credit"; any capitalized term used herein and not defined herein shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in favor of the Trustee.

(1)  The Trustee is the Trustee under the Bond Indenture for the holders of the Bonds.

(2)  The Trustee is making a drawing under the Letter of Credit with respect to [[the payment of the principal of the Bonds] [and] [the payment of interest accrued on the Bonds]] [payments on the Bonds that are due following an acceleration of the Bonds] in accordance with Section [4.02(c)] [6.02] of the First Supplemental Indenture.

(3)  None of the Bonds with respect to which this drawing is being made is registered in the name of any Member or any Affiliate of any Member.

(4)  The amount of the draft accompanying this Certificate does not exceed the amount available to be drawn under the Letter of Credit in respect of payment of principal of or interest accrued on the Bonds and was computed in accordance with the terms and conditions of the Bonds and the Bond Indenture.

D0016956

IN WITNESS WHEREOF, the Trustee has executed and
delivered this Certificate as of the __ day of _____, ____.

By_____
            [Name and Title]

2

D0016957

EXHIBIT 2 TO THE
LETTER OF CREDIT

CERTIFICATE FOR THE
PAYMENT OF A TENDER DRAWING

The undersigned, a duly authorized officer of Mellon Bank, N.A. (the "Tender Agent"), hereby certifies to Morgan Guaranty Trust Company of New York (the "Bank"), with reference to Irrevocable Letter of Credit No. 867121 (the "Letter of Credit"; any capitalized term used herein and not defined herein shall have its meaning as set forth in the Letter of Credit) that:

1.  The Tender Agent is the Tender Agent under the Bond Indenture for the holders of the Bonds.

2.  The Tender Agent is making a drawing under the Letter of Credit to enable the Tender Agent to pay the purchase price of Tendered Bonds in accordance with Section [5.03] [5.04] of the First Supplemental Indenture.

3.  None of the Tendered Bonds with respect to which this drawing is being made is registered in the name of any Member or any Affiliate of any Member.

4.  The purchase price of the Tendered Bonds is $_____, and the amount of the draft accompanying this Certificate does not exceed such purchase price.

5.  The amount of the draft accompanying this Certificate does not exceed the amount available on the date hereof to be drawn under the Letter of Credit in respect of the purchase price of Tendered Bonds, and was computed in accordance with the terms and conditions of the Bonds and the Bond Indenture.

D0016958

IN WITNESS WHEREOF, the Tender Agent has executed
and delivered this Certificate as of the __ day of _____,
____.

By_____
    [Name and Title]

2

D0016959

EXHIBIT 3 TO THE
LETTER OF CREDIT

INSTRUCTIONS TO REDUCE LETTER OF CREDIT
AMOUNT OR TO TERMINATE THE LETTER OF CREDIT

_____, 19__

Morgan Guaranty Trust Company
   of New York
c/o J.P. Morgan Services, Inc.
500 Stanton Christiana Road
Newark, Delaware 19713-2107
Attention:
          International Trade Services

          Re: Irrevocable Letter of Credit No. 867121

Gentlemen:

          We refer to the above-referenced Irrevocable Letter
of Credit issued pursuant to the Reimbursement and Security
Agreement dated as of April 1, 1995 (as amended from time to
time, the "Reimbursement Agreement") among Allegheny General
Hospital, Allegheny-Singer Research Institute and Morgan
Guaranty Trust Company of New York.  Terms used herein and not
otherwise defined are used herein as defined (or incorporated
by reference) in the Reimbursement Agreement.

          We hereby instruct you [, subsequent to a payment or
redemption of a portion (but less than all) of the Bonds
pursuant to the Bond Indenture, to reduce the Letter of Credit
Amount by the aggregate amount of $_____ (_____
Dollars), of which (i) an aggregate amount of $_____
(_____ Dollars) is being reduced with respect to principal
of such Bonds and (ii) an aggregate amount of $_____
(_____ Dollars) is being reduced with respect to interest
on the Bonds] [to terminate the Letter of Credit as the
principal amount of and interest on all of the Bonds has been
paid in full or provision for such payment has been made or
deemed made] [to terminate the Letter of Credit as the
interest rate on all of the Bonds has been converted, as of a
date not less than five Business Days prior to the date of

D0016960

this notice, to the Fixed Rate (as defined in the First
Supplemental Indenture)].

