April 13, 1995
Page 3

perform certain rate-setting functions with respect to the Variable Rate Bonds in accordance with the First Supplemental Bond Indenture and the Remarketing Agreement.

To render this opinion, I have examined such documents, certificates, records and corporate proceedings of the Obligated Group and such other certificates, instruments and matters as I have deemed relevant and necessary. I refer to the Bond Indenture, the Master Indenture, the Reimbursement Agreement and the Official Statement dated April 7, 1995 (the "Official Statement") relating to the Bonds for the description of certain documents referred to herein (executed or certified copies of which I have examined) and for the definition of certain terms used herein.

Based upon such examination, I am of the opinion that:

1.    Each member of the Obligated Group is a nonprofit corporation, duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania (the "Commonwealth") and authorized to transact business as a domestic nonprofit corporation under the laws of the Commonwealth with all corporate power to own its properties and conduct its business as now conducted and as described in the Official Statement.

2.    Each member of the Obligated Group is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), is not a "private foundation" within the meaning of Section 509(a) of the Code, is exempt from federal income tax under Section 501(a) of the Code, except for unrelated business income subject to taxation under Section 511 of the Code, and has received a ruling issued by the Internal Revenue Service to the effect that it is such an organization, which ruling has not been modified, limited or revoked, and I know of no circumstances which would disqualify it as such an organization, including (i) the execution and delivery of, and the performance by each Obligated Affiliate of its obligations under, the Loan Agreement, the Master Indenture, the Reimbursement Agreement, the Security Agreement and the Bond Purchase Agreement and (ii) the intended use of the 1995 Project.

3.    To the best of my knowledge, the information in the Official Statement under the captions, "PLAN OF FINANCING," "THE OBLIGATED GROUP" and "LITIGATION" and in Appendix A to the Official Statement (as such information pertains to the members of the Obligated Group or the business and affairs thereto and, to the extent described therein, of affiliated entities), together with the corresponding statements under the caption, "INTRODUCTORY STATEMENT" in the Official Statement, does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

PGH:12364.1

D0016975

April 13, 1995
Page 4

4.     Except as set forth in the Official Statement, there is no action, suit, proceeding or investigation at law or in equity before or by any court, public board or body, pending or, to the best of my knowledge, threatened against or affecting any member of the Obligated Group, or any Affiliate (as defined in the Reimbursement Agreement) which challenges or draws into question the validity or enforceability of the Bond Indenture, the Bond Purchase Agreement, the Bonds and the Credit Facility or the validity or enforceability of the Master Indenture, the Loan Agreement, the Reimbursement Agreement, the Security Agreement, the Remarketing Agreement, the Series 1995 Note, the Bank Note and the Letter of Representations dated April 12, 1995 attached to ·the Bond Purchase Agreement (the "Letter of Representations") (the "Financing Documents") or wherein an unfavorable decision, ruling or finding would materially adversely affect the transactions contemplated by the Official Statement, the collection or application by each Obligated Affiliate of its revenues in the manner contemplated by the Master Indenture, the financial condition or operations of any Obligated Affiliate or which in any manner draws into question the validity, effectiveness, priority enforceability or perfection of any Lien (as defined in the Reimbursement Agreement) on the Collateral (as defined in the Reimbursement Agreement).

5.     The execution and delivery of the Financing Documents by the Obligated Affiliates, as applicable, and compliance with the provisions thereof by such Obligated Affiliate, under the circumstances contemplated thereby, do not and will not conflict with or constitute on the part of such Obligated Affiliate a breach of or default under the articles of incorporation or by-laws thereof or any existing ordinance or administrative regulation to which such Obligated Affiliate is subject or any agreement, judgment, injunction, order, decree or other instrument (other than agreements or instruments relating to the incurrence of debt) to which such Obligated Affiliate is a party or by which any of its property is bound.

6.     Each member of the Obligated Group is fully qualified by all necessary and material permits, licenses and certifications to conduct its business as it is presently conducted, to be reimbursed as a provider of health care services (to the extent reimbursement is applicable) and to incur the indebtedness contemplated by the Financing Documents.

7.     To the best of my knowledge upon reasonable investigation, no consent or approval of any trustee or holder of indebtedness of any member of the Obligated Group, and no approval or other action by any governmental authority or agency, that, in each case, has not been obtained, is required in connection with the execution, delivery or performance of the Financing Documents by the Obligated Affiliates, as applicable, other than as may be required under any state securities laws.

                    Sincerely,

                    *[signature]*

PGH:12364.1

D0016976

<u>EXHIBIT D</u>

## TRUSTEE'S AND TENDER AGENT'S LETTER

[Dated the Date of Issuance]

Morgan Guaranty Trust Company
  of New York
60 Wall Street
New York, New York  10260

       Re:   Irrevocable Letter of Credit No. 867121

Gentlemen:

      We refer to the above-referenced Irrevocable Letter of Credit issued pursuant to the Reimbursement and Security Agreement dated as of April 1, 1995 (as amended from time to time, the "Reimbursement Agreement") among Allegheny General Hospital, Allegheny-Singer Research Institute and Morgan Guaranty Trust Company of New York.   Terms used herein and not otherwise defined herein are used herein as defined in (or incorporated by reference in) the Reimbursement Agreement.

