LETTER OF CREDIT
                                              NO. A-308179

            ANNEX 8 to PNC Bank, National Association
            Irrevocable Letter of Credit No. A-308179


PNC Bank, National Association
3rd Floor Annex
237 Fifth Avenue
Pittsburgh, Pennsylvania 15222
Attention:  Letter of Credit Department

        Re:  PNC Bank, National Association Irrevocable
             Letter of Credit No. A-308179

Ladies and Gentlemen:

      For value received, the undersigned beneficiary hereby
irrevocably transfers to:

      (Name of Transferee)

      (Address)

all rights of the undersigned beneficiary to draw under the above
Letter of Credit in its entirety.  Said transferee has succeeded
to the undersigned as Trustee and Tender Agent under the Trust
Indenture dated as of June 1, 1996 (the "Indenture"), between
Pennsylvania Higher Educational Facilities Authority and the
Trustee.

      By this transfer, all rights of the undersigned beneficiary
in such Letter of Credit are transferred to the transferee and
the transferee shall have the sole rights as beneficiary thereof,
including sole rights relating to any amendments whether
increases or extensions or other amendments and whether now
existing or hereafter made.  All amendments are to be advised
direct to the transferee without necessity of any consent of or
notice to the undersigned beneficiary.

      The original of such Letter of Credit is returned herewith,
and in accordance therewith we ask you to transfer the Letter of
Credit to the transferee in the Letter of Credit Amount (both as
defined in the Letter of Credit) with provision for reinstating
or increasing the Letter of Credit Amount with respect to all
drawings by Interest Drafts and Tender Drafts (as defined in the
Letter of Credit) with respect to which the Letter of Credit

                                              PNC18800

**EXHIBIT  0333**

148642

PM

## LETTER OF CREDIT, REIMBURSEMENT AND SECURITY AGREEMENT

THIS LETTER OF CREDIT, REIMBURSEMENT AND SECURITY AGREEMENT (the "Agreement") is dated as of June 1, 1996, between ALLEGHENY UNIVERSITY HOSPITALS (the "System"), and PNC BANK, NATIONAL ASSOCIATION (the "Bank")

### W I T N E S S E T H

DV967

A.   The System is issuing its Commercial Paper Notes in an aggregate principal amount to be outstanding at any one time not to exceed $54,194,000 in accordance with and pursuant to the terms of that certain Depositary Agreement dated as of June 1, 1996 (the "Depositary Agreement"), among the System, PNC Bank, National Association, as Depositary (in such capacity, the "Depositary") and Issuing Agent and Paying Agent, and PNC Bank, National Association, as fiduciary on behalf of the holders of the Commercial Paper Notes.

B.   In order to facilitate the issuance and sale of the Commercial Paper Notes and to enhance the marketability of the Commercial Paper Notes and thereby achieve interest cost savings and other savings, the System has requested that the Bank issue, and the Bank has agreed to issue, its irrevocable direct pay letter of credit (together with any substitute letter of credit issued pursuant to the terms hereof, the "Letter of Credit") to the Depositary, for the account of the System, authorizing the Depositary to make one or more draws on the Bank up to an aggregate of $54,194,000, as reduced and reinstated from time to time in accordance with the provisions hereof and of the Letter of Credit (the "Commitment Amount").

C.   The payment obligations of the System under the Depositary Agreement with respect to the Commercial Paper Notes will be evidenced and secured by a certain promissory note (the "1996E Master Indenture Note") issued by the System to the Depositary under that certain Master Trust Indenture dated as of May 15, 1996, among the System, Allegheny United Hospitals, Inc., St. Christopher's Hospital For Children, Horizon Medical Corporation, Hahnemann University Hospital, and Allegheny University For Health Sciences (each an initial "Member of the Obligated Group" and collectively, together with any and all additional Members of the Obligated Group, the "Obligated Group") and Norwest Bank Minnesota, National Association, as Master Trustee (in such capacity, the "Master Trustee"), as amended and supplemented by a First Supplemental Master Trust Indenture dated

PNC18687

DEPOSITION
EXHIBIT
353
AKF

AH- 13677

148642

as of May 15, 1996 (as so supplemented and amended the "Master Trust Indenture").

D. The obligation of the System to repay amounts drawn under the Letter of Credit will be evidenced and secured by a certain promissory note (the "1996G Master Indenture Note" and together with the 1996E Master Indenture Note the "Master Notes") issued by the System to the Bank under the Master Trust Indenture.

E. The Bank is willing to issue the Letter of Credit upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the undertakings herein set forth, and intending to be legally bound, the System and the Bank hereby agree as follows:

PNC18688

AH- 13478

148640

# ARTICLE I

## DEFINITIONS

Section 1.01.  _Definitions_.  In this Agreement (except as otherwise expressly provided for or unless the context otherwise requires), defined terms may be used in the singular or the plural, the use of any gender includes all other genders and the following terms have the following meanings:

"Bank Documents" means this Agreement, the Letter of Credit and any other document or instrument executed and delivered by the System and/or the Bank in connection with the transactions contemplated herein.

"Bond Insurer" shall have the meaning ascribed to such term in the Master Trust Indenture.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in the city of Pittsburgh, Pennsylvania are authorized or required by law to be closed.

"Code" means the Internal Revenue Code of 1986 and the rules and regulations thereunder, including any amendments and successor provisions thereto.

"CP Documents" means the Commercial Paper Notes, the Dealer Agreement, the Depositary Agreement and any other agreements or instruments relating thereto.

"Date of Issuance" means the date on which the Letter of Credit is issued.

"Dealer Agreement" means that certain Commercial Paper Dealer Agreement dated June 19, 1996, between Merrill Lynch and the System.

"Default Draft" means a sight draft under the Letter of Credit accompanied by a Certificate in the form of Annex 2 to the Letter of Credit.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and, unless the context otherwise requires, the rules and regulations promulgated thereunder from time to time.

"Event of Default" shall have the meaning ascribed to such term in Section 7.01.

"Facilities" means all Property which is property, plant and equipment under GAAP.

PNC18689

- 3 -

AH- 13670

148642

"Fiscal Year" means the annual accounting year of the Obligated Group, which currently begins on July 1 in each calendar year.

"GAAP" means generally accepted accounting principles applied on a consistent basis.

