148642

Annex 4
to Irrevocable
Letter of Credit
No. A-308180

CERTIFICATE OF NO ISSUANCE NOTICE
UNDER THE DEPOSITARY AGREEMENT

TO:   PNC Bank, National Association,
        as Depositary
      Corporate Trust Department
      One Oliver Plaza, 27th Floor
      Pittsburgh, PA  15222
      Attention: Fred Deramo, Vice President

      Re:   Irrevocable Letter of Credit No. A-308180

      The undersigned hereby certifies to PNC Bank, National
Association, as Depositary (the "Depositary"), with reference to
Irrevocable Letter of Credit No. A-308180 (the "Letter of
Credit") issued by PNC Bank, National Association (the "Bank") in
favor of the Depositary and for the account of Allegheny
University Hospitals (the "Account Party"), that an Event of
Default has occurred and is now continuing under the Letter of
Credit, Reimbursement and Security Agreement dated as of June 1,
1996 (the "Reimbursement Agreement"), between the Bank and the
Account Party so that the Commitment Amount of the Letter of
Credit shall not be reinstated.  The Bank further instructs the
Depositary to cease issuing Commercial Paper Notes because the
issuance of Commercial Paper Notes is prohibited by the
provisions of Section 4(e) of the Depositary Agreement.

      IN WITNESS WHEREOF, the Bank has executed and delivered this
Certificate as of the ___ day of _____, ____.

                        PNC BANK, NATIONAL ASSOCIATION


                        By:_____
                        Title:

PNC18735

148642

Annex 5<br>
to Irrevocable<br>
Letter of Credit<br>
No. A-308180

## CERTIFICATE NOTIFYING DEPOSITARY OF
EVENT OF DEFAULT UNDER REIMBURSEMENT AGREEMENT

TO:

PNC Bank, National Association,
    as Depositary
Corporate Trust Department
One Oliver Plaza, 27th Floor
Pittsburgh, PA  15222
Attention: Fred Deramo, Vice President

    Re:   Irrevocable Letter of Credit No. A-308180

    The undersigned hereby (i) certifies to PNC Bank, National Association, as Depositary (the "Depositary"), with reference to Irrevocable Letter of Credit No. A-308180 (the "Letter of Credit") issued by PNC Bank, National Association (the "Bank") in favor of the Depositary and for the account of Allegheny University Hospitals (the "Account Party"), that an Event of Default has occurred and is now continuing under the Letter of Credit, Reimbursement and Security Agreement dated as of June 1, 1996, between the Bank and the Account Party and (ii) instructs the Depositary to make a drawing under the Letter of Credit in an amount equal to the aggregate amount required to pay the aggregate face amount of all Outstanding Commercial Paper Notes. The Bank further notifies the Depositary that (i) pursuant to paragraph 7 of the Letter of Credit, any now outstanding reductions in the Commitment Amount of the Letter of Credit on account of payment of Commercial Paper Notes at maturity will not be reinstated and (ii) pursuant to paragraph 8(ii)(C) of the Letter of Credit, the Letter of Credit will terminate effective the fifteenth calendar day next following the receipt by the Depositary of this Certificate.  Upon the termination of the Letter of Credit, the Bank has no obligation to, and will not, honor demands for payment thereunder.

    IN WITNESS WHEREOF, the Bank has executed and delivered this Certificate as of the ___ day of _____, ____.

PNC BANK, NATIONAL ASSOCIATION,<br>
as issuer of the Letter of Credit<br><br><br>
By:_____<br>
Title:

PNC18736

AH- 13726

148642

Annex 6
to Irrevocable
Letter of Credit
No. A-308180

CERTIFICATE EVIDENCING EXTENSION OF
LETTER OF CREDIT STATED EXPIRATION DATE

TO:   PNC Bank, National Association,
      as Depositary
      Corporate Trust Department
      One Oliver Plaza, 27th Floor
      Pittsburgh, PA  15222
      Attention: Fred Deramo, Vice President

      Re:  Irrevocable Letter of Credit No. A-308180

      The undersigned hereby certifies to PNC Bank, National
Association, as Depositary (the "Depositary"), with reference to
Irrevocable Letter of Credit No. A-308180 (the "Letter of
Credit") issued by PNC Bank, National Association (the "Bank") in
favor of the Depositary and for the account of Allegheny
University Hospitals (the "Account Party"), that, at the request
of the Account Party, the Bank has agreed to extend the Stated
Expiration Date of the Letter of Credit from _____ to
_____.   This Certificate should be attached to the
Letter of Credit.

      IN WITNESS WHEREOF, the Bank has executed and delivered this
Certificate as of the _____ day of _____, ____.

                              PNC BANK, NATIONAL ASSOCIATION


                              By:_____
                              Title:

PNC18737

AH- 13727

148642

Annex 7
to Irrevocable
Letter of Credit
No. A-308180


FORM OF TRANSFER LETTER


_____, _____


TO:   PNC Bank, National Association
      3rd Floor Annex
      237 Fifth Avenue
      Pittsburgh, PA  15222
      Attention: Letter of Credit Department


      Re:  Irrevocable Letter of Credit No. A-308180

Ladies and Gentlemen:

     For value received, the undersigned beneficiary hereby
irrevocably transfers to:

      (Name of Transferee)
      (Address)

all rights of the undersigned beneficiary to make demands for
payment under the above-referenced transferable letter of credit
(the "Letter of Credit") in its entirety.  Said transferee has
succeeded the undersigned beneficiary as Depositary under the
Depositary Agreement dated as of June 1, 1996 among Allegheny
University Hospitals and the undersigned pursuant to which
Allegheny University Hospitals may issue and sell up to
$54,194,000 aggregate face amount of its Commercial Paper Notes
outstanding at any one time.

     By this transfer, all rights of the undersigned beneficiary
in the Letter of Credit are transferred to the transferee and the
transferee shall have the sole rights as beneficiary thereof,
including sole rights relating to any amendments (whether
increases or extensions or other amendments) of the Letter of
Credit and whether now existing or hereafter made.  All
amendments of the Letter of Credit are to be advised directly to
the transferee without the necessity of any consent of or notice
to the undersigned beneficiary.

PNC18738

AH- 13728

148642

The Letter of Credit is returned herewith.  We ask that you endorse the transfer on the reverse side of the Letter of Credit and forward the Letter of Credit directly to the transferee with your customary notice of transfer.

Signature Authenticated:                Very truly yours,

                                        PNC BANK, NATIONAL ASSOCIATION,
                                        as Depository
_____
(Bank)

                                        By:_____
_____            Title:
(Authorized Signature)


Signature Authenticated:                **[NAME OF TRANSFEREE]**, as
                                        Depository
_____
(Bank)

                                        By:_____
_____            Title:
(Authorized Signature)

PNC18739

AH- 13729

**EXHIBIT  0347**

EXECUTION COPY

## AMENDMENT NO. 1 TO
## REIMBURSEMENT AND SECURITY AGREEMENT

AMENDMENT dated as of *Jun 1*, 1997 to the Reimbursement and Security Agreement dated as of April 1, 1995 (the "**Agreement**") among ALLEGHENY GENERAL HOSPITAL (AGH), Allegheny-Singer Research Institute (ASRI), and MORGAN GUARANTY TRUST COMPANY OF NEW YORK, as Bank (the "**Bank**").

### W I T N E S S E T H :

WHEREAS, the parties hereto have heretofore entered into the Agreement; and

WHEREAS, the parties hereto desire to amend the Agreement as provided herein.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1. *Definitions; References.* Unless otherwise specifically defined herein, each term used herein which is defined in the Agreement has the meaning assigned to such term in the Agreement. Each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Agreement shall, after this Amendment becomes effective, refer to the Reimbursement and Security Agreement as amended hereby.

SECTION 2. *Amendment to Section 7(b)(i) of the Agreement.* The reference to "66 2/3%" in Section 7(b)(i) of the Agreement is amended to read "63%."

SECTION 3. *Amendment to Section 7(b)(ii) of the Agreement.* The reference to "$200,000,000" in Section 7(b)(ii) of the Agreement is amended to read "$160,000,000."

(NY) /dpw-cw/028/27039/061/RSA/amend

DEPOSITION
EXHIBIT

347

AKF

REC'D MAY 9 1997

PNC11239

SECTION 4  *Amendment to Section 7(d)(A) of the Agreement.*  The reference to "1 20" in Section 7(d)(A) of the Agreement is amended to read "1 30."

SECTION 5  *Governing Law*  This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

SECTION 6.  *Effectiveness.*  This Amendment shall become effective as of the date hereof on the date when the parties hereto have executed this Amendment.

(NY) /dpw/cw/028/27009/061/RSA/amend

2

PNC11240

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written

ALLEGHENY GENERAL HOSPITAL

By: _____

Title: Treasurer

ALLEGHENY-SINGER RESEARCH INSTITUTE

By: _____

Title: Treasurer

MORGAN GUARANTY TRUST COMPANY
OF NEW YORK

By: _____

Title: Vice President

(NY) /dpw/cw/028/27099/061/RSA/amend

3

PNC11241

**EXHIBIT  0413**

FROM                               (FRI) 9. 12' 97 12:42/ST. 12:20/NO. 4860068124 P  1

## FOLEY LARDNER WEISSBURG & ARONSON
Suite 3300
One IBM Plaza
330 North Wabash Avenue
Chicago, Illinois 60611-3608
Telephone (312) 755-1900
Facsimile (312) 755-1925

**DATE:**             September 12, 1997

**TO:**               Mike Martin
                      Sue Gilbert

**COMPANY:**          Allegheny Health, Education and
                      Research Foundation

**FAX NO:**           (412) 442-2290

**FROM:**             Becky B. Serafini

**CLIENT/MATTER NO:**   032234-0108

**PAGES (including this page):** 28

**MESSAGE (if any):**     Attached please find our memorandum regarding financial
                          statement requirements which has been revised to include an
                          "action plan" for each agreement.

NOTE TO FACSIMILE OPERATOR:
IF YOU DID NOT RECEIVE ALL OF THE PAGES, CONTACT US IMMEDIATELY.

### NOTE TO ALL RECIPIENTS:

The information contained in this facsimile message is attorney privileged and confidential information intended
for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, or
the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this fax
in error, please immediately notify us by telephone, and return the original message to us at the above address via
the U.S. Postal Service.

