time, in any order of maturity or portion of each maturity to be redeemed as may be designated by AGH, and by lot within a maturity, upon payment of redemption prices set forth in the following table:

|  | Redemption Prices (expressed as percentages of principal amount) |
|---|---|
| Redemption Date | |
| September 1, 2005 through August 31, 2006 | 102% |
| September 1, 2006 through August 31, 2007 | 101% |
| September 1, 2007 and thereafter | 100% |

In the case of the optional redemption of 1995A Bonds subject to mandatory sinking fund redemption prior to maturity, the Authority at the direction of AGH shall be entitled to designate whether such payments shall be credited against principal amounts due at maturity or against particular mandatory redemption obligations with respect to the 1995A Bonds.

*Extraordinary Redemption.* The 1995A Bonds are subject to extraordinary redemption prior to maturity by the Authority, at the direction of AGH, at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the redemption date, (a) out of insurance proceeds, condemnation awards and the proceeds of conveyances in lieu of condemnation deposited with or held by the Bond Trustee for such purpose, in whole or in part at any time, in any order of maturity or portion of each maturity to be redeemed as may be designated by AGH, and by lot within a maturity, and, (b) on the earliest practicable date in the event that (1) the Board of Directors of AGH determines in good faith that the continued operation of the Facilities of AGH (or portions thereof) financed or refinanced with the proceeds of the 1995A Bonds is not financially feasible or is otherwise disadvantageous to AGH, and (2) as a result thereof, AGH sells, leases, or otherwise disposes of all or such portion of such Facilities to a person or entity unrelated to AGH, and (3) there is delivered to the Authority and the Bond Trustee a written statement of Bond Counsel to the effect that, unless the 1995A Bonds are redeemed or retired in the amount specified therein either prior to or concurrently with such sale, lease or other disposition, or on a subsequent date prior to the first date on which the 1995A Bonds are subject to redemption, without premium, at the option of the Authority at the direction of AGH, such Bond Counsel will be unable to render an unqualified opinion to the effect that such sale, lease or other disposition of all or a portion of such Facilities will not adversely affect the validity of any 1995A Bonds or any exemption to which the interest on the 1995A Bonds would otherwise be entitled. In the case of the extraordinary redemption of 1995A Bonds subject to mandatory sinking fund redemption prior to maturity, the Authority at the direction of AGH shall be entitled to designate whether such payments shall be credited against principal amounts due at maturity or against particular mandatory redemption obligations with respect to the 1995A Bonds.

*Notice of Redemption.* Not more than sixty (60) nor less than thirty (30) days before the redemption date of any 1995A Bonds, the Bond Trustee will send notice by first class mail to all registered owners of 1995A Bonds to be redeemed as a whole or in part. Such redemption notice will set forth the details with respect to the redemption in accordance with the provisions of the Bond Indenture and shall state that on the date fixed for redemption interest will cease to accrue on the 1995A Bonds so called for redemption. Failure to give such notice by mail to any holder of 1995A Bonds, or any defect therein, will not affect the validity of any proceedings for the redemption of any other 1995A

- 8 -

GOV 19756

Bonds. If at the time of mailing of any notice of redemption, the Authority shall not have deposited with the Bond Trustee moneys sufficient to redeem all the 1995A Bonds called for redemption, such notice may state that it is subject to the deposit of sufficient moneys with the Bond Trustee not later than the opening of business on the redemption date and shall be of no effect unless such moneys are so deposited.

So long as DTC or its nominee is the registered owner of the 1995A Bonds, any failure on the part of DTC or failure on the part of a nominee of a beneficial owner (having received notice from a DTC Participant or otherwise) to notify the beneficial owner affected by any redemption of such redemption shall not affect the validity of the redemption. So long as DTC or its nominee is the registered owner of the 1995A Bonds, if less than all of the 1995A Bonds of any one maturity shall be called for redemption, the particular 1995A Bonds or portions of 1995A Bonds of such maturity to be redeemed shall be selected by lot by DTC, the DTC Participants and Indirect Participants in such manner as they may determine.

## BOOK-ENTRY-ONLY SYSTEM

The information set forth herein concerning DTC and the book-entry-only system described below has been extracted from materials provided by DTC for such purpose and is not guaranteed as to accuracy or completeness, and is not to be construed as a representation by the Obligated Group or the Authority.

DTC will act as securities depository for the 1995A Bonds. The 1995A Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered certificate will be issued for each maturity of the 1995A Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants ("Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The rules applicable to DTC and its participants are on file with the Securities and Exchange Commission.

Purchases of 1995A Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 1995A Bonds on DTC's records. The ownership interest of each actual purchaser of 1995A Bonds (the "Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant

- 9 -

GOV 19757

through which the Beneficial Owner entered into the transaction. Transfer of ownership interests in the 1995A Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in 1995A Bonds, except in the event that use of the book-entry system for the 1995A Bonds is discontinued.

To facilitate subsequent transfers, all 1995A Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of 1995A Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 1995A Bonds; DTC's records reflect only the identify of the Direct Participants to whose accounts such 1995A Bonds are credited, which may or may not be the Beneficial Owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices with respect to any 1995A Bonds shall be sent to Cede & Co. If less than all of the 1995A Bonds of a particular maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such 1995A Bonds to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to any matter related to the 1995A Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 1995A Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal and interest payments on the 1995A Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payment date. Payments by Participants and Indirect Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant or Indirect Participant and not of DTC, the Bond Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Authority and the Bond Trustee; disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the 1995A Bonds at any time by giving reasonable notice to the Authority. Upon the written request of AGH, the Authority may decide to discontinue use of the system of book-entry transfers for the 1995A Bonds through DTC (or a successor securities depository). Under such circumstances, in the event that a successor securities depository is not obtained, certificates for the 1995A Bonds will be printed and delivered as provided in the Bond Indenture.

- 10 -

GOV 19758

THE AUTHORITY, THE OBLIGATED GROUP AND THE BOND TRUSTEE CANNOT AND DO NOT GIVE ANY ASSURANCES THAT THE DTC PARTICIPANTS OR THE INDIRECT PARTICIPANTS WILL DISTRIBUTE TO THE BENEFICIAL OWNERS OF THE 1995A BONDS (1) PAYMENTS OF PRINCIPAL OF OR INTEREST AND PREMIUM, IF ANY, ON THE 1995A BONDS, (2) CERTIFICATES REPRESENTING AN OWNERSHIP INTEREST OR OTHER CONFIRMATION OF BENEFICIAL OWNERSHIP INTERESTS IN 1995A BONDS, OR (3) NOTICES OF REDEMPTION OR OTHER NOTICES SENT TO DTC OR ITS NOMINEE, CEDE & CO., AS THE REGISTERED OWNER OF THE 1995A BONDS, OR THAT THEY WILL DO SO ON A TIMELY BASIS OR THAT DTC, DTC PARTICIPANTS OR INDIRECT PARTICIPANTS WILL SERVE AND ACT IN THE MANNER DESCRIBED IN THIS OFFICIAL STATEMENT. THE CURRENT "RULES" APPLICABLE TO DTC ARE ON FILE WITH THE SECURITIES AND EXCHANGE COMMISSION, AND THE CURRENT "PROCEDURES" OF DTC TO BE FOLLOWED IN DEALING WITH DTC PARTICIPANTS MAY BE OBTAINED FROM DTC.

NEITHER THE AUTHORITY, THE OBLIGATED GROUP NOR THE BOND TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO ANY DTC PARTICIPANT, INDIRECT PARTICIPANT OR ANY BENEFICIAL OWNER OR ANY OTHER PERSON WITH RESPECT TO: (1) THE 1995A BONDS; (2) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC OR ANY DTC PARTICIPANT OR INDIRECT PARTICIPANT; (3) THE PAYMENT BY DTC OR ANY DTC PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT DUE TO ANY BENEFICIAL OWNER IN RESPECT OF THE PRINCIPAL OR REDEMPTION PRICE OF OR INTEREST ON THE 1995A BONDS; (4) THE DELIVERY BY ANY DTC PARTICIPANT OR INDIRECT PARTICIPANT OF ANY NOTICE TO ANY BENEFICIAL OWNER WHICH IS REQUIRED OR PERMITTED UNDER THE TERMS OF THE INDENTURE TO BE GIVEN TO BONDHOLDERS; (5) THE SELECTION OF THE BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE 1995A BONDS; OR (6) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC AS BONDHOLDER.

