ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

———————

1.   Organization:

Allegheny General Hospital (AGH) is a Pennsylvania nonprofit charitable organization that operates a 746- bed tertiary care facility and a 119-bed subacute hospital-based skilled nursing facility. AGH is the parent company of Allegheny Singer Research Institute (ASRI) and Allegheny Neuropsychiatric Institute (ANI). AGH, ASRI, and ANI make up a restricted group formed in connection with the issuance of hospital revenue bonds. ASRI is a nonprofit medical research institute that receives funding principally from affiliates, government grant programs, and private donors. ANI is a nonprofit charitable organization that operates a 94-bed neuropsychiatric hospital. It is anticipated that the ANI facility will close in November, 1994 and relocate its programs and services to AGH.

Allegheny Health, Education and Research Foundation (AHERF), a nonprofit organization, is the parent company of AGH. AHERF is also the parent company of The Medical College of Pennsylvania (MCP), The Medical College Hospitals (MCH), St. Christopher's Hospital for Children (SCHC), Diversified Health Group, Inc. (DHG), Allegheny Health Services Providers Insurance Company (AHSPIC), and effective July 1, 1994, Hahnemann University and its affiliates.

2.   Accounting Policies:

The significant accounting policies applied in preparing the accompanying consolidated financial statements are summarized below:

Principles of Consolidation:

The accompanying consolidated financial statements include the accounts of AGH, ASRI, and ANI. All intercompany transactions have been eliminated in consolidation.

Cash Equivalents:

Highly liquid investments purchased with a maturity date of three months or less and the current portion of investments limited or restricted as to use are considered to be cash equivalents.

Investments and Investment Income:

Short-term investments are carried at cost, which approximates fair value.

AGH's short-term investments and those investments restricted by donors for specific purposes are managed pursuant to a master trust arrangement (Master Trust) that includes the investments of other AHERF entities. Investments in the Master Trust consist primarily of government and corporate obligations and repurchase agreements collateralized by U.S. Treasury notes and bonds that have fixed rates of return. Investment income and realized gains or losses are allocated on the pro rata cost value of each entity's investment. AGH's pro rata share of the Master Trust is stated at cost.

AGH's endowment investments and those investments limited as to use, which are carried at cost, consist generally of investments similar to those in the Master Trust and marketable equity securities of domestic companies.

6

GOV 19831

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

---

2.    Accounting Policies, continued:

Investments and Investment Income, continued:

Donated investments from organizations within the AHERF system are recorded at cost, with those from all other sources recorded at estimated fair value at the date of contribution. Investments in fixed income securities are recorded at cost when it is management's intent and ability to hold these obligations until maturity. Marketable equity securities included in investment portfolios are carried at the lower of aggregate cost (determined on an average cost basis) or fair value at the balance sheet date. Impairments in value that are deemed to be other than temporary are reflected in the consolidated statements of revenue and expenses. Unrestricted investment income and gains and losses on sales of investments, which are based on average cost, are included in nonoperating gains.

Grants Receivable and Deferred Grant Revenue:

Grants and contracts are recognized in the year in which expenditures are made, either as research support or, in the case of expenditures for equipment, as credits directly to net equity. Receivables are recorded when contract and grant expenditures exceed funds received. Deferrals are recorded when funds received are in excess of expenditures incurred. Additionally, notices of Federal and other research grant awards have been received but have not been recorded because they relate to future years. Such awards approximated $5,800 at June 30, 1994 and 1993.

Inventories:

Inventories are valued at the lower of cost (determined on the first-in, first-out method) or fair value.

Property and Equipment:

Property and equipment, along with expenditures that extend the useful lives of assets, are recorded at cost. Certain internal computer software and development costs are capitalized and included in property and equipment. Maintenance and repairs are charged to expense as incurred. At the time assets are retired or otherwise disposed of, the cost thereof and accumulated depreciation or amortization are eliminated and any resulting gain or loss on disposition is recorded as nonoperating gains.

Depreciation is provided over the estimated useful lives of the assets computed under the straight-line method commencing when the related assets are placed into service. Depreciation of assets acquired with funds restricted for research is recorded as a reduction of specific purposes net equity on the consolidated statements of changes in net equity.

7

GOV 19832

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

———————

2.    Accounting Policies, continued:

### Other Assets:

Other assets consist primarily of bond financing costs, investments in annuity contracts on behalf of employees and investments in joint ventures. The bond financing costs are being amortized over the respective terms of the related bond issues on a basis that approximates the interest method.

### Restricted Net Equity:

Restricted gifts and other restricted resources are recorded as additions to the appropriate restricted net equity. Such amounts are restricted by the donor and may be used only in accordance with the purposes established by the donor. Amounts restricted by donors for specific operating expenses are reported as revenue to the extent used within the period. Amounts restricted by donors for acquisition of property and equipment are transferred to general net equity to the extent expended within the period.

### Charity Care:

AGH maintains a charity care policy which was established to assure that all persons seeking treatment receive needed health care services regardless of their ability to pay. This policy provides that persons who lack the means to pay for all or a portion of their needed health care services receive financial assistance in the form of partial or total charge reductions. Because AGH does not pursue collection of amounts determined to qualify as charity care, they are not reported as revenue.

### Net Patient Service Revenue:

A substantial portion of revenue in fiscal year 1994 was earned under agreements with Medicare (46%), Blue Cross (23%), and Medical Assistance (12%), and other third party payors. Such revenue is subject to audit and retroactive adjustment by the various third party payors. Amounts due from or payable to these third party payors are recorded in patient accounts receivable at the estimated net realizable value for services rendered to individuals covered under the agreements. Adjustments related to final settlements with third party payors and changes in estimates are included in the determination of net patient service revenue in the year in which such adjustments or changes become known.

### Related Party Transactions:

Fees charged for services provided to or incurred for services purchased from affiliates and recurring operational commitments pursuant to contractual affiliation agreements are included in the consolidated statements of revenue and expenses. All other transactions between affiliates are recorded as net equity transfers. Any resulting accounts receivable or payable with affiliates are settled periodically in the normal course of business.

8

GOV 19833

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

2.    Accounting Policies, continued:

   Reclassifications:

   Certain amounts in the fiscal year 1993 consolidated financial statements have been
   reclassified for comparative purposes.

