(iii) if all amounts due or to become due on any Related Bond have not been fully paid to the Holder thereof, there shall have been delivered to the Master Trustee an Opinion of Bond Counsel to the effect that under then existing law the consummation of such merger, consolidation, sale, or conveyance, whether or not contemplated on any date of the delivery of such Related Bond, would not adversely affect the exclusion from gross income of interest received by the Holder of such Related Bond, to the extent such interest has been previously excluded from gross income.

In case any such successor corporation or other transferee entity shall succeed to and be substituted for its predecessor and shall become an Obligated Affiliate, any such successor corporation or transferee entity of an Obligated Affiliate thereupon may cause to be signed, and may issue in its own name, Notes or Guaranties issuable hereunder; and upon the order of such successor corporation or other transferee entity and subject to all the terms, conditions and limitations in the Master Indenture prescribed, the Master Trustee shall authenticate and shall deliver Notes that such successor corporation or other transferee entity shall have caused to be signed and delivered to the Master Trustee. All Outstanding Notes so issued and all Outstanding Guaranties issued by such successor corporation or other transferee entity hereunder shall in all respects have the same legal rank and benefit under the Master Indenture as Outstanding Notes or Guaranties theretofore or thereafter issued in accordance with the terms of the Master Indenture as though all of such Notes and Guaranties had been issued hereunder by an Obligated Affiliate without any such consolidation, merger, sale or conveyance having occurred.

**Filing of Financial Statements, Certificate of No Default, Other Information**

The Obligated Group, acting through the Obligated Group Agent, covenants that it will:

(a) As soon as practicable but in no event later than five months after the end of each fiscal year, file with the Master Trustee, with each Noteholder who may have so requested in writing or in whose behalf the Master Trustee may have so requested and with Moody's Investors Service and Standard & Poor's Ratings Group a copy of its audited Financial Statements as of the end of such fiscal year accompanied by the opinion of independent certified public accountants. Such audited Financial Statements shall be prepared in accordance with generally accepted accounting principles and shall include such statements as shall be necessary for a fair presentation of financial position, results of operations and changes in Total Fund Balance and financial position as of the end of such fiscal year.

(b) As soon as practicable but in no event later than five months after the end of each fiscal year, file with the Master Trustee, and with each Noteholder who may have so requested or in whose behalf the Master Trustee may have so requested, an Officer's Certificate of the Obligated Group Agent and a report of independent certified public accountants stating the Historical Long-Term Debt Service Coverage Ratio for such fiscal year and stating whether or not, to the best knowledge of the signers, the Obligated Group is in default in the performance of any covenant contained in the Master Indenture and, if so, specifying each such default of which the signers may have knowledge.

(c) If an Event of Default shall have occurred and be continuing, (i) file with the Master Trustee such other financial statements concerning the operations and financial affairs of the Obligated Group as the Master Trustee may from time to time reasonably request, excluding specifically donor records, patient records and personnel records and (ii) provide access to its facilities for the purpose of inspection by the Master Trustee during regular business hours or at such other times as the Master Trustee may reasonably request.

(d) Within 10 days after its receipt thereof, file with the Master Trustee a copy of each report which any provision of the Master Indenture requires to be prepared by a Consultant or an Insurance Consultant.

**Cessation of Status as Obligated Affiliate**

Each Obligated Affiliate covenants that it will not cease to be an Obligated Affiliate unless, prior to the taking of such action, there is delivered to the Master Trustee an Officer's Certificate of the Obligated Group Agent stating that immediately after such action is taken:

(i) the Historical Long-Term Debt Service Coverage Ratio for the most recent fiscal year, assuming such action actually occurred at the beginning of such period, would not have been reduced to less than 1.10:1; or

(ii) the Projected Long-Term Debt Service Coverage Ratio for the fiscal year immediately succeeding the proposed date of such action is expected to be greater than 1.10.

**Addition of Obligated Affiliates**

Persons which are not Obligated Affiliates and corporations which are successor corporations to any Obligated Affiliate through a merger or consolidation may become Obligated Affiliates, if, among other things, the Master Trustee shall also have received (i) a report by a Consultant which demonstrates that, immediately upon any Person or successor transferee entity becoming an Obligated Affiliate the Obligated Group would not, as part of such transaction, be in default in the performance or observance of any covenant or condition to be performed or observed by it hereunder and the Obligated Group could meet the conditions described in clause (a)(i) or (ii) under the caption, "**Additional Indebtedness**" for the incurrence of one dollar of additional Long-Term Indebtedness, and (ii) if all amounts due or to become due on any Related Bond have not been paid to the holder thereof, an Opinion of Bond Counsel to the effect that under then existing law the consummation of such transaction, whether or not contemplated on any date of the delivery of any such Related Bond, would not adversely affect the exclusion from gross income of interest received by the Holder of any such Related Bond, to the extent such interest had been previously excluded from gross income.

**Defaults and Remedies**

**Events of Default.** Each of the following is an "Event of Default" under the Master Indenture:

(a) The Obligated Group shall fail to make any payment required by a Note or a Guaranty when and as the same shall become due and payable, whether at maturity, by proceedings for redemption, by acceleration or otherwise, in accordance with the terms thereof, of the Master Indenture and any Supplemental Indenture, and any grace period with respect thereto shall have expired; provided, however, that no such grace period shall exceed 30 days.

(b) The Obligated Group shall fail duly to observe or perform any covenant or agreement on its part under the Master Indenture for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Obligated Group Agent by the Master Trustee or to the Obligated Group Agent and the Master Trustee by the holders of at least 20% in aggregate principal amount of Notes and Guaranties then Outstanding.

(c) An event of default shall occur under a Related Bond Indenture or a Related Bond.

(d) Any Obligated Affiliate shall fail to make any required payment with respect to any Indebtedness (other than Notes or Guaranties and other than Non-Recourse Indebtedness), and any period of grace with respect thereto shall have expired; or an event of default, as defined in any mortgage, indenture or instrument, under which there may be issued, or by which there may be secured or evidenced, any Indebtedness, whether such Indebtedness now exists or shall hereafter be created, shall occur; provided, however, that such default shall not constitute an Event of Default if within 30 days, or within the time allowed for service of a responsive pleading if any proceeding to enforce payment of the Indebtedness is commenced, (i) such Obligated Affiliate in good faith commences proceedings to contest the existence or payment of such Indebtedness, and (ii) sufficient moneys are escrowed with a bank or trust company for the payment of such Indebtedness; provided, however, that Indebtedness (other than Indebtedness secured by Notes or Guaranties) with an aggregate principal amount of less than $1,000,000, whether singly or in the aggregate, shall not be considered Indebtedness for purposes of the Events of Default described in this clause (d).

(e) The entry of a decree or order by a court having jurisdiction in the premises adjudging any Obligated Affiliate a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of any Obligated Affiliate under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee or sequestrator (or other similar official) of any Obligated Affiliate or of any substantial part of its Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days.

(f) The institution by any Obligated Affiliate of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the Federal Bankruptcy Code or any other similar applicable Federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of any Obligated Affiliate or of any substantial part of its Property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due.

**Acceleration.** Upon the occurrence of any Event of Default, the Master Trustee may, and upon the request of the holders of not less than 20% of the principal amount of all Notes and Guaranties Outstanding shall declare all Notes and Guaranties to be immediately due and payable. If all Events of Default are remedied prior to entry of final judgment or decree in any suit, action or proceeding instituted on account of such Event of Default, the Master Trustee may annul such declaration.

The 1995A Bonds will become immediately due and payable if the 1995A Master Note is declared to be immediately due and payable by the Master Trustee. In the event that the Master Trustee annuls any such declaration of acceleration of the 1995A Master Note, the acceleration of the 1995A Bonds will be automatically annulled.

