*97*

ALLEGHENY-SINGER RESEARCH INSTITUTE

NOTES TO FINANCIAL STATEMENTS
June 30, 1996
(Dollars in Thousands)

———

2.    **Accounting Policies:**  (continued)

**Property and Equipment:**

Property and equipment, along with expenditures that extend the useful lives of assets, are recorded at cost.  Maintenance and repairs are charged to expense as incurred.  At the time assets are retired or otherwise disposed of, the cost thereof and the related accumulated depreciation or amortization are eliminated and any resulting gain or loss on disposition is recorded as other revenue.

Depreciation is provided over the estimated useful life of the assets computed under the straight-line method with one-half year of depreciation recognized in the year the related assets are placed into service.

**Other Assets:**

Other assets consist primarily of patents that are being amortized over five years using the straight-line method and an investment in a licensing agreement to develop cardiac assist devices.

**Restricted Net Assets:**

Temporarily restricted net assets are those whose use has been limited by donors for a specific purpose or a specific time period.  Permanently restricted net assets have been restricted by donors to be maintained in perpetuity.  Temporarily restricted assets released from restriction during the period are reflected in the statement of operations.

**Related Party Transactions:**

Fees charged for services provided by affiliates are included in expenses with  all other transactions among affiliates recorded as net asset transfers.  Any resulting accounts receivable or payable with affiliates are settled periodically in the normal course of business.

**Income Tax:**

ASRI has been recognized as tax exempt pursuant to Section 501 (c)(3) of the Internal Revenue Code.

JB 01705

**98**

ALLEGHENY-SINGER RESEARCH INSTITUTE

NOTES TO FINANCIAL STATEMENTS
June 30, 1996
(Dollars in Thousands)

3.    **Investments:**

The following table sets forth the composition of investments by investment type at June 30, 1996:

| | |
|---|---:|
| Unrestricted: | |
| Cash and short-term investments | $      94 |
| Government and corporate obligations | 407 |
| Marketable equity securities | 1,311 |
| | 1,812 |
| Temporarily Restricted: | |
| Cash and short-term investments | 76 |
| Government and corporate obligations | 1,064 |
| Marketable equity securities | 3,330 |
| | 4,470 |
| Permanently Restricted: | |
| Cash and short-term investments | 121 |
| Government and corporate obligations | 2,408 |
| Marketable equity securities | 3,457 |
| | 5,986 |
| Investments | $ 12,268 |

Investment returns consisted of the following for the year ended June 30, 1996:

| | |
|---|---:|
| Net gains on investments | $      41 |
| Dividends and interest | 17 |
| | $      58 |

4.    **Property and Equipment:**

Property and equipment consists of the following components at June 30, 1996:

| | |
|---|---:|
| Building improvements | $ 9,070 |
| Equipment | 14,680 |
| | 23,750 |
| Less accumulated depreciation and amortization | 10,255 |
| Property and equipment, net | $ 13,495 |

10

JB 01706

**99**

ALLEGHENY-SINGER RESEARCH INSTITUTE

NOTES TO FINANCIAL STATEMENTS
June 30, 1996
(Dollars in Thousands)

5.    **Commitments:**

ASRI leases certain research and office equipment and office space used in its operations. Rental expenses for operating leases for the fiscal year ended June 30, 1996 were $470. The annual and total future minimum lease payments under noncancelable operating leases entered into as of June 30, 1996 are as follows:

| Year | |
|------|------:|
| 1997 | $   364 |
| 1998 | 324 |
| 1999 | 320 |
| 2000 | 331 |
| 2001 | 358 |
| 2002 and thereafter | 3,997 |
| Total minimum payments | $ 5,694 |

6.    **Insurance:**

AHERF is self-insured for primary coverage and for certain levels of excess coverage related to professional and general liability claims through AHSPIC, an affiliated captive insurance company incorporated in the Cayman Islands. In addition, AHERF participates in the Medical Professional Liability Catastrophic Loss Fund of the Commonwealth of Pennsylvania (CAT Fund) and maintains insurance under commercially insured programs on a claims-made basis for amounts in excess of the self-insurance and CAT Fund coverages. Premiums paid by AHERF to AHSPIC are retrospectively rated and are based on funding requirements determined by independent insurance actuaries to include provisions for estimates of the ultimate costs for both reported claims and claims incurred but not reported, determined on a discounted basis using a 7.5% rate. Professional and general liability expense is allocated by AHERF to each relevant AHERF entity based principally upon such entity's reported claims and estimated claims incurred but not reported. During fiscal year 1996, ASRI's total professional and general liability expense was $8.

AHERF is also self-insured for workers' compensation liability claims and has established a trust fund for the payment of such claims. Funding requirements and estimates of losses incurred are determined on a discounted basis using actuarial assumptions which include a 6.0% discount rate and which are subject to revision based upon actual experience. Workers' compensation expense is allocated by AHERF to each relevant AHERF entity based principally upon such entity's reported claims and estimated claims incurred but not reported. During fiscal year 1996, ASRI workers' compensation expense was $185.

11                    JB 01707

ALLEGHENY-SINGER RESEARCH INSTITUTE

NOTES TO FINANCIAL STATEMENTS
June 30, 1996
(Dollars in Thousands)

―――――――

7.    **Pension Plan:**

AHERF maintains a noncontributory, defined benefit pension plan covering substantially all ASRI employees. Under this cash balance plan (the Plan), pension accruals are determined using a defined percentage of an employee's current compensation based on the employee's age and years of service. Each employee's individual retirement benefit is defined within the Plan's obligation as a notational cash balance retirement account and is credited with interest based on a defined interest rate. AHERF's funding policy is to contribute such amounts as are necessary on an actuarial basis to provide the Plan with assets sufficient to meet benefits to be paid to retirees or their beneficiaries and to satisfy the minimum funding requirements of the Employee Retirement Income Security Act of 1974. Pension expense is allocated by AHERF to each relevant AHERF entity based principally upon the number of full and part time employees covered by the Plan and their respective salary levels. During fiscal year 1996, ASRI's pension expense was $2.

AHERF sponsors a contributory, defined contribution savings plan which is available to substantially all ASRI employees in order to provide additional security during retirement by creating an incentive for employees to make regular contributions on their own behalf. Under this plan, and as determined on an individual employee basis, AHERF contributes an amount equal to 25% of an employee's contribution for an employee contribution up to 4% of such employee's salary in a given year. Such expense is allocated by AHERF to each relevant AHERF entity based on actual contributions made. ASRI's expense associated with contributions to this savings plan was $97 for the year ended June 30, 1996.

8.    **Related Party Transactions:**

ASRI exercises control over Allegheny Heart Institute (AHI), a Pennsylvania non-profit organization whose principal purpose is to fund specific research initiatives at ASRI. During fiscal year 1996, AHI provided funding to ASRI of $10. AHI had net income of $131, cash and cash equivalents of $23, short-term investments of $659 and net assets of $682 as of June 30, 1996. The financial position and statement of operations of AHI have not been combined with ASRI as of June 30, 1996.

12

JB 01708

**101**

ALLEGHENY-SINGER RESEARCH INSTITUTE

NOTES TO FINANCIAL STATEMENTS
June 30, 1996
(Dollars in Thousands)

8.    **Related Party Transactions:**  (continued)

AHERF provides selected management, administrative and support services to its operating units and charges them for these services. During fiscal year 1996, ASRI incurred services charges from AHERF of $456 . These charges are included on the statement of operations as materials, supplies and services. Additionally, AHERF is committed to advancing the quality of health care services provided to the communities it serves through the sponsorship of biomedical research. Funding provided to ASRI in this connection amounted to $18,565 for the fiscal year ended June 30, 1996 and was recorded as net asset transfers. At June 30, 1996 deferred grant revenue included $3,523 of funding for human genetics research from AHERF. In fiscal year 1996, AHERF provided $868 to ASRI as matching support related to externally funded contributions to establish endowments. At June 30, 1996, ASRI has a receivable from AHERF of $1,241.

ASRI provided research grants to Allegheny University of $3,571 in fiscal year 1996.

ASRI provided AGH with $128 in fiscal year 1996 for AGH's library to purchase research journals and to perform information searches related to research initiatives.

AGH transferred a $906 investment to ASRI in fiscal year 1996 which is reflected as a net asset transfer.

ASRI utilizes laboratory and office space owned by AGH. AGH charged ASRI a fee of $2,800 in fiscal year 1996.

ASRI provided research grants to St. Christopher's of $239 in fiscal year 1996.

ASRI, as the prime grantee on specific research grants, has subcontracted with St. Christopher's to perform certain services related to the grants. Total funding available to St. Christopher's is $195, of which $26 was transferred in fiscal year 1996.

ASRI is a member of The Obligated Group, comprised of AGH and ASRI under a Master Trust Agreement. The Obligated Group obtained proceeds from the issuance of various bonds and notes, which are collateralized by the pledge of certain Obligated Group receivables to the Master Trustee.

JB 01709

ALLEGHENY-SINGER RESEARCH INSTITUTE

NOTES TO FINANCIAL STATEMENTS
June 30, 1996
(Dollars in Thousands)

9.    **Functional Expenses:**

ASRI performs medical research through its research institute . Expenses related to these
services are as follows for the year ended June 30, 1996:

| | |
|---|---|
| Medical research | $ 21,891 |
| General and administrative | 4,902 |
| | $ 26,793 |

10.    **Fair Value of Financial Instruments:**

The following methods and assumptions were used by ASRI in estimating the fair value of
its financial instruments:

**Short-term Investments:** The carrying value reported in the balance sheet for short-
term investments approximates its fair value.

**Investments:** These assets consist primarily of government and corporate
obligations and marketable equity securities. Fair values were determined based on
quoted market prices and dealer quotes where available, or quoted market prices
pertaining to similar securities where not available. The carrying value reported on
the balance sheet for investments approximate their fair value.

