53726

hereby agree to repay immediately to the Bank, in immediately available funds in Dollars, the amount of such draw. All sums payable to the Bank under this Subsection 2.3(b) shall bear interest payable on the last Business Day of each month, from the date the corresponding amount is drawn under the Letter of Credit until such sums are paid in full (it being understood and agreed that any sum paid after 3:00 p.m. on a Business Day shall bear interest as if it was paid at 9:00 a.m. on the next following Business Day), at a fluctuating rate per annum (computed for the actual number of days elapsed, based on a 360-day year) equal to the Prime Rate for the first 30 days, the Prime Rate plus twenty-five one hundredths percent (.25%) for the next 60 days and the Prime Rate plus fifty one hundredths percent (.50%) thereafter. Anything to the contrary notwithstanding, if an Event of Default shall have occurred hereunder, any sums or interest due and payable to the Bank under this Agreement shall thereafter bear interest at a fluctuating rate per annum (computed for the actual number of days elapsed, based on a 360-day year) equal to two percent (2%) per annum above the Prime Rate until such sum or interest and all other amounts due and payable under this Agreement have been paid in full.

Section 2.4    Fees and Costs.

(a)    Commitment Fee.    The Borrowers shall pay to the Bank a commitment fee equal to 3/16% of the average daily unused portion of the Revolving Credit Loan Amount, determined by subtracting from the Revolving Credit Loan Amount the aggregate outstanding amount of all Disbursements and the aggregate Stated Amount of all Letters of Credit, as the same may be reduced from time to time.    Such fee shall be payable quarterly in arrears.

(b)    Letter of Credit Fees.

(i)    The Borrowers shall pay to the Bank a fee equal to 3/8% per annum on the average daily Stated Amount of all Letters of Credit during the preceding quarterly period (or portion thereof upon termination).    Such fee shall be payable quarterly in arrears on the last day of each March, June, September and December during the period when Letters of Credit are outstanding and on the expiry date or any other termination date of each Letter of Credit.

(ii)    The Borrowers shall pay to the Bank, upon the issuance of each new Letter of Credit, a one-time upfront fee equal to 1/10% of the Stated Amount of the new Letter of Credit.

Section 2.5    Indemnity; Loss of Margin.    The Borrowers shall indemnify the Bank against any loss or expense which the Bank sustains or incurs as a consequence of (i) a prepayment of any Disbursement or (ii) an Event of Default including, without limitation, any failure of the Borrowers to pay when due (at maturity, by acceleration or otherwise) any principal, interest, fee or any other amount due under this Agreement, the Note or the

53729

other Loan Documents.  If the Bank sustains or incurs any such
loss or expense, it will notify the Borrowers in writing of the
amount determined in good faith by the Bank (which determination
will be conclusive) to be necessary to indemnify the Bank for the
loss or expense.  Such amount will be due and payable by the
Borrowers to the Bank within ten (10) Business Days after
presentation by the Bank of a statement setting forth a brief
explanation of and the Bank's calculation of such amount, which
statement shall be conclusively deemed correct absent manifest
error.  Any amount payable to the Bank under this Section will
bear interest at the Prime Rate per annum (computed for the
actual number of days elapsed on the basis of a year of 360 days)
from the due date until paid (before and after judgment).

        In the event that any Governmental Rule or treaty, or
the interpretation or application thereof, or the compliance with
any guideline or request of any central bank or other
Governmental Person (whether or not having the force of law):

        (i)     subjects the Bank to any tax with respect to any
                amounts payable under this Agreement, the Note,
                any Letter of Credit or the other Loan Documents
                by the Borrowers or otherwise with respect to
                the transactions contemplated under this
                Agreement, the Note, any Letter of Credit or the
                other Loan Documents (except for taxes on the
                overall net income of the Bank imposed by the
                United States of America or any political
                subdivision thereof), or

        (ii)    imposes, modifies or deems applicable any
                deposit insurance, reserve, special deposit,
                capital maintenance or similar requirement
                against assets held by, or deposits in or for
                the account of, or Disbursements or commitments
                to make Disbursements by, or Letters of Credit
                issued or commitments to issue Letters of Credit
                by, the Bank, or

        (iii)   imposes upon the Bank any other conditions with
                respect to the Revolving Credit Loan,

and the result of any of the foregoing is to increase the costs
of the Bank, reduce the income receivable by or return on equity
of the Bank or impose any expense upon the Bank with respect to
the Revolving Credit Loan or Letters of Credit, the Bank shall so
notify the Borrowers in writing.  The Borrowers agree to pay to
the Bank the amount of such increase in cost, reduction in
income, reduced return on equity or additional expense within ten
(10) Business Days after presentation by the Bank of a statement
concerning such increase in cost, reduction in income, reduced
return on equity or additional expense.  Such statement shall set
forth a brief explanation of the amount and the Bank's
calculation of the amount (in determining such amount the Bank

53729

may use any reasonable averaging and attribution methods), which
statement shall be conclusively deemed correct absent manifest
error.  If the amount set forth in such statement is not paid
within ten (10) Business Days after such presentation of such
statement, interest will be payable on the unpaid amount at the
Prime Rate per annum (computed for the actual number of days
elapsed on the basis of a year of 360 days) from the due date
until paid (before and after judgment).

3.   SUBROGATION; SECURITY

        Section 3.1  Subrogation.  The Borrowers and the Bank
intend that, in the event of a draw under any Letter of Credit,
the Bank will be subrogated pro tanto to the rights of the
beneficiary of such Letter of Credit in and to all funds and
security held by the beneficiary.

        Section 3.2  Security.  Payment of all Disbursements
and all other Obligations shall be secured by (a) the Guaranty,
in form and substance satisfactory to the Bank, (b) the
collateral assignment by Horizon to the Bank of the Sublease,
pursuant to the Assignment of Sublease, in form and substance
satisfactory to the Bank and (c) certain provisions of the
Operating Agreement.

4.   REPRESENTATIONS AND WARRANTIES OF BORROWERS

        To induce the Bank to enter into this Agreement, to
make Disbursements and to issue Letters of Credit, each of the
Borrowers jointly and severally represents and warrants to the
Bank, as of the Closing Date, as of the date of any request by
the Borrowers for a Disbursement or the issuance of a Letter of
Credit, and as of the date of any Disbursement made by the Bank
or the issuance of a Letter of Credit by the Bank, that:

        Section 4.1  Organization and Qualification.  The
Borrower is a nonprofit corporation duly organized, validly
existing and in good standing in the jurisdictions of its
incorporation, and an organization qualified under Section
501(c)(3) of the Code.  The Borrower is duly qualified to do
business as a foreign corporation and is in good standing in all
jurisdictions in which the ownership of its properties or the
nature of its business makes such qualification necessary.

        Section 4.2  Authority and Authorization.  The Borrower
has the corporate power and authority to own its properties and
assets, to conduct its business as presently conducted, to
execute and deliver this Agreement and the Loan Documents, to
consummate the transactions contemplated hereby and thereby and
to perform its obligations hereunder and thereunder.  Subject to
ratification by the respective Boards of Directors of Allegheny
United Hospitals, Inc. and St. Christopher's Hospital for

53729

Children (which ratification is expected to be considered in March, 1994), the execution and delivery by the Borrower of this Agreement and the Loan Documents, the consummation of the transactions contemplated hereby and thereby and the performance by the Borrower of its obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate proceedings on its part.

Section 4.3  Execution and Binding Effect.  Subject to the acts of ratification set forth in Section 4.2 above, this Agreement and the Loan Documents have been duly and validly executed and delivered by the Borrower and constitute legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms.

Section 4.4  No Breach or Default.  The execution and delivery by the Borrower of this Agreement and the Loan Documents, the consummation of the transactions contemplated hereby and thereby and the performance by the Borrower of its obligations hereunder and thereunder do not and will not:

(a)  violate the Borrower's Constituent Documents;

(b)  breach or result in a default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, require any consent under or give to others any rights of termination, acceleration, suspension, revocation, cancellation or amendment of, any material agreement to which the Borrower is a party or Governmental Permit obtained by or issued to the Borrower;

(c)  breach or otherwise violate any Law, Governmental Order or Governmental Rule; or

(d)  result in the creation of any Lien on any of the Borrower's properties or assets, except for Liens created in favor of the Bank pursuant hereto or to any of the Loan Documents.

Section 4.5  No Violation of Law.  The execution and delivery by the Borrower of this Agreement and the Loan Documents, the consummation of the transactions contemplated hereby and thereby and the performance by the Borrower of its obligations hereunder and thereunder are not prohibited by, and do not and will not subject the Borrower to any fine, penalty or similar sanction under, any Law or Governmental Rule.

Section 4.6  No Consent.  No consent, authorization, approval, exemption or other action by, and no filing, registration or qualification with, any Governmental Person is or will be necessary or advisable in connection with the execution and delivery by the Borrower of this Agreement and the Loan Documents, the consummation of the transactions contemplated

PNC38143          AII 4160

53729

hereby and—thereby or the performance by the Borrower of its
obligations hereunder or thereunder.

Section 4.7  <u>Subsidiaries</u>.  <u>Schedule 4.7</u> hereto sets
forth a correct and complete list of (a) the name of each
Subsidiary and its jurisdiction of incorporation, (b) the number
of shares, if any, of each class of capital stock issued and
outstanding of each Subsidiary and (c) the number and percentage
of outstanding shares, if any, of each such class of capital
stock owned by the Borrower or any Subsidiary.  The issued and
outstanding shares of capital stock of each Subsidiary have been
duly authorized and validly issued and are fully paid and non-
assessable.  The Borrower and each Subsidiary owns beneficially
and of record and has good title to all of the shares it is
listed as owning on <u>Schedule 4.7</u>, free and clear of any Liens.

Section 4.8  <u>Financial Statements</u>.  Each Borrower has
previously delivered to the Bank correct and complete copies of
(a) balance sheets for its and its consolidated Subsidiaries'
fiscal year ended June 30, 1993 and the related statements of
revenues and expenses and changes in fund balances and changes in
financial position for such fiscal year, as examined and
certified by Coopers & Lybrand, independent certified public
accountants, or any other nationally-recognized accounting firm
acceptable to the Bank, and (b) interim balance sheet and the
related statements of revenues and expenses and changes in fund
balances and changes in financial position for its and its
consolidated Subsidiaries' first fiscal quarter ending September
30, 1993 (the "Current Financial Statements" and, together with
the items described in clause (a) above, the "Financial
Statements").  The Financial Statements present fairly the
financial condition of the Borrower and its consolidated
Subsidiaries as at the end of the periods covered thereby, all in
accordance with GAAP subject, in the case of the Current
Financial Statements, to year-end audit adjustments.  Except as
set forth in, and to the extent disclosed in the Current
Financial Statements and on <u>Schedule 4.8</u> hereto, the Borrower and
its consolidated Subsidiaries have no liabilities of any kind,
whether direct or indirect, fixed or contingent or otherwise.

Section 4.9  <u>Tax Matters</u>.  All tax returns and reports
required to be filed by the Borrower have been properly prepared
and filed.  The Borrower has paid, or has made adequate reserves
on its books for the payment of, all taxes, interest, penalties,
assessments and deficiencies shown to be due on such tax returns
and reports or claimed to be due by any Governmental Person.  The
reserves and provisions for taxes on the books of the Borrower
are adequate for all open years and for its current fiscal
period.  The Borrower has no knowledge of any proposed assessment
of any additional taxes by any Governmental Person or of any
basis for any such assessment (whether or not reserved against).

Section 4.10  <u>Litigation</u>.  Except as otherwise set
forth on <u>Schedule 4.10</u> hereto, there is no pending or, to the

53729

best of the Borrower's knowledge, threatened action or proceeding
by or before any Governmental Person or arbitrator (a) seeking to
restrain, prohibit or invalidate any of the transactions
contemplated hereby, by the Loan Documents or by the 1988
Indenture Documents or (b) which, if decided adversely to the
Borrower, would be likely to result in a Material Adverse Change
or to have a material adverse effect on the ability of the
Borrower to perform its obligations hereunder or under the Loan
Documents, and the Borrower has no knowledge of any basis for any
such action or proceeding. Schedule 4.10 hereto sets forth a
correct and complete list of each action and proceeding described
in the preceding sentence, the parties thereto, the alleged basis
therefor, the relief sought therein and the current status
thereof.

