Contribution Agreement by which it agrees to be obligated to make payments to AGH in amounts sufficient to enable AGH to make payments on all Notes and Guaranties issued under the Master Indenture, each Restricted Affiliate agrees to be bound by the covenants and restrictions set forth in the Master Indenture and to grant to AGH a security interest in its Gross Revenues as security for its payment obligations under the Contribution Agreement. AGH has assigned its interest in and to such Contribution Agreements, including its security interest in the Gross Revenues and other property of each Restricted Affiliate, to the Master Trustee for the equal and ratable benefit of the holders of Notes and Guaranties outstanding thereunder, including the Bond Trustee as the holder of the Series 1991 Note. For a more complete description of the terms and provisions of the Master Indenture and the requirements of each Contribution Agreement, see Appendix D -- "SUMMARY OF THE MASTER TRUST INDENTURE AND CERTAIN PROPOSED AMENDMENTS TO THE MASTER TRUST INDENTURE: Summary of Contribution Agreements."

In connection with the issuance by the Insurer of its insurance policy with respect to the Insured Term Bonds, as described herein under "MUNICIPAL BOND INSURANCE POLICY," the Hospital has entered into a separate agreement with the Insurer providing for certain additional financial covenants and restrictions for the benefit of the Insurer. The breach by the Hospital of these covenants or agreements would constitute an Event of Default under the Loan Agreement, which could result in the acceleration of the Bonds and the Series 1991 Note.

AGH has previously issued its Series 1983A Note dated as of December 1, 1983 (the "Series 1983 Note") in the aggregate principal amount of $65,870,000, its Series 1988A Note dated as of February 24, 1988 (the "Series 1988A Note") in the aggregate principal amount of $60,000,000, and its Series 1988B Note dated as of February 1, 1988 (the "1988 Bank Note" and, together with the Series 1988A Note, the "Series 1988 Notes") in the aggregate principal amount not to exceed $61,208,220. The Series 1983 Note and the Series 1988 Notes were issued under and, together with the Series 1991 Note, are equally and ratably secured by the Master Indenture. The Series 1983 Note was issued to evidence AGH's payment obligations with respect to the $65,870,000 aggregate principal amount of Hospital Revenue Bonds (Allegheny Health, Education and Research Corporation), Series of 1983 (the "1983 Bonds") of the Allegheny County Hospital Development Authority (the "Allegheny County Authority"). The Series 1988A Note was issued to evidence AGH's payment obligations with respect to the $60,000,000 aggregate principal amount of Hospital Revenue Bonds (Allegheny Health, Education and Research Corporation) Series 1988A through Series 1988D (the "1988 Bonds") of the

- 12 -

MBIA          010775

Allegheny County Authority.  The 1988 Bank Note was issued to evidence AGH's reimbursement obligations in connection with a bank letter of credit which further secures payment of the 1988 Bonds.  The 1983 Bonds and the 1988 Bonds are issued under and secured, separately from the Bonds, under separate bond indentures between the Allegheny County Authority and Mellon Bank, N.A., as trustee.

In connection with the issuance by the Allegheny County Authority of the 1983 Bonds and the 1988 Bonds, AGH has leased to the Allegheny County Authority, pursuant to separate Leases (the "Prior Leases") dated as of December 1, 1983 and February 1, 1988, respectively, between AGH, as lessor, and the Allegheny County Authority, as lessee, certain premises comprising substantially all of the hospital facilities owned and operated by AGH and ANI.  In connection therewith, pursuant to separate Sublease Agreements (the "Prior Subleases") dated as of December 1, 1983 and February 1, 1988, respectively, between the Allegheny County Authority, as sublessor and AGH, as sublessee, AGH has subleased these same facilities from the Allegheny County Authority in return for rental payments to be paid to the Allegheny County Authority in amounts sufficient to pay the principal of and interest on the 1983 Bonds and the 1988 Bonds (which amounts would be offset by amounts paid under the Series 1983A Note and the Series 1988A Note).  In the event of a default by AGH under the Prior Subleases which results in the acceleration of the 1983 Bonds and the 1988 Bonds, the Allegheny County Authority would be entitled under the Prior Subleases to terminate the Prior Subleases, and to take over the operation of or to take redelivery and possession of the facilities subject thereto for the remaining term of the Prior Leases, which may be extended until all of the 1983 Bonds and the 1988 Bonds have been paid in full.  Upon such termination, the Allegheny County Authority would be entitled to the exclusive right to charge and collect the revenues therefrom and apply the proceeds thereof exclusively to the payment of the 1983 Bonds and the 1988 Bonds.  In the event of such default and repossession, revenues derived by the Allegheny County Authority from such facilities would not be available for payment of the principal of and interest on the Bonds.

Upon compliance with certain procedures set forth in the Bond Indenture, the Authority may issue Additional Bonds under the Bond Indenture for the benefit of AGH, which Additional Bonds would be equally and ratably secured, together with the Bonds, by the Bond Indenture (except with respect to any special fund which might be established under the Bond Indenture for any series of Additional Bonds, as, for example, any separate debt service reserve fund which might be established in the future solely for the benefit of the registered owners of a particular series of Additional Bonds).

- 13 -

MBIA    010776

See Appendix C – "SUMMARY OF CERTAIN PROVISIONS OF THE BOND INDENTURE AND THE LOAN AGREEMENT:  The Bond Indenture - Additional Bonds."  AGH is also permitted to issue additional Notes and Guaranties under the Master Indenture or to incur Additional Indebtedness upon compliance with the terms and conditions thereof.  See Appendix D – "SUMMARY OF THE MASTER TRUST INDENTURE AND CERTAIN PROPOSED AMENDMENTS TO THE MASTER TRUST INDENTURE: Summary of the Master Indenture - Limitations on Additional Indebtedness."  Notes and Guaranties which may be issued in the future under the Master Indenture, to the extent permitted thereby, would be secured thereunder equally and ratably with the Series 1983 Note, the Series 1988 Notes and the Series 1991 Note, including with respect to the security interest granted thereunder and under the Contribution Agreements in the Gross Revenues of AGH and the Restricted Affiliates respectively.

