**32**

**Allegheny University Hospitals - Western Region**

**Report from the Special Task Force Reviewing Intercompany Loans**

On April 18, 1998, a special Task Force of the Resource Management Committee consisting of Mr. Ira Gumberg as Chair and Messrs., David Barensfeld, Robert Hernandez, Steve Elliott, and Robert Fletcher, met with Messrs. Sherif Abdelhak, Anthony Sanzo, Joseph Dionisio, Al Adamczak, Barry Roth and Bill Buettner (Coopers & Lybrand) to obtain a further understanding of the origin and nature of intercompany transactions and advances.

The Task Force received a comprehensive verbal report from Mr. Abdelhak regarding the operation of an AHERF-wide concentration cash account and its implications. In particular, AHERF fees/allocations to the operating units for corporate services and the like are recorded through the intercompany advance accounts, and thus, are usually cleared in the normal course of business — sometimes at differing amounts than the actual allocations for practical reasons and other times in recognition of a particular affiliate's ability to pay that month's allocations. Accordingly, from time to time, one affiliate may actually fund amounts in excess of the corporate allocations on behalf of an affiliate who is unable to meet that month's obligations. In addition, direct advances from one affiliate to another occur, more so in the recent past than currently. Lastly, non-recurring transactions in support of affiliates occurred as well.

The Task Force reviewed the underlying nature and reasons for advances and the substantial non-cash credits against such advances, particularly to AUHS and AUMP representing the equivalent of unbudgeted permanent working capital advances.

The Task Force was generally satisfied with the explanations, but nonetheless, agreed to continue to monitor these transactions in the future and emphasized the importance of complying with the Resource Management Committee's resolution to obtain advance approval for such advances. The Task Force also requested the opportunity to review enterprise wide financial information particularly for unconsolidated Western Region affiliates.

COMPYFREINCLOANTAXII.FIC

DEPOSITION
EXHIBIT
2051
AKF 10/3/63

HE 01373

**EXHIBIT  2056**

## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
### Board Room, Center City Campus
### Philadelphia, Pennsylvania

The meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation (AHERF), was held on Friday, June 21, 1996 in the Board Room at the Center City Campus, Philadelphia, Pennsylvania. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board of Trustees. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| Members Present | Appointed Officers and Invited Guests | Members Absent |
|---|---|---|
| Sherif S. Abdelhak | Calvin Bland | Dorothy M. Brown, Ed.D. |
| William F. Adam | Beth Boyer, Staff | Ronald R. Davenport |
| Henry G. Allyn, Jr. | D. Walter Cohen, D.D. S. | Judith S. Eaton, Ph.D. |
| George Amrom, M.D. | Mary Ann Darragh | William H. Genge |
| Barbara F. Atkinson, M.D. | Glenda Donoghue, M.D. | Teresa Heinz |
| J. David Barnes | Lynn R. Isaacs | Robert M. Hernandez |
| Iain F. S. Black, M.D. | Dwight Kasperbauer | Stanley M. Marks, M.D. |
| Ralph W. Brenner, Esquire | Donald Kaye, M.D. | Joseph C. Maroon, M.D. |
| Douglas D. Danforth | David W. McConnell | Alfred W. Martinelli |
| Leonard T. Ebert | James H. McMaster, M.D. | Joseph Neubauer |
| Harry R. Edelman, III | Jean Rocks | Chryss O'Reilly |
| Ira J. Gumberg | Leonard L. Ross, Ph.D. | David W. Sculley |
| Oksana Korzeniowski, M.D. | Anthony M. Sanzo | J. Brandon Snyder |
| Leslie Anne Miller, Esquire | Daniel Walsh | W. Bruce Thomas |
| Donna M. Murasko, Ph.D | Cherry S. White | |
| Francis B. Nimick, Jr. | Nancy A. Wynstra, Esquire | |
| Robert B. Palmer | | |
| W. P. Snyder, III | | |
| Richard Spielvogel, M.D. | | |
| Leon C. Sunstein, Jr. | | |
| Margaret Gray Wood, M.D. | | |

DVR:41218.1



DEPOSITION EXHIBIT
2056
AKF 10/3/03

GOV 53197

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 2

**I.    Opening of Meeting**

The meeting was called to order by W.P. Snyder, III, Chairman. Nancy A. Wynstra, Esq. maintained the minutes. The Chairman declared that a quorum was present and the meeting was competent to proceed.

**II.    Educational Presentation**

Due to time constraints, the Educational Presentation on the Code of Ethics was deferred until the next regular meeting.

**III.    Additions to the Agenda**

There were no additions to the agenda.

**IV.    AHERF Governance Issues**

    **A.    Minutes from the Meeting held on December 15, 1995**

Mr. Snyder presented the minutes from the meeting held on December 15, 1995. Upon motion duly made and seconded, the Board approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, approves the minutes from the meeting held on December 15, 1995, as presented.

    **B.    AHERF Executive Committee Minutes from the Meeting Held on April 29, 1996**

Mr. Snyder presented the minutes from the meeting held on April 29, 1996. Upon motion duly made and seconded, the Board approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, approves the minutes from the Executive Committee meeting held on April 29, 1996, as presented.

    **C.    AHERF Goals & Objectives**

Mr. Abdelhak presented proposed Goals and Objectives for AHERF and its member organizations. He noted that each responsible executive will develop baseline data about the relevant measures using 1996 data and that improvements will be mesured against this baseline. Upon motion duly made and seconded, the Board approved the following resolutions:

DVR:41218.1

GOV 53198

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 3

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation approves the goals and objectives for AHERF and its member organizations as presented; and

FURTHER RESOLVED, that the Secretary is directed to append a copy of the Goals and Objectives as approved to the original minutes of this meeting.

D.    **AHERF Scientific Misconduct Policies**

Dr. McMaster presented the proposed AHERF Scientific Misconduct Policies: "Policy for the Conduct of Research" and "Responding to Allegations of Scientific Misconduct". He noted the proposed policies represent revisions to existing policies to make them consistent with applicable requirements. Following discussion and upon motion duly made and seconded, the Board approved the following resolutions:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation approves the AHERF Scientific Misconduct Policies: "Policy for the Conduct of Research" and "Responding to Allegations of Scientific Misconduct" as presented, and

FURTHER RESOLVED, that the Secretary is directed to append a copy of the policies as approved to the original minutes of this meeting.

E.    **Annual Review of AHERF Bylaws**

Nancy A. Wynstra presented the proposed Bylaw Amendments. At this time, consistent with the discussions which have been held over the past several months about how to make more effective use of the Trustee's time, the Boards are asked to consider changing the number of required meetings of the Boards; clarifying subsidiary representation on the Board; further defining what constitutes a quorum for the board, as well as a committee; adding to the Bylaws the charge of committees; clarifying that the "Purposes" of each corporation are as stated in its Articles of Incorporation or any amendments thereto; and further delineating approvals for the appointment and removal of the President and Chief Executive Officer of subsidiary corporations.

Section numbers will be changed as appropriate within the individual sets of Bylaws and any language in any of the Bylaws which is inconsistent with the approved amendments will be deleted when the Bylaws are restated.

To make the process of comparison easier going forward, it is recommended that, when restating the various Bylaws, the Secretary be authorized and directed to modify the order of all Bylaws to make them as consistent as possible.

DVR:41218.1

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 4

Following discussion and upon motion duly made and seconded, the Board approved the following resolutions:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation (AHERF) hereby adopts amendments to its Bylaws, in the form presented at this meeting, effective immediately; and

FURTHER RESOLVED, that the Secretary is authorized and directed to modify the order of the Bylaws as necessary for consistency throughout the organization; and

FURTHER RESOLVED, that the Secretary is directed to append a copy of the Bylaw amendments, as adopted, to the original minutes of the meeting and to restate the Bylaws of the corporation.

**F.**    Appointment of AHERF Trustee

Mr. Nimick presented the Committee on Trustees recommendation for appointment of an AHERF Trustee. Upon motion duly made and seconded, the Board approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation appoints the following to serve as Trustee of Allegheny Health, Education and Research Foundation in such class and for such term as indicated:

Class I - Term Expiring Annual Meeting 1999

Thomas H. O'Brien

Mr. O'Brien will join the Board in January, 1997.

**V.**    Report from the Finance Committee

**A.**    Results of AHERF Operations and Financials Ending April 30, 1996

Mr. Barnes presented the report of the AHERF Operations and Financials for the Period Ending April 30, 1996. He noted that while AHERF had positive earnings this year, there were many negative trends which cost AHERF about $50 Million this year. A lengthy discussion followed. Thereafter, upon motion duly made and seconded, the Board approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, approves the results of the AHERF Operations and Financials for the Period Ended April 30, 1996, and directs the Secretary to attach a copy of the approved financial statements to the original minutes of this meeting.

