Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 5

FURTHER RESOLVED, that the discretionary income authorized to be
included in the KEYSOP™ Plan shall be treated as non-taxable deferred
compensation to the maximum extent consistent with applicable law; and

FURTHER RESOLVED, that before any accrued balances are transferred
from any existing Deferred Compensation programs to the KEYSOP™,
verification of those balances, as well as a verification of the percent of the
base compensation to be directed to the KEYSOP™ will be performed by
Coopers & Lybrand and that a copy of the calculations be appended to the
original minutes of this meeting; and

FURTHER RESOLVED, that the trust instrument established to implement
the KEYSOP™ Plan, in order to provide maximum protection of the
KEYSOP™ assets, shall be segregated and placed in a bank not regularly
used by the organization which bank may be located outside the United
States; and

FURTHER RESOLVED, that the President or his designee(s) and such
officers as may be necessary are hereby authorized to take all such actions as
may be necessary, including but not limited to execution of any and all
documents, to carry out the intent of this Resolution.

D.    Compensation Items/Executive Loan Program Amendment

Mr. Abdelhak and Mr. Kasperbauer then asked the Committee to consider an
amendment to the current Executive Loan Program, to achieve the results
discussed earlier. They reviewed the current program, established June 12, 1989,
whereby the CEO and his direct reports could secure loans from a local bank
(Northside Deposit Bank) with the assistance and support of Allegheny. On July
19, 1993, the loan program was reaffirmed and expanded to include the
participation of PNC Bank. An amendment to the Executive Loan Program is now
requested to enhance the value of the benefit to participating executives by
consolidating the program at PNC, which has offered a very competitive interest
rate.

The Committee was asked to consider consolidation of the credit facility at PNC
Bank; to affirm the loan limit at one times total compensation; and to set the
aggregate loan pool amount not to exceed $7.0 million. Furthermore, the

Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 6

Committee was asked to consider allowing loan program participants to reduce
total annual compensation through the KEYSOP™ program, in an amount equal
to the value of the interest paid by AHERF on the participant's behalf. It was
explained and understood that this arrangement will not increase the compensation
paid by AHERF to the loan program participant.

Mr. Abdelhak added that contingent upon the approval of the amendment,
Coopers & Lybrand will verify the appropriate offsets to compensation for the
value of the loan interest and deliver the results of this calculation to the
Compensation Committee.

He added that the loans will be secured by virtue of employment agreements which
in each case provide sufficient severance compensation to cover outstanding loan
balances. As a condition of employment/separation, loan balances would be
required to be paid before payment of final accrued benefits and compensation
would be distributed.

Individuals eligible to participate in the Executive Loan Program are:

> Sherif S. Abdelhak
> Dwight Kasperbauer
> Donald Kaye, M.D.
> David W. McConnell
> Anthony M. Sanzo
> Nancy A. Wynstra, Esquire

Upon motion duly made and seconded, the Committee approved the following
resolution:

**WHEREAS, the Executive Loan Program has been a valuable employment
benefit for qualified senior executives; and**

**WHEREAS, by consolidating the Credit Facility within PNC Bank,
participants in the Program will receive a better interest rate on any loans;
and**

**WHEREAS, permitting loan program participants to pay applicable loan**

Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 7

interest through a reduction to their total annual compensation would
enhance the value of the benefit to participating executives,

NOW THEREFORE BE IT RESOLVED, that the establishment of an
Executive Loan Program for the senior officers of the corporation,
specifically Sherif S. Abdelhak, Dwight Kasperbauer, Donald Kaye, M.D.,
David W. McConnell, Anthony M. Sanzo, and Nancy A. Wynstra is hereby
affirmed; and

FURTHER RESOLVED, that the Committee authorizes the establishment of
a unified Credit Facility at PNC Bank with the aggregate loan pool amount
not to exceed seven million dollars ($7,000,000); and

FURTHER RESOLVED, that the Committee affirms the loan limit for each
participating executive at one times (1x) their total annual compensation;
and

FURTHER RESOLVED, that the Committee authorizes allowing loan
participants to pay the interest due on their loans by reducing total annual
compensation in an amount equal to the applicable interest, with the
calculation to determine the appropriate offset to be verified by Coopers &
Lybrand and to be appended to the original minutes of this meeting; and

FURTHER RESOLVED, that each participating executive will agree in
advance of obtaining a loan that any loan balance outstanding at the time the
individual leaves employment at AHERF would be repaid from funds
constituting the applicable executive's accrued benefits or other relevant
compensation before any final compensation payment would be distributed
to the executive.

E.    Compensation Items/Incentive Plan Awards Fiscal Year 1997

Mr. Abdelhak then explained that despite exceptional operating results for Fiscal
Year 1997, management felt it was appropriate to suspend consideration of both
the management annual and deferred bonus programs in the Fall of 1997 due to the
effects of a precipitous drop in reimbursement. He explained that suspension of
both programs meant reduction in pay of at least 20% and in some cases 50% for
management. He noted that while suspension of both programs was prudent at

D 0000582

Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 8

that time, it had a major effect on the actions of the management staff and has
caused them to make significant progress to remedy the effects of the revenue
reduction.
While the decision to suspend bonus awards was prudent at the time, management
now believes it is appropriate to consider some level of bonus awards, albeit at a
lower level, to maintain morale and retain the core of the management team.

Mr. Abdelhak recommended that anyone eligible for the deferred bonus program
be granted an accrual of 20% for future distribution subject to satisfactory
performance and that all others, currently eligible for the management annual
incentive program and not receiving a deferred bonus award be granted a five
percent (5%) award, subject to a satisfactory performance evaluation.

Mr. Abdelhak noted that the cost of the deferred bonus accrual and a 5% annual
award would be $1.7 Million.

After lengthy discussion and upon motion duly made and seconded, the Committee
rejected to providing the management annual award of 5% at this time, but
adopted the following resolution pertaining to the Deferred Bonus Program:

**WHEREAS, this Committee established certain goals for AHERF senior
management for Fiscal Year 1997; and**

**WHEREAS, the established goals for Fiscal Year 1997 were substantially
achieved; and**

**WHEREAS, management determined following the close of Fiscal Year 1997
that, due to a precipitous drop in reimbursement in the fall of 1997 for Fiscal
Year 1997, it would be appropriate to suspend consideration of the
Management Annual Incentive and the Deferred Compensation Awards
pending development of strategies and a plan for dealing with the anticipated
revenue reduction; and**

**WHEREAS, such planning process is now in process; and**

**WHEREAS, suspension of the bonus programs resulted in significant
reductions in compensation for the affected individuals; and**

Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 9

WHEREAS, the Committee wishes to recognize both the achievement of the
established goals for Fiscal Year 1997 and the substantial progress made in
Fiscal Year 1998 toward remedying the effects of the revenue reduction and
in order to retain the committed members of management who were affected
by the suspension of the consideration of the Deferred Compensation Awards
for 1997.

