**MBIA**

MBIA Insurance Corporation
113 King Street
Armonk, NY 10504
914 273 4545

June 19, 1996

the principal corporate trust office of Norwest Bank Minnesota, National Association
Columbia, Maryland

$227,830,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series A of 1996

Gentlemen:

In connection with the above-described obligations (the "Obligations") of which you are acting as paying agent (the "Paying Agent"), please be advised that the payment to you of principal of and interest on the Obligations has been guaranteed by a policy of financial guaranty insurance (the "Policy") issued by the MBIA Insurance Corporation (the "Insurer"). State Street Bank and Trust Company, N.A., New York, New York, (the "Fiscal Agent") is acting as the fiscal agent for the Insurer.

The Policy unconditionally and irrevocably guarantees to any owner or holder of the Obligations or, if applicable, of the coupons appertaining thereto (the "Owner"), the full and complete payment required to be made by or on behalf of the issuer of the Obligations (the "Issuer") to the Paying Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference (a "Preference") to the Owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence are referred to collectively in this letter as the "Insured Amounts."

The Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligations. The Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of Obligations upon tender by an Owner thereof; or (iv) any Preference relating to (i) through (iii) above.

**MBIA**

-2-

In the event that the Issuer does not make full and complete payment when due of the principal of and interest on the Obligations, please immediately notify, by telephone or telegraph, the Insurer, 113 King Street, Armonk, New York, 10504, (914) 273-4545. On the due date or within one business day after receipt of such notice, whichever is later, the Insurer will deposit funds with the Fiscal Agent sufficient to pay the Obligations (or, if applicable, coupons appertaining thereto) then due. Upon presentment and surrender of such Obligations (or, if applicable, coupons) or presentment of such other proof of ownership of Obligations together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for the Owners in any legal proceeding related to payment of Insured Amounts on the Obligations (or, if applicable, coupons), such instruments being in a form satisfactory to the Fiscal Agent, shall disburse to you payment of the Insured Amounts due on such Obligations (and, if applicable, coupons), less any amount held by you for the payment of such Insured Amounts and legally available therefor.

Forms of such instruments of assignment and instruments to effect the appointment of the Insurer as such agent for the Owners (collectively, the "Claim Documents"), which are currently acceptable to the Fiscal Agent and the Insurer, are on file with the Fiscal Agent. The Insurer may, from time to time, file revised forms of Claim Documents with the Fiscal Agent in substitution for the forms previously filed with the Fiscal Agent, and upon such filing, the revised forms shall supersede all forms of Claim Documents previously filed with the Fiscal Agent, except as otherwise directed by the Insurer in writing.

In the event that you shall have prior knowledge of an impending failure by the Issuer to make payment on the Obligations (or, if applicable, coupons) when due, please immediately notify the Insurer so that it will be possible to have funds available for you on the due date to make payments against surrendered Obligations (and, if applicable, coupons).

Your cooperation in this matter will be most appreciated and will make it possible for the Owners of Obligations guaranteed by the Insurer to be assured of all payments when due.

Very truly yours,

*Richard Weill*

Richard L. Weill
President

 **MBIA**    MBIA Insurance Corporation
113 King Street
Armonk, NY 10504
914 273 4545

June 19, 1996

the principal corporate trust office of Norwest Bank Minnesota, National Association
Columbia, Maryland

$19,203,063.75
Debt Service Reserve Fund for the
$227,830,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series A of 1996

Gentlemen:

In connection with the above-described obligations (the "Obligations") for which you are acting as Paying Agent, please be advised that the payment to you of certain amounts which are to be applied to payment of principal of and interest on the Obligations has been guaranteed by the accompanying Surety Bond No. 21271 (the "Surety Bond") issued by MBIA Insurance Corporation (the "Insurer"). State Street Bank and Trust Company, N.A., New York, New York, (the "Fiscal Agent") is acting as the fiscal agent for the Insurer.

The maximum amount available under the Surety Bond for payment pursuant to any one demand for payment by you as described below (a "Demand for Payment") shall not exceed the Surety Bond Limit as defined on the first page of the Surety Bond. The amount available at any particular time to be paid to you under the Surety Bond (the "Surety Bond Coverage") shall be reduced and may be reinstated from time to time as set forth in the Surety Bond and as described below.

If the Issuer under the Document (as those terms are defined on the first page of the Surety Bond) does not make full and complete payment thereunder when due, please immediately deliver, by prepaid rapifax, telex, TWX or telegram, a complete executed Demand for Payment (substantially in the form of Attachment 1 to the Surety Bond) to the Insurer, MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504 (telephone: (914) 273-4545; telecopy (914) 765-3161 or 3162). Please confirm delivery and receipt of such Demand for Payment by telephone.

MBIA    051303

# MBIA

Page Two
June 19, 1996

Upon the later of: (i) three (3) days after receipt by the Insurer of a completed Demand for Payment, duly executed by you certifying that payment due under the Document has not been made to you; or (ii) the payment date of the Obligations as specified in the Demand for Payment presented by you to the Insurer, the Insurer will make a deposit of funds in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment to you, of amounts which are then due to you (as specified in the Demand for Payment) subject to the Surety Bond Coverage.

The amount payable by the Insurer under the Surety Bond pursuant to a particular Demand for Payment shall be limited to the Surety Bond Coverage. The Surety Bond Coverage shall be reduced automatically to the extent of each payment made by the Insurer under the Surety Bond and will be reinstated to the extent of each reimbursement of the Insurer by the Obligor pursuant to Article II of the accompanying Financial Guaranty Agreement between the Insurer and the Obligor (the "Financial Guaranty Agreement"). In no event shall such reinstatement exceed the Surety Bond Limit. The Insurer will notify you, in writing within five (5) days of such reimbursement, that the Surety Bond Coverage has been reinstated to the extent of such reimbursement pursuant to the Financial Guaranty Agreement and such reinstatement shall be effective as of the date the Insurer gives such notice. The notice to you will be substantially in the form attached to the Surety Bond as Attachment 2.

This letter does not alter the terms of the Surety Bond or the Financial Guaranty Agreement.

In the event that you shall have prior knowledge of an impending failure by the Obligor to make payment as required by the Document when due, please immediately notify the Insurer so that it will be possible for the Insurer to have funds available for you on the due date to make payments as described above.

Your cooperation in this matter will be most appreciated and will make it possible for the holders of Obligations to be assured of all payments when due to the extent of the Surety Bond Coverage.

Very truly yours,

*Richard Weill*

Richard L. Weill
President

**MBIA**

CLOSING ITEM NO. A-7(b)

# FINANCIAL GUARANTY INSURANCE POLICY

## MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. 21272

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to  the principal corporate trust office of Norwest Bank Minnesota, National Association, Columbia, Maryland  or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

$33,055,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series B of 1996

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this 19th day of June, 1996         , but this policy shall not be valid unless countersigned by an authorized resident licensed agent of the Insurer.

COUNTERSIGNED:

_Resident Licensed Agent_

LANCASTER, PA
City, State

STD-RMS-PA-6
495

MBIA Insurance Corporation

_Richard Weill_

President

Attest:

Assistant Secretary

**MBIA**  MBIA Insurance Corporation
113 King Street
Armonk, NY 10504
914 273 4545

June 19, 1996

the principal corporate trust office of Norwest Bank Minnesota, National Association
Columbia, Maryland

$33,055,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series B of 1996

Gentlemen:

In connection with the above-described obligations (the "Obligations") of which you are acting as paying agent (the "Paying Agent"), please be advised that the payment to you of principal of and interest on the Obligations has been guaranteed by a policy of financial guaranty insurance (the "Policy") issued by the MBIA Insurance Corporation (the "Insurer"). State Street Bank and Trust Company, N.A., New York, New York, (the "Fiscal Agent") is acting as the fiscal agent for the Insurer.

The Policy unconditionally and irrevocably guarantees to any owner or holder of the Obligations or, if applicable, of the coupons appertaining thereto (the "Owner"), the full and complete payment required to be made by or on behalf of the issuer of the Obligations (the "Issuer") to the Paying Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Policy shall be made in such amounts  and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference (a "Preference") to the Owner within the meaning of any applicable bankruptcy law.  The amounts referred to in clauses (i) and (ii) of the preceding sentence are referred to collectively in this letter as the "Insured Amounts."

The Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligations.  The Policy does not, under any circumstance, insure against loss relating to:  (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of Obligations upon tender by an Owner thereof; or (iv) any Preference relating to (i) through (iii) above.

# MBIA

-2-

In the event that the Issuer does not make full and complete payment when due of the principal of and interest on the Obligations, please immediately notify, by telephone or telegraph, the Insurer, 113 King Street, Armonk, New York, 10504, (914) 273-4545. On the due date or within one business day after receipt of such notice, whichever is later, the Insurer will deposit funds with the Fiscal Agent sufficient to pay the Obligations (or, if applicable, coupons appertaining thereto) then due. Upon presentment and surrender of such Obligations (or, if applicable, coupons) or presentment of such other proof of ownership of Obligations together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for the Owners in any legal proceeding related to payment of Insured Amounts on the Obligations (or, if applicable, coupons), such instruments being in a form satisfactory to the Fiscal Agent, shall disburse to you payment of the Insured Amounts due on such Obligations (and, if applicable, coupons), less any amount held by you for the payment of such Insured Amounts and legally available therefor.

Forms of such instruments of assignment and instruments to effect the appointment of the Insurer as such agent for the Owners (collectively, the "Claim Documents"), which are currently acceptable to the Fiscal Agent and the Insurer, are on file with the Fiscal Agent. The Insurer may, from time to time, file revised forms of Claim Documents with the Fiscal Agent in substitution for the forms previously filed with the Fiscal Agent, and upon such filing, the revised forms shall supersede all forms of Claim Documents previously filed with the Fiscal Agent, except as otherwise directed by the Insurer in writing.

In the event that you shall have prior knowledge of an impending failure by the Issuer to make payment on the Obligations (or, if applicable, coupons) when due, please immediately notify the Insurer so that it will be possible to have funds available for you on the due date to make payments against surrendered Obligations (and, if applicable, coupons).

Your cooperation in this matter will be most appreciated and will make it possible for the Owners of Obligations guaranteed by the Insurer to be assured of all payments when due.

Very truly yours,

Richard Weill

Richard L. Weill
President



**MBIA Insurance Corporation**
113 King Street
Armonk, NY 10504
914 273 4545

June 19, 1996

the principal corporate trust office of Norwest Bank Minnesota, National Association
Columbia, Maryland

$3,092,937.50
Debt Service Reserve Fund for the
$33,055,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series B of 1996

Gentlemen:

In connection with the above-described obligations (the "Obligations") for which you are acting as Paying Agent, please be advised that the payment to you of certain amounts which are to be applied to payment of principal of and interest on the Obligations has been guaranteed by the accompanying Surety Bond No. 21273 (the "Surety Bond") issued by MBIA Insurance Corporation (the "Insurer"). State Street Bank and Trust Company, N.A., New York, New York, (the "Fiscal Agent") is acting as the fiscal agent for the Insurer.

