*e.*

# CERTIFIED COPY OF RESOLUTION

I, Cherry S. White, Assistant Secretary, hereby certify that the following is a complete, true and correct copy of a Resolution of the Board of Trustees of Allegheny Health, Education and Research Foundation, acting as the Class A Member of Hahnemann University Hospital, a Pennsylvania non-profit corporation; said resolution is currently in effect, has not been rescinded or modified, and was duly adopted by the Board of Trustees on the 6th day of April, 1995.

Hahnemann University Hospital Line of Credit

WHEREAS, First Fidelity Bank, N.A. has established a $7.5 million line of credit to Hahnemann University; and

WHEREAS there is currently a drawdown on this line of credit, in the amount of $2.8 million; and

WHEREAS First Fidelity Bank, N.A., has offered to continue this line of credit in the name of Hahnemann University Hospital; and

WHEREAS, Hahnemann University Hospital is the sole surviving member of the Hahnemann obligated group; and

WHEREAS, in an effort to afford Hahnemann University Hospital continued and improved financial flexibility and liquidity, management recommends that the revolving line of credit be renewed in an amount not to exceed $7.5 million; and

WHEREAS, the Board of Trustees of Hahnemann University Hospital on March 15, 1995 approved a resolution to renew this line of credit; and

WHEREAS, the Class "A" member of Hahnemann University Hospital is Allegheny Health, Education and Research Foundation;

NOW, THEREFORE, BE IT RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, Acting as the Class A Member of HUH, approves and authorizes Hahnemann University Hospital to renew, with modifications, the $7.5 million revolving line of credit with First Fidelity Bank, N.A.; and

WACH 00798

FURTHER RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, Acting as the Class A Member of HUH, approves any and all actions by the Board of Trustees of Hahnemann University Hospital required to effect this transaction.

IN WITNESS WHEREOF, The Assistant Secretary of the Corporation has hereunder set her hand and affixed the seal of the Corporation this the 11th day of April, 1995.

Cherry S. White
Assistant Secretary

f.

## CERTIFIED COPY OF RESOLUTION

I, Lynn R. Isaacs, Assistant Secretary, hereby certify that the following is a complete, true and correct copy of a Resolution of the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System, in its capacity as the Class "B" Member of Hahnemann University Hospital, a Pennsylvania non-profit corporation; said resolution is currently in effect, has not been rescinded or modified, and was duly adopted by the Board of Trustees at its meeting on the 15th day of March 1995.

WHEREAS, First Fidelity Bank, N.A. has established a $7.5 million line of credit to Hahnemann University; and

WHEREAS there is currently a drawdown on this line of credit, in the amount of $2.8 million; and

WHEREAS First Fidelity Bank, N.A., has offered to continue this line of credit in the name of Hahnemann University Hospital; and

WHEREAS, Hahnemann University Hospital is the sole surviving member of the Hahnemann obligated group; and

WHEREAS, in an effort to afford Hahnemann University Hospital continued and improved financial flexibility and liquidity, management recommends that the revolving line of credit be renewed in an amount not to exceed $7.5 million; and

WHEREAS, the Board of Trustees of Hahnemann University Hospital on March 15, 1995 approved a resolution to renew this line of credit; and

WHEREAS, the Class "B" member of Hahnemann University Hospital is the Medical College of Pennsylvania and Hahnemann University Hospital System; and

WHEREAS, borrowing of funds in excess of $500,000 by Hahnemann University Hospital requires the approval of the Class "B" member.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System approves and authorizes Hahnemann University Hospital to renew, with modifications, the $7.5 million revolving line of credit with First Fidelity Bank, N.A.; and

DVR:19235.1

WACH  00800

**FURTHER RESOLVED**, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System approves any and all actions by the Board of Trustees of Hahnemann University Hospital required to effect this transaction.

IN WITNESS WHEREOF, the Assistant Secretary of the Corporation has hereunder set her hand and affixed the seal of said corporation on this March 29, 1995..

(CORPORATE SEAL)

Lynn R. Isaacs
Assistant Secretary

DVR:19235.1

WACH  00801

G.

To Whom It May Concern:

The following are the duly elected officers of Hahnemann University Hospital as of this date:

| | |
|---|---|
| Harry R. Edelman, III | Chair of the Board |
| Margaret Gray Wood, M.D. | Vice Chair of the Board |
| Donald Kaye, M.D. | President |
| Robert M. McNair, Jr., Esquire | Secretary |
| Charles P. Morrison | Treasurer |
| Lynn R. Isaacs | Assistant Secretary |
| Mark A. Lieberman, Esquire | Assistant Secretary |
| Nancy A. Wijnstra, Esquire | Assistant Secretary |
| Stephen H. Spargo | Assistant Treasurer |

_(signature)_

Lynn R. Isaacs
Assistant Secretary

Philadelphia, Pennsylvania

Date: <u>March 29, 1995</u>

DVR:4081.1

WACH  00802

**EXHIBIT  2677**

## MASTER CONTINUING DISCLOSURE AGREEMENT

This **MASTER CONTINUING DISCLOSURE AGREEMENT** dated as of June 19, 1996 (the "Master Continuing Disclosure Agreement") is executed and delivered by Allegheny University Hospitals ("University Hospitals"), as the initial Obligated Group Agent (under and (as defined in) the hereinafter defined Master Indenture, on behalf of the Obligated Group established under (and as defined in) the Master Indenture, and accepted by Allegheny Health Education and Research Foundation ("AHERF") and by Norwest Bank Minnesota, National Association, as Dissemination Agent (the "Dissemination Agent") hereunder. Additional capitalized terms used herein shall have the meanings ascribed thereto in Section 2 hereof.

**SECTION 1.** <u>Nature of Undertaking</u>. This Master Continuing Disclosure Agreement constitutes an undertaking by the Obligated Group Agent, on behalf of the Obligated Group, under paragraph (b)(5) of the Rule to provide Annual Financial Information and notice of the occurrence of certain events with respect to Related Bonds, as provided in paragraph (b)(5)(i)(C) of the Rule, and otherwise to assist Participating Underwriters in complying with paragraph (b)(5) of the Rule with respect to Offerings of Related Bonds. Among other things, the Obligated Group Agent is hereby undertaking, on behalf of the Obligated Group, (i) to disseminate an Annual Report not later than the last day of the sixth calendar month after the end of each Fiscal Year of the Obligated Group in accordance with paragraph (b)(5)(i)(A) of the Rule and Section 5 hereof, which contains Annual Financial Information with respect to those Persons which were Obligated Persons during the Fiscal Year immediately preceding the date of such Annual Report, (ii) if an Annual Report does not contain the Audited Financial Statements, to disseminate the Audited Financial Statements in accordance with paragraph (b)(5)(i)(B) of the Rule and Section 5 hereof as soon as practicable after they shall have been approved by the Governing Body, (iii) to provide notice in a timely manner, in accordance with paragraph (b)(5)(i)(C) of the Rule and Section 7 hereof, of the occurrence of any of the Listed Events related to Persons which were Obligated Persons at the time of the occurrence of such events and (iv) to provide notice in a timely manner, in accordance with paragraph (b)(5)(i)(D) of the Rule and Section 5(e) hereof, of any failure to disseminate an Annual Report in accordance with the preceding clause (i) of this sentence.

**SECTION 2.** <u>Definitions</u>. In addition to the definitions set forth above and in the Master Indenture, which shall apply to any capitalized terms used herein, the following capitalized terms shall have the following meanings, unless otherwise defined therein:

"**Annual Financial Information**" shall have the meaning ascribed thereto in paragraph (f)(9) of the Rule.



"**Annual Report**" means a document or set of documents which (a) identifies the Obligated Persons as of date of the Annual Report; (b) contains (or includes by reference to documents which were provided to each Repository or filed with the SEC or, if by reference to a Final Official Statement, filed with the MSRB prior to the date that the Annual Report containing such reference is provided to the Dissemination Agent in accordance with Section 5 hereof): (i) Financial Information and Operating Data for those Persons which were Obligated Persons during the Fiscal Year immediately preceding the date of the Annual Report; (ii) Audited Financial Statements if such Audited Financial Statements shall have been approved by the Governing Body at the time the Annual Report is required to be provided to the Dissemination Agent in accordance with Section 5 hereof; and (iii) Unaudited Financial Statements if the Audited Financial Statements shall not have been approved by the Governing Body at the time the Annual Report is required to be provided to the Dissemination Agent in accordance with Section 5 hereof; (c) contains the name and address of any bond insurers, credit enhancers or liquidity providers described in any Final Official Statement; (d) in the event that the Obligated Group Agent delivers a Continuing Disclosure Certificate to the Dissemination Agent pursuant to Section 6(b) hereof, contains (in the case of the Annual Report disseminated on or immediately after the date such Continuing Disclosure Certificate is so delivered) a narrative explanation of the reasons for the changes in Financial Information and/or Operating Data set forth in such Continuing Disclosure Certificate and the effect of the changes on the types of Financial Information and/or Operating Data being provided in such Annual Report; and (e) in the event that the Obligated Group authorizes a change in the accounting principles by which its Audited Financial Statements are prepared, contains (in the case of the Annual Report disseminated on or immediately after the date of such change) (1) a comparison between the Financial Information prepared on the basis of the new accounting principles which is contained in such Annual Report and the Financial Information prepared on the basis of the former accounting principles which was contained in the previous Annual Report disseminated immediately prior to such Annual Report and (2) a discussion of the differences between such accounting principles and the effect of such change on the presentation of the Financial Information being provided in such Annual Report.

