## THE PARTIES

7.      Plaintiff The Bank of New York is a corporation organized under the laws of the State of New York with an office located at 101 Barclay Street, New York, NY 10286. The Bank of New York is successor to IBJ Whitehall Bank & Trust Company, and serves as Master Trustee under a Master Trust Indenture dated as of December 1, 1991 (as supplemented and amended, "Master Indenture"). IBJ Whitehall was successor Trustee to First Union, and First Union was successor Trustee to Meridan Trust Company. The Bank of New York brings this action in its capacity as Master Trustee under the Master Indenture.

8.      Defendant Philadelphia Health Care Trust ("PHCT") (f/k/a Graduate Health System, Inc.) is a non-profit entity organized and existing under the laws of Pennsylvania, and is located at 2129 Chestnut Street, Philadelphia. Pennsylvania 19103.

9.      Defendant Bernard J. Korman, Esquire ("Korman") is an adult citizen of the City of Philadelphia, who resides at 220 W. Rittenhouse Square, Apt. 6C, Philadelphia, Pennsylvania 19103. This action is brought against Korman individually and in his capacity as an officer and director of PHCT.

10.     Defendant Harold Cramer, Esquire ("Cramer") is an adult citizen of the City of Philadelphia, with a business address of Mesirov, Gelman, Jaffe, Cramer & Jamieson, L.L.P., 1733 Market Street, Philadelphia, Pennsylvania 19108-7598. This action is brought against Cramer individually and in his capacity as an officer and director of PHCT.

CB     1277

11.    Defendant Robert S. Mathews ("Mathews") is an adult citizen of the City of New Hope, who resides at 5025 Stoney Hill Road, New Hope, Pennsylvania 18938. This action is brought against Mathews individually and in his capacity as an officer of PHCT.

12.    Defendant Joseph Huber ("Huber") is an adult citizen of Philadelphia, with a business address of Philadelphia Health Care Trust, 2129 Chestnut Street, Philadelphia, Pennsylvania 19103. This action is brought against Huber individually and in his capacity as a director and/or officer of PHCT.

13.    Defendant Janice L. Richter, Esq. ("Richter") is an adult citizen of the City of Philadelphia with a business address of Fellheimer, Braverman & Kaskey, 21st Floor, One Liberty Place, Philadelphia, Pennsylvania 19103. This action is brought against Richter individually and in her capacity as a director of PHCT.

14.    Defendant Russell J. Kunkel ("Kunkel") is an adult citizen of the City of Reading, who resides at 205 W. 39th Street, Reading, Pennsylvania 19606  This action is brought against Kunkel individually and in his capacity as a director of PHCT.

15.    Defendant Mark W. Durishan, CPA ("Durishan") is an adult citizen of the City of West Chester, who resides at 427 Gateswood Drive, West Chester, Pennsylvania 19380. This action is brought against Durishan individually in his capacity as an officer of PHCT.

8

CB    1278

16.     Defendant Lee W. Doty, Esq. ("Doty") is an adult citizen of the City of Philadelphia, who resides at 21 Summit Street, Philadelphia, Pennsylvania 19118. This action is brought against Doty individually and in her capacity as an officer of PHCT.

17.     Defendant J. Kenneth Fullerton ("Fullerton") is an adult citizen of the City of Philadelphia, with a business address of Philadelphia Health Care Trust, 2129 Chestnut Street, Philadelphia, Pennsylvania 19103. This action is brought against Fullerton individually and in his capacity as an officer of PHCT. (Cramer, Korman, Mathews, Huber, Richter, Kunkel, Durishan, Doty and Fullerton collectively are referred to herein as the "Directors and Officers").

## BACKGROUND OF THE BONDS

18.     As of December 1, 1991, The Graduate Hospital, a Pennsylvania non-profit entity ("Graduate"), Fifth and Reed Hospital d/b/a Mt. Sinai Hospital, a Pennsylvania non-profit entity ("Mt. Sinai"), and Meridian Trust Company ("Meridian") executed the Master Indenture. Graduate and Mt. Sinai constituted the Obligated Group as that term is defined in the Master Indenture (the "Obligated Group"). Meridian was the original Master Trustee under the Master Indenture and, after a merger between Meridian and First Union, First Union became successor Trustee. IBJ Whitehall Bank and Trust Company became successor trustee to First Union, and The Bank of New York became successor trustee to IBJ Whitehall. PHCT was the original Obligated Group Agent under the Master Indenture. PHCT was the parent company of Graduate and Mt. Sinai and thereby controlled Graduate and Mt. Sinai.

9

CB     1279

19.    Pursuant to the Master Indenture, as well other documents, $114,665,000 of Hospitals and Higher Educational Facilities of Authority of Philadelphia Hospital Revenue Bonds Series A and B of 1991 (Graduate Health System Obligated Group) and $57,985,000 of Hospitals and Higher Educational Facilities Authority of Philadelphia Revenue Bonds, Series A and Series B of 1993 (Graduate Health System Obligated Group) were issued.  The bonds were secured, *inter alia*, by all "gross revenues" of Graduate and Mount Sinai, which term was defined to include all operating revenues and non-operating revenues, under generally accepted accounting principles, of Graduate and Mt. Sinai and all income and receipts in respect thereof and all rights to receive the same, whether in the form of accounts receivable, contract rights, chattel paper, instruments, general intangibles or other rights, and all proceeds thereof, including insurance proceeds and condemnation awards, whether then existing or thereafter coming into existence and whether then owned or thereafter acquired (the "Gross Revenues").  Additional contractual protections for the bondholders' investment of millions of dollars were negotiated for and detailed in the Master Indenture, as well as other documents including, among others, the following agreements:

1.    Trust Indenture between Meridian Trust Company and the Hospitals and Higher Education Facilities Authority of Philadelphia dated as of December 1, 1991.

2.    Supplemental Trust Indenture between Meridian Trust Company and the Hospital and Higher Educational Facilities Authority of Philadelphia dated as of June 1, 1993.

3.    First Supplemental Indenture dated as of December 1, 1991.

4.    Second Supplemental Indenture Authorizing Master Note No. 3 dated as of June 30, 1993.

5.    Third Supplemental Indenture authorizing Master Note No. 4 and Master Note No. 5 dated as of June 1, 1993.

10

CB    1280

6. Fourth Supplemental Indenture authorizing Master Note No. 6 dated as of June 30, 1993.

7. Loan Agreement between the Hospitals and Higher Educational Facilities Authority of Philadelphia and Graduate dated December 1, 1991 (and assignment to Meridian Trust Company as Trustee).

8. Loan Agreement between the Hospitals and Higher Education Facilities Authority of Philadelphia and Mt. Sinai dated December 1, 1991 (and assignment to Meridian Trust Company as Trustee).

9. Supplemental Loan Agreement dated as of June 1, 1993 between the Hospital and Higher Educational Facilities Authority Philadelphia and the Graduate Hospital (and assignment to Meridian Trust Company as assignee).

10. Loan Agreement between the Hospitals and Higher Educational Facilities Authority of Philadelphia and SSMOB, Inc. dated as of June 1, 1993 (and assignment to Meridian Trust Company as Trustee).

11. Master Notes No. 1, 2, 3, 4, 5 and 6.

20. Central among these bargained-for contractual protections were those that related to the financial integrity of the Obligated Group. *Specifically, the Obligated Group covenanted that it would not enter into a merger transaction unless certain well-delineated financial requirements were satisfied and so certified to the Trustee by the Obligated Group Agent.*

21. A failure of the Obligated Group to comply with any of the covenants set forth in the Master Indenture triggered an "Event of Default" under the Master Indenture. An Event of Default permitted the Master Trustee to declare the outstanding principal on the Bonds to be immediately due and payable and to exercise certain remedies, including liquidation of the Gross Revenues.

11

CB    1281

## THE SDN MERGER

22.    Effective October 31, 1996, Graduate, Mt. Sinai, and GHS Osteopathic, Inc. were merged together into SDN. In addition to being the parent company to Graduate and Mt. Sinai, PHCT was also the parent company of GHS Osteopathic, Inc., a Pennsylvania non-profit corporation which owned Parkview Hospital ("Parkview") and City Avenue Hospital ("City Avenue"). Thus, the merger resulted in a combination of the assets and liabilities of the original Obligated Group (Graduate and Mt. Sinai) with these two new hospitals, all of which were controlled by PHCT.

23.    Under the terms of the Master Indenture, the SDN merger would only be permitted if one of several possible financial tests were met (the "Merger Tests") and a certificate of the Obligated Group Agent certifying compliance was delivered to the Master Trustee prior to such merger (the "Officer's Certificate"). (The Merger Tests are contained in Section 6.5 (a)(iii) and Section 4.2(a) of the Master Indenture) (a true and accurate copy of the Master Indenture is attached hereto as Exhibit A). In anticipation of delivery of the Officer's Certificate in connection with the SDN merger, on October 10, 1996, PHCT sent a notice to the Trustee to the effect that, effective with the merger, it would resign as Obligated Group Agent under the Master Indenture (a true and accurate copy of that notice is attached hereto as Exhibit B.). Twenty-one days later, PHCT caused SDN to submit an Officer's Certificate to the Trustee in connection with the merger.

