Please indicate your acceptance of this Agreement by signing and dating the enclosed copy at the place provided below and returning such copy to us.

Very truly yours,

CoreStates Bank, N.A.

*Gary L. Seybold* / *FEB*

By: Gary L. Seybold
Vice President

The terms and conditions set forth in the above Master Note Agreement are agreed to and accepted by and on behalf of the addressee of said Agreement this ___30-___ day of ___January___, 19 95, intending to be legally bound thereby.

| Medical College of PA and Hahnemann University | Medical College of PA and Hahnemann University Hospital System |
|---|---|
| By *Charles P. Morrison* (ASST) | By *Charles P. Morrison* (ASST) |
| CHARLES P. MORRISON TREASURER | CHARLES P. MORRISON TREASURER |
| (Name and Title) | (Name and Title) |
| By *Matthew J. Dowling* VICE PRESIDENT | By *Matthew J. Dowling* VICE PRESIDENT |
| MATTHEW J. DOWLING, JR | MATTHEW J. DOWLING, JR |
| (Name and Title) | (Name and Title) |

FOLEY     21192

CoreStates Bank NA
PO Box 7558
Philadelphia PA 19101-7558
215 973 3100

EXHIBIT A

MASTER NOTE



**CoreStates Bank**

$10,000,000                                    January 30, 1995

    Medical College of PA and Hahnemann University/Medical College of PA and Hahnemann University Hospital System (the "Makers") promises to pay to the order of CoreStates Bank, N.A. (the "Payee") at any of its banking offices, the lesser of (i) the principal sum of $10,000,000 or (ii) the sum of the aggregate amount of Loans outstanding and unpaid under the line of credit extended by the Payee to the Makers pursuant to the Master Note Agreement described below plus interest on the unpaid principal balance of this Master Note as set forth in the Master Note Agreement.  Both the principal of and interest on this Note shall be payable as provided in said Master Note Agreement.

    In addition to all of the other sums payable hereunder, the Makers agrees to pay to the holder of this Master Note on demand all costs and expenses (including reasonable attorneys' fees and other legal expenses) which may be incurred in the enforcement of this Note.

    This note is the Master Note referred to in Paragraph 7 of a certain Master Note Agreement dated January 30, 1995 between the Makers and the Payee, which Agreement provides for, among other things, borrowings under a line of credit, interest to be payable at a rate or rates related to the Payee's prime rate of interest or at a rate or rates otherwise agreed to between the Makers and the Payee, and the acceleration of maturity of loans made upon the occurrence of certain specified events.

    This Note amends and supersedes but does not extinguish the liabilities of the Makers under that certain Master Note given by the Medical College of PA and the Medical College Hospitals to the Bank dated July 27, 1992.

    IN WITNESS WHEREOF, the Makers has executed and delivered this Master Note, intending to be legally bound hereby, as of the date first appearing above.

Medical College of PA and
Hahnemann University

By _____
                 (Asst)
   CHARLES P. MELLICK   TREASURER
   Name and Title
[SEAL]

Medical College of PA and
Hahnemann University Hosptial
System.

By _____
                 (Asst)
   CHARLES P. MELLICK   TREASURER
   Name and Title

**EXHIBIT  2765**

12/5/00

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Case Nos. 98-25773 MBM through |
| ALLEGHENY HEALTH, EDUCATION | : | 98-25777 MBM inclusive |
| AND RESEARCH FOUNDATION, | : | |
| ALLEGHENY UNIVERSITY OF THE | : | Chapter 11 |
| HEALTH SCIENCES, ALLEGHENY | : | |
| UNIVERSITY MEDICAL PRACTICES, | : | |
| ALLEGHENY HOSPITALS, | : | Consolidated for |
| CENTENNIAL AND ALLEGHENY | : | Administration at 98-25773 MBM |
| UNIVERSITY HOSPITALS-EAST, | : | |
| | : | |
| Debtors. | : | |

## SECOND AMENDED CONSOLIDATED LIQUIDATING PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PROSKAUER ROSE LLP**
1585 Broadway
New York, New York  10036
(212) 969-3000
Alan B. Hyman (AH 6655)

-and-

**SABLE, PUSATERI, ROSEN, GORDON
& ADAMS, LLC**
Frick Building, 7th Floor
Pittsburgh, PA  15219
(412) 471-4996
Robert G. Sable (PA 00964)

Co-Counsel to William J. Scharffenberger,
the Chapter 11 Trustee of the Debtors

Dated:   December 5, 2000
         Pittsburgh, Pennsylvania

**EXHIBIT**

2765
±0   6/28/04

AHERF LIT
USDC W. D. Pa.
MISC. No. 00-40

1598A
EXHIBIT NO.

4844/66146-003 NYLIB2/797157 v1

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS AND CONSTRUCTION OF TERMS ....................................... 1
1.1     "Administrative Expense Claim" ............................................. 1
1.2     "AHERF" .................................................................. 2
1.3     "AHSPIC .................................................................. 2
1.4     "Allowed" ................................................................ 2
1.5     "AUH-East" ............................................................... 2
1.6     "AUHS" ................................................................... 2
1.7     "AUMP" ................................................................... 2
1.8     "Avoidance Actions" ...................................................... 2
1.9     "Ballot" ................................................................. 2
1.10    "Bankruptcy Code" ........................................................ 2
1.11    "Bankruptcy Court" ....................................................... 2
1.12    "Bankruptcy Officers" .................................................... 2
1.13    "Bankruptcy Officer Indemnification Order" ............................... 2
1.14    "Bankruptcy Rules" ....................................................... 2
1.15    "Bar Date" ............................................................... 2
1.16    "Beneficiaries" .......................................................... 3
1.17    "BNY PHCT Actions" ....................................................... 3
1.18    "BNY Stay Relief Order" .................................................. 3
1.19    "Business Day" ........................................................... 3
1.20    "Cash" ................................................................... 3
1.21    "Cash Equivalents" ....................................................... 3
1.22    "Causes of Action" ....................................................... 3
1.23    "Centennial" ............................................................. 3
1.24    "Centennial Bondholder Claims" ........................................... 3
1.25    "Centennial Bonds" ....................................................... 3
1.26    "Centennial Convenience Claim" ........................................... 3
1.27    "Centennial Convenience Class Election" .................................. 3
1.28    "Centennial Indenture Trustee" ........................................... 3
1.29    "Centennial Master Trust Indenture" ...................................... 4
1.30    "Centennial Unsecured Claims" ............................................ 4
1.31    "Chapter 11 Cases" ....................................................... 4
1.32    "Chapter 11 Trustee" ..................................................... 4
1.33    "Claim" .................................................................. 4
1.34    "Class" .................................................................. 4
1.35    "Commercial Paper Notes" ................................................. 4
1.36    "Collateral" ............................................................. 4
1.37    "Confirmation Date" ...................................................... 4
1.38    "Confirmation Hearing" ................................................... 4
1.39    "Confirmation Order" ..................................................... 4
1.40    "Contingent or Unliquidated Claim" ....................................... 4
1.41    "Convenience Claim" ...................................................... 4
1.42    "Convenience Class Election" ............................................. 5
1.43    "Creditors' Committee" ................................................... 5
1.44    "D&O Action" ............................................................. 5
1.45    "Debtors" ................................................................ 5
1.46    "Delaware Valley Obligated Group" or "DVOG" .............................. 5

1.47    "Disclosure Statement" .................................................. 5
1.48    "Disputed" .............................................................. 5
1.49    "Disputed Claim Amount" ................................................. 5
1.50    "Disputed Claim Reserve" ............................................... 5
1.51    "Distribution Record Date" ............................................. 5
1.52    "DVOG Bonds" ........................................................... 5
1.53    "DVOG Bond Insurance" .................................................. 5
1.54    "DVOG Master Indenture Trustee" ........................................ 5
1.55    "DVOG/MBIA Bondholders" ................................................ 5
1.56    "DVOG Master Trust Indenture" .......................................... 6
1.57    "DVOG/MBIA Bonds" ...................................................... 6
1.58    "DVOG Series Bond Indenture Trustee" ................................... 6
1.59    "DVOG/PNC Bonds" ....................................................... 6
1.60    "Effective Date" ....................................................... 6
1.61    "Estates" .............................................................. 6
1.62    "Estate Assets" ........................................................ 6
1.63    "Final Order" .......................................................... 6
1.64    "General Secured Claim" ................................................ 6
1.65    "General Unsecured Claim" .............................................. 6
1.66    "Graduate Action" ...................................................... 6
1.67    "Graduate Health Systems Obligated Group" .............................. 6
1.68    "Indemnification Claims" ............................................... 6
1.69    "Insurance Claim" ...................................................... 7
1.70    "Insurance Policy" ..................................................... 7
1.71    "IRC" .................................................................. 7
1.72    "IRS" .................................................................. 7
1.73    "Lien" ................................................................. 7
1.74    "Liquidating AHERF" .................................................... 7
1.75    "Liquidating AHERF Bylaws" ............................................. 7
1.76    "Liquidation Administrative Claim Reserve Amount" ...................... 7
1.77    "Liquidation  Administrative Expenses" ................................. 7
1.78    "Liquidation Expense Reserve Account" .................................. 7
1.79    "MBIA/PNC" ............................................................. 7
1.80    "MBIA/PNC Claims" ...................................................... 7
1.81    "MBIA Series Trust Indentures" ......................................... 7
1.82    "Medicare Claims" ...................................................... 8
1.83    "Mellon Action" ........................................................ 8
1.84    "Membership Interests" ................................................. 8
1.85    "Person" ............................................................... 8
1.86    "Petition Date" ........................................................ 8
1.87    "Plan" ................................................................. 8
1.88    "Plan Documents" ....................................................... 8
1.89    "Plan Supplement" ...................................................... 8
1.90    "PNC" .................................................................. 8
1.91    "PNC Notes" ............................................................ 8
1.92    "PNC Reimbursement Agreements" ......................................... 8
1.93    "PNC Trust Indenture" .................................................. 8
1.94    "Priority Claims" ...................................................... 8
1.95    "Priority Tax Claim" ................................................... 9
1.96    "Professionals" ........................................................ 9
1.97    "Pro Rata" ............................................................. 9
1.98    "PWC Action" ........................................................... 9

1.99     "Recovery Actions" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.100    "Reserve Income" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.101    "Retiree Benefits" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.102    "Schedules" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.103    "Series A Bondholder Secured Liquidation Participation" . . . . . . . . . . . . . . . . 9
1.104    "Series B Bondholder Secured Liquidation Participation" . . . . . . . . . . . . . . . . 9
1.105    "Series C Bondholder Secured Liquidation Participation" . . . . . . . . . . . . . . . . 9
1.106    "Secured Claim" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
1.107    "Small Payment Reserve" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
1.108    "Subsidiary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
1.109    "Subordinated Claims" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
1.110    "Unsecured Claim" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
1.111    "Unsecured Claim Liquidation  Participation" . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE 2

SUBSTANTIVE CONSOLIDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.1      Substantive Consolidation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE 3

TREATMENT OF ALLOWED ADMINISTRATIVE
EXPENSE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS . . . . . . . . . . . . . . . . . . 11
3.1      Non-Classification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
3.2      Administrative Expense Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
3.3      Priority Tax Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
3.4      Certain Claims Against Liquidating AHERF . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 4

CLASSIFICATION OF CLAIMS AND MEMBERSHIP INTERESTS . . . . . . . . . . . . . . . 12

ARTICLE 5

TREATMENT OF CLAIMS AND MEMBERSHIP INTERESTS . . . . . . . . . . . . . . . . . . . 12
5.1      CLASS 1 – ALLOWED PRIORITY CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.2      CLASS 2 – GENERAL SECURED CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.3      CLASS 3 –  SECURED CLAIMS OF HOLDERS OF CENTENNIAL BONDHOLDER
         CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5.4      CLASS 4 – SECURED CLAIMS OF HOLDERS OF MBIA/PNC CLAIMS . . . . . . . . 15
5.5      CLASS 5(A) – GENERAL UNSECURED CLAIMS . . . . . . . . . . . . . . . . . . . . . . 16
5.6      CLASS 5(B) – CENTENNIAL UNSECURED CLAIMS . . . . . . . . . . . . . . . . . . . 16
5.7      CLASS 6(A) – ALLOWED CONVENIENCE CLAIMS. . . . . . . . . . . . . . . . . . . . . 16
5.8      CLASS 6(B) – ALLOWED CENTENNIAL CONVENIENCE CLAIMS. . . . . . . . . . . 17
5.9      CLASS 7 – INSURANCE CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
5.10     CLASS 8 – ALLOWED MEMBERSHIP INTERESTS. . . . . . . . . . . . . . . . . . . . . 18

