-5-

**Cash Equivalent Vehicles**--If commercial paper is used for short-term investments, it must be of high quality, rated at least the equivalent of "A-1" or "P-1."

4.    **Prohibited Investments**

**Other Restricted Securities**--The following categories are not considered appropriate.

    Venture Capital
    Private Placements
    Unregistered or Restricted Stock
    Options and Futures, Except for Hedging
    Margin Trading
    Commodities
    Limited Partnerships
    Short Selling

CL 032081

-7-

c.   <u>Secondary Objectives - Trailing One-Year Horizon</u>

Same as the primary objectives but measured on a one-year trailing period.

\*An index constructed from a 70% weight in the S&P 500 and 30% in the Shearson Lehman Government/Corporate Intermediate Bond Index.

\*\*Those portfolios whose equity allocation represents 55% - 75% of the total assets.

CL 032082

EXHIBIT A

# Capital Markets

## Return Comparison

### 1926 - 1989

|  | Return | Risk |
|---|---|---|
| Stocks | 10.3% | 20.7% |
| Corporate Bonds | 5.1 | 8.4 |
| Long Government Bonds | 4.5 | 8.4 |
| T-Bills | 3.6 | 3.3 |
| Inflation | 3.8 | 4.8 |

CL 032083

YANNI-BILKEY Investment Consulting 2500 Grant Building • Pittsburgh, Pennsylvania 15219 • (412) 232-1000 • FAX: (412) 232-1027

EXHIBIT C

# Risk/Return Tradeoff
## Expected Five-Year Return



CL 032084

Date Prepared __ 8/20/91
Prepared by
at C & L
to Client and
Examined by __ SWS
Reviewed by
C & L SW/SP

AHERF
Invest Guidelines For Unrestricted Endowment Funds
6/30/XX

CL 032085

Attachment D

ALLEGHENY HEALTH SERVICES AND ITS AFFILIATES

STATEMENT OF INVESTMENT GUIDELINES

FOR

RESTRICTED ENDOWMENT FUNDS

DATED:  June 26, 1990

CL 032086

-1-

### INTRODUCTION

This Statement of Investment Guidelines will provide the framework for investing the Restricted Endowment Funds of Allegheny Health Services and its affiliates ("AHS"). Restricted Endowment Funds are those whereby a testator irrevocably transferred his/her right to property to a trustee. The trustee has full authority to manage and control the trust estate. The trustee does not have to consult the beneficiaries regarding investment policy.

B.   **Purpose of the Funds**

The purpose of the Funds is to provide for the continued operation of various components of the Alleghney system by providing current and future operating income. Each Deed of Trust between the testator and the Trustee stipulates that all income generated is to be paid to a specific component of AHS while the corpus of the Fund is to remain intact and managed by each respective Trustee. Such income will be generated from dividends and interest only, without inclusion of capital gains, whether realized or unrealized. The Fund's assets must be invested with care, skill, and diligence that a prudent person would exercise to comply with the objectives, the Investment Advisory Act of 1940, and all other governing statues. Both the trustee and the beneficiary agree that the primary goals in investing these Endowment Funds are to (1) produce a growing stream of income, (2) protect against inflation, and (3) insure against principal loss.

Endowment funds create unique investment problems for trustees and beneficiaries. The pressures of maintaining an acceptable income stream while increasing the corpus in excess of inflation are often conflicting goals. This document is intended to mitigate these problems by clearly stating the income policy and the principal policy, the performance objectives and the communication guidelines.

C.   **Interrelationship Between Income Policies and Asset Allocation**

In order to understand the interrelationship between income policies and principal policies, it is critical to have a clear picture of how asset classes have performed in the past and how they react to inflation in order to develop expected returns for the future.

Stocks produce limited income (lower than most endowment income policies) but have historically provided a premium return over inflation. Bonds, on the other hand, have predictable cash flows; however, if held to maturity, they offer no principal growth. Cash equivalents produce income, albeit lower than bonds, and have no principal fluctuations.

CL 032087

-3-

RECOMMENDED POLICY

A. **Statement of Income Policy**

The yearly income target consisting of interest and dividends will be 5.5% unless five-year bond yields exceed 10%. During any year where five-year bond yields average more than 10%, the income target will increase 50 basis points for each additional percent over 10%. This objective will largely be a function of the Fund's long-term target asset mix and capital market expectations.

B. **Statement of Principal Policy**

The annual principal target is to grow principal of fund assets by at least the inflation rate, as measured by the Consumer Price Index.

C. **Statement of Investment Discretion of Trustee**

Each Trustee has discretion to allocate assets and diversify holdings for the purpose of achieving target returns and managing risk exposure. Within the constraints imposed by this document, the Trustee will have total discretion to manage the Fund's assets according to its professional judgment and fiduciary obligations. Additionally, the Trustee is given broad responsibility to shift the Fund's asset commitment among industry sectors and individual securities to pursue opportunities presented by changes within the capital markets.

D. **Other Investment Guidelines and Definitions**

1. **Types of Securities**

**Equities** mean high-quality common stocks or equivalents. Specific constraints include the avoidance of extremely volatile issues, as well as issues with limited marketability.

**Fixed-Income** securities shall be represented by marketable debt issues of:

    U.S. Treasury or Agencies
    U.S. Domestic Corporations
    U.S. Domestic Banks or Other Financials
    Institutions

**Cash Equivalent** investments may be represented by any of the following:

    U.S. Treasury Bills
    U.S. Government Repurchase Agreements
    Money Market Funds
    Commercial Paper

CL 032088

-5-

4.  **Prohibited Investments**

    **Other Restricted Securities**--The following categories
    are not considered appropriate.

    > Venture Capital
    > Private Placements
    > Unregistered or Restricted Stock
    > Options and Futures, Except for Hedging
    > Margin Trading
    > Commodities
    > Limited Partnerships
    > Short Selling

CL 032089

-7-

C.  **Secondary Objectives**

Same as the primary objectives but measured on a one-year trailing period.

*An index constructed from a 50% weight in the S&P 500 and 50% in the Shearson Lehman Government/Corporate Intermediate Bond Index.

