The transaction enabled GHS to pay off $5,609,325 in lease and sublease obligations to the Quakertown General Authority. 17th and South Parking Corp. retired all of its long term debt when it paid off a $3,891,976 loan from the Philadelphia Authority for Industrial Development (PAID). To a lesser degree, Graduate Hospital reduced its long term debt by paying off the remaining $349,998 on a note to the University of Pennsylvania.

The lease was classified as an operating lease. We understand the lessee's incremental borrowing rate assumption approximated 11%. Graduate Hospital recorded a gain on this transaction of $5,949,178. This gain, recorded as deferred revenue, is being amortized into other operating revenue notably over 17 years (the initial term of the lease). We have requested D & T's analysis of this transaction and the operating vs. capital lease accounting treatment analysis. To date this has not been received. GHS has not been able to locate the operating vs. capital lease calculations. **Given the significance of this complicated transaction and its potential impact on debt covenants, we recommend that a formal review of the proper accounting treatment be undertaken.**

The Osteopathic Acquisition

On July 13, 1993, GHS acquired City Avenue Hospital and Parkview Hospital, affiliates of the Philadelphia College of Osteopathic Medicine (PCOM). This transaction was effective July 1, 1993. Pursuant to the acquisition agreement dated March 17, 1993, the newly formed entity, GHS Osteopathic, Inc. paid $18.9 million in cash, assumed liabilities of approximately $29 million, and issued three non-interest bearing subordinated notes to PCOM.

The following is a summary of the transaction:

| | |
|---|---|
| Cash portion | $ 18,900,000 |
| Cash flow note | 12,000,000 |
| Short term note | 2,100,000 |
| Short term note | 4,200,000 |

CL 039136

The $12 million cash flow note is subordinated to all other debt including capital leases. Minimum annual payments begin at the end of the sixth fiscal year. According to the acquisition agreement, the payments will be the greater of: a) $125,000 or b) 100% of the cash flow of the acquired hospitals for the preceding fiscal year or $500,000 whichever is less. For the purposes of this note, "cash flow" means: revenue less a) expenses before depreciation, amortization and inter-affiliate payables; and b) principal payments on all other long term debt.

The discounted value of the $12 million cash flow note net of payments appears on Parkview/City Avenue's balance sheet. The present value calculation assumed a discount rate of 6% and minimum payments of $500,000. The entire unpaid principal balance of this note is due and payable July 13, 2023.

The note for $2.1 million represented prepaid rent due to PCOM. The first installment of $850,000 was paid in December 1993. The remainder was paid in 1994. It appears that the rent was related to an operating lease for Parkview's medical office building. Along with capital leases, GHS Osteopathic also assumed the operating lease obligations of the two hospitals.

The note for $4.2 million was intended to cover unpaid expenses and was paid at closing.

CL 039137

## II. PHYSICIAN PRACTICE TRANSACTIONS

Founders Health Care, Inc. ("FHC") and related entities (Founders Medical Group ("FMG") P.C., FMG Central PA, P.C., FMG NJ, P.C., and FMG Delaware, P.A.) have acquired various physician practices since 1994. Attached as Exhibit A is a schedule of practices acquired, the related purchase price, cash paid at closing and the payment dates for promissory notes delivered as part of the transactions.

Note Guarantees

GHS guaranteed the following FHC notes due to physicians groups:

- Burlington County Internal Medicine Associates;
- Callowhill Medical Associates;
- Cinnaminson Pediatrics;
- Fleetwood Medical Associates;
- Grossman & Levine Associates; and
- Mt. Laurel Family Physicians.

**Given the SDN transaction, SDN's legal counsel should assess the impact of the transaction on the above loans' guarantee status.**

GHS also guaranteed the following lease and note from FHC:

- Copelco Capital Inc. - Equipment lease (multiple items) to FHC guaranteed by GHS commencing in February 1996 for a term of 60 months at $5,845 per month; and

- CoreStates, Inc. - Loan to FHC guaranteed up to $4 million by GHS dated March 1995. Under this agreement, GHS must maintain its corporate existence and shall

Page 4

CL 039138

not dissolve or otherwise dispose of all, or substantially all of its assets, or consolidate with, or merge into another corporation.  GHS must also maintain at all times investments with a fair market value of not less than $10 million.  **Given the SDN transaction, SDN's legal counsel should assess whether there has been a default under this loan.**

Due Diligence/Valuations

There were no individual due diligence reports for the FHC physician practice acquisitions. Information obtained during the FHC's diligence process was included in the valuation information.  **No significant due diligence issues were identified in the FHC valuation information.**

We analyzed the valuation methodologies employed by FHC in its determination of the fair market value of the physician practice acquisitions.  In addition, we attempted to reconcile specific revenue, compensation, and synergistic assumptions inherent in the valuations to a board approved business plan.  As part of this process, we attempted to identify areas which do not appear to comply with regulatory guidelines.

The IRS indicates that the valuation of a business interest is generally based on the determination of the entity's Business Enterprise Value ("BEV").   BEV is defined as invested capital which is equivalent to the fair market value of the equity plus interest bearing debt.

In determining the BEV the IRS' CPE Manual states:

"A valuation appraisal should include all recognized approaches for estimating BEV, including the market approach, cost approach, and income approach.  The income approach is generally employed in IDS (integrated delivery system) cases, because it includes the excess earnings method described in Rev. Rule 68-609, 1968-2 C.B. 327, and approved for the valuation of intangible assets acquired by exempt organizations in

Page 5

CL 039139

Rev. Rule 76-91, 1976-1 C.B. 149.   Valuation analysts generally favor the income approach in appraising physician practices...

While BEV may appropriately be measured using the income approach, it is important to note that the approach (which includes a number of different methodologies) frequently depends on assumptions made about future events; information upon which the assumptions are based is under the control of the parties - who may not be dealing at arm's-length and is often difficult to verify.  Different assumptions can result in different values.  Thus, the factual assumptions upon which such valuation is based should be reviewed carefully to ensure that they are realistic."

Each approach utilizes various methods depending on the situation.  The Discounted Cash Flow (Income) Approach is based on the generally accepted principle that the fair market value of an entity may be measured by the present value of its future cash flows.  This approach is preferred by the IRS for physician practice valuations.   The Market Approach is based on either transactions involving similar entities or similar operational characteristics.   The Underlying Asset Approach requires the determination of the aggregate fair market value of the assets and liabilities of the entity.  Under this approach, stockholder's equity is adjusted to fair market value.

We analyzed twenty-nine valuation reports prepared internally by FHC and related financial information and made inquiries with management.  Our observations are:

- The historical financial and operational detail included in the valuations differed by practice.   While many (i.e. Theodore Bear, G.P., Ltd.) practices included historical financial statements, five year projections and various valuation methodologies others were limited to brief description of the practice's historical operational statistics;

---

CL 039140

- **In general, the valuation methodologies (where present) were not consistent with IRS guidelines and approaches.** For those with a completed valuation analysis, the following methodologies were performed:

  ** FHC presented a market approach based on a goodwill estimate. Practice gross revenues were multiplied by a weighted multiple and averaged. This methodology is problematic in that there was no underlying support for the determination of the multiples;

  ** The second valuation methodology is based on a discounted cash flow (DCF) approach of adjusted weighted net cash flows. The net cash flows were then averaged. Inconsistencies inherent in the model include: 1) The present value of cash flows is based on three year historical "normalized cash flows" instead of reasonable projections (the IRS has established a five year projection period) and excluded a residual value estimate; 2) By using Medical Group Management Association data to adjust historical physician compensation, cash flows and therefore value were not based on actual physician compensation to be paid by FHC, and 3) cash flows appear to be based on adjusted *pre-tax* income; and

  ** The third valuation approach is an attempt at the IRS' CPE Manual's underlying asset approach. The approach presents the net value of practice assets which included equipment and furnishings, medical and office supplies and existing patient charts and records.

