| DOCUMENT NUMBER | CONTENTS |
|---|---|
| PWC-SUB-PR-012267-012375 | Leasing Information on 1700 South Street |
| PWC-SUB-PR-012376-012479 | Leasing Information on 1740 South Street |
| PWC-SUB-PR-012480-012483 | AHERF Bankruptcy Schedule Disc Covers |
| PWC-SUB-PR-012484-012489 | AHERF Bankruptcy Creditors Committee Meeting Info Misc. |
| PWC-SUB-PR-012490-012505 | Cost Allocation Methodology for the AHERF Parent FY 1998 |
| PWC-SUB-PR-012506-012511 | AHERF/AUH East Consolidated Sched of Exp for Mo end 7/31/98 |
| PWC-SUB-PR-012512-012514 | Aetna/US Healthcare Contracts |
| PWC-SUB-PR-012515-012525 | Financial Transactions from 5/1/97 to 6/30/97 |
| PWC-SUB-PR-012526-012541 | Rancocas Hosp Y-to-D Detail Trial Balance 12/31/97 |
| PWC-SUB-PR-012542-012544 | Rancocas Intercompany Accounts |
| PWC-SUB-PR-012545-012552 | AHERF Purchase Price Allocation for last 12 mos end 7/31/98 |
| PWC-SUB-PR-012553-012559 | Financials |
| PWC-SUB-PR-012560-012561 | Key Employee Retention Plan Summary Report 9/24/98 |
| PWC-SUB-PR-012562-012563 | New AHERF Severance Plan Cost Estimate Model |
| PWC-SUB-PR-012564-012564 | AHERF Comparative Analysis of Severance Program |
| PWC-SUB-PR-012565-012566 | AHERF Key Employee Retention Plan Comparative Analysis of Proposal, Motion, and Negotiations 9/21/98 |
| PWC-SUB-PR-012567-012582 | Proceeds From Sale and Liquidation of Hospitals |
| PWC-SUB-PR-012629-012697 | Asset Purchase Agreement |
| PWC-SUB-PR-012698-012938 | Health Service Revenue Bond Anal |
| PWC-SUB-PR-012939-013016 | Committee Reports |
| PWC-SUB-PR-013017-013083 | Pleadings |
| PWC-SUB-PR-013084-013116 | Notes |
| PWC-SUB-PR-013117-013185 | AHERF Bankruptcy Executory Contracts |
| PWC-SUB-PR-013186-013303 | Designation of V-II Acquisition Co., Inc. and Vanguard Health Sys of Executory Contracts and Unexpired Leases to be Assumed and Assigned |
| PWC-SUB-PR 013325-013327 | AHERF Vendor List |
| PWC-SUB-PR-013304-013304 | Real Property Rejection Claim for Rejected Leases |
| PWC-SUB-PR-013305-013318 | Vanguard and IBM Master List of AHERF Equip Lease Analysis |
| PWC-SUB-PR-013319-013324 | Allowance of Claims or Interests |
| PWC-SUB-PR-013328-013329 | AHERF Notes to Consolidated Fin Statements 6/30/97 |

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| PWC-SUB-PR-013330-013330 | Accounting Policies |
| PWC-SUB-PR-013331-013525 | AHERF - Motions, Dockets, etc. |
| PR-SEC-00891-00933 | April 1996 Monthly AHERF Financial Reporting Summary |
| PR-SEC-00934-00978 | May 1996 Monthly AHERF Financial Reporting Summary |
| PR-SEC-01023-01075 | July 1996 Monthly AHERF Financial Reporting Summary |
| PR-SEC-01076-01129 | August 1996 Monthly AHERF Financial Reporting Summary |
| PR-SEC-01130-01184 | September 1996 Month End AHERF Financial Reporting Sum |
| PR-SEC-01185-01238 | October 1996 Monthly AHERF Financial Reporting Summary |
| PR-SEC-01239-01295 | November 1996 Month End AHERF Finan Reporting Summary |
| PR-SEC-01296-01359 | December 1996 Month End AHERF Fin Report Summ Mid FY |
| PR-SEC-01360-01423 | January 1997 AHERF Financial Reporting Exec Summary |
| PR-SEC-01424-01493 | February 1997 AHERF Financial Reporting Exec. Summary |
| PR-SEC-01494-01569 | March 1997 AHERF Financial Reporting Executive Summary |
| PR-SEC-01570-01648 | April 1997 AHERF Fincial Reporting Executive Summary |
| PR-SEC-01649-01724 | May 1997 AHERF Fincial Reporting Executive Summary |
| PR-SEC-01726-01780 | October 1996 Month End AHERF Finan Reporting Summary |
| PR-SEC-01781-01844 | December 1996 Month End AHERF Fin Reporting Summary Mid FY |
| PR-SEC-01845-01908 | January 1997 AHERF Financial Reporting Executive Summary |
| PR-SEC-01909-01985 | March 1997 AHERF Financial Reporting Executive Summary |
| PR-SEC-01986-02064 | April 1997 AHERF Fincial Reporting Executive Summary |
| PR-SEC-02065-02137 | July 1997 AHERF-PFS Fincial Reporting Executive Summary |
| PR-SEC-02138-02213 | May 1997 AHERF Fincial Reporting Executive Summary |
| PR-SEC-02214-02296 | June 1998 AHERF-PFS Fin Reporting Exec Summary Western Region |
| PR-SEC-02297-02383 | April 1998 AHREF-PFS Fin Reporting Exec Summary |
| PR-SEC-02384-02439 | November 1996 Month End AHERF Financial Reporting Summary |
| PR-SEC-02440-02493 | September 1996 Month End AHERF Financial Reporting Summary |
| PR-SEC-02065-02137 | July 1997 AHERF-PFS Fincial Reporting Executive Summary |
| PR-SEC-02138-02213 | May 1997 AHERF Fincial Reporting Executive Summary |
| PR-SEC-02214-02296 | June 1998 AHERF-PFS Fin Reporting Exec Summary Western Region |
| PR-SEC-02297-02383 | April 1998 AHREF-PFS Fin Reporting Exec Summary |

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| PR-SEC-02384-02439 | November 1996 Month End AHERF Financial Reporting Summary |
| PR-SEC-02440-02493 | September 1996 Month End AHERF Financial Reporting Summary |
| PR-SEC-02494-02538 | May 1996 Monthly AHERF Financial Reporting Summary |
| PR-SEC-02539-02591 | July 1996 AHERF Financial Reporting Summary |
| PR-SEC-02592-02692 | August 1996 AHREF Financial Reporting Summary |
| PR-SEC-02693-02765 | July 1997 AHERF - PFS Financial Reporting Executive Summary |
| PR-SEC-02766-02839 | August 1997 AHERF - PFS Financial Reporting Executive Summary |
| CL 000927-000929 | Coopers & Lybrand LLP Working Papers |
| CL 000966-000968 | Coopers & Lybrand LLP Working Papers |
| CL 0001030-001033 | Coopers & Lybrand LLP Working Papers |
| CL 0001066-001069 | Coopers & Lybrand LLP Working Papers |
| CL 0001077-001079 | Coopers & Lybrand LLP Working Papers |
| CL 0001114-001119 | Coopers & Lybrand LLP Working Papers |
| CL 0001160-001162 | Coopers & Lybrand LLP Working Papers |
| CL 0001194-001196 | Coopers & Lybrand LLP Working Papers |
| CL 0001206-001213 | Coopers & Lybrand LLP Working Papers |
| CL 0001238-001239 | Coopers & Lybrand LLP Working Papers |
| CL 0001251-001253 | Coopers & Lybrand LLP Working Papers |
| CL 0001270-001278 | Coopers & Lybrand LLP Working Papers |
| CL 0001292-001293 | Coopers & Lybrand LLP Working Papers |
| CL 0001314-001315 | Coopers & Lybrand LLP Working Papers |
| CL 0001327-001329 | Coopers & Lybrand LLP Working Papers |
| CL 0001346-001354 | Coopers & Lybrand LLP Working Papers |
| CL 011262-011262 | Coopers & Lybrand LLP Working Papers |
| CL 011263-011277 | AHERF Year-to-Date Trial Balance 6/30/96 |
| CL 011278-011288 | AGH Departmental Rev and Exp June 30, 1996 |
| CL 011289-011308 | AGH Year-To-Date Trial Balance 6/30/96 |
| CL 011309-011318 | AGH Departmental Rev and Exp 6/30/96 |
| CL 011319-011328 | ASRI Year-To-Date Trial Balance 6/30/96 |
| CL 011329-011339 | AUH-East Falls Detail Bal Sheet mo end 6/30/96 |

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| CL 011340-011348 | AUH-East Falls Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011349-011359 | AUH-East Falls Sched of Op Exp for mo end 6/30/96 |
| CL 011369-011362 | AUH-East Falls Sched of Non-Pat Svc Rev mo end 6/30/96 |
| CL 011363-011366 | AUH-East Falls Gross/Net Pat Rev by Pat. Type for mo end 6/96 |
| CL 011367-011375 | AUH-Elkins Park Detail Bal Sheet for mo end 6/30/96 |
| CL 011376-011382 | AUH-Elkins Park Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011383-011391 | AUH-Elkins Park Sched of Oper Exp for mo end 6/30/96 |
| CL 011392-011393 | AUH-Elkins Park Sched of Non-pat Svc Rev for mo end 6/30/96 |
| CL 011394-011396 | AUH-Elkins Park Gross/Net Pat Rev by Pat Type mo end 6/30/96 |
| CL 011397-011405 | AUH-Bucks County Det Bal Sheet for mo end 6/30/96 |
| CL 011406-011413 | AUH-Bucks County Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011414-011423 | AUH-Bucks County Sched of Oper Exp for mo end 6/30/96 |
| CL 011424-011425 | AUH-Bucks County Sched of Non-Pat Svc Rev for mo end 6/30/96 |
| CL 011426-011429 | AUH-Bucks Cty Gross/Net Pat Rev by Pat Type for mo end 6/96 |
| CL 011430-011455 | AUH-Mgmt Svcs Detail Bal Sheet for mo end 6/30/96 |
| CL 011456-011461 | AUH-Mgmt Svcs Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011462-011470 | AUH-Mgmt Svcs Sched of Operating Exp for mo end 6/30/96 |
| CL 011471-011472 | AUH-Mgmt Svcs Sched of Non-Pat Svc Rev for mo end 6/30/96 |
| CL 011473-011482 | St. Christopher's Hosp for Child Det Bal Sheet for mo end 6/30/96 |
| CL 011483-011490 | St. Christopher's Hosp for Child Stmt of Rev and Exp mo end 6/96 |
| CL 011491-011500 | St. Christopher's Hosp for Child Sched of Oper Exp mo end 6/96 |
| CL 011501-011503 | St. Christopher's Hosp for Child Sched of Non-Pat Svc Rev 6/96 |
| CL 011504-011505 | St. Christopher's Hops for Child Gross/Net Pat Rev by Pat Type |
| CL 011506-011510 | Horizon Detailed Balance Sheet for mo end 6/30/96 |
| CL 011511-011512 | Horizon Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011513-011515 | Horizon Sched of Oper Exp for mo end 6/30/96 |
| CL 011516-011516 | Horizon Sched of Non-Pat Svc Rev for mo end 6/30/96 |
| CL 011517-011528 | AUH-Center City Detail Balance Sheet for mo end 6/30/96 |
| CL 011529-011537 | AUH-Center City Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011538-011548 | AUH-Center City Sched of Operating Exp for mo end 6/30/96 |

