## A. Acquisition of the Graduate Hospitals in Philadelphia

Among the transactions that would not have occurred but for Coopers' misstatements was AHERF's acquisition of five financially distressed hospitals from the Graduate Health System during Fiscal Year 1997.

On August 5, 1996, Mr. Abdelhak and Mr. Snyder sent a letter to the AHERF Board of Trustees to inform Board members that the Graduate Health System had approached AHERF management about certain of its hospitals and other organizations becoming part of AHERF.[133] The letter also indicates that rather than consummating an immediate transaction between AHERF and the Graduate Health System, that the transaction would initially occur between the Graduate Health System and SDN, an entity managed by AHERF, but independent of AHERF. Because SDN was not part of the AHERF System, the letter stated that no prior approval of the Board of Trustees was necessary to approve the transaction. However, if the Graduate Health System entities were to be merged into AHERF in the future, the AHERF Board would have the opportunity to review and confirm the actions taken by the Executive Committee.[134]

Effective November 1, 1996, the Graduate Hospitals in Philadelphia were merged into SDN.[135]

At the Annual Meeting of the AHERF Board of Trustees held on December 12, 1996, the Board authorized Mr. Abdelhak to take any and all reasonable action necessary to effectuate the reorganization of the Graduate Hospitals into the AHERF System.[136] Four of the purchased hospitals were located in the Philadelphia area: Graduate, Parkview, City Avenue and Mt. Sinai. These hospitals would ultimately be merged into the Allegheny Hospitals, Centennial ("Centennial") division of AHERF, a Debtor entity. One of the purchased hospitals, Rancocas Hospital, was located in New Jersey. Rancocas Hospital was ultimately merged into a division of AHERF, Allegheny Hospitals, New Jersey, which was not part of the bankruptcy.

---

[133] Letter from Mr. Abdelhak and Mr. Snyder to the AHERF Board of Trustees, August 5, 1996 (D 0004319).
[134] Ibid.
[135] Minutes from the Meeting of the Board of Trustees of AHERF (December 12, 1996).
[136] Ibid.

As stated earlier, considered collectively, the Graduate Hospitals were in financial distress at the time that AHERF acquired them. The Graduate Hospitals demonstrated declining margins between fiscal year 1995 to fiscal year 1996, the last completed fiscal year prior to AHERF's acquiring the hospitals. At fiscal year end 1995, the Graduate Hospitals had an operating loss of $7.3 million or an operating margin of -2.3%, which declined further by the end of fiscal year 1996 to $19.4 million in operating losses or an operating margin of -6.4%.[137]

In addition, the Graduate Hospitals carried a bond debt balance of $171 million by the end of fiscal year 1996. The heavy debt load required the Graduate Hospitals to repay approximately $5 million per year in principal and $14 million per year in interest expense.[138] Without knowing the true financial condition of the AHERF System, the AHERF Trustees approved the transaction. Had I been consulted at the time, and based on accurately stated financial statements for the AHERF System, I would have advised against the purchase.

Ultimately, the Centennial division of AHERF, which held the Graduate Hospitals, experienced negative financial consequences that, but for the acquisition of the financially distressed hospitals would not have been incurred. First, Centennial incurred cash flow losses of $26.7 million from May 1, 1997 through June 30, 1998. I have also included cash flow losses of $14.2 million for the period of July 21, 1998 through November 9, 1998, the end of operations under AHERF.

The starting point for the calculation of the cash flow losses that I have calculated is net income before extraordinary items. I have adjusted this figure for depreciation and amortization expense and unusual items to derive the measure of Earnings Before Taxes, Depreciation and Amortization ("EBTDA"). From EBTDA, I subtract capital expenditures as they represent cash spent on property, plant and equipment. Finally, I adjust for any increases or decreases in working capital requirements in order to derive the cash flow losses of the Graduate Hospitals

---

[137] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal years ended June 30, 1995 and June 30, 1996. If non-operating gains are included in the operating margin calculation, the Fiscal Year 1995 margin is −1.4% and the Fiscal Year 1996 margin is −3.8%.

[138] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal years ended June 30, 1995 and June 30, 1996.

for both fiscal years 1997 and 1998, while owned by AHERF. These cash flow losses would not have occurred had the transaction not taken place.

In addition to the cash flow losses generated by the Graduate Hospitals, AHERF became liable for $174 million in bond debt held by the hospitals. Of the total amount of bond debt assumed, $7.0 million was extinguished prior to June 30, 1998, the amount of which I have also included as a component of damages. In addition, I have included the repayment of a line of credit in the amount of $6.2 million, which was assumed in the transaction, as a damage component. I have offset the cash flow losses and the bond debt for the cash received by AHERF in its acquisition of the Graduate Hospitals totaling $4.7 million. This amount of cash would have been a benefit provided to the AHERF System in the acquisition. In addition to the bond debt assumed in the acquisition of the Graduate Hospitals, other liabilities were also assumed. The balance of these liabilities ultimately became the responsibility of Centennial. Accordingly, I have included the balance of liabilities just after the sale of the hospitals to Tenet as an amount of damage. In order to appropriately state damages, I have offset the liabilities with the corresponding recoveries achieved through the sale of the assets to Tenet and in the runoff of the Centennial estate, as discussed below.

As discussed in detail in Section III above, on September 29, 1998, Tenet made an offer for nearly the entirety of the Eastern Entities. The offer was in the amount of $345 million and was contingent on Tenet being able to find a partner to operate the Allegheny University of the Health Sciences. Drexel University agreed to manage the Allegheny University of the Health Sciences and $110 million of the $345 million in sale proceeds were directed towards the Allegheny University of the Health Sciences. Therefore, $235 million of the $345 million sale proceeds related to the eight Philadelphia hospitals. As a further mitigating factor to the damages related to the Centennial transaction, I have considered the portion of the $235 million in sale proceeds attributable to Centennial.

Zolfo Cooper LLC ("Zolfo Cooper"), a financial advisor to the Committee, prepared an allocation analysis of the Tenet sale proceeds.[139] The analysis indicates that the net sale proceeds

---

[139] HLAH 0003641 - 3647.

related to Centennial was approximately 22% of the total net sale proceeds.[140]  I have applied the 22% allocation to the $235 million in sale proceeds to determine the amount of the Tenet consideration due Centennial.  This approach is conservative based on the fact that Vanguard specifically identified only approximately 17% of its $460 million offer as relating to the Centennial hospitals.[141]

In addition to the Tenet sale proceeds attributable to Centennial, other amounts have been recovered related to the Centennial assets, including, for example, $36.8 million in accounts receivable collections, $17.9 million related to the Centennial debt service reserve funds, $10 million related to a settlement with Medicare and $14 million related to a settlement involving the PHCT litigation.[142]  I have deducted the sum of known recoveries from the total liabilities assumed in my calculation of damages.  Total damages related to the Graduate Health System acquisition are $167.5 million.  See Exhibit 11.

**B.  Continued Acquisition of Physician Practices**

Another loss-producing activity of AHERF's strategic plan, which would have likely been curtailed had AHERF's financial situation been accurately reported by Coopers, was the continued acquisition of physician practices.  As stated earlier, AHERF acquired hundreds of physician practices between fiscal years 1995 and 1998.  The bulk of this acquisition activity occurred in fiscal years 1996 and 1997.[143]  See Exhibit 12 for a list of the physician practices that AHERF acquired subsequent to September 30, 1996.

Between fiscal years 1996 and 1998, Allegheny Integrated Health Group reported severe operating losses.  Despite these losses, significant capital continued to be spent to acquire more physician practices.  The table below shows specifically what the audited financial statements

---

[140] HLAH0003646.

[141] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.

[142] PWC-SUB-A+M 04140 to 04151.  Deposition Exhibit 2752.  Joint Motion to Approve Settlement Agreement and Stipulation and Order Approving Settlement Agreement and Stipulation between the Trustee and Tenet. Application For An Order Approving a Certain Settlement Agreement and Order Approving A Certain Settlement Agreement between the Trustee and Philadelphia Health Care Trust.  Letter from Mr. Peter A. Biagetti on behalf of the Bank of New York as indenture trustee for the Centennial bondholders dated August 13, 2004.

[143] Deposition Exhibits 1227, 1302, 1303.

demonstrated the net losses of Allegheny Integrated Health Group to be in fiscal years 1996 and
1997 as well as the losses in the internal fiscal year end 1998 financial statements.

| | Fiscal Years Ended June 30 ($ millions) | | |
| | 1996 | 1997 | 1998[144] |
| --- | --- | --- | --- |
| Net income (loss) before extraordinary items | ($40.9) | ($61.4) | ($56.1) |
| *% Margin* | *-53.7%* | *-48.8%* | *-29.6%* |

*Source: AHERF Audited Financial Statements; AHERF Internal Financial Statements*

While Allegheny Integrated Health Group generated these losses, approximately $21 million and
$32 million was spent to acquire additional physician practices in fiscal years 1996 and 1997,
respectively.

AHERF's commitments to its physicians were the primary contributing factor to Allegheny
Integrated Health Group's operating losses. First, AHERF guaranteed high salaries relative to
national benchmarks.[145] Second, AHERF offered five-year contracts with guaranteed salaries,
and did not include in these contracts any post-acquisition productivity requirements.[146] AHERF
experienced declining physician productivity post-acquisition.[147] As a result, Salaries, Wages
and Benefits expense at Allegheny Integrated Health Group exceeded its total revenue in fiscal
years 1996 through 1997.

As stated previously, AHERF made its largest single physician practice acquisition in April of
1997 when it acquired the practices of more than 100 physicians of PGMA in the Pittsburgh
region. Donald Kline ("Mr. Kline"), CFO of the Allegheny Integrated Health Group, testified
that PGMA had historical demonstrable operating losses[148] and continued projected losses of $17

---

[144] The Allegheny University Medical Practices revenues in Fiscal Year 1998 contain $560.5 million in risk contract
revenue. The same amount of expenses are contained on the Allegheny University Medical Practices income
statement for Fiscal Year 1998 related to the risk contract revenue. Accordingly, there is no impact on the net
income amount; however, the Allegheny University Medical Practices total revenue needs to be adjusted for the risk
contract revenue in order for the calculated margin to be comparable to the prior years. The adjusted revenue for
purposes of the margin calculation is $189.9 million.
[145] Deposition Exhibit 792.
[146] Deposition Exhibit 790.
[147] Deposition testimony of Donald Kline (April 9, 2003) at pages 437 - 438.
[148] Ibid at pages 342 - 343.

million, $11 million and $4 million over the ensuing three years.[149]  AHERF paid $20 million in cash to acquire these practices.[150]

Had I been consulted by the Trustees around September 30, 1996, following disclosure of accurately stated financial statements, I would have advised against the continued purchase of the physician practices.

To quantify damages related to the continued acquisition of loss-generating physician practices, I have focused only on those physicians purchased after September 30, 1996 and therefore after the issuance of Coopers' Fiscal Year 1996 audit report.  I have relied upon schedules produced in this matter, which provide detail at the practice level of the revenue, expenses and net income of AHERF physician practices.[151]  The schedules also provide detail related to miscellaneous overhead expenses, which I have allocated to each physician practice based on its contributed percentage of revenue to Allegheny Integrated Health Group.  I have also added back estimated depreciation expense and unusual items, by allocating total Allegheny Integrated Health Group depreciation expense[152] and unusual items based on the revenue of those physician practices acquired after September 30, 1996, as a percentage of total Allegheny Integrated Health Group revenue, which results in the estimated EBTDA of these practices.  The EBTDA between September 30, 1996 and June 30, 1998 of those practices purchased after September 30, 1996 is negative $19.0 million.

