# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF        )
UNSECURED CREDITORS OF           )
ALLEGHENY HEALTH, EDUCATION      )
AND RESEARCH FOUNDATION,         )
                                 )
     Plaintiff,              )        Civil Action No. 00-684
                                 )
     v.                      )
                                 )        Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP,     )
                                 )
     Defendant.              )

## APPENDIX TO THE COMMITTEE'S RESPONSE TO PwC'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS UNDER LOCAL RULE 56.1(C)(1)

### VOLUME 10

James M. Jones (PA #81295)
Laura E. Ellsworth (PA #39555)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 31st Floor
Pittsburgh, PA  15219

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114

Attorneys for Plaintiff The Official Committee
of Unsecured Creditors of AHERF

July 11, 2005

# COMMITTEE APPENDIX

## Tab 3

Berliner Report

Den Uyl Report

Kite Report

Regan Report

Schwartz Report

Singleton Report

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS OF<br>ALLEGHENY HEALTH, EDUCATION<br>AND RESEARCH FOUNDATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 00-684 |
| v. | ) ) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) | |

## DECLARATION OF ROBERT W. BERLINER

I, Robert W. Berliner, hereby depose and state as follows:

1.      I am over the age of 18.  I have personal knowledge of, and am competent to testify about, the matters set forth herein.

2.      I have been retained by the Plaintiff to serve as an expert witness, offering expert opinion testimony, in the above-captioned matter.  I am submitting this Declaration in support of the Plaintiff's opposition to Defendant's Motion For Summary Judgment in the above matter.

3.      Attached hereto are true and correct copies of the expert reports that I prepared in connection with my engagement:

- the Expert Report of Robert W. Berliner

- the Supplementary Expert Report of Robert W. Berliner

- the Second Supplementary and Rebuttal Expert Report of Robert W. Berliner

4.      If called to testify at trial, I would testify in a manner consistent with the opinions expressed in these expert reports.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _July 6_____, 2005 in New York, New York.

_____
Robert W. Berliner

# EXPERT REPORT

## OF

## ROBERT W. BERLINER

## RE: AHERF OFFICIAL COMMITTEE OF UNSECURED CREDITORS v. PRICEWATERHOUSE COOPERS LLP

### (Civil Action No. 00-684)

### SEPTEMBER 3, 2004

EXPERT REPORT OF ROBERT W. BERLINER

RE: AHERF OFFICIAL COMMITTEE OF UNSECURED CREDITORS v.
PRICEWATERHOUSE COOPERS LLP

(CIVIL ACTION NO. 00-684)

September 3, 2004

## A. INTRODUCTION

I am a certified public accountant. I have been retained by plaintiff as an expert witness regarding accounting, auditing and financial reporting issues in the above referenced litigation. Attached to this report are the following exhibits:

- a copy of my curriculum vitae (Exhibit A);
- a listing of cases in which I have testified as an expert at trial or by deposition within the preceding four years (Exhibit B);
- a listing of all publications I authored or coauthored within the preceding ten years (Exhibit C); and
- the hourly rates charged for work on this engagement (Exhibit D).

Prior to the time I testify at deposition or trial, I plan to review additional documents that are provided to me, including reports of other experts. The opinions expressed herein are based on my review of the materials set forth in Section B below and may change as a result of my review of additional documents. Accordingly, I reserve the right to supplement, update or otherwise modify this report at a later date.

## B. SCOPE OF ENGAGEMENT

The opinions set forth in this report have been formed based upon my review of parts or all of photocopies of various materials, principally including the following:

- the second amended complaint in this litigation;
- audited consolidated financial statements and supplementary consolidating and combining financial statements of Allegheny Health, Education and Research Foundation ("AHERF") and its subsidiaries for the fiscal years ended June 30, 1995, 1996, and 1997 ("FY'95, FY'96 and FY'97");
- audited financial statements of various AHERF subsidiaries and audited combined financial statements of various obligated groups for FY'95 and FY'96;
- Secondary Market Disclosure Reports issued by various AHERF entities for FY'96 and FY'97;
- certain other of AHERF and its subsidiaries' documents, including press releases, Board of Trustees' minutes of meetings, memoranda, correspondence, agreements, and copies of accounting records for various interim and annual periods and balance-sheet dates in FY'95 through FY'98;

1

- compact discs containing certain general ledgers and journal entry data of AHERF and its subsidiaries;
- audit workpapers, including permanent files, of PricewaterhouseCoopers LLP[1] relating to its audits of AHERF's and its subsidiaries' financial statements as of June 30, 1995, 1996 and 1997, and for the years then ended;
- C&L's audit workpapers for its incomplete FY'98 audit;
- C&L's FY'98 workpapers with respect to whether AHERF's previously issued financial statements should be restated;
- various compact disks containing C&L's FY'96 and FY'97 audit workpapers that were prepared using its computerized CLASS formats;
- "personal" files of C&L auditors consisting of AHERF-related documents;
- debt compliance letters issued by C&L to AHERF's Board of Trustees indicating that it did not detect debt covenant violations during its FY'96 and FY'97 audits of the Delaware Valley Obligated Group ("DVOG") and Allegheny General Hospital Obligated Group ("AGHOG");
- a legal opinion of Steven B. Kite, Esq. pertaining to whether failure to meet certain financial covenants of senior debt instruments constituted events of default of those debt instruments;
- various sections of C&L's internal manuals in effect in FY'96 and FY'97;
- various memoranda and correspondence to or from C&L; and
- transcripts of the depositions of various individuals taken in this case or in the United States Securities and Exchange Commission case against C&L engagement partner William Buettner and managers Mark Kirstein and Amy Frazier.

In addition, in respect to the matters discussed herein, I have researched relevant professional literature relating to generally accepted accounting principles ("GAAP"), generally accepted auditing standards ("GAAS"), and certain Medicare rules and regulations.

## C. SUMMARY OF OPINIONS

Based upon my education, training, professional experience, and the work performed and the materials reviewed as described above, it is my professional opinion that:

Violations of GAAP

   a.  AHERF's audited consolidated financial statements as of June 30, 1996 and June 30, 1997 and for the years then ended were materially false and misleading.

---

[1] Price Waterhouse LLP and Coopers & Lybrand LLP merged on or about July 1, 1998 to form Pricewaterhouse Coopers LLP. However, audits of AHERF's financial statements were performed by Coopers & Lybrand LLP for many years preceding the merger. For simplification, I generally use "C&L" when making reference in this report to AHERF's auditors.

b. The consolidating and combining schedules included as supplementary information in AHERF's audited consolidated FY'97 financial statements were materially false and misleading.

c. The audited financial statements of DVOG and AGHOG as of June 30, 1996 and for the year then ended were materially false and misleading.

d. The material misstatements of the above mentioned financial statements and schedules that I have identified were attributable to a multitude of GAAP violations, many of which were committed for the express purpose of masking the deteriorating financial condition of AHERF and its subsidiaries and for meeting financial covenants of debt instruments.

e. As a result of the material misstatements, DVOG and AGHOG falsely reported to their primary lenders that they had met certain restrictive financial covenants in their debt instruments which they would have failed to meet but for the misstatements.

2. Violations of GAAS

C&L failed to detect certain misstatements in the financial statements of AHERF and its subsidiaries and detected but disregarded certain other misstatements. As a result, its audits of AHERF's financial statements for the years ended June 30, 1996 and June 30, 1997 were not conducted in accordance with GAAS, and its audit reports on those financial statements were materially false and misleading. More specifically, C&L violated the following generally accepted auditing standards:

- General Standard No. 2, in that it failed to maintain an independence in mental attitude in all matters relating to those audits;

- General Standard No. 3, in that due professional care was not exercised in the performance of its audits and the preparation of its audit reports;

- Standard of Field Work No. 3, in that sufficient, competent evidential matter was not obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for each of its opinions;

- Standard of Reporting No. 1, in that its reports each stated incorrectly that AHERF's financial statements were presented in conformity with GAAP;

- Standard of Reporting No. 3, in that the financial statements omitted or inadequately disclosed material information required by GAAP; and

- Standard of Reporting No. 4, in that it had insufficient basis for expressing its unqualified opinions as its audits had not been conducted in accordance with GAAS.

