reserves thereon). At that point, it was highly unlikely that any meaningful amount of collections would be realized. However, to allow for some minimal collections, a 95% reserve rate was applied rather than a 100% rate. A November 4, 1996 memorandum from Dan Cancelmi showed that balances had reduced by only $1.6 million during the first three months of FY 1997.

I made the following adjustments to the reserve calculated using the AGH rates:

- Invision accounts at HUH, MCPH and EPPI over 360 days old were reserved at 95%.
- All Patcom accounts at BCH, EPH and SCHC were reserved at 95%.

The estimated DVOG bad debt reserve under this methodology is $92,079,000 resulting in an understatement of $26,943,000 as of June 30, 1996.

Accounting Department method

In September 1996, Mr.Cancelmi proposed three reserve rate scenarios to be applied to all DVOG hospitals. Scenarios 1 and 2 proposed reserve rates based on aging buckets without consideration of payor type.

Scenario 3 proposed reserve rates based on broad aging periods (e.g., over or under 180 days) and further segregated by payor type: Medical Assistance, self pay and all other payor types. AHERF adopted Scenario 3 and adjusted DVOG's June 30, 1997 bad debt reserves using the Scenario 3 reserve rates proposed by Cancelmi.

I applied the bad debt reserve rates proposed by Mr. Cancelmi to the DVOG hospital aging reports as of June 30, 1996 for purposes of calculating DVOG's bad debt reserve under this method.

The estimated DVOG bad debt reserve under this methodology is $92,302,000 resulting in an understatement of $27,166,000 as of June 30, 1996.

PFSG method

Russell Laing, a former member of C&L before joining PFSG, performed detailed analyses of patient accounts receivable. Based on his analysis, Mr. Laing recommended rates to apply to both inpatient and outpatient receivables for all DVOG hospitals based on aging buckets by type of payor.

I applied the bad debt reserve rates proposed by Mr. Laing to the DVOG hospital aging reports as of June 30, 1996 for purposes of calculating DVOG's bad debt reserve under this method.

The estimated bad debt reserve under this methodology is $113,326,000 resulting in an understatement of $48,190,000 as of June 30, 1996.

Hospital/Snow method

Greg Snow, former Vice President in charge of PFSG suggested in his deposition testimony reserve rates that he believed would have been appropriate to apply to accounts for certain types of DVOG payors in 1996.

I applied the bad debt reserve rates proposed by Mr. Snow to the DVOG hospital aging reports as of June 30, 1996 for purposes of calculating DVOG's bad debt reserve under this method.

The estimated DVOG bad debt reserve under this methodology is $105,486,000 resulting in an understatement of $40,350,000 as of June 30, 1996.

3

### 3. C&L violated GAAS by failing to require AHERF to correct its improper accounting for DVOG's 1997 bad debt expense

## Background

Mr. Cancelmi's September 24, 1996, memorandum to Mr. Spargo noted that the accounts receivable "aging categories continue to deteriorate" and proposed the following resolution:

> I believe it is fair to state that there is a pool of old receivables that we will not be able to collect. The questions that all of us have been struggling with is how much is the amount of bad debts and *can we afford to write the accounts off* (emphasis added)… now may be the time to "bite the bullet" and write off the accounts using bad debt reserves.

> Certainly upon the write off of the old accounts, our remaining reserves will be negligible. However, the strategy would be to build up the reserves over the remainder of fiscal 1997…. **[Ex. 310, GOV 43687, Attachment A to Ex. 164]**

Consequently, Mr. Cancelmi proposed in his memorandum to write off $81.452 million of accounts receivable of various DVOG hospitals and further proposed the use of existing reserves as follows:

- Bad debt reserves [various hospitals]           $53,867
- Other reserves segregated for bad debts @6/30/96    17,500[1]
- AGH capitalized interest reserve                 7,500[2]
- Other reserves to be used                        2,585
                                                  $81,452

Mr. Cancelmi's memo also contains a handwritten note from Steve [Spargo] to David [McConnell] stating: "I think Dan has captured the essence of our bad debt problems and am in agreement with his recommendation. If we are able to *start over* (emphasis added), perhaps we can better focus on operating performance and necessary corrective action."

Subsequent to Mr. Cancelmi's recommendation and Mr. Spargo's concurrence, AHERF management[3] decided to write off $81 million[4] of old ("past statute") and other ("PATCOM") accounts.[5] However, rather than writing off the accounts when the

---

[1] The improper use of the $17.5 million of "other reserves" is discussed in Basis for Opinion 8.
[2] The improper accounting for capitalized interest is discussed in Basis for Opinion 11.
[3] Messrs. Cancelmi and Snow attributed the decision to Mr. McConnell. **[Cancelmi 171:19-22; Snow 166:19-23]**
[4] The $81 million represented the gross amount of write-offs; net of previously-recorded contractual allowances, the amount was approximately $60.5 million. **[Ex. 138]**
[5] Greg Snow, Vice President of the Patient Financial Service Group ("PFSG"), testified that PFSG had identified in early FY'96 approximately $50 million of accounts that PFSG believed were uncollectible. Mr. Snow wanted to write these accounts off but was not permitted to do so until FY'97. **[Snow 122:5-20]**

decision was made, AHERF recorded the $81 million of write-offs in four "installments" approximating $20 million in October and November 1996 and March and June 1997.

**Relevant GAAP**

The relevant GAAP is contained in Bases for Opinions 2, 4 and 8.

**Violations of GAAP**

As discussed in the Addendum to Basis for Opinion 2, DVOG's recorded allowance for uncollectible accounts ("bad debt reserve") was approximately $65.1 million as of June 30, 1996.[6] Consequently, the write off of $81 million of accounts receivable during fiscal 1997 would have resulted in significant "shortfalls" in DVOG's aggregate bad debt reserves unless the reserve was (a) properly replenished through additional provisions for bad debt expense[7] or (b) improperly increased through other means, such as transfer of reserves from other entities.[8]

Mr. Cancelmi's May 1, 1997 memorandum to Mr. Morrison discusses the "year-end reporting concerns related to the [DVOG] bad debt reserve shortfall position [and] various adjustments to the bad debt reserve accounts [that] were processed in March 1997 to *alleviate* the shortfall (emphasis added)" which approximated $62.3 million prior to such adjustment. Among the adjustments to which Mr. Cancelmi refers are the following:

