Moreover, at his deposition, Mr. Zimmerman testified:

> Q. At the time you signed your December 1, 1997 letter **[Ex. 419]**, what was your understanding regarding how Coopers would be reporting on the consolidating schedules?
>
> A. That the reader of the consolidating schedule could conclude based upon the language respecting the application of audit procedures that the quality of financial information subject to the opinion would be the same as the quality one would get if we had a separate consolidated financial statement for that -- for each of the entities that were the topic of a column in the consolidating schedule.
>
> **[Zimmerman 221:18-222:5]**

Mr. Buettner has acknowledged that the consolidating and combining financial information, and a C&L report thereon, were necessary to meet the reporting requirements contained in the Obligated Groups' debt agreements:

> Q. Was it your understanding that this report on this page and the consolidating information to which it refers were necessary to satisfy the reporting requirements of the various lenders for the various obligated groups at AHERF?
>
> A. Yes, my conclusions were based on the conclusions of Mr. Zimmerman that this reporting format would meet certain reporting requirements for the obligated groups.
>
> **[Buettner 579: 4-18]**

As discussed in Basis for Opinion 2, in any hospital audit the assessment of the adequacy of bad debt reserves is a critical area of a hospital audit. In failing, apparently, to perform an adequate assessment of whether the DVOG entities were adequately reserved for bad debts, C&L failed to do what it said it had done in its report on the consolidating information. In that report, C&L stated:

> The supplementary consolidating financial information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in our opinion, is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole. **[Ex. 58]**

Because it did not, apparently, perform an assessment of whether the DVOG entities were adequately reserved for bad debts, C&L failed to subject one the most important components of DVOG's reported financial information to adequate auditing procedures.

C&L knew, or should have known, that DVOG's reported Statement of Operations in the consolidating financial information was materially misstated because of the failure to create necessary reserves through a charge to bad debt expense. The misstatement was so large as to materially misstate the AHERF consolidated financial statements as well.

Such a misstatement cannot be offset or overlooked simply by including the impacts of reserve levels at entities outside of DVOG.

As discussed earlier, SAS 29 requires the auditor to take affirmative steps if it is aware that there are misstatements in the consolidating information:

> If the auditor concludes, on the basis of the facts known to him, that any accompanying information is materially misstated in relation to the basic financial statements taken as a whole, he should discuss the material with the client and propose appropriate revision of the accompany information.  If the client will not agree to revision of the accompanying information, the auditor should either modify his report on the accompanying information and describe the misstatement or refuse to include the information in the document.  **(AU § 551.09)**

The language "in relation to the consolidated financial statements taken as a whole," contained in GAAS and at the end of C&L's report on the consolidating and combining financial information, is not an invitation to perform auditing procedures that ignore the separate nature of individual entities within a consolidated entity.  This is particularly true given the nature of the AHERF system, where creditors and other users of the financial statements had particular interest in assessing how certain components of the system were performing.  Nor is the language intended to suggest that the auditor should aggregate audit adjustments at the consolidated level in determining whether adjustments amount to a material misstatement of the consolidated financial statements.  The "taken as a whole" language means that, in evaluating whether a misstatement or misstatements are material, the auditor might apply a larger numerical materiality threshold applicable to the consolidated entity, and may adjust his auditing procedures accordingly.[16]  As Mr. Buettner testified, when asked about his understanding of C&L's opinion on the consolidating and combining financial information:

> I'm simply indicating that from – we believe that the information attached is fairly stated based in the materiality parameters in relation to the consolidated financial statements ….  **[Buettner 593:10-14]**

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

---

[16] When an auditor reports on financial information accompanying the basic financial statements, "the measurement of materiality is the same as that used in forming an opinion on the basic financial statements taken as a whole.  Accordingly, the auditor need not apply procedures as extensive as necessary to express an opinion on the information taken by itself. …" AU § 551.08.

CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY

Mr. Buettner also ignored the knowledge he had that users of the financial statements cared about the financial performance and condition of particular components within the AHERF system and, in the case of certain creditors, had the legal right to an audit opinion stating whether a particular obligated group's presented financial information was materially misstated.

In assessing materiality with respect to the $50 million transfer, C&L ignored its obligations under SAS 53 to report that transaction as a violation of GAAP. As discussed above, C&L's auditors have testified that they believed the $50 million transfer violated GAAP. In creating and then transferring the $50 million of reserves, it is clear that AHERF management had engaged in an accounting treatment that was an outright violation of GAAP. Even if Mr. Buettner and C&L had believed that the transfer was immaterial, it is clear that AHERF management did not. AHERF clearly thought a substantial enhancement of the DVOG entities' bad debt reserves was needed, and they developed and implemented an improper mechanism to fix it without hurting the bottom line. If ever something is qualitatively material, this is it.

Even had Mr. Buettner's evaluation of bad debt reserves at only the "old AHERF" level been appropriate under GAAS, his analysis was flawed. First, Mr. Buettner stated that his level was merely a "top side" review. **[Buettner 607:24, 608:18, 696:12]** As C&L knew or should have known, AHERF clearly engaged in the $50 million transfer because it believed that DVOG was under-reserved for bad debts by at least $50 million. Given this fact, the importance of the audit of the estimate for bad debts, and C&L's past knowledge that the DVOG entities did not adequately reserve for bad debts, GAAS required more than a "top side" analysis. C&L should have performed a detailed review,

including discussions with management, about why management felt the DVOG entities needed $50 million of additional bad debt reserves.

Had C&L done so, its assessment would have come out much differently than the flawed analysis Mr. Buettner has testified that he performed during the 1997 audit. Mr. Buettner's assessment is simply incorrect -- his numbers are wrong in numerous respects. In other respects, components of his analysis are suspect, at best, and reflect a predetermined conclusion.

First, in calculating the amount of reserves on the books of the "old AHERF" entities, Mr. Buettner erroneously includes, as an increase to reserves, the amount of bad debt expense for the entirety of AHERF for FY'97, not just the "old AHERF" entities. The amount of bad debt expense attributable to acquired entities of $6,866,000  **[Ex. 60]** had no place in Mr. Buettner's "old AHERF" analysis.

Second, Mr. Buettner's calculation of the existing bad debt reserves on the "old AHERF" entities omits from the calculation over $20 million of writeoffs and other accounting treatments that served to further reduce the balances in the DVOG entities' bad debt reserve accounts, beyond the $95 million of charge offs he included for the old AHERF entities. Mr. Buettner's calculation also failed to consider the fact that the DVOG entities actually started out FY'97 with $17.5 million more of reserves than his calculation assumed. Had Mr. Buettner discussed his evaluation with others on the audit team, or even consulted the bad debt rollforward schedules, he likely would not have made these mistakes. It was inappropriate to resolve a major audit issue, particularly one as material as this, with nothing more than an error-filled, "top side" analysis.

