## 6.  C&L failed to require AHERF to correct its improper financial reporting of cost rate adjustments

### Background

AHERF's hospital entities filed claims in the ordinary course of business with Medicare, Pennsylvania Medical Assistance, and Blue Cross that included overhead costs based on an estimated rate of reimbursement for each fiscal year. The estimated reimbursement rate was based on assumptions as to costs, certain types of other income, and patient volume.

Subsequent to each fiscal year from at least 1990 through fiscal year 1997, annual cost reports were filed for each AHERF hospital entity.[1] The cost reports purported to comply with the third-party payors' rules and regulations to report (i) total allowable costs incurred during the year, determined on a departmental level net of other income (e.g., interest income) and (ii) certain statistical data pertinent to determining average cost for services. The cost reports compared the actual net allowable costs to the total costs reimbursed based on an estimated reimbursement rate throughout the year through paid claims. The net amount of over and under-reimbursements reflected in the cost reports represented an amount due to or from the third-party payor, subject to audit by the third-party payor.

The time period from the initial filing of a cost report to final settlement could span from one to several years. **[Scharf 39:23-40:4; 42:21-23]** Over this period of time, the process affecting the final settlement typically included the following:

- Cost reports were filed three to five months after the June 30 year-end, reporting over and under-reimbursements for the fiscal year.[2]
- Following receipt of the cost report, the third-party payor would either make preliminary adjustments or accept the cost report as filed. This resulted in a tentative settlement and, if applicable, a payment to the hospital or a request for payment from the hospital.
- The third-party payor[3] would exercise its regulatory or contractual rights to conduct a field or a desk audit of the cost report, and to add, modify or reject any costs or other income that it deemed had been omitted or reported incorrectly under its reporting rules and regulations.
- AHERF's Reimbursement Department would respond to the audit findings by submitting requested information, arguing technical matters, and/or accepting some or all of the findings of the third-party payor.

---

[1]  Senior Director of Reimbursement Joseph Scharf testified that AHERF's Philadelphia-area hospitals filed their own reports through fiscal 1994. Thereafter, the cost reports were compiled in Pittsburgh by the Reimbursement Department **[Scharf 69:14-25]**, which was one component of Corporate Support Services ("CSS").

[2]  The Medicare cost report was due within five months of the AHERF hospital's fiscal year end. **[Scharf 37:6-8]** Blue Cross and Pennsylvania Medical Assistance generally followed the rules prescribed for filing Medicare reports. **[Scharf 21:10-14]**

[3]  Medicare's appointed regional intermediary, which was usually a large insurance company, processed claims and reviewed and audited Medicare cost reports on behalf of Medicare.

- A final settlement would be reached, resulting either in a payment by the hospital to the third-party payor or a receipt by the hospital from the third-party payor.[4]

**[Scharf 35:18-40:9]  [Girol 38:24-47:5]**

As of the year-end balance sheet date for which the annual cost reports were filed, the Reimbursement Department was responsible for making the initial estimates of the final settlement amounts that would occur in the future with respect to each such cost report. A separate cost rate adjustment ("CRA") account was created in each hospital's general ledger for each fiscal year and for each third-party payor for purposes of recording such initial estimates. The initially recorded estimate was subject to revision based on subsequent events such as audits by payors, tentative settlements, and final settlement.

Based on findings from audits conducted by or on behalf of third-party payors, the initial CRA estimates recorded in the general ledgers sometimes differed from the amounts of recovery or obligation reflected in the initial cost reports. According to the testimony of Mr. Scharf, the cost reports were more in the nature of an aggressive estimate, although there was a good faith belief to claim all of the reimbursement on the cost reports. **[Scharf 238:2-12]**

## Relevant GAAP

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

SFAS 5 establishes standards of financial accounting for and reporting of a loss contingency, which it defines as an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. SFAS 5 states:

> An estimated loss from a loss contingency shall be accrued by a charge to income if *both* of the following conditions are met:
> a. Information available prior to the issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
> b. The amount of the loss can be reasonably estimated. (¶ 8)

SFAS 5 defines "probable" for these purposes to mean "[t]he future event or events are likely to occur." Occurrence of a loss contingency might instead be remote, meaning that

---

[4] Even after final settlement, the third-party payors could reopen the fiscal year based on certain findings made subsequent thereto. If, after a final Medicare settlement, AHERF determined it was owed an additional amount or that it owed Medicare an additional amount, it had up to three years to request a reopening of the year.  **[Scharf 40:10-41:16, 234:7-18]**

the chance is slight that it will occur; or might be reasonably possible, which places the likelihood of loss between probable and remote.  (¶ 3)

The condition that a loss contingency be accrued if it is probable that a liability has been incurred is intended to prohibit recognition of losses that relate to future periods but to require accrual of losses that relate to the current or a prior period.  (¶ 71)

With respect to losses associated with unasserted claims and assessments, SFAS 5 provides, in relevant part:

> ... If an unfavorable outcome is probable but the amount of loss cannot be reasonably estimated, accrual would not be appropriate, but disclosure would be required...
> (¶ 38)

The accrual of losses for general or unspecified business risks is prohibited by the following language:

> Some enterprises in the past accrued so-called 'reserves for general contingencies.'  General or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made.  (¶ 14)

With respect to the requirement that the loss be reasonably estimable, SFAS 5 states, in relevant part:

> The requirement that the loss be reasonably estimable is intended to prevent accrual in the financial statements of amounts so uncertain as to impair the integrity of those statements.  (¶ 59)

SFAS 5 indicates that gain contingencies should not be recorded until realized; it states:

> a. Contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.
> b. Adequate disclosure shall be made of contingencies that might result in gains, but care shall be exercised to avoid misleading implications as to the likelihood of realization.  (¶ 17)

Financial Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss - an Interpretation of FASB Statement No. 5* ("FIN 14")

FIN 14 addresses situations in which the criteria of SFAS 5 have been met for loss recognition (loss is probable and estimable) but no single amount within the range of loss appears at the time to be a better estimate than any other amount within the range.  It states, in relevant part:

When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. (¶ 3)

Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20")

APB 20 describes the need for estimates in preparing financial statements; it states:

Changes in estimates used in accounting are necessary consequences of periodic presentations of financial statements. Preparing financial statements requires estimating the effects of future events. Future events and their effects cannot be perceived with certainty; estimating, therefore, requires the exercise of judgment. Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained. (¶ 10)

With respect to reporting a change in accounting estimate, APB 20 states:

The Board concludes that the effect of a change in accounting estimate should be accounted for in (a) the period of change if the change affects that period only or (b) the period of change and future periods if the change affects both. (¶ 31)

APB 20 describes accounting errors, contrasts them to changes in accounting estimates, and mandates that they be reported as prior period adjustments; it states:

Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared. In contrast, a change in accounting estimate results from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error ... (¶ 13)

The Board concludes that the correction of an error in the financial statements of a prior period discovered subsequent to their issuance should be reported as a prior period adjustment. (¶ 36)

Statement of Financial Accounting Standards No. 16, *Prior Period Adjustments* ("SFAS 16")

SFAS 16 sets forth the requirement that an item of profit and loss related to the correction of an error in the financial statements of prior periods shall be accounted for and reported as a prior period adjustment and excluded from the determination of net income for the current period.[5] (¶ 11. a.)

---

[5] This paragraph was superseded by SFAS 109 (¶ 288. n.) but the requirement was unchanged.

