I can conclude, however, that the recording of the additional $7,111,000 of CRA obligation as of June 30, 1995 as part of the capitalization of interest did not represent a probable liability and violated GAAP, as did the subsequent use of $3,750,000 of this excessive liability to increase net patient service revenue in FY'97. GAAP was violated in FY'97 by failing to eliminate the $7,111,000 CRA obligation through a prior period adjustment. Had that been done, AGH's unrestricted net assets as of July 1, 1996 (the opening balance for FY'97) would have increased by $7,111,000, and none of it would have been available to increase net patient service revenue in FY'97.

C&L violated GAAS in FY'96 by permitting AHERF to add an undesignated excessive reserve of $7,111,000 to its FY'96 Medicare CRA obligation when capitalizing interest costs incurred on construction projects, as discussed in Basis for Opinion 11. Although it identified the CRA obligation as being an error, and posted a proposed adjustment to its SUD, C&L violated GAAS by failing to accord prior period adjustment treatment to the correction of the errors it detected. Further, the SUD entry C&L proposed was improper; it proposed eliminating the CRA obligation and increasing net patient service revenue by the full $7,100,000 (rounded amount). **[PwC 001534; CL 002448, 000327]**

C&L's proposed correcting entry ignored the fact that the excessive CRA obligation had been created from the capitalization of interest (of which approximately $6,500,000 related to prior periods) and had not been created through a current charge to net patient service revenue. Thus, the correcting entry to reverse the CRA obligation should have been to reduce FY'96 interest expense by approximately $600,000 and the balance of $6,500,000 should have been an increase in opening net assets rather than an increase in FY'96 patient revenue. This improper correcting entry increasing FY'96 revenue was used by C&L to offset other proposed correcting entries affecting income, which effectively reduced C&L's net negative adjustments to FY'96 income to $2,142,000. **[PwC 001535]** Had the correcting entry been prepared in accordance with GAAP, the net negative adjustments affecting income would have totaled $8,642,000 ($2,142,000 + $6,500,000). This was material in relation to AHERF's FY'96 reported consolidated income before extraordinary item and change in accounting principles of $6,547,000 and in relation to its consolidated net loss of $11,837,000 for FY'96.

C&L's FY'96 GAAS failures contributed to its GAAS failure in FY'97, when it failed to compel AHERF to eliminate the CRA obligation of $7,111,000 as of July 1, 1996 as a prior period adjustment and to remove the $3,750,000 from FY'97 net patient service revenue that was recorded when the excessive $7,111,000 CRA obligation balance was reduced by that amount.

7

**7.  C&L failed to require AHERF to correct its improper accounting for certain excessive liabilities, understated assets, and excessive asset valuation allowance accounts**

## Background

In the ordinary course of recording and revising accounting estimates, management may create an "excessive reserve." An "excessive reserve" may be a recorded liability for which an obligation does not presently exist, an understatement of a recorded asset (i.e., a "hidden reserve"), or an overstatement of an asset valuation allowance account.[1] An excessive reserve might also be created by an error in an assumption embedded in a calculation of a liability or an asset valuation allowance, or by a mathematical error in such a calculation.

An accounting estimate should be revised in the period when information becomes available to better determine the amount of the estimate, which is when uncertainties are partially or fully resolved. GAAP is violated when an excessive reserve is not corrected in that period. When the excessive reserve is reduced or eliminated in some later period, and the amount of the reduction is material to the financial statements of either the current period or the period (or periods) when the revision should have been recorded, it should be treated as a prior period adjustment, which removes the effects of the correction from the current period income statement and effectively pushes the effects back to the period or periods when it should appropriately have been revised.

The intentional failure to reduce an excessive reserve on a timely basis is one form of financial statement fraud by means of which management improves earnings of future periods as opposed to the current period. Excessive reserves have sometimes been referred to as "cookie jar" reserves.

## Relevant GAAP

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

SFAS 5 establishes standards of financial accounting and reporting for a loss contingency, which it defines as an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. SFAS 5 states:

> An estimated loss from a loss contingency shall be accrued by a charge to income if *both* of the following conditions are met:

---

[1] This is also known as a "contra asset" account, because it is offset against an asset account for reporting purposes. When accounted for in conformity with GAAP, it reduces an asset to its net realizable value (e.g., an allowance for doubtful accounts) or its depreciated cost (e.g., accumulated depreciation of property and equipment).

    a. Information available prior to the issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

    b. The amount of the loss can be reasonably estimated. (¶ 8)

SFAS 5 defines "probable" for these purposes to mean "[t]he future event or events are likely to occur." Occurrence of a loss contingency might instead be remote, meaning that the chance is slight that it will occur; or might be reasonably possible, which places the likelihood of loss between probable and remote. (¶ 3)

The condition that a loss contingency be accrued if it is probable that a liability has been incurred is intended to prohibit recognition of losses that relate to future periods, but to require accrual of losses that relate to the current or a prior period. (¶ 71)

The accrual of losses for general or unspecified business risks is prohibited by the following language:

> Some enterprises in the past accrued so-called 'reserves for general contingencies.' General or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made. (¶ 14)

FASB Concepts Statement No. 6, *Elements of Financial Statements* ("CON 6")

In discussing the elements of financial statements, CON 6 defines liabilities as:

> Probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions. (¶ 35)

Paragraph 70 of SFAS 5 provides support to the CON 6 notions that liabilities represent *present obligations* to *other entities* by quoting other definitions of liabilities published in accounting literature, as follows:

> Liabilities are claims of creditors against the enterprise, arising out of past activities that are to be satisfied by the disbursement or utilization of corporate resources.[2]

> A liability is the result of a transaction of the past, not of the future.[3]

---

[2] Referenced to "American Accounting Association, *Accounting and Reporting Standards for Corporate Financial Statements and Preceding Statements and Supplements* (Sarasota, Fla.: AAA, 1957), p. 16."

