**10.  C&L failed to require AHERF to correct its improper accounting for certain periodic interim payment plans with Medicare**

### Background

Through at least fiscal year 1996, Hahnemann University Hospital ("Hahnemann") received periodic interim payments ("PIP") from Medicare.  **[CL 051335-37]**  These cash advances were to be applied against claims approved by Medicare for patient services provided.

Joseph Scharf, AHERF's Senior Director of Corporate Reimbursement, testified about the Medicare PIP plan, as follows:

> A lot of the Philadelphia hospitals were paid on PIP, periodic interim payments. It's a cash flow plan by Medicare where hospitals will get an estimated amount of payments over one fiscal year over a total of 52 weeks which consisted of 26 biweekly payments based on estimates that were filed with them. **[Scharf 43:15-22]**

As Medicare processed and approved claims for a given fiscal year, it transmitted remittance advices to Hahnemann, specifying which claims were being "paid."[1] During FY'95 and FY'96, Hahnemann maintained a PIP clearing account in its general ledger for each year that a PIP plan was in effect.  **[CL 051384, 011518]**  PIP advances were recorded by increasing both the operating cash account and the PIP clearing account for that fiscal year.  As remittance advices were matched to detailed patient accounts receivable balances, the PIP clearing account for the year the patient was discharged and patient accounts receivable should have been reduced.  **[CL 001470]**

Therefore, Hahnemann's PIP clearing accounts should ordinarily have had a credit balance, similar to a liability account, inasmuch as the advances were repayable to Medicare until matched against approved claims for services rendered.  At any point in time, Hahnemann should have had the ability to determine the proper PIP credit balances by (i) totaling PIP advances received, (ii) subtracting all matched remittance advices received, and (iii) reconciling the remaining outstanding patient accounts receivables for patients discharged in the given year with the PIP balance outstanding (the net amount of i and ii).[2]  If PIP advances were excessive compared to total approved Medicare claims for the fiscal year, money would be owed back to Medicare.  If the PIP advances were inadequate, the PIP clearing account balance should be zero, and the excess of claims

---

[1]  The remittance advice reflected the patient number or social security number, name, patient days they were in-house, gross charges, deductibles and co-insurance, and a net amount that Medicare would otherwise have paid if there had not been a PIP plan. **[Scharf 328:9-15]**

[2]  If the PIP advances were to exactly equal the amount of claims submitted to Medicare for the year, which is highly unlikely, the unmatched PIP advances would be equal to the claims that were rejected and were in process of being resolved plus unbilled receivables as of year-end for discharged patients for whom final billing had not yet been rendered (net of contractual allowances and charges for non-covered portions of the billing).

over PIP advances would be in patient accounts receivable awaiting cash remittance (rather than another notice of claims paid) from Medicare. Differences between actual PIP cash advances and remittance advices for a given year would normally be closed out to the CRA account to be settled in connection with the related Medicare cost reports.

In FY'96, AHERF's centralized Patient Financial Services Group ("PFSG") was primarily responsible for ensuring that remittance advices were matched against PIP advances and that patient accounts were closed as having been collected. **[Scharf 335:15-22]**

In FY'95, C&L noted that, due to internal control deficiencies, remittances had been incorrectly posted to Hahnemann's other general ledger accounts and to PIP accounts for the wrong fiscal year. **[CL 051335]** C&L's management letter dated October 16, 1995 described the following PIP internal control deficiencies:

> The AHERF Delaware Valley Hospitals have approximately $31 million of credit balances in various PIP accounts at June 30, 1995. These credit balances may represent either unapplied remittance advices or payables to third party payors as a result of overpayments. These credit balances should be analyzed and appropriately resolved in order to enhance management's ability to properly assess outstanding patient accounts.

> In addition, we noted that the details of the PIP accounts are not being reconciled to the general ledger on a periodic basis. **[CL 057358, 057364]**

Management responded to C&L's comments as follows:

> Effective July 1, 1995, procedures were implemented for PIP reconciliation. …The status of PIP activity related to fiscal year 1994 and prior is not resolved primarily due to uncertainties inherent in the activity related to fiscal year 1994 and prior, especially the Hahnemann University Hospital (HUH) data prior to HUH's affiliation with AHERF. **[CL 057365]**

### Relevant GAAP

Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20")

APB 20 describes accounting errors, and mandates that corrections of errors arising in a prior period be reported as an adjustment to those prior period financial statements; it states:

> Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared. **(¶ 13)**

The Board concludes that the correction of an error in the financial statements of a prior period discovered subsequent to their issuance should be reported as a prior period adjustment. (¶ 36)

Statement of Financial Accounting Standards No. 16, *Prior Period Adjustments* ("SFAS 16"), as amended

The requirement that an item of profit and loss related to the correction of an error in the financial statements of a prior period shall be accounted for and reported as a prior period adjustment and excluded from the determination of net income for the current period was originally set forth in SFAS 16 (¶ 11) and was superseded by SFAS 109 (¶ 288 n).

Accounting Principles Board Opinion No. 9, *Reporting the Results of Operations* ("APB 9")

APB 9 sets forth the requirements for reporting prior period adjustments; it states:

> When prior period adjustments are recorded, the resulting effects (both gross and net of applicable income tax) on the net income of prior periods should be disclosed in the annual report for the year in which the adjustments are made. When financial statements for a single period only are presented, this disclosure should indicate the effects of such restatement on the balance sheet of retained earnings at the beginning of the period and on the net income of the immediately preceding period. (¶ 26)

FASB Concepts Statement No. 6, Elements of Financial Statements ("CON 6")

In discussing the elements of financial statements, CON 6 defines liabilities as:

> Probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions. (¶ 35)

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

SFAS 5 establishes standards of financial accounting and reporting for a loss contingency, which it defines as an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. SFAS 5 states:

> An estimated loss from a loss contingency shall be accrued by a charge to income if *both* of the following conditions are met:
> a. Information available prior to the issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements. It is implicit in

> this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
> b. The amount of the loss can be reasonably estimated. **(¶ 8)**

SFAS 5 defines "probable" for these purposes to mean "[t]he future event or events are likely to occur." Occurrence of a loss contingency might instead be remote, meaning that the chance is slight that it will occur; or might be reasonably possible, which places the likelihood of loss between probable and remote. **(¶ 3)**

The accrual of losses for general or unspecified business risks is prohibited by the following language:

> Some enterprises in the past accrued so-called 'reserves for general contingencies.' General or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made. **(¶ 14)**

### AHERF's accounting for Hahnemann's PIP credit balances

PIP clearing account balances were reported as components of patient accounts receivable, as were estimated cost rate adjustment ("CRA") accounts and cash clearing accounts. **[CL 051383-051384, 011517-011519]** Hahnemann began FY'95 (July 1, 1994) with credit balances in Medicare PIP FY'92 and FY'93 clearing accounts of $581,000 and $5,442,000, respectively, and ended the year with $590,000 and $5,021,000, respectively, a total of $5,611,000 two or more years old.

However, its June 30, 1995 aging report reflected only $4,714,000[3] of Medicare patient accounts receivable over one year old, before contractual allowances on outpatient accounts. The aging does not indicate the portion of the accounts receivable that were over two years old (from FY'93) and over three years old (from FY'92), which, to the extent that they existed, would have been the only portions that would properly have been applied against those respective PIP clearing account balances which totaled $5,611,000. **[CL 051076, CL 051095]**

Medicare patient accounts receivable over two years old generally represented claims that were uncollectible because they had become "past statute."[4] Accordingly, a PIP clearing account credit balance which was two or more years old represented either an amount to be repaid to Medicare (i.e., excessive advances) or, to the extent that it exceeded unmatched patient accounts receivable of the same age, an overstated liability – i.e., an excess reserve, which, if not corrected, violated GAAP.

---

[3] Medicare inpatient accounts receivable, net of contractual allowances, totaled $2,211,000 and Medicare outpatient accounts receivable, before contractual allowances, totaled $2,503,000. Because the billing system did not automatically apply contractual allowances to outpatient accounts; manual accruals of contractual allowances were estimated and adjusted to actual when cash was collected from Medicare (or other third-party payors).

[4] See Basis for Opinion 2.

C&L's audit workpapers document that there was very little activity in these accounts during the last six months of FY'95. **[CL 051396-97, 051403-05]**

Mr. Scharf testified that the Reimbursement Department ceased to get remittance advices for matching to accounts after Mr. Snow took over PFSG (in May 1995), and that this made it difficult for his area to identify and resolve errors in PIP accounts. **[Scharf 328:22-329:25, 334:6-335:4]** However, as his testimony indicates, he thought that such errors, which had resulted in large PIP account credit balances, were offset by errors in the other direction in the cash clearing accounts:

> A.   ... So there was no way, without me getting the remittance advices, that I could actually work with these accounts to try to do anything with them. <u>So we were going under the assumption that what was in cash clearing[5] and what was in PIP clearing, one was going to offset the other.</u> We had nothing more than that to go on, and Coopers was well aware of that. **[Scharf 329:17-25]** [Emphasis added]

> Q.   And you felt that offsetting that credit—that high credit balance in the PIP clearing account would be a high debit balance in the cash clearing accounts?
> A.   Yes.
> **[Scharf 338:20-24]**

However, when shown the June 30, 1995 trial balance **[CL 058529-30 of Ex. 1361]**, Mr. Scharf acknowledged that there were no cash clearing account debit balances to offset the PIP credit balances, and revised his view that there had been posting errors that were offset by cash clearing accounts:

> Q.   Now, I think you'll note here that there is not large debit balances in the cash clearing accounts, at least for Hahnemann, is that right?
> A.   That is correct.

> Q.   Does that make you question your initial testimony that it was offset?
> A.   Yes. Yes, it does.

> Q.   Does it cause you concern?
> A.   Yes.

> Q.   Why would it cause you concern?
> A.   Because there's nothing to offset PIP clearing.
> **[Scharf 341:11-23]**

***

---

[5]  In FY'96, some PIP remittance notices were erroneously posted to a cash clearing account, another component of patient accounts receivable, instead of reducing the appropriate PIP account. **[CL 001471]**

Q. Okay. But in total, is it fair to say that the DVOG entities' credit balances in the PIP accounts are not offset by unapplied cash or cash clearing accounts?
A. Yes.
**[Scharf 343:21-25]**

A jointly issued September 21, 1995 memo of AHERF accountants Bill Gedman and Susan Rutter indicates that the FY'94 and FY'95 Medicare PIP advances payments had been matched against remittance advices and posted to detailed patients' accounts, but that general ledger PIP accounts for fiscal years before FY'95 may have been incorrectly posted. Hahnemann could not establish which, if any, Medicare PIP clearing accounts prior to FY'95 were misposted. **[CL 051381]**

Q. Do you recall an issue or analysis where AHERF attempted to see if there had indeed been unapplied remittance advices on PIP accounts?
A. Yes.

Q. What do you recall about that?
A. Everything had been applied.

Q. So that took away one possible explanation for the credit balance that we saw in Coopers' management comment letter; right?
A. Yes, yes.
**[Snow 383:23 – 384:8]**

In FY'96, the FY'92 and FY'93 Hahnemann Medicare PIP credit balances were eliminated through the following adjustments:

- The $590,000 FY'92 PIP balance was eliminated through a series of accounting adjustments[6] that ultimately transferred the amount to Hahnemann's FY'94 Medicare cost rate adjustment ("CRA") account.

- Of the $5,021,000 FY'93 PIP credit balance outstanding at June 30, 1995, $4,770,000 was eliminated in FY'96 through a series of accounting adjustments that ultimately increased Hahnemann's FY'93 and FY'94 Medicare CRA accounts by $3,770,000[7] and $1,000,000,[8] respectively. The remaining $251,000 had been eliminated through PIP related transactions during the period July 1, 1995 through December 31, 1995.

---

[6] Journal vouchers V1005 and V0511 transferred the balance to the FY'92 Medicare CRA account and journal voucher V0625 transferred that balance in addition to other balances to the FY'94 Medicare CRA account.

