## Relevant GAAP

<u>Statement of Financial Accounting Standards No. 78, *Classification of Obligations That Are Callable by The Creditor* ("SFAS 78")</u>

SFAS 78 states:

> The current liability classification ... is intended to include long-term obligations that are or will be callable by the creditor either because the debtor's violation of a provision of the debt agreement at the balance sheet date makes the obligation callable or because the violation, if not cured within a specified grace period, will make the obligation callable. Accordingly, such callable obligations shall be classified as current liabilities unless one of the following conditions is met:
>
> a. The creditor has waived[6] or subsequently lost[7] the right to demand repayment for more than one year (or operating cycle, if longer) from the balance sheet date.
>
> b. For long-term obligations containing a grace period within which the debtor may cure the violation, it is probable[8] that the violation will be cured within that period, thus preventing the obligation from becoming callable." (¶ 5)

If an obligation under (b) above is classified as a long-term liability (or, in the case of an unclassified balance sheet, is included as a long-term liability in the disclosure of debt maturities), the circumstances shall be disclosed. (¶ 5)

## C&L's audit procedures pertaining to debt compliance

C&L's FY'96 and FY'97 audit program steps with respect to debt compliance provide for, among other things, the following:

- "Obtain an understanding of debt covenants currently in effect, including amendments and modifications....If provisions or covenants of debt agreements are unclear, the auditor should ask the client to request lenders to provide a written interpretation of the item or items in question." **[CL 02843, 15079]**

- "Ascertain that any waiver of debt covenant violations received by the client from a lender(s) specifically and appropriately address each event of noncompliance." **[CL 002849, 015098]**

---

[6] "If the obligation is callable because of violations of certain provisions of the debt agreement, the creditor needs to waive its right with regard only to those violations."

[7] "For example, the debtor has cured the violation after the balance sheet date and the obligation is not callable at the time the financial statements are issued."

[8] "Probable is defined in Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, as 'likely to occur' and is used in the same sense in this paragraph."

- "Obtain copies of appropriate written waivers of debt covenant violations lenders for our working papers. … In reviewing a waiver of debt covenant violations to determine whether to classify the liability as current or long-term, the auditor should obtain assurance that the waiver is unconditional for a period greater than one year from the balance sheet date and that it specifically and appropriately addresses each event of noncompliance." **[CL 002850, 015099]**

C&L's flawed determination of materiality

One aspect of audit risk in an audit of financial statements arises from the possibility of the misclassification of long-term debt. Because uncured events of default in most debt agreements ultimately provide lenders with the right to call the debt, the auditor needs to approach this area of the audit with objectivity and awareness of possible bias by the client in classifying debt as nonconcurrent, especially in circumstances when covenants have been violated and no loan modifications or waivers have been received by the date of the audit report. However, in performing its debt compliance procedures, C&L failed to demonstrate objectivity in the judgments it made pertaining to this area of its FY'96 and FY'97 audits.

With respect to the influence that debt service coverage ratios have on setting the materiality threshold (the basis for reflecting errors on the SUD), C&L engagement partner William Buettner testified:

> We would look at the debt service coverage ratio to determine that the organizations met that requirement. And if some of these items that we're waiving on influenced that ratio as pass/fail scenario, … but caused them to flunk a test as opposed to pass a test, that would be material under the guidelines outline in the firm documentation as well as other documentation on materiality. **[Buettner 428:8-18]**

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

As discussed in Basis for Opinion 1, C&L measured audit materiality on the AHERF engagement primarily based upon consolidated net assets. By doing so, the engagement team failed to consider GAAP, GAAS,                guidelines which recognize the importance of materiality and financial statement errors in terms of the needs of financial statement users and those who would be relying upon such statements. In this case, one of the most important groups of users was AHERF's creditors. Compliance with debt covenants was materially affected by the results of operations of AHERF and the

individual Obligated Groups. This fact should have caused C&L to consider adjusted net income[9] of AHERF and of its separate obligated groups as a significant factor in determining audit materiality both for audit planning purposes and for purposes of evaluating audit results.

### Violations of debt covenants, violations of GAAP and violations of GAAS

AHERF's accounting for and pertinent disclosures about the obligated groups' indebtedness, its violations of GAAP, and C&L's violations of GAAS are discussed below separately, for each obligated group and AHERF's line of credit. Those sections are followed by an additional section describing C&L's flawed determination of materiality for detecting misstatements as they relate to debt compliance.

### Allegheny General Hospital Obligated Group ("AGHOG")

Violation of debt covenants

AGHOG's loan covenants with Morgan Guaranty Trust Company of New York ("Morgan Guaranty") require it to maintain at least $200 million and $160 million of "Consolidated Unrestricted Fund Balance" ("Fund Balance"), as defined in the debt instrument, as of June 30, 1996 and June 30, 1997, respectively. The debt instrument requires loans and investments in affiliates outside the obligated group and intangible assets to be excluded from the Fund Balance.

Prior to issuance of the debt, Morgan Guaranty, in a March 17, 1995 memorandum to AHERF and others,[10] expressed concerns over the "substantial volume of intercompany flows that have occurred and that may occur in the future" and stated that they were seeking "protection, customary for this type transaction, that our limited obligation will not be weakened by net outflows to the advantage of other parts of the System." To remedy the matter, Morgan Guaranty indicated it wanted minimum consolidated unrestricted fund balances to exclude "loans to and investment in affiliates outside the AHG Obligated Group." **[Ex. 328, F&L-01-021562]**

The calculations annexed to AGHOG's debt compliance certificate as of June 30, 1996, which indicated that AGHOG was in compliance, reflect that net intercompany receivables of approximately $26 million were included in determining the Fund Balance. No disclosure was made in AHERF's consolidated or AGHOG's combining financial statements that the covenant had been violated as of that date.

In its June 30, 1997 consolidating balance sheet, which was included as a supplementary financial schedule to AHERF's audited FY'97 consolidated financial statements, AHERF

---

[9]  Most of the debt service coverage ratio calculations used income before depreciation and amortization, interest on long-term debt, extraordinary items and effects of a change in accounting principles as the numerator of a fraction in which the denominator was the sum of next year's projected principal and interest payments.

[10]  The memo was written by Susan Flanagan to Michael Martin, Tom Barry and Bob Zimmerman, Esq. (Foley & Lardner).

included approximately $114 million of AGH intercompany receivables in "Assets limited or restricted as to use" (i.e., investments) in the AGH column of the consolidating balance sheet. A negative $114 million was reflected in the "Eliminations" column of the schedule on the investments line, and an offsetting $114 million eliminating entry added the $114 million back to intercompany payables, thereby eliminating all intercompany receivables and payables,[11] and adjusting investments as reported on the consolidated balance sheet. **[PwC 0047762]** Because five additional columns of the consolidating balance sheet (each representing an individual entity or another obligated group) also reflected investments, of which AHERF and two additional obligated groups each had investments exceeding $114 million, a user of that schedule had no way to identify to which entity or obligated group the $114 million reduction from investments that was shown in the elimination column pertained.

The supporting calculations to the draft certificate improperly included approximately $143 million[12] of intercompany receivables as qualifying assets. By excluding the $143 million from AGHOG's Fund Balance, AGHOG failed to comply by $111.5 million.[13]

It was not until March 1998 that AGHOG issued its actual debt compliance certificate as of June 30, 1997 (after C&L's FY'97 audit report was issued) that informed Morgan Guaranty of the violation of the Fund Balance covenant. The supporting calculations attached to the certificate properly excluded $114 million of intercompany receivables from Fund Balance, but improperly included $29.8 million of intercompany receivables. **[Ex. 360, PR-DLC-BRM-01-00556-00557]** Therefore, in respect to a covenant requirement to maintain at least $160 million of Fund Balance, AGHOG reported only $78.3 million (and should have reported only $48.5 million before giving effect to my correcting entries, which further reduced the Fund Balance to $42.5 million), as reflected in the Addendum hereto.

As of June 30, 1997, AHERF calculated AGHOG's Indebtedness to Capitalization ratio by dividing long-term debt by the sum of the long-term debt plus consolidated unrestricted fund balance ("cufb"), which, unlike the Fund Balance covenant, was not a defined term for this covenant. AHERF logically calculated the cufb in a manner consistent with its Fund Balance calculation. A Foley & Lardner's memorandum[14] advised AHERF that Morgan Guaranty may take the position that the term used in the definition of "Consolidated Capitalization" should have the same meaning as it does for

---

[11] Eliminating entries are typically used in consolidating financial statements to remove intercompany transactions and intercompany receivable and payable balances (which should net to zero) from the consolidated financial statement amounts. GAAP generally requires intercompany receivables and payables to be eliminated from consolidated balance sheets so that reported receivables and payables reflect amounts due to or from persons or entities external to the reporting entity.

[12] In the AGH column of the consolidating balance sheet, $114 million of the $143 million was improperly included in AGH's Assets limited or restricted as to use and the remaining $29 million was reported as Due from affiliates.

[13] After deducting intercompany receivables, AGHOG's consolidated unrestricted fund balance, was $48.5 million, which was $111.5 million less than the required minimum balance of $160 million.

[14] February 5, 1998 memorandum from Becky (Serafini) Brueckel of Foley & Lardner to CFO David McConnell and Treasurer Michael Martin. **[PR-DLC-BRM-01-00708-00709]**

the Fund Balance[15] test.  In later correspondence dated March 5, 1998 **[Ex. 356]**, after the issuance of the audited financial statements, Foley & Lardner advised AHERF not to exclude intercompany receivables for this covenant, but to exclude such amounts from the Fund Balance covenant.  However, AGHOG only achieved compliance by including intercompany receivables in the cufb.  Due to this ambiguity over the meaning of cufb, AHERF should have obtained an interpretation from Morgan.

Violations of GAAP

AGHOG's debt compliance certificate falsely reflected that it was in compliance with its Morgan Guaranty financial covenants as of June 30, 1996 because it had failed to maintain $200 million of Fund Balance.  In reporting $211.1 million of Fund Balance to Morgan Guaranty as of June 30, 1996, AGHOG failed to deduct $26.4 million of intercompany receivables from such $211.1 million.  That would have reduced the defined amount to $184.7 million, which is $15.3 million less than the required $200 million minimum level.  Although at that time the violation appeared to be curable,[16] GAAP would have necessitated disclosure of the violation and the manner in which it was to be cured in AGHOG's combined and AHERF's consolidated FY'96 financial statements.

Again in AHERF's consolidated FY'97 financial statements, no disclosure was made of the violation and the manner in which it was to be cured.  For the debt to be classified as non-current in conformity with SFAS 78, AGHOG would have had to obtain either a loan modification to reduce the net asset requirement to an achievable, lower Fund Balance amount effective through July 1, 1998[17] or a waiver of noncompliance effective through that date.  Therefore, in the absence of such a loan modification or waiver, the debt should have been classified as current in conformity with GAAP.

The reclassification of the debt to current liabilities would have caused a cascading effect of violations of loan covenants in all of AGHOG's debt instruments, which, in the absence of loan modifications or waivers, could have resulted in Events of Default by AGHOG in those debt instruments and MTI.  For example, AGHOG's historical debt service coverage ratio would have been violated if all of its long-term debt became immediately due and payable.[18]

Although it cannot be known what action Morgan Guaranty and PNC Bank would have taken if notified of AGHOG's failure to achieve compliance as of June 30, 1997 at the time that those financial statements were issued, I classified the debt as current in my corrected financial statements as of June 30, 1997 assuming that the violation could not

---

[15]  Refers to Section 7(b)(ii) of the Morgan Guaranty agreement, which defines the term.

[16]  A combination of $15.3 million of repayments of intercompany receivables due AGHOG or a transfer of net assets to AGHOG would have cured the covenant violation as of June 30, 1996, either of which appeared to be within AHERF's ability to accomplish at that time.

[17]  July 1, 1998 represents a year and 1 day after the June 30, 1997 balance-sheet date, as required by SFAS 78.

[18]  The denominator in the formula for calculating the ratio is the expected maximum amount of debt to be paid by AGHOG in the next twelve months (which typically is the current portion of the long-term debt). My understanding from Mr. Kite is that accelerated debt should be included in such denominator.

be cured, and that AGHOG would not have obtained satisfactory loan modifications or waivers from Morgan Guaranty and PNC Bank.[19] [20]

Had such debt been classified to current liabilities, AGHOG would then have failed to meet the Historical Debt Service Coverage Liquidity Ratio requirements of the PNC loan instruments (as well as in the Morgan Guaranty loan agreements), creating Events of Default in all of the long-term debt agreements in the MTI.

Violations of GAAS

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

I did not see any indication in C&L's FY'96 workpapers that it detected the impropriety of including $26.4 million of intercompany receivables as a component of Fund Balance.

