Materiality

Mr. Tillett asserts that my "opinions on materiality are based *solely* in relation to net income" which, Mr. Tillett claims, "is inconsistent with the [relevant accounting] guidance [set forth in his report]."[16] (emphasis added)

However, Mr. Tillett has completely misstated the opinions set forth in my report, which included, among other things, the following conclusions regarding materiality:

- Mr. Buettner's assessment of materiality based on "fund balance," apparently to the exclusion of other important evaluations, is erroneous.[17]

- Given the significance of operating results to the users of the financial statements of AHERF and its Obligated Groups and the nature of AHERF and its affiliates as essentially business organizations, neither GAAS nor C&L's own guidance provided any reasonable basis for C&L to conclude that a balance sheet measure, such as net assets (fund balance), should be the primary determinant of materiality with respect to AHERF's financial statements.[18]

Although balance sheet elements, such as net unrestricted assets or total net assets, may be appropriate in measuring materiality in some circumstances, they certainly do not represent the only financial statement elements that might be relevant to the auditor's assessment of materiality or to the entity's financial statement users. It is evident from the documents and testimony in the case that the primary users of the financial statements, including the Board of Trustees and AHERF's lenders, were acutely interested in the "bottom line" and trend of earnings. Therefore, assessing materiality primarily at the net asset (fund balance) level would cause significant adjustments to results of operations to be considered immaterial because AHERF and its affiliates and obligated groups were large organizations with significant amounts of net assets.

Furthermore, although Mr. Tillett acknowledges "that materiality judgments involve both quantitative and qualitative considerations,"[19] he fails to describe the qualitative considerations that entered into his assessment of materiality. Important qualitative considerations include, among other things, the environment in which the entity is operating, such as a highly-competitive healthcare market; the types and nature of the misstatements, such as transfers of reserves among affiliated entities to avoid charges to income; management's consistent failure to record audit adjustments that negatively impact the statement of operations; and, whether the misstatements turned an operating loss into an operating profit.

---

[16] Tillett report, page 24.
[17] Berliner report, page 1-8.
[18] Berliner report, page 1-11.
[19] Tillett report, page 24.

Finally, as noted in my expert report, GAAP indicates that the "omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."[20]  In other words, the ultimate test of materiality is what users care about.

<u>Summary of Unadjusted Differences</u>

Mr. Tillett asserts that I have applied the rollover method when considering the effects of my adjusting entries and am using a method inconsistent with that used by C&L."[21]  However, Mr. Tillett's assertion mischaracterizes my treatment of the effects of C&L's SUD entries.  As indicated in my expert report, I used the rollover method to include the effects of the SUD entries in the quantification of misstatements, principally because the magnitude of the errors I detected necessitated restatement of AHERF's financial statements.[22]  I did not suggest that C&L's use of the Iron Curtain method was, in itself, inappropriate.

Accordingly, Mr. Tillett's opinion that it was inappropriate for me to use "the rollover method to evaluate the effect of the SUD" is, quite simply, erroneous.

<u>Communications with the Audit Committee</u>

In determining what to disclose to the Audit Committee, Mr. Tillett asserts that C&L (a) "relied on their past experience with the Audit Committee; what they believed to be the Audit Committee's expectations; the sensitivity of the matter; and other business factors" and (b) "communicated more to the Audit Committee than [the Audit Committee] wanted."[23]  As support for his assertions, Mr. Tillett cites C&L's management letters which, he states, "were provided to the Board of Trustees"[24] and "indicat[ed] items that C&L believed the Board of Trustees (the "Board") should be aware of and the issues facing AHERF."[25]

Although it appears that C&L's communications required by SAS 61, *Communications with Audit Committees*, contained the customary "boilerplate" language, neither C&L's management letters nor its required communications under SAS 61 contain disclosures of the $50 million reserve transfers from the Graduate hospitals to the DVOG hospitals.  Mr. Tillett's rationale as to why the "$50 Million Reserve transfer…did not warrant communication to the audit committee" is that "C&L reasonably concluded…the transfers did not have a significant effect on the *consolidated* financial statements" and C&L "did not consider [the transfer] a material error or irregularity."  (emphasis added)

---

[20] Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information* ("CON2"), paragraph 132.
[21] Tillett report, page 34.
[22] Berliner report, page 15-5.
[23] Tillett report, pages 37 and 39.
[24] The Board of Trustees included members of the Audit Committee.
[25] Tillett report, page 37.

To the contrary, it is my view that the improper transfer of $50 million of reserves between subsidiary entities lacked economic substance and was an intentional, material misstatement by AHERF's management of the separate operating results of AHERF's Obligated Groups. Therefore, as discussed previously, such transfer was an irregularity under SAS 53. As to auditor communications concerning errors and irregularities, SAS 53 states:

> For the audit committee to make informed judgments necessary to fulfill its responsibility for the oversight of financial reporting, the auditor should *assure* himself that the audit committee is adequately informed about any irregularities of which the auditor becomes aware during the audit *unless those irregularities are clearly inconsequential.* For example, a minor defalcation by an employee at a low level in the organization might be considered inconsequential. However, irregularities involving senior management of which the auditor becomes aware *should be* reported directly to the audit committee…. (emphasis added) **(AU § 316A.28)**

Mr. Tillett makes still another extreme attempt to absolve C&L from any blame for not disclosing the reserve transfer to the Audit Committee by suggesting that the *$50 million* reserve transfers were irrelevant. However, the very fact that management thought the $50 million transfer was necessary in itself makes it relevant. In addition, Mr. Tillett's rationale that "AHERF's deteriorating financial condition, poor performance, declining cash flows and challenges ahead were adequately disclosed to management and the Board in the consolidated financial statements and provided sufficient warnings to the users of the financial statements that AHERF and its affiliates could have difficulties satisfying their obligations"[26] is flawed. In essence, then, Mr. Tillett is saying that the Board and Audit Committee had all the financial information it needed concerning the financial condition of AHERF and, therefore, further communications from C&L were unnecessary.

Thus, in addition to management's improprieties, the Audit Committee was also culpable, in Mr. Tillett's view, for C&L's audit failure because they knew there was trouble and didn't do anything about it. However, not all of the foregoing matters listed by Mr. Tillett are "disclosed in the financial statements." Furthermore, the matters not disclosed by C&L to the Audit Committee, including the reserve transfers, concealed the true seriousness of AHERF's "deteriorating financial condition." Indeed, the very reason the reserve transfers were made was to avoid the recognition of bad debt expense.

In summary, C&L's decision to withhold disclosure of the reserve transfers from the Audit Committee is contrary to GAAS, and, therefore, Mr. Tillett's opinion that the "$50 Million Reserve transfer…did not warrant disclosure to the audit committee" is erroneous.

---

[26] Tillett report, page 42.

Prior period adjustments

Mr. Tillett stresses the fact that, under GAAP, prior period adjustments "are rare in modern financial accounting."[27] As a guiding principle for entities that endeavor to prepare financial statements in conformity with GAAP, I do not disagree with that accounting concept. However, the notion that prior period adjustments *should be* rare assumes that the reporting entity has not engaged in a pattern of "earnings management" as was the case at AHERF. In such an environment, the common misuse of facts to manage earnings requires correction of errors or irregularities to be accounted for as prior period adjustments.

Mr. Tillett asserts that "[m]any of the items that [I] allege to be errors simply involve changes in estimates that are necessary when evaluating patient accounts receivable of a healthcare entity."[28] However, Mr. Tillett fails to understand the conclusions set forth in my expert report that prior period adjustments are errors or irregularities attributable to the misuse of facts that existed at the balance sheet date or arose from improper application of accounting principles—as distinguished from accounting estimates. Accordingly, Mr. Tillett's conclusion that many of the "restatement" items contained in my expert and supplementary expert reports are simply changes in estimates is erroneous.

## Other Matters

In addition to the conceptual matters discussed above, I disagree with Mr. Tillett regarding a number of other conclusions set forth in his report. The principal bases for my disagreements are set forth in the sections that follow.

FY '96 Allowance for uncollectible accounts ("bad debt reserve") and bad debt expense

- Reserve methodologies

    Mr. Tillett asserts that I have merely gone through the mathematical exercise of applying loss percentages to patient accounts receivable aging categories without consideration of historical trends or industry data and experience.[29] To the contrary, the estimates to which Mr. Tillett refers were based upon historical trends, industry data and experience, and market conditions, as reflected in information and data in AHERF documents and/or provided by AHERF personnel in deposition testimony.

    In Mr. Tillett's opinion, the allowances for uncollectible accounts that I calculated are unreasonable in comparison to historical DVOG amounts and the market in which the hospitals were operating.[30] Mr. Tillett fails to recognize that existing facts and circumstances, including the consolidation of the billing function in Pittsburgh, negated, in significant measure, the applicability of historical

---

[27] SFAS 16, *Prior Period Adjustments*, paragraph 1.
[28] Tillett report, page 16.
[29] Tillett report, page 62.
[30] Tillett report, page 62.

relationships (for example, reserves to receivables or bad debt expense to revenue). Such historical relationships failed to reflect the continued deterioration in DVOG's receivables as well as its continuing failure to provide an adequate bad debt reserve and properly provide for bad debt expense. C&L's workpapers and testimony of AHERF's accounting and Patient Financial Services Group ("PFSG") personnel indicate that the historical reserve rates and bad debt reserve methodologies (whether historical statistics were used or not) were inadequate. **[Snow 302:16-344:4; Franz 378:6-394:10; and Laing 281:13-285:13 and 293:20-295:24]** Mr. Tillett also fails to recognize that historical rates were distorted because even C&L concluded that DVOG's bad debt reserve and bad debt expense were understated. C&L's SUD entry proposed increasing such reserves by $7.5 million as of June 30, 1995, which AHERF did not record, and C&L's discussions with management resulted in the $17.5 million recorded increase in DVOG reserves as of June 30, 1996.

Mr. Tillett further asserts that "it would not have been reasonable to simply apply the AGH loss percentages to the DVOG hospitals' accounts receivable agings and have that result be the determinative factor in C&L's evaluation of the allowance for uncollectible accounts during their audits of the financial statements...."[31] However, as indicated in Table 10 of Mr. Tillett's report, the application of AGH rates was but one of several methodologies that I used to independently estimate the allowance for uncollectible accounts. In fact, C&L itself had planned to perform the procedure in 1996 but did not, even though applying the AGH reserve rates to DVOG aging buckets caused C&L to believe that DVOG's allowance was understated as of June 30, 1995. Indeed, C&L had recommended to AHERF in its FY'95 management letter that "the current methodology utilized by AGH should be considered for application at all AHERF hospitals." **[Ex. 7]**

Furthermore, DVOG's extensive registration and billing (and rebilling) problems adversely affected the realizability of DVOG's receivables. **[Franz 427:21-430:10; Snow 346:12-20]** These problems were further exacerbated by AHERF's decision to consolidate the accounts receivable functions in Pittsburgh. **[Buettner 45:11-47:5, 145:8-148:3]** In addition, DVOG's receivables, in actuality, were older in every aging bucket than AGH's. However, they were not reflected as being older (as C&L noted in its FY'96 workpapers) because rather than being aged from discharge date, as was the case at AGH, DVOG revised its aging methodology in FY'96 to age its inpatient accounts from final billed date[32] and its outpatient accounts from date of last collection (which classified an outpatient account of any age as current even if only $1 were collected). **[Snow 345:16-347:18; Franz 284:13-289:10]**

---

[31] Tillett report, page 56.

[32] Mr. Snow testified that "if you rebill an account it would reage the account in the billing system...if you had an account that was 360 days old, and you rebilled it, the aging on that account would be zero or one day" rather than 360 days. As to the effect of rebilling on bad debt reserves, Mr. Snow testified that "[i]f bad debt reserves were based on aging, then by reaging the account, yes, it would have lowered the bad debt reserves." **[Snow 345:16-346:8, 347:3-6]**

- Past statute accounts

Mr. Tillett asserts that "C&L performed extensive work in this area and did not identify or conclude that there were significant accounts that were past statute. The bases for [Mr. Berliner's] conclusions seem to be based on the premise that accounts greater than 365 days old are automatically past statute. This is not correct."[33]  Mr. Tillett's premise is unfounded.  Nowhere in my expert report did I assert that accounts over 365 days were automatically past statute.

Past statute accounts were only one consideration in my analysis of the adequacy of AHERF's bad debt reserves as of June 30, 1996.  Among other things, I considered the testimony of PFSG personnel, including Lora Franz and Greg Snow.  They testified that accounts over a year old were highly likely to be uncollectible[34] either because they were overstated or past statute, insufficient information existed to correctly rebill accounts that had been billed incorrectly, collection attempts had become minimal as PFSG and outsourcers focused on collecting larger, newer, or more easily collectible accounts, or they deemed any further collection attempts to be futile.  **[Franz 120:17-121:14, 166:6-169:22, 290:5-294:17 and 375:7-378:5; and Snow 83:13-84:13, 159:12-162:10, 244:10-245:13, 252:8-257:8]**  Thus, in addition to mischaracterizing my conclusions, Mr. Tillett ignores the deposition testimony of experienced PFSG personnel directly responsible for collection and management of DVOG's accounts receivable.

