As stated earlier, considered collectively, the Graduate Hospitals were in financial distress at the time that AHERF acquired them. The Graduate Hospitals demonstrated declining margins between fiscal year 1995 to fiscal year 1996, the last completed fiscal year prior to AHERF's acquiring the hospitals. At fiscal year end 1995, the Graduate Hospitals had an operating loss of $7.3 million or an operating margin of -2.3%, which declined further by the end of fiscal year 1996 to $19.4 million in operating losses or an operating margin of -6.4%.[137]

In addition, the Graduate Hospitals carried a bond debt balance of $171 million by the end of fiscal year 1996. The heavy debt load required the Graduate Hospitals to repay approximately $5 million per year in principal and $14 million per year in interest expense.[138] Without knowing the true financial condition of the AHERF System, the AHERF Trustees approved the transaction. Had I been consulted at the time, and based on accurately stated financial statements for the AHERF System, I would have advised against the purchase.

Ultimately, the Centennial division of AHERF, which held the Graduate Hospitals, experienced negative financial consequences that, but for the acquisition of the financially distressed hospitals would not have been incurred. First, Centennial incurred cash flow losses of $26.7 million from May 1, 1997 through June 30, 1998. I have also included cash flow losses of $14.2 million for the period of July 21, 1998 through November 9, 1998, the end of operations under AHERF.

The starting point for the calculation of the cash flow losses that I have calculated is net income before extraordinary items. I have adjusted this figure for depreciation and amortization expense and unusual items to derive the measure of Earnings Before Taxes, Depreciation and Amortization ("EBTDA"). From EBTDA, I subtract capital expenditures as they represent cash spent on property, plant and equipment. Finally, I adjust for any increases or decreases in working capital requirements in order to derive the cash flow losses of the Graduate Hospitals

---

[137] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal years ended June 30, 1995 and June 30, 1996. If non-operating gains are included in the operating margin calculation, the Fiscal Year 1995 margin is –1.4% and the Fiscal Year 1996 margin is –3.8%.

[138] Audited financial statements for the hospitals that comprised the Graduate Health System for the fiscal years ended June 30, 1995 and June 30, 1996.

for both fiscal years 1997 and 1998, while owned by AHERF. These cash flow losses would not have occurred had the transaction not taken place.

In addition to the cash flow losses generated by the Graduate Hospitals, AHERF became liable for $174 million in bond debt held by the hospitals. Of the total amount of bond debt assumed, $7.0 million was extinguished prior to June 30, 1998, the amount of which I have also included as a component of damages. In addition, I have included the repayment of a line of credit in the amount of $6.2 million, which was assumed in the transaction, as a damage component. I have offset the cash flow losses and the bond debt for the cash received by AHERF in its acquisition of the Graduate Hospitals totaling $4.7 million. This amount of cash would have been a benefit provided to the AHERF System in the acquisition. In addition to the bond debt assumed in the acquisition of the Graduate Hospitals, other liabilities were also assumed. The balance of these liabilities ultimately became the responsibility of Centennial. Accordingly, I have included the balance of liabilities just after the sale of the hospitals to Tenet as an amount of damage. In order to appropriately state damages, I have offset the liabilities with the corresponding recoveries achieved through the sale of the assets to Tenet and in the runoff of the Centennial estate, as discussed below.

As discussed in detail in Section III above, on September 29, 1998, Tenet made an offer for nearly the entirety of the Eastern Entities. The offer was in the amount of $345 million and was contingent on Tenet being able to find a partner to operate the Allegheny University of the Health Sciences. Drexel University agreed to manage the Allegheny University of the Health Sciences and $110 million of the $345 million in sale proceeds were directed towards the Allegheny University of the Health Sciences. Therefore, $235 million of the $345 million sale proceeds related to the eight Philadelphia hospitals. As a further mitigating factor to the damages related to the Centennial transaction, I have considered the portion of the $235 million in sale proceeds attributable to Centennial.

Zolfo Cooper LLC ("Zolfo Cooper"), a financial advisor to the Committee, prepared an allocation analysis of the Tenet sale proceeds.[139] The analysis indicates that the net sale proceeds

---

[139] HLAH 0003641 - 3647.

related to Centennial was approximately 22% of the total net sale proceeds.[140]  I have applied the 22% allocation to the $235 million in sale proceeds to determine the amount of the Tenet consideration due Centennial.  This approach is conservative based on the fact that Vanguard specifically identified only approximately 17% of its $460 million offer as relating to the Centennial hospitals.[141]

In addition to the Tenet sale proceeds attributable to Centennial, other amounts have been recovered related to the Centennial assets, including, for example, $36.8 million in accounts receivable collections, $17.9 million related to the Centennial debt service reserve funds, $10 million related to a settlement with Medicare and $14 million related to a settlement involving the PHCT litigation.[142]  I have deducted the sum of known recoveries from the total liabilities assumed in my calculation of damages.  Total damages related to the Graduate Health System acquisition are $167.5 million.  See Exhibit 11.

### B. Continued Acquisition of Physician Practices

Another loss-producing activity of AHERF's strategic plan, which would have likely been curtailed had AHERF's financial situation been accurately reported by Coopers, was the continued acquisition of physician practices.  As stated earlier, AHERF acquired hundreds of physician practices between fiscal years 1995 and 1998.  The bulk of this acquisition activity occurred in fiscal years 1996 and 1997.[143]  See Exhibit 12 for a list of the physician practices that AHERF acquired subsequent to September 30, 1996.

Between fiscal years 1996 and 1998, Allegheny Integrated Health Group reported severe operating losses.  Despite these losses, significant capital continued to be spent to acquire more physician practices.  The table below shows specifically what the audited financial statements

---

[140] HLAH0003646.

[141] Asset Purchase Agreement By and Among AHERF, et al. and Vanguard Health Systems, Inc. dated as of July 31, 1998 at Deposition Exhibit 1160.

[142] PWC-SUB-A+M 04140 to 04151.  Deposition Exhibit 2752.  Joint Motion to Approve Settlement Agreement and Stipulation and Order Approving Settlement Agreement and Stipulation between the Trustee and Tenet. Application For An Order Approving a Certain Settlement Agreement and Order Approving A Certain Settlement Agreement between the Trustee and Philadelphia Health Care Trust.  Letter from Mr. Peter A. Biagetti on behalf of the Bank of New York as indenture trustee for the Centennial bondholders dated August 13, 2004.

[143] Deposition Exhibits 1227, 1302, 1303.

demonstrated the net losses of Allegheny Integrated Health Group to be in fiscal years 1996 and 1997 as well as the losses in the internal fiscal year end 1998 financial statements.

| | Fiscal Years Ended June 30 ($ millions) | | |
|---|---|---|---|
| | 1996 | 1997 | 1998[144] |
| Net income (loss) before extraordinary items | ($40.9) | ($61.4) | ($56.1) |
| *% Margin* | *-53.7%* | *-48.8%* | *-29.6%* |

*Source: AHERF Audited Financial Statements; AHERF Internal Financial Statements*

While Allegheny Integrated Health Group generated these losses, approximately $21 million and $32 million was spent to acquire additional physician practices in fiscal years 1996 and 1997, respectively.

AHERF's commitments to its physicians were the primary contributing factor to Allegheny Integrated Health Group's operating losses. First, AHERF guaranteed high salaries relative to national benchmarks.[145] Second, AHERF offered five-year contracts with guaranteed salaries, and did not include in these contracts any post-acquisition productivity requirements.[146] AHERF experienced declining physician productivity post-acquisition.[147] As a result, Salaries, Wages and Benefits expense at Allegheny Integrated Health Group exceeded its total revenue in fiscal years 1996 through 1997.

As stated previously, AHERF made its largest single physician practice acquisition in April of 1997 when it acquired the practices of more than 100 physicians of PGMA in the Pittsburgh region. Donald Kline ("Mr. Kline"), CFO of the Allegheny Integrated Health Group, testified that PGMA had historical demonstrable operating losses[148] and continued projected losses of $17

---

[144] The Allegheny University Medical Practices revenues in Fiscal Year 1998 contain $560.5 million in risk contract revenue. The same amount of expenses are contained on the Allegheny University Medical Practices income statement for Fiscal Year 1998 related to the risk contract revenue. Accordingly, there is no impact on the net income amount; however, the Allegheny University Medical Practices total revenue needs to be adjusted for the risk contract revenue in order for the calculated margin to be comparable to the prior years. The adjusted revenue for purposes of the margin calculation is $189.9 million.
[145] Deposition Exhibit 792.
[146] Deposition Exhibit 790.
[147] Deposition testimony of Donald Kline (April 9, 2003) at pages 437 - 438.
[148] Ibid at pages 342 - 343.

million, $11 million and $4 million over the ensuing three years.[149]  AHERF paid $20 million in
cash to acquire these practices.[150]

Had I been consulted by the Trustees around September 30, 1996, following disclosure of
accurately stated financial statements, I would have advised against the continued purchase of
the physician practices.

