member Economic Damages Section. I am currently Chair of the 28,000 member CalCPA.

The American Institute of Certified Public Accountants ("AICPA") has a national Forensic and Litigation Services Subcommittee ("FLSS") (formerly the Litigation and Dispute Resolution Subcommittee ("LDRS")). From 1998 until July of 2001, I served as one of the nine members of this national committee. The FLSS oversees and provides guidance to the AICPA's 330,000 members in their practice as it relates to litigation consulting and dispute resolution. The FLSS also provides guidance and supervision to its subcommittees, which include Economic Damages, of which I was its chairperson from 1999 to July 2001.

My firm has been compensated for my review and analysis in this matter at my standard hourly rate, which is currently $475 per hour. Others have assisted me in my work and my firm has been compensated for their work at their standard hourly rates.

## V.  Evidence Considered

In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field. Those sources are identified in Exhibit B to this report. I have also relied upon my own professional judgment and expertise gathered during the more than 30 years I have been in public accounting analyzing financial statements, audits of financial statements, and transactions that are the subject of legal disputes.

## VI.  Discussion of Opinions

### A. Background (Presented as of June 30, 1997)

1.  AHERF was the parent company of, among other entities, Allegheny General Hospital ("AGH"), Allegheny University of the Health Sciences ("AU"), Allegheny University Hospitals, St. Christopher's Hospital for Children ("SCHC"), Allegheny Integrated Health Group ("AIHG") and Allegheny Health Services Providers Insurance Company ("AHSPIC"). AGH, AU, Allegheny University Hospitals, SCHC, and AIHG were Pennsylvania nonprofit charitable organizations. AHSPIC was a captive insurance company incorporated in the Cayman Islands, which was also wholly owned by AHERF.[2]

---

[2] AHERF and Obligated Groups Audited Financial Statements For Fiscal Year 1996, SEC Exhibit 204, PwC 0050491

Page 4 of 114

Prepared in connection with litigation

2. During fiscal year 1996, AGH was the parent company of Allegheny-Singer Research Institute ("ASRI"). AGH and ASRI comprised an obligated group, AGHOG, which was formed in connection with the issuance of hospital revenue bonds. ASRI was a nonprofit medical research institute that received funding principally from affiliates, government grant programs, and private donors.[3] During fiscal year 1997, all academic and research related activities of ASRI included in the AGH Obligated Group were transferred to Allegheny University of the Health Sciences.[4]

3. DVOG consisted of AU, Allegheny University Hospitals and SCHC. Allegheny University Hospitals owned and operated two tertiary care teaching hospitals (Allegheny Center City Hospital "HUH" and Allegheny East Falls Hospital "MCP") and two acute care community hospitals (Allegheny Bucks County Hospital "Bucks" and Allegheny Elkins Park Hospital "Elkins Park") in Philadelphia, Pennsylvania. Additionally, Allegheny University Hospitals operated, on behalf of the Commonwealth of Pennsylvania, an inpatient psychiatric facility (Eastern Pennsylvania Psychiatric Institute "EPPI") for adults and children located in Philadelphia, Pennsylvania. SCHC was an acute care children's hospital and a regional referral center located in Philadelphia, Pennsylvania.[5] In this report the term "DVOG Hospitals" includes HUH, MCP, EPPI, Bucks, Elkins, and SCHC.

4. On or around October 31, 1996, The Graduate Hospital, The Fifth and Reed Hospital d/b/a Mt. Sinai Hospital and GHS-Osteopathic, Inc. (which operated City Avenue Hospital and Parkview Medical Center), each Pennsylvania nonprofit corporations formerly affiliated with Graduate Health System, Inc., were merged into SDN, Inc., a Pennsylvania nonprofit corporation ("SDN"), which was managed by AHERF.[6] The Rancocas Hospital, also formerly associated with Graduate Health System, was merged into SDN on or around December 31, 1996.[7] Graduate Hospital, Mt. Sinai Hospital, City Avenue Hospital, Parkview Medical Center and Rancocas Hospital, collectively referred to herein as the "Graduate Hospitals", were merged into AHERF during fiscal year 1997. This merger was accounted for under the purchase method of accounting.

5. Also in fiscal year 1997, the Forbes Health System (FHS) and Allegheny Valley Health System (AVH) became part of Allegheny University Medical Centers (AUMC) via statutory mergers, effective January 1, 1997, and

---

[3] Ibid, PwC 0050517
[4] AHERF Secondary Market Disclosure Report for Fiscal Year 1997, Exhibit 650, GOV 20215
[5] AHERF and Obligated Groups Audited Financial Statements For Fiscal Year 1996, SEC Exhibit 204, PwC 0050572
[6] AGHOG Secondary Market Disclosure Report Fiscal Year 1996, CL 046787
[7] AHERF Secondary Market Disclosure Report for Fiscal Year 1997, Exhibit 650, GOV 20262

Prepared in connection with litigation

March 1, 1997, respectively.[8] These mergers were accounted for under the purchase method of accounting.

