ii.   $7,444,463 in realized gains were improperly recorded as investment revenue, which became part of unrestricted net assets,[57]

iii.  $3,751,105 in unrealized gains were improperly recorded as investment revenue, which became part of unrestricted net assets,[58] and

iv.   The remainder, $4,223,844 was released to operations and treated as investment income, which also became part of unrestricted net assets.[59]

m.  $15,419,412[60] of the $28,876,073 unrestricted net assets represented improperly recognized income to AHERF.

n.  The difference between the fair value of the assets as of June 30, 1996 and the amount recorded in AHERF's permanently restricted net assets as of the year then ended was $81,663,780 ($52,787,707 classified as temporarily restricted net assets and $28,876,073 as unrestricted net assets).  In showing this amount as not permanently restricted, AHERF gave the incorrect impression to the reader of its financial statements that such amount, was or could be available for operating purposes.  As mentioned before, AHERF had no access to the corpus, which was in the custody of Mellon Bank.

o.  PwC knew, or should have known, that the aforementioned misclassifications and improperly recognized revenues by AHERF violated the related donor-imposed restrictions and GAAP.

i.   Prior to fiscal year 1996, the book value of the AHERF Irrevocable Trusts was recorded in AHERF's financial statements as restricted endowments.  The book value included accumulated realized gains and losses since the inception of the trusts.[61]

ii.  During the course of adopting FAS 117 in 1996, AHERF transferred out of permanent restriction, on its books, all but $5.4 million of the total original contribution.[62]

---

[56] See CL 011264, from the trial balance, in which a handwritten note shows that this amount was being added to the unrestricted net asset balance.

[57] Exhibit 4108, CL 002088

[58] Ibid

[59] This amount is included in the $4,478,000 shown on CL 002076. The difference of approximately $254,000 is due to accrued interest added by AHERF to the fair values shown on the Mellon Bank statements.

[60] Sum of l.ii through l.iv above. ($7,444K, $3,751K, and $4,224K)

[61] Exhibit 467 and CL 049578

[62] Exhibit 185, CANDEP 02476 and Exhibit 2295, JD-DC 0023945

Prepared in connection with litigation

iii.   PwC's audit working papers for 1996 indicate that PwC reviewed
the underlying trust documents.

- PwC's "Permanent" file for Endowments contained a
"Permanent Binder Review Sheet" which various auditors
initialed in connection with their review of AHERF's
endowments.[63]

- In the column for the "1996" audit year are the initials of Marc
Panucci, who performed the audit work on investments in
1996.[64] Mr. Panucci testified that the presence of his initials on
this working paper indicates that he reviewed the documents
next to which his initials appear.[65] Included within the list of
documents are "AHERF Endowments" and "AGH
Endowments."

- Included in the "Permanent" file was a cover sheet with a
notation, "Copies of full agreements maintained by Al Zwirn,
AGH acctg [accounting]"[66] and documentation of the
provisions of the AHERF Irrevocable Trusts in summary
form.[67]  For each trust, the corresponding summary sheet states
that principal was restricted and income was unrestricted.

- Mr. Zwirn testified that he maintained complete copies of the
AHERF Irrevocable Trust agreements and he identified Ex.
2221 as a copy of the materials he maintained.  Mr. Zwirn also
indicated that the original version of his materials related to the
AHERF Irrevocable Trusts was produced to the SEC in
connection with its investigation relating to AHERF.  He
identified Exhibit 4111 (which is not Bates numbered) as a
copy of those materials. [68]

- In its "Classification Testing" during the 1996 audit, the
purpose of which was to "evaluate the propriety of the
classification of the investments":

---

[63] Exhibit 4061, CL 031992
[64] Ibid
[65] Marc Panucci SEC 03/01/99 deposition, page 178 lines 7 to 24
[66] Exhibit 4061, CL 031994
[67] Ibid, CL 032001 - 032005
[68] Albert Zwirn 11/20/03 deposition, page 24 line 1 through page 30 line 11

Prepared in connection with litigation

     i)    PwC noted for Lockhart No.1, Lockhart No. 2 and Lewis A. Park that it "reviewed the endowment agreements and noted the principal was permanently restricted and the income was unrestricted."[69]

     ii)   PwC noted for Lockhart Fund and Edith Anne Oliver that it "reviewed the endowments and noted there were general income restrictions on the items."[70]

- Mr. Panucci testified that in connection with his testing of AHERF's classification of the endowment funds under FAS 116 and FAS 117, he was given a binder by AHERF personnel that contained copies of the underlying trust agreements.[71] Mr. Panucci also testified that the information in this binder provided the information necessary to determine the propriety of AHERF's classifications of the endowment funds and that he did not look at anything beyond that binder.[72]

iv.   Also included within PwC's Permanent file for Endowments is a letter dated July 2, 1990 from Kathleen S. Wright, Vice President and Treasurer, Allegheny Health Foundation, to Ms. Barbara K. Robinson, Vice President, Mellon Bank. This letter contains instructions to Mellon Bank with respect to its treatment of "unrestricted income" from various trust accounts, including the AHERF Irrevocable Trusts. That income was to be transferred on a monthly basis into a separate account maintained by Mellon Bank. As a result, each month the balance in the trust accounts themselves would be reduced to an amount equal to the corpus of those trusts.[73]

- PwC was therefore aware that the income generated by these trusts, and available for use by AHERF, was segregated in a separate account at Mellon Bank.