                                Very truly yours,

                                MELLON BANK, N.A.,
                                  as Trustee


                                By _____
                                   Title:


                                        2

D0016961

EXHIBIT 4 TO THE
LETTER OF CREDIT

## INSTRUCTION TO TRANSFER

_____, 19__

Morgan Guaranty Trust Company
    of New York
c/o J.P. Morgan Services, Inc.
500 Stanton Christiana Road
Newark, Delaware 19713-2107
Attention: International Trade Services

    Re:  Irrevocable Letter of Credit No. 867121

Gentlemen:

    For value received, the undersigned beneficiary hereby irrevocably instructs you to transfer to:

_____
(Name of Transferee)

_____
(Address)

all rights of the undersigned beneficiary to draw under the above-captioned Letter of Credit (the "Letter of Credit"). The transferee has succeeded the undersigned as [Trustee] [Tender Agent] under the Trust Indenture dated as of March 1, 1995 between the Allegheny County Hospital Development Authority and Mellon Bank, N.A., as Bond Trustee, as amended and supplemented by the First Supplemental Indenture dated as of April 1, 1995, and as further amended and supplemented prior to the date hereof.

    By this transfer, all rights of the undersigned beneficiary in the Letter of Credit are transferred to the transferee and the transferee shall hereafter have the sole rights as beneficiary thereof; provided, however, that no rights shall be deemed to have been transferred to the

D0016962

transferee until such transfer complies with the requirements of the Letter of Credit pertaining to transfers.

The Letter of Credit is returned herewith and in accordance therewith we ask that this transfer be effected.

<div style="margin-left:40%">

Very truly yours,

[MELLON BANK, N.A.,
  as Trustee]

[MELLON BANK, N.A.,
  as Tender Agent]


By_____
       [Name and Title]

</div>

2

D0016963

EXHIBIT B

OPINION OF DAVIS POLK & WARDWELL,
SPECIAL COUNSEL FOR THE BANK

[Dated the Date of Issuance]

Morgan Guaranty Trust Company
   of New York
60 Wall Street
New York, New York   10260

Dear Sirs:

   We have participated in the preparation of the
Reimbursement and Security Agreement dated as of April 1,
1995 (the "Agreement") among Allegheny General Hospital and
Allegheny-Singer Research Institute, each a nonprofit
corporation organized under the laws of the Commonwealth of
Pennsylvania, and Morgan Guaranty Trust Company of New York
(the "Bank") and have acted as special counsel for the Bank
for the purpose of rendering this opinion pursuant to
Section 3(b)(ii) of the Agreement.   Terms defined in the
Agreement are used herein as therein defined.

   We have examined originals or copies, certified or
otherwise identified to our satisfaction, of such documents,
corporate records, certificates of public officials and
other instruments and have conducted such other
investigations of fact and law as we have deemed necessary
or advisable for purposes of this opinion.

   Upon the basis of the foregoing, we are of the
opinion that the Agreement constitutes a valid and binding
agreement of each Member of the Obligated Group.

   We are members of the bar of the State of New York
and the opinion expressed herein is limited to the laws of
the State of New York and the federal laws of the United
States.

D0016964

In giving the foregoing opinion, (i) we express no opinion as to the applicability (and, if applicable, the effect) of Section 548 of the United States Bankruptcy Code or any comparable provision of state law to the questions addressed above or on the conclusions expressed with respect thereto and (ii) we have relied, without independent investigation, as to all matters governed by the law of the Commonwealth of Pennsylvania, upon the opinions of Foley & Lardner, counsel for the Members of the Obligated Group, and Nancy A. Wynstra, Esq., General Counsel of AHERF, in each case dated the date hereof, a copy of which has been delivered to you.

This opinion is rendered solely to you in connection with the above matter. This opinion may not be relied upon by you for any other purpose or relied upon by or furnished to any other person without our prior written consent.