      We hereby agree to provide notice to you in the form of Exhibit 3 to Exhibit A to the Reimbursement Agreement when and as contemplated by the Letter of Credit and otherwise to enforce the provisions of the Bond Indenture for your benefit to the extent applicable.

                  Very truly yours,

                  Mellon Bank, N.A. as Trustee,
                  and as Tender Agent

                  By_____
                    Title:

D0016977

SECURITY AGREEMENT dated as of April 1, 1995 (the "Security Agreement") among ALLEGHENY GENERAL HOSPITAL (with its successors, "AGH") and ALLEGHENY-SINGER RESEARCH INSTITUTE (with its successors, "ASRI") (collectively, the "Members of the Obligated Group" or the "Obligated Group" and each individually a "Member of the Obligated Group"), each a Pennsylvania nonprofit corporation, MORGAN GUARANTY TRUST COMPANY OF NEW YORK (the "Bank") and MELLON BANK, N.A., as Tender Agent under the below-referenced Bond Indenture (with its successors, the "Tender Agent").  Pursuant to the Reimbursement and Security Agreement dated as of April 1, 1995 among the Members of the Obligated Group and the Bank (as the same may from time to time be amended or supplemented in accordance with its terms, the "Reimbursement Agreement"):

W I T N E S S E T H :

WHEREAS, the Allegheny County Hospital Development Authority, a body politic and corporate and a public instrumentality of the Commonwealth of Pennsylvania (the "Issuer"), having, inter alia, the powers set forth in the Municipality Authorities Act of 1945, approved May 2, 1945, P.L. 382, as amended, proposes to issue $50,000,000 aggregate principal amount of its Allegheny County Hospital Development Authority Variable Rate Hospital Revenue Bonds, Series B of 1995 (Allegheny General Hospital Project) (the "Bonds") pursuant to a Trust Indenture dated as of March 1, 1995 between the Issuer and Mellon Bank, N.A., as bond trustee (with its successors, the "Trustee"), as amended and supplemented by the First Supplemental Trust Indenture dated as of April 1, 1995 (as amended and supplemented from time to time in accordance with the terms thereof and hereof, the "First Supplemental Indenture") (the Original Bond Indenture, as amended and supplemented by the First Supplemental Indenture and as further amended and supplemented from time to time in accordance with the terms thereof and hereof, being referred to herein as the "Bond Indenture"), and to make the proceeds of the Bonds available to AGH pursuant to a Loan Agreement dated as of March 1, 1995 (the "Original Loan Agreement") between the Issuer and AGH, as amended and supplemented by the First Supplemental Loan Agreement dated as of April 1, 1995 (as amended and supplemented from time to time in accordance with the terms thereof and hereof, the "First Supplemental Loan Agreement") (the Original Loan Agreement, as amended and supplemented by the First Supplemental Loan Agreement and as further amended and

D0016978

supplemented from time to time in accordance with the terms
thereof and hereof, being referred to herein as the "Loan
Agreement"), for the purposes of (i) financing a portion of
the costs of the construction, renovation and equipment of the
Northwest wing of AGH's hospital campus and the acquisition of
certain capital equipment and other capital improvements at
such hospital campus, (ii) financing a portion of the costs of
the acquisition of an off-campus facility for AGH and
renovation and equipment of such facility for health care and
related purposes and (iii) paying certain costs of issuing the
Bonds; and

        WHEREAS, in order to secure the obligations of AGH
to the Issuer under the Loan Agreement, the Members of the
Obligated Group will execute and deliver to the Issuer their
promissory note in the principal amount of $50,000,000 ( as
amended and supplemented from time to time in accordance with
the terms thereof and hereof, the "Series 1995B Master Note")
under the Master Trust Indenture (as defined below), as
supplemented by the First Supplemental Master Trust Indenture
dated June 17, 1994, the Second Supplemental Master Trust
Indenture dated as of March 1, 1995 and the Third Supplemental
Master Trust Indenture dated as of April 1, 1995, among the
Members of the Obligated Group and the Master Trustee (as
defined below), which Series 1995B Master Note will be
assigned to the Trustee as security for the Bonds pursuant to
the Bond Indenture; and

        WHEREAS, in order to support payment when due of the
principal of and interest accrued at a rate of up to 12% per
annum (recalculated on the basis of the actual number of days
elapsed in a year of 365 or 366 days, as applicable) for up to
a 46-day period on the Bonds and to provide liquidity in case
the Tender Agent is required to purchase the Bonds on behalf
of Members of the Obligated Group pursuant to the Bond
Indenture and the Bonds, the Members of the Obligated Group
have requested that the Bank issue an irrevocable transferable
letter of credit, substantially in the form of Exhibit A
hereto (as amended and supplemented from time to time, the
"Letter of Credit"), in an aggregate amount of $50,756,165 (as
the same may be reduced or reinstated from time to time as
provided therein, the "Letter of Credit Amount") of which up
to $50,000,000 may be drawn upon in respect of principal of
the Bonds or the portion of the purchase price of Bonds
tendered or deemed tendered under the Bond Indenture equal to
the principal amount thereof and up to $756,165 of which may
be drawn upon in respect of interest on the Bonds or the
portion of the purchase price of the Bonds tendered or deemed
tendered under the Bond Indenture equal to the interest
accrued thereon; and