"Governmental Person" means the government of the United States or the government of any state or locality therein, any political subdivision or any governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body or entity, or other regulatory bureau, authority, body or entity of the United States or any state or locality therein, including the Federal Deposit Insurance Corporation, the Comptroller of the Currency or the Board of Governors of the Federal Reserve System, any central bank or any comparable authority.

"Governmental Rule" means any law, rule, regulation, ordinance, order, judgment or decision of any Governmental Person.

"Indebtedness" shall have the meaning ascribed to such term in the Master Trust Indenture.

"Lien" shall have the meaning ascribed to such term in the Master Trust Indenture.

"Long-Term Indebtedness" shall have the meaning ascribed to such term in the Master Trust Indenture.

"Maturity Draft" means a sight draft under the Letter of Credit accompanied by a Certificate in the form of Annex 1 to the Letter of Credit.

"Merrill Lynch" means Merrill Lynch Money Markets Inc., its successors and assigns.

"Multi-employer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA.

"Obligated Group Agent" shall have the meaning ascribed to such term in the Master Trust Indenture.

"Outstanding" when applied to the Commercial Paper Notes means as of any date of determination, all Commercial Paper Notes theretofore issued and not paid and discharged.

"Participating Banks" shall have the meaning ascribed to such term in Section 8.11.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

PNC18690

AH- 13690

148642

"Permitted Liens" shall have the meaning ascribed to such term in the Master Trust Indenture.

"Person" means any natural person, corporation, partnership, association, joint-stock company, trust, unincorporated organization, joint venture, Governmental Person, public body or other legal entity.

"Plan" means any employee benefit, plan (other than a Multi-employer Plan) maintained for employees and covered by Title IV of ERISA.

"Prime Rate" means the fluctuating rate of interest per annum (computed on the basis of a year of 365 or 366 days, as the case may be) publicly announced by the Bank from time to time as the prime rate of the Bank, adjusted automatically as of the date of an announcement of any change in such prime rate. The prime rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index, nor necessarily reflects the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

"Principal Office" means the Bank's office located at 237 Fifth Avenue, Third Floor Annex, Pittsburgh, Pennsylvania 15222, Attention: Letter of Credit Department, or any other office in the City of Pittsburgh which may be designated in writing to the Obligated Group Agent.

"Property" means any and all right, title and interest in and to any and all property whether real or personal, tangible or intangible and wherever situated.

"Related Documents" means the Bank Documents, the CP Documents and the Master Trust Indenture, any notes issued pursuant thereto, and any other agreements or instruments relating thereto.

"Reportable Event" shall have the meaning ascribed to that term in Title IV of ERISA and the regulations thereunder.

"Termination Event" means (i) a Reportable Event described in Section 4043 of ERISA (other than a Reportable Event not subject to the provision for 30 day notice to the PBGC under the regulations promulgated under such Section) with respect to any Plan, (ii) the withdrawal of any Member of the Obligated Group from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (iii) the cessation of operations of any facility of any Member of the Obligated Group if, pursuant to Section 4062(e) of ERISA, such cessation causes such Member of the Obligated Group to be treated as a "substantial employer," (iv) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, (v) the institution

PNC18691

AH-1368;

148642

of proceedings by the PBGC to terminate a Plan, or (vi) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

Section 1.02. <u>Rules of Construction; Time of Day</u>. The words "hereof", "herein", "hereto", "hereby" and "hereunder" refer to this entire Agreement. Unless otherwise indicated, all references to particular Articles or Sections are references to the Articles or Sections of this Agreement. References to any time of the day in this Agreement shall refer to Eastern standard time or Eastern daylight saving time, as in effect in Pittsburgh, Pennsylvania on such day. All accounting terms used herein which are not otherwise expressly defined herein shall have the meanings given them by GAAP.

ARTICLE II

LETTER OF CREDIT AND REIMBURSEMENT

Section 2.01. <u>Issuance of Letter of Credit</u>. Subject to the conditions precedent hereinafter set forth, the Bank will issue to the Depositary, pursuant to the request of the System, on the date of execution and delivery of this Agreement, the Letter of Credit in the Commitment Amount and substantially in the form attached hereto as <u>Exhibit A</u>. The Letter of Credit shall expire at 5:00 p.m. on June 10, 1999. The Letter of Credit is subject to prior automatic termination as provided therein.

Section 2.02. <u>Reimbursement and Other Payments</u>.

(a) The System hereby agrees to pay or cause to be paid to the Bank a sum equal to (i) each amount drawn under the Letter of Credit <u>minus</u> (ii) the proceeds received by the Bank from the subsequent sale of new Commercial Paper Notes on the same Business Day that such amount is so drawn; provided, however, that in the event new Commercial Paper Notes are not sold on the same Business Day that a drawing is made under the Letter of Credit pursuant to a Maturity Draft (a "Maturity Drawing"), then the System hereby agrees to pay or cause to be paid to the Bank on the same Business Day that a Maturity Drawing is made a sum equal to (y) the amount drawn under the Letter of Credit <u>minus</u> (z) the proceeds received from the prior sale of maturing Commercial Paper Notes paid with the proceeds of the Maturity Drawing, with the balance of the amount drawn under the Letter of Credit payable upon the occurrence of the earliest of

(i) the subsequent sale of new Commercial Paper Notes,

(ii) an Event of Default hereunder, or

(iii) the expiration or termination of the Letter of Credit.

PNC18692

- 6 -

AH- 13682

148642

Except as otherwise provided herein, all sums payable to the Bank under this Section 2.02(a) shall bear interest payable on the first day of each month, from the date the corresponding amount is drawn under the Letter of Credit until such sums are paid in full (it being understood and agreed that any sum paid after 3:00 p.m. on a Business Day shall bear interest as if it was paid at 9:00 a.m. on the next following Business Day), at a fluctuating rate per annum (computed for the actual number of days elapsed, based on a 365 or 366-day year, as the case may be) equal to the Prime Rate for the first 30 days, the Prime Rate plus twenty-five one hundredths percent (.25%) for the next 60 days and the Prime Rate plus fifty one hundredths percent (.50%) thereafter. Anything to the contrary notwithstanding, if an Event of Default shall have occurred hereunder, any sums or interest due and payable to the Bank under this Agreement shall thereafter bear interest at a fluctuating rate per annum (computed for the actual number of days elapsed, based on a 365 or 366-day year, as the case may be) equal to two percent (2%) per annum above the Prime Rate until such sum or interest and all other amounts due and payable under this Agreement having been paid in full. All payments under this Section 2.02(a) shall be applied first to the payment of interest due and payable under this Section 2.02(a) and then to the reduction of the principal balance of sums due and payable under this Section 2.02(a).