Fax Operator _____



DEPOSITION
EXHIBIT
4/3
AKF

PR-PRIV-EXECS
014357

# FOLEY LARDNER
# WEISSBURG & ARONSON

ATTORNEYS AT LAW

| | | |
|---|---|---|
| CHICAGO | ONE IBM PLAZA | SAN FRANCISCO |
| JACKSONVILLE | SUITE 3300 | TALLAHASSEE |
| LOS ANGELES | 330 NORTH WABASH AVENUE | TAMPA |
| MADISON | CHICAGO, ILLINOIS 60611-3608 | WASHINGTON D.C. |
| MILWAUKEE | TELEPHONE (312) 755-1700 | WEST PALM BEACH |
| ORLANDO | FACSIMILE (312) 755-1925 | |
| SACRAMENTO | | LEON FOLEY (1894-1970) |
| SAN DIEGO | WRITER'S DIRECT LINE | LYNFORD LARDNER, JR. (1915-1973) |

## MEMORANDUM

TO:        Michael Martin                    CC: Robert Zimmerman
           Susan Gilbert

FROM:      Becky Serafini
           Joel Dalinka

DATE:      September 11, 1997

RE:        Financial Statement Requirements and Action Plan

---

## I.  GRADUATE HEALTH SYSTEM AFFILIATES

A.    Master Trust Indenture

(1)  Section 6.6.  Filing of Financial Statements, Certificates of No Default, Other Information.  Each Obligated Issuer covenants that it will:

(a)        as soon as practicable but in no event later that five months after the close of the Fiscal Year, file, or cause to be filed, with the Master Trustee and, if such Persons are then providing a rating with respect to Obligations or any Related Bonds, with each Rating Agency, (i) a combined or consolidated revenue and expense statement of Graduate, Mt. Sinai and each other Obligated Issuer for such Fiscal Year and (ii) combined or consolidated balance sheet of Graduate, Mt. Sinai and each other Obligated Issuer as of the end of such Fiscal Year, each accompanied by the certificate or opinion of an Accountant;

(b)        as soon as practicable but in no event later than five months after the end of each Fiscal Year, file with the Master Trustee, an Accountant's Letter stating that the Historical Debt Service Coverage Ratio for such Fiscal Year, stating the ratio determined by dividing the Total Income Available for Debt Service for such Fiscal Year by the Maximum Annual Debt Service for such Fiscal Year, and an Officer's Certificate of the Obligated Group Agent stating whether or not to the best knowledge of the signer, any

ESTABLISHED 1842

A MEMBER OF GLOBALEX WITH MEMBER OFFICES IN BERLIN, BRUSSELS, DRESDEN, FRANKFURT, LONDON, PARIS, SINGAPORE, STUTTGART AND TAIPEI

PR-PRIV-EXECS
014358

Michael Martin
Susan Gilbert
September 11, 1997
Page 2

Obligated Issuer is in default in the performance of any covenant contained in this Indenture, and, if so, specifying each such default of which the signer may have knowledge.

"Fiscal Year" means a period of twelve consecutive months ending on June 30 or on such other date as may be specified in an Officer's Certificate of the Obligated Group Agent executed and delivered to the Master Trustee; for purposes of combination or consolidation of financial information, with respect to any Obligated Issuer whose actual fiscal year is different from that designated by the Obligated Group Agent, the actual fiscal year or such Obligated Issuer which ended within the Fiscal Year so designated shall be used.

**B.    Third Supplemental (Master) Indenture**

(1)    Section 4.1.  Reports.  The Obligated Group covenants that it will file with the Master Trustee and the 1991/1993 Bond Trustee:

(a)    as soon as is practicable but in no event later than five months after the close of each Fiscal Year, the audited financial statements of the Obligated Group described in Section 6.6(a) of the Master Indenture;

(b)    as soon as is practicable but in no event later than five months after the close of each Fiscal Year, annual audited financial statements for each Obligated Issuer;

(c)    as soon as is practicable but in no event later than five months after the close of each Fiscal Year, annual audited financial statements of Graduate Health Systems, Inc;

(d)    as soon as is practicable but in no event later than 60 days after the close of each quarter, quarterly unaudited financial statements of the Obligated Group and of each Obligated Issuer.

**ACTION PLAN:**  During the month of September 1997, AHERF will send to the Master Trustee the following:

(a)    A letter stating that:

(i)    for fiscal year 1997, AHERF will deliver to the Master Trustee sometime in November 1997:  (1) the AHERF consolidated audit (with footnotes) for fiscal year 1997 only, including unaudited schedules (without footnotes) setting forth the Obligated Group's balance sheet, statement of operations, statement of changes in net assets and statement

PR-PRIV-EXECS
014359

FROM                                    (FRI) 9. 12' 97 12:44/ST. 12:20/NO. 4860068124 P  4

Michael Martin
Susan Gilbert
September 11, 1997
Page 3

of cash flows for the two months ended May 31, 1997 and June 30, 1997 and (2) the accountants' report on the AHERF audit only; and

(ii)     for all subsequent fiscal years, AHERF will deliver to the Master Trustee: (1) the AHERF consolidated audit (with footnotes) for the most recently completed fiscal year (the "AHERF Audit"), including unaudited schedules setting forth the Obligated Group's balance sheet, statement of operations, statement of changes in net assets and statement of cash flows for the most recently completed fiscal year (the "Schedules"), (2) the accountants' report on the AHERF Audit and (3) the Obligated Group Agent's no-default certificate.

(b)     The Obligated Group's balance sheet and statement of operations for the 12 months ended June 30, 1997 prepared by management.

(c)     A schedule demonstrating management's calculation of the historical debt service coverage ratio and the maximum annual debt service coverage ratio for the 12 months ended June 30, 1997.  (These ratios will be negative.)

(d)     An agreed-upon procedures letter from the accountants with respect to management's calculation of the above-described ratios.

(e)     Subject to the next succeeding subparagraph, the above-described letter will also state that the Obligated Group has retained Coopers & Lybrand as its Consultant pursuant to Section 6.3 of the Master Indenture ("Rates and Charges") as a result of the Obligated Group's failure to satisfy its historical debt service coverage ratio covenant, and that, by virtue of the Obligated Group's having retained a Consultant, no Event of Default has occurred under Section 7.1(a)(ii). (Section 7.1(a)(ii) provides that, in order for an Event of Default, other than a payment or bankruptcy default, to have occurred, the Master Trustee must give notice thereof to the Obligated Group and 30 days must have elapsed from the giving of such notice, but that no Event of Default shall be deemed to have occurred even if the Master Trustee gives such notice and the default is not cured within such 30-day period as long as (i) the nature of the default is such that it cannot be cured with such 30-day period and (ii) the defaulting Obligated Issuer takes actions to remedy the default within such 30-day period and diligently pursues the completion of such actions.) The debt service coverage ratio default is the kind of default which cannot be remedied within a 30-day period, and the Obligated Group has taken the action required by Section 6.3 by retaining a

PR-PRIV-EXECS
014360

Michael Martin
Susan Gilbert
September 11, 1997
Page 4

Consultant. So even if the Master Trustee gave a default notice under Section 7.1(a)(ii), it would not become an Event of Default.

**NOTE, HOWEVER, THAT:** It has been suggested that, rather than agreeing to appoint a Consultant in the first instance, AHC request that the Master Trustee waive Section 6.3's requirement for the appointment of a Consultant upon failure to maintain a coverage ratio of not less than 1.10 times and acknowledge that, on the basis of actions being taken by AHC to remedy the default, no Event of Default be deemed to have occurred in accordance with the proviso to Section 7.1(a)(ii). If the Master Trustee is unwilling to give such waiver and acknowledgment, AHC would appoint a Consultant at that point.

(f)    The letter will ask the Master Trustee to sign the statement of acceptance at the end of the letter, evidencing its acceptance of the matters set forth in or enclosed with the letter. (Coopers & Lybrand has conditioned the release of its audit report upon AHERF's securing such acceptance from the various trustees, banks and lenders to which AHERF affiliates are obligated to deliver audited financial statements in a form different than the consolidated audit.)

**NOTE THAT:** If AHERF decides to ask for the waiver and acknowledgment described in subparagraph (e) above, the letter will also ask the Master Trustee to waive the requirement for the appointment of a Consultant and to acknowledge that, on the basis of actions being taken by AHC to remedy the default, no Event of Default shall be deemed to have occurred in accordance with the proviso to Section 7.1(a)(ii).

**ACTION TAKEN:**


**STATUS:**


C.    Master Financing Agreement dated as of December 7, 1995 among HHEFAP, Allegheny Hospitals, Centennial ("AHC"), as successor to The Graduate Hospital, and GE Capital Corporation ("GECC")

(1)    Section 6.05.  Reporting Requirements.  Obligor will deliver, or cause to be delivered, to Lender and Issuer each of the following, which shall be in form and detail acceptable to Lender and Issuer:

PR-PRIV-EXECS
014361

FROM                          (FRI) 9. 12' 97 12:45/ST. 12:20/NO. 4860068124 P 6

Michael Martin
Susan Gilbert
September 11, 1997
Page 5

     (a)    as soon as available, and in any event within 150 days after the end of each fiscal year of Obligor, audited financials of Obligor with the unqualified opinion of independent certified public accountants selected by Obligor and acceptable to Lender and not unsatisfactory to Issuer, which annual financial statements shall include the balance sheet of Obligor as at the end of such fiscal year and the related statements of income, retained earnings and cash flows of Obligor for the fiscal year then ended, all in reasonable detail and prepared in accordance with GAAP applied on a basis consistent with the accounting practices applied in the financial statements referred to in Article II hereof, together with (i) a report signed by such accountants stating that in making the investigations necessary for said opinion they obtained no knowledge, except as specifically stated, of any Default or Event of Default hereunder and (ii) a certificate of the chief financial officer of Obligor stating that such financial statements have been prepared in accordance with GAAP applied on a basis consistent with the accounting practices reflected in the annual financial statements referred to in Article II hereof and whether or not such officer has knowledge of the occurrence of any Default or Event of Default hereunder and, if so, stating in reasonable detail the facts with respect thereto;

     (b)    as soon as available and in any event within 60 days after the end of each fiscal quarter of Obligor, an unaudited/internal balance sheet and statements of income and retained earnings of Obligor as of the end of and for such month and for the year to date period then ended, in reasonable detail and stating in comparative form the figures for the corresponding date and period in the previous year, all prepared in accordance with GAAP applied on a basis consistent with the accounting practices applied in the financial statements referred to in Article II hereof and certified by the CFO of Obligor, subject to year-end audit adjustments; and accompanied by a certificate of that officer stating (i) that such financial statements have been prepared in accordance with GAAP applied on a basis consistent with the accounting practices reflected in the financial statements referred to in Article II hereof and (ii) whether or not such officer has knowledge of the occurrence of any Default or Event of Default hereunder not theretofore reported and remedied and, if so, stating in reasonable detail the facts with respect thereto.