The book-entry system for registration of the ownership of the 1995A Bonds may be discontinued at any time if: (i) DTC determines to resign as securities depository for the 1995A Bonds; or (ii) AGH determines (and notifies the Authority of its determination) that continuation of the system of book-entry transfers through DTC (or through a successor securities depository) is not in the best interests of the Beneficial Owners. In either such event (unless the Authority appoints a successor securities depository), 1995A Bonds will then be delivered in registered certificate form to such persons, and in such maturities and principal amounts, as may be designated by DTC, but without any liability on the part of the Authority, the Obligated Group or the Bond Trustee for the accuracy of such designation. Whenever DTC requests the Authority or the Bond Trustee to do so, the Authority or the Bond Trustee shall cooperate with DTC in taking appropriate action after reasonable notice to arrange for another securities depository to maintain custody of certificates evidencing the 1995A Bonds.

## SOURCES OF PAYMENT AND SECURITY FOR THE 1995A BONDS

The 1995A Bonds are limited obligations of the Authority payable solely from and equally and ratably secured under the Bond Indenture by a pledge and assignment by the Authority of payments due from AGH under the Loan Agreement and by moneys and investments held by the Bond Trustee in the funds and accounts established under the Bond Indenture. In addition, the 1995A Bonds are payable from amounts paid by the Obligated Affiliates to the Bond Trustee, as the assignee of the Authority, under the

- 11 -

GOV 19759

1995A Master Note. The covenants and agreements in the Bond Indenture will be for the equal and ratable benefit of the present and future holders of the 1995A Bonds and any Additional Bonds which may from time to time be issued by the Authority in the future in accordance with the provisions of the Bond Indenture.

Payments under the Loan Agreement and the 1995A Master Note are required to be made at times and in amounts so as to enable the Authority to make timely payment of the principal of, redemption premium, if any, and the interest on the 1995A Bonds. Payments made by AGH or any other Obligated Affiliate under the 1995A Master Note will satisfy the obligation of AGH to make payments under the Loan Agreement. As security for their obligations to make payments under the 1995A Master Note, and all other Master Notes and Guaranties issued under the Master Indenture, each Obligated Affiliate has granted to the Master Trustee, for the benefit of the holders of all such Master Notes and Guaranties (including the Bond Trustee as the holder of the 1995A Master Note), a lien on and security interest in its Unrestricted Receivables, which include all accounts, assignable general intangibles and contract rights of each Obligated Affiliate, and all proceeds therefrom, whether cash or non-cash, of each Obligated Affiliate, excluding certain restricted gifts and other specified income not available for the payment of debt service, and subject in each case to Permitted Liens and other limitations described below. Payment of the 1995A Bonds or amounts due under the 1995A Master Note is not secured by the pledge or assignment of any assets of AGH or the Obligated Group other than the Unrestricted Receivables of each Obligated Affiliate.

The security interests in the Unrestricted Receivables and other property of the Obligated Affiliates described above may be limited by a number of factors, including, but not limited to: (i) statutory liens; (ii) rights arising in favor of the United States of America or an agency thereof; (iii) present or future prohibitions against the assignment of amounts due under the Medicare or Medicaid programs contained in statutes or regulations of the United States or the Commonwealth of Pennsylvania; (iv) constructive trusts, equitable liens or other rights conferred or impressed by any state or federal court in the exercise of its equitable jurisdiction; (v) federal or state laws respecting bankruptcy, insolvency and creditors' rights generally; (vi) rights of third parties in Unrestricted Receivables converted to cash and not in the possession of the Master Trustee; and (vii) claims that might arise if appropriate financing or continuation statements are not filed in accordance with the Uniform Commercial Code of the Commonwealth of Pennsylvania as from time to time in effect.

Pursuant to the Master Indenture, each Obligated Affiliate is subject to certain operational and financial covenants and restrictions as set forth therein. These include primarily covenants and restrictions with respect to debt service coverage, the incurrence, directly or by guaranteeing the obligations of others, of additional indebtedness, the ability of any Obligated Affiliate to transfer any of its assets, including both physical and liquid assets, the ability of other entities to become Obligated Affiliates through merger or otherwise, and the ability of any Obligated Affiliate to cease being an Obligated Affiliate. For a more complete description of the terms and provisions of the Master Indenture, see Appendix D: "SUMMARY OF THE RESTATED AND AMENDED MASTER TRUST INDENTURE".

AGH has previously issued Master Notes which are equally and ratably secured under the Master Indenture with the 1995A Master Note. For a description of the previously issued and outstanding Master Notes of the Obligated Group, see "INDEBTEDNESS OF THE OBLIGATED GROUP" in Appendix A hereto.

GOV 19760

The Authority has previously issued its Hospital Revenue Bonds (Allegheny Health Education and Research Corporation), Series 1988A through Series 1988D (collectively, the "1988 Bonds") in the original aggregate principal amount of $60,000,000, of which $54,300,000 is presently outstanding. The 1988 Bonds were issued to finance or refinance certain projects on behalf of AGH.

The 1988 Bonds were issued by the Authority and are secured under a separate trust indenture between the Authority and Mellon Bank, N.A., as trustee. In connection with the issuance by the Authority of the 1988 Bonds, AGH leased to the Authority, pursuant to a lease agreement (the "Prior Lease"), certain premises comprising substantially all of the hospital facilities owned and operated by AGH. In connection therewith, pursuant to a sublease agreement (the "Prior Sublease"), AGH subleased these same facilities for operation and use from the Authority in return for rental payments to be paid to the Authority in amounts sufficient to pay the principal of and interest on the 1988 Bonds (which amounts would be offset by amounts paid under the 1988A Note). In the event of a default by AGH under the Prior Sublease which results in the acceleration of the 1988 Bonds, the Authority would be entitled under the Prior Sublease to terminate the Prior Sublease, and to take over the operation of or to take redelivery and possession of the facilities subject thereto for the remaining term of the Prior Lease, which may be extended until all of the 1988 Bonds have been paid in full. Upon such termination, the Authority would be entitled to the exclusive right to charge and collect the revenues therefrom and apply the proceeds thereof to the payment of the 1988 Bonds before any such proceeds would be available for the payment of any other indebtedness of AGH including its obligations with respect to the 1995A Bonds.

Upon compliance with certain procedures set forth in the Bond Indenture, the Authority may issue Additional Bonds under the Bond Indenture for the benefit of AGH (which may include the Additional 1995 Bonds), which Additional Bonds would be equally and ratably secured, together with the 1995A Bonds, by the Bond Indenture (except with respect to any special fund which might be established under the Bond Indenture for any series of Bonds, as, for example, any separate debt service or debt service reserve fund which might be established in the future solely for the benefit of the registered owners of a particular series of Bonds). See Appendix C: "SUMMARY OF CERTAIN PROVISIONS OF THE BOND INDENTURE AND THE LOAN AGREEMENT: The Bond Indenture - Additional Bonds." The Obligated Affiliates are also permitted to issue additional Master Notes and Guaranties under the Master Indenture or to incur Additional Indebtedness upon compliance with the terms and conditions thereof. See Appendix D: "SUMMARY OF THE RESTATED AND AMENDED MASTER TRUST INDENTURE: Limitations on Additional Indebtedness." Master Notes and Guaranties which may be issued in the future under the Master Indenture, to the extent permitted thereby, would be secured thereunder equally and ratably with the 1995A Master Note, including with respect to the security interest granted thereunder in the Unrestricted Receivables of the Obligated Affiliates.

## MUNICIPAL BOND INSURANCE POLICY

**The following information has been furnished by Municipal Bond Investors Assurance Corporation (the "Bond Insurer") for use in this Official Statement. No representation is made by the Authority, AGH or the Underwriter as to the accuracy or adequacy of the following information or as to the absence of material adverse changes in that information subsequent to the date hereof. For a specimen of the Bond Insurance Policy, see Appendix F hereto.**

The Bond Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the Bond Trustee or its successor of an

- 13 -

GOU 19761

amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the 1995A Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Bond Insurance Policy shall be made in such amounts and at such times as such payment of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any Owner of the 1995A Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Owner within the meaning of any applicable bankruptcy law (a "preference").

The Bond Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any 1995A Bond. The Bond Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of 1995A Bonds upon tender by an Owner thereof; or (iv) any Preference relating to (i) through (iii) above. The Bond Insurance Policy also does not insure against nonpayment of principal of or interest on the 1995A Bonds resulting from the insolvency, negligence or any other act or omission of the Bond Trustee or any other paying agent for the 1995A Bonds. In addition, the Bond Insurance Policy does not insure against the failure of DTC, any DTC Participant or any Indirect Participant to make payments to the Beneficial Owners of the 1995A Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Bond Insurer from the Bond Trustee or any Owner of 1995A Bonds the payment of an insured amount for which is then due, that such required payment has not been made, the Bond Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such 1995A Bonds or presentment of such other proof of ownership of the 1995A Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the 1995A Bonds as are paid by the Bond Insurer, and appropriate instruments to effect the appointment of the Bond Insurer as agent for such Owners of the 1995A Bonds in any legal proceeding related to payment of insured amounts on the 1995A Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such Owners or the Bond Trustee payment of the insured amounts due on such 1995A Bonds, less any amount held by the Bond Trustee for the payment of such insured amounts and legally available therefor.