3.    Investments Limited or Restricted as to Use:

Investments limited or restricted as to use consist of the following components:

|  | June 30, | |
|---|---|---|
|  | 1994 | 1993 |
| By Board of Trustees: | | |
| Future addition or replacement of property and equipment | $113,018 | $133,750 |
| Self-insurance reserve funds | 961 | 2,033 |
|  | 113,979 | 135,783 |
| By Financing Agreements: | | |
| Debt service fund | 1 | 15 |
|  | 1 | 15 |
| By Donor Restriction: | | |
| Specific purposes | 7,350 | 6,826 |
| Endowments | 10,014 | 6,941 |
|  | 17,364 | 13,767 |
| Total investments limited or restricted as to use | 131,344 | 149,565 |
| Less current portion included in cash and cash equivalents | 962 | 2,048 |
| Investments limited or restricted as to use | $130,382 | $147,517 |

9

GOV 19834

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

June 30, 1994 and 1993

(Dollars in Thousands)

---

3.  <u>Investments Limited or Restricted as to Use</u> continued:

The Board of Trustees retains control over designated investments and may, at its discretion, subsequently use such investments for other purposes.  Investments limited or restricted as to use that are required to satisfy obligations classified as current liabilities are included in cash and cash equivalents on the consolidated balance sheets.  The fair value of all investments limited or restricted as to use was approximately $131,000 and $155,000 at June 30, 1994 and 1993, respectively.  For marketable equity securities and government and corporate obligations, such fair values were determined based on quoted market prices and dealer quotes where available, or quoted market prices pertaining to similar securities where not available.  The carrying value for investments included in the Master Trust approximates fair value.

Gross unrealized gains and losses pertaining to all marketable equity securities were as follows:

|  | June 30, | |
|---|---|---|
|  | 1994 | 1993 |
| Gross unrealized gains | $4,631 | $6,506 |
| Gross unrealized losses | $3,622 | $2,002 |

4.  <u>Property and Equipment</u>:

Property and equipment consists of the following components:

|  | June 30, | |
|---|---|---|
|  | 1994 | 1993 |
| Buildings and building improvements | $218,999 | $205,297 |
| Equipment | 172,008 | 142,408 |
| Land and land improvements | 10,058 | 10,043 |
| Construction in progress | 38,179 | 28,349 |
|  | 439,244 | 386,097 |
| Less accumulated depreciation and amortization | 202,125 | 176,634 |
| Property and equipment, net | $237,119 | $209,463 |

10

GOV 19835

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

———————

5.  Long-Term Debt:

Long-term debt consists of the following obligations:

|  | June 30, | |
|---|---|---|
|  | 1994 | 1993 |
| Series 1993 A-C Notes: | | |
| A (with maturity dates through July 1, 2012 and adjustable interest rates ranging from 3.42% to 4.83% during fiscal year 1994) | $29,500 | $ 30,000 |
| B (with maturity dates through January 1, 2012 and a fixed interest rate of 7.85%) | 14,639 | 15,000 |
| C (with maturity dates through January 1, 2004 and a fixed interest rate of 7.33%) | 15,000 | 15,000 |
|  | 59,139 | 60,000 |
| Series 1991 A Revenue Bonds, net of unamortized discount of $781 in 1994 and $834 in 1993 (with maturity dates through September 1, 2017 and fixed interest rates from 5.8% to 7.25%) | 57,309 | 58,236 |
| Series 1988 A - D Revenue Bonds (with maturity dates through March 1, 2018 and adjustable interest rates ranging from 1.45% to 3.40% during fiscal year 1994) | 54,300 | 55,400 |
| Term loan (with a maturity date of June 16, 1999 and adjustable interest rates ranging from 3.85% to 4.97% during fiscal year 1994) | 7,500 | 7,500 |
|  | 178,248 | 181,136 |
| Less amounts maturing within one year | 4,541 | 10,389 |
| Long-term debt | $173,707 | $170,747 |

11

GOV 19836

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

--------

5.    Long-Term Debt, continued:

In January 1993, $60,000 of Series 1993 A-C Notes (1993 Notes) were issued in a private placement to refund Allegheny County Hospital Development Authority (ACHDA) Hospital Revenue Bonds, Series 1983 D (1983 Bonds), which were previously issued to refund ACHDA Hospital Revenue Bonds, Series 1979 N (1979 Bonds) and ACHDA Hospital Revenue Refunding and Improvement Bonds, Series 1977 K (1977 Bonds). Pursuant to the refunding plan, the proceeds from the 1993 Notes, along with funds held under the 1983 Bonds' indenture, were deposited into an irrevocable escrow account invested in federal government obligations that matured and earned interest in amounts sufficient to meet all debt service requirements including their extinguishment on January 1, 1994. Likewise, the 1983 Bonds' proceeds were previously deposited into an irrevocable escrow account invested in federal government obligations scheduled to pay interest in amounts sufficient to meet all debt service requirements for the 1979 and 1977 Bonds. The escrow funds, along with the 1979 and 1977 Bonds, are not included on AGH's consolidated balance sheets. The outstanding principal balances of the 1979 and 1977 Bonds were $66,035 and $8,375, respectively, at June 30, 1994. The interest rate on the adjustable rate portion of the 1993 Notes was 4.70% at June 30, 1994. Redemption of the 1993 Notes is supported by a renewable irrevocable letter of credit from a bank which expires January 29, 1998.

In January 1991, $60,000 of Series 1991 A Hospital Revenue Bonds (1991 Bonds) were issued by the Pennsylvania Higher Educational Facilities Authority (PHEFA).

In February 1988, $60,000 of Allegheny County Hospital Development Authority (ACHDA) Hospital Revenue Bonds, Series 1988 A - D (1988 Bonds) were issued. Under the provisions of the 1988 Bonds, six different interest methods can be selected. Currently, interest is accruing under the weekly method and, at June 30, 1994, the rate was 2.40%. Redemption of these Bonds is supported by a renewable irrevocable letter of credit from a bank.

In accordance with the Master Trust Indenture, the 1993 Notes and 1991 and 1988 Bonds are subject to early redemption at the option of AGH. Additionally, under the provisions of the Master Trust Indenture, AGH is directly obligated to make loan payments under the 1993 Notes' loan agreement and rental payments under lease and sublease arrangements related to the 1991 and 1988 Bonds, which are sufficient to enable the PHEFA and the Authority, respectively, to make timely payments of principal and interest. These bonds are collateralized by the pledge of certain of AGH's accounts receivable to the Master Trustee. This indenture contains certain covenants, the most restrictive of which requires AGH to maintain a long-term debt service coverage ratio of 1.2 or greater, calculated at the end of each fiscal year.