**Additional Remedies and Enforcement of Remedies.** Upon the occurrence and continuance of any Event of Default, the Master Trustee may, and upon the written request of the Holders of not less than 20% in aggregate principal amount of the Notes and Guaranties Outstanding, together with indemnification of the Master Trustee to its satisfaction, shall, proceed forthwith to protect and enforce its rights and the rights of such Noteholders by such proceedings as the Master Trustee deems expedient.

Regardless of the occurrence of an Event of Default, the Master Trustee, if requested in writing by the Holders of not less than 20% in aggregate principal amount of the Notes and Guaranties then Outstanding, shall, when indemnified to its satisfaction, institute and maintain proceedings necessary or expedient to prevent any impairment of security by any acts which may be unlawful or in violation of the Master Indenture, or to preserve or protect the interests of the Holders, provided that such action is not in conflict with applicable law or the Master Indenture and, in the Master Trustee's sole judgment, is not unduly prejudicial to the Holders of Notes and Guaranties not making such request.

**Application of Revenues and Other Monies After Default.** During the continuance of an Event of Default all monies received by the Master Trustee, after payment of costs and expenses, shall be applied as follows:

Unless the principal of all Outstanding Notes and Guaranties shall have been declared due and payable: First: to the payment of all installments of interest then due on the Notes and Guaranties in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full all installments maturing on the same date, then ratably, according to the amounts due, without discrimination or preference; and Second: to the payment of the unpaid principal installments of any Notes and Guaranties then due, whether at maturity or by call for redemption, in the order of their due dates, and if the amounts available shall not be sufficient to pay in full all the Notes and Guaranties when due on any date, then ratably, according to the amounts of principal installments due on such date, without discrimination or preference.

If the principal of all Outstanding Notes and Guaranties shall then be or have been declared to be due and payable, to the payment of the principal and interest then due and unpaid without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Note or Guaranty over any other Note or Guaranty, ratably, according to the amounts due respectively for principal and interest, without discrimination or preference.

Monies to be applied by the Master Trustee during continuance of an Event of Default shall be applied as the Master Trustee shall determine, having due regard for the amount available and the likelihood of additional monies becoming available in the future. Whenever the Master Trustee shall apply such monies, it shall fix the date upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such dates shall cease to accrue. The Master Trustee shall give such notice as it may deem appropriate of such date.

**Noteholders' Control of Proceedings.** If any Event of Default shall have occurred and be continuing, the Holders of at least a majority in aggregate principal amount of Notes and Guaranties then Outstanding shall have the right, subject to the terms of the Master Indenture, to direct the method and place of conducting any enforcement proceedings.

GOV 19884

**Waiver of Events of Default.** No delay or omission of the Master Trustee or of any Holder of the Notes or Guaranties to exercise any right or power upon an Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default. Every power and remedy given to the Master Trustee and the Holders of the Notes and Guaranties, respectively, may be exercised from time to time and as often as may be deemed expedient by them. The Master Trustee may waive any Event of Default which in its opinion shall have been remedied before the entry of final judgment. The Master Trustee, upon the written request of the Holders of a majority of the aggregate principal amount of Notes and Guaranties then Outstanding, shall waive any Event of Default under the Master Indenture (except a default in payment of principal, premium, if any, or interest on any Note or payment on any Guaranty which may be waived only by Holders of all the Notes and Guaranties then Outstanding), and its consequences. In case of such waiver, all parties shall be restored to their former positions but no such waiver shall extend to any subsequent or other Event of Default.

**Appointment of Receiver.** Upon the occurrence of any Event of Default, the Master Trustee shall be entitled to the appointment of a receiver or receivers of the Property of the Obligated Group with such powers as the court shall confer.

**Notice of Default.** The Master Trustee shall, within 10 days after it has knowledge of the occurrence of an Event of Default, mail to all holders of Notes and Guaranties as the names and addresses of such Holders appear on the books of the Master Trustee, notice of such Event of Default known to the Master Trustee. Except in the case of nonpayment of any Notes and Guaranties or bankruptcy or similar defaults, the Master Trustee may withhold such notice if it determines that such withholding is in the interests of the Holders of Notes and Guaranties.

**Satisfaction and Discharge of Master Indenture**

If the Obligated Group Agent shall deliver to the Master Trustee for cancellation all Notes and Guaranties theretofore authenticated (other than any Notes and Guaranties which shall have been mutilated, destroyed, lost or stolen and which shall have been replaced or paid as provided in the Master Indenture) and not theretofore canceled, or (ii) all Notes and Guaranties not theretofore canceled or delivered to the Master Trustee for cancellation shall have become due and payable and been paid, or (iii) the Obligated Group shall deposit with the Master Trustee (or with a bank or trust company acceptable to the Master Trustee) pursuant to an agreement between the Obligated Group and such bank or trust company in form acceptable to the Master Trustee as trust funds cash or Qualified Investments, the principal of and the interest on which when due, will be sufficient to pay at maturity or upon redemption all Notes and Guaranties not theretofore canceled or delivered to the Master Trustee for cancellation, including principal and interest due or to become due to such date of maturity or redemption date, or with respect to Notes or Guaranties securing Related Bonds, sufficient funds shall be deposited with the Related Bond Trustee to deem such Related Bonds no longer Outstanding under the Related Bond Indenture and if in any case the Obligated Group shall also pay or cause to be paid all other sums payable under the Master Indenture by the Obligated Group, then the Master Indenture shall cease to be of further effect, and the Master Trustee, on demand of the Obligated Group Agent, and at the cost and expense of the Obligated Group, shall execute proper instruments acknowledging satisfaction of and discharging the Master Indenture.

Notwithstanding the discharge of the lien thereof, the Master Trustee shall nevertheless retain such rights, powers and duties thereunder as may be necessary and convenient for the payment of amounts due or to become due on the Notes and Guaranties and the registration, transfer, exchange and

GOV 19885

replacement of Notes and Guaranties as provided therein. Nevertheless, any moneys held by the Master Trustee or any paying agent for the payment of the principal of, premium, if any, or interest on any Note or Guaranty remaining unclaimed for five years after the principal of all Notes and Guaranties has become due and payable, whether at maturity or upon proceedings for redemption or by declaration as provided therein, shall then be paid to the Obligated Group, and the Holders of any Notes or Guaranties not theretofore presented for payment shall thereafter be entitled to look only to the Obligated Group for payment thereof as unsecured creditors, and all liability of the Master Trustee or any paying agent with respect to such moneys shall thereupon cease.

**Supplements and Amendments**

**Supplements Not Requiring Consent of Noteholders.** The Master Indenture may be supplemented or amended without the consent of or notice to any of the Holders, but only to cure any ambiguity or formal defect or omission; to correct or supplement any provision which may be inconsistent with any other provision, or to make any other provisions with respect to matters or questions arising under the Master Indenture which shall not materially and adversely affect the interests of the Holders; to grant or confer ratably upon all Holders any additional rights, remedies, powers or authority that may lawfully be granted or conferred upon them; to qualify the Master Indenture under the Trust Indenture Act of 1939, as amended, or corresponding provisions of federal laws from time to time in effect; to create and provide for the issuance of a series of Notes or a Guaranty as permitted under the Master Indenture; to add an Obligated Affiliate; to amend the covenants or provisions of the Master Indenture in the event there is a material change in the method or practices of third party reimbursement; and to amend any covenant or provision in any respect, provided that, following such amendment, any rating on any Related Bond or Indebtedness in effect immediately prior to such amendment will not be withdrawn or reduced as a direct consequence of such amendment.