11.    **Indirect Costs:**

ASRI's approved two-year, predetermined indirect cost rate of 52% plus fringe benefits at
19.4%, was effective from July 1, 1992 through June 30, 1994; subsequent to this period,
these rates are provisional until renegotiated and approved. The predetermined fixed rate
was determined based on ASRI's financial information as of June 30, 1991 and for the year
then ended. ASRI has continued to utilize the established provisional rate through June 30,
1996.

JB 01710

F

JB 01711

**Coopers**
**&Lybrand**

Coopers & Lybrand L.L.P.

a professional services firm

**103**

## Report of Independent Accountants

To the Board of Trustees of
  Allegheny General Hospital:

We have audited, in accordance with generally accepted auditing standards, the consolidated balance sheet of Allegheny General Hospital, hereinafter referred to as the Obligated Group, as of June 30, 1996, and the related consolidated statement of operations, changes in net assets, and cash flows for the year then ended, and have issued our report thereon dated September 11, 1996. The Obligated Group includes the accounts of Allegheny General Hospital and Allegheny-Singer Research Institute.

In connection with our audit, nothing came to our attention that caused us to believe that the Obligated Group was not in compliance with the covenants (insofar as they relate to accounting matters) contained in Article V of the Restated and Amended Master Trust Indenture dated April 7, 1993 (as supplemented and amended) with PNC Bank (as Master Trustee). It should be noted, however, that our audit was not directed primarily toward obtaining knowledge of such noncompliance.

This report is intended solely for the information and use of the Board of Trustees and management of the Obligated Group and PNC Bank and should not be used for any other purpose.

*Coopers & Lybrand L.L.P.*

Pittsburgh, Pennsylvania
September 11, 1996

JB 01712

Coopers & Lybrand L.L.P. is a member of Coopers & Lybrand International, a limited liability association incorporated in Switzerland

**104**

Coopers
&Lybrand

Coopers & Lybrand L.L.P.

a professional services firm

### Report of Independent Accountants

To the Board of Trustees of
  Allegheny General Hospital:

We have audited, in accordance with generally accepted auditing standards, the consolidated balance sheet of Allegheny General Hospital, hereinafter referred to as the Obligated Group, as of June 30, 1996, and the related consolidated statement of operations, changes in net assets, and cash flows for the year then ended, and have issued our report thereon dated September 11, 1996. The Obligated Group includes the accounts of Allegheny General Hospital and Allegheny-Singer Research Institute.

In connection with our audit, nothing came to our attention that caused us to believe that the Obligated Group was not in compliance with the covenants (insofar as they relate to accounting matters) contained in Section 7 of the Reimbursement and Security Agreement dated April 1, 1995 with Morgan Guaranty Trust Company of New York and PNC Bank (as Master Trustee). It should be noted, however, that our audit was not directed primarily toward obtaining knowledge of such noncompliance.

This report is intended solely for the information and use of the Board of Trustees and management of the Obligated Group and PNC Bank and should not be used for any other purpose.

*Coopers + Lybrand L.L.P.*

Pittsburgh, Pennsylvania
September 11, 1996

JB 01713

Coopers & Lybrand L.L.P. is a member of Coopers & Lybrand International, a limited liability association incorporated in Switzerland.

## Coopers & Lybrand

Coopers & Lybrand L.L.P.

a professional services firm

**105**

### Report of Independent Accountants

To the Board of Trustees of
  Allegheny University Hospitals,
  Allegheny University of the Health Sciences
  and St. Christopher's Hospital for Children:

We have audited, in accordance with generally accepted auditing standards, the combined balance sheet of the Delaware Valley Obligated Group, hereinafter referred to as the Obligated Group, as of June 30, 1996, and the related combined statement of operations, changes in net assets, and cash flows for the year then ended, and have issued our report thereon dated September 11, 1996.

In connection with our audit, nothing came to our attention that caused us to believe that the Obligated Group was not in compliance with the covenants (insofar as they relate to accounting matters) contained in Article 6 of the Master Trust Indenture and Sections 3.6 and 3.21 of the First Supplemental Master Trust Indenture dated May 15, 1996 with Norwest Bank, Minnesota, N.A. (as Master Trustee). It should be noted, however, that our audit was not directed primarily toward obtaining knowledge of such noncompliance.

This report is intended solely for the information and use of the Board of Trustees and management of the Obligated Group and Norwest Bank, Minnesota, N.A. and should not be used for any other purpose.

*Coopers & Lybrand L.L.P.*

Pittsburgh, Pennsylvania
September 11, 1996

JB 01714

Coopers & Lybrand L.L.P. is a member of Coopers & Lybrand International, a limited liability association incorporated in Switzerland.

**EXHIBIT  1664**

**80**

Sherif S. Abdelhak
President and
Chief Executive Officer

**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-3009
412-359-8800

Broad & Vine Streets
Mail Stop 400
Philadelphia, PA 19102-1192
215-762-8450

January 11, 1998

| | |
|---|---|
| **MEMORANDUM TO:** | J. David Barnes |
| **FROM:** | Sherif S. Abdelhak  SSA |
| **SUBJECT:** | Establishment of an Internal Loan Committee |

This will confirm your agreement to chair an Internal Loan Committee for Allegheny Health, Education and Research Foundation. Other members of the Committee who have agreed to serve are Ira Gumberg, Claire Gargalli, Robert Fletcher, Robert Palmer and David McConnell.

The committee must authorize any and all intercompany loans in excess of $10 million to, or from, any Allegheny entity to another, including the interest to be charged and the repayment schedule. Any such request would come from the Chief Executive Officer and Chief Financial Officer of the entities in question.

I am hereby requesting that the Committee establish the terms and conditions of any loans that are currently outstanding. The Committee's decisions are to be reported to the relevant Resource Management committees and to the AHERF Finance and Audit Committee.

SSA:aks

cc:     Chairs of AHERF Boards
        Joseph D. Dionisio
        Claire Gargalli
        Ira Gumberg
        Robert Fletcher
        Donald Kaye, M.D.
        David W. McConnell
        Charles Morrison
        Robert Palmer
        Leonard L. Ross, Ph.D.
        Anthony M. Sanzo



EXHIBIT
1664
PENGAD-Bayonne, N. J.

bcc:    Lynn Issacs

RS 00459

Allegheny Health, Education and Research Foundation
Allegheny General Hospital • Allegheny Integrated Health Group • Allegheny University of the Health Sciences
Allegheny University Hospitals • Allegheny University Medical Centers • St. Christopher's Hospital for Children

**EXHIBIT  1667**

Site Visit Memo
May 4, 1998

To:    David Stevens, Pat Mathis

cc.    Carolyn Tain, Alyssa Park, Bob Cathcart (Consultant)

From:  Karleen Strayer, Chip Reilly

Re:    4/29/98 Meeting With ADVOG (PA0543)
       $256.3MM
       Rated: 8C

Meeting Format:  We requested a series of independent meetings with specific attendees to
maximize the benefit of the meetings for MBIA.

| Meetings | AHERF | MBIA | Merrill Lynch |
|----------|-------|------|---------------|
| 9:00AM | Sherif Abdelhak, AHERF President & CEO Mike Martin, SVP Treasury | David Stevens Karleen Strayer Carolyn Tain Chip Reilly Bob Cathcart (Consultant) | Craig Carnoroli |
| 10:00AM | Tony Sanzo, President & CEO, AUH-West Joseph Dionisio, SVP & CFO AUM-West Mike Martin, SVP Treasury | David Stevens Karleen Strayer Carolyn Tain Chip Reilly Bob Cathcart (Consultant) | Ed Malmstrom Craig Carnaroli |
| 12:00PM | David Barnes, Trustee Ira Gumberg, Trustee | David Stevens Karleen Strayer Carolyn Tain Chip Reilly Bob Cathcart (Consultant) | |
| 1:00PM | Dr. John Cinicola, Dept. of Medicine | Bob Cathcart (Consultant) | |



EXHIBIT
1667

PENGAD-Bayonne, N. J.

MBIA  --   030209

| Meeting | AHERF | MBIA | Merrill Lynch |
|---------|-------|------|---------------|
| 9:00AM | Sherif Abdelhak, AHERF President & CEO Mike Martin, SVP Treasury | David Stevens Karleen Strayer Carolyn Tain Chip Reilly Bob Cathcart (Consultant) | Craig Carnoroli |

Sherif explained that they now estimate a $200MM-$300MM loss for FY98 (6/30), as a result of restructurings and downsizing currently in the works. Roughly $150MM of this amount is goodwill, the remaining $50MM-$150MM will have a real cash impact. Although all of the write-off will be expensed in FY98, much of the negative cash flow impact will be felt in FY99, because much of the downsizing is at the Universities, where faculty will get notices this year, work the '98-'99 academic year and terminate 6/99. Many of the terminated faculty members will leave before 6/99, as they find new jobs, which will reduce the losses and cash outflow.

Sherif blames the difficult revenue environment for the losses. He claims that their costs are reasonable as they are one of the lowest cost providers in the State. The pressure on revenue is due to lower Medicare and Medicaid reimbursement and increased Managed Care pressures, particularly, Managed Medicare. While Medicaid appears to have stabilized, Medicare reimbursement continues to get worse, although reimbursement decreases should be less in the future. He is looking to cut costs further (see consultants below).

Sherif has revised AHERF's strategy and admits that previous strategies have contributed to the current losses. As a result, he is doing the following:

- Sell 50% of East to Vanguard for $400MM (these are community hospitals, not fitting AHERF's new strategy).
- Keep the Philly medical schools, Hahneman, MCP and St. Christophers.
- Focus on fewer, more profitable products where they have extensive expertise (ie. cardio and oncology), abandon the large diverse integrated healthcare system strategy (bigger is not necessarily better anymore).
- Do not renew risk sharing contracts (insurance is a bad business for hospitals).
- Renegotiate or terminate all contracts of owned PCPs so that all owned PCPs are profitable.
- No new debt (The $87MM line of credit with Mellon Bank was repaid).