Section 4.11  No Material Adverse Change. Since
December 31, 1992, there has been no Material Adverse Change in
the assets, business, operations or financial condition of the
Borrower.

Section 4.12  Compliance With Laws. To the best
knowledge of the Borrower after reasonable investigation, the
Borrower is in compliance with all Laws, Governmental Rules,
Governmental Permits and Governmental Orders applicable to the
Borrower or its business, properties or assets including, without
limitation, all Environmental Rules.

Section 4.13  Solvent Financial Condition. The present
fair market value of the Borrower's assets is greater than the
amount required to pay its total liabilities, and the Borrower is
able to pay its debts as they mature. The Borrower will maintain
such solvent financial condition, giving effect to the
Obligations, as long as the Borrowers are obligated to the Bank
under this Agreement or in any other manner whatsoever.

Section 4.14  Accurate Disclosure. There is no fact
known to the Borrower which materially adversely affects, or in
the future may (as far as the Borrower can now foresee)
materially adversely affect, the operations, properties, assets
or financial condition of the Borrower which has not been set
forth herein, in any Loan Documents or in any certificate
delivered in connection herewith or therewith in connection with
the transactions contemplated hereby and thereby.

5.  COVENANTS OF BORROWERS; REPORTING REQUIREMENTS

Section 5.1  Covenants. Until payment in full of all
Obligations and performance of all other obligations of the
Borrowers under the Loan Documents, each Borrower hereby
covenants and agrees as follows:

(a)  Master Indenture Covenants. The Borrower agrees
to be bound by and adhere to the covenants set forth at Sections

53729

7.3, 7.4, 7.5, 7.7, 7.8, 7.9 and 7.10 of the Master Indenture, as amended and supplemented to the date hereof, which Sections are incorporated herein by reference as if specifically set forth herein, whether or not the Borrower is an Obligated Issuer (as defined in the Master Indenture). The Borrower further agrees to provide to the Bank, simultaneously with the delivery thereof to the Master Trustee under the Master Indenture, copies of any and all documents, certificates, opinions and other instruments delivered to the Master Trustee under the Master Indenture.

(b) <u>Visitation and Inspection of Books and Records</u>. The Borrower will permit, during regular business hours, such persons as the Bank may designate from time to time to visit and inspect any of the property of the Borrower, to examine and to make copies from books and records, as often as the Bank may request, and to discuss the Borrower's affairs with officers, employees and independent accountants. The Borrower hereby authorizes such officers, employees and independent accountants to discuss with the Bank the affairs of the Borrower. The Borrower will furnish any additional information regarding its business affairs and its financial condition within a reasonable time after written request by the Bank. Such visitations and inspections shall, so long as there has not been an Event of Default, be at the sole cost and expense of the Bank. Upon the occurrence of an Event of Default and during the continuance thereof, the Borrower shall be responsible for all out-of-pocket costs and expenses incurred by the Bank in connection with such visitations and inspections.

(c) <u>Pension Plans</u>. The Borrower will: (1) fund any and all Pension Plans which it may hereafter adopt or maintain, in accordance with no less than the minimum funding standards of Section 302 through 305 of ERISA; (2) contribute in a timely manner all amounts which it hereafter may agree to contribute to any multiemployer defined benefit pension plan; (3) furnish to the Bank, promptly after the filing of the same, copies of all reports or other statements filed by the Borrower with the United States Department of Labor or the Internal Revenue Service with respect to all such Pension Plans; and (4) promptly after it acquires actual knowledge thereof, advise the Bank of the occurrence of any Reportable Event or Prohibited Transaction with respect to any such Plan.

(d) <u>Amendment of Documents</u>. The Borrower will not permit, consent to or enter into any modification or amendment to the 1988 Indenture Documents, the Master Indenture or the Operating Agreement without first obtaining the written consent of the Bank.

Section 5.2 <u>Reporting Requirements</u>. Until payment in full of all Obligations and performance of all other obligations of the Borrowers under the Loan Documents, each Borrower hereby covenants and agrees to:

53729

(a)  <u>Financial and Other Reporting Information</u>.

(1)  <u>Quarterly Financials</u>.  Within sixty (60) days after the close of each of the first three quarterly periods during the Borrower's fiscal year, furnish to the Bank a balance sheet and the related statements of revenues and expenses and changes in fund balances and changes in financial position as of the end of such quarterly period, all in reasonable detail, subject to year-end audit adjustments and certified by the Borrower's president or principal financial officer to have been prepared in accordance with GAAP, except for any inconsistencies explained in such certificate.

(2)  <u>Annual Financials</u>.  Within one hundred twenty (120) days after the close of each fiscal year, furnish to the Bank consolidated and consolidating:

(A)  balance sheets as of the end of such fiscal year; and

(B)  the related statements of revenues and expenses and changes in fund balances and changes in financial position for such fiscal year,

all in reasonable financial detail, including all supporting comments and notes; the statements to be audited by an independent certified public accountant acceptable to the Bank, and certified by such accountants to have been prepared in accordance with GAAP, except for any inconsistencies explained in such certificate.  The Bank shall have the right, from time to time, to discuss the Borrower's affairs directly with the Borrower's independent certified public accountants after notice to the Borrower and opportunity of the Borrower to be present at any such discussions.

(3)  <u>Officer's Certificate</u>.  Contemporaneously with each quarterly and annual financial report required by the foregoing Paragraphs (1) and (2), a certificate of the president or principal financial officer of the Borrower stating that he has reviewed the provisions of this Agreement, and that a review of the activities of the Borrower during such period has been made by him or under his supervision, with a view to determining whether the Borrower has fulfilled all its obligations under this Agreement, and that, to the best of his knowledge, the Borrower has observed and performed each undertaking contained in this Agreement and is not in default in the observance or performance of any of the provisions hereof or, if the Borrower

53729

shall be so in default, specifying all such defaults and events of which he may have knowledge.

(b) <u>Other Information</u>. The Borrower will promptly deliver to the Bank such other financial statements, reports and information concerning the operations, business affairs and financial condition of the Borrower as the Bank may reasonably request.

(c) <u>Notices to Bank</u>. Each Borrower will give immediate notice to the Bank of: (i) any litigation or proceeding in which it is a party if an adverse decision therein would be likely to result in a Material Adverse Change or to have a material adverse effect on the ability of the Borrower to perform its obligations hereunder or under the Loan Documents; and (ii) the institution of any other suit or proceeding including, but not limited to, any Federal, state or local environmental notices or proceedings, involving the Borrower that may materially and adversely affect its operations, financial condition, property or business.

(d) <u>Notice of Event of Default</u>. Each Borrower will notify the Bank immediately if it becomes aware of the occurrence of any Event of Default or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default under this Agreement, the Guaranty, the Operating Agreement, the Master Indenture or the 1988 Indenture Documents, or any fact, condition or event that with the giving of notice or passage of time, or both, could become an Event of Default hereunder or thereunder or of the failure of the Borrower to observe any of its undertakings hereunder.

6. CONDITIONS PRECEDENT TO DISBURSEMENTS AND THE ISSUANCE OF LETTERS OF CREDIT; REQUIRED DOCUMENTS

The obligation of the Bank to make Disbursements and to issue Letters of Credit hereunder is subject to (i) the accuracy in all material respects of the representations, warranties and covenants contained in the Loan Documents, all of which shall be deemed to have been relied upon by the Bank in making any Disbursement or issuing any Letter of Credit under this Agreement, regardless of any investigation made by the Bank or on its behalf, (ii) the performance by the Borrowers of all of their obligations under the Loan Documents and (iii) the satisfaction of the following further conditions precedent:

Section 6.1 <u>Conditions Precedent to All Disbursements and Letters of Credit</u>. The obligation of the Bank to make any Disbursement or issue any Letter of Credit hereunder is subject to the following conditions precedent:

(a) <u>No Default</u>. The Borrowers shall have performed and complied with all agreements and conditions herein required

53729

to be performed or complied with by them prior to the funding of
a Disbursement or the issuance of a Letter of Credit, and no
condition or event shall exist which constitutes or, which after
the giving of notice or passage of time or both, would
constitute, an Event of Default; and

(b) <u>Representations Correct</u>. The representations and
warranties (i) contained in Article 4 and otherwise made in
writing by or on behalf of the Borrowers, and (ii) made by the
Guarantor in the Guaranty, in connection with the transactions
contemplated hereby shall be correct in all material respects
when made and at the time of each Disbursement. Each Request for
Disbursement shall be deemed to be, as of the date of the
Disbursement, a representation and warranty by the Borrowers as
to the facts specified in this Section 6.1.

(c) <u>No Material Adverse Change</u>. There shall have been
no Material Adverse Change since September 30, 1993, with respect
to any Borrower or the Guarantor.

(d) <u>No Material Litigation</u>. There shall be no
proceedings reasonably likely to result in a Material Adverse
Change pending or, to the knowledge of any Borrower or the
Guarantor, threatened against or affecting any Borrower or the
Guarantor in any court or before any Governmental Person,
authority or arbitration board or tribunal.

Section 6.2 <u>Documents Required for Closing</u>. In
addition to the applicable conditions set forth in Section 6.1
above, the obligation of the Bank to make the initial
Disbursement is subject to the delivery to the Bank of each of
the following items:

(a) A duly executed Revolving Credit Note, in
substantially the form of <u>Exhibit A</u> attached hereto;

(b) A duly executed Guaranty, in form and substance
satisfactory to the Bank;

(c) A duly executed Operating Agreement, in form and
substance satisfactory to the Bank;

(d) A duly executed Assignment of Sublease and
Termination of Assignment, each in form and substance
satisfactory to the Bank;

(e) With respect to each Borrower and the Guarantor,
copies of its Constituent Documents, certified (i) with respect
to articles or certificates of incorporation, by the Secretary of
State of the state of incorporation of the Borrower or the
Guarantor, as the case may be, and (ii) with respect to bylaws,
by the Borrower's or the Guarantor's corporate secretary or
assistant secretary, as the case may be;

S3729

(f)  With respect to each Borrower and the Guarantor, a certificate of the Secretary of State of the state of incorporation of the Borrower and the Guarantor, as the case may be, as to the good standing of the Borrower and the Guarantor;

(g)  With respect to each Borrower (except as otherwise indicated) and the Guarantor, a certificate (dated as of the date hereof) of the Borrower's or the Guarantor's corporate secretary or assistant secretary, as the case may be (i) as to the incumbency and signatures of the officers (A) of the Borrower executing the Loan Documents and (B) of the officers of the Guarantor executing the Guaranty and (ii) providing a true, correct and complete copy of resolutions (A) of Horizon's board of directors authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to be delivered pursuant hereto and (B) of the Guarantor's board of directors authorizing the execution, delivery and performance of the Guaranty;

(h)  A written opinion of counsel to the Borrowers and the Guarantor, dated as of the date hereof and addressed to the Bank, with respect to (i) the matters described in Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.10 and 4.12 hereof and (ii) with respect to the same matters as they relate to the Guarantor and the Guaranty, in form and substance satisfactory to the Bank;

(i)  A certificate of an authorized officer of each of Allegheny United Hospitals, Inc. and St. Christopher's Hospital for Children stating that, as of the Closing Date, each of them is in compliance with all of the terms and conditions set forth in the Master Indenture and the agreements and documents executed in connection therewith;

(j)  Copies of the Internal Revenue Service private letter ruling(s) with respect to the status of each Borrower as an organization under Section 501(c)(3) of the Code;

(k)  All legal details and proceedings in connection with the transactions contemplated by this Agreement shall be satisfactory to the Bank and the Bank shall have received all such counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Bank, as the Bank may from time to time request; and

(l)  The Borrowers shall have paid all fees and charges as required herein including legal fees, closing costs and similar matters pertinent to the Closing.

PNC38150

AH- 4167

53729

7.   EVENTS OF DEFAULT

     The following shall be "Events of Default" under this Agreement and the terms "Events of Default" or "Default" shall mean any one or more of the following events:

     Section 7.1  <u>Default in Payment of Principal of or Interest on Note</u>.  Failure to pay when due any payment of principal of or interest on the Note.

     Section 7.2  <u>Default on Reimbursement Obligation</u>. Failure to reimburse the Bank when required for amounts drawn under the Letters of Credit.