The Bond Indenture provides that the Authority may in the future establish separate debt service reserve funds solely for the benefit of the holders of Additional Bonds issued under the Bond Indenture for which such funds may be established.  No debt service reserve fund has been established for the benefit of the owners of the Bonds and the owners of the Bonds will have no right to the benefits of any debt service reserve fund which may be established in the future in connection with the issuance of Additional Bonds under the Bond Indenture.  However, the Bond Indenture provides that, in the event that the Hospital fails to comply with certain financial covenants in the future, the Hospital would be required to deposit cash or a Reserve Fund Credit Facility in an amount equal to the maximum annual debt service on the Bonds into a debt service reserve fund established under the Bond Indenture solely for the benefit of the owners of the Bonds.  See Appendix C – "DEFINITIONS OF CERTAIN TERMS AND SUMMARY OF CERTAIN PROVISIONS OF THE BOND INDENTURE AND THE LOAN AGREEMENT: The Bond Indenture – Debt Service Reserve Fund."

The Second Supplemental Master Trust Indenture dated as of February 1, 1988 proposed certain significant amendments to the Master Indenture.  The amendments to the Master Indenture will materially increase the ability of the Restricted Group to incur additional indebtedness, grant security interests in its assets and transfer assets.  In addition, the proposed amendments to the Master Indenture will limit the security interest of the Master Trustee to the "Unrestricted Receivables" of AGH and each Restricted Affiliate (generally including all accounts, assignable general intangibles, contract rights and all proceeds thereof), rather than the Gross Revenues and other property of AGH and the Restricted Affiliates currently pledged as security to the Master Trustee.  Except as described below,

- 14 -

MBIA        010777

these proposed amendments cannot become effective without the consent of the holders of 100% of the Outstanding Notes issued under the Master Indenture, including the holders of the Series 1983 Note, the Series 1988 Notes and the Series 1991 Note (being the trustees for the 1983 Bonds and the 1988 Bonds and the Bond Trustee, respectively). Each purchaser of a Bond by his acceptance of such Bond, and the Bond Trustee, by its acceptance of the Series 1991 Note, will be deemed to have consented to the revisions, as described in Appendix D hereto and as set forth specifically in the Second Supplemental Master Indenture and the Restated Master Indenture. The owners of the 1988 Bonds and the trustee for the 1988 Bonds, as the holder of the Series 1988A Note, and the holder of the 1988 Bank Note have similarly been deemed to have given their consent to such amendments. The trustee for the 1983 Bonds, as holder of the Series 1983 Note, has advised AGH that it will not consent to amendments until it has obtained the consent of the owners of 100% of the 1983 Bonds. Accordingly, all of the amendments effected by the Second Supplemental Master Trust Indenture will become effective upon the earlier to occur of the receipt of the consent of the owners of 100% of the outstanding 1983 Bonds or the payment in full of amounts due under the 1983 Bonds and the Series 1983 Note. There can be no assurance as to whether or when these amendments will become effective. However, in the event the consent of the holders of the 1983 Bonds is obtained or the 1983 Bonds and the Series 1983 Note are paid in full, the amendments to the Master Indenture set forth in the Second Supplemental Master Trust Indenture will become effective without further consent of, or notice to, the registered owners of the Bonds.

Notwithstanding the foregoing, certain of the amendments proposed in the Second Supplemental Master Indenture may become effective upon the consent of the holders of at least 60% in aggregate principal amount of outstanding Notes and Guaranties. Upon the issuance of the Bonds and the Series 1991 Note, the holders of more than 60% in aggregate principal amount of Notes and Guaranties will have consented to such amendments. AGH may then determine to implement those amendments which do not require the consent of the holders of all of the outstanding Notes and Guaranties.

For more detailed discussion of the amendments proposed by the Second Supplemental Master Indenture, see Appendix D - "SUMMARY OF THE MASTER TRUST INDENTURE AND CERTAIN PROPOSED AMENDMENTS TO THE MASTER TRUST INDENTURE: Summary of Certain Proposed Amendments to the Master Trust Indenture."

MBIA     010778

MUNICIPAL BOND INSURANCE POLICY

The following information has been furnished by Municipal Bond Investors Assurance Corporation (the "Insurer") for use in this Official Statement. Reference is made to Appendix F for a specimen of the Insurer's policy.

The Insurer's policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, those Bonds maturing September 1, 2011 and September 1, 2014 (the "Insured Term Bonds") (and no other Bonds), in each case, as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Insurer's policy shall be made in such amounts and at such time as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of any Insured Term Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy laws (a "Preference").

The Insurer's policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Insured Term Bond. The Insurer's policy does not, under any circumstances, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of Insured Term Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The Insurer's policy also does not insure against nonpayment of principal of or interest on the Insured Term Bonds resulting from the insolvency, negligence or any other act or omission of the Trustee or any other paying agent for the Insured Term Bonds. In addition, the Insurer's policy does not insure against the failure of DTC, any DTC Participant or any Indirect Participant to make payments to the beneficial owners of the Insured Term Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or

- 16 -

certified mail, or upon receipt of written notice by
registered or certified mail, by the Insurer or its designee
from the Trustee or any owner of an Insured Term Bond the
payment of an insured amount for which is then due, that such
required payment has not been made, the Insurer on the due
date of such payment or within one business day after receipt
of notice of such nonpayment, whichever is later, will make a
deposit of funds, in an account with Citibank, N.A., in New
York, or its successor, sufficient for the payment of any such
insured amounts which are then due.  Upon presentment and
surrender of such Insured Term Bonds or presentment of such
other proof of ownership of the Insured Term Bonds, together
with any appropriate instruments of assignment to evidence the
assignment of the insured amounts due on the Insured Term
Bonds as are paid by the Insurer, and appropriate instruments
to effect the appointment of the Insurer as agent for such
owners of the Insured Term Bonds in any legal proceeding
relating to payment of insured amounts on the Insured Term
Bonds, such instruments being in a form satisfactory to
Citibank, N.A., Citibank, N.A. shall disburse to such owners
of the Trustee payment of the insured amounts due on such
Insured Term Bonds, less any amount held by the Trustee for
the payment of such insured amounts and legally available
therefor.

The Insurer is the principal operating subsidiary of
MBIA Inc.  The principal shareholders of MBIA Inc. are Aetna
Life and Casualty Company, Fireman's Fund Insurance Company,
subsidiaries of CIGNA Corporation, The Continental Insurance
Company and one of its affiliates, and Credit Local de France,
CAECL S.A., and they own approximately 85% of the outstanding
common stock of MBIA Inc.  Neither MBIA Inc. nor its
shareholders are obligated to pay the debts of or claims
against the Insurer.  The Insurer is a limited liability
corporation rather than a several liability association.  The
Insurer is domiciled in the State of New York and licensed to
do business in all 50 states, the District of Columbia and the
Commonwealth of Puerto Rico.