DVR:41218.1

GOV 53199A

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 5

B.    AHERF Budgeted Consolidated Financial Statements for FY 97

Mr. Barnes presented the AHERF Budgeted Consolidated Financial Statements for FY 1997, which, he noted, call for a 5% productivity improvement. He noted that no salary adjustments are projected for management; staff salary adjustments up to 3% may occur if performance warrants. Upon motion duly made and seconded, the Board approved the following resolutions:

RESOLVED, that the Allegheny Health Education and Research Foundation Board of Trustees approves the Budgeted Consolidated Financial Statements for FY 1997; and

FURTHER RESOLVED, that the Board of Trustees instructs the Secretary to attach a copy of the approved Budgeted Consolidated Financial Statements for FY 1997 to the original minutes of this meeting.

C.    Clinical & Academic Information Strategic System Plan

Mr. Barnes presented the Clinical and Academic Information Strategic System Plan for approval. Upon motion duly made and seconded, the Board approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation approves the capital investment required currently estimated to total approximately $50 million over the next four fiscal years to implement the Clinical and Academic Information Strategic System Plan.

VI.    Report from the Audit Committee

A.    Coopers & Lybrand Proposed AHERF Audit Plan for FY 1996

Mr. Barnes presented the Coopers & Lybrand proposed AHERF Audit Plan for FY 1996. Upon motion duly made and seconded, the Board approved the following resolutions:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation (AHERF) approves the C&L Proposed AHERF Audit Plan for FY 1996 as presented; and

FURTHER RESOLVED, that the Board instructs the Secretary to append a copy of the C&L Proposed AHERF Audit Plan for FY 1996, as approved at this meeting, to the original minutes of the meeting.

DVR:41218.1

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 6

**B.**   Proposed FY 1997 and FY 1998 Audit Services Workplans (Pittsburgh and Delaware Valley)

Mr. Barnes presented the proposed FY 1997 and FY 1998 Audit Services Workplans for Pittsburgh and the Delaware Valley.  Upon motion duly made and seconded, the Board adopted the following resolutions:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation approves the proposed FY 1997 and FY 1998 Audit Services Workplans for Pittsburgh and the Delaware Valley; and

FURTHER RESOLVED, that the Board instructs the Secretary to append a copy of the Audit Services Workplans, as approved at this meeting, to the original minutes of the meeting.

**C.**   Proposed FY 1997 Audit Services Operating Budget (Pittsburgh and Delaware Valley)

Mr. Barnes presented the proposed FY 1997 Audit Services Operating Budget for Pittsburgh and the Delaware Valley.  Upon motion duly made and seconded, the Board approved the following resolutions:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation approves the proposed FY 1997 Audit Services Operating Budget for Pittsburgh and the Delaware Valley; and

FURTHER RESOLVED, that the Board instructs the Secretary to append a copy of the FY 1997 Audit Services Operating Budget, as approved at this meeting, to the original minutes of the meeting.

**VII.**   Information Items

**A.**   Allegheny Health, Education and Research Foundation Management Report

Mr. Abdelhak presented to the Board the report for the Third Quarter of FY 1996.  He announced that the Ten Year Institutional Review would be held over a two day period, commencing on November 21, 1996 in Philadelphia. The first day and a half will be spent detailing with management and the various constituencies. Mr. Abdelhak pointed out that this is an extremely valuable process for AHERF to undertake and hopes to present the Review findings to the AHERF Board as soon as possible.

DVR:41218.1

GOV 53201

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 7

**B.**     <u>Reports from Support Organizations</u>

1.     <u>Allegheny General Hospital</u>

Mr. Sanzo presented the Allegheny General Hospital Report for the Third Quarter of FY 96. He announced that David W. Sculley would remain as Chairman of the AGH Board of Trustees, even though he has resigned his position at H.J. Heinz.

2.     <u>Allegheny-Singer Research Institute</u>

Dr. McMaster presented the ASRI Report to the AHERF Board of Trustees for the Third Quarter of FY 96. He noted that the goal is for ASRI to become a self-sustaining organization within the next few years.

3.     <u>Allegheny Health Services Providers Insurance Co.</u>

Nancy Wynstra presented the AHSPIC Quarterly Report to the Board as information.

4.     <u>Allegheny Integrated Health Group</u>

Dr. Kaye presented the AIHG report to the AHERF Board of Trustees.

5.     <u>Diversified Health Group</u>

David McConnell presented the DHG report to the AHERF Board of Trustees.

6.     <u>The Medical College of Pennsylvania and Hahnemann University</u>

Dr. Ross presented the MCPHU report to the AHERF Board of Trustees.

7.     <u>The Medical College of Pennsylvania and Hahnemann University Hospital System</u>

Dr. Kaye presented the MCPHUS report to the AHERF Board of Trustees.

8.     <u>St. Christopher's Hospital for Children</u>

Mr. Bland presented the SCHC report to the AHERF Board of Trustees. He mentioned that the Horse Show was a huge success and that the Bell Atlantic Classic was occurring now.

DVR:41218.1

Meeting of the Board of Trustees of AHERF
Board Room, Center City Campus
Page 8

    **C.**    <u>Management Report from Managed Organization:</u>

        1.    <u>Ohio Valley Health Services Educational Corporation</u>

           Mr. McConnell presented the President's Report and reported that an agreement was made to extend the ten year contract between AHERF and OVHS & E for another ten years.

**VIII.**   **Adjournment**

    There being no further business, the meeting was adjourned at 2:15 p.m.

               Sincerely,

               Nancy A. Wynstra, Esq.
               Secretary

NAW:bb:mcz:41218

NOTED ATTACHMENTS:  Minutes, AHERF Goals and Objectives, AHERF Scientific Misconduct Policies, AHERF Bylaw Amendments, AHERF Budgeted Consolidated Financial Statements for FY 97, Coopers & Lybrand Proposed AHERF Audit Plan for FY 1996, Audit Services Workplans, FY 1997 Audit Services Operating Budget

DVR:41218.1

GOV 53203

**EXHIBIT  2060**

Chronology – IJG

## April 23/24, 1998

On the 23rd or 24th of April I received a phone call from Sherif Abdelhak telling me that he was aware that two participants in the Mellon loan wanted to be paid off immediately. He advised that he had, in his opinion, no choice but to pay down the loan to avoid a default with the bank, as well as triggering other "cross defaults". I asked him how he paid the bank, and Sherif said he paid them off with AHERF funds. My conversation with him then came to an end.

## Monday, April 27, 1998

I then received a call from Sherif on Monday, April 27, 1998 to tell me that he would like to be included in the MBIA pre-meeting which was taking place on Tuesday, April 28th in our corporate suite, and would I please make arrangements for his attendance.

He went on to express to me that he felt an obligation to me to further define the source of funds utilized to pay off the bank loan, and then divulged to me that $29 Million came from AHERF operating funds and that approximately $66 Million came from Forbes funded depreciation. I immediately responded by telling Sherif that he had just breached his commitment to the Resource Management Committee of AUH West and to the Board of AUH West, in contravention of a Resolution requiring that all intercompany transfers require the approval of the Resource Management Committee and the Board of AUH West unless for previously budgeted transfers or if considered to be in the normal course of business.

Sherif's initial response was "Yes, you're right, that's true – but I had no choice". He proceeded to defend his position by telling me that "a gun was put to his head" and that the bank wire transfer system was going to close down for the day within 7 minutes from the time he had to make the decision. He also told me that he was highly irritated by the fact that David McConnell, CFO, brought this to him with no prior notice and, as well, blamed McConnell for him now having to take this precipitous action. He told me that the funds would be restored through a transfer of funds from AHERF endowments.

I explained to Sherif that I felt there were two issues at stake here: the first issue was his ignoring his commitment to his Board and to my Committee in the face of the recent Resolution; and the second issue was the fact that the funds that had been sitting in the Forbes funded depreciation account had been viewed as marketable securities non-restricted, and that endowed restricted funds in my opinion were not an appropriate substitute for un-restricted funds. Sherif said he understood and would go to work immediately to advise his financial people to find truly appropriate replacement funds, and would then report back to me.

DEPOSITION
EXHIBIT
2060
AKF 10/3/03

IG 00335

Chronology – IJG
Page Two.

Tuesday, April 28, 1998

On Tuesday, April 28, 1998 I hosted a lunch pre-meeting with a number of management people, including David Barnes, myself, as well as Sherif, to review what was to be expected during the interview with MBIA. As part of the MBIA discussions, Sherif made me aware – for the first time – that there would be substantial re-structuring and write-offs expected to be taken yet this fiscal year, both unexpected and unbudgeted.

The write-downs added up to approximately $200 Million. When asked if these were all of them, Sherif responded by saying he thought they would be around $300 Million, and maybe even as much as $350 Million, half of which were described as being employee severance and cash-oriented, and the other half asset write-downs, which while not cash, would have a significant impact on our net worth. He then asked if I or David Barnes had an opinion as to when we should do this, and Barnes' response was, first of all, that we should be sure what the final number is – his experience is that you don't go at this several times, but catch it all at one time; and that he, Barnes, felt they should more accurately know what the total re-structuring and write-off number would be and perhaps should consider delaying the write-downs until such time as the accounts to be adjusted could be more firmly defined – but certainly by June of this year.