FURTHER RESOLVED, that the Committee authorizes an accrual of 20%
of base salary for those individuals eligible for the Deferred Compensation
program with distribution of such accrual to occur in the future, as set forth
in the various applicable bonus programs, subject to satisfactory
performance; and

F.    Deferred Incentive Plan Award for Fiscal Year 1994

Mr. Abdelhak explained that the Deferred Incentive Program defers payment of
awards for five years from the year in which they are earned and it serves as a
retention tool. He asked the Committee to consider a resolution to release the
earned compensation which normally occurs immediately after the close of the
fiscal year completing the five-year period. He added that the management team
would receive a distribution in the amount identified below and asked that any
deferral for senior officers be placed in the Keysop™ Program for those eligible to
participate in that program.

After a lengthy discussion and upon motion duly made and seconded, the
Committee approved the following resolution:

WHEREAS, AHERF's Deferred Compensation program calls for release of
accrued deferred incentive awards five years after accrual, subject to an
evaluation of organization performance; and

WHEREAS, organizational performance for Fiscal Years 1994 to 1997 was
excellent and met all established goals;

D 0000584

Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 10

NOW, THEREFORE, BE IT RESOLVED, that the Compensation
Committee approves the release of the accrued Deferred Incentive Awards
for Fiscal Year 1994, to the executives listed below and in the amounts listed
herein.

| | |
|---|---|
| Calvin Bland | $64,391.44 |
| D. Walter Cohen, D.D.S. | $56,877.68 |
| Vincent Cristofalo | $39,338.06 |
| Joseph D. Dionisio | $58,106.34 |
| Thomas P. Galinski | $55,372.31 |
| James H. McMaster, M.D. | $77,753.50 |
| Robert M. McNair, Esquire | $51,673.90 |
| Leonard L. Ross, Ph.D. | $72,533.80 |
| William E. Welton | $44,976.20 |

Executive Session

The Committee then went into Executive Session and excused all guests other than
Mr. Abdelhak.

Formalized Succession Plan

Mr. Abdelhak noted that, to assure the continued effective operation of the
organization, it would be important at some time to decide on a succession plan
and to identify the individuals who will fill the positions of President and Chief
Executive Hospital of Allegheny University of the Health Sciences and President
and Chief Executive Officer of AHERF.  He indicated to the Committee that his
current thinking is that Dr. Kaye should be named President of AUHS, that a
national search should be conducted to identify a new President and CEO for AUH
East and that, Mr. Sanzo should be appointed as head of AUH West, and that, in
approximately five years, the Board would then be in a position to identify either
Mr. Sanzo or the President and CEO of AUH East as the future President and
CEO of AHERF.  Discussion followed and the Committee indicated its conceptual
agreement with this plan.

D 0000585

Allegheny Health, Education and
Research Foundation (AHERF)
Compensation Committee Minutes
Page 11

### Compensation Related Items

The Committee then discussed various compensation related items.


There being no further business, the meeting was adjourned at 5:30 p.m.

Respectfully submitted,


Nancy A. Wynstra, Esquire

NAW:kss/mcz
Enclosures:05-30-98

D 0000586

**EXHIBIT  2494**

| | |
|---|---|
| **From:** | Miriam Bailey |
| **To:** | DKASPERB |
| **Date:** | 5/1/98 12:37pm |
| **Subject:** | Funding |

Dwight - I reviewed the numbers with Mike Martin.   He said you may use the total T-Note for the KeSop funding.   In the meantime he is looking for the additional $2 million for next week.   He is concerned that the $2 million will have a negative impact on Payroll at the end of the month.

We cashed out $756 thousand today in TVM and he expressed concern that the money might not be available until Monday and people would be cashing checks today.

Additionally, he said the New Compensation $2 Million will have to wait until later in the year - but could not say which month.   Possibly he can make the funds available over several months?

Thanks for your help.

MB

**CC:**        MRANDALL



DEPOSITION
EXHIBIT

2494

3-5-04    SSS

PENGAD-Bayonne, N.J.

**DBR-DK
003545**

**EXHIBIT  2500**

## Assessment of Control Environment
### HEALTH CARE
### AHERF
### 06/30/96

**Section: A: Role of the Board of Directors**

| Area for Assessment: | Comments: |
| --- | --- |
|  |  |



DEPOSITION
EXHIBIT
PENGAD-Bayonne, N.J.
2500
3-5-04   SSS

CL 003241

The composition and activities of members of the board of directors and the information provided to it, is an important consideration in its effectiveness in reducing the likelihood of management:
- involving the enterprise in material illegal acts (violations of laws and regulations)
- misappropriating material resources
- subjecting material assets of the enterprise to inordinate risks
- otherwise failing to act in the material interests of non controlling interests
- failing to ensure an adequate control structure.

The various organizations within AHERF maintain boards of directors in addition to the AHERF board. This permits an additional oversight function at the respective entity level.

C&L's experience with the individual boards is that they are generally independent of management, extremely qualified and diligent in completing their responsibilities and are cognizant of their actions and the associated impact on the organizations' employees, patients, local communities and society at large.

See attached for a complete listing of the Board members.

We are not aware of any controversial resignations in recent years.

The Board reviews the internal monthly reporting package (i.e. operating results, budget vs. actual and relevant statistics). The Board also approves the annual budgets, including charge rate increases.

The Board is actively involved in significant situations regarding the entity's "code of conduct".

Annual compensation of executive officers is reviewed annually by the compensation committee of the Board of Directors.

Appointments and terminations of executive officers are determined by the Board.

All material non-routine transactions are reviewed by the Board.

Board meetings are held approximately every three months or more frequently as necessary depending upon the circumstances.

The Board contains several committes (ie., audit committees, compensation committee, etc)

Significant findings and decisions are brought to the attention of the full Board as deemed necessary.

**Confirmation:**

☐ System Confirmed?

☒ Completed

| | | | |
|---|---|---|---|
| **Completed By:** | Amy S. Frazier | **Date:** | 07/17/96 11:02:11 AM |
| **Confirmed By:** | | **Date:** | |
| **Last Modified By:** | William F. Buettner | **Date:** | 08/09/96 08:20:32 AM |

| ☐ Reviewed | Mark D. Kirstein | 07/16/96 03:52:53 PM |
|---|---|---|
| | William F. Buettner | 08/09/96 08:20:32 AM |

☐ Mark for Deletion

CL 003243

## Assessment of Control Environment
HEALTH CARE
**AHERF**
06/30/96

Section: B: Effectiveness of the organization and key management

| Area for Assessment: | Comments: |
|---|---|
| The organizational structure of an enterprise is an important consideration in the enterprise's ability to control its activities. The structure should be neither so simple that it cannot adequately monitor the enterprise's activities nor so complex that it inhibits the flow of necessary information. Executive officers, senior management and others in key management positions (particularly those that have direct responsibility for the financial statements) should possess the requisite experience and level of knowledge commensurate with their positions. In assigning responsibility and delegating authority, management should establish policies that provide a basis for accountability and control, and set out individuals' respective roles. | The AHERF organization is a very structured environment. AHERF senior management coordinate the operations of all subsidiary entities from a central office in Pittsburgh. These executives are all very experienced, well qualified individuals that set the direction of the organization. <br><br> Each subsidiary is also staffed with a full complement of executives that manage all operational aspects of the entity. It has been our experience that these individuals are also very well qualified and could assume the senior AHERF roles if needed. These individuals report on a regular basis to the executive AHERF management. <br><br> Decisions are made in a very structured environment utilizing committees and task forces for many areas. At times, it appears that the information flow is slowed due to the structure, however, it has not presented a concern from an overall management perspective to date. <br><br> With regard to information systems and the desire to automate where possible, AHERF has been active in this area and pursued improvements at a reasonable pace. Until recently, the financial systems were not all centralized, but essentially, in 1995/96, management has been successful in integrating many of the systems to centralized systems. <br><br> From an accountability perspective there are many reports and measurements that are shared throughout the organization. Budgets are established at all levels and reports to senior management are made monthly. These reports contain substantial operational information as well as financial. |