The maximum amount available under the Surety Bond for payment pursuant to any one demand for payment by you as described below (a "Demand for Payment") shall not exceed the Surety Bond Limit as defined on the first page of the Surety Bond. The amount available at any particular time to be paid to you under the Surety Bond (the "Surety Bond Coverage") shall be reduced and may be reinstated from time to time as set forth in the Surety Bond and as described below.

If the Issuer under the Document (as those terms are defined on the first page of the Surety Bond) does not make full and complete payment thereunder when due, please immediately deliver, by prepaid rapifax, telex, TWX or telegram, a complete executed Demand for Payment (substantially in the form of Attachment 1 to the Surety Bond) to the Insurer, MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504 (telephone: (914) 273-4545; telecopy (914) 765-3161 or 3162). Please confirm delivery and receipt of such Demand for Payment by telephone.

MBIA    051308



Page Two
June 19, 1996

Upon the later of: (i) three (3) days after receipt by the Insurer of a completed Demand for Payment, duly executed by you certifying that payment due under the Document has not been made to you; or (ii) the payment date of the Obligations as specified in the Demand for Payment presented by you to the Insurer, the Insurer will make a deposit of funds in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment to you, of amounts which are then due to you (as specified in the Demand for Payment) subject to the Surety Bond Coverage.

The amount payable by the Insurer under the Surety Bond pursuant to a particular Demand for Payment shall be limited to the Surety Bond Coverage. The Surety Bond Coverage shall be reduced automatically to the extent of each payment made by the Insurer under the Surety Bond and will be reinstated to the extent of each reimbursement of the Insurer by the Obligor pursuant to Article II of the accompanying Financial Guaranty Agreement between the Insurer and the Obligor (the "Financial Guaranty Agreement"). In no event shall such reinstatement exceed the Surety Bond Limit. The Insurer will notify you, in writing within five (5) days of such reimbursement, that the Surety Bond Coverage has been reinstated to the extent of such reimbursement pursuant to the Financial Guaranty Agreement and such reinstatement shall be effective as of the date the Insurer gives such notice. The notice to you will be substantially in the form attached to the Surety Bond as Attachment 2.

This letter does not alter the terms of the Surety Bond or the Financial Guaranty Agreement.

In the event that you shall have prior knowledge of an impending failure by the Obligor to make payment as required by the Document when due, please immediately notify the Insurer so that it will be possible for the Insurer to have funds available for you on the due date to make payments as described above.

Your cooperation in this matter will be most appreciated and will make it possible for the holders of Obligations to be assured of all payments when due to the extent of the Surety Bond Coverage.

Very truly yours,

*Richard Weill*

Richard L. Weill
President

MBIA    051309

## MBIA

CLOSING ITEM NO. A-7(c).

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. 21274

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to the principal corporate trust office of Norwest Bank Minnesota, National Association, Columbia, Maryland or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

$45,265,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series C of 1996

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this 19th day of June, 1996, but this policy shall not be valid unless countersigned by an authorized resident licensed agent of the Insurer.

COUNTERSIGNED:

_Resident Licensed Agent_

LANCASTER, PA
City, State

### MBIA Insurance Corporation

_Richard Weill_

President

Attest:

Assistant Secretary

STD-RMS-PA-6
4/95



**MBIA Insurance Corporation**
113 King Street
Armonk, NY 10504
914 273 4545

June 19, 1996

the principal corporate trust office of Norwest Bank Minnesota, National Association
Columbia, Maryland

$45,265,000
Pennsylvania Higher Educational Facilities Authority
Hospital Revenue Bonds
(Allegheny Delaware Valley Obligated Group Project)
Series C of 1996

Gentlemen:

In connection with the above-described obligations (the "Obligations") of which you are acting as paying agent (the "Paying Agent"), please be advised that the payment to you of principal of and interest on the Obligations has been guaranteed by a policy of financial guaranty insurance (the "Policy") issued by the MBIA Insurance Corporation (the "Insurer"). State Street Bank and Trust Company, N.A., New York, New York, (the "Fiscal Agent") is acting as the fiscal agent for the Insurer.

The Policy unconditionally and irrevocably guarantees to any owner or holder of the Obligations or, if applicable, of the coupons appertaining thereto (the "Owner"), the full and complete payment required to be made by or on behalf of the issuer of the Obligations (the "Issuer") to the Paying Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference (a "Preference") to the Owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence are referred to collectively in this letter as the "Insured Amounts."

The Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligations. The Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of Obligations upon tender by an Owner thereof; or (iv) any Preference relating to (i) through (iii) above.

MBIA    051311

# MBIA

-2-

In the event that the Issuer does not make full and complete payment when due of the principal of and interest on the Obligations, please immediately notify, by telephone or telegraph, the Insurer, 113 King Street, Armonk, New York, 10504, (914) 273-4545. On the due date or within one business day after receipt of such notice, whichever is later, the Insurer will deposit funds with the Fiscal Agent sufficient to pay the Obligations (or, if applicable, coupons appertaining thereto) then due. Upon presentment and surrender of such Obligations (or, if applicable, coupons) or presentment of such other proof of ownership of Obligations together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for the Owners in any legal proceeding related to payment of Insured Amounts on the Obligations (or, if applicable, coupons), such instruments being in a form satisfactory to the Fiscal Agent, shall disburse to you payment of the Insured Amounts due on such Obligations (and, if applicable, coupons), less any amount held by you for the payment of such Insured Amounts and legally available therefor.

Forms of such instruments of assignment and instruments to effect the appointment of the Insurer as such agent for the Owners (collectively, the "Claim Documents"), which are currently acceptable to the Fiscal Agent and the Insurer, are on file with the Fiscal Agent. The Insurer may, from time to time, file revised forms of Claim Documents with the Fiscal Agent in substitution for the forms previously filed with the Fiscal Agent, and upon such filing, the revised forms shall supersede all forms of Claim Documents previously filed with the Fiscal Agent, except as otherwise directed by the Insurer in writing.

In the event that you shall have prior knowledge of an impending failure by the Issuer to make payment on the Obligations (or, if applicable, coupons) when due, please immediately notify the Insurer so that it will be possible to have funds available for you on the due date to make payments against surrendered Obligations (and, if applicable, coupons).

Your cooperation in this matter will be most appreciated and will make it possible for the Owners of Obligations guaranteed by the Insurer to be assured of all payments when due.

Very truly yours,

*Richard Weill*

Richard L. Weill
President

9

MBIA     051313

**MBIA**

## CERTIFICATE OF MBIA INSURANCE CORPORATION

I, Frederick B. Hnat, Assistant Secretary of MBIA Insurance Corporation, do hereby certify that the information concerning MBIA Insurance Corporation and its policies as set forth in the Official Statement, dated May 30, 1996 under the caption "Municipal Bond Insurance Policies", regarding $227,830,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series A of 1996; $19,203,063.75 Debt Service Reserve Fund for the $227,830,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series A of 1996; $33,055,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series B of 1996; $3,092,937.50 Debt Service Reserve Fund for the $33,055,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series B of 1996; $45,265,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series C of 1996; $3,816,555 Debt Service Reserve Fund for the $45,265,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series C of 1996, is accurate.

IN WITNESS WHEREOF, I hereunto set my hand and deliver this Certificate on this 19th day of June, 1996.

_____
Assistant Secretary



**MBIA Insurance Corporation**
113 King Street
Armonk, NY 10504
914 273 4545

## TAX CERTIFICATE

Pennsylvania Higher Educational Facilities Authority
1035 Mumma Road
Wormleysburg, Pennsylvania 17043

RE:  $227,830,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series A of 1996;

$19,203,063.75 Debt Service Reserve Fund for the $227,830,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series A of 1996;

$33,055,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series B of 1996;

$3,092,937.50 Debt Service Reserve Fund for the $33,055,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series B of 1996;

$45,265,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series C of 1996;

$3,816,555 Debt Service Reserve Fund for the $45,265,000 Pennsylvania Higher Educational Facilities Authority, Hospital Revenue Bonds (Allegheny Delaware Valley Obligated Group Project) Series C of 1996;
(collectively, the "Obligations")

Ladies and Gentlemen:

In connection with the issuance of the above-referenced obligations (the "Obligations"), MBIA Insurance Corporation (the "Insurer") is issuing a financial guaranty insurance policy (the "Policy") and debt service reserve fund surety bond (the "Surety Bond") securing the payment of principal and interest on the Obligations.

This is to advise you that:

1    The Policy and Surety Bond are unconditional obligations of the Insurer to pay scheduled payments of principal and interest on the Obligations in the event of a failure to do so by the Pennsylvania Higher Educational Facilities Authority (the "Issuer");

2.    The insurance premium in the amounts of $6,257,000, for the Policies and Surety Bonds respectively, represent the charge for a transfer of credit are required to be paid as a condition to the issuance of the Policy and Surety Bond;

3.    The premium payable to MBIA Insurance Corporation for the municipal bond insurance policies and the premium payable to MBIA Insurance Corporation for the debt service reserve surety bond were determined separately and each was determined in an arms length manner;

4.    No portion of such premiums represents an indirect payment of costs related to the issuance of the Obligations other than for the transfer of credit risk;

# MBIA

5.    The Insurer does not reasonably expect that it will be called upon to make any payment under the Policy;

6.    To the extent the Insurer is called upon to make any payment under the Policy, the Insurer reasonably expects to pursue all available legal remedies to secure reimbursement for such payment; and

7.    The Insurer would not have issued the Policy in the absence of a Debt Service Reserve Fund of the size and type established by the Loan Agreement and Master Trust Indenture pursuant to which the Obligations are being issued.