"**Annual Report Certificate**" means an Annual Report Certificate in the form attached hereto as **Exhibit A.**

"**Annual Report Date**" means the date which is the last day of the sixth calendar month after the end of a Fiscal Year.

"**Audited Financial Statements**" means the financial statements of the Obligated Group which have been examined by independent certified public accountants in accordance with generally accepted auditing standards. The Audited Financial Statements shall be prepared in accordance with generally accepted accounting principles on a comparative basis for the two Fiscal Years immediately preceding the date of the Annual Report.

2

FOLEY    22547

"Bondholder" means (i) the registered owner of a Related Bond and (ii) the beneficial owner of a Related Bond, as the term "beneficial owner" is used in any agreement with a securities depository for a series of Related Bonds and as the term may be modified by an interpretation by the SEC of paragraph (b)(5) of the Rule.

"Continuing Disclosure Certificate" means a Continuing Disclosure Certificate in the form attached hereto as **Exhibit B-1** or **Exhibit B-2** delivered by the Obligated Group Agent to AHERF and the Dissemination Agent pursuant to Section 6 hereof.

"Dissemination Agent" means Norwest Bank Minnesota, National Association, acting in its capacity as Dissemination Agent hereunder or any successor Dissemination Agent which is appointed pursuant to Section 4 hereof or to which the responsibilities of Dissemination Agent under this Master Continuing Disclosure Agreement shall have been assigned in accordance with Section 12 hereof.

"Event Notice" means notice of the occurrence of a Listed Event.

"Final Official Statement" means the Final Official Statement (as defined in paragraph (f)(3) of the Rule) prepared in connection with an Offering of Related Bonds.

"Financial Information" means financial information related to the Obligated Persons of the types identified in the Continuing Disclosure Certificate most recently delivered by the Obligated Group Agent to AHERF and the Dissemination Agent in accordance with Section 6 hereof. The Financial Information (i) shall be prepared for the Fiscal Year immediately preceding the date of the Annual Report containing such Financial Information, (ii) shall be prepared on the basis of the Audited Financial Statements to be provided to the Dissemination Agent concurrently with the Annual Report, provided that, if the Audited Financial Statements are to be provided to the Dissemination Agent subsequent to the date that the Annual Report is provided to the Dissemination Agent, such Financial Information may be prepared on the basis of the Unaudited Financial Statements, and (iii) shall cover those Persons which were Obligated Persons during the Fiscal Year for which the Financial Information is prepared and with respect to whose operations such Financial Information is relevant.

"Governing Body" shall have the meaning ascribed thereto in the Master Indenture, provided that, as used herein with respect to the Obligated Persons, the term "Governing Body" shall mean the Governing Body of the Person or Persons which the Articles of Incorporation or the Bylaws of the Obligated Persons provide shall approve the Audited Financial Statements.

"Listed Events" means any of the events with respect to Related Bonds which are listed in paragraph (b)(5)(i)(C) of the Rule as in effect on the date hereof and which are set forth in Section 7 hereof.

"Master Continuing Disclosure Agreement" means this Master Continuing Disclosure Agreement, as the same may be supplemented and amended pursuant to Section 11 hereof.

3

FOLEY     22548

"**Master Indenture**" means the Master Trust Indenture dated as of May 15, 1996 by and among the Members of the Obligated Group and the Master Trustee, as the same may be supplemented and amended from time to time.

"**MSRB**" means the Municipal Securities Rulemaking Board.

"**NRMSIR**" means, as of the date of determination, any Nationally Recognized Municipal Securities Information Repository for purposes of paragraph (b)(5) of the Rule. As of the date hereof, the names and addresses of the NRMSIRs are: (i) Bloomberg Municipal Repositories, P.O.B. 840, Princeton, New Jersey 08542-0840; (ii) Thompson's NRMSIR, 395 Hudson Street - 3rd Floor, New York, New York 10014; (iii) Disclosure, Inc. (Attn. Document Acquisitions/Municipal Securities), 5161 River Road, Bethesda, Maryland 20816; (iv) Kenny Information Systems, Inc. (Attn. Kenny Repository Service), 16th Floor, 65 Broadway, New York, New York 10006; (v) Moody's NRMSIR, Public Finance Information Center, 99 Church Street, New York, New York 10007; and (vi) R.R. Donnelly Financial, Municipal Securities Disclosure Archive, 559 Main Street, Hudson, Massachusetts 01749.

"**Obligated Person**" means, prior to the time that no Obligations are Outstanding, each Member of the Obligated Group until (i) such Member withdraws from the Obligated Group and retains no liability for the repayment of any Related Bonds, (ii) such Member merges with another Member of the Obligated Group or (iii) such Member merges with another Person which becomes a Member of the Obligated Group, all in accordance with the Master Indenture.

"**Obligations**" shall have the meaning ascribed thereto in the Master Indenture, provided that, as used herein, such term shall be deemed to refer only to Obligations which secure the payment of Related Bonds.

"**Offering**" shall have the meaning ascribed thereto in paragraph (a) of the Rule.

"**Operating Data**" means operating data of the types identified in the Continuing Disclosure Certificate most recently delivered by the Obligated Group Agent to AHERF and the Dissemination Agent in accordance with Section 6 hereof. The Operating Data (i) shall be prepared for the Fiscal Year immediately preceding the date of the Annual Report containing such Operating Data and (ii) shall cover those Persons which were Obligated Persons during the Fiscal Year for which the Operating Data are prepared and with respect to whose operations such Operating Data are relevant.

"**Participating Underwriter**" shall have the meaning ascribed thereto in paragraph (a) of the Rule.

"**Related Bond Trustee**", with respect to any series of Related Bonds, shall have the meaning ascribed thereto in the Master Indenture.

4

"**Related Bonds**" shall have the meaning ascribed thereto in the Master Indenture, provided that, as used herein, such term shall be deemed to refer only to the following Related Bonds: (i) the Offering of such Related Bonds is subject to paragraph (b)(5) of the Rule and is not exempt therefrom pursuant to paragraph (d) or (e) of the Rule; (ii) this Master Continuing Disclosure Agreement shall have been designated by the Obligated Group Agent as the written undertaking under paragraph (b)(5) of the Rule entered into with respect to such Related Bonds, which designation shall be made pursuant to a Continuing Disclosure Certificate prepared and delivered by the Obligated Group Agent to AHERF and the Dissemination Agent pursuant to Section 6(a) hereof; and (iii) such Related Bonds are Outstanding on the date of any determination hereunder.

"**Related Bond Indenture**" shall have the meaning ascribed thereto in the Master Indenture, provided that any bonds issued pursuant to any such Related Bond Indenture shall constitute Related Bonds hereunder.

"**Related Issuer**" means the issuer of any series of Related Bonds.

"**Related Loan Agreement**" means any lease, loan or other agreement entered into by a Member of the Obligated Group in connection with the issuance of Related Bonds, which agreement provides for the loan of the proceeds of such Related Bonds to such Member and the repayment of such loan by such Member.

"**Repository**" or "**Repositories**" means the NRMSIRs and the SIDs, either individually or collectively, as the context requires.

"**Rule**" means Rule 15c2-12 adopted by the SEC under the Securities Exchange Act of 1934, as amended, as the Rule may be amended from time to time, or any successor provision thereto.

"**SEC**" means the Securities and Exchange Commission.

"**SID**" means, as of the date of determination, any public or private repositories or entities which are designated by the states in which the issuers of Related Bonds are located as state information depositories for purposes of paragraph (b)(5) of the Rule and recognized as such by the SEC.

"**Tax-Exempt**" means that interest on a series of Related Bonds is not includible in the gross income of the owners thereof for federal income tax purposes, whether or not such interest is includible as an item of tax preference or is otherwise includible directly or indirectly for purposes of calculating any other tax liability, including any alternative minimum tax or environmental tax.

5

FOLEY    22550

"**Unaudited Financial Statements**" means unaudited financial statements of the Obligated Group for any Fiscal Year which have been prepared on a basis substantially consistent with the Audited Financial Statements to be subsequently prepared for such Fiscal Year. The Unaudited Financial Statements for any Fiscal Year shall be prepared on a comparative basis with the Audited Financial Statements prepared for the preceding Fiscal Year.

**SECTION 3.**     **Appointment of AHERF as Agent of Obligated Group.**  The Obligated Group Agent, on behalf of the Obligated Group, hereby appoints AHERF to act as the agent of the Obligated Group for purposes of carrying out the undertakings described in clauses (i) through (iii) of Section 1 hereof, in the manner provided in Sections 5 and 7 hereof, and for such other purposes as shall hereinafter be specifically delineated.  AHERF hereby accepts such appointment.