24.    On October 31, 1996, with PHCT's knowledge and assent, and purporting to comply with the requirements of the Master Indenture, SDN, as the purportedly new Obligated

12

CB    1282

Group Agent, delivered the Officer's Certificate to the Trustee (a true and accurate copy of the Officers' Certificate is attached hereto as Exhibit C). Then, by a Fifth Supplemental Master Trust Indenture also dated as of October 31, 1996 and executed by SDN and the Trustee (the "Fifth Supplemental Indenture"), SDN purportedly replaced PHCT as the Obligated Group Agent under the Master Indenture.

25.    The Officer's Certificate certified compliance with one of the Merger Tests and demonstrated that purported compliance in an attached schedule. That test -- known as a Debt Service Coverage Ratio -- required that net income available to pay debt service during the prior fiscal year must have been 1.25 times the maximum amount of annual debt service on long term indebtedness that is due and payable in any fiscal year. That test was required to be performed on a combined or consolidated basis for all of the entities to be merged and was required to be based on the most recently available financial statements reported upon by an independent certified public account for the most recent fiscal year preceding the delivery of the Officer's Certificate ("Reported Financial Statements"). In addition, as required, the Officer's Certificate certified that, as of October 31, 1996, no Event of Default existed under the Master Indenture nor, to the knowledge of the certifying officer, did there exist any event which, with the passage of time or the giving of notice or both, would or might become an Event of Default under the Master Indenture. Events of Default are defined under Article 7 of the Master Indenture and include, among other things, consummating a merger without complying with the Merger Tests.

26.    The schedule attached to the Officer's Certificate was based on financial statements reported by Deloitte & Touche LLP ("D & T") for the fiscal year ended June 30,

13

1995. The schedule misrepresented the combined Debt Service Coverage Ratio for Graduate, Mt. Sinai, Parkview and City Avenue as 1.50x, based upon material omissions from the calculation of the Debt Service Coverage Ratio. In fact, if accurately calculated to include adjustments to reflect the terms of the merger, including the write-off of intercompany receivables, the combined Debt Service Coverage Ratio for Graduate, Mt. Sinai, Parkview and City Avenue, based on Reported Financial Statements for the fiscal year ended June 30, 1995, was less than 1.25x, thereby prohibiting the merger under the terms of the Master Indenture.

27. Moreover, prior to October 31, 1996, D&T had prepared Reported Financial Statements for Graduate and Mt. Sinai for the fiscal year ended June 30, 1996, and had also prepared Reported Financial Statements for Parkview and City Avenue for the fiscal year ended June 30, 1996, and was simply waiting for its client, PHCT, to request the auditor's reports.

28. In fact, prior to the merger on October 31, 1996, the 1996 Reported Financial Statements for Graduate and Mt. Sinai, or the information contained therein, were available to the Boards of Directors of Graduate, Mt. Sinai, and, upon information and belief, of SDN and PHCT. Also prior to the merger on October 31, 1996, the 1996 Reported Financial Statements for Parkview and City Avenue, or the information contained therein, were available to the Boards of Directors of Parkview, City Avenue, and, upon information and belief, SDN and PHCT. Prior to October 31, 1996, PHCT, and defendants Korman, Cramer and Mathews had in their possession these more recent Reported Financial Statements, or at the very least, had knowledge of all of the material financial information contained therein. Because more recent Reported Financial Statements for all of these entities, or the information contained therein, were

14

available at the time of the delivery of the Officer's Certificate, the Master Indenture required that those statements be used as the basis for the calculation of the Debt Service Coverage Ratio.

29.    Had the Reported Financial Statements for the fiscal year ended June 30, 1996 for Graduate/Mt. Sinai and Parkview/City Avenue, or the information contained therein, been used in the calculation of the Debt Service Coverage Ratio, the Merger Test would not have been satisfied. Specifically, the Debt Service Coverage Ratio would have been less than 1.25x, thereby prohibiting the merger. But the Trustee did not have the benefit of these most recent Reported Financial Statements because defendants did not provide them until mid-December, 1996 -- almost two months after the merger fraudulently had been effected and two weeks after the deadline required by the Master Indenture.

30.    Moreover, using any combination of the Reported Financial Statements for the fiscal years ended either June 30, 1995 or June 30, 1996 for Graduate/Mt. Sinai and Parkview/City Avenue Hospitals would have resulted in a Debt Service Coverage Ratio less than 1.25x, thereby prohibiting the merger.

31.    PHCT deliberately structured the merger so that at least $53 million of amounts owed to Graduate and Mt. Sinai by PHCT or its affiliates was eliminated. Because these balances owed to the original Obligated Group were part of the collateral securing repayment of the bonds, the bondholders were severely injured by this merger. Moreover, because Parkview and City Avenue were so financially fragile, their merger with the original Obligated Group dramatically weakened the cash position of the hospitals. Specifically, the Reported Financial

15

CB    1285

Statements for Graduate and Mt. Sinai for the fiscal year ended June 30, 1996 revealed that, prior to the proposed merger, they had total net *assets* of approximately $63 million and amounts *due to them* from PHCT and/or PHCT affiliates of approximately $53 million. The Reported Financial Statements for Parkview/City Avenue, however, revealed that, for the fiscal year ended June 30, 1996, they had unrestricted net *liabilities* of approximately $16 million, and *owed to* PHCT and/or PHCT affiliates another approximately $27 million. Finally, Reported Financial Statements for the fiscal year ended June 30, 1996 revealed that, while the net assets of the Graduate and Mt. Sinai *increased* in fiscal 1996, the net assets of Parkview and City Avenue substantially *decreased* in fiscal 1996. In sum, the effect of the SDN merger was to eliminate millions of dollars of bondholder collateral and to saddle the Obligated Group with two very weak hospitals.

32.    Through their control of Graduate, Mt. Sinai, Parkview and City Avenue, PHCT and certain other defendants orchestrated and facilitated the SDN merger. The merger served no legitimate corporate purpose, but provided a substantial benefit to PHCT and other defendants at the expense of the Bondholders. The merger eliminated millions of dollars owed to the Obligated Group by PHCT and its affiliates -- dollars which defendants Korman, Cramer and Mathews had "borrowed" from the Obligated Group in violation of the restrictions in the Master Indenture and then used for years to finance transactions which personally had benefited them and their co-conspirators.

16

33.    Subsequent to the SDN merger, on May 1, 1997, SDN changed its name to Allegheny Hospitals, Centennial, and Allegheny Health, Education and Research Foundation became its parent company.

34.    Just over a year later, on July 21, 1998, Allegheny Hospitals, Centennial -- financially weakened by the SDN merger -- filed a petition under Chapter 11 of the United States Bankruptcy Code.

## THE CONSPIRACY BEHIND THE SDN MERGER

35.    The consummation of the SDN merger, as described above, was the final step in a conspiracy and scheme undertaken by defendants Korman, Cramer, Mathews and others to systematically divert funds and other valuable consideration, including the bondholders' collateral, to PHCT for improper purposes and to facilitate transactions which were in their self-interest but undermined the best interests of the Trustee and the bondholders.

36.    This conspiracy and scheme involved the upstreaming of the bondholder's collateral away from the Obligated Group to entities controlled by Korman, Cramer and/or Mathews, or to them personally.  These upstreamed funds were characterized in the combined annual financial statements of the Obligated Group as funds "due from affiliates."  From 1992 to 1996, these funds "due from affiliates" were diverted from the Obligated Group to PHCT, with the total climbing to approximately $53 million for the fiscal year ended June 30, 1996.

17

CB    1287

37.     Defendants Korman, Cramer, Mathews and others agreed and conspired to use these millions of dollars upstreamed from the Obligated Group to facilitate transactions by which Korman, Cramer and Mathews benefited personally, to cause PHCT to engage in transactions which stripped the bondholder's collateral, and then ultimately, to escape their and PHCT's obligations to reimburse the Obligated Group for these upstreamed funds by fraudulently eliminating those obligations through the SDN merger.

38.     As detailed above, the SDN merger had the immediate effect of eliminating approximately $53 million in bondholders' collateral.  By effecting this transaction, defendants Korman, Cramer and Mathews essentially erased any obligation to replace the millions of dollars that they had caused to be upstreamed to PHCT and to themselves, and thus conferred a substantial benefit upon PHCT, and indirectly upon themselves, at the expense of the bondholders and in violation of the terms of the Master Indenture.

## GHS OSTEOPATHIC

39.     In the Obligated Group's 1993 financial statements, total funds "due from affiliates" were reported to have increased to $23 million in 1993.  This upstreaming then was characterized in the footnotes to financial statements as connected to related-party transactions by which PHCT acquired facilities in the Philadelphia area.  On information and belief, these transactions reflect, in part,  the fact that the Obligated Group had advanced approximately $20 million in 1993 and 1994 to PHCT, which funds were used by PHCT to acquire Parkview Hospital and City Avenue Hospital from the Philadelphia College of Osteopathic Medicine.

18

CB     1288

These entities then became a newly-formed PHCT subsidiary corporation called GHS Osteopathic, Inc. The Obligated Group, however, never obtained any security interest or other rights to the cash flow from this new PHCT subsidiary despite the fact that the Obligated Group had provided millions of dollars in upstreamed funds to enable PHCT to acquire the subsidiary's two hospital assets.