ARTICLE 6

LIQUIDATING AHERF; DISTRIBUTIONS AND DISPUTED CLAIMS . . . . . . . . . . . . . . 18
6.1      Purpose of Liquidating AHERF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.2      Transfer of Assets to Liquidating AHERF. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6.3     Liquidation of Estate Assets; Responsibilities of Chapter 11 Trustee
        and Creditors' Committee ............................................................. 18
6.4     Attorney Client Privilege ............................................................. 19
6.5     Payment of and Reserve for Liquidation Administrative Expenses ....................... 19
6.6     Distributions of Estate Assets. ...................................................... 19
6.7     Excess Estate Assets. ................................................................ 20
6.8     Method of Distributions Under the Plan .............................................. 21
6.9     Reserve on Account of Disputed Claims: .............................................. 21
6.10    Reversion to Estate Assets .......................................................... 22
6.11    Aggregation of Claims ............................................................... 22
6.12    Subordination of Claims ............................................................. 22
6.13    Investment Powers. .................................................................. 22

**ARTICLE 7**

        PROVISIONS REGARDING IMPLEMENTATION OF PLAN ................................... 22
7.1     Cancellation of Existing Securities and Agreements. .................................. 22
7.2     Effect of Convenience Class Election and Centennial Convenience Class Election ........ 22
7.3     Resolution of Administrative Expense Claims, Claims and Liquidation   Administrative
        Expenses. ........................................................................... 23

**ARTICLE 8**

        PROVISIONS REGARDING VOTING .................................................. 23
8.1     Voting of Claims. ................................................................... 23
8.2     Nonconsensual Confirmation. ......................................................... 23

**ARTICLE 9**

        EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
        BANKRUPTCY OFFICER INDEMNIFICATION
        CLAIMS; AND RETIREE BENEFITS ................................................. 23
9.1     Rejection of Executory Contracts and Unexpired Leases. ............................... 23
9.2     Rejection Damage Claims. ............................................................ 23
9.3     Certain Agreements Unaffected by the Plan and Disclosure Statement. .................. 24
9.4     Retiree Benefits. ................................................................... 24
9.5     Compensation and Benefit Programs ................................................... 24
9.6     Bankruptcy Officers ................................................................. 24

**ARTICLE 10**

        PROVISIONS REGARDING RELEASE AND DISCHARGE .................................. 25
10.1    Discharge. .......................................................................... 25
10.2    Injunction Relating to the Plan. .................................................... 25

**ARTICLE 11**

        PROVISIONS REGARDING CONDITIONS PRECEDENT
        TO EFFECTIVE DATE AND EFFECTS OF CONFIRMATION ............................... 25
11.1    Conditions Precedent to Effectiveness. .............................................. 25
11.2    Waiver of Conditions. ............................................................... 26
11.3    Deadline for Effective Date ......................................................... 26

| | | | |
|---|---|---|---|
| 11.4 | Continuation of Bankruptcy Injunction or Stays. | | 26 |
| 11.5 | General Release of Liens. | | 26 |
| 11.6 | Full and Final Satisfaction. | | 26 |
| 11.7 | Administration Pending Effective Date. | | 26 |
| 11.8 | Setoffs. | | 26 |

**ARTICLE 12**

| | | | |
|---|---|---|---|
| | RETENTION OF JURISDICTION | | 26 |
| 12.1 | Retention of Jurisdiction. | | 26 |

**ARTICLE 13**

| | | | |
|---|---|---|---|
| | CORPORATE ACTION | | 27 |
| 13.1 | Effectuating Documents and Further Transactions. | | 27 |
| 13.2 | Corporate Action. | | 27 |
| 13.3 | Dissolution of the Debtors other than AHERF. | | 27 |
| 13.4 | Dissolution and Consolidation of Subsidiaries. | | 27 |
| 13.5 | Dissolution of Liquidating AHERF | | 27 |
| 13.6 | Dissolution or Insolvency Proceeding of AHSPIC | | 28 |

**ARTICLE 14**

| | | | |
|---|---|---|---|
| | MISCELLANEOUS PROVISIONS | | 28 |
| 14.1 | Exemption from Transfer Taxes. | | 28 |
| 14.2 | Exculpation. | | 28 |
| 14.3 | Amendment or Modification of the Plan. | | 28 |
| 14.4 | Severability. | | 29 |
| 14.5 | Revocation or Withdrawal of the Plan. | | 29 |
| 14.6 | Binding Effect. | | 29 |
| 14.7 | Notices. | | 29 |
| 14.8 | Continuation of Creditors' Committee. | | 29 |
| 14.9 | Continuation of Chapter 11 Trustee. | | 29 |
| 14.10 | Governing Law. | | 30 |
| 14.11 | Withholding and Reporting Requirements. | | 30 |
| 14.12 | Plan Supplement. | | 30 |
| 14.13 | Post-Confirmation Fees, Final Decree. | | 30 |
| 14.14 | Allocation of Plan Distributions Between Principal and Interest. | | 30 |
| 14.15 | Headings. | | 30 |
| 14.16 | Filing of Additional Documents. | | 30 |
| 14.17 | Inconsistency. | | 30 |
| 14.18 | Reservation of Rights. | | 30 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | Case Nos. 98-25773 MBM through |
| ALLEGHENY HEALTH, EDUCATION | : | 98-25777 MBM inclusive |
| AND RESEARCH FOUNDATION, | : | |
| ALLEGHENY UNIVERSITY OF THE | : | Chapter 11 |
| HEALTH SCIENCES, ALLEGHENY | : | |
| UNIVERSITY MEDICAL PRACTICES, | : | Consolidated for |
| ALLEGHENY HOSPITALS, | : | Administration at 98-25773 MBM |
| CENTENNIAL AND ALLEGHENY | : | |
| UNIVERSITY HOSPITALS-EAST, | : | |
| | : | |
| Debtors. | : | |

SECOND AMENDED CONSOLIDATED LIQUIDATING PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WILLIAM J. SCHARFFENBERGER, the Chapter 11 Trustee of Allegheny Health, Education and Research Foundation, Allegheny University of the Health Sciences, Allegheny University Medical Practices, Allegheny Hospitals, Centennial and Allegheny University Hospitals - East, the above captioned debtors, proposes the following second amended consolidated liquidating plan of reorganization under Section 1121(c) of Title 11 of the United States Code:

ARTICLE 1

DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions; Interpretation; Application of Definitions and Rules of Construction. For purposes of this Plan, the following terms shall have the meanings specified in this Article 1. A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. Wherever from the context it appears appropriate, each term stated shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter, regardless of how stated. Unless otherwise specified, all section, article, schedule or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Section, sub-Section or clause contained in the Plan. The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction hereof. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

1.1    "Administrative Expense Claim" shall mean a Claim that is Allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates or administering the Chapter 11 Cases as authorized and approved by a Final Order, (b) any actual and necessary costs and expenses incurred in the ordinary course of the Debtors' businesses subsequent to the Petition Date, unless otherwise determined by a Final Order, (c) fees and expenses of Professionals Allowed pursuant to a Final Order entered under Sections 330, 331, or 503 of the Bankruptcy Code, and (d) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930.

1.2    "AHERF" shall mean Allegheny Health, Education and Research Foundation, a Pennsylvania not-for-profit corporation.

1.3    "AHSPIC" shall mean Allegheny Health Services Providers Insurance Company, a Cayman Islands insurance company.

1.4    "Allowed" shall mean, with reference to any Claim:  (a) a Claim that has been listed by the Debtors in their Schedules and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of Claim has been filed by the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or (d) any Claim allowed under this Plan or pursuant to the Confirmation Order.

1.5    "AUH-East" shall mean Allegheny University Hospitals-East, a Pennsylvania  not-for-profit corporation.

1.6    "AUHS" shall mean Allegheny University of the Health Services, a Pennsylvania not-for-profit corporation.

1.7    "AUMP" shall mean Allegheny University Medical Practices, a Pennsylvania not-for-profit corporation.

1.8    "Avoidance Actions" shall mean Causes of Action arising or held by the Chapter 11 Trustee under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

1.9    "Ballot" shall mean the form distributed to each holder of an impaired Claim entitled to vote on the Plan on which an acceptance or rejection of the Plan shall be indicated.

1.10    "Bankruptcy Code" shall mean Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.11    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Western District of Pennsylvania having jurisdiction over the Chapter 11 Cases and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court under 28 U.S.C. § 151.

1.12    "Bankruptcy Officers" shall mean the Persons set forth in the Plan Supplement acting in the capacity or capacities designated therein.

1.13    "Bankruptcy Officer Indemnification Order" shall mean that certain "Order Granting the Application for an Order Approving Indemnification of the Chapter 11 Trustee and the Debtors' Officers for Any Claims Arising from Official Acts," that was entered by the Bankruptcy Court on March 7, 2000.

1.14    "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

1.15    "Bar Date" shall mean the date(s) fixed by order(s) of the Bankruptcy Court by which Persons asserting a Claim against the Debtors must file a proof of claim or be forever barred from asserting a Claim against the Debtors or their property and from voting on the Plan and/or sharing in distributions hereunder.

1.16    "Beneficiaries" shall mean all Persons entitled to receive distributions from Liquidating AHERF pursuant to the Plan.

1.17    "BNY PHCT Actions" shall mean, collectively, that certain litigation encaptioned "*The Bank of New York v. Philadelphia Healthcare Trust*" pending in the Philadelphia County Court of Common Pleas (October Term, 1998, Case No. 1612) together with that certain litigation encaptioned *The Bank of New York v. Bernard J. Korman, et al.*, Civil Action 99-1347, pending in the United States District Court for the Eastern District of Pennsylvania.

1.18    "BNY Stay Relief Order" shall mean that certain "Stipulated Order Granting Partial Relief From the Automatic Stay to IBJ Whitehall Bank and Trust Company," related to Motion No. 99-2289M, that was entered by the Bankruptcy Court on October 18, 1999.

1.19    "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006.

1.20    "Cash" shall mean lawful currency of the United States of America (including cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

1.21    "Cash Equivalents" shall mean equivalents of Cash in the form of readily marketable securities or instruments issued by a Person other than the Debtors or an affiliate of the Debtors, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's Rating of "A" or better, or equivalent rating of any other nationally recognized rating service, interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than Two Hundred Million Dollars ($200,000,000).

1.22    "Causes of Action" shall mean, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands whatsoever, whether known or unknown, in law, equity or otherwise.

1.23    "Centennial" shall mean Allegheny Hospitals, Centennial, a Pennsylvania not-for-profit corporation.

1.24    "Centennial Bondholder Claims" shall mean, collectively, all Claims arising under or related to a Centennial Bond.

1.25    "Centennial Bonds" shall mean, collectively, the Series A and Series B bonds of 1991 and the Series A and Series B bonds of 1993, issued pursuant to the Centennial Master Trust Indenture.

1.26    "Centennial Convenience Claim" means all Centennial Unsecured Claims of a single holder of a type which would otherwise be included in Class 5(B) which are either (i) $5,000 or less in the aggregate, or (ii) greater than $5,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce to $5,000 by making a Centennial Convenience Class Election.

1.27    "Centennial Convenience Class Election" means an election by a holder of a Centennial Unsecured Claim that would otherwise be a Class 5(B) Claim, within the time fixed by the Court for voting on the Plan, to have such Claim treated as a Centennial Convenience Claim.

1.28    "Centennial Indenture Trustee" shall mean The Bank of New York, as successor trustee under the Centennial Master Trust Indenture, or a successor thereto.

1.29    "Centennial Master Trust Indenture" shall mean that certain master trust indenture dated as of December 1, 1991 (as same may have been supplemented or amended), between the Graduate Health System Obligated Group and the Centennial Indenture Trustee.

1.30    "Centennial Unsecured Claims" shall mean Unsecured Claims against the Estate of Centennial prior to giving effect to the substantive consolidation of the Estates pursuant to Article 2 of this Plan.