**Those portfolios whose equity allocation represents 40% - 60% of the total assets.

CL 032090

EXHIBIT A

# Capital Markets

## Return Comparison

### 1926 - 1989

|  | Return | Risk |
|---|---|---|
| Stocks | 10.3% | 20.7% |
| Corporate Bonds | 5.1 | 8.4 |
| Long Government Bonds | 4.5 | 8.4 |
| T-Bills | 3.6 | 3.3 |
| Inflation | 3.8 | 4.8 |

CL 032091

YANNI-BILKEY INVESTMENT CONSULTING 2500 Grant Building • Pittsburgh, Pennsylvania 15219 • (412) 232-1000 • FAX: (412) 232-1027

EXHIBIT C

# ALLEGHENY HEALTH SERVICES
## RESTRICTED ENDOWMENT
### VARIOUS ASSET ALLOCATION STRATEGIES



INCOME GROWTH



PRINCIPAL GROWTH

ASSUMPTIONS: BEGINING VALUE = $55 MILLION
ALL INCOME IS WITHDRAWN FROM THE FUND
HISTORIC RETURNS FROM 1946 - 1989

CL 032092

Date Prepared  8/20/96
Prepared by
a) C & L
b) Client and    SwJS
Examined by
Reviewed by
C & L SWGP

AHERF
Invest Guidelines For Restricted Endowment Funds
6/30/xx

CL 032093

Attachment H

ALLEGHENY HEALTH SERVICES AND ITS AFFILIATES

STATEMENT OF INVESTMENT GUIDELINES

FOR

RESEARCH ENDOWMENT FUNDS

DATED:  June 26, 1990

CL 032094

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Definition of Research Endowment Funds . . . . . . . 1

    B.   Purpose of the Funds . . . . . . . . . . . . . . . . 1

    C.   Interrelationship Between Income Policies and
        Asset Allocation . . . . . . . . . . . . . . . . . 1

RECOMMENDED POLICY. . . . . . . . . . . . . . . . . . . . . 3

    A.   Statement of Income Policy . . . . . . . . . . . . 3

    B.   Statement of Asset Allocation Policy with respect
        to Principal . . . . . . . . . . . . . . . . . . . 3

    C.   Statement of Investment Discretion of Trustee. . . . 3

    D.   Other Guidelines and Definitions . . . . . . . . . . 3

        1.  Types of Securities. . . . . . . . . . . . . . 3

        2.  Diversification. . . . . . . . . . . . . . . . 4

        3.  Quality. . . . . . . . . . . . . . . . . . . . 4

        4.  Prohibited Investments . . . . . . . . . . . . 5

PERFORMANCE OBJECTIVES. . . . . . . . . . . . . . . . . . . 6

    A.   Time Horizon . . . . . . . . . . . . . . . . . . . 6

    B.   Primary Objectives-Trailing Three-Year Time Horizon. 6

    C.   Secondary Objectives - Trailing One-Year Horizon . . 7

COMMUNICATIONS. . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Statements, Reports, and Meetings. . . . . . . . . . 8

    B.   Primary Contacts . . . . . . . . . . . . . . . . . 8

    C.   Dynamic Nature of Policy . . . . . . . . . . . . . 8

CL 032095

-1-

INTRODUCTION

This Statement of Investment Guidelines will provide the
framework for investing the Endowment Funds of Allegheny Singer
Research Institute, the primary free-standing research entity
within the system.   The Endowment Funds for research are those
whereby a testator irrevocably transferred his/her right to
property to a trustee to support research or those which were es-
tablished by the Board at the request of the testator to support
general research or some specific area of research.

B.    Purpose of the Funds

      The purpose of the Funds is to provide for the continued
      operation of and enhancement of the research activities
      funded by ASRI.   The Fund's assets must be invested with
      care, skill, and diligence that a prudent person would exer-
      cise to comply with the objectives, the Investment Advisory
      Act of 1940, and all other governing statues.   Both the
      trustee and the beneficiary agree that the primary goals in
      investing these Endowment Funds are to (1) produce a growing
      stream of income, (2) protect against inflation, and (3) in-
      sure against principal loss.   In the case of the irrevocable
      trusts of ASRI, the trustee has the full authority to manage
      and control the trust estate and does not have to consult
      with the beneficiary regarding the policy.

      Endowment funds create unique investment problems for
      trustees and beneficiaries.   The pressures of maintaining an
      acceptable income stream while increasing the corpus in ex-
      cess of inflation are often conflicting goals.   This docu-
      ment is intended to mitigate these problems by clearly stat-
      ing the income policy and the principal policy, the perfor-
      mance objectives and the communication guidelines.

C.    Interrelationship Between Income Policies and Asset
      Allocation

      In order to understand the interrelationship between income
      policies and principal policies, it is critical to have a
      clear picture of how asset classes have performed in the
      past and how they react to inflation in order to develop ex-
      pected returns for the future.

      Stocks produce limited income (lower than most endowment in-
      come policies) but have historically provided a premium
      return over inflation. Bonds, on the other hand, have pre-
      dictable cash flows; however, if held to maturity, they of-
      fer no principal growth.   Cash equivalents produce income,
      albeit lower than bonds, and have no principal fluctuations.

CL 032096

-2-

Exhibit A details the historical returns and risk (volatility) of the asset classes for the past 63 years. Stocks have been, over time, the best performing asset class. However, they have also been the most volatile. Thus, a tradeoff emerges. Exhibit B demonstrates that over long horizons, stocks outperform other classes. Yet, over short time periods, stocks may provide negative returns, thereby creating substantial declines in value. Bonds, on the other hand, have provided historically lower returns, but offer a more consistent cash flow and pattern of returns.

The dilemma, both historically and in the future, is to combine these asset classes in a way that accomplishes the conflicting goals of generating high income while growing principal and maintaining minimal exposure to loss.

In Exhibit C the interrelationship of asset mix, yield and growth of principal is simulated. By simulating specific asset structures over differing market conditions, one can see, firsthand, the investment implications of various levels of yield requirements. The end result of this exercise is the recommendation of a target allocation designed to maximize return and meet income requirements, while maintaining the minimum risk levels the Funds will assume.

From the analysis, it appears that the following long-term asset mix levels are appropriate:

| Section | Target | Range |
|---|---|---|
| Equity | 50% | 40% to 60% |
| Fixed Income | 50% | 40% to 60% |
| Cash | 0% | 0% to 20% |

Rationale for the recommendation includes:

1. A long-term income policy in the 5% to 6% area is reasonable, assuming a 50% equity commitment.

2. The recommended target mix allows the Fund to pay out 5.5% of the total return while growing the principal at approximately the historic inflation (CPI) rate.