- **Contrary to the IRS' recommended valuation guidelines, the practice valuations were internally prepared as compared to having them prepared by an independent third party.**

During our analysis, we were unable to identify specific assumptions (i.e. revenue, operations and synergies) utilized in the valuations as to the anticipated future course of action to be taken.

Page 7

CL 039141

Furthermore, without appropriate assumptions, we were not able to correlate management's commitment to the general assumptions included in the *revised* October, 1995 Business Plan. Although the existing FHC Business Plan may effectively be utilized by its board of directors in the exercise of its fiduciary responsibility, it could not be used to evaluate FHC's decision to purchase a practice and evaluate the performance of the acquisitions at appropriate future intervals. The IRS has announced that it views the existence of a detailed business plan in general, and in a situation such as physician practice acquisitions to be an important part of the hospital's decision making process. It is for this reason, in addition to the potential for abuse in the lack of detailed assumptions, that the IRS has placed emphasis on detailed assumptions being included in an overall business plan to explain how the expansion is expected to occur.

In conclusion, if the IRS were to audit the practice acquisitions, it may be necessary to reperform the valuations utilizing methodologies recommended by the IRS. Additionally, the supporting assumptions for the valuation conclusions would need to be documented.

CL 039142

### III. FINANCIAL REPORTING

Audited financial statements and the related workpapers for the following entities have been made available for the periods indicated:

| Entity | Fiscal Year Ending | Auditor |
|---|---|---|
| The Graduate Hospital | 06/30/96<br>06/30/95<br>06/30/94 | Deloitte & Touche<br>("D&T") |
| Mt. Sinai Hospital | 06/30/96<br>06/30/95<br>06/30/94 | Deloitte & Touche |
| Parkview Hospital/<br>City Avenue Hospital | 06/30/96 (*)<br>06/30/95<br>06/30/94 | Deloitte & Touche |
| Zurbrugg Memorial Hospital | 12/31/95<br>12/31/94<br>12/31/93 | Ernst & Young<br>("E&Y") |

(*) The financial statements and all workpapers related to the fiscal year ending June 30, 1996 for the Parkview/City Avenue hospitals were not complete for certain audit areas as a result of open audit adjustments that were not yet finalized at the time of issuance of this report.

This section contains a summary of significant observations noted in our analysis of the financial statements and the respective external auditors workpapers:

---

CL 039143

**The Graduate Hospital**

Unapplied Patient Accounts Receivable Cash Account:

The workpapers for both fiscal 1995 and 1994 indicated that there is a general cushion in the unapplied cash account of approximately $300,000. This amount was not highlighted in the 1996 workpapers. However, based on our analysis of the workpapers, we did note that amounts within this unapplied cash account are allocated to each payor based on a weighted average approach using gross accounts receivable outstanding at month end as the factor in determining the weighted average. The amounts are not allocated to each payor based on known collections. **The balance in this account at June 30, 1996 was approximately $996,000 of unapplied credits.**

Bad Debt Reserve and other Patient Accounts Receivable:

D&T performs three approaches to the bad debt reserve analysis for patient accounts receivable at each entity. The income statement methods (i.e. historical write-off and historical provision) have generally indicated that the overall reserve is insufficient. However, the balance sheet method which assigns collection percentages by payor has been comparable to Graduate Hospital's methodology of applying reserve percentages by payor. Graduate Hospital has historically assigned reserve percentages from 65% to 100% of accounts greater than 180 days for all payors. D&T's analysis resulted in proposed adjustments for additional reserves, e.g. $683,000 in fiscal 1995. However, the 1996 analysis indicated that Graduate Hospital's methodology, which is consistent with previous years, was approximately $1 million greater than the D&T balance sheet analysis. No adjustment was proposed by D&T to reduce the reserve. Furthermore, it should be noted that during fiscal 1996, Graduate Hospital's provision was not sufficient to cover current year write-offs. This, supported by improved aging of the accounts, indicates that an increase in the reserve was not considered necessary for future write-offs.

CL 039144

Lastly, we noted that several of the affiliates within the Graduate Health System participate in a capitated fee arrangement with Wise Choice. Documentation throughout the workpapers indicates that management receives reimbursement at approximately 15% of established rates. **Based on our analysis of the other liabilities area, we noted that under the Wise Choice arrangement, Graduate Hospital recorded a liability of approximately $335,000 related to an overpayment received for patient referrals outside of the network which are not covered by the program.**

Assets Limited or Restricted As to Use:

As noted in our analysis of each years' workpapers, Graduate Hospital includes in this category an investment with Omega Healthcare Investors which is in the form of a note receivable with a fixed interest rate of 7%. It appears the carrying value of the receivable has been concluded to approximate fair value for disclosure purposes. Also noted in our analysis of the 1996 financial statements and workpapers was the sale transaction of Greater Atlantic by Graduate Health System to Health Systems International, Inc. **As a result of the Greater Atlantic/Health Systems transaction, the Graduate Hospital received a $10 million lump sum payment as a guarantee payment to provide service for the subscribers of the health plan in the future. The payment has been invested in various investment security vehicles and has been included as a component of the Assets Limited or Restricted as to Use Board Designated Funds at June 30, 1996.**

Inventory:

Graduate Hospital maintains inventory annual policies and procedures. It was noted in the workpapers that no inventory of the operating room had been conducted internally or externally. This area has not historically carried material book to physical adjustments. Though not a material area, (i.e., balance of approximately $462,000 at June 30, 1996), the assets have not been properly captured in the annual inventory process established by the Graduate Hospital's established policies and procedures.

Page 11

CL 039145

**Research Grants Observations:**

In fiscal 1995, Graduate Hospital received approximately $2,900,000 in research grants from the Department of Health and Human Services ("DHHS"). **Management concluded that reporting under the requirements of OMB Circular A-133 were not applicable.** This conclusion was reached based upon the specific exclusion clause for hospital organizations from the definition of a not-for-profit organization contained in the circular. However, it appears that there is a contractual affiliation relationship with the University of Pennsylvania since Graduate Hospital's separation. **This relationship and resulting reporting requirements, should be further analyzed based upon the clarification of an affiliation issued by DHHS in the March 1, 1991 Federal Register.** D&T has concurred with management's conclusions and have not issued a report on Graduate Hospital's compliance in accordance with OMB Circular A-133. **It should be further noted, based on the revised requirements of OMB Circular A-133 which were issued in the April 30, 1996 Federal Register, entities which are defined as hospital organizations that receive a minimum of $300,000 of federally funded dollars, excluding Medicare and Medicaid programs, will now be required to comply with the provisions by providing an organizational-wide audit.**

Also, for grant funding, Graduate Hospital defers recognition until the cash is received. All expenses are accumulated on the balance sheet as a grant receivable and recognized as revenue and expense when the funds are received. This treatment should only result in a gross-up of the income statement accounts with no impact on excess of revenues and gains over expenses. At June 30, 1995, there was approximately $824,000 in the ending receivable. Reference to this accounting treatment was not made in the 1996 workpapers, however, the balance in the ending receivable was approximately $531,000.

In our analysis of other liabilities, we noted that during fiscal 1996 a National Institutes of Health (NIH) dispute arose. NIH, a significant federal government funding source to the Graduate Hospital has raised questions related to the treatment of FICA costs for reimbursement. Currently, the Graduate Hospital is appealing NIH's proposed settlement. However, at June 30,

CL 039146

1996 an accrual exists for $470,000 of the approximate $800,000 of questioned costs. No further details of the makeup of the questioned costs, NIH's position or detail on management's estimates of the amount were noted based on our analysis of the workpapers. We were advised that, subsequent to June 30, 1996, a reserve for the entire amount of questioned costs was established.