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| CL 011549-011551 | AUH-Center City Sched of Non-Pat Svc Rev for mo end 6/96 |
| CL 011552-011554 | AUH-Center City Gross/Net Pat Rev by Pat type 6/30/96 |
| CL 011555-011564 | DVR Consolidated Detail Bal Sheet for mo end 6/30/96 |
| CL 011565-011573 | DVR Consolidated Stmt of Rev and Exp for mo end 6/30/96 |
| CL 011574-011585 | DVR Consolidated Sched of Oper Exp for mo end 6/30/96 |
| CL 011586-011595 | AIHG Summary Year to Date Trial Balance 6/30/96 |
| JD-DC-0055769-0055832 | AIHG financial statement for November 30, 1997 |
| JD-DC-0057397-0057453 | AIHG financial statement for 1998 |
| DLC-NR-02-0348-1140 | |
| DLC-NR-02-12201-2763 | |
| | CD-"FY 96/97/98 DVOG and Add'l G.L.'s" from West Penn |
| | CD-AHERF1:FY92-98a |
| | CD-AHERF2: FY98b-00 |
| | CD - "FY96/97 DVOG G.L." |
| | 2 CDs - Standard FACS Tap Formats |
| | 2 CDs - DVOGMTH.XLS |
| | CD - FY97.xls |
| | CD - "Payroll 95/97/97" |
| | 1966 & 1997 C&L Class Database |
| | CD - Files from Seagate Medalist Drive #109720 |
| | CD - 11/1/00 UB Print Image AHERF/PREMIS |
| | CD - 11/28/00 AHERF Active+Paid Accounts |
| | CD - CFI#110303, 7/02/01 |
| | Business Office Data for Elkins Park Hospital, St. Christopher's Hospital for Children, and Bucks County Hospital for the period from December 1995 to November 1998 |

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| | Deposition Transcript and accompanying exhibits of: |
| | J. David Barnes - July 8-9, 2003 |
| | Ira Gumberg - October 2-3, 2003 |
| | Douglas D. Danforth - October 7-8, 2003 |
| | Robert M. Hernandez - September 8, 2003 |
| | Frank V. Cahouet - March 5, 2004 |
| | Donald Kaye, M.D. - June 17-18, 2003 |
| | Joseph D. Dionisio - September 11-12, 2003 |
| | William Gedman - April 25, 2003 |
| | Anthony Sanzo - July 1-2, and August 11, 2003 |
| | William Snyder, III - July 15-16 2003 |
| | W. Bruce Thomas - September 16, 2003 |
| | Barbara Atkinson, M.D. - May 12, 2004 |
| | Dorothy McKenna Brown, ED.D. - May 4, 2004 |
| | Dr. Donna Marie Murasko - April 8, 2004 |
| | Ronald Davenport - April 20, 2004 |
| | Alfred W. Martinelli - May 5, 2004 |
| | Gregory Snow - July 25 and 26, 2003 |
| | Al Adamczak - June 19-20, 2003; June 26-27, 2003 |
| | Anthony Cook - September 4, 2003; May 7, 2004 |
| | Jane Berkebile - March 18, 2004 |
| | C. David Cook - November 24-25, 2003 |
| | Carolyn Cafaro - August 2 and 13, 2002 |
| | Brian Christian - October 13-14, 2003 |
| | Daniel Cancelmi - January 23-24, 2003; February 6-7, 2003; November 24-25, 2003 |
| | David Leondi - February 4-5, 2004 |
| | David Sculley - December 3, 2003 |
| | David Stevens - February 10, 2004 |
| | Dwight Kasperbauer - March 5, 2004 |
| | R. Evan Fox - November 14, 2002 |
| | Graemer Hilton - August 13, 2003 |
| | Norb Kaliszewski - January 15, 2003 |
| | Karleen Strayer - October 8-9, 2003 |
| | Craig Kocak - November 14, 2003 |
| | Janet Lewis - November 20, 2003 |
| | Muncie Knittel - July 23-24, 2003; June 24, 2004 |
| | Masha Wicker - February 25, 2004 |
| | Robert McNair - January 17 and 30, 2003 |
| | Melissa Matthews - February 19, 2004 |
| | Paul Neuwirth - September 24, 2003 |

| DOCUMENT NUMBER | CONTENTS |
|---|---|
| | Paula Mammarella - July 28-29, 2003<br>Robert Paulich - November 21-22, 2002<br>Richard Madison - March 14, 2003<br>Ralph Michael - March 11, 2004<br>Ralph Brenner - September 30, 2003<br>Randall Russell - September 29, 2003<br>Richard Daniel - October 10, 2003<br>Richard Weill - June 15, 2004; July 7, 2004<br>Robert Palmer - August 8, 2003<br>Gregory Snow - July 25-26, 2003<br>Stephen Spargo - July 17-18, 2003; November 4-5, 2003<br>Daniel Stickler - May 5 and 28, 2003<br>Susan Flanagan - June 23, 2004<br>Thomas McCool - October 28, 2003; July 1, 2004<br>Thomas O'Brien - October 16, 2003<br>Richard Madison - March 14, 2003<br>Charles Reilly - November 21, 2003 |
| | Deposition transcripts of:<br>Charles Martin - April 30, 2003<br>Mark Kirstein- May 11-13, 2004<br>Lora Franz - November 22, 2002; December 4, 2002<br>Russell Laing - April 22-23, 2004<br>Stephen Spargo (SEC transcript) - March 25, 1999 |

**EXHIBIT  6015**

# Corrections to previously submitted - Review and Comment on the "Report of Robert A. Dickinson" (Issued January 11, 2005)

**Submitted by:**

## Thomas W. Singleton
## February 14, 2005

**In the matter of**

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION )
)
       Plaintiff )  Civil Action No. 00-684
)  Judge David Stewart
vs. )  Cercone
)
PRICEWATERHOUSECOOPERS, LLP )
)
       Defendant )

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**



DEPOSITION
EXHIBIT
6 015
*AKF*

## Correction of Errors in Calculation of Productivity Improvements

I have further reviewed the "Report of Robert A. Dickinson" (Dickinson Report) issued November 8, 2004 and my response to this report. I have determined that a formulaic error in my calculation inappropriately understated the productivity improvement opportunity available to the DVOG entities. In determining the "Hour Variance" column on Exhibit XII, attached to my report of January 11th, I divided by the respective case mix index of each entity. The appropriate calculation is multiplication by the case mix index.

**Incorrect formula used in original report and rebuttal report:**
Hour Variance=(Fte's per 100 adj. disch Case mix adj. *minus* Bench mark)
*Multiplied by* (adj. Dischs/100) *multiplied by* 2080 *divided by* Case mix index

**Corrected formula**
Hour Variance=(Fte's per 100 adj. disch Case mix adj. *minus* Bench mark)
*Multiplied by* (adj. Dischs/100) *multiplied by* 2080 **multiplied by** Case mix index

When this correction is made, the EBITDA improvement opportunity for productivity becomes $137.5 million (see Exhibit XII-A) instead of $86.1 million as in the Rebuttal Report. In addition, benchmark changes utilizing the "Urban (All)" category have been incorporated. Although numerous benchmark changes were made, our use of the most generous benchmark in the array resulted in a 1/100[th] change in the benchmark utilized to calculate EBITDA improvement opportunity for two hospitals. The "Benchmark Value Utilized" column of the exhibit has been changed to 3.86 from the previously presented 3.87 for Allegheny Elkins Park and Allegheny Bucks County Hospitals.

In addition, originally I had used the 2003 Solucient Source Book which did not include the 1996 quartile benchmarks. Thus, I used the 25% quartile[1] benchmark for 1999 which was available in the 2003 Solucient Source Book. In his report, Mr. Dickenson points out that the 1996 Solucient quartile data is available. I have now received, electronically, a copy of the out-of-print 2000 Solucient Source Book that does, in fact, provide fiscal 1996 quartile data. This change in benchmarks reduces the EBITDA Improvement Opportunity for productivity by $21.6 million.

The net effect of the calculation revision, correcting for the formula error discussed previously and utilizing fiscal 1996 Solucient benchmark data, yields a revised EBITDA Improvement Opportunity for productivity of $115.9 million when fully implemented (see Revised Exhibit XII). In addition, it is appropriate to point out that this figure is conservatively calculated.

---

[1] Solucient Source Book 2003 defines the 25% quartile as, "the value for which 25% of the group has lesser values and 75% has greater values".

Also, the expenses for "Severance" and "Turnaround Consulting Fees" have been included in the Summary of EBITDA Improvement table and the Simplified Cash Flow table.

The changes noted above impact certain charts and exhibits formerly submitted in my January 11th Report. I have included as attachments the following:

- Revised Exhibit XII
- Exhibit XII-A
- Revised Summary of EBITDA Improvement Changes
- Revised Summary of EBITDA Improvement
- Revised Simplified Cash Flow

Thomas W. Singleton

February 14, 2005

2

DVOG
REVISED EXHIBIT XII - to replace Exhibit XII of the January 11th Report
SALARY AND BENEFIT EBITDA OPPORTUNITY
CORRECTED BENCHMARKS (URBAN ALL HOSPITALS - 1998 26th percentile)
CALCULATION ERROR CORRECTED
Source Solucient 2000 - Urban (All)

FULL TIME EQUIVALENT PERSONNEL PER 100 ADJUSTED DISCHARGES-CASE MIX ADJUSTED

| COMPANY NUMBER | FACILITY | FTE'S FROM COST REPORTS | FTE'S INCLUDING IN COST REPORT FTE'S | COST REPORT FTE'S EXCLUDING RESIDENTS | ADJUSTED DISCHARGES | ADJUSTED DAYS | ADJUSTED AVERAGE DAILY CENSUS (AADC) | CMI | FTES PER AADC INCLUDING RESIDENTS | FTES PER AADC EXCLUDING RESIDENTS | FTE PER 100 ADJUSTED DISCHARGES INCLUDING RESIDENTS | FTE PER 100 ADJUSTED DISCHARGES-CMI ADJUSTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 210 | Allegheny East Falls Hospital | 1,830 | 225 | 1,610 | 16,914 | 117,431 | 322 | 1.13 | 5.60 | 5.92 | 10.76 | 7.01 |
| 211 | Allegheny Elkins Park Hospital | 616 | 616 | 476 | 12,897 | 66,444 | 166 | 0.90 | 3.47 | 3.91 | 4.70 | 4.45 |
| 212 | Allegheny Bucks County Hospital | 467 | 3 | 476 | 9,222 | 53,709 | 147 | 0.95 | 3.55 | 5.95 | 6.16 | 6.40 |
| 220 | St. Christopher Hospital | 1,450 | 116 | 1,331 | 13,964 | 64,022 | 176 | 1.06 | 5.26 | 7.62 | 10.32 | 8.35 |
| 230 | Allegheny Center City Hospital | 3,116 | 299 | 2,816 | 24,803 | 183,540 | 408 | 1.77 | 7.26 | 6.31 | 11.47 | 6.4 |

| COMPANY NUMBER | FACILITY | 100 TO 249 BEDS | 250 TO 399 BEDS | TEACHING | SPECIALTY CHILDRENS HOSPITAL | STATE - PENNSYLVANIA | SYSTEM AFFILIATED | SEP A BOND RATING | MANAGED CARE PENETRATION MEDIAN | BENCHMARK VALUE UTILIZED | FTE VARIANCE | HOUR VARIANCE | AVERAGE HOURLY WAGE AND BENEFIT | EBITDA IMPACT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 210 | Allegheny East Falls Hospital | | | | | | | | | 4.51 | 2.49 | 114,481 | 26.08 | 29,894,451 |
| 211 | Allegheny Elkins Park Hospital | 4.00 | | | | | | | | 4.00 | 0.71 | 114,336 | 21.02 | 3,884,740 |
| 212 | Allegheny Bucks County Hospital | 2.70 | | | | | | 2.64 | | 4.00 | 1.37 | 235,116 | 22.17 | 6,646,554 |
| 220 | St. Christopher Hospital | 3.76 | | | | | 4.00 | | 4.02 | 6.00 | 2.17 | 887,637 | 24.25 | 21,771,344 |
| 230 | Allegheny Center City Hospital | 3.76 | | | | 6.40 | | 3.56 | | 4.00 | 1.94 | 1,422,800 | 27.40 | 34,614,149 |