A second component of the calculation of cash flow losses related to the continued acquisition of physician practices is the cash spent on the practices between September 30, 1996 and June 30, 1998 of $31.6 million.[153]  In addition, I have allocated the other capital expenditures for PP&E and changes in working capital of Allegheny Integrated Health Group to the physician practices

---

[149] Deposition Exhibit 727.
[150] Asset Purchase Agreement between AHERF and HealthAmerica, February 26, 1997 at page 5.
[151] Allegheny Integrated Health Group Financial Statements, May 31, 1997 (JD-DC-0057397 to 57467).  Allegheny Integrated Health Group Financial Statements, June 30, 1997 (JD-DC-0057380 to 57394).  Allegheny University Medical Practices Financial Statements, May 31, 1998 (JD-DC 0055458 to 55527).
[152] In June 1997, property plant and equipment and intangibles were transferred from Allegheny Integrated Health Group to Allegheny General Hospital and DVOG.  For purposes of my depreciation calculation, and in order to be conservative, I have treated these assets as restored at Allegheny Integrated Health Group for fiscal years 1997 and 1998.
[153] Fiscal years 1997 and 1998 cash flow statements.

purchased after September 30, 1996 based on the revenue of these practices as a percentage of total revenue of Allegheny Integrated Health Group.

The resulting cash flow losses related to physician practices acquired after September 30, 1996, between September 30, 1996 and June 30, 1998, is $50.0 million. I have also included cash losses of $1.5 million for the period of July 21, 1998 through November 9, 1998, the end of operations under AHERF.

I also included, as a component of damages, a proportion of the AUMP liabilities following the sale of certain entities to Tenet. I offset the physician practice related liabilities assumed with a proportion of any known recoveries achieved by the AUMP estate.[154]

The total damages caused by the continued physician practice acquisition activity, calculated as the cash losses incurred and the cash spent on the AHERF physician practices acquired after September 30, 1996, as well as the ultimate balance of liabilities offset for any known recoveries of the Allegheny University Medical Practices $64.3 million. See Exhibit 13.

Although I understand the goal of the AHERF System with regard physician practice acquisitions was to bolster patient volume at the AHERF System hospitals, based on the restated financial statements there were not discernible profitability improvements at the Debtor entity hospitals subsequent to the September 30, 1996 time period. Therefore, I have not adjusted my analysis for any potential growth in inpatient admissions.

*C. HealthAmerica Risk Contract*

In connection with AHERF's acquisition of the PGMA physician practices, AHERF entered into a Risk-Sharing agreement (the "Risk Contract") with HealthAmerica on March 31, 1997.[155]

---

[154] HLAH 0003640 - 3644. Monthly Operating Report (November 30, 1998). Charles Morrison deposition testimony dated June 29, 2004 at pages 50 - 54.
[155] Risk Sharing Agreement by and between HealthAmerica Pennsylvania, Inc., Coventry Corporation and AHERF, March 31, 1997.

HealthAmerica, as a health insurer, received premium payments from enrollees in its health insurance plans (the "Covered Lives") to cover the potential health care needs of those individuals in a given year.[156]  HealthAmerica offered various insurance programs, including Commercial Health Maintenance Organizations ("HMO"), Preferred Provider Organizations ("PPO") and Medicare HMOs to which those Covered Lives could subscribe.[157]  Pursuant to the Risk Contract, AHERF would receive a fixed percentage of the premiums paid to HealthAmerica (the "AHERF Premium").[158]  In return for this percentage of compensation, AHERF would be responsible for the total costs of health care for the Covered Lives.  AHERF therefore assumed the risk of financial losses associated with the provision of care for the Covered Lives.[159]  The table below summarizes the percentage of premiums paid to AHERF from HealthAmerica.

| Program | Duration | Percentage of Total Premium |
|---------|----------|-----------------------------|
| Commercial HMO Program | First Five Years of Contract | 78.0% |
| Commercial HMO Program | Year 6 Through End of Agreement | 78.5% |
| PPO Program | Not Specified | 78.0% |
| Point of Service Program | Not Specified | 78.0% |
| Medicare HMO Risk Program | Not Specified | 81.0% |

*Source:  Risk Sharing Agreement by and Between HealthAmerica and AHERF*

When health providers performed services for the Covered Lives, HealthAmerica reimbursed the providers, including AHERF and non-AHERF providers for the services rendered (the "Provider Payments").[160]

Per Section 5.4 of the Risk Contract, in order to facilitate prompt reconciliation of the differences between the amounts paid and amounts owed between AHERF and HealthAmerica, quarterly reconciliations were performed for the first three quarters of each year of the Risk Contract.[161]  Such reconciliations included the calculation of the "Interim Premium Reconciliation Amount",

---

[156] Ibid at page 4.
[157] Ibid at pages 3 - 4.
[158] Ibid at page 2.
[159] Ibid at page 18.
[160] Ibid at page 5.
[161] Ibid at page 19.

which equals the difference between (1) the AHERF Premium Amount for a given period plus any payments made by AHERF pursuant to Section 5.10.6 and (2) the total amount of Provider Payments incurred by HealthAmerica for services provided plus an amount for claims incurred by not reported ("IBNR"), calculated consistently with HealthAmerica's other IBNR claims calculations, less any amounts recovered by AHERF from an applicable reinsurer.[162]  If the Interim Premium Reconciliation Amount was a positive number, *HealthAmerica would pay that amount to AHERF*.  If the Interim Premium Reconciliation Amount was a negative number, *AHERF would pay that amount to HealthAmerica*.[163]  For example, if the AHERF Premium was $100 in a given period and the Provider Payments equaled $120, assuming other components of the Interim Premium Reconciliation Amount were equal to zero, the Interim Premium Reconciliation Amount would be equal to ($20) and AHERF would owe HealthAmerica $20.

The financial impact of the Risk Contract was recorded on the financial statements of the AHERF parent company ("AHERF Parent"), a Debtor entity.[164]  AHERF anticipated that it would incur $64 million in losses during the first two years of the Risk Contract, or $8 million per quarter.[165]  To reflect these anticipated losses, $64 million in goodwill and a corresponding $64 million liability in accounts payable and accrued expenses and in other non-current liabilities was recorded on the AHERF Parent's balance sheet.[166]  The $64 million of goodwill was to be amortized over 35 years, with the amortization expense also recorded on the books of the AHERF Parent.[167]

The Risk Contract also included a $20 million note payable, to be paid over 10 years, which was recorded on the balance sheet of Allegheny Integrated Health Group in other assets ($20 million), accounts payable and accrued expenses ($2 million), and other non-current liabilities

---

[162] Ibid at page 19.
[163] Ibid at page 19.
[164] Coopers & Lybrand workpapers (CL 012628).
[165] Ibid.
[166] Coopers & Lybrand workpapers (CL 017051, CL 017089).
[167] Allegheny Health, Education and Research Foundation 1997 Audit Update dated October 1, 1997 (PwC 0036868 - 0036880).

($18 million).[168]  It appears that $4 million in payments were made on the note to HealthAmerica.[169]

Although as indicated above the Risk Contract required AHERF to pay HealthAmerica for any negative Interim Premium Reconciliation Amount, AHERF did not do so and HealthAmerica was left with a shortfall in the amount due it from AHERF.  Accordingly, to quantify damages associated with the Risk Contract, I have relied upon the information contained in claim filed by HealthAmerica in the bankruptcy proceedings and corresponding attachments.  HealthAmerica initially filed a proof of claim (the "HealthAmerica Claim") on March 1, 1999.[170]  The Claim was subsequently revised on December 20, 2000.[171]  The following table summarizes the Claim as initially filed and as revised.

| Component of Claim | Original Claim ($ millions) | Revised Claim ($ millions) |
|---|---|---|
| Risk Sharing Agreement – Note Payable | $16.0 | $12.5 |
| Risk Sharing Agreement – Losses | $30.7 | $27.8 |
| Lease Guarantees | $9.3 | $1.0 |
| Data Services | $0.3 | $0.3 |
| Insurance Premiums | $0.1 | $0.1 |
| Total Claim Amount[172] | $56.4 | $41.7 |

Source: HealthAmerica Claim, Attachment F

Based on information contained in the HealthAmerica Claim, it appears that the cost incurred to provide healthcare services for the Covered Lives exceeded the AHERF Premium by $57.8

---

[168] Allegheny Integrated Health Group Footnotes to Financial Statements (May 31, 1997) (JD-DC 0057396).
[169] The Proof of Claim filed by HealthAmerica included a claim for $16 million related to the note payable, which indicates that of the $20 million note, $4 million had been paid by AHERF.
[170] Proof of Claim filed by HealthAmerica (March 1, 1999).  Stephen Dengler deposition testimony, June 10, 2004 at pages 30 - 35.
[171] Stipulation and Agreed Order resolving the Claim of HealthAmerica Pennsylvania, Inc. and certain related entities filed against the Debtors' Estates (December 20, 2000).  Stephen Dengler deposition testimony, June 10, 2004 at pages 57 - 58.
[172] The source of this data is an analysis prepared on November 2, 2000, which is attached to the Claim as Attachment F.  There are minor discrepancies between the total claim amounts shown here and the original and revised claim amounts as filed.  The amounts per the original and revised claims as filed are $56,400,000 and $41,556,648.

million, and thus HealthAmerica was owed this amount by AHERF.[173]    However, HealthAmerica owed AHERF $27.1 million for AHERF Premiums that had not yet been provided to AHERF by HealthAmerica.[174]    Accordingly, the net amount that AHERF owed to HealthAmerica per the HealthAmerica claim was $30.7 million, derived by subtracting the $27.1 million in AHERF Premiums due AHERF from the $57.8 million in net costs of providing healthcare services to the Covered Lives.  This amount is shown on the table above as the "Risk Sharing Agreement-Losses" component of the original Claim.   The amount was later reduced from $30.7 million to $27.8 million due to an update on the IBNR run out of claims paid after the Bankruptcy Claim was filed.[175]

AHERF's participation in the Risk Contract resulted in losses of approximately $27.8 million.  In addition to these losses, and as stated earlier, AHERF also paid $4 million to HealthAmerica per Section 5.11 of the Risk Contract on the $20 million note.  The sum of these amounts results in damages of $31.8 million.  See Exhibit 14.

Alternatively, if the entire amount of the note payable and other HealthAmerica claimed items are included in the quantification of damages related to the Risk Contract, then the calculation would include the full $41.6 million amount that the Court has determined that AHERF owed HealthAmerica, plus $4 million paid on the note for a total of approximately $45.6 million.

Had I been consulted about the HealthAmerica risk contract, provided that accurately stated financial statements were available, I would have advised against entering into the contract.