Statements on Auditing Standards ("SASs") issued by the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA") are recognized as interpretations of GAAS. The AICPA's Code of Professional Conduct requires that members of the AICPA be prepared to justify departures from such SASs.

Particularly relevant guidance from the SASs interpreting those Standards of Field Work with which C&L repeatedly failed to comply in its FY'96 and FY'97 AHERF audits is excerpted in Appendix IV.

## D. EFFECTS OF THE VIOLATIONS OF GAAP

The effects of the violations of GAAP that I have identified are reflected in Appendices I and II. Set forth therein are the (a) financial statements of AHERF and its subsidiaries as reported[2], (b) the net amounts of my correcting entries, and (c) the corrected financial statements.[3] My correcting entries themselves are set forth in Appendix III.

I did not perform an audit of AHERF and its subsidiaries. Had I done so, it is possible that I would have identified additional misstatements. Further, since not all of the information I needed to quantify the effects of the violations of GAAP on the consolidated, consolidating, and combining financial statements of AHERF and its subsidiaries was available to me, I made various assumptions based on the facts and circumstances existing when those financial statements were issued. Nevertheless, in my opinion, my correction of the violations of GAAP reasonably indicates the order of magnitude of the misstatements in the above-mentioned financial statements.

The materiality of the net aggregate effect of the misstatements necessitated correction not only of the FY'96 and FY'97 financial statements (including the supplementary consolidating or combining schedules accompanying them) but also of financial statements for years prior thereto. Consequently, although certain of the misstatements were not material individually, I refer in this report to the need to treat their correction, when applicable, as prior period adjustments. Inasmuch as only single year financial statements (i.e., non-comparative financial

---

[2] The notes to the financial statements have been omitted.

[3] Although AHERF did not externally issue restated financial statements for any year, it informed the public in a September 2, 1998 press release that no reliance should be placed on its FY'97 financial statements or C&L's audit report thereon. Further, AHERF restated its June 30, 1997 balance sheet in its FY'98 year-end, internal comparative financial reports.

4

statements) were issued in FY'96, the effects of the prior-year adjustments are reflected in the balance of unrestricted net assets as of July 1, 1995.

## E. BASES FOR OPINIONS

The bases for my opinions are discussed on the following pages under these captions:

1. C&L violated GAAS by failing to properly assess the materiality of AHERF's GAAP violations

2. C&L violated GAAS by failing to require AHERF to record an adequate allowance for uncollectible accounts and to correct DVOG's FY'96 bad debt expenses

3. C&L violated GAAS by failing to require AHERF to correct its improper accounting for DVOG's 1997 bad debt expense

4. C&L violated GAAS by failing to require AHERF to correct its improper accounting for its acquisition of GHS entities and transfers of acquisition reserves and other liabilities among affiliated entities

5. C&L failed to require AHERF to correct its improper accounting for certain irrevocable, permanently restricted trusts

6. C&L failed to require AHERF to correct its improper financial reporting of cost rate adjustments

7. C&L failed to require AHERF to correct its improper accounting for certain excessive liabilities, understated assets, and excessive asset valuation allowance accounts

8. C&L failed to require AHERF to correct its improper accounting for DVOG's FY'96 year-end increase in allowance for uncollectible accounts and bad debt expense

9. C&L failed to require AHERF to correct its improper accounting for Medicare reimbursements of Graduate Medical Education program costs

10. C&L failed to require AHERF to correct its improper accounting for certain periodic interim payment plans with Medicare

11. C&L failed to require AHERF to correct its improper accounting for interest costs on construction projects

12. C&L failed to require AHERF to correct its improper accounting for investment in Health Partners of Philadelphia, Inc.

5

13. C&L failed to require AHERF to correct its improper accounting for tort settlements with two former executives

14. C&L failed to require AHERF to correct its improper accounting for contingent amounts of depreciation recapture from Medicare

15. C&L failed to require AHERF to correct other GAAP violations

16. C&L failed to require AHERF to classify certain long-term debt as current liabilities and disclose violations of certain debt covenants

17. C&L failed to communicate to AHERF's Board of Trustees and/or Audit Committee matters required to be communicated by GAAS

18. C&L failed to maintain independence in the performance of its audits

_Robert W. Berliner_
Robert W. Berliner

# INDEX TO APPENDICES

I.    June 30, 1996 consolidated and consolidating balance sheets and consolidated and
      consolidating statements of operations

      Corrected Consolidated Balance Sheet
      Corrected Consolidating Balance Sheet
      Corrected DVOG Combining Balance Sheet
      Corrected Consolidated Statement of Operations
      Corrected Consolidating Statement of Operations
      Corrected DVOG Combining Statement of Operations

II.   June 30, 1997 consolidated and consolidating balance sheets and consolidated and
      consolidating statements of operations

      Corrected Consolidated Balance Sheet
      Corrected Consolidating Balance Sheet
      Corrected DVOG Combining Balance Sheet
      Corrected Allegheny Hospitals, Centennial ("Centennial") Combining
           Balance Sheet
      Corrected Consolidated Statement of Operations
      Corrected Consolidating Statement of Operations
      Corrected DVOG Combining Statement of Operations
      Corrected Centennial Combining Statement of Operations

III.  Correcting entries

      Robert W. Berliner's Correcting Entries as of June 30, 1995, 1996 and 1997
      C&L's proposed SUD entries[4] as of June 30, 1995, 1996 and 1997 (including
           reversals, if any, in fiscal years ended June 30, 1996 and 1997)
      Sort of the above sets of entries to facilitate posting corrections to Appendices I
           and II

IV.   Excerpts of particularly relevant guidance from Statements on Auditing Standards
      ("SAS") interpreting GAAS as to which C&L repeatedly failed to comply in its
      FY'96 and FY'97 AHERF audits.

---

[4] C&L's proposed entries were reflected on its Summary of Unadjusted Differences schedules for the years
indicated.

7

# BASES FOR OPINIONS

1

## 1.  C&L violated GAAS by failing to properly assess the materiality of AHERF's GAAP violations

<u>Relevant GAAP</u>

<u>General Concepts</u>

Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information* ("CON 2"), describes *materiality* as:

> ...a pervasive concept that relates to the qualitative characteristics, especially relevance and reliability. Materiality and relevance are both defined in terms of what influences or makes a difference to a decision maker, but the two terms can be distinguished. A decision not to disclose certain information may be made, say, because investors have no need for that kind of information (it is not relevant) or because the amounts involved are too small to make a difference (they are not material). Magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment. The Board's present position is that no general standards of materiality can be formulated to take into account all the considerations that enter into an experienced human judgment. Quantitative materiality criteria may be given by the Board in specific standards in the future, as in the past, as appropriate.

More specifically, the glossary in CON 2 defines materiality as:

> The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

Although materiality judgments "are primarily quantitative in nature," CON 2 notes that whether an item is "large enough for users of the information to be influenced by it...will usually be affected by the nature of the item; items too small to be thought material if they result from routine transactions may be considered material if they arise in abnormal circumstances."  In other words, "magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."

Furthermore, the "more important [an item] is, the finer the screen should be that will be used to determine whether it is material."  For example, a "failure to disclose separately a nonrecurrent item of revenue may be material at a lower threshold than would otherwise be the case if the revenue turns a loss into a profit or reverses the trend of earnings from a downward to an upward trend."  CON 2 further notes that "amounts too small to warrant disclosure or correction in normal circumstances may be considered material if they arise from abnormal or unusual transactions or events."  Consequently, "the relative rather than

the absolute size of a judgment item determines whether it should be considered material in a given situation."