> The second set of adjustments consisted of $25 million of reserves transferred to [DVOG] in March 1997 that were initially earmarked for [GHS entities]. It should be noted that an additional $25 million of [GHS] reserves will be transferred to [DVOG] in the fourth quarter [ended June 30, 1997]. Accordingly, by year-end [GHS] reserves of $50 million will have been transferred to [DVOG]. **[Ex. 277, ten 67]**

As of May 31, 1997, the "unadjusted" reserve shortfall had increased to approximately $75 million. Thus, despite improperly transferring $50 million of GHS bad debt reserves, the "adjusted" shortfall still exceeded $25 million, indicating the need for additional reserve increases. As discussed in Basis for Opinion 4, a substantial portion of the remaining shortfall was covered by the improper transfer of $20.1 million of additional acquisition reserves. **[Ex. 254, AHW DC 00052]**

SFAS 5 requires an estimated loss from a loss contingency, including an allowance for uncollectible accounts, to be recorded as a charge to income. Instead, AHERF recorded an increase in DVOG's allowance for uncollectible accounts (and, thus, "covered"

---

[6] The inadequacy of the year-end 1996 bad debt reserve is discussed in Basis for Opinion 2.

[7] Alternatively, the write-offs could be charged directly to bad debt expense rather than charged against the reserve and replenished through periodic charges to bad debt expense.

[8] The improper transfer of GHS acquisition reserves to "cover" DVOG's 1997 reserve shortfall is discussed in Basis for Opinion 4.

3-2

DVOG's reserve shortfall) principally by transferring bad debt and other acquisition reserves to DVOG as discussed in Mr. Cancelmi's aforementioned May 1 memo and in Bases for Opinions 4 and 8 of this report. Accordingly, AHERF violated GAAP by failing to charge bad debt expense to replenish bad debt reserves after writing off $81 million of accounts receivable.

### Violations of GAAS

C&L's workpapers provide clear evidence that C&L knew or should have known that AHERF had (a) written off in excess of $80 million of accounts receivable and (b) transferred reserves from other AHERF entities to increase DVOG's bad debt reserves after it had recorded the $80 million of account write-offs.

Ms. Frazier confirmed that C&L was aware of the $80 million of write-offs when she testified as follows:

> Q. Did you come to learn in 1997, in your audit work at AHERF, that AHERF had recently written off 80 million dollars of old accounts receivable or 80 million dollars of any accounts receivable?
> A. Yes.
>
> Q. When did you, if you recall, come to learn of that?
> A. Sometime during the planning or the preliminary field work of -- for AHERF, so I don't know when that would have spanned, but –
>
> Q. In the early to spring months of '97, roughly?
> A. I would say the first six months of calendar 1997. I just don't know when.
> **[Frazier 550:23-551:17]**

Among the workpapers prepared by AHERF and maintained by C&L in connection with its 1997 audit were the *Summary of Reserves for Bad Debt* ("Rollforward") schedules for the individual DVOG hospitals that clearly disclosed the following items:

- Past statute write-offs
- Past statute account write-offs
- Contractual reserve reclasses
- Reserve adjustments
- Transfer of reserves and
- Bad debt shortfall adjustments
**[CLASS 0053:39-43]**

In many cases, the amounts of these individual items, listed in the *Other* column of the Rollforward schedules, were often significantly larger than the aggregate amount of the

annual provision for bad debt expense. Furthermore, many of the adjustments occurred in the last quarter of the year.

Just as the numerous engagement red flags discussed in Bases for Opinions 2 and 4 should have raised C&L's professional skepticism, the plethora of "other" adjustments on a reserve rollforward schedule should have alerted C&L to the potential misstatement of the reserve accounts and, correspondingly, the financial statements.

In addition, the March 31, 1997 version of the Rollforward schedules, reviewed by C&L during the preliminary fieldwork stage of the audit **[Heinlein 87:11-88:6]**, showed that amounts in the DVOG hospitals' bad debt reserve accounts had decreased substantially since the beginning of FY'97. **[Exs. 4286, 4287, 4288, 4289, 4290]** Some hospitals carried a *debit* balance in either the inpatient or outpatient reserve account. **[Exs. 4286, 4289, 4290]** This was another red flag that AHERF was going to have to increase reserves substantially by the end of the fiscal year.

Customarily, an asset, contra asset or liability rollforward schedule shows additions and deductions to the beginning balance to arrive at the ending balance, whereas "other" adjustments are typically infrequent or inconsequential. However, as noted above, DVOG's "other adjustments" were neither infrequent nor inconsequential. Furthermore, the amounts and timing of such adjustments were also suspicious. Taken together, these factors should have been an instant "tip off" to C&L of potential errors and irregularities in the area of the bad debt reserves.

Had C&L performed even a cursory investigation of these highly unusual items, it certainly would have discovered that AHERF had transferred reserves, from the GHS entities, to increase the DVOG hospitals' allowance for uncollectible accounts, without charging bad debt expense. Thus, even assuming that the allowance for uncollectible accounts was fairly stated in all material respects, bad debt expense and, accordingly, net income was materially misstated both at the obligated group level and on a consolidated basis. Accordingly, C&L violated GAAS by failing to (a) exercise the proper degree of professional skepticism in accordance with SAS 53, (b) obtain sufficient competent evidential matter in accordance with SAS 31 and 48 and, (c) perform effective analytical procedures in accordance with SAS 56 in connection with its audit of DVOG's 1997 allowance for uncollectible accounts and related bad debt expense.

Furthermore, having learned of the $80 million of write-offs which significantly exceeded the prior year's aggregate reserve, C&L was required by SAS 1 (§ 561) to investigate the potential impact of such information on AHERF's 1996 financial statements and C&L's accompanying audit report. **(¶ 5)** The fact that the write-offs began such a short period of time after completion of the 1996 audit and significantly exceeded the prior year's ending reserve should have alerted C&L to the possible misstatement of the DVOG's allowance for uncollectible accounts as of June 30, 1996.

In fact, AHERF had estimated at some point during FY'97 that the "Bad Debt Allowance Deficiency @ 6/30/96" for the DVOG hospitals was approximately $42 million.