Third, many of the $22.5 million of "Other Reserves" Mr. Buettner and Ms. Frazier identified as being available for use as bad debt reserves were not "excess reserves" at all. I have not seen anything in C&L's workpapers to suggest it concluded that the DVOG entities had some $9 million of excess contractual allowances, much less how they derived that figure.[17] (As discussed in Basis for Opinion 15, contractual allowances for DVOG entities were underaccrued as of June 30, 1996 and 1997.) In fact, the $9 million of "excess reserves" related to the DVOG entities included in Mr. Buettner's analysis can be traced to certain manual reserves recorded by AHERF's accounting department for a variety of very specific and needed reasons, such as reserves for inpatient Medical Assistance Applying accounts that were not contractualized at the time of billing. Similarly, much of the purported excesses in CRA accounts were dubious at best,

---

[17] Mr. Buettner stated that he obtained this figure from Ms. Frazier, but did not recall the detail of how she obtained the figure. **[Buettner 706:10-707:25]** Ms. Frazier's most recent testimony on the matter suggested that the $10 million figure for excess contractual allowances emanated from her personal review of accounts receivable. She stated "there were differences between what was needed in their calculations versus what was recorded on the actual trial balances and summing them up across the entities." Ms. Frazier also testified that she used a piece of paper to capture her findings, but acknowledged that she has not seen this piece of paper since -- even though she has spent days preparing with counsel.
**[Frazier 750:1-752:17]** I have also not seen any such analysis in C&L's workpapers. Nor do either of the auditors involved with the detailed analysis of accounts receivable or contractual allowances recall any discussion of there being "excess contractual allowances." **[Heinlein 332:2-342:12; Porter 365:3-6, 368:13-17]**

particularly relating to the purported excesses at the DVOG entities. These amounts related to recently received "tentative settlements" that AHERF's accounting department believed were needed for a variety of reasons.[18] It was not C&L's practice in prior audits to consider such reserves "excess."[19]

C&L's consideration of these reserves as excess reserves that could be used in lieu of the $50 million of reserves transferred from the GHS entities, and Mr. Buettner's questionable $9 million "revision" to AHERF's calculation of its reserve needs,[20] indicate that C&L and Mr. Buettner were "stretching" to satisfy themselves that the $50 million transfer did not result in a material misstatement.

C&L's assessment that the $50 million of goodwill recorded on the books of the Graduate entities did not result in a material misstatement of the balance sheet is also flawed. All, or nearly all, of the purported unreserved liabilities identified in C&L's workpapers did not meet the criteria for recording a contingent liability under GAAP. For example, C&L's analysis presumes that the GHS entities for some reason needed $25 million of reserves for "corporate compliance" reasons. Mr. Buettner testified that other hospitals had been hit with penalties from governmental audits, and that, accordingly, he felt it was appropriate to record reserves for such potential penalties at the GHS entities. **[Buettner 759:5-762:12]** He was aware of no investigation of any AHERF entities however, including the GHS entities. **[Buettner 762:13-763:2]** Therefore, such an accrual would be nothing more than a general reserve for potential contingencies, the type of reserve that is specifically prohibited by GAAP (SFAS 5).

Also, Mr. Buettner's analysis and testimony suggest that GHS entities would need reserves for obligations under the Qualmed contract. However, there were no "obligations" relating to the Qualmed contract as of June 30, 1997. As Ms. Frazier testified in her SEC deposition, the deferred revenue that was on the books of the GHS entities was set up as an offset to prudent buyer exposures that might result from GHS' sale of Qualmed to HSI. Inasmuch as the prudent buyer clause was deemed invalid in January 1997, there was no more need for the accrual. **[Frazier SEC Dep. at 684-701]**

---

[18] Joseph Scharf, Senior Director of Corporate Reimbursement, testified that he would never have considered the tentative settlements booked at the DVOG entities to be unnecessary general reserves. **[Scharf 174:3-175:15 (quoting from Mr. Scharf's SEC testimony)]** Moreover, Ms. Frazier's notes on these balances indicate that they were "designated" amounts. **[Ex. 4043, to X 23993-94]**

[19] Moreover, over $3 million of the "excess CRA" reserves included in Buettner's analysis related to amounts remaining from the CRA cushion booked at AGH in conjunction with AGH's capitalization of interest in FY'96. As discussed in Basis for Opinion 6, this reserve should never have been on the AGH's books in the first place.

[20] Greg Snow, Vice President of the Patient Financial Services Group, the entity charged with the billing and collecting of patient receivables, testified that he did not believe it would have been appropriate to reserve the old Blue Cross accounts at the rates suggested by Mr. Buettner's analysis. He believed Blue Cross accounts over a year old should be reserved at a rate of 80 to 100 percent, and accounts over 270 days at 60 to 75 percent. When asked if a 30 percent reserve rate on such receivables would be fair, Mr. Snow testified that such a percentage "would be overly aggressive." He stated that although there may have been some slowdown in payments from Blue Cross, "I don't believe there was a 180-day slowdown." **[Snow 241:1-243:1]**

Nor was there any prudent buyer exposure on the books of the GHS entities as of June 30, 1997 not already well covered by existing reserves. By the end of the FY'97 audit, AHERF had provided C&L with materials showing that the prudent buyer exposures were well below the accruals already on the books. **[CL 037559-641]**

Finally, it was not clear at all that the GHS entities themselves, as opposed to GHS, were liable for losses incurred by HSI under the PFMA contract. Indeed, AHERF's in-house counsel concluded that GHS was liable for the losses, not the GHS hospital entities. **[Ex. 1060]** Ms. Frazier's notes on the August 22, 1997 Audit Update state "legal documentation indicates that GHS is obligated. transferred reserves of the books to DV." **[CL 037536]** I have not seen any evidence in C&L's workpapers as to why it disagreed with AHERF's determination.