Accounting Principles Board Opinion No. 9, *Reporting the Results of Operations* ("APB 9")

APB 9 sets forth the requirements for reporting prior period adjustments; it states:

> When prior period adjustments are recorded, the resulting effects (both gross and net of applicable income tax) on the net income of prior periods should be disclosed in the annual report for the year in which the adjustments are made. When financial statements for a single period only are presented, this disclosure should indicate the effects of such restatement on the balance sheet of retained earnings at the beginning of the period and on the net income of the immediately preceding period. (¶ 26)

FASB Concepts Statement No. 6, *Elements of Financial Statements* ("CON 6")

In discussing the elements of financial statements, CON 6 defines liabilities as:

> Probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions. (¶ 35)

Paragraph 70 of SFAS 5 provides support to the notions that liabilities represent present obligations to other entities by quoting other definitions of liabilities published in accounting literature, as follows:

> Liabilities are claims of creditors against the enterprise, arising out of past activities, that are to be satisfied by the disbursement or utilization of corporate resources.[6]

> A liability is the result of a transaction of the past, not of the future.[7]

AICPA Audit and Accounting Guide, *Audits of Providers of Healthcare Services,*[8] (the "Audit Guide")

In addition to providing recommendations on the application of generally accepted auditing standards, the Audit Guide also provides recommendations on financial accounting and reporting principles. With respect to amounts realizable from third-party payors for health care services, the Audit Guide provides:

---

[6] Referenced to "American Accounting Association, *Accounting and Reporting Standards for Corporate Financial Statements and Preceding Statements and Supplements* (Sarasota, Fla.: AAA, 1957), p. 16."

[7] Referenced to "Maurice Moonitz, 'The Changing Concept of Liabilities,' *The Journal of Accountancy*," May 1960, p.44."

[8] The relevant Audit Guides were those published as of May 1, 1994 (the "1994 Guide"), effective beginning in 1990, and as of June 1, 1996 (the "1996 Guide"), effective for AHERF's FY'97 year-end.

Under a retrospective rate-setting system, an entity may be entitled to receive additional payments or may be required to refund amounts received in excess of amounts earned under the system. Although final settlements are not made until a subsequent period, they are usually subject to reasonable estimates and are reported in the financial statements in the period in which services are rendered. Differences between original estimates and subsequent estimate revisions (including final settlements) are included in the statement of revenue and expenses in the period in which the revisions are made in accordance with APB Opinion No. 20, *Accounting Changes.* Those differences are not treated as prior period adjustments unless they meet the criteria for prior period adjustments as set forth in FASB statement No. 16, *Prior Period Adjustments.* (¶ **7.09**)[9]

GAAP Summary

When facts and circumstances indicate that it is no longer probable that an obligation exists for all or a portion of a recorded liability, GAAP requires that the obligation be reduced to reflect the amount that is expected to be paid. An adjustment to an estimated liability should be accompanied by an adjustment to the account, typically an expense, that was recorded when the liability was initially established.

An accounting estimate must be revised in the period when information first becomes available to better determine the amount that is likely to be paid to satisfy the obligation, which is when uncertainties are partially or fully resolved. When an estimated obligation is not properly adjusted in the appropriate period, an excessive reserve can result. If such excessive reserve is corrected and reduced in some later period, GAAP requires that the correction be treated as a prior period adjustment. Such treatment removes the income statement effect of the correction from the current period and pushes the effect back to the period or periods when it should appropriately have been reduced (or adjusts beginning net assets).

Intentional failure to reduce excessive reserves on a timely basis can be a form of management fraud (assuming the amounts are significant) when such excess reserves are used to improve earnings in future periods when reducing or eliminating them (a) by recognizing revenue or reducing expense, or (b) by recording or increasing a bona fide liability or reducing an asset without reducing revenue or increasing an expense.[10]

### **AHERF's accounting for CRAs**

AHERF's accounting policy regarding CRAs was set forth in its Accounting Policies notes to its FY'96 and FY'97 consolidated financial statements under the caption of "Net patient service revenue:"

---

[9] In the 1996 Guide, the reference is ¶ **5.07**.
[10] Shifting reserves from reserve accounts to liability and asset accounts by-passes the statement of operations, which may be inappropriate, as explained herein.

...Net patient service revenue is reported at the estimated net realizable amounts from patients, third-party payors, and others for services rendered, including estimated net retroactive adjustments under reimbursement agreements with third-party payors. Retroactive adjustments are accrued on an estimated basis in the period the related services are rendered and adjusted in future periods as final settlements are determined. **[PwC 0050495, CL 044501]**

Consistent with its treatment of the estimated reimbursements as part of net patient service revenue, AHERF entities reported all CRA account balances as a component of net patient accounts receivable (whether recoveries or obligations). **[CL 049729]** Based on this accounting policy, any subsequent revisions of estimates would properly be recorded as part of net patient service revenue.

### Violations of GAAP

This section is intended to provide an overview of AHERF's GAAP violations related to its CRA accounts. Specific examples of the GAAP violations are contained in the Addendum to this Basis for Opinion.

As of June 30, 1995, AHERF's audited financial statements unreasonably overestimated amounts that the hospital entities would be required to repay the third-party payors and failed to appropriately reduce certain CRA obligations (reserves) despite information that portions of the recorded obligations no longer represented probable liabilities. When these excessive reserves were later reduced, rather than properly account for the correction as a prior period adjustment increasing the opening balance of unrestricted net assets, AHERF used the excessive CRA reserves to materially overstate its FY'96 and FY'97 earnings by:

- taking them into net patient service revenue in FY'96 or FY'97;
- shifting them to unrelated CRA accounts or to certain other accounts that were similarly reported as components of net patient accounts receivable instead of adjusting net patient service revenue or an expense account in the appropriate fiscal year; and
- charging unrelated losses against a CRA reserve account, instead of recognizing an expense in the current fiscal year for the unrelated loss.

For example, AHERF Director of Reimbursement Joseph Scharf testified that he kept track of excess CRA reserves and that management would come to him when they needed to take portions of excess CRA reserves into income. **[Scharf 160:19-161:9]** Mr. Scharf also testified that undesignated or unallocated reserves might also be used to cover another year or another CRA account that might be under-reserved. **[Scharf 77:18-81:9]**

AHERF's financial staff knew of the excessive reserves in CRA accounts. They compiled schedules called "Analysis of Reserves," which listed excessive reserves that the staff deemed available to use whenever it chose to improve earnings. A listing of

excess reserves as of June 30, 1995 and 1996 includes lines captioned "Prior Year CRA" that reflect Hahnemann University Hospital ("Hahnemann") had excess CRA obligations totaling $19.5 million as of June 30, 1995. Such schedules showed that by June 30, 1996 the entire $19.5 million of excess reserves had been eliminated without recording any prior period adjustment. **[Ex. 10: TN C9A 01351-52]**

The following extract from the testimony of Duane Girol, the C&L specialist responsible for auditing the CRA account balances, indicates his view that no misstatement occurred if reserves were merely shifted around:[11]

> ...[I]n my tenure at Coopers & Lybrand, if we had designated some sort of reserve as being excessive, it was always acceptable to apply that reserve in some area where you needed reserves. I mean, money's fungible; you can move it back and forth. You don't have to eliminate one reserve and book another reserve if you can just move balances around." **[Girol 126:2-10]**

Mr. Girol's statement is correct only to the extent that adjustments to reserve balances represent appropriate current period revisions of estimates and not corrections of errors that should have been treated as prior period adjustments.