[3] Referenced to "Maurice Moonitz, 'The Changing Concept of Liabilities,' *The Journal of Accountancy*, May 1960, p.44."

Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20")

APB 20 describes the need for estimates in preparing financial statements; it states:

> Changes in estimates used in accounting are necessary consequences of periodic presentations of financial statements. Preparing financial statements requires estimating the effects of future events. Future events and their effects cannot be perceived with certainty; estimating, therefore, requires the exercise of judgment. Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained. (¶ 10)

With respect to reporting a change in accounting estimate, APB 20 states:

> The Board concludes that the effect of a change in accounting estimate should be accounted for in (a) the period of change if the change affects that period only or (b) the period of change and future periods if the change affects both ... (¶ 31)

APB 20 describes accounting errors, contrasts them to changes in accounting estimates, and mandates that they be reported as prior period adjustments; it states:

> Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared. In contrast, a change in accounting estimate results from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate ... (¶ 13)

> The Board concludes that the correction of an error in the financial statements of a prior period discovered subsequent to their issuances should be reported as a prior period adjustment. (¶ 36)

Statement of Financial Accounting Standards No. 16, *Prior Period Adjustments* ("SFAS 16")

SFAS 16 sets forth the requirement that an item of profit and loss related to the correction of an error in the financial statements of prior periods shall be accounted for and reported as a prior period adjustment and excluded from the determination of net income for the current period.[4] (¶ 11. a.)

Accounting Principles Board Opinion No. 9, *Reporting the Results of Operations* ("APB 9")

APB 9 sets forth the requirements for reporting prior period adjustments; it states:

> When prior period adjustments are recorded, the resulting effects (both gross and net of applicable income tax) on the net income of prior periods should be

---

[4] This paragraph was superseded by SFAS 109 (¶ 288. n.) but the requirement was unchanged.

disclosed in the annual report for the year in which the adjustments are made. When financial statements for a single period only are presented, this disclosure should indicate the effects of such restatement on the balance sheet of retained earnings at the beginning of the period and on the net income of the immediately preceding period. **(¶ 26)**

Accounting Research Bulletin No. 43, *Restatement and Revision of Accounting Research Bulletins* ("ARB 43")

ARB 43, Chapter 4 sets forth the general principles applicable to the impairments of inventory values; it states:

> Thus, in accounting for inventories a loss should be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, changes in price levels, or other causes. The measurement of such losses is accomplished by applying the rule of pricing inventories at *cost or market, whichever is lower.*
> **(¶ 8)**

## AHERF's accounting for accumulated depreciation, accounts receivable credit balances, corporate service accruals and inventory valuation allowance violated GAAP

AHERF and its subsidiaries manipulated earnings in FY'96 and FY'97 by using excessive reserves in one or more of the following ways:

- by intentionally creating them in FY'95 and in years prior thereto;
- by failing to reduce them in periods when knowledge of the excesses first became known;
- by materially improving FY'96 and FY'97 results of operations when reducing or eliminating the excessive reserves; and/or
- by shifting amounts from excessive reserves to record or increase needed liabilities as of June 30, 1996 and 1997 or to reduce otherwise overstated assets as of those dates, instead of treating corrections of the excessive reserves as prior period adjustments.

In fact, AHERF kept track of its "inventory" of excessive reserves in listings it updated periodically, which were known internally as the "X Files."

Certain excessive reserve accounting issues are dealt with in other Bases for Opinions: these include the following:

- Estimated cost rate adjustments (Basis for Opinion No. 6)

- Periodic interim payments, pertaining to reimbursement of Graduate Medical Education program costs (Basis for Opinion No.10)

- The $17.5 million fiscal 1996 year-end increase in DVOG entities' allowances for uncollectible accounts (Basis for Opinion No. 8)

The excessive reserve accounting issues covered in this Basis for Opinion relate to the following:

| Type of Reserve | Excess as of June 30, | | |
| --- | --- | --- | --- |
| | 1995 | 1996 | 1997 |
| Accumulated depreciation | $  3,917,000 | | |
| Credit balances in patient accounts receivable | 1,411,000 | | |
| Corporate service accruals | 8,802,000 | 2,850,000 | 2,326,000 |
| Inventory valuation allowance | 1,587,000 | 587,000 | - |
| | $  15,717,000 | $ 3,437,000 | $ 2,326,000 |

Accumulated depreciation

AHERF's stated accounting policy was to depreciate property and equipment using systematic and rational methods applied over the estimated economic useful lives of the underlying assets. However, in its FY'95 audit, C&L identified excessive accumulated depreciation reserves, including the following:

- Elkins Park Hospital ("Elkins") - $597,000  [CL 056303]
- St. Christopher's Hospital for Children ("SCHC") - $1,133,000  [CL 056265]
- Bucks County Hospital ("Bucks") - $1,493,000[5]  [Ex. 212]
- Hahnemann University Hospital ("Hahnemann") - $694,000  [CL 056329]

These excessive reserves were documented in C&L's FY'95 "PP&E Scoresheet" as proposed adjustments.  [CL 056131]

During FY'96, $3,417,000 of the excessive accumulated depreciation was eliminated.[6]  A total of $2,723,000 of the excessive amounts of Elkins, SCHC and Bucks were "shifted" within the DVOG entities' in order to increase the allowances for uncollectible accounts. [Exs. 112 and 114, CL 001281]  Hahnemann eliminated its excess reserve by underproviding for depreciation expense in FY'96.[7]

Because the excess accumulated depreciation was a known error as of FY'95, correction of the error in FY'96 should have been treated as a prior period adjustment, increasing unrestricted net assets by $3,417,000 as of July 1, 1995.  Had that been done, none of the $2,723,000 would have been available to "shift" to DVOG entities' allowances for

---

[5]  Although the identified Bucks excess accumulated depreciation as of June 30, 1995 was $1,493,000 [CL 056131, 002544], only $993,000 of this amount was eliminated in FY'96.