[7] The FY'93 PIP account was eliminated and transferred to the FY'93 Medicare CRA account by journal voucher V0511.

[8] $1,000,000 of the FY'93 PIP balance was eliminated with journal voucher V0404 and transferred to the FY'94 Medicare CRA account.

- The $5,360,000 in FY'92[9] and FY'93 PIP credit balances that were initially transferred to the FY'93 and FY'94 CRA balances were shifted in June 1996 to the FY'96 Medicare PIP account as described in Basis for Opinion 6. **[CL 011518]**

In summary, substantially all of the FY'92 and FY'93 Hahnemann Medicare PIP obligation balances outstanding as of June 30, 1995 were eliminated by first increasing CRA accounts and then increasing a PIP account related to a different year.

## **Violations of GAAP**

Contrary to Mr. Scharf's understanding, as expressed in his testimony, contrary to his and C&L's previous understanding, the large credit balances in the Hahnemann FY'92 and FY'93 Medicare PIP accounts that existed as of June 30, 1995 were not offset by large debit balances in cash clearing accounts. Such balances were also not offset by similarly aged patient accounts receivable. If these PIP accounts had represented overpayments that were owed to Medicare, it would be expected that the Hahnemann Medicare CRA liabilities for FY'92 and FY'93 would have been under accrued by like amounts. While the FY'92 and FY'93 PIP credit balances were in fact initially transferred to the FY'93 and FY'94 CRA accounts, such CRA accounts were in excess of the actual liabilities and the excess was then transferred to Hahnemann's Medicare PIP account for FY'96. The only remaining explanation is that these balances were simply overstated liabilities that should have been eliminated no later than June 30, 1995 by an increase in net patient service revenue.

As of June 30, 1995, there was no reasonable basis to conclude that obligations to repay PIP advances existed for the FY'92 and FY'93 Medicare reporting years. At that time, these balances were two or three years old, and were unlikely to be applied to any further claims for services rendered for those years because almost every possible open claim would have been "past statute,"[10] and no collection from Medicare would ever be received. Prior to the issuance of the FY'95 financial statements, information was available necessary to conclude that the FY'92 and FY'93 PIP credit balances were overstated by $5,360,000. **[CL 051381]**

Since the aforementioned Medicare PIP credit balances were overstated in the FY'95 balance sheets, and the effect on originally reported net results for FY'95 and FY'96 was material (even more so when aggregated with other misstatements), GAAP was violated by the failure to treat the elimination in FY'96 of the FY'92 and FY'93 PIP credit balances of $590,000 and $4,770,000, respectively, as a prior period adjustment. Had that been done, Hahnemann's (and AHERF's) unrestricted net assets as of July 1, 1995 (the opening balance sheet date) would have increased, and all $5,360,000 would not have been available to increase net patient service revenue in FY'96.

---

[9] Comprised of the aforementioned $590,000 plus $5,021,000 less $251,000.

[10] As discussed in Basis for Opinion 2, Medicare had a designated number of days for resubmission or appeal of a rejected claim beyond which it became "past statute" and would not be honored.

## Violations of GAAS

C&L's principal audit procedures with respect to its FY'96 audit of PIP balances consisted of the following:

- Met with Joseph Scharf and discussed posting errors and AHERF's approach to reconciling the various mispostings during the current year. **[CL 001474]**
- Obtained an understanding of the yearly changes in the PIP accounts based upon discussions with Joseph Scharf **[CL 001470-1472]**
- Agreed total remittances applied relating to prior year cases to the final remittance from the third-party payor. **[CL 001478]**

In addition, C&L's FY'96 audit program provided for the following procedures to be performed:

- Review accounts receivable trial balance noting any prior years' cases still open; **[CL 001482]**
- Obtain from client an analysis of current year PIP payments by payor including payments for hospital specific portion, direct medical education, etc., lump sum adjustments and remittance applied; **[CL 001485]**
- Agree significant current year activity from the previous audit step to supporting documentation such as PIP payments, lump-sum adjustments and remittances from third party correspondence; and **[CL 001491]**
- Review cut-off at 6/30/96 to assure that the client has recorded PIP cash received for payments during the year, appropriate fraction of the first subsequent payment relating to the F/Y under audit and lump sum payments receivable **[CL 001492]**

C&L's FY'95 and FY'96 audit workpapers describe the PIP clearing account balance as follows:

> The PIP clearing account balance at year-end should be a credit equal to total third party Accounts Receivable detail (less coinsurance and deductibles) at year-end. Based on the remittance rollforward (A/R Validation Audit Program), PIP clearing should be adjusted to equal subsequent receipts plus unpaid cases at the cut-off date. The offset to the adjustment should be the third party settlement account representing the PIP rate/volume variance.[11] **[CL 051334, 001493]**

---

[11] This last sentence refers to the estimated final settlement of a Medicare cost report for the fiscal year; therefore, C&L's audit program indicated that excessive advances (total collections less paid and unpaid claims) should be closed out to CRA accounts. See Basis for Opinion 6, which discusses estimated Cost Rate Adjustment ("CRA") accounts. Mr. Scharf concurred; he testified that PIP accounts should be closed out to CRA accounts, and then the CRA accounts should be closed out when cost reports are settled. **[Scharf 328:22-329:4]**

C&L's FY'96 interim audit workpapers showed the large credit balances in the
Hahnemann PIP clearing accounts as of June 30, 1995 and noted that the client planned
to analyze and adjust the account for year end, attributing the problem to mispostings
between the cash clearing and PIP clearing accounts. **[CL 001471]** However, the
available evidence contradicted the explanation provided in C&L's audit workpapers.
Based on a review of the June 30, 1995 trial balance, as corroborated by the testimony of
Mr. Scharf, there were no offsetting debits in the cash clearing accounts.
**[CL 058529-30; Scharf 341:11-23]**

C&L violated SAS 19 in FY '96 by its failure to corroborate Mr. Scharf's explanation as
to the reason for the large credit balance (mispostings). Had it done so, it would have
learned that the client's explanation for the large credit balances in the PIP clearing
accounts as of June 30, 1995 was not valid. C&L's failure to follow up on the client's
analysis and adjustment of the account balances as of June 30, 1996 was also a violation
of SAS 31, requiring the auditor to obtain sufficient competent evidential matter. Had it
done so, it would have learned that the reductions in the credit balances in the PIP
accounts did not come about through the correction and offsetting of mispostings
between the cash clearing and PIP clearing accounts, but instead through improper
transfers to CRA and unrelated PIP accounts, and increases in net patient service revenue.

Further, C&L should have questioned the propriety of such large credit balances in the
PIP accounts for FY'92 and FY'93 (indicating obligations) based on the indication in its
FY'96 audit workpapers that the cost reports for these two years had been final settled.[12]
By June 30, 1996, as far as Medicare was concerned, no open PIP balances remained.

C&L also knew or should have known that the transfer of these credit balances to
unrelated CRA and PIP accounts in FY'96 was a further indication that there were no
bases for these PIP balances as of July 1, 1995.

There is no indication that in FY'96 C&L reevaluated its procedures performed and
conclusions reached in the FY'95 audit, or had any other basis to conclude that the FY'92
and FY'93 PIP accounts were not excessive reserves (i.e., general contingencies) as of
June 30, 1995. Other than a rollforward of the FY'92 and FY'93 PIP balances from June
30, 1994 to June 30, 1995, C&L's FY'95 workpapers contained no competent evidential
matter to substantiate these balances as of June 30, 1995. **[CL 051333]**

To gain assurance that the PIP clearing account balances were reasonable, C&L should
have obtained listings of unpaid patient accounts having dates of services rendered in
FY'92 and FY'93 that were not yet past statute, if any, and which would qualify for
matching against the FY'92 and FY'93 PIP clearing accounts when problems heretofore
preventing collection were resolved. There is no indication in the FY'95 audit
workpapers that C&L gained such assurance. Alternatively, to the extent that there were

---

[12] The FY'93 Medicare cost report was final settled during FY'96 (see the Addendum to Basis For Opinion
6), and the status of both the FY'92 and FY'93 Medicare cost reports were denoted as "Final Settled" in
C&L's FY'96 audit workpaper "CRA Summary Settlement Schedule at 6/30/96." **[CL 037995]**

no receivables against which the PIP credit balances would be applied, C&L should have questioned whether the balances represented true obligations. There is no indication that it performed such procedures.

In addition to its violations of SAS 19, and 31, C&L also violated SAS 53 which requires the auditor to maintain an attitude of professional skepticism, to objectively evaluate evidential matter, and to evaluate the significance of differences between the accounting records and the underlying facts and circumstances detected by the application of auditing procedures.

Since the misstatements were material to FY'95 and FY'96 reported net results (especially when aggregated with other misstatements), C&L violated GAAS in FY'96 by failing to compel AHERF and its subsidiaries to treat elimination of the Hahnemann FY'92 and FY'93 Medicare PIP account balances as prior period adjustments, and to reduce FY'96 net patient service revenue by the $5,360,000.

### Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry number 27, which is presented in Appendix III of this report.

11

## 11. C&L failed to require AHERF to correct its improper accounting for interest costs on construction projects

### Background

Generally accepted accounting principles consider the cost of borrowed funds to be as much a cost of construction as are "hard" costs, like bricks, mortar, and labor. Therefore, GAAP requires interest incurred on debt that is used to fund construction projects to be capitalized (i.e., included in the cost of property and equipment).

AHERF had various construction projects in progress at Allegheny General Hospital ("AGH") **[CL 007539]** and several of the Delaware Valley hospitals[1] between 1992 and 1996. From FY'92 through FY'95, $8,519,000 of interest costs incurred in connection with those projects required capitalization but were instead expensed. In FY'96, the $8,519,000 of qualifying interest costs were capitalized.

In FY'95, AHERF's disclosed accounting policy for property and equipment made no mention of interest costs. Such disclosure was modified in FY'96 to add:

> "Interest is capitalized in accordance with the construction of major capital items."

### Relevant GAAP

Statement of Financial Accounting Standard No. 34, *Capitalization of Interest Cost* ("SFAS 34") as amended by Statement of Financial Accounting Standard No. 42, *Determining Materiality for Capitalization of Interest Cost* ("SFAS 42")

SFAS 34, as amended by SFAS 42, requires capitalization of interest costs incurred to construct facilities, as follows:

> The historical cost of acquiring an asset includes the costs necessarily incurred to bring it to the condition and location necessary for its intended use. If an asset requires a period of time in which to carry out the activities necessary to bring it to that condition and location, the interest cost incurred during that period as a result of expenditures for the asset is a part of the historical cost of acquiring the asset. (¶ 6)

> Interest shall be capitalized for the following types of assets ('qualifying assets'):

> a. Assets that are constructed or otherwise produced for an enterprise's own use (including assets constructed or produced for the enterprise by others for which deposits or progress payments have been made) (¶ 9)

---

[1] The Delaware Valley hospital entities were reorganized during FY'96 by AHERF to be components of its Delaware Valley Obligated Group ("DVOG").

Because interest cost is an integral part of the total cost of acquiring a qualifying asset, its disposition shall be the same as that of other components of asset cost. (¶ **20**)

Accounting Principles Board Opinion 20, *Accounting Changes* ("APB 20")

APB 20 defines accounting errors and requires them to be treated as prior period adjustments:

The Board concludes that correction of an error in the financial statements of a prior period discovered subsequent to their issuance (paragraph 13) should be reported as a prior period adjustment.  (¶ **36**)

APB 9, *Reporting the Results of Operations* ("APB 9")

APB 9 provides the following guidance on the presentation of prior period adjustments:

Those items that are reported as prior period adjustments shall, in single period statements, be reflected as adjustments of the opening balance of retained earnings.  When comparative statements are presented, corresponding adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, to reflect the retroactive application of the prior period adjustments. (¶ **18**)

Statements of Financial Accounting Standards No. 16, *Prior Period Adjustments* ("SFAS 16"), as amended

The requirement that an item of profit and loss related to the correction of an error in the financial statements of a prior period shall, if material, be accounted for and reported as a prior period adjustment and excluded from the determination of net income for the current period was originally set forth in SFAS 16 (¶ **11**) and superseded by SFAS 109 (¶ **288 n**).