---

[19] Morgan Guaranty issued a temporary waiver through May 31, 1998 **[Ex. 365]** and then a second one through September 1, 1998. **[Ex. 368]** Notably, the initial waiver did not extend the waiver beyond June 30, 1998, which SFAS 78 required for classifying debt having covenant violations as long-term as of June 30, 1997. Also neither May 31 nor September 1 are calendar quarter-end dates, which are the reporting dates for debt compliance certificates, which meant that AGHOG had to be in compliance as of the reporting dates or it would need to obtain another waiver.
[20] Even if AGHOG had requested and received either a loan modification or a waiver, the financial covenant violations should have been disclosed in the audited FY'97 financial statements.

Although the violation appeared to be curable by AHERF at that point in time, C&L violated GAAS (SAS 19) by placing undue reliance on Management's representations that AHERF's calculations conformed to the requirements of the debt instrument (as reflected in the calculations attached to the debt compliance certificate).

The error of including intercompany receivables in Fund Balance calculations was again repeated by AHERF with respect to the June 30, 1997 calculation. C&L wrote the following in its FY'97 debt compliance memo:

> During the debt covenant review C&L noted that AGH met it's financial covenants. C&L further notes that AGH has an intercompany receivable, which has been recorded as a component of assets limited as to use, from affiliated entities (i.e., principally members of the DVOG) of approximately $116 million. Additionally, AGH has recorded a non-current intercompany receivable of approximately $30 million. Due to the strain on operations, particularly at the University, and the lack of formalized repayment terms, the collectibility of the receivable by AGH is at risk. As such, should these amounts not be collected and determined to be a net asset transfer that would reduce unrestricted net assets, AGH would be at risk of violating a financial covenant related to requirements to maintain minimum levels of $200 million[21] in unrestricted net assets for both bond agreements with PNC Bank and Morgan Guarantee Trust Company of New York. As of 6/30/97, AGH's unrestricted net assets were $252.1 million. C&L considered this impact on the covenants and notes the following: AHERF, as AGH's parent, has the ability to fund the intercompany receivable to AGH, even if the individual entities do not have the where with all [sic] to pay their obligation; current year activity has demonstrated that intercompany amounts are settled periodically during the year at volume levels which have exceeded the 6/30/97 outstanding balance; we have obtained representation from management regarding the collectibility of the intercompany receivables. **[Ex. 382]**

Mr. Buettner testified that he had been asked by AHERF Executive Vice President Joe Dionisio, during the period when drafts of the FY'97 financial statements were being prepared, if C&L "could accept the transfer of $114 million dollars" from intercompany receivables to investments **[Buettner 806:14-807:1]** He further testified:

> I told him that I could live with either presentation, that the [draft] presentation[22] as it existed was fine, but if they wanted to move it up into assets limited as to use, I could accept that because it was funded depreciation that was sent up to the parent and I had seen other situations where hospitals had borrowed, if you will, or moved funded depreciation. And under the Medicare rules, the requirement was such that you had to keep the funded depreciation, the amounts, the loans, if you will, included in the funded depreciation account. So I told him it was really

---

[21] The Morgan Guaranty requirement was reduced to $160 million effective January 1, 1997. **[Ex. 347: PNC 11239-11241]**

[22] An early draft properly reflected the $114 million of intercompany receivables as Due from affiliates. **[CL 017051]**

a decision on their part, that they could make the change or not.
**[Buettner 807:4-807:19]**

Mr. Buettner knew or should have known that borrowings by the general fund from funded depreciation accounts, under Medicare rules and regulations in effect at that point in time, were required to be approved by AGH's Board of Trustees and evidenced by formal borrowing agreements in which a market rate of interest was paid to the funded depreciation account. I did not see any documentation in C&L's audit workpapers that it noted any such Board approval or examined any such formal borrowing agreements. Therefore, C&L's FY'97 audit workpapers are inconsistent with Mr. Buettner's testimony.

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

Further, C&L expressed concern about the collectibility of the intercompany receivable as it pertained to the debt covenant. Although collectibility was relevant to determining Fund Balance under the PNC covenant,[24] it was irrelevant to the Morgan Guaranty covenant because it specifically required all loans to affiliates to be excluded from Fund Balance. As in FY'96, C&L again failed to verify that AHERF's calculations conformed to the requirements of the debt instrument by relying unduly on management representations that the calculations were reasonably correct. Consequently, it failed to compel AHERF to exclude intercompany receivables from the calculations of the Fund Balance. It further relied unduly on Management representations in concluding that AHERF had the ability to pay intercompany receivables to AGH even if the individual entities did not have the wherewithal to pay their obligations to AGH.

As a justification for not excluding intercompany receivables from the calculation of Fund Balance, C&L Senior Manager Amy Frazier testified that:

> "We believed that the intercompany balances did not represent loans in the term of … repayment and an agreement schedule. They represented day to-day cash transactions that were occurring throughout the AHERF organization and that…

CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY

---

[24] The PNC Bank Fund Balance covenant did not require loans to and investments in affiliates outside the AGHOG and intangible assets to be excluded from the Fund Balance.

would not be something that would be backed out of the calculation."
**[Frazier 233:25-234:7]**

I have not seen anything in C&L's audit workpapers that provides a basis for
Ms. Frazier's interpretation. There is no indication in C&L's audit workpapers that it
obtained legal advice (i.e., that it used the services of a specialist) or that it contacted
Morgan Guaranty to confirm the propriety of including intercompany receivables as a
component of the defined Fund Balance.

C&L's reports to AHERF's Board of Trustees, dated September 11, 1996 and
January 8, 1998, falsely provided the following assurance as to AGHOG's debt
compliance as of June 30, 1996 and June 30, 1997, respectively:

> In connection with our audit, nothing came to our attention that caused us to
> believe that the [AGH] Obligated Group was not in compliance with the
> covenants (insofar as they relate to accounting matters or auditing matters)
> contained in Section 7 of the Reimbursement and Security Agreement
> (Agreement) dated April 1, 1995 with Morgan Guaranty Trust Company of New
> York and PNC Bank (as Master Trustee). It should be noted, however that our
> audit was not directed primarily toward obtaining knowledge of such
> noncompliance. **[CL 006236, CL 68662]**

C&L failed to obtain a written interpretation from Morgan Guaranty that it was proper to
include the intercompany receivables as a component of Fund Balance and a component
of the Indebtedness to Capitalization ratio. Therefore, it had no reasonable basis for
providing such assurance to AGHOG's Board of Trustees, Morgan Guaranty, and PNC
Bank. C&L violated SAS 31 by failing to obtain sufficient competent evidential matter
to conclude, as it did incorrectly, that the inclusion of such item was appropriate. As a
result, it failed to execute its own audit program,
C&L also violated SAS 19 by relying on Management's interpretation of the covenant
and AHERF's ability to repay intercompany debt to AGHOG without gaining highly
persuasive corroborative evidential matter.

In March 1998, two months after C&L issued its audit report on AHERF's consolidated
financial statements and its report on supplemental information included in the annual
report, AGHOG filed its debt compliance certificate reflecting its violation of the
aforementioned covenant in the Morgan Guaranty debt instrument. Its supporting
calculation appropriately reflected the deduction of intercompany receivables from
unrestricted net assets, in conformity with the loan covenant. **[Ex. 360]** This filing
further demonstrates C&L's failure to corroborate management's representations when
issuing its audit report on AHERF's FY'97 financial statements, its "clean" opinion on
the supplementary information, and the aforementioned negative assurance letter. C&L
violated SASs 19 and 62. Additionally, SAS 29 and 52 provide guidance to an auditor
with respect to reporting on supplementary information contained in auditor-submitted
documents. Whereas the supplementary information in AHERF's FY'97 annual report
was "client-prepared,"

CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY

the guidance set forth in SAS 29 and 52 pertaining to an auditor's responsibility upon discovering an error in supplementary information to audited financial statements.

AHERF's FY'97 financial statements further violated GAAP by failing to disclose the loan covenant violations, and C&L violated GAAS by failing to (a) require AHERF to make such disclosures and to gain assurance that the debt was properly classified in AHERF's FY'97 consolidated and consolidating financial statements, or (b), if AHERF did not reclassify the debt, modify its audit report accordingly, including providing an explanation of the departure from GAAP.

DVOG

Violations of debt covenants

DVOG's combined and combining financial statements for FY'96 and FY'97, as reported, and its debt compliance certificates and supporting calculations all reflect that it was in compliance with its financial covenants in its debt instruments.

However, as stated in Note 17 to AHERF's FY'97 audited financial statements, DVOG's financial condition caused both AHERF and DVOG to violate loan covenants subsequent to June 30, 1997:

> For the two quarterly periods ended September 30, 1997 and December 31, 1997, AHERF did not comply with a liquidity ratio under certain of its lines of credit debt with respect to the DVOG. For the quarterly period ended December 31, 1997, the DVOG did not comply with certain liquidity ratios under certain letter of credit agreements associated with certain long-term debt. The potential also exists that the DVOG may not meet its debt service coverage ratio related to certain long-term debt for the fiscal year ending June 30, 1998. Management of AHERF and the DVOG have and will be taking steps to cure the present and any anticipated noncompliance issues in an effort to satisfy the conditions set forth in such agreements and to prevent these existing and potential noncompliance events from becoming events of default.[25] **[PwC 0047760]**

Violations of GAAP

In contrast to its reported financial condition and results of operations, after the effects of my corrections of GAAP misstatements, DVOG failed to meet the historical debt service coverage ratio and, upon reclassifying the debt as current, the liquidity ratio requirements of its debt instruments as of June 30, 1996 and for each period thereafter through July 1998 when bankruptcy filings for DVOG entities were made. The historical debt service

---

[25] An internal AHERF memo from Kelly L. Mertz, Senior Treasury Analyst to David W. McConnell, Executive Vice President and Chief Financial Officer dated April 2, 1998 states: "[T]he DVOG was out of compliance with the liquidity ratio requirement as of December 31, 1997. A request for a waiver through June 30, 1998, signed by Michael P. Martin, was sent to Frank Taucher at PNC Bank on December 23, 1997....Draft waiver documentation...was received by AHERF Treasury on March 26, 1998. Such documentation is currently under discussion and negotiation". **[Ex. 344: PR-PRIV-018939-018940]**

coverage ratios, as corrected, were under 1.00 to 1.00 based on DVOG's corrected FY'96 and FY'97 financial statements. Mr. Kite's opinion is that the failure to achieve a debt service coverage ratio of at least 1.00 to 1.00 is an Event of Default that the engaging of a qualified consultant could not cure. AHERF first reported DVOG's failure to achieve compliance to Norwest Bank, DVOG's Master Trustee, for the quarter ended December 31, 1997, **[PwC 0047760]** as discussed above.

The new bond and note offering was completed late in FY'96. Although it cannot be known what action Norwest Bank would have taken if notified of DVOG's failure to achieve compliance so soon thereafter, I classified the debt as current in my corrected financial statements as of June 30, 1996 assuming that the violations could not be cured, and that DVOG would not have obtained satisfactory loan modifications or waivers from Norwest Bank, MBIA and PNC Bank. For those reasons and under the same assumptions, I continued to classify the debt as current in my corrected financial statements as of June 30, 1997.

Violations of GAAS

As discussed in other Bases for Opinions and as a result of its many violations of GAAS, C&L failed to detect and/or correct errors that were, in the aggregate, material to DVOG's FY'96 financial statements and to the DVOG component of AHERF's FY'97 financial statements. Correction of those errors would have caused DVOG's historical debt service coverage ratio to fall below 100% in each year.

C&L issued reports following its FY'96 and FY'97 audits in which it indicated that it was not aware of any violations by DVOG of any of its debt covenants. **[CL 044348, 68664]** Such reports were incorrect based on my correcting entries.