Mr. Tillett asserts that "C&L utilized a specialist from its Health Care Regulatory Group, to assist with the evaluation of the billing function at the DVOG hospitals."[35]  However, Mr. Kaliszewski, an HCRG manager/specialist assigned to direct HCRG's AHERF assignment, testified that his consulting team did not perform work with respect to either the collectibility of accounts receivable or the adequacy of the bad debt reserves on the books of the various AHERF entities. **[Kaliszewski 43:17-46:13]**

- C&L's independent analysis of AHERF's bad debt reserves

Mr. Tillett asserts that "C&L performed procedures to develop an independent expectation of the estimate to corroborate the reasonableness of AHERF management's estimate as required by GAAS"[36] and that, therefore, my conclusion "that C&L failed to develop an independent expectation of the allowance for uncollectible accounts...is not correct."[37]  Contrary to Mr. Tillett's suggestion, the simple fact is that nowhere in C&L's workpapers did I find any

---

[33] Tillett report, page 58.
[34] Mr. Buettner also testified that Mr. Kirstein, as expressed in his letter **[Ex. 1448]** had "a concern with the collectibility of A/R over 180 days old.  That is one additional factor that we looked at that led us to believe that the reserve—reserve level should be enhanced." **[Buettner 150:10-14]**
[35] Tillett report, page 58.
[36] Tillett report, page 54.
[37] Tillett report, page 58.

documentation indicating that it had, in fact, developed an independent expectation of the estimate, and Mr. Tillett does not cite any.

Furthermore, neither Messrs. Buettner nor Kirsten had a reasonable explanation of how they arrived at the determination that AHERF's bad debt reserve was understated by $15-20 million. In my experience, whether or not the client records the adjustment, it is inappropriate and unusual for such a large proposed adjustment not to be documented and explained in the workpapers. **[Buettner 245:13-249:20]**

- The $17.5 million bad debt reserve adjustment

  Mr. Tillett asserts the following:

  > [Mr. Berliner] alleged that AHERF violated GAAP by failing to record the entire increase in the allowance for uncollectible accounts as a charge to income (bad debt expense) and that C&L violated GAAS by allowing AHERF to do so.[38] I disagree. As discussed previously in this report, it is common for an entity to combine the effect of several journal entries into one. The auditor is not responsible for evaluating and opining on the bookkeeping of an organization. Rather, the auditor is responsible for assessing whether the entries caused the financial statements to be materially misstated.[39]

  While Mr. Tillett is correct that the auditor's opinion does not address the adequacy of the entity's "bookkeeping" policies and procedures, he overlooks the auditor's need to be aware that the "netting" of entries to circumvent internal controls is one method of concealing misstatements in the financial statements.

- Information withheld from C&L by AHERF management

  It is Mr. Tillett's opinion that "information that AHERF management withheld from C&L would have been significant to C&L's evaluation relative to patient accounts receivable and related allowance for uncollectible accounts in connection with their audit of the 1996 financial statements."[40] As support for his opinion, Mr. Tillett paraphrases the deposition testimony of Mr. Snow as follows:

  > Mr. Snow testified he did not communicate this information[41] to C&L because he thought he would be "fired." Mr. Snow further implied he would only provide relevant information if asked and before he provided the information he would have to get "clearance to provide it."[42]

---

[38] Berliner report, page 8-3.
[39] Tillett report, page 68.
[40] Tillett report, page 70.
[41] Mr. Snow testified that "the patient accounting department had identified approximately $50 million of accounts receivable that were uncollectible." **[Snow 122:6-9]**
[42] Tillett report, page 70.

However, Mr. Snow said more at his deposition. When asked if he believed that he was prohibited from sharing "internal information with anyone from the outside," he testified:

> "No. If information was requested, then I would provide it or attempt to get clearance to provide it, but I was not going to volunteer any information." **[Snow 124:6-9]**

Mr. Snow could not have expressed his belief any clearer in testifying that there were two reasons for his not disclosing such information to C&L: "Number one,...if I had divulged that information directly, I would have been, in my opinion, terminated. And the second thing, they never asked." **[Snow 407:18-22]** Notwithstanding the apprehension of AHERF personnel to "volunteer information," it is my view that C&L had a responsibility to make inquiries of key operating personnel, particularly those responsible for accounts receivable billing and collection. Furthermore, had C&L made inquiries of PFSG personnel, any failure to respond would have been a red flag requiring further investigation.

Mr. Tillett also cites a June 30, 1996 memorandum from Mr. Laing as support for his opinion that management withheld information. Mr. Laing's memo discusses C&L's request that AHERF provide selected patient account information for it to test:

> I would recommend that all interested parties be apprised of the expectations [of C&L's possible findings] as noted above, <u>before proceeding to make the requested information available to C&L</u> (emphasis added). I do not take any exception to what they have proposed to do by way of their audit approach, but merely note that under the circumstances it may not be an effective use of their (or our own) time given the expected results.[43]

With respect to this memo, Mr. Laing testified that "what struck me as...being not very useful in their approach was that they were spending so much effort trying to test these internal transactions during a time when we were experiencing a lot of organizational change, as opposed to focusing on validating the year-end balances of those accounts...." **[Laing 245:22-246:3]** Therefore, the memo was written to discuss whether C&L's planned interim procedures were effective, as the memo states, because the receivables were in such bad condition that the audit approach he thought more beneficial, based on his prior experience as a C&L auditor, would be to perform procedures designed to substantiate year-end receivable balances.

---

[43] Tillett report, page 71; emphasis had been added by Mr. Tillett.

Mr. Laing also testified that he would have expressed his concerns over his perceived inadequacy of the bad debt reserves to C&L if he had been asked. **[Laing 95:4-11]**

Mr. Tillett's citation of this testimony and corporate memo is an excellent example of his failure to understand the auditor's responsibility to, among other things, obtain competent evidential matter by making appropriate inquiries of client personnel. C&L failed to ask appropriate personnel the right questions with respect to collectibility of receivables and, correspondingly, the adequacy of AHERF's bad debt reserves. Instead, it limited its inquiries to Accounting personnel and failed to direct inquiries to PFSG personnel, such as Messrs. Snow and Laing and Ms. Franz, who were directly responsible for the billing and collection of patient accounts receivable, and for maintaining individual patient account balances, including adjustments and corrections thereof during FY'96 (and FY'97).

In his effort to blame AHERF for withholding information, Mr. Tillett ignores the information that was furnished to C&L, including the DVOG aging reports as of March 31, 1996 and June 30, 1996. Based upon its review of these reports, C&L noted that agings had continued to deteriorate from prior years, but failed to adequately respond to obvious questions of collectibility portrayed by them. Nothing prevented C&L from independently determining that reserve rates and other assumptions inherent in DVOG's accounting estimates for bad debt reserves on patient accounts receivable, especially pertaining to older accounts receivable, were unreasonable.

FY '97 bad debt reserve and bad debt expense

- The $80 million write-off of patient receivables

  Mr. Tillett states the following:

  > The $80 Million Write-off was a decision made by AHERF senior management and represented a change in management's intentions during fiscal year 1997 and after the issuance of the 1996 financial statements. Changes in management's intentions give rise to changes in estimates and should not be recorded as prior period adjustments. Therefore, C&L reasonably concluded the effect of write-off was properly accounted for in fiscal 1997 as a change in accounting estimate, not as a prior period adjustment.[44]

Management knew the accounts were uncollectible as of June 30, 1996, but failed to adjust them to net realizable value. **[Spargo 125:11-20, 142:7-145:18 and 148:11-150:14; Snow 122:5-20, 156:8-157:7, 166:7-20 and 359:17-362:5; Franz 107:22-111:8; and Fox 128:10-129:25]** The fact that management waited

---

[44] Tillett report, page 81.

until FY'97 to make the write-offs was not a result of changed circumstances requiring recognition in FY'97 but, instead, an acknowledgement of facts and circumstances that existed in FY'96, including the effects of management's directives to not write-off accounts.[45]

Mr. Tillett also asserts that "[i]t is further apparent that many of the accounts written-off as a result of this unusual management decision were, in fact, collectible had AHERF management decided to pursue collection more vigorously, rather than performing a mass write-off."[46]  However, this assertion represents pure speculation by him and is unsupported by the facts.  Documents produced and testimony given indicate that AHERF and its collection outsourcers had given up on these accounts and that only a few million dollars of the $80 million written off were ever recovered.  **[Ex. 4248 at 010266, K-L; 010278, K-L; 010290, L-M; 010294, E-F; 010306, K-L; Snow 252:8-257:8; and Franz 290:5-294:17]** Indeed, it was in recognition of the possible recovery of some of the delinquent accounts that I estimated the bad debt reserve as of June 30, 1996 based on 95% (rather than 100%) of total receivables over 365 days old.

Mr. Tillett attempts to support his hypothetical assertion that many accounts written off were collectible by stating that Mr. Cancelmi acknowledged that accounts being written off were in fact collectible.  As support, he cites Mr. Cancelmi's September 24, 1996 memo which states:

> Furthermore, any future collections on the accounts to be written off of $81,452 would also increase our bad debt reserve as of June 30, 1997.[47]

There is no reason to believe that Mr. Cancelmi or others at AHERF thought that any significant amount of collections would come from these receivables.  In fact, Mr. Cancelmi candidly recognized that the older accounts were uncollectible.  In that September 24, 1996 memo cited by Mr. Tillett, which was addressed to Mr. Spargo and issued to discuss the effects on DVOG's bad debt reserves of writing off $81,452,000 of DVOG entities' inpatient and outpatient accounts, he wrote:

> "I believe it is fair to state that there is a pool of old receivables that we will not be able to collect."  **[Ex. 29]**

Mr. Cancelmi's view as to the appropriate accounting for hypothetical (i.e., "future") collections is irrelevant to whether or not the receivables written off were indeed still collectible.  Not only has Mr. Tillett failed to provide any support for his assertion that many of the $81 million of written off accounts were collectible, but he ignores the practical realities of the existing facts and

---

[45] Mr. Snow's October 2, 1995 memo to Mr. Dionisio stated: "This memo will serve to confirm the discussion on Friday, September 29, 1995 at Mr. McConnell's staff meeting.  My instructions were as follows:  'Do not write-off any amounts with dates of service prior to July 1, 1995 for any reason.'…" **[Ex. 822]**
[46] Tillett report, page 80.
[47] Tillett report, page 80.

circumstances, documentary evidence to the contrary, and extensive testimony from knowledgeable individuals bearing directly on the subject.

- The $50 million bad debt reserve transfers

Mr. Tillett asserts that "C&L senior team members have testified that they objected to the accounting for these transfers and requested the accounting entries for the transfers be reversed."[48] There is nothing in C&L's audit workpapers to document this position; not only did C&L fail to propose an adjustment to reverse the transfers, it also failed to inform the Audit Committee of them.

The only evidence produced that C&L performed an analysis is Mr. Buettner's handwritten notes, which are undated, and which were not included in the audit workpapers but were produced from his personal files. Therefore, C&L failed to comply with SAS 41, *Working Papers*, which states:

> The information contained in the working papers constitutes the principal record of the work that the auditor has done and the conclusions he has reached concerning significant matters. **(AU § 339.01)**

> Working papers are records kept by the auditor of the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement. **(AU § 339.03)**

Thus, C&L's failure to properly document in its workpapers the $50 million reserve transfers violated these basic tenets of SAS 41.

Furthermore, C&L violated GAAS by failing to disclose to the Audit Committee its disagreement with management, as characterized by Mr. Tillett, regarding the bad debt reserve transfers. SAS 61 states:

> Disagreements with management may occasionally arise over the application of accounting principles to the entity's specific transactions and events and the basis for management's judgments about accounting estimates. Disagreements may also arise regarding the scope of the audit, disclosures to be included in the entity's financial statements, and the wording of the auditor's report. The auditor should discuss with the audit committee any disagreements with management, whether or not satisfactorily resolved, about matters that individually or in the aggregate could be *significant* to the entity's financial statements or the auditor's report…. (emphasis added) **(AU § 380.11)**

The transfer of bad debt reserves among subsidiary entities, which C&L itself and Mr. Tillett acknowledged was improper,[49] was significant to both AHERF's

---

[48] Tillett report, page 89.
[49] Tillett report, pages 89 & 91.

consolidated financial statements and the individual financial information of its obligated groups. Indeed, such entries would fail to pass any reasonable "smell" test. Mr. Buettner sought to rationalize them by attempting to "pull rabbits out of a hat" (i.e., his handwritten notes). Such unusual bad debt reserve transfers called for more than a minor whimper by C&L about improprieties. They should have heightened C&L's professional skepticism about management's true objectives, alerted C&L to the possibility that additional improper transfers were made, and compelled it to uphold its reporting responsibility to the Audit Committee.