To quantify damages related to the continued acquisition of loss-generating physician practices, I
have focused only on those physicians purchased after September 30, 1996 and therefore after
the issuance of Coopers' Fiscal Year 1996 audit report.  I have relied upon schedules produced in
this matter, which provide detail at the practice level of the revenue, expenses and net income of
AHERF physician practices.[151]  The schedules also provide detail related to miscellaneous
overhead expenses, which I have allocated to each physician practice based on its contributed
percentage of revenue to Allegheny Integrated Health Group.  I have also added back estimated
depreciation expense and unusual items, by allocating total Allegheny Integrated Health Group
depreciation expense[152] and unusual items based on the revenue of those physician practices
acquired after September 30, 1996, as a percentage of total Allegheny Integrated Health Group
revenue, which results in the estimated EBTDA of these practices.  The EBTDA between
September 30, 1996 and June 30, 1998 of those practices purchased after September 30, 1996 is
negative $19.0 million.

A second component of the calculation of cash flow losses related to the continued acquisition of
physician practices is the cash spent on the practices between September 30, 1996 and June 30,
1998 of $31.6 million.[153]  In addition, I have allocated the other capital expenditures for PP&E
and changes in working capital of Allegheny Integrated Health Group to the physician practices

---

[149] Deposition Exhibit 727.

[150] Asset Purchase Agreement between AHERF and HealthAmerica, February 26, 1997 at page 5.

[151] Allegheny Integrated Health Group Financial Statements, May 31, 1997 (JD-DC-0057397 to 57467).  Allegheny
Integrated Health Group Financial Statements, June 30, 1997 (JD-DC-0057380 to 57394).  Allegheny University
Medical Practices Financial Statements, May 31, 1998 (JD-DC 0055458 to 55527).

[152] In June 1997, property plant and equipment and intangibles were transferred from Allegheny Integrated Health
Group to Allegheny General Hospital and DVOG.  For purposes of my depreciation calculation, and in order to be
conservative, I have treated these assets as restored at Allegheny Integrated Health Group for fiscal years 1997 and
1998.

[153] Fiscal years 1997 and 1998 cash flow statements.

purchased after September 30, 1996 based on the revenue of these practices as a percentage of total revenue of Allegheny Integrated Health Group.

The resulting cash flow losses related to physician practices acquired after September 30, 1996, between September 30, 1996 and June 30, 1998, is $50.0 million. I have also included cash losses of $1.5 million for the period of July 21, 1998 through November 9, 1998, the end of operations under AHERF.

I also included, as a component of damages, a proportion of the AUMP liabilities following the sale of certain entities to Tenet. I offset the physician practice related liabilities assumed with a proportion of any known recoveries achieved by the AUMP estate.[154]

The total damages caused by the continued physician practice acquisition activity, calculated as the cash losses incurred and the cash spent on the AHERF physician practices acquired after September 30, 1996, as well as the ultimate balance of liabilities offset for any known recoveries of the Allegheny University Medical Practices $64.3 million. See Exhibit 13.

Although I understand the goal of the AHERF System with regard physician practice acquisitions was to bolster patient volume at the AHERF System hospitals, based on the restated financial statements there were not discernible profitability improvements at the Debtor entity hospitals subsequent to the September 30, 1996 time period. Therefore, I have not adjusted my analysis for any potential growth in inpatient admissions.

## C. HealthAmerica Risk Contract

In connection with AHERF's acquisition of the PGMA physician practices, AHERF entered into a Risk-Sharing agreement (the "Risk Contract") with HealthAmerica on March 31, 1997.[155]

---

[154] HLAH 0003640 - 3644. Monthly Operating Report (November 30, 1998). Charles Morrison deposition testimony dated June 29, 2004 at pages 50 - 54.
[155] Risk Sharing Agreement by and between HealthAmerica Pennsylvania, Inc., Coventry Corporation and AHERF, March 31, 1997.

HealthAmerica, as a health insurer, received premium payments from enrollees in its health insurance plans (the "Covered Lives") to cover the potential health care needs of those individuals in a given year.[156] HealthAmerica offered various insurance programs, including Commercial Health Maintenance Organizations ("HMO"), Preferred Provider Organizations ("PPO") and Medicare HMOs to which those Covered Lives could subscribe.[157] Pursuant to the Risk Contract, AHERF would receive a fixed percentage of the premiums paid to HealthAmerica (the "AHERF Premium").[158] In return for this percentage of compensation, AHERF would be responsible for the total costs of health care for the Covered Lives. AHERF therefore assumed the risk of financial losses associated with the provision of care for the Covered Lives.[159] The table below summarizes the percentage of premiums paid to AHERF from HealthAmerica.

| Program | Duration | Percentage of Total Premium |
| --- | --- | --- |
| Commercial HMO Program | First Five Years of Contract | 78.0% |
| Commercial HMO Program | Year 6 Through End of Agreement | 78.5% |
| PPO Program | Not Specified | 78.0% |
| Point of Service Program | Not Specified | 78.0% |
| Medicare HMO Risk Program | Not Specified | 81.0% |

*Source:  Risk Sharing Agreement by and Between HealthAmerica and AHERF*

When health providers performed services for the Covered Lives, HealthAmerica reimbursed the providers, including AHERF and non-AHERF providers for the services rendered (the "Provider Payments").[160]

Per Section 5.4 of the Risk Contract, in order to facilitate prompt reconciliation of the differences between the amounts paid and amounts owed between AHERF and HealthAmerica, quarterly reconciliations were performed for the first three quarters of each year of the Risk Contract.[161] Such reconciliations included the calculation of the "Interim Premium Reconciliation Amount",

---

[156] Ibid at page 4.
[157] Ibid at pages 3 - 4.
[158] Ibid at page 2.
[159] Ibid at page 18.
[160] Ibid at page 5.
[161] Ibid at page 19.

which equals the difference between (1) the AHERF Premium Amount for a given period plus any payments made by AHERF pursuant to Section 5.10.6 and (2) the total amount of Provider Payments incurred by HealthAmerica for services provided plus an amount for claims incurred by not reported ("IBNR"), calculated consistently with HealthAmerica's other IBNR claims calculations, less any amounts recovered by AHERF from an applicable reinsurer.[162]  If the Interim Premium Reconciliation Amount was a positive number, *HealthAmerica would pay that amount to AHERF*.  If the Interim Premium Reconciliation Amount was a negative number, *AHERF would pay that amount to HealthAmerica*.[163]  For example, if the AHERF Premium was $100 in a given period and the Provider Payments equaled $120, assuming other components of the Interim Premium Reconciliation Amount were equal to zero, the Interim Premium Reconciliation Amount would be equal to ($20) and AHERF would owe HealthAmerica $20.

The financial impact of the Risk Contract was recorded on the financial statements of the AHERF parent company ("AHERF Parent"), a Debtor entity.[164]  AHERF anticipated that it would incur $64 million in losses during the first two years of the Risk Contract, or $8 million per quarter.[165]  To reflect these anticipated losses, $64 million in goodwill and a corresponding $64 million liability in accounts payable and accrued expenses and in other non-current liabilities was recorded on the AHERF Parent's balance sheet.[166]  The $64 million of goodwill was to be amortized over 35 years, with the amortization expense also recorded on the books of the AHERF Parent.[167]

The Risk Contract also included a $20 million note payable, to be paid over 10 years, which was recorded on the balance sheet of Allegheny Integrated Health Group in other assets ($20 million), accounts payable and accrued expenses ($2 million), and other non-current liabilities

---

[162] Ibid at page 19.
[163] Ibid at page 19.
[164] Coopers & Lybrand workpapers (CL 012628).
[165] Ibid.
[166] Coopers & Lybrand workpapers (CL 017051, CL 017089).
[167] Allegheny Health, Education and Research Foundation 1997 Audit Update dated October 1, 1997 (PwC 0036868 - 0036880).