6. PwC issued unqualified audit opinions relating to the following financial statements for the year ended June 30, 1996:

    a. The consolidated financial statements and the accompanying consolidating financial information of AHERF,

    b. The consolidated financial statements and the accompanying consolidating financial information of AGHOG,

    c. The combined financial statements and the accompanying combining financial information of DVOG,

    d. The financial statements of AIHG, and

    e. The financial statements of ASRI.

7. PwC issued an unqualified audit opinion for the year ended June 30, 1997 relating to the consolidated financial statements of AHERF and issued a report on the accompanying consolidating and combining financial information of AHERF stating that such information had "been subjected to the auditing procedures applied in the audit of the consolidated financial statements and, in our opinion, is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole."

## B. Relevant Accounting and Auditing Standards

### 1 AICPA Code of Professional Conduct

    a. The American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct (Rule 201) requires that a member, such as PwC, comply with the following standards and with any interpretations thereof by bodies designated by Council.[9]

        i. Professional Competence – A member must undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence.

---

[8] AHERF Audited Consolidated Financial Statements for the year ended June 30, 1997, Exhibit 58, TN CBC43B 00901

[9] "Council" is authorized to designate bodies to promulgate technical standards under the Rules, and the bylaws require adherence to those Rules and standards. I am currently a member of the AICPA Council.

Prepared in connection with litigation

    ii.    Due Professional Care – A member must exercise due professional care in the performance of professional services. A member has an obligation to perform professional services with concern for the best interest of those for whom the services are performed and consistent with the accounting profession's responsibility to the public.

    iii.    Planning and Supervision – A member must adequately plan and supervise the performance of professional services.

    iv.    Sufficient Relevant Data – A member must obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.

## 2    The Nature of Generally Accepted Accounting Principles

a.    The phrase "generally accepted accounting principles" is a technical accounting term that encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules, and procedures provide a standard by which to measure financial presentations.[10] The sources of established accounting principles that are generally accepted in the United States of America are:

    i.    Financial Accounting Standards Board ("FASB") Statements and Interpretations, APB Opinions, and AICPA Accounting Research Bulletins;

    ii.    FASB Technical Bulletins, AICPA Industry Audit and Accounting Guides, and AICPA Statements of Position;

    iii.    Consensus positions of the FASB Emerging Issues Task Force ("EITF"); and AICPA Practice Bulletins;

    iv.    AICPA accounting interpretations, "Qs and As" published by the FASB staff, as well as industry practices widely recognized and prevalent;

---

[10] Statement on Auditing Standards No. 69, as amended by Statement of Position 93-3. Statements on Auditing Standards and Statements of Position of the Auditing Standards Division of the American Institute of Certified Public Accountants (AICPA) are approved and issued by the Auditing Standards Board.

Prepared in connection with litigation

    v.    Other accounting literature, including FASB Concepts Statements; AICPA Issues Papers; International Accounting Standards Committee Statements; GASB Statements, Interpretations, and Technical Bulletins; pronouncements of other professional associations or regulatory agencies; AICPA Technical Practice Aids, and accounting textbooks, and articles.

b.    If there is a conflict between principles in the above categories, the principle in the highest category should be followed (e.g., category i over category ii).

c.    For entities such as AHERF and its obligated groups, which issued municipal securities, rules and interpretive releases of the SEC have the highest authority, similar to category i. In addition, the SEC staff issues Staff Accounting Bulletins that represent practices followed by the SEC staff in administering SEC disclosure requirements. The SEC staff will also challenge accounting that differs from an EITF consensus position.

FASB Statements of Financial Accounting Concepts

d.    The purpose of the FASB Statements of Financial Accounting Concepts was to set forth fundamentals on which financial accounting and reporting standards would be based. More specifically they were intended to establish the objectives and concepts that the FASB would use in developing standards of financial accounting and reporting.

e.    FASB Statements of Financial Accounting Concepts Nos. 1 and 2 establish the objectives of general purpose external financial reporting by business enterprises. Relevant concepts or principles include:

    i.    Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, paragraph 34);

    ii.    Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, paragraph 40);

    iii.    The primary focus of financial reporting is information about an enterprise's performance provided by measures of earnings and its components (FASB Statement of Concepts No. 1, paragraph 43);

Prepared in connection with litigation

iv.   Financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, paragraphs 58-59);

v.    Completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, paragraph 79);

vi.   Conservatism is used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, paragraph 95 and 97).