- As part of its 1996 audit, PwC confirmed directly with Mellon Bank the balance of this "unrestricted income" account.[74]

---

[69] Exhibit 4108, CL 002088
[70] Ibid
[71] Marc Panucci SEC 3/01/99 deposition, page 55 line 20 through page 56 line 15
[72] Ibid, page 148 lines 12 through 19
[73] Exhibit 4061, CL 031995 - 031996
[74] PwC 1996 audit working paper, Board designated Confirmation, CL 006717 to 6728

Page 31 of 114

Prepared in connection with litigation

- Also as part of its 1996 audit, PwC confirmed directly with Mellon Bank the balance of the corpus in each of the trust accounts.

    v. _ . _ . As indicated in paragraph iii above, Mr. Panucci testified that he had all of the information necessary to determine whether AHERF's classification of the AHERF Irrevocable Trusts was appropriate and that he reviewed the contents of PwC's Permanent file. However, both the underlying trusts documents and the July 2, 1990 letter of instruction to Mellon Bank contained in PwC's Permanent file provided information that indicated that this classification was inappropriate. PwC failed to challenge AHERF's classification of these endowment funds as other than permanently restricted despite this evidence to the contrary.

p. Mr. Buettner has testified[75] that PwC was not given complete copies of the underlying trust agreements and that PwC was told that complete documents were not available.

    i.    PwC was required by GAAS to evaluate the audit evidence and, to the extent that PwC remained in substantial doubt about any assertion of material significance, it had to refrain from forming an opinion until it had obtained sufficient competent evidential matter to remove such substantial doubt. [AU 326.23]

    ii.    However, as discussed in paragraph o.iii above, Mr. Panucci has testified that he had everything he needed to conclude as to the propriety of AHERF's classification of the AHERF Irrevocable Trusts. If Mr. Buettner believed he did not have full copies and that what he had did not provide sufficient competent evidential matter with respect to the classification of these trust assets, all he had to do was go to the person who had them, as indicated in PwC's Permanent file, Mr. Zwirn. In the alternative, PwC could have requested complete copies of the trust agreements from Mellon Bank, whom PwC knew to be the trustee of the funds.

q. The classification of $52,787,707 as temporarily restricted net assets had no basis given that there was no action that could be taken by AHERF that would remove the restrictions on these assets. The entire $52,787,707 that was classified by AHERF as being temporarily restricted related to two of the five AHERF Irrevocable Trusts, the John

---

[75] William Buettner 06/23/04 deposition, page 471 line 15 to 476 line 9

Prepared in connection with litigation

Marshall Lockhart Fund and the Edith Anne Oliver & Edith Oliver Rea Trust. Even if there were no language in the trust speaking specifically to gains, there could be no justifications for a temporary classification of income. The trust did not contain donor-imposed restrictions on income (exclusive of any gains) as defined by GAAP.

r. Had PwC appropriately tested the classification of these endowments, it would have been aware of the improper nature of the classifications made by AHERF's management. The extent and nature of the differences that would have been identified would also have required communication to AHERF's audit committee.

## 3    Reserve for Uncollectible Accounts was Materially Understated

a. Accounts receivable includes amounts due from patients and third-party payors. These amounts are included in the financial statements net of a reserve for uncollectible accounts and other contra accounts.

b. The reserve for uncollectible accounts is intended to reflect management's judgment as to the likely amount of accounts for which payment will not be received.

c. Prior to the issuance of the combined financial statements for the year ended June 30, 1996, the DVOG Hospitals had recorded a balance of $47.6 million in reserves for uncollectible accounts in their trial balances.

   i. PwC signed off on the "numbers" in AHERF's and DVOG's June 30, 1996 financial statements on September 3, 1996.[76]

   ii. On September 4, 1996, adjusting entries were recorded and reflected in DVOG's financial statements as of June 30, 1996. These adjustments increased DVOG's reserve for uncollectible accounts by $17.5 million to $68.1 million (although the financial statements incorrectly disclosed the allowance for uncollectible accounts to be $50.6 million).[77]

   iii. A September 24, 1996 memorandum[78] from Daniel J. Cancelmi, Senior Director, Financial Services, to Stephen H. Spargo, Senior

---

[76] PwC 1996 audit working paper, CL 000316
[77] June 30, 1996 DVOG Financial Statements, SEC Exhibit 204, PwC 0050568
[78] Exhibit 29, AHERF Internal Memo, DBR-RS-0225 and 0226

Prepared in connection with litigation

Vice President, Corporate Support Services, included the following:

- "I believe it is fair to state that there is a pool of old receivables that we will not be able to collect. The questions that all of us have been struggling with is how much is the amount of bad accounts and can we afford to write the accounts off. For almost a year, we have bled the accounts off or suffered the consequences of deteriorating aging categories, which has served to impair operating results. In turn, Finance has had to react to a barrage of inquiries from operating unit personnel. Since their patience may be wearing thin, now may be the time to 'bite the bullet' and write off accounts using existing bad debt reserves."

- Recognition of a need to write off $81.5 million in uncollectible accounts receivable and the fact that this write-off would exhaust all of the DVOG Hospitals' reserves for uncollectible accounts, leaving "zero bad debt reserves." [emphasis in original]

iv.   In a later memo dated September 30, 1996, from Dan Cancelmi to Stephen Spargo, Mr. Cancelmi discussed a shortfall of reserves for uncollectible accounts that would result from the proposed writeoff of $81.5 million of uncollectible old accounts. After the proposed use of existing reserves for uncollectible accounts, the $17.5 million of newly created reserves for uncollectible accounts, as well as other reserves – including a $7.5 million reserve from AGH – Mr. Cancelmi estimated a shortfall of between $22.1 and $28.6 million as of August 31, 1996. This shortfall range was calculated utilizing bad debt reserve methodologies developed by Mr. Cancelmi, and perhaps others at AHERF. AHERF eventually determined that Mr. Cancelmi's "Scenario 3" which suggested a shortfall of $28.6 million was the most appropriate methodology.[79] In fact as of June 30, 1997, AHERF utilized this methodology to calculate its required reserves.

v.   On September 27, 1996,[80] PwC released its unqualified opinions on DVOG's June 30, 1996, combined financial statements. Specifically, these financial statements incorrectly reflected a

---

[79] Dan Cancelmi 1/24/03 deposition, page 489 line 16 through page 490 line 9
[80] PwC 1996, audit working paper, CL 000316