Very truly yours,

2

D0016965

EXHIBIT

# FOLEY & LARDNER
ATTORNEYS AT LAW

MILWAUKEE
MADISON
WASHINGTON, D C
JACKSONVILLE
ORLANDO
TALLAHASSEE
TAMPA
WEST PALM BEACH

ONE IBM PLAZA
SUITE 3300
330 NORTH WABASH AVENUE
CHICAGO, ILLINOIS 60611
TELEPHONE (312) 755-1900
FACSIMILE (312) 755-1925
WRITER'S DIRECT LINE

A MEMBER OF GLOBAL
WITH MEMBER OFFICES

BCPL
BRUSSEL
DRESDE
FRANKFL
LONDC
PAR
SINGAPOR
STUTTGAF
TAIP

April 13, 1995

Allegheny County Hospital
 Development Authority
Pittsburgh, Pennsylvania

Ballard Spahr Andrews & Ingersoll
Philadelphia, Pennsylvania

J. P. Morgan Securities Inc.
New York, New York

PNC Securities Corp
Pittsburgh, Pennsylvania

Morgan Guaranty Trust Company
 of New York
New York, New York

      Re:   $50,000,000 Allegheny County Hospital Development Authority Variable Rate
              Hospital Revenue Bonds, Series B of 1995 (Allegheny General Hospital Project)

Ladies and Gentlemen:

      We have acted as special counsel to Allegheny General Hospital, a Pennsylvania nonprofit corporation (the "Hospital"), and Allegheny-Singer Research Institute, a Pennsylvania nonprofit corporation ("ASRI" and, together with the Hospital, the "Obligated Affiliates" or the "Obligated Group"), in connection with the issuance by the Allegheny County Hospital Development Authority (the "Authority") of its $50,000,000 Variable Rate Hospital Revenue Bonds, Series B of 1995 (Allegheny General Hospital Project) (the "Bonds") pursuant to a Trust Indenture dated as of March 1, 1995 (the "Original Bond Indenture"), as supplemented and amended by the First Supplemental Trust Indenture dated as of April 1, 1995 (the "First Supplemental Bond Indenture" and, together with the Original Bond Indenture, the "Bond Indenture") between the Authority and Mellon Bank, N.A., as bond trustee (the "Bond Trustee"), and the loan of the proceeds of the sale of the Bonds to the Hospital pursuant to a Loan Agreement dated as of March 1, 1995

April 13, 1995
Page 2

(the "Original Loan Agreement"), as supplemented and amended by the First Supplemental Loan Agreement dated as of April 1, 1995 (the "First Supplemental Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement") between the Authority and the Hospital. The proceeds of the loan will be used by the Hospital to pay or reimburse the Hospital for the payment of the costs of the 1995 Project (as defined in the Bond Indenture). The Bonds will be purchased by J. P. Morgan Securities Inc. and PNC Securities Corp (the "Underwriters") pursuant to a Bond Purchase Agreement dated April 12, 1995 (the "Bond Purchase Agreement") among the Authority, the Underwriters and the Hospital.

As security for the Bonds, the Hospital will issue and deliver to the Authority its 1995B Note (Allegheny County Hospital Development Authority) in the aggregate principal amount of $50,000,000 (the "Series 1995 Note") pursuant to the Third Supplemental Master Trust Indenture dated as of April 1, 1995 (the "Third Supplement") to the Restated and Amended Master Trust Indenture dated April 7, 1993 (the "Original Master Indenture" and, as heretofore amended and supplemented and as supplemented by the Third Supplement, the "Master Indenture"), by and among the Hospital, ASRI and PNC Bank, National Association, as master trustee (the "Master Trustee").

Payment of the principal of and interest on, and the purchase price of, the Bonds will be funded in whole or in part by amounts available under an irrevocable letter of credit in the amount of $50,756,165 (the "Credit Facility") issued by Morgan Guaranty Trust Company of New York (the "Bank"). The Credit Facility will be issued in accordance with the terms of a Reimbursement and Security Agreement dated as of April 1, 1995 (the "Reimbursement Agreement") among the Hospital, ASRI and the Bank. Unless earlier terminated or extended in accordance with the Reimbursement Agreement, the Credit Facility will expire on April 13, 1998.