        WHEREAS, in order to evidence and secure their
obligations to the Bank under this Agreement, the Members of
the Obligated Group will execute and deliver to the Bank their

2                     D0016979

promissory note in a principal amount not to exceed
$50,756,165 (as amended and supplemented from time to time in
accordance with the terms thereof and hereof, the "Series
1995C Master Note") under the above-referenced Master Trust
Indenture;

WHEREAS, it is a condition precedent to the
willingness of the Bank to enter into the Reimbursement
Agreement and to issue the Letter of Credit that the Members
of the Obligated Group, jointly and severally, shall have
executed and delivered this Security Agreement to the Bank;

NOW, THEREFORE, in consideration of the premises and
in order to induce the Bank to issue the Letter of Credit and
to enter into the Reimbursement Agreement and to make loans
thereunder and for other good and valuable consideration the
receipt and sufficiency of which is hereby acknowledged, the
Members of the Obligated Group, jointly and severally, hereby
agree with the Bank as follows:

1.    <u>Defined Terms</u>.  Unless otherwise defined
herein, terms defined in (including terms incorporated by
reference in) the Reimbursement Agreement shall have such
defined meanings when used herein.

2.    <u>Pledge and Grant of Security</u>.

(a)   Each Member of the Obligated Group hereby
pledges, assigns, hypothecates, transfers and delivers to the
Bank, and hereby grants to the Bank a first lien on, and first
security interest in and to, (i) all of its rights to receive
the Pledged Bonds and all of its right, title and interest in
and to the Pledged Bonds and all rights with respect thereto,
including all rights to receive payments in respect thereof
and all proceeds thereof, (ii) all of its right, title and
interest in and to the Collateral Account (as hereinafter
defined), all funds and Investments held therein and all
certificates and instruments (if any) from time to time
representing or evidencing the Collateral Account, and all
rights with respect thereto, including all proceeds thereof,
and (iii) all other property at any time or from time to time
pledged with the Bank hereunder (whether described herein or
not), all income thereon and all rights with respect thereto,
including all proceeds thereof (collectively, the
"Collateral"), in each case whether now owned or hereafter
acquired and wherever located, now or hereafter existing, and
in each case as collateral security for the payment when due
of all amounts owing from time to time by Members of the
Obligated Group to the Bank under the Reimbursement Agreement
and hereunder (the "Secured Obligations").   The Tender Agent,
acting in its capacity as custodian, will hold the Pledged
Bonds for the Bank as contemplated by the Bond Indenture and
Section 8-313(1)(a) of the New York Uniform Commercial Code.

3

D0016980

(b)   The Bank may exercise all rights, privileges and options pertaining to any Pledged Bonds as if it were the absolute owner thereof.

3.   <u>Principal and Interest on the Pledged Bonds</u>.

(a)   Pursuant to the Bond Indenture, all payments of principal of and interest on the Pledged Bonds shall be payable to the Bank, as registered owner of such Pledged Bonds; <u>provided</u> that no drawing shall be made under the Letter of Credit to pay the principal of and interest on any Pledged Bond, and <u>provided</u> further, that if, while this Agreement is in effect, the Members of the Obligated Group shall, for any reason, become entitled to receive or shall receive any payment of principal of, or accrued interest on, the Pledged Bonds, the Members of the Obligated Group agree to accept the same as the Bank's agent and to hold the same in trust on behalf of the Bank and to deliver the same forthwith to the Trustee acting in its capacity as custodian for the benefit of the Bank.   While the Bonds are in book-entry form, the Tender Agent shall, in its capacity as custodian for the Bank hereunder, cause all Pledged Bonds to be held in the Tender Agent's Participant Account with The Depository Trust Company (with its successors, "DTC") (or with DTC's successor as depository for the Bonds (DTC and its successors in such capacity, the "Depository")), for the benefit and account of the Bank as the beneficial owner thereof, all in accordance with the applicable book-entry procedures of the Depositary as in effect from time to time; <u>provided</u> that the Tender Agent shall, at the request of the Bank at any time but subject to the provisions set forth above relating to the release and/or sale of such Pledged Bonds, cause Pledged Bonds to be transferred to the Bank's Participant Account with the Depository.

(b)   The Tender Agent, acting in its capacity as custodian for the benefit of the Bank, agrees to distribute immediately to the Bank in payment or prepayment of its obligations under this Agreement all payments of principal of, or interest on, the Pledged Bonds received by the Tender Agent acting in its capacity as custodian for the benefit of the Bank.

(c)   All payments of principal of and interest on the Pledged Bonds received by the Bank shall reduce <u>pro</u> <u>tanto</u>, respectively, the principal of and interest on the Secured Obligations.

4.   <u>Certain Matters Pertaining to the Tender Agent</u>.

(a)   The Tender Agent may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or

4                          D0016981

document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)  Any request, direction, order or demand of the Bank shall be sufficiently evidenced by an instrument signed in the name of the Bank by one who purports to be an officer thereof.

(c)  The Tender Agent may consult with counsel and the advice of such counsel or any opinion of counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with such advice or opinion of counsel.