(b)  On the date of execution and delivery hereof, the System shall pay to the Bank a one-time up-front fee of $27,097. On July 1, 1996, and quarterly on each October 1, January 1, April 1 and July 1 thereafter so long as any credit remains available to the Depositary under the Letter of Credit and on the date of termination of the Letter of Credit, the System shall pay to the Bank a Letter of Credit commitment fee computed at the rate of thirty-five one hundredths percent (.35%) per annum on the average daily Commitment Amount during the preceding quarterly period (or portion thereof in the case of the termination of the Letter of Credit on a day other than an April 1, July 1, October 1 or January 1); provided that, for purposes of computing such average daily Commitment Amount, the Commitment Amount shall be treated as having been reinstated with respect to each drawing to the extent the Bank is reimbursed therefor. Computations of Letter of Credit commitment fees under this Section shall be for the actual number of days in the applicable period, based on a 365 or 366-day year, as the case may be.

(c)  The System shall pay to the Bank all reasonable transaction charges that the Bank may make for drawings under the Letter of Credit.  Such transaction charges shall be payable quarterly at the same times as the fees described in Section 2.02(b) hereof are payable, upon submission to the System by the Bank of the Bank's invoice therefor.  In addition, the System shall pay to the Bank on demand any and all reasonable charges

PNC18693

- 7 -

AH- 13683

148642

and expenses which the Bank may pay or incur relative to the
Letter of Credit.  The System shall pay to the Bank upon each
transfer of the Letter of Credit in accordance with its terms a
transfer fee, together with any and all reasonable costs and
expenses of the Bank incurred in connection with such transfer.
Any fees or charges imposed pursuant to this Section 2.02(c)
shall not exceed those customarily charged by the Bank ($50 being
the charge presently made by the Bank for drawings under letters
of credit).

        (d) (i)   If any enactment, promulgation or adoption of or
change in any applicable Governmental Rule or in the
interpretation or administration thereof by any Governmental
Person charged with the interpretation or administration thereof,
or compliance by the Bank with any guideline, request or
directive (whether or not having the force of law) of any such
Governmental Person, shall either (A) impose, modify or deem
applicable any reserve, special deposit or similar requirement
(including without limitation a guideline, request or directive
which affects the manner in which the Bank allocates capital
resources to its commitments, including its obligations under
this Agreement and the Letter of Credit), (B) subject the Bank to
any tax or change the basis of taxation of the Bank (other than a
change in a rate of tax based on overall net income of the Bank),
or (C) impose on the Bank any other condition regarding this
Agreement or the Letter of Credit, and the result of any event
referred to in clause (A), (B) or (C) of this sentence shall be
to increase the direct or indirect cost to the Bank of issuing or
maintaining the Letter of Credit or the Bank's obligations under
this Agreement or to reduce the amounts receivable by the Bank
hereunder (which increase in costs or reduction in amounts
receivable shall be determined by the Bank's reasonable
allocation of such cost increase or reduction in amounts
receivable resulting from such event), then within 10 Business
Days after demand by the Bank, the System shall pay to the Bank,
from time to time as specified by the Bank, additional amounts
that in the aggregate shall be sufficient to compensate the Bank
for such increased cost or reduction in amounts receivable.   A
certificate as to such increased cost or reduction in amounts
receivable by the Bank as a result of any event mentioned in
clause (A), (B) or (C) above to the System shall, in absence of
manifest error, be conclusive and binding for all purposes.

        (ii) If the Bank shall have determined that any enactment,
promulgation or adoption of or change in any applicable
Government Rule or guideline regarding capital adequacy, or in
the interpretation or administration thereof, by any Governmental
Person charged with the interpretation or administration thereof,
or compliance by the Bank (or any controlling affiliate or
entity) with any guideline, request or directive regarding
capital adequacy (whether or not having the force of law and
whether or not failure to comply thereunder would be unlawful) of
any such Governmental Person, affects or would affect the amount
of capital required or expected to be maintained by the Bank (or

PNC18694

- 8 -

AH- 13684

148642

any controlling affiliate or entity) and the Bank determines, on the basis of reasonable allocations, that the amount of such capital is increased by or is based on its issuance or maintenance of the Letter of Credit or the Bank's obligations under this Agreement, then, within 10 Business Days after demand by the Bank, the System shall pay to the Bank, from time to time as specified by the Bank, additional amounts sufficient to compensate the Bank therefor.  A certificate as to such amounts submitted to the System by the Bank shall, in the absence of manifest error, be conclusive and binding for all purposes.

(e)  Whenever any payment pursuant to this Article shall be due on any day that is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day.  Except as otherwise provided in Section 2.02(a), all payments to the Bank under this Agreement (including, without limitation, all payments becoming due under Sections 2.02 and 8.05) shall be accompanied by interest thereon, from the date such payments become due (whether or not a Business Day) until they are paid in full, at a fluctuating rate per annum equal to two percent (2%) per annum above the Prime Rate.  All payments by or on behalf of the System to the Bank under this Agreement shall be made in lawful currency of the United States at the Bank's office at Fifth Avenue and Wood Street, Pittsburgh, Pennsylvania 15222, Attention: Manager, Health Care Group, or at such other address and to the attention of such other person as the Bank may stipulate by written notice to the System, or by a wire transfer in immediately available funds from the System or on behalf of the System to the Bank in accordance with written wire instructions given to the System by the Bank.  All payments hereunder shall be made in immediately available funds at such office of the Bank or other address as the Bank may so stipulate by written notice to the System.

(f)  The Bank shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the System and the amounts payable and paid from time to time hereunder.  In any legal action or proceeding in respect of this Agreement, the entries made in such account or accounts shall be presumptive evidence of the existence and amounts of the obligations of the System therein recorded.  The failure to record any such amount shall not, however, limit or otherwise affect the obligations of the System hereunder to repay all amounts owed hereunder together with all interest accrued thereon as provided herein.

Section 2.03.  <u>Transfer of Letter of Credit; Reduction of Commitment Amount; Reinstatement</u>.

(a)  The Letter of Credit may be transferred in accordance with the provisions set forth in the Letter of Credit.