**ACTION PLAN:** During the month of September 1997, AHERF will send to GECC and HHEFAP the following:

     (a)    A letter stating that:

         (i)    for fiscal year 1997, AHC will deliver to GECC and HHEFAP sometime in November 1997: (1) the AHERF audit for fiscal year 1997, including schedules setting forth AHC's balance sheet, statement of operations, statement of changes in net assets and statement

PR-PRIV-EXECS
014362

Michael Martin
Susan Gilbert
September 11, 1997
Page 6

of cash flows for the two months ended May 31, 1997 and June 30, 1997,
(2) AHC's balance sheet and statement of operations for the 12 months
ended June 30, 1997 prepared by management, (3) the accountants' report
on the AHERF audit, (4) the accountants' no-default certificate as to the
Master Financing Agreement and (5) AHC's no-default certificate as to
the Master Financing Agreement;

(ii)     for all subsequent fiscal years, AHERF will deliver to
GECC and HHEFAP: (1) the AHERF Audit, including the AHC
Schedules for the most recently completed fiscal year, (2) the accountants'
report on the AHERF Audit, (3) the accountants' no-default certificate as
to the Master Financing Agreement and (4) AHC's no-default certificate
as to the Master Financing Agreement; and

(iii)     for each of AHC's first three fiscal quarters, AHC's
balance sheet, statement of operations [, statement of changes in net
assets and statement of cash flows?] prepared by management, stating
in comparative form the figures for the corresponding date and period in
the previous year (the "Quarterly Statements"), together with a certificate
of the CFO of Obligor, stating (a) that such financial statements fairly
present the financial condition of AHC as of the end of such fiscal quarter
and (b) whether or not such officer has knowledge of the occurrence of
any Default or Event of Default under the Master Financing Agreement
not theretofore reported and remedied and, if so, stating in reasonable
detail the facts with respect thereto.

(f)     The letter will ask GECC and HHEFAP to sign the statement of
acceptance at the end of the letter, evidencing their acceptance of the matters set
forth in the letter.

### ACTION TAKEN:

### STATUS:

PR-PRIV-EXECS
014363

FROM                                    (FRI) 9.12'97 12:47/ST. 12:20/NO. 4860068124 P  8

Michael Martin
Susan Gilbert
September 11, 1997
Page 7

**D.**    **TGH/OMEGA Pepper Pavilion Operating Lease (dated October 27, 1993)**

   (1)    Section 13 provides that:

            (C)    Within 120 days after the end of each fiscal year, Tenant shall
      furnish to Omega its financial statements for such fiscal year, prepared by Tenant
      in accordance with GAAP, consistently applied, and audited by an independent
      accounting firm which is reasonably acceptable to OMEGA.  In addition, such
      financial statement shall be certified as true and correct by the CFO of Tenant.
      During the term of this Operating Lease, the fiscal year of the Tenant shall be
      from July 1 to June 30 or such other fiscal year as Tenant shall employ, but if
      Tenant changes its fiscal year to a calendar year, then the financial information
      required under the preceding sentence shall be furnished within 90 days after the
      end of such fiscal year.

            Within 45 days after the end of each of the first three quarters of each
      fiscal year, Tenant shall furnish to OMEGA its management-prepared financial
      statement for such fiscal quarter in a form that is reasonably acceptable to
      OMEGA.

      **ACTION PLAN:**  During the month of September 1997, AHERF will send to Omega
      the following:

            (a)    A letter stating that:

                  (i)    for fiscal year 1997, AHERF will deliver to Omega
            sometime in November 1997: (1) the AHERF audit for fiscal year 1997,
            including schedules setting forth AHC's balance sheet, statement of
            operations, statement of changes in net assets and statement of cash flows
            for the two months ended May 31, 1997 and June 30, 1997, (2) AHC's
            balance sheet and statement of operations for the 12 months ended
            June 30, 1997 prepared by management, (3) the accountants' report on the
            AHERF audit and (4) a certificate of the CFO of AHC that the financial
            statements are true and correct;

                  (ii)    for all subsequent fiscal years, AHERF will deliver to
            Omega: (1) the AHERF Audit, including the AHC Schedules, (2) the
            accountants' report on the AHERF Audit and (3) a certificate of the CFO
            of AHC that the financial statements are true and correct; and

PR-PRIV-EXECS
014364

Michael Martin
Susan Gilbert
September 11, 1997
**Page 8**

        (iii)   for each of AHC's first three fiscal quarters, AHC's Quarterly Statements, together with a certificate of the CFO of Obligor, stating that such financial statements fairly present the financial condition of AHC as of the end of such fiscal quarter.

        (b)   The letter will ask Omega to sign the statement of acceptance at the end of the letter, evidencing its acceptance of the matters set forth in the letter.

**ACTION TAKEN:**

**STATUS:**

**E.**    **TGH/OMEGA 1700 South Street Parking Garage Operating Lease**

(1)   Section 13 provides that:

        (C)   Within 120 days after the end of each fiscal year, Tenant shall furnish to Omega its financial statement for such fiscal year, prepared by Tenant in accordance with GAAP, consistently applied, and audited by an independent accounting firm which is reasonably acceptable to OMEGA.  In addition, such financial statement shall be certified as true and correct by the CFO of Tenant. During the term of this Operating Lease, the fiscal year of the Tenant shall be from July 1 to June 30 or such other fiscal year as Tenant shall employ, but if Tenant changes its fiscal year to a calendar year, then the financial information required under the preceding sentence shall be furnished within 90 days after the end of such fiscal year.

        Within 45 days after the end of each of the first three quarters of each fiscal year, Tenant shall furnish to OMEGA its management-prepared financial statement for such fiscal quarter, in a form that is reasonably acceptable to OMEGA.

**ACTION PLAN:** Same as for Pepper Pavilion Operating Lease.

Michael Martin
Susan Gilbert
September 11, 1997
Page 9

## II.  FORBES HEALTH SYSTEM

**A.     Master Trust Indenture**

(1)     Section 7.10.  <u>Filing of Financial Statements; Certificate of No Default, Other Information</u>.  Each Obligated Issuer shall:

(a)     as soon as practicable but in no event later than five months after the end of each of its fiscal years, file with the Master Trustee (and combined or consolidated financial statements if appropriate under GAAP) of the Obligated Issuer (or of any consolidated group of companies of which Obligated Issuer is a member) prepared in accordance with GAAP as of the end of such fiscal year, each as examined and reported on by an Independent Public Accountant;

(b)     as soon as practicable but in no event later than five months after the end of each fiscal year, to file with the Master Trustee an Officer's Certificate and a certificate of Independent Public Accountants stating whether to the best knowledge of the signers such Obligated Issuer is in default in the performance of any covenant contained in this Indenture and if so specifying each such default of which the signers may have knowledge.

**B.     Original Sublease**

(1)     Section 8.02.  <u>System Books and Records; Audits</u>.  The System covenants to keep accurate records and books of account with respect to its financial condition and operations and to have its financial statements examined annually by an Independent Public Accountant. Concurrently with the delivery thereof to the Master Trustee pursuant to the Master Indenture, a copy of such financial statements and the Independent Public Accountant's report thereon shall be delivered to the Authority, the Trustee and to Standard & Poor's Corporation.

**C.     Third Supplemental Sublease**

(1)     Section 11 adds the following Section 8.12 to Original Sublease:

Section 8.12.  <u>Continuing Disclosure Covenant</u>.

(a)     The System shall, not later than six months after the end of each Fiscal Year, commencing with the first Fiscal Year ending after January 1, 1996, provide to each Repository an annual report (the "Annual Report") which contains or incorporates by reference the following information:

PR-PRIV-EXECS
014366

Michael Martin
Susan Gilbert
September 11, 1997
Page 10

(i)    a copy of the System's annual financial statements prepared in accordance with GAAP and audited by a certified public accountant;

[Other specific information in the Official Statement needs to be updated also.]

(d)    In a timely manner, the System shall give notice to the Trustee and each Repository of any failure by the System to provide any information required pursuant to subsection (a) above within the time limit specified therein.

(e)    A copy of the Annual Report and any notice provided pursuant to subsection (d) above shall be provided to the Trustee concurrently with the delivery of such information to any Repository.

**ACTION PLAN**:  During the month of September 1997, AHERF will send to the Master Trustee, the Authority and the Bond Trustee the following:

(a)    A letter stating that:

(i)    for fiscal year 1997, AHERF will deliver to the Master Trustee, the Authority and the Bond Trustee sometime in November 1997: (1) the AHERF audit for fiscal year 1997, including schedules setting forth the Obligated Group's balance sheet, statement of operations, statement of changes in net assets and statement of cash flows, in the case of Forbes, for the six months ended June 30, 1997 and, in the case of AVH, for the four months ended June 30, 1997, (2) the Obligated Group's balance sheet and statement of operations for the 12 months ended June 30, 1997 prepared by management, (3) the accountants' report on the AHERF audit and (4) the Obligated Group Agent's no-default certificate; and

(ii)    subject to the anticipated 1997 refunding, for all subsequent fiscal years, AHERF will deliver to the Master Trustee, the Authority and the Bond Trustee:  (1) the AHERF Audit, including the Obligated Group Schedules, (2) the accountants' report on the AHERF Audit and (3) the accountants' and Obligated Group Agent's no-default certificates.

(b)    The Obligated Group's balance sheet and statement of operations for the 12 months ended June 30, 1997 prepared by management.

PR-PRIV-EXECS
014367

Michael Martin
Susan Gilbert
September 11, 1997
Page 11

      (c)    A schedule demonstrating management's calculation of the maximum annual debt service coverage ratio for the 12 months ended June 30, 1997.

      (d)    An agreed-upon procedures letter from the accountants with respect to management's calculation of the above-described ratio.