The Bond Insurer is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against the Bond Insurer. The Bond Insurer is a limited liability corporation rather than a several liability association. The Bond Insurer is domiciled in the State of New York and licensed to do business in all 50 states, the District of Columbia and the Commonwealth of Puerto Rico.

As of December 31, 1993 the Bond Insurer had admitted assets of $3.1 billion (audited), total liabilities of $2.1 billion (audited), and total capital and surplus of $978 million (audited), determined in

- 14 -

GOV 19762

accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of September 30, 1994, the Bond Insurer had admitted assets of $3.3 billion (unaudited), total liabilities of $2.2 billion (unaudited), and total capital and surplus of $1.1 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. Copies of the Bond Insurer's year end financial statements prepared in accordance with statutory accounting practices are available from the Bond Insurer. The address of the Bond Insurer is 113 King Street, Armonk, New York 10504.

Moody's Investors Service, Inc. rates the claims paying ability of the Bond Insurer "Aaa." The 1995A Bonds are rated in the highest rating category by Moody's.

Standard & Poor's Ratings Group, a division of McGraw Hill, Inc. ("Standard & Poor's"), rates the claims paying ability of the Bond Insurer "AAA." The 1995A Bonds are rated in the highest rating category by Standard & Poor's.

The Moody's Investors Service, Inc. rating of the Bond Insurer should be evaluated independently of the Standard & Poor's rating of the Bond Insurer. No application has been made to any other rating agency in order to obtain additional ratings on the 1995A Bonds. The ratings reflect the respective rating agency's current assessment of the creditworthiness of the Bond Insurer and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the 1995A Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of either or both ratings may have an adverse effect on the market price of the 1995A Bonds.

## DEBT SERVICE REQUIREMENTS

The following table sets forth, for each fiscal year, the amounts required for the total debt service due with respect to the outstanding long-term indebtedness of the Obligated Group. For purposes of such table, (i) debt service on outstanding indebtedness bearing interest at a variable rate (including the 1988 Bonds and the 1993A Note) has been calculated based upon assumed rates (not including fees for remarketing and credit support) determined in the manner required under the Master Indenture (see the information under the heading "SUMMARY OF THE RESTATED AND AMENDED MASTER INDENTURE – Limitations on Additional Indebtedness" in Appendix D hereto), and (ii) projected debt service on the Additional 1995 Bonds, which are expected to bear interest at a variable rate, has been calculated based upon an assumed annual interest rate of 5% (not including fees for remarketing or credit support), with principal amortized on a level debt service basis starting after the fiscal year ended June 30, 2012. Such table includes the actual debt service requirements for all indebtedness bearing interest at fixed rates, including the 1995A Bonds and the 1991 Bonds.

GOV 19763

| Year | 1995A Bonds | Additional 1995 Bonds | All Other Long-Term Debt | Total Debt Service |
|---|---|---|---|---|
| 1995 | | | $ 14,249,143 | $ 14,249,143 |
| 1996 | $ 2,772,107 | $ 2,500,000 | 14,262,977 | 19,535,084 |
| 1997 | 3,885,336 | 3,504,250 | 14,273,676 | 21,663,262 |
| 1998 | 3,884,383 | 3,501,500 | 14,379,050 | 21,764,933 |
| 1999 | 3,885,433 | 3,506,000 | 21,868,394 | 29,259,827 |
| 2000 | 3,883,283 | 3,502,625 | 14,000,188 | 21,386,096 |
| 2001 | 3,886,753 | 3,506,250 | 14,188,921 | 21,581,924 |
| 2002 | 3,885,148 | 3,501,750 | 14,166,231 | 21,553,129 |
| 2003 | 3,884,070 | 3,504,000 | 14,139,158 | 21,527,228 |
| 2004 | 3,883,771 | 3,502,750 | 14,209,468 | 21,595,989 |
| 2005 | 3,883,558 | 3,502,875 | 12,030,116 | 19,416,549 |
| 2006 | 3,887,549 | 3,504,125 | 12,287,198 | 19,678,872 |
| 2007 | 3,885,708 | 3,501,375 | 12,231,675 | 19,618,758 |
| 2008 | 3,882,743 | 3,504,375 | 12,272,118 | 19,659,236 |
| 2009 | 3,885,728 | 3,502,875 | 12,302,132 | 19,690,735 |
| 2010 | 3,884,728 | 3,501,750 | 12,522,548 | 19,909,026 |
| 2011 | 3,886,828 | 3,505,625 | 12,432,567 | 19,825,020 |
| 2012 | 3,884,428 | 3,504,250 | 12,533,165 | 19,921,843 |
| 2013 | 3,886,788 | 3,502,500 | 9,790,313 | 17,179,601 |
| 2014 | 3,885,313 | 3,505,000 | 8,660,334 | 16,050,647 |
| 2015 | 3,884,538 | 3,501,500 | 8,657,383 | 16,043,421 |
| 2016 | 3,883,843 | 3,501,750 | 8,741,907 | 16,127,500 |
| 2017 | 3,886,719 | 3,505,250 | 8,820,145 | 16,212,114 |
| 2018 | 3,887,344 | 3,501,750 | 8,899,928 | 16,289,022 |
| 2019 | 3,885,781 | 3,505,875 | - - | 7,391,656 |
| 2020 | 3,886,250 | 3,502,250 | - - | 7,388,500 |
| 2021 | 3,887,813 | 3,505,500 | - - | 7,393,313 |
| Total: | $99,905,943 | $90,087,750 | $301,918,735 | $491,912,428 |

## BONDHOLDERS' RISKS

The following is intended only as a summary of certain risk factors attendant to an investment in the 1995A Bonds and is not intended to be exhaustive. In order to identify risk factors and make an informed investment decision, potential investors should be thoroughly familiar with the entire Official Statement (including each Appendix) in order to make a judgment as to whether the 1995A Bonds are an appropriate investment. Purchasers of the 1995A Bonds, particularly purchasers that are corporations (including S corporations and foreign corporations operating branches in the United States of America), property or casualty insurance companies, banks, thrifts or other financial institutions or certain recipients of Social Security benefits, are advised to consult their tax advisors as to the tax consequences of purchasing or holding the 1995A Bonds. See "TAX MATTERS" herein.

GOV 19764

The descriptions set forth below of certain governmental policies affecting health care and other matters are not intended as a complete discussion of all aspects of laws and regulations and such matters which may affect the financial performance of health care providers such as the Obligated Affiliates. Health care providers operate in a complicated regulatory environment, many aspects of which may adversely affect the revenues and operations of such providers.

## General

The 1995A Bonds are limited obligations of the Authority payable solely from payments made by AGH pursuant to the Loan Agreement, from amounts payable by the Obligated Affiliates under the 1995A Master Note and from certain funds held by the Bond Trustee pursuant to the Bond Indenture. No representation or assurance can be given that AGH or the other Obligated Affiliates will generate sufficient revenues to meet their respective payment obligations under the Loan Agreement or the 1995A Master Note. The ability to generate such revenues could be affected adversely by future legislation, regulatory actions, economic conditions, increased competition, changes in the demand for services or other factors. The Underwriter and the Authority have made no independent investigation of the extent to which any such factors may have an adverse effect on the revenues of the Obligated Group.

## Bond Insurance

There can be no assurance that the Bond Insurer will be financially able to meet its contractual obligations under the Bond Insurance Policy. Certain information with respect to the Bond Insurer is set forth under the caption "Municipal Bond Insurance Policy" herein. Such information was provided by the Bond Insurer, and no representation is made as to the adequacy or the accuracy thereof. In the event that the Bond Insurer is required to pay principal of or interest on the 1995A Bonds, no representation or assurance is given or can be made that such event will not adversely affect the market price for or marketability of the 1995A Bonds. Owners of the 1995A Bonds should note that, while the Bond Insurance Policy will insure payment of the principal amount (but not any premium) paid to any Owner in connection with the optional or extraordinary optional redemption of any 1995A Bonds which is recovered from such Owner as a voidable preference under applicable bankruptcy law, such amounts will be repaid by the Bond Insurer to such Owner only at the times and in the amounts as would have been due absent such redemption.

So long as the Bond Insurer performs its obligations under the Bond Insurance Policy, the 1995A Bonds cannot be accelerated without the prior written consent of the Bond Insurer. Furthermore, so long as the Bond Insurer performs its obligations under the Bond Insurance Policy, the Bond Insurer may direct any remedies that the Bond Trustee exercises under the Bond Indenture.