In June 1994, $7,500 was borrowed by ANI under a term loan agreement. The proceeds of the loan were utilized to refinance a $7,500 term loan which was to mature on June 30, 1994. Under the provisions of the loan agreement, two different interest methods can be selected. Currently, interest is accruing under a method based on Eurodollar rates and, at June 30, 1994, the rate was 4.97%. The loan agreement also provides for early redemption at the option of ANI.

12

GOV  19837

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

5.  Long-Term Debt, continued:

Following are scheduled principal repayments and sinking fund requirements on the long-term debt for each of the next five fiscal years:

1995 - $ 4,541
1996 - $ 4,812
1997 - $ 5,097
1998 - $ 5,496
1999 - $13,315

The fair value of all obligations included in long-term debt at June 30, 1994 and 1993 was $182,806 and $192,966, respectively. Such fair value is based on rates currently available to AGH for debt with similar terms and remaining maturities.

6.  Commitments:

As of June 30, 1994, AGH had capital expenditure purchase commitments outstanding related to a major addition to its facility of approximately $21,000.

AGH leases certain medical and office equipment and office space used in its operations. Rental expense for operating leases for the fiscal years ended June 30, 1994 and 1993 was $10,727 and $9,007, respectively. The annual and total future minimum lease payments under noncancelable operating leases entered into as of June 30, 1994 are as follows:

| Year | |
|---|---|
| 1995 | $ 6,430 |
| 1996 | 4,484 |
| 1997 | 2,680 |
| 1998 | 1,899 |
| 1999 | 1,722 |
| 2000 and thereafter | 1,590 |
| Total minimum payments | $18,805 |

13

GOV 19838

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

June 30, 1994 and 1993

(Dollars in Thousands)

---

7. Charity Care:

AGH maintains records to identify and monitor the level of charity care it provides. These records include the amount of charges forgone for services and supplies furnished under its charity care policy and the estimated expenses incurred to provide such services and supplies. The following information measures the level of charity care provided:

| | Years Ended June 30, | |
| | 1994 | 1993 |
|---|---|---|
| Charges forgone, based on established rates. | $11,186 | $9,677 |
| Estimated expenses incurred to provide charity care | $ 5,369 | $4,742 |

8. Net Patient Service Revenue:

Net patient service revenue consists of the following components:

| | Years Ended June 30, | |
| | 1994 | 1993 |
|---|---|---|
| Gross patient service revenue: | | |
| Hospital charges | $830,039 | $778,697 |
| Professional fees | 3,463 | 2,590 |
| | 833,502 | 781,287 |
| Less provisions for contractual adjustments | 432,606 | 388,443 |
| Net patient service revenue | $400,896 | $392,844 |

Contractual adjustments represent the difference between standard billing rates and amounts estimated to be paid under hospitalization or other related health benefit agreements. Provisions for contractual adjustments are recorded in the period in which the services are provided.

During fiscal years 1994 and 1993, AGH's bad debt expense amounted to $11,775 and $11,682, respectively, and is included in materials, supplies, and services expense on the consolidated statements of revenue and expenses.

9. Nonoperating Gains, Net:

Nonoperating gains, net consist of the following components:

| | Years Ended June 30, | |
| | 1994 | 1993 |
|---|---|---|
| Investment income/(loss) from: | | |
| Investments limited or restricted as to use | $10,494 | $14,393 |
| Cash, cash equivalents, and short-term investments | 658 | 380 |
| Other | 32 | (1,736) |
| Gifts and bequests | 549 | 1,201 |
| Loss on disposition of property and equipment | (160) | (116) |
| Nonoperating gains, net | $11,573 | $14,122 |

14

GOV 19839

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

June 30, 1994 and 1993

(Dollars in Thousands)

10.    Insurance:

AGH is insured for primary coverage and for certain levels of excess coverage related to professional and general liability claims through AHSPIC, a captive insurance company incorporated in the Cayman Islands. In addition, AGH participates in the Medical Professional Liability Catastrophic Loss Fund of the Commonwealth of Pennsylvania (CAT Fund) and maintains insurance under commercially insured programs on a claims-made basis for amounts in excess of the AHSPIC and CAT Fund coverages. Premiums paid by AGH to the captive insurance company, AHSPIC, are retrospectively rated and are based on funding requirements determined by independent insurance actuaries to include provisions for estimates of the ultimate costs for both reported claims and claims incurred but not reported, determined on a discounted basis using a 6.5% rate. During fiscal years 1994 and 1993, AGH's total professional and general liability insurance expenses were $5,485 and $5,394, respectively, including $4,048 and $3,301, respectively, related to coverage from AHSPIC.

AGH is self-insured for workers' compensation liability claims and has established a trust fund for the payment of related claims. Funding requirements and estimates of losses incurred are determined on a discounted basis using actuarial assumptions which include a 6% discount rate and which are subject to revisions based on actual experience. During fiscal years 1994 and 1993, total workers' compensation expenses were $5,103 and $4,589, respectively.

11.    Pension Plans:

AGH maintains a noncontributory, defined benefit pension plan covering substantially all employees at AGH, ASRI, and ANI. Under this cash balance plan, pension accruals are determined using a defined percentage of an employee's current compensation based on the employee's age and years of service. Each employee's individual retirement benefit is defined within the plan's obligation as a notational cash balance retirement account and credited with interest based on a defined interest rate. AGH's funding policy is to contribute such amounts as are necessary on an actuarial basis to provide the plan with assets sufficient to meet benefits to be paid to retirees or their beneficiaries and to satisfy the minimum funding requirements of the Employee Retirement Income Security Act.

Net pension cost for fiscal year 1993 includes $920 which was actuarially determined relative to a special voluntary retirement incentive program which provides additional benefits for eligible employees who voluntarily elected to retire after May 13, 1993 and on or before June 30, 1993. Additionally, other costs of $1,145 also related to this voluntary retirement program are included in salaries, wages, and fringe benefits on the consolidated statements of revenue and expenses for the year ended June 30, 1993.