**Supplements Requiring Consent of Noteholders.** Other than supplements referred to in the preceding paragraph, the Holders of not less than 60% in aggregate principal amount of the Notes and Guaranties then Outstanding have the right to approve execution of Supplemental Indentures modifying, in any particular, the Master Indenture and becoming a part of the Master Indenture, except a Supplemental Indenture which would extend the stated maturity of or time for paying interest on any Note or reduce the principal amount of or the redemption premium or rate of interest payable on any Note without the consent of the Holder of such Note or reduce the aggregate principal amount of Notes and Guaranties then Outstanding the consent of which is required for Supplemental Indentures without the consent of the Holders of all Notes and Guaranties then Outstanding. All Supplemental Indentures executed pursuant to the Master Indenture shall be binding on all Holders of Notes and Guaranties.

## SUMMARY OF SUPPLEMENTAL INDENTURES

As described in Appendix A to the Official Statement under the caption, "INDEBTEDNESS OF THE OBLIGATED GROUP", the Obligated Group has previously incurred indebtedness which is presently outstanding and secured by Notes. (See the caption, "INDEBTEDNESS OF THE OBLIGATED GROUP", in said Appendix A for definitions of certain capitalized terms used, but not defined, below.) The 1993 Notes and the 1994A Note were issued pursuant to Supplemental Indentures which contain particular covenants for the benefit of the holders of such Notes. Set forth below is a summary of such covenants.

GOV 19886

**1993 Notes**

Pursuant to the Supplemental Indenture under which the 1993 Notes were issued, AGH agrees not to withdraw from the Obligated Group and to remain a primary obligor on the 1993 Notes.

With respect to events of default under the Master Indenture, the Supplemental Indenture provides (i) that, notwithstanding the provisions of the Master Indenture, (a) the Master Trustee shall, at the direction of the Holder of either the 1993B Note or the 1993C Note upon the occurrence of a payment default with respect to such Note, declare such Note to be immediately due and payable, and (b) the Master Trustee shall, at the direction of the Holders of 25% in aggregate outstanding principal amount of the 1993B Note and the 1993C Note, upon the occurrence of any other event of default under the Master Indenture, declare the 1993B Note and the 1993C Note to be immediately due and payable; (ii) that no such declaration or acceleration with respect to a payment default shall be rescinded without the consent of the Holder of either the 1993B Note or the 1993C Note so affected; and (iii) that no such declaration or acceleration with respect to any other event of default shall be rescinded without the consent of the Holders of 25% in the aggregate outstanding principal amount of the 1993B Note and the 1993C Note.

With respect to supplements and amendments to the Master Indenture requiring the consent of the Holders of Notes, the Supplemental Indenture provides that no such supplement or amendment shall become effective without the consent of the Holders of 66 and 2/3% in aggregate outstanding principal amount of the 1993B Note and the 1993C Note.

**1994A Note**

The Supplemental Indenture under which the 1994A Note was issued provides that the following additional events shall constitute events of default under the Master Indenture:

(i)    Any representation or warranty made by any Obligated Affiliate pursuant to or in connection with any of the documentation for the loan secured by the 1994A Note or in any financial statement, certificate, report or document furnished by an Obligated Affiliate to the Holder of the 1994A Note pursuant to or in connection with such documentation shall prove to have been false or misleading in any material respect;

(ii)    The Obligated Group shall fail to provide the Holder of the 1994A Note with certain financial statements for a period of 30 days following written notice of such failure from such Holder to the Obligated Group Agent; and

(iii)    No Obligated Affiliate (other than Allegheny Neuropsychiatric Institute) may cease to be a member of the Obligated Group.

GOV 19887

## Appendix E

# Proposed Form of Opinion of Bond Counsel

APPENDIX E

FORM OF BOND COUNSEL OPINION

Re: $50,000,000 Allegheny County Hospital Development Authority Hospital Revenue Bonds, Series A of 1995 (Allegheny General Hospital Project)

We have acted as bond counsel in connection with the issuance by the Allegheny County Hospital Development Authority (the "Authority") of $50,000,000 aggregate principal amount of its Hospital Revenue Bonds, Series A of 1995 (Allegheny General Hospital Project) (the "1995A Bonds"). The 1995A Bonds are issued under and pursuant to the laws of the Commonwealth of Pennsylvania, including the Municipality Authorities Act of 1945, approved May 2, 1945, P.L. 382, No. 164, as amended (the "Act"), and a Trust Indenture dated as of March 1, 1995 (the "Indenture"), between the Authority and Mellon Bank, N.A., as trustee (the "Trustee").

The 1995A Bonds are being issued at the request of Allegheny General Hospital (the "Borrower") to provide funds which, together with the other available funds, will be used to finance the costs of a project (the "1995 Project") consisting of the payment or reimbursement for payment of the costs of: (i) the construction, renovation and equipping of the Northwest wing of the Borrower's hospital campus and acquisition of certain capital equipment and other capital improvements at such hospital campus, (ii) the acquisition of an off-campus facility for the Borrower and renovation and equipment of such facility for health care and related purposes, and (iii) the payment of certain costs and expenses incident to the issuance of the 1995A Bonds.

The proceeds of the 1995A Bonds are being loaned to the Borrower pursuant to a Loan Agreement dated as of March 1, 1995 (the "Loan Agreement") entered into by the Authority and the Borrower. Under the Loan Agreement, the Borrower is obligated to make payments in amounts sufficient to pay, among other things, the principal or redemption price of and interest on the 1995A Bonds and any Additional Bonds.

The 1995A Bonds are equally and ratably secured by the Indenture and by an assignment to the Trustee of all of the Authority's right, title and interest in and to the Loan Agreement (except for the Authority's rights thereunder to receive payments of administrative fees and expenses and indemnification against liability). The payment obligations of the Borrower under the Loan Agreement are evidenced and secured by a promissory note (the "1995A Master Note") in an amount equal to the aggregate principal amount of the 1995A Bonds, issued by the Borrower to the Authority and assigned to the Trustee. The 1995A Master Note is being issued pursuant to a Restated and Amended Master Trust Indenture dated April 7, 1993, as supplemented, among the Borrower, Allegheny-Singer Research Institute and PNC Bank, National Association, as Master Trustee.

The Borrower has represented in the Loan Agreement that it is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). The Borrower has covenanted that, throughout the term of the Loan Agreement, it will not carry on or permit to be carried on upon its Facilities (as defined in the Loan Agreement) any trade or business, nor will it take any action or permit any action to be taken on its behalf, or cause or permit any circumstance within its control to arise or continue if, the conduct of such trade or business or such other action or circumstance would

cause the interest paid by the Authority on the 1995A Bonds to be subject to Federal income tax in the hands of the holders thereof. The Borrower has further covenanted that it will neither make or instruct the Trustee to make any investment or other use of the proceeds of the 1995A Bonds, nor take or omit to take any other action, which would cause the 1995A Bonds to be arbitrage bonds under Section 148 of the Code.

Under the Indenture, the Authority has covenanted that it will comply with the requirements of Section 148 of the Code pertaining to arbitrage bonds. In addition, an officer of the Authority responsible for issuing the 1995A Bonds and an officer of the Borrower have executed a certificate (the "Tax Certificate") stating the reasonable expectations of the Authority and the Borrower on the date of issue of the 1995A Bonds as to future events that are material for the purposes of such requirements of the Code.

In our capacity as bond counsel, we have examined such documents, records of the Authority and other instruments as we deemed necessary to enable us to express the opinions set forth below, including original counterparts or certified copies of the Indenture, the Loan Agreement and the other documents listed in the closing memorandum in respect of the 1995A Bonds filed with the Trustee. We have assumed that the Authority and the Borrower will comply with their respective covenants in the Indenture and the Loan Agreement relating to the tax-exempt status of the 1995A Bonds. We have also examined an executed 1995A Bond, authenticated by the Trustee, and have assumed that all other 1995A Bonds have been similarly executed and authenticated. We also assume that the Indenture has been duly authorized, executed and delivered by the Trustee, and the Loan Agreement has been duly authorized, executed and delivered by the Borrower..