External Consultants are helping design cost cutting plans but are not going to be involved in the implementation. Sherif maintains that the Consultants are meant to affirm and support management's plans and he and his staff will implement.

- McKinnsey & Co. is analyzing nonclinical operations such as back office administration, accounting, finance, administration, HR, IS. McKinsey is good at cost cutting and rengineering procedures.
- APM is analyzing clinical/patient service related employees. APM is a well known healthcare consulting firm, known for improving efficiency of patient services.

Rationale to keep any of Philly's operations. Sherif wants to keep the medical schools and the three hospitals needed to support them because they greatly enhance the academic and research quality of the overall institution. He further maintains that they attract, generate and retain higher caliber doctors because of the medical schools.

2

MBIA    030210

| Meetings | AHERF | MBIA | Merrill Lynch |
|----------|-------|------|---------------|
| 10:00AM | Tony Sanzo, President & CEO, AUH-West<br>Joseph Dionisio, SVP & CFO AUM-West<br>Mike Martin, SVP Treasury | David Stevens<br>Karleen Strayer<br>Carolyn Tain<br>Chip Reilly<br>Bob Cathcart (Consultant) | Ed Malmstrom<br>Craig Carnaroli |

- Sanzo has a direct relationship with Frank Couhette, Chmn. of Mellon, who gives Sanzo advice and referred him to McKinsey for consulting expertise. (Sanzo seemed to speak more of Couhette than Sherif.)

- Turnaround should be manageable. They have identified $60MM of cost savings and $5MM of revenue enhancement.

- McKinsey has been hired to help review the nonclinical operations. McKinsey adds value because they instill discipline, which will continue beyond their assignment term. McKinsey is also effective at evaluating and redesigning processes. They are willing to eliminate and consolidate processes where it makes sense.

- APM will perform the clinical side of the consulting task.

- This next round of cuts will be more carefully planned. Last time, the cuts were too rushed and were not carefully planned, resulting in some confusion and bad press. Certain terminated positions needed to be reinstated. Sanzo believes that they are overstaffed and that they will be able to focus on the overstaffed areas, with the help off the current consulting assignments.

- Sanzo supports the Medical School, and accepts "the value it adds to the System as well as its baggage."

- Sanzo confirmed that they are getting out of the risk contracting business and are cutting and restructuring the owned-PCPs. A number of PCP's were bought to serve the risk contract population and will not be needed anymore. Sanzo is aware that McConnel (CFO) has been renegotiating the contracts with the PCPs (he has heard the complaints), but he does not know how far along he is.

- Sanzo was willing to meet again to spend more time on the numbers.

3

MBIA  --  030211

| Meetings | AHERF | MBIA | Merrill Lynch |
|----------|-------|------|---------------|
| 12:00PM | David Barnes, Trustee<br>Ira Gumberg, Trustee | David Stevens<br>Karleen Strayer<br>Carolyn Tain<br>Chip Reilly<br>Bob Cathcart (Consultant) | |

- The Board members appear to be *relatively* open minded about rethinking strategy (such as retaining any of the Eastern operations) and were interested in learning more about managing hospitals, particularly regarding medical schools. Bob Cathcart will send them a list of premier hospitals without medical schools. He pointed out that a number of hospitals have strong quality affiliations with medical schools or own or affiliate with high quality research clinics or medical centers to achieve the same goals as they would seek by owning a medical school. His point is that they do not need to own the medical schools in Philly. (We believe that Sherif has very strong influence on the Board, but maybe not total control.)

- The Trustees firmly believe that the academic and research quality of AGH improved significantly with the medical schools, despite the financial losses in the East. Ira described the contribution of the medical schools as a "clinical and research renaissance." The schools help boost the quality of the AGH doctors and the community knows this and supports it.

- The Trustees give the Vanguard transaction a 90% chance of occurring.

- David Barnes was impressed with management's corporate-minded strategy of taking the one-time write-offs to clean up the balance sheet and position them selves for the future. He believes that management has been responsive and has done a lot over the last six months when the losses started to get much worse. He thinks that management appears to be very proactive, which impresses the Board.

- Both Trustees are on the Loan Committee, but the Committee has not met yet. They were aware that the $87MM Mellon loan was repaid, but there wasn't a meeting to address the cash transfers to repay the loan, as intended for the Loan Committee.

- The Trustees agree with Sherif that the reimbursement problems are the significant factor depressing revenues and causing the losses. They know it is a problem throughout the State, but the impact on AHERF is more severe due to its urban locations.

- The Trustees are aware of the A/P squeeze, but perhaps not the severity of the issues (structured deals with the vendors, equating to COD).

- The Trustees see one System, although the doctors see two: East and West

| 1:00PM | Dr. John Cinicola, Dept. of Medicine | Bob Cathcart (Consultant) | |
|--------|-------------------------------------|---------------------------|---|

- Bob advised that Cinicola was very devoted and loyal to AHERF, a real company man. There was a clear message that AGH is a top notch hospital with a big teaching responsibility and favorable community ratings.

4

**EXHIBIT  1676**

ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION
AUDIT COMMITTEE
Pittsburgh, Pennsylvania

A meeting of the Audit Committee of Allegheny Health, Education & Research Foundation
was held on Tuesday, October 15, 1996, at 10:00 a.m. in the Board Room of Allegheny
General Hospital, Pittsburgh, Pennsylvania. The meeting was called pursuant to notice duly
given in accordance with the Bylaws to each member of the Committee. A copy of the notice
is appended to the original minutes of this meeting. The following individuals were present:

| Members Present | Other Invitees | Members Absent |
|---|---|---|
| J. David Barnes | Sherif S. Abdelhak | Ralph W. Brenner, Esq. |
| Anthony M. Cook | Calvin Bland | W. P. Snyder III |
| Robert M. Hernandez | William F. Buettner | |
| Graemer K. Hilton | (Coopers & Lybrand) | |
| W. Bruce Thomas | Carol Gordon | |
| | Lynn Isaacs | |
| | Dwight Kasperbauer | |
| | Donald Kaye, M.D. | |
| | David W. McConnell | |
| | Leonard L. Ross, Ph. D. | |
| | Anthony M. Sanzo | |
| | Diane K. Schrecengost | |
| | Cherry S. White | |
| | Nancy A. Wynstra, Esq. | |

I.     Opening of Meeting

       The meeting was called to order by J. David Barnes, Chairman. Nancy A. Wynstra,
       Esq. kept the minutes. The Chairman declared that a quorum was present and the
       meeting was competent to proceed.

II.    Additions to the Agenda

       Mr. Barnes noted there were no additions to the agenda.


DEPOSITION
EXHIBIT
1676
AKF

SEC-1 -- 0001756

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 2

III.    Approval Items

    A.    Summary of Discussions from the Meeting Held on April 8, 1996

        The Summary of Discussions from the meeting held on April 8, 1996 was
approved as presented.

    B.    Report on Fiscal Year 1996 Audited Financial Statements and Related Reports
for AHERF and Subsidiaries

        William F. Buettner reported that the financial statements had been audited by
Coopers & Lybrand according to the audit plan approved by the Committee in
April. Mr. Buettner noted that this has been a year of significant changes from
a financial reporting perspective, with the institution of three major changes in
accounting principles which required restatement of prior year financial
statements. Specifically, AHERF made changes to:

        .    its method of accounting for contributions by adopting Statement of
Financial Accounting Standards (SFAS) No. 116, "Accounting for
Contributions Received and Contributions Made",

        .    its method of reporting by adopting SFAS No. 117, "Financial
Statements of Not-for-Profit Organizations", and

        .    its method of accounting for investments by adopting SFAS No. 124,
"Accounting for Certain Investments Held by Not-for-Profit
Organizations".

        Mr. Buettner further stated that Coopers & Lybrand had rendered unqualified
opinions for all AHERF audited entities. Discussion took place regarding the
adoption of SFAS No. 124, "Accounting for Certain Investments Held by Not-
for-Profit Organizations" and the effect it will have upon the balance sheet.
Mr. McConnell stated that he will study this and work with Coopers & Lybrand
on the related issues and bring any recommendations to the next meeting. He
noted that only one year's worth of financial statements are being presented at
this time due to lack of comparability. Mr. Barnes noted that this has been a
tough year from a P&L standpoint but that the strategies which have been put in
place to manage the organization's finances seem to be working. Mr. Abdelhak

SEC-1 -- 0001757

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 3

noted that, system wide, the various entities absorbed approximately $82 million in negative adjustments during this fiscal year, and that there has been a 6% increase in market share system wide. He further noted that, to the best of his knowledge, Allegheny University of the Health Sciences is the only university that includes depreciation as an expense. He stated that, while last year was a very challenging year, all of the Allegheny organizations performed in an extraordinary manner. Mr. McConnell then reviewed the changes that have taken place in the Billing Department during the past Fiscal Year, noting that the present focus on Accounts Receivable has resulted in improvement, particularly in Pittsburgh. Mr. McConnell further noted that Coopers & Lybrand provided a debt compliance verification letter for each outstanding debt obligation requiring such annual verification. Following discussion and upon motion duly made and seconded, the Audit Committee recommended that the Board of Trustees of AHERF approve the following resolution:

> **RESOLVED, that the Allegheny Health, Education and Research Foundation Board of Trustees approves the Audited Financial Statements and the related debt compliance letters for Fiscal Year 1996; and**

> **FURTHER RESOLVED, that the Board instructs the Secretary to append copies of the accepted Fiscal Year 1996 Financial Statements and related debt compliance letters to the original minutes of this meeting.**

C.    Fiscal Year 1996 Reports on AHERF Internal Controls

William F. Buettner reported that Coopers & Lybrand had reviewed internal controls within AHERF and its Obligated Group entities and stated that there were no matters noted during the audits that would be considered to be material weaknesses in the internal control structure. The letter reporting on the absence of material weaknesses is being provided to enable AHERF and its affiliates to comply with Medicare regulations requiring that such reports be included as an attachment to the Medicare Cost Report. All prior year comments made by Coopers & Lybrand have been adequately addressed by management. Upon motion duly made and seconded, the Audit Committee recommended that the Board of Trustees of AHERF approve the following resolution:

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 4

> RESOLVED, that the Allegheny Health, Education and Research
> Foundation Board of Trustees accepts the Coopers & Lybrand
> Report on Internal Controls as presented; and
>
> FURTHER RESOLVED, that the Board instructs the Secretary to
> attach a copy of the Report to the original minutes of this meeting.