     Section 7.3  <u>Default on Indebtedness</u>.  Any Borrower or the Guarantor shall (i) default (as principal or guarantor or other surety) in any payment of any obligation (or set of related obligations) in respect of Indebtedness in excess of $100,000 in the aggregate, beyond any period of grace with respect to the payment, or, if an obligation (or set of related obligations) is or are payable or repayable on demand, fail to pay or repay such obligation or obligations when demanded, or (ii) default in the observance of any other covenant, term or condition contained in any agreement or instrument by which an obligation (or set of related obligations) is or are created, secured or evidenced if the effect of such default is to cause, or to permit the holder or holders of such obligation or obligations (or a trustee or agent on behalf of such holder or holders) to cause, all or part of such obligation or obligations to become due before its or their otherwise stated maturity.

     Section 7.4  <u>Default in Material Agreements</u>.  Any Borrower or the Guarantor shall be in breach of any material agreement, document or instrument including, without limitation, the Master Indenture, the 1988 Indenture Documents or the Operating Agreement, whether formerly, now or after the date of this Agreement existing between any Borrower or the Guarantor and any other Person if such breach might result in a Material Adverse Change.

     Section 7.5  <u>Insolvency</u>.  Any Borrower or the Guarantor shall become insolvent, shall become generally unable to pay its debts as they become due, shall voluntarily suspend transaction of its business, shall make a general assignment for the benefit of creditors, shall institute a proceeding described in Section 7.6(i) of this Agreement or shall consent to any order for relief, declaration, finding or relief described in Section 7.6(i) of this Agreement, shall institute a proceeding described in Section 7.6(ii) of this Agreement or shall consent to the appointment or to the taking of possession by any such official of all or any substantial part of its property whether or not any proceeding is instituted, dissolves, winds-up or liquidates itself or any substantial part of its property, or shall take any action in furtherance of any of the foregoing.

- 25 -                    AH-4168

PNC38151

53729

Section 7.6  Bankruptcy; Receiver.  A proceeding shall be instituted in respect of any Borrower or the Guarantor:

(i)  seeking to have an order for relief entered in respect of such Borrower or the Guarantor, or seeking a declaration or entailing a finding that such Borrower or the Guarantor is insolvent or a similar declaration or finding, or seeking dissolution, winding-up, charter revocation or forfeiture, liquidation, reorganization, arrangement, adjustment, composition or other similar relief with respect to such Borrower or the Guarantor, its assets or its debts under any law relating to bankruptcy, insolvency, relief of debtors or protection of creditors, termination of legal entities or any other similar law now or in the future in effect; or

(ii)  seeking appointment of a receiver, trustee, custodian, liquidator, assignee, sequestrator or other similar official for such Borrower or the Guarantor or for all or any substantial part of its property.

Section 7.7  Non-Performance or Observance of Covenants.  Any Borrower or the Guarantor shall be in default in the performance or observance of any other covenant, agreement or duty under this Agreement, the Note, the Guaranty or any of the other agreements, instruments, documents or undertakings arising under or in connection with any of the Obligations and such default shall continue for a period of thirty (30) days after notice from the Bank, except if the Borrower or Guarantor, as the case may be, is diligently pursuing a cure of such default; provided, however, that in no event shall such default continue for a period of sixty (60) days after the original notice from the Bank.

Section 7.8  Representations Incorrect.  Any representation or warranty made by any Borrower or the Guarantor herein or in the Guaranty or as an inducement to the Bank to enter into this Agreement is untrue in any material respect, or any schedule, statement, report, notice or writing furnished by any Borrower or the Guarantor to the Bank is untrue in any material respect on the date as of which the facts set forth therein are stated.

Section 7.9  Levy or Repossession of Property.  Any judgment creditor of any Borrower or the Guarantor shall obtain lawful possession of any property, real or personal, material to the operation of such Borrower's or the Guarantor's business by any means including, without limitation, levy, distraint, replevin or self-help.

PNC38152

AH- 4169

53729

Section 7.10  <u>Material Adverse Change</u>.  The Bank shall determine in good faith (which determination is conclusive) that a Material Adverse Change has occurred with respect to the assets, business, operations or financial condition of any Borrower or the Guarantor or that the prospect of payment or performance of any covenant, agreement or duty under this Agreement, the Note, the Guaranty or any of the other agreements, instruments, documents or undertakings arising under or in connection with any of the Obligations is impaired in any material respect.

Section 7.11  <u>Judgments</u>.  The issuance, filing or levy against any Borrower or the Guarantor of an attachment, injunction, execution, tax lien or judgment in excess of $100,000 which is not discharged in full or stayed within thirty (30) days after issuance or filing.

Section 7.12  <u>Board Ratification</u>.  The Board of Directors of either Allegheny United Hospitals, Inc. or St. Christopher's Hospital for Children shall not have ratified the execution, delivery and performance hereof and of the other Loan Documents by April 15, 1994.

8.  REMEDIES

Section 8.1  <u>Acceleration</u>.  Upon the occurrence of any Event of Default, in addition to all other rights and remedies which the Bank may have hereunder or under any other Loan Document or the Guaranty, at law, in equity or otherwise, the Bank shall be under no further obligation to make any Disbursement or issue any Letter of Credit, and the Bank may (i) following an Event of Default set forth in any of Sections 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.9, 7.10, 7.11 or 7.12, declare all Obligations to be immediately due and payable, and such Obligations shall thereupon become and be immediately due and payable, without presentment, demand, protest, notice of protest or other notice of dishonor of any kind, all of which are hereby expressly waived by the Borrowers, and an action therefor shall immediately accrue and (ii) following an Event of Default set forth in any of Sections 7.7 or 7.8, upon ten (10) days written notice from Bank, declare all Obligations to be immediately due and payable, and such Obligations shall thereupon become and be immediately due and payable, without presentment, demand, protest, notice of protest or other notice of dishonor of any kind, all of which are hereby expressly waived by the Borrowers, and an action therefor shall immediately accrue.

Section 8.2  <u>Additional Remedies</u>.  After any acceleration, as provided for in Section 8.1, the Bank shall have, in addition to the rights and remedies given it by the Loan Documents, all those allowed by applicable Law, including, without limitation, the UCC.

PNC38153

AH- 4170

53729

Section 8.3  <u>Right of Set-Off</u>.  If the unpaid principal amount of the Note, interest accrued on the unpaid principal amount or other amount owing by the Borrowers under this Agreement, the Note or the other Loan Documents or any of the Obligations shall have become due and payable (at maturity, by acceleration or otherwise), the Bank and the holder of any participation will each have the right, to the extent permitted by law, in addition to all other rights and remedies available to it, without notice to the Borrowers, to set-off against and to appropriate and apply to such due and payable amounts any debt owing to, and any other funds held in any manner for the account of, the Borrowers by the Bank or by such holder including, without limitation, all funds in all deposit accounts (whether time or demand, general or special, provisionally credited or finally credited, or otherwise) now or in the future maintained by Borrowers with the Bank or such holder.  The Borrowers consent to and confirm the foregoing arrangements and confirm the Bank's rights and such holder's rights of banker's lien and set-off. Nothing in this Agreement will be deemed a waiver or prohibition of or restriction on the Bank's rights or any such holder's rights of banker's lien or set-off.

Section 8.4  <u>Remedies Cumulative; No Waiver</u>.  All rights and remedies given by the Loan Documents are cumulative and not exclusive of any thereof or of any other rights or remedies available to the Bank, and no course of dealing between the Borrowers and the Bank or any delay or omission in exercising any right or remedy shall operate as a waiver of any right or remedy, and every right and remedy may be exercised from time to time and as often as shall be deemed appropriate by the Bank.

9.  MISCELLANEOUS

Section 9.1  <u>Amendments</u>.  This Agreement and any Loan Document may be amended only by a writing signed by each of the parties, and any such amendment shall be effective only to the extent specifically set forth in such writing.

Section 9.2  <u>Assignment</u>.  The Borrowers shall not assign, pledge or otherwise transfer any of their rights, interest or obligations hereunder, whether by operation of law or otherwise, without the prior written consent of the Bank.  The Bank shall be permitted to assign any of its rights, interest and obligations hereunder.

Section 9.3  <u>Participations</u>.  Notwithstanding any other provision of this Agreement, the Borrowers understand that the Bank may at any time enter into participation agreements with one or more participating banks whereby the Bank will allocate certain percentages of the Revolving Credit Loan (including Letters of Credit) to them.  The Borrowers acknowledge that, for the convenience of all parties, this Agreement is being entered into with the Bank only and that their obligations under this

- 28 -

AH-4171    PNC38154

53729

Agreement are undertaken for the benefit of, and as an inducement to, any such participating bank as well as the Bank, and the Borrowers hereby grant to each participating bank, to the extent of its participation in the loans or commitments, the right to set off deposit accounts maintained by the Borrowers with such bank.

Section 9.4    <u>Counterparts; Facsimile Signature Page</u>. This Agreement may be executed in any number of counterparts, and by each of the parties on separate counterparts, each of which, when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument. Delivery of executed signature pages to this Agreement by facsimile transmission from one party to another shall constitute effective execution and delivery hereof by such sending party.

Section 9.5    <u>Entire Agreement</u>. This Agreement and the Loan Documents contains the entire agreement of the parties with respect to the transactions contemplated hereby and thereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions.

Section 9.6    <u>Exhibits and Schedules</u>. The Exhibits and Schedules attached hereto and to the Loan Documents are an integral part hereof and thereof and all references herein to this Agreement and to the Loan Documents shall include such Exhibits and Schedules.

Section 9.7    <u>Expenses; Taxes</u>. The Borrowers agree to pay or cause to be paid and to save the Bank harmless against liability for the payment of all reasonable out-of-pocket expenses including, but not limited to, fees and expenses of counsel and paralegals for the Bank incurred by the Bank from time to time (i) arising in connection with the preparation, execution, delivery and performance of this Agreement, the Note and Letters of Credit, (ii) relating to any requested amendments, waivers or consents to this Agreement or the Note, (iii) arising in connection with the Bank's enforcement or preservation of rights under this Agreement, the Note or the Obligations including, but not limited to, such expenses as may be incurred by the Bank in the collection of Disbursements and the aggregate Stated Amount of Letters of Credit and (iv) arising in connection with any case under the Bankruptcy Code filed by or against the Borrowers. The Borrowers agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or in the future determined by the Bank to be payable in connection with this Agreement, the Note or the Obligations. The Borrowers agree to save the Bank harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions. In the event of termination adverse to the Borrowers of any action at law or suit in equity in relation to this Agreement, the Borrowers will pay, in addition to all other sums which the

PNC38155          AH-4172

53729

Borrowers may be required to pay, reasonable attorneys' and paralegals' fees incurred by the Bank or the holder of the Note in connection with such action or suit. All payments due from the Borrowers under this Section will be added to and become part of the Obligations until paid in full.

Section 9.8  <u>Further Assurances</u>.  The parties shall from time to time do and perform such additional acts and execute and deliver such additional documents and instruments as may be required by applicable Governmental Rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement and the Loan Documents.

Section 9.9  <u>Gender and Number</u>.  As used in this Agreement and the Loan Documents, the masculine, feminine or neuter gender, and the singular or plural number, shall include the others whenever appropriate in the context.

Section 9.10  <u>Governing Law</u>.  This Agreement shall be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the laws of said Commonwealth.

Section 9.11  <u>Headings</u>.  All titles and headings in this Agreement and the Loan Documents are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

Section 9.12  <u>Jurisdiction and Service of Process</u>.

(a)  Each of the parties hereby:

(i)  irrevocably submits to the jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania and to the jurisdiction of the United States District Court for the Western District of Pennsylvania for the purposes of any action or proceeding arising out of or relating to this Agreement or the Loan Documents or the subject matter hereof or thereof and brought by any other party;

(ii)  waives and agrees not to assert, by way of motion, as a defense or otherwise, in any such action or proceeding, any claim that (A) it is not personally subject to the jurisdiction or such courts, (B) the action or proceeding is brought in an inconvenient forum or (C) the venue of the action or proceeding is improper; and

(iii)  agrees that, notwithstanding any right or privilege it may possess at any time, such party and its property are and shall be generally subject to suit on account of the obligations assumed by it hereunder.

PNC38156

AH- 4173

- 30 -

S3729

    (b)   Each party agrees that service in person or by certified or registered U.S. mail to its address set forth in Section 9.13 hereof shall constitute valid <u>in personam</u> service upon such party and its successors and assigns in any action or proceeding with respect to any matter as to which it has submitted to jurisdiction hereunder.