Effective December 31, 1989, MBIA Inc. acquired Bond
Investors Group, Inc.  On January 5, 1990, the Insurer
acquired all of the outstanding stock of Bond Investors Group,
Inc., the parent of Bond Investors Guaranty Insurance Company
(BIG).  Through a reinsurance agreement, BIG has ceded all of
its net insured risks, as well as its unearned premium and
contingency reserves, to the Insurer and the Insurer has
reinsured BIG's net outstanding exposure.

As of December 31, 1989 the Insurer had admitted
assets of $1.299 billion (audited), total liabilities of $907
million (audited), and total capital and surplus of $392
million (audited) prepared in accordance with statutory

- 17 -

MBIA      010780

accounting practices prescribed or permitted by insurance regulatory authorities. As of September 30, 1990, after giving effect to the acquisition of BIG, the Insurer had admitted assets of $1.747 billion (unaudited), total liabilities of $1.184 billion (unaudited), and total capital and surplus of $563 million (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. Copies of the Insurer's financial statements prepared in accordance with statutory accounting practices are available from the Insurer. The address of the Insurer is 113 King Street, Armonk, New York, 10504.

Moody's Investors Service rates all bond issues insured by the Insurer and BIG "Aaa" and short term loans "MIG 1", both designated to be of the highest quality.

Standard & Poor's Corporation rates all new issues insured by the Insurer and BIG "AAA" Prime Grade.

The Moody's Investors Service rating of the Insurer should be evaluated independently of the Standard & Poor's Corporation rating of the Insurer. No application has been made to any other rating agency in order to obtain additional ratings on the Insured Term Bonds. The ratings reflect the respective rating agency's current assessment of the creditworthiness of the Insurer and its ability to pay claim on its policies and insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Insured Term Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of either or both ratings may have an adverse effect on the market price of the Insured Term Bonds.

## THE PROJECT

The Project to be financed with the proceeds of the Bonds consists of (i) reimbursement to AGH for recent expenditures for the acquisition of capital equipment and the renovation of certain facilities of AGH, (ii) payment of the costs of additional equipment acquisitions and renovations of additional facilities in the current fiscal year and construction of the Continuing Care Center, and (iii) payment of a portion of the costs of issuing the Bonds.

MBIA          010781

## ESTIMATED SOURCES AND USES OF FUNDS

The following table sets forth the estimated sources and uses of funds in connection with Project:

Sources of Funds:

| | |
|---|---|
| Principal Amount of the Bonds................. | $60,000,000 |
| Accrued Interest.............................. | 150,396 |
| Total Sources of Funds........................ | $60,150,396 |

Uses of Funds:

| | |
|---|---|
| Reimbursement for Capital Expenditures........ | $47,134,546 |
| Deposit to Construction Fund.................. | 10,399,759 |
| Accrued Interest.............................. | 150,396 |
| Original Issue Discount....................... | 969,695 |
| Costs of Issuance[1].......................... | 1,496,000 |
| Total Uses of Funds........................... | $60,150,396 |

---

(1) Includes underwriters' discount, bond insurance premium and, to the extent paid from Bond proceeds, fees and expenses of the Bond Trustee, Master Trustee and Authority, and legal, printing and other expenses.

- 19 -

BOND DEBT SERVICE REQUIREMENTS

The following table sets forth, for each fiscal year, the amounts required for the total debt service due with respect to the Bonds, the 1983 Bonds and the 1988 Bonds. For purposes of such table, debt service on the 1988 Bonds, which currently bear interest at a variable rate, has been calculated based upon an assumed interest rate of 6.18% (including fixed fees for remarketing and liquidity support), the average rate applicable to the 1988 Bonds for the period from the date of issuance thereof through October 31, 1990. Such table sets forth the actual debt service requirements for the 1983 Bonds.

| Year | Bonds | 1983 Bonds | 1988 Bonds | Total Debt Service |
|------|-------|-----------|-----------|----------|
| 1991 | $ 2,776,542 | $ 7,453,430 | $ 4,475,130 | $ 14,705,102 |
| 1992 | 5,094,813 | 7,454,070 | 4,516,420 | 17,065,303 |
| 1993 | 5,091,803 | 7,456,513 | 4,454,620 | 17,002,935 |
| 1994 | 5,094,963 | 7,454,115 | 4,489,730 | 17,038,808 |
| 1995 | 5,093,603 | 7,455,428 | 4,421,750 | 16,970,780 |
| 1996 | 5,092,603 | 7,459,028 | 4,450,680 | 17,002,310 |
| 1997 | 5,090,955 | 7,454,338 | 4,473,430 | 17,018,723 |
| 1998 | 5,093,150 | 7,450,888 | 4,393,090 | 16,937,128 |
| 1999 | 5,093,990 | 7,454,725 | 4,409,660 | 16,958,375 |
| 2000 | 5,092,990 | 7,455,450 | 4,420,050 | 16,968,490 |
| 2001 | 5,094,650 | 7,451,488 | 4,424,260 | 16,970,398 |
| 2002 | 5,091,363 | 7,458,422 | 4,422,290 | 16,972,074 |
| 2003 | 5,090,238 | 7,454,484 | 4,414,140 | 16,958,862 |
| 2004 | 5,094,563 | 7,457,922 | 4,302,900 | 16,851,384 |
| 2005 | 5,091,625 | 7,455,547 | 4,288,570 | 16,835,742 |
| 2006 | 5,092,713 | 7,454,172 | 4,364,970 | 16,911,854 |
| 2007 | 5,093,113 | 7,455,344 | 4,332,100 | 16,880,556 |
| 2008 | 5,092,113 | 7,454,281 | 4,293,050 | 16,839,444 |
| 2009 | 5,092,213 | 7,457,000 | 4,247,820 | 16,797,033 |
| 2010 | 5,094,713 | 7,452,922 | 4,293,320 | 16,840,954 |
| 2011 | 5,093,563 | 7,457,000 | 4,229,550 | 16,780,113 |
| 2012 | 5,093,063 | 7,452,594 | 4,159,600 | 16,705,256 |
| 2013 | 5,092,163 | 3,728,063 | 4,180,380 | 13,000,605 |
| 2014 | 5,094,813 | -- | 4,188,800 | 9,283,613 |
| 2015 | 5,094,613 | -- | 4,087,950 | 9,182,563 |
| 2016 | 5,090,188 | -- | 4,077,830 | 9,168,018 |
| 2017 | 5,094,375 | -- | 4,055,350 | 9,149,725 |
| 2018 | -- | -- | 4,020,510 | 4,020,510 |
| Total | $135,191,484 | $167,737,224 | $120,887,950 | $423,816,654 |

MBIA    010783

## THE RESTRICTED GROUP

AGH owns and operates an acute care hospital located in Pittsburgh, Pennsylvania licensed for 746 beds, all of which are currently staffed, providing tertiary care hospital services to inhabitants of Western Pennsylvania and nearby areas of other states. AGH is also the Pittsburgh campus of The Medical College of Pennsylvania, the main campus of which is located in Philadelphia, Pennsylvania. ANI owns a psychiatric hospital located in Oakdale, Pennsylvania, operated by AGH, which is licensed for 94 beds, of which 55 are currently staffed, and which treats patients with dual diagnoses of neurological disorder coupled with psychiatric complications. ASRI, located at AGH, performs clinical and non-clinical research.