My response at the meeting was to concur, and I stated that I was concerned that we had 100% of all knowledge and that we dealt with it expeditiously. This was obviously a shock to me and rather unsettling. I was greatly concerned we were having this kind of discussion and yet were expected to meet with MBIA tomorrow. I asked Sherif to be sure that he told them that in fact this was what was being talked about, and Sherif agreed he would. We then proceeded to get through the data in preparation for the meeting with MBIA. When we were through, I asked Sherif if he would give both David Barnes and I an update on our strategic direction, that if I were MBIA sitting with a director, that I would want to be sure that they were "in tune" with our most recent strategic direction (since it had just been publicly announced in a newspaper article).

When the meeting was over, I asked David Barnes, Sherif, and Tony Sanzo if they would stay, and dismissed everyone else. My reason for this was that I wanted to mention to Sherif in front of both Barnes and Tony Sanzo that I obviously had been aware of intercompany transfers and wanted Sherif to know that I was still concerned that our Balance Sheet showed Board-designated funded depreciation of a rather large number, a significant portion of which was made up by intercompany receivables due from AHERF or the East, and that I wanted to be sure that he fully explained the situation to MBIA – to which Sherif replied he would do; but then immediately responded by also saying "I'm glad the four of us are alone – I have something rather critical to discuss".

Chronology – IJG
Page Three.

April 28, 1998   (cont'd).

Sherif proceeded to discuss with the three of us the fact that he had just discovered that there was an additional $110 Million expected write-down that was created at Graduate by McConnell – that McConnell "really messed up the books" and, not only overstated reserves at Graduate, but then transferred those reserves to Hahnemann, MCP, and St. Christopher's to clean up what he referred to as "water in the receivables" dating back to 1995. Hearing this, I turned to him and said, "Sherif, it would seem to me that this man ought to go, and go now". He then told me that he had discussed this the night before with David Barnes and that he, Barnes, had said the same thing, but that there was concern that the institution have good legal backing before terminating McConnell. Sherif said he discussed this with Nancy Wynstra, who is in-house general counsel for AHERF. Barnes added that he thought this should be handled by independent counsel, and I agreed. Sherif asked for our recommendation and I suggested Charles (Chuck) Queenan of Kirkpatrick and Lockhart. Barnes quickly agreed and said he would be more than happy to meet with Sherif and Queenan promptly.

Just so I could better understand Sherif's earlier thinking, I asked him if this $110 Million was part of the $300-$350 mentioned earlier – he said this would be in addition, so that now the write-offs are more like $460 Million.

Wednesday, April 29, 1998

On April 29, 1998 I participated in the MBIA interview along with David Barnes. During our portion of the interview, I learned they were told by Sherif that there were unexpected asset write-downs and re-structuring costs in the "$200 Million+" range and that Barnes responded that he believed a corporate approach was best, even when dealing with an eleemosynary institution and considering we would be taking a major write-down this year. The rest of the meeting was fairly straightforward and proceeded as expected.

Wednesday night, April 29th, I received a call at home from Sherif which lasted the better part of an hour and a half. He reviewed with me in great detail the fact that he had met with Chuck Queenan and David Barnes that afternoon on the McConnell issue. He explained to me that Queenan had been hired as independent counsel on behalf of the AHERF Audit and Finance Committee and that Queenan wanted to start a very private and secret investigation that involved his (Queenan's) coaching a young member of the AHERF in-house legal department, who would then meet with members of the Finance Department, such as Joe Dionisio, Al Adamczak, etc. and begin interviews with them – trying to get memos or affidavits supporting the fact that these folks had been asked since 1995 to not make appropriate write-offs of receivables.

IG 00337

Chronology – IJG
Page Four.

<u>April 29, 1998</u>  (cont'd)

Sherif said Queenan furthermore wanted to know exactly what these people were going to say before they fired McConnell. Sherif told me that Queenan told him that he (McConnell) would probably turn on Sherif -- the term he used was "whistleblower" -- and that McConnell would blame Sherif for these financial decisions, indicating that Sherif was part of the decision-making process. I immediately at that point asked Sherif if he was in fact part of those decisions. Sherif said "absolutely not". I then asked him if "he was aware of those decisions", and Sherif again claimed "he was not". Sherif then asked me what he could have done differently, and I reminded him of the private dialogue I had had with him back in November or December of last year (1997) when I confronted Sherif before an AHERF Audit Committee meeting and told him it was my opinion that the Balance Sheet of AGH had been mis-stated.

That meeting turned out to be a pretty rough one -- Sherif at first denied it and then finally blamed everything on McConnell, citing the fact that while he was in the hospital recovering from surgery, McConnell made decisions to transfer funds from AGH and did not properly account for such actions. I told Sherif that from that moment on he should not have trusted anything that McConnell did and that as the CEO of the organization, it was his responsibility, and that was where I criticized him. He responded back to me saying, "I guess you're right".

I then asked him if he was going to announce at the next meeting of the Executive Committee of AUH East that we have these major re-structuring and write-off costs facing us, as well as this new $110 Million reserve transfer mix-up issue, that will result in an additional $110 Million write-down for MCP, Hahnemann, and St. Christopher's. Sherif said "No", he was advised not to by Chuck Queenan, more particularly as it relates to the $110 Million part of this because of the involvement with Dave McConnell. I then nudged him again on restoring the $66 Million back to Forbes.

About a half hour after hanging up with Sherif, David Barnes called me. To help both Dave and myself so he would not have to rehash everything that had occurred, I told Dave that I had already heard from Sherif, and quickly summarized our conversation. Dave told me that he might change some nouns and verbs around, but that in essence he thought that what Sherif told me was generally accurate and that he would keep me posted. I mentioned to David that I thought it was really important that once he had his hands around the issue, that he call a meeting of the AHERF Audit/Finance Committee to discuss the issues in full.

IG 00338

Chronology – IJG
Page Five.

Thursday, April 30, 1998

On Thursday, April 30, 1998, I participated in an 8:00 am teleconference meeting of the AUH East Executive Committee. Five minutes before the meeting, when the operator was the connecting the participants, Sherif started to ask me if I had time for him later that morning, that he had something very important to discuss with me. During the Executive Committee discussion, he at one point advised the group that he had to pay off the bank loan – that a gun had been put to his head, and that the payment was made using $29 Million of AHERF operating funds and $66 Million of Forbes funds from the West. For the first time he mentioned a very specific endowment that he would be transferring from AHERF to AUH West and mentioned the *George Lockhart* endowment as the source to replace the funds used.

I reminded Sherif (over the phone) very nicely that we cannot view donor endowed funds as fungible assets replacing previous funded depreciation assets. He acknowledged what I was trying to say.

Following the conference call, I then attended a Governor's Reception hosted by Sherif at the Duquesne Club (Noon). He took me aside and told me that the reason he wanted to see me was that he was concerned that in discussions with Trustees, he needed me to help him – to take the pressure off by helping him explain to the Board the reasons for his actions. Sherif told me he was "tired and beat up" and that he wanted me to help him. My response back to him was that I needed to hear from him what his plan was to restore the funds immediately. He told me he was leaving later that day to go to the Kentucky Derby and would be back Monday. I told him we would speak then. As I was walking away from him, Sherif grabbed me by the arm and said to me, "Please, Ira, you need to help me in this", and whispered in my ear that the Queenan investigation was going to start immediately, and he would keep me apprised.

I then saw Charles Queenan (at the same reception) and walked up to him to say hello. After we had acknowledged each other, he indicated to me that he was aware that in addition to David Barnes, I was aware of what was now happening, and as a matter of fact, said to me, he was still waiting for Sherif to annoint somebody in his legal department to come and meet with him.

I then happened to bump into Joe Dionisio, who whispered in my ear that he had just been asked two minutes ago by Sherif if he would give him an affidavit stating what had happened since 1995 regarding receivables and the fact that Joe Dionisio, while abiding by his superior's instructions, inveighed that request. I was quiet and didn't understand why Sherif went to Joe, as I thought this was supposed to have been done through our independent counsel and not direct between Sherif and employees.

IG 00339

Chronology – IJG
Page Six.

Monday, May 4, 1998

On Monday, May 4, 1998, I made arrangements to meet Sherif and we spent the better part of two hours together. He told me that the weekend he took off "refreshed his batteries", that he had a chance to think. He went on to explain to me how all of the funds invested, no matter what entity they reside in, are centrally invested and then there is an allocation back to those entities as to their total return, and that within this centralized treasury function there is an appropriate amount invested in equities, bonds, etc. and, therefore, there was no need to worry about restoring the $66 Million because in essence the monies are centralized through the treasury department and that appropriate allocations are made back to the individual entities.

I responded that it seems to me that while this is an efficient way of investing our funds, it has nothing to do with the fact that at one point we were able to put our hands in our pocket and have something we could touch and spend and now we cannot. It was clear to me that Sherif was trying to "juggle" and get me to buy off on his statement that whether or not there were true funds sitting there that were un-restricted really didn't matter since the invested funds that he would have in their place which were restricted still would generate the appropriate return. I rebuffed him and said I could not look any Trustee in the face and agree with that concept, and that I required an immediate restoration of those funds. He said that he would ask his finance people to immediately scour the system and go through all the closets to find what he referred to as "current assets".