**Appendix B**

CL 003244

**Confirmation:**



_____



| | | |
|---|---|---|
| **Completed By:** | Mark D. Kirstein | **Date:** 07/16/96 04:21:29 PM |
| **Confirmed By:** | | **Date:** |
| **Last Modified By:** | William F. Buettner | **Date:** 08/09/96 08:21:09 AM |

| ☐ Reviewed | William F. Buettner | 08/09/96 08:21:09 AM |
|---|---|---|

☐ Mark for Deletion

**Appendix B**

CL 003245

### Assessment of Control Environment
HEALTH CARE
**AHERF**
**06/30/96**

---

**Section: C: Human resource policies and procedures**

| Area for Assessment: | Comments: |
|---|---|
| Policies and procedures should establish that sufficient competent people are recruited and retained to enable the enterprise's plans to be carried out so that its business objectives can be achieved. | AHERF personnel are comprised of some of the more highly qualified individuals in each of the respective areas of focus. Most senior management positions are staffed with individuals that have diverse and significant experience in their area of expertise.<br><br>With regard to policies and procedures for hiring and supervising. Based on our experiences, it appears that AHERF continues to focus on hiring highly qualified individuals to support senior management. From a developmental perspective, there does not appear to be much formal training, however, the on-the-job training and supervision appears to be strong.<br><br>In the key areas affecting financial reporting there has been very little turnover in the past several years. When AHERF consolidated many functions from Philly to Pittsburgh there were some individuals who left the organization, however, many of the key senior management remained with AHERF. |

**Confirmation:**



---



| | | | |
|---|---|---|---|
| **Completed By:** | Mark D. Kirstein | **Date:** | 07/16/96 04:26:36 PM |
| **Confirmed By:** | | **Date:** | |
| **Last Modified By:** | William F. Buettner | **Date:** | 08/09/96 08:21:40 AM |

|  | William F. Buettner | 08/09/96 08:21:40 AM |
|---|---|---|

CL 003246



CL 003247

# Assessment of Control Environment
HEALTH CARE
**AHERF**
06/30/96

**Section:** D: Integrity and ethical values

| Area for Assessment: | Comments: |
|---|---|
| Management should convey the message that integrity and ethical values within the organization cannot be compromised, and employees should receive and understand that message. Management should continually demonstrate, through words and actions, a commitment to high ethical standards and proper working practices. | Based on our experience and knowledge, it appears that management has established a solid "tone at the top" and enforces sound ethical policies throughout the organization. We are not aware of any instances whereby management compromised their integrity for the good of either themselves or the organization.<br><br>Over the years, management has been very candid with C&L. They have communicated their business plans, problems that they have encountered, etc. to C&L before entering into transactions.<br><br>In the financial reporting area, management is candid and open about the financial position of the organization. At times, management appears to be aggressive in their reporting, usually leaning toward recognition of less expenses than required, however, they take a position and communicate it to C&L. |

**Confirmation:**





| | | | |
|---|---|---|---|
| Completed By: | Mark D. Kirstein | **Date:** | 07/16/96 04:37:37 PM |
| Confirmed By: | | **Date:** | |
| Last Modified By: | William F. Buettner | **Date:** | 08/09/96 08:22:06 AM |

| | | |
|---|---|---|
| Reviewed | William F. Buettner | 08/09/96 08:22:06 AM |



CL 003248

**Assessment of Control Environment**
HEALTH CARE
**AHERF**
06/30/96

**Section: E: Risk of intentional misstatement of the financial statements**

| Area for Assessment: | Comments: |
|---|---|
| The auditor should be alert for any known circumstances that indicate management might, under certain conditions, override the internal control structure or intentionally misstate the enterprise's financial statements. | AHERF monitors budgeted results very carefully. As a result, there are instances where management has taken aggressive stances in order to improve earnings or make the balance sheet appearance improved. While we are not aware of any intentional acts to overstate the financial statements, we are alert to the possibility.<br><br>Management of AHERF receives very healthy bonuses based on the results of the operations. This is also a factor that we consider in reviewing the results of the organization.<br><br>Lastly, AHERF has significant amounts of debt outstanding in the municipal market and have recently begun floating commercial paper. Each of these require secondary market reporting to the public. We will consider this as we review the financial statements and disclosures. Recently as part of the Delaware Valley debt offering, management adopted certain accounting policies (still in accordance with GAAP) which improved results. The items were fully disclosed to C&L and the public, however, the impetus for the change could be the need to refinance the DV debt.<br><br>Overall, we are not aware of any instances to intentionally misstate the financial statements. |

**Confirmation:**





| Completed By: | Mark D. Kirstein | Date: | 07/16/96 04:53:28 PM |
|---|---|---|---|
| Confirmed By: | | Date: | |
| Last Modified By: | William F. Buettner | Date: | 08/09/96 08:22:32 AM |

 Reviewed          William F. Buettner          08/09/96 08:22:32 AM

☐ Mark for Deletion

CL 003250

**Assessment of Control Environment**
HEALTH CARE
**AHERF**
**06/30/96**

Section: F: Reliability of management's estimates

| Area for Assessment: | Comments: |
|---|---|
| The development of reliable estimates is an important management responsibility. To ensure that estimates are appropriate in the circumstances, management should establish a methodology based on current and reliable data, supervise the development of the estimates and seek input from those who possess the knowledge to contribute to the reasonableness of the estimates. | AHERF places great emphasis on the budgets prepared for its operational functions and on other estimates that are material to the financial statements such as bad debt reserve, malpractice insurance and workers compensation insurance.<br><br>There is a separate department that does budgeting for the organization. Each area generally has different individuals responsible for overseeing the budget process: Peter Keys, DV, Gene Trout, AGH, and Elaine Junio, ASRI. It has been our experience that the budget is carefully crafted, monitored regularly by senior management (monthly board reports) and adjusted to react to changing circumstances if need be. We have noted that there are 2 budgets prepared; one management budget and one board budget. The board budget calls for the organization to make more profits than the management budget. We have inquired and noted that this is used as an ultimate target, however, the management target is the real budget.<br><br>With respect to risk management programs specifically malpractice and workers compensation, AHERF is very structured and has experienced personnel in each area that comprise operations, legal and accounting/finance. |

Confirmation:

 System Confirmed

 Complete

CL 003251

| | | | |
|---|---|---|---|
| **Completed By:** | Mark D. Kirstein | **Date:** | 07/16/96 05:02:43 PM |
| **Confirmed By:** | | **Date:** | |
| **Last Modified By:** | William F. Buettner | **Date:** | 08/09/96 08:23:09 AM |