Dated: June 19, 1996

**MBIA Insurance Corporation**

Assistant Secretary

MBIA     051316

**EXHIBIT  2641**

ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARY

CONSOLIDATED FINANCIAL STATEMENTS

JUNE 30, 1996

S:\FINSTMT\AGHCON\FS0696.WK3
09/17/96

EXHIBIT

DX-2641
6/23/04

PR-BINDER-12-00713

ALLEGHENY GENERAL HOSPITAL
CONSOLIDATED BALANCE SHEETS
as of June 30, 1996 and 1995
(Dollars in Thousands)

(UNAUDITED)

| ASSETS | 1996 | 1995 |
|---|---|---|
| Current: | | |
| Cash and cash equivalents | $ 2,447 | $ 383 |
| Short-term investments | 11,394 | 10,063 |
| Assets limited as to use | 3,957 | 4,127 |
| Receivables: | | |
| Patient accounts | 50,036 | 67,959 |
| Grants and other | 5,077 | 2,307 |
| Inventories | 10,045 | 9,431 |
| Prepaid expenses | 839 | 629 |
| | | |
| Total current assets | 83,795 | 94,899 |
| | | |
| Assets limited or restricted as to use: | | |
| Unrestricted | | |
| By board for designated purposes | 151,298 | 166,662 |
| Under indenture - held by trustee | 12,336 | 21,144 |
| Endowments | 1,910 | - |
| Temporarily restricted by donor | 2,315 | 8,005 |
| Permanently restricted endowments | 13,832 | 10,865 |
| | 181,691 | 206,676 |
| | | |
| Property and equipment, net | 248,747 | 267,018 |
| Due from affiliates | 26,369 | 104 |
| Other assets | 25,760 | 14,645 |
| | | |
| Total Assets | $ 566,362 | $ 583,342 |

| LIABILITIES AND NET ASSETS | 1996 | 1995 |
|---|---|---|
| Current: | | |
| Accounts payable and accrued exp. | $ 54,044 | $ 36,107 |
| Deferred grant revenue | 3,717 | 3,362 |
| Current portion of long-term debt | 7,023 | 4,782 |
| | | |
| Total current liabilities | 64,784 | 44,251 |
| | | |
| Long-term debt | 257,521 | 268,444 |
| Deferred grant revenue | 1,074 | 2,920 |
| Other noncurrent liabilities | 784 | 14,797 |
| | | |
| Total Liabilities | 324,163 | 330,412 |
| | | |
| Net assets: | | |
| Unrestricted | 227,876 | 234,060 |
| Restricted - Temporarily | 6,773 | 10,186 |
| - Permanently | 7,550 | 8,684 |
| | | |
| Total net assets | 242,199 | 252,930 |
| | | |
| Total Liabilities and Net Assets | $ 566,362 | $ 583,342 |

PR-BINDER-12-00714

**ALLEGHENY GENERAL HOSPITAL**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
for the twelve months ended June 30, 1996 and 1995
(Dollars in Thousands)

(UNAUDITED)

| | Actual 1996 | Budget 1996 | Actual 1995 |
|---|---|---|---|
| Unrestricted revenues, gains and other support: | | | |
| Net patient service | $ 394,561 | $ 409,500 | $ 405,370 |
| Research and training support | 8,789 | 8,884 | 19,048 |
| Premium revenue | 817 | - | - |
| Investment income | 27,007 | 14,869 | 14,006 |
| Net assets released from restrictions used for operations | 8,518 | 925 | 1,203 |
| Other | 23,164 | 12,531 | 10,932 |
| Total revenue, gains and other support | 462,856 | 446,709 | 450,559 |
| Expenses: | | | |
| Salaries, wages and fringe benefits | 204,513 | 208,950 | 208,626 |
| Materials, supplies and services | 201,662 | 191,909 | 188,324 |
| Depreciation and amortization | 33,284 | 30,114 | 26,578 |
| Interest | 13,927 | 14,833 | 11,642 |
| Unusual items - reduction in workforce cost | 3,149 | - | - |
| Total expenses | 456,535 | 445,806 | 435,170 |
| Net income | $ 6,321 | $ 903 | $ 15,389 |

PR-BINDER-12-00715

**ALLEGHENY GENERAL HOSPITAL**
**CONSOLIDATED STATEMENTS OF CHANGES IN NET ASSETS**
**for the twelve months ended June 30, 1996**
**(Dollars in Thousands)**

**(UNAUDITED)**

**Unrestricted net assets:**

| | | |
|---|---|---:|
| Net income | $ | 6,321 |
| Transfers (to)/from | | |
| Affiliates, net | | (14,158) |
| Deferred revenue | | 562 |
| Net assets released from restrictions used for acquisition of property and equipment | | 1,091 |
| Decrease in unrestricted net assets | | (6,184) |

**Temporarily restricted net assets:**

| | |
|---|---:|
| Adjustment from change in accounting principles | 1,213 |
| Contributions | 2,529 |
| Investment income | 1,767 |
| Net assets released from restrictions | (11,350) |
| Unrealized appreciation/(depreciation) of investments | 639 |
| Decrease in temporarily restricted net assets | (5,202) |

**Permanently restricted net assets:**

| | |
|---|---:|
| Contributions | 655 |
| Increase in permanently restricted net assets | 655 |
| Decrease in net assets | (10,731) |
| Net assets, June 30, 1995 | 252,930 |
| Net assets, June 30 1996 | $ 242,199 |

PR-BINDER-12-00716

ALLEGHENY GENERAL HOSPITAL
CONSOLIDATED STATEMENTS OF CASH FLOWS
for the twelve months ended June 30, 1996 and 1995
(Dollars in Thousands)

|  | 1996 | 1995 |
|---|---|---|
| Cash flows from operating activities | | |
| Change in net assets | $ (10,731) | $ 3,119 |
| Adjustments to reconcile change in net assets | | |
| to net cash provided by operating activities: | | |
| Adjustment from change in accounting principle | (4,929) | - |
| Depreciation and amortization | 33,284 | 26,578 |
| Amortization of bond discount | 81 | 52 |
| Unrealized depreciation of investments | (443) | - |
| Net transfer to affiliates | 14,158 | 15,338 |
| Gain on sale of Four Allegheny Center building | (6,739) | - |
| Gain on sale of ANI building | (700) | - |
| Income from equity investments | (4,779) | (3,261) |
| Increase/(decrease) in cash and cash equivalents from changes in: | | |
| Short-term investments | (1,331) | 7,510 |
| Patient accounts receivable | 17,923 | 5,397 |
| Due to/from affiliates | (26,265) | 1,648 |
| Other receivables | (2,770) | 509 |
| Inventories | (614) | (458) |
| Prepaid expenses | (210) | 694 |
| Accounts payable and accrued expenses | 18,292 | (9,745) |
| Other | (22,960) | 4,223 |
| Net cash provided by operating activities | 1,267 | 51,604 |
| Cash flows from investing activities | | |
| Acquisition of property and equipment, net | (34,209) | (55,979) |
| Proceeds on sale of Four Allegheny Center building | 21,500 | - |
| Proceeds on sale of former ANI building | 5,900 | - |
| Decrease/(increase) in assets limited or restricted as to use | 30,527 | (80,421) |
| Net cash provided/(used) by investing activities | 23,718 | (136,400) |
| Cash flows from financing activities | | |
| Issuance of long-term debt | - | 100,000 |
| Repayments of long-term debt | (8,763) | (5,074) |
| Net transfers to affiliates | (14,158) | (15,338) |
| Net cash provided/(used) by financing activities | (22,921) | 79,588 |
| Net increase/(decrease) in cash and cash equivalents | 2,064 | (5,208) |
| Cash and cash equivalents, beginning of period | 383 | 5,591 |
| Cash and cash equivalents, end of period | $ 2,447 | $ 383 |

PR-BINDER-12-00717

**ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES**
**CONSOLIDATING BALANCE SHEET**
**AS OF JUNE 30, 1996**
**(Dollars in Thousands)**

| | AGH | ASRI | Elimination | Consolidated AGH |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | $1,737 | $710 | - | $2,447 |
| Short-term investments | 6,455 | 4,939 | - | 11,394 |
| Assets limited as to use | 3,957 | - | - | 3,957 |
| Receivables | | | | |
| Patient accounts | 50,036 | - | - | 50,036 |
| Grants | - | 2,727 | - | 2,727 |
| Other | 2,350 | - | - | 2,350 |
| Inventories | 10,045 | - | - | 10,045 |
| Prepaid expenses | 833 | 6 | - | 839 |
| Due from affiliates: | | | | |
| AGH | - | - | - | - |
| AHERF | - | - | - | - |
| AHSPIC | - | - | - | - |
| ASRI | - | - | - | - |
| DHG | - | - | - | - |
| ALLEGHENY UNIVERSITY | - | - | - | - |
| SCHC | - | - | - | - |
| Total current assets | 75,413 | 8,382 | - | 83,795 |
| Assets limited or restricted as to use: | | | | |
| Unrestricted: | | | | |
| By board of trustees | 151,298 | - | - | 151,298 |
| Under indenture - held by trustee | 12,336 | - | - | 12,336 |
| Endowments | 1,910 | - | - | 1,910 |
| Temporarily restricted be donor | 2,315 | - | - | 2,315 |
| Permanently restricted endowments | 1,564 | 12,268 | - | 13,832 |
| | 169,423 | 12,268 | - | 181,691 |
| Property and equipment, net | 235,252 | 13,495 | - | 248,747 |
| Due from affiliates | 25,128 | 1,241 | - | 26,369 |
| Other assets | 24,406 | 1,354 | - | 25,760 |
| Total assets | $529,622 | $36,740 | $0 | $566,362 |

PR-BINDER-12-00718

ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES
CONSOLIDATING BALANCE SHEET
AS OF JUNE 30, 1996
(Dollars in Thousands)

| | AGH | ASRI | Elimination | Consolidated AGH |
|---|---|---|---|---|
| **LIABILITIES AND NET ASSETS** | | | | |
| **Current:** | | | | |
| Accounts payable and accrued expenses | $50,768 | $3,276 | - | $54,044 |
| Deferred grant revenue | - | 3,717 | - | 3,717 |
| Current portion of long-term debt | 7,023 | - | - | 7,023 |
| Due to affiliates: | | | | |
| AGH | - | - | - | - |
| AHERF | - | - | - | - |
| AHSPIC | - | - | - | - |
| ASRI | - | - | - | - |
| DHG | - | - | - | - |
| ALLEGHENY UNIVERSITY | - | - | - | - |
| SCHC | - | - | - | - |
| Total current liabilities | 57,791 | 6,993 | - | 64,784 |
| Long-term debt | 257,521 | - | - | 257,521 |
| Payables to affiliates: | | | | |
| AGH | - | - | - | - |
| AHERF | - | - | - | - |
| AHSPIC | - | - | - | - |
| ASRI | - | - | - | - |
| DHG | - | - | - | - |
| ALLEGHENY UNIVERSITY | - | - | - | - |
| SCHC | - | 1,074 | - | 1,074 |
| Deferred grant revenue | - | - | - | - |
| Other noncurrent liabilities | 784 | - | - | 784 |
| Total liabilities | 316,096 | 8,067 | - | 324,163 |
| **Net assets:** | | | | |
| Unrestricted | 209,647 | 18,229 | - | 227,876 |
| Restricted: | | | | |
| Temporarily | 2,315 | 4,458 | - | 6,773 |
| Permanently | 1,564 | 5,986 | - | 7,550 |
| Total net assets | 213,526 | 28,673 | - | 242,199 |
| Total liabilities and net assets | $529,622 | $36,740 | $0 | $566,362 |

PR-BINDER-12-00719

**ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES**
**CONSOLIDATING STATEMENT OF OPERATIONS**
**FOR THE TWELVE MONTHS ENDED JUNE 30, 1996**
(Dollars in Thousands)

| | AGH | ASRI | Elimination | Consolidated AGH |
|---|---|---|---|---|
| **Unrestricted revenues, gains and other support:** | | | | |
| Net patient service | $391,615 | - | - | $391,615 |
| Professional fees | 2,946 | - | - | 2,946 |
| Premium revenue | 817 | - | - | 817 |
| Research and training support | - | 8,789 | - | 8,789 |
| Investment income | 26,676 | 331 | - | 27,007 |
| Net assets released from restrictions used for operations | 6,838 | 1,680 | - | 8,518 |
| Other | 21,351 | 1,813 | - | 23,164 |
| | | | | |
| Total revenue, gains and other support | 450,243 | 12,613 | - | 462,856 |
| | | | | |
| **Expenses** | | | | |
| Salaries, wages, and fringe benefits | 195,809 | 8,704 | - | 204,513 |
| Materials, supplies and services | 185,632 | 16,030 | - | 201,662 |
| Depreciation and amortization | 31,233 | 2,051 | - | 33,284 |
| Interest | 13,919 | 8 | - | 13,927 |
| Unusual items - reduction in workforce cost | 3,149 | | - | 3,149 |
| | | | | |
| Total expenses | 429,742 | 26,793 | - | 456,535 |
| | | | | |
| Net income/(loss) | $20,501 | ($14,180) | - | $6,321 |