**SECTION 4.**     **Appointment of Dissemination Agent; Obligations of Obligated Group Respecting Undertaking.**  (a)  The Obligated Group Agent, on behalf of the Obligated Group, hereby appoints Norwest Bank Minnesota, National Association, to act as the initial Dissemination Agent hereunder.  Norwest Bank Minnesota, National Association, hereby accepts such appointment.  AHERF may, from time to time, on behalf of the Obligated Group, appoint a successor Dissemination Agent or discharge any then acting Dissemination Agent, with or without cause.  If at any time there shall be no Dissemination Agent appointed and acting hereunder or the then appointed and acting Dissemination Agent shall fail to perform its obligations hereunder, the Obligated Group Agent, on behalf of the Obligated Group, hereby appoints AHERF to discharge such obligations on behalf of the Obligated Group until such time as AHERF shall appoint a successor Dissemination Agent or the then appointed and acting Dissemination Agent shall resume the performance of such obligations.

(b)     The Obligated Group Agent hereby acknowledges, on behalf of the Obligated Group, that the individual Members of the Obligated Group are obligated to comply with paragraph (5)(i) of the Rule in connection with the issuance of Related Bonds and that the appointment of the Obligated Group Agent, AHERF and the Dissemination Agent as agents of the Obligated Group for the purposes herein provided does not relieve the Members of the Obligated Group of their individual obligations with respect to paragraph (5)(i) of the Rule.

**SECTION 5.**     **Annual Financial Information.**   (a)    The Annual Financial Information shall be contained in the Annual Reports and, if provided separately in accordance with Section 5(b) hereof, the Audited Financial Statements which AHERF is required to deliver to the Dissemination Agent for dissemination in accordance with this Section 5.

(b)     AHERF shall provide an Annual Report to the Dissemination Agent, together with an Annual Report Certificate, not later than each Annual Report Date, provided that, if the Annual Report does not include the Audited Financial Statements, AHERF shall provide the Audited Financial Statements to the Dissemination Agent as soon as practicable after they shall have been approved by the Governing Body.

6

(c)     The Dissemination Agent shall provide the Annual Report and, if received separately in accordance with Section 5(b) hereof, the Annual Financial Statements to each Repository, each Related Bond Trustee, each Related Issuer and the provider of any credit enhancement or the issuer of any liquidity facility respecting a series of Related Bonds within five (5) Business Days after receipt thereof from AHERF.

(d)     The Dissemination Agent shall provide AHERF, the Obligated Group Agent and each Related Bond Trustee written confirmation that the Annual Report and, if received separately in accordance with Section 5(b) hereof, the Annual Financial Statements were provided to each Repository and Related Bond Trustee in accordance with Section 5(c) hereof.

(e)     If the Dissemination Agent shall not have received the Annual Report by the Annual Report Date, the Dissemination Agent shall so notify AHERF, the Obligated Group Agent, the Repositories and each Related Bond Trustee within five (5) Business Days of the Annual Report Date, regardless of whether the Dissemination Agent shall have received the Annual Report during the period between the Annual Report Date and such fifth Business Day.

SECTION 6.     Continuing Disclosure Certificates. (a) The Obligated Group Agent shall prepare a Continuing Disclosure Certificate in the form attached hereto as **Exhibit B-1** in connection with each Offering of Related Bonds and shall deliver the same to AHERF, to the Dissemination Agent for dissemination to the Participating Underwriter of such Related Bonds and, upon request, to the issuer of such Related Bonds and the Related Bond Trustee for such Related Bonds. A Continuing Disclosure Certificate which is prepared pursuant to this Section 6(a) after the initial Continuing Disclosure Certificate prepared pursuant to this Section 6(a) shall identify the types of Financial Information and Operating Data included in the previous Continuing Disclosure Certificate most recently delivered to the Dissemination Agent (the "Prior Certificate") pursuant to this Section 6 and any additional types of Financial Information and Operating Data included in the Final Official Statement for such Offering of such Related Bonds, all of which types of Financial Information and Operating Data shall be included in the Annual Reports to be prepared subsequent to the issuance of such Related Bonds pursuant to Section 5 hereof.

(b)     (i)     The Obligated Group Agent may from time to time deliver to AHERF and the Dissemination Agent a Continuing Disclosure Certificate in the form attached hereto as **Exhibit B-2** which (i) shall specify other types of Financial Information or Operating Data to be contained in the Annual Reports prepared subsequent to the delivery of such Continuing Disclosure Certificate (the "Future Annual Reports") which shall be in addition to, or in lieu of, the types of Financial Information and Operating Data (collectively, the "Prior Information") specified in the Prior Certificate or (ii) shall specify that certain types of Prior Information shall be deleted from the Future Annual Reports. A Continuing Disclosure Certificate prepared pursuant to this Section 6(b) shall also identify the Prior Information which shall continue to be contained in the Future Annual Reports.

7

FOLEY     22552

(ii)    Subject to Section 6(d) hereof, any Continuing Disclosure Certificate delivered pursuant to this Section 6(b) which specifies that other types of Financial Information and Operating Data shall be included in Future Annual Reports in lieu of Prior Information (the "Substituted Information") and/or that certain types of Prior Information shall be deleted from the Future Annual Reports shall also (a) identify the Prior Information which shall no longer be included in the Future Annual Reports; (b) state that the deletion of the Prior Information is being made in connection with a change in (1) the identity, nature or status of any Member of the Obligated Group, (2) the types of business conducted by the Members of the Obligated Group and/or (3) the laws applicable to the Members of the Obligated Group; and (c) be accompanied by an opinion of nationally recognized disclosure counsel (which may also act as counsel to one or more Members of the Obligated Group) to the effect that the undertakings made pursuant to this Master Continuing Disclosure Agreement (taking into account the types of Financial Information and Operating Data identified in such Continuing Disclosure Certificate for inclusion in the Future Annual Reports) comply with the Rule, as in effect on the date of the first Offering of Related Bonds to occur on or after the execution and delivery of this Master Continuing Disclosure Agreement, taking into account any amendment or interpretation of the Rule by the SEC or any adjudication of the Rule by a final decision of a court of competent jurisdiction which may have occurred subsequent to the execution and delivery of this Master Continuing Disclosure Agreement.

(c)    Subject to Section 6(d) hereof, no such Continuing Disclosure Certificate which is delivered pursuant to Section 6(b) hereof shall be effective for purposes of the preparation of Future Annual Reports unless (i) a party unaffiliated with any Related Issuer or Obligated Person, as permitted by the Rule, shall have determined that the substitution of the Substituted Information for Prior Information or the deletion of Prior Information will not adversely affect the Bondholders in any material respect or (ii) the Bondholders of each series of Related Bonds shall have consented to such substitution or deletion in the manner prescribed in the Related Bond Indentures for amendments to such Related Bond Indentures requiring Bondholders' consent.

(d)    Notwithstanding Sections 6(b)(ii) and 6(c) hereof, the Obligated Group Agent shall not be required to comply with either Section 6(b)(ii) or Section 6(c) hereof if such Section shall no longer be deemed to be required in order for this Master Continuing Disclosure Agreement to comply with the Rule as a result of the adoption, rendering or delivery of (i) an amendment or interpretation of the Rule by the SEC, (ii) an adjudication of the Rule by a final decision of a court of competent jurisdiction or (iii) an opinion of nationally recognized disclosure counsel (which may also act as counsel to one or more Members of the Obligated Group), in each case, to that effect.

(e)    Any delivery of a Continuing Disclosure Certificate pursuant to Section 6(b) hereof shall not be deemed to be an amendment to this Master Continuing Disclosure Agreement and shall not be subject to the provisions of Section 11 hereof.

8

**SECTION 7.**     <u>Reporting of Listed Events</u>.  (a)  This Section 7 governs the provision of Event Notices relating to *Listed Events* with respect to Related Bonds.  The following events are "Listed Events":

       (i)    Principal and interest payment deficiencies;

      (ii)    Non-payment related defaults;

     (iii)    Unscheduled draws on debt service reserves reflecting financial difficulties;

     (iv)    Unscheduled draws on credit enhancements reflecting financial difficulties;

      (v)    Substitution of credit or liquidity providers or their failure to perform;

     (vi)    Adverse tax opinions or events affecting the tax-exempt status of the Related Bonds;

    (vii)    Modifications to the rights of the holders of Related Bonds;

   (viii)    Redemption calls;

     (ix)    Defeasances;

      (x)    Release, satisfaction or sale of property securing repayment of Related Bonds; and

     (xi)    Rating changes;

provided that each of the Listed Events shall be interpreted in accordance with any interpretation of the Rule by the SEC or adjudication of the Rule by a final decision of a court of competent jurisdiction which may occur subsequent to the date of the original execution and delivery hereof.

    **(b)**     The Obligated Group Agent, any other Member of the Obligated Group and the Dissemination Agent shall, within three (3) Business Days of obtaining actual knowledge of the occurrence of any of the Listed Events from a source other than AHERF, notify AHERF of the occurrence thereof in writing.  As used in this subparagraph, "actual knowledge," in the case of the Dissemination Agent, shall mean actual knowledge of a responsible officer of the Dissemination Agent's corporate trust group.