## OMEGA

40.    In fiscal year 1994 and 1995, the amount "due from affiliates" had increased another $9.3 million and $12.5 million respectively. These increases, on information and belief, arose when defendants Korman, Cramer and Mathews caused PHCT to enter into a sale/lease-back arrangement with a real estate investment trust called Omega Healthcare, Inc., ("Omega"), including the sale of substantial real property owned by the Obligated Group ("the Omega transaction"). Specifically, a medical office building owned by the Obligated Group, the Pepper Pavilion, was sold to Omega for a purchase price of $15.3 million. Despite this sale of a $15.3 million property owned by the Obligated Group, these defendants caused the Obligated Group to receive only $7.5 million in notes payable from Omega. The difference of approximately $7.8 million was paid in cash and went directly into the coffers of PHCT. The Obligated Group never received any portion of that $7.8 million in cash. Instead, on information and belief, cash owed to the Obligated Group as a result of the Omega transaction became part of the growing amount of money purportedly "due from affiliates."

19

41.    In addition to the $7.8 million in cash which improperly flowed to PHCT in connection with the Omega transaction, defendant Korman, a director and officer of PHCT, caused himself to be paid approximately $961,000 from the transaction proceeds -- including cash and stock in Omega valued at between $150,000 to 160,000 -- purportedly as a "finder's fee" to reward him for facilitating the deal.  Furthermore, to circumvent the legal restriction that Korman, as a director and officer of PHCT, could not personally benefit from the Omega transaction, defendant Cramer procured an opinion from Cramer's own law firm which blessed this payment, and Korman obtained an opinion from a close associate in the investment banking field relating to the "reasonableness" of his million-dollar windfall if it were considered to be a "finder's fee."  No facts, however, were given to support a characterization as a "finder's fee."  Defendant Korman further used the Omega transaction to become a director of Omega and thereby acquire valuable stock options.

42.    Thus, while the terms of the Master Indenture expressly prohibited the sale of the Obligated Group's property absent certified compliance with specified financial tests, defendants Korman, Cramer, Mathews and others agreed and conspired to cause PHCT wrongfully to sell such property through the Omega transaction without providing to Graduate its full value, to direct $7.8 million of the cash proceeds to PHCT, to certify falsely that proceeds of the sale would be applied to repay certain indebtedness of Graduate and the remainder invested in Graduate, and to allow Korman to benefit by a windfall of close to $1 million.

20

## HMO SALE

43.    The upstreaming of funds by Korman, Cramer and Mathews away from the Obligated Group continued through fiscal year 1996, by which time the funds "due from affiliates" to the Obligated Group had increased to approximately $53 million.  During fiscal year 1996, these three defendants caused PHCT to sell its HMO subsidiary, Greater Atlantic Health Services, to Health Systems International, Inc. ("HSI"), reportedly for $100 million in cash and securities.  PHCT kept most or all of the $100 million in deal proceeds, leaving Graduate, and therefore the Obligated Group, with mounting funds "due from affiliates."

44.    In addition, defendants Korman, Cramer and Mathews continued to enrich themselves personally through this transaction by causing Graduate and Mt. Sinai, as well as other PHCT hospitals, to enter into lucrative "management contracts" with a newly created management company, and by causing this new management company, HSI Management Co. ("HSIM"), to award lucrative employment contracts and pension benefits to defendants Cramer and Mathews.

45.    Less than a year later, defendants Korman, Cramer and Mathews caused the provisions of the SDN merger to require the termination of the HSIM agreements.  As a result of the termination of the management agreement and his employment contract with HSIM, Cramer personally received lump sum payments totalling nearly $1 million, plus substantial long-term benefits.  Mathews was also promised substantial long-term benefits.  Moreover, defendants Korman, Cramer and Mathews caused the provisions of the SDN merger to require Graduate to

21

CB    1291

pay to HSIM an additional $2 million, purportedly for shares of stock in HSIM, and also caused Graduate to become obligated for another $12 million, purportedly for "technology" (which was and continued to be largely inoperative), and another $3 million in consideration of HSI's termination of the management agreements.

46.    Defendants Korman, Cramer, Mathews and others agreed and conspired to cause PHCT to engage in each of the transactions described above and, on information and belief, other transactions for the purposes of diverting funds from the Obligated Group to PHCT, benefiting themselves through self-interested transactions, and eliminating any obligation of PHCT or, indirectly, these three defendants, to repay those funds to the Obligated Group.

47.    Defendants Korman, Cramer and Mathews each personally committed a substantial step or steps to accomplish the unlawful purpose of this conspiracy and scheme. Moreover, defendants Korman, Cramer and Mathews each recruited other individuals, including the directors of PHCT, to enlist their participation in this conspiracy and to effect actions by certain of the Directors and Officers of PHCT and SDN necessary to accomplish the conspiracy's ends.

## COUNT ONE

### (Fraud Against PHCT, Korman, Cramer and Mathews)

48.    The Bank of New York repeats and realleges paragraphs 1 through 47 of this Complaint as if set forth herein.

22

49.    The Officer's Certificate that was provided to the Trustee relating to the SDN merger contained false statements regarding material facts and omitted to state material facts despite an obligation to disclose such facts.

50.    Specifically, the Officer's Certificate falsely stated that, as of October 31, 1996, no Event of Default existed under the Master Indenture nor, to the knowledge of the certifying officer, did there exist any event which, with the passage of time or the giving of notice or both, would or might become an Event of Default under the Master Indenture.

51.    The Officer's Certificate also falsely stated that the requirements of Sections 6.5(a)(iii) and 4.2(a)(i) of the Master Indenture had been satisfied.

52.    Defendants PHCT, Korman, Cramer and Mathews intentionally made these false statements, or caused them to be made, in the Officer's Certificate or recklessly disregarded the truth or falsity of these statements in the Officer's Certificate.

53.    The Officer's Certificate that was provided to the Trustee, relating to the SDN merger, was based on financial statements for the year ended June 30, 1995, and falsely certified that the merger test had been satisfied, when in fact the underlying calculations had been derived as a result of material omissions.

23

CB    1293

54.     Morever, pursuant to the Master Indenture, the representations in the Officer's
Certificate were to have been based on the most recently available Reported Financial
Statements.

55.     Prior to the October 31, 1996 delivery of the Officer's Certificate, D&T had
prepared Reported Financial Statements for Graduate and Mt. Sinai for the year ended June 30,
1996, and had also prepared Reported Financial Statements for Parkview and City Avenue for
the year ended June 30, 1996.

56.     Prior to October 31, 1996, the 1996 Reported Financial Statements for Graduate
and Mt. Sinai, or the information contained therein, had been provided to the Boards of Directors
of Graduate, Mt. Sinai, and, upon information and belief, of SDN and PHCT.  Also prior to
October 31, 1996, the 1996 Reported Financial Statements for Parkview and City Avenue, or the
information contained therein, had been provided to the Boards of Directors of Parkview, City
Avenue, and, upon information and belief, SDN and PHCT.  Pursuant to the Master Indenture,
the Reported Financial Statements of Graduate and Mt. Sinai and PHCT were required to be
provided to the Trustee as soon as practicable, but no later than November 30, 1996.

57.     The Trustee was not provided with the 1996 Reported Financial Statements
relating to Graduate and Mt. Sinai until mid-December 1996.

58.     Defendants PHCT, Korman, Cramer and Mathews failed to disclose to the
Trustee the Reported Financial Statements for the year ended June 30, 1996, for Graduate/Mt.
Sinai and Parkview/City Avenue, or the information contained therein, with the intent to mislead

24

the Trustee into relying on the Officer's Certificate and the Debt Service Coverage Ratio calculation submitted therewith, which was based upon the stale financials for the previous year and derived as a result of material omissions, thereby allowing the SDN merger to occur.

59.    The Trustee reasonably relied on the Officer's Certificate, which purported to utilize the most recently available Reported Financial Statements and certified that, as of October 31, 1996, no Event of Default existed under the Master Indenture nor, to the knowledge of the certifying officer, did there exist any event which, with the passage of time or the giving of notice or both, would or might become an Event of Default under the Master Indenture.

60.    By their failure to include adjustments to reflect the terms of the merger, including the write-off of intercompany receivables, in the Debt Service Coverage Ratio calculation, and by their failure to disclose to the Trustee the Reported Financial Statements for the year ended June 30, 1996, for Graduate/Mt. Sinai and Parkview/City Avenue, or the information contained therein, defendants PHCT, Korman, Cramer and Mathews concealed from the Trustee that the SDN merger did not comply with the Master Indenture.

61.    Thus, these failures prevented the Trustee from taking actions pursuant to the Master Indenture to protect the interests and collateral of the bondholders.

62.    Defendants PHCT, Korman, Cramer and Mathews intended that the Trustee rely on the Officer's Certificate and its false statements and omissions.

25

63.     The Trustee reasonably relied, to its detriment, on the Officer's Certificate and its false statements and omissions.

64.     The above-described actions of defendants PHCT, Korman, Cramer and Mathews served no legitimate corporate purpose, provided a substantial benefit to PHCT, and injured the bondholders, whose rights are represented by the Trustee.

WHEREFORE, The Bank of New York demands judgment against defendants for compensatory and exemplary damages, which exceed $50,000, attorney's fees, costs, and any and all further relief the Court determines is just and proper.