1.31    "Chapter 11 Cases" shall mean the Debtors' jointly administered cases under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

1.32    "Chapter 11 Trustee" shall mean William J. Scharffenberger, as Chapter 11 trustee of the Debtors' Estates both prior to and, pursuant to the provisions of the Plan and the Confirmation Order, after the occurrence of the Effective Date or any successor thereto appointed pursuant to the terms of the Liquidating AHERF Bylaws.

1.33    "Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.34    "Class" shall mean a category of Persons holding Claims which are substantially similar in nature to the Claims of other holders in such Class, as designated in Article 4 of this Plan.

1.35    "Commercial Paper Notes" shall mean the taxable commercial paper notes issued pursuant to a depository agreement dated as of June 1, 1996 between the DVOG member signatory thereto and PNC, as depository.

1.36    "Collateral" shall mean any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

1.37    "Confirmation Date" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.38    "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.39    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code.

1.40    "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court (a) which was not filed in a sum certain, or which has not accrued and is dependent upon a future event that has not occurred or may never occur, and (b) which has not been Allowed.

1.41    "Convenience Claim" means all General Unsecured Claims of a single holder of a type which would otherwise be included in Class 5(A) which are either (i) $1,000 or less in the aggregate, or (ii) greater than $1,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce to $1,000 by making a Convenience Class Election.

1.42    "Convenience Class Election" means an election by a holder of a General Unsecured Claim that would otherwise be a Class 5(A) Claim, within the time fixed by the Court for voting on the Plan, to have such Claim treated as a Convenience Claim.

1.43    "Creditors' Committee" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code and, on and after the Effective Date, continuing in such capacity and as a representative of the Estates pursuant to Section 14.8 of the Plan.

1.44    "D&O Action" shall mean that certain adversary proceeding encaptioned "The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. Sherif S. Abdelhak, et al., Adv. No. 99-2465."

1.45    "Debtors" shall mean, collectively, AHERF, AUHS, AUMP, Centennial and AUH-East.

1.46    "Delaware Valley Obligated Group" or "DVOG" shall mean, collectively, AUHS and AUH-East, as successors-in-interest to Allegheny University Hospitals, Hahnemann University Hospital, Allegheny United Hospitals, Inc., St. Christopher's Hospital for Children and Horizon Medical Corporation.

1.47    "Disclosure Statement" shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

1.48    "Disputed" shall mean, with respect to any Claim:  (a) if no proof of claim relating to such Claim has been filed, that is listed in the Schedules as unliquidated, disputed or contingent; or (b) if a proof of claim relating to such Claim has been filed, as to which the Chapter 11 Trustee, the Creditors' Committee or any other party-in-interest have interposed a timely objection or request for estimation, or have sought to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by the Chapter 11 Trustee, or the Creditors' Committee, in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; (c) which is a Contingent or Unliquidated Claim; or (d) any Claim that has not been reconciled by the Chapter 11 Trustee with the Debtors' books and records.

1.49    "Disputed Claim Amount" shall mean the amount set forth in the proof of claim relating to a Claim that is Disputed or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Claim that is Disputed in accordance with Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018.

1.50    "Disputed Claim Reserve" shall have the meaning set forth in Section 6.9 hereof.

1.51    "Distribution Record Date" shall mean the Business Day after the Confirmation Date.

1.52    "DVOG Bonds" shall mean, collectively, the DVOG/MBIA Bonds, the PNC Notes and the DVOG/PNC Bonds.

1.53    "DVOG Bond Insurance" shall mean the bond insurance issued by MBIA Insurance Corporation covering the DVOG/MBIA Bonds.

1.54    "DVOG Master Indenture Trustee" shall mean Norwest Bank Minnesota, National Association, as trustee under the DVOG Master Trust Indenture, and any successor thereto.

1.55    "DVOG/MBIA Bondholders" shall mean, collectively, the record holders of the DVOG/MBIA Bonds.

1.56    "DVOG Master Trust Indenture" shall mean that certain master trust indenture dated as of May 15, 1996 (as same has been supplemented and modified), between the members of the Delaware Valley Obligated Group and the DVOG Master Indenture Trustee.

1.57    "DVOG/MBIA Bonds" shall mean, collectively, the Series A 1996 bonds, the Series B 1996 bonds, and the Series C 1996 bonds each dated as of May 15, 1996, all of which were issued pursuant to the MBIA Series Trust Indenture.

1.58    "DVOG Series Bond Indenture Trustee" shall mean, Norwest Bank Minnesota, National Association, as trustee under the MBIA Series Trust Indentures and the PNC Trust Indenture, and any successor thereto.

1.59    "DVOG/PNC Bonds" shall mean, collectively, the Series D 1996 bonds, dated as of June 1, 1996, issued pursuant to the PNC Trust Indenture and the Commercial Paper Notes.

1.60    "Effective Date" shall mean the date which is eleven (11) days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; provided, however, that if, as of such date, all conditions to the occurrence of the Effective Date set forth in Sections 11.1 and 11.3 of this Plan have not been satisfied or waived pursuant to Sections 11.2 or 11.3 (as to the condition contained therein) of this Plan, then the first Business Day on which all such conditions have been satisfied or waived.

1.61    "Estates" shall mean the estates created in the Chapter 11 Cases pursuant to Section 541 of the Bankruptcy Code.

1.62    "Estate Assets" shall mean, after giving effect to the payments to occur on the Effective Date, all of the property of the Estates of the Debtors.

1.63    "Final Order" shall mean an order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Chapter 11 Trustee or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.64    "General Secured Claim" shall mean any Secured Claim other than a Centennial Bondholder Claim or a MBIA/PNC Claim.

1.65    "General Unsecured Claim" shall mean any Unsecured Claim that is not a Centennial Unsecured Claim, a Convenience Class Claim or a Centennial Convenience Class Claim.

1.66    "Graduate Action" shall mean that certain adversary proceeding encaptioned  *"William J. Scharffenberger, as Chapter 11 Trustee of Allegheny Hospitals, Centennial v. Philadelphia Healthcare Trust"*, Adv. No. 00-2157.

1.67    "Graduate Health Systems Obligated Group" shall mean Centennial, as successors- in-interest to The Graduate Hospital and The Fifth and Reed Hospital (d/b/a Mt. Sinai Hospital).

1.68    "Indemnification Claims" shall mean all obligations relating to contribution, indemnification, reimbursement (excluding obligations arising under or related to the  Reimbursement Agreements) and exculpation by

the Debtors and the Subsidiaries arising under applicable laws or agreements or as provided in any of the Debtors' or Subsidiaries' certificate of formation or by-laws or any similar documents.

1.69    "Insurance Claim" shall mean any Claim against the Debtors to the extent that it is payable under any Insurance Policy or payable by the Pennsylvania Property and Casualty Insurance Guaranty Association, established pursuant to Pa. St. §§ 991.1801 et seq.

1.70    "Insurance Policy" shall mean any policy of insurance and agreements relating thereto that may be available to provide coverage for Claims against the Debtors.

1.71    "IRC" shall mean the Internal Revenue Code of 1986, as amended from time to time.

1.72    "IRS" shall mean the Internal Revenue Service, an agency of the United States Department of Treasury.

1.73    "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

1.74    "Liquidating AHERF" shall mean Allegheny Health, Education and Research Foundation on and after the Effective Date, as successor to the Debtors.

1.75    "Liquidating AHERF Bylaws" shall mean the Bylaws for Liquidating AHERF, effective as of the Effective Date, substantially in the form contained in the Plan Supplement, as they may be modified from time to time pursuant to their terms.

1.76    "Liquidation Administrative Claim Reserve Amount" shall mean the reserve established on the Effective Date and maintained by Liquidating AHERF in such aggregate amount as  required by the Plan and the Liquidating AHERF Bylaws.

1.77    "Liquidation  Administrative Expenses" shall mean, consistent with the Plan and the Plan Documents, all reasonable costs, expenses and fees incurred in connection with maintaining Liquidating AHERF and the Estate Assets, including, without limitation, (a) all reasonable fees and expenses incurred by the Chapter 11 Trustee, the Creditors' Committee and the individual members of the Creditors' Committee in such capacity in employing attorneys, accountants, experts, advisors, consultants, appraisers, auctioneers or other professionals to represent or assist them in carrying out their duties under the Plan, (b) the compensation paid to the Chapter 11 Trustee under the Plan Documents, (c) pursuant to Section 3.4 of the Plan, any Administrative Expense Claim or Priority Tax Claim that is allowed after the Effective Date and (d) all other reasonable costs incurred in liquidating and maintaining the Estate Assets in accordance with the Plan Documents.

1.78    "Liquidation Expense Reserve Account" means the bank account(s) or investments established to pay and reserve for Liquidation Administrative Expenses.

1.79    "MBIA/PNC" shall mean, collectively, MBIA Insurance Corporation and PNC.

1.80    "MBIA/PNC Claims" shall mean, collectively, all Claims against the Debtors arising under or related to the DVOG Bonds,  the DVOG Master Trust Indenture, the PNC Reimbursement Agreements and the DVOG Bond Insurance.

1.81    "MBIA Series Trust Indentures" shall mean, collectively, those certain trust indentures governing the Series A 1996 bonds, the Series B 1996 bonds and the Series C 1996 bonds between Pennsylvania Higher Educational Facilities Authority and the DVOG Series Bond Indenture Trustee.

1.82    "Medicare Claims" shall mean any Causes of Action against the United States Department of Health and Human Services arising under Title XIX of the Social Security Act.

1.83    "Mellon Action" shall mean that certain adversary proceeding commenced in the Bankruptcy Court encaptioned "*William J. Scharffenberger, as Chapter 11 Trustee of Allegheny Health, Education And Research Foundation v. Mellon Bank, N.A., et al.*, Adv. 99-2344".

1.84    "Membership Interests" shall mean AHERF's membership interests in each of AUHS, AUMP, Centennial and AUH-East.

1.85    "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or political subdivision thereof.

1.86    "Petition Date" shall mean July 21, 1998, the date upon which the Debtors filed their voluntary Chapter 11 petitions with the Bankruptcy Court pursuant to the Bankruptcy Code.

1.87    "Plan" shall mean this Second Amended Consolidated Liquidating Plan of Reorganization Under Chapter 11 of the Bankruptcy Code including, without limitation, the Plan Supplement and the Plan Documents, and all exhibits, supplements, appendices and schedules hereto and thereto, either in its present form or as the same may be altered, amended or modified from time to time.

1.88    "Plan Documents" shall mean the (i) Liquidating AHERF Bylaws, (ii) a list of the Bankruptcy Officers, (iii) a list of the Claims Allowed pursuant to the Plan, and (iv) the other agreements, instruments and documents governing the establishment, administration and operation of Liquidating AHERF, as they may be amended at any time prior to the conclusion of the Confirmation Hearing, or thereafter, in accordance with Section 14.3 hereof.

1.89    "Plan Supplement" shall mean the supplement, containing copies of the Plan Documents, which shall be filed with the Bankruptcy Court. The Plan Supplement is incorporated into, and is a part of, this Plan as if set forth in full herein, and all references to this Plan shall refer to this Plan together with all documents contained in the Plan Supplement. The Plan Supplement (containing drafts or final versions of the Plan Documents subject to amendment in accordance with Section 14.3 hereof) shall be filed with the Bankruptcy Court as early as practicable (but in no event later than seven (7) Business Days) prior to the deadline fixed for filing objections to confirmation of the Plan, or on such other date as the Bankruptcy Court may establish.

1.90    "PNC" shall mean PNC Bank, National Association.

1.91    "PNC Notes" shall mean (i) the promissory note ("1996F Note") issued pursuant to the DVOG Master Trust Indenture to PNC to secure DVOG's obligations under the PNC Reimbursement Agreement relating to the Series D 1996 Bonds, dated as of June 1, 1996, issued pursuant to the PNC Trust Indenture and (ii) the promissory note ("1996G Note") issued pursuant to the DVOG Master Trust Indenture to PNC to secure DVOG's obligations under the PNC Reimbursement Agreement relating to the Commercial Paper Notes.

1.92    "PNC Reimbursement Agreements" shall mean those certain reimbursement agreements dated as of June 1, 1996 between PNC and members of DVOG relating to the DVOG/PNC Bonds.

1.93    "PNC Trust Indenture" shall mean the trust indenture between the Pennsylvania Higher Education Facilities Authority and the DVOG Series Bond Indenture Trustee, dated as of June 1, 1996, pursuant to which the Series D 1996 Bonds were issued.

1.94    "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under Section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Expense Claims.