CL 032097

-3-

RECOMMENDED POLICY

**A.  Statement of Income Policy**

The yearly income target consisting of interest and dividends will be 5.5% unless five-year bond yields exceed 10%.  During any year where five-year bond yields average more than 10%, the income target will increase 50 basis points for each additional percent over 10%.  This objective will largely be a function of the Fund's long-term target asset mix and capital market expectations.

**B.  Statement of Principal Policy**

The annual principal target is to grow principal of fund assets by at least the inflation rate, as measured by the Consumer Price Index.

**C.  Statement of Investment Discretion of Trustee**

Each Trustee has discretion to allocate assets and diversify holdings for the purpose of achieving target returns and managing risk exposure.  Within the constraints imposed by this document, the Trustee will have total discretion to manage the Fund's assets according to its professional judgment and fiduciary obligations.  Additionally, the Trustee is given broad responsibility to shift the Fund's asset commitment among industry sectors and individual securities to pursue opportunities presented by changes within the capital markets.

**D.  Other Investment Guidelines and Definitions**

   **1.  Types of Securities**

      **Equities** mean high-quality common stocks or equivalents.

      **Fixed-Income** securities shall be represented by marketable debt issues of:

         U.S. Treasury or Agencies
         U.S. Domestic Corporations
         U.S. Domestic Banks or Other Financials Institutions

      **Cash Equivalent** investments may be represented by any of the following:

         U.S. Treasury Bills
         U.S. Government Repurchase Agreements
         Money Market Funds
         Commercial Paper

CL 032098

-4-

2.  **Diversification**

   **Equity Issues**--The investment manager should diversify
   the equity section in an attempt to minimize the impact
   of substantial loss in any specific industry or issue.
   Therefore, no more than 5% of the equity section may be
   invested in any one company, valued at cost, and no
   more than 20% of the equity section may be invested in
   any one industry, valued at market.  In addition, no
   more than 10% of the equity section may be invested in
   any one company, valued at market.

   **Fixed-Income Securities**--The investment manager should
   also diversify the fixed-income section of the Fund
   within the quality and maturity guidelines, outlined in
   the next section, in an attempt to minimize the adverse
   effects of interest rate fluctuations.  Therefore, ex-
   cept for U.S. Treasury and Agency obligations, the
   fixed-income section may not contain more than 10%,
   valued at cost, of a given domestic issuer, regardless
   of the number of differing issues.

3.  **Quality**

   **Equity Issues**--There are no qualitative guidelines sug-
   gested with regard to equity ratings, rankings, etc.,
   except that prudent standards should be developed and
   maintained by the investment manager.  Convertible
   bonds will be considered as an equity investment and
   must be rated "Baa"/"BBB" or better by a recognized
   rating service (i.e. Moody's or Standard & Poor's).

   **Fixed-Income Securities**--Bonds held in the portfolio
   must be rated investment grade ("Baa") or equivalent by
   the rating services.  This guideline is intended to
   give the investment manager(s) sufficient latitude to
   periodically take advantage of yield spreads among
   various sectors.   The average par-weighted quality
   shall be no less than 3.0 based on the following scale:

   | | |
   |---|---|
   | U.S. Government and Agencies | 5.0 |
   | Aaa Bonds | 4.0 |
   | Aa Bonds | 3.0 |
   | A Bonds | 2.0 |
   | Baa Bonds | 1.0 |

   The maturities of the bonds held in the portfolio are
   at the discretion of the investment manager.  However,
   expected risk and return will be measured relative to
   the Shearson Lehman Government/Corporate Intermediate
   Bond Index.

   **Cash Equivalent Vehicles**--If commercial paper is used
   for short-term investments, it must be of high quality,
   rated at least the equivalent of "A-1" or "P-1."

CL 032099

-5-

4.    **Prohibited Investments**

**Other Restricted Securities**--The following categories
are not considered appropriate.

> Venture Capital
> Private Placements
> Unregistered or Restricted Stock
> Options and Futures, Except for Hedging
> Margin Trading
> Commodities
> Limited Partnerships
> Short Selling

CL 032100

-6-

## PERFORMANCE OBJECTIVES

Investment objectives are intended to provide quantifiable benchmarks against which the progress toward long-range invest- ment goals can be measured.   Primary and secondary objectives have been established.

Primary objectives are those which should be attained if the as- sets are to be considered well-invested.   Well-invested implies that, within the framework of this investment policy, the assets are generating returns sufficient to indicate long-range goals will be met.

Secondary objectives are measured over a shorter time span than primary objectives.   Secondary objectives can serve as an early indication of the progress toward meeting the more fundamental and more important primary objectives.

A.   Time Horizon

Progress toward stated goals will be measured regularly; however, the Trustee may require a market cycle (three to five years) to fully implement its management style.

B.   Primary Objectives -- Trailing Three-Year Time Horizon

- Total return requirements (annualized):

| Section | Benchmark | Expectation |
|---|---|---|
| Total Fund | Target Index* | Exceed by 75 basis points |
| Equity | S&P 500 Stock Index | Exceed by 100 basis points |
| Fixed Income | Shearson Lehman Gov't./Corp. Intermediate Bond Index | Exceed by 25 basis points |

- Relative to other professionally managed accounts in the Yanni-Bilkey GRID Universe:

| Section | Y-B GRID Universe | Expectation |
|---|---|---|
| Total Fund | Balanced Core Equity** | Top 50% |
| Equity | " " " | Top 50% |
| Fixed Income | " " " | Top 50% |

CL 032101

-7-

C.    <u>Secondary Objectives</u>

Same as the primary objectives but measured on a one-year trailing period.

*An index constructed from a 50% weight in the S&P 500 and 50% in the Shearson Lehman Government/Corporate Intermediate Bond Index.

**Those portfolios whose equity allocation represents 40% - 60% of the total assets.

CL 032102

-8-

## COMMUNICATIONS

AHS considers the ongoing process of understanding the Trustee's strategy and actions of primary importance. Each Trustee should maintain complete, open, and timely communications with Allegheny Health Foundation ("AHF"), the investment subsidiary of the system, at all times.

A.    Statements, Reports, and Meetings

The Trustee/Custodian of the Fund is expected to:

1. Provide monthly statements of portfolio transactions and invested positions, by cost and market.

Mellon Bank as the Investment Manager of the majority of these funds is expected to:

2. Attend a Board meeting annually to review investment activity and results. This appraisal should indicate the current portfolio strategy, as well as commentary on the outlook for the economy and capital markets.