Physician Loans and other Physician Transactions:

At Graduate Hospital, there are loans to physicians with a balance of $3,380,000. There is a general reserve against these loans of $2,300,000. The following table summarizes these loans:

| Physician | Balance at 10/31/96 | Explanation |
|---|---|---|
| Horace MacVaugh | $ 300,000 | Physician in bankruptcy with little collateral |
| Charles Wolferth | $1,259,000 | Loan for surgery/practice development. Physician no longer making payments. However, Graduate Hospital is transferring funds from the surgery endowment fund to make payments on the loan. |
| Thomas Sedlacek | $1,821,000 | Loan for gynecology practice development. Physician no longer making payments. Settlement negotiations are in progress. Graduate Hospital's management believes but is not certain, that funds advanced to this practice were included in the practice's income. |

To date no tax Form 1099s have been issued in connection with these loans. **Additionally, SDN's legal counsel should investigate the appropriateness of utilizing surgery endowment funds to make payments on the Wolferth loan.**

---

Page 13

CL 039147

For the June 30, 1995 and 1996 audits, D & T indicated that loans to physicians represented a riskier audit area due to the weak payment histories of the accounts. D&T proposed adjustments to increase the reserves on the loans to the entire outstanding balances in both fiscal years. It also recommended improving the controls over the accounts. This should be a continuing area of focus due to the tax ramifications to the physicians of writing off the loans.

Additionally, it should be noted that Graduate Hospital has various receivables with physicians for rental income for practice offices. At June 30, 1996, approximately $371,000 of the outstanding receivable is greater than 90 days old with no reserve assigned to the balances. D&T did not propose an adjustment for the aged accounts, however, a recommendation was made to management to consider establishing such reserves for accounts greater than 90 days old. Also included in the amount receivable for rental income was approximately $157,000 to be received from Founders Health Care, a related party.

Property and Equipment:

During 1994, Graduate Hospital engaged Valuation Counselors to perform a property and equipment inventory. The study indicated that certain assets had been over depreciated in prior years resulting in $4,400,000 of excess accumulated depreciation. This was viewed as an opportunity by Graduate Hospital to improve recordkeeping over the fixed asset system. As a result, $4.0 million of the $4.4 million general reserves were utilized in fiscal 1994 for the following:

CL 039148

| | |
|---|---|
| Reclassification to CRA's for depreciation errors in filed cost reports | $2.0 million |
| Write-off of reconciling differences between the fixed asset detail and the results of the inventory | 1.3 million |
| Reduction to current year depreciation | .6 million |
| Valuation Counselors fees | .06 million |
| Other | .04 million |
| Total | $4.00 million |

A general depreciation reserve remained at June 30, 1995 in the amount of $400,000. The workpapers for fiscal 1996 did not address the issue. Additionally, the property and equipment inventory resulted in approximately $9.2 million of fully depreciated assets being removed from the fixed asset subsidiary ledger since the items either were not located or were no longer in service.

D&T recommended that Graduate Hospital consider obtaining a new property accounting system. The existing system did not provide management with adequate tools to utilize property subledger information. Graduate Hospital management agreed with the recommendation and it was going to evaluate various systems. During fiscal 1996, various systems were evaluated and a system from Best was chosen. However, given the transaction with SDN, Graduate Hospital is awaiting a decision as to whether to convert to the Best system or to SDN's system.

CL 039149

Due from Affiliates:

The $53.9 million balance at June 30, 1996 principally consists of a $50 million receivable from Graduate Health System. The remainder of this balance represents various other transactions with the foundation and other members within Graduate Health System offset by a reserve of $5.5 million. It should be noted that an analysis of the collectibility is performed at the parent level and that as a result of the analysis during fiscal 1996, approximately $2 million of the reserve was reversed to income. **Furthermore, it should be noted that a receivable of approximately $766,000 from Bala Imaging, of which $242,000 is included in Due from Affiliates, is included in the June 30, 1996 financial statements. Our analysis of D&T workpapers indicates that the collectibility of this receivable has been guaranteed by Health Systems International, Inc. and Graduate Health System.** It is unclear in the workpapers if the guarantee is for the full amount outstanding or if it excludes the $242,000 included in the Due from Affiliates financial statement classification.

Patient Accounting System:

The patient accounting system provides a one day time lag between the transfer of accounts from discharged not final billed and final billed status. As a result, management continues to assess an estimated contractual allowance for those accounts included in the lag account at the end of each month until the amounts net at the time of transfer to final billed status.

Benefit Programs:

As indicated in the notes of the financial statements, Graduate Hospital terminated its noncontributory defined benefit pension plan in 1992. An adjustment continues to be recorded for the current expense related to the unfunded obligation which is recorded in the financial statements. D&T's actuarial analysis of the unfunded obligation made a recommendation to increase the discount rate used in determining the obligation from 6.75% to 7.50%. They further recommended that the rate of return on plan assets be decreased from 9% to 8%. It is unclear

Page 16

CL 039150

based on our analysis of the workpapers and the disclosure included in the Notes of the financial statements as to management's conclusions on the assumptions used.

Deferred Revenue Observations:

As disclosed in the notes of the financial statements, deferred revenue consists principally of the deferred gain on the sale-leaseback transaction with Omega Healthcare Investors discussed in Section 1 of this report and the unamortized portion of deferred revenue received from the sale of Greater Atlantic Health Services as discussed earlier in this section of the report. Based on our analysis of the documentation included in D&T's workpapers, the amount is being amortized over 10 years into income. Note 13 of the financial statements does not provide for a definitive time frame. Such amortization should be monitored based on expected patient levels and the requirements of the sale agreement.

CRA Observations:

Based on our analysis of the D&T workpapers, little to no adjustments were suggested as a result of their procedures in this area. We did note however, that D&T believes that there may be exposure related to the "72 Hour Rule". Additionally, it was noted that D&T does not agree with management's treatment of recording a contingent gain related to a 1991 Medicare appeal. Offsetting these amounts, the workpapers did indicate that there are potential favorable adjustments related to the 1995 filed cost report for IME and DSH. In summary, though there are variances in the individual assessment of the open cost reporting years, in the aggregate, D&T did not propose an adjustment to the recorded amounts.

Due to the various factors discussed in Note 19 of the financial statements, Graduate Hospital has recorded a liability of approximately $2.8 million related to Independence Blue Cross's Prudent Buyer clause. **At the time of our analysis of D&T's workpapers, the analysis of Prudent Buyer exposure had not been finalized. No Prudent Buyer obligations had been recorded for the 1995 or 1994 fiscal years.**

Page 17

CL 039151

Unrecorded Liabilities:

No adjustments were identified as a result of D&T's search for unrecorded liabilities.

Mt. Sinai Hospital

Assets Limited or Restricted as to Use:

As described in the Graduate Hospital section of this report, Mt. Sinai Hospital received approximately $883,000 from the sale transaction involving Greater Atlantic Health Services during fiscal 1996.

CRA:

In prior years, an adjustment was proposed by D&T to CRA for $150,000 of cushion. It was unclear, however, which payor or year this cushion related to. An adjustment was not recorded. In fiscal 1996, no mention was made of this cushion.

Outpatient Ancillary Charges:

Outpatient ancillary charges are included in accounts receivable at gross charges due to the overall immateriality of the amounts. The growth in these charges should be monitored by management to ensure that this methodology is appropriate. It should be noted that all other charges are netted at the time of billing.

HDS and SMS System Interface:

D&T noted that as a result of inaccurate links between the HDS and SMS systems, several procedures were inaccurately billed resulting, in some cases, in lost revenue. It was recommended that the controls over the HDS/SMS interface could be enhanced through

CL 039152

implementation of basic review and monitoring procedures such as: review of data prior to transmission to SMS for reasonableness; daily review of the exception reports produced by SMS which lists errors; and for procedures which were not billed, a monthly recommendation of the Rev3 report to the HDS printouts and a monthly analytical review of the revenue by each department head to assess the consistency of the revenue with the level of activity within the department.

Mt. Sinai Hospital management indicated that the Finance Department performs an analysis of data parity between HDS and SMS on a monthly basis for ancillary departments to test revenue produced.

Bad Debt Reserve:

During fiscal 1995, Mt. Sinai management reversed approximately $680,000 of bad debt reserves. The results of their balance sheet analysis indicated that the excess reserves were not necessary. Consequently, fiscal 1995 operating results were increased due to the reversal of this excess reserve. During fiscal 1996 procedures, D&T concluded that the reserves were understated and proposed an adjustment to increase the reserves by $500,000 and reduce excess CRA reserves. This adjustment was made and resulted in no net impact to the 1996 operating results.