ADD:
MANAGEMENT SUPPORT SERVICES    16,220,000

TOTAL    115,940,000

PERCENTAGE OF NET REVENUE

| COMPANY NUMBER | FACILITY | NET REVENUE | SALARY AND BENEFITS | CAMDO BENCHMARK 4% OF NET REVENUE | SALARY AND BENEFITS IN EXCESS OF BENCHMARK |
|---|---|---|---|---|---|
| 210 | Allegheny East Falls Hospital | 172,090 | 100,816 | 79,250 | 22,320 |
| 211 | Allegheny Elkins Park Hospital | 48,540 | 26,653 | 22,070 | 4,591 |
| 212 | Allegheny Bucks County Hospital | 34,810 | 22,070 | 17,440 | 4,590 |
| 220 | St. Christopher Hospital | 124,490 | 87,440 | 69,820 | 6,920 |
| 230 | Allegheny Center City Hospital | 300,610 | 185,051 | 133,322 | 29,729 |
| | TOTAL | 376,030 | 213,390 | | 84,440 |
| | ADD: MANAGEMENT SUPPORT SERVICES | | | | 16,220 |
| | TOTAL | | | | 80,660 |

DVOG
EXHIBIT XII-A
SALARY AND BENEFIT EBITDA OPPORTUNITY
CORRECTED BENCHMARKS (URBAN ALL HOSPITALS - 1999 25th percentile)
CALCULATION ERROR CORRECTED
Source: Solucient 2003 - Urban (All)

| COMPANY NUMBER | FTE's FROM COST REPORTS | MEDICARE INCLUDED IN COST REPORT FTE'S | COST REPORT FTE EXCLUDING RESIDENTS | ADJUSTED DISCHARGES | ADJUSTED DAYS | ADJUSTED AVERAGE DAILY CENSUS (AADC) | CMI | FTE'S PER AADC INCLUDING RESIDENTS | FTE'S PER AADC EXCLUDING RESIDENTS | FTE/100 ADJUSTED DISCHARGES - INCLUDING RESIDENTS | FTE/100 ADJUSTED DISCHARGES-CMI ADJUSTED |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 210 | 1,830 | 220 | 1,610 | 19,614 | 117,461 | 322 | 1.29 | 5.69 | 5.00 | 9.23 | 7.51 |
| 211 | 815 | 18 | 896 | 12,867 | 64,444 | 166 | 0.99 | 3.47 | 3.19 | 6.33 | 4.52 |
| 212 | 481 | 3 | 478 | 8,222 | 63,796 | 141 | 0.84 | 3.33 | 3.35 | 8.15 | 6.43 |
| 220 | 1,455 | 116 | 1,331 | 12,164 | 84,022 | 176 | 1.00 | 8.26 | 8.26 | 10.21 | 8.51 |
| 290 | 3,115 | 290 | 2,816 | 24,663 | 146,660 | 446 | 1.77 | 7.08 | 6.50 | 11.47 | 8.46 |

**FULL TIME EQUIVALENT PERSONNEL, PER 100 ADJUSTED DISCHARGES, CASE MIX ADJUSTED.**

| COMPANY NUMBER | FACILITY | 100 TO 249 BEDS | 250 TO 399 BEDS | TEACHING | SPECIALTY CHILDRENS HOSPITAL | STATE: PENNSYLVANIA | SYSTEM AFFILIATED | S&P & BOND RATIO | MATURED CARE PENETRATION - HIGH/LOW | BENCHMARK VALUE (SELECTED) | FTE VARIANCE | HOUR VARIANCE | AVERAGE HOURLY WAGE AND BENEFIT | EBITDA IMPACT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 210 | Allegheny East Falls Hospital | 3.85 | | | | | | | | 4.51 | 2.45 | 1,116,577 | 30.00 | 33,517,463 |
| 211 | Allegheny Elbra Park Hospital | | | | | | | | | 3.90 | 0.04 | 344,097 | 21.50 | 5,273,004 |
| 212 | Allegheny Bucks County Hospital | 3.80 | | | | | | | | 3.50 | 1.00 | 252,652 | 22.17 | 6,474,474 |
| 220 | St. Christophers Hospital | 3.80 | | | | 3.62 | | 2.60 | 3.88 | 6.12 | 2.11 | 1,050,415 | 34.30 | 25,486,879 |
| 290 | Allegheny Center City Hospital | 3.12 | | | 4.51 | | | | | 4.63 | 1.90 | 1,764,172 | 27.96 | 44,680,019 |

|  |  |
|---|---|
| ADD: MANAGEMENT SUPPORT SERVICES | 18,230,000 |
| TOTAL | 137,549,250 |
| | 121,291,348 |

**PERCENTAGE OF NET REVENUE**

| COMPANY NUMBER | FACILITY | NET REVENUE | SALARY AND BENEFITS | CMI BENCHMARK 16% OF NET REVENUE | SALARY AND BENEFITS IN EXCESS OF BENCHMARK |
|---|---|---|---|---|---|
| 210 | Allegheny East Falls Hospital | 172,590 | 100,046 | 78,391 | 22,352 |
| 211 | Allegheny Elbra Park Hospital | 48,049 | 26,453 | 22,072 | 4,851 |
| 212 | Allegheny Bucks County Hospital | 38,810 | 22,070 | 17,440 | 4,639 |
| 220 | St. Christophers Hospital | 134,880 | 87,449 | 60,620 | 6,929 |
| 290 | Allegheny Center City Hospital | 300,916 | 166,061 | 136,337 | 29,726 |
| | TOTAL | | 375,030 | 313,000 | 64,400 |

|  |  |
|---|---|
| ADD MANAGEMENT SUPPORT SERVICES | 18,533 |
| TOTAL | 80,963 |

To Replace Table on Page 6 of the January 11th Report

## REVISED SUMMARY OF EBITDA IMPROVEMENT

| | Delaware Valley Obligated Group and AIHG Total EBITDA for Fiscal Year Ending 6/30/1996 and Improvements | EBITDA Improvement Phase In | | |
| --- | --- | --- | --- | --- |
| | | Fiscal Year Ending 6/30/1997 | Fiscal Year Ending 6/30/1998 | Fiscal Year Ending 6/30/1999 |
| **Delaware Valley Obligated Group** | | | | |
| EBITDA as properly stated by the Creditor's Committee Accounting Experts | 36,129 | 36,129 | 38,129 | 38,129 |
| EBITDA Improvements (Cambio Findings) | | | | |
| Supply Chain Management | 18,254 | 4,107 | 12,776 | 18,254 |
| Productivity | 115,949 | 26,089 | 81,164 | 115,949 |
| Case Management | 2,546 | 573 | 1,782 | 2,546 |
| Revenue Cycle | 32,331 | 7,274 | 22,632 | 32,331 |
| Discretionary Spending | 7,642 | 1,720 | 5,350 | 7,642 |
| Total EBITDA Improvements | 176,722 | 39,763 | 123,706 | 176,722 |
| **Allegheny Integrated Health Group** | | | | |
| EBITDA as properly stated by the Creditor's Committee Accounting Experts after improvements | (36,659) | (40,682) | (40,682) | (40,682) |
| **DVOG and AIHG Combined** | | | | |
| **Less:** | | | | |
| Severance Costs | 8,638 | 1,944 | 6,047 | 8,638 |
| Turnaround Costs | - | 1,500 | - | - |
| EBITDA as properly stated by the Creditor's Committee Accounting Experts after improvements | 178,192 | 33,766 | 115,108 | 165,531 |

Note: The Delaware Valley Obligated Group is comprised of the following entities:
Hahnemann University Hospital
Medical College of Pennsylvania Hospital
Bucks County Hospital
Elkins Park Hospital
Allegheny University of Health and Science Services - ( a medical school entity)
Management Support Services - ( an entity providing system resources such as Human Resources, Legal, etc.)

Note: The Allegheny Integrated Health Group is an entity charged with management and financial reporting of employed physicians and all risk contracting for all of AHERF

To Replace Table on Page 5 of the January 11th Report

## REVISED SUMMARY OF EBITDA IMPROVEMENT CHANGES
### Annual Amounts as of 1999

| Delaware Valley Obligated Group | Singleton Report | Dickinson Report | Revised Singleton |
|---|---|---|---|
| **Medicare BBA/BBR** | -- | (31,298) | -- |
| **Welfare Reform** | -- | (12,168) | -- |
| **Malpractice Premiums** | -- | (13,997) | -- |
| Supply Chain Management | 18,254 | | 18,254 |
| Productivity | 62,878 | 6,595 | 115,949 |
| Case Management | 2,546 | 1,163 | 2,546 |
| Revenue Cycle | 32,331 | 10,942 | 32,331 |
| Discretionary Spending | 7,642 | 4,209 | 7,642 |
| **Total EBITDA Improvements** | 123,651 | (34,354) | 176,722 |

### Other Amounts Cumulative from 1996-97

| | | | |
|---|---|---|---|
| Severance costs | | (8,638) | (8,638) |
| Consulting Turnaround fees | | (1,500) | (1,500) |

**To Replace Table on Page 7 of the January 11th Report**

| REVISED SIMPLIFIED CASH FLOW | | | |
|---|---|---|---|
| | Fiscal 1997 | Fiscal 1998 | Fiscal 1999 |
| EBITDA estimate including AIHG | 33,766 | 115,106 | 165,531 |
| Less: | | | |
| Debt Service | 25,089 | 36,165 | 35,134 |
| Capital Requirements | 50,231 | 50,231 | 50,231 |
| Cash Required | 75,320 | 86,396 | 85,365 |
| | | | |
| Excess / (Deficit) Cash | (41,554) | 28,710 | 80,166 |
| Beginning Cash | 27,762 | (13,792) | 14,918 |
| Ending Cash | (13,792) | 14,918 | 95,085 |

**EXHIBIT  6016**

# Corrections to previously submitted – Review and Comment on the "Report of Robert A. Dickinson" (Issued January 11, 2005)

Submitted by:

## Thomas W. Singleton
## February 18, 2005

In the matter of

| | |
|---|---|
| **THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION** )<br>)<br>)<br>)<br>) | |
| Plaintiff  )<br>) | **Civil Action No. 00-684** |
| )<br>) | **Judge David Stewart Cercone** |
| **vs.**  )<br>) | |
| **PRICEWATERHOUSECOOPERS, LLP**  )<br>) | |
| Defendant  )<br>) | |

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**



DEPOSITION
EXHIBIT
6016
AKF

## Correction of an Error in Revenue Cycle Chart

I have determined that a chart presented on page 19 of my January 11th report did not include consideration of an $11.5 million increase to bad debt for fiscal years prior to 1996 recorded by the creditors committee's accounting experts. For demonstration purposes I have applied this increase to fiscal 1995. This adjustment resulted in an overall percentage of bad debt to total gross revenue of 2.21% for fiscal 1995. My previously submitted chart presented the percentage as 1.55%, the appropriate percentage prior to consideration of the accounting expert's adjustment.

This change does not impact my calculations or my conclusions within the revenue cycle section of my report. It is merely a change in chart presentation.

Presented below is the chart as originally presented, and then, as corrected.