### D. Executive and Management Incentive Compensation

I have also included, as a component of damages, the executive incentive compensation that would not have been paid by the AHERF System had the accurate financial statements been available.  In particular, I have summed the amounts of annual incentive compensation paid to

---

[173] This amount is per Attachment A to the Claim and reflects Dates of Service from April 1, 1997 through July 20, 1998, with claims paid through December 31, 1998.
[174] AHERF Contract Close (Attachment A to HealthAmerica Claim).
[175] HealthAmerica Claim Summary Revised (Attachment F to HealthAmerica Claim).

executive and management employees in Fiscal Year 1997.[176]  The annual incentive amounts paid are based in part on the AHERF System performance of Fiscal Year 1996 as represented by the misstated audited financial statements.[177]  I have also summed the long-term incentive compensation paid to executive and management employees in Fiscal Year 1998.[178]  The Compensation Committee of AHERF approved the long-term incentive payments during fiscal year 1997, which related to accrued incentive compensation from fiscal year 1993.[179]  The long-term incentive awards were approved based in part on AHERF System financial performance of Fiscal Year 1996, again per the misstated audited financial statements.[180]  Finally, I have summed the transaction related and extraordinary bonus payments made to certain AHERF System executives that either represented payments for transactions that likely would not have been undertaken had accurate financial statements been available or that occurred subsequent to the misstated audited financial statements of Fiscal Year 1996.[181]

The executive and management incentive compensation as identified above and for which I was able to locate supporting documentation, totals approximately $4 million.  Because the Compensation Committee provided approval to pay incentive compensation to several employees for which records are not readily available, the incentive compensation amount that I have determined is conservative and would increase if such information were located.  See Exhibit 15.

---

[176] Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 to JD-HL 0021010).  Deposition Exhibit 2472.
[177] Deposition Exhibits 2480 and 2482.
[178] Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 to JD-HL 0021010).  Deposition Exhibit 2472.  Series of July 1, 1997 letters providing notice to employees of the long-term incentive award (DBR-DK 006006 to DBR-DK 006023).
[179] Memo from David M. Deasy dated June 20, 1997 (DBR-DK 006040).
[180] Coopers & Lybrand report dated June 30, 1997 (DBR-DK 001541 to DBR-DK 001543).
[181] Memo from Dave Deasy dated July 8, 1998 (DBR-DD-0042 to DBR-DD-0073).

### E. *Avoidable Costs Conclusion*

Damages measured by the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions discussed above, that were undertaken and that would likely not have occurred but for the misstated financial statements as audited by Coopers & Lybrand total approximately $267.5 million. See Exhibit 16.

*    *    *

My analysis of Avoidable Costs relates primarily to three transactions that were undertaken by the Debtor Entities subsequent to September 30, 1996, the approximate date of the Coopers Fiscal Year 1996 audit opinion, which accompanied the materially misstated AHERF financial statements. The three transactions *do not* represent all of the losses that were incurred by the Debtor Entities during the period at issue. For example, the DVOG hospitals incurred losses during the time period from September 30, 1996 through the sale of the entities to Tenet but those losses are not included in the Avoidable Costs analysis. Another example of losses that are not included in the Avoidable Costs analysis are the losses related to the physician practices that were acquired by the AHERF System prior to September 30, 1996. These types of excluded losses provide the primary basis for the difference between the damages determined via the Avoidable Costs methodology and the total creditor shortfall methodology.

In regard to the DVOG entities, in particular, I understand that Mr. Singleton has quantified the amount of cost savings that could have been achieved had a turnaround been undertaken following the receipt of accurately stated financial statements for Fiscal Year 1996. Accordingly, accurately stated financial statements would have provided the necessary information for responsible parties to take actions to improve the AHERF financial situation. I have not considered these types of losses in my analysis.

## VII. Documents and Information Considered

A listing of the documents and information that I considered in forming my opinions are attached as Exhibit 17.

## VIII. Additional Analysis and Demonstrative Aids

I reserve the right to amend and/or supplement this report based upon any new and/or additional facts, which may come to my attention, or information, including expert reports and/or opinions, deposition testimony and related document exhibits thereto, which may be produced.

If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts or tables.

## IX.    Qualifications and Publications

See Exhibits 1 and 2.

## X.    Compensation for Study and Testimony

My hourly rate for work in this matter is $495. Billing rates of the team of AlixPartners personnel who worked under my direction and control range from $135 to $375 per hour.

## XI.    Other Cases in Which the Expert has Testified Within the Last Four Years

See Exhibit 3.

R. Bruce Den Uyl

Dated: September 3, 2004



Exhibit 1

## CURRICULUM VITAE
## OF
## R. BRUCE DEN UYL

**POSITION**    Principal, AlixPartners, LLC, Chicago, Illinois

**EDUCATION**    B.A. - Economics (Cum Laude); Lawrence University, Appleton, Wisconsin

M.S. - Resource Economics; University of Michigan, Ann Arbor, Michigan

Completed coursework for the Ph.D. in Resource Economics; University of Michigan, Ann Arbor, Michigan

**PROFESSIONAL HISTORY**    Mr. Den Uyl was with Price Waterhouse from 1985 to 1998, where he was a Partner and Director of Healthcare Valuations. Prior to joining Price Waterhouse, Mr. Den Uyl was with the Economics Advisory Group at Coopers & Lybrand and a Financial Advisor to Olde & Company (stockbrokers). He also directed an economic consulting group in Michigan.

**PROFESSIONAL EXPERIENCE**    Mr. Den Uyl has extensive experience as a consultant on a broad array of financial issues. He has prepared financial and accounting analyses, valuations and efficiency studies in connection with mergers and acquisitions, bankruptcies, fairness opinions and litigation issues. He has acted as a consultant to companies and governmental bodies for the purpose of establishing values for acquisitions and divestitures. Mr. Den Uyl has prepared analyses for cases involving failed acquisitions, fraudulent conveyance, bankruptcy, breach of contract, antitrust and securities issues. He has extensive experience preparing valuations and financial analyses in the healthcare industry including hospitals, HMOs, PPOs, physician practices, clinics, etc. He has acted as an expert and advisor to troubled and financially viable healthcare entities. He has also provided fairness reviews of transactions for Attorneys General throughout the United States. Mr. Den Uyl has provided expert testimony in several healthcare cases.



Exhibit 2

# R. BRUCE DEN UYL
## Presentations/Publications in the Last Ten Years

"Valuations in Distressed Markets: Methodologies and Analytics," Financial Research Associates, Distressed Debt Summit, New York, New York, October 28, 2003.

"Valuation in Bankruptcy and Restructuring," American Society of Appraisers, Advanced Business Valuation Conference, Chicago, Illinois, October 16, 2003.

"When It Looks Too Good To Be True, It Usually Is: Detecting, Investigating, Litigating and Recovering From Ponzi Schemes," 2003 National Association of Bankruptcy Trustees Annual Convention, Washington, DC, September 8, 2003.

"Litigation Workshop: Proving 'Insolvency' in Fraudulent Conveyance Actions," American Bankruptcy Institute, Bankruptcy Conference, New York, New York, May 5, 2003.

"When It Looks Too Good to Be True, It Usually Is: Detecting, Investigating, Litigating and Recovering From Ponzi Schemes," American Bar Association Spring Meeting, Litigation and Trustee's & Examiner's Subcommittee, Los Angeles, California, April 3, 2003.

"Valuation in Healthcare Conversions," NAAG/NASCO Conference on the Issue of Healthcare Mergers and Valuations, Minneapolis, Minnesota, October 2002.

"Valuations of Intellectual Property, Dot.com Businesses, Customer Lists and Other Intangibles" (with D. Saunders, J. Sutton and W. Anson), American Bankruptcy Institute - Bankruptcy Conference, New York, May 6, 2002.

"Preparing a Chapter 11 Bankruptcy Case", the Young Lawyers Section of The Chicago Bar Association, The Chicago Bar Association, March 23, 2001 (panel discussion).

"Strategies for Dealing with Ailing Dot Com and High Tech Start-Ups", Buying, Selling & Financing Internet Companies Conference, American Conference Institute, New York, November 2000.

"Valuations in Bankruptcy" (with Louis Dudney), Business Valuation Association, April 27, 2000.

"Healthcare Related Insolvency Valuation Issues," American Bar Association, March 23, 2000.

AlixPartners LLC

| Change the outcome.

Exhibit 2

R. Bruce Den Uyl
Publications/Presentations
Page 2

"Procedural Prudence and Technical Thoroughness in the Business Valuation Process," co-authored in Employee Stock Ownership Plans, A Practice Guide to ESOPs and Other Broad Ownership Programs, 2000 Edition.

"Valuation Strategies When Bottom-Fishing for Undervalued Companies: How to Determine that a Company is Worth Buying," Troubled & Bankrupt Business Acquisitions, March 17-18, 1999.

"A New Look at Healthcare Restructuring," National Conference of Bankruptcy Judges, October 22-25, 1998.

"Health Care Conversions & Acquisitions," The Massachusetts Attorney General's Office, Regulator Training Conference on Non-Profit Healthcare Conversions, July 19-21, 1998.

"The Role of Intellectual Property in the Enterprise Value," Price Waterhouse Intellectual Property Leadership Forum, March 4-7, 1998.

"Valuation and Negotiation - Software and Telecommunications Industries," Licensing Executives Society Annual Meeting, November 2-6, 1997.

"Maximized Intellectual Property Portfolio Management System," Developing Licensing Strategies in the Pharmaceutical and Biotech Industries, April 29-30, 1997.

"Valuing Nonprofit Healthcare Assets," Ohio Attorney General's Symposium on Nonprofit HealthCare Conversions, April 17-18, 1997.

"Determining a Reasonable Royalty," Intellectual Property Leadership Forum, February 23, 1995.

"Advanced Application of Valuation Principles - Case Study," Licensing Executives Society, Annual Meeting, October 16-19, 1994.

"Procedural Prudence and Technical Thoroughness in the Business Valuation Process," co-authored in Journal on Employee Ownership Law & Finance, Summer, 1994.

AlixPartners LLC

*| Change the outcome.*

Exhibit 3

# R. BRUCE DEN UYL
## Deposition and Trial Testimony Within The Last Four Years

Michael J. Lisle, et al. v. Health Communication Services, Inc., et al., Cook County Circuit Court, Illinois County Department, Law Division, No. 01 CH 5326.

Corson Manufacturing Company, et al. v. HSBC Bank USA, et al., United Stated Bankruptcy Court, Western District of New York, Bankruptcy No. 99-16855K, Chapter 11.

Faet Corporation, et al., Plaintiffs, v. Waste Management Holdings, Inc., et al., Defendants and Third Party Plaintiffs, v. O. David Fischer, et al., Third Party Defendants. Superior Court of New Jersey Law Division: Morris County, Docket No. MRS-L-02667-00

Ha-Lo Industries, Inc. v. Credit Suisse First Boston Corp., United States District Court, Northern District of Illinois, Eastern Division, Case No. 02 B 12059

Nortel Networks, Inc., et al. v. Foundry Networks, Inc., United States District Court, District of Massachusetts, Civil Action No. 01-10442

Ole K. Nilssen v. Magnetek, Inc., United States District Court, Northeastern District of Illinois, Eastern Division, Civil Action No. 98 C 2229

AgriBioTech, Inc. and Anthony H.N. Schnelling, Creditor Trustee v. Bill L. Rose, L.L.C., et al., United States Bankruptcy Court, District of Nevada, Bankruptcy No. BK-S-00-10533 and Adversary No. 02-1031-LBR

ANC Rental Corporation, et al., Debtor, United States Bankruptcy Court, District of Delaware, Chapter 11, Case No. 01-11200

Heartland Rail Corporation v. Railroad Development Corporation, United States District Court, Northern District of Illinois, Eastern Division, No. 02 C 2850

Ole K. Nilssen v. Motorola, Inc. and Motorola Lighting, Inc., Arbitration, Chicago, Illinois (January 27 – 31, 2003)

Ecolab, Inc. v. Gardner Manufacturing Co., Inc. and Guardian Pest Control, Inc., United States District Court, District of Minnesota, Civil Action No. 98-2294

Henderson v. Newman, United States District Court, Eastern District of Tennessee at Greeneville, Civil Action No. 2:99-CV-267



AlixPartners LLC

| Change the outcome.