CON 2 further acknowledges "that no general standards of materiality could be formulated to take into account all the considerations that enter into an experienced human judgment." The Board concluded that the "predominant view is that materiality judgments can properly be made only by those with all the facts."

In summary, CON 2 concludes:

> The essence of the materiality concept is clear. The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

<u>Other Relevant Accounting Literature</u>

The SEC's Staff Accounting Bulletin 99 ("SAB 99"), *Materiality*, further stressed the need to consider both qualitative as well as quantitative factors in assessing the materiality of a misstatement as set forth in CON 2. In reaching its conclusions, the Staff relied upon the guidance set forth in CON 2 as well as the courts and noted, further, that the "formulation [concept of materiality] in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws."

In responding to a question as to whether amounts and items are material to the financial statements if they "fall below a percentage threshold set by management or the auditor," the Staff noted that "one rule of thumb… suggests that the misstatement or omission of an item that falls under a 5% threshold is not material in the absence of especially egregious circumstances." However, the SEC Staff noted that while it "has no objection to such a 'rule of thumb' as an *initial step* [emphasis added] in assessing materiality …quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."

The Staff further noted that:

> …an assessment of materiality requires that one views the facts in the context of the 'surrounding circumstances,' as the accounting literature puts it, or the 'total mix' of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the 'total mix' includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this

analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality. Court decisions, Commission rules and enforcement actions, and accounting and auditing literature have all considered 'qualitative' factors in various contexts.

In that regard, SAB 99 contains a comprehensive, but not an "exhaustive list of the circumstances that may affect materiality of a quantitatively small misstatement." Those circumstances include, among others, the following:

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

- whether the misstatement changes a loss into income or vice versa

- whether the misstatement concerns a segment or other portion of the enterprise's business that has been identified as playing a significant role in the registrant's operations or profitability

- whether the misstatement affects the enterprise's compliance with regulatory requirements

- whether the misstatement affects the enterprise's compliance with loan covenants or other contractual requirements

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- whether the misstatement involves concealment of an unlawful transaction.

According to the Staff, another qualitative factor concerning the materiality of an item "may turn on where it appears in the financial statements". For example, "a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. 'A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information - as with materiality generally - situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole."

Although not issued until December 1999, SAB 99 merely summarizes the SEC Staff's views as a result of its reviews of previous filings. Thus, in closing, the Staff concluded that "this SAB is **not intended to change current law or guidance** in the accounting or auditing literature" (emphasis added) and that "this SAB and the authoritative accounting literature cannot specifically address all of the novel and complex business transactions and events that may occur."

Relevant GAAS

Statement on Auditing Standards No. 47, *Audit Risk and Materiality in Conducting an Audit* ("SAS 47" or AU § 312), provides guidance to auditors regarding their assessment of materiality. Specifically, SAS 47 indicates that "financial statements are materially misstated when they contain misstatements whose effect, either individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with generally accepted accounting principles... Misstatements result from misapplication of generally accepted accounting principles, departures from fact, or omissions of necessary information." Errors are defined as "unintentional misstatements or omissions of amounts or disclosures in financial statements... [and] may involve mistakes in gathering or processing data from which financial statements are prepared." **(AU § 312.04-06)**

Furthermore, SAS 47 states:

> As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements. For example, an illegal payment of an otherwise immaterial amount could be material if there is a reasonable possibility that it could lead to a material contingent liability or a material loss of revenue. **(AU § 312.11)**

> In evaluating whether the financial statements are presented fairly, in all material respects, in conformity with generally accepted accounting principles, the auditor should aggregate misstatements that the entity has not corrected in a way that enables him or her to consider whether, in relation to individual amounts, subtotals, or totals in the financial statements, they materially misstate the financial statements taken as a whole. Qualitative considerations also influence the auditor in reaching a conclusion as to whether misstatements are material. **(AU § 312.34)**

> The aggregation of misstatements should include the auditor's best estimate of the total misstatements in the account balances or classes of transactions that he or she has examined ... not just the amount of misstatements specifically identified ... **(AU § 312.35)**

1-4

> The risk of material misstatement of the financial statements is generally greater when account balances and classes of transactions include accounting estimates rather than essentially factual data because of the inherent subjectivity in estimating future events. Estimates, such as those for ... uncollectible receivables ... are subject not only to the unpredictability of future events but also to misstatements that may arise from using inadequate or inappropriate data or misapplying appropriate data ... **(AU § 312.36)**

An *Auditing Interpretation of AU Section 312* (the "Interpretation" or AU § 9312)[1] indicates that a misstatement may consist of any of the following:

> a. A difference between the amount, classification, or presentation of a reported financial statement element, account, or item and the amount, classification, or presentation that would have been reported under generally accepted accounting principles
>
> b. The omission of a financial statement element, account, or item
>
> c. A financial statement disclosure that is not presented in accordance with generally accepted accounting principles
>
> d. The omission of information required to be disclosed in accordance with generally accepted accounting principles  **(AU § 9312 .02)**

In addition, the Interpretation provides the following guidance regarding quantitative materiality:

> The quantitative evaluation of identified misstatements is a matter of professional judgment and should reflect a measure of materiality that is based on the element or elements of the financial statements that, in the auditor's judgment, are expected to affect the judgment of a reasonable person who will rely on the financial statements, considering the nature of the reporting entity. For example, it is generally recognized that *after-tax income from continuing operations* [emphasis added] is, in most circumstances, the measure of greatest significance to the financial statement users of entities whose debt or equity securities are publicly traded. Depending on the entity's particular circumstances, other elements of the financial statements that may be useful in making a quantitative assessment of the materiality of identified misstatements include current assets, net working capital, total assets, total revenues, gross profit, total equity, and cash flows from operations. In all instances, the element or elements selected should reflect, in the auditor's judgment, the measures most likely to be considered important by the financial statement users. **(AU § 9312.11)**

---

[1] Although the Interpretation was not issued until December 2000, it established no new standards. Instead, this Interpretation merely provided additional guidance based on the principles set forth in CON 2 and SAB 99.

As noted above, materiality evaluations include both quantitative and qualitative considerations. The Interpretation identifies the following qualitative factors, among others, to be considered in evaluating whether a misstatement is material to the financial statements:

    a.  The potential effect of the misstatement on trends, especially trends in profitability

* * *

    c.  The effect of the misstatement on segment information, for example, the significance of the matter to a particular segment important to the future profitability of the entity, the pervasiveness of the matter on the segment information, and the impact of the matter on trends in segment information, all in relation to the financial statements taken as a whole

    d.  The potential effect of the misstatement on the entity's compliance with loan covenants, other contractual agreements, and regulatory provisions

* * *

    h.  The significance of the financial statement element affected by the misstatement, for example, a misstatement affecting recurring earnings as contrasted to one involving a non-recurring charge or credit, such as an extraordinary item

* * *

    j.  The significance of the misstatement or disclosures relative to known user needs, for example:

- The significance of earnings and earnings per share to public-company investors and the significance of equity amounts to private-company creditors
- The magnifying effects of a misstatement on the calculation of purchase price in a transfer of interests (buy/sell agreement)
- The effect of misstatements of earnings when contrasted with expectations

* * *

    l.  The motivation of management with respect to the misstatement, for example (i) an indication of a possible pattern of bias by management when developing and accumulating accounting estimates or (ii) a misstatement precipitated by management's continued unwillingness to correct weaknesses, such as weaknesses in internal control policies and procedures, in the financial reporting process.