**[Ex. 164, DBR-RS-0298]**  However, C&L's workpapers do not indicate that an adequate investigation and evaluation of the impact of the 1997 write-offs on AHERF's 1996 financial statements was performed.  Accordingly, in my opinion, C&L also violated GAAS by failing to "advise [AHERF] to make appropriate disclosures of the...impact [of the $80 million of write-offs] on [AHERF's 1996] financial statements to persons who [were] known to be...relying on...the financial statements and the related auditor's report" in accordance with § 561 of SAS 1. (¶ 6)

<u>**Effects of GAAP Violations on AHERF's Financial Statements**</u>

The effects of the aforementioned GAAP violations on DVOG's combined, AHCOG's combined, AHNJ's and AHERF's consolidated financial statements are reflected in correcting entry numbers 1, 2 and 3, which are presented in Appendix III of this report.

4

### 4. C&L violated GAAS by failing to require AHERF to correct its improper accounting for its acquisition of GHS entities and transfers of acquisition reserves and other liabilities among affiliated entities

### Background

In August 1996, AHERF's Senior Management reached an agreement whereby SDN[1] would acquire certain operating entities of Graduate Health System, Inc. ("GHS").[2] Pending AHERF's due diligence review and obtaining appropriate regulatory approvals, GHS and AHERF agreed that the GHS entities would be acquired by SDN, Inc. ("SDN"). Upon completion of AHERF's due diligence and regulatory approval, it was contemplated that the GHS entities transferred to SDN would become a part of the AHERF integrated delivery system. This "two-step" merger is described in the footnotes to the June 30, 1996 audited financial statements of the various GHS entities as follows:

> On August 5, 1996, the GHS Board of Directors approved resolutions which provide for the sale or transfer of ownership of certain GHS subsidiaries, including the Obligated Group,[3] from GHS to SDN, Inc. ('SDN'), contingent upon the completion of certain other transactions and the fulfillment of all legal and regulatory requirements. SDN is managed under contract by [AHERF]. It is anticipated that some or all of the transferred GHS subsidiaries may become part of the integrated health system operated by AHERF following the completion of due diligence and the above-referenced contingencies.

C&L was engaged by AHERF to participate in the aforementioned due diligence in connection with its acquisition of the former GHS entities. AHERF concluded that C&L's due diligence procedures had been substantially completed and regulatory approvals had been obtained by April 30, 1997. Accordingly, AHERF selected May 1, 1997 as the "consummation date" and accounted for the merger under the purchase method of accounting.

---

[1] The corporate name SDN came from the initials of the first names of three AHERF executives, namely, Sherif Abdelhak, CEO; David McConnell, CFO; and Nancy Wynstra, General Counsel.

[2] The GHS entities to be merged with AHERF were The Graduate Hospital ("TGH"), Mt. Sinai Hospital ("MSH"), Parkview Hospital ("PH"), City Avenue Hospital ("CAH"), Rancocas Hospital ("RH"), Zurbrugg Memorial Hospital ("ZMH"), and other healthcare-related entities.

[3] AHERF's "Obligated Groups" were comprised of entities that jointly and severally guaranteed repayment of specified debt.

## **Relevant GAAP and GAAS**

Accounting Principles Board Opinion No. 16, *Business Combinations* ("APB 16")

With respect to business combinations accounted for under the purchase method of accounting, APB 16 states:

> The purchase method accounts for a business combination as the acquisition of one company by another. The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill. The reported income of an acquiring corporation includes the operations of the acquired company after acquisition, based on the cost to the acquiring corporation. **(¶ 11)**

Paragraph 67 of APB 16 provides the primary guidance for determining the cost of a purchase business combination:

> … assets acquired for other than cash, including shares of stock issued, should be stated at "cost" when they are acquired and "cost" may be determined either by the fair value of the consideration given or by the fair value of the property acquired, whichever is the more clearly evident …

With respect to allocating costs among acquired assets, paragraph 68 of APB 16 states:

> …The cost of a group is determined by the principles described in paragraph 67. A portion of the total cost is then assigned to each individual asset acquired on the basis of its fair value. A difference between the sum of the assigned costs of the tangible and identifiable intangible assets acquired less liabilities assumed and the cost of the group is evidence of unspecified intangible values.

The allocation of liabilities assumed in an acquisition should follow the principles described in paragraph 88 of APB 16 as follows:

1. Accounts and notes payable, long-term debt, and other claims payable at present values of amounts to be paid determined at appropriate current interest rates.

2. Liabilities and accruals—for example, warranties, vacation pay, deferred compensation—at present values of amounts to be paid determined at appropriate current interest rates.

3. Other liabilities and commitments, including unfavorable leases, contracts, and commitments and plant closing expense incident to the acquisition, at present values of amounts to be paid determined at appropriate current interest rates.

Statement of Financial Accounting Standards No. 38, *Accounting for Preacquisition Contingencies of Purchased Enterprises*, (SFAS 38)

SFAS 38 defines *preacquisition contingency as* a "contingency of an enterprise that is acquired in a business combination accounted for by the purchase method and that is in existence before the consummation of the combination. A preacquisition contingency can be a contingent asset, a contingent liability, or a contingent impairment of an asset." With respect to the allocation of purchase price, SFAS 38 indicates that a "preacquisition contingency…shall be allocated…based on the amount determined as follows:

  a.  If the fair value of the preacquisition contingency can be determined during the "allocation period," that preacquisition contingency shall be included in the allocation of the purchase price based on that fair value.
  b.  If the fair value of the preacquisition contingency cannot be determined during the "allocation period," that preacquisition contingency shall be included in the allocation of the purchase price based on an amount determined in accordance with the following criteria:

    (1) Information available prior to the end of the "allocation period" indicates that it is probable that an asset existed, a liability had been incurred, or an asset had been impaired at the consummation of the business combination. It is implicit in this condition that it must be probable that one or more future events will occur confirming the existence of the asset, liability, or impairment.
    (2) The amount of the asset or liability can be reasonably estimated."

Finally, SFAS 38 states that the allocation period[4] "ends when the acquiring enterprise is no longer waiting for information that it has arranged to obtain and that is known to be available or obtainable."[5]

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

SFAS 5 requires an estimated loss from a loss contingency to be accrued by a *charge to income* (emphasis added) when both the probability and estimability conditions, set forth therein, are met.[6] (¶ 8) With respect to collectibility of receivables, SFAS 5 states:

> … The conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which case a contingency exists…. Losses

---

[4] The period that is required to identify and quantify the assets acquired and liabilities assumed.

[5] Consistent with APB 16, SFAS 38 indicates that the allocation period "usually [should] not exceed one year from the consummation of the business combination."