In addition, the analysis that Mr. Buettner and Ms. Frazier state that they performed during the 1997 audit on why the $50 million was needed on the books of the acquired entities is inconsistent with the C&L workpapers contained on C&L's CLASS system. The workpapers discussing why the $50 million was established on the books of the GHS entities state the following:

> Prior experience with the Delaware Valley entities led to the $50 million reserve for bad debts. AHERF management believed that when the DV entities were brought into the AHERF system, the entities did not have sufficient reserves on their books for bad debts. Therefore, management wanted to have sufficient reserve for The Graduate Hospitals when they were brought into AHERF. AHERF management discussed the decision with the C&L partner who agreed that a reserve should be established.
> **[Exs. 4363, 4123, 4125]**

Thus, based on the documents and testimony that I have reviewed, C&L failed to (a) exercise due professional care in planning, performing, and evaluating the results of its audit procedures, (b) exercise the proper degree of professional skepticism in light of numerous red flags, and (c) obtain and evaluate sufficient competent evidential matter leading to the erroneous conclusion that the $50 million of transferred GHS reserves was immaterial. C&L also violated GAAS by failing to inform the Audit Committee of AHERF's Board of Trustees of the material GAAP violation.

### $49.6 million of transfers

As previously discussed, AHERF improperly transferred an additional $49.6 million of excess reserves from the GHS entities to the DVOG entities. These reserves came principally from accounts contained in accounts receivable and accounts payable accounts. C&L has testified that it did not become aware of these additional transfers until after the issuance of its audit report on AHERF's 1997 financial statements. C&L further asserts that it was "duped" by AHERF's management. For example, Ms. Frazier testified as follows:

A. I asked Dan Cancelmi. I don't want to include the PFMA. It was just all – any other reserves. I just asked outright is there anything else.

**\*\*\*\***

Q. What did he say?
A. No, there was nothing else that had been transferred.
**[Frazier 701:23-702:1 and 702:24-703:1]**

As noted previously, an audit is a cumulative process. When circumstances, events or information arise that differ adversely from the auditor's expectations, SAS 53 requires that "the planned scope of audit procedures should be reconsidered. [Furthermore,] the auditor should consider whether the assessment of risk…made in the planning stage of the engagement is still appropriate." Given the number of "red flags" known to C&L at the planning stages of the audit, C&L should have been on "heightened alert" for potential misstatement of AHERF's financial statements, particularly relating to the transfer of reserves from the recently acquired GHS entities.

Upon learning of the transfer of the $50 million bad debt reserves, C&L should have exercised a significantly greater degree of professional skepticism in conducting its 1997 audit, rather than continuing to place substantial and undue reliance on management's assertions and representations. Not only should C&L have been far more skeptical of other management representations, it should have reconsidered its preliminary assessment of inherent and control risk as well as planning materiality and expanded its audit procedures to corroborate management's assertions through substantive audit procedures as required by SAS 19. For example, C&L should have performed or expanded its review of intercompany transactions, bad debt reserves, bad debt expense, and non-standard journal entries.

If C&L did not, in fact, become aware of some or all of the additional $49.6 million of inappropriate transfers, its failure was attributable to its poorly designed, poorly executed, and insufficient audit procedures. For example, rather than analyzing changes in balance sheet amounts from the May 1, 1997 acquisition date to the June 30, 1997 year-end, C&L performed year-over-year comparisons (June 30, 1996 vs. June 30, 1997) that it had employed in the past. Such flawed analytical procedures failed to detect that the substantial amount of reserves recorded on the books of GHS when acquired by AHERF had all but "disappeared" at year end, because $49.6 million of such reserves had been transferred to DVOG. The design of C&L's audit procedures was equally flawed, because it failed to include a review of unusual or late-in-the-year journal entries, which also would have reflected the improper reserve transfers.

A proper review of C&L's accounts receivable and accounts payable "lead schedules" workpapers would have indicated suspicious and unusual activity. C&L's audit program called for it to obtain explanations for significant fluctuations in account balances. **[Ex. 4132]** Had it done so, it would have been able to determine all, or nearly all, of the subsequent inappropriate transfers. For example, if it had determined why "accrued miscellaneous" accounts on the books of the GHS entities had gone down by millions

between May 1, 1997 and June 30, 1997, it would have become aware that substantial reserve balances in those accounts had been transferred to DVOG. **[Ex. 4130]**

In addition, the DVOG's bad debt reserve rollforwards, contained in C&L's FY'97 audit workpapers, disclosed not only the $50 million bad debt reserve transfer[21] but also reflected a substantial portion of the $49.6 acquisition reserve transfers. See Basis for Opinion 3. For C&L not to have followed up on the huge numbers described as "shortfall adjustments" is inexplicable. It suggests that C&L already knew the nature of the adjustments.

Also, the former GHS hospital entities' combined total of intercompany debt had increased to $113,663,000 as of June 30, 1997.[22] Such a large amount of intercompany debt in recently acquired entities should have prompted C&L to investigate the nature of and circumstances surrounding such related party transactions that gave rise to the significant increase.[23] None of the workpapers I have reviewed document such an analysis or inquiry.

C&L appears to have been aware of the fact that AHERF transferred $14 million of "PFMA" reserves from the GHS entities to the DVOG entities. In the previously mentioned August 22, 1997 Audit Update agenda, Ms. Frazier noted next to the item for "PFMA Contract:"

> Reserves recorded in SDN legal documentation indicates that
> GHS is obligated. transferred reserves of the books to DV.
> **[CL 037536]**

Similarly, Mr. Kirstein notes on his copy of the August 22, 1997 agenda next to the PFMA Contract include the following:

> WHERE DID IT GO?
>
> NOT THRU INCOME/MOVED TO DV RESERVES FOR
> A/R **[CL 039228]**

Also, Mr. Cancelmi testified that he discussed the transfer of the PFMA reserves with C&L:

> Q. And your statement is that you recall discussions with Coopers about the
>    fact that the PFMA reserve, in fact, went to DVOG?
> A. Yes.
> **[Cancelmi 301: 12-16]**

---

[21] The transfer was made in two "installments" of $25 million in March and April 1997.

[22] As reported on the consolidating balance sheet, AHC and AHNJ had intercompany debt of $100,249,000 and $13,414,000, respectively. **[C&L 0047762]**

[23] C&L knew of intercompany debt on the May 1, 1997 balance sheets of the former GHS entities pertaining to the $50 million of bad debt reserves and from management fees charged by AHERF to the GHS entities while they were owned by SDN.

In my view, the application of the basic audit procedures outlined above would have disclosed the additional acquisition reserve transfers. Instead, Ms. Frazier and C&L inexplicably were (purportedly) satisfied with merely obtaining Mr. Cancelmi's representation, without corroboration, that there were no transfers other than the $50 million of bad debt reserves.