Many hospitals base their initial CRA estimates on the results of compiling a given year's cost report using a range of alternative assumptions with respect to allowable costs and allocations thereof. Further, cost reports (and the related CRA account balances) typically fall within the calculated range. It is also my understanding that when a hospital does not perform its own calculations based on a range of alternative assumptions, such calculations are often made by the independent auditor in order to test the reasonableness of the hospital's estimates.[12]

The initial CRA estimates made with respect to AHERF's cost reports should have taken into consideration, among other things, the degree of uncertainty or probability of various reimbursement assumptions, historical results from third-party payor's audits, current year changes in compiling the cost report (that make it inconsistent with prior year filings), and new rules and regulations or notifications of interpretations issued by third-party payors with respect to specified types and allocations of costs.

As new and better information became available to AHERF's Corporate Reimbursement Department, it should have revised the initial CRA estimates and increased or decreased net patient service revenue accordingly. Often, it did not do so. Under Mr. Scharf's directives, as authorized by Stephen Spargo, his direct superior and Senior Vice President of Corporate Support Services, excessive amounts of obligations were embedded in many

---

[11] As also discussed in Bases for Opinions 7 and 8, C&L proposed no adjustments although it knew that many of the previously existing excessive reserves it had identified were being shifted all over AHERF's balance sheet without any adjustments being made to revenues and expenses.

[12] This practice would be consistent with SAS 57, which provides that in evaluating the reasonableness of an accounting estimate, an auditor may choose to develop an independent expectation of the estimate.

of the CRA account balances. **[Scharf 66:6-67:8]** This was accomplished in various ways, including the following:

- failing to record any reduction in a CRA obligation even when an event occurred that warranted such reduction;
- recording receipts of tentative settlements as if they were CRA obligations (i.e., as if the hospital would have to return the funds upon final settlement) **[Scharf 38:2-39:22]**; and
- recording unsupported increases in CRA obligations.

Mr. Scharf went out of his way to avoid any large negative swings from his estimates to actual findings. He testified that he tended to err on the side of having excess reserves **[Scharf 62:14-23]**. For example, with respect to a hypothetical swing of $4 million between a cost report showing a receivable from Medicare of $2 million and a later finding by Medicare that the hospital owed Medicare $2 million, he said:

> Better not have a swing that bad. I wouldn't have a job. **[Scharf 56:12-13]**

Mr. Spargo provided additional testimony as to the existence and use of excess CRA reserves:

- In FY'96, AHERF and C&L personnel discussed a search for reserves to solve a $17.5 million shortfall in DVOG's allowance for bad debts in which a total of $7 million of CRA accounts from Hahnemann and St. Christopher's Hospital for Children were identified. **[Spargo 193:10-195:20; TN RC013 01853]**
- Certain analyses of CRA balances included three categories of cushions: specific, debatable, and general. "General" cushions were considered free reserves—"there's no specific reason or purpose or use of a general cushion. It's just because we don't need to reflect as much income or as much on the balance sheet, so we back off when we book the CRA balance." [13] **[Spargo 296:4-298:21]**
- AHERF set up excess CRA reserves in connection with the acquisition of Hahnemann in FY'95. **[Spargo 348:17-349:11]**
- Excess CRA and general reserves were established in connection with the acquisition of the Graduate Hospital System in FY'97 which Mr. Spargo believed would not be necessary and could be used for alternative purposes. **[Spargo 349:17-352:10]**

AHERF Senior Director of Finance Al Adamczak testified with respect to a $7.1 million AGH CRA reserve that had been established through the capitalization of interest. When asked why capitalized interest would have been recorded as a CRA reserve he responded, "That's often where we kept a lot of the general reserves." **[Adamczak 156:9-157:21]**

---

[13] Mr. Spargo defined a "specific" cushion as an issue that AHERF was near 100% sure that it would prevail on, whereas a "debatable" cushion was defined as having less of a likelihood of victory. Based on these definitions, it would seem that any "specific" cushion was also an excessive reserve.

As further described in the Addendum, AHERF's GAAP violations with respect to its CRA accounts resulted in materially overstated net results of operations as reported in AHERF's and its subsidiaries' FY'96 and FY'97 consolidated or combined financial statements.

## Violations of GAAS

This section is intended to provide an overview of C&L's GAAS violations with respect to its audit of the CRA accounts. Additional specific examples of C&L GAAS violations are discussed in the Addendum.

C&L's principal audit procedures with respect to its FY'96 and FY'97 audits of CRA accounts were limited to the following:

- it obtained rollforward analyses of CRA account balances that showed prior year-end balances, the changes in CRA balances, and current year-end CRA account balances **[CL 013946]**;
- it requested from the Reimbursement Department any evidential support it had with respect to changes in CRA account balances that occurred from the prior year-end **[CL 013946]**;
- it provided the support it obtained to C&L Health Care Regulatory Group ("HCRG") manager Duane Girol, who, because of his expertise, was assigned as a member of the audit team to review the documentation, discuss account balances with Mr. Scharf and evaluate the adequacy of the CRA estimates. **[CL 014164; Scharf 83:22-85:20]**

The nature of these procedures indicate that from the three possible approaches outlined in SAS 57 for evaluating the reasonableness of an accounting estimate, C&L elected to evaluate CRA estimates by reviewing and testing the process used by management to develop them.[14] However, C&L's procedures to review and test the process used by management to develop the CRA estimates were inadequate. C&L's workpapers contained no evidence that it had performed any of the following procedures recommended by SAS 57:

- identification of the sources of data and factors that management used in forming the assumptions and consideration as to whether such data and factors were relevant, reliable, and sufficient for the purposes based on information gathered in other audit tests;
- evaluation of whether the assumptions were consistent with each other, the supporting data, relevant historical data, and industry data; or
- testing the calculations used by management to translate the assumptions and key factors into the accounting estimate.

---

[14] The other two possible approaches were to develop an independent estimate or to review subsequent events.

Due to the relative significance of the amounts involved and the complexity of determining health care service revenue and cost reimbursements, there are risks inherent in the determination of such amounts.[15] SAS 47 highlights the relatively higher degree of risk associated with accounting estimates and amounts based on complex calculations. These risks and uncertainties were noted by William Buettner who testified that CRAs were "a subjective area, so the area is ripe for different interpretations ... we would view that as being a complicated area so that the inherent risk would be greater than in other areas ..." **[Buettner 370:23-25, 365:7-21]** Mr. Girol also testified that the review of CRA accounts was considered a high risk area of the audit. **[Girol 138:7-9]** C&L was required by SAS 47 and the Guide to consider these identified risks in designing its audit procedures with respect to the estimated CRA account balances in order to gain sufficient assurance that the balances were not materially misstated.

C&L's CRA audit workpapers consisted primarily of rollforward analyses, a summary schedule that reflected which cost reports were "final settled," Mr. Girol's handwritten notes from his discussions with Mr. Scharf, copies of journal vouchers that adjusted account balances, and copies of certain correspondence with third-party payors. In contrast to the procedures set forth in SAS 57, these audit workpapers did not identify the factors that the Reimbursement Department had used in making its CRA estimates, did not include tests of CRA estimate calculations, and did not include documentation to support the reasonableness of the ending balances. While copies of documents evidencing cash receipts or payments do support some of the postings made to the accounts, they provide no support as to the reasonableness of the estimates comprising the ending CRA account balances.