[6]  It is not clear how the remaining $500,000 of excess reserve may have been disposed of.

[7]  C&L's analytical test of Hahnemann's depreciation expense in its FY'96 audit workpapers reflects an estimated underprovision of $737,000 (which is slightly higher than the $694,000 excess as of June 30, 1995).  [CL 002580]

uncollectible accounts in FY'96,[8] and, in conformity with GAAP, bad debt expense
would have been charged when the allowances were increased. Likewise, the $694,000
would not have been available to decrease Hahnemann's depreciation expense in FY'96.
Together, these improper uses of the excess accumulated depreciation resulted in a
$3,417,000 overstatement of FY'96 income.

Even were it appropriate to correct the overstated accumulated depreciation through an
increase in FY'96 income, the entire correction would have properly been reflected
through a reduction in depreciation expense (a non-cash charge) rather than treating a
portion of the adjustment as a reduction in bad debt expense. Such a misclassification of
expenses within the statement of operations can affect calculations made for determining
compliance with debt covenants, as discussed in Basis for Opinion No. 16.

Credit balances in patient accounts receivable

DVOG entities (and AHERF) reported patient accounts that had credit balances as
reductions of patient accounts receivable. As of June 30, 1995, C&L identified
$3,141,000 of credit balances (i.e., amounts due to patients or third-party payors) in
certain DVOG hospital entities'[9] patient accounts receivable detailed accounts. Of that
amount, it concluded that $1,411,000[10] should be eliminated through recognition as net
patient service revenue, as it represented excessive credits for which no obligation
existed. The $1,411,000 error was included in C&L's FY'95 "A/R Scoresheet" as a
proposed adjustment. **[CL 050952]**

Inasmuch as C&L's workpapers did not reflect a proposed SUD adjustment for patient
accounts receivable credit balances as of June 30, 1996, it is evident that DVOG entities
took the $1,411,000 of excessive credits into net patient service revenue in FY'96.
Because this was a known error in FY'95, its correction in FY'96 should have been
treated as a prior period adjustment (because the aggregation of prior period adjustments
is material), increasing unrestricted net assets as of July 1, 1995 rather than being
recognized as revenue in FY'96.

Corporate Service Accruals

AHERF (parent) and Allegheny General Hospital ("AGH") carried combined balances in
accounts payable and accrued expenses of $8,802,000, $2,850,000 and $2,326,000 as of
June 30 1995, 1996 and 1997, respectively, related to Corporate Service Accruals[11]
("CSAs"), as summarized below:

---

[8] In addition to the $2,723,000, another $6,000,000 of excessive accumulated depreciation was shifted to
DVOG entities' allowances for uncollectible accounts in FY'96 along with other adjustments that increased
the allowances by $17,500,000. This is discussed in Basis for Opinion No. 8.

[9] Consists of SCHC-$1,626,000, Hahnemann-$762,000 and MCPH-$753,000.

[10] Consists of SCHC-$233,000, Hahnemann-$474,000 and MCPH-$704,000.
**[CL 050952, 051185, 051112-19, 051045]**

[11] Consists of AHERF 6/30/95-$6,585,000 **[CL056854]**, 6/30/96-$662,000 **[CL 002889]**, and 6/30/97-
$2,326,000 **[CL 015129]**, and AGH 6/30/95-$2,217,000 **[CL 056854]** and 6/30/96-$2,188,000
**[CL 002871]**

| Fiscal Year End | AHERF | AGH | Combined |
|---|---|---|---|
| June 30, 1995 | $6,585,000 | $2,217,000 | $8,802,000 |
| June 30, 1996 | 662,000 | 2,188,000 | 2,850,000 |
| June 30, 1997 | 2,326,000 | -- | 2,326,000 |

C&L noted in its audit workpapers that AHERF considered the combined AHERF (parent) and AGH CSA balance of $8,802,000 as of June 30, 1995 to be available for use as undesignated CRA obligations. **[CL 056871, 056854]** As a result, C&L proposed adjustments to reclassify the amounts from CSA liabilities to Cost Rate Adjustment ("CRA") liabilities in an "A/P [accounts payable] Scoresheet." **[CL 056854]** However, because actual CRA obligations relate to cost reports filed with respect to specific years and specific third party payors, an "undesignated" CRA obligation is, by definition, unnecessary. Further, because the recorded CRA liabilities related to designated cost reports had been reviewed by a C&L specialist for adequacy, there was no need for additional undesignated CRA accruals at June 30, 1995 (see Basis for Opinion #6). As such, the $8,802,000 in CSAs were nothing more than reserves for general contingencies, the accrual of which is prohibited by SFAS 5.