SFAS 16 further sets forth the requirement that a prior period adjustment is to be reflected as an adjustment to the opening balance of retained earnings in single period financial statements.  (¶ **16 a**)

## AHERF's accounting for interest costs on certain construction projects

AGH and certain of AHERF's hospitals in the Delaware Valley region expensed interest costs incurred on construction projects between fiscal years 1992 through 1995.

In 1996, AGH capitalized $7,111,000 of interest costs that had been incurred by AGH ($6,519,000 of which was incurred and expensed in FY'92 through FY'95 and $592,000 of which was incurred and expensed in FY'96). **[CL 007539-40]** In doing so, AGH

credited the full amount to a Cost Rate Adjustment ("CRA") account pertaining to its FY'96 Medicare cost report.

In FY'96, DVOG entities capitalized $2,000,000 of interest costs that had been incurred in FY'95,[2] and credited the full amount to its allowance for uncollectible accounts.

## Violations of GAAP

AHERF and its subsidiaries violated GAAP by failing to capitalize interest between FY'92 and FY'95 on borrowings that were used to fund various construction projects.

AGH further violated GAAP because it did not treat the FY'96 capitalization of $6,519,000 of interest costs incurred in fiscal years 1992 through 1995 as a prior period adjustment, by failing to reduce FY'96 interest expense by $592,000, and by instead adding the $7,111,000 to its FY'96 Medicare CRA obligation. **[CL 011290, 037995]** This increase in the CRA obligation was undesignated as to any year's cost report and was described as a "general cushion." **[DBR AA12753-5]** In FY'97, AGH used $3,750,000 of the over-accrued CRA obligation to inflate net patient service revenue. These intentional accounting improprieties are also discussed in Basis for Opinion 6.[3]

DVOG violated GAAP because it did not treat the FY'96 capitalization of $2,000,000 of interest costs incurred in FY'95 as a prior period adjustment. Instead of increasing unrestricted net assets as of July 1, 1995, DVOG entities increased the allowance for uncollectible accounts as of June 30, 1996 without charging bad debt expense. These intentional accounting improprieties are also discussed in Basis for Opinion 8.

The FY'96 adjustments to capitalize $8,519,000 of interest costs incurred in years prior to FY'96 ($6,519,000 + $2,000,000) should have been treated as prior period adjustments because the effects of the corrections were material to FY'96 results of operations, especially when aggregated with other misstatements.

Capitalized interest is to be depreciated in the same manner as other components of capitalized asset cost. Therefore, another consequence of the failure to capitalize $8,519,000 of interest in FY'92 through FY'95 was the failure to provide depreciation thereon in those years. AGH's depreciation expense was understated by $831,000 in fiscal years 1992 through 1995, and by $681,000 in FY'96.

---

[2] The DVOG entities to which these FY'95 amounts applied were: MCPH-$600,000, Elkins-$5,000, Bucks-$100,000, Hahnemann-$750,000, Management Services ("Mgt")-$475,000, SCHC-$20,000, and AUHS-$50,000. **[AHW DC 11125, EXH 217: JE 96PPE-0043-44; SEC EXH 709: TN C9A 01370]**

[3] As stated therein, the $7,111,000 additional CRA obligation was deemed to be excessive when recorded. The excess was also depicted as such on AHERF's June 30, 1997 "Comparative Cushion Summary" schedule for AGH. **[Exh. 198: DBR-AA 12753-5]**

**C&L violated GAAS in its FY'96 audit by failing to require AHERF to properly account for interest costs on certain construction projects**

C&L knew that the failure to capitalize qualifying interest costs was a GAAP violation. In its FY'95 audit, C&L posted a proposed adjustment to capitalize $1.6 million of AGH's interest costs to its Summary of Unadjusted Differences ("SUD") schedule.[4] **[CL 056131]** AHERF Senior Vice President of Corporate Support Services Stephen Spargo testified that C&L had been consistently telling AHERF about the need to record capitalized interest for a number of years. **[Spargo, 716:18-717:1, 719:11-15]**

On a FY'96 audit workpaper pertaining to capitalized interest, C&L in-charge senior Christa Porter wrote the following justification for not treating the capitalization in FY'96 of the $6,519,000 of qualifying interest costs incurred by AGH during FY'92 through FY'95 as the correction of an error:

> C&L notes that AGH has changed its policy for capitalizing interest. In prior years, AGH elected not to capitalize interest. During FY96, AGH has decided to capitalize all previous interest ... C&L does not consider the amounts to be prior period adjustments or correction of an error due to overall imm (sic) impact on the FS. **[CL 007539]** [Emphasis added]

The manner in which the AGH capitalized interest was recorded, by crediting a CRA obligation and an allowance for doubtful accounts, was highly unusual. These accounts had nothing to do with one another and this should have caused C&L to question the propriety of such entries and heightened its professional skepticism.

Based on the testimony of Mr. Spargo, C&L was at least aware that the decision to record the previously uncapitalized DVOG interest costs in FY'96 was a means of achieving, or at least partially offsetting, the needed increase in DVOG entities' allowance for doubtful accounts that is discussed in Basis for Opinion 8:

> Q. Do you recall whether Mr. Buettner himself raised capitalized interest as a potential way to work towards solving the bad debt reserve problem at DVOG in fiscal year 1996?
>
> A. I don't recall if it was him. He would have been aware of it.
>
> Q. Do you recall generally conversations during the audit update meetings or the closing meetings for fiscal year 1996 with Coopers & Lybrand that capitalized interest in [and?]certain other reserves got Coopers & Lybrand more comfortable with the reserve amount at DVO for fiscal year 1996?
>
> A. Question being do I recall—
>
> Q. Conversations about that point.
>
> A. About Coopers finding comfort in having other reserves that they could mentally offset against the A/R reserve shortfall.

---

[4] I cannot explain why C&L proposed capitalizing only $1.6 million.

Q. At DVOG?
A. Absolutely.
**[Spargo 229:8-230:3]**

\*\*\*

Q. Do you recall discussing the carry-over or prior year use with folks at Coopers
   & Lybrand?
A. I don't actually recall it, but I seem to recall laughing when it was suggested
   that that's one of the items we could use in "96.

Q. Do you recall being surprised that there was no disagreement from Coopers &
   Lybrand on that front?
A. I believe they suggested it.
**[Spargo 201:24-202:9]**

By changing its policy in FY'96 and making the decision to capitalize the prior years'
interest costs without treating the correction as a prior period adjustment, AHERF was
able to avoid charging bad debt expense for a portion of the required increase in DVOG's
allowance for doubtful accounts in FY'96 and to create a reserve that it used to inflate net
patient service revenues in FY'97.

C&L was fully aware of AGH's intentional misapplication of accounting principles in
which a correction of an error was improperly used to create excessive reserves, avoid a
charge to bad debt expense, and to inflate revenue. SAS 53 defines an intentional
misapplication of accounting principles, as an *irregularity* and provides that when the
auditor identifies a misstatement that is or may be an irregularity, the auditor should
consider the implications for other aspects of the audit. Evidence that a client has
intentionally violated GAAP, in an amount that *could* be material, raises the possibility
that the client may have intentionally committed other similar violations. An indication
that management has a predisposition to distort financial statements is among the risk
factors cited in SAS 53 as indicative of increased risk of material misstatement that the
auditor should consider in the overall audit strategy and the conduct and scope of the
audit. I have seen nothing in C &L's FY'95 or FY'96 audit working papers to indicate
that C&L considered this, or any of the other irregularities it identified, as to the
implications for other aspects of the audit.

SAS 53 also provides that if the financial statements are materially affected by the
irregularity, the auditor should <u>insist</u> that the financial statements be revised. Based on
the impact of this irregularity, C&L had no reasonable basis to state that the amount was
immaterial. Of the total of $9.1 million capitalized in FY'96, $3.3 million was incurred
by AGH ($1.3 million) and DVOG entities ($2 million) in FY'95 alone, and such $3.3
million was material to FY'95 reported results of operations. Although none of the $6.5
million of capitalizable interest incurred by AGH in prior years was used to improve
FY'96 reported results of operations, $3.75 million of the excessive $7.1 million included

in AGH's FY'96 Medicare CRA account was improperly used to improve FY'97 results of operations, as discussed in Basis for Opinion 6.

These failures on the part of C&L indicate that it was not objective in its evaluation of the evidential matter that it had obtained in order to determine whether the financial statements were free of material misstatement.

C&L also detected the failure to provide $1,512,000 of depreciation on the $7,111,000 of capitalized interest in FY'96, of which approximately $681,000 should have been provided in FY'96 and $831,000 should have been provided through June 30, 1995.[5] However, C&L's proposed FY'96 SUD adjustment charged all of the $1,512,000 against FY'96 operations. **[CL 002448, CL 007539, CL 000333]** Consistent with its failure to require capitalization of the $6,519,000 of interest costs as a prior period adjustment, C&L also failed to treat as a prior period adjustment the $831,000 portion of its proposed adjustment to provide depreciation on the capitalized interest.

### Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on DVOG's combined, AGHOG's combined, and AHERF's consolidated financial statements are reflected in correcting entry numbers 5 and 17 to 23, which are presented in Appendix III of this report.

---

[5] These amounts are based on the calculation of the $1,512,000 cumulative total through June 30, 1996 shown on C&L's FY'96 capitalized interest workpaper. **[CL 007539]**

12

**12. C&L failed to require AHERF to correct its improper accounting for its investment in Health Partners of Philadelphia, Inc.**

### Background

Key elements of the relationship of AHERF and its subsidiaries with Health Partners of Philadelphia, Inc ("HP") were as follows:[1]

- HP was formed in the mid-1980s and has contracts with various Delaware Valley hospitals ("the Participating Hospitals") to provide a full range of medical care services to members selecting affiliated primary care doctors as their physicians.

- The organizations that hold an ownership interest in HP are seven of the thirteen Participating Hospitals.

- Two participating AHERF hospitals, MCPH and SCHC, had a combined ownership interest in HP of approximately 28% as of December 31, 1994 and September 18, 1995.

- Based on preliminary information obtained from HP personnel, MCPH's and SCHC's share of HP's undistributed equity as of December 31, 1994 was $3,562,609 and $1,263,594, respectively. The $4,826,203 sum was equal to approximately 28% of HP's total undistributed net equity as of December 31, 1994 of $17,253,832.

Additional information regarding HP and the Participating Hospitals follows:

- Virtually all of HP's premium revenue was derived from providing medical care pursuant to a contract with the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW").

- The Participating Hospitals were, in turn, paid by HP generally on a per diem or per case basis.[2]

- Since January 1, 1995, HP had been generating sizable operating deficits that had created a need to increase the reserves being recorded on AHERF's Delaware Valley financial statements.

- There were no HP investment balances on either MCPH's or SCHC's financial statements as of June 30, 1995.
  **[CL 057323-26]**

---

[1] This information was set forth in AHERF Senior Accounting Director Daniel Cancelmi's September 18, 1995 memo to AHERF Senior Vice President Stephen Spargo.

[2] In effect, the payments are on behalf of members of DPW that are in Participating Hospitals because the affiliated doctors had them hospitalized.

## Relevant GAAP

The AICPA Audit and Accounting Guide for Health Care Organizations ("HCOAAG")[3] indicates that, although APB 18 is specifically exempt from applying to not-for-profit organizations **(Appendix A)**, it should nonetheless be applied in the following circumstances:

> Investments in common stock of for-profit entities in which the reporting entity has 50 percent or less of the voting stock in the investee should be reported under the equity method in conformity with APB Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock*, if the guidance in that opinion requires use of the equity method. **(¶11.16)**

With respect to ownership interests of between 20% and 50% of an investee, the table in the HCOAAG **(¶11.27)** summarizing the reporting and disclosure requirements of nongovernmental health care organizations states:

| Circumstances | Requirements |
|---|---|
| The reporting entity owns 50 percent or less of the common stock of an investee and can exercise significant influence over operating and financial policies. | The investment should be accounted for under the equity method in accordance with APB Opinion No. 18. |

## AHERF's accounting for its investment in HP

HP's preliminary reports indicated that MCPH and SCHC had an equity interest in HP's undistributed net equity as of December 31, 1994 of $3,563,000 and $1,264,000. respectively. As indicated above, however, as of June 30, 1995, there were no HP investment balances on either MCPH's or SCHC's financial statements.