Centennial

Violation of Debt Covenant

Note 17 to AHERF's FY'97 financial statements states that Centennial

> "... was not in compliance with its debt service coverage ratio covenant for the twelve-month period ended June 30, 1997. As a result of such noncompliance, under the master trust indenture, the [Centennial] Obligated Group was required to retain a consultant to make recommendations with respect to the Obligated Group's methods of operations and the factors affecting its financial condition. AHERF was chosen as such consultant and has promulgated its recommendations to the Obligated Group. Accordingly, the [debt] ... have been classified as noncurrent liabilities in the accompanying consolidated balance sheet. **[PwC 0047760]**

The debt agreement with respect to Centennial's 1991 revenue bonds required it to achieve an annual Historical Debt Service Coverage ratio ("HDSC")[26] of not less than 1.10 to 1.00. The HDSC for FY'97 reported by Centennial was a negative 1.62 to 1.00 [CL 027101], which violated that covenant. First Union, the Master Trustee of the MTI, did not waive the violation nor agree to modify the violated loan covenant. Despite having no waiver, AHERF classified the debt as noncurrent in its Consolidating Balance Sheet as of June 30, 1997. [PwC 0047774]

AHERF's basis for classifying Centennial's debt as noncurrent appears to be based, in part, upon a November 3, 1997 memorandum from Becky (Serafini) Brueckel, Esq. of the law firm of Foley & Lardner to AHERF's Treasurer Michael Martin and its Director of Treasury Operations Susan Gilbert. [Gilbert, 12:13-15] The memorandum set forth the nature of the noncompliance, indicated that AHERF was appointed as the Consultant to Centennial, and concluded as follows:

> By retaining a Consultant, AHC will have taken what action it can take ... in order to remedy the default, thereby preventing the default from becoming an Event of Default. With AHC having taken such action, thereby preventing the default from becoming an Event of Default, the accountants [C&L] should be able to release their unqualified report. [PR-Binder-01-00598-599]

CFO David McConnell's November 19, 1997 letter, addressed to First Union Vice President Jeff Alexander, requested that First Union waive Centennial's June 30, 1997 covenant violations, and also informed First Union that Centennial had appointed AHERF as a consultant to provide recommendations to improve Centennial's financial health, an action that was required by the debt instrument if the ratio fell below 1.10 to 1.00. [CL 036738-36741] In stark contrast to providing the waiver, First Union's November 21, 1997 letter from Lynn Hines (Vice President and Managing Director of the Pennsylvania Corporate Trust Bond Administration Office) to Mr. McConnell advised AHERF that it considered Centennial's failure to maintain Total Income Available for Debt Service of at least 100% of the Maximum Annual Debt Service for such fiscal year an Event of Default.[28] However, this letter did not serve as a formal notice of default. [CL 036742]

---

[26] This ratio is determined by dividing Total Income Available for Debt Service for a given period by the Debt Service Requirement of the Obligated Group for such period. [CL 113896] Total Income Available for Debt Service [CL 113910] includes, among other things, the "excess of revenues over expenses, ... as determined in accordance with generally accepted accounting principles, to which shall be added depreciation, amortization and interest expense on Long-Term Indebtedness, and from which shall be excluded any extraordinary items, any gain or loss resulting from either the extinguishment of Indebtedness or the sale, exchange or other disposition of assets not made in the ordinary course of business and any revenues or expenses of any Person [other than a Limited Obligor] not a member of the Obligated Group." [CL 113897]

[28] First Union denied AHERF's request to acknowledge AHC's efforts by stating "you have asked that the Master Trustee acknowledge the adequacy of Centennial's remedial efforts in order to facilitate the release of AHERF's audited consolidated financial statements. The Master Trust Indenture does not provide for this type of action by the Master Trustee.

As Consultant to Centennial, AHERF furnished a draft report of its recommendations to First Union on January 8, 1998. **[Ex. 387]** In that letter, AHERF stated:

> The source of the non-compliance for fiscal 1997 are the restructuring costs associated with the aforementioned affiliation [with AHERF]. On a full twelve month basis, these costs total $46.083 million leading to a debt service coverage ratio of (1.62xs). Excluding the restructuring charges yields a coverage ratio of 1.24xs.

> While the restructuring charges are felt to be nonrecurring costs, AHERF has recommended to AHC certain initiatives to further reduce operating expense and to build revenue producing programs. These initiatives take into account the highly competitive Philadelphia market place and declines in reimbursement rates for health care providers…

> No assurance can be provided for the achievement of these initiatives and associated performance goals.

The report discussed certain market conditions in the Philadelphia area that could adversely affect Centennial's ability to successfully achieve a debt service coverage ratio of 1.10 to 1.00. It states:

> Providers of health care in Philadelphia are facing extremely difficult operating conditions. AHC is no different from its competitors and may face a more challenging set of factors than others due to slow responses to changing market conditions in the past.

> In general, hospitals in this market are experiencing significant pressures which are being realized in revenue and earnings declines. The problems have worsened since there has been no significant reduction in excess bed capacity and a continuation of managed care penetration into the region.

> It has been estimated that the managed care penetration for the Philadelphia market stands at 32% of the payor mix. Given the oversupply of beds, many insurers have been successful in pushing through lower rates for the region. With Aetna/U.S. healthcare and Independence Blue Cross controlling upwards of 80% of the managed care business in the Philadelphia market, these insurers have an overwhelming competitive edge in contract negotiation. This can only translate into lower premium levels for providers and, hence, lower revenues and excess earnings.
> **[Ex. 387: SEC-1 – 001090]**

Despite these conditions, but after assuming no recurrence of the "restructuring" charges, as reflected in Appendix D to the report, AHERF projected a net deficiency of $10.3 million for the obligated group for FY'98. After adding back interest, depreciation and amortization, the income available for debt service was $17.4 million, which when

divided by "Maximum Annual Debt Service of $16.1 million, yields a debt service coverage ratio of 1.076 to 1.00. **[Ex. 387: SEC-1 – 001115]**

Violations of GAAP

As disclosed in Note 17 to the FY'97 financial statements, AHERF apparently deemed such draft report to "cure" the violation. Mr. Kite's opinion is that a failure to achieve a historical debt service coverage ratio of at least 1.00 to 1.00, based on the language in the debt instrument, gave First Union the right to issue a notice of default, declaring such noncompliance to be an Event of Default, inasmuch as the violation could not be cured (as it was a mathematical result as of a fixed point in time). He does not consider the engagement of a consultant a "cure" under these circumstances.

As indicated in AHERF's report as Centennial's consultant, there could be no assurance that Centennial would subsequently be in compliance with its loan covenants. Given that a requested waiver was not granted as of January 8, 1998, as required by SFAS 78, AHERF should have classified Centennial's debt as current as of June 30, 1997.

Violations of GAAS

In its Debt compliance issues memo, C&L stated:

> AHERF has elected to cure the violation vs. obtaining a waiver for the violation through development of a consultant to provide a "Consultant's Report" to the trustee, First Union National Bank. (It should be noted that First Union has accepted AHERF as the consultant for the 1997 violation based on the fact that AHERF recently acquired the entity and was viewed as independent from the trustee's point of view.) Such consultant's report is to provide an evaluation of the obligated group's ability to meet such financial covenants prospectively within the next 12 months. Based on the results of such report and the submission of the report to the Trustee, C&L will evaluate the reasonableness of the assumptions used in determining if the obligated group will be successful in achieving financial covenant requirements. Further, at the date in which the obligated group cures such violation, we will dual date our opinion to reflect the client's disclosure of such cure. The client has updated their disclosure to reference the cure and our opinion has been dated 1/8/98 to reflect the date of the consultant's report that will be filed with the trustee. **[Ex. 382: CL 216927]**

The last two sentences in the above memo were apparently added upon review of AHERF's January 8, 1998 Consultant's report to First Union.

First Union's November 21, 1997 letter failed to provide the requested waiver, clearly stated that it considered the failure to achieve the historical debt service coverage ratio was an Event of Default, and requested proof that AHERF qualified as a turnaround consultant, all of which should have been construed by C&L as a contentious posture. This letter was in C&L's FY'97 audit workpapers.

16-17

C&L should have contacted First Union or its counsel to find out what First Union intended to do. The Consultant's report could not "cure" the violation, which was a mathematical result of historical results and could not be changed retroactively. Irrespective of whether that report temporarily estopped an Event of Default from occurring, C&L needed to gain assurance[29] that First Union would waive the violation through at least July 1, 1998, as required by SFAS 78, to justify classifying Centennial's debt as long-term. However, it did not gain such assurance.

As for the projections in the January 8, 1998 report, there were so many caveats as to raise significant doubt as to Centennial's ability to comply in the future with the debt service coverage ratio. In fact, the projected ratio of 1.07 failed to achieve the required 1.10 to 1.00 ratio to be in compliance.

I did not see anything in C&L's audit workpapers documenting that it objectively evaluated the assumptions in the Consultant's report, as its memo indicated it would do, let alone doing so with the heightened degree of professional skepticism warranted by the facts and circumstances. Further, C&L knew or should have known that many of the restructuring costs would recur as ordinary operating expenses and, therefore, should not be construed as non-recurring costs, as discussed in Basis for Opinion 15. The projected FY'98 results were flawed to the extent that such costs were eliminated from the FY'98 projections. C&L should have caused AHERF to provide persuasive evidence that the assumptions were reasonable. I did not see anything in the audit workpapers that would lead me to conclude that C&L obtained persuasive evidential matter to gain assurance that the projections were reasonable.

Although gaining such assurance would have been supportive of appropriate footnote disclosures to the effect that the company had plans to achieve compliance in the future, it was still insufficient to overcome the requirements of SFAS 78. Without a waiver through at least July 1, 1998 or an adequate modification of loan covenants, the Centennial debt should have been classified as a current liability. Neither appointment of a Consultant nor the issuance of a Consultant's report cured the event of default, and C&L was informed of First Union's position on this matter. (Indeed, First Union issued a Notice of Default in March 1998.)

Therefore, I conclude that C&L subordinated its judgment to that of AHERF's management in permitting AHERF to report the Centennial debt as a long-term liability. C&L violated GAAS by failing (a) to require AHERF to classify the Centennial debt as current, or (b) if AHERF did not reclassify the debt, to modify its audit report accordingly, including providing an explanation of the departure from GAAP.

---

[29] Such assurance would be a written waiver or a promise from an authorized officer of First Union or First Union's counsel that a waiver through at least July 1, 1998 was in the process of being and would shortly be issued.

## AHERF's line of credit

### Violations of debt covenants

AHERF's consolidated financial statements for FY'97, as reported, reflect that it was in compliance with its Liquidity Ratio in its line of credit agreement as of June 30, 1997.

### Violations of GAAP

In contrast to its reported financial condition and results of operations, after the effects of my corrections of GAAP misstatements, AHERF failed to meet the requirements of the liquidity ratio in its line of credit agreement. Correction of those errors, and, in particular, the misclassification of the assets of five irrevocable trusts as discussed in Basis for Opinion 5, would have caused AHERF's Liquidity Ratio to fall below the required minimum of 1.40 to 1.00 as of June 30, 1997.

### Violations of GAAS

As discussed in other Bases for Opinions and as a result of its many violations of GAAS, C&L failed to detect and/or correct errors that were, in the aggregate, material to AHERF's FY'97 financial statements.

**Addendum to Basis for Opinion 16**

The Addendum reflects certain debt compliance calculations made as of June 30, 1996 and 1997 and for the years then ended to determine whether each obligated group and AHERF complied with the financial covenants of its debt instruments. The Addendum identifies the obligor, the debt instrument, the financial covenant, extracts from the definitions of terms provided in the debt instrument pertaining to the financial covenant, the formulae for numerators and denominators (if applicable), and the related debt compliance calculations, both as reported by AHERF and as corrected. The "Corrected" column of each calculation was derived by adjusting the amount reported for the effects of correcting entries that I made (including C&L's proposed audit adjustments) and errors I detected in AHERF's debt compliance calculations.

**AGH Obligated Group (AGHOG)**

**Debt Compliance Tests**

All FY96 amounts consist of Allegheny General Hospital ("AGH") and Allegheny-Singer Research Institute ("ASRI"). FY97 amounts are as footnoted below because in some cases AHERF prepared covenant calculations to include AGH and ASRI and in other cases the AHERF calculations include only AGH .

**Morgan Guaranty Trust Co. of NY**
**Series 1995-B Reimbursement and**
**Security agreement- Section 7 [Exhibit 327]**
**Amended as of January 1, 1997 [Exhibit 347]**

Obligated Group consists of AGH and ASRI

**Requirements:**
Liquidity ratio shall not be less than 2:1 at any time.

Consolidated Obligated Group debt shall not exceed 66 2/3% of consolidated capitalization  (Amended to 63%)
Debt service coverage ratio shall not be less than 1.2:1  (Amended to 1.3 to 1)
Consolidated unrestricted fund balances shall not be less than $200 million
(Amended to $160 million as of January 1, 1997)

**Definitions:**
Liquidity ratio
> (A) consolidated current assets of the Obligated Group plus
> (B) the consolidated unrestricted Board-designated *funds of the Obligated Group plus*
> (iii) the aggregate amount of funds held by a trustee held in a debt service, bond or similar fund for the payment of
> "Indebtedness" or "Related Bonds" (as defined in the Master Trust Indenture), but excluding funds held in a debt
> service reserve, depreciation reserve and similar funds, divided by
> (B) the consolidated current liabilities of the Obligated Group

Consolidated Group Debt to Consolidated Capitalization
> Consolidated capitalization means as of any date the sum of (i) consolidated unrestricted
> fund balances of the Obligated Group (not a defined term) and (ii) Consolidated Obligated Group Debt.

Consolidated Unrestricted Fund Balance
> *Defined to exclude (x) all write-ups...subsequent to June 30, 1994 in the book value of any assets owned by a Member of the Obligated*
> Group, (y) all loans to and other Investments in Affiliates which are not Members of the Obligated Group and all equity Investments in
> Persons which are not Subsidiaries, and (z) all unamortized debt discount and expense, unamortized deferred charges... and other
> intangible assets, all as determined as of such date.