- The $49.6 million reserve and other account transfers

  Mr. Tillett acknowledges that the $49.6 million of Graduate entities' reserve "transfers" to DVOG entities in May and June 1997 were inappropriate, that they involved many accounts, and that components thereof were reflected on schedules given to C&L.[50] However, he absolves C&L of any responsibility for detection thereof because management allegedly failed to inform C&L about them. This further illustrates Mr. Tillett's failure to understand the respective roles of management and the auditor.

  As discussed earlier, it is the responsibility of the auditor to perform effective audit procedures to gain reasonable assurance that the financial statements are free of material misstatement. As set forth in my expert report, C&L did not do so, failed to objectively evaluate audit evidence pertaining to the $49.6 million of improper transfers in both the DVOG and Graduate entities' books and records, failed to investigate if more than the identified $50 million of bad debt reserve transfers between obligated groups had been made (i.e., failed to heighten its professional skepticism to an appropriate degree based on its knowledge about the first $50 million of transfers), performed ineffective analytical procedures, and relied unduly on alleged management representations.

  In any event, nothing raised by Mr. Tillett in his report supports the notion that C&L was precluded from discovering and properly responding to the "undisclosed" $49.6 million of improper transfers. For example, C&L's failure to properly investigate large and unusual increases in DVOG's bad debt reserves identified as "bad debt shortfall adjustments" on bad debt reserve rollforward analyses, which were prepared by AHERF and included in C&L's audit workpapers, cannot be blamed on management.

Compliance with debt covenants

In connection with AHERF's (and its obligated groups') compliance with debt covenants, Mr. Tillett asserts the following:

  The auditor's responsibility is to plan and perform its audits to obtain reasonable assurance that the financial statements are free from material misstatement. In

---

[50] Tillett report, pages 94-95.

performing its audit to obtain such assurance, an auditor typically performs tests of an entity's compliance with debt covenants. The auditor performs recalculations of the covenants and agrees the underlying numbers used in the calculations to information gathered by the auditor during the course of his audit, on a test basis. However, the responsibility of reviewing and interpreting the underlying debt agreements is the responsibility of management and its legal counsel. The interpretation of the language in a debt covenant is a legal question that an auditor is not qualified to answer. The extent to which the auditor reviews and analyzes the underlying debt agreements is a matter of professional judgment.[51]

Although it is true that the auditor is solely responsible for its opinion on the financial statements, Mr. Tillett's assertions mischaracterize the auditor's responsibilities under GAAS for a number of reasons. SAS 31 states that "[m]ost of the independent auditor's work in forming his opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."[52]

With respect to an entity's debt, an important aspect of obtaining sufficient competent evidential matter is obtaining a proper understanding of the debt agreements. Without such understanding the auditor would be unable to (i) design adequate audit procedures (ii) assess compliance with loan covenants and (iii) draw valid conclusion regarding proper classification of debt. In fact, C&L's audit workpapers contain an audit procedure to "[o]btain an understanding of debt covenants currently in effect, including amendments and modifications." This indicates that C&L determined this was a necessary audit step to enable it to render an opinion that AHERF's financial statements were fairly presented in all material respects in conformity with GAAP. Furthermore, long-term debt was material to AHERF's financial statements. Consequently, compliance with the debt covenants was material to AHERF's ability to continue as a going concern because non-compliance could result in an event of default, thereby causing the debt to be callable by the lenders.

Although an auditor is permitted by GAAS to utilize the services of a third-party specialist, such as an attorney, to assist in obtaining and evaluating evidential matter, the auditor is solely responsible for determining the sufficiency and competence of such evidential matter in forming its opinion on the financial statements. To suggest otherwise is to suggest that the auditor can abdicate its responsibility to the client or third-party specialist.

As documented in its workpapers, C&L issued various reports[53] regarding AHERF's compliance with debt covenants; for example, C&L's September 11, 1996 debt compliance letter issued to AGH's Board of Trustees stated that "nothing came to our attention that caused us to believe that the Obligated Group was not in compliance with

---

[51] Tillett report, pages 137-138.
[52] Financial statement assertions include existence or occurrence, completeness, rights and obligations, valuation or allocation, and presentation and disclosure.
[53] The auditor's responsibilities in connection with the issuance of such reports are covered in SAS 62, *Special Reports*.

the covenants ...."[54] Such language was typically included in C&L's debt compliance letters. Thus, C&L's audit program and its special reports on AHERF's compliance with its debt covenants are contrary to Mr. Tillett's assertion that management and its legal counsel (and not the auditor) are responsible for reviewing and interpreting the underlying debt agreements.

In a final attempt to justify C&L's failure to detect and report on AHERF's (and its obligated groups') non-compliance with debt covenants in a timely manner, Mr. Tillett argues that even "assuming [that the] $50 million [reserve transfer] was expensed at the DVOG...there would not have been a covenant violation." However, Mr. Tillett's calculation on page 93 of his report fails to include the additional $49.6 million of improper transfers discussed in my expert report and elsewhere herein. Had Mr. Tillett properly included the effects of the misstatements reflected in my expert report, his calculations would have reflected a violation of DVOG's FY '97 *Debt Service Coverage Ratio*.

Finally, in note 271 of his report, Mr. Tillett asserts that "the C&L audit team utilized the concurring partner assigned to the engagement, Jeffrey Hoover, to discuss the effect of the $50 Million Reserve Transfer on the consolidated financial statements." However, Mr. Hoover testified that he does not "recall an issue regarding a transfer as part of my concurring partner review. No, I don't recall that issue being reviewed with me." **[Hoover SEC 163:5-164:3]**

I have also reviewed the November 9, 2004 Expert Report of Robert P. Mitchell, Esq. Among other things, Mr. Mitchell opines that "it was certainly reasonable for Coopers & Lybrand to rely on the legal opinions of Foley & Lardner with respect to ... the consequences of a violation of the debt service coverage ratio under the ... Centennial Master Indentures."[55]

As indicated above, I disagree with Mr. Mitchell's opinion because I believe that the question of whether or not it is reasonable for C&L to have relied on the legal opinions of Foley & Lardner is an auditing issue to be decided by the auditor based upon the relevant facts and circumstances. As applied here, it was unreasonable for C&L to rely on the Foley & Lardner opinion because, among other things, C&L was fully aware that the bond trustee had taken a position in conflict with the substance of the Foley & Lardner opinion.

<u>Consolidating and Combining Information</u>

Mr. Tillett opines that "the presentation of the $50 Million Reserve Transfer in the consolidating information columns had no effect on the reported net assets or net income for any obligated group."[56] As support for his erroneous opinion, Mr. Tillett cites the testimony of Ms. Frazier in the SEC's Civil Action. However, the cited testimony given

---

[54]Exhibit 187 of Mr. Tillett's report.
[55] Mitchell report, pages 5-6.
[56] Tillett report, page 91.

by Ms. Frazier provides no substantiation of Mr. Tillett's opinion.[57]  Furthermore, there is no evidence in C&L's workpapers that it ever quantified the impact of the misstatements on either the DVOG or Graduate entities (i.e., Allegheny Hospitals, Centennial) obligated group arising from the $50 million "transfer" of bad debt reserves.

Endowments

Mr. Tillett asserts that information that "AHERF management withheld from C&L would have been significant to C&L's evaluation relative to the classification of the Lockhart Trust Funds in connection with their audits of the 1996 and 1997 consolidated financial statements."[58]  However, Mr. Tillett fails to consider that professional skepticism and adequate audit procedures, including analysis of the Lockhart Trust ("Trust" or "Funds") documents by experienced personnel, would have disclosed the failure of AHERF to comply with GAAP in reporting the classification of net assets.

Mr. Tillett also fails to explain how any management misrepresentation and/or omission precluded C&L from being able to detect the material misclassifications of net assets related to the Funds.  As Mr. Tillett acknowledges in his report,[59] there is no evidence that C&L *was not provided* the most important documents (the Trust agreements themselves) considered necessary to properly audit the propriety of management's classifications of net assets.  In fact, C&L's workpapers clearly indicate that C&L *was provided* the Trust agreements.[60]

Mr. Tillett further asserts that "[w]hen an auditor updates permanent files, he does not necessarily review and analyze each document maintained in the file.  Rather, updating the permanent files means adding new documents obtained in the current year and typically removing documents that are no longer relevant to the audit."[61]  Mr. Tillett's assertion represents a gross misunderstanding of the auditor's responsibilities in connection with the audit of a not-for-profit entity's classification of net assets.

In addition, the adoption of major new accounting standards for not-for-profit organizations[62] required increased professional skepticism and due care.  Those standards mandated the reading of the relevant Trust documents by experienced professional staff to assess the client's proper classification of net assets in conformity with the new standards rather than assigning such review and audit procedures to staff with relatively little experience in reading and interpreting trust documents.  Accordingly, C&L should have recognized the need for expanded audit procedures rather than simply relying on a "discussion with management" and obtaining a management representation letter to substantiate AHERF's compliance with the new not-for-profit accounting standards.

---

[57] Frazier 249:1-256:24.

[58] Tillett report, page 7.

[59] Tillett report, page 132.

[60] Ex. 4109 at EXH0404945 indicates that C&L "reviewed the endowment agreements."

[61] Tillett report, page 128.

[62] SFAS No. 116, *Accounting for Contributions Received and Contributions Made* ("SFAS 116"); SFAS No. 117, *Financial Statements of Not-for-Profit Organizations* ("SFAS 117"); and SFAS No. 124, *Accounting for Certain Investments Held by Not-for-Profit Organizations* ("SFAS 124").

Furthermore, Mr. Panucci's testimony indicates that he did not have the requisite not-for-profit experience to perform the critical analysis necessary to assess management's assertions regarding the classification of AHERF's investments and net assets.

Mr. Tillett states that C&L, among other things, "review[ed] *available* trust documentation provided and maintained by AHERF to support management's classifications."[63] (emphasis added)  Although he acknowledges that he "does not know what documentation was provided"[64] to C&L, Mr. Tillett refers to auditor testimony suggesting that Trust documentation made available to C&L did not contain all of the language relevant to a determination of the proper classification of net assets pertaining to the Funds.

GAAS requires the auditor to obtain sufficient competent evidential matter, which should include a complete set of executed trust documents.  Accordingly, incomplete or unexecuted documents do not constitute sufficient competent evidential matter, particularly in connection with the adoption of SFAS 116, 117 and 124.  Furthermore, the unavailability of a complete set of documents would not only raise questions about management's integrity and/or control procedures but also make it extremely difficult if not impossible to ascertain the proper classification of net assets.[65]  Contrary to Mr. Tillett's opinion that C&L "had no responsibility to contact the Trustee,"[66] the failure to confirm significant provisions of the trust agreements directly with the Trustee was inexcusable if C&L were unable to obtain a complete set of executed documents from AHERF.[67]

Mr. Tillett further asserts that C&L fulfilled its responsibilities under GAAS by meeting with AHERF's management to discuss net asset classification.[68]  However, as stated previously, the auditor is responsible for obtaining sufficient competent evidential matter.

---

[63] Tillett report, page 130.

[64] Tillett report, page 132.

[65] AICPA AAG, *Not-for-Profit Organizations*, states that: "Not-for-profit organizations that receive significant amounts of contributions should have an accounting system, along with controls built into that system, for recording the receipt and collection of contributions. Internal control should also provide reasonable assurance that revenues arising from conditional promises to give are recognized when the conditions have been substantially met and that restrictions on contributions are recognized in the appropriate net asset class. The absence of such an accounting system and related controls might make it difficult for the auditor to obtain the necessary assurance about the completeness assertion and the presentation and disclosure assertion for contribution revenues and receivables and net assets. Accordingly, the auditor's assessment of control risk with respect to assertions related to contribution revenues and receivables may constitute a major activity in the planning process." **(AAG-NP0 5.83)**

[66] Tillett report, pages 130-131.

[67] AICPA AAG, *Not-for-Profit Organizations*, states that "Receivables are usually confirmed principally to provide evidence about the existence/occurrence assertion. FASB Statement No. 116 specifies that for a promise to give to be recognized in financial statements there must be sufficient evidence in the form of verifiable documentation that a promise was received. *If the documentation is not present, an asset should not be recognized.* The verifiable documentation required by FASB Statement No. 116 for recognition of promises to give may not be sufficient evidence concerning the existence/occurrence assertion. Confirming recorded promises to give (contributions receivable) may provide additional evidence about the existence of promises to give, the existence or absence of restrictions, the existence or absence of conditions, and the periods over which the promises to give become due." (emphasis added) **(AAG-NPO 5.85)**

[68] Tillett report, page 132.