($18 million).[168]  It appears that $4 million in payments were made on the note to HealthAmerica.[169]

Although as indicated above the Risk Contract required AHERF to pay HealthAmerica for any negative Interim Premium Reconciliation Amount, AHERF did not do so and HealthAmerica was left with a shortfall in the amount due it from AHERF.  Accordingly, to quantify damages associated with the Risk Contract, I have relied upon the information contained in claim filed by HealthAmerica in the bankruptcy proceedings and corresponding attachments.  HealthAmerica initially filed a proof of claim (the "HealthAmerica Claim") on March 1, 1999.[170]  The Claim was subsequently revised on December 20, 2000.[171]  The following table summarizes the Claim as initially filed and as revised.

| Component of Claim | Original Claim ($ millions) | Revised Claim ($ millions) |
| --- | --- | --- |
| Risk Sharing Agreement – Note Payable | $16.0 | $12.5 |
| Risk Sharing Agreement – Losses | $30.7 | $27.8 |
| Lease Guarantees | $9.3 | $1.0 |
| Data Services | $0.3 | $0.3 |
| Insurance Premiums | $0.1 | $0.1 |
| Total Claim Amount[172] | $56.4 | $41.7 |

*Source:  HealthAmerica Claim, Attachment F*

Based on information contained in the HealthAmerica Claim, it appears that the cost incurred to provide healthcare services for the Covered Lives exceeded the AHERF Premium by $57.8

---

[168] Allegheny Integrated Health Group Footnotes to Financial Statements (May 31, 1997) (JD-DC 0057396).

[169] The Proof of Claim filed by HealthAmerica included a claim for $16 million related to the note payable, which indicates that of the $20 million note, $4 million had been paid by AHERF.

[170] Proof of Claim filed by HealthAmerica (March 1, 1999).  Stephen Dengler deposition testimony, June 10, 2004 at pages 30 - 35.

[171] Stipulation and Agreed Order resolving the Claim of HealthAmerica Pennsylvania, Inc. and certain related entities filed against the Debtors' Estates (December 20, 2000).  Stephen Dengler deposition testimony, June 10, 2004 at pages 57 - 58.

[172] The source of this data is an analysis prepared on November 2, 2000, which is attached to the Claim as Attachment F.  There are minor discrepancies between the total claim amounts shown here and the original and revised claim amounts as filed.  The amounts per the original and revised claims as filed are $56,400,000 and $41,556,648.

million, and thus HealthAmerica was owed this amount by AHERF.[173]  However, HealthAmerica owed AHERF $27.1 million for AHERF Premiums that had not yet been provided to AHERF by HealthAmerica.[174]  Accordingly, the net amount that AHERF owed to HealthAmerica per the HealthAmerica claim was $30.7 million, derived by subtracting the $27.1 million in AHERF Premiums due AHERF from the $57.8 million in net costs of providing healthcare services to the Covered Lives.  This amount is shown on the table above as the "Risk Sharing Agreement-Losses" component of the original Claim.  The amount was later reduced from $30.7 million to $27.8 million due to an update on the IBNR run out of claims paid after the Bankruptcy Claim was filed.[175]

AHERF's participation in the Risk Contract resulted in losses of approximately $27.8 million.  In addition to these losses, and as stated earlier, AHERF also paid $4 million to HealthAmerica per Section 5.11 of the Risk Contract on the $20 million note.  The sum of these amounts results in damages of $31.8 million.  See Exhibit 14.

Alternatively, if the entire amount of the note payable and other HealthAmerica claimed items are included in the quantification of damages related to the Risk Contract, then the calculation would include the full $41.6 million amount that the Court has determined that AHERF owed HealthAmerica, plus $4 million paid on the note for a total of approximately $45.6 million.

Had I been consulted about the HealthAmerica risk contract, provided that accurately stated financial statements were available, I would have advised against entering into the contract.

### D. Executive and Management Incentive Compensation

I have also included, as a component of damages, the executive incentive compensation that would not have been paid by the AHERF System had the accurate financial statements been available.  In particular, I have summed the amounts of annual incentive compensation paid to

---

[173] This amount is per Attachment A to the Claim and reflects Dates of Service from April 1, 1997 through July 20, 1998, with claims paid through December 31, 1998.
[174] AHERF Contract Close (Attachment A to HealthAmerica Claim).
[175] HealthAmerica Claim Summary Revised (Attachment F to HealthAmerica Claim).

executive and management employees in Fiscal Year 1997.[176] The annual incentive amounts paid are based in part on the AHERF System performance of Fiscal Year 1996 as represented by the misstated audited financial statements.[177] I have also summed the long-term incentive compensation paid to executive and management employees in Fiscal Year 1998.[178] The Compensation Committee of AHERF approved the long-term incentive payments during fiscal year 1997, which related to accrued incentive compensation from fiscal year 1993.[179] The long-term incentive awards were approved based in part on AHERF System financial performance of Fiscal Year 1996, again per the misstated audited financial statements.[180] Finally, I have summed the transaction related and extraordinary bonus payments made to certain AHERF System executives that either represented payments for transactions that likely would not have been undertaken had accurate financial statements been available or that occurred subsequent to the misstated audited financial statements of Fiscal Year 1996.[181]

The executive and management incentive compensation as identified above and for which I was able to locate supporting documentation, totals approximately $4 million. Because the Compensation Committee provided approval to pay incentive compensation to several employees for which records are not readily available, the incentive compensation amount that I have determined is conservative and would increase if such information were located. See Exhibit 15.

---

[176] Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 to JD-HL 0021010). Deposition Exhibit 2472.
[177] Deposition Exhibits 2480 and 2482.
[178] Meeting of the Compensation Committee, Allegheny Health, Education and Research Foundation dated October 15, 1996 (JD-HL 0020966 to JD-HL 0021010). Deposition Exhibit 2472. Series of July 1, 1997 letters providing notice to employees of the long-term incentive award (DBR-DK 006006 to DBR-DK 006023).
[179] Memo from David M. Deasy dated June 20, 1997 (DBR-DK 006040).
[180] Coopers & Lybrand report dated June 30, 1997 (DBR-DK 001541 to DBR-DK 001543).
[181] Memo from Dave Deasy dated July 8, 1998 (DBR-DD-0042 to DBR-DD-0073).

### E. Avoidable Costs Conclusion

Damages measured by the amount of liabilities assumed, cash expended and operational losses incurred by the Debtor Entities on acquisitions and transactions discussed above, that were undertaken and that would likely not have occurred but for the misstated financial statements as audited by Coopers & Lybrand total approximately $267.5 million. See Exhibit 16.

\*    \*    \*

My analysis of Avoidable Costs relates primarily to three transactions that were undertaken by the Debtor Entities subsequent to September 30, 1996, the approximate date of the Coopers Fiscal Year 1996 audit opinion, which accompanied the materially misstated AHERF financial statements. The three transactions *do not* represent all of the losses that were incurred by the Debtor Entities during the period at issue. For example, the DVOG hospitals incurred losses during the time period from September 30, 1996 through the sale of the entities to Tenet but those losses are not included in the Avoidable Costs analysis. Another example of losses that are not included in the Avoidable Costs analysis are the losses related to the physician practices that were acquired by the AHERF System prior to September 30, 1996. These types of excluded losses provide the primary basis for the difference between the damages determined via the Avoidable Costs methodology and the total creditor shortfall methodology.

In regard to the DVOG entities, in particular, I understand that Mr. Singleton has quantified the amount of cost savings that could have been achieved had a turnaround been undertaken following the receipt of accurately stated financial statements for Fiscal Year 1996. Accordingly, accurately stated financial statements would have provided the necessary information for responsible parties to take actions to improve the AHERF financial situation. I have not considered these types of losses in my analysis.

## VII. Documents and Information Considered

A listing of the documents and information that I considered in forming my opinions are attached as Exhibit 17.

## VIII.  Additional Analysis and Demonstrative Aids

I reserve the right to amend and/or supplement this report based upon any new and/or additional facts, which may come to my attention, or information, including expert reports and/or opinions, deposition testimony and related document exhibits thereto, which may be produced.

If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts or tables.

## IX.    Qualifications and Publications

See Exhibits 1 and 2.

## X.    Compensation for Study and Testimony

My hourly rate for work in this matter is $495.  Billing rates of the team of AlixPartners personnel who worked under my direction and control range from $135 to $375 per hour.

## XI.    Other Cases in Which the Expert has Testified Within the Last Four Years

See Exhibit 3.