f.  FASB Statement of Financial Accounting Concepts No. 4 establishes the objectives of general purpose external financial reporting by non-business organizations. The relevant guidance includes the following:

i.    This Statement focuses on organizations that have predominantly nonbusiness characteristics that heavily influence the operations of the organization. The line between nonbusiness organizations and business enterprises is not always sharp since the incidence and relative importance of those characteristics in any organization are different (FASB Statement of Financial Accounting Concepts No. 4, paragraph 7);

ii.   Some organizations have no ownership interests but are essentially self-sustaining from fees they charge for goods and services. Examples are those private nonprofit hospitals and nonprofit schools that may receive relatively small amounts of contributions and grants but finance their capital needs largely from the proceeds of debt issues and their operating needs largely from service charges rather than from private philanthropy or government grants. As a result, assessments of amounts, timing, and uncertainty of cash flows becomes the dominant interest of their creditors and other resource providers and **profitability becomes an important indicator of performance**. Consequently, the objectives of Concepts Statement No. 1 may be more appropriate for those organizations (FASB Statement of Financial Accounting Concepts No. 4, paragraph 8) [emphasis added].

iii.  It appears that the readers of AHERF's financial statements were focused on the financial performance of AHERF.

Page 9 of 114

Prepared in connection with litigation

### 3    The Nature of Generally Accepted Auditing Standards

a.  In performing an audit, the AICPA Code of Professional Conduct (Rule 202) requires compliance with established audit-related standards, which are referred to as Generally Accepted Auditing Standards ("GAAS"). GAAS consists of standards that specify "measures of the quality of the performance of [procedures] and the objectives to be attained by the use of the procedures undertaken." GAAS consists of three general standards, three standards of fieldwork, and four standards of reporting. These ten standards are further defined or interpreted by "Statements on Auditing Standards" (SASs), which are codified and are referred to by reference to "AU."

b.  The general, fieldwork, and reporting standards (the 10 standards)[11] approved and adopted by the membership of the AICPA, as amended by the AICPA Auditing Standards Board, are as follows:

General Standards

i.   The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

ii.  In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

iii. Due professional care is to be exercised in the performance of the audit and the preparation of the report.

Standards of Field Work

i.   The work is to be adequately planned and assistants, if any, are to be properly supervised.

ii.  A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

iii. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

---

[11] AU Section 150, Codification of Auditing Standards. The standards are further discussed in AU Sections 200 – 500.

Page 10 of 114

Prepared in connection with litigation

Standards of Reporting

i.  The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles ("GAAP").

ii.  The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

iii.  Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

iv.  The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

c.  The Auditor's Responsibility for Communication of Internal Control Structure Related Matters Noted in an Audit

i.  The auditor is required by GAAS to communicate "reportable conditions" to the entity's audit committee. Reportable conditions are "matters coming to the auditor's attention [during the course of the audit] that, in his judgment, should be communicated to the audit committee because they represent significant deficiencies in the design or operation of the internal control structure, which could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements." [AU 325.02] [12]

ii.  GAAS provides specific examples of possible reportable conditions, which are grouped in the following categories:  a) "Deficiencies in internal control structure design", b) "Failures in

---

[12] "Assertions are representations by management that are embodied in financial statements components. They can be either explicit or implicit and can be classified according to the following broad categories: Existence or Occurrence, Completeness, Rights and Obligations, Valuation or Allocation, Presentation and Disclosure" [AU 326.03]

Page 11 of 114

Prepared in connection with litigation

the operation of the internal control structure", c) "Others."
Included within these specific examples are the following:

- Evidence of intentional override of internal control by those in authority to the detriment of the overall objectives of the system,
- Evidence of willful wrongdoing by employees or management,
- Evidence of intentional misapplication of accounting principles,
- Absence of a sufficient level of control consciousness within the organization, and
- Evidence of undue bias or lack of objectivity by those responsible for accounting decisions. [AU 325.21]

iii.   GAAS also states that the "communication [by the auditor] would generally be to the audit committee or to individuals with a level of authority and responsibility equivalent to an audit committee in organizations that do not have one, such as the board of directors, the board of trustees, an owner in an owner-managed enterprise, or others who may have engaged the auditor." [AU 325.01]

iv.   Furthermore, if the auditor encountered any reportable conditions, they should make a report to the audit committee, preferably in writing.  GAAS states "if information is communicated [to the client] orally, the auditor should document the communication by appropriate memoranda or notations in the working papers." [AU 325.09]  It is presumed that such communication provides the audit committee the opportunity to take appropriate corrective action in order to improve the entity's financial reporting processes.

d.  The Auditor's Responsibility for Communication with Audit Committees

i.   GAAS requires the auditor "to ensure that the audit committee receives additional information regarding the scope and results of the audit that may assist the audit committee in overseeing the financial reporting and disclosure process for which management is responsible." [AU 380.02]

ii.   The matters to be communicated include the following:

- The Auditor's Responsibility under GAAS

Page 12 of 114

Prepared in connection with litigation

"... an audit committee is usually interested in the internal control and in whether the financial statements are free of material misstatement. In order for the audit committee to understand the nature of the assurance provided by an audit, the auditor should communicate the level of responsibility assumed for these matters under generally accepted auditing standards." [AU 380.06]

- Significant Accounting Policies

"The auditor should determine that the audit committee is informed about the initial selection of and changes in significant accounting policies or their application." [AU 380.07]