Page 34 of 114

reserve for uncollectible accounts receivable of $50.6 million (the actual recorded reserves in DVOG's books and records were $68.1 million).

d.   GAAP required that DVOG's reserves for uncollectible accounts be established at a level based upon the following:

    i.   Information available prior to issuance of the financial statements indicating that it was probable that receivables were unlikely to be collected in full.

    ii.  The amount of the uncollectible receivables could be reasonably estimated. [FAS 5, par. 8]

To the extent that the analysis in (i) and (ii) called for an increase in the reserves for uncollectible accounts, FAS 5 required that it be established through a reduction to income.

e.   In evaluating DVOG's reserves for uncollectible accounts, GAAS states that PwC should consider, with an attitude of professional skepticism, both the subjective and objective factors, when planning and performing procedures to evaluate its reserve for uncollectible receivables. [AU 342.04] As discussed in the AICPA Auditing and Accounting Guide referred to in paragraph B.4.a.viii above, the reserve for uncollectible accounts is a very important area of a hospital audit due to the large monetary amount and the complexities involved.

    i.   When performing this evaluation, PwC should obtain and evaluate sufficient competent evidential matter to provide reasonable assurance that the reserve for uncollectible accounts was reasonable in the circumstances. [AU 342.07]

    ii.  In evaluating the reasonableness of reserves for uncollectible accounts, GAAS calls for PwC to concentrate on key factors and assumptions that are –

    • Significant to the accounting estimate,
    • Sensitive to variations,
    • Deviations from historical patterns, and
    • Subjective and susceptible to misstatement and bias.

PwC should consider the historical experience of DVOG in making past estimates as well as PwC's own experience in the industry. [AU 342.09]

Page 35 of 114

Prepared in connection with litigation

iii.   In complying with GAAS, PwC should have obtained an understanding of how DVOG's management developed the estimate. Based on that understanding, PwC should then have used one or a combination of the following approaches:

- "Review and test the process used by management to develop the estimate.

- Develop an independent expectation of the estimate to corroborate the reasonableness of management's estimate.

- Review subsequent events or transactions occurring prior to completion of fieldwork." [AU 342.10]

iv.   In evaluating the process used by management to develop the estimate, PwC should have tested the process to determine if the underlying assumptions utilized were reasonable. Among other things, this review and testing should have encompassed:

- Identify the sources of data and factors that management used in forming the assumptions, and consider whether such data and factors are relevant, reliable, and sufficient for the purpose based on information gathered in other audit tests,

- Consider whether there are additional key factors or alternative assumptions about the factors,

- Evaluate whether the assumptions are consistent with each other, the supporting data, relevant historical data, and industry data,

- Analyze historical data used in developing the assumptions to assess whether the data is comparable and consistent with data of the period under audit, and consider whether such data is sufficiently reliable for the purpose,

- Consider whether changes in the business or industry may cause other factors to become significant to the assumptions, and

- Review available documentation of the assumptions used in developing the accounting estimates and inquire about any other plans, goals, and objectives of the entity, as well as consider their relationship to the assumptions. [AU 342.11]

Page 36 of 114

Prepared in connection with litigation

f.  From its previous experience as AHERF's independent auditor, PwC was aware, prior to its 1996 audit, of significant control weaknesses relating to both AHERF's billing and collecting of patient accounts receivable and its accounting for those receivables, including the methods used to calculate the reserve for uncollectible accounts. These weaknesses related primarily to the DVOG Hospitals. PwC was also aware that the aging of the DVOG Hospitals' accounts receivable had deteriorated significantly during fiscal year 1996.

i.  In its 1995 audit of DVOG, PwC knew that DVOG had collection problems and an unreliable billing process for its accounts receivable. These issues, as PwC knew, or should have known, created a greater risk that a significant portion of the recorded accounts receivable might not be collected. The following comments indicate PwC's awareness of these circumstances.

- "significant cash collection problems as a result of turnover [in personnel performing collection functions] in March 95 through June 95,"[81]

- "Collection agency focusing on current accounts w/ [with] incentive to collect dollars [leaving non-current accounts to be uncollected],"[82]

- "during the period of March 95 through June 95 there was a significant staffing turnover in both billing and follow up. Vacancies were filled w/ [with] poorly trained temporary staff. Emphasis from management was focused on billing and the collection of current accounts,"[83] and

- "DNFB [discharged not final billed] ↑ [increase] - turnover in medical records causing delays in final billing coding."[84]

ii.  During the 1995 audit, PwC was also aware that management's process for developing its reserve for uncollectible accounts at the DVOG hospitals was flawed and inadequate. As noted in a draft management letter comment contained within PwC's files:

---

[81] PwC 1995 audit working papers, Exhibit 4077, CL 050982
[82] Ibid, CL 051058
[83] Ibid, CL 051016
[84] Ibid, CL 051058

Page 37 of 114

Prepared in connection with litigation

"Systemwide, AHERF had $40 million of accounts receivable older than 180 days at June 30, 1995 (primarily in the Delaware Valley). During our audit, we noted that the methodology used to calculate the bad debt allowance was inconsistent between several AHERF hospitals. The inconsistencies in the methodologies were especially prevalent in the Delaware Valley where the reserve percentages were significantly lower than those at AGH. The variations between entities appear to cause difficulties in analyzing the bad debt allowance which could possibly result in an inadequate reserve in future years."[85]

iii.    Because it knew the process utilized by management to calculate reserves for uncollectible accounts for the DVOG Hospitals was flawed and inadequate, during the 1995 audit PwC recalculated the reserves for uncollectible accounts, in an effort to corroborate the reasonableness of management's estimate. Using AGH's methodology to calculate the overall DVOG reserves, PwC found a shortfall in DVOG's reserves for uncollectible accounts in excess of $18.7 million.[86]

- In PwC's assessment the shortfall was decreased by applying $3.8 million (15% of $25.2 million) of unapplied periodic interim payment cash to reserve for uncollectible accounts.