As security for its obligations under the Reimbursement Agreement, the Hospital will issue and deliver to the Bank its 1995C Note (Morgan Guaranty Trust Company of New York) in a principal amount not to exceed $50,756,165 (the "Bank Note") pursuant to the Third Supplement.

Pursuant to a Remarketing Agreement dated as of April 1, 1995 (the "Remarketing Agreement") between the Hospital and J.P. Morgan Securities Inc., as remarketing agent (the "Remarketing Agent"), the Remarketing Agent will remarket Bonds which constitute Variable Rate Bonds (as defined in the First Supplemental Bond Indenture) tendered for purchase and perform certain rate-setting functions with respect to the Variable Rate Bonds in accordance with the First Supplemental Bond Indenture and the Remarketing Agreement.

To render this opinion, we have examined such documents, certificates, records and corporate proceedings of the Obligated Group and such other certificates, instruments and matters as we have deemed relevant and necessary. We refer to the Bond Indenture, the Master Indenture, the Reimbursement Agreement and the Official Statement dated April 7, 1995 (the

D0016967

April 13, 1995
Page 3

"Official Statement") relating to the Bonds for the description of certain documents referred to herein (executed or certified copies of which we have examined) and for the definition of certain terms used herein.

Based upon such examination, we are of the opinion that:

1.    Each member of the Obligated Group is a nonprofit corporation, duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania (the "Commonwealth") and authorized to transact business as a domestic nonprofit corporation under the laws of the Commonwealth with all corporate power required to own its properties and conduct its business as now conducted and as described in the Official Statement.

2.    Each member of the Obligated Group is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), is not a "private foundation" within the meaning of Section 509(a) of the Code, is exempt from federal income tax under Section 501(a) of the Code, except for unrelated business income subject to taxation under Section 511 of the Code, and has received a ruling issued by the Internal Revenue Service to the effect that it is such an organization, which ruling has not been modified, limited or revoked, and we know of no circumstances which would disqualify it as such an organization, including (i) the execution and delivery of, and the performance by each Obligated Affiliate of its obligations under, the Loan Agreement, the Master Indenture, the Reimbursement Agreement, the Security Agreement and the Bond Purchase Agreement and (ii) the intended use of the 1995 Project.

3.    Each member of the Obligated Group is a corporation organized and operated for educational and charitable purposes, not for pecuniary profit, and no part of the net earnings of any of them inures to the benefit of any person, private stockholder or individual, all within the meaning, respectively, of subsection 3(a)(4) of the Securities Act of 1933, as amended, and of subsection 12(g)(2) (D) of the Securities Exchange Act of 1934, as amended.

4.    Pursuant to due authorization, the Hospital has approved the Bond Purchase Agreement and has authorized the distribution of the Official Statement.

5.    Each member of the Obligated Group has each duly authorized, executed and delivered the Letter of Representations dated April 12, 1995 attached to the Bond Purchase Agreement (the "Letter of Representations"), and the Letter of Representations constitutes the legal, valid and binding agreement of each of them, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights generally or by general principles of equity and except as the indemnification provisions therein may be limited by applicable securities laws or held to be against public policy.

D0016968

April 13, 1995
Page 4

     6.     The Bond Purchase Agreement, the Letter of Representations, the Loan Agreement, the Reimbursement Agreement, the Remarketing Agreement, the Security Agreement, the Series 1995 Note and the Bank Note (collectively, the "Financing Documents") (including the performance thereof, and any pledge or security interest granted thereunder, by the Obligated Affiliates party thereto) have been duly authorized by the Obligated Affiliates and the Financing Documents have been duly executed and delivered by the Obligated Affiliates, as applicable. Assuming due authorization, execution and delivery by the other parties thereto, the Financing Documents constitute the legal, valid and binding obligations of each of the Obligated Affiliates, as applicable, enforceable against it in accordance with their respective terms, except as enforcement may be limited by bankruptcy, insolvency and other laws affecting the enforcement of creditors' rights generally or by general principles of equity.