(d)  The Tender Agent shall be under no obligation to assist the Bank in the exercise of any of the rights or powers vested in it pursuant to this Agreement under circumstances which in the reasonable judgment of the Tender Agent, may subject the Tender Agent to pecuniary liability unless the Bank shall have offered to the Tender Agent reasonable security or indemnity against the costs, expenses and liabilities which might be incurred therein or thereby. The Members of the Obligated Group agree to promptly reimburse the Bank for all reasonable costs, fees, expenses or liabilities incurred in connection with providing any such security or indemnity.

(e)  The Tender Agent shall not be liable for any action taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it pursuant hereto.

(f)  The Tender Agent may perform any duties hereunder either directly or by or through agents or attorneys and the Tender Agent shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(g)  The Tender Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, advice, opinion, report, notice, request, direction, consent, order, bond, or other paper or document, but the Tender Agent, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit.

(h)  The Tender Agent makes no representation as to the validity or sufficiency of this Agreement or the Collateral or otherwise.

5.  <u>Release of Pledged Bonds</u>.  (i) If the Members of the Obligated Group make or cause to be made payment in full of all or any portion of any Tender Drawing, together

D0016982

with accrued interest thereon in accordance with the
provisions of the Reimbursement Agreement, then, so long as no
Default shall have occurred and be continuing, the Bank shall
cause the Tender Agent to release the Pledged Bonds which were
purchased with the proceeds of such Tender Drawing (or portion
thereof) from the Lien created thereby.

(ii)  Without limiting the generality of the
foregoing, prior to 11:30 A.M. (New York City time) on any
Business Day on which the Tender Agent, on behalf of the Bank,
holds Pledged Bonds and so long as no Default has occurred and
is continuing, Members of the Obligated Group or their
designee, including, without limitation, the Remarketing
Agent, may deliver a notice (a "Purchase Notice") to the Bank
stating that it has located a purchaser (the "Purchaser") for
some or all of such Pledged Bonds and that such Purchaser
desires to purchase on such Business Day a minimum of $100,000
aggregate principal amount of such Pledged Bonds (or any
larger multiple of $100,000) at a price of par plus interest
accrued thereon to but excluding such Business Day.  The
Tender Agent will deliver such Pledged Bonds to the
Remarketing Agent by 3:00 P.M. (New York City time) on such
Business Day against receipt by the Tender Agent for the
account of the Bank in immediately available funds of the
purchase price therefor plus any other amounts (including,
without limitation, additional interest payable pursuant to
Section 2(a)(i)(E) of the Reimbursement Agreement) payable by
the Members of the Obligated Group in respect of the Tender
Drawing for such Pledged Bonds.  The Bank shall apply such
purchase price and other amounts toward payment of the Tender
Drawing pursuant to which such Pledged Bonds so sold were
purchased and interest accrued on such Tender Drawing, as
required pursuant to Section 2(b)(ii) of the Reimbursement
Agreement.  Any sale of a Pledged Bond, or portion thereof,
pursuant to Section 2(b) of the Reimbursement Agreement shall
be without recourse to the seller and without representation
or warranty of any kind, to the fullest extent permitted by
law.

6.  Collateral Account.  (a)  There is hereby
established with the Bank a cash collateral account (the
"Collateral Account") in the name and under the control of the
Bank into which there shall be deposited from time to time the
funds required to be delivered to the Bank pursuant to Section
8 of the Reimbursement Agreement or pursuant to any other
Related Document.  Any income received by the Bank with
respect to the balance from time to time standing to the
credit of the Collateral Account, including any interest or
capital gains on Investments made from time to time pursuant
to paragraph (b) below, shall remain, or be deposited, in the
Collateral Account.  All right, title and interest in and to
the cash amounts on deposit from time to time in the
Collateral Account together with any Investments from time to
time made pursuant to paragraph (b) below shall vest in the

6

D0016983

Bank, shall constitute part of the Collateral hereunder and shall not constitute payment of the Secured Obligations until applied thereto as hereinafter provided.

(b) The Bank will, subject to the provisions of Section 8 hereof, from time to time (i) invest amounts on deposit in the Collateral Account in such Investments as the Members of the Obligated Group may select and which are consistent with the Obligated Group's investment policy, as in effect and provided to the Bank from time to time, and (ii) re-invest interest paid on such Investments, and other proceeds of such Investments that may mature or be sold, in each case in such Investments as the Members of the Obligated Group may select and which are consistent with the Obligated Group's investment policy, as in effect and provided to the Bank from time to time; provided that (A) an amount not in excess of the lesser of (I) 10% of the original principal amount of the Bonds, (II) 125% of average annual debt service on the Bonds and (III) maximum annual debt service on the Bonds, may be invested at a yield in excess of the yield on the Bonds, (B) amounts in excess of the amount described in clause (A) may not be invested at a yield in excess of the yield on the Bonds or may be invested at an unrestricted yield but subject to yield reduction payments pursuant to Treas. Reg. § 1.148-5(c) and (C) amounts on deposit in the Collateral Account will be subject to rebate. Each such Investment shall mature within 30 days after it is acquired by the Bank and, in order to provide the Bank with a perfected security interest therein, shall be either:

(x) evidenced by negotiable certificates or instruments, or, if non-negotiable, issued in the name of the Bank, which (together with any appropriate instruments of transfer) are delivered to, and held by, the Bank or an agent thereof (which shall not be any Member of the Obligated Group or any of its Affiliates) in the State of New York; or

(y) in book-entry form and issued by the United States and subject to pledge under applicable state law and Treasury regulations and as to which (in the opinion of counsel to the Bank) appropriate measures shall have been taken for perfection of the security interests.