(b)  The Commitment Amount shall be automatically reduced as specified in the Letter of Credit.  With respect to

PNC18695

4H-13685

148642

any reductions of the Commitment Amount pursuant to the terms of the Letter of Credit, the Bank shall have the right, at its option, to require the Depositary to surrender promptly the outstanding Letter of Credit to the Bank and to accept in substitution therefor a substitute letter of credit in the form of Exhibit A attached hereto, dated the date of such substitution, for an amount equal to the Commitment Amount as so reduced, but otherwise having terms identical to the then outstanding Letter of Credit.

(c)  In the event of a drawing under the Letter of Credit with a Maturity Draft, the Commitment Amount shall, as provided in the Letter of Credit and subject to the conditions therein set forth, be automatically reinstated as set forth in the Letter of Credit.

Section 2.04.  Obligations Absolute.  The obligations of the System under this Article shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including without limitation the following circumstances (i) any lack of validity or enforceability of this Agreement, the Related Documents or any other agreement or document relating thereto; (ii) any amendment or waiver of or any consent to or departure from this Agreement, the Related Documents or any document relating thereto; (iii) the existence of any claim, set-off, defense or other right which the System may have at any time against the Depositary, the Bank or any other person or entity, whether in connection with this Agreement, the transactions described herein or any unrelated transaction, or (iv) any of the circumstances contemplated in clauses (i) through (vii), inclusive, of Section 2.06.

Section 2.05.  Indemnification.  To the extent permitted by applicable law, the System hereby agrees to indemnify and hold harmless the Bank (and its directors, officers, employees and agents) from and against any and all claims, damages, losses, liabilities, costs or expenses (including reasonable attorneys' fees) whatsoever that the Bank may incur (or which may be claimed against the Bank by any person or entity whatsoever) by reason of or in connection with (a) the issuance or a transfer of, or payment or failure to pay under, the Letter of Credit, (b) any breach by any Member of the Obligated Group of any representation, warranty, covenant, term or condition in, or the occurrence of any default under, this Agreement or the Related Documents, including all reasonable fees or expenses resulting from the settlement or defense of any claims or liabilities arising as a result of any such breach or default, (c) any inaccuracy or alleged inaccuracy in any material respect, or any untrue or alleged untrue statement of any material fact, contained in any offering memorandum or similar document for the Commercial Paper Notes or any amendment or supplement thereto, or by reason of the omission or alleged omission to state therein a material fact necessary to make the statements made therein, in

PNC18696

AH 18696

148642

light of the circumstances under which they were made, not
misleading (in each case, other than with respect to the Bank),
and (d) involvement of the Bank in any suit, investigation,
proceeding, inquiry or action as a consequence, direct or
indirect, of the Bank's issuance of the Letter of Credit, its
entering into this Agreement or any other event or transaction
contemplated by any of the foregoing; provided the System shall
not be required to indemnify the Bank for any claims, damages,
losses, liabilities, costs or expenses to the extent, but only to
the extent, caused by (i) the willful misconduct or gross
negligence of the Bank or (ii) the Bank's willful failure to pay
under the Letter of Credit after the presentation to it by the
Depositary of a sight draft and certificate strictly complying
with the terms and conditions of the Letter of Credit, unless the
Bank in good faith and upon advice of counsel believes that it is
prohibited by law or other legal authority from making such
payment.  Provided, further, that, if the System is required to
indemnify and hold harmless Merrill Lynch pursuant to Section 8
of the Commercial Paper Dealer Agreement dated June ___, 1996
between Merrill Lynch and the System against any liabilities,
penalties, suits, causes of action, losses, damages, claims,
costs and expenses (including without limitation fees and
disbursements of counsel) or judgments of whatever kind and
nature, imposed upon, incurred by or asserted against the
Indemnitees (as defined therein) (collectively, the "Losses")
arising out of or based upon any allegation that any Offering
Material (as defined therein) or any information provided to
Merrill Lynch thereunder, in either case relating to the Bank or
its affiliated entities, includes an untrue statement of a
material fact or omits to state any material fact necessary to
make the statements therein, in light of the circumstances under
which they were made, not misleading, then the Bank shall
indemnify and hold harmless the System from and against such
Losses but only to the extent that any such Loss arises out of or
is based upon any statement or omission made in reliance upon and
in conformity with written information furnished to the System or
Merrill Lynch by the Bank expressly for use in any Offering
Material or any written information of the Bank or PNC Bank Corp
specifically incorporated by reference in the Offering Material;
provided that the System shall notify the Bank of any possible
claim against it pursuant to said Section 8, shall allow the Bank
the opportunity to participate in the defense of the same and
will not settle or compromise any such claim without the prior
written consent of the Bank.  Nothing in this Section is intended
to limit the reimbursement obligations of the System contained in
Section 2.02(a).  The obligations of the System under this
Section shall survive the termination of this Agreement.

    Section 2.06.  <u>Liability of Bank</u>.  As between the System and
the Bank, the System assumes all risks of the acts or omissions
of the Depositary or any of its agents with respect to the use of

PNC18697

AH-13687

148642

the Letter of Credit by the Depositary.  Neither the Bank nor any of its officers or directors shall be liable or responsible for (i) the use which may be made of the Letter of Credit or for any acts or omissions of the Depositary or any of its agents in connection therewith; (ii) the form, validity, sufficiency, accuracy or genuineness of any documents (including without limitation any documents presented under the Letter of Credit), or of any statement therein or endorsement thereon, even if any such documents, statements or endorsements should in fact prove to be in any or all respects invalid, insufficient, fraudulent, forged, inaccurate or untrue; (iii) the payment by the Bank against presentation of documents which do not comply with the terms of the Letter of Credit including failure of any documents to bear any reference or adequate reference to the Letter of Credit; or any other failure by the Depositary or any of its agents to comply fully with conditions required in order to effect a drawing under the Letter of Credit; (iv) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign the Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (v) errors, omissions, interruptions or delays in transmission or delivery of any messages by mail, cable, telegraph, telex, telephone or otherwise; (vi) any loss or delay in the transmission or otherwise of any document or draft required in order to make a drawing under the Letter of Credit; or (vii) any other circumstances whatsoever in making or failing to make payment under the Letter of Credit, except only that the System shall have a claim against the Bank, and the Bank shall be liable to the System, to the extent, but only to the extent, of any direct, as opposed to consequential, damages suffered by the System which the System proves were caused by (x) the Bank's willful misconduct or gross negligence or (y) the Bank's willful failure to pay under the Letter of Credit after the presentation to it by the Depositary of a draft and certificate strictly complying with the terms and conditions of the Letter of Credit, unless the Bank in good faith and upon advice of counsel believes that it is prohibited by law or other legal authority from making such payment.  In furtherance and not in limitation of the foregoing, the Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary.  Except for the Bank's obligations under the Letter of Credit, the Bank shall have no liability to the Obligated Group or any other person as a result of any reduction of the credit rating of the Bank or any deterioration in the Bank's financial condition, and the System hereby indemnifies and holds harmless the Bank from any and all claims, damages, losses, liabilities, costs or expenses relating to the Obligated Group or the Commercial Paper Notes which the Bank may incur in connection therewith.  No reduction of the credit rating of the Bank or deterioration in the Bank's financial condition shall reduce or in any way diminish the obligations of the System to the Bank under this Agreement, including without limitation the System's