      (e)    The letter will also state that financial statements will be included in the Annual Report as follows: (i) the 1997 AHERF audit will be included in the 1997 Annual Report; (ii) the AHERF Audit for subsequent fiscal years, together with the AHERF Audit for the immediately preceding fiscal year, will be included in subsequent Annual Reports; (iii) all Annual Reports will include (x) a summary statement of operations based on the 12-month statement of operations prepared by management and described in subparagraph (b) above and (y) the maximum annual debt service coverage ratios for the two most recently completed fiscal years. (AHERF and F&L need to discuss whether Rule 15c2-12 and Forbes' undertaking thereunder require that a full set of management-prepared financial statements in comparative form (and not just for one year, as is presently contemplated) corresponding to the financial statements included in the 1995 Official Statement — balance sheet, statement of operations, statement of changes in fund balances and statement of cash flows — needs to accompany the annual report, rather than just a summary statement of operations.)

      (f)    The letter will ask the Master Trustee, the Authority and the Bond Trustee to sign the statement of acceptance at the end of the letter, evidencing their acceptance of the matters set forth in the letter.

**ACTION TAKEN:**


**STATUS:**


**III. ALLEGHENY VALLEY HOSPITAL**

**A.**    **Trust Indenture (dated as of November 1, 1982)**

    (1)    Section 8.09. <u>Employment of Independent Public Accountant</u>. The Authority will employ an Independent Public Accountant to perform the auditing and accounting functions required under the Act and the Indenture. The Authority will at all times maintain an accurate

PR-PRIV-EXECS
014368

Michael Martin
Susan Gilbert
September 11, 1997
Page 12

system of accounts and keep proper books of records and accounts relating to the Hospital. The Independent Public Accountant shall make an annual examination and audit of the accounts, books and records of the Authority relating to the Hospital. Said audit shall set forth the deposits made to the various Funds by the Trustee pursuant to the provisions of the Indenture and a statement whether, in the opinion of such Independent Public Accountant, the provisions of the Sublease have been complied with in connection with the payment of Rentals due under the Sublease. A signed copy of the audit with financial statements shall be delivered to the Trustee within 90 days after the end of each Fiscal Year. Upon written request, the Authority shall furnish copies of such audit to any Bondholder, or agent or representative of such holder, and to Moody's Investors Service, Inc. and Standard & Poor's Corporation as long as each shall respectively maintain an investment advisory service.

The term "Fiscal Year" is defined as any period of twelve consecutive months adopted by the Hospital as its fiscal year for financial reporting purposes and initially shall mean the period beginning on July 1 in any year and ending on June 30 in the following year.

B.    **Guaranty and Security Agreement (dated as of November 1, 1990)**

(1)    Section 2.05 provides that:

[AVH] agrees to furnish to the Trustee . . . within 150 days after the end of each fiscal year of [AVH], a copy of [AVH's] consolidated balance sheet and profit and loss statement, in each case certified by independent certified public accountants. Such financial statements shall be accompanied by a certificate from [AVH] stating whether or not a going concern qualification is contained in such financial statements. (Note that 1986 Guaranty is the same except that there are multiple guarantors.)

ACTION PLAN:  During the month of September 1997, AHERF will send to the Authority and the Bond Trustee the following:

(a)    A letter stating that:

(i)    for fiscal year 1997, AHERF will deliver to the Authority and the Bond Trustee sometime in November 1997: (1) the AHERF audit for fiscal year 1997, including schedules setting forth the Obligated Group's balance sheet, statement of operations, statement of changes in net assets and statement of cash flows, in the case of Forbes, for the six months ended June 30, 1997 and, in the case of AVH, for the four months ended June 30, 1997, (2) the accountants' report on the AHERF audit and (3) the accountants' no payment-default certificate; and

PR-PRIV-EXECS
014369

Michael Martin
Susan Gilbert
September 11, 1997
Page 13

(ii)    subject to the anticipated 1997 refunding, for all subsequent fiscal years, AHERF will deliver to the Authority and the Bond Trustee:  (1) the AHERF Audit, including the Obligated Group's Schedules for the most recently completed fiscal year, (2) the accountants' report on the AHERF Audit and (3) the accountants' no payment-default certificate.

(b)    The Obligated Group's balance sheet and statement of operations for the 12 months ended June 30, 1997 prepared by management.

(c)    A schedule demonstrating management's calculation of the maximum annual debt service coverage ratio and the "gross patient receivables/average daily gross patient revenues" ratio for the 12 months ended June 30, 1997.

(d)    An agreed-upon procedures letter from the accountants with respect to management's calculation of the above-described ratio.

(e)    The letter will ask the Authority and the Bond Trustee to sign the statement of acceptance at the end of the letter, evidencing their acceptance of the matters set forth in the letter.

**ACTION TAKEN:**

**STATUS:**

C.    Original Sublease (dated as of November 1, 1982)

(1)    Section 22 requires that:

on or before October 1 of each year, the CFO of the Hospital will furnish to the Authority and the Trustee a depreciation schedule prepared by an Independent Public Accountant for purposes of the Depreciation Reserve Account. [There are 12 subsections which spell out what must be included in the schedule.]

PR-PRIV-EXECS
014370

FROM                                    (FRI) 9. 12' 97 12:50/ST. 12:20/NO. 4960068124 P 15

Michael Martin
Susan Gilbert
September 11, 1997
Page 14


        **ACTION PLAN:**  AHERF has contacted the Authority and the Bond Trustee and written
        them a letter dated September 10, 1997, taking the position that AUMC should be
        required to prepare the depreciation schedule only for AVH and only as of
        February 28, 1997 (which immediately precedes the March 1 merger of AVH into
        AUMC) and make Depreciation Reserve Fund deposits on the basis of this schedule only.

        **ACTION TAKEN:**

        **STATUS:**


## IV.  ZURBRUGG MEMORIAL HOSPITAL

        The schedules to the AHERF audit will include only partial-year financial information
for Allegheny Hospitals, New Jersey ("AHNJ") -- i.e., from the date of affiliation with AHERF
through June 30, 1997.  However, AHNJ's financial statements will still be audited at
December 31, 1997.  Therefore, the New Jersey Authority and the New Jersey Bond Trustee
will not be approached regarding the AHERF audit at this time.  The following summary
of the AHNJ financial statement requirements is provided for informational purposes only.

A.      Second Mortgage Modification Agreement

        (1)      Section 6.15.  Financial and Other Reports.

        (a)      The Institution shall quarterly (within 45 days after the end of each
quarter), or monthly if requested by the Authority or the Trustee, deliver to the Authority
and the Trustee:

                (i)      unaudited financial statements for the Institution, including a
statement of revenues and expenses and a balance sheet in reasonable detail;

                (ii)      a certificate signed by the chief financial officer of the Institution
stating that the unaudited financial statements and computations referred to above
have been prepared in accordance with generally accepted accounting principles
on substantially the same basis as the Institution's audited financial statements;
and

                (iii)      a report on the utilization of the Institution in such detail as the
Authority may require, including (a) number of beds in service, admissions or
discharges, patient days, average length of stay and occupancy, all in such

PR-PRIV-EXECS
014371

Michael Martin
Susan Gilbert
September 11, 1997
Page 15

reasonable detail as the Authority may request and (b) outpatient and emergency room visits and laboratory tests.

(b)    The Institution shall deliver to the Authority and the Trustee, as soon as available, but in no event later than 150 days of the end of each Fiscal Year, audited financial statements for the preceding Fiscal Year, which shall:  (1) be audited by an independent firm of certified public accountants; (2) include a statement of revenues and expenses and a balance sheet in reasonable detail; and (3) include (or be accompanied by a letter from such Accountant which|sets forth) a computation as of the end of the preceding Fiscal Year, or in the case of Section 6.05(A) hereof for the preceding Fiscal Year, of the Institution's compliance with the terms of Sections 6.05, 6.06 and 6.07 hereof.    Concurrently with the delivery of such audited financial statements, the Institution shall deliver or caused to be delivered to the Authority and the Trustee, a certificate signed by the chief financial officer of the Institution that, to the best knowledge of the signer, after review of the provisions of the Agreement and Mortgage, no event has occurred which, with the giving of notice or the passage of time, would constitute an Event of Default hereunder and a certificate signed by the accountant which audited such financial statements that nothing came to the attention of such accountant during the course of such audit which caused such accountant to believe any such event had occurred.

(c)    The Institution shall also furnish to the Authority and the Trustee, upon receipt thereof by the Institution: (1) copies of any letter or report with respect to the management of the Institution's operations submitted to the Institution by its accountants in connection with any annual or interim audit of the Institution's accounts and a copy of any written response of the Institution to any such letter or report; and (2) evidence of the continued licensure of the Institution by the New Jersey State Department of Health.

(d)    Copies of the reports required by paragraph (B) above shall be sent by the Institution to each rating service which has assigned a rating to the Bonds Outstanding and shall also be filed with the Trustee in sufficient quantity to permit the Trustee to retain at least one copy for inspection by Bondholders.  Copies of such reports shall be mailed at the expense of the Institution to any Bondholder who files a written request therefor and to the managing underwriters for the Bonds.

PR-PRIV-EXECS
014372

Michael Martin
Susan Gilbert
September 11, 1997
Page 16

## V.  DELAWARE VALLEY OBLIGATED GROUP

A.    Master Trust Indenture

(1)    Section 6.6.  Filing of Financial Statements, Certificate of No Default, Other Information.  The Obligated Group covenants that it will:

(a)    as soon as practicable but in any event not later than six months after the end of each Fiscal Year, file or cause to be filed with the Master Trustee and each applicable Rating Agency a copy of its Audited Financial Statements;

(b)    as soon as practicable but in any event not later than six months after the end of each Fiscal Year, file with the Master Trustee, an Officer's Certificate of the Obligated Group Agent and stating that the Historical Debt Service Coverage Ratio for such Fiscal Year stating the ratio determined by dividing the Total Income Available for Debt Service for such Fiscal Year by the Maximum Annual Debt Service for such Fiscal Year, and stating whether or not, to the best knowledge of such officer, any Member of the Obligated Group is in default in the performance of any covenant contained in this Master Indenture, and, if so, specifying each such default of which such officer may have knowledge.

"Audited Financial Statements" is defined to mean the consolidated or combined revenue and expense statement and balance sheet of the Obligated Group reported upon by an independent certified public Accountant, prepared (in accordance with Section 1.4) in accordance with GAAP.

(2)    Section 6.7(a) of the First Supplemental Master Indenture provides that as soon as practicable but in any event not later than five (5) months after the end of each Fiscal Year, file or cause to be filed a copy of its Audited Financial Statements with the Master Trustee, the Bond Insurer and each applicable Rating Agency.