## Health Care Legislation and Reform

A variety of legislative proposals to substantially reform the payment for and delivery of health care services have been presented at both the federal and state levels in the past two years. Among issues addressed by such legislation were means to control or reduce public and private spending on health care, to reform the payment methodology for health care goods and services by both the public (Medicare and Medicaid) and private sectors, limitations on federal spending for health care benefits, and universal access to health care. No such reform legislation has been enacted into law in the Commonwealth of Pennsylvania or by the federal government. Reform proposals may continue to be considered by the legislatures of both the United States and the Commonwealth in the future; however, it is uncertain what

GOV 19765

proposals may be made in the future or whether any such proposals will be enacted as law. Elements of reform proposals, if acted upon by federal, state or private payors for health care goods and services, may result in reduced or limited payment for health care services or in controlled or limited access to certain health care services generally. There can be no assurance what effect such reforms may have on the business of the Obligated Group, and no assurance can be given that any such reforms would not have an adverse effect on the Obligated Group's revenues and earnings.

## Reimbursement from Third Parties

Most of the patient service revenue of AGH is derived from third party payors which reimburse or pay for the services they provide to patients covered by such third parties for such services. Such payors include, among others, the federal Medicare program, the Pennsylvania Medical Assistance Program ("Medicaid") and Blue Cross and other third-party payors such as health maintenance organizations, employers under self-insurance programs, commercial insurers and preferred provider organizations. Most of those programs, some of which are described in greater detail below, make payments at rates other than the provider's direct charges which rates may be determined other than on the basis of the actual costs incurred in providing services to such patients. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred by AGH. In addition, the financial performance of AGH could be adversely affected by the insolvency of, or other delay in receipt of payments from, third-party payors which provide coverage for services to patients. For further discussion of certain matters pertaining to third-party reimbursement, see the caption "SOURCES OF REVENUE" in Appendix A hereto.

## Medicare Reimbursement

The Medicare Program provides health care benefits to beneficiaries who are 65 years or older, are disabled or qualify for the End Stage Renal Disease Program. The Medicare Program is administered by the Secretary of the United States Department of Health and Human Services ("HHS"), which has delegated this responsibility to the Health Care Financing Administration ("HCFA"). In recent years, Congress has adopted legislation designed to limit the cost of Medicare in response to the high rate of increase in Medicare expenditures and as part of a general program to limit federal spending. Proposals to limit Medicare spending include plans to cover more senior citizens through managed care programs such as HMOs, increases in Medicare costs to higher income senior citizens, the reduction or elimination of payment formulas which provide increased Medicare payments to hospitals which provide a disproportionate share of indigent care, and the reduction or elimination of Medicare payments to teaching hospitals (such as AGH) to subsidize the costs of providing medical education. Additional changes in Medicare and reductions of Medicare funding levels could have an adverse effect on the Obligated Group.

*Hospital Inpatient Services.* Medicare payments for the delivery of inpatient hospital services currently are based on a prospective payment system ("PPS") which generally pays hospitals a predetermined fixed amount for each Medicare inpatient discharge based upon patient diagnosis and certain other factors used to classify each patient into a Diagnosis Related Group ("DRG"). Each DRG is given a relative value from which a fixed payment can then be established. With certain exceptions (referred to as "outliers"), such payments are not adjusted for actual costs, for variations in intensity of illness or for length of stay. PPS payment rates are subject to annual review by HCFA and/or Congress and thus are subject to deficit reduction measures affecting the federal budget generally and/or the Medicare program specifically. There can be no assurance that payments under PPS will be sufficient to cover all of the actual costs of AGH in providing inpatient hospital services to Medicare patients.

- 18 -

GOV 19766

Certain hospitals and distinct inpatient psychiatric and rehabilitation units are not covered under the DRG system but are reimbursed on a "reasonable and allowable cost" basis, not to exceed a hospital's 1983 cost per discharge adjusted for the Medicare inflation allowance. Under this system, if a hospital or a distinct unit of a hospital is operated at costs less than the established rate, it is paid an incentive of 50% of the difference up to a maximum of 5% of the target rate per discharge.

In August 1993, Congress approved the Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993") which mandates approximately $56 billion in additional reductions to Medicare payment increases over a five-year period beginning in federal fiscal year 1994. It is anticipated that approximately one-half of the Medicare reductions will be borne by acute care hospitals.

*Hospital Outpatient Services.* Payments under Medicare Part B for hospital costs incurred for physician and ancillary services and hospital costs incurred in the treatment of outpatients are excluded from PPS and generally are paid on a fee-schedule basis or a fee-schedule and cost-blend basis. The Secretary of HHS is charged with developing a proposal for a prospective pricing system for all outpatient services. Such a system would cause a hospital with costs above the payment rate to incur losses on such services provided to Medicare beneficiaries. No assurance can be given that the current methodology will continue or that fee schedules will be maintained at current levels.

*Physician Services.* Effective January 1, 1992, the Medicare program implemented the Resource Based Relative Value Scale ("RBRVS") fee schedule for payment of services of physicians. The RBRVS payment methodology affects virtually every physician who provides services to Medicare beneficiaries, but the effect will vary among the various specialties with some receiving fee increases and others experiencing decreases.

*Capital Expenditures.* On August 30, 1991, HCFA adopted regulations incorporating Medicare payments for capital expenditures into PPS. There is a separate prospective per case standardized amount for capital costs, adjusted to take into account certain hospital characteristics and weighted by DRG. The regulations provide for a phase-in of prospective capital rates over a ten-year transition period.

During the ten-year transition period, HCFA is providing two alternative payment methods: a fully prospective method and a "hold harmless" method for hospitals with high-cost capital assets. The fully prospective method combines a "standard federal rate" based on the estimated fiscal year 1993 national average capital cost per discharge adjusted to reflect each hospital's case mix, cost of outliers, location and indigent care burden and each hospital's specific rate. Each hospital's specific rate is adjusted for case mix and updated to fiscal year 1994 based on the increase in national average capital cost per discharge. Over the ten-year period, the federal portion of the rate increases gradually until payment is entirely based on this amount.

Under the "hold harmless" method, hospitals with a hospital specific rate above the federal rate will receive payment for old capital costs at reasonable cost minus 15% during the transition period. "Old capital" costs include those capital-related items reported in the Medicare cost report for fiscal year 1990, and those capital costs that hospitals are legally obligated to incur by an enforceable contract entered into on or before December 31, 1990, and that are put into patient use by October 1, 1994. "New capital" costs include costs for all other capital-related items. Under the "hold harmless" method, new capital costs are paid at a proportion of the federal rate based on each hospital's proportion of new capital. A hospital being paid under the "hold harmless" system will be paid at 100% of the federal rate

- 19 -

GOV 19767

if that is higher.  At any point in the ten year transition, such a hospital may choose to be paid fully at the federal rate.  However, such a change will then be permanent.

*Nursing Care.*  Medicare provides payment to Medicare certified nursing facilities for extended care inpatient services provided to Medicare beneficiaries.  These services, which consist of skilled nursing or rehabilitation services such as those provided by AGH's Continuing Care Center, are similar to the kinds of services provided to hospital inpatients, but at a lower level of care and are only available for inpatients who need, on a daily basis, skilled nursing care or other skilled rehabilitation services which, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis. Extended care inpatient services are not covered under Part A unless the beneficiary has been (1) an inpatient of a hospital for at least three consecutive calendar days, and (2) is transferred to a skilled nursing facility within 30 days after discharge from the hospital.  Medicare reimbursement for nursing care is limited to a 100-day period for each qualified patient.

Medicare currently pays an amount equal to the lesser of the allowed reasonable direct and indirect costs, subject to reduction (including depreciation, interest and overhead, if applicable), or maximum per diem limitations plus capital related costs for the extended care inpatient services provided to the Medicare beneficiaries.

The amendments to Medicare enacted under Title VI of the Social Security Amendments of 1983 ("Title VI") and related regulations provide for significant changes in Medicare reimbursement of nursing facilities.  Title VI provides for implementation of a prospective payment reimbursement system for the payment of all inpatient rehabilitation and extended care inpatient services in place of the current reasonable cost system of reimbursement. In addition, informal proposals have been made for a prospective payment system for Medicare outpatient care and for Medicare reimbursement of interest expenses.  The prospective payment system for nursing homes is still being developed by the federal government and, therefore, the effect that such a system may have on the operations of the Obligated Group cannot be predicted at this time.

*Mental Health Services.*  Part A of the Medicare Program provides payment to providers of mental health services for inpatient services provided to Medicare beneficiaries.  Coverage of inpatient mental health services is limited to 190 days of inpatient psychiatric hospital services during a beneficiary's lifetime, with certain limitations.  Payments are made in an amount equal to the lesser of the billed charges or allowed reasonable direct and indirect costs (including depreciation, interest and overhead, if applicable) for the inpatient mental health services provided to Medicare beneficiaries. Medicare payments for inpatient mental health services are subject to a limitation based on a target rate ceiling (which is tied to an inflation index and determined annually for each psychiatric hospital) for the rate of increase in the provider's operating costs for inpatient services.  The target rate ceiling does not apply to capital-related costs.