Net pension cost includes the following components:

| | For the Years Ended June 30, | |
| --- | --- | --- |
| | 1994 | 1993 |
| Service cost benefits earned during the period | $ 6,743 | $ 5,774 |
| Interest cost on projected benefit obligation | 4,237 | 3,831 |
| Actual return on assets | (3,895) | (7,553) |
| Net amortization and deferral | (2,944) | 1,044 |
| Cost recognized for voluntary retirement benefits | - | 920 |
| Net pension cost | $ 4,141 | $ 4,016 |

15

GOV 19840

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

_____

11.   <u>Pension Plans</u> continued:

Significant assumptions used in the accounting for net pension cost were:

|  | June 30, | |
|---|---|---|
|  | 1994 | 1993 |
| Discount rate | 8.25% | 8.50% |
| Rate of increase in compensation levels | 5.00% | 5.50% |
| Expected long-term rate of return on assets | 9.50% | 9.50% |

The following table sets forth the funded status of the defined benefit plan:

|  | as of June 30, | |
|---|---|---|
|  | 1994 | 1993 |
| Actuarial present value of benefit obligation: | | |
|   Vested benefit obligation | $(58,330) | $(49,056) |
|   Nonvested benefit obligation | (1,694) | (3,277) |
|     Accumulated benefit obligation | (60,024) | (52,333) |
| Effect of projected future compensation levels | (234) | (611) |
|     Projected benefit obligation | (60,258) | (52,944) |
| Plan assets at fair value (primarily listed equity securities, convertible securities and bonds) | 59,906 | 62,413 |
|     Funded status - (projected benefit obligation in excess of plan assets)/plan assets in excess of projected benefit obligation | (352) | 9,469 |
| Unrecognized prior service credit due to plan amendments | (3,309) | (3,518) |
| Unrecognized net loss/(gain) from past experience different from that assumed | 3,770 | (707) |
| Unrecognized net asset arising at transition | (7,960) | (8,954) |
| Accrued pension costs | $ (7,851) | $ (3,710) |

GOV 19841

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

---

11.    Pension Plan, continued:

AHERF sponsors a contributory, defined contribution savings plan which is available to substantially all employees of AGH, ASRI, and ANI in order to provide additional security during retirement by creating an incentive for employees to make regular contributions on their own behalf. Under this plan, and as determined on an individual employee basis, AGH contributes an amount equal to 25% of an employee's contribution for employee contributions up to 4% of such employee's salary in a given year. The cost of AGH's contribution to this savings plan was $975 and $789 for the years ended June 30, 1994 and 1993, respectively.

12.    Related Party Transactions:

An affiliation agreement between AHERF and MCP stipulates certain AHERF financial commitments to MCP, to, among other things, strengthen MCP's teaching, academic research, and health service programs. Such financial support of operations is determined annually based upon MCP's needs and available funds within the AHERF system. During fiscal years 1994 and 1993, AHERF, through AGH, transferred $6,613 and $6,737, respectively, to MCP. Additionally, during fiscal years 1994 and 1993, AGH, ANI, and ASRI, collectively, purchased $17,293 and $12,788, respectively, of physician administrative and teaching services and researcher services from MCP and initiated charges of $3,721 and $1,531, respectively, to MCP for support and administrative services provided to MCP. The amounts transferred to and purchased from MCP are included in materials, supplies, and services expenses, while the amounts charged to MCP are included in other revenue on the consolidated statements of revenue and expenses.

During fiscal year 1994 and 1993, AGH transferred $13,519 and $37,079, respectively, to AHERF to support information service and other corporate initiatives. Additionally, AHERF transferred $8,485 of property and equipment to AGH in fiscal 1994. Transfers for support and equipment were recorded as net equity transfers. AHERF provides selected management and administrative services to its operating units and charges them for these services on a basis that approximates its cost of providing such services. During fiscal years 1994 and 1993, AGH incurred service charges from AHERF of $16,584 and $15,129, respectively. These charges are included on the consolidated statements of revenue and expenses based on their natural classification. Additionally, AHERF is committed to advancing the quality of health care services provided to the communities it serves through the sponsorship of human genetic and biomedical research. In fiscal year 1994 and 1993, research funding provided by AHERF to AGH amounted to $14,209 and $13,341, respectively. AGH recognizes this support in the year in which expenditures are made, either as research support or, in the case of expenditures for equipment, as credits directly to net equity. During fiscal years 1994 and 1993, $11,338 and $8,870, respectively, of such support from AHERF is included in research support on the consolidated statements of revenue and expenses. AHERF also provided contributions of $1,000 in fiscal years 1994 and 1993, to AGH as matching support related to externally funded contributions to establish an endowment. In addition, AHERF has, as of June 30, 1994, a commitment to provide matching support of $250 related to external endowment commitments.

13.    Disclosures About the Fair Value of Financial Instruments:

In addition to the methods and assumptions previously described to estimate the fair value of investments limited or restricted as to use and long-term debt, the carrying amounts of all other financial instruments have been determined to be reasonable estimates of fair value.

17

GOV 19842

ALLEGHENY GENERAL HOSPITAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
June 30, 1994 and 1993
(Dollars in Thousands)

14.    Legal Matters:

AGH is subject to legal proceedings and claims which have arisen in the ordinary course of its business and which have not yet been finally adjudicated. The liability from these actions, when ultimately concluded, cannot be determined because of the uncertainties that exist. In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on the consolidated financial position of AGH. However, it is possible that, upon settlement, results of operations in a particular period could be materially affected.

GOV 19843

**Appendix C**

# Summaries of Certain Provisions of the Bond Indenture and the Loan Agreement

GOV 19844

# TABLE OF CONTENTS

Page

DEFINITIONS OF CERTAIN TERMS

THE BOND INDENTURE

Pledge and Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-6
Issuance of 1995A Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-6
Additional Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-6
Debt Service Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-6
Redemption Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-7
Special Clearing Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-7
Construction Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-7
Funds Held for All Bondholders; Certain Exceptions . . . . . . . . . . . . . . . . . . C-7
Investment or Deposit of Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-8
Covenants of the Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-8
Events of Default and Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-9
Actions by Bondholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-10
Application of Moneys Upon Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-11
Employment and Duties of the Bond Trustee . . . . . . . . . . . . . . . . . . . . . . . C-11
Removal and Resignation of the Bond Trustee . . . . . . . . . . . . . . . . . . . . . . C-11
Rights of the Bond Insurer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-11
Amendments to Bond Indenture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-12
Amendments to Loan Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-13
Defeasance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-13
Unclaimed Moneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-14

THE LOAN AGREEMENT

The Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-14
Repayment of Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-14
Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-15
Nature of Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-15
Insurance Proceeds and Condemnation Awards . . . . . . . . . . . . . . . . . . . . . C-15
Additional Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-15
Events of Default and Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-16
Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-17

GOV 19845

## SUMMARY OF CERTAIN PROVISIONS OF
## THE BOND INDENTURE AND THE LOAN AGREEMENT

The following are definitions of certain terms used in, and summaries of certain provisions of, the Bond Indenture and the Loan Agreement. The summaries set forth below should not be regarded as full statements of the documents themselves, or of the portions summarized. Reference is made to the documents in their entireties for the complete statements of the provisions thereof. Copies of the Bond Indenture and the Loan Agreement shall be on file at the principal office of the Authority and the principal corporate trust office of the Bond Trustee.