Based on the foregoing, it is our opinion that:

1. The Authority is a body corporate and politic validly existing under the laws of the Commonwealth of Pennsylvania, with full power and authority to undertake the 1995 Project, to execute and deliver the Indenture and the Loan Agreement and to issue and sell the 1995A Bonds.

2. The Indenture and the Loan Agreement have been duly authorized, executed and delivered by the Authority and the covenants of the Authority therein are valid and binding obligations of the Authority enforceable in accordance with their terms, except as the rights created thereunder and the enforcement thereof may be limited by bankruptcy, insolvency or other laws or equitable principles affecting the enforcement of creditors' rights generally.

3. The issuance and sale of the 1995A Bonds have been duly authorized by the Authority. Based on the assumption as to execution and authentication set forth above, the 1995A Bonds have been duly executed and delivered by the Authority and authenticated by the Trustee, are valid and binding obligations of the Authority and are entitled to the benefit and security of the Indenture, except as the rights created thereunder, and the enforcement thereof may be limited as indicated in paragraph 2..

4. Under the laws of the Commonwealth of Pennsylvania as presently enacted and construed, the 1995A Bonds are exempt from personal property taxes in Pennsylvania, and interest on the 1995A Bonds is exempt from Pennsylvania personal income tax and corporate net income tax.

5. Under existing law as presently enacted and construed, interest on the 1995A Bonds is excludable from gross income for purposes of Federal income taxation, assuming the accuracy

of the representations by the Authority and the Borrower in the Tax Certificate, the Indenture and the Loan Agreement and continuing compliance by the Authority with its covenants under the Indenture and by the Borrower with its covenants under the Loan Agreement, as described above. Interest on the 1995A Bonds will not be an item of tax preference for purposes of determining either individual or corporate alternative minimum tax, but interest on 1995A Bonds held by a corporation (other than an S corporation, regulated investment company, real estate investment trust or real estate mortgage investment conduit) may be indirectly subject to alternative minimum tax and an environmental tax because of its inclusion in the earnings and profits of such corporate holder. Interest on 1995A Bonds held by a foreign corporation may be subject to the branch profits tax imposed by the Code.

Ownership of 1995A Bonds may result in collateral Federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain S corporations with "excess net passive income," individual recipients of Social Security or Railroad Retirement benefits and taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry the 1995A Bonds. We offer no opinion as to such collateral tax consequences.

The initial public offering price of certain 1995A Bonds ("Discount Bonds") may be less than the principal amount payable at maturity. The difference between the initial public offering price of the Discount Bonds and the principal amount payable at maturity constitutes original issue discount. The appropriate portion of such original issue discount allocable to the original and each subsequent holder of Discount Bonds will, upon sale, exchange, redemption, or payment at maturity of such Discount Bonds, be treated as interest and excluded from gross income for federal income tax purposes to the same extent as interest on the 1995A Bonds.

We express no opinion herein with respect to adequacy of the security or sources of payment for the 1995A Bonds or the accuracy or completeness of any offering document used in connection with the sale of 1995A Bonds.

We call your attention to the fact that the 1995A Bonds are limited obligations of the Authority, payable only out of certain revenues of the Authority and certain other moneys available therefor as provided in the Indenture, and that the 1995A Bonds do not pledge the credit or taxing power of the County of Allegheny, the Commonwealth of Pennsylvania or any political subdivision, agency or instrumentality thereof. The Authority has no taxing power.

Very truly yours,

## Appendix F

# Specimen Municipal Bond Insurance Policy

GOV 19892



# FINANCIAL GUARANTY INSURANCE POLICY

## Municipal Bond Investors Assurance Corporation
## Armonk, New York 10504

Policy No. [NUMBER]

Municipal Bond Investors Assurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [INSERT NAME OF PAYING AGENT] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

[PAR]
[LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR], but this policy shall not be valid unless countersigned by an authorized resident licensed agent of the Insurer.

MUNICIPAL BOND INVESTORS ASSURANCE CORPORATION

COUNTERSIGNED:

______________________
Resident Licensed Agent

______________________
President

______________________
City, State

Attest: ______________________
Assistant Secretary

SPECIMEN

STD-RMS-PA-5
1/1/94

GOV 19893

**EXHIBIT  1057**

Microfilm Number________________

Entity Number________________

4.2

Filed with the Department of State on APR 30 1997

Secretary of the Commonwealth

# ARTICLES OF DIVISION-NONPROFIT CORPORATION

DSCB:15-5954 (Rev 90)

In compliance with the requirements of 15 Pa.C.S. § 5954 (relating to articles of division) the undersigned busi corporation, desiring to effect a division, hereby states that:

1. The name of the dividing corporation is: SDN, Inc.

2. (Check and complete one of the following):

X The dividing corporation is a domestic nonprofit corporation and the (a) address of its current registered offic Commonwealth or (b) name of its commercial registered office provider and the county of venue is (the De is hereby authorized to correct the following information to conform to the records of the Department):

(a) 100 West Laurel Avenue, Cheltenham, PA 19012 Montgomery

Number and Street City State Zip Co

(b) c/o: ________________

Name of Commercial Registered Office Provider Co

For a corporation represented by a commercial registered office provider, the county in (b) shall be deemed the county in w corporation is located for venue and official publication purposes.

___The dividing corporation is a qualified foreign nonprofit corporation incorporated under the laws of ________ ________ and the (a) address of its current registered office in this Commonwealth or (b) name of its co registered office provider and the county of venue is (the Department is hereby authorized to correct the foll information to conform to the records of the Department):

(a) ________________

Number and Street City State Zip Co

(b) c/o: ________________

Name of Commercial Registered Office Provider Co

For a corporation represented by a commercial registered office provider, the county in (b) shall be deemed the county in w corporation is located for venue and official publication purposes.

___The dividing corporation is a nonqualified foreign nonprofit corporation incorporated under the laws of ______ ________ and the address of its principal office under the laws of such domiciliary jurisdiction is:

________________

Number and Street City State Zip Co

3. The statute by or under which it was incorporated is: Pennsylvania Nonprofit Corporation Law, Act of May 5, 1933, as amended

4. The date of its incorporation is: April 23, 1990

FL-B 014795

FL06527

EXHIBIT 1057 1-17-03 MM

FOLEY 29561

DSCB:15-5954 (Rev 90)-2

5. (Check one of the following):

_X_ The dividing corporation will survive the division.

___ The dividing corporation will not survive the division.

6. The name and the address of the registered office in this Commonwealth or name of its commercial registered provider of each new domestic nonprofit corporation and qualified foreign nonprofit corporation resulting from th are as follows:

| Name of Corporation | Address of Registered Office or Name of Commercial Registered Office Provider | C |
|---|---|---|
| SDN Transition Corporation | 100 West Laurel Avenue, Cheltenham, PA 19012 | Montgome |

7. (Check, and if appropriate complete, one of the following):

___ The plan of division shall be effective upon filing these Articles of Division in the Department of State.

_X_ The plan of division shall be effective on: May 1, 1997 (Date) at 12:02 A.M. (Hour)

8. (Check one of the following):

___ The dividing corporation is a domestic nonprofit corporation and the plan of division was adopted by action members (or shareholders) pursuant to 15 Pa.C.S. § 5905.

___ The dividing corporation is a domestic nonprofit corporation and the plan of division was adopted by action members (or shareholders) pursuant to 15 Pa.C.S. §§ 5924(a) and 5952(c) and (d).