IV.    Information and Discussion Items

A.    Coopers & Lybrand Management Letter and AHERF Management Response

David W. McConnell noted that the detailed Coopers & Lybrand management
letter provided AHERF with system-wide internal control observations.
William Buettner stated that the letter was provided to suggest enhancements to
the control environment within AHERF, and he reiterated that no material
control weaknesses were identified by Coopers & Lybrand during its audits.
Mr. Buettner reported that the complexity of hospital billing and collection of
accounts receivable within the AHERF system was recognized.
Recommendations were made to management in order to streamline billing
activity throughout the organization.  A review of the Information Services
Department identified various opportunities for improving AHERF's
information systems controls and security.  These were reported to
management, and the recommendations were accepted. Mr. Buettner reported
that security controls continue to improve, and there are no significant
weaknesses.  Improvement in the paper flow in the Human Resources and
Payroll Departments needs to occur.

B.    Coopers & Lybrand Required Communication to the Audit Committee

Mr. Buettner reported that the American Institute of Certified Public
Accountants (AICPA) requires external auditors to communicate certain matters
to their audit clients on an annual basis, and this letter is provided in compliance
with such requirement.

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 5

C.    Discussion of Government Audits of Physicians at Teaching Hospitals (PATH)

It was reported that the Office of the Inspector General (OIG) for the
Department of Health and Human Services has initiated a series of nationwide
reviews of compliance with rules governing physicians at teaching hospitals
(PATH) and other Medicare payment reviews.  The focus of these reviews
include compliance with Medicare rules affecting payment for physician
services provided by residents and the propriety of coding and medical chart
documentation supporting billed services.  To date, settlements have been
reached and widely publicized with two major teaching institutions, both of
which are located in Philadelphia.  Under the PATH program, the OIG is
inviting interested organizations to pay for an independent review conducted by
a third party, using the OIG's review protocol.  To be eligible to participate in
the PATH initiative, an organization must be an institution that receives
graduate medical education payments under Medicare part A (i.e., a teaching
hospital).  Historically, Medicare's rules on the Part B payment for physician
services provided by residents in a teaching setting have been generally
acknowledged to lack clarity and consistent interpretation, and Medicare
recently published new final rules to clarify teaching physician requirements.
Although all possible ramifications of the PATH program are not yet clear,
AHERF executive management believes that AHERF's best interests will be
served by cooperating with the government under the protocols of the PATH
program.

D.    Review of AHERF's Matched Savings Plan

Diane Schrecengost reported that due to increased scrutiny by the Internal
Revenue Service of tax-sheltered annuity programs offered by non-profit
employers, an audit of AHERF's Plan was undertaken as a joint project
involving Audit Services, AHERF's Tax Department, and technical experts
from Coopers & Lybrand.  Certain defects were identified during the
compliance review, and it was determined that AHERF would take advantage of
the voluntary correction program offered by the IRS.  The estimated sanction
amount of $27,000 is expected for the deficiencies identified.  The full report
by Audit Services will be provided for review at the next meeting of the
Committee.

SEC-1 -- 0001760

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 6

E.    IRS Intermediate Sanctions

Nancy Wynstra noted that a Summary of the IRS Intermediate Sanctions which
provide a new mechanism, short of revocation of tax-exempt status, for
enforcing compliance with applicable laws by tax-exempt organizations was
rovided as information, and that mechanisms for assuring compliance with the
IRS requirements are being developed and implemented system-wide.

F.    Review of Audit Services Activities from March 1996 to Present (Pittsburgh
and Delaware Valley)

Diane Schrecengost reported that summary reports of all Audit Services audits
and/or reviews were provided for information, and there were no significant
issues to be brought to the attention of the Committee.  There is increasing
focus on the part of Audit Services on billing and compliance.  The Committee
requested that an updated organization chart be provided.

Executive Session

The offer of Executive Session was made to the representatives of Coopers & Lybrand,
and the offer was declined.

The offer of Executive Session was also extended to Audit Services, and the offer was
declined.

The offer of Executive Session was made to management, and the offer was accepted.

Summary of Discussions - Executive Session

The Summary of Discussions from the Executive Session of April 8, 1996 was
approved.  Mr. Barnes noted that he had been asked by certain members of the
AHERF management group if they could accept tickets to the Summer Olympics made
available by certain organizations with whom AHERF does business.  Mr. Barnes
informed the Committee that he had told the management personnel that they could
accept the tickets as long as they paid for the tickets (and the associated travel costs)
personally.

SEC-1 -- 0001761

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 7

Review of Executive Management Business Expenses

Ms. Schrecengost presented the results of Audit Services' annual review of Executive
Management Business Expenses. She summarized the Fiscal Year 1996 review and
noted that audit testing of a sample of Executive Expense Reports showed a very high
level of compliance with institutional policies and Internal Revenue Service regulations
among senior AHERF personnel.

Recommendation of Appointment of External Auditors

Mr. McConnell presented management's recommendation that the Audit Committee
recommend to the AHERF Board that Coopers & Lybrand be reappointed to serve as
external auditors for AHERF and its subsidiary organizations for Fiscal Year 1997.
Mr. McConnell noted that management would report to the Audit Committee at its next
meeting on the result of management negotiations with Coopers & Lybrand regarding
audit fees. Discussion ensued regarding the proposed appointment and centered upon
the level of confidence the Committee placed in Coopers & Lybrand while they are
represented by Mr. Buettner as the Managing Partner for the AHERF audit.
Mr. McConnell expressed his desire to have flexibility in having Ernst & Young
(E&Y) stay on as auditors for the Graduate Health System's New Jersey operating units
for the year ended December 31, 1996 due to E&Y's experience with the New Jersey
operations and regulations. Mr. McConnell also noted that it would be his intention to
have Coopers & Lybrand act as auditors for the Forbes Health System (FHS) for the
year ended June 30, 1997, assuming that FHS becomes part of AHERF. Upon motion
duly made and seconded, the Audit Committee recommended that the Board of
Trustees of Allegheny Health, Education and Research Foundation consider the
following resolution:

> **RESOLVED, that the Allegheny Health, Education and Research
> Foundation Board of Trustees reappoints Coopers & Lybrand as
> independent auditors of AHERF and its subsidiary organizations for Fiscal
> Year 1997.**

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Meeting of the Audit Committee
October 15, 1996
Page 8

Adjournment

There being no further business, the meeting was adjourned at approximately
11:45 a.m.

Respectfully submitted

Nancy A. Wynstra, Esq.
Secretary

NAW:cg

c:\minutes\101596.aud

NOTED ATTACHMENTS:  Notice of meeting; approved Fiscal Year 1996 Audited Financial
Statements and Related debt compliance letters; and Coopers & Lybrand Reports on AHERF
Internal Controls.

SEC-1 -- 0001763

**EXHIBIT  1689**

**AHERF**
**Analysis of Reserves**
**After Proposed Adjustments**

|  | 06/30/95 | 06/30/96 |
|---|---|---|
| **Alleg. Univ.** | | |
| PP&E Reserve | $4,100,000 | $3,500,000 |
| Revenue Reserve from Center City | 2,100,000 | - |
| Accrued Severance | 1,100,000 | - |
| Hamot Restricted Monies | - | 1,500,000 |
| **Total Alleg. Univ.** | 7,300,000 | 5,000,000 |
| | | |
| **SCHC** | | |
| Accrual of FY 97 Expenses | - | 2,200,000 |
| Accrual of FY 96 Expenses | 1,700,000 | - |
| Revenue Reserve | 2,300,000 | - |
| Prior Year CRA | 2,500,000 | 2,400,000 |
| PP&E Reserve | 1,133,000 | - |
| Health Partners Unrecorded Equity | 1,264,000 | 17,000 |
| Temple O.R. Reserve | - | 450,000 |
| **Total SCHC** | 8,897,000 | 5,067,000 |
| | | |
| **Alleg. Univ. Hosp.** | | |
| **Center City** | | |
| Inventory Reserve | 1,587,000 | 587,000 |
| Prior Year CRA | 19,500,000 | - |
| PP&E Reserve | 1,773,000 | 1,550,000 |
| SHSH Building | (1,470,000) | (1,310,000) |
| Disproportionate Share | 180,000 | - |
| Sales Tax | 500,000 | - |
| Self Insurance Trust | (2,161,000) | (330,000) |
| Hahnemann Insurance Company deficit | (1,922,000) | (2,113,000) |
| **Total Center City** | 17,987,000 | (1,616,000) |
| | | |
| **Others** | | |
| Misc. Revenue Reserves | 1,265,000 | - |
| Health Partners Unrecorded Equity - East Falls | 3,563,000 | 84,000 |
| PP&E Reserve - Bucks County | 1,493,000 | - |
| PP&E Reserve - East Falls | 3,500,000 | 2,900,000 |
| PP&E Reserve - Elkins Park | 597,000 | 50,000 |
| PP&E Reserve - Mgmt. Services | 1,650,000 | 100,000 |
| Self Insurance Trust - East Falls | (1,185,000) | - |
| City of Phila Tax Audit | (1,000,000) | - |
| Inventory Adjustment - East Falls | - | 345,000 |
| Unrecorded Centre Square Lease - MS | - | (1,400,000) |
| | 9,883,000 | 2,079,000 |
| **Total Alleg. Univ. Hosp.** | 27,870,000 | 463,000 |
| | | |
| **TOTAL DV OBLIGATED GROUP** | 44,067,000 | 10,530,000 |