    (c)   Notwithstanding the foregoing, any party may at its option bring any action or other proceeding arising out of or relating to this Agreement or any Loan Document or the subject matter hereof or thereof against any other party or any of its assets in the courts of any jurisdiction or place where such other party or such assets may be found or where such other party may be subject to personal jurisdiction, and may effect service of process as provided under any applicable Governmental Rule.

    Section 9.13   <u>Notices</u>.  Unless otherwise specifically provided herein, all notices, consents, requests, demands and other communications required or permitted hereunder:

    (a)   shall be in writing;

    (b)   shall be sent by messenger, certified or registered U.S. mail, a reliable express delivery service or telecopier (with a copy sent by one of the foregoing means), charges prepaid as applicable, to the appropriate address(es) or number(s) set forth below; and

    (c)   shall be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a Business Day, on the first Business Day after the date of receipt), as evidenced by (i) a receipt executed by the addressee (or a responsible person in his or her office) or a notice to the effect that such addressee refused to accept such communication, if sent by messenger, U.S. mail or express delivery service, or (ii) a receipt generated by the sender's telecopier showing that such communication was sent to the appropriate number on a specified date, if sent by telecopier.

All such communications shall be sent to the following addresses or numbers, or to such other addresses or numbers as any party may inform the others by giving five Business Day's prior notice:

| If to the Borrowers: | With a copy to: |
|---|---|
| c/o Allegheny Health, Education<br>   and Research Foundation<br>Treasury Department<br>320 East North Avenue<br>Pittsburgh, PA  15212-4772<br>Attn:  Michael P. Martin<br>Telecopier No.:(412)442-2290 | Allegheny Health, Education<br>   and Research Foundation<br>100 West Laurel Avenue<br>Cheltenham, PA  19012-2098<br>Attn:  Robert M. McNair, Esq.<br>Telecopier No.:(215)663-5369 |

*AH-4174*

PNC38157

S3729

If to the Bank:

PNC Bank, National Association
One PNC Plaza
Health Care Group – Third Floor
Fifth Avenue and Wood Street
Pittsburgh, PA  15222
Attn:  Emery D. Holloway
Telecopier No.:(412)762-2784

  Section 9.14  <u>Severability</u>.  Any provision of this
Agreement which is prohibited or unenforceable in any
jurisdiction shall, as to such jurisdiction, be ineffective to
the extent of such prohibition or unenforceability without
invalidating the remaining portions hereof or affecting the
validity or enforceability of such provision in any other
jurisdiction.

  Section 9.15  <u>Successors and Assigns</u>.  This Agreement
shall be binding upon and shall inure to the benefit of each of
the parties and their respective successors and permitted
assigns.

  Section 9.16  <u>Survival; Duration</u>.  All representations
and warranties of the Borrowers contained herein and in any of
the Loan Documents or made in connection herewith or therewith
shall survive, and shall not be waived by, any investigation by
the Bank, the execution and delivery of this Agreement and the
Loan Documents or the performance by the Borrowers of their
obligations hereunder and thereunder.  All covenants and
agreements of the parties set forth herein shall continue in full
force and effect from and after the date hereof until such date
as all of such covenants and agreements have been satisfied in
full or this Agreement has otherwise been terminated, except for
such covenants and agreements as survive such termination by
their own terms.

  **SECTION 9.17  <u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HEREBY
WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING
ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE LOAN
DOCUMENTS OR THE SUBJECT MATTER HEREOF OR THEREOF AND BROUGHT BY
ANY OTHER PARTY.**

PNC38158

AH-4175

53729

IN WITNESS WHEREOF, the parties hereto by their authorized agents with intent to be legally bound hereby have executed this Credit Agreement on the date first above written.

ATTEST:

_[signature]_

ALLEGHENY UNITED HOSPITALS, INC.

By: _[signature]_
  Name:   Charles P. Morrison
  Title:   Treasurer

ATTEST:

_[signature]_

ST. CHRISTOPHER'S HOSPITAL
FOR CHILDREN

By: _[signature]_
  Name:   Charles P. Morrison
  Title:   Treasurer

ATTEST:

_[signature]_ Almeta E. Cozzar

HORIZON MEDICAL CORPORATION

By: _[signature]_
  Name:   Charles P. Morrison
  Title:   Treasurer

PNC BANK, NATIONAL ASSOCIATION

By: _[signature]_
  Name: Emery D. Holloway
  Title: Vice President
         Health Care Group

PNC38159

AH-4176

53729

## EXHIBITS

Revolving Credit Note                    Exhibit A
Request for Disbursement                 Exhibit B


## SCHEDULES

Schedule 4.7                    Subsidiaries
Schedule 4.8                    Liabilities
Schedule 4.10                   Litigation
Schedule 5.2                    Indebtedness

PNC38160

AH-4177

ALLEGHENY, HEALTH EDUCATION AND RESEARCH FOUNDATION
SCHEDULE OF SUBSIDIARIES
SCHEDULE 4.7

| SUBSIDIARY | JURISDICTION OF INCORPORATION | NUMBER OF SHARES ISSUED AND OUTSTANDING |
|---|---|---|
| 1. Allegheny Health, Education and Research Foundation (AHERF) | Pennsylvania | N/A |
| 2. Allegheny General Hospital | Pennsylvania | N/A |
| 3. Allegheny Neuropsychiatric Institute | Pennsylvania | N/A |
| 4. Allegheny Singer Research Institute | Pennsylvania | N/A |
| 5. Medical College of Pennsylvania | Pennsylvania | N/A |
| 6. Medical College Hospitals | Pennsylvania | N/A |
| 7. St. Christopher's Hospital for Children | Pennsylvania | N/A |
| 8. Horizon Medical Corporation | Pennsylvania | N/A |
| 9. Diversified Health Group, Inc. | Pennsylvania | 1000 shares * |
| 10. Allegheny United Hospitals, Inc. | Pennsylvania | N/A |
| 11. Allegheny Health Services Providers Insurance Company (AHSPIC) | Cayman Islands | 120,000 shares * |
| 12. United Hospitals Insurance Co., Ltd. (UHIC) | Cayman Islands | 120,000 shares + |

\* DHG and AHSPIC are 100% owned subsidiaries of AHERF

+ UHIC is a 100% owned subsidiary of AHSPIC

PNC38161

filename: Sched4 – 7\kkl

AH- 4178

**ALLEGHENY-UNITED HOSPITALS, INC.**
**ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN**
**HORIZON MEDICAL CORPORATION**

**SCHEDULE 4.8**

None.

PNC38162

AH- 4179

**ALLEGHENY-UNITED HOSPITALS, INC.**
**ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN**
**HORIZON MEDICAL CORPORATION**

**SCHEDULE 4.10**

None.

PNC38163

AH- 4180

SCHEDULE OF INDEBTEDNESS
ALLEGHENY–UNITED HOSPITALS, INC.,
ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN
HORIZON MEDICAL CORPORATION
SCHEDULE 5.2

| DESCRIPTION | | BALANCE AT SEPT. 30, 1993 |
|---|---|---|
| *Allegheny–United Hospitals, Inc. and St. Christopher's Hospital for Children* | | |
| | | |
| The Montgomery County Higher Education and Health Authority | | |
| Gross Hospital Revenue Bonds: | | |
| Series 1989 | $ | 81,345 |
| Series 1987 | | 28,020 |
| Series 1985 A | | 12,690 |
| Less unamortized bond discount | | (3,691) |
| | | 118,364 |
| | | |
| Hospital Equipment Acquisition and Improvement Variable Rate | | |
| Demand Bonds | | 945 |
| Promissory and equipment notes payable | | 1,013 |
| Capitalized lease obligations | | 18 |
| | | |
| Total indebtedness–Allegheny–United Hospitals, Inc. and St. Christopher's Hospital for Children | $ | 120,340 |
| | | |
| *Horizon Medical Corporation* | | |
| | | |
| Variable rate demand Hospital Revenue Bonds Series 1988 | | 8,400 |
| | | |
| Total indebtedness–Horizon Medical Corporation | $ | 8,400 |
| | | |
| Total indebtedness | $ | 128,740 |

PNC38164

filename: LTDLOC09\kkJ

AH- 4181

56950                                              <u>EXHIBIT A</u>

<u>REVOLVING CREDIT NOTE</u>

$25,000,000                          Pittsburgh, Pennsylvania
                                         January 6, 1994


        FOR VALUE RECEIVED, the undersigned, ALLEGHENY UNITED
HOSPITALS, INC., ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN AND
HORIZON MEDICAL CORPORATION (collectively, the "Borrowers"),
jointly and severally promise to pay to the order of PNC BANK,
NATIONAL ASSOCIATION (the "Bank") on or before November 30, 1997,
or such earlier date as contemplated in the Credit Agreement (as
hereinafter defined), the lesser of (i) the principal sum of
TWENTY-FIVE MILLION DOLLARS ($25,000,000) or (ii) the aggregate
unpaid principal amount of all Disbursements made by the Bank to
the Borrowers from time to time pursuant to Section 2.1 of that
certain Credit Agreement dated as of January 6, 1994 by and among
the Borrowers and the Bank (as the same may be amended, modified
or supplemented from time to time, the "Credit Agreement").  The
Borrowers further promise to pay to the order of the Bank
interest on the unpaid principal amount hereof from time to time
outstanding at the rate or rates per annum determined pursuant to
the Credit Agreement, payable on the dates set forth in the
Credit Agreement.  Capitalized terms not otherwise defined herein
shall have the respective meanings ascribed to them by the Credit
Agreement.

        This Note is the "Revolving Credit Note" referred to
in, and is entitled to the benefits of, the Credit Agreement.
Reference is made to the Credit Agreement for provisions for the
prepayment hereof and for the acceleration of the maturity
hereof.  All of the terms, conditions, covenants, representations
and warranties of the Credit Agreement are incorporated herein by
reference as if the same were fully set forth herein.  Upon the
occurrence of an Event of Default, the principal hereof and
accrued interest hereon may be declared to be and shall thereupon
become forthwith due and payable as provided in the Credit
Agreement.

        This Note is secured by, and is entitled to the
benefits of, certain Liens granted by the Borrowers, and is
entitled to the benefit of certain guarantees referred to in the
Credit Agreement.

        The Borrowers hereby expressly waive presentment,
demand, notice, protest and all other demands and notices in
connection with the delivery, acceptance, performance, default or
enforcement of this Note or the Credit Agreement, and an action
for amounts due hereunder or thereunder shall immediately accrue.

        This Note shall be governed by, construed and enforced
in accordance with, the laws of the Commonwealth of Pennsylvania,
without regard to principles of choice of law.

                                             AH- 4182

56950

      IN WITNESS WHEREOF, and intending to be legally bound hereby, the Borrowers have caused this Note to be executed and delivered as of the day and year first above written.

ALLEGHENY UNITED HOSPITALS, INC.

By: _____
    Name:
    Title:


ST. CHRISTOPHER'S HOSPITAL
FOR CHILDREN

By: _____
    Name:
    Title:


HORIZON MEDICAL CORPORATION

By: _____
    Name:
    Title:

PNC38166

AH-4183

56954                                                                    EXHIBIT B

## REQUEST FOR DISBURSEMENT

           The undersigned certify that each is an authorized
officer of ALLEGHENY UNITED HOSPITALS, INC., ST. CHRISTOPHER'S
HOSPITAL FOR CHILDREN AND HORIZON MEDICAL CORPORATION
(collectively, the "Borrowers"), respectively, and that each is
authorized to execute this Request for Disbursement on behalf of
the respective Borrowers.  With reference to the Credit Agreement
dated as of January 6, 1994 (as the same may be amended, modified
or supplemented from time to time, the "Credit Agreement"), among
the Borrowers and PNC Bank, National Association, the undersigned
further certify, represent and warrant as follows (each
capitalized term used herein having the same meaning given to it
in the Credit Agreement unless otherwise specified):

           (a)  Each of the Borrowers has performed and complied
with all agreements and conditions required to be performed or
complied with by it prior to the funding of a Disbursement, and
no condition or event exists which constitutes or, which after
the giving of notice or passage of time or both, would
constitute, an Event of Default.

           (b)  The representations and warranties contained in
Article 4 of the Credit Agreement and otherwise made in writing
by or on behalf of each of the Borrowers in connection with the
transactions contemplated thereby are correct in all material
respects as of the date hereof.

           (c)  There has been no Material Adverse Change since
September 30, 1993, with respect to any Borrower.