The sole corporate member of AGH is Allegheny Health Services, Inc. ("AHS"). AHS and AGH are the only members of ASRI and ANI. Other entities affiliated with AHS are described in APPENDIX A - "ALLEGHENY GENERAL HOSPITAL AND THE RESTRICTED GROUP." Neither AHS nor any of its affiliated corporations, other than AGH, ASRI and ANI, are members of the Restricted Group.

ASRI and ANI have each executed a Contribution Agreement with AGH in accordance with the provisions of the Master Indenture pursuant to which each has agreed to make payments (by loan, contribution or otherwise) to AGH sufficient to enable AGH to meet its payment obligations with respect to Notes and Guaranties issued under the Master Indenture and, accordingly, each is obligated as a Restricted Affiliate under the Master Indenture.

Effective January 11, 1991, AHS has entered into a proposed affiliation with United Hospitals, Inc. See Appendix A - "ALLEGHENY GENERAL HOSPITAL AND THE RESTRICTED GROUP: Management's Discussion and Analysis - Proposed Affiliation."

More complete information with respect to the Restricted Group is set forth in Appendix A - "ALLEGHENY GENERAL HOSPITAL AND THE RESTRICTED GROUP."

## THE AUTHORITY

The Authority is a body corporate and politic, constituting a public corporation and a governmental instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth"), created by the Pennsylvania Higher Educational Facilities Authority Act of 1967 (Act No. 318 of the General Assembly of the Commonwealth of Pennsylvania,

- 21 -

MBIA      010784

approved December 6, 1967, as amended) (the "Act").

The Authority is authorized under the Act, among other things, to acquire, construct, finance, improve, hold and use any property and any educational facility (as therein defined) and, with respect to a college, to finance projects by making loans, to lease as lessor or lessee, to transfer or sell any educational facility or property, to charge and collect amounts for the payment of expenses of the Authority and for payment of the principal of and interest on its obligations, to issue bonds and other obligations for the purpose of paying the cost of projects, to issue refunding bonds and to pledge all or any of the revenues of the Authority for all or any of such obligations, and to enter into trust indentures providing for the issuance of such obligations and for their payment and security.

Under the Act, the Authority consists of the Governor of the Commonwealth, the State Treasurer, the Auditor General, the Secretary of the Department of Education, the Secretary of the Department of General Services, the President Pro Tempore of the Senate, the Speaker of the House of Representatives, the Minority Leader of the House of Representatives and the Minority Leader of the Senate. The members of the Authority serve without compensation but are entitled to reimbursement for all necessary expenses incurred in connection with the performance of their duties as members.

As of December 13, 1990, the Authority had $1,670,015,414 in aggregate principal amount of revenue bonds and notes outstanding.

None of the revenues of the Authority with respect to any of the revenue bonds and notes referred to above are pledged as security for any of the Bonds, and conversely, the revenue bonds and notes referred to above are not payable from or secured by the revenues of the Authority or other moneys securing any of the Bonds.

Educational facility building projects undertaken by the Authority are designed by architects retained by the institutions for whom it provides financing. The Authority has the right to review all plans and specifications for the projects, inspect such projects during and after the construction period, and offer services in connection with the furnishing and equipping of projects it undertakes.

The Authority has issued, and may continue to issue, other series of bonds for the purpose of financing other projects, including other educational facilities. Each such series of bonds is or will be secured by instruments separate and apart from the Indenture securing the bonds, unless such bonds are issued as Additional Bonds under the Bond Indenture.

- 22 -

MBIA          010785

Administrative Budget

The Act provides that the Authority is to obtain from the State Public School Building Authority, for a fee, those executive, fiscal and administrative services which are not available from the colleges and universities, and are required to carry out the functions of the Authority under the Act. Accordingly, the Authority and the State Public School Building Authority share an executive, fiscal and administrative staff, which currently numbers 20 people, and operate under a joint administrative budget.

## BONDHOLDERS' RISKS

General

The Bonds are limited obligations of the Authority. They are secured by and payable solely from funds payable to the Authority by AGH under the terms and conditions of the Loan Agreement and funds payable by AGH under the Series 1991 Note and from certain funds held by the Bond Trustee pursuant to the Bond Indenture. There is no representation or assurance that AGH will generate sufficient revenues to meet its repayment obligations under the Loan Agreement or the Series 1991 Note. Future legislation, regulatory actions, economic conditions, demand for services, competition and other factors could adversely affect AGH's ability to pay its obligations under the Loan Agreement and the Series 1991 Note and, consequently, payment of principal of and interest on the Bonds.

Legislation

A number of bills proposing to regulate, control or alter the method of financing health care costs have been discussed and certain of such bills have been introduced in Congress. There are wide variations among these bills and proposals, and the effect of these bills and proposals on the health care industry and AGH cannot be determined at this time. There are many possible financial effects which would result from enactment of any of such bills and it is not possible at this time to predict the effect on AGH's business if any of these proposals were enacted. Legislative efforts to secure further cost containment could impair the ability of AGH to realize revenues currently anticipated.

Reimbursement from Third Parties

Most of the patient service revenues of AGH are derived from third party payors which reimburse or pay AGH for the services it provides to patients covered by such third

- 23 -

MBIA    010786

MBIA    010787

parties for such services, primarily the Federal Medicare Program, the state Medical Assistance Program ("Medicaid") and Blue Cross and other third-party insurers, including health maintenance organizations and preferred provider organizations. Many of those programs, some of which are described in greater detail below, make payments to AGH at rates other than AGH's direct charges which rates may be determined other than on the basis of AGH's actual costs incurred in providing services to such patients. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover AGH's actual costs. In addition, AGH's financial performance could be adversely affected by the insolvency of, or other delay in receipt of payments from, third-party payors which provide coverage for services to AGH's patients.