During lunch, he also told me that he spoke with Dionisio and had asked him for a memo dealing with the issue of receivables, and the fact that he had recalled that Joe Dionisio strongly protested. I asked him if he had received the memo, and Sherif said he wasn't sure since he had not yet gone through his mail. I also mentioned to him that I thought this was supposed to be done by independent counsel and not by him direct. His response was that it had been his idea to have independent counsel make these requests, not Queenan's. I stayed quiet. Sherif also made reference to McConnell again, using the phrase "cooked the books".

We then spent a great deal of time discussing the problems in the East, and where he stood in his attempts to sell the six hospitals to Vanguard. Sherif said that as a matter of fact, he was meeting with Vanguard the next day – Tuesday, May 5th, and would call me later that day.

IG 00340

Chronology – IJG
Page Seven.


<u>Monday, May 4, 1998</u> (cont'd)

The other subject that came up during our lunch meeting was my discussion with Sherif that it was my feeling that I had a fiduciary responsibility to share with my fellow Trustees what had transpired with the transfer of the $66 Million from the institution, and that I still viewed this as a transgression of his commitment to the Board, and that I thought enough time had now passed; and that while I was trying to give him time in which to replace the funds, I felt that he should now be reporting this to the Chairman of the Board, Frank Cahouet, so that Frank was fully aware of what had occurred.

Sherif also told me during this part of our conversation that Tom O'Brien had resigned from the Board  -- he had been the Chair of Forbes – on the basis that there were PNC banking issues along with the Mellon pressure, and that Tom felt conflicted representing both his corporation, PNC, and being a member of the Board. I told Sherif that I thought he should also share this with Frank. He asked me why. I said, "How can you not report to the Chairman of the Board information like this?" Sherif said, "I guess you're right. I am just concerned that Frank may take the same path and resign, as well." My only response to him was that he had no choice but to report to Frank on the Tom O'Brien issue, and further, that I expected him to go to Frank immediately on the $66 Million transfer of funds to pay off the bank. He said that he would do that as soon as he had the funds restored, which he expected to have done in the next day or so, and that as a matter of fact, to make me feel good, he would send me a letter confirming the fact that the funds have been restored in the form of ."current assets". I said I would appreciate receiving a letter, but also wanted a phone call, and that I also wanted to hear from him that he had spoken with Frank.


<u>Tuesday, May 5, 1998</u>

I received a call from Sherif at home this evening. He told me about his meeting with Vanguard. He believed he was able to hold their feet to the fire and keep them committed to the deal by making certain adjustments to the price of services that we would be supplying in the form of billing and information systems. He was still not sure quite where Vanguard stood but felt better after the meeting with them today.

I asked him once again where he was with the $66 Million issue, and he said that he had not had a chance to deal with it today, but was expecting Dave McConnell to report to him tomorrow, Wednesday, May 6th.

IG 00341

Chronology – IJG
Page Eight.


Wednesday, May 6, 1998

I participated in another AUH East Executive Committee meeting this morning, which focused on the Vanguard deal and the cash losses and negative run rates that are taking place in the East.  When that meeting concluded, I immediately called Sherif's office to speak with him.  He called me back at approximately 2:00 that day.  I asked him if he had heard from McConnell regarding the restoring of the $66 Million, and Sherif told me that the funds were going to be restored with current assets but that he had not yet met with McConnell but was assured that it would be accomplished.  I then said "I assume when you say 'current assets' you mean marketable securities that are un-restricted".  Sherif said, "Not necessarily".  I got very perturbed.  Sherif proceeded to remind me that AHERF is the sole member that can transfer funds as needed, and I then reminded him of his breach.  I emphasized the word "breach" in my voice and told him that he had an obligation to sanitize this issue immediately. He lost it, and proceeded to tell me he was tired of hearing the word "sanitize" because it had a dirty connotation.  I told him that he had pristine reputations sitting around his Board table and that every one of us were entitled to be protected and fully informed, that he could pick any word he wanted to replace "sanitize, but that if he didn't think that things were "dirty", he should at least feel they were extremely "dusty".

Sherif said to me "Do you realize all the problems that I have had to deal with and that I am trying to work through these problems as best I can, and that you know McConnell has 'cooked the books'."  I said, "Sherif, I've given you enough time to clean up the numbers by restoring the $66 Million so that I could be in a position to help you and the institution when if asked or if I thought it was import to volunteer to members of the Board what had transpired, that I could put the best foot forward for you – explaining what you did a week ago, rightly or wrongly, but that the funds had been restored."  I also said to him, "Sherif, I will not lie for anyone".  He said he did not expect me to lie any more than he would lie, and that he felt that I was carrying the responsibility of this issue and shouldn't be.  I said "Fine".  I told him to pick up the phone and call Frank Cahouet right now and let Frank know what he did.  And to also pick up the phone and call Bob Fletcher, former Chairman of Forbes, to let him know.

IG 00342

Chronology – IJG
Page Nine.

Wednesday, May 6, 1998 (cont'd)

Sherif, attempting to change the subject, proceeded to tell me that he needs to make some leadership changes and that he felt the Boards were working against the institutions and that there needed to be one consolidated board. I chose to sidestep this conversation, feeling he was trying to bait me into an increased leadership role, and I told Sherif that right now I could only respond in my current capacity recognizing my fiduciary responsibility as Chairman of the Resource Management Committee and member of the Board, and that I felt very uncomfortable having to respond to any other Trustee other than truthfully and accurately. Sherif said he felt very secure as CEO and that if some directors didn't like what he did, that's just too bad". I told him that was "his call, not mine" and that I wanted him to come clean immediately with what transpired with the $66 Million, and that he had yet to replace the funds with like kind. I then asked him that before he sent me any letter divulging the fact that he was replacing those funds with some funds, that I would like to have it certified by Nancy Wynstra, our chief counsel. He said that he would speak with her. I said that was fine, but that I wanted to have her certification as well. I then told him I would like to know when he is calling Frank, and that my advice to him was that he call Frank quick, before Frank calls me.

Sherif once more attempted to change the subject and began talking again about the governance/organizational changes and quickly told me that parallel to this he would also make management changes – that he was thinking about promoting Joe Dionisio to CFO and Tony Sanzo to President and CEO of AHERF, and that he would become a paid Chairman and probably at the same time arrange for Bill Snyder to retire. He asked me my opinion of Joe and Tony. I responded to each of them individually only as professionals, and told Sherif I did not wish my responses to be interpreted as acceptance of his new structure. He said that he understood and that that's why he likes talking to me – because he feels he does not have to watch his words, and that he could run ideas by me for feedback, and added that he felt we have similar leadership ways of thinking. I said, "Sherif, I am really concerned and I want you to make everything right, quickly." We agreed to hang up.

I had put a call in to Harry Edelman immediately after the AUH East Executive Committee meeting. Harry called me back and we talked about what had been discussed at the meeting and that there had been a violation of a Resolution that was recently approved. Harry said he was sorry that he had not been present for some of the recent meetings and probably should have been, but remarked that this could be a very serious issue because of the "spin" it creates in terms of Sherif's credibility. Harry Edelman had been made aware by Joe Dionisio and Tony Sanzo that Barry Roth was aware of the issue via Nancy Wynstra and that they are certain other top management people are aware of what's going on.

IG 00343

Chronology – IJG
Page Ten.

Thursday, May 7, 1998

I received a phone call this afternoon from Sherif. Sherif prefaced his comments to me saying that he had part of the information but was still waiting for another part of the information. He told me that the *Lockhart* gift was made in the 1920's for an amount between $2 and $3 Million. That all of the dividends, interest, and earnings from that principal amount were allowed to be used for AGH needs and that they have kept re-investing all those earnings, etc. for all this time so that it is now a total fund worth over $120 Million.

It was his opinion that $95 Million of that is accumulated currency in the bank so to speak, that could be drawn down and used by AGH, and that $30-some Million is the portion that would be applied to restricted principal. I asked him if he was sure he had the right to take accumulated currency and now distribute it in one fell swoop or should it have been used equally in the past. He said "Remember, Ira, as I told you in the beginning, I only have part of the information – I don't have it all." He said he wanted to get his hands on the agreement and read it himself and try to come to a decision that would allow us to release the $95 Million of earnings, interest and dividends. I said to him that I also thought it was important that he have Nancy Wynstra lend her eyes to the agreement and opine to the final determination. He said that Nancy is tied up with a relative out of town that she is putting into a nursing home and wouldn't be back in the office until Monday. I said "Fine. I'd like to hear from you as soon as you review this yourself and after you speak with her." He then told me he had an appointment at 3:00 today with Frank Cahouet to review all of the recent matters, and said he would call me and report back to me the results of that discussion.

Friday, May 8, 1998

On Friday afternoon, May 8th, Sherif called to fill me in on his discussions with Frank Cahouet. Sherif said he basically had an agenda containing three items:

1. Resignation of Tom O'Brien;
2. The use of *AUMC* funds to pay off the Bank consortium;
3. Issues related to Board governance.