 Reviewed     William F. Buettner          08/09/96 08:23:09 AM

Mark for Deletion

CL 003252

## Assessment of Control Environment
### HEALTH CARE
### AHERF
### 06/30/96

**Section: G: Role of the audit committee**

| Area for Assessment: | Comments: |
|---|---|
| The composition and activities of the audit committee of the board of directors is important, since the audit committee monitors/reviews the enterprise's accounting and financial reporting policies and practices and helps to maintain a direct line of communication with the enterprise's external and internal auditors. An audit committee therefore may reduce the likelihood of management:<br>    .   materially misstating the enterprise's externally issued financial reports.<br>    .   failing to maintain adequately the enterprise's internal control structure in all material respects. | The audit committee at AHERF is very active and has significant influence in the operations of the organization. They meet with C&L at least 2 times a year to discuss the audit plan and the audit results. In addition, they review the internal audit plan each year and review any significant findings that may arise from their work.<br><br>The committee is comprised of well respected, qualified professionals in the business community that evidence a strong regard to controls and the operations within AHERF.<br><br>Any comments made as part of the audit are considered very important and addressed by the committee. Each year, updates are required of prior year comments and, if satisfactory action has not been taken, typically the committee will investigate why. |

**Confirmation:**





| Completed By: | Mark D. Kirstein | Date: | 07/16/96 05:07:14 PM |
|---|---|---|---|
| Confirmed By: | | Date: | |
| Last Modified By: | William F. Buettner | Date: | 08/09/96 08:23:34 AM |

|  | William F. Buettner | 08/09/96 08:23:34 AM |
|---|---|---|



CL 003253

# Assessment of Control Environment
## HEALTH CARE
## AHERF
## 06/30/96

**Section: H: Internal audit**

| Area for Assessment: | Comments: |
|---|---|
|  |  |

CL 003254

When involved in testing financial records and data, internal audit carries out a special control function. Internal audit is part of the control environment and provides assurance to those within the organization responsible for establishing internal control structure policies and procedures that their policies and procedures are functioning as prescribed.

The internal audit department has formal goals and objectives which are presented to all members upon hiring.

Internal audit has open communication with members of the Audit Committee at all times.

Internal Audit is responsible for testing and evaluating the entities internal and computer controls on an ongoing basis.

Internal audit uses standards developed by professional internal audit associations and is looked upon favorably within the enterprise.

C&L is included on the distribution list for internal audit reports and it appears that the assignments and reports generated are appropriate to meet the department's objectives. It should be noted that the scope of Internal Audit's work has been focused on information systems and operational controls.

Based on the review procedures, staffing levels and qualifications of the individuals within the department and the quality of the products provided to C&L in the past, it appears the department's work is adequate and reliable.

Significant issues discovered by the Internal Audit department are brought to the attention of the Audit Committee which in turn dictates the necessary action.

Internal Audit has experienced little to no resistence in its scope of activities and frequently has been requested by management to pursue certain projects based on situations or areas of concern that have been identified by management.

The internal audit department has approximately 21 professionals all of which have undergraduate degrees and/or advanced degrees. Additionally, 18 of the staff are certified in some specialty. As currently structured, the Internal Audit function is centralized from an oversight function with a VP (ie., D. Schrecengost). The department is then segregated by its Pittsburgh vs. DV operations. To extent that certain skills, such as an RN for coding review, is needed resources at the various locations are utilized.

Internal audit has submitted to the audit committee their work plan for 1997 and proposed 1998. This work plan does not

CL 003255

**Confirmation:**





| | | | |
|---|---|---|---|
| **Completed By:** | Mark D. Kirstein | **Date:** | 07/16/96 05:09:33 PM |
| **Confirmed By:** | | **Date:** | |
| **Last Modified By:** | William F. Buettner | **Date:** | 08/09/96 08:24:01 AM |

| Reviewed | William F. Buettner | 08/09/96 08:24:01 AM |
|---|---|---|

CL 003256

**Area for Assessment:**

When involved in testing financial records and data, internal audit carries out a special control function. Internal audit is part of the control environment and provides assurance to those within the organization responsible for establishing internal control structure policies and procedures that their policies and procedures are functioning as prescribed.

**Points of Focus**

**Comments:**

The internal audit department has formal goals and objectives which are presented to all members upon hiring.

Internal audit has open communication with members of the Audit Committee at all times.

Internal Audit is responsible for testing and evaluating the entities internal and computer controls on an ongoing basis.

Internal audit uses standards developed by professional internal audit associations and is looked upon favorably within the enterprise.

C&L is included on the distribution list for internal audit reports and it appears that the assignments and reports generated are appropriate to meet the department's objectives. It should be noted that the scope of Internal Audit's work has been focused on information systems and operational controls.

Based on the review procedures, staffing levels and qualifications of the individuals within the department and the quality of the products provided to C&L in the past, it appears the department's work is adequate and reliable.

Significant issues discovered by the Internal Audit department are brought to the attention of the Audit Committee which in turn dictates the necessary action.

Internal Audit has experienced little to no resistence in its scope of activities and frequently has been requested by management to pursue certain projects based on situations or areas of concern that have been identified by management.

The internal audit department has approximately 21 professionals all of which have undergraduate degrees and/or advanced degrees. Additionally, 18 of the staff are certified in some specialty. As currently structured, the Internal Audit function is centralized from an oversight function with a VP (ie., D. Schrecengost). The department is then segregated by its Pittsburgh vs. DV operations. To extent that certain skills, such as an RN for coding review, is needed resources at the various locations are utilized.

Internal audit has submitted to the audit committee their work plan for 1997 and proposed 1998. This

CL 003257

work plan does not consider any management request projects that may be presented during the upcoming year.

Additionally, as noted through discussions with VP of Internal Audit, D. Schrecengost, a proposal to implement management self audits and coordination of a consolidated corporate integrity compliance program.

CL 003258

## Assessment of Control Environment
HEALTH CARE
AHERF
06/30/96

---

**Section: I: Reasonableness of management plans and budgetary control**

| Area for Assessment: | Comments: |
|---|---|
| Management develops plans and budgets to monitor the activities of the business. To be effective, these plans and budgets should be realistic, based on valid assumptions and developed by knowledgeable individuals. Management must also have sufficient reliable information on a timely basis to review and evaluate the enterprise's operations. Many of management's procedures will be specific to particular transaction cycles and account balances and should be considered in relation to the relevant monitoring control objectives. | See earlier discussions in ACE on managements estimates, monitoring of monthly results and BOD reviews of results. In all cases, AHERF focuses significant attention on the preparation of budgets and the achievement of the budgeted results.<br><br>It appears that appropriate levels of management are involved in the development of the estimates. The process for DV and AGH are generally the same w/ Department Chairs developing estimates of volume projections. After volume projections are completed and returned to Budgeting, the revenue is projected. Fixed costs are then taken into consideration by the budget department. Budgeting then takes revenue less the required bottom line (set by CEO of each facility at DV), less the fixed costs to calculate a remaining pool of money, which represents the other elements in the budget that are completed by the Department heads of each facility. ASRI is different due to their type operations. |