PR-BINDER-12-00720

ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES
CONSOLIDATING STATEMENT OF CHANGES IN UNRESTRICTED NET ASSETS
FOR THE TWELVE MONTHS ENDED JUNE 30, 1996
(Dollars in Thousands)

| | AGH | ASRI | Elimination | AGH |
|---|---|---|---|---|
| Balances, June 30, 1995 | $222,694 | $11,366 | - | $234,060 |
| Net income/(loss) | 20,501 | (14,180) | - | 6,321 |
| Transfers | | | | |
| (To)/from affiliates | (33,629) | 19,471 | - | (14,158) |
| From deferred revenue | - | 562 | - | 562 |
| Net assets released from restrictions used for acquisition of property and equipment | 81 | 1,010 | - | 1,091 |
| Balances, June 30, 1996 | $209,647 | $18,229 | $0 | $227,876 |

PR-BINDER-12-00721

**ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES**
**CONSOLIDATING STATEMENT OF CHANGES IN TEMPORARILY RESTRICTED NET ASSETS**
**FOR THE TWELVE MONTHS ENDED JUNE 30, 1996**
(Dollars in Thousands)

| | AGH | ASRI | Elimination | AGH |
|---|---|---|---|---|
| Balances, June 30, 1995 | $9,794 | $2,181 | - | $11,975 |
| Income from change in accounting principle | 259 | 954 | - | 1,213 |
| Contributions | 1,468 | 1,061 | - | 2,529 |
| Investment income | 467 | 1,300 | - | 1,767 |
| Transfers | | | | |
| From affiliates | 35 | - | (35) | - |
| Net assets released from restrictions | (9,694) | (1,691) | 35 | (11,350) |
| Unrealized appreciation/(depreciation) of investments | (14) | 653 | - | 639 |
| Balances, June 30, 1996 | $2,315 | $4,458 | $0 | $6,773 |

PR-BINDER-12-00722

ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES
CONSOLIDATING STATEMENT OF CHANGES IN PERMANENTLY RESTRICTED NET ASSETS
FOR THE TWELVE MONTHS ENDED JUNE 30, 1996
(Dollars in Thousands)

|  | AGH | ASRI | Elimination | AGH |
|---|---|---|---|---|
| Balances, June 30, 1995 | $1,055 | $5,840 | - | $6,895 |
| Contributions | 509 | 146 | - | 655 |
| Balances, June 30, 1996 | $1,564 | $5,986 | $0 | $7,550 |

PR-BINDER-12-00723

ALLEGHENY GENERAL HOSPITAL AND SUBSDIARIES
CONSOLIDATING AND ELIMINATING ENTRIES
JUNE 30, 1996
(Dollars in Thousands)

| | Deprec Exp ASRI | AGH Support from ASRI | TOTAL |
|---|---|---|---|
| **LIABILITIES AND NET ASSETS:** | | | |
| Net assets' | | | |
| Unrestricted | | | |
| Restricted | | | |
| Temporarily | | | |
| Transfers from affiliates | - | (35) | (35) |
| Net assets released from restictions | - | 35 | 35 |
| Permanently | | | |
| Total liabilities and net assets | $0 | $0 | $0 |
| | | | |
| **REVENUES & EXPENSES:** | | | |
| Patient service revenue | - | - | - |
| Total revenue | - | - | - |
| Salaries, wages and fringe benefits | - | - | - |
| Materials, supplies and services | - | - | - |
| Depreciation and amortization | - | - | - |
| Total expenses | - | - | - |
| Operating income/(loss) | - | - | - |
| Nonoperating gains, net | - | - | - |
| Net income/(loss) | $0 | $0 | $0 |

PR-BINDER-12-00724

## ALLEGHENY GENERAL HOSPITAL AND SUBSIDIARIES
### CONSOLIDATING STATEMENT OF BUDGETED OPERATIONS
### FOR THE TWELVE MONTHS ENDED JUNE 30, 1996
(Dollars In Thousands)

| | AGH | ASRI | Elimination | Consolidated AGH |
|---|---|---|---|---|
| **Unrestricted revenues, gains and other support:** | | | | |
| Net patient service | $408,195 | - | - | $408,195 |
| Professional fees | 1,305 | - | - | 1,305 |
| Premium revenue | - | - | - | - |
| Research and training support | - | 8,884 | - | 8,884 |
| Investment income | 14,710 | 159 | - | 14,869 |
| Net assets released from restriction used for operations | 925 | - | - | 925 |
| Other | 12,531 | - | - | 12,531 |
| Total revenue, gains and other support | 437,666 | 9,043 | - | 446,709 |
| **Expenses:** | | | | |
| Salaries, wages, and fringe benefits | 201,059 | 7,891 | - | 208,950 |
| Materials, supplies and services | 172,898 | 19,011 | - | 191,909 |
| Depreciation and amortization | 28,205 | 1,909 | - | 30,114 |
| Interest | 14,833 | - | - | 14,833 |
| Unusual items - reduction in workforce cost | - | - | - | - |
| Total expenses | 416,995 | 28,811 | - | 445,806 |
| Net income/(loss) | $20,671 | ($19,768) | - | $903 |

PR-BINDER-12-00725

**AGH OBLIGATED GROUP (AGH & ASRI)**
**SERIES 1995-B REIMBURSEMENT & SECURITY AGREEMENT**
**ANALYSIS OF ADJUSTED CONSOLIDATED**
**UNRESTRICTED FUND BALANCES AS OF 6/30/96**

*Fund Balances before adjustments:*

| | | |
|---|---|---:|
| AGH General Fund Balance | | $209,646,780.22 |
| ASRI General Fund Balance | | 18,228,739.29 |
| | | |
| AGH Consolidated General Fund Balance before adjustments | | $227,875,519.51 |

*Less: (y) Equity Investments in & loans to Persons which*
*are not Subsidiaries:*

| | | |
|---|---:|---:|
| Gateway Health Plan | $6,810,944.00 | |
| SIDN Network | 800,000.00 | |
| SW Pa. Litho | 37,781.00 | |
| GRC/AGH Associates | 87,747.00 | |
| Penn NY Financial Services | 22,895.00 | |
| Life Home Health Services | 583,305.00 | |
| Hospital Linen Service | 516,402.13 | |
| Cranberry Township Property | 843,616.94 | |
| Cranberry Physician Timeshare | 1,925.46 | |
| HLSF Advances | 599,806.12 | |
| | | |
| Total Equity Investments in Persons who are not Subsidiaries | | (10,304,422.65) |

*Less: (z) All Unamortized Debt Discount & Expense,*
*Unamortized Deferred Charges, Goodwill & Patents:*

| | | |
|---|---:|---:|
| Bond Discount 1988A-D | $420,000.00 | |
| Bond Discount Contra 1988A-D | (170,566.00) | |
| Bond Discount 1991A-Current | 50,070.42 | |
| Bond Discount 1995A-Current | 29,320.80 | |
| Bond Discount 1991A-LTD | 969,695.35 | |
| Bond Discount Contra 1991A | (342,260.37) | |
| Bond Discount 1995A-LTD | 487,514.40 | |
| Bond Discount Contra 1995A | (66,564.60) | |
| Deferred Finance Costs 1988A-D | 549,967.68 | |
| Deferred Finance Costs 1991A | 1,512,703.59 | |
| Deferred Finance Costs 1993 | 398,394.85 | |
| Deferred Finance Costs 1994 Note | 15,000.00 | |
| Deferred Finance Costs 1995A | 1,226,501.30 | |
| Deferred Finance Costs 1995B | 485,257.18 | |
| Accumulated Amortization-1988A-D | (153,000.00) | |
| Accumulated Amortization-1991A | (311,995.09) | |
| Accumulated Amortization-1993 | (70,103.81) | |
| Accumulated Amortiz-1994 Note | (6,116.67) | |
| Accumulated Amortization-1995A | (60,294.60) | |
| Accumulated Amortization-1995B | (23,018.68) | |
| Goodwill-Surg Center Acquisition | 1,833,310.64 | |
| Accumulated Amortizat-Goodwill | (755,359.00) | |
| ASRI-Patents | 948,711.91 | |
| Accumulated Amortizat-Patents | (499,948.16) | |
| | | |
| Total Unamortized Debt Discount, Deferred Finance Costs, Unamortized Goodwill & Unamortized Patents: | | (6,467,221.14) |
| | | |
| Total AGH/ASRI General Fund Balance after adjustments | | $211,103,875.72 |
| | | |
| Required per Reimbursement & Security Agreement | | 200,000,000.00 |
| | | |
| Excess (Deficiency) | | $11,103,875.72 |

PR-BINDER-12-00726

**EXHIBIT  2669**

**ALLEGHENY
HEALTH,
EDUCATION AND
RESEARCH
FOUNDATION**

Office of Legal Affairs

*file*

Broad & Vine
Philadelphia, PA  19012-1192
Telephone (215) 762-8740

August 29, 1995

Mr. Thomas C. Woodward
First Fidelity Bank, N.A.
Healthcare Division, 7th Floor
123 South Broad Street
Philadelphia, PA 19109

> Re:   Unsecured Discretionary Line of Credit from First Fidelity Bank,
> National Association (the "Bank") to Hahnemann University
> Hospital (the "Borrower")

Dear Mr. Woodward:

Enclosed is the fully Allonge to the Grid Note effecting the above transaction which has been executed by appropriate officers of the hospital.  I believe that this should complete the documentation for this line of credit.

If I can be of any further assistance please do not hesitate to call me at (215) 762-7547.

Very truly yours,

Michael Burke
Paralegal
Office of Legal Affairs

cc:    Tom Bott, Esq. (w enclosure)

**EXHIBIT**
2669
CW 7/22/04

WACH  00780

## ALLONGE TO GRID NOTE

Payor:              Hahnemann University Hospital, a Pennsylvania nonprofit
                    Corporation

Payee:              First Fidelity Bank, National Association

Date of Note:       March 30, 1995

Principal Amount:   $7,500,000

### Background

Reference is made to that certain Grid Note and Rider to Grid Note attached thereto and made a part thereof, dated March 30, 1995, executed by the Payor in favor of the Payee in the original principal amount not to exceed $7,500,000 (the "Note").