9

**F O L E Y     22554**

(c)    Whenever AHERF obtains actual knowledge of the occurrence of any of the Listed Events, whether from the Obligated Group Agent or the Dissemination Agent pursuant to Section 7(b) hereof or otherwise, AHERF shall, on a timely basis and in any event within ten (10) Business Days, determine whether the occurrence of such event is material to any of the Bondholders.

(d)    If AHERF determines that the occurrence of any of the Listed Events is material to any of the Bondholders, AHERF shall promptly notify the Obligated Group Agent and the Dissemination Agent of such determination in writing and instruct the Dissemination Agent to provide Event Notice in accordance with Section 7(f) hereof.

(e)    If, in response to a notice from the Obligated Group Agent or the Dissemination Agent pursuant to Section 7(b) hereof, AHERF determines that the occurrence of the Listed Event described in such notice is not material, AHERF shall notify the Obligated Group Agent and the Dissemination Agent of such determination, and no Event Notice shall be provided pursuant to Section 7(f) hereof.

(f)    If AHERF instructs the Dissemination Agent to provide Event Notice pursuant to Section 7(d) hereof, the Dissemination Agent shall, within three (3) Business Days thereafter, file an Event Notice with each Repository, each Related Bond Trustee, each Related Issuer and the provider of any credit enhancement or the issuer of any liquidity facility respecting a series of Related Bonds.  The Dissemination Agent shall provide AHERF, the Obligated Group Agent and each Related Bond Trustee written confirmation that such Event Notice was provided to each Repository in accordance with this Section 7(f).

(g)    Notwithstanding the foregoing, an Event Notice with respect to a Listed Event described in Section 7(a)(viii) or (ix) shall not be given under this Section 7 any earlier than the notice (if any) of such event is given to the affected Bondholders pursuant to the relevant Related Bond Indenture, as confirmed to the Dissemination Agent by the Related Bond Trustee.

(h)    Notwithstanding the foregoing, whenever the Obligated Group authorizes a change in either its Fiscal Year or the accounting principles by which its Audited Financial Statements are prepared, AHERF shall provide the Dissemination Agent with written notice of such change and instruct the Dissemination Agent to file a copy of such notice with each Repository and Related Bond Trustee, and the Dissemination Agent shall, within three (3) Business Days thereafter, file a copy of such notice with each Repository and Related Bond Trustee.  The Dissemination Agent shall provide AHERF, the Obligated Group Agent and each Related Bond Trustee written confirmation that such notice was provided to each Repository in accordance with this Section 7(h).

10

**SECTION 8.**        **Agreement to Provide Information; Coordination of Dissemination of Information.** (a) The Obligated Group Agent shall, on behalf of the Obligated Group, provide AHERF with (i) the Financial Information and Operating Data related to the Obligated Group which AHERF is hereby required to include in the Annual Report and the Audited Financial Statements for any future Fiscal Year and (ii) any information with respect to the occurrence of a Listed Event which AHERF is hereby required to provide Event Notice of to the Dissemination Agent.

(b)        The Obligated Group Agent, on behalf of the Obligated Group, agrees that no Member of the Obligated Group shall disseminate Financial Information, Operating Data or Event Notices with respect to itself or any other Members of the Obligated Group to any Person other than AHERF prior to the time that (a) in the case of Financial Information or Operating Data to be included in an Annual Report or the Audited Financial Statements, the Dissemination Agent confirms in writing with the Obligated Group Agent pursuant to Section 5(d) hereof that it has provided the Annual Report and the Audited Financial Statements to the Repositories and the Related Bond Trustees in accordance with Section 5(c) hereof, and (b) in the case of the occurrence of a Listed Event, AHERF notifies the Obligated Group Agent whether or not it has determined that the occurrence of such Listed Event is material in accordance with Section 7(c) hereof and, if it has determined that the occurrence of such Listed Event is material, the Dissemination Agent confirms in writing with the Obligated Group Agent pursuant to Section 5(d) hereof that it has Event Notice to the Repositories and the Related Bond Trustees in accordance with Section 7(f) hereof.

**SECTION 9.**        **Additional Information.** Nothing in this Master Continuing Disclosure Agreement shall be deemed to prevent (i) AHERF or a Member of the Obligated Group from disseminating any information or notice of the occurrence of any event using the means of dissemination specified in this Master Continuing Disclosure Agreement or other means, except as provided in Section 8 hereof, or (ii) AHERF from including in an Annual Report any information which shall be in addition to the Financial Information, Operating Data and Audited or Unaudited Financial Statements required by Section 5 hereof to be included in such Annual Report, provided that this Master Continuing Disclosure Agreement shall not be deemed to require AHERF to include or update any such additional information in any subsequently prepared Annual Report.

**SECTION 10.**        **Defaults.** (a) In the event of a failure by AHERF or the Obligated Group Agent to comply with any of its obligations under this Master Continuing Disclosure Agreement, the Dissemination Agent or any Bondholder may and, upon the written direction of, and receipt of satisfactory indemnity from, any Bondholders (or Related Bond Trustees representing Bondholders) owning not less than 25% in aggregate principal amount of all of the Related Bonds then Outstanding, the Dissemination Agent shall take such actions as it may deem necessary and appropriate, including seeking mandamus or specific performance by court order, to cause AHERF or the Obligated Group Agent to comply with such obligations.

11

**FOLEY    22556**

(b)      In the event of a failure by the Dissemination Agent to comply with any of its obligations under this Master Continuing Disclosure Agreement, AHERF or any Bondholder may and, upon the direction of any Bondholders (or Related Bond Trustees representing Bondholders) owning not less than 25% in aggregate principal amount of all of the Related Bonds then Outstanding, AHERF shall take such actions as it may deem necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Dissemination Agent to comply with such obligations.

(c)      A default under this Master Continuing Disclosure Agreement shall not be deemed to be a default or an event of default under the Master Indenture or any Related Bond Indenture or Related Loan Agreement, and the sole remedy for a default hereunder shall be an action to compel performance.

SECTION 11.      Amendments; Waivers.  (a)  This Master Continuing Disclosure Agreement may be amended, and any provision hereof may be waived, by the parties hereto if, prior to the effective date of any such amendment or waiver, AHERF delivers to the Dissemination Agent an opinion of nationally recognized disclosure counsel (which may also act as counsel to one or more Members of the Obligated Group) to the effect that this Master Continuing Disclosure Agreement (taking into account such amendment or waiver) complies with the Rule, as in effect on the date of the first Offering of Related Bonds to occur on or after the execution and delivery of this Master Continuing Disclosure Agreement, taking into account any amendment or interpretation of the Rule by the SEC or any adjudication of the Rule by a final decision of a court of competent jurisdiction which may have occurred subsequent to the execution and delivery of this Master Continuing Disclosure Agreement.  The Dissemination Agent shall notify the Repositories of any such amendment and shall provide the Repositories with a summary of the provisions of any such amendment.

(b)      Any delivery of a Continuing Disclosure Certificate pursuant to Section 6(b) hereof shall not be deemed to be an amendment to this Master Continuing Disclosure Agreement and shall not be subject to the provisions of this Section 11.

SECTION 12.      Assignment.  The Obligated Group Agent may assign its obligations under this Master Continuing Disclosure Agreement only to a successor Obligated Group Agent which is appointed pursuant to the Master Indenture and is an Obligated Person. AHERF may assign its rights and responsibilities hereunder only to the Obligated Group Agent under the Master Indenture.  The Dissemination Agent may assign its rights and responsibilities hereunder to a third party with the consent of AHERF.

SECTION 13.      Compensation of the Dissemination Agent.  As compensation to the Dissemination Agent for its services pursuant to this Master Continuing Disclosure Agreement, University Hospitals agrees to pay all fees and all expenses of the Dissemination Agent including, without limitation, all reasonable expenses, charges, costs and other disbursements in the administration and performance of its duties hereunder, and shall indemnify and save the Dissemination Agent and its officers, directors, attorneys, agents and employees

12

FOLEY    22557

harmless from and against any costs, expenses, damages or other liabilities (including attorneys fees) which it (or they) may incur in the exercise of its (or their) powers and duties hereunder, except with respect to its (or their) willful misconduct or gross negligence.

SECTION 14.    Concerning the Dissemination Agent and AHERF.   (a) The Dissemination Agent is not answerable for the exercise of any discretion or power under this Master Continuing Disclosure Agreement or for anything whatever in connection herewith, except only its own willful misconduct or gross negligence.  The Dissemination Agent shall have no liability to the Bondholders or any other person with respect to the undertakings described in Section 1 hereof, except as expressly set forth in this Master Continuing Disclosure Agreement regarding its own willful misconduct or gross negligence; and

(b)      The parties to this Master Continuing Disclosure Agreement acknowledge and agree that AHERF assumes no obligations hereunder other than those specifically assumed by AHERF herein.

SECTION 15.    Termination of this Master Continuing Disclosure Agreement. This Master Continuing Disclosure Agreement may be terminated at any time that no Obligations shall be Outstanding.