## COUNT TWO

### (Negligent Misrepresentation and Omission Against PHCT, Korman, Cramer and Mathews and the Directors and Officers)

65.     The Bank of New York repeats and realleges paragraphs 1 through 64 of this Complaint as if set forth herein.

66.     The Officer's Certificate that was provided to the Trustee, relating to the SDN merger, contained false statements regarding material facts and omitted to state material facts despite an obligation to disclose such facts.

26

CB     1296

67.     Defendants knew or should have known of the falsity of the statements and omissions in the Officer's Certificate, and/or failed to make a reasonable investigation of the truth or completeness of the statements in the Officer's Certificate.

68.     The Officer's Certificate that was provided to the Trustee relating to the SDN merger was based on financial statements for the year ended June 30, 1995, and falsely certified that the merger test had been satisfied, when in fact the underlying calculations had been derived as a result of material omissions.

69.     Moreover, pursuant to the Master Indenture, the representations in the Officer's Certificate were to have been based on the most recently available Reported Financial Statements.

70.     Prior to the October 31, 1996 delivery of the Officer's Certificate, however, D&T had prepared Reported Financial Statements for Graduate and Mt. Sinai for the year ended June 30, 1996, and had also prepared Reported Financial Statements for Parkview and City Avenue for the year ended June 30, 1996.

71.     Prior to the October 31, 1996 merger, the 1996 Reported Financial Statements for Graduate and Mt. Sinai, or the information therein, had been provided to the Boards of Directors of Graduate, Mt. Sinai, and, upon information and belief, of SDN and PHCT. Also on or about October 4, 1996, the 1996 Reported Financial Statements for Parkview and City Avenue, of the information contained therein, had been provided to the Boards of Directors of Parkview, City

27

Avenue, and, upon information and belief, SDN and PHCT. Pursuant to the Master Indenture, the Reported Financial Statements of Graduate and Mt. Sinai were required to be provided to the Trustee as soon as practicable or no later than November 30, 1996.

72.    The Trustee was not provided with the 1996 Reported Financial Statements relating to Graduate and Mt. Sinai until mid-December 1996.

73.    PHCT and the officers and directors of PHCT and SDN failed to exercise reasonable care, skill and diligence by failing to include adjustments to reflect the terms of the SDN merger, including the write-off of intercompany receivables, in the Debt Service Coverage Ratio calculation, and by failing to disclose and to utilize the Reported Financial Statements, or the information contained therein, for the fiscal year ended June 30, 1996 for Graduate/Mt. Sinai and Parkview/City Avenue.

74.    The Trustee reasonably relied on the Officer's Certificate, which purported to utilize the most recently available Reported Financial Statements and which purported that, based upon the Reported Financial Statements for the fiscal year ended June 30, 1995 for Graduate/Mt. Sinai and Parkview/City Avenue Hospitals, the Debt Service Coverage Ratio was 1.50x.

75.    Through their failure to include adjustments to reflect the terms of the SDN merger in the Debt Service Coverage Ratio calculation, and their failure to disclose and utilize the Reported Financial Statements, or the information contained therein, for the fiscal year ended

28

CB    1298

June 30, 1996 for Graduate/Mt. Sinai and Parkview/City Avenue, PHCT and the officers and

directors of PHCT and SDN concealed from the Trustee the fact that the SDN merger did not

comply with the Master Indenture.

76.    Defendants' failure to include adjustments to reflect the terms of the SDN merger

in the Debt Service Coverage Ratio calculation, and their failure to disclose and utilize the

Reported Financial Statements for the fiscal year ended June 30, 1996, or the information

contained therein, for Graduate/Mt. Sinai and Parkview/City Avenue, prevented the Trustee from

taking actions pursuant to the Master Indenture to protect the interests and collateral of the

bondholders.

77.    Defendants knew or should have known that the Trustee would rely on the

Officer's Certificate and its false statements and omissions.

78.    The Trustee reasonably relied on the Officer's Certificate and its false statements

and omissions.

79.    The above-described actions of defendants PHCT, Korman, Cramer and Mathews

and the Officers and Directors of PHCT and SDN served no legitimate corporate purpose, and

provided a substantial benefit to PHCT at the expense of the Obligated Group and the

bondholders, whose rights are represented by the Trustee.

29

WHEREFORE, The Bank of New York demands judgment against Defendants for compensatory damages, which exceed $50,000, attorney's fees, costs, and any and all further relief the Court determines is just and proper.

## COUNT THREE

### (Tortious Interference With Contract Against Korman, Cramer and Mathews and PHCT)

80.    The Bank of New York repeats and realleges paragraphs 1 through 79 of this Complaint as if set forth at length herein.

81.    The Trustee had a contractual relationship with Graduate, Mt. Sinai, and SDN, as Obligated Issuers, and SDN as Obligated Group Agent.

82.    PHCT, Korman, Cramer and Mathews purposefully and intentionally interfered with the contractual relationship between the Trustee, and Graduate, Mt. Sinai, and SDN, with the purpose and intent of causing damage to the bondholders.

83.    PHCT, Korman, Cramer and Mathews interfered with that contractual relationship by, among other things, eliminating without consideration a substantial portion of the bondholders' collateral in knowing violation of the Master Indenture.

30

84.    PHCT, Korman, Cramer and Mathews accomplished this interference through the SDN merger and elimination of amounts owed to Graduate and Mt. Sinai with other indebtedness owed to PHCT and/or its affiliates.

85.    PHCT, Korman, Cramer and Mathews lacked any privilege or justification for their interference.

86.    The bondholders were damaged as a result of the interference.  Such damages included, but were not limited to, the elimination of approximately $53 million of collateral.

WHEREFORE, The Bank of New York demands judgment against PHCT, Korman, Cramer and Mathews for compensatory and exemplary damages, which exceed $50,000, attorney's fees, costs, and any and all further relief the Court determines is just and proper.

## COUNT FOUR

### (Conversion Against PHCT, Korman, Cramer and Mathews)

87.    The Bank of New York repeats and realleges paragraphs 1 through 86 of this Complaint as if set forth herein.

88.    The Trustee holds a security interest in the Gross Revenues, including amounts owed to Graduate and Mt. Sinai.

31

89.    PHCT, Korman, Cramer and Mathews willfully interfered with the Trustee's security interest by eliminating without consideration approximately $53 million of bondholder collateral, through the SDN merger.

90.    The willful interference of PHCT, Korman, Cramer and Mathews was done without lawful justification.

91.    As a result of the willful interference of PHCT, Korman, Cramer and Mathews, the Trustee, on behalf of the bondholders, has been deprived of the use, possession and benefit of its collateral.

WHEREFORE, The Bank of New York demands judgment against PHCT, Korman, Cramer and Mathews for compensatory and exemplary damages, which exceed $50,000, attorney's fees, costs, and any and all further relief the Court determines is just and proper.

## COUNT FIVE

### (Unjust Enrichment Against PHCT, Korman, Cramer and Mathews)

92.    The Bank of New York repeats and realleges paragraphs 1 through 91 of this Complaint as if set forth at length herein.

93.    The Trustee holds a security interest in the Gross Revenues, including amounts owed to the Graduate and Mt. Sinai.

32

94.    PHCT, Korman, Cramer and Mathews eliminated without consideration approximately $53 million of bondholder collateral, including amounts owed by PHCT and/or PHCT affiliates, through the SDN merger.

95.    It would be inequitable for PHCT, Korman, Cramer and Mathews to retain the benefit of the elimination of some $53 million of the bondholder collateral.

WHEREFORE, The Bank of New York demands judgment against PHCT, Korman, Cramer and Mathews for compensatory damages, which exceed $50,000, attorney's fees, costs, and any and all further relief the Court determines is just and proper.

## COUNT SIX

### (Breach of Contract Against PHCT)

96.    The Bank of New York repeats and realleges paragraphs 1 through 95 of this Complaint as if set forth herein.

97.    PHCT entered into a contractual relationship with the Trustee pursuant to the Master Indenture, in which PHCT agreed to serve as Obligated Group Agent.

98.    PHCT breached its duties under the Master Indenture, among other ways:  by causing the delay of the issuance of the Reported Financial Statements for the fiscal year ended

33

June 30, 1996 for Graduate/Mt. Sinai and Parkview/City Hospitals in knowing violation of the

Master Indenture; by causing SDN to provide a certificate which reported a Debt Service

Coverage Ratio that was not based on the most recently available Reported Financial Statements,

that was derived as a result of material omissions, and that certified a ratio of 1.50x when, in fact,

the ratio was less than 1.25x based upon either the Report Financial Statements for the fiscal

years ended either June 30, 1995 or 1996, or for any combination of those years, for

Graduate/Mt. Sinai and Parkview/City Avenue Hospitals; by causing SDN to certify falsely that

no Event of Default existed under the Master Indenture nor, to the knowledge of the certifying

officer, did there exist any event which, with the passage of time or the giving of notice or both,

would or might become an Event of Default under the Master Indenture; and by causing SDN to

provide a certificate of the Obligated Group Agent when in fact SDN was not the Obligated

Group Agent under the Master Indenture, all in knowing violation of the Master Indenture.


99.    As a result of that breach, the bondholders were damaged.


WHEREFORE, The Bank of New York demands judgment against PHCT for

compensatory damages, which exceed $50,000, attorney's fees, costs, and any and all further

relief the Court determines is just and proper.