1.95    "Priority Tax Claim" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.96    "Professionals" shall mean those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.97    "Pro Rata" shall mean a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

1.98    "PWC Action" shall mean that certain adversary proceeding encaptioned "*The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. PricewaterhouseCoopers LLP*", Civil Action No. 00-684".

1.99    "Recovery Actions" shall mean all Causes of Action that have been or may be brought by or on behalf of the Debtors, the Chapter 11 Trustee, or the Creditors' Committee, including, without limitation (a) the Mellon Action, (b) the PWC Action, (c) the D&O Action, (d) the Graduate Action and (e) Avoidance Actions.

1.100    "Reserve Income" shall mean the interest earned on all funds maintained in the Disputed Claim Reserve on account of a Claim that is Disputed prior to the distribution of such funds (based upon the average rate of interest earned on all accounts and investments in which the Disputed Claim Reserve are invested as estimated by the Chapter 11 Trustee).

1.101    "Retiree Benefits" shall mean payments to any entity or Person for the purpose of providing or reimbursing payments for retired employees of the Debtors and of any other entities as to which the Debtors are obligated to provide retiree benefits and the eligible spouses and eligible dependents of such retired employees, for medical, surgical, or hospital care benefits, or in the event of death of a retiree under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established by the Debtors prior to the Petition Date, as such plan, fund or program was then in effect or as heretofore or hereafter amended.

1.102    "Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

1.103    "Series A Bondholder Secured Liquidation Participation" shall mean those beneficial interests, as created and evidenced by this Plan, in distributions from Liquidating AHERF to be allocated to holders of Allowed Centennial Bondholder Claims and Allowed MBIA/PNC Claims, pursuant to Sections 5.3 and 5.4 of the Plan, respectively, entitling such holders to receive distributions from Liquidating AHERF pursuant to Section 6.6 of the Plan.

1.104    "Series B Bondholder Secured Liquidation Participation" shall mean those beneficial interests, as created and evidenced by this Plan, in distributions from Liquidating AHERF to be allocated to holders of Allowed MBIA/PNC Claims, pursuant to Section 5.4 of the Plan, entitling such holders to receive distributions from Liquidating AHERF pursuant to Section 6.6 of the Plan.

1.105    "Series C Bondholder Secured Liquidation Participation" shall mean those beneficial interests, as created and evidenced by this Plan, in distributions from Liquidating AHERF to be allocated to holders of Allowed MBIA/PNC Claims, pursuant to Section 5.4 of the Plan, entitling such holders to receive distributions from Liquidating AHERF pursuant to Section 6.6 of the Plan.

1.106   "Secured Claim" shall mean any Claim, to the extent reflected in the Schedules or a proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

1.107   "Small Payment Reserve" shall have the meaning set forth in Section 6.8(b) hereof.

1.108   "Subsidiary" shall mean any entity of which the outstanding capital stock or membership interests entitled to vote for the election of directors, officers or trustees was owned or controlled on the Petition Date, directly or indirectly, by a Debtor, by one or more Subsidiaries of a Debtor, or by a Debtor and one or more of its other Subsidiaries.

1.109   "Subordinated Claims" shall mean any Claims subordinated to the payment of all other Allowed Claims by a Final Order or by settlement between the Chapter 11 Trustee, the Creditors' Committee and the holder of such Claim.

1.110   "Unsecured Claim" shall mean a Claim that is not a Secured Claim, Insurance Claim or that is not entitled to priority of payment under Section 507 of the Bankruptcy Code.

1.111   "Unsecured Claim Liquidation Participation" shall mean those beneficial interests in the distributions from Liquidating AHERF allocated or to be allocated to holders of Allowed Centennial Bondholder Claims, Allowed MBIA/PNC Claims, Allowed General Unsecured Claims and Allowed Centennial Unsecured Claims, pursuant to Sections 5.3(c)(ii), 5.4(c)(ii), 5.5(b) and 5.6(b) of the Plan, respectively, upon the Allowance of such Claims, entitling such holders to receive distributions from Liquidating AHERF pursuant to Section 6.6 of the Plan, subject to the provisions of Article 2 of the Plan.


## ARTICLE 2

## SUBSTANTIVE CONSOLIDATION

2.1   Substantive Consolidation.  On the Effective Date: (i) all assets (and all proceeds thereof) and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of AHERF, (ii) no distributions shall be made under the Plan on account of inter-company Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, and (iv) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors; provided, however, that (a) for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, the Debtors shall be treated as separate entities so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any of the Debtors may not be set-off against the debts of any of the other Debtors, (b) for purposes of determining the plaintiff of, and the availability of defenses to, Recovery Actions, the Debtors may, at the option of the Chapter 11 Trustee upon the direction of the Creditors' Committee, be treated as separate entities and (c) holders of Centennial Unsecured Claims shall be afforded the treatment set forth in Section 5.6 of the Plan for all purposes and shall not be deemed General Unsecured Creditors for purposes of distributing under or voting for the Plan as a result of giving effect to this Article 2.  To the extent that a creditor, including, but not limited to, the Pension Benefit Guaranty Corporation, is holding an Allowed Claim against more than one of the Debtors' Estates arising out of the joint and several obligations of the Debtors, such creditor shall be treated as a holder of an Allowed General Unsecured Claim under Class 5(A) of the Plan.

## ARTICLE 3

### TREATMENT OF ALLOWED ADMINISTRATIVE
### EXPENSE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

3.1 <u>Non-Classification</u>. As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for the purposes of voting on or receiving distributions under this Plan. All such Claims are instead treated separately upon the terms set forth in this Article 3.

3.2 <u>Administrative Expense Claims</u>.

(a) <u>General</u>. All Administrative Expense Claims shall be paid in full, in Cash, in such amounts as (a) are incurred in the ordinary course of business by the Debtors pursuant to the normal business terms between the parties, (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (c) may be agreed upon between the holder of such Administrative Expense Claim and the Chapter 11 Trustee and the Creditors' Committee. Such Administrative Expense Claims shall include undisputed costs incurred in the operation of the Debtors' businesses after the Petition Date and fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

(b) <u>Professional Compensation and Expense Reimbursement Claims</u>. All entities, including, without limitation, the individual members of the Creditors' Committee, seeking an award by the Bankruptcy Court of professional fees, including the fees of the Chapter 11 Trustee, or of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Confirmation Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Chapter 11 Trustee and the Creditors' Committee. All fees and expenses of Professionals for services rendered in connection with the Chapter 11 Cases and the Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved hereunder and the resolution of Disputed Claims, shall be paid by the Chapter 11 Trustee from the assets of Liquidating AHERF upon receipt of reasonably detailed invoices therefor by the Chapter 11 Trustee and Creditors' Committee, for such amounts and on such terms as such Professional and the Chapter 11 Trustee with the consent of the Creditors' Committee, may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order.

3.3 <u>Priority Tax Claims</u>. Each holder of an Allowed Priority Tax Claim shall be paid in full in Cash. Such payments shall be made (a) in full in Cash on the later of the Effective Date or the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced or (b) upon such other terms as may be agreed to between the Chapter 11 Trustee and any holder of an Allowed Priority Tax Claim.

3.4 <u>Certain Claims Against Liquidating AHERF</u>. Any Administrative Expense Claim, Priority Tax Claim, or Priority Claim that is Allowed on or subsequent to the Effective Date shall be deemed to be a Liquidation Administrative Expense and paid in full in Cash from the Liquidation Expense Reserve Account.

## ARTICLE 4

### CLASSIFICATION OF CLAIMS AND MEMBERSHIP INTERESTS

Claims, other than Administrative Expense Claims and Priority Tax Claims, and Membership Interests are classified for all purposes, including voting on, confirmation of and distribution pursuant to the Plan, as follows:

| Class | | Status |
|---|---|---|
| Class 1 – | Priority Claims | Unimpaired |
| Class 2 – | General Secured Claims | Unimpaired |
| Class 3 – | Secured Claims of holders of Centennial Bondholder Claims | Impaired |
| Class 4 – | Secured Claims of holder of MBIA/PNC Claims | Impaired |
| Class 5(A) – | General Unsecured Claims | Impaired |
| Class 5(B) – | Centennial Unsecured Claims | Impaired |
| Class 6(A) – | Convenience Class | Impaired |
| Class 6(B) – | Centennial Convenience Class | Impaired |
| Class 7 – | Insurance Claims | Impaired |
| Class 8 -- | Membership Interests | Unimpaired |

## ARTICLE 5

### TREATMENT OF CLAIMS AND MEMBERSHIP INTERESTS

5.1     CLASS 1 – ALLOWED PRIORITY CLAIMS.

(a)     Impairment and Voting. Class 1 is unimpaired by the Plan. Consequently, each holder of an Allowed Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Each holder of an Allowed Priority Claim shall receive Cash in an amount equal to such Allowed Priority Claim on the later of the Effective Date and the date such Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Chapter 11 Trustee with the consent of the Creditors' Committee, agree to a different treatment thereof.

5.2     CLASS 2 – GENERAL SECURED CLAIMS.

(a)     Impairment and Voting. Class 2 is unimpaired by the Plan. Consequently, each holder of an Allowed General Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Subclassification</u>.  Each General Secured Claim shall constitute a separate Class numbered 2.1, 2.2, 2.3 and so on.

(c)     <u>Distributions</u>.  At the option of the Chapter 11 Trustee with the consent of the Creditors' Committee, (i) a holder of an Allowed General Secured Claim shall receive Cash in an amount equal to such Allowed General Secured Claim, including any interest on such Allowed General Secured Claim required to be paid pursuant to Section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such General Secured Claim becomes an Allowed General Secured Claim, or as soon thereafter as is practicable,  (ii) a holder of an Allowed General Secured Claim shall receive the Collateral securing its Allowed General Secured Claim, in full and complete satisfaction thereof on the later of the Effective Date and the date such General Secured Claim becomes Allowed, or as soon thereafter as is practicable, (iii) an Allowed General Secured Claim shall be reinstated and rendered unimpaired in accordance with Section 1124(2) of the Bankruptcy Code or (iv) to the extent a General Secured Claim arises by virtue of setoff, the right of setoff is preserved under Section 553 of the Bankruptcy Code to the extent authorized by applicable law.

5.3     <u>CLASS 3 – SECURED CLAIMS OF HOLDERS OF CENTENNIAL BONDHOLDER CLAIMS</u>.

(a)     <u>Allowance of Centennial Bondholder Claims</u>.  On the Effective Date, holders of Centennial Bondholder Claims shall be granted an Allowed  Secured Claim in the amount of $33 million and an Allowed Centennial Unsecured Claim in the amount of $105.6 million, subject to Section 5.3(e) hereof.

(b)     <u>Impairment and Voting</u>.  Class 3 is impaired by the Plan.  Consequently, each holder of an Allowed Centennial Bondholder Claim shall be entitled to vote to accept or reject the Plan.  Each vote cast for or against the Plan by the holder of an Allowed Centennial Bondholder Claim shall be deemed a vote of such holder's Secured and Unsecured Claims. 33/138.6 of each  Allowed Centennial Bondholder Claim voted shall be attributable to such holder's Secured Claim and shall be deemed a vote to accept or reject Class 3 of the Plan.  105.6/138.6 of each Allowed Centennial Bondholder Claim voted shall be attributable to such holder's Unsecured Claim and shall be deemed a vote to accept or reject Class 5(B) of the Plan.

(c)     <u>Distributions</u>.

(i)     <u>Distributions on Account of Allowed Secured Claim</u>:  Under this Plan, on the Effective Date, each holder of an Allowed Centennial Bondholder Claim shall receive, in full and final satisfaction of its Allowed Secured Claim, its Pro Rata share of:  (w) $20.5 million Cash and (x) a Series A Bondholder Secured Liquidation Participation in the amount of $12.5 million.

(ii)    <u>Distributions on Account of Allowed Unsecured Claim</u>:  Each holder of an Allowed Centennial Bondholder Claim shall receive, in full and final satisfaction of its Allowed Unsecured Claim, its Pro Rata share of distributions payable under the Plan on account of an Allowed Centennial Unsecured Claim in the amount of $105.6 million, subject to adjustment pursuant to Section 5.3(e) hereof.