3. Meet with Management at least semiannually to discuss investment strategies.

The Consultant is expected to provide a quarterly review of investment activity and results presented in light of the appropriate standards set forth in this Statement of Investment Guidelines. All investment results will be reported net of all fees.

B.    Primary Contacts

**Allegheny Health Foundation**

      Kathleen S. Wright

**Yanni-Bilkey Investment Consulting**

      Terry Bilkey

**Mellon Bank**

      Barbara Robinson

C.    Dynamic Nature of Policy

It is understood that all parties have an obligation to report new trends or philosophies in investment management of Endowment Funds so that excellence in investment management will be maintained.

KSW/jmk
ENYBRSH\DOC
Draft 5 - 6/21/90

CL 032103

EXHIBIT A

# Capital Markets

## Return Comparison

### 1926 - 1989

| | Return | Risk |
|---|---|---|
| Stocks | 10.3% | 20.7% |
| Corporate Bonds | 5.1 | 8.4 |
| Long Government Bonds | 4.5 | 8.4 |
| T-Bills | 3.6 | 3.3 |
| Inflation | 3.8 | 4.8 |

YANNI-BILKEY 2300 Grant Building • Pittsburgh, Pennsylvania 15219 • (412) 232-1000 • FAX: (412) 232-1027

CL 032104

EXHIBIT C

# ALLEGHENY HEALTH SERVICES
## RESEARCH ENDOWMENT
## VARIOUS ASSET ALLOCATION STRATEGIES

- INCOME GROWTH



PRINCIPAL GROWTH



ASSUMPTIONS: BEGINING VALUE = $ 4 MILLION
ALL INCOME IS WITHDRAWN FROM THE FUND
HISTORIC RETURNS FROM 1946 – 1989

CL 032105

Date Prepared 8/20/91
Prepared by
at C & L
in Client and
Examined by SWS
Reviewed by
C & L DH/SJF

*AHERF*

*Invest Guidelines For Research Endowment Funds*

6/30/XX

CL 032106

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
CORPORATE FINANCE MANUAL
TREASURY

| POLICY: | POLICY NUMBER:  D-3 |
|---|---|
| Endowment Matching Distributions From Allegheny Health, Education and Research Foundation | PAGE 1 of 2 |
| | ORIGINAL ISSUE DATE: June 3, 1993 |
| | DATE OF LAST REVIEW: |
| APPROVED: *David W McConnell* | DATE OF LAST REVISION: |

## STATEMENT OF POLICY:

Allegheny Health, Education and Research Foundation (*AHERF*) receives numerous requests throughout its fiscal year for matching endowment funds from various endowments throughout the AHERF system. These endowments have been created to further the goals, missions and reputation of AHERF. As such, the AHERF Policy on Endowment Matching Distributions (the *Policy*) has been developed to assure endowments within the AHERF corporate structure of resources to be used in supplementing the assets of the endowment. This will serve to enhance and encourage the endowment efforts. The endowments within AHERF may receive a matching distribution as described below.

## DEFINITIONS:

AHERF presently has endowment investment portfolios from which it generates or receives investment income. The income of many of these endowments has no legally imposed restrictions on its use. This particular aggregated income flow will provide the monies from which AHERF will provide a matching distribution. Investment income is defined as the money received as a result of it being invested in various financial instruments having associated interest or dividend payment streams. For this purpose, investment income does not include any realized or unrealized changes in value of the principal of any endowment investments from fluctuations in market values. Since financial market conditions vary over time as a result of numerous factors, the aggregated investment income available for distribution will vary over time.

CL 032107

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
CORPORATE FINANCE MANUAL
TREASURY

| | |
|---|---|
| POLICY NUMBER: D-3 | |
| PAGE 2 of 2 | |

**PROCEDURES:**

AHERF will make a match from the aggregate earned income generated during the prior twelve months which coincides with the prior fiscal year of AHERF. The amount of income that will be released will be no more than fifty percent (50.0%) of the total earned during the prior period. The remaining fifty percent (50.0%) of total income will be returned to the AHERF - *Unrestricted Income Endowment* for reinvestment in principal. This will work over time towards assisting in the continuing growth of these endowment assets.

Any properly established AHERF endowment with pre-existing funding of $250,000 may petition for a matching distribution. The request must be in writing and state the requesting endowment, the endowment's mission, the desired AHERF match and the endowment's use for any matching funds. The request must be received in writing by the Chief Executive Officer of AHERF (*AHERF CEO*) from the Chief Executive Officer of the various operating units (*Operating Unit CEOs*) of AHERF or appropriate designated staff. If no requests are received during a fiscal year, all of the appropriate unrestricted income earned within the fiscal year will be returned to the *AHERF - Unrestricted Income Endowment* for reinvestment in its principal.

Requests for matching funds must be received prior to April first of any year. Distributions will occur within sixty (60) days after the conclusion of the AHERF fiscal year. Matching fund requests will be handled on a first come, first served basis. A maximum of $1.0 million per endowment will be matched by AHERF.

**RESPONSIBILITIES:**

With written notice from the AHERF CEO, the AHERF Chief Financial Officer (*AHERF CFO*) will bear oversight responsibilities for the matching distributions. Distributions to the designated endowment accounts will be effected by the AHERF Treasury Department upon appropriate written notification from the AHERF CFO. Responsibility for the record keeping associated with any approved distributions resides with the AHERF Corporate Accounting Department and the regional operating unit or endowment fund receiving a distribution.

MPM:ams
POLICYD3

CL 032108

Date Prepared ____ 8/20/93
Prepared by
  at C&L
  to Client and
  Examined by ____ SWS
Reviewed by
  C&L SVMP ____

AHERF

AHERF Endowment Matching Policy

6/30/XX

CL 032109

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
CORPORATE FINANCE MANUAL
TREASURY

| POLICY: | POLICY NUMBER:  D-4 |
|---|---|
| Income Distributions From The Allegheny Health, Education and Research Foundation Charitable Care Endowment Fund | PAGE 1 of 2 |
| | ORIGINAL ISSUE DATE: June 3, 1993 |
| | DATE OF LAST REVIEW: |
| APPROVED: *David W McConnell* | DATE OF LAST REVISION: |

## STATEMENT OF POLICY:

The Allegheny Health, Education and Research Foundation (*AHERF*) Charitable Care Endowment Fund (the *Fund*) was established to assure operating entities within the AHERF corporate structure of resources for use in the providing of indigent healthcare services. The various entities within AHERF may receive support for indigent care, as described below, from the distribution of investment income earned over a twelve month period by the Fund.