D&T also indicated that Mt. Sinai management continues to record reserves necessary for patient receivable bad debts using general reserve percentages. It was recommended that this methodology be revaluated and to provide for specific reserves by payor type. This recommendation was based in part on the shift taking place in the health care industry towards outpatient services and the new implementation of Mt. Sinai's Partial Program. By determining specific reserves, a more reflective allowance would be determined and it would help identify any significant uncollectible accounts and unfavorable trends in third-party payments or billing errors.

CL 039153

Mt. Sinai management indicated that it now tests general reserves used for accounts receivable utilizing the analytical review process developed by D&T and updated by Mt. Sinai. Adjustments to the general reserves, if needed, are done on a monthly basis.

Joint Venture Interest:

Mt. Sinai has a 50% equity interest in MSH/US Regional Occupational Sport Medicine, Inc. which began operations in January 1995. Mt. Sinai has approximately $200,000 invested in the joint venture consisting of equity contributions and a demand note receivable. It does not appear that the operating losses from this venture are properly recorded under the equity method of accounting. However, these amounts were immaterial in fiscal 1995 (approximately $13,000). Management should continue to monitor these results in the event they become more material in future years.

Unrecorded Liabilities:

No adjustments were identified as a result of D&T's search for unrecorded liabilities.

Parkview Hospital/City Avenue Hospital

Cash:

**At June 30, 1996 and 1995, approximately $6.6 million and $2.4 million, respectively of negative cash was reclassified as accounts payable.**

Bad Debt Reserve and Other Patient Accounts Receivable:

As indicated in the Graduate Hospital section of this report, D&T evaluates the adequacy of the allowance for uncollectible accounts based on a three method approach. No adjustments were

CL 039154

identified in this area based on the procedures. It was noted that during fiscal 1996, the aging analysis by payor for assignment of allowance was discontinued. However, the new methodology was reasonable based on D&T's procedures.

It was also noted that no formal charity care policy has been established for Parkview/City Avenue Hospitals.

Parkview/City Avenue are participants in the Wise Choice fee capitation arrangement. A liability of approximately $700,000 was recorded related to these payments, however, it was unclear if this amount represents unapplied cash or amounts owed related to referral outside of the network.

Assets Limited or Restricted as to Use:

**As discussed earlier in the Graduate Hospital section of this report, Parkview/City Avenue Hospitals have recorded approximately $1.6 million of deferred revenue related to the Greater Atlantic Health Services sale. According to the documentation included in the workpapers, this amount is being amortized into income over a three year period which is inconsistent with the amortization period for Graduate Hospital's portion of the proceeds.**

CRA:

D&T noted that due to the large number of managed care contracts and the limited number of pay classes within the billing system, Parkview/City Avenue Hospitals use an estimated overall percentage to calculate contractual allowances for certain outpatient receivables. It was recommended that system enhancements be investigated to improve managed care reporting and estimation of contractual allowances. According to Parkview/City Avenue management, the required enhancements were completed.

---

Page 21

CL 039155

D&T also noted that the SMS generated inpatient Medicare contractual allowance was overstated. As a result, the IME and Capital portions of the Medicare receivable balance appear to be understated at the time of final billing but are subsequently adjusted at the point of payment. D&T recommended that management work with SMS to perfect the system generated contractual allowance at the point of final billing and eliminate the need for recurring manual adjustment at the time of payment.

Management agreed with D&T's observation. However, it believed that the components which are incorrectly valued represented minor differences from the final payment that is received from Medicare and are adjusted to actual at the time of payment. Management was taking steps to resolve the incorrect values.

Property and Equipment:

It was noted by D&T that a physical inventory of fixed assets had not been performed for several years. Also, Parkview/City Avenue Hospitals do not physically label their property and equipment with an identifying number. Management had received a proposal from an independent valuation firm to perform the inventory but the cost was too prohibitive. However, management was going to use internal resources to inventory its fixed assets. To date, this inventory has not been done. However, management plans on doing the fixed asset inventory in fiscal 1997. It was also noted in the detail of a repairs and maintenance expense analysis that a service contract with GHS Technology Management, Inc. is in place to monitor biomedical equipment. The monthly contract fee for the agreement is $57,025 for fiscal 1996 and $25,075 for fiscal 1995.

CL 039156

**Legal and Other Reserves:**

There were approximately $70,000 of legal reserves at June 30, 1995. However, there was no discussion of the need for such reserves. The fiscal 1996 workpapers did not provide details for these reserves.

There also appear to be various general reserves/cushion available as of June 30, 1995. These include a settlement on a contract with a physician that appears to have been paid but for which a reserve of $124,100 exists, accruals for personal time (not eligible to be carried forward per the time-off policy) included in the vacation accrual of $275,000, and an accrued pension cushion of $65,800 related to fiscal 1995 contributions. There were not significant variations in the make-up of these accounts in fiscal 1996.

**Unrecorded Liabilities:**

No adjustments were identified as a result of D&T's search for unrecorded liabilities.

**Areas Impacting Graduate Hospital, Mt. Sinai Hospital and Parkview Hospital/City Avenue Hospital**

**Workers' Compensation:**

It was noted based on our analysis of the workpapers, that during fiscal 1996, a decision was made to "push down" all workers compensation liabilities from the parent level (i.e., Graduate Health System) to the affiliate level. At June 30, 1996, the related restricted assets had not been transferred to the affiliates and remained at the parent level. However, a due from Graduate Health System was recorded for a like amount. **The analysis of the June 30, 1996 workers' compensation liability utilizes a 7.5% discount rate which varies from the AHERF discount rate, should these entities join the AHERF system and adopt similar accounting policies.**

CL 039157

Malpractice:

**During fiscal 1996, the discount rate used in determining the reserves for professional liability claims was increased to 6% from the 5% used in 1995. It should be noted that the 6% discount varies from the AHERF discount rate should these entities join the AHERF system and adopt similar accounting policies.**

Other Observations:

The following represents a summary of other miscellaneous observations noted based on our analysis of D&T's workpapers:

- Graduate Hospital is required to provide the City of Philadelphia an audit in accordance with Government Audit Standards and the City of Philadelphia Subrecipient Audit Guide for the Ryan White program funding. This audit report was prepared for the program period ending April 3, 1996 and will be eligible for incorporation into an organizational-wide as previously discussed.

Zurbrugg Memorial Hospital

Accounts Receivable Credit Balances:

At December 31, 1995, there were $1,783,234 of credit balances in the inpatient patient accounts receivable accounts of which $1,641,685 were aged over 120 days. In the over 120 day category $1,182,968 were related to U.S. Healthcare with 93% of this amount representing PIP receipts. The PIP receipts are zeroed out as USHC vouchers are received and payments are applied to patient accounts. The balance of the credit balances in the over 120 day category of $458,717 represent credit balances ranging from $27,000 to $70,000 in the commercial, New Jersey Blue Cross, self-pay, Pru-Care and Champus payor categories. Zurbrugg considered the credit balance

Page 24

CL 039158

accounts valid and the patient accounting staff periodically works the accounts. It was noted that the overall credit balances were consistent with the prior year.

At December 31, 1995, there were credit balances in the outpatient patient accounts receivable of $767,461 of which $733,798 were over 120 days. In the over 120 day category is an amount due Medicaid of $260,150. The payment creating this credit balance was received on December 6, 1995 relating to services provided on July 27, 1995. Medicaid was overpaid due to a keying error that was corrected on July 31, 1995. The credit balance was to be repaid to Medicaid through the voucher take-backs. Most of the balance in the over 120 day category ($316,816) consists of miscellaneous accounts. A high priority is not placed on resolving the balances due to the high volume of accounts. Consequently, the potential need exists to use cash to refund the balances to the patients or make a payment to New Jersey under any escheat laws.