ORIGINAL – see page 19 of my January 11th Report



CORRECTED



Thomas W. Singleton

February 18, 2005

1

**EXHIBIT  6106**



# $\bigwedge$lixPartners LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| ALLEGHENY HEALTH, EDUCATION | ) | |
| AND RESEARCH FOUNDATION, | ) | |
| | ) | Civil Action No. 00-684 |
| Plaintiff, | ) | Judge David Stewart Cercone |
| | ) | |
| v. | ) | |
| | ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) | |
| | ) | |
| Defendant. | ) | |

Rule 26(a)(2)(B) Report of R. Bruce Den Uyl

## I.    Introduction

This report contains my opinions in the matter brought by The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation (the "Committee" or "Plaintiff") against the PricewaterhouseCoopers ("PwC", "Coopers" or the "Defendant").[1]  I have been retained to provide expert opinions regarding the damages sustained as a result of misstatements contained in the audited financial statements of the Allegheny Health, Education and Research Foundation and its affiliates (the "AHERF System") for fiscal years ended June 30, 1996 and June 30, 1997.

## II.    Personal Background, Information and Qualifications

I am a Principal in the professional services firm AlixPartners LLC ("AlixPartners").  As part of performing my analysis, I utilized a team of AlixPartners personnel who worked under my direction and control.

---

[1] Coopers & Lybrand ("Coopers") and Price Waterhouse merged to create PricewaterhouseCoopers ("PwC") in July of 1998.  The legacy Coopers auditors were the auditors of the Allegheny Health, Education and Research Foundation and its affiliates for the fiscal years 1996 and 1997.

All of the opinions presented in this report are based on my analysis of the available information and my experience, education and expertise as a financial consultant.

I have had extensive experience as a consultant on a broad array of financial issues. I have prepared financial and accounting analyses, valuations and efficiency studies in connection with mergers and acquisitions, bankruptcies, fairness opinions and litigation issues. I have acted as a consultant to companies and governmental bodies for the purpose of establishing values for acquisitions and divestitures. I have prepared analyses for cases involving failed acquisitions, fraudulent conveyance, bankruptcy, breach of contract, antitrust and securities issues. In addition, I have extensive experience preparing valuations and financial analyses in the healthcare industry including hospitals, HMOs, PPOs, physician practices, and clinics. I have acted as an expert and advisor to troubled and financially viable healthcare entities. I have also provided fairness reviews of transactions for Attorneys General throughout the United States and have provided expert testimony in several healthcare cases.

Exhibits 1, 2 and 3 contain copies of my curriculum vitae, a list of my presentations and publications in the last ten years, and a list of my deposition and trial testimony within the last four years, respectively.

## III.    Background

### A.  The History of Allegheny Health, Education and Research Foundation

AHERF was a Pennsylvania nonprofit corporation that was originally created in 1983 to function as the sole member of Allegheny General Hospital, which at that time had operated for nearly 100 years.[2] In the late 1980s, AHERF was a financially stable organization acting primarily as Allegheny General Hospital's parent foundation and coordinating the efforts of a relatively small

---

[2] First Amended Complaint at page 4.

number of affiliated healthcare entities.[3]  By fiscal year end 1987, Allegheny General Hospital (800 beds) had a long-term debt balance of approximately $73 million and total revenue of approximately $210 million.[4, 5]

In the following fiscal year, AHERF looked to the Philadelphia market for expansion.[6]  In 1988, AHERF acquired the Medical College of Pennsylvania, which operated a medical school and an associated hospital (495 beds) in Philadelphia.[7, 8]  At the time, the Medical College of Pennsylvania was in serious financial distress.[9]  The Medical College of Pennsylvania agreed to the acquisition when AHERF pledged an infusion of capital of $40 million to $60 million over a five-year period.[10]  By 1990, the AHERF System was profitable and carried a debt balance of approximately $160 million.[11]

In 1991, AHERF acquired the United Health System, which operated St. Christopher's Hospital for Children in Philadelphia (183 beds) and three suburban hospitals:  Warminster (later known as Bucks County with 190 beds), Rolling Hills (later known as Elkins Park with 304 beds) and Lawndale (which closed a year after acquisition).[12, 13]  At the time, the three community hospitals were encountering financial difficulties and the United Health System was headed toward bankruptcy.[14]

In 1994 AHERF acquired another, larger Philadelphia medical school, Hahnemann University Medical School, and its associated medical center, the 638-bed Hahnemann University Hospital.[15, 16]  In 1994, AHERF merged its two Philadelphia medical schools into MCP-

---

[3] Ibid at page 7.
[4] Allegheny General Hospital and Subsidiaries Consolidated financial statements for the years ended June 30, 1988, 1987 and 1986 (DBR-AA 4808 to 4831).
[5] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[6] J. David Barnes deposition testimony, July 8, 2003 at pages 25 - 27.
[7] Amended Disclosure Statement at page 16.
[8] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[9] Amended Disclosure Statement at page 16.
[10] Ibid at page 16.
[11] Allegheny Health Services consolidated financial statements for the years ended June 30, 1991 and 1990.
[12] First Amended Complaint at page 9.
[13] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[14] First Amended Complaint at page 9.
[15] Ibid at page 9.
[16] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).

3

Hahnemann School of Medicine (which later became Allegheny University of the Health Sciences). In 1996, the Allegheny University of the Health Sciences and what were then AHERF's five Philadelphia-area hospitals -- Medical College of Pennsylvania Hospital, Hahnemann University Hospital, St. Christopher's, Elkins Park, and Bucks County -- combined to issue bonds and notes as the Delaware Valley Obligated Group ("DVOG"), totaling approximately $407 million of new and replacement long-term debt.[17]

In connection with the June 1996 DVOG bond issuance, AHERF insured the bonds through MBIA Insurance Corporation ("MBIA"). At the same time, PNC Bank ("PNC") issued letters of credit relating to DVOG long-term debt. By insuring the debt, AHERF garnered a AAA rating for DVOG's debt. The underlying rating for the DVOG bonds (in the absence of insurance) by all three major rating agencies was BBB.[18]

In August of 1996, AHERF senior management began its efforts to acquire five more Philadelphia-area hospitals then owned by the Graduate Health System: Graduate (330 beds), Mt. Sinai (225 beds, which was closed by AHERF in October 1997), Parkview (212 beds), City Avenue (248 beds) (collectively, the Philadelphia-area hospitals were known as the "Graduate Hospitals") and Rancocas Hospital (353 beds), a hospital in New Jersey[19] (collectively, the "Graduate Acquisitions").[20, 21] Considered collectively, the Graduate Hospitals were in financial distress at the time, a fact reported by the Philadelphia media and shown in the Graduate Hospitals financial statements.[22] In late August 1996, Moody's downgraded the bonds of the Graduate Hospitals to Ba (junk-bond status)[23] from Baa, citing the change in control and the uncertainty regarding the timing surrounding an improvement in the Graduate Hospitals'

---

[17] First Amended Complaint at page 10. Secondary Market Disclosure report for Fiscal Year 1997. The $407 million includes newly issued bonds and commercial paper.
[18] Deposition Exhibit 617.
[19] Allegheny Hospitals, New Jersey operated Rancocas Hospital and Zurbrugg Memorial Health Center, a community health center with specialized non-acute medical programs with 24 licensed beds. Zurbrugg Memorial Health Center was under contract for sale at the time of its acquisition by AHERF and was ultimately sold after the AHERF bankruptcy. Zurbrugg Memorial Health Center was not operated as an acute care facility during the time period that it was held by AHERF.
[20] First Amended Complaint at page 10.
[21] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[22] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal year ended June 30, 1996.
[23] Moody's Ba rating reflects a bond that is not investment grade (junk bond).

financial condition.[24]  Graduate and Mt. Sinai alone had approximately $160 million in outstanding long-term debt arising out of bonds issued in 1991 and 1993.[25]  The overall bond debt related to the Graduate Hospitals as of June 30, 1996 was approximately $171 million.[26]

The transaction involving the Graduate Hospitals was structured such that the hospitals were initially acquired by an AHERF non-member affiliated shell corporation known as SDN, Inc. ("SDN").  On May 1, 1997 AHERF became the sole member of the corporate entities that owned the Graduate Hospitals.[27]  The stated purpose for the hospitals being acquired initially by SDN was to allow AHERF time to undertake due diligence related to the hospitals.[28]  As a result of these transactions, the Philadelphia and New Jersey based hospitals of the Graduate Health System came to be owned by Allegheny Hospitals, Centennial ("Centennial") and Allegheny Hospitals, New Jersey, respectively.

In September 1996, Coopers issued its report to the AHERF Board of Trustees[29] (the "Board of Trustees" or "Trustees") regarding its audit of the consolidated financial statements of AHERF and the supplementary consolidating financial information related to AHERF's subsidiaries for the fiscal year ended June 30, 1996 ("Fiscal Year 1996").[30, 31]  Further in September 1996, Coopers issued reports regarding its audit of each of the individual AHERF subsidiary financial statements.  In regard to the AHERF consolidated audit, Coopers' report stated, "In our opinion, the consolidated financial statements referred to above [AHERF balance sheet as of June 30, 1996 and related statements of operations, changes in net assets and cash flows] present fairly, in all material respects, the consolidated financial position of Allegheny Health, Education and Research Foundation as of June 30, 1996 and the consolidated results of its operations, changes

---

[24] Business Wire, August 26, 1996.
[25] Audited financial statements for the Graduate Hospital for the year ended June 30, 1996. Audited financial statements for Mt. Sinai Hospital for the year ended June 30, 1996.
[26] Audited financial statements for the hospitals that comprised the Graduate Health System for the year ended June 30, 1996.
[27] AHERF Fiscal Year 1997 Audited Consolidated Financial Statements at page 7.
[28] Letter from Mr. Abdelhak and Mr. Snyder to the AHERF Board of Trustees, August 5, 1996 (D 0004319).
[29] As of 1997, the AHERF System had 10 separate Boards of Trustees. The AHERF Board of Trustees was the largest board and had oversight of the parent organization.
[30] Coopers & Lybrand Report of Independent Accountants dated September 11, 1996 (Deposition Exhibit 1661).
[31] The Graduate Hospitals were merged into SDN effective November 1, 1996. A Board resolution related to the ultimate merger of the entities into AHERF was approved at the Annual Meeting of the Board of Trustees of AHERF dated December 12, 1996 (PR-1-000745 and PR-1-000747).

in net assets and cash flows for the year then ended in conformity with generally accepted accounting principles."[32]  Coopers provided a similar opinion with regard to the supplementary consolidating financial information and for each of the individual entities for Fiscal Year 1996.[33]

In the months following the issuance of Coopers' Fiscal Year 1996 audit report, and in addition to its aforementioned acquisition of the Graduate Hospitals, AHERF acquired the entities known as the Forbes Health System (Forbes Regional Hospital, Forbes Metropolitan Hospital, Forbes Hospice, Forbes Nursing Center), and Allegheny Valley Hospital (collectively, the Allegheny University Medical Centers).[34]  The Forbes Health System and the Allegheny Valley Hospital acquisitions added another $122 million of bond debt to the AHERF System's consolidated balance sheet.[35]  By this point, AHERF's total debt had increased from approximately $73 million in 1987[36] to approximately $1.1 billion by fiscal year end 1997.[37]  Total revenue of the system increased from approximately $210 million to approximately $2 billion over the same time period.[38]  The final hospital addition to the Allegheny University Medical Centers came with the acquisition of Canonsburg Hospital on July 1, 1997.[39]  Exhibit 4 provides a chart of the various AHERF obligated groups and member entities.  Exhibit 5 provides a summary of AHERF's bond debt assumptions and issuances over time.