**Exhibit 3**

R. BRUCE DEN UYL
PAGE 2

IDT Corporation v. Telefonica Internacional, S.S., American Arbitration Association, International Center for Dispute Resolution, Case No. 50-T-181-00225-01

New Heights Recovery & Power, LLC (formerly known as CGE Ford Heights L.L.C.) and CGE Fulton, L.L.C. v. Commonwealth Edison Company, Circuit Court of Cook County, Illinois County Department, Chancery Division, No. 00 CH 3157

R2 Investments, LDC v. World Access, Inc., et al., United States Bankruptcy Court, Northern District of Illinois, Case No. 01 B 14633 (Jointly Administered), Adversary Proceeding No. 01 A 01219

Hecla Mining Company v. Zemex Corporation, United States District Court, Northeastern District of Illinois, Eastern Division, Case No. 01 C 0405

Frydman & Company, et al., v. Credit Suisse First Boston Corporation et al., Supreme Court of the State of New York, County of New York, Index No. 605549/98 I.A.S. Part 3

EMC Group, Inc. v. Ryerson Tull, Inc. et al., Circuit Court of Cook County, Illinois County Department, Law Division, Transferred from Chancery Division (No. 99 CH 05521)

R.J. Reynolds Tobacco Company and GMB, Inc., v. Cigarettes Cheaper!, et al., United States District Court for the Northern District Court of Illinois, Eastern Division, Case No.: 99C 1174

Ann E. Bublitz and Dorothy A. Pierce, et al., v. E.I. duPont de Nemours and Company and Pioneer Hi-Bred International, Inc., United States District Court for the Southern District of Iowa, Central Division, Civil No. 4-00-CV-90247

Robert Martins v. Michael J. Gorun, A.I.N. Corporation, Autobytel.com, Inc., Superior Court of the State of California, County of Contra Costa, Case No. C-99-04771

800-JR Cigar, Inc., v. GoTo.com, Inc., et al., United States District Court for the District of New Jersey, Case No. 2:00 CV 03179 (JCC)

Weissmann v. Pre-Press Graphics Co., Inc., et al., Circuit Court of Cook County, Illinois, Case No. 00-CH-13071

Pepsico, Inc. v. Marion Pepsi-Cola Bottling Co., United States District Court for the Southern District of Illinois, Case No. 00-229-DRH



Exhibit 3

| Change the outcome.

R. BRUCE DEN UYL
PAGE 3

An adjudicatory hearing, Office of the Attorney General of Connecticut, to evaluate the application of Essent Healthcare, Inc. to purchase Sharon Hospital Inc., Docket No. 01-486-01

Norcross Safety LLC v. Invensys PLC, Siebe International Limited, Deutsche Siebe GmbH, and Siebe, Inc., Arbitration

EBS Litigation, L.L.C., v. Barclays Global Investors, et al., District Court for the District of Delaware, Case No. 98-547-SLR

Dynex Capital, Inc. v. PricewaterhouseCoopers, LLP, District Court of Travis County, Texas, 126th District, Case No. GN 00-0936

Syndia Corp., et al v. Lemelson Medical Education and Research Foundation, L.P., et al. United States District Court for the Northern District of Illinois, Eastern Division, Case No. 99-C-8241

Steven E. Leatherman, et al. v. Walter F. Imhoff, et al., National Association of Securities Dealers, Inc., Denver, Colorado, Arbitration Case No. 99-03239

Gibson & Associates, Inc. v. Robert J. Pachmayer, American Arbitration Association, Chicago, Illinois, No. 51 168 00133 00

Reliance Acceptance Group, Inc., et al & David T. Allen, Not Individually but Solely as Estate Representative for the Substantively Consolidated Post-Confirmation Chapter 11 Estate of Reliance, Acceptance Group, Inc., and its Subsidiaries, United States Bankruptcy, District of Delaware, Case No. 99-146-RRM

Zeta Consumer Products Corp., United States Bankruptcy Court, District of New Jersey, Case No. 00-34148 (NLW)

Intelect Communications, Inc., et al. v. Cadence Design Systems, Inc., District Court of Dallas County, Texas, 134th Judicial District, No. DV99-5670

**Expert Report of R. Bruce Den Uyl**
**AHERF Obligated Groups and Member Entities**
**Exhibit 4**

| Obligated Group | Member Entities | Licensed Beds |
|---|---|---|
| Allegheny General Hospital (AGH) | Allegheny General Hospital | 800 |
| Allegheny University Medical Centers (AUMC) | Forbes Health System (Forbes Regional, Forbes Metropolitan, Forbes Hospice, Forbes Nursing Center) | 472[1] |
| | Allegheny Valley Hospital | 288 |
| | Canonsburg Hospital | 120 |
| Delaware Valley Obligated Group (DVOG) | Medical College of Pennsylvania[2] | NA |
| | Hahnemann University[2] | NA |
| | Medical College of Pennsylvania Hospital | 495 |
| | Hahnemann University Hospital | 638 |
| | Elkins Park Hospital | 304 |
| | Bucks County Hospital | 190 |
| | St. Christopher's Hospital for Children | 183 |
| Allegheny Hospitals Centennial (Centennial f/k/a the GHS Hospitals) | Graduate Hospital | 330 |
| | City Avenue Hospital | 248 |
| | Parkview Hospital | 212 |
| | Mt. Sinai Hospital | 225 |
| Allegheny Hospitals New Jersey (New Jersey) | Rancocas Hospital | 353 |

[1] Excludes Forbes Nursing Center and Forbes Hospice.
[2] The Medical College of Pennsylvania and Hahnemann University were combined in 1994 to form Allegheny University of the Health Sciences ("AUHS").
Sources: *AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037). Secondary Market Disclosure Report, Fiscal Year 1997.*

**Expert Report of R. Bruce Den Uyl**
**AHERF Historical Bond Debt Issuances and Assumptions**
**Exhibit 5**

| Relevant Entity | Year | Bond Debt | Method |
|---|---|---|---|
| Allegheny General Hospital | 1983 | $66 million | Issued |
| Allegheny General Hospital | 1988 | $60 million | Issued |
| Medical College of Pennsylvania | 1989-1991 | $79 million | Issued |
| United Hospitals[1] | 1991 | $133 million | Assumed |
| Allegheny General Hospital | 1991 | $60 million | Issued |
| Allegheny General Hospital | 1995 | $100 million | Issued |
| Delaware Valley Obligated Group | 1996 | $356 million | Re-Issued[2] |
| Allegheny Hospitals, Centennial | 1997 | $174 million | Assumed |
| Allegheny Hospitals, New Jersey | 1997 | $41 million | Assumed |
| Allegheny University Medical Centers | 1997 | $122 million | Assumed |

[1] Does not include current portion of long-term debt as the figure is unavailable.
[2] The outstanding debt of the Medical College of Pennsylvania and the United Hospitals was re-financed under the 1996 DVOG issuance.
*Sources: Secondary Market Disclosure Report, Fiscal Year 1997. AHERF audited financial statements for the fiscal years ended June 30, 1991-1992.*

**Expert Report of R. Bruce Den Uyl**
**AHERF Hospital Acquisitions**
**Exhibit 6**

| Entity | Date Acquired | Region | Debtor / Non-Debtor |
|---|---|---|---|
| Medical College of Pennsylvania (MCP) and MCP Hospital | 1988 | East | Debtor |
| United Hospitals | | | |
| St. Christopher's Hospital for Children | July 1, 1991 | East | Debtor |
| Elkins Park Hospital | July 1, 1991 | East | Debtor |
| Bucks County Hospital | July 1, 1991 | East | Debtor |
| Hahnemann University and Hahnemann University Hospital (HUH) | July 1, 1994 | East | Debtor |
| Graduate Health System (GHS) | | | |
| Graduate Hospital | May 1, 1997 | East | Debtor |
| City Avenue Hospital | May 1, 1997 | East | Debtor |
| Parkview Hospital | May 1, 1997 | East | Debtor |
| Mt. Sinai Hospital | May 1, 1997 | East | Debtor |
| Rancocas Hospital | May 1, 1997 | East (New Jersey) | Non-Debtor |
| Forbes Health System | | | |
| Forbes Regional Hospital | January 1, 1997 | West | Non-Debtor |
| Forbes Metropolitan Hospital | January 1, 1997 | West | Non-Debtor |
| Forbes Nursing Center | January 1, 1997 | West | Non-Debtor |
| Forbes Hospice | January 1, 1997 | West | Non-Debtor |
| Allegheny Valley Hospital | March 1, 1997 | West | Non-Debtor |
| Canonsburg Hospital | July 1, 1997 | West | Non-Debtor |

*Sources: Amended Disclosure Statement. AHERF audited financial statements.*

**Expert Report of R. Bruce Den Uyl**
**AHERF Lending Institutions**
**Exhibit 7**

| Obligated Group | Bank/Bond Trustees | Bond Insurer | Letter of Credit Bank |
|---|---|---|---|
| Allegheny General Hospital | Chase Manhattan Bank<br>PNC Bank | MBIA Insurance Corp. | PNC Bank<br>Morgan Guaranty |
| Allegheny University Medical Centers | Chase Manhattan Bank<br>PNC Bank | | |
| Delaware Valley Obligated Group | Norwest Bank Minnesota | MBIA Insurance Corp. | PNC Bank |
| Allegheny Hospitals, Centennial | First Union | | |
| Allegheny Hospitals, New Jersey | The Bank of New York | | |
| AHERF | Mellon Bank | | |

*Sources: Secondary Market Disclosure Report, Fiscal Year 1997. GOV 55868.*

Expert Report of R. Bruce Den Uyl
AlixPartners Calculation of Total Creditor Shortfall [1]
Exhibit 8
($000)

| Type | Class | | Allowed to Date | Total Paid to Date | Recovery % | | Shortfall to Date |
|---|---|---|---|---|---|---|---|
| Administrative Expense Claims | Not Applicable | | $11,310 | $11,310 | 100.000% | | $0 |
| Priority Claims | 1 | | $4,052 | $4,052 | 100.000% | | $0 |
| General Secured Claims | 2 | | $2,063 | $2,063 | 100.000% | | $0 |
| Secured Claims of Holders of MBIA/PNC Claims | 4 | | $50,000 | $50,000 | 100.000% | | $0 |
| Secured Claims of Centennial Bondholders | 3 | | $33,000 | $33,000 | 100.000% | | $0 |
| Unsecured Claims of Centennial Bondholders | 3 | [2] | $75,660 | $4,369 | 5.775% | | $71,291 |
| Unsecured Claims of Holders of MBIA/PNC Claims | 4 | | $342,573 | $65,945 | 19.250% | | $276,628 |
| General Unsecured Claims | 5(A) | | $255,153 | $48,971 | 19.193% | [3] | $206,183 |
| Centennial Unsecured Claims | 5(B) | | $29,681 | $1,714 | 5.775% | | $27,967 |
| Convenience Claims | 6(A) | | $1,449 | $145 | 10.000% | | $1,304 |
| Centennial Convenience Claims | 6(B) | | $850 | $25 | 3.000% | | $824 |
| | | | $805,792 | $221,595 | 27.500% | | $584,196 |

*Adjustments:*

| | |
|---|---|
| Anticipated AHENJ Liquidation Recovery and Medicare Recoveries | $4,900 |
| Total Assets of Liquidating AHERF as of June 30, 2004 | $23,132 |
| Litigation Expenses | TBD |
| **Adjusted Creditor Shortfall** | **$556,164** |

[1] Calculation is based on information obtained from the Trustee's office and per Donlin Recano as of April 2004.