**(AU § 9312.17)**

1-6

<u>C&L's failure to properly assess the materiality of AHERF's GAAP Violations</u>

As noted in detail throughout this report, AHERF and/or its affiliates' financial statements contained numerous departures from GAAP. As revealed in C&L's workpapers and Summaries of Unadjusted Differences ("SUDs"), C&L was aware of many of these misstatements. When asked why C&L, in its role as C&L's independent auditor, did not qualify its audit opinions or take other actions called for under GAAS, Mr. Buettner, the Engagement Partner, and Mr. Kirstein and Ms. Frazier, the Audit Managers, routinely state in their depositions that certain misstatements were "immaterial" to AHERF and/or its affiliates' financial statements.

Mr. Buettner testified that, in evaluating whether AHERF and/or its affiliates' financial statements were materially misstated, C&L primarily focused on the impact misstatements had on "unrestricted net assets" (or "fund balance"), a balance sheet measure, rather than the impact misstatements had on income statement items like net income. His testimony in that regard included the following:

> I think our firm policy for not-for-profits is that you generally look at what I would call fund balance. If we can reach some sort of agreement that that's really net assets, if you will, in the AGH financial statement presentation, that we would use that as our primary measure of materiality. But we would also look at other items. We would look at the impact that our items would have on debt covenants. We would look at the impact that it would have on the current asset classification or current liability classification, or working capital.
> But the primary comparison is really, in the AGH case, net unrestricted assets or what I would call fund balance. It's an older terminology. I guess I'm dating myself. **[Buettner 313:7-24]**

***

> Our assessment of materiality is based on the items listed in the SUD. Our overall riding [sic] comparison was net…unrestricted net assets. I guess I have two nets there. Unrestricted net assets, if you will, or what I would call fund balance. That was our – that was our data point, if you will, in terms of our overall assessment. That is the firm's policy. It's a policy for healthcare providers. It's clearly documented in the firm's auditing textbook, which the staff used in terms of trying to assess materiality. It's consistent with what's in section 310 [of the BAM]. So when we're evaluating materiality, we will look at materiality as it relates to unrestricted net assets or some other measurements … such as working capital or cash flows or things of that nature.     **[Buettner 404:24-405:19]**

However, Mr. Buettner was not able to identify a threshold of impact on AHERF or an affiliates' fund balance, whether as a percentage or in absolute terms, beyond which he would consider a misstatement or misstatement to be material. **[Buettner 422:23-**

**434:17]**  For the FY'97 audit, CYL did, however, establish a preliminary materiality threshold of $1.5 million for planning purposes. **[Ex. 4275]**

Mr. Buettner's assessment of materiality based on "fund balance," apparently to the exclusion of other important evaluations is erroneous.  Although AHERF was a not-for-profit entity that was comprised principally of other not-for-profit entities, it was also a fully functioning health care system that operated like, and competed with, for-profit health care enterprises.  Recognizing the similarities between *nonbusiness organizations*, such as AHERF, that "are essentially self-sustaining from fees they charge for goods and services," the FASB has noted the following in CON 4, *Objectives of Financial Reporting by Nonbusiness Organizations*:

> Some organizations have no ownership interests but are essentially self-sustaining from fees they charge for goods and services.  Examples are these private nonprofit hospitals and nonprofit schools that may receive relatively small amounts of contributions and grants but finance their capital needs largely from the proceeds of debt issues and their operating needs largely from service charges rather than from private philanthropy or governmental grants.  As a result, assessment of amounts, timing, and uncertainty of cash flows becomes the dominant interest of their creditors and other resource providers and profitability becomes an important indicator of performance.  Consequently, the objectives of [CON 1, *Objectives of Financial Reporting by Business Enterprises*] may be more appropriate for those organizations.  **(¶ 8)**

Further recognizing the significance of the operating activities vis-à-vis the philanthropic activities of certain nonbusiness organizations, such as AHERF, the AICPA's Audit and Accounting Guide for Health Care Organizations ("Health Care Guide") stated the following:

> Based on the theoretical support provided in [CON 4], as well as the FASB allowance for more specific guidance...Chapter 1 of the [Health Care] Guide defines four types of operating structures that are found within the industry: (1) not-for-profit business-oriented organizations, (2) investor-owned health care enterprises, (3) governmental health care organizations, and (4) not-for-profit, nonbusiness-oriented organizations. This [Health Care] Guide provides specific reporting guidance for not-for-profit business-oriented organizations, investor-owned enterprises and governmental entities. (Not-for-profit nonbusiness organizations follow guidance for not-for-profit entities provided in the Audit and Accounting Guide *Not-for-Profit Organizations*) The [Health Care] Guide recommends that these entities provide a classified balance sheet and a statement of operations. The [Health Care] Guide also encourages natural class reporting on the face of the financial statements, with disclosure of functional details in the footnotes.

According to the scope provisions of the AICPA Audit and Accounting Guide for Not-for-Profit Organizations (the "NPO Guide"), not-for-profit organizations that provide

health care services are not subject to the NPO Guide. Such organizations are instead governed by the provisions of the Health Care Guide. In discussing materiality, the Health Care Guide refers to SAS 47 (¶ **4.07**), in which materiality is defined in terms of the "needs of a reasonable person who will rely on the financial statements." Regarding the significance of operating performance, the Health Care Guide states:

> The statement of operations for not-for-profit organizations should include a performance indicator that reports results of operations. [Footnote deleted] *Because of the importance of the performance indicator*, it should be clearly labeled with a descriptive term such as revenues over expenses, revenues and gains over expenses and losses, earned income, or performance earnings.

CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY

Mr. Buettner's testimony ignores the distinctions the auditing literature provides between the auditing of non-business not-for-profit organizations and business-oriented not-for-profit organizations like AHERF, discussed above.

CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY

CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY

AHERF's significant use of debt financing created a very important group of third-party users of its financial statements, that is, AHERF's lenders and guarantors of its bonds and notes,[3] who relied upon AHERF's consolidated and the Obligated Groups' combined financial statements. Cash flow from operations (operating income) was critical to the Obligated Groups' ability to meet their respective debt service obligations. In addition, the results of operations of the obligated groups was not only relevant, but critical to, AHERF's and the Obligated Groups' compliance with certain financial loan covenants contained in the loan agreements.

In addition to third-party users, AHERF's results of operations was also important to internal users, such as the Board of Trustees and management itself. For example, AHERF sponsored a management bonus plan that was based, in part, on AHERF's operating results. **[Buettner 843:9-25; Kirstein 826:13-827:2]** Also, numerous Board members testified about the importance of operating results in evaluating the operating performance of the organization. For many Board members, the most important piece of information on the audited financial statements was the net income figure, or "bottom line." For example, Mr. David Barnes, former CEO of Mellon Bank and Chairman of AHERF's Audit Committee, testified as follows:

A.   … I was particularly concerned about earnings and earnings causing cash flow, and then I was interested in the notes of the -- you know, attached to the audit, and tried to, and I think did, give it a fairly thorough review.

Q.   Why were you particularly concerned about earnings.

A.   Well, in, let's see, 1993, 94, for instance, or '94, '95, I forget which, the -- or let me answer that slightly differently. I had been harping for years in the organization about why it ought to get the earnings up; and if it had been any

---

[3] The lenders and guarantors are identified in Basis for Opinion 16, as are the financial covenants requiring achievement of certain levels of net income (as defined), liquidity, and unrestricted net assets (as defined) by AHERF and the obligated groups.

other hospital, I would have been saying the same thing. I think the managements don't produce as much earnings as they should. That's a common problem in all eleemosynary [sic] institutions. There's a tendency to have a bias towards being big-hearted in service rather than as hard-nosed as you'd be in a business enterprise. So I always looked at the earnings to see whether the earnings were "coming through" as I felt they should, and because the organization reported, for instance, losses in '94, '95, I was particularly anxious to see if it was developing earnings and if the strategy, if you will, for Philadelphia was coming through.

**[Barnes 50:3-51:5]**

\*\*\*

Q. You've testified that in reviewing financial statements – I believe you testified to this, and if I'm wrong, you can correct me, but I believe you said that your focus was on the income statement or the statement of the statement of operations more than the balance sheet, is that right?
A. That's correct.