[6] Basis for Opinion 2 discusses the criteria for loss recognition under SFAS 5 in connection with determining the adequacy of an allowance for uncollectible accounts.

from uncollectible receivables shall be accrued when both conditions in paragraph 8 are met ... (¶ 22)

In addition, paragraph 14 precludes the accrual of "reserves for general contingencies," and further states that: "[g]eneral or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made."

FASB Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information* ("CON 2")

CON 2 defines materiality as:

The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that *the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.* (Emphasis added)

Statement of Auditing Standards No. 29, *Reporting on Information Accompanying the Basic Financial Statements in Auditor-Submitted Documents* ("SAS 29")

SAS 29 provides guidance on the form and content of reporting when an auditor submits to his client or to others a document that contains information in addition to the client's basic financial statements and the auditor's report thereon. (AU § 551.09) Under "Reporting Relationship," it states (among other things):

If the auditor concludes, on the basis of the facts known to him, that any accompanying information is materially misstated in relation to the basic financial statements taken as a whole, he should discuss the matter with the client and propose appropriate revision of the accompanying information. If the client will not agree to revision of the accompanying information, the auditor should either modify his report on the accompanying information and describe the misstatement or refuse to include the information in the document. (AU § 551.09)

## Violations of GAAP
## (in AHERF's accounting for its acquisition of the GHS entities)

In accounting for its acquisition of the GHS entities, AHERF recorded numerous asset valuation allowances (including allowances for uncollectible accounts and estimated contractual adjustments), restructuring reserves and various other loss contingency reserves, in addition to accounts payable, debt and other liabilities.[7]

---

[7] Total recorded liabilities of the GHS entities exceeded assets by $214.3 million as of the May 1, 1997 acquisition date. Subsequently, $97.3 million was allocated to Property and equipment, and the balance of $117 million was recorded as unspecified intangible assets (goodwill).

Based on the documents and deposition testimony that I have reviewed, a material portion of the valuation allowances and other reserves (collectively, the "acquisition reserves") recorded by AHERF failed to comply with GAAP. Most notably, AHERF management set up $50 million of reserves in connection with the purchase accounting for the GHS entities for the specific purpose of "transferring" those reserves to the books of the DVOG entities in order to enhance those entities' bad debt reserves. In describing the reason for this $50 million of reserves, Dan Cancelmi, Senior Director, Finance Services, stated that the reserves were actually "[a]ccruals for the existing AHERF Delaware Valley hospitals bad debt reserves." He noted that the creation of these reserves was "not reflected on the income statement [of AHERF]." **[CL 027005]**

Also, Mr. Cancelmi's June 20, 1997 memorandum indicates that "several *attractive* (emphasis added) features of capitalizing these [GHS] intangibles are that (i) we have been afforded the opportunity to establish substantial amounts of reserves on the respective Graduate balance sheets and (ii) the unrestricted deficits of the Graduate entities were eliminated before the Graduate balance sheets came into the AHERF system on May 1, 1997." **[Ex. 4444, X 25984]** Among the items outlined in Mr. Cancelmi's memorandum is "Bad debt reserves for DV [OG] A/R [accounts receivable]."

In addition to improperly recording $50 million of unnecessary bad debt reserves for the DVOG entities, AHERF also improperly recorded additional "cushions" in connection with the purchase accounting for the GHS entities. Notably, AHERF recorded a "Contingent Liability Reserve" in the aggregate amount of $10 million. As stated in C&L's workpapers, this reserve "represents an additional reserve for potential costs that may be encountered by AHERF due to the merger [with GHS] ... Basically, this account was set up for cushion." **[Ex. 4263]**

These "cushions" were in addition to the many "restructuring reserves" recorded by AHERF management on the books of the GHS entities from the time of the acquisition agreement between GHS and SDN to the time of the merger with AHERF on May 1, 1997. Many of these reserves, recorded inappropriately as "restructuring costs," were unnecessary and did not meet the requirements of EITF 95-3, *Recognition of Liabilities in Connection with a Purchase Business Combination,* for accruing liabilities.

Further, paragraph 14 of SFAS 5 specifically precludes the accrual of reserves for "general or unspecified business risks." Thus, AHERF violated GAAP by improperly recording excessive allowances for uncollectible accounts and contingency reserves in connection with its acquisition of the GHS entities.

A May 1, 1998 memo from Al Adamczak, Senior Director of Finance, to Sherif Abdelhak, AHERF's CEO, subsequently acknowledged that AHERF had set up cushions in connection with the acquisition of the GHS entities. He further described what AHERF eventually did with these cushions. Mr. Adamczak wrote:

> During the latter part of fiscal year 1997 approximately $99.6 million of reserves established as part of the Graduate acquisition were *determined to be cushion*

> *from a Graduate perspective* (emphasis added), and were transferred from the
> Graduate entities to other DV [OG] entities. **[JD-SA-0001743-44]**

As discussed below, AHERF "eliminated" many of the excessive reserves on the GHS
entities' books by improperly transferring them to various DVOG entities.[8]  Thus,
AHERF further violated GAAP by recording the subsequent adjustments to acquisition
reserves as "intercompany transfers," rather than adjustments to purchase price (and,
accordingly, property and equipment and goodwill), as required by SFAS 38.

**Violations of GAAP**
**(re AHERF's "transfers" of GHS acquisition reserves to DVOG)**

For the year ended June 30, 1997, AHERF issued consolidating and combining financial
information (hereinafter referred to as "consolidating financial information") as
supplemental schedules to its consolidated financial statements. **[PwC 0047761-76]**
Prior to 1997, AHERF also issued, in addition to its consolidated financial statements,
separate audited financial statements of certain subsidiaries and Obligated Groups,
including DVOG.[9]  The FY'97 consolidating financial information contained the same
level of detail (other than footnotes) presented in AHERF's consolidated financial
statements and, therefore, presented the financial position, results of operations, changes
in net assets and cash flows of AHERF's individual subsidiaries and obligated groups.

During 1997, AHERF improperly "transferred" $99.6 million of excessive acquisition
reserves recorded on the books of the former GHS entities[10] to various DVOG entities
through a series of "intercompany" transactions utilizing the AHERF corporate entity.
As a result, the entities recorded substantial intercompany receivables and payables. The
improper transfers had no legitimate business purpose, lacked economic substance, and
were recorded solely to avoid charges to DVOG's operating expense and to increase its
net patient service revenue. More specifically, the improper transfers of reserves
incorrectly reflected the following on the books of the DVOG entities:

- a $70.1 million increase in DVOG's allowance for uncollectible accounts,

---

[8] Even if some of the $49.6 million of acquisition reserves and other liabilities were legitimately thought to
be needed when recorded, they ceased to have validity when they were "transferred" to DVOG entities and
not rebooked by GHS entities by June 30, 1997.