* * * * *

In conclusion, it is clear to me that, rather than exercising heightened professional skepticism and objective evaluation of available audit evidence, C&L subordinated its judgment to that of its client, thereby causing its independence as AHERF's outside auditor to be impaired. As a result, C&L failed to cause AHERF to correct the material misstatements discussed herein on AHERF's June 30, 1997 consolidated and consolidating financial statements or, failing that, to properly modify its audit report, including disclosure of the departures from GAAP.

**Effects of GAAP Violations on AHERF's Financial Statements**

The effects of the aforementioned GAAP violations on DVOG's combined, AHCOG's combined, AHNJ's and AHERF's consolidated financial statements are reflected in correcting entry numbers 1, 2 and 3, which are presented in Appendix III of this report.

5

**5. C&L failed to require AHERF to correct its improper accounting for certain irrevocable, permanently restricted trusts**

### Relevant GAAP

Statement of Financial Accounting Standard No. 116, *Accounting for Contributions Received and Contributions Made* ("SFAS 116")

SFAS 116 requires not-for-profit organizations to distinguish between contributions received that increase permanently restricted net assets, temporarily restricted net assets, and unrestricted net assets. **(¶ 14)** Appendix D to SFAS 116 contains a glossary defining certain terms used in the Statement, including the following:

**Donor-imposed condition**

> A donor stipulation that specifies a future and uncertain event whose occurrence or failure to occur gives the promisor a right of return of the assets it has transferred or releases the promisor from its obligation to transfer its assets. **(¶ 209)**

**Donor-imposed restriction**

> A donor stipulation that specifies a use for the contributed asset that is more specific than broad limits resulting from the nature of the organization, the environment in which it operates, and the purposes specified in its articles of incorporation or bylaws or comparable documents for an unincorporated association. A restriction on an organization's use of the asset contributed may be temporary or permanent. **(¶ 209)**

**Permanent restriction**

> A donor-imposed restriction that stipulates that resources be maintained permanently but permits the organization to use up or expend part or all of the income (or other economic benefits) derived from the donated assets. **(¶ 209)**

**Permanently restricted net assets**

> The part of the net assets of a not-for profit organization resulting (a) from contributions and other inflows of assets whose use by the organization is limited by donor-imposed stipulations that neither expire by passage of time nor can be fulfilled or otherwise removed by actions of the organization, (b) from other asset enhancements and diminishments subject to the same kinds of stipulations... **(¶ 209)**

**Temporary restriction**

> A donor-imposed restriction that permits the donee organization to use up or expend the donated assets as specified and is satisfied either by the passage of time or by actions of the organization. **(¶ 209)**

**Temporarily restricted net assets**

> The part of the net assets of a not-for profit organization resulting (a) from contributions and other inflows of assets whose use by the organization is limited by donor-imposed stipulations that either expire by passage of time or can be fulfilled and removed by actions of the organization pursuant to those stipulations, (b) from other asset enhancements and diminishments subject to the same kinds of stipulations, and (c) from reclassification to (or from) other classes of net assets as a consequence of donor-imposed stipulations, their expiration by passage of time, or their fulfillment and removal by actions of the organization pursuant to those stipulations …**(¶ 209)**

**Unrestricted net assets**

> The part of net assets of a not-for-profit organization that is neither permanently restricted nor temporarily restricted by donor-imposed stipulations … **(¶ 209)**

SFAS 116 states that a restriction on an organization's use of the assets contributed results either from a donor's explicit stipulation or from circumstances surrounding the receipt of the contribution that make clear the donor's implicit restriction on use. **(¶ 14)**

Statement of Financial Accounting Standard No. 117, *Financial Statements of Not-for-Profit Organizations* ("SFAS 117")

SFAS 117 establishes standards for general-purpose financial statements provided by a not-for-profit organization. It requires the amounts for each of the three classes of net assets (permanently restricted, temporarily restricted, and unrestricted) to be reported in the statement of financial position (balance sheet) based on the existence or absence of donor-imposed restrictions **(¶ 13)** and the amounts of change in each of those classes of net assets to be reported in a statement of activities (income statement). **(¶ 19)**

Under "Classification of Revenues, Expenses, Gains, and Losses," SFAS 117 states:

> A statement of activities shall report revenues as increases in unrestricted net assets unless the use of the assets received is limited by donor-imposed restrictions. For example, fees from rendering services and income from investments generally are unrestricted; however, income from donor-restricted permanent or term endowments may be donor restricted and increase either temporarily restricted net assets or permanently restricted net assets. A statement of activities shall report expenses as decreases in unrestricted net assets. **(¶ 20)** A statement of activities shall report gains and losses recognized on investments

and other assets (or liabilities) as increases or decreases in unrestricted net assets unless their use is temporarily or permanently restricted by explicit donor stipulations or by law. For example, net gains on investment assets, to the extent recognized in financial statements, are reported as increases in unrestricted net assets unless their use is restricted to a specified purpose or future period. If the governing board determines that the relevant law requires the organization to retain permanently some portion of gains on investment assets of endowment funds, that amount shall be reported as an increase in permanently restricted net assets. (¶ 22)

Statement of Financial Accounting Standard No. 124, *Accounting for Certain Investments Held by Not-for Profit Organizations* ("SFAS 124")

SFAS 124 establishes standards of financial accounting and reporting for certain investments in securities and establishes disclosure requirements for most investments held by not-for-profit organizations. (¶ 1) Under "Reporting Investment Gains, Losses, and Income," it states the following with respect to "Donor-Restricted Endowment Funds:"

> A donor's stipulation that requires a gift to be invested in perpetuity or for a specified term creates a donor-restricted endowment fund. Unless gains and losses are temporarily or permanently restricted by a donor's explicit stipulation or by a law that extends a donor's restriction to them, gains and losses on investments of a donor-restricted endowment fund are changes in unrestricted net assets. (¶ 11)

Thus, under SFAS 124, restrictions on capital gains are precluded from being reported as components of changes in unrestricted net assets.

SFAS 124 also prescribes the use of fair value in accounting for investments in debt securities and certain equity securities.

> Investments in equity securities with readily determinable fair values and all investments in debt securities shall be measured at fair value in the statements of financial position. (¶ 7)

## Background

SFAS 116 and SFAS 117 became effective for AHERF's fiscal year ended June 30, 1996, and set forth certain new accounting and reporting requirements for not-for-profit entities. As a result, AHERF was required to make certain reclassifications of restricted assets and restricted net assets that had been contributed to it in prior years. These restrictions were to be based on donors' restrictions as to how and when their

contributions could be spent. In addition, AHERF decided to early adopt SFAS 124 in FY'96.[1]

Through June 30, 1995, AHERF generally included and reported contributed assets that had any form of restriction on their use as "restricted" net assets, and reported those without restrictions as "unrestricted" net assets. The new accounting standards required AHERF to separate its previously reported restricted net assets into permanently restricted or temporarily restricted net assets based on the donor's requirements, and to reclassify any assets restricted only by AHERF's Board of Trustees as unrestricted net assets.