SAS 57 provides that the auditor should normally consider the historical experience of the entity in making past estimates. In addition, the Audit Guide provides the following specific examples of auditing procedures related to the initial preparation and subsequent settlement of cost reports:

- Test cost reimbursement reports and other settlement reports to determine that they are prepared on the basis of the appropriate principles of reimbursement;

- Review third-party payor audit reports and adjustments for prior years' cost reports or settlements to consider whether (1) the effect of such adjustments has been properly reported in the financial statements and (2) adjustments of a similar nature apply to the current period;

- Review third-party payor contracts and methods of payment and test the entity's computation of estimated adjustments to revenue to requirements under such contracts by—
  - Comparing prior-year settlements with prior-year estimates and determining that all differences have been accounted for properly.

---

[15] These risks are noted in the 1996 Guide; par. 2.07 and 2.09 and the 1994 Guide: par. 4.08.

o  Test the entity's procedures for determining retrospective revenue
   adjustments as a result of third-party settlement negotiations.
(Emphasis added)

However, I have seen no evidence in C&L's workpapers that it quantified and analyzed
the differences between final settlement amounts and previously estimated amounts as
indicators of the reasonableness and reliability of AHERF's estimation process.
I have also seen nothing in C&L's workpapers to indicate that it reviewed AHERF's cost
reports or compared such reports with the recorded CRA estimates. As noted in
Addendum 1, there were significant differences between the amounts reflected in certain
cost reports and the amounts recorded in the related CRA accounts. A comparison of the
two would have provided C&L with critical audit evidence raising concerns with respect
to the reasonableness of the recorded amounts. Mr. Scharf testified that Mr. Girol
reviewed the documents furnished to the staff auditor and then "came in and talked to me
for a short period of time." **[Scharf 84:20-22]** According to Mr. Scharf, C&L personnel
and he "never had meetings to go over the cost reports." **[Scharf 75:15-19]** "We never
got into the cost reports. I mean, they were looking to see what was filed and what was
settled. They didn't get into specific questions about the cost reports themselves."
**[Scharf 238:22-239:2]**

The settlement amount reflected in the cost report as originally filed is a benchmark upon
which the initially recorded CRA account estimate should have been based, taking into
consideration the possible effects of aggressive positions taken in the cost report. By
ignoring the cost reports and by not requiring that AHERF run alternative calculations
using less aggressive positions, or doing so itself, C&L had no reasonable basis to fairly
evaluate the assumptions underlying the recorded CRA estimates.

Mr. Girol testified that he spent two to three days on each of about 25 different audit
engagements in a given year, made handwritten notes with respect to those estimates on
which he had comments, discussed those with the audit manager or partner, left
resolution of any open matters to the audit engagement team, and moved on to the next
engagement. He did not discuss his evaluations with members of AHERF management –
the audit engagement team was supposed to do that. **[Girol 64:16-65:15]** It is highly
questionable that Mr. Girol, after devoting only two to three days per year, could have
adequately assessed the reasonableness of the many CRA estimates needed for the entire
AHERF System.

Also, I have seen no evidence in C&L's workpapers as to the scope of Mr. Girol's work,
what factors he considered, or the conclusions reached by him. Nor did I locate in C&L's
FY'96 or FY'97 audit workpapers answers to the questions that Mr. Girol raised in his
notes that the audit engagement team was to resolve. This absence of documentation
violates SAS 41, which provides that an auditor's working papers constitute the principal
record of the work performed and the conclusions reached concerning significant matters.

It is evident that C&L and Mr. Girol relied heavily on Mr. Scharf's representations that
the CRA estimates were fair and reasonable. Mr. Scharf testified that C&L told him that

"they felt that I knew my job, and they relied on me that I was up-front with them."
**[Scharf 300:2-4]** This undue reliance on AHERF's representations violated SAS 19,
which provides that the auditor is required to corroborate management representations
and that management representations are not a substitute for those auditing procedures
necessary to afford a reasonable basis for the auditor's opinion.

SAS 48 requires that when a specialist functions as a member of the audit team, the
auditor[16] must be in a position to evaluate whether the specified procedures will meet the
auditor's objectives and to evaluate the results of the procedures. As the person with
final responsibility for the audit, Mr. Buettner's testimony indicated he did not have a
clear and complete understanding of the process or assessment that the C&L specialist
had performed in this high risk area. He testified: "The specialist assigned to the account
would meet with the heads of the department …and go through some sort of assessment
as to how they are managing the accounting for the estimates." **[Buettner 381:23-382:3]**

C&L's audit workpapers included roll forward analyses (along with adjusting journal
vouchers) showing the activity in the various CRA accounts from year to year. This
activity included certain unusual adjustments that should have alerted C&L to the risk
that AHERF was manipulating its results of operations through accounting improprieties.
As discussed in Addendum 1, these unusual adjustments included:

- recoding payments made in settlement of one cost report against a different
  CRA obligation;
- reclassifying CRA obligations among various years and among non-CRA
  accounts;
- charging off a malpractice settlement against a CRA account;
- reducing or eliminating prior year excess CRA obligations through increases
  in current year revenue;
- reclassifying excess CRA obligations to allowances for doubtful accounts; and
- creating unsupported CRA recoveries in order to increase allowances for
  doubtful accounts.

In summary, C&L violated GAAS by failing to:

- adequately address the risks it identified pertaining to CRAs, including their
  inherent complex nature and the unusual account activity (SAS 47, SAS 53,
  and the Audit Guide);
- appropriately supervise and review the work of the C&L specialist (SAS 48);
- obtain sufficient competent evidential matter to afford a basis for concluding
  as to the reasonableness of the year-end CRA balances (SAS 31); and
- appropriately evaluate the reasonableness of the accounting estimates related
  to the CRA balances (SAS 57).

---

[16] The term "auditor" refers to the person with final responsibility for the audit, except to the extent that
portions of planning or supervision may be delegated to other firm personnel. **(AU § 311.03)**

In FY'96 C&L should have but recklessly failed to:

- compel AHERF's management to correct the GAAP misstatements in the FY'96 financial statements; and
- if management refused to correct the misstatements, disclose the departures from GAAP and the effects on the current year and prior year financial statements in its audit report, and to issue a qualified or adverse opinion on the financial statements that contained those GAAP departures.

C&L's FY'96 GAAS failures were repeated in its FY'97 audit with respect to CRA estimates, in that excessive CRA account balances were again improperly used to inflate FY'97 results of operations.

### Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations (including the violations discussed in the accompanying Addendum 1) on DVOG's combined, AGHOG's combined, and AHERF's consolidated financial statements are reflected in correcting entry numbers 5, 10, 11, 12, 13, 30, and 40 which are presented in Appendix III of this report.[17]

---

[17] The effects of the utilization of CRA obligations to improperly avoid charging $7,000,000 of bad debt expense when DVOG entities' increased their allowances for uncollectible accounts by $17,500,000 as of June 30, 1996, are also covered in Basis for Opinion 8.

### Addendum to Basis for Opinion 6

### Examples of AHERF's GAAP Violations and C&L's GAAS Violations

Hahnemann University Hospital's ("Hahnemann") FY'94 and FY'93 Medicare CRA
accounts

As of June 30, 1995, Hahnemann's CRA Medicare account balance related to FY'94
reflected an obligation of approximately $13,586,000. **[CL 049729]** This was in stark
contrast with its cost report, in which Hahnemann claimed Medicare had under-
reimbursed it by approximately $6,329,000. **[VER 00011714]** During FY'95,
Hahnemann had received a tentative settlement of the claimed $6,329,000 in the amount
of approximately $2,324,000, leaving a claimed balance of $4,005,000. **[CL 049732]**
This represented a difference of $17,591,000 between the $13,586,000 recorded
obligation and the remaining reimbursement claimed on the cost report. The magnitude
of this difference was a "red flag" that the recorded CRA obligation of approximately
$13,586,000 was an excess reserve as of June 30, 1995.