In FY'96, the $8,802,000 in CSAs was adjusted to $2,850,000 with the reduction of $5,952,000, referred to as a "cushion," recognized in income. C&L's FY'96 audit workpapers note the following with respect to the reduction:

> Per conversation with Jack Lydon, C&L notes that AHERF has reduced its "cushion" for accruals during the course of the year. C&L does not take exception and waives further review. **[CL 002889]**

As of June 30, 1996, the remaining AHERF (parent) portion of the CSA of $662,000 was labeled as "cushions" for accruals. **[CL 002889]**

The remaining AGH CSA of $2,188,000 as of June 30, 1996 is described in C&L's audit workpapers as consisting of two specific items aggregating $1,364,000[12] plus a "cushion" of $824,000. **[CL 002871]** The following explanation documented in C&L's audit workpapers makes it clear that the $824,000 "cushion" was simply a reserve for general contingencies:

> Per conversation with Jack Nelson, C&L notes that this line item represents a "cushion" for accruals. <u>The cushion is available for any surprises which may arise and it is also for third party settlements. This amount also includes items hung up on the B/S [Balance Sheet] that could have gone to the I/S [Income Statement]</u>. C&L notes the conservative approach taken and does not take exception. (Emphasis added) **[CL 002871]**

---

[12] Per C&L's audit workpapers, AGH's CSA as of June 30, 1996 included $1,002,000 "mainly comprised of the adjustment for the restricted asset income per the FAS # 117 implementation analysis" and $362,000 that was labeled as "VHA Rec." **[CL 002871]**

During FY'97, $2,000,000 of the $2,188,000 AGH CSA was transferred to AHERF (parent). As of June 30, 1997, the remaining combined CSA was $2,326,000. The net reduction of $524,000 from June 30, 1996 was recognized as income in FY'97. **[CL 015129]** The increase in the AHERF (parent) CSA, resulting from the inter-company transfer, was explained in C&L's audit workpapers as follows:

> The increase relates to AHERF moving a risk management liability [from AGH] to a general cushion because AHERF does not have risk management liabilities, the individual entities do. Therefore, instead of hitting the P&L, they set up a general reserve. **[CL 015129]**

This explanation provides further evidence that the portion of the AGH CSAs as of June 30, 1996 that had been attributed to the two specific items represented nothing more than an improper reserve for general contingencies.

In summary, the $8,802,000 of CSAs as of June 30, 1995 violated GAAP as they represented reserves for general contingencies. This entire amount should have been reflected as a prior period adjustment in FY'96, increasing unrestricted net assets as of July 1, 1995 rather than being included in income in FY'96 ($5,952,000) and FY'97 ($524,000).

Inventory valuation allowance

The FY'96 reduction in Hahnemann's inventory valuation allowance account from $1,587,000 as of June 30, 1995 to $587,000 as of June 30, 1996 resulted in a $1,000,000 improvement in its FY'96 operating results. [13] **[CL 004041]**

C&L's FY' 96 audit workpapers describe Hahnemann's inventory valuation allowance as arbitrary:

> …It [the inventory valuation reserve] was decreased because in 1994 when AHERF purchased Hahnemann they put a lot of reserves on the books. This was an arbitrary number and they adjusted it this year [FY'96] to better reflect the true inventory value and the fact they don't have obsolete inventory. Although the reserve in the current year is also arbitrary, it does not appear to be an unreasonable reserve in light of current information. Given these facts, it still appears that the client is being very conservative with their inventory value. **[CL 004041]**

In FY'97, this inventory valuation reserve was first increased by $48,000 to $635,000 and then eliminated in its entirety. A corresponding increase was made to Hahnemann's

---

[13] This improvement was reflected in the line item "materials, supplies, and services expense" on Hahnemann's statements of operations. Journal vouchers 12ADJ and CTYE1 reduced Med/Surg Supplies expense.

reserve for losses in Health Partners.[14]  However, by using the remaining excess inventory valuation allowance to increase the reserve, AHERF was able to bypass reporting the $635,000 loss in the FY'97 DVOG combined and AHERF consolidated statements of operations.  **[JD-DC0002522; Ex. 43: CLIS 0186]**

It is evident that the inventory valuation allowance, which C&L indicated had been arbitrary from the outset, represented an excessive reserve.  The statement that the FY'96 reduction was needed "to better reflect the true inventory value" is further indication that it had been excessive at June 30, 1995.   The entire $1,587,000 should have been treated as a prior period adjustment, increasing unrestricted net assets as of July 1, 1995 rather than being used to increase income in FY'96 and FY'97.

## Violations of GAAS

Failure to cause AHERF to appropriately correct known errors

In its FY'95 audit, C&L identified and documented excessive reserves aggregating $14,130,000 pertaining to accumulated depreciation, accounts receivable credit balances, and corporate service accruals.[16]  C&L proposed adjusting entries in each of those areas on workpapers it labeled "Scoresheet." **[CL 056131, 050952, and 056854]**  However, it did not reflect these proposed adjustments in its FY'95 Summary of Unadjusted Differences ("SUD").  This failure to accumulate potential audit adjustments, summarize them, and evaluate their combined effect on the financial statements violated SAS 47 and SAS 53.

C&L's failure to cause AHERF to adjust these items in FY'95 and to treat subsequent corrections as prior period adjustments resulted in a $10,780,000[17] overstatement of AHERF's FY'96 results of operations relating to these issues.  These errors, when aggregated with errors reflected on C&L's FY'96 consolidated SUD that netted to $2,142,000 of additional expense **[PwC 001535]**, totaled $12,922,000.  That amount would represent approximately 200% of AHERF's FY'96 net income before

---

[14]  As discussed in Basis for Opinion # 12, the loss represented an excess of claims incurred over premiums earned, which AHERF normally reflected as a reduction of net patient service revenue.  AHERF's total share of such loss was $3,859,000 of which $640,000 had been allocated to Hahnemann.