In FY'96, MCPH and SCHC recorded a combined amount of approximately $4.8 million of cumulative equity interest in HP from prior years. This was reflected in the DVOG's FY'96 Combined and Combining Statement of Operations. **[CL 011348, 011489, 035968, 000185]**

From June 30, 1996 to June 30, 1997, MCPH's and SCHC's Investment-other accounts decreased by $750,000 and $700,000, respectively, **[PWCK2 285]** of which $500,000 of the MCPH decrease and all of the SCHC decrease were recorded through the "transfer" of acquisition reserves from the recently acquired Graduate Health System ("GHS") entities to DVOG entities, as discussed in Basis For Opinion 4.

---

[3] The AHCOAAG superseded the AAG for Audits of Providers of Health Care Services. Although the latter was in effect for FY'95, it did not give suitable guidance as to accounting by the investor for equity investments of between 20% and 50% ownership of an investee.

In its FY'97 audit of these accounts, C&L noted that Stephen Spargo's March 24, 1997 memo to Mr. Cancelmi indicated that HP's loss allocated to MCPH for calendar year 1996 was $766,648 (approximately the $750,000 recording). **[PWCK2 290 - Note G]** It also noted that the $700,000 reduction in SCHC's investment account recorded in FY'97, as represented to C&L by AHERF accountant Chuck Lisman, was attributable to SCHC's share of the net loss of Health Partners for the year ended 12/31/96. **[PWCK2 293 – Note L]**

Also in FY'97, Hahnemann University Hospital ("Hahnemann"), which by FY'97 apparently was a Participating Hospital, used $635,000 of its excessive inventory valuation allowance to cover a portion of its share of HP losses. **[SEC Ex. 328] [Ex. 43: CLIS 0186]**

## Violations of GAAP

AHERF knew the amounts of HP's undistributed equity prior to issuing its FY'95 financial statements,[4] but failed to record the investment as of June 30, 1995. In FY'96 there was no additional justification for recording the equity interests in HP in conformity with GAAP other than that which existed as of June 30, 1995. Since the $4.8 million was material to reported net income in FY'96, especially when aggregated with other misstatements, MCPH and SCHC should have treated it as a prior period adjustment. Had it done so, unrestricted net assets in FY'96 would have increased and net income would have decreased by the $4.8 million.

In FY'97, both MCPH and SCHC improperly failed to charge their shares of HP's operating losses of $750,000 and $700,000, respectively, against current earnings and against their investment in HP accounts. Instead, $500,000 of the $750,000 and all of the $700,000 was included in the $99.6 million of reserve transfers from the former GHS entities, the improprieties of which are discussed in Basis For Opinion 4.

Also in FY'97, Hahnemann reduced its excessive inventory valuation allowance by $635,000 when recording a reserve (a liability) for its share of HP's losses, as discussed in Basis for Opinion 7. This reduction of the $635,000 excessive inventory reserve should have been treated as a prior period adjustment in FY'96 because its effect on FY'96 was material when aggregated with other misstatements. The $635,000 HP addition to the HP reserve for losses should have been recorded through a FY'97 charge against earnings in conformity with GAAP.

## Violations of GAAS

C&L's FY'95 Critical Issues audit memo with respect to MCPH's and SCHC's rights to distributions from HP states:

---

[4] Although C&L's audit report was dated September 8, 1995, its critical issues memo was completed between September 25 and September 28, 1995. Mr. Cancelmi's aforementioned memo was annexed thereto, and bore a handwritten notation that indicates C&L assessed the memo before AHERF's earnings were released. **[CL 057321, 23]**

C&L discussed this issue with the client, reviewed documentation, and it appears as though MCPH should reflect its equity portion in this entity. Presently no amounts are reflected in the financial statements and pursuant to GAAP, the full investment should be recorded. See S.U.D. and memo regarding these issues and results. Under the equity method of accounting & a strict interpretation of GAAP the entity should pick up their respective portion. (combined ownership 37%)[5][6] **[CL 057320]**

C&L's FY'95 SUD reflects that MCPH and SCHC should have recorded unrestricted income in the form of equity interests in Health Partners, and their investments therein, of $3,563,000 and $1,264,000, respectively, as of June 30, 1995. **[CL 057341, 057339, 057335]** I concur with C&L's proposed adjustment.

In FY'96, C&L violated GAAS (SAS 47) by failing to aggregate the effects of the FY'95 misstatement on FY'96 results of operations, and by failing to require AHERF to treat the $4.8 million as a prior period adjustment rather than allowing it to materially overstate AHERF's FY'96 net income. In failing to do so, C&L allowed AHERF to engage in a pattern in which it materially improved FY'96 results of operations by correcting prior year errors, as discussed in various other Bases for Opinions in this report.

In FY'97, C&L violated various SASs by failing to require AHERF to charge $1,835,000 ($1,200,000 and $635,000) of losses from HP's operations against FY'97 earnings, as discussed in more detail in Bases for Opinions 4 and 7.

### Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry numbers 2, 7, and 31, which are presented in Appendix III of this report.

---

[5] The first three sentences were typed, but the last sentence was handwritten.
[6] It is unclear why C&L indicated that total ownership interest was 37% when the supporting memo stated 28%.

*13*

### 13. C&L failed to require AHERF to correct its improper accounting for tort settlements with two former executives

### Background

In November 1995, AHERF terminated the employment of Iqbal Paroo from his position as the president of Allegheny University of the Health Sciences **[Paroo 213: 10-24]** and, in February 1996, it terminated Carol Calvert[1] from her positions as the President and Chief Executive Officer of Allegheny Integrated Health Group and Executive Vice President of AHERF.

Both former employees purportedly threatened AHERF with lawsuits.  Before any lawsuits were filed, both former employees released AHERF from any claims for wrongful termination and intentional infliction of emotional distress.  **[Paroo 241:3-242:3 and 246:9-18]**

Pursuant to terms of the November 15, 1995 agreement with Mr. Paroo, AHERF agreed to pay him a lump-sum amount of $3,300,000 by December 5, 1995 to settle his tort claim[2] that alleged "intentional infliction of emotional distress."  AHERF also agreed to pay to Mr. Paroo his pension and all benefits under the AHERF Management Long-Term Incentive Plan and the flexible benefit program ("the Incentive Programs"), which may be in a lump-sum, "upon proof from Paroo to AHERF's satisfaction that any noncompete provisions contained in the Incentive Programs have not been violated by Paroo."[3]  In exchange, Mr. Paroo agreed to release AHERF from any claims he might have pertaining to the termination of his services.  **[PR-PLD-062-02217-23]**

Pursuant to terms of the February 15, 1996 agreement with Ms. Calvert, AHERF agreed to pay her a lump-sum amount of $1,600,000 by February 29, 1996 to settle Ms. Calvert's tort claim[4] that alleged "intentional infliction of emotional distress."  AHERF also agreed to make a separate lump-sum payment to Ms. Calvert for pension and other fringe benefits under the AHERF Management Long-Term Incentive Plan and to continue her health insurance coverage under COBRA, all as consideration for her adherence to the non-compete provisions of the settlement agreement.[5]  In exchange, Ms. Calvert agreed to release AHERF from any claims she might have pertaining to the termination of her services.  **[DBR-DK 010282-86]**

In summary, during FY'96 AHERF paid lump-sum amounts totaling $4,900,000 to the two individuals to satisfy their claims for damages arising from the alleged wrongful

---

[1]  Ms. Calvert did not provide any testimony at her deposition citing her rights under the Fifth Amendment.

[2]  Paragraph 16 of the agreement states: "[p]ayment of the settlement sum is in full and final settlement of a disputed tort claim relative to Paroo's claims against AHERF of intentional infliction of emotional distress."

[3]  As set forth in paragraphs 3 and 4 of the agreement.

[4]  Paragraph 13 of the agreement state: "[p]ayment of the settlement sum is in full and final settlement of a disputed tort claim relative to Calvert's claims against AHERF of intentional infliction of emotional distress."

[5]  As set forth in paragraphs 2, 3, 4 and 17 of the agreement.

terminations, and further agreed to pay pension and other fringe benefits otherwise accruing to them provided that the former employees adhered to non-compete agreements in the Incentive Programs. In other words, compliance with the non-compete clauses referenced in the settlement agreements were tied only to the payout of fringe benefits, not to the $4.9 million of tort settlement payments. Based upon the terms of the agreements, AHERF had no right to recover any portion of such $4.9 million even if the former employees violated the non-compete provisions referenced in the settlement agreements.

Mr. Paroo testified that he understood that the $3,300,000 did not in any way relate to the non-compete provision referenced in the settlement agreement. **[Paroo 251:21-252:18]** He further testified that the non-compete covenant expired on November 30, 1997, at which time AHERF paid him the amounts in the executive retirement accounts to which he was entitled. **[Paroo 250:11-251:5]**, Mr. Paroo also testified that AHERF notified him by letter dated November 26, 1997 that it was satisfied that he complied with the non-compete provisions, and therefore paid him the $45,545.02 to which he was entitled. **[Paroo 253:20-255:3]**

## Relevant GAAP

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

SFAS 5 requires an estimated loss from a loss contingency to be accrued by a charge against income if it is probable that an asset has been impaired or a liability has been incurred as of the date of the financial statements, and that the amount of loss can be reasonably estimated. **(¶ 8)**

FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("CON 5")

CON 5 states:

> An expense or loss is recognized if it becomes evident that … a liability has been incurred or increased, without associated benefits. **(¶ 87)**

FASB Concepts Statement No. 6, *Elements of Financial Statements* ("CON 6")

CON 6 defines "assets" as that which can reasonably be expected or believed on the basis of available evidence or logic to have "future economic benefits obtained or controlled by a particular entity..." **(¶ 25 as clarified by footnote 18 relating thereto)**

### AHERF's accounting for the tort settlement agreements

In FY'96, AHERF capitalized the $3,300,000 and $1,600,000 of tort settlement payments, and included such amount in Other assets (a non-current asset). C&L's June 30, 1996 "Other Assets - lead schedule" indicates that AHERF's apparent justification for capitalizing the payments was that they were deemed to pertain to the non-compete covenants in the settlement agreements.[6] **[CL 002752-54]**

After each of the settlement sums were paid, AHERF commenced amortizing the $3,300,000 paid to Mr. Paroo and $1,600,000 paid to Ms. Calvert over their respective five-year periods in equal, monthly charges against income of $55,000 and $26,667, respectively. **[CL 014996-97]**

The combined unamortized balance of these capitalized settlements was approximately $4,382,000 and $3,402,000 as of June 30, 1996 and 1997, respectively, net of amortization expense of $518,000 and $980,000 that was recorded in FY'96 and FY'97, respectively. **[CL 014994-97]**

### Violations of GAAP

Paragraph 16 of the agreement with Mr. Paroo and paragraph 13 of the agreement with Ms. Calvert unequivocally state that the settlement sums are for payment of the damages claimed for the alleged tort (i.e., "emotional distress" and wrongful terminations). The agreements explicitly link the non-compete covenants only to the payment of pension and other fringe benefits.[7]  AHERF gained no future economic benefits from the tort settlement payments – the compensation was paid to settle claims for emotional distress allegedly arising from AHERF's past actions, and AHERF did not receive any future services from the former employees. Therefore, no asset was obtained and the full $4,900,000 of settlement sums should have been recorded as a loss charged against income in FY'96. Had the $4,900,000 been expensed, no amortization expense thereon would have been recorded in FY'96 and FY'97.

Because their inclusion in assets continued to be an accounting error in FY'97, the remaining unamortized balance of $4,382,000 should have been written off as a prior period adjustment in FY'97, and the $980,000 of amortization expense recorded in FY'97 should have been reversed.