Debt Service Coverage ratio
> Debt Service Coverage ratio:
> The ratio of Income available for Debt Service ...To Projected Long-Term debt Service Requirements
> for the succeeding twelve-month period.
>
> Income Available for Debt Service:
> The sum of (A) the excess of Revenues over Expenses for such period plus (B) the aggregate
> amount of consolidated depreciation, amortization, non-cash extraordinary expenses of the Obligated
> Group plus ( C ) the aggregate amount of interest accruing during such period on Consolidated Obligated
> Group Debt.
>
> Projected Long-Term Debt Service Requirements:
> For any period, the aggregate of all amounts actually payable to holders of consolidated Obligated Group Debt
> during such period.....

AGHOG

Morgan Guaranty Trust Co. of NY
Series 1995-B Reimbursement and
Security agreement- Section 7 [Exhibit 327]
Amended as of January 1, 1997 [Exhibit 347]

**Maintain Consolidated Unrestricted Fund Balance of $200 million (as amended to $160 million)**

Calculation:

| | As of June 30, 1997 (A) | | | | As of June 30, 1996 | | |
|---|---|---|---|---|---|---|---|
| | As Reported (Exhibit 360) | As reported, but net of intercompany receivables | Corrected | | As Reported | As reported, but net of intercompany receivables | Corrected |
| Consolidated unrestricted fund balance (B)(C) | 78,349 | 78,349 | 78,349 | (B) | 211,104 | 211,104 | 211,104 |
| Less: remaining intercompany receivables | | (29,830) | (29,830) (1) | | (4) | (26,369) | (26,369) (D) |
| | 78,349 | 48,519 | 48,519 | | 211,104 | 184,735 | 184,735 |
| Quantification adjustments | | | (1,253) | | | | 6,845 |
| Less: additional intercompany receivables arising from quantification adjustments | | | (4,786) | | | | (7,104) |
| | 78,349 | 48,519 | 42,480 | | 211,104 | 184,735 | 184,476 |
| Required | 160,000 | 160,000 | 160,000 | | 200,000 | 200,000 | 200,000 |
| | Fail | Fail | Fail | | Pass | Fail | Fail |

Under the terms of the agreement, loans to affiliates were to be excluded in calculating the Consolidated Unrestricted Fund Balance. As of June 30, 1997 and June 30, 1996 intercompany receivables (loans to affiliates outside the Obligated Group) of $143,714 ($113,884 + $29,830) (3) and $26,369, respectively, were included in the Consolidated Unrestricted Fund Balance calculation. Subsequent to the issuance of the FY'97 audited financial statements, an officer's compliance certificate dated March 9, 1998 and related debt covenant calculation (**Exhibit 360, PR-DLC-BRM-01-00556-00557**) were issued excluding intercompany receivables of $113,884 (but failing to exclude the remaining $29,830 of intercompany receivables) to arrive at consolidated unrestricted fund balance of $78,349 as of June 30,1997, below the $160 million requirement. This resulted in additional technical violations and Events of Default as discussed below .

(A) Does not include ASRI

(B) AHERF did not report noncompliance with the Consolidated Unrestricted Fund Balance covenant until March 12, 1998. (**Exhibits 359 and 360**). The AHERF audited financial statements for FY'97 did not disclose noncompliance with this covenant.

(C) AHERF's supporting calculation of Consolidated Unrestricted Fund Balance

| | | June 30, 1997 | June 30, 1996 |
|---|---|---|---|
| Net assets per balance sheet | (1) | 252.085 | 227,876 (2) |
| Less: intangibles | | (49,241) | (6,468) |
| Less: equity investments in and loans to persons which are not subsidiaries FY '97 [CL 20845] FY'96 [Exhibit 1938] | | 192.233 | 211,104 |
| Less: Intercompany receivable | | (113,884) | |
| | | 78,349 | |

(D) The $26,369 6/30/96 amount is the net of "Due from affiliates" reported on AGHOG's audited fiscal year 1996 financial statements. [**PWC 0050508**] As of 6/30/96, the total amount owed to AGH's funded depreciation account from affiliates outside of AGHOG was $35,052. (**Exhibit 536**)

(1) CL 004517

(2) PWC 0050508

(3) Exhibit 360: PR-BLC-BRM-001-00556

(4) PWC 0050513

AHOG

Morgan Guaranty Trust Co. of NY
Series 1995-B Reimbursement and
Security agreement- Section 7 [Exhibit 327]
Amended as of January 1, 1997 [Exhibit 347]

Liquidity Ratio-

**Formula:**

Current assets + Board Designated Assets
Current Liabilities

**Calculation:**

Version 1- Reflects in the "Corrected" column the elimination of the intercompany receivable-See Note B below

|  |  | As of June 30, 1997 (A) | | |  | As of June 30, 1996 | |
|---|---|---|---|---|---|---|---|
|  |  | As reported | Corrected |  |  | As reported [CL 006236] | Corrected |
|  |  | [Foley 12579] | |  |  | [CL 006238] | |
| Current assets |  | 86,243 | 89,604 |  | (1) | 83,795 | 98,010 |
| Board designated assets |  | 164,158 | 50,274 (B) |  | (2) | 151,298 | 151,298 (C) |
|  |  | 250,401 | 139,878 |  |  | 235,093 | 249,308 |
| Divided by: |  |  |  |  |  |  |  |
| Current liabilities | (D) | 66,404 | 310,305 |  | (1) | 64,784 | 64,140 |
| Required ratio |  | 2.00 | 2.00 |  |  | 2.00 | 2.00 |
| Ratio |  | 3.77 | 0.45 |  |  | 3.63 | 3.89 |
|  |  | Pass | Fail |  |  | Pass | Pass |

Version 2- For June 30, 1997, the "Corrected" column includes intercompany receivables as a component of "Board designated assets." This version is based upon a memo from Kelly Mertz, Senior Treasury Analyst [Exhibit 351, PR-DLC-BRM-01-00688], discussing the potential failure to achieve the liquidity ratio requirement as of September 30, 1997 if the intercompany receivable was not included. The memo further states that David McConnell directed Treasury to incorporate the AGH Note Receivable into the liquidity ratio for the June 30, 1997 and September 30, 1997 quarters resulting in Liquidity Ratios of 3.77 to 1 and 3.7 to 1 (not displayed), respectively. The officer's compliance certificate and related calculation [Exhibit 360, PR-DLC-BRM-01-00556] report this version as of June 30, 1997. A Version 2 is not presented for June 30, 1996 since AHERF excluded intercompany receivables from the calculation.

|  |  | As of June 30, 1997 (A) | |
|---|---|---|---|
|  |  | As reported | Corrected |
|  |  | [Foley 12579] | |
| Current assets |  | 86,243 | 89,604 |
| Board designated assets |  | 164,158 | 164,158 |
|  |  | 250,401 | 253,762 |
| Divided by: |  |  |  |
| Current liabilities | (D) | 66,404 | 310,305 |
| Required ratio |  | 2.00 | 2.00 |
| Ratio |  | 3.77 | 0.82 |
|  |  | Pass | Fail |

(A) Does not include ASRI

(B) Eliminates intercompany receivables of $113,884. Although intercompany receivables are not specifically excluded from Board designated assets in the Morgan debt instrument, a proper measure of liquidity (refers to the nearness of cash of an asset or liability as set forth in paragraph 5 of FASB Statement of Financial Accounting Concepts No. 5) would exclude the above intercompany receivables which AHERF classified under the non-current asset caption "assets limited or restricted as to use, net of current portion".

(C) Primarily represents funded depreciation.

(D) The "Corrected" column in FY97 reflects the reclassification of long-term debt to current liabilities due to the failure of AGHOG to meet the required Consolidated Unrestricted Fund Balance covenant under the Morgan agreement (which also would trigger a violation of the Historical Debt Service Coverage Ratio covenant in the Morgan agreement). These financial covenant violations constitued an Event of Default under the Morgan agreement. The Morgan debt together with substantially all other AGHOG indebtedness is covered under an MTI. In the opinion of Mr. Kite, an Event of Default under the Morgan agreement triggers an Event of Default under Section 6.01(D) of the MTI 30 days after notice, unless waived, giving the Master Trustee to right to call all AGH debt. Under GAAP, all long-term debt is reflected as a current liability. This presentation assumes AGHOG would not have been successful in obtaining either a satisfactory loan modification or a waiver of the Event of Default through at least July 1, 1998 prior to the finalization of the FY97 audited financial statements, thus presenting the worst case scenario caused by AGHOG's non-compliance.

(1) PWC 0050513

(2) PWC 0050522

AGHOG

Morgan Guaranty Trust Co. of NY
Series 1995-B Reimbursement and
Security agreement- Section 7 [Exhibit 327]
Amended as of January 1, 1997 [Exhibit 347]


Total Indebtedness to Total Capitalization


Formula:

$$\frac{\text{Consolidated Obligated Group Debt}}{\text{Consolidated Capitalization (Consolidated Obligated Group Debt+ consolidated unrestricted fund balances)}}$$

Calculation:

Version 1 computes Consolidated Capitalization (the denominator) by calculating "consolidated unrestricted fund balances" as defined in Section 7(b)(ii). During FY'96 and FY'97, AHERF calculated compliance with this covenant in a way that utilized the definition of Consolidated Unrestricted Fund Balances in Section 7(b)(ii), except that it did not deduct intercompany receivables.

| | | As of June 30, 1997 | | | | As of June 30, 1996 | |
| | As reported | As reported, but net of intercompany receivables | Corrected | | As reported | As reported, but net of intercompany receivables | Corrected |
|---|---|---|---|---|---|---|---|
| (1) Consolidated Obligated Group Debt | $ 242,454 | $ 242,454 | $ 242,454 | (3) $ 257,521 | $ 257,521 | $ 257,521 |
| | | | | | | | |
| Consolidated Obligated Group Debt | 242,454 | 242,454 | 242,454 | 257,521 | 257,521 | 257,521 |
| Consolidated Unrestricted Fund balances (see calculation above) (E) | 192,233 | 48,519 | 42,480 | 211,104 | 184,735 | 184,476 |
| | 434,687 | 290,973 | 284,934 | 468,625 | 442,256 | 441,997 |
| Required ratio | 63.00% | 63.00% | 63.00% | 66.67% | 66.67% | 66.67% |
| Ratio | 55.78% | 83.33% | 85.09% | 54.95% | 58.23% | 58.26% |
| | Pass | Fail | Fail | Pass | Pass | Pass |

Version 2 computes Consolidated Capitalization (the denominator) by calculating "Consolidated Unrestricted Fund Balances" as defined in Section 7(b)(ii), except that this version does not deduct intercompany receivables. During FY'96 and FY'97, AHERF calculated compliance with this covenant in a way that utilized the definition of Consolidated Unrestricted Fund Balances in Section 7(b)(ii), except that it did not deduct intercompany receivables.

| | As of June 30, 1997 | | | As of June 30, 1996 | |
| | As reported [Exhibit 360] | Corrected | | As reported | Corrected |
|---|---|---|---|---|---|
| (1) Consolidated Obligated Group Debt | $ 242,454 | $ 242,454 | | $ 257,521 | $ 257,521 |
| | | | | | |
| Consolidated Obligated Group Debt | 242,454 | 242,454 | | 257,521 | 257,521 |
| (2) Consolidated unrestricted fund balances (E)(F) | 192,233 | 190,980 | | 211,104 | 217,949 |
| | 434,687 | 433,434 | | 468,625 | 475,470 |
| Required ratio | 63.00% | 63.00% | | 66.67% | 66.67% |
| Ratio | 55.78% | 55.94% | | 54.95% | 54.16% |
| | Pass | Pass | | Pass | Pass |

(1) CL 044517

(2) From AHERF's supporting calculations of Consolidated Unrestricted Fund Balance

(3) PWC 0050508

AGHOG

**Morgan Guaranty Trust Co. of NY**
**Series 1995-B Reimbursement and**
**Security agreement- Section 7 [Exhibit 327]**
**Amended as of January 1, 1997 [Exhibit 347]**

**Version 3** reflects consolidated unrestricted fund balances, as reported on the consolidating balance sheets as of June 30, 1996 and 1997.

| | As of June 30, 1997 | | | As of June 30, 1996 | |
| --- | --- | --- | --- | --- | --- |
| | As reported | Corrected | | As reported | Corrected |
| Consolidated obligated group debt | $ 242,454 | $ 242,454 | | $ 257,521 | $ 257,521 |
| | | | | | |
| Consolidated obligated group debt | 242,454 | 242,454 | | 257,521 | 257,521 |
| Consolidated Unrestricted Fund Balances (E) | 252,086 | 250,833 | (2) | 227,876 | 234,721 |
| | 494,540 | 493,287 | | 485,397 | 492,242 |
| Required ratio | 63.00% | 63.00% | | 66.67% | 66.67% |
| Ratio | 49.03% | 49.15% | | 53.05% | 52.32% |
| | Pass | Pass | | Pass | Pass |

(E) Does not include ASRI's unrestricted net deficiency of $792.