In my experience, the auditor's procedures would typically include the reading of trust documents and direct confirmation with the Trustee. Furthermore, the failure of C&L to obtain sufficient competent evidential matter, in the form of complete and executed documents, represents yet another example of C&L's over-reliance on management representations.

Mr. Tillett asserts that he has "seen no evidence that C&L was even informed that AHERF management had questions concerning the classification of the [Trusts] under the new accounting standards."[69] However, Mr. Tillett ignores the fact that Ms. Frazier acknowledged in deposition testimony that "the interpretation of the agreements [was] not clear as to whether or not the income was available for operations."[70] **[Frazier 390:17-19]** In any event, Mr. Tillett provides no explanation as to how any management misrepresentation and/or omission relevant to the classification of net assets pertaining to the Trusts precluded C&L from conducting its audit in accordance with GAAS.

Finally, Mr. Tillett states that he "[did] not know what specific paragraphs, articles or other documentation AHERF management relied on when making their initial classification of the Lockhart Trust Funds in connection with their adoption of the new accounting standards. Nor [did he] know what documentation was provided to Mr. Panucci to support AHERF management's classification."[71] Accordingly, Mr. Tillett has no basis for concluding that "C&L's audit procedures with respect to AHERF management's classification of contributions received in accordance with the new accounting standards were performed in accordance with GAAS."

_Robert W. Berliner_ (signature)
_____
Robert W. Berliner

---

[69] Tillett report, page 135.
[70] Ms. Frazier defined income as "unrealized, realized gains and interest income, dividends and earnings" or "anything that wasn't the original contribution." **[Frazier 391:22-392:10]**
[71] Tillett report, page 132.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS OF<br>ALLEGHENY HEALTH, EDUCATION<br>AND RESEARCH FOUNDATION, | ) )<br>) )<br>) )<br>) ) | |
| Plaintiff, | ) )<br>) | Civil Action No. 00-684 |
| v. | ) )<br>) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, | ) )<br>) | |
| Defendant. | ) | |

## DECLARATION OF R. BRUCE DEN UYL

I, R. Bruce Den Uyl, hereby depose and state as follows:

1.      I am over the age of 18.  I have personal knowledge of, and am competent to testify about, the matters set forth herein.

2.      I have been retained by the Plaintiff to serve as an expert witness, offering expert opinion testimony, in the above-captioned matter.  I am submitting this Declaration in support of the Plaintiff's opposition to Defendant's Motion For Summary Judgment in the above matter.

3.      Attached hereto are true and correct copies of the expert reports that I prepared in connection with my engagement:

- the Rule 26(a)(2)(B) Report of R. Bruce Den Uyl and

- the Rule 26(a)(2)(B) Rebuttal Report of R. Bruce Den Uyl.

4.      If called to testify at trial, I would testify in a manner consistent with the opinions expressed in these expert reports.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 2005 in Chicago, Illinois.

R. Bruce Den Uyl

AlixPartners LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| ALLEGHENY HEALTH, EDUCATION | ) | |
| AND RESEARCH FOUNDATION, | ) | |
| | ) | **Civil Action No. 00-684** |
| Plaintiff, | ) | **Judge David Stewart Cercone** |
| | ) | |
| v. | ) | |
| | ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) | |
| | ) | |
| Defendant. | ) | |

### Rule 26(a)(2)(B) Report of R. Bruce Den Uyl

### I.    Introduction

This report contains my opinions in the matter brought by The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation (the "Committee" or "Plaintiff") against the PricewaterhouseCoopers ("PwC", "Coopers" or the "Defendant").[1]  I have been retained to provide expert opinions regarding the damages sustained as a result of misstatements contained in the audited financial statements of the Allegheny Health, Education and Research Foundation and its affiliates (the "AHERF System") for fiscal years ended June 30, 1996 and June 30, 1997.

### II.    Personal Background, Information and Qualifications

I am a Principal in the professional services firm AlixPartners LLC ("AlixPartners").  As part of performing my analysis, I utilized a team of AlixPartners personnel who worked under my direction and control.

---

[1] Coopers & Lybrand ("Coopers") and Price Waterhouse merged to create PricewaterhouseCoopers ("PwC") in July of 1998.  The legacy Coopers auditors were the auditors of the Allegheny Health, Education and Research Foundation and its affiliates for the fiscal years 1996 and 1997.

All of the opinions presented in this report are based on my analysis of the available information and my experience, education and expertise as a financial consultant.

I have had extensive experience as a consultant on a broad array of financial issues. I have prepared financial and accounting analyses, valuations and efficiency studies in connection with mergers and acquisitions, bankruptcies, fairness opinions and litigation issues. I have acted as a consultant to companies and governmental bodies for the purpose of establishing values for acquisitions and divestitures. I have prepared analyses for cases involving failed acquisitions, fraudulent conveyance, bankruptcy, breach of contract, antitrust and securities issues. In addition, I have extensive experience preparing valuations and financial analyses in the healthcare industry including hospitals, HMOs, PPOs, physician practices, and clinics. I have acted as an expert and advisor to troubled and financially viable healthcare entities. I have also provided fairness reviews of transactions for Attorneys General throughout the United States and have provided expert testimony in several healthcare cases.

Exhibits 1, 2 and 3 contain copies of my curriculum vitae, a list of my presentations and publications in the last ten years, and a list of my deposition and trial testimony within the last four years, respectively.

## III.    Background

### A. The History of Allegheny Health, Education and Research Foundation

AHERF was a Pennsylvania nonprofit corporation that was originally created in 1983 to function as the sole member of Allegheny General Hospital, which at that time had operated for nearly 100 years.[2] In the late 1980s, AHERF was a financially stable organization acting primarily as Allegheny General Hospital's parent foundation and coordinating the efforts of a relatively small

---

[2] First Amended Complaint at page 4.

number of affiliated healthcare entities.[3]  By fiscal year end 1987, Allegheny General Hospital (800 beds) had a long-term debt balance of approximately $73 million and total revenue of approximately $210 million.[4, 5]

In the following fiscal year, AHERF looked to the Philadelphia market for expansion.[6]  In 1988, AHERF acquired the Medical College of Pennsylvania, which operated a medical school and an associated hospital (495 beds) in Philadelphia.[7, 8]  At the time, the Medical College of Pennsylvania was in serious financial distress.[9]  The Medical College of Pennsylvania agreed to the acquisition when AHERF pledged an infusion of capital of $40 million to $60 million over a five-year period.[10]  By 1990, the AHERF System was profitable and carried a debt balance of approximately $160 million.[11]

In 1991, AHERF acquired the United Health System, which operated St. Christopher's Hospital for Children in Philadelphia (183 beds) and three suburban hospitals:  Warminster (later known as Bucks County with 190 beds), Rolling Hills (later known as Elkins Park with 304 beds) and Lawndale (which closed a year after acquisition).[12, 13]  At the time, the three community hospitals were encountering financial difficulties and the United Health System was headed toward bankruptcy.[14]

In 1994 AHERF acquired another, larger Philadelphia medical school, Hahnemann University Medical School, and its associated medical center, the 638-bed Hahnemann University Hospital.[15, 16]  In 1994, AHERF merged its two Philadelphia medical schools into MCP-

---

[3] Ibid at page 7.
[4] Allegheny General Hospital and Subsidiaries Consolidated financial statements for the years ended June 30, 1988, 1987 and 1986 (DBR-AA 4808 to 4831).
[5] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[6]  J. David Barnes deposition testimony, July 8, 2003 at pages 25 - 27.
[7] Amended Disclosure Statement at page 16.
[8] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[9] Amended Disclosure Statement at page 16.
[10] Ibid at page 16.
[11] Allegheny Health Services consolidated financial statements for the years ended June 30, 1991 and 1990.
[12] First Amended Complaint at page 9.
[13] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[14] First Amended Complaint at page 9.
[15] Ibid at page 9.
[16] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).

Hahnemann School of Medicine (which later became Allegheny University of the Health
Sciences). In 1996, the Allegheny University of the Health Sciences and what were then
AHERF's five Philadelphia-area hospitals -- Medical College of Pennsylvania Hospital,
Hahnemann University Hospital, St. Christopher's, Elkins Park, and Bucks County -- combined
to issue bonds and notes as the Delaware Valley Obligated Group ("DVOG"), totaling
approximately $407 million of new and replacement long-term debt.[17]

In connection with the June 1996 DVOG bond issuance, AHERF insured the bonds through
MBIA Insurance Corporation ("MBIA"). At the same time, PNC Bank ("PNC") issued letters of
credit relating to DVOG long-term debt. By insuring the debt, AHERF garnered a AAA rating
for DVOG's debt. The underlying rating for the DVOG bonds (in the absence of insurance) by
all three major rating agencies was BBB.[18]

In August of 1996, AHERF senior management began its efforts to acquire five more
Philadelphia-area hospitals then owned by the Graduate Health System: Graduate (330 beds),
Mt. Sinai (225 beds, which was closed by AHERF in October 1997), Parkview (212 beds), City
Avenue (248 beds) (collectively, the Philadelphia-area hospitals were known as the "Graduate
Hospitals") and Rancocas Hospital (353 beds), a hospital in New Jersey[19] (collectively, the
"Graduate Acquisitions").[20, 21] Considered collectively, the Graduate Hospitals were in financial
distress at the time, a fact reported by the Philadelphia media and shown in the Graduate
Hospitals financial statements.[22] In late August 1996, Moody's downgraded the bonds of the
Graduate Hospitals to Ba (junk-bond status)[23] from Baa, citing the change in control and the
uncertainty regarding the timing surrounding an improvement in the Graduate Hospitals'

---

[17] First Amended Complaint at page 10. Secondary Market Disclosure report for Fiscal Year 1997. The $407
million includes newly issued bonds and commercial paper.
[18] Deposition Exhibit 617.
[19] Allegheny Hospitals, New Jersey operated Rancocas Hospital and Zurbrugg Memorial Health Center, a
community health center with specialized non-acute medical programs with 24 licensed beds. Zurbrugg Memorial
Health Center was under contract for sale at the time of its acquisition by AHERF and was ultimately sold after the
AHERF bankruptcy. Zurbrugg Memorial Health Center was not operated as an acute care facility during the time
period that it was held by AHERF.
[20] First Amended Complaint at page 10.
[21] AHERF Licensed Beds at June 30, 1997 (DBR-SG-WP-1037).
[22] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal year ended
June 30, 1996.
[23] Moody's Ba rating reflects a bond that is not investment grade (junk bond).

financial condition.[24]  Graduate and Mt. Sinai alone had approximately $160 million in outstanding long-term debt arising out of bonds issued in 1991 and 1993.[25]  The overall bond debt related to the Graduate Hospitals as of June 30, 1996 was approximately $171 million.[26]

The transaction involving the Graduate Hospitals was structured such that the hospitals were initially acquired by an AHERF non-member affiliated shell corporation known as SDN, Inc. ("SDN").  On May 1, 1997 AHERF became the sole member of the corporate entities that owned the Graduate Hospitals.[27]  The stated purpose for the hospitals being acquired initially by SDN was to allow AHERF time to undertake due diligence related to the hospitals.[28]  As a result of these transactions, the Philadelphia and New Jersey based hospitals of the Graduate Health System came to be owned by Allegheny Hospitals, Centennial ("Centennial") and Allegheny Hospitals, New Jersey, respectively.

In September 1996, Coopers issued its report to the AHERF Board of Trustees[29] (the "Board of Trustees" or "Trustees") regarding its audit of the consolidated financial statements of AHERF and the supplementary consolidating financial information related to AHERF's subsidiaries for the fiscal year ended June 30, 1996 ("Fiscal Year 1996").[30, 31]  Further in September 1996, Coopers issued reports regarding its audit of each of the individual AHERF subsidiary financial statements.  In regard to the AHERF consolidated audit, Coopers' report stated, "In our opinion, the consolidated financial statements referred to above [AHERF balance sheet as of June 30, 1996 and related statements of operations, changes in net assets and cash flows] present fairly, in all material respects, the consolidated financial position of Allegheny Health, Education and Research Foundation as of June 30, 1996 and the consolidated results of its operations, changes

---

[24] Business Wire, August 26, 1996.
[25] Audited financial statements for the Graduate Hospital for the year ended June 30, 1996. Audited financial statements for Mt. Sinai Hospital for the year ended June 30, 1996.
[26] Audited financial statements for the hospitals that comprised the Graduate Health System for the year ended June 30, 1996.
[27] AHERF Fiscal Year 1997 Audited Consolidated Financial Statements at page 7.
[28] Letter from Mr. Abdelhak and Mr. Snyder to the AHERF Board of Trustees, August 5, 1996 (D 0004319).
[29] As of 1997, the AHERF System had 10 separate Boards of Trustees. The AHERF Board of Trustees was the largest board and had oversight of the parent organization.
[30] Coopers & Lybrand Report of Independent Accountants dated September 11, 1996 (Deposition Exhibit 1661).
[31] The Graduate Hospitals were merged into SDN effective November 1, 1996. A Board resolution related to the ultimate merger of the entities into AHERF was approved at the Annual Meeting of the Board of Trustees of AHERF dated December 12, 1996 (PR-1-000745 and PR-1-000747).

in net assets and cash flows for the year then ended in conformity with generally accepted accounting principles."[32] Coopers provided a similar opinion with regard to the supplementary consolidating financial information and for each of the individual entities for Fiscal Year 1996.[33]

In the months following the issuance of Coopers' Fiscal Year 1996 audit report, and in addition to its aforementioned acquisition of the Graduate Hospitals, AHERF acquired the entities known as the Forbes Health System (Forbes Regional Hospital, Forbes Metropolitan Hospital, Forbes Hospice, Forbes Nursing Center), and Allegheny Valley Hospital (collectively, the Allegheny University Medical Centers).[34] The Forbes Health System and the Allegheny Valley Hospital acquisitions added another $122 million of bond debt to the AHERF System's consolidated balance sheet.[35] By this point, AHERF's total debt had increased from approximately $73 million in 1987[36] to approximately $1.1 billion by fiscal year end 1997.[37] Total revenue of the system increased from approximately $210 million to approximately $2 billion over the same time period.[38] The final hospital addition to the Allegheny University Medical Centers came with the acquisition of Canonsburg Hospital on July 1, 1997.[39] Exhibit 4 provides a chart of the various AHERF obligated groups and member entities. Exhibit 5 provides a summary of AHERF's bond debt assumptions and issuances over time.