R. Bruce Den Uyl

Dated: September 3, 2004

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF )
UNSECURED CREDITORS OF )
ALLEGHENY HEALTH, EDUCATION )
AND RESEARCH FOUNDATION, )
)
     Plaintiff, )    Civil Action No. 00-684
)
     v. )
)    Judge David Stewart Cercone
PRICEWATERHOUSECOOPERS, LLP, )
)
     Defendant. )

## DECLARATION OF STEVEN B. KITE

    I, Steven B. Kite, hereby depose and state as follows:

    1.    I am over the age of 18. I have personal knowledge of, and am competent to testify about, the matters set forth herein.

    2.    I have been retained by the Plaintiff to serve as an expert witness, offering expert opinion testimony, in the above-captioned matter. I am submitting this Declaration in support of the Plaintiff's opposition to Defendant's Motion For Summary Judgment in the above matter.

    3.    Attached hereto are true and correct copies of the expert reports that I prepared in connection with my engagement:

-     the Expert Report of Steven B. Kite, Esq. and

-     the Rebuttal Expert Report of Steven B. Kite, Esq.

    4.    If called to testify at trial, I would testify in a manner consistent with the opinions expressed in these expert reports.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___J.l l___, 2005 in Chicago, Illinois.

_____
Steven B. Kite

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, <br><br> Plaintiff, <br><br> v. <br><br> PRICEWATERHOUSECOOPERS, LLP, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 00-684 |

## EXPERT REPORT OF STEVEN B. KITE, ESQ.

I, Steven B. Kite, Esq., am submitting this expert report in the above-captioned case.

## I.    QUALIFICATIONS

I am a lawyer and partner with Gardner Carton & Douglas LLP, Chicago, Illinois. I received a Bachelor of Arts degree from the University of Illinois (Urbana-Champaign) in 1971 and graduated Phi Beta Kappa with High Honors and Distinction in Finance. I received my Juris Doctor degree from Harvard Law School in 1974. I am a member of the State Bar of Illinois, the State Bar of Georgia and the Florida Bar Association.

During my professional career, I have served as bond counsel, underwriter's counsel, borrower's counsel, bank counsel, insurer's counsel and issuer's counsel on more than 410 tax exempt bond financings aggregating in excess of $13 billion of principal amount in almost thirty years of doing bond financings.

I am the author of *Tax-Exempt Financing for Non-Profit Healthcare Organizations* published by the Bureau of National Affairs (BNA) as part of its Health Law and Business Series. In the past ten years, I have also authored or co-authored articles on matters of topical interest related to tax-exempt health care bonds. I also was co-author of *Bond Financing*, published by BNA under its corporate law series.

I am a member of the National Association of Bond Lawyers and have regularly served as a panelist on healthcare bond financing matters for NABL's Bond Attorneys Workshop. In 2004, I was named a "Leading Lawyer" in Illinois for my work in Public Finance Law. My resume appears at *Tab 1*.

## II.    PRIOR SERVICE AS AN EXPERT

I have not previously provided expert testimony in any matter.

## III.    COMPENSATION

I am being compensated by the Plaintiff for my time in connection with this case at the rate of $440 per hour, plus expenses.

## IV.    MATERIALS REVIEWED

I have reviewed transcripts of bond financings and other lending agreements as described in the chart attached at *Tab 2* and in Section V. C below. I have also reviewed certain correspondence and memoranda related thereto, the First Amended Complaint, the Answer to First Amended Complaint, Plaintiff's Responses to Defendant's Second Set of Interrogatories, audited financial statements of AHERF, DVOG, and AGHOG, and the deposition transcripts of Marsha Wicker, Thomas Woodward and Robert J. Zimmerman. I have also reviewed debt

compliance calculations, restated financial statements and summary of opinions prepared by Marks, Paneth & Shron ("Marks Paneth"), forensic accountants, who I understand have been retained to provide expert testimony in this matter.

## V.    OPINIONS

### A.    Introduction

I have been retained by the Plaintiff to provide expert opinions with respect to covenants contained in financing documentation of Allegheny Health, Education and Research Foundation ("AHERF") and certain affiliated entities, including, but not limited to, Allegheny University Hospitals (formerly the Medical College of Pennsylvania and Hahnemann University Hospital System), Hahnemann University Hospital, Allegheny United Hospitals, Inc., Allegheny University for Health Sciences (formerly the Medical College of Pennsylvania and Hahnemann University), St. Christopher's Hospital for Children, Horizon Medical Corporation (collectively "DVOG"), and those entities and facilities comprising the Allegheny General Hospital Obligated Group ("AGHOG").   In this respect, I have identified (i) the significance and purpose of financial covenants, (ii) the covenants whose violation would have been disclosed had the 1996 and 1997 audited financial statements of AHERF, DVOG and AGHOG been properly prepared and audited, (iii) the effect of such breaches and the rights of the creditors as a consequence of such breaches, taking into account the multiple creditors and multiple credit agreements (and their interaction), and (iv) mitigating actions intervening creditors and financing trustees could have taken.

The opinions expressed in this report are my present opinions based upon the materials I have reviewed and my experience.   My analysis primarily focuses on the time period when the

fiscal year 1996 audited financial statements were released in September 1996. Amendments or additions to this report may be required based on developments which may occur prior to trial including discovery of new evidence, the completion of the discovery process and results from other testimony.

**B.**    Summary of Opinions

　　　　1.    AHERF, DVOG and AGHOG were subject to a number of standard financial covenants used by creditors to monitor the financial condition and performance of a debtor, including covenants related to debt service coverage, unrestricted fund balances, liquidity and the provision of accurate and timely audited financial statements. In my opinion and based on my experience, these financial covenants are conventional and commonly included in health care bond financings. The covenants are designed to provide early warning of financial or operational problems such that failure to comply with covenants would give creditors time to work with the borrower to implement reforms to maximize the ability of borrowers to improve operations, conserve resources, and, ultimately, be able to repay creditors.

　　　　2.    As depicted in the materials prepared by Marks Paneth, the fiscal year 1996 and 1997 audited financial statements of AHERF, DVOG and AGHOG, for which the Defendant provided an unqualified opinion, were not prepared in accordance with GAAP, contained material misstatements and did not accurately represent the financial condition and results of operations of the debtors. Had the financial statements been prepared and

-4-

audited correctly, it would have been evident in 1996 that certain financial covenants as described herein had been breached, which would have enabled bond and master trustees of these financings to declare "Events of Default" and, working with creditors, exercise broad-based powers and remedies over the debtors. The creditors would have been in a position to take action to pressure and influence the bond and master trustees and AHERF, DVOG and/or AGHOG management and their trustees to adopt measures which could have either avoided bankruptcy or mitigated its effects.

3.      Based on my experience and the documents I have reviewed, it is my opinion that the following financial covenants were breached:

- DVOG's debt service coverage covenant contained in Section 6.3 of its master trust indenture and Section 3.21 of the First Supplemental Master Trust Indenture in 1996 and 1997

- DVOG's obligation to provide properly audited financial statements for 1996 and 1997[1]

- AGHOG's Consolidated Unrestricted Fund Balance covenant contained in the Reimbursement and Security Agreement with Morgan Guaranty Trust Company of New York in 1996 and 1997

- AGHOG's obligation to provide properly audited financial statements for 1996 and 1997

---

[1]     Throughout this report, and where it is relevant, it is acknowledged that if correct and properly audited financial statements had been provided, this covenant would not have been breached.

- AGHOG's liquidity covenants contained in various financing documents in 1997

- AHERF's covenant that it would maintain a parent-level liquidity ratio of at least 1.4:1.0 as required by its Credit Agreement with a syndicate of banks led by Mellon Bank; this covenant was violated at the time the Credit Agreement became effective and at fiscal year-end 1997.

- AHERF's covenants that DVOG and AGHOG were in compliance with their respective master trust indentures as required by the aforesaid Credit Agreement

- Centennial's debt service coverage ratio contained in Section 6.3 of its master trust indenture for 1997

As a result of these covenant breaches, the bond and master trustees of DVOG's and AGHOG's long-term debt financings, MBIA, PNC Bank, Morgan Guaranty Trust Company of New York, and various providers of lines of credit to AHERF affiliates would have been in a position in the fall of 1996 to pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system.

**C.**    Analysis

1.    *The Role of Covenants*

In my opinion and based on my experience, financial covenants are intended to perform four basic functions:

- Preserve the debtor's ability to repay the debt

- Protect against precipitous deteriorations in credit quality

- Provide early warning of credit deterioration

- Provide protection in the event of default

The covenants included in the DVOG and AGHOG Master Indentures and other financing documents relating to AHERF affiliates are all typical of covenants commonly included in hospital bond financings. These covenants include limitations on the ability to incur indebtedness, maintaining certain insurance coverage, maintaining corporate existence, limitations on the creation of liens, requirements that a debtor's income available for debt service exceed its debt service requirement by a designated percentage, limitations on the ability to dispose of property, to maintain certain liquidity requirements and fund balances, and provide financial information, including audited financial statements prepared in accordance with GAAP.