- Management Judgments and Accounting Estimates

"Accounting estimates are an integral part of the financial statements prepared by management and are based upon management's current judgments. Those judgments are normally based on knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ markedly from management's current judgments. The auditor should determine that the audit committee is informed about the process used by management in formulating particularly sensitive accounting estimates and about the basis for the auditor's conclusions regarding the reasonableness of those estimates." [AU 380.08]

- Significant Audit Adjustments

"The auditor should inform the audit committee about adjustments arising from the audit that could, in his judgment, either individually or in the aggregate, have a significant effect on the entity's financial reporting process. For purposes of this section, an audit adjustment, whether or not recorded by the entity, is a proposed correction of the financial statements that, in the auditor's judgment, may not have been detected except through the auditing procedures performed. Matters underlying adjustments proposed by the auditor but not recorded by the entity could potentially cause

Prepared in connection with litigation

future financial statements to be materially misstated, even though the auditor has concluded that the adjustments are not material to the current financial statements." [AU 380.09]

- Other Information in Documents Containing Audited Financial Statements

  "…The auditor should discuss with the audit committee his responsibility for other information in documents containing audited financial statements, any procedures performed, and the results." [AU 380.10]

- Disagreements With Management

  "Disagreements with management may occasionally arise over the application of accounting principles to the entity's specific transactions and events and the basis for management's judgments about accounting estimates. Disagreements may also arise regarding the scope of the audit, disclosures to be included in the entity's financial statements, and the wording of the auditor's report. The auditor should discuss with the audit committee any disagreements with management, whether or not satisfactorily resolved, about matters that individually or in the aggregate could be significant to the entity's financial statements or the auditor's report. For purposes of this section, disagreements do not include differences of opinion based on incomplete facts or preliminary information that are later resolved." [AU 380.11]

- Consultation With Other Accountants

  "In some cases, management may decide to consult with other accountants about auditing and accounting matters. When the auditor is aware that such consultation has occurred, he should discuss with the audit committee his views about significant matters that were the subject of such consultation." [AU 380.12]

- Major Issues Discussed With Management Prior to Retention

  "The auditor should discuss with the audit committee any major issues that were discussed with management in connection with the initial or recurring retention of the

Page 14 of 114

Prepared in connection with litigation

auditor, including, among other matters, any discussions regarding the application of accounting principles and auditing standards." [AU 380.13]

4    <u>Materiality</u>

a.    GAAS required PwC to consider audit risk and materiality both in (a) planning the audit and designing auditing procedures and (b) evaluating whether the financial statements taken as a whole are presented fairly, in all material respects, in conformity with generally accepted accounting principles. [AU 312.01]

   i.    "...Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his opinion on financial statements that are materially misstated." [AU 312.02]

   ii.    "The concept of materiality recognizes that some matters either individually or in the aggregate, are important for fair presentation of financial statements in conformity with generally accepted accounting principles..." [AU 312.03]

   iii.    "Financial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with generally accepted accounting principles. Misstatements result from misapplications of generally accepted accounting principles, departures from fact, or omissions of necessary information."[AU 312.04]

   iv.    "The auditor's consideration of materiality is a matter of professional judgment and is influenced by his perception of the needs of a reasonable person who will rely on the financial statements. The perceived needs of a reasonable person are recognized in the discussion of materiality in Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, which defines materiality as 'the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.' That discussion recognizes that materiality judgments are made in light of surrounding circumstances and necessarily involved both quantitative and qualitative considerations." [AU 312.06]

Page 15 of 114

Prepared in connection with litigation

v.  "As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements." [AU 312.07]

vi.  "In planning auditing procedures, the auditor should consider the nature, cause (if known), and amount of misstatements that he is aware of from the audit of the prior period's financial statements." [AU 312.16]

vii.  "An assessment of the risk of material misstatements should be made during the planning. The auditor's understanding of the internal control structure should either heighten or mitigate the auditor's concern about the risk of material misstatements. The factors considered in assessing risk should be considered in combination to make an overall judgment; the presence of some factors in isolation would not necessarily indicate increased risk. Factors such as those listed below may be considered."

- Management operating and financing decisions are dominated by a single person.
- Management's attitude toward financial reporting is unduly aggressive.
- Management places undue emphasis on meeting earnings projections.
- Many contentious or difficult accounting issues are present.
- Significant difficult-to-audit transactions or balances are present.
- Significant and unusual related party transactions not in the ordinary course of business are present.
- Nature, cause (if known), or the amount of known and likely misstatements detected in the audit of prior period's financial statements is significant. [AU 316.10]

viii.  In particular the AICPA Audit and Accounting Guide, Health Care Organizations highlights certain inherent risks in the audits of health care providers, including the following:

- "Because of the large monetary amounts and the complexity of determining health care service revenue and receivables, there are risks associated with health care service revenue recognition and the valuation of the related receivables. A significant portion of services usually is paid for by third parties such as Medicare, Medicaid, and various health