- In addition, for financial statement purposes, the reserve for uncollectible accounts was increased by $4.0 million by decreasing "excess" other unrelated reserves, which had been recorded as non-current liabilities. [87] This was merely a mechanical transfer of reserves, with the source of the transfer (an excess reserve) a likely violation of GAAP (details discussed in Section C.4 of this report). The $4 million reserve was not actually transferred within DVOG's books and records. This further reduced PwC's original assessment of an $18.7 million shortfall.[88]

- In evaluating the fairness of DVOG's financial statements, PwC posted a $7.5 million[89] entry to increase DVOG's reserve for uncollectible accounts to its summary of unadjusted differences

---

[85] Exhibit 4090
[86] PwC 1995 audit working paper, Exhibit 1523, CL 057292
[87] PwC 1995 audit working paper, Exhibit 1338, CL 053899
[88] PwC 1995 audit working paper, Exhibit 1523, CL 057292
[89] Ibid

Prepared in connection with litigation

("SUD")[90], which is a document listing all audit differences that PwC used to assess material misstatements in DVOG's financial statements.

- • PwC also believed that DVOG had general reserves of $3 to $5 million[91] in receivable accounts, which served to further decrease its shortfall assessment.

iv.   In a letter dated September 11, 1995 from Mark Kirstein (PwC audit manager) to Chuck Morrison (Senior Vice President and Chief Financial Officer, Delaware Valley Region), Mr. Kirstein stated:

"Based on our review, we believe that the reserve for accounts receivable should be enhanced and the methodology used to establish the reserves reviewed for future reference. Our basis for this conclusion is rooted in the amount of A/R over 180 days old coupled with the reduction in the reserve as a percentage of A/R at several of the hospitals. In order to analyze the potential adjustment we applied the AGH reserve percentages to each of the hospitals agings and identified what the adjustment would entail under this premise."[92]

v.   On October 16, 1995, PwC issued a management letter,[93] which included, among other things, the following comments and recommendations:

- "During fiscal year 1995, the accounts receivable agings deteriorated from those which existed at June 30, 1994. Approximately $18 million of Delaware Valley hospital accounts, net of established reserves, are greater than 180 days old as of June 30, 1995. Management continues to assess the collectibility of these accounts and has established reserves that, in their judgment, approximate the amount that will not be collected. While the established reserves appear reasonable, it appears that management should increase efforts to pursue collection of these aged accounts.

Recommendation:

---

[90] Exhibit 1339, CL 057339 and 057341
[91] PwC 1995 audit working paper, Exhibit 1523, CL 057292 (General reserve is a violation of FAS 5. Refer to section 1ci)
[92] Letter from PwC to AHERF, Exhibit 1448
[93] Exhibit 7, (DC8221 page 1 and 5 of 22)

Page 39 of 114

Prepared in connection with litigation

Management should continue focusing on the underlying
reasons for the deterioration in the aging of receivables and
dedicate resources to pursue collection of all aged receivables."

- "Each AHERF hospital utilizes a different methodology to
establish reserves for bad debts. While such methods have been
used consistently by each organization, we recommend that
management consider utilizing a consistent methodology for all
AHERF affiliated hospitals. The use of a consistent
methodology will allow management to evaluate their reserves
based on a comparison to other hospitals within the AHERF
system.

Recommendation:

Management should establish a system-wide methodology for
calculating the reserve for bad debts using aging percentages by
payor based on actual historical data. We believe that the
current methodology utilized by AGH should be considered for
application at all AHERF hospitals."

g.  As a result of this past experience, as well as significant growth and
deterioration in the accounts receivable balances, PwC planned to
perform extensive audit testing in the accounts receivable area during
the 1996 audit.

   i.  On April 8, 1996, PwC provided the audit committee of AHERF a
package[94] discussing changes at AHERF and its 1996 audit plans
for AHERF. PwC's audit plan indicated to the audit committee
that it was going to focus on the audit of patient receivables. PwC
planned to spend 66% of its audit time dedicated to high-risk
assessment accounts, in which patient receivable was included.[95]
One of the approaches for patient receivable that PwC planned to
take was to "Evaluate net realizable value of patient accounts
based on historical results and existing contracts."[96]

   ii.  At the planning stage for the 1996 audit, PwC noted issues
regarding the DVOG's Hospitals billing and collection of patient
receivable, problems that would increase the risk that the hospitals

---

[94] Audit Committee Letter on April 8, 1996, Exhibit 4458, CL 036236
[95] Ibid, CL 036241
[96] Ibid, CL 036243

Prepared in connection with litigation

would not receive payments for services.  PwC also identified issues relating to problems in the accounting for these receivables.

- "AHERF places great emphasis on the budgets prepared for its operational functions and on other estimates that are material to the financial statements such as **bad debt reserve,** malpractice insurance and workers compensation insurance."[97] [emphasis added]

- "Testing has been expanded in the area of patient revenue and receivables as discussed previously, the change is necessary due to **an apparent breakdown in controls** and significant increases in the accounts receivable balance."[98] [emphasis added]

- "Per discussion with Debra Walters, HUH Medical Records Director and Bob Ruzzo, HUH Director of Patient Accounting, there has not been timeliness in updating the patient accounting system for patient's [sic] with status changes. ... **Causes delays and rejections in billing.**"[99] [emphasis added]

- "Per discussion with the Managed Care Billing Director, there has been a problem with obtaining the proper primary care physician (PCP) referral for patients covered under a HMO on the Delaware Valley facilities.  When the proper PCP approval is not obtained it is more than likely any procedures performed on a patient will not be reimbursed."[100]

- "Per discussion with patient accounting, there are 'mis' contractuals within the patient accounting system.  Our procedures will include reviewing high dollar accounts and transaction testing of patient accounts to identify payors and/or accounts that have been improperly recorded."[101]

- "When a patient account becomes a certain age (i.e., different ages for each payor) The [sic] patient accounting system is automatically reversing the contractual allowance and moving the patient account into the self pay category where it remains

---

[97] SEC 209, PwC 00353
[98] PwC 1996 audit working paper, CL 000386
[99] SEC Exhibit 212, PwC 004003
[100] Ibid, PwC 003996
[101] PwC 1996 audit working paper, CL 003505

Page 41 of 114

Prepared in connection with litigation

at gross. This causes AHERF's contractual allowance and bad debt reserve to be distorted.