     7.     The Master Indenture (including the performance thereof by the Obligated Affiliates) has been duly authorized, executed and delivered by the Obligated Affiliates, the Third Supplement (including the performance thereof by the Obligated Affiliates) has been duly authorized, executed and delivered on behalf of the Obligated Group by the Hospital as the Obligated Group Agent, and the Third Supplement (including the performance thereof by the Obligated Affiliates) has been duly authorized by ASRI. The Master Indenture constitutes the legal, valid and binding obligation of each of the Obligated Affiliates, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, and other laws affecting the enforcement of creditors' rights generally and by general principles of equity; provided that the enforceability of the joint and several obligations of the Obligated Affiliates to make payments on any Note or Guaranty may be limited to the extent that such payments (a) are requested to be made by any Obligated Affiliate other than the Obligated Affiliate issuing such Note or Guaranty, which such Note or Guaranty has been (i) issued for a purpose which is not consistent with the charitable purposes of the Obligated Affiliate from which such payment is requested or (ii) issued for the benefit of any entity other than a nonprofit corporation which is exempt from federal income taxes under Sections 501(a) and 501(c)(3) of the Code and not a "private foundation" as defined in Section 509(a) of the Code; (b) are requested to be made from any moneys or assets which are donor restricted or which are subject to a direct or express trust which does not permit the use of such monies or assets for such payment; (c) would result in the cessation or discontinuation of any material portion of the health care or related services previously provided by the Obligated Affiliate from which such payment is requested (other than the Obligated Affiliate which issued such Note or Guaranty); or (d) are requested to be made pursuant to any loan violating applicable usury laws.

     8.     To the best of our knowledge, the information in the Official Statement under the captions, "THE OBLIGATED GROUP," "PLAN OF FINANCING" and "BONDHOLDERS' RISKS" and in Appendix A to the Official Statement (as such information pertains to the members of the Obligated Group or the business and affairs thereto and, to the extent described therein, of affiliated entities), together with the corresponding statements under the caption, "INTRODUC-

D0016969

April 13, 1995
Page 5

TORY STATEMENT" in the Official Statement, does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

9.    The statements in the Official Statement under the subheadings "The Credit Facility" and "The Reimbursement Agreement" under the caption "THE CREDIT FACILITY" accurately summarize the provisions of the Credit Facility and the Reimbursement Agreement intended to be summarized therein. The statements in Appendix D to the Official Statement, "SUMMARY OF THE RESTATED AND AMENDED MASTER TRUST INDENTURE," together with the corresponding statements under the captions, "INTRODUCTORY STATEMENT" and "SOURCES OF PAYMENT AND SECURITY FOR THE 1995A BONDS," accurately and fairly summarize the principal provisions of the Master Indenture.

10.    The execution and delivery of the Financing Documents by the Obligated Affiliates, as applicable, and compliance with the provisions thereof by such Obligated Affiliate, under the circumstances contemplated thereby, (i) do not and will not conflict with or constitute on the part of such Obligated Affiliate a breach of or default under the articles of incorporation or by-laws thereof or any existing law to which such Obligated Affiliate is subject or any agreement or instrument relating to the incurrence of debt to which such Obligated Affiliate is a party or any other agreement or instrument to which such Obligated Affiliate is a party or by which any of its property is bound and of which we are aware and (ii) do not result in the creation or imposition of any Lien (as defined in the Reimbursement Agreement) on any asset of the Obligated Affiliates, except as provided in the Financing Documents.

11.    The assignment by the Authority of all its right, title and interest in the First Supplemental Loan Agreement (to the extent provided in the First Supplemental Bond Indenture) and the Series 1995 Note and the pledge of money due thereunder to the Bond Trustee will not affect the validity or enforceability against each Obligated Affiliate, as applicable, of the Loan Agreement, the Series 1995 Note or the Master Indenture.