7. <u>Rights of the Bank</u>. The Bank shall not be liable for failure to collect or realize upon the Secured Obligations or any collateral security or guarantee therefor, or any part thereof, or for any delay in so doing, nor shall the Bank be under any obligation to take any action whatsoever with regard thereto. If an Event of Default under the Reimbursement Agreement has occurred and is continuing the Bank may, as pledgee hereunder of the Pledged Bonds (without prejudice to any of its rights hereunder or under the Bond Indenture as registered owner of the Pledged Bonds) and all

7

D0016984

other Collateral, thereafter without notice exercise all rights, privileges or options pertaining to any Pledged Bonds and such other Collateral as if it were the absolute owner thereof (including without limitation registering the Pledged Bonds or the Investments in the Collateral Account in the name of its nominee), upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Bank shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing.    The Tender Agent shall have no responsibility to assist the Bank in any remedies pursuant to this Section 7 but may (upon reasonable notice to the Bank), and shall (upon the request of the Bank), deliver all Collateral held by it to the Bank and thereafter have no further liability hereunder.

       8.    _Remedies_.  In the event that all or any portion of the Secured Obligations has been declared due and payable pursuant to the terms of the Reimbursement Agreement or is otherwise due and payable, the Bank, without demand of performance or other demand, advertisement or notice of any kind (except the notices specified below of time and place of public or private sale) to or upon the Members of the Obligated Group or any other Person (all and each of which demand, advertisements and/or notices are hereby expressly waived to the fullest extent permitted under applicable law), may forthwith withdraw cash and Investments from the Collateral Account and liquidate such Investments and/or may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase, contract to sell or otherwise dispose of and deliver said Collateral, or any part thereof, in one or more parcels at public or private sale or sales, at any exchange, broker's board or at any of the Bank's offices or elsewhere upon such terms and conditions as it may deem advisable (so long as such terms and conditions are commercially reasonable) and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, with the right of the Bank upon any such sale or sales, public or (subject to the provisions of Section 9-504(3) of the New York Uniform Commercial Code) private, to purchase the whole or any part of said Collateral so sold (to the extent it is not already the owner thereof) free, to the extent permitted by law, of any right or equity of redemption in any Member of the Obligated Group, which right or equity is hereby expressly waived or released, to the extent permitted by law; _provided_ that if the Letter of Credit has not been terminated, the Bank may not withdraw cash or Investments from the Collateral Account or liquidate any such Investments except to the extent necessary to reimburse the Bank for amounts drawn under the Letter of Credit to pay principal of and/or interest on the Bonds or the purchase price of Bonds tendered for purchase.  Subject to the proviso

D0016985

in the preceding sentence, the Bank shall apply the net proceeds of any such withdrawal, liquidation, collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care, safekeeping or otherwise of any and all of the Collateral or in any way relating to the rights of the Bank hereunder, including reasonable attorney's fees and legal expenses, to the payment, in whole or in part, of the Secured Obligations in such order as the Bank may elect, each Member of the Obligated Group remaining liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the Bank of any other amount required by any provision of law need the Bank account for the surplus, if any, to the Members of the Obligated Group.   The Members of the Obligated Group agree that the Bank need not give more than 10 days' notice of the time and place of any public sale or of the time after which a private sale or other intended disposition is to take place and that such notice is reasonable notification of such matters.  No notification need be given to any Member of the Obligated Group if such Person or its duly authorized representative has signed after default a statement renouncing or modifying any right to notification of sale or other intended disposition.   In addition to the rights and remedies granted to it in this Security Agreement and in any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations, the Bank shall have all of the rights and remedies of a secured party under the New York Uniform Commercial Code.

        9.   <u>Representations, Warranties and Covenants of the Member of the Obligated Group</u>.  Each Member of the Obligated Group jointly and severally represents and warrants that:  (a) upon delivery to the Tender Agent acting in its capacity as custodian for the benefit of the Bank of any Pledged Bonds described herein, neither the Remarketing Agent, the Tender Agent, the Trustee, nor any other Person (including, without limitation, the holder of any Bond) will have any rights or interest in and to the Pledged Bonds, (b) they have full power, authority and legal right to pledge pursuant to this Security Agreement, and to grant a security interest pursuant to this Security Agreement in and to, all of the right, title and interest they have in and to the Collateral Account and, upon delivery of any Pledged Bonds to the Tender Agent acting in its capacity as custodian for the benefit of the Bank or upon delivery of funds to the Bank pursuant to the Reimbursement Agreement for deposit in the Collateral Account, as the case may be, they will have full power, authority and legal right to pledge pursuant to this Security Agreement, and to grant a security interest pursuant to this Security Agreement in and to, all of the right, title and interest they have in and to the Pledged Bonds and to the funds and Investments in the Collateral Account, respectively, (c) no financing statement, mortgage, security agreement or