PNC18698

- 12 -

AH-13088

145642

obligation to pay Letter of Credit commitment fees to the Bank
and to reimburse the Bank for any drawing under the Letter of
Credit.

Section 2.07. <u>Dealer Agreement</u>. The Bank acknowledges that
the System has agreed in Sections 4 and 5 of the Dealer Agreement
to cause the Bank to perform certain undertakings, and the Bank
hereby agrees to perform such undertakings in accordance with the
Dealer Agreement. In addition, the Bank agrees to the provisions
of Section 5 of the Dealer Agreement relating to the Bank.


ARTICLE III

SECURITY

Section 3.01. <u>Subrogation</u>. The System and the Bank intend
that, in the event of one or more draws under the Letter of
Credit and the application thereof to the payment of Commercial
Paper Notes, (i) the Bank will have the security and benefit of
the CP Documents as and to the extent provided therein and (ii)
the Bank will be subrogated pro tanto to the rights of the
Depositary in and to all funds and security held by the
Depositary thereunder for the payment of such Commercial Paper
Notes, including, without limitation, all debt service funds and
other funds and securities and other instruments comprising
investments thereof. In addition, the Bank shall have any and
all other subrogation rights available to the Bank at law or in
equity.

Section 3.02. <u>Pledge of Rights to Certain Funds and
Investments</u>. To secure the System's obligations to the Bank
under this Agreement, the System hereby pledges, assigns and
grants to the Bank a security interest in all of the System's
right, title and interest in and to (but not its duties or
obligations with respect to) all funds and investments thereof
now or hereafter held by the Depositary under the CP Documents as
security for the payment of the Commercial Paper Notes including,
without limitation, any and all debt service funds and other
funds and securities and other instruments comprising investments
thereof and interest and other income derived therefrom held as
security for the payment of the Commercial Paper Notes. The
Bank's rights under this Section are in addition to, and not in
lieu of, its rights described in Section 3.01 and are subject to
the prior rights of the Depositary and the holders of the
Commercial Paper Notes. The System covenants and agrees that it
will defend the Bank's rights and security interests created by
this Section against the claims and demands of all persons. In
addition to its other rights and remedies under this Agreement
and the CP Documents, the Bank shall have all the rights and
remedies of a secured party under the Uniform Commercial Code of
the Commonwealth of Pennsylvania or other applicable law with
respect to the security interests created by this Section.

PNC18699

- 13 -

148642

Section 3.03. <u>Financing Statements</u>. The System will execute such financing statements and continuation statements under the Uniform Commercial Code or other applicable law as the Bank may specify in connection with the Bank's security interests under this Agreement and will pay the costs of filing the same in such public offices as the Bank may designate.

Section 3.04. <u>Joint and Several Obligation</u>. Each Member of the Obligated Group by its execution of this Agreement or the Acknowledgment and Consent hereto acknowledges and agrees that it shall be jointly and severally liable for all obligations of the System hereunder.

ARTICLE IV

CONDITIONS PRECEDENT

Section 4.01. <u>Documentation</u>. As conditions precedent to the Bank's issuance of the Letter of Credit, the Bank shall have received all of the following in form and substance satisfactory to the Bank:

(a) An executed copy of this Agreement, the Master Notes and true and correct copies of executed copies of the other Related Documents and all documentation delivered in connection therewith;

(b) Certified copies of the Articles of Incorporation and the Bylaws of the System, and authorizing resolutions of the System;

(c) An opinion (or opinions) of counsel to the System and the other Members of the Obligated Group covering such matters relating to the transactions contemplated hereby or by the other Related Documents as the Bank may reasonably request;

(d) Receipt by the Bank of a copy of each opinion, certificate and other document (in each case addressed to it if so requested by the Bank) required to be delivered in connection with the due issuance and delivery of the Commercial Paper Notes;

(e) Audited consolidated financial statements of the Obligated Group for the Fiscal Year ended June 30, 1995 and unaudited consolidated financial statements of the Obligated Group for the nine months ended March 31, 1996 which include the information set forth in Section 5.11;

(f) Evidence of the insurance required under Section 6.03; and

(g) Receipt by the Bank of all other documents and opinions it may reasonably request relating to the existence of the Obligated Group, the authority of and the validity, binding

PNC18700

- 14 -

*AH- 13690*

143642

effect and enforceability of this Agreement and each other
Related Document and any other matters relevant hereto or
thereto, all in form and substance satisfactory to the Bank.

Section 4.02.  Issuance of Commercial Paper Notes.  On the
date of execution and delivery hereof, all conditions precedent
to the issuance and sale of the Commercial Paper Notes shall have
been satisfied and the Commercial Paper Notes shall have been
duly issued and delivered.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

The System, for itself and each other Member of the
Obligated Group, represents and warrants to the Bank as follows:

Section 5.01.  Existence.  Each Member of the Obligated
Group is a Pennsylvania nonprofit corporation, duly organized,
validly existing and in good standing under the laws of the
Commonwealth of Pennsylvania.  Each Member of the Obligated Group
has all necessary material permits, licenses, certifications and
qualifications to conduct its business as it is presently being
conducted.

Section 5.02.  Tax-exempt Organization.  Each Member of the
Obligated Group is an organization described in Section 501(c)(3)
of the Code, is exempt from federal income tax under Section
501(a) of the Code and is not a "private foundation" as defined
in Section 509(a) of the Code.