ACTION PLAN:  AHERF has already approached the Master Trustee about the AHERF audit and received a letter from the Master Trustee agreeing to accept the AHERF audit. AHERF is going to share the letter with the accountants and see if the letter suffices for their purposes.  (The Bond Insurer will be approached as described in paragraph (D) below.)

ACTION TAKEN:

STATUS:

PR-PRIV-EXECS
014373

FROM                              (FRI) 9. 12' 97 12:52/ST. 12:20/NO. 4860068124 P 18

Michael Martin
Susan Gilbert
September 11, 1997
Page 17


**B.**    **1996 Loan Agreements**

    (1)    Section 510.  Financial Statements; Insurance Information.

        (a)    The Borrower shall cause its financial statements for each Fiscal Year to be prepared in accordance with generally accepted accounting principals and audited by a certified public accountant; provided, however, that as long as the Borrower is a member of the Obligated Group, the combined or consolidated financial statements of the Obligated Group may be provided in lieu of the financial statements of the Borrower. Such financial statements and the certified public accountant's report thereon shall be furnished to the Authority, the Trustee and each Rating Agency within six (6) months after the end of each fiscal year.


    **ACTION PLAN:**  During the month of September 1997, AHERF will send to PHEFA and the Bond Trustee (which as Master Trustee has already agreed to accept the AHERF audit) a letter stating that, for fiscal year 1997 and all subsequent fiscal years, AHERF will deliver to PHEFA and the Bond Trustee sometime in November 1997:  (1) the AHERF Audit for the most recently completed fiscal year, including the Obligated Group's Schedules for the most recently completed fiscal year and (2) the accountants' report on the AHERF Audit.

    The letter will also ask PHEFA and the Bond Trustee to sign the statement of acceptance at the end of the letter, evidencing their acceptance of the matters set forth in the letter.

    **ACTION TAKEN:**


    **STATUS:**


**C.**    **1996 Letter of Credit, Reimbursement and Security Agreements for the Variable Rate Bonds and the Commercial Paper Program**

    (1)    Section 6.06.  Keeping of Books.  Each Member of the Obligated Group will keep proper books of record and account, in which full and correct entries shall be made of financial transactions and the assets and operations of such Member of the Obligated Group in accordance with GAAP.

PR-PRIV-EXECS
014374

Michael Martin
Susan Gilbert
September 11, 1997
Page 18

(2)    Section 6.08.  Reporting Requirements.  The Obligated Group will furnish or cause to be furnished to the Bank the following:

(a)    as soon as available and in any event within 150 days after the end of each Fiscal Year a consolidated and consolidating balance sheet of the Obligated Group as of the end of such Fiscal Year and the related (i) consolidated and consolidating statement of revenues and expenses and (ii) consolidated statements of change in fund balances and changes in financial position, in each case for the year then ended, setting forth in comparative form the corresponding figures for the immediately preceding Fiscal Year, which shall be prepared and audited by certified public accountants satisfactory to the Bank and certified as fairly presenting the consolidated financial position and the revenues and expenses and changes in fund balances and changes in financial position for, the Fiscal Year then ended, all in conformity with GAAP; together with a certificate of the chief financial officer of the Obligated Group (i) certifying that they fairly present the consolidated financial condition of the Obligated Group at the end of, and the results of operations of the Obligated for, such Fiscal Year [and] setting forth calculations in detail satisfactory to Bank demonstrating compliance with the provisions of section 6.10(c) hereof, and (ii) stating that no Event of Default, or event which, with the giving of notice or lapse of time or both, would constitute any Event of Default, has occurred and is continuing or, if an Event of Default or such event has occurred and is continuing, a statement as to the nature thereof and the action which the Obligated Group proposes to take with respect thereto; stating that such officer has reviewed the provisions of this Agreement and the Related Documents and has made or caused to be made under his supervision a review of the condition and operations of the Members of the Obligated Group during the period covered by such financial statements for the purposes of determining whether or not each Member of the Obligated Group has complied with all of the terms, provisions and conditions of this Agreement and the Related Documents applicable to it, and to the best of his knowledge each Member of the Obligated Group has kept, observed, performed and fulfilled each and every covenant, provision and condition of this Agreement and the Related Documents on its part to be performed and is not in default in the performance or observance of any of the terms, covenants, provisions or conditions hereof or thereof, or, if there is a default, such certificate shall specify all such defaults, the nature and status thereof and any remedial steps taken or proposed to correct such default;

(b)    as soon as available and in any event within 60 days after the end of the first three quarters of each Fiscal Year, a consolidated and consolidating balance sheet of the Obligated Group as of the end of such quarter and the related (i) consolidated and consolidating statement of revenues and expenses and (ii) consolidated statements of changes in fund balances and changes in financial position, in each case for the quarter then ended, setting forth in comparative form the corresponding figures for the

PR-PRIV-EXECS
014375

Michael Martin
Susan Gilbert
September 11, 1997
Page 19

corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, together with a certificate of the chief financial officer of the Obligated Group (i) certifying that they fairly present the consolidated financial condition of the Obligated Group at the end of such quarter and the results of the operations of the Obligated Group for such periods (subject to normal year-end audit adjustments) and have been prepared in accordance with GAAP, (ii) setting forth calculations in detail satisfactory to Bank demonstrating compliance with the provisions of Section 6.10(c) hereof, and (iii) stating that no Event of Default, or event which, with the giving of notice of lapse of time or both, would constitute any Event of Default, has occurred and is continuing or, if an Event of Default or such event has occurred and is continuing or, if an Event of Default or such event has occurred and is continuing, a statement as to the nature thereof and the action which the Member of the Obligated Group proposes to take with respect thereto.

**ACTION PLAN:** AHERF has approached PNC Bank (Marcie Knittel) about amending Section 6.08 to allow for the delivery of the AHERF Audit, the Obligated Group Schedules and the Obligated Group's Quarterly Statements. PNC Bank has indicated that such an amendment is acceptable, provided that PNC Bank may request additional financial information, given that the Obligated Group Schedules will not be audited and will not have any footnotes. Foley & Lardner will prepare a draft of amended Section 6.08 for PNC Bank's counsel to incorporate into an amendment to the LOC Agreements.

**ACTION TAKEN:**

**STATUS:**

D.    Financial Guaranty Agreements (with MBIA)

(1)    Section 2.06. On-Going Information Obligations of Obligor.

(a)    Quarterly Reports: The Obligor will provide to the Insurer within 45 days of the close of each quarter interim financial statements covering all fund balances under the Document, a statement of operations (income statement), balance sheet and changes in fund balances. These statements need not be audited by an independent certified public accountant, but if any audited statements are produced, they must be provided to the Insurer;

PR-PRIV-EXECS
014376

FROM                                    (FRI) 9. 12' 97 12:54/ST. 12:20/NO. 4860068124 P 21

Michael Martin
Susan Gilbert
September 11, 1997
Page 20

      (b)    Annual Reports:  The Obligor will provide to the Insurer annual financial statements audited by an independent certified public accountant within 90 days of the end of each fiscal year; . . .

      (d)    On an annual basis the Obligor will provide to the Insurer a certificate confirming compliance with all covenants and obligations hereunder and under the Revenue Agreement, the Document or any other document executed in connection with the issuance of the Obligations.

__ACTION PLAN__:  During the month of September 1997, AHERF will send to MBIA a letter stating that:

      (i)    for fiscal year 1997 and all subsequent fiscal years, AHERF will deliver to MBIA:   (1) the AHERF Audit, (2) the accountants' report on the AHERF audit and (3) the Obligor's no-default certificate; and

      (ii)    for each of the Obligated Group's first three fiscal quarters, the Obligated Group's Quarterly Statements.

      The letter will ask MBIA to sign the statement of acceptance at the end of the letter, evidencing its acceptance of the matters set forth in the letter.

__ACTION TAKEN__:


__STATUS__:


E.    Master Continuing Disclosure Agreement

(1)    Section 5 provides that:

      (b)    AHERF shall provide an Annual Report to the Dissemination Agent, together with an Annual Report Certificate, not later than each Annual Report Date, provided that, if the Annual Report does not include the Audited Financial Statements, AHERF shall provided Audited Financial Statements to the Dissemination Agent as soon as practicable after they shall have been approved by the Governing Body.

      (c)    The Dissemination Agent shall provide the Annual Report and, if received separately in accordance with Section 5(b) hereof, the Audited Financial Statements to each Repository, each Related Bond Trustee, each Related Issuer and the provider of any

PR-PRIV-EXECS
014377

FROM                                      (FRI) 9. 12' 97 12:55/ST. 12:20/NO. 4860068124 P 22

Michael Martin
Susan Gilbert
September 11, 1997
Page 21

credit enhancement or the issuer of any liquidity facility respecting a series of Related Bonds within five (5) Business Days after receipt thereof from AHERF.

"Audited Financial Statements" means the financial statements of the Obligated Group which have been examined by independent certified public accountants in accordance with GAAP. The Audited Financial Statements shall be prepared in accordance with GAAP on a comparative basis for the two Fiscal Years immediately preceding the date of the Annual Report.

**ACTION PLAN:** Subject to the next succeeding paragraph, AHERF will send a letter to the Dissemination Agent (which is also the Master Trustee and the Bond Trustee and which, as Master Trustee, has already agreed to accept the AHERF audit) proposing an amendment to the Master Continuing Disclosure Agreement to change the definition of "Audited Financial Statements" in order to allow for the delivery of the AHERF Audit under the Master Continuing Disclosure Agreement. As so amended, the Master Continuing Disclosure Agreement would require that the AHERF Audits for the two most recently completed fiscal years would be included in the Annual Report (or, in the case of the 1997 Annual Report, the 1997 AHERF audit and the 1995/1996 Obligated Group audit?).

F&L will need to give the opinion required by Section 11 of the Master Continuing Disclosure Agreement ("Amendments; Waivers") that the Master Continuing Disclosure Agreement, as so amended, complies with Rule 15c2-12. Before AHERF approaches the Dissemination Agent about the proposed amendment, F&L must determine that the amendment complies with the Rule. (In particular, F&L must determine whether the Rule requires that the Annual Report include 12-month comparative management-prepared Obligated Group financial statements, including a balance sheet, a statement of operations, statement of changes in net assets and statement of cash flows.)