*Medical Education Costs.*  Under PPS, hospitals receive additional payments for the direct and indirect costs of graduate medical education.  Payments for direct medical education costs attributable to medical education programs meeting certain criteria, and certain indirect medical education costs attributable to graduate medical education programs are not included in PPS but are reimbursed using separate formulae.  The formulae used to determine payments for medical education do not necessarily reflect the actual costs of such education. There can be no assurance that the formulae used in the past will continue to be applied or that payments to AGH under the Medicare program will be adequate to

GOV 19768

cover its direct and indirect costs of providing medical education to interns, residents, fellows, nurses and allied health professionals.

### Medicaid Reimbursement

Medicaid is a jointly administered federal/state program providing payment of hospital benefits within prescribed limits within each state to persons meeting certain minimum income or other eligibility standards. The Pennsylvania Medicaid program, which is administered by the Pennsylvania Department of Public Welfare ("DPW"), generally reimburses hospitals in Pennsylvania for costs of providing services to covered patients as described below. Because it is partially funded by, and its funding is administered through, the Commonwealth of Pennsylvania, the timing and amount of payments under the Medicaid program may be particularly affected by Pennsylvania budgetary constraints.

*Inpatient Services.* Since July 1984, Medicaid payment for acute care services has been based on a prospective payment system similar to the federal Medicare DRG-based, prospective payment system described above. After almost three years of litigation over Medicaid inpatient reimbursement rate issues initiated by numerous Pennsylvania general acute care hospitals, the Commonwealth of Pennsylvania and a number of hospitals entered into a stipulation of settlement. Pursuant to the settlement, and amendments thereto, hospitals were retroactively reimbursed for inpatient services previously provided and future prospective payment reimbursement rates were increased. To assist in funding the enhanced rates of reimbursement, the settlement provided for voluntary donations by or taxes imposed on the litigant hospitals to be applied to a pooled fund which would qualify for federal matching funds. The Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 restricted the use after federal fiscal year 1992 of this type of arrangement to attain federal matching funds. There can be no assurance that future Medicaid inpatient reimbursement rates will remain at the current levels, or that such rates will be adequate to reimburse AGH for the costs of providing inpatient care to Medicaid patients. In spite of this change, the Commonwealth has agreed to continue to fund the plan through June 30, 1995 as long as alternative funding sources are available. It has done this based upon the fact that other Commonwealth funds (General Assistance monies) have been identified for use in securing matching monies to offset the majority of those monies lost as a result of the regulation change.

*Capital Expenditures.* Payment for capital costs (including depreciation and interest, but excluding such costs for moveable equipment) has been integrated into a comprehensive prospective payment system for both capital costs and operating costs of providing inpatient services. There is no assurance that Medicaid reimbursement levels for capital depreciation and interest will be adequate to satisfy capital requirements of AGH.

*Outpatient Services.* Medicaid pays for hospital outpatient services rendered based on the lower of the usual charge to the general public for the same service or the Medicaid maximum allowable fee, or the upper limit established by Medicare or Medicaid.

*Inpatient Mental Health and Rehabilitation Services.* Medicaid provides payment for inpatient mental health and rehabilitation services rendered to eligible recipients by private psychiatric hospitals, such as ANI, and rehabilitation distinct part units at a per diem rate subject to retroactive adjustment. The per diem rates are established at the lesser of the hospital's billed charges or the allowable reasonable and direct and indirect cost (including capital costs) of rendering such services. Such payments are, however, subject to a per diem ceiling on operating costs which is based upon the hospital's Medicare per diem ceiling, adjusted annually by an inflation factor determined annually by DPW.

- 21 -

GOV 19769

*Nursing Care.* Medicaid pays for skilled nursing care and intermediate care services rendered to eligible recipients (who have been certified and periodically recertified for receipt of such services) by nursing homes enrolled as providers under Medicaid, such as the Continuing Care Center of AGH. Medicaid presently reimburses skilled and intermediate care nursing facilities on a flexible retrospective payment plan which provides reimbursement of allowable operating costs plus 6% of such allowable costs. Reimbursement of operating costs is subject to ceilings on various categories of operating expenses based on the costs incurred with respect to such categories of operating expenses by nursing facilities in the region in which the facility is located. The current ceiling for operating costs is 115% of year-end reported median costs. Capital related costs are subject to a $22,000 per bed construction cost limitation for certain fixed items (land, buildings, and fixed equipment).

Recent federal nursing home reform legislation requires changes in nursing home operations and patient services. The Pennsylvania Medicaid program has taken formal steps to implement a system that will address these changes. DPW proposed a case-mix payment system for nursing home services which will address some of the shortcomings in the present reimbursement method and effectively increase access to services for heavier care Medicaid patients. Case-mix reimbursement systems systematically link the amount paid to the types of residents treated: the more extensive the services and the greater the need, the higher the case-mix index incorporated into the payment rate. The system selected to be used in determining the case-mix index is Resource Utilization Groups -- Version II (RUGS-II), which groups residents into 44 groups using two major classification structures: a clinical (medical and mental) topology and a measure of functionality represented by the Activities of Daily living. The pricing model would establish prices among peer groups of facilities based upon costs of the group, other than capital costs, rather than costs of individual facilities. Payments for resident care costs, other resident related costs and administrative costs will be determined using the median costs for a peer group of facilities. Capital costs are to be paid using a facility-specific rate based on fair rental value.

In July 1994, House and Senate committees voted to disapprove the proposed regulations. The Independent Regulatory Review Commission also voted to disapprove the regulations citing several concerns including failure by DPW to lift the moratorium on reimbursement of depreciation and interest costs relating to new construction. It is not clear when or whether the proposed regulations will be introduced or finally promulgated or if a different system will be adopted.

In order for the Commonwealth of Pennsylvania to continue to receive partial reimbursement for the cost of its Medicaid program from the federal government, it must administer its program in accordance with federal regulations. The federal government has on occasion threatened to cut off or reduce Medicaid funds to states that are not in compliance with its regulations. Any such federal action taken with respect to the Pennsylvania Medicaid program would likely have an adverse effect upon AGH.

*Post-Pooling Negotiations.* Prior to July 1, 1993, funds available for Medicaid reimbursement in Pennsylvania were enhanced through a pooling agreement under which voluntary donations by hospitals were combined in a pool which increased the federal matching funds available. DPW had received approval from HCFA for higher Medicaid DRG rates based on the increased funds available from the pooling arrangement. Federal legislation enacted in November 1991 prohibited most such pooling arrangements by states, and the enhanced funding available from the Pennsylvania pooling arrangement ceased as of July 1, 1993. Hospitals in Pennsylvania have negotiated a new Medicaid reimbursement arrangement to reflect the loss of pooling funds, but some hospitals have elected not to accept the arrangement and to litigate against DPW instead. AGH has accepted the new arrangement and is not a party to any such litigation against DPW.

- 22 -

GOV 19770

**Blue Cross and Indemnity Contracts**

The Obligated Affiliates also receive reimbursement from a variety of private payors, including indemnity plans such as Blue Cross and other private insurance carriers. Such indemnity plans, including Blue Cross, are prepaid health care programs that pay for a variety of defined benefits for their insured subscribers. Such plans generally make direct payments to hospitals or reimburse their policyholders, and such reimbursement is often subject to policyholder copayments and deductibles. Specific coverages in such plans vary substantially from plan to plan. In most cases, indemnity plans, including Blue Cross, make payment on the basis of either (1) established charges or a percentage thereof, or (2) daily rates negotiated by each facility with the indemnity plan. In some cases, indemnity plans pay according to a formula based on hospital costs and typically use the reimbursement principles and limitations of the Medicare Program discussed above. There is no assurance that the Obligated Group will maintain such contracts or obtain other similar contracts in the future. Failure to maintain such Blue Cross contracts could have the effect of reducing the revenues of the Obligated Affiliates.

**Private Health Plans and Insurance**

Certain payors contract with hospitals on an "exclusive" or a "preferred" provider basis, and some payors have introduced plans known as "preferred provider organizations" ("PPOs"). Under such plans, there may be financial incentives for subscribers to use only those hospitals which contract with the plans. In addition, health maintenance organization ("HMOs") and exclusive provider managed care plans limit coverage to those services provided by selected hospitals, except in certain cases of medical emergency. With this contracting authority, private payors may direct patients away from nonselected hospitals by denying or limiting coverage for services provided by them.

Most PPOs and HMOs currently pay hospitals on a discounted fee-for-service basis or on a discounted fixed rate per day of care. Consequently, the discounts offered to HMOs and PPOs may result in payment at less than a hospital's actual cost, and the volume of patients directed to a hospital under an HMO and/or PPO contract may vary significantly from projections. Therefore, the future financial consequences of such contracts may be unknown. In cases where an HMO is a major purchaser of services from a particular hospital, contract rate reduction, contract cancellation, inability to pay, business failure or bankruptcy of the HMO may have a substantial negative effect on the hospital's financial condition.