## DEFINITIONS OF CERTAIN TERMS

"**Additional Bonds**" shall mean any bonds or series of bonds issued under the Bond Indenture subsequent to the issuance of the 1995A Bonds.

"**Administrative Expenses**" shall mean reasonable fees and expenses of the Authority and the Bond Trustee, including reasonable legal fees and expenses, in connection with any Bonds or the administration of the Bond Indenture or the Loan Agreement.

"**Authority Representative**" shall mean the Chairman, the Vice Chairman, the Second Vice Chairman, the Secretary, the Assistant Secretary, the Second Assistant Secretary, the Treasurer, the Assistant Treasurer, the Second Assistant Treasurer or the Manager of the Authority or any other officer, member or other person designated by a Certified Resolution of the Authority to act for any of the foregoing, either generally or with respect to the execution of any particular document or other specific matter, a copy of which shall be on file with the Bond Trustee.

"**Bond Indenture**" or "**Indenture**" shall mean the Trust Indenture dated as of March 1, 1995 between the Authority and the Bond Trustee, as amended or supplemented from time to time.

"**Bond Trustee**" shall mean Mellon Bank, N.A., acting as trustee under the Bond Indenture, and all successors and assigns.

"**Bondholder**", "**holder**" or "**owner**" shall mean, when used with respect to Bonds, the Person in whose name any Bond is registered in the registration books kept pursuant to the Bond Indenture.

"**Bond Insurance Policy**" shall mean the financial guaranty insurance policy issued by the Bond Insurer insuring the payment of principal of and interest on the 1995A Bonds when due.

"**Bond Insurer**" shall mean Municipal Bond Investors Assurance Corporation.

"**Bonds**" shall mean the 1995A Bonds and any Additional Bonds authenticated and delivered pursuant to the Bond Indenture.

C-1

GOV 19846

"**Borrower Representative**" means the person or persons at the time authorized to act on behalf of the Borrower, either generally or with respect to the execution of any particular document or other specific matter, as set forth in By-Laws of the Borrower or a Certified Resolution of the Borrower, copies of which shall be on file with the Authority and the Bond Trustee.

"**Capital Additions**" shall mean any additions, improvements, repairs to or replacements of all or any part of the Borrower's Facilities, the cost of which is properly chargeable to a plant or property account under generally accepted accounting principles.

"**Certificate**" shall mean a certificate or report, in form and substance satisfactory to the Authority and not unsatisfactory to the Bond Trustee, executed: (a) in the case of an Authority Certificate, by an Authority Representative; (b) in the case of a Borrower Certificate, by a Borrower Representative; and (c) in the case of a Certificate of any other Person, by such Person, if an individual, and otherwise by an officer, partner or other authorized representative of such Person.

"**Certified Resolution**" shall mean, as the context requires: (a) one or more resolutions or ordinances of the governing body of the Authority, certified by the Secretary or Assistant Secretary of the Authority, under its seal, to have been duly adopted or enacted and to be in full force and effect as of the date of certification; or (b) one or more resolutions of the governing body of the Borrower or a duly authorized committee thereof, certified by the Secretary or Assistant Secretary of the Borrower or other officer serving in a similar capacity, under its corporate seal, to have been duly adopted and to be in full force and effect as of the date of certification.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations thereunder, as the same may be amended from time to time. Reference herein to any specific provision of the Code shall be deemed to refer to any successor provision of the Code.

"**Counsel**" shall mean an attorney-at-law or law firm (which may be counsel to the Authority or the Borrower) not unsatisfactory to the Authority or the Bond Trustee.

"**Event of Default**" shall mean any of the events described as an event of default under the headings "THE BOND INDENTURE - Events of Default and Remedies" and "THE LOAN AGREEMENT - Events of Default and Remedies" in this Appendix C.

"**Facilities**" shall mean any or all of the Borrower's land, buildings, fixtures, equipment, furnishings and other physical assets and facilities including any of the foregoing which is owned by the Borrower or which is otherwise operated by the Borrower under a lease, license, operating agreement or other comparable contractual arrangement.

"**Fiscal Year**" shall mean the annual accounting year of the Borrower, which currently begins on July 1 of each year.

"**Government Obligations**" shall mean:

(i) direct obligations of, or obligations the timely payment of the principal of and interest on which is guaranteed by, the United States of America;

C-2

GOV 19847

(ii) evidences of ownership of a proportionate interest in specified direct obligations of, or specified obligations the timely payment of the principal of and the interest on which are unconditionally and fully guaranteed by, the United States of America, which obligations are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of custodian;

(iii) obligations issued by the Resolution Funding Corporation pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (the "FIRRE Act"), (A) the principal of which obligations is payable when due from payments of the maturing principal of non-interest bearing direct obligations of the United States of America which are issued by the Secretary of the Treasury and deposited in the Funding Corporation Principal Fund established pursuant to the FIRRE Act, and (B) the interest on which obligations, to the extent not paid from other specified sources, is payable when due by the Secretary of the Treasury pursuant to the FIRRE Act; and

(iv) obligations which are (A) issued by any state or political subdivision thereof or any agency or instrumentality of such a state or political subdivision, (B) fully secured as to principal and interest by obligations described in clause (i), (ii) or (iii) above and (C) rated at the time of purchase by a Rating Agency in its highest Rating Category.

**"Loan Agreement"** shall mean the Loan Agreement dated as of March 1, 1995 between the Authority and the Borrower, as amended or supplemented from time to time.