_X_ The dividing corporation is a domestic nonprofit corporation and the plan of division was adopted by action of t of directors pursuant to 15 Pa.C.S. §§ 5924(b) and 5952(c) and (d).

9. (Check, and if appropriate complete, one of the following):

_X_ The plan of division is set forth in full in Exhibit A attached hereto and made a part hereof.

___ Pursuant to 15 Pa.C.S. § 5901 (relating to omission of certain provisions, in any, from filed plans) the provisio plan of division that amend or constitute the operative provisions of the Articles of Incorporation of the resul corporations as in effect subsequent to the effective date of the plan are set forth in full in Exhibit A attache and made a part hereof. The full text of the plan of division is on file at the principal place of business of the corporation, the name and address of which is:

| Name of Resulting Corporation | Number and Street | City | State | Zip | Co |
|---|---|---|---|---|---|

FL-B 014796

FL06528

FOLEY 29562

DSCB:15-5954 (Rev 90)-3

IN TESTIMONY WHEREOF, the undersigned corporation has caused these Articles of Division to be signed by a duly authorized officer thereof this 25th day of April, 19 97.

SDN, Inc.
(Name of Corporation)

BY: [signature]
(Signature)

Robert M. McNair, Jr., Esq.
TITLE: Assistant Secretary

FL-B 014797

FL06529

Exhibit "A"

PLAN OF DIVISION

OF

SDN, INC.

SDN, Inc., a Pennsylvania nonprofit corporation (hereinafter, "SDN"), desires, pursuant to the Pennsylvania Nonprofit Corporation Law of 1988, as amended (the "Nonprofit Law"), particularly 15 Pa. C.S.A. §5951, et seq.., to divide its assets and liabilities between itself and a new Pennsylvania nonprofit corporation to be created hereunder and named SDN Transition Corporation (hereinafter "STC").

1. Terms and Conditions of the Division:

SDN shall, at the Effective Time (as hereinafter defined), divide into two (2) corporations with the respective names, attributes, assets and liabilities as set forth in this Plan of Division (collectively, the "Division").

1.1 The Surviving Corporation: SDN, Inc. ("SDN")

SDN shall survive the Division. At the Effective Time, SDN shall have its name changed to Allegheny Hospitals, Centennial and shall become a membership corporation having as its sole Member Allegheny Health, Education and Research Foundation, which is a Pennsylvania nonprofit corporation and an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 as amended. SDN shall have the same trustees as it had immediately prior to the Effective Time. At the Effective Time, the Articles of Incorporation of SDN shall be amended and restated as set forth in Exhibit "1," attached hereto and made a part hereof by reference. After the Effective Time, SDN shall in all respects not specifically provided for in this Plan of

Division (the "Plan") continue to exist and operate and to hold the same assets and be responsible for the same obligations existing immediately prior to the Effective Time, as though the Division had not occurred.

1.2 The Resulting Corporation: SDN Transition Corporation ("STC")

The new corporation resulting from the Division (referred to as the "Resulting Corporation") will be known as "SDN Transition Corporation" ("STC"). As of the Effective Time, the Resulting Corporation will be organized and operate under the Articles of Incorporation set forth in Exhibit "2", attached hereto and made a part hereof by reference. The members of the initial Board of Trustees of the Resulting Corporation, and the terms of their respective offices, will be as set forth in Exhibit "3", attached hereto. The initial officers of the Resulting Corporation shall be as set forth on Exhibit "4", attached hereto. The Resulting Corporation will have no members.

1.3 Effective Time:

The Division shall take effect, and the Resulting Corporation shall come into existence at 12:02 A.M. on May 1, 1997. The date and time when the Division becomes effective shall be the "Effective Time" referred to in this Plan of Division.

2. Assets:

At the Effective Time, the assets of SDN will be divided between SDN and the Resulting Corporation as hereinafter provided in this Plan.

2.1 SDN Assets:

At and after the Effective Time, all of the assets owned by SDN immediately preceding the Effective Time shall be retained by SDN, except for the following specified assets (the "Transferred Assets"), which shall be transferred to STC from SDN by means of the division authorized hereby: (a) all of the shares held by SDN in GHS Holding Corporation, a Pennsylvania business corporation; (b) the membership interest held by SDN in U/G Holding, Inc., a

FL-B 014799

FL06531

FOLEY 29565

Pennsylvania nonprofit corporation, and (c) the membership interest held by SDN in 17th & South Street Parking Corp., a Pennsylvania nonprofit corporation.

2.2 Resulting Corporation's Assets:

At and after the Effective Time, the assets of STC shall consist of the "Transferred Assets" which shall be transferred to STC from SDN by means of the division authorized hereby.

3. Liabilities and Other Obligations:

At and after the Effective Time, SDN's and STC's respective liabilities and obligations shall be as hereinafter set forth.

3.1 SDN:

At and after the Effective Time, all of the debts, liabilities and obligations owed by or accrued by SDN immediately preceding the Effective Time shall be retained by SDN, except for the liabilities accrued or accruing from, stemming or arising from, or associated with the "Transferred Assets." STC shall indemnify and hold harmless SDN from and against liabilities, damages and/or judgments of any kind whatsoever arising from such debts, liabilities and/or obligations.

3.2 The Resulting Corporation:

At and after the Effective Time, the debts, liabilities and obligations owed by or accrued by STC shall be the debts, liabilities and obligations accrued or accruing from, stemming or arising from, or associated with the "Transferred Assets."

4. Mode of Carrying the Division Into Effect:

At and after the Effective Time, the initial trustees of the Resulting Corporation named in Exhibit "3", hereto shall hold an initial meeting, or shall execute a written unanimous consent in lieu of such meeting, to conduct any business as such trustees of the Resulting Corporation shall deem appropriate. SDN and its officers shall take such further actions as the Resulting Corporation shall

reasonably request in order to vest, perfect or confirm titles to any property of SDN conveyed or transferred to the Resulting Corporation by virtue of the Division and to carry out the purposes of this Plan.

IN WITNESS WHEREOF, the undersigned corporation has caused this Plan of Division to be executed the 25th day of April, 1997.

SDN, INC.

By: ______________________
Robert M. McNair, Jr., Esq.
Assistant Secretary

Exhibit "1"
to the
Plan of Division of
SDN, INC.

AMENDED AND RESTATED ARTICLES OF INCORPORATION

of

ALLEGHENY HOSPITALS, CENTENNIAL
(A Pennsylvania Nonprofit Corporation)

ARTICLE I

The name of the corporation is: Allegheny Hospitals, Centennial.

ARTICLE II

The location and address of the registered office in the Commonwealth is: 100 West Laurel Avenue, Cheltenham, PA 19012.