ten

1758



DEPOSITION
EXHIBIT
1689
7-18-03 Sparrow
PENGAD 800-631-6989

**AHERF**
**Analysis of Reserves**
**After Proposed Adjustments**

|  | 06/30/95 | 06/30/96 |
|---|---|---|
| **AGH** | | |
| Prior Year CRA | 1,000,000 | - |
| ANI Disposal | 1,000,000 | - |
| General Reserve | 2,000,000 | 2,000,000 |
| **Total AGH** | 4,000,000 | 2,000,000 |
| **AHERF** | | |
| Insurance Debits - Elkins Park | (1,357,000) | - |
| Insurance Debits - Bucks County | (762,000) | (382,000) |
| **Total AHERF** | (2,119,000) | (382,000) |
| **GRAND TOTAL** | $45,948,000 | $12,148,000 |

ten                1759

**EXHIBIT  1700**

**ALLEGHENY
HEALTH,
EDUCATION AND
RESEARCH
FOUNDATION**

Dwight Kasperbauer
Executive Vice President and
Chief Human Resources Officer

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-3009
Telephone (412) 359-3137

Broad & Vine Streets
Mail Stop 490
Philadelphia, PA 19102-1192
Telephone (215) 762-3060

September 6, 1996

William Buettner
Partner
Coopers & Lybrand
600 Grant Street - 35th Floor
Pittsburgh, PA 15219

Dear Mr. Buettner:

Coopers & Lybrand has been asked to perform certain agreed-upon procedures pertaining to the performance measures used by the AHERF and subsidiary Compensation Committees to evaluate management's performance and determine management incentive payments. Specifically, we are requesting that Coopers & Lybrand confirm, through agreement to underlying source documents, the performance measures as provided on Attachment A. In addition, we are requesting that you verify through recalculation and agreement to source documents the participant incentive plan compensation as provided on Attachment B.

The source documents for the quantitative performance measures are available from Al Adamczak in Corporate Finance. The source documents for the calculation of participants' payments are maintained in the Corporate Payroll Department.

I look forward to receiving your report and will include it with the full report to the various Compensation Committees at their upcoming meetings.

Sincerely,

Dwight Kasperbauer

DK:kss
Attachments
cc: Al Adamczak

DEPOSITION
EXHIBIT
1700
Spargo 7-18-03

PENGAD 800-631-6989

**DBR-AA
22694**

Members of the Allegheny Health, Education and Research Foundation
Allegheny General Hospital • Allegheny Integrated Health Group • Medical College of Pennsylvania and Hahnemann University •
Medical College of Pennsylvania and Hahnemann University Hospital System • St. Christopher's Hospital for Children

## ALLEGHENY HEALTH EDUCATION & RESEARCH FOUNDATION
## MEMORANDUM

**FINAL**

DATE:    September 20, 1996

TO:    Dwight Kasperbauer
       Executive Vice President &
       Chief Human Resource Officer

FROM:  Al Adamczak
       Senior Director, Accounting & Financial Reporting
       Pittsburgh and AHERF

RE:    FY96 Business Unit Performance Indicators

---

Following are the FY96 performance targets that are of a financial nature as compiled and reviewed by the AHERF Finance Department. It should be noted that information for OVHS&E is calendar year 1995 and 1996 which corresponds to their official year end.

| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
|---|---|---|---|---|---|---|---|
| **ADMISSIONS (PATIENT VOLUME/UTILIZATION)** | | | | | | | |
| FY96 Actual | 30,302 | 50,362 | 10,469 | - | - | 91,133 | 10,846 |
| FY95 Actual | 30,551 | 47,795 | 10,029 | - | - | 88,375 | 11,297 |
| Increase/(Decrease) | (249) | 2,567 | 440 | - | - | 2,758 | (451) |
| % Increase/(Decrease) | (0.82%) | 5.37% | 4.39% | - | - | 3.12% | (3.99%) |

| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
|---|---|---|---|---|---|---|---|
| **COST PER ADJUSTED DISCHARGE (CPAD) (Cost Control)** | | | | | | | |
| FY96 Actual | $5,896 | $7,005 | $8,846 | - | - | $6,717 | $4,700 |
| FY95 Actual | 6,111 | 7,151 | 8,764 | - | - | 6,880 | 4,912 |
| Increase/(Decrease) | ($215) | ($146) | $82 | - | - | ($163) | ($212) |
| % Increase/(Decrease) | (3.52%) | (2.04%) | 0.94% | - | - | (2.37%) | (4.32%) |
| Medical Mkt CPI Inc. | 4.60% | 4.60% | 4.60% | | | 4.60% | 4.60% |

| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
|---|---|---|---|---|---|---|---|
| **NET INCOME (OPERATING PERFORMANCE)** | | | | | | | |
| FY96 Actual | $6,321,000 | $17,604,000 | $15,433,000 | ($1,794,000) | ($40,875,000) | $20,697,000 | ($1,460,000) |
| FY96 Projection | 2,859,000 | 16,776,000 | 14,729,000 | (2,800,000) | (37,930,000) | 15,159,000 | 135,000 |
| Favorable/(Unfavorable) Variance | $3,462,000 | $828,000 | $704,000 | $1,006,000 | ($2,945,000) | $5,538,000 | ($1,595,000) |

DBR-AA
22695

MEMO RE:  FY96 BUSINESS UNIT PERFORMANCE INDICATORS  (9/20/96)
PAGE 2

### NET EQUITY (Financial Viability)

| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
|---|---|---|---|---|---|---|---|
| FY96 Actual* | $254,577,000 | $157,020,000 | $99,393,000 | $90,769,000 | ($29,722,000) | $728,813,000 | $44,217,000 |
| FY95 Actual | 252,931,000 | 140,231,000 | 87,251,000 | 83,560,000 | 11,163,000 | $711,732,000 | 45,203,000 |
| Increase/(Decrease) | 1,646,000 | 16,789,000 | 12,142,000 | 7,209,000 | (40,885,000) | 17,081,000 | (986,000) |
| % Increase/(Decrease) | 0.65% | 11.97% | 13.92% | 8.63% | (366.25%) | 2.40% | (2.18%) |
| CPI Inc. | 2.70% | 2.50% | 2.50% | 2.50% | 2.60% | 2.60% | 2.60% |

### UNCOMPENSATED CARE

| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
|---|---|---|---|---|---|---|---|
| **FY96 Actual:** | | | | | | | |
| Net Patient Service Revenue | $394,561,000 | $618,214,000 | $134,149,000 | $131,453,000 | $74,097,000 | 1,352,474,000 | $93,920,000 |
| Uncompensated Care | 20,489,000 | 41,677,000 | 6,777,000 | 11,025,000 | 1,137,000 | 81,105,000 | 7,186,000 |
| Percentage | 5.19% | 6.74% | 5.05% | 8.39% | 1.53% | 6.00% | 7.65% |
| **FY95 Actual:** | | | | | | | |
| Net Patient Service Revenue | 405,427,000 | 584,808,000 | 127,317,000 | 105,282,000 | 23,172,000 | 1,246,006,000 | 97,717,000 |
| Uncompensated Care | 21,708,000 | 26,638,000 | 7,206,000 | 9,109,000 | 150,000 | 64,811,000 | 10,305,000 |
| Percentage | 5.35% | 4.55% | 5.66% | 8.65% | 0.65% | 5.20% | 10.55% |

### LEVEL OF EXTERNAL FUNDS SECURED FOR RESEARCH

| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
|---|---|---|---|---|---|---|---|
| FY96 Actual | $8,789,000 | - | - | $43,347,000 | - | $57,079,000 | N/A |
| FY95 Actual | $11,678,000 | - | - | $33,911,000 | - | $45,589,000 | N/A |

*FY 96 actual net equity is exclusive of transfers to affiliates, unusual items and cummulative efforts of new FASB adoptions.

Should you have any questions or comments relative to the preceding, please feel free to contact me at your convenience. Thank you.