           (d)  There are no proceedings reasonably likely to
result in a Material Adverse Change pending or, to the knowledge
of the undersigned, threatened against or affecting any Borrower
in any court or before any Governmental Person, authority or
arbitration board or tribunal.

           (e)  The Borrowers wish to borrow the amount and at the
rates as set forth in Schedule I hereto.

PNC38167

AH- 4184

56954

ALLEGHENY UNITED HOSPITALS, INC.

By: _____
    Name:
    Title:


ST. CHRISTOPHER'S
HOSPITAL FOR CHILDREN

By: _____
    Name:
    Title:


HORIZON MEDICAL CORPORATION

By: _____
    Name:
    Title:


PNC38168


AH- 4185

S6954

## REQUEST FOR DISBURSEMENT

Date of Borrowing _____

Amount of Borrowing _____

Interest Rate Options _____

_____

Interest Rate Portions _____

_____

Interest Rate Periods _____
(if applicable)

Prior Disbursements _____
Outstanding

Stated Amount of Letters
of Credit Outstanding _____

Account to be Credited _____

_____

PNC38169

AH- 4186

**EXHIBIT  1785**

## CREDIT INFORMATION SHEET

Segment: Healthcare

| | | |
|---|---|---|
| Borrower Name: | AHERF, Allegheny General Hospital (Obligated Group), Allegheny University Medical Centers, AHERF-Delaware Valley Obligated Group, (DVOG), Allegheny University of the Health Sciences, Allegheny Integrated Health Group | Cost Ctr.: 857    Market: PGH |

Comm'l Loan Acct No.: 9914239/9128924/9415261/9713824/9?23??/9442366    (or check here if NEW    ) Power ID: 260718

City: Pittsburgh    State: PA    ZIP: 15212

Names of Related Credits:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CRA? | [] Yes | [X] No | | | Annl Sales Vol. | $1.703 million | |
| Comply w/FDICIA? | [] Yes | [] No | [X] N/A | | LTV ratio: | N/A | |
| SNC? | [] Yes | [X] No | | | SNC Agent Bank: | N/A | |
| Reg O? | [] Yes | [X] No | | | SIC: | 8062 | |
| Section 20 Issuer? | [] Yes | [X] No | | | COC: | 091 | |
| HLT? | [] Fed | [] Bank | | | COC Title: | Gen Med Surgical Hospital | |
| New Customer? | [] Yes | [X] No | | | Entity Type: | 501c-3 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Obligor Rating: | 3/4/5 | Date Assigned: 12/97 | Was Rating: | Changed? Yes-see RR grids | Confirmed? Y-RR grids |
| Facility(s) Rating: | 3/4/5 | Date Assigned: 12/97 | Was Rating: | Changed? Yes-see RR grids | Confirmed? Y-RR grids |
| S & P: | A-AGH | Date Assigned: 12/4/97 | Moody's: A2-AGH | Date Assigned: | 11/12/97 |

### Reasons For Submission

| | | |
|---|---|---|
| [] New Loans Not Under Commitment | [] New Commitment | [] Covenant Amendment/Waiver |
| [] Renewal of Loan | [] Commitment Renewal | [X] Annual Review |
| [] Modification of Loan | [] Modification of Commitment | [] Other |

### Credit Compliance

| | | | |
|---|---|---|---|
| Mgmt Policy Excptns? N | Underwrtng Std Excptns? N | Policy: | Offrg Page: |
| Covenant Violations? N | Offrg Page: N/A | Credit File Rvwd/Complies? | Y |

| | | | |
|---|---|---|---|
| Total DHE Apprvd Today: $0 | Total DSE Apprvd Today: $0 | | Increm. Exposure: $0 |
| Borrower DHE: $2.9MM | Borrower DSE: $1.7MM | Market MRE: $188.9MM* | PNC MRE: $188.9MM* |

More liberal? N [] If Y, [] Price    Term    Covts    Coll    Guar    Struct

Signature Approval? [X] Yes    No  Is Modification? [] Major [] Minor    Approval Committee: Signature

(Type first initial and last name; sign next to it; include your extension and the date signed)

| | | | | |
|---|---|---|---|---|
| RM: | Paula A. Mammarella | | [x83804] | date: 12/2/97 |
| Grp Mgr: | Frank A. Taucher | | [x27469] | date: 12/24/97 |
| DCO: | W. Alex Eliason | | [x28418] | date: 12/22/97 |
| Div Mgr: | C.David Cook | | [x22219] | date 12/2/97 |
| Sr. CPO: | Frank R. Krepp | | [x27510] | date: 6/2/97 |

Highest Credit Signatory affirmation that signatures are complete?  FRK  (w/c,sc) (initial)

| | | | |
|---|---|---|---|
| Credit Underwriting By: | Brian Camp | [x88258] | Credit Reviewed By: Brian Camp    [x88258] |
| Approval Date: 12/22/97 | Last Annual Review Date: various | | Next Annual Review Date: 12/98 |

Subject To:

Recorded in the Minutes of the
Market Credit Committee

1/28/98    BM
Date    Recording Secretary
Credit Files Copy

*Gross MRE of AHERF

Form Date 9/15/96

DEPOSITION
EXHIBIT
1785
AKF

PNC30833

CREDIT INFORMATION SHEET

Segment: Healthcare

| | | |
|---|---|---|
| Borrower Name: | Allegheny General Hospital (Obligated Group) | Cost Ctr.: 857    Market: PGH |
| Comm'l Loan Acct No.: | 9914239/9128924     (or check here if NEW   ) | Power ID: 6997 |
| City: Pittsburg | State: PA | ZIP: 15212 |

Names of Related Credits: AHERF, Allegheny University Medical Centers, (AHERF) Delaware Valley Obligated Group, (DVOG) Allegheny University of the Health Sciences, Allegheny Integrated Health Group

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CRA? | [] | Yes | [X] | No | | Annl Sales Vol. | $441.0 million |
| Comply w/FDICIA? | [] | Yes | [] | No | [X]   N/A | LTV ratio: | N/A |
| SNC? | [X] | Yes | [] | No | | SNC Agent Bank: | PNC Bank |
| Reg O? | [] | Yes | [X] | No | | SIC: | 8062 |
| Section 20 Issuer? | [] | Yes | [X] | No | | COC: | 091 |
| HLT? | [] | Fed | [] | Bank | | COC Title: | Gen Med Surgical Hospital |
| New Customer? | [] | Yes | [X] | No | | Entity Type: | 501c-3 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Obligor Rating: | 3 | Date Assigned: | 12/97 | Was Rating: | Changed? | Confirmed? | Y |
| Facility(s) Rating: | 3 | Date Assigned: | 12/97 | Was Rating: | Changed? | Confirmed? | Y |
| S & P: | A | Date Assigned: | 12/4/97 | Moody's: A2 | Date Assigned: | | 11/12/97 |

### Reasons For Submission

| | | |
|---|---|---|
| [] New Loans Not Under Commitment | [] New Commitment | [] Covenant Amendment/Waiver |
| [] Renewal of Loan | [X] Commitment Renewal | [X] Annual Review |
| [] Modification of Loan | [X] Modification of Commitment | [] Other |

### Credit Compliance

| | | | |
|---|---|---|---|
| Mgmt Policy Excptns? N | Underwrtng Std Excptns? N | Policy: | Offrg Page: |
| Covenant Violations? N | Offrg Page: N/A | Credit File Rvwd/Complies? | Y |

| | | |
|---|---|---|
| Total DHE Apprvd Today: $26.3MM (gross) | Total DSE Apprvd Today: $0 | Increm. Exposure: $0 |
| Borrower DHE: $74.2MM (gross) | Borrower DSE: $0 | Market MRE: $188.9MM*    PNC MRE: $188.9MM* |

More liberal?  N  [X]  If Y,  []  Price _____  Term _____  Covts _____  Coll _____  Guar _____  Struct _____

Signature Approval?   [X]  Yes  []  No  Is Modification?  []  Major  [x]  Minor   Approval Committee: Signature

| (Type first initial and last name; sign next to it; include your extension and the date typed) | | | |
|---|---|---|---|
| RM: | Paula A. Mammarella | [x83804] | date: 12/22/97 |
| Grp Mgr: | Frank A. Taucher | [x27469] | date: |
| DCO: | W. Alex Eliason | [x28418] | date: 12/22/97 |
| Div Mgr: | C. David Cook | [x22219] | date: 12/24/97 |
| Sr. CPO: | Frank R. Krepp | [x27510] | date: 12/22/97 |

Highest Credit Signatory affirmation that signatures are complete?  FRK _____ (initial)

| | | | |
|---|---|---|---|
| Credit Underwriting By: | Brian Camp | [x88258] | Credit Reviewed By: Brian Camp  [x88258] |
| Approval Date: | 12/22/97 | Last Annual Review Date: 2/5/97 | Next Annual Review Date: 12/98 |
| Subject To: | | | |

*Gross MRE of AHERF

Form Date 9/15/96

PNC30834

**CREDIT INFORMATION SHEET**

Segment: Healthcare___ ___

| | | | |
|---|---|---|---|
| Borrower Name: | Allegheny University Medical Centers | Cost Ctr.: | 857 | Market: PGH |

Comm'l Loan Acct No.: 9713824   (or check here if NEW   ) Power ID: 13757

City: Pittsburgh    State: PA    ZIP: 15212

Names of Related Credits: AHERF, Allegheny General Hospital (Obligated Group), AHERF-Delaware Valley Obligated Group, (DVOG), Allegheny University of the Health Sciences, Allegheny Integrated Health Group

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CRA? | [ ] Yes | [X] No | | | Annl Sales Vol. | $1.703 million |
| Comply w/FDICIA? | [ ] Yes | [ ] No | [X] N/A | | LTV ratio: | N/A |
| SNC? | [ ] Yes | [X] No | | | SNC Agent Bank: | N/A |
| Reg O? | [ ] Yes | [X] No | | | SIC: | 8062 |
| Section 20 Issuer? | [ ] Yes | [X] No | | | COC: | 091 |
| HLT? | [ ] Fed | [ ] Bank | | | COC Title: | Gen Med Surgical Hospital |
| New Customer? | [ ] Yes | [X] No | | | Entity Type: | 501c-3 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Obligor Rating: | 4 | Date Assigned: | 12/97 | Was Rating: | Changed? | | Confirmed? Y |
| Facility(s) Rating: | 4 | Date Assigned: | 12/97 | Was Rating: | Changed? | | Confirmed? Y |
| S & P: | n/a | Date Assigned: | n/a | Moody's: | n/a | Date Assigned: | |

### Reasons For Submission

| | | | |
|---|---|---|---|
| [ ] New Loans Not Under Commitment | [ ] New Commitment | [ ] Covenant Amendment/Waiver |
| [ ] Renewal of Loan | [X] Commitment Renewal | [X] Annual Review |
| [ ] Modification of Loan | [ ] Modification of Commitment | [ ] Other |

### Credit Compliance

| | | | | |
|---|---|---|---|---|
| Mgmt Policy Excptns? | N | Underwrtng Std Excptns? | N | Policy: | | Offrg Page: |
| Covenant Violations? | N | Offrg Page: | N/A | Credit File Rvwd/Complies? | Y |

Total DHE Apprvd Today: $0    Total DSE Apprvd Today: $1.5MM    Increm. Exposure: $0

Borrower DHE: $1.4MM    Borrower DSE: $2.5MM    Market MRE: $188.9MM*    PNC MRE: $188.9MM*

More liberal? N [ ] If Y, [ ] Price ___ Term ___ Covts ___ Coll ___ Guar ___ Struct ___

Signature Approval? [X] Yes [ ] No Is Modification? [ ] Major [ ] Minor    Approval Committee: Signature

(Type first initial and last name; sign next to it; include your extension and the date signed)

| | | | | |
|---|---|---|---|---|
| RM: | Paula A. Mammarella | | [x83804] | date: 12/22/97 |
| Grp Mgr: | Frank A. Taucher | | [x27469] | date: 12/22/97 |
| DCO: | W. Alex Eliason | | [x28418] | date: 12/22/97 |
| Div Mgr: | C. David Cook | | [x22219] | date: 12/24/97 |
| Sr. CPO: | Frank R. Krepp | | [x27510] | date: 12/23/97 |
| Highest Credit Signatory affirmation that signatures are complete? | FRK (initial) | | | |

Credit Underwriting By: Brian Camp    [x88258]    Credit Reviewed By: Brian Camp    [x88258]

Approval Date: 12/22/97    Last Annual Review Date: various    Next Annual Review Date: 12/98

Subject To:

*Gross MRE of AHERF

Form Date 9/15/96

**ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION,**
Pittsburgh, PA, *Parent:*
**ALLEGHENY GENERAL HOSPITAL OBLIGATED GROUP, consisting of**
*ALLEGHENY GENERAL HOSPITAL;*
**ALLEGHENY UNIVERSITY MEDICAL CENTERS;**
**DELAWARE VALLEY OBLIGATED GROUP, consisting of**
the *ALLEGHENY UNIVERSITY HOSPITALS,*
*ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN, and*
*ALLEGHENY UNIVERSITY OF THE HEALTH SCIENCES,* and
**ALLEGHENY INTEGRATED HEALTH GROUP**

**December 19, 1997**

Transaction Summary

Refer to the attached organization chart. The Allegheny General Hospital Obligated Group ("AGHOG") consists of Allegheny General Hospital (AGH). AGH, a non-profit charitable organization, has a licensed capacity of 728 acute care beds and 80 post-acute care beds. Allegheny Health Education and Research Foundation ("AHERF"), a non-profit organization, is the parent corporation for AGH, Delaware Valley Obligated Group and Allegheny University Medical Centers. In the spring of 1997, AHERF acquired Allegheny Valley Hospital and Forbes Health System and merged them into Allegheny University Medical Centers ("AUMC".) Although the debt of AGH and AUMC is secured separately, there are expected to be operational synergies that will aid both credits.