Medicare Reimbursement

Approximately 43.5% of the gross patient service revenues of the Restricted Group for the fiscal year ended June 30, 1990 were derived from the Federal Health Insurance for the Aged and Disabled Program, commonly known as the Medicare Program.

Hospital Inpatient Services. Part A of the Medicare Program provides payment to AGH for inpatient services provided to Medicare beneficiaries, including nursing care, room and board, medical social services, use of hospital facilities, drugs and biologicals, supplies, appliances and equipment, physical, occupational, respiratory, and speech therapy, and other necessary services provided by hospitals. The Medicare Program pays hospitals for rendering services to hospital inpatients, other than for inpatient psychiatric care and certain other exceptions, who are Medicare beneficiaries on a prospective payment system. Under the Medicare payment system, hospital payment rates are calculated prospectively based on predetermined national rates for treating or performing various diagnoses and procedures which have been grouped into diagnosis-related groups ("DRGs") applicable to each patient discharge, rather than on the basis of a hospital's actual costs incurred in providing such care. The DRG rates are computed using base year cost data increased by a statistical estimate known as the update factor. The Medicare Program reimburses hospitals for a portion of their capital-related and medical education costs.

Under the Omnibus Budget Reconciliation Act of 1987 ("OBRA 1987"), the payment rate for each DRG increases annually by an amount equal to the "market basket" rate of increase, which is the amount, estimated annually by the Secretary of Health and Human Services (the "Secretary"), by which the cost of certain goods and services used in hospitals

- 24 -

MBIA        010788

in providing inpatient services for the reporting period exceeds the costs of such goods and services for the preceding reporting period. Any increase in DRG rates which is less than the increase in the market basket rate requires Congressional approval. Medicare reimbursement is also affected by the Balanced Budget and Emergency Deficit Control Act of 1985 (the "Gramm-Rudman Act"), which provides, among other things, for automatic reductions in federal expenditures for certain programs, including Medicare.

For federal fiscal year 1989, DRG payment rates were increased by 3.4% for hospitals located in urban areas with populations greater than one million. For federal fiscal year 1990, the Secretary implemented a DRG payment rate increase of 5.5% effective October 1, 1989, based on the market basket rate of increase. However, because Congress had not enacted budget legislation in sufficient time to avoid automatic spending reductions under the Gramm-Rudman Act, payments to hospitals were reduced by 2.092% for the period October 1, 1989 through December 31, 1989. Pursuant to the Omnibus Budget Reconciliation Act of 1989 ("OBRA 1989"), effective January 1, 1990, the DRG payment rates for hospitals located in urban areas with populations greater than one million were increased by the market basket rate (5.5%) less 1.1%. For federal fiscal year 1991, various payment rates will be in effect. Pursuant to the Omnibus Budget Reconciliation Act of 1990 ("OBRA 1990"), for the period from October 1, 1990 through January 1, 1991, DRG payment rates were not increased over rates paid for the federal fiscal year 1990. Effective January 1, 1990, the DRG payment rates for hospitals located in all urban areas were increased by the market basket rate (5.2%) less 2.0%.w

Pursuant to OBRA 1990, for federal fiscal years 1992 and 1993, the DRG payment rates for hospitals located in urban areas will be increased by the market basket rate for the immediately preceding fiscal year less 1.6% and 1.55%, respectively; for federal fiscal years 1994 and 1995, the DRG payment rates for such hospitals will be increased by the market basket rate for the immediately preceding year. Notwithstanding the foregoing with respect to future federal fiscal years, future budget legislation or other laws may change such rates.

<u>Hospital Capital Costs</u>. Hospital capital-related costs are currently excluded from the Medicare prospective payment system and hospitals are reimbursed on the basis of their actual reasonable capital-related costs, which include depreciation, interest, taxes, insurance, and similar expenses attributable to capital assets (and, in the case of interest, to current borrowing) to the extent such costs are reasonable and related to the provision of patient care.

- 25 -

MBIA          010789

Pursuant to OBRA 1987, hospitals continue to be reimbursed on a cost basis for capital costs. However, such capital payments were reduced by 15% for federal fiscal year 1989. Such reductions expired effective October 1, 1989, although payments to hospitals were generally reduced pursuant to the Gramm-Rudman Act, as described above. Pursuant to OBRA 1989, for the period commencing January 1, 1990 through September 30, 1990, the reduction of capital reimbursement to 85% of otherwise allowable costs was reinstated. Pursuant to OBRA 1990, capital payments will continue to be reduced to 85% through September 30, 1991.

Further, OBRA 1987 prohibits the incorporation of capital costs into the prospective payment system prior to October 1, 1991. Given the variety of proposals that have been made with respect to capital-related costs, it is impossible to predict the method or timing of the inclusion of capital costs in the prospective payment system. Any method of capital cost payment that does not account for each hospital's specific capital requirements could have a material adverse effect on the revenues of the Hospital as a source of payment for the Bonds.

In addition to reductions of reimbursement for capital-related costs for inpatient services, capital reimbursement for outpatient services have been reduced by 15% for cost reporting periods beginning during the Federal fiscal years 1990 and 1991. Pursuant to OBRA 1990, total capital reimbursement for outpatient-services under the Medicare system will be reduced by 10% for cost reporting periods commencing during federal fiscal years 1992 through 1995.

Medical Education Costs. Historically, costs of direct medical education, such as costs of interns and residents, were excluded from the Medicare prospective payment system and reimbursed by Medicare at full reasonable cost. In October, 1989, the Medicare Program adopted regulations retroactively limiting payments to hospitals for educational costs incurred in cost reporting periods beginning after July 1, 1985. Under those regulations, the Medicare Program now pays a fixed amount per full-time equivalent resident as adjusted by inflation. The retroactive and prospective effects of the limitations on Medicare reimbursement for direct medical education costs to AGH are not fully known at this time.

In addition to reimbursement for direct medical education costs, teaching hospitals receive payments for indirect medical education costs subject to limits imposed by OBRA 1987, which limits are determined on the basis of ratios between full-time equivalent residents and hospital beds, and a specified statistical adjustment factor. Medicare payments for the direct and indirect costs of medical education do not

- 26 -

MBIA        010790

necessarily reimburse AGH for the full actual cost of medical education allocable to Medicare inpatient services, and there can be no assurance that Medicare payments attributable to educational costs will equal or exceed the attributable Medicare portion of such costs.