IG 00344

**EXHIBIT  2063**

draft/work in process does
not reflect final opinion or fact
determination

9

ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE    *DRAFT*
Pittsburgh, Pennsylvania

A resumption of the suspended meeting of the Finance and Audit Committee of Allegheny
Health, Education & Research Foundation was held on Tuesday, September 1, 1998 at
7:00 a.m. in the Board Room of Allegheny General Hospital, Pittsburgh, Pennsylvania and in
the President's Conference Room, 19th Floor, New College Building, Philadelphia,
Pennsylvania. The meeting was called pursuant to notice duly given to each member of the
Committee. A copy of the notice is appended to the original minutes of this meeting. The
following individuals were present:

| Members Present | Other Invitees | Members Absent |
|---|---|---|
| J. David Barnes | Thomas P. Chakurda | Randall L.C.Russell, Ph. D. |
| Douglas D. Danforth | Joseph D. Dionisio | |
| Harry R. Edelman, III* | Carol Gordon | |
| Ira J. Gumberg | Lynn R. Isaacs** | |
| Paul D. Neuwirth** | Ben Korbly | |
| Robert B. Palmer** | (PricewaterhouseCoopers) | |
| | Charles P. Morrison | |
| | Lee D. Powar, Esq. | |
| | (HahnLoeser Parks, LLP) | |
| | Anthony M. Sanzo | |
| | James C. Stalder | |
| | (PricewaterhouseCoopers) | |

** Via Videoconference
* Via Telephone Conference

I.    Opening of Meeting

The meeting was called to order by J. David Barnes, Chairman. Lee D. Powar, Esq.
maintained the minutes. The Chairman declared that a quorum was present and the
meeting was competent to proceed.

II.    Additions to the Agenda

Mr. Barnes noted that there were no additions to the agenda.

CL 150841



DEPOSITION
EXHIBIT
2063
*AKF*

10

draft/work in process does
not reflect final opinion or fact
determination

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                                    ***DRAFT***
September 1, 1998
Page 2

III.   Approval Items

   A.   Summary of Discussions from the AHERF Finance and Audit Committee
        Meeting Held on March 11, 1998

        Mr. Barnes noted that the Summary of Discussions had been reviewed during the
        previous meeting and stated that the Summary was a record of what was said at
        the March 11, 1998, meeting. There being no further questions, the Summary of
        Discussions was approved.

IV.    Information and Discussion Items

   A.   Potential Restatement of Prior Year Financial Statements and Communication
        Plan

        Mr. Dionisio briefly restated his comments at the prior meeting that it appeared
        during Fiscal Year 1997 there may have been some accounting and reporting
        decisions made that subsequent facts do not support or that may have been
        overlooked or misinterpreted. He reiterated that a restatement of the financial
        statements for Fiscal Year 1997 did not entail republication of the statements but
        that changes would ultimately appear in the financial statements of Fiscal Year
        1998 to certain year end balances with full disclosure as to the changes. If the
        Committee agrees that revisions are necessary, Allegheny Health, Education and
        Research Foundation (AHERF) is obligated to advise potential users that the
        statements shouldn't be relied upon.   Four issues of potential restatement were
        discussed:

        -   Trust assets of approximately $16 million related to executive retirement
            accounts appear to have been unrecorded. These accounts (approximately
            $11 million in the name of AHERF and $5 million in the name of
            Hahnemann) were established in connection with unqualified retirement
            accounts and executive benefits.

        -   Contingent liability reserves totaling $99 million established in connection
            with the May, 1997 acquisition of the Graduate Hospitals were transferred
            to the Delaware Valley Obligated Group (DVOG). In connection

CL 150842

draft/work in process does
not reflect final opinion or fact
determination

11

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                                     **DRAFT**
September 1, 1998
Page 3

therewith, $28 million was used to increase June 30, 1997 DVOG patient
revenue and $71 million remained on the DVOG balance sheet in the form
of bad debt reserves.

- The buildup in the Lockhart funds, attributed to reinvestment of earnings
and trading gains, was recorded as income in 1996 and 1997 in the
amounts of $15 million and $54 million, respectively. It appears these
amounts are restricted and, thus, should be included as restricted assets
and not taken into earnings.

- Intercompany advances by Allegheny General Hospital (AGH) and certain
other entities were presented as assets limited or restricted as to use--
which were the source of the funds--primarily because these advances
were intended to be repaid with interest. These intercompany balances
were eliminated in consolidation.

Mr. Dionisio provided additional background and historical information on each
of the issues. PricewaterhouseCoopers representatives stated that the accounting
treatment accorded certain of the entries was a matter of interpretation of
Generally Accepted Accounting Principles and they would review the entries in
that light. Further, Mr. Dionisio reviewed each of the areas of restatement
individually, providing expected financial results of the restatement. Mr. Dionisio
stated that both Vanguard and Tenet are relying on a 12-month average and are
working with 1998 results. The Trustees and management discussed the
obligation of AHERF and PricewaterhouseCoopers to disclose the expected
revisions to the consolidated financial statements. Mr. Powar emphasized the
necessity to make good disclosure immediately, particularly in light of the
impatience of the Creditors' Committee.

Discussion ensued regarding the type of communication that should be made
regarding the financial statements and AHERF's obligation in this matter. The
extent of information that should be provided in the press release was reviewed,
and it was agreed that the issues under review should be noted without the detail
of the dollar impact.

CL 150843

12

draft/work in process does
not reflect final opinion or fact
determination

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                                    *DRAFT*
September 1, 1998
Page 4

B.   Other Matters

Lee Powar noted that AHERF was recently informed through Deloitte &
Touche that Vanguard has a requirement that in order to obtain their financing
they must obtain audited June 30, 1998, financial statements for the filed entities
whose assets they are acquiring. Morgan Stanley has provided Vanguard with a
deadline of September 28, 1998, for receipt of the audited financial statements,
and Vanguard has proposed paying for the audit. Deloitte & Touche, which has
been approved to audit the filed entities, is willing to begin immediately,
however, it is physically impossible to complete the work within the prescribed
time. While there have been serious concerns articulated by the Creditors'
Committee about the PricewaterhouseCoopers firm, it would appear that this
firm is the only one which could conclude an audit within the requested
timeframe, in view of the preliminary work which has been completed.
Discussion followed regarding the level of comfort available from
PricewaterhouseCoopers and the competence of the firm. Mr. Dionisio
affirmed that only two audits are required by Vanguard: that of Allegheny
University Hospitals-East and Allegheny University Hospitals-Centennial. It
was further noted that PricewaterhouseCoopers has declined to make their work
papers, completed on behalf of the Fiscal Year 1998 audit, available to any
other firm. Lack of availability of the work papers would add four-five weeks
to the timing for any other firm. Following further lengthy discussion, the
Trustees agreed to the following:

1.   AHERF will permit Vanguard to engage PricewaterhouseCoopers to
     audit the sale entities. The audit will be made available to AHERF and
     to the other bidders.

2.   PricewaterhouseCoopers will staff the audit with former Price
     Waterhouse auditors but will have access to the Coopers & Lybrand
     work papers.

3.   Management and Deloitte & Touch will integrate Deloitte & Touche in
     monitoring the audit to assure their access to the work papers and that
     they are knowledgeable with regard to the results.

CL 150844

draft/work in process does
not reflect final opinion or fact
determination

15

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                              *DRAFT*
September 1, 1998
Page 5

V.    Adjournment

There being no further business, the meeting was suspended at 10:15 a.m.

Respectfully submitted

Lee D. Powar, Esq.
Secretary

LDP:cg

c:\minutes\090198.aud

NOTED ATTACHMENTS:  Notice of meeting

CL 150845

**EXHIBIT  2105**

draft/work in process does
not reflect final opinion or fact
determination

2

ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE    *DRAFT*
Pittsburgh, Pennsylvania

A meeting of the Finance and Audit Committee of Allegheny Health, Education & Research Foundation was held on Thursday, August 27, 1998 at 8:00 a.m. in the Board Room of Allegheny General Hospital, Pittsburgh, Pennsylvania and in the President's Conference Room, 19th Floor, New College Building, Philadelphia, Pennsylvania. The meeting was called pursuant to notice duly given to each member of the Committee. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| Members Present | Other Invitees | Members Absent |
|---|---|---|
| J. David Barnes | Joseph D. Dionisio | |
| Douglas D. Danforth | Carol Gordon | |
| Harry R. Edelman, III* | Lynn R. Isaacs** | |
| Ira J. Gumberg* | Ben Korbly. | |
| Paul D. Neuwirth** | (PricewaterhouseCoopers) | |
| Robert B. Palmer** | Michael P. Martin | |
| Randall L.C.Russell, Ph.D. | Lee D. Powar, Esq. | |
| | (HahnLoeser Parks, LLP) | |
| | Anthony M. Sanzo | |
| | James C. Stalder | |
| | (PricewaterhouseCoopers) | |
| | W. P. Snyder III | |
| | Diane K. Schrecengost | |
| | Nancy A. Wynstra, Esq. | |

** Via Videoconference
* Via Telephone Conference

I.    Opening of Meeting

The meeting was called to order by J. David Barnes, Chairman. Nancy A. Wynstra maintained the minutes. The Chairman declared that a quorum was present and the meeting was competent to proceed.

II.    Additions to the Agenda

Mr. Barnes noted that there were no additions to the agenda.