**Confirmation:**



---



| | | | |
|---|---|---|---|
| **Completed By:** | Mark D. Kirstein | **Date:** | 07/16/96 05:11:11 PM |
| **Confirmed By:** | | **Date:** | |
| **Last Modified By:** | William F. Buettner | **Date:** | 08/09/96 08:24:29 AM |

| Reviewed | William F. Buettner | 08/09/96 08:24:29 AM |
|---|---|---|

CL 003259

**EXHIBIT  2508**

Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Thursday, March 12, 1998 - 10:00 a.m. by Videoconference
Allegheny University Hospitals, Allegheny General Board Room, Pittsburgh
and
Hahnemann New College Building Board Room, Philadelphia

## Members

William F. Adam
J. David Barnes
Ralph W. Brenner, Esq.
Dorothy McKenna Brown, Ed.D.
Frank Cahouet
D. Walter Cohen, D.D.S.
Douglas D. Danforth
Ronald R. Davenport
Harry R. Edelman, III
Robert L. Fletcher
Ira J. Gumberg

Robert M. Hernandez
Alfred W. Martinelli
Joseph Neubauer
Francis B. Nimick, Jr.
Thomas H. O'Brien
Robert B. Palmer
Robert Potamkin, Esq.
David W. Sculley
W. P. Snyder III
Walter L. Williamson

## Ex-Officio Members

Sherif S. Abdelhak
Barbara Atkinson, M.D.
Jeffrey Glassroth, M.D.
Joseph C. Maroon, M.D.

Donna Murasko, Ph.D.
Joel Roslyn, M.D.
Richard Shannon, M.D.

## Other Invitees

Lynn R. Isaacs
Dwight Kasperbauer
Donald Kaye, M.D.
David W. McConnell

Leonard L. Ross, Ph.D.
Anthony M. Sanzo
Nancy A. Wynstra, Esq.



DEPOSITION
EXHIBIT
2508
AKF 3/15/04

DVR: 76031.1

JB 02256

AHERF Board of Trustees
March 12, 1998
Page 2

## AGENDA

|  |  |  | Presenter | Action Required | Tab |
|---|---|---|---|---|---|
| I. | **Opening of the Meeting** | | W.P. Snyder III | | |
| II. | **Additions to the Agenda** | | | | |
| III. | **AHERF Governance Issues** | | | | |
| | A. | Minutes from the Meeting held on October 30, 1997 | W.P. Snyder III | Approval | 1 |
| | B. | Minutes from the Special Meeting held on January 5, 1998 | W.P. Snyder III | Approval | 2 |
| | C. | Amendment to AHERF Bylaws and Articles of Incorporation | N. Wynstra, Esq. | Approval | 3 |
| IV. | **Report from the Finance and Audit Committee** | | J.D. Barnes | | |
| | A. | Results of AHERF Operations for the Period Ended January 31, 1998 | | Acceptance | 4 |
| | B. | Update: Status of Intercompany Borrowings | | Information | 5 |
| | C. | Update: Status of Government Audits of Physicians at Teaching Hospitals | | Information | 6 |
| | D. | Information Systems and Technology Strategic Status Report | | Information | 7 |

JB 02257

AHERF Board of Trustees
March 12, 1998
Page 3

V.    <u>Information Items</u>

      AHERF - Report of the President          S. Abdelhak          Information          8
              and CEO

VI.    <u>Adjournment</u>                          W.P. Snyder III

DVR: 76031.1                                                              JB 02258

AHERF Board of Trustees
March 12, 1998
Page 4

## AHERF MEETING AS THE MEMBER

|  |  | Presenter | Action Required | Tab |
|---|---|---|---|---|
| **I.** | **AHERF Meeting as the Member of Allegheny General Hospital** |  |  |  |
|  | A. Minutes from the AHERF Meeting as the Member of AGH held on October 30, 1997 | W.P. Snyder III | Approval | 9 |
|  | B. Amendments to AGH Bylaws | N. Wynstra, Esq. | Approval | 10 |
| **II.** | **AHERF Meeting as the Member of Allegheny University Medical Centers** |  |  |  |
|  | A. Minutes from the AHERF Meeting as the Member of AUMC held on October 30, 1997 | W.P. Snyder III | Approval | 11 |
|  | B. Amendments to AUMC Bylaws | N. Wynstra | Approval | 12 |
| **III.** | **AHERF Meeting as the Member of Allegheny University Hospitals - West** |  |  |  |
|  | AUH- West Bylaws | N. Wynstra, Esq. | Approval | 13 |
| **IV.** | **AHERF Meeting as the Member of Allegheny University Hospitals - East, Allegheny Hospitals, Centennial, and Allegheny Hospitals, New Jersey** |  |  |  |
|  | A. Minutes from the AHERF Meeting as the Member of AUH held on October 30, 1997 | W.P. Snyder III | Approval | 14 |
|  | B. Minutes from the AHERF Meeting as the Member of AH,C held on October 30, 1997 | W.P. Snyder III | Approval | 15 |

DVR: 76031.1                                    JB 02259

AHERF Board of Trustees
March 12, 1998
Page 5

|  |  | Presenter | Action Required | Tab |
|---|---|---|---|---|
| C. | Minutes from the AHERF Meeting as the Member of AH,NJ held on October 30, 1997 | W.P. Snyder III | Approval | 16 |
| D. | Articles of Merger and Corporate Bylaws | N. Wynstra, Esq. | Approval | 17 |

**V.   AHERF Meeting as the Member of St. Christopher's Hospital for Children**

| A. | Minutes from the AHERF Meeting as the Member of SCHC held on October 30, 1997 | W.P. Snyder III | Approval | 18 |
|---|---|---|---|---|
| B. | Articles of Merger and Corporate Bylaws | N. Wynstra, Esq. | Approval | 19 |

**VI.   AHERF Meeting as the Member of Allegheny University of the Health Sciences**

| A. | Minutes from the AHERF Meeting as the Member of AUHS held on October 30, 1997 | W.P. Snyder III | Approval | 20 |
|---|---|---|---|---|
| B. | Amendments to AUHS Bylaws | N. Wynstra, Esq. | Approval | 21 |

**VII.   AHERF Meeting as the Member of Allegheny Integrated Health Group d/b/a Allegheny University Medical Practices**

| A. | Minutes from the AHERF Meeting as the Member of AIHG held on October 30, 1997 | W.P. Snyder III | Approval | 22 |
|---|---|---|---|---|
| B. | Amendments to AIHG Bylaws and Articles of Incorporation | N. Wynstra, Esq. | Approval | 23 |

DVR: 76031.1

JB 02260

**EXHIBIT  2562**

SPECIAL MEETING OF THE BOARD OF TRUSTEES
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
MEETING AS THE MEMBER OF ALLEGHENY UNIVERSITY HOSPITALS-EAST
Monday, June 1, 1998 - 10:00 A.M.
Allegheny University Hospitals, Allegheny General Board Room
Pittsburgh, Pennsylvania