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged and intending to be legally bound, the parties hereto agree as follows:

1.    **Amendment.**

The Note is hereby amended by replacing the date "March 31, 1995" which appears in the first sentence of the introductory paragraph thereof with the date "October 31, 1996."

2.    **Representations and Warranties.** By signing below, Payor hereby represents and warrants to Payee that:

    (a)    All of the representations and warranties contained in the Note are true and correct as of this date;

    (b)    After giving effect to this Allonge, no default or event of default will exist under the Note, and no condition will exist which, but for the passage of time or the giving of notice, or both, would constitute a default or event of default under the Note;

    (c)    The execution and delivery of this Allonge will not violate any agreements binding upon the Payor or its property; and

148489.2 7/14/95

WACH 00781

(d)     The Payor has taken all necessary action (corporate or otherwise) to authorize the execution and delivery of this Allonge and no consent from any other party is necessary to make this Allonge valid and binding on the Payor.

3.      <u>Continuing Effect</u>.  Except as expressly set forth herein, all of the terms, covenants and conditions of the Note  (INCLUDING, WITHOUT LIMITATION, THE PROVISIONS RELATING TO THE AUTHORITY GRANTED TO THE PAYEE TO CONFESS JUDGMENT AGAINST THE PAYOR AND THE WAIVER BY THE PAYOR OF THE RIGHT TO TRIAL BY JURY) shall remain in full force and effect. This Allonge is given as a modification of the Payor's obligations under the Note and is not given in substitution therefor or extinguishment thereof and is not intended to be a novation.

4.      <u>Attachment to Note</u>.  This Allonge shall be and remain attached to the Note and shall be an integral part thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Allonge to Grid Note to be duly executed this *24* day of ~~July~~, 1995 (but to be effective as of the 31st day of March, 1995).           *AUGUST*

Attest:                                          HAHNEMANN UNIVERSITY HOSPITAL

By: *Michael P Burke*                            By: *Donald Kaye*
Name: Michael P. Burke                           Name: Donald Kaye, M.D.
Title:    Office of Legal Affairs                Title: President, CEO, Medical College
                                                        of Pennsylvania and Hahnemann
                                                        University Hospital System

                                                 By: *Charles P Morrison*
                                                 Name: Charles P. Morrison
                                                 Title: Treasurer, Hahnemann University
                                                         Hospital

ACKNOWLEDGED AND AGREED TO BY:
FIRST FIDELITY BANK, NATIONAL ASSOCIATION

By: *Thomas C Woodward*
   Name: Thomas C. Woodward
   Title: Vice President

WACH  00782

AUG-19-96 13:41 FROM:DOC RETENTION          ID:2015651765          PAGE  2/8

**FIDELITY**

D.          **Grid Note**
(Pennsylvania)

Obligor No. 337815465204
Obligation No. 3100003

_____ March ___ 30 ___ 19 95

_____ Philadelphia _____, Pennsylvania

FOR VALUE RECEIVED, and intending to be legally bound hereby, the Borrower, jointly and severally, unconditionally promise(s) to pay to the order of First Fidelity Bank, National Association (the "Bank") on __March 31, 1995__ ("maturity") the principal amount of all unpaid and outstanding advances and/or any extensions or renewals thereof (individually, an "Advance" and collectively, the "Advances"), that may now or hereafter be made by the Bank hereunder in its sole and absolute discretion, together with accrued and unpaid interest thereon. The amount of each Advance, if any, made hereunder shall be determined by the Bank, in its sole and absolute discretion, following a request therefor by the Borrower. The Borrower shall not request the Bank to make an Advance pursuant to this Grid Note which, if made, would cause the outstanding principal balance of this Grid Note to exceed **Seven Million Five Hundred Thousand** _____ Dollars ($ 7,500,000.00) (the "face amount"). Notwithstanding the foregoing, in the event that the Bank makes Advances causing the outstanding principal balance hereof to exceed the face amount, this Grid Note shall evidence the Borrower's obligation to pay the face amount of the Grid Note together with such additional Advances together with accrued, unpaid interest thereon.

                                                    **See Rider 1**

Requests for Advances hereunder may be made by writing or telephone. The Bank may enter in its business records and/or on the grid attached hereto (the "Grid") the amount and payment terms of each Advance made hereunder. The Bank's records of each such Advance shall, in the absence of manifest error, be conclusively binding upon the Borrower. In the event the Bank provides confirmation of the terms of any Advance to the Borrower, the Borrower agrees that unless the Bank receives a written notification of exceptions to such statement or notice within ten (10) calendar days after such confirmation is mailed, the confirmation shall be deemed an account stated, correct, acceptable and conclusively binding upon the Borrower.

**A.  Terms of Grid Note.**

                                    **See Rider 2**          **See Rider 3**

1.  **Interest Rate and Payment of Interest.**  Interest on the outstanding principal balance hereunder shall accrue at an annual rate equal to ~~the Base Rate plus _____ percentage points~~. Interest on the amount of each Advance made hereunder shall begin to accrue on the date such Advance is made. Except as provided on the Grid, interest on the outstanding principal hereof shall be payable in arrears on the __first business__ day of each consecutive ☐ month, ☐ quarter for as long as a principal balance is outstanding hereunder. Notwithstanding the foregoing, upon and following an Event of Default, interest shall be payable upon demand.

2.  **Principal Payments.**  Except as provided on the Grid, the principal balance outstanding however shall be due and payable to the Bank at maturity.

3.  **Interest Computation.**  Interest charged hereunder shall be computed daily on the basis of a 360 day year for the actual number of days elapsed.

                        **See Rider 4**
4.  **Late Charge.**  If any payment is not paid in full when the same is due, the Borrower shall pay the Bank a fee on such unpaid amount equal to five percent (5%) of such amount.

5.  **Payment Terms.**  All payments made hereunder shall be made on the due date thereof, in immediately available funds and in lawful currency of the United States of America. All payments made hereunder shall be made to the Bank at its offices set forth in this Grid Note or at such other address as the Bank shall notify the Borrower of in writing.

                        **See Rider 5**
6.  **Advance.**  Advances made under this Grid Note and any repayments thereof may be set forth on the Grid; however the failure of the Bank to make a notation(s) on the Grid as to Advances or repayments made hereunder shall not affect the validity or enforceability of this Grid Note for the full amount of all Advances, accrued and unpaid interest thereon and any fees and costs to which the Bank is entitled hereunder or under applicable law.

                            **See Rider 6**
7.  **Crediting of Account.**  ~~Each Advance (excluding any extension, renewal or readvance of an outstanding Advance) hereunder shall be made by crediting the Borrower's account # _____ (the "Account") at the Bank. All Advances made by crediting the Account shall be conclusively presumed to have been properly authorized by the Borrower. Requests for Advances to be made by any means other than crediting the Account shall be made in writing by the Borrower to the Bank.~~

8.  ~~**Debiting of Account.**  The Borrower agrees to maintain the Account at the Bank continuously until the Liabilities due hereunder are paid in full. The Bank may, and the Borrower authorizes the Bank to, debit the Account for the amount of any payment as and when such payment becomes due hereunder. If there are insufficient funds in the Account at the time the Account is debited, and the debiting creates an overdraft, the Bank may charge the Borrower an administrative fee in an amount established from time to time by the Bank. The foregoing rights of the Bank to debit the Borrower's accounts shall be in addition to, and not in limitation of, any rights of set-off which the Bank may have hereunder or under any Loan Document.~~

                        **See Rider 7**
9.  **Prepayment.**  ~~Prepayment of this Grid Note may be made at any time without prepayment penalty or premium. All payments received on this Grid Note may be applied in such order as the Bank in its sole discretion shall determine.~~

6010-6505 (2-94)                              1 of 6          OCT 2 0 1995

                                                    **WACH  00783**

THE BORROWER ACKNOWLEDGES AND AGREES THAT THE BANK SHALL HAVE NO OBLIGATION TO MAKE ANY ADVANCES HEREUNDER AND TH    DVANCES, IF ANY, MAY OR MAY NOT BE MADE    EUNDER IN THE BANK'S SOLE AND ABSOLUTE DISCRETION. THE BORROWER HEREBY WAIVES ANY RIGHTS THAT IT MAY HAVE ARISING OUT OF ANY PAST OR PRESENT AGREEMENT OR REPRESENTATION THAT WOULD REQUIRE THE BANK TO MAKE ANY SUCH ADVANCES. THIS GRID NOTE SHALL NOT BE DEEMED TO BE A COMMITMENT OR AGREEMENT BY THE BANK TO MAKE ANY ADVANCES AT ANY TIME, AND IS BEING EXECUTED AND DELIVERED BY THE BORROWER SOLELY TO SET FORTH CERTAIN TERMS AND CONDITIONS IN THE EVENT THE BANK DETERMINES, IN ITS SOLE AND ABSOLUTE DISCRETION, TO MAKE ANY ADVANCES HEREUNDER.

B. **Definitions.** As used herein, the following terms shall have the following meanings:

   1. **Affiliate.** The term "Affiliate" means First Fidelity Bancorporation and any of its direct and indirect affiliates and subsidiaries.

   2. **Base Rate.** The term "Base Rate" means the rate of interest established by the Bank as its reference rate in making loans, and is not tied to any external rate of interest or index. The rate of interest charged with respect to each Advance made hereunder shall change automatically and immediately as of the date of any change in the Base Rate without notice to the Borrower.

   3. **Borrower.** The term "Borrower" means every person or entity that is a signatory to this Grid Note other than the Bank.

   4. **Grid Note.** The term "Grid Note" shall mean this Grid Note together with any attachments hereto and any modifications or amendments hereto in effect from time to time.

   5. **Liabilities.** The term "Liabilities" means any and all obligations and indebtedness of every kind and description of the Borrower owing to the Bank or to any Affiliate whether such debts or obligations are primary or secondary, direct or indirect, absolute or contingent, sole, joint, or several, secured or unsecured, due or to become due, contractual or tortious, arising by operation of law or otherwise, or now or hereafter existing, including, without limitation, principal, interest, fees, late fees, expenses, attorneys' fees and costs, and/or allocated fees and costs of the Bank's in-house legal counsel, that have been or may hereafter be contracted or incurred.

   6. **Obligor.** The term "Obligor" means the Borrower and each and every maker, endorser, guarantor or surety of or for the Liabilities.