SECTION 16.    Beneficiaries.  This Master Continuing Disclosure Agreement shall inure solely to the benefit of AHERF, the Members of the Obligated Group, the Dissemination Agent, the Related Bond Trustees, the issuers of Related Bonds and any Persons which shall become Participating Underwriters or Bondholders from time to time.  This Master Continuing Disclosure Agreement shall not be deemed to inure to the benefit of or grant any rights to any party other than the parties specified in the preceding sentence.

SECTION 17.    Counterparts.  This Master Continuing Disclosure Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

SECTION 18.    Governing Law.  This Master Continuing Disclosure Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

FOLEY     22558

**IN WITNESS WHEREOF,** the Obligated Group Agent, AHERF and the Dissemination Agent have caused this Master Continuing Disclosure Agreement to executed and delivered as of the date first written above.

ALLEGHENY UNIVERSITY HOSPITALS,
   as Obligated Group Agent

By:  _____
        Its: _____


**ALLEGHENY HEALTH, EDUCATION AND
RESEARCH FOUNDATION**

By:  _____
        Its: _____


**NORWEST BANK MINNESOTA, NATIONAL
   ASSOCIATION,** as Dissemination Agent

By:  _____
        Its: _____

14

## EXHIBIT A

### Form of Annual Report Certificate

The undersigned duly appointed and acting _____ of Allegheny Health, Education and Research Foundation ("AHERF"), hereby certifies on behalf of AHERF pursuant to the Master Continuing Disclosure Agreement dated as of June 19, 1996 (the "Master Continuing Disclosure Agreement") executed and delivered by Allegheny University Hospitals, and accepted by AHERF and by Norwest Bank Minnesota, National Association, as Dissemination Agent (the "Dissemination Agent"), as follows:

1.    **Definitions.**  Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Continuing Disclosure Agreement.

2.    **Annual Report.**  Accompanying this Annual Report Certificate is the Annual Report for the Fiscal Year ended June 30, 19__.

3.    **Compliance with Master Continuing Disclosure Agreement.**  The Annual Report is being delivered to the Dissemination Agent herewith not later than the last day of the sixth calendar month after the Fiscal Year which is the applicable Annual Report Date for purposes of such Annual Report.  The Annual Report contains, or includes by reference, Financial Information and Operating Data of the types identified in the Continuing Disclosure Certificate most recently delivered to the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement.  The Financial Information and Operating Data relates to the Obligated Persons identified in Schedule 1 hereto to the extent such Financial Information and Operating Data is relevant to such Obligated Persons' operations, and such Obligated Persons constitute all of the Obligated Persons with respect to the Related Bonds for the Fiscal Year covered by the Annual Report.  To the extent any such Financial Information or Operating Data is included in the Annual Report by reference, any document so referred to has been previously provided to the Repositories or filed with the SEC or, in the case of a reference to a Final Official Statement, has been filed with the MSRB.

Such Financial Information and Operating Data have been prepared on the basis of the **[Audited/Unaudited] Financial Statements.  [Such Audited Financial Statements are included as part of the Annual Report.]  [Because the Audited Financial Statements have not been approved by the Governing Body]** as of the date hereof, the Unaudited Financial Statements have been included as part of the Annual Report.  The Unaudited Financial Statements have been prepared on a basis substantially consistent with such Audited Financial Statements.  AHERF shall deliver such Audited Financial Statements to the Dissemination Agent as soon as practicable after they have been approved by the Governing Body.

A-1

4.    Attached hereto as Schedule A is a listing of the Related Bond Trustees, the Related Issuers and the providers of any credit enhancement and the issuers of any liquidity facilities respecting any Related Bonds.

**IN WITNESS WHEREOF** the undersigned has executed and delivered this Annual Report Certificate to the Dissemination Agent, which has received such certificate and the Annual Report, all as of the ____ day of _____, 19__.

**ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION**

By:    _____

Its:    _____

Acknowledgment of Receipt:

**Norwest Bank Minnesota, National Association,**
  as Dissemination Agent

By:    _____

Its:    _____

A-2

**FOLEY    22561**

**SCHEDULE 1**

**List of Obligated Persons**

A-3

FOLEY     22562

**SCHEDULE A**

**List of Related Bond Trustees, Related Issuers, Etc.**

A-4

FOLEY   22563

**EXHIBIT B-1**

**Form of Section 6(a) Continuing Disclosure Certificate**

Allegheny Health, Education and
  Research Foundation
Pittsburgh, Pennsylvania

Norwest Bank Minnesota,
  National Association,
Minneapolis, Minnesota

      The undersigned duly appointed and acting _____ of Allegheny University Hospitals, the Obligated Group Agent under (and as defined in) the Master Trust Indenture dated as of May 15, 1996, as supplemented and amended (the "Master Indenture"), by and among the Members of the Obligated Group (as defined in the Master Indenture)and Norwest Bank Minnesota, National Association, as Master Trustee (the "Master Trustee"), hereby certifies on behalf of the Obligated Group Agent and the Obligated Group pursuant to the Master Continuing Disclosure Agreement dated as of June 19, 1996 (the "Master Continuing Disclosure Agreement") executed and delivered by the Obligated Group Agent and accepted by AHERF and by Norwest Bank Minnesota, National Association, as Dissemination Agent (the "Dissemination Agent"), as follows:

      1.    **Definitions.**  Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Continuing Disclosure Agreement.

      2.    **Purpose.**  The Obligated Group Agent is delivering this Continuing Disclosure Certificate to AHERF and the Dissemination Agent pursuant to Section 6(a) of the Master Continuing Disclosure Agreement.

      3.    **Written Undertaking.**  On behalf of the Obligated Group, the Obligated Group Agent hereby designates the Master Continuing Disclosure Agreement to be the written undertaking under paragraph (b)(5) of the Rule with respect to the **[DESCRIBE BONDS]** (the "Bonds"), which Bonds by virtue of such designation constitute Related Bonds under the Master Continuing Disclosure Agreement.

      4.    **[No] Previous Continuing Disclosure Certificate.** **[No Continuing Disclosure Certificate has been previously delivered by the Obligated Group Agent to AHERF and the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement.] [The following types of Financial Information and Operating Data were identified in the previous Continuing Disclosure Certificate most recently delivered to**

B-1-1

AHERF and the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement for inclusion in the Annual Reports:

         (i)    **Financial Information**

         (ii)   **Operating Data**

]

    5.    **[Additional] Financial Information and Operating Data Included in Final Official Statement.**  The following [additional] types of Financial Information and Operating Data were included in the Final Official Statement for the Bonds:

         (i)    **Financial Information**

         (ii)   **Operating Data**

B-1-2

FOLEY    22565

6.    **Annual Report**.  Until such time as the Obligated Group Agent delivers another Continuing Disclosure Certificate to AHERF and the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement, the Financial Information and Operating Data of the types identified in [paragraph 3 and] paragraph 4 of this certificate shall be included in the Annual Reports delivered by AHERF to the Dissemination Agent pursuant to Section 5 of the Master Continuing Disclosure Agreement.

7.    **Participating Underwriter**.  The following is the name, address and telephone number of the Participating Underwriter of the Bonds:

B-1-3

FOLEY    22566

**IN WITNESS WHEREOF** the undersigned has executed and delivered this Continuing Disclosure Certificate to AHERF and the Dissemination Agent, which has received the same, all as of the _____ day of _____, 19__.

**ALLEGHENY UNIVERSITY HOSPITALS,**
as Obligated Group Agent

By: _____

Its: _____

Acknowledgment of Receipt:

**Allegheny Health, Education and
Research Foundation**

By: _____

Its: _____

**Norwest Bank Minnesota, National Association,**
as Dissemination Agent

By: _____

Its: _____

B-1-4

**FOLEY    22567**

EXHIBIT B-2

Form of Section 6(b) Continuing Disclosure Certificate

Allegheny Health, Education and
   Research Foundation
Pittsburgh, Pennsylvania

Norwest Bank Minnesota,
   National Association,
Minneapolis, Minnesota

The undersigned duly appointed and acting _____ of Allegheny University Hospitals, the Obligated Group Agent under (and as defined in) the Master Trust Indenture dated as of May 15, 1996, as supplemented and amended (the "Master Indenture"), by and among the Members of the Obligated Group (as defined in the Master Indenture), and Norwest Bank Minnesota, National Association, as Master Trustee (the "Master Trustee"), hereby certifies on behalf of the Obligated Group Agent and the Obligated Group pursuant to the Master Continuing Disclosure Agreement dated as of June 19, 1996 (the "Master Continuing Disclosure Agreement") executed and delivered by the Obligated Group Agent and accepted by AHERF and by Norwest Bank Minnesota, National Association, as Dissemination Agent (the "Dissemination Agent"), as follows:

1.     **Definitions.**  Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Master Continuing Disclosure Agreement.

2.     **Modification of Types of Financial Information [and/or] Operating Data.**  The Obligated Group Agent is delivering this Continuing Disclosure Certificate to AHERF and the Dissemination Agent pursuant to Section 6(b) of the Master Continuing Disclosure Agreement in order to modify the types of Financial Information [and/or] Operating Data to be included in the Annual Reports (the "Future Annual Reports") hereafter delivered by AHERF to the Dissemination Agent pursuant to Section 5 of the Master Continuing Disclosure Agreement.