34

CB    1304

## COUNT SEVEN

### (Conspiracy Against Korman, Cramer and Mathews)

100.    The Bank of New York repeats and realleges paragraphs 1 through 99 of this Complaint as if set forth herein.

101.    At all times material hereto, defendants Korman, Cramer, Mathews, together with the Officers and Directors, as well as others, have conspired and agreed and acted in combination to accomplish an unlawful purpose, and together pursued and continue to pursue that conspiracy, common course of conduct and common enterprise.

102.    Defendants Korman, Cramer and Mathews, acting together and in combination with others including, but not limited to, the Directors and Officers, have pursued this conspiracy, common course of conduct and common enterprise to defraud and otherwise injure the Trustee and the bondholders by, among other things, "upstreaming" of funds from the Obligated Group to PHCT for the purpose of facilitating self-interested transactions, and the fraudulent elimination, through the SDN merger, of millions of dollars of bondholder collateral that had been "upstreamed."

103.    The conduct and conspiracy of the defendants, acting together and in concert with others, as described above, have caused severe economic damage to the Trustee and the bondholders in an amount to be determined at trial.

35

CB    1305

WHEREFORE The Bank of New York demands judgment against Korman, Cramer, Mathews and the defendant Officers and Directors for compensatory damages, which exceed $50,000, attorney's fees, costs, and any and all further relief the Court determines is just and proper.

CB    1306

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY
ON ALL ISSUES AND CLAIMS TRIABLE TO A JURY

THE BANK OF NEW YORK,
in its capacity as Trustee,
101 Barclay Street
New York, NY 10286

By its counsel,

ECKERT SEAMANS CHERIN &
MELLOTT, LLC
By:  Albert G. Bixler, Esq.
I.D. No. 45639
1515 Market Street,
Philadelphia, PA  15219
(215) 851-8400

OF COUNSEL:

MINTZ, LEVIN, COHN FERRIS,
GLOVSKY AND POPEO, P.C.
By:  Peter A. Biagetti, Esq.
*Pro Hac Vice*
One Financial Center
Boston, MA  02111
(617) 542-6000

LITDOCS:1199861.4(ppth04!.DOC)

37

CB    1307

**EXHIBIT  2730**

CoreStates Bank
PO Box 7618
Philadelphia PA 19101-7618

<u>MASTER NOTE AGREEMENT</u>

March 6, 1995

COPY



**CoreStates
Bank**

Mr. Matthew Dowling, Jr.
Vice President, Finance
Hahnemann University Hospital
Broad and Vine Streets
Philadelphia, PA  19102-1192

Dear Matt:

   We have agreed to make available a line of credit in the
amount of $7,500,000 (the "line of credit" or the "line") under
which you may request, and we may in our sole discretion grant,
loans or other extensions of credit to you from time to time for
business purposes ("Loan(s)" or "Extension(s) of Credit").  This
Agreement sets forth the procedures, terms and conditions for
borrowing under the line.  As used in this Agreement, the terms
we, us, our and the Bank mean CoreStates Bank, N.A.* and the
terms you and your mean the addressee of this Agreement.  This
letter does not constitute a commitment to lend or to extend
credit.  It is understood and agreed that Loans and Extensions of
Credit granted under the line will be governed by the following:

   1.  <u>Requests for Loans or Extensions of Credit</u>.  A person
duly authorized under Paragraph 2 may request Loans or Extensions
of Credit by telephone, facsimile transmission or letter.  If we
elect to make a Loan or Extension of Credit, then we will credit
your designated account with us or wire such sum upon your
written instructions.  Upon your request we will forward to you a
written advice or statement of each Loan or Extension of Credit
which will specify the manner of disbursement, the rate or rates
of interest payable on the Loan or Extension of Credit if
different from the rate set forth in Paragraph 5 and such other
terms as may have been agreed to.

   2.  <u>Resolutions Authorizing Loans</u>.  Any and all documents
required to be executed in conjunction with Loans or Extensions
of Credit may be signed by any of the officers or other persons
authorized by your borrowing resolutions as in effect from time
to time, provided that a copy of such resolutions is certified by
the Secretary of your corporation and delivered to us.  We shall
incur no liability to you or any other person in acting upon any
request for a Loan or Extension of Credit which we believe in
good faith to have been made by a person duly authorized to
borrow on your behalf as set forth in your borrowing resolutions.

\* CoreStates Bank, N.A. also conducts business as Philadelphia
National Bank, as CoreStates First Pennsylvania Bank and as
CoreStates Hamilton Bank



EXHIBIT

2730

FOLEY    21266

3. **Bank Records Conclusive.** The amount and terms of Loans or Extensions of Credit, the outstanding amounts thereof, the rate or rates of interest payable on them and your repayments and those made on your behalf shall be established and evidenced by our records which shall be conclusively deemed to be correct in the absence of manifest error.

4. **Payment of Loans.** All Loans and Extensions of Credit under the line of credit shall be payable on demand, unless we mutually agree that a particular Loan or Extension of Credit shall be payable on a time or other basis. As long as the line of credit remains in effect, you may, subject to the provisions of paragraph 14, borrow, repay and reborrow up to the maximum specified in this Agreement, provided, however, that only Loans or Extensions of Credit which are payable on demand may be paid in whole or in part at any time. Loans which are payable on a basis other than demand may not be prepaid prior to their maturity date or dates without our explicit consent, and we may require, as a condition to such consent (or, if prepayment is due to acceleration we may require) that you compensate us, at the time of prepayment, for any funding losses and expenses incurred by us as a result of the prepayment. Upon the payment of any Loan or Extension of Credit as provided above, accrued and unpaid interest on the amount repaid shall be simultaneously paid unless we agree otherwise.

5. **Interest.** Unless otherwise agreed in writing, interest on all outstanding Loans and Extensions of Credit shall be payable monthly and shall be computed at a rate per annum equal to the rate established and announced publicly by us from time to time as the Bank's prime rate. Said per annum rate shall change each time the Bank's prime rate shall change effective as of the date of the change. Each overdue payment of principal on any Loan and any Extension of Credit and, to the extent permitted by law, each overdue payment of interest shall bear interest, payable on demand, for each day until paid at a rate per annum equal to one percent in excess of our prime rate. Interest on all Loans and Extensions of Credit shall be computed on the basis of a year of 360 days for each day of the year actually elapsed.

You may, as an alternative to the Prime Rate, elect to have Loans accrue interest at 1.50% per annum in excess of the LIBOR Interest Rate, it being understood that for purposes hereof, the following definitions shall apply:

"Assessment Rate" means, for any Interest Rate Period the average rate (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which premiums for deposit insurance are then charged by the Federal Deposit Insurance Corporation (or any successor) during such Interest Period to the Bank for Dollar time deposits with the Bank at its foreign branches.

- 2 -

FOLEY    21267

"Eurocurrency Reserve Requirement" means, for any Interest Period the daily average of the stated maximum rate (expressed as a decimal) at which reserves (including any marginal, supplemental, or emergency reserves) are required to be maintained during such Interest Period under Regulation D by the Bank against "Eurocurrency liabilities" (as such terms is used in Regulation D) but without benefit or credit proration, exemptions, or offsets that might otherwise be available to the bank from time to time under Regulation D.  Without limiting the effect of the foregoing, the Eurocurrency Reserve Requirement shall reflect any other reserves required to be maintained by the Bank against any category of liabilities.

"Interest Period" means any period of 30, 60, or 90 days selected by you for which LIBOR is customarily quoted.

"LIBOR Interest Rate" means the rate per annum (rounded upwards, if necessary, to the nearest 1/16 of 1% determined by the Bank according to the following formula:

$$R = \frac{X}{1 - Y} + Z*$$

where R = LIBOR Interest Rate
      X = London Interbank Offered Rate for such Interest Period
      Y = Eurocurrency Reserve Requirement for such Interest Period
      Z = * (if applicable) the Assessment Rate

"London Interbank Offered Rate" applicable to any Interest Period means the rate per annum (rounded upward, if necessary, to the nearest 1/16 of 1%) quoted at approximately 11:00 a.m. London time, to the principal London branch of the bank two Business Days prior to the first day of such Interest Period for the offering by leading banks in the London interbank market in an amount, comparable to the Interest period and principal amount of the Loan which shall be made by the bank and outstanding during such Interest Period.

6.    Payments.  If you are not an individual, you irrevocably authorize us to effect payment of principal of and interest on all Loans and Extensions of Credit made under the line of credit whenever such payment is due and to debit your designated account for the amount of such payment.  We shall furnish to you a written confirmation of the amount of each principal and interest payment charged against your designated account.  You will pay to us promptly such amounts as may be due if your designated account balance is insufficient.

7.    Further Evidence of Loans.  Upon your acceptance of this Agreement, you will execute and deliver to us a promissory note in the form of Exhibit A attached hereto and by this

- 3 -

reference made a part hereof, in the principal sum of $7,500,000 the full amount of the line of credit, payable to the order of the Bank (the "Master Note"). Upon our request, you agree to execute and deliver to us such other instruments and agreements as we may require in connection with Extensions of Credit requested by you and granted by us hereunder.