(d)     <u>Retention of Rights</u>.  The Centennial Indenture Trustee, on behalf of the Centennial Bondholders, may continue to pursue at its own cost the BNY PHCT Actions and, pursuant to the BNY Stay Relief Order, continue to collect all uncollected collateral for which it was granted relief from stay pursuant to the BNY Relief Order, including, without limitation, all of the Medicare Claims of the Centennial Estate, and shall be entitled to receive the proceeds of any recoveries related thereto as a secured party holding a valid and perfected Secured Claim for such amounts; provided, however, that the aggregate Allowed Unsecured Claim of the holders of Allowed Centennial Bondholder Claims shall be reduced by the amount of any such recoveries.  The entry of the Confirmation Order shall constitute the entry of an order pursuant to 42 U.S.C. §1395 g(c), 42 U.S.C. §1395 u(b)(6) and 42 U.S.C. §1396 (a)(32)

requiring the United States Department of Health and Human Services to pay all Medicare Claims of the Centennial Estate to the Centennial Indenture Trustee; provided, however, that the receipt of any proceeds of Medicare Claims by the Centennial Indenture Trustee shall be subject to the provisions of 42 CFR § 424.90(c). Notwithstanding anything to the contrary contained in this Plan, the Centennial Indenture Trustee shall retain its lien on any collateral for which it was granted relief from stay pursuant to the BNY Stay Relief Order. The Centennial Indenture Trustee, with respect to Centennial Medicare Claims, and the Chapter 11 Trustee, with respect to the Medicare Claims asserted by Debtors other than Centennial, shall cooperate with each other in their respective collection efforts, but such agreement to cooperate shall in no way impair the ability of each, independent of the other, to pursue, settle and compromise its respective Medicare Claims. Pursuant to the BNY Stay Relief Order, the Centennial Indenture Trustee shall bear all costs incurred by it and its predecessor indenture trustee, and otherwise shall be responsible for all matters arising from or relating to the collection of Centennial receivables and the pursuit of Centennial Medicare Claims from and after the date of the BNY Stay Relief Order.

(e)     Reconciliation. Prior to each date on which the Centennial Bondholders are to receive distributions from Liquidating AHERF on account of their Allowed Centennial Unsecured Claims, the Centennial Indenture Trustee and the Chapter 11 Trustee shall in good faith reconcile and, to the extent necessary, reduce dollar for dollar, the aggregate Allowed Centennial Unsecured Claim granted to holders of Allowed Centennial Bondholder Claims by such amounts as are collected by the Centennial Indenture Trustee in accordance with Section 5.3(d) hereof. Upon giving effect to such reconciliation, holders of Allowed Centennial Bondholder Claims shall be entitled to receive subsequent distributions under the Plan only to the extent that such holders' aggregate distributions under the Plan are equal to the distributions that such holders would have received if the Allowed Centennial Unsecured Claim of such holders had been Allowed on the Effective Date in such reduced amount; provided, however that holders of Allowed Centennial Bondholder Claims shall not be required to disgorge any prior distributions.

(f)     Discharge of Obligations Owing on Centennial Bonds and Related Instruments. As of the Effective Date, the obligations of the Debtors under all Centennial Bonds, the Centennial Master Trust Indenture and all agreements, instruments and other documents evidencing Centennial Bondholder Claims and the rights of the holders thereof against the Debtors shall be discharged and released but such agreements, instruments and documents shall not be canceled. Notwithstanding the foregoing, such discharge and release shall not impair the rights and duties under the Centennial Master Indenture as between the Centennial Indenture Trustee and the holders of the Centennial Bonds nor shall such discharge and release, impair, release, discharge or otherwise affect any Claim of the Centennial Bondholders against any Person or entity which is not a Debtor, the Chapter 11 Trustee, Liquidating AHERF or the Creditors' Committee or any of the Professionals, all such Claims being hereby expressly preserved.

(g)     Pending Litigation. All outstanding litigation between the Centennial Bondholders and the Chapter 11 Trustee and the Creditors' Committee shall be deemed dismissed with prejudice upon the occurrence of the Effective Date, and the Centennial Indenture Trustee and the Chapter 11 Trustee shall file a notice of dismissal of such litigation with prejudice with the Bankruptcy Court promptly upon the occurrence of the Effective Date.

(h)     Mutual Release. All potential Causes of Action of the Creditors' Committee, the Debtors, the Debtors' Estates, and the Chapter 11 Trustee, including without limitation, Avoidance Actions, against each of the Centennial Bondholders and the Centennial Indenture Trustee shall be deemed released, settled and compromised including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment provided to such creditors pursuant to the Plan. All potential Causes of Action of the Centennial Bondholders and the Centennial Indenture Trustee against each of the Debtors, the Debtors' Estates, the Chapter 11 Trustee and the Creditors' Committee shall be deemed released, settled and compromised including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules in consideration of the treatment provided to each pursuant to the Plan.

5.4     CLASS 4 – SECURED CLAIMS OF HOLDERS OF MBIA/PNC CLAIMS.

(a)     Allowance of MBIA/PNC Claims.  On the Effective Date, the holders of MBIA/PNC Claims shall be granted an Allowed Secured Claim in the amount of $50 million and an Allowed Unsecured Claim in the amount of $340.3 million, subject to adjustment pursuant to Section 5.4(d) hereof.

(b)     Impairment and Voting.  Class 4 is impaired by the Plan.  Consequently, each holder of an Allowed MBIA/PNC Claim shall be entitled to vote to accept or reject the Plan.  Each vote cast for or against the Plan by the holder of an Allowed MBIA/PNC Claim shall be deemed a vote of such holder's Secured and Unsecured Claims. 50/390.3 of each Allowed MBIA/PNC Claim voted shall be attributable to such holder's Secured Claim and shall be deemed a vote to accept or reject Class 4 of the Plan.  340.3/390.3 of each Allowed MBIA/PNC Claim voted shall be attributable to such holder's Unsecured Claim and shall be deemed a vote to accept or reject Class 5(A) of the Plan.

(c)     Distributions:

(i)     Distributions on Account of Allowed Secured Claim:  Each holder of an Allowed MBIA/PNC Claim shall receive on the Effective Date, in full and final satisfaction of its Allowed Secured Claim, its Pro Rata share of: (w) $10 million Cash, (x) a Series A Bondholder Secured Liquidation  Participation in the amount of $15 million, (y) a Series B Bondholder Secured Liquidation  Participation in the amount of $15 million, and (z) a Series C Bondholder Secured Liquidation Participation in the amount of $10 million, subject to adjustment pursuant to Section 5.4(d) hereof.

(ii)    Distributions on Account of Allowed Unsecured Claim:  Each holder of an Allowed MBIA/PNC Claim shall receive, in full and final satisfaction of its Allowed Unsecured Claim, its Pro Rata share of distributions payable under the Plan pursuant to Section 5.5 of the Plan on account of an Allowed General Unsecured Claim in the amount of $340.3 million, subject to adjustment pursuant to Section 5.4(d) hereof.

(d)     Distribution Adjustment.  The Series C Bondholder Secured Liquidation Participation granted to holders of Allowed MBIA/PNC Claims pursuant to Section 5.4(c)(i)(z) hereof shall be increased, if necessary, and the General Unsecured Claim granted pursuant to Section 5.4(c)(ii) hereof shall be concomitantly reduced, so that the total distribution to holders of Allowed MBIA/PNC Claims on account of their Allowed Secured and Unsecured Claims equals at least $100 million at such time as $150 million of aggregate distributions from Liquidating AHERF have been made pursuant to Section 6.6 hereof; provided, however, that in no event will such increase exceed $2 million.

(e)     Discharge of Obligations Owing on DVOG Bonds.  As of the Effective Date, the obligations of the Debtors under all DVOG Bonds, the DVOG Master Trust Indenture, the PNC Notes, the PNC Reimbursement Agreements, the DVOG Bond Insurance, and all agreements, instruments and other documents evidencing the MBIA/PNC Claims and the rights of the holders thereof against the Debtors shall be discharged and released but such agreements, instruments and documents shall not be canceled.  Notwithstanding the foregoing, such discharge and release shall not impair the rights and duties (i) under the DVOG Master Trust Indenture as between the DVOG Master Indenture Trustee and MBIA/PNC or (ii) under the MBIA Series Trust Indentures as between the DVOG Series Bond Indenture Trustee and the DVOG/MBIA Bondholders, nor shall such discharge and release, impair, release, discharge or otherwise affect any Claim of MBIA/PNC or the DVOG/MBIA Bondholders against any Person or entity which is not a Debtor, the Chapter 11 Trustee, Liquidating AHERF or the Creditors' Committee or any of the Professionals, all such Claims being hereby expressly preserved.

(f)     DVOG/MBIA Bonds.  Except to the extent set forth in Section 5.4(e) above, the rights of the DVOG/MBIA Bondholders are unaffected by the terms of the Plan.  The DVOG/MBIA Bonds, however, shall

merely represent the right to collect payments from the DVOG Series Bond Indenture Trustee from the proceeds of the DVOG Bond Insurance.

(g)    Certificate of Allowed Claims.  At the request of PNC, the Chapter 11 Trustee shall issue one or more certificates in an assignable form and in the amounts and in the names of the beneficial holder of an Allowed MBIA/PNC Claim as directed by PNC representing the Allowed MBIA/PNC Claim of such holder in form and substance reasonably acceptable to PNC, as the case may be, and the Creditors' Committee.

(h)    Mutual Release.  All potential Causes of Action of the Creditors' Committee, the Debtors, the Debtors' Estates, and the Chapter 11 Trustee, including, without limitation, Avoidance Actions, against MBIA and/or PNC shall be deemed released, settled and compromised, including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment provided to such creditors pursuant to the Plan.  All potential Causes of Action of PNC and/or MBIA against each of the Debtors, the Debtors' Estates, the Chapter 11 Trustee and the Creditors' Committee shall be deemed released, settled and compromised including, to the extent relevant, pursuant to Rule 9019 of the Bankruptcy Rules, in consideration of the treatment provided to each pursuant to the Plan.

5.5    CLASS 5(A) – GENERAL UNSECURED CLAIMS.

(a)    Impairment and Voting.  Class 5(A) is impaired by the Plan.  Consequently, each holder of an Allowed General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive, on the Effective Date, in full and final satisfaction of such Allowed Claim: (a) a payment in Cash equal to five percent (5%) of such Allowed Claim and (b) an Unsecured Claim Liquidation Participation equal to such Allowed Claim.

5.6    CLASS 5(B) – CENTENNIAL UNSECURED CLAIMS.

(a)    Impairment and Voting.  Class 5(B) is impaired by the Plan.  Consequently, each holder of an Allowed Centennial Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed Centennial Unsecured Claim as of the Distribution Record Date shall receive, on the Effective Date, in full and final satisfaction of such Allowed Claim: (a) a payment in Cash equal to one and one-half percent (1.5%) of such Allowed Claim and (b) an Unsecured Claim Liquidation Participation equal to thirty percent (30%) of such Allowed Claim.

5.7    CLASS 6(A) – ALLOWED CONVENIENCE CLAIMS.

(a)    Impairment and Voting.  Class 6(A) is impaired by the Plan.  Consequently, each holder of an Allowed Convenience Claim shall be entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed Convenience Claim, in full and final satisfaction of such Claim, shall receive Cash in an amount equal to ten percent (10%) of such holder's Allowed Convenience Claim on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, and shall receive no other distributions on account of such Claim.

(c)    Reservation of Rights.  In the event that a Recovery Action is settled prior to the Confirmation Date resulting in a material recovery to the Estates, the Chapter 11 Trustee, subject to the consent of the Creditors' Committee, reserves the right to amend the Plan pursuant to Section 14.3 hereof to provided for a higher distribution to holders of Allowed Convenience Claims or to eliminate such Class and treat such claimants as holders of a Claim in Class 5(A).  In the event that the Plan is amended to eliminate Class 6(A), votes cast to accept or reject

the Plan shall be deemed votes to accept or reject Class 5(A) of the Plan and the Claims of holders that made a Convenience Class Election shall be restored to their full Allowed amount.

5.8    CLASS 6(B) – ALLOWED CENTENNIAL CONVENIENCE CLAIMS.

(a)    Impairment and Voting. Class 6(B) is impaired by the Plan. Consequently, each holder of an Allowed Centennial Convenience Claim shall be entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed Centennial Convenience Claim, in full and final satisfaction of such Claim, shall receive Cash in an amount equal to three percent (3%) of such holder's Allowed Centennial Convenience Claim on the later of the Effective Date and the date such Centennial Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, and shall receive no other distributions on account of such Claim.