## DEFINITIONS:

Investment income is defined as the money received from the Fund's principal as a result of its being invested in various financial instruments. For this purpose, investment income (does) not include any realized or unrealized changes in value of the principal of the Fund resulting from fluctuations in market values. Distributions from the Fund will be made to the extent income is available.

## PROCEDURES:

The Fund will pay out its earned income from the prior twelve months which coincides with the prior fiscal year of AHERF. The amount of income that will be released by the Fund will naturally vary over time. From July 1, 1990, through July 1, 1995, sixteen percent (16.0%) of the Fund's income will be available for distribution on a cumulative annual basis up to a maximum of eighty percent (80.0%). The remaining undistributed income for these periods will be reinvested in the Fund as principal. Subsequent to July 1, 1995, eighty percent

*— of what earned inc*    *32%/*

CL 032110

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
CORPORATE FINANCE MANUAL
TREASURY

POLICY NUMBER:  D-4

_____

PAGE 2 of 2

_____

(80.0%) of the earned income from the prior fiscal year will be available for distribution.  The remaining undistributed income will be reinvested as principal.

Any AHERF operating entity providing free or reduced rate indigent care may request a distribution from the Fund.  The request must be in writing and state the total free care and charges foregone due to reduced rate care provided by the entity in the prior fiscal year along with the desired distribution.  The request must be received in writing by the Chief Executive Officer of AHERF (*AHERF CEO*) from the Chief Executive Officer of the various operating units of AHERF (*Operating Unit CEOs*) within ninety (90) days of fiscal year end.  If no requests are received, all income earned by the Fund within the fiscal year will be reinvested as principal.

**RESPONSIBILITIES:**

The Chief Financial Officer of AHERF (*AHERF CFO*) will be responsible for overseeing the process for the distribution of funds.  Operating Unit CEOs or appropriate designated staff will be responsible for requesting the actual distributions.  Distributions to the operating entities will be effected by the AHERF Treasury Department upon appropriate written notification from the AHERF CFO.  Responsibility for the record keeping associated with any approved distributions resides with the AHERF Corporate Accounting Department and the accounting departments of any regional entity requesting and receiving a distribution.  In situations where total requests are in excess of the amount available for distribution from the Fund, each requesting entity will receive a sum based on their proportion of the total requested by all entities applied against the total dollars available for distribution from the Fund for the present fiscal year.  Under no circumstances, may an entity request or receive a distribution that reduces its level of free care and charges foregone due to reduced rate indigent care to a point that jeopardizes its tax exempt status pursuant to applicable state and federal law.

MPM:ams
POLICYD4

CL 032111

Date Prepared  8/20/97
Prepared by
  a) C & L
  b) Client and
    Examined by  SCWS

Reviewed by
  C & L MVRP

AHERF

Charitable Care Income Dist Policy

6/30/XX

CL 032112

AHERF
Investment Agreement         6/11/95
6/20/95                       WIP

This WIP Represents the Investment Agreement between AHSI And Norgan
Stanley for the Funded Depreciation Account.

CL 032113

9



**ALLEGHENY HEALTH SERVICES INC.**

320 East North Avenue
Pittsburgh, Pennsylvania 15212-9986
412-359-3001

November 29, 1988

Mr. Michael Crowe
Morgan Stanley Asset Management, Inc.
1251 Avenue of the Americas
New York, NY  10020

Dear Mike:

Enclosed please find the following:

- Two executed copies of the Management Agreement with Attachments A and B
- A certified copy of a resolution of Allegheny Health Foundation appointing the Chicago Group/Morgan Stanley Asset Management, Inc
- W-9 Form, Part 1

As we discussed, funding will occur in the first quarter of 1989 and I will contact you at a later date to confirm the exact timing and any requirements you may have.

Please accept my apology for the delay in sending this information to you.  We look forward to our relationship with The Chicago Group.  Please feel free to contact me if I can be of further assistance.

Sincerely,

Joyce L. Oelach
Manager of Treasury Operations

attachments

cc:  Kathleen Wright

JLD/pw
11291/JLD

CL 032114

VHA.

## MORGAN STANLEY & CO.
*INCORPORATED*

**Part 1**

Substitute Form W-9 Payer's Request for Taxpayer Identification Number.

| Account Number | Taxpayer Identification Number | Enter Taxpayer Identification Number Only if Incorrect or Missing |
|---|---|---|
| | 25-1505742 | |

Allegheny Health Foundation

320 E. North Avenue

Pittsburgh          PA      15212

**Part 2**

**Backup Withholding On Accounts Opened After 12/31/83**

Check the box if you are subject to backup withhold-ing under the provisions of section 3406(a)(1)(C) of the Internal Revenue Code .... ►☐

(See **Highlight** in Instructions)

**Certification.** — Under the penalties of perjury, I certify that the information provided on this form is true, correct, and complete.

Signature *David W. McConnell*          David W. McConnell   Date
                                        President & COO



CL 032115

Dear Customer:

Under the Federal income tax law, we are required to withhold 20% of dividends, interest and gross proceeds from sales of securities on any account that does not have a valid taxpayer identification number.

For accounts opened after January 1, 1984, a valid taxpayer identification number is considered to have been provided if the customer has certified, under penalties of perjury, that the number provided to us is correct. The required certification, Form W-9, is enclosed for this purpose.

Part 1 of the Form W-9 enclosed reflects information we currently have on file. If it is correct, please sign the form and return it to us in the postage-prepaid envelope provided. If the information is incorrect or incomplete, please correct or complete it, sign the form and return it to us in the postage-prepaid envelope provided. A response is required in Part 2 of Form W-9 ONLY if you have been notified by the Internal Revenue Service that you are subject to backup withholding due to underreporting interest or dividends on your income tax returns.

Backup withholding is not an additional tax. Rather, the tax liability of persons subject to backup withholding will be reduced by the amount of the tax withheld. If withholding results in an overpayment of taxes, a refund may be obtained when you file your income tax return.

In order to prevent unnecessary withholding of tax, please **Return This Form Immediately.**

Should you have any questions concerning the completion of this form, please contact your investment representative.





CL 032116

CERTIFIED COPY OF RESOLUTION

This is to certify that the following is a complete, true and correct copy of a Resolution of the Board of Directors of Allegheny Health Foundation, a Pennsylvania not-for-profit corporation, duly adopted by Unanimous Consent on the 4th day of August, 1988.