Riverside Facility Exposure:

In September 1995, Zurbrugg consolidated its Riverside Division with the Rancocas Division. Management intends to sell the Riverside facility. At December 31, 1995, the Riverside facility is included as "other current assets" in the amount of $1,000,000. An appraisal was completed by Valuation Counselors on May 31, 1995 which indicated a value in the range of $800,000 to $1,000,000. The highest and best use was indicated as "partial demolition and conversion to an assisted living facility. To the extent a sale of this facility is expected at less than $1,000,000, there will be a loss incurred on the disposal.

Prudent Buyer:

At December 31, 1995, the due to third parties account included amounts for New Jersey Blue Cross ("NJBC") prudent buyer of $569,000 for 1993, $766,000 for 1994 and $751,000 for 1995. To our knowledge, NJBC hasn't performed any audits or collected any monies under the prudent buyer provision in its contracts. Consequently, there are potential

CL 039159

excess third party reserves of $2,086,000. The prudent buyer clause appears to have been negotiated out of Zurbrugg's current agreement. This should be verified by SDN's legal counsel. There was no revocation of the prudent buyer provisions for the contracts covering years 1993 through 1995, however. One word of caution, however. We understand that Anthem Blue Cross Blue Shield of Ohio, which is in the process of acquiring NJBC, is beginning to pursue collection in Ohio under its prudent buyer contract language. Anthem had not previously enforced this provision even though it had been in its contracts for several years.

Medical Malpractice:

At December 31, 1995, the medical malpractice IBNR reserve was $925,500. E&Y estimated that this account had an excess reserve of approximately $475,000. However, E&Y passed on making an adjustment for the difference due to the uncertainty of malpractice claims.

Lease Payment Disclosures:

There is no disclosure of future minimum payments under operating leases. E&Y passed on disclosure since the total amounts are immaterial (less than $50,000) and most leases are year-to-year.

NJHCFFA Revenue Bond Compliance:

Zurbrugg was **not** in compliance with the Debt Service Coverage Ratio of at least 1.10 for the year ended December 31, 1995. As required by the terms of the loan agreement, a consultant (E &Y) was hired to prepare a report setting forth the reasons for the noncompliance and making recommendations with respect to the operations and management of the hospital which will enable the hospital to comply with the Debt Service Coverage Ratio requirement at the earliest practical time. E&Y's report was issued on July 3, 1996.

Page 26

CL 039160

E&Y's report indicated Zurbrugg's inability to comply with the rate covenant requirement in 1995 was due primarily to the significant operating losses incurred by the Riverside Division and costs incurred to transition all Riverside acute care services to the Rancocas Division. The acute care services at Riverside Division were closed to ensure the long term viability of Zurbrugg and to help bring Zurbrugg back into ratio covenant compliance.

The following were identified as management's plans to cure ratio noncompliance:

- Consolidation of acute care services and the Riverside facility disposition.; This has been completed;

- Development of a physician network in Zurbrugg's primary service area, which is in process;

- Continued development of managed care contracts. As of June 1, 1996, Zurbrugg became part of the Aetna provider network and management anticipates an increase in inpatient and outpatient volume. Zurbrugg also entered an agreement with CIGNA recently.

The following were E&Y's recommendations to management to assist in correcting the ratio coverage noncompliance:

- Considering unbudgeted reduction in state charity care funding, E&Y believed that it was critical for Zurbrugg to continue monitoring volume, length of stay, staffing, payer mix, case mix, overtime, the use of temporary help and other information compared to budget. This initiative is in process;

- E&Y believed Zurbrugg must lower its cost structure and suggested the following initiatives, all of which are in process:

Page 27

CL 039161

- Further consolidate services with GHS such as laboratory, contract negotiation, and certain administrative services;

- Outsource certain services including dietary management which is being evaluated;

- Process improvement and reengineering initiatives to enhance staff efficiency and reduce staffing needs, including a systematic review of all operational expense categories to identify short-term and long-term opportunities for cost reduction;

- Review its organizational structure and wherever opportunity exists, expand spans of control and reduce levels of management;

- Develop case management protocols to reduce unnecessary utilization of services and shorten the length of stay; and

- Assess the extent to which it uses available information technology to streamline work processes and improve efficiency.

- E&Y suggested that management prepare a cost/benefit analysis for the disposition of the Riverside facility including the potential Medicare depreciation recapture, and options for relocating the services and programs from the Riverside facility to the Rancocas facility or other sites. This initiative has been completed;

- Zurbrugg should continue to maximize the opportunities offered through its relationship with GHS including service/administrative consolidation, managed care contracting, and other economics of scale. This was in process and will continue under SDN's control;

- Zurbrugg needs to develop a capital financing plan to maintain the facility at the levels needed to meet regulatory requirements as well as to remain competitive. This initiative is in process;

- E&Y suggested that the current marketing plan should be expanded to provide a cohesive strategic plan which clearly establishes a vision and overall financial, operational and organizational direction for Zurbrugg over the next three to five years to better position

CL 039162

the hospital in an increasingly competitive, managed care-driven marketplace. This initiative is in process;

- Management should develop a comprehensive methodology to evaluate product/service line and payer profitability on a routine basis which would enable it to more effectively negotiate managed care contracts and focus efforts on marginal programs. This recommendation was implemented.

Based on its review and recommendations, and, if the recommended planning and monitoring processes were in place, E&Y concluded that Zurbrugg should be able to achieve the profitability required to attain compliance with the required ratio covenant.

CoreStates Bank Loan Compliance:

**For the year ended December 31, 1995, Zurbrugg was not in compliance with the Debt Service Coverage Ratio of at least 1.25. A waiver was received by management for this covenant as a result of amendment of the loan agreement dated December 8, 1995.**

Board Minutes:

It was noted that a $5 million discrimination suit filed by a lab employee. This suit was noted in the February 27, 1996 Board minutes. SDN legal counsel should follow-up on the merits and status of this suit.

**Also, in the March 28, 1995 Board minutes, it was indicated that Zurbrugg would receive a 1995 charity care subsidy of $1,800,000 as a result of proposed legislation. The amount actually received in 1995 was $1,828,000. No charity care subsidy was received in 1994 and $3,800,000 was received in 1993.**

---

Page 29

CL 039163

Finally, the December 11, 1995 Board minutes indicated that a third party lawsuit was filed by S.C. Holding Inc. in connection with an environmental clean-up claim. Zurbrugg and other parties are being sued to clean-up a site. The minutes indicated that any exposure should be minimal due to the number of parties involved. SDN's environmental consultants should evaluate any potential financial exposure.

CL 039164

## IV. PAYMENTS TO RELATED PARTIES

We read the conflict of interest statements for the years 1993 through 1996 submitted by the various officers and directors of Graduate Health System, Zurbrugg Memorial Hospital, The Graduate Hospital, Mt. Sinai Hospital and City Avenue/Parkview Hospitals. For entities identified in the statements we conducted a search for any payments made to the entities from July 1, 1995 through June 30, 1996 from Zurbrugg Memorial Hospital, The Graduate Hospital, Mt. Sinai Hospital and City Avenue/Parkview Hospitals. **The following material payments were identified:**

| Name | Title | Relationship | Payments 7/1/95 to 6/30/96 |
|---|---|---|---|
| Peter D. Carlino | Director, GHS | Son-in-law, Jay Irwin is EVP of Flanigan, O'Hara, Gentry & Associates which provides insurance brokerage services to Graduate Hospital | $ 198,152 |
| Bernard Korman | Director, GHS | Former President, CEO and Director of Mediq, Inc., parent corporation of Medifac/ Granary, Mediq Management Services Inc., Mediq/PRN Life Support Services Inc. and Mediq Consulting Group and a director of Omega | $4,050,145* |
| David M. Eveland | Director, GHS | Director of SJ X-Ray | $1,956,921 |
| Barry Fabius | President, BF Health Care Inc. | President, BF Health Care Inc. | $ 812,358 |
| Kenneth Brait | Chairman, Dept. Neurological Sciences at Rancocas | Brait, Parton and Margolia | $ 96,000 |

CL 039165

| Name | Title | Relationship | Payments 7/1/95 to 6/30/96 |
|---|---|---|---|
| Charles Goldstein | Formerly Pres. of Zurbrugg Med. Staff, Director, and Attending Radiologist | ZMH Cat Scan, ZMH Outpatient Radiology and Med. Staff | $ 73,169 |

* Additionally, at SDN's request we conducted a search for payments to Omega Healthcare for fiscal 1994 and fiscal 1995. It was noted that for the period November 1993 through June 1995, payments totaled $5,848,398.