Besides acquiring these facilities, AHERF expanded its physician network throughout Pennsylvania by purchasing primary care physician practices, which were organized under Allegheny University Medical Practices, formerly known as Allegheny Integrated Health

---

[32] Coopers & Lybrand Report of Independent Accountants dated September 11, 1996 (Deposition Exhibit 1661).
[33] Allegheny Health, Education and Research Foundation Audited Financial Statements for Fiscal Year 1996 (Deposition Exhibit 1661).
[34] The Forbes Health System hospitals and the Allegheny Valley Hospital became part of AHERF effective January 1, 1997 and March 1, 1997, respectively.  The Forbes Health System hospitals had a total of 472 beds and the Allegheny Valley Hospital had 288 beds (DBR-SG-WP-1037).
[35] Allegheny Health, Education and Research Foundation audited financial statements for the fiscal year ended June 30, 1997.
[36] Allegheny General Hospital and Subsidiaries Consolidated financial statements for the years ended June 30, 1988, 1987 and 1986 (DBR-AA 4808 to 4831).
[37] Allegheny Health, Education and Research Foundation audited financial statements for the fiscal year ended June 30, 1997.
[38] Ibid.  Allegheny General Hospital and Subsidiaries Consolidated financial statements for the years ended June 30, 1988, 1987 and 1986 (DBR-AA 4808 to 4831).
[39] Canonsburg Hospital had 120 beds (GOV 20226).

6

Group.[40]  AHERF spent millions of dollars on these practices, which in turn produced significant losses to the AHERF System.[41]  In addition, AHERF guaranteed high salaries to the physicians who agreed to join the AHERF System and furthermore, AHERF's contracts included no requirements related to practice productivity.[42]  AHERF's largest acquisition of physician practices became effective in April 1997 when it acquired the practices of more than 100 physicians including approximately 80 primary care physicians of the Penn Group Medical Associates ("PGMA") for $20 million in cash.[43]

Also in the latter half of the 1990s, AHERF entered into risk contracts with certain health insurance companies whereby AHERF agreed to be financially liable for healthcare services to subscribers of these insurers in exchange for a capitated amount of revenue.  Effective April of 1997, in connection with the PGMA acquisition, AHERF entered into such a risk contract with HealthAmerica Pennsylvania, Inc. ("HealthAmerica"), which was expected to result in significant losses to the AHERF System.[44]

In the fall of 1997, Coopers again issued a clean opinion, using the same language as its Fiscal Year 1996 report, for the AHERF consolidated financial statements for the fiscal year ended June 30, 1997 ("Fiscal Year 1997").  Likewise, Coopers provided a clean opinion on the supplementary consolidating and combining financial information related to the AHERF affiliates.  This consolidating and combining information accompanied the consolidated financial statements and was indicated to have been subjected to the auditing procedures applied by Coopers in the audit of the AHERF consolidated financial statements.  Coopers' audit report was dated September 1997 with the exception of a footnote related to debt covenant violations at Centennial and DVOG, which was dated January 8, 1998.[45]

---

[40] Amended Disclosure Statement at page 17.
[41] According to the Fiscal Year 1996 and Fiscal Year 1997 audited financial statements, Allegheny Integrated Health Group had net losses of $41 million and $61 million in fiscal years 1996 and 1997, respectively.  Additionally, approximately $21 million and $32 million was spent to acquire additional physician practices in fiscal years 1996 and 1997, respectively.
[42] Amended Disclosure Statement at page 17.  Deposition Exhibit 790.
[43] Asset Purchase Agreement by and among HealthAmerica Pennsylvania, Inc. and AHERF at page 5.  Letter from Sherif S. Abdelhak to Members of the Allegheny Consolidated Boards of Trustees dated February 5, 1997 (JD-SA-0004069).
[44] Risk Contract Analysis (CL 025664).
[45] Coopers & Lybrand Report of Independent Accountants (D 0018504, D 0018529).

Signs of AHERF's financial distress started to become evident in the fall of 1997. The financial statements for the first quarter of fiscal year 1998 (quarter ended September 30, 1997) showed net losses of $42.6 million.[46] AHERF then announced that it would have employee layoffs of 6% of its workforce, said executive salaries would be trimmed and reported that medical school faculty members' salaries would be linked to productivity.[47] In January 1998, both Moody's and Standard & Poor's downgraded their respective bond ratings for Centennial and Allegheny Hospitals, New Jersey.[48]

AHERF's financial situation continued to deteriorate throughout the year ended June 30, 1998 ("Fiscal Year 1998"). As a result, AHERF attempted to raise cash through asset sales. On February 13, 1998, AHERF entered into an asset purchase agreement with Vanguard Health Systems, Inc. ("Vanguard"), under which Vanguard would buy six of AHERF's Eastern hospitals (Graduate, City Avenue, Parkview, Elkins Park, Bucks County and Rancocas) for $400 million.[49] The section of this report titled "Sale of AHERF Assets" provides further detail on the Vanguard purchase agreement, as well as others, including the final purchase agreement entered into with Tenet Healthcare Corporation ("Tenet").

In May 1998, Moody's downgraded its bond ratings for Allegheny General Hospital and Allegheny University Medical Centers.[50] Around this time, Mr. Sherif Abdelhak ("Mr. Abdelhak") was ousted by the AHERF board and replaced by Mr. Anthony Sanzo ("Mr. Sanzo").[51] Based on the recommendation of Mr. Sanzo, then AHERF's CEO, Mr. David McConnell ("Mr. McConnell") was forced out as AHERF CFO shortly thereafter.[52] The following month, Moody's released a rating of below investment grade (Caa1) for DVOG.[53]

---

[46] Allegheny Health, Education Research Foundation Consolidating Statement of Operations for the Three Months Ended September 30, 1997 (JB 00791).
[47] Deposition Exhibit 1989.
[48] The Bond Buyer, January 7, 1998. PR Newswire, January 27, 1998.
[49] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. Dated February 13, 1998 at Deposition Exhibit 572.
[50] The Bond Buyer, May 21, 1998.
[51] Deposition Exhibit 1677.
[52] Ira Gumberg deposition testimony, October 3, 2003 at pages 346 - 349.
[53] Capital Markets Report, July 21, 1998.

On July 21, 1998, AHERF and several of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code ("Petition Date").[54] When the Chapter 11 cases were filed, the entities that comprised the remainder of the AHERF System could be grouped into one of two categories: the "Debtor Entities" or "Debtors" (which were primarily those entities with operations in the Philadelphia area and, together with Allegheny Hospitals, New Jersey are sometimes referred to as the "Eastern Entities"); and the "Non-Debtor Entities" (which were primarily those entities with operations in the Pittsburgh area, and are sometimes referred to as the "Western Entities").[55]  At the time of the filing of the Chapter 11 cases, the Non-Debtor Entities included Allegheny General Hospital, Allegheny University Medical Centers, Allegheny Hospitals, New Jersey and Allegheny University Hospitals-West, which provided support services for the hospitals operated by Allegheny General Hospital and Allegheny University Medical Centers.  The Debtor Entities, which each filed a Chapter 11 case in addition to AHERF, included:

- Allegheny University of the Health Sciences;
- Allegheny University Hospitals-East, which operated the Medical College of Pennsylvania Hospital, Hahnemann University Hospital, Bucks County, Elkins Park and St. Christopher's (these hospitals and Allegheny University of the Health Sciences comprised DVOG);
- Centennial; and
- Allegheny University Medical Practices.[56]

Shortly after AHERF and most of the Eastern Entities filed for bankruptcy, the Finance and Audit Committee of the AHERF Board of Trustees, together with senior management of AHERF and PwC, publicly announced that they were reviewing certain accounting and reporting issues related to the Fiscal Year 1997 financial statements audited by Coopers and that pending completion of their review, no further reliance should be placed on the financial statements or on

---

[54] Amended Disclosure Statement, Introduction and Summary.
[55] First Amended Complaint at page 5.
[56] Ibid at page 6.  The Second Amended Plan of Reorganization (the "Plan") dated December 5, 2000 indicates that the Debtor Entities were ultimately substantively consolidated.

9

the Coopers & Lybrand report on the financial statements.[57]  At that time, the AHERF Finance and Audit Committee removed PwC as its external auditors.[58]

### *Sale of AHERF Assets*

As briefly addressed above, AHERF began its attempt to sell certain of its assets in early 1998. In doing so, AHERF retained Merrill Lynch & Co. ("Merrill Lynch") in January 1998 to assist in the sale of AHERF assets in the Philadelphia area.[59]  Prior to AHERF's filing for bankruptcy on July 21, 1998, Merrill Lynch acted as the "exclusive financial advisor to the Debtors in order to solicit, negotiate, and structure a 'business combination' including a sale of all or a substantial portion of the assets of the Centennial Hospitals Group and the Delaware Valley Hospitals Group."[60]

In July 1998, AHERF retained Lehman Brothers, Inc. ("Lehman Brothers") as general restructuring consultants and financial advisors in the Chapter 11 cases.[61]  Lehman Brothers worked with Merrill Lynch in an attempt to achieve a sale of the AHERF assets.[62]

As previously noted, on February 13, 1998 Vanguard made a cash offer of $400 million for six of the AHERF community hospitals including: Graduate, City Avenue, Parkview, Elkins Park, Bucks County, and Rancocas.[63]

Vanguard revised its offer on or about July 20, 1998.  The offer was to acquire all eight AHERF Philadelphia area hospitals and the New Jersey based Rancocas Hospital for $502 million.  The hospitals included in the offer were: Graduate, City Avenue, Parkview, Elkins Park, Bucks County, St. Christopher's Hospital for Children, the Medical College of Pennsylvania Hospital,

---

[57] Deposition Exhibit 1289.
[58] Finance and Audit Committee Meeting Minutes (August 27, 1998).
[59] Per the Affidavit of Lorrie Warner, Director at Merrill Lynch & Co., the assets at issue were located in the area known as the Eastern Region and included the Graduate, Bucks County, Elkins Park, Parkview, City Avenue, the Hahnemann University Hospital, the MCP Hospital, the University, and Rancocas (Deposition Exhibit 1166 at page "Merrill Lynch 403").
[60] Ibid at page 407.
[61] Ibid at page 409.
[62] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 381").
[63] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. Dated February 13, 1998 at Deposition Exhibit 572.

the Hahnemann University Hospital, and Rancocas Hospital. The offer included a carve out of the New Jersey-based Rancocas Hospital. An adjustment of approximately $42 million would be made to the offer price if Rancocas Hospital were not acquired by Vanguard.[64] Vanguard agreed to provide $20 million in working capital for the Allegheny University of the Health Sciences and to work jointly with the Allegheny University of the Health Sciences to find a permanent solution for its management.[65]

On July 30, 1998 a second bidder, Tenet, made an offer to acquire all eight of the AHERF Philadelphia-based hospitals for $465 million.[66] Vanguard followed up with an offer also on or about July 30, 1998 in the amount of $460 million for all eight Philadelphia area hospitals. The offer excluded the New Jersey Rancocas Hospital.[67] In both the Tenet and Vanguard Asset Purchase Agreements, the audited financial statements of the AHERF System were represented to be "true, complete and accurate and fairly present the financial condition and results of operations" for the Fiscal Year 1997.[68]

At mid-September, the Bankruptcy Court imposed a deadline of September 25, 1998 for the submission of offers for the AHERF assets being marketed by Merrill Lynch and Lehman Brothers.[69] During this same time frame, Tenet expressed its doubts as to whether it would submit or confirm a bid in the $465 million range for the Philadelphia area assets, in light of:

- "the uncertainties surrounding the University's future financial stability;
- the recent material restatement of the Debtors' financial statements; and

---

[64] Letter of intent from Vanguard dated July 20, 1998 at JD-LB-000246 to 252.
[65] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 414").
[66] Ibid at page 416. Letter of intent from Tenet dated July 30, 1998 at PR-PLD-029-00415 to 428. Asset Purchase Agreement By and Among AHERF, et al. and Tenet HealthSystem Medical, Inc., et al. dated as of August 11, 1998.
[67] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 415"). Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.
[68] Asset Purchase Agreement By and Among AHERF, et al. and Tenet HealthSystem Medical, Inc., et al. dated as of August 11, 1998. Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.
[69] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 392").