[2] Per letter from Peter Biagetti dated August 13, 2004, the Centennial Bondholders were initially allowed an Unsecured Claim of $105.6 million. The letter indicates that these creditors have received approximately $30 million resulting from litigation settlements and accounts receivable collections. The Centennial Bondholder allowed claim was therefore reduced to $75.6 million.

[3] Payments on certain of the General Unsecured Claims have been adjusted or capped due to special circumstances. Therefore, the percentage recovery on these claims differs slightly from the overall percentage paid to date of 19.25%.

*Sources: Claims Data as of April 14, 2004. Disbursement Schedules per the Trustee's Office. Deposition testimony of Charles Morrison (June 29, 2004) at pages 146 - 147. Letter from Peter Biagetti dated August 13, 2004. Monthly Operating Report for the month ended June 30, 2004.*

**Expert Report of R. Bruce Den Uyl**
**Total Creditor Shortfall Per June 30, 2004 Monthly Operating Report ("MOR")**
**Exhibit 9**
**($000)**

| | |
|---|---:|
| Total Allowed Claims Per Liquidating Plan of Reorganization | $677,178 |
| Claims Reclassified from Disputed Category to Allowed Category | $128,507 |
| Overall Total Allowed Claims per MOR | $805,685 |
| Liquidation of Claims | $220,670 |
| Remaining Obligations of Liquidating AHERF on Allowed Unsecured Claims | $585,015 |
| *Adjustments:* | |
| Anticipated AHNJ Liquidation Recovery and Medicare Recoveries | $4,900 |
| Total Assets of Liquidating AHERF as of June 30, 2004 | $23,132 |
| Litigation Expenses | TBD |
| **Adjusted Remaining Obligations on Allowed Unsecured Claims** | **$556,983** |

*Sources: Monthly Operating Report for the months ended June 30, 2004 and December 31, 2000.*
*Deposition testimony of Charles Morrison (June 29, 2004) at pages 146 - 147.*

**Expert Report of R. Bruce Den Uyl**
Reconciliation of AlixPartners Calculation [1] to June 30, 2004 Monthly Operating Report
Exhibit 10
($000)

| | |
|---|---:|
| Total Creditor Shortfall As Calculated by AlixPartners | $584,196 |
| Plus: Aetna / US Healthcare Distributions Held by Trustee Due to Pending Adversary Proceeding | $926 |
| Subtotal | $585,123 |
| Less: Unexplained Variance in Allowed Claim Calculation ($805,792 - $805,685) | $107 |
| Subtotal | $585,016 |
| **Remaining Obligations of Liquidating AHERF on Allowed Unsecured Claims per Monthly Operating Report** | **$585,015** |
| | |
| *Adjustments:* | |
| Anticipated AHNJ Liquidation Recovery and Medicare Recoveries | $4,900 |
| Total Assets of Liquidating AHERF as of June 30, 2004 | $23,132 |
| Litigation Expenses | TBD |
| **Adjusted Remaining Obligations on Allowed Unsecured Claims** | **$556,983** |

[1] Calculation is based on information obtained from the Trustee's office and per Donlin Recano as of April 2004.

*Sources: Claims Data as of April 14, 2004. Disbursement Schedules per the Trustee's Office. Deposition testimony of Charles Morrison (June 29, 2004) at pages 146 - 147.*
*Letter from Peter Biagetti dated August 13, 2004. Monthly Operating Report for the month ended June 30, 2004.*

Expert Report of R. Bruce Den Uyl
Damages Resulting from Centennial Acquisition
Exhibit 11
($000)

| | 06/30/97 | 06/30/98 | 07/21/98 to 11/09/98 | Post 11/09/98 | Total |
|---|---|---|---|---|---|
| Net Income (Loss) | $685 | ($114,342) | | | |
| Add Back: Depreciation and Amortization | $948 | $7,451 | | | |
| Add Back: Asset Impairment Charges | $0 | $67,642 | | | |
| EBTDA | $1,633 | ($39,249) | | | |
| Capital Expenditures | ($4,208) | ($8,868) | | | |
| Change in Working Capital | $587 | $23,364 | | | |
| Cash Flow Gains (Losses) | ($1,988) | ($24,753) | ($14,159) | | ($40,900) |
| Plus: Cash Obtained in Business Combination | $4,696 | | | | $4,696 |
| Less: Repayment of Bond Principal | ($204) | ($6,746) | | | ($6,950) |
| Less: Repayment of Line of Credit | ($6,156) | | | | ($6,156) |
| Less: Liabilities Remaining | | | | ($262,441) | ($262,441) |
| Plus: Allocation for Centennial Recoveries | | | | $144,297 | $144,297 |
| Total Centennial Damages | ($3,652) | ($31,499) | ($14,159) | ($118,144) | ($167,454) |

*Sources: AHERF financial statements for the fiscal years ended June 30, 1997 and 1998, as restated by Mr. Berliner.  AHERF audited financial statements for the fiscal year ended June 30, 1997. AHERF consolidated financial statements, June 30, 1998.  Monthly Operating Report for the months ended November 30, 1998, June 30, 2000 and January 31, 2001.  Letter from Peter Biagetti dated August 13, 2004.  HLAH0003643, HLAH0003644 and HLAH0003646.  PWC-SUB-A+M 04140 - 04151.  Deposition Exhibits 2744 and 2752.  Settlement Order and Agreement between Trustee and Tenet.  Settlement Agreement between Trustee and PHCT.  Bank of New York letter dated December 1, 1998.  Charles Morrison deposition transcript dated June 29, 2004.*

Expert Report of R. Bruce Den Uyl
Physician Practices Purchased After September 30, 1996
Exhibit 12
($000)

| | Date of Acquisition | Revenue Less Expenses FY 1997 | Revenue Less Expenses FY 1998 |
|---|---|---|---|
| Cardiology Satellite Testing | 10/01/1996 | $14 | ($15) |
| B Peds Associate - Shaler | 10/01/1996 | ($53) | ($22) |
| Family & Internal Medicine | 10/17/1996 | ($222) | ($822) |
| Pine Hollow Med. Assoc. | 10/26/1996 | ($483) | ($426) |
| Island Ave. Pediatrics | 11/01/1996 | ($107) | ($135) |
| Oxford Crossing Multi. | 12/15/1996 | ($57) | ($37) |
| W/Woman Midwifery | 12/15/1996 | ($118) | NA |
| Primary Pediatrics at Broad | 12/17/1996 | NA | $0 |
| Gerald D. Klug, MD | 12/18/1996 | ($99) | ($40) |
| Babcock OB/GYN Assoc | 12/18/1996 | ($122) | $49 |
| MHV Murthy | 12/30/1996 | ($9) | $109 |
| Harleysville Med. Assoc. | 01/01/1997 | $352 | $503 |
| Roxborough Family Practice | 01/01/1997 | $2 | $10 |
| Roxborough Internal Medicine | 01/01/1997 | NA | ($2) |
| Bala Medical Assoc. | 01/01/1997 | ($31) | ($21) |
| Founders Med. Group NE | 01/01/1997 | ($163) | $137 |
| Founders NE Multi-Spec. | 01/01/1997 | ($66) | $0 |
| Founders NE Radiology | 01/01/1997 | NA | $0 |
| Langehorne Multi-Specialty | 01/01/1997 | NA | ($65) |
| Hollace Leppert, DO | 01/01/1997 | $63 | $4 |
| Founders NE Pediatrics | 01/01/1997 | $158 | ($302) |
| Margel C. Guie, DO | 01/01/1997 | ($30) | ($29) |
| Somerset Family | 01/01/1997 | $30 | ($23) |
| Mary Cavasins, MD | 01/01/1997 | ($46) | NA |
| Primcare | 01/01/1997 | ($699) | ($893) |
| Robert S. Milligan, MD | 01/01/1997 | ($10) | ($44) |
| Dr. Coyle - Cannonsburg | 01/01/1997 | NA | ($42) |
| East Suburban OB/GYN | 01/01/1997 | ($157) | ($616) |
| White Oak OB/GYN Assoc | 01/01/1997 | ($58) | ($340) |
| Mt. Laurel Family Physicians | 02/01/1997 | ($72) | ($34) |
| N.E. Family Practice | 02/01/1997 | ($20) | ($52) |
| Burlington City Internal Medicine | 02/01/1997 | $808 | $651 |
| Douglas F Smith, DO | 02/01/1997 | ($48) | NA |
| Grossman-Levine Assoc. | 02/01/1997 | ($25) | ($481) |
| Cinnaminson Ped. Assoc. | 02/01/1997 | $47 | $57 |
| Somerset Family - Logan / Berlin | 02/20/1997 | ($96) | $24 |
| Luis Lacouture, MD | 02/26/1997 | $16 | $20 |
| Bucks-Philadelphia Medical | 03/01/1997 | $42 | ($120) |
| Triboro Family Phys. | 03/01/1997 | ($9) | $89 |
| Rancocas OB/GYN | 03/01/1997 | ($97) | $50 |
| PGMA - VFP - Lower Burrell / Tarentum | 04/01/1997 | ($410) | $8 |
| Allegheny Optometry Associates | 04/01/1997 | NA | ($436) |
| Allergy Associates | 04/01/1997 | NA | ($233) |
| Cardiology Associates | 04/01/1997 | NA | $26 |
| Dermatology | 04/01/1997 | NA | $111 |
| Joel Kramer, DO | 04/01/1997 | ($205) | $126 |
| FMA- Braddock Hills | 04/01/1997 | NA | ($1) |
| PGMA - Brooktree | 04/01/1997 | ($13) | ($14) |
| PGMA - Century Three | 04/01/1997 | ($237) | ($710) |
| PGMA - Cherrington | 04/01/1997 | $37 | ($486) |
| PGMA - Cranberry | 04/01/1997 | ($4) | ($299) |
| PGMA - Greentree | 04/01/1997 | ($333) | ($984) |
| PGMA - Monroeville | 04/01/1997 | ($548) | ($426) |
| PGMA - Penn Hills | 04/01/1997 | ($329) | ($714) |
| PGMA - Sterling | 04/01/1997 | ($798) | ($1,102) |
| PGMA - Upper St. Clair | 04/01/1997 | ($263) | ($553) |
| PGMA - Wexford | 04/01/1997 | $59 | ($266) |
| PGMA Pharmacy - Century3 | 04/01/1997 | ($305) | $168 |
| PGMA Pharmacy - Monrville | 04/01/1997 | ($205) | ($733) |
| PGMA Pharmacy - Sterling | 04/01/1997 | ($213) | ($11) |