Q. Why would that be?
A. Because I think that demonstrates what you're earning from your efforts, and in the final analysis, those earnings are what make it possible for you to achieve your mission.

**[Barnes 298: 9-20]**

Given the significance of operating results to the users of the financial statements of AHERF and its Obligated Groups and the nature of AHERF and its affiliates as essentially business organizations neither GAAS nor C&L's own guidance provided any reasonable basis for C&L to conclude that a balance sheet measure, such as net assets (fund balance), should be the only determinant of materiality with respect to AHERF's financial statements. Although GAAS provides that the evaluation of materiality is a matter of judgment, such judgment is to be influenced by the perceived needs of persons relying on such financial statements. Results of operations were of paramount importance to the users of AHERF's financial statements, for AHERF to meet its debt service requirements, and to AHERF's Management because its bonus compensation plan was tied to earnings.

Thus, in conclusion, C&L violated GAAS by failing to consider the needs of AHERF's financial statement users when it evaluated materiality based solely on AHERF's consolidated balance sheet (net assets or fund balance).

2

**2.  C&L violated GAAS by failing to require AHERF to record an adequate allowance for uncollectible accounts and to correct DVOG's FY'96 bad debt expense**

**Background**

AHERF's June 30, 1996 financial statements indicate that its patient accounts receivable ("A/R") represented nearly 71% of current assets and 26% of total assets, and net patient service revenue represented 82% of total revenues. **[CL 046965-66]** Thus, AHERF's accounts receivable and related revenue were clearly material to AHERF's consolidated financial statements as well as to the financial statements of its obligated groups, including DVOG.  In addition, the calculation of the allowance for uncollectible accounts ("bad debt reserve") and related bad debt expense is both a material component of the financial statements of a hospital and subject to significant judgment.

During 1996, the DVOG hospitals, continued to experience deterioration in the "aging" of patient accounts receivable that had begun in 1995. **[Schaffer 21:18-24, 138:2-8; Cancelmi 471:10-21; CL 006257, CL 057362]**  Among the factors contributing to this deterioration were the following:

- The increased number of managed care and capitation plan arrangements entered into by DVOG hospitals that led to increased patient registration and billing errors.  Consequently, difficulties in timely and properly registering and billing clients led to an increase in rejected claims.  **[CL 006246] [Ex. 901 TOB 000963, 000967; Buettner 130:4-13]**

- The centralization of the billing and collections operations in Pittsburgh that led to "difficulties in mailing bills and following up on collections as a result of staffing problems." **[Ex. 901 TOB 000935-36; Franz 112:7-113:7; Buettner 45:11-22]** Lora Franz[1] testified that the Philadelphia Hospitals were in a "general state of disarray." **[Franz 9:10-10:16, 106:5-6]**

- The conversion from the PATCOM accounts receivable accounting software to the newest version of SMS Invision for new patients that led to collectibility problems for patient accounts receivable remaining on the PATCOM software. Russell Laing (Director, Financial Reporting, PSFG) testified that "there was always an issue throughout the time that I was there about the collectibility of the Patcom Receivables.  There was never a time when it was not an issue, that I can recall." **[Laing 90:22-91:4]**

---

[1] Ms. Franz was Director of Patient Services in the Patient Financial Services Group ("PSFG").  From July 1996 she was in charge of collections of accounts under 90 days old.

2-1

In addition, the DVOG hospitals used a variety of methodologies and reserve percentages[2] to compute bad debt reserves.  The methodologies were inconsistent and the reserve rates used were inappropriate.   Regarding the various reserve methodologies and percentages employed by DVOG, Robin Schaffer[3] testified as follows:

> Q.  Now, I think we had gone on to this topic because you were telling me that the different DVOG hospitals actually had different bad debt allowance methodologies; is that correct?
> A.  Yes.
>
> Q.  What were the differences that you can recall?
> A.  The one that was the most unique would have been MCP and EPPI. They basically only reserved patient balances. What I mean is you can have a person that comes into the hospital and has insurance coverage, but a portion of their balance may be covered, they have to pay it themselves.
>
> In the bad debt methodology for MCP and EPPI all they reserved for was the patient balances on all the financial classes meaning your Medicare, Blue Cross, your HMOs, et cetera.
>
> Whereas the normal is to reserve on the entire account balance regardless of whether or not it's insurance or patient. The biggest difference between all five of them were just the percentages that were used as far as if an account was zero to 30 days old, how much reserve was on that versus if it was over a year old.
>
> All the percentages were very different. The other difference is the way we would book bad debt, meaning for Elkins, Bucks, St. Chris and MCP, EPPI.
> **[Schaffer 40:16-41:1-22]**

Collectively, these facts and circumstances had a significant adverse impact on DVOG's agings and the collectibility of its A/R and, consequently, the calculation of its estimate of bad debt reserves.

---

[2] Reserve percentages represent the estimated loss reserve as a percentage of a given type of account and aging.
[3] Ms. Schaffer (Supervisor, Accounting and Financial Reporting) was specifically responsible for patient revenue and accounts receivable matters.

**Relevant GAAP**

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*
(SFAS 5")

SFAS 5 requires that an "estimated loss from a loss contingency shall be accrued by a
charge to income if *both* of the following conditions are met: [Footnote 2 omitted]

> a.   Information available prior to issuance of the financial statements indicate that
>      it is probable that an asset had been impaired or a liability had been incurred
>      at the date of the financial statements.  It is implicit in this condition that it
>      must be probable that one or more future events will occur confirming the fact
>      of loss.

> b.   The amount can reasonably be estimated.

SFAS 5 defines probable as the "future event or events are likely to occur" and includes,
among the examples of loss contingencies, "collectibility of receivables."

With respect to collectibility of receivables, SFAS 5 states:

> …The conditions under which receivables exist usually involve some degree of
> uncertainty about their collectibility, in which case a contingency exists…. Losses
> from uncollectible receivables shall be accrued when both conditions in paragraph
> 8 are met…. Losses from uncollectible receivables shall be accrued when both
> conditions of paragraph 8 are met.  Those conditions may be considered in
> relation to individual receivables or in relation to groups of similar types of
> receivables.  If the conditions are met, accrual shall be made even though the
> particular receivables that are uncollectible may not be identifiable.  (¶ 22)

> If, based on current information and events, it is probable that the enterprise will
> be unable to collect all amounts due according to the contractual terms of the
> receivable, the condition in paragraph 8(a) is met. … Whether the amount of loss
> can be reasonably estimated (the condition in paragraph 8(b)) will normally
> depend on, among other things, the experience of the enterprise, information
> about the ability of individual debtors to pay, and appraisal of the receivables in
> light of the current economic environment.  In the case of an enterprise that has no
> experience of its own, reference to the experience of other enterprises in the same
> business may be appropriate.  (¶ 23)

FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss* ("FIN 14")

FIN 14 provides additional guidance with respect to the application of ¶ 8 of SFAS 5 as
follows:

When condition (a) in paragraph 8 is met with respect to a particular loss contingency and the reasonable estimate of the loss is a range, condition (b) in paragraph 8 is met and an amount shall be accrued for the loss. When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.[4] In addition, paragraph 9 of the Statement may require disclosure of the nature and, in some circumstances, the amount accrued, and paragraph 10 requires disclosure of the nature of the contingency and the additional exposure to loss if there is at least a reasonable possibility of loss in excess of the amount accrued.

### Violations of GAAP

AHERF's general accounting department (otherwise known as "Corporate Support Services" or "Financial Services") had primary responsibility for implementing accounting policies to assure that patient revenues and related accounts receivable-related balances were accounted for in accordance with GAAP, including the estimation of the allowance for uncollectible accounts ("bad debt reserves"). Dan Cancelmi (Director, Financial Services) and Robin Schaffer (Supervisor, Accounting & Financial Reporting) who were supervised by Stephen Spargo (Senior Vice President, Corporate Support Services), had primary responsibility for estimating and recording DVOG's bad debt reserves.