[9] For FY'97, AHERF decided that it would no longer present separate audited financial statements for its
Obligated Groups and other AHERF subsidiaries. When it discussed these plans with C&L, C&L advised
AHERF that it should obtain waivers from certain of its lenders, as the new "consolidated" format was
different than the separate audited financial statements required by debt agreements relating to Obligated
Group debt. **[Ex. 4431; Buettner 562:19-563:22]** AHERF's attempts, through its Treasury department, to
secure written waivers from its lenders received a mixed response, such that AHERF still had not secured
such approvals as it approached its reporting deadlines for FY'97. **[M. Martin 531:6-533:12]** Eventually,
AHERF requested and received a legal opinion from its bond counsel, Foley & Lardner, that opined that
AHERF's planned new financial reporting format would meet with reporting requirements contained in the
various debt agreements. **[Ex. 419]**

[10] Four former GHS hospitals were included in the AHC Obligated Group and two former GHS hospitals
were included in AH New Jersey.

- a $28.3 million decrease in DVOG's contractual allowance expense,[11] and
- a $1.2 million reduction in an investment in an affiliate.

Therefore, AHERF violated GAAP by improperly "transferring" excessive acquisition reserves among subsidiaries. Those improper transfers resulted in the material misstatement of the 1997 consolidating information of DVOG, AHC and AHNJ.

## Violations of GAAS
### (in C&L's 1997 audit of acquisition reserves and intercompany transfers)

$50 million of transfers

In planning its audit of AHERF's June 30, 1997 financial statements, C&L was required by GAAS to exercise the proper degree of professional skepticism, to assess audit risk, and to design its audit procedures in light of the circumstances surrounding the engagement. As a result of its due diligence work, C&L was fully aware of the business combinations that AHERF had entered into during fiscal 1997, including the GHS merger. C&L considered this an "important audit area" for 1997 and, therefore, planned to test the acquisition entries to record such business combinations. However, its audit procedures and corresponding conclusions were flawed in several significant respects.

The audit is a cumulative process requiring the auditor to continually evaluate the information and evidence obtained during the audit. In both planning and conducting its audit, C&L either failed to identify or chose to ignore a number of critical "red flags" with respect to AHERF's 1997 financial statements. Among the more glaring indicators of potential misstatements of those financial statements were the following:

- The unusual "two-step" transaction utilized to effect the merger;

- The Management Agreement that essentially gave AHERF operating control of the GHS entities during the period such entities were "owned" by SDN;

- The "elimination" of separate audited financial statements of the Obligated Groups for 1997;

- The "transfer" of $50 million of reserves from GHS entities to DVOG entities before the May 1, 1997 consummation date of the mergers with AHERF;

- The liabilities of GHS entities substantially exceeded the assets acquired;

- The recording of substantial contingency reserves as part of the acquisition of the GHS entities and their subsequent "transfer" to DVOG;

- C&L's 1996 management letter comments ("MLCs") regarding the continued deterioration of the DVOG entities' patient accounts receivable agings and the

---

[11] A reduction in contractual allowances and, therefore, contractual allowance expense, results in a corresponding increase in net patient service revenue.

inconsistency in reserving methodologies among subsidiary hospitals (as discussed in Basis For Opinion 2); and

- The $81 million write-off of DVOG patient accounts receivable in 1997.

Individually, any of these red flags should have increased an auditor's professional skepticism. Collectively, they should have led C&L to re-evaluate its audit plan and to modify its audit procedures to gain persuasive evidence that the financial statements were presented fairly, particularly in the areas of accounts receivable and bad debt reserves and the GHS acquisition reserves. For example, the improper transfer of $50 million of bad debt reserves should have caused C&L to modify its assessment of AHERF's internal controls, expand its review of non-standard journal entries, and further limit its reliance on management's representations. The significant write-off of accounts receivable should have caused C&L to modify and/or expand its audit procedures for accounts receivable and bad debt reserves. However, none of the workpapers I have reviewed indicates that C&L modified and/or expanded its audit plan or audit procedures in response to the aforementioned red flags.

As noted previously, AHERF's entries to record the GHS acquisition reflect the improper accrual of numerous valuation allowances, and restructuring reserves and other liabilities, including the previously described $50 million of unnecessary bad debt reserves recorded on the books of the GHS entities. This was done despite C&L's own due diligence procedures that assessed financial reporting matters, including possible areas of exposures, and did not uncover any matters requiring the magnitude of reserves that were recorded in conjunction with AHERF's acquisition of GHS entities. **[CL 064565]** In addition, the AICPA's Audit Risk Alert, *Health Care Industry Developments – 1996/97* (the "H/C Risk Alert"), noted that the "SEC Staff has expressed concern that providers may in some cases use reserves…to manage the amount of income that is reported in a particular year…. [I]f a provider involved in an acquisition accrues excess…reserves at the acquisition date, the later release of the excess reserve would result in an overstatement of income."

It is evident from my review of C&L's workpapers that the C&L auditors were aware of AHERF's intention to create $50 million of reserves on the books of the GHS entities for the sole purpose of enhancing DVOG's bad debt reserves at least as early as the preliminary fieldwork stage of their audit. For example, Mr. Kirstein took handwritten notes of an apparent meeting or conference call held on April 18, 1997 between at least himself, Mr. Buettner, Ms. Frazier, and Mr. Cancelmi. From a review of his notes, it is evident that the plan to record $50 million of reserves for the DVOG entities was discussed at that meeting. His notes include the following:

$50 MM RESERVES AT GRADUATE

- WILL HAVE $80 MM C/O [charge/offs] IN DV BY 6/30/97
(GROSS # ON A/R OUTPATIENT.