Both before and after June 30, 1995, AHERF's restricted donations were invested in equity and debt securities which generated dividend and interest income. The new accounting standards required investment income from permanently restricted and temporarily restricted assets to be classified based on the donor's instructions. If there were no restrictions on use of the income, or if the donor permitted the income to be used for general, non-specified purposes, such income was to be classified as unrestricted. If the donor placed specific restrictions on the use of the income, that were no more specific than broad limits resulting from the nature of the organization and the nature in which it operates, the income was to be classified based upon those restrictions.

It is common for institutions like hospitals (and universities) to receive donations under terms of irrevocable, permanent trust agreements that prohibit them from using the donated funds for any purpose other than to generate investment income, which is then used by the institution in the ordinary course of accomplishing its general mission or for purposes specified by the donor. As of June 30, 1995, AHERF (parent) held investments under five such irrevocable, permanent trust instruments with respect to donations made by individuals to Allegheny General Hospital ("old AGH"), from which investment income was expected to be generated that would enable AGH to fulfill its general mission.

When old AGH was reorganized into AHERF, the assets in these endowments became assets of AHERF. The five trusts, referred to by AHERF as "endowments," consisted of:

- three John Marshall Lockhart trusts ("Lockhart Trusts"), two of which were created in 1922 and the third in 1935; **[CL 032001, 032002, 032005, CL 75705, 75732, 75668]**

- the Lewis A. Park Trust ("Park Trust"), which was a restricted donation made to AGH on November 6, 1962; **[CL 032004, ED 137-138]** and

- the Edith Anne Oliver and Edith Oliver Rea Trust ("Oliver Trust"), which was a restricted donation made to AGH on December 30, 1915 and was by far the

---

[1] SFAS 124 was first effective for fiscal years beginning after December 15, 1995, but early application of the standard was encouraged.

> smallest of the five irrevocable, permanent trusts. **[CL 032003, JD-DC-0004143]**

Each of the irrevocable trust instruments required the donated assets to be placed in trust, permanently restricted their use to generating income, and required them to be administered by an independent trustee. From the inception of each trust, Mellon Bank ("Mellon"), as successor to the Union Trust Company of Pittsburgh, served as Trustee and custodian of the trust investments and controlled and managed the trusts' investment portfolios. Mellon made all of the investment trading decisions, and was compensated for its services from the income earned on the trust investments.

The five trusts either do not contain restrictions on the use of income, or contain broad language stating that income should be used to meet AGH's general mission. Accordingly, AHERF considered the income earned on these trusts to be "Unrestricted." Lockhart Trust 500-007 states that income distributed to AGH was "to be used for the furtherance of its charitable work." **[DBR-ZWR-02142]** Neither Lockhart Trusts 500-017 and 500-022 contain any language restricting the use of income distributed to AGH, though 500-017 provided that any cash dividends in excess of 10% per year and all stock dividends were to be considered principle or corpus and not income. **[DBR-ZWR-02179-02233]**. The Park Trust states that "net income therefrom shall be paid over to the proper officers of the said hospital for its upkeep and maintenance." **[DBR-ZWR-02240]**. The Oliver Trust states that income "shall be expended for the maintenance of Allegheny General Hospital." **[DBR-ZWR-02236-37]**.

The trusts also contain language providing that any gains on the sale of trust assets shall be added to the permanently restricted principle or corpus of the trusts. All three of the Lockhart Trusts contain the same language in this regard: "In the case of the sale of any securities of the trust fund at a premium or profit, such premium or profit shall become part of the corpus and not income." **[DBR-ZWR-02147, 02186, 02212-13]**. The Park Trust indicates that "all stock dividends and income from capital gain shall be considered principal and retained and added to the corpus of the trust." **[Exhibit 435]**.    The Oliver Trust states that trustee of the trust was to "HAVE AND HOLD the said securities and the proceeds of the sale or conversion of the same … IN TRUST." **[DBR-ZWR-02236]**.

Accordingly, the additional funds generated from capital gains realized on sales of investments were to remain in the five trusts as corpus.

Prior to July 1990, Mellon distributed interest and dividend income to AGH, and later AHERF. Therefore, except for yet undistributed interest and dividends, all undistributed assets in the five trust accounts prior to 1990 were comprised of the original donations and net capital gains and, as such, were corpus. Commencing in July 1990, as instructed by AHERF, all interest and dividends from the five endowments (net of Mellon's fees) were periodically "swept" from the Mellon trust accounts and consolidated at Mellon Bank into one account owned and controlled by AHERF. **[CL 031995-032000]** Thus, after July 1990, all remaining assets in the five trust accounts were also corpus.

At her deposition, Mellon Trust Development Vice President Barbara Robinson testified that:

- all realized and unrealized gains were part of the principal [corpus] of the five trust accounts and AHERF did not have access thereto; **[Robinson 67:21-68:24]**
- all interest and dividends had been distributed to the income beneficiaries; **[Robinson 65:24-67:20, 69:15-25]**
- the increase in market value from the original funding of each of the Lockhart trusts was due entirely to these realized or unrealized gains; and **[Robinson 164:8-14]**
- based on her review of SFAS 116 and 117, none of the trust corpus could be fairly characterized as being temporarily restricted [or unrestricted]. In her view, the entire corpus was permanently restricted. **[Robinson 179:3-10]**

For the reasons set forth above, all of the corpus in the five trusts, including net capital gains, should have been classified as permanently restricted, as defined by GAAP.