By June 30, 1996, the recorded balance of Hahnemann's FY'94 CRA Medicare
obligation had been reduced from $13,586,000 to $125,000 **[CL 011519]**, and by June
30, 1997 it had been eliminated. **[PwC 018385]** The following reflects the FY'96
account activity:

- AHERF reduced the FY'94 obligation by recording a $4,024,000 payment
  made on final settlement of the FY'93 cost report even though no FY'93 CRA
  Medicare obligation was on the books as of June 30, 1995. **[CL 008802-03]**
  By doing so, it by-passed the reduction in net patient service revenue it
  otherwise would have recorded with respect to final settlement of the 1993
  Medicare cost report.[18]
- AHERF made other adjustments to decrease the account by a net amount of
  $2,566,000,[19] principally through increases in other reserves, by-passing the
  reduction in net patient service revenue it otherwise would have recorded with
  respect thereto.
- Hahnemann increased the recorded obligation by $5,651,000 by closing three
  other CRA obligation accounts into this account,[20][21] **[CL 008803-008804]**

---

[18] The fact that there was no balance for this CRA obligation in its general ledger account as of June 30,
1995 indicates that an unfavorable settlement was not expected when the FY'95 financial statements were
issued. AHERF acquired Hahnemann July 1, 1994 and, apparently, did not record a CRA obligation for the
FY'93 Medicare cost report. Therefore, a $4,024,000 reduction of net patient service revenue should have
been recorded when the settlement occurred in FY'96.

[19] C&L's CRA rollforward workpaper indicates the $2,566,000 consisted of the net effect of
reclassifications of "PT revenue" - $2,000,000; "FY Reserves" – ($3,537,000); "HHA CRA" - $200,000;
and "SHSH reserve" - $3,903,000.

[20] The CRA accounts and approximate amounts closed into the FY'94 CRA account were: FY'92
Medicare -$1,582,000; FY'93 Medicare - $3,663,000; and FY'92 Blue Cross - $406,000.

again by-passing the adjustment to net patient service revenue it otherwise would have recorded with respect thereto.

- Finally, in June 1996, the account was reduced, on journal voucher V0621, by $12,522,000 and the obligation in the Medicare FY'96 periodic interim payment ("PIP") account was increased by such amount. **[CL 011518]** This excessive reserve should have been corrected as a prior period adjustment. The FY'96 PIP account had been reduced earlier in the year, on journal voucher VPR001, to "cover" certain favorable revenue adjustments, accounting entries that increased patient revenue, as discussed in Basis for Opinion 10.

Elimination of the FY'94 CRA obligation in FY'96 without a payment being made with respect to the FY'94 cost report is evidence that an error existed as of June 30, 1995. GAAP was violated in FY'96 by the failure to treat the elimination of all but $125,000 of the FY'94 $13,586,000 CRA obligation as a prior period adjustment. Had that been done, Hahnemann's unrestricted net assets as of July 1, 1995 (the opening balance for FY'96) would have increased, and $13,461,000 would have been charged against earnings in FY'96 when the FY'93 final settlement was disposed of and the other accounts due to or from third-party payors were adjusted.

Given the magnitude of the difference between the remaining amount claimed on the FY'94 cost report and the recorded CRA balance, had C&L compared the two, it would have seen that management had no reasonable basis to support the recorded obligation. When asked about this CRA obligation at his deposition, Mr. Girol testified that he could not recall any reasons why there was such a large credit balance in that particular account. **[Girol 182:18-186:2]**

In Note E to its FY'96 Hahnemann CRA rollforward schedule, C&L wrote the following explanation about the change in the CRA obligation:

> The large change in the balance of MC FY 94 primarily relates to the analysis performed by reimbursement in which items were reclassified to the appropriate years. (See the rollforward for the reclassifications) Also FY 93 was final settled and closed out in the current year and was lumped into this account. Through discussion with Joe Scharf, reimbursement believes that the reserve amount remaining in this year is sufficient and if needed there is other cushion on the balance sheet. In FY 90 and prior there is approximately $470k of cushion for settlements reached." **[CL 008802]** (Emphasis added)

---

[21] $590,000 of the $1,582,000 FY'92 Medicare CRA account was created in FY'96 when the FY'92 PIP account was closed into it on journal voucher V1005. $3,770,000 of the FY'93 PIP account was closed into the FY'93 Medicare CRA account in FY'96 on journal voucher V0511, and that CRA account was subsequently reduced by $107,000 to $3,663,000 and closed into the FY'94 CRA account. Prior thereto, $1,000,000 had been shifted from the FY'93 PIP account directly into the FY'94 CRA account on journal voucher V0404. See Basis for Opinion 10.

This explanation relies solely on management's representation, without corroboration or critical assessment of the facts presented. It addresses the sufficiency of the reserve but fails to address the excessiveness of the reserve that had existed as of June 30, 1995 and the implications of moving the excess reserve to other years.

C&L's workpapers contained no indication that any events transpired (e.g., audit findings by Medicare's intermediary) during FY'96 that would justify almost total elimination of the FY'94 CRA obligation or the basis (and audit evidence) for moving over $12,000,000 from the FY'94 CRA obligation to the FY'96 PIP account. Nor have I seen any indication in the audit workpapers that C&L considered whether or not the FY'94 CRA obligation had been overstated as of June 30, 1995. I have also seen no indication in its FY'96 audit workpapers that C&L considered whether net patient service revenue should have been reduced for the settlement of the FY'93 cost report.

C&L's FY'96 Hahnemann CRA rollforward analysis workpapers indicate that the FY'94 CRA obligation pertained to both the 1994 and 1993 cost reports. **[CL 008802-03]** However, I have seen nothing in C&L's FY'95 workpapers to indicate that the FY'94 CRA account also pertained to the FY'93 cost report. **[CL 049729-34]** Because separate CRA accounts were opened for each year for every AHERF hospital for each third-party payor having retrospective audit rights, it is inexplicable why C&L would make that assertion or accept any such representation, if made, from management. I have seen nothing in C&L's FY'96 audit workpapers discussing why Hahnemann had failed to record a FY'93 CRA estimate before posting the $4,024,000 final settlement for FY'93 against the FY'94 CRA account in FY'96. Notably, the FY'93 Medicare CRA account was later opened and used to record an unsupportable CRA estimated recovery (i.e., a contingent gain) of $1,200,000, which was part of the $4,000,000 FY'96 year-end adjustment to increase Hahnemann's allowance for uncollectible accounts, which is discussed below. I have also not seen anything in C&L's FY'96 audit workpapers that would provide a basis for the transfers from other unrelated CRA accounts into the Medicare FY'94 CRA account.

In summary, C&L violated GAAS in FY'96 by failing to compel AHERF to treat the virtual elimination of this $13,586,000 FY'94 CRA obligation as a prior period adjustment, to charge the $4,024,000 final settlement of the FY'93 Medicare cost report against net patient service revenue in FY'96, and to charge the remaining $9,562,000 against FY'96 net patient service revenue rather than permitting AHERF to move all but $125,000 to and from other CRA accounts and Hahnemann's FY'96 Medicare PIP account. Like CRAs, PIP accounts relate to transactions with a specific payer for a specific year. Therefore, it was inappropriate to shift the FY'94 CRA credit balance into the FY'96 PIP account.[22]

---

[22] Unapplied PIP balances are generally closed into the CRA accounts when the cost report is filed. See Basis for Opinion 10.