[16]  Comprised of accumulated depreciation-$3,917,000 ($597,000+$1,133,000+$1,493,000+$694,000), patient accounts receivable credit balances-$1,411,000 ($233,000+474,000+704,000), and corporate service accruals-$8,802,000 ($6,585,000+$2,217,000).  In addition to this $14,130,000, C&L identified additional excess accumulated depreciation for MCPH of $2,006,000 **[CL 056131]**, which is discussed in Basis for Opinion # 8.

[17]  Consists of $3,417,000 from reversals of accumulated depreciation, $1,411,000 from taking credits in patient accounts to net patient service revenue, and $5,952,000 from reductions in CSAs.  The use of $1,000,000 of excess inventory valuation allowances in 1996 is not included, as C&L did not include this on a "Scoresheet" in FY'95.

extraordinary item and change in accounting principles. Because these errors, especially when combined with other errors noted in this report, materially misstated AHERF's financial statements, C&L should have required AHERF to correct them or, failing that, should have modified its audit report in accordance with SAS 47, SAS 58 and SAS 69.

C&L Senior Manager Amy Frazier testified that scoresheets were prepared to "capture possible differences or adjustments for consideration both to aggregate and evaluate whether or not they were material to the financial statements taken as a whole ..." **[Frazier 114:18-21]** When asked who made the call about which scoresheet entries made it to the SUD, Ms. Frazier testified:

> There's a review process that takes into consideration whether or not what may initially be a recommended score sheet entry. Further facts and circumstances may dictate later in the audit process as to whether or not an initial proposed score sheet adjustment is really, truly an unadjusted difference... **[Frazier 116:16-25]**

The implication of Ms. Frazier's testimony is that an item shown on a scoresheet that was not posted to SUD was ultimately determined not to represent an actual unadjusted difference (or was below a posting threshold). However, SAS 41 provides that, "the information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions that he has reached concerning significant matters." The scoresheets and entries referred to in this Basis for Opinion were included in C&L's final audit workpapers and I found no indication therein that the specific errors referred to above had been determined not to represent unadjusted differences or to be below any posting threshold. The fact that $10,780,000 of such amounts were reversed in FY'96 and taken into income is a further indication that they represented unadjusted errors at June 30, 1995. Moreover, the more senior auditors who reviewed "scoresheet" entries agreed that they represented audit differences. **[CL 056246-50, CL 056262-67, CL 056288-91, CL 056300-03, CL056310-16 and CL 056326-32]**

Additional GAAS violations with respect to the aforementioned GAAP errors are discussed in the following paragraphs.

Corporate service accruals

In FY'95, 96, and 97 C&L knew or should have known that the AGH and AHERF CSAs constituted reserves for general contingencies, which are prohibited under GAAP. Its workpapers related to these accruals provide no supporting evidence as to their validity and contain numerous references to the CSAs representing "cushions" or general reserves. **[CL 002889, 002871, 015129]**

Further, with respect to AGH's CSA balance as of June 30, 1996, and in violation of SAS 19, 31, and 48, C&L failed to obtain sufficient competent evidential matter corroborating an AHERF accountant's representation that $1,002,000 pertained to "the adjustment for the restricted asset income per the FAS# 117 implementation analysis," and failed to obtain any evidence as to the basis upon which that item and another item of $362,000

noted as "VHA Rec" met the probable and estimable criteria of SFAS 5 for recording a liability.

In addition, C&L failed to exercise the degree of professional skepticism required by SAS 53 in its continuing unchallenged acceptance of changing explanations as to the need for the CSAs. As of June 30, 1995, they were purportedly available for undesignated CRA obligations. As of June 30, 1996, portions of the CSAs were explained as being related to a FAS 117 adjustment and a VHA receivable, with the remainder representing a "cushion" for accruals. As of June 30, 1997, these same CSAs were explained as being a general reserve.

Inventory valuation allowance

C&L's FY' 96 audit workpapers describe Hahnemann's inventory valuation allowance as having been arbitrary since its adoption in 1994. C&L's inventory workpaper concludes that although no physical inventory was taken in FY'96, the balances were substantially consistent with the prior year and the pharmacy inventory was more understated than overstated. **[CL 004041]** However, C&L violated SAS 31 by failing to obtain sufficient competent evidential matter to support management's assertion that the valuation allowance had been appropriate in accordance with GAAP. Further, C&L violated SAS 57 by failing to properly evaluate management's estimate of the allowance.

## Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on DVOG's combined, AGHOG's combined, and AHERF's consolidated financial statements are reflected in correcting entry numbers 14, 16A, 16C, 24, 25, 26, 28, 29, 31 and 35, which are presented in Appendix III of this report.

8

**8. C&L failed to require AHERF to correct its improper accounting for DVOG's FY'96 year-end increase in allowance for uncollectible accounts and bad debt expense**

### Background

After discussions with C&L near the end of the 1996 audit, AHERF recorded entries to increase the allowance for uncollectible accounts on the books of various DVOG entities by $17.5 million. **[Buettner 218:18-219:11]** Regarding the amount of the increase, C&L Partner William Buettner testified as follows:

> Q. Did [AHERF] give you an amount for the allowance boost, the allowance for doubtful accounts?
> A. They...gave us [C&L] a summary of what they would be willing to post, and I believe it was 17 million dollars.
>
> Q. I've seen a number 17.5 million dollars in other depositions and other documents. Does that sound about right to you?
> A. That's probably right.
>
> Q. So the 15 to 20 [million] range was yours and the 17.5 [million] was AHERF's as the way the conversations [with management] played out?
> A. Yes.
> **[Buettner 221:12-25]**