As a secondary criticism, AHERF amortized the assets improperly.  Given its failure to expense the $3,300,000 and $1,600,000 payments to Mr. Paroo and Ms. Calvert,

---

[6]  Amounts paid for non-compete covenants obtained from departing personnel may appropriately be capitalized as an intangible asset in conformity with GAAP if the covenants are both legally enforceable and have future value to the entity.  Paragraphs 27 and 28 of Accounting Principles Board Opinion No. 17, *Intangible Assets*, requires each intangible asset to be amortized over the estimated life of that specific asset.

[7]  The agreements gave AHERF the option to accelerate payments for pension and other fringe benefits.

respectively, in FY'96, AHERF lacked a basis for amortizing the payments over 5 years because the non-compete covenants expired in two to three years.

## Violations of GAAS

C&L's audit program set forth the procedures to be performed in FY'96 to substantiate balances of non-current assets other than property and equipment:

> Examine documentation (e.g., invoices, correspondences or agreements, appropriate authorizations) that supports additions…The auditor should use judgment in determining the extent of tests after considering factors such as the reliability of the client's accounting records and control procedures, the type and frequency of errors in prior years, materiality of amounts and the nature and complexity of the transactions. **[CL 002762]**

AHERF treated the settlement agreements with Mr. Paroo and Ms. Calvert as confidential. Therefore, it appears that AHERF wanted only Mr. Buettner to have access to reviewing the agreements. The settlement agreements were contained in CFO David McConnell's files. **[Cancelmi 646:1-647:21]** However, I did not see any indication in the FY'96 and FY'97 audit workpapers[8] that Mr. Buettner obtained and reviewed the settlement agreements, even though the $4.9 million of additions to Other assets exceeded C&L's materiality threshold amount.

Mr. Buettner testified that he did not see the two agreements until 1999, had not fully read them then, and had not read them in their entirety at any time before his deposition. **[Buettner 529:20-530:11]** Senior Manager Mark Kirstein testified that he believed he too had not seen the settlement agreements. **[Kirstein 532:21-23]**

C&L indicated the following in its June 30, 1996 Other Assets lead schedule pertaining to the $4,382,000 balance of capitalized settlement payments:

> … relates to tort settlements with former employees to not compete…C&L noted that this will be amortized over 5 years. Based on discussions w/ D. McConnell these amounts represent covenants not-to-compete that should be amortized over 4 years. **[CL 002752]**

C&L violated SAS 19 by failing to corroborate management's representation that the tort settlement payments were linked to the non-compete provisions. C&L violated SAS 53 by failing to demonstrate the appropriate degree of professional skepticism about the future economic value of these capitalized costs because of the amounts involved and because the assets were described as being "tort settlements." There were no such similarly capitalized costs of such magnitude for previously terminated employees on AHERF's books. Due to their unusual description and size, an auditor exercising an ordinary level of due care would insist upon examining the agreements, and, if there were

---

[8] I did not see copies of the settlement agreements or a workpaper extracting or summarizing provisions thereof in C&L's FY'96 and FY'97 audit workpapers, including its permanent files.

any ambiguity, obtain permission from the client to communicate with the attorneys who wrote the agreements on the client's behalf in order to gain a complete understanding of their nature.

C&L's relevant June 30, 1997 audit workpapers reflect the opening and ending capitalized balances and FY'97 amortization pertaining thereto, and are each labeled "Tort Settlement Amortization." **[CL 014996-97]** As in FY'96, that description should have compelled C&L to gain assurance that the capitalized costs had future economic value. It failed to do so. Nor is there any indication that C&L made any inquiries about whether the two former employees were in compliance with the non-compete covenants, which C&L had indicated was the basis for capitalizing the payments.

C&L also violated SAS 31in FY'96 and FY'97 by failing to obtain sufficient competent evidential matter upon which to conclude that the tort settlements provided future economic benefits.

Consequently, C&L failed to detect the material misstatement of AHERF's FY'96 financial statements caused by the GAAP violation discussed herein, the effects of which misstated its FY'97 financial statements.

<u>**Effects of GAAP Violation on AHERF's Financial Statements**</u>

The effects of the aforementioned GAAP violation on AHERF's consolidated financial statements are reflected in correcting entry number 32, which is presented in Appendix III of this report.

14

**14. C&L failed to require AHERF to correct its improper accounting for contingent amounts of depreciation recapture from Medicare**

### Background

AHERF used Allegheny University Medical Centers ("AUMC")[1] to effect statutory mergers with Forbes Hospital System ("Forbes") and Allegheny Valley Hospital ("AVH"), effective January 1, 1997 and March 1, 1997, respectively.  Both acquisitions were accounted for by the purchase method of accounting under which the acquired assets and assumed liabilities were adjusted to their estimated fair values.  **[CL 016591, 013019-29, 019040]**  Since both acquisitions were effected by AUMC taking ownership of the net assets without any additional consideration, **[Ex. 1319]** and given that the fair value of the assets acquired exceeded the fair value of the liabilities assumed, "negative goodwill" was recorded in an amount necessary for the assets acquired to equal the liabilities assumed.[2]

In the terminating cost reports filed in FY'97 in connection with the Forbes and AVH statutory mergers, based on the adjusted fair values of property and equipment, AHERF claimed depreciation recapture of approximately $21 million and $14 million, respectively. **[Ex. 1317, Ex. 1352]**  Senior Director of Corporate Reimbursement Joseph Scharf explained at his deposition that Medicare depreciation recapture is a payment from the government in connection with a change in control of a hospital because the price paid for the hospital's assets indicates that the government had previously under-reimbursed the hospital for depreciation expense.  **[Scharf 121:13-122:23]**  C&L Senior Manager Duane Girol is a specialist in reimbursement issues.  Mr.Girol's understanding of depreciation recapture was consistent with Mr. Scharf's.  **[Girol 274:2-275:2]**

Veritus Medicare Services ("Veritus"), the Medicare intermediary in the Pittsburgh area, sought a decision directly from the U.S. Department of Health and Human Services ("DHHS") in order not to err with respect to any payment of the Forbes and AVH depreciation recapture.[3]  **[Ex. 1319]**  DHHS denied the application for depreciation recapture in an April 8, 1998 letter to Veritus.[4]  **[DBR-AA 14414-14416]**  Mr. Scharf's April 23, 1998 memo informed Messrs. McConnell, Dionisio and Adamczak of the denial, the reasons given in support of the ruling, and his belief that it would take about four years for an appeal by AHERF, if filed, to be heard by the Provider Reimbursement Review Board.  **[DBR-AA 14413]**

---

[1]  AHERF formed AUMC during FY'97 and was its sole member.
[2]  GAAP requires non-current assets, such as property and equipment, to be reduced to zero before recording negative goodwill.
[3]  Medicare rules and regulations were at that time issued and interpreted by the Health Care Financing Administration ("HCFA"), a federal agency within DHHS.
[4]  The reasons given by DHHS for denying the application were: (1) the value of the consideration was so low in relation to the assets acquired that the transactions did not constitute bona fide sales of the depreciable assets; and (2) there was no change in control (and thus, no sale) based on the finding that substantially the same individuals controlled the providers both before and after the mergers.

## **Relevant GAAP**

Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5")

With respect to gain contingencies, SFAS 5 states:

> a. Contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.
> b. Adequate disclosure shall be made of contingencies that might result in gains, but care shall be exercised to avoid misleading implications as to the likelihood of realization. **(¶ 17)**

Accounting Principles Board Opinion No. 16, *Business Combinations*, ("APB 16")

In discussing the application of the purchase method of accounting for a business combination, under "Recording Assets Acquired and Liabilities Assumed," APB 16 states:

> An acquiring corporation should allocate the cost of an acquired company to the assets acquired and liabilities assumed. ...
>
> First, all identifiable assets acquired, either individually or by type, and liabilities assumed in a business combination, whether or not shown in the financial statements of the acquired company, should be assigned a portion of the cost of the acquired company, normally equal to their fair values at date of acquisition.
>
> Second, the excess of the cost of the acquired company over the sum of the amounts assigned to identifiable assets acquired less liabilities assumed should be recorded as goodwill. The sum of the market or appraisal values of identifiable assets acquired less liabilities assumed may sometimes exceed the cost of the acquired company. If so, the values otherwise assignable to noncurrent assets acquired (except long-term investments in marketable securities) should be reduced by a proportionate part of the excess to determine the assigned values. A deferred credit for an excess of assigned value of identifiable assets over cost of an acquired company (sometimes called "negative goodwill") should not be recorded unless those assets are reduced to zero value. ... **(¶ 87)**

Statement of Financial Accounting Standards No. 38, *Accounting for Preacquisition Contingencies of Purchased Enterprises* ("SFAS 38")

SFAS 38 "specifies how an acquiring enterprise should account for contingencies of an acquired enterprise that were in existence at the purchase date and for subsequent adjustments that result from those contingencies. Amounts that can be reasonably

estimated for contingencies that are considered probable are recorded as part of the allocation of the purchase price. Subsequent adjustments are included in net income when the adjustments are determined except in limited circumstances described in this Statement." **(Summary)**

SFAS 38 defines a preacquisition contingency as one that is in existence before the consummation of the combination and provides that the "allocation period" required to identify and quantify the assets acquired should usually not exceed one year from the consummation of a business combination. **(¶ 4.a. and 4.b.)**

Under "Allocation of the Purchase Price," SFAS 38 states: **(¶ 5.)**

> A preacquisition contingency other than the potential tax benefit of a loss carryforward shall be included in the purchase allocation based on an amount determined as follows:
>
> > a. If the fair value of the preacquisition contingency can be determined during the "allocation period," that preacquisition contingency shall be included in the allocation of the purchase price based on that fair value.
> >
> > b. If the fair value of the preacquisiton contingency cannot be determined during the "allocation period," that preacquisition contingency shall be included in the allocation of the purchase price based on an amount determined in accordance with the following criteria:
> >
> > > (1) Information available prior to the end of the "allocation period" indicates that it is probable that an asset existed ... It is implicit in this condition that it must be probable that one or more future events will occur confirming the existence of the asset ...
> > >
> > > (2) The amount of the asset ... can be reasonably estimated.

Under "Subsequent Adjustments." SFAS 38 states: **(¶ 6.)**

> After the end of the "allocation period," an adjustment that results from a preacquisiton contingency other than a loss carryforward shall be included in the determination of net income in the period in which the adjustment is determined.

FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("CON 5")

CON 5 states that two factors should be considered when determining when to recognize revenue on a transaction - when the revenue is realized or realizable, and when it is earned. It states:

14-3

Revenues and gains generally are not recognized until realized or realizable. (¶ 83.a.)

… [R]evenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. (¶ 83.b.)

### AHERF's accounting for the Forbes and AVH depreciation recapture

In FY'97, after the effective dates of the mergers but prior to any decision by DHHS, AHERF recorded $7,106,000 of estimated recapture receivables from Medicare ($3,096,000 for Forbes and $4,010,000 for AVH) by debiting Medicare Depreciation Recapture Cost Rate Adjustment ("CRA") accounts[5] and recognizing the $7,106,000[6] as net patient service revenue earned in FY'97. [Ex. 4043, X 23984-85] This accounting reflects not only an expectation of a favorable finding by DHHS (i.e., recapture amounts would be approved and received), but also the view that the recapture assets had arisen subsequent to the effective dates of the mergers (rather than being assets acquired in the merger or contingent assets that were in existence at the purchase date).

In addition to recognizing $7.1 million in revenue and recording the related receivables, AHERF established general reserves or "cushions," in connection with its FY'97 acquisitions.[7] [CL 018910-11, 037249] Since these reserves were set up through purchase accounting adjustments, and there were no charges to expense, they did not offset AHERF's recording of the $7.1 million of net patient service revenue in FY'97.