(F) Consolidated unrestricted fund balance "As reported" plus the Robert W. Berliner quantification adjustments to the AGHOG statement of operations. ($192,233 -$1,253= $190,980)

(1) **CL 044517**

(2) **PWC 0050508**

AGHOG

*Morgan Guaranty Trust Co. of NY*
*Series 1995-B Reimbursement and*
*Security agreement- Section 7 [Exhibit 327]*
*Amended as of January 1, 1997 [Exhibit 347]*

**Debt Service Coverage Ratio**

Formula:

Excess Revenue Over Expenses- Gain on Sale Leaseback+Depreciation & Amortization+ Interest Expense on Long -Term Debt
12- Month Projected Long-Term Debt Service Coverage Requirement

Calculation:

|  | FY'97 (G) | | | FY'96 | |
|---|---|---|---|---|---|
|  | As reported [CL 68662] [Foley 12579] | Corrected | | As reported [CL 006236] [CL 006238] | Corrected |
| Excess revenue over expenses | 6,007 | (2,091) | (2) | 6,321 | 4,035 |
| Gain on sale/leaseback | (538) | (538) | | | |
| Depreciation and amortization | 31,756 | 31,882 | (2) | 33,284 | 33,494 |
| L/T Interest exp | 12,975 | 12,975 | | 13,927 | 13,335 |
|  | 50,200 | 42,228 | | 53,532 | 50,864 |
| 12 month Projected Long-Term Debt Service Requirement  (H) | 22,066 | 264,520 | | 21,797 | 21,797 |
| Required Ratio | 1.30 | 1.30 | | 1.20 | 1.20 |
| Ratio | 2.27 | 0.160 | | 2.46 | 2.33 |
|  | Pass | Fail | | Pass | Pass |

(G) Includes operations of ASRI

(H) In FY'97, the "Corrected" column reflects the Projected Long-Term Debt Service Requirement of $22,066 in the
"As reported" column plus the Long-Term Debt ($242,454) that has been reclassified to current liabilities due to the
Events of Default under the MTI. This presentation assumes AGHOG would not have been successful in obtaining
either a satisfactory loan modification or a waiver of the Event of Default through at least July 1, 1998 prior to the
finalization of the FY'97 audited financial statements, thus presenting the worst case scenario caused by AGHOG's non
compliance.

(1) CL 044518

(2) PWC 050514

Page 6

AGHOG

**LETTER OF CREDIT, REIMBURSEMENT**
**AND SECURITY AGREEMENT WITH**
**PITTSBURGH NATIONAL BANK, Dated as**
**of January 29, 1993 [Exhibit 326]**

Does not include ASRI

**Liquidity Ratio-**     **[Exhibit 326: D0016862]**

**Formula:**

current assets + unrestricted Board designated assets
             Current liabilities

**Calculation:**

Version 1- Reflects in the "Corrected" column the elimination of the intercompany receivable–See Note B below

| | | As of June 30, 1997 | |
| --- | --- | --- | --- |
| | | As reported [Exhibit 2132] | Corrected |
| Current assets | | 86,243 | 89,604 |
| Board designated assets | | 164,158 | 50,274  (A) |
| | | 250,401 | 139,878 |
| Divided by | | | |
| Current liabilities | (B ) | 66,404 | 310,305 |
| Required ratio | | 2.00 | 2.00 |
| Ratio | | 3.77 | 0.45 |
| | | Pass | Fail |

Version 2-  The "Corrected" column includes intercompany receivables as a component of  "Board designated assets". This Version is based upon a memo  from Kelly M. Mertz, Senior Treasury Analyst **[Exhibit 351, PR-DLC-BRM-01-00688]** discussing the potential failure to achieve the Liquidity Ratio requirement as of September 30, 1997 if the intercompany receivable was not included. The memo further states that David McConnell directed Treasury to incorporate the AGH Note Receivable into the liquidity ratio for the June 30, 1997 and September 30, 1997 quarters, resulting in Liquidity Ratios of 3.77 to 1 and 3.7 to 1 (not displayed), respectively. The officer's *compliance certificate and related calculation* **[Exhibit 2132, PNC24513-24514]** reflect this version as of June 30, 1997.

| | | As of June 30, 1997 | |
| --- | --- | --- | --- |
| | | As reported [Exhibit 2132] | Corrected |
| Current Assets | | 86,243 | 89,604 |
| Board Designated Assets | | 164,158 | 164,158 |
| | | 250,401 | 253,762 |
| Divided by | | | |
| Current liabilities | (B ) | 66,404 | 310,305 |
| Required ratio | | 2.00 | 2.00 |
| Ratio | | 3.77 | 0.82 |
| | | Pass | Fail |

(A) Eliminates intercompany receivables of $113,884. Although intercompany receivables are not specifically excluded from Board designated assets in the Pittsburgh National Bank debt instrument, a proper measure of liquidity (refers to the nearness of cash of an asset or liability as set forth in paragraph 5 of **FASB Statement of Financial Accounting Concepts No. 5**) *would exclude the above* intercompany receivables which AHERF classified under the non-current asset caption "assets limited or restricted as to use, net of current portion".

(B) The "Corrected" column in FY'97 reflects the *reclassification of long-term debt to current liabilities due to the Events of Default under the MTI.  This presentation assumes AGHOG would not have been successful in obtaining either a satisfactory loan modification or a waiver of the Event of Default through at least July 1, 1998 prior to the finalization of the FY'97 audited financial statements, thus presenting the worst case scenario caused by AGHOG's non-compliance.

Page 7

AGHOG

**LETTER OF CREDIT, REIMBURSEMENT
AND SECURITY AGREEMENT WITH
PITTSBURGH NATIONAL BANK, Dated as of
January 29, 1993**

**Total Indebtedness to Total Capitalization - [Exhibit 326: D001682-3]**

**Formula:**

$$\frac{\text{Indebtedness}}{\text{Indebtedness + Unrestricted Fund Balances}}$$

**Calculation:**

| | | As of June 30, 1997 | |
|---|---|---|---|
| | | As reported [CL 020831] [Exhibit 2132] | Corrected |
| Indebtedness (D ) | (1) | 242,454 | 242,454 |
| Indebtedness | | 242,454 | 242,454 |
| Total Capitalization | (1) | 252,086 | 250,833 |
| | | 494,540 | 493,287 |
| Required ratio | | 66.67% | 66.67% |
| Ratio | | 49.03% | 49.15% |
| | | Pass | Pass |

(D) Does not include current portion of long-term debt (which would have no impact on whether AGHOG would meet the covenant).

**Debt Service Coverage Ratio**

**Formula:**

$$\frac{\text{Excess Revenue Over Expenses- Gain on Sale Leaseback+Depreciation and Amortization+ Interest Expense on Long-Term Debt}}{\text{12- Month Projected Long-Term Debt Service Coverage Requirement}}$$

Required- not less than 1.2:1 (AHERF calculation reflects a required ratio of 1.3:1). In addition to this Letter of Credit, Reimbursement and Security Agreement, the MTI [Exhibit 324, PR-Binder-01-00003-00090], which covers this 1993 indebtedness, requires a minimum debt service coverage ratio of 1.1 to 1. As a result of the other financial covenant violations, AGHOG would fail all the historical debt service covenants in FY'97.

**Calculation:**

| | FY97 | | | FY96 | |
|---|---|---|---|---|---|
| | As reported [CL 020839] | Corrected | | As reported [CL 006240] [CL006277] | Corrected |
| Excess revenue over expenses | 11,843 | 7,682 | | 6,321 | 4,035 |
| Gain on sale/leaseback | (538) | (538) | | | |
| Depreciation and amortization | 30,873 | 31,710 | | 33,284 | 33,494 |
| L/T Interest exp | 12,975 | 12,975 | | 13,927 | 13,335 |
| | 55,153 | 51,829 | | 53,532 | 50,864 |
| 12 month projected L/T debt requirement (E) | 21,431 | 263,885 | | 19,886 | 19,886 |
| Required ratio | 1.20 | 1.20 | | 1.30 | 1.20 |
| Ratio | 2.57 | 0.20 | | 2.69 | 2.56 |
| | Pass | Fail | | Pass | Pass |

| | |
|---|---|
| Depreciation | 30,873 |
| Robert W. Berliner's adjustments | 126 |
| | 30,999 |

(E) In FY'97, the "Corrected" column reflects the Projected Long-Term Debt Service Requirement of $21,431 in the column "As reported" plus the Long-Term Debt ($242,454) that has been reclassified to current liabilities due to the *Events of Default under the MTI. This presentation assumes AGHOG would not have been successful in obtaining either a satisfactory loan modification or a waiver of the Event of Default through at least July 1, 1998 prior to the finalization of the FY'97 audited financial statements, thus presenting the worst case scenario caused by AGHOG's non-compliance.

(1) CL 044517

Page 8

AGHOG

**LETTER OF CREDIT, REIMBURSEMENT
AND SECURITY AGREEMENT WITH
PITTSBURGH NATIONAL BANK, Dated as of
January 29, 1993**

**Maintain consolidated unrestricted fund balances
of at least $200,000**

**Calculation:**

|  |  | Including intercompany Receivables As of June 30, 1997 | | |
| --- | --- | --- | --- | --- |
|  |  | As reported [CL 020839] |  | Corrected |
| Consolidated unrestricted fund balances | (1) | $ 252,086 | $ | 250,833 |
|  |  | Pass |  | Pass |

**Maintain $30 million in cash or
 investments, that are unencumbered and
 satisfactory to PNC**

**Calculation:**

|  | As of June 30, 1997 | | |
| --- | --- | --- | --- |
|  | As reported [CL 020839] |  | Corrected |
| Funded depreciation portfolio | $ 50,274 | $ | 50,274 |
|  | Pass |  | Pass |

(1) **CL 044517**

Page 9

AGHOG

**RESTATED AND AMENDED MASTER TRUST INDENTURE
COVENANT**

**Historical Long-Term Debt Service Coverage Ratio**

**Formula:**

Excess Revenue Over Expenses- Gains *not in the ordinary Course of Business* +Depreciation and Amortization+  Interest Expense on Long-Term Debt
Long-Term Debt Service Requirement

**Calculation:**

|  |  | As of June 30, 1997 (A) | |
|---|---|---|---|
|  |  | As reported [PNC 24526] | Corrected |
| Excess revenue over expenses | (1) | 6,007 | (2,091) |
| Depreciation and amortization | (2) | 31,756 | 31,882 |
| L/T Interest exp |  | 12,975 | 12,975 |
| Income from the sale of assets not |  |  |  |
| in the ordinary course of business |  | (538) | (538) |
|  |  | 50,200 | 42,228 |
| Long -term debt service requirement (B) |  | 28,894 | 271,348 |
| Required Ratio |  | 1.10 | 1.10 |
| Ratio (C ) |  | 1.74 | 0.156 |
|  |  | Pass | Fail |

(A) Includes operations of ASRI

(B) In FY'97, the "Corrected" column reflects the Projected Long-Term Debt Service Requirement of $28,894 in the "As reported" column plus the Long-Term Debt ($242,454) that was reclassified to current liabilities due to the Events of Default under the MTI. The "As reported" column includes the debt service requirement for the 1988, 1991, 1993 and 1995 Bonds, ANI term loan, capital leases and guarantees, as defined.

(C) C&L's letter [CL 68663] regarding historical debt service coverage ratio as of June 30, 1997 reports a ratio of 1.74 to 1.00.

(1) CL 044518

(2) PWC 050514

**Delaware Valley Obligated Group (DVOG)**

**Debt Compliance Tests**

**Master Trust Indenture By and Among DVOG And,**
**Norwest Bank Minnesota, N.A., as Master Trustee, dated as of May 15, 1996**
**[CL 79567-79636]**

**Requirement:**

Historical Debt Service Coverage Ratio must be at least 1.10 (Section 6.3) **[CL 79608]**

(Paraphrased) No event of default shall exist if the total income available for debt service is equal to not less than 100% of the actual debt service requirement for the year so long as a consultant was retained and the Obligated group follows the consultant's recommendations to the extent feasible. (Section 6.3) **[CL 79608]**

In the opinion of Steven B. Kite, an expert retained by the Creditors' Committee in the area of healthcare bond financing, the failure to achieve a total income available for debt service of at least 100% would lead to an Event of Default under the Master Trust Indenture ("MTI") 30 days after notice, unless waived.

**Definitions:**

Historical Debt Service Coverage Ratio **[CL 79578]**
        Total Income Available for Debt Service/ Maximum annual Debt Service Requirement of the Obligated Group.

Total Income Available for Debt Service: **[CL 79589]**
        a) Aggregate of Income Available for Debt Service of each member of the Obligated
            Group for such period…, plus
        b) the Income Available for Debt Service of each Limited Obligor up to an amount equal
            to the outstanding principal balance evidenced by such Limited Obligor's Pledged Note.

 Limited Obligor
        Definition can be found at **CL 79581**.


Maximum Annual Debt Service **[CL 79581]**
        highest annual Debt Service Requirement **[CL 79575]** of the Obligated Group for the current or
        any succeeding Fiscal Year

Income Available for Debt Service **[CL 79578]**
        (Paraphrased) As determined in accordance with GAAP to which shall be added depreciation, amortization
        and interest expense on long-term debt and from which shall be excluded any extraordinary items, any gain or
        loss resulting from either extinguishment of indebtedness or the sale, exchange or other disposition of assets
        not made in the ordinary course of business, any gain resulting from the valuation of investment securities
        at market and any other gain or loss that does not require or result in the expenditure of cash.