Besides acquiring these facilities, AHERF expanded its physician network throughout Pennsylvania by purchasing primary care physician practices, which were organized under Allegheny University Medical Practices, formerly known as Allegheny Integrated Health

---

[32] Coopers & Lybrand Report of Independent Accountants dated September 11, 1996 (Deposition Exhibit 1661).

[33] Allegheny Health, Education and Research Foundation Audited Financial Statements for Fiscal Year 1996 (Deposition Exhibit 1661).

[34] The Forbes Health System hospitals and the Allegheny Valley Hospital became part of AHERF effective January 1, 1997 and March 1, 1997, respectively. The Forbes Health System hospitals had a total of 472 beds and the Allegheny Valley Hospital had 288 beds (DBR-SG-WP-1037).

[35] Allegheny Health, Education and Research Foundation audited financial statements for the fiscal year ended June 30, 1997.

[36] Allegheny General Hospital and Subsidiaries Consolidated financial statements for the years ended June 30, 1988, 1987 and 1986 (DBR-AA 4808 to 4831).

[37] Allegheny Health, Education and Research Foundation audited financial statements for the fiscal year ended June 30, 1997.

[38] Ibid. Allegheny General Hospital and Subsidiaries Consolidated financial statements for the years ended June 30, 1988, 1987 and 1986 (DBR-AA 4808 to 4831).

[39] Canonsburg Hospital had 120 beds (GOV 20226).

Group.[40] AHERF spent millions of dollars on these practices, which in turn produced significant losses to the AHERF System.[41] In addition, AHERF guaranteed high salaries to the physicians who agreed to join the AHERF System and furthermore, AHERF's contracts included no requirements related to practice productivity.[42] AHERF's largest acquisition of physician practices became effective in April 1997 when it acquired the practices of more than 100 physicians including approximately 80 primary care physicians of the Penn Group Medical Associates ("PGMA") for $20 million in cash.[43]

Also in the latter half of the 1990s, AHERF entered into risk contracts with certain health insurance companies whereby AHERF agreed to be financially liable for healthcare services to subscribers of these insurers in exchange for a capitated amount of revenue. Effective April of 1997, in connection with the PGMA acquisition, AHERF entered into such a risk contract with HealthAmerica Pennsylvania, Inc. ("HealthAmerica"), which was expected to result in significant losses to the AHERF System.[44]

In the fall of 1997, Coopers again issued a clean opinion, using the same language as its Fiscal Year 1996 report, for the AHERF consolidated financial statements for the fiscal year ended June 30, 1997 ("Fiscal Year 1997"). Likewise, Coopers provided a clean opinion on the supplementary consolidating and combining financial information related to the AHERF affiliates. This consolidating and combining information accompanied the consolidated financial statements and was indicated to have been subjected to the auditing procedures applied by Coopers in the audit of the AHERF consolidated financial statements. Coopers' audit report was dated September 1997 with the exception of a footnote related to debt covenant violations at Centennial and DVOG, which was dated January 8, 1998.[45]

---

[40] Amended Disclosure Statement at page 17.
[41] According to the Fiscal Year 1996 and Fiscal Year 1997 audited financial statements, Allegheny Integrated Health Group had net losses of $41 million and $61 million in fiscal years 1996 and 1997, respectively. Additionally, approximately $21 million and $32 million was spent to acquire additional physician practices in fiscal years 1996 and 1997, respectively.
[42] Amended Disclosure Statement at page 17. Deposition Exhibit 790.
[43] Asset Purchase Agreement by and among HealthAmerica Pennsylvania, Inc. and AHERF at page 5. Letter from Sherif S. Abdelhak to Members of the Allegheny Consolidated Boards of Trustees dated February 5, 1997 (JD-SA-0004069).
[44] Risk Contract Analysis (CL 025664).
[45] Coopers & Lybrand Report of Independent Accountants (D 0018504, D 0018529).

Signs of AHERF's financial distress started to become evident in the fall of 1997. The financial statements for the first quarter of fiscal year 1998 (quarter ended September 30, 1997) showed net losses of $42.6 million.[46] AHERF then announced that it would have employee layoffs of 6% of its workforce, said executive salaries would be trimmed and reported that medical school faculty members' salaries would be linked to productivity.[47] In January 1998, both Moody's and Standard & Poor's downgraded their respective bond ratings for Centennial and Allegheny Hospitals, New Jersey.[48]

AHERF's financial situation continued to deteriorate throughout the year ended June 30, 1998 ("Fiscal Year 1998"). As a result, AHERF attempted to raise cash through asset sales. On February 13, 1998, AHERF entered into an asset purchase agreement with Vanguard Health Systems, Inc. ("Vanguard"), under which Vanguard would buy six of AHERF's Eastern hospitals (Graduate, City Avenue, Parkview, Elkins Park, Bucks County and Rancocas) for $400 million.[49] The section of this report titled "Sale of AHERF Assets" provides further detail on the Vanguard purchase agreement, as well as others, including the final purchase agreement entered into with Tenet Healthcare Corporation ("Tenet").

In May 1998, Moody's downgraded its bond ratings for Allegheny General Hospital and Allegheny University Medical Centers.[50] Around this time, Mr. Sherif Abdelhak ("Mr. Abdelhak") was ousted by the AHERF board and replaced by Mr. Anthony Sanzo ("Mr. Sanzo").[51] Based on the recommendation of Mr. Sanzo, then AHERF's CEO, Mr. David McConnell ("Mr. McConnell") was forced out as AHERF CFO shortly thereafter.[52] The following month, Moody's released a rating of below investment grade (Caa1) for DVOG.[53]

---

[46] Allegheny Health, Education Research Foundation Consolidating Statement of Operations for the Three Months Ended September 30, 1997 (JB 00791).
[47] Deposition Exhibit 1989.
[48] The Bond Buyer, January 7, 1998. PR Newswire, January 27, 1998.
[49] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. Dated February 13, 1998 at Deposition Exhibit 572.
[50] The Bond Buyer, May 21, 1998.
[51] Deposition Exhibit 1677.
[52] Ira Gumberg deposition testimony, October 3, 2003 at pages 346 - 349.
[53] Capital Markets Report, July 21, 1998.

On July 21, 1998, AHERF and several of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code ("Petition Date").[54] When the Chapter 11 cases were filed, the entities that comprised the remainder of the AHERF System could be grouped into one of two categories: the "Debtor Entities" or "Debtors" (which were primarily those entities with operations in the Philadelphia area and, together with Allegheny Hospitals, New Jersey are sometimes referred to as the "Eastern Entities"); and the "Non-Debtor Entities" (which were primarily those entities with operations in the Pittsburgh area, and are sometimes referred to as the "Western Entities").[55] At the time of the filing of the Chapter 11 cases, the Non-Debtor Entities included Allegheny General Hospital, Allegheny University Medical Centers, Allegheny Hospitals, New Jersey and Allegheny University Hospitals-West, which provided support services for the hospitals operated by Allegheny General Hospital and Allegheny University Medical Centers. The Debtor Entities, which each filed a Chapter 11 case in addition to AHERF, included:

- Allegheny University of the Health Sciences;
- Allegheny University Hospitals-East, which operated the Medical College of Pennsylvania Hospital, Hahnemann University Hospital, Bucks County, Elkins Park and St. Christopher's (these hospitals and Allegheny University of the Health Sciences comprised DVOG);
- Centennial; and
- Allegheny University Medical Practices.[56]

Shortly after AHERF and most of the Eastern Entities filed for bankruptcy, the Finance and Audit Committee of the AHERF Board of Trustees, together with senior management of AHERF and PwC, publicly announced that they were reviewing certain accounting and reporting issues related to the Fiscal Year 1997 financial statements audited by Coopers and that pending completion of their review, no further reliance should be placed on the financial statements or on

---

[54] Amended Disclosure Statement, Introduction and Summary.

[55] First Amended Complaint at page 5.

[56] Ibid at page 6. The Second Amended Plan of Reorganization (the "Plan") dated December 5, 2000 indicates that the Debtor Entities were ultimately substantively consolidated.

the Coopers & Lybrand report on the financial statements.[57] At that time, the AHERF Finance and Audit Committee removed PwC as its external auditors.[58]

### Sale of AHERF Assets

As briefly addressed above, AHERF began its attempt to sell certain of its assets in early 1998. In doing so, AHERF retained Merrill Lynch & Co. ("Merrill Lynch") in January 1998 to assist in the sale of AHERF assets in the Philadelphia area.[59] Prior to AHERF's filing for bankruptcy on July 21, 1998, Merrill Lynch acted as the "exclusive financial advisor to the Debtors in order to solicit, negotiate, and structure a 'business combination' including a sale of all or a substantial portion of the assets of the Centennial Hospitals Group and the Delaware Valley Hospitals Group."[60]

In July 1998, AHERF retained Lehman Brothers, Inc. ("Lehman Brothers") as general restructuring consultants and financial advisors in the Chapter 11 cases.[61] Lehman Brothers worked with Merrill Lynch in an attempt to achieve a sale of the AHERF assets.[62]

As previously noted, on February 13, 1998 Vanguard made a cash offer of $400 million for six of the AHERF community hospitals including: Graduate, City Avenue, Parkview, Elkins Park, Bucks County, and Rancocas.[63]

Vanguard revised its offer on or about July 20, 1998. The offer was to acquire all eight AHERF Philadelphia area hospitals and the New Jersey based Rancocas Hospital for $502 million. The hospitals included in the offer were: Graduate, City Avenue, Parkview, Elkins Park, Bucks County, St. Christopher's Hospital for Children, the Medical College of Pennsylvania Hospital,

---

[57] Deposition Exhibit 1289.

[58] Finance and Audit Committee Meeting Minutes (August 27, 1998).

[59] Per the Affidavit of Lorrie Warner, Director at Merrill Lynch & Co., the assets at issue were located in the area known as the Eastern Region and included the Graduate, Bucks County, Elkins Park, Parkview, City Avenue, the Hahnemann University Hospital, the MCP Hospital, the University, and Rancocas (Deposition Exhibit 1166 at page "Merrill Lynch 403").

[60] Ibid at page 407.

[61] Ibid at page 409.

[62] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 381").

[63] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. Dated February 13, 1998 at Deposition Exhibit 572.

the Hahnemann University Hospital, and Rancocas Hospital. The offer included a carve out of the New Jersey-based Rancocas Hospital. An adjustment of approximately $42 million would be made to the offer price if Rancocas Hospital were not acquired by Vanguard.[64] Vanguard agreed to provide $20 million in working capital for the Allegheny University of the Health Sciences and to work jointly with the Allegheny University of the Health Sciences to find a permanent solution for its management.[65]

On July 30, 1998 a second bidder, Tenet, made an offer to acquire all eight of the AHERF Philadelphia-based hospitals for $465 million.[66] Vanguard followed up with an offer also on or about July 30, 1998 in the amount of $460 million for all eight Philadelphia area hospitals. The offer excluded the New Jersey Rancocas Hospital.[67] In both the Tenet and Vanguard Asset Purchase Agreements, the audited financial statements of the AHERF System were represented to be "true, complete and accurate and fairly present the financial condition and results of operations" for the Fiscal Year 1997.[68]

At mid-September, the Bankruptcy Court imposed a deadline of September 25, 1998 for the submission of offers for the AHERF assets being marketed by Merrill Lynch and Lehman Brothers.[69] During this same time frame, Tenet expressed its doubts as to whether it would submit or confirm a bid in the $465 million range for the Philadelphia area assets, in light of:

- "the uncertainties surrounding the University's future financial stability;
- the recent material restatement of the Debtors' financial statements; and

---

[64] Letter of intent from Vanguard dated July 20, 1998 at JD-LB-000246 to 252.
[65] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 414").
[66] Ibid at page 416. Letter of intent from Tenet dated July 30, 1998 at PR-PLD-029-00415 to 428. Asset Purchase Agreement By and Among AHERF, et al. and Tenet HealthSystem Medical, Inc., et al. dated as of August 11, 1998.
[67] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 415"). Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.
[68] Asset Purchase Agreement By and Among AHERF, et al. and Tenet HealthSystem Medical, Inc., et al. dated as of August 11, 1998. Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.
[69] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 392").