It is critical to the value of financial covenants, generally, that the audited financial statements be prepared and audited properly as that information is the basis for determining whether the financial covenants have, in fact, been satisfied. The effectiveness of each of these covenants depends on proper financial reporting and auditing, as inaccurate audits can result in inaccurate covenant calculations. Improperly audited financial statements can thwart the ability of creditors to accurately evaluate the credit-worthiness of the borrower.

A breach of a covenant enables creditors to be in a position to influence management's operations before the debtor's financial condition and results of operation have deteriorated to the point where repayment of the debt is threatened. A covenant breach provides creditors remedies which they can use or threaten to use and thereby influence the course of the debtor's operations. Consultants can be hired and new actions can be implemented to improve

operations. If a covenant breach can be linked to credit-harming transactions in which the debtor has engaged, the creditors can, in certain circumstances, persuade or influence the debtor to alter its business operations or adjust a strategic plan. Ultimately, creditors may elect to accelerate the debt if they perceive that the debtor cannot (or will not) make improvements creditors deem necessary.

The longer it takes for a creditor to learn about a covenant breach, the less leverage the creditor will have and the less opportunity exists to cause the debtor to effect meaningful change. Moreover, if the discovery of a covenant breach is delayed, the risk increases that the debt will not be repaid as the debtor's financial position continues to deteriorate. As a result of AHERF's prominence in the Pittsburgh and Philadelphia healthcare markets, it is my opinion, based on my experience, that the disclosure of a covenant breach as discussed herein would have generated significant publicity, thereby adding to the pressure on AHERF's management and fiduciaries to implement remedial measures.

Even in the absence of pressure from creditors or the community, the early warning function that a covenant breach is designed to provide, would, if disclosed here, have enabled the trustees of AHERF to properly exercise their fiduciary duty to assure that management takes the necessary operational and strategic steps to enable the health care system to, at a minimum, maintain its viability.

It is also helpful to distinguish between a breach of a covenant that represents a lack of compliance, and an "event of default" under a financing document. Noncompliance with a covenant, in and of itself, may not give bond and master trustees and other creditors any formal rights. In many circumstances, there exists a requirement that notice of noncompliance be provided and the debtor be allowed a limited time to cure the breach. The giving of notice and

the failure to cure within the specified time period triggers the bond and/or master trustee's or creditor's ability to declare an "event of default" and begin the formal exercise of remedial actions. It is this occurrence of a formal default that triggers (i) notice requirements under federal securities laws in order to alert the investment community of problems, and (ii) the ability of a creditor to exercise remedies. It is, therefore, easy to see the importance of accurate financial statements. The more time that passes before a breach is discovered, the longer it is before notices can be given and remedial action instituted.

### 2. *Overview of Financings of DVOG, AGHOG and AHERF*

This section provides an overview of the financing documents governing the DVOG, AGHOG and AHERF indebtedness, and briefly identifies covenant breaches by AHERF and its affiliates, and the rights and remedies available to creditors.

Under its Master Indenture, DVOG breached its debt service coverage ratio and its obligations to provide financial statements audited in accordance with GAAP. Under other debt instruments, it breached covenants to (i) be in compliance with its financing documents and (ii) give notices of material adverse change of financial condition.

As a result of these breaches, notices of default could have been given which would have entitled creditors to accelerate DVOG's indebtedness. Creditors could also have elected to exercise other remedies existing in law or in equity or by statute. Breaching a covenant in one set of documents had the general result of causing a breach in other financing documents, thereby cross-defaulting all of these debt obligations. "Gross Revenues" would have become subject to a "lock box" arrangement which would have given the master trustee significant leverage over DVOG's operations.

Similarly, with respect to AGHOG, there were covenants to maintain debt service coverage ratios and to provide financial statements prepared in accordance with GAAP. There were also liquidity tests and other financial covenants. Most significantly, there was a requirement to maintain a minimum consolidated unrestricted fund balance. According to Marks Paneth, that covenant was breached in 1996, but the breach was not disclosed until 1998. This breach also would have cross-defaulted other AGHOG debt resulting in potential acceleration or the ability of creditors to exercise any remedies available at law, in equity or by statute. The ability of AGHOG to make distributions to or for the benefit of DVOG would have been limited. Again, earlier knowledge by AGHOG's creditors could have led to a more measured response to avoid the resulting DVOG and AHERF bankruptcy or ameliorate its effects.

Ultimately, AHERF itself entered into a Credit Agreement with a syndicate of banks led by Mellon Bank which included covenants relating to liquidity, that there was no material adverse change of financial position, that financial statements would be in accordance with GAAP and that each obligated group (AGHOG and DVOG) was in compliance and would continue to comply with its respective Master Indenture. Based upon my experience, and the materials I have reviewed, it is my opinion that if AHERF's actual results of operations and financial condition had been known at the time the Mellon credit facility was extended (June 1997), it is likely that such facility would not have been concluded in the form it was and that matters would again have come to a head at a date earlier than they finally did allowing creditors to act in a more timely manner.

Regardless of the legal remedies that would have been available to creditors, as the Marks Paneth debt compliance calculations show, accurate financial statements would have disclosed covenant violations, thereby giving creditors earlier notice of the financial and

-10-

operational problems at AHERF and its affiliates. In my opinion, and based on my experience, the trustees of AHERF and its affiliates in the exercise of their fiduciary duties would have directed management to make changes in operations to reflect and give more weight to creditors' interests. Ultimately, the absence of accurate financial statements for fiscal year 1996 denied creditors a meaningful opportunity to intervene with AHERF and its affiliates and thereby preserve and protect the value of those entities.

3.   *The Fiscal Year 1996 and 1997 Financial Statements Failed to Disclose the Violation of Financial Covenants by the Delaware Valley Obligated Group ("DVOG")*

(a)   Debt Secured by the DVOG Master Indenture

(i)   *Master Indenture Provisions*

At June 30, 1996, the end of its 1996 fiscal year, DVOG had outstanding and intertwined debt issues and lines of credit such that a default under one transaction would cross-default other transactions. The long-term debt financings were all secured by obligations issued under a Master Trust Indenture dated as of May 15, 1996 ("DVOG Master Indenture") between DVOG and Norwest Bank Minnesota, National Association, as Master Trustee (the "Master Trustee"). The DVOG Master Indenture secured more than $400 million in debt incurred on June 16, 1996, two weeks prior to the end of the fiscal year. (It also subsequently secured an extension of credit from a syndicate of banks led by Mellon Bank to AHERF in 1997.)

Sections 1.4 and 6.6 of the DVOG Master Indenture together require that DVOG's financial statements be prepared in accordance with GAAP. This requirement is significant because of the need to be able to accurately calculate DVOG's income available to pay debt service in order to determine whether the covenant in Section 6.3 of the DVOG Master Indenture described below has been satisfied.

-11-

Based on the debt compliance calculations prepared by Marks Paneth, the historical debt service coverage ratio for DVOG for fiscal year 1996 was 0.88:1.00 (and 0.63:1.00 for fiscal year 1997). Section 6.3 of the DVOG Master Indenture requires that if in any fiscal year, the historical debt service coverage ratio is less than 1.10:1.00, DVOG shall be required to retain a Consultant to make recommendations with respect to its rates, fees and charges, methods of operations and other factors affecting DVOG's financial condition in order to increase the historical debt service coverage ratio to at least 1.10:1.00 in succeeding fiscal years. However, Section 6.3 goes on to provide that so long as DVOG retains a Consultant and follows the Consultant's recommendation to the extent feasible, no Event of Default shall be deemed to have occurred under the DVOG Master Indenture, *provided only* that Total Income Available for Debt Service for <u>each</u> <u>such</u> fiscal year is equal to not less than 100% of the actual Debt Service Requirements for such fiscal year. Here, DVOG fell below the 100% debt service coverage requirement, and consequently in my opinion, the debt service coverage ratio was breached. Moreover, the breach of this covenant could not be cured by hiring a Consultant because debt service coverage was less than 100%. Accordingly, because Total Income Available for Debt Service should have been reported as being less than 100% of the actual Debt Service Requirement for fiscal year 1996 (as shown by Marks Paneth), a non-curable breach occurred but was not disclosed.