Page 16 of 114

Prepared in connection with litigation

insurance carriers under statutory provisions or other arrangements in amounts that can be significantly different from, and frequently less than, the entity's established rates."[13]

- • "Although significant accounting estimates may affect many elements of a health care organization's financial statements, they most often affect the following:

  - The provision for third-party payor contractual adjustments and allowances and the provision for estimated receivables and payables for final settlements with those payors
  - The provision for uncollectible accounts
  - Accruals for uninsured medical malpractice claims
  - Accruals for obligations under continuing care contracts
  - Accruals by providers of prepaid health care services for IBNR [incurred but not reported] costs."[14]

  ix.  "An audit of financial statements in accordance with generally accepted auditing standards should be planned and performed with an attitude of professional skepticism. The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. Rather, the auditor recognizes that conditions observed and evidential matter obtained, including information from prior audits, need to be objectively evaluated to determine whether the financial statements are free of material misstatement." [AU 316.16]

b.  SEC Staff Accounting Bulletin No. 99 on Materiality[15] states the following:

  i.  The FASB has long emphasized that materiality cannot be reduced to a numerical formula. In its Concepts Statement No. 2, the FASB noted that some had urged it to promulgate quantitative materiality guides for use in a variety of situations. The FASB rejected such an approach as representing only a "minority view," stating –

    - The predominant view is that materiality judgments can properly be made only by those who have all the facts. The Board's present position is that no general standards of

---

[13] AICPA Audit and Accounting Guide, Health Care Organizations (New Edition as of June 1, 1996), paragraph 2.09

[14] Ibid, paragraph 2.25

[15] The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Page 17 of 114

Prepared in connection with litigation

materiality could be formulated to take into account all the considerations that enter into an experienced human judgment.

ii.   As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are:

- whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate
- **whether the misstatement masks a change in earnings or other trends** [emphasis added]
- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
- **whether the misstatement changes a loss into income or vice versa** [emphasis added]
- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability
- whether the misstatement affects the registrant's compliance with regulatory requirements
- **whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements** [emphasis added]
- **whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation** [emphasis added]
- whether the misstatement involves concealment of an unlawful transaction

…the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings are immaterial. While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally

Page 18 of 114

Prepared in connection with litigation

misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.

iii.   If the misstatement of an individual amount causes the financial statements as a whole to be materially misstated, that effect cannot be eliminated by other misstatements whose effect may be to diminish the impact of the misstatement on other financial statement items. To take an obvious example, if a registrant's revenues are a material financial statement item and if they are materially overstated, the financial statements taken as a whole will be materially misleading even if the effect on earnings is completely offset by an equivalent overstatement of expenses.

iv.   Even if misstatements are immaterial, registrants must comply with Sections 13(b)(2) - (7) of the Securities Exchange Act of 1934 (the "Exchange Act"). Under these provisions, each registrant with securities registered pursuant to Section 12 of the Exchange Act, or required to file reports pursuant to Section 15(d), must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. In this context, determinations of what constitutes "reasonable assurance" and "reasonable detail" are based not on a "materiality" analysis but on the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs. Accordingly, failure to record accurately immaterial items, in some instances, may result in violations of the securities laws.

v.   This SAB was not intended to change current law or guidance in the accounting or auditing literature but to discuss "long standing" practice.

c.   In connection with the development of SAB 99 by the SEC, the Big Five Audit Materiality Task Force was formed by "the (then) Big Six Professional Practice Partners in order to identify and understand practice issues that have emerged relating to audit materiality, with a

Page 19 of 114

Prepared in connection with litigation

particular focus on recent concerns expressed by the SEC staff, and to formulate responses addressing these issues."[16]

   d.  The Task Force developed four principal recommendations which it believed would serve to strengthen financial reporting and audit effectiveness:

   1.  "Adopting a set of audit requirements aimed at encouraging audit clients to record proposed audit adjustments...

   2.  Developing guidance covering the auditor's consideration of qualitative factors when evaluating the materiality of proposed audit adjustments...

   3.  Committing each of our firms to: a) review the adequacy of its consultation requirements dealing with the auditor's consideration of proposed audit adjustments; and, b) issue a communication to its audit personnel discussing the importance of effective evaluation of these proposed adjustments and the consultation process when issues arise in this regard.  Exhibit C is a copy of the Ernst & Young policy in this area which we believe provides a good example of the type of requirements that all our firms should have in place.