There were charge entry problems for, at least, one facility (SCHC), where only room & board charges were posted to individual patient accounts. There were no service charges for a period of approximately one month.

What both of these situations may indicate is that there is a lack of monitoring controls by patient accounting and finance over patient accounting."[102]

iii.   An AHERF memo, apparently drafted by the Patient Financial Services Group,[103] included in Mr. Buettner's working paper files, contained the following comments:

- "An implementation team consisting of patient accounting executives developed a Strategic Plan in July 1994 which included as its core the *phased* relocation and consolidation of all patient accounting/billing functions to Pittsburgh, the conversion of disparate patient accounting computer systems to a standard system and the implementation of leading edge or state-of-the-art enabling technology (i.e.; optical imaging)"

  "The Strategic Plan along with its inherent/identified risks was adopted and implementation began in the fall 1994. As previously noted, the plan provided for the *phased* relocation/consolidation in Pittsburgh on an entity-by-entity basis. … Regrettably, in October 1994 an internal communication outlining the then undisclosed plans to relocate patient accounting/billing to Pittsburgh was intercepted by a low level patient accounting employee which led to an unauthorized dissemination of the relocation plans. The result was predictable -- employee anxiety was heightened, turnover accelerated and vacancies increased notwithstanding our efforts to reassure employees that other opportunities would be sought for them."

  "After considerable deliberation, it was decided to outsource on a transitional basis billing/collections for the entirety of the DVR and proposals were sought from a number of

---

[102] PwC 1996 audit working paper, Exhibit 4021, CL 003506
[103] PwC 1996 audit working paper, CL 035638 to 035640

Page 42 of 114

Prepared in connection with litigation

organizations. Eventually, Healthcare Business Management (HBM) was selected as the transitional outsource firm primarily in consideration of its commitment to hire all DVR patient accounting/billing personnel who chose to join them.

The transitional outsourcing arrangement with HBM commenced on February 1, 1995, and was expected to last for approximately one year. ... Beginning in the fall 1994 and continuing into the winter 1995, accounts receivable in the DVR deteriorated substantially. Nearly 85% of the increase occurred between February and June 1995."

"In the spring 1995 it became apparent that HBM was not capable of meeting our expectations as a transitional outsourcer, and we accelerated plans to 'take back' responsibility for billing/collection functions, albeit on a phased basis, with the first such 'take back' occurring in July 1995. HBM's involvement was progressively phased out beginning in July 1995 and terminated entirely in November 1995, much earlier than originally planned."

iv.    As a result of the significant issues it noted with the DVOG Hospitals' accounts receivable processes, some of which are described above, PwC modified the audit approach in 1996 by bringing in a PwC consultant, Norb Kaliszewski, manager in the Health Care Regulatory Group, to review and test the billing process.[104]

- According to Mr. Kaliszewski, he did review the revenue and billing cycles but did not perform his work from an audit perspective. He also stated that the collectibility of accounts receivable was not the focus of his engagement.[105]

- A report dated August 1996, [106] summarizing the work and findings of Mr. Kaliszewski and others at PwC, included the following comments:

    "the percentage of time an account processed correctly the first time was estimated to be approximately 60% system wide."

---

[104] Amy Frazier, 3/8/99 SEC deposition, page 170 line 13 through page 172 line 5
[105] Norb Kaliszewski 1/15/04 deposition, page 44 line 24 through page 45 line 21, and page 105 lines 11 through 16
[106] Exhibit 14, CL 000426 to 000433

Page 43 of 114

Prepared in connection with litigation

"Electronic claims submission appears hindered due to incomplete and missing data from registration data."

"Through the normal month-end closing process, in September 1995, management discovered that all Medical Assistance Application accounts (individuals pending approval from MA) that were included in Discharged Not Final Billed (DNFB) were moved to final billed within the system without taking a contractual allowance."

"Volume of rebills on managed care and commercial accounts appears significant."

"Considerable resources are being expended doing rework of claims passed as collection accounts but not paid due to inaccurate or missing registration data and inconsistent account follow up."

h. During its 1996 audit, PwC knew, or should have known, that the reserve for uncollectible accounts for the DVOG Hospitals was materially understated.

　　i. PwC knew, or should have known, that the varying methods AHERF used for developing the estimate of uncollectible accounts for the DVOG Hospitals were seriously flawed and inadequate.

- For example, PwC noted that MCP and EPPI computed their reserves for uncollectible accounts utilizing only "self-pay" accounts and the patient portion of third party receivables.[107] This meant that all of its other financial classes of accounts receivable, including Blue Cross, Medicare, Medicaid, and HMOs, had no reserves for uncollectible accounts recorded by MCP at June 30, 1996 (except for the relatively small patient portion of these receivables). PwC recommended that the reserve analysis be updated to include all financial classes by aging category.[108] In fact, Mr. Buettner noted in his working paper file: "MCPH – Aging must be revised – Not included for third party Billings."[109]

---

[107] Exhibit 4274, CL 001178
[108] Ibid
[109] Exhibit 4201, CL 035625

Page 44 of 114

Prepared in connection with litigation

     i)     Using the bad debt reserve methodology of HUH, PwC caused the client to calculate MCP's reserves for bad debts on all financial classes of accounts receivable. This resulted in a computed reserve for bad debts of $21.7 million, which was $15.2 million greater than MCP's recorded reserves for uncollectible accounts of $6.5 million.[110]

     ii)    Furthermore, Greg Snow, Vice President of Patient Financial Services who was in-charge of the collection of accounts receivable, testified that it is not appropriate to only reserve for self-pay accounts and not the third party payor portion.[111]

- PwC knew, or should have known, that the percentages used by other DVOG hospitals to calculate their reserves were extremely low, particularly for old accounts. For example, Blue Cross payor accounts receivable arising from its PATCOM billing system for Elkins Park, aged at 181 – 360 days and over 360 days had reserve percentages of 10% and 20%,[112] respectively for inpatient account balances, and 1.10% and 1.10%,[113] respectively for outpatient account balances.