12.    The Master Indenture creates legally valid and binding security interest in favor of the Master Trustee in the Unrestricted Receivables, and financing statements have been filed and continued in the offices of the Secretary of State of the Commonwealth (the "Secretary of State") and the Prothonotary of Allegheny County (the "Prothonotary") sufficient to perfect such security interest to the extent such security interest may be perfected by filing. In reliance upon UCC-1 searches in the offices of the Prothonotary of Allegheny County and the Department of State of the Commonwealth and a certificate of the Obligated Affiliates delivered to you on the date hereof, there is no prior lien on the Unrestricted Receivables, except as permitted by the Master Indenture. In our opinion, such UCC-1 searches identify the proper filing offices, names and addresses to identify persons who may have filed financing statements with respect to the Unrestricted Receivables.

D0016970

April 13, 1995
Page 6

13.     The Bank has a valid and perfected security interest in the Collateral Account established under the Security Agreement.  Upon the transfer of any Pledged Bonds (as defined in the Security Agreement) to the Tender Agent, as the Bank's designee, the Bank will have a valid and perfected security interest in the Pledged Bonds, subject to no other Liens (as defined in the Reimbursement Agreement).  Upon the delivery by the Obligated Affiliates of cash collateral for deposit in the Collateral Account pursuant to Section 8 of the Reimbursement Agreement, the Bank will have a valid and perfected security interest in such cash collateral, subject (to the extent such cash collateral constitutes cash proceeds of Unrestricted Receivables subject to Permitted Liens, as defined in the Master Indenture) to Permitted Liens.

14.     Registration of the Series 1995 Note and the Bank Note under the Securities Act of 1933, as amended, and qualification of the Master Indenture under the Trust Indenture Act of 1939, as amended, are not required.

15.     The payment by any Member of the Obligated Group of interest or any other amount on the Bank Note or under the Reimbursement Agreement will not violate any usury or similar law of the Commonwealth of Pennsylvania.

16.     The 1995C Note is equally and ratably secured, together with all other Notes and Guaranties (as defined in the Master Indenture), by the Master Indenture.  Notwithstanding the foregoing, the Holder (as defined in the Master Indenture) of any Note or Guaranty may be secured by additional Liens, as defined in the Master Indenture, provided such Liens are Permitted Liens.

17.     No consent or approval of any trustee or holder of indebtedness of any member of the Obligated Group, and no approval or other action by any governmental authority or agency, that, in each case, has not been obtained, is required in connection with the financing of the 1995 Project and the execution, delivery or performance of the Financing Documents by the Obligated Affiliates, as applicable, other than as may be required under any state securities laws.

18.     Without having undertaken to determine independently the accuracy or completeness of, or to verify the information furnished with respect to, matters described in the Official Statement, except as provided in paragraphs 8 and 9 above, but on the basis of our assistance to the members of the Obligated Group in the preparation of the Official Statement and our representation of the members of the Obligated Group in connection therewith, nothing has come to our attention that causes us to believe that the Official Statement (other than the financial and statistical information contained therein, all information describing the Authority and The Depository Trust Company, and the information under the captions, "BOOK-ENTRY-ONLY SYSTEM," "TAX EXEMPTION" and "RATINGS," as to which we express no opinion) contains an untrue statement of a fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

April 13, 1995
Page 7

    19.    The obligations of the members of the Obligated Group under the Reimbursement Agreement constitute "Commitment Indebtedness" incurred under (and as defined in) the Master Indenture.

Respectfully,

Foley & Lardner

D0016972

ALLEGHENY
HEALTH,
EDUCATION AND
RESEARCH
FOUNDATION

Nancy A. Wynstra
Executive Vice President
and General Counsel
Legal Department

EXHIBIT 7

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-1009
Telephone (412) 359-6044

Broad & Vine Streets
Mail Stop #400
Philadelphia, PA 19102-1192
Telephone (215) 762-8450

April 13, 1995

Allegheny County Hospital
 Development Authority
Pittsburgh, Pennsylvania

Ballard Spahr Andrews & Ingersoll
Philadelphia, Pennsylvania

J. P. Morgan Securities Inc.
New York, New York

PNC Securities Corp
Pittsburgh, Pennsylvania

Morgan Guaranty Trust Company
 of New York
New York, New York

    Re:    $50,000,000 Allegheny County Hospital Development Authority Variable Rate
           Hospital Revenue Bonds, Series B of 1995 (Allegheny General Hospital Project)