D0016986

similar or equivalent document or instrument covering all or any part of the Collateral is on file or of record in any jurisdiction in which such filing or recording would be effective to perfect a Lien on such Collateral and (d) the Bank has a valid and perfected security interest in the Collateral Account and, upon the delivery of any Pledged Bonds to the Tender Agent acting in its capacity as custodian for the benefit of the Bank or upon the delivery of funds to the Bank pursuant to the Reimbursement Agreement for deposit in the Collateral Account, as the case may be, the Bank will have a valid and perfected security interest in the Pledged Bonds and in the funds and Investments in the Collateral Account, respectively, in each case subject to no prior Lien. Members of the Obligated Group covenant and agree that they will defend the Bank's right, title and interest in and to the Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and covenant and agree that they will have like title to and right to pledge any other property at any time hereafter pledged to the Bank as Collateral hereunder and will likewise defend the Bank's right thereto and security interest therein.

        10. <u>No Liens, etc</u>. Without the prior written consent of the Bank, the Members of the Obligated Group agree that they will not create, incur or permit to exist any Lien on, or option with respect to, any of the Collateral, or any interest therein, or any proceeds thereof, except for the Lien provided for by this Security Agreement.

        11. <u>Sale of Collateral</u>. The Members of the Obligated Group agree to do or cause to be done all acts and things, consistent with their obligations under the Reimbursement Agreement, and the other Related Documents and as authorized by law, as may be necessary to make a sale or sales of any portion or all of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at the expense of the Members of the Obligated Group. The Members of the Obligated Group further agree that a breach of any of the covenants contained in this Section 11 will cause irreparable injury to the Bank and that the Bank has no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section shall be specifically enforceable against the Members of the Obligated Group. To the fullest extent permitted by applicable law, the Members of the Obligated Group hereby waive and agree not to assert any defense against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Reimbursement Agreement or that such actions would be inconsistent with such obligations or prohibited by law.

                            D0016987

12. <u>Further Assurances</u>. (i) The Members of the Obligated Group agree that at any time and from time to time upon the written request of the Bank, the Members of the Obligated Group will execute and deliver such further documents and do such further acts and things as the Bank may reasonably request in order to effect the purposes of this Security Agreement.

(ii) It is understood and agreed that should any dispute arise with respect to the payment and/or ownership or right of possession of the Collateral, the Tender Agent is authorized and directed to retain in its possession, without liability to anyone, all or any part of said Collateral until such dispute shall have been settled either by mutual agreement by the parties concerned or by the final order, decree or judgment of a court or other tribunal of competent jurisdiction in the United States of America and time for appeal has expired and no appeal has been perfected, but the Tender Agent shall be under no duty whatsoever to institute or defend any such proceedings.

13. Beyond the exercise of reasonable care in the custody thereof, the Bank shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as the preservation of rights against prior parties or any other rights pertaining thereto. The Bank shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property, and shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act of omission of any agent or bailee selected by the Bank in good faith.

14. Upon the repayment in full of all Secured Obligations and the termination of the Letter of Credit, the security interests in the Collateral granted hereunder shall terminate and all rights in the Collateral shall revert to the Members of the Obligated Group.

15. <u>Severability</u>. Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

16. <u>No Waiver; Cumulative Remedies</u>. The Bank shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder and no waiver shall be valid unless in writing, signed by the Bank, and then

11

D0016988

only to the extent therein set forth.  A waiver by the Bank of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Bank would otherwise have on any future occasion.  No failure to exercise nor any delay in exercising on the part of the Bank any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights or remedies provided by law.

17.  Waivers, Amendments; Applicable Law.  None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by the Bank, the Members of the Obligated Group and, if the rights or obligations of the Tender Agent as custodian are affected thereby, by the Tender Agent, as custodian.  This Security Agreement and all obligations of the Members of the Obligated Group hereunder shall be binding upon the successors and assigns of Members of the Obligated Group, and shall, together with the rights and remedies of the Bank hereunder, inure to the benefit of the Bank and their respective successors and assigns.  This Security Agreement shall be governed by, and be construed and interpreted in accordance with, the law of the State of New York.

18.  Counterparts.  This Security Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

D0016989

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be duly executed and delivered by its respective duly authorized officers or agents all as of the day and year first above written.

ALLEGHENY GENERAL HOSPITAL


By: _____
     Title:


ALLEGHENY-SINGER RESEARCH
   INSTITUTE


By: _____
     Title:


MORGAN GUARANTY TRUST COMPANY
   OF NEW YORK, as the Bank


By: _____
     Title: Vice President


MELLON BANK, N.A., as Tender Agent


By: _____
     Title:


13

D0016990

**EXHIBIT  0328**

March 17, 1995

To: Mike Martin, Tom Barry, and Bob Zimmerman

From: Susan Flanagan

I understand that of the six unresolved issues relating to the Reimbursement Agreement, our proposed approach to item #2 ( relating to AHERF) remains a major problem for the Group.

Morgan's proposed solution was not intended to tie into AHERF's assets. (You will note that we have not requested or received financial information relating to AHERF). We can remove references to AHERF in the Agreement. However, given the substantial volume of intercompany flows that have occurred and that may occur in the future, we seek protection, customary for this type of transaction, that our limited obligation will not be weakened by net outflows to the advantage of other parts of the System.