Section 5.03.  Power, Authorization and No Conflicts.  The
execution, delivery and performance by each Member of the
Obligated Group of this Agreement and the Related Documents to
which it is a party are within its powers, have been duly
authorized by all necessary action of the Boards of Trustees of
each Member of the Obligated Group and do not contravene the
Articles or Certificate of Incorporation or the Bylaws of the
Member of the Obligated Group or any Governmental Rule applicable
to such Member of the Obligated Group or any agreement or
contractual restriction binding on or affecting such Member of
the Obligated Group or any of its properties.

Section 5.04.  Governmental and Other Approvals.  No
authorization, approval or other action by, and no notice to or
filing with, any Governmental Person is required for the due
execution, delivery and performance by the Members of the
Obligated Group of this Agreement or any Related Document, except
such as have been obtained (including compliance with certificate
of need requirements, if any).

Section 5.05.  Validity and Binding Effect.  This Agreement
and the Related Documents to which it is a party are the legal,

PNC18701

- 15 -

AH-15691

148642

valid and binding obligations of each Member of the Obligated Group enforceable against each Member of the Obligated Group in accordance with their terms, subject to the application by a court of general principles of equity and to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally.

Section 5.06. <u>No Litigation</u>. Except as disclosed to the Bank in writing prior to the date of execution and delivery hereof, there is no pending action or proceeding before any Governmental Person or arbitrator against or directly involving a Member of the Obligated Group and, to the best of the System's knowledge, there is no threatened action or proceeding affecting any Member of the Obligated Group before any Governmental Person or arbitrator which, in any case, might materially and adversely affect its financial condition or operations or the validity or enforceability of this Agreement or any Related Document.

Section 5.07. <u>No Violations</u>. No Member of the Obligated Group is in any material way in breach of or in default under (a) any applicable law or administrative regulation of the Commonwealth of Pennsylvania or the United States or any applicable judgment or decree or (b) except as disclosed to the Bank in writing prior to the date of execution and delivery hereof, any loan agreement, indenture, lease, sublease, bond, note, resolution, agreement or other instrument to which it is a party or otherwise subject, and no event has occurred and is continuing which, with the passage of time or the giving of notice or both, would constitute an event of default under any such instrument except for violations, if any, which the System has disclosed to the Bank in writing and is proceeding in good faith to remove or correct or cause to be removed or corrected. The System has no knowledge of any violation, nor is there any notice or other record of any violation, of any Governmental Rule or restrictive covenant or other restriction applicable to the Facilities of each Member of the Obligated Group, except for violations, if any, which the System has disclosed to the Bank in writing and is proceeding in good faith to remove or correct or cause to be removed or corrected.

Section 5.08. <u>Compliance</u>. The operation of the Facilities of each Member of the Obligated Group does and shall, in all material respects, comply with, and are lawful, permitted and conforming uses under, all material applicable Governmental Rules.

Section 5.09. <u>No Liens</u>. There exist no Liens upon the Facilities of any Member of the Obligated Group other than Permitted Liens.

PNC18702

Section 5.10. <u>Third Party Reimbursement</u>.

(a) Each Member of the Obligated Group is duly authorized and licensed and certified to operate its Facilities

- 16 -

AH 13692

148642

and receive reimbursement therefor (to the extent reimbursement
is applicable and available) under the Governmental Rules of the
Commonwealth of Pennsylvania.

(b)   No Member of the Obligated Group has had or
expects to receive requests or assertions of claims for
reimbursement or repayment by such Member of the Obligated Group
of costs and/or payments heretofore made by any third party payor
which, if adversely determined, would result in any material
adverse change in the financial condition, operations or affairs
of such Member of the Obligated Group.

Section 5.11.  _Financial Information_.  The consolidated
balance sheet of the Obligated Group as at June 30, 1995 and as
at March 31, 1996 and the related consolidated statements of
revenues and expenses--general funds and changes in fund balances
and changes in financial position of such Members of the
Obligated Group for the Fiscal Year and the nine months then
ended, respectively, (a) have been prepared in accordance with
GAAP consistently applied, (b) with respect to the information as
at June 30, 1995, have been certified by Coopers & Lybrand,
Certified Public Accountants, (c) are true and complete and
present fairly the financial condition and results of operations
of the Members of the Obligated Group as of June 30, 1995 and as
at March 31, 1996 for the period covered thereby, and (d) said
balance sheet and the notes thereto accurately reflect all
liabilities, including contingent liabilities, of each Member of
the Obligated Group as of the date thereof.  Since April 1, 1996,
each of the Members of the Obligated Group has conducted its
operations in the ordinary course and there has been no material
adverse change in the financial condition, operations or affairs
of such Member of the Obligated Group.

Section 5.12.  _ERISA_.  With respect to each Plan, each
Member of the Obligated Group is in material compliance with the
applicable provisions of ERISA and the regulations and published
interpretations thereunder.

Section 5.13.  _Absence of Events of Default Under Master
Trust Indenture_.  No Event of Default, as that term is defined in
the Master Trust Indenture, has occurred and is continuing nor
has any event occurred which, with the giving of notice or lapse
of time, or both, would constitute an Event of Default
thereunder.

Section 5.14.  _Insurance_.  Each Member of the Obligated
Group currently maintains insurance which meets or exceeds the
requirements of Section 6.03 and such insurance is of such type
and in such amounts (or in excess of such amounts) as are
customarily carried by, and insures against such risks as are
customarily insured against by, health care facilities systems of
like size and character to each Member of the Obligated Group and
its Facilities.  Any reserves maintained by any Member of the
Obligated Group with respect to its self insurance programs have

PNC18703

AH- 13603

149642

been actuarially determined to provide reasonable reserves with
respect to the risks involved.

     Section 5.15.  <u>Incorporation of Representations and
Warranties by Reference</u>.  Each Member of the Obligated Group
hereby makes to the Bank the same representations and warranties
as are made by the Obligated Group and set forth in the other
Related Documents, which representations and warranties, as well
as the related defined terms contained therein, are hereby
incorporated by reference with the same effect as if each and
every such representation and warranty and defined term were set
forth herein in its entirety.  No amendment to such
representations and warranties or defined terms made pursuant
thereto shall be effective to amend such representations and
warranties and defined terms as incorporated by reference herein
without the consent of the Bank.