**ACTION TAKEN:**

**STATUS:**

PR-PRIV-EXECS
014378

FROM                              (FRI) 9. 12' 97 12:56/ST. 12:20/NO. 4860068124 P 23

Michael Martin
Susan Gilbert
September 11, 1997
Page 22


## VII.   ALLEGHENY GENERAL HOSPITAL

**A.    Master Trust Indenture**

(1)    Section 5.11.  <u>Filing of Financial Statements, Certificate of No Default, Other
Information</u>.  The Obligated Group . . . will:

(a)    As soon as practicable but in no event later than five months after the end
of each fiscal year, file with the Trustee, with each Noteholder who may have so
requested in writing or in whose behalf the Trustee may have so requested and with
Moody's Investors Service and Standard & Poor's Corporation a copy of its audited
Financial Statements as of the end of such fiscal year accompanied by the opinion of
independent certified public accountants.  Such audited Financial Statements shall be
prepared in accordance with generally accepted accounting principles and shall include
such statements as shall be necessary for a fair presentation of financial position, results
of operation and changes in Total Fund Balance and financial position as of the end of
such fiscal year.

(b)    As soon as practicable but in no event later than five months after the end
of each fiscal year, file with the Trustee and with each Noteholder who may have so
requested or in whose behalf the Trustee may have so requested, an Officer's Certificate
of the Obligated Group Agent and a report of independent certified public accountants
stating the Historical Long-Term Debt Service Coverage Ratio for such fiscal year and
stating whether or not, to the best knowledge of the signers, the Obligated Group is in
default in the performance of any covenant contained in the Master Indenture and, if so,
specifying each such default of which the signers may have knowledge.

"Financial Statements" is defined to mean ". . . depending on the context, the
consolidated or combined financial statements of the Obligated Group which contain certain
summarized consolidated or combined financial information concerning the Obligated Group or
the statements of an Obligated Affiliate, in all cases prepared in accordance with GAAP."

<u>ACTION PLAN</u>:  During the month of September 1997, AHERF will send to the
Master Trustee a letter stating that, for fiscal year 1997 and all subsequent fiscal years,
AHERF will deliver to the Master Trustee:  (1) the AHERF Audit, including the
Obligated Group Schedules, (2) the accountants' report on the AHERF Audit and (3) the
certificate of the Obligated Group Agent and a report of the accountants as to the
historical long-term debt service coverage ratio and as to no-defaults.

PR-PRIV-EXECS
014379

Michael Martin
Susan Gilbert
September 11, 1997
Page 23

        The letter will also ask the Master Trustee to sign the statement of acceptance at the end of the letter, evidencing its acceptance of the matters set forth in the letter.

**ACTION TAKEN:**

**STATUS:**

**B.**    **1988 and 1993 Letter of Credit, Reimbursement and Security Agreements**

    (1)    Section 6.08. <u>Reporting Requirements</u>. The Corporation will furnish . . . to the Bank the following:

        (a)    as soon as available and in any event within 120 days after the end of each Fiscal Year, a consolidated balance sheet of the Obligated Group as of the end of such Fiscal Year and the related consolidated statements of revenues and expenses and changes in fund balances and changes in financial position for the year then ended, setting forth in comparative form the corresponding figures for the immediately preceding Fiscal Year, which shall be prepared and audited by certified public accountants satisfactory to the Bank and certified as fairly presenting the combined financial position and the revenues and expenses and changes in fund balances and changes in financial position for the Fiscal Year then ended, all in conformity with GAAP; together with a certificate of the chief financial officer of the Corporation . . . certifying that they fairly present the combined financial condition of the Obligated Group at the end of, and the results of operations of the Obligated Group for, such Fiscal Year [and] setting forth calculations in detail satisfactory to the Bank demonstrating compliance with the provisions of Section 6.11(b) [liquidity, capitalization and debt service coverage ratios] hereof;

        (b)    as soon as available and in any event within 45 days of the end of the first three quarters of each Fiscal Year, a consolidated balance sheet of the Obligated Group as of the end of such quarter and the related consolidate statements of revenues and expenses and changes in fund balance and changes in financial position for the quarter then ended, setting forth in comparative form the corresponding figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, together with a certificate of the chief financial officer of the Corporation . . . certifying that they fairly present the combined financial condition of the Obligated Group at the end of such quarter and the results of operations of the Obligated Group for such periods (subject to normal year-end audit adjustments) and have been prepared in accordance with GAAP.

PR-PRIV-EXECS
014380

Michael Martin
Susan Gilbert
September 11, 1997
Page 24

ACTION PLAN: The plan for these agreements is the same as for the Delaware Valley Letter of Credit, Reimbursement and Security Agreements with PNC Bank described in paragraph V.A. above.

ACTION TAKEN:

STATUS:

C.    1991 Loan Agreement with PHEFA; 1995 Loan Agreement with ACHDA

    (1)    Section 510. Financial Statements; Insurance Information; Disclosure Information.

        (a)    The Borrower shall cause its financial statements for each Fiscal Year to be examined by an independent public accountant. Such financial statements and the independent public accountant's report thereon shall be furnished to the Authority, the Trustee and each Rating Agency within 150 days after the end of the Fiscal Year to which they relate. Such financial statements shall be accompanied by a Borrower's Certificate stating whether the Borrower is in default in the performance of any of its obligations hereunder and, if any such default has occurred, setting forth the actions being taken by the Borrower to remedy the same.

ACTION PLAN: During the month of September 1997, AHERF will send to PHEFA, ACHDA and the Bond Trustees a letter stating that, for fiscal year 1997 and all subsequent fiscal years, AHERF will deliver to PHEFA, ACHDA and the Bond Trustees: (1) the AHERF Audit, including the Obligated Group Schedules, (2) the accountants' report on the AHERF Audit and (3) AGH's no-default certificate.

        The letter will also ask PHEFA, ACHDA and the Bond Trustees to sign the statement of acceptance at the end of the letter, evidencing their acceptance of the matters set forth in the letter.

ACTION TAKEN:

STATUS:

PR-PRIV-EXECS
014381

Michael Martin
Susan Gilbert
September 11, 1997
Page 25

**D.**    **1993 Financing Agreement with Morgan Guaranty Trust Company**

(1)    Section 504.    <u>General Covenants</u>.  AGH will furnish to the Owners [of the 1993 Master Notes] within 120 days after the end of each fiscal year of AGH a complete set of combined and combining financial statements of AGH and the members of the Restricted Group and, following the implementation of the Restated Master Indenture, the members of the Obligated Group, in each case prepared in accordance with GAAP by certified public accountants and in each case setting forth in comparative form the corresponding figures for the preceding fiscal year, all in reasonable detail.

> **ACTION PLAN:**  AHERF will approach Morgan Guaranty about amending Section 504 to allow for the delivery of the AHERF Audit and the Obligated Group Schedules.  If Morgan Guaranty concurs, Foley & Lardner will prepare a draft of amended Section 504 for Morgan Guaranty's counsel to incorporate into an amendment to the Financing Agreement.

> **ACTION TAKEN:**

> **STATUS:**

**E.**    **1993 Note Purchase Agreement with Manufacturers and Unum**

(1)    Section 6.2.    <u>Filing of Financial Statements, Certificate of No Default, Other Information</u>.  AGH will:

(a)    As soon as practicable but in no event later than five months after the end of each fiscal year, deliver to each Noteholder and, if the Noteholders shall so request, deliver to the National Association of Insurance Commissioners, copies of the audited Financial Statements of the Restricted Group as of the end of such fiscal year accompanied by the opinion of independent certified public accountants.  Such audited Financial Statements shall be prepared in accordance with GAAP and shall include such statements as shall be necessary for a fair presentation of financial position, results of operations and changes in unrestricted fund balance and financial position as of the end of such fiscal year.

(b)    As soon as practicable but in no event later than ___ days after the end of each fiscal quarter, deliver to the Noteholders copies of the unaudited Financial Statements of the Restricted Group as of the end of such fiscal quarter.  Such Financial Statements shall be prepared in accordance with GAAP and shall include such statements

PR-PRIV-EXECS
014382

FROM                                    (FRI) 9.12'97 12:58/ST. 12:20/NO. 4860068124 P 27

Michael Martin
Susan Gilbert
September 11, 1997
Page 26

as shall be necessary for a fair presentation of financial position, results of operations and
changes in unrestricted fund balance and financial position as of the end of such fiscal
quarter (subject to year end audit adjustments).

(c)    At the time of delivery to the Trustee, deliver to each Noteholder copies
of the Officer's Certificate and report of independent certified public accountants required
to be delivered to the Trustee from time to time pursuant to Section 5.11(b) of the Master
Trust Indenture or Section 5.11(b) of the Restated Master Trust Indenture and copies of
each report required to be delivered to the Trustee from time to time pursuant to Section
5.11(d) of the Master Trust Indenture or Section 5.11(d) of the Restated Master Trust
Indenture.

The term "Financial Statements," as used in this agreement, is defined in the same
manner as in the Master Indenture.

ACTION PLAN:   AHERF will approach Manufacturers and Unum about amending
Section 6.2 to allow for the delivery of the AHERF Audit, the Obligated Group
Schedules and the Obligated Group Quarterly Statements. If Manufacturers and Unum
concur, Foley & Lardner will prepare a draft of amended Section 6.2 for their counsel
to incorporate into an amendment to the Financing Agreement.

ACTION TAKEN:

STATUS:

F.    1995 Reimbursement and Security Agreement

(1)    Section 7(a).  Information.  The Members of the Obligated Group will deliver to
the Bank:

(i)    as soon as available but in any event not later than 150 days after the end
of each fiscal year of the Obligated Group, the audited consolidated and unaudited or,
if available, audited consolidating balance sheets of the Obligated Group as of the fiscal
year then ended and the related audited consolidated and unaudited or, if available,
audited consolidating statements of revenue and expenses, changes in net equity and cash
flows for such fiscal year, setting forth in comparative form the figures for the previous
fiscal year, and in the case of each audited financial statement, reported on by (x)
Coopers & Lybrand L.L.P. or (y) other independent public accountants of nationally
recognized standing;

PR-PRIV-EXECS
014383

FROM                                    (FRI) 9. 12' 97 12:59/ST. 12:20/NO. 4860068124 P 28

Michael Martin
Susan Gilbert
September 11, 1997
Page 27

   (ii)   as soon as available but in any event not later than 60 days after the end of each fiscal quarter of the Obligated Group, the unaudited consolidated and consolidating balance sheets of the Obligated Group as of such fiscal quarter and the related consolidated and consolidating statements of revenue and expenses for the fiscal quarter then ended and for the portion of the Obligated Group's fiscal year ended at the end of such quarter, setting forth in each case in comparative form the figures for the corresponding quarter and the corresponding portion of the Obligated Group's previous fiscal year, all certified (subject to normal year-end adjustments) as to fairness of presentation, generally accepted accounting principles and consistency by the chief financial officer or the chief accounting officer of AGH; . . .