There is no assurance that contracts with HMOs and PPOs will be maintained or that other similar contracts will be obtained in the future. Failure to execute and maintain such PPO and HMO contracts could have the effect of reducing the patient base or gross revenues of the Obligated Affiliates. Conversely, participation may maintain or increase the patient base, but may result in reduced payment and lower net income to the Obligated Group.

**Retroactive Adjustments of Payments**

Funds received from Medicare, Medicaid and some third-party payors may be subject to audit. These audits can result in retroactive adjustments of payments received. If, as a result of such audits, it is determined that overpayments of benefits were made, the excess amount must be repaid. If, on the other hand, it is determined that an underpayment was made, payors may make additional payments to the provider. The Obligated Affiliates maintain reserves for possible adjustments at levels which they believe to be adequate to cover any adjustments.

- 23 -

GOV 19771

**Integrated Delivery Systems**

Many hospitals are pursuing integrated delivery systems generally designed to conform to existing trends in the delivery of health care services, to implement anticipated aspects of health care reform, to increase physician availability to the community, and to enhance the managed care capability of the affiliated hospital and physicians. Such strategies may create certain business and legal liabilities for such hospitals. Typical integration strategies include medical service organizations which may provide a combination of administrative services, premises and equipment to physicians; medical practice foundations, which may purchase and own physician practices and provide all administrative services for such practices; and other organizational forms, including HMOs which may contract with or employ physicians. Generally, the start-up funding for such developments, as well as operational deficits, may be capitalized by the sponsoring hospital, and these capital requirements may be substantial. For a discussion of certain activities of AGH with respect to the establishment of an integrated delivery system, see the caption, "SOURCES OF REVENUE — Managed Care Relationships" in Appendix A hereto.

Such integrated delivery developments create legal or regulatory risks in varying degrees. Common risks to such developments include compliance with the Medicare Anti-Kickback Law and Stark Bill (discussed below under "Regulation of Provider Relationships") and relevant antitrust laws. Other related legal and regulatory risks may arise, including reimbursement arrangement, employment, pension and benefits, and corporate practice of medicine. There can be no assurance that such risks relating to potential integrated delivery system activities of the Obligated Affiliates will not experience material adverse consequences.

**Antitrust**

Enforcement of federal and state antitrust laws against health care providers is becoming more common, and antitrust liability may arise in a wide variety of circumstances, including medical staff privilege disputes, third party contracting, physician relations and joint venture, merger, affiliation and acquisition activities. Enforcement activity by federal and state agencies appears to be increasing. Violation of the antitrust laws could result in criminal and civil enforcement by federal and state agencies, as well as by private litigants.

A recent U.S. Supreme Court decision permits physicians who are subject to adverse peer review proceedings to file federal antitrust actions against hospitals and seek treble damages. Hospitals regularly are engaged in disputes with physicians regarding credentialing and peer review, and therefore may be subject to allegations of liability in this area. Recent court decisions also have established private causes of action against hospitals which use their local market power to promote ancillary health care businesses in which they have a financial or ownership interest. Such activities may result in monetary liability for the participating hospitals under certain circumstances where a competitor suffers business damage. Whether antitrust liability will be imposed on a hospital generally depends on the facts and circumstances of each case. Although the Obligated Affiliates believe that they are in compliance with these laws, there can be no assurance that enforcement agencies will not assert that one of the Obligated Affiliates has violated or is violating a federal or state antitrust law, or that if any such assertion were made, that the Obligated Affiliates would prevail, or whether any sanction imposed would have a material adverse effect on the operations of the Obligated Group.

- 24 -

GOV 19772

**Other Legislative and Regulatory Actions**

The Obligated Affiliates and their operations are subject to regulation, certification and accreditation by various federal, state and local government agencies and by certain nongovernmental agencies such as, in the case of AGH, the Joint Commission on Accreditation of Healthcare Organizations. No assurance can be given as to the effect on future hospital operations of existing laws, regulations and standards for certification or accreditation or of any future changes in such laws, regulations and standards.

**Technology and Services**

Scientific and technical advances, new procedures, drugs and appliances, preventive medicine, occupational health and safety and outpatient health care delivery may reduce utilization of services by the Obligated Affiliates and revenues of the Obligated Group in the future. Technological advances in recent years have accelerated the trend toward the use by hospitals of sophisticated and costly equipment and services for diagnosis and treatment. The acquisition and operation of certain equipment and services may continue to be a significant factor in hospital utilization, but the ability to offer such equipment or services may be subject to the availability of equipment or service specialists, governmental approval or the ability of the Obligated Group to finance such acquisitions and operations.

**Competition and Service Areas**

The Obligated Affiliates could face additional competition in the future from other hospitals and health care providers which could offer comparable health care services to the population which the Obligated Affiliates presently serve. This could include the initiation of new health care services and the construction or the renovation of hospitals, health maintenance organizations, ambulatory surgical centers, private laboratories and radiological services. One of the chief effects of both the Medicare and Medicaid prospective payment systems has been an increase in competition among health care providers. There are now federal incentives to control costs and deliver services in a more efficient and economical fashion and health care providers, including the Obligated Affiliates, are attempting to respond to these incentives. This change in federal reimbursement policy coincides with the development of alternative forms of health care delivery to replace inpatient care. The alternative forms of health care services, such as ambulatory surgical centers and skilled nursing facilities, are being pursued by HMO's and other insurance organizations as a way to reduce costs. No assurance can be given that occupancy at AGH will not be adversely affected either by the future availability of other health facilities in the primary service area of AGH or if increases in charges at AGH were to exceed increases at other hospitals or that new health care services, the construction and renovation of hospitals, health maintenance organizations, ambulatory surgical centers, private laboratories and radiological services will not be initiated and have an adverse affect on the financial condition of the Obligated Group. The financial performance of each Obligated Affiliate is, to some extent, dependent upon the economic vitality of its service area. If there were a general economic downturn in the geographic areas served by the Obligated Affiliates, it could result in a decrease of the population served by the Obligated Affiliates or a loss of insurance benefits for a portion of the patients of the Obligated Affiliates.

**Tax-Exempt Status**

In recent years, the activities of tax-exempt hospitals and other health care providers have been subjected to increasing scrutiny by federal, state, and local legislative and administrative agencies

- 25 -

GOV 19773

(including the United States Congress, the Internal Revenue Service (the "IRS"), and local taxing authorities). Various proposals either have been considered previously or are presently being considered at the federal, state, and local level which would variously restrict the definition of tax-exempt status, impose new restrictions on the activities of tax-exempt corporations, and/or tax or otherwise burden the activities of such corporations (including proposals to broaden or strengthen federal tax provisions respecting unrelated business income of nonprofit, tax-exempt corporations or proposals requiring the provision of free care to indigent patients or the amount of care provided to Medicare or Medicaid patients). There can be no assurance that future changes in the laws, rules, regulations, interpretations and policies relating to the definition, activities, and/or taxation of tax-exempt corporations will not have material adverse effects on the future operations of the Obligated Group.

Uncertainty about the IRS's position on a wide range of common activities by health care organizations increased with the release of General Counsel Memorandum No. 39862 ("GCM") in December 1991. The GCM proposed the revocation of three previous Private Letter Rulings of the IRS regarding the sale by hospitals of net revenue streams to joint ventures involving physician investors. This change of direction by the IRS with respect to previously issued Private Letter Rulings may indicate more stringent enforcement and interpretation of rules regarding tax-exempt health care organizations generally, and may signal an abandonment of other positions previously announced by the IRS and relied upon by tax-exempt hospitals. In addition, the GCM undertakes an in-depth analysis of compliance with the Anti-Kickback Law and the regulations thereunder regarding direct or indirect payments for referrals, and the GCM, together with subsequent letters written by the Office of Inspector General to the IRS, suggests that tax-exempt hospitals which are in violation of these broadly-stated payments for referral prohibitions may also be subject to revocation of their tax-exempt status... See the information herein under the caption, "BONDHOLDERS' RISKS-Regulation of Provider Relationships". As a wide variety of commonplace hospital-physician transactions may violate the prohibitions of the Anti-Kickback Law on inducements for referrals, the GCM and subsequent correspondence by the Office of Inspector General appear to have broadened the range of activities which may directly affect tax exemption, without defining specifically how such rules will be applied. As a result, tax-exempt hospitals, such as AGH, which have, and will continue to have, extensive transactions with physicians are subject to an increased degree of scrutiny and perhaps enforcement by the IRS. The GCM is merely a statement of policy and interpretation of the IRS, and is not necessarily indicative of the result of a judicial adjudication of the applicable issues. If any of the ventures or other arrangements of a particular Obligated Affiliate were determined to result in private inurement, excessive private benefit or a violation of the Anti-Kickback Law, such Obligated Affiliate could lose its tax-exempt status.