**"Master Indenture"** shall mean the Restated and Amended Master Trust Indenture dated April 7, 1993, as supplemented and amended, among the Borrower, Allegheny-Singer Research Institute and the Master Trustee.

**"Master Note"** or **"Note"** shall mean any Note (including the 1995A Master Note) issued, authenticated and delivered under the Master Indenture as security for the payment of the Bonds.

**"Master Trustee"** shall mean PNC Bank, National Association, acting as trustee under the Master Indenture, and all successors and assigns.

**"1995A Master Note"** shall mean the promissory note issued under the Master Indenture by the Borrower evidencing and securing the Borrower's obligations under the Loan Agreement.

**"1995 Project"** shall mean the project to be financed with the proceeds of the 1995A Bonds as more fully described in the Preliminary Official Statement under the heading "PLAN OF FINANCING—The 1995 Project."

**"Outstanding"** shall mean all Bonds authenticated and delivered under the Bond Indenture as of the time in question, except:

(a) All Bonds theretofore cancelled or required to be cancelled pursuant to the Bond Indenture;

(b) Bonds for the payment or redemption of which provision has been made in accordance with the Bond Indenture; provided that, if such Bonds are being redeemed, the required notice

C-3

GOV 19848

of redemption shall have been given or provision satisfactory to the Bond Trustee shall have been made therefor, and that if such Bonds are being purchased, there shall be a firm commitment for the purchase and sale thereof; and

(c) Bonds in substitution for which other Bonds have been authenticated and delivered pursuant to the Bond Indenture.

"**Person**" shall mean an individual, a corporation, a partnership, an association, a joint stock company, a trust, any unincorporated organization, a governmental body or a political subdivision, a municipality, a municipal authority or any other group or organization of individuals.

"**Pledged Revenues**" shall mean (a) the loan payments received or receivable by the Authority from the Borrower under the Loan Agreement (or under any Master Note relating thereto), except for certain payments reserved to the Authority in respect of its Administrative Expenses and indemnification rights, (b) any and all other amounts payable to the Bond Trustee as specified in the Bond Indenture, and (c) all income and receipts on the funds held by the Bond Trustee under the Bond Indenture.

"**Qualified Financial Institution**" shall mean a bank, trust company, national banking association, insurance company or other financial services company whose unsecured long term debt obligations or insurance claims paying abilities (as applicable) at the time of purchase of an investment are rated by a Rating Agency in either of its two highest rating categories.

"**Qualified Investments**" shall mean and include any of the following, to the extent permitted under the applicable laws of the Commonwealth:

(a)      Government Obligations;

(b)      Debt obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such a state or political subdivision, and (ii) at the time of purchase, rated by a Rating Agency in either of its two highest Rating Categories;

(c)      any bond, debenture, note, participation certificate or other similar obligation which is either (i) issued by the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation or the Student Loan Marketing Association, or (ii) backed by the full faith and credit of the United States of America;

(d)      certificates of deposit, whether negotiable or nonnegotiable, issued by any bank, trust company or national banking association (including the Bond Trustee), provided that, unless issued by a Qualified Financial Institution, such certificates of deposit must be (i) continuously and fully insured by the Federal Deposit Insurance Corporation and (ii) continuously and fully secured, to the extent not insured by the Federal Deposit Insurance Corporation, by Government Obligations having a market value (exclusive of accrued interest, other than accrued interest paid in connection with the purchase of such securities) at all times at least equal to the principal amount of such certificates of deposit (or portion thereof not insured as aforesaid), which securities shall be lodged with the Bond Trustee, or any Federal Reserve Bank or Depositary, as custodian, by the issuer of such certificates of deposit;

GOV 19849

(e)    bonds, notes, debentures, investment agreements or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by a Rating Agency in any of its three highest Rating Categories;

(f)    investments in money market funds which are registered under the Investment Company Act of 1940, whose shares are registered under the Securities Act of 1933 and which, at the time of purchase, are rated by a Rating Agency in either of its two highest Rating Categories, including money market funds for which the Bond Trustee or an affiliate provides services for a fee, whether as an investment advisor, custodian, transfer agent, registrar, sponsor, distributor, manager or otherwise, provided that sums not in excess of specified limits may be invested in money market funds which do not satisfy the foregoing requirements for periods of up to six months;

(g)    repurchase agreements with respect to and secured by Government Obligations, which agreements may be entered into with any Qualified Financial Institution or with primary government securities dealers which report to, trade with and are recognized as primary dealers by a Federal Reserve Bank and are members of the Securities Investors Protection Corporation, provided the Bond Trustee has a perfected first security interest in the collateral, that the Bond Trustee or an agent has possession of the collateral and that the collateral is, to the knowledge of the Bond Trustee, free and clear of third party claims; and

(h)    commercial paper (having original maturities of not more than 270 days) rated, at the time of purchase, "P-1" or better by Moody's Investors Service, Inc. or "A-1" or better by Standard & Poor's Ratings Group.

"Rating Agency" shall mean any of the following organizations (or their respective successor organizations, if applicable) if such organization maintains a rating on any series of Bonds at the time in question: (a) Moody's Investors Service, Inc.; (b) Standard & Poor's Ratings Group; (c) Fitch Investors Service, Inc.; or (d) such other nationally recognized credit rating organization as may be designated by the Borrower.

"Rating Category" shall mean, with respect to a particular investment or the provider thereof, any of the principal rating categories which are assigned by a Rating Agency to investments or providers of the type in question; provided that distinctions within any such principal rating category (including distinctions identified by numerical symbols or symbols such as "+" or "-") shall be disregarded for purposes of any specific Rating Category or minimum Rating Category required under the Bond Indenture.

"Regulatory Body" shall mean any federal, state or local government, department, agency, authority or instrumentality (other than the Authority acting in its capacity as lender pursuant to the Loan Agreement) and any other public or private body, including accrediting organizations, having regulatory jurisdiction and authority over the Borrower or its properties or operations.

"Supplemental Indenture" or "indenture supplemental thereto" shall mean any indenture amending or supplementing the Bond Indenture which may be entered into in accordance with the provisions of the Bond Indenture.