ARTICLE III

The corporation, which does not contemplate pecuniary gain or profit, incidental or otherwise, is incorporated under the Pennsylvania Nonprofit Corporation Law of 1988. The corporation is incorporated and shall be operated exclusively for charitable, scientific and educational purposes within the meaning of section 501 (c) (3) of the Internal Revenue Code of 1986 as amended, particularly for the following purposes:

(a) To establish, maintain, operate and support either directly or in cooperation with other organizations, such facilities and services providing health care for the sick, injured, disabled,

indigent, or infirm persons and providing for the preservation of health as the Board of Trustees may determine from time to time to be appropriate, including without limitation, hospitals, psychiatric hospitals, children's hospitals, rehabilitation hospitals, ambulatory care services, long term care facilities, and agencies or facilities providing for persons in their homes; and

(b)    To establish, maintain, operate and support either directly, through subsidiary organizations, or in cooperation with other organizations, such activities, services, and facilities as are designed or intended to advance or support provision of health care services, including without limitation, programs involving education, research, and preventive health activity; and

(c)    To engage in, promote, or support either directly, through subsidiary organizations, or in cooperation with other organizations, any activity designed to promote the general health, rehabilitation, or social needs of the public, either within or outside the Commonwealth of Pennsylvania; and

(d)    To raise, receive and distribute funds either directly, or through related organizations or other organizations exempt from tax under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended in furtherance of the purposes of the corporation, subject to limitations on the nature or extent of such activities applicable to organizations exempt from tax under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended; and

(e)    To engage in business and activities either directly or through tax exempt or taxable subsidiaries, or in cooperation with other organizations, which activities support the purposes of the corporation, subject to limitations on the nature and extent of such activities applicable to nonprofit corporations under the laws of the Commonwealth of Pennsylvania or to organizations exempt from tax under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended; and

(f)    To acquire, own, dispose of, and deal with real and personal property whether tangible or intangible, and interests therein, and to apply contributions, gifts, grants, bequests, and devises,

and the proceeds thereof, in furtherance of the purposes of the corporation.

(g) To carry out all other objects as stated in the Articles of Incorporation and to engage in any lawful activities for which corporations may be organized under Pennsylvania Nonprofit Corporation Law and which are within the scope of activities permitted under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended.

No part of the corporation's net earnings shall inure to the benefit of, or be distributed to any member, contributor, director, officer or other individual except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein. No substantial part of the activities of the corporation shall consist of carrying on propaganda or otherwise attempting to influence legislation, and the corporation shall be empowered to make the election authorized under section 501 (h) of the Internal Revenue Code of 1986 as amended. The corporation shall not participate or intervene in any political campaign on behalf of or in opposition to any candidate for public office.

Notwithstanding any other provisions hereof, the corporation shall not conduct or carry on any activities not permitted to be conducted or carried on (i) by an organization which is tax exempt under the provisions of section 501 (a) of the Internal Revenue Code of 1986 as amended as an organization described in section 501 (c) (3) of such Code or (ii) by a corporation contributions to which are deductible under section 170 (a) of the Internal Revenue Code of 1986 as amended.

References herein to sections of the Internal Revenue Code of 1986 as amended are to provisions of the Internal Revenue Code of 1986, as amended, as those provisions are now enacted or to corresponding provisions of any future United States internal revenue law.

ARTICLE IV

The corporation shall have one class of members, and there shall be only one member of such class, which shall be Allegheny Health, Education and Research Foundation (the "Member"), which is a nonprofit corporation organized and operating under the laws of the Commonwealth of Pennsylvania and is an organization described in section 501 (c) (3) of the Internal Revenue Code, as amended. The Member shall have all of the rights and privileges conferred upon nonprofit corporate members under the laws of the Commonwealth of Pennsylvania, except as otherwise specified in the Bylaws of the corporation, as well as such additional rights and privileges as shall be specified in the Bylaws of the corporation. The corporation is organized upon a nonstock basis.

ARTICLE V

Except as otherwise reserved to the Member in Article IV, above, or as established by law or by the Bylaws of the corporation, the business and affairs of the corporation shall be managed under the direction of a Board of Trustees. The number, term and manner of appointment, term of office, voting rights and other provisions relating to the Board of Trustees shall be fixed and governed by the Bylaws of the corporation.

ARTICLE VI

Any reference herein to specific provisions of the law of the Commonwealth of Pennsylvania or to specific provisions of the Internal Revenue Code of 1986 as amended shall be construed to include subsequent amendments to such specific provisions and to include corresponding provisions of subsequent legislation which may relate to, supersede, or otherwise alter such specific provisions.

ARTICLE VII

Except as otherwise required by law, upon dissolution of the corporation, all of the corporation's

assets, after providing for debts and obligations of the corporation, shall be distributed to Allegheny Health, Education and Research Foundation, a Pennsylvania nonprofit corporation described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or to its successor, provided that Allegheny Health, Education and Research Foundation or any such successor receiving such a distribution shall then be in existence and shall then be an organization exempt from income taxes under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended. If upon the dissolution of the corporation, Allegheny Health, Education and Research Foundation and any of its successors, is not then in existence or neither Allegheny Health, Education and Research Foundation nor any of its successors is then an organization exempt from income taxes under Section 501 (c)(3) of the Internal Revenue Code of 1986, as amended, all of the corporation's assets remaining, after providing for debts and obligations of the corporation, shall be distributed to one or more organizations exempt from income taxes under section 501 (c) (3) of the Internal Revenue Code of 1986, as amended, as may be designated by the Board of Trustees of the corporation.

Dated: May 1, 1997

Exhibit "2"
to the
Plan of Division of
SDN, INC.

ARTICLES OF INCORPORATION

of

SDN TRANSITION CORPORATION

(A Pennsylvania Nonprofit Corporation)

ARTICLE I

The name of the corporation is: SDN Transition Corporation.

ARTICLE II

The location and address of the registered office in the Commonwealth shall be: 100 West Laurel Avenue, Cheltenham, PA 19012.

ARTICLE III

The corporation, which does not contemplate pecuniary gain or profit, incidental or otherwise, is incorporated under the Pennsylvania Nonprofit Corporation Law of 1988. The corporation is incorporated and shall be operated exclusively for charitable, scientific and educational purposes within the meaning of section 501 (c) (3) of the Internal Revenue Code of 1986 as amended, particularly for the following purposes:

(a) To establish, maintain, operate and support either directly or in cooperation with other organizations, such facilities and services providing health care for the sick, injured, disabled, indigent, or infirm persons and providing for the preservation of health as the Board of Trustees may

determine from time to time to be appropriate, including without limitation, hospitals, psychiatric hospitals, children's hospitals, rehabilitation hospitals, ambulatory care services, long term care facilities, and agencies or facilities providing for persons in their homes; and

(b) To establish, maintain, operate and support either directly, through subsidiary organizations, or in cooperation with other organizations, such activities, services, and facilities as are designed or intended to advance or support provision of health care services, including without limitation, programs involving education, research, and preventive health activity; and

(c) To engage in, promote, or support either directly, through subsidiary organizations, or in cooperation with other organizations, any activity designed to promote the general health, rehabilitation, or social needs of the public, either within or outside the Commonwealth of Pennsylvania; and

(d) To raise, receive and distribute funds either directly, or through related organizations or other organizations exempt from tax under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended in furtherance of the purposes of the corporation, subject to limitations on the nature or extent of such activities applicable to organizations exempt from tax under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended; and

(e) To engage in business and activities either directly or through tax exempt or taxable subsidiaries, or in cooperation with other organizations, which activities support the purposes of the corporation, subject to limitations on the nature and extent of such activities applicable to nonprofit corporations under the laws of the Commonwealth of Pennsylvania or to organizations exempt from tax under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended; and

(f) To acquire, own, dispose of, and deal with real and personal property whether tangible or intangible, and interests therein, and to apply contributions, gifts, grants, bequests, and devises, and the proceeds thereof, in furtherance of the purposes of the corporation.

(g) To carry out all other objects as stated in the Articles of Incorporation and to engage in any lawful activities for which corporations may be organized under Pennsylvania Nonprofit Corporation Law and which are within the scope of activities permitted under section 501 (c) (3) of the Internal Revenue Code of 1986 as amended.

No part of the corporation's net earnings shall inure to the benefit of, or be distributed to any member, contributor, director, officer or other individual except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein. No substantial part of the activities of the corporation shall consist of carrying on propaganda or otherwise attempting to influence legislation, and the corporation shall be empowered to make the election authorized under section 501 (h) of the Internal Revenue Code of 1986 as amended. The corporation shall not participate or intervene in any political campaign on behalf of or in opposition to any candidate for public office.