AA:kw
s:\kim\123\96perftrgt

cc:     Steve Spargo

DBR-AA
22696

**EXHIBIT  1701**

53729

EXECUTION COPY

CREDIT AGREEMENT

BY AND AMONG

ALLEGHENY UNITED HOSPITALS, INC.,

ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN,

HORIZON MEDICAL CORPORATION

AND

PNC BANK, NATIONAL ASSOCIATION

Dated as of January 6, 1994



DEPOSITION
EXHIBIT
1701
AKF 7/63/05

PNC38124

AH- 4141

53729

# TABLE OF CONTENTS

1. DEFINITIONS ........................................1

2. THE LOAN .........................................9

    Section 2.1   Revolving Credit Loan ..................9
    Section 2.2   Interest Rates .........................10
    Section 2.3   Letters of Credit ......................13
    Section 2.4   Fees and Costs .........................14
    Section 2.5   Indemnity; Loss of Margin..............14

3. SUBROGATION; SECURITY ..............................16

    Section 3.1   Subrogation ............................16
    Section 3.2   Security ...............................16

4. REPRESENTATIONS AND WARRANTIES OF BORROWERS .........16

    Section 4.1    Organization and Qualification ........16
    Section 4.2    Authority and Authorization ...........16
    Section 4.3    Execution and Binding Effect ..........17
    Section 4.4    No Breach or Default ..................17
    Section 4.5    No Violation of Law ...................17
    Section 4.6    No Consent ............................17
    Section 4.7    Subsidiaries ..........................18
    Section 4.8    Financial Statements ..................18
    Section 4.9    Tax Matters ...........................18
    Section 4.10   Litigation ............................18
    Section 4.11   No Material Adverse Change ............19
    Section 4.12   Compliance With Laws ..................19
    Section 4.13   Solvent Financial Condition ..........19
    Section 4.14   Accurate Disclosure ...................19

5. COVENANTS OF BORROWERS; REPORTING REQUIREMENTS ......19

    Section 5.1   Covenants ..............................19
    Section 5.2   Reporting Requirements .................20

6. CONDITIONS PRECEDENT TO DISBURSEMENTS AND THE
   ISSUANCE OF LETTERS OF CREDIT; REQUIRED DOCUMENTS ...22

    Section 6.1   Conditions Precedent to All Disbursements
                  and Letters of Credit .................22
    Section 6.2   Documents Required for Closing ........23

7. EVENTS OF DEFAULT .................................25

    Section 7.1   Default in Payment of Principal of
                  or Interest on Note ...................25
    Section 7.2   Default on Reimbursement Obligation ...25
    Section 7.3   Default on Indebtedness ...............25

53729

Section 7.4     Default in Material Agreements .......25
Section 7.5     Insolvency ...........................25
Section 7.6     Bankruptcy; Receiver .................26
Section 7.7     Non-Performance or Observance of
                Covenants ...........................26
Section 7.8     Representations Incorrect ...........26
Section 7.9     Levy or Repossession of Property ......26
Section 7.10    Material Adverse Change ...............27
Section 7.11    Judgments ............................27
Section 7.12    Board Ratification ...................27

8.    REMEDIES .........................................27

Section 8.1     Acceleration .........................27
Section 8.2     Additional Remedies ..................27
Section 8.3     Right of Set-Off .....................28
Section 8.4     Remedies Cumulative; No Waiver ........28

9.    MISCELLANEOUS ....................................28

Section 9.1     Amendments ...........................28
Section 9.2     Assignment ...........................28
Section 9.3     Participations .......................28
Section 9.4     Counterparts; Facsimile Signature Page 29
Section 9.5     Entire Agreement .....................29
Section 9.6     Exhibits and Schedules ...............29
Section 9.7     Expenses; Taxes ......................29
Section 9.8     Further Assurances ...................30
Section 9.9     Gender and Number ....................30
Section 9.10    Governing Law ........................30
Section 9.11    Headings .............................30
Section 9.12    Jurisdiction and Service of Process ...30
Section 9.13    Notices ..............................31
Section 9.14    Severability .........................32
Section 9.15    Successors and Assigns ...............32
Section 9.16    Survival; Duration ...................32
Section 9.17    Waiver of Jury Trial .................32

PNC38126

AH- 4143

53729

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT (the "Agreement") is made as of January 6, 1994, among ALLEGHENY UNITED HOSPITALS, INC., a Pennsylvania nonprofit corporation, ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN, a Pennsylvania nonprofit corporation, and HORIZON MEDICAL CORPORATION, a Pennsylvania nonprofit corporation (together, the "Borrowers" and individually, a "Borrower"), and PNC BANK, NATIONAL ASSOCIATION, a national banking association (the "Bank").

### Recitals:

WHEREAS, the Borrowers desire to obtain a revolving line of credit from the Bank in an aggregate principal amount equal to $25,000,000, pursuant to which they may borrow, repay and reborrow up to such amount, and request the issuance of standby letters of credit in an aggregate amount not to exceed $15,000,000; provided, that the sum of disbursements under the revolving line of credit and letter of credit shall not exceed $25,000,000;

WHEREAS, each Borrower has determined that its execution, delivery and performance of this Agreement will directly benefit, and will be within the corporate purposes and in the best interests of, the Borrower; and

WHEREAS, the Bank is willing to make such credit facility available to the Borrowers upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and with the intent to be legally bound hereby, the Borrowers, jointly and severally, and the Bank hereby agree as follows:

## 1.  DEFINITIONS

In addition to other words and terms defined elsewhere in this Agreement, as used herein the following words and terms shall have the following meanings, respectively, unless the context hereof otherwise clearly requires:

Affiliate shall mean (i) any Person which directly or indirectly controls, or is controlled by, or is under common control with, any Borrower, (ii) any Person which owns beneficially or of record 5% or more of any class of capital stock of any Borrower or a Subsidiary, (iii) any Person of which 5% or more of any class of capital stock (or in the case of a Person that is not a corporation, 5% or more of the equity interest) is owned beneficially or of record by any Borrower or a Subsidiary or (iv) a Subsidiary, and for each individual who is

53729

an Affiliate within the meaning of the foregoing, any other individual related to such Affiliate by consanguinity within the third degree or in a step or adoptive relationship within such third degree or related by affinity with such Affiliate or any such individual, and any Person directly or indirectly controlled by any of the foregoing. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction or the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise.

Assignment of Sublease shall mean the Assignment of Sublease and Security Agreement executed by Horizon pursuant to Section 3.2 hereof.

Bank shall mean PNC Bank, National Association.

Borrowers shall mean Allegheny United Hospitals, Inc., St. Christopher's Hospital For Children and Horizon Medical Corporation.

Business Day shall mean any day other than a Saturday, Sunday, public holiday under the laws of the Commonwealth of Pennsylvania or other day on which banking institutions are authorized or obligated to close in Pittsburgh, Pennsylvania or Philadelphia, Pennsylvania.

Closing Date shall mean January 6, 1994.

Code shall mean the Internal Revenue Code of 1986, as amended, and all rules, regulations and orders issued thereunder, as any of the same may be amended from time to time.

Constituent Documents shall mean, with respect to the Borrowers, their articles or certificates of incorporation and bylaws, as any of the same may be amended from time to time.

Disbursement shall mean any one or more of the advances of proceeds to the Borrowers made pursuant to Section 2.1 hereof.

Environmental Rule shall mean any Governmental Rule which relates to hazardous substances, pollution or protection of the environment including, without limitation, any Governmental Rule relating to the generation, use, treatment, storage, release, transport or disposal of hazardous substances and any common laws of nuisance, negligence and strict liability relating thereto, and shall specifically include the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., as amended by the Water Quality Act of 1987, Pub. L. No. 100-4 (Feb. 4, 1987), the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. Section 136 et seq., the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq., the Surface Mining

53729

Control and Reclamation Act, 30 U.S.C. Section 1021 et seq., the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., the Superfund Amendment and Reauthorization Act of 1986 ("SARA"), Public Law 99-499, 100 Stat. 1613, the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Section 6901 et seq., and the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. Section 655 and Section 657, together with all rules, regulations and orders issued thereunder, as any of the same may be amended.

ERISA means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the Governmental Rules thereunder.

ERISA Affiliate shall mean any trade or business which, together with any Borrower, is treated as a single employer under Section 4001(b)(1) of ERISA or Sections 414(b), (c), (m) or (o) of the Code.

Event of Default shall have the meaning given to such term in Article 7 hereof.

Financial Statements means the audited balance sheets and related statements of revenues and expenses and changes in fund balances and changes in financial position of the Borrowers and their consolidated Subsidiaries for the period ended June 30, 1993, and the unaudited financial statements for the period ended September 30, 1993.

GAAP shall mean generally accepted accounting principles in the United States of America (as such principles may change from time to time) applied on a consistent basis (except for changes in application in which the Borrowers' independent certified public accountants concur), applied both to classification of items and amounts.

Governmental Order shall mean any order, writ, judgment, injunction or decree issued by a Governmental Person or arbitrator which names any Borrower or is directed to such Borrower or its properties or assets.

Governmental Permit shall mean any permit, license, franchise, certificate, authorization, approval or consent obtained from, or issued by, any Governmental Person.

Governmental Person shall mean any governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, agency, bureau, body or entity of the United States of America or of any state, county, municipality or other political subdivision located therein.

PNC38129                    AH-4146

53729

Governmental Rule shall mean any law (including common law), statute, rule, regulation, ordinance, code, order, writ, judgment, injunction, decree, guideline, directive or decision of any Governmental Person, whether or not having the force of Law and whether now or hereafter existing, as any of the same may be amended from time to time.

Guarantor shall mean Allegheny Health, Education and Research Foundation.

Guaranty shall mean the Guaranty and Suretyship Agreement executed by the Guarantor pursuant to Section 3.1 hereof.

Horizon shall mean Horizon Medical Corporation, its successors and assigns.

Indebtedness means, as to any Borrower, all items of indebtedness, obligation or liability, whether matured or unmatured, liquidated or unliquidated, direct or contingent, joint or several, including, without limitation:

(a)  All indebtedness guaranteed, directly or indirectly, in any manner, or endorsed (other than for collection or deposit in the ordinary course of business) or discounted with recourse;

(b)  All indebtedness in effect guaranteed, directly or indirectly, through agreements, contingent or otherwise:  (1) to purchase such indebtedness; or (2) to purchase, sell or lease (as lessee or lessor) property, products, materials or supplies or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such indebtedness or to assure the owner of the indebtedness against loss; or (3) to supply funds to or in any other manner invest in the debtor; and

(c)  All indebtedness secured by (or for which the holder of such indebtedness has a right, contingent or otherwise, to be secured by) any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance upon property owned or acquired subject thereto, whether or not the liabilities secured thereby have been assumed.

1988 Indenture shall mean the Trust Indenture dated as of July 1, 1988, between Montgomery County Higher Education and Health Authority and Continental Bank, as Trustee.

1988 Indenture Documents shall mean the 1988 Indenture and the Sublease.

PNC38130

AH- 4147

53729

   **Law** means all ordinances, statutes, rules, regulations, orders, injunctions, writs or decrees of any government or political subdivision or agency thereof, or any court or similar entity established by any thereof.