In addition to AGH, AHERF's primary operating affiliates include the Delaware Valley Obligated Group (DVOG), which consists of: Allegheny University of the Health Sciences (Delaware Valley - formerly Hahnemann University and the Medical College of PA), Allegheny University Hospitals (DE Valley - comprised of the Medical College of PA Hospital, Hahnemann University Hospital, Bucks County Hospital and Elkins Park Hospital), St. Christopher's Hospital for Children (DE Valley). Other primary affiliates include: Allegheny Integrated Health Group (AIHG), in Pittsburgh & DE Valley - holds the primary care physicians which have been acquired by AHERF and Allegheny Health Service Providers Insurance Co. Approximately 2/3 of AHERF's revenues are derived from its Delaware Valley affiliates.

In the first quarter of 1998, AHERF contemplates refinancing all debt on the western side of the organization. Of our exposure, this should include the $26,288,500 letter of credit (L/C) to AGH ($13,407,135 net of the participated amount), the $47,742,411 L/C to AGH ($32,742,411 net), the $150,000 L/C to AGH and the $1,350,000 L/C to AUMC (this L/C is expected to be allowed to expire per the customer.) The net total of these amounts is $47,649,546. This effects the opportunity for PNC Bank to reduce our exposure to AHERF to a more manageable level. With our total net DHE currently at $136,769,797, should we elect not to participate in the new facility, our total DHE would be reduced to $89,120,250. If the $1,350,000 L/C to AUMC expires as expected, our DHE would then be $87,770,251. See Strategy Matrix & Business Prospects.

PNC30836

_____
Actions Requested

1) Approval to renew PNC Bank's $26,897,500 letter of credit supporting Allegheny General Hospital's Series 1993 variable rate bond issue. We have received verbal confirmation that Sanwa Bank will retain its $13,179,775 participation (PNC Bank's net exposure is then $13,717,725). The renewed facility will expire 1/28/99. *(#9128924-90035)*

2) Renewal of the Operational Services Exposure to Allegheny University Medical Centers in the reduced amount of $1,500,000 (previously $2,300,000) for ACH operational services for one year.

3) Annual review of the AHERF relationship.

_____
Credit Issues

**AHERF:**

**Ratings downgrade by S&P; Moody's puts subsidiaries on watch-list:** S&P lowered its debt ratings on an AHERF subsidiary, AGH, while Moody's put some AGH bonds and another AHERF subsidiary on its watch-list for a possible downgrade. S&P and Moody's both placed heavy emphasis for their concerns on AHERF's acquisitions of physician practices in Pittsburgh and in Philadelphia. The practices have not only been costly to acquire but have run at a loss as well. See below.

These issues are compounded by the fact that AHERF's operations are in over-bedded markets. AHERF continues to aggressively consolidate operations and cut expenses. AHERF's goal is to consolidate and integrate operations into a state-wide and, eventually, a regional integrated health system.

**Medicare and Medicaid Reform:** Issues being addressed include a means to control or reduce public and private spending on health care, to reform the payment methodology for heath care goods and services by both the public (Medicare and Medicaid) and private sectors and limitations on federal spending for health care benefits.

On 8/5/97, the Balanced Budget Act of 1997 was passed which contained many provisions which will be phased in over the next 5 years. This is supposed to continue to take monies out of Medicare, which may exacerbate problems that AHERF may experience otherwise.

**Payor concentration/Over-bedding:** In the Philadelphia market, there is a surplus of bed capacity and a pool of providers relectuant to consolidate. In Pittsburgh, there are risks associated with hospitals' high percentage of Blue Cross business. See the Credit Issues section of the Credit Underwriting Memorandum.

**Year 2000 compliance:** AHERF has formed a specialist group in its Information Systems segment to address Year 2000 compliance to ensure that the system is not jeopardized in any way.

PNC30837

AGHOG:

Concern is growing over transfers from AGH to other AHERF subsidiaries that are experiencing losses: In 1997, management of AHERF indicated that $34.0 million was transferred from operations of AGH to support physicians, mostly in the AIHG. This transfer of monies has been cause for concern regarding AGH's operating performance, to the extent that AGH would continue to be called upon to make up losses in the other subsidiaries, which would adversely affect liquidity.

S&P downgraded its rating on a series of bonds issued by AGH, while Moody's put some AGH bonds on its watch-list for possible downgrade, approximately two months after AHERF cut staffing in its Philadelphia hospitals by 1,200 jobs, or 6%, stating that AGH may continue to be called upon to transfer monies to cover losses in the DVOG. The S&P downgrade, however, brings that rating more in line with the current Moody's, both of which translate, per PNC Bank's risk rating grids, to a "2." S&P reports AGH's outlook as stable citing its solid business position and stable liquidity. This concern/downgrade, however, may result in AGH's reduced ability to access the capital markets going forward.

Expansion of the physician network: The amount budgeted for physician acquisitions for 1998 is $0 as the physicians already acquired from HealthAmerica continue to roll into AHERF. AGH will now concentrate on restructuring the primary care physician practices in the Pittsburgh area that were acquired over the last few years. To date, AGH has acquired approximately 143 primary care doctors. The plan is to have 200 primary care doctors by FYE97 and 400 by FYE99. AGH continues to maintain strong cash and board designated funds balances of $172.0 million which provides comfort during a period of such growth.

AHERF is planning to combine the AGHOG with AUMC during the first quarter of 1998 to create a united entity that will take advantage of efficiencies in operations and will benefit from reduced costs of financing, etc.

DVOG:

The subsidiary that houses AHERF's physician practices continues to experience losses. AHERF has expanded on into managed care in the Philadelphia region, within the DVOG market. The practices have been very costly to acquire and require large restructurings, which may take years, before they can be turned around. Management does realize this, and is endeavoring to put forth the necessary resources to right-size these operations.

PNC30838

While cost savings of approximately $40.0 to $50.0 million through headcount cuts have been achieved so far, (specifically a 6% reduction in the work force, or 1,200 jobs, primarily in Philadelphia), such expenses still have negatively impacted the organization's operating results as much more restructuring is needed. AHERF management initially stated that the staffing cuts and a 20% pay cut imposed upon executives throughout its system were due to the states' mandatory shift of Philadelphia's Medicaid patients into managed care and on the federal government's attempts to rein in on Medicare spending. AIHG, which is designed to acquire and run the system's physician practices, suffered a loss of $61.0 million for the FYE 97, up from $41.0 million last year.

The Balanced Budget Act's reduction in Medicare reimbursement will only exacerbate this problem. Therefore, liquidity is being constrained. Going forward, management needs to continue to focus its attention on controlling these operating expenses while endeavoring to maintain and improve operating volume.

| Policy Exceptions | | N/A |
|---|---|---|

| Credit Concessions | | N/A |
|---|---|---|

| Pricing | 1) | Letter of credit fee: 55 b.p. per annum. |
|---|---|---|

If Moody's downgrades AGH to an A3, the L/C fee will be adjusted to 65 b.p. per annum; if AGH is downgraded below an A3, the L/C fee will be adjusted again to 75 b.p. per annum.

Renewal Fee: 5 b.p.
Liquidity Draw: PNC Prime Rate
Default Rate: PNC Prime Rate + 200 b.p.

The increase in pricing is necessitated by our recognition of the change in the credit risk of the borrower. Additionally, we will experience no change in exposure, but will now have a way to reduce our exposure to AHERF.

| | 2-3) | n.a. |
|---|---|---|

| Term Summary | 1) | Maturity date: January 29, 1999. |
|---|---|---|
| | 2) | December 22, 1998. |
| | 3) | n.a. |

| Support | 1) | Pledge of gross revenues and a security interest in the assets held by the Trustee. |
|---|---|---|

4

PNC30839

2-3)     .i.a.

Guarantees

1)     N/A

2-3)     n/a.

Financial Covenants     1)     The covenant package is as follows:

**Liquidity Ratio of not less than 2.0:1.0:** (current assets + board
designated assets)/ current liabilities.
*Actual at 6/30/97: 3.77:1.0*

**Total Indebtedness to Total Capitalization of not more than   66-
2/3%.** (long-term debt)/(long-term debt + consolidated unrestricted
fund balances).
*Actual at 6/30/97: 49.03%*

**Debt Service Coverage Ratio of not less than 1.2:1.0.** (excess
revenues over expenses - gain on sale/leaseback + depreciation and
amortization + long-term interest expense)/12 month projected long-
term debt service requirement.
*Actual at 6/30/97: 2.34:1.0*

**Maintain a Consolidated Unrestricted Fund Balance of at least
$200MM.**
*Actual at 6/30/97:  $252.1MM*

**Maintain $30MM in Cash or Investments, Unencumbered and
Satisfactory to the Bank.**
*Actual at 6/30/97:  $50.3MM*

2-3)     n/a.

Management

Sherif S. Abdelhak is President & Chief Executive Officer of AHERF.

Thomas O'Brien, Chairman & Chief Executive Officer of PNC Bank,
joined the Board of Directors of AHERF during 1996.  Mr. O'Brien also
serves as the Chairman of the Allegheny University Medical Center.

David W. McConnell is the EVP and Chief Financial Officer of
AHERF.

Anthony M. Sanzo has been the President & Chief Executive Officer of
AGH since 1990.  From 1986 to 1990 he served as Chief Operating
Officer of AGH.

5

PNC30840

**Joseph D. Dionisio** has been the Senior Vice President and Chief Financial Officer of AGH since 1989. He also serves as the Chief Information Officer of AHERF. Prior to joining AGH, Mr. Dionisio spent 20 years with Price Waterhouse providing auditing and consulting services primarily to the healthcare industry.

| | | | |
|---|---|---|---|
| Source of Repayment | 1) | Primary: | Cash flow from operations and unencumbered investments. |
| | | Secondary: | Sale of hospitals. |
| | 2-3) | n/a. | |

---

**FDICIA Compliance**    N/A

---

**Environmental Risk**    Low

---

**Legal/Regulatory Risk**    Moderate. Changes in health care policies may have an effect on third party reimbursement rates and/or utilization *(see Credit Issues)*.

---

**Other Credit Facilities**    At FYE97, AHERF had a $100.0 million working capital line of credit from a consortium of banks (led by Mellon Bank, N.A.) with various interest rate options (5.99%) at 6/30/97 with a maturity date of 3/7/2000 and with a commitment fee of .2% on the total commitment amount of the line. The amount outstanding under the line was $85.0 million as of 11/97, of which most of the balance was for the benefit of the DE Valley. The most restrictive covenant requires certain AHERF obligated groups to maintain minimum liquidity ratios.

Morgan Guaranty Trust Co. provides a letter of credit in support of AGH's Series 1995B Bonds

---

**Risk Rating Rationale**    Refer to the risk rating grid attached. We are confirming AHERF's risk rating of "4," reflecting the effects of declining operating performance in the entity's obligated groups, particularly in the Delaware Valley, while the Allegheny Obligated Group entities continue to generate positive cash flows.