<u>Hospital Outpatient Services</u>.  Part B of the Medicare Program provides payment to AGH for certain outpatient services provided to Medicare beneficiaries.  AGH is generally reimbursed for covered outpatient services provided to Medicare beneficiaries based on the lesser of its billed charges or its reasonable cost in providing such services. Reasonable cost is the cost actually incurred, excluding therefrom any part of capital related costs and incurred costs found to be unnecessary in the efficient delivery of health care services and determined in accordance with Medicare regulations establishing the method or methods to be used, and the items to included.  Pursuant to OBRA 1990, such reasonable costs will be reduced by 5.8% for payments attributable to portions of cost reporting periods occurring during federal fiscal years 1991 through 1995.  Cost reimbursement for services rendered to Medicare outpatients is subject to certain limitations, including the same limitations on medical education costs discussed above with respect to Medicare hospital inpatient services under the caption, "Medical Education Costs" and capital-related costs as discussed above under the caption, "Hospital Capital Costs."  Special reimbursement rules apply to services performed in a hospital ambulatory surgery or end stage renal disease facility, to clinical laboratory services, and to diagnostic testing, among other inpatient services, among other outpatient services. Pursuant to OBRA 1990, the Secretary is directed to develop a prospective payment system for outpatient services by January 1, 1991 and submit the same for Congressional consideration; the details of such a system and its possible effects on Medicare outpatient service reimbursement to AGH cannot be predicted at this time.

<u>Mental Health Services</u>.  Part A of the Medicare Program provides payment to providers of mental health services, such as AGH and ANI, for inpatient services provided to Medicare beneficiaries.  Coverage of inpatient mental health services is limited to 190 days of inpatient psychiatric hospital services during a beneficiary's lifetime, with certain limitations.  Payments are made in an amount equal to the lesser of the billed charges or allowed reasonable direct and indirect costs (including depreciation, interest and overhead, if applicable) for the inpatient mental health services provided to Medicare beneficiaries.  Medicare Program payments for inpatient mental health services are subject to a limitation based on a target rate ceiling (which is tied to an inflation index and determined annually for each psychiatric

- 27 -

MBIA          010791

hospital) for the rate of increase in the provider's operating costs for inpatient services. The target rate ceiling does not apply to capital-related costs.

Nursing Care. Part A of the Medicare Program provides payment to facilities for inpatient skilled nursing services, such as those expected to be provided by AGH's Continuing Care Center currently under construction, which are provided to Medicare beneficiaries who have been certified for entitlement under the Medicare Program. Skilled nursing care providers, such as AGH's Continuing Care Center, are reimbursed for services provided to Medicare patients at the lesser of allowable reasonable direct and indirect costs (excluding capital-related costs) or a maximum per diem limitation. Capital costs are reimbursed separately from the prospective payment per diem limitations based on reasonable costs. In addition, new facilities may be exempted from the per diem limitations for the first three years of operation and may be reimbursed instead based on actual costs. It is expected that the Continuing Care Center will apply to receive reimbursement based on actual allowable costs for the first three years of operation and thereafter based on the lesser of allowable costs or the maximum per diem limitations.

Retroactive Adjustments of Medicare Payments. Funds received from the Medicare Program are subject to audit. These audits can result in retroactive adjustments of payments received from the Program. If, as a result of such audits, it is determined that overpayments of benefits were made, the excess amount must be repaid to the Federal government. If, on the other hand, it is determined that an underpayment was made, the Medicare Program will make an additional payment to the provider. AGH has provided for possible adjustments in the financial statements at levels which it believes to be adequate to cover any adjustments.

Other Federal Initiatives

In 1985, Congress passed the Gramm-Rudman Act in an attempt to eliminate the Federal deficit by the end of Federal fiscal year 1990 through the control of the Federal budgeting process and the gradual reduction of the deficit by specific amounts. The Gramm-Rudman Act called for a reduction in Medicare payment rates of up to 1% for Federal fiscal year 1986 and up to 2% for each Federal fiscal year thereafter as part of total spending cuts required to reduce the Federal deficit. Automatic cuts mandated by the Gramm-Rudman Act were in effect for a brief time in federal fiscal years 1987 and 1990 when Congress failed to pass deficit reduction legislation in time to meet its self-imposed deadline. Although subsequent legislation replaced the reductions, the Gramm-Rudman Act may continue to affect health care reimbursement programs in the future.

MBIA    010792

In October, 1990, Congress enacted OBRA 1990, which includes a comprehensive package of deficit reduction measures to be implemented on October 1, 1990 for federal fiscal year 1991 and in subsequent fiscal years.  Among the provisions of the deficit reduction agreement are requirements for reductions of $43 billion in Medicare payments over the five Federal fiscal years beginning with Federal fiscal year 1991.  At this time it is impossible to say with certainty how the proposed reductions in Medicare expenditures will affect hospitals generally or AGH or ANI specifically, although it is possible that such reductions will materially reduce Medicare payments to AGH and ANI during the five-year period.

Future actions by the Federal government are expected to continue the trend toward more restrictive limits on reimbursement for hospital services.  AGH cannot assess or predict the ultimate effect of any such legislation or regulation, if created or adopted, on its operations.

Medicaid Reimbursement

Approximately 12.5% of the gross patient service revenues of the Restricted Group for the fiscal year ended June 30, 1990 was derived from the Medical Assistance Program or "Medicaid," a jointly funded federal-state program administered by the Pennsylvania Department of Public Welfare ("DPW") which is designed to provide payment for necessary medical services to economically disadvantaged individuals.

Hospital Inpatient Services.

The Pre-1990 Plan.  The Medical Assistance Program effective on January 1, 1990 (the "Pre-1990 Plan") provided payment for medically necessary covered inpatient services provided to eligible recipients by a general hospital enrolled as a provider under the Pre-1990 Plan.  Reimbursement under the Medical Assistance Program for the operating costs (including depreciation and interest costs for major moveable equipment but excluding depreciation and interest costs for buildings and fixtures and medical education costs) incurred in providing inpatient hospital care was based on a prospective per diem rate applying a DRG methodology similar, but not identical, to that used under Medicare.  The DRG basis for Medical Assistance payment applied under the Pre-1990 Plan to all routine and ancillary service operating costs and special care unit operating costs relating to inpatient hospital services.  Under the Pre-1990 Plan, Medical Assistance reimbursed hospitals for the cost of depreciation and interest for buildings and fixtures, heretofore reimbursed on a "reasonable cost" basis, on a prospective system phased in over a seven year period beginning on October 1, 1986.  During the phase-in period under the Pre-1990 Plan, payment

- 29 -

for these capital costs included a combination of a hospital's specific payment and a payment representing the statewide average percentage of capital costs to operating costs.  Once the new system had been completely phased in, reimbursement for capital costs under the Pre-1990 Plan would have been based solely on the prospective payment rate for operating costs.  Additional payments of capital costs for depreciation and interest for buildings and fixtures would have been made to hospitals meeting certain criteria including those serving a disproportionate share of Medical Assistance patients.  Payments to hospitals for medical education costs, such as interns' and residents' salaries, were excluded under the Pre-1990 Plan from the prospective payment system and hospitals are reimbursed on the basis of their actual reasonable medical education costs, except that such reimbursement is limited to the amount of such costs incurred during their fiscal year ended June 30, 1986, increased by an annual percentage increase set by DPW.  Teaching hospitals receive no additional payments for indirect medical education costs, such as increased tests ordered by interns and residents.  Over the past several years, the Governor of Pennsylvania has indicated on several instances that the proposed budgets for Medical Assistance for subsequent fiscal years will exclude Medical Assistance payments for the direct cost of medical education, although no such elimination of Medical Assistance payments for direct medical education costs has yet been implemented.