DEPOSITION
EXHIBIT
2105
AKF 8/8/03

CL 150833

3

draft/work in process does
not reflect final opinion or fact
determination

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE
August 27, 1998                                    *DRAFT*
Page 2

III.    Approval Items

    A.    Summary of Discussions from the AHERF Finance and Audit Committee
        Meeting Held on March 11, 1998

        Mr. Barnes asked the Committee for their review and approval of the Summary
        of Discussions.  Mr. Edelman questioned the Summary of Discussions, saying
        he felt that Sections III C. and IV A. did not report the facts.  Mr. Edelman
        further noted that he did not attend the March 11 meeting.  Mr. Barnes
        reminded the Committee that approval of the Summary of Discussions does not
        convey approval of actions taken but approval of what was said at the meeting.
        In view of time constraints in the present meeting, further discussion on the
        matter of approval of the Summary of Discussions was suspended until the next
        meeting of the Committee, to take place on Tuesday, September 1, 1998.

IV.    Information and Discussion Items

    A.    Potential Restatement of Prior Year Financial Statements and Communication
        Plan

        Joseph Dionisio introduced to the Committee the representatives from
        PricewaterhouseCoopers, LLP, James Stalder and Ben Korbly.  Nothing that
        Price Waterhouse merged with Coopers & Lybrand on July 1, 1998, it was
        further noted that Mr. Stalder and Mr. Korbele were from the Price Waterhouse
        firm.  Mr. Dionisio noted that early in 1997, a proposal was made to the Audit
        Committee by prior management that in lieu of preparing individual audits by
        Obligated Group, it would be beneficial to do a single audit on a consolidated
        basis for Fiscal Year 1997, thus reducing the audit fees by $150,000.

        There was some question about whether Bond Trustees, on behalf of
        bondholders, would accept a consolidated Allegheny Health, Education and
        Research Foundation (AHERF) audit in lieu of Obligated Group audits, and the
        Audit Committee asked that this approach be approved by the Bond Trustees.
        In some cases, there was a positive approval and in other cases, no responses
        were obtained.

        In light of the events that have transpired, some accounting and reporting
        decisions that may have been appropriate on a consolidated basis are

draft/work in process does
not reflect final opinion or fact
determination

4

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                    *DRAFT*
August 27, 1998
Page 3

problematic for the Obligated Groups, inasmuch as there were decisions made
that subsequent facts do not support and there are some facts that may have been
overlooked or misinterpreted.

Mr. Dionisio stated that it was his judgment as Chief Financial Officer of
AHERF that there is a question whether the June 30, 1997 audit report could be
relied upon because of expected restatement of the financial statements.
Mr. Dionisio noted that, after extensive consultation with Jim Stalder of
PricewaterhouseCoopers, they are in general agreement that the financial
statements should not be relied upon. Mr. Stalder and Mr. Korbele concurred
with Mr. Dionisio's report and with the recommendation that users of the
financial statements be notified.

The changes affect the reclassification of intercompany accounts which would
have no bearing on the earnings of the Obligated Group and the impact would be
in the years 1995 and 1996, which would not impact the 1997 earnings.

Mr. Dionisio further noted that both Vanguard and Tenet are relying on a 12-
month average and are working with 1998 results.

Discussion ensued as to the timeframe in which the details would be known to
the Finance and Audit Committee, recognizing that a prompt disclosure be made
to the Creditors' Committee. Trustees present were very clear in stating that
they needed to be aware of the details of the proposed restatement before giving
approval. Mr. Barnes recapped the discussion, noting that there are disclosure
issues that must be reported to the users of the Financial Statements.

Based on the need of the Finance and Audit Committee to learn more facts,
Mr. Barnes suggested that the discussion be suspended until the next meeting of
the Finance and Audit Committee on September 1, 1988. Mr. Stalder and Mr.
Korbele were excused from the meeting.

B.   Other Matters

Mr. Dionisio affirmed the need to appoint auditors for Fiscal Year 1998 and to
perform some additional work on Fiscal Year 1997 matters. He suggested that the
Committee first consider whether or not to continue with
PricewaterhouseCoopers. With respect to this issue, he outlined several
advantages:

CL 150835

5

draft/work in process does
not reflect final opinion or fact
determination

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                    *DRAFT*
August 27, 1998
Page 4

- With the merger of Price Waterhouse and Coopers & Lybrand, AHERF would be assured of a new audit team with some of the advantages of continuity/access.

- Prior to the merger, Coopers & Lybrand completed the interim audit consisting of about 50% of the work.

- AHERF and Price Waterhouse are near completion of the Office of Management and Budget (OMB) C-133 audit for Allegheny University of the Health Sciences (AUHS) for Fiscal Year 1997. OMB C-133 is a special report related to grant funding. PricewaterhouseCoopers is prepared to issue the report, pending resolution of the decision on the Fiscal Year 1998 audit. If the report is not issued, waivers must be secured from the OMB. Mr. Dionisio noted that there is about $60-80 million in grant funds involved.

- PricewaterhouseCoopers could be a potential advocate in anticipated Director and Officer litigation. AHERF would be in a position to support prior management and the Directors with respect to any third party action, given their vested interest.

The disadvantages would include:

- There has been recent disappointment related to past financial statement accounting and reporting matters.

- Management has noted that concerns have been expressed by Members of the Board of Trustees about some of the matters that have come to their attention. In addition, the Coopers & Lybrand firm, and now PricewaterhouseCoopers, is generally not viewed favorably by the Creditors' Committee.

- Inasmuch as the Creditors' Committee did not react favorably to the potential reappointment of PricewaterhouseCoopers, it is possible PricewaterhouseCoopers could be the subject of creditor litigation.

- Depending on the future turn of events, PricewaterhouseCoopers could be a potential defendant in AHERF-initiated litigation.

CL 150836

draft\work in process does
not reflect final opinion or
fact determination

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE                    *DRAFT*
August 27, 1998
Page 5

Discussion ensued regarding the extent to which the Creditors' Committee would
be against PricewaterhouseCoopers. Lee Powar noted that the Creditors'
Committee, driven by PNC Bank and MBIA is very hostile to AHERF in general
(management and the Board) for having filed bankruptcy. A great deal of detail
has been provided to them on audit-related issues, and they have asked many
questions. Mr. Powar further noted that based on his information, which is
certainly not totally complete, his recommendation is that the Coopers firm, now a
part of PricewaterhouseCoopers, is a potential target for AHERF to consider
suing, either for actions taken or omitted. He further stated that in good
conscience, AHERF should not consider retaining them. Mr. Sanzo noted that his
initial intent, upon taking his present position, was to change auditors in the
second year, however, based on current findings and with a hostile Creditors'
Committee, he does not think the advantages outweigh the disadvantages.  It was
noted by Mr. Dionisio that changing auditing firms would not interfere with the
restatement and/or reissuance of the Fiscal Year 1997 report. In response to a
question about the accessibility of working papers, Mr. Powar noted that access
would be relatively easy because of the bankruptcy position. Upon motion made
and seconded, the Trustees recommended that the following resolution be
approved:

> RESOLVED, that the Finance and Audit Committee recommends to
> the AHERF Board of Trustees that the firm of
> PricewaterhouseCoopers LLP be replaced as external auditors for
> AHERF and subsidiaries.

Mr. Dionisio advised the Committee of discussions entered into with Lee Powar
regarding future audit reports and noted it will not be necessary to prepare
traditional reports for the Debtor-in-Possession companies (AHERF, AUHS,
Allegheny University Medical Practices [AUMP], Allegheny University
Hospitals-Centennial [AUH-Centennial], and Allegheny University Hospitals-
East [AUH-East]. It is recommended that the firm of Deloitte & Touche be
retained to perform necessary special procedures audit for the Debtor-in-
Possession companies. They had been previously selected and recommended to
the court in this regard. Regarding the non-debtor companies (Allegheny General
Hospital [AGH] and Allegheny University Medical Centers [AUMC]), Mr.
Dionisio stated that he and Mr. Sanzo recommended appointment of KPMG Peat
Marwick LLP (KPMG). Proposals had been received from both firms that were
fairly equal in terms of cost. Upon motion made and seconded, the Trustees
recommended that the following resolution be approved:

*7*

draft/work in process does
not reflect final opinion or fact
determination

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE
August 27, 1998                                                          *DRAFT*
Page 6

RESOLVED, that the Finance and Audit Committee recommends to the AHERF Board of Trustees that the firm of Deloitte & Touche be retained as external auditors for the Debtor-in-Possession entities AHERF, AUHS, AUMP, Allegheny Hospitals- Centennial, and Allegheny University Hospitals-East.

FURTHER RESOLVED, that the Finance and Audit Committee recommends to the AHERF Board of Trustees that the firm of KPMG Peat Marwick LLP be retained as external auditors for the non-debtor companies AGH and AUMC.

V.    Offer of Executive Session

The Trustees requested of Mr. Barnes that the meeting continue in Executive Session without management.

VI.    Adjournment

Inasmuch as the time allotted for the meeting had expired, the meeting was suspended until Tuesday, September 1, 1998, at 7:00 a.m.