A special meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation ("AHERF"), meeting as the Member of Allegheny University Hospitals-East, was held on Monday, June 1, 1998 at 10:00 a.m. in the Allegheny University Hospitals, Allegheny General Board Room in Pittsburgh. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board of Trustees. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| MEMBERS PRESENT | OTHER INVITEES | MEMBERS ABSENT |
|---|---|---|
| Sherif S. Abdelhak | Lynn R. Isaacs | Frank V. Cahouet |
| Barbara F. Atkinson, M.D. | Dwight Kasperbauer | Jeffrey Glassroth, M.D. |
| William F. Adam | Donald Kaye, M.D. | Alfred W. Martinelli |
| J. David Barnes | David W. McConnell | Joseph Neubauer |
| Ralph W. Brenner, Esq. | Charles P. Morrison | Robert M. Potamkin, Esq. |
| · Dorothy McKenna Brown, Ed.D. | Leonard L. Ross, Ph.D. | David W. Sculley |
| D. Walter Cohen, D.D.S. | Barry H. Roth | |
| Douglas D. Danforth | Anthony M. Sanzo | |
| Ronald R. Davenport | Nancy A. Wynstra, Esq. | |
| Harry R. Edelman, III | | |
| Robert L. Fletcher | | |
| · Ira J. Gumberg | | |
| Robert M. Hernandez | | |
| Joseph C. Maroon, M.D. | | |
| Donna M. Murasko, Ph.D. | | |
| Francis B. Nimick, Jr. | | |
| Robert B. Palmer* | | |
| Joel Roslyn, M.D. | | |
| Richard P. Shannon, M.D. | | |
| W.P. Snyder III | | |
| Walter L. Williamson | | |

* By Phone

I.    OPENING OF THE MEETING

The special meeting was called to order at 10:00 a.m. by W.P. Snyder III, Chairman. Nancy A. Wynstra, Esq. maintained the minutes. The Chairman declared that a quorum was present and the meeting was competent to proceed.

TAC054490  CM

DVR: 81363.1



Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 2

II.     **ADDITIONS TO THE AGENDA**

There were no additions to the agenda.

III.    **APPROVAL ITEMS**

A.     Leveraging Non-Clinical Assets

Mr. Morrison presented a proposed resolution regarding leveraging of non-clinical assets. For the past year senior management has been evaluating various ways of improving liquidity in the Eastern Region. Within the recent past, several parties representing Real Estate Investment Trusts ("REITS") have approached AHERF to learn whether the organization would be interested in selling, in some form or another, any real estate of the organization. The managers of REITS, actively look for real estate investment opportunities by investing their participants' funds in real estate to generate a competitive rate of return.

Mr. Morrison reviewed terms of the leaseback as well as related expenses and conditions of the agreement. He stated that in a sale and leaseback, the property is sold and the seller then leases back the property for a lengthy term, often with a repurchase option. Senior management has explored the form of a sale and leaseback as a way to get additional liquidity for the Eastern Region without losing control over the property after the sale and providing the opportunity to repurchase, if needed, the property at the end of the lease.

The proposed resolutions authorize the sale and leaseback (and under specified circumstances, the lease and leaseback) of four non-clinical assets comprising the three parking garages located at Vine Street and associated with the Hahnemann Campus, "A" Street at St. Christopher's Hospital for Children and at Henry Avenue on the East Falls Campus as well as the Bellet Building across from the Hahnemann Campus. The four properties will be sold to United States Realty Advisors, Inc. or its nominee on the general terms and conditions set forth on Exhibit "A" for a gross, aggregate purchase price of approximately $60,000,000.00. Mr. Morrison reviewed the approximate fees associated with the transaction as set forth on Exhibit "A." Ms. Wynstra noted that there are some zoning issues relative to the Hahnemann and MCP garages. If necessary approvals are not able to be obtained, the MCP garage in particular, may have to be taken out of the transaction or a lease/leaseback arrangement may be a possibility. As the transaction is being underwritten on the credit of the Delaware Valley Obligated Group, Allegheny University of the Health Sciences may be required to execute a guaranty of the lease payments.

TAC054491 CM

DVR: 81363.1

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 3

Upon motion duly made and seconded, the Board of Trustees of Allegheny Health, Education and
Research Foundation, acting in its capacity as the Member of Allegheny University Hospitals-East
(AUH,E), approved the following resolutions:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and
Research Foundation, in its capacity as the Member of AUH,E hereby authorizes
the sale-leaseback (or if necessary for zoning purposes, the lease-leaseback) to
United States Realty Advisors, Inc. or its nominee of the parking garage located at
Vine Street, the parking garage located on the St. Christopher's Hospital for
Children campus, the parking garage located on the East Falls Campus and the
property known as the Bellet Building on the corner of 15th and Race Streets
(collectively, the "Properties") for a gross aggregate purchase price of
approximately $60,000,000.00 on the general terms and conditions set forth on
Exhibit "A" attached hereto and made a part hereof, and any other reasonable
actions or undertakings associated therewith;

FURTHER RESOLVED, that the Board of Trustees hereby authorizes the execution
and delivery of a guaranty of the lease payments by AUHS.

FURTHER RESOLVED, that the Board of Trustees hereby authorizes the
defeasance of bond debt incurred in connection with the Properties in an amount
as required but not to exceed the purchase price received for the Properties or the
restriction of the use of the proceeds of the purchase price and any other such
actions to the extent required to preserve the tax-exempt status of the bonds.

B.    Sale of Delaware Valley Community Hospitals

Ms. Wynstra presented, for consideration, a proposed resolution regarding the sale of certain
Delaware Valley Hospitals to the Vanguard Health System.    She reviewed the various documents
that were submitted to the Office of the Attorney General of the Commonwealth of Pennsylvania
with regard to the transaction. There was discussion regarding the level of administrative services
Allegheny will continue to provide to Vanguard. This service agreement and the establishment
of general terms and costs associated with the provision of services is still under negotiation. Ms.
Wynstra explained the approval process for the Vanguard transaction as related to the
Pennsylvania Attorney General as well as the Orphan's Court. She noted that the Attorney
General may determine that a public comment session will be held. Other constituencies will
possibly express opinions at the Orphan's Court level. She noted that the Attorney General has
obtained its own fairness opinion from the firm of Arthur Anderson. Ms. Wynstra stated that
Allegheny does not intend to formally initiate the New Jersey approval process without additional
knowledge of the status of the Pennsylvania approval process.

TAC054492 Cm

DVR: 81363.1

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 4

In reviewing the various documents, Ms. Wynstra advised that the Attorney General appears to understand Allegheny's need to pay off outstanding debt with the proceeds from the sale, and it is not anticipated that Allegheny will be expected to set aside proceeds for a community foundation, as is normally the requirement when a non-profit institution is sold to a for-profit entity.