                                                                                                            See Rider 8
C. **Representations and Warranties.** The Borrower hereby agrees that any request for an Advance pursuant to this Grid Note shall constitute a representation and warranty that: (i) each Advance is authorized and the person making a request for any Advance is authorized to do so; (ii) there has been no material adverse change in the financial condition of the Borrower from the condition of the Borrower reflected in the Borrower's last financial statements provided to the Bank; (iii) there has been no material change in the management or ownership of the Borrower since the date of this Grid Note; (iv) the Borrower is in compliance with all applicable laws, rules, regulations and orders, including, without limitation, those concerning the environment, employees' pension or benefit funds and the payment of taxes, assessments and other governmental charges; (v) an Event of Default (as hereinafter defined) has not occurred hereunder, nor shall one occur with notice or the passage of time or both; and (vi) the Borrower has no knowledge of: (a) the discovery, discharge or release of any hazardous substance for which the Borrower is in any way responsible under any applicable federal or state environmental law, (b) the existence of any event or condition which presents a risk of creating a material liability in the Borrower under 29 U.S.C. 1001 *et seq.* (ERISA), or (c) the occurrence or existence of any other event, condition or fact which may impact negatively upon the financial condition of the Borrower.
                    See Rider 9

D. **Events of Default.** Each of the following shall constitute an event of default ("Event of Default") hereunder:
                    See Rider 10
   1. **Breach.** A breach by any Obligor of any term, provision, obligation, covenant, representation, or warranty arising under (i) this Grid Note, including failure to make any payment when due; (ii) any present or future agreement or instrument with or in favor of the Bank and/or any Affiliate, including the failure to make any payment when due for (iii) any present or future agreement or instrument for borrowed money or other financial accommodations with any other person or entity.
                    See Rider 13                    See Rider 11    See Rider 12
                                                                                                            See Rider 14
   2. **Bankruptcy; Insolvency.** (i) Any Obligor commences any bankruptcy, reorganization, debt arrangement, or other case or proceeding under the United States Bankruptcy Code or under any similar foreign, federal, state, or local statute, or any dissolution or liquidation proceeding, or makes a general assignment for the benefit of creditors, or takes any action for the purpose of effecting any of the foregoing; (ii) Any bankruptcy, reorganization, debt arrangement, or other case or proceeding under the United States Bankruptcy Code or under any similar foreign, federal, state or local statute, or any dissolution or liquidation proceeding, is involuntarily commenced against or in respect of any Obligor or an order for relief is entered in any such proceeding; (iii) The appointment, or the filing of a petition seeking the appointment, of a custodian, receiver, trustee, or liquidator for any Obligor or any of its property, or the taking of possession of any part of the property of any Obligor at the instance of any governmental authority or (iv) Any Obligor becomes insolvent (however defined), is generally not paying its debts as they become due, or has suspended transaction of its usual business;
                                                                                                            See Rider 15
   3. **Death; Reorganization.** The death, dissolution, merger, consolidation, or reorganization of any Obligor;
                                                                                                            See Rider 16
   4. **Material Misstatement and/or Adverse Change.** Any statement, representation, or warranty made in or pursuant to this Grid Note or to induce the Bank to enter into this Grid Note or to enter into the transactions referred to in this Grid Note shall prove to be untrue or misleading in any material respect or any Obligor suffers any material adverse change in its business or financial condition (as determined by the Bank in its sole discretion);
                                                                                                            see Rider 17

                                          2 of 8

WACH 00784

~~consisting interest. Any Obligor incurs additional debt (other than~~ debt to the Bank and/or an Affiliate and/or trade debt in ~~the ordinary course of its business, or~~ sfers or grants any lien or security interest in any of it  operty on which the Bank or any Affiliate has a lien and or security interest ~~without the prior written consent of the Bank;~~

**See Rider 19      See Rider 20**

6.    **Entry of Judgment.** The filing, entry, or issuance of ~~any judgment~~, execution, garnishment, attachment, distraint, or lien against any Obligor or its property, or the entry of any order enjoining or restraining any Obligor and/or restraining or seizing any property of any Obligor/or

**See Rider 21**

7.    **Transfer of Assets.** Any Obligor transfers or sells all or substantially all of its assets, without the prior written consent of the Bank.

**8.  See Rider 22.**

E.  **Remedies.**

1.    **Acceleration of Liabilities; Rights of Bank.** Upon the occurrence of an Event of Default (other than any Event of Default described in Paragraph D.2. above), at the Bank's sole option, all Liabilities shall become immediately due and payable in full, without protest, presentment, demand or further notice of any kind to the Borrower or any other Obligor, all of which are expressly waived. Upon and following the occurrence of an Event of Default described in Paragraph D.2. above, immediately and automatically, all Liabilities shall become due and payable in full, all without protest, presentment, demand or further notice of any kind to the Borrower or any other Obligor, all of which are expressly waived. Upon and following an Event of Default, the Borrower shall not make any further requests for Advances hereunder and the Bank may, at its option, exercise any and all rights and remedies it has under this Grid Note, and/or applicable law, including, without limitation, the right to charge and collect interest on the principal portion of the Liabilities from the date of nonpayment of the Liabilities, at a rate equal to the lesser of: (i) four percent (4%) above the highest rate of interest otherwise payable hereunder or (ii) the highest rate of interest allowed by law (the "Default Rate") which Default Rate shall apply to the Liabilities, at the Bank's option, upon and after an Event of Default, maturity, whether by acceleration or otherwise, and after the entry of a judgment in favor of the Bank with respect to any or all of the Liabilities. Upon and following an Event of Default, the Bank may proceed to protect and enforce the Bank's rights by action at law, in equity or other appropriate proceeding including, without limitation, any action for specific performance to enforce or aid in the enforcement of any provision hereof.

2.    **Right of Set-off.** If any of the Liabilities shall be due and payable and whether or not the Bank shall have made any demand under this Grid Note and regardless of the adequacy of any collateral or other means of obtaining repayment of the Liabilities, the Bank shall have the right, without notice to the Borrower or to any other Obligor, and is specifically authorized by the Borrower to apply toward and set-off against and apply to the then unpaid balance of the Liabilities any items or funds of the Borrower held by the Bank or any Affiliate, any and all deposits (whether general or special, time or demand, matured or unmatured) or other property of the Borrower, including, without limitation, securities and/or certificates of deposit, now or hereafter maintained by the Borrower for its own account with the Bank or any Affiliate, and any other indebtedness at any time held or owing by the Bank or any Affiliate to or for the credit or the account of the Borrower, even if effecting such set-off results in a loss or reduction of interest to the Borrower or the imposition of a penalty applicable to the early withdrawal of time deposits. For such purpose the Bank shall have, and the Borrower hereby grants to the Bank, a first lien on and security interest in such deposits, property, funds and accounts and the proceeds thereof. The Borrower further authorizes any Affiliate, upon and following the occurrence of an Event of Default, at the request of the Bank, and without notice to the Borrower, to turn over to the Bank any property of the Borrower held by the Affiliate for the Borrower's account and to debit any deposit account maintained by the Borrower with such Affiliate (even if such deposit account is not then due or there results a loss or reduction of interest or the imposition of a penalty in accordance with law applicable to the early withdrawal of time deposits), in the amount requested by the Bank up to the amount of the Liabilities, and to pay or transfer such amount or property to the Bank for application to the Liabilities.

3.    **Confession of Judgment.**

a.    THE FOLLOWING PARAGRAPH SETS FORTH A WARRANT OF AUTHORITY FOR ANY ATTORNEY TO CONFESS JUDGMENT AGAINST THE BORROWER.  IN GRANTING THIS WARRANT OF ATTORNEY TO CONFESS JUDGMENT AGAINST THE BORROWER, THE BORROWER, FOLLOWING CONSULTATION WITH (OR DECISION NOT TO CONSULT) SEPARATE COUNSEL FOR THE BORROWER AND WITH KNOWLEDGE OF THE LEGAL EFFECT HEREOF, HEREBY KNOWINGLY, INTENTIONALLY, VOLUNTARILY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS THE BORROWER HAS OR MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES OF AMERICA, THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE.  IT IS SPECIFICALLY ACKNOWLEDGED BY THE BORROWER THAT THE BANK HAS RELIED ON THIS WARRANT OF ATTORNEY IN RECEIVING THIS GRID NOTE AND AS AN INDUCEMENT TO GRANT FINANCIAL ACCOMMODATIONS CONTAINED HEREIN.

b.    Upon and following the occurrence of an Event of Default, the Borrower hereby jointly and severally authorizes and empowers any attorney of any court of record or the prothonotary or clerk of any county in the Commonwealth of Pennsylvania, or, in any jurisdiction where permitted by law or the clerk of any United States District Court, to appear for the Borrower or any of them in any and all actions which may be brought hereunder and enter and confess judgment against the Borrower or any of them in favor of the Bank for such sums as are due or may become due hereunder and any other Liabilities together with costs of suit and actual collection costs including, without limitation, reasonable attorneys' fees equal to five percent (5%) of the Liabilities then due and owing but in no event less than $5000, with or without declaration, without prior notice, without stay of execution and with release of all procedural errors and the right to issue executions forthwith. To the extent permitted by law, the Borrower waives the right of inquisition on any real estate levied on, voluntarily condemns the same, authorizes the prothonotary or clerk to enter upon the writ of execution this voluntary condemnation and agrees that such real estate may be sold on a writ of execution; and also waives any relief from any appraisement, stay or exemption law of any state now in force or hereafter enacted. If a copy of this Grid Note verified by affidavit of any officer of the Bank shall have been filed in such action, it shall not be necessary to file the original thereof as a warrant of attorney, any practice or usage to the contrary notwithstanding. The authority herein granted to confess judgment shall not be exhausted by any single exercise thereof, but shall continue and may be exercised from time to time as often as the Bank shall find it necessary and desirable and at all times until full payment of all Liabilities. The Bank may confess one or more judgments in the same or different jurisdictions for all or any part of the obligations arising hereunder, without regard to whether judgment has theretofore been confessed on more than one occasion for the same obligations. In the event that any judgment confessed against the Borrower is stricken or opened upon application by or on behalf of the Borrower or any Obligor for any reason, the Bank is hereby authorized and empowered to again appear for and confess judgment against the Borrower for any part or all of the obligations due and owing under this Grid Note and for any other Liabilities.

WACH 00785

AUG-19-96 13:44 FROM:DOC RETENTION                    ID:2015651765            PAGE    5/8

Remedies Cumulative; No Waiver. The rights, powers and remedies of the Bank provided in     Grid Note are cumulative and concurrent, and not exclusive of any other rights, powers or   edies available to the Bank. No failure or delay on the part of the Bank in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.

5.    **Continuing Effect of this Grid Note.** If, after receipt of any payment of all or any part of the Grid Note or the Liabilities, the Bank is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason, then this Grid Note shall continue in full force and effect or be reinstated, as the case may be. The provisions of this Paragraph shall survive the termination of this Grid Note and shall be remain effective notwithstanding the payment of the Liabilities, the cancellation of the Grid Note, the release of any security interest, lien or encumbrance securing the Liabilities or any other action which the Bank may have taken in reliance upon its receipt of such payment.

F.    **Miscellaneous.**

1.    **Waiver of Demand.** The Borrower hereby (i) waives demand, presentment, protest, notice of protest and notice of dishonor of this Grid Note; (ii) consents to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Bank with respect to the payment or other provisions of this Grid Note, and to the release of any Collateral, with or without substitution; and (iii) agrees that makers, endorsers, guarantors, and sureties may be added or released without notice and without affecting their liability hereunder. The liability of the Borrower hereunder shall be absolute and unconditional.

2.    **Completion of Grid Note.** The Borrower hereby authorizes the Bank to date this Grid Note as of the date when the initial Advance, if any, is made hereunder and to complete this Grid Note with any other particulars according to the terms of the Bank's understanding of the terms of any such Advance. Any consent, agreement, instruction or request pertaining to any matter under or in connection with this Grid Note signed by any Borrower shall be binding upon each Borrower.