3.     **Previous Continuing Disclosure Certificate.**  (a)  The following types of Financial Information and Operating Data which were identified in the previous Continuing Disclosure Certificate most recently delivered to AHERF and the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement for inclusion in the Annual Reports shall continue to be included in the Future Annual Reports:

B-2-1

FOLEY     22568

(i)      **Financial Information**

(ii)     **Operating Data**

(b)      The following types of Financial Information [and/or] Operating Data which were identified in the previous Continuing Disclosure Certificate most recently delivered to AHERF and the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement for inclusion in the Annual Reports shall be deleted from the Future Annual Reports:

(i)      **Financial Information**

(ii)     **Operating Data**

Such Financial Information [and/or] Operating Data [is/are] being deleted from the Future Annual Reports as a result of [an amendment or interpretation of the Rule made since the date of the previous Continuing Disclosure Certificate most recently delivered to the Dissemination Agent] [an adjudication of the Rule by a final decision of a court of competent jurisdiction][a change in the following [IDENTIFY THE APPLICABLE CIRCUMSTANCE(S)]:   (i) the identity, nature or status of any Member of the Obligated Group; (ii) the types of business conducted by the Members of the Obligated Group; or (iii) the laws applicable to the Members of the Obligated Group].

B-2-2

FOLEY     22569

Accompanying this Continuing Disclosure Certificate is the opinion of nationally recognized disclosure counsel required by Section 6(b) of the Master Continuing Disclosure Agreement to be delivered to the Dissemination Agent with Continuing Disclosure Certificates which identify Financial Information or Operating Data to be deleted from the Future Annual Reports. [Also accompanying this Continuing Disclosure Certificate [is/are] the consent(s) of the [Master Trustee/Related Bond Trustees/Bondholders] required by Section 6(b) of the Master Continuing Disclosure Agreement to be delivered to the Dissemination Agent with Continuing Disclosure Certificates which identify Financial Information and Operating Data to be deleted from the Future Annual Reports as a result of a change in the following [IDENTIFY THE APPLICABLE CIRCUMSTANCE(S)]: (i) the identity, nature or status of any Member of the Obligated Group; (ii) the types of business conducted by the Members of the Obligated Group; or (iii) the laws applicable to the Members of the Obligated Group.]

[4.    Additional Financial Information [and/or] Operating Data.  The following additional types of Financial Information [and/or] Operating Data shall be included in the Future Annual Reports:

      (i)    Financial Information

      (ii)    Operating Data

]

5.    Annual Report.  Until such time as the Obligated Group Agent delivers another Continuing Disclosure Certificate to AHERF and the Dissemination Agent pursuant to Section 6 of the Master Continuing Disclosure Agreement, the Financial Information and Operating Data of the types identified in paragraph 3(a) [and paragraph 4] of this certificate shall be included in the Future Annual Reports delivered to the Dissemination Agent pursuant to Section 5 of the Master Continuing Disclosure Agreement.

B-2-3

IN WITNESS WHEREOF the undersigned has executed and delivered this Continuing Disclosure Certificate to AHERF and the Dissemination Agent, which has received the same, all as of the _____ day of _____, 19__.

ALLEGHENY UNIVERSITY HOSPITALS,
as Obligated Group Agent

By: _____

Its: _____

Acknowledgment of Receipt:

Allegheny Health, Education and
Research Foundation

By: _____

Its: _____

Norwest Bank Minnesota, National Association,
as Dissemination Agent

By: _____

Its: _____

C:\WP51\DOCS\AHERF\DELAWARE\005CDA.C1|06/14/96|CHGOB021|BBS:tob

B-2-4

**EXHIBIT  2693**

**SECOND ALLONGE TO GRID NOTE**

**Maker:**    Hahnemann University Hospital

**Payee:**    First Union National Bank

**Date of Note:**    March 30, 1995

**Original Principal Amount:**    $7,500,000

### Background

Reference is made to that certain Grid Note and Rider to Grid Note attached thereto and made part thereof, dated March 30, 1995, executed by the Payor in favor of the Payee in the original principal amount not to exceed $7,500,000 (the "Note").

The Amendment, the Maker and the Payee wish to amend the terms of that certain grid note, dated as of March 30, 1995, by the Maker in favor of the Payee in the original principal amount of $7,500,000 (together with all amendments and modifications thereto including the first Allonge dated as of March 31, 1995, the "Note").

NOW THEREFORE, incorporating the foregoing by reference and for other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged and intending to be legally bound, the parties hereto agree as follows:

1. **Amendments.** Notwithstanding anything to the contrary contained in the Note or the other Loan Documents, the Maturity Date, as amended in the First Allonge, is hereby further amended by replacing the date "October 31, 1996" with the date March 31, 1997. In addition, the Payee shall henceforth be First Union National Bank, formerly known as First Fidelity Bank, N.A.

2. **Continuing effect.** Except as expressly set forth herein, all of the terms, covenants and conditions of the Note (including, but not limited to, provisions relating to any authority granted to the Bank to confess judgment against the Borrower and any waiver of the right to trial by jury) shall remain in full force and effect. This Allonge is given as a modification of the Maker's obligations under the Note and is not given in substitution therefor or extinguishment thereof and is not intended to be a novation.

3. **Attachment to Note.** This Allonge shall be and remain attached to the Note and shall be an integral part thereof.

s:\cont\sfh\form\Allonge2.FRM

EXHIBIT

tabbies 2693

CW  7/22/04

WACH 00777

**IN WITNESS WHEREOF**, the parties hereto have caused this Allonge to be duly executed as of this 31 day of October , 1996.

ATTEST:                                    Hahnemann University Hospital

By: _Signature_                           By: _Donald Kaye_

  Name: Lynn R. Isaacs                Name: Donald Kaye

  Title: Assistant Secretary           Title: President & CEO

                                          By: _Charles P Marrison_

                                            Name: CHARLES P. MARRISON

                                            Title: TREASURER

s:\comt\sfh\form\Allonge2.FRM

WACH  00778

**EXHIBIT  2709**

3

## MEETING OF THE BOARD OF TRUSTEES
## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
### Friday, June 20, 1997 - 12:30 p.m.
### Via Videoconference
### Allegheny General Hospital Board Room, Pittsburgh
### Allegheny University Hospitals, MCP Board Room, Philadelphia

A meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation ("AHERF") was held on Friday, June 20, 1997, at 12:30 p.m., by videoconference in the Allegheny General Hospital Board Room, Pittsburgh and Allegheny University Hospitals, MCP Board Room, Philadelphia. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board of Trustees. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| Members Present | Other Invitees | Members Absent |
|---|---|---|
| Sherif S. Abdelhak | Calvin Bland | Ralph W. Brenner, Esq. |
| William F. Adam | Debra Caplan | Dorothy McKenna Brown, Ed.D. |
| Henry G. Allyn, Jr. | Mary Anne Darragh | Ronald R. Davenport |
| Barbara F. Atkinson, M.D. | Joseph Dionisio | William H. Genge |
| J. David Barnes | Thomas Galinski | Ira J. Gumberg |
| Iain F.S. Black, M.D. | David Gur, Sc.D. | Teresa Heinz |
| Douglas D. Danforth | Lynn R. Isaacs | Joseph Neubauer |
| Leonard T. Ebert | Dwight Kasperbauer | Francis B. Nimick, Jr. |
| Harry R. Edelman, III | Donald Kaye, M.D. | Thomas H. O'Brien |
| Robert L. Fletcher | Donald E. Kline | Chryss O'Reilly |
| Robert M. Hernandez | Robert Mathews | Richard L. Ray, M.D. |
| Oksana Korzeniowski, M.D. | David W. McConnell | David W. Sculley |
| Joseph C. Maroon, M.D. | James H. McMaster, M.D. | J. Brandon Snyder |
| Alfred W. Martinelli | Charles Morrison | Leon C. Sunstein, Jr. |
| Donna M. Murasko, Ph.D. | Leonard L. Ross, Ph.D. | |
| Robert B. Palmer | Barry H. Roth | |
| W.P. Snyder, III | Anthony M. Sanzo | |
| Richard Spielvogel, M.D. | Myles Turtz, M.D. | |
| W. Bruce Thomas | Cherry S. White | |
| Mark Victor, M.D. | Nancy A. Wynstra, Esq. | |
| Walter L. Williamson | | |
| Margaret Gray Wood, M.D. | | |



EXHIBIT
2709
NM - 6-22-01

4

Meeting of the Board of Trustees
of Allegheny Health, Education and Research Foundation
June 20, 1997
Page 2


I.      OPENING OF THE MEETING

        The meeting was called to order at 12:30 p.m. by W.P. Snyder III, Chairman. Nancy A. Wynstra, Esq.
        maintained the minutes.   The Chairman declared that a quorum was present and the meeting was
        competent to proceed.

II.     ADDITIONS TO THE AGENDA

        There were no additions to the agenda.