8.   Security; Negative Pledge.   Loans and Extensions of Credit may be secured by security interests, mortgages and other liens given especially for such purposes or given to secure other indebtedness that you have to us. Whether such security interests and other liens were given to secure other indebtedness that you have to us or are given to secure Loans and Extensions of Credit, you agree that such security interests and liens shall secure all of your existing and future indebtedness to us. In addition, to secure payment of all sums owing under this Agreement, we shall have, in addition to our right of setoff, a lien upon, and security interest in, any balance belonging to you or any deposit or other accounts with the Bank and any other amounts which may be owing from time to time by the Bank to you.

9.   Your Representations.   If you are a corporation or a general or limited partnership, you represent and warrant that you are validly existing and in good standing in the jurisdiction under whose laws you were organized, that the execution, delivery and performance of this Agreement and the Master Note are within your powers, have been duly authorized by all necessary action and are not in contravention of the terms of your charter documents. You represent and warrant that this Agreement and the Master Note have been validly executed and are enforceable in accordance with their respective terms, that the execution, delivery and performance by you of this Agreement and the Master Note are not in contravention of law and do not conflict with any indenture, agreement or undertaking to which you are a party or are otherwise bound, and that no consent or approval of any governmental authority or any third party is required in connection with the execution, delivery and performance of this Agreement and the Master Note.

10.   Termination.   This Agreement shall remain in full force and effect until either of us gives notice of termination to the other, which must be given or confirmed in writing, but no such termination shall affect your obligation to repay with interest to the date of repayment all sums due and owing with respect to Loans and Extensions of Credit made to you that are outstanding under the terms of this Agreement at the time of such termination.

11.   Default.   The occurrence of any of the following events shall cause you to be in default on any Loans or Extensions of Credit that are payable on a basis other than demand:

- 4 -

FOLEY     21269

(a)  the non-payment when due (whether by demand, stated due date, acceleration or otherwise) of any amount payable on any of the Liabilities (the term "Liabilities" shall mean all obligations and liabilities in connection with Loans and Extensions of Credit and any renewals, extensions and modifications thereof and all of your other existing and future liabilities, whether absolute or contingent, to the Bank regardless of their source or nature);

(b)  the failure of any Obligor to pay, observe or perform any indebtedness, obligation or agreement of any nature with the Bank (the term "Obligor" includes you and all persons otherwise liable for the payment of all Loans and Extensions of Credit and all renewals, extensions or modifications thereof, such as endorsers or guarantors);

(c)  if any representation, warranty, certificate, financial statement or other information made or given by any Obligor to the Bank is materially incorrect or misleading;

(d)  if any Obligor shall become insolvent or make an assignment for the benefit of creditors or if any petition shall be filed by or against any Obligor under any bankruptcy or insolvency law;

(e)  the entry of any judgment against any Obligor which remains unsatisfied for 15 days or the issuance of any attachment, tax lien, levy or garnishment against any property of material value in which any Obligor has an interest;

(f)  if any attachment, levy, garnishment or similar legal process is served upon the Bank as a result of any claim against any Obligor or against any property of any Obligor;

(g)  the dissolution, merger, consolidation, or the sale or change in control (as control is defined in Rule 12b-2 under the Securities Exchange Act of 1934) of any Obligor which is a corporation or partnership, or transfer of any substantial portion of any Obligor's assets, or if any agreement for such dissolution, merger, consolidation, change in control, sale or transfer is entered into by any Obligor, without the written consent of the Bank;

(h)  the death of any Obligor who is a natural person;

(i)  if the Bank determines reasonably and in good faith that an event has occurred or a condition exists which has had, or is likely to have, a material adverse effect on the financial condition or creditworthiness of any Obligor, or on the ability of any Obligor to perform the Liabilities;

- 5 -

FOLEY    21270

(j)  if any Obligor shall fail to remit promptly when due to the appropriate government agency or authority depository, any amount collected or withheld from any employee of said Obligor for payroll taxes, Social Security payments or similar payroll deductions;

(k)  if any Obligor shall attempt to terminate or disclaim such Obligor's liability for the Liabilities;

(l)  if the Bank shall reasonably and in good faith determine and notify you that any collateral for the Liabilities is insufficient as to quality or quantity;

(m)  if any Obligor shall fail to pay when due any material indebtedness for borrowed money other than to the Bank; or

(n)  if you shall be notified of the failure of any Obligor to provide such financial and other information promptly when reasonably requested by the Bank.

12.  <u>Acceleration</u>.  (a)  Whenever you are in default, unless the Bank elects otherwise, the entire unpaid amount of such of the Liabilities as are not then due and payable shall become due and payable without notice to or demand on any Obligor.  You waive all right to stay of execution and exemption of property in any action to enforce the Liabilities.

(b)  Upon the occurrence of any such default or at any time thereafter, the Bank may, at its option, and upon five days' written notice to you, begin accruing interest on the outstanding Loans and Extensions of Credit, at a rate not to exceed five percent (5%) per annum in excess of the Prime Rate in effect from time to time on the unpaid principal balance thereof; provided, however, that no interest shall accrue in excess of the maximum rate permitted by law.  All such additional interest shall be payable on demand.

13.  <u>CONFESSION OF JUDGMENT</u>.  You irrevocably authorize and empower any attorney or any clerk of any court of record to appear for and confess judgment against you for such sums as are due and owing on this Master Note Agreement with or without declaration, with costs of suit, without stay of execution and with an amount added for reasonable collection fees not to exceed the greater of fifteen percent (15%) of the principal amount of such judgment or $5,000.  If a copy of this Agreement, verified by affidavit by or on behalf of the Bank, shall have been filed in such action, it shall not be necessary to file the original of this Agreement.  The authority granted hereby shall not be exhausted by the initial exercise thereof and may be exercised by the Bank from time to time until all sums payable by you have been paid in full.  There shall be excluded from the lien of any

- 6 -

FOLEY    21271

judgment obtained solely pursuant to this paragraph all improved real estate in any area identified as having special flood hazards under regulations promulgated under the Flood Disaster Protection Act of 1973, if the community in which such area is located is participating in the National Flood Insurance Program. Any such exclusion shall not affect any lien upon property not so excluded.

14. <u>Discretionary Nature of Line; Demand Loans</u>. The Bank shall have the unconditional right to decline to honor any request for Loans or Extensions of Credit and to demand payment of Loans and Extensions of Credit payable on demand. These rights may be exercised in whole or in part at any time, whether or not you are in compliance with or in default under this Agreement or any other agreement with the Bank.

15. <u>Payment of Costs</u>. In addition to the principal and interest payments specified in paragraphs 4 and 5, you agree to pay, upon demand, all costs and expenses (including reasonable attorneys' fees and legal expenses) we incur in the administration and enforcement of this Agreement, the Master Note, and any other agreement relating to Extensions of Credit or any liens or security interests securing any of the Liabilities.

16. <u>Governing Law</u>. This Agreement, the Master Note, and any other notes issued under this Agreement shall be construed in accordance with and governed by the laws of Pennsylvania.

17. <u>Miscellaneous</u>. Any failure of the Bank to exercise any right under this Agreement shall not be construed as a waiver of its right to exercise the same or any other right at any other time. If more than one person signs this Agreement as borrower, then such persons shall be jointly and severally liable under this Agreement. The parties intend this Agreement to be a sealed instrument and to be legally bound by it.

18. <u>JURISDICTION AND VENUE</u>. in any judicial proceeding involving, directly or indirectly, any matter arising out of or related to this agreement or the relationship established hereunder, you hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court located in any county in the commonwealth of pennsylvania where the bank maintains an office and agree not to raise any objection to such jurisdiction or to the laying or maintaining of the venue of any such proceeding in such county. You agree that service of process in any such proceeding may be duly effected upon you by mailing a copy thereof, by registered mail, postage prepaid, to you.

- 7 -

**FOLEY    21272**

19.  WAIVER OF JURY TRIAL.  each party hereto hereby waives
trial by jury in any judicial proceeding involving, directly or
indirectly, any matter (whether sounding in tort, contract or
otherwise) in any way arising out of or related to this agreement
or the relationship established hereunder.  This provision is a
material inducement for the bank to enter into this agreement.

20.  AMENDMENT AND REPLACEMENT.  This agreement amends and
supersedes and assumes the liabilities of Hahnemann University
under that certain Master Note Agreement between Hahnemann
University and the Bank dated April 22, 1994.

Please indicate your acceptance of this Agreement by signing
and dating the enclosed copy at the place provided below and
returning such copy to us.

Very truly yours,

CoreStates Bank, N.A.

By: Gary L. Seybold
Vice President

The terms and conditions set forth in the above Master Note
Agreement are agreed to and accepted by and on behalf of the
addressee of said Agreement this ___8th___ day of ___March___,
19_45_, intending to be legally bound thereby.

Hahnemann University Hospital

By _____
Charles P. Morrison  Treasurer
(Name and Title)

By _____
Matthew J. Dowling, Jr.  Vice President
(Name and Title)

- 8 -

FOLEY    21273

CoreStates Bank
PO Box 7618
Philadelphia PA 19101-7618



**CoreStates
Bank**

EXHIBIT A

MASTER NOTE

$7,500,000                                                    March 6, 1995

    Hahnemann University Hospital (the "Maker") promises to pay
to the order of CoreStates Bank, N.A. (the "Payee") at any of its
banking offices, the lesser of (i) the principal sum of
$7,500,000 or (ii) the sum of the aggregate amount of Loans
outstanding and unpaid under the line of credit extended by the
Payee to the Maker pursuant to the Master Note Agreement
described below plus interest on the unpaid principal balance of
this Master Note as set forth in the Master Note Agreement.  Both
the principal of and interest on this Note shall be payable as
provided in said Master Note Agreement.