(c)    Reservation of Rights.  In the event that  a Recovery Action is settled prior to the Confirmation Date resulting in a material recovery to the Estates, the Chapter 11 Trustee, subject to the consent of the Creditors' Committee, reserves the right to amend the Plan pursuant to Section 14.3 hereof to provided for a higher distribution to holders of Allowed Centennial Convenience Claims or to eliminate such Class and treat such claimants as holders of a Claim in Class 5(B). In the event that the Plan is amended to eliminate Class 6(B), votes cast to accept or reject the Plan shall be deemed votes to accept or reject Class 5(B) of the Plan and the Claims of holders that made a Centennial Convenience Class Election shall be restored to their full Allowed amount.

5.9    CLASS 7 – INSURANCE CLAIMS.

(a)    Impairment and Voting. Class 7 is impaired by the Plan and the holders of Insurance Claims do not receive or retain any property under the Plan on account thereof.  Consequently, all holders of Insurance Claims are deemed to reject the Plan.

(b)    Distributions. Each holder of an Insurance Claim shall retain all proceeds derived from any applicable Insurance Policy but shall receive no other distributions under the Plan on account of its Insurance Claim.

(c)    Non-Bankruptcy Officer Indemnification Claims.  Notwithstanding anything to the contrary contained herein, all Persons (other than Bankruptcy Officers) holding or asserting Indemnification Claims (whether directly, by subrogation or otherwise) shall be entitled, to the extent payable, to obtain recovery on account of such Claims solely from the proceeds of any applicable directors' and officers' or executive protection Insurance Policy maintained by the Debtors, as the case may be, to which they may be entitled as a named insured, and shall not, under any circumstances, be entitled to obtain a recovery in respect of such Indemnification Claims from the Debtors or Liquidating AHERF.

(d)    Insurance Policies.  The provisions of the Plan shall not diminish or impair the enforceability of any Insurance Policies that may be applicable to Insurance Claims or Recovery Actions.

(e)    Coverage Limitations.  A holder of a Claim that is identified in the Plan Supplement as an Insurance Claim that ultimately is not covered in whole or in part by insurance will be treated as an Allowed General Unsecured Claim or an Allowed Centennial Unsecured Claim, as the case may be; provided, however, that (i) such holder notifies the Chapter 11 Trustee, the Creditors' Committee or any other person or entity designated by Liquidating AHERF of such coverage limitation immediately upon discovery of the coverage limitation, (ii) Liquidating AHERF need not establish a Disputed Claim Reserve for claims identified as Insurance Claims and, (iii) distributions on behalf of Claims identified as Insurance Claims but ultimately classified as General Unsecured Claims or Centennial Unsecured Claims, as the case may be, shall be limited to amounts held in the Liquidation Expense Reserve Account.

5.10    CLASS 8 – ALLOWED MEMBERSHIP INTERESTS.

(a)    Impairment and Voting. Class 8 is unimpaired by the Plan. Consequently, each holder of a Membership Interests is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, record holders of Membership Interests shall continue to hold such membership interest until the dissolution of such Subsidiaries pursuant to Section 13.3. hereof, subject in all respects to the provisions of this Plan.

## ARTICLE 6

## LIQUIDATING AHERF; DISTRIBUTIONS AND DISPUTED CLAIMS

6.1    Purpose of Liquidating AHERF. Liquidating AHERF shall be maintained for, among other things, the purpose of liquidating and distributing the Estate Assets and resolving and administering Claims.

6.2    Transfer of Assets to Liquidating AHERF.

(a)    On the Effective Date, right, title and interest to all Estate Assets of the Estate of AHERF shall re-vest in Liquidating AHERF.

(b)    Pursuant to Article 2 hereof, on the Effective Date, the Estates of AUHS, AUMP, Centennial and AUH-East shall be deemed to assign, set over, transfer and convey to Liquidating AHERF all of their right, title, and interest in the Estate Assets. To the extent that certain Estate Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be assigned, set over, transferred or conveyed to Liquidating AHERF on the Effective Date, such Estate Assets shall be deemed assigned, set over, transferred and conveyed to Liquidating AHERF as soon as practical after the Effective Date.

(c)    On the Effective Date, the Chapter 11 Trustee shall continue as plaintiff in all Recovery Actions in which he is a party, on behalf of the Beneficiaries, and the Creditors' Committee shall continue as plaintiff in the D&O Action and the PWC Action and all other Recovery Actions in which it is a plaintiff, on behalf of the Beneficiaries. All recoveries and proceeds arising from the Recovery Actions shall be deemed assigned, set over, transferred and conveyed to Liquidating AHERF upon receipt thereof. All fees and costs of the Chapter 11 Trustee and the Creditors' Committee arising from or related to pursuing the Recovery Actions shall be Liquidation Administrative Expenses.

(d)    The transfer of the Estate Assets to Liquidating AHERF shall be made for the benefit of the Beneficiaries, in each case, only to the extent the Beneficiaries are entitled to distributions under the Plan.

6.3    Liquidation of Estate Assets; Responsibilities of Chapter 11 Trustee and Creditors' Committee.

(a)    Responsibility of Chapter 11 Trustee: The Chapter 11 Trustee shall exercise reasonable business judgment to administer the Estate Assets and to make timely distributions from Liquidating AHERF, subject in all respects to the direction of the Creditors' Committee.

(b)    Responsibility of Creditors' Committee: The Creditors' Committee shall have responsibility for and authority over all substantive and material decisions respecting the administration of Liquidating AHERF, including the timing and amount of all distributions from Liquidating AHERF and the prosecution of the Recovery Actions, including the engagement and direction of counsel, subject to the terms of the Plan and the Liquidating AHERF Bylaws.

(c)    Authority to Grant Releases:  Without limiting the generality of Section 6.3(b) hereof, in connection with the compromise and settlement of any Recovery Actions, the Creditors' Committee and the Chapter 11 Trustee (with prior consent of the Creditors' Committee), are authorized to release and discharge, to the fullest extent permitted by law, the non-Debtor parties to the Recovery Actions from all Claims and Causes of Action that the Debtors, the Creditors' Committee or the Chapter 11 Trustee has or may have whether known or unknown against such Persons. Any settlement effectuated prior to the Confirmation Date, upon notice thereof to the Bankruptcy Court, shall be deemed incorporated into the Plan and entry of the Confirmation Order including the provisions of such settlement shall be deemed a settlement pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code.

6.4    Attorney Client Privilege.  Any attorney-client privilege, work-product privilege or other privilege or immunity that the Estates, Chapter 11 Trustee or Creditors' Committee are entitled to assert in the Recovery Actions shall vest in the Chapter 11 Trustee and the Creditors' Committee (and their respective attorneys and agents) and they shall be entitled to assert such privilege and immunity to the same extent that they are entitled to do so prior to the Effective Date; provided, however, that the Confirmation Order shall provide that if the Chapter 11 Trustee (with the prior consent of the Creditors' Committee) or the Creditors' Committee determine to waive any aspect of the Estates' or their attorney-client privilege (including any other applicable privileges or other immunities from disclosure) in connection with requests for documentation and information heretofore sought or to be sought by governmental agencies or other third parties investigating and litigating matters related to the Debtors such determination shall be deemed as (i) a reasonable exercise of the Creditors' Committee's and the Chapter 11 Trustee's business judgment, as the case may be, and (ii) in the best interest of the Beneficiaries.

6.5    Payment of and Reserve for Liquidation Administrative Expenses.

(a)    Liquidation Administrative Expenses will be satisfied by Liquidating AHERF.  With the consent of the Creditors' Committee, the Chapter 11 Trustee may pay Liquidation Administrative Expenses upon receipt of an invoice therefor without the need for further Bankruptcy Court authorization or entry of a Final Order.  If the Creditors' Committee and any Person cannot agree on the amount or timing of payment of Liquidation Administrative Expenses to be paid to such Person, such amount or timing shall be determined by the Bankruptcy Court.

(b)    On the Effective Date, the Chapter 11 Trustee shall transfer all Estate Assets remaining after the initial distributions required under the Plan to the Liquidation Expense Reserve Account and thereafter, with the consent of the Creditors' Committee, transfer such amounts from the Estate Assets, and retain such amounts in the Liquidation Expense Reserve Account as are reasonably necessary to meet Liquidation Administrative Expenses, subject to the Liquidating AHERF Bylaws; provided, however, that an increase of the amount of $30 million in the Liquidation Expense Reserve Account to prosecute the Recovery Actions will require appropriate notice and a hearing.  The Liquidating AHERF Bylaws will provide, inter alia, that creditors may make reasonable requests to the Chapter 11 Trustee for information regarding the fees and expenses of the professionals prosecuting the Recovery Actions on behalf of the Creditors' Committee and the Chapter 11 Trustee.

6.6    Distributions of Estate Assets.

(a)    From time to time in accordance with the provisions of this Plan and the Liquidating AHERF Bylaws, the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall distribute to the Beneficiaries all net Cash income plus all net Cash proceeds held by Liquidating AHERF (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall retain such amounts in the Liquidation Expense Reserve Account as are reasonably necessary to meet future Liquidation Administrative Expenses, subject to the Liquidating AHERF Bylaws. The Liquidating AHERF Bylaws shall provide that upon the resolution of discrete Recovery Actions the Creditors' Committee will evaluate, upon the advice of its counsel, whether it is appropriate to reduce the amount retained in the Liquidation Expense Reserve Account. The Chapter 11 Trustee may also withhold from amounts distributable to any Person any and all amounts, determined in the Chapter 11 Trustee's and Creditors' Committee reasonable discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.  The Chapter 11 Trustee shall not be under any obligation to make any

distributions from Liquidating AHERF to the Beneficiaries unless the aggregate amount to be distributed equals or exceeds $50,000,000, unless such distribution is the last such distribution to be made under the Plan or is otherwise directed by the Creditors' Committee.

      (b)    Distributions from Liquidating AHERF pursuant to the preceding sub-paragraph shall be made to the following Persons in the following order of priority, with no payment being made unless and until all prior items have been fully satisfied.

      (i)    The first $50 million of distributions from Liquidating AHERF shall be made as follows:

FIRST, Pro Rata to holders of Series A Bondholder Secured Liquidation Participations (for purposes of clarification, MBIA/PNC shall receive 15/27.5 of each of the first dollars distributed until their Series A Bondholder Secured Liquidation Participation in the amount of $15 million is satisfied in full, and the Centennial Bondholders shall receive 12.5/27.5 of each of the first dollars distributed until their Series A Bondholder Secured Liquidation Participation in the amount of $12.5 million is satisfied in full); and

SECOND, Pro Rata to holders of Unsecured Claim Liquidation Participations; provided, however that the Chapter 11 Trustee shall transfer to the Small Payment Reserve and the Disputed Claims Reserve such amounts as are required to be reserved in accordance with Sections 6.8(b) and 6.9(a) hereof, respectively.

      (ii)    The next $50 million of distributions from Liquidating AHERF shall be made as follows:

FIRST, Pro Rata to MBIA/PNC until their Series B Bondholder Secured Liquidation Participation in the amount of $15 million is satisfied in full; and

SECOND, Pro Rata to holders of Unsecured Claim Liquidation Participations; provided, however that the Chapter 11 Trustee shall transfer to the Small Payment Reserve and the Disputed Claims Reserve such amounts as are required to be reserved in accordance with Sections 6.8(b) and 6.9(a) hereof, respectively.

      (iii)    All subsequent distributions from Liquidating AHERF shall be made as follows: (a) Holders of Series C Bondholder Secured Liquidation Participations shall receive 20% of each dollar distributed from Liquidating AHERF, to be distributed Pro Rata to such holders, until all Series C Bondholder Secured Liquidation Participations in the amount of $10 million are fully satisfied and (b) all other distributions from Liquidating AHERF shall be made Pro Rata to holders of Unsecured Claim Liquidation Participations; provided, however that the Chapter 11 Trustee shall transfer to the Small Payment Reserve and the Disputed Claims Reserve such amounts as are required to be reserved in accordance with Sections 6.8(b) and 6.9 (a) hereof, respectively.