### Appointment of Funded Depreciation Equity Manager

RESOLVED, That the Board of Directors of Allegheny Health Foundation appoints the Chicago Group/Morgan Stanley Asset Management, Inc. as an Investment Manager for the Funded Depreciation Assets pursuant to the Statement of Investment Guidelines for Funded Depreciation Assets as adopted by the Board on April 18, 1988, and instructs management to take whatever steps are necessary to implement this decision.

IN WITNESS WHEREOF, the Assistant Secretary of the corporation has hereunder set her hand and affixed the seal of said corporation this 15th day of August, 1988.

Mary S. Sammond
Assistant Secretary

/amf

CL 032117

**DISCRETIONARY**

November 16,    , 19 88

MORGAN STANLEY ASSET MANAGEMENT INC.
1251 Avenue of the Americas
New York, New York 10020

Dear Sirs:

The Undersigned ("Client") hereby authorizes you to act as Client's agent and attorney-in-fact to manage Client's securities held in the account or accounts described in the exhibit hereto (the "Portfolio") in such manner as you may deem advisable and, with full authority and at your discretion, on Client's *in accor-* behalf and at Client's risk, to purchase, sell and trade in, or write options on, securities of such type, in such *dance wit* amounts, at such prices, and in such manner, as you may deem advisable, and without prior notice to *the guide* Client. In this Agreement the term "securities" shall include stocks, bonds, debentures, notes, other *lines set* evidences of indebtedness, puts and calls, contracts for future delivery or sale of any security, subscription *forth in* rights, partnership interests, or any other instrument of any kind in the nature of a security, whether *Attachmen·* represented by trust, participating or other certificates or otherwise. You will reinvest any income from the *A,* Portfolio unless otherwise instructed by the Client. *Dan*

You will furnish Client with a complete valuation of the Portfolio every three months and a confirmation of trade or a debit/credit advice promptly after completion of any portfolio transaction for which you placed the order. Client will cause you to be notified promptly of any other changes in the Portfolio.

Subject to any other written instructions of Client, you are appointed Client's agent and attorney-in-fact in your discretion to vote or convert any securities in the Portfolio; to execute proxies, waivers, consents and other instruments with respect to such securities; to endorse, transfer or deliver such securities and to participate in or consent to any plan of reorganization, merger, combination, consolidation, liquidation or similar plan with reference to such securities; and you shall not incur any liability to Client by reason of any exercise of, or failure to exercise, any such discretion.

You will receive an investment management fee, payable at the end of each quarter for the preceding three months, to be computed as follows:

|  |  |  |
|---|---|---|
| On the first $ 1.0 million | 1.00% | |
| On the next  9.0 million | 0.75 | |
| On the next 20.0 million | 0.50 | |
| On the next 30.0 million | 0.375 | |
| Thereafter | 0.300 | *Dan* |

In addition, Client will be responsible for brokerage commissions, taxes and any other transaction-related fees, and Client authorizes you to incur and pay such expenses for its account. It is understood that your policy with respect to allocation of brokerage and brokerage commissions is set forth in Part II of your Form ADV, the receipt of a copy of which is hereby acknowledged. Client also acknowledges receipt of, and confirms having read and understood, your letter delivered today setting forth various procedures and understandings relating to Client's account with you and agrees that your services hereunder shall be subject to such procedures and understandings. If Client's account is subject to Section 11(a) of the Securities Exchange Act of 1934 and Rule 11a2-2(T) thereunder (or any similar rule which may be adopted in the future), it is agreed that, unless otherwise instructed by Client in writing, Morgan Stanley & Co. Incorporated may retain commissions in connection with effecting any securities transactions for the Portfolio and you shall furnish Client at least annually a statement setting forth the total amount (or an estimate thereof) of all compensation retained by any person associated with you in connection with effecting securities transactions for the Portfolio during the period covered by the statement, which amount shall exclude all amounts paid to other persons during that period for services rendered in effecting such transactions.

CL 032118

If Client is a group or entity comprised of more than one individual, Client has provided you with a certificate of its Secretary or other appropriate person setting forth the names and specimen signatures of all the individuals (the "Authorized Persons") who are authorized to act on behalf of Client with respect to the Portfolio, and, promptly after any change therein, Client will send you a revised list of Authorized Persons and evidence of the authority for such change. The one or more individuals executing this Agreement for Client are Authorized Persons. You shall not be liable and shall be fully protected in relying upon any notice, instruction or other communication that you reasonably believe (based on the most recent certificate of Client received by you) to have been given by an Authorized Person.

(See Attachment B)

You shall not assign this Agreement without Client's consent, and, if Client is an individual, the powers conferred upon you hereunder shall not be affected by the subsequent disability or incompetence of Client. The services provided for herein shall continue in full force and effect until terminated in writing by one of the parties hereto or, if Client is an individual, until you receive what you deem to be reliable notice of the death of Client. Upon termination the fee described above will be prorated, and any trade executed but not settled prior to such termination will be honored.

The authority with respect to the securities in the Portfolio granted herein to buy and sell securities shall not be impaired or affected by the fact that you may be buying or selling under similar discretionary authority from others.

This Agreement shall be governed by and construed in accordance with the laws of the State of ~~New York~~ Pennsylvania.

Very truly yours,

Signed: _David W. McConnell_ ........................

D....: : David W. McConnell
Signed:..President and COO........................
        Allegheny Health Foundation
Address:320 E. North Avenue........................
        Pittsburgh, PA  15212

Agreed and accepted:

MORGAN STANLEY ASSET MANAGEMENT INC.

By........................................................

Date:................................, 19

CL 032119

ATTACHMENT A

**THE CHICAGO GROUP
OF
MORGAN STANLEY**

Attachment                                          (excerpts from March 21, 1988
Pool C                                              Policy Document)

<u>EXECUTIVE SUMMARY</u>

The statement of investment objectives and guidelines will provide the framework for invest-
ing Allegheny Health Services Inc.'s Funded Depreciation Assets.  The document includes a
statement of (1) long-term goals, (2) asset mix strategy, (3) guidelines for security selection,
(4) measurable objectives, and (5) ongoing communications among the respective parties
involved in the investment program.

<u>Long-Term Goals</u>

In a broad sense, the long-term goals are to invest the assets in a diversified program of
domestic stocks, bonds, and cash equivalent investments, while maintaining sufficient liquidity
to meet projected withdrawals without invading principal.