Attached as Exhibit B is a schedule which identifies the entities from which the payments identified above were made.

CL 039166

## V. GOVERNMENT ACTIONS

On April 3, 1996, Graduate Hospital entered into a settlement with the federal government for alleged violations of Title XVIII of Social Security Act with respect to Medicare billing for nonphysician outpatient services provided in conjunction with inpatient admissions (Graduate Hospital did not admit to any liability or wrongdoing).

Graduate Hospital agreed to pay the federal government the sum of $163,370 for claims filed from October 1987 to December 31, 1991 and $148,205 for all erroneous claims submitted and paid on or after January 1, 1992 (up to December 31, 1995).

CL 039167

**EXHIBIT A**

**PHYSICIAN PRACTICE ACQUISITION SUMMARY**

CL 039168

Founders Health Care, Inc. *(Promissory notes due next four years)*
Practice Acquisitions

| Closing Date | Practice Name | Total Purchase Price | Cash Paid at Closing | Promissory Notes Deferred | Scheduled Payment Dates | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| 4/29/94 | Roxborough Family Practice | $348,420 | $198,420 | $75,000 $75,000 | 4/29/95 plus accrued interest @ prime payable annually 4/29/96 | | | | |
| | Roxborough Family Practice | $282,876 | $282,876 | $0 | N/A | | | | |
| 8/1/94 | Bucks-Phila Medical Center | $300,000 | $150,000 | $150,000 | 7/31/98 plus accrued interest @ prime | | $150,000 | | |
| 9/29/94 | Harleysville Med. Assoc., PC | $665,000 | $365,000 | $100,000 $200,000 | 11/1/95 plus accrued interest @ prime 11/1/98 plus accrued interest @ prime | | $200,000 | | |
| 2/1/95 | Blast & Assoc. Internal Medicine (Stock Purchase Agreement) | $300,535 | $400,263 | $98,064 $98,064 $102,067 $102,067 | 2/28/97 plus accrued interest @ prime 2/28/98 plus accrued interest @ prime 2/28/97 plus accrued interest @ prime 2/28/98 plus accrued interest @ prime | $98,064 $102,067 | $98,064 $102,067 | | |
| 4/1/95 | Leppart & Buckley | $28,971 | $28,971 | $0 | N/A | | | | |
| | FMG-NE (No Acquisition Cost) | $0 | $0 | $0 | N/A | | | | |
| 7/18/94 | Family Physicians of Cinnaminson | $175,000 | $100,000 | $75,000 | monthly* | | | | |
| 12/1/94 | Singer, Cook & Greenwood | $723,850 | $236,350 | $81,250 $81,250 $81,250 $81,250 $81,250 | 6/1/95 11/1/95 6/1/96 11/1/96 6/1/97 11/1/97 plus accrued interest at 8.5% compounded annually and payable on Final Maturity Date | $81,250 $81,250 | | | |
| 2/5/95 | Burlington Co. Internal Med. Assoc. (Stock Purchase Agreement) | $1,594,568 | $494,568 | $500,000 $500,000 $500,000 | 2/28/96 plus accrued interest at 8.5% payable with each payment 2/28/97 plus accrued interest at 8.5% payable with each payment 2/28/98 plus accrued interest at 8.5% payable with each payment | $500,000 | $500,000 | | |

\* payable in equal monthly installments, commencing first day of the month following the last day of employment of Dr. Micozi, and ending the first day of the month following one year from the date of Closing.

CL 039169

**Founders Health Care, Inc.**
**Practice Acquisitions**

| Closing Date | Practice Name | Total Purchase Price | Cash Paid at Closing | Promissory Notes Delivered | Scheduled Payment Date | | Amounts due by calendar year 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/23/95 | Grossman-Levine Associates (Stock Purchase Agreement) | $2,300,000 | $1,150,000 | $287,500 $287,500 $575,000 | 2/25/96 2/25/97 1/31/98 | plus accrued interest @ prime rate plus accrued interest @ prime rate plus accrued interest @ prime rate | $287,500 | $575,000 | | |
| 3/8/95 | Robert Stedman, D.O. | $159,835 | $82,335 | $77,500 | 4/7/99 | plus accrued interest @ 9% | | | $77,500 | |
| 1/12/94 | Callowhill Medical Associates, P.C | $250,000 | $150,000 | $100,000 | 10/31/98 | plus accrued interest @ prime rate | | $100,000 | | |
| 11/2/94 | Fleetwood Medical Associates | $500,000 | $250,000 | $250,000 | 10/31/98 | plus accrued interest @ prime rate | | $250,000 | | |
| 8/1/94 | Mid-City Family Practice | $122,309 | $107,309 | $15,000 | 2/1/95 | plus accrued interest @ prime rate | | | | |
| 1/5/95 | Barry Bob, M.D | $191,026 | $155,026 | $36,000 | 1/1/99 | plus accrued interest @ 8.5% per annum compounded annually | | | $36,000 | |
| 7/2/95 | Exeter Pediatrics | $350,000 | $175,000 | $175,000 | 7/1/99 | plus accrued interest @ prime rate | | | $175,000 | |
| 5/1/95 | Sandhya Buch | $180,000 | $100,000 | $80,000 | 4/30/98 | plus accrued interest @ prime rate | | $80,000 | | |
| 1/18/95 | David Estock, M.D. | $455,648 | $355,648 | $100,000 | 2/1/99 | plus accrued interest @ prime rate | | | $100,000 | |
| 2/27/95 | Bernard King, D.O. | $314,345 | $314,345 | $0 | N/A | | | | | |
| | Wyomissing Medical Associates | Start-up Practice | | | | | | | | |
| 1/0/96 | Northeast Family Practice Associates | $117,628 | $117,628 | $0 | N/A | | | | | |
| 9/1/95 | Carponia Family Practice | $38,000 | $38,000 | $0 | N/A | | | | | |
| 10/27/95 | Robert J Kaplan, D.O. | $170,000 | $100,000 | $70,000 | 10/27/99 | plus accrued interest @ prime | | | $70,000 | |
| 10/27/95 | Donald Baseman, D.O | $318,672 | $75,000 | $91,772 $151,900 | 1/2/96 10/27/99 | plus accrued interest @ prime plus accrued interest @ prime | | $151,900 | | |
| 12/6/95 | Frank Gunn, D.O | $170,000 | $170,000 | $0 | | | | | | |

CL 039170

Founders Health Care, Inc.
Practice Acquisitions

| Closing Date | Practice Name | Total Purchase Price | Cash Paid at Closing | Promissory Notes Delivered | Scheduled Payment Date | | Amounts due by calendar year | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1997 | 1998 | 1999 | 2000 |
| 12/1/95 | Mt. Laurel Family Physicians (Stock Purchase Agreement) | $1,550,352 | $590,352 | $0 | 12/1/96 | *Accrued interest @ prime only to be paid | | | | |
| | | | | $150,000 | 12/1/97 | plus accrued interest @ prime | $350,000 | | | |
| | | | | $150,000 | 12/1/98 | plus accrued interest @ prime | | $350,000 | | |
| | | | | $150,000 | 12/1/99 | plus accrued interest @ prime | | | $350,000 | |
| 2/1/96 | Paul Kaplan, M.D. | $311,000 | $211,000 | $100,000 | 2/1/00 | plus accrued interest @ prime | | | | $100,000 |
| 3/1/96 | Cinnaminson Pediatric Associates (Stock Purchase Agreement) | $1,198,374 | $710,874 | $243,750 | 3/1/98 | plus accrued interest @ prime | | $243,750 | | |
| | | | | $243,750 | 3/1/00 | plus accrued interest @ prime | | | | $243,750 |
| 4/16/96 | Drs. Formica & Strauss | $325,000 | $325,000 | $0 | N/A | | | | | |
| 7/1/96 | Douglas F. Smith, M.D. | Start-up Practice | | | | | | | | |
| | Totals | $14,341,399 | $7,343,965 | $6,997,434 | | | $1,500,131 | $2,648,881 | $960,400 | $343,750 |