- the continuing decline in value of the assets due to physician attrition and declining census trends."[70]

There were no qualifying bids received on the September 25, 1998 Court imposed deadline for offer submissions. On September 27, 1998, Vanguard provided notice that the "continued significant worsening of the Debtors' financial statements and the issuance of the financial restatements constituted a 'material adverse change.'" Due in part to the financial deterioration, Vanguard withdrew its earlier bid.[71] Instead, Vanguard expressed interest in acquiring five of the Philadelphia area hospitals for $150 million to $200 million.[72] Ultimately, Vanguard submitted an offer for two of the Philadelphia area hospitals for $125 million,[73] followed by an offer for six hospitals and the Allegheny University of the Health Sciences on September 28, 1998 in the amount of $225 million.[74]

Based on the misstated financial statements of AHERF and the continued asset deterioration, Tenet indicated that it would consider pricing a new asset purchase proposal in the $200 million range.[75] On September 29, 1998, Tenet made an offer for all eight of the AHERF Philadelphia based hospitals, the Allegheny University of the Health Sciences, and approximately 150 physician practices. The offer was in the amount of $345 million and was contingent on finding a partner to operate the Allegheny University of the Health Sciences.[76]

---

[70] Ibid at page 393.

[71] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 419"). Anne Morse deposition testimony, October 22, 2003 at pages 61 - 63.

[72] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 394"). The five hospitals are unnamed.

[73] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 405"). The two hospitals are unnamed.

[74] Ibid at page 405 and 419 to 420. The six hospitals are unnamed.

[75] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 395").

[76] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. states that "Merrill Lynch's participation was necessary to consummate the transaction which resulted in an increased value to the Debtor's estates" even "in the face of deteriorating asset values" (Deposition Exhibit 1166 at page "Merrill Lynch 406"). Asset Purchase Agreement By and Among AHERF and Tenet Healthcare Corporation dated as of September 29, 1998 at ML-AHERF 2393 to 2508. First Amendment to the Asset Purchase Agreement By and Among AHERF, et al. and Tenet Healthcare Corporation, et al. dated as of November 10, 1998 at ML-AHERF 2363 to 2377.

On or about October 19, 1998, and while an Allegheny University of the Health Sciences partner was being sought in regard to the Tenet deal, Vanguard provided yet another offer for four hospitals for a purchase price of $145 million to $150 million.[77]

Drexel University ("Drexel") ultimately became the Allegheny University of the Health Sciences partner in regards to the Tenet offer and $110 million of Tenet's $345 million in sale proceeds were directed toward the Allegheny University of the Health Sciences; $60 million to a newly incorporated educational institution and $50 million to Drexel for management of the Allegheny University of the Health Sciences.[78]    Accordingly, approximately $235 million of the $345 million sale proceeds related to the eight Philadelphia hospitals.  The deal was approved by the bankruptcy court and closed on November 10, 1998.[79]

*B. The Financial Performance of AHERF*

In 1990 the AHERF System, which then primarily consisted of Allegheny General Hospital in Pittsburgh and the Medical College of Pennsylvania and its associated hospital in Philadelphia, was a profitable entity which reported revenues of more than $500 million, Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $57.4 million and an EBITDA margin of approximately 11%.[80]    As discussed in Section III A., AHERF consummated several acquisitions throughout the 1990s, which resulted in substantial growth in its revenue and total debt balance.  According to AHERF's audited financial statements for the fiscal years ended June 30, 1990 through June 30, 1995, AHERF was able to maintain a stable level of profitability as it integrated several new entities into its rapidly expanding organization.  Exhibit 6 provides a summary of AHERF's hospital acquisitions over time.  The table below summarizes the growth in AHERF's revenue and total debt, as well as its profitability on an EBITDA basis during the fiscal years ended June 30, 1990 through June 30, 1995:[81]

---

[77] Ibid at page 421.  The four hospitals are unnamed.
[78] Asset Purchase Agreement By and Among AHERF and Tenet Healthcare Corporation dated as of September 29, 1998 at ML-AHERF 2393 to 2508.  First Amendment to the Asset Purchase Agreement By and Among AHERF, et al. and Tenet Healthcare Corporation, et al. dated as of November 10, 1998 at ML-AHERF 2363 to 2377.
[79] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 423").
[80] Allegheny Health Services audited financial statements for the fiscal years ended June 30, 1991 and 1990.
[81] Both Revenues and EBITDA figures shown include investment income in all years.

13

| | Fiscal Years Ended June 30 ($ millions) | | | | | |
|---|---|---|---|---|---|---|
| | **1990** | **1991** | **1992** | **1993** | **1994** | **1995** |
| Revenue | $509.8 | $578.7 | $889.1 | $935.7 | $972.8 | $1,441.5 |
| *% Growth* | | *13.5%* | *53.6%* | *5.2%* | *4.0%* | *48.2%* |
| | | | | | | |
| EBITDA | $57.4 | $67.2 | $113.6 | $105.0 | $101.0 | $159.2 |
| *% Margin* | *11.3%* | *11.6%* | *12.8%* | *11.2%* | *10.4%* | *11.0%* |
| | | | | | | |
| Total debt | $160.5 | $216.9 | $413.5 | $414.3 | $546.1 | $627.1 |
| *% Growth* | | *35.1%* | *90.6%* | *0.2%* | *31.8%* | *14.8%* |

*Source: AHERF Audited Financial Statements*

## C. The Restated Financial Statements

As previously noted, the Fiscal Year 1997 audited financial statements were announced to be unreliable in early September 1998. In conjunction with the current matter, investigations into the AHERF financial statements for fiscal years 1996 and 1997 have been conducted and adjustments have been made to the audited financial statements for both the fiscal years 1996 and 1997 by the firm Marks Paneth & Shron ("Marks Paneth"). I understand that Mr. Robert Berliner ("Mr. Berliner"), the expert opining on the Marks Paneth restated financial statements, has described the adjustments in detail in his expert report (the "Berliner Report").

The adjustments made by Marks Paneth in its restatement of the audited financial statements of AHERF in the fiscal years 1996 and 1997 were significant. The table below shows a comparison of certain of the AHERF financial metrics as reported in the AHERF financial statements audited by Coopers versus the same metric as restated by Marks Paneth for the fiscal years 1996 and 1997.

14

| Financial Metric | Fiscal Years Ended June 30 (S millions) | | | | | |
| | 1996 | | | 1997 | | |
| | Audited | Restated | Variance | Audited | Restated | Variance |
|---|---|---|---|---|---|---|
| Net patient service revenue | $1,352.5 | $1,330.8 | ($21.7) | $1,702.7 | $1,639.7 | ($63.0) |
| Net income, before extraordinary item | $6.5 | ($89.8) | ($96.3) | $21.9 | ($134.9) | ($156.9) |
| Net loss | ($11.8) | ($108.2) | ($96.4) | $21.9 | ($134.9) | ($156.9) |
| Unrestricted Net Assets | $559.2 | $473.1 | ($86.1) | $569.8 | $326.8 | ($242.9) |
| Temporarily Restricted Assets | $109.0 | $56.4 | ($52.5) | $110.8 | $98.9 | ($11.8) |
| Permanently Restricted Assets | $102.6 | $200.3 | $97.7 | $144.2 | $258.0 | $113.8 |

*Source: AHERF Audited Financial Statements; AHERF Restated Financial Statements prepared by Marks Paneth*

AHERF's EBITDA margins in fiscal years 1996 and 1997 were 9.2% and 8.1%, respectively, based on the financial statements audited by Coopers. On a restated basis, however, AHERF's EBITDA margins are dramatically reduced to 3.3% and 0.5% for Fiscal Year 1996 and Fiscal Year 1997, respectively. If investment income is excluded from the calculation of EBITDA, AHERF, on a restated basis, had negative EBITDA margins in fiscal years 1996 and 1997, as indicated in the table below.

| Financial Metric | Fiscal Years Ended June 30 (S millions) | | | |
| | 1996 | | 1997 | |
| | Audited | Restated | Audited | Restated |
|---|---|---|---|---|
| EBITDA (Including Investment Income) | $148.4 | $51.4 | $167.2 | $9.8 |
| *% Margin* | *9.2%* | *3.3%* | *8.1%* | *0.5%* |
| EBITDA (Excluding Investment Income) | $74.3 | ($6.6) | $81.3 | ($56.0) |
| *% Margin* | *4.8%* | *(0.4%)* | *4.1%* | *(3.0%)* |

*Source: AHERF Audited Financial Statements; AHERF Restated Financial Statements prepared by Marks Paneth*

I have utilized the Marks Paneth restated financial statements for purposes of determining the damages associated with certain events that occurred at AHERF that would not have occurred

had the misstatements contained in the audited financial statements been known.[82]  Those events are described in further detail later in this report.

## D.  The Reaction of Responsible Parties

Had they been provided with correct financial statements during fiscal years 1996 and 1997, responsible parties would not have undertaken certain acquisitions and would have proceeded to take counter actions.  Such behavior would have avoided significant costs that the creditors ultimately bore and would have steered the AHERF System from the course that ended in bankruptcy.

Accurate financial statements were imperative to the Board of Trustees.  Several members of the Board of Trustees, in particular those on the Audit Committee testified that they relied on Coopers to bring misstatements to their attention and that it was important for the Board of Trustees to be aware of material misstatements.[83]  For example, Ralph Brenner ("Mr. Brenner"), a member of the Audit Committee, testified that, in the eyes of the Board of Trustees, Coopers was the ultimate guardian of management and the financial affairs of AHERF and that he would expect Coopers to bring to the Board's attention any material misstatements.[84]  Mr. Brenner also testified that had Coopers come to the Audit Committee and indicated that the financial statements were intentionally misstated, he would have intensely investigated the situation.[85]  Similarly, Robert Palmer ("Mr. Palmer"), testified that a materially worse performance from a financial perspective during 1996 and 1997 would have caused an in-depth examination of the steps of the IDS [integrated delivery system], again suggesting the importance of the audited financial statements to the decision making processes of the Board of Trustees.[86]  Furthermore, Mr. Palmer testified that the Board expected losses during the first years after beginning to

---

[82] In certain aspects of my analyses, I have utilized the Marks Paneth restated financial statements, including that for fiscal year 1998.

[83] J. David Barnes deposition testimony, July 9, 2003 at pages 313 - 314.  Ralph W. Brenner deposition testimony, September 30, 2003 at pages 160-161.  Anthony M. Cook deposition testimony, September 4, 2003 at pages 258 - 259.  Claire Gargalli deposition testimony, August 26, 2003 at pages 160 - 161.  Robert Hernandez deposition testimony, September 3, 2003 at pages 158 - 169.  Graemer Hilton deposition testimony, August 13, 2002 at pages 218 - 220.

[84] Ralph W. Brenner deposition testimony, September 30, 2003 at pages 160 - 161.

[85] Ibid at pages 170 - 175.

[86] Robert Palmer deposition testimony, August 8, 2003 at pages 236 - 239.

acquire physician practices, however, had the losses been 50% greater than expected as opposed to 5% greater, it would have caused him to examine the concept further.[87]

Likewise, in assessing whether or not to do business with AHERF, third party entities relied on the accuracy of the AHERF audited financial statements. For example, Mr. Stephen Dengler ("Mr. Dengler"), an employee of HealthAmerica, testified that he recalls that a great deal of reliance was placed on the Coopers audited financial statements in Fiscal Year 1996.[88] In fact, Mr. Dengler testified that the Fiscal Year 1996 audited financial statements were the basis for HealthAmerica's conclusion that AHERF was a viable entity and that HealthAmerica therefore was able to do business with AHERF.[89]

Evidence of options available to such responsible parties if faced with financial statements that significantly differed from those provided for fiscal years 1996 and 1997, rest in at least the following areas.