Expert Report of R. Bruce Den Uyl
Physician Practices Purchased After September 30, 1996
Exhibit 12
($000)

| | Date of Acquisition | Revenue Less Expenses FY 1997 | Revenue Less Expenses FY 1998 |
|---|---|---|---|
| PGMA Pharmacy - Wexford | 04/01/1997 | ($213) | $53 |
| Pittsburgh Women's Health | 04/01/1997 | NA | ($1,183) |
| N. Huntingdon Family | 04/16/1997 | ($82) | ($41) |
| N. Hills Internal Medicine | 04/23/1997 | NA | ($547) |
| Valley OB/GYN | 04/23/1997 | NA | ($522) |
| Frank Guinn, DO | 05/01/1997 [1] | ($40) | ($137) |
| Knorr Family Practice | 05/01/1997 | NA | ($10) |
| PHA-Bourse Bld. | 05/01/1997 | ($208) | ($212) |
| Drs. Formica & Strauss | 05/01/1997 [1] | ($30) | ($129) |
| Philadelphia Health Assoc - Internal Medicine | 05/01/1997 | $304 | $107 |
| Neshaminy Pediatrics | 05/01/1997 | NA | ($202) |
| Oxford Ave. Pediatrics | 05/01/1997 | $4 | ($98) |
| PHA- Pediatrics | 05/01/1997 | $34 | ($361) |
| Philadelphia Health Associates - Specialty Service | 05/01/1997 | ($42) | ($361) |
| Richard Mirabelli, MD | 05/01/1997 | ($32) | NA |
| Youssef S. Ragheb, MD | 05/08/1997 | NA | ($417) |
| Fam. Pr. Assoc.- Burlington | 05/15/1997 | ($74) | $118 |
| Forbes Trail Med. Center | 05/16/1997 | $0 | $0 |
| Jennerstown Med. Center | 05/16/1997 | $0 | $1 |
| West Main Med. Center | 05/16/1997 | $0 | $1 |
| Somerset Peds | 05/16/1997 | $0 | $2 |
| West Philadelphia Medical | 05/19/1997 | NA | ($3) |
| John E. Love, DO | 06/01/1997 [2] | ($13) | ($83) |
| Parkview OB/GYN | 06/18/1997 | NA | $548 |
| N.A. Int. Med - Cranberry | 06/19/1997 | NA | ($385) |
| Joel Kramer - Township Line OB/GYN | 06/30/1997 | ($9) | ($27) |
| William P. Coyle, MD - Waterdam | 06/30/1997 | ($8) | ($107) |
| ENT | 06/30/1997 | ($4) | ($323) |
| E Suburban Peds - Murrys / Irwin | 06/30/1997 | ($6) | ($304) |
| B. Peds Assoc - S. Pointe | 07/01/1997 | NA | $0 |
| Kiski Valley Comm. Med. | 07/01/1997 | NA | ($12) |
| Datar Singh-Kitning | 07/08/1997 | NA | ($45) |
| Natrona Heights OB/GYN | 07/08/1997 | NA | $766 |
| Northeast Multi-Specialty | 07/15/1997 | NA | ($38) |
| Pennsauken Medical | 07/22/1997 | NA | $0 |
| Allegheny Comp. OB/GYN-Pine | 07/31/1997 | NA | ($782) |
| Assoc. IN Internal Med. | 08/01/1997 | NA | ($153) |
| E. Suburb Peds - White Oak | 09/29/1997 | NA | ($30) |
| Corkery & Heise-Canons | 10/01/1997 | NA | $28 |
| PCE-Corkery & Heise | 10/01/1997 | NA | ($260) |
| Bensalem Physical Therapy | 01/01/1998 | NA | ($16) |
| Total | | ($5,551) | ($14,551) |

[1] The fiscal year 1997 schedules do not provide a Date of Acquisition for these practices, however, a date is provided in the fiscal year 1998 schedules.

[2] There is a discrepancy between the fiscal year 1997 and 1998 schedules related to the Date of Acquisition of the practice of John E. Love, DO, which show June 1, 1997 and June 5, 1997, respectively. In addition, the May 1997 year-to-date schedule shows losses related to Dr. Love despite the identified Date of Acquisition of June 1997.

*Sources: Allegheny Integrated Health Group Financial Statements, May 31, 1997 and June 30, 1997. Allegheny University Medical Practices Financial Statements, May 31, 1998.*

Expert Report of R. Bruce Den Uyl
Damages Resulting from Continued Physician Practice Acquisitions After September 30, 1996
Exhibit 13
($000)

| | 06/30/97 | 06/30/98 | 07/21/98 to 11/09/98 | Post 11/09/98 | Total |
|---|---|---|---|---|---|
| Revenue Less Expenses | ($5,551) | ($14,551) | | | |
| Allocation of Miscellaneous Expenses [1] | ($3,004) | ($2,406) | | | |
| Add back: Depreciation and Amortization [1] | $1,187 | $4,299 | | | |
| Add back: Extraordinary Item (Reorganization Costs) [1] | $225 | $778 | | | |
| EBTDA | ($7,143) | ($11,880) | | | |
| Cash Used in Acquisitions of Physician Practices | ($31,573) | $0 | | | |
| Other Capital Expenditures for PP&E [1] [2] | ($194) | ($415) | | | |
| Change in Working Capital [1] | | $1,165 | | | |
| **Cash Flow Gains (Losses)** | ($38,909) | ($11,129) | ($1,509) | | ($51,548) |
| Less: Liabilities Remaining | | | | ($14,763) | ($14,763) |
| Plus: Allocation for Physician Practice Recoveries | | | | $2,013 | $2,013 |
| **Total Physician Practice Damages** | ($38,909) | ($11,129) | ($1,509) | ($12,750) | ($64,298) |

[1] Allocated to the physician practices purchased after September 30, 1996 based on the percentage of revenue contributed by those practices as a percentage of AIHG (AUMP) total revenue.

[2] Capital expenditures of approximately $2.2 million related to the first quarter of the fiscal year ended June 30, 1997 are excluded from this analysis.

*Sources: AHERF financial statements for the fiscal years ended June 30, 1997 and 1998, and the three months ended September 30, 1996, as restated by Mr. Berliner. Allegheny Integrated Health Group Financial Statements, May 31, 1997 and June 30, 1997. Allegheny University Medical Practices Financial Statements, May 31, 1998. AHERF audited financial statements for the fiscal year ended June 30, 1997. AHERF consolidated financial statements, June 30, 1998. Monthly Operating Report for the months ended November 30, 1998 and June 30, 2000. PWC-SUB-A+M 04140 - 04151. HLAH0003644 and HLAH0003646.*

**Expert Report of R. Bruce Den Uyl**
**Damages Resulting from the HealthAmerica Risk Contract**
**Exhibit 14**
($000)

| | |
|---|---|
| Net Losses on HealthAmerica Contract | ($27,751) |
| Payments Made on Note | ($4,000) |
| **Total HealthAmerica Risk Contract Damages** | ($31,751) |

*Sources: HealthAmerica Proof of Claim.*

**Expert Report of R. Bruce Den Uyl**
**Damages Resulting from Executive and Management Incentive Compensation**
**Exhibit 15**
**($000)**

| | |
|---|---:|
| Annual Incentive Plan (Fiscal Year 1996 paid in Fiscal Year 1997) | ($2,180) |
| Long-Term Incentive Plan (Fiscal Year 1993 paid in Fiscal Year 1997) | ($1,055) |
| Transaction Related Bonuses | ($748) |
| **Total Executive Incentive Compensation Damages** | **($3,982)** |

*Sources: Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 - 0021010). Deposition Exhibit 2472. Memo from David M. Deasy dated June 20, 1997 (DBR-DK 006040). Series of July 1, 1997 letters (DBR-DK 006006 - 006023). Memo from Dave Deasy dated July 8, 1998 (DBR-DD-0042 - 0061, 0064 - 0073).*

**Expert Report of R. Bruce Den Uyl**
**Total Damages Resulting from Avoidable Transactions**
Exhibit 16
($000)

| Event | Total |
|---|---|
| Centennial Acquisition | ($167,454) |
| Continued Acquisition of Physician Practices After September 30, 1996 | ($64,298) |
| HealthAmerica Risk Contract | ($31,751) |
| Executive and Management Incentive Compensation | ($3,982) |
| **Total** | **($267,486)** |

*Sources: Exhibits 10 - 15.*

**Expert Report of R. Bruce Den Uyl**
**Documents and Information Considered**
**Exhibit 17**

**General:**

- Analysis of Tenet Acquisition Purchase Price — HLAH003641 – HLAH0003647

- Letter of Peter A. Biagetti dated August 13, 2004 and Stipulation And Consent Order Resolving Claims And Plan Objection Of United States Department of Health And Human Services

- Deposition Exhibits, including: 1396, 2472, 2480, 2482, 2744, 617, 1989, 1289, 1677, 1647, 2019, 1302, 1227, 725, 727, 792, 790, 2283, 226, 228, 1303, 2752

- Deloitte & Touche Consulting Group: Cash Receipts Summary – Hospital Accounts Receivable – October 31, 1999 — PWC-SUB-A+M 04140 – PWC-SUB-A+M 04151

- Allegheny Accounts Receivable Aging — HLAH0007826 – HLAH0007840

- Letters related to Centennial Bondholder Updates — BONY026 – BONY087

- Bankruptcy documents prepared by the Chapter 11 Trustee's Office — JD-AHERF 1548, JD-AHERF 1584 – JD-AHERF 1585, JD-AHERF 1547 – JD-AHERF 1548, JD-AHERF 1566, JD-AHERF 1571 – JD-AHERF 1579, JD-AHERF 1582, JD-AHERF 1589 – JD-AHERF 1590 – 1597

- Compensation Committee meeting package dated October 15, 1997 — JD-HL 0020966 – JD-HL 00210210

- AHERF Management Incentive Plan, Determination of FY 1994 Awards — PwC-SUB-DC-06659 – PwC-SUB-DC-06666

- Memo to AHERF Compensation Committee from Sherif S. Abdelhak dated September 26, 1997 — JD-DMC-0002331

Expert Report of R. Bruce Den Uyl
Documents and Information Considered
Exhibit 17

- Management Annual Incentive Plan, Allegheny Health, Education and Research Foundation Administrative Guide — JD-HL 0020914 – JD-HL 0020926

- Management Long-Term Incentive Plan, AHERF Administrative Guide, Addendum to Annual Incentive Plan — JD-HL 0020927 – JD-HL 0020930

- Letters to former AHERF employees dated July 1, 1997 re: Long-Term Incentive Plan payments — DBR-DK 006006 – DBR-DK 006023

- Memo from David M. Deasy to Dwight Kasperbauer dated June 20, 1997 re: Long Term Incentive Payout — DBR-DK 006040 – DBR-DK 006041

- Coopers & Lybrand procedures report re: AHERF Long-Term Incentive Plan dated June 30, 1997 — DBR-DK 001541 – DBR-DK 001543

- Memo from Dave Deasy to Anthony Sanzo dated July 8, 1998 re: transaction bonuses — DBR-DD-0042 – DBR-DD 0061

- Claims Register as of April 14, 2004 (Deposition Exhibit 2767)

- AHERF and affiliated entities electronic General Ledger for the fiscal years 1996, 1997 and 1998

- Allegheny Health, Education & Research Foundation, Analysis of Incentive Payments, FY97 — DLC-NR-21-00050 – DLC-NR-21-00051; DBR-AA 888616

- Asset Purchase Agreement by and among AHERF, et al. and V-II Acquisition Co. (Vanguard) dated as of February 13, 1998 — DM2698, pages 1-68

- Letter of Intent from Vanguard Health Systems to AHERF dated as of July 20, 1998 — JD-LB-000246 – JD-LB-000252

- Asset Purchase Agreement by and among AHERF, et al. and Vanguard Health Systems, et al. dated as of July 31, 1998 — ML-AHERF 5381 – ML-AHERF 5456