During FY'96, AHERF's accounting department continued to utilize inconsistent and inadequate methodologies to estimate DVOG's bad debt reserves despite a number of "red flags" indicating that such reserves were understated. These red flags included the following:

- The significant number of "very old accounts at June 30, 1996." **[Schaffer 157:3-12; Ex. 24]** Ms. Franz testified that "most of them [the Philadelphia hospital accounts] by t[he] time [they came to Pittsburgh] were beyond the billing statutes." **[Franz: 110:1-3]**

- DVOG's use of reserve percentages that were too low given the nature of its operating environment and distribution of patient service types (inpatient vs. outpatient), particularly the PATCOM accounts. **[Schaffer 65:10-23; Franz 384:17-386:24]**

- Establishing reserves for only self-pay accounts by MCP/EPPI. **[Schaffer 40:23-41:5]** Ms. Franz testified that "the failure to assign any reserve percentage to [the non-self-pay component of third-party payor accounts]

---

[4] Note 1 to FIN 14 states: "Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount."

would be a serious problem with the methodology for calculating the required reserves." **[Franz 393:19 – 394:10]**

- The significant increase in past-statute accounts. The balance of past-statute accounts doubled in just seven months from December 1995 to July 1996. **[Ex. 905, GOV 43674]**

- Use of primarily the income-statement method[5] to compute bad debt reserves of certain DVOG hospitals. **[Schaffer 41:23-24]**

- Management's decision in September 1995 to suspend write-offs of accounts receivable effective for dates of service prior to July 1, 1995. Mr. Laing testified that such a directive "has the effect of distorting the financial statements or creating the risk that financial reporting will be distorted. It serves…no productive basis and it evidences a-- a very high, extreme, intense level of concern that's not normal in an ongoing, you know, operation. You'd see this kind of thing normally in…an operation that was having financial viability concerns. I mean…this level of concern is consistent with an organization that is struggling for survival." **[Ex. 905, GOV 43675; Ex. 822, GOV 43691; Laing 130:4-15]**

In fact, Ms. Schaffer further testified that "[w]e in accounting felt there were still problems [in 1996], and the problems were getting worse…." **[Schaffer 138:2-4]** Despite the deterioration in agings and the numerous red flags noted above, AHERF continued to use bad debt reserve methodologies that improperly assumed high collection rate on very old accounts.

In connection with the year end FY'96 audit, C&L and AHERF agreed that AHERF would increase the amount in the DVOG hospitals' bad debt reserve accounts by $17.5 million.[6] It is not clear how C&L or AHERF came to conclude that the $17.5 million figure was an amount sufficient to raise the DVOG hospitals' bad debt reserves to a reasonable level. The $17.5 million adjustment does not appear to have been based on a detailed assessment of reserve needs but, rather, appears to have been based on the amount of "general reserves" available at the DVOG hospitals that could be used to increase bad debt reserves.

It is my belief that AHERF violated GAAP by failing to record an adequate allowance for uncollectible accounts based on more appropriate reserve methodologies and that

---

[5] Ms. Schaffer describes the income-statement method as "taking a historical percentage of bad debt in relation to net revenue…" **[Schaffer 41:23-42:1]**

[6] AHERF improperly reported DVOG's allowance for uncollectible accounts as $50.6 million in its 1996 consolidated and consolidating and combining financial statements, rather than the $68.1 contained in its workpapers. AHERF's improper accounting for the $17.5 million of yearend adjustments to DVOG's bad debt reserves and the inaccurate disclosure of its allowance for uncollectible accounts is discussed in Basis for Opinion 8.

2-5

DVOG's bad debt reserve as of June 30, 1996 was understated by a calculated range of $26.9 million to $48.2 million (see the addendum to this Basis for Opinion).

## Violations of GAAS

The estimation of bad debt reserves is a critical audit area, particularly in a hospital audit. Mr. Laing described the significance of bad debt reserves as follows:

> Q.  In relation to the audit as a whole, how important is the audit of the patient revenue accounts receivable area?
> A.  It's extremely important.  It's the most variable and the most susceptible to judgment area of the entire audit.
> It involves significantly a more higher [sic] level of technical complexity in— in arriving at that estimation in the healthcare setting.
> **[Laing 25:2-23]**

C&L's October 16, 1995 management letter (for C&L's FY 1995 audit) commented that "management was still faced with very difficult challenges in coordinating the consolidation of staff and resources and integrating the operating activities.  [As a result,] certain operational issues, such as increased receivable balances, deterioration in the aging of receivables and the timeliness of cash applications emerged."  **[CL 057361-62]**  Furthermore, C&L's September 23, 1996 management letter (for C&L's FY 1996 audit) noted that certain issues related to accounts receivable ("A/R") had "not been addressed during 1996 …"  Those matters included the following:

- Deterioration of Accounts Receivable Aging
- Methodology for Establishing Bad Debt Reserves should be Applied Consistently
- Patient Liability Amounts should be Reclassified to Self-Pay
- Procedures to Identify Charity Care should be Enhanced in the Delaware Valley

**[CL 006243-58]**

Thus, in planning its audit, C&L was aware of numerous "red flags" in connection with its audit of AHERF's accounts receivable and bad debt reserves.  Those red flags included, but were not necessarily limited to, the following matters:

- The materiality of A/R to AHERF's and DVOG's financial statements
- The continued deterioration in the agings
- The registration, billing and collection difficulties associated with the centralization of the billing and collection functions
- A high initial processing error rate
- Significant internal control weaknesses[7]

---

[7] C&L's failure to communicate reportable conditions to the Audit Committee is discussed in Basis for Opinion 17.

Despite the numerous red flags noted above, C&L assessed audit risk for accounts receivable at "below the maximum." The significance of assessing risk below the maximum was noted in Mr. Laing's June 10, 1996 memorandum to Mr. Snow memorializing his conference call with Messrs. Kirstein and Kaliszewski,[8] during which Mr. Kirstein "mentioned that at the highest level of risk ("Maximum"), a sample selection would have run into the 'thousands of accounts' and would have required an extensive time/effort to complete." **[PR-LAING 00086]** Mr. Laing's memorandum further stated:

> Given the level of corrections and adjustments with receivables in the current fiscal year…as well as outstanding prior year(s) issues, there is a *strong likelihood* (emphasis added) that such an extended detailed audit of receivables [would] disclose issues that:
>
> - Might be noted in the Management Letter (on operational and control deficiencies)
>
> - Could potentially result in a decision by C&L to resort to more extensive detailed year-end audit procures with respect to the balances as of 6/30/96, in addition to the extensive effort invested during the preliminary phase of their audit.
>   **[PR-LAING 00087]**

Mr. Laing testified that C&L did not discuss the bad debt reserves or other A/R valuation issues with him during the 1996 audit, despite the fact that C&L was aware of the wealth of knowledge Mr. Laing had regarding A/R valuation issues at AHERF. **[Laing 91:24-95:3]** Instead, C&L planned its audit based on a risk assessment at below the maximum and included, among other procedures, tests of AHERF's accounting policies, procedures and computer systems and substantive tests, consisting principally of analytical procedures, tests of high dollar accounts and subsequent receipts testing. **[Ex. 4386; CL 035649]**

From the outset, however, C&L's audit procedures disclosed numerous instances of evidential matter that should have raised concerns about the adequacy of DVOG's bad debt reserves as of June 30, 1996. For example, C&L's preliminary analytical review of balance sheet accounts noted that DVOG's "[p]atient accounts receivable appear[ed] to have been the most volatile account. Balances jumped by [$93.6 million] from 1995 …" **[CL 000221]** Rather than being put "on notice" that the problems encountered in the 1995 audit may still have existed in 1996, C&L apparently proceeded with its audit plan and did not alter its audit procedures in response to the significant increase in net DVOG A/R.