4-8

> - PLACING RESERVES ON GRADUATE ENTITIES TO BE
> USED FOR DV A/R @ Y/E.
>
> - DOES NOT BELIEVE THERE IS ANY GENERAL
> RESERVES OTHER THAN $50 MM.
>
> - BECOMES PART OF PPE/INTANGIBLE AS PART OF
> PURCHASE ADJUSTMENT FROM SDN TO AHERF
>
> - DEFERS A/R PROBLEM TO BE DEFERRED.
> **[CL 039248]**

Mr. Kirstein took notes of other meetings held early in the FY'97 audit wherein the $50 million plan was discussed. His notes of a June 10, 1997 meeting include the following:

> -    $50 MM ADD'L RESERVE
>         $25 MILLION THRU MARCH
>         $25 MILLION THRU APRIL
>
> -    $80 MM WRITE OFFS + OFFSET BY $50 RESERVE
> **[CL 039240]**

In addition to these notes, Kristen Heinlein, the staff auditor working in the receivables area, drafted an "Issue Document," dated June 9, 1997, that states:

> Per conversation with [AHERF staff accountant] Robin Schaffer,
> C&L notes that a total of $50 million was intercompanied from the
> Graduate hospitals to the Delaware Valley hospitals due to the DV
> bad debt shortfalls ..." **[Ex. 4297]**

Ms. Heinlein testified that she first learned of the $50 million transfer referenced in her June 9, 1997 Issue Document from Ms. Frazier. **[Heinlein 116:16-125:25]**

These documents, in addition to several others, leave little doubt that C&L was aware of AHERF's intention to set up $50 million of reserves on the GHS entities' books for the sole purpose of enhancing the DVOG entities' bad debt reserves early in its FY'97 audit. Such documents also suggest that C&L was involved in the initial discussions wherein this plan was developed.

In fact, Stephen Spargo, Senior Vice President of Corporate Support Services, has testified that he believes it was Mr. Buettner who first proposed the idea of using the acquisition of the GHS entities to create reserves for transfer to the DVOG entities to help solve the DVOG entities' bad debt reserve shortfalls. **[Spargo 372:8-373:5]** In addition, Mr. Adamczak testified that "Bill Buettner made the comment that that's the beauty of an acquisition, that it gives you the opportunity to, in essence, take care of an

issue like bad debts over several years by capitalizing it as goodwill." **[Adamczak 259:16-23]** No matter who initially "came up with the idea," it appears from C&L's workpapers that it was involved in the idea from the outset.

C&L's auditors have acknowledged that they became aware of the $50 million transfer during their 1997 audit work. **[Buettner 613:6-24, 617:1; Kirstein 630:20-631:12; Frazier 577:5-24]** C&L's auditors, including Mr. Buettner, have also acknowledged that the $50 million transfer was a departure from GAAP. Mr. Buettner testified:

> Q. But you just said you told Amy to tell Dan that we wouldn't accept it. So your initial reaction was that there was at least a problem here?
> A. Well, my initial reaction, as I said, is that we would not accept the use of those reserves in evaluation the Delaware Valley accounts receivable.
>
> Q. Do you believe that the entries or the series of accounting transactions violated GAAP today?
> A. Oh, yes, yes.
>
> Q. You believed it at the conclusion of your '97 audit work, is that fair to say?
> A. Yes, I believe that the transfers in and of themselves were a departure from GAAP.
> **[Buettner 617:23-618:14]**

Mr. Buettner and Ms. Frazier have claimed that they requested AHERF, specifically Mr. Cancelmi, to reverse the transfers. Mr. Buettner testified:

> Q. What did you say, if anything, in response to her [Ms. Frazier] telling you this?
> A. I basically told her that they couldn't do that. I mean, just from a – they couldn't move a purchase transaction over and use it for bad debt reserve at Delaware Valley.
>
> Q. Did you give her any instructions after telling her that?
> A. I told her to talk to Dan about it and tell her – tell him that we wouldn't accept the reserves over at the Delaware Valley.
> **[Buettner 616:16-617:1]**

Ms. Frazier testified:

> Q. … [Y]ou told Mr. Cancelmi to … reverse this transfer?
> A. I just said it was unnecessary, you don't need it, why are you doing it? You need to have transfers at Graduate, keep them there.
>
> Q. My question was, did you tell him to reverse it?
> A. Yes.

Q. What did he say in this conversation?

A. I don't recall. I mean – it had been on two occasions at least that I had had that discussion with him and – and I just – I don't recall what he said. I do recall, back again to that first conversation of it's what they did, figure it out.

**[Frazier 583:23-584:14]**

I have seen no evidence in C&L's workpapers relating to C&L's request to AHERF to reverse the transfers. Mr. Cancelmi testified that he did not recall any auditor from C&L requesting him to reverse the transfer:

Q. Do you recall sometime in the summer of 1997, late summer, like August, Amy Frazier coming into your office and saying to you, what the hell is this all about?

A. No.

Q. Do you remember telling her, it's your problem?

A. No. I don't remember that. I've heard that – I've heard that statement. Again, I'll go back to, you know, I was always under the understanding and impression that Coopers was aware of these transactions well before August of '97.

**[Cancelmi 258:2-16]**

\* \* \*

Q. But, in any event, at no point in time did Coopers & Lybrand ever tell AHERF to reverse any of these reserve transfers, right?

A. Not that I'm aware of.

**[Cancelmi 263:14-17]**

Mr. Buettner has testified that he did not personally raise his purported disagreement with AHERF management or with the AHERF audit committee. He also testified that he did not personally discuss the matter with the C&L concurring partner, Jeffrey Hoover. **[Buettner 618:15-620:14]** When asked why he did not inform the audit committee of his disagreement, Mr. Buettner testified that the $50 million transfer did not result in a material misstatement of AHERF's consolidated financial statements:

A. The 50 million dollar transfer, as I testified to a little earlier today, in my opinion was not material. It had no impact on the consolidated financial statements of AHERF, and this letter refers to our audit of the consolidated statements of AHERF. No impact on key parameters or measurements within the AHERF system when you measure materiality. No impact on net unrestricted assets. No impact on working capital. No impact on total assets. I viewed the transfer as nothing more than a related party transaction that eliminated in consolidation.

Q. You didn't – let me try that one again. A couple headings up there's a section called errors, fraud or illegal act. Did you consider the transfer an error, these 50 million dollars' worth of transfers, an error, a fraud or an illegal act?

A. No.

Q. Did you consider it an error? I apologize, sir, your counsel has made an objection, so I'm trying to make it clear. Did you consider the 50 million dollars of reserve transfers an error?

A. I considered it a departure from GAAP which was immaterial to the – to the consolidated financial statements of AHERF and did not view the transfer as an error as outlined within the statement of auditing standards definitions, if you will.