### AHERF's accounting for the endowments

C&L's workpapers document the aggregate fair value of the year-end balances of the five irrevocable trust accounts:

| As of | Fair Value | Bates reference |
|-------|------------|-----------------|
| 6/30/95 | $ 76,110,000 | CL 010419 |
| 6/30/96 | $ 87,305,000 | CL 006628, 35, 42, 50, & 56 |
| 6/30/97 | $ 103,754,000[2] | CL 021343 |

The following table summarizes the changes in investment balances and classifications of net assets of the five trusts from June 30, 1995 through June 30, 1997 as reported by AHERF:

---

[2] Includes $526,000 of unrestricted undistributed dividend and interest income that was received or accrued.

| | Permanently restricted net assets[3] | Temporarily restricted net assets | Unrestricted net assets |
|---|---|---|---|
| July 1, 1995 reclassification of the June 30, 1995 balance of $66,532,000, at cost , of the five trusts purportedly to conform to SFAS 116 and 117 | 5,387,000 | 61,145,000 | |
| Add unrealized gains as of June 30, 1995 to conform to SFAS 124 | | 9,578,000 | |
| Reclassification of gains on three trusts to unrestricted net assets | | (13,457,000) | 13,457,000 |
| **June 30, 1995 balance, as reclassified in AHERF's audited FY'96 financial statements** | 5,387,000 | 57,266,000 | 13,457,000 |
| FY'96 gains realized on sales of investments | | | 7,444,000 |
| Net increase in unrealized gains from June 30, 1995 to June 30, 1996 | | | 3,751,000 |
| Assets released from restriction for use in operations | | (4,478,000) | 4,478,000 |
| **June 30, 1996 balance, as reflected in AHERF's audited FY'96 financial statements** | 5,387,000 | 52,788,000 | 29,130,000 |
| FY'97 gains realized on sales of investments | | | 18,065,000 |
| Assets released from restriction for use in operations | | (36,663,000) | 36,663,000 |
| Net decrease in unrealized gains from June 30, 1996 to June 30, 1997 | | (1,889,000) | |
| Reclassification of investments incorrectly labeled in company documents as a decrease in unrealized gains from June 30, 1996 to June 30, 1997 | | (2,157,000) | 2,157,000 |
| Unidentified difference | | | 273,000 |
| **June 30, 1997 balance, as reflected in AHERF's audited FY'97 financial statements** | 5,387,000 | 12,079,000 | 86,288,000 |

Upon early adopting SFAS 124 as of July 1, 1995, AHERF added $9,578,000[4] of unrecorded net unrealized gains to Temporarily restricted net assets.

During FY'96, AHERF reclassified $17,935,000 of the fair value as of June 30, 1995 of three of the trusts' assets (net of the $4,400,000 originally donated, permanently restricted portion) to unrestricted net assets, of which $13,457,000 was directly reclassified from restricted net assets to unrestricted net assets retroactive to June 30,

---

[3]  The $5,387,000 reclassified as Permanently restricted net assets represents AHERF's total estimated amount of the originally donated assets (all securities).

[4]  AHERF included the $9,578,000 in the $17,974,000 increase in Temporarily restricted net assets reflected on its FY'96 Consolidated Statement of Changes in Net Assets under the caption "Adjustment from change in accounting principle."

1995. This direct reclassification to unrestricted net assets was done during the time of the year-end audit. **[CL 010420]** C&L noted that AHERF made the adjustment because there were no restrictions on the income of those three trusts. **[Ex. 4109: Note A]** The remaining $4,478,000 of the $17,935,000 was recorded as unrestricted income during FY'96, as discussed below. Therefore, the restated balance of Temporarily restricted net assets as of July 1, 1995 was $57,266,000, which included the $4,478,000 from the three trusts (prior to the income recognition) and approximately $52,788,000[5] of unrealized and realized gains prior to June 1, 1995 on the other two trusts (the largest Lockhart Trust and the Oliver Trust). C&L noted that AHERF classified those two trusts as being subject to temporary restrictions because the terms of the trust agreements contained "general restrictions" on the use of income. **[Ex. 4109: Note B]**

In FY'96, AHERF included realized gains of $7,444,000 **[CL 010420]** on sales of the trusts' investments and the increase in net unrealized gains during FY'96 of $3,751,000[6] **[CL 010420]** as unrestricted investment income in its Statement of Operations. These gains related to all five of the trusts. It included the aforementioned $4,478,000 **[CL 010420]** in the $18,916,000 amount reported as "Net assets released from restrictions used for operations" in AHERF's FY'96 Consolidated Statement of Operations. The $15,674,000 sum of the "income" amounts from the five trusts was material in relation to AHERF's reported FY'96 consolidated unrestricted income before extraordinary item and change in accounting principle of $6,547,000.

In FY'97, AHERF included realized gains of $18,065,000 on sales of the trusts' investments and $36,663,000 in "Assets released from restrictions used for operations" in income. C&L indicated its understanding of AHERF's rationale for recognizing "Assets released from restrictions" revenue in the amount of $36,663,000 to be that the losses incurred by AHERF in FY'97 justified releasing the assets from temporary restrictions (i.e., for the general good of the organization). The $54,728,000 sum of these two amounts was material in relation to AHERF's FY'97 consolidated net income of $21,926,000.

Also in FY'97, AHERF deducted from Temporarily restricted net assets $1,889,000[7] of net depreciation on the investments (i.e., a net decrease in unrealized capital gains) of the five trusts and apparently shifted an additional $2,157,000[8] of Temporarily restricted net assets pertaining to the five trusts to Unrestricted net assets.

---

[5] Total fair value as of July 1, 1995 was $53,775,000, of which approximately $987,000 represented the estimated fair value of the originally donated assets which was classified as permanently restricted net assets. **[CL 010419]**

[6] Measured by subtracting net unrealized gains of $9,578,000 **[CL 010419]** as of June 30, 1995 from net unrealized gains of $13,329,000 **[CL 006628, 35, 42, 50, 56]** as of June 30, 1996.

[7] Measured by subtracting net unrealized gains of $13,329,000 as of June 30, 1996 from net unrealized gains of $11,440,000 ($103,227,000 total fair value less $91,787,000, at cost, as of June 30, 1997, as per Mellon trust account reports. **[CL 021381, 87, 93, 99, 066117]**

[8] Derived by subtracting the $36,663,000 assets released, $1,889,000 unrealized loss, and $12,079,000 ending balance from the 7/1/96 balance of $52,788,000.

As of at least March 31, 1998, Mellon never distributed any of the capital gains that had accumulated over time in the five trust accounts to AGH or AHERF. As of March 31, 1998, their total market value had increased to $118.5 million. **[D 0014908]**

## Violations of GAAP

Because of the permanent restrictions placed on use of the capital gains of the five irrevocable trusts, AHERF violated GAAP by classifying those realized and unrealized gains as unrestricted or temporarily restricted net assets as of July 1, 1995, June 30, 1996 and June 30, 1997. None of the aforementioned gains and reclassifications should have been reflected as temporarily restricted or unrestricted net assets. In recognizing unrestricted income relating to the capital gains on the five trusts, as described above, AHERF materially overstated its net income for FY'96 and FY'97. Also, these misclassifications constituted material misstatements of AHERF's balance sheet as of July 1, 1995, June 30, 1996, and June 30, 1997.