Hahnemann's FY'95 Medicare CRA account

As of June 30, 1995, Hahnemann's FY'95 CRA Medicare account balance reflected a reimbursement receivable of $2,429,000. **[CL 049729]** Its amended cost report claimed an under-reimbursement by Medicare of approximately $3,936,000 **[VER 00017698]**, against which a tentative settlement of $750,000 was received in FY'96.
**[CL 008800, 03]**

By June 30, 1996, the FY'95 CRA Medicare account balance was converted from a receivable into an obligation of $3,198,000 (which obligation balance remained unchanged as of June 30, 1997). **[CL 011519, PwC 018385]** The following reflects the FY'96 account activity:

- The $750,000 settlement was posted as a reduction of the estimated recovery.
- An estimated additional recovery of $68,000 was added.
- In June 1996, two entries totaling $4,945,000 were made to convert the estimated recovery to an obligation. **[CL 011519]** C&L's CRA rollforward workpaper noted that the two entries were reclassifications from "USHC FY93-FY95" and "Medicare cash" accounts of $2,282,000 and $2,663,000, respectively. **[CL 008804]** Assuming that those two accounts were deemed to be overstated in FY'96, they should have been eliminated by taking them into net patient service revenue.

Hahnemann's amended FY'95 Medicare cost report dated January 4, 1996 reflected a net claim receivable of $3,186,000 (after reducing the $3,936,000 claimed under-reimbursement by the $750,000 tentative settlement) as compared to the recorded obligation balance of $3,198,000 as of June 30, 1996, resulting in a $6,384,000 difference between the amended cost report and the recorded CRA balance. Such difference had resulted principally from the shifting of other unneeded obligations into this CRA account. It is evident that the inclusion of this CRA obligation in the FY'96 and FY'97 balance sheets constituted an overstated or excessive reserve. Had net patient service revenue been increased when the other unneeded obligations were eliminated during FY'96, Hahnemann's unrestricted net assets as of July 1, 1996 (the opening balance for FY'97) would have increased by at least $3,198,000, and there would have been no remaining obligation balance in the Hahnemann FY'95 Medicare CRA account as of either June 30, 1996 or June 30, 1997.

I have seen nothing in C&L's workpapers to indicate that it compared the claimed receivable in the amended cost report to the obligation recorded in accounting records. I have also seen nothing to indicate that C&L considered whether the transfers from unrelated reserves reflected in its FY'96 audit workpapers should instead have been recorded as increases in net patient service revenue in conformity with GAAP. [CL 008802-04] Nor have I seen anything in C&L's FY'96 or FY'97 audit workpapers to indicate that it obtained sufficient competent evidential matter to support the reasonableness of the $3,198,000 recorded obligation in Hahnemann's FY'95 Medicare CRA account balance as of June 30, 1996 and 1997.

C&L also violated GAAS in FY'96 by failing to compel AHERF to increase net patient service revenue by a net $3,198,000, which would have occurred if the $750,000 tentative settlement, the $4,945,000 from eliminating the two other unrelated accounts, and the remaining FY'95 Medicare CRA balance had been reduced to zero with adjustments made through net patient service revenue.

C&L's FY'96 GAAS failures contributed to its GAAS failure in FY'97, when it failed to compel AHERF to eliminate the unsupported $3,198,000 CRA obligation as a prior period adjustment.

Hahnemann's FY'93 and FY'94 Blue Cross CRA account

As of June 30, 1995, Hahnemann's FY'93 and FY'94 Blue Cross ("BC") CRA account balances reflected obligations of $1,295,000 and $1,000,000, respectively. **[CL 049729, CL 008807]** However, I have seen nothing in C&L's FY'95 audit workpapers or any other documentation that would provide a basis for such obligations as of June 30, 1995. C&L's FY'96 interim audit workpapers stated with respect to the $2,295,000 in obligation balances, "No activity in the current year. Amounts are primarily reserves." **[CL 008799-8800]** C&L's FY'96 CRA rollforward analyses note that Mr. Scharf explained the elimination of the FY'93 ($1,295,000) and FY'94 ($1,000,000) BC CRA obligations in FY'96 as the "result of Reimbursement [Department] contacting Blue Cross and Blue Cross saying that there was nothing out there for these years." **[CL 008801-8802]** Based upon the foregoing, I conclude that no such liabilities existed as of June 30, 1995 and that the $2,295,000 represented excessive reserves as of that date.

C&L's FY'96 CRA rollforward workpapers indicate that Hahnemann reduced the $1,295,000 FY'93 BC CRA obligation to zero by using $795,000 of it to cover a loss on a malpractice settlement, and by offsetting the remaining $500,000[23] obligation against other Hahnemann BC and Medicare CRA accounts. **[CL 008807]** Such use of the excessive reserves improperly avoided a charge to malpractice expense and a decrease in net patient service revenue, which otherwise would have been required to increase the other CRA obligations. The FY'94 BC CRA obligation, which had been overstated by $1,000,000 as of June 30, 1995, was used in FY'96 to improperly increase net patient service revenue as per journal voucher VO511. **[CL 008807]**

Given the overstatement of these CRA obligations as of June 30, 1995, and the materiality of the effect on originally reported net results for FY'96, especially when aggregated with other misstatements, GAAP was violated in FY'96 by the failure to treat elimination of the $2,295,000 as a prior period adjustment. Had it done so, Hahnemann's unrestricted net assets as of July 1, 1995 (the opening balance for FY'96) would have

---

[23] Hahnemann closed its FY'90 plus prior years BC CRA recovery balance of $92,000 into the FY'93 BC account as of May, 31, 1996 as per journal voucher VO511. It reduced the remaining FY'93 BC obligation of $408,000 to zero by shifting it to FY'92, FY'93 and/or FY'94 Medicare CRA accounts as of June 30, 1996, as per journal voucher VO625.

increased, the $1,295,000 would have been charged against earnings in FY'96 when the insurance settlement occurred and the other CRA accounts were adjusted, and none of the $1,000,000 would have been available to increase net patient service revenue in FY'96.

C&L violated GAAS in FY'95 by failing to obtain sufficient competent evidential matter upon which to support the reasonableness of the estimates or any CRA amounts as of June 30, 1995 pertaining to the FY'93 and FY'94 BC cost reports. C&L violated GAAS in FY'96 by failing to compel AHERF to treat elimination of the $2,295,000 of BC CRA obligations as a prior period adjustment, to charge the $795,000 malpractice settlement against FY'96 earnings, to reduce FY'96 net patient service revenue by the $500,000 of close outs of unrelated CRA accounts, and to remove $1,000,000 from FY'96 net patient service revenue that was recorded when the FY'94 BC CRA estimated obligation was reduced to zero.

Furthermore, charging the CRA account with a malpractice settlement was highly irregular and an obvious misuse of the account. This should have alerted C&L to the risk that AHERF was manipulating its results of operations through the use of accounting improprieties. C&L failed to respond to this risk, did not extend its audit procedures, and did not even propose an adjustment to correct that impropriety.

### Medical College of Pennsylvania Hospital ("MCPH") FY'90 and prior years, FY'91, FY'92 and FY'93 BC CRA accounts

MCPH's FY'90 and prior years, FY'91, FY'92 and FY'93 BC CRA account balances as of June 30, 1995 reflected obligations of $2,086,146, $65,221, $2,744 and $180,094, respectively, which aggregated $2,334,295. **[CL 051727]**

Mr. Girol testified that there was nothing contained in his review notes that spoke to the appropriateness of either the Blue Cross accounts for FY'90 and prior years or the FY'91 year balances as of June 30, 1995. **[Girol 219:10-23]** I have seen nothing in C&L's FY'95 audit workpapers, or any other documentation, that would provide a reasonable basis upon which to conclude that the BC CRA balances related to FY'90 and prior years and the FY'91, FY'92 and FY'93 obligations were reasonable as of June 30, 1995.