However, AHERF charged only $2.5 million of the $17.5 million increase in the DVOG allowances to bad debt expense. The remaining $15 million was charged to a variety of general ledger accounts, spread among the following general account classifications:

| | |
|---|---|
| Accumulated depreciation | $6 million[1] |
| Property, plant and equipment | $2 million[2] |
| Cost rate adjustment ("CRA") accounts of SCHC and Hahnemann | $7 million[3] |
| **[CL 010553]** | |

Stephen Spargo, the Senior Vice President of Corporate Support Services testified as follows about that the identification of the "reserves and cushions" to be charged:

---

[1] Of this amount $5 million related to years prior to 1996 and $1 million related to 1996. **[CL 002495]**
[2] Various property, plant and equipment accounts were increased to capitalize interests costs incurred in prior years on construction projects.
[3] Includes $3 million related to Pennsylvania Medical Assistance cost reports for SCHC and $4 million related to the improper recording of estimated cost recoveries on previously settled Medicare cost reports for Hahnemann.

Q. Do you have any general idea about some figure being arrived at that would comprise the amount of an adjustment that would be made to the bad debt reserve at DVOG?

A. My guess is these numbers that comprise the 17.5 would have come off a similar schedule that we looked at for our analysis of reserves and cushions. And that they would have been identified to help mitigate the extent to which our A/R reserves were insufficient. So we basically went shopping on our list of cushions.

**[Spargo 193:10-193:21]**

## Relevant GAAP

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

SFAS 5 requires an estimated loss from a loss contingency to be accrued by a *charge to income* (emphasis added) when both the probability and estimability conditions, set forth therein, are met.[4]  (¶ 8) With respect to collectibility of receivables, SFAS 5 states:

> ...The conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which case a contingency exists.... Losses from uncollectible receivables shall be accrued when both conditions in paragraph 8 are met... (¶ 22)

Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20")

APB 20 requires a correction of an error in the financial statements of a prior period discovered subsequent to their issuance to be reported as a prior period adjustment (¶ 36) in conformity with APB 9, *Reporting the Results of Operations* ("APB 9"), which states:

> Those items that are reported as prior period adjustments shall, in single period statements, be reflected as adjustments of the opening balance of retained earnings. When comparative statements are presented, corresponding adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, to reflect the retroactive application of the prior period adjustments. (¶ 18)

Statements of Financial Accounting Standards No. 16, *Prior Period Adjustments* ("SFAS 16"), as amended

The requirement that an item of profit and loss related to the correction of an error in the financial statements of a prior period shall, if material, be accounted for and reported as a prior period adjustment and excluded from the determination of net income for the

---

[4] Basis for Opinion 2 discusses the criteria for loss recognition under SFAS 5 in connection with determining the adequacy of an allowance for uncollectible accounts.

current period was originally set forth in SFAS 16 (¶ **11**) and amended by SFAS 109 (¶ **288 n**).

SFAS 16 further sets forth the requirement that a prior period adjustment is to be reflected as an adjustment to the opening balance of retained earnings in single period financial statements. (¶ **16 a**)

Other Relevant GAAP

The relevant GAAP with respect to interest capitalization and accounting for CRAs is discussed in Bases for Opinions 6 and 11, respectively.

## **Violations of GAAP**

AHERF violated GAAP by failing to record all of the increase in the allowance for uncollectible accounts as a charge to income (bad debt expense) as required by SFAS 5. Instead, AHERF improperly offset $15 million of the increase in the allowance by debiting various asset and contra asset ("reserve") accounts, principally to correct excessive reserves recorded in prior periods and to improperly record adjustments of previously settled cost reports. The correction of errors affecting prior periods should have been reported as prior period adjustments in conformity with GAAP.

Mr. Buettner has testified that AHERF represented to C&L that the $17.5 million increase in the allowance would be offset by the write-off of a like amount of patient accounts. Mr. Buettner testified as follows:

> Q. Do you have an understanding as to why the allowance does not appear to increase as a consequence of the adjustments reflected on the schedule?
>
> ***
>
> A. AHERF management, when they came to us and indicated they wanted to increase reserves by 17.5 million also indicated that they wanted to write off a like amount of what they would consider to be uncollectible accounts, so, in effect they were to write off of their accounts receivable ledger or aging schedules 17.5 million dollars of accounts.
> **[Buettner 291:4-18]**

AHERF reported the allowance for uncollectible accounts in the 1996 *Combined Financial Statements* of DVOG and the *Consolidated Financial Statements* of AHERF as if the accounts had been written off against the allowance. However, the documents I have reviewed indicate that AHERF did not write off $17.5 million of accounts receivables as of June 30, 1996. For example,

- An AHERF schedule, *Year End A/R Reserve Adjustment*, reflects DVOG's "Unadjusted Balance" of $50,627[000] and the "Final F/S [financial statement]" amount of $68,127[000].  **[Ex. 122: AHW DC 11125]**
- The June 30, 1996 final trial balances contained in C&L's workpapers reflect DVOG's "Final F/S" amount of $68,127,000.  **[CL 011329-32, 011367-69, 011397-99, 011474-75, and 011517-19]**

Accordingly, DVOG should have reported the allowance as $68,125,000 instead of $50,625,000[5]  **[CL 035946]** in its combined financial statements, and AHERF should have reported the allowance as $81,330,000 instead of $63,830,000  **[PwC 0050487]** in its consolidated financial statements.