Senior Director of Accounting Dan Cancelmi's June 25, 1998 memo indicated that, during FY'98, an additional $7 million of depreciation recapture receivables (i.e., in addition to the $7.1 million recorded in FY'97) had been recorded on the books of Forbes and AVH, with corresponding increases in patient revenue. Mr. Cancelmi recommended a write-off of the $14.1 million of receivables as of June 30, 1998 by reversing the $7 million of recapture receivables and patient revenue recognized during FY'98 and writing-off the $7.1 million recorded in FY'97 as a restructuring charge. [Ex. 1316] The June 30, 1998 detailed trial balances run on August 27, 1998 show that the Medicare CRA recapture accounts were reduced to zero through postings having effective dates of June 1998. [PwC-SUB-DC-00376 (for Forbes); AVH general ledger page 170]

---

[5] AHERF included CRA accounts as a component of consolidated net patient accounts receivable as of June 30, 1997 (consistent with its prior year reports).

[6] AHERF had filed claims totaling $35 million for depreciation recapture but "conservatively" recorded only the amounts discussed herein. [CL 018083, 012585-6]

[7] AHERF recorded "Corporate Services Accruals" totaling $11.061 million that also included a specific $3 million reserve related to "Pyramid risk contract accrual," leaving a balance of $8.061 million of reserves that had inappropriately reduced the amount allocated to negative goodwill.
[CL 013030-31, 013098; PwC-SUB-DC-00380]

## Violations of GAAP

AHERF's recognition of $7.1 million of patient revenue with respect to depreciation recapture during FY'97 was inappropriate because realization was contingent on a favorable ruling by DHHS. When the June 30, 1997 financial statements were issued, such a favorable ruling was not reasonably assured and, thus, represented a contingent gain. Mr. Scharf highlighted the contingent nature of the recapture claims in an August 19, 1997 memo to Vice President, Financial Services, Al Adamczak:

> As you are aware, Veritus, Inc. has denied any advances on these monies until the Cost Reports have been audited. Since the audits will cover legal as well as financial documents, there is no guarantee that the monies requested constitute a 100% receivable. In addition, the purchase price allocation methodology as well as the actual loss calculations will be scrutinized by the auditors. Based on this information, I would not anticipate receiving any cash until sometime during Fiscal Year 2000. **[Ex. 1352: DBR-AA 14443]**

Mr. Scharf reiterated his position at his deposition stating that he believed the $7.1 million recognition of revenue was improper:

> Q. Why, again, did you think it was improper?
> A. Because we weren't sure we were going to be able to collect that money. If there was a chance we wouldn't collect it and we recorded it, I didn't know how we were going to be able to offset that impact to the bottom line at a later date.
>
> Q. Was there any other reason that you were opposed to recognizing the depreciation recapture as revenue?
> A. Before we received the letter that was sent to Veritus to Richard Rinchler by HCFA stating they were going to disallow it, we had heard from the Veritus Medicare auditors that there's a possibility it would not be allowed.
> **[Scharf 315:19 – 316:15]**

Because the claim for reimbursement represented a contingent gain, AHERF's recognition of revenue related to this item in FY'97 violated GAAP. Even if, hypothetically, the recording of the receivable could be justified, it should properly have been recorded as part of the allocation of purchase price, this would have increased the amount allocated to negative goodwill rather than affecting revenue. If the contingent nature of the claim had been resolved within one year from the dates of the mergers, it should have resulted in a retroactive adjustment to the opening balance sheet (and negative goodwill) and still should not have affected revenue. Only if a favorable notification from Medicare was received more than a year after the effective dates of the mergers would it have been in conformity with GAAP to recognize revenue from the claimed amounts of the depreciation recapture.

In addition to violating GAAP by recognizing the $7.1 million as revenue (and the related receivable) in FY'97, AHERF's recording of the general reserve as part of the purchase accounting adjustments (which did not reduce income) had the effect of understating the amount properly allocated to negative goodwill. This in turn had the effect of understating the amortization of negative goodwill. As explained above, the total amount of excess reserves affecting negative goodwill was $8.061 million, for which the related understatement of amortization of negative goodwill for FY'97 was $115,000.[8]

### Violations of GAAS

The issue of Medicare depreciation recapture was discussed at a meeting on January 20, 1997 attended by Mr. Buettner, Mr. Kirstein, Ms. Frazier, Mr. Spargo, Mr. Adamczak, and Mr. Cancelmi. Those individuals apparently discussed how AHERF might account for recapture claims made in connection with recent acquisitions, specifically whether claims should be recorded as part of purchase accounting or through income. **[CL 037722-24]**

Shortly thereafter, Audit Senior Manager, Mark Kirstein requested guidance from Kelly Barnes and Maribess Miller[9] of C&L's Dallas, Texas office. In a January 23, 1997 e-mail response to Mr. Kirstein, they concluded that any recapture asset would properly be included as part of the assets acquired in the purchase transactions (rather than as income):

> We agree (and current discussion at HFMA and the P&P Board also support) with your initial reaction that the recapture is really an asset of OLDCO for which consideration would be given in the allocation of the purchase price. While there is no hard and fast 'rule' or technical 'guidance' that spells this out – it's really a matter of common sense in the context of transaction accounting. OLDCO will have to file a terminating cost report. The asset that will be generated from the recapture is an asset of OLDCO and is related to their PP&E and their Medicare volumes. ... The treatment of the recapture in this situation would be as an asset acquired in the purchase (and accordingly, established at its fair value). This will ultimately reduce the value of any intangible that is recorded. ... If the amount that is ultimately received exceeds the amount that you determine should be recorded it can be treated as an adjustment of the purchase price (within the first year.) **[Ex. 4409: CL 158744-5, 037724]**

In forwarding the e-mail later that day to Mr. Buettner and Ms. Frazier, Mr. Kirstein stated:

> We should discuss. The answer does not support AHERF's intentions; however, there is no clear guidance. **[Ex. 4409: CL 158744]**

---

[8] The $115,000 represents one-half year based on a 35 year amortization period.

[9] According to the testimony of Mr. Buettner, Ms. Miller was the C&L partner responsible for the healthcare practice of the firm. **[Buettner 773:25-774:3]**

On January 24, 1997, Mr. Buettner e-mailed the following reply to Mr. Kirstein:

> I agree.  Please call Steve [Spargo] ASAP and mention to him our findings.  Tell him we want to work with AHERF to accomplish their objectives.  One idea is to place a large reserve against the initial claim and release the reserve at a later date.  Also tell Steve that our findings are based on what other organizations are doing and what the AICPA has discussed informally.  We run the risk that a final rule may come out on a retro date which will force a change.
> **[Ex. 4409: CL 158744]**

In a September 9, 1997 "Issue Topic" memo pertaining to AHERF's FY'97 non-recurring revenue, created by In-charge Senior Christa Porter and last modified by Senior Manager Amy Frazier in December 1997, C&L concluded that the aforementioned $7.1 million of depreciation recapture was a contingent gain.  The memo stated that "C&L had proposed an entry to reverse the recognition of income and receivable.  See SUD for entry."  **[CL 012585-6]**

Another FY'97 C&L "Issue Topic" memo pertaining to the $7.1 million Medicare recapture entry, created by staff auditor Dana Bleckman and cleared by Ms. Porter, stated that "C&L has proposed this entry to reverse the amount as it related to a gain contingency which under FAS 5 should not be recorded until received." The same entry appeared on C&L's CRA lead schedule for June 30, 1997. **[Ex. 4265]**  The proposed entry was a debit to "Income" and a credit to "CRA Medicare Recapture."

C&L's regulatory healthcare specialist Duane Girol, who audited AHERF's CRA estimates, testified at his deposition that it was C&L's normal practice at the time to treat depreciation recapture claims as contingent gains, that he supported the decision to propose the adjustment to reverse the $7.1 million of recapture revenue, and that he did not recall anyone on the engagement team disagreeing with that decision:

> Q.  In assessing – in evaluating the propriety of recording the receivables on its audit client's books, did it [C&L] have the position that the normal practice would be not to record any receivables because it was a contingent gain?
> A.  That would be the normal practice.  I didn't see anything in writing for a directive of that, but it would be normal practice that it would be considered contingent.
>
> Q.  And then – so it would not be appropriate to record the receivable?  Right?  Is that your understanding?  Or to reserve it if you did record it?
> A.  Yeah, if you recorded it, I would recommend that it be reserved.
>
> Q.  Do you recall having any discussions with other members of the audit team about that position?
> A.  Yeah, that was reviewed.

Q. With who?
A. I believe with Amy.

Q. Amy Frazier?
A. Amy Frazier.
**[Girol 277:29-278:24]**

\* \* \*

Q. Did you have any part in coming to this footnote [the footnote, which appears in Ex. 4058, states "C&L proposes the following entry to reverse the amount ($7,137,602) as it is a gain contingency which should not be recorded until received."] where C&L proposes the following entries -- entry to reverse the amount?
A. I don't have any disagreement with this. … Did I have any part in coming up with that decision?

Q. Yeah, to propose an entry to reverse the amount.
A. I would say that my work papers on these other pages would say that I had a part in supporting that decision.

Q. Do you recall if anybody on the Coopers' audit team voiced any disagreement with you?
A. No.
**[Girol 282:17-283:20]**

Mr. Buettner testified as to his agreement that such a gain contingency should not have been recognized in income but stated he was unaware that the receivables were recorded through income. He testified that he believed the $7.1 million had been booked as part of the purchase adjustments or part of the goodwill computation:

Q. Miss Porter and/or Miss Bleckman, however, have apparently expressed at least their opinion that C&L would propose an entry to reverse the amount— the 7.1 million dollar amount as it related to a gain contingency, which under FAS 5 should not be recorded until received?
A. Yes.

Q. Did you, therefore, disagree with them at some point?
A. No. The booking of this receivable in my opinion was somewhat aggressive. But if structured the right way, presumably the AHERF enterprise would have collected some amount. But we weren't sure how [much]. So our recommendation to the client is that you really don't know how much you're going to collect. It should be booked as an adjustment to goodwill. Our suggestion is that you reserve for the amount until you determine exactly how much you're going to collect and that would probably take a year.

> Q. Did you recall learning during your'97 audit work that the Allegheny Valley
> Hospital and Forbes Medical Center had indeed recorded income in the
> amount of over 7 million dollars for Medicare recapture?
>
> A. No, I was not aware of that.  I knew the Medicare recapture had been booked,
> but my understanding was that it had been booked as a part of the purchase
> adjustments or part of the goodwill computation.
>
> **[Buettner 768:11-769:17]**

Mr. Buettner also testified that in addition to his understanding that the client had booked
the Medicare recapture as an element of the purchase accounting adjustments (not as
income), he understood that a reserve for such amount had been recorded.
**[Buettner 774:22-775:4]**

The aforementioned proposed SUD entry, to reverse the recording of the receivable and
the income was "marked for deletion" by Ms. Frazier late in the 1997 audit and the entry
was not posted to C&L's SUD.  When asked why the proposed correcting entry had not
been posted to C&L's SUD schedule, Mr. Buettner testified that it was because it had
been fully reserved for:

> Q. Do you recall any particular discussion about any SUD entry for this amount
> and for this item?
>
> A. No.  As I testified to earlier, my memory is that this item would not go on the
> SUD because it was fully reserved for.
>
> **[Buettner 776:22-777:3]**

When asked why she removed the SUD entry, Ms. Frazier testified:  "Because it was
determined that it had not been recorded through income, and that it had been recorded as
part of the opening balance sheet, and should not be a reduction to income."
**[Frazier, SEC 293:12-18]**

It is odd that Mr. Buettner and Ms. Frazier would state that they were not aware that the
receivables were recorded with a corresponding credit to the income statement.  In
addition to the SUD entry discussed above (which proposed a decrease to income when
removing the receivables), both were copied on the e-mail correspondence in January of
1997 wherein it was recognized that it was "AHERF's intentions" to record gains in
connection with depreciation recapture filings.  Mr. Buettner commented that it was his
belief that "the client wishes to record the gain at the time the recapture claim is made
…." **[Ex. 4409]** Mr. Buettner's January 24, 1997 e-mail indicated that he was aware of
AHERF's intentions to recognize the $7.1 million of depreciation recapture as revenue
and expressed his desire to "work with AHERF to accomplish their objectives." That e-
mail also suggested the placement of a "large reserve against the initial claim."
**[Ex. 4409]**

Moreover, Ms. Frazier's annotated copy of an August 22, 1997 Audit Update agenda had
a note, in her handwriting, next to the "Medicare Recapture" item, that stated "through
income."  Also, the numerous working papers in C&L's files relating to the opening

balance sheet and purchase price adjustments for Forbes and AVH make no mention of any "purchase adjustment" for the recording of Medicare depreciation recapture receivables. **[Ex. 4128, CLASS 0026-102]** Ms. Frazier is listed on a CRA-related workpaper in the subsequent review period of the audit that noted: "Relative to MC recapture, they are continuing to record amounts for Forbes and AVH ...." **[Ex. 4038]**.