DVOG

**Formula:**

(Excess of Revenue over Expenses + Depreciation/Amortization + Interest Expense on Long-Term debt+Extraordinary Expenses -Change in Accounting Principle-Unrealized Investment Appreciation)

Maximum Annual Debt Service Requirement

**Calculation:**

| | | FY'97 | | | | FY'96 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | As reported (Exh 1462 Merrill Lynch 04399) | Corrected | | | As reported [CL 006319] | Corrected |
| Net income (loss) | (1) | $ 23,701 | $ (56,595) | | | $ (1,291) | $ (67,257) |
| Depreciation and amortization | (1) | 57,099 | 57,230 | | | 50,339 | 50,231 |
| Interest on Long-term debt | | 22,283 | 22,283 | | | 26,049 | 26,049 |
| Add: extraordinary loss | | | | | | 32,534 | 32,534 |
| Less: | | | | | | | |
| Income from change in accounting principle | | | | | (D) | (4,363) | (4,363) |
| Unrealized investment appreciation | | | | | (A) | (6,302) | (6,302) |
| | | 103,083 | 22,918 | | | 96,966 | 30,892 |
| Maximum annual debt service requirement | (C) | 36,629 | 36,629 | | ( B ) | 34,951 | 34,951 |
| Required ratio | | 1.10 | 1.10 | | | 1.10 | 1.10 |
| Required ratio below which is an event of default | | 1.00 | 1.00 | | | 1.00 | 1.00 |
| Actual ratio | | 2.81 | 0.63 | | | 2.774 | 0.884 |
| | | Pass | Fail | | | Pass | Fail |

(A) C&L incorrectly reflected the *unrealized appreciation on investments as $10,399* (which included unrealized appreciation of investments in permanently and temporarily restricted net assets) instead of $6,302 [CL 139840] (which represented unrealized appreciation only on unrestricted investments reflected in the statement of operations).
(B) Maximum debt service [CL 006321]
(C) Source of information not provided for FY'97.
(D) Adjustment to fair value equity and debt securities as of July 1, 1995 in accordance with SFAS 124  [CL 047052]

(1) CL 04518

**DVOG**

**PNC Bank, N.A.**
**Series 1996 Reimbursement and Security agreement**

**Requirements:**

Debt service coverage ratio

> The Debt Service Coverage ratio for PNC Bank was calculated in the same manner as the formula in the MTI. . By reflecting the Robert W. Berliner correcting adjustments in the quantification, DVOG would have failed this test in FY'96 and FY'97.

Liquidity Ratio
> Not less than 1.75 to 1 for FY'97
> Not less than 2.0 to 1 for FY'98 and thereafter

**Liquidity Ratio**
**Formula:**

$$\frac{\text{(Cash + Short-term Investments + Board Designated Assets)}}{\text{Current Maturities of Ltd for Next 12 months + Interest Expense}}$$

| Calculation: | | As of June 30, 1997 | |
| --- | --- | --- | --- |
| | | As reported [Exh 1830, CL 020781] | Corrected |
| Cash | $ | 20,449 | $ 20,444 |
| Board Designated assets | | 57,102 | 57,102 |
| | | 77,551 | 77,546 |
| Current maturities of debt (A) | | 12,803 | 407,281 |
| Interest expense | | 22,283 | 22,283 |
| | | 35,086 | 429,564 |
| Required ratio | | 1.75 | 1.75 |
| Actual ratio | | 2.21 | 0.18 |
| | | Pass | Fail |

(A) The "Corrected" column reflects the reclassification of long-term debt to current liabilities due to the Event of Default from the failure to achieve a historical debt service coverage ratio of at least 100%. This presentation assumes DVOG would not have been successful in obtaining either a satisfactory loan modification or a waiver of the Event of Default through at least July 1, 1998 prior to the finalization of the FY'97 audited financial statements, thus presenting the worst case scenario caused by DVOG's non-compliance.

Allegheny Hospitals, Centennial
("Centennial")

**Debt Compliance Tests**

**Master Trust Indenture, between Centennial and, Meridan Trust Company,
as Master Trustee, dated as of December 1, 1991  [CL 113883-113973]**

**Requirement:**
Historical Debt Service Coverage Ratio must be at least 1.10. (section 6.3)  **[CL 113936]**

(Paraphrased) No Event of Default shall exist if the Total Income Available For Debt Service is not less than 100% of actual debt service requirement for the year so long as a consultant was retained and the *Obligated Group* follows the consultant's recommendations to the extent feasible. (Section 6.3)  **[CL 113936]**

In the opinion of Steven B. Kite, an expert retained by the Creditors' Committee in the area of healthcare bond financing, the failure to achieve a total income available for debt service of at least 100% would lead to an Event of Default under the MTI 30 days after notice, unless waived.

**Definitions:**
Historical Debt Service Coverage Ratio: **[CL 113896]**
>    Total Income Available or Debt Service/Maximum Annual Debt Service of the Obligated Group.

Total Income Available for Debt Service: **[CL 113910]**
>    a) aggregate of Income Available for Debt Service of each member of the obligated
>       group for such period…, plus
>    b) the Income Available for Debt Service of each Limited Obligor up to an amount equal
>       to the outstanding principal balance evidenced by such limited obligor's pledged note.

Limited Obligor:
>    Definition can be found at **[CL 113901]**

Maximum Annual Debt Service requirement of the Obligated Group: **[CL 113902]**
>    highest annual Debt Service Requirement **[CL 113894]** of the Obligated Group for the current or
>    any succeeding fiscal year

Income available for debt service: **[CL 113897]**
>    (Paraphrased) As determined in accordance with GAAP to which shall be added depreciation, amortization and
>    interest expense on Long-Term Indebtedness and from which shall be excluded any extraordinary items, any gain or
>    loss resulting from either extinguishment of indebtedness or the sale, exchange or other disposition of assets
>    not made in the ordinary course of business, and any revenues or expenses of any person (other than a limited
>    obligor) not a member of the obligated group.

Centennial

<u>Formula:</u>

(Excess of Revenue over Expenses + Depreciation/Amortization + Interest Expense on Long-Term Debt-Extraordinary Expenses -Change in Accounting Principle-Unrealized Investment Appreciation)

Maximum Annual Debt Service Requirement

<u>Calculation:</u>

| | FY'97 | | | Excluding restructuring costs (C ) FY'97 | | |
|---|---|---|---|---|---|---|
| | As reported [CL 027100] (A) | Corrected (B) | | As reported [CL 027101] | Corrected (B) | |
| Net income (loss) | $ (50,582) | $ (30,926) | | $ (50,582) | $ (30,926) | |
| Depreciation and amortization | 11,308 | 11,969 | | 11,308 | 11,969 | |
| Interest expense on long-term debt | 13,168 | 13,168 | | 13,168 | 13,168 | |
| Restructuring costs | | | | 46,083 | 4,265 | |
| Income available for debt service | (26,106) | (5,789) | | 19,977 | (1,524) | |
| Maximum annual debt service requirement | 16,129 | 16,129 | | 16,129 | 16,129 | |
| Required ratio | 1.10 | 1.10 | | 1.10 | 1.10 | |
| Required ratio not triggering event of default | 1.00 | 1.00 | | 1.00 | 1.00 | |
| Ratio | (1.62) | (0.36) | | 1.24 | (0.09) | |
| | Fail | Fail | | Pass | Fail | |

(A) Pro forma earnings after restructuring expense.
(B) Per pro forma statement of operations prepared under Robert W. Berliner's supervision.
(C ) Restructuring charges do not qualify as "Extraordinary expenses" but are reflected above for comparing corrected amounts to reported amounts.

Page 15

**Credit Agreement, dated as of March 7, 1997 by and among AHERF, as Borrower, and Mellon Bank N.A. [Exhibit 2330]**

**AHERF (parent) Liquidity Ratio**

**Formula:**

$$\frac{\text{Net Unrestricted Assets of AHERF (Parent Only) + Net Temporarily Restricted Assets of AHERF (Parent Only)}}{\text{Outstanding Indebtedness of AHERF (Including This Bank Debt)}}$$

Excludes AHSPIC's assets from the calculation.

**Calculation**

|  | As of June 30, 1997 | |
|---|---|---|
|  | As reported | Corrected |
|  | DC3948 Page 1 of 1 |  |
| Parent Only Unrestricted Assets | 158,743 | 68,176  (A) |
| Net temporarily restricted assets | 12,079 | 261 |
| Total parent liquidity | 170,822 | 68,437 |
| Outstanding Indebtedness | 57,100 | 57,100 |
| Required ratio (1) | 1.40 | 1.40 |
| Actual ratio | 2.99 | 1.20 |
|  | Pass | Fail |

(A) Calculated as follows:

|  | Net unrestricted assets | Temporarily restricted | Permanently restricted assets |  |
|---|---|---|---|---|
| Per internal calculation | 158,743 | 12,079 | 50,528 | 221,350 |
| Net adjustments to asset side | 11,452 |  |  | 11,452 |
| RWB correcting entry number 4 | (85,762) | (12,079) | 97,841 | - |
| C&L SUD entry S-14 | (16,257) | 261 | 15,996 | - |
|  | 68,176 | 261 | 164,365 | 232,802 |

**(1) Exhibit 2330: PRC-DLC-160-01894**

17

## 17. C&L failed to communicate to AHERF's Board of Trustees and/or Audit Committee matters required to be communicated by GAAS

Statement on Auditing Standards No. 60, *Communication of Internal Control Structure Related Matters Noted in an Audit* ("SAS 60")

SAS 60 requires an auditor to communicate certain deficiencies in internal controls observed during an audit of financial statements to its client's audit committee.[1]  It states:

> During the course of an audit, the auditor may become aware of matters relating to the internal control structure that may be of interest to the audit committee.  The matters that this section requires for reporting to the audit committee are referred to as *reportable conditions.*  Specifically, these are matters coming to the auditor's attention that, in his judgment, should be communicated to the audit committee because they represent significant deficiencies in the design or operation of the internal control structure, which could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions[2] of management in the financial statements.  Such deficiencies may involve aspects of the internal control structure elements of (a) the control environment, (b) the accounting system, or (c) control procedures.  **(AU § 325.02)**

> The auditor may also identify matters that, in his judgment, are not reportable conditions as defined in paragraph .02; however, the auditor may choose to communicate such matters ...  **(AU § 325.03)** In a communication that contains both observations deemed by the auditor to be reportable conditions, as defined, and other comments, it may be appropriate to indicate which comments are in each category.  **(AU § 325.14)**

> Any report issued on reportable conditions should include the definition of reportable conditions ...  **(AU § 325.11)** The following is an illustration of the sections of a report encompassing the above requirements.

>> ... However, we noted certain matters involving the internal control and its operation that we consider to be reportable conditions ... Reportable conditions involve ... **(AU § 325.12)**

> A reportable condition may be of such magnitude as to be considered a material weakness.  A *material weakness* in the internal control structure is a reportable condition in which the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.  Although this section does not require that the auditor separately identify and communicate material weaknesses, the auditor may choose or the

---

[1] SAS 60 states that, in organizations that do not have an audit committee, the communication would be to individuals with a level of authority and responsibility equivalent to an audit committee, such as the board of directors, the board of trustees, an owner in an owner-managed enterprise, or others who may have engaged the auditor.

[2] Management's "assertions" are embodied in financial statement components and are classified by GAAS according to the following broad categories: existence or occurrence, completeness, rights and obligations, valuation or allocation, and presentation and disclosure.  **(AU § 326.03)**

client may request the auditor to separately identify and communicate as material weaknesses those reportable conditions that, in the auditor's judgment, are considered to be material weaknesses. **(AU § 325.15)**

SAS 60 provides the following examples, among others, of possible reportable conditions:

- Inadequate procedures for appropriately assessing and applying accounting principles
- Evidence that a system fails to provide complete and accurate output
- Evidence of intentional override of the internal control
- Evidence of failure to perform tasks that are part of internal control
- Evidence of willful wrongdoing by employees or management
- Evidence of intentional misapplication of accounting principles
- Evidence of undue bias or lack of objectivity by those responsible for accounting decisions
- Evidence that employees or management lack the qualifications and training to fulfill their assigned functions.