- the continuing decline in value of the assets due to physician attrition and declining census trends."[70]

There were no qualifying bids received on the September 25, 1998 Court imposed deadline for offer submissions. On September 27, 1998, Vanguard provided notice that the "continued significant worsening of the Debtors' financial statements and the issuance of the financial restatements constituted a 'material adverse change.' " Due in part to the financial deterioration, Vanguard withdrew its earlier bid.[71] Instead, Vanguard expressed interest in acquiring five of the Philadelphia area hospitals for $150 million to $200 million.[72] Ultimately, Vanguard submitted an offer for two of the Philadelphia area hospitals for $125 million,[73] followed by an offer for six hospitals and the Allegheny University of the Health Sciences on September 28, 1998 in the amount of $225 million.[74]

Based on the misstated financial statements of AHERF and the continued asset deterioration, Tenet indicated that it would consider pricing a new asset purchase proposal in the $200 million range.[75] On September 29, 1998, Tenet made an offer for all eight of the AHERF Philadelphia based hospitals, the Allegheny University of the Health Sciences, and approximately 150 physician practices. The offer was in the amount of $345 million and was contingent on finding a partner to operate the Allegheny University of the Health Sciences.[76]

---

[70] Ibid at page 393.

[71] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 419"). Anne Morse deposition testimony, October 22, 2003 at pages 61 - 63.

[72] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 394"). The five hospitals are unnamed.

[73] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 405"). The two hospitals are unnamed.

[74] Ibid at page 405 and 419 to 420. The six hospitals are unnamed.

[75] Affidavit of Anne Morse, Vice President, Lehman Brothers, Inc. (Deposition Exhibit 1167 at page "Merrill Lynch 395").

[76] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. states that "Merrill Lynch's participation was necessary to consummate the transaction which resulted in an increased value to the Debtor's estates" even "in the face of deteriorating asset values" (Deposition Exhibit 1166 at page "Merrill Lynch 406"). Asset Purchase Agreement By and Among AHERF and Tenet Healthcare Corporation dated as of September 29, 1998 at ML-AHERF 2393 to 2508. First Amendment to the Asset Purchase Agreement By and Among AHERF, et al. and Tenet Healthcare Corporation, et al. dated as of November 10, 1998 at ML-AHERF 2363 to 2377.

On or about October 19, 1998, and while an Allegheny University of the Health Sciences partner was being sought in regard to the Tenet deal, Vanguard provided yet another offer for four hospitals for a purchase price of $145 million to $150 million.[77]

Drexel University ("Drexel") ultimately became the Allegheny University of the Health Sciences partner in regards to the Tenet offer and $110 million of Tenet's $345 million in sale proceeds were directed toward the Allegheny University of the Health Sciences; $60 million to a newly incorporated educational institution and $50 million to Drexel for management of the Allegheny University of the Health Sciences.[78]  Accordingly, approximately $235 million of the $345 million sale proceeds related to the eight Philadelphia hospitals.  The deal was approved by the bankruptcy court and closed on November 10, 1998.[79]

### B. The Financial Performance of AHERF

In 1990 the AHERF System, which then primarily consisted of Allegheny General Hospital in Pittsburgh and the Medical College of Pennsylvania and its associated hospital in Philadelphia, was a profitable entity which reported revenues of more than $500 million, Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $57.4 million and an EBITDA margin of approximately 11%.[80]  As discussed in Section III A., AHERF consummated several acquisitions throughout the 1990s, which resulted in substantial growth in its revenue and total debt balance.  According to AHERF's audited financial statements for the fiscal years ended June 30, 1990 through June 30, 1995, AHERF was able to maintain a stable level of profitability as it integrated several new entities into its rapidly expanding organization.  Exhibit 6 provides a summary of AHERF's hospital acquisitions over time.  The table below summarizes the growth in AHERF's revenue and total debt, as well as its profitability on an EBITDA basis during the fiscal years ended June 30, 1990 through June 30, 1995:[81]

---

[77] Ibid at page 421.  The four hospitals are unnamed.
[78] Asset Purchase Agreement By and Among AHERF and Tenet Healthcare Corporation dated as of September 29, 1998 at ML-AHERF 2393 to 2508.  First Amendment to the Asset Purchase Agreement By and Among AHERF, et al. and Tenet Healthcare Corporation, et al. dated as of November 10, 1998 at ML-AHERF 2363 to 2377.
[79] Affidavit of Lorrie Warner, Director, Merrill Lynch & Co. (Deposition Exhibit 1166 at page "Merrill Lynch 423").
[80] Allegheny Health Services audited financial statements for the fiscal years ended June 30, 1991 and 1990.
[81] Both Revenues and EBITDA figures shown include investment income in all years.

| | Fiscal Years Ended June 30 (S millions) | | | | | |
|---|---|---|---|---|---|---|
| | **1990** | **1991** | **1992** | **1993** | **1994** | **1995** |
| Revenue | $509.8 | $578.7 | $889.1 | $935.7 | $972.8 | $1,441.5 |
| % Growth | | 13.5% | 53.6% | 5.2% | 4.0% | 48.2% |
| | | | | | | |
| EBITDA | $57.4 | $67.2 | $113.6 | $105.0 | $101.0 | $159.2 |
| % Margin | 11.3% | 11.6% | 12.8% | 11.2% | 10.4% | 11.0% |
| | | | | | | |
| Total debt | $160.5 | $216.9 | $413.5 | $414.3 | $546.1 | $627.1 |
| % Growth | | 35.1% | 90.6% | 0.2% | 31.8% | 14.8% |

*Source: AHERF Audited Financial Statements*

## C. The Restated Financial Statements

As previously noted, the Fiscal Year 1997 audited financial statements were announced to be unreliable in early September 1998. In conjunction with the current matter, investigations into the AHERF financial statements for fiscal years 1996 and 1997 have been conducted and adjustments have been made to the audited financial statements for both the fiscal years 1996 and 1997 by the firm Marks Paneth & Shron ("Marks Paneth"). I understand that Mr. Robert Berliner ("Mr. Berliner"), the expert opining on the Marks Paneth restated financial statements, has described the adjustments in detail in his expert report (the "Berliner Report").

The adjustments made by Marks Paneth in its restatement of the audited financial statements of AHERF in the fiscal years 1996 and 1997 were significant. The table below shows a comparison of certain of the AHERF financial metrics as reported in the AHERF financial statements audited by Coopers versus the same metric as restated by Marks Paneth for the fiscal years 1996 and 1997.

14

| Financial Metric | Fiscal Years Ended June 30 ($ millions) | | | | | |
| | 1996 | | | 1997 | | |
| | Audited | Restated | Variance | Audited | Restated | Variance |
|---|---|---|---|---|---|---|
| Net patient service revenue | $1,352.5 | $1,330.8 | ($21.7) | $1,702.7 | $1,639.7 | ($63.0) |
| Net income, before extraordinary item | $6.5 | ($89.8) | ($96.4) | $21.9 | ($134.9) | ($156.9) |
| Net loss | ($11.8) | ($108.2) | ($96.4) | $21.9 | ($134.9) | ($156.9) |
| Unrestricted Net Assets | $559.2 | $473.1 | ($86.1) | $569.8 | $326.8 | ($242.9) |
| Temporarily Restricted Assets | $109.0 | $56.4 | ($52.5) | $110.8 | $98.9 | ($11.8) |
| Permanently Restricted Assets | $102.6 | $200.3 | $97.7 | $144.2 | $258.0 | $113.8 |

*Source: AHERF Audited Financial Statements; AHERF Restated Financial Statements prepared by Marks Paneth*

AHERF's EBITDA margins in fiscal years 1996 and 1997 were 9.2% and 8.1%, respectively, based on the financial statements audited by Coopers. On a restated basis, however, AHERF's EBITDA margins are dramatically reduced to 3.3% and 0.5% for Fiscal Year 1996 and Fiscal Year 1997, respectively. If investment income is excluded from the calculation of EBITDA, AHERF, on a restated basis, had negative EBITDA margins in fiscal years 1996 and 1997, as indicated in the table below.

| Financial Metric | Fiscal Years Ended June 30 ($ millions) | | | |
| | 1996 | | 1997 | |
| | Audited | Restated | Audited | Restated |
|---|---|---|---|---|
| EBITDA (Including Investment Income) | $148.4 | $51.4 | $167.2 | $9.8 |
| *% Margin* | *9.2%* | *3.3%* | *8.1%* | *0.5%* |
| EBITDA (Excluding Investment Income) | $74.3 | ($6.6) | $81.3 | ($56.0) |
| *% Margin* | *4.8%* | *(0.4%)* | *4.1%* | *(3.0%)* |

*Source: AHERF Audited Financial Statements; AHERF Restated Financial Statements prepared by Marks Paneth*

I have utilized the Marks Paneth restated financial statements for purposes of determining the damages associated with certain events that occurred at AHERF that would not have occurred

had the misstatements contained in the audited financial statements been known.[82]  Those events
are described in further detail later in this report.

### D. The Reaction of Responsible Parties

Had they been provided with correct financial statements during fiscal years 1996 and 1997,
responsible parties would not have undertaken certain acquisitions and would have proceeded to
take counter actions.  Such behavior would have avoided significant costs that the creditors
ultimately bore and would have steered the AHERF System from the course that ended in
bankruptcy.

Accurate financial statements were imperative to the Board of Trustees.  Several members of the
Board of Trustees, in particular those on the Audit Committee testified that they relied on
Coopers to bring misstatements to their attention and that it was important for the Board of
Trustees to be aware of material misstatements.[83]  For example, Ralph Brenner ("Mr. Brenner"),
a member of the Audit Committee, testified that, in the eyes of the Board of Trustees, Coopers
was the ultimate guardian of management and the financial affairs of AHERF and that he would
expect Coopers to bring to the Board's attention any material misstatements.[84]  Mr. Brenner also
testified that had Coopers come to the Audit Committee and indicated that the financial
statements were intentionally misstated, he would have intensely investigated the situation.[85]
Similarly, Robert Palmer ("Mr. Palmer"), testified that a materially worse performance from a
financial perspective during 1996 and 1997 would have caused an in-depth examination of the
steps of the IDS [integrated delivery system], again suggesting the importance of the audited
financial statements to the decision making processes of the Board of Trustees.[86]  Furthermore,
Mr. Palmer testified that the Board expected losses during the first years after beginning to

---

[82] In certain aspects of my analyses, I have utilized the Marks Paneth restated financial statements, including that for
fiscal year 1998.
[83] J. David Barnes deposition testimony, July 9, 2003 at pages 313 - 314.  Ralph W. Brenner deposition testimony,
September 30, 2003 at pages 160-161.  Anthony M. Cook deposition testimony, September 4, 2003 at pages 258 -
259.  Claire Gargalli deposition testimony, August 26, 2003 at pages 160 - 161.  Robert Hernandez deposition
testimony, September 3, 2003 at pages 158 - 169.  Graemer Hilton deposition testimony, August 13, 2002 at pages
218 - 220.
[84] Ralph W. Brenner deposition testimony, September 30, 2003 at pages 160 - 161.
[85] Ibid at pages 170 - 175.
[86] Robert Palmer deposition testimony, August 8, 2003 at pages 236 - 239.

acquire physician practices, however, had the losses been 50% greater than expected as opposed to 5% greater, it would have caused him to examine the concept further.[87]

Likewise, in assessing whether or not to do business with AHERF, third party entities relied on the accuracy of the AHERF audited financial statements. For example, Mr. Stephen Dengler ("Mr. Dengler"), an employee of HealthAmerica, testified that he recalls that a great deal of reliance was placed on the Coopers audited financial statements in Fiscal Year 1996.[88] In fact, Mr. Dengler testified that the Fiscal Year 1996 audited financial statements were the basis for HealthAmerica's conclusion that AHERF was a viable entity and that HealthAmerica therefore was able to do business with AHERF.[89]

Evidence of options available to such responsible parties if faced with financial statements that significantly differed from those provided for fiscal years 1996 and 1997, rest in at least the following areas.