The First Supplemental Master Trust Indenture entered into by DVOG and the Master Trustee simultaneously with the DVOG Master Indenture contains separate provisions for the benefit of MBIA, the bond insurer of the 1996 bonds. Section 3.21 of the First Supplement revised Section 6.3, but continued to provide that, if total income for debt service were less than 100% of the actual debt service requirement for a fiscal year, an Event of Default would result. Pursuant to Section 3.1 of the First Supplement, MBIA could enforce this covenant by itself and

without the consent of the Master Trustee or any other bondholder. Accordingly, knowledge of a breach of Section 3.21 of the First Supplement would have enabled MBIA to cause a default to be declared under the DVOG Master Indenture.

The occurrence of an Event of Default is then subject to the application of Section 7.1 of the DVOG Master Indenture. Clause (a)(ii) of this Section provides a thirty (30) day grace period after written notice of the failure to perform a covenant in the DVOG Master Indenture, and, in certain circumstances, allows that thirty day period to be extended. Upon a covenant breach, notice thereof and lapse of 30 days without cure, extension or waiver, an "Event of Default" would occur. As the covenant in question required a certain coverage level for fiscal year 1996, there was no work that could be done or actions that could be taken to cure the default described in Section 6.3. Accordingly, and subject only to DVOG determining whether there was a mathematical computation mistake during the thirty day notice period, an Event of Default existed and would have been disclosed in 1996 if the fiscal year 1996 audit had been done properly.

As noted above, inasmuch as the debt service coverage ratio was less than 100%, hiring a Consultant could not cure the default. Allowing the hiring of a Consultant to "cure" this breach would render meaningless the language in Section 6.3 that to avoid an Event of Default, debt service coverage had to be at least 100% of the debt service requirement for such fiscal year. It also ignores the fact that this covenant is tested at a specific date – as of the end of each fiscal year. Absent a mathematical error, nothing could be done after June 30, 1996 to "cure" the fact that debt service coverage as of the end of fiscal year 1996 was less than 100%. Given the nature of this covenant and the reference therein to "Event of Default," it is not credible to argue that a coverage ratio of less than 100% at June 30, 1996 could be "cured" by hiring a Consultant.

-13-

Under such an interpretation, it is possible, even likely, that no event of default would *ever* occur as a result of this breach. If that was intended, it would have been much easier to either not have Section 6.3 in the document or write it in such a manner to provide that if coverage fell below a certain threshold i.e., 1.10:1.00, DVOG would have to hire a Consultant. There would be no need to distinguish between what happens if DVOG's coverage goes below 110% or 100%. Robert J. Zimmerman, AHERF's (and DVOG's) counsel, testified at his deposition on April 1, 2003 that a historical rate covenant violation could not be cured. (Zimmerman deposition at pages 252-253).

Once an Event of Default occurs, the DVOG Master Indenture provides for a range of remedies the Master Trustee may take. These remedies are all undertaken at the DVOG Master Trustee's discretion, and in many instances, the Master Trustee is required to follow the directions of the creditors. Thus, pursuant to Section 7.1(b) of the DVOG Master Indenture, the Master Trustee has the power to accelerate all outstanding obligations under the DVOG Master Indenture as well as exercise any other remedy under the DVOG Master Indenture or otherwise existing at law or in equity or by statute. The Master Trustee must accelerate if directed to do so by the holders of at least 25% of the principal amount of outstanding obligations.

As security for the performance by DVOG of its obligations under the DVOG Master Indenture, Section 2.3 of the DVOG Master Indenture granted a security interest in the Gross Revenues of each Member of the Obligated Group. Gross Revenues include all revenues received by the Members of the Obligated Group, investment income, insurance proceeds and gifts, grants, bequests, contributions and donations received by the Members of the Obligated Group exclusive of donor restricted bequests. If an Event of Default occurs, DVOG is required to immediately deposit with the Master Trustee all Gross Revenues then on hand (and not yet

commingled) and, thereafter, on a daily basis deposit Gross Revenues with the Master Trustee. The Master Trustee then has the sole discretion, working with a consultant, to spend the Gross Revenues on operations, maintenance and debt service. Consequently and in my opinion, if the financial statements of DVOG had been properly audited, the breach of the debt service coverage covenant would have been disclosed, whereby the Master Trustee would have gained control over DVOG's Gross Revenues.

(ii)    *Loan Agreement Provisions*

The loan agreements between DVOG and the Pennsylvania Higher Educational Facilities Authority relating to the debt secured by the Master Indenture all require the borrower to observe its covenants and agreements under the DVOG Master Indenture (Section 502) and to cause its financial statements to be prepared in accordance with GAAP (Section 510). A DVOG Master Indenture default is a default under the Loan Agreement with no further cure opportunity, and the remedies granted under the Loan Agreement are broad and include the right to accelerate all amounts due under the Loan Agreement.

(iii)    *Bond Indenture Provisions*

Similarly, with respect to each of the Bond Indentures related to the outstanding bonds, notice of a default under the DVOG Master Indenture or the occurrence of an Event of Default under a Loan Agreement constitutes a default under the applicable Bond Indenture, and no cure period is provided with respect to the DVOG Master Indenture Event of Default. The remedies for Bond Indenture defaults also include accelerating the Bonds and a wide range of other legal and equitable remedies. The Bond Trustee is to generally act at the written request of the holders of a majority in outstanding amount of Bonds, and per Section 9.14 of the Bond Indentures, the

-15-

Bond Insurer, or Letter of Credit Bank, as applicable, is given the power under the Bond Indentures to have the exclusive right to act on behalf of the Bondholders.

(iv)    *PNC Reimbursement Agreements*

PNC Bank, National Association, entered into a Letter of Credit, Reimbursement and Security Agreement with DVOG dated June 1, 1996 to secure a $50 million bond issue for the benefit of DVOG. In addition, PNC Bank, National Association entered into a separate Letter of Credit, Reimbursement and Security Agreement with Allegheny University Hospitals dated as of June 1, 1996 to secure $52 million in commercial paper. Both the commercial paper and the bonds were secured by the DVOG Master Indenture, as was the DVOG obligation to reimburse PNC Bank for amounts drawn on the letters of credit.

The Reimbursement Agreements are cross defaulted with the DVOG Master Indenture, as Section 6.04 of the Reimbursement Agreements requires DVOG to comply with its covenants and agreements under the Related Documents, which includes the DVOG Master Indenture. The Reimbursement Agreements also contain additional financial covenants not included in the DVOG Master Indenture and provide that the Bank is to have the benefit of the Bond Insurer covenants that were in the First Supplement described previously for the benefit of MBIA. The Bank was authorized to enforce these covenants directly with the Master Trustee.

Section 6.10(j) of the Reimbursement Agreements authorizes that upon an Event of Default under the DVOG Master Indenture, account debtors and third party payors are to make all payments directly to a lock box for credit to a cash collateral account with the Master Trustee for the benefit of all holders of the DVOG Master Indenture Notes. This provision is consistent with the Gross Revenue security interest discussed above. Together, these provisions would

-16-

have given the Master Trustee greater control over DVOG's operations. Pursuant to Section 7.01(b), there is a 30-day cure period for defaults under the Reimbursement Agreements, but for any cure to go past 30 days, the Bank's consent is required. A DVOG Master Indenture default is also a default under the Reimbursement Agreements without any cure period, per Section 7.01(e).

(v)     *Disclosure Agreement*

Pursuant to Section 7 of the Master Continuing Disclosure Agreement entered into by DVOG, a nonpayment related default is a "Listed Event" which, if determined by AHERF to be material, must be disclosed to the Dissemination Agent, who must then give an event notice to the nationally recognized municipal securities information repositories identified in the Master Continuing Disclosure Agreement. This would have the effect of making the covenant defaults public which would have put bondholders on notice and, therefore, brought increasing pressure to bear on DVOG to take mitigating action. Because a result of the covenant breaches is a potential acceleration of the debt, AHERF should have determined that the Listed Events were material and made the appropriate disclosures. Again, because the audited financial statements contained material misstatements, and the covenant breaches were not disclosed, bondholders and other creditors were left in the dark on these breaches and thus were unable to take mitigating action. The publicity that would have resulted from this notice would have increased pressure on DVOG (and AHERF) to make needed reforms. It would have been particularly damning for AHERF and DVOG had the investment community been aware that within months of a $400 million financing, DVOG had breached a fundamental financial covenant. Presumably, AHERF intended to access the capital markets from time to time in the future, and in my opinion and based on my experience, Wall Street's knowledge of the debt service

-17-

coverage breach would have closed such access unless and until AHERF and DVOG took credible action to improve financial performance.