   4.  Sponsoring audit research to better understand whether the evaluation of materiality by the auditor needs to be updated for changing investor expectations..."[17]

The Ernst & Young policy attached as Exhibit C included quantitative guidelines as to when consultation with the firm's Regional Director of Accounting and Auditing was required as follows:

"...whenever the gross or net unrecorded difference, in the aggregate, or any individual gross unrecorded difference exceeds five percent of pretax income when planning materiality is based on pretax income or an amount that represents the low end of the range of acceptable values for planning materiality (e.g., one-half of one percent of sales; one percent of gross margin; one percent of equity) when planning materiality is based on other measures.  Previously the threshold for consultation was 75 percent of planning materiality."[18]

---

[16] Letter dated October 9, 1998, from Robert H. Herz, PwC, to Mr. Lynn E. Turner, Chief Accountant of the SEC – see Exhibit C
[17] Ibid
[18] Ibid

Prepared in connection with litigation

*C. PwC's 1996 Audit*

1    <u>Planning the Audit (For Fiscal Year 1996 and 1997)</u>

a.  During the planning stage of its 1996 and 1997 audits of AHERF and its related entities, PwC noted the following:

i.   "At times, management appears to be aggressive in their reporting, usually leaning toward recognition of less expenses than required, however, they take a position and communicate it to C&L."[19,20]

ii.  "AHERF monitors budgeted results very carefully.  As a result, there are instances where management has taken aggressive stances in order to improve earnings or make the balance sheet appearance improved.  While we are not aware of any intentional acts to overstate the financial statements, we are alert to the possibility."[21]

"Management of AHERF receives very healthy bonuses based on the results of the operation.  This is also a factor that we consider in reviewing the results of the organization."[22,23]

iii. "AHERF places great emphasis on the budgets prepared for its operational functions and on other estimates that are material to the financial statements such as bad debt reserve, malpractice insurance and workers compensation insurance. ...

We have noted that there are 2 budgets prepared; one management budget and one board budget.  The board budget calls for the organization **to make more profits** than the management budget. We have inquired and noted that this is used as an ultimate target, however, the management target is the real budget."[24,25] [emphasis added]

iv.  "The audit committee at AHERF is very active and has significant influence in the operation of the organization.  They meet with C&L at least 2 times a year to discuss the audit plan and the audit

---

[19] SEC Exhibit 209, PwC 003350
[20] Fiscal Year 1997 PwC Assessment of Control Environment, CL 015624
[21] SEC Exhibit 209, PwC 003351 [This note was not found in PwC's 1997 planning working papers]
[22] Ibid
[23] Fiscal Year 1997 PwC Assessment of Control Environment, CL 015624
[24] SEC Exhibit 209, PwC 003353
[25] Fiscal Year 1997 PwC Assessment of Control Environment, CL 015633

Prepared in connection with litigation

results.  In addition, they review the internal audit plan each year and review any significant findings that may arise from their work."[26, 27]

v.-. . PwC also noted many significant issues to indicate increased risk for accounts receivable.  Details of the issues identified during the planning stage are discussed in section C.3 below.

b.  Although there is no evidence in the 1996 planning audit working papers that PwC determined what would be deemed "material" for planning and conducting the audit, a working paper in the 1997 audit working papers indicated that PwC chose $1.5 million as the "Materiality Threshold for T/B [trial balance] Accounts."[28]

c.  Although planning materiality is determined at the beginning of each audit, the evidence obtained during the audit may cause an auditor "to modify the nature, timing, and extent of other planned procedures. Information may come to the auditor's attention as [sic] result of performing audit procedures or from other sources during the audit that differs significantly from the information on which his audit plan was based." [AU 312.26]

d.  Since AHERF expanded in 1997 by acquiring Graduate, Forbes, and AVH, it is reasonable to conclude that the 1996 planning materiality threshold would not be greater than the corresponding amount for the 1997 audit; in fact, it is likely to have been lower.


**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

---

[26] SEC Exhibit 209, PwC 003355
[27] Fiscal Year 1997 PwC Assessment of Control Environment, CL 015626
[28] Exhibit 4275, CL 012625-012626

Page 22 of 114

Prepared in connection with litigation

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

f.   In addition to PwC's establishment of an objective level of materiality of $1.5 million for its 1997 audit, an auditor is also required to consider qualitative factors impacting the fairness of presentation in the financial statements, as discussed in section B.4.b above.

g.   With respect to PwC's evaluation of materiality for the AHERF audits, Mr. Buettner testified as follows:

"Our evaluation of materiality for AGH or any not-for-profit or healthcare entity is not based on the income statement per se.  It's based on what we would view as either fund balance, [sic] I guess that's the old terminology.  But it would be net assets, net unrestricted assets or total net assets."[31]

"I think I've just answered we're measuring materiality, balance sheet and income statement in terms of the impact on net unrestricted assets, as well as a number of other factors that are outlined in our write-up on items on the SUD or whatever.

I think our firm policy for not-for-profits is that you generally look at what I would call fund balance.  If we can reach some sort of agreement that that's really net assets, if you will, in the AGH financial statement presentation, that we would use that as our primary measure of materiality.

---

**CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY**

[31] William Buettner 6/23/04 deposition, page 312, lines 7 to 13

Prepared in connection with litigation

But we would also look at other items. We would look at the impact that our items would have on debt covenants. We would look at the impact it would have on the current asset classification or current liability classification, or working capital.