- HUH also reserved at very low percentages for old accounts. Its Invision Inpatient Blue Cross accounts, which were over 365 days old, were reserved at only 10%.[114] PwC's audit working papers demonstrated that these reserves for uncollectible accounts percentages for Blue Cross account balances were inadequate. In its high dollar testing working papers for HUH, PwC found $350,000[115] of "A- Phila Blue Cross" past statute[116] Invision accounts receivables, which were uncollectible

---

[110] Exhibit 1075 contains the following: MCP I/P Required Reserve of $8.5M [refer to CL 001181], EPPI Required Reserve of $4.2M [refer to CL 001191], and MCP O/P Required Reserve of $9.0 M [refer to CL 001185], which totals to $21.7M.

Prior to the $17.5M adjustment, MCP's recorded reserves of $6.5M [refer to CL 001153] on its trial balance, which is a $15.2 million shortfall as compared to the required reserves. Although MCP increased its reserve by $3.9 million [Exhibit 4026, CL 001153], the increase was not enough to remedy the material shortfall.

[111] Greg Snow 07/26/03 deposition, page 298 line 18 through page 299 line 5

[112] Elkins Park Patcom working paper, Exhibit 113, page 16 of 27

[113] Ibid, page 22 of 27

[114] 1996 PwC audit working paper, Exhibit 4387, CL 001101

[115] 1996 PwC audit working paper, CL 009929 (Catherine Townes - $124,581, Ann Weber - $113,454, and Benjamin Bashore - $109,830)

[116] SEC Exhibit 415, PR-SEC 02948 - Past Statute accounts are receivables whose balance(s) have not been resolved within pre-determined time frames as set by the payors. The time parameters used to determine "past statute" for Blue Cross is 24 months.

Prepared in connection with litigation

accounts that should be 100% written off. However, the HUH calculated reserve for these tested receivables was only $35,000. It should be noted that since the HUH Invision accounts which were over 360 days old totaled $1.8 million and its reserve for bad debts was $180,000, this level of reserves for uncollectible accounts was inadequate for the $350,000 that were tested let alone any of the remaining accounts totaling $1.45 million over 360 days old, which were not tested.

    i)    The reserve percentages for Blue Cross accounts mentioned above are significantly lower than the percentages suggested by Greg Snow in his July 26, 2003 deposition. He suggested that any class of accounts (including Blue Cross) over 360 days old be reserved at close to 100 percent and any class of accounts (including Blue Cross) six months or older be reserved in the 70 to 75 percent range or greater.[117]

- In addition to the low Blue Cross reserve percentages, other third party payors' reserve percentages were also very low for old accounts in the DVOG Hospitals. For example, Medicare and "HMO PA" reserve percentages for Bucks outpatient accounts greater than 360 days are 0.68% for both payors.[118] This reserve percentage implies a collection rate of 99.32%, which is unreasonable given the aging of these receivables and the billing and collection issues at the DVOG Hospitals identified above.

- Reserve percentages for Bucks, Elkins Park, and SCHC are inconsistent with the same third party payors for the same aging category between Invision and Patcom. For example, Blue Cross reserve percentages for inpatient balances greater than 360 days are 70% for Invision[119] and 30% for Patcom.[120] The disparity was even greater for outpatient accounts. Had PwC performed proper audit procedures for reserve for uncollectible accounts, PwC should have been aware that the Patcom reserves were inadequate, resulting in a material shortfall in reserve for uncollectible accounts.

---

[117] Greg Snow 7/26/03 deposition, page 307, lines 21 to 25
[118] PwC 1996 audit working paper, CL 001005 - 001006
[119] Exhibit 4023, CL 000996
[120] Ibid, CL 000997

Prepared in connection with litigation

- PwC analyzed DVOG's accounts receivable aging by major payors, which showed that a total of $92 million of accounts receivable balance greater than 180 days had no reserves.[121] This unreserved balance should have indicated to PwC that the reserve for uncollectible accounts was materially understated. Mr. Buettner also testified the following: "it would tell us [PwC] that we would want to take a look at an increase in the reserve, not a decrease in the reserve."[122]

i.  PwC's working papers indicate that PwC planned to evaluate the reserve for uncollectible accounts requirements of the DVOG Hospitals by applying the AGH reserve model, as PwC had done in its fiscal year 1995 audit. The audit procedures planned for the fiscal year 1996 audit suggest that PwC would, among other things, "Prepare AGH model reserve for all entities"[123] and "Review bad debt reserve methodology for all entities and consider whether AGH or similar model is applied."[124] However, the working papers do not contain the results of such testing, which is curious because working papers relating to PwC's review of the reserve for uncollectible accounts for certain DVOG Hospitals indicate, "C&L [PwC] has prepared an additional analysis for the bad debt reserve using AGH's reserve percentages."[125]

   i.  Had PwC prepared (or kept) such an analysis, the recalculated reserve requirement for the DVOG Hospitals would have shown a shortfall far in excess of the $17.5 million audit adjustment booked.

j.  PwC failed to develop (or failed to retain) an independent expectation of the estimate for the DVOG Hospitals' reserve for uncollectible accounts. Nor did PwC perform most of the other audit steps suggested in AU 342 to evaluate the reasonableness of management's estimate. For example, there is no evidence of: [

   i.  "Identify[ing] whether there are controls over the preparation of accounting estimates and supporting data that may be useful in the evaluation…