Ladies and Gentlemen:

    I am Executive Vice President and General Counsel of Allegheny Health, Education and
Research Foundation, a Pennsylvania nonprofit corporation, and as such am familiar with the
affairs of Allegheny General Hospital, a Pennsylvania nonprofit corporation (the "Hospital"),
and Allegheny-Singer Research Institute, a Pennsylvania nonprofit corporation ("ASRI" and,
together with the Hospital, the "Obligated Affiliates" or the "Obligated Group"), in particular
as they relate to the issuance by the Allegheny County Hospital Development Authority (the
"Authority") of its $50,000,000 Variable Rate Hospital Revenue Bonds, Series B of 1995
(Allegheny General Hospital Project) (the "Bonds") pursuant to a Trust Indenture dated as of

PGH:12364.1

D0016973

April 13, 1995
Page 2

March 1, 1995 (the "Original Bond Indenture") as supplemented and amended by the First Supplemental Trust Indenture dated as of April 1, 1995 (the "First Supplemental Bond Indenture" and, together with the Original Bond Indenture, the "Bond Indenture") between the Authority and Mellon Bank, N.A., as bond trustee (the "Bond Trustee"), and the loan of the proceeds of the sale of the Bonds to the Hospital pursuant to a Loan Agreement dated as of March 1, 1995 (the "Original Loan Agreement"), as supplemented and amended by the First Supplemental Loan Agreement dated as of April 1, 1995 (the "First Supplemental Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement") between the Authority and the Hospital. The proceeds of the loan will be used by the Hospital to pay or reimburse the Hospital for the payment of the costs of the 1995 Project (as defined in the Bond Indenture). The Bonds will be purchased by J. P. Morgan Securities Inc. and PNC Securities Corp (the "Underwriters") pursuant to a Bond Purchase Agreement dated April 12, 1995 (the "Bond Purchase Agreement") among the Authority, the Underwriters and the Hospital.

To evidence and secure payment of the Hospital's Obligations under the Loan Agreement with respect to the Bonds, the Hospital will issue and deliver to the Authority its 1995B Note (Allegheny County Hospital Development Authority) in the aggregate principal amount of $50,000,000 (the "Series 1995 Note") pursuant to the Third Supplemental Master Trust Indenture dated as of April 1, 1995 (the "Third Supplement") to the Restated and Amended Master Trust Indenture dated April 7, 1993 (the "Original Master Indenture" and, as heretofore amended and supplemented and as supplemented by the Third Supplement, the "Master Indenture"), by and among the Hospital, ASRI and PNC Bank, National Association, as master trustee (the "Master Trustee").

Payment of the principal of and interest on, and the purchase price of, the Bonds will be funded in whole or in part by amounts available under an irrevocable letter of credit in the amount of $50,756,165 (the "Credit Facility") issued by Morgan Guaranty Trust Company of New York (the "Bank"). The Credit Facility will be issued in accordance with the terms of a Reimbursement and Security Agreement dated as of April 1, 1995 (the "Reimbursement Agreement") among the Hospital, ASRI and the Bank. Unless earlier terminated or extended in accordance with the Reimbursement Agreement, the Credit Facility will expire on April 13, 1998.

As security for its obligations under the Reimbursement Agreement, the Hospital will issue and deliver to the Bank its 1995C Note (Morgan Guaranty Trust Company of New York) in a principal amount not to exceed $50,756,165 (the "Bank Note") pursuant to the Third Supplement.

Pursuant to a Remarketing Agreement dated as of April 1, 1995 (the "Remarketing Agreement") between the Hospital and J.P. Morgan Securities Inc., as remarketing agent (the "Remarketing Agent"), the Remarketing Agent will remarket Bonds which constitute Variable Rate Bonds (as defined in the First Supplemental Bond Indenture) tendered for purchase and

PGH:12364.1

D0016974