We are willing to take another approach to achieve the same objective by requiring minimum consolidated unrestricted fund balances, defined to exclude "loans to and investments in affiliates outside the AHG Obligated Group" and expressed as a percentage of Total Assets. We would wish to have appropriate assurance that there are (would be) no legal limitations on the availability of the unrestricted fund balance for payment of principal and interest as well as information regarding the liquidity characteristics of the unrestricted fund balances.

I will call you on Monday to see whether you wish to go further with this concept. Thanks and Regards.

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
**17857**
EXHIBIT NO.

**Post-It™ brand fax transmittal memo 7671** | # of pages ▶ /
| To Mike Martin | From S. FLANAGAN |
| Co. | Co. |
| Dept. | Phone # |
| Fax # (412) 442-2290 | Fax # |

**Post-It™ brand fax transmittal memo 7671** | # of pages ▶ /
| To TOM BARRY | From S. FLANAGAN |
| Co. | Co. |
| Dept. | Phone # |
| Fax # 259-5401 | Fax # |

**Post-It™ brand fax transmittal memo 7671** | # of pages ▶ /
| To R. Zimmerman | From S. FLANAGAN |
| Co. | Co. |
| Dept. | Phone # |
| Fax # (312) 455-1925 | Fax # |

F&L-01-021562



DEPOSITION
EXHIBIT
328
AKF

**EXHIBIT  0329**

March 21, 1995

TO: Mike Martin      CC: Tom Barry and Bob Zimmerman

REF: Alleghany General Hospital Reimbursement and Security Agreement

Pursuant to your request, I am revising certain sections of my memo to you (dated 3/15/95), relating to the proposed Letter of Credit/Reimbursement Agreement, to reflect what was mutually agreed during the telephone conversation of yesterday.

**(1) Investments- page 36, Section 7 (e)**

As stated in 3/15/95 memo. While we would wish to be advised of your investment policy, we believe we have common interests in this area and don't anticipate any difficulty reaching acceptable language.

**(2) Reference to AHERF in the Reimbursement Agreement-**

All reference to AHERF will be removed from the Reimbursement Agreement.

**(3) Sale/Transfer of Assets**

The Reimbursement Agreement will not contain the customary 10% per annum limitation on Sales/Transfers of Assets, as we believe the $200 million Unrestricted Fund Balance requirement will effectively protect the asset base during the original 3 year term of the letter of credit. The Unrestricted Fund Balance, as defined in the Reimbursement Agreement, would exclude intangible assets as well as investments in and loans to (due from) affiliates, etc. outside the AGH Obligated Group.

We will likely wish to revisit the subject of Sale/Transfer of Assets and/or the amount of the minimum Unrestricted Fund Balance requirement prior to the original termination date.

**(4) Negative Pledge (ie Liens)**

As stated in the memo dated March 15, 1995.

**(5) Constitution of the Obligated Group**

As stated in the memo dated March 15, 1995.

**(6) Acceleration of 1995 B Bonds**

As stated in the memo dated March 15, 1995.

I trust the above accurately reflects the outcome of our 3/20/95 telephone conversation; however, if there are any misunderstandings or omissions, please do not hesitate to call me at (212) 648-6804. Regards.

F&L-01-021561

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
**17858**
EXHIBIT NO.



**EXHIBIT  0330**

[340530.002:PF]

CLED T ITEM NO. 2

MASTER TRUST INDENTURE

By and Among

ALLEGHENY UNIVERSITY HOSPITALS
(formerly The Medical College of Pennsylvania and
Hahnemann University Hospital System)

HAHNEMANN UNIVERSITY HOSPITAL

ALLEGHENY UNITED HOSPITALS, INC.

ALLEGHENY UNIVERSITY FOR HEALTH SCIENCES
(formerly The Medical College of Pennsylvania and Hahnemann
University)

ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN

HORIZON MEDICAL CORPORATION

AND SUCH OTHER PERSONS AS MAY BECOME
MEMBERS OF THE OBLIGATED GROUP

And

NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION,
as Master Trustee

Dated as of May 15, 1996

This  instrument  was  prepared
by:

Foley & Lardner
One IBM Plaza
Suite 3300
330 N. Wabash Avenue
Chicago, Illinois  60611

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
24021
EXHIBIT NO.

DEPOSITION
EXHIBIT
330
AKF

K&L/DAK 00003

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . .  i

GRANTING CLAUSE . . . . . . . . . . . . . . . . . . . .  i

ARTICLE ONE

DEFINITIONS OF TERMS, CONSTRUCTION
AND CERTAIN GENERAL PROVISIONS

Section 1.1.   Definitions of Terms . . . . . . . . . . . .  2
Section 1.2.   Construction of References . . . . . . . . . 18
Section 1.3.   Separability Clause . . . . . . . . . . . . 18
Section 1.4.   Accounting Principles . . . . . . . . . . . 19