     Section 5.16.  <u>Disclosure</u>.  There is no fact known to the
System which materially adversely affects or in the future may
(so far as the System can now foresee) materially adversely
affect the financial condition, operations or affairs of any
Member of the Obligated Group which has not been set forth in
this Agreement or in the other documents, certificates and
statements furnished to the Bank by or on behalf of the Obligated
Group prior to the date of execution and delivery of this
Agreement in connection with the transactions contemplated
hereby.


                              ARTICLE VI

                          GENERAL COVENANTS

     So long as any amount is available under the Letter of
Credit or any amount is due and owing to the Bank hereunder, the
System covenants that, except to the extent the Bank shall
otherwise consent in writing, each of the following covenants
shall be performed and complied with by the System or party as
indicated:

     Section 6.01.  <u>Maintenance of Existence; Mergers</u>.  Each
Member of the Obligated Group (a) will maintain its existence,
rights, privileges and licenses and its right to do business in
the Commonwealth of Pennsylvania, (b) will not dissolve or
otherwise dispose of all or substantially all of its assets, (c)
unless permitted under the Master Trust Indenture and if such
action will not result in an Event of Default hereunder, will not
consolidate with or merge into another entity or permit one or
more other entities to consolidate with or merge into it;
provided, however, that any Member of the Obligated Group may
merge with or into any other Member of the Obligated Group, and
(d) will remain a member of the Obligated Group and not withdraw
therefrom without the prior written consent of the Bank.  To the
extent a consolidation, merger, disposition of assets or
withdrawal requires an instrument or opinion to be satisfactory

AH. 13694

148642

to the Master Trustee under the Master Trust Indenture, it is agreed that such instrument or opinion also must be satisfactory to the Bank.

Section 6.02.  Compliance with Governmental Rules, Etc. Each Member of the Obligated Group will comply in all material respects with all applicable Governmental Rules the noncompliance with which could materially and adversely affect its operations or condition, except for any such Governmental Rules which such Member of the Obligated Group is contesting in good faith by appropriate proceedings and the noncompliance with which during such contest would not materially and adversely affect the Member of the Obligated Group's operations or condition if the result of such contest is adverse to such Member of the Obligated Group.

Section 6.03.  Maintenance of Insurance.  Each Member of the Obligated Group will maintain or cause to be maintained such insurance as is required under the Master Trust Indenture and shall provide to Bank the same reports of the Insurance Consultant (as defined therein), Officer's Certificates (as defined therein) and any other information as is required to be provided to the Master Trustee (and within the same time period as is required) thereunder.

Section 6.04.  Compliance with Related Documents and Other Contracts.  Each Member of the Obligated Group will comply with all of its covenants and agreements under the Related Documents, as the same may hereafter be amended or supplemented from time to time (to the extent permitted herein), and comply with, or cause to be complied with, all material requirements and conditions of all contracts and insurance policies which relate to such Member of the Obligated Group or its Facilities.

Section 6.05.  Visitation Rights.  Each Member of the Obligated Group will, at any reasonable time and from time to time, permit the Bank or its agents or representatives to examine and make copies of and abstracts from the records, except for confidential patient information, and books of account of, and visit the properties of, such Member of the Obligated Group and to discuss its affairs, finances and accounts  with its officers and accountants.

Section 6.06.  Keeping of Books.  Each Member of the Obligated Group will keep proper books of record and account, in which full and correct entries shall be made of financial transactions and the assets and operations of such Member of the Obligated Group in accordance with GAAP.

Section 6.07.  Maintenance of Properties.  Each Member of the Obligated Group will maintain and preserve all of its Property in good working order and condition, ordinary wear and tear excepted; not permit, commit or suffer any waste of any of its Property; not use or permit the use of any of its Facilities for any unlawful purpose or permit any nuisance to exist thereon;

PNC18705

AH- 13605

143642

and not sell, lease, transfer or otherwise dispose of any
substantial part of its Property, except in the ordinary course
of its operations or except as permitted by the Master Trust
Indenture.

Section 6.08.  <u>Reporting Requirements</u>.  The Obligated Group
will furnish or cause to be furnished to the Bank the following:

(a)  as soon as available and in any event within 150
days after the end of each Fiscal Year a consolidated and
consolidating balance sheet of the Obligated Group as of the end
of such Fiscal Year and the related (i) consolidated and
consolidating statement of revenues and expenses and (ii)
consolidated statements of changes in fund balances and changes
in financial position, in each case for the year then ended,
setting forth in comparative form the corresponding figures for
the immediately preceding Fiscal Year, which shall be prepared
and audited by certified public accountants satisfactory to the
Bank and certified as fairly presenting the consolidated
financial position and the revenues and expenses and changes in
fund balances and changes in financial position for, the Fiscal
Year then ended, all in conformity with GAAP; together with a
certificate of the chief financial officer of the Obligated Group
(i) certifying that they fairly present the consolidated
financial condition of the Obligated Group at the end of, and the
results of operations of the Obligated Group for, such Fiscal
Year, setting forth calculations in detail satisfactory to Bank
demonstrating compliance with the provisions of Section 6.10(c)
hereof, and (ii) stating that no Event of Default, or event
which, with the giving of notice or lapse of time or both, would
constitute any Event of Default, has occurred and is continuing
or, if an Event of Default or such event has occurred and is
continuing, a statement as to the nature thereof and the action
which the Obligated Group proposes to take with respect thereto;
stating that such officer has reviewed the provisions of this
Agreement and the Related Documents and has made or caused to be
made under his supervision a review of the condition and
operations of the Members of the Obligated Group during the
period covered by such financial statements for the purpose of
determining whether or not each Member of the Obligated Group has
complied with all of the terms, provisions and conditions of this
Agreement and the Related Documents applicable to it, and to the
best of his knowledge each Member of the Obligated Group has
kept, observed, performed and fulfilled each and every covenant,
provision and condition of this Agreement and the Related
Documents on its part to be performed and is not in default in
the performance or observance of any of the terms, covenants,
provisions or conditions hereof or thereof, or, if there is a
default, such certificate shall specify all such defaults, the
nature and status thereof and any remedial steps taken or
proposed to correct such default;

(b)  as soon as available and in any event within 60
days after the end of the first three quarters of each Fiscal