   (iv) simultaneously with the delivery of each set of financial statements referred to in clauses (i) and (ii) above, a certificate of the chief financial officer or the chief accounting officer of AGH (x) setting forth in reasonable detail the calculations required to establish whether the Members of the Obligated Group were in compliance with the requirements of Sections 7(b) ["Capitalization"], (c) ["Liquidity"] and (e) ["Negative Pledge"] on the date of such financial statements and (y) stating whether any Default exists on the date of such certificate and, if any Default then exists, setting forth the details thereof and the action which such Person is taking or proposes to take with respect thereto;

   (v) simultaneously with the delivery of each set of financial statements referred to in clause (i) above, (A) a statement of each of the firms of independent public accountants which reported on such statements (x) whether anything has come to their attention to cause them to believe that any Default existed on the date of such statements and (y) confirming the calculations set forth in the officer's certificates delivered simultaneously therewith pursuant to clause (iv) above and clause (B) below, and (B) a certificate of the chief financial officer of AGH setting forth in reasonable detail the calculations required to establish whether the Members of the Obligated Group were in compliance with the requirements of Section 7(d) ["Debt Service Coverage Ratio"] on the date of such financial statements.

**ACTION PLAN:** AHERF will approach Morgan Guaranty about amending Section 7(a) to allow for the delivery of the AHERF Audit, the Obligated Group Schedules and the Obligated Group Quarterly Statements. If Morgan Guaranty concurs, Foley & Lardner will prepare a draft of amended Section 7(a) for Morgan Guaranty's counsel to incorporate into an amendment to the Reimbursement Agreement.

**ACTION TAKEN:**

**STATUS:**

C:\wp51\document\mf\general\finacials.3|8/12/97|Tblamuel|s

PR-PRIV-EXECS
014384

**EXHIBIT  0419**

(MON) 12. 1' 97 15:34/ST. 15:32/NO. 4860068509 P   2

# FOLEY LARDNER
# WEISSBURG & ARONSON

ATTORNEYS AT LAW

CHICAGO
JACKSONVILLE
LOS ANGELES
MADISON
MILWAUKEE
ORLANDO
SACRAMENTO
SAN DIEGO

ONE IBM PLAZA
SUITE 3300
330 NORTH WABASH AVENUE
CHICAGO, ILLINOIS 60611-3608
TELEPHONE (312) 755-1900
FACSIMILE (312) 755-1925

WRITER'S DIRECT LINE

December 1, 1997

*ONE*

*AHERF*

*Audit*

Mr. David W. McConnell
Allegheny Health, Education and
    Research Foundation
Fifth Avenue Place, Suite 2900
Pittsburgh, Pennsylvania 15222

Re:   Compliance with Financial Reporting Requirements

Dear David:

You have provided me with a copy of the consolidated financial statements of Allegheny Health, Education and Research Foundation ("AHERF") for the fiscal year ended June 30, 1997 and the accompanying consolidating financial statements for those entities whose financial information is included in the consolidated financial information (collectively, the "1997 AHERF Audit"). The financial statements include two reports of Coopers & Lybrand — one relating to the consolidated financial statements and the other relating to the consolidating financial statements.

Coopers & Lybrand's report with respect to the consolidated financial statements states that "in [Coopers & Lybrand's] opinion the consolidated financial statements...present fairly, in all material respects, the consolidated financial position of [AHERF] as of June 30, 1997 and the consolidated results of its operations, changes in net assets and cash flows for the year then ended in conformity with generally accepted accounting principles." Coopers & Lybrand's report with respect to the consolidating financial statements states that "the supplementary consolidating financial information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in [Coopers & Lybrand's] opinion, is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole."

The AHERF affiliates listed on Schedule A to this opinion (collectively, the "AHERF Affiliates") are parties to, or are otherwise bound by the provisions of, the indentures and agreements listed on Schedule A (such indentures and agreements being hereinafter referred to as the "Affiliate Agreements"). Certain of the AHERF Affiliates are members of obligated

ESTABLISHED 1842

A MEMBER OF GLOBALEX WITH MEMBER OFFICES IN BERLIN, BRUSSELS, DRESDEN, FRANKFURT, LONDON, SINGAPORE, STUTTGART ...

PR-PRIV-111-00509



DEPOSITION
EXHIBIT
419
AKF

FROM

December 1, 1997
Page 2

groups identified on Schedule A. Prior to fiscal year 1997, separate audits were prepared for certain of the AHERF Affiliates (or their corporate predecessors, which are also listed on Schedule A) which, in the case of affiliates constituting members of an obligated group, presented combined financial information for the obligated group (such audits being hereinafter referred to as the "Pre-FY 1997 Audits"). The Pre-1997 FY Audits provided comparative financial information for the most recently completed fiscal year as well as for the preceding fiscal year.

Allegheny University Medical Centers ("AUMC") (the successor to Forbes Health System and Allegheny Valley Hospital ("AVH")) and Allegheny Hospitals, Centennial ("AHC") (the successor to The Graduate Hospital and The Fifth and Reed Hospital d/b/a Mt. Sinai Hospital) affiliated with AHERF on or after January 1, 1997. Consequently, the 1997 AHERF Audit contains only partial-year financial information for AUMC and AHC. Also, the Pre-1997 FY Audits for the corporate predecessors to AUMC (other than AVH) and AHC were reported on by different accounting firms than Coopers & Lybrand.

Certain of the Affiliate Agreements require that the audited financial statements be prepared in comparative form for each of the two most recently completed fiscal years and that, where the AHERF Affiliates are members of an obligated group, the audited financial information for the members be combined. All of the indentures and agreements require that the audited financial statements be prepared in accordance with generally accepted accounting principles.

You have asked me to advise you whether the AHERF Affiliates will be in compliance with the Affiliate Agreements by delivering the 1997 AHERF Audit, as well as the annual AHERF consolidated and consolidating audit prepared for each subsequent fiscal year (the "Subsequent AHERF Audits"), to those parties entitled by such agreements to receive the audited financial statements of the AHERF Affiliates or the obligated groups of which they are members. You have also asked me to advise you whether AUMC and AHC will be in compliance with their respective Affiliate Agreements by delivering only the partial-year audited financial information contained in the 1997 AHERF Audit.

Based upon a review of the Affiliate Agreements and assuming that the Subsequent AHERF Audits (including the accountants' reports) are prepared on a basis substantially similar to the 1997 AHERF Audit and in accordance with generally accepted accounting principles, (i) the AHERF Affiliates will be in compliance with the Affiliate Agreements by delivering the 1997 AHERF Audit and the Subsequent AHERF Audits to those parties entitled by such agreements to receive the audited financial statements of the AHERF Affiliates or the obligated groups of which they are members and (ii) for fiscal year 1997, AUMC and AHC will be in compliance with their respective Affiliate Agreements by delivering only the partial-year audited financial information contained in the 1997 AHERF Audit.

PR-PRIV-111-00510

December 1, 1997
Page 3


        This opinion does not address compliance by the AHERF Affiliates with any
requirements of the Affiliate Agreements other than the requirements respecting the delivery of
audited financial statements of the respective AHERF Affiliates or the obligated groups of which
they are members.   In particular, it does not address (a) the requirements of the Affiliate
Agreements relating to (i) the delivery of accountants' and officer's compliance and debt service
coverage certificates in conjunction with the audited financial statements of the Affiliates or the
obligated groups of which they are members or (ii) the timing of the delivery of such audited
financial statements and certificates, (b) compliance by AHC for fiscal year 1997 with Section
6.3, "Rates and Charges," of the Master Trust Indenture dated as of December 1, 1991 between
AHC (as successor by merger to The Graduate Hospital and The Fifth and Reed Hospital d/b/a
Mt. Sinai Hospital) and First Union National Bank (as successor to Meridian Trust Company),
as Master Trustee (as supplemented and amended, the "AHC Master Indenture") or (c) the
remedial actions, if any, which are required to, or may, be taken under the AHC Master
Indenture with respect to compliance with said Section 6.3 of the AHC Master Indenture.

                              Respectfully,


cc:     Michael Martin
        Susan Gilbert

PR-PRIV-111-00511

## SCHEDULE A

## AHERF Affiliates, Obligated Groups and Affiliate Agreements

### Allegheny Delaware Valley Obligated Group

AHERF Affiliates:

(1) Allegheny University Hospitals (formerly Hahnemann University Hospital), successor by merger to Allegheny University Hospitals and Allegheny United Hospitals, Inc. ("AUH")

(2) St. Christopher's Hospital for Children ("SCHC")

(3) Allegheny University of the Health Sciences ("AUHS")

Affiliate Agreements:

(1) Master Trust Indenture dated as of May 15, 1996, as supplemented and amended, among AHC, SCHC, AUHS and Norwest Bank Minnesota, N.A., as Master Trustee

(2) Loan Agreements dated as of May 15, 1996 between each of AHC, SCHC and AUHS and Pennsylvania Higher Educational Facilities Authority

(3) Loan Agreements dated as of June 1, 1996 among each of AHC, SCHC and AUHS, AHC as Program Administrator and Pennsylvania Higher Educational Facilities Authority ("PHEFA")

(4) Letter of Credit, Reimbursement and Security Agreement dated as of June 1, 1996 among AUH, SCHC, AUHS and PNC Bank, National Association

(5) Letter of Credit, Reimbursement and Security Agreement dated as of June 1, 1996 between AUH and PNC Bank, National Association

(6) Financial Guaranty Agreements dated as of June 19, 1996 between each of AHC, SCHC and AUHS

A-1

PR-PRIV-111-00512

(MON)12. 1'97 15:36/ST. 15:32/NO. 4860068509 P 6

FROM

## Allegheny General Hospital Obligated Group

**AHERF Affiliates:**    (1)    Allegheny General Hospital ("AGH"), successor by merger to Allegheny Neuropsychiatric Institute