Compliance with current and future regulations and rulings of the IRS could adversely affect the ability of the Obligated Group to charge and collect revenues, finance or incur indebtedness on a tax-exempt basis or otherwise generate revenues necessary to provide for payment of the 1995A Bonds. Although each Obligated Affiliate has covenanted to maintain its tax-exempt status, loss of tax-exempt status by AGH would likely have a significant adverse effect on the Obligated Group and operations and could result in the includability of interest on the 1995A Bonds in gross income for federal income tax purposes retroactive to their date of issue or acceleration of the maturity of the 1995A Bonds.

**Regulation of Provider Relationships**

The Federal Medicare/Medicaid Anti-Fraud and Abuse Amendments to the Social Security Act (the "Anti-Kickback Law") make it a criminal offense to offer, pay, solicit or receive remuneration in order to induce business for which reimbursement is provided under Medicare or Medicaid. In addition

- 26 -

GOV 19774

to criminal penalties, including fines of up to $25,000 and five years imprisonment, violations of the Anti-Kickback Law can lead to civil monetary penalties and exclusion from the Medicare and Medicaid programs. The scope of prohibited payments in the Anti-Kickback Law is broad and includes a large number of economic arrangements involving hospitals, physicians and other health care providers, including joint ventures, space and equipment rentals, purchases of physician practices and management and personal services contracts. HHS has published regulations which describe certain arrangements that will not be deemed to constitute violations of the Anti-Kickback Law (the "Safe Harbors"). The Safe Harbors described in the regulations are narrow and do not cover a wide range of economic relationships which many hospitals, physicians and other health care providers consider to be legitimate business arrangements not prohibited by the statute. Because the Safe Harbors do not purport to describe comprehensively all lawful or unlawful economic arrangements or other relationships between health care providers and referral sources, hospitals and other health care providers having these arrangements or relationships may or may not be required to alter them in order to ensure compliance with the Anti-Kickback Law.

Effective January 1, 1992, Section 6204 of the Omnibus Budget Reconciliation Act of 1989 ("Stark I") prohibits, with certain limited exceptions, physicians who have a "financial relationship" with an entity from referring Medicare patients or specimens to that entity for clinical laboratory services. "Financial relationship" includes, among other relationships, an ownership or investment interest in the entity, or a compensation arrangement with the entity by a physician or a member of the physician's immediate family. The Omnibus Budget Reconciliation Act of 1993 included certain amendments to Stark I ("Stark II" and, together with Stark I, the "Stark Law") which significantly broadened the scope of prohibited physician self-referrals contained in Stark I to include, among others, referrals by physicians to entities with which the physician has a financial relationship and which provide physical and occupational therapy services, radiology and other diagnostic services, radiation therapy, durable medical equipment, parenteral and enteral nutrition, prosthetics, orthotics, home health services, outpatient prescription drugs, and inpatient and outpatient hospital services which are reimbursable by Medicare or Medicaid.

The Stark Law also requires all Medicare providers (a) to report to the Department of Health and Human Services the names and provider numbers of physicians who have any ownership interests in the provider and are in a position to make or influence referrals to the provider and (b) to report on every bill submitted for Medicare reimbursement the name and provider number of the physician who referred the patient for such services and whether the referring physician has an ownership interest in the provider. The Medicare program may deny reimbursement for any claim that fails to provide such information. In addition, any person who fails to meet the reporting requirements described above is subject to a civil monetary penalty of not more than $10,000 for each day for which reporting is required to have been made.

Unlike the Anti-Kickback Law that describes generally prohibited conduct and then provides safe harbors for particular arrangements, the Stark Law absolutely prohibits specific referral arrangements unless a particular exception applies. The amended Stark Law contains exceptions to the self-referral prohibition, including an exception where the physician has an ownership interest in the entire hospital. The amendments became effective on December 31, 1994 and contemplate the promulgation of regulations implementing the new provisions. No regulations have yet been adopted or proposed.

- 27 -

GOV 19775

Sanctions for prohibited referrals under the Stark Law include the denial of Medicare payment for the clinical laboratory services, civil money penalties, and possible exclusion from the Medicare program.

The Stark Law also requires all Medicare providers (a) to report to the Department of Health and Human Services the names and provider numbers of physicians who have any ownership interests in the provider and are in a position to make or influence referrals to the provider and (b) to report on every bill submitted for Medicare reimbursement the name and provider number of the physician who referred the patient for such services and whether the referring physician has an ownership interest in the provider. The Medicare program may deny reimbursement for any claim that fails to provide such information. In addition, any person who fails to meet the reporting requirements described above is subject to a civil monetary penalty of not more than $10,000 for each day for which reporting is required to have been made.

In addition, from time to time, legislation is introduced or regulations are proposed at the federal and state levels that would further restrict relationships and compensation arrangements among health care providers. Pennsylvania has adopted certain referral limitations in the Workers' Compensation Act and further limitations are included in the comprehensive health reform legislation proposed by former Governor Casey in the Pennsylvania Health Security Act.

AGH has relationships with physicians and other referral sources which may not qualify for Safe Harbor protection or for an exception from the Stark Law under the statute itself or the regulations which have yet to be promulgated. Both the Anti-Kickback Law and the Stark Law are broadly drafted, and their application to such arrangements is often uncertain. Since the inquiry under both laws is highly factual, it is not possible to predict how they may be applied to certain arrangements between AGH and other health care providers. Although AGH believes that it is in compliance with these laws, there can be no assurance that enforcement authorities will not assert that AGH, or certain transactions into which they have entered, has violated or is violating the Anti-Kickback Statute or the Stark Law, or that if any such assertion were made, that AGH would prevail, or whether any sanction imposed would have a material adverse effect on the operations of the Obligated Group. Even the assertion of a violation of the Anti-Kickback Law, the Stark Law or similar laws could have a material adverse effect upon the Obligated Group.

**Property Tax Assessments**

In recent years, a number of local taxing authorities in Pennsylvania, including the County of Allegheny, the City of Pittsburgh and the School District of the City of Pittsburgh, have sought to subject the facilities of nonprofit hospitals and nursing facilities to local real estate taxes, primarily by challenging their status as "purely public charities" as described in the Pennsylvania Constitution, notwithstanding the fact that Pennsylvania hospital facilities historically have been viewed as exempt from such taxes. Pennsylvania court decisions have produced differing results in such cases and have failed to provide clear guidance on the question; although a 1994 decision of the Pennsylvania Supreme Court does provide some favorable guidance regarding the application of certain tests to determine the charitable nature of nonprofit nursing homes. Nonetheless, such cases are highly fact-specific, and it can be expected that local taxing authorities will continue to assert claims for taxes against nonprofit institutions, including hospitals, or to negotiate payments in lieu of taxes. AGH currently pays an aggregate of approximately $1.4 million annually in lieu of taxes under agreements with the County of Allegheny, the City of Pittsburgh and the School District of the City of Pittsburgh which expire in 1999. There can be no assurance that such

- 28 -

GOV 19776

amounts will not increase after such time or that such taxing authorities will not assert additional claims against the Obligated Affiliates.

**Certain Matters Relating to Enforceability of Obligations**

No facilities of any Obligated Affiliate are pledged as security for the 1995A Bonds. In addition, with certain minor exceptions, the facilities of the Obligated Affiliates are not general purpose facilities and are not likely to be suitable for industrial or commercial use. Consequently, it would be difficult to find a buyer or lessee for such facilities and, in the event of the institution of bankruptcy proceedings, the estate in bankruptcy may not realize the amount of the outstanding 1995A Bonds from the disposition of such facilities.

The practical realization of value upon any default will depend upon the exercise of various remedies specified in the Bond Indenture, the Loan Agreement and the Master Indenture. These and other remedies may, in many respects, require judicial actions which are often subject to discretion and delay. The various legal opinions to be delivered concurrently with the delivery of the 1995A Bonds will contain customary qualifications as to the enforceability of the various legal instruments by limitations imposed by state and federal laws, rulings and decisions affecting remedies and by bankruptcy, reorganization, fraudulent conveyances, or other laws affecting the enforcement of creditors' rights generally.

The provisions of the Master Indenture pursuant to which each Obligated Affiliate guarantees the payment of any and all amounts due under the Master Notes of all Obligated Affiliates, including the 1995A Master Note, may not be enforceable if payments or such guaranties: (a) are required with respect to payments of any Master Note which was issued for a purpose which is not consistent with the charitable purpose of the Obligated Affiliate from which such payments are required or which is issued for the benefit of any entity other than a not-for-profit corporation which is exempt from federal income taxes under Sections 501(a) and 501(c)(3) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code; (b) are required to be made from any moneys or assets of the Obligated Affiliate from which such payments are required which are donor restricted or which are subject to a direct or express trust which does not permit the use of such moneys or assets for such payments; (c) would result in a cessation or discontinuance of any material portion of the health care or related services previously provided by the Obligated Affiliate from which such payments are required; or (d) are required to be made pursuant to any loan violating applicable usury laws.