C-5

GOV 19850

## THE BOND INDENTURE

### Pledge and Assignment

Under the Bond Indenture, the Authority will pledge to the Bond Trustee all of its right, title and interest in and to the Pledged Revenues, the Loan Agreement (except for certain rights to receive payment of its Administrative Expenses and indemnification against liabilities) and the 1995A Master Note (which shall be issued directly in favor of the Authority and assigned to the Bond Trustee), all funds held in trust pursuant to the Bond Indenture and all of the rights and interest of the Authority in and to any additional property subsequently acquired as security for the obligations of the Borrower under the Loan Agreement and the 1995A Master Note. Except as otherwise provided in the Bond Indenture, the foregoing shall be held by the Bond Trustee for the equal and ratable benefit of all Bondholders.

### Issuance of 1995A Bonds

Upon the issuance of the 1995A Bonds, the Bond Trustee shall apply the proceeds thereof, together with other available funds, as follows: (a) a portion of the proceeds of the 1995A Bonds representing accrued interest thereon shall be deposited in the Debt Service Fund established under the Bond Indenture; (b) a portion of the proceeds of the 1995A Bonds shall be deposited into the Special Clearing Fund for payment of certain costs of issuance associated with the 1995A Bonds; and (c) the balance of the proceeds of the 1995A Bonds shall be deposited in the Construction Fund.

### Additional Bonds

The Authority may issue one or more series of Additional Bonds from time to time and lend the proceeds thereof to the Borrower pursuant to the Loan Agreement to provide funds for any purpose permitted under the Act. Such Additional Bonds may be issued upon compliance with all applicable requirements under the Master Indenture for the Borrower's incurrence of the indebtedness represented by the Additional Bonds. In addition, the Bond Indenture requires (a) the delivery of certain opinions of Counsel pertaining to the Additional Bonds; (b) the execution of such amendments or supplements to the Bond Indenture or Loan Agreement and such other financing documents as may be necessary; (c) the issuance of a Master Note under the Master Indenture to evidence and secure the Borrower's payment obligations in respect of the Additional Bonds; and (d) the adoption of certain Certified Resolutions of the Authority and the Borrower pertaining to the Additional Bonds.

### Debt Service Fund

The Bond Trustee shall establish a Debt Service Fund, into which it shall deposit (i) a portion of the proceeds of the 1995A Bonds representing accrued interest; (ii) payments by the Borrower in respect of the principal of and interest on the 1995A Bonds; and (iii) all other amounts required or permitted under the Bond Indenture to be deposited in the Debt Service Fund. Moneys so deposited shall be used to pay the principal of the 1995A Bonds coming due at maturity or upon mandatory sinking fund redemption and to pay the interest coming due on the 1995A Bonds from time to time.

GOV 19851

**Redemption Fund**

The Bond Trustee shall establish a Redemption Fund into which it shall deposit any moneys provided by the Borrower for optional or extraordinary redemptions of Bonds. The moneys so deposited shall be used to pay the redemption price of Bonds called for any such optional or extraordinary redemption.

**Special Clearing Fund**

The Bond Trustee shall establish a Special Clearing Fund into which it shall deposit a portion of the proceeds of the 1995A Bonds for the payment of certain costs associated with the issuance thereof. Moneys on deposit in the Special Clearing Fund which are not required for such purpose shall be transferred to the Construction Fund.

**Construction Fund**

The Bond Trustee shall establish a Construction Fund for the payment of costs of the 1995 Project and any future Capital Additions to be paid from the proceeds of Additional Bonds. The costs of such 1995 Project and any Capital Additions shall be paid by the Bond Trustee upon requisition therefor by the Borrower. Upon completion of the 1995 Project, any moneys remaining in the Construction Fund shall be transferred into the Redemption Fund or the Debt Service Fund in accordance with and at the written direction of a Borrower Representative. Upon completion of any future Capital Additions for which Additional Bonds are issued, moneys remaining in the Construction Fund shall be applied as specified in the applicable Supplemental Indenture.

**Funds Held for All Bondholders; Certain Exceptions**

The moneys and investments held in the foregoing Funds established under the Bond Indenture shall be held in trust for the equal and ratable benefit of the holders of all Outstanding Bonds, except that: (a) on and after the date on which the interest on or principal or redemption price of any particular Bond or Bonds is due and payable from the Debt Service Fund or Redemption Fund, the unexpended balance of the amount deposited or reserved in either or both of such Funds for the making of such payments shall, to the extent necessary therefor, be held for the benefit of the Bondholder or Bondholders entitled thereto; (b) any special fund established in connection with the issuance of any Additional Bonds for a refunding shall be held for the benefit of the holders of Bonds being refunded; and (c) the rights of any Bondholders with respect to principal or interest payments extended beyond their due dates by such holders shall be subordinate to the rights of Bondholders with respect to payments not so extended.

The Bond Indenture also permits the establishment of additional Funds (other than those referred to above) in connection with the issuance of any future series of Bonds, if so provided in the applicable Supplemental Indenture for such series of Bonds. Such Funds (which may include a debt service fund or debt service reserve fund for a particular series of Bonds or a purchase fund for Bonds which are subject to tender for purchase) may be held solely for the benefit and security of the series of Bonds for which they are established or the issuer of any liquidity or credit facility provided for such series of Bonds.

C-7

GOV 19852

**Investment or Deposit of Funds**

All moneys on deposit in any Fund established under the Bond Indenture shall be considered trust funds, shall not be subject to lien or attachment and shall, except as provided in the Bond Indenture, be deposited in the commercial department of the Bond Trustee, until or unless invested or deposited as provided below. All deposits in the commercial department of the Bond Trustee shall, to the extent not insured, be fully secured as to principal by Government Obligations.

All investments shall constitute Qualified Investments and shall mature, or be subject to repurchase, withdrawal without penalty or redemption at the option of the holder on or before the dates on which the amounts invested are reasonably expected to be needed for the purposes of the Bond Indenture.

All investments shall be made at the written direction of a Borrower Representative or, in the absence of a specific direction, in the investments described in paragraph (f) under the definition of Qualified Investments. No investments shall be made which would cause the 1995A Bonds to become "arbitrage bonds" within the meaning of Section 148 of the Code.

The principal of the Qualified Investments and the interest, income and gains received in respect thereof shall be applied as follows: (a) unless otherwise provided in an applicable Supplemental Indenture, during the construction period for any Capital Addition for which a Construction Fund is established, all interest, income and profits received in respect of the Qualified Investments or upon the sale or other disposition thereof shall (after deduction of any losses) be retained in or transferred to the Construction Fund and, after the completion of such construction, shall be retained in or transferred to the Debt Service Fund and credited against subsequent deposit requirements as provided in the Bond Indenture; and (b) whenever any other transfer or payment is required to be made from any particular Fund, such transfer or payment shall be made from such combination of maturing principal, redemption or repurchase prices, liquidation proceeds and withdrawals of principal as the Bond Trustee deems appropriate for such purpose.