Notwithstanding any other provisions hereof, the corporation shall not conduct or carry on any activities not permitted to be conducted or carried on (i) by an organization which is tax exempt under the provisions of section 501 (a) of the Internal Revenue Code of 1986 as amended as an organization described in section 501 (c) (3) of such Code or (ii) by a corporation contributions to which are deductible under section 170 (a) of the Internal Revenue Code of 1986 as amended.

References herein to sections of the Internal Revenue Code of 1986 as amended are to provisions of the Internal Revenue Code of 1986, as amended, as those provisions are now enacted or to corresponding provisions of any future United States internal revenue law.

ARTICLE IV

The corporation shall have no members. The corporation is organized upon a nonstock basis.

ARTICLE V

Except as otherwise established by law or by the Bylaws of the corporation, the business and affairs of the corporation shall be managed under the direction of a Board of Trustees. The number, term and manner of appointment, term of office, voting rights and other provisions relating to the Board of Trustees shall be fixed and governed by the Bylaws of the corporation.

ARTICLE VI

Any reference herein to specific provisions of the law of the Commonwealth of Pennsylvania or to specific provisions of the Internal Revenue Code of 1986 as amended shall be construed to include subsequent amendments to such specific provisions and to include corresponding provisions of subsequent legislation which may relate to, supersede, or otherwise alter such specific provisions.

ARTICLE VII

Except as otherwise required by law, upon dissolution of the corporation, all of the corporation's assets, after providing for debts and obligations of the corporation, shall be distributed to one or more organizations exempt from income taxes under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, as may be designated by the Board of Trustees of the corporation.

Dated: May 1, 1997

Exhibit "3"
to the Plan of Division of
SDN, Inc.

Initial Board of Trustees of SDN Transition Corporation

The following persons shall serve as trustees of SDN Transition Corporation until their respective successors are duly elected and shall have qualified:

Sherif S. Abdelhak
Donald Kaye, M.D.
David W. McConnell
Nancy A. Wynstra, Esq.

Exhibit "4"
to the Plan of Division of
SDN, Inc.

Initial Officers of SDN Transition Corporation

The following persons shall serve as the initial officers of SDN Transition Corporation:

Sherif S. Abdelhak - Chairman
Donald Kaye, M.D. - Vice Chairman, President and Chief Executive Officer
David W. McConnell - Treasurer
Nancy A. Wynstra, Esq. - Secretary and General Counsel
Robert M. McNair, Jr, Esq. - Assistant Secretary

**EXHIBIT  1063**

draft work in process does
not reflect final opinion or fact
determination

RJC Notes

CL 147594



DEPOSITION
EXHIBIT
1063
1-23-03
PENGAD 800-631-6989

draft\ work in process does not reflect final opinion or fact determination

✓ Rollforward of AR allowance for doubtful accts for Drug entity

1996 Allowance for D/A

Allow Drug

Allow all others

1997 Allowance for DA

Allow Drug

allowance all others

Drug Beg bal, Provision, charges, E-R balance

✓ Who was decision maker in movement of reserves.

✓ Difference between other co. - assets which use in [illegible] & other co accounts - due from/to affiliates? why two lines? Cash / non cash? Any note agreements?

Whose decision was it to [illegible]?

✓ Plan documents (copies) for both AHERF & Hanaway.
Asset statement for AHERF
Plan Register for AHERF & Hanaway

[illegible] Perbauer 350-5767 Exec VP HR

✓ Who does Craig Snow report to?

6 To whom were distributions made from AHERF Plan. At 6/97 Bal was $11.5M in 6/98 balance was $ 9.9M.

CL 147595

draft\ work in process does not reflect final opinion or fact determination

## STATUS OF "FOUR ITEMS"

| ITEM | REQUIREMENTS |
|---|---|
| | |
| Analysis of acquisition and other reserves; credits to income. | Confirm that PwC will have full access to the key financial people and to the records supporting the subject transactions/recordings. |
| | |
| Endowment accounting particularly for Lockhart trusts | Request that the legal review being completed by outside counsel be bifurcated to the extent that the required legal analysis of the Lockhart trusts be completed within the next week. |
| | |
| Rabbi Trusts | Matter must be pursued with the finance and treasury personnel to determine how the existence of the funds was not recorded on the books and to reconcile such with the representations made in connection with the fiscal 1997 financials. |
| | |
| Intercompany advances. | Probably area of least concern at this time, particularly as to additional work required. |
| | |

- We should establish the goal of substantially completing the required "field work" during the week of October 12, 1998.
- David should establish an Audit Committee date for the week of October 19, 1998.
- Throughout the coming week, every effort should be made to surface any other issues which management is aware of that could impact on the fiscal 1997 accounts.

draft\ work in process does not reflect final opinion or fact determination

10/15/98 4

Miriam Bailey & Dwight Kasperbauer

Exec - Flex Plan:

In benefits amount equal to 33% of Salary to pay all benefits except DB Pension Plan. 33% covered: FICA, FUTA, Vacation, S-T Disability, health insurance, Dental, etc.

Any excess between 33% and payment to salary is placed in an executive retirement acct (ERA) to non qualified deferred comp account.

Vesting is: Selected by Employee; i 2yrs or age 65
ii Vests 100% at Final
iii Vests in 2yrs if employee leaves & fulfills 2yr non-compete
assets & pledges

Other Plans Exist:

Restoration Plan — Dick Vitovich (pension on calcula:)
AHERF AHA Plan "
Humana AHA Plan "
Long Term Deferred Incentive Plan — Dave D33:, VPR Disbursements
Annual Management Incentive Plan " "
KSOP Plan ?

draft\ work in process does not reflect final opinion or fact determination

2/

Company also has a DB Plan however, Company does create a Pro-forma Plan register by Participant.

The Exec Flex Restoration Plan provides a "non qualified" deferred comp plan for Execs who make greater than the DB Erisa Salary Cap of $165,000. A Proforma Calculation is performed for all benefits under the DB. This difference is placed in the restoration plan.

Split Dollar - Exec Flex Plan w/ Pacific Mutual.

KSOP Plan

| | | | | Refunded Amts to AHERF |
|---|---|---|---|---|
| Abdelhack | ($2.1 mm) | Took distributions | Used to repay loans | no |
| McConnell | ($781m) | | some | no |
| Mynsorra | ($797k) | | | no |
| Kesenbaum | ($621k) | | | yes |
| Sanzo | ($590k) | | | |
| Doctor K | ($754k) | | | |

Distributions made in May 1998 by Dwight Kasenbaum indicated it was per Compensation Committee approval. Indicated that he determined that Committee did not approve distribution. Refunds by KSOP people were mailed for a sum.

CL 147598

draft\ work in process does not reflect final opinion or fact determination

10/14/98 1/2

Al Adamczak

- Indicated he did not take responsibility of East hospitals until 7/97

Indicated a decision was made at a closing meeting that 96 AR reserve was 30 million under reserved and to take it in over 3 years. Done at a closing meeting, all heads including [illegible]

Indicated 96 short fall was thought to be $30 in 96. It was not until '97 that he heard of short fall of $50, 70 & 99 million.

Reckless of $50 m of reserves was originally introduced by Dan Cancelmi to Mark Kierstein, who indicated he thought it was ok, but wanted to run it up a flag pole

Al is not [illegible] of any analysis which specifically addresses why $71 xx is a 96 event. He is also unconvinced it is all a PP A/E and in fact only part may be seen as a possible PP adj.

He will ask Dan for analysis whose PP A/E is from, doesn't know if they exist.

CL 147599

draft\ work in process does not reflect final opinion or fact determination

2/2

Re Fixed depreciation, Reclass of items to Assets whose use is limited. This was Sherriff's & David's idea and cleared w/ Bill Buettner.