   **Letters of Credit** shall mean any standby letters of credit issued pursuant to Section 2.3 hereof by the Bank for the account of the Borrowers, together with any and all substitute letters of credit issued pursuant hereto.

   **LIBOR-Rate** shall mean, for any day, for each LIBOR-Rate Portion corresponding to a LIBOR-Rate Interest Period, the rate per annum determined by the Bank by dividing (the resulting quotient to be rounded upward to the nearest 1/100 of 1%) (i) the rate of interest (which shall be the same for each day in such LIBOR-Rate Interest Period) determined in good faith by the Bank in accordance with its usual procedures (which determination shall be conclusive) to be the rate per annum for deposits in Dollars offered to the Bank in the London interbank market at approximately 11:00 a.m. (London time) three (3) Business Days prior to the first day of such LIBOR-Rate Interest Period for delivery on the first day of such LIBOR-Rate Interest Period in amounts comparable to such LIBOR-Rate Portion and having maturities comparable to such LIBOR-Rate Interest Period by (ii) a percentage (expressed as a decimal) equal to 1.00 minus the LIBOR-Rate Reserve Percentage.  The LIBOR-Rate shall be adjusted automatically with respect to any LIBOR-Rate Portion outstanding on the effective date of any change in the LIBOR-Rate Reserve Percentage, as of such effective date.  In the event that the LIBOR-Rate Reserve Percentage is 0%, the LIBOR-Rate shall be calculated in accordance with item (i) above.

   **LIBOR-Rate Interest Period** shall mean any individual period of one (1), two (2), three (3) or six (6) months selected by the Borrowers commencing on the Disbursement date, conversion date or renewal date of any LIBOR-Rate Portion to which such period shall apply.

   **LIBOR-Rate Option** shall have the meaning assigned to it in Subsection 2.2(a)(iii).

   **LIBOR-Rate Portion** shall mean for each LIBOR-Rate Interest Period the Portion, including the whole, of the aggregate outstanding principal balance of the Revolving Credit Loans bearing interest for such LIBOR-Rate Interest Period under the LIBOR-Rate Option.

   **LIBOR-Rate Reserve Percentage** shall mean that percentage (expressed as a decimal), as calculated by the Bank, as to the LIBOR-Rate Portion as to which the interest rate is then being set, which is in effect on any day of such LIBOR-Rate Interest Period, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirements (including, without limitation,

53729

supplemental, marginal or emergency reserve requirements) with respect to eurocurrency funding of a member bank in such System. The Bank and the Borrowers agree, that as of the Closing Date, the LIBOR-Rate Reserve Percentage is 0%.

Lien shall mean any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

Loan Documents shall mean all or any of the agreements of the Borrowers and the Bank relating to the Obligations including, without limitation, this Agreement, the Note, the Assignment of Sublease and any and all other agreements, instruments or documents executed or delivered in connection herewith or therewith, including the Operating Agreement, and any and all renewals, modifications, extensions, replacements or amendments hereto and thereto.

Loan Termination Date shall mean December 31, 1997, or such earlier date as contemplated herein.

Master Indenture shall mean the Master Trust Indenture dated as of November 1, 1985, among The New St. Christopher's Hospital for Children Division of United Hospitals, Inc., Lawndale Community Hospital, Inc., St. Christopher's Hospital for Children and Mellon Bank, N.A., as Master Trustee, together with all amendments and supplements thereto.

Material Adverse Change shall mean, with respect to any Person, a material adverse change in the business, operations, financial condition or prospects of a Person or in the ability of such Person to perform its obligations under any material agreement.

Note or Revolving Credit Note means the Revolving Credit Note executed by the Borrowers and delivered to the Bank pursuant to Subsection 2.1(b) hereof, and any and all renewals, extensions, modifications, replacements or amendments thereof.

Obligations means the obligation of the Borrowers:

   (a)   To pay the principal of and interest on the Note in accordance with the terms thereof and to satisfy all of their liabilities to the Bank, whether hereunder or otherwise, whether now existing or hereafter incurred, matured or unmatured, direct or contingent, joint or several, including any extensions, modifications, renewals or refundings thereof and substitutions therefor;

AH-4140

PNC38132

- 6 -

53729

    (b)  To repay to the Bank all amounts advanced by the Bank hereunder or otherwise on behalf of the Borrowers including, without limitation, reimbursement of amounts drawn under Letters of Credit; and

    (c)  To reimburse the Bank, on demand, for all of the Bank's reasonable out-of-pocket expenses and costs, including the reasonable fees and expenses of its counsel, in connection with the preparation, administration, amendment, modification or enforcement of this Agreement and the documents required hereunder including, without limitation, any proceeding brought or threatened to enforce payment of any of the obligations referred to in the foregoing Paragraphs (a) and (b).

Operating Agreement shall mean the Amended and Restated Operating Deficit Reimbursement Agreement dated as of January 6, 1994, between St. Christopher's Hospital for Children and Horizon Medical Corporation.

Pension Plan shall mean, at any time, any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) covered by Title IV of ERISA by reason of Section 4021 of ERISA and (a) which is maintained for past or present employees of any Borrower or any ERISA Affiliate or (b) to which any Borrower or any ERISA Affiliate made, or was required to make, contributions within the preceding five years, as any of the same may be amended.

Person means any individual, corporation, partnership, association, joint-stock company, trust, unincorporated organization, joint venture, court or government or political subdivision or agency thereof.

PNC Cost of Funds Rate shall mean, for any day, the cost of funds to the Bank, as determined solely by the Bank.

PNC Cost of Funds Rate Option shall have the meaning assigned to it in Subsection 2.2(a)(ii).

PNC Cost of Funds Rate Portion shall mean that Portion of the Revolving Credit Loans bearing interest in accordance with the terms of the PNC Cost of Funds Rate Option.

Portion shall mean any Prime Rate Portion, PNC Cost of Funds Rate Portion or LIBOR-Rate Portion or all three taken collectively.

Prime Rate shall mean the prime rate of interest publicly announced by the Bank from time to time, which rate need not be the lowest interest rate then being charged by the Bank to other commercial borrowers at any time or from time to time.

AH- 4150

PNC38133

53729

Prime Rate Option shall have the meaning assigned to it in Subsection 2.2(a)(i).

Prime Rate Portion shall mean that Portion of the Revolving Credit Loans bearing interest in accordance with the terms of the Prime Rate Option.

Prohibited Transaction shall mean any transaction described in Section 406 of ERISA which has not been exempted under Sections 407 or 408 of ERISA.

Reportable Event shall mean any of the events described in Section 4043 of ERISA, the occurrence of which will materially affect adversely the properties, businesses, prospects, profits or conditions (financial or otherwise) of any Borrower or the ability of any Borrower to perform under the Loan Documents except (a) those events where the 30-day notice requirement has been waived by the Pension Benefit Guaranty Corporation or (b) the events described in Section 4043(b)(5) of ERISA for which any Plan Employer (as such term is defined in ERISA) has received a waiver of the minimum funding standards.

Revolving Credit Loan shall mean the revolving credit loan made by the Bank to the Borrowers in an aggregate principal amount equal to the Revolving Credit Loan Amount.

Revolving Credit Loan Amount shall mean $25,000,000.

Stated Amount shall mean the face amount of any Letter of Credit and shall include the principal and interest components thereof.

Sublease shall mean the Sublease and Security Agreement dated as of July 1, 1988, as amended by the First Amendment to Sublease and Security Agreement dated as of February 24, 1989, between Montgomery County Higher Education and Health Authority and Horizon.

Subsidiary shall mean, with respect to any Person, any corporation, partnership, joint venture or other business entity with respect to which such Person or any Subsidiary of such Person is entitled, by reason of a direct or indirect ownership interest therein, to (a) elect a majority of the directors thereof or otherwise direct or cause the direction of the management and policies thereof or (b) receive a majority of the dividends and other distributions made thereby, in each case regardless of any contingency which does or may suspend or dilute such rights.

Termination of Assignment shall mean the Termination of Assignment executed by First Fidelity Bank, N.A. with respect to the Sublease.

AH-4151    PNC38134

53729

UCC shall mean the UCC as in effect on the date of this Agreement and as amended from time to time, of the state or states having jurisdiction with respect to the property in question.

2.  THE LOAN

Section 2.1  Revolving Credit Loan.

(a)  Amount.  Subject to the terms and conditions hereof, and relying upon the representations and warranties set forth herein, the Bank will make available to the Borrowers from time to time until the Loan Termination Date, a revolving line of credit in an aggregate principal amount not to exceed the Revolving Credit Loan Amount.  The Borrowers may borrow, repay without penalty or premium, and reborrow hereunder from the date hereof until the Loan Termination Date, either the full amount available to the Borrowers hereunder or any lesser sum; provided, however, that the aggregate amount of (i) all Disbursements outstanding hereunder and (ii) the aggregate Stated Amount of all Letters of Credit issued pursuant to Section 2.3 hereof, at any time or from time to time, shall not at any time exceed the Revolving Credit Loan Amount.

(b)  Revolving Credit Note.  The obligation of the Borrowers to repay all Disbursements shall be evidenced by a promissory note substantially in the form of the Revolving Credit Note attached hereto as Exhibit A in the principal amount of Twenty-Five Million Dollars ($25,000,000.00).  The Revolving Credit Note shall be payable to the order of the Bank at the Bank's principal office and shall bear interest in accordance with the provisions of Section 2.2 hereof.