Refer to the risk rating grid attached. We are confirming AGH's risk rating of "3." The S&P downgrade of the Pennsylvania Higher Educational Facility Authority's health care revenue bond series 1991A, issued for AGH, to single "A" from "A+," essentially brings that rating in line with the Moody's rating of "A2," which translates to a "2" in the PNC Bank risk rating grid. Moody's put some AGH bonds on its "Watch-list" for possible downgrade, citing concern on AHERF's acquisitions of physician practices in Pittsburgh and Philadelphia, which have been costly to acquire and have run at a loss. As mentioned in the

PNC30841

credit issues section, it is recognized that there are negative market dynamics and potential negative impacts of these physician groups, should AGH be called upon to make up losses. AGH is still a clinical leader in the western Pennsylvania market and its financial condition and operating performance are continuing to remain steady or show improvement.

We are confirming the risk rating of "4" for the Allegheny University Medical Centers. The entities which were consolidated into AUMC have combined to create an adequate balance sheet and strong cash flow/coverages. Given the affiliation with AHERF management, additional comfort is provided.

We are recommending a downgrade of the risk rating to "5" for the Delaware Valley Obligated Group to more closely reflect the effects of declining operating performance for the entity. Refer to the attached Risk Rating Grid. Operating performance for the entire group continues to be increasingly negative. While improvements are being make through restructurings, much more is needed. S&P's downgrade of the Pennsylvania Higher Educational Facility Authority's health care revenue bond series 1991A, issued to AGH was mostly due to the transfer of funds from AGH to support Allegheny Integrated Health Group (AIHG). This entity lost $61.0 million for FY97, an increase over the last FYE's loss of $41.0 million. The mounting concern in the analysts' viewpoint is due to the expectation that AGH may need to continue to help fund future losses. Therefore, liquidity is being constrained

We are confirming the risk rating of "5" for the Allegheny University of the Health Sciences. AUHS's financial condition, operating performance and cash flows are acceptable considering the academic nature of its operations and its affiliation with AHERF. Refer to the attached Risk Rating Grid.

We are recommending a risk rating of "5" for the Allegheny Integrated Health Group. This risk rating reflects the operating losses experienced by the group, and the effects on the group's balance sheet. Transfers from other AHERF subsidiaries have been called upon to cover these losses. The letter of credit is cash collateralized by a certificate of deposit issued by PNC Bank, N.A., and carries a risk rating of "1."

PNC30842

**Conclusion**

PNC Bank's relationship with AHERF is long-standing and very profitable. We maintain a broad credit relationship with AHERF, and we are the system's primary cash concentration bank. Treasury management activity should generate approximately $750,000 in gross annual income. Going forward, the Health Care Banking Group will continue to pursue investment management opportunities with AHERF, as well as continue to grow the treasury management business as the system's network grows. Given AHERF's aggressive acquisition of Pittsburgh area hospitals, the relationship remains important to the Health Care Banking Group's portfolio. **The $450.0 million bond issue, which is to substantially refinance the debt on the western side of the organization, currently being considered to take place during the first quarter of 1998 at AHERF, provides PNC Bank the opportunity to reduce our exposure to a more manageable level in the near term.** As such, the Health Care Banking Group recommends the renewal of the AGH subject letter of credit as well as approval for the annual review of the entire AHERF relationship.

**Index of Attachments**

| | Page |
|---|---|
| Master Relationship Summary | 9, |
| Customer Profitability Summary | 10, |
| SVA | 11, |
| Customer Other Facilities Detail | 12-13, |
| PNC Bank Strategy & Business Prospects Matrix | 14, |
| International Bank Exposure Report/Memo | 15-21 |
| RAROC Analyses | 22-33, |
| Risk Rating Grids | 34-45, |
| Healthcare Compliance Form | 46-47, |
| Syndications Memo/Sanwa Approval Letter | 48, |
| Operational Services Exposure Form | 49-50, |
| Credit Underwriting Memorandum | 51-58, |
| Exhibits | 59-71, |
| Financial Statement Spreads | 72-95 |

*Paula A. Mammarella*

Paula A. Mammarella
Health Care Banking Group

PNC30843

# BANK MASTER RELATIONSHIP SUMMARY

### Allegheny Health, Education and Research Foundation

## HARD DIRECT

| Facility Type | Facility Number | Date Approved | Maturity | Gross Exposure | Participants Sold | Bank Net Hard Direct | Total Affiliate Net Hard Direct |
|---|---|---|---|---|---|---|---|
| Outstanding under Guid. Line | 950990-50005 | 09/16/97 | 03/31/98 | $2,870,771 | | $2,870,771 | |
| Total | | | | $2,870,771 | | $2,870,771 | |

## SOFT DIRECT

| Facility Type | Facility Number | Date Approved | Maturity | Gross Exposure | Participants Sold | Bank Net Soft Direct | Total Affiliate Net Hard Direct |
|---|---|---|---|---|---|---|---|
| Unused Guidance Line | 2950990-50005 | 09/16/97 | 03/31/98 | $629,229 | | $629,229 | |
| Total | | | | $629,229 | | $629,229 | |

## INDIRECT

| Facility Type | Facility Number | Date Approved | Maturity | Gross Exposure | Participants Sold | Bank Net Hard Direct | Total Affiliate Net Hard Direct |
|---|---|---|---|---|---|---|---|
| Total | | | | $0 | | $0 | |

## RELATED

| Facility Type | Facility Number | Date Approved | Maturity | Gross Exposure | Participants Sold | Bank Net Hard Direct | Total Affiliate Net Hard Direct |
|---|---|---|---|---|---|---|---|
| Letter of Credit (AUHS) | 9133512-90027 | 11/08/96 | 05/15/98 | $900,000 | | $900,000 | |
| Letter of Credit (AUMC) | 9713824-90118 | 05/14/97 | 01/01/98 | $1,350,000 | | $1,350,000 | (1) |
| Operational Services (AUMC) | | 04/28/97 | 12/22/98 | $1,500,000 | | $1,500,000 | |
| Security Exposure (AUMC) | | | | $1,000,000 | | $1,000,000 | |
| Security Exposure - Misc | | | | $1,100,000 | | $1,100,000 | |
| Letter of Credit (AGH) | 9128924-90027 | 10/16/91 | 10/18/98 | $150,000 | | $150,000 | |
| Letter of Credit (AGH) | 9128924-90035 | 01/29/93 | 01/29/98 | $26,288,500 | $12,881,365 | $13,407,135 | |
| Letter of Credit (AGH) | 9914239-90019 | 03/02/88 | 03/15/00 | $47,742,411 | $15,000,000 | $32,742,411 | |
| Letter of Credit (DVOG) | 9415261-90019 | 06/19/96 | 06/10/99 | $50,805,480 | $9,677,282 | $41,128,198 | |
| Letter of Credit (DVOG) | 9415261-90027 | 06/19/96 | 06/10/99 | $54,194,000 | $10,322,718 | $43,871,282 | |
| Letter of Credit (AIHG) | 9442366-90019 | 07/01/97 | 06/30/98 | $350,000 | | $350,000 | |
| Total | | | | $185,380,391 | $47,881,365 | $137,499,026 | |

## CALCULATIONS

|  | Gross | Net |
|---|---|---|
| **Bank MRE = Bank Exposure to Relationship = I + III + V + VII =** | $188,880,391 | $140,999,026 |
| **Total Net Affiliate Exposure = II + IV + VI + VIII =** | $0 | $0 |
| **PNC MRE = Bank MRE + Total Net Affiliate Exposure =** | $188,880,391 | $140,999,026 |

(1) AUMC will, in all likelihood, allow this letter of credit to expire. Exposure will roll off in the coming weeks.

9

PNC30844

PNC Financial Corp
Customer Profitability Summary

Company Name: AHERF

Prepared by: PAM
Date: 12/22/97

## Interest Earning Facilities

| Credit Facility | Facility Description | Capital Required | Average Outstandings | | Spread >Cost | | Spread ≥Prime | Proj 12 Mo Pre-Tax Income | Full Util Pre-Tax Income | Prior 12 Mo Pre-Tax Income |
|---|---|---|---|---|---|---|---|---|---|---|
| UC* | | $1,072,571 | $13,407,135 | x | 0.550% | | | $73,739 | $73,739 | |
| UC* | | $2,619,393 | $32,742,411 | x | 0.550% | | | $180,083 | $180,083 | |
| UC* | | $12,000 | $150,000 | x | 0.250% | | | $375 | $375 | |
| UC* | | $3,290,256 | $41,128,198 | x | 0.350% | | | $143,949 | $143,949 | |
| UC* | | $3,509,703 | $43,871,282 | x | 0.375% | | | $164,517 | $164,517 | |
| UC* | | $72,000 | $900,000 | x | 0.375% | | | $3,375 | $3,375 | |
| UC* | | $28,000 | $350,000 | x | 0.250% | | | $875 | $875 | |
| Guidance Line | | $229,682 | $2,870,771 | x | 1.000% | | | $28,708 | $35,000 | |
| **Total** | | **$10,833,584** | **$135,419,797** | | | | | **$595,621** | **$601,914** | **$0** |

## Fee Earning Facilities/Fees

| Credit Facility | Fee Type/ Description | Capital Required | Facility Amount | | Fee Rate | | Add'l Am't +Fees * | Proj 12 Mo Pre-Tax Income | Full Util Pre-Tax Income | Prior 12 Mo Pre-Tax Income |
|---|---|---|---|---|---|---|---|---|---|---|
| UC* | Renewal | $1,051,540 | $26,288,500 | x | 0.050% | | | $13,144 | $13,144 | |
| **Total** | | **$1,051,540** | **$26,288,500** | | | | | **$13,144** | **$13,144** | **$0** |

## Other Operational Services

| | | Proj 12 Mo. Bal. (Income) x Margin = | | | | Proj 12 Mo Pre-Tax Income | Full Util Pre-Tax Income | Prior 12 Mo Pre-Tax Income |
|---|---|---|---|---|---|---|---|---|
| Excess Collected Balances | | | x | 0.0000 | | | | |
| Time Deposit Balances | | | x | 0.0000 | | | | |
| Cash Management Fee Income | | $750,000 | x | 0.2500 | | $187,500 | $187,500 | |
| Corporate Trust Income | | | x | 0.0000 | | | | |
| Other | | | x | 0.0000 | | | | |
| **Total** | | | | | | **$187,500** | **$187,500** | **$0** |

| | | |
|---|---|---|
| Total Pre-Tax Income | $796,265 | $802,558 |
| Total Outstandings | $135,419,797 | $138,040,026 |
| Pre-Tax ROA (Total) | 0.59% | 0.59% |
| Total Capital Required | $11,885,124 | $11,935,482 |
| Pre-Tax ROC (Int. Earning Fac. Only) | 5.01% | 5.04% |
| Pre-Tax ROC (Total) | 6.70% | 6.72% |
| ROC Target-A | 0.00% | |
| Add'l Income Req'd | $0 | |
| ROC Target-B | 0.00% | |
| Add'l Income Req'd | $0 | |
| ROC Target-C | 0.00% | |
| Add'l Income Req'd | 0 | |

Comments:

PNC30845

10

Calculation of Return on SVA Capital

AHERF

### SVA CAPTURING TREASURY MANAGEMENT AND CORPORATE FINANCE INCOME

| | |
|---|---|
| Average DHE for past 12 months (from concentration of credit report) | 137,499,026 |
| Average SVA equity capital (Avg. DHE *.027) | $3,712,474 |
| | |
| FROM CRISP: | |
| Net Interest Margin | 608,765 |
| Gross Treasury Management Income | 750,000 |
| Gross Corporate Finance Income | 0 |
| Pre-overhead, pre-tax income on relationship | $1,358,765 |
| | |
| Net income on relationship (pre-oh, pre-tax income *.3457) | $469,725 |
| | |
| Return on SVA Capital | 12.65% |