    <u>Medicaid Litigation</u>.  During 1988 and 1989, numerous Pennsylvania hospitals, including AGH, initiated litigation in the Federal District Court for Eastern Pennsylvania, alleging that the Pre-1990 Plan for Medical Assistance payments for general acute care hospital inpatient services was inconsistent with Federal law.  In early 1990, Judge John P. Fullam ruled that the Pre-1990 Plan violated various provisions of Federal law and directed that the Commonwealth and DPW take action to bring the Medical Assistance Plan into compliance with Federal law.  Those cases are still pending.  Since the date of such ruling, DPW has continued to make Medical Assistance payments in accordance with the Pre-1990 Plan, as modified in accordance with various orders of Judge Fullam.  In September, 1990, DPW filed a modification of the Pre-1990 Plan with the United States Department of Health and Human Services ("HHS") for approval in accordance with Federal law.  The proposed plan filed by DPW with HHS would make various modifications in the payment methodologies used in the Pre-1990 Plan, including modifications to the DRG rate setting method, increases in payments to hospitals treating disproportionate shares of Medical Assistance patients, limitations on payments for direct costs of medical education, and modifications to cost comparison methodologies to pay the full cost of operating an efficiently and economically operated hospital as required by Federal law.  At present, the

- 30 -

proposed plan filed by DPW has not been approved by HHS or by
Judge Fullam, and it is unclear when such a plan will be
approved or what the final form of the modified Medical
Assistance Plan will be.  Accordingly, it is impossible to
predict the effect upon AGH of a final Medical Assistance Plan
as it may be approved by HHS and by Judge Fullam.  However, it
should be noted that the plan filed by DPW with HHS for
approval could have an adverse effect upon the Medical
Assistance reimbursement of AGH by, among other provisions,
eliminating payments to AGH for treating disproportionate
numbers of Medical Assistance patients and by substantially
reducing or eliminating reimbursement to AGH for the direct
costs of medical education.

<u>Hospital Outpatient Services</u>.  The Medical Assistance
Program provides payment for hospital outpatient and emergency
room services based on, at the option of AGH, either a fee
schedule for specific compensable procedures or a flat visit
fee (which includes the professional, technical and support
components of a visit, the medical services rendered by a
physician or under the supervision of a physician, drugs and
biologicals administered during the visit and services and
supplies commonly rendered without charge and incident to
professional services).  In addition, hospitals receive addi-
tional reimbursement for certain diagnostic and therapeutic
medical services provided during routine examination and
treatment services.  Hospitals are reimbursed for emergency
room services based on a fee schedule for compensable proce-
dures (separate from the physician component).  The amounts
paid to hospitals for outpatient and emergency room services
are inclusive of capital-related and medical education costs.
Payments for outpatient services will remain at the 1987
Budget levels.  Effective April 1, 1989, rates for emergency
(as opposed to routine non-emergency) use of hospital emer-
gency rooms were increased by $5.00 per visit.

<u>Mental Health Facilities</u>.  The Medical Assistance
Program provides payment for inpatient mental health services
rendered to eligible recipients by private psychiatric
hospitals, such as ANI, enrolled as providers under the
Medical Assistance Program.  The Medical Assistance Program
provides reimbursement for mental health inpatient services
provided to Medical Assistance recipients equal to the lesser
of the billed charges or allowable reasonable direct and
indirect costs (including capital-related costs) of rendering
such services.  Medical Assistance Program payments for such
services are subject to a per diem ceiling on operating costs
(exclusive of capital-related costs).  The per diem ceiling is
based on the hospital's Medicare per diem ceiling and is
increased annually by an inflation factor determined by the
Department.

- 31 -

MBIA        010795

Nursing Care. The Medical Assistance Program provides payment for skilled nursing care and intermediate care services rendered to eligible recipients (who have been certified and periodically recertified for receipt of such services) by nursing homes enrolled as providers under the Medical Assistance Program. The Medical Assistance Program provides reimbursement to nursing homes, such as AGH's Continuing Care Center currently under construction, for care to Medical Assistance recipients equal to the lesser of the billed charges or allowable reasonable direct and indirect costs (including capital-related costs) of rendering such services. Medical Assistance Program payments for skilled and intermediate care services are subject to a per diem ceiling on operating costs (exclusive of capital-related costs). The maximum per diem rates for nursing homes are derived from cost information supplied by nursing homes in the state.

Retroactive Adjustments of Medicaid Payments. Funds received from the Medical Assistance Program are subject to audit. These audits can result in retroactive adjustments of payments received from the Program. If, as a result of such audits, it is determined that overpayments of benefits were made, the excess amount must be repaid. If, on the other hand, it is determined that an underpayment was made, the Medical Assistance Program will make an additional payment to the provider. AGH maintains reserves for possible adjustments at levels which it believes to be adequate to cover any adjustments. The federal Consolidated Omnibus Reconciliation Act of 1985, and Pennsylvania regulations promulgated thereunder, require inpatient providers not subject to prospective payment (such as ANI) to repay any overpayment made by DPW, the administrator of the Medical Assistance Program within 90 days of the discovery thereof by DPW. Moreover, an appeal of DPW's finding will not suspend the provider's obligation to make the repayment. However, if the provider's appeal succeeds, DPW will refund the amount contested. This regulation is effective for cost reporting periods ending on or after October 1, 1985. The requirement to make repayments within 90 days may have an adverse impact on the cash flows of AGH.