Respectfully submitted


Nancy A. Wynstra, Esq.
Secretary

NAW:cg
c:\minutes\082798.aud

NOTED ATTACHMENTS:  Notice of meeting


CL 150838

**EXHIBIT  2171**



BABST
CALLAND
CLEMENTS
AND
ZOMNIR
A PROFESSIONAL CORPORATION

SARA M. ANTOL
Attorney at Law
(412) 394-6528

February 15, 1996

**HAND DELIVERY**

Sherif S. Abdelhak
Allegheny Health Education and Research Foundation
Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, Pennsylvania 15222-3009

Re:    **Allegheny Integrated Health Group**

Dear Mr. Abdelhak:

Please be advised that we are representing Carol L. Calvert, the President and Chief Executive Officer of Allegheny Integrated Health Group (the "Group"). As you are aware, the Allegheny Health, Education and Research Foundation ("AHERF") has undertaken a recent corporate restructuring. As a result of certain actions taken in connection with the restructuring, Ms. Calvert's position and her responsibilities thereunder have been effectively eliminated. These actions clearly violate the terms, as well as the spirit, of Ms. Calvert's employment agreement with the Group and the manner in which these intentional actions have been carried out amounts to intentional infliction of emotional distress which is actionable in tort. When viewed in light of the considerable contributions Ms. Calvert has made on behalf of the Group and AHERF and the high level to which she has performed her many responsibilities over the years, these actions are an affront and cannot be tolerated.

We strongly intend that both AHERF and the Group must be fully responsible for any damages, including any claims of emotional distress, that have been and may, in the future, be caused to my client as a result of these wrongful actions. We have examined this matter, and fully intend to proceed with legal action based in tort against AHERF, the Group and any other subsidiary organizations.

We understand that in the hope of avoiding a court proceeding, AHERF would consider making Ms. Calvert an offer of settlement. We are willing to give AHERF the opportunity, prior to proceeding with our full judicial remedies, to present an offer that fairly compensates Ms. Calvert

Two Gateway Center, Eighth Floor
Pittsburgh, Pennsylvania 15222
412 / 394-5400
Fax 412 / 394-6576



DEPOSITION
EXHIBIT
2171
WK11-05-03

PR-PLD-062-02251

Sherif S. Abdelhak
February 15, 1996
Page 2

for the wrong effected upon her.  However, it must be emphasized that if that offer is not adequate, a legal proceeding will be instituted.  In addition, this letter is not intended to, nor may it be construed as, waiving any legal rights or claims Ms. Calvert has against AHERF, the Group or any other subsidiary organization.

        Please contact me when you are prepared to discuss a proposed settlement.

                                        Sincerely,

                                        Sara M. Antol

                                        Sara M. Antol

SMA/

cc:    Carol L. Calvert

PR-PLD-062-02252

**EXHIBIT  2172**

## AGREEMENT

THIS AGREEMENT is made this _15th_ day of _February_,
1996, by and between CAROL CALVERT (hereinafter referred to as
"Calvert") and ALLEGHENY HEALTH, EDUCATION and RESEARCH
FOUNDATION (hereinafter referred to as "AHERF").

WHEREAS, the parties hereto desire to put to rest and settle
all controversy between them related to and/or arising out of
Calvert's employment with, and her resignation from, AHERF and
the facts and circumstances underlying the same, and to settle
and compromise any and all claims and differences between them
related to Calvert's employment with, and her resignation from,
AHERF, its related entities, affiliates, successors and assigns,
including, but not limited to, Allegheny Integrated Health Group,
Inc., the Medical College of Pennsylvania and Hahnemann
University and their officers, trustees, agents and employees.
Specifically, Ms. Calvert claims that, as a result of certain
actions on the part of AHERF, she has suffered from an
intentional infliction of emotional distress which she claims is
actionable.  While AHERF does not admit that there is any legal
merit to the claims made by Ms. Calvert, both parties desire to
settle any disputes by this Agreement.

NOW, THEREFORE, INTENDING TO BE LEGALLY BOUND HEREBY and in
consideration of the promises contained herein, Calvert and AHERF
hereby agree as follows:

## SEPARATION BENEFITS

1.    Calvert hereby resigns her employment and positions as
Executive Vice President, AHERF; President and Chief Executive
Officer, Allegheny Integrated Health Group, Inc.; and Executive
Vice President, the Medical College of Pennsylvania and Hahnemann
University; effective February 29, 1996.  It is understood and
agreed that all of Calvert's duties associated with Calvert's
positions at AHERF and its subsidiaries will end on or before
February 29, 1996.  If requested, Calvert will provide to AHERF
resignation letters satisfactory to AHERF and its related
subsidiaries.

2.    Calvert is entitled to purchase COBRA continuation health
insurance coverage at a cost of $349.69 per month for a period of
eighteen (18) months following the effective date of this
Agreement.  Calvert acknowledges that she has been provided with

PGH:18182.1



DEPOSITION
EXHIBIT
2172
WK11·05·03

AMS6 000153

full information relating to her health insurance continuation coverage rights under COBRA.

3.    Calvert shall receive the benefits under the AHERF pension program in the amount of Sixty Thousand, Twenty-one Dollars ($60,021.00) and the benefits in her Executive Retirement Account in the amount of Sixty-one Thousand, Seven Hundred Sixty-three Dollars and Sixty-eight Cents ($61,763.68) and the benefits under the flexible benefit program (hereinafter referred to collectively as the "Programs").  AHERF agrees to consider an accelerated payment or, in the alternative, to pay a lump sum amount to Calvert at an address provided by Calvert upon the expiration of the applicable period defined in the Programs and upon receipt by AHERF of proof from Calvert to AHERF's satisfaction that any noncompete provisions contained in the Programs have not been violated by Calvert.

4.    Calvert shall receive the benefits under the AHERF Management Long Term Incentive Plan in the amount of Four Hundred Forty-three Thousand, Eight Hundred and Four Dollars and Sixty-three Cents ($443,804.63) to be paid in a lump sum payment upon execution of this Agreement.

5.    AHERF will withhold Federal, State and local income taxes on all retirement payments and payments made to Calvert pursuant to the terms of the Incentive Programs to the extent required by law.

6.    Calvert shall receive no salary/vacation or holiday pay which may have been due.

7.    If Calvert files an application for unemployment compensation, AHERF will advise the Pennsylvania Bureau of Employment Security that AHERF requested Calvert's resignation. AHERF will not appear at any unemployment compensation hearings for the purpose of opposing any award made to Calvert and AHERF will not appeal any award of unemployment compensation.

8.    It is understood and agreed that AHERF will provide Calvert with positively-stated letters of reference.  All inquiries for references with respect to Calvert's professional performance while employed at AHERF should be directed to Sherif S. Abdelhak, President and Chief Executive Officer of AHERF.

9.    Calvert and AHERF, for themselves and their predecessors, successors, assigns, agents, heirs, personal representatives, affiliates, and related entities, do hereby remise, release and forever discharge each other from any and all claims of whatever nature arising from or related to Calvert's employment with and resignation from AHERF and its related entities and affiliates, including without limitation, Allegheny Integrated Health Group, Inc., and the Medical College of Pennsylvania and Hahnemann

PGH:18182.1

AMS6 000154

University.

10.  The parties hereto acknowledge and agree that this Agreement supersedes any and all agreements and any amendments thereto, and any and all severance benefits noted therein, between Calvert and AHERF and/or its affiliates and subsidiaries.

### SETTLEMENT OF DISPUTED CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

11.  For and in consideration of the payment of the sum of One Million, Six Hundred Thousand Dollars ($1,600,000.00) (hereinafter referred to as the "Settlement Sum") to be paid to Calvert by AHERF, and in consideration of the promises of Calvert contained herein, Calvert and AHERF hereby agree to settle the claims of Calvert against AHERF relating to alleged intentional infliction of emotional distress.  Calvert shall execute a general release of AHERF concurrently herewith, which release shall be attached hereto and become an integral part hereof.

12.  The Settlement Sum shall be paid to Calvert by AHERF no later than February 29, 1996 and shall be made via wire transfer into an account designated by Calvert.

13.  The parties acknowledge that payment of the Settlement Sum is in full and final settlement of a disputed tort claim relative to Calvert's claims against AHERF of intentional infliction of emotional distress.  As a result, AHERF shall record, account for and represent the payment of the Settlement Sum consistent with the terms of this Agreement.  The parties acknowledge that the Settlement Sum is not subject to withholding of tax under the applicable rules of the Internal Revenue Service (hereinafter referred to as the "IRS") or any state or local taxing authority. Calvert understands and agrees that she will be solely responsible for any and all tax liabilities for FICA, Medicare and Medicaid which may be assessed against either Calvert or AHERF by virtue of the payment of the Settlement Sum.  Calvert and AHERF acknowledge and agree that each will be responsible for its own additional tax liabilities and/or penalties which may be assessed against either of them individually.

### GENERAL PROVISIONS

14.  This Agreement shall be governed by and construed according to the provisions of the laws of the Commonwealth of Pennsylvania notwithstanding the present or future domiciliary of either party hereto.

15.  Neither Calvert nor AHERF will in any way disparage or make negative comments regarding the other party, its officers, agents, affiliates, related entities, or trustees, to any future employer, client, or any other person or entity.