After much discussion, and upon motion duly made and seconded, the Board of Trustees of Allegheny Health, Education and Research Foundation, acting in its capacity as the Member of Allegheny University Hospitals-East (AUH-E), approved the following resolution, as presented, subject to a clarification, in the form of a side letter of understanding, of the issues of non-compete relative to restrictions placed on the remaining institutions so they can remain competitive in the community, and subject to further review of the ancillary agreements, earn out agreements, left behind opinion and representations and warranties letter:

WHEREAS, Allegheny University Hospitals-East ("AUH-E") owns and operates five hospitals located in the Delaware Valley region of the Commonwealth of Pennsylvania, which include Allegheny University Hospitals, Elkins Park, located in Elkins Park, PA and Allegheny University Hospitals, Bucks County, located in Warminster, PA;

WHEREAS, AUH-E is part of a multi-hospital health, education and research system (the "Allegheny System") operated by Allegheny Health, Education and Research Foundation ("AHERF"), which system operates hospitals, a health sciences university, physician practices and other health-related activities in the eastern and western sections of the Commonwealth of Pennsylvania and in surrounding states, including New Jersey;

WHEREAS, the Allegheny System owns and operates six community hospitals in the Delaware Valley region; Allegheny University Hospitals, Graduate ("AUH,G"); Allegheny University Hospitals, City Avenue ("AUH,CA"), Allegheny University Hospitals, Parkview ("AUH,P"), all of which are located in Philadelphia, PA, Allegheny University Hospitals, Rancocas ("AUH,R"), located in Rancocas, NJ and AUH,EP, and AUH,BC (collectively the "Delaware Valley Community Hospitals");

WHEREAS changing demographic, competitive and economic circumstances in the Delaware Valley healthcare marketplace have caused the Allegheny System to reevaluate the appropriateness of operating community hospitals in the Delaware Valley region and, after detailed review, have resulted in a decision to discontinue the operation of the Delaware Valley Community Hospitals and a concomitant decision to concentrate on the provision of tertiary hospital services and education and research services in that region;

TAC05449

DVR: 81363.1

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 5

WHEREAS, after extensive analysis of alternatives, the Allegheny System has determined that its long-term viability would be best protected in the Delaware Valley region by selling the Delaware Valley Community Hospitals to a successor owner which would concentrate on the provision of community hospital services and which would not compete directly with the tertiary services provided by the three tertiary hospitals in the Allegheny System in the Delaware Valley region;

WHEREAS, Vanguard Health Systems, Inc.("Vanguard") is a newly formed investor-owned healthcare company with principals with extensive experience in the ownership and operation of community hospitals, which company intends to specialize in the acquisition and operation of community hospitals formerly operated by non-profit owners, and does not intend to compete directly with the tertiary hospitals in the Allegheny System;

WHEREAS, after extensive arm's-length negotiation and the accomplishment of extensive due diligence reviews by both the Allegheny system and Vanguard, AUH-E, along with its affiliates operating hospitals in the Delaware Valley region, Allegheny University Hospitals, Centennial ("AUH-C") and Allegheny Hospitals, New Jersey ("AH-NJ"), have concluded an Asset Purchase Agreement (the APA") with Vanguard and its wholly owned subsidiary, VH-II, Inc., under the terms of which AUH-E, AUH-C and AH-NJ would sell, and VH-II would acquire and operate the Delaware Valley Community Hospitals presently owned and operated by AUH-E, AUH-C, and AH-NJ respectively;

WHEREAS, the terms and conditions of the APA provided for the sale of the tangible assets of the Delaware Valley Community Hospitals (including property, plant and equipment) and for assignment of certain contracts and other intangible assets and obligations pertaining to the Delaware Valley Community Hospitals as agreed upon by the parties;

WHEREAS, after careful review of the proposed terms and conditions of the APA, the Board of Trustees of AUH-E (the "Board") has determined that the proposed terms and conditions of the sale of the Delaware Valley Community Hospitals as contained in the APA (the "Sale") were negotiated at arm's length, that such terms and conditions are reasonable, appropriate and in the best interests of AUH-E, and that the consideration contained in the APA for the sale of AUH-EP and AUH-BC and the other Delaware Valley Community Hospitals to VH-II represents fair and reasonable compensation to AUH-E for the value of those hospitals;

WHEREAS, after reviewing the APA and the terms and conditions thereof, the Board desires to approve and authorize the APA and the Sale, and the actions, transactions and undertakings associated therewith;

DVR: 81363.1

TAC054494 CM

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 6

NOW THEREFORE, BE IT RESOLVED, by the Board of Trustees of AHERF, acting as the member of Allegheny University Hospitals-East, that the proposed Asset Purchase Agreement (the "APA") by and between AUH-E, Allegheny Hospitals, Centennial ("AUH-C") and Allegheny Hospitals, New Jersey, on the one hand, and VH-II, Inc., a wholly owned subsidiary of Vanguard Health Systems, Inc., on the other hand, is hereby approved, authorized and ratified, and the sale to VH-II of the assets of Allegheny University Hospitals, Elkins Park and Allegheny University, Bucks County, along with all of the actions, transactions and/or undertakings associated therewith (including, without limitation, the transfer of the property, plant equipment and other tangible and intangible assets of those hospitals as agreed upon between the parties) are hereby approved, authorized and ratified;

FURTHER RESOLVED that the Board has determined and hereby affirms and states that the proposed terms and conditions of the sale of the Delaware Valley Community Hospitals as contained in the APA (the "Sale") were negotiated at arm's length, that such terms and conditions are reasonable, appropriate and in the best interests of AUH-E and that the consideration contained in the APA for the sale of AUH-EP and AUH-BC to VH-II represents fair and reasonable compensation to AUH-E for the value of those hospitals;

FURTHER RESOLVED, that AUH-E shall, in cooperation with Vanguard and VH-II, cause all approvals to be obtained which are legally required to be obtained in connection with the Sale and/or any of the actions, transactions and/or undertakings associated therewith, from any person or entity, whether governmental or private, including, but not limited to, any bond trustee, bond insurer, governmental agency or court, in order to effect the Sale and/or any of the actions, transactions and/or undertakings associated therewith (including, without limitation, the transfer of the property, plant equipment and other tangible and intangible assets of those hospitals as agreed upon between the parties, provided that any modifications or reconfigurations in the terms of the Sale required to secure any such approval shall be undertaken and are hereby approved as shall be determined to be reasonable, appropriate, and in the best interests of AUH-E as determined by the President and CEO of AUH-E, but further provided that the Sale and the essential terms thereof as approved herein shall be maintained in all such circumstances, and despite any such structural modifications which may be required;

FURTHER RESOLVED, that any of the Authorized Officers of AUH-E are hereby authorized and directed to do all such things and take all such actions as may deem be reasonable and appropriate to provide for the implementation and effectuation of the Sale and/or any of the actions, transactions and/or undertakings associated therewith, including without limitation, by execution of contracts and other

DVR: 81363.1

TAC054495 Cm

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 7

undertakings, delivery of deeds and other instruments, nsecuring of licenses, permits, and approvals, and making of filings and notifications, and all such actions are hereby approved and ratified; and

FURTHER RESOLVED, that for the purpose of this resolution, the persons holding the positions within AUH-E of President & CEO, Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer as of the date of any action authorized or contemplated hereunder with respect to such Officer, are "Authorized Officers" duly authorized to enter into the transactions contemplated by this resolution in the name and on behalf of AUH-E; and