                                                                            See Rider 23
3.    **Notices.** Notices and communications under this Grid Note shall be in writing and shall be given by either (i) hand-delivery, (ii) first-class mail (postage prepaid), (iii) reliable overnight commercial courier (charges prepaid), or (iv) telecopy to the addresses and telecopier numbers listed in this Grid Note (provided that if no telecopier numbers appear on this Grid Note, to the telecopier numbers that the parties notify one another of from time to time). Notice given by telecopy shall be deemed to have been given and received when sent. Notice by overnight courier shall be deemed to have been given and received on the date scheduled for delivery. Notice by mail shall be deemed to have been given and received three (3) calendar days after the date first deposited in the United States Mail. Notice by hand delivery shall be deemed to have been given and received upon delivery. A party may change its address and/or telecopier number by giving written notice to the other party as specified herein.            See Rider 24
                        See Rider 25
4.    **Costs and Expenses.** Whether or not the transaction contemplated by this Grid Note is fully consummated, the Borrower shall promptly pay (or reimburse, as the Bank may elect) all costs and expenses which the Bank has incurred or may hereafter incur in connection with the negotiation, preparation, reproduction, interpretation, perfection, protection of collateral, monitoring, administration and enforcement of this Grid Note, the collection of all amounts due under this Grid Note, and all amendments, modifications, consents or waivers, if any, to this Grid Note. The Borrower's reimbursement obligations under this Paragraph shall survive any termination of this Grid Note.

5.    **Payment Due on a Day Other than a Business Day.** If any payment due or action to be taken under this Grid Note falls due or is required to be taken on a day that the Bank is not open for business, such payment or action shall be made or taken on the next succeeding day when the Bank is open for business and such extended time shall be included in the computation of interest.

6.    **Governing Law.** This Grid Note shall be construed in accordance with and governed by the substantive laws of the Commonwealth of Pennsylvania without reference to conflict of laws principles.

7.    **Integration; Amendment.** This Grid Note constitutes the sole agreement of the parties with respect to the subject matter hereof and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. No amendment of this Grid Note, and no waiver of any one or more of the provisions hereof shall be effective unless set forth in writing and signed by the parties hereto. See Rider 26

8.    **Successors and Assigns.** This Grid Note (i) shall be binding upon the Borrower and the Bank and, where applicable, their respective heirs, executors, administrators, successors and permitted assigns, and (ii) shall inure to the benefit of the Borrower and the Bank and, where applicable, their respective heirs, executors, administrators, successors and permitted assigns; provided, however, that the Borrower may not assign its rights hereunder or any interest herein without the prior written consent of the Bank, and any such assignment or attempted assignment by the Borrower shall be void and of no effect with respect to the Bank. The Bank may from time to time sell or assign, in whole or in part, or grant participations in some or all of this Grid Note and/or the obligations evidenced hereby. The Borrower authorizes the Bank to provide information concerning the Borrower to any prospective purchaser, assignee or participant.

9.    **Severability and Consistency.** The illegality, unenforceability and/or inconsistency of any provision of this Grid Note or any instrument or agreement required hereunder shall not in any way affect or impair the legality, enforceability or consistency of the remaining provisions of this Grid Note or any instrument or agreement required hereunder. The Borrower agrees that in the event of any ambiguity in this Grid Note, the Grid Note shall not be construed against any one party but shall be interpreted consistent with the Bank's policies and procedures.

10.   **Consent to Jurisdiction and Service of Process.** The Borrower irrevocably appoints each and every owner, partner and/or officer of the Borrower as its attorneys upon whom may be served, by regular or certified mail at the address set forth in this Grid Note, any notice, process or pleading in any action or proceeding against it or in connection with this Grid Note or any of the other Loan Documents. The Borrower hereby consents and agrees that (i) any action or proceeding against it may be commenced and maintained in any court within the Commonwealth of Pennsylvania or in the United States District Court for the Eastern District of Pennsylvania by service of process on any such owner, partner and/or officer; and (ii) the courts of the Commonwealth of Pennsylvania and the United States District Court for the Eastern District of Pennsylvania shall have jurisdiction with respect to the subject matter hereof and the person of the Borrower and all collateral for the Liabilities. The Borrower agrees that any action brought by the Borrower shall be commenced and maintained only in a court in the federal judicial district or county in which the Bank has a place of business in Pennsylvania.

                                        4 of 5

                                                                    WACH  00786

CONFIDENTIAL - ATTORNEYS EYES ONLY

AUG-19-96 13:46 FROM:DOC RETENTION            ID:2015651765          PAGE  8/8
                                                                    P14

**11.  Judicial Proceeding: Waivers.**

THE BANK AND THE BORROWER ACKNOWLEDGE AND AGREE THAT (i) ANY SUIT, ACTION OR PROCEEDING WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY EITHER THE BANK OR THE BORROWER HEREUNDER OR ANY SUCCESSOR OR ASSIGN OF EITHER THE BANK OR THE BORROWER, ON OR WITH RESPECT TO THIS GRID NOTE OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO, OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY; (ii) EACH WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; AND (iii) THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS GRID NOTE AND THAT THE BANK WOULD NOT EXTEND CREDIT TO THE BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS GRID NOTE.

IN WITNESS WHEREOF, the Borrower has executed and delivered to the Bank this Grid Note on the day and year first above written.

Name: _____            Name: _____

Address: **SIGN HERE**                    Address: _____
         _____                   _____

Telecopier No.: _____   Telecopier No.: _____

** By _Charles P Manson_                   HAHNEMANN UNIVERSITY HOSPITAL
    Name: CHARLES P MANSON                 Corporation or Partnership Name
    Title: ASST TREAS HUH                  By _Michael P Martin_
                                              Name: MICHAEL Q MARTIN
                                              Title: U.R - TREASURY : AHERF
                                           ** Ass't. Treasurer : AUH
                                              Address: _____

                                           Telecopier No.: _____

Accepted and Agreed to by:

First Fidelity Bank, National Association

By _Janette Wolff_
   Name: Jeanett Griffin
   Title: _____          _3781545504_
                                              _51003_
Address: 123 S. Broad Street
         Philadelphia, PA  19109

Telecopier No.: _____


                                           OCT 2 0 1995

5 of 6

WACH  00787

THE BANK AND THE BORROWER ACKNOWLEDGE AND AGREE THAT (i) ANY SUIT, ACTION OR PROCEEDING WHETHER CLAIM O
COUNTERCLAIM, BROUGHT OR INSTITUTED BY EITHER THE BANK OR THE BORROWER HEREUNDER OR ANY SUCCESSOR OR ASSIGN O
EITHER THE BANK OR THE BORROWER, ON OR WITH RESPECT TO THIS GRID NOTE OR THE DEALINGS OF THE PARTIES WITH RESPEC
HERETO, OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY; (ii) EACH WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OI
RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR AN'
DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; AND (iii) THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS GRII
NOTE AND THAT THE BANK WOULD NOT EXTEND CREDIT TO THE BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION WERE NO'
A PART OF THIS GRID NOTE.

IN WITNESS WHEREOF, the Borrower has executed and delivered to the Bank this Grid Note on the day and year first above written.

Name: _____

Address: _____

_____

Telecopier No.: _____

Name: _____

Address: _____

_____

Telecopier No.: _____

HAHNEMANN UNIVERSITY HOSPITAL
Corporation or Partnership Name

** By _____
   Name:
   Title:

By: _Michael P. Marton_____
Name: _Michael P. Marton_____
Title: _V.D —Treasury : AHP_____
** Address: _Ass't. Treasurer : AUH____

_____

Telecopier No.: _____

Accepted and Agreed to by:

First Fidelity Bank, National Association

By: _Jeanette Griffith_____
Name: Jeanette Griffith
Title:

Address:  123 S. Broad Street
          Philadelphia, PA  19109

Telecopier No.: _____

3781545504
51000 3

Oct 2 0 1995

WACH  00788

ATTACHMENT TO GRID NOTE

| OBLIGATION NO. | DATE OF ADVANCE | PRINCIPAL ADVANCE AMOUNT | PRINCIPAL MATURITY | PRINCIPAL REPAID |
|---|---|---|---|---|
| 0007300015 | June 16, 1993 | $2,800,000 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

WACH 00789

*C.*

## RIDER TO GRID NOTE

THIS RIDER TO GRID NOTE executed this 30 day of March, 1995, between **HAHNEMANN UNIVERSITY HOSPITAL** ("Borrower") and **FIRST FIDELITY BANK, NATIONAL ASSOCIATION** ("Bank"), is to be attached to and made a part of that certain Grid Note ("Grid Note") dated of even date herewith, between the Borrower and the Bank. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Grid Note.

**RIDER 1:**   (including the applicable interest rate thereon)

**RIDER 2:**   of each Advance

**RIDER 3:**   the rate quoted for each such Advance by the Bank and accepted by the Borrower, which rate(s) shall be noted, respectively, on the Bank's books and records and/or on the Grid and shall be, in the absence of manifest error, conclusively binding on the Borrower, as aforesaid.

**RIDER 4:**   within five (5) days after the date

**RIDER 5:**   ,the respective interest rate applicable to each Advance,

**RIDER 6:**   Each Advance hereunder shall be made pursuant to written wire instructions provided by the Borrower to the Bank. All Advances made by the Bank pursuant to such instructions shall be conclusively presumed to have been properly authorized by the Borrower.

**RIDER 7:**   Each Advance hereunder accruing interest at a floating rate may be prepaid at any time without prepayment penalty or premium. Each Advance hereunder accruing interest at a fixed rate (including LIBOR) may be prepaid, in whole or in part, at any time, provided that any such prepayment (whether in whole or in part and whether made voluntarily or because of acceleration or otherwise) shall also be accompanied by (i) all accrued and unpaid interest on such Advance and all other fees, expenses, and other sums due and owing hereunder, and (ii) an additional amount (the "Make Whole Premium") determined by the Bank in its sole discretion. The Bank's determination of the Make Whole Premium shall be conclusive and binding, absent manifest error. All payments received on this Grid Note may be applied in such order as the Bank in its sole discretion shall determine.

138516.2 3/24/95

WACH  00790

**RIDER 8:**   in all material respects

**RIDER 9:**   have a Material Adverse Effect (as defined below) upon the Borrower; (vii) no event of default has occurred or is continuing under any agreement or instrument to which Borrower is a party or by which any of its property is bound, which default would reasonably be expected to have a material adverse effect upon (a) the business, condition (financial or otherwise), operations, properties or prospects of the Borrower, (b) the ability of the Borrower to perform its obligations under this Grid Note, and/or (c) the rights and remedies of the Bank under this Grid Note (collectively, "Material Adverse Effect"); and (viii) neither the Borrower's execution of, nor performance under, this Grid Note will create a default under any material agreement or instrument to which Borrower is a party or by which any of its property is bound.