III.    AHERF GOVERNANCE ISSUES

        A.   Minutes from the Meeting Held on April 5, 1997

             Mr. Snyder presented for consideration the Minutes from the meeting of the Board of Trustees
             of Allegheny Health, Education and Research Foundation held on April 5, 1997.  Upon motion
             duly made and seconded, the Board approved the following resolution:

                  RESOLVED, that the Board of Trustees of Allegheny Health, Education and
                  Research Foundation approves the minutes from the meeting held on April 5,
                  1997, as presented.

        B.   AHERF Strategic Direction

             Mr. Abdelhak presented for consideration a proposed resolution requesting the Board of
             Trustees' approval of the proposed AHERF Strategic Direction document.  Mr. Abdelhak
             reviewed the document which included modifications to former system-wide strategies to
             support AHERF's Mission and Vision.  The document has been updated to reflect current
             needs and market trends.  Allegheny is striving toward leading edge rather than state of the
             art status.  Mr. Abdelhak highlighted strategies regarding the need to maintain or expand our
             integrated delivery system to provide ease of access, prevention, definitive diagnosis, leading
             edge treatment, excellent outcomes and reasonable costs.

             Mr. Abdelhak noted that, following approval by the AHERF Board, the document will be
             widely and effectively disseminated.

             Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

PGH: 28398.1

**5**

Meeting of the Board of Trustees
of Allegheny Health, Education and Research Foundation
June 20, 1997
Page 3

> RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation (AHERF) approves the AHERF Strategic Direction document, as presented; and
>
> FURTHER RESOLVED, that the Board instructs the Secretary to append a copy of the AHERF Strategic Direction document, as approved at this meeting, to the original minutes of the meeting.

IV.     **REPORT FROM THE FINANCE COMMITTEE**

   A.     Results of AHERF Operations for the Period Ended March 31, 1997

   Mr. Barnes presented, for information, the Results of AHERF Operations for the Period Ended March 31, 1997, noting that management and faculty have produced commendable results in a difficult and competitive marketplace. He stated that there has been a significant increase in the levels of services provided, with admission and discharge activity ahead of budget, and that the hospitals continue to show positive results. AIHG and the University remain at variance with the budgeted results. In reviewing the Consolidated Statement of Operations, Mr. McConnell reported that net income through March 31, 1997 has exceeded the full fiscal year expectations. Revenues continue to increase and progress is occurring in receivables management.

   B.     AHERF Operating and Capital Budget for Fiscal Year 1998

   Mr. Barnes presented the proposed AHERF Operating and Capital Budget for Fiscal Year 1998, noting that the proposed budget predicts a substantial level of growth of market share and overall revenue. The operating results are projected to improve significantly due the Health America transaction in Pittsburgh as well as increased admissions as a result of the increase in referrals from physician practice acquisitions. Upon motion duly made and seconded, the Board approved the following resolution:

> RESOLVED, that the Allegheny Health, Education and Research Foundation Board of Trustees approves the Operating and Capital Budget for Fiscal Year 1998, as presented; and
>
> FURTHER RESOLVED, that the Board of Trustees instructs the Secretary to attach a copy of the approved Operating and Capital Budget for Fiscal Year 1998 to the original minutes of this meeting.

PGH: 28398.1



Meeting of the Board of Trustees
of Allegheny Health, Education and Research Foundation
June 20, 1997
Page 4


V.    INFORMATION ITEMS

A.    AHERF - Management Report

Mr. Abdelhak presented the report from the President and CEO of AHERF for the Third Quarter, Fiscal Year 1997, as information. He highlighted system-wide research development efforts, and expanded upon plans for the research areas of cancer, aging and cardiovascular disease.

B.    Reports from Subsidiary Organizations:

1.    Allegheny General Hospital

Mr. Sanzo presented the Report from the President and CEO of Allegheny General Hospital for the Third Quarter, Fiscal Year 1997, as information, highlighting the significant growth that has been experienced in both inpatient and outpatient activity. He also reviewed the strategy for affiliations with hospitals located some distance from Allegheny General Hospital.

2.    Allegheny Health Services Providers Insurance Company

Ms. Wynstra presented the Quarterly Report for Allegheny Health Services Providers Insurance Company ("AHSPIC"), as information.

3.    Allegheny Integrated Health Group

Dr. Kaye presented the Report from the President and CEO of Allegheny Integrated Health Group, as information. He highlighted efforts underway to manage risk and risk contracts. Case and disease management protocols are being implemented to assist in this effort. Including physicians participating in the Management Services Organization, there are 700 physicians in the network.

Mr. Barnes commented that AIHG management has effectively met operational objectives to increase admissions at certain AHERF entities. Furthermore, AIHG is making progress toward the economic objective of achieving a break even status. Mr. Barnes noted, however, that achievement of this goal would take several years.

PGH: 28398.1

GOV 76032

**7**

Meeting of the Board of Trustees
of Allegheny Health, Education and Research Foundation
June 20, 1997
Page 5

4.    Allegheny University Medical Centers

Mr. Roth presented the Report from the President and CEO of Allegheny University
Medical Centers, as information, noting that in the six months since the integration of
Forbes into the Allegheny system, a cost savings of $1.4 million has been achieved
through consolidation of corporate services.

Mr. Roth highlighted activities underway regarding the consolidation of AGH and
Forbes Hospice programs and the increased expansion of ambulatory sites throughout
the service area.

5.    Allegheny University Hospitals

Dr. Kaye presented the Report from the President and CEO of Allegheny University
Hospitals, as information. Mr. Edelman commended management on the 7% increase
in admissions in a healthcare environment where there is clearly increased  pressure for
market share.

6.    Allegheny (University) Hospitals, Centennial

Mr. Mathews presented the Report of the President of Allegheny (University)
Hospitals, Centennial, as information, noting a projected 31% increase in admissions.

7.    Allegheny (University) Hospitals, New Jersey

Mr. Mathews presented the Report of the President of Allegheny (University)
Hospitals, New Jersey, as information, noting a significant projected increase in
admissions and outpatient activity due to the development of a new medical office
building, construction of replacement operating rooms and expansion of the intensive
care facility. Mr. Mathews also noted that Allegheny Rancocas had recently received
accreditation with commendation from the Joint Commission on Accreditation of
Healthcare Organizations.

8.    Allegheny University of the Health Sciences

Dr. Ross presented the Report of the Provost of Allegheny University of the Health
Sciences, as information, noting the major recruitment of faculty in clinical
departments, and the significant increase in research funding.  AUHS is now ranked 35
out of 125 medical schools in NIH support.

PGH: 28398.1

Meeting of the Board of Trustees
of Allegheny Health, Education and Research Foundation
June 20, 1997
Page 6

Mr. Abdelhak also briefed the Board on a matter involving Harper's Magazine. Harper's published a recent article criticizing certain research practices at Allegheny University Hospitals, MCP. The article was an excerpt from an article published elsewhere. Mr. Abdelhak stated that all allegations were totally untrue and legal counsel was seeking appropriate retraction by the publisher. Mr. Abdelhak emphasized that he felt certain Allegheny would be successful in satisfactorily resolving the issue, and assured the Board that it would be kept apprised of further developments.

9.    St. Christopher's Hospital for Children

Mr. Bland presented the Report of the President and CEO of St. Christopher's Hospital for Children, as information, noting that the recruitment of physician's from Temple University's School of Medicine has been extremely successful. A list of Temple faculty joining SCHC and the University was distributed. Mr. Bland also discussed the negative impact of all Medical Assistance patients now being enrolled in managed care programs. The development of a regional Pediatric Ambulatory Network is the principal strategy being implemented to respond to the challenges facing SCHC.

B.    Management Reports from Managed Organizations:

1.    Ohio Valley Health Services Educational Corporation

Mr. McConnell presented the President's Report of Ohio Valley Health Services Educational Corporation, as information, noting that this is the eleventh year of this management contract and Ohio Valley is still very pleased with the arrangement.

2.    Delaware Valley Medical Center

Dr. Kaye presented the Management Report of Delaware Valley Medical Center (DVMC), as information. He noted that Allegheny owns many practices in the DVMC service area, and evaluation of its possible consolidation with AHERF is ongoing. Following payment of AHERF's management fee, DVMC still has a positive bottom line.

PGH: 28398.1

GOV 76034

**9**

Meeting of the Board of Trustees
of Allegheny Health, Education and Research Foundation
June 20, 1997
Page 7

VI.     **ADJOURNMENT**

There being no further business, the meeting was adjourned.