    In addition to all of the other sums payable hereunder, the
Maker agrees to pay to the holder of this Master Note on demand
all costs and expenses (including reasonable attorneys' fees and
other legal expenses) which may be incurred in the enforcement of
this Note.

    This note is the Master Note referred to in Paragraph 7 of a
certain Master Note Agreement dated January 30, 1995 between the
Maker and the Payee, which Agreement provides for, among other
things, borrowings under a line of credit, interest to be payable
at a rate or rates related to the Payee's prime rate of interest
or at a rate or rates otherwise agreed to between the Maker and
the Payee, and the acceleration of maturity of loans made upon
the occurrence of certain specified events.

    This note amends and supersedes and assumes the liabilities
of the Maker under that certain Master Note given by Hahnemann
University to the Bank dated April 22, 1994.

    IN WITNESS WHEREOF, the Maker has executed and delivered
this Master Note, intending to be legally bound hereby, as of the
date first appearing above.

Hahnemann University Hospital

By _____          By _____
    CHARLES P. MORRISON  TREASURER
    Name and Title                                   Name and Title

[SEAL]

FOLEY     21274

CoreStates Bank
PO Box 7618
Philadelphia PA 19101-7618



**CoreStates
Bank**

MASTER NOTE

$7,500,000                                                    March 6, 1995

Hahnemann University Hospital (the "Maker") promises to pay to the order of CoreStates Bank, N.A. (the "Payee") at any of its banking offices, the lesser of (i) the principal sum of $7,5000,000 or (ii) the sum of the aggregate amount of Loans outstanding and unpaid under the line of credit extended by the Payee to the Maker pursuant to the Master Note Agreement described below plus interest on the unpaid principal balance of this Master Note as set forth in the Master Note Agreement.  Both the principal of and interest on this Note shall be payable as provided in said Master Note Agreement.

In addition to all of the other sums payable hereunder, the Maker agrees to pay to the holder of this Master Note on demand all costs and expenses (including reasonable attorneys' fees and other legal expenses) which may be incurred in the enforcement of this Note.

This note is the Master Note referred to in Paragraph 7 of a certain Master Note Agreement dated January 30, 1995 between the Maker and the Payee, which Agreement provides for, among other things, borrowings under a line of credit, interest to be payable at a rate or rates related to the Payee's prime rate of interest or at a rate or rates otherwise agreed to between the Maker and the Payee, and the acceleration of maturity of loans made upon the occurrence of certain specified events.

This note amends and supersedes and assumes the liabilities of the Maker under that certain Master Note given by Hahnemann University to the Bank dated April 22, 1994.

IN WITNESS WHEREOF, the Maker has executed and delivered this Master Note, intending to be legally bound hereby, as of the date first appearing above.

Hahnemann University Hospital

By _____          By _____

Charles P. Harrison (Sr.) Treasurer
Name and Title                            Name and Title

(SEAL)

**FOLEY    21275**

**EXHIBIT  2731**

CoreStates Bank
PO Box 7618
Philadelphia PA 19101-7618

✓RS

## MASTER NOTE AGREEMENT

January 30, 1995



**CoreStates Bank**

Mr. Matthew Dowling, Jr.
Vice President, Finance
Medical College of PA and
Hahnemann University
3300 Henry Avenue
Philadelphia, PA 19129

Medical College of PA and
Hahnemann Univ. Hosp. System
3300 Henry Avenue
Philadelphia, PA 19129

Dear Matt:

We have agreed to make available a line of credit in the amount of $10,000,000 (the "line of credit" or the "line") under which you may request, and we may in our sole discretion grant, loans or other extensions of credit to you from time to time for business purposes ("Loan(s)" or "Extension(s) of Credit"). This Agreement sets forth the procedures, terms and conditions for borrowing under the line. As used in this Agreement, the terms we, us, our and the Bank mean CoreStates Bank, N.A.* and the terms you and your mean the addressee of this Agreement. This letter does not constitute a commitment to lend, or to extend credit. It is understood and agreed that Loans and Extensions of Credit granted under the line will be governed by the following:

1. <u>Requests for Loans or Extensions of Credit</u>. A person duly authorized under Paragraph 2 may request Loans or Extensions of Credit by telephone, facsimile transmission or letter. If we elect to make a Loan or Extension of Credit, then we will credit your designated account with us or wire such sum upon your written instructions. Upon your request we will forward to you a written advice or statement of each Loan or Extension of Credit which will specify the manner of disbursement, the rate or rates of interest payable on the Loan or Extension of Credit if different from the rate set forth in Paragraph 5 and such other terms as may have been agreed to.

2. <u>Resolutions Authorizing Loans</u>. Any and all documents required to be executed in conjunction with Loans or Extensions of Credit may be signed by any of the officers or other persons authorized by your borrowing resolutions as in effect from time to time, provided that a copy of such resolutions is certified by the Secretary of your corporation and delivered to us. We shall incur no liability to you or any other person in acting upon any request for a Loan or Extension of Credit which we believe in good faith to have been made by a person duly authorized to borrow on your behalf as set forth in your borrowing resolutions.

* CoreStates Bank, N.A. also conducts business as Philadelphia National Bank, as CoreStates First Pennsylvania Bank and as CoreStates Hamilton Bank



EXHIBIT

2731

N. 9.24.04

3.  <u>Bank Records Conclusive</u>.  The amount and terms of Loans or Extensions of Credit, the outstanding amounts thereof, the rate or rates of interest payable on them and your repayments and those made on your behalf shall be established and evidenced by our records which shall be conclusively deemed to be correct in the absence of manifest error.

4.  <u>Payment of Loans</u>.  All Loans and Extensions of Credit under the line of credit shall be payable on demand, unless we mutually agree that a particular Loan or Extension of Credit shall be payable on a time or other basis.  As long as the line of credit remains in effect, you may, subject to the provisions of paragraph 14, borrow, repay and reborrow up to the maximum specified in this Agreement, provided, however, that only Loans or Extensions of Credit which are payable on demand may be paid in whole or in part at any time.  Loans which are payable on a basis other than demand may not be prepaid prior to their maturity date or dates without our explicit consent, and we may require, as a condition to such consent (or, if prepayment is due to acceleration we may require) that you compensate us, at the time of prepayment, for any funding losses and expenses incurred by us as a result of the prepayment. Upon the payment of any Loan or Extension of Credit as provided above, accrued and unpaid interest on the amount repaid shall be simultaneously paid unless we agree otherwise.

5.  <u>Interest</u>.  Unless otherwise agreed in writing, interest on all outstanding Loans and Extensions of Credit shall be payable monthly and shall be computed at a rate per annum equal to the rate established and announced publicly by us from time to time as the Bank's prime rate.  Said per annum rate shall change each time the Bank's prime rate shall change effective as of the date of the change.  Each overdue payment of principal on any Loan and any Extension of Credit and, to the extent permitted by law, each overdue payment of interest shall bear interest, payable on demand, for each day until paid at a rate per annum equal to one percent in excess of our prime rate.  Interest on all Loans and Extensions of Credit shall be computed on the basis of a year of 360 days for each day of the year actually elapsed.

You may, as an alternative to the Prime Rate, elect to have Loans accrue interest at 1.375% per annum in excess of the LIBOR Interest Rate, it being understood that for purposes hereof, the following definitions shall apply:

"Assessment Rate" means, for any Interest Rate Period the average rate (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which premiums for deposit insurance are then charged by the Federal Deposit Insurance Corporation (or any successor) during such Interest Period to the Bank for Dollar time deposits with the Bank at its foreign branches.

"Eurocurrency Reserve Requirement" means, for any Interest Period the daily average of the stated maximum rate (expressed as a decimal) at which reserves (including any marginal,

supplemental, or emergency reserves) are required to be maintained during such Interest Period under Regulation D by the Bank against "Eurocurrency liabilities" (as such terms is used in Regulation D) but without benefit or credit proration, exemptions, or offsets that might otherwise be available to the bank from time to time under Regulation D. Without limiting the effect of the foregoing, the Eurocurrency Reserve Requirement shall reflect any other reserves required to be maintained by the Bank against any category of liabilities.

"Interest Period" means any period of 30, 60, or 90 days selected by you for which LIBOR is customarily quoted.

"LIBOR Interest Rate" means the rate per annum (rounded upwards, if necessary, to the nearest 1/16 of 1% determined by the Bank according to the following formula:

$$R = \frac{X}{1 - Y} + Z*$$

where R = LIBOR Interest Rate
      X = London Interbank Offered Rate for such Interest Period
      Y = Eurocurrency Reserve Requirement for such Interest Period
      Z = * (if applicable) the Assessment Rate

"London Interbank Offered Rate" applicable to any Interest Period means the rate per annum (rounded upward, if necessary, to the nearest 1/16 of 1%) quoted at approximately 11:00 a.m. London time, to the principal London branch of the bank two Business Days prior to the first day of such Interest Period for the offering by leading banks in the London interbank market in an amount, comparable to the Interest period and principal amount of the Loan which shall be made by the bank and outstanding during such Interest Period.