    6.7    Excess Estate Assets. To the extent that (a) there are any Estate Assets remaining after payment, in full, of all Liquidation Administrative Expenses, Series A, B and C Bondholder Secured Liquidation Participations, and Unsecured Claim Liquidation Participations, including any applicable interest, or (b) the final distribution to holders of Unsecured Claim Liquidation Participations would aggregate less than $100,000, such excess Estate Assets shall be transferred in accordance with the Liquidating AHERF Bylaws (x) first Pro Rata to the holders of any Allowed Subordinated Claim until such Claims are fully satisfied and (y) then to such charitable purposes as the Chapter 11

Trustee, at the direction of the Creditors' Committee, in its reasonable discretion, shall determine; provided, however that such charitable purposes shall be related to providing health care for the sick, injured, disabled, indigent or infirm or promoting the general health of the public.

6.8     Method of Distributions Under the Plan.

(a)     In General.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by Liquidating AHERF (by the Chapter 11 Trustee or its disbursing agent) to the holder of each Allowed Claim shall be mailed to the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Chapter 11 Trustee has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.

(b)     Distributions of Cash.  Any payment of Cash made by Liquidating AHERF (by the Chapter 11 Trustee or its disbursing agent) pursuant to the Plan shall be made by wire transfer or check drawn on a domestic bank; provided, however, that after the occurrence of the Effective Date the Chapter 11 Trustee is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); provided, further that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was greater than or equal to ten dollars ($10) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions it would otherwise be entitled.

(c)     Timing of Distributions.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)     Fractional Cents.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of .50 or less and rounding up in the case of more than .50).

(e)     Distributions to Holders of Allowed Centennial Bondholder Claims.  Payments to be made pursuant to this Plan to holders of Allowed Centennial Bondholder Claims shall be made by the Chapter 11 Trustee to the Centennial Indenture Trustee and distributed to holders of Allowed Centennial Bondholder Claims pursuant to the terms of the Centennial Master Trust Indenture.

(f)     Distributions to Holders as of the Distribution Record Date.  As of the close of business on the Distribution Record Date, the Chapter 11 Trustee's claims register shall be closed, and the Chapter 11 Trustee shall not recognize any further changes in the record holders of any Claims.  The Chapter 11 Trustee shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those holders of record as of the close of business on the Distribution Record Date.

6.9     Reserve on Account of Disputed Claims:

(a)     Establishment and Maintenance of Reserve for Disputed Claims.  Liquidating AHERF shall maintain a reserve (the "Disputed Claims Reserve") equal to the aggregate of any distributable amounts of Cash and Unsecured Claim Liquidation Participations required to be set aside on account of Disputed Claims pursuant to Section 6.6 hereof equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or such lesser amount as required by a Final Order.  For the purposes of effectuating the provisions of this Section 6.9 and the distributions to holders of Allowed Claims, the Bankruptcy Court, on or prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set, may fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed the amounts of the Disputed

Claims for purposes of distribution under this Plan. In lieu of fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by agreement in writing by and between the Debtors and the holder of a Disputed Claim.

(b)     Distributions Upon Allowance of Disputed Claims. The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any Reserve Income earned thereon. No holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve or Liquidating AHERF with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim except for any Reserve Income earned thereon.

6.10     Reversion to Estate Assets. The following amounts shall become Estate Assets and shall be distributed pursuant to Section 6.6 of the Plan: (i) distributions under the Plan that are unclaimed for a period of one year after the date of such distribution and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or Cash Equivalents in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim plus Reserve Income related thereto.

6.11     Aggregation of Claims. Subject to Article 2 hereof, each and every Unsecured Claim filed or to be filed in any of the Chapter 11 Cases against the Estates of AHERF, AUMP, AUHS or AUH-East shall be aggregated and deemed one Claim in Class 5(A) or Class 6(A) as the case may be. Subject to Article 2 hereof, each and every Unsecured Claim filed or to be filed against the Estate of Centennial shall be aggregated and deemed one Claim in Class 5(B) or Class 6(B) as the case may be.

6.12     Subordination of Claims. The Chapter 11 Trustee and the Creditors' Committee reserve their right to move before the Bankruptcy Court, upon notice and hearing, to subordinate the payment of any Claim to the payment of all other Allowed Claims.

6.13     Investment Powers. The right and power of the Chapter 11 Trustee to invest assets transferred to, and retained by, Liquidating AHERF, the proceeds thereof or any income earned by Liquidating AHERF, shall be limited to the right and power to invest such assets in Cash Equivalents.

ARTICLE 7

PROVISIONS REGARDING IMPLEMENTATION OF PLAN

7.1     Cancellation of Existing Securities and Agreements. Except as may otherwise be provided in the Plan, including without limitation, as provided in Sections 5.3(f) and 5.4(e) of the Plan, on the occurrence of the Effective Date and the making of the initial distribution to the holders of Secured and Unsecured Claims, the promissory notes, share certificates, bonds and other instruments evidencing Claims, except as set forth in Section 9.3 hereof, against the Debtors shall be canceled without further act or action by any Person under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under any promissory notes, share certificates, bonds and other instruments evidencing any Claim shall be deemed discharged and released.

7.2     Effect of Convenience Class Election and Centennial Convenience Class Election. By voting to accept the Plan and marking the ballot in the space provided for electing such treatment, the holder of a General Unsecured Claim or Centennial Unsecured Claim, as the case may be, aggregating in excess of $1,000 or $5,000, respectively, may elect to reduce the aggregate amount of such holder's Claim to $1,000 or $5,000, respectively, and,

in such event, only receive treatment as an Allowed Convenience Claim or Allowed Centennial Convenience Claim, as the case may be, in the amount of $1,000 or $5,000, respectively, and receive the treatment provided to such holders pursuant to Sections 5.7(b) or 5.8(b) of the Plan, respectively. Such an election constitutes a waiver of the amount of the General Unsecured Claim or Centennial Unsecured Claim in excess of such amounts and the holder of such Allowed Claim shall be deemed to release the Debtors from any and all liability for such excess amounts.

       7.3    Resolution of Administrative Expense Claims, Claims and Liquidation  Administrative Expenses. Except as to applications for allowances of compensation for services rendered and reimbursement of expenses incurred on or prior to the Confirmation Date under Sections 330 and 503 of the Bankruptcy Code (with respect to which procedures respecting objections shall be governed by Section 3.2(b) hereof and the Confirmation Order or other Final Order), the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall have the right to determine the validity and amount of Administrative Expense Claims or any other Claims incurred after entry of the Confirmation Order either on behalf of Liquidating AHERF or otherwise; provided, however, that the Chapter 11 Trustee, at the direction of the Creditors' Committee, shall have the authority to compromise, settle otherwise resolve or withdraw any objection without further order of the Bankruptcy Court.

# ARTICLE 8

## PROVISIONS REGARDING VOTING

       8.1    Voting of Claims.  Subject to Sections 5.3(b) and 5.4(b) hereof, each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

       8.2    Nonconsensual Confirmation.  If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Chapter 11 Trustee reserves the right (a) to undertake to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code and (b) to amend the Plan in accordance with Section 14.3 of the Plan to the extent necessary to obtain entry of the Confirmation Order.

# ARTICLE 9

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
## BANKRUPTCY OFFICER INDEMNIFICATION
## CLAIMS; AND RETIREE BENEFITS

       9.1    Rejection of Executory Contracts and Unexpired Leases.  Any executory contracts or unexpired leases (other than Insurance Policies) which (a) have not expired by their own terms on or prior to the Confirmation Date,  (b) have not been assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (c) are not the subject of a motion to assume or reject the same which is pending at the time of the Confirmation Date, shall be deemed rejected on the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

       9.2    Rejection Damage Claims.  If the rejection of an executory contract or unexpired lease by the Debtors pursuant to Section 9.1 hereof results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, Liquidating AHERF or their respective properties or agents, successors, or assigns,

unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Chapter 11 Trustee on or before forty-five days following the Confirmation Date. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan. The Chapter 11 Trustee shall have the right to object to any rejection damage claims filed in accordance with the preceding sentence.

9.3    Certain Agreements Unaffected by the Plan and Disclosure Statement. Nothing in the Disclosure Statement or the Plan shall alter, amend or supersede (1) that certain asset purchase agreement among Tenet Healthcare Corporation, Tenet HealthSystem Philadelphia, Inc. (collectively, "Tenet"), the Debtors and Diversified Health Group (together, the "Sellers") dated September 29, 1998, and amended November 10, 1998 (the "Tenet Purchase Agreement") and any related agreements including, inter alia, the Grant Escrow Agreement dated November 10, 1998 among Tenet, Philadelphia Health Education Corporation ("PHEC"), the Sellers and Chicago Title Company, or the Agreement of Settlement of Issues Relating to Accounts Receivable, Grants and Grant Indemnification by and between the Chapter 11 Trustee and Tenet (together with the Tenet Purchase Agreement, the "Tenet Agreements") or (2) the orders dated October 1, 1998 and October 30, 1998 with respect to the Tenet Purchase Agreement, and any other orders enforcing, interpreting or pertaining to the Tenet Sale Orders, including, but not limited to, any order pertaining to rejection, assumption and assignment of contracts, cure reserves and indemnity escrow accounts (collectively, the "Tenet Sale Orders"). Nothing in the Disclosure Statement or the Plan shall alter, amend or supersede (1) that certain settlement agreement dated as of June 30, 1999 among certain of the Non-Debtor Entities, the Debtors, the Chapter 11 Trustee, the Creditors' Committee and the Healthcare Alliance for Western Pennsylvania, Inc. (the "West Penn Settlement Agreement") and any related agreements including, inter alia, that certain Pension Obligation and Release Agreement dated as of June 30, 1999 among the Pension Benefit Guaranty Corporation ("PBGC"), certain of the Non-Debtor Entities, the Chapter 11 Trustee, the Debtors, the Creditors' Committee, the Healthcare Alliance for Western Pennsylvania, Inc. and the Western Pennsylvania Health System (collectively, "West Penn") (the "PBGC Settlement Agreement") or (2) the order dated July 23, 1999 approving the West Penn Settlement Agreement and the PBGC Settlement Agreement (the "West Penn Orders").

The Tenet Agreements, the Tenet Sale Orders, the West Penn Settlement Agreement, the PBGC Settlement Agreement and the West Penn Orders shall continue to remain in full force and effect and shall govern the rights and liabilities of the Chapter 11 Trustee, the Debtors' Estates, the Creditors' Committee, Liquidating AHERF, Tenet, PHEC, Philadelphia Health Research Corporation, those Non-Debtor Entities party to the West Penn Settlement Agreement and the PBGC Settlement Agreement, West Penn and the PBGC with respect to the rights and obligations of such parties arising thereunder or related thereto, including, but not limited to, the maintenance of segregated escrow accounts with respect to the Tenet indemnity escrow and/or the cure reserves.

9.4    Retiree Benefits. Payment of any Retiree Benefits shall be continued solely to the extent, if any, and for the duration of the period the Debtors are contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtors under applicable law. The Chapter 11 Trustee is not aware of any continuing obligations to provide Retiree Benefits.

9.5    Compensation and Benefit Programs. Except as otherwise provided in the Plan, all employment and severance practices and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their directors, officers or employees, including, without limitation, all savings plans, retirement plans, health care plans, severance benefit plans, incentive plans, workers' compensation programs and life, disability and other insurance plans are treated either as executory contracts pursuant to Section 9.1 of the Plan, or as permitted under applicable non-bankruptcy law.

9.6    Bankruptcy Officers. As of the Effective Date, the Debtors and Liquidating AHERF (as successor to the Debtors) shall assume all obligations related to Indemnification Claims of Bankruptcy Officers consistent with the Bankruptcy Officer Indemnification Order.

## ARTICLE 10

### PROVISIONS REGARDING RELEASE AND DISCHARGE

10.1    Discharge.  Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors of any debt of the Debtors that arose before the Effective Date, and any debt of the Debtors of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of Claim based on such debt, obligation or equity interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim has accepted the Plan; provided, however, that the foregoing discharge shall not apply to rights of holders of Insurance Claims to nominally name the Debtors as defendants in any litigation solely to obtain a right of recovery against any applicable Insurance Policy (but not to enforce a judgment against any property of the Debtors or Liquidating AHERF).