<u>Asset Mix Strategy</u>

The asset mix strategy is designed to achieve the highest possible total return within strict
risk parameters.  Three separate pools, ranging from low principal risk to moderate risk, are
specified to meet short- and long-term needs.

<u>Guidelines for Security Selection</u>

To provide for a well diversified, high quality investment program, the document establishes
investment guidelines.  For example, no more than 5% at cost of the equity section of any
portfolio may be invested in securities of one company.  Fixed-income guidelines are set at
10%, except for U.S. Treasury and Agency obligations.  To further ensure high quality fixed-
income investments, the average par-weighted quality of each portfolio shall be no less than
3.5 based on a scale which assigns the numbers 1 through 5 to bonds based on quality
ratings.

<u>Measurable Objectives</u>

To assess the value added of active management, specific measurable objectives are set for
each manager.  These objectives measure performance relative to (a) appropriate market
indices, (b) inflation, (c) other professionally managed portfolios, and (d) special goals which
are unique to each manager's investment style.

<u>Ongoing Communication</u>

As part of the ongoing communication and control of the investment program, the document
defines the role of the sponsor, the investment manager, and the performance measurement
consultant.  Ongoing reports and analyses will be provided to ensure that assets are
prudently invested and that a basis is established for any ongoing changes.

CL 032120

## I.    INTRODUCTION

Experience has shown that the most common and costly error of a fund sponsor is the failure to communicate return expectations, risk tolerances, time horizons, and liquidity needs to his investment managers.

It is critical for Allegheny Health Services Inc. (AHSI) to document these investment preferences.    Only through this exercise can AHSI adequately interpret investment activity and results.

The purpose of this document is threefold.    First, it will constitute the plan for investing the Funded Depreciation Assets.  Second, it will serve as a communication tool between AHSI and its investment managers.  Third, these guidelines will provide a framework to measure the ongoing progress of the assets.

### A.    Sources of Information

Sources of information for this document include:    (1) review of historical investment strategies developed by AHSI (2) an analysis of the internal financial statement projections for the next five to ten years, and (3) Butcher Consulting Group's (BCG) experience and philosophy in developing a written statement of investment guidelines.

### B.    Pertinent Fund Information

The assets that make up the Funded Depreciation Account have been invested by Mellon Bank in an extended cash management portfolio with maturities less than three years.  Short maturity guidelines for investing these assets were developed in October, 1986, pending further analysis as to the most efficient asset mix among stocks, bonds, and short investments.

## II.    GOALS

The long-term goals of these assets are to:

1.    Provide sufficient liquidity to meet unanticipated withdrawals, and

2.    Maintain a diversified portfolio mix of stocks, bonds, and cash equivalent investments which (a) satisfies the constraints imposed by this document, and (b) is structured to produce the stated return/risk targets.

Within the constraints imposed by this document, the managers will have total discretion to manage the fund's assets according to their professional judgment and fiduciary obligations.

1

CL 032121

III.    **RECOMMENDED POLICY**

Historical performance results and future expectations suggest that common stocks will provide higher total investment returns than fixed-income securities over a long-term investment horizon. However, one can expect an increase in portfolio volatility as the stock percentage is increased.

A.    **Liquidity Needs**

Projected net cash flows, i.e. inflows less capital expenditures, are expected to be positive through 1992. The following projections will be updated on a yearly basis to ensure that the investment advisors are aware of any changes in AHSI's plans.

| Fiscal | Projected Net Cash Flows |
|--------|--------------------------|
| 1988   | $5 million               |
| '89    | 5 million                |
| '90    | 5 million                |
| '91    | 5 million                |
| '92    | 5 million                |

B.    **Asset Mix Strategy**

To ensure that assets need not be sold at principal loss, three separate pools-- based upon exposure to market losses--are established.

Pool A, composed of limited maturity fixed-income investments, will serve as the liquidity pool. The investment advisor for this pool will be responsible for meeting all projected and unexpected expenditures. Pool A will be seeded with sufficient assets to comfortably meet any unanticipated outflows. The maximum maturity holding in this pool will be three years, at the time of purchase. Finally, on a periodic basis, assets may be transferred from the other pools to meet future years' projected outflows.

Pool B, a fixed-income fund with limits on bond maturity, will have an intermediate (0 to 10 years) focus. The intermediate orientation will allow the portfolio to maintain a current yield while seeking a total return in excess of inflation.

Pool C, an equity fund, will focus on generating growth for AHSI. This pool will have fewer constraints than the others and the investment manager will be expected to achieve returns commensurate with the relaxed constraints.

CL 032122

C.   Asset Allocation Guidelines

Based on the investment goals and risk tolerances stated in this document, the following asset mix strategies are appropriate.   The investment manager has discretion to move away from the target allocations; however, this deviation from the target should be an expression of the manager's confidence or concern for the capital markets.   Investments should not exceed the minimum and/or maximum levels (at market value) without written or verbal permission of AHSI.

| Pool | Target Asset Mix | Range of Manager Discretion |
|------|------------------|-----------------------------|
| C | 100% equity | 50% to 100% equity |
| | 0% cash equivalents | 0% to 50% cash equivalents |

D.   Time Horizon

Progress toward stated goals will be measured regularly; however, the sponsor recognizes that the investment manager may require a period up to three months to fully implement his investment strategies.

E.   Investment Guidelines and Definitions

1.   Types of Securities

Equities mean high quality common stocks or equivalents (i.e. ADR's, convertible bonds, etc.).   Specific constraints include the avoidance of extremely volatile issues, as well as issues with limited marketability.

2.   Diversification

Equity Sections -- The investment manager should diversify his Equity Section in an attempt to minimize the impact of substantial loss in any specific industry or issue.   Therefore, no more than 5% of the Equity Section may be invested in any one company (valued at cost), and no more than 20% of the Equity Section may be invested in any one industry (valued at market).   In addition, no more than 10% of the Equity Section may be invested in any one company (at market).

3.   Quality

Equity Sections -- There are no qualitative guidelines suggested with regard to equity ratings, rankings, etc., except that prudent standards should be developed and maintained by the investment manager.   Convertible bonds will be considered as an equity investment and must be rated "Baa"/"BBB" or better by a recognized rating service (i.e. Moody's or Standard & Poor's).

CL 032123

3

Prohibited Investments -- The following categories of securities are not considered appropriate at the present time.

- Private Placements
- Unregistered or Restricted Stock
- Options and Futures, Except for Hedging
- Margin Trading
- Commodities

Tobacco-related issues may be restricted from purchase. The investment manager should discuss these potential purchases with AHSI prior to taking such positions.