CL 039171

**EXHIBIT B**

**SUMMARY OF DISBURSEMENTS**
**TO CERTAIN IDENTIFIED RELATED PARTIES**

CL 039172

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS | Harold Cramer | CEO | 1995/1996 1993 | • Director of Bio / Data Corp.  He indicated that no compensation was received for his services.<br>• Director of Phila Aids Coalition.<br>• Director & VP of JPS.<br>• Trustee of Fed Jewish Amenities.<br>• Chairman of the Board for Jewish Newspapers | $0 |
| GHS | Peter D. Carlino | Director | 1996 | Peter's son-in-law, Jay Irwin, is the Executive V.P. of Flanigan, O'Hara, Gentry & Associates. FOG&A provides insurance broker services to the GHS. | $198,152 |
| GHS | Russell J. Kunkel | Director | 1995/1994 1993 | • Employee - Meridian Bancorp, Inc.(95)<br>• President & CEO Meridian Mortgage Corporation (94' 93').<br>• Vice Chairman-Meridian Banc Corp., Inc.<br>• Vice Chairman-Meridian Bank. | $9,595 Note: payments do not include payments related to the bond issuance. |
| GHS | Janice L. Richter | Director | 1996 | • Member, Board of Trustees.  Coriell Institute, Camden, NJ.<br>• Related to owner, Hill International, Inc. Willingboro, NJ.<br>• Trustee, Trenton State College Foundation, Trenton NJ. | $0 |

CL 039173

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|--------|------|-------|------|--------------|---------------------------------|
| GHS | Janice L. Richter | Director | 1993/1994 | • Married to owner of Hill International, Inc. who has a subsidiary the environmental consulting firm of Kaselaan & D'Angelo, which has provided certain services to GHS or its members in the past. | $0 |
| GHS | Marc S. Cornblatt | Secretary | 1996 | Legal counsel for:<br>• (i) Charles C. Wolferth, Jr., MD. and Graduate Surgical Associates, P.C.<br>• (ii) Nicholas L. Depace, MD and Philadelphia Health Group, P.C. | $88,756 |
| GHS | Joseph M. Huber | Treasurer and Assistant Secretary | 1996 | • Non-voting shareholder of Cope Care Inc.<br>• Shareholder of Venture Control Enterprises inc. | $0 |
| GHS | Bernard J. Koman | Director | 1993/1994 | • President, CEO, Director of Mediq Incorporated, Parent corporation of Mediflac, Inc. / Granary.<br>• Mediq Management Services, Inc.<br>• Mediq / PRN Life Support Services, Inc.<br>• Mediq Consulting Group.<br>• Director of Omega Health care. | Mediq- $513,770<br>Omg- $3,536,375<br>(Note: total payments to Omega for the period 11/93-6/95 were $5,848,398) |
| GHS | Robert E. Mathews | President | 1993 | • Shareholder-Mediq Inc. | $513,770 |

CL 039174

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GIIS | Paul A. Dandridge | Director | 1993 | • Consultant with Birch & Davis. B&D proposed to the Health Choices RFP. Greater Atlantic is also responding to this RFP. | $0 |
| The Graduate Hospital | Mary Ann Lenzi | VP of Finance | 1994 | • Member BOD TGH Physician Hospital Organization.<br>• Treasurer Vice President Graduate Campus Condominium Association.<br>• Delaware Valley Hospital | $38,390 |
| Zurbrugg | Bernadette M. Mangan | President, Zurbrugg, Riverside | 1992 | • PTI && Delran-Board Member (Physical Therapy and Sports Services) | $0 |
| GHS | Michael Margolin, MD | Board member | 1996/1992 | • Brait Parton Margolin has agreements with the hospital to perform testing (EEG, EMC, Evoked Responses)<br>• His group competes with the Hospitals for CT scanner.<br>• Additionally, the group performs MRI's for the Hospital. | $96,000 |

CL 039175

**Exhibit B**

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS | David M. Eveland | Director | 1996/1995 1994 | • <u>SJ X-Ray</u>: Director / Executive Director, • "I am involved in the overall management of the company, but have individual sales representatives who call at the hospital. I am not a shareholder in the corporation." | $1,956,921 |
| GHS | Gregory A. Gast | Vice President, Human Resources | 1996 | • Small shareholder of <u>Smith Klein Beecham, Inc.</u> | $458,707 |
| Zurbrugg | Jeffrey Kossow | Chairman, QA | 1994 | • Contract with Hospital for PA activities, additional QA activity. Paid stipend by <u>Med staff</u> for chairmanship of QA. | $4,889 |
| Zurbrugg | Kenneth Brait | Chrmn, Dept Neurological Sciences | 1994 | • **Brait Parton Margolin** has agreements with the hospital to perform testing (EEG, EMC, Evoked Responses) His group competes with the Hospitals for CT scanner. | $96,000 |
| Zurbrugg | Charles Goldstein, MD | President of Med Staff, Board Member, Attending Rad | 1994 | • Contract with the Hospital to provide CT Services:    - <u>ZMH Cat Scan</u>    - <u>ZMH Outpatient Radiology</u> • <u>Med Staff</u> | $67,175 $1,105 $4,889 |

CL 039176

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| Mt. Sinai | Richard T. Cohen | Board Member | 1995 | • Philadelphia Health Mgmt Corp, Pres and CEO; <br> • The Bridge-Board Member -sec/tres; Interim House-Board Member; <br> • NET (LKE)s-Board Member; <br> • JFK; JJPI. | $0 |
| Mt. Sinai | Richard J. Cohen | Board Member | 1993 | • Phila Health mgmt Corp - Sale of health care related date and / or drug & alcohol treatment services. | $0 |
| Mt. Sinai | Barry Fabius, MD | President, BF Health Care Inc. / Medical Director | 1995/1992 | • President, BF Health Care Inc. | $812,358 |
| Mt. Sinai | Thomas J. Kelly Jr. | Board Member | 1993 | • Thomas's wife, Frances R. Delly is an employee of Pro-Cor Ambulance Co, a provider of ambulance services to Mt.Sinai. | $0 |
| Mt. Sinai | Frances J. Bonner | Director of PM&R | 1992 | • Chairman Dept of PM&R Graduate Hospital | $0 |
| GHS-Osteopathic, Inc. | Lee W. Dorty, Esq | Director, Secretary | 1996 | • Employed by HSI Management Co Inc (HSI is a managed care company). <br> • General council and vice President of GHS | N/A |

CL 039177

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS-Ost eopathic | Stanley Goldfarb, M.D. | None Indicated | 1994/1995 - | VP of Patient Care Education & Research. | N/A |

South Jersey X-ray is the distributor of choice for Dupont's film products. The hospitals receive a 1% vendor discount for film product purchases made from South Jersey X-ray. Capital equipment purchases are also made through South Jersey X-ray.