*Board Member Deposition Testimony*

Several members of the AHERF Board of Trustees testified that they understood the Audit Committee of the AHERF Board had direct interaction with Coopers in regard to reviewing the audited financial statements of the AHERF System. The testimony of those Board members further indicated that, had any problems or issues been discovered with the audited financial statements, they would have expected those issues to be brought to the attention of the Audit Committee by Coopers, and ultimately to the AHERF Board.[90]

Mr. J. David Barnes ("Mr. Barnes"), Chairman of the Audit Committee in both fiscal years 1996 and 1997, was deposed in this matter. When asked whether he knew what the Audit Committee would have done if Coopers had informed the Committee that the Fiscal Year 1996 financial statements were overstated and that rather than having approximately $6 million in net income

---

[87] Ibid at pages 236 - 239.
[88] Stephen Dengler deposition testimony, June 10, 2004 at pages 70 - 79.
[89] Ibid at pages 70 - 79.
[90] Barbara Atkinson deposition testimony, May 12, 2004 at pages 115 - 135. Dorothy McKenna Brown deposition testimony, May 4, 2004 at pages 159 – 175. Donna Marie Murasko deposition testimony, April 8, 2004 at pages 178 - 187.

for the year, AHERF suffered a net loss, Mr. Barnes testified that a lot of questions would have been raised.[91]  Mr. Barnes testified that the Audit Committee would have looked into whether the financial statement misstatement was a recurring problem or whether it was a discrete one-year problem.  He would have asked where in the AHERF System, the problem happened and why it had occurred.  He testified that the Audit Committee would have questioned whether the financial statement problem related to one issue or several and would have caused the Committee to question whether the financial statement system was any good.[92]  Mr. Barnes indicated that the next set of questions would have involved determining what could be done about the financial statement problems.  He testified that the Trustees could have opted to give up on Philadelphia and have sold everything, could have installed a new management team, or could have brought in a consultant in response to the financial statement problems.[93]

When asked what he would have done if faced with financial statements that showed, by way of example, losses of $70 million in Fiscal Year 1996 as opposed to $6.5 million in income as per the Coopers audited financials (the Marks Paneth restated financial statements actually show a loss of nearly $90 million as opposed to the Coopers $6.5 million income figure), Mr. Barnes testified that such an event would have caused "more questions faster."[94]  In fact, Mr. Barnes agreed that such a change in financial statements would have raised questions as to whether or not there should be a change in management, whether there would be a need for a consultant to review the operation, whether the entity could continue to afford a physician acquisition program or any capital expenditure, including whether it would be prudent to acquire five more Eastern hospitals from Graduate Health System.[95]

Similarly, Mr. Ira Gumberg ("Mr. Gumberg"), another member of the Audit Committee, testified in his deposition that if the Trustees had known that the financial statements were materially misstated and that Coopers & Lybrand was therefore issuing an adverse opinion on those statements, he would have had several reactions.  First, Mr. Gumberg indicated that he would

---

[91] J. David Barnes deposition testimony, July 8, 2003 at page 183.
[92] Ibid at pages 183 - 184.
[93] Ibid at page 184.
[94] J. David Barnes deposition testimony, July 9, 2003 at pages 333 - 334.
[95] Ibid at pages 335 - 336.

have been "scared" to hear that the financial statements were materially misstated.[96] Second, Mr. Gumberg testified that he believes consultants would have been brought in to advise the Board of Trustees on the situation.[97] Mr. Gumberg believes that the Board of Trustees may have asked the auditors to delve deeper into the misstatement issues and to report back to the Audit Committee.[98] Further, Mr. Gumberg testified, "we may have put the brakes on everything that was going on until we [got] our hands around it."[99] In elaborating on what he meant by the "brakes on everything" Mr. Gumberg testified that "I would think if we had found ourselves in that position, [we] would have had to have looked at everything that was happening"[100] including hospital and physician practice acquisitions.[101] When asked what options the Board of Trustees would have had if inquiries led by the auditors, the Board of Trustees, or consultants drew into question the competence and integrity of financial management leadership, Mr. Gumberg testified that he believes the Board would have had no option other than to terminate AHERF financial management.[102]

When provided with hypothetical situations of AHERF audited financial statements misstating net income by approximately $80 million in Fiscal Year 1996 and by approximately $100 million or more in Fiscal Year 1997, Mr. Gumberg testified that he would have had the same reaction with regard to putting the brakes on further acquisitions.[103] Mr. Gumberg indicated that had it been brought to his attention that the Fiscal Year 1996 and 1997 financial statements were overstated by such significant amounts as $80 million and $100 million, for example, that those losses would have called into question his view of whether real efficiencies or synergies or other benefits had materialized from the integrated delivery system.[104] Furthermore, Mr. Gumberg testified that any time an entity is under a crisis and has been advised that sizeable mistakes to financial statements have been made, such as an overstatement of $80 million in one year and

---

[96] Ira Gumberg deposition testimony, October 3, 2003 at page 350.
[97] Ibid at page 349 - 351.
[98] Ibid at page 349 - 351.
[99] Ibid at pages 349 - 351.
[100] Ibid at pages 349 - 351.
[101] Ibid at pages 349 - 351.
[102] Ibid at pages 350 - 351.
[103] Ibid at pages 352 - 353.
[104] Ibid at page 356.

$100 million in the next year, he believes that all of what the Board of Trustees is doing would be called into question, including the [executive] team.[105]

In regard to acquisitions that Mr. Gumberg testified would have been called into question had the Board of Trustees been advised that the AHERF financial statements were materially misstated, he testified that he did not recall ever having been advised by Coopers that the acquisition of the Graduate Hospitals could threaten the AHERF System's ongoing financial viability.  Neither did he recall seeing anything in the audited financial statements that would have led him to believe that the financial viability of the AHERF System could be threatened by the acquisition.[106] Similarly, Mr. Gumberg did not recall either having been informed by Coopers or seeing anything in the audited financial statements for fiscal years 1996 or 1997 that led him to believe that ongoing physician practice acquisitions could threaten the financial viability of AHERF.[107]

In his deposition, Mr. William Snyder ("Mr. Snyder"), Chairman of the AHERF Board of Trustees, recalled that Messrs. Barnes and Gumberg did not think that risk contracts undertaken by AHERF were a good idea.[108]

Based on this testimony, as well as similar testimony by other Trustees, the acquisition strategy of AHERF, in particular the purchase of the former Graduate Hospitals and the continued acquisition of physician practices could and likely would have been avoided in the event that the Trustees were aware of material misstatements to the audited financial statements for fiscal years 1996 and 1997.  In addition, given the fact that the HealthAmerica contract, effective April 1997, was expected to generate significant losses in the first two years of the contract's existence (see detail related to the risk contract later in this report) and the fact that Messrs. Barnes and Gumberg were not in favor of risk contracts, the HealthAmerica risk contract would have likely been avoided had the Trustees known that the audited financial statements were materially misstated.

---

[105] Ibid at page 356.
[106] Ibid at pages 356 – 357.
[107] Ibid at page 357.
[108] William Snyder deposition testimony, July 15, 2003 at pages 26 - 27.

### Third-Party Involvement

Important to the issue of what may have been done differently had accurate audited financial statements been provided by Coopers, is the fact that certain third parties would have been involved in any such process based on debt covenant violations that would have occurred. Based on the restated financial statements prepared by Marks Paneth in fiscal years 1996 and 1997, AHERF and/or its obligated groups would have been in violation of certain debt covenants by the end of Fiscal Year 1996.[109]  Mr. Gumberg also testified that he believed debt compliance was important because it stated that the AHERF fund balance and/or income and liquidity were acceptable to their lending institutions.[110]

Deposition testimony of the insurers and guarantors of the AHERF System bonds, as well as bond trustee representatives indicates that those parties would have communicated with and become involved in the decisions surrounding acquisition and investing activities of AHERF had the parties known of debt covenant violations.  Specifically, representatives from PNC and MBIA have testified that had they known about AHERF's deteriorating financial situation sooner, steps would have been taken to address the situation.  See Exhibit 7 for a summary chart of the Bond Trustees, Insurers, and Guarantors related to the various bonds outstanding.

Mr. Ralph Michael ("Mr. Michael"), CEO of Corporate Banking for PNC, testified that had PNC been made aware of AHERF's financial issues earlier, PNC would have had active discussions about either restructuring the debt in some form or fashion or accelerating repayment.[111]  Furthermore, Mr. Michael testified that he is confident that had AHERF's financial statements been accurately presented, that the bond rating for AHERF would have been downgraded and that this would have caused creditors to pressure AHERF much more strongly to restructure and limit costs and in general "right the ship" from an operating perspective.[112]  Mr. Michael also testified that a standard commercial banking practice is to introduce a crisis manager or turnaround specialist hired by the company [borrower] to assist in bringing about financial

---

[109] Expert Report of Steven B. Kite, Esq. dated September 1, 2004.
[110] Ira Gumberg deposition testimony, October 3, 2003 at pages 326 - 327.
[111] Ralph Michael deposition testimony, March 11, 2004 at pages 11 – 12 and 155 - 156.
[112] Ibid at pages 161 - 164.

resolution.[113]  Had Coopers issued a qualified audit opinion [as opposed to a clean bill of health] after the PNC letter of credit was approved, it would have been a "severe red flag" and PNC would immediately have contacted Coopers to obtain more information.[114]  Further, Mr. Michael testified that had Coopers issued a qualified opinion on any AHERF or DVOG financial statements, the [DVOG] credit never would have received investment grade status, a necessary condition for PNC to sign an approval of the credit.[115]

Mr. Richard Weill ("Mr. Weill"), President of MBIA and supervisor of the healthcare group beginning in 1994, testified in his deposition that he is absolutely sure that had MBIA known of AHERF's true financial condition sooner, it would have advocated steps including discontinuing physician practice acquisitions, cutting costs and hiring professionals to assist with AHERF's accounts receivable.[116]  Furthermore, if Coopers' misstatements had been known sooner, MBIA would have had the leverage to hire a turnaround consultant such as the Hunter Group.[117]

## E. Avoidable Acquisitions

Rather than curtailing hospital or physician practice acquisitions as they could have beginning at the end of Fiscal Year 1996 had accurate financial statements been provided, AHERF moved forward with both hospital and physician practice acquisitions.  In fact, as previously stated, AHERF acquired the Graduate Hospitals in May of 1997.  The Trustees knew that the Graduate Hospitals were poor performing hospitals.[118]  However, the Trustees did not know the true financial condition of the AHERF System, nor did they have accurate disclosure of the financial performance of the Philadelphia area facilities previously acquired by the AHERF System.  Accordingly, the Trustees actions regarding the acquisition of the Graduate Hospitals, were undertaken under the guise of misstated AHERF financial statements.

---

[113] Ibid at pages 165 - 167.
[114] Ibid at pages 171 - 172.
[115] Ibid at pages 171 - 173.
[116] Richard Weill deposition testimony, October 8, 2003 at page 286 - 288.
[117] Ibid at page 289.
[118] J. David Barnes deposition testimony, July 8, 2003 at pages 131 - 132.  Ira Gumberg deposition testimony, October 3, 2003 at page 268.  Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal year ended June 30, 1996.

22

Furthermore, during Fiscal Year 1997, AHERF acquired the practices of more than 200 physicians.[119]  The acquisition of the new practices during Fiscal Year 1997 alone required approximately $32 million in cash.[120]  The newly acquired physician practices combined with existing physician practices rendered significant net losses for the AHERF System.  The net losses totaled nearly $62 million in Fiscal Year 1997.[121]  The Trustees authorized the continued acquisition of physician practices based on a falsely stated AHERF financial condition.

In following the strategy of expanding its referral base and patient volume, AHERF also entered into a new risk contract during the Fiscal Year 1997.  The risk contract was with HealthAmerica and included the acquisition of the practices of more than 100 physicians including approximately 80 primary care physicians known as PGMA.  Documentation available in this matter shows that AHERF anticipated losses of $64 million related to the HealthAmerica risk contract over the initial two year time period of the contract.[122]  Again, this contract would not have likely been entered into had the Trustees known the true financial condition of AHERF.