Expert Report of R. Bruce Den Uyl
Documents and Information Considered
Exhibit 17

- Letter of Intent from David R. Mayeux to the Board of Trustees of AHERF dated as of July 30, 1998 — PR-PLD-029-00415 – PR-PLD-029-00428

- Asset Purchase Agreement by and Among AHERF, et al. and Tenet Healthcare Corporation, et al. dated as of September 29, 1998 — ML-AHERF 2393 – ML-AHERF 2508

- First Amendment to the Asset Purchase Agreement by and Among AHERF, et al. and Tenet Healthcare Corporation, et al. dated as of November 10, 1998 — ML-AHERF 2363 – ML-AHERF 2377

- Asset Purchase Agreement by and Among AHERF et al. and Tenet Healthcare Corporation et al. dated as of August 11, 1998

- Asset Purchase Agreement by and among HealthAmerica Pennsylvania, Inc. and AHERF — CL 036900 – CL 036934

- Interviews with personnel of the Chapter 11 Trustee's Office

- Capitation Management Report: 1998 Capitation Survey (National Health Information, LLC)

- Memo from Stephen H. Spargo to Daniel J. Cancelmi dated as of March 17, 1997 re: Graduate Purchase Price Allocation — D0014968 – D0014974

- The Hospital & HealthSystem Association of Pennsylvania: Performance Profile report

- AHERF Licensed Beds at June 30, 1997 — DBR-SG-WP-1037

- Troubled Company Reporter (November 10, 1998)

- Letter from Sherif Abdelhak and William P. Snyder to the Members of AHERF Board of Trustees (August 5, 1996) — D 0004319 – D 0004321

- Minutes from the Annual Meeting of the Board of Trustees of AHERF (December 12, 1996) — PR-1-000740 – PR-1-000763

**Expert Report of Bruce Den Uyl**
**Documents and Information Considered**
**Exhibit 17**

- Minutes from the AHERF Finance and Audit
  Committee Meeting held on August 27, 1998

  CL 150832 –
  CL 150838

- Secondary Market Disclosure Report, Fiscal Year
  1997

  GOV 20207 –
  GOV 20268

- Risk Contract Analysis FY 1997

  CL 025664

- AHERF 6/30/97 Risk Contracting

  CL 012627 –
  CL 012629

- Allegheny Health, Education and Research
  Foundation Consolidating Balance Sheet as of June
  30, 1997

  CL 017089
  CL 017051

- Expert Report of Steven B. Kite, Esq. (September 1,
  2004)

- Expert Report of Thomas W. Singleton ("Allegheny
  Health Education and Research Foundation Delaware
  Valley Obligated Group Turnaround Evaluation As
  of September 30, 1996")

- Report of Independent Accountants

  GOV 55868

- Allegheny Health, Education and Research
  Foundation 1997 Audit Update, October 1, 1997

  PwC 0036868 –
  PwC 0036880

- Allegheny Integrated Health Group Footnotes to
  Financial Statements, May 31, 1997

  JD-DC-0057396

- Letter from Sherif S. Abdelhak to Members of the
  Allegheny Consolidated Boards of Trustees dated as
  of February 5, 1997

  JD-SA-0004069

- News article: "Moody's downgrades Philadelphia
  Hospitals and Higher Education Facilities Authority
  Graduate Health System's Debt to Ba from Baa"
  (August 26, 1996)

- News article: "Moody's Investors Service
  Downgrades Allegheny Hospitals Centennial Debt to
  B2" (January 7, 1998)

Expert Report of R. Bruce Den Uyl
Documents and Information Considered
Exhibit 17

- News article: "S&P Cuts New Jersey Health Care Facility Finance / Allegheny Hospital to BB-" (January 27, 1998)

- News article: "Moody's Downgrades Two Divisions of Allegheny Health" (May 21, 1998)

- News article: "Allegheny MBIA-backed Debt/Moody's –2: $298M DVOG Bonds" (July 21, 1998)

- News article: "PricewaterhouseCoopers, Conceived in September, Born Today" (July 1, 1998)

- Public credit ratings information

**Financial Statements, including:**

| | |
|---|---|
| - Allegheny General Hospital and Subsidiaries Consolidated Financial Statements for the years ended June 30, 1988, 1987 and 1986 | DBR-AA 4808 – DBR-AA 4831 |
| - Allegheny Health Services Consolidated Financial Statements for the years ended June 30, 1991 and 1990 | GOV 69736 – GOV 69826 |
| - Allegheny Health, Education and Research Foundation Consolidated Financial Statements for the year ended June 30, 1992 | D 0018617 – D 0018638 |
| - Allegheny Health, Education and Research Foundation Consolidated Financial Statements for the years ended June 30, 1993 and 1992 | D 0018596 – D 0018616 |
| - Allegheny Health, Education and Research Foundation Consolidated Financial Statements for the years ended June 30, 1994 and 1993 | D 0018571 – D 0018595 |
| - Allegheny Health, Education and Research Foundation Consolidated Financial Statements for the years ended June 30, 1995 and 1994 | D 0017023 – 0017045 |

- Allegheny Health, Education and Research Foundation Audited Financial Statements for Fiscal Year 1996

  JB 01602 – JB 01714

- Allegheny Health, Education and Research Foundation Consolidated Financial Statements for the year ended June 30, 1997

  D 0018502 – D 0018545

- Allegheny Health, Education and Research Foundation Consolidated Financial Statements, September 30, 1997

  JB 00790 – JB 00795

- Allegheny Integrated Health Group Financial Statements: May 31, 1997; June 30, 1997; May 31, 1998 and June 30, 1998

  JD-DC-0057397 – JD-DC-0057467; JD-DC-0057380 – JD-DC-0057394; JD-DC-0055458 – JD-DC-0055527 JD-DC-0055431 – JD-DC-0055454

- AHERF Consolidated Financial Statements for the year ended June 30, 1998 (internal)

  JD-DC-0050334 – 0050376

- Financial Statements for the year ended June 30, 1998 for Allegheny University Hospitals, Allegheny General (audited by KPMG)

  ML-AHERF 7447 – ML-AHERF 7472

- Audited Financial Statements Allegheny University Medical Centers Fiscal Year Ended June 30, 1998 (audited by KPMG)

  ML-AHERF 7474 – ML-AHERF 7478

- The Graduate Hospital Financial Statements for the Years Ended June 30, 1996 and 1995 and Independent Auditors' Report (Deloitte & Touche LLP)

  JD-DMC-0007556 – JD-DMC-0007574

- Parkview and City Avenue Hospital Combined Financial Statements for the Years Ended June 30, 1996 and 1995, Supplemental Combining Schedule for the Year Ended June 30, 1996 and Independent Auditors' Report (Deloitte & Touche LLP)

  M2601 – M2615

- Mt. Sinai Hospital Financial Statements for the Years Ended June 30, 1996 and 1995 and Independent Auditors' Report (Deloitte & Touche LLP)

  JD-DMC-0007575 – JD-DMC-0007589

- The Graduate Hospital Financial Statements, April 30, 1997

  DBR-AA 74286 – DBR-AA 74301

- Mr. Sinai Hospital Financial Statements, April 30, 1997

  DBR-AA 74302 – DBR-AA 74317

- City Avenue Hospital Financial Statements, April 30, 1997

  DBR-AA 74342 – DBR-AA 74357

- Parkview Hospital Financial Statements, April 30, 1997

  DBR-AA 74358 – DBR-AA 74373

- AHERF trial balances by entity for the fiscal years ended June 30, 1996, 1997 and 1998

  CL 011262 – CL 011595; CL 023384 – CL 023870; PwC-SUB-DC-00057-00084; PwC-SUB-DC-00590-00611; PwC-SUB-DC-00651-00655; PwC-SUB-DC-00541-00550; PwC-SUB-DC-00562-00587; PwC-SUB-DC-00528-00537; PwC-SUB-DC-00681-00720; PwC-SUB-DC-00434-00451; PwC-SUB-DC-00504-00515; PwC-SUB-DC-00538-00540; PwC-SUB-DC-00365-00375; PwC-SUB-DC-00612-00640; PwC-SUB-DC-00003-00056; PwC-SUB-DC-00230-00269; PwC-SUB-DC-00137-00211; PwC-SUB-DC-00165-00174; PwC-SUB-DC-00127-00136; PwC-SUB-DC-00123-00126; PwC-SUB-DC-00956-00968; PwC-SUB-DC-00990-00997; PwC-SUB-DC-00735-00764; PwC-SUB-DC-00376-00401; PwC-SUB-

Expert Report of R. Bruce Den Uyl
Documents and Information Considered
Exhibit 17

DC-00120-00122; PwC-
SUB-DC-00422-00433;
PwC-SUB-DC-00460-
00464; PwC-SUB-DC-
00326-00345; PwC-SUB-
DC-00500-00503; PwC-
SUB-DC-00308-00325;
PwC-SUB-DC-00402-
00421, PwC-SUB-DC-
00765-00778; PwC-SUB-
DC-00798-00807; PwC-
SUB-DC-00818-00828;
PwC-SUB-DC-00840-843;
PwC-SUB-DC-00844-853;
PwC-SUB-DC-00872-
00884; PwC-SUB-DC-
00641-00668; PwC-SUB-
DC-00551-00561; PwC-
00976-00989; PwC-SUB-
DC-01000-01009; PwC-
SUB-DC-00954-00955; JD-
PRAN-00001-00073

- Allegheny Health, Education and Research Foundation Executive Financial Summary, September 30, 1996

  JD-DC-0031167 –
  JD-DC-0031211

- Allegheny Health, Education and Research Foundation Executive Financial Summary, October 31, 1996

  DBR-AA 88617 – DBR-AA
  88661

- Allegheny Health, Education and Research Foundation Consolidated Financial Statements, October 31, 1996

  DBR-AA 88585 –
  DBR-AA 88602

- Allegheny Health, Education and Research Foundation Consolidating financial statements, October 31, 1996

  DBR-AA 88662 – DBR-AA
  88667

- Restated Financial Statements prepared by Marks Paneth for the fiscal years 1996, 1997 and 1998, and for the time period September 30, 1996 and May 1, 1997

**Monthly Operating Reports, including:**
- October 31, 1998
- November 30, 1998
- June 30, 2000
- December 31, 2000
- January 31, 2001
- April 30, 2004
- June 30, 2004

**Orders, Settlement Agreements and Proofs of Claim, including:**
- Order Approving Settlement Agreement And Stipulation between William J. Scharffenberger, Chapter 11 Trustee and Tenet Healthcare Corp.

- Joint Motion To Approve Settlement Agreement And Stipulation between William J. Scharffenberger, Chapter 11 Trustee and Tenet Healthcare Corp.