---

[8] The reference was to Audit Senior Manager Mark Kirstein and C&L Health Care Regulatory Group Manager Norb Kaliszewski.

Additional examples of C&L's workpapers that should have alerted it to the likelihood that bad debt reserves were understated include the following:

- *Final Analytical Procedures – DV Obligated Group*, completed by Ms. Frazier on August 2, 1996, noted that "patient accounts receivable, net increased by 45%" and, further, that the number [of] days in A/R increased from 80 to 107--an increase of 33.75%. **[CL 000183]**

- An August 1996 *Summary of Accounts Receivable Testing* noted a change in DVOG's "aging methodology" as follows:

  > The aging methodology has been changed as of 1996 based on final bill date for inpatient and last pay date for outpatient versus discharge date and registration date, respectively. Under this scenario, outpatient accounts become current after each *partial payment* (emphasis added) is received. Inpatient accounts do not age until the account is final billed. The financial impact of this change could be reflected in bad debt reserve since the amount recorded is based on aging of accounts. **[Ex. 14, CL 000431]**

- *AHERF-Major Payor A/R>180 Days* indicated that accounts over 180 days old exceeded $131 million as of June 30, 1996; yet, bad debt reserves and contractual allowance reserves were far below that amount. **[Ex. 4022, CL 004244]**

- Certain of AHERF's *Summary of Reserves for Bad Debt* ("Rollforward Schedules") by individual entity contained the following remark by the C&L auditor: "Per discussion with Robin Schaffer, the client's allowance for bad debt as a percentage of A/R has increased due to an increase in the age of A/R accounts. The increase in the age has occurred because of problems with collections and increased volume within patient accounting during the fiscal year." **[CL 001016-17, 001110]**

With respect to subsequent receipts testing, the *Accounts Receivable Procedures* workpaper indicates that C&L would "seek high coverage." **[CL 00035649]** Although the percentage that constituted "high coverage" was not identified on the workpaper, the actual cash received as a percentage of outstanding receivables ranged from 13.1% to 20.4% for DVOG's hospitals. On the other hand, cash collections for the same period for AGH were 34.5%. Given C&L's planned intention to rely on this substantive audit procedure in conjunction with its planned analytical procedures, these percentages seemed unusually low for a cash receipts test, particularly when "high coverage" was required to meet the audit objective, and, therefore, provided very little assurance as to the valuation (i.e. net realizable value) of patient A/R.

Thus, during the course of its audit, C&L became aware of the following facts and circumstance that should have been taken into account in assessing the adequacy of DVOG's bad debt reserves:

- A dramatic increase in A/R

- A significant shift to managed care and outpatient services **[Ex. 32, Ex. 387]**

- A continued deterioration in A/R agings from 1995

- Relatively low cash collections subsequent to the balance sheet date

- Inconsistent and inadequate methods for computing bad debt reserves, particularly among the DVOG hospitals

Despite these significant "red flags" and the significant adverse information C&L had obtained through the audit procedures it performed, its 1996 audit workpapers provide little, if any, indication that its audit plan for evaluating the adequacy of DVOG's bad debt reserve was modified in response to the mounting negative evidential matter. In fact, not only did C&L fail to expand its 1996 planned audit procedures but also failed to perform a procedure that it had performed during the 1995 audit and that was prominently listed among the audit procedures C&L planned to perform. **[Ex. 4386, CL 035491]**

That procedure was the application of AGH's reserve percentages (rates) to the DVOG hospitals' accounts receivable. That 1995 test indicated that DVOG's reserves might be understated by as much as $14.3 million. **[CL 057292]** However, an adjustment of only $7.5 million was posted to C&L's 1995 SUD. Despite the continued deterioration in the agings and dramatic increase in A/R in 1996 and the resulting proposed SUD adjustment in 1995, C&L apparently failed to perform the "AGH reserve model" procedure in its 1996 audit.[9] Mr. Buettner has testified that he considered the procedure unnecessary and that he had not requested any C&L auditor to perform such procedure, even though it was included among the list of accounts receivable procedures to be performed. **[Buettner 151:1-153:24]**

Although the inconsistency in the calculation of bad debt reserves among the DVOG hospitals is identified in C&L's workpapers, there is no indication that C&L assessed the reasonableness of the individual reserve rates used by AHERF in light of the facts and circumstance existing at the time of the 1996 audit. Ms. Franz testified that AHERF and,

---

[9] Workpapers related to certain of the DVOG hospitals' bad debt reserves suggest that C&L prepared an analysis of reserve requirements using an "AGH model." For example, a C&L footnote on a Hahnemann bad debt reserve calculation schedule indicates: "C&L does not propose an entry for the difference between the two reserve calculations because C&L has prepared an additional analysis for the bad debt reserve using AGH's reserve percentages and the client has booked an additional reserve." **[Ex. 4387]** However, none of the documents I have reviewed indicates that such analysis was prepared.

therefore, C&L could have run 'ad hoc' reports "that would go substantiate that the account was established to date, that payments were received and look at the lag between each of those. **[Franz 238:10-13]** Rather than availing itself of unlimited access to the client's receivables database to design and perform effective audit procedures, C&L, instead, chose to merely "check the mathematical accuracy" of the calculations. Ms. Franz further testified that "certain reserve percentages were *highly* (emphasis added) optimistic based on her collection experiences at AHERF and other facilities." **[Franz 384:23-24]**

With respect to whether C&L tested AHERF's reserve percentages, Mr. Kirstein testified as follows:

> Q.  No, I said if you don't remember this specific schedule, tell me generally how you got comfortable with the resaonableness of the percentages applied to aged receivable buckets at AHERF hospitals during your work on the AHERF audits?

> \*\*\*

> A.  ... so I think the answer to your question is I'm not sure I'll be able to show you a step that says that's how we audited the 15 percent, the 20 percent, the 30 percent, whatever, because that's really not the objective of auditing the reserve.
> **[Kirstein 47:6-11, 48:6-11]**

> Q.  Is it fair that – as part of the analyzing either the percentages themselves applied to the aging buckets or, as you say, the total allowance generated by those percentages, during the 1995 and more recent AHERF audits with which you were involved, do you recall asking AHERF for actual collection history to support the loss percentages?

> A.  I do not recall asking to support those loss percentages in a work paper.

> As I said, we discussed that isn't necessarily an objective of an audit test.  But I do recall subsequent receipts testing.  I believe we did that each year.  In fact, subsequent receipts testing is a form of collections testing.

> Q.  Was there ever a template provided to you by Coopers & Lybrand with proposed appropriate percentages for your work in healthcare auditing as that could or would be applied to aged accounts receivable buckets?

> A.  Not that I recall.
> **[Kirstein 51:3-24]**

Furthermore, in performing it's A/R and bad debt audit procedures, C&L dealt almost exclusively, if not entirely, with AHERF's accounting department.  C&L's workpapers contain no indication that any C&L personnel communicated with members of PFSG, who were responsible for billings, collections and write-offs .  The deposition testimony

of PFSG members confirm this. For example, Ms. Franz testified that she had absolutely no interaction with Coopers and she never saw a Coopers auditor. **[Franz 188:25-189:6]** Mr. Laing also testified as follows:

> A. It struck me as extremely odd that they didn't want to sit down and engage in a conversation or – or review with me issues relating to the valuation of accounts receivable and net revenue. I was very surprised at that.
>
> Q. Were they aware of the – of what you were doing at AHERF in your job?
> A. Yes, they were.
> **[Laing 94:2-9]**

***

> Q. If Coopers had come to you and asked you questions and asked for your thoughts on the valuation issues that you were working on, would you have shared your thoughts with them?
> A. Yes, I would in every respect that was material and important to the process of financial reporting.
> **[Laing 95:4-11]**

After obtaining an understanding of how management developed an accounting estimate, such as bad debt reserves, an auditor is required by SAS 57 to use one or a combination of the following approaches to evaluate the reasonableness of that estimate:

> a. Review and test the process used by management to develop the estimate.
>
> b. Develop an independent expectation of the estimate to corroborate the reasonableness of management's estimate.
>
> c. Review subsequent events or transactions occurring prior to completion of fieldwork. **(AU § 342.10)**

C&L's audit procedures to "Assess reasonableness of the allowance at 6/30/96" was as follows:

> Assess the overall reasonableness of the allowance using an analytical review and/or by considering changes in the economy, any changes in the clients payor mix or collection patterns and any changes in the industry. **[CL 001019]**

In addition, the *Accounts Receivable Procedures* workpaper provided that C&L was to perform "subsequent receipts testing (seek high dollar)." Thus, it would appear that C&L intended to use a combination of the three approaches outlined in SAS 57. However, in every aspect, C&L failed to execute its planned procedures.