Q. It was a departure from GAAP but not an error in your view?

A. A material error.

**[Buettner 640:1-641:12]**

Mr. Buettner testified that he performed a "top side" analysis to evaluate whether the "old AHERF" entities[12] needed the additional $50 million of reserves that were transferred to DVOG's books and whether the recording of the $50 million on the books of the GHS entities misstated the AHERF consolidated balance sheet. **[Buettner 709:3-715:22, 720:10-726:2]** As a result of this analysis, he concluded that the $50 million transfer did not materially misstate the AHERF consolidated financial statements. **[Buettner 607:19-24; Ex. 4473, CL 036438-39]**

Mr. Buettner's analysis is documented in handwritten notes that he says were created during the 1997 audit. **[Ex. 4473, CL 036438-39; Buettner 682:12-683:20]** These notes are attached at the back of a "1997 Audit Update" document, dated October 1, 1997, that he used as a discussion tool for the Fall meeting of the AHERF Audit Committee. Mr. Buettner testified that he is not aware of any other written analysis that summarizes or reflects how C&L determined the $50 million transaction did not result in a material misstatement of the FY'97 AHERF financial statements. **[Buettner 683:17-20]**

At his deposition, Mr. Buettner described how his handwritten notes reflect the conclusions he reached during the 1997 audit. According to his testimony, he first attempted to determine (on the first page of these notes) the amount of bad debt reserves the "old AHERF" entities had recorded in their accounts as of June 30, 1997 without the $50 million transferred from the GHS entities. Instead of looking to C&L's workpapers for these amounts, however, Mr. Buettner performed a rollforward that started with $63.8 million of bad debt reserves (the amount that he believed was recorded on the old AHERF entities' books at the end of FY '96). To this amount (which was taken from the FY '96 audited financial statements), he added the $66.4 million of bad debt expense recorded at the consolidated AHERF level. He then deducted from the resulting sum ($130.2 million) the "charge offs" of $95 million at the old AHERF entities. This

---

[12] Mr. Buettner and Ms. Frazier have stated that the old AHERF entities would consist of those entities affiliated with AHERF as of June 30, 1996. **[Buettner 682:20-683:11; Frazier 711:25-712:2]**

resulted in $35.2 million of bad debt reserves on the books of the old AHERF entities as of June 30, 1997 (without the $50 million transferred from the GHS entities). **[Buettner 694:3-699:17]**

Mr. Buettner testified that he and Ms. Frazier were able to identify "other reserves" on the books of the old AHERF entities that could be used to enhance the existing bad debt reserves on the books of the old AHERF entities. These reserves included $10 million of "excess CRA" reserves, $9.8 million of "excess c/a" [contractual allowance reserves], a $1.7 million "legal reserve," and a $1 million "SCHC collection." He stated that the $22.5 million aggregate amount of these "other reserves" was then added to the $35.2 million of reserves he believed the old AHERF entities already had as bad debt reserves on their books. **[Buettner 704:12-707:25; Ex. 4473, CL 036438-39]** Also added were the balances of bad debt reserves at the new AHERF entities aggregating $40 million ($2.9 million at Forbes, $1.1 million at AVH, and $36 million at GHS). This summed to $97.7 million ($35.2 million plus $22.5 million plus $40 million).

Mr. Buettner described notes toward the bottom of CL 039348 as relating to exposures related to the accounts receivable area that he believed the GHS entities had not properly reserved. **[Buettner 709:3-715:22]** He added the balances of these items (which aggregate to approximately $33 million) to the $97.7 million. This satisfied him that the resulting sum of $130.8 million was consistent with the $127.4 million of bad debt reserves shown on the AHERF consolidated balance sheet. **[Buettner 709:3-12]**

Mr. Buettner then testified that, on the second page of his notes, he started off with $77.1 million,[13] an amount that resulted from a high-level calculation he had earlier performed (again, by hand) to determine the reserve needs of the old AHERF entities. He stated that this analysis was based on the AGH bad debt reserve model and that he did not retain these notes. **[Buettner 723:-726:20]** Mr. Buettner then testified that he modified the $77.1 million calculation to take into account two factors. First, he reduced his reserve needs calculation by $9 million to account for delays in collection of payments from Blue Cross and HMO payors. **[Buettner 726:21-730:5]** Second, he reduced his reserve needs calculation by $1.9 million or one-half of the balances in unapplied cash accounts. **[Buettner 730:6-731:7]** These modifications resulted in a required reserve of $66.2 million which was only $8.5 million more than the $57.7 million resulting from adding the $22.5 million of the "other reserves" to the $35.2 million of bad debt reserves on the books of the old AHERF entities. **[CL 036439]**

Neither Mr. Buettner nor Ms. Frazier were able to identify any analysis in the C&L workpapers that evaluated whether DVOG itself (i.e., not in connection with other "old AHERF" entities) had sufficient reserves on its books without the $50 million of reserves transferred from the GHS entities. When asked why he did not prepare such an analysis, Mr. Buettner stated:

---

[13] The figure listed on Mr. Buettner's notes could be either $77.1 million or $79.1 million. The original figure appears to have been $77.1, but it seems to have been modified to $79.1 million. Mr. Buettner testified that he believed, based on other figures on the page, that the figure he intended to write was $77.1 million. **[Buettner 722:4-15]**

Q. Why then were you focusing on something greater than the Delaware Valley Obligated Group hospitals?

A. We were performing a consolidated audit of AHERF, and I wanted to gain comfort, not only of the reserve adequacy of Delaware Valley, which I'm not opining on, but on old AHERF with an understanding that the organizations that were coming in throughout the year would have their own reserves and the staff was looking at those reserves.

\* \* \*

Q. Then why, again, focus on more than the Delaware Valley Obligated Group hospitals?

A. Well, because, [as] indicated earlier, I'm doing – my audit opinion is geared towards a consolidated AHERF report. And a consolidated AHERF report would include both Allegheny General as well as the eastern hospitals or the Delaware Valley hospitals, however you want to define them.

**[Buettner 685:15-687:7]**

It is odd that C&L did not prepare an analysis to evaluate whether the DVOG entities had sufficient bad debt reserves without the $50 million transferred from the GHS entities. In other areas of the audit, including areas involving the audit of important accounting estimates (e.g., workers' compensation, pension liabilities, etc.), it evaluated the accounting on an entity or at least on an obligated group basis. C&L did not lump entities together to see if the amount of recorded liabilities or reserves was fairly stated. Moreover, C&L prepared separate Summaries of Unadjusted Differences ("SUDs")[14] for the "old AHERF" entities for purposes of evaluating the 1997 financial statements, thereby indicating that C&L considered these groups of entities to be separate when evaluating the effect of audit differences.