In classifying over $57 million of realized and unrealized gains relating to the five irrevocable trusts as "temporarily restricted" as of July 1, 1995, AHERF created a "cookie jar" from which AHERF's management could, and did improve, AHERF's unrestricted net income in FY'96 and FY'97.

Thus, even if capital gains on the five trusts constituted "income" (which they did not) and were not required to be classified as permanently restricted corpus, AHERF should have treated the capital gains as unrestricted, not temporarily restricted, income and net assets as of July 1, 1995 because "income" on the five trusts was not subject to a donor-imposed restriction as defined in SFAS 116. Had AHERF done so, it would not have been able to recognize $4,478,000 and $36,663,000 of "Assets released from restrictions" in revenue in FY '96 and FY '97, respectively.

Even the caption "Assets released from restriction used for operations" was false and misleading as no corpus was ever released by Mellon from restriction and no such funds were ever "used" in operations.

## Violations of GAAS

The newly adopted requirements of SFAS 116, 117 and 124 presented significant new accounting and financial reporting issues to AHERF. This new accounting coupled with the significance of the amounts involved created greater than normal audit risk which GAAS required C&L to consider in its audit strategy and the conduct and scope of its audit. Specifically, C&L should have exercised heightened professional skepticism in the planning and conduct of its audits to achieve reasonable assurance that material errors in the accounting for these five irrevocable, permanent trusts would be detected.

In FY'96, C&L violated SAS 22, SAS 47, and SAS 53 by failing to adequately respond to the risk of material misstatement of AHERF's financial statements considering the pervasive effect the accounting for the five irrevocable trusts had thereon. Its failure in

FY'96 contributed to its repeated failures in its FY'97 audit pertaining to the accounting for the five irrevocable trusts.

C&L knew or should have known that appropriate adoption of the new accounting rules was dependent upon the provisions of the various trust agreements. In the absence of reading the agreements, a simple inquiry made directly of a Mellon trust account officer would have determined if AHERF's accounting treatment was consistent with the trusts' provisions. C&L failed to make the inquiry, or to otherwise confirm the propriety of AHERF's reclassifications with Mellon's trust department.

A C&L permanent workpaper binder pertaining to the trust agreements contained a sign-off sheet in front of it with one column identifying the documents that were considered pertinent to the audit and five columns for sign-offs by auditors for fiscal year audits from 1993 through 1997. Initials of a C&L staff person were recorded on the sign-off sheet for each of those years and for each of the trust agreements. Instructions on that sheet requested the auditor to:

> Initial the appropriate column after each of the items listed to indicate that the items have been considered for pertinence to the current audit. **[CL 031992]**

C&L assigned Marc Panucci and James McIntire, two relatively inexperienced staff auditors, to audit the endowments in FY'96 and FY'97, respectively. Mr. Panucci testified that he initialed the sign-off sheet on the "AHERF Endowments" line to indicate that the documents were still pertinent to the current audit. **[CL 031992; Panucci 219:16-21]** Mr. McIntire testified that he signed off to indicate that the agreements were "just included in the permanent binder." He stated that he did not know why C&L wanted to ensure such inclusion. **[CL 031992; McIntire 106:4 - 107:24]**

Mr. Panucci indicated that C&L reviewed all five of the endowment agreements. With respect to the largest Lockhart Trust and the Oliver Trust, which AHERF had classified as being subject to temporary restrictions, he failed to make the important distinction between interest and dividend income and capital gains which were permanently restricted:

> C&L reviewed the endowment agreements and noted the principal was permanently restricted and the income was unrestricted. C&L noted part of the income was kept as temporarily restricted. **[Ex. 4109, Note A]**

With respect to the other three trusts, he wrote:

> C&L reviewed the endowment agreements and noted there were general income restrictions on the items. Management took the current income as unrestricted, since the amount would have been expensed in the current year and any income from the prior years was kept as temporarily restricted. The reason was management was being conservative and could not take the approach the entire

amount has been expensed. C&L agrees with this treatment.[9] **[Ex. 4109: Note B]**

With respect to the approximately $61,145,000 of investment gains realized and accumulated in the five trust accounts through June 30, 1995, Mr. Panucci also noted the following:

> Amount represents income on the endowments from FY 95 and before. In accordance with SFAS 116 the only part that should be in permanent is the original contribution, therefore the prior year amounts were reclassified to temporary and permanent. **[Ex. 4109, Note G]**

However, Mr. Panucci's conclusion ignores the critical distinction between permanently restricted capital gains and interest and dividend income. It also ignores language in the five trust agreements, quoted above, clearly providing that capital gains were to be added to corpus, which was permanently restricted. C&L failed to adequately review the five irrevocable trusts to determine whether AHERF had appropriately classified the trusts' assets in accordance with the donor restrictions contained in the trust agreements.

It is evident that any review of the trust agreements actually performed by any C&L auditor was cursory at best, because the explicit language in four of the five agreements provided that capital gains were to be added to corpus, in direct conflict with AHERF's accounting treatment. In view of the magnitude and pervasive effect on AHERF's FY'96 consolidated financial statements of the revenue recognition and the net asset reclassifications pertaining to these five trusts, GAAS (SAS 31) required C&L to carefully examine the trust agreements to obtain sufficient audit evidence that the accounting conformed to the terms of the trust agreements. Had it done so for even just one of the four larger trusts, it is likely that it would have detected the classification errors, and made the same search or otherwise investigated the possibility that the capital gains in the other four endowments were similarly restricted. However, C&L failed to do so.

A C&L FY'96 audit workpaper states that the original endowment agreements were kept in AHERF's development office, and that copies were sent to AHERF's accounting and legal departments. **[CL 002084]** Also, C&L's permanent file for Endowments indicated that "copies of full agreements maintained by Al Zwirn, AGH acctg." **[Ex. 4061; CL 031994]** Mr. Zwirn testified that he maintained a binder that contained full copies of the agreements. He identified Ex. 4111 as a copy of the original binder he maintained and Ex. 2221 as a copy of his binder that he made when the SEC requested his original binder. **[Zwirn, 24:1-30:11.]** Both binders contain full copies of the Lockhart Trusts

---

[9] Apparently he was attempting to justify the delay in reporting the $4,478,000 portion (see the table above) of the aforementioned $17,954,000 as "Assets released for use in operations" during FY'96 until losses were incurred to justify taking it into income, instead (albeit improper) of it being classified as unrestricted net assets as of July 1, 1995 along with the $13,476,000 portion thereof that was so classified. Notably the $13,476,000 did not improve the FY'96 statement of operations, whereas the $4,478,000 did. I disagree with Mr. Panucci's and C&L's engagement team's implied conclusion that the opening restated balance sheet, which was never presented, needed to be more conservative than the FY'96 statement of operations, which was anything but conservative.

and the Oliver Trust, including the language pertaining to capital gains. Therefore, the agreements were readily available for C&L's examination.