In FY'96, MCPH reduced the $2,086,146 FY'90 and prior years CRA obligation by almost $1,425,000[24] to approximately $661,000 by shifting the account balance for FY'90 and prior years BC CRA into its FY'93 MC CRA account. Also in FY'96, it eliminated the $248,059 total of the FY'91, FY'92 and FY'93 BC CRA obligations by increasing net patient service revenue. **[CL 001706-001707]**

C&L's FY'96 audit workpapers indicated that, except for the FY'93 year, these Blue Cross years had been settled and the amounts were being held in reserves. **[CL 008814-17]** To explain the decrease in these account balances from FY'95 to FY'96, C&L wrote in Note E to its June 30, 1996 MCPH CRA summary schedule:

---

[24] On journal voucher V0621 dated 7/25/96, $1,424,746.23 of the account balance for FY'90 and prior years BC CRA was shifted into MCPH's FY'93 CRA account. **[CL 012459-60]**

> Through discussion with Joe Scharf and as noted as [sic] prelim, these Blue Cross
> years had been final settled and the amounts were being held as reserves. In the
> final quarter, the hospital took these amounts to income. **[CL 001706-1707]**

In FY'97, MCPH collected the final settlement amount of $202,000 from Blue Cross on
the cost reports for FY'90 and prior years. Under its own accounting policies, MCPH
should have increased net patient service revenue by $863,000 ($202,000 + $661,000).
Instead, MCPH eliminated the remaining $661,000 BC CRA obligation by increasing one
or more unrelated Medical Assistance CRA obligation accounts by $400,000 and one or
more unrelated Medicare CRA obligation accounts by $261,000, all $661,000 of which
C&L indicated were to be used as "cushions" in those accounts. **[CL 013934, 013977]**

The elimination of the CRAs comprising the $2,334,000 of BC CRA obligations in
FY'96 and FY'97 should have been accounted for as prior period adjustments. Had that
been done, MCPH's unrestricted net assets as of July 1, 1995 (the opening balance for
FY'96) would have increased by $2,334,000, and none of the $1,673,000 would have
been available to increase net patient service revenue in FY'96. Nor would the remaining
$661,000 obligation as of June 30, 1996 have been available to shift to other CRA
accounts in FY'97. Instead, in conformity with GAAP (and AHERF's own accounting
policy), the creation of such CRA obligations would have required a charge to MCPH's
net patient service revenue.

C&L violated GAAS with respect to its FY'95 audit by failing to obtain sufficient
competent evidential matter upon which to conclude that the $2,334,295 of recorded
CRA obligations were reasonable. The age of these recorded obligations alone should
have caused C&L to question their validity. C&L violated GAAS with respect to its
FY'96 and FY'97 audits by failing to require AHERF to treat the correction of the
excessive obligations as prior period adjustments or, failing such treatment, to modify its
audit reports.

St Christopher's Hospital for Children ("SCHC") FY'92 Pennsylvania Medical
Assistance CRA account

SCHC's FY'92 Pennsylvania Medical Assistance ("MA") CRA obligation balance of
$1,890,000 as of June 30, 1995 lacked basis as the cost report indicated a recovery was
due from MA. **[CL 051850]**

In FY'96, SCHC collected $829,000 upon final settlement of its FY'92 cost report and
added the $829,000 to the CRA obligation balance, increasing it to $2,719,000. The
$829,000 was described in C&L's FY'96 audit workpapers as an "undesignated reserve."
**[CL 008820-21]** Later in FY'96, SCHC reduced the obligation by $338,000.
**[CL 008822-23]** Then, SCHC eliminated the remaining $2,381,000 obligation and
increased its allowance for uncollectible accounts by such amount, **[TN C9A 01368,
CL 011167, CL 011475]** thereby avoiding a charge to bad debt expense. This entry was
a part of the $17,500,000 FY'96 year-end adjustment to increase DVOG entities'

allowances for uncollectible accounts (the accounting improprieties of which are discussed in Basis for Opinion 8).

Correction of the $1,890,000 overstatement of the June 30, 1995 balance of this CRA obligation in FY'96 should have been made as a prior period adjustment given the materiality of its effects on FY'96 originally reported results (especially when aggregated with the other misstatements). Had that been done, SCHC's unrestricted net assets as of June 30, 1995 would have been increased by $1,890,000. Also, when increasing its allowance for uncollectible accounts by $2,381,000, SCHC should have charged that amount to bad debt expense (this entry was linked to the $619,000 entry made to SCHC's FY'94 MA CRA account, discussed in the next section). Finally, C&L knew but disregarded the fact that the favorable final settlement of $829,000, identified as an undesignated reserve, should have been recorded in FY'96 as net patient service revenue[25] in conformity with GAAP (and AHERF's own accounting policy).

I have seen nothing in C&L's FY'95 audit working papers to indicate that it compared the cost report for the FY'92 MA claimed reimbursement with the recorded CRA obligation. Such a comparison would have revealed the significant variance between the two and caused C&L to question the validity of the recorded obligation. In its FY'96 audit, C&L became aware of the final settlement and the collection of $829,000, which should have caused C&L to consider whether the June 30, 1995 CRA obligation balance had been an error as of that date. **[CL 008825]** However, I have seen no indication in C&L's FY'96 audit workpapers that it did so

In addition to its failure to properly evaluate the evidence which showed that the $1,890,000 CRA obligation was an excess liability as of June 30, 1995, C&L permitted the $829,000 final settlement to be added to the existing CRA obligation in FY'96 and then permitted AHERF to shift the remaining CRA obligation (after a $338,000 reduction) of $2,381,000 to SCHC's allowance for uncollectible accounts as of June 30, 1996 without charging bad debt expense.

C&L violated GAAS in FY'96 by failing to compel AHERF to treat elimination of the $1,890,000 FY'92 MA CRA obligation as a prior period adjustment, and to increase net patient service revenue in FY'96 for the net $491,000 by which the CRA account was improperly increased in FY'96. As discussed in Basis for Opinion 8, C&L also violated GAAS in FY'96 by permitting SCHC's allowance for uncollectible accounts to be increased without charging bad debt expense.

---

[25] Presumably the aforementioned $338,000 reduction in this FY'92 CRA obligation was recorded through an increase in net patient service revenue. Therefore, the $829,000 final settlement amount less such $338,000, or $491,000, has been added to net patient service revenue in quantification entry number 11. Also, the $619,000 correction with respect to SCHC's FY'94 Medical Assistance CRA account was added to the $491,000, resulting in a proposed increase of $1,110,000 to FY'96 net patient service revenue as reflected in the quantification of misstatements.

SCHC's FY'94 MA CRA account

SCHC's FY'94 MA CRA account balance as of June 30, 1995 reflected an obligation of $54,000. **[CL 051850, 008825]** During FY'96, SCHC's FY'90 MA obligation of $166,000 was shifted to this CRA account, thereby increasing the obligation to $220,000. **[CL 011168, 008822-23]** Then, SCHC recorded a $619,000 adjustment to this account, which converted the balance of the CRA account from a $220,000 obligation to an estimated recovery of $399,000 and simultaneously increased SCHC's allowance for uncollectible accounts by such $619,000 as of June 30, 1996. **[TN C9A 01368, CL 011167, 011475]** This adjustment was a part of the $17,500,000 FY'96 year-end adjustment to increase the DVOG entities' allowances for uncollectible accounts which is discussed in Basis for Opinion 8.