<u>**Violations of GAAS**</u>

As indicated above, AHERF violated GAAP by failing to charge bad debt expense when it increased DVOG's allowance for uncollectible accounts in 1996.  As documented in its workpapers, C&L knew that AHERF had offset the increase in the allowance by charging other "reserve" and contra asset accounts rather than bad debt expense.  For example, Mr. Kirstein testified that AHERF "recorded additional reserve, which would increase [the allowance].  And then they also had other reserves, the CRAs and the capitalized interest, that on the income statement may have offset an increase to the expense." **[Kirstein 444:17-22]**  However, as noted in the section on GAAP Violations, a majority of the purported expense offsets (previously unrecorded revenue and overstated expenses) related to prior periods, which should have been reported as prior period adjustments rather than offsets to 1996 bad debt expense.

Mr. Kirstein further testified as follows:

> Q.  I'm going to now refer you back to Exhibit 1587 for a moment and in particular the second page, which I believe under the heading Effect of Adjustments lists a number of adjustments that were either made or proposed in regard to the 17.5 million dollar figure we've been discussing…. Am I right?
> A.  Yes.  **[Kirstein 434:22-435:3]**
>
> ***
>
> Q.  …it's fair to say that since these are work papers Coopers & Lybrand auditors saw these proposed adjustments, am I right?
> A.  Management made the adjustments.  We told them that any adjustments you make, we need to audit those changes.
>
> Q.  So you saw these because they're in your workpapers, somebody at Coopers & Lybrand did?
> A.  Yes.
> **[Kirstein 436:20-437:5]**

---

[5] The reported amount differs from the "Unadjusted Balance" presented in the aforementioned *Year End A/R Reserve Adjustment* schedule by $2 thousand.

Q. My question is, did anybody at Coopers & Lybrand take exception with the way these adjustments were to be made?

\*\*\*

A. From a financial statement perspective. I don't believe so. I don't recall necessarily getting down into the actual bookkeeping of the debits and credits that AHERF made. But at the financial statement level of DVOG, I don't believe we took exception to this.

**[Kirstein 437:6-8, 437:25-438:6]**

Based on the documents I have reviewed and testimony I have read, C&L violated GAAS by failing to properly evaluate the results of its audit procedures in accordance with SAS 47 and SAS 53 and, therefore, failed to require AHERF to report the adjustment of previously recorded reserves as corrections of errors (prior period adjustments), as required by GAAP, rather than as offsets to bad debt expense.

C&L further violated GAAS by failing to corroborate management's assertions, as required by SAS 19, that accounts receivable in the amount of $17.5 million had, in fact, been written off by AHERF. C&L violated SAS 32 by failing to properly assess the adequacy of the financial statement disclosures regarding the amount of the allowance for uncollectible accounts reported in AHERF's consolidated and DVOG's combined 1996 financial statements. Taken together with its failures discussed in other Bases for Opinions, it is evident that C&L permitted AHERF to engage in pattern of correcting prior year errors in FY'96 to materially increase FY'96 results of operations.

### Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry numbers 11 to 13, 16B, 16D, and 17 to 23, which are presented in Appendix III of this report.

9

## 9.  C&L failed to require AHERF to correct its improper accounting for Medicare reimbursements of Graduate Medical Education program costs

### Background

Commencing in 1985, Medicare reimbursed teaching hospitals for certain costs of GME programs, based upon an average allowable cost per resident.[1]   When Hahnemann University Hospital ("Hahnemann") merged with AHERF as of July 1, 1994, Hahnemann had a Graduate Medical Education ("GME") program in place in which physicians (residents) were trained in medical specialties after they completed medical school. **[CL 049737, 049739]**

Senior Director of Reimbursement Joseph Scharf testified that in FY'95, through the efforts of his department, AHERF had convinced Aetna, Medicare's intermediary, that the average cost per resident had previously been underreported in Hahnemann's cost reports. **[Scharf, 249:2-253:17]**  According to Mr. Scharf, the additional reimbursements were to be based on the following methodology:

> Medicare had established a base year in 1985 which had your total internal resident cost divided by your total number of residents.  That average per resident amount was then indexed forward for each year which is what your payment was based on.  So you had your allowable resident count times your resident amount basically times your Medicare utilization is what you would get paid for GME. **[Scharf, 53:13-22]**

Aetna's November 3, 1994 letter to Mr. Scharf corroborates his testimony as to the methodology for calculating the additional reimbursements, which supports the calculations reflected in the GME REIMBURSEMENT SETTLEMENT ANALYSIS described below.  It established an average cost per resident for fiscal 1985 (the base year for the program) of $53,506.35, which is more than $15,000 greater per resident than what had been reflected in Hahnemann's Medicare cost report for that year. **[CL 049737-39]**

C&L's FY'95 audit workpapers include a schedule, entitled "GME REIMBURSEMENT SETTLEMENT ANALYSIS," which reflects estimated additional recoveries for Hahnemann's GME program costs aggregating $14,476,360 for fiscal years 1986 through 1994:

- For fiscal years 1986 to 1991, the schedule indicates that the audit status of Hahnemann's Medicare cost reports were "FINAL" and that Hahnemann estimated it was entitled to receive additional GME reimbursements totaling $8,275,892.

---

[1] Hahnemann reported its GME program costs and statistics pertaining thereto in its annual Medicare cost reports.

- For fiscal years 1992 to 1994, the schedule indicates that the audit status of Hahnemann's FY'92 Medicare cost report was "AUDITED" and for FY'93 and FY'94, the status was "FILED." For these three years, the schedule indicates that Hahnemann estimated that it should be entitled to receive additional GME reimbursements totaling $6,200,468. **[CL 049740]**

In November 1994 (FY'95), Hahnemann received a reimbursement of GME program costs of $7,400,000 for its fiscal years 1986 through 1991. **[CL 049802]**

It is unclear when and if any additional GME reimbursements were received pertaining specifically to the aforementioned years.