Mr. Buettner's testimony that he was unaware that it had been recognized as revenue is inconsistent with his responsibilities in accordance with GAAS (SAS 22). As the partner with final responsibility for the audit, Mr. Buettner (or his designee) was required to review the proposed adjustments and the adjustments actually recorded by the client as reflected in the audit workpapers. Given the amount of consultation with respect to this particular issue and its significance to the financial statements, Mr. Buettner and Ms. Frazier should have been aware of how the client had actually recorded this transaction.

Had the $7,106,000 error been properly posted to the SUD and added to the net reduction in income of $2,155,000 that was shown on the SUD, the combined error of $9,261,000 would have represented approximately 40% of AHERF's reported FY'97 consolidated net income, an amount that was material to AHERF's financial statements and requiring adjustment, especially when combined with the other misstatements referred to in this report. **[CL 012582-83]** In summary, C&L's GAAS violations included:

- The failure to properly accumulate likely misstatements and failure to either cause management to eliminate a material misstatement or issue a qualified or adverse opinion. **(SAS 47, 53, and 58)**
- The failure to exercise due care in evaluating the results of audit procedures. **(SAS 53)**
- The failure to insist that the financial statements be revised for the effects of a material irregularity (intentional misstatement). **(SAS 53)**

### Effects of GAAP Violations on AHERF's Financial Statements

The effects of the aforementioned GAAP violations on AUMC's combined and AHERF's consolidated financial statements are reflected in correcting entries number 6 and 39, which are presented in Appendix III of this report.

15

## 15. C&L failed to require AHERF to correct other GAAP violations

In addition to matters discussed elsewhere in this report, AHERF violated GAAP by failing to correctly account for or adequately disclose in its financial statements certain other matters. C&L violated GAAS in the manner discussed below.

### A. Improper accounting for various matters

1. In addition to the improper creation of excessive acquisition reserves on the books of the former GHS entities in FY'97, and the improper transfer thereof to DVOG entities (see Basis For Opinion 4), AHERF similarly violated GAAP within GHS entities as follows:

   • AHERF improperly reduced the contractual allowance expense of The Graduate Hospital ("TGH")[1] during the two months ended June 30, 1997 by $4 million (which increased net patient service revenue) when eliminating an excessive general contingency reserve, which was in TGH's opening balance sheet as of May 1, 1997. **[Ex. 308]** Instead, in conformity with GAAP covering purchase accounting for business combinations, elimination of the unneeded reserve, which was deemed to be excessive, should have been treated as a reduction of the liabilities as of the acquisition date. Had that been done, TGH's property and equipment would have been reduced by $4 million (because 100% of the excess of the TGH's cost over the fair value of its net assets acquired was allocated to Property and equipment).

   • Similarly, AHERF improperly reduced the contractual allowance expense of Rancocas Hospital ("RH")[2] during the two months ended June 30, 1997 by $2.5 million when eliminating a general contingency reserve that was in RH's opening balance sheet as of May 1, 1997. **[Ex. 309]** Instead, in conformity with GAAP covering purchase accounting for business combinations, elimination of the unneeded reserve, which was deemed to be excessive, should have been treated as a reduction of the liabilities assumed as of the acquisition date. Had that been done, RH's Other assets (which includes goodwill) would have been reduced by $2.5 million (the excess of cost over the fair value of AHNJ's net assets acquired was substantially allocated to goodwill as of the acquisition date).

---

[1] TGH, Parkview Hospital and City Avenue Hospital were subsidiaries of Allegheny Hospitals, Centennial Obligated Group ("Centennial"), of which AHERF was the sole member.
[2] RH was the principal subsidiary of Allegheny Hospitals, New Jersey ("AHNJ"), of which AHERF was the sole member.

I saw nothing in C&L's audit workpapers to indicate that it detected the improper creation of the artificial revenue.[3] C&L's GAAS violations with respect to these GAAP misstatements are the same as discussed in Basis for Opinion 4.

The effects of these GAAP violations on Centennial's combined financial statements and on AHNJ's and AHERF's consolidated financial statements are reflected in correcting entry number 33, which is presented in Appendix III of this report.

2.  As of June 30, 1996 and 1997, the contractual allowances (CAs) of DVOG entities were understated by approximately $4.9 million and $9.2 million, respectively. The principal cause of these underaccruals was a failure by AHERF to manually accrue a sufficient amount of CAs to adequately reflect (a) historically incurred rates of CAs for commercial accounts, (b) CAs on patient accounts covered by third-party payors for which human error, computer limitations, or other factors prevented the CAs from being automatically applied to such patient accounts, and (c) CAs needed to reduce patient billings on patient accounts covered by capitation arrangements to zero.

AHERF's PFSG and Accounting Department produced monthly "Accounts at Gross" reports which contained billed patient accounts that were both (a) over $2,500 and (b) the net billed amount was 90% or more of the gross charges. **[Ex. 147]** AHERF also produced monthly reports in which it quantified the adverse effect the "out-of-period" contractuals had on the current month's net patient service revenue. Based on the June 30, 1996 and 1997 Accounts at Gross reports, and on the out-of-period contractual reports, AHERF's Accounting Department should have accrued adequate contractual allowances as of both year-ends. However, it failed to do so.

Standard audit procedures include performing cutoff tests and reviewing transactions for a period of time after year-end to determine that revenue is properly included or excluded from the financial statements of the year under audit. In order to determine the proper cutoff and accrual of CAs as of June 30, 1996 and June 30, 1997, C&L should have (a) obtained from AHERF the same "ad hoc" reports that AHERF used to determine if accounts were appropriately contractualized, and (b) reviewed contractual allowances recorded subsequent to year-end (which AHERF called "out-of-period contractuals") to gain assurance that accruals of contractual allowances were adequate as of year-end balance sheet dates.

I saw no indication in C&L's FY'96 audit workpapers that it performed any substantive audit procedures to identify out-of-period CAs recorded by AHERF subsequent to the balance sheet, despite its knowledge of the improper reporting of accounts at gross. However, C&L did not propose a SUD entry to record the underaccrual of contractual allowance reserves of approximately $5 million as of June 30, 1996.

---

[3] The violation of GAAP discussed herein is similar to the improper reduction of $28.3 million of DVOG entities' contractual allowances discussed in Basis for Opinion 4.

For the FY'97 audit, in reviewing AHERF's Q1'98 internal reports, C&L noted that unrestricted net assets had been reduced by approximately $23 million (without a charge to earnings) purportedly representing AHERF's estimate of unrecorded CAs that applied to services provided to patients in FY'97. C&L performed additional work in December 1997 to determine the amount of unrecorded CAs as of June 30, 1997,[4] from which it detected underaccruals of CAs on DVOG entities' inpatient accounts totaling $5.2 million. **[Ex. 4039, CL 015525-27]**

C&L's FY'97 audit workpapers also contain an Out of Period Adjustments schedule for Outpatient CAs as of September 30, 1997. That schedule, which is devoid of any explanations, does not indicate if there was an underaccrual of outpatient account CAs as of June 30, 1997 or as of any point in time. **[Ex. 4040, CL 015537-38]** However, the AHERF schedule from which the C&L data was copied has a handwritten notation designating certain unfavorable variances from budgeted Q1'98 revenue as being "prior period adjust," including $4 million attributable to capitation writeoffs for the USHC ($1.3 million) and Keystone ($2.2 million) arrangements plus $0.5 million for the effects of a reserve rate change on commercial accounts. **[CL 027145]** Other items (principally volume variances) on the schedule cannot be deemed to be overstatements of revenue with certainty.

Therefore, CAs were understated by at least $9.2 million ($5.2 million on inpatient accounts plus $4.0 million on capitation accounts) as of June 30, 1997. However, C&L did not post an entry to its FY'97 SUD to correct the CA underaccruals it detected as of June 30, 1997, although it identified the $5.2 million as "Additional Allowance to be Recorded." Thus, C&L violated SAS 47 by failing to include the item in the aggregation of errors it detected.

The effects of this GAAP violation on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry number 8, which is presented in Appendix III of this report.

3. During the two months ended June 30, 1997, AHERF recorded net patient service revenue aggregating approximately $10.9 million by eliminating deferred credits of TGH, Parkview Hospital and City Avenue Hospital that were in those entities' opening balance sheets as of May 1, 1997.[5] Its rationale for doing so was that the presumed obligation giving rise to the deferred credit had disappeared. Instead, it should have eliminated the deferred credit as of May 1, 1997, and reduced Property and equipment of TGH and Other assets (i.e., goodwill) of Parkview Hospital and City Avenue Hospital, accordingly.

---

[4] The timing of these extended procedures preceded the January 8, 1998 final dating of C&L's audit report on AHERF's FY'97 financial statements.

[5] The deferred credits had been recorded to give recognition to potential exposure to loss under the prudent buyer clause of Blue Cross contracts. The prudent buyer clause gave Blue Cross protection that the cost reimbursements that it provided to a former GHS hospital would not be higher than the cost reimbursements provided to them by any other significant third-party payor.

C&L deemed the revenue recognition to be an error, and proposed a SUD adjustment to reverse $14 million from revenue and restore it to deferred revenue of AHC. **[PwC 009743]** I saw no explanation in C&L's workpapers as to why C&L proposed reversing $14 million of revenue rather than the $10.9 million actually taken into income by those entities during May and June 1997.

4. C&L noted in its Non-recurring Revenue issues memo that GHS entities had prudent buyer clause exposure[6] with respect to the lower rates for medical services that they charged to patients under an arrangement with Qualmed, a former affiliated entity.[7] **[CL 012585]** I did not find in C&L's FY'97 audit workpapers a legal opinion or other competent evidential matter to support its view. Furthermore, there is no indication that Duane Girol, C&L's cost rate adjustment specialist[8] (see Basis for Opinion 6), had reviewed the proposed SUD adjustment for propriety.

   The prudent buyer clause was removed from the contract between Blue Cross and AHERF as of January 1, 1997; **[Frazier (SEC) 691:1-13, 695:2-11]** therefore, no further exposure to loss thereunder existed past that date. Assuming the Blue Cross cost rate adjustment estimates for prior periods were reasonable, the deferred credits should have been removed from GHS entities' opening balance sheets, with corresponding reductions of Property and equipment or goodwill (i.e., the accounts written up to record the excess of cost over the underlying fair value of net assets acquired during purchase accounting for the GHS acquisition in FY'97). AHERF made an improper, self-serving determination that the deferred revenue was earned in the last two months of FY'97, when AHERF owned the former GHS entities.

   The effects of this GAAP violation on Centennial's combined and AHERF's consolidated financial statements are reflected in correcting entry number 38, which is presented in Appendix III of this report.

5. In the quarter ended March 31, 1996, AHERF recognized as income a $6.7 million "gain" on the sale component of a sale and leaseback transaction pertaining to an AGH-owned building in which IBM subleased approximately 40% of the space. **[Ex. 4399: CL 000379]**

   C&L proposed SUD entries to correct AGHOG's combined and AHERF's consolidated FY'96 and FY'97 financial statements for this error, but then waived the adjustments as not being material when aggregated with the other SUD adjustments. The effects of this GAAP violation on AGHOG's combined and AHERF's consolidated FY'96 and FY'97 financial statements are reflected in SUD correcting

---

[6] Prior to January 1, 1997, AHERF's contracts with Blue Cross ("BC") usually contained prudent buyer clauses which contractually granted BC the right to pay for medical services provided to its subscribers at rates not less than the rates received by AHERF from any other significant third-party payor. The clause also gave it the right to reject excessive costs resulting from purchase of an excessive quantity of goods, or from paying for goods and services at prices that were excessive.