**(AU § 325.21)**

Statement on Auditing Standards No. 61, *Communication with Audit Committees* ("SAS 61")

In addition to the requirement of SAS 60 to communicate reportable conditions, SAS 61 requires the auditor to determine that certain other matters related to the conduct of an audit are communicated to the Audit Committee.[3] **(AU § 380.01)** According to SAS 61, matters about which an audit committee should be informed include:

- The process used by management in formulating particularly sensitive accounting estimates and the basis for the auditor's conclusions regarding the reasonableness of those estimates. **(AU § 380.08)**

- Adjustments arising from the audit (whether or not recorded by the entity) that could, in the auditor's judgment, either individually or in the aggregate, have a significant effect on the entity's financial reporting process. Matters underlying adjustments proposed by the auditor but not recorded by the entity could potentially cause future financial statements to be materially misstated, even though the auditor has concluded that the adjustments are not material to the current financial statements. **(AU § 380.09)**

- Disagreements with management, whether or not satisfactorily resolved, that could be significant to the financial statements or the auditor's report. Such matters include the application of accounting principles, judgments about accounting estimates, the scope of the audit, financial statement disclosures, and the wording of the auditor's report. **(AU § 380.13)**

---

[3] These communication requirements are applicable to (1) entities that either have an audit committee or that have otherwise formally designated oversight of the financial reporting process to a group equivalent to an audit committee (such as a finance committee or budget committee) and (2) all SEC engagements.

**Communications to the Board of Trustees**

C&L's October 16, 1995 management letter of comments ("MLC"), addressed to AHERF's Board of Trustees, included the following observations with respect to accounts receivable matters noted during the course of its fiscal 1995 audit:

- Accounts receivable increased approximately $63 million from the preceding year-end, principally within the Delaware Valley ("DV") hospitals with the increase attributed primarily to the relocation of billing and collection activities.

- Approximately $18 million of DV hospital accounts, net of established reserves, were over 180 days old as of June 30, 1995. "Management should increase efforts to pursue collection of these aged accounts."

- "Each AHERF hospital utilizes a different methodology to establish reserves for bad debts." – "While such methods have been used consistently by each organization, we recommend that management consider utilizing a consistent methodology for all AHERF affiliated hospitals. The use of a consistent methodology will allow management to evaluate their reserves based on a comparison to other hospitals within the AHERF System. ... Management should establish a system-wide methodology ... using percentages based on actual historical data. We believe that the current methodology utilized at AGH should be considered for application at all AHERF hospitals."

- Receivables due from patients that are incorrectly reflected as due from third-party payors should be reclassified to "self-pay." "These misclassifications may result in delayed billings to patients and could impair collection efforts." (Emphasis added)

- Periodic interim payment account details were not reconciled monthly to the general ledger and differences were unresolved, making it difficult for management to analyze account balances. As of June 30, 1995, DV hospitals had approximately $31 million of unapplied remittances (or overpayments). (Emphasis added)
  **[CL 057358, 006243, 043946]**

These failures to properly classify self-pay accounts and to reconcile account details and apply remittances are evidence that the system was not providing complete and accurate output which was adversely affecting AHERF's ability to process financial data and its ability to pursue and collect past due accounts. In addition, absence of a system-wide methodology for determining the reserve for bad debts was an impediment to the establishment of an appropriate reserve balance. These were significant internal control deficiencies that constituted reportable conditions as defined by SAS 60.

C&L Manager Mark Kirstein's September 11, 1995 letter to Charles Morrison, Senior Vice President and CFO, AHERF-East, stated that C&L believed "the reserve for accounts receivable should be enhanced and the methodology used to establish the reserve reviewed for future reference." Mr. Kirstein noted that the "basis for this conclusion is rooted in the amount of A/R over 180 days old coupled with the reduction in the reserve as a percentage of A/R at several of the hospitals." **[Ex. 1448]**

17-3

**Fiscal year 1996**

C&L's September 23, 1996 MLC included the following observations with respect to deficiencies in internal controls that it detected during the course of its fiscal year 1996 audit, none of which was identified as a reportable condition:

- "Centralization projects and system conversions have continued to provide a challenging environment for the AHERF system's accounts receivable management …"

- "With regard to the process of registering patients, billing the appropriate third-party payors and collecting amounts owed, we would recommend that management focus its attention on two items: (1) <u>training appropriate personnel in the registration and billing of patient accounts</u> with attention directed to the implications that managed care contracts have on these processes; and (2) <u>establishing standardized account follow-up procedures to be deployed during the collection process.</u>" (Emphasis added)

- "AHERF should <u>consider enhanced education and training of registration staff</u> … Improvements in the registration area, coupled with <u>a better understanding of the managed care contracts, will allow management to submit accurate claims in a more efficient manner, as well as improve the timeliness of third-party claims payments.</u>" (Emphasis added)

The lack of qualifications and training to fulfill assigned functions is one of the examples of a possible reportable condition cited in SAS 60. In AHERF's case, this lack of training was directly affecting its ability to register and bill patient accounts and to submit accurate claims. This in turn was adversely affecting collections and merited recognition as a reportable condition in C&L's communication to the Board of Trustees.

Most of the internal control deficiencies commented on in the 1995 MLC had not been addressed by AHERF management in 1996. Under "Status of Prior Year Observations," the 1996 MLC stated:

> As previously discussed, management recognizes the unique issues surrounding AHERF's accounts receivable management. Though the following observations have not been addressed during 1996, appropriate follow-up procedures are currently in the development stage:
>
> - Deterioration of Accounts Receivable Aging
> - Methodology for Establishing Bad Debt Reserves should be Applied Consistently
> - Patient Liability Amounts should be Reclassified to Self-Pay
> - Procedures to Identify Charity Care should be Enhanced in the Delaware Valley
> **[CL 006243-58]**

By failing to identify these significant continuing deficiencies as reportable conditions and advising the Audit Committee that "follow-up procedures are currently in the development

stage," C&L improperly conveyed to the Board or the Audit Committee no particular sense of importance or urgency with respect to these issues.

Misleading statements and significant control deficiencies not communicated

To add to its failure to identify the bad debt accounting issues as reportable conditions, C&L's MLC inappropriately minimized any potential concern that the Board of Trustees might have had by reporting to AHERF's Board of Trustees:

> As a result of our procedures, we have concluded that the controls over the establishment and monitoring of accounts receivable reserves are designed appropriately and are operating effectively so as to properly adjust accounts receivable balances to their estimated net realizable value. **[CL 006246]**

As in FY'95, C&L was aware that AHERF's DVOG hospitals continued, in large part, to utilize inadequate methodologies to estimate the required reserve for bad debts. For example, C&L noted in its workpapers that MCPH's practice of reserving only self-pay receivables and patient deductibles needed to be revised: "The client bases its reserve for doubtful accounts calculation on the balances contained in the self pay financial classes, as well as, the patient account balance portion of all other financial classes. The analysis should be revised to include the insurance as well as the patient account balance for all financial classes." **[Ex. 4274]**

C&L knew that AHERF's internal accounting controls were not properly adjusting accounts receivable balances to a reasonable estimate of net realizable value. In conjunction with the FY'96 audit, AHERF recorded an adjustment to increase bad debt reserves on the books of the DVOG hospitals by $17.5 million. Even though this audit adjustment was recorded by the client, C&L was required to communicate the fact of the adjustment to the Audit Committee.

C&L also knew that the internal controls over the registration and billing systems in the DV hospitals[4] continued to be inadequate throughout fiscal 1996. Material amounts of patient receivables became uncollectible because corrections of claims that had to be submitted to third-party payors were not resubmitted within statutory time limits. Further, as a result of system limitations and the increase in the number of managed care entities, significant amounts of contractual allowances relating to services rendered to patients were not recorded in fiscal 1996. (See Bases for Opinions 2 and 15.) None of this was communicated by C&L in its MLC for 1996.

In addition, C&L determined that AGH violated GAAP in fiscal 1996 by improperly recognizing a $6.7 million gain on the sale and leaseback of a building, and improperly setting up a $7.1 million cushion in its CRA accounts, despite the fact that C&L took exception to these accounting improprieties. C&L posted proposed adjustments to correct these accounting improprieties to its fiscal 1996 summary of unadjusted differences ("SUD"). These accounting improprieties reflect AHERF management's intentional misapplication of accounting principles, which SAS 60 indicates is a reportable condition. However, C&L made no mention of the improper accounting in its 1996 MLC. These accounting treatments also represented disagreements with management over the application of accounting principles, as defined by SAS 61. C&L also failed to communicate these disagreements to the Audit Committee.

---

[4] In 1996, these hospitals were reorganized into the Delaware Valley Obligated Group ("DVOG").

**Fiscal year 1997**

It was not until fiscal 1997 that AHERF managed to improve the billing and receivable deficiencies to the point of reducing remaining problems to less than reportable conditions. However, as discussed below, other reportable conditions existed which C&L failed to disclose in its September 22, 1997 MLC[5] or in other communications to the Audit Committee with respect to deficiencies in internal controls that it observed during the course of its 1997 audit. **[CL 043946-62]**

General Journal Entries

General journal entries, because they are outside the normal processing of transactions, can be used by management to circumvent normal internal accounting controls. During fiscal 1997, as discussed in many of the accompanying Bases for Opinions, AHERF created material amounts of unrestricted revenues, materially reduced its unrestricted net loss, and overstated intangible assets and intercompany receivables and liabilities by making general journal entries based on accounting rationales that were designed to intentionally misapply or otherwise violate GAAP. These entries were material in amount, of an unusual nature, and outside the normal processing of transactions.

The most material of such general journal entries were recorded principally in connection with the fiscal 1997 merger with Graduate Health System and resulted in the improper creation and disposition of acquisition reserves and acquisition assets. C&L was aware of at least $50 million of such entries that effectively transferred acquisition reserves from the acquired entity to the DVOG reserve for bad debts, avoiding the recognition of bad debt expense. See Bases for Opinions 3 and 4.

C&L was aware of other accounting treatments that misapplied accounting principles in an effort to improve income. For example, C&L knew that AHERF created approximately $10 million of income on the books of the recently acquired GHS entities by reversing deferred revenue accounts in the two months the GHS entities were consolidated with AHERF in 1997. This accounting treatment, to which C&L took exception, was a material misstatement and should have been reported to the Audit Committee. C&L also knew that AHERF had recorded over $7 million of income relating to Medicare depreciation recapture filings, and C&L knew this accounting treatment was not in accordance with GAAP. This accounting treatment represented another material misstatement that should have been reported to the Audit Committee.

Other unusual general journal entries were made during fiscal 1997 to transfer assets and excess liabilities ("cushions"), primarily from one subsidiary to another. Such accounting violated GAAP and enabled DVOG and Allegheny General Hospital each to achieve compliance with debt covenants that they otherwise would have failed. (See Basis for Opinion 16.)

C&L failed to inform the Audit Committee of management's unusual and irregular use of general journal entries to record material amounts of assets, reserves, revenues and expenses. Even if the entries had been appropriate under GAAP, the mere existence of so many material "correcting" journal entries is indicative that systems and procedures underlying the otherwise

---

[5] Unlike the 1995 and 1996 MLCs, the 1997 MLC was addressed to AHERF's Audit Committee.

unadjusted accounting records had failed to produce reasonably accurate books and records. In either case, C&L had a professional obligation to inform the Audit Committee of the extent and significance of these adjustments and their implications with respect to internal control deficiencies.

Internal Funds Transfers

Throughout FY'96 and FY'97, in response to a need for cash to meet operating costs, AHERF's Senior Management caused the transfer to its general fund of material amounts of funds from various subsidiaries' funded depreciation bank accounts. It did so without creating the documentation to formalize the transfers as "borrowings" by the general fund from the funded depreciation accounts. Under Medicare rules and regulations, failure to create formal loan documentation and obtain board approval of the borrowing exposed AHERF to having to pay Medicare significant amounts of interest, penalties, and possibly treble damages if it failed to properly report to Medicare non-qualifying use of funded depreciation accounts. C&L knew of the transfers, and knew or should reasonably have known that no formal loan documentation had been created nor Board approval obtained, but failed to report this reportable condition to AHERF's Audit Committee.

**SAS 61 Letters**

Following each of its FY'95, 96 and 97 audits, C&L issued a letter ("SAS 61 letter")[6] reporting on the matters required to be communicated by SAS 61. With respect to accounting estimates, C&L's SAS 61 letters stated:

> Senior management is appropriately involved in the development, review, and approval of significant judgments and estimates used in the preparation of the financial statements. The issues are reviewed on a regular basis, and adjustments are made, as appropriate, based upon changes in facts and circumstances. As a part of our audit procedures, we have become satisfied that appropriate controls are in place to ensure that judgments and estimates are appropriate. All significant accounting estimates have been evaluated by C&L during the audit.[7] **[CL 057465, 036045]**

SAS 61 requires the auditor to inform the Audit Committee of the process used by management in formulating particularly sensitive accounting estimates and the basis for the auditor's conclusion regarding the reasonableness of those estimates. The above statement is nothing more than "boilerplate" conveying no meaningful information that would allow the Audit Committee to understand and evaluate the nature of particularly sensitive estimates, how they had been determined, or the basis for the auditor's conclusions. The statement fails to even disclose which estimates were considered to be particularly sensitive.