### Board Member Deposition Testimony

Several members of the AHERF Board of Trustees testified that they understood the Audit Committee of the AHERF Board had direct interaction with Coopers in regard to reviewing the audited financial statements of the AHERF System. The testimony of those Board members further indicated that, had any problems or issues been discovered with the audited financial statements, they would have expected those issues to be brought to the attention of the Audit Committee by Coopers, and ultimately to the AHERF Board.[90]

Mr. J. David Barnes ("Mr. Barnes"), Chairman of the Audit Committee in both fiscal years 1996 and 1997, was deposed in this matter. When asked whether he knew what the Audit Committee would have done if Coopers had informed the Committee that the Fiscal Year 1996 financial statements were overstated and that rather than having approximately $6 million in net income

---

[87] Ibid at pages 236 - 239.
[88] Stephen Dengler deposition testimony, June 10, 2004 at pages 70 - 79.
[89] Ibid at pages 70 - 79.
[90] Barbara Atkinson deposition testimony, May 12, 2004 at pages 115 - 135. Dorothy McKenna Brown deposition testimony, May 4, 2004 at pages 159 – 175. Donna Marie Murasko deposition testimony, April 8, 2004 at pages 178 - 187.

for the year, AHERF suffered a net loss, Mr. Barnes testified that a lot of questions would have been raised.[91]  Mr. Barnes testified that the Audit Committee would have looked into whether the financial statement misstatement was a recurring problem or whether it was a discrete one-year problem.  He would have asked where in the AHERF System, the problem happened and why it had occurred.  He testified that the Audit Committee would have questioned whether the financial statement problem related to one issue or several and would have caused the Committee to question whether the financial statement system was any good.[92]  Mr. Barnes indicated that the next set of questions would have involved determining what could be done about the financial statement problems.  He testified that the Trustees could have opted to give up on Philadelphia and have sold everything, could have installed a new management team, or could have brought in a consultant in response to the financial statement problems.[93]

When asked what he would have done if faced with financial statements that showed, by way of example, losses of $70 million in Fiscal Year 1996 as opposed to $6.5 million in income as per the Coopers audited financials (the Marks Paneth restated financial statements actually show a loss of nearly $90 million as opposed to the Coopers $6.5 million income figure), Mr. Barnes testified that such an event would have caused "more questions faster."[94]  In fact, Mr. Barnes agreed that such a change in financial statements would have raised questions as to whether or not there should be a change in management, whether there would be a need for a consultant to review the operation, whether the entity could continue to afford a physician acquisition program or any capital expenditure, including whether it would be prudent to acquire five more Eastern hospitals from Graduate Health System.[95]

Similarly, Mr. Ira Gumberg ("Mr. Gumberg"), another member of the Audit Committee, testified in his deposition that if the Trustees had known that the financial statements were materially misstated and that Coopers & Lybrand was therefore issuing an adverse opinion on those statements, he would have had several reactions.  First, Mr. Gumberg indicated that he would

---

[91] J. David Barnes deposition testimony, July 8, 2003 at page 183.
[92] Ibid at pages 183 - 184.
[93] Ibid at page 184.
[94] J. David Barnes deposition testimony, July 9, 2003 at pages 333 - 334.
[95] Ibid at pages 335 - 336.

have been "scared" to hear that the financial statements were materially misstated.[96]  Second,
Mr. Gumberg testified that he believes consultants would have been brought in to advise the
Board of Trustees on the situation.[97]  Mr. Gumberg believes that the Board of Trustees may have
asked the auditors to delve deeper into the misstatement issues and to report back to the Audit
Committee.[98]  Further, Mr. Gumberg testified, "we may have put the brakes on everything that
was going on until we [got] our hands around it."[99]  In elaborating on what he meant by the
"brakes on everything" Mr. Gumberg testified that "I would think if we had found ourselves in
that position, [we] would have had to have looked at everything that was happening"[100] including
hospital and physician practice acquisitions.[101]  When asked what options the Board of Trustees
would have had if inquiries led by the auditors, the Board of Trustees, or consultants drew into
question the competence and integrity of financial management leadership, Mr. Gumberg
testified that he believes the Board would have had no option other than to terminate AHERF
financial management.[102]

When provided with hypothetical situations of AHERF audited financial statements misstating
net income by approximately $80 million in Fiscal Year 1996 and by approximately $100
million or more in Fiscal Year 1997, Mr. Gumberg testified that he would have had the same
reaction with regard to putting the brakes on further acquisitions.[103]  Mr. Gumberg indicated that
had it been brought to his attention that the Fiscal Year 1996 and 1997 financial statements were
overstated by such significant amounts as $80 million and $100 million, for example, that those
losses would have called into question his view of whether real efficiencies or synergies or other
benefits had materialized from the integrated delivery system.[104]  Furthermore, Mr. Gumberg
testified that any time an entity is under a crisis and has been advised that sizeable mistakes to
financial statements have been made, such as an overstatement of $80 million in one year and

---

[96] Ira Gumberg deposition testimony, October 3, 2003 at page 350.
[97] Ibid at page 349 - 351.
[98] Ibid at page 349 - 351.
[99] Ibid at pages 349 - 351.
[100] Ibid at pages 349 - 351.
[101] Ibid at pages 349 - 351.
[102] Ibid at pages 350 - 351.
[103] Ibid at pages 352 - 353.
[104] Ibid at page 356.

$100 million in the next year, he believes that all of what the Board of Trustees is doing would be called into question, including the [executive] team.[105]

In regard to acquisitions that Mr. Gumberg testified would have been called into question had the Board of Trustees been advised that the AHERF financial statements were materially misstated, he testified that he did not recall ever having been advised by Coopers that the acquisition of the Graduate Hospitals could threaten the AHERF System's ongoing financial viability. Neither did he recall seeing anything in the audited financial statements that would have led him to believe that the financial viability of the AHERF System could be threatened by the acquisition.[106] Similarly, Mr. Gumberg did not recall either having been informed by Coopers or seeing anything in the audited financial statements for fiscal years 1996 or 1997 that led him to believe that ongoing physician practice acquisitions could threaten the financial viability of AHERF.[107]

In his deposition, Mr. William Snyder ("Mr. Snyder"), Chairman of the AHERF Board of Trustees, recalled that Messrs. Barnes and Gumberg did not think that risk contracts undertaken by AHERF were a good idea.[108]

Based on this testimony, as well as similar testimony by other Trustees, the acquisition strategy of AHERF, in particular the purchase of the former Graduate Hospitals and the continued acquisition of physician practices could and likely would have been avoided in the event that the Trustees were aware of material misstatements to the audited financial statements for fiscal years 1996 and 1997. In addition, given the fact that the HealthAmerica contract, effective April 1997, was expected to generate significant losses in the first two years of the contract's existence (see detail related to the risk contract later in this report) and the fact that Messrs. Barnes and Gumberg were not in favor of risk contracts, the HealthAmerica risk contract would have likely been avoided had the Trustees known that the audited financial statements were materially misstated.

---

[105] Ibid at page 356.
[106] Ibid at pages 356 – 357.
[107] Ibid at page 357.
[108] William Snyder deposition testimony, July 15, 2003 at pages 26 - 27.

***Third-Party Involvement***

Important to the issue of what may have been done differently had accurate audited financial statements been provided by Coopers, is the fact that certain third parties would have been involved in any such process based on debt covenant violations that would have occurred. Based on the restated financial statements prepared by Marks Paneth in fiscal years 1996 and 1997, AHERF and/or its obligated groups would have been in violation of certain debt covenants by the end of Fiscal Year 1996.[109] Mr. Gumberg also testified that he believed debt compliance was important because it stated that the AHERF fund balance and/or income and liquidity were acceptable to their lending institutions.[110]

Deposition testimony of the insurers and guarantors of the AHERF System bonds, as well as bond trustee representatives indicates that those parties would have communicated with and become involved in the decisions surrounding acquisition and investing activities of AHERF had the parties known of debt covenant violations. Specifically, representatives from PNC and MBIA have testified that had they known about AHERF's deteriorating financial situation sooner, steps would have been taken to address the situation. See Exhibit 7 for a summary chart of the Bond Trustees, Insurers, and Guarantors related to the various bonds outstanding.

Mr. Ralph Michael ("Mr. Michael"), CEO of Corporate Banking for PNC, testified that had PNC been made aware of AHERF's financial issues earlier, PNC would have had active discussions about either restructuring the debt in some form or fashion or accelerating repayment.[111] Furthermore, Mr. Michael testified that he is confident that had AHERF's financial statements been accurately presented, that the bond rating for AHERF would have been downgraded and that this would have caused creditors to pressure AHERF much more strongly to restructure and limit costs and in general "right the ship" from an operating perspective.[112] Mr. Michael also testified that a standard commercial banking practice is to introduce a crisis manager or turnaround specialist hired by the company [borrower] to assist in bringing about financial

---

[109] Expert Report of Steven B. Kite, Esq. dated September 1, 2004.
[110] Ira Gumberg deposition testimony, October 3, 2003 at pages 326 - 327.
[111] Ralph Michael deposition testimony, March 11, 2004 at pages 11 – 12 and 155 - 156.
[112] Ibid at pages 161 - 164.

resolution.[113]  Had Coopers issued a qualified audit opinion [as opposed to a clean bill of health] after the PNC letter of credit was approved, it would have been a "severe red flag" and PNC would immediately have contacted Coopers to obtain more information.[114]  Further, Mr. Michael testified that had Coopers issued a qualified opinion on any AHERF or DVOG financial statements, the [DVOG] credit never would have received investment grade status, a necessary condition for PNC to sign an approval of the credit.[115]

Mr. Richard Weill ("Mr. Weill"), President of MBIA and supervisor of the healthcare group beginning in 1994, testified in his deposition that he is absolutely sure that had MBIA known of AHERF's true financial condition sooner, it would have advocated steps including discontinuing physician practice acquisitions, cutting costs and hiring professionals to assist with AHERF's accounts receivable.[116]  Furthermore, if Coopers' misstatements had been known sooner, MBIA would have had the leverage to hire a turnaround consultant such as the Hunter Group.[117]

### E.  Avoidable Acquisitions

Rather than curtailing hospital or physician practice acquisitions as they could have beginning at the end of Fiscal Year 1996 had accurate financial statements been provided, AHERF moved forward with both hospital and physician practice acquisitions.  In fact, as previously stated, AHERF acquired the Graduate Hospitals in May of 1997.  The Trustees knew that the Graduate Hospitals were poor performing hospitals.[118]  However, the Trustees did not know the true financial condition of the AHERF System, nor did they have accurate disclosure of the financial performance of the Philadelphia area facilities previously acquired by the AHERF System. Accordingly, the Trustees actions regarding the acquisition of the Graduate Hospitals, were undertaken under the guise of misstated AHERF financial statements.

---

[113] Ibid at pages 165 - 167.
[114] Ibid at pages 171 - 172.
[115] Ibid at pages 171 - 173.
[116] Richard Weill deposition testimony, October 8, 2003 at page 286 - 288.
[117] Ibid at page 289.
[118] J. David Barnes deposition testimony, July 8, 2003 at pages 131 - 132.  Ira Gumberg deposition testimony, October 3, 2003 at page 268.  Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal year ended June 30, 1996.

Furthermore, during Fiscal Year 1997, AHERF acquired the practices of more than 200 physicians.[119] The acquisition of the new practices during Fiscal Year 1997 alone required approximately $32 million in cash.[120] The newly acquired physician practices combined with existing physician practices rendered significant net losses for the AHERF System. The net losses totaled nearly $62 million in Fiscal Year 1997.[121] The Trustees authorized the continued acquisition of physician practices based on a falsely stated AHERF financial condition.

In following the strategy of expanding its referral base and patient volume, AHERF also entered into a new risk contract during the Fiscal Year 1997. The risk contract was with HealthAmerica and included the acquisition of the practices of more than 100 physicians including approximately 80 primary care physicians known as PGMA. Documentation available in this matter shows that AHERF anticipated losses of $64 million related to the HealthAmerica risk contract over the initial two year time period of the contract.[122] Again, this contract would not have likely been entered into had the Trustees known the true financial condition of AHERF.

---

[119] Allegheny Integrated Health Group Board Meeting Packages.
[120] "Acquisition of physician practice assets, net" and "Acquisition of physician practice intangible assets" per consolidating cash flow statement for Fiscal Year 1997.
[121] Net loss per Marks Paneth restated consolidating income statement. The audited physician losses for Fiscal Year 1997 total $61 million.
[122] Coopers & Lybrand workpapers (CL 012628).

## IV. Summary of Opinions

A.   One measure of damages in this matter is the amount of the actual total creditor shortfall. Had the true financial condition of the AHERF System at or before September 1996 been known by the Board and third parties, appropriate intervention to prevent unnecessary costs and liabilities could and likely would have occurred. My opinion is informed by the analysis of Mr. Thomas Singleton ("Mr. Singleton") that such an intervention could and likely would have allowed a turnaround and therefore the avoidance of any creditor loss. The bankruptcy records as of June 30, 2004 reflect that the bankrupt entities have an existing shortfall to their creditors of approximately $557.0 million, and the obligation of the bankruptcy estates for this shortfall is an appropriate measure of the avoidable insolvency of the AHERF System.