### (b)    Lines of Credit.

At the same time that the breach of the debt service coverage covenant would have been disclosed to MBIA and PNC (and to the investment community), approximately $57 million in outstanding lines of credit would also have been subject to renegotiation. AHERF would also have had to be responsive to those banks to avoid having to immediately repay these lines which would have been an undesirable strain on its liquidity. The banks that loaned the $57 million under the lines of credit would have had the right to demand repayment if they were not satisfied with DVOG's response to its violation of the debt service coverage covenant under the DVOG Master Indenture.

### (i)    *Line of Credit between Hahnemann University Hospital and First Fidelity Bank*

As of September 18, 1996, there was $7,500,000 outstanding under a line of credit between Hahnemann University Hospital and First Fidelity Bank (later First Union). This line of credit was scheduled to come due on October 31, 1996, but was subsequently extended to March 31, 1997 and finally to June 30, 1997 in order for AHERF to put in place a lending facility with a syndicate of bonds led by Mellon Bank which was used to pay off this line of credit and the ones described below. Mr. Thomas Woodward, the bank officer in charge of this line of credit, testified in his deposition of July 22, 2004, that it was difficult to know whether the line of credit would have been extended past October 31, 1996 if he had known there was a breach of the debt service coverage test. In his view, it was a fair assessment to say that he would want to be satisfied that AHERF management was doing the right thing in response to a debt service coverage violation before extending the credit. (Woodward deposition at pages 134-

-18-

137). If the line were not extended, the full $7,500,000 would have been due on October 31, 1996. Assuming that HUH could have paid this amount, it is my opinion based on my experience that there would have been concern by other lenders over why this line was not otherwise routinely extended. Failure to pay the line would have resulted in cross-defaults under other debt instruments, particularly the other lines of credit described in this Section (and potentially the DVOG Master Indenture), perhaps starting a domino effect that could have led to restructuring of AHERF's activities in late 1996. Knowledge of the covenant breach likely would have adversely affected negotiations with Mellon Bank in putting the replacement credit facility in place, and it was only the representation that Mellon was going to take out First Fidelity's line that allowed it to be extended past the scheduled due date (Woodward deposition at p. 143).

> (ii)   *Lines of credit among the Medical College of Pennsylvania, the Medical College Hospitals, Allegheny United Hospitals Inc., St. Christopher's Hospital for Children, Horizon Medical Corporation and Pittsburgh National Bank/PNC Bank.*

There were two separate lines of credit to these members of the AHERF system from PNB/PNC, aggregating $33 million in principal amount outstanding at September 18, 1996. The Credit Agreement with Allegheny United, St. Christopher's and Horizon was amended at the time of the 1996 bond financing to add a covenant by which the borrowers agreed to be bound by the financial covenants of the new 1996 Master Indenture discussed above. A breach of the DVOG Master Indenture is a default under the Credit Agreement and would have allowed PNC to exercise a wide variety of remedies including acceleration of all amounts owed under this line of credit. Other defaults that trigger these remedies would have been a good faith determination by the Bank that a material adverse change had occurred with respect to the business or financial condition of any borrower or the Guarantor or that the prospect of payment or performance under

-19-

the Credit Agreement was impaired in any material respect. This line of credit matured on December 31, 1997, but was repaid in June 1997 from the proceeds of the Mellon Bank facility.

Successors to Medical College Hospital had $8 million in principal amount outstanding as of September 18, 1996 under a line of credit with Pittsburgh National Bank (by then PNC Bank). Defaults under the Medical College transaction included any failure by the borrower to comply fully with all of its obligations to or with PNC in this Agreement or any other agreements securing any other obligation of the borrower to PNC as well as any materially adverse change in the financial condition of the borrower. This line of credit was also amended in June 1996 to contain a representation that the borrowers will remain in full compliance with the DVOG Master Indenture being entered into in connection with the 1996 Bond financings discussed above. Accordingly, a breach of the DVOG Master Indenture, as discussed above, constitutes a default under this line of credit.

Thus, the $33 million owed to PNC under the lines of credit would have given PNC additional leverage in negotiating over the DVOG violation of the debt service coverage ratio in the DVOG Master Indenture.

(iii)    *Two lines of Credit with CoreStates Bank.*

Two lines of credit existed with CoreStates Bank, one involving the Medical College of Pennsylvania and Hahnemann University Medical Center, and the other including the Medical College of Pennsylvania and Hahneman University Hospital System. As of September 18, 1996, there was $16,500,000 outstanding on these lines of credit. Except for dollar amounts, the terms of these lines are virtually identical. Among the defaults on these lines were if CoreStates determined reasonably and in good faith that an event had occurred or a condition existed which

-20-

had, or was likely to have, a material adverse effect on the financial condition or credit-worthiness of a borrower, or on the ability of the borrower to pay back its debt to CoreStates. A default authorized the acceleration of the liabilities. Again, recognition of the true financial condition of DVOG and its constituent members would have put CoreStates in a position to declare a default under these lines of credit. In any event, the Master Note Agreements provided that these lines were both payable on demand (unless some other mutually agreed upon arrangement was made). In my opinion and based on my experience, it is likely that if CoreStates knew of a breach of a Master Indenture covenant, it would have demanded to be paid off promptly or required DVOG to take specified actions to CoreState's satisfaction.

4.    *Financing Relationships of Allegheny General Hospital Obligated Group*

The Allegheny General Hospital Obligated Group consisted of entities primarily located in the Pittsburgh area. This obligated group was separate and apart from DVOG, and AGHOG was not liable on the DVOG Master Indenture debt. Section 5.11 of the AGHOG Master Indenture requires the preparation of annual financial statements in accordance with generally accepted accounting principles, and the failure to do so would have constituted a default which could have led to acceleration of the AGHOG debt. The breach would have created pressure on AGHOG to cease making transfers for the benefit of DVOG. The effect of this would have been to put additional strains on DVOG's operations at a much earlier date and would have created further early warnings for fiduciaries and creditors of DVOG to begin to take mitigating actions. Further, the Reimbursement and Security Agreement which AGHOG entered into with Morgan Guaranty Trust Company of New York relating to the Series 1995B bond financing contained certain covenants, the breach of which, if known, would have had an impact on both AGHOG and DVOG.

-21-

As of September 1996, the Morgan Guaranty Reimbursement Agreement contained a covenant that AGHOG's Consolidated Unrestricted Fund Balances shall be at least $200,000,000 at all times. AGHOG's fiscal 1996 audited financial statements failed to disclose that AGHOG had breached this covenant. As shown by Marks Paneth, the covenant was breached in fiscal year 1996 because Consolidated Unrestricted Fund Balances had declined to $184.5 million. Subsequently, in fiscal year 1997, the covenant was reduced to $160 million, but was again breached (as shown by Marks Paneth) because the Consolidated Unrestricted Fund Balances declined to $42.5 million. Again, if Defendant had properly audited the financial statements of AGHOG, knowledge of this covenant breach would have been discovered earlier, thereby allowing the creditors and trustees to take remedial actions at an earlier date. Morgan Guaranty would have had the power to give notice to the bond trustee of the breach of the Reimbursement Agreement. If it had done so, a default under the related bond indenture for the Series 1995B Bonds would have resulted. In turn, this would have become a default under the AGHOG Master Indenture. Notice from the Master Trustee to the Bond Trustee of a default under the AGHOG Master Indenture is a default under the bond indenture for the Series 1995A Bonds which would have triggered a number of rights in MBIA as insurer of the 1995A Bonds. Accordingly, the entire AGHOG financing structure could have collapsed in 1996 had Morgan Guaranty and MBIA been aware of AGHOG's breach of the Consolidated Unrestricted Fund Balance covenant. This clearly would have provided additional pressure to reform operations at AGHOG and DVOG.

Significantly, one of the Events of Default under the AGHOG Master Indenture (Section 6.01(d)) is a cross default provision. This section provides, in general, that a payment default of more than $1 million or the occurrence of an event of default under "any mortgage, indenture or instrument under which there may be issued, or by which there may be secured or evidenced, and

-22-

Indebtedness..." would be a default under the AGHOG Master Indenture. Therefore, this breach of the unrestricted fund balance covenant could have the effect of accelerating all the AGHOG Master Indenture debt per Section 6.02 of the AGHOG Master Indenture. Not only would this have affected the 1995 bond financing, but also the outstanding 1988 and 1993 issues all secured under this master indenture, aggregating approximately $200 million.