But the primary comparison is really, in the AGH case, net unrestricted assets or what I would call fund balance."[32]

h.  As discussed in section B.4.b above, the accounting literature recognizes that there is not always a clear distinction between for-profit and non-profit entities. In fact, the example given in Statement of Financial Accounting Concepts No. 4 as to a non-profit entity for which the materiality considerations used for for-profit entities would be more appropriate, closely matches AHERF and its subsidiaries.

i.  The basic underlying concept of any materiality measure is whether the impact of an item would affect the judgment or decisions of users of the financial statements. When viewed in the context of AHERF, it would therefore be unreasonable to assume that the level of profitability of the various hospitals and obligated groups would not be something that would impact the decisions of the Board of Trustees and other users of the financial statements.

j.  Transcriptions of the audit committee meetings and testimonies of members of Board of Trustees indicated that results of operations of AHERF and its affiliates were important.[33]

2    **AHERF Irrevocable Trusts (Overstated Investment Income by $15.4 million)**

a.  Included in AHERF's financial statements were, among others, five irrevocable trusts, herein collectively called the "AHERF Irrevocable Trusts."

b.  The AHERF Irrevocable Trusts assets were maintained by Mellon Bank, N.A., the independent trustee, and, for purposes of this report, comprised the following accounts:

---

[32] Ibid, page 313, lines 1 to 22

[33] For example, David Barnes 7/8/2003 deposition, page 49 line 10 to page 53 line 24, Exhibit 1648 (Transcription of Shorthand Notes of Carol Gordon – Audit Committee, October 15, 1996), and GOR0000025 – 37 (Transcription of Shorthand Notes of Carol Gordon – Audit Committee, October 15, 1997)

Page 24 of 114

Prepared in connection with litigation

    i.    John Marshall Lockhart Fund - Mellon Trust No. 500-007,[34]

    ii.   John Marshall Lockhart, No. 1 - Mellon Trust No. 500-017,[35]

    iii.  John Marshall Lockhart, No. 2 - Mellon Trust No. 500-022,[36]

    iv.  Edith Anne Oliver & Edith Oliver Rea – Mellon Trust No. 510-000,[37] and

    v.   Lewis A. Park Fund – Mellon Trust No. 505-208.[38]

c.  GAAP required AHERF to adopt the newly issued FAS 116 and 117 effective as of the fiscal year ended June 30, 1996.

    i.    FAS 116, *Accounting for Contributions Received and Contributions Made*, required AHERF "to distinguish between contributions received with permanent restrictions, those received with temporary restrictions, and those received without donor-imposed restrictions. A restriction on an organization's use of the assets contributed results either from a donor's explicit stipulation or from circumstances surrounding the receipt of the contribution that make clear the donor's implicit restriction on use."[39]

    ii.   FAS 117, *Financial Statements of Not-for-Profit Organizations*, required AHERF to classify its "net assets and its revenues, expenses, gains and losses based on the existence or absence of donor-imposed restrictions."[40] FAS 117 required AHERF to display in its balance sheet the amounts for the three classes of net assets – permanently restricted, temporarily restricted and unrestricted.[41]

d.  GAAP required AHERF to adopt the newly issued FAS 124 effective as of the fiscal year ended June 30, 1997, but also allowed for earlier adoption. AHERF elected to adopt the requirements of FAS 124 in fiscal year 1996.

    i.    FAS 124, *Accounting for Certain Investments Held by Not-for-Profit Organizations*, required AHERF to record the funds related to the AHERF Irrevocable Trusts at fair value in AHERF's financial statements, with gains and losses reported as increases or

---

[34] PwC Permanent file, Exhibit 4061, CL 032005

[35] Ibid, CL 032001

[36] Ibid, CL 032002

[37] Ibid, CL 032003

[38] Ibid, CL 032004

[39] See FAS 116, par. 14

[40] See FAS 117, excerpted from summary section

[41] Ibid, par 13

Prepared in connection with litigation

decreases in unrestricted net assets unless their use is temporarily or permanently restricted by explicit donor stipulations or by law.[42]

e. The trust instruments for the AHERF Irrevocable Trusts provided that capital gains were considered principal or corpus and contained no provisions pursuant to which AHERF could have access to such capital gains.[43] Accordingly, the realized and unrealized gains relating to the AHERF Irrevocable Trusts in 1996 and 1997 should have been included in AHERF's permanently restricted net assets.

f. GAAS required PwC to obtain sufficient competent evidential matter in its audit with respect to the AHERF Irrevocable Trusts.

GAAS states, "To be competent, evidence must be both valid and relevant. The validity of evidential matter is so dependent on the circumstances under which it is obtained that generalization about the reliability of various types of evidence are subject to important exceptions. If the possibility of important exceptions is recognized, however, the following presumptions, which are not mutually exclusive, about the validity of evidential matter in auditing have some usefulness:

- When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.