---

[121] Exhibit 4022, CL 004244 and Exhibit 4463, CL 035635
[122] William Buettner 6/22/04 deposition, page 244 line 1 through page 245 line 10
[123] Exhibit 4386
[124] Exhibit 4385
[125] Exhibits 4387, CL 001098 for HUH and Exhibit 4023, CL 000993 for Bucks

Prepared in connection with litigation

     ii.    Evaluat[ing] whether the assumptions are consistent with each other, the supporting data, relevant historical data, and industry data…

     iii. ·  Analyz[ing] historical data used in developing the assumptions to assess whether the data is comparable and consistent with data of the period under audit, and consider whether such data is sufficiently reliable for the purpose…

     iv.    Consider[ing] whether changes in the business or industry may cause other factors to become significant to the assumptions." [AU 342.11]

k.  The other audit testing that PwC did perform did not provide support for the level of reserve for uncollectible accounts established by management. For example, PwC performed subsequent receipts testing to evaluate the collectibility of the accounts receivable for AGH and DVOG. This testing was intended to determine the June 30, 1996 accounts receivable balance that was collected during the month of July. The collection percentages should have indicated collection problems for DVOG when comparing the percentages to those at AGH, which had collections of 34.5% of the June 30, 1996 balances. HUH's percentage was 20.4% and all other DVOG hospitals' percentages were below 15.0%.[126]

l.  Despite PwC having identified problems in the processing of billings for the DVOG entities, when he was asked at his deposition about the significantly lower reserve percentages used by the DVOG entities than were used by AGH, Mr. Buettner testified that there was a low level of credit risk associated with third party payors:

"When you look at a bad debt reserve computation for a hospital, you're attempting to evaluate or measure credit risk, the inability of somebody to pay.

I've had a number of clients who would apply that assessment only on self-pay and would not go through the exercise of evaluating Blue Cross, Medicare, Medical Assistance, Medicaid, whatever you want to call it, the commercial insurers, because the credit risk is rather low.

So when you sit down and you're looking at how you're measuring that level of credit risk to come up with a reserve, you want to look at it in its

---

[126] Exhibit 4024, CL 000860 - 866

Prepared in connection with litigation

total. You're going to take a look at the situation, you're going to look at the processing that the company goes through to get a bill out the door, who are the payors, what is the history of charge-offs, what's the history for recoveries on charge-offs. And you evaluate all of that. You're just not going to be looking at a particular loss percentage one way or another."[127]

m. However, Mr. Buettner's comments on low credit risks with third party payors are contradicted by the following:

i. Included in PwC's 1995 audit working papers, an "ANALYSIS OF DENIED DAYS BY FINANCIAL CLASS AND REASON FOR DENIAL" stated:

"It is noteworthy that as of February, 1994, several of the major third party payors have adopted new criteria for admission and length of stay reviews… These revised criteria have resulted in a dramatic increase in denied days. A recent poll of Phila. [Philadelphia] area hospitals indicated that hospitals are experiencing a doubling or tripling in the no. of denied days as compared with those based on previously utilized third party review criteria,"[128]

ii. An AHERF memo dated May 30, 1996 regarding "AHERF Rejected Bill Analysis" stated: "near 50% rejection rate for both inpatient and outpatient claims seems to be a function of a more thorough review of utilization and authorization criteria, strict eligibility requirements and additional informational needs."[129]

iii. In a report by Mr. McConnell to the Board of Trustees, dated February 18, 1997, on accounts receivable,[130] the discussion of denial rates with third party payors stated the following:

"Pre and post billing denial rates at AUH [DVOG without SCHC] – and across much of AHERF – are unacceptably high and, as previously noted, represent one of the more significant factors impacting accounts receivable."

---

[127] William Buettner 6/22/04 deposition, page 166 line 15 through page 167 line 12
[128] Exhibit 4078, CL 051258
[129] Exhibit 1762, DB-CM-050-00226
[130] Exhibit 901, TOB 000954 - 5

Page 49 of 114

Prepared in connection with litigation

"After processing by third party payors, many accounts are returned to PFS [Patient Financial Services] rejected for payment. While many of the reasons for being denied payment are intercepted through pre-billing edits, other reasons for denial include:

- service provided out of network,
- service not authorized or lacking authorization numbers,
- patient not eligible (covered) based on date of service,
- patient's insurance benefits have been exhausted,
- referring physician not valid (i.e.; not recognized by that insurer),
- insured believes that another insurance carrier is the primary payor, and
- provider not eligible to provide specific services."

"Many third party payors, particularly managed care companies, are increasingly resorting to the practice of denials under complex contractual arrangements in order to deny financial responsibility for payment altogether, or to shift some portion of the claim to another insurance carrier or the patient."

iv.   Mr. Snow testified that some of the reasons for denial mentioned above could not be fixed.[131]

v.    The other factors cited by Mr. Buettner in paragraph 3.1 above as considerations that would be relevant to the evaluation of the level of reserves required, given PwC's knowledge of the state of affairs at the DVOG hospitals, would have indicated a need for higher reserve percentages for the DVOG hospitals than for AGH, rather than the opposite.

n.   In addition, a significant factor not referred to by Mr. Buettner in paragraph above was that there were specified time limits during which claims had to be submitted for payment. The aging of DVOG receivables indicated, at a minimum, that a portion of these claims were at or beyond those time limits.

o.   Mr. Buettner testified that he suggested to AHERF that the reserve for uncollectible amounts be increased by between $15 million and $20

---

[131] Greg Snow 07/25/03 deposition, page 230 line 6 through page 232 line 1

Page 50 of 114

Prepared in connection with litigation

million.[132]  However, there is no evidence in PwC's audit working papers as to any analysis performed to arrive at this $15 to $20 million range or the communication of that range to AHERF.  According to Mr. Buettner this occurred near the end of the audit and was one of seven or ten items that were being discussed with AHERF management that PwC thought they should consider.[133]

p.  According to Mr. Buettner, a short time later AHERF management responded with a proposal to address some of these items with an entry[134] that, in part, increased the DVOG Hospitals' bad debt reserve by $17.5 million.