ARTICLE TWO

NOTES AND INDENTURE GUARANTIES

Section 2.1.   Issuance of Obligations; Form and Terms Thereof.19
Section 2.2.   Payment of Obligations . . . . . . . . . . . 19
Section 2.3.   Cross-Guaranties; Security Therefor . . . . . 20
Section 2.4.   Execution and Authentication of Obligations . 21
Section 2.5.   Registration, Transfer and Exchange . . . . . 22
Section 2.6.   Mutilated,   Destroyed,   Lost   or   Stolen
               Obligations . . . . . . . . . . . . . . . . . 22
Section 2.7.   Establishment of Funds and Investment of Fund
               Money . . . . . . . . . . . . . . . . . . . . 24
Section 2.8.   Supplemental   Indenture   Creating   any
               Obligation . . . . . . . . . . . . . . . . . 24
Section 2.9.   Conditions   to   Issuance   of   Obligations
               Hereunder . . . . . . . . . . . . . . . . . . 24

ARTICLE THREE

MEMBERSHIP IN AND WITHDRAWAL
FROM THE OBLIGATED GROUP

Section 3.1.   Conditions for Membership.  . . . . . . . . . 25
Section 3.2.   Withdrawal from the Obligated Group . . . . . 26

i

K&L/DAK 00004

## ARTICLE FOUR

### LIMITATIONS ON INCURRENCE OF ADDITIONAL INDEBTEDNESS

Section 4.1.   Short-Term Indebtedness . . . . . . . . . .   27
Section 4.2.   Other Indebtedness . . . . . . . . . . . .   28
Section 4.3.   Guaranties; Limited Obligors . . . . . . .   30
Section 4.4.   Debt Service on Balloon Indebtedness and
               Variable Rate Indebtedness . . . . . . . . . . . .   31
Section 4.5.   Other Indebtedness . . . . . . . . . . . .   32

## ARTICLE FIVE

### INSURANCE; DAMAGE TO OR DESTRUCTION OR TAKING OF PROPERTY

Section 5.1.   Required Insurance Coverage .  . . . . . .   32
Section 5.2.   Self-Insurance . . . . . . . . . . . . . .   33
Section 5.3.   Recovery of Insurance Proceeds . . . . . .   33
Section 5.4.   Use of Net Proceeds . . . . . . . . . . .   33
Section 5.5.   Balance of Net Proceeds . . . . . . . . .   33
Section 5.6.   Eminent Domain . . . . . . . . . . . . . .   33

## ARTICLE SIX

### GENERAL COVENANTS OF EACH MEMBER OF THE OBLIGATED GROUP

Section 6.1.   Covenants as to Corporate Existence, Maintenance of
               Property, Etc. . . . . . . . . . . . . . . . . . .   34
Section 6.2.   Limitations on Creation of Liens . . . . . .   35
Section 6.3.   Rates and Charges . . . . . . . . . . . .   35
Section 6.4.   Sale, Lease or Other Disposition of Property .   36
Section 6.5.   Consolidation, Merger, Sale or Conveyance  . .   37
Section 6.6.   Filing of Financial Statements, Certificate of
               No Default,
               Other Information . . . . . . . . . . . . . .   39

K&L/DAK 00005

## ARTICLE SEVEN

### REMEDIES OF THE MASTER TRUSTEE AND HOLDERS IN EVENT OF DEFAULT

Section 7.1.    Events of Default . . . . . . . . . . . . . 40
Section 7.2.    Payment of Obligations on Default . . . . . . 42
Section 7.3.    Suit for Moneys Due . . . . . . . . . . . 42
Section 7.4.    Proceedings in Bankruptcy . . . . . . . . . 43
Section 7.5.    Suit by Master Trustee . . . . . . . . . . 43
Section 7.6.    Application of Moneys Collected . . . . . . 43
Section 7.7.    Actions by Holders . . . . . . . . . . . . 44
Section 7.8.    Direction of Proceedings by Holders . . . . 45
Section 7.9.    Delay or Omission of Master Trustee . . . . 46
Section 7.10.   Remedies Cumulative . . . . . . . . . . . 46
Section 7.11.   Notice of Default . . . . . . . . . . . . 46

## ARTICLE EIGHT

### CONCERNING THE MASTER TRUSTEE

Section 8.1.    Duties and Liabilities of Master Trustee . . . 47
Section 8.2.    Reliance on Documents; Indemnification, Etc . 48
Section 8.3.    Responsibility for Recitals, Validity of Indenture, Proceeds of Notes . . . . . . . . . . . . 49
Section 8.4.    Master Trustee May Own Notes . . . . . . . . 49
Section 8.5.    Compensation and Expenses of Master Trustee . 49
Section 8.6.    Officer's Certificate as Evidence . . . . . 50
Section 8.7.    Resignation, Removal and Succession of Master Trustee . . . . . . . . . . . . . . . . . . . 50
Section 8.8.    Acceptance by Successor Master Trustee . . . . 51
Section 8.9.    Qualifications of Successor Master Trustee . . 51
Section 8.10.   Successor by Merger . . . . . . . . . . . . 51
Section 8.11.   Co-Master Trustees . . . . . . . . . . . . 51

## ARTICLE NINE

### SUPPLEMENTS AND AMENDMENTS

Section 9.1.    Supplemental Indentures without Consent of Holders . . . . . . . . . . . . . . . . . . . 52
Section 9.2.    Modification of Master Indenture with Consent of Holders . . . . . . . . . . . . . . . . . . 54
Section 9.3.    Effect of Supplemental Indenture . . . . . . 55
Section 9.4.    Obligations May Bear Notation of Changes . . . 55

iii

K&L/DAK 00006