PNC18706

AH- 13696

Year, a consolidated and consolidating balance sheet of the Obligated Group as of the end of such quarter and the related (i) consolidated and consolidating statement of revenues and expenses and (ii) consolidated statements of changes in fund balances and changes in financial position, in each case for the quarter then ended, setting forth in comparative form the corresponding figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, together with a certificate of the chief financial officer of the Obligated Group (i) certifying that they fairly present the consolidated financial condition of the Obligated Group at the end of such quarter and the results of the operations of the Obligated Group for such periods (subject to normal year-end audit adjustments) and have been prepared in accordance with GAAP, (ii) setting forth calculations in detail satisfactory to Bank demonstrating compliance with the provisions of Section 6.10(c) hereof, and (iii) stating that no Event of Default, or event which, with the giving of notice or lapse of time or both, would constitute any Event of Default, has occurred and is continuing or, if an Event of Default or such event has occurred and is continuing, a statement as to the nature thereof and the action which the Member of the Obligated Group proposes to take with respect thereto;

(c)    from time to time upon Bank's request, any Member of the Obligated Group's internally prepared balance sheets and statements of income and expenditures reasonably accurately reflecting the financial condition of such Member of the Obligated Group;

(d)    upon receipt by any Member of the Obligated Group, copies of any letter or report with respect to the management, operations or facilities of such Member submitted to it by its accountants in connection with any annual or interim audit by such Member's accounts, and a copy of any written response of such Member of the Obligated Group to any such letter or report;

(e)    as soon as available and in any event within 30 days after the close of each Fiscal Year of each Member of the Obligated Group, each Member of the Obligated Group's budget and projection of cash flow for the next Fiscal Year, prepared in form and detail satisfactory to the Bank and approved by the Board of Trustees of the Members of the Obligated Group;

(f)    as soon as available and in any event within 150 days after the close of each Fiscal Year, utilization statistics of each Member of the Obligated Group as the Bank may reasonably request including, but not limited to, the number of licensed beds, the average daily patient census and the patient payor mix at each of its Facilities;

(g)    promptly upon obtaining knowledge thereof, written notice of the commencement or threat of any litigation, arbitration or governmental proceeding against any Member of the

PNC18707

- 21 -

AH- 13697

148642

Obligated Group, or any governmental investigation or labor dispute pending or threatened against any Member of the Obligated Group, which could reasonably be expected to interfere substantially with its usual operations or materially adversely affect its financial condition, business or operations;

(h)  from time to time such additional information regarding the business, properties or the condition or operations, financial or otherwise, of any Member of the Obligated Group as the Bank may reasonably request;

(i)  as soon as possible and in any event (i) within 5 days after the occurrence of an Event of Default, (ii) within 30 days of becoming aware of the same, an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default, or (iii) a material adverse change in the condition, financial or otherwise, or operations of any Member of the Obligated Group, a written statement of an officer of the Obligated Group setting forth the details of such Event of Default, event or material adverse change and the action which such Member of the Obligated Group proposes to take, with respect thereto;

(j)  (i) as soon as possible and in any event (1) within 30 days after any Member of the Obligated Group knows or has reason to know that any Termination Event described in clause (i) of the definition of Termination Event with respect to any Plan has occurred, and (2) within 10 days after any Member of the Obligated Group knows or has reason to know that any other Termination Event with respect to any Plan has occurred, a statement of the chief financial officer of the Obligated Group describing such Termination Event and the action, if any, which such Member of the Obligated Group proposes to take with respect thereto, and (ii) promptly and in any event within two Business Days after receipt thereof by any Member of the Obligated Group from the PBGC, copies of each notice received by any Member of the Obligated Group of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan;

(k)  promptly after the incurrence by any Member of the Obligated Group of Long-Term Indebtedness in excess of $10,000,000 certificates and reports substantially similar to those required pursuant to Section 4.2 of the Master Trust Indenture; and

(l)  simultaneously with deliveries required under the Master Trust Indenture, deliver or cause to be delivered copies of all reports, notices, certificates, opinions and other documents required to be delivered under the Master Trust Indenture on behalf of the Obligated Group or any Member of the Obligated Group.

Section 6.09.  <u>Amendments to CP Documents or Master Trust Indenture</u>.  Neither the System nor any Member of the Obligated

PNC18708

- 22 -

AH- 13698

148642

Group will consent to or enter into any amendment of or
supplement to the CP Documents or the Master Trust Indenture
without the prior written consent of the Bank; provided, however,
that amendments of or supplements to the Master Trust Indenture
for the purposes described in Sections 9.1(a)(i), 9.1(a)(ii),
9.1(a)(v), 9.1(a)(vi) and 9.1(a)(vii) of the Master Trust
Indenture shall not require the prior written consent of the Bank
(but the form of such amendments or supplements shall be provided
to the Bank at least 10 days prior to the execution and delivery
thereof).

Section 6.10.  <u>Financial Covenants</u>.

(a)  No Member of the Obligated Group will create,
incur, assume or permit to exist any Lien upon any of its
Facilities, other than Permitted Liens.

(b)  The Members of the Obligated Group agree that the
provisions of the First Supplemental Master Trust Indenture shall
be for the benefit of the Bank as well as for the Bond Insurer
and, accordingly, the representations, warranties, covenants and
agreements contained in the Master Trust Indenture, as so
supplemented, are incorporated herein by reference for the
benefit of the Bank.

(c)  Beginning September 30, 1996, and measured on a
rolling four quarter basis on each December 31, March 31, June 30
and September 30 thereafter, the Members of the Obligated Group
shall maintain a Liquidity Ratio as set forth below.  As used
herein, "Liquidity Ratio" means, with respect to the Obligated
Group taken as a whole, the ratio of (i) the sum of (a) cash and
short-term investments, plus (b) assets restricted as to use by
the Boards of Trustees to (ii) the sum of (a) the current
maturities of Long-Term Indebtedness (as defined in the Master
Trust Indenture) for the succeeding 12 months, plus (b) interest
expense for the preceding 12 months, all as determined in
accordance with GAAP.

| Period | Liquidity Ratio |
| --- | --- |
| Fiscal Year 1997 | 1.75 to 1.00 |
| Fiscal Year 1998 and thereafter | 2.00 to 1.00 |

(d)  (1)  No Member of the Obligated Group shall sell
its accounts receivable except on an arms length basis and if
immediately following such sale the Members of the Obligated
Group shall not be in violation of any covenant, representation
or warranty hereunder.

(2)  The phrase "with or without recourse" shall
be substituted for the phrase "with recourse" wherever it occurs
in subparagraph (f) of Section 4.2 of the Master Trust Indenture.

PNC18709

- 23 -

AH-13600