**Affiliate Agreements:**    (1)    Master Trust Indenture dated April 7, 1993, as supplemented and amended, between AGH and PNC Bank, National Association, as Master Trustee

    (2)    Letter of Credit, Reimbursement and Security Agreement dated as of February 1, 1988 between AGH and PNC Bank, National Association

    (3)    Loan Agreement dated as of January 1, 1991 between AGH and PHEFA

    (4)    Financing Agreement dated January 29, 1993 between AGH and Morgan Guaranty Trust Company of New York ("Morgan Guaranty")

    (5)    Letter of Credit, Reimbursement and Security Agreement dated as of January 29, 1993 between AUH and PNC Bank, National Association

    (6)    Note Purchase Agreement dated as of January 29, 1993 among AGH, The Manufacturers Life Insurance Company and Unum Life Insurance Company of America

    (7)    Loan Agreement dated as of March 1, 1995, as supplemented and amended, between AGH and Allegheny County Hospital Development Authority ("ACHDA")

    (8)    Reimbursement and Security Agreement dated as of April 1, 1995, as supplemented and amended, between AGH and Morgan Guaranty

## Allegheny Hospitals, Centennial Obligated Group

**AHERF Affiliates:**    (1)    Allegheny Hospitals, Centennial ("AHC"), successor by merger to The Graduate Hospital and The Fifth and Reed Hospital d/b/a Mt. Sinai Hospital

A-2

PR-PRIV-111-00513

(MON) 12. 1' 97 15:37/3T. 15:32/NO. 4860068509 P 7

| | | |
|---|---|---|
| Affiliate Agreements: | (1) | Master Trust Indenture dated as of December 1, 1991, as supplemented and amended, between AHC and First Union National Bank, as Master Trustee |
| | (2) | Master Financing Agreement dated as of December 7, 1995 among GE Capital Corporation, The Hospitals and Higher Education Facilities Authority and AHC |
| | (3) | Pepper Pavilion Operating Lease dated October 27, 1993 between AHC and Omega Health Care Investors, Inc. ("Omega") |
| | (4) | 1700 South Street Parking Garage Operating Lease dated October 27, 1993 between AHC and Omega Health Care Investors, Inc. ("Omega") |

### Allegheny University Medical Centers Obligated Group

| | | |
|---|---|---|
| AHERF Affiliates: | (1) | Allegheny University Medical Centers ("AUMC"), successor by merger to Forbes Health System and Allegheny Valley Hospital |
| Affiliate Agreements: | (1) | Master Trust Indenture dated as of January 1, 1985, as supplemented and amended, between AUMC and PNC Bank, National Association, as Master Trustee |
| | (2) | Sublease Agreement dated as of January 1, 1985, as supplemented and amended, between AUMC and Monroeville Hospital Authority |
| | (3) | Trust Indenture dated as of November 1, 1982 between ACHDA and Mellon Bank, N.A., as Bond Trustee |
| | (4) | Guaranty and Security Agreement dated as of November 1, 1990 between AUMC and Mellon Bank, N.A., as Bond Trustee |

C:\wp6.1\docstions\fsodisther.1.Aud | 12/1/97 | 0:52:00 |:

A-3

PR-PRIV-111-00514

**EXHIBIT  0429**

*A      H      E      R      F*

M E M O R A N D U M

██████████████      _____  _____  _____  _____  ___ ___ ___

**to:**      Sherif S. Abdelhak
          President, CEO - AHERF

**from:**    Michael P. Martin
          Senior Vice President, Treasury - AHERF

**subject:** AGH Funded Depreciation Cash Flow Activity - 7/1/95 to Present

**date:**    March 18, 1998

_____

As per your recent request, attached is a report tracing the cash flow activity for the AGH Funded
Depreciation accounts.  The report covers the period from July first of 1995 to the present,
estimated market value.

If you have any questions or require additional information, please call.


Attachment


C:\OFFICE\WPWIN\WPDOCS\MEMOS\SSA2.WPD      1



AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
24087
EXHIBIT NO.

JD-SA-0001595

P. 03

MAR-18-98 SUN 16:59

AGH Funded Depreciation
Cash Flow Activity

filename: s:\123\smm\misc\agh_tfrs.wk4
Date: Mar-17-98

| FISCAL YEAR 1996 ACTIVITY |
|---|

Jun-30-95    Beginning Market Value =    166,662,000

Withdrawals from AGH Funded Depreciation:

| Date: | Amount: | Use of Dollars |
|---|---|---|
| Sep-8-95 | 6,500,000 | Operating Needs |
| Oct-13-95 | 3,000,000 | Operating Needs |
| Oct-16-95 | 1,500,000 | Operating Needs |
| Oct-23-95 | 3,200,000 | Operating Needs |
| Nov-10-95 | 2,750,000 | Temple Payment |
| Nov-20-95 | 2,200,000 | Operating Needs |
| Dec-1-95 | 8,000,000 | Operating Needs |
| Dec-4-95 | 2,000,000 | Operating Needs |
| Dec-5-95 | 3,700,000 | Operating Needs |
| Dec-8-95 | 1,600,000 | Operating Needs |
| Dec-11-95 | 3,200,000 | Operating Needs |
| Dec-11-95 | 3,200,000 | Operating Needs |
| Dec-29-95 | 10,000,000 | Operating Needs |
| Jan-2-96 | 15,000,000 | Operating Needs |
| Jan-16-96 | 2,500,000 | Operating Needs |
| Feb-5-96 | 2,000,000 | Operating Needs |
| Feb-6-96 | 1,200,000 | Operating Needs |
| Feb-7-96 | 1,400,000 | Operating Needs |
| Feb-7-96 | 1,100,000 | Operating Needs |
| Feb-8-96 | 1,800,000 | Operating Needs |
| Feb-8-96 | 1,900,000 | Operating Needs |
| Feb-9-96 | 8,100,000 | Operating Needs |
| Feb-13-96 | 975,000 | Operating Needs |
| Feb-16-96 | 4,700,000 | Operating Needs |
| Feb-20-96 | 2,100,000 | Operating Needs |
| Feb-21-96 | 1,400,000 | Operating Needs |
| Mar-1-96 | 1,000,000 | Operating Needs |
| Apr-1-96 | 1,500,000 | Operating Needs |
| Apr-1-96 | 4,100,000 | Operating Needs |
| May-31-96 | 4,300,000 | Operating Needs |
| May-31-96 | 4,000,000 | Operating Needs |
| Jun-3-96 | 4,000,000 | Operating Needs |
| Jun-3-96 | 3,000,000 | Operating Needs |
| Jun-14-96 | 1,000,000 | Operating Needs |
| Jun-24-96 | 1,900,000 | Operating Needs |
| | 119,825,000 | |

JD-SA-0001596

Page 2

*FISCAL YEAR 1996 ACTIVITY  - Continued*

Additions to AGH Funded Depreciation:

| Date: | Amount: | Source of Dollars |
|-------|---------|-------------------|
| Oct-18-95 | 5,196,845 | Req #4 - AGH Series 1995 Bond Issue |
| Dec-8-95 | 9,008,036 | Req #5 - AGH Series 1995 Bond Issue |
| Mar-12-96 | 5,096,112 | Req #6 - AGH Series 1995 Bond Issue |
| Mar-20-96 | 1,000,000 | Transfer from AHERF Concentration |
| Apr-10-96 | 1,500,000 | Transfer from AHERF Concentration |
| Apr-18-96 | 2,000,000 | Transfer from AHERF Concentration |
| May-07-96 | 2,807,000 | Req #7 - AGH Series 1995 Bond Issue |
| May-08-96 | 3,500,000 | Transfer from AHERF Concentration |
| May-20-96 | 4,000,000 | Transfer from AHERF Concentration |
| Jun-24-96 | 49,844,125 | Payback from DV; Proceeds |
|           |            | from DVOG Series 1996-D issue |
|           | 83,952,118 | |

FY 1996 Net Deposit / (Withdrawal):          (35,872,882)

JD-SA-0001597

Page 3

FISCAL YEAR 1997 ACTIVITY

Jun-30-96        Beginning Market Value =        151,298,251

Withdrawals from Funded Depreciation:

| Date: | Amount: | Use of Dollars |
|---|---|---|
| Jul-19-96 | 3,700,000 | Operating Needs |
| Aug-21-96 | 2,000,000 | Operating Needs |
| Aug-30-96 | 2,000,000 | Operating Needs |
| Sep-3-96 | 8,000,000 | Operating Needs |
| Sep-16-96 | 5,300,000 | Operating Needs |
| Sep-18-96 | 3,200,000 | Operating Needs |
| Sep-20-96 | 3,000,000 | Operating Needs |
| Sep-30-96 | 12,300,000 | Operating Needs |
| Oct-1-96 | 8,400,000 | Operating Needs |
| Oct-7-96 | 2,200,000 | Operating Needs |
| Oct-15-96 | 1,000,000 | Operating Needs |
| Nov-1-96 | 3,000,000 | Operating Needs |
| Nov-4-96 | 3,500,000 | Operating Needs |
| Dec-2-96 | 1,400,000 | Operating Needs |
| Dec-6-96 | 5,000,000 | Operating Needs |
| Dec-10-96 | 2,000,000 | Operating Needs |
| Dec-13-96 | 4,000,000 | Operating Needs |
| Jan-2-97 | 2,100,000 | Operating Needs |
| Jan-2-97 | 2,400,000 | Operating Needs |
| Jan-3-97 | 8,500,000 | Operating Needs |
| Jan-6-97 | 1,850,000 | Operating Needs |
| Jan-10-97 | 1,800,000 | Operating Needs |
| Jan-10-97 | 5,000,000 | Operating Needs |
| Jan-31-97 | 3,100,000 | Operating Needs |
| Mar-31-97 | 4,000,000 | Operating Needs |
| Apr-3-97 | 2,300,000 | Operating Needs |
| Apr-4-97 | 6,500,000 | Operating Needs |
| Apr-18-97 | 1,200,000 | Operating Needs |
| Apr-30-97 | 3,000,000 | Operating Needs |
| May-1-97 | 1,600,000 | Operating Needs |
| May-2-97 | 6,500,000 | Operating Needs |
| May-30-97 | 5,000,000 | Operating Needs |
| Jun-13-97 | 2,000,000 | Operating Needs |
| Jun-20-97 | 5,000,000 | Operating Needs |
| Jun-30-97 | 5,300,000 | Operating Needs |
|  | 137,150,000 |  |

JD-SA-0001598