There is no clear precedent in the law as to whether payments on a Master Note by an Obligated Affiliate may be voided by a trustee in bankruptcy in the event of a bankruptcy of such Obligated Affiliate or by third party creditors in an action brought pursuant to state fraudulent conveyances statutes. Under the United States Bankruptcy Code, a trustee in bankruptcy, and under state fraudulent conveyances statutes a creditor of a guarantor, may avoid any obligation incurred by a guarantor if, among other bases therefor, (a)(1) the guarantor has not received fair consideration or reasonably equivalent value in exchange for the guaranty, and (2) the guaranty renders the guarantor insolvent, as defined in the United States Bankruptcy Code or state fraudulent conveyances statutes, or (b) the guarantor is under-capitalized. Application by courts of the tests of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law. It is possible that, in an action to force an Obligated Affiliate to make a payment on a Master Note, including the 1995A Master Note, issued other than by such Obligated Affiliate, a court might not enforce such a payment in the event it is determined that sufficient consideration for the Obligated Affiliate's guaranty was not received or

- 29 -

GOV 19777

that the incurrence of such guaranty has rendered or will render the Obligated Affiliate insolvent or the Obligated Affiliate is or will thereby become under-capitalized.

There exists statutory authority in Pennsylvania for a court to dissolve a nonprofit corporation or undertake supervision of its affairs on various grounds, including a finding that such corporation is insolvent. Moreover, pursuant to the common law and statutory power to enforce charitable trusts and to see that charitable funds are applied to their intended uses, the Attorney General of the Commonwealth of Pennsylvania (in which each Obligated Affiliate is incorporated) may commence legal proceedings to dissolve a non-profit corporation acting contrary to its charitable purposes or to restrain actions inconsistent with the charitable use of such funds or which render such non-profit corporation unable to discharge its charitable functions. In certain states, such actions may arise on a court's own motion or pursuant to a petition of the attorney general or such other persons who have interests different than those of the general public. The obligations of each Obligated Affiliate may be limited by such charitable trust laws.

## Bankruptcy

The rights and remedies of the owners of the 1995A Bonds are subject to various provisions of the federal Bankruptcy Code. If an Obligated Affiliate were to file a petition for relief under the Bankruptcy Code, its revenues (to the extent such revenues are not proceeds of a pre-petition security interest in Gross Revenues) and certain of its accounts receivable and other property created or otherwise acquired after the filing of such petition would not be subject to the security interest of the Master Trustee created under the Master Indenture for the benefit of the holders of Master Notes and Guaranties, including the Bond Trustee as the holder of the 1995A Master Note. The filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against such Obligated Affiliate and its property, and as an automatic stay of any act or proceeding to enforce a lien upon or to otherwise exercise control over its property. If the bankruptcy court so ordered, the property of such Obligated Affiliate, including accounts receivable and proceeds thereof, could be used for the financial rehabilitation of such Obligated Affiliate despite the security interest of the Master Trustee therein. While the Bankruptcy Code requires that the interests of the Master Trustee, as the holder of liens and security interest created pursuant to the Master Indenture, be adequately protected before the collateral may be used by the Obligated Affiliate, such protection could take the form of a replacement lien on assets of the Obligated Affiliate acquired or created after the bankruptcy petition is instituted. The rights of the Master Trustee to enforce such liens and security interests against such Obligated Affiliate could be delayed during the pendency of the rehabilitation proceeding.

An Obligated Affiliate could file a plan for the adjustment of its debts in any such proceeding which could include provisions modifying or altering the rights of creditors generally, or any class of them, secured or unsecured, which had notice or knowledge of the plan and discharges all claims against the debtor provided for in the plan. No plan may be confirmed unless certain conditions are met, among which are that the plan is in the best interests of creditors, is feasible and has been accepted by each class of claims impaired thereunder. Each class of claims has accepted the plan if at least two-thirds in dollar amount and more than one-half in number of the class votes in its favor. Even if the plan is not so accepted, it may be confirmed if the court finds that the plan is fair and equitable with respect to each class of non-accepting creditors impaired thereunder and does not discriminate unfairly.

GOV 19778

**Other Factors**

Additional factors that may affect future operations of the Obligated Group to an extent that cannot be determined at this time include the following:

(i)    Adoption by the Commonwealth of Pennsylvania of legislation that would establish a rate-setting agency with statutory control over hospitals in Pennsylvania.

(ii)    Adverse labor actions that could result in a substantial reduction in revenues without corresponding decreases in cost.

(iii)    Reduced demand for hospitalization or other services arising from future medical and scientific advances.

(iv)    Efforts by insurers and governmental agencies to limit the cost of hospital services and to reduce utilization of inpatient hospital facilities by such means as preventive medicine, improved occupational health and safety, and outpatient care.

(v)    Availability of nurses and other qualified health care technicians and personnel.

(vi)    Imposition of wage and price controls for the health care industry.

(vii)    Occurrences of natural disasters, including floods, volcanic eruptions and earthquakes, which may damage the facilities of the Obligated Group or interrupt utility service to the facilities or otherwise impair the operation of the Obligated Group and the generation of revenues from the facilities.

(viii) Continued increase in assessments and premiums paid by certain Obligated Affiliates and members of their medical staffs for professional malpractice insurance which may have a material adverse affect on the financial condition of the Obligated Group or cause certain physicians to retire from the medical staff or reduce their activities.

(ix)    Amendments to federal tax law place limitations on the ability of nonprofit hospitals to finance certain projects, invest bond proceeds and advance refund prior tax-exempt bond issues.    These limitations may increase the interest costs for future borrowings by the Obligated Group.

(x)    Inability of Obligated Affiliates to obtain future governmental approvals to undertake projects necessary to remain competitive as to rates and charges as well as quality and scope of care.

- 31 -

GOV 19779

## LITIGATION

### Issuance of the 1995A Bonds

There is no litigation now pending against the Authority or AGH or, to the knowledge of their respective officers, threatened, restraining or enjoining the issuance, sale, execution or delivery of the 1995A Bonds, or in any way contesting or affecting the validity of the 1995A Bonds, any proceeding of the Authority or AGH taken concerning the issuance or sale thereof or the security provided for the payment of the 1995A Bonds, or the existence or powers of the Authority relating to the issuance of the 1995A Bonds.

### The Obligated Group

AGH and ASRI advise that no litigation or proceedings are pending or, to their knowledge, threatened against either of them or their officers, except (i) litigation in which the probable recoveries and the estimated costs and expenses of defense, in the opinion of their counsel, will be entirely within their applicable insurance policy limits (subject to applicable deductibles) or are not in excess of the total reserves held under any applicable self-insurance program, or (ii) litigation in which, in the opinion of their counsel, an adverse determination would not have a materially adverse effect on the operations or conditions, financial or otherwise, of the Obligated Group. AGH and ASRI further advise that no litigation or proceedings are pending or, to their knowledge, threatened against any or all of them which in any manner questions their right to effect the financing described herein.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance and sale of the 1995A Bonds by the Authority are subject to the approving opinion of Ballard Spahr Andrews & Ingersoll, Philadelphia, Pennsylvania, Bond Counsel. Certain legal matters will be passed upon for AGH and the Obligated Affiliates by its special counsel, Foley & Lardner, Chicago, Illinois and by Nancy A. Wynstra, Esquire, Executive Vice President and General Counsel of AHERF; for the Authority by its solicitor, Mead J. Mulvihill, Jr., Esquire, Pittsburgh, Pennsylvania; and for the Underwriter by its counsel, Drinker Biddle & Reath, Philadelphia, Pennsylvania. Drinker Biddle & Reath, counsel for the Underwriter, has, from time to time, performed legal services for AHERF and its affiliates.

## TAX EXEMPTION

On the date of issuance of the 1995A Bonds, Bond Counsel will deliver an opinion in substantially the form attached hereto as Appendix E to the effect that interest on the 1995A Bonds is excludable from gross income for purposes of federal income tax under existing law as presently enacted and construed, assuming the accuracy of the representations and certifications by the Authority and AGH and continued compliance by the Authority and AGH with the requirements of the Internal Revenue Code of 1986, as amended (the "Code").

Interest on the 1995A Bonds will not be an item of tax preference for purposes of determining either individual or corporate alternative minimum tax, but interest on 1995A Bonds held by a corporation (other than an S corporation, regulated investment company, real estate investment trust or real estate

- 32 -

GOV 19780