Neither the Authority nor the Bond Trustee shall be accountable for any depreciation in the value of the Qualified Investments or any losses incurred upon any authorized disposition thereof.

The Bond Trustee shall determine the value of the assets in each of the Funds established under the Bond Indenture annually. As soon as practicable after each such valuation date, the Bond Trustee shall furnish to the Authority and the Borrower a report of the status of each Fund as of such date. The Bond Trustee shall also advise the Borrower at such time of the amount then available in the Debt Service Fund as a credit against future deposits prior to the next valuation date in direct order of the due dates of such deposits. In computing the value of assets in any Fund or Account, investments shall be valued at the market value thereof, and all investments and accrued interest thereon shall be deemed a part of such funds and accounts.

**Covenants of the Authority**

The Authority covenants, among other things, promptly to pay, but only from Pledged Revenues, the principal of and interest on all Bonds. The Authority shall enforce all of its rights and privileges under the Loan Agreement, and honor all of its obligations thereunder. The Authority shall

GOV 19853

not make any investment or other use of the proceeds of any series of Bonds issued under the Bond Indenture which would cause such series of Bonds to be "arbitrage bonds" as that term is defined in Section 148(a) of the Code.

### Events of Default and Remedies

Each of the following is an Event of Default under the Bond Indenture:

(a)    If the principal or redemption price of any Bond is not paid when the same shall become due and payable at maturity, upon redemption or otherwise; or

(b)    If an installment of interest on any Bond is not paid when the same shall become due and payable; or

(c)    If the Borrower shall fail to pay, when due and payable, any sum due pursuant to the provisions of the Loan Agreement and such failure continues to exist as of the expiration of any grace period provided in the Loan Agreement; or

(d)    If the Bond Trustee receives notice from the Master Trustee that an event of default under the Master Indenture has occurred and is continuing; or

(e)    If any event of default under the Loan Agreement shall occur and be continuing (other than an event of default resulting from an occurrence described in paragraph (c) or (d) above); or

(f)    If the Authority fails to comply with any provision of the Act which renders it incapable of fulfilling its obligations thereunder or under the Bond Indenture; or

(g)    If the Authority fails to perform any of its covenants, conditions, agreements and provisions contained in the Bonds or in the Bond Indenture (other than as specified in paragraphs (a) and (b) above);

provided, however, that no default under paragraph (e), (f) or (g) above shall constitute an Event of Default until actual notice of such default by registered or certified mail shall be given to the Authority and the Borrower by the Bond Trustee or by the holders of not less than 25% in aggregate principal amount of all Bonds Outstanding and until the Authority and the Borrower shall have had 30 days after receipt of such notice to correct such default, and shall not have corrected it; provided, further that, if the default is such that it cannot be corrected within such 30 day period, it shall not constitute an Event of Default if corrective action is instituted by the Authority or the Borrower within such 30 day period and is diligently pursued to completion by the Authority or the Borrower.

Should any Event of Default occur and be continuing, then the Bond Trustee may, by notice in writing delivered to the Authority, the Borrower and the Bondholders, declare the principal of all Bonds then Outstanding to be due and payable immediately, and upon such declaration the said principal, together with interest accrued thereon, shall become due and payable immediately; provided, however, that no such declaration shall be made if the Borrower cures such Event of Default prior to the date of the declaration. The Bond Trustee shall be required to take the foregoing actions if requested in

C-9

GOV 19854

writing to do so by the holders of at least 25% in aggregate principal amount of all Outstanding Bonds. The Bond Trustee may annul any such declaration and its consequences if all Events of Default are cured after the declaration is made. Any such annulment shall be binding upon the Bond Trustee and upon all holders of Outstanding Bonds; but no such annulment shall extend to or affect any subsequent default.

The above provisions are subject to the further condition that the 1995A Bonds shall be accelerated only if and to the extent that the 1995A Master Note issued to secure the same have been accelerated pursuant to the Master Indenture, and that any such acceleration of 1995A Bonds shall be annulled if and to the extent that the acceleration of the 1995A Master Note securing the same has been annulled.

Upon the happening and continuance of any Event of Default, the Bond Trustee may, and upon the written request of the holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding under the Bond Indenture shall: (i) proceed to protect and enforce its rights and the rights of the Bondholders under the laws of the Commonwealth of Pennsylvania and under the Loan Agreement and the Bond Indenture by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant, condition or agreement contained in the Bond Indenture or in aid of execution of any power granted to the Bond Trustee or for the enforcement of any proper legal or equitable remedy, as the Bond Trustee, being advised by Counsel, shall deem most effectual to protect and enforce such rights; and (ii) proceed to protect and enforce its rights as a Master Noteholder, on behalf of the Bondholders, in accordance with the Master Indenture.

Upon the occurrence and continuance of an Event of Default and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and of the Bondholders under the Bond Indenture, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers with respect to the Borrower, its Facilities and the rents, revenues, issues, earnings, income, products and profits thereof, pending such proceedings, with such powers as the court making such appointment shall confer.

If any proceeding taken by the Bond Trustee on account of any Event of Default is discontinued or abandoned for any reason, or determined adversely to the Bond Trustee, then and in every case the Authority, the Bond Trustee and the Bondholders shall be restored to their former positions and rights under the Bond Indenture.

## Actions by Bondholders

The holders of a majority in principal amount of the Outstanding Bonds under the Bond Indenture shall have the right to direct the method and place of conducting all remedial proceedings by the Bond Trustee upon delivery to the Bond Trustee of satisfactory indemnity. No Bondholder shall have any right to pursue any remedy under the Bond Indenture unless (a) the Bond Trustee shall have been given written notice of an Event of Default, (b) the holders of at least 25% in principal amount of the Outstanding Bonds shall have requested the Bond Trustee, in writing, to exercise the powers granted under the Bond Indenture or to pursue such remedy in its or their name or names, (c) the Bond Trustee shall have been offered security and indemnity satisfactory to it against costs, expenses and liabilities, and (d) the Bond Trustee shall have failed to comply with such request within a reasonable time:

C-10

GOV 19855