Al indicated that he and Clay thought a presentation should be made. Al also indicated that Joe spoke w/ Bill re this as well.

Bill indicated that al, anyone who reads the F/S would see the elimination entry.

This event occurred in (ie the reclass to the 1997 accounts) 10/97

Al also indicated 96 inter co. a/cs were not liquidated at 6/30/96.

Inter co - assets whose use is limited - due from hosp 1 to pay liab of Hosp 2

Inter co - due from affiliates all other inter co practice.

CL 147600

draft\ work in process does not reflect final opinion or fact determination

10/14/98

Meeting with Chuck Morrison

- CFO for Eastern Hospice Division

Responsibilities included overseeing the EPPA

Not responsible for financial statements or JE. Chuck indicated that he received financial statements after the fact. He stated he had no input in closing process.

Periodic meetings held with McConnell, Morrison, Spargo and Dionisio (the Senior Team meeting)

Chuck indicated McConnell authorized when accounts could be written off.

The AR issue came to light in 1997 Senior team meetings held more frequently

Chuck indicated detailed assessments of collectability were made by Joe Dionisio & Craig Shaw.

Chuck indicated a concern level around reserves was there in 1996 however it was not until 1997 that an acceptance that these accounts could not be collected existed.

CL 147601

draft\ work in process does not reflect final opinion or fact determination

10/13 - work plan

1. Journal Entries Re Reserves

i. Summarize JE both DVOG & Graduate

ii. What type of work did C&L do surrounding AHERF reserves

iii. Document what AHERF did Re Establishing 1996 reserves. Need information from Dan Cancelmi. We spoke w/ Business office ([illegible]) who appeared to have a role but did not speak w/ people who have responsibility

iv. Need org chart for Finance & business office

v. AR rollforwards for DVOG entities

vi. Actual movement of reserves who was decision maker regarding movement of the reserves

vii. For "uploaded" JE get [illegible] summary of JE

viii. For a [illegible] JE [illegible]

ix. Who approved JE? [illegible] (Cancelmi)

CL 147602

draft\ work in process does not reflect final opinion or fact determination

2. Other Company Funds

i. Get administrative literature both AEC[illegible] & [illegible]

ii. [illegible] Bullis [illegible] regarding [illegible]

iii. JE. Who was conversation between? When were JE recorded.

iii. What was money for, [illegible] or [illegible] activity?

iv. What is different about [illegible] funds classified as assets whose use is limited. That it is not recorded with [illegible]. Due from is [illegible] from affiliates?

3. Rabbi Trusts

i. Need a copy of the plan

ii. need [illegible] register for some plans ([illegible])

iii. need [illegible] for 1997 & 1998

iv. Who administrates plan. Who made determination that plan assets were held in a trust or [illegible] bank account.

4. Lockhart Trust

i. Wait.

CL 147603

draft\ work in process does not reflect final opinion or fact determination

1. Elkins Park, Bucks how are Patco AK Considered is the allowance for DA?

2. AK 1600500 Prepaid Exec Benefits & [illegible] ($2.5 million) Prepaid?

3. CSU do Split Life, any Policy Loans o/s? [illegible] the asset?

draft\ work in process does not reflect final opinion or fact determination

10/13/98
Dan Cancelmi
Robyn Schaffer

Sushil Aseltak
Pres ...

Dave McConnell
Exec VP CFO

Steve Spargo
Sr VP Corp Acct

provided for Andersen

Al Adamczak

Dan Cancelmi

Chuck Morrison
CFO of Eastern Hospitals

Joe Dionisio
CFO of Pittsburgh Hlth
CIO
Patient Accounting - CBO

Craig Snow

CL 147605

draft\ work in process does not reflect final opinion or fact determination

10/12/98 Meeting with 1/3

Craig Snow VP of Financial Services
Russ Laird, Director of Financial Reporting
Robin Holland, Mgr of Envision Services
Jeanne Collins, Pr. Acct Analysis
Kaveh Kocki Systems Programmer

October 1994 & 1995
: Decision made to move bus office ops for Dvoz entity to a CBO in Pitts
· Premier [illegible] letters out to Dvoz hosp (a Stray fix gets [illegible] to employee [illegible] [illegible]).
· Mass exodus from Dvoz business offices occurs.
· 2/95 Dvoz business office functions, including all o/s AR at 1/95 and all bus office OPs 2/95 & subsequent are outsourced to HBM (H/C Bus. mgt.) a subsidiary of East Coast Credit
· Company has a Cash Collections S/W in 3/95

Craig Snow Starts 3/95

Conversion begins in June and July 1995
· At 7/1 MCP ($150 xx), EAPI ($12-15xx) and Hammann ($80 xx) plan was for MCP, EAPI & Hammann to keep all pre 7/1 A/R and all post 7/1 to be worked by the CBO.

CL 147606

draft\ work in process does not reflect final opinion or fact determination

2/3

- After review of HOM's work Craig pulled all Accounts Receivable back in house for MCP, EPPI and Hanneman
- Craig indicated they (the Bus Office) was analyzing accounts in detail, but in 9/95 Craig was instructed by McConnell to stop his detailed analysis

Regarding Bucks, Elkins & St. Chris

- Conversion [illegible] in 12/95 (1-11)
- Craig locked HBm out of system on 9/15/95 and turned all of [illegible] AR to AR-Trek
- In [illegible] $110 million in AR was sent to AR-Trek
- Craig Snow assessed Emul collectability of $110 AR AR based upon:
  1. Sale of AR
  2. Budget to negotiate w/ a 3rd Party to [illegible] est was $55-60 was collectible. Actual collected was $60.

CL 147607

At 6/30/97 all AR relating to these items was > 390

During this time frame monthly meetings were held w/ AR Fin services & Finance (Og Cacelin: Controller and Chuck Morrison, CFO).

Noted in 96 Bus Office [illegible] reports monthly identifying all AR - IP with [illegible] was [illegible] of bill [illegible] Date [illegible] to Acct Fin-Special Reserve

draft\ work in process does not reflect final opinion or fact determination

3/3

Craig Saur indicated that he was instructed by McManus not to adjust constituents on any pre 7/95 Duoy AIR activity.

CL 147608

draft\ work in process does not reflect final opinion or fact determination

3/3 [illegible]

Questions to Craig S[illegible]

1. Were all old DUR receivables transferred to ARTrak or just Bucks, Elkins, St Chris

2. Regarding bucks, elkins & St Chris $110 [illegible] AR with only $55-6[illegible] collectable, who did you inform about this? how was it documented?

3. Was a similar analysis performed for MCP, Elk. & Hahnemann

CL 147609

AHERF 10/19/98

draft\ work in process does not reflect final opinion or fact determination

Meeting w/ Dan Cancelmi, Robin Shetler

Dan [illegible] File documentation for the following if such documentation exists

1. IBM Bldg Sale / lease back
2. Parking Garage Sale / lease back
3. Establishment of a bad bank for:
   - AR
   - Contingent Earnings

[illegible]

Trust Classification (Lockbox)

Other [illegible] Activity Graduate - DVOZ

Rabbi Trust

Meeting w/ IS

Chris Middlemiss, Director; Robin Holland, mgr of Envision; Jeannie Collins, PT Acct Analysis; Karen Korki Systems [illegible]

| | FY 97 | FY 96 |
|---|---|---|
| Bucks | GT Corporate - Envision (SAS) | |
| Elkins | | |
| St Chris | Unity Dec System | |
| MCP | SMS in McIvera (FMS system) | |
| EPPI | TDS Front | |
| Hahnemann | GT Hahnemann - Envision (SAS) | |

CL 147610