(c)  Disbursements.  Each request for a Disbursement shall be made in writing or by facsimile by 11:00 a.m., Pittsburgh, Pennsylvania time, (i) on the day of the proposed Disbursement if the Disbursement is initially to bear interest at the Prime Rate Option or (ii) at least three (3) Business Days prior to the proposed Disbursement if the Disbursement or any part thereof is to initially bear interest at either the PNC Cost of Funds Rate Option or the LIBOR-Rate Option, to the Bank.  Any oral request for any Disbursement hereunder shall be followed immediately by the Borrowers' written confirmation of such request.  Such written request or written confirmation shall be in the form of the Request for Disbursement attached hereto as Exhibit B.  A request from the Borrowers pursuant to this Subsection, with respect to a Disbursement or any part thereof which is initially to bear interest at the LIBOR-Rate Option, once agreed to by the Bank and the Borrowers, shall irrevocably commit the Borrowers to accept such Disbursement on the date specified in such request.  Subject to the applicable conditions set forth in Article 6 hereof, the Bank will make such funds available to the Borrowers on the same Business Day by depositing

PNC38135

53729

or effecting a wire transfer of such funds in a demand deposit account maintained with the Bank or such other financial institution as the Borrowers shall designate in the Request for Disbursement. Subject to Subsection 2.2(c)(i), each Disbursements shall be in the minimum principal amount of $100,000; provided, however, that each incremental unit in excess of $100,000 shall be $1,000 or an integral multiple thereof.

(d)  Use of Proceeds.  The Borrowers shall use the proceeds of the Disbursements for the Borrowers' working capital and general corporate purposes.

(e)  Extension or Renewal of Revolving Credit Loan. The Borrowers, at their option, shall submit a written request to extend the Loan Termination Date and renew the Revolving Credit Loan to the Bank within sixty (60) days of the Loan Termination Date. The Bank shall, within thirty (30) days following receipt of such request, notify the Borrowers of its determination with respect to the extension or renewal of the Revolving Credit Loan. Such determination shall be made in the sole discretion of the Bank and the Borrowers acknowledge that the Bank shall have no obligation to extend or renew the Revolving Credit Loan beyond the initial Loan Termination Date. Failure of the Bank to respond to such request within thirty (30) days shall constitute a denial of such request.

Section 2.2  Interest Rates.

(a)  Interest Rate Options.  During the term hereof, the Borrowers, in accordance with the provisions of Subsection 2.2(b), shall have the option of electing from time to time one or a combination of more than one of the interest rate options set forth below to be applied by the Bank to Disbursements then outstanding.

(i)  Prime Rate Option.  The rate of interest per annum on all Disbursements outstanding hereunder under this option shall be an amount equal to the Prime Rate from time to time in effect.

(ii)  PNC Cost of Funds Rate Option.  The rate of interest on all Disbursements outstanding hereunder under this option shall be an amount equal to the sum of (i) the PNC Cost of Funds Rate plus (ii) one percent (1%) per annum.

(iii)  LIBOR-Rate Option.  The rate of interest on all Disbursements outstanding hereunder under this option shall be an amount equal to the sum of (i) the LIBOR-Rate plus (ii) one and one-quarter percent (1-1/4%) per annum.

(iv)  Interest Upon Event of Default.  Upon the occurrence of an Event of Default, and for so long as such Event of Default is continuing, the interest rate or rates, where applicable, shall be increased automatically, without prior

53729

notice to the Borrowers, to a rate per annum equal to the then-applicable Prime Rate plus two percent (2%).

(b)  Interest Rate Option Election.  The Borrowers shall have the option to elect to have all or any Portion of the Disbursements bear interest at any of the Prime Rate Option, the PNC Cost of Funds Rate Option or the LIBOR-Rate Option; subject, however, to the other provisions of this Agreement.  Notice of the Borrowers' election may be made to the Bank orally or in writing by 11:00 A.M. Pittsburgh, Pennsylvania time (i) on the day of such election, if such election is the election of the Prime Rate Option, and (ii) at least three (3) Business Days prior to the proposed effective date of such election, if such election is the election of the PNC Cost of Funds Rate Option or the LIBOR-Rate Option.  Each such notice of election shall specify the desired interest rate option and the amount of the Disbursements to bear interest at such interest rate option, and in the case of the selection of the LIBOR-Rate Option, the LIBOR-Rate Interest Period.  Any oral notice of election shall be followed immediately by the Borrowers' written confirmation of such interest rate election.  Elections of or conversions to the Prime Rate Option or PNC Cost of Funds Rate Option shall continue in effect until converted as herein set forth.  Elections of, conversions to or renewals of the LIBOR-Rate Option shall expire as to each such LIBOR-Rate Option at the expiration of the applicable LIBOR-Rate Interest Period.  Any Portion of a Disbursement outstanding for which no election has been made shall bear interest at the Prime Rate Option.

(c)  Interest Rate Options and Interest Periods; Limitations on Elections.

(i) Each election, conversion or renewal of a LIBOR-Rate Option must be in the minimum principal amount of $1,000,000; provided, however, that each incremental unit in excess of $1,000,000 shall be $100,000 or an integral multiple thereof.

(ii)  Any LIBOR-Rate Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in the succeeding calendar month in which case such Interest Period shall end on the next preceding Business Day;

(iii)  Any LIBOR-Rate Interest Period which begins on the last day of a calendar month or on a day for which there is no numerically corresponding day in the calendar month during which such LIBOR-Rate Interest Period is to end shall end on the last Business Day of such subsequent month; and

(iv)  No LIBOR-Rate Interest Period may be elected with regard to any Portion of a Disbursement which would end on a date following the Loan Termination Date.

PNC38137

AH- 4154

53729

    (d)    Interest Payment Dates.

        (i)    Prime Rate and PNC Cost of Funds Rate Disbursements.    Interest on Prime Rate and PNC Cost of Funds Rate Disbursements shall be payable monthly on the last Business Day of each month.    Such interest rate shall change on the effective date of any change in the Prime Rate or PNC Cost of Funds Rate without notice to the Borrowers.    Interest shall be calculated on the basis of a 360-day year, counting the number of days actually elapsed.

        (ii)    LIBOR-Rate Borrowings.    Interest on LIBOR-Rate Disbursements shall be payable the earlier of (A) quarterly (every 90 days) or (B) on the last Business Day of each LIBOR-Rate Interest Period.    Interest shall be calculated on the basis of a 360-day year counting the number of days actually elapsed.

    (e)    LIBOR-Rate Unascertainable.    In the event that

        (i)    on any date on which a LIBOR-Rate would otherwise be set the Bank shall have determined in good faith (which determination shall be conclusive) that:

        (A)    adequate and reasonable means do not exist for ascertaining such LIBOR-Rate, or

        (B)    a contingency has occurred which materially and adversely affects the London interbank market for deposits in Dollars;

then, and in any such event, the Bank may notify the Borrowers of such determination.    Upon such date as shall be specified in such notice (which shall not be earlier than the date such notice is given), the obligation of the Bank to allow the Borrowers to select, convert to or renew the LIBOR-Rate Option shall be suspended until the Bank shall have later notified the Borrowers of the Bank's determination in good faith (which determination shall be conclusive) that the circumstances giving rise to such previous determination no longer exist.

        (f)    Illegality.    If the Bank shall determine in good faith (which determination shall be final and conclusive) that compliance by the Bank with any applicable Law, Governmental Rule, regulation, guideline, order, request or directive (whether or not having the force of Law), or the interpretation or application thereof by any Governmental Person, has made it unlawful for the Bank to make or maintain Disbursements under the LIBOR-Rate Option, the Bank shall give notice of such determination to the Borrowers (which notice shall include the reasons for such unavailability).    Notwithstanding any provision of this Agreement to the contrary, unless and until the Bank shall have given notice that the circumstances giving rise to such determination no longer apply on such date, if any, as shall be required by law, LIBOR-Rate Portions then outstanding shall be

53729

automatically renewed at the Prime Rate Option and the Borrowers shall pay to the Bank the accrued and unpaid interest on such Portion to (but not including) such renewal date.

(g) <u>Additional Consideration</u>. The Borrowers shall pay to the Bank any additional amounts reasonably necessary to compensate the Bank (on an after-tax basis) for any out-of-pocket costs incurred by the Bank as a result of (i) any renewal or prepayment by the Borrowers of any LIBOR-Rate Portion on a day other than the last day of the relevant LIBOR-Rate Interest Period, or (ii) any prepayment by the Borrowers of a fixed PNC Cost of Funds Rate Portion including, but not limited to, any interest or fees payable by the Bank to lenders of funds obtained by it to loan or maintain the lending of Disbursements so renewed or prepaid. The Bank shall furnish to the Borrowers a certificate showing the calculation of the amount necessary to compensate it (on an after-tax basis) for such costs (which certificate, in the absence of error, shall be conclusive), and the Borrowers shall pay such amount to the Bank, as additional consideration hereunder, within ten (10) days of the Borrowers' receipt of such certificate.

Section 2.3 <u>Letters of Credit</u>.

(a) <u>Issuance of Letters of Credit</u>. Subject to the terms and conditions hereof, and relying upon the representations and warranties set forth herein, the Bank agrees to issue, upon the application of any Borrower, Letters of Credit for the account of the Borrowers. The Letters of Credit shall be in form and substance satisfactory to the Bank and shall be issued on the following terms and conditions:

(i) The aggregate Stated Amount of Letters of Credit shall not exceed $15,000,000;

(ii) The term of each Letter of Credit shall not exceed four years and, in any event, all Letters of Credit shall expire on or prior to the Loan Termination Date;

(iii) Letters of Credit shall be issued in accordance with the Bank's then current practices relating to the issuance by the Bank of standby letters of credit including, but not limited to, the payment by the Borrowers of all applicable fees. Once requested, the Letters of Credit will be issued after all the conditions precedent to the issuance thereof have been satisfied; and

(iv) At no time may Letters of Credit be issued if the aggregate Stated Amount thereof, when added to the aggregate amount of all Disbursements outstanding, would exceed the Revolving Credit Loan Amount.

(b) <u>Payments Under Letters of Credit</u>. Upon the occurrence of a draw under a Letter of Credit, the Borrowers

PNC38139        AU 4157