### SVA CAPTURING ALL GROSS SERVICE INCOME

| | |
|---|---|
| Average DHE for past 12 months (from concentration of credit report) | 137,499,026 |
| Average SVA equity capital (Avg. DHE *.027) | $3,712,474 |
| | |
| FROM CRISP: | |
| Net Interest Margin | 608,765 |
| Gross Treasury Management Income | 750,000 |
| Gross Corporate Finance Income | 0 |
| Gross PNC Securities/ILMG | 0 |
| Gross Ret. & Investment Service Trust | 0 |
| OTHER - NOT CAPTURED ON CRISP: | |
| Gross C+I Trust Income | 0 |
| Gross Corporate Trust Income | 0 |
| Gross Employee Benefits Income | 0 |
| Gross BlackRock Income | 0 |
| Gross Delaware Holding Company Income | 0 |
| Other | 0 |
| Pre-overhead, pre-tax income on relationship | $1,358,765 |
| | |
| Net income on relationship (pre-oh, pre-tax income *.3457) | $469,725 |
| | |
| Return on SVA Capital | 12.65% |

| | |
|---|---|
| SVA with Credit Facility only | 5.67% |
| SVA with Credit Facility & Treasury Management | 12.65% |
| SVA with Credit Facility, Treasury Mgmt & Black Rock | 12.65% |
| SVA with Credit Facility, Treasury Mgmt, Black Rock & DE Holding Co. | 12.65% |

PNC30846

aherfsva.WK4

01/05/98

## Customer Other Facilities Detail

| Borrower: | 1) | Allegheny General Hospital |
|---|---|---|
| | 2) | Allegheny General Hospital |
| | 3) | AHERF - Delaware Valley Obligated Group |
| | 4) | AHERF - Delaware Valley Obligated Group |
| | 5) | Allegheny University Medical Centers |
| | 6) | AHERF - Delaware Valley Obligated Group: Allegheny University of the Health Sciences |
| | 7) | Allegheny Integrated Health Group |

| Type: | 1) | Letter of Credit *(#9914239-90019)* |
|---|---|---|
| | 2) | Letter of Credit *(#9128924-90027)* |
| | 3) | Letter of Credit *(#9415261-90019)* |
| | 4) | Letter of Credit *(#9415261-90027)* |
| | 5) | Letter of Credit *(#9713824-90118)* |
| | 6) | Letter of Credit *(#9133512-90027)* |
| | 7) | Letter of Credit *(#9442366-90019)* |

| Amount: | 1) | $47,742,411 ($15,000,000 participation sold); $32,742,411 net |
|---|---|---|
| | 2) | $150,000 |
| | 3) | $50,805,480 ($9,677,282 participated sold); $41,128,198 net |
| | 4) | $54,194,000 ($10,322,718 participated sold); $43,871,282 net |
| | 5) | $1,350,000 |
| | 6) | $900,000 |
| | 7) | $350,000 |

| Term and Amortization: | 1) | 3/15/00 |
|---|---|---|
| | 2) | 10/18/98 |
| | 3&4) | 6/10/99 |
| | 5) | 1/1/98 |
| | 6) | 5/15/98 |
| | 7) | 6/30/98 |

| Rate: | 1) | 55 basis points |
|---|---|---|
| | 2) | 25 basis points |
| | 3&4) | 35 basis points |
| | 5) | 37.5 basis points |
| | 6) | 37.5 basis points |
| | 7) | 25 basis points |

| Purpose: | 1) | Supports the hospital's Series 1988 bonds. |
|---|---|---|
| | 2) | AGH must maintain this letter of credit as an indication of financial responsibility to the U.S. Nuclear Regulatory Commission. The amount of the L/C is based upon AGH's relative share of radioactive wastes disposed of to a particular waste facility. |
| | 3) | Provides liquidity and credit enhancement in support of AHERF's Series 1996D bonds. |
| | 4) | Provides liquidity and credit enhancement in support of AHERF's 1996 Commercial Paper Notes. |
| | 5) | Insurance-related letters of credit. |
| | 6) | AGH must maintain this letter of credit as an indication of financial responsibility to the U.S. Nuclear Regulatory Commission. |
| | 7) | Enhancement of AIHG's obligations under a property lease. |

| Guarantors: | 1 - 7) | None |
|---|---|---|

| Covenants: | 1) | Liquidity ratio, total indebtedness/total capitalization, debt service coverage, maintenance of consolidated unrestricted fund balances, maintenance of cash or investments at certain levels. |
|---|---|---|
| | 2) | None. |
| | 3&4) | Minimum liquidity ratio, restrictions on additional long term debt, short term debt and transfer of assets. |
| | 5) | None. |
| | 6) | None. |
| | 7) | None. |

PNC30847

12

| Collateral: | 1) | Pledge . .gross revenues and a security interest in the assets he. .oy the Trustee. |
|---|---|---|
| | 2) | Unsecured. |
| | 3&4) | Pledge of gross revenues and a security interest in the assets held by the Trustee and Depository. |
| | 5) | Unsecured. |
| | 6) | Unsecured. |
| | 7) | Secured fully with a certificate of deposit on account with PNC Bank, N.A. |

| Source of Repayment: | 1, 2) | Primary: Cash from operations |
|---|---|---|
| | | Secondary: Sale of Hospitals. |
| | 3, 4) | Primary:  Cash from operations. |
| | | Secondary:  Liquidation of AHERF Delaware Valley Obligated Group investments. |
| | 5-7) | Primary:  Cash from operations. |
| | | Secondary:  Liquidation of Board Designated Funds. |

**Total Direct Hard Exposure:**          $133,899,026

PNC30848

AHERF
STRATEGY MATRIX & BUSINESS PROSPECTS

| Division | Opportunity | Time Table | Income Associated | Likelihood |
|----------|-------------|------------|-------------------|------------|
| Treasury Management | Cash Concentration for acquired hospitals | Next 12-18 months | Unknown. | Moderate |
| PNC Capital Markets | Asset Securitization | Next 12 months | Unknown | Moderate |
| PNC Asset Management | Trustee | Next 12 months | Unknown | Moderate |
| PNC Capital Markets | Bond Refinancing | Unknown | Unknown | Moderate |

Strategic Discussion:

PNC Bank maintains a broad credit relationship with AHERF, and we are the system's primary cash concentration bank. Going forward, the Health Care Group will pursue investment management opportunities with AHERF, as well as incremental treasury management business as the system continues to grow throughout Pennsylvania.

As AHERF continues to acquire other health care institutions in Pennsylvania, bond refinancing opportunities may present themselves where AHERF is a stronger credit than the merged institution. PNC Capital Markets has provided its services to AHERF in the past and will pursue such opportunities in the future.

Given AHERF's continued expansion in the state of Pennsylvania, this relationship represents a large share of the PNC Bank Health Care Portfolio. While the Health Care Group is comfortable with AHERF exposure, we would like to reach a DHE level of approximately $80.0 to $90.0 million within the first half of 1998. In the first quarter of 1998, AHERF contemplates refinancing all debt on the western side of the organization. Of our exposure, this should include the $26,288,500 letter of credit (L/C) to AGH ($13,407,135 net of the participated amount), the $47,742,411 L/C to AGH ($32,742,411 net), the $150,000 L/C to AGH and the $1,350,000 L/C to AUMC (it is expected that this L/C will be permitted to expire per the customer.) The total of these amounts is $47,649,546. This effects the opportunity for PNC Bank to reduce our exposure to AHERF to a more manageable level. With our total DHE currently at $136,769,797, should we elect not to participate in the new facility, our total DHE would be reduced to $85,120,250. If the $1,350,000 L/C to AUMC expires as expected, our DHE would then be $87,770,251.

The then remaining exposure would be to the entities in the Delaware Valley Obligated Group (DVOG). Given the level of credit risk involved with the DVOG (see the Risk Rating Rationale and the Risk Rating Grid), we will pursue further reducing our exposure during 1998, creating the capacity to possibly take additional exposure on the western side of the AHERF organization.

PNC30849

14

DEC-01-1997 15:24    PNC FINANCIAL INSTITUTION         412 766 4404   P.01/02

# PNC BANK, N.A.
## FAX TRANSMITTAL FORM

DATE:      December 1, 1997

TO:      Paula Mammarella

COMPANY:      PNC, Pitt.

FAX #      8-5149

NO. OF PAGES:      2      (including this cover sheet)

FROM:      Friedrich G. Mayer
.. Vice President & Manager
PNC Bank, N.A.
Pittsburgh, PA   U.S.A.
DEPT:      International Correspondent Banking
PHONE #:      412-762-2545
FAX #:      412-762-5022



### MESSAGE:      Re: Allegheny General Hospital

We have risk participated out $13.18million in subject loan to Sanwa Bank Ltd., Tokyo. I hereby approve this renewed exposure. The attached one page IBCA report is to be included in your loan approval document.

Regards,

Friedrich G. Mayer
Vice President & Manager
International Correspondent Banking

PNC30850

15

# JAPAN
## SANWA BANK



| RATINGS | (October 1997) | | | Short-term | Long-term | Individual | Legal |
|---------|----------------|---|---|------------|-----------|------------|-------|
| Sanwa Bank | | | | A1+ | AA- | C | 1 |

| SANWA BANK LIMITED (C.) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Assets USD mln | Total Assets JPY bln | Equity JPY bln | Net Income JPY bln | ROA (av.) % | ROE (av.) % | Equity/Assets % | Tier 1 ratio % |
| 31/03/97 | 427,265.9 | 53,023.7 | 1,880.8 | 26.7 | 0.05 | 1.42 | 3.55 | 4.55 |
| 31/03/96 | 500,712.7 | 53,250.8 | 1,875.7 | -124.0 | -0.23 | -6.35 | 3.53 | 4.56 |

Analysts: Reiko Toritani, Koyo Ozeki, David Marshall

**Background:** The Sanwa Bank, Limited (Sanwa), one of the largest banks in the world in terms of assets, is the product of the merger in 1933 of three retail banks in the Osaka (Kansai) region. Its head office is in Osaka but it has increased its representation in the Tokyo area. It has a network exceeding 360 branches and 720 unmanned offices (ATMs); the latter is the largest number among the Japanese banks. Although it is not one of the pre-war zaibatsu (industrial concern) banks, Sanwa is now at the centre of industrial and financial groups that include some of Japan's leading corporations. It has a wholly-owned securities subsidiary and trust banking subsidiary in Japan. Overseas, in addition to the major presence in the USA through Sanwa Bank California and Sanwa Securities (USA) Co., L.P., a US primary dealer, the bank has an extensive network in South-East Asia.

**Support/Legal:** Although it is not guaranteed by the Japanese state, Sanwa is of such importance, both internationally and domestically, that support from the state would, in our view, be forthcoming, should it ever be necessary.

**Assessment:** Although their asset quality began to deteriorate in the early 1990s, it was only in 1995/96 that most Japanese banks stepped up their efforts to build up an adequate level of loan loss reserves. For the six years to end-March 1997, Sanwa reported loan loss charges exceeding JPY2,000 bln, nearly half of which was reported in 1995/96. Sanwa initially appeared to have fared better than its peers in the asset quality debacle but its loan losses have proved to be similar and by March 1997 its published net problem loans were in line with those of other large city banks. At the same date, these stood at 2.3% of total loans. Sanwa's specific reserves covered 55% of non-performing and restructured loans. Financial assistance for its non-bank affiliates has progressed but the bank's loans to its own troubled non-bank affiliates are still relatively large, and will give rise to further loan losses in the future. Its aggregate loan loss charges during the past six years have been a little more than its gyomu-juneki (i.e. pre-provision operating profit) for the same period. This situation is less severe in comparison with most other city banks, thanks to its somewhat stronger operating profitability, which arises from above average interest margins (despite a conservative interest rate gapping policy) and below average overhead expenses. As a result, Sanwa has relied less heavily on equity capital gains by realising hidden reserves than most of its peer banks, except in 1996/97, when it again reported large loan loss charges. During that year, its stock market exposure increased because of the sale and buy-back of equities, but the degree of its exposure remains somewhat lower than that of other major Japanese banks. For 1997/98, the bank projects a small increase in gyomu-juneki while, at the same time, it again projects sizeable loan loss charges, of about JPY300 bln, which would bring its reserve coverage ratio to near 70%. However, we believe that Sanwa may make larger provisions following a more critical review of its loan portfolio as required by the MOF's new "Prompt Corrective Action" policy starting in April 1998. As a result, the bank might again report a net loss. We had previously expected a quicker recovery in the Japanese economy and a more rapid return to financial health by Sanwa and its peer banks, yet, on the contrary, the fundamentals of the economy still do not appear promising. Sanwa is and in our view will remain one of the major players in the Japanese banking system but its financial profile has been weakened by the ongoing downturn in Japan. We have lowered our Long-term rating of Sanwa to AA-; our other ratings are unchanged.

PNC30851

16

TOTAL P.02