Other Reimbursement

Approximately 24% of the gross patient service revenues of the Restricted Group for the fiscal year ended June 30, 1990 were derived from reimbursement from Blue Cross of Western Pennsylvania ("Blue Cross") and 19.9% from private insurance carriers. Blue Cross currently reimburses AGH on a prospective basis whereby AGH and Blue Cross agree upon an annual operating budget with incentives or penalties based upon AGH's actual cost performance. AGH presently is renegotiating its contract for Blue Cross reimbursement and

- 32 -

MBIA    010796

the effect of the final agreement upon Blue Cross reimbursement to AGH cannot be predicted with certainty. Other private insurance carriers, including those which operate health maintenance organizations and preferred provider organizations, generally reimburse their policyholders or make direct payments to providers on the basis of the direct charges of the provider or prevailing area rates, plus ancillary service charges, subject to various limitations, insurance provisions and deductibles.

## Commonwealth of Pennsylvania Cost Containment Act

On July 8, 1986, the General Assembly of the Commonwealth of Pennsylvania enacted the Health Care Cost Containment Act ("Cost Containment Act"). The Cost Containment Act created an independent Health Care Cost Containment Council ("Council") and requires the Council to: (1) develop a computerized system for the collection, analysis, and dissemination of specified health-related data, including data reflecting provider quality and provider service effectiveness (all Pennsylvania hospitals will be required to submit to the Council detailed information concerning patient services and other financial data); (2) establish a Pennsylvania Uniform Claims and Billing Form; and (3) recommend to the General Assembly before July 1, 1989 a plan for the delivery and financing of health services to the medically indigent ("Plan"). No Plan has been submitted to the General Assembly as of the date hereof. The Cost Containment Act further requires that the General Assembly must, within 120 days of the Plan's submission, enact the Plan as submitted by the Council, modify and enact the Plan or enact a substitute Plan.

No prediction can be made at this time as to the economic effect the Cost Containment Act will have on AGH.

## Property Tax Assessments

In recent years, a number of local taxing authorities in Pennsylvania have sought to subject the facilities of nonprofit hospitals to local real estate taxes, primarily by challenging their status as "purely public charities" as described in the Pennsylvania Constitution, notwithstanding the fact that Pennsylvania hospital facilities historically have been viewed as exempt from such taxes. Decisions of local courts in these cases have produced differing results and have not provided clear guidance on the question of whether or when the hospital facilities of a nonprofit hospital may generally be subject to such taxation, nor has any appellate court in Pennsylvania addressed these recent challenges to the local property tax exemption for hospitals. In 1990, the City of Pittsburgh and the County of Allegheny,

- 33 -

MBIA    010797

where the facilities of AGH are located, challenged the exemption from local real estate taxes of the hospital facilities of AGH. AGH is contesting this matter and in November, 1990 a hearing was held before the Board, which has not yet ruled on AGH's objections. While AGH expects to vigorously contest any adverse ruling of the Board in this matter, no assurance can be provided that it will ultimately prevail, either before such Board or upon appeal to the judicial courts of Pennsylvania, and any payments which AGH might be required to make in respect of local property taxes could adversely effect its future operating results.

**Tax-Exempt/Non-Profit Status**

In recent years, the activities of non-profit tax-exempt hospitals have been subjected to increasing scrutiny by Federal, state, and local legislative and administrative agencies (including the United States Congress, the Internal Revenue Service, the Pennsylvania General Assembly and, as noted above, taxing authorities of Allegheny County and the City of Pittsburgh). Various proposals either have been considered previously or are presently being considered at the Federal, state, and local level which would variously restrict the definition of tax-exempt or non-profit status, impose new restrictions on the activities of tax-exempt non-profit corporations, and/or tax or otherwise burden the activities of such corporations. There can be no assurance that future changes in the laws, rules, regulations, interpretations, and policies relating to the definition, activities, and/or taxation of non-profit tax-exempt corporations will not have material adverse effects on the future operations of AGH or of one or more Restricted Affiliates.

**Competition and Service Area**

AGH could face additional competition in the future from other hospitals and health care providers which could offer comparable health care services to the population which AGH presently serves. This could include the initiation of new health care services and the construction or the renovation of hospitals, health maintenance organizations, ambulatory surgical centers, private laboratories and radio-logical services. One of the chief effects of both the Medi-care and Medicaid prospective payment systems has been an increase in competition among health care providers. There are now Federal incentives to control costs and deliver ser-vices in a more efficient and economical fashion and health care providers, including AGH, are attempting to respond to these incentives. This change in Federal reimbursement policy coincides with the development of alternative forms of health care delivery to replace inpatient care. The alternative forms of health care services, such as ambulatory surgical

- 34 -

MBIA          010798

centers and skilled nursing facilities, are being pursued by HMO's and other insurance organizations as a way to reduce costs. No assurance can be given that occupancy at the facilities operated by AGH will not be adversely affected either by the future availability of other health facilities in the primary service area of AGH or if increases in charges at facilities operated by AGH were to exceed increases at other hospitals or that new health care services, the construction and renovation of hospitals, health maintenance organizations, ambulatory surgical centers, private laboratories and radiological services will not be initiated and have an adverse affect on the financial condition of AGH. The financial performance of AGH is, to some extent, dependent upon the economic vitality of its service area. If there were a general economic downturn in the geographic area served by AGH, it could result in a decrease of the population served by AGH or a loss of insurance benefits for a portion of the patients of AGH.

## Other Risk Factors

In the future, other factors may adversely affect the operation of health care facilities, including those of the Hospital to an extent that cannot be determined at this time, including, but not limited to, future Federal, state and local legislation, regulatory actions, economic conditions, adverse labor actions, bankruptcy or insolvency, labor shortages, changes in the demand for services and other factors which might adversely affect AGH's ability to generate revenues.

## Certain Matters Relating to Enforceability of Obligations

The financial statements of AGH and any Restricted Affiliates will be combined and will be used in determining whether various covenants and tests contained in the Master Indenture (including tests relating to the issuance of Additional Indebtedness) are met, notwithstanding uncertainties as to the enforceability of certain obligations of AGH contained in the Master Indenture and of the Restricted Affiliates in the Contribution Agreements which bear on the availability of the assets and revenues of the Restricted Affiliates for payment of debt service on Notes issued under the Master Indenture, including the Series 1991 Note pledged under the Bond Indenture as security for the Bonds. The obligations described herein of ASRI and ANI or any other future Restricted Affiliate to make payments, loans or other transfers of monies or assets to AGH and the obligation described herein of AGH to cause any Restricted Affiliate to make such transfers (including transfers in connection with voluntary dissolution or liquidation) to make payments on the Series 1991 Note, are, in the opinion of counsel to AGH, enforceable under the laws of Pennsylvania, except to the

- 35 -

MBIA          010799