PGH:18182.1

AMS6 000155

16.   Neither Calvert nor AHERF will disclose, or authorize the disclosure of, the terms or facts of this Agreement to any individual outside of Calvert's immediate family, attorney and other confidential advisers (unless Calvert becomes legally compelled by oral questions, interrogatories, requests for information or documentation, subpoenas, civil investigative demands, orders of a court of competent jurisdiction, or other similar process to disclose such terms or facts), and the management of AHERF including its subsidiaries, and Calvert agrees that Calvert will not divulge, directly or indirectly, any business secret, special or general method, or other confidential or proprietary information of AHERF or its subsidiaries to any person, firm, partnership, venture or corporation, except as required by law.

17.   In consideration of the separation benefits granted to Calvert herein as described in paragraphs numbered 2 through 4 above, Calvert agrees that she will neither accept employment, contract with, nor become a shareholder of any entity which competes with AHERF, its subsidiaries or affiliates, for a period of three (3) years from the date of this Agreement.

18.   AHERF agrees that it will pay the legal fees incurred by Calvert in connection with her claim against AHERF and the negotiation of this Agreement. Calvert has retained the law firm of Babst, Calland, Clements and Zomnir, P.C. to represent her in this matter.  Both AHERF and Calvert acknowledge that Babst, Calland, Clements and Zomnir, P.C. have represented AHERF in the past and each of the parties, with knowledge of these facts, hereby waives any conflicts which may be created or exist as a result of the representation of Calvert by Babst, Calland, Clements and Zomnir, P.C.

19.   The parties hereto acknowledge and agree that this is the entire Agreement between the parties related to the settlement of all claims of each against the other, and there are no written or oral understandings, promises or agreements that are not set forth in full herein.

20.   In the event that any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, and said remaining Agreement shall be enforceable in accordance with its terms.

PGH:18182.1

AMS6 000156

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals or caused this Agreement to be executed by their duly authorized agents on the day and year first above written.

WITNESS:                          ALLEGHENY HEALTH, EDUCATION and
                                  RESEARCH FOUNDATION

                                  By: _____
                                      Sherif S. Abdelhak
                                      President and
                                      Chief Executive Officer


WITNESS:                          CAROL CALVERT

                                  _____


PGH:18182.1

AMS6 000157

**EXHIBIT  2174**

## SERVICES AGREEMENT

THIS Services Agreement ("Agreement") is made by and between **ALLEGHENY HEALTH, EDUCATION and RESEARCH FOUNDATION ("AHERF")** and **CAROL CALVERT** ("Calvert") for a period of time beginning on March 1, 1996 and continuing for a period of ten (10) months unless renewed for another ten (10) month period upon mutual agreement of the parties.

WHEREAS, Calvert was previously employed by AHERF as Executive Vice President and also previously served as President and Chief Executive Officer of Allegheny Integrated Health Group, Inc., and Executive Vice President of the Medical College of Pennsylvania and Hahnemann University;

WHEREAS, AHERF desires to engage Calvert and Calvert agrees to be so engaged to provide consultation services to AHERF and its subsidiaries;

NOW THEREFORE, in consideration of the promises and obligations set forth below, the parties agree as follows:

1.    Calvert is hereby engaged by AHERF to consult and assist on matters within her expertise and relevant experience as an independent contractor.

2.    AHERF agrees to compensate Calvert or her designee at the rate of Thirty Thousand Dollars ($30,000.00) per month through the end of this Agreement.  AHERF agrees that Calvert may earn incentive bonus payments in addition to the compensation above based on meeting performance standards to be developed and agreed upon by the parties.

3.    AHERF agrees to reimburse Calvert for travel and incidental expenses, provided that approval is given prior to incurring such expenses.  Approval must be secured from David McConnell, Executive Vice President and Chief Financial Officer.

4.    Calvert will submit a monthly invoice to AHERF which will include any expenses claimed, along with a clear photocopy of all receipts supporting those expenses.  These invoices should be mailed or given to David McConnell at AHERF for approval.

5.    Calvert agrees to keep the terms of this Agreement confidential and also agrees not to disclose any proprietary information relating to this engagement.

6.    This Agreement is to be interpreted under the laws of the Commonwealth of Pennsylvania.

PGH:18204.1



DEPOSITION
EXHIBIT
2174
WK11-05-03

PR-PLD-062-02247

7.    This is the entire Agreement between AHERF and Calvert.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of this _____1st_____ day of _____February_____, 1996.


**ALLEGHENY HEALTH, EDUCATION and RESEARCH FOUNDATION**

Sherif S. Abdelhak
President and Chief Executive Officer


**CAROL CALVERT**


PGH:18204.1

**EXHIBIT  2178**

**Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Pittsburgh, Pennsylvania**

A special meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation was held on Monday, January 5, 1998 at 10:30 a.m. via videoconference between the AHERF Fifth Avenue Place Conference Room, Pittsburgh, Pennsylvania and the Hahnemann President's Conference Room, Philadelphia, Pennsylvania and via teleconference.

| Members Present | Invited Guests Present | Members Absent |
|---|---|---|
| Sherif S. Abdelhak | Donald Kaye, M.D. | Leonard T. Ebert |
| William F. Adam* | Dwight Kasperbauer | Robert L. Fletcher |
| Henry G. Allyn, Jr.* | David W. McConnell | Teresa Heinz |
| Barbara F. Atkinson, M.D.* | Anthony M. Sanzo | Alfred W. Martinelli |
| J. David Barnes* | Nancy A. Wynstra, Esq. | Joseph Neubauer |
| Iain F.S. Black, M.D.* | | Thomas H. O'Brien |
| Ralph W. Brenner, Esq.* | | Chryss O'Reilly |
| Dorothy McKenna Brown, Ed.D.* | | David W. Sculley |
| Douglas D. Danforth | | |
| Ronald R. Davenport* | | |
| Harry R. Edelman III* | | |
| William H. Genge* | | |
| Ira J. Gumberg | | |
| Robert M. Hernandez* | | |
| Joseph C. Maroon, M.D.* | | |
| Donna M. Murasko, Ph.D*. | | |
| Francis B. Nimick, Jr. | | |
| Robert B. Palmer | | |
| Richard L. Ray, M.D.* | | |
| J. Brandon Snyder* | | |
| W.P. Snyder III | | |
| Richard Spielvogel, M.D.* | | |
| Leon C. Sunstein, Jr.* | | |
| W. Bruce Thomas* | | |
| Stanley Trooskin, M.D.* | | |
| Mark Victor, M.D.* | | |
| Walter L. Williamson* | | |
| Margaret Gray Wood* | | |

\*        Attendance via telephone conference



DEPOSITION
EXHIBIT
2128
AKF

DVR: 75561.1



Special Meeting of the AHERF Board
January 5, 1998
Page 3


B.  <u>Amendments to Articles of Incorporation and Bylaws [Exhibit 2]</u>

Mr. Nimick presented for consideration conceptual changes to the organization's Bylaws and some of the Articles of Incorporation set forth in Exhibit 2, which would be necessary to compliment the proposed governance restructuring. Ms. Wynstra summarized the areas of the Bylaws and Articles of Incorporation which will require amendment to implement the proposed governance structure. Ms. Wynstra noted that changes in the legal structure will be implemented over time so that the legal structure mirrors the governance structure. Several questions about the proposed Bylaw changes were raised and addressed.

C.  <u>Recommendations for Board and Committee Membership and Allegheny Officers for Calendar Year 1998 [Exhibit 3]</u>

Mr. Nimick presented for consideration recommendations for Board and Committee membership, Board and Committee Chairs and Allegheny Officers for Calendar Year 1998 as set forth in Exhibit 3.

Following discussion and upon motion duly made and seconded, the Board of Trustees approved the following resolution:

> **RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation (AHERF), and of AHERF, acting as the Member of Allegheny General Hospital, Allegheny University Medical Centers, Allegheny-Singer Research Institute, Allegheny Integrated Health Group, Allegheny University of the Health Sciences, St. Christopher's Hospital for Children, and Allegheny University Hospitals, hereby adopts, in concept, the governance structure as outlined on Exhibit 1; and**

> **FURTHER RESOLVED, that the Board hereby adopts, in concept, amendments to the Bylaws and the Articles of Incorporation as outlined in Exhibit 2; and**

DVR: 75561.1



**Special Meeting of the AHERF Board**
**January 5, 1998**
**Page 5**

market position and low costs. He noted that two top level management teams, one in the East and one in the West, are currently reviewing everything in order to make recommendations as to what should be discontinued. A fundamental fact, he said, is that we cannot continue to subsidize as many programs as we currently subsidize. During the discussion the Trustees emphasized that we must never think of ourselves as a commodity and that we should seek to better educate the public as to the real cost of the level and quality of service that they want. It was also noted that we need to see how we can improve our information systems so that management has better and more current information upon which to make its evaluation.

Mr. Abdelhak also noted that some portion of our unrestricted assets have been liquidated in order to significantly reduce the level of payables in both Pittsburgh and Philadelphia and that he has instructed that the level of payables must be maintained on a much more current level than has been the case over the past year. He also noted that we are looking into the possibility of leveraging our receivables.

## IV.    ADJOURNMENT

There being no further business, the meeting was adjourned.

Respectfully submitted,

_____
Nancy A. Wynstra, Esq.
Secretary

Noted Attachments: Meeting Notice, Exhibits 1, 2 and 3.

DVR: 75561.1