FURTHER RESOLVED, that, notwithstanding the implementation or completion or the Sale and/or any of the actions, transactions and/or undertakings associated therewith, there is hereby authorized the continuing execution and delivery by the Authorized Officers or any one of them, in the name of and on behalf of AUH-E of all such instruments, undertakings, certificates or documents advisable, convenient or necessary to formulate, proceed with, accomplish, effect and/or implement the to provide for the accomplishment, effectuation and/or implementation of the Sale and/or any of the actions, transactions and/or undertakings associated therewith, and the execution thereof by any such Authorized Officer shall be conclusive as to such Officer's determination of the advisability, necessity or convenience of such document, instrument or undertaking with respect to the formulation, proceeding with, accomplishment, effectuation and/or implementation of the Sale and/or any of the actions, transactions and/or undertakings associated therewith;

FURTHER RESOLVED, that any action taken by any Authorized Officer as authorized by these resolutions with respect to any acts, transactions or undertakings undertaken by or on behalf of AUH-E to proceed with, accomplish, effect and/or implement the Sale and/or any of the actions, transactions and/or undertakings associated therewith are hereby approved and ratified; and

FURTHER RESOLVED that the effectiveness of these resolutions, including without limitation the approval and authorization of the Sale and of all of the actions, transactions and/or undertakings authorized and approved hereby shall be expressly conditioned upon the approval and authorization of the Sale and of all of the actions, transactions and/or undertakings reasonably appropriate, necessary or incident to the Sale by each of the following: AHERF;AUH,C; and AUH, NJ and any other affiliate or entity within the Allegheny System which is a participant in, or whose approval is required to accomplish, implement and/or effectuate, the Sale and/or the actions, transactions and/or undertakings associated therewith;

DVR: 81363.1

TAC054496 Cm

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Meeting as the Member of Allegheny University Hospitals-East
June 1, 1998
Page 8

FURTHER RESOLVED, that the Secretary of the corporation is hereby authorized and directed to maintain an executed copy of the Asset Purchase Agreement in the business records, including without limitation, all amendments, novations or modifications of the Agreement, and all exhibits and schedules to the Agreement in the form finally agreed upon between the parties.

Mr. Snyder announced that he had directed Mr. Abdelhak and his management team to refocus the strategic direction of AHERF to support tertiary care services, while maintaining productive education and research initiatives. Mr. Snyder stated that management would respond with suggested revisions to the strategic planning document and a special meeting of the AHERF Board will be held to discuss the issue.

IV.     ADJOURNMENT

There being no further business, the meeting was adjourned.

Respectfully submitted,

_____
Nancy A. Wynstra, Esq.
Secretary

NOTED ATTACHMENTS: Meeting Notice; Exhibit A to Leveraging Non-Clinical Assets Resolutions.

TAC054497 Cm

DVR: 81363.1

**EXHIBIT  2592**

PNC Bank, N.A.
Pittsburgh, PA 15265

File: Allegheny General Hospital

# PNCBANK

March 6, 1997

Allegheny General Hospital
D. L. Clark Building
503 Martindale Street, 4th Floor
Pittsburgh, PA  15212

Attention:  Michael P. Martin, Vice President of Treasury

           Re:  Allegheny County Hospital Development Authority
                Adjustable Convertible Extendable Securities,
                Hospital Revenue Bonds (Allegheny Health,
                Education and Research Corporation) Series 1988A
                through Series 1988D

Dear Mike:

        On February 24, 1988, we issued our irrevocable letter
of credit (the "Letter of Credit") in the amount of $61,208,220
on behalf of your predecessor, Allegheny Health, Education and
Research Corporation ("AHERC") to secure the above-referenced
Bonds.  The Letter of Credit was issued pursuant to a Letter of
Credit, Reimbursement and Security Agreement dated as of
February 1, 1988 (the "Reimbursement Agreement") between AHERC
and Pittsburgh National Bank (now PNC Bank, National Association,
"PNC") and currently is scheduled to terminate on March 15, 1997,
unless extended.

        We are pleased to advise you that, subject to the terms
hereof and your execution of the Acceptance hereto, we are
extending the Stated Termination Date of the Letter of Credit to
March 15, 2000, subject to the following:

        1.   The Letter of Credit commitment fee referred
to in Section 2.02(b) of the Reimbursement Agreement shall be
increased to (i) fifty-five one hundredths percent (.55%) per
annum for so long as the Corporation maintains a rating from
Moody's Investors Service, Inc. of A2 or better, (ii) sixty-five
one hundredths percent (.65%) per annum in the event that the
Corporation's rating from Moody's Investors Service, Inc. is
dropped below A2 but is at least A3 and (iii) seventy-five one
hundredths percent (.75%) per annum in the event that the
Corporation's rating from Moody's Investors Service, Inc. drops
below A3.

PNC25024



DEPOSITION
EXHIBIT
2592
AKF 5/7/04

Allegheny General Hospital
March 6, 1997
Page 2


        2.  The first sentence following Section
2.02(a)(iv) of the Reimbursement Agreement shall be amended and
restated in its entirety as follows:

                In the event a Tender Draft remains unpaid
                upon the expiration of the Letter of Credit,
                such unpaid amount shall be payable by the
                Corporation in twenty equal consecutive
                quarterly installments on March 1, June 1,
                September 1 and December 1 of each year (each
                a "Payment Date"), with the first such
                installment to be due and payable on the
                first Payment Date following the expiration
                of the Letter of Credit with accrued interest
                on such unpaid amount payable on each Payment
                Date in addition to principal at the rate and
                in the manner provided below.

        All other terms of the Reimbursement Agreement shall
remain in full force and effect.

        Please confirm your acceptance of the foregoing and
that the Reimbursement Agreement and the Series 1988B Note dated
February 24, 1988 (the "Note"), issued by AHERC to PNC pursuant
to the Master Indenture referred to therein remain in full force
and effect by signing the Acceptance set forth below.  Upon
acceptance hereof, a renewal fee equal to five one hundredths
percent (.05%) of the Letter of Credit Amount shall be due and
payable to PNC.  Capitalized terms used herein and not otherwise
defined shall have the meanings given them in the Letter of
Credit.

                        Very truly yours,

                        PNC BANK, NATIONAL ASSOCIATION

                        By: _____

PNC25025

Allegheny General Hospital
March 6, 1997
Page 3

ACCEPTANCE

Allegheny General Hospital, the successor to Allegheny Health,
Education and Research Corporation, intending to be legally bound
hereby, hereby agrees to the matters set forth above and confirms
that the Reimbursement Agreement and the Note, both as defined
above, remain in full force and effect as of March 15, 1997.

ALLEGHENY GENERAL HOSPITAL

By: Michael P. Martin
Name:  Michael P. Martin
Office:  Vice President of Treasury

207905.1

PNC25026

**EXHIBIT  2618**

# MBIA

CLOSING ITEM NO.A 7(a)

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

Policy No.  21270

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to the principal corporate trust office of Norwest Bank Minnesota, National Association, Columbia, Maryland or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

$227,830,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series A of 1996

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or its designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this 19th day of June, 1996            , but this policy shall not be valid unless countersigned by an authorized resident licensed agent of the Insurer.

COUNTERSIGNED:

_____
Resident Licensed Agent

LANCASTER, PA
City, State

MBIA Insurance Corporation

_____
President

Attest:

_____
Assistant Secretary

STD-RMS-PA-6
4/95

EXHIBIT
2618
By  6/15/04
PENGAD 800-631-6989

MBIA          051300