**RIDER 10:**   within five (5) days from the date

**RIDER 11:**   ,and such breach shall continue after any applicable grace period specified in such agreement or instrument;

**RIDER 12:**   material

**RIDER 13:**   ,and such breach shall continue after any applicable grace period specified in such agreement or instrument;

**RIDER 14:**   and such case, proceeding or order shall remain undismissed or undischarged for a period of thirty (30) days;

**RIDER 15:**   (and with respect to such appointment or taking of possession which is involuntarily commenced against or in respect of any Obligor, such appointment or taking of possession shall remain undismissed or undischarged for a period of thirty (30) days);

**RIDER 16:**   (and in the case of a merger or consolidation of any Obligor, without the prior written consent of the Bank, which consent shall not be unreasonably withheld);

**RIDER 17:**   reasonable

138516.2 3/24/95

WACH  00791

**RIDER 18:**  other than (i) debt to the Bank and/or an Affiliate, (ii) trade debt in the ordinary course of Borrower's business, (iii) debt existing on the date hereof and which is listed on Schedule A attached hereto, (iv) subject to paragraph (vi) below, debt incurred solely to finance the acquisition of specific property, plant or equipment, which debt may be secured by a purchase money security interest solely in the specific property, plant or equipment purchased, (v) subject to paragraph (vi) below, short term intercompany debt (defined herein to mean debt due and payable on or before 365 days from the date of issuance) which does not in any event exceed $5,000,000.00 in the aggregate, and (vi) additional unsecured debt which, at the time incurred, together with any other debt then outstanding and permitted by this paragraph (vi) and paragraphs (iv) and (v) above, does not exceed $10,000,000.00 in the aggregate.

**RIDER 19:**  ,or transfers or grants any lien or security interest in any of its property in favor of CoreStates Bank, N.A. (other than as contemplated by the Master Indenture (as defined in Schedule A attached hereto)), in each case without the Bank's prior written consent, which consent shall not be unreasonably withheld;

**RIDER 20:**  (a) any judgment or judgments for the payment of money in excess of $5,000,000.00 in the aggregate against any Obligor or its property which, within thirty (30) days from such filing or entry of such judgment or judgments, shall not have been fully bonded, discharged or stayed pending appeal (and in the case of a stay pending appeal, discharged within thirty (30) days from the entry of a final order of affirmance on appeal from which no further appeal may be taken), or (b) any

**RIDER 21:**  and the result of such execution, garnishment, attachment, distraint, lien or order would reasonably be expected to have a Material Adverse Effect upon any Obligor;

**RIDER 22:**  Allegheny Health, Education and Research Foundation shall cease to be ~~the sole~~ Member of the Borrower.

*M. P. Martin*
*3-27-95*

**RIDER 23:**  certified mail, return receipt requested

**RIDER 24:**  upon the earlier of (a) when actually received, and (b) five (5)

**RIDER 25:**  reasonable

138516.2 3/24/95                       -3-

WACH  00792

**RIDER 26:**   The Medical College of Pennsylvania & Hahnemann University (f/k/a Hahnemann University) (the "Prior Obligor") previously executed and delivered to the Bank that certain $2,800,000.00 Promissory Note (Judgment) dated June 16, 1993 ("Prior Note").   By execution of this Grid Note, Borrower assumes and undertakes to pay the entire indebtedness of the Prior Obligor owing to the Bank under the Prior Note (which as of the date of this Grid Note remains outstanding in the principal amount of $2,800,000), the terms of repayment of which shall now be governed by the provisions of this Grid Note.  This Grid Note, inter alia, (i) now evidences such outstanding indebtedness evidenced by the Prior Note and hereby assumed by the Borrower, (ii) is given in substitution of and not in payment or extinguishment of the indebtedness evidenced by the Prior Note, and (iii) is not intended to discharge or constitute a novation of such outstanding indebtedness.   Borrower hereby waives any and all defenses, counterclaims and offsets with respect to the indebtedness assumed hereunder that may exist on the date hereof.

     IN WITNESS WHEREOF, the Borrower and Bank have executed this Rider to Grid Note as of the day and year first above written.

HAHNEMANN UNIVERSITY HOSPITAL

By: _Michael P. Marto_____
   Name: Michael P. Marto
   Title: V.P. - Treasury : AHERF
       Asst. Treasurer : HUH

By: _____
   Name:
   Title:

FIRST FIDELITY BANK, NATIONAL ASSOCIATION

By: _____
   Name:    William J. Rafferty  Jeanette Graffeo
   Title:       Vice President

138516.2 3/24/95          -4-

WACH  00793

**RIDER 26:**  The Medical College of Pennsylvania & Hahnemann University (f/k/a Hahnemann University) (the "Prior Obligor") previously executed and delivered to the Bank that certain $2,800,000.00 Promissory Note (Judgment) dated June 16, 1993 ("Prior Note").  By execution of this Grid Note, Borrower assumes and undertakes to pay the entire indebtedness of the Prior Obligor owing to the Bank under the Prior Note (which as of the date of this Grid Note remains outstanding in the principal amount of $2,800,000), the terms of repayment of which shall now be governed by the provisions of this Grid Note.  This Grid Note, inter alia, (i) now evidences such outstanding indebtedness evidenced by the Prior Note and hereby assumed by the Borrower, (ii) is given in substitution of and not in payment or extinguishment of the indebtedness evidenced by the Prior Note, and (iii) is not intended to discharge or constitute a novation of such outstanding indebtedness.   Borrower hereby waives any and all defenses, counterclaims and offsets with respect to the indebtedness assumed hereunder that may exist on the date hereof.

IN WITNESS WHEREOF, the Borrower and Bank have executed this Rider to Grid Note as of the day and year first above written.

HAHNEMANN UNIVERSITY HOSPITAL

By: _____
    Name: MICHAEL P. MARTIN
    Title: V. P. - TREASURER ; AHERF
        Assr. TREASURER ; HUH

By: _____
    Name: CHARLES P. MORRISON
    Title: ASST TREAS. HUH

FIRST FIDELITY BANK, NATIONAL ASSOCIATION

By: _____
    Name:  ~~William J. Rafferty~~  Jeanette Griffen
    Title:  Vice President

134516.2 3/24/95

-4-

OCT 0   1995

## SCHEDULE A TO RIDER TO GRID NOTE

### Schedule of Existing Debt

1.    Master Trust Indenture dated as of October 1, 1989, as amended and supplemented (the "Master Indenture"), between Borrower (as successor by assumption to The Medical College of Pennsylvania & Hahnemann University (f/k/a Hahnemann University) ("MCP/HU")) and CoreStates Bank, N.A., as Trustee

   a.    Master Note issued under the Master Indenture in connection with the Pennsylvania Higher Education Facilities Authority (the "Authority") $117,000,000 Revenue Bonds (Hahnemann University Project), Series 1989, of which $111,151,000 was outstanding as of June 30, 1994

   b.    Master Note issued under the Master Indenture in connection with the Authority's $35,000,000 Revenue Bonds (Hahnemann University Project), Series 1991, of which $33,673,000 was outstanding as of June 30, 1994

2.    $7,500,000 Discretionary Line of Credit between the Borrower (as successor by assumption to MCP/HU) and CoreStates Bank, N.A.

3.    PHEFA Series 14 Bonds

4.    Capital Lease Obligations set forth in the interim Financial Statements of MCP/HU dated 9/30/94

5.    Notes Payable set forth in the interim Financial Statements of MCP/HU dated 9/30/94

138516.2 3/24/95                                 A-1                          OCT 2 0 1995

WACH 00795

COMMONWEALTH OF PENNSYLVANIA        :
                                    :        SS
COUNTY OF                           :

On this _24_ day of ~~July~~ *August* 1995, before me, a Notary Public, the undersigned officer, personally appeared *Charles Mittson*, who acknowledged himself/herself to be *Treasurer* of Hahnemann University Hospital, and that he/she as such *officer*, being authorized to do so, executed the foregoing Allonge to Grid Note for the purpose therein contained by signing the name of the Corporation by himself/herself as *Treasurer* of same.

WITNESS my hand and Notarial seal, the day and year aforesaid.

*Rose M. Jenkins*
Notary Public

My Commission Expires:

NOTARIAL SEAL
ROSE M. JENKINS, Notary Public
City of Philadelphia, Phila. County
My Commission Expires May 13, 1996


COMMONWEALTH OF PENNSYLVANIA        :
                                    :        SS
COUNTY OF                           :

On this _24_ day of ~~July~~ *August* 1995, before me, a Notary Public, the undersigned officer, personally appeared *David Kaighn*, who acknowledged himself/herself to be *President* of Hahnemann University Hospital, and that he/she as such *officer*, being authorized to do so, executed the foregoing Allonge to Grid Note for the purpose therein contained by signing the name of the Corporation by himself/herself as *President* of same.

WITNESS my hand and Notarial seal, the day and year aforesaid.

*Rose M. Jenkins*
Notary Public

My Commission Expires

NOTARIAL SEAL
ROSE M. JENKINS, Notary Public
City of Philadelphia, Phila. County
My Commission Expires May 13, 1996

148489.2 7/14/95

WACH 00796

D.

## CERTIFIED COPY OF RESOLUTION

I, Lynn R. Isaacs, Assistant Secretary, hereby certify that the following is a complete, true and correct copy of a Resolution of the Board of Trustees of Hahnemann University Hospital, a Pennsylvania non-profit corporation; said resolution is currently in effect, has not been rescinded or modified, and was duly adopted by the Board of Trustees at its meeting on the 15th day of March 1995.

**WHEREAS**, First Fidelity Bank, N.A. has established a $7.5 million line of credit to The Medical College of Pennsylvania and Hahnemann University; and

**WHEREAS**, Hahnemann University Hospital is the sole surviving member of the Hahnemann obligated group; and

**WHEREAS**, First Fidelity Bank, N.A., has offered to continue this line of credit under the name of Hahnemann University Hospital; and

**WHEREAS** there is currently a drawdown on this line of credit in the amount of $2.8 million; and

**WHEREAS**, in an effort to afford Hahnemann University Hospital continued and improved financial flexibility and liquidity, management recommends that the revolving line of credit be renewed under the name of Hahnemann University Hospital in an amount not to exceed $7.5 million; and

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Trustees of Hahnemann University Hospital hereby approves and authorizes the renewal, with modifications, of the $7.5 million revolving line of credit with First Fidelity Bank, N.A.; and

**FURTHER RESOLVED**, that the Board of Trustees of Hahnemann University Hospital authorizes the President, Chief Financial Officer, Treasurer, Assistant Treasurer or any other authorized officer of Hahnemann University Hospital, each severally, to execute and deliver on behalf of and in the name of Hahnemann University Hospital any and all instruments, agreements or documents that may be required by First Fidelity Bank, N.A. to effect this transaction.

IN WITNESS WHEREOF, the Assistant Secretary of the Corporation has hereunder set her hand and affixed the seal of said corporation on this March 29, 1995.

(CORPORATE SEAL)

Lynn R. Isaacs
Assistant Secretary

DVB-19233.1

WACH  00797