Respectfully submitted,

_____
Nancy A. Wynstra, Esq.
Secretary

NOTED ATTACHMENTS: Meeting Notice; AHERF Strategic Direction document; AHERF Operating and
Capital Budget for FY98

PGH: 28398.1

**EXHIBIT  2713**

b-MT-SV

**THIS IS NOT AN ARBITRATION CASE
AN ASSESSMENT OF DAMAGES HEARING IS REQUIRED**

ECKERT SEAMANS CHERIN & MELLOTT, LLC
By:      Albert G. Bixler, Esq.               Attorneys for Plaintiff,
          I.D. No. 45639                          The Bank of New York
          1515 Market Street                    in its Capacity as Trustee
          Philadelphia, PA  19102
          (215) 851-8400


OF COUNSEL:
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
By:      Peter A. Biagetti, Esq.
          One Financial Center
          Boston, MA  02111
          (617) 542-6000


THE BANK OF NEW YORK,                       )      PHILADELPHIA COUNTY
in its capacity as Trustee,                         )      COURT OF COMMON PLEAS
                                                            )      TRIAL DIVISION
                                                            )
               Plaintiff,                              )      OCTOBER TERM, 1998
                                                            )      NO. 1612
                                                            )
          v.                                            )
                                                            )      JURY TRIAL DEMANDED
PHILADELPHIA HEALTH CARE             )
TRUST (f/k/a GRADUATE HEALTH       )
SYSTEM, INC.)                                     )
2129 Chestnut Street                             )
Philadelphia, PA 19103,                          )
                                                            )
          and                                          )
                                                            )
BERNARD J. KORMAN, ESQUIRE,      )
INDIVIDUALLY AND IN HIS               )
CAPACITY AS AN OFFICER AND        )
DIRECTOR OF PHILADELPHIA         )
HEALTH CARE TRUST (f/k/a              )
GRADUATE HEALTH SYSTEM, INC.)   )
220 W. Rittenhouse Square                      )
Apt. 6C                                               )
Philadelphia, PA 19103                           )



DEPOSITION EXHIBIT
DK 2713
6-21-04
TAMMEY M. PASTOR, R.P.R.

and                                        )
                                           )
HAROLD CRAMER, ESQUIRE,                    )
INDIVIDUALLY AND IN HIS                    )
CAPACITY AS A                              )
DIRECTOR AND OFFICER OF                    )
PHILADELPHIA HEALTH CARE                   )
TRUST (f/k/a GRADUATE HEALTH               )
SYSTEM, INC.)                              )
c/c Mesirov Gelman Jaffe                   )
Cramer & Jamieson, L.L.P.                  )
1735 Market Street                         )
Philadelphia, PA 19103-7598                )
                                           )
and                                        )
                                           )
JOSEPH HUBER,                              )
INDIVIDUALLY AND IN HIS                    )
CAPACITY AS AN OFFICER AND                 )
DIRECTOR OF PHILADELPHIA                   )
HEALTH CARE TRUST                          )
(f/k/a GRADUATE HEALTH                     )
SYSTEM, INC.)                              )
c/o Philadelphia Health Care Trust         )
2129 Chestnut Street                       )
Philadelphia, PA 19103                     )
                                           )
and                                        )
                                           )
ROBERT E. MATHEWS,                         )
INDIVIDUALLY AND IN HIS                    )
CAPACITY AS AN                             )
OFFICER OF PHILADELPHIA                    )
HEALTH CARE TRUST                          )
(f/k/a GRADUATE HEALTH                     )
SYSTEM, INC.),                             )
6025 Stoney Hill Road                      )
New Hope, PA 18938                         )
                                           )
and                                        )
                                           )
JANICE L. RICHTER, ESQ.,                   )
INDIVIDUALLY AND IN HER                    )
CAPACITY AS A                              )
DIRECTOR OF                                )
PHILADELPHIA HEALTH CARE TRUST             )

2

CB     1272

(f/k/a GRADUATE HEALTH                    )
SYSTEM, INC.),                             )
Fellheimer, Braverman & Kaskey            )
21st Floor, One Liberty Place             )
Philadelphia, PA  19103                   )
                                          )
          and                             )
                                          )
RUSSELL J. KUNKEL, INDIVIDUALLY           )
AND IN HIS CAPACITY AS A                  )
DIRECTOR OF                               )
PHILADELPHIA HEALTH CARE TRUST            )
(f/k/a GRADUATE HEALTH                    )
SYSTEM, INC.),                            )
205 W. 39th Street                        )
Reading, PA  19606                        )
                                          )
          and                             )
                                          )
MARK W. DURISHAN, CPA,                    )
INDIVIDUALLY AND IN HIS                   )
CAPACITY AS AN                            )
OFFICER OF                                )
PHILADELPHIA HEALTH CARE TRUST            )
(f/k/a GRADUATE HEALTH                    )
SYSTEM, INC.),                            )
427 Gateswood Drive                       )
West Chester, PA  19380                   )
                                          )
          and                             )
                                          )
LEE W. DOTY, ESQ., INDIVIDUALLY           )
AND IN HER CAPACITY AS AN                 )
OFFICER OF                                )
PHILADELPHIA HEALTH CARE TRUST            )
(f/k/a GRADUATE HEALTH                    )
SYSTEM, INC.),                            )
21 Summit Street                          )
Philadelphia, PA  19118                   )
                                          )
          and                             )
                                          )
                                          )

3

CB     1273

J. KENNETH FULLERTON,                    )
INDIVIDUALLY AND IN HIS                  )
CAPACITY AS AN OFFICER OF                )
PHILADELPHIA HEALTH CARE TRUST           )
(f/k/a GRADUATE HEALTH                   )
SYSTEM, INC.),                           )
Philadelphia Health Care Trust           )
2129 Chestnut Street                     )
Philadelphia, PA  19103                  )
                                         )

## AMENDED COMPLAINT - CIVIL ACTION

Plaintiff The Bank of New York ("Trustee") as successor to IBJ Whitehall Bank

& Trust Company in its capacity as trustee, by its undersigned attorneys, alleges as follows:

## SUMMARY OF THE ACTION

1.      In 1991 and 1993, bondholders purchased approximately $172 million of Hospital

Revenue Bonds in reliance on a Master Indenture which provided three essential protections for

the bondholders' investment: (a) that two hospitals, Graduate and Mt. Sinai (together, the

"Obligated Group") were jointly and severally obligated to pay the principal and interest due on

the bonds; (b) that payment of such principal and interest to the bondholders was secured by the

revenues, *including all amounts owed* to these two hospitals; and (c) that strict financial

covenants were in force regarding operations of the Obligated Group, *including very specific*

*limitations on when the Obligated Group could be merged into another entity.*  The bondholders

purchased the bonds based on the credit strength of these two hospitals and in full reliance upon

the value of the collateral and the protections afforded by these financial covenants.  The Bank of

New York, as Trustee under that Indenture, now brings this action, on behalf of the bondholders,

against defendants because they fraudulently structured and effected a merger which stripped

approximately $53 million of bondholder collateral from the original Obligated Group, sapped

4

CB      1274

the financial strength of the two hospitals, left the cash position of the post-merger entity so withered that it soon declared bankruptcy, and thereby culminated a four-year string of transactions by which defendants victimized the Obligated Group by using its resources to bankroll *their own* corporate acquisitions, *their own* real estate accumulation, and *their own* million-dollar salaries, bonuses and sweetheart management fees, all at the bondholders' great expense.

    2.    In 1996, defendants fraudulently caused and/or facilitated the merger of the Obligated Group, together with two other hospitals which were in dire financial condition, into a company called SDN, Inc. ("SDN"). The merger did not comply with the limitations contained in the Master Indenture, but the defendants still wrongfully effected it by concealing relevant facts from First Union National Bank ("First Union"), which was the Trustee at the time of the merger. After the merger, SDN, as owner of the four hospitals, became the new "Obligated Group" under the Master Indenture.

    3.    Defendants concealed from the Trustee the merger's failure to comply with the financial and other covenants in the Master Indenture by delaying the issuance of, and withholding from the Trustee, the most recent financial statements, or the material information contained therein, which evidenced that failure, and by causing the Trustee to receive, in connection with the merger, a Debt Service Coverage Ratio calculation derived as a result of material omissions, thereby falsely representing that the ratio met the requirements of the Master Indenture. Defendants breached these covenants because, based upon either the Reported Financial Statements for the fiscal years ended either June 30, 1995 or 1996, or any combination

5

of those years' Reported Financial Statements for Graduate/Mt. Sinai and City Avenue/ Parkview Hospitals, the merger would not have been permitted. Due to the concealment and fraudulent actions of the defendants, the Trustee could not take steps to prevent the merger and approximately $53 million in security for the bonds immediately was lost.

4.      Defendants deliberately constructed the merger to provide for the immediate elimination of approximately $53 million in funds due to the Obligated Group from defendant PHCT and its affiliates, which constituted bondholder collateral. Indeed, shortly after the merger, SDN (now known as Allegheny Hospitals, Centennial) -- which had become the only obligated party under the Master Indenture -- filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. The bondholders are still owed approximately $160 million.

5.      As detailed below, by causing and directing the merger, defendants sapped the financial strength of the original Obligated Group and drained away its assets, including receivables, in which the Trustee held a security interest. Even worse, defendants' consummation of the merger was the final step in a long-term conspiracy and scheme to divert, or "upstream," funds away from the original Obligated Group so that certain defendants could effect self-interested transactions and, ultimately, breach their obligation ever to repay such funds to the original Obligated Group.

6.      The Bank of New York, as successor Trustee, seeks to recover from defendants, among other things, the value of their collateral which improperly were stripped away by defendants.

6

CB      1276