6. <u>Payments</u>. If you are not an individual, you irrevocably authorize us to effect payment of principal of and interest on all Loans and Extensions of Credit made under the line of credit whenever such payment is due and to debit your designated account for the amount of such payment. We shall furnish to you a written confirmation of the amount of each principal and interest payment charged against your designated account. You will pay to us promptly such amounts as may be due if your designated account balance is insufficient.

7. <u>Further Evidence of Loans</u>. Upon your acceptance of this Agreement, you will execute and deliver to us a promissory note in the form of Exhibit A attached hereto and by this reference made a part hereof, in the principal sum of $7,500,000 the full amount of the line of credit, payable to the order of the Bank (the "Master Note"). Upon our request, you agree to execute and deliver to us such other instruments and agreements as we may require in connection with Extensions of Credit requested by you and granted

FOLEY    21187

by us hereunder.

8.  <u>Security; Negative Pledge</u>.  Loans and Extensions of Credit may be secured by security interests, mortgages and other liens given especially for such purposes or given to secure other indebtedness that you have to us.  Whether such security interests and other liens were given to secure other indebtedness that you have to us or are given to secure Loans and Extensions of Credit, you agree that such security interests and liens shall secure all of your existing and future indebtedness to us.  In addition, to secure payment of all sums owing under this Agreement, we shall have, in addition to our right of setoff, a lien upon, and security interest in, any balance belonging to you or any deposit or other accounts with the Bank and any other amounts which may be owing from time to time by the Bank to you.

9.  <u>Your Representations</u>.  If you are a corporation or a general or limited partnership, you represent and warrant that you are validly existing and in good standing in the jurisdiction under whose laws you were organized, that the execution, delivery and performance of this Agreement and the Master Note are within your powers, have been duly authorized by all necessary action and are not in contravention of the terms of your charter documents.  You represent and warrant that this Agreement and the Master Note have been validly executed and are enforceable in accordance with their respective terms, that the execution, delivery and performance by you of this Agreement and the Master Note are not in contravention of law and do not conflict with any indenture, agreement or undertaking to which you are a party or are otherwise bound, and that no consent or approval of any governmental authority or any third party is required in connection with the execution, delivery and performance of this Agreement and the Master Note.

10.  <u>Termination</u>.  This Agreement shall remain in full force and effect until either of us gives notice of termination to the other, which must be given or confirmed in writing, but no such termination shall affect your obligation to repay with interest to the date of repayment all sums due and owing with respect to Loans and Extensions of Credit made to you that are outstanding under the terms of this Agreement at the time of such termination.

11.  <u>Default</u>.  The occurrence of any of the following events shall cause you to be in default on any Loans or Extensions of Credit that are **payable on a basis other than demand**:

(a)  the non-payment when due (whether by demand, stated due date, acceleration or otherwise) of any amount payable on any of the Liabilities (the term "Liabilities" shall mean all obligations and liabilities in connection with Loans and Extensions of Credit and any renewals, extensions and modifications thereof and all of your other existing and future liabilities, whether absolute or contingent, to the Bank regardless of their source or nature);

**FOLEY     21188**

(b) the failure of any Obligor to pay, observe or perform any indebtedness, obligation or agreement of any nature with the Bank (the term "Obligor" includes you and all persons otherwise liable for the payment of all Loans and Extensions of Credit and all renewals, extensions or modifications thereof, such as endorsers or guarantors);

(c) if any representation, warranty, certificate, financial statement or other information made or given by any Obligor to the Bank is materially incorrect or misleading;

(d) if any Obligor shall become insolvent or make an assignment for the benefit of creditors or if any petition shall be filed by or against any Obligor under any bankruptcy or insolvency law;

(e) the entry of any judgment against any Obligor which remains unsatisfied for 15 days or the issuance of any attachment, tax lien, levy or garnishment against any property of material value in which any Obligor has an interest;

(f) if any attachment, levy, garnishment or similar legal process is served upon the Bank as a result of any claim against any Obligor or against any property of any Obligor;

(g) the dissolution, merger, consolidation, or the sale or change in control (as control is defined in Rule 12b-2 under the Securities Exchange Act of 1934) of any Obligor which is a corporation or partnership, or transfer of any substantial portion of any Obligor's assets, or if any agreement for such dissolution, merger, consolidation, change in control, sale or transfer is entered into by any Obligor, without the written consent of the Bank;

(h) the death of any Obligor who is a natural person;

(i) if the Bank determines reasonably and in good faith that an event has occurred or a condition exists which has had, or is likely to have, a material adverse effect on the financial condition or creditworthiness of any Obligor, or on the ability of any Obligor to perform the Liabilities;

(j) if any Obligor shall fail to remit promptly when due to the appropriate government agency or authority depository, any amount collected or withheld from any employee of said Obligor for payroll taxes, Social Security payments or similar payroll deductions;

(k) if any Obligor shall attempt to terminate or disclaim such Obligor's liability for the Liabilities;

(l) if the Bank shall reasonably and in good faith determine and notify you that any collateral for the Liabilities is insufficient as to quality or quantity;

**FOLEY    21189**

(m)   if any Obligor shall fail to pay when due any material indebtedness for borrowed money other than to the Bank; or

(n)   if you shall be notified of the failure of any Obligor to provide such financial and other information promptly when reasonably requested by the Bank.

12.  <u>Acceleration</u>.  (a)  Whenever you are in default, unless the Bank elects otherwise, the entire unpaid amount of such of the Liabilities as are not then due and payable shall become due and payable without notice to or demand on any Obligor.  You waive all right to stay of execution and exemption of property in any action to enforce the Liabilities.

(b)   Upon the occurrence of any such default or at any time thereafter, the Bank may, at its option, and upon five days' written notice to you, begin accruing interest on the outstanding Loans and Extensions of Credit, at a rate not to exceed five percent (5%) per annum in excess of the Prime Rate in effect from time to time on the unpaid principal balance thereof; provided, however, that no interest shall accrue in excess of the maximum rate permitted by law.  All such additional interest shall be payable on demand.

13.  <u>CONFESSION OF JUDGMENT</u>.  You irrevocably authorize and empower any attorney or any clerk of any court of record to appear for and confess judgment against you for such sums as are due and owing on this Master Note Agreement with or without declaration, with costs of suit, without stay of execution and with an amount added for reasonable collection fees not to exceed the greater of fifteen percent (15%) of the principal amount of such judgment or $5,000.  If a copy of this Agreement, verified by affidavit by or on behalf of the Bank, shall have been filed in such action, it shall not be necessary to file the original of this Agreement.  The authority granted hereby shall not be exhausted by the initial exercise thereof and may be exercised by the Bank from time to time until all sums payable by you have been paid in full.  There shall be excluded from the lien of any judgment obtained solely pursuant to this paragraph all improved real estate in any area identified as having special flood hazards under regulations promulgated under the Flood Disaster Protection Act of 1973, if the community in which such area is located is participating in the National Flood Insurance Program.  Any such exclusion shall not affect any lien upon property not so excluded.

14.  <u>Discretionary Nature of Line; Demand Loans</u>.  The Bank shall have the unconditional right to decline to honor any request for Loans or Extensions of Credit and to demand payment of Loans and Extensions of Credit payable on demand.  These rights may be exercised in whole or in part at any time, whether or not you are in compliance with or in default under this Agreement or any other agreement with the Bank.

15. <u>Payment of Costs</u>.  In addition to the principal and interest payments specified in paragraphs 4 and 5, you agree to pay, upon demand, all costs and expenses (including reasonable attorneys' fees and legal expenses) we incur in the administration and enforcement of this Agreement, the Master Note, and any other agreement relating to Extensions of Credit or any liens or security interests securing any of the Liabilities.

16. <u>Governing Law</u>.  This Agreement, the Master Note, and any other notes issued under this Agreement shall be construed in accordance with and governed by the laws of Pennsylvania.

17. <u>Miscellaneous</u>.  Any failure of the Bank to exercise any right under this Agreement shall not be construed as a waiver of its right to exercise the same or any other right at any other time.  If more than one person signs this Agreement as borrower, then such persons shall be jointly and severally liable under this Agreement.   The parties intend this Agreement to be a sealed instrument and to be legally bound by it.

18. <u>JURISDICTION AND VENUE</u>.  In any judicial proceeding involving, directly or indirectly, any matter arising out of or related to this agreement or the relationship established hereunder, you hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court located in any county in the commonwealth of pennsylvania where the bank maintains an office and agree not to raise any objection to such jurisdiction or to the laying or maintaining of the venue of any such proceeding in such county.  You agree that service of process in any such proceeding may be duly effected upon you by mailing a copy thereof, by registered mail, postage prepaid, to you.

19. <u>WAIVER OF JURY TRIAL</u>.  each party hereto hereby waives trial by jury in any judicial proceeding involving, directly or indirectly, any matter (whether sounding in tort, contract or otherwise) in any way arising out of or related to this agreement or the relationship established hereunder.  This provision is a material inducement for the bank to enter into this agreement.

20. <u>AMENDMENT AND REPLACEMENT</u>.  This agreement amends and supersedes but does not extinguish the liabilities of the Medical College of Pennsylvania and the Medical College Hospitals under that certain Master Note Agreement between the Medical College of Pennsylvania and the Medical College Hospitals and the Bank dated July 27, 1992.