10.2    Injunction Relating to the Plan.  As of the Effective Date, except as otherwise provided in the Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against the Debtors, their Estates or the Chapter 11 Trustee, on account of or respecting any Claims, debts, rights, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

## ARTICLE 11

### PROVISIONS REGARDING CONDITIONS PRECEDENT
### TO EFFECTIVE DATE AND EFFECTS OF CONFIRMATION

11.1    Conditions Precedent to Effectiveness.  The Plan shall not become effective unless and until the following conditions and the condition set forth in Section 11.3 hereof shall have been satisfied or waived pursuant to Section 11.2 of the Plan or Section 11.3 (as to the condition therein):

(a)    none of the material Recovery Actions shall have been settled, compromised or discontinued unless at the direction of the Creditors' Committee;

(b)    the Confirmation Order, in form and substance reasonably acceptable to the Chapter 11 Trustee and the Creditors' Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(c)    each of the Plan Documents, in form and substance reasonably acceptable to the Chapter 11 Trustee and the Creditors' Committees, shall have been effected or executed and delivered;

(d)    all actions, other documents and agreements necessary to implement the Plan shall have been effected or executed and delivered;

(e)    the Estates shall have sufficient Cash to meet all Cash funding obligations under the Plan and to make all payments required to be made on the Effective Date, including without limitation, sufficient Cash, as determined by the Creditors' Committee, to establish the Liquidation Expense Reserve Account to prosecute the Recovery Actions; provided, however, that an amount of at least $30 million shall be deemed sufficient for such purposes as of the Effective Date and the appropriate amount for such purposes thereafter shall be determined by the Creditors' Committee in accordance with the Liquidating AHERF Bylaws.

11.2    Waiver of Conditions.  Upon the written consent, which consent shall not be unreasonably withheld, of each of the Chapter 11 Trustee, MBIA, PNC, the Centennial Indenture Trustee and the Creditors' Committee, filed by the Chapter 11 Trustee with the Bankruptcy Court, one or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.1 above may be waived, except that the parties may not waive the condition that the Estates will have sufficient Cash to meet all payment and funding obligations under Articles 3 and 5 and Section 6.9 of the Plan upon the occurrence of the Effective Date.

11.3    Deadline for Effective Date.  In the event that the Effective Date has not occurred on or prior to December 15, 2000, unless such deadline is waived in writing by the Chapter 11 Trustee, the Creditors' Committee, MBIA, PNC and the Centennial Indenture Trustee, upon notification thereof submitted by the Chapter 11 Trustee to the Bankruptcy Court (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Estates and all Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and all obligations of the Estates to holders of Claims shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estates or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

11.4    Continuation of Bankruptcy Injunction or Stays.  All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

11.5    General Release of Liens.  Except as otherwise provided in the Plan, on the Effective Date and concurrently with the payments and distributions to be made on the Effective Date, all mortgages, deeds of trust, liens or other security interests against property of the Estates are hereby released and extinguished, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests will revert to Liquidating AHERF as successor of the Debtors.

11.6    Full and Final Satisfaction.  All payments and all distributions hereunder and under the Plan Documents shall be in full and final satisfaction, settlement, release and discharge of all Claims, except as otherwise provided in the Plan.

11.7    Administration Pending Effective Date.  Prior to the Effective Date, the Chapter 11 Trustee shall continue to administer the liquidation of the Estates and the Chapter 11 Trustee and the Creditors' Committee shall continue to prosecute the Recovery Actions, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules, except as provided in Section 3.2(b) hereof.

11.8    Setoffs.  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estates of any rights of setoff the Estates may have against any Person.

## ARTICLE 12

## RETENTION OF JURISDICTION

12.1    Retention of Jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction of the following specified matters arising out of, and related to, the Chapter 11 Cases, the Plan and Liquidating AHERF pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code:

(a)    to hear and determine the Recovery Actions or matters related thereunder to enable the Chapter 11 Trustee and the Creditors' Committee to prosecute the Recovery Actions;

(b)  to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims or to liquidate or estimate any Disputed Claim, provided that only the Chapter 11 Trustee, and the Creditors' Committee may file objections to Claims;

(c)  to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses, pursuant to Section 3.2(b) hereof;

(d)  to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

(e)  to enforce the provisions of the Plan subject to the terms thereof;

(f)  to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, Plan Documents or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

(g)  to determine any Claim or liability to a governmental unit, to the extent jurisdiction is proper in the Bankruptcy Court, which may be asserted as a result of the transactions contemplated herein;

(h)  to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code; and

(i)  to determine such other matters as may be provided for in the Confirmation Order.

## ARTICLE 13

## CORPORATE ACTION

13.1  Effectuating Documents and Further Transactions. Each of the Debtors, the Creditors' Committee, the Chapter 11 Trustee, and Liquidating AHERF, as the case may be, is authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.2  Corporate Action. Pursuant to 15 Pa. Con. Stat. Ann. § 5903, all terms of this Plan may be put into effect and carried out without further action by the Chapter 11 Trustee or the members, boards of trustees or directors of the Debtors, who shall be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated herein.

13.3  Dissolution of the Debtors other than AHERF. Pursuant to 15 Pa. Con. Stat. Ann. § 5903, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause the Debtors to dissolve, merge or otherwise consolidate, each pursuant to applicable state law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

13.4  Dissolution and Consolidation of Subsidiaries. The Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause the Subsidiaries to dissolve, merge or otherwise consolidate the Subsidiaries, each pursuant to applicable state law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

13.5  Dissolution of Liquidating AHERF. Pursuant to 15 Pa. Con. Stat. Ann. §5903, upon completion of all obligations under the Plan and the distribution of all Estate Assets, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, shall cause Liquidating AHERF to dissolve pursuant to applicable state law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

13.6    Dissolution or Insolvency Proceeding of AHSPIC. Pursuant to 15 Pa. Con. Stat. Ann. § 5903, the Chapter 11 Trustee, subject to prior approval of the Creditors' Committee, may cause AHSPIC to dissolve, merge or file for insolvency protection or the appointment of a receiver, pursuant to applicable law, without the need for further Bankruptcy Court authorization or entry of a Final Order.

## ARTICLE 14

## MISCELLANEOUS PROVISIONS

14.1    Exemption from Transfer Taxes. In accordance with Section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

14.2    Exculpation. Neither the Debtors, the Chapter 11 Trustee, the Creditors' Committee (including its individual members), the Bankruptcy Officers or their advisors, agents or Professionals shall have or incur any liability to any holder of a Claim or any fiduciary for such holder for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Chapter 11 Trustee, or Creditors' Committee and each of their respective members, officers, directors, employees, advisors, agents and Professionals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that nothing in the Plan shall, or shall be deemed to, release or exculpate such parties with respect to their respective obligations or covenants arising pursuant to this Plan. Notwithstanding the foregoing, and except as provided in the PBGC Settlement Agreement, nothing in this Plan shall constitute or be construed as a release or exculpation from liability for claims against non-Debtors brought by the Pension Benefit Guaranty Corporation under the Employee Retirement Income Security Act or other applicable laws that relate to fiduciary obligations to or administration of the Allegheny Health, Education and Research Foundation Retirement Account Plan, the Graduate Hospital Pension Plan, the Graduate Hospital Teamsters Plan and the Zurbrugg Memorial Hospital Retirement Income Plan.

14.3    Amendment or Modification of the Plan. Alterations, amendments or modifications of the Plan may be proposed in writing by the Chapter 11 Trustee, upon the prior written consent of the Creditors' Committee, at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11 Trustee shall have complied with Section 1125 of the Bankruptcy Code. Upon the prior written consent of the Creditors' Committee, the Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially

and adversely change the treatment of the Claim of such holder. Upon the prior written consent of the Creditors' Committee, the Chapter 11 Trustee may, without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any exhibit hereto or in any Plan Document.

14.4    Severability. If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Chapter 11 Trustee and the Creditors' Committee, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.5    Revocation or Withdrawal of the Plan. The Chapter 11 Trustee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If, until such approval, the Chapter 11 Trustee revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void upon the consent of the Creditors' Committee. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

14.6    Binding Effect. The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

14.7    Notices. All notices, requests and demands to or upon the Debtors, the Chapter 11 Trustee, or the Creditors' Committee, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| If to the Debtors, Chapter 11 Trustee or Liquidating AHERF: | If to the Creditors' Committee: |
| William J. Scharffenberger | Jones, Day, Reavis & Pogue |
| c/o Proskauer Rose LLP | North Point |
| 1585 Broadway | 901 Lakeside Avenue |
| New York, New York 10036-8299 | Cleveland, OH 44114 |
| Attn: Alan B. Hyman, Esq. | Attn: David G. Heiman, Esq. |
| tel: 212.969.3000 | tel: 216.586.7175 |
| fax: 212.962.2900 | fax: 216.579.0212 |

14.8    Continuation of Creditors' Committee. On the Effective Date, the Creditors' Committee shall, among other things, continue to act as plaintiff in the Recovery Actions, pursuant to Section 1123(3)(B) of the Bankruptcy Code, to which it is a party, and to fulfil its other obligations under the Plan, as a five member committee consisting of one representative of each of MBIA, PNC, the Centennial Indenture Trustee, Aetna US Healthcare, Inc. and Health America.

14.9    Continuation of Chapter 11 Trustee. On the Effective Date, the Chapter 11 Trustee shall, among other things, continue to act as plaintiff in the Recovery Actions, pursuant to Section 1123(3)(B) of the Bankruptcy Code, to which he is a party and to fulfill his other obligations under the Plan and shall be appointed as sole trustee and chief

liquidating officer of Liquidating AHERF, subject in all respects to the supervision of the Creditors' Committee and the provisions of this Plan.

14.10   Governing Law. Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan, including documents contained in the Plan Supplement, provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law of such jurisdiction.

14.11   Withholding and Reporting Requirements. In connection with the consummation of the Plan, the Chapter 11 Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

14.12   Plan Supplement. Forms of the Plan Documents shall be contained in the Plan Supplement. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Chapter 11 Trustee in accordance with Section 14.7 hereof. The Plan Supplement is incorporated into and made a part of the Plan as if set forth in full herein.

14.13   Post-Confirmation Fees, Final Decree. Liquidating AHERF shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C.§ 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered. A final decree shall be entered as soon as practicable after initial distributions have commenced under this Plan.

14.14   Allocation of Plan Distributions Between Principal and Interest. Unless an Allowed Claim is governed by an applicable indenture, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

14.15   Headings. Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

14.16   Filing of Additional Documents. On or before substantial consummation of the Plan, the Chapter 11 Trustee, with the prior approval of the Creditors' Committee, shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

14.17   Inconsistency. In the event of any inconsistency between the Plan and the Disclosure Statement or the Plan Documents or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

14.18   Reservation of Rights. Notwithstanding any language in the Plan or the Confirmation Order to the contrary, MBIA, PNC and the Centennial Indenture Trustee on behalf of the Centennial Bondholders reserve all of their rights and Claims against any Person or entity which is not a Debtor, the Chapter 11 Trustee, Liquidating AHERF, the Creditors' Committee or their respective Professionals and the Allowed amount of Claims hereunder shall be binding only with respect to the treatment afforded to MBIA, PNC and the Centennial Bondholders pursuant to the terms of this Plan and shall not be binding on MBIA, PNC or the Centennial Indenture Trustee on behalf of the Centennial Bondholders in connection with any Claim against any Person or entity other than the Debtors, the Chapter 11 Trustee, the Creditors' Committee, Liquidating AHERF and their Professionals. This Plan does not create, and shall not be construed as creating, any rights enforceable by any Person against MBIA, PNC, the DVOG Master Indenture Trustee, the DVOG Series Bond Indenture Trustee, the Centennial Bondholders or the Centennial Indenture Trustee other than the Debtors, the Chapter 11 Trustee, the Creditors' Committee, and Liquidating AHERF.

Dated:    Pittsburgh, Pennsylvania
          December 5, 2000

ALLEGHENY HEALTH, EDUCATION AND RESEARCH
FOUNDATION

By: _____
    WILLIAM J. SCHARFFENBERGER
    CHAPTER 11 TRUSTEE

ALLEGHENY UNIVERSITY OF THE HEALTH SCIENCES

By: _____
    WILLIAM J. SCHARFFENBERGER
    CHAPTER 11 TRUSTEE

ALLEGHENY UNIVERSITY MEDICAL PRACTICES

By: _____
    WILLIAM J. SCHARFFENBERGER
    CHAPTER 11 TRUSTEE

ALLEGHENY HOSPITALS, CENTENNIAL

By: _____
    WILLIAM J. SCHARFFENBERGER
    CHAPTER 11 TRUSTEE

ALLEGHENY UNIVERSITY HOSPITALS - EAST

By: _____
    WILLIAM J. SCHARFFENBERGER
    CHAPTER 11 TRUSTEE

31