IV.    OBJECTIVES

Investment objectives are intended to provide quantifiable benchmarks to measure and evaluate portfolio return and risk. The following objectives apply to the portfolio managed by The Chicago Group and will be measured over a three-year time horizon.

A.    Return Requirements

- Relative to appropriate indices:

| Section | Index | Expectation |
|---|---|---|
| Total Fund | S&P 500 | Exceed Index by 1.0 percentage points (net of fees) |

- Relative to other professionally managed accounts:

| Section | G.R.I.D. Universe | Expectation |
|---|---|---|
| Total Fund | Equity Universe* | Top 40% |

- Other return requirements:

| Section | Benchmark | Expectation |
|---|---|---|
| Total Fund | CPI | Exceed the CPI +5 percentage points |

---

*Those funds consisting of equity and cash equivalent securities only.

4

CL 032124

ATTACHMENT B

Morgan Stanley Asset Management
One Financial Place
440 S. LaSalle Street
Chicago, IL  60605

Gentlemen:

Following is a list of authorized signatures for the account of
the _____ Allegheny Health Foundation _____

David W. McConnell
(Name)

*David W. McConnell*
(Signature)

Kathleen S. Wright
(Name)

*K.S. Wright*
(Signature)

_____
(Name)

_____
(Signature)

_____
(Name)

_____
(Signature)

_____
(Name)

_____
(Signature)

Very truly yours,    CL 032125

*David W. McConnell*

David W. McConnell
President & COO
Allegheny Health Foundation

**EXHIBIT  4090**

## A Consistent Methodology for Determining the Bad Debt Reserve should be Established to Improve Management's Ability to Monitor Bad Debt

Systemwide, AHERF had $40 million of accounts receivable older than 180 days at June 30, 1995 (primarily in the Delaware Valley). During our audit, we noted that the methodology used to calculate the bad debt allowance was inconsistent between several AHERF hospitals. The inconsistencies in the methodologies were especially prevalent in the Delaware Valley where the reserve percentages were significantly lower than those at AGH. The variations between entities appear to cause difficulties in analyzing the bad debt allowance which could possibly result in an inadequate reserve in future years.

**Recommendation:**

Due to the magnitude of old accounts, we recommend that management establish a system wide methodology for calculating the bad debt allowance using aging percentages by payor based on actual historical data. In addition, an allowance review should be conducted on a periodic basis in order to ensure assumptions used have not changed as a result of changes in each provider's environment. Through the establishment of a consistent methodology and periodic review management will be better able to analyze the bad debt allowances in the future.



EXHIBIT
4090
11|14|03   WH

JD-CL-DISK-0293
Mlc_bd.sam-1

**EXHIBIT  4109**



**AHERF**
**06/30/1996**

**Working Paper Name:**       Classification Testing
**Working Paper Reference:**  0063-206
**Working Paper Type [J]:**   OLE

**Allegheny Health, Education & Research Foundation**
**Analysis of Endowments**
**June 30, 1996**

**Completed**

**Completed By:**      Marc A. Panucci      **Date:**  09/12/1996 04:15:43 PM
**Last Modified By:**  Marc A. Panucci      **Date:**  10/20/1996 03:46:05 PM
                       Marc A. Panucci               10/20/1996 03:46:05 PM

**Modification History:**
   Marc A. Panucci



PLAINTIFF'S
EXHIBIT
4109
11|18    B6

Allegheny Health, Education & Research Foundation
Analysis of Endowments
June 30, 1996

Endowments - Permanently Restricted (account #2003000)

| Cost Center | Trust # | Description | | Market Value | | Unrealized Gain/(Loss) 30-Jun-95 | | 30-Jun-96 | | Book Value | | Realized Gain/(Loss) 30-Jun-95 | | 30-Jun-96 | | Contribution | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 66330040 | 500-007 | J.M. Lockhart | B | $61,021,775.53 | E, 63-207 | $6,717,440.72 | F, 2 | $2,733,578.96 | | $51,570,755.85 | CL | $45,747,387.00 | E | $5,095,768.85 | G, 2 | $727,600.00 | E |
| 66330410 | 500-017 | J.M. Lockhart | A | 10,075,488.88 | E, 63-207 | 1,103,412.54 | F | 284,125.67 | | 8,687,950.67 | CL | 6,676,162.00 | E | 1,011,788.67 | G | 1,000,000.00 | E |
| 66330240 | 500-022 | J.M. Lockhart | A | 9,400,163.35 | E, 63-207 | 1,045,815.35 | F | 407,308.81 | | 7,947,039.19 | CL | 5,310,062.00 | E | 790,977.19 | G | 1,846,000.00 | E |
| 66330440 | 510-000 | E.A. Oliver | B | 675,932.36 | E, 63-207 | 32,981.19 | F, 2 | 50,660.28 | | 592,290.89 | CL | 289,898.00 | E | 42,392.89 | G, 2 | 260,000.00 | E |
| 66330340 | 505-208 | Lewis A. Park | A | 6,131,713.89 | E, 63-207 | 678,044.64 | F | 275,431.06 | | 5,178,238.19 | CL | 3,121,231.54 | E | 503,535.19 | G | 1,553,471.46 | E |
| | | | | $87,305,074.01 F | 1 | $9,577,694.44 F | | $3,751,104.78 F | | $73,976,274.79 F | | $61,144,740.54 F | | $7,444,462.79 F | | $5,387,071.46 F | |

A  C&L reviwed the endowment agreements and noted the principal was permanently restricted and the income was unrestricted. C&L noted part of the income was kept as temporary restricted. The client has made the adjustment, see below.

B  C&L reviewed the endowments and noted there were general income restrictions on the items. Management took the current income as unrestricted, since the amount would have been expensed in the current year and any income from the prior years was kept as temporary restricted. The reason was management was being conservative and could not take the approach the entire amount has been expensed. C&L agrees with this treatment.

C  C&L agreed the amounts to the endowment agreements without exception.

D  C&L noted the original contribution was not recorded on the endowment, therefore AHERF had to estimate the original contribution. The estimation was based on approx. 30% of the AGH endowment portfolio was the original contribution, therefore 30% of the fund was placed in as permanently restricted. C&L recalculated the amount as follows:

Total Endowment Portfolio at book value:
(5,159,470 x 30% = 1,547,841)
Amount Rec.     1,553,471

E  C&L agreed the amounts to the Mellon Bank Reconciliation of Assets Accrued.