CL 039178

EXHIBIT B

## SUMMARY OF DISBURSEMENTS
### For The Period Ended (7/01/95- 6/30/98)

| | Parkview AMS | Single Disbursements | City Ave/Parkview SMS | City Ave AMS | Single Disbursements | Rancocas / Zurbrugg | Graduate | Single Disbursements | Mt. Sinai | Single Disbursements | Total Payments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BF Health Care Inc. | $0 | | $0 | $0 | | $404,420 | $22,528 | | $385,410 | | $812,358 |
| Bio Data Inc. | | | | | | | | | | | $0 |
| Bio / Data Corp. | | | | | | | | | | | $0 |
| Birch Davis | | | | | | 96,000 | | | | | $96,000 |
| Brett Perron Margolin | | | | | | | | | | | $0 |
| Communitee General Hospital | | | | | | | | | | | $0 |
| Core Care Inc. | | | | | | | | | | | $0 |
| Cortell Institute of Camden | | | 285 | 215 | | | 1,379 | 25,765 | 10,578 | 170 | $38,390 |
| Delaware Valley Hospital Counsel | | | | | | | | | | | $0 |
| Dept. of MH & I E (Graduate Hospital) | | | 53,545 | 11,874 | | | 87,315 | | 25,425 | | $198,152 |
| Flanigan O'Hara, Gentry & Associates | 9,904 | | | | | 68,200 | | | | | $68,200 |
| Graduate Campus Condominium Association | | | | | | | | | | | $0 |
| Gary Rannaher (contract with Zurbrugg) | | | | | | | | | | | $0 |
| Health Management Corp | | | | | | | | | | | $0 |
| Hill International Inc. | | | | | | | | | | | $0 |
| Interim / House | | | | | | | | | | | $0 |
| JFK | | | | | | | | 0 | | | $0 |
| JPK | | | | | | | 0 | | | | $0 |
| Kaashan & Diangelo | 8,044 | | 107,487 | 27,365 | | 72,205 | 196,573 | | | | $411,673 |
| Mediflex Inc. / Grenery Assoc. | | | | | | | | | | | $0 |
| Medix | | | | | | 2,607 | 11,902 | | | | $14,509 |
| Medix Consulting Group | | | | | | | | | | | $0 |
| Medix Management Services, Inc. | 5,050 | | 17,971 | 8,161 | | 7,792 | 55,653 | | 8,344 | | $102,981 |
| Medix / PRN Life Support Services, Inc. | | | | | | 4,830 | | | | | $4,830 |
| Medistaff | | | | | | | 52,743 | | 1,303 | | $58,788 |
| Mastery, Gelman Jeffs, | 8,002 | | 17,652 | 8,845 | | | | | | | $0 |
| NM / Libke | | | | | | | 3,536,375 | | | | $3,536,375 |
| Omega Healthcare | | | | | | | | | | | $0 |
| Penoper Hamiltion | | | | | | | | | | | $0 |
| Philadelphia Health Management Corp. | | | | | | | | | | | $0 |
| Pro-cor Ambulance Co. (Combine of Delaware Valley) | | | | | | | | | | | $0 |
| PT & S | 211,349 | | 153,081 | 204,700 | | 229,350 | 846,579 | 48,231 | 11,253 | | $229,350 |
| SJ & Co | 21,025 | | 82,214 | 24,511 | | 427,959 | 82,653 | | 5,424 | | $1,058,921 |
| Smith Klein Beecham, Inc. | | | | | | 194,344 | | | | | $458,702 |
| TGP Physician Hospital Organization | | | | | | | | | | | $0 |
| The Bridge | | | | | | | | | | | $0 |
| Trenton State College Foundation | | | | | | | | | | | $0 |
| Venture Control Enterprises | | | | | | | | | | | $0 |
| | $255,464 | $0 | $437,446 | $285,650 | $0 | 1,107,835 | $4,975,802 | $73,996 | $457,735 | $170 | $7,557,106 |

CL 039179

Note: Information obtained from AMS and SMS Accounts Payable Systems.

**CORPORATE FINANCE GROUP**

| | | | | | |
|---|---|---|---|---|---|
| **Atlanta** 404-870-1180 | **Boston** 617-478-5488 | **Chicago** 312-701-6336 | **Dallas** 214-754-5310 | **Denver** 303-573-2823 | **Detroit** 313-446-7142 |
| **Houston** 713-657-8330 | **Los Angeles** 213-356-6206 | **New York** 212-259-2753 | **Philadelphia** 215-963-8350 | **San Francisco** 415-957-3190 | **Tysons Corner** 703-918-3404 |

CL 039180

**EXHIBIT  4411**

# DRAFT

Allegheny Health, Education and Research Foundation

*Consolidated*

*Financial*

*Statements*

*for the*

*year ended*

*June 30, 1997*

CL 145630



DEPOSITION
EXHIBIT

4411

Kirsten  5-13-04

PENGAD 800-631-6989

# DRAFT

## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

### Index to Financial Statements

|  | Pages |
|---|---|
| Report of Independent Accountants | 1 |
| **Financial Statements:** | |
| Consolidated Balance Sheet | 2 |
| Consolidated Statement of Operations | 3 |
| Consolidated Statement of Changes in Net Assets | 4 |
| Consolidated Statement of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-25 |
| **Other Financial Information:** | |
| Report of Independent Accountants on Consolidating and Combining Financial Information | 26 |
| Consolidating Balance Sheet | 27 |
| Consolidating Statement of Operations | 28 |
| Consolidating Statement of Changes in Net Assets | 29 |
| Consolidating Statement of Cash Flows | 30 |
| Allegheny University Medical Centers (AUMC) Consolidating Balance Sheet | 31 |
| AUMC Consolidating Statement of Operations | 32 |
| AUMC Consolidating Statement of Changes in Net Assets | 33 |
| AUMC Consolidating Statement of Cash Flows | 34 |
| Delaware Valley Obligated Group (DVOG) Combining Balance Sheet | 35 |
| DVOG Combining Statement of Operations | 36 |
| DVOG Combining Statement of Changes in Net Assets | 37 |
| DVOG Combining Statement of Cash Flows | 38 |
| Allegheny Hospitals, Centennial Combining Balance Sheet | 39 |
| Allegheny Hospitals, Centennial Combining Statement of Operations | 40 |
| Allegheny Hospitals, Centennial Combining Statement of Changes in Net Assets | 41 |
| Allegheny Hospitals, Centennial Combining Statement of Cash Flows | 42 |

CL 145631

# DRAFT

## Report of Independent Accountants

To the Board of Trustees of
   Allegheny Health, Education and Research Foundation:

We have audited the accompanying consolidated balance sheet of Allegheny Health, Education and Research Foundation as of June 30, 1997 and the related consolidated statements of operations, changes in net assets, and cash flows for the year then ended. These consolidated financial statements are the responsibility of Allegheny Health, Education and Research Foundation's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Allegheny Health, Education and Research Foundation as of June 30, 1997 and the consolidated results of its operations, changes in net assets, and cash flows for the year then ended in conformity with generally accepted accounting principles.

Pittsburgh, Pennsylvania
September 4, 1997, except Note 17 which is dated September _____, 1997

1

CL 145632

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

CONSOLIDATED BALANCE SHEET
as of June 30, 1997
(Dollars in Thousands)

DRAFT

## ASSETS

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 20,516 |
| Short-term investments | | 3,804 |
| Assets limited or restricted as to use | | 73,922 |
| Receivables: | | |
| Patient accounts, less allowance for uncollectible accounts of $127,424 | | 367,061 |
| Grants and other | | 92,119 |
| Inventories | | 33,466 |
| Prepaid expenses | | 15,168 |
| Total current assets | | 606,056 |
| Assets limited or restricted as to use, net of current portion | | 780,821 |
| Property and equipment, net | | 920,870 |
| Other assets | | 315,933 |
| Total assets | $ | 2,623,680 |

## LIABILITIES AND NET ASSETS

| | | |
|---|---|---:|
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ | 489,522 |
| Deferred revenue | | 16,373 |
| Line of credit | | 57,100 |
| Current portion of long-term debt | | 34,704 |
| Total current liabilities | | 597,699 |
| Long-term debt, net of current portion | | 960,273 |
| Self-insurance liabilities | | 91,841 |
| Other noncurrent liabilities, includes $20,249 of deferred revenue | | 149,101 |
| Total liabilities | | 1,798,914 |
| Net assets: | | |
| Unrestricted | | 569,796 |
| Restricted: | | |
| Temporarily | | 110,758 |
| Permanently | | 144,212 |
| Total net assets | | 824,766 |
| Total liabilities and net assets | $ | 2,623,680 |

The accompanying notes are an integral part of the consolidated financial statements.

2

CL 145633