---

[119] Allegheny Integrated Health Group Board Meeting Packages.
[120] "Acquisition of physician practice assets, net" and "Acquisition of physician practice intangible assets" per consolidating cash flow statement for Fiscal Year 1997.
[121] Net loss per Marks Paneth restated consolidating income statement.  The audited physician losses for Fiscal Year 1997 total $61 million.
[122] Coopers & Lybrand workpapers (CL 012628).

## IV. Summary of Opinions

A.    One measure of damages in this matter is the amount of the actual total creditor shortfall.  Had the true financial condition of the AHERF System at or before September 1996 been known by the Board and third parties, appropriate intervention to prevent unnecessary costs and liabilities could and likely would have occurred.  My opinion is informed by the analysis of Mr. Thomas Singleton ("Mr. Singleton") that such an intervention could and likely would have allowed a turnaround and therefore the avoidance of any creditor loss.  The bankruptcy records as of June 30, 2004 reflect that the bankrupt entities have an existing shortfall to their creditors of approximately $557.0 million, and the obligation of the bankruptcy estates for this shortfall is an appropriate measure of the avoidable insolvency of the AHERF System.

B.    Alternatively, damages could be measured as the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions that were undertaken and that could have been avoided had the Board and third parties been apprised of the true AHERF System financial statements for fiscal years 1996 and 1997. The amount of damage under this analysis is approximately $267.5 million, and is a measure of the avoidable loss to the AHERF System incurred by virtue of the failure to disclose the true financial condition of the AHERF System at fiscal year end 1996.   These avoidable costs were incurred over time as reflected in the exhibits hereto.

**V.** One measure of damages in this matter is the amount of the actual total creditor shortfall. Had the true financial condition of the AHERF System at or before September 1996 been known by the Board and third parties, appropriate intervention to prevent unnecessary costs and liabilities could and likely would have occurred. My opinion is informed by the analysis of Mr. Thomas Singleton ("Mr. Singleton") that such an intervention could and likely would have allowed a turnaround and therefore the avoidance of any creditor loss. The bankruptcy records as of June 30, 2004 reflect that the bankrupt entities have an existing shortfall to their creditors of approximately $557.0 million, and the obligation of the bankruptcy estates for this shortfall is an appropriate measure of the avoidable insolvency of the AHERF System.

Under the Liquidating Plan of Reorganization of the Debtors (the "Plan"), as of December 26, 2000 ("Plan Confirmation"), total allowed consolidated claims against the Debtors' estates were approximately $677 million.[123] The Plan provided, among other things, that the holders of the MBIA/PNC Claims (the insurers of the DVOG bonds) and Centennial bondholders would have a portion of their claims classified as Secured, with the remainder of claims classified as Unsecured. The Plan classified all claims against the Debtor Entities into ten separate classes and subclasses.[124] The following table summarizes the classification and treatment of claims under the Plan.

| Class | Description | Class Treatment | Projected Distribution as of Effective Date |
|---|---|---|---|
| N/A | Administrative Expense Claims | Paid in full. | Paid 100% in Cash. |
| N/A | Priority Tax Claims | Paid in full. | Paid 100% in Cash. |
| 1 | Priority Claims | Paid in full. | Paid 100% of Claim in Cash. |
| 2 | General Secured Claims | Paid in full or otherwise rendered unimpaired. | Paid 100% of Claim in Cash or otherwise rendered unimpaired. |

---

[123] Monthly Operating Report (June 30, 2004).
[124] Amended Disclosure Statement at page 3.

| Class | Description | Class Treatment | Projected Distribution as of Effective Date |
|---|---|---|---|
| 3 | Secured Claims of holders of Centennial Bondholder Claims | Granted an Allowed Secured Claim of $33 million and an Allowed Centennial Unsecured Claim of $105.6[125] million. | Paid $20.5 million of Allowed Secured Claim and granted an entitlement to recover remaining portion of Allowed Secured Claim upon first distribution by Liquidating AHERF. |
| 4 | Secured Claim of holders of MBIA/PNC Claims | Granted an Allowed Secured Claim of $50 million and an Allowed Unsecured Claim of $340.3 million.[126] | Paid $10 million of Allowed Secured Claim and granted an entitlement to recover remaining portions upon first, second and subsequent distributions by Liquidating AHERF in accordance with the Plan. |
| 5(A) | General Unsecured Claims | Distribution of Cash. | Paid 5% of Allowed Unsecured Claim in Cash and entitled to subsequent distributions by Liquidating AHERF in accordance with the Plan based on participation equal to amount of Allowed Claim. |
| 5(B) | Centennial Unsecured Claims | Distribution of Cash. | Paid 1.5% of Allowed Unsecured Claim in Cash and entitled to recover subsequent distributions by Liquidating AHERF in accordance with the Plan based on participation equal to 30% of Allowed Claim. |
| 6(A) | Allowed Convenience Claims | Distribution of Cash to holders of Allowed Unsecured claims less than $1,000. | Paid 10% of Allowed Unsecured Claim in Cash; not entitled to further distributions. |
| 6(B) | Allowed Centennial Convenience Claims | Distribution of Cash to holders of Allowed Centennial Unsecured Claims less than $5,000. | Paid 3% of Allowed Unsecured Claim in Cash; not entitled to further distributions. |
| 7 | Insurance Claims | Retain proceeds from any applicable Insurance Policy | No other distributions under Plan. |
| 8 | Allowed Membership Interests | Retain Membership Interests | Retain 100% of Membership Interests |

*Source: Amended Disclosure Statement dated August 15, 2000 at pages 3-5*

---

[125] Per the Amended Disclosure Statement, the Centennial Bondholders were allowed a Secured Claim of $105.6 million. These creditors received approximately $30 million in payments resulting from litigation settlements and accounts receivable collection rights. The Centennial bondholder allowed claim was therefore reduced to $75.6 million (JD-AHERF 1590 to 1597). See also the letter from Mr. Peter A. Biagetti on behalf of the Bank of New York as indenture trustee for the Centennial bondholders dated August 13, 2004.
[126] The MBIA/PNC Allowed Unsecured Claim was later changed to $342.6 million.

To date, all allowed claims of the Secured Creditors have been paid in full. The table below summarizes the payouts to these creditors:

| Type | Class | Claim/Payment Amount ($ millions) |
|---|---|---|
| Administrative Expense Claims | N/A | $11.3 |
| Priority Claims | 1 | $4.1 |
| General Secured Claims | 2 | $2.1 |
| Secured Claims of Centennial Bondholders | 3 | $33.0 |
| Secured Claims of Holders of MBIA/PNC Claims | 4 | $50.0 |
| **Total Secured Claims** | | **$100.4** |

*Source: Schedules prepared by personnel of the Chapter 11 Trustee's office and Donlin Recano database (JD-AHERF 1585, JD-AHERF 0766-0768*

With regard to the Unsecured Claims, an initial and four incremental distributions have been made to the Unsecured Creditors. These distributions are summarized in the table below.

| Distribution | Total Amount Distributed | General Unsecured Non-Centennial | General Unsecured Centennial |
|---|---|---|---|
| Initial Distribution – Per Plan (December 2000 / March 2001) | $26.7 million | 5.000% | 1.500% |
| First Incremental Distribution – After Settlement of Mellon Preference Action (July 2001) | $16.9 million | 3.000% | 0.900% |
| Second Incremental Distribution – After D&O / GLS Settlement (July 2002) | $38.4 million | 6.500% | 1.950% |
| Third Incremental Distribution – After Resolution of Tenet Escrow Amount (February 2003) | $21.5 million | 3.500% | 1.050% |
| Fourth Incremental Distribution – After Re-evaluation of Reserves (December 2003) | $7.8 million | 1.250% | 0.375% |
| **Cumulative Distribution as of December 2003** | **$111.3 million** | **19.250%** | **5.775%** |

*Source: Schedules prepared by personnel of the Chapter 11 Trustee's office (JD-AHERF 1548)*

Other distributions have been made under special circumstances, such as when the Bankruptcy Court has ordered that a specific creditor receive payment.[127]  Also, since the Petition Date, additional creditor claims that were initially disputed have been allowed.[128]

I have calculated the total creditor shortfall based on the information provided in the Plan, and through materials obtained from the Trustee's office and Donlin, Recano & Company ("Donlin Recano"), the claims administration agent to the Trustee.  The result of my calculations indicates a total creditor shortfall of $584.2 million.  From the total creditor shortfall figure, I have made two adjustments and expect to make a third adjustment at a later date, which had the impact of reducing the total creditor shortfall.  First, I deducted $4.9 million, which I understand the Trustee expects to obtain related to recoveries from the Allegheny Hospitals, New Jersey liquidation and Medicare recoveries that are not yet finalized.[129]  Second, I reduced the total creditor shortfall by the amount of total assets held by the Trustee, which in large part consist of cash and cash equivalents, totaling $23.1 million as of June 30, 2004.[130]  Making this reduction at this time is generous due to the fact that the existing amount of cash and cash equivalents will certainly decline over time and therefore not be available in total for distribution to creditors.  The resulting adjusted creditor shortfall based on the two adjustments made to date is $556.2 million.[131]  See Exhibit 8.

Per the Monthly Operating Report for the month ended June 30, 2004, the total remaining obligations related to the Allowed Claims of the Unsecured Creditors was $585.0 million.[132]  After making the same adjustments to this figure as made in my calculation above, the amount of adjusted creditor shortfall is $557.0 million.  See Exhibit 9.

---

[127] Interview with Diane Schrecengost, April 16, 2004.

[128] Approximately $129 million in claims that were initially disputed have since been allowed.

[129] Charles Morrison deposition testimony, June 29, 2004 at pages 141 - 150.

[130] Monthly Operating Report, Balance Sheets as of June 30, 2004.

[131] I have been advised by counsel that it may be appropriate to deduct fees paid to professionals in the prosecution of this litigation.  Accordingly, I plan to deduct the professional fees after such fees have been fully incurred and/or finalized.

[132] The Trustee submits a monthly report to the Bankruptcy Court that contains, among other things, information related to the claims that have been filed, claims that have been allowed and claims that have been liquidated.  This report is known as the Monthly Operating Report.

The Trustee's office has provided me the necessary information to reconcile the slight discrepancy between my calculation of the total creditor shortfall and the corresponding information presented in the June 30, 2004 Monthly Operating Report. I understand that the discrepancy primarily relates to certain distributions held back by the Trustee due to pending adversary proceedings. A reconciliation of my calculations to the Monthly Operating Report is presented in Exhibit 10. The bankruptcy records indicate and my analysis confirms that the bankrupt estates have been damaged by the amount of approximately $557.0 million as of June 30, 2004.

VI.    **Alternatively, damages could be measured as the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions that were undertaken and that could have been avoided had the Board and third parties been apprised of the true AHERF System financial statements for fiscal years 1996 and 1997. The amount of damage under this analysis is approximately $267.5 million, and is a measure of the avoidable loss to the AHERF System incurred by virtue of the failure to disclose the true financial condition of the AHERF System at fiscal year end 1996. These avoidable costs were incurred over time as reflected in the exhibits hereto.**

I have also taken an alternative approach to quantifying damages due to the misstated financial statements as audited by Coopers. In particular, during the period between the end of the first quarter of Fiscal Year 1997 (shortly after Coopers issued its audit report related to the misstated financial statements for Fiscal Year 1996) through the end of Fiscal Year 1997 (the second year of the Coopers misstated financial statements) there were a number of acquisitions and/or transactions that were undertaken by the AHERF System. As outlined above, evidence in the record indicates that the acquisitions and/or transactions would not have occurred had accurate financial statements been presented in fiscal years 1996 and 1997 (the "Avoidable Costs").