- Order Approving A Certain Settlement Agreement between William J. Scharffenberger, Chapter 11 Trustee and Philadelphia Health Care Trust

- Application For An Order Approving A Certain Settlement Agreement between William J. Scharffenberger, Chapter 11 Trustee and Philadelphia Health Care Trust

- Stipulation And Agreed Order Resolving Claim of HealthAmerica Pennsylvania, Inc. And Certain Related Entities Filed Against the Debtors' Estates dated December 20, 2000

- HealthAmerica Pennsylvania Inc. Proof of Claim dated March 1, 1999

Expert Report of R. Braden Ux.
Documents and Information Considered
Exhibit 17

**Legal Pleadings and Documents:**

- Allegheny Health, Education and Research Foundation, et al. Amended Disclosure Statement dated August 15, 2000

- Allegheny Health, Education and Research Foundation, et al. Second Amended Consolidated Liquidating Plan of Reorganization dated December 5, 2000

- First Amended Complaint in the matter of The Official Committee Of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. PricewaterhouseCoopers, LLP dated April 16, 2001

- Declaration of Lorrie Warner Pursuant to 28 U.S.C. Section 1746 In Response to the Order of the Court     MERRILL LYNCH 402-423

- Declaration of Anne Morse     MERRILL LYNCH 380-401

- Defendant's Responses And Objections To Plaintiff's Fourth Set of Interrogatories

- Plaintiff's Responses to Defendant's Second Set of Interrogatories

**Deposition Transcripts:**

*Board of Trustees Deponents*
- William Adam: December 17, 2003
- Henry Allyn: December 11, 2003
- Barbara Atkinson, M.D.: May 12, 2004
- J. David Barnes: July 8 and 9, 2003
- Ralph W. Brenner, Esq.: September 30, 2003
- Dorothy McKenna Brown: May 4, 2004
- Anthony M. Cook: September 4, 2003
- Douglas D. Danforth: October 7 and 8, 2003
- Richard H. Daniel: October 10, 2003
- Ronald R. Davenport: April 20, 2004
- Claire Gargalli: August 26, 2003

**Documents and Information Considered**
**Exhibit 17**

- William Genge: November 17, 2003
- Ira Gumberg: October 2 and 3, 2003
- Robert M. Hernandez: September 3, 2003
- Graemer Hilton: August 13, 2003
- Alfred W. Martinelli: May 5, 2004
- Donna M. Murasko, Ph.D.: April 8, 2004
- Paul D. Neuwirth: September 24, 2003
- Thomas H. O'Brien: October 16, 2003
- Robert B. Palmer: August 8, 2003
- Randall L. C. Russell, Ph.D.: September 29, 2003
- David W. Sculley: December 3, 2003
- William Penn Snyder, III: July 15, 2003
- Richard L. Spielvogel, M.D.: May 19, 2004
- W. Bruce Thomas: September 16, 2003

*Third Party Deponents*
- Jay Brodish: July 17, 2004
- William F. Buettner: March 2 and 3, 1999; August 8, 2000; January 17, 2003; June 22, 23 and 24, 2004
- C. David Cook: November 4 and 25, 2003
- Stephen R. Dengler: June 10, 2004
- Susan A. Flanagan: June 23, 2004
- Amy Frazier: March 8 and 9, 1999; March 11 and 12, 1999; August 10, 2000; January 10, 2003; June 9 and 10, 2004
- Duane Girol: October 22, 2003
- Mark D. Kirstein: June 2, 1999; August 11, 2000; January 6, 2003; May 11, 12 and 13, 2004
- Marcella Knittel: July 23 and 24, 2003
- Bernard J. Korman, Esq.: August 28, 2002
- David Leondi: February 4, 2004
- Janet Grace Lewis: November 20, 2003
- Loretta A. Lundberg: June 21, 2004
- Edward Malmstrom: February 20, 2003
- Paula Mammarella: July 28 and 29, 2003
- Charles Martin: April 30, 2002
- Robert E. Mathews: June 24, 2003
- Melissa Matthews: February 19, 2004
- David R. Mayeux: June 5, 2003
- Thomas McCool: October 28, 2003
- Ralph S. Michael: March 11, 2004
- Anne Morse: October 22, 2003

**Expert Report of R. Bruce Den Uyl**
**Documents and Information Considered**
**Exhibit 17**

- David M. Ondish: June 28, 2004
- Charles E. Reilly: November 21, 2003
- James C. Stalder: January 26, 2004; March 4, 2004; July 7, 2004
- David C. Stevens: February 10, 2004
- Daniel L. Stickler: May 9, 2003; May 28, 2003
- Karleen Carlson Strayer: October 8 and 9, 2003
- Richard Weill: June 15, 2004; July 7, 2004
- Marsha Wicker: February 25, 2004

*Former AHERF Personnel Deponents*
- Albert Adamczak: June 19 and 20, 2003; June 26 and 27, 2003
- Daniel Cancelmi: January 23 and 24, 2003; February 6 and 7, 2003; November 24 and 25, 2003
- Connie Cibrone: December 11, 2002; April 10, 2003
- Joseph D. Dionisio: September 11 and 12, 2003
- Shelly Gebar: August 8 and 9, 2002
- Susan Murray Gilbert: September 24, 25 and 26, 2002; October 15, 2002
- Mary Goessler, M.D.: September 30, 2002; October 21, 2002
- Judy Harrington: April 3, 2003
- Dwight Kasperbauer: March 5, 2004
- Donald Kaye M.D.: June 17 and 18, 2003
- Donald E. Kline: April 8 and 9, 2003
- Charles Lisman, Jr.: May 22, 23 and 24, 2002
- Michael Martin: May 8 and 9, 2003; August 22, 2003
- Margaret McGoldrick: March 25, 2003
- Richard J. McKeown: December 16 and 17, 2002
- Robert M. McNair, Jr.: January 17 and 30, 2003
- Charles P. Morrison: May 13 and 14, 2003; August 4, 2003; June 29, 2004
- Robert G. Pavlich: November 21 and 22, 2002
- Ian G. Rawson: January 24, 2003; February 13, 2003
- Anthony M. Sanzo: July 1 and 2, 2003; August 11, 2003
- Stephen H. Spargo: March 25, 1999; July 17, 2003

**EXHIBIT  6116**

**ALLEGHENY
HEALTH,
EDUCATION AND
RESEARCH
FOUNDATION**

William P. Snyder III
Chairman

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-3009
Telephone (412) 359-8590

**PERSONAL AND CONFIDENTIAL**

TO:      J. David Barnes
          Douglas D. Danforth
          Graemer K. Hilton
          Francis B. Nimick, Jr.

FROM:    W.P. Snyder III

SUBJECT: Unanimous Consent Resolution
           (Key Management Long-Term Incentive Plan Award)

DATE:     June 11, 1996

The enclosed Unanimous Consent Resolution and supporting documentation are being sent for your consideration to authorize payment of the Key Management Long-Term Incentive Plan award accrued in 1992, based on the performance for the period Fiscal Year 1992 - 1996.

Since the proposed authorization to distribute previously accrued amounts is the only action item for consideration at the Spring meeting of the AHERF Compensation Committee, I am suggesting that we act on this matter by unanimous consent.

If after reviewing the report and resolution you concur with payment of the award, please sign and return the consent resolution to Dwight Kasperbauer by June 24, 1996.

As always, Sherif S. Abdelhak will be available to answer your questions should you wish further clarification of management's report. If you wish to discuss the proposed action with me, feel free to call.

WPSIII:kss
Attachments

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
15653
EXHIBIT NO.

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
7795
EXHIBIT NO.

PR-PLD-009-01279

AHERF LIT
USDC W.D. Pa.
MISC No. 00-40
15608
EXHIBIT NO.

*Members of the Allegheny Health, Education and Research Foundation*
*Allegheny General Hospital • Allegheny Integrated Health Group • Medical College of Pennsylvania and Hahnemann University •*
*Medical College of Pennsylvania and Hahnemann University Hospital System • St. Christopher's Hospital for Children*

## Key Management Long-Term Incentive Plan Distribution

Under the terms of the Key Management Long-Term Incentive Plan, an amount equal to the eligible executives' annual incentive award (not to exceed 20% of base salary) is deferred and credited with interest. Distribution of the award, after passage of the deferral period, is at the sole discretion of the Compensation Committee, based upon the Committee's assessment of the executive team's performance and progress toward the attainment of established long-term objectives as set forth in the mission statement and operating plans for the prior five-year period. The Committee's assessment may include both quantitative and qualitative considerations deemed relevant by the Committee including, without limitation, measures of quality of care, level of charity care provided, excellence of educational and research programs and financial viability.

In accordance with the terms of the Plan, the senior management team submits as its report on achievement of established strategic goals three documents: 1) A Report to the Board of Trustees Academic and Fiscal Year 1995 - This comprehensive report addresses all of the major mission elements of the system and the quantifiable measures of progress in each area; 2) The Consolidated Financial Statements as of April 30, 1996; 3) The Consolidated Financial Statements projected for June 30, 1996.

Pursuant to the Plan, the Committee is asked to determine if the accrued deposits should be released based upon performance for Fiscal Years 1992 - 1996. If the Committee approves the enclosed Unanimous Consent Resolution, payments in the amounts authorized will be distributed on or before July 15, 1996 to the eligible participants.

The senior executives eligible for a distribution of 1992 accruals are noted below. The Committee may authorize distribution for the group of any amount between zero and 100%. The Plan requires that the percentage of the accrual authorized for release be uniform for all members of the management team eligible for a distribution in any year. Thus, the Committee may not authorize different percentage distributions for different members of the management team.

| Name | Award Amount |
|------|--------------|
| Sherif S. Abdelhak | $123,150 |
| Calvin Bland | $ 52,331 |
| D. Walter Cohen, D.D.S. | $ 49,899 |
| Thomas P. Galinski | $ 49,062 |
| Dwight Kasperbauer | $ 56,076 |
| Donald Kaye, M.D. | $ 74,106 |
| David W. McConnell | $ 77,233 |
| Leonard L. Ross, Ph.D. | $ 59,923 |
| Anthony M. Sanzo | $ 69,118 |
| Nancy A. Wynstra, Esquire | $ 66,750 |

PR-PLD-009-01280

## UNANIMOUS CONSENT RESOLUTION

The Committee is asked to consider the following resolution:

WHEREAS, The Compensation Committee adopted a Key Management Long-Term Incentive Plan to encourage and reward senior managers for the attainment of established long-term objectives; and,

WHEREAS, The organization has received a favorable ruling from the IRS concerning such Plan; and,

WHEREAS, The Plan provides for the distribution of accrued incentive awards subject to the Compensation Committee's determination of management performance; and,

WHEREAS, An assessment of progress concerning quality of care, level of charity care, excellence in educational and research programs and financial viability indicates that the system has been and continues to be effectively managed in the long-term best interests of patients, students and staff.

NOW, THEREFORE, BE IT RESOLVED, That the Compensation Committee authorizes the distribution of accrued long-term incentive awards for Fiscal Year 1992 plus accrued interest to the following individuals:

| Name | Award Amount |
|---|---|
| Sherif S. Abdelhak | $123,150 |
| Calvin Bland | $ 52,331 |
| D. Walter Cohen, D.D.S. | $ 49,899 |
| Thomas P. Galinski | $ 49,062 |
| Dwight Kasperbauer | $ 56,076 |
| Donald Kaye, M.D. | $ 74,106 |
| David W. McConnell | $ 77,233 |
| Leonard L. Ross, Ph.D. | $ 59,923 |
| Anthony M. Sanzo | $ 69,118 |
| Nancy A. Wynstra, Esquire | $ 66,750 |

FURTHER RESOLVED, That the Committee authorizes distribution of the deferred award amount, as noted, based on its evaluation of management's progress and performance each year for the prior five years; and

FURTHER RESOLVED, That the Committee directs that the list of individuals and the specific awards authorized be appended in a sealed envelope to the original minutes of this meeting.

Approvals: _W. P. Snyder_     _6-11-96_
W.P. Snyder III, Chair           Date

_J. David Barnes_
J. David Barnes

_____
Douglas D. Danforth

_____
Graemer K. Hilton

_____
Francis B. Nimick, Jr.

PR-PLC-009-01281