2-11

First, as detailed above, the workpapers and schedules obtained by C&L from AHERF provided numerous indicators of variances and/or unusual relationships among the accounting data that clearly should have raised C&L's level of professional skepticism and caused it to investigate more fully the nature of and reason for those variances and relationships. Instead, C&L relied almost entirely on the representations of management to "explain away" the variances and unusual relationships without obtaining further competent evidential matter to corroborate management's assertions. For example, many C&L workpapers contain explanations beginning with "Per discussion with Robin Schafer…" but provide little, if anything, in the way of documentation corroborating Ms. Schaffer's explanations. With respect to management's assumptions, C&L's workpapers provide little in the way of documentation of its assessment of DVOG's reserve rates used by management that were so critical to the calculation of the estimated reserves.

C&L's subsequent receipts testing was equally flawed and/or ineffective for a number of reasons. In the first place, C&L used only the month of July for its test period, despite the fact that its audit report was not dated until September 11, 1996, and C&L had documented (see above) that DVOG's days in A/R was in excess of 100 days. One might argue that over time the month-to-month variations would even out; however, there is nothing in C&L's workpapers indicating that it even considered the impact of the days in A/R on its subsequent receipts testing. Second, C&L's workpapers contained schedules of collections for July for the DVOG hospitals as well as AGH. **[CL 000975-82]** As noted above, those schedules indicate that subsequent receipts at AGH significantly out-paced any of the DVOG hospitals. Investigation of the reasons for the differences in cash receipts and evaluation of management's responses to the auditor's inquiries are the backbone of any proper analytical review. Yet, again, C&L's workpapers contain no documentation of its investigation and evaluation of the underlying reason for the unusual differences between AGH and the DVOG hospitals. Indeed, Mr. Kirstein testified that C&L was unconcerned about the results of their subsequent receipt testing. Mr. Kirstein testified as follows:

> Q. Do you recall yourself being concerned about the fact that AGH's cash summary was a number of percentage points higher than any of its sisters -- than that of any of its sisters?
> A. No. But I think that given that one piece of data, that is potentially consistent with what we knew about the systems in 1996 and that they had converted systems, they had moved people, they had various agings, accounts aging at Delaware Valley.

> Q. Do you recall coming to any conclusions in connection with your AHERF 1996 audit work that the Delaware Valley Obligated Group subsequent receipts testing came out badly or suggested an adjustment should be made to the reserve - at those hospitals?
> A. I don't recall that.

Q. You don't recall being concerned about the subsequent receipts testing at the Delaware Valley Obligated Group hospitals?

A. No.

**[Kirstein 371:9 – 372:7]**

Finally, I have not seen any indication in either the deposition testimony of C&L's auditors or the 1996 workpapers that C&L developed an independent expectation of the estimate to corroborate the reasonableness of management's estimate. This failure is particularly troubling given the utter lack of other procedures designed to evaluate the reasonableness of AHERF's estimate for DVOG's bad debt reserves.

Thus, based on the documents I have reviewed and deposition testimony I have read, it is my conclusion that C&L merely "papered the files" with large quantities of AHERF-prepared documents and C&L "summary" worksheets, but performed, at best, only perfunctory audit procedures. It is my further conclusion that C&L violated GAAS by failing to comply with the following relevant auditing standards:

- SAS 19 -- by failing to corroborate management's assertions and thereby subordinating its judgment to that of its client.

- SAS 31 -- by failing to obtain and properly evaluate sufficient competent evidential matter supporting its conclusion that bad reserves were not materially misstated.

- SAS 41 -- by failing to maintain its workpapers regarding its "AGH model reserve" calculations, if prepared.

- SAS 47 -- by failing to properly assess audit risk in light of the numerous red flags of which it was aware.

- SAS 53 -- by failing to exercise the proper degree of professional skepticism and properly evaluate the results of its audit tests that disclosed numerous instances of negative information adversely impacting DVOG's bad debt reserves.

- SAS 56 -- by failing to perform planned tests, such as the AGH model reserve; failing to properly evaluate the results of the tests it did perform, such as analysis of payor mix and subsequent receipts testing; and failing to investigate and evaluate significant differences, such as AGH's subsequent receipts vis-à-vis DVOG's subsequent receipts.

- SAS 57 -- by failing to properly test management's estimate of DVOG's bad debt reserve, perform the planned "AGH reserve model" test, or perform an effective subsequent receipts test.

**Effects of GAAP Violations on AHERF's Financial Statements**

The effects of the aforementioned GAAP violations on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry number 1, which is presented in Appendix III of this report.

Correcting entry number 1 takes into consideration the June 30, 1995 report-only adjustment, which reduced Hahnemann's non-current liabilities by $4 million and increased its bad debt reserves by $4 million (as discussed in Basis for Opinion 9).  No such entry was made on Hahnemann's books.

## Addendum to Basis for Opinion 2

### Estimation of Understatement of DVOG Bad Debt reserve as of June 30, 1996

As I concluded in Basis for Opinion 2, AHERF violated GAAP by failing to record an adequate bad debt reserve and, thereby, understated DVOG's bad debt expense for 1996. For purposes of determining an adequate reserve and related bad debt expense, I computed a reserve estimate under the following four alternative methodologies:

- *AGH method*—Using AGH reserve rates and adding additional reserves for PATCOM accounts and Invision accounts over 365 days old

- *Accounting Department method*—using Dan Cancelmi's suggested reserve rates

- *PFSG method*—using Russell Laing's suggested reserve rates

- *Hospital/Snow method*—using DVOG hospital entity methodologies plus additional reserves for selected payors with balances over 180 days old as suggested by Greg Snow

The four methodologies produced a bad debt reserve estimate for DVOG ranging from $92.0 million to $113.3 million, resulting in an understatement of DVOG's bad debt reserve ranging from $26.9 million to $48.2 million as of June 30, 1996. In conformity with FASB Interpretation 14, the minimum amount in the range was used for purposes of preparing correcting entries as set forth in Appendix III. The four methodologies are described below.

### AGH method

Under this method, AGH bad debt reserve rates were applied to each DVOG hospital inpatient and outpatient aging reports for Invision accounts for purposes of calculating reserves except for accounts over 365 days old. AGH did not have separate reserve rates for accounts over 360 days and, particularly relative to the DVOG hospitals, did not carry many accounts aged over 360 days in its active receivables. **[Ex. 4022, CL 004243-44]**

Former members of PFSG (Snow, Laing, Franz) testified that accounts over a year old were highly unlikely to be recovered by any hospital. Given the registration and billing problems arising from the centralization plan, it was even more unlikely that DVOG hospitals could collect accounts over a year old. The former PFSG members indicated that the reserve rates used in the June 30, 1996 DVOG reserve calculations were far too low and unrealistic.

With respect to PATCOM accounts, ARTRAC had substantially completed its collection of the outstanding PATCOM receivables as of June 30, 1996. Such receivables aggregated $39,136,000 as of that date (net of $16,070,000 of contractual allowance