Had C&L performed an evaluation of whether the DVOG entities themselves had sufficient reserves on their books, it would have confirmed what it likely already knew — without the $50 million from the GHS entities, the DVOG entities were materially under-reserved for bad debts.[15] Mr. Buettner acknowledged that, at the time he did his "old

---

[14] In its Summary of Unadjusted Differences ("SUD"), which was "cleared" by Mr. Buettner, C&L acknowledged the importance of the separate financial results of the obligated groups as follows:

> For purposes of evaluation, the [SUD] has been prepared by obligated financial results. This was done since C&L issues a debt compliance letter for the AGH and DVOG obligated groups.... It has been determined that though consolidated financial statements are presented, given the various debt covenant requirements, separate evaluation at the obligated group level is necessary. **[Ex. 1079, PwC 009741]**

[15] In addition, a simple review of the bad debt rollforward schedules would have made clear that the DVOG entities would not have had sufficient bad debt reserves without the $50 million "transferred from Graduate." One can see from those schedules that the DVOG entities had moved or were moving into a debit position in their bad debt reserve accounts before the transfers from Graduate. **[Ex. 4248, PwC 010266.K & .L, PwC 010278.K & .L, PwC 010290.L & .M, PwC 010294.E & .F, PwC 010306.K & .L]**

AHERF" assessment, he was aware that the vast majority of the unusually high writeoffs in FY'97 was at the DVOG hospitals and that AHERF had transferred $50 million of reserves from the GHS entities to DVOG. **[Buettner 684:23-685:14]** It is evident from Mr. Kirstein's handwritten notes of June 10, 1997, quoted above, that C&L was aware that AHERF was "offsetting" the $80 million of writeoffs at DVOG with the $50 million of reserves transferred from the GHS entities. **[CL 039240]**

It is likely that C&L did not perform a separate evaluation of whether DVOG was sufficiently reserved without the $50 million because it knew that such an analysis would merely highlight the reserve inadequacies at DVOG. This is also the likely reason as to why C&L did not separately reflect the purported differences with the client, discussed above in connection with Mr. Buettner's analysis on CL 036438-39, on its SUDs.

From the outset of the plan to create $50 million of reserves for the DVOG entities through the acquisition of the GHS entities, it appears that C&L and AHERF were already discussing the notion that the reserve transfers could be rationalized by AHERF's preparation of consolidated audited financial statements for FY'97. On this point, Mr. Cancelmi testified:

> Q. ... Do you recall discussing with Coopers & Lybrand in the April time frame, when this idea was initially broached, that ... Coopers could view in its audit these transfers on a consolidated basis?
> A. Yeah, I've testified to that a number of times that, you know, we were discussing this with Coopers at that time frame.
>
> Q. And my question is that specific point, which is they could look at the transfer on a consolidated basis when ... deciding their responsibilities as auditors?
> A. That was my understanding how it was being looked at, on a consolidated basis.
>
> Q. Okay. And this was something that was discussed as early as April of 1997?
> A. That's my recollection.
> **[Cancelmi 1733:1-1733:23]**

If C&L was not going to require AHERF to reverse the $50 million of reserves and charge bad debt expense to create the necessary bad debt reserves, it should have performed an analysis of whether the DVOG entities were sufficiently reserved without the $50 million transfer. The DVOG entities were a separate obligated group from AGH, and the reserves on the books of AGH had no impact on whether the DVOG entities were adequately reserved. Just as it would violate GAAP to transfer reserves from the GHS entities to the DVOG, it would violate GAAP to transfer reserves from AGH to DVOG. One cannot avoid such a violation of GAAP by simply "considering" reserves at AGH as being available to DVOG, effectively what Mr. Buettner does in his "old AHERF" analysis.

In addition, from his past experience with AHERF, Mr. Buettner was aware that the
entities within "old AHERF" were separate legal entities, with separate creditors and
other interested parties. He knew that DVOG and AGH had separate financial reporting
requirements under loan agreements which required the presentation of audited financial
statements at the obligated group level. He knew, or should have known, that there were
users of the financial statements that were interested in the financial performance and
condition of separate components of the AHERF system. These facts should have
influenced at least his qualitative assessment of materiality in assessing the impact of the
$50 million of reserves on AHERF's financial statements.

The change in FY'97 to a "consolidated" financial reporting format did not change these
fundamental facts. C&L knew, or should have known that, in opining that the new
financial reporting format would satisfy the reporting requirements of the obligated
groups' debt agreements, Foley & Lardner, AHERF's bond counsel, was relying on the
fact that C&L was performing auditing procedures on the consolidating information and
was issuing a report thereon. **[Ex. 419]** The opinion of Mr. Zimmerman of Foley &
Lardner that the new financial reporting format would satisfy the provisions in the debt
agreements was premised on his understanding that C&L was providing something more
than merely a report on the consolidated financial statements. Mr. Zimmerman placed
importance on the audit assurance C&L was providing on the consolidating financial
information. His letter stated the following:

> You have provided me with a copy of the consolidated financial
> statements of [AHERF] for the fiscal year ended June 30, 1997 and
> the accompany consolidating financial statements for those entities
> whose financial information is included in the consolidated
> financial information (collectively, the "1997 AHERF Audit").
> The financial statements include two reports from Coopers and
> Lybrand — one relating to the consolidated financial statements
> and the other relating to the consolidating financial statements.
>
> Coopers & Lybrand's report with respect to the consolidated
> financial statements states that "[in Coopers & Lybrand's] opinion
> the consolidated financial statements ... present fairly, in all
> material respects, the consolidated financial position of [AHERF]
> as of June 30, 1997 and the consolidated results of operations,
> changes in net assets and cash flows for the year then ended in
> conformity with generally accepted accounting principles."
> Coopers & Lybrand's report with respect to the consolidating
> financial statements states that "the supplementary consolidating
> financial information has been subjected to the auditing procedures
> applied in the audit of the consolidated financial statements and, in
> [Coopers & Lybrand's] opinion, is fairly stated, in all material
> respects, in relation to the consolidated financial statements taken
> as a whole." **[Ex. 419]**