Mr. Buettner testified that he was not certain whether the FY'96 AHERF audit team had in fact reviewed the respective trust documents to gain an understanding of the various trust provisions:

> It was my understanding that Mark Panucci reviewed documents that were made available to him by…AHERF management. I'm not sure that in every case you would call it an endowment agreement…, but it was documentation that basically outlined the terms of an endowment or the fact that an endowment existed. **[Buettner, 468:19-469: 1]**

***

> I believe Miss Frazier told me that AHERF management told her or told the engagement team that they simply did not have total portions of the trust agreements and they gave us what they had. **[Buettner, 471:4-8]**

Mr. Buettner testified that he was not concerned that the AHERF engagement team, going into the final report period in FY'96, did not have full copies of the Lockhart Trust agreements because he understood that the client performed an exhaustive search and was doing what it could do to adopt the provisions of SFAS 116 and 117. **[Buettner, 475:25-476:9]**

No evidence is provided in C&L's audit workpapers in connection with either the FY'96 or FY'97 audits or through testimony[10] that the C&L audit team requested AHERF to contact Mellon to obtain missing portions of the Lockhart trust documents. Given the magnitude of these trusts and their materiality to AHERF's financial statements, C&L should have done so.

Ms. Robinson stated that she had no recollection of any inquiry from C&L about the trust documentation during calendar years 1996 and 1997, **[Robinson 174:6-24, 191:7-192:22]** although she remembers complying with requests by other auditors about trust documentation in the 1995 through 1997 time frame in conjunction with the adoption of the new accounting standards **[Robinson 177:12-177:23]** She further testified that Mellon routinely provided auditors with requested copies of trust documents, and she has no reason to doubt that she and Mellon would have provided copies of the five trust agreements to C&L if it had requested them. **[Robinson 176:10-177:11]** She also stated that she would be the person at Mellon to whom such requests would be directed. **[Robinson 174:21-175:11]**

---

[10] Mr. Buettner testified that he never told anyone at AHERF to contact Mellon nor was he aware that anyone on his engagement team requested AHERF to do that in connection with the FY'96 or FY'97 audit. **[Buettner 475:1-24]**

Manager Amy Frazier testified as to having doubts as to the definition of income in the trust agreements:

> Q. When you say income was not clear, or restrictions on income was not clear, or the interpretations related to income was not clear, what do you mean by income?

> A. The availability of ...unrealized, realized gains and interest income, dividends and earnings.
> **[Frazier 391:22-392:3]**

However, there is no indication that C&L either made inquiry of the trustee, compelled AHERF to engage or itself engaged the services of a lawyer (i.e., a legal specialist) to interpret trust agreement clauses it felt were difficult to understand or, if it deemed necessary, to provide an opinion as to how state law applied to use of the five trusts' assets.

In its June 30, 1997 Issues memo about "Non-recurring revenue," which discussed unusual and significant amounts of revenue recognized in FY'97, C&L noted:

> AHERF recorded approximately $36.6 million of revenue related to expiration of restrictions on temporarily restricted investments. The restriction on the monies was that they were to be used for the good of the organization. Due to expenses being greater than expected at AHERF, this money was released into income to cover the additional expenses that were not transferred out to the affiliates. Approx. $12 million of this temporarily restricted monies remains at 6/30/97.
> **[CL 012585]**

C&L posted to its 1997 Summary of Unadjusted Differences ("SUD") schedule a proposed adjustment to release into unrestricted income the remaining $12.1 million of temporarily restricted net assets pertaining to the five trusts as of June 30, 1997. This entry was improper for the reasons discussed herein. With that SUD entry, the adjustments proposed by C&L in its FY'97 audit netted to a reduction of net results of operations of $2,155,000, which C&L waived as being immaterial. **[CL 012582]** Without that erroneous $12.1 million SUD entry, the adjustments proposed by C&L in its FY'97 audit netted to a $14,234,000 reduction of net income, which together with other misstatements as discussed in this report, was certainly material by any standard of measurement to the $21,926,000 consolidated net income AHERF reported for FY'97.

The only reasonable explanation for C&L's misunderstandings of the unequivocal language in the Lockhart Trust instruments, which permanently restricted the use of capital gains for any purpose other than generating interest and dividend income, is that it failed to examine and apply the provisions of the trust agreements, did not use the services of an independent attorney to interpret them, and did not discuss their classifications and restrictions on use with Mellon Bank (i.e., Ms. Robinson). Therefore, it failed to obtain sufficient competent evidential matter to corroborate Management

representations on which it unduly relied.

C&L knew or should have known (a) from its many years of performing AHERF audits and (b) the growth of the balances from original amounts donated to June 30, 1996 that none of the capital growth of the investments had been distributed by Mellon. Deeming the assets to be released from restrictions for the good of the organization would seemingly have entitled AHERF to use these funds. This paradox should have heightened C&L's professional skepticism and compelled it to learn why none of the accumulated capital gains had ever been distributed to AHERF and whether such balances were, in fact, available in accordance with the provisions of the trust agreements. I did not see any documents or testimony to indicate that it did so.

In summary, C&L violated SASs 22, 31, and 41 in that I have seen nothing in C&L's FY'96 and FY'97 audit workpapers to demonstrate that it performed any meaningful audit procedure to afford it a reasonable basis upon which to conclude, as it did, that the classifications of the trust assets were free from material misstatement. Because they were not free from material misstatement, the FY'96 and FY'97 financial statements taken as a whole were materially misstated. C&L violated SAS 53 by failing to demonstrate the appropriate degree of professional skepticism in conducting this area of its FY'96 and FY'97 audits. C&L also violated SAS 19 in failing to corroborate Management's stated and implied assertions about the propriety of its treatment of the capital gains of the five irrevocable trusts in FY'96 and FY'97.

The following extract from Mr. Buettner's testimony indicates C&L's undue reliance on AHERF's management with respect to the classifications by restriction:

> The classification was determined by AHERF management. Our conclusion on whether we agreed or disagreed on that classification was based on information given to us by AHERF management, some of it in writing, some of it in interpretation or oral. **[Buettner 478:21-479:6-11]**

## Effect of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on AHERF's consolidated financial statements are reflected in correcting entry number 4, which is presented in Appendix III of this report.

6