Assuming that a $399,000 estimated recovery balance was reasonable and realizable, the $619,000 adjustment should have been recorded as an increase of FY'96 net patient service revenue in conformity with GAAP (and AHERF's own accounting policy). Further, when increasing its allowance for uncollectible accounts by $619,000, SCHC should have charged the $619,000 to bad debt expense.

When asked at his deposition if he recalled the circumstances that led to booking a $399,000 receivable, Mr. Scharf said he did not. **[Scharf 305:15-19]** Furthermore, he acknowledged that the $619,000 "could be just a filler amount. I really don't know" **[Scharf 306:24-307:25]** (i.e., a plugged amount to get to the $3,000,000 when added to elimination of the $2,381,000 FY'92 MA CRA account).

I have seen nothing in C&L's audit workpapers to indicate that it gained any substantive evidence to support the revised $399,000 recovery balance reflected in this CRA account as of June 30, 1996 or to support the adjustments made to create this balance. Mr. Scharf could not remember if he had any discussions with C&L about the valuation of the account. **[Scharf 305:20-306:5]** Given the unusual nature of the $619,000 adjustment made to the CRA balance that was used to increase the allowance for uncollectible accounts, C&L should have made inquiry as to the basis for and propriety of such an adjustment. I have seen nothing in its FY'96 audit workpapers to indicate that it made such inquiry.

C&L violated GAAS in FY'96 by having failed to compel AHERF to increase net patient service revenue by $619,000 to give effect to the revisions in this CRA account in accordance with AHERF's own accounting policy. Furthermore, as discussed in Basis for Opinion 8, C&L also violated GAAS in FY'96 by permitting SCHC's allowance for uncollectible accounts to be increased without charging bad debt expense.

Hahnemann Medicare CRA recovery accounts for FY'90 to FY'93

During the closing of its FY'96 books and records, Hahnemann violated GAAP by recording contingent gains in the form of additional CRA recoveries of $400,000, $1,200,000, $1,200,000 and $1,200,000 (a total of $4,000,000) to its previously settled

Medicare CRA accounts for FY'90 and prior years, FY'91, FY'92 and FY'93, respectively. **[CL 011519, 011189]** Instead of recording net patient service revenues, the $4,000,000 increase in CRA recoveries was recorded as an increase in Hahnemann's allowance for uncollectible accounts, thereby avoiding a charge to bad debt expense. Like the $3,000,000 discussed in the two preceding sections, this $4,000,000 was a component of the $17,500,000 FY'96 year-end adjustment (the accounting improprieties of which are discussed in Basis for Opinion 8).

The following excerpt from Mr. Scharf's deposition testimony indicates that there was no reasonable basis for recording the $4,000,000 of CRA recoveries for those years:

> Q. ... [D]o you recall any specifics as to why you believe there was a total of $4 million of additional receivables that you found in the three-week time period between 8-21-96 through 9-13-96?
> A. Probably because they asked me for $4 million. That's all.
> **[Scharf 292:18-25]**

Mr. Scharf testified that although Medicare's intermediary had advised him that there was a lack of documentation to support reversing audit findings unfavorable to Hahnemann or granting adjustments of the cost report favorable to the hospital, he believed that there was documentation to justify recovery of $4,000,000 of costs, but realization would have required reopening the cost reports, which had been final settled. **[Scharf 301:14-303:7, 293:1-12, 299:5-11]**

With respect to fiscal years 1991, 1992 and 1993, Mr. Girol's notes from his FY'96 CRA review stated that there is "nothing out there, will request reopening of I&R account." **[CL 008848]** When asked about potential recoveries for fiscal years 1991, 1992 and 1993 at his deposition, and without knowledge that the $4 million had been booked, he testified based on reading his FY'96 CRA review notes that he considered it to be contingent and wouldn't want to record it. **[Girol 254:6-18]** He also stated:

> In other words, they weren't comfortable in booking a receivable for that issue because they weren't certain whether Aetna would reopen those years. They didn't have confirmation on that. **[Girol 239:15-19]**

When he was shown at his deposition that the $4 million was recorded as of June 30, 1996 sometime between August 21 and September 13, 1996, Mr. Girol stated that the C&L engagement team did not discuss the propriety of recording these estimated recoveries with him. **[Girol 254:6-18]**

As of June 30, 1996, approvals had not been obtained and there could be no assurance that, even if re-openings of the cost reports were approved, Medicare would concur with the Reimbursement Department that more monies were due Hahnemann. Based upon the testimony of Mr. Scharf and Mr. Girol, the recording of the $4 million in recoveries was apparently based principally on management's goal of increasing the allowance for

doubtful accounts (while avoiding a charge to bad debt expense) without any reasonable assurance of recovery of such amounts.

Accordingly, as of June 30, 1996, Hahnemann should not have recorded these contingent gains and should have charged bad debt expense when it increased its allowance for uncollectible accounts. Had it done so, net patient accounts receivable, reported net income and unrestricted net assets would have all decreased by $4 million.

By June 30, 1997, the sum of the four balances of those CRA accounts decreased by a net $498,000, leaving a revised estimated total recovery of $6,094,000. As of that date, a vast majority, if not all, of the $4 million remained uncollected. **[PwC 018385]** **[Scharf 301:19-303:7]** Mr. Scharf could not recall if this $4 million was ever collected. **[Scharf 294:24-295:1]**

C&L disregarded the fact that, as of June 30, 1996, there was no reasonable assurance that (a) either Medicare or the intermediary would agree to reopen these years and (b) even if reopened, approvals for reimbursement for any portion of the $4,000,000 would be obtained. C&L's own cost reimbursement specialist, Mr. Girol, testified that any such additional recovery represented a contingency that should not be recorded. As discussed in Basis for Opinion 8, C&L also disregarded the fact that the entries to record these contingent gains were made for the express purpose of avoiding a charge to bad debt expense when increasing Hahnemann's allowance for uncollectible accounts (as part of the $17,500,000 FY'96 year end increases in DVOG entities' allowances).

Allegheny General Hospital's ("AGH") undesignated Medicare CRA Obligation

In FY'96, AHERF capitalized $7,111,000 of interest by increasing property and equipment and increasing AGH's FY'96 Medicare CRA obligation,[26] which is discussed in Basis for Opinion 11. **[CL 011290, 037995]** This increase in the CRA obligation was undesignated as to any year's cost report, was described as a "general cushion," **[DBR AA12753-5]** and was not a bona fide liability. As of June 30, 1996, the obligation balance in AHG's FY'96 Medicare CRA account was $8,325,903.

In FY'97, the balance was increased by the amount of a tentative settlement received ($5,589,000) and reduced by $3,750,000 with a corresponding increase in AGH's net patient service revenue. **[DBR-AA 12755]** After certain other transactions were posted to the account in FY'97, the balance as of June 30, 1997 was $9,765,448, of which approximately $4,176,000 was labeled by C&L as being a "cushion." This cushion represented the approximate difference between the account balance and the amount of the settlement that had been added to the obligation. **[CL 018060]** I have seen nothing to indicate why the receipt of a tentative settlement should be carried as an obligation but I am unable to conclude that this amount represents an error.

---

[26] The interest costs were incurred on construction projects in FY'96 ($592,000) and prior years ($6,519,000).