### Relevant GAAP

Statement of Financial Accounting Standards No. 16, *Prior Period Adjustments* ("SFAS 16")

SFAS 16 sets forth the requirement that an item of profit and loss related to the correction of an error in the financial statements of prior periods shall be accounted for and reported as a prior period adjustment and excluded from the determination of net income for the current period.[2] **(¶ 11. a.)**

FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("CON 5")

CON 5 states that two factors should be considered when determining when to recognize revenue on a transaction - when the revenue is realized or realizable, and when it is earned. It states:

> Revenues and gains generally are not recognized until realized or realizable. **(¶ 83.a.)**

> … [R]evenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. **(¶ 83.b.)**

FASB Concepts Statement No. 6, *Elements of Financial Statements* ("CON 6")

In discussing the elements of financial statements, CON 6 defines liabilities as:

> Probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions. **(¶ 35)**

---

[2] This paragraph was superseded by SFAS 109 (¶ 288. n.) but the requirement was unchanged.

Paragraph 70 of SFAS 5 provides support to the CON 6 notion that liabilities represent *present obligations* to *other entities* by quoting the following other definitions of liabilities from accounting publications:

> Liabilities are claims of creditors against the enterprise, arising out of past activities, that are to be satisfied by the disbursement or utilization of corporate resources.

> A liability is the result of a transaction of the past, not of the future.

### AHERF's accounting for Hahnemann GME reimbursements

Pursuant to Mr. Scharf's instructions and with Corporate Support Services[3] Vice President Steve Spargo's approval, the $7,400,000 GME reimbursement received in FY'95 was initially recorded as a liability in a cost rate adjustment ("CRA") account. **[CL 049741, Scharf, 253:20-254:2]** This accounting treatment presumes that it had not been earned and that repayment was probable. Later in FY'95, the amount was reclassified from a CRA liability to other non-current liabilities. **[CL 049801, 011527]** Finally, in connection with preparing the FY'95 financial statements, Hahnemann reclassified $4,000,000 from this non-current liability to increase its allowance for uncollectible accounts.[4] **[CL 053899]**

Hahnemann did not accrue any additional potential GME reimbursements in FY'95 and it is not clear if any such amounts may have been recognized in FY'96 or FY'97.

In June 1996, AHERF reversed the $7,400,000 non-current liability and recognized $7,400,000 of net patient service revenue. **[CL 011527, 011529]**

### Violations of GAAP

Hahnemann's recording of the $7,400,000 received from Medicare for GME reimbursements through FY'91 as a non-current liability as of June 30, 1995 was in violation of GAAP. **[CL 049738]** The $7,400,000 should have been recognized as revenue in FY'95 since the funds had been realized and Hahnemann had accomplished what it had to do to be entitled to the benefits received. In addition, because the audit status of the 1986 through 1991 cost reports were "final settled," it was not probable that Hahnemann would be required to repay the amounts already received; accordingly, the amount did not represent a liability as defined by GAAP.

The recognition of the $7,400,000 as income in FY'96 was a further violation of GAAP. The recognition of income should have been treated as a prior period adjustment, increasing unrestricted net assets as of July 1, 1995 rather than including such amount in FY'96 as net patient service revenue.

---

[3] This department included the Accounting Department and the Reimbursement Department.

[4] This reclassification was made in the financial statements but not in Hahnemann's general ledger.

## Violations of GAAS

In its FY'95 audit, C&L learned that Hahnemann improperly recorded the $7,400,000 GME reimbursement as a non-current liability rather than as income. C&L concluded that, in addition to the $7,400,000 actually received, Hahnemann should have recognized another $6,000,000 of income related to additional reimbursements for FY'92 through FY'94. The FY'95 C&L workpapers include the following handwritten note from Audit Manager Amy Frazier:

> ...HUH has reflected $7.4 M of this (which has been received) as a CRA reserve. C&L proposes an adjustment to record this amount in income. Note, the $7.4 M is related to final settled years. HUH has not recorded a receivable for the remaining open yrs (i.e., FY92, 93 & 94). C&L also proposes an adjustment to record the remaining years. Total amount recognized to income $13.4 M. **[CL 049738]**

C&L's FY'95 Summary of Unadjusted Differences ("SUD") proposed to increase revenue by $9,400,000, to decrease non-current liabilities by $3,400,000, and to increase current assets by $6,000,000. **[CL 057342]** In arriving at this proposed adjustment, C&L took into consideration the $4,000,000 report reclassification in Hahnemann's June 30, 1995 balance sheet from non-current liabilities to the allowance for uncollectible accounts.[5]

C&L violated GAAS (SAS 47, 53, and 58) in its FY'96 audit by allowing AHERF to recognize the $7,400,000 as revenue in FY'96 rather than as a prior period adjustment. I did not see anything in C&L's FY'96 audit workpapers indicating that C&L even considered whether this item should have been a prior period adjustment. Because the $7,400,000 was material to DVOG's FY'96 net income, C&L should have either (a) required AHERF to correct this misstatement in FY'96, or (b) modified its audit report accordingly, including providing an explanation of the departure from GAAP

## Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry number 9, which is presented in Appendix III of this report.

I proposed no adjustment pertaining to additional GME program cost reimbursements for amounts in excess of the $7,400,000 discussed herein.

---

[5] C&L noted the "shift" in its fluctuation analysis of Other Noncurrent Liabilities:
"In addition, prior to close mgt reversed $4 MM of this against bad debts to increase bad debt reserves. C&L has considered this on our SUD." **[CL 053899]**

10