[7] Loss of affiliation through sale of Qualmed's parent exposed GHS entities to prudent buyer claims by Blue Cross.

[8] A prudent buyer reserve is a form of cost rate adjustment.

entry number S-21, which is presented in Appendix III of this report.  See Basis for Opinion 17 with respect to C&L's GAAS violation of failing to communicate this matter to AHERF's Board of Trustees.

6.  In July 1998, in restating its July 1, 1997 balance sheets, AHERF corrected its financial statements by increasing Assets limited or restricted as to use and non-current liabilities in equal amounts to record the funded obligations under certain employee fringe benefit plans.  The effects of this GAAP violation on DVOG's combined and AHERF's consolidated financial statements are reflected in correcting entry numbers 36 and 37, which are presented in Appendix III of this report.

7.  C&L used the "iron curtain" approach to aggregating differences it detected in FY'95, FY'96 and FY'97.  Under that approach, proposed audit adjustments that are waived are not taken into consideration in aggregating misstatements in the ensuing year.

CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY

I reflected the C&L SUD items as correcting entries in Appendix III (excluding certain SUD entries proposed by C&L which were superseded by my correcting entries or which were de minimus).  However, I used the "rollover"[10] approach rather than the iron curtain approach in including the effects of the SUD entries in the quantification of misstatements, principally because the magnitude of the errors I detected necessitate restatement of AHERF's (and its subsidiaries') July 1, 1995 opening balance of net assets, net results of operations for FY'96 and FY'97, and balance sheet amounts as of June 30, 1996 and 1997.  Consequently, in accordance with SAS 47, in reflecting the effects of the FY'95 and FY'96 SUD entries, I also reflected the effects of such entries in the ensuing year, which typically was a reversal of the revenue or expense effects of the original SUD entry.

B.  Improper disclosures of restructuring costs

AHERF's disclosure of ordinary AHC/AHNJ operating expenses as restructuring costs in its FY'97 financial statements was false and misleading.

The pro forma disclosure in Note 15 to AHERF's FY'97 financial statements of expenses incurred by the former GHS entities (AHC and AHNJ)[11] reflects $49 million of restructuring costs for the twelve months ended June 30, 1997.  **[PwC 0047759]** C&L knew or should have known from the nature of the items comprising these restructuring costs that only a minimal amount of such costs,[12] if any, "qualified" for reporting as

CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY

---

[11]  GAAP requires an acquirer to disclose revenues, expenses and net income (loss) of acquired entities for the acquiror's full fiscal year, which, among other things, enables a user to be better able to evaluate the potential impact of the acquisition on future results of operations and to compare actual results in future periods with the pro forma disclosures.

[12]  Irrespective of whether the required approvals by the Board were obtained for exit costs of certain operations and termination costs of employees deemed redundant, about $5 million of the $49 million

restructuring costs incurred in connection with an acquisition in conformity with EITF 95-3. C&L's "Purchase accounting" Issue-type memo reviewed by the top members of the audit engagement team[13] concludes that "[m]anagement has made appropriate disclosures related to the business combinations disclosed in Note 15." However I have not seen anything in C&L's audit workpapers to indicate that it evaluated the classification of the $49 million as qualifying for disclosure as "restructuring costs."

C&L knew before the FY'97 financial statements were issued that AHERF's November 3, 1997 letter to First Union National Bank (Centennial's Master Trustee) requesting a waiver of loan covenant defaults claimed that its reason for noncompliance with financial covenants in FY'97 was attributable to the non-recurring restructuring costs. **[CL 036738-41]** C&L also knew that AHERF's report as Centennial's turnaround consultant also treated the costs as non-recurring **[Ex. 387]**, as discussed in Basis for Opinion 16. C&L failed to demonstrate objectivity in having permitted the false and misleading financial statement disclosure, especially when it knew that AHERF was using such characterization of the costs to induce the Master Trustee to grant a waiver of Centennial's debt covenant violations.

---

might qualify (based solely on the description of the costs) as "restructuring" costs. As reflected in C&L's audit workpapers, most of the remaining items should have been reported as operating expenses, as they primarily included write-offs of current assets (receivables and inventories) or accruals of expenses associated with ongoing revenue-producing activities. **[SEC Ex. 227, PwC 015206-11]**

[13] The memo was reviewed by partners Buettner and Hoover and managers Frazier and Kirstein after initially being created by in-charge senior Porter.

16

## 16.  C&L failed to require AHERF to classify certain long-term debt as current liabilities and disclose violations of certain debt covenants

### Background

AHERF and its subsidiaries had long-term debt agreements in which certain groupings of subsidiaries jointly and severally agreed to repay specific borrowings, and were therefore called "obligated groups." The debt was primarily in the form of bonds and notes held by bond and note holders of the obligated groups and loans to AHERF (parent) from financial institutions. Repayments to the bond and note holders were generally secured by guarantees from financial institutions, primarily under financial guaranty insurance policies and reimbursement and letter of credit agreements between the lenders, the bond and note holders, and the obligated groups. Generally, certain of the assets and gross revenues of each member of the obligated group were pledged as collateral securing the debt of the obligated group. The debt instruments pertaining to debt of the obligated groups were administered by a master trustee pursuant to terms of a master trust indenture ("MTI").

This Basis for Opinion uses certain terminology that is described in more detail in the Addendum hereto. The Addendum reflects certain debt compliance calculations made as of June 30, 1996 and 1997 and for the years then ended to determine whether each obligated group and AHERF complied with the financial covenants of its debt instruments. The Addendum identifies the obligor, the debt instrument, the financial covenant, extracts from the definitions of terms provided in the debt instrument pertaining to the financial covenant, the formulae for numerators and denominators (if applicable), and the related debt compliance calculations, both as reported by AHERF and as corrected. The "Corrected" column of each calculation was derived by adjusting the amount reported for the effects of correcting entries that I made (including C&L's proposed audit adjustments) and errors I detected in AHERF's debt compliance calculations.

As of June 30, 1996, AHERF's obligated groups were the Allegheny General Hospital Obligated Group ("AGHOG") and the Delaware Valley Obligated Group ("DVOG").

The AGHOG had bonds and notes outstanding under its MTI aggregating approximately $257 million and $250 million as of June 30, 1996 and 1997, respectively. The Master Trustee of the AGHOG MTI was PNC Bank. PNC Bank or Morgan Guaranty Trust Co. of New York ("Morgan Guaranty") provided credit enhancements to certain of the bonds and notes, and MBIA insured repayment of certain of the bonds. As of January 1, 1997, Allegheny Singer Research Institute was transferred from AGHOG into DVOG and certain financial covenants in the AGHOG debt instruments were modified accordingly.

The DVOG was formed in FY'96 through reorganization of certain entities for the primary purpose of issuing over $408 million (at face value) of bonds and notes **[CL 035959]** in an offering that was completed late in FY'96. The bonds and notes outstanding, net of unamortized bond discount, aggregated approximately $404 million as of both June 30, 1996 and 1997. The proceeds from issuance thereof were used primarily to repay approximately $342 million of DVOG entities' previously outstanding debt. **[CL 035959]** The Master Trustee of the DVOG MTI was Norwest Bank Minnesota, N.A. Repayments of the bonds and notes covered by the MTI were guaranteed by MBIA Insurance Corporation and by PNC Bank, N.A. **[CL 006312]**

During FY'97, Allegheny Hospitals, Centennial ("AHC") was formed for purposes of effecting mergers with four hospital entities previously owned by the Graduate Hospital System ("GHS").[3] The mergers were deemed to be consummated May 1, 1997. Those entities comprise the AHC Obligated Group ("Centennial"), and their outstanding bonds payable under the MTI aggregated $160, 556,000 as of June 30, 1997. First Union National Bank ("First Union") was the master trustee of the MTI. **[CL 036738]** Repayments of Centennial's bonds were not guaranteed or credit enhanced by any third party.

In FY'97, AHERF obtained a line of credit facility of $100 million from a consortium of banks, for which Mellon Bank served as the lead bank. This credit facility replaced the $83 million total of line of credit facilities in place as of June 30, 1996. During FY'97, DVOG entities borrowed $57.1 million under the new line of credit, and used the proceeds primarily to repay their borrowings under the old lines of credit (which aggregated $40.3 million as of June 30, 1996). Repayments of borrowings under the FY'97 line of credit were secured by certain assets of the consolidated AHERF System and AHERF, AGHOG and DVOG were each required to comply with certain financial covenants, including minimum liquidity ratio requirements. **[PwC 0047750, 0050498]**

The MTIs, the various debt instruments covered by the MTIs, and the direct loan agreements with lenders required the Obligated Groups and AHERF to, among other things, comply with certain financial covenants contained in the debt instruments. Each debt instrument defined the terms reflected in the covenants, and some definitions differed in the various loan instruments. Generally, a violation of a financial covenant, if not cured within a specified period of time, could become an Event of Default if notice of default was given to the obligor by the party whose debt instrument was violated. In the legal opinion of Steven B. Kite, Esq.,[4] an expert in the area of healthcare bond financing who was retained by the Creditors' Committee, an uncured Event of Default under one debt instrument covered by a MTI could result in an Event of Default of the MTI. In the absence of a cure, loan modification or a waiver granted by the lender or the Master

---

[3] Initially, the obligated group was comprised of The Graduate Hospital and Mt. Sinai Hospital. Following the merger (either with SDN or AHERF) Parkview Hospital and City Avenue Hospital were added to the Centennial Obligated Group.

[4] Henceforth in this document, references to Mr. Kite are made to indicate that I am placing reliance on his expert opinion with respect to the matters associated with such references.

Trustee, the lender or the Master Trustee then had the right to demand immediate repayment of (i.e., "call") all the debt under that specific MTI.

Financial reporting

The debt instruments required each obligated group to furnish audited annual financial statements that were presented fairly in conformity with GAAP to the lenders and guarantors of its long-term debt, and to provide to them on a periodic basis (generally quarterly), debt compliance certificates signed by an officer of the obligated group attesting to its compliance or noncompliance with the financial covenants of the debt instrument. Summarized calculations showing the formula for each covenant calculation, the amounts corresponding to the formula, and the results of the calculation had to be filed with each debt compliance certificate in support of the attestations.

Separate audited combining financial statements for June 30, 1996 and the year then ended were issued for AGHOG and for DVOG. In the AHERF consolidated and the AGHOG and DVOG separate combining financial statements for June 30, 1996 and the year then ended, the debt was classified as long-term (excluding current maturities thereof). Notes to these financial statements of AHERF and the obligated groups made customary disclosures about long-term debt agreements and identified the most restrictive financial covenants. **[PwC 0050500,    PwC 0047752]** There were no loan covenant violations disclosed in any of the above mentioned financial statements.

AHERF did not issue separate financial statements for its obligated groups as of June 30, 1997 and for the year then ended. Instead, it added supplementary information to its consolidated financial statements, comprised of AHERF consolidating and obligated group combining (a) balance sheets, (b) statements of operations, (c) statements of changes in net assets, and (d) cash flow statements. In its consolidated, consolidating and combining FY'97 financial statements, the issuance of which was delayed until February 1998,[5] AHERF classified all of its outstanding indebtedness, excluding current maturities thereof, as long-term debt.

Note 17 to AHERF's consolidated financial statements disclosed that Centennial was in violation of its loan covenants as of June 30, 1997, as discussed below. The note also disclosed that for each of the first two quarters of FY'98, AHERF failed to comply with a financial covenant under its bank line of credit facility, and that, as of December 31, 1997, DVOG violated its liquidity ratio requirements under its debt instruments.

---

[5] C&L dated its audit report January 8, 1998, which was after AHERF disclosed (in Note 17) the AHCOG and DVOG debt covenant violations and the issuance by AHERF of its draft report of recommendations as "Consultant" to AHCOG. AHERF could not issue "audited" FY'97 financial statements until C&L rendered its audit report thereon.