---

[6]  C&L did not label these letters as "SAS 61" letters, but it is clear from the captions that the three letters were issued to comply with SAS 61 requirements. The letters were dated October 16, 1995 **[CL 057464-6],** October 15, 1996 **[CL 036044-6],** and September 22, 1997 **[CL 041002-4]**. The 1995 and 1997 SAS 61 letters bear the same dates as the MLC cover letters. The 1996 SAS 61 letter is dated 22 days after the September 23, 1996 MLC cover letter.

[7]  The fiscal 1997 SAS 61 letter from C&L expressed the same conclusion with a slightly different first sentence and deletion of the last sentence. **[CL 041003]**

Management's estimate of the reserve for bad debts was of significant importance and particularly sensitive. Given the control deficiencies related to billings and collections and the absence of a system-wide methodology for establishing reserves, SAS 61 required C&L to inform the Audit Committee of the process used by management to formulate the estimate and the basis for C&L's conclusion as to its reasonableness. C&L's SAS 61 letters accomplished neither.

With respect to significant audit adjustments and disagreements with management, C&L's SAS 61 letters stated:

> We did not discover any adjustments during the course of our audit which, individually or in the aggregate, would have a significant effect on AHERF's financial statements, nor represent significant weaknesses in AHERF's financial reporting process which could materially misstate future financial statements. **[CL 057466, 036046]**[8]

> No significant disagreements with management arose during the audit with respect to: (1) the application of accounting principles to specific transactions, (2) judgments about accounting estimates ... **[CL 057466, 036046, 041003]**

On a combined basis, C&L's SUD schedules for all three years (1995-97) contained in excess of 100 audit adjustments. **[PwC 009743-5; CL 000326-37, 057335-42]** The documents I have reviewed and the testimony I have read indicates that C&L failed to inform the Audit Committee as to the existence of any of these proposed audit adjustments.

In addition, although not reflected on its SUD schedules, C&L also knew of the $50 million transfer in acquisition reserves in fiscal 1997 to the DVOG reserve for bad debts. According to the testimony of C&L engagement partner, William Buettner, he considered the $50 million transfer to be a departure from GAAP over which C&L had a disagreement with management. Mr. Buettner testified that he did not feel it was necessary to inform the Audit Committee of this departure from GAAP or the disagreement as, in his view, the error was not material to the consolidated financial statements. **[Buettner 638:7- 649:5]** The requirement of SAS 61 to inform the Audit Committee about audit adjustments is based on whether the adjustments (individually or in the aggregate) <u>could have a significant effect on the entity's financial reporting process,</u> not on whether it is <u>material to the financial statements.</u> (Emphasis added.) In my opinion, these errors were material to the financial statements but even if they were not, they still met the SAS 61 criteria of being significant to the financial reporting process. Similarly, the SAS 61 criteria for informing the Audit Committee of disagreements with management is based on whether the matter could be significant, not on whether it is material.

Finally, each of C&L's SAS 61 letters to the Audit Committee contained a section on material weaknesses in internal accounting control which stated:

> ... We did not note any weakness in internal accounting control that we would classify as material. **[CL 057465, 036045, 041003]**

---

[9] The fiscal 1997 SAS 61 letter made the same statement except the second "significant" was dropped (thereby lowering the threshold for the reporting of 1997 audit adjustments to the Audit Committee). **[CL 041003]**

Material weaknesses in internal control are not among the matters required to be communicated by SAS 61. Similarly, SAS 60 does not require the auditor to separately identify and communicate material weaknesses. C&L's statement as to the absence of material weaknesses misstated the severity of the control deficiencies. Coupled with its failure to identify significant internal control weaknesses as reportable conditions, this further misled the Audit Committee as to the seriousness of AHERF's control deficiencies.

In summary, C&L's audits of FY'96 and FY'97 failed to comply with GAAS due to its failure to:

- communicate significant control deficiencies constituting reportable conditions that were known to exist;

- identify as reportable conditions certain significant control deficiencies that were communicated;

- inform the Audit Committee of the existence of audit adjustments that either individually or in the aggregate could have a significant effect on the reporting process;

- inform the Audit Committee that management had intentionally misapplied accounting principles;

- inform the Audit Committee of disagreements with management that could be significant to the financial statements; and

- inform the Audit Committee of the process used by management to formulate the estimate of the June 30, 1996 bad debt reserve and the basis for C&L's conclusion as to its reasonableness.

- Inform the Audit Committee of the FY'97 transfers of $50 million of bad debt reserves from GHS entities to DVOG entities.

In addition, C&L's communications further misled the Board of Trustees and the Audit Committee by inappropriately stating that AHERF's bad debt reserves were reasonable and that C&L had not noted any material weaknesses.

18

## 18.  C&L failed to maintain independence in the performance of its audits

### Relevant GAAS

The second general standard of GAAS is:

> In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.  **(AU § 150.02)**

This general standard requires that the auditor be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be.  **(AU § 220.02)**

To be independent, the auditor must be intellectually honest; to be *recognized* as independent, the auditor must be free from any obligation to or interest in the client, its management, or its owners. … Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence.  **(AU § 220.03)**

The profession has established, through the AICPA's Code of Professional Conduct, precepts to guard against the *presumption* of loss of independence.  'Presumption' is stressed because the possession of intrinsic independence is a matter of personal quality rather than of rules that formulate certain objective tests.  Insofar as these precepts have been incorporated in the profession's code, they have the force of professional law for the independent auditor.  **(AU ¶220.04)**  GAAS provides that the independent auditor should administer his practice within the spirit of these precepts and rules if he is to achieve a proper degree of independence in the conduct of his work.  **(AU ¶ 220.06)**

The AICPA Code of Ethics

The Code of Professional Conduct (the "Ethics Code") of the American Institute of Certified Public Accountants (the "AICPA"), the national organization of CPAs in the United States, consists of two sections – (1) the Principles and (2) the Rules.  The Principles provide the framework for the Rules, which govern the performance of professional services by members of the AICPA.

The Principle as to objectivity and independence is set forth in Article IV of the Ethics Code as follows:

> A member should maintain objectivity and be free of conflicts of interest in discharging professional responsibilities.  A member in public practice should be independent in fact and appearance when providing auditing and other attestation services.  **(ET §55)**

Relevant commentary in support of this principle from Article IV follows:

> Objectivity is a state of mind, a quality that lends value to a member's services. It is a distinguishing feature of the profession. The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest.
> **(ET §55.01)**
>
> ... Regardless of service or capacity, members should protect the integrity of their work, maintain objectivity, and avoid subordination of their judgment.
> **(ET § 55.02)**

The relevant Rule of the Ethics Code to which members of the AICPA are required to adhere is Rule 102 – Integrity and objectivity:

> In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.
> **(ET §102.01)**

## Violations of GAAS

It is widely recognized that the independence rules are intended to ensure that auditors remain impartial in their evaluations of clients' financial statements. Indeed, the requirement that an audit of financial statements must be made by an independent auditor is a bedrock principle of our securities laws.

Although I cannot "get into the minds of the C&L auditors" to ascertain the nature of their mental attitude, the only reasonable explanation I can draw from C&L's egregious and pervasive disregard of GAAP and of facts documented in its own audit workpapers, and its many violations of GAAS, is that it failed to maintain the independence and objectivity required of an independent auditor and subordinated its professional judgment to that of its client.

Among C&L's many audit failures that demonstrate the impairment of its independence and its lack of objectivity are the following:

A. Knowingly allowing AHERF to:

1. retain as of June 30, 1995 over $25 million of excessive reserves or (for general contingencies, accumulated depreciation, credits in patient accounts receivable, inventory reserves, reimbursed GME program costs, and unrecorded interest capitalization) which it detected in its FY'95 audit if not in its audits of prior years;

a.  C&L posted proposed adjustments to eliminate some of these errors to its FY'95 Summary of Unadjusted Differences ("SUD") but these errors were not corrected because C&L concluded that the net effect of all of its SUD items was immaterial.

b.  C&L failed to post to its FY'95 SUD certain errors it detected in its FY'95 audit, particularly proposed adjustments it listed on "scoresheets" to eliminate over $15 million of such excessive reserves. Had C&L also posted to its FY'95 SUD the proposed adjustments it listed on these "scoresheets," it would have had no reasonable basis to conclude that the net effect of all of its SUD items was immaterial.

c.  C&L simply characterized some of the excessive reserves it detected in FY'95 as "cushions" without proposing that a correcting adjustment be made.

2.  materially inflate its FY'96 results of operations by using the excessive reserves that had existed as of June 30, 1995 to provide for needed increases in allowances for uncollectible accounts and other reserves that would otherwise have required a charge against FY'96 income;

3.  fail to capitalize $6.5 million of interest costs incurred by AGH from 1992 through 1995 on construction projects and then:

a.  to capitalize such costs in FY'96 without a corresponding increase in opening unrestricted net assets on the rationale that it did not consider a prior period adjustment necessary due to its overall immaterial impact on the financial statements;

b.  to recognize such $6.5 million as a CRA obligation as of June 30, 1996 (i.e., recording it as additional CRA reserves) despite the fact that it was unneeded and had nothing whatsoever to do with CRA obligations; and

c.  to use $3.75 million of the CRA obligation to inflate revenue in FY'97.

4.  record $4 million of contingent CRA receivables to avoid recording $4 million of bad debt expense (when making adjustments as of June 30, 1996 to increase the DVOG entities' allowances for uncollectible accounts by $17.5 million) despite the fact that:

a.  these contingent receivables represented "estimated" potential recoveries of additional costs from Medicare with respect to cost reports for prior years that had been "final settled" and for which

there could be no reasonable assurance that any recoveries would materialize; and that

    b.  there is no direct relationship between bad debt expense and potential CRA recoveries.

5.  fail to record $4.5 million of its equity in undistributed income of an investee accumulated in years prior to FY'96 and, instead, record all of it as income in FY'96;

6.  create $50 million1 of excessive amounts of bad debt allowances in FY'97 in connection with the acquisition of entities from Graduate Health System and then "transfer" them to DVOG entities in order to reduce the material shortfalls in the DVOG entities' allowances for uncollectible accounts (without charging bad debt expense); and to

7.  record $7,100,000 of income in FY'97 from potential depreciation recapture arising from the FY'97 mergers with Forbes Health System and Allegheny Valley Hospital despite there being no reasonable assurance of collection and in direct conflict with C&L's own audit workpapers which concluded that such income should be reversed.

B.  Failing in FY'96 and '97 to corroborate management representations that it was appropriate to report as unrestricted income capital gains on investments in five irrevocable trust accounts that had amassed over periods of up to 75 years through June 30, 1997, including that trust assets had been partially or fully released from donor restrictions despite knowing in FY'96 that new accounting standards necessitated reassessments of classifications of assets contributed by donors in prior years.

C.  Failing in FY'96 and FY'97 to obtain sufficient competent evidential matter to corroborate many other important management representations.

D.  Issuing a misleading report on the consolidating financial information supplementing AHERF's FY'97 consolidated financial statements (which C&L knew were to be used by the lenders in lieu of issuing separate audit reports on financial statements of the obligated groups) by falsely stating that such supplementary consolidating financial information was fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole despite knowing that:

1.  Due from affiliates (i.e., intercompany receivables) of approximately $114 million were reflected as investments (assets limited or restricted as to

---

[1] In fact, a total of $99.6 million comprised of various acquisition reserves were subsequently identified by AHERF as having been transferred to DVOG entities, but C&L acknowledged only being aware of the "transfer" of $50 million of bad debt reserves.

use)[2] in the AGH column of the consolidating balance sheet[3] as of June 30, 1997; and

2. Materials, supplies and services expense in the DVOG column of the consolidating statement of operations was materially misstated because bad debt expense was not charged when DVOG's bad debt reserves were increased.

E. Failing to communicate required matters to the Board of Trustees, failing to inform the Board of Trustees that various matters which were communicated were reportable conditions, misinforming the Board of Trustees that there were no material weaknesses in internal control, and misinforming the Board of Trustees about the realizability of patient accounts receivable.

As a result of the impairment of C&L's objectivity and independence, AHERF was able to report substantially better results of operations than it had actually achieved and, as a result, to meet certain financial covenants in major debt instruments that it otherwise would have failed. Its false and misleading "audited" financial statements masked the fact that the financial condition of AHERF, Delaware Valley Obligated Group ("DVOG"), and even Allegheny General Hospital ("AGH")[4] as of June 30, 1996 had significantly deteriorated since the prior year-end.

---

[2] Investments were improperly reported as $173 million instead of $59 million. Due from affiliates was improperly reported as $30 million instead of $144 million.

[3] C&L permitted AHERF to then reduce assets limited or restricted as to use to the amount appearing on the consolidated balance sheet by reflecting a $114 million negative adjustment to that line item in the column for eliminating entries, with an offsetting elimination entry to increase intercompany receivables, which was essential to make intercompany receivables eliminate against intercompany payables). Because five other columns in the consolidating balance sheet reflected assets limited or restricted as to use, three of which were individually greater than $114 million, it was impossible to readily determine to which entity or entities the elimination entry pertained by looking at the consolidating schedule.

[4] AGH's assets were used to provide cash needed by entities located in the Delaware Valley.

APPENDIX I