B.   Alternatively, damages could be measured as the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions that were undertaken and that could have been avoided had the Board and third parties been apprised of the true AHERF System financial statements for fiscal years 1996 and 1997. The amount of damage under this analysis is approximately $267.5 million, and is a measure of the avoidable loss to the AHERF System incurred by virtue of the failure to disclose the true financial condition of the AHERF System at fiscal year end 1996. These avoidable costs were incurred over time as reflected in the exhibits hereto.

**V.    One measure of damages in this matter is the amount of the actual total creditor shortfall. Had the true financial condition of the AHERF System at or before September 1996 been known by the Board and third parties, appropriate intervention to prevent unnecessary costs and liabilities could and likely would have occurred. My opinion is informed by the analysis of Mr. Thomas Singleton ("Mr. Singleton") that such an intervention could and likely would have allowed a turnaround and therefore the avoidance of any creditor loss. The bankruptcy records as of June 30, 2004 reflect that the bankrupt entities have an existing shortfall to their creditors of approximately $557.0 million, and the obligation of the bankruptcy estates for this shortfall is an appropriate measure of the avoidable insolvency of the AHERF System.**

Under the Liquidating Plan of Reorganization of the Debtors (the "Plan"), as of December 26, 2000 ("Plan Confirmation"), total allowed consolidated claims against the Debtors' estates were approximately $677 million.[123] The Plan provided, among other things, that the holders of the MBIA/PNC Claims (the insurers of the DVOG bonds) and Centennial bondholders would have a portion of their claims classified as Secured, with the remainder of claims classified as Unsecured. The Plan classified all claims against the Debtor Entities into ten separate classes and subclasses.[124] The following table summarizes the classification and treatment of claims under the Plan.

| Class | Description | Class Treatment | Projected Distribution as of Effective Date |
|---|---|---|---|
| N/A | Administrative Expense Claims | Paid in full. | Paid 100% in Cash. |
| N/A | Priority Tax Claims | Paid in full. | Paid 100% in Cash. |
| 1 | Priority Claims | Paid in full. | Paid 100% of Claim in Cash. |
| 2 | General Secured Claims | Paid in full or otherwise rendered unimpaired. | Paid 100% of Claim in Cash or otherwise rendered unimpaired. |

---

[123] Monthly Operating Report (June 30, 2004).
[124] Amended Disclosure Statement at page 3.

| Class | Description | Class Treatment | Projected Distribution as of Effective Date |
|---|---|---|---|
| 3 | Secured Claims of holders of Centennial Bondholder Claims | Granted an Allowed Secured Claim of $33 million and an Allowed Centennial Unsecured Claim of $105.6[125] million. | Paid $20.5 million of Allowed Secured Claim and granted an entitlement to recover remaining portion of Allowed Secured Claim upon first distribution by Liquidating AHERF. |
| 4 | Secured Claim of holders of MBIA/PNC Claims | Granted an Allowed Secured Claim of $50 million and an Allowed Unsecured Claim of $340.3 million.[126] | Paid $10 million of Allowed Secured Claim and granted an entitlement to recover remaining portions upon first, second and subsequent distributions by Liquidating AHERF in accordance with the Plan. |
| 5(A) | General Unsecured Claims | Distribution of Cash. | Paid 5% of Allowed Unsecured Claim in Cash and entitled to subsequent distributions by Liquidating AHERF in accordance with the Plan based on participation equal to amount of Allowed Claim. |
| 5(B) | Centennial Unsecured Claims | Distribution of Cash. | Paid 1.5% of Allowed Unsecured Claim in Cash and entitled to recover subsequent distributions by Liquidating AHERF in accordance with the Plan based on participation equal to 30% of Allowed Claim. |
| 6(A) | Allowed Convenience Claims | Distribution of Cash to holders of Allowed Unsecured claims less than $1,000. | Paid 10% of Allowed Unsecured Claim in Cash; not entitled to further distributions. |
| 6(B) | Allowed Centennial Convenience Claims | Distribution of Cash to holders of Allowed Centennial Unsecured Claims less than $5,000. | Paid 3% of Allowed Unsecured Claim in Cash; not entitled to further distributions. |
| 7 | Insurance Claims | Retain proceeds from any applicable Insurance Policy | No other distributions under Plan. |
| 8 | Allowed Membership Interests | Retain Membership Interests | Retain 100% of Membership Interests |

Source:  Amended Disclosure Statement dated August 15, 2000 at pages 3-5

---

[125] Per the Amended Disclosure Statement, the Centennial Bondholders were allowed a Secured Claim of $105.6 million. These creditors received approximately $30 million in payments resulting from litigation settlements and accounts receivable collection rights. The Centennial bondholder allowed claim was therefore reduced to $75.6 million (JD-AHERF 1590 to 1597). See also the letter from Mr. Peter A. Biagetti on behalf of the Bank of New York as indenture trustee for the Centennial bondholders dated August 13, 2004.

[126] The MBIA/PNC Allowed Unsecured Claim was later changed to $342.6 million.

To date, all allowed claims of the Secured Creditors have been paid in full. The table below summarizes the payouts to these creditors:

| Type | Class | Claim/Payment Amount ($ millions) |
|---|---|---|
| Administrative Expense Claims | N/A | $11.3 |
| Priority Claims | 1 | $4.1 |
| General Secured Claims | 2 | $2.1 |
| Secured Claims of Centennial Bondholders | 3 | $33.0 |
| Secured Claims of Holders of MBIA/PNC Claims | 4 | $50.0 |
| **Total Secured Claims** | | **$100.4** |

*Source: Schedules prepared by personnel of the Chapter 11 Trustee's office and Donlin Recano database (JD-AHERF 1585, JD-AHERF 0766-0768*

With regard to the Unsecured Claims, an initial and four incremental distributions have been made to the Unsecured Creditors. These distributions are summarized in the table below.

| Distribution | Total Amount Distributed | General Unsecured Non-Centennial | General Unsecured Centennial |
|---|---|---|---|
| Initial Distribution – Per Plan (December 2000 / March 2001) | $26.7 million | 5.000% | 1.500% |
| First Incremental Distribution – After Settlement of Mellon Preference Action (July 2001) | $16.9 million | 3.000% | 0.900% |
| Second Incremental Distribution – After D&O / GLS Settlement (July 2002) | $38.4 million | 6.500% | 1.950% |
| Third Incremental Distribution – After Resolution of Tenet Escrow Amount (February 2003) | $21.5 million | 3.500% | 1.050% |
| Fourth Incremental Distribution – After Re-evaluation of Reserves (December 2003) | $7.8 million | 1.250% | 0.375% |
| **Cumulative Distribution as of December 2003** | **$111.3 million** | **19.250%** | **5.775%** |

*Source: Schedules prepared by personnel of the Chapter 11 Trustee's office (JD-AHERF 1548)*

Other distributions have been made under special circumstances, such as when the Bankruptcy Court has ordered that a specific creditor receive payment.[127]  Also, since the Petition Date, additional creditor claims that were initially disputed have been allowed.[128]

I have calculated the total creditor shortfall based on the information provided in the Plan, and through materials obtained from the Trustee's office and Donlin, Recano & Company ("Donlin Recano"), the claims administration agent to the Trustee.  The result of my calculations indicates a total creditor shortfall of $584.2 million.  From the total creditor shortfall figure, I have made two adjustments and expect to make a third adjustment at a later date, which had the impact of reducing the total creditor shortfall.  First, I deducted $4.9 million, which I understand the Trustee expects to obtain related to recoveries from the Allegheny Hospitals, New Jersey liquidation and Medicare recoveries that are not yet finalized.[129]  Second, I reduced the total creditor shortfall by the amount of total assets held by the Trustee, which in large part consist of cash and cash equivalents, totaling $23.1 million as of June 30, 2004.[130]  Making this reduction at this time is generous due to the fact that the existing amount of cash and cash equivalents will certainly decline over time and therefore not be available in total for distribution to creditors. The resulting adjusted creditor shortfall based on the two adjustments made to date is $556.2 million.[131]  See Exhibit 8.

Per the Monthly Operating Report for the month ended June 30, 2004, the total remaining obligations related to the Allowed Claims of the Unsecured Creditors was $585.0 million.[132] After making the same adjustments to this figure as made in my calculation above, the amount of adjusted creditor shortfall is $557.0 million.  See Exhibit 9.

---

[127] Interview with Diane Schrecengost, April 16, 2004.

[128] Approximately $129 million in claims that were initially disputed have since been allowed.

[129] Charles Morrison deposition testimony, June 29, 2004 at pages 141 - 150.

[130] Monthly Operating Report, Balance Sheets as of June 30, 2004.

[131] I have been advised by counsel that it may be appropriate to deduct fees paid to professionals in the prosecution of this litigation.  Accordingly, I plan to deduct the professional fees after such fees have been fully incurred and/or finalized.

[132] The Trustee submits a monthly report to the Bankruptcy Court that contains, among other things, information related to the claims that have been filed, claims that have been allowed and claims that have been liquidated.  This report is known as the Monthly Operating Report.

28

The Trustee's office has provided me the necessary information to reconcile the slight discrepancy between my calculation of the total creditor shortfall and the corresponding information presented in the June 30, 2004 Monthly Operating Report. I understand that the discrepancy primarily relates to certain distributions held back by the Trustee due to pending adversary proceedings. A reconciliation of my calculations to the Monthly Operating Report is presented in Exhibit 10. The bankruptcy records indicate and my analysis confirms that the bankrupt estates have been damaged by the amount of approximately $557.0 million as of June 30, 2004.

VI.    **Alternatively, damages could be measured as the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions that were undertaken and that could have been avoided had the Board and third parties been apprised of the true AHERF System financial statements for fiscal years 1996 and 1997. The amount of damage under this analysis is approximately $267.5 million, and is a measure of the avoidable loss to the AHERF System incurred by virtue of the failure to disclose the true financial condition of the AHERF System at fiscal year end 1996. These avoidable costs were incurred over time as reflected in the exhibits hereto.**

I have also taken an alternative approach to quantifying damages due to the misstated financial statements as audited by Coopers. In particular, during the period between the end of the first quarter of Fiscal Year 1997 (shortly after Coopers issued its audit report related to the misstated financial statements for Fiscal Year 1996) through the end of Fiscal Year 1997 (the second year of the Coopers misstated financial statements) there were a number of acquisitions and/or transactions that were undertaken by the AHERF System. As outlined above, evidence in the record indicates that the acquisitions and/or transactions would not have occurred had accurate financial statements been presented in fiscal years 1996 and 1997 (the "Avoidable Costs").

29

## A. Acquisition of the Graduate Hospitals in Philadelphia

Among the transactions that would not have occurred but for Coopers' misstatements was AHERF's acquisition of five financially distressed hospitals from the Graduate Health System during Fiscal Year 1997.

On August 5, 1996, Mr. Abdelhak and Mr. Snyder sent a letter to the AHERF Board of Trustees to inform Board members that the Graduate Health System had approached AHERF management about certain of its hospitals and other organizations becoming part of AHERF.[133] The letter also indicates that rather than consummating an immediate transaction between AHERF and the Graduate Health System, that the transaction would initially occur between the Graduate Health System and SDN, an entity managed by AHERF, but independent of AHERF. Because SDN was not part of the AHERF System, the letter stated that no prior approval of the Board of Trustees was necessary to approve the transaction. However, if the Graduate Health System entities were to be merged into AHERF in the future, the AHERF Board would have the opportunity to review and confirm the actions taken by the Executive Committee.[134]

Effective November 1, 1996, the Graduate Hospitals in Philadelphia were merged into SDN.[135]

At the Annual Meeting of the AHERF Board of Trustees held on December 12, 1996, the Board authorized Mr. Abdelhak to take any and all reasonable action necessary to effectuate the reorganization of the Graduate Hospitals into the AHERF System.[136] Four of the purchased hospitals were located in the Philadelphia area: Graduate, Parkview, City Avenue and Mt. Sinai. These hospitals would ultimately be merged into the Allegheny Hospitals, Centennial ("Centennial") division of AHERF, a Debtor entity. One of the purchased hospitals, Rancocas Hospital, was located in New Jersey. Rancocas Hospital was ultimately merged into a division of AHERF, Allegheny Hospitals, New Jersey, which was not part of the bankruptcy.

---

[133] Letter from Mr. Abdelhak and Mr. Snyder to the AHERF Board of Trustees, August 5, 1996 (D 0004319).
[134] Ibid.
[135] Minutes from the Meeting of the Board of Trustees of AHERF (December 12, 1996).
[136] Ibid.