Similarly, according to Marks Paneth, the liquidity ratio, which AGHOG was required to maintain under the Morgan Guaranty Reimbursement Agreement and the 1993 PNC Letter of Credit, Reimbursement and Security Agreement, would have been breached in 1997 had the transfers from AGHOG been accounted for correctly.

As noted previously in the discussion of the 1996 DVOG debt, PNC had issued letters of credit to support approximately $100 million in DVOG debt. PNC was also a significant credit provider to AGHOG. This support included a letter of credit securing 1988 bonds which was renewed as of March 15, 1997, and a letter of credit serving 1993 bonds, which was renewed as of January 29, 1998. $25,300,000 was outstanding on the 1993 facility, and approximately $50 million was outstanding on the 1988 facility. The renewals of the letters of credit, in my opinion, would have been problematic if the true financial condition of AHERF, DVOG and AGHOG had been known, even in the absence of the exposure PNC also had to DVOG.

5.    *AHERF – Mellon Bank Line of Credit*

Had properly audited financial statements been available for fiscal year 1996, then it is likely that the negotiations related to the 1997 Mellon Bank credit facility by AHERF would have concluded differently. AHERF would have been negotiating with MBIA, PNC and Morgan Guaranty over the defaults related to the outstanding debt of DVOG and AGHOG aggregating in

-23-

excess of $600 million, and the various lines of credit discussed above would also have been at risk. As Mellon Bank did not have knowledge of these matters in June 1997, AHERF was able to enter into a credit agreement with various lenders, including Mellon Bank. In a series of material representations, AHERF represented that its 1996 audit was done in accordance with GAAP, that interim financial statements for the period ended September 30, 1996 were done in accordance with GAAP, that there were no liabilities or obligations of any nature that would affect AHERF or any obligated group member that would have a material adverse effect except as disclosed in the financial statements or otherwise incurred in the ordinary course of business, and consistent with past practices, and that since June 30, 1996, there had been no material adverse change in the business or financial condition of AHERF and its subsidiaries. Had the financial statements been properly audited by the Defendant, the inaccuracy of these material representations would have been apparent, and in my opinion, and based on my experience, this transaction would likely not have gone forward, or not have proceeded under the terms and conditions it did. In this connection, both DVOG and AGHOG in Supplemental Master Indentures, represented that they were in compliance with their respective existing Master Indentures, which was not true at that time. Had fiscal year 1996 audited financial statements been prepared properly, DVOG's and AGHOG's non-compliance with financial covenants would have been evident for fiscal year 1996. Further, as a condition for the drawing down of any loan under the Credit Agreement, there could be no material adverse change of any of the obligated group members and AHERF since June 30, 1996. Given the significant worsening of the financial condition of DVOG between June 30, 1996 and June, 1997, had this been known to the lenders, no further credit likely would have been extended under this Agreement or Mellon would not have entered into this facility (Deposition of Marsha Wicker of Mellon Bank dated February 25, 2004 at page 248).

-24-

This Agreement also contained a series of financial covenants such that AHERF, on an unconsolidated basis, would have to maintain a liquidity ratio of not less than 1.40:1 and individually, each of DVOG and AGHOG had to maintain historical coverage ratios of not less than 1.10:1, and liquidity ratios of not less than 1.60:1. AHERF also covenanted that DVOG and AGHOG were in compliance with the covenants in their respective Master Trust Indentures. Again, if accurate financial statements had been prepared for the 1996 fiscal year, it would have been clear that these covenants were not satisfied and, in my opinion, this transaction likely would not have happened, at least in the manner in which it did. As shown in the Marks Paneth debt compliance calculations, the AHERF Liquidity Ratio was 0.65:1.00 as of September 30, 1996.

A breach of a representation as discussed above is an Event of Default without any cure period. Similarly, any breach of a financial covenant is a default, again with no cure period allowed. Further, a cross default provision is provided such that a default with respect to an obligation in excess of $2,000,000 would trigger a default under this Credit Agreement.

6.    *Additional Issues Regarding Debt Service Coverage Covenants.*

Prior to DVOG's deteriorating financial condition, the AHERF system had previously been required to evaluate the results of an affiliate having income available for debt service of less than 100% of debt service requirements. In 1991, AHERF acquired United Hospitals. Section 7.4 of the United Master Indenture was very similar to Section 6.3 of the DVOG Master Indenture, and provided that revenues available for debt service be at least 110% of the maximum annual debt service on all long term indebtedness of the United Obligated Group. However, no Event of Default shall be deemed to have occurred as a result of a failure to realize that coverage level so long as revenues available for debt service were at least equal to 100% of

-25-

the maximum annual debt service requirement on all long term indebtedness of the United Obligated Group and certain conditions (primarily relating to the hiring of a consultant and the implementation of the consultant's recommendations) were satisfied. Section 8.1(a)(i) of the United Master Indenture is for all practical purposes identical to Section 7.1(a)(ii) of the DVOG Master Indenture. In this situation both Reed Smith, Shaw and McClay, in a memorandum dated February 8, 1991, and Foley & Lardner, counsel to AHERF, in a memorandum dated May 7, 1991, concluded that if revenues available for debt service were less than 100% of maximum annual debt service, an Event of Default under the Master Indenture would occur. In its memorandum, Foley & Lardner concluded that a debt service coverage ratio of less than one to one was not curable. Despite Foley & Lardner's 1991 analysis, the firm subsequently, pursuant to correspondence dated December 22, 1997 to the Defendant, opined that failure to comply with the rate covenant could not be cured within the notice parameters of Section 7.1(a)(ii), but that hiring a Consultant was sufficient to avoid an Event of Default from occurring. In my opinion and based on my experience, the analysis by Foley & Lardner and Reed Smith in 1991 was correct, and Foley & Lardner's 1997 opinion was wrong. Foley & Lardner made a similar analysis in a memorandum dated November 3, 1997 with respect to the Centennial Obligated Group, whose debt service coverage covenant was substantially identical to DVOG's, again contradicting its earlier advice from 1991 in connection with the United acquisition.

This issue was also faced in connection with the fiscal year 1994 financial results of another AHERF affiliate, Hahnemann University. Again, Section 6.3 and 7.1(a)(ii) of that master indenture are virtually identical to the 1996 DVOG Master Indenture and the Centennial Master Indenture. The bond insurer covenants of the First Supplemental Master Indenture for Hahnemann University also contained a revision to the rate covenant solely for the benefit of MBIA, which provided that no Event of Default shall be deemed to have occurred *provided only*

that total income available for debt service for each such fiscal year was at least equal to 100% of maximum annual debt service for such fiscal year. AHERF acknowledged that Hahnemann missed the required coverage, and a waiver and direction to Bond Trustee was negotiated with MBIA. MBIA specifically directed the Master Trustee to not deliver a written notice of default pursuant to Section 7.1(a)(ii) of the Master Indenture and to not declare an Event of Default to have arisen by operation of that Section and further waived any default that may give rise to an Event of Default as a consequence of the failure to achieve the one times coverage. Further MBIA directed that the issuer of the Bonds and the Bond Trustee not deliver a notice of noncompliance with the rate covenant and not declare an Event of Default to have arisen by operation of the cross default provisions of the loan agreements related to this failure to maintain the one times debt service coverage ratio. Accordingly, both in 1991 and 1994, AHERF and its counsel believed that language essentially identical to that contained in the 1996 DVOG Master Indenture resulted in a non-curable Event of Default if income available for debt service was less than 100% of debt service requirements. Only in 1997 faced with a looming prospect of bankruptcy and a meltdown of the entire DVOG system, did AHERF and its counsel assert that the provisions could be interpreted otherwise. Again, in my opinion and based on my experience, the 1991 and 1994 analyses are correct as otherwise the specific reference to the occurrence of an Event of Default if coverage was less than 100% would be rendered meaningless as is the notion that a covenant measuring a financial condition as of a stated date can be "cured." This appears to have been confirmed by AHERF's counsel, Robert J. Zimmerman, in his deposition testimony noted previously, that a historical debt service coverage violation such as that in question could not be cured.

In sum in my opinion, and based on my experience, for both DVOG and Centennial, a violation of the debt service coverage ratio covenant in Section 6.3 of both the DVOG and Centennial master trust indentures could not have been cured by the retention of a consultant so long as the ratio was less than 1.00:1.00.

DATED: September 1, 2004

Steven B. Kite, Esq.