- The more effective the internal control structure, the more assurance it provides about the reliability of the accounting data and financial statements.

- The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." [AU 326.19]

---

[42] See FAS 124, par. 8. Paragraph 8.15 of the *AICPA's Audit and Accounting Guide for Not-for-Profit Organizations (with conforming changes as of May 1, 1997)* states "Classification of recognized gains and losses should be based on the underlying facts and circumstances. If limitations exist that preclude the use of net gains on permanently restricted net assets, either as a result of explicit or clear implicit donor stipulations or by the laws of the relevant jurisdiction, the net gains are permanently restricted." Similarly, paragraph 4.08 of the *AICPA's Audit and Accounting Guide for Health Care Organizations (with conforming changes as of May 1, 1997)* states "...investment return (including realized and unrealized gains and losses) restricted by donors or by law, should be classified as changes in temporarily or permanently restricted net assets consistent with the applicable restrictions."

[43] Exhibit 2221, DBR-ZWR-02138-02240

Prepared in connection with litigation

GAAS states that sufficient evidential matter is "for the auditor to determine in the exercise of his professional judgment after a careful study of the circumstances in the particular case. In the great majority of cases, the auditor finds it necessary to rely on evidence that is persuasive rather than convincing." [AU 326.20]

GAAS also states, "Evidential matter supporting the financial statements consists of underlying accounting data and all corroborating information available to the auditor." [AU 326.14]

GAAS further states, "The books of original entry, the general and subsidiary ledgers, related accounting manuals, and such informal memorandum records as work sheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of financial statements." [AU326.15]

Finally, GAAS also states, "Corroborating evidential matter includes documentary material such as checks, invoices, contracts, and minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him to reach conclusions through valid reasoning." [AU 326.16]

g. In applying GAAS, PwC prepared an audit plan for testing AHERF's classification of investments, which called for "Select[ing] a sample of 5 of each type of classifications (ie.,[sic] unrestricted, temporarily restricted and permanently restricted[)] and determin[ing] if the current classification is appropriate based on the supporting documentation."[44] Accordingly, PwC tested the classification of all 5 of the AHERF Irrevocable Trusts.[45]

h. The total fair value of the AHERF Irrevocable Trusts assets, as of June 30, 1996, was $87,050,851.

    i.    John Marshall Lockhart Fund - $60,846,208,[46]
    ii.   John Marshall Lockhart, No. 1 - $10,046,549,[47]
    iii.  John Marshall Lockhart, No. 2 - $9,371,348,[48]

---

[44] Exhibit 4108, CL 002086
[45] Ibid, CL 002088
[46] Mellon Bank statement, CL 006628
[47] Mellon Bank statement, CL 006635
[48] Mellon Bank statement, CL 006642

Prepared in connection with litigation

     iv.   Edith Anne Oliver & Edith Oliver Rea – 673,800, and [49]
     v.   Lewis A. Park Fund - $6,112,946.[50]

i.  For each of the AHERF Irrevocable Trusts, the underlying trust documents contained the following terms:

     i.   The "net income" was to be paid to AHERF (then Allegheny General Hospital);
     ii.  Any gains on the sale of trust assets were considered principal or corpus and not income.[51] For example, language in accounts, 500-007, 500-017, and 500-022 provided: "In case of the sale of any securities of the trust fund at a premium or profit, such premium or profit shall become a part of the corpus and not income."[52]

j.  Since the trust instruments provided that AHERF was to receive only the net income (which did not include gains on the sale of trust assets), and there was no provision for the use by AHERF of the corpus, the corpus itself was not available or accessible to AHERF. Accordingly, the entire corpus of the AHERF Irrevocable Trusts assets, in the amount of $87,050,851 (less any accrued and unpaid interest and dividends), should have been treated and reported as permanently restricted in AHERF's financial statements.[53]

k.  The total permanently restricted corpus of $87,050,851 was, in violation of GAAP, reflected in AHERF's financial statements under the following classifications of net assets:

| | |
|---|---|
| Permanently restricted net assets: | $5,387,071[54] |
| Temporarily restricted net assets: | $52,787,707[55] |
| Unrestricted net assets: | $28,876,073 |

l.  The $28,876,073 classified as unrestricted net assets was comprised of the following:

     i.   $13,456,661 was reclassified directly to unrestricted assets,[56]

---

[49] Mellon Bank statement, CL 006656
[50] Mellon Bank statement, CL 006650
[51] JD-SS-0000850-852, letter from Mellon Bank to AHERF dated October 30, 1996. (Same document as Exhibit 435)
[52] Exhibit 2221
[53] According to FAS 116 par. 209, permanently restricted net assets include "contributions and other inflows of assets whose use by the organization is limited by donor-imposed stipulations that neither expire by passage of time nor can be fulfilled or otherwise removed by actions of the organization."
[54] PwC 1996 audit working paper, CL 002034
[55] PwC 1996 audit working paper, CL 010398

Prepared in connection with litigation