q.  Although DVOG recorded this entry on September 4, 1996 to increase the reserves for uncollectible accounts by $17.5 million to a total of $68.1 million, PwC knew, or should have known, that the reserves for uncollectible accounts continued to be materially understated.

r.  I have prepared Exhibit D to implement the methodology and/or testimony of Messrs. Cancelmi, Snow, and Laing, to estimate the reserves for uncollectible accounts required by the DVOG Hospitals at June 30, 1996.  These methodologies are considered to be credible alternatives based on the position and duties as described below of these three individuals within AHERF and their familiarity with the issues involved.  Utilizing these methodologies, the DVOG Hospitals' reserves for uncollectible accounts were materially understated even after the $17.5 million adjustment.

   i.  Mr. Cancelmi, Senior Director of Corporate Accounting and Financial Reporting,[135] developed three different methodologies for reserves for uncollectible accounts in a memo dated September 30, 1996.  When his "Scenario 3" methodology was applied to June 30, 1996 net accounts receivable balances, a shortfall of $26.2 million resulted for reserves for uncollectible accounts.  This is the methodology that was later adopted by AHERF, as discussed in paragraphs g through i above.

   ii.  Furthermore, Greg Snow, Vice President, Patient Financial Services Group, who was responsible for billings and collection

---

[132] William Buettner 6/22/04 deposition, page 218 line 22 through page 219 line 2
[133] Ibid, page 219 lines 4 to 8
[134] Ibid, page 221 lines 5 to 25
[135] Dan Cancelmi 2/6/03 Deposition, page 720 line 14 through page 721 line 22

Prepared in connection with litigation

activities for AHERF and selected physicians,[136] suggested in his depositions that reserve percentages should be higher than the ones used by DVOG for the older accounts receivable.[137]

    iii.  Russ Laing, Director of Patient Financial Services Group, also prepared an analysis of reserves for uncollectible accounts as of March 1997.[138] Mr. Laing's duties include performing analyses on financial reporting issues related to patient revenues and accounts receivables. If his rates were applied to June 30, 1996 balances, the reserves for uncollectible accounts shortfall would be $53.0 million.

    iv.  These calculations result in a required reserve for bad debts at June 30, 1996, ranging from $91.3 to $118.1 million. Since as of June 30, 1996 the DVOG Hospitals' books and records reflected a reserve for uncollectible accounts of $65.1 million, it appears that such reserve was materially understated.

  s.  PwC also knew, or should have known, that the late adjustments to DVOG's reserve for uncollectible accounts totaling $17.5 million were not in accordance with GAAP in that the DVOG financial statements avoided increasing bad debt expense for much of these $17.5 million of adjustments and the basis and appropriateness of the accounts actually adjusted was largely unsupported. The $17.5 million consisted of:

    i.  $6.0 million of "excess accumulated depreciation" was eliminated from DVOG's balance sheet. This avoided an increase in bad debt expenses, a violation of FAS 5 paragraph 8 that required DVOG to record reserves for uncollectible accounts by a charge to income. According to PwC's audit working papers the basis and appropriateness of some of this "excess accumulated depreciation" was believed by PwC to be unsupported.[139]

    ii.  $7.0 million was comprised of entries that recorded "receivables" arising from 1990 through 1993 transactions or eliminated unsubstantiated recorded liabilities. These amounts were offset by an equal amount to the allowance for bad debts. Therefore, this entry did not cure any shortfall of the reserve for uncollectible accounts as of June 30, 1996 since it either recorded "new"

---

[136] Greg Snow 7/25/03 Deposition, page 10 lines 14 through 20
[137] Greg Snow 7/26/03 Deposition, pages 306-310, 315-317, and 326-331
[138] Exhibit 1258, PR-Laing 00166
[139] PwC 1996 audit working paper, CL 002495

Page 52 of 114

Prepared in connection with litigation

receivables as of June 30, 1996 that were likely to be uncollectible or it reduced unsubstantiated previously recorded liabilities. These entries violate FAS 5 paragraph 8 by not charging the increase of reserves for uncollectible accounts to bad debt expense.

    iii.    $4.5 million of interest expense was capitalized to offset the increase in bad debt expenses. $2.0 million[140] of the capitalized interest related to interest incurred in fiscal year 1995. Decreasing interest expense in 1996 through capitalization of interest incurred in fiscal year 1995 improperly reduced DVOG's 1996 net loss by $2.0 million.

t.    Mr. Buettner acknowledged that the $17.5 million increase in the reserve for uncollectible accounts was not accomplished with a corresponding increase in bad debt expense:

"No, because, as I mentioned to you in previous testimony, when we sat down and had our discussion, there were a variety of other items that we wanted to talk to them about. Some that were going, let's say, in an expense way where they would have to book additional expense. Some that would go in a revenue way."[141]

u.    With respect to the other components of the $17.5 million entry recorded by AHERF Mr. Buettner testified as follows:

    i.    The inclusion of $2 million of prior years' capitalized interest "was not distortive of the financial statements" based on materiality and "GAAP does not require you to restate prior years for immaterial amounts."[142]

    ii.    With respect to the $6 million of excess depreciation PwC was "aware that the organization had a problem in terms of coming up with a proper number. We had communicated our concerns to management. We had communicated our concerns to the audit committee. By '96 I guess they were able to get their hands around the number and they fixed it. Again, if you're – if you're looking at an item being recorded in 1996 to correct an error in the prior year, you have to evaluate whether it's material or not. We reached the conclusion that it was not material and by booking it

---

[140] Exhibit 10, TN C9A 01366, and Exhibit 4026, CL 010553
[141] William Buettner 6/22/04 Deposition, page 256 lines 1 to 7
[142] Ibid, page 264 lines 21 through